LATHAM & WATKINS LLP
Wayne S. Flick (Bar No. 149525)
  *wayne.s.flick@lw.com*
Manuel A. Abascal (Bar No. 171301)
  *manny.abascal@lw.com*
James H. Moon (Bar No. 268215)
  *james.moon@lw.com*
Kristin P. Housh (Bar No. 286651)
  *kristin.housh@lw.com*
Robin A. Kelley (Bar No. 287696)
  *robin.kelley@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California  90071-1560
Telephone:  +1.213.485.1234
Facsimile:  +1.213.891.8763

| | |
|---|---|
| AMERICAN IMMIGRATION COUNCIL | CENTER FOR CONSTITUTIONAL RIGHTS |
| Melissa Crow (*pro hac vice* pending)  *mcrow@immcouncil.org* | Baher Azmy (*pro hac vice* pending)  *bazmy@ccrjustice.org* |
| Karolina Walters (*pro hac vice* pending)  *kwalters@immcouncil.org* | Ghita Schwarz (*pro hac vice* pending)  *gschwarz@ccrjustice.org* |
| Kathryn Shepherd (*pro hac vice* pending)  *kshepherd@immcouncil.org* | Angelo Guisado (*pro hac vice* pending)  *aguisado@ccrjustice.org* |
| 1331 G Street, NW, Suite 200 Washington, DC  20005 Telephone:  +1.202.507.7523 Facsimile:  +1.202.742.5619 | 666 Broadway, 7th Floor New York, NY  10012 Telephone:  +1.212.614.6464 Facsimile:  +1.212.614.6499 |

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, INC., a California corporation; ABIGAIL DOE, BEATRICE DOE, CAROLINA DOE, DINORA DOE, INGRID DOE and JOSE DOE, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>     v.<br><br>JOHN F. KELLY, Secretary, United States Department of Homeland Security, in his official capacity; | Case No.  2:17-cv-5111<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR:**<br><br>**(1)   VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C. § 1101, *ET SEQ*.**<br><br>**(2)   VIOLATION OF THE ADMINISTRATIVE** |

| | |
|---|---|
| 1 | KEVIN K. MCALEENAN, Acting |
| 2 | Commissioner, United States Customs and Border Protection, in his official |
| 3 | capacity; TODD C. OWEN, Executive Assistant Commissioner, Office of |
| 4 | Field Operations, United States Customs and Border Protection, in his |
| 5 | official capacity; and DOES 1-25, inclusive, |
| 6 | |
| 7 | Defendants. |

PROCEDURE ACT, 5 U.S.C.
§ 551, *ET SEQ.*

**(3)   VIOLATION OF THE FIFTH
AMENDMENT TO THE
UNITED STATES
CONSTITUTION
(PROCEDURAL DUE
PROCESS)**

**(4)   VIOLATION OF THE *NON-
REFOULEMENT* DOCTRINE**

**CLASS ACTION**

# I.   __INTRODUCTION__

Plaintiff Al Otro Lado, Inc. ("Al Otro Lado"), a non-profit legal services organization, and Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, Ingrid Doe and Jose Doe ("Class Plaintiffs"), acting on their own behalf and on behalf of all similarly situated individuals presenting themselves at Ports of Entry ("POEs," or individually, "POE") along the U.S.-Mexico border to seek asylum in the United States, allege as follows:

1.      U.S. Customs and Border Protection ("CBP") officials have systematically violated U.S. law and binding international human rights law by refusing to allow individuals, including Class Plaintiffs – who present themselves at POEs along the U.S.-Mexico border and assert their intention to apply for asylum or a fear of returning to their home countries – to seek protection in the United States.

2.      CBP is violating the law by utilizing various tactics – including misrepresentations, threats and intimidation, verbal abuse and physical force, and coercion – to deny asylum seekers, including Class Plaintiffs, access to the asylum process.  CBP officials have, for example, misinformed asylum seekers that they could not apply for asylum because "Donald Trump just signed new laws saying there is no asylum for anyone," coerced asylum seekers into signing forms abandoning their asylum claims by threatening to take their children away, threatened to deport asylum seekers back to their home countries (where they face persecution) if they persisted in their attempts to seek asylum, and even forcefully removed asylum seekers from POEs.

3.      The prevalence and persistence of CBP's illegal practice of denying asylum seekers access to the U.S. asylum process has been observed by Plaintiff Al Otro Lado and Class Plaintiffs and has been well documented as occurring along the entire U.S.-Mexico border through comprehensive reporting by non-governmental organizations, such as Human Rights First, Amnesty International,

and Human Rights Watch; other experts working in the U.S.-Mexico border region; as well as numerous news outlets, including The Washington Post, The New York Times, and USA Today.

4.     CBP's illegal conduct is occurring as a humanitarian crisis drives vulnerable people experiencing persecution in their home countries to seek refugee protection in the United States.  Asylum seekers, including Class Plaintiffs, have fled persecution, violence and death, and face grave and immediate danger to their lives if denied access to the asylum process – a system specifically designed to protect refugees like them.  CBP's unlawful practice of turning asylum seekers away from POEs is forcing asylum seekers, including Class Plaintiffs, to return to Mexico and other countries where they remain susceptible to serious harm such as kidnapping, rape, trafficking, torture or even death.

5.     On information and belief, CBP's unlawful acts were performed (and continue to be performed) at the instigation, under the control or authority of, or with the knowledge, consent, direction or acquiescence of, the Defendants named in this action ("Defendants").  By refusing to follow the law, Defendants are engaged in an officially sanctioned policy or practice that has caused, and will continue to cause, Class Plaintiffs and Al Otro Lado concrete and demonstrable injuries and irreparable harm.

6.     Defendants have deprived Class Plaintiffs and similarly situated individuals of their statutory and regulatory rights to apply for asylum, violated their due process rights under the Fifth Amendment to the United States Constitution and violated the United States' obligations under international law to uphold the principle of *non-refoulement*.  Each Class Plaintiff has attempted to access the asylum process and would seek to do so again, but for Defendants' systematic, illegal practice at issue in this action, which has deprived them of such access.

7.     Defendants have caused injury to Plaintiff Al Otro Lado by frustrating its ability to advance and maintain its central institutional mission and forcing the organization to divert substantial portions of its limited time and resources away from its various programs in Los Angeles, California and Tijuana, Mexico to counteract CBP's unlawful practices.

8.     Despite persistent advocacy by Al Otro Lado and other advocates, and despite Class Plaintiffs' desperate need to seek asylum in the United States, CBP shows no signs of abating its illegal practice.  Accordingly, Al Otro Lado and Class Plaintiffs require the intervention of this Court to declare that CBP's conduct violates U.S. and international law, to enjoin Defendants from circumventing their legal obligations and to order Defendants to implement procedures to ensure effective oversight and accountability in the inspecting and processing of asylum seekers.  Absent the Court's intervention, CBP's unlawful conduct will continue to imperil the lives and safety of numerous vulnerable asylum seekers.

9.     In addition, because Class Plaintiffs face imminent and irreparable injury if they are not afforded access to the asylum process, they seek immediate injunctive relief in the form of a temporary restraining order ordering Defendants to allow Class Plaintiffs to enter the United States to pursue their asylum claims. Plaintiff Al Otro Lado and Class Plaintiffs also seek permanent injunctive relief to ensure that Defendants no longer deny other asylum seekers the rights afforded to them under U.S. and international law.

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1350.  Defendants have waived sovereign immunity for purposes of this suit pursuant to 5 U.S.C. § 702.  The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

11.     Venue is proper in this district under 28 U.S.C. § 1391(e).  All Defendants are sued in their official capacity.  Plaintiff Al Otro Lado is an organization that resides and is incorporated in Los Angeles, California.

### III.     PARTIES

12.     Plaintiff Al Otro Lado is a non-profit, non-partisan organization incorporated in California, and was established in 2014.  Al Otro Lado is a legal services organization serving indigent deportees, migrants, refugees and their families, principally in Los Angeles, California and Tijuana, Mexico.  Al Otro Lado's mission is to coordinate and to provide screening, advocacy and legal representation for individuals in asylum and other immigration proceedings, to seek redress for civil rights violations and to provide assistance with other legal and social service needs.  Defendants have frustrated Al Otro Lado's mission and have forced Al Otro Lado to divert significant resources away from its other programs to counteract CBP's illegal practice of turning away asylum seekers at POEs.

13.     Through its Refugee Program in Tijuana, Mexico, Al Otro Lado assists individuals seeking protection from persecution in the United States.  In response to CBP's unlawful practice, Al Otro Lado has had to expend significant organizational time and resources and alter entirely its previously used large-scale clinic model.  For example, Al Otro Lado previously held large-scale, mass-advisal legal clinics in Tijuana that provided a general overview on asylum laws and procedures.  This type of assistance (similar to the Legal Orientation Program of the Executive Office for Immigration Review) only was workable when CBP allowed asylum seekers into the United States in accordance with the law.

14.     Since 2016, however, CBP's illegal conduct has compelled Al Otro Lado to expend significant time and resources to send representatives to Tijuana from Los Angeles multiple times per month for extended periods to provide more individualized assistance and coordination of legal and social services, including

individual screenings and in-depth trainings to educate volunteer attorneys and asylum seekers regarding CBP's practice and potential strategies to pursue asylum in the face of CBP's tactics.  Whereas Al Otro Lado previously was able to accommodate several dozen attorneys and over 100 clients at a time in its large-scale clinics, Al Otro Lado has been forced to transition to an individualized representation model where attorneys are required to work with asylum seekers one-on-one and provide direct representation.  Al Otro Lado has expended (and continues to expend) significantly more resources recruiting, training and mentoring pro bono attorneys to help counteract CBP's unlawful practice.  Nevertheless, even asylum seekers provided with such individualized pro bono representation are being turned away by CBP in violation of the law.

15.    Al Otro Lado also has spent time and resources advocating that CBP provide asylum seekers with access to the asylum process and cease using unlawful tactics to circumvent its legal obligations.  For example, Al Otro Lado representatives have filed numerous complaints with the U.S. government detailing examples of CBP's unlawful practice depriving asylum seekers of access to the asylum process.

16.    Such diversion of Al Otro Lado's time and resources negatively impacts its other programs.  For example, Al Otro Lado has not been able to pursue funding for or otherwise advance the following programs:  (1) its Deportee Reintegration Program through which Al Otro Lado assists deportees who struggle to survive in Tijuana, many of whom have no Mexican identity documents or health coverage, and may not even speak Spanish; and (2) its Cross-Border Family Support Program through which Al Otro Lado assists families with cross-border custody issues, and helps connect family members residing in the United States to social, legal, medical and mental health services.  Other programs that have been impacted include Al Otro Lado's Deportee Financial Literacy Program, Deportee

Education Fund, Refugee Mental Health Program and Opioid Recovery Program, among others.

17.    In addition, the constraints on Al Otro Lado's limited time and resources has negatively impacted its operations in Los Angeles, including delaying the opening of its Los Angeles office through which it coordinates "Wraparound" services for low-income immigrants in Los Angeles.  The increased need for on the ground support in Tijuana has impacted Al Otro Lado's ability to satisfy its clinical obligations for low-income immigrants at the Wellness Center, located on the grounds of the Los Angeles County+USC Medical Center, and to conduct outreach to provide free legal assistance to homeless individuals in Los Angeles to allow them to better access permanent supportive housing, employment and educational opportunities.

18.    Al Otro Lado continues to be harmed by Defendants because CBP's illegal practice at the border frustrates its organizational mission and forces Al Otro Lado to divert resources from its other objectives.  If Al Otro Lado had not been compelled to divert resources to address CBP's unlawful conduct at the U.S.-Mexico border, it would have directed these resources toward its other programs to further the advancement of its core mission.

19.    Plaintiff Abigail Doe ("A.D.") is a female native and citizen of Mexico.  She is the mother of two children under the age of ten.  A.D. and her family have been targeted and threatened with death or severe harm in Mexico by a large drug cartel that had previously targeted her husband, leaving her certain she would not be protected by local officials.  A.D. fled with her two children to Tijuana, where they presented themselves at the San Ysidro POE.  On behalf of herself and her children, A.D. expressed her fear of returning to Mexico and her desire to seek asylum in the United States.  CBP officials coerced A.D. into recanting her fear and signing a form withdrawing her application for admission to the United States.  As a result of this coercion, the form falsely states that A.D.

1   does not have a credible fear of returning to Mexico.  As a result of Defendants'

2   conduct, A.D. and her children were unable to access the asylum process and were

3   forced to return to Tijuana, where they remain in fear for their lives.  A.D. and her

4   children would like to present themselves again for asylum but, based on their

5   experience and the experience of others with CBP's practice at the U.S.-Mexico

6   border, she understands that they would likely be turned away again.  A.D. and her

7   children are currently living in temporary housing in Tijuana and can no longer

8   remain in Mexico and have no place else to turn for safety but the United States.

9        20.    Plaintiff Beatrice Doe ("B.D.") is a female native and citizen of

10   Mexico.  She is the mother of three children under the age of sixteen.  B.D. and her

11   family have been targeted and threatened with death or severe harm in Mexico by a

12   dangerous drug cartel; she was also subject to severe domestic violence.  B.D. fled

13   with her children and her nephew to Tijuana, where they presented themselves

14   once at the Otay Mesa POE and twice at the San Ysidro POE.  On behalf of herself

15   and her children, B.D. expressed her fear of returning to Mexico and her desire to

16   seek asylum in the United States.  CBP officials coerced B.D. into recanting her

17   fear and signing a form withdrawing her application for admission to the United

18   States.  As a result of this coercion, the form falsely states that B.D. and her

19   children have no fear of returning to Mexico.  As a result of Defendants' conduct,

20   B.D. and her children were unable to access the asylum process and were forced to

21   return to Tijuana, where they remain in fear for their lives.  B.D. and her children

22   would like to present themselves again for asylum but, based on their experience

23   and the experience of others with CBP's practice at the U.S.-Mexico border, she

24   understands that they would likely be turned away again.  B.D. and her children are

25   currently living in temporary housing in Tijuana and can no longer remain in

26   Mexico and have no place else to turn for safety but the United States.

27        21.    Plaintiff Carolina Doe ("C.D.") is a female native and citizen of

28   Mexico.  She is the mother of three children.  C.D.'s brother-in-law was kidnapped

1   and dismembered by a dangerous drug cartel in Mexico, and after the murder, her

2   family also was targeted and threatened with death or severe harm.  C.D. fled with

3   her children to Tijuana, where they presented themselves at the San Ysidro, POE.

4   On behalf of herself and her children, C.D. expressed her fear of returning to

5   Mexico and her desire to seek asylum in the United States.  CBP officials coerced

6   C.D. into recanting her fear on video and signing a form withdrawing her

7   application for admission to the United States.  As a result of this coercion, the

8   form falsely states that C.D. and her children have no fear of returning to Mexico.

9   As a result of Defendants' conduct, C.D. and her children were unable to access

10   the asylum process and were forced to return to Tijuana, where they remain in fear

11   for their lives.  C.D. and her children would like to present themselves again for

12   asylum but, based on their experience and the experience of others with CBP's

13   practice at the U.S.-Mexico border, she understands that they would likely be

14   turned away again.  C.D. and her children are currently living in temporary

15   housing in Tijuana and can no longer remain in Mexico and have no place else to

16   turn for safety but the United States.

17        22.    Plaintiff Dinora Doe ("D.D.") is a female native and citizen of

18   Honduras.  D.D. and her eighteen-year-old daughter have been targeted, threatened

19   with death or severe harm, and repeatedly raped by MS-13 gang members.  D.D.

20   fled with her daughter to Tijuana, where they presented themselves at the Otay

21   Mesa, POE on three occasions.  D.D. expressed her fear of returning to Honduras

22   and her desire to seek asylum in the United States.  CBP officials misinformed

23   D.D. about her rights under U.S. law and denied her the opportunity to access the

24   asylum process.  As a result of Defendants' conduct, D.D. and her daughter were

25   forced to return to Tijuana, where they remain in fear for their lives.  D.D. and her

26   daughter would like to present themselves again for asylum but, based on their

27   experience and the experience of others with CBP's practice at the U.S.-Mexico

28   border, she understands that they would likely be turned away again.  D.D. is

currently living in temporary housing with her daughter in Tijuana and can no longer remain in Mexico and have no place else to turn for safety but the United States.

23.     Plaintiff Ingrid Doe ("I.D.") is a female native and citizen of Honduras.  She is the mother of two children and is currently pregnant with her third child.  I.D.'s mother and three siblings were murdered by 18th Street gang members in Honduras.  After the murders, 18th Street gang members threatened to kill I.D.  I.D. and her children were also subject to severe domestic violence.  I.D. fled with her children to Tijuana, where they presented themselves at the Otay Mesa POE and at the San Ysidro POE.  On behalf of herself and her children, I.D. expressed her fear of returning to Honduras and her desire to seek asylum in the United States.  CBP officials misinformed I.D. about her rights under U.S. law and denied her the opportunity to access the asylum process.  As a result of Defendants' conduct, I.D. and her children were forced to return to Tijuana, where they remain in fear for their lives.  I.D. and her children would like to present themselves again for asylum but, based on their experience and the experience of others with CBP's practice at the U.S.-Mexico border, she understands that they would likely be turned away again.  I.D. is currently living in temporary housing with her children in Tijuana and can no longer remain in Mexico and have no place else to turn for safety but the United States.

24.     Plaintiff Jose Doe ("J.D.") is a male native and citizen of Honduras. J.D. was brutally attacked by 18th Street gang members in Honduras.  The 18th Street gang also murdered several of his family members and threatened to kidnap and harm J.D.'s two daughters.  J.D. fled Honduras and arrived in Nuevo Laredo, Mexico, where he was accosted by gang members.  J.D. presented himself at the Laredo, Texas POE the next day.  J.D. expressed his fear of returning to Honduras and his desire to seek asylum in the United States.  CBP officials misinformed J.D. about his rights under U.S. law and denied him the opportunity to access the

asylum process.  As a result of Defendants' conduct, J.D. was forced to return to Nuevo Laredo where he again was approached by gang members.  J.D. fled to Monterrey, Mexico, where he remains in fear for his life.  J.D. would like to present himself again for asylum but, based on his experience and the experience of others with CBP's practice at the U.S.-Mexico border, he understands that he would likely be turned away again.  J.D. is currently staying temporarily with his wife's relatives in Monterrey, Mexico and is afraid to return to Honduras.  J.D. can no longer remain in Mexico and have no place else to turn for safety but the United States.

25.     Defendant John F. Kelly is the Secretary of the United States Department of Homeland Security ("DHS").  In this capacity, he is charged with enforcing and administering U.S. immigration laws.  He oversees each of the component agencies within DHS, including CBP, and has ultimate authority over all CBP policies, procedures and practices.  He is responsible for ensuring that all CBP officials perform their duties in accordance with the Constitution and all relevant laws.

26.     Defendant Kevin K. McAleenan is Acting Commissioner of CBP.  In this capacity, he has direct authority over all CBP policies, procedures and practices, and is responsible for ensuring that all CBP interactions with asylum seekers are performed in accordance with the Constitution and all relevant laws.  Defendant McAleenan oversees a staff of more than 60,000 employees, manages a budget of more than $13 billion, and exercises authority over all CBP operations.

27.     Defendant Todd C. Owen is the Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO").  OFO is the largest component of CBP and is responsible for border security, including immigration and travel through U.S. POEs.  Defendant Owen exercises authority over 20 major field offices and 328 POEs.  Defendant Owen oversees a staff of more than 29,000 employees, including more than 24,000 CBP officials and specialists, and manages a budget of

1   more than $5.2 billion.  Defendant Owen is responsible for ensuring that all OFO

2   officials perform their duties in accordance with the Constitution and all relevant

3   laws.

4       28.   Does 1 through 25, inclusive, are sued herein under fictitious names

5   inasmuch as their true names and capacities are presently unknown to Al Otro

6   Lado and Class Plaintiffs.  Al Otro Lado and Class Plaintiffs will amend this

7   complaint to designate the true names and capacities of these parties when the

8   same have been ascertained.  Al Otro Lado and Class Plaintiffs are informed and

9   believe, and on that basis allege, that Does 1 through 25, inclusive, were agents or

10   alter egos of Defendants, or are otherwise responsible for all of the acts hereinafter

11   alleged.  Al Otro Lado and Class Plaintiffs are informed and believe, and on that

12   basis allege, that the actions of Does 1 through 25, inclusive, as alleged herein,

13   were duly ratified by Defendants, with each Doe acting as the agent or alter ego of

14   Defendants, within the scope, course, and authority of the agency.  Defendants and

15   Does 1 through 25, inclusive, are collectively referred to herein as "Defendants."

16   ## IV.   FACTUAL BACKGROUND

17   **A.   Humanitarian Crisis South of the U.S.-Mexico Border**

18       29.   In recent years, children and adults have fled horrendous persecution

19   in their home countries and arrived at POEs along the U.S.-Mexico border to seek

20   protection in the United States through the asylum process.  The vast majority of

21   these individuals come from Guatemala, Honduras and El Salvador, an area often

22   termed Central America's "Northern Triangle."

23

24

25

26

27

28

30.     These governments are known for corruption,[1] including having corrupt police forces filled with gang-related members.[2]  Furthermore, the "penetration of the state by criminal groups" is responsible, at least in part, for the fact that as many as 95% of crimes go unpunished.[3]

31.     The "pervasive and systematic levels of violence" associated with the increasing reach of gangs in the Northern Triangle have been well documented.[4] Those fleeing the Northern Triangle cite "violence [from] criminal armed groups, including assaults, extortion, and disappearances or murder of family members,"[5] as reasons for their flight.  These armed groups operate with impunity due to their influence and control over the governments of Northern Triangle countries, which have repeatedly proven to be unable or unwilling to protect their citizens.[6]  The

---

[1]     *See* Christina Eguizábal *et al.*, *Crime and Violence in Central America's Northern Triangle*, The Wilson Ctr., 2 (2015), https://www.wilsoncenter.org/sites/default/files/FINAL%20PDF_CARSI%20REPORT_0.pdf.

[2]     "Over the past five years, at least 435 members of the [Salvadoran] armed forces were fired for being gang members or having ties to gangs . . . .  Another 39 aspiring police officers were expelled from the National Public Security Academy over the same period, of which 25 'belonged to' the Mara Salvatrucha, or MS13, while 13 were from the Barrio 18 gang. Nine more active police officers were also dismissed for alleged gang ties over the five years."  Mimi Yagoub, *480 Gang Members Infiltrated El Salvador Security Forces: Report*, InSight Crime (Feb. 22, 2016), http://www.insightcrime.org/news-briefs/did-480-gang-members-infiltrate-el-salvador-security-forces.

[3]     Eguizábal *et al.*, *supra* note 1, at 2.

[4]     UNHCR, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico*, 15 (2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html [hereinafter *Women on the Run*].

[5]     *Id.*

[6]     *Id.* at 16 (finding that citizens of Northern Triangle countries are "murdered with impunity"); *id.* at 23 (finding that 69% of women interviewed tried relocating within their own countries at least once before fleeing and indicating that 10% "stated that the police or other authorities were the direct source of their harm").

degree of violence suffered by people in the Northern Triangle has been compared to that experienced in war zones.[7]

32.     This violence and corruption is not limited to the Northern Triangle, but also is experienced by individuals fleeing Mexico.  Mexico has faced a drastic rise in criminal activity since the early 2000s that is attributed to organized criminal groups and has been accompanied by increases in violence and corruption.[8]  Although the northern half of Mexico was often considered the most dangerous, recent reports reveal an increase in violence in the central and southern states of Mexico, particularly in Guerrero, Michoacán, and the State of Mexico.[9]  Along with the increase in violence and organized criminal activity, it is well documented that the police and armed forces operate with impunity in Mexico, leaving victims unable to resort to their own government for protection.[10]  Indeed, "[i]n some regions of Mexico the state has become so closely identified with

---

[7]     Médecins Sans Frontières (Doctors Without Borders), *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis*, 6 (2017), https://www.doctorswithoutborders.org/sites/usa/files/msf_forced-to-flee-central-americas-northern-triangle.pdf [hereinafter *Forced to Flee*].

[8]     Dominic Joseph Pera, *Drugs Violence and Public [In]Security:  Mexico's Federal Police and Human Rights Abuse*, 2-4, 7 (Justice in Mex. Working Paper Series Paper No. 1, 2015), https://justiceinmexico.org/wp-content/uploads/2015/12/151204_PERA_DOMINIC_DrugViolenceandPublicInsecurity_FINAL.pdf; *see* U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices for 2014*, https://www.state.gov/j/drl/rls/hrrpt/2014humanrightsreport/index.htm?year=2014&dlid=236702#wrapper.

[9]     *See, e.g.*, U.S. Dep't of State, Bureau of Diplomatic Sec., *Mexico 2015 Crime and Safety Report: Mexico City*, https://www.osac.gov/pages/ContentReportDetails.aspx?cid=17114 (reporting that a "common practice is for gangs to charge 'protection fees' or add their own tax to products and services with the threat of violence for those who fail to pay").

[10]     *See* Pera, *supra* note 8, at 4 ("Drug trafficking organizations have infiltrated government positions in many areas, and their influence over state personnel has dramatic implications.").

1  criminal gangs and drug cartels that these criminal organizations do not need to

2  corrupt the state – they essentially 'are' part of the state."[11]

3       33.   In addition, women and children often flee severe domestic violence.

4  Women report prolonged instances of physical, sexual and psychological domestic

5  violence, and most of their accounts demonstrate that the authorities in their home

6  countries were either unable or unwilling to provide meaningful assistance.[12]

7  Abusive partners are often members or associates of criminal armed groups.[13]

8  Abusers frequently threaten women with harm to their parents, siblings or children

9  if they try to leave.[14]  Some women who fled their countries have heard from

10  family members back home that their abusers continue to look for them.[15]

11       34.   After fleeing their home countries, children and adults face an arduous

12  and dangerous journey to the United States.[16]  The situation along the popular

13  migration routes to the United States has been termed a "humanitarian crisis"

---

[11]   Alberto Díaz-Cayeros *et al.*, *Caught in the Crossfire: The Geography of Extortion and Police Corruption in Mexico*, 3-4 (Stanford Ctr. for Int'l Dev., Paper No. 545, 2015), http://scid.stanford.edu/publications/caught-crossfire-geography-extortion-and-police-corruption-mexico.

[12]   *Women on the Run*, *supra* note 4, at 25.  The women interviewed described repeated rapes and sexual assaults as well as violent physical abuse that included: "beatings with hands, a baseball bat and other weapons; kicking; threats to do bodily harm with knives; and repeatedly being thrown against walls and the ground." *Id.*

[13]   *Id.*

[14]   *Id.* at 27.

[15]   *Id.*

[16]   *See id.* at 43-45 (describing extortion, sexual violence, and physical violence); *see also* Rodrigo Dominguez Villegas, *Central American Migrants and "La Bestia": The Route, Dangers, and Government Responses*, Migration Info. Source (Sept. 10, 2014), http://www.migrationpolicy.org/article/central-american-migrants-and-%E2%80%9Cla-bestia%E2%80%9D-route-dangers-and-government-responses (listing "injury or death from unsafe travelling conditions, gang violence, sexual assault, extortion, kidnapping, and recruitment by organized crime" as dangers faced on the journey to the United States).

because of the extraordinary violence faced by those making the journey.[17]  In 2015 and 2016, 68% of migrants from the Northern Triangle region experienced violence, including sexual assault, on their journeys through Central America and Mexico.[18]  Perpetrators of violence "include[] members of gangs and other criminal organizations, as well as members of the Mexican security forces."[19]  Thus, the initial mistrust and inability to rely upon government authorities for protection that leads many to flee their home countries accompanies them along their journeys.[20]

35.     In addition, Mexico's northern border region is particularly plagued with crime and violence, presenting renewed dangers for asylum seekers just as they approach their destination.[21]  The most pervasive problems include disappearances, kidnappings, rape, trafficking, extortion, execution and sexual and

---

[17]     *See* Eguizábal *et al.*, *supra* note 1, at 3.

[18]     *See Forced to Flee*, *supra* note 7, at 11.  Close to half (44%) of the migrants reported being hit, 40% said they had been pushed, grabbed or asphyxiated, and 7% said they had been shot.  *Id.*  Nearly one-third (31.4%) of women and 17.2% of men surveyed during that same time period had been sexually abused during their journeys.  *Id.* at 12.

[19]     *Id.* at 5.

[20]     *See, e.g.*, Villegas, *supra* note 16 (referencing documentation of "the abuse of power by various Mexican authorities, including agents from the National Migration Institute, municipal governments, and state police" against individuals traveling to the U.S. border).

[21]     *See* U.S. Dep't of State, *Mexico Travel Warning* (Dec. 8, 2016), https://travel.state.gov/content/passports/en/alertswarnings/mexico-travel-warning.html (reporting violent crime and an increase in homicide in the state of Baja California (including Tijuana and Mexicali); criminal activity and violence in the state of Chihuahua (including Ciudad Juarez); violence and criminal activity, including homicide, armed  robbery, carjacking, kidnapping, extortion, and sexual assault in the state of Coahuila (particularly along the highways between Piedras Negras and Nuevo Laredo); that the state of Sonora (including Nogales) is a key region in the international drug and human trafficking trades; and violent crime, including homicide, armed robbery, carjacking, kidnapping, extortion, and sexual assault in the state of Tamaulipas (including Matamoros, Nuevo Laredo, and Reynosa), where state and municipal law enforcement capacity is limited to nonexistent in most parts of the  state).

1  labor exploitation by state and non-state actors.[22]  Recently, the situation at the

2  border has worsened:  smugglers have increased their prices, cartel members have

3  increased their surveillance and control of areas around border crossings, and the

4  number of migrants kidnapped and held for ransom has increased.[23]

5     36.    By rejecting asylum seekers at POEs, Defendants are forcing them to

6  return to the dangerous conditions that drove them to flee their countries in the first

7  place.[24]

8     **B.    Defendants' Systematic, Illegal Practice**

9     37.    Since at least the summer of 2016 and continuing to the present, CBP

10 officials, at or under the direction or with the knowledge of Defendants, have

11 consistently and systematically prevented asylum seekers arriving at POEs along

12 the U.S.-Mexico border from accessing the U.S. asylum process.[25]  CBP's illegal

13

14 [22]    B. Shaw Drake *et al.*, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers*, Human Rights First, 16 (2017),

15 https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf [hereinafter *Crossing the Line*].

16 [23]    *Id.*

17 [24]    *Id.; see also* B. Shaw Drake, *Violations at the Border: The El Paso Sector*,

18 Human Rights First, 2-3 (2017), http://www.humanrightsfirst.org/sites/default/ files/hrf-violations-at-el-paso-border-rep.pdf (explaining the risks facing asylum

19 seekers who are turned away at U.S. POEs, including being deported back to their home countries where they face persecution).

20 [25]    There is evidence that CBP officials began unlawfully dissuading asylum

21 seekers from pursuing their claims or flatly refusing them entry to the United States even prior to 2016.  *See* American Immigration Council, *Mexican and*

22 *Central American Asylum and Credible Fear Claims: Background and Context*,

23 10 (2014), https://www.americanimmigrationcouncil.org/sites/ default/files/research/asylum_and_credible_fear_claims_final_0.pdf (reporting that

24 Mexican asylum seekers arriving in El Paso "expressed a fear of persecution [but] were told by CBP that the U.S. doesn't give Mexicans asylum, and they [we]re

25 turned back"); *see also* U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations*,

26 54 (2005) [hereinafter 2005 USCIRF Report] (reporting that two groups of asylum seekers who arrived at the San Ysidro POE were "improperly refused entry to the

27 United States for . . . lacking proper documentation and [were] 'pushed back' . . .

28 without [being] refer[red] . . . to secondary inspection" and without a "record of the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1   practice, which violates U.S. and international law, has been documented in

2   hundreds of cases at POEs, including POEs in San Ysidro, California; Otay Mesa,

3   California; Tecate, California; Calexico, California; Nogales, Arizona; Eagle Pass,

4   Texas; El Paso, Texas; Laredo, Texas; and Hidalgo, Texas, among others.

5         38.   CBP's practice of denying asylum seekers access to the asylum

6   process has been well documented.[26]  Al Otro Lado and Class Plaintiffs, as well as

7   numerous non-governmental organizations[27] and news outlets,[28] have documented

8   _____

9   primary inspection" being created); *see also* Human Rights Watch, *"You Don't
    Have Rights Here": US Border Screening and Returns of Central Americans to*

10  *Risk of Serious Harm*, 2, 8 (2014), https://www.hrw.org/report/2014/10/16/you-
    dont-have-rights-here/us-border-screening-and-returns-central-americans-risk

11  [hereinafter *You Don't Have Rights Here*] (concluding that the "cursory screening
    [conducted by CBP officials] is failing to effectively identify [asylum seekers]"

12  and reporting that some "border officials acknowledged hearing [non-citizens']
    expressions of fear but pressured them to abandon their claims").

13

14  [26]    *See, e.g.*, Borderland Immigration Council, *Discretion to Deny: Family
    Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands*

15  *of Immigration Authorities Along the U.S.-Mexico Border*, 12 (2017), https://
    media.wix.com/ugd/e07ba9_72743e60ea6d4c3aa796becc71c3b0fe.pdf (reporting

16  that "it is commonplace for asylum seekers to be placed in expedited removal
    proceedings and summarily deported . . ., despite expressing fear"); U.S. Comm'n

17  on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum
    Seekers in Expedited Removal*, 20 (2016) (reporting that despite findings and

18  recommendations in a 2005 study relating to primary inspection, USCIRF
    observers in 2016 continued to find "several examples of non-compliance with

19  required procedures" in CBP primary inspection interviews); *see also* 2005
    USCIRF Report, *supra* note 25, at 54 (finding that, in approximately half of the

20  inspections observed, inspectors failed to read the proper advisals regarding
    asylum to the non-citizen and that "in 15 percent of [the] cases [ ] where an

21  arriving [non-citizen] expressed a fear of return to the inspector, that [non-citizen]
    was not referred" for a credible fear interview).

22

23  [27]    *See, e.g.*, *Crossing the Line*, *supra* note 22; Amnesty Int'l, *Facing Walls:
    USA and Mexico's Violation of the Rights of Asylum Seekers*, 19-22 (2017),

24  https://www.amnestyusa.org/reports/facing-walls-usa-mexicos-violation-rights-
    asylum-seekers/ [hereinafter *Facing Walls*]; *"You Don't Have Rights Here*," *supra*

25  note 25, at 2, 4.

26  [28]    Joshua Partlow, *U.S. Border Officials Are Illegally Turning Away Asylum
    Seekers, Critics Say*, Wash. Post (Jan. 16, 2017), https://www.washingtonpost.

27  com/world/the_americas/us-border-officials-are-illegally-turning-away-asylum-
    seekers-critics-say/2017/01/16/f7f5c54a-c6d0-11e6-acda-59924caa2450_story.

28

1   well over 100 cases in which CBP officials have failed to comply with U.S. and

2   international law and arbitrarily denied access to the asylum process to asylum

3   seekers presenting themselves at POEs along the U.S.-Mexico border.

4          **1.      Defendants Have Violated Each of the Class Plaintiffs'**

5                   **Rights to Seek Asylum**

6   *Plaintiff Abigail Doe*

7          39.     A.D. is a native and citizen of Mexico.  She is the mother of two

8   children under the age of ten, with whom she previously lived in Central Mexico.

9   In May 2017, A.D.'s husband disappeared after he refused to allow drug cartel

10  members to use his tractor-trailer to transport drugs.

11         40.     When A.D. reported her husband's disappearance to governmental

12  authorities, members of the drug cartel abducted her, held her at gunpoint,  and

13  threatened to kill her and her children if she continued to investigate her husband's

14  disappearance.  One cartel member told A.D. that she had to leave if she wanted to

15  live.  Fearing for her life, A.D. fled to Tijuana with her children to seek asylum in

16  the United States.

17         41.     After arriving in Tijuana, A.D. and her children immediately went to

18  the San Ysidro POE, where she informed CBP officials of her intent to apply for

19  asylum and her fear of returning to Mexico.  CBP officials repeatedly misinformed

20  A.D. that she did not qualify for asylum.  One CBP official threatened that her

21  children would be taken away from her if they allowed her to cross the border and

22  again misinformed her that only the Mexican government could help her.

23         42.     CBP officials coerced A.D. into signing a document in English which

24  she could not read and did not understand.  The document stated that she did not

25  ───────────────

26  html?utm_term=.83c7aed8fc6c; Caitlin Dickerson & Miriam Jordan, *'No Asylum Here': Some Say U.S. Border Agents Rejected Them*, N.Y. Times (May 3, 2017),

27  https://www.nytimes.com/2017/05/03/us/asylum-border-customs.html; Rafael Carranza, *Are Asylum Seekers Being Turned Away at the Border?*, USA Today

28  (May 5, 2017), https://www.usatoday.com/story/news/politics/2017/05/05/asylum-seekers-turned-away/311552001/.

have a fear of returning to Mexico and was withdrawing her application for admission.  CBP officials then instructed A.D. to say that she had agreed to accept the assistance of the Mexican government and used a video camera to record her statement.  A CBP official then took A.D. and her children back to Mexico and left them to fend for themselves.

43.     The statements CBP coercively obtained from A.D. were and are still false; A.D. does fear returning to and staying in Mexico and does not intend to seek assistance from the Mexican government because she believes such efforts would be futile.

44.     A.D. and her children would like to present themselves again to seek asylum but, based on their experience and the experience of others with CBP's practice at POEs, she understands that they would likely be turned away again or that CBP would take her children away from her.

45.     A.D. and her children are currently staying in temporary housing in Tijuana, where A.D. continues to fear for her life and the lives of her children. A.D. can no longer remain in Mexico and has no place else to turn for safety but the United States.

***Plaintiff Beatrice Doe***

46.     B.D. is a native and citizen of Mexico.  In May 2017, B.D. fled her hometown in Mexico with her three children, ages seven, eleven and fifteen, and her nephew.  B.D.'s nephew was targeted by the Zetas, a Mexican drug cartel that controls most of Southern Mexico, for failing to pay a fee that the Zetas demanded from all individuals who worked in the market.  The Zetas threatened to kill B.D.'s nephew and to harm his family if he did not pay the fees.  The cartel also pressured B.D.'s nephew to join their forces and threatened to increase the fee if he refused. On two occasions when B.D.'s nephew failed to pay the fees, the Zetas beat him up.

47.    B.D. herself suffered severe domestic violence at the hands of her husband. In May 2017, she reported his abuse to two government agencies. When Mexican government officials subsequently requested that B.D.'s husband meet with them, he responded that he would continue to do what he wanted with B.D. and his children. Terrified, B.D. left their house the same day.

48.    B.D. fled with her children and nephew and traveled to Tijuana in order to seek asylum in the United States. Initially, B.D. and her family went to the Otay Mesa POE. When B.D. expressed their intent to seek asylum, a CBP official told her that asylum-related services were not provided at that port, and directed her to go to the San Ysidro POE. B.D. and her family then attempted twice to request asylum at the San Ysidro POE, but CBP officials turned them away both times.

49.    The first time B.D. and her family presented themselves at the San Ysidro POE, she explained that their lives were at risk in Mexico and that she was afraid of her husband. CBP officials misinformed her that the U.S. government had no obligation to help her or her family, that they did not have a right to enter the United States because they were not born there, and that she should seek help from the Mexican government.

50.    Another CBP official then threatened to take B.D.'s nephew away from her and to put her in jail if she refused to sign an English document which she did not understand. Believing that she had no other option, she signed the document. CBP officials then escorted B.D. and her family out of the POE.

51.    The statement CBP coercively obtained from B.D. were and are still false; B.D. and her children do fear returning to and staying in Mexico.

52.    The next day, B.D. and her family returned to the San Ysidro POE. A CBP official who recognized B.D. from the day before misinformed her that she had no right to enter the United States or seek asylum, and that she would be put in jail for three years if she returned to the POE. After another CBP official

separately threatened to transfer B.D.'s nephew to Mexican authorities and return him to Southern Mexico, CBP officials again escorted B.D. and her family out of the San Ysidro POE.

53.     B.D. and her children would like to present themselves again for asylum, but based on their experience and the experience of others with CBP's practice at POEs, she understands that they would likely be turned away again or put in jail as the CBP officials threatened.

54.     B.D. and her children are currently staying in temporary housing in Tijuana, where B.D. continues to fear for her life and the lives of her children. B.D. can no longer remain in Mexico and has no place else to turn for safety but the United States.

**Plaintiff Carolina Doe**

55.     C.D. is a native and citizen of Mexico.  In May 2017, C.D. fled her hometown in Mexico with her three children, ages nine, fifteen and eighteen, after her brother-in-law, a high-ranking police official, was kidnapped, tortured and killed by members of a drug trafficking cartel.  His dismembered body was found in garbage bags in a cemetery.  C.D.'s husband witnessed the kidnapping and showed C.D. a picture of one of the men who was involved.  Drug cartel members threatened C.D.'s husband after the murder, and C.D. and her husband saw the van used in the kidnapping drive by their house twice.  Two men followed C.D. and her daughters on her way home from work, and several men came to their home at night.  C.D. was terrified and hid with her daughters in the bathroom because she feared for her life and the lives of her daughters.

56.     In May 2017, C.D. fled in the middle of the night with her daughters and traveled to Tijuana in order to seek asylum in the United States.  C.D. and her daughters presented themselves at the San Ysidro POE, and C.D. explained that they were afraid of returning to Mexico and wanted to seek asylum.  CBP officials locked them in a room overnight at the San Ysidro POE.  In the morning, a CBP

official told C.D. that she would not be granted asylum and misinformed her that the protection she was seeking in the United States could be provided by the Mexican authorities.  The CBP official threatened to take away C.D.'s fifteen-year-old U.S. citizen daughter and put her in foster care, and told C.D. that if she did not want her daughter taken away from her, then she had to make a statement on video that she was not afraid of returning to Mexico.

57.     The CBP officials coerced C.D. into recanting her fear on video.  C.D. initially did not respond as the CBP officials instructed her to do because the responses they told her to say were not true.  C.D. was afraid and wanted to respond that she was very scared to return to Mexico.  One of the CBP officials repeated that the only way C.D. and her daughters would be able to leave voluntarily without her U.S. citizen daughter being taken away from her was if C.D. stated on video that she was not scared.  Having been locked in a room overnight, C.D. was tired and scared and felt like she was in jail.  The CBP officials continued to coerce her until she finally did what they told her to do, believing she had no choice.

58.     The CBP officials also coerced C.D. into signing a document in English which she could not read and did not understand.  The document stated that she did not have a fear of returning to Mexico and was withdrawing her application for admission.  The statements CBP coercively obtained from C.D. were and are still false; C.D. does fear returning to and staying in Mexico.

59.     Several days after CBP turned away C.D. and her daughters at the POE, C.D. made arrangements for her U.S. citizen daughter to cross into the United States.  C.D. and her other two children would like to present themselves again for asylum, but based on their experience and the experience of others with CBP's practice at POEs, she understands that they would likely be turned away again.

60.    C.D. and her two children are currently staying in temporary housing in Tijuana, where C.D. continues to fear for her life and the lives of her children. C.D. can no longer remain in Mexico and has no place else to turn for safety but the United States.

**Plaintiff Dinora Doe**

61.     D.D. is a native and citizen of Honduras.  MS-13 gang members repeatedly threatened to kill D.D. and her then-seventeen-year-old daughter if they did not leave their house.  After receiving the third threat, they fled to another city where they remained in hiding.

62.    When D.D. and her daughter subsequently returned home, three MS-13 members held them captive for three days and repeatedly raped each of them in front of the other.

63.    When D.D. and her daughter finally escaped, they fled to a shelter in Mexico.  However, after being threatened by MS-13 gang members again in Mexico, they knew they had to leave.

64.    On three separate occasions in August 2016, D.D. and her daughter went to the Otay Mesa POE and expressed their intent to seek asylum in the United States.  Each time, CBP officials turned them away.

65.    During D.D.'s first attempt, CBP officials misinformed her that there was no asylum in the United States and escorted D.D. and her daughter outside the POE.

66.    During her second attempt later the same day, one CBP official misinformed D.D. that there was no asylum available in the United States for Central Americans and that if they returned to the POE, they would be handed over to Mexican authorities and deported to Honduras.

67.    During her third attempt the next morning, a CBP official misinformed D.D. that she could pass through the POE, but would have to leave

1  her daughter behind.  When D.D. insisted that she and her daughter had a right to

2  apply for asylum, CBP officials escorted them out of the POE.

3      68.    D.D. and her children would like to present themselves again for

4  asylum but, based on their experience and the experience of others with CBP's

5  practice at POEs, she understands that they would likely be turned away again or

6  separated from each other.

7      69.    D.D. and her daughter are currently staying in Tijuana.  In June 2017,

8  D.D. received a call from a person connected to the MS-13 gang trying to identify

9  her location in Mexico.  D.D. continues to fear for her life and the life of her

10  daughter.  D.D. can no longer remain in Mexico and has no place else to turn for

11  safety but the United States.

12  ***Plaintiff Ingrid Doe***

13      70.    I.D. is a native and citizen of Honduras.  I.D. has two children and is

14  pregnant and expecting her third child in September.

15      71.    18th Street gang members murdered I.D.'s mother and three siblings.

16  They also threatened to kill I.D.

17      72.    For several years, I.D. and her children were subject to severe abuse

18  by her partner and the father of her son and the child that she is expecting.  I.D.'s

19  partner regularly raped I.D., sometimes in front of her children.  He would also

20  burn and beat I.D.  One day, I.D.'s partner put a gun to I.D.'s head and threatened

21  to kill her.

22      73.    In June 2017, I.D. fled with her children to Tijuana, where they

23  presented themselves at the Otay Mesa POE to seek asylum in the United States.

24      74.    When they arrived at the Otay Mesa POE, I.D. approached CBP

25  officials and expressed her intent to seek asylum.  The CBP officials misinformed

26  I.D. that they could not help her at the Otay Mesa POE and that she must go to the

27  San Ysidro POE.

28

75.     I.D. immediately went to the San Ysidro POE with her children, approached several CBP officials, and expressed her intent to seek asylum.  One of the officials misinformed I.D. that there was no asylum and that she could not pass through the POE because she did not have any documents.  I.D. again stated that she wanted to seek asylum and that she could not go back to Honduras because she and her children would be killed.  The CBP official responded that there was a new law in the United States that meant that there was no more asylum.  Another CBP official then escorted I.D. and her children out of the port.

76.     I.D. and her children would like to present themselves again for asylum but, based on their experience and the experience of others with CBP's practice at POEs, I.D. understands that they would likely be turned away again.

77.     I.D. and her children are currently staying in a shelter in Tijuana, where I.D. continues to fear for her life and the lives of her children.  I.D. can no longer remain in Mexico and has no place else to turn for safety but the United States.

### Plaintiff Jose Doe

78.     J.D. is a native and citizen of Honduras.  J.D. operated a small banana business in Honduras.  18th Street gang members began targeting his business for extortion and brutally attacked J.D. with a machete when he fell behind on payments.  18th Street later targeted another business J.D. established.

79.     In 2016, 18th Street kidnapped and killed his wife's cousin after she resisted the gang, and threatened to kidnap and sexually assault J.D.'s two teenage daughters.  18th Street also killed two of his wife's uncles.

80.     In June 2017, J.D. fled Honduras and took many buses through Honduras and Guatemala to avoid detection.  J.D. arrived in Nuevo Laredo and was accosted by multiple gang members.  J.D. presented himself at the Laredo, Texas POE the next day after this terrifying encounter, and he explained that he was afraid of returning to Honduras and wanted to seek asylum.  CBP officials at

1   the POE misinformed J.D. that he needed a visa to apply for asylum and told him

2   that there was no one to handle his application.  CBP officials sent J.D. back to

3   Nuevo Laredo, where he again was approached by gang members.

4       81.    J.D. would like to present himself again to seek asylum but, based on

5   his experience and the experience of others with CBP's practice at POEs, he

6   understands that he would likely be turned away again.

7       82.    J.D. is currently staying temporarily with his wife's relatives in

8   Monterrey, Mexico where he continues to fear for his life.  J.D. cannot remain in

9   Mexico and has no place to turn for safety but the United States.

10       **2.**    **CBP Officials Have Systematically Denied Numerous Other**

11           **Asylum Seekers Access to the Asylum Process**

12       83.    Class Plaintiffs' experiences reflect a systematic and persistent

13   practice by CBP that has unlawfully denied numerous other asylum seekers access

14   to the U.S. asylum process.

15       84.    CBP officials have carried out Defendants' systematic practice of

16   denying asylum seekers access to the U.S. asylum process by relying on certain

17   categories of tactics, including misrepresentations, threats and intimidation, verbal

18   and physical abuse, and coercion.  Asylum seekers and advocates have experienced

19   and/or witnessed firsthand CBP's illegal conduct.

20       **a.**    **Misrepresentations**:

21       85.    CBP officials misinform asylum seekers of the following:  that the

22   United States is no longer providing asylum; that President Trump signed a new

23   law that ended asylum in the United States; that the law providing asylum to

24   Central Americans recently ended; that Mexicans are no longer eligible for asylum;

25   that the United States is no longer accepting mothers with children; that asylum

26   seekers cannot seek asylum at the POE but must go to the U.S. Consulate in

27   Mexico instead; that visas are required to cross at a POE; and that asylum seekers

28

must obtain a "ticket" from a Mexican government agency (Grupo Beta) before they will be allowed to enter the United States to seek asylum.

86.     Class Plaintiffs A.D., B.D., D.D., I.D., and J.D. each experienced this practice.  D.D. and I.D. both were told asylum was no longer available in the United States.  A.D. was told that only the Mexican government could help her. B.D. was told that the U.S. government had no obligation to help her and that she had no right to enter the United States.  J.D. was told, falsely, that he needed a visa in order to apply for asylum.

### b.     Use of Threats and Intimidation:

87.     CBP officials threaten and intimidate asylum seekers in the following ways:  threatening to take asylum seekers' children away from them if they did not leave the POE; threatening to detain and to deport asylum seekers to their home countries if they persisted in their claims; threating to call Mexican immigration or otherwise turn asylum seekers over to the Mexican government if they do not leave the POE; threatening to ban asylum seekers from the United States for life if they continued to pursue asylum; and blocking asylum seekers from entering the CBP office and threatening to let dogs loose if they did not leave the POE.

88.     Class Plaintiffs A.D., B.D. and C.D. each experienced this practice and were threatened that if they tried to cross and pursue their asylum claims, U.S. government officials would take their children away or separate their families. Additionally, D.D. was threatened that if she and her daughter returned to the POE, they would be deported to Honduras.  B.D. was told that if she returned to the POE, she would be put in jail for three years.

### c.     Use of Verbal and Physical Abuse:

89.     As part of their systematic practice of denying asylum seekers arriving at POEs access to the U.S. asylum process, CBP officials also regularly resort to verbal and even physical abuse.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

90.   For example, CBP officials have resorted to the following verbal and physical abuse:  grabbing an asylum seeker's six-year-old daughter's arm and throwing her down onto the ground; holding a gun to an asylum seeker's back and forcing her out of the POE; knocking a transgender asylum seeker to the ground and stepping on her neck; telling an asylum seeker she was scaring her five-year-old son by persisting in her request for asylum and accusing her of being a bad mother; laughing at an asylum-seeking mother and her three children and mocking the asylum seeker's thirteen-year-old son who has cerebral palsy; and yelling profanities at an asylum-seeking mother and her five-year-old son, throwing her to the ground, and forcefully pressing her cheek into the pavement.

91.   Class Plaintiffs D.D. and B.D. both experienced this practice.  One CBP official pulled D.D. inside a gate at the POE to try to separate her from her daughter.  Later, as CBP officials escorted D.D. and her daughter out of the POE, one of the CBP officials tried to drag D.D. by her arm.  B.D. also experienced rough treatment and cried out in pain when a CBP official forcefully searched her for drugs.

### d.   <u>Use of Coercion</u>:

92.   CBP officials resort to coercion to deny asylum seekers arriving at POEs access to the U.S. asylum process, including: coercing asylum seekers into recanting their fear on video; and coercing asylum seekers into withdrawing their applications for admission to the United States.

93.   Class Plaintiffs A.D., B.D. and C.D. each experienced this practice of coercion.  Each was coerced to sign a form, written in English and not translated, which they did not understand, that stated they were voluntarily withdrawing their claims for asylum on the grounds that they did not fear returning to Mexico.  The forms CBP officials coerced them to sign were and still are false: A.D., B.D. and C.D. still have a grave fear of persecution in Mexico.

94.     CBP officials' use of various tactics, including misrepresentations, threats and intimidation, verbal and physical abuse, and coercion, at the POEs along the U.S.-Mexico border further evidence a systematic practice of denying asylum seekers access to the U.S. asylum process.

95.     The prevalence and persistence of CBP's illegal practice has been heavily documented by non-governmental organizations and other experts working in the U.S.-Mexico border region.

96.     In May 2017, Human Rights First, a respected non-governmental organization, published an Exhaustive Report entitled, "Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers."[29]  In that report, Human Rights First details firsthand accounts of CBP officials turning away asylum seekers without referring them for further screening or immigration court proceedings at POEs across the U.S.-Mexico border.  The report details the following conduct:

a.     CBP officials simply ignore requests by individuals to seek asylum;

b.     CBP officials give false information about U.S. laws and procedures, such as saying that "the United States is not giving asylum anymore" and "[President] Trump says we don't have to let you in";

c.     CBP officials mock and intimidate asylum seekers;

d.     CBP officials impose a "gauntlet" and "charade" of procedures, including a "ticketing" system, to discourage asylum seekers; and

e.     CBP officials coerce asylum seekers into denouncing any fear of persecution.

97.     Despite the complete lack of statistics or recordkeeping on CBP's failure to comply with the law, Human Rights First's Report references more than

---

[29] *See Crossing the Line*, *supra* note 22.

125 cases of CBP turning away individuals and families seeking asylum at POEs along the U.S.-Mexico border between November 2016 and April 2017. This is likely a small fraction of the number of asylum seekers being illegally denied access to the asylum process.

98.    In June 2017, Amnesty International, a non-profit human rights organization, published a report on CBP's ongoing practice of turning away asylum seekers at the U.S.-Mexico border entitled "Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers."[30]  In compiling the report, Amnesty International interviewed more than 120 asylum seekers as well as approximately 25 government officials and 40 civil society organizations. The report documents numerous instances in which CBP officials denied asylum seekers access to the asylum system at five different POEs along the U.S.-Mexico border.  The report details the following conduct:

a.    CBP officials coerce asylum seekers into recanting their fear of persecution on videotape and threaten to deport them back to their home countries if they do not comply;

b.    CBP officials tell asylum seekers that they will first have to get a "ticket" from Mexican authorities before seeking asylum;

c.    CBP officials coerce asylum seekers into signing a voluntary return paper under the threat that, if they do not, then they will be deported and will never be allowed into the United States; and

d.    CBP officials tell Mexican asylum seekers that there is no more asylum for Mexicans.

99.    From October 2016 to the present, the Women's Refugee Commission, a non-profit organization that advocates for women and children fleeing violence and persecution, has investigated and documented numerous

---

[30]    *See Facing Walls*, *supra* note 27.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1    instances in which CBP officials have turned asylum seekers away and refused to

2    process them at four POEs along the U.S.-Mexico border, including POEs in

3    Calexico, California; Nogales, Arizona; McAllen, Texas; and Laredo, Texas.  The

4    Women's Refugee Commission has documented the following conduct:

5             a.     CBP officials tell asylum seekers there is no space for them;

6             b.     CBP officials tell asylum seekers that the policies have changed

7                    and that they no longer qualify for asylum;

8             c.     CBP officials threaten to call Mexican immigration authorities

9                    to remove asylum seekers from the POEs;

10            d.     CBP officials forcibly remove asylum seekers from the POEs;

11                   and

12            e.     CBP officials tell asylum seekers to go away.

13        100.   From October 2016 through the present, the Project in Dilley, which

14    provides pro bono legal services to mothers and children detained at the South

15    Texas Family Residential Center in Dilley, Texas, has identified more than 50

16    asylum-seeking mothers who were turned away by CBP officials at POEs along

17    the U.S.-Mexico border, including POEs in San Ysidro, California; McAllen,

18    Texas; Laredo, Texas; and Eagle Pass, Texas.  The Project in Dilley has

19    documented the following conduct:

20            a.     CBP officials tell asylum seekers that asylum law is no longer

21                   in effect;

22            b.     CBP officials tell asylum seekers that they have orders to send

23                   away everyone who is seeking asylum;

24            c.     CBP officials tell asylum seekers they cannot seek asylum

25                   because there is no more space;

26            d.     CBP officials threaten to deport asylum seekers to their home

27                   countries; and

28

e. CBP officials use physical force to remove asylum seekers from POEs, including by handcuffing them, throwing them to the ground, shoving them and dragging them out of the POEs.

101. Since December 2015, representatives of Plaintiff Al Otro Lado have accompanied more than 160 asylum seekers to the San Ysidro POE. Several representatives have witnessed firsthand and/or otherwise documented the tactics employed by CBP to prevent asylum seekers from accessing the U.S. asylum process. Al Otro Lado representatives have documented the following conduct:

a. CBP officials tell asylum seekers they have to apply for asylum at the U.S. Consulate in Mexico;

b. CBP officials tell asylum seekers that they must first obtain a "ticket" from Mexican immigration in order to seek asylum;

c. CBP officials tell asylum seekers that they are not processing asylum seekers at that POE and they must go to another POE to be processed;

d. CBP officials tell asylum seekers that they cannot seek asylum at that time and must be put on a waiting list;

e. CBP officials tell asylum seekers that they do not qualify for asylum; and

f. CBP officials coerce asylum seekers into withdrawing their asylum claims, including by threatening that they will be deported if they do not do so.

102. On January 13, 2017, various non-governmental organizations submitted an administrative complaint to DHS' Office for Civil Rights and Civil Liberties ("CRCL") and Office of Inspector General ("OIG").[31] The

---

[31] *See* American Immigration Council, Complaint Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, 1-2 (Jan. 13, 2017), https://www.

administrative complaint provided specific examples of CBP turning away asylum seekers at POEs along the U.S.-Mexico border and urged CRCL and OIG to conduct a prompt and thorough investigation into this illegal practice and take swift corrective action.

103.   Despite this administrative complaint, Defendants' illegal practice continues.  In fact, CBP has acknowledged its illegal practice in sworn testimony before Congress.  On June 13, 2017, in questioning before the House Appropriations Committee, the Executive Assistant Commissioner for CBP's OFO admitted that CBP officials were turning away asylum applicants at POEs along the U.S.-Mexico border.[32]

## V.   LEGAL BACKGROUND

### A.   U.S. Law Requires that Individuals Be Provided a Meaningful Opportunity to Seek Asylum in the United States

104.   U.S. law requires CBP to give individuals who present themselves at a POE and express a desire to apply for asylum or a fear of persecution in their home countries the opportunity to seek protection in the United States.

105.   Specifically, the Immigration and Nationality Act ("INA") and its implementing regulations set forth a variety of ways in which such individuals may seek protection in the United States.  *See, e.g.*, 8 U.S.C. § 1157 (admission of refugees processed overseas); 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1231(b)(3) (restriction of removal to a country where individual's life or freedom would be threatened); 8 C.F.R. §§ 208.16-18 (protection under the Convention Against Torture).

---

americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[32]   *Hearing on the Immigration and Customs Enforcement and Customs and Border Protection F.Y. 2018 Budgets*. Before the Subcomm. on Homeland Sec. of the H. Appropriations Comm., 115th Cong. (2017) (statement of John Wagner, Executive Assistant Comm'r for CBP's Office of Field Operations).

106.   The INA provides that any noncitizen "who is physically present in the United States or who arrives in the United States" has a statutory right to apply for asylum, irrespective of such individual's status.  8 U.S.C. § 1158(a)(1).  The INA also specifies processes that must be followed when an individual states a desire to seek asylum or expresses a fear of returning to his or her home country.  *See* 8 U.S.C. § 1158(d)(1) ("The Attorney General shall establish a procedure for the consideration of asylum applications filed [by individuals physically present in the United States or who arrive in the United States].").  Under the INA, CBP must either:

a.   Refer the asylum seeker for a credible fear interview (*see* 8 U.S.C. § 1225(b)(1)); or

b.   Place the asylum seeker directly into regular removal proceedings by issuing a Notice to Appear ("NTA"), which will then allow the asylum seeker to pursue his or her asylum claim before an immigration judge (*see* 8 U.S.C. §§ 1125(b)(2), 1229, 1129a).

107.   The U.S. government has admitted that the duty to allow a noncitizen access to the asylum process is "not discretionary."  *See, e.g.*, Federal Defendant's Reply Brief in Support of Motion for Summary Judgment and Dismissal for Lack of Jurisdiction, cited in *Munyua v. United States*, No. 03-4538, 2005 U.S. Dist. LEXIS 11499, at *16-19 (N.D. Cal. Jan. 10, 2005) ("[D]efendant acknowledges that [the immigration officers] did not have the discretion to ignore a clear expression of fear of return or to coerce an alien into withdrawing an application for admission").

108.   CBP is responsible for the day-to-day operation of POEs along the U.S.-Mexico border.  CBP's obligations include inspecting and processing individuals who present themselves at POEs to enable them to pursue their claims

for asylum in the United States.  CBP officials themselves are not authorized to evaluate, grant or reject an individual's asylum claim.

109.   All noncitizens arriving at POEs along the U.S.-Mexico border must be inspected by CBP officials.  *See* 8 U.S.C. § 1225(a)(3) ("All [noncitizens] . . . who are applicants for admission or otherwise seeking admission . . . ***shall be inspected*** by immigration officers.") (emphasis added).  During inspection, CBP officials must determine whether a noncitizen may be admitted to the United States.  *See* 8 U.S.C. § 1182(a) (specifying grounds of inadmissibility).  In order to make this determination, CBP scrutinizes an individual's entry documents.  *See* 8 U.S.C. § 1181(a) (outlining documentation requirements for the admission of noncitizens into the United States).  Asylum seekers often flee their countries on very short notice and thus frequently lack valid entry documents.  Once a CBP official makes a determination of inadmissibility, the individual becomes subject to removal from the United States.

110.   CBP officials must then place the noncitizen into either expedited removal proceedings under 8 U.S.C. § 1225(b) or regular removal proceedings under 8 U.S.C. § 1229.

111.   Expedited removal proceedings involve a more streamlined process than regular removal proceedings and are reserved for people apprehended at or near the border.  *See* 8 U.S.C. § 1225(b)(1)(A)(i) (permitting certain persons who are seeking admission at the border to the United States to be expeditiously removed without a full immigration judge hearing).  However, Congress included important safeguards in the expedited removal statute in an effort specifically to protect asylum seekers.

112.   The INA unequivocally states that if a noncitizen placed in expedited removal proceedings "indicates either an intention to apply for asylum . . . or a fear of persecution, the [CBP] officer ***shall*** refer the [noncitizen] for an interview by an asylum officer."  8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added).  The requirement

1    to refer an asylum seeker placed in expedited removal proceedings to an asylum

2    officer is _**mandatory**_.

3         113.   Likewise, the applicable regulations promulgated under the INA

4    reinforce that if an individual in expedited removal proceedings asserts an intention

5    to apply for asylum or a fear of persecution, then "the inspecting officer _**shall not**_

6    proceed further with removal of the [noncitizen] until the [noncitizen] has been

7    referred for an interview by an asylum officer."  8 C.F.R. § 235.3(b)(4) (emphasis

8    added).

9         114.   Importantly, CBP officials must read a form to noncitizens subject to

10   expedited removal advising them of their right to speak to an asylum officer if they

11   express a desire to apply for asylum or a fear of returning to their home countries.

12   _See_ 8 C.F.R. § 235.3(b)(2)(i); DHS Form I-867A.

13        115.   Affirming that the CBP officials themselves are not authorized to

14   adjudicate asylum claims, the regulations specifically charge _**asylum officers**_ from

15   U.S. Citizenship and Immigration Services with making initial determinations as to

16   whether there is a "significant possibility" that an individual can establish

17   eligibility for asylum.  _See_ 8 C.F.R. § 235.3(b)(4); _see also_ 8 U.S.C.

18   § 1225(b)(1)(B)(ii).  This is because asylum officers are trained in the often

19   complicated and evolving law surrounding asylum, and thus are uniquely

20   positioned to conduct such interviews, which themselves require particular

21   interviewing and assessment skills as well as comprehension of the social and

22   political contexts from which asylum seekers flee.  In fact, the INA specifically

23   defines "asylum officer" as an immigration officer who "has had professional

24   training in country conditions, asylum law, and interview techniques comparable to

25   that provided to full-time adjudicators of applications under section 1158."  8

26   U.S.C. § 1225(b)(1)(E).

27        116.   Applicants who establish that they have a "significant possibility" of

28   proving their eligibility for asylum receive positive credible fear determinations.

1   They are taken out of the expedited removal system altogether and placed into

2   regular removal proceedings, where they have the opportunity to submit an asylum

3   application, develop a full record before an Immigration Judge, appeal to the Board

4   of Immigration Appeals and seek judicial review of an adverse decision.  8 U.S.C.

5   § 1225(b)(1)(B)(ii); 8 C.F.R. §§ 235.6(a)(1)(ii), (iii).

6        117.   Alternatively, CBP officials may place noncitizens directly into

7   regular removal proceedings by issuing an NTA.  8 U.S.C. §§ 1225(b)(2),

8   1229(a)(1), 1229a.  Once in regular removal proceedings, the asylum seeker can

9   submit an asylum application and must receive a full hearing before an

10  Immigration Judge, file an administrative appeal with the Board of Immigration

11  Appeals and seek judicial review.  8 U.S.C. § 1229a(a)(1) ("An immigration judge

12  shall conduct proceedings for deciding the inadmissibility or deportability of an

13  alien.").

14       118.   Despite these prescribed procedures, CBP regularly employs a variety

15  of egregious tactics (including those described above) that have one unlawful

16  result:  depriving Class Plaintiffs, and the asylum seekers they represent, of *any*

17  access to the asylum process, and stripping them of their right to seek asylum

18  under U.S. law.

19   **B.      Defendants Have No Authority Under the INA to Turn a**

20  **Noncitizen Seeking Admission Away at a POE**

21       119.   CBP's authority is limited to that granted by Congress in the INA.

22  Nothing in the INA authorizes Defendants, through their officers and employees,

23  to turn away a noncitizen who seeks admission at a POE.

24       120.   When inspecting a noncitizen who arrives at a POE, CBP officials

25  must follow the procedures mandated by Congress in 8 U.S.C. § 1225.  Pursuant to

26  this section, CBP officials are limited to the following possible actions with respect

27  to any arriving noncitizen who is not clearly and beyond a doubt entitled to be

28  admitted:

a. Place arriving noncitizens who are inadmissible under one of two grounds specified by statute in expedited removal proceedings pursuant to 8 U.S.C. § 1225(b)(1)(A)(i);

b. Refer any noncitizen placed in expedited removal proceedings who expresses either an intent to apply for asylum or a fear of persecution if returned to his or her home country to an asylum officer for a credible fear interview pursuant to 8 U.S.C. §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B);

c. Place "other" arriving noncitizens (*i.e.*, those who are not placed in expedited removal proceedings under 8 U.S.C. § 1225(b)(1)(A) and who are neither crewmen or stowaways) in removal proceedings under 8 U.S.C. § 1229a pursuant to 8 U.S.C. § 1225(b)(2);

d. Follow other removal procedures with respect to noncitizens suspected of being inadmissible on terrorism or related security grounds pursuant to 8 U.S.C. § 1225(c); or

e. Accept from the noncitizen a voluntary (*i.e.*, non-coerced) withdrawal of her application for admission pursuant to 8 U.S.C. § 1225(a)(4) and 8 C.F.R. § 235.4.

121. Defendants, through their officers and employees, act without authority and in violation of the law when they turn away an individual at a POE.

**C.   <u>Class Plaintiffs Are Entitled to Procedural Due Process Rights Under the Fifth Amendment to the U.S. Constitution</u>**

122. The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law."  U.S. Const. Amend. V.  In addition, where Congress has granted statutory rights and has directed an agency to establish a procedure for providing such rights, the Constitution requires the

1    government to establish a fair procedure and to abide by that procedure.  In the

2    asylum context, U.S. law mandates that asylum seekers be provided with such

3    process.  Multiple courts have recognized that such procedural rights are critical in

4    the asylum context and can result in life or death decisions, because applicants

5    wrongly denied asylum can be subject to death or other serious harm in their home

6    countries.  *See, e.g.*, *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) ("The

7    basic procedural rights Congress intended to provide asylum applicants . . . are

8    particularly important because an applicant erroneously denied asylum could be

9    subject to death or persecution if forced to return to his or her home country.").

10          123.   The INA and its implementing regulations provide Class Plaintiffs

11    with the right to be processed at a POE and granted access to the asylum process.

12    *See, e.g.*, 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B),

13    1225(b)(2).  By systematically turning away asylum seekers presenting themselves

14    at POEs along the U.S.-Mexico border and thus denying them access to the asylum

15    process, Defendants have failed to comply with the due process procedures for

16    processing asylum seekers under the INA and its implementing regulations.

17    **D.    The *Non-Refoulement* Doctrine Under International Law**

18          **Requires Implementation and Adherence to a Procedure to**

19          **Access Asylum**

20          124.   The United States is obligated by a number of treaties and protocols to

21    adhere to the duty of *non-refoulement* – a duty that prohibits a country from

22    returning or expelling an individual to a country where he or she has a well-

23    founded fear of persecution and/or torture.

24          125.   The primary treaty source for the duty of *non-refoulement* is the 1951

25    Convention on the Rights of Refugees.  Article 33 of the Convention prohibits a

26    state from returning "a refugee in any manner whatsoever to the frontiers of

27    territories where his life or freedom would be threatened on account of his race,

28    religion, nationality, membership of a particular social group or political opinion."

1951 Refugee Convention, Art. 33.  The United States adopted the protections of Article 33 by signing onto the 1967 Protocol Relating to the Status of Refugees, which incorporated Articles 2-34 of the 1951 Convention.

126.   The prohibition against *refoulement* is likewise central to other treaties ratified by the United States, including the International Covenant on Civil and Political Rights ("ICCPR") and the Convention Against Torture ("CAT"), both of which prohibit returning an individual to harm and obligate the United States to implement and follow legal procedures to protect refugees' right to *non-refoulement*.  *See* ICCPR, Art. 13; CAT, Art. 3.

127.   In order to effectuate an asylum seeker's right to *non-refoulement*, the United States is obligated to implement and follow procedures to ensure that his or her request for asylum be duly considered.  The United States implemented this legal obligation with the passage of the 1980 Refugee Act, which established a procedure for a noncitizen physically present in the United States or at a land border or POE to apply for asylum.  *See* Refugee Act of 1980, Pub. L. No. 96-212, § 201(b), 94 Stat. 102 (1980).

128.   In practice, the duty of *non-refoulement* covers not only those refugees and asylum seekers already present inside the country, but also those who present themselves at POEs along the U.S. border.  The duty requires U.S. officials such as Defendants to consider the claims of those seeking to cross the U.S. border and not to deny them access to a lawful process to present a claim for asylum.

129.   The norm of *non-refoulement* is specific, universal and obligatory.  It is so widely accepted that it has reached the status of *jus cogens* – a norm not subject to derogation.  Indeed, in 1996, the United Nations Executive Committee on the International Protection of Refugees explicitly concluded that the *non-refoulement* principle had achieved the status of a norm "not subject to derogation."  Executive Committee Conclusion No. 79, *General Conclusion on International Protection* (1996).  The principle was recognized as such in the 1984

1    Cartagena Declaration on Refugees; was included in a portion of the Refugee

2    Convention from which derogation is not permitted; and has been recognized by

3    bodies, including the Inter-American Commission on Human Rights and the

4    Organization of American States General Assembly.

5         130.   Defendants' actions to deny Class Plaintiffs, and the asylum seekers

6    they represent, access to the U.S. asylum process violate their binding and

7    enforceable obligations under international law.

8                    **VI.    CLASS ACTION ALLEGATIONS**

9         131.   Class Plaintiffs bring this action pursuant to Federal Rules of Civil

10   Procedure 23(a) and 23(b)(2) on behalf of themselves and all other persons

11   similarly situated.  The proposed class is defined as follows:

12            All noncitizens who present themselves at a POE along the U.S.-

13            Mexico border, assert an intention to seek asylum or express a fear of

14            persecution in their home countries, and are denied access to the U.S.

15            asylum process by CBP officials.

16        132.   The class is so numerous that joinder of all members is impracticable.

17   CBP's misconduct toward asylum seekers at POEs along the U.S.-Mexico border

18   has been the focus of monitoring, reporting and advocacy by numerous well-

19   respected non-governmental organizations.  These organizations have investigated

20   and documented hundreds of examples of asylum seekers being turned away by

21   CBP officials.  Many more asylum seekers have likely been the victims of this

22   unlawful conduct as these abuses often go unreported.  Asylum seekers who are

23   turned away at the border are continuously moving and relocating, also making

24   joinder impracticable.

25        133.   There are questions of law and fact that are common to the class.  The

26   class alleges common harms: a violation of the class members' statutory right to

27   access the U.S. asylum process, procedural due process rights and right not to be

28   returned to countries where they fear persecution.  The class members' entitlement

1  to these rights is based on a common core of facts.  All members of the proposed

2  class have expressed a fear of return to their home countries or a desire to apply for

3  asylum.  These facts entitle all of them to the opportunity to seek asylum.  Yet each

4  class member has been and likely will again be unlawfully denied access to the

5  U.S. asylum process by CBP.  Moreover, all class members raise the same legal

6  claims: that U.S. immigration laws and the Constitution require CBP officials at

7  POEs to give them access to the asylum process.  Their shared common facts will

8  ensure that judicial findings regarding the legality of the challenged practices will

9  be the same for all class members.  Should Class Plaintiffs prevail, *all* class

10  members will benefit; each of them will be entitled to a lawful inspection at a POE

11  along the U.S.-Mexico border and an opportunity to seek asylum.

12      134.   Class Plaintiffs' claims are typical of the claims of the class.  Class

13  Plaintiffs and class members raise common legal claims and are united in their

14  interest and injury.  All Class Plaintiffs, like all class members, are asylum seekers

15  to whom CBP officials unlawfully denied access to the U.S. asylum process after

16  they presented themselves at POEs along the U.S.-Mexico border.  Class Plaintiffs

17  and class members are thus victims of the same, unlawful course of conduct.

18      135.   Class Plaintiffs are adequate representatives.  Class Plaintiffs seek

19  relief on behalf of the class as a whole and have no interest antagonistic to other

20  members of the class.  Class Plaintiffs' mutual goal is to declare Defendants'

21  challenged policies and practices unlawful and to obtain declaratory and injunctive

22  relief that would cure this illegality.  Class Plaintiffs seek a remedy for the same

23  injuries as the class members, and all share an interest in having a meaningful

24  opportunity to seek asylum.  Thus, the interests of the Class Plaintiffs and of the

25  class members are aligned.

26      136.   Class Plaintiffs are represented by attorneys from the American

27  Immigration Council, the Center for Constitutional Rights and Latham & Watkins

28  LLP.  Counsel have a demonstrated commitment to protecting the rights and

1   interests of noncitizens and, together, have considerable experience in handling

2   complex and class action litigation in the immigration field.  Counsel have

3   represented numerous classes of immigrants and other victims of systematic

4   government misconduct in actions in which they successfully obtained class relief.

5       137.   Defendants have acted or refused to act on grounds that are generally

6   applicable to Class Plaintiffs and the class.  Defendants have failed to provide

7   Class Plaintiffs and class members with access to the U.S. asylum process.

8   Defendants' actions violate Class Plaintiffs' and class members' statutory,

9   regulatory and constitutional rights to access to the asylum process.  Declaratory

10  and injunctive relief are appropriate remedies.

11      138.   In the absence of a class action, there is substantial risk that individual

12  actions would be brought in different venues, creating a risk of inconsistent

13  injunctions to address Defendants' common conduct.

14  **FIRST CLAIM FOR RELIEF**

15  **DECLARATORY RELIEF**

16  **AGAINST ALL DEFENDANTS**

17  **(VIOLATION OF THE RIGHT TO SEEK ASYLUM UNDER THE**

18  **IMMIGRATION AND NATIONALITY ACT)**

19      139.   Al Otro Lado and Class Plaintiffs reallege and incorporate by

20  reference each and every allegation contained in the preceding paragraphs as if set

21  forth fully herein.

22      140.   INA § 208(a)(1) (8 U.S.C. § 1158(a)(1)) gives any noncitizen who is

23  physically present in or who arrives in the United States a statutory right to seek

24  asylum, regardless of such individual's immigration status.

25      141.   When a noncitizen presents himself or herself at a POE and indicates

26  an intention to apply for asylum or a fear of persecution, CBP officials must refer

27  the noncitizen for a credible fear interview under 8 U.S.C. § 1225(b)(1)(A)(ii) and

28

8 C.F.R. § 235.3(b)(4), or, in accordance with 8 U.S.C. § 1225(b)(2), place the noncitizen directly into regular removal proceedings under 8 U.S.C. § 1229(a)(1).

142.   Class Plaintiffs presented themselves at U.S. POEs along the U.S.-Mexico border and asserted an intention to apply for asylum and/or a fear of persecution in their countries of origin.  Nevertheless, CBP officials did not refer Class Plaintiffs to an asylum officer for credible fear interviews pursuant to 8 U.S.C. § 1225(b)(1)(A)(ii), or, in accordance with 8 U.S.C. § 1225(b)(2), place Class Plaintiffs directly into regular removal proceedings pursuant to 8 U.S.C. § 1229(a)(1).

143.   Instead, in direct contravention of the INA, CBP officials engaged in unlawful tactics that prevented Class Plaintiffs from accessing the statutorily prescribed asylum process and forced them to return to Mexico.

144.   CBP officials' treatment of Class Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction or acquiescence of Defendants.

145.   As a result of Defendants' violations of the INA, Class Plaintiffs have been damaged – through the denial of access to the asylum process and by being forced to return to Mexico or other countries where they face threats of further persecution.

146.   As a result of Defendants' violations of the INA, Plaintiff Al Otro Lado has been damaged – namely its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

147.   Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their statutory rights.  Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged

1   herein, and therefore seek injunctive relief restraining Defendants from continuing

2   to engage in the unlawful practices and policies alleged herein.

3        148.   Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201

4   and 2202, this Court may declare the rights or legal relations of any party in any

5   case involving an actual controversy.

6        149.   An actual controversy has arisen and now exists between Class

7   Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other.  Class

8   Plaintiffs and Al Otro Lado contend that Defendants' conduct and practices, as

9   alleged in this Complaint, violate the INA.  On information and belief, Defendants

10  contend that the conduct and practices are lawful.

11       150.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to

12  a judicial determination as to the rights and obligations of the parties with respect

13  to this controversy, and such a judicial determination of these rights and

14  obligations is necessary and appropriate at this time.

15                    **SECOND CLAIM FOR RELIEF**

16                       **DECLARATORY RELIEF**

17                    **AGAINST ALL DEFENDANTS**

18    **(VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)**

19       151.   Al Otro Lado and Class Plaintiffs reallege and incorporate by

20  reference each and every allegation contained in the preceding paragraphs as if set

21  forth fully herein.

22       152.   The Administrative Procedure Act ("APA") (5 U.S.C. § 551, *et. seq.*)

23  authorizes suits by "[a] person suffering legal wrong because of agency action, or

24  adversely affected or aggrieved by agency action within the meaning of a relevant

25  statute."  5 U.S.C. § 702.  The APA also provides relief for a failure to act: "The

26  reviewing court shall . . . compel agency action unlawfully withheld or

27  unreasonably delayed."  5 U.S.C. § 706(1).

28

153.   CBP officials have failed to take actions mandated by the following statutes and implementing regulations in violation of the APA:

- 8 U.S.C. § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, *may apply for asylum.* . . .") (emphasis added);
- 8 U.S.C. § 1225(a)(1)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States *shall be inspected by immigration officers*.") (emphasis added);
- 8 U.S.C. § 1225(b)(1)(A)(ii) ("If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible . . .  and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, *the officer shall refer the alien for an interview by an asylum officer*. . . .") (emphasis added);
- 8 U.S.C. § 1225(b)(2) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.");
- 8 C.F.R. § 235.3(b)(4) ("[T]he inspecting officer *shall not proceed further* with removal of the alien *until the alien has been referred for an interview by an asylum officer*. . . .") (emphasis added); and
- 8 C.F.R. § 235.4 ("The alien's decision to withdraw his or her application for admission must be made voluntarily . . . .").

154.   In addition, CBP officials have acted in excess of their statutorily prescribed authority and without observance of the procedures required by law in violation of the APA.  *See* 5 U.S.C. §§ 706(2)(C), (D).  Congress mandated the

various procedures that Defendants are authorized to follow when inspecting individuals who seek admission at POEs. *See* 8 U.S.C. § 1225. None of these procedures authorizes a CBP official to turn back a noncitizen seeking asylum at a POE.

155. In turning Class Plaintiffs and purported class members away at POEs along the U.S.-Mexico border without following the procedures mandated by the INA, CBP officials have acted and continue to act in excess of the authority granted them by Congress and without observance of procedure required by law.

156. CBP's treatment of Class Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction or acquiescence of Defendants.

157. Defendants' repeated and pervasive failure to act and the actions taken in excess of their authority, which denied Class Plaintiffs access to the statutorily prescribed asylum process, constitute unlawfully withheld or unreasonably delayed agency action, is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law, and therefore gives rise to federal jurisdiction and mandates relief under the APA.

158. As a result of the acts constituting violations of the APA, Class Plaintiffs have been damaged through the denial of access to the asylum process and by being forced to return to Mexico or other countries where they face threats of further persecution.

159. As a result of the acts constituting violations of the APA, Plaintiff Al Otro Lado has been damaged – namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

160. Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their statutory and regulatory rights. Class

Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to engage in the unlawful practices alleged herein.

161.   Al Otro Lado and Class Plaintiffs have exhausted all available administrative remedies and have no adequate remedy at law.

162.   Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in any case involving an actual controversy.

163.   An actual controversy has arisen and now exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other.  Class Plaintiffs and Al Otro Lado contend that Defendants' conduct and practices, as alleged in this Complaint, violate the APA.  On information and belief, Defendants contend that the conduct and practices are lawful.

164.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

## THIRD CLAIM FOR RELIEF

### DECLARATORY RELIEF

### AGAINST ALL DEFENDANTS

### (VIOLATION OF PROCEDURAL DUE PROCESS)

165.   Al Otro Lado and Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

166.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law."  U.S. Const. Amend. V.

167.   Congress has granted certain statutory rights to asylum seekers, such as Class Plaintiffs and the asylum seekers they represent, and has directed DHS to establish a procedure for providing such rights.  The Due Process Clause thus requires the government to establish a fair procedure and to abide by that procedure.

168.   As set forth above, the INA and its implementing regulations provide Class Plaintiffs the right to be processed at a POE and granted access to the asylum process.  *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), 1225(b)(2); *see also* 8 C.F.R. § 235.3(b)(4).

169.   By using a variety of tactics to turn away asylum seekers at POEs along the U.S.-Mexico border, CBP officials have denied Class Plaintiffs access to the asylum process and failed to comply with procedures set forth in the INA and its implementing regulations.

170.   CBP officials' treatment of Class Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction or acquiescence of Defendants.

171.   By denying Class Plaintiffs access to the asylum process, Defendants have violated Class Plaintiffs' procedural due process rights under the Fifth Amendment to the U.S. Constitution.

172.   As a result of the Defendants' violations of the Fifth Amendment to the U.S. Constitution, Class Plaintiffs have been damaged through the denial of access to the asylum process and by being forced to return to Mexico or other countries where they face threats of further persecution.

173.   As a result of Defendants' violations of the Fifth Amendment to the U.S. Constitution, Al Otro Lado has been damaged – namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

174.   Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their constitutional rights.  Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from engaging in the unlawful conduct and practices alleged herein.

175.   An actual controversy exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other.  Class Plaintiffs and Al Otro Lado contend that Defendants' conduct and practices, as alleged in this Complaint, violate the Fifth Amendment to the United States Constitution.  On information and belief, Defendants contend that the conduct and practices are lawful.

176.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

## FOURTH CLAIM FOR RELIEF
## DECLARATORY RELIEF
## AGAINST ALL DEFENDANTS
## (VIOLATION OF THE *NON-REFOULEMENT* DOCTRINE)

177.   Al Otro Lado and Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

178.   CBP officials have systematically denied Class Plaintiffs, and the asylum seekers they represent, access to the asylum system, in violation of customary international law reflected in treaties which the United States has ratified and implemented: namely, the specific, universal and obligatory norm of *non-refoulement*, which has also achieved the status of a *jus cogens* norm, and

1    which forbids a country from returning or expelling an individual to a country

2    where he or she has a well-founded fear of persecution and/or torture.

3         179.   CBP officials' treatment of Class Plaintiffs at the U.S.-Mexico border

4    was inflicted at the instigation, under the control or authority, or with the

5    knowledge, consent, direction or acquiescence of Defendants.

6         180.   Defendants' conduct is actionable under the Alien Tort Statute, 28

7    U.S.C. § 1350, which authorizes declaratory and injunctive relief.

8         181.   As a result of the acts constituting violations of the *jus cogens* norm of

9    *non-refoulement*, Class Plaintiffs have been damaged through denial of access to

10   the asylum process and by being forced to return to Mexico or other countries

11   where they face threats of further persecution.

12        182.   As a result of the acts constituting violations of the norm of *non-*

13   *refoulement*, Al Otro Lado has been damaged – namely, its core mission has been

14   frustrated and it has been forced to divert substantial resources away from its

15   programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico

16   border.

17        183.   Defendants' practices have resulted and will continue to result in

18   irreparable injury, including a continued risk of violence and serious harm to Class

19   Plaintiffs and further denials of the protections afforded to them under international

20   law.  Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to

21   redress the violations alleged herein, and therefore seek injunctive relief restraining

22   Defendants from engaging in the unlawful conduct and practices alleged herein.

23        184.   An actual controversy exists between Class Plaintiffs and Al Otro

24   Lado, on one hand, and Defendants, on the other.  Class Plaintiffs and Al Otro

25   Lado contend that Defendants' conduct and practices, as alleged in this Complaint,

26   violate the norm of *non-refoulement*.  On information and belief, Defendants

27   contend that the conduct and practices are lawful.

28

185.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

## PRAYER FOR RELIEF

186.   WHEREFORE, Plaintiff Al Otro Lado and Class Plaintiffs respectfully request that the Court:

    a.    Issue an order certifying a class of individuals pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2);

    b.    Appoint the undersigned as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

    c.    Issue a judgment declaring that Defendants' policies, practices, acts and/or omissions described herein give rise to federal jurisdiction;

    d.    Issue a judgment declaring that Defendants' policies, practices, acts and/or omissions described herein violate one or more of the following:

        (1)    The Immigration and Nationality Act, based on violations of 8 U.S.C. §§ 1158 and 1225;

        (2)    The Administrative Procedure Act, based on violations of 8 U.S.C. §§ 1158, 1225 and 8 C.F.R. §§ 235.3, 235.4;

        (3)    The Due Process Clause of the Fifth Amendment; and

        (4)    The duty of *non-refoulement* under international law;

    e.    Issue injunctive relief requiring Defendants to comply with the laws and regulations cited above;

    f.    Issue injunctive relief prohibiting Defendants, and any of their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them or on their

1 behalf, from engaging in the unlawful policies, practices, acts

2 and/or omissions described herein at POEs along the U.S.-

3 Mexico border;

4      g. Issue injunctive relief requiring Defendants to implement

5 procedures to provide effective oversight and accountability in

6 the inspection and processing of individuals who present

7 themselves at POEs along the U.S.-Mexico border and indicate

8 an intention to apply for asylum or assert a fear of persecution

9 in their home countries;

10      h. Award Plaintiffs their reasonable attorneys' fees, costs and

11 other expenses pursuant to 28 U.S.C. § 2412, and other

12 applicable law; and

13      i. Grant any and all such other relief as the Court deems just and

14 equitable.

15 Dated:  July 12, 2017             LATHAM & WATKINS LLP

16                     Wayne S. Flick

Manual A. Abascal

17                     James H. Moon

18                     Kristin P. Housh

Robin A. Kelley

19

20                 By */s/ Manual A. Abascal*

21                    Manual A. Abascal

22                 *Attorneys for Plaintiffs*

23

24

25

26

27

28