1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, INC., a California Corporation; ABIGAIL DOE, BEATRICE DOE, CAROLINA DOE, DINORA DOE, INGRID DOE, and JOSE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KIRSTJEN NIELSEN, Secretary, U.S. Department of Homeland Security, in her official capacity; KEVIN K. MCALEENAN, Acting Commissioner, U.S. Customs and Border Protection, in his official capacity; TODD C. OWEN, Executive Assistant Commissioner, Officer of Field Operations, U.S. Customs and Border Protection, in his official capacity,<br><br>Defendants. | Case No. 17-cv-02366-BAS-KSC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**<br><br>**[ECF No. 135]** |

This case concerns an alleged practice in which U.S Customs and Border Protection ("CBP") officials at ports of entry ("POE") along the U.S.-Mexico border deny asylum seekers access to the U.S. asylum process. The Defendants in this case are Kirstjen Nielsen, the Secretary of the U.S. Department of Homeland Security; Kevin K. McAleenan, Acting Commissioner of CBP; and Defendant Todd C. Owen, the Executive Assistant Commissioner of the Office of Field Operations for CBP.

Each Defendant has a role in the direction and oversight of CBP and each is sued in his or her official capacity.  Defendants move to dismiss the Complaint in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (ECF No. 135.) Plaintiffs oppose (ECF No. 143) and Defendants have replied in support (ECF No. 145).  For the reasons herein, the Court grants in part and denies in part Defendants' motion to dismiss.

# I. BACKGROUND

## A. Relevant Statutory and Regulatory Background[1]

At the heart of this case are several provisions of the Immigration and Nationality Act ("INA") and its implementing regulations which elaborate a procedure by which asylum seekers who arrive at POEs may seek asylum in the United States—a procedure Plaintiffs refer to as "access to the U.S. asylum process."[2] (*See generally* ECF No. 1, Compl.)  The INA generally provides that "[a]ny alien who is physically present in the United States or who arrives in the United States [], irrespective of such alien's status, may apply for asylum in accordance with . . . where applicable, section 1225(b)[.]"  8 U.S.C. § 1158(a)(1).

An alien who arrives in the United States, including at a designated POE, is

---

[1] The Court relies on portions of the statutory and regulatory background identified in the Complaint and the parties' briefing to outline the relevant background for the purposes of this opinion.  (*See* Compl. ¶¶ 104–118; ECF No. 135-1; ECF No. 143.)  The Court does not include all aspects of the statutory and regulatory scheme concerning asylum.

[2] Defendants take issue with Plaintiffs' use of the phrase "access to the asylum process," asserting that "Plaintiffs misstate the law" because the INA does not use that phrase.  (ECF No. 135-1 at 5 n.2.)  However, Defendants themselves use the phrase "asylum process" to refer to the statutory provisions identified in the Complaint. (ECF No. 67-3 Ex. B.)  The Court does not understand the phrase "access to the asylum process" as a statement of the law itself, but rather as a shorthand to collectively describe certain provisions of the INA and its implementing regulations at issue in this case.  The Court similarly uses this shorthand in this opinion.

deemed an "applicant for admission," who "shall be inspected by immigration officers," and may be removed "without further hearing" "if an immigration officer determines" that the alien "is inadmissible." *See* 8 U.S.C. § 1225(a)(1); 8 U.S.C. § 1225(a)(3); 8 U.S.C. § 1182(a). The INA, however, treats asylum seekers differently.

An "alien [who] indicates either an intention to apply for asylum under section 1158 . . . or a fear of persecution" is excepted from this summary removal. 8 U.S.C. § 1225(b)(1)(A)(i). Instead, "[i]f an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible . . . and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer[.]" 8 U.S.C. § 1225(b)(1)(A)(ii). An implementing regulation similarly requires that if a noncitizen in expedited removal proceedings asserts an intention to apply for asylum or a fear of persecution, "the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer[.]" 8 C.F.R. § 235.3(b)(4). The regulation further mandates that "the examining immigration officer shall record sufficient information in the sworn statement to establish and record that the alien has indicated such intention, fear, or concern, and to establish the alien's inadmissibility." *Id.*

An alien seeking asylum is subsequently referred to an "asylum officer," who is statutorily required to be "an immigration officer who has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 1158 of this title," and "is supervised by an officer who," *inter alia*, "has had substantial experience adjudicating asylum applications." 8 U.S.C. § 1225(b)(1)(E). The INA further elaborates the conduct of asylum officers in the interview and a process for removal if the officer determines that an alien does not have a credible fear of persecution. 8 U.S.C. § 1225(b)(1)(B).

At any point during this process, "[a]n alien applying for admission may, in the

discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States." 8 U.S.C. § 1225(a)(4). An implementing regulation further provides that "the alien's decision to withdraw his or her application for admission must be made voluntarily[.]" 8 C.F.R. § 235.4.

## B. Factual Synopsis

The Plaintiffs are six individuals, Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, Ingrid Doe, and Jose Doe (collectively, the "Individual Plaintiffs"), and organizational Plaintiff Al Otro Lado, Inc. ("Al Otro Lado").[3] They allege that CBP officials have "systematically violated U.S. law and binding international human rights law by refusing to allow individuals . . . who present themselves at POEs along the U.S.-Mexico border and assert their intention to apply for asylum or a fear of returning to their home countries—to seek protection in the United States." (Compl. ¶¶ 1–6, 37.) Plaintiffs allege that "[b]y refusing to follow the law, Defendants are engaged in an officially sanctioned policy or practice[.]" (*Id.* ¶ 5.)

Plaintiffs point to several reports from non-governmental organizations working in the U.S.-Mexico border region and Al Otro Lado's firsthand account, which describe instances in which CBP officials denied asylum seekers who presented themselves at POEs along the border access to the U.S. asylum process between December 2015 and June 2017. (*Id.* ¶¶ 37–39, 96–103.) Plaintiffs allege that CBP officials have carried out this practice through misrepresentations, threats and intimidation, verbal and physical abuse, and coercion. (*Id.* ¶¶ 84–103.) For example, CBP officials are alleged to turn away asylum seekers by falsely informing

---

[3] The Court granted each of the Individual Plaintiffs permission to proceed pseudonymously in this litigation due to their asserted fears for their physical safety. (ECF No. 138.) Accordingly, each of these names is a fictitious name used by an Individual Plaintiff solely for the purposes of this litigation.

them that the U.S. is no longer providing asylum, that President Trump signed a new law ending asylum, that a law providing asylum to Central Americans ended, that Mexican citizens are not eligible for asylum, and that the U.S. is no longer accepting mothers with children for asylum. (*Id.* ¶ 85.) CBP officials are alleged to intimidate asylum seekers by threatening to take away their children if they do not renounce a claim for asylum and to deport the asylum seekers. (*Id.* ¶ 87.) CBP officials are also alleged to force asylum seekers to sign forms in English, without translation, in which the asylum seekers recant their fears of persecution. (*Id.* ¶ 92.) CBP officials are further alleged to instruct the asylum seekers to recant their fears of persecution while being recorded on video. (*Id.* ¶ 92.) The Court briefly sets forth the Individual Plaintiffs' and Al Otro Lado's experiences of these alleged practices.

<u>The Individual Plaintiffs</u>

Plaintiffs Abigail Doe ("A.D."), Beatrice Doe ("B.D."), and Carolina Doe ("C.D.") are natives and citizens of Mexico, each of whom fled with their families to Tijuana, Mexico, where they attempted to access the U.S. asylum process. (Compl. ¶¶ 19–21.) Plaintiff A.D. sought to flee Mexico in May 2017 after her husband disappeared at the hands of a Mexican drug cartel. A cartel member threatened her with death. (*Id.* ¶¶ 19, 39–40.) She alleges that CBP officials at the San Ysidro POE coerced her into signing a form which falsely stated that she did not have a fear of returning to Mexico and withdrew her application for admission to the U.S., and forced her and her children to return to Mexico. (*Id.* ¶¶ 41–45.) Plaintiff B.D. sought to flee Mexico in May 2017 with her nephew and three children after the Zetas, a Mexican drug cartel in southern Mexico, targeted her nephew, and after she suffered severe domestic violence from her husband. (*Id.* ¶¶ 20, 46–47.) She presented herself at the Otay Mesa POE and twice at the San Ysidro POE, where CBP officials coerced her into signing a form in which she stated that she and her children have no fear of returning to Mexico and withdrew her application for admission. (*Id.* ¶¶ 48–54.) Plaintiff C.D. sought to flee Mexico in May 2017 with her three children after a drug

cartel kidnapped and dismembered her brother-in-law and subsequently targeted her family with death and severe harm. (*Id.* ¶¶ 21, 55–56.) She alleges that CBP officials coerced her into recanting her fear on video and into signing a form withdrawing her application for admission to the U.S. (*Id.* ¶¶ 57–60.)

Plaintiffs Dinora Doe ("D.D."), Ingrid Doe ("I.D."), and Jose Doe ("J.D.") are natives and citizens of Honduras. (*Id.* ¶¶ 22–24.) Plaintiff D.D. alleges that MS-13 gang members threatened to kill her and her 17-year old daughter if they did not leave their home, and subsequently repeatedly raped her and her daughter over a three-day period. (*Id* ¶¶ 22, 61–62.) D.D and her daughter fled to Mexico where MS-13 gang members threatened them again. (*Id.* ¶ 63.) On three occasions in August 2016, D.D. and her daughter sought asylum in the United States at the Otay Mesa POE, but CBP officials told her that "there was no asylum in the United States," including specifically "for Central Americans," and that she "would be handed over to Mexican authorities and deported to Honduras." (*Id.* ¶¶ 64–69.) Plaintiff I.D. alleges that 18th Street gang members in Honduras murdered her mother and three siblings and that the gang threatened her with death. (*Id.* ¶¶ 23, 71.) She also alleges that her partner in Honduras severely abused her and her three children for several years, and regularly raped her, including in front of her children. (*Id.* ¶¶ 23, 72.) In June 2017, I.D. and her children fled to Tijuana and sought asylum at the Otay Mesa and the San Ysidro POEs, where CBP officers told them that they could not seek asylum in the U.S. (*Id.* ¶¶ 73–77.) Plaintiff J.D. alleges that 18th Street gang members murdered several of his family members in Honduras. He further alleges that gang members attacked him and threatened to kidnap and harm his two daughters. (*Id.* ¶¶ 24, 78–79.) J.D. fled Honduras in June 2017 and sought asylum at the Laredo, Texas POE, but CBP officers told him he could not get asylum in the United States. (*Id.* ¶¶ 80–82.)

At the time the Complaint was filed, the Individual Plaintiffs alleged that they "would like to present themselves again to seek asylum, but based on their experience

and the experience of others with CBP's practice at POEs, [they] understand that they would likely be turned away again[.]" (*Id.* ¶¶ 44, 53, 59, 68, 76, 81.) They also allege that they are not alone. Rather, CBP officials are alleged to have a "prevalent and persistent" illegal practice since summer 2016 of denying other asylum seekers who present themselves at POEs along the U.S.-Mexico border access to the U.S. asylum system. Accordingly, the Individual Plaintiffs seek to represent a class of individuals with similar claims. (*Id.* ¶¶ 131–138 (class allegations).)

<u>Al Otro Lado</u>

Al Otro Lado is a non-profit California legal services organization established in 2014, which provides services to indigent deportees, migrants, refugees, and their families. (Compl. ¶ 12; Decl. of Erika Pinheiro, ECF No. 90–1 ("Pinheiro Decl.") ¶ 2.) Al Otro Lado's mission is to coordinate and to provide screening and legal representation for individuals in asylum and other immigration proceedings, seek redress for civil rights violations, and provide assistance with other legal and social services. (Compl. ¶ 12; Pinheiro Decl. ¶ 2.) Since December 2015, its representatives have accompanied asylum seekers to the San Ysidro POE and witnessed the alleged conduct of CBP officials. (Compl. ¶ 101.) In response to the alleged practices of CBP officials, Al Otro Lado has diverted significant time and resources from its L.A. operations and several of its non-refugee programs to send representatives to Tijuana. (*Id.* ¶¶ 14, 16–17; Pinheiro Decl. ¶¶ 4, 6–7.) Al Otro Lado has altered its previous "large-scale, mass-advisal legal clinics" in Tijuana that provided a general overview on asylum laws and procedures to provide individualized assistance and direct representation of asylum seekers, which has required Al Otro Lado to recruit and train more attorneys. (Compl. ¶¶ 13–14; Pinheiro Decl. ¶¶ 3–4.) Al Otro Lado expends significant time and resources to provide individual screenings and in-depth trainings to educate asylum seekers about CBP's conduct and challenge the alleged practices. (*Id.* ¶ 14; Pinheiro Decl. ¶ 4.)

### C. Relevant Procedural Background

Plaintiffs filed the putative class action Complaint in the Central District of California on July 12, 2017. (ECF No. 1.) The Complaint presses three claims against the Defendants related to the INA provisions. Plaintiffs allege that (1) Defendants have violated various provisions of the INA that together constitute a "right to seek asylum under the [INA]," (Compl. ¶¶ 139–150); (2) the INA statutory violations also violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (Compl. ¶¶ 151–164) (asserting claims under Sections 706(1) and 706(2) of the APA); and (3) Defendants have violated Plaintiffs' Fifth Amendment procedural due process rights based on the alleged failure to comply with the INA's statutory protections (*id.* ¶¶ 165–176). Plaintiffs also assert claims pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, for Defendants' alleged "violation of the *non-refoulement* doctrine," a doctrine which Plaintiffs contend is a "specific, universal, and obligatory norm," "which has also achieved the status of a *jus cogens* norm." (Compl. ¶¶ 177–185). Plaintiffs seek declaratory and injunctive relief for their claims. (*Id.* at 52–53.)

## II. LEGAL STANDARDS

### A. Rule 12(b)(1) and Federal Court Jurisdiction

Pursuant to Rule 12(b)(1), a party may move to dismiss based on the court's lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A defendant may challenge the court's subject-matter jurisdiction in several ways, two of which are raised by Defendants' motion to dismiss: mootness and sovereign immunity. When a defendant challenges the Article III standing of a plaintiff or the related issue of mootness, Rule 12(b)(1) is the appropriate standard of review because it is the court's subject-matter jurisdiction which is challenged. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Mootness . . . pertain[s] to a federal court's subject-matter jurisdiction under Article III, [so it is] properly raised in a motion to dismiss under [Rule] 12(b)(1)."). A Rule 12(b)(1) motion is also "a proper vehicle for invoking sovereign immunity from suit." *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir.

2015).  When the United States is sued or a suit implicates its sovereign immunity, a waiver of sovereign immunity is deemed a prerequisite for jurisdiction.  *FDIC v. Meyer*, 510 U.S 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Jachetta v. United States*, 653 F.3d 898, 903 (9th Cir. 2011) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.") (quoting *United States v. Mitchell,* 463 U.S. 206, 212 (1983)).  When sovereign immunity is invoked as the basis for the absence of subject-matter jurisdiction, "[a]s the party asserting a claim against the United States, [the plaintiff] has the burden of 'demonstrating an unequivocal waiver of immunity.'"  *United States v. Park Place Associates, Ltd*., 563 F.3d 907, 924 (9th Cir. 2009) (quoting *Cunningham v. United States*, 786 F.2d 1445, 1446 (9th Cir. 1986)).

### B.    Rule 12(b)(6) and the Sufficiency of the Complaint

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A defendant may move to dismiss a complaint on the ground that its allegations fail to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion tests the sufficiency of a complaint's allegations.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  To survive such a motion, a plaintiff is required to set forth "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Factual allegations must be enough to raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 556.  In assessing the sufficiency of a complaint, a court

accepts as true the complaint's factual allegations and construes them in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). Yet, the court need not accept as true legal conclusions pled in the guise of factual allegations. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994). A pleading is insufficient if it offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," without adequate factual allegations. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 676. Generally, a court assesses a complaint's sufficiency based on its allegations, but a court may consider materials properly submitted as part of the complaint to resolve a Rule 12(b)(6) motion to dismiss. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

## III. DISCUSSION

### A. Mootness

In the days following the filing of the Complaint, Defendants agreed to process the Individual Plaintiffs for inspection and to permit them to access the asylum process. The agreement provides that: "[t]he government agrees to allow the class representatives and their children to present themselves at the San Ysidro and Laredo ports of entry and access the credible fear, withholding-only, or asylum process as appropriate under the [INA]." (ECF No. 67-3 Ex. B.) Three Individual Plaintiffs were processed at the San Ysidro POE on July 15, 2017 and another was processed on July 18, 2017. (ECF No. 135-2 Ex. A ¶ 4.) A fifth Individual Plaintiff was processed at the Laredo, Texas POE on July 18, 2017. (ECF No. 135-3 Ex. B. ¶ 4.) According to the Defendants, these five Individual Plaintiffs have been either referred to the asylum process or placed in removal proceedings. (ECF No. 135-1 at 1, 3.)

The parties have different views about what this means for the Court's jurisdiction. Defendants contend that the Individual Plaintiffs' Section 706(1) claims are now moot and so the Court should dismiss the entire case. (*Id.* at 1, 4–9.) Defendants assert that the Individual Plaintiffs have received "all the relief the Court could have granted" on their Section 706(1) claims: "the verifiable opportunity to be

17cv2366

processed as applicants for admission" at a POE along the U.S.-Mexico border consistent with the INA's provisions. (*Id.* at 3, 6.) Plaintiffs argue that the Section 706(1) claims are not moot because (1) Plaintiff Beatrice Doe has not been processed for admission and therefore has not "actually received" the relief and (2) the Individual Plaintiffs who have been processed for admission only received "partial relief." (ECF No. 143 at 11.) Plaintiffs further argue that all Individual Plaintiffs who "crossed the U.S.-Mexico border" have a "continuing interest in pursuing a Rule 23 class action" for the conduct challenged in this case. (*Id.* at 11, 14.)

Article III limits the jurisdiction of the federal courts to "cases" or "controversies." U.S. Const. art. III, § 2; *see also Allen v. Wright*, 468 U.S. 737, 750 (1984). Because of this Article III limitation, a plaintiff must show the "irreducible constitutional minimum" of standing to invoke the federal judicial power: (1) an "injury in fact," (2) fairly traceable to the challenged action of the defendant, (3) which is "likely" to be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 560–61. "This requirement ensures that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolution of which have direct consequences on the parties involved." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013). Standing frames mootness. Mootness is "the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness)." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). To avoid mootness, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (internal quotation marks and citation omitted). When a case becomes moot, a federal court must dismiss it for lack of jurisdiction. *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086–87 (9th Cir. 2011).

To resolve Defendants' mootness challenge, the Court first considers whether the Individual Plaintiffs' receipt of Section 706(1) relief could alone moot this case—

it does not—and, second, whether the Individual Plaintiffs' Section 706(1) claims asserted on behalf of a putative class warrant a mootness exception—they do.  In considering these issues, the Court keeps in mind that "[t]he party asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court to provide."  *In re Palmdale Hills Property*, 654 F.3d 868, 874 (9th Cir. 2011); *San Luis & Delta-Mendota Water Auth. v. United States DOI*, 870 F. Supp. 2d 943, 953 (E.D. Cal. 2012).

### 1.    This Case is Not Moot

Defendants' argument that this case is moot ignores organizational Plaintiff Al Otro Lado's presence in this case and the Individual Plaintiffs' other requests for relief.  "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Knox v. SIEU, Local 1000*, 567 U.S. 298, 307 (2012); *Johnson v. Rancho Santiago Cmty. College Dist.*, 623 F.3d 1011, 1018 (9th Cir. 2010) (internal quotations and citation omitted) (a case is moot when there is no "present controversy as to which effective relief can be granted").  "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Knox*, 567 U.S. at 307–08 (quoting *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984)).  Setting aside whether the Individual Plaintiffs' Section 706(1) claims are moot, this case is not moot given that it remains possible for the Court to grant effectual relief to Al Otro Lado and the Individual Plaintiffs.

### a.    Al Otro Lado

Faced with Al Otro Lado's argument that it possesses Article III standing, Defendants assert that they do not "yet dispute[] Al Otro Lado's Article III standing." (ECF No. 145 at 8.)  Despite Defendants' assertion, the Court has an independent duty to assess whether Al Otro Lado satisfies Article III's "irreducible constitutional minimum" of standing.  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional]

doctrines.'" (quoting *Allen*, 468 U.S. at 750)). The Court readily concludes that Al Otro Lado has Article III standing.

An organizational plaintiff like Al Otro Lado may have Article III standing to sue in its own right. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). "An organization has 'direct standing to sue [when] it show[s] a drain on its resources from both a diversion of its resources and frustration of its mission.'" *Valle Del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (quoting *Fair Hous. Council of San Fernando Valley v. Roomate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012)). Of course, "[a]n organization cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that would not otherwise affect the organization[.]" *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). Al Otro Lado satisfies this test.

Al Otro Lado is a non-profit that provides services to indigent deportees, migrants, refugees, and their families in Los Angeles, California and Tijuana, Mexico. Its core mission is, *inter alia*, to coordinate and provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings. (Compl. ¶ 12.) As a result of CBP officers' conduct at POEs along the U.S.-Mexico border since 2016, Al Otro Lado alleges that it has diverted significant time and resources from its L.A. operations and its non-refugee programs to send representatives to Tijuana to provide individualized assistance and coordination of legal and social services, including individual screenings and in-depth trainings to educate asylum seekers about CBP's alleged conduct of denying the most basic form of access to the asylum process. (*Id.* ¶¶ 14, 16–18.) These alleged harms are sufficient for Article III standing. *See Valle Del Sol Inc.*, 732 F.3d at 1018 (organization had standing because its diverted resources from its core mission to address constituents' concerns); *Smith v. Pac. Props & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (finding standing where an organization alleged that "[it] has had . . . to divert its scarce resources from other efforts . . . to benefit the disabled

community in other ways"). Accordingly, Al Otro Lado has an interest in this case that is not mooted by Defendants' post-Complaint conduct.[4]

### b. The Individual Plaintiffs' Other Claims for Relief

For the Individual Plaintiffs, Defendants' mootness challenge is narrow. It concerns only one form of relief in the Complaint on only one of the Plaintiffs' four claims. (*See* Compl. ¶¶ 152–153.) But the Individual Plaintiffs request other forms of relief, including: (1) "relief prohibiting Defendants" and their agents "from engaging in the unlawful policies, practices, acts and/or omissions . . . at POEs along the U.S.-Mexico border" and (2) "relief requiring Defendants to implement procedures to provide effective oversight and accountability in the inspection and processing of individuals who present themselves at POEs along the U.S.-Mexico border and indicate an intention to apply for asylum or assert a fear of persecution in their home countries." (*Id.* at 52–53.) The Complaint also requests a declaratory judgment that "Defendants' policies, practices, acts and/or omissions . . . violate" the INA, the APA, the Due Process Clause of the Fifth Amendment, and/or the "duty of *non-refoulement* under international law." (*Id.* at 52.) Defendants make no meaningful attempt to argue that their agreement to process the Individual Plaintiffs moots these requests for injunctive and declaratory relief.

Rather, Defendants' mootness argument treats these requests as irrelevant on the ground that Plaintiffs' other claims fail because the Plaintiffs do not plausibly allege that Defendants have a policy or practice. But a "party's prospects of success on a claim are not pertinent to the mootness inquiry." *Looks Filmproduktionen GmbH v. CIA*, 199 F. Supp. 3d 153, 179 (D.D.C. 2016) (internal quotations and alterations

---

[4] "The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993). However, because the parties dispute the ability of the Individual Plaintiffs to seek Section 706(1) relief for the putative class in this case, the Court does not limit its mootness analysis to organizational Plaintiff Al Otro Lado.

omitted) (quoting *Schnitzler v. United States*, 761 F.3d 33, 39 (D.C. Cir. 2014)); *see also Aracely, R. v. Nielsen*, No. 17-cv-1976-RC, —F. Supp. 3d—, 2018 WL 3243977, at *15 (D.D.C. July 3, 2018); *Ramirez v. ICE*, 310 F. Supp. 3d 7, 18 (D.D.C. 2018). Defendants' argument that Plaintiffs' other claims are moot because there is no policy or practice "confuses mootness with the merits." *Chafin v. Chafin*, 568 U.S. 165, 166 (2013). "[J]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action[.]" *Bell v. Hood*, 327 U.S. 678, 682 (1946); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction." (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998))); *Eubanks v. McCotter*, 802 F.2d 790, 793 (5th Cir. 1986) ("If federal jurisdiction turned on the success of a plaintiff's federal cause of action, no such case could ever be dismissed on the merits.").

Even on the merits, Defendants' argument cannot show that this entire case is moot because it conflates whether the Complaint plausibly shows the existence of a policy with whether the Complaint plausibly shows the existence of a practice. As the Court later explains, although the Complaint fails to show the existence of a policy, it plausibly shows the existence of a pattern or practice of denials faced by some asylum seekers. Accordingly, the Court cannot find that this entire case is moot by virtue of Defendants' agreement to process the Individual Plaintiffs.

## 2. The Section 706(1) Claims Are Not Moot

Although this *case* is not moot, Defendants' narrow mootness argument squarely raises the issue whether the Section 706(1) *claims* for relief asserted in the Complaint are. "A lawsuit—*or an individual claim*—becomes moot when a plaintiff actually receives all of the relief he or she could receive on the claim through further litigation." *Chen v. Allstate Ins. Co.*, 819 F.3d 1136, 1144 (9th Cir. 2016) (emphasis added). The Court must consider whether the agreement moots all the Section 706(1)

claims asserted in this case and concludes that it does not.  Al Otro Lado asserts APA claims, including a Section 706(1) claim, yet the agreement does not purport to provide any relief to Al Otro Lado.  The Individual Plaintiffs also assert Section 706(1) claims on behalf of a putative class—a point Defendants' motion to dismiss elides.  *See Pitts*, 653 F.3d at 1087 ("The distinction between issues that have become moot and parties whose interest in the issue may have become moot is especially visible in the context of class actions.").

### a.    Al Otro Lado's APA Claims

Defendants' Section 706(1) mootness challenge contains a key omission: Plaintiff Al Otro Lado's Section 706(1) claim.  (Compl. ¶¶ 151, 159–164.) Defendants omit discussion of any of Al Otro Lado's APA claims by assuming the merits of their separate argument that Al Otro Lado fails the zone of interests test applicable to claims asserted pursuant to the APA.  (ECF No. 135 at 10–11.)  The Court does not find that argument to be meritorious.[5]

"In addition to [Article III's standing] requirements, a plaintiff bringing suit under the [APA] for a violation of [a statute] must show that his alleged injury falls within the 'zone of interests' that [the statute] was designed to protect."  *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001).  "[T]he breadth of the zone of interests varies according to the provisions of law at issue[.]"  *Bennett v. Spear*, 520 U.S. 154, 163 (1997).  Courts "presume that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'"  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129

---

[5] The Court recognizes that the zone of interests test does not itself implicate the Court's subject matter jurisdiction, but rather whether a particular plaintiff has a statutory cause of action.  *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1155 (9th Cir. 2015) (citing *Lexmark Int'l, Inc. v. Static Control Components*, 572 U.S. 118, 127–28 (2014)).  Because Defendants' mootness argument concerns the Plaintiffs' Section 706(1) claims, however, the Court addresses whether Al Otro Lado may assert any APA causes of action in this case as part of its mootness analysis.

(2014) (quoting *Allen*, 468 U.S. at 751). The APA's "'zone of interests' test is 'not meant to be especially demanding,' and a court should deny standing only 'if the plaintiff's interests are *so marginally related to or inconsistent with* the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1177 (9th Cir. 2004) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)) (emphasis added). The test does not require a specific congressional purpose to benefit the would-be plaintiff. *Clarke*, 479 U.S. at 399–400. And the "benefit of any doubt goes to the plaintiff." *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

Defendants first argue that Al Otro Lado fails the zone of interests test because it does not cite any INA provision permitting it to sue. (ECF No. 135 at 10–11.) This argument is unavailing. "The APA confers a general cause of action upon persons 'adversely affected or aggrieved by action within the meaning of the relevant statute,' but withdraws that cause of action to the extent the relevant statute 'preclude[s] judicial review." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984); see *also Reeb v. Thomas*, 636 F.3d 1224, 1226 (9th Cir. 2011) (same); *Defenders of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1098 (D. Ariz. 2009) (same). Defendants do not purport to argue that the INA itself precludes judicial review in this case.

Defendants' second argument is that Al Otro Lado "ha[s] failed to plead sufficient facts to demonstrate that [it] has statutory standing as a legal advocacy group to pursue a claim under 8 U.S.C. §§1158 or 1225." (ECF No. 145 at 8.) Defendants ground this argument in an opinion decided by a single Supreme Court justice, which granted the government's application to stay a district court's injunction order entered in favor of several legal organizations pending appeal. *See INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301 (1993) (O'Connor, J.) [hereinafter "*L.A.P.*"]. *L.A.P.* concerned the Immigration Reform and Control Act of 1986 ("IRCA"), a statute which created a limited amnesty

period for certain undocumented aliens to seek legalization. Considering whether to grant a stay, Justice O'Connor "predict[ed]" that "this Court would grant certiorari and conclude that the respondents"—organizations "that provide legal help to immigrants"—"are outside the zone of interests IRCA seeks to protect, and that therefore they had no standing to seek the order entered by the District Court." *Id.* at 1302, 1305. She reasoned that although IRCA provided a role for legal help organizations during the amnesty period in the role of "so-called 'qualified designated entities,'" there was "no indication" that IRCA was addressed to the interests of the organizations, but rather it was "clearly meant to protect" the interests of undocumented aliens. *Id.* at 1305 (citing 8 U.S.C. § 1255(a)(2)). Defendants argue that, like the respondent organizations who Justice O'Connor predicted the Supreme Court would find as outside IRCA's zone of interests, Al Otro Lado falls outside the INA's zone of interests. The Court rejects this argument.

As an initial matter, the precedential value of Justice O'Connor stay opinion is questionable. Justice O'Connor recognized that her task in deciding whether to grant a stay was a "difficult and speculative inquiry" that required her "to predict whether four Justices would vote to grant certiorari and whether the Court would then set the order aside." *L.A.P.*, 510 U.S. at 1304. In relevant part, her zone of interests answer to that concededly speculative inquiry did not prove true. The Court granted certiorari and, instead of adopting Justice O'Connor's merits reasoning, it vacated the judgment below and remanded to the Ninth Circuit for further consideration in light of, *inter alia, Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993). *See INS v. L.A.P.*, 510 U.S. 1007 (1993). Given the posture of Justice O'Connor's opinion and the Supreme Court's ultimate disposition, this Court does not view *L.A.P.* as binding. *See Lozano v. City of Hazleton*, 496 F. Supp. 2d 477, 502 & n.2 (M.D. Pa. 2007) ("Because of the nature of [*L.A.P.*]—a speculative opinion by one Supreme Court Justice sitting as a Circuit Court Justice—and the fact the decision served only to delay implementation of an order pending appeal, we do not consider that opinion as

binding, but rather as persuasive authority."), *aff'd in part and rev'd in part on other grounds by*, 620 F.3d 170 (3d Cir. 2010), *vacated and remanded* on *other grounds by*, 563 U.S. 1030 (2011).

Setting aside its questionable precedential value, the Court does not find *L.A.P.*'s reasoning helpful because *L.A.P.* concerned IRCA's zone of interests—not the INA. This distinction is important. Justice O'Connor's analysis cannot be isolated from the cases her opinion discussed, which narrowly interpreted standing to sue under IRCA even as applied to undocumented aliens. For example, Justice O'Connor began her opinion with a discussion of *Reno*, decided some five months earlier and which the INS argued required vacating the district court's order. *L.A.P.*, 510 U.S. at 1303. In *Reno*, the Supreme Court held that "the only people who could ask for injunctive or declaratory relief under IRCA" from an alleged administrative INS "front-desking policy" of discouraging legalization applications were those to whom that policy was directly applied. *L.A.P.*, 510 U.S. at 1303 (quoting *Reno*, 509 U.S. at 61–67). *Reno*'s view of standing was adopted in *Ayuda, Inc. v. Reno*, 7 F.3d 246 (D.C. Cir. 1993), a decision with which Justice O'Connor viewed the decisions of the district court and Ninth Circuit in *L.A.P.* as in "conflict." *L.A.P.*, 510 U.S. at 1305. In *Ayuda, Inc.*, the D.C. Circuit held that "in light of the [*Reno*] analysis, it is now quite clear that the organizational plaintiffs did not have standing to raise their claims challenging INS policies or regulations that interpreted aliens' rights to legalization under IRCA." *Ayuda, Inc.*, 7 F.3d at 251 (citing *Reno*, 509 U.S. at 61) (vacating district court orders for lack of jurisdiction).[6] Placed in context, Justice

---

[6] The INS's petition for a writ of certiorari in *L.A.P.* is also illuminative. The INS argued that the Ninth Circuit's treatment of the organizational standing question was "in substantial tension" with the D.C. Circuit's earlier opinion in *Ayuda, Inc.*. *L.A.P.*, Petition for Writ of Certiorari, 510 U.S. 1007 (1993) (No. 93-73), 1993 WL 13076006, at *8 (citing *Ayuda, Inc. v. Thornburgh*, 880 F.3d 1325, 1339 (D.C. Cir. 1989), *vacated on other grounds by*, 498 U.S. 1117 (1991)). The earlier *Ayuda* opinion determined that "qualified designated entities" ("QDEs") established by

– 19 –

O'Connor's view of IRCA's zone of interests says much about the restrictive judicial treatment of challenges concerning IRCA and little about the INA's zone of interests.

Courts have not interpreted the INA's zone of interests as narrowly as IRCA's and non-alien plaintiffs, including organizational plaintiffs, have been permitted to assert claims based on the INA.[7] *See Hawaii v. Trump*, 859 F.3d 741, 766 (9th Cir. 2017) (finding that plaintiff states' "efforts to enroll students and hire faculty members who are nationals from six countries" affected by president order fell within zone of interests), *vacated on other grounds by Trump v. Hawaii*, 138 S. Ct. 377 (2017); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1067–68 (W.D. Wash. 2017) (relying on *Hawaii* to conclude that two organizational plaintiffs fell within the zone of interests of the INA and the Refugee Act of 1980 because of their "core mission" involved "[m]aking provisions for the resettlement and absorption of refugees"); *V. Real Estate Group, Inc. v. United States Citizenship & Immigration Servs.*, 85 F.

_____

IRCA fell outside IRCA's zone of interests because "Congress, at most, intended the QDEs to act as intermediaries, not litigating ombudsmen. And even if the QDEs are thought of as agents for the aliens, we doubt Congress intended the agents to have broader rights to seek judicial review than do the principals." *Ayuda, Inc.*, 880 F.3d at 1339.

[7] Other district courts have found that organizational plaintiffs like Al Otro Lado can fall within the INA's zone of interests when it has members or clients targeted by the government action. *See Vidal v. Nielsen*, 291 F. Supp. 3d 260, 269 n.3 (E.D.N.Y. 2018) (determining that organizational plaintiff met zone of interests test to challenge DACA rescission because it had members, clients, and employees who received DACA); *see also NAACP v. Trump*, 298 F. Supp. 3d 209, 235 (D.D.C. 2018) (determining that organizational plaintiffs fells within INA's zone of interests because "each has members who are DACA beneficiaries and whose interests consequently fall within the zone of interests regulated by the INA"). Although Al Otro Lado has not expressly invoked representative standing as the basis for its Article III standing in this case, the asylum seekers Al Otro Lado serves and represents are ostensibly its clients. *Vidal* and *NAACP* provide a persuasive basis for the conclusion that Al Otro Lado would likely also fall within the INA's zone of interests on this basis as well.

Supp. 3d 1200, 1209 (D. Nev. 2015) (company could sue for USCIS's revocation of an EB-5 foreign investor visa because its "interest . . is more than just marginally related to the statutes' purpose since the company was actually founded with the intent that its model would satisfy the requirements of the EB-5 program and bring Chinese investors to the country.").

The specific INA provisions in this case evince a congressional intent that aliens—including those arriving at POEs and those facing expedited removal—have "an opportunity . . . to have the merits of his or her claim promptly assessed by officers." *Castro v. United States Dep't of Homeland Sec.*, 163 F. Supp. 3d 157, 161 (E.D. Pa. 2016) (quoting H.R. Rep. No. 104-828, at 209–10 (1996) (Conf. Rep.)); *see also* 8 U.S.C. § 1158; 8 U.S.C. § 1225. Al Otro Lado alleges that part of its mission is to serve and represent asylum and refugee seekers. (Compl. ¶ 12.) In furtherance of this mission, Al Otro Lado established and operates its Refugee Program in Tijuana, Mexico, which services individuals who wish to seek asylum in the United States. (*Id*. ¶ 13.) The alleged conduct of CBP officers has caused Al Otro Lado to expend significant time and resources to assist asylum seekers in responding to CBP officials' alleged conduct of foreclosing even the most basic aspect of the INA's asylum procedures—the opportunity to be processed in the first place. (*Id*. ¶¶ 12–15.) This Court finds Al Otro Lado's interests in this case "are related to the basic purposes of the INA['s]" goal of permitting aliens to apply for asylum in the United States at POEs and not so marginally related that its interests fall outside the INA's zone of interests. *Hawaii*, 859 F.3d at 766; *Doe v. Trump*, 288 F. Supp. 3d at 1067–68. Accordingly, the Court rejects Defendants' challenge to Al Otro Lado's INA-based claims.

### b. The Individual Plaintiffs' Section 706(1) Claims

Five of the six Individual Plaintiffs have received the requested relief from Defendants' agreement to process these "class representatives and their children" at POEs. Thus, their Section 706(1) claims are moot unless an exception applies.

Plaintiffs contend, however, that the Section 706(1) claim of Beatrice Doe is not moot because she has not "actually received" the relief provided in the agreement. (ECF No. 143 at 11.) The Court does not share Plaintiffs' view.

Plaintiffs' argument relies solely on case law holding that a rejected or unaccepted Rule 68 offer of judgment does not moot a plaintiff's individual claims even when that offer would provide full relief. *See Chen*, 819 F.3d at 1136; *Diaz v. First. Am. Home Buyers Prot. Corp.*, 732 F.3d 948, 954–55 (9th Cir. 2013) ("[A]n unaccepted offer that would . . . fully satisf[y] a plaintiff's claim does not render that claim moot."). This is true of an unaccepted settlement offer as well. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016).

Defendants' agreement, however, is not a Rule 68 offer of judgment or a settlement offer and thus *Chen* and *Diaz* are not directly applicable. Even if the reasoning of these cases extends to less formal offers, what is before the Court is not an *offer* which Beatrice Doe has yet to accept or reject, but rather an *agreement*. The agreement permits her to be processed by CBP officials at a POE in accordance with the INA and has no expiration. The evidence shows that five of the six Individual Plaintiffs were processed pursuant to the agreement and there is no basis for the Court to find that Beatrice Doe will be treated any differently. Defendants readily concede that Beatrice Doe "can return to a port of entry to be processed as an arriving alien at any time, should she choose to do so" pursuant to the agreement. (ECF No. 135-1 at 3.) And they "fully expect that 'she would be processed as an applicant for admission[.]'" (ECF No. 145 at 2 (quoting ECF No. 135-2 Ex. A ¶ 4).). Beatrice Doe is in no different a position than she would be with a court order compelling agency action. Accordingly, her individual Section 706(1) claim, like those of the other Individual Plaintiffs, is moot unless an exception applies.

Even when a claim becomes moot due to subsequent events after the commencement of a lawsuit, "the flexible character of the Art[icle] III mootness doctrine" may warrant the exercise of jurisdiction over the claim. *United States*

*Parole Comm'n v. Geraghty*, 445 U.S. 388, 401 (1980); *see also San Luis & Delta-Mendota Water Auth.*, 870 F. Supp. 2d at 958 ("Even if a case is technically moot, it may nevertheless be judiciable if one of three exceptions to the mootness doctrine applies," including "'for wrongs capable of repetition yet evading review.'") (quoting *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964–66 (9th Cir. 2007)). Under the "capable of repetition, yet evading review" exception, a claim is justiciable notwithstanding mootness if: (1) there is "a 'reasonable expectation' that the same party will confront the same controversy again" and (2) if the underlying dispute is "inherently limited in duration such that it is likely always to become moot before federal court litigation is completed." *W. Coast Seafood Processors Ass'n v. NRDC*, 643 F.3d 701, 704 (9th Cir. 2011) (quoting *Feldman v. Bomar*, 518 F.3d 637, 644 (9th Cir. 2008)), *id.* at 705 (quoting *Ctr. for Biological Diversity*, 511 F.3d at 965 (internal quotations omitted)). The parties dispute whether this exception applies.

Defendants argue that it does not. (ECF No. 135-1 at 8.) In Defendants' view, "[t]here is no reason to anticipate that the Doe Plaintiffs . . . will return to a [POE] as applicants for admission in the future, or that, upon doing so, they will not be properly processed, especially considering the low percentage rate of improper processing[.]" (*Id.*) It is unclear what basis there is for Defendants' assertion. Unless the Individual Plaintiffs are granted asylum, there is nothing in the Complaint that suggests that they will not attempt to seek asylum again and, if so, that CBP officers will not turn them away from a POE. Each Individual Plaintiff has alleged that he or she does not wish to return to his or her home country because of a fear of violence. Each Individual Plaintiff has also alleged being turned away by CBP officials on multiple occasions and a practice of such conduct. Even if Defendants are correct that the Complaint fails to show a blanket policy of turning away asylum seekers at POEs, "the 'capable of repetition yet evading review' exception is not so narrowly circumscribed." *San Luis & Delta-Mendota Water Auth.*, 870 F. Supp. 2d at 960. Based on the limited nature of the Court's review of the pleadings at this stage, the Court cannot say that

– 23 –

the Individual Plaintiffs' allegations do not show a reasonable expectation that they would again be subjected to the conduct they have alleged experiencing.

Furthermore, contrary to Defendants' argument (ECF No. 135-1 at 9), the putative class action nature of this case does change the Court's analysis regarding the effect of their agreement.[8]  Courts are sensitive to assertions of mootness in the class action context.  *See Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991); *Sosna v. Iowa*, 419 U.S. 393, 401 (1975); *Gerstein v. Pugh*, 420 U.S. 103, 110 (1975). The "capable of repetition, yet evading review" mootness exception has a particular application in the class action context when the defendant's actions after the filing of the complaint moot the proposed class representative's individual claims.  Courts are sensitive to a defendant's tactics of "picking off lead plaintiffs" so as "to avoid a class action," even when a proposed class representative's "claims are not 'inherently transitory as a result of being time sensitive." *Pitts*, 653 F.3d at 1091 (quoting *Weiss v. Regal Collections*, 385 F.3d 337, 347 (3d Cir. 2004)).  "The end result is the same: a class transitory by its very nature and one transitory by virtue of the defendant's litigation strategy share the reality that both claims would evade review." *Id*.  Even if the named plaintiff in a putative class action receives "complete relief on [his or her] individual claims . . . before class certification, fully satisfying those individual claims, [the plaintiff] still would be entitled to seek certification." *Chen*, 819 F.3d at 1142.

Defendants acknowledge *Pitts* and *Chen*, yet they contend that unlike the defendants in those cases, they have not sought to "buy-off" the Plaintiffs in this case to avoid a class action.  (ECF No. 135-1 at 9; ECF No. 145 at 4.)  However, Plaintiffs

---

[8] Central to Defendants' argument is the notion that "[t]he styling of the Complaint as a putative class action does not change this analysis."  (ECF No. 135-1 at 9)  Contrary to this characterization of the Complaint, the Complaint contains class action allegations and the conduct at issue is alleged to affect the putative class. (Compl. ¶¶ 131–138 (the "class action allegations")).)  Defendants have not moved to strike these allegations; they remain an integral feature of the Complaint in this case.

seek only declaratory and injunctive relief. The fact that Defendants have provided one form of the injunctive relief solely to the "class representatives" (ECF No. 67-3 Ex. B) after the filing of this case is no less a potential "buy-off" strategy that effectively renders transitory the claims they seek to assert on behalf of a putative class. The government could simply render moot any class action Section 706(1) claims concerning the conduct at issue in this case by affording relief to any individual plaintiffs who seek to challenge such conduct as soon as the case is filed and long before a court could reasonably be expected to rule on a motion for class certification. *See Haro v. Sebelius*, 747 F.3d 1099, 1110 (9th Cir. 2014) (determining that the expiration of the plaintiff's claim one month after filing the lawsuit did not moot the class's claim for injunctive relief because "the district court could not have been expected to rule on a motion for class certification in that period").

Defendants possess the authority to direct CBP officials to process aliens who present themselves at POEs along the U.S.-Mexico border in accordance with the requirements of the INA and implementing regulations. Defendants' agreement to exercise that authority occurred a mere two days after the filing of the Complaint and only when confronted with the possibility that Plaintiffs would file an *ex parte* request for a temporary restraining order that all Individual Plaintiffs be processed at a POE. (ECF No. 67-1 ¶¶ 2–7.) Under these circumstances, the Court is convinced that the Section 706(1) claims the Individual Plaintiffs assert on behalf of themselves and the putative class fall within an exception from mootness.

### B. Sovereign Immunity

Defendants' motion to dismiss also raises the issue of sovereign immunity. (ECF No. 135-1 at 21; ECF No. 145 at 1.) "Sovereign immunity is a threshold question that is sometimes described as 'jurisdictional.'" *Forester v. Chertoff*, 500 F.3d 920, 925 n.5 (9th Cir. 2007) (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94 (1990)); *see also Reed v. Dep't of Homeland Sec.*, No. CV 16-7170 CJC (JC), 2017 WL 2701940, at *3 (C.D. Cal. May 25, 2017) ("Sovereign immunity is a

threshold issue [that] goes to the court's subject matter jurisdiction.") (quoting *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1026 (9th Cir. 2010) (en banc), *cert. denied*, 564 U.S. 1037 (2011)).

Plaintiffs sue the named Defendants in their official capacity as United States officers, each of whom is alleged to oversee the enforcement and administration of U.S. immigration laws, including oversight of CBP. (Compl. 1–2 (caption); *id.* ¶¶ 25–27.). "An action against an officer, operating in his or her official capacity as a United States agent, operates as a claim against the United States." *Ministerio Roca Solida v. McKelvey*, 820 F.3d 1090, 1095 (9th Cir. 2016) (citing *Farmer v. Perrill*, 275 F.3d 958, 963 (10th Cir. 2001)); *see also Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). Plaintiffs must therefore contend with the sovereign immunity of the United States. *See Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985) ("It has long been held that the bar of sovereign immunity cannot be avoided by naming officers and employees of the United States as defendants."); *Allen v. United States,* 871 F. Supp. 2d 982, 988 (N.D. Cal. 2012) (the issue of sovereign immunity "includes suits against federal officers in their official capacities to compel them to act") (citing *Dugan v. Rank*, 372 U.S. 609, 620 (1963)).

"The United States, as a sovereign, is immune from suit *unless* it has waived its immunity." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007) (emphasis added) (citing *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999)); *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). "When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction." *United States v. Mottaz*, 476 U.S 834, 841 (1986) (citing *United States v. Sherwood*, 312 U.S. 584, 586 (1941)); *see also Cent. Sierra Envtl. Res. Ctr. v. Stanislaus Nat'l Forest*, 304 F. Supp. 3d 916, 932–33 (E.D. Cal. 2018) (same) (quoting *Balser v. Dep't of Justice, Office of U.S. Tr.*, 327 F.3d 903, 907 (9th Cir. 2003)). Thus, consistent with sovereign immunity and any waiver of it, a court may only exercise jurisdiction over claims

against the United States within the parameters set by Congress.

### 1. The APA Supplies the Relevant Waiver

The APA "contains a specific waiver of the United States' sovereign immunity." *Matsuo v. United States*, 416 F. Supp. 2d 982, 988 (D. Haw. 2006) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 891–92 (1988)). As a general matter, the APA permits suits against the United States by "[a] person suffering legal wrong because of the agency action, or adversely affected or aggrieved by agency action within the meaning of relevant statute." 5 U.S.C. § 702. This portion of Section 702 constitutes the APA's judicial review provision and dates to the APA's original enactment in 1946. *See* Administrative Procedure Act, Pub. L. No. 79-404 § 10(a), 60 Stat. 237, 243 (1946) (codified as amended at 5 U.S.C. § 702); *see also Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1168 (9th Cir. 2017). Claims asserted pursuant to the APA must satisfy Section 702's "agency action" requirement and the further requirement under Section 704 of the APA that a plaintiff must identify a "final agency action" to obtain judicial review. 5 U.S.C. § 704.

Apart from Section 702's judicial review provision for APA claims is the APA's waiver of sovereign immunity, also located in Section 702. The waiver provides that: "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity . . . shall not be dismissed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702. This waiver of sovereign immunity was enacted as a 1976 amendment to the APA, which aimed "to clear up a morass of federal sovereign immunity jurisprudence" and "aimed to 'broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment.'" *Navajo Nation*, 876 F.3d at 1168 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 891–92 (1988)). Unlike Section 702's judicial review provision, which is textually limited to "agency action," Section 702's waiver of sovereign immunity contains no such textual

limitation. 5 U.S.C. § 702; *see also Navajo Nation*, 876 F.3d at 1171. Accordingly, as amended, the APA "waives sovereign immunity broadly for all causes of action that meet its terms" irrespective of whether the claims satisfy the APA's requirements for judicial review of an agency action. *Navajo Nation*, 876 F.3d at 1172; *see also The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989) (Section 702 is "an unqualified waiver of sovereign immunity in actions seeking nonmonetary relief").[9] Thus, a plaintiff need only seek nonmonetary relief against the government in order to avail himself of the APA's waiver of sovereign immunity. In this case, Plaintiffs invoke the APA's waiver and seek only non-monetary relief against Defendants, based on claims regarding the purported actions and failures to act of CBP officials and the named Defendants. (Compl. ¶ 10; *id.* at 52–53.) Accordingly, Plaintiffs' claims for relief fall squarely within the broad waiver of sovereign immunity reflected in Section 702.

Because the APA supplies the relevant waiver of the sovereign immunity in

_____

[9] There is Ninth Circuit precedent which suggests that the APA's sovereign immunity waiver is tethered to the APA's requirements for judicial review of APA causes of action. *See Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998) (determining that the APA's waiver of sovereign immunity contains several limitations," including Section 704's limitations to review of only "final agency action" and "agency action otherwise reviewable by statute"); *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998) (referring to Sections 702 and 704 to conclude that "the APA waives sovereign immunity for [a plaintiff's] claims only if three conditions are met: (1) its claims are not for money damages, (2) an adequate remedy for its claims is not available elsewhere and (3) its claims do not seek relief expressly or impliedly forbidden by another statute."). In the face of Ninth Circuit precedent that grafts the APA's review requirements onto Section 702's waiver, the *Navajo Nation* panel attempted to clarify that the APA's waiver exists independently of the APA's requirements for APA causes of action. *See Navajo Nation*, 876 F.3d at 1171; *id.* at 1172 (summing up conclusion as "the second sentence of § 702 waives sovereign immunity broadly for all causes of action that meet its terms, while § 704's 'final agency action' limitation applies only to APA claims"). This Court finds *Navajo Nation*'s reading of Section 702 persuasive and appropriate, and applies it in this case.

this case, the Court can easily reject Defendants' argument that "Congress has not waived sovereign immunity to create a private right of action for a *per se* 'pattern or practice' claim against federal law enforcement." (ECF No. 135-1 at 21; ECF No. 145 at 1.) Setting aside that the Complaint does not separately plead such a claim and that the Plaintiffs disavow bringing one (*see generally* Compl.; *see also* ECF No. 143 at 19 n.6), Defendants' argument fails under *Navajo Nation*. Because Plaintiffs' claims fall within the scope of Section 702's waiver, they do not need to identify a separate waiver of sovereign immunity for "pattern or practice" claims against the government. *See Navajo Nation*, 876 F.3d at 1172 ("§ 702 waives sovereign immunity broadly for all causes of action that meet its terms[.]"). To the extent Defendants are arguing that pattern or practice claims are not cognizable under the APA, that is an issue that concerns the sufficiency of such claims, not whether the United States or its officers are immune from such claims. *See id*.; *see also Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006) (concluding that Section 702's waiver of sovereign immunity applies regardless of whether the challenged conduct itself satisfies the APA's review provisions).

### 2. The APA's Waiver Extends to Plaintiffs' ATS Claims

The APA's waiver of sovereign immunity also resolves one of Defendants' challenges to Plaintiffs' ATS claims. The Complaint alleges ATS claims against the Defendants for "violation of the *non-refoulement* doctrine" under international law. (Compl. ¶ 180.) Defendants argue that the ATS "does not constitute a waiver of sovereign immunity and therefore does not create a cause of action against the government." (ECF No. 135-1 at 11–12 n.5.)[10] Defendants thus appear to suggest

---

[10] Defendants also argue that although Plaintiffs refer to the "duty of *non-refoulement*" as the basis for their ATS claims, Plaintiffs "fail to explain how it imposes relevant legal obligations on the government beyond the obligations captured in 8 U.S.C. § 1225(b)(1)(A)(ii)." (ECF No. 135-1 at 12 n.5.) To the extent that Defendants contend that the ATS claims must be dismissed because a remedy is available under domestic law, the Court rejects that argument. "Contrary to

– 29 –

that this Court lacks jurisdiction over the ATS claims asserted against the Defendants as a matter of sovereign immunity.

Defendants are correct that the ATS does not waive the sovereign immunity of the United States. The ATS provides only that "the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The text of the ATS says nothing about sovereign immunity and, thus, it cannot be construed as a waiver. *See Lane v. Pena*, 518 U.S. 187, 192 (1996) (internal citations omitted) (stating that "[a] waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied"). Specifically, the ATS does not waive the government's sovereign immunity. *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011) ("[T]he Alien Tort Statute has been interpreted as a jurisdiction statute only—it has not been held to imply any waiver of sovereign immunity.").

However, at least one appellate court has suggested that the APA is "arguably available" as a waiver of sovereign immunity for claims asserted against federal officers sued in their official capacity for nonmonetary relief. *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985) (recognizing the possibility that ATS suits seeking non-monetary relief may proceed against the Secretary of Defense and the Director of the CIA under the APA's waiver of sovereign immunity). The D.C. Circuit ultimately declined to apply the APA's waiver to the ATS claims in *Sanchez-Espinoza* because it did not believe that the alien plaintiffs in that case who challenged

---

defendants' argument, there is no absolute preclusion of international law claims by the availability of domestic remedies for the same alleged harm." *See Hawa Abdi Jama v. United States INS*, 22 F. Supp. 2d 353, 364 (D.N.J. 1998). Defendants raise no other arguments showing that dismissal of Plaintiffs' ATS claims is warranted and neither side has briefed the sufficiency of the claims. Accordingly, the Court expresses no further view on them in this opinion aside from the sovereign immunity issue.

"support for military operations" were entitled to the discretionary declaratory and injunctive relief available under the APA in an area "so sensitive a[s] foreign affairs." *Id.* at 208. The notion that the APA's waiver of sovereign immunity should not apply to permit equitable relief in military matters or sensitive foreign affairs cases has been echoed by other courts. *See, e.g., Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 41–43 (D.D.C. 2010) (questioning "whether the APA should be interpreted as a waiver of sovereign immunity for an ATS claim like plaintiff's" against the U.S. Secretary of Defense and Director of the CIA which requested "discretionary relief that would prohibit military and intelligence activities against an alleged enemy abroad").

This case, however, does not involve military matters, nor do Defendants argue that it involves sensitive foreign affairs. At least one district court has applied the APA's waiver of sovereign immunity for international law claims asserted against the U.S. government for non-monetary relief in such circumstances. *See Rosner v. United States*, 231 F. Supp. 2d 1202, 1211–12 (S.D. Fla. 2002). In line with the APA's broad waiver of sovereign immunity for claims against the United States for nonmonetary relief, the Court finds that the APA's unqualified waiver of sovereign immunity supplies a waiver for the ATS claims asserted in this case. *See* 5 U.S.C. § 702; *Navajo Nation*, 876 F.3d at 1171.

### C. The Sufficiency of the APA Claims

The Complaint asserts two APA claims against the Defendants. First, the Complaint raises Section 706(1) claims "to compel agency action unlawfully withheld or unreasonably delayed." (Compl. ¶ 152 (citing 5 U.S.C. § 706(1).) The basis of these claims is CBP officials' alleged "failure to take actions mandated" by various provisions of the INA and implementing regulations. (*Id.* ¶ 153; *see also id.* ¶ 157 (referring to "Defendants' repeated and pervasive failure to act").) The Complaint also alleges a Section 706(2) claim to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). The basis of this claim is that "CBP officials have acted in excess of their statutorily proscribed authority and without observance of the

procedures required by law in violation of the APA." (*Id.* ¶ 154 (citing 5 U.S.C. §§706(2)(C), (D)), *id.* ¶ 155 (alleging that "in turning Class Plaintiffs . . . away at POEs along the U.S.-Mexico border without following the procedures mandated by the INA, CBP officials have acted in excess of the authority granted them by Congress"); *id.* ¶ 157 (referring to Defendants' "action taken in excess of their authority").)

In moving to dismiss, Defendants argue that (1) Plaintiffs' "only well-pleaded" claims are the Section 706(1) claims and (2) Plaintiffs have failed to identify a "final agency action" necessary to seek review of Defendants' alleged policy pursuant to Section 706(2). (ECF No. 135-1 at 4–9 (mootness for Section 706(1) claims), 11–20 (failure to state a Section 706(2) claim).) In opposition, Plaintiffs argue that they have pleaded Section 706(1) claims and not brought a Section 706(2) claim. (ECF No. 143 at 19–21.) Independently of their Section 706(1) claims, however, the Plaintiffs contend that they have plausibly pleaded that Defendants have "an illegal policy or practice." (*Id.* at 21–23.) To resolve the parties' dispute, the Court first outlines the APA's framework for judicial review of agency action. The Court then considers the sufficiency of Plaintiffs' Section 706(1) claims. Finally, the Court determines that Defendants' alleged policy must be reviewed pursuant to Section 706(2) and concludes that Plaintiffs have failed to identify a final agency action subject to judicial review.

### 1. Judicial Review of Agency Action Pursuant to the APA

As a general matter, the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. This judicial review provision "is not so all-encompassing as to authorize . . . judicial review over everything done by an administrative agency." *Wild Fish Conservancy v. Jewell*, 703 F.3d 791, 800–01 (9th Cir. 2013). The APA confines what is subject to judicial review by limiting review to an "agency action," which is

– 32 –

in turn defined to only "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2) (incorporating Section 551's definition of "agency action").

The APA also places limits on when agency action is subject to judicial review. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704; *see also Navajo Nation*, 876 F.3d at 1171 ("[Section] 704's requirement that to proceed under the APA, agency action must be final or otherwise reviewable by statute is an independent element without which courts may not determine APA claims.").  "Where no other statute provides a private right of action, the 'agency action' complained of must be 'final agency action.'" *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61–62 (2004) [hereinafter "*SUWA*"] (quoting 5 U.S.C. § 704); *see also Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 591 (9th Cir. 2008) (referring to "final agency action" as a "jurisdictional requirement imposed by statute"); *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 266 (9th Cir. 1990) (same).

Section 706 of the APA further defines the "scope of review" for an agency action that is subject to judicial review.  As a general matter, a court "shall decide all relevant questions of law" and "interpret constitutional and statutory provisions" as part of its review of agency action "[t]o the extent necessary to decision and when presented."  5 U.S.C. § 706.  In addition, a court may provide relief from agency action in one of two ways.  Under Section 706(1), a court "shall . . . compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Under Section 706(2), a court "shall hold unlawful and set aside agency action . . . found to be," *inter alia*, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory rights" or "without observance of procedure required by law."  5 U.S.C. § 706(2).  A challenge to an agency's alleged failure to act is more appropriately

channeled through Section 706(1).  *See Rosario v. United States Citizenship*, No. C15-0813JLR, 2017 WL 3034447, at *7 n.6 (W.D. Wash. July 18, 2017); *Leigh v. Salazar*, No. 3:13-cv-00006-MMD-VPC, 2014 WL 4700016, at *4 (D. Nev. Sept. 22, 2014) (construing a Section 706(2) claim regarding an agency's alleged failure to act as in fact a Section 706(1) claim).  Section 706(2) is typically reserved for completed agency actions whose validity can be assessed according to the bases for setting aside agency action set forth in that provision.  *See Nw. Envtl. Defense Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680–81 & n.10 (9th Cir. 2007).  With these general principles in mind, the Court turns to the APA claims in this case.

### 2.  The Complaint States Section 706(1) Claims for "Unlawfully Withheld" Access to the U.S. Asylum Process

The Court turns first to the Individual Plaintiffs' Section 706(1) claims that CBP officials have failed permit asylum seekers to access the U.S. asylum process. Defendants concede that the Individual Plaintiffs' Section 706(1) claims are "well-pleaded."  (ECF No. 135-1 at 4–5; ECF No. 145 at 1.)  Defendants, however, suggest that such claims are not cognizable insofar as they concern a putative class of other asylum seekers who have experienced the alleged pattern of denials.  Plaintiffs in turn argue that they have stated Section 706(1) claims for Defendants' alleged "failure to act" and that they can challenge a pattern of violations.  (ECF No. 143 at 19–20, *id*. at 19 n.6.)  Because Section 706(1) claims may be dismissed if the plaintiff fails to show an entitlement to agency action that a court can properly compel, the Court addresses the sufficiency of the Complaint's Section 706(1) claims as they pertain to the Individual Plaintiffs and the putative class.[11]  *See Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008, 1019–20 (9th Cir. 2007) ("a Section 706(1) claim may be dismissed for lack of jurisdiction" when plaintiff fails to show he is entitled to relief

---

[11] Defendants do not raise an issue as to whether Al Otro Lado has plausibly stated a claim for Section 706(1) relief.

under the provision); *Gros Ventre Tribe v. United States*, 469 F.3d 801, 814 (9th Cir. 2006).

### a.    The Individual Plaintiffs

Section 706(1) grants a court authority to "compel agency action unlawfully withheld." 5 U.S.C. §706(1). Under this provision, a court's "ability to 'compel agency action' is carefully circumscribed to situations where an agency has ignored a specific legislative command." *Hells Canyon Pres. Council v. United States Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010). When a plaintiff challenges an agency's alleged failure to act, that challenge must satisfy certain limitations. The APA's use of the phrase "failure to act" means "a failure to take an *agency action*—that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)," *i.e.*, an "agency rule, order, license, sanction, or relief." *SUWA*, 542 U.S. at 62–63; *see also* 5 U.S.C. §551(13). Thus, a Section 706(1) claim "can only proceed where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *SUWA*, 542 U.S. at 64 (emphasis in original).

These requirements to obtain Section 706(1) relief from a court are mutually reinforcing. The discrete agency action "limitation" precludes a "broad programmatic attack" against an agency. *Id*. As such, it "protect[s] agencies from undue judicial interference with their lawful discretion" and "avoid[s] entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* at 66–67. Thus, a plaintiff "cannot seek wholesale improvements of [a] program by court decree" under the guise of a Section 706(1) claim. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *Public Lands for the People, Inc. v. U.S. Dep't of Agric.*, 733 F. Supp. 2d 1172, 1183 (E.D. Cal. 2010) ("This interpretation effectively precludes enforcement of broad statutory mandates under section 706(1), insofar as a broad mandate typically is not one that requires discrete agency action."). The "limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law." *SUWA*, 542 U.S. at 65. Because of that

17cv2366

limitation, courts "have no authority to compel agency action merely because the agency is not doing something we may think it should do." *Zixiang Li v Kerry*, 710 F.3d 995, 1004 (9th Cir. 2013) (Smith, M.D., J.). Thus, a plaintiff seeking relief under Section 706(1) must identify an actual legal obligation for the agency to take some action. *Id.*

The gravamen of Plaintiffs' Section 706(1) claims is that CBP officials failed to take actions that the INA requires when a noncitizen asserts an intent to seek asylum. The Complaint grounds these claims in various statutory and regulatory provisions, including 8 U.S.C. § 1225(a)(1)(3), 8 U.S.C. § 1225(b)(1)(A)(ii), 8 U.S.C. § 1225(b)(2)(A), and 8 C.F.R. § 235.3(b)(4). (Compl. ¶¶ 104–121, 153.)[12] There is no dispute between the parties regarding the sufficiency of the Individual Plaintiffs' Section 706(1) claims under these provisions. Defendants agree that "APA relief under section 706(1)" is "an appropriate remedy" for the failures to act the Individual Plaintiffs allege. (ECF No. 145 at 1.) [13] These concessions buttress the Court's

---

[12] The Complaint's Section 706(1) claim invokes 8 U.S.C. § 1158(a)(1). (Compl. ¶ 153.) The Court observes that it likely could not compel relief for this statutory provision. 8 U.S.C. § 1158(a)(1) does not identify any specific obligations placed on an immigration officer and, therefore, may not serve as the basis for Section 706(1) relief. *See Public Lands for the People, Inc.*, 733 F. Supp. 2d at 1183 ("[W]here a statutory directive does not require action, that statute may be so 'broad' that it cannot be enforced under section 706(1)[.]"). Plaintiffs do not invoke 8 U.S.C. § 1158 in discussing the sufficiency of their Section 706(1) claims and so the Court deems any claims premised on it as waived. The Complaint also invokes 8 C.F.R. § 235.4, a regulation which provides that "[t]he alien's decision to withdraw his or her application admission must be made voluntarily[.]" (Compl. ¶ 153.) As the Court discusses separately, Plaintiffs cannot seek Section 706(1) relief with respect to this regulation and any Section 706(1) claims seeking to compel agency action based on it are subject to dismissal.

[13] However, Defendants argue that because the parties agree on what the law requires, "Plaintiffs have failed to identify any legal dispute between the parties," and thus there is no "live case or controversy." (ECF No. 135-1 at 19 & n.9.) Defendants' argument is an inartful attempt to attack Plaintiffs' Article III standing. To have

conclusion that Plaintiffs have stated Section 706(1) claims for discrete and legally required agency actions.

### b.    The Putative Class and Practice Allegations

A salient aspect of the Complaint are the allegations that there is a "practice" of CBP officials refusing to permit asylum seekers who present themselves at POEs along the U.S.-Mexico border to access the asylum process in the United States.  (*See generally* Compl.)  Plaintiffs' Section 706(1) claims incorporate these allegations.  (*Id.* ¶ 157 ("Defendants' repeated and pervasive failure to act . . ., which denied Class Plaintiffs access to the statutorily prescribed asylum process . . . mandates relief under the APA."); *id.* ¶ 163 (alleging that "Defendants' conduct and practices, as alleged in this Complaint, violate the APA.").)  Defendants primarily take issue with these pattern allegations as a matter of sovereign immunity.  As the Court has already concluded, that argument lacks merit.  Even so, Defendants' argument that there is "no cause of action" for pattern or practice claims raises a different issue: whether and how pattern and practice claims are cognizable under the APA.

Two courts have considered this issue in the context of Section 706(1) claims based on an agency's alleged failure to act.  These courts concluded that pattern and practice challenges to an agency's alleged failure to act are not legally cognizable under the APA.  *See Californians v. United States EPA*, No. C 15-3292 SBA, 2018 WL 1586211, at *19 (N.D. Cal. Mar. 30, 2018) (dismissing separately pleaded claim

_____

standing, a plaintiff must allege: (1) an injury in fact (2) "fairly traceable to the challenged action of the defendant" (3) that may be "redressed by a favorable decision" from a court.  *Lujan*, 504 U.S. at 560−61 (internal citations and quotations omitted).  The Complaint plainly shows that the Plaintiffs have standing based on the injuries caused by CBP officials at POEs along the U.S.-Mexico border in violation of the INA and its implementing regulations.  This Court has the authority to redress those injuries.  *See* 5 U.S.C. § 706(1).  The parties' apparent agreement in their legal memoranda submitted to this Court on what the INA and its implementing regulations require cannot vitiate Plaintiffs' standing based on the harms resulting from CBP officials' alleged violations of those provisions.

against EPA for an alleged pattern or practice of failing to timely act on administrative complaints); *Del Monte Fresh Produce N.A., Inc. v. United States*, 706 F. Supp. 2d 116 (D.D.C. 2010) (dismissing claim against FDA for an alleged unlawful pattern and practice of delay in sampling and inspecting food imported by plaintiff). The reasoning underlying these conclusions turns on Section 706(1)'s discrete agency action limitation. *See Californians*, 2018 WL 1586211, at *19 (citing *Lujan*, 497 U.S. at 891; *SUWA*, 542 U.S. at 66–67); *Del Monte*, 706 F. Supp. 2d at 119 (citing *SUWA*, 542 U.S. at 64, 66–67). As the Court has previously discussed, that limitation precludes a plaintiff from using Section 706(1) to launch a "programmatic attack" or seek "wholesale improvement" of an agency's procedures. *SUWA*, 542 U.S. at 64. Both the *Del Monte* and *Californians* courts determined that the "pattern or practice" claims in those cases were impermissible attacks on the relevant agency.

For example, in *Del Monte*, the court concluded that the plaintiffs could not pursue a claim against the FDA for its alleged pattern and practice of not inspecting Del Monte products within a reasonable time period. The *Del Monte* court reasoned that such a claim would require the court to "consider the procedures by which the FDA inspects samples and makes decisions as to their suitability for import" as a general matter. *Del Monte*, 706 F. Supp. 2d at 119. As such, the court would have engaged in "broad review of agency operations" of "just the sort of 'entanglement' in daily management of the agency's business that the Supreme Court has instructed is inappropriate." *Id.* The *Del Monte* plaintiff never challenged, nor sought relief for specific instances of the FDA's alleged failure to act or unreasonable delay in taking action despite referring to several such instances. *Id.* at 120 n.6. In *Californians*, the court similarly determined that the plaintiffs' separately pleaded pattern and practice claim against "the EPA's general practice in handling [administrative] complaints, as opposed to seeking relief on a specific complaint" was "in effect" "a programmatic attack" on the EPA's procedures and therefore "impermissible." *Californians*, 2018 WL 1586211, at *19. The court, however, reached this conclusion even as it

determined that the plaintiffs' other five claims "seek[ing] relief based on the EPA's failure to act on each of the Plaintiffs' respective [administrative] complaints" "clearly satisf[ied] the discrete agency action requirement." *Id*. *Del Monte* and *Californians*, as well as their reliance on *SUWA* and *Lujan*, caution this Court to take a closer look at the practice allegations in this case to ensure that they do not constitute an impermissible broad-based programmatic attack against CBP.

Plaintiffs assert that they have not "attempt[ed] to bring a so-called 'pattern or practice' claim as an independent cause of action." (ECF No. 143 at 19 n.6.) This assertion is supported by the Complaint, which does not facially plead independent Section 706(1) claims for Defendants' alleged practice of denying asylum seekers who present themselves at POEs along the U.S.-Mexico border access to the asylum process. Instead of raising an independent pattern or practice claim, the Section 706(1) claims incorporate the practice allegations as part of Plaintiffs' request for relief from "Defendants' repeated and pervasive failure to act." (Compl. ¶ 157.) Plaintiffs challenge not only alleged agency failures to act in their particular cases, they challenge CBP officials' failures to act experienced by other individuals. (*Compare id.* ¶¶ 39–82 (allegations of each Individual Plaintiff's experiences) *with id.* ¶¶ 83, 85–91, 96(a)–(d), 97, 98(b), (d), 99, 100, 101(a)–(e), 102 (allegations that "CBP officials have systematically denied numerous other asylum seekers access to the asylum process") *and id.* ¶¶ 131–138 (setting forth "class action allegations").) Neither *Del Monte*, which involved an attempt to bring a freestanding pattern or practice claim, nor *Californians*, which involved an attempt to plead a pattern or practice claim independently of claims targeting discrete agency actions, is thus on point.

The Court does not view the incorporation of these pattern allegations as an impermissible "programmatic" attack. Unlike this case, *SUWA*, *Lujan*, *Del Monte*, and *Californians*, did not involve Section 706(1) claims asserted on behalf of a putative class of individuals. The Section 706(1) relief is no less discrete and lawfully

required simply because it is requested on behalf of a putative class. *See Ramirez*, 310 F. Supp. 3d at 21 ("Defendants confuse aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action—for a broad programmatic attack.") (rejecting challenge to Section 706(1) relief sought on behalf of class). This conclusion is reinforced by the fact that Section 706(1) claims to compel agency action may be asserted on behalf of a class. *See, e.g., Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1971 (9th Cir. 2016) (affirming district court preliminary injunction in a case involving Section 706(1) claims asserted on behalf of a class of all current or former members of the armed forces who were test subjects in certain government programs during their service); *Ramirez*, 310 F. Supp. 3d at 21; *Venantius Nkafor Ngwanyia v. Gonzales*, 376 F. Supp. 2d 923, 925 (D. Minn. 2005) (approving settlement in a class action suit involving allegations that federal immigration agencies improperly administered the system by which asylees become lawful permanent residents).

Defendants suggest that Section 706(1) relief is not available on a class-wide basis, arguing that "Plaintiffs' 'pattern or practice' allegations are too speculative to otherwise establish a live case or controversy" and, thus, "the Court should dismiss any 'pattern or practice' claims under Rule 12(b)(1)." (ECF No. 135-1 at 22, 24.) Central to this argument is Defendants' contention that "Plaintiffs have not alleged that all CBP officers at [POEs] always deny asylum seekers access to the asylum process." (*Id.* at 24.) Like Defendants' misguided attack on the Individual Plaintiffs' Article III standing based on the parties' agreement about what the INA requires, Defendants' targeting of the pattern allegations as "too speculative" to establish a "live case or controversy" misses the mark.

Defendants readily concede that the Complaint identifies incidents in which asylum seekers who presented themselves at POEs along the U.S.-Mexico border have been denied access to the asylum process. (ECF No. 135-1 at 24.) Even in the absence of Defendants' concession, the Complaint incorporates numerous reports

from non-governmental organizations operating in the U.S.-Mexico border region, which document hundreds of examples of asylum seekers who CBP officials denied access to the U.S. asylum process.  (Compl. ¶¶ 37–38, 96–102.)  While Defendants may seek to minimize those allegations by selectively casting doubt on the reliability of those portions of the reports that reflect negatively on CBP and by characterizing the reports as showing only "an alleged 1.6% denial rate," (ECF No. 135-1 at 14), the volume of denials is irrelevant to whether the Complaint concretely alleges that other individuals have been subjected to the same alleged failures to act by CBP officials. The Complaint plainly alleges such failures, which the Court is required to take as true at this stage.  Because the Individual Plaintiffs have standing in their own right to seek Section 706(1) relief to compel the Defendants to inspect and process them for admission, they may request that relief for a putative class of others asylum seekers who have allegedly experienced the same failures to act.  *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).  Accordingly, the Court rejects Defendants' challenge to the Complaint's practice allegations, which are merely a feature of the class action nature of this case.

### 3.      The Complaint Fails to State a Section 706(1) Claim for Relief Pursuant to 8 C.F.R. § 235.4

Although the Complaint states Section 706(1) claims regarding the alleged failures of CBP officials to permit the Individual Plaintiffs to access the U.S. asylum process, certain Individual Plaintiffs also seek relief regarding alleged coercion by CBP officials.  As the Court has discussed, all Plaintiffs argue that they only press Section 706(1) claims to compel agency action unlawfully withheld.  (ECF No. 143 at 19.)  The Court will therefore consider these Plaintiffs' coercion allegations within the Section 706(1) framework.

Plaintiffs A.D., B.D., and C.D. each allege that on of one of the occasions they sought asylum, CBP officials coerced them to into signing documents which stated that they lacked a fear of persecution.  (Compl. ¶¶ 42–43, 50–51, 56–58.)  A.D. and

C.D. further allege that CBP officials forced them to recant their fears in video recorded statements. (*Id.* ¶¶ 42–43, 56–58.) They further refer to their allegations regarding CBP's alleged coercion of certain Individual Plaintiffs in discussing their Section 706(1) claims. (ECF No. 143 at 20.) Both sides further agree that "the law requires an alien's decision to withdraw his or her application for admission be voluntary" under 8 C.F.R. § 235.4. (ECF No. 135-1 at 20; ECF No. 143 at 20.) That the parties agree on the text of the INA's provisions and certain implementing regulations, however, does not mean that the Court in fact has authority to provide Section 706(1) relief based on 8 C.F.R. § 235.4. The Court concludes that it does not.

The Court has the authority to compel an agency action pursuant to Section 706(1) only when there is "a specific, unequivocal command" placed on the agency to take a "discrete agency action," and the agency has failed to take that action. *SUWA*, 542 U.S. at 63–64. The obligation placed on the agency action must be "so clearly set forth that it could traditionally have been enforced through a writ of mandamus." *Hells Canyon Pres. Council*, 593 F.3d at 932. The action must be a "precise, definite act." *Id.* The only provision Plaintiffs cite in the Complaint and their opposing papers regarding the alleged coercion of withdrawal statements is 8 C.F.R. § 235.4, a regulation which states that "[t]he alien's decision to withdraw his or her application [for admission] must be made voluntarily[.]" 8 C.F.R. § 235.4. This language is an insufficient basis for the Court to grant any Section 706(1) relief pursuant to the regulation.

Although the clear objective of 8 C.F.R. § 235.4 is to ensure that an alien's withdrawal of an application for admission is made voluntarily, the regulation's plain text "does not instruct [the Defendants] to do anything." *San Luis Unit Food Producers v. United States*, 709 F.3d 798, 807 (9th Cir. 2013). The regulation does not require CBP officers to determine whether a withdrawal was made voluntarily, and it does not specify what CBP officers must do if a withdrawal was not. The regulation thus "leaves [the agency] a great deal of discretion in deciding how to

achieve" its objective and, in turn, lacks "the clarity necessary to support judicial action under § 706(1)." *SUWA*, 542 U.S. at 66; *see also San Luis Unit Food Producers*, 709 F.3d at 803 ("Statutory goals that are 'mandatory as to the object to be achieved; but that leave the agency 'with discretion in deciding how to achieve' those goals are insufficient to support a 'failure to act claim because such discretionary actions are not 'demanded by the law.'").

Although Plaintiffs' allegations may show that there are "[g]eneral deficiencies in compliance," *SUWA*, 542 U.S. at 66, there is nothing this Court can permissibly compel from Defendants pursuant to with 8 C.F.R. § 235.4 to correct those deficiencies. Accordingly, the Court dismisses Plaintiff A.D., B.D., and C.D.'s Section 706(1) claims without prejudice *only insofar* as these Plaintiffs seek relief pursuant to this regulation. This determination does not affect the Court's conclusion that these Plaintiffs have otherwise stated Section 706(1) claims regarding their alleged denial of access to the asylum process in the United States.

### 4. The Complaint Fails to State a Section 706(2) Claim Regarding Defendants' Alleged Policy

The Complaint alleges that CBP officials have systematically prevented asylum seekers arriving at POEs along the U.S.-Mexico border from accessing the U.S. asylum process since summer 2016. (Compl. ¶¶ 1, 5, 37.) Plaintiffs allege that this conduct has been documented "in hundreds of cases" at POEs along the border. (*Id.* ¶¶ 37–38.) The bulk of Defendants' motion to dismiss concerns whether Plaintiffs have stated a Section 706(2) claim regarding an alleged "policy" of the Defendants to deny asylum seekers who present themselves at POEs along the U.S.-Mexico border access to the asylum process. (ECF No. 135-1 at 11–20.) Defendants argue that "[w]hile the Complaint does not expressly seek judicial review of a final agency action, it alleges that CBP has adopted an 'officially sanctioned policy'[.]" (*Id.* at 11 (citing Compl. ¶¶ 5, 154).) Defendants contend that "to the extent the Court construes those references as a request for judicial review of an alleged unlawful

policy under the APA" pursuant to Section 706(2), the Court should dismiss that request because: (1) Plaintiffs fail to identify an agency action and, even if Plaintiffs have done so, (2) the Complaints fails to show a final agency action. (*Id.* at 12.)

Plaintiffs assert that "Defendants' critique is misplaced" because "the review of 'final agency action' . . . under [] § 706(2) is distinct from the analysis for APA claims to compel agency action under § 706(1), and Plaintiffs brought the latter APA claim." (ECF No. 143 at 19.) Normally, the Court would construe Plaintiffs' response as a concession that they do not press a Section 706(2) claim and would not address the issue further. However, two points convince the Court that further analysis warranted. For one, the Complaint expressly invokes Section 706(2) as a basis for judicial review of Defendants' alleged conduct. (Compl. ¶¶ 151–164.) Plaintiffs' requested injunctive relief in turn includes "prohibiting Defendants . . . from engaging in the unlawful policies . . . described herein at POEs along the U.S.-Mexico border." (*Id.* at 52–53.) Therefore, contrary to Plaintiffs' assertion, the Complaint appears to include a Section 706(2) claim. Second, in opposing Defendants' motion, Plaintiffs assert that they "have alleged an illegal policy or practice" because they "have pled sufficient facts . . . to support a reasonable inference of liability" of the named Defendants. (ECF No. 143 at 21.) Plaintiffs' assertion is made *independently* of the APA's basis for judicial review of agency action. (*Contrast id.* at 19–20 (arguing that Section 706(1) APA claim is plausible) *with id.* at 21–23 (arguing that Defendants' policy is plausible).)

The Complaint and Plaintiffs' assertions raise two issues. First, the Court must consider whether Plaintiffs may seek review of Defendants' alleged policy independently of the APA. The Court concludes that they may not. Second, because Plaintiffs must seek review of any alleged policy pursuant to Section 706(2), the Court must consider whether the Plaintiffs have satisfied the APA's requirements for judicial review and, specifically, the final agency action requirement. The Court concludes they have not.

### a. Judicial Review of Defendants' Alleged Policy Must Proceed Under the APA

Plaintiffs assert that Defendants may be held liable for an alleged policy of denying asylum seekers who present themselves at POEs along the U.S.-Mexico border access to the U.S. asylum process. And they make that assertion by relying solely on cases in which courts considered Section 1983 and *Bivens* challenges. Neither Section 1983, nor *Bivens*, however, provides a basis for holding the Defendants liable. Nor does either supply the appropriate legal framework for review of Defendants' alleged policy. Based on the pleadings, the APA supplies the appropriate framework for judicial review of the alleged policy.

As a general matter, "[t]he APA governs the conduct of federal administrative agencies," *Aracely, R.*, —F. Supp. 3d—, 2018 WL 3243977, at *5, and it provides a "default judicial review standard" for agency action, *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000). "While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless specifically excluded." *Webster v. Doe*, 486 U.S. 592, 607 n* (1988) (Scalia, J., dissenting); *Ninilchik Traditional* Council, 227 F.3d at 1194 (citing Scalia's *Webster* dissent approvingly). In this case, the Complaint challenges agency action pursuant to the APA. (Compl. ¶¶ 151–164.) Although the Complaint purports to bring a separate claim for violation of the Plaintiffs' "procedural due process rights under the Fifth Amendment," that claim expressly incorporates the alleged APA violations. (*Id*. ¶¶ 166, 171.) Plaintiffs allege that "the INA and its implementing regulations provide Class Plaintiffs the right to be processed at a POE and granted access to the asylum process" and that "CBP officials have denied Class Plaintiffs access to the asylum process and failed to comply with procedures set forth in the INA and its implementing regulations." (*Id*. ¶¶ 168, 169.) "Insofar as [Plaintiffs] have such an entitlement" under the INA and its implementing regulations, Plaintiffs

"may obtain all the relief they request under the provisions of the APA." *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1001 n.2 (9th Cir. 1998). Obtaining such relief from Defendants' alleged policy of course requires Plaintiffs to satisfy the APA's judicial review requirements. *See Navajo Nation*, 876 F.3d at 1171 ("§ 704's requirement that to proceed under the APA, agency action must be final or otherwise reviewable by statute is an independent element without which court may not determine APA claims."). Plaintiffs' reliance on Section 1983 and *Bivens* case law does not convince the Court otherwise.

Liability under Section 1983 is inapt in this case. The Complaint does not invoke Section 1983 as a basis for holding the named Defendants liable. Even if it did, liability would not lie against the Defendants. Defendants Nielsen, McAleenan, and Owen are Federal Executive officers or officials sued in their official capacity for their duties pursuant to federal law. (Compl. ¶¶ 25–27.) As Defendants recognize (ECF No. 145 at 9–10), Section 1983's plain terms do not provide a cause of action against federal officers acting in their official capacity. *See* 42 U.S.C. § 1983; *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017) ("[Section 1983] entitles an injured person to money damages if a state official violates his or her constitutional rights. Congress did not create an analogous statute for federal officials."); *Pangacos v. Towery*, 782 F. Supp. 2d 1983, 1189 (W.D. Wash. 2011) ("Federal officers are exempt from the proscription of § 1983) (citing *District of Columbia v. Carter*, 409 U.S 418, 424–25 (1973); *McCloskey v. Mueller*, 446 F.3d 262, 271 (1st Cir. 2006)); *Comm. for Immigrant Rights v. Cty. of Sonoma*, 644 F. Supp. 2d 1177, 1203 (N.D. Cal. 2009) ("Federal officers acting under federal authority are immune from suit under § 1983 unless the state or its agents significantly participated in the challenged activity). Plaintiffs' reliance on Section 1983 to assert that the Defendants may be held liable is thus inappropriate. *See Morse v. North Coast Opportunities, Inc*., 118 F.3d 1338, 1343 (9th Cir. 1997) ("Lest there be any continuing confusion, we take this opportunity to remind the Bar that by its very terms, § 1983 precludes liability in

1   federal government actors.”).

2          Taking for granted that Section 1983 does not apply to federal officers,

3   Plaintiffs further assert that their “allegations of a policy or practice are analogous to

4   claims brought under *Monell*[.]” (ECF No. 143 at 21 n.7.) *Monell* permits a Section

5   1983 plaintiff to establish municipal liability for an alleged constitutional violation in

6   certain circumstances, including by showing that a municipal employee committed

7   an alleged constitutional violation pursuant to a formal government policy or a

8   longstanding practice or custom which constitutes the standard operating procedure

9   of the local governmental entity. *See Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701,

10  737(1989); *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). To the extent

11  Plaintiffs are arguing that an alleged policy is subject to judicial review because their

12  allegations could establish *Monell* liability, the Court rejects this argument. *Monell*

13  arose in the context of a statute that is fundamentally different from the APA. Most

14  relevant here are two limitations: (1) whereas the APA is limited to “agency action,”

15  Section 1983 reaches the conduct of “[e]very person” alleged to have violated federal

16  law, and (2) whereas the APA permits judicial review of only a “final agency action”

17  unless another statute makes the action reviewable, Section 1983 contains no identical

18  or analogous limitation on review. *Contrast* 5 U.S.C. §§ 702, 704 *with* 42 U.S.C. §

19  1983. Given these key differences, analogizing to Section 1983 liability is not

20  helpful.

21         The remaining cases cited by both parties involve *Bivens* actions against federal

22  officers sued in their individual capacity for alleged constitutional violations. (ECF

23  No. 135-1 at 11, 17; ECF No. 143 at 23.) In *Bivens*, the Supreme Court fashioned a

24  judicial cause of action for damages to redress constitutional violations committed by

25  a federal officer by treating such an action as one against the officer in his or her

26  individual capacity and thus not barred by sovereign immunity. *Bivens*, 403 U.S. 388,

27  409–10 (1971) (Harlan, J, concurring). By its nature, a *Bivens* suit is limited to

28  *damages* claims against a federal officer in his or her *individual capacity*. *See*

*Ministerio Roca Solida*, 820 F.3d at 1093–94; *see also Consejo de Desarrollo Economico de Mexicali, A.C.*, 482 F.3d at 1173; *Vaccaro v. Dobre*, 81 F.3d 854, 857 (9th Cir. 1996) (a *Bivens* action "can be maintained against a defendant in his or her individual action only, and not in his or her official capacity."). A *Bivens* action "does not encompass injunctive and declaratory relief where . . . the equitable relief requires official government action." *Ministerio Roca Solida*, 820 F.3d at 1093–94; *Consejo de Desarrollo Economico de Mexicali, A.C.*, 482 F.3d at 1173. In such cases, "*Bivens* is both inappropriate and unnecessary" in large part "because the Administrative Procedure Act waives sovereign immunity for such claims" and thus provides a mechanism for judicial review. *Ministerio Roca Solida*, 820 F.3d at 1095, 1096.

Much of the dispute between the parties regarding Plaintiffs' policy allegations concerns whether Defendants may be held liable for the alleged conduct of some CBP officials along the U.S.-Mexico border, liability which requires some connection between the conduct of those officials and the named Defendants in this case. (*Compare* ECF No. 135-1 at 11, 17 *with* ECF No. 143 at 23.) [14] This dispute overlooks a key point: the *Bivens* framework for holding federal government officials liable for alleged constitutional violations has no application in this case This case is far from a *Bivens* action in form and substance. The Complaint names the Defendants in their official capacity and seeks declaratory and injunctive relief that undoubtedly requires official government action. Thus, *Bivens* liability is not appropriate.

---

[14] For example, Defendants rely on *Perez v. United States*, 103 F. Supp. 3d 1180, 1200 (S.D. Cal. 2015), to argue that Plaintiffs have failed to allege "any factual connection between the alleged misconduct of a handful of officers and a policy" of the named Defendants and thus cannot show a "broadly sanctioned policy." (ECF No. 135-1 at 11, 17.) In contrast, Plaintiffs argue that the Complaint demonstrates an alleged "high-level knowledge and acquiescence in the unlawful conduct," of CBP officials by the named Defendants for which the latter may be held liable. (ECF No. 143 at 23.) The assumption underlying each of these arguments is that *Bivens* supervisory liability for the allegedly unconstitutional conduct of low-level officers is applicable in this case. It is not.

17cv2366

With neither Section 1983, nor *Bivens* providing a framework applicable to Defendants' alleged policy, the Court affirms that the APA supplies the relevant framework for considering Defendants' alleged policy. *See Am. Fin. Benefits Ctr. v. Fed. Trade Comm'n*, No. 17-04817, 2018 WL 3203391, at *5 (N.D. Cal. May 29, 2018) (analyzing plaintiffs' claims under the APA because "although Plaintiffs assert that the APA is inapplicable, they fail to identify any other basis for judicial review or the exercise of this Court's jurisdiction").

### b.    The Complaint Does Not Identify a Final Agency Policy

The APA limits judicial review to agency action in the form of "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). An agency action must be "reviewable by statute or a "final agency action for which there is no other adequate remedy[.]" 5 U.S.C. § 704. Two conditions must be satisfied for an agency action to be final: (1) "the action must mark the consummation of the agency's decisionmaking process— it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *United States Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett*, 520 U.S. at 177–78). Although the finality requirement is "flexible" and must be applied in a "pragmatic way," it is nevertheless a requirement that a plaintiff seeking review of agency action must satisfy.[15] *See*

---

[15] The Ninth Circuit has previously referred to the final agency action requirement as a jurisdictional requirement. *See City of San Diego v. Whitman*, 242 F.3d 1097, 1102 (9th Cir. 2001). However, this view of the final agency requirement, as applicable to courts in the Ninth Circuit, has been questioned. *See Pebble Ltd. P'ship v. United States EPA*, 604 Fed. App'x 623, 625–26 (9th Cir. 2015) (Watford, J., concurring) ("[I]n my view the D.C. Circuit has persuasively explained why our court's precedent on this point is wrong. As that court held in *Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006), § 704 is not a jurisdiction-conferring statute."). The *Navajo Nation* panel at least suggested that Section 704's finality requirement should not be viewed as jurisdictional. *See Navajo Nation*, 876 F.3d at 1171 ("[Section]

*Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).

The Complaint contains a single allegation that Defendants have an "officially sanctioned policy" of denying asylum seekers who present themselves at POEs along the U.S.-Mexico border access to the U.S. asylum process. (Comp. ¶ 5.) The only formulation of the alleged policy suggested by Plaintiffs is that CBP officials have a categorical policy of denying asylum seekers who present themselves at POEs along the U.S.-Mexico border access to the U.S. asylum system. (*Id.* ¶¶ 1–6.) A further variant of this policy is one in which CBP officials deny access through tactics of misrepresentations, harassment, coercion, threats, and physical violence. (*Id.* ¶¶ 95–101, ECF No. 143 at 23.) But the Court cannot locate a single agency action reflecting Defendants' alleged policy, let alone one that is final.

Neither the Complaint, nor Plaintiffs' opposition to the motion to dismiss "refer[s] to a single . . . order or regulation" of the Defendants' which constitutes or reflects an agency policy applicable to all CBP officials at POEs along the U.S.-Mexico border for the challenged conduct. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990) (rejecting plaintiffs' challenge to the Bureau of Land Management's alleged "land withdrawal program" because there was no agency action on which to base their challenge under the APA); *ONRC Action v. BLM*, 150 F.3d 1132, 1136 (9th Cir. 1998) (rejecting APA claims because "this case presents a situation where there is no identifiable agency order, regulation, policy or plan that may be subject to challenge as a final agency action').

Plaintiffs observe in opposition that a policy need not be in written form to exist, thus suggesting that the Court should infer the existence of a policy even if the Court cannot locate one reduced to writing. (ECF No. 143 at 21.) The Court readily acknowledges that "agency action . . . need not be in writing to be final and judicially

_____

704's requirement that to proceed under the APA, agency action must be final or otherwise reviewable by statute is an *independent element* without which courts may not determine APA claims.").

17cv2366

reviewable" pursuant to the APA. *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015). An unwritten policy can still satisfy the APA's pragmatic final agency action requirement. *See Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (reviewing challenge to an agency's "decision . . . to adopt [an unwritten] policy of disclosing confidential information without notice" because such a policy was "surely a consummation of the agency's decisionmaking process" that impacted the plaintiff's rights); *R.I.L.-R*, 80 F. Supp. 3d at 174–176 (determining that plaintiffs had shown a reviewable unwritten "DHS policy direct[ing] ICE officers to consider deterrence of mass migration as a factor in their custody determinations" as underlying the plaintiffs' detention). "[A] contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" *R.I.L.-R*, 80 F. Supp. at 184 (quoting *Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003)); *see also Aracely R.*, —F. Supp. 3d—, 2018 WL 3243977, at *16 ("Despite Defendants' assertions to the contrary, agency action need not be in writing to be judicially reviewable as a final action.").

Recent cases provide examples of challengeable unwritten agency policies in the immigration context. For example, in *R.I.L.-R*, the plaintiffs challenged two variants of an alleged DHS detention policy affecting Central American mothers accompanied by minor children. In sustaining the "narrower formulation of the relevant policy," the court rejected the government's APA finality argument that the plaintiffs had failed to identify a regulation, policy memoranda, or any other document memorializing the challenged policy. *R.I.L.-R*, 80 F. Supp. 3d at 174. The court determined that the plaintiffs had shown the existence of a "DHS policy direct[ing] ICE officers to consider deterrence of mass migration as a factor in their custody determinations" through firsthand knowledge and data showing that "ICE has been largely denying release to Central American mothers accompanied by minor children since June 2014." *Id.* These denials were "contrary to past practice" of DHS and, while claiming there was no policy document, Defendants had "essentially

conceded that the recent surge in detention during a period of mass migration . . . reflects a design to deter such migration." *Id.* at 175. The plaintiffs in *Aracely, R. v. Nielsen* challenged prolonged detention of asylum seekers who present themselves at POEs. They alleged a "de facto immigration policy promulgated by high-level officials in Washington D.C.," which began in 2014 and was "re-emphasized . . . after the 2016 Presidential election." *Aracely, R.*, —F. Supp. 3d—, 2018 WL 3243977, at *4. The alleged policy was "designed to serve as a deterrent to asylum seekers" by "ordering local officials to heavily weight immigration deterrence in deciding parole and similar forms of release." *Id.* The plaintiffs pointed to data showing that the parole release rate of the asylum seekers who crossed a U.S. POE was 80% in 2012, but dropped to 47% in 2015. *Id.* The *Aracely* court found this sufficient to show a final agency policy subject to APA review. *Id.* at *16.

To assess whether the Complaint shows an unwritten policy, the Court turns to the Complaint's pattern allegations. Plaintiffs rely on those allegations to defend the existence of an alleged policy and argue that they "have pled sufficient facts to show a widespread pattern or practice of denial of access to the asylum process[.]" (ECF No. 143 at 21.) The Court, however, is not convinced that the Complaint's disparate "examples"—in Plaintiffs' words—of conduct by CBP officials supports the inference that there is an overarching policy. *See Pearl River Union Free Sch. Dist. v. King*, 214 F. Supp. 3d 241 (S.D.N.Y. 2016) ("[T]his is not a case where a policy of some kind was plainly adopted and illuminated, albeit imperfectly . . . rather, at best, Plaintiff has alleged that Defendants took certain action with respect to it and asks the Court to surmise therefrom the existence of a broader policy."); *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) ("Plaintiffs appear to have attached a 'policy' label to their own amorphous description of the [defendant government agency's] practices. But a final agency action requires more.").

Unlike the unwritten policies challenged in *R.I.L.-R* and *Aracely*, the Complaint does not plausibly show the existence of the unwritten policy the Plaintiffs ask this

Court to infer.  As an initial matter, while the Complaint contains allegations about the tactics employed by various CBP officials (Compl. ¶¶ 83–103), there are no allegations connecting any of that conduct with an unwritten policy created by the Defendants.  In fact, Plaintiffs do not even allege that the Defendants were involved in the development of any policy in this case.  *Aracely, R.*, —F. Supp. 3d—, 2018 WL 3243977, at *4.  The Complaint's pattern allegations also fail to show a categorical unwritten policy of the type Plaintiffs suggest.  Even accepting the Complaint's references to documented instances of asylum seekers at POEs along the U.S.-Mexico border who were denied access to the asylum process, the Complaint expressly incorporates reports which show that many more asylum seekers were not denied access.[16]  For example, the Complaint cites a 2017 report from Human Rights First, which reports at least 125 occasions between December 2016 and March 2017 in which applicants for admission were denied access.  (Compl. ¶ 38 n.27.)[17]  Yet, the report also states that "CBP agents referred some 8,000 asylum seekers at [POEs]" along the U.S-Mexico border to credible fear interviews during the same period.  *See Crossing the Line*, at 1.  This information defeats the inference that a categorical policy of the nature Plaintiffs intimate exists.  *See R.I.L.-R*, 80 F. Supp. 3d at 174 (declining to find that "DHS adopted a categorical policy in June 2014 of denying

---

[16] Plaintiffs contend that "evidentiary arguments" regarding the existence of the unwritten policy they allege are not appropriate at the pleading stage.  (ECF No. 143 at 23 n.8.)  Because the Complaint expressly incorporates various reports and articles and provides the web links to them, the Court may consider these materials in full to assess the sufficiency of the allegations in the Complaint.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (courts may also consider "documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'").

[17] The Complaint provides the following source: B. Shaw Drake, *et al.*, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers*, Human Rights First, 16 (2017), https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf ["*Crossing the Line*"].

1  release to all asylum-seeking Central American families in order to deter further

2  immigration" given that "in some small number of cases" ICE granted bonds).

3       Both sides also dispute whether the Complaint shows the existence of an

4  unwritten policy based on the following allegation: "[o]n June 13, 2017, in

5  questioning before the House Appropriations Committee, the Executive Assistant

6  Commissioner for CBP's OFO admitted that CBP officials were turning away asylum

7  applicants at POEs along the U.S.-Mexico border."  (Compl. ¶ 103.)  However, the

8  Complaint does not incorporate any particular portion of the testimony of John

9  Wagner, Deputy Executive Assistant Commissioner for the Office of Field

10 Operations of CBP, and thus it is not clear that this information is properly reviewable

11 at the motion to dismiss stage.  Even if it were, the Court does not find the testimony

12 sufficient to show the existence of the unwritten policy Plaintiffs allege.  Insofar as

13 CBP is "working with Mexico to develop methods to control the flow of migrants

14 entering U.S. [POEs] at any given time" (ECF No. 135-1 at 16), that information does

15 not show the consummation of an agency decision-making process, let alone one that

16 applies to asylum seekers in the manner Plaintiffs allege.  As for the "contingency

17 plans" for a future "surge of migrants," (*id.*), it is unclear how a such a plan has any

18 application in this case because the Complaint does not allege that any Plaintiff was

19 turned away by CBP officials as part of a policy concerning migrant "surges."

20      In the absence of allegations showing a final agency order, rule, regulation,

21 policy, or plan to deny asylum seekers who present themselves at POEs along the

22 U.S-Mexico border—or allegations from which the Court could infer that one

23 exists—the Complaint fails to plead that Defendants have a policy this Court can

24 "hold unlawful and set aside."  5 U.S.C. § 706(2).  Because Plaintiffs may be able to

25 allege the existence of a policy, the Court dismisses without prejudice Plaintiffs'

26 Section 706(2) claim concerning an alleged policy.  This conclusion does not affect

27 the sufficiency of Plaintiffs' Section 706(1) claims.  *See Bark v. U.S. Forest Serv.*, 37

28 F. Supp. 3d 41, 50–51 (D.D.C. 2014) (rejecting challenge to "a generalized, unwritten

administrative 'policy,'" but permitting challenge to five challenged permits).

**IV. CONCLUSION & ORDER**

For the foregoing reasons, the Court **HEREBY ORDERS** that:

1. The Court **GRANTS IN PART** Defendants' motion to dismiss and **DISMISSES WITHOUT PREJUDICE**: (a) Plaintiffs A.D, B.D., and C.D.'s claims under Section 706(1) only insofar as they have sought to compel agency action under 8 C.F.R § 235.4, and (b) all Plaintiffs' claims under Section 706(2) regarding Defendants' alleged policy.

2. The Court **DENIES ON ALL OTHER GROUNDS** Defendants' motion.

3. The Court Plaintiffs **GRANTS LEAVE TO AMEND** the pleadings consistent with this Order. Plaintiffs may file a First Amended Complaint **no later than September 15, 2018**.

4. If Plaintiffs do not file an amended complaint or request additional time to do so by the foregoing date, Defendants shall file an Answer **no later than September 24, 2018**.

**IT IS SO ORDERED.**

**DATED: August 20, 2018**

Hon. Cynthia Bashant
United States District Judge

17cv2366