**FILED**

SEP **17** 2018

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, INC., *et al*. <br><br> Plaintiffs, <br><br> v. <br><br> KIRSTJEN NIELSEN, Secretary, U.S. Department of Homeland Security, in her official capacity, *et al*. <br><br> Defendants. | Case No.: 3:17-cv-02366-BAS-KSC <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PROTECTIVE ORDER** <br><br> **[Doc. No. 148]** |

Presently before the Court is a Motion for a Protective Order sought by the defendants regarding their preservation obligations of video and audio data collected at multiple Ports of Entry ("POE") along the Southwest border by the U.S. Customs and Border Patrol ("CBP"). For the reasons explained in greater detail below, defendants' Motion is **GRANTED** in part and **DENIED** in part.

///

///

///

///

## I.   BACKGROUND

### A.   Factual Background

The individual plaintiffs in this case are non-U.S. citizens who allege they were denied access to the asylum process in the United States because of defendants' policies, practices, and procedures for handling individuals that present themselves at POEs along the U.S.-Mexico border. [Doc. No. 1 at pp. 1-2]. The individual plaintiffs seek asylum in the United States due to fears of death or physical injury in their home countries, Mexico and Honduras, which they attribute to gang violence, drug cartels, and, in some cases, severe domestic violence. Plaintiff, Al Otro Lado, Inc., is an organization alleging that defendants' unlawful policies, practices, and procedures have forced it to divert substantial resources from other efforts to counteract defendants' alleged wrongful actions. [*Id.* at p. 4].

This case was filed as a class action. No class has yet been certified nor has a motion for class certification been filed since the case was transferred from the Central District of California to the Southern District of California. [Doc. No. 1]. The named plaintiffs, proceeding pseudonymously [Doc. No. 138], allegedly presented themselves to CBP officials at the San Ysidro and Otay Mesa, California, and Laredo, Texas ports of entry. [Doc. No. 1]. They seek to represent a class of asylum seekers who they allege were also denied appropriate access to the asylum process along the entire U.S.-Mexico border.

Before defendants' Motion to Transfer Venue was granted by the U.S. District Court for the Central District of California [Doc. No. 113] on November 21, 2017, the parties filed a Joint Rule 26(f) Report [Doc. No. 83]. Initial disclosures were exchanged in late October, 2017 [*Id.* at p. 5], and an initial round of requests for production of documents and responses thereto were exchanged. [*Id.* at pp. 5-6]. This Court stayed discovery on January 31, 2018. [Doc. No. 144]. The instant dispute was filed as a Joint Motion on February 20, 2018. [Doc. No. 148]. Therein, defendants informed the Court that the dispute required speedy resolution due to an imminently scheduled technological infrastructure event that would result in the *permanent deletion of all currently stored video*

*and audio data on the San Ysidro POE surveillance system.*[1] That Electronically Stored Information ("ESI") deletion forms the basis of the instant dispute. The Court held a hearing on the Joint Motion on February 28, 2018. [Doc. No. 150]. At the conclusion of the hearing, the Court issued an Order staying the scheduled technological infrastructure event described by defendants as the "transition" of the San Ysidro POE to the Centralized Video Surveillance System ("CAVSS"), pending a ruling by this Court on the instant Motion. [Doc. No. 153]. On March 9, 2018, defendants filed Supplemental Briefing as ordered to address the questions posed by the Court during the hearing. [Doc. Nos. 156, 161].

## B. Technological Infrastructure of CBP Surveillance Systems

For a better understanding of the respective arguments of the parties, a brief summary of the surveillance system infrastructure at CBP POEs is appropriate.

Any video or audio data recorded by CBP under its current system begins with multiple cameras and microphones positioned throughout POE facilities. [*See, e.g.,* Doc. No. 148-22, Decl. of Adrian C. Guerra]. Some cameras are associated with microphones, while some microphones are free standing, recording audio not *directly* tied to a specific camera. [Doc. No. 148]. All such data is recorded to either Digital Video Recorders ("DVRs") or Network Video Recorders ("NVRs"). No hardware-specific differences between these devices have been communicated to the Court other than the representation that, "[i]n general, DVRs have smaller hard drives than NVRs, and so are generally capable of storing a smaller quantity of data." [Doc. No. 148-18 at p. 4, Decl. of Heather M. Robinson]. For this reason – and because NVRs have the added benefit of remote access and updating as discussed below – NVRs are preferred, and CBP is working across POEs to replace DVRs with NVRs where possible. [*Id.*].

---

[1] Other than limited surveillance data that has already been archived.

CBP is in the process of implementing its preferred means of surveillance data management nationally through the Centralized Video Surveillance System ("CAVSS") at the San Ysidro POE, an "enterprise-wide program that is intended to be the fixed facility surveillance solution for the agency."[2] [*Id.* at p. 2]. A fully operational CAVSS system at a POE includes DVRs, NVRs, viewing monitors, computer workstations, storage devices (e.g., DVDs, CDs, hard drives, and other storage devices), and specialized software (such as the Video Management Software ("VMS") used to review and then archive data for longer-term preservation). [*Id.*]. Importantly, CAVSS permits CBP officials "to centrally and remotely maintain" NVRs on the system, allowing CBP to swiftly address cybersecurity vulnerabilities. [*Id.* at p. 8]. Some POEs have already been partially integrated into CAVSS, while others have not. [*Id.*].

For those surveillance systems already on CAVSS, the aim is to preserve video and audio data for 90 days before it is overwritten. [*Id.* at p. 4]. The overall tenor of CBP's briefing suggests that it is more common for cameras to begin overwriting video sooner than the 90 day standard. Some cameras begin overwriting in less than thirty days, while others might not begin overwriting for nearly 700 days.[3] [Doc. No. 148-22, Decl. of Adrian C. Guerra]. The more movement in a camera field of view, the more data it records, the more quickly the allocated storage is filled, and thus the more quickly overwriting occurs. [Doc. No. 148-16 at p. 4]. As a result, cameras that pan, zoom, or focus on areas of high traffic will capture more data per second of video than fixed cameras, or cameras in less

---

[2] CAVSS began as a surveillance system deployed along the U.S. northern border, but was later deemed important to implement at southern border POEs post September 11, 2001. [Doc. No. 156-3, p. 3]. The system did not receive congressional funding to cover management or implementation costs until 2016. Up until 2015, the Border Security Development Office implemented CAVSS when and where it could across the southern border depending on where the need was greatest. Ms. Robertson explains that the implementation was piecemeal because the Border Security Development Office was limited to using operational funds in the absence of clearly segregated funding. [*Id.* at pp. 3-4].

[3] The number of days surveillance data is retained before being overwritten is distinct from non-retention due to power outages, equipment malfunctions, and the normal challenges facing any large scale surveillance system.

4

1 trafficked areas. [*Id.*]. In sum, regardless of whether a surveillance system in its entirety,
2 some portion, or no portion has been integrated into CAVSS, the quantity of data preserved
3 at a POE may vary substantially. [*See* Doc. Nos. 148-16, 148-22, 148-23, 148-24, 148-
4 25]. This is true of the San Ysidro POE in its current, non-CAVSS integrated state.

5 Because all data is eventually overwritten, CBP personnel can choose to retrieve
6 relevant video or audio data to "archive" specific, identifiable incidents. [Doc. No. 148-16
7 at p. 6]. The most common storage method appears to be DVDs, however personnel also
8 use external hard drives. [Doc. Nos. 148-16, 148-22, 148-23, 148-25]. Archives are for a
9 "specific" and "abbreviated" time period, commonly referred to as an "incident."
10 "Incidents" are "identified, archived, and preserved as soon as possible after their
11 occurrence." [Doc. No. 148 at p. 12]. This process is "labor and resource-intensive" so
12 CBP personnel at the Laredo Field Office, for example, find it neither "practical [n]or
13 necessary to preserve all footage. . ." [Doc. No. 148-22 at p. 4]. CBP "does not generally
14 have the resources to indefinitely archive all video data." [Doc. No. 148-16 at p. 6].

15 Counsel for the government took great pains at the hearing to impress upon the Court
16 that "the system is designed for incident-specific archiving" and that CBP does not ever
17 contemplate holding on to, for example, "a whole day of video." [Doc. No. 157 at p. 10].
18 This point is reiterated in its Supplemental Brief when CBP writes "[d]efendants' technical
19 infrastructure is only able to support archiving of specific incidents such as alleged defined
20 crimes or a specific altercation." [Doc. No. 156 at p. 4]. Implicit in defendants' statements
21 is that retention of surveillance data beyond a narrow, time-bounded "incident" is possible,
22 but exceeds CBP's current practices and available data storage infrastructure.[4]

23
24
25

26 [4] Elsewhere in defendants' papers, CBP states that it has retained seven months of surveillance data of
individuals that withdrew their applications for asylum. [Doc. No. 148 at p. 1]. While the *exact* nature of
27 that surveillance data or why the government chose to retain this data has not been explained to the Court,
it is nonetheless important when parsing the assertions regarding the full scope of CBP's preservation
28 capabilities. *See* Discussion, Section II, *infra*.

To reiterate, CBP's practice is to save only a small amount of data (i.e., specific incidents as needed) to a DVD, CD, or external hard drive. [Doc. Nos. 148-16, 148-22, 148-23, 148-25]. CBP did not provide the typical costs incurred by the agency for preserving limited "incidents" in its normal course of operations. CBP also did not provide the costs associated with retaining the surveillance data that it has already agreed to preserve and produce for purposes of this lawsuit. CBP continues to maintain that the only feasible way to satisfy plaintiff's preservation requests is to preserve *all* surveillance ESI currently stored to date at the San Ysidro POE. [Doc. No. 161 at pp. 11-12].[5]

In support of its description of the burden imposed when identifying and preserving electronic data for specific incidents, CBP provided contradictory explanations and declarations. The Declaration of Mr. Adrian C. Guerra, Program Manager for Border Security at the Laredo Field Office states the following, rough, rule of thumb:

> [I]n my experience, when an incident has been identified as requiring preservation, the process can take as many man hours to complete as the time period provided to identify the incident . . . . For example, if a window of 3 hours is provided with a general description of the individual involved, and a specific POE in which the even occurred, it could take up to 3 hours to identify the relevant data . . . . Having as much information about an event as possible – [like] date, time and location of event, a relevant date of birth, alien number, and description – makes identifying the relevant data much more efficient and potentially near instantaneous.

---

[5] This all or nothing rationale is best captured in the following excerpt:

> The cameras at PedWest and AEU capture processing of all individuals, which would include "those seeking asylum or expressing a fear of return to their countries of origin," (ECF No. 148-15, Hood Decl. ¶ 10), and the AEU video cameras "capture the processing of all . . . aliens, not just a particular subset, such as those seeking asylum or expressing a fear of return to their countries of origin [.]" Hood Decl. ¶ 8. All individuals, "regardless of their citizenship and immigration status," are subject to inspection by CBP officers. *See* Hood Decl. ¶ 5."

3:17-cv-02366-BAS-KSC

[Doc. No. 148-22 at p. 5-6]. The more detailed the identifying information given to CBP personnel, the faster an incident can be identified in the stored surveillance data. According to Mr. Guerra, specific incidents can almost always be archived if brought to CBP's attention within 30 days of the incident. [Doc. No. 148-22 at p. 5-6]. By contrast, in his Supplemental Declaration, Johnny Armijo contends it took 4.5 weeks for one CBP officer to find the video and audio data of the named plaintiffs, even with their identifying information.[6] [Doc. No. 156-1].

To date, two facilities at the San Ysidro POE – Pedestrian West Facility ("PedWest") and the Admissibility Enforcement Unit ("AEU") – have not been integrated into CAVSS. [*Id.* at p. 6]. The CBP official overseeing POE integration, Heather Robinson, was notified in July, 2017 that the San Ysidro POE was ready to be transitioned to CAVSS. [Doc. No. 156-3 at p. 5]. Ms. Robinson' office was also notified around the same time that the transition would need to be delayed due to this litigation. [*Id.*]. The transition was subsequently set for January 31, 2018 [*Id.*], but was further delayed to March 5, 2018 when plaintiffs objected. This Court stayed the transition to CAVSS at the San Ysidro POE scheduled for March 5, 2018, which the government emphasizes "increases the risk that

---

[6] As explained by Mr. Armijo, archiving the video took so long because:

> "CBP cannot simply 'automatically retrieve pertinent video footage and/or audio files; the whole process is manual.' Armijo Supp. Decl. ¶ 3. The officer pulling and archiving the video and audio files of named [p]laintiffs had to 'determine each and every part of the ports that each [p]laintiff had passed through. Then he had to determine which cameras or microphones would capture each [p]laintiff in each of those locations, and then determine which NVR . . . those cameras and/or microphones were associated with. [Next] he had to review the pertinent video footage and/or audio files on each of those NVRs, and copy that video footage and/or audio files to an external storage device."

[Doc. No. 156 at p. 16]. Presumably a map or list of the cameras and microphones that correlate with specific regions of a POE, once made, would expedite the process of matching an individual's path through a POE with the audiovisual recordings on which he or she might appear.

the system will be corrupted by a cyber-event or hacked by an outside entity." [*Id.* at p. 6].[7] Notably, following service of the instant lawsuit, CBP did not alter its automatic deletion of electronic surveillance data. Furthermore, the Order by this Court staying the transition to CAVSS did not halt the standard overwriting policy consistently in place on CBP DVRs and NVRs at the San Ysidro POE.[8]

## C.  Relief Requested

The defendants seek permission from this Court to transition to CAVSS at the San Ysidro POE, which as stated will result in the destruction of all electronic data from their current system that has not otherwise been retained. Before this transition, they have agreed to preserve and produce the following materials:

> (1) video of currently-named plaintiffs to the extent it is identifiable and in existence;
>
> (2) recordings preserved by CBP of arriving aliens at the San Ysidro POE, which were made during the process of these aliens seeking to withdraw their applications for admission, between October 28, 2016, and June 8, 2017;
>
> (3) video retained in the official case files for investigations conducted by investigative entities into allegations of misconduct by CBP officers at southern land POEs since January 1, 2016, which are similar to allegations in the Complaint; and,
>
> (4) video of discrete incidents involving any named plaintiffs, if identified by name, A-number or date of birth, date and time of incident, and port location, and provided to defendants within 30 days of the incident.

[Doc. No. 148 at p. 2].

---

[7] The Court was not informed of impending transition events to CAVSS at other relevant, southern border POEs. Consequently, this Order pertains only to the CAVSS transition at the San Ysidro POE.

[8] It is not evident to this Court that the plaintiffs asked CBP to cease entirely its normal ESI over-writing procedures.

Plaintiffs do not object to the production of the above referenced electronic data, but also seek the following:

(a) recordings preserved by CBP of arriving aliens at all southern border POEs, which were made during the process of these aliens seeking to withdraw their applications for admission, from January 1, 2016 to the present. Plaintiffs also note that defendants are obligated to preserve related audio recordings where available.

(b) video of identifiable incidents involving any individual where port location, date, time, and identity are provided within 45 days; [and,]

(c) video of the lines of individuals waiting in Mexico to access the southern border POEs.[9]

[*Id.* at p. 49, n. 1]. The defendants object to plaintiffs' first and third requests. With respect to the second request, it is comparable to defendants' category No.4 for preservation and production, except the number of days required for notification to defendants of any request to preserve information related to specific incidents. Defendants seeks a Protective Order affirming their arguments that each request by plaintiffs exceeds the scope of preservation required under the Federal Rules of Civil Procedure and that such information need not be preserved or produced.

/ / /

---

[9] Plaintiffs clarified, and narrowed, the scope of this request during the discovery hearing. Counsel stated:

> [O]ur complaint covers the improper interactions between CBP and Mexican authorities; for example, the ticketing system and pulling people from lines to get into the ports of entry. So these incidents are relevant to the complaint.
>
> And as we've explained to the defendants, we are willing to narrow the request. We're not seeking wholesale preservation of these lines outside the ports of entry, rather, *we have identified a specific timeframe within that week* [December 17-27, 2017] *that was recorded in the new report.* And also (inaudible) specific cameras that are already in existence. And again, *moving forward, we'd like a 45-day window from learning of a relevant incident to request that footage from the defendants.*

[Doc. No. 157 at p. 21 (emphasis added)].

9

## II.  **LEGAL STANDARD**

### A.  **Factors To Consider for Granting a Protective Order**

A Court may, for good cause shown, enter a protective order pursuant to Federal Rule of Civil Procedure 26(c).  Rule 26(c) permits the Court to alter the method of discovery requested by a party, allocate costs, and/or forbid inquiry into some matters entirely. Rule 26(c)(1)(A)-(H).  The party seeking a protective order under Rule 26 bears the burden of demonstrating good cause and the "particular need" for protection. Nonetheless, Rule 26(c) "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Robinson v. Chef's Warehouse*, 3:15-cv-054210-RS (KAW), 2017 WL 836944, at *1 (N.D. Cal. Mar. 3, 2017) (citing *Seattle Times v. Rhineheart*, 467 U.S. 20, at 36 (1984)).

Complicating the Rule 26(c) analysis here is that CBP requests the Court to protect it from over-burdensome *preservation* and *production*. Typically, Courts are presented with requests seeking the preservation of relevant data, not requests like the one at issue where the party requesting the protective order seeks judicial permission to *destroy* potentially relevant documents and information.  Accordingly, there is minimal case law support for defendants' request.  Nonetheless, this Court will consider the following general factors when evaluating whether a protective order is appropriate:

> 1) the level of concern the court has for the continuing existence and maintenance of the integrity of the evidence in question in the absence of an order directing preservation of the evidence; 2) any irreparable harm likely to result to the party seeking the preservation of evidence absent an order directing preservation; and 3) the capability of an individual, entity, or party to maintain the evidence sought to be preserved, not only as to the evidence's original form, condition or contents, but also the physical, spatial and financial burdens created by ordering evidence preservation.

*Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 433034 (W.D. Pa. 2004).  Other courts rely on a two-factor test laid out in *Pueblo of Laguna v. U.S.*, 60 Fed. Cl. 133, 138 (1991) ("To meet the first prong of this test, the proponent must show that absent a court order, there is significant risk that relevant

10

evidence will be lost or destroyed. [ . . . . ] [Second], the proponent must show that the particular steps to be adopted will be effective, but not overbroad . . ."). "The difference between these two tests lies in what the moving party must show with respect to the content of the evidence that is in danger of being destroyed. However, the distinction is more apparent than real." *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 370 (S.D.N.Y. 2006).

This Court favors the three-factor *Capricorn* test because, at bottom, it more squarely addresses the key considerations of a party's preservation obligations: whether the information at issue is relevant to the parties' claims and defenses, and whether the ability and effort necessary to preserve the information is proportional to the needs of the case. It is those issues the Court prioritizes in evaluating this dispute.

## B. Scope of Duty to Preserve

The seminal cases discussing a litigant's duty to preserve address when the duty is triggered and the scope of the duty. *See, e.g., In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). The duty to preserve documents is triggered "when a party should have known that the evidence may be relevant to future litigation." *Zubulake*, 220 F.R.D. at 216. Once triggered, "a litigant must preserve evidence which it knows, or would reasonably know, is relevant to the parties' claims or defenses." *See In re Napster*, 462 F. Supp. 2d at 1067; *see also Apple v. Samsung Electronics Co., Ltd.*, 881 F. Supp. 2d 1132, 1136 ("The duty to preserve evidence also includes an obligation to identify, locate and maintain, [relevant] information") (internal quotation and citation omitted). While an opposing party might explicitly request preservation of some information, parties must also independently evaluate their obligation to preserve. *Starline Windows Inc. v. Quanex Bldg. Prod. Corp.*, No. 15-cv-1282-L-WBG, 2016 WL 4485568, at *12 (S.D. Cal. Aug. 19, 2016); *see also Scalera v. Electrograph Systems, Inc.*, 262 F.R.D. 162, 171 (E.D.N.Y. 2009) (the "obligation to preserve relevant evidence exists whether or not the evidence has been specifically requested in a demand for discovery."). "Attorneys must take responsibility for ensuring their clients conduct a comprehensive and appropriate . . . search . . . . The

Committee's concerns are heightened in this age of electronic discovery when attorneys may not physically touch and read every document within the client's custody and control." *Qualcomm Inc. v. Broadcom Corp.*, No. 05-CV-1958-RMB-BLM, 2008 WL 66932, at *1 (S.D. Cal. Jan. 7, 2008), *vacated in part*, No. 05-CV-1958-RMB-BLM, 2008 WL 638108 (S.D. Cal. Mar. 5, 2008).

The scope of a party's duty to preserve is the same as the scope of discovery articulated in Rule 26(b)(1); namely that a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26. Preservation is evaluated on a standard of *reasonableness*, which is in turn informed by proportionality. *See, e.g., Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 522 (D. Md. 2010) ("Whether preservation or discovery conduct is acceptable in a case depends on what is reasonable, and that in turn depends on whether what was done–or not done–was proportional to that case and consistent with clearly established applicable standards."). Thus, the standard reflects the reality that "perfection in preserving all relevant electronically stored information is often impossible." Fed. R. Civ. P. 37(e) Adv. Comm. Notes (2015).

When considering the preservation or production of ESI, a frequent issue is its accessibility. *See generally Zubulake v. UBS Warburg*, 216 F.R.D. at 284. The linchpin of accessibility analysis is the effort or expenditure of resources required to access and/or produce relevant ESI. *See Quinby v. West LB AG*, 245 F.R.D. 94 (S.D.N.Y. 2006); *see also Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. 5-2310 (DCD/JJG), 2007 WL 3333987, at *1 (D. Minn. Feb. 1, 2007). Courts emphasize that "the primary source of ESI to be produced during discovery's progression should be *active* ESI, typically defined as ESI currently or habitually in use by the requested entity." *U.S. ex rel. Carter v. Bridgeport Educ., Inc.*, 305 F.R.D. 225, 238 (S.D. Cal. 2015) (quoting *The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic*

*Document Production 139* (2d ed. 2007)). [11] Yet with the declining practice of storing ESI as "inactive data," courts have shifted their focus to consideration of the cost and effort needed to retain allegedly inaccessible data. *The Sedona Principles*, *Third Edition*, 19 Sedona Conf. J. 139 (2018). Considerations include whether active data is frequently overwritten to make space for new data, or whether data is difficult to search, thus compounding time and labor costs.

In short, sensitivity to "on-the-ground" realities of a party's ESI management and maintenance is necessary, and the parties bear the burden of sufficiently educating a court about those nuanced realities. It is all the more important, therefore, that parties state clearly the relief they seek and the technical details undergirding a dispute. Parties are best served by carefully tracking the process by which they identify and preserve relevant ESI in the event of a dispute. The Sedona Conference recently affirmed the value of this approach in its most recent Statement of Principles:

> Responding parties and their counsel should consider what documentation of their discovery process (i.e., preservation, collection, review, and production) is appropriate to the needs of the particular case. Such documentation may include a description of what is being preserved; the processes and validation procedures employed to preserve, collect, and prepare the materials for production; and the steps taken to ensure the integrity of the information throughout the process . . . . *Having documentation can help respond to legitimate challenges* . . . *—even those made years later—to the processes employed, avoid overlooking ESI that should be collected, and avoid collecting ESI that is neither relevant nor responsive to the matter at issue.*

*Sedona Principles*, *Third Edition*, 19 Sedona Conf. J. 126-27 (2018) (emphasis added).

/ / /

---

[11] The Third Edition of the Sedona Principles describes active data as follows: "Active Data . . . is information residing on the direct access storage media (disk drives or servers) that is readily visible to the operating system and/or application software with which it was created, and is immediately accessible to users or administrators without restoration or reconstruction." *The Sedona Principles*, *Third Edition*, 19 Sedona Conf. J. 138 (2018).

## III. **DISCUSSION**

Below, the Court analyzes the discovery issues raised in the defendants' Motion for Protective Order [Doc. No. 148]. Section A addresses defendants' posture regarding the instant dispute and whether it has complied fully with its preservation obligations. Section B addresses the preservation request for CBP surveillance data of individuals withdrawing their applications for admission. Section C addresses whether plaintiffs' request for 45 days, rather than 30 days, in which to bring an incident to the attention of CBP for preservation is appropriate. Section D addresses whether CBP must preserve surveillance data of lines stretching south from the San Yisdro POE into Mexico for a limited period of time in December, 2017.

### A. **Defendants Have Failed To Adequately Fulfill Their Affirmative Preservation Obligations**

Before addressing the issues for which defendant seeks a Protective Order, the Court finds it necessary to address some of defendants' underlying arguments and factual assertions. After careful review of the briefing and discovery hearing transcript, this Court concludes that defendants have consistently failed to consider their affirmative duty to preserve documents and information. In so doing, the defendants have misconstrued plaintiffs' preservation requests as over-burdensome. While plaintiffs are required to articulate defined requests for preservation and/or production, so too must defendants take seriously their independent obligation to preserve information, and to arrive at workable preservation solutions, which balance the proportionality of preservation against the need for eventual production of information.

The recent amendments to Rule 34 of the Federal Rules of Civil Procedure, although addressing requests for production, are instructive.[12] Rule 34(b)(2)(C) obligates a responding party, when faced with a request for production, to "state whether any

---

[12] This Court notes that while preservation issues in this dispute are presented in the context of a Motion for a Protective Order, they could have easily arisen in response to an objection by the defendants to a request for production of ESI.

responsive materials are being withheld on the basis" of its objection. Fed R. Civ. P. Rule 34 (2015). The Advisory Committee Notes explain that when a party objects to a request for production because it is overbroad, it must also acknowledge if "some part of the request is appropriate [and] state the scope that is not overbroad." Advisory Committee Notes, Fed. R. Civ. P. 34 (2015). Parties are not excused from this obligation because their data systems are complex, making it difficult to map exactly where data resides. Nor is a party excused from this obligation because a workable solution is not immediately apparent. "A party responding to a document request cannot furnish only that information within his immediate knowledge or possession; he is under an affirmative duty to seek that information reasonably available to him from his employees, agents, or others subject to his control." *Bryant v. Armstrong*, 285 F.R.D. 596, 607 (S.D. Cal. 2012) (internal quotations and citation omitted).

In the same way that the relevance standard of Rule 26 is the touchstone for the scope of preservation, so too is Rule 34 for a party's obligation in the face of allegedly objectionable preservation requests. Each party has an obligation to think critically, not to object reflexively. *See, e.g., Hee Nam You v. Japan*, No. C 15-03257 WHA, 2015 U.S. Dist. LEXIS 123877, at *2-5 (N.D. Cal. Sept. 16, 2015) (approving defendant's request for a protective order upon review of defendant's proposed alternative preservation solution in the face of a regular data erasure policy); *Brown v. Tellermate Holdings, Ltd.*, No. 2:11-cv-1122, 2014 U.S. Dist. LEXIS 90123, at *19 (S.D. Ohio July 1, 2014) (admonishing defense counsel that misrepresentations in its briefing regarding their client's data systems could have been prevented "had the right questions been asked of the right people.").

Throughout defendant's briefing and at the discovery hearing, they emphasized that their surveillance infrastructure permits *only* "incident specific" archiving. [*See* Doc. No. 148 at p. 39]. The manner in which CBP selectively chooses to archive incidents recorded by its surveillance system, however, does not mean that CBP is unable to preserve larger quantities of data. CBP has simply determined that preserving specific incidents is the best method to meet its operational needs. [Doc. No. 148 at p. 33]. As acknowledged, hundreds

of thousands of hours worth of readily accessible, surveillance data exists on CBP NVRs and DVRs at any given moment. [*See* Doc. Nos. 148-16, 148-22, 148-23, 148-24, 148-25]. If it so chose, CBP could preserve a 15 day portion of video recorded at an entire POE, or, presumably, video from a limited number of cameras at a POE.[13] Defendants' briefing admits as much.[14] That litigation may require a party to deviate from its normal data ESI management protocols is not unusual, or on its face, a viable basis for objection. Nor does a data management system that regularly overwrites information in the normal course of operation excuse a party from fulfilling their duty to preserve documents and information.

Emphasizing the "incident specific" nature of CBP surveillance systems dovetails with defendants' most frequently used argument against preservation: to construe every request by plaintiffs to require "wholesale preservation" of *all* existing ESI on CBP NVRs and DVRs across a single POE, or every POE. [Doc. No. 148 at p. 21]. For example, defendants assert that plaintiffs' requests for 45 days' notice to bring an incident to their attention, *and* to preserve surveillance data of individuals withdrawing their applications for admission would require the "wholesale preservation" of all surveillance ESI at the entire San Ysidro POE. [*Id.* at 21]. This Court acknowledges that holding onto every second of video at a POE may, indeed, be over-burdensome. Recognizing that, the Court sought at the discovery hearing to strike a balance, and asked defendants how the quantity of preserved ESI could be tailored to reduce the amount of ESI subject to preservation, and perhaps later, production:

---

[13] To the extent that this the Court misstates the archival capabilities of defendants' surveillance system, the fault for that misunderstanding lies with defendants for their failure to provide such detailed information, even following inquiry from this Court.

[14] Larger scale preservation is undertaken by CBP only when "required for some evidentiary or operational reason." [Doc. No. 161 at p. 1]. In fact, seven months of surveillance data at the San Ysidro POE was preserved by CBP for just such an unknown, unexplained, and undefined "operational reason", and is *exactly* the type of data plaintiffs' request be preserved. (*see* Section II, *infra*). Given CBP has preserved such quantities of data before, the Court is forced to conclude – whatever CBP has asserted to the contrary – that its reluctance to preserve identical information in this case is the product of preference and unwillingness to incur the associated costs, not capability.

3:17-cv-02366-BAS-KSC

Court: And has the . . . government identified which specific cameras and microphones within the two locations at San Ysidro, mainly Ped West and AEU, might have relevant recorded interactions between plaintiffs – potential plaintiffs and CBP?

I mean, the Robertson declaration points out the tremendous costs associated with archiving and how much data is at issue at the port in general. I'd like to know whether there are any specific cameras and microphones that are at issue that really would contain the information which is relevant to this case. Do you know the answer to that?

Ms. Saeed: We – we have retained video of all named plaintiffs at this time. I think we would have to – we would have to . . . check into that.

Court: Alright. So that's another thing I need to know, the specific cameras and microphones that are most likely to have relevant recorded interactions between the named plaintiffs and any potential plaintiffs, which obviously would be coming through the same entry spots, and where those cameras and microphones are located. And I'm asking specifically now for San Ysidro.

[Doc. No. 157 at pp. 33-35]. The Court recognizes, as it did at the hearing, that it is unlikely a single camera or microphone would record *all* relevant data. Hence the request for more narrowly drawn preservation options. Despite the Court's request for this specific information, the defendants doubled down in their Supplemental Briefing and accompanying declarations, continuing to assert an all or nothing approach, thereby ignoring this Court's specific request for this information that might allow for the issuance of a tailored, more cost-effective solution.[15]  [See Doc. No. 161 at p. 11 citing Doc. No. 148-15].

---

[15] This is not the only example of explicit requests by the Court for which defendants provided either insufficiently detailed answers or no meaningful response at all. Some of the questions listed below, the Court understands, do not align perfectly with the on-the-ground realities. Nonetheless, and as the Court explained, *supra*, the government is obligated to provide sufficient detail so a reasonable determination can be articulated by the Court. Below are some of the questions for which either no, or unsatisfactory, answers were provided by the government:

There are 207 cameras and 55 microphones recording to 20 NVRs at the San Ysidro Ped West and AEU facilities. [*Id.* at p. 10]. As previously addressed, some cameras are affiliated with microphones while others are not. [*See, e.g.*, Doc No. 148-22]. Given the

---

Court: [W]hat I'm thinking about is any location where there would be direct – where there's an opportunity for an asylum applicant to have any direct contact with an officer.

Ms. Saeed: We'll have to – we'll have to look into that.

Court: Okay. And I do see paragraph 15 of the Robertson declaration talks about 162 cameras and 31 microphones at Ped West, and 45 cameras and 24 microphones at AEU. I don't know how many of those pertain to the actual interview area where there would be direct interaction, but if you could clarify that, that would be helpful.

[Doc. No. 157 at pp. 36-37].

---

Court: Okay. And you see – I mean, if we are talking about a more concise group of cameras, then that – that cost may be less if it – if it can be segregated. And I don't know if it can.

Ms. Saeed: I think part of the issue is that there are a lot of different people coming through these areas, including legal permanent residents, U.S. citizens, so it's kind of hard to segregate, and that this would be an extremely burdensome cost for the government. Even if the cost was reduced . . . .

Court: I'm just trying to get a better understanding of what the circumstances are, and there's a lot of generalities in the declaration, which is why I'm asking for specifics.

But it may be that that cost relates to a much broader scope of information than is actually necessary. In other words, if there are just specific cameras that are used when there's interaction with asylum seekers that may be, you know, cameras 10 through 20 out of 200 cameras, which may be a much more succinct and limited amount of data.

[*Id.* at pp. 37-39].

---

Court: You're still not answering my question, and the declarations don't address it. What I want you to find out is, are there certain locations where the asylum – where interaction with the asylum applicants take place, and if there are, I want to know what cameras are controlled or are geared and relevant to those particular locations.

[*Id.* at p. 40].

1   allegations in the Complaint, cameras paired with microphones would likely be the most
2   valuable as they would record conversations between asylum seekers and CBP personnel.
3   Perhaps the preservation of recorded video from a limited number cameras would provide
4   a bird's eye view of the interior region where interactions at issue occur. Those recordings
5   conceivably could be coupled with audio recordings to preserve the relevant incident(s).
6   Further, while the surveillance system functions 24/7, one might inquire whether a greater
7   number of persons flow through the facilities during the daytime hours than at night. These
8   are the kinds of line-drawing efforts the Court expected defendants to address in order to
9   find a reasonable preservation solution. Defendants failed, without any satisfactory
10  explanation, to provide this information, or otherwise engage in meaningful meet and
11  confer efforts on this issue as required by this Court. *See* Judge Crawford Chambers' Rules,
12  V(B).

13       Defendants also miss the mark when characterizing all CBP surveillance data they
14  would prefer not to produce as "inaccessible." For example, defendants' state that "video
15  of any identifiable individuals within 45 days of all southern land border POEs, as well as
16  video capturing lines in Mexico at the San Ysidro POE is an *inaccessible source of ESI*
17  that defendants should not have to preserve or produce." [Doc. No. 148 at pp. 39-42
18  (emphasis added)]. They assert the data is inaccessible because: (1) to meet plaintiffs'
19  requests would exceed the capacity of its existing storage infrastructure and so compliance
20  would require that more storage be created; and (2) the large scale video preservation that
21  plaintiffs propose is not "accessible" because the data 'need[s] to be restored or otherwise
22  manipulated to be usable.' [*Id.* at 40 *quoting Zubulake v. UBS Warburg, LLC*, 217 F.R.D.
23  309, 320 (S.D.N.Y. 2003)].

24       Defendants have not persuaded this Court that targeted and narrowly drawn
25  archiving is unachievable. That the production of such data might be costly or inconvenient
26  does not, by definition, render it "inaccessible." The defense has acknowledged that data
27  on CBP servers is easily accessed and frequently archived. *See* Background, Section II,
28  *supra.* Consistent with the time and labor necessary to procure the information, the Court

19

expects the parties to meet and confer to arrive at reasonable solutions balancing CBP's limitations with plaintiffs right to relevant ESI.

The Court also fundamentally disagrees with defendants' analogy to *Zubulake* for the proposition that *all* CBP surveillance ESI is inaccessible. *Zubulake*, 217 F.R.D. at 320. *Zubulake* addressed the accessibility of information on backup tapes, which is the paradigmatic example of an inaccessible ESI storage medium. *Id.* To access ESI on a backup tape requires substantial effort and cost because, in many cases, it is necessary to restore an entire server's worth of information to access the limited information sought. *Id.* at 314. By contrast, CBP personnel regularly access surveillance ESI because it is active data, while backup tapes are inactive. *Id.* Moving active and easily accessible ESI from one storage medium to another does not, by itself, render it inaccessible.

In sum, defendants have failed to recognize their preservation obligations, and in turn, take seriously these obligations, nor have they answered explicit questions put to them by the Court. These failures unnecessarily complicates and hamstrings the ability of this Court to analyze and craft reasonable and appropriate solutions.

## B.    Defendant CBP's Obligation to Preserve Surveillance Data of Individuals Withdrawing Their Applications for Admission

Plaintiffs request that CBP preserve recordings "of arriving aliens at all southern border POEs [that] were made during the process of these aliens seeking to withdraw their applications for admission, from January 1, 2016 to the present." [Doc. No. 148 at p. 49 n. 1]. CBP has already preserved recordings of "arriving aliens [that withdrew their applications] at the San Ysidro [POE] . . . between October 28, 2016 and June 8, 2017." [*Id.* at p. 1]. Defendant's agreed to preserve those seven months of such incidents at the San Ysidro POE because it had already done so for "operational reasons."[16] [Doc. No. 157

---

[16] Defendants fails to define "operational reasons", nor do they explain why they were able to retain such a large amount of data for their own purposes while arguing that the preservation of similar ESI requested

at p. 27]. Preserving data for "operational reasons" implies CBP did so independent of and *before* its duty to preserve arose from this litigation, and before plaintiffs requested this information.[17] [*Id.*]. Defendants otherwise assert CBP cannot preserve incidents that occurred seven months before the date on which it searches its surveillance storage systems because data will almost always be overwritten after the passage of so much time. CBP further clarifies that the seven months of surveillance data from the San Ysidro POE is the only available data of withdrawals it has retained. [Doc. No. 161 at p. 3]. CBP does not normally archive surveillance data of individuals who withdraw their applications for admission and is "aware of no other recordings having been made" at other POEs at which named plaintiffs' claims occurred. [*Id.*].

CBP opposes preserving recordings of incidents at *all* southern border POEs from January 1, 2016 to the present in which arriving aliens have withdrawn their applications for admission [Doc. No. 148 at p. 1], but does not explain with any precision why it opposes the request. The clearest argument articulated by the defense for why CBP should be relieved of its obligation to preserve the ESI under discussion is contained in CBP's supplemental briefing:

> Defendants independently informed Plaintiffs of the existence and preservation of the San Yisdro withdrawal videos for the dates specified, just as Defendants became aware of the recordings at San Ysidro. Finally, Defendants do not have any operational need or the technical infrastructure necessary to record and preserve anything other than specific, discrete incidents (unless required for some evidentiary or operational reason); thus there is no reason to archive 100% of all NVR and DVR recordings. Ex. C, Supplemental Declaration of Heather M. Robinson.

---

by plaintiffs is "inaccessible." If the data is "inaccessible" because it is too costly to preserve, defendants again fail to explain why the cost was justified then for their own "operational reasons", but not now when plaintiffs request the same information for a different time period.

[17] The Complaint was filed in July, 2017. [Doc. No. 1].

[Doc. No. 161 at p. 1]. In sum, their justification for not retaining the ESI is that it has no operational need for it the wholesale preservation of this information. Plaintiffs' only written position regarding this evidence is set forth in a footnote in which they reiterate their request, not why they request the information, or why it is relevant. [Doc. No. 148 at p. 49, n. 1]. Plaintiffs did clarify during the discovery hearing that they have not asked defendant CBP to preserve evidence of application withdrawals of individuals other than named plaintiffs at this time, which by definition dramatically reduces the universe of ESI to preserve. [Doc. No. 157 at p. 26].

Balancing the needs of both parties, and mindful of the proportionality requirement under Rule 26, the Court concludes that defendants are not required to preserve surveillance data across all southern border POEs of aliens who withdrew their applications for entry from January 1, 2016 to the present, beyond what they have already preserved. Plaintiffs have not clearly articulated why surveillance data is relevant, nor is the Court convinced that defendants could reasonably meet plaintiffs' request without incurring substantial burden.[18] The Court concludes that preservation of application withdrawals at *all* southern border POEs from January 1, 2016 to the present is not proportional to the needs of the case.

Accordingly, defendants' Motion for a protective order on this issue is **GRANTED**. Defendants will not be required to preserve all surveillance ESI "of arriving aliens at all southern border POEs [that] were made during the process of these aliens seeking to withdraw their applications for admission, from January 1, 2016 to the present." [Doc. No. 148 at p. 49 n. 1]. Any ESI *already* preserved and responsive to plaintiffs' requests,

---

[18] The Court disputes, however, defendants' assertions that this request would require it to preserve "100% of all NVR and DVR recordings." [Doc. No. 148 at p. 43]. Further, defendants do not explain why such a course of action was reasonable for the October 28, 2016 to June 8, 2017 time period, for which CBP voluntarily retained near-identitcal ESI for "operational reasons," but is over-burdensome for a more limited time period requested by plaintiffs.

however, must be retained, including recordings already preserved of the plaintiffs seeking to withdraw their applications. Going forward, defendants must retain specific incidents in which an individual has withdrawn their asylum application if identified by plaintiffs within 45 days, and defendants are provided with the individual's name, A-number or date of birth, relevant POE, and the date and time of the incident.[19]

### C. Defendants Must Preserve Specific Incidents Identified by Plaintiffs Within 45 Days of Occurrence

Next before the Court is whether CBP must preserve ESI of individual incidents between alleged asylum seekers and the government if reported by plaintiffs within 30 or 45 days. Defendants offer to preserve such incidents if reported within thirty days and if provided with the individual's name, A-number or date of birth, date and time of the incident, and the relevant POE. [Doc. No. 148 at p. 34]. To expand the time frame beyond 30 days, CBP contends, would require CBP "to create infrastructure to preserve the video." [*Id.*]. CBP claims plaintiffs' request would require "wholesale" preservation that exceeds current CBP infrastructure, and so the 45-day timeframe is over burdensome. Plaintiffs clarified during the discovery hearing that they are simply requesting a 45 day window in which to report an incident to CBP, thereby triggering ESI preservation. [Doc No. 157 at p. 20]. They acknowledge that the surveillance data they seek may well be overwritten within 30 days in the normal course of CBP's surveillance operations, and are willing to accept that risk. [*Id.*]. They also argue CBP's stated policy goal of preserving surveillance data for at least 90 days supports their request for a 45-day window.

CBP relies in part on *Maxwell v. Tyson Foods, Inc.*, 2011 WL 13146733 at *3 (S.D. Iowa Sept. 27, 2011) to support its contention that plaintiffs' request imposes an "undue burden . . . upon [CBP's] business operations by requiring its surveillance system to be modified to continually preserve all footage recorded, with specific portions retrieved for

---

[19] The Court reserves the right to revisit this decision if presented with new information.

production as designated by plaintiffs." [Doc. No. 148 at p. 38 *quoting Maxwell*]. In *Maxwell*, Tyson Foods' surveillance system had 91 cameras that would overwrite once available server space filled. *Id.* at *2. That surveillance system, like the one in use here, existed for security purposes, but unlike CBP, Tyson Foods did not appear to regularly archive surveillance data. Moreover, substantial video evidence had already been provided to the *Maxwell* plaintiffs; plaintiffs brought in their *own* videographers to film the goings-on at the Tyson facility production floor "for 30 hours over the course of two days"; the surveillance video quality was poor and might not adequately depict what individuals were wearing, a central issue in the case; and additional surveillance data was duplicative and overly burdensome in light of already-collected evidence, written statements, and witness testimony given by employees. *Id.* at *3-4.

While the quantity of data at issue is greater in the instant dispute as compared to *Maxwell*, the video evidence here is highly relevant and central to allegations made in plaintiffs' Complaint. And unlike the poor video quality in *Maxwell*, the visual and/or audio quality of the ESI at issue here is not contested. Taken together, these facts distinguish this case from the facts presented to the *Maxwell* Court.

The Court agrees with plaintiffs. First, granting plaintiffs 15 additional days – for a 45-day window – in which to bring an incident to the attention of CBP is not overly burdensome so long as the specific identifying information described above is provided. CBP acknowledges that when it is provided with specific, identifying information, the time and effort involved in locating and retaining relevant ESI is substantially reduced. Plaintiffs are to provide the "port location, date, time, and identity" for each individual for whom information is requested. [Doc. No. 148 at p. 49 n. 1].

Second, 15 days' worth of additional time (i.e., from 30 to 45 days) will not unduly burden CBP's technological infrastructure, as explained to this Court. CBP will not need to increase the number of existing NVRs and DVRs, and if the purchase of additional DVDs or external hard drives is necessary, the cost is marginal relative to the needs of the case and magnitude of the claims at issue. Plaintiffs also rightly point out that 45 days is

well within CBP's operational policy of preserving surveillance data for 90 days before it is overwritten. [Doc. No. 148 at p. 4]. In a similar vein, plaintiffs acknowledge and accept the possibility that an incident might already be overwritten when requested after 30, but before 45, days elapse.[20] This should encourage plaintiffs to expedite their preservation requests.

Third, presumably some percentage of incidents that plaintiffs identify will have already been preserved and/or identified by CBP's own preservation compliance efforts. Plaintiffs' requests are not made in a vacuum and do not alleviate defendants' obligation to engage in an active process to identify and preserve relevant incidents. Thus the burden of plaintiffs' requests must be considered against the backdrop of defendants' own preservation obligations. Reframing the issue in this way reveals that the additional burden is minimal and proportional to the needs of the case.

Defendants raise the more challenging question of whether they are obligated to preserve incidents involving individuals who "plaintiffs believe may be a putative class member." [Doc. No. 148 at p. 39]. They also argue that because plaintiffs did not assert any need for discovery to defend the pending Motion to Dismiss [Doc. No. 135], they should not have to preserve any of the surveillance data identified by plaintiffs. [Doc. No. 148 at p. 37]. The Court disagrees. First, that plaintiffs did not require discovery to oppose defendants Motion to Dismiss does not alleviate defendants' obligation to preserve relevant information. Even where a motion to dismiss is granted, a class certification ruling – and accompanying precertification discovery – might be necessary to determine the appropriate scope of the dismissal. *See In re Wal-Mart Stores, Inc. Wage and Hour Litig.*, 505 F. Supp. 2d 609, 615-16 (N.D. Cal. 2007).

---

[20] The need for prompt presentment of a preservation request will also avoid the risk of data loss in high density locations where data is more likely to be over-written in 30 days or less.

Second, discovery is currently stayed pending the plaintiffs' filing of an Amended Complaint in light of the District Court's ruling on defendant's Motion to Dismiss. The Court will reconsider the appropriate scope of discovery at that time.[21] "District courts have broad discretion to control the class certification process, and whether or not discovery will be permitted lies within the sound discretion of the trial court." *Vinole v. Countrywide Home Loans Inc.*, 571 F.3d 935, 942 (9th Cir. 2009). Rule 26 permits discovery of matters relevant to pre-class certification, but is typically limited to the factors that inform class certification: e.g., number of class members, existence of common questions, typicality of claims, and the representatives' ability to represent the class. Fed. R. Civ. P. 23. In some types of cases, precertification discovery can include "[t]he disclosure of names, addresses, social security numbers, and telephone numbers" when relevant to meet the Rule 23 factors. *Currie-White v. Blockbuster, Inc.*, No. C 09-2593 MMC (MEJ), 2010 WL 1526314, at *2 (N.D. Cal. 2010). The Ninth Circuit is clear that "[t]he propriety of a class action cannot be determined in some cases without discovery, as for example, where discovery is necessary to determine the existence of a class or set of subclasses." *Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977). The incidents not only are relevant to plaintiffs' broad substantive claims, but also appear relevant to the factors that will be evaluated at the class certification stage. *See* Fed. R. Civ. P. Rule 23. Indeed, a party must preserve evidence relevant to claims and defenses, not only the subset that would inform a motion to dismiss. For that reason, defendants cannot escape their duty to preserve relevant information where the preservation is not over-burdensome.

Accordingly, defendants Motion for a Protective Order on this issue is **DENIED**. Defendants going forward must preserve surveillance ESI not already over-written of individual incidents between alleged asylum seekers and the government if reported by

---

[21] Plaintiffs filed a Motion for Class Certification on November 13, 2017. [Doc. No. 98]. The Motion was denied as moot when the Motion to Transfer Venue was granted on November 21, 2017. [Doc. No. 113].

plaintiffs within 45 days and defendants are provided with the individual's name, A-number or date of birth, date and time of the incident, and the relevant POE. Defendants are to also preserve such information for incidents that occurred before the entry of this Order, to the extent it has not been over-written.

### D. CBP Must Preserve Surveillance ESI of Lines Stretching From the San Ysidro POE into Mexico Between December 18, 2017 and December 26, 2017

Finally, defendants seek a protective order that would preclude them from preserving surveillance ESI of individuals waiting in lines on the Mexican side of the border waiting to enter the United States at the San Ysidro POE for an eight day period – from December 18, 2017 through December 27, 2017. Defendants also request that they be protected from the need to preserve any future similar ESI that plaintiffs request.

In the initial Joint Motion, plaintiffs appear to request that defendants preserve *all* surveillance data of individuals waiting in line in Mexico attempting to enter U.S. border POEs. [Doc. No. 148 at p. 49, n. 1].[22] The dispute over preserving surveillance ESI of individuals waiting in these lines stems from news reports that plaintiffs' identified in the Joint Motion, and that are provided in their entirety in defendants' Supplemental Briefing. [*Id.* at p. 51; Doc. No. 156, Exhibits 4-6]. During the Discovery Hearing, the Court pressed plaintiffs to clarify the scope of their request, to which they explained that they were "tailored . . . to exercise time periods."[23] [Doc. No. 157 at p. 24]. More specifically, the time period of December 18, 2017 through December 27, 2017 at the San Ysidro POE was identified, which encompasses the events described in the aforementioned relevant news

---

[22] A careful reading of plaintiffs' portion of the Joint Motion suggests that the summary in footnote 1 was an overstatement of plaintiffs' request. Plaintiffs acknowledge that "CBP's technical infrastructure is intended to permit video archiving of specific events" and so it should be well within CBP's abilities to preserve "specifically identifiable and highly relevant incidents." [Doc. No. 148 at p. 51].

[23] In context, counsel's statement emphasizes the specific nature of the requests. [*See* Doc. No. 157 at pp. 21-25].

reports. Thus, the Court understands plaintiffs' request as limited to apply to the December 18, 2017 through December 27, 2017 timeframe at the San Ysidro POE, and to future, narrowly drawn, time-bound, incidents at all southern POEs.

Plaintiffs assert that video of individuals waiting in line to enter the San Ysidro POE between December 18, 2017 and December 27, 2017 is relevant and should be preserved because plaintiffs allege defendants have "an unlawful policy of denying access to the asylum process to any individual lacking a 'ticket' given by Mexican immigration authorities." [Doc. No. 148 at p. 51 *citing* Complaint at ¶¶ 85, 96(d), 98(b), 101(b)]. The cooperation between Mexican officials and CBP personnel, plaintiffs argue, "is at the core of [their] complaint." [Doc. No. 148 at p. 51]. Plaintiffs expect that video of these lines might show individuals, as alleged, being told "to go get a ticketing system" and then "seek[ing] out a ticket or being pulled out of line by the Mexican officials." [Doc. No. 157 at p. 23]. Because plaintiffs allege Mexican and CBP officials cooperate with one another to deny asylum seekers their rights and because plaintiffs seek a relatively narrow period of video surveillance, they contend the burden is proportional to the needs of the case.

Defendants counter that the requested surveillance ESI is "at best . . . tangentially relevant to [p]laintiffs' Complaint." [Doc. No. 148 at p. 36]. Similarly, they assert that "any lines in Mexico or actions by Mexican officials are not under the control of Defendants and such video, if it existed, is *outside the scope* of the Complaint filed by [p]laintiffs." [*Id.* at p. 31 (emphasis added)]. Finally, defendants argue the requested surveillance ESI does "not involve specific incidents which CBP's infrastructure is set up to preserve" and "actually demonstrates that the agency is following the law but is constrained by limited resources." [Doc. No. 156 at p. 20].

Plaintiffs allege in their Complaint that the use of a ticketing system is one method, among many, CBP employs to deny asylum seekers access to the asylum system.

[Complaint at ¶¶ 85, 96(d), 98(b), 101(b)].[25] If in fact defendants have such ESI, to require defendants to preserve *all* video surveillance on an ongoing basis of lines stretching into Mexico that might capture the ticketing practice alleged would, in the judgment of this court, be over-burdensome. Yet the more narrowly drawn time period identified by plaintiffs by way of news reporting constitutes a reasonable quantity of relevant data. Defendants note that the Court is not obligated "to indulge . . . every request [or] allow discovery on every conceivable issue that arises in [a] case, and fill every gap a party raises." *Lopez v. United States*, 15-cv-180-JAH(WVG), 2017 WL 1062581, at *5 (S.D. Cal. Mar. 21, 2017). The limited time period requested by plaintiffs, however, is reasonable and proportional.

Defendants are not obligated to wait indefinitely to transition to CAVSS given the longstanding plan to transition all POEs to this system. The Court recognizes the cybersecurity concerns raised by CBP, but notes that these vulnerabilities appear to have existed for years and that CBP delayed CAVSS implementation and has operated the current surveillance system at San Ysidro, long before this litigation commenced. [*See* Doc. No. 162-2, Decl. of Heather Robertson, at pp. 5-7]. CBP cannot obviate its preservation obligation, which is clearly set out in the Federal Rules of Civil Procedure, because of an impending deadline of its own creation and the inconvenience that the preservation obligation imposes.

---

[25] Plaintiff Al Otro Lado alleges it has documentation for the following incidents in its Complaint:
- "CBP officials tell[ing] asylum seekers they have to apply for asylum at the U.S. Consulate in Mexico";
- "CBP officials tell[ing] asylum seekers that they are not processing asylum seekers at that POE and they must go another POE to be processed";
- "CBP officials tell[ing] asylum seekers that they cannot seek asylum at that time and must be put on a waiting list";
- "CBP officials tell[ing] asylum seekers that they do not qualify for asylum";
- "CBP officials coerc[ing] asylum seekers into withdrawing their asylum claims, including by threatening that they will be deported if they do not do so."

[Doc. No. 1 at p. 34].

Accordingly, defendants' Motion for a Protective Order on this issue is **DENIED**. Defendants must preserve surveillance ESI of lines of individuals attempting to enter the San Ysidro POE between December 18, 2017 and December 26, 2017, to the extent such information has not already been overwritten. The Court recognizes ten days of video recordings can constitute a substantial amount of data. Defendants are within their rights to identify what camera(s) provides the best view of the lines, and preserve this ESI. Once preserved, or it is determined the December, 2017 data no longer exists on CBP servers, defendants may move forward and transition the San Ysidro POE to CAVSS. On a going forward basis, defendants must preserve specific, similarly limited surveillance ESI of lines stretching into Mexico at all southern border POEs when incidents are reported by plaintiffs within 45 days.[26]

## IV.  CONCLUSION

As this case progresses, the Court expects both parties to take seriously their affirmative meet and confer obligations to identify mutually acceptable solutions.

The undersigned confirms the prior findings and partially **GRANTS** in part and **DENIES** in part, Defendants' Motion for a Protective Order.

1.  IT IS HEREBY ORDERED Defendants will not be required to preserve all surveillance ESI "of arriving aliens at all southern border POEs [that] were made during the process of these aliens seeking to withdraw their applications for admission, from January 1, 2016 to the present." [Doc. No. 148 at p. 49 n. 1]. Any ESI *already* preserved and responsive to plaintiffs' requests, however, must be retained, including recordings already preserved of the plaintiffs seeking to withdraw their applications. Going forward, defendants must retain specific incidents in which an individual has withdrawn their asylum application if identified by plaintiffs within 45 days, and defendants are provided

_____

[26] The obligation to produce ESI upon request applies only where such information has not been over-written in the ordinary course.

with the individual's name, A-number or date of birth, relevant POE, and the date and time of the incident.

2.    IT IS FURTHER ORDERED that defendants going forward must preserve surveillance ESI of individual incidents between alleged asylum seekers and the government if reported by plaintiffs within 45 days and defendants are provided with the individual's name, A-number or date of birth, date and time of the incident, and the relevant POE. To the extent that this information has not been overwritten, defendants are to also preserve such information for incidents that occurred before the entry of this Order.

3.    IT IS FURTHER ORDERED that defendants must preserve surveillance ESI of lines of individuals attempting to enter the San Ysidro POE between December 18, 2017 and December 26, 2017, to the extent such information has not already been overwritten. The Court recognizes ten days of video recordings can constitute a substantial amount of data. Defendants are within their rights to identify what camera(s) provides the best view of the lines, and preserve this ESI. Once preserved, or it is determined the December, 2017 data no longer exists on CBP servers, defendants may move forward and transition the San Ysidro POE to CAVSS. On a going forward basis, defendants must preserve specific, similarly limited surveillance ESI of lines stretching into Mexico at all southern border POEs when incidents are reported by plaintiffs within 45 days.

**IT IS SO ORDERED**.

Dated: September /7 2018

Hon. Karen S. Crawford
United States Magistrate Judge