1  LATHAM & WATKINS LLP
2      Manuel A. Abascal (CA Bar No. 171301)
       *manny.abascal@lw.com*
3      Michaela R. Laird (CA Bar No. 309194)
       *michaela.laird@lw.com*
4  355 South Grand Avenue, Suite 100
   Los Angeles, California  90071-1560
5  Telephone:  +1.213.485.1234
   Facsimile:  +1.213.891.8763
6
7  SOUTHERN POVERTY LAW CENTER
       Melissa Crow (DC Bar No. 453487)
8      *melissa.crow@splcenter.org*
       (admitted *pro hac vice*)
9  1666 Connecticut Avenue NW
   Suite 100
10 Washington, DC  20009
   Telephone:  +1.202.355.4471
11 Facsimile:  +1.404.221.5857
12
13 *Additional counsel listed on next page*
14 *Attorneys for Plaintiffs*

15          **UNITED STATES DISTRICT COURT**
16         **SOUTHERN DISTRICT OF CALIFORNIA**

17

| | |
|---|---|
| AL OTRO LADO, INC., a California corporation; ABIGAIL DOE, BEATRICE DOE, CAROLINA DOE, DINORA DOE, INGRID DOE, ROBERTO DOE, MARIA DOE, JUAN DOE, ÚRSULA DOE, VICTORIA DOE, BIANCA DOE, EMILIANA DOE, AND CÉSAR DOE individually and on behalf of all others similarly situated, | No. 3:17-cv-02366-BAS-KSC *Honorable Cynthia A. Bashant* **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR:** |
| Plaintiffs, | **(1)   VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C. § 1101, *ET SEQ.*** |
| v. | |
| KIRSTJEN M. NIELSEN, Secretary, United States Department of Homeland Security, in her official capacity; KEVIN K. MCALEENAN, Commissioner, United States Customs | **(2)   VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 551, *ET SEQ.*** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and Border Protection, in his official capacity; TODD C. OWEN, Executive Assistant Commissioner, Office of Field Operations, United States Customs and Border Protection, in his official capacity; and DOES 1-25, inclusive,

Defendants.

**(3)**  **VIOLATION OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION (PROCEDURAL DUE PROCESS)**

**(4)**  **VIOLATION OF THE *NON-REFOULEMENT* DOCTRINE**

**CLASS ACTION**

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740)
  *bazmy@ccrjustice.org*
  (admitted *pro hac vice*)
  Ghita Schwarz (NY Bar No. 3030087)
  *gschwarz@ccrjustice.org*
  (admitted *pro hac vice*)
  Angelo Guisado (NY Bar No. 5182688)
  *aguisado@ccrjustice.org*
  (admitted *pro hac vice*)
666 Broadway, 7th Floor
New York, NY  10012
Telephone:  +1.212.614.6464
Facsimile:  +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Mary Bauer (VA Bar No. 31388)
  *mary.bauer@splcenter.org*
  (admitted *pro hac vice*)
1000 Preston Avenue
Charlottesville, VA  22903
  Sarah Rich (GA Bar No. 281985)
  *sarah.rich@splcenter.org*
  (admitted *pro hac vice*)
  Rebecca Cassler (MN Bar No. 0398309)
  *rebecca.cassler@splcenter.org*
  (*pro hac vice* forthcoming)
150 East Ponce de Leon Avenue
Suite 340
Decatur, GA  30030

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113)
  *kwalters@immcouncil.org*
  (admitted *pro hac vice*)
1331 G Street, NW, Suite 200
Washington, DC  20005
Telephone:  +1.202.507.7523
Facsimile:  +1.202.742.5619

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

# I.    **INTRODUCTION**

Plaintiff Al Otro Lado, Inc. ("Al Otro Lado"), a non-profit legal services organization, and Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, Ingrid Doe, Roberto Doe, Maria Doe, Juan Doe, Úrsula Doe, Victoria Doe, Bianca Doe, Emiliana Doe, and César Doe ("Class Plaintiffs"), acting on their own behalf and on behalf of all similarly situated individuals, allege as follows:

1.    Class Plaintiffs are noncitizens who have fled grave harm in their countries to seek protection in the United States.  All of them sought to access the U.S. asylum process by presenting themselves at official ports of entry ("POEs," or individually, "POE") along the U.S.-Mexico border, but were denied such access by or at the instruction of U.S. Customs and Border Protection ("CBP") officials pursuant to a policy initiated by Defendants or practices effectively ratified by Defendants in contravention of U.S. and international law.

2.    Since 2016 and continuing to this day, CBP has engaged in an unlawful, widespread pattern and practice of denying asylum seekers access to the asylum process at POEs on the U.S.-Mexico border through a variety of illegal tactics.  These tactics include lying; using threats, intimidation and coercion; employing verbal abuse and applying physical force; physically obstructing access to the POE building; imposing unreasonable delays before granting access to the asylum process; denying outright access to the asylum process; and denying access to the asylum process in a racially discriminatory manner.  Since the presidential election, CBP officials have, for example, misinformed asylum seekers that they could not apply for asylum because "Donald Trump just signed new laws saying there is no asylum for anyone," coerced asylum seekers into signing forms abandoning their asylum claims by threatening to take their children away, threatened to deport asylum seekers back to their home countries (where they face persecution) if they persisted in their attempts to seek asylum, and even forcefully removed asylum seekers from POEs.  In March 2018, four Guatemalan asylum

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

1

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

seekers at an El Paso POE, were denied access to the asylum process after CBP officials told them that "Guatemalans make us sick."  As recently as September 2018, CBP denied access to an asylum seeker who was four months pregnant and a victim of sexual violence.  These practices all violate U.S. law, which requires that asylum seekers "shall" have access to the asylum process.

3.    In addition, beginning around 2016, high-level CBP officials, under the direction or with the knowledge or authorization of the named Defendants (the "Defendants"), adopted a formal policy to restrict access to the asylum process at POEs by mandating that lower-level officials directly or constructively turn back asylum seekers at the border (the "Turnback Policy") contrary to U.S. law.  In accordance with the Turnback Policy, CBP officials have used and are continuing to use various methods to unlawfully deny asylum seekers access to the asylum process based on purported—but ultimately untrue—assertions that there is a lack of "capacity" to process them.  These methods include coordinating with Mexican immigration authorities and other third parties to implement a "metering," or waitlist, system that creates unreasonable and life-threatening delays in processing asylum seekers; instructing asylum seekers to wait on the bridge, in the pre-inspection area, or at a shelter until there is adequate space at the POE; or simply asserting to asylum seekers that they cannot be processed because the POE is "full" or "at capacity."  On information and belief, the claims of a lack of capacity are false.

4.    Both Defendants' widespread practice of denying access to the asylum process and their formal Turnback Policy are designed to serve the Trump administration's broader, publicly proclaimed goal of deterring individuals from seeking access to the asylum process.  Rather than changing existing law, the Administration is simply not following it.  The Turnback Policy also reflects the Trump administration's significant antipathy to the fundamental humanitarian

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   principles embodied in asylum laws, as well as to the Central and South American

2   populations seeking access to the asylum process in the United States.

3       5.      In the spring of 2018, and in response to the anticipated arrival of a

4   sizeable number of asylum seekers who had traveled together on the dangerous

5   journey North in a so-called "caravan," high-level Trump administration officials

6   publicly and unambiguously proclaimed the existence of their policy to

7   intentionally restrict access to the asylum process at POEs in violation of U.S. law.

8   Attorney General Jefferson B. Sessions pledged that asylum seekers would not

9   "stampede" our borders and announced a related "Zero Tolerance" policy to

10  prosecute all who enter the country unlawfully, and thereby to separate them from

11  their children (the very threat a number of Plaintiffs received when attempting to

12  seek asylum).  Around the same time, United States Department of Homeland

13  Security ("DHS") Secretary Kirstjen Nielsen characterized the asylum process—

14  mandated by U.S. statute and international law—as a legal "loophole" and publicly

15  announced a "metering" process designed to restrict—and to constructively deny—

16  access to the asylum process through unreasonable and dangerous delay.

17      6.      Indeed, President Trump offered a public, full-throated and racially-

18  discriminatory defense of his administration's aggressive implementation of the

19  Turnback Policy and the related, widespread CBP practice of denying access to the

20  asylum process, by referring to asylum seekers as "criminals" and "animals"

21  seeking to "infest" and "invade" the United States, and by specifically stating, via

22  tweet, that the United States "must bring them back from where they came" and

23  must "escort them back without going through years of legal maneuvering."

24      7.      Soon afterward, CBP officials implemented the Turnback Policy

25  through a tactic of asserting a "lack of capacity" to process asylum-seekers and by

26  coordinating with Mexican officials to prevent or delay asylum seekers from

27  reaching inspection points at POEs, even as CBP officials knew or should have

28  known of the dangerous conditions of rampant crime and violence by gangs and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

3

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

cartels on the Mexican side of the border.  The unreasonable delays imposed on asylum seekers—which are done pursuant to the Trump administration's broader goal of deterring future asylum seekers from presenting at the border at all—also amount to a constructive denial of access to the asylum process.

8.     As detailed more fully below, the Turnback Policy comes from high-level U.S. government officials and is having the intended effect of severely restricting—and constructively denying—access to the asylum process at POEs. Indeed, an October 2018 report by DHS's Office of Inspector General ("OIG") concluded that CBP has been "regulating the flow of asylum-seekers at ports of entry," and that by limiting the volume of asylum seekers entering at POEs, the government has prompted some individuals "who would otherwise seek legal entry into the United States to cross the border illegally."[1]

9.     Many desperate asylum seekers, faced with the consequences of the Turnback Policy and unlawful CBP practices, have felt compelled to enter the United States outside of POEs, often by swimming across the Rio Grande or paying smugglers exorbitant sums to transport them, to reach safety as quickly as possible.

10.    On information and belief, CBP's conduct pursuant to the Turnback Policy and other unlawful practices were and continue to be performed at the instigation, under the control or authority of, or with the direction, knowledge, consent or acquiescence of Defendants.  By refusing to follow the law, Defendants have caused, and will continue to cause, Class Plaintiffs and Al Otro Lado concrete and demonstrable injuries and irreparable harm.

---

[1]  U.S. Dep't of Homeland Sec., Office of the Inspector Gen., OIG-18-84, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 5-6 (2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf [hereinafter *OIG Report*].

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

4

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

11.     Each of the Class Plaintiffs has been subject to Defendants' pattern and practice of denying access to the asylum process and/or to the Turnback Policy.

12.     Defendants have deprived Class Plaintiffs and similarly situated individuals of their statutory and international-law rights to apply for asylum, violated their due process rights under the Fifth Amendment to the United States Constitution, and violated the United States' obligations under international law to uphold the principle of *non-refoulement*.  Defendants' Turnback Policy and other unlawful practices also constitute unlawful agency action that should be set aside and enjoined pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.  Each Class Plaintiff has attempted to access the asylum process and would seek to do so again, but for Defendants' systematic, illegal Turnback Policy and other unlawful practices at issue in this action, which have impeded their access.

13.     Defendants have caused injury to Plaintiff Al Otro Lado by frustrating its ability to advance and maintain its central institutional mission and forcing the organization to divert substantial portions of its limited time and resources away from its various programs in Los Angeles, California, and Tijuana, Mexico, to counteract the effects of the Turnback Policy and Defendants' other unlawful practices.

14.     Despite persistent advocacy by Al Otro Lado and other advocates, and despite Class Plaintiffs' desperate need and right to seek asylum without delay in the United States, CBP shows no signs of abating its illegal policy and practices. Accordingly, Al Otro Lado and Class Plaintiffs require the intervention of this Court to declare that Defendants' conduct violates U.S. and international law, to enjoin Defendants from continuing to violate the law, and to order Defendants to implement procedures to ensure effective compliance with the law, including, without limitation, oversight and accountability in the inspection and processing of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

5

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

asylum seekers. Absent the Court's intervention, CBP's unlawful conduct will continue to imperil the lives and safety of countless vulnerable asylum seekers.

## II.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1350. Defendants have waived sovereign immunity for purposes of this suit pursuant to 5 U.S.C. § 702. The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

16.    Venue is proper in this district under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred at or in the vicinity of the San Ysidro POE. All Defendants are sued in their official capacity.

## III.    PARTIES

A.    **Plaintiffs**

17.    Plaintiff Al Otro Lado is a non-profit, non-partisan organization incorporated in California and established in 2014. Al Otro Lado is a legal services organization serving indigent deportees, migrants, refugees and their families, principally in Los Angeles, California, and Tijuana, Mexico. Al Otro Lado's mission is to coordinate and to provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings, to seek redress for civil rights violations, and to provide assistance with other legal and social service needs. Defendants have frustrated Al Otro Lado's mission and have forced Al Otro Lado to divert significant resources away from its other programs to counteract CBP's illegal practice of turning back asylum seekers at POEs.

18.    Through its Border Rights Project in Tijuana, Mexico, Al Otro Lado assists individuals seeking protection from persecution in the United States. In response to CBP's unlawful policy and practices, Al Otro Lado has had to expend significant organizational time and resources and alter entirely its previously used

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

6

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

large-scale clinic model.  For example, Al Otro Lado previously held large-scale, mass-advisal legal clinics in Tijuana that provided a general overview on asylum laws and procedures.  This type of assistance (similar to the Legal Orientation Program of the Executive Office for Immigration Review) only was workable when CBP allowed asylum seekers into the United States in accordance with the law.

19.    Since 2016, however, CBP's illegal conduct has compelled Al Otro Lado to expend significant time and resources to send representatives to Tijuana from Los Angeles multiple times per month for extended periods to provide more individualized assistance and coordination of legal and social services, including individual screenings and in-depth trainings to educate volunteer attorneys and asylum seekers regarding CBP's unlawful policy and practices and potential strategies to pursue asylum in the face of CBP's tactics.  Whereas Al Otro Lado previously was able to accommodate several dozen attorneys and over 100 clients at a time in its large-scale clinics, Al Otro Lado has been forced to transition to an individualized representation model where attorneys are required to work with asylum seekers one-on-one and provide direct representation.  Al Otro Lado has expended (and continues to expend) significantly more resources recruiting, training and mentoring pro bono attorneys to help counteract CBP's unlawful policy and practices.  Nevertheless, even asylum seekers provided with such individualized pro bono representation are being turned back by CBP in violation of the law.

20.    Al Otro Lado also has spent time and resources advocating that CBP provide asylum seekers with access to the asylum process and cease using unlawful tactics to circumvent its legal obligations.  For example, Al Otro Lado representatives have filed numerous complaints with the U.S. government detailing examples of CBP's unlawful policy and practices depriving asylum seekers of access to the asylum process.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

7

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

21.    Such diversion of Al Otro Lado's time and resources negatively impacts its other programs. For example, Al Otro Lado has not been able to pursue funding for or otherwise advance the following programs: (1) its Deportee Reintegration Program through which Al Otro Lado assists deportees who struggle to survive in Tijuana, many of whom have no Mexican identity documents or health coverage, and may not even speak Spanish; and (2) its Cross-Border Family Support Program through which Al Otro Lado assists families with cross-border custody issues, and helps connect family members residing in the United States to social, legal, medical and mental health services. Al Otro Lado has all but ceased its programmatic work with deportees and families separated by deportation due to the diversion of resources caused by CBP's unlawful actions.

22.    In addition, the constraints on Al Otro Lado's limited time and resources have negatively impacted its operations in Los Angeles, including delaying the opening and expansion of its Los Angeles office through which it coordinates "Wraparound" services for low-income immigrants in Los Angeles. The increased need for on-the-ground support in Tijuana has impacted Al Otro Lado's ability to satisfy its clinical obligations for low-income immigrants at the Wellness Center, located on the grounds of the Los Angeles County+USC Medical Center, and to conduct outreach to provide free legal assistance to homeless individuals in Los Angeles to allow them to better access permanent supportive housing, employment and educational opportunities.

23.    Al Otro Lado continues to be harmed by Defendants because CBP's illegal conduct at or in the vicinity of the border frustrates its organizational mission and forces Al Otro Lado to divert resources from its other objectives. If Al Otro Lado had not been compelled to divert resources to address CBP's unlawful conduct at the U.S.-Mexico border, it would have directed these resources toward its other programs to further the advancement of its core mission.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

8

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

24.     Plaintiff Abigail Doe is a female native and citizen of Mexico.  She is the mother of two children under the age of ten.[2]  Abigail and her family have been targeted and threatened with death or severe harm in Mexico by a large drug cartel that had previously targeted her husband, leaving her certain she would not be protected by local officials.  Abigail fled with her two children to Tijuana, where they presented themselves at the San Ysidro POE.  On behalf of herself and her children, Abigail expressed her fear of returning to Mexico and her desire to seek asylum in the United States.  CBP officials coerced Abigail into recanting her fear and signing a form withdrawing her application for admission to the United States.  As a result of this coercion, the form falsely states that Abigail does not have a credible fear of returning to Mexico.  As a result of Defendants' conduct, Abigail and her children were unable to access the asylum process and were forced to return to Tijuana, where at the time the initial Complaint was filed, they remained in fear for their lives.  Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Abigail and her children into the United States.

25.     Plaintiff Beatrice Doe is a female native and citizen of Mexico.  She is the mother of three children under the age of sixteen.  Beatrice and her family have been targeted and threatened with death or severe harm in Mexico by a dangerous drug cartel; she was also subject to severe domestic violence.  Beatrice fled with her children and her nephew to Tijuana, where they presented themselves once at the Otay Mesa POE and twice at the San Ysidro POE.  On behalf of herself and her children, Beatrice expressed her fear of returning to Mexico and her desire to seek asylum in the United States.  CBP officials coerced Beatrice into recanting her fear and signing a form withdrawing her application for admission to the United States.  As a result of this coercion, the form falsely states that Beatrice and her children

---

[2]   The ages listed for children of Abigail Doe, Beatrice Doe, Carolina Doe, and Dinora Doe are as they were at the time the initial Complaint was filed.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

9

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

have no fear of returning to Mexico.  As a result of Defendants' conduct, Beatrice

and her children were unable to access the asylum process and were forced to

return to Tijuana, where at the time the initial Complaint was filed, they remained

in fear for their lives.  While she was sheltered in Tijuana, her abusive spouse

located her and coerced her and her children to return home with him.

26.  Plaintiff Carolina Doe is a female native and citizen of Mexico.  She

is the mother of three children.  Carolina's brother-in-law was kidnapped and

dismembered by a dangerous drug cartel in Mexico, and after the murder, her

family also was targeted and threatened with death or severe harm.  Carolina fled

with her children to Tijuana, where they presented themselves at the San Ysidro,

POE.  On behalf of herself and her children, Carolina expressed her fear of

returning to Mexico and her desire to seek asylum in the United States.  CBP

officials coerced Carolina into recanting her fear on video and signing a form

withdrawing her application for admission to the United States.  As a result of this

coercion, the form falsely states that Carolina and her children have no fear of

returning to Mexico.  As a result of Defendants' conduct, Carolina and her children

were unable to access the asylum process and were forced to return to Tijuana,

where at the time the initial Complaint was filed, they remained in fear for their

lives.  Following the filing of the initial Complaint in this case, Defendants made

arrangements to facilitate the entry of Carolina and her children into the United

States.

27.  Plaintiff Dinora Doe is a female native and citizen of Honduras.

Dinora and her eighteen-year-old daughter have been targeted, threatened with

death or severe harm, and repeatedly raped by MS-13 gang members.  Dinora fled

with her daughter to Tijuana, where they presented themselves at the Otay Mesa,

POE on three occasions.  Dinora expressed her fear of returning to Honduras and

her desire to seek asylum in the United States.  CBP officials misinformed Dinora

about her rights under U.S. law and denied her the opportunity to access the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

10

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

asylum process.  As a result of Defendants' conduct, Dinora and her daughter were forced to return to Tijuana, where at the time the initial Complaint was filed, they remained in fear for their lives.  Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Dinora and her daughter into the United States.

28.    Plaintiff Ingrid Doe is a female native and citizen of Honduras.  At the time the initial Complaint was filed, she had two children and was pregnant with her third child.  Ingrid's mother and three siblings were murdered by 18th Street gang members in Honduras.  After the murders, 18th Street gang members threatened to kill Ingrid.  Ingrid and her children were also subject to severe domestic violence.  Ingrid fled with her children to Tijuana, where they presented themselves at the Otay Mesa POE and at the San Ysidro POE.  On behalf of herself and her children, Ingrid expressed her fear of returning to Honduras and her desire to seek asylum in the United States.  CBP officials misinformed Ingrid about her rights under U.S. law and denied her the opportunity to access the asylum process.  As a result of Defendants' conduct, Ingrid and her children were forced to return to Tijuana, where at the time the initial Complaint was filed, they remained in fear for their lives.  Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Ingrid and her children into the United States.

29.    Plaintiff Roberto Doe is a male native and citizen of Nicaragua.  Fearing for his life and the lives of his family members, Roberto fled Nicaragua due to threats of violence from the Nicaraguan government and paramilitaries allied with the government.  Roberto sought access to the asylum process by presenting himself at the Hidalgo, Texas POE.  When he encountered CBP officials in the middle of the bridge, he told them that he wanted to seek asylum in the United States.  CBP officials denied Roberto access to the asylum process by telling him the POE was full and that he could not enter.  Mexican officials then

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

11

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  escorted Roberto back to Mexico.  At the time of the filing of the First Amended

2  Complaint, Roberto desired to return immediately to the Hidalgo POE to seek

3  asylum, but based on his experiences and the experiences of others with CBP's

4  practices at the U.S.-Mexico border, he understood that he would likely be turned

5  away again.  After the filing of the First Amended Complaint, Roberto did return

6  to the Hidalgo POE, where Mexican officials detained him as he was walking onto

7  the international bridge to seek access to the asylum process in the United States.

8  Roberto remains in the custody of the Mexican government.  On information and

9  belief, his *refoulement* to Nicaragua is imminent.  He can no longer remain in

10 Mexico and has no place else to turn for safety but the United States.

11        30.      Plaintiff Maria Doe is a female native and citizen of Guatemala and a

12 permanent resident of Mexico.  She was married to a Mexican citizen, with whom

13 she has two children who were both born in Mexico.  Since Maria left her husband,

14 who was abusive and is involved with cartels, two different cartels have been

15 tracking and threatening her.  Maria and her children fled and sought access to the

16 asylum process by presenting themselves at the Laredo, Texas POE.  When Maria

17 encountered CBP officials in the middle of the bridge, she told them that she and

18 her children wanted to seek asylum in the United States.  CBP officials told them

19 to wait on the Mexican side of the bridge.  There, two Mexican officials told Maria

20 that U.S. officials would not let her and her children cross the bridge, but that they

21 could help her if she paid a bribe.  Having no money to pay the bribe, Maria

22 traveled with her children to Reynosa, Mexico.  There, accompanied by an

23 American lawyer, they sought access to the asylum process by presenting

24 themselves at the Hidalgo POE.  On the Mexican side of the bridge leading to the

25 Hidalgo POE, a Mexican official threatened to destroy Maria's identity documents

26 if she and her children did not leave the bridge.  Two weeks later, Maria and her

27 children, accompanied by the same American lawyer, again sought access to the

28 asylum process by presenting themselves at the Hidalgo POE.  When Maria

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

12

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    encountered CBP agents at the middle of the bridge, she told them that she and her

2    children wanted to seek asylum in the United States.  Mexican officials then forced

3    Maria and her children off the bridge.  Although Maria and her lawyer repeatedly

4    told CBP officials that she and her children wanted to seek asylum in the United

5    States, the CBP officials denied Maria and her children access to the asylum

6    process.  At the time the First Amended Complaint was filed, Maria and her

7    children desired to return immediately to a POE to seek asylum, but based on their

8    experience and the experiences of others with CBP's practices at the U.S.-Mexico

9    border, she understood that they would likely be turned away again.  Maria and her

10   children remained in Mexico, where their lives were in danger.  They could no

11   longer remain in Mexico and had no place else to turn for safety but the United

12   States.  Following the filing of the First Amended Complaint in this case,

13   Defendants made arrangements to facilitate the entry of Maria and her children

14   into the United States.

15          31.    Plaintiff Juan Doe is a male native and citizen of Honduras.  Plaintiff

16   Úrsula Doe is a female native and citizen of Honduras.  Juan and Úrsula are

17   husband and wife and together have two children, twin thirteen-year-old boys.

18   They fled Honduras with their sons after receiving death threats from gangs.  Juan,

19   Úrsula, and their children sought access to the asylum process by presenting

20   themselves at the Laredo POE.  When Juan, Úrsula, and their children reached the

21   middle of the bridge to the POE, CBP officials denied them access to the asylum

22   process by telling them the POE was closed and that they could not enter.  Juan,

23   Úrsula, and their children subsequently tried to seek access to the asylum process

24   by presenting themselves at the Hidalgo POE, but Mexican officials stopped them

25   just as they were entering the pedestrian walkway on the Reynosa bridge and

26   threatened to deport them to Honduras if they did not leave.  At the time the First

27   Amended Complaint was filed, Juan, Úrsula, and their children desired to return

28   immediately to the Hidalgo POE to seek asylum, but based on their experience and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

13

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

the experiences of others with CBP's practices at the U.S.-Mexico border, they understood that they would likely be turned away again. At that time, Juan, Úrsula, and their children resided in Reynosa, Mexico, where they remained in fear for their lives. They could no longer remain in Mexico and had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Juan, Úrsula, and their children into the United States.

32.    Plaintiff Victoria Doe is a sixteen-year old female native and citizen of Honduras. Victoria has been threatened with severe harm and death by members of the 18th Street gang for refusing to become the girlfriend of one of the gang's leaders. Fearing for her life, Victoria fled to Mexico where she gave birth to her son. Victoria and her son sought access to the asylum process by presenting themselves at the San Ysidro POE. When Victoria expressed her desire to seek asylum in the United States, CBP officers denied her access to the asylum process by stating that she could not apply for asylum at that time and telling her to speak to a Mexican official without providing any additional information. At the time the First Amended Complaint was filed, Victoria desired to return immediately to the San Ysidro POE to seek asylum on behalf of herself and her son, but based on her experience and the experience of others with CBP's practices at the U.S.-Mexico border, she understood that she would likely be turned away again. At that time, Victoria and her son were residing in a shelter in Tijuana, but could no longer remain in Mexico because of threats from gangs who continued to target them in Mexico. They had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Victoria and her child into the United States.

33.    Plaintiff Bianca Doe is a transgender woman who is a native and citizen of Honduras. Bianca has been subjected to extreme and persistent physical and sexual assault, as well as discrimination and ongoing threats of violence in

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

14

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Honduras and Mexico City, where she subsequently moved, because she is a
transgender woman.  Fearing for her safety based on numerous threats and
harassment, including at the hands of Mexican police, Bianca fled to Tijuana and
sought access to the asylum process by presenting herself at the San Ysidro POE.
CBP officers denied Bianca access to the asylum process by stating that she could
not apply at that time because they were at capacity.  Bianca returned to the POE
the next day. She was given a piece of paper with the number "919," placed on a
waiting list, and told that she would have to wait several weeks to proceed to the
POE.  Feeling desperate and unsafe, Bianca attempted to enter the United States
without inspection by climbing a fence on a beach in Tijuana.  Once over the
fence, a U.S. Border Patrol officer stopped Bianca, who expressed her desire to
seek asylum in the United States.  The U.S. Border Patrol officer told Bianca that
there was no capacity in U.S. detention centers and threatened to call Mexican
police if Bianca did not climb the fence back into Mexico.  Terrified, Bianca
returned to Mexico.  Bianca subsequently sought access to the asylum process by
again presenting herself at the San Ysidro POE.  She was told, once again, that
CBP had no capacity for asylum seekers.  At the time the First Amended
Complaint was filed, Bianca desired like to return immediately to the San Ysidro
POE to seek asylum, but based on her experience and the experience of others with
CBP's practice at the U.S.-Mexico border, she understood that she would likely be
turned away again.  At that time, Bianca was residing in a shelter in Tijuana where
she feared further violence as a transgender woman.  She could no longer remain in
Mexico and had no place else to turn for safety but the United States.  Following
the filing of the First Amended Complaint in this case, Defendants made
arrangements to facilitate Bianca's entry into the United States.

     34.    Plaintiff Emiliana Doe is a transgender woman and a native and
citizen of Honduras.  Emiliana was subjected to multiple sexual and physical
assaults, kidnapping, discrimination, as well as threats of severe harm and violence

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

15

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

in Honduras because she is a transgender woman.  Fearing for her life, she made an

arduous and dangerous journey to Mexico, where she was raped repeatedly and

threatened with death.  After arriving in Tijuana, Emiliana sought access to the

asylum process by presenting herself at the San Ysidro POE and stating her

intention to apply for asylum in the United States.  She was given a piece of paper

with the number "1014" on it, placed on a waiting list, and told to return in six

weeks.  Feeling desperate and unsafe, Emiliana returned to the POE just a few

weeks later.  CBP officers denied Emiliana access to the asylum process by telling

her that there was no capacity for asylum seekers and instructing her to wait for

Mexican officials.  At the time the First Amended Complaint was filed, Emiliana

desired like to return immediately to the San Ysidro POE to seek asylum, but based

on her past experience with CBP's practice at the U.S.-Mexico border, she

understood that she would likely be turned away again.  At that time, Emiliana was

residing in a hotel in Tijuana where she feared further violence as a transgender

woman.  She suffers from serious health issues caused by a stroke two years ago,

could no longer remain in Mexico, and had no place else to turn for safety but the

United States.  Following the filing of the First Amended Complaint in this case,

Defendants made arrangements to facilitate Emiliana's entry into the United States.

35.    Plaintiff César Doe is an eighteen-year old male native and citizen of

Honduras.  César has been threatened numerous times with severe harm and death

and kidnapped by members of the 18th Street gang.  Fearing for his life, César fled

Honduras and traveled to Tijuana.  César sought access to the asylum process by

presenting himself at the San Ysidro POE, but was intercepted by individuals

belonging to "Grupo Beta."  César was told he would be placed on a waitlist, but

instead was detained for twelve days by Mexican immigration under threat of

deportation to Honduras.  After an individual at a local shelter secured César's

release from detention, he returned to the San Ysidro POE and was placed on a

waitlist.  After a few weeks, César again sought access to the asylum process by

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

16

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   presenting himself at the San Ysidro POE, but CBP officers refused to accept him.

2   A few weeks later, he returned to the San Ysidro POE, but members of Grupo Beta

3   intercepted him and threatened to call Mexican immigration officials and child

4   protective services.  A staff member from Plaintiff Al Otro Lado intervened and

5   escorted César back to the shelter.  At the time the First Amended Complaint was

6   filed, César desired to return immediately to the San Ysidro POE to seek asylum,

7   but based on his experience and the experiences of others with CBP's practices at

8   the U.S.-Mexico border, he understood that he would likely be turned away again.

9   At that time, César wass residing in a shelter in Tijuana, could no longer remain in

10  Mexico because of crime, violence and threats from gangs, and had no place else

11  to turn for safety but the United States.  Following the filing of the First Amended

12  Complaint in this case, Defendants made arrangements to facilitate César's entry

13  into the United States.

14  **B.**     **Defendants**

15       36.     Defendant Kirstjen Nielsen is the Secretary of DHS.  In this capacity,

16  she is charged with enforcing and administering U.S. immigration laws.  She

17  oversees each of the component agencies within DHS, including CBP, and has

18  ultimate authority over all CBP policies, procedures and practices.  She is

19  responsible for ensuring that all CBP officials perform their duties in accordance

20  with the Constitution and all relevant laws.

21       37.     Defendant Kevin K. McAleenan is the Commissioner of CBP.  In this

22  capacity, he has direct authority over all CBP policies, procedures and practices,

23  and is responsible for ensuring that all CBP interactions with asylum seekers are

24  performed in accordance with the Constitution and all relevant laws.  Defendant

25  McAleenan oversees a staff of more than 60,000 employees, manages a budget of

26  more than $13 billion, and exercises authority over all CBP operations.

27       38.     Defendant Todd C. Owen is the Executive Assistant Commissioner of

28  CBP's Office of Field Operations ("OFO").  OFO is the largest component of CBP

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

17

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

and is responsible for border security, including immigration and travel through U.S. POEs.  Defendant Owen exercises authority over 20 major field offices and 328 POEs.  Defendant Owen oversees a staff of more than 29,000 employees, including more than 24,000 CBP officials and specialists, and manages a budget of more than $5.2 billion.  Defendant Owen is responsible for ensuring that all OFO officials perform their duties in accordance with the Constitution and all relevant laws.

39.    Does 1 through 25, inclusive, are sued herein under fictitious names inasmuch as their true names and capacities are presently unknown to Al Otro Lado and Class Plaintiffs.  Al Otro Lado and Class Plaintiffs will amend this complaint to designate the true names and capacities of these parties when the same have been ascertained.  Al Otro Lado and Class Plaintiffs are informed and believe, and on that basis allege, that Does 1 through 25, inclusive, were agents or alter egos of Defendants, or are otherwise responsible for all of the acts hereinafter alleged.  Al Otro Lado and Class Plaintiffs are informed and believe, and on that basis allege, that the actions of Does 1 through 25, inclusive, as alleged herein, were duly ratified by Defendants, with each Doe acting as the agent or alter ego of Defendants, within the scope, course, and authority of the agency.  Defendants and Does 1 through 25, inclusive, are collectively referred to herein as "Defendants."

## IV.    FACTUAL BACKGROUND

### A.    Humanitarian Crisis South of the U.S.-Mexico Border

40.    In recent years, children and adults have fled horrendous persecution in their home countries and arrived at POEs along the U.S.-Mexico border to seek protection in the United States through the asylum process.  While asylum seekers travel to the U.S.-Mexico border from all across the world, including from Haiti, Cuba, Venezuela and Iraq, the vast majority of these individuals come from Guatemala, Honduras and El Salvador, an area often termed Central America's "Northern Triangle."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

18

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

41.    The Northern Triangle governments are known for corruption,[3] including having corrupt police forces filled with gang-related members.[4] Furthermore, the "penetration of the state by criminal groups" is responsible, at least in part, for the fact that as many as 95% of crimes go unpunished in those countries.[5]

42.    The "pervasive and systematic levels of violence" associated with the increasing reach and power of gangs in the Northern Triangle have been well documented.[6]  Those fleeing the Northern Triangle cite "violence [from] criminal armed groups, including assaults, extortion, and disappearances or murder of family

---

[3]    *See* Christina Eguizábal et al., Woodrow Wilson Center Reports on the Americas No. 34, *Crime and Violence in Central America's Northern Triangle: How U.S. Policy Reponses are Helping, Hurting, and Can be Improved* 2 (2015), https://www.wilsoncenter.org/sites/default/files/FINAL%20PDF_CARSI%20REPORT_0.pdf+; *see also* U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor, *Country Reports on Human Rights Practices for 2017*, https://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm#wrapper (noting "widespread government corruption" is a significant human rights issue in El Salvador, Guatemala, and Honduras).

[4]    "Over the past five years, at least 435 members of the [Salvadoran] armed forces were fired for being gang members or having ties to gangs . . .  Another 39 aspiring police officers were expelled from the National Public Security Academy over the same period, of which 25 'belonged to' the Mara Salvatrucha, or MS13, while 13 were from the Barrio 18 gang. Nine more active police officers were also dismissed for alleged gang ties over the five years."  Mimi Yagoub, *480 Gang Members Infiltrated El Salvador Security Forces: Report*, InSight Crime (Feb. 22, 2016), https://www.insightcrime.org/news/brief/did-480-gang-members-infiltrate-el-salvador-security-forces/ (citation omitted).

[5]    Eguizábal et al., *supra* note 3, at 2.

[6]    UNHCR, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico* 15 (2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html [hereinafter *Women on the Run*]; *see also* Int'l Crisis Grp., Latin America Report No. 64, *El Salvador's Politics of Perpetual Violence* 8–11 (2017), https://d2071andvip0wj.cloudfront.net/064-el-salvador-s-politics-of-perpetual-violence.pdf.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

19

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  members,"[7] as reasons for their flight.  These armed groups operate with impunity

2  due to their influence and control over the governments of Northern Triangle

3  countries, which have repeatedly proven to be unable or unwilling to protect their

4  citizens.[8]  The degree of violence suffered by people in the Northern Triangle has

5  been compared to that experienced in war zones.[9]

6          43.      In addition, Central American women and children often flee severe

7  domestic violence and sexual abuse.[10]  Women report prolonged instances of

8  physical, sexual, and psychological domestic violence, and most of their accounts

9  demonstrate that the authorities in their home countries were either unable or

---

[7]  *Women on the Run*, *supra* note 6, at 15; *see* Refugees Int'l, *Closing Off Asylum
at the U.S.-Mexico Border* 7 (2018),
https://static1.squarespace.com/static/506c8ea1e4b01d9450dd53f5/t/5b86d0a18
8251bbfd495ca3b/1535561890743/U.S.-Mexico+Border+Report+-
+August+2018+-+FINAL.pdf [hereinafter *Closing Off Asylum*]; Int'l Crisis
Grp., Latin America Report No. 62, *Mafia of the Poor: Gang Violence and
Extortion in Central America* 2 (2017),
https://d2071andvip0wj.cloudfront.net/062-mafia-of-the-poor_0.pdf.

[8]  *Women on the Run*, *supra* note 6, at 16 (finding that citizens of Northern
Triangle countries are "murdered with impunity"); *id.* at 23 (finding that 69% of
women interviewed tried relocating within their own countries at least once
before fleeing and indicating that 10% "stated that the police or other
authorities were the direct source of their harm"); *Closing off Asylum*, *supra*
note 7, at 7 ("[T]here is considerable evidence that officials in each of the
Northern Triangle countries have extremely limited capacity – and in many
cases limited will – to protect those at grave risk.").

[9]  Médecins Sans Frontières (Doctors Without Borders), *Forced to Flee Central
America's Northern Triangle: A Neglected Humanitarian Crisis* 6 (2017),
https://www.msf.org/sites/msf.org/files/msf_forced-to-flee-central-americas-
northern-triangle_e.pdf [hereinafter *Forced to Flee*].

[10]  Kids in Need of Def. & Human Rights Ctr. Fray Matías de Córdova, *Childhood
Cut Short: Sexual and Gender-based Violence Against Central American
Migrant and Refugee Children* 12-20 (2017), https://supportkind.org/wp-
content/uploads/2017/06/Childhood-Cut-Short-KIND-SGBV-
Report_June2017.pdf [hereinafter *Childhood Cut Short*] (describing sexual and
gender-based violence against children and young women in the Northern
Triangle).

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

20

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   unwilling to provide meaningful assistance.[11]  Abusive partners are often members

2   or associates of criminal armed groups.[12]  Abusers frequently threaten women with

3   harm to their parents, siblings or children if they try to leave.[13]  Some women who

4   fled their countries have heard from family members back home that their abusers

5   continue to look for them.[14]  In addition, "[s]exual harassment and the threat of

6   sexual violence by gangs shapes the everyday lives of women and girls," in the

7   Northern Triangle, and experts estimate that rape and torture of girls is "extremely

8   widespread."[15]

9          44.    After fleeing their home countries, children and adults face an arduous

10  and dangerous journey to the United States.[16]  The situation along the popular

11  migration routes to the United States has been termed a "humanitarian crisis"

12  because of the extraordinary violence faced by those making the journey.[17]  In

---

[11]  *Women on the Run*, *supra* note 6, at 25.  The women interviewed described
repeated rapes and sexual assaults as well as violent physical abuse that
included:  "beatings with hands, a baseball bat and other weapons; kicking;
threats to do bodily harm with knives; and repeatedly being thrown against
walls and the ground."  *Id.*

[12]  *Id.*

[13]  *Id.* at 27.

[14]  *Id.*

[15]  *Childhood Cut Short*, *supra* note 10, at 17.

[16]  *See Women on the Run*, *supra* note 6, at 43-45 (describing extortion, sexual
violence, and physical violence); *see also* Rodrigo Dominguez Villegas,
*Central American Migrants and "La Bestia": The Route, Dangers, and
Government Responses*, Migration Info. Source (Sept. 10, 2014),
https://www.migrationpolicy.org/article/central-american-migrants-and-
%E2%80%9Cla-bestia%E2%80%9D-route-dangers-and-government-responses
(listing "injury or death from unsafe travelling conditions, gang violence, sexual
assault, extortion, kidnapping, and recruitment by organized crime" as dangers
faced on the journey to the United States).

[17]  *See* Eguizábal et al., *supra* note 3, at 3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

21

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

2015 and 2016, 68% of migrants from the Northern Triangle region experienced violence, including sexual assault, on their journeys through Central America and Mexico.[18]  Mexico has faced a drastic rise in criminal activity since the early 2000s that is attributed to cartels and has been accompanied by increases in violence and corruption.[19]  The rate of violence continues to rise; 2017 was the deadliest year on record in Mexico.[20]  Although the northern half of Mexico was often considered the most dangerous, recent reports reveal an increase in violence in the central and southern states of Mexico, particularly in Guerrero, Michoacán, and the State of Mexico.[21]  The U.S. State Department currently advises "no travel"—its highest

[18]  *See Forced to Flee*, *supra* note 9, at 11.  Close to half (44%) of the migrants reported being hit, 40% said they had been pushed, grabbed or asphyxiated, and 7% said they had been shot.  *Id.*  Nearly one-third (31.4%) of women and 17.2% of men surveyed during that same time period had been sexually abused during their journeys.  *Id.* at 12.

[19]  Dominic Joseph Pera, *Drugs Violence and Public [In]Security: Mexico's Federal Police and Human Rights Abuse*, 2–4, 7 (Justice in Mex. Working Paper Ser. Vol. 14, No. 1, 2015), https://justiceinmexico.org/wp-content/uploads/2015/12/151204_PERA_DOMINIC_DrugViolenceandPublicInsecurity_FINAL.pdf; *see* U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor, *Country Reports on Human Rights Practices for 2017 (Mexico)*, http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2017 &dlid=277345.

[20]  Human Rights First, *Mexico: Still Not Safe for Refugees and Migrants* 1 (2018), https://www.humanrightsfirst.org/sites/default/files/Mexico_Not_Safe.pdf [hereinafter *Mexico: Still Not Safe*].

[21]  *See, e.g.*, U.S. Dep't of State, Bureau of Diplomatic Sec., *Mexico 2015 Crime and Safety Report: Mexico City*, https://www.osac.gov/pages/ContentReportDetails.aspx?cid=17114 (reporting that a "common practice is for gangs to charge 'protection fees' or add their own tax to products and services with the threat of violence for those who fail to pay"); *see also* Human Rights First, *Dangerous Territory: Mexico Still Not Safe for Refugees* 4 (2017), http://www.humanrightsfirst.org/sites/default/files/HRF-Mexico-Asylum-System-rep.pdf [hereinafter *Dangerous Territory*] ("Human rights monitors stressed that there is a large presence of transnational gangs in southern Mexico, which have easy access to those fleeing gang persecution in the Northern Triangle.") (citations omitted).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

22

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

level of travel warning, which also applies in active war zones like Syria,
Afghanistan, and Yemen—to five Mexican states due to high crime rates.[22]
Human rights groups report that since mid-2017, "the dangers facing refugees and
migrants in Mexico have escalated."[23]  Perpetrators of violence against migrants
"include[] members of gangs and other criminal organizations, as well as members
of the Mexican security forces."[24]  Along with the increase in violence and
organized criminal activity, it is well documented that the police and armed forces
operate with impunity in Mexico, leaving victims unable to resort to the
government for protection.[25]  Indeed, "[i]n some regions of Mexico the state has
become so closely identified with criminal gangs and drug cartels that these
criminal organizations do not need to corrupt the state—they essentially 'are' part
of the state."[26]  Thus, the initial mistrust and inability to rely upon government

---

[22] U.S. Dep't of State, Bureau of Consular Affairs, *Mexico Travel Advisory* (Aug. 22, 2018), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html [hereinafter *Mexico Travel Advisory*].

[23] *Mexico: Still Not Safe*, *supra* note 20, at 1; *see also Dangerous Territory*, *supra* note 21, at 3 ("Human rights monitors report an increase in kidnappings, disappearances, and executions of migrants and refugees in recent years.").

[24] *Forced to Flee*, *supra* note 9, at 5; *see also Closing Off Asylum*, *supra* note 7, at 9 (explaining that when crossing Mexico, migrants suffer "abuses at the hands of organized crime, exploitative smugglers, and predatory state security and police").

[25] *See* Pera, *supra* note 19, at 4 ("Drug trafficking organizations have infiltrated government positions in many areas, and their influence over state personnel has dramatic implications."); Ximena Suárez et al., Wash. Office on Latin Am., *Access to Justice for Migrants in Mexico: A Right That Exists Only on the Books*, 24-27, 30–31 (2017), https://www.wola.org/wp-content/uploads/2017/07/Access-to-Justice-for-Migrants_July-2017.pdf [hereinafter *Access to Justice*] (documenting Mexican authorities' unwillingness to investigate crimes against migrants).

[26] *Access to Justice*, *supra* note 25, at 30-31; Alberto Díaz-Cayeros et al., *Caught in the Crossfire: The Geography of Extortion and Police Corruption in Mexico*,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

23

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

authorities for protection that leads many to flee their home countries accompanies

them along their journeys through Mexico.[27]

45.    Furthermore, migrants seeking international protection have a small

chance of receiving it in Mexico.  Amnesty International reports that "the Mexican

government is routinely failing in its obligations under international law to protect

those who are in need of international protection, as well as repeatedly violating the

*non-refoulement* principle."[28]

46.    In addition, Mexico's northern border region is particularly plagued

with crime and violence, presenting renewed dangers for asylum seekers just as

they approach their destination.[29]  The state of Tamaulipas, which borders South

---

3-4 (Stanford Ctr. for Int'l Dev., Working Paper No. 545, 2015),
https://globalpoverty.stanford.edu/sites/default/files/publications/545wp_0.pdf.

[27] *See, e.g.*, Villegas, *supra* note 16 (referencing documentation of "the abuse of
power by various Mexican authorities, including agents from the National
Migration Institute, municipal governments, and state police" against
individuals traveling to the U.S. border).

[28] Amnesty Int'l, *Overlooked, Under-Protected, Mexico's Deadly* Refoulement *of
Central Americans Seeking Asylum* 2 (2018), https://www.amnesty.org/
download/Documents/AMR4176022018ENGLISH.PDF; *see id.* at 8-20
(describing the multiple layers of institutional failure leaving refugees and
asylum seekers vulnerable to *refoulement* in Mexico); *accord* Francisca
Vigaud-Walsh et al., Refugees Int'l, *Putting Lives at Risk: Protection Failures
Affecting Hondurans and Salvadorans Deported from the United States and
Mexico* 11-12 (2018), https://static1.squarespace.com/static/506c8ea1e4b01
d9450dd53f5/t/5a849f81c830250842098d87/1518641035445/Northern+Triangl
e+-+Refugees+International.pdf; *Dangerous Territory*, *supra* note 21, at 4-9.

[29] *See Mexico Travel Advisory*, *supra* note 22 (reporting violent crime and an
increase in homicide in the state of Baja California (encompassing border towns
Tijuana and Mexicali) compared to 2016; widespread violent crime and gang
activity in the state of Chihuahua (encompassing border town Ciudad Juarez);
widespread violent crime and limited law enforcement capacity to prevent and
respond to crime in the state of Coahuila (particularly in the northern part of the
state); that the state of Sonora (encompassing border town Nogales) is a key
region in the international and human trafficking trades; and common violent
crime, including homicide, armed robbery, carjacking, kidnapping, extortion,
and sexual assault in the state of Tamaulipas (encompassing border towns

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

24

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    Texas cities including Laredo, McAllen, and Brownsville, is on the U.S. State

2    Department's "no travel" list.[30]  Most of Mexico's other border states, including

3    Sonora, Chihuahua, Coahuila, and Nuevo León, are classified at Level 3,

4    "Reconsider Travel," due to the prevalence of violent crime and gang activity.[31]

5    The most pervasive problems migrants face in Mexico's northern border states

6    include disappearances, kidnappings, rape, trafficking, extortion, execution and

7    sexual and labor exploitation by state and non-state actors.[32]  Recently, the situation

8    at the border has worsened:  smugglers have increased their prices, cartel members

9    have increased their surveillance and control of areas around border crossings, and

10   the number of migrants kidnapped and held for ransom has increased.[33]  Even

11   migrants in the immediate vicinity of a POE are at risk of violence and

12   exploitation.[34]  Those who seek refuge in shelters may be in particular danger.

---

14   Matamoros, Nuevo Laredo, and Reynosa), where law enforcement capacity to
15   respond to violence is limited throughout the state).

16   [30] *Id.*

17   [31] *Id.*

18   [32] B. Shaw Drake et al., Human Rights First, *Crossing the Line: U.S. Border
19   Agents Illegally Reject Asylum Seekers* 16 (2017),
     https://www.humanrightsfirst.org/ sites/default/files/hrf-crossing-the-line-
20   report.pdf [hereinafter *Crossing the Line*].

21   [33] *Id.*

22   [34] Josiah Heyman & Jeremy Slack, *Blockading Asylum Seekers at Ports of Entry
23   at the US-Mexico Border Puts Them at Increased Risk of Exploitation,
     Violence, and Death*, Ctr. for Migration Stud. (June 25, 2018), http://cmsny.org/
24   publications/heyman-slack-asylum-poe/#_ednref11.pdf ("When asylum-seekers
     are turned away by US authorities, they return to areas around the Mexican-side
25   POEs.  These are characteristically busy zones of businesses, restaurants, bars,
     discos, drug sellers, hustlers, and commercial sex work, although each border
26   port has its own characteristics.  They are areas that increase the vulnerability
     and exploitability of non-Mexican migrants with little knowledge and few
27   resources.").

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

25

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    Some shelters are infiltrated by organized crime, while others have been the sites of

2    recent vandalism, burglary, threats, and kidnapping.[35]

3        47.    By turning back individuals who seek to access the asylum process by

4    presenting themselves at POEs on the U.S.-Mexico border, Defendants are forcing

5    them to return to the dangerous conditions that drove them to flee their countries in

6    the first place.[36]

7    **B.    Defendants' Policy and Widespread Practices of Denying Asylum**

8         **Seekers Access to the Asylum Process**

9        48.    Starting in 2016 and continuing to the present, CBP officials, at or

10   under the direction or with the knowledge and acquiescence or authorization of

11   Defendants, have systematically restricted the number of asylum seekers who can

12   access the U.S. asylum process through POEs along the U.S.-Mexico border.[37]

---

[35] *Id.*; Wash. Office on Latin Am. et al., *Situation of Impunity and Violence In Mexico's Norther Border Region* 2-4 (Mar. 2017), https://www.wola.org/wp-content/uploads/2017/04/Situation-of-Impunity-and-Violence-in-Mexicos-northern-border-LAWG-WOLA-KBI.pdf.

[36] *Crossing the Line*, *supra* note 32, at 16*; see also* B. Shaw Drake, Human Rights First, *Violations at the Border: The El Paso Sector* 2–3 (2017), https://www.humanrightsfirst.org/resource/violations-border-el-paso-sector (explaining the risks facing asylum seekers who are turned back at U.S. POEs, including being deported back to their home countries where they face persecution).

[37] There is anecdotal evidence that CBP officials began unlawfully dissuading asylum seekers from pursuing their claims or flatly refusing them entry to the United States even prior to 2016.  *See* Sara Campos & Joan Friedland, Am. Immigration Council, *Mexican and Central American Asylum and Credible Fear Claims: Background and Context* 10 (2014), https://www.american immigrationcouncil.org/sites/default/files/research/asylum_and_credible_fear_claims_final_0.pdf (reporting that Mexican asylum seekers arriving in El Paso "expressed a fear of persecution [but] were told by CBP that the U.S. doesn't give Mexicans asylum, and they [we]re turned back"); *see also* U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* 54 (2005), https://www.uscirf .gov/sites/default/files/resources/stories/pdf/asylum_seekers/Volume_I.pdf [hereinafter *2005 USCIRF Report*] (reporting that two groups of asylum seekers

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES                                                    26

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    That has been accomplished both through the Turnback Policy that seeks to restrict

2    access to the asylum process and also through widespread practices across the

3    U.S.-Mexico border also designed to deny access to the asylum process.

4          49.     Al Otro Lado and Class Plaintiffs, as well as numerous non-

5    governmental organizations[38] and news outlets,[39] have documented thousands of

6    cases in which CBP officials have arbitrarily denied and/or unreasonably delayed

7    access to the asylum process to individuals seeking asylum by presenting

8

9

10

     who arrived at the San Ysidro POE were "improperly refused entry to the

11    United States for . . . lacking proper documentation and [were] 'pushed back'
. . . without [being] refer[red] . . . to secondary inspection" and without a

12    "record of the primary inspection" being created); *see also* Human Rights

13    Watch, *"You Don't Have Rights Here": US Border Screening and Returns of
Central Americans to Risk of Serious Harm* 2, 8 (2014), https://www.hrw.org/

14    sites/default/files/reports/us1014_web_0.pdf [hereinafter *"You Don't Have
Rights Here"*] (concluding that the "cursory screening [conducted by CBP

15    officials] is failing to effectively identify [asylum seekers]" and reporting that
some "border officials acknowledged hearing [non-citizens'] expressions of

16    fear but pressured them to abandon their claims").

17 [38] *See, e.g.*, *Crossing the Line*, *supra* note 32; Amnesty Int'l, *Facing Walls: USA

18    and Mexico's Violation of the Rights of Asylum Seekers* 19–22 (2017),
https://www.amnestyusa.org/wp-content/uploads/2017/06/USA-Mexico-

19    Facing-Walls-REPORT-ENG.pdf [hereinafter *Facing Walls*]; *"You Don't Have
Rights Here"*, *supra* note 37, at 2, 4.

20

21 [39] Joshua Partlow, *U.S. Border Officials Are Illegally Turning Away Asylum

22    Seekers, Critics Say*, Wash. Post (Jan. 16, 2017), https://www.washingtonpost
.com/world/the_americas/us-border-officials-are-illegally-turning-away-

23    asylum-seekers-critics-say/2017/01/16/f7f5c54a-c6d0-11e6-acda-
59924caa2450_story.html?noredirect=on&utm_term=.ed5c3100d451; Caitlin

24    Dickerson & Miriam Jordan, *'No Asylum Here': Some Say U.S. Border Agents
Rejected Them*, N.Y. Times (May 3, 2017),

25    https://www.nytimes.com/2017/05/03/us/ asylum-border-customs.html; Rafael
Carranza, *Are Asylum Seekers Being Turned Away at the Border?*, USA Today

26    (May 4, 2017, 10:55 PM),
https://www.azcentral.com/story/news/politics/immigration/2017/05/05/asylum

27    -seekers-being-turned-away-border/309398001/.

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

27

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    themselves at POEs along the U.S.-Mexico border.[40]  The Turnback Policy and

2    CBP's other widespread, unlawful practices have been documented at POEs

3    spanning the length of the U.S.-Mexico border, including POEs in San Ysidro,

4    California; Otay Mesa, California; Tecate, California; Calexico, California; San

5    Luis, Arizona; Nogales, Arizona; El Paso, Texas; Del Rio, Texas; Eagle Pass,

6    Texas; Laredo, Texas; Roma, Texas;  Hidalgo, Texas; Los Indios, Texas; and

7    Brownsville, Texas.

8                    **1.    Initiation of the Turnback Policy**

9           50.    Internal CBP documents reveal that CBP officials at the highest levels

10   mandated turnbacks at POEs along the U.S.-Mexico border.[41]

11          51.    Evidence of a Turnback Policy, at least regarding the San Ysidro

12   POE, exists starting in May 2016.  In an email dated May 29, 2016, the Watch

13   Commander at the San Ysidro POE notes that "[t]he Asylee line in the pedestrian

14   building is not being used at this time, there is a line staged on the Mexican side."

15   In an email sent roughly a month later, the same individual reiterated that "[i]t's

16   even more important that when the traffic is free-flowing that the limit line officers

17   ask for and check documents to ensure that groups that may be seeking asylum are

18   directed to remain in the waiting area on the Mexican side."

19

20   [40]  Amnesty Int'l, *USA: 'You Don't Have Any Rights Here': Illegal Pushbacks,*

21   *Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States* 17
     (2018), https://www.amnesty.org/download/Documents/AMR5191012018

22   ENGLISH.PDF [hereinafter *You Don't Have Any Rights Here*] ("While there
     are no official statistics on how many people CBP has illegally turned away

23   without processing their asylum requests, Amnesty International has received
     numerous secondary reports from NGOs indicating that CBP has forced

24   thousands of asylum-seekers to wait in Mexico – including families with
     children, mostly from Central America.").

25

26   [41]  These documents, produced during the limited discovery that took place while
     this case was pending in the U.S. District Court for the Central District of

27   California, relate exclusively to POEs under the responsibility of the Laredo
     Field Office and the San Ysidro POE.  Additional discovery could reveal

28   further details regarding the contours of the Turnback Policy.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

28

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

52.     CBP's collaboration with the Mexican government to turn back asylum seekers at the San Ysidro POE was formalized in a document issued on an unspecified date after July 15, 2016, which provides:

> In coordination with the GoM [Government of Mexico] we have identified two (2) periods throughout the day to intake asylum claims into our custody (8am and 4 pm).   At each period, we intake approximately [redacted] applicants, with a daily intake total of approximately [redacted] applicants.   If an applicant does not meet these intake time periods, they are requested to remain in-line in Mexico until the next intake period. . . . In order to control the flow of asylees in their area, the GoM has instituted a numerical process by giving asylum applicants numbers with intake dates in the order of their arrival.   The applicants are also given the locations of humanitarian shelters in Tijuana where they receive food and shelter until their intake date.  The implementation of this process was developed by the GoM.

53.     On December 6, 2016, the Director of Field Operations at CBP's San Diego Field Office confirmed that the Turnback Policy remained in effect:

> Metering continues at both San Ysidro and Calexico POEs the numbers are adjusted based on space availability and ERO [ICE's Office of Enforcement and Removal Operations] movement of detainees from the ports.  Mexican immigration is handling the metering process before the OTMs [Other Than Mexicans] arrive at the port of entry; no issues on our end with aliens being turned away.

54.     On information and belief, other CBP Field Offices also implemented the Turnback Policy.  Although certain port directors periodically suspended the Turnback Policy, they never abandoned it.  Moreover, direct turnbacks of asylum seekers—via misrepresentations about the availability of asylum, intimidation, and coercion, among other tactics—continued in practice even during periods of formal suspension of the policy.

55.     Evidence that a border-wide Turnback Policy was authorized at the highest levels of CBP, including by Defendant and now-Commissioner Kevin

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

29

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

McAleenan, exists as of November 2016. In an email communication dated
November 12, 2016, the Assistant Director Field Operations for the Laredo Field
Office instructed all Port Directors under his command to follow the mandate of
the then-CBP Commissioner and Deputy Commissioner:

> At the request of C-1 [then CBP Commissioner R. Gil Kerlikowski] and
> C-2 [then CBP Deputy Commissioner Kevin McAleenan], you are to
> meet with your INM [Instituto Nacional de Migración, Mexico's
> immigration agency] counterpart and request they control the flow of
> aliens to the port of entry. For example, if you determine that you can
> only process 50 aliens at a time, you will request that INM release only
> 50.
>
> If INM cannot or will not control the flow, your staff is to provide the
> alien with a piece of paper identifying a date and time for an
> appointment and return then [sic] to Mexico. This is similar to what
> San Diego is doing. We understand the alien may express a fear of
> returning to Mexico and we will address as the situation dictates.[42]

56.    This email directive was promptly implemented by the Laredo Field
Office, which encompasses the Brownsville, Del Rio, Eagle Pass, Hidalgo, Laredo,
Progreso, Rio Grande, and Roma, Texas POEs and covers nearly 400 miles of the
Texas-Mexico border. According to an internal email dated November 22, 2016,
"Our instructions from Service Headquarters and LFO [Laredo Field Office] is that
we will only accept 'what we can handle/process'. All others will be turned back
to Mexico with an appointment date/time if possible." Other email correspondence
from CBP officials at the Laredo, Hidalgo and Roma POEs indicates that
individuals turned back did not receive appointment notices.

57.    The directive was memorialized in a memorandum from the Laredo
Field Office dated January 13, 2017. The memorandum directs that "metering"

---

[42] An email sent the following day clarified that this directive was to apply only to
Central Americans. In practice, however, individuals of many other
nationalities have also been affected.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

30

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

procedures—i.e. procedures to regulate and restrict the access of asylum seekers to POEs—be implemented once case processing numbers exceed a certain (redacted) number, that such procedures are to be conducted "at the middle of the bridge," and that "all foreign nationals seeking a benefit are given an appointment window to return for processing." The Laredo Command Center is required to provide hourly updates to "local upper management," among others, who must also be notified once normal operations resume.

58.    In the months that followed, asylum seekers from Central America and elsewhere continued to seek access to the U.S. asylum process by presenting themselves at POEs along the U.S.-Mexico border, but many were turned back by, at the instruction of, or with the knowledge of CBP officials.

59.    On June 13, 2017, in questioning before the House Appropriations Committee, John P. Wagner, the Deputy Executive Assistant Commissioner for OFO, admitted that CBP officials were turning back asylum applicants at POEs along the U.S.-Mexico border.[43]  When asked to comment on the numerous press reports that CBP officers at POEs had been "turning away individuals attempting to claim credible fear," Mr. Wagner acknowledged that CBP had indeed engaged in turnbacks, and argued the practice was justified by a lack of capacity.[44]  Mr.

---

[43] *Department of Homeland Security Appropriations for 2018 Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 115th Cong. 289-90 (2017) (testimony of John P. Wagner, Deputy Executive Assistant Comm'r, Office of Field Operations, Customs and Border Protection), https://www.gpo.gov/fdsys/pkg/CHRG-115hhrg27050/pdf/CHRG-115hhrg27050.pdf [hereinafter *Wagner Testimony*].

[44] Congresswoman Roybal-Allard asked:

It is my understanding that CBP is legally required to process credible fear claims when they are presented, and it is not authorized to turn back individuals claiming fear even temporarily. In addition to commenting on those allegations, what steps can be taken or have been taken to ensure this is not occurring or continuing to occur at the ports

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

31

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  Wagner also stated on the record that because POEs "do not have the kind of space

2  to hold large volumes of people," CBP "worked a process out with the Mexican

3  authorities to be able to limit how many people a day could come across the border

4  into [CBP's] facility to be processed."[45]

5      60.    Following dozens of turnbacks of asylum seekers in San Ysidro in

6  December 2017, the CBP Field Operations Director in charge of the San Ysidro

7  POE acknowledged and defended the turnbacks, stating: "So they weren't being

8  allowed into the port-of-entry. We said, 'we're at capacity, so wait here.' It's

9  because of our detention space limitation, we were at capacity."[46]

10          **2.    High Level Officials' Public Confirmation and Escalation of**

11              **the Turnback Policy and CBP's Aggressive Implementation**

12      61.    In late April 2018, following an arduous, widely-publicized journey, a

13  group of several hundred asylum seekers—referred to in the press as a "caravan"—

14

----

15      of entry, such as, is there training or other guidance, reminding CBP
       personnel how they are required to treat individuals who express fear?
16

17  Mr. Wagner responded:

18      Sure. It was a question really of the space available to process people.
       And our facilities were at capacity to be able to take more people in, go
19      through the processing, and turn them over to ICE after that. And the
       building was full, and we could not humanely and safely and securely
20      hold any more people in our space.

21  The Congresswoman later clarified:

22      "So it wasn't an issue of officers not knowing what the law was. It was
       more of an issue of capacity?" And Mr. Wagner responded: "It was an
23      issue of capacity and being able to put people into the facility without
       being overrun or having unsafe and unsanitary conditions."
24

25  *Id*.

26  [45]  *Id*.

27  [46]  *You Don't Have Any Rights Here*, *supra* note 40, at 16.

28

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  arrived at the San Ysidro POE.  As they approached the United States, President

2  Trump posted a series of messages on Twitter warning of the dangers posed by the

3  group, including one indicating that he had instructed DHS "not to let these large

4  Caravans of people into our Country."[47]

5       62.    Thereafter, the highest-ranking officials in the Department of Justice

6  and DHS publicly and unambiguously proclaimed the existence of a Turnback

7  Policy.  CBP continued to buttress the Turnback Policy through the practices

8  described above, including misrepresentations, threats and intimidation, verbal

9  abuse and physical force, coercion, outright denials of access, and physically

10  obstructing access to POEs.

11      63.    Attorney General Sessions, refusing to acknowledge that some of the

12  caravan members might have legitimate claims to asylum under U.S. law,

13  characterized the caravan's arrival as "a deliberate attempt to undermine our laws

14  and overwhelm our system."[48]  Upon the caravan's arrival, CBP officials

15  indicated—in accordance with the Turnback Policy—that they had exhausted their

16  capacity to process individuals traveling without proper documentation.[49]

17      64.    As the caravan was approaching the United States, Attorney General

18  Sessions announced that all individuals who crossed the U.S.-Mexico border

19  illegally would be criminally prosecuted.[50]  Following the arrival of the caravan, he

20

21  [47]  Donald J. Trump (@realDonaldTrump) Twitter (Apr. 2, 2018, 4:02 AM)
     https://twitter.com/realDonaldTrump/status/980762392303980544.

22
23  [48]  Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Statement
     on Central America 'Caravan', (Apr. 23, 2018), https://www.justice.gov/opa/pr/
24     attorney-general-jeff-sessions-statement-central-american-caravan.

25  [49]  Kirk Semple & Miriam Jordan, *Migrant Caravan of Asylum Seekers Reaches
     U.S. Border*, N.Y. Times (Apr. 29, 2018), https://www.nytimes.com/2018/
26     04/29/world/americas/mexico-caravan-trump.html.

27  [50]  Press Release, U.S. Dep't of Justice, Attorney General Announces Zero-
     Tolerance Policy for Criminal Illegal Entry (Apr. 6, 2018), https://www.justice
28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

33

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

pronounced that "[p]eople are not going to caravan or otherwise stampede our
border," and reiterated his commitment to prosecuting illegal border crossers.[51]

65.     On May 15, 2018, DHS Secretary Kirstjen Nielsen likewise publicly
and unambiguously confirmed the existence of the Turnback Policy, dismissing the
United States' legal obligation to receive and process asylum seekers at U.S.
borders as a legal "loophole":

> We are "metering," which means that if we don't have the resources to
> let them [asylum-seekers] in on a particular day, they are going to have
> to come back.  They will have to wait their turn and we will process
> them as we can, but that's the way that the law works.  Once they come
> into the United States, we process them.  We have asked Congress to
> fix this loophole.  It's a huge gaping hole that we need to fix because it
> is so abused.[52]

66.     Trump himself continued to publicly pronounce the importance of the
Turnback Policy, through tweets, including direct statements that promote the
direct violation of the law:

- June 24, 2018: "When somebody comes in, we must
  immediately, with no Judges or Court Cases, bring them back
  from where they came."[53]

---

.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-
entry.

[51] U.S. Attorney Gen. Jefferson B. Sessions, Remarks Discussing the Immigration
Enforcement Actions of the Trump Administration (May 7, 2018),
https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-
discussing-immigration-enforcement-actions.

[52] *Secretary Nielsen Talks Immigration, Relationship with Trump*, Fox News
(May 15, 2018), https://video.foxnews.com/v/5785340898001/?#sp=show-
clips.

[53] Donald J. Trump (@realDonaldTrump) Twitter (Apr. 24, 2018, 8:02 AM)
https://twitter.com/realdonaldtrump/status/1010900865602019329?lang=en.

LATHAM&WATKINS⣿
ATTORNEYS AT LAW
LOS ANGELES

34

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

- June 30: "When people come into our Country illegally, we must IMMEDIATELY escort them back out without going through years of legal maneuvering."[54]

- July 5: "When people, with or without children, enter our Country, they must be told to leave without our Country being forced to endure a long and costly trial.  Tell the people, 'OUT,' and they must leave, just as they would if they were standing in your front lawn."[55]

67.    Meanwhile, CBP officials continue to turn back asylum seekers who seek access to the U.S. asylum process by presenting themselves at POEs. Predictably, the Turnback Policy has caused and continues to cause many asylum seekers, desperate to avoid danger on the Mexican side of the border, to seek to enter the United States outside POEs and thereafter be arrested and prosecuted for unlawful entry and in many cases forcibly separated from their children.

68.    In recent months, Commissioner McAleenan and other high-level CBP officials have openly acknowledged that the Turnback Policy remains in effect, and that the United States is actively collaborating with Mexico to reduce the flow of asylum seekers.[56]

---

[54] Donald J. Trump (@realDonaldTrump) Twitter (June 30, 2018, 12:44 PM) https://twitter.com/realdonaldtrump/status/1013146187510243328?lang=en.

[55] Donald J. Trump (@realDonaldTrump) Twitter (July 5, 2018, 7:08 AM) https://twitter.com/realdonaldtrump/status/1014873774003556354; Donald J. Trump (@realDonaldTrump) Twitter (July 5, 2018, 7:16 AM) https://twitter.com/realdonaldtrump/status/1014875575557804034.

[56] *See, e.g.,* CBP Comm'r Kevin McAleenan, Statement on Operations at San Ysidro Port of Entry (April 29, 2018), https://www.cbp.gov/newsroom/speeches-and-statements/statement-commissioner-kevin-mcaleenan-operations-san-ysidro-port (explaining that "individuals [without appropriate entry documentation] may need to wait in Mexico as CBP officers work to process those already within our facilities"); Molly Hennessy-Fiske, *Border Protection Commissioner Talks 'Zero Tolerance,' Family Separations and How To Discourage Immigration*, L.A. Times (June 11, 2018) http://www.latimes.com/

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

35

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

69.     A high-level CBP officer reiterated the contours of the Turnback Policy in a meeting with immigrant rights groups in El Paso on June 27, 2018 and confirmed that it was being applied border-wide.[57]

70.     Notably, a September 27, 2018 report from the OIG ("OIG Report"), attached as Exhibit A, references the policy under which CBP systematically restricts access to the asylum process at POEs and confirms the policy was directed by DHS.  The OIG Report states the existence of a "CBP guidance" which indicates that "[w]hen the ports of entry are full . . . [CBP] officers should inform individuals that the port is currently at capacity and that they will be permitted to enter once there is sufficient space and resources to process them."[58]  Although this "guidance" states that CBP officers "may not discourage individuals from waiting to be processed," some officers in El Paso informed OIG investigators that they advise asylum seekers to "return later."[59]  Also, according to the report, while "[u]nder the Zero Tolerance Policy, the Government encouraged asylum-seekers to come to U.S. ports of entry[,] . . .[a]t the same time, CBP reported that overcrowding at the ports of entry caused them to limit the flow of people that could enter."[60]  The report elaborates that "CBP was regulating the flow of asylum-seekers at ports of entry through 'metering,' a practice CBP has utilized at least as far back as 2016 to regulate the flow of individuals at ports of entry."[61]

nation/la-na-border-patrol-immigration-20180611-htmlstory.html ("We're not denying people approaching the U.S. border without documents.  We're asking them to come back when we have the capacity to manage them.").

[57] *You Don't Have Any Rights Here*, *supra* note 40, at 17.

[58] *OIG Report*, *supra* note 1, at 6.

[59] *Id*. at 7.

[60] *Id*. at 5.

[61] *Id*. at 5-6; *see id*. at 6-7 (describing CBP's "metering" practice at POEs, explaining that "CBP officers stand at the international line out in the middle of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

36

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

71.    DHS's response to the OIG Report confirms that CBP has engaged in "queue management practices . . . directed by [Defendant Nielsen].[62]  The response also confirms that "CBP's processes and policies at ports of entry may require some individuals who do not have travel documents to wait at the International Boundary prior to entering the United States."[63]

72.    In addition, officials from the Mexican immigration agency, *Instituto Nacional de Migración* ("INM"), have confirmed the existence of an agreement with CBP under which INM assists with the Turnback Policy by hindering asylum seekers' access to POEs.  For example, as reported in the Amnesty International report released on October 11, 2018, the INM head delegate in the Mexican state of Baja California reportedly expressed doubt about CBP's claims of capacity constraints and "voiced his frustration that [CBP was] making INM do [its] dirty work."[64]  The INM delegate stated:

> [T]hat CBP requested INM to remove . . . 20 asylum-seekers from the turnstiles [at the San Ysidro POE], as well as the rest of the [April 2018] caravan members from the plaza at El Chaparral, where they were camping on the Mexican side of the port-of-entry. Implicit in the CBP request, the INM delegate said, was that such detentions could result in INM deporting those asylum-seekers who were not legally present in Mexico.[65]

the footbridges," checking pedestrians' travel documents, and preventing asylum-seekers from crossing the international line until space is "available . . . to hold the individual while being processed").

[62]  *Id*. at 19-20.

[63]  *Id.* at 20.

[64]  *You Don't Have Any Rights Here*, *supra* note 40, at 23.

[65]  *Id*. at 23.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

37

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

73.    Later, on June 14, 2018, a senior Mexican immigration official in Sonora reportedly stated that US officials had requested INM to detain and check the papers of the asylum-seekers whom CBP was pushing back to the Mexican side of the Nogales border crossing. The INM official relayed also that he understood the request by US authorities implicitly to be for INM to deport asylum-seekers without legal status in Mexico to their home countries from which they had fled.[66]

74.    Also in June 2018, Mexican immigration officials told human rights researchers that "CBP officers were calling Mexican immigration to collect any individuals at the border line, including asylum seekers, who attempted to approach the port of entry to request protection and did not have visas or other documentation."  As a result, asylum seekers were physically prevented from reaching the POE to request protection.[67]

75.    Statements from on-the-ground CBP officials further confirm the continued existence of a high-level Turnback Policy.  In El Paso, a CBP official

---

[66] *Id*. at 21; see also *id*. at 22 ("On the Mexico side of the bridges in July 2018, three Mexican immigration officials informed [a] US immigration lawyer . . . that they were screening asylum-seekers and preventing their access to US ports-of-entry upon the request of CBP. One of the Mexican officials told her: 'Yes, it's a collaborative program that we're doing with the Americans.'  The immigration officials were detaining non-Mexicans who lacked valid Mexican transit visas, and threatened them with deportation if they returned to the bridge. At the mid-point of the bridge, CBP again screened those who were able to pass through the Mexican immigration filter, and forced them to wait on the half of the bridge closer to Mexico.  According to [the U.S. immigration lawyer], the Mexican immigration officers informed her that when asylum seekers crossed onto the bridge without valid Mexican travel documents, CBP officers called on Mexican immigration officials to remove them from the bridge.").

[67] Human Rights First, *Zero-Tolerance Criminal Prosecutions: Punishing Asylum Seekers and Separating Families* 8 (2018), https://www.humanrights first.org/resource/zero-tolerance-criminal-prosecutions-punishing-asylum-seekers-and-separating-families [hereinafter *Zero-Tolerance Criminal Prosecutions*].

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

38

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

blocking asylum seekers' path to the POE on the bridge explained that he was
"following directions.  And this is not even local directions."[68]  On a separate
occasion, CBP officials in El Paso, including supervisors, told a non-profit worker
that they were turning back asylum seekers because they "ha[d] orders not to let
anybody in," that "this is a policy across the border," and that "[i]t's an order from
[U.S. Attorney General Jeff] Sessions."[69]

      76.    Recent official government statements acknowledging the policy
assert a "lack of capacity" to process the flow of asylum seekers at the southern
border.  In fact, and in accordance with a central goal of the Turnback Policy to
deter future asylum seekers from presenting themselves at the U.S. border, CBP's
own statistics indicate that there has not been a particular surge in numbers of
asylum seekers coming to POEs.  From January through September 2018, the
number of people without legal status attempting to enter the United States from
Mexico, including asylum seekers, has stayed at roughly the same level as over the
previous five years.  During those five years, U.S. authorities regularly processed
asylum seekers without the delays that CBP has imposed in 2018.[70]  Based on
available statistics, Amnesty International has characterized the "supposedly
unmanageable number of asylum claims" as "a fiction." [71]

---

[68] Robert Moore, *Border Agents Are Using a New Weapon Against Asylum
Seekers*, Tex. Monthly (June 2, 2018), https://www.texasmonthly.com/politics/
immigrant-advocates-question-legality-of-latest-federal-tactics/.

[69] Declaration of Taylor Levy in Support of the State of Wash. at 8, Washington v
Trump, No. 18-939-MJP (W.D. Wash. July 2, 2018), https://agportal-
s3bucket.s3.amazonaws.com/uploadedfiles/Another/News/Press_Releases/
motion%20declarations%201-33.pdf.

[70] *Southwest Border Migration FY2018*, U.S. Customs & Border Protection,
https://www.cbp.gov/newsroom/stats/sw-border-migration (last visited Oct. 10,
2018).

[71] *You Don't Have Any Rights Here*, *supra* note 40, at 14.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

39

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

77.    In fact, there is substantial evidence that calls into question the claims
of a lack of capacity.  There is evidence to suggest such claims are false and
instead are designed to effectuate the broader policy goal of restricting access to
the asylum process, according to governmental and non-governmental sources.  In
early 2018, senior CBP and ICE officials in San Ysidro, California, stated in
interviews that "CBP has only actually reached its detention capacity a couple
times per year and during 'a very short period' in 2017."[72]  The OIG Report notes
that while CBP justifies the official "metering" policy by citing a lack of capacity
to process asylum seekers, "the OIG team did not observe severe overcrowding at
the ports of entry it visited."[73]  Human rights researchers visiting seven POEs in
Texas in June 2018 reported that "[t]he processing rooms visible in the ports of
entry . . . appeared to be largely empty."[74]  CBP's "capacity" excuse appears to be
a cover for a "deliberate slowdown" of the rate at which the agency receives
asylum seekers at POEs.[75]

78.    On October 10, 2018, CBP rejected thirty-two asylum seekers
including small children and pregnant women at the Córdoba International Bridge

---

[72] *Id*. at 15 (citing an interview with ICE's Assistant Field Office Director at Otay
Mesa Detention Center on May 1, 2018, and an interview with the CBP Field
Officer Director in San Diego on January 5, 2018).

[73] *OIG Report*, *supra* note 1, at 8.

[74] *Zero-Tolerance Criminal Prosecutions*, *supra* note 67, at 9.

[75] Adam Isacson et al., Wash. Office on Latin Am., *"Come Back Later":
Challenges for Asylum Seekers Waiting at Ports of Entry* 3 (2018),
https://www.wola.org/wp-content/uploads/2018/08/Ports-of-Entry-Report_
PDFvers-3.pdf [hereinafter *Come Back Later*]; Debbie Nathan, *Desperate
Asylum-Seekers Are Being Turned Away by U.S. Border Agents Claiming
There's "No Room"*, The Intercept (June 16, 2018, 8:37 AM),
https://theintercept.com/ 2018/06/16/immigration-border-asylum-central-
america/ (reporting that a shelter manager in the El Paso area familiar with
CBP's and ICE's local processing facilities "can't imagine they are overtaxed").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

40

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   between Ciudad Juarez and El Paso, Texas.  CBP stopped the individuals and told

2   them that there was no capacity to take them in, including the pregnant women

3   who were some of the most vulnerable people in the group.  However, only two or

4   so hours later, CBP officers in the middle of the bridge received orders to let all

5   thirty-two individuals in belying the initial assertion of a lack of capacity.

6   Similarly, in Nogales, Arizona, recently CBP abruptly switched from processing

7   six asylum seekers per day—citing a lack of capacity to take any more—to twenty

8   asylum seekers per day.  "The sudden change in processing capability points more

9   to an administrative decision than to an increase in capacity which would more

10  likely happen gradually."[76]

11          79.     By restricting the number of individuals who can seek access to the

12  asylum process—particularly given manifestly grave dangers asylum seekers face

13  while waiting on the Mexican side of the border—the Turnback policy operates as

14  a constructive denial of access to the asylum process.  The denial threatens grave

15  harm to vulnerable individuals waiting in very dangerous conditions on the

16  Mexican side of the border.

17          80.     In addition, an assertion of a lack of capacity is not a lawful basis to

18  deny the non-discretionary duty to provide access to the asylum process.

19          81.     Other U.S. government entities have raised concerns about CBP's

20  treatment of asylum seekers.  In 2016, for example, the bipartisan U.S.

21  Commission on International Religious Freedom noted some CBP officers'

22  "outright skepticism, if not hostility, toward asylum claims."[77]

23  ───────────────

    [76] *Come Back Later*, *supra* note 75, at 5.

24

25  [77] *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The
    Treatment of Asylum Seekers in Expedited Removal* 2 (2016) (reporting that

26  despite findings and recommendations in a 2005 study relating to primary
    inspection, USCIRF observers in 2016 continued to find "several examples of

27  non-compliance with required procedures" in CBP primary inspection
    interviews); *see also 2005 USCIRF Report*, *supra* note 37, at 54 (finding that, in

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES                                              41

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   82.     Congress has also signaled concern over CBP's treatment of asylum

2   seekers at the border.  "While proposing over $58 billion in federal funding for

3   DHS agencies, the House Appropriations Committee in July 2018 called on DHS

4   to 'ensure that the United States is meeting its legal obligations, to include

5   reminding field officers and agents about CBP's legal responsibilities to ensure

6   that asylum-seekers can enter at POEs [ports-of-entry].'"[78]

7   83.     As detailed below, Plaintiffs Bianca, Emiliana, César, Roberto, Maria,

8   Úrsula, and Juan were each subject to the Turnback Policy when CBP officials told

9   them there was no capacity to process them and/or that they had to wait an

10  unreasonable or indeterminate amount of time in very dangerous conditions on the

11  Mexican side of the border before they could access the asylum process.  Plaintiffs

12  Victoria, César, Maria, Úrsula, and Juan were each subject to the Turnback Policy

13  when CBP officials told them to speak to a Mexican official (Victoria) or when

14  Mexican officials intercepted them (César, Maria, Úrsula, Juan) and interfered with

15  their ability to access the U.S. asylum process.

16  **C.     CBP Officials' Unlawful Practices Have Denied Hundreds of**

17  **Asylum Seekers Access to the Asylum Process**

18  84.     Starting in or around mid-2016 and continuing to the present, CBP

19  officials also have been engaging in other unlawful, widespread practices to deny

20  asylum seekers access to the asylum process—independently or as a part of or

21  incident to the Turnback Policy.  These practices include the use of

22

23  approximately half of the inspections observed, inspectors failed to read the
    proper advisals regarding asylum to the non-citizen and that "in 15 percent of
24  [the] cases [ ] where an arriving [non-citizen] expressed a fear of return to the
    inspector, that [non-citizen] was not referred" for a credible fear interview).
25

26  [78] *You Don't Have Any Rights Here*, *supra* note 40, at 11 (citing Staff of H.R.
    Comm. on Appropriations, 115th Cong., Rep. on Department of Homeland
27  Security Appropriations Bill, 2019 4, 26 (Comm. Print 2018),
    https://docs.house.gov/meetings/AP/AP00/20180725/108623/HMKP-115-
28  AP00-20180725-SD004.pdf [hereinafter *Bill Report Draft*]).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

42

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  misrepresentations; threats and intimidation; coercion; and verbal and physical

2  abuse; denying outright access to the asylum process; physically obstructing access

3  to the POE; forcing asylum seekers to wait unreasonable or indeterminate amounts

4  of time before being processed; and racially discriminatory denials of access.

5  Asylum seekers and advocates have experienced and/or witnessed firsthand CBP's

6  illegal conduct.

7                  **1.**     **Misrepresentations**

8        85.    CBP officials misinform asylum seekers with the following

9  misrepresentations, among others:  that the United States is no longer providing

10  asylum; that President Trump signed a new law that ended asylum in the United

11  States; that the law providing asylum to Central Americans ended; that Mexicans

12  are no longer eligible for asylum; that the United States is no longer accepting

13  mothers with children; that the United States got rid of the law that allowed for

14  asylum for children; that asylum seekers cannot seek asylum at the POE, but must

15  go to the U.S. Consulate in Mexico instead; that visas are required to cross at a

16  POE; that asylum seekers must first speak with Mexican immigration officials

17  before they will be allowed to enter the United States to seek asylum; that there is

18  not "space" for additional asylum seekers to enter; that there are "too many

19  people"; that the port is "full"; that the shelters or detention centers where asylum

20  seekers will be held are "full"; that there are too few officials in the port to process

21  asylum seekers; that asylum seekers must wait for people to leave before they can

22  enter; and that by coming to the POE, asylum seekers are in a "federal zone" and

23  therefore they must leave.

24        86.    Class Plaintiffs Abigail, Beatrice, Dinora, Ingrid, Victoria, Bianca,

25  Emiliana, Roberto, Úrsula, and Juan each experienced this practice.  Dinora and

26  Ingrid both were told asylum was no longer available in the United States.  Abigail

27  was told that only the Mexican government could help her.  Beatrice was told that

28  the U.S. government had no obligation to help her and that she had no right to

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES

43

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

enter the United States.  Victoria and Bianca were told they needed to speak with
Mexican officials.  When Bianca, Emiliana, and Roberto approached CBP officials
to apply for asylum, they were told they could not apply because the ports were
"full."  Úrsula and Juan were told that the POE was "closed" even though it was
mid-afternoon.

### 2.    Threats and Intimidation

87.    CBP officials threaten and intimidate asylum seekers in the following
ways:  threatening to take asylum seekers' children away from them if they did not
leave the POE; threatening to separate children from parents if they did not accept
voluntary departure; threatening to detain and to deport asylum seekers to their
home countries if they persisted in their claims; threatening to ban asylum seekers
from the United States for life if they continued to pursue asylum; threatening to
bring criminal charges against asylum seekers if they refused to leave the POE;
threatening to use a taser or let dogs loose if asylum seekers refused to go back to
Mexico; and threatening to call Mexican immigration officers if asylum seekers
did not leave the POE.

88.    Class Plaintiffs Abigail, Beatrice, and Carolina each experienced this
practice and were threatened that if they tried to cross and pursue their asylum
claims, U.S. government officials would take their children away or separate their
families.  Additionally, Dinora was threatened that if she and her daughter returned
to the POE, they would be deported to Honduras.  Beatrice was told that if she
returned to the POE, she would be put in jail for three years.

### 3.    Verbal and Physical Abuse

89.    As part of their systematic practice of denying asylum seekers arriving
at POEs access to the U.S. asylum process, CBP officials also regularly resort to
verbal and even physical abuse, including, for example, by:  grabbing an asylum
seeker's six-year-old daughter's arm and throwing her down onto the ground;
holding a gun to an asylum seeker's back and forcing her out of the POE; knocking

a transgender asylum seeker to the ground and stepping on her neck; telling an asylum seeker she was scaring her five-year-old son by persisting in her request for asylum and accusing her of being a bad mother; laughing at an asylum-seeking mother and her three children and mocking the asylum seeker's thirteen-year-old son who has cerebral palsy; yelling profanities at an asylum-seeking mother and her five-year-old son, throwing her to the ground, and forcefully pressing her cheek into the pavement; making very derogatory comments about an asylum seeker's country of origin ("Fuck Honduras"); denying four asylum seekers on five consecutive days because "Guatemalans make us sick"; repeatedly and angrily yelling at asylum seekers to make them leave the POE; inquiring whether an asylum seeker was pregnant, and when the answer was negative, saying "that was good because they did not want more children in the United States"; grabbing the arms of an asylum seeker hard enough to leave bruises, bending them behind her back in order to drag her back to Mexico, and also physically dragging her child back to Mexico; grabbing another asylum seeker by the shoulders hard enough to leave bruises and dragging her out of the POE with her seven-year-old watching and yelling "leave my mommy alone!"; pushing an asylum seeker while she was holding her infant daughter; and pushing another asylum seeker while she was holding her three-year-old son.  One asylum seeker reported that she sought mental health treatment to process how she was treated after being forcibly dragged out of the POE and back to Mexico with her two children.

90.    Class Plaintiffs Dinora and Beatrice both experienced this practice. One CBP official pulled Dinora inside a gate at the POE to try to separate her from her daughter.  Later, as CBP officials escorted Dinora and her daughter out of the POE, one of the CBP officials tried to drag Dinora by her arm.  Beatrice also experienced rough treatment and cried out in pain when a CBP official forcefully searched her for drugs.

### 4.    Coercion

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

45

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

91.    CBP officials resort to coercion to deny asylum seekers arriving at POEs access to the U.S. asylum process, including: coercing asylum seekers into recanting their fear on video; and coercing asylum seekers into withdrawing their applications for admission to the United States.

92.    Class Plaintiffs Abigail, Beatrice and Carolina each experienced this practice of coercion.  Each was coerced to sign a form, written in English and not translated, which they did not understand, that stated they were voluntarily withdrawing their claims for asylum on the ground that they did not fear returning to Mexico.  The forms CBP officials coerced them to sign were and still are false. At the time the initial Complaint in this case was filed, Abigail, Beatrice and Carolina still had a grave fear of persecution in Mexico.

### 5.    Outright Denial of Access

93.    In some cases, CBP officials simply turn asylum seekers away from POEs without any substantive explanation.  For example, CBP officials have indicated that a particular POE is not receiving any asylum seekers; that asylum seekers should "*vete*" (go away); that asylum seekers must leave; that asylum seekers will not be allowed to enter the United States; that there is no help for asylum seekers at the POE; and that asylum seekers simply must "move aside" to allow other pedestrian traffic to pass.  In other cases, CBP officials simply ignore people who indicate a desire to seek asylum, or flatly refuse to look at their identity documents.

94.    Victoria and César both experienced this practice.  When Victoria told a CBP official she wanted to seek asylum, the official responded that she could not do so at that time.  When César tried to present himself at a POE and stated his intent to apply for asylum, CBP officials refused to let him proceed to the POE.

### 6.    Physically Blocking Access to the POE

95.    In recent months, CBP officials at numerous POEs have begun preliminarily checking pedestrian travelers' documents at makeshift or permanent

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

46

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   "pre-checkpoints" housed under tarps or in tents at or near the U.S.-Mexico

2   border.[79]  The CBP officials do not permit asylum seekers to walk past the pre-

3   checkpoint to enter the POE building, forcing them to remain on the Mexican side

4   of the border just inches away from the United States.

5        96.    On information and belief, CBP sometimes enlists Mexican officials

6   to act as their agents in blocking asylum seekers' access to POEs.  In the Rio

7   Grande Valley, for example, Mexican officials have intercepted asylum seekers as

8   they were approaching turnstiles at bridge entrances on the Mexican side.  Without

9   passing through the turnstile, an asylum seeker cannot walk across the bridge to the

10   POE to seek protection in the United States.  Mexican officials also reportedly

11   meet CBP officials in the middle of bridges to escort asylum seekers away from

12   the border and back into Mexico, where they are often detained or deported to

13   dangerous conditions in their home countries.

14        97.    CBP physically blocked Roberto, Maria, Úrsula, and Juan from

15   accessing the asylum process by stopping them at pre-checkpoints at the border

16   and refusing to let them pass.  In addition, César was intercepted by Mexican

17   officials outside the POE and pushed into a corner to prevent him from

18   approaching the POE.  Mexican officials physically escorted Roberto and Maria

19   away from CBP officials stationed at the border and detained them to block their

20

21   [79] *See, e.g.*, Hannah Wiley, *Critics Say New Barriers on Border Bridge Are Meant

22   to Deter Asylum-Seekers*, Tex. Trib. (Oct. 1, 2018), https://www.texastribune
.org/2018/10/01/border-asylum-port-of-entry-texas-mexico/; Meredith

23   Hoffman, *The Horrible Conditions Endured by Migrants Hoping to Enter the

24   US Legally*, VICE (July 3, 2018), https://www.vice.com/en_us/article/59qny3/
migrants-hoping-to-get-us-asylum-forced-to-wait-on-bridge; John Burnett,

25   *After Traveling 2,000 Miles for Asylum, This Family's Journey Halts at a
Bridge*, NPR (June 15, 2018), https://www.npr.org/2018/06/15/620310589/

26   after-a-2-000-mile-asylum-journey-family-is-turned-away-before-reaching-u-s-
soil; Molly Hennessy-Fiske, *Caught in Limbo, Central American Asylum-

27   Seekers Are Left Waiting on a Bridge Over the Rio Grande*, L.A. Times (June 7,
2018), http://www.latimes.com/nation/la-na-asylum-seeking-families-border-

28   bridges-20180605-story.html; Moore, *supra* note 68.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

47

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

access to the POE.  Mexican officials also blocked Maria, Juan, and Úrsula from
reaching the POE by preventing them from walking onto the sidewalk leading to
the POE.  CBP officials witnessed Mexican officials block Maria's access and,
when Maria's lawyer questioned them about it, CBP officials refused to intervene.

### 7.    Waitlists and Unreasonable Delays

98.    By its own admission, CBP officials force asylum seekers to wait for
days, weeks or indefinitely in Mexico before allowing them to access the asylum
process.

99.    CBP officials process a limited number of asylum seekers per day,
even when dozens are waiting.  At some POEs, CBP appears to process a fixed
number of asylum seekers—often two, three, or four.  On some days, CBP officials
do not process any asylum seekers.

100.    CBP officials also routinely tell asylum seekers approaching POEs
that in order to apply for asylum, they must get on a list or get a number.  The lists
are typically managed by Mexican immigration officials or other third parties
based in Mexico.  CBP officials will not permit asylum seekers to enter the United
States until their number is called, which can take days, weeks or longer.  Often,
the people managing the lists only give out new numbers during particular hours of
the day, and so are inaccessible to asylum seekers who are unable to locate them.
Despite diligent efforts, some individuals have reportedly been unable to get their
names on the lists due to the list managers' biases against the individuals'
ethnicity, sexual orientation or gender identity.

101.    As a result of these practices, asylum-seeking men, women and
children wait endlessly on or near bridges leading to POEs in rain, cold, and
blistering heat, without sufficient food or water and with limited bathroom access.
They sleep outside for many nights in a row, sometimes for a week or more.  The
entire time they are waiting to be processed, the asylum seekers are at risk of harm
from either persecutors that have followed them from their home countries, or from

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

48

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    gang violence and other criminal threats prevalent along the Mexico side of the

2    U.S.-Mexico border.

3        102.   Bianca, Emiliana, and César experienced this practice because they

4    were required to get on a list in order to access the asylum process.  Bianca,

5    Emiliana, and Roberto were told they would have to wait an indeterminate and

6    unreasonable amount of time before they could seek asylum—Bianca was told she

7    would have to wait "multiple weeks"; Emiliana was told to come back in six

8    weeks; Roberto was told he would have to wait for "hours, days, or weeks".  In

9    addition, Bianca, Emiliana, and Maria were merely told to stand aside and wait for

10   an indeterminate period of time.  Úrsula and Juan were told they had to "wait their

11   turn," without any indication of what that meant.

### 8.    Racially Discriminatory Denials of Access

13       103.   In March 2018, CBP officials at the midpoint of the Paso Del Norte

14   Bridge separating Ciudad Juarez, Mexico and El Paso, Texas, rejected four

15   Guatemalan asylum seekers' requests to access the asylum process on five

16   consecutive days because according to CBP, "Guatemalans make us sick."

17       104.   On information and belief CBP agents racially profile individuals

18   crossing on bridges, stopping and asking for identification documents from darker-

19   skinned Central American-appearing individuals while allowing lighter-skinned

20   individuals to pass.

21       105.   César was subject to this practice. When he approached the POE to

22   apply for asylum, he was placed in a group with only other Central Americans,

23   away from the Africans and Mexicans, after which he was arrested, detained, and

24   threatened with deportation.

25       106.   All of the above-referenced tactics served to deny asylum seekers

26   access to the U.S. asylum process.

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

49

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1     **D.     Documentation from Experts and NGOs Confirms the Prevalence**
2          **and Persistence of the Turnback Policy and CBP's Other**
3          **Unlawful Practices**

4          107.    Non-governmental organizations and other experts working in the

5     U.S.-Mexico border region have extensively documented the devastating

6     consequences of CBP's unlawful Turnback Policy and other unlawful practices

7     designed to restrict or deny access to the asylum process.

8          108.    In June 2017, Amnesty International, a non-profit human rights

9     organization, published a report on CBP's ongoing practice of turning back asylum

10    seekers at the U.S.-Mexico border entitled *Facing Walls: USA and Mexico's*

11    *Violations of the Rights of Asylum-Seekers*.[80]  In compiling the report, Amnesty

12    International interviewed more than 120 asylum seekers as well as approximately

13    25 government officials and 40 civil society organizations.  The report documents

14    numerous instances in which CBP officials denied asylum seekers access to the

15    asylum system at five different POEs along the U.S.-Mexico border.  The report

16    details the following conduct:

17          a.     CBP officials coerce asylum seekers into recanting their fear of

18               persecution on videotape and threaten to deport them back to

19               their home countries if they do not comply;

20          b.     CBP officials tell asylum seekers that they will first have to get

21               a "ticket" from Mexican authorities before seeking asylum;

22          c.     CBP officials coerce asylum seekers into signing a voluntary

23               return paper under the threat that, if they do not, then they will

24               be deported and will never be allowed into the United States;

25               and

26

27

28    [80]  *See Facing Walls*, *supra* note 38.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

50

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

        d.     CBP officials tell Mexican asylum seekers that there is no more
asylum for Mexicans.

109.   In October 2018, Amnesty International issued a subsequent report
entitled *USA: 'You Don't Have Any Rights Here':  Illegal Pushbacks, Arbitrary
Detention & Ill-Treatment of Asylum-Seekers in the United States*,[81] documenting
CBP's continuing practice of turnbacks at POEs in California, Arizona and Texas,
and concluding that, in 2017 and 2018, the U.S. government had "intensified a
systematic and dangerous *de facto* policy of illegal pushbacks against asylum
seekers, in order to prevent them from requesting protection at official U.S. ports-
of-entry."  In addition to the conduct outlined above, the report details the
following:

        a.     CBP used "slowdown" tactics to force asylum seekers to wait
for days or weeks in Mexico before allowing them to seek
protection at POEs;

        b.     At several POEs, CBP officials temporarily stopped receiving
any asylum seekers;

        c.     CBP erected temporary checkpoints in the centers of
international bridges to Mexico at various POEs, where CBP
officers instructed pedestrians without valid Mexican travel
documents to return to Mexico or called Mexican officials to
remove such individuals from the bridge.

110.   In August 2018, the Washington Office on Latin America ("WOLA"),
a non-profit human rights research and advocacy organization, published a
thorough report entitled *'Come Back Later': Challenges for Asylum Seekers
Waiting at Ports of Entry*.[82]  WOLA's report, based on years of documentary

---

[81] *You Don't Have Any Rights Here*, *supra* note 40.

[82] *Come Back Later*, *supra* note 75.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

51

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

research and a visit to the U.S.-Mexico border in June 2018, details the following

developments:

    a.    There has recently been "a marked slow-down" in CBP's processing of asylum seekers at POEs, leading to long lines of individuals and families waiting to present themselves to seek asylum;

    b.    In June 2018, CBP officials at the Nogales POE had allowed a backlog of 113 people, including 48 families, who were waiting in Nogales, Mexico to present themselves to seek asylum;

    c.    CBP officials "have positioned themselves on the [physical] border, pre-screening people before they are allowed to enter U.S. territory and repeatedly denying asylum-seekers entry into the country, forcing them to wait days or even weeks in hot and in some areas dangerous Mexican border towns";

    d.    CBP officials at smaller POEs tell asylum seekers that they no longer process asylum claims at those POEs, and that the migrants must travel to larger POEs many miles away; and

    e.    Mexican government officials block access to the McAllen POE on the Reynosa side, and detain asylum seekers who lack the proper travel documents to be in Mexico.

111.    In May 2017, Human Rights First, a respected non-governmental organization, published an exhaustive report entitled, "Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers."[83]  In that report, Human Rights First details firsthand accounts of CBP officials turning back asylum seekers without referring them for further screening or immigration court proceedings at POEs across the U.S.-Mexico border.  The report details the following conduct:

---

[83]  *See Crossing the Line, supra* note 32.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

52

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

a.   CBP officials simply ignore requests by individuals to seek
asylum;

b.   CBP officials give false information about U.S. laws and
procedures, such as saying that "the United States is not giving
asylum anymore" and "[President] Trump says we don't have
to let you in";

c.   CBP officials mock and intimidate asylum seekers;

d.   CBP officials impose a "gauntlet" and "charade" of procedures,
including a "ticketing" system, to discourage asylum seekers;
and

e.   CBP officials coerce asylum seekers into denouncing any fear
of persecution.

112.   Despite the complete lack of statistics or recordkeeping on CBP's
failure to comply with the law, Human Rights First's Report references more than
125 cases of CBP turning back individuals and families seeking asylum at POEs
along the U.S.-Mexico border between November 2016 and April 2017.  This is
likely a small fraction of the number of asylum seekers who were illegally denied
access to the asylum process during that period.

113.   In July 2018, Human Rights First supplemented its 2017 report with
an issue brief documenting researchers' visits to seven international bridges in June
2018, at Hidalgo, Texas; Brownsville, Texas; Roma, Texas; Progreso, Texas;
Laredo, Texas; and El Paso, Texas.  The researchers found:

a.   At all seven bridges visited, "CBP installed new checkpoints at
the international border line" where "agents conduct document
screening ahead of the processing center" and regularly turn
back asylum seekers;

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

53

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

b.    CBP agents tell asylum seekers at the bridges that the POE is "full" or "at capacity," which leaves asylum seekers "stranded for days or weeks in dangerous or difficult conditions";

c.    Asylum seekers whom CBP fails to process "face extreme heat, lack of food, water, and bathroom facilities, [and] in some areas, they also face grave dangers and risks," particularly kidnapping;

d.    A shelter in Tijuana, Mexico, was broken into and set on fire "likely because a group of transgender women were seeking refuge there after being turned away several times by [CBP]"; and

e.    CBP officers tell asylum seekers that they cannot cross at the Stanton Street Bridge POE in El Paso, Texas.[84]

114.    From December 2016 to the present, the Women's Refugee Commission, a non-profit organization that advocates for women and children fleeing violence and persecution, has investigated and documented numerous instances in which CBP officials have turned asylum seekers away and refused to process them at various POEs along the U.S.-Mexico border, including POEs in San Ysidro and Calexico, California; Nogales and San Luis, Arizona; Santa Teresa, New Mexico; and El Paso, Laredo, and McAllen, Texas.  The Women's Refugee Commission has documented the following conduct:

a.    CBP officials tell asylum seekers there is no space for them;

b.    CBP officials tell asylum seekers that the policies have changed and that they no longer qualify for asylum;

c.    CBP officials threaten to call Mexican immigration authorities to remove asylum seekers from the POEs;

---

[84]    *Zero-Tolerance Criminal Prosecutions*, *supra* note 67, at 8-9.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

54

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

d.    CBP officials threaten asylum seekers with prolonged detention in the U.S. if they pursue their asylum claims;

e.    CBP officials threaten physical force to remove asylum seekers from the POEs;

f.    CBP officials forcibly remove asylum seekers from the POEs;

g.    CBP officials tell asylum seekers to go away;

h.    CBP officials tell asylum seekers that they must coordinate with Mexican immigration authorities in order to be processed;

i.    CBP officials, in coordination with Mexican officials and agents, filter out asylum seekers who lack valid travel documents;

j.    CBP officials deny asylum seekers the right to apply for asylum at certain POEs; and

k.    CBP places officials, and sometimes semi-permanent structures, at the middle of international bridges to pre-screen migrants.

115.    From October 2016 through the present, the Project in Dilley, which provides pro bono legal services to mothers and children detained at the South Texas Family Residential Center in Dilley, Texas, has identified more than 100 asylum-seeking mothers who were turned back by CBP officials at POEs along the U.S.-Mexico border, including POEs in San Ysidro, California; Calexico, California; San Luis, Arizona; Nogales, Arizona; El Paso, Texas; Del Rio, Texas; Eagle Pass, Texas; Laredo, Texas; Roma, Texas; McAllen, Texas; Los Indios, Texas; and Brownsville, Texas.  The Project in Dilley has documented the following conduct:

a.    CBP officials tell asylum seekers that asylum law is no longer in effect;

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

55

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

b.    CBP officials tell asylum seekers that they have orders to send
away everyone who is seeking asylum;

c.    CBP officials tell asylum seekers that the POE is full and that
they must wait to be processed, causing some asylum seekers to
wait days or weeks without access to shelter, food, water, or
bathrooms;

d.    CBP officials threaten to deport asylum seekers to their home
countries; and

e.    CBP officials use physical force to remove asylum seekers from
POEs, including by handcuffing them, throwing them to the
ground, shoving them and dragging them out of the POEs.

116.    Since December 2015, representatives of Plaintiff Al Otro Lado have
accompanied more than 160 asylum seekers to the San Ysidro POE.  Several
representatives have witnessed firsthand and/or otherwise documented the tactics
employed by CBP to prevent asylum seekers from accessing the U.S. asylum
process.  Al Otro Lado representatives have documented the following conduct:

a.    CBP officials tell asylum seekers they have to apply for asylum
at the U.S. Consulate in Mexico or the U.S. Embassy in their
home countries;

b.    CBP officials tell asylum seekers that they must first obtain a
"ticket" from Mexican immigration in order to seek asylum;

c.    CBP officials tell asylum seekers that they are not processing
asylum seekers at that POE and they must go to another POE to
be processed;

d.    CBP officials tell asylum seekers that they cannot seek asylum
at that time and must be put on a waiting list;

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

56

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

e.    CBP officials require asylum seekers to register with migrant shelters in Mexico which control the flow of asylum seekers to the POEs;

f.    CBP officials tell asylum seekers that they do not qualify for asylum;

g.    CBP officials coerce asylum seekers into withdrawing their asylum claims, including by threatening that they will be deported if they do not do so;

h.    CBP officials threaten asylum seekers with forced separation from their children, prolonged detention, and eventual deportation;

i.    CBP officials subject asylum seekers to verbal abuse and degradation during the inspection process;

j.    CBP officials ask asylum seekers to present paperwork they are not required to present; and

k.    CBP officials threaten U.S. attorneys attempting to assist asylum seekers with *ultra vires* removal to Mexico.

117.    On January 13, 2017, various non-governmental organizations submitted an administrative complaint to DHS' Office for Civil Rights and Civil Liberties ("CRCL") and the OIG.[85]    The administrative complaint provided specific examples of CBP turning back asylum seekers at POEs along the U.S.-Mexico border and urged CRCL and OIG to conduct a prompt and thorough investigation into this illegal practice and take swift corrective action.

---

[85] *See* Am. Immigration Council at al., Complaint Re:  U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border 1-2 (Jan. 13, 2017), https://www.american immigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_deni al_of_entry_to_asylum_seekers_advocacy_document.pdf.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

57

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

118.    Meanwhile, Defendants' illegal turnbacks continue.  In fact, as previously noted, CBP has acknowledged its Turnback Policy in sworn testimony before Congress.[86]

**E.    Defendants' Policy and Practices Have Denied Each of the Class Plaintiffs Access to the Asylum Process**

*Plaintiff Abigail Doe*

119.    Abigail is a native and citizen of Mexico.  She is the mother of two children under the age of ten, with whom she previously lived in Central Mexico.  In May 2017, Abigail's husband disappeared after he refused to allow drug cartel members to use his tractor-trailer to transport drugs.

120.    When Abigail reported her husband's disappearance to governmental authorities, members of the drug cartel abducted her, held her at gunpoint, and threatened to kill her and her children if she continued to investigate her husband's disappearance.  One cartel member told Abigail that she had to leave if she wanted to live.  Fearing for her life, Abigail fled to Tijuana with her children to seek asylum in the United States.

121.    After arriving in Tijuana, Abigail and her children immediately sought access to the asylum process by presenting themselves at the San Ysidro POE.  At the POE, Abigail informed CBP officials of her intent to apply for asylum and her fear of returning to Mexico.  CBP officials repeatedly misinformed Abigail that she did not qualify for asylum.  One CBP official threatened that her children would be taken away from her if they allowed her to cross the border and again misinformed her that only the Mexican government could help her.

122.    CBP officials coerced Abigail into signing a document in English which she could not read and did not understand.  The document stated that she did not have a fear of returning to Mexico and was withdrawing her application for

---

[86]    *Wagner Testimony*, *supra* note 43, at 289–90.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

58

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    admission.  CBP officials then instructed Abigail to say that she had agreed to

2    accept the assistance of the Mexican government and used a video camera to

3    record her statement.  A CBP official then took Abigail and her children back to

4    Mexico and left them to fend for themselves.

5         123.   The statements CBP coercively obtained from Abigail were and are

6    still false; Abigail does fear returning to and staying in Mexico and believes

7    seeking assistance from the Mexican government would be futile.

8         124.   Following the filing of the initial Complaint in this case, Defendants

9    made arrangements to facilitate the entry of Abigail and her children into the

10   United States.

11   ***Plaintiff Beatrice Doe***

12        125.   Beatrice is a native and citizen of Mexico.  In May 2017, Beatrice fled

13   her hometown in Mexico with her three children, ages seven, eleven and fifteen,

14   and her nephew.  Beatrice's nephew was targeted by the Zetas, a Mexican drug

15   cartel that controls most of Southern Mexico, for failing to pay a fee that the Zetas

16   demanded from all individuals who worked in the market.  The Zetas threatened to

17   kill Beatrice's nephew and to harm his family if he did not pay the fees.  The cartel

18   also pressured Beatrice's nephew to join their forces and threatened to increase the

19   fee if he refused.  On two occasions when Beatrice's nephew failed to pay the fees,

20   the Zetas beat him up.

21        126.   Beatrice herself suffered severe domestic violence at the hands of her

22   husband.  In May 2017, she reported his abuse to two government agencies.  When

23   Mexican government officials subsequently requested that Beatrice's husband

24   meet with them, he responded that he would continue to do what he wanted with

25   Beatrice and his children.  Terrified, Beatrice left their house the same day.

26        127.   Beatrice fled with her children and nephew and traveled to Tijuana in

27   order to seek access to the asylum process in the United States.  Initially, Beatrice

28   and her family sought access to the asylum process by presenting themselves at the

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES
59
No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Otay Mesa POE.  When Beatrice expressed their intent to seek asylum, a CBP official told her that asylum-related services were not provided at that port, and directed her to go to the San Ysidro POE.  Beatrice and her family then attempted twice to seek access to the asylum process at the San Ysidro POE, but CBP officials turned her away both times.

128.   The first time Beatrice and her family presented themselves at the San Ysidro POE, she explained that their lives were at risk in Mexico and that she was afraid of her husband.  CBP officials misinformed her that the U.S. government had no obligation to help her or her family, that they did not have a right to enter the United States because they were not born there, and that she should seek help from the Mexican government.

129.   Another CBP official then threatened to take Beatrice's nephew away from her and to put her in jail if she refused to sign an English document which she did not understand.  Believing that she had no other option, she signed the document.  CBP officials then escorted Beatrice and her family out of the POE.

130.   The statements CBP coercively obtained from Beatrice were and are still false; Beatrice and her children fear returning to and staying in Mexico.

131.   The next day, Beatrice and her family returned to seek access to the asylum process by presenting themselves at the San Ysidro POE.  A CBP official who recognized Beatrice from the day before misinformed her that she had no right to enter the United States or seek asylum, and that she would be put in jail for three years if she returned to the POE.  After another CBP official separately threatened to transfer Beatrice's nephew to Mexican authorities and return him to Southern Mexico, CBP officials again escorted Beatrice and her family out of the San Ysidro POE.

132.   Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Beatrice and her children into the United States.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

60

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

*Plaintiff Carolina Doe*

133.    Carolina is a native and citizen of Mexico.  In May 2017, Carolina fled her hometown in Mexico with her three children, ages nine, fifteen and eighteen, after her brother-in-law, a high-ranking police official, was kidnapped, tortured and killed by members of a drug trafficking cartel.  His dismembered body was found in garbage bags in a cemetery.  Carolina's husband witnessed the kidnapping and showed Carolina a picture of one of the men who was involved. Drug cartel members threatened Carolina's husband after the murder, and Carolina and her husband saw the van used in the kidnapping drive by their house twice. Two men followed Carolina and her daughters on her way home from work, and several men came to their home at night.  Carolina was terrified and hid with her daughters in the bathroom because she feared for her life and the lives of her daughters.

134.    In May 2017, Carolina fled in the middle of the night with her daughters and traveled to Tijuana in order to seek access to the asylum process in the United States.  Carolina and her daughters presented themselves at the San Ysidro POE, and Carolina explained that they were afraid of returning to Mexico and wanted to seek asylum.  CBP officials locked them in a room overnight at the San Ysidro POE.  In the morning, a CBP official told Carolina that she would not be granted asylum and misinformed her that the protection she was seeking in the United States could be provided by the Mexican authorities.  The CBP official threatened to take away Carolina's fifteen-year-old U.S. citizen daughter and put her in foster care, and told Carolina that if she did not want her daughter taken away from her, then she had to make a statement on video that she was not afraid of returning to Mexico

135.    The CBP officials coerced Carolina into recanting her fear on video. Carolina initially did not respond as the CBP officials instructed her to do because the responses they told her to say were not true.  Carolina was afraid and wanted to

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

61

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  respond that she was very scared to return to Mexico.  One of the CBP officials

2  repeated that the only way Carolina and her daughters would be able to leave

3  voluntarily without her U.S. citizen daughter being taken away from her was if

4  Carolina stated on video that she was not scared.  Having been locked in a room

5  overnight, Carolina was tired and scared and felt like she was in jail.  The CBP

6  officials continued to coerce her until she finally did what they told her to do,

7  believing she had no choice.

8      136.   The CBP officials also coerced Carolina into signing a document in

9  English which she could not read and did not understand.  The document stated

10  that she did not have a fear of returning to Mexico and was withdrawing her

11  application for admission.  The statements CBP coercively obtained from Carolina

12  were and are still false; Carolina does fear returning to and staying in Mexico.

13      137.   Several days after CBP turned back Carolina and her daughters at the

14  POE, Carolina made arrangements for her U.S. citizen daughter to cross into the

15  United States.  Following the filing of the initial Complaint in this case,

16  Defendants made arrangements to facilitate the entry of Carolina and her other

17  children into the United States.

18  ***Plaintiff Dinora Doe***

19      138.   Dinora is a native and citizen of Honduras.  MS-13 gang members

20  repeatedly threatened to kill Dinora and her then-seventeen-year-old daughter if

21  they did not leave their house.  After receiving the third threat, they fled to another

22  city where they remained in hiding.

23      139.   When Dinora and her daughter subsequently returned home, three

24  MS-13 members held them captive for three days and repeatedly raped each of

25  them in front of the other.

26      140.   When Dinora and her daughter finally escaped, they fled to a shelter

27  in Mexico.  However, after being threatened by MS-13 gang members again in

28  Mexico, they knew they had to leave.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

62

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

141.    On three separate occasions in August 2016, Dinora and her daughter sought access to the asylum process by presenting themselves at the Otay Mesa POE and expressing their intent to seek asylum in the United States.  Each time, CBP officials turned them away

142.    During Dinora's first attempt, CBP officials misinformed her that there was no asylum in the United States and escorted Dinora and her daughter outside the POE.

143.    During her second attempt later the same day, one CBP official misinformed Dinora that there was no asylum available in the United States for Central Americans and that if they returned to the POE, they would be handed over to Mexican authorities and deported to Honduras.

144.    During her third attempt the next morning, a CBP official misinformed Dinora that she could pass through the POE, but would have to leave her daughter behind.  When Dinora insisted that she and her daughter had a right to apply for asylum, CBP officials escorted them out of the POE.

145.    Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Dinora and her daughter into the United States.

### Plaintiff Ingrid Doe

146.    Ingrid is a native and citizen of Honduras.  At the time the initial Complaint was filed, Ingrid had two children and was pregnant with her third child.

147.    18th Street gang members murdered Ingrid's mother and three siblings.  They also threatened to kill Ingrid.

148.    For several years, Ingrid and her children were subject to severe abuse by her partner and the father of her son and the child that she was expecting. Ingrid's partner regularly raped Ingrid, sometimes in front of her children.  He

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

63

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    would also burn and beat Ingrid.  One day, Ingrid's partner put a gun to Ingrid's

2    head and threatened to kill her.

3        149.    In June 2017, Ingrid fled with her children to Tijuana, where they

4    sought access to the asylum process by presenting themselves at the Otay Mesa

5    POE.

6        150.    When they arrived at the Otay Mesa POE, Ingrid approached CBP

7    officials and expressed her intent to seek asylum.  The CBP officials misinformed

8    Ingrid that they could not help her at the Otay Mesa POE and that she must go to

9    the San Ysidro POE.

10        151.    Ingrid immediately went to the San Ysidro POE with her children to

11   present herself and seek access to the asylum process.  She approached several

12   CBP officials, and expressed her intent to seek asylum.  One of the officials

13   misinformed Ingrid that there was no asylum and that she could not pass through

14   the POE because she did not have any documents.  Ingrid again stated that she

15   wanted to seek asylum and that she could not go back to Honduras because she and

16   her children would be killed.  The CBP official responded that there was a new law

17   in the United States that meant that there was no more asylum.  Another CBP

18   official then escorted Ingrid and her children out of the port.

19        152.    Following the filing of the initial Complaint in this case, Defendants

20   made arrangements to facilitate the entry of Ingrid and her children into the United

21   States.

22   ***Plaintiff Roberto Doe***

23        153.    Roberto is a native and citizen of Nicaragua.  Roberto fled Nicaragua

24   in early September 2018 after receiving targeted threats of violence from the

25   Nicaraguan government and paramilitaries allied with the government.

26        154.    Roberto traveled through Mexico and arrived in Reynosa, Tamaulipas

27   on September 29, 2018.  On October 2, 2018, he sought access to the asylum

28   process by presenting himself at the Hidalgo POE.  Roberto was part of a group of

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

64

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  six Nicaraguan nationals and one Honduran who were waiting in line.  The group

2  approached the U.S. immigration officials who were standing at the middle point

3  of the bridge that divides the United States from Mexico, and told the U.S. officials

4  that they wanted to seek asylum in the United States.

5        155.   One of the U.S. officials responded that he had to talk to his office and

6  made a call on his radio in English.  He then directed Roberto and the rest of the

7  group to stand to one side.  After that, the U.S. official informed the group that

8  they could not enter the POE, which was "all full."  The U.S. official indicated that

9  the group might have to wait for "hours, days, or weeks" before he could seek

10  asylum.

11        156.   A short while later, a female U.S. official made another call, and

12  Roberto heard her say in Spanish that someone would come and pick up some

13  people.  A few minutes later, a Mexican immigration official arrived and asked to

14  see the group members' papers.  After Roberto and the rest of the group handed

15  over their papers, the Mexican official instructed them to come with him.  One of

16  the Nicaraguans asked the U.S. official to help them, saying that the Mexican

17  immigration officials would deport them.  The U.S. official responded that he did

18  not care and did nothing.

19        157.   The Mexican immigration official took Roberto and the rest of the

20  group to the Mexican side of the bridge, where he left them in an office with

21  Mexican immigration officials.  While the group waited, various officials spoke on

22  the phone.  Roberto heard one of the officials say that they needed seven or eight

23  spaces for the next deportation transport.

24        158.   Eventually, the Mexican officials confiscated the asylum seekers'

25  phones and escorted them to a small bathroom, where they were forced to wait,

26  crowded together, for about an hour.  While they were waiting, a Mexican official

27  entered the bathroom and told them that they did not have the right to apply for

28  asylum in the United States, and that it was a crime to try to do so.  The Mexican

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

65

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   official indicated that he was in communication with the U.S. authorities and that if

2   they came back to the bridge and attempted to seek asylum, the U.S. officials

3   would turn them over to the Mexican authorities and they would be deported to

4   Nicaragua.  The Mexican officials subsequently returned their papers and directed

5   them to leave.

6       159.   At the time the First Amended Complaint was filed, Roberto desired

7   to return immediately to the Hidalgo POE to seek access to the asylum process, but

8   based on his past experience with CBP's practices at the U.S.-Mexico border, he

9   feared that he would be turned away again and deported to Nicaragua.   Defendants

10  subsequently agreed to allow Roberto to access the asylum process if he returned

11  to the Hidalgo POE.  Roberto returned to the bridge on October 18, 2018, and as he

12  was about to walk onto the pedestrian footbridge to walk to the POE, Mexican

13  immigration officials detained him.  Roberto has been in Mexican government

14  custody since that date, and on information and belief, his *refoulement* to

15  Nicaragua is imminent.

16  ***Plaintiff Maria Doe***

17      160.   Maria is a citizen of Guatemala and a permanent resident of Mexico.

18  She was married to a Mexican man and has two children who were born in

19  Mexico.

20      161.   Maria lived in Chiapas, Mexico for seven years with her husband and

21  children.  Maria left her husband, who was very abusive toward her and her

22  children, after learning that he was involved with cartels.  After she left, the cartels

23  began searching for Maria and her children.  For about two years, Maria and her

24  children searched for a safe place to live, in Guatemala and in Mexico, but the

25  cartels invariably found them and went after them.  Maria's ex-husband remains

26  involved with cartels and continues to threaten Maria and her children.

27      162.   In September 2018, Maria traveled with her children to Nuevo

28  Laredo, Mexico.  On September 10, 2018, Maria and her children sought access to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

66

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

the asylum process by presenting themselves at the Laredo POE around 8:00 p.m.
As they approached the midpoint of the bridge to the United States, CBP officials
stopped Maria and her children and asked to see their identification.  Maria told the
U.S. officials that she wanted to seek asylum in the United States.  The U.S.
officials told her to wait on the Mexican side of the bridge until they called her.

163.   After a few minutes, two Mexican officials walked toward her from
the Mexican side of the bridge.  The Mexican officials told Maria that the United
States officials would not let her cross the bridge, but that they could help if she
paid them $1,500 for herself and her children.  Maria did not have money to pay
the bribe, and instead traveled with her children to Reynosa, Mexico, to try to cross
a different bridge to the United States.

164.   After Maria arrived in Reynosa, she did not feel safe going to the
bridge immediately.  While staying at a shelter in Reynosa, Maria met an
American lawyer who agreed to accompany her to the Hidalgo POE.

165.   On September 19, 2018, Maria and her children, accompanied by the
American lawyer, sought access to the asylum process by presenting themselves at
the Hidalgo POE.  They walked up to the bridge in Reynosa.  They were at the
turnstile at the entrance to the bridge and had only taken a few steps when a
Mexican immigration official demanded to see their identification documents.
After Maria gave him their documents, the Mexican official started screaming that
Maria was abusing her Mexican residence by trying to cross the bridge to seek
asylum.  He warned her that he would rip up her identity documents if she did not
leave the bridge.  Although Maria and her lawyer maintained that she had the right
to seek asylum, she and her children left the bridge for fear that the Mexican
official would hurt them or destroy their documents and deport them to Guatemala.

166.   Maria and her children returned to the shelter for two weeks before
attempting to seek access to the asylum process again.  On October 9, 2018, Maria
and her children, again accompanied by the American lawyer, sought access to the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

67

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    asylum process by presenting themselves at the Hidalgo POE for the second time.

2    When they arrived at the middle of the bridge, Maria started to tell the U.S.

3    officials that she sought asylum.  At that moment, however, a Mexican

4    immigration officer grabbed Maria's arm and demanded to see her papers.  Maria

5    told the Mexican officer that she was a legal resident of Mexico with two Mexican

6    children and showed him her papers.  The officer told her that the Mexican

7    residency permit did not allow her to go to the United States, and he ordered her to

8    go to a station on the Mexican side of the border.  Although Maria and the lawyer

9    insisted that Maria had a right to seek asylum in the United States, the Mexican

10   official called for backup.

11        167.   Meanwhile, the American lawyer explained to the U.S. officials

12   standing at the bridge that Maria wanted to seek asylum and that she and her

13   children were in danger.  The U.S. officials said that what was happening had

14   nothing to do with them.

15        168.   The Mexican officials took Maria to an office at the foot of the bridge

16   and separated her from her children and the lawyer.  They took Maria into a small

17   room and told her that if she came back to the Hidalgo POE, they would revoke her

18   Mexican residency.

19        169.   At the time the First Amended Complaint was filed, Maria feared for

20   her life in Mexico and desired to return to a POE to seek access to the asylum

21   process, but based on her past experiences with CBP's practices at the U.S-Mexico

22   border, she feared that she and her children would be turned away again or

23   deported to Guatemala.  Maria and her children feared for their lives in

24   Mexico.  After they arrived in Reynosa, they received multiple phone calls from

25   blocked numbers, which Maria believes were from cartel members trying to track

26   her location.  On or around October 8, 2018, Maria's ex-husband called her

27   directly and threatened her.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

68

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

170.    Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Maria and her children into the United States.

### Plaintiffs Úrsula Doe and Juan Doe

171.    Úrsula and Juan are natives and citizens of Honduras.  They are a married couple with two children.  They left Honduras with their children in August 2018 out of fear for their lives and the lives of their children.

172.    Úrsula saw members of a Honduran gang kill her brother in 2014. The gang knows she witnessed the murder and have repeatedly warned Úrsula and Juan of harm to their family.  Gang members have called the family, gone to their house, and threatened to hurt their children.

173.    Úrsula and Juan fled Honduras with their children to seek access to the asylum process in the United States.  They traveled to Mexico, where they were robbed at gunpoint by three men who took all their money.  Eventually they made it to Nuevo Laredo, Mexico, in late September 2018.

174.    The day after they arrived in Nuevo Laredo, Úrsula, Juan, and their children went to the international bridge around 2:00 pm and sought access to the asylum process by presenting themselves at the Laredo POE.  When they arrived at the middle of the bridge, U.S. officials told them they could not pass because the port was closed.  Although Juan insisted that they wanted to request asylum, one of the officials said that they had to wait their turn, the port was closed, and they could not pass.

175.    Úrsula, Juan, and their children subsequently traveled to Reynosa to seek access to the asylum process by presenting themselves at the Hidalgo POE. They went to the bridge in Reynosa with their children around 5:00 a.m.  Shortly after they passed through the turnstile, a Mexican official grabbed their documents and ordered them to walk with him back to Mexico.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

69

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

176.    The Mexican official took Úrsula and Juan to a waiting room.  A different Mexican official took Juan aside and warned him that he and his family could be deported.  Úrsula, Juan, and their children were forced to wait all day without much food or water.  Around 6:00 or 7:00 p.m., they were allowed to leave.

177.    At the time the First Amended Complaint was filed, Úrsula and Juan desired to seek access to the asylum process in the United States, but based on their past experience with CBP's practice at the U.S.-Mexico border, they feared that they would be turned away again or deported to Honduras.  At that time, they feared for their lives in Reynosa.

178.    Defendants subsequently made arrangements to facilitate the entry of Juan, Úrsula, and their children into the United States.

***Plaintiff Victoria Doe***

179.    Victoria is a sixteen-year old female native and citizen of Honduras. She is an unaccompanied minor and the mother of a one-year old child.  In 2017, members of the infamous 18th Street gang held her at gunpoint and threatened her with death if she did not submit herself sexually to the leader of the gang.  Fearful for her life, she was able to flee to a separate part of Honduras.  Shortly thereafter, the very same gang members followed her and repeated the same threats, demanding that she submit and become the property of the gang.

180.    Victoria came to Tijuana with a refugee caravan in April 2018, intending to seek asylum in the United States.  She lived in a migrant shelter for four months but was in constant fear of murder and other crime and was threatened by male strangers on a number of occasions.  She was also fearful that she would be forced into sex trafficking as the 18th Street Gang had attempted.

181.    On October 8, 2018, Victoria sought to access the asylum process by presenting herself at the San Ysidro POE, despite her fears that she and her son

LATHAM&WATKINS℠
ATTORNEYS AT LAW
LOS ANGELES

70

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    would be subject to the U.S. child separation policy.  When she arrived, she

2    informed the CBP officials of her intent to apply for asylum and her fear of

3    returning to Honduras.  In response, the CBP official told her that she could not

4    apply for asylum at that time, and that she had to speak with a Mexican officer

5    instead.  The CBP official did not give further instruction as to which Mexican

6    officer or where to locate the officer.

7        182.    At the time the First Amended Complaint was filed, Victoria desired

8    to return immediately to seek access to the asylum process by presenting herself at

9    the San Ysidro POE, but based on her past experience with CBP's practice at the

10    U.S.-Mexico border, she understood that she would likely be turned away again.

11    Victoria was fearful of remaining in Tijuana, for her life and the life of her son.

12    She could not remain and believed seeking assistance from the Mexican

13    government would be futile.

14        183.    Following the filing of the First Amended Complaint in this case,

15    Defendants made arrangements to facilitate the entry of Victoria and her child into

16    the United States.

17

18    ***Plaintiff Bianca Doe***

19        184.    Bianca is a native and citizen of Honduras.  She is a transgender

20    woman.  Bianca suffered physical violence and extreme discrimination while in

21    Honduras because she is transgender.  She was targeted by the infamous MS-13

22    gang who tried to recruit her.  Rather than join, and fearing for her life, she fled

23    Honduras on April 2, 2018.

24        185.    Bianca arrived in Tapachula, Mexico and then later Mexico City,

25    where she faced much of the same harassment and discrimination, including by

26    police and federal officials.  Eventually she reached Tijuana on September 19,

27    2018. She proceeded to seek access to the asylum process by presenting herself at

28    the San Ysidro POE.  CBP officials informed her that she could not apply for

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

71

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

asylum because they were "full."  Instead, they told her to seek assistance from Mexican workers in white shirts.  She did not see any and returned to a local shelter where she was staying.

186.    Bianca returned the following day to seek access to the asylum process at the San Ysidro POE.  She identified the Mexican workers in white shirts who informed her that they handled the asylum "waitlist" process.  She was given a number, "919" which reflected her place on the waitlist.  The Mexican workers told her that when her number was called she would be able proceed to the POE. She was informed that she would have to wait multiple weeks.

187.    Desperate for her life, her safety, and with little resources, on or about September 28th, 2018, at 1:00 a.m. Bianca approached the U.S.-Mexico border fence abutting the beach and climbed over the fence into U.S. territory.  Eventually a U.S. Border Patrol guard spotted her on U.S. soil and demanded that she climb back over the fence and into Mexico or else he would call the Mexican authorities.

188.    On October 8, 2018, Bianca attempted once again to seek access to the asylum process by presenting herself at the San Ysidro POE.  At the POE CBP official "Soto" denied Bianca's request to seek asylum, again informing her that they were "full."  He instructed Bianca to stand aside and wait for a Mexican official.  No Mexican official came and she left.

189.    At the time the First Amended Complaint was filed, Bianca desired to return immediately to seek access to the asylum process by presenting herself at the San Ysidro POE, but based on her past experience with CBP's practice at the U.S.-Mexico border, she understood that she would likely be turned away again. Bianca was fearful of remaining in Tijuana.  She could not remain and believed seeking assistance from the Mexican government would be futile.

190.    Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate Bianca's entry into the United States.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

72

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

*Plaintiff Emiliana Doe*

191.    Emiliana is a native and citizen of Honduras.  She is a transgender
woman. She was threatened with violence and death by transnational drug dealers
and gang members in Honduras.  She was raped on multiple occasions by police
officers.  In May 2017, she was kidnapped and held for three days, and eventually
thrown out of a moving car.  In April 2018, she was abducted by four drug dealers,
beaten for over six hours, pistol whipped, thrown out of a moving truck, and
ordered to sell drugs.  She was refused medical attention because she is
transgender.

192.    Emiliana fled Honduras on June 5, 2018 and embarked on the arduous
journey through Mexico, where she was again repeatedly raped and threatened
with death.  She eventually reached Tijuana in September 2018.  Emiliana intended
to seek access to the asylum process in the United States, but was unsure how.  She
spoke with a stranger who was also attempting to apply for asylum who informed
her that she needed to get on the "waiting list."  She proceeded to the seek access
to the asylum process by going to the San Ysidro POE and speaking with two
women who gave her a number, "1014," which reflected her place on a waitlist.
They told Emiliana to come back in six weeks.

193.    Given the dangers in Tijuana, particularly to transgender women,
Emiliana could not wait six weeks and instead on October 8, 2018, she sought
access to the asylum process by presenting herself at the San Ysidro POE to ask for
asylum.  When she informed a CBP official that she wished to seek asylum in the
United States, he responded that she could not because they were "full," and
instead ordered her to wait off to the side until a Mexican immigration official
could come over.  No official ever came.

194.    At the time the First Amended Complaint was filed, Emiliana desired
to return immediately to seek access to the asylum process by presenting herself at
the San Ysidro POE, but based on her past experience with CBP's practice at the

1    U.S.-Mexico border, she understood that she would likely be turned away again.
2    Emiliana was fearful of remaining in Tijuana.  She could not remain and believed
3    seeking assistance from the Mexican government would be futile.

4        195.    Following the filing of the First Amended Complaint in this case,
5    Defendants made arrangements to facilitate Emiliana's entry into the United States.

6

7    *Plaintiff César Doe*

8        196.    César is a native and citizen of Honduras.  Earlier in 2018, the 18th
9    Street gang demanded that he join the gang at threat of death.  He refused.  The
10    gang later kidnapped him and kept him in an abandoned house in the mountains.
11    He was able to escape, and fled Honduras the next day.

12        197.    César reached Tijuana on August 1, 2018 with the intention of seeking
13    access to the asylum process in the United States.  César approached the plaza
14    immediately before the San Ysidro POE where he was approached by members of
15    "Grupo Beta."  Grupo Beta informed him that he would need to go through them to
16    apply for asylum.  They explained that they would put him on a list and give him a
17    number, and only when his number was called could he apply for asylum.

18        198.    Soon thereafter, Grupo Beta began racially segregating individuals
19    into three groups: Africans, Central Americans, and Mexicans.  They placed César
20    in the Central America group and then Mexican officials arrested him and placed
21    him into detention.  César was detained for twelve days and Mexican officials
22    threatened to deport him on multiple occasions.  A local shelter eventually secured
23    César's release from detention.

24        199.    Continuing to fear for his life in Tijuana, César returned to the San
25    Ysidro POE to seek access to the asylum process, and he spoke with Grupo
26    Beta.  He was eventually placed on the waitlist and given number "740."  After
27    waiting a few weeks, César sought access to the asylum process by presenting
28    himself at the San Ysidro POE with two staff members from Al Otro Lado.  César

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

74

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

informed CBP officials that he intended to seek asylum in the United States and that he feared return to his home country. The CBP officials refused to let him pass or seek asylum.

200. After waiting another few weeks, in September 2018 César sought access to the asylum process once again by presenting himself at the San Ysidro POE. Members of Grupo Beta intercepted him and threatened to call Mexican immigration officials and child protective services on him. The individuals pushed César toward the corner the plaza near the POE and called Mexican immigration. A staff member from Al Otro Lado escorted César back to the shelter.

201. At the time the First Amended Complaint was filed, César desired to return immediately to seek access to the asylum process by presenting himself at the San Ysidro POE, but based on his past experience with CBP's practice at the U.S.-Mexico border, he understood that he would likely be turned away again. César was fearful of remaining in Tijuana. He could not remain and believed seeking assistance from the Mexican government would be futile.

202. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate César's entry into the United States.

## V.     LEGAL BACKGROUND

### A.     U.S. Law Requires that Asylum Seekers Who Present Themselves at POEs Have Meaningful Access to the Asylum Process

203. U.S. law requires CBP to give individuals who present themselves at POEs and express a desire to apply for asylum or a fear of persecution in their home countries the opportunity to seek protection in the United States without unreasonable delay.

204. Specifically, the Immigration and Nationality Act ("INA") and its implementing regulations set forth a variety of ways in which such individuals may seek protection in the United States. *See, e.g.*, 8 U.S.C. § 1157 (admission of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

75

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  refugees processed overseas); 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1231(b)(3)

2  (restriction of removal to a country where individual's life or freedom would be

3  threatened); 8 C.F.R. §§ 208.16-18 (protection under the Convention Against

4  Torture).

5       205.  The INA provides that any noncitizen "who is physically present in

6  the United States or who arrives in the United States" has a statutory right to apply

7  for asylum, irrespective of such individual's status.  8 U.S.C. § 1158(a)(1).  The

8  INA also specifies processes that must be followed when an individual states a

9  desire to seek asylum or expresses a fear of returning to his or her home country.

10  *See* 8 U.S.C. § 1158(d)(1) ("The Attorney General shall establish a procedure for

11  the consideration of asylum applications filed [by individuals physically present in

12  the United States or who arrive in the United States].").  Under the INA, CBP must

13  either:

14         a.  Refer the asylum seeker for a credible fear interview (*see* 8

15             U.S.C. § 1225(b)(1));

16         b.  Place the asylum seeker directly into regular removal

17             proceedings by issuing a Notice to Appear ("NTA"), which will

18             then allow the asylum seeker to pursue his or her asylum claim

19             before an immigration judge (*see* 8 U.S.C. §§ 1225(b)(2), 1229,

20             1229a); or

21         c.  Parole the asylum seeker temporarily into the United States for

22             urgent humanitarian reasons or significant public benefit (*see* 8

23             U.S.C. § 1182(d)(5)(A)).

24       206.  The U.S. government recognized that the duty to allow a noncitizen

25  access to the asylum process is "not discretionary."  *See, e.g.*, Federal Defendant's

26  Reply Brief in Support of Motion for Summary Judgment and Dismissal for Lack

27  of Jurisdiction, cited in *Munyua v. United States*, No. 03-4538, 2005 U.S. Dist.

28  LEXIS 11499, at *16-19 (N.D. Cal. Jan. 10, 2005) ("[D]efendant acknowledges

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
LOS ANGELES

76

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  that [the immigration officers] did not have the discretion to ignore a clear

2  expression of fear of return or to coerce an alien into withdrawing an application

3  for admission").

4      207.   CBP is responsible for the day-to-day operation of POEs along the

5  U.S.-Mexico border.  CBP's obligations include inspecting and processing

6  individuals who present themselves at POEs to enable them to pursue their claims

7  for asylum in the United States.  CBP officials themselves are not authorized to

8  evaluate, grant or reject an individual's asylum claim.

9      208.   All noncitizens arriving at POEs along the U.S.-Mexico border must

10  be inspected by CBP officials.  *See* 8 U.S.C. § 1225(a)(3) ("All [noncitizens] . . .

11  who are applicants for admission or otherwise seeking admission . . . ***shall be***

12  ***inspected*** by immigration officers.") (emphasis added).  During inspection, CBP

13  officials must determine whether a noncitizen may be admitted to the United

14  States.  *See* 8 U.S.C. § 1182(a) (specifying grounds of inadmissibility).  In order to

15  make this determination, CBP scrutinizes an individual's entry documents.  *See* 8

16  U.S.C. § 1181(a) (outlining documentation requirements for the admission of

17  noncitizens into the United States).  Asylum seekers often flee their countries on

18  very short notice and thus frequently lack valid entry documents.  Once a CBP

19  official makes a determination of inadmissibility, the individual becomes subject to

20  removal from the United States.

21      209.   CBP officials must then place the noncitizen into either expedited

22  removal proceedings under 8 U.S.C. § 1225(b) or regular removal proceedings

23  under 8 U.S.C. § 1229.

24      210.   Expedited removal proceedings involve a more streamlined process

25  than regular removal proceedings and are reserved for people apprehended at or

26  near the border.  *See* 8 U.S.C. § 1225(b)(1)(A)(i) (permitting certain persons who

27  are seeking admission at the border to the United States to be expeditiously

28  removed without a full immigration judge hearing).  However, Congress included

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

77

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

important safeguards in the expedited removal statute in an effort specifically to
protect asylum seekers.

211.    The INA unequivocally states that if a noncitizen placed in expedited
removal proceedings "indicates either an intention to apply for asylum . . . or a fear
of persecution, the [CBP] officer ***shall*** refer the [noncitizen] for an interview by an
asylum officer." 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). The requirement
to refer an asylum seeker placed in expedited removal proceedings to an asylum
officer is ***mandatory***.

212.    Likewise, the applicable regulations promulgated under the INA
reinforce that if an individual in expedited removal proceedings asserts an intention
to apply for asylum or a fear of persecution, then "the inspecting officer ***shall not***
proceed further with removal of the [noncitizen] until the [noncitizen] has been
referred for an interview by an asylum officer." 8 C.F.R. § 235.3(b)(4) (emphasis
added).

213.    Importantly, CBP officials must read a form to noncitizens subject to
expedited removal advising them of their right to speak to an asylum officer if they
express a desire to apply for asylum or a fear of returning to their home countries.
*See* 8 C.F.R. § 235.3(b)(2)(i); DHS Form I-867A.

214.    Affirming that the CBP officials themselves are not authorized to
adjudicate asylum claims, the regulations specifically charge ***asylum officers*** from
U.S. Citizenship and Immigration Services with making initial determinations as to
whether there is a "significant possibility" that an individual can establish
eligibility for asylum. *See* 8 C.F.R. § 235.3(b)(4); *see also* 8 U.S.C.
§ 1225(b)(1)(B)(ii). This is because asylum officers are trained in the often
complicated and evolving law surrounding asylum, and thus are uniquely
positioned to conduct such interviews, which themselves require particular
interviewing and assessment skills as well as comprehension of the social and
political contexts from which asylum seekers flee. In fact, the INA specifically

78

1    defines "asylum officer" as an immigration officer who "has had professional

2    training in country conditions, asylum law, and interview techniques comparable to

3    that provided to full-time adjudicators of applications under section 1158." 8

4    U.S.C. § 1225(b)(1)(E).

5        215.    Applicants who establish that they have a "significant possibility" of

6    proving their eligibility for asylum receive positive credible fear determinations.

7    They are taken out of the expedited removal system altogether and placed into

8    regular removal proceedings, where they have the opportunity to submit an asylum

9    application, develop a full record before an Immigration Judge, appeal to the Board

10   of Immigration Appeals, and seek judicial review of an adverse decision.  8 U.S.C.

11   § 1225(b)(1)(B)(ii); 8 C.F.R. §§ 235.6(a)(1)(ii), (iii).

12       216.    Alternatively, CBP officials may place noncitizens directly into

13   regular removal proceedings by issuing an NTA.  8 U.S.C. §§ 1225(b)(2),

14   1229(a)(1), 1229a.  Once in regular removal proceedings, the asylum seeker can

15   submit an asylum application and must receive a full hearing before an

16   Immigration Judge, file an administrative appeal with the Board of Immigration

17   Appeals, and seek judicial review.  8 U.S.C. § 1229a(a)(1) ("An immigration judge

18   shall conduct proceedings for deciding the inadmissibility or deportability of an

19   alien.").

20       217.    At the discretion of the DHS Secretary, an individual may also be

21   temporarily paroled into the United States for urgent humanitarian reasons or

22   significant public benefit.  When the purposes of such parole have been served, the

23   individual must be returned to the custody from which he was paroled, after which

24   his case will continue to be handled in the same manner as that of any other

25   applicant for admission to the United States.  8 U.S.C. § 1182(d)(5)(A).

26       218.    Despite these prescribed procedures, CBP has implemented a policy

27   and regularly employs a variety of egregious practices (including those described

28   above) that have one unlawful result:  directly or constructively depriving Class

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

79

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   Plaintiffs, and the asylum seekers they represent, of meaningful access to the

2   asylum process, and thereby violating their right to seek asylum under U.S. law.

3       219.   Acknowledging the illegality of the Trump administration's ongoing

4   pushbacks of asylum seekers at the border, the House Appropriations Committee

5   called on DHS in July 2018 to "ensure that the United States is meeting its legal

6   obligations, to include reminding field officers and agents about CBP's legal

7   responsibilities to ensure that asylum-seekers can enter at POES."[87]

8       **B.**    **Defendants Have No Authority Under the INA to Turn Back a**

9              **Noncitizen Seeking Admission at a POE**

10      220.   CBP's authority is limited to that granted by Congress in the INA.

11  Nothing in the INA authorizes Defendants, through their officers and employees,

12  to turn back a noncitizen who seeks admission at a POE.

13      221.   When inspecting a noncitizen who arrives at a POE, CBP officials

14  must follow the procedures mandated by Congress in 8 U.S.C. § 1225.  Pursuant to

15  this section, CBP officials are limited to the following possible actions with respect

16  to any arriving noncitizen who is not clearly and beyond a doubt entitled to be

17  admitted:

18          a.    Place arriving noncitizens who are inadmissible under one of

19                two grounds specified by statute in expedited removal

20                proceedings pursuant to 8 U.S.C. § 1225(b)(1)(A)(i);

21          b.    Refer any noncitizen placed in expedited removal proceedings

22                who expresses either an intent to apply for asylum or a fear of

23                persecution if returned to his or her home country to an asylum

24                officer for a credible fear interview pursuant to 8 U.S.C.

25                §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B);

26

27

28  [87]  *Bill Report Draft*, *supra* note 78, at 4.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

80

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1        c.     Place "other" arriving noncitizens (*i.e.*, those who are not

2              placed in expedited removal proceedings under 8 U.S.C.

3              § 1225(b)(1)(A) and who are neither crewmen nor stowaways)

4              in removal proceedings under 8 U.S.C. § 1229a pursuant to 8

5              U.S.C. § 1225(b)(2);

6        d.     Follow other removal procedures with respect to noncitizens

7              suspected of being inadmissible on terrorism or related security

8              grounds pursuant to 8 U.S.C. § 1225(c); or

9        e.     Accept from the noncitizen a voluntary (*i.e.*, non-coerced)

10             withdrawal of her application for admission pursuant to 8

11             U.S.C. § 1225(a)(4) and 8 C.F.R. § 235.4.

12    222.   Defendants, through their officers, employees, and agents, act without

13  authority and in violation of the law when they directly deny an individual access

14  to the U.S. asylum process at a POE.

15    223.   Defendants, through their officers, employees, and agents, act without

16  authority and in violation of the law when they constructively deny an individual's

17  access to the asylum process by unreasonably delaying their ability to present

18  themselves at a POE.

19    224.   Moreover, Defendants' Turnback Policy is *ultra vires*.

20  **C.**    **Class Plaintiffs Are Entitled to Procedural Due Process Rights**

21         **Under the Fifth Amendment to the U.S. Constitution**

22    225.   The Due Process Clause of the Fifth Amendment to the U.S.

23  Constitution prohibits the federal government from depriving any person of "life,

24  liberty, or property, without due process of law."  U.S. Const. Amend. V.  In

25  addition, where Congress has granted statutory rights and has directed an agency to

26  establish a procedure for providing such rights, the Constitution requires the

27  government to establish a fair procedure and to abide by that procedure.  In the

28  asylum context, U.S. law mandates that asylum seekers be provided with such

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

81

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

process. Multiple courts have recognized that such procedural rights are critical in the asylum context and can result in life or death decisions, because applicants wrongly denied asylum can be subject to death or other serious harm in their home countries. *See, e.g.*, *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) ("The basic procedural rights Congress intended to provide asylum applicants . . . are particularly important because an applicant erroneously denied asylum could be subject to death or persecution if forced to return to his or her home country.").

226.   The INA and its implementing regulations provide Class Plaintiffs with the right to be processed at a POE and granted meaningful access to the asylum process. *See, e.g.*, 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), 1225(b)(2). By systematically turning away asylum seekers presenting themselves at POEs along the U.S.-Mexico border or unreasonably delaying their inspections—and thus directly or constructively denying them access to the asylum process, Defendants have failed to comply with the due process procedures for processing asylum seekers under the INA and its implementing regulations.

**D.   The *Non-Refoulement* Doctrine Under International Law Requires Implementation and Adherence to a Procedure to Ensure Prompt Access to Asylum**

227.   The United States is obligated by a number of treaties and protocols to adhere to the duty of *non-refoulement*—a duty that prohibits a country from returning or expelling an individual to a country where he or she has a well-founded fear of persecution and/or torture and that requires processes that ensure fair and efficient administration of the asylum process.

228.   The Office of the United Nations High Commissioner for Refugees ("UNHCR") has described *non-refoulement* as "the cornerstone of international refugee protection," and notes that it is "of particular relevance to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

82

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

asylum-seekers."[88]  The primary treaty source for the duty of *non-refoulement* is
the 1951 Convention on the Rights of Refugees.  Article 33 of the Convention
prohibits a state from returning "a refugee *in any manner* whatsoever to the
frontiers of territories where his life or freedom would be threatened on account of
his race, religion, nationality, membership of a particular social group or political
opinion."[89]  As UNHCR has explained, the Treaty's emphasis on "any manner" of
*refoulement* reflects a state duty to avoid using direct or indirect ways of subjecting
a person to a risk of return to persecution.[90]

229.    In addition, the duty of *non-refoulement* extends not only to a person's
country of origin, "but also to any other place where a person has reason to fear
threats to his or her life or freedom related to one or more of the grounds set out in
the 1951 Convention, or from where he or she risks being sent to such a risk."[91]
Accordingly, a state must not only prevent return to danger, it must take
affirmative measures to prevent a risk of harm by "adopt[ing] a course that does
not result in [asylum seekers] removal, directly or indirectly, to a place where their
lives or freedom would be in danger."[92]  This includes "access to the territory and
to *fair and efficient* asylum procedures."[93]

---

[88]  *Advisory Opinion on the Extraterritorial Application of Non-Refoulement
Obligations under the 1951 Convention relating to the Status of Refugees and
its 1967 Protocol*, UNHCR (Jan. 26, 2007), http://www.unhcr.org/4d9486929
.pdf.

[89]  1951 Refugee Convention, Art. 33 (emphasis added).

[90]  *Id*. at 7.

[91]  *Id*. at 3 (citing UNHCR, Note on Non-Refoulement (EC/SCP/2), 1977 ¶4).

[92]  *Id*. at ¶ 8.

[93]  *Id.* (emphasis added).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

83

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

230.   The United States adopted the protections of Article 33 by signing onto the 1967 Protocol Relating to the Status of Refugees, which incorporated Articles 2-34 of the 1951 Convention.

231.   The prohibition against *refoulement* is likewise central to other treaties ratified by the United States, including the International Covenant on Civil and Political Rights ("ICCPR") and the Convention Against Torture ("CAT"), both of which prohibit returning an individual to harm and obligate the United States to implement and follow legal procedures to protect refugees' right to *non-refoulement*.[94]

232.   In order to effectuate an asylum seeker's right to *non-refoulement*, the United States is obligated to implement and follow procedures to ensure that his or her request for asylum be duly and efficiently considered.  The United States implemented this legal obligation with the passage of the 1980 Refugee Act, which established a procedure for a noncitizen physically present in the United States or at a land border or POE to apply for asylum.[95]

233.   In practice, the duty of *non-refoulement* covers not only those refugees and asylum seekers already present inside the country, but also those who present themselves at POEs along the U.S. border.  The duty requires U.S. officials such as Defendants to process those seeking to cross the U.S. border and not to deny or unreasonably delay their access to an efficient, lawful process to present a claim for asylum.

234.   The norm of *non-refoulement* is specific, universal and obligatory.  It is so widely accepted that it has reached the status of *jus cogens*—a norm not subject to derogation.  Indeed, in 1996, the United Nations Executive Committee

---

[94]   *See* ICCPR, Art. 13; CAT, Art. 3.

[95]   *See* Refugee Act of 1980, Pub. L. No. 96-212, § 201(b), 94 Stat. 102 (1980).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

84

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   on the International Protection of Refugees explicitly concluded that the *non-*

2   *refoulement* principle had achieved the status of a norm "not subject to

3   derogation."[96]  The principle was recognized as such in the 1984 Cartagena

4   Declaration on Refugees; was included in a portion of the Refugee Convention

5   from which derogation is not permitted; and has been recognized by bodies,

6   including the Inter-American Commission on Human Rights and the Organization

7   of American States General Assembly.

8       235.   Defendants' policy and actions to actively or constructively deny

9   Class Plaintiffs, and the asylum seekers they represent, access to the U.S. asylum

10  process violate their binding and enforceable obligations under international law.

11              **VI.    CLASS ACTION ALLEGATIONS**

12      236.   Class Plaintiffs bring this action pursuant to Federal Rules of Civil

13  Procedure 23(a) and 23(b)(2) on behalf of themselves and all other persons

14  similarly situated.  The proposed class is defined as follows:

15              All noncitizens who seek or will seek to access the U.S. asylum

16              process by presenting themselves at a POE along the U.S.-

17              Mexico border and are denied access to the U.S. asylum process

18              by or at the instruction of CBP officials.

19      237.   The class is so numerous that joinder of all members is impracticable.

20  CBP's misconduct toward asylum seekers at POEs along the U.S.-Mexico border

21  has been the focus of monitoring, reporting and advocacy by numerous well-

22  respected non-governmental organizations.  These organizations have investigated

23  and documented thousands of examples of asylum seekers being turned back by

24  CBP officials.  Many more asylum seekers likely have been the victims of this

25  unlawful conduct as these abuses often go unreported.  Asylum seekers who are

26

27

28  [96]  Executive Committee Conclusion No. 79, *General Conclusion on International
    Protection* (1996).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

85

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  turned back at the border are continuously moving and relocating, also making

2  joinder impracticable.

3        238.   There are questions of law and fact that are common to the class.  The

4  class alleges common harms:  denial of access to the asylum process at POEs along

5  the U.S.-Mexico border and a violation of the right not to be returned to countries

6  where they fear persecution.  The class members' entitlement to these rights is

7  based on a common core of facts.  All members of the proposed class have

8  attempted to seek asylum by presenting themselves at a POE along the U.S.-

9  Mexico border.  All of them have expressed a fear of persecution or a desire to

10  apply for asylum, or would have done so but for the conduct of Defendants.  These

11  facts entitle all of them to the opportunity to seek asylum.  Yet each class member

12  has been and likely will again be unlawfully denied access to the U.S. asylum

13  process by CBP.  Moreover, all class members raise the same legal claims: that

14  U.S. law requires CBP officials at POEs to give them meaningful access to the

15  asylum process.  Their shared common facts will ensure that judicial findings

16  regarding the legality of the challenged practices will be the same for all class

17  members.  Should Class Plaintiffs prevail, *all* class members will benefit; each of

18  them will be entitled to a prompt, lawful inspection at a POE along the U.S.-

19  Mexico border and an opportunity to seek asylum.

20        239.   Class Plaintiffs' claims are typical of the claims of the class.  Class

21  Plaintiffs and class members raise common legal claims and are united in their

22  interest and injury.  All Class Plaintiffs, like all class members, are asylum seekers

23  to whom CBP officials unlawfully denied, whether actively or constructively,

24  access to the U.S. asylum process after they presented themselves at POEs along

25  the U.S.-Mexico border.  Class Plaintiffs and class members are thus victims of the

26  same, unlawful course of conduct.

27        240.   Class Plaintiffs are adequate representatives.  Class Plaintiffs seek

28  relief on behalf of the class as a whole and have no interest antagonistic to other

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

86

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  members of the class.  Class Plaintiffs' mutual goal is to declare Defendants'

2  challenged policies and practices unlawful and to obtain declaratory and injunctive

3  relief that would cure this illegality.  Class Plaintiffs seek a remedy for the same

4  injuries as the class members, and all share an interest in having a meaningful

5  opportunity to seek asylum.  Thus, the interests of the Class Plaintiffs and of the

6  class members are aligned.

7      241.   Class Plaintiffs are represented by attorneys from the Southern

8  Poverty Law Center, the Center for Constitutional Rights, the American

9  Immigration Council, and Latham & Watkins LLP.  Counsel have a demonstrated

10  commitment to protecting the rights and interests of noncitizens and, together, have

11  considerable experience in handling complex and class action litigation in the

12  immigration field.  Counsel have represented numerous classes of immigrants and

13  other victims of systematic government misconduct in actions in which they

14  successfully obtained class relief.

15      242.   Defendants have acted or refused to act on grounds that are generally

16  applicable to Class Plaintiffs and the class.  Defendants have failed to provide

17  Class Plaintiffs and class members with meaningful access to the U.S. asylum

18  process.  Defendants' actions violate Class Plaintiffs' and class members'

19  statutory, regulatory and constitutional rights to access to the asylum process.

20  Declaratory and injunctive relief are appropriate remedies.

21      243.   In the absence of a class action, there is substantial risk that individual

22  actions would be brought in different venues, creating a risk of inconsistent

23  injunctions to address Defendants' common conduct.

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

87

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    **FIRST CLAIM FOR RELIEF**

2    **DECLARATORY AND INJUNCTIVE RELIEF**

3    **AGAINST ALL DEFENDANTS**

4    **(VIOLATION OF THE RIGHT TO SEEK ASYLUM UNDER THE**

5    **IMMIGRATION AND NATIONALITY ACT)**

6    244.   Al Otro Lado and Class Plaintiffs reallege and incorporate by

7    reference each and every allegation contained in the preceding paragraphs as if set

8    forth fully herein.

9    245.   INA § 208(a)(1) (8 U.S.C. § 1158(a)(1)) gives any noncitizen who is

10   physically present in or who arrives in the United States a statutory right to seek

11   asylum, regardless of such individual's immigration status.

12   246.   When a noncitizen presents himself or herself at a POE and indicates

13   an intention to apply for asylum or a fear of persecution, CBP officials must refer

14   the noncitizen for a credible fear interview under 8 U.S.C. § 1225(b)(1)(A)(ii) and

15   8 C.F.R. § 235.3(b)(4), or, in accordance with 8 U.S.C. § 1225(b)(2), place the

16   noncitizen directly into regular removal proceedings under 8 U.S.C. § 1229(a)(1).

17   247.   Class Plaintiffs presented themselves at POEs and either asserted an

18   intention to apply for asylum or a fear of persecution in their countries of origin or

19   would have done so but for the Defendants' conduct.  Nevertheless, CBP officials

20   did not refer Class Plaintiffs to an asylum officer for credible fear interviews

21   pursuant to 8 U.S.C. § 1225(b)(1)(A)(ii), or, in accordance with 8 U.S.C.

22   § 1225(b)(2), place Class Plaintiffs directly into regular removal proceedings

23   pursuant to 8 U.S.C. § 1229(a)(1).

24   248.   Instead, in direct contravention of the INA, CBP officials engaged in

25   unlawful tactics, including the implementation of the Turnback Policy, that

26   actively or constructively denied Class Plaintiffs' access to the statutorily

27   prescribed asylum process and forced them to return to Mexico.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

88

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

249.   CBP officials' treatment of Class Plaintiffs at the POEs and the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction and/or acquiescence of Defendants.

250.   As a result of Defendants' violations of the INA, Class Plaintiffs have been damaged—through the active or constructive denial of access to the asylum process and by being forced to return to Mexico or other countries where they face threats of further persecution.

251.   As a result of Defendants' violations of the INA, Plaintiff Al Otro Lado has been damaged—namely its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at or near POEs along the U.S.-Mexico border.

252.   Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their statutory rights.  Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

253.   Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in any case involving an actual controversy.

254.   An actual controversy has arisen and now exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other.  Class Plaintiffs and Al Otro Lado contend that Defendants' Turnback Policy, as well as the conduct and practices carried out in reliance on it, as alleged in this Second Amended Complaint, violate the INA.  On information and belief, Defendants contend that their Turnback Policy, conduct and practices are lawful.

255.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

89

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

to this controversy, and such a judicial determination of these rights and
obligations is necessary and appropriate at this time.

## SECOND CLAIM FOR RELIEF

## DECLARATORY RELIEF AND INJUNCTIVE RELIEF

## AGAINST ALL DEFENDANTS

## (VIOLATION OF SECTION 706(1) OF THE ADMINISTRATIVE

## PROCEDURE ACT)

256.   Al Otro Lado and Class Plaintiffs reallege and incorporate by
reference each and every allegation contained in the preceding paragraphs as if set
forth fully herein.

257.   The Administrative Procedure Act ("APA") (5 U.S.C. § 551, *et. seq.*)
authorizes suits by "[a] person suffering legal wrong because of agency action, or
adversely affected or aggrieved by agency action within the meaning of a relevant
statute."  5 U.S.C. § 702.  The APA also provides relief for a failure to act: "The
reviewing court shall . . . compel agency action unlawfully withheld or
unreasonably delayed."  5 U.S.C. § 706(1).

258.   CBP officials, at the instigation, under the control or authority of, or
with the direction, knowledge, consent, or acquiescence of Defendants, have
engaged in an unlawful widespread pattern or practice of denying and
unreasonably delaying asylum seekers' access to the asylum process by, among
other tactics: lying; using threats, intimidation and coercion; employing verbal
abuse and applying physical force; physically blocking access to POE buildings;
imposing unreasonable delays before granting access to the asylum process;
denying outright access to the asylum process; and denying access to the asylum
process in a racially discriminatory manner.

259.   CBP officials, at the instigation, under the control or authority of, or
with the direction, knowledge, consent, or acquiescence of Defendants, have also
adopted and implemented the Turnback Policy, restricting access to the asylum

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

90

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

process at POEs by mandating that CBP officers directly or constructively turn

back asylum seekers at the border based on purported "capacity" constraints.

260.    Through this conduct, CBP officials have failed, in violation of the

APA, to take actions mandated by the following statutes and implementing

regulations:

- 8 U.S.C. § 1225(a)(1)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States *shall be inspected by immigration officers*.") (emphasis added);

- 8 U.S.C. § 1225(b)(1)(A)(ii) ("If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible . . .  and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, *the officer shall refer the alien for an interview by an asylum officer* . . . .") (emphasis added);

- 8 U.S.C. § 1225(b)(2) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."); and

- 8 C.F.R. § 235.3(b)(4) ("If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer *shall not proceed further* with removal of the alien *until the alien has been referred for an interview by an asylum officer* . . . .") (emphasis added).

261.    Through this conduct, CBP officials have also failed, in violation of

the APA, to take the above-listed mandated actions without unreasonable delay.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

91

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

262.   Defendants' repeated and pervasive failures to act, and/or to act within a reasonable time, which denied and/or unreasonably delayed Class Plaintiffs' access to the statutorily prescribed asylum process, constitute unlawfully withheld and unreasonably delayed agency action and therefore give rise to federal jurisdiction and mandate relief under the APA.

263.   As a result of the acts constituting violations of the APA, Class Plaintiffs have been damaged through the denial and/or unreasonable delay of access to the asylum process and by being forced to return to and/or wait in Mexico, where they face threats of further persecution.

264.   As a result of the acts constituting violations of the APA, Plaintiff Al Otro Lado has been damaged—namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

265.   Defendants' Turnback Policy and widespread pattern or practice have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their statutory and regulatory rights.  Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to engage in the unlawful practices alleged herein.

266.   Al Otro Lado and Class Plaintiffs have exhausted all available administrative remedies and have no adequate remedy at law.

267.   Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in any case involving an actual controversy.

268.   An actual controversy has arisen and now exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other.  Class Plaintiffs and Al Otro Lado contend that Defendants' Turnback Policy and

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

92

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  sanctioning of CBP's unlawful widespread pattern or practice at POEs along the

2  U.S.-Mexico border, as alleged in this Complaint, violate the APA.  On

3  information and belief, Defendants contend that the Turnback Policy and

4  widespread pattern or practice are lawful.

5      269.  Class Plaintiffs and Al Otro Lado therefore request and are entitled to

6  a judicial determination as to the rights and obligations of the parties with respect

7  to this controversy, and such a judicial determination of these rights and

8  obligations is necessary and appropriate at this time.

9                          **THIRD CLAIM FOR RELIEF**

10              **DECLARATORY RELIEF AND INJUNCTIVE RELIEF**

11                        **AGAINST ALL DEFENDANTS**

12        **(VIOLATION OF SECTION 706(2) OF THE ADMINISTRATIVE**

13        **PROCEDURE ACT—AGENCY ACTION IN EXCESS OF STATUTORY**

14        **AUTHORITY AND WITHOUT OBSERVANCE OF PROCEDURES**

15                          **REQUIRED BY LAW)**

16      270.  Al Otro Lado and Class Plaintiffs reallege and incorporate by

17  reference each and every allegation contained in the preceding paragraphs as if set

18  forth fully herein.

19      271.  Under the APA, "the reviewing court shall . . . hold unlawful and set

20  aside agency action, finding, and conclusions found to be . . . in excess of statutory

21  jurisdiction, authority, or limitations, or short of statutory right [and/or] without

22  observance of procedure required by law."  5 U.S.C. § 706(2)(C), (D).

23      272.  Defendants, through implementation of the Turnback Policy and

24  sanctioning of CBP's unlawful widespread pattern or practice of denying and

25  unreasonably delaying asylum seekers' access to the asylum process, have acted in

26  excess of their statutorily prescribed authority and without observance of the

27  procedures required by law in violation of section 706(2) of the APA.  *See* 5

28  U.S.C. §§ 706(2)(C), (D).  Congress mandated the various procedures that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

93

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Defendants and their officers, employees, and agents are authorized and required to follow when inspecting individuals who seek admission at POEs.  *See* 8 U.S.C. § 1225.  Regulations implementing section 1225 also establish the required procedures for inspection of individuals who seek admission at POEs.  *See* 8 C.F.R. § 235.3(b)(4).  None of these procedures authorizes a CBP official to turn back a noncitizen seeking asylum at a POE, at the physical U.S.-Mexico border, or any place in between.

273.    In turning back Class Plaintiffs and purported class members at POEs or along the U.S.-Mexico border without following the procedures mandated by the INA and its implementing regulations, CBP officials have acted and continue to act in excess of the authority granted to them by Congress and without observance of procedure required by law.

274.    The Turnback Policy is a policy authorized by Defendants with the purpose of restricting and unreasonably delaying asylum seekers' access to the U.S. asylum process on the basis of purported capacity constraints at U.S. POEs. Defendants' own statements and communications, as well as a report of the DHS Office of Inspector General, confirm Defendants ordered the Turnback Policy and its implementation by CBP.  The Turnback Policy thus constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2).

275.    Furthermore, each instance where Defendants, through their officers, employees, and agents, directly or constructively deny Class Plaintiffs or purported class members access to the asylum process constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2).

276.    As a result of the acts constituting violations of the APA, Class Plaintiffs have been damaged through the denial, restriction, and/or unreasonable delay of access to the asylum process and by being forced to return to and/or wait in Mexico where they face threats of further persecution and/or other serious harm.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

94

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

277.   As a result of the acts constituting violations of the APA, Plaintiff Al Otro Lado has been damaged—namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

278.   Defendants' Turnback Policy and widespread pattern or practice have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their statutory and regulatory rights.  Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy alleged herein.

279.   Al Otro Lado and Class Plaintiffs have exhausted all available administrative remedies and have no adequate remedy at law.

280.   Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in any case involving an actual controversy.

281.   An actual controversy has arisen and now exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other.  Class Plaintiffs and Al Otro Lado contend that Defendants' Turnback Policy and sanctioning of CBP's unlawful widespread pattern or practice at POEs along the U.S.-Mexico border, as alleged in this Complaint, violate the APA.  On information and belief, Defendants contend that the Turnback Policy and widespread pattern or practice are lawful.

282.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

95

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

# FOURTH CLAIM FOR RELIEF

## DECLARATORY RELIEF AND INJUNCTIVE RELIEF

## AGAINST ALL DEFENDANTS

## (VIOLATION OF PROCEDURAL DUE PROCESS)

283.    Al Otro Lado and Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

284.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law."  U.S. Const. Amend. V.

285.    Congress has granted certain statutory rights to asylum seekers, such as Class Plaintiffs and the asylum seekers they represent, and has directed DHS to establish a procedure for providing such rights.  The Due Process Clause thus requires the government to establish a fair procedure and to abide by that procedure.

286.    As set forth above, the INA and its implementing regulations provide Class Plaintiffs the right to be processed at a POE and granted meaningful access to the asylum process.  *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), 1225(b)(2); *see also* 8 C.F.R. § 235.3(b)(4).

287.    By adopting the Turnback Policy and using a variety of tactics to turn back asylum seekers at POEs along the U.S.-Mexico border, CBP officials have denied Class Plaintiffs access to the asylum process and failed to comply with procedures set forth in the INA and its implementing regulations.

288.    CBP officials' treatment of Class Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, or acquiescence of Defendants.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

96

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

289.    By denying Class Plaintiffs' access to the asylum process, Defendants have violated Class Plaintiffs' procedural due process rights under the Fifth Amendment to the U.S. Constitution.

290.    As a result of the Defendants' violations of the Fifth Amendment to the U.S. Constitution, Class Plaintiffs have been damaged through the denial of access to the asylum process and by being forced to return to Mexico where they face threats of further persecution.

291.    Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their constitutional rights.  Class Plaintiffs do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from engaging in the unlawful policy, conduct and practices alleged herein.

292.    An actual controversy exists between Class Plaintiffs, on one hand, and Defendants, on the other.  Class Plaintiffs contend that Defendants' Turnback Policy and sanctioning of CBP's unlawful widespread pattern or practice at POEs along the U.S.-Mexico border, as alleged in the Complaint, violate the Fifth Amendment to the United States Constitution.  On information and belief, Defendants contend that the Turnback Policy and widespread pattern or practice are lawful.

293.    Class Plaintiffs therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

97

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

# FIFTH CLAIM FOR RELIEF

## DECLARATORY RELIEF AND INJUNCTIVE RELIEF

## AGAINST ALL DEFENDANTS

## (VIOLATION OF THE *NON-REFOULEMENT* DOCTRINE)

294.   Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

295.   CBP officials have systematically denied, or unreasonably delayed, access to the asylum process by Class Plaintiffs, and the asylum seekers they represent, in violation of customary international law reflected in treaties which the United States has ratified and implemented: namely, the specific, universal and obligatory norm of *non-refoulement*, which has also achieved the status of a *jus cogens* norm, and which forbids a country from returning or expelling an individual to a country where he or she has a well-founded fear of persecution and/or torture, whether it is her home country or another country.

296.   The duty of *non-refoulement* also requires the adoption of procedures to ensure prompt, efficient, and unbiased access to the asylum process.

297.   CBP officials' treatment of Class Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction or acquiescence of Defendants.

298.   Defendants' conduct is actionable under the Alien Tort Statute, 28 U.S.C. § 1350, which authorizes declaratory and injunctive relief.

299.   As a result of the acts constituting violations of the *jus cogens* norm of *non-refoulement*, Class Plaintiffs have been damaged through denial or unreasonable delay of access to the asylum process and by being forced to return to Mexico or other countries where they face threats of further persecution.

300.   As a result of the acts constituting violations of the norm of *non-refoulement*, Al Otro Lado has been damaged—namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

98

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico

2  border.

3      301.   Defendants' practices have resulted and will continue to result in

4  irreparable injury, including a continued risk of violence and serious harm to Class

5  Plaintiffs and further infringement of the protections afforded to them under

6  international law.  Class Plaintiffs and Al Otro Lado do not have an adequate

7  remedy at law to redress the violations alleged herein, and therefore seek injunctive

8  relief restraining Defendants from engaging in the unlawful conduct and practices

9  alleged herein.

10     302.   An actual controversy exists between Class Plaintiffs and Al Otro

11  Lado, on one hand, and Defendants, on the other.  Class Plaintiffs and Al Otro

12  Lado contend that Defendants' Turnback Policy, as well as the widespread pattern

13  or practice carried out in reliance on it, as alleged in this Complaint, violate the

14  norm of *non-refoulement*.  On information and belief, Defendants contend that

15  their policy, conduct and practices are lawful.

16     303.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to

17  a judicial determination as to the rights and obligations of the parties with respect

18  to this controversy, and such a judicial determination of these rights and

19  obligations is necessary and appropriate at this time.

20  **PRAYER FOR RELIEF**

21     304.   WHEREFORE, Plaintiff Al Otro Lado and Class Plaintiffs

22  respectfully request that the Court:

23          a.   Issue an order certifying a class of individuals pursuant to

24               Federal Rule of Civil Procedure 23(a) and 23(b)(2);

25          b.   Appoint the undersigned as class counsel pursuant to Federal

26               Rule of Civil Procedure 23(g);

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

99

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

c.    Issue a judgment declaring that Defendants' Turnback Policy, as well as the practices, acts and/or omissions described herein, give rise to federal jurisdiction;

d.    Issue a judgment declaring that Defendants' Turnback Policy, as well as the practices, acts and/or omissions described herein, violate one or more of the following:

(1)    The Immigration and Nationality Act, based on violations of 8 U.S.C. §§ 1158 and 1225;

(2)    Section 706(1) of the Administrative Procedure Act, based on the unlawful withholding and unreasonable delay of agency action mandated by 8 U.S.C. § 1225 and 8 C.F.R. § 235.3;

(3)    Section 706(2) of the Administrative Procedure Act;

(4)    The Due Process Clause of the Fifth Amendment; and

(5)    The duty of *non-refoulement* under international law;

e.    Issue injunctive relief requiring Defendants to comply with the laws and regulations cited above;

f.    Issue injunctive relief prohibiting Defendants, and any of their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them or on their behalf, from continuing to implement the Turnback Policy and from engaging in the unlawful practices, acts and/or omissions described herein at POEs along the U.S.-Mexico border;

g.    Issue injunctive relief requiring Defendants to implement procedures to provide effective oversight and accountability in the inspection and processing of individuals who present themselves at POEs along the U.S.-Mexico border for the purpose of seeking asylum;

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

100

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

h.   Award Plaintiffs their reasonable attorneys' fees, costs and
other expenses pursuant to 28 U.S.C. § 2412, and other
applicable law; and

i.   Grant any and all such other relief as the Court deems just and
equitable.

Dated:  November 7, 2018                LATHAM & WATKINS LLP
                                        Manuel A. Abascal
                                        Michaela R. Laird


                                    By: /s/ Manuel A. Abascal
                                        Manuel A. Abascal
                                        *Attorneys for Plaintiffs*

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

101

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

## **CERTIFICATE OF SERVICE**

1

2          I hereby certify that I electronically filed the foregoing with the Clerk

3 of the Court for the Southern District of California by using the CM/ECF system

4 on November 13, 2018. I certify that all  participants in the case are registered

5 CM/ECF users and that service will be accomplished by  the CM/ECF system.

6

7

8                      */s/ Manuel A. Abascal*

9                     Manuel A. Abascal

10                  LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100

11                 Los Angeles, California  90071-1560
(213) 485-1234

12                 *manny.abascal@lw.com*

13                 *Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

1

No. 3:17-cv-02366-BAS-KSC
SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF