1  JOSEPH H. HUNT
2  Assistant Attorney General, Civil Division
   AUGUST E. FLENTJE
3  Special Counsel
   WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  GISELA A. WESTWATER (NE 21801)
6  Assistant Director
   YAMILETH G. DAVILA (FL 47329)
7  Assistant Director

8  ALEXANDER J. HALASKA (IL 6327002)     KATHERINE J. SHINNERS (DC 978141)
9  Trial Attorney                         Senior Litigation Counsel
   United States Department of Justice    BRIAN C. WARD (IL 6304236)
10 Civil Division                         Senior Litigation Counsel
   Office of Immigration Litigation – District   DANIELLE LINDERMUTH (MD Bar)
11 Court Section                          Trial Attorney
12 P.O. Box 868, Ben Franklin Station     SAIRAH G. SAEED (IL 6290644)
   Washington, D.C. 20044                 Trial Attorney
13 Tel: (202) 307-8704 | Fax: (202) 305-7000
14 alexander.j.halaska@usdoj.gov          *Counsel for Defendants*
15

16              **UNITED STATES DISTRICT COURT**
17        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
18                       **(San Diego)**

19 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC
20
21                          *Plaintiffs*,   Hon. Cynthia A. Bashant
22                    v.
                                           **DEFENDANTS' MEMORANDUM IN**
23                                         **SUPPORT OF THEIR MOTION TO**
24 Kirstjen NIELSEN, Secretary, U.S.       **PARTIALLY DISMISS THE SECOND**
   Department of Homeland Security, in her **AMENDED COMPLAINT**
25 official capacity, *et al.*,
26                         *Defendants*.
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................1

STATEMENT .................................................................................1

ARGUMENT ..................................................................................5

I.   The Extraterritorial Plaintiffs' Claims Fail as a Matter of Law. ...................6

   A.   The Extraterritorial Plaintiffs' Section 706(1) Claims Fail Because the INA Does Not Apply to Individuals in Mexico.................6

   B.   The Extraterritorial Plaintiffs' Section 706(2) Claims Fail Because Metering is Lawful..............................................................11

   C.   The Extraterritorial Plaintiffs' Section 706(2) Claims Fail Because Defendants' Have Not Taken Final Agency Action.................15

   D.   The Extraterritorial Plaintiffs Fail to State Due Process Claims.................................................................................18

   E.   The Extraterritorial Plaintiffs Fail to State INA Claims or Non-*Refoulement* Claims. ..........................................................22

II.  The Political Question Doctrine Precludes Consideration of Defendants' Coordination with a Foreign Nation to Regulate Border Crossings. ......................................................................25

III. Al Otro Lado's Claims Fail as a Matter of Law...........................................28

IV.  The Territorial Plaintiffs' Re-Pleaded Claims Fail as a Matter of Law. .............................................................................................29

   A.   Abigail's, Beatrice's, and Carolina's Section 706(1) Claims Fail as a Matter of Law................................................................29

   B.   The Territorial Plaintiffs' Section 706(2) Claims Fail Because Defendants Have Not Taken Final Agency Action..............................30

CONCLUSION ...............................................................................31

CERTIFICATE OF SERVICE ...........................................................33

# TABLE OF AUTHORITIES

## Federal Cases

*Almeida-Sanchez v. United States*,
        413 U.S. 266 (1973)................................................................. 11, 12

*Alperin v. Vatican Bank*,
        410 F.3d 532 (9th Cir. 2005) ...........................................................27

*American Ins. Ass'n v. Garamendi*,
        539 U.S. 396 (2003)..........................................................................27

*Ashcroft v. Iqbal*,
        556 U.S. 662 (2009)..........................................................................17

*Baker v. Carr*,
        369 U.S. 186 (1962)..........................................................................27

*Balistreri v. Pacifica Police Dept.*,
        901 F.2d 696 (9th Cir. 1988) ...........................................................25

*Bancoult v. McNamara*,
        445 F.3d 427 (D.C. Cir. 2006)................................................... 26, 28

*Barapind v. Gov't of Republic of India*,
        844 F.3d 824 (9th Cir. 2016) ...........................................................24

*Bark v. U.S. Forest Service*,
        37 F.Supp.3d 41 (D.D.C. 2014)........................................................16

*Bennett v. Spear*,
        520 U.S. 154 (1997)..........................................................................18

*Beshir v. Holder*,
        10 F.Supp.3d 165 (D.D.C. 2014)......................................................18

*bin Ali Jaber v. United States*,
        861 F.3d 241 (D.C. Cir. 2017)..........................................................27

*Boumediene v. Bush*,
        553 U.S. 723 (2008)..........................................................................20

*Bridges v. Wixon*,
    326 U.S. 135 (1954)..................................................................................20

*Bringas-Rodriguez v. Sessions*,
    850 F.3d 1051 (9th Cir. 2017) .................................................................8

*Carroll v. United States*,
    267 U.S. 132 (1925)..................................................................................12

*Chae Chan Ping v. United States*,
    130 U.S. 581 (1889)..................................................................................12

*Chicago & Southern Air Lines v. Waterman S.S. Corp.*,
    333 U.S. 103 (1948)..................................................................................28

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971)..................................................................................15

*Copelan v. Techtronics Industries Co., Ltd*,
    95 F.Supp.3d 1230 (S.D. Cal. 2015) .......................................................3

*Corrie v. Caterpillar, Inc.*,
    503 F.3d 974 (9th Cir. 2007) ...........................................................26, 28

*Cunningham v. Neagle*,
    10 S. Ct. 658 (1890)..................................................................................12

*Dhakal v. Sessions*,
    895 F.3d 532 (7th Cir. 2018) ...................................................................24

*Filartiga v. Pena-Irala*,
    630 F.2d 876 (2d Cir. 1980) .....................................................................25

*Fong Yue Ting v. United States*,
    149 U.S. 698 (1893)..................................................................................12

*Galvan v. Press*,
    347 U.S. 522 (1954)..................................................................................12

*Goss v. Lopez*,
    419 U.S. 565 (1975)...........................................................................18, 22

iii

*Graham v. Fed. Emergency Mgmt. Agency*,
    149 F.3d 997 (9th Cir. 1998) ................................................................ 19, 21

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952)..................................................................................28

*Hells Canyon Preservation Council v. U.S. Forest Service*,
    593 F.3d 923 (9th Cir. 2010) ...............................................................7, 30

*I.N.S. v. Stevic*,
    467 U.S. 407 (1984)..................................................................................23

*Ibrahim v. Dept. of Homeland Security*,
    669 F.3d 983 (9th Cir. 2012) ................................................................ 19, 21

*Jafarzadeh v. Nielsen*,
    321 F.Supp.3d 19 (D.D.C. 2018)............................................................29

*Japan Whaling Ass'n v. American Cetacean Society*,
    478 U.S. 221 (1986)............................................................................ 26, 28

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950)............................................................................ 19, 20

*Kerry v. Din*,
    135 S. Ct. 2128 (2015)..............................................................................22

*Khan v. Holder*,
    584 F.3d 773 (9th Cir. 2009) ....................................................................24

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ......................................................................3

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)..................................................................................12

*Kwong Hai Chew v. Colding*,
    344 U.S. 590 (1953)..................................................................................20

*Lightfoot v. District of Columbia*, 273 F.R.D. 314 (D.D.C. 2011).................. 17, 31

*Lujan v. Nat'l Wildlife Federation*,
    497 U.S. 870 (1990)..................................................................................16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Medellin v. Texas*,
    552 U.S. 491 (2008)................................................................................23

*Navajo Nation v. Dept. of the Interior*,
    876 F.3d 1144 (9th Cir. 2017) ..............................................................18

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001) ..................................... 11, 14, 18, 22

*Ninilchik Traditional Council v. United States*,
    227 F.3d 1186 (9th Cir. 2000) ..............................................................23

*Nishimura Ekiu v. United States*,
    142 U.S. 651 (1892)................................................................................12

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004)........................................................ 7, 18, 30

*Plyler v. Doe*,
    457 U.S. 202 (1982)................................................................................20

*Reid v. Covert*,
    354 U.S. 1 (1957)....................................................................................19

*Russian Volunteer Fleet v. United States*,
    282 U.S. 481 (1931)................................................................................20

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993)..................................................... 8, 10, 23, 24

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005)..............................................................27

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
    899 F.3d 1064 (9th Cir. 2018) ..............................................................26

*Serra v. Lappin*,
    600 F.3d 1191 (9th Cir. 2010) ....................................... 22, 24

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953)...................................................... 12, 20

*Sluss v. U.S. Dept. of Justice, Int'l Prisoner Transfer Unit,*
    898 F.3d 1242 (D.C. Cir. 2018).................................................................23

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004).......................................................................................25

*Stanley v. Gonzalez,*
    476 F.3d 653 (9th Cir. 2007) .........................................................................21

*Tobar v. United States,*
    639 F.3d 1191 (9th Cir. 2011) .......................................................................25

*Underhill v. Hernandez,*
    168 U.S. 250 (1897).......................................................................................26

*United States ex rel. Knauff v. Shaughnessy,*
    338 U.S. 537 (1950)................................................................................. 12, 20

*United States v. Barajas-Alvarado,*
    655 F.3d 1077 (9th Cir. 2011) .......................................................................10

*United States v. Chen,*
    2 F.3d 330 (9th Cir. 1993) ........................................................ 12, 13, 14, 15

*United States v. Curtiss-Wright Export Corp.,*
    299 U.S. 304 (1936).......................................................................................12

*United States v. Delgado-Garcia,*
    374 F.3d 1337 (D.C. Cir. 2004)....................................................................12

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990)............................................................................ 18, 19, 20

*Vieth v. Jubelirer,*
    541 U.S. 267 (2004).......................................................................................27

*Webster v. Doe,*
    486 U.S. 592 (1988).......................................................................................23

*Weyerhaeuser Co. v. U.S. Fish and Wildlife Service,*
    586 U.S. — (2018).........................................................................................14

vi

*Wong Wing v. United States*,
   163 U.S. 228 (1896).........................................................................20

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886).........................................................................20

*Yuen Jin v. Mukasey*,
   538 F.3d 143 (2d Cir. 2008) ...........................................................24

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)................................................................... 19, 20

## **Federal Statutes**

5 U.S.C. § 701(a) ............................................................... 14, 15

5 U.S.C. § 704 .................................................................... 15, 30

5 U.S.C. § 706(1) ...........................................................................7

5 U.S.C. § 706(2) .........................................................................11

6 U.S.C. § 202 ......................................................... 6, 12, 13, 15

8 U.S.C. § 1101(a)(3)...............................................................29

8 U.S.C. § 1101(a)(42)(A) .....................................................8, 29

8 U.S.C. § 1103(a)(1) ............................................... 6, 12, 13, 15

8 U.S.C. § 1103(a)(3) ............................................... 6, 12, 13, 15

8 U.S.C. § 1158(a)(1) ............................................... 8, 18, 21, 28

8 U.S.C. § 1225(a)(1) ............................................... 8, 9, 10, 11

8 U.S.C. § 1225(a)(3) .......................................................... passim

8 U.S.C. § 1225(a)(4) ..................................................................30

8 U.S.C. § 1225(b)(1)(A)(ii) ............................................... passim

8 U.S.C. § 1225(b)(1)(B) ...................................................... 18, 21

8 U.S.C. § 1225(b)(2)...................................................... 18, 21, 28

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

1

8 U.S.C. § 1225(b)(2)(A) ............................................................... 7, 9, 30

2

8 U.S.C. § 1231 note ...................................................................24

3

8 U.S.C. § 1252(a)(4) ...................................................................24

4

5

8 U.S.C. § 1325 ...........................................................................14

6

19 U.S.C. § 1318(b)(2) .................................................................14

7

19 U.S.C. § 2 ...............................................................................14

8

28 U.S.C. § 1350 .................................................................. 22, 25

9

OIG Report at 6 ...........................................................................30

10

11

## Federal Regulations

12

8 C.F.R. § (e)(2) ..........................................................................24

13

8 C.F.R. § 1.2 ....................................................................... 10, 11

14

15

8 C.F.R. § 100.4 ..........................................................................14

16

8 C.F.R. § 208.18(e)(1) ................................................................24

17

8 C.F.R. § 235.1(a) ....................................................................8, 9

18

8 C.F.R. § 235.3(b)(1) .................................................................10

19

8 C.F.R. § 235.3(b)(4) ........................................................ passim

20

21

8 C.F.R. § 235.4 ..........................................................................30

22

## Federal Rules

23

Federal Rule of Civil Procedure 12(b)(6) ...................................... passim

24

Federal Rule of Evidence 106 .........................................................3

25

## Constitutional Provisions

26

U.S. Const. amend. V ...................................................................19

27

28

## **Acts of Congress**

Administrative Procedure Act,
    Pub. L. No. 79-404, 60 Stat. 237 (1946) ................................................. passim

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No, 105-
    277, Div. G., Title XXII, 112 Stat. 2681 (1998) ...........................................24

Immigration and Nationality Act,
    Pub. L. No. 82-414, 66 Stat. 163 (1952) ........................................... 1, 5, 6, 7

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) ....................... 22, 24

## **Treaties, Conventions, and Protocols**

Convention Against Torture and Other Cruel, Inhuman or Degrading
    Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 114 ........ 22, 23, 24

Convention Relating to the Status of Refugees, July 28, 1951, 189
    U.N.T.S. 150 ................................................................................. 22, 23, 28

International Covenant on Civil and Political Rights, Dec. 19, 1966, 999
    U.N.T.S. 171 ................................................................................. 22, 23, 24

Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S.
    267 ............................................................................................... 22, 23, 24

## **Other Authorities**

U.S. Customs and Border Protection, National Standards on Transport,
    Escort, Detention, and Search (Oct. 2015) ......................................... 5, 13, 15

U.S. Department of Homeland Security, Office of Inspector General,
    *Special Review – Initial Observations Regarding Family
    Separation Issues Under the Zero Tolerance Policy*, OIG-18-84
    (Sept. 27, 2018) ..........................................................................................5, 16

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

# INTRODUCTION

This case arises out of the Federal Government's exercise of its inherent and statutory authority to control the flow of travel across the U.S.-Mexico border. The individual Doe Plaintiffs, all of whom are aliens who wish to apply for asylum in the United States, claim a right in the Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (1952), the Fifth Amendment, and various treaties or international agreements to cross the border at a port of entry upon demand, at any point in time, regardless of whether the port has the capacity to process their applications for admission in accordance with federal law. No such right exists, much less a right to cross when the port's operational capacity is strained. By asking the Court to apply federal immigration law to aliens physically outside the United States, Plaintiffs seek to drastically reduce the scope of the Executive's broad authority to oversee the border and the ports of entry and jeopardize the safe, humane, and efficient processing of all persons seeking to cross. The Court should decline their request and dismiss the Second Amended Complaint ("SAC") as set forth below.

# STATEMENT

Thirteen Doe Plaintiffs, all of whom are aliens from Mexico or Central America, and one Organizational Plaintiff broadly allege on behalf of themselves and a similarly situated putative class that the United States has "systematically restricted the number of asylum seekers who can access the asylum process" through ports of entry along the U.S.-Mexico border since 2016. ECF No. 189 ¶ 48. Organizational Plaintiff Al Otro Lado, Inc., a non-profit corporation, claims that its mission has been "frustrated" by the Government's alleged actions at ports of entry along the U.S.-Mexico border. *Id.* ¶ 17. The five original Doe Plaintiffs—Abigail, Beatrice, Carolina, Dinora, and Ingrid (the "Territorial Plaintiffs")—claim they physically crossed into the United States and asserted their intention to seek asylum to a U.S. Customs and Border Protection ("CBP") officer at the San Ysidro

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

or Otay Mesa ports of entry, but were "coerced" into withdrawing their applications for admission or told they could not apply for asylum and escorted back to Mexico. *See id.* ¶¶ 84–106, 119–52.

The SAC also includes new allegations that, "beginning around 2016," Defendants implemented a "formal" "Turnback Policy," by which CBP officials, in "coordina[tion]" with the government of Mexico, prevent individuals in Mexico who wish to seek asylum in the United States from crossing the border. *Id.* ¶¶ 3, 7, 50–83. Eight newly-added Plaintiffs—Roberto, Maria, Úrsula, Juan, Victoria, Bianca, Emiliana, and César (the "Extraterritorial Plaintiffs")—allege they experienced the purported "Turnback Policy" when they approached the border to the territorial United States at the San Ysidro, Laredo, or Hidalgo ports of entry but were prevented by CBP officers or Mexican immigration officials from physically crossing the international boundary. *Id.* ¶¶ 50–83, 153–202. None of the Territorial Plaintiffs alleges they were subjected to the purported "Turnback Policy."[1] *Id.* ¶ 83.

The SAC includes allegations that Defendants are "metering" at ports of entry along the U.S-Mexico border. "Metering" is a term used to describe an

---

[1] Plaintiffs allege throughout the SAC that they "presented themselves" at ports of entry. Sometimes this phrase is used to describe when a Doe Plaintiff alleges she physically entered a port of entry in the United States, and sometimes it is used to describe when a Doe Plaintiff alleges she spoke to a CBP officer in the United States but never herself crossed the border. *Compare, e.g.*, ECF No. 189 ¶ 134 ("Carolina and her daughters presented themselves at the San Ysidro POE," where "CBP officials locked them in a room overnight.") *with id.* ¶ 161–64 ("Maria and her children sought access to the asylum process by presenting themselves at the Laredo POE," but "[a]s they approached the middle of the bridge, CBP officials stopped Maria and her children and asked to see her identification."). Defendants refer to the former as "Territorial Plaintiffs" and the latter as "Extraterritorial Plaintiffs." As discussed below, this distinction is critical because Defendants' duties under the INA are not triggered until an alien is physically present in the United States. *See infra* at I.A.

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

operational decision to control the flow of travel across the U.S.-Mexico border based on operational constraints at the ports of entry. To support their metering allegation, Plaintiffs cite to a selection of Defendants' internal documents produced during the initial round of discovery and to public statements from government officials which refer or relate CBP's operations at the ports. *See* Email from San Ysidro Watch Commander (May 29, 2016) [2] ("Ex. 1"), at 1 (cited at ECF No. 189 ¶ 51) (referring to "increased workload in AEU [San Ysidro's Admissibility Enforcement Unit] and the changes made to increase our intake and processing efforts"); Memorandum Regarding San Ysidro Operations (undated) ("Ex. 2"), at 1 (cited at ECF No. 189 ¶ 52) (noting that "the significant volume of arriving undocumented travelers has surpassed the physical capacity of the port," "has resulted in a tremendous strain on all available local resources, to include personnel," and has "seriously compromised the port's ability to safely and humanely care for the basic necessities of the asylees in custody"); Email from Branch Chief, Field Liaison Division, Office of Field Operations, CBP (Dec. 6, 2016) ("Ex. 3"), at 1 (cited at ECF No. 189 ¶ 53) (noting that "[m]etering continues at both San Ysidro and Calexico POEs" and that "the numbers are adjusted based on space availability and ERO [U.S. Immigration and Customs Enforcement's ("ICE") Enforcement and Removal Operations] movement of detainees from the ports"); Email from Assistant Director Field Operations – Border Security, Laredo Field Office, Office of Field Operations, CBP (Nov. 12–13, 2016) ("Ex. 4"), at 1 (cited at ECF No. 189 ¶ 55) ("For example, if you

---

[2] Plaintiffs have incorporated these documents into the SAC by reference because they quote from them to substantiate their allegations. *See* ECF No. 189 ¶¶ 50–83; *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018); *Copelan v. Techtronics Industries Co., Ltd*, 95 F.Supp.3d 1230, 1236–37 (S.D. Cal. 2015) ("[T]he court may consider the full text of . . . documents even when the complaint quotes only selected portions."); *see also* Fed. R. Evid. 106.

DEFS' MEMO. IN SUPPORT OF MOT. TO PARTIALLY DISMISS SECOND AM. COMPL. Case No. 3:17-cv-02366-BAS-KSC

determine that you can only process 50 aliens at a time, you will request that INM [Mexico's immigration agency] release only 50."); Email, "FW: Metering" (Nov. 22, 2016) ("Ex. 5"), at 1 (cited at ECF No. 189 ¶ 56) (noting that metering "is being done for humanitarian reasons (health/safety) of everyone"); Memorandum Regarding Laredo Operations (Jan. 13, 2017) ("Ex. 6"), at 1 (cited at ECF No. 189 ¶ 57) (noting that "[t]he Port of Laredo, Texas has metering procedures in place to address any capacity, safety and health concerns at the Port of Entry"); ECF No. 189 ¶ 59 n.44 ("It was an issue of capacity and being able to put people into the facility without being overrun or having unsafe and unsanitary conditions."); *id.* ¶ 65 ("We are 'metering,' which means that if we don't have the resources to let [aliens without travel documents] in on a particular day, they are going to have to come back. They will have to wait their turn and we will process them as we can, but that's the way the law works. Once they come into the United States, we process them."); *id.* ¶ 68 n.56 (noting that "individuals [without travel documents] may need to wait in Mexico as CBP officers work to process those already within our facilities"); *id.* ("We're not denying people approaching the U.S. border without documentation. We're asking them to come back when we have the capacity to manage them.").

Each port's operational capacity is informed by a number of dynamic factors, including, for example, the physical layout of each port, including the constraints imposed by ongoing construction at some ports; the physical holding space of each port; agency policies and court-imposed limitations governing short-term holding; staff availability in light of other mission demands, such as trade inspection; the logistics behind other non-party agencies' implementation of their statutory responsibilities; and the less-prevalent but still unpredictable circumstances related to each alien's arrival in the United States, such as, for example, the occasional need to obtain obscure translation services or transport an alien to a medical facility, which put additional strain on the ports' resources. *See,*

DEFS' MEMO. IN SUPPORT OF MOT. TO PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

1   *e.g.*, Dkt. No. 63, *Padilla v. Nielsen*, No. 2:18-cv-928 (W.D. Wash.), Declaration

2   of Sidney K. Aki (Sept. 24, 2018) ("Aki Decl.") ¶¶ 5–13; U.S. Customs and Border

3   Protection, National Standards on Transport, Escort, Detention, and Search § 4.3

4   (Oct. 2015) [hereinafter TEDS], *available at* https://www.cbp.gov/document/

5   directives/cbp-national-standards-transport-escort-detention-and-search; U.S.

6   Department of Homeland Security, Office of Inspector General, *Special Review –*

7   *Initial Observations Regarding Family Separation Issues Under the Zero*

8   *Tolerance Policy*, OIG-18-84, 6–7 (Sept. 27, 2018) [hereinafter OIG Report]; Ex.

9   1, at 1; Ex. 2, at 2–3; Ex. 3, at 1–2; Ex. 4, at 1–2; Ex. 6, at 1.

## ARGUMENT

11      The Extraterritorial Plaintiffs' two claims under the Administrative

12   Procedure Act ("APA"), Pub. L. No. 79-404, 60 Stat. 237 (1946), fail as a matter

13   of law. Neither the INA, the Fifth Amendment, nor the cited treaties give an alien

14   without appropriate travel documents the right to cross the border from Mexico

15   into a U.S. port of entry upon demand. Defendants' alleged practice of metering—

16   to which Plaintiffs affix their own "Turnback Policy" label—is well within their

17   inherent and statutory authority to control the flow of traffic across the

18   international border.

19      Al Otro Lado's two APA claims also fail as a matter of law. Although the

20   Court previously ruled that the organization has constitutional and statutory

21   standing, the INA and treaty provisions Al Otro Lado cites apply only to "aliens"

22   or "refugees." Al Otro Lado is neither, and so those provisions of law afford it no

23   possibility of relief.

24      Finally, the Court should dismiss Abigail's, Beatrice's, and Carolina's re-

25   pleaded section 706(1) claims because they allege they withdrew their applications

26   for admission. Although those withdrawals were purportedly "coerced," these three

27   Territorial Plaintiffs cite no provision of law under which CBP would continue to

28   have a duty to "inspect," "refer," or "detain" them after an application for

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

admission is withdrawn. Further, the Territorial Plaintiffs again fail to adequately plead a section 706(2) claim. The allegations in the SAC and the documents incorporated by reference show that Defendants *have not* sanctioned a "widespread pattern or practice of denying and unreasonably delaying asylum seekers' access to the asylum process." With the exception of Dinora's and Ingrid's section 706(1) claims, the Court should dismiss the SAC in its entirety.

## I.    The Extraterritorial Plaintiffs' Claims Fail as a Matter of Law.

The Extraterritorial Plaintiffs allege that Defendants began metering at ports of entry "around 2016" to "directly or constructively turn back asylum seekers at the border contrary to U.S. law." ECF No. 189 ¶¶ 3, 50–83, 153–202. They assert APA claims that metering—which, as Plaintiffs' allegations show, is an operational decision to allow aliens without appropriate travel documents to cross the border at a port of entry only as quickly as the port can safely and humanely process their applications for admission in accordance with federal law—violates the INA, the Fifth Amendment, and the non-*refoulement* obligations of various treaties and international agreements. *Id.* ¶¶ 244–303.

The Extraterritorial Plaintiffs' APA claims fail as a matter of law. Nothing in the INA, the Fifth Amendment, or the cited treaties provides individuals in Mexico who lack appropriate travel documents with a right to cross the border upon demand. The Executive has inherent and express statutory authority to control the flow of travel across the border, and this authority may be exercised based on operational constraints and safety concerns. *See, e.g.*, 6 U.S.C. § 202(2), (8); 8 U.S.C. § 1103(a)(1), 8 U.S.C. § 1103(a)(3). The Extraterritorial Plaintiffs' APA claims based on the INA, Fifth Amendment, and cited treaties must accordingly be dismissed under Rule 12(b)(6).

### A. The Extraterritorial Plaintiffs' Section 706(1) Claims Fail Because the INA Does Not Apply to Individuals in Mexico.

The Extraterritorial Plaintiffs claim that metering reflects Defendants'

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

failure to "to take actions mandated" by the INA at 8 U.S.C. §§ 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(2)(A) and 8 C.F.R. § 235.3(b)(4). ECF No. 189 ¶¶ 256–69; 5 U.S.C. § 706(1). They are incorrect. Section 706(1) allows a court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), but the Extraterritorial Plaintiffs must first show "that an agency failed to take a *discrete* agency action that it is *required* to take." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004); *Hells Canyon Preservation Council v. U.S. Forest Service*, 593 F.3d 923, 932 (9th Cir. 2010). Although the Court already ruled that the Territorial Plaintiffs and the putative class members they seek to represent (*i.e.*, aliens without appropriate travel documents who allegedly cross the border and indicate an intention to apply for asylum or a fear of persecution to a CBP officer but are escorted back to Mexico without further process) have identified such nondiscretionary duties, *see* ECF No. 166 at 34–41, that decision cannot be understood to apply here: the Territorial Plaintiffs were physically present in the United States when the INA was allegedly violated, but the Extraterritorial Plaintiffs were not. *See* ECF No. 166 at 5–7, 34–37; ECF No. 189 ¶¶ 50–83, 153–202.

This distinction is critical. The plain text of the relevant statutes and regulations make clear that CBP's duties to "inspect," "refer," or "detain" an alien are triggered *only* if the alien is on American soil. Section 1158(a)(1)[3] states:

> Any alien who is *physically present in* the United States or who *arrives in* the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or,

---

[3] Although the Extraterritorial Plaintiffs do not cite section 1158(a)(1) as a basis for their section 706(1) claims, they raise it as part of their independent INA claims. *See* ECF No. 189 ¶¶ 245, 256–69. Defendants address it here for completeness, but note that the Court has already ruled that it "likely could not compel relief" under this provision. ECF No. 166 at 36 n.12.

DEFS' MEMO. IN SUPPORT OF MOT. TO PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1) (emphasis added); *Sale v. Haitian Ctrs. Council, Inc.*, 509
U.S. 155, 162 n.11 (1993); *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1062
(9th Cir. 2017) ("The Attorney General may, in his discretion, grant asylum to
applicants *in the United States* who meet the definition of 'refugee' under 8 U.S.C.
§ 1101(a)(42)(A)." (emphasis added)). None of the Extraterritorial Plaintiffs
alleges he or she was "physically present in" the United States or had "arrive[d] in"
the United States when subjected to Defendants' alleged conduct. *See* ECF No.
189 ¶¶ 83, 85–86, 93–94, 95–97, 98–102, 103–05,[4] 153–202. Defendants thus had
no duty to the Extraterritorial Plaintiffs under section 1158(a)(1) that they failed to
carry out, so section 1158(a)(1) cannot form the basis of a cognizable section
706(1) claim.

Section 1225(a)(3) requires immigration officers to "inspect[]" "[a]ll
aliens . . . who are applicants for admission or otherwise seeking admission or
readmission to or transit through the United States." 8 U.S.C. § 1225(a)(3). But the
Extraterritorial Plaintiffs, because they were not physically present within the
United States, were not "applicants for admission" at the time of their alleged
injuries, nor were they "seeking admission" in the manner prescribed by statute
and regulation. *See* 8 U.S.C. § 1225(a)(1) ("An alien *present in the United States*
who has not been admitted or who arrives *in the United States* (whether or not at a
designated port of arrival . . . ) shall be deemed for purposes of this chapter an
applicant for admission." (emphasis added)); 8 C.F.R. § 235.1(a) (an application
"to lawfully enter the United States shall be made in person to a U.S. immigration
officer *at a U.S. port-of-entry*" (emphasis added)); ECF No. 189 ¶¶ 83, 85–86, 93–

---

[4] César alleges he experienced a "racially discriminatory denial[] of access," ECF
No. 189 ¶¶ 103–05, 198, but those allegations are raised against only Mexican
government officials acting in Mexico. Mexico is not a defendant, and so those
allegations do not form the basis of any cognizable legal claim.

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

94, 95–97, 98–102, 103–05, 153–202. Thus, Defendants had no duty to the Extraterritorial Plaintiffs under section 1225(a)(3) that they failed to carry out, so section 1225(a)(3) cannot form the basis of a cognizable section 706(1) claim.

Section 1225(b)(1) states:

> If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving *in the United States* or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added); *id.* § 1225(a)(1). But none of the Extraterritorial Plaintiffs alleges he or she had "arriv[ed] in the United States" at the time of his or her alleged injuries. *See* ECF No. 189 ¶¶ 83, 85–86, 93–94, 95–97, 98–102, 103–05, 153–202. Defendants accordingly had no duty to the Extraterritorial Plaintiffs under section 1225(b)(1) that they failed to carry out, so section 1225(b)(1) cannot form the basis of a cognizable section 706(1) claim.

Section 1225(b)(2)(A) states:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A). An applicant for admission is "[a]n alien present in the United States." *Id.* § 1225(a)(1); *see also* 8 C.F.R. § 235.1(a) (An application "to lawfully enter the United States shall be made in person to a U.S. immigration officer *at a U.S. port-of-entry*." (emphasis added)). The Extraterritorial Plaintiffs do not allege they were present in the United States, which means they were not "applicants for admission" at the time of their alleged injuries. *See* ECF No. 189 ¶¶ 83, 85–86, 93–94, 95–97, 98–102, 103–05, 153–202. Defendants therefore had

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

no duty to the Extraterritorial Plaintiffs under section 1225(b)(2) that they failed to carry out, so section 1225(b)(2) does not form the basis of a cognizable section 706(1) claim.

Finally, the regulation at section 235.3(b)(4) states in relevant part:

> If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 C.F.R. § 208.30.

8 C.F.R. § 235.3(b)(4). The expedited removal provisions apply to certain aliens who entered without inspection, which Plaintiffs do not allege they did, and to certain "arriving aliens." 8 C.F.R. § 235.3(b)(1). The regulations define an "arriving alien" as:

> an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport.

8 C.F.R. § 1.2; *see also* 8 U.S.C. § 1225(a)(1) ("An alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission."). This definition does not include an alien who is physically outside the United States, like the Extraterritorial Plaintiffs. *See Sale*, 509 U.S. at 173 (explaining that "there is no provision in the [INA] for the conduct of [deportation and former exclusion] proceedings outside the United States"); *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1081 (9th Cir. 2011) ("The expedited removal statute, § 1225(b)," applies "when an alien seeks admission to the United States *after* arriving at a port of entry . . . ." (emphasis added)). Rather, as the regulation says, an "arriving alien"

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

is an "applicant for admission" *at a port of entry*, all of which are located within the territorial United States. 8 C.F.R. §§ 1.2, 235.3(b)(4); 8 U.S.C. § 1225(a)(1). The Extraterritorial Plaintiffs allege they were outside the United States at the time of their alleged injuries, which means they were not subject to the expedited removal provisions under section 235.3(b)(4), which means Defendants had no duty to them that they failed to carry out. *See* 8 C.F.R. § 235.3(b)(4); ECF No. 189 ¶¶ 83, 85–86, 93–94, 95–97, 98–102, 103–05, 153–202. Section 235.3(b)(4) does not form the basis of a cognizable section 706(1) claim.

In sum, the Extraterritorial Plaintiffs were not physically in the United States at the time of their alleged injuries. *See* ECF No. 189 ¶¶ 83, 153–202. They were therefore not "applicants for admission," or "arriving aliens," or otherwise "subject to the expedited removal provisions" of the INA, which means that Defendants' duties to "inspect[]," "refer," or "detain" them had not been triggered. The Extraterritorial Plaintiffs therefore fail as a matter of law to state any cognizable claims for relief under section 706(1), so those claims must be dismissed under Rule 12(b)(6). *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

## B. The Extraterritorial Plaintiffs' Section 706(2) Claims Fail Because Metering is Lawful.

The Extraterritorial Plaintiffs claim Defendants, by metering, have exceeded the scope of their statutory authority and acted without observance of procedures required by law. ECF No. 189 ¶¶ 224, 270–82 (citing 5 U.S.C. § 706(2)(C), (D)). They are incorrect. Defendants have the inherent and statutory authority to control the flow of travel across the border.

As a matter of first principles, the authority to control the flow of travel across the border is rooted in the Federal Government's "undoubted[]" power "to exclude aliens from the country" in the first place. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973). As the Supreme Court has explained, "this power can be effectuated by routine inspections and searches of individuals or

conveyances seeking to cross our borders." *Id.* "Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in[.]" *Carroll v. United States*, 267 U.S. 132, 154 (1925). Controlling the manner and pace of travel across the border is thus "a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936), and *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893)); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953); *Kleindienst v. Mandel*, 408 U.S. 753, 765–67 (1972); *Galvan v. Press*, 347 U.S. 522, 531 (1954); *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892); *Chae Chan Ping v. United States*, 130 U.S. 581, 604 (1889) ("Jurisdiction over its own territory . . . is an incident of every independent nation. It is a part of its independence."); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004).

Congress has also vested this authority in Defendants by statute. *See Knauff*, 338 U.S. at 543; *Cunningham v. Neagle*, 10 S. Ct. 658, 667–69 (1890). Relevant here, Congress has "charged" the Secretary of Homeland Security with "the administration and enforcement of [Title 8, Chapter 12] and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). The Secretary "shall . . . perform such other acts as [she] deems necessary for carrying out" that authority. *Id.* § 1103(a)(3). This power is "extremely broad." *United States v. Chen*, 2 F.3d 330, 333 (9th Cir. 1993). Congress has also made the Secretary responsible for "[s]ecuring the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States, including managing and coordinating those functions transferred to the Department [of Homeland Security] at ports of entry." 6 U.S.C. § 202(2). "In

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

carrying out [these] responsibilities," the Secretary is responsible for "ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce." *Id.* § 202(8).

Section 1103(a)(3)'s "such other acts" provision and section 202's "port management" and "orderly traffic" provisions allow CBP to permit an alien without appropriate travel documentation to cross the border only if the port has the capacity to safely and humanely process her application for admission and hold her for further proceedings. 8 U.S.C. § 1103(a)(3); 6 U.S.C. § 202(2), (8); *Chen*, 2 F.3d at 333. As noted, port management is a complex task that is dependent on a number of dynamic factors. *See supra* at pp. 1–5. CBP necessarily could not "secure" or "manage" a port if, in addition to its other mission responsibilities, *any* alien without appropriate travel documents could cross the border whenever she chooses and immediately trigger Defendants' statutory duties to "inspect[]," "refer," or "detain[]" her under section 1225. *See, e.g.*, Ex. 2, at 1 ("The significant volume of arriving undocumented travelers has surpassed the physical capacity of the port and has resulted in a tremendous strain on all available local resources, to include personnel."); TEDS §§ 4.1–4.16; *see also* 6 U.S.C. § 202(1)–(8) (setting forth the Secretary's additional border, maritime, and transportation responsibilities); 8 U.S.C. § 1103(a)(1) ("charg[ing]" the Secretary "with the administration and enforcement of . . . all other laws relating to the immigration . . . of aliens"); Aki Decl. ¶¶ 5–6. Section 202 and section 1103(a)(3) especially authorize CBP officers to keep the ports from being overwhelmed by an unsafe number of pedestrians entering at a given time. *See Chen*, 2 F.3d at 333. The Extraterritorial Plaintiffs are simply incorrect that metering is *ultra vires*, exceeds the scope of Defendants' authority, or occurs without observance of procedures required by law.[5] *See* ECF No. 189 ¶¶ 224, 270–82. Their section

---

[5] A number of other provisions, while not controlling or directly applicable to the issues presented in this case, contemplate the Government's authority to control

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

706(2) claims are insufficient as a matter of law and must be dismissed under Rule

12(b)(6). *See Navarro*, 250 F.3d at 732.

      The Extraterritorial Plaintiffs also make no attempt in their legal background section to square the breadth of Defendants' authority to meter under these statutes with the APA's prohibition on judicial review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see* ECF No. 189 ¶¶ 203–35. As noted, the statutes governing Defendants' responsibility and authority to control the flow of traffic across the border are "extremely broad." *Chen*, 2 F.3d at 333. Sections 1103(a) and 202 do not set forth any "unified process" by which the Secretary must make border management decisions, nor do they require the consideration of any specific "relevant factors" in making such decisions, nor do they offer any other standard against which such decisions may be evaluated. *See Weyerhaueser Co. v. U.S. Fish and Wildlife Service*, 586 U.S. — , 2018 WL 6174253, at *9–10 (2018). They simply lay out the Secretary's responsibilities,

---

the manner and pace of border crossings, which further rebuts the assertion that metering is *ultra vires*. *See, e.g.*, 19 U.S.C. § 2 (authorizing the Secretary "from time to time, as the exigencies of the service may require, to rearrange, by consolidation or otherwise, the several customs-collection districts and to discontinue ports of entry by abolishing the same or establishing others in their stead"); *id.* § 1318(b)(2) ("Notwithstanding any other provision of law, the Commissioner of U.S. Customs and Border Protection, when necessary to respond to a specific threat to human life or national interests, is authorized to close temporarily any Customs office or port of entry or take any other lesser action that may be necessary to respond to the specific threat."); 8 C.F.R. § 100.4 (establishing different classes of ports of entry as open to only certain classes of aliens and authorizing the Commissioner, "whenever, in [his] judgment . . . , such action is warranted," to withdraw such designations): 8 U.S.C. § 1325 (establishing criminal penalties for "[a]ny alien" who, *inter alia*, "enters or attempts to enter the United States at any time or place *other than as designated by immigration officers*" (emphasis added)). Again, these provisions have not been invoked here, but they rest on the necessary premise that the Federal Government may dictate the manner and pace of border traffic.

14     DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

authorities, and duties, and, where relevant, require the Secretary to "perform such other acts" if she deems them "necessary for carrying out [her] authority." 8 U.S.C. §§ 1103(a)(1), 1103(a)(3); 6 U.S.C. § 202(2), (8). The record before the Court shows clearly that the Secretary and her designees have deemed it necessary to manage the flow of pedestrian traffic when port resources are strained. *See* Ex. 1, at 1; Ex. 2, at 2–3; Ex. 3, at 1–2; Ex. 4, at 1–2; Ex. 6, at 1; TEDS §§ 4.1–4.16. The statutes themselves are drawn so broadly—and, as it pertains to the Extraterritorial Plaintiffs, are not otherwise bounded by the cited provisions of the INA, *see supra* at I.A—that there is no other "law to apply" to evaluate whether such a determination is lawful. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971); *cf. Chen*, 2 F.3d at 334 (explaining that "[i]t is apparent from the face of section 1103(a) and (b) that if the [Secretary] deemed it necessary, she could, by herself, undertake an undercover investigation of the type involved here, as long as her actions *did not directly contravene* any constitutional provision"). Thus, metering determinations are unreviewable under the APA. 5 U.S.C. § 701(a)(2).

### C. The Extraterritorial Plaintiffs' Section 706(2) Claims Fail Because Defendants' Have Not Taken Final Agency Action.

The Extraterritorial Plaintiffs' section 706(2) claims fail for the independent reason that the SAC does not show any final agency action to "deny" anyone the opportunity to cross the border at a port of entry. *See* 5 U.S.C. § 704; ECF No. 166 at 49–55. Taking the Extraterritorial Plaintiffs' factual allegations as true, the SAC and the documents incorporated by reference show that that Defendants *have not* sanctioned a "widespread pattern or practice of denying and unreasonably delaying asylum seekers' access to the asylum process" and *do not* have a "formal" policy of "directly or constructively turn[ing] back asylum seekers at the border contrary to U.S. law." ECF No. 189 ¶¶ 3, 258. Rather, as Secretary Nielsen stated, the ports "*will* process [aliens without appropriate travel documents] as [they] can . . . . Once [such persons] come into the United States, [Defendants] process them." *Id.* ¶ 65

DEFS' MEMO. IN SUPPORT OF MOT. TO PARTIALLY DISMISS SECOND AM. COMPL. Case No. 3:17-cv-02366-BAS-KSC

(emphasis added); *see also id.* ¶ 68 n.56 ("We're not denying people approaching the U.S border without documents. We're asking them to come back when we have the capacity to manage them."); Ex. 1, at 2 ("SYS CBP personnel are not denying anyone requesting asylum, however are directing potential applicants to Pedwest to ensure a timelier and efficient intake process."); Ex. 6, at 1 ("All foreign nationals seeking a benefit [at a port of entry within the Laredo Field Office's area of responsibility] are given an appointment window to return for processing. (*Processing is not denied to any applicant*)." (emphasis added)); OIG Report at 6 ("When the ports of entry are full, CBP guidance states that officers should inform individuals that the port is currently at capacity and that *they will be permitted to enter once there is sufficient space and resources to process them*." (emphasis added)).

The Extraterritorial Plaintiffs point to a limited selection of "Defendants' own statements and communications" in support of their assertion that Defendants "ordered" and "implement[ed]" a formal, final "Turnback Policy." ECF No. 189 ¶ 274; *see id.* ¶ 51 (citing Ex. 1, at 1); *id.* ¶ 52 (citing Ex. 2, at 1–3); *id.* ¶ 53 (citing Ex. 3, at 1); *id.* ¶ 55 (citing Ex. 4, at 1–2). But those documents and public statements do not show "an agency policy applicable to all CBP officials at POEs along the U.S.-Mexico border." ECF No. 166 at 50. They show, rather, that Defendants are managing the ports of entry in a safe and humane manner in light of their operational capacities. *See* Ex. 1, at 1; Ex. 2, at 1–3; Ex. 3, at 1; Ex. 4, at 1–2. The Extraterritorial Plaintiffs "have attached a 'policy' label to their own amorphous description of the [CBP's] practices. But a final agency action requires more." *Bark v. U.S. Forest Service*, 37 F.Supp.3d 41, 50 (D.D.C. 2014); *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 870, 890 (1990) ("The term 'land withdrawal review program' (which as far as we know is not derived from any authoritative text) does not refer to a single [Bureau of Land Management] order or regulation, or even to a completed universe of particular BLM orders and regulations. It is

simply the name by which petitioners have occasionally referred to the continuing
(and thus constantly changing) operations of the BLM in reviewing withdrawal
revocation applications and the classifications of public lands and developing land
use plans as required by the FLPMA. It is no more an identifiable 'agency
action'—much less a 'final agency action'—than a 'weapons procurement
program' of the Department of Defense or a 'drug interdiction program' of the
Drug Enforcement Administration."); *cf. Lightfoot v. District of Columbia*, 273
F.R.D. 314, 326 (D.D.C. 2011) ("The question is not whether a constellation of
disparate but equally suspect practices may be distilled from the varying
experiences of the class; rather, Plaintiffs must first identify the 'policy or custom'
they contend violates [the law] and then establish that the 'policy or custom' is
common to the class."). That the Extraterritorial Plaintiffs have selectively
presented Defendants' public statements and internal documents under a
"Turnback Policy" label is not enough for the Court to plausibly infer that there is
"an agency policy applicable to all CBP officials at POEs along the U.S.-Mexico
border" to "deny access to the asylum process." ECF No. 166 at 50; *see also
Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680 (2009) (a broad legal conclusion
"couched as a factual allegation" is "not entitled to the assumption of truth").

  Further, any individual instances of metering do not constitute final agency
actions to "deny" anyone the opportunity to cross the border at a port of entry and
apply for admission. The Extraterritorial Plaintiffs' allegations show only that an
alien without appropriate travel documents may be required to wait in Mexico for a
limited amount of time until resource constraints at the port allow her to cross and
present an application for admission in an orderly manner. *See, e.g.*, ECF No. 189
¶ 3 (alleging the existence of a "'metering,' or *waitlist*, system" and that
individuals are instructed to "*wait* . . . until there is adequate space" (emphasis
added). That such an individual may be required to "wait" does not mean the
agency has reached "the 'consummation' of [its] decisionmaking process," nor is it

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

1   an action "by which 'rights or obligations have been determined,' or from which

2   'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997);

3   *cf. Beshir v. Holder*, 10 F.Supp.3d 165, 173 (D.D.C. 2014) ("[T]o the extent that

4   Beshir argues that the delay represents a 'refusal' to adjudicate her application,

5   thus proffering a possibly nondiscretionary action over which the Court could have

6   jurisdiction, her argument is unavailing."). It may be a delay *until* final agency

7   action can be taken, but challenges to "the manner and pace of agency compliance

8   with . . . congressional directives is not contemplated by the APA." *Norton*, 542

9   U.S. at 67. Metering is not a final agency action, so the Extraterritorial Plaintiffs'

10  section 706(2) claims must be dismissed under Rule 12(b)(6). *Navarro*, 250 F.3d at

11  732; *Navajo Nation v. Dept. of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017)

12  ("§ 704's requirement that to proceed under the APA, agency action must be final

13  or otherwise reviewable by statute is an independent element without which courts

14  may not determine APA claims.").

### D. The Extraterritorial Plaintiffs Fail to State Due Process Claims.

16      The Extraterritorial Plaintiffs claim a protected Fifth Amendment interest in

17  certain INA provisions and argue that Defendants' practice of metering violates

18  their right to procedural due process. ECF No. 189 ¶¶ 225–26, 283–93 (claiming

19  "the right to be processed at a POE and granted meaningful access to the asylum

20  process" under 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii),

21  1225(b)(1)(B), and 1225(b)(2), and 8 C.F.R. § 235.3(b)(4)); *see Goss v. Lopez*, 419

22  U.S. 565, 572 (1975) ("Protected interests . . . are normally not created by the

23  Constitution. Rather, they are created and their dimensions defined by an

24  independent source such as state statutes or rules entitling the citizen to certain

25  benefits." (internal quotation marks omitted)). But the Fifth Amendment does not

26  apply to aliens outside the United States, particularly where they do not allege they

27  have any previous voluntary connection to the United States. *United States v.*

28  *Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) ("[O]ur rejection of extraterritorial

application of the Fifth Amendment [in *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950),] was emphatic[.]"). Even if the Fifth Amendment applied, "the protections of the Due Process Clause . . . extend only as far the plaintiffs' statutory rights," *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1001 (9th Cir. 1998), and the Extraterritorial Plaintiffs have no statutory rights while outside the United States. *Supra* at I.A. Their due process claim fails as a matter of law.

The Due Process Clause states that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Clause's reference to "person[s]," while broad, does not include non-resident aliens outside the United States. *Eisentrager*, 339 U.S. at 770–71. It is an "undoubted proposition that the Constitution does not create, nor do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory." *Verdugo-Urquidez*, 494 U.S. at 275 (Kennedy, J. concurring); *Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001). Certainly, when the government "reaches out" to take action against "a *citizen* who is abroad," that citizen does not lose his constitutional protections simply because he is in a different country. *Reid v. Covert*, 354 U.S. 1, 6 (1957) (emphasis added). But no such presumption exists for aliens abroad who do not allege any connection to the United States. *See Eisentrager*, 339 U.S. at 770. Although aliens "ha[ve] been accorded a generous and ascending scale of rights as [they] increase[] [their] identity with our society," the Supreme Court, "in extending constitutional protections beyond the citizenry, . . . has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act." *Id.* at 770, 771. While the question whether the Constitution applies extraterritorially generally "turn[s] on objective factors and practical concerns, not formalism," or on whether the individual has a "significant voluntary connection" to the United States, *see Ibrahim v. Dept. of Homeland Security*, 669 F.3d 983, 997 (9th Cir. 2012) (citing *Boumediene v. Bush*, 553 U.S.

19

723, 764 (2008), and *Verdugo-Urquidez*, 494 U.S. 259), the Supreme Court's rejection of Plaintiffs' due process argument has been "emphatic": the Fifth Amendment does not apply to aliens outside the United States. *Verdugo-Urquidez*, 494 U.S. at 269; *Zadvydas*, 533 U.S. at 694; *Mezei*, 345 U.S. at 215; *Wong Wing v. United States*, 163 U.S. 228, 238 (1896); *cf. Knauff*, 338 U.S. at 542 ("[A]n alien who seeks admission to this country may not do so under any claim of right.").

Neither the Supreme Court's other decisions pertaining to the constitutional rights of aliens in the United States nor the Ninth Circuit's *Ibrahim* decision mandate a different conclusion. In *Verdugo-Urquidez*, a case about whether the Fourth Amendment applies to the search and seizure of property located abroad and owned by a nonresident alien, the Supreme Court explicitly rejected the argument that its decisions in *Plyler v. Doe*, 457 U.S. 202 (1982), *Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953), *Bridges v. Wixon*, 326 U.S. 135 (1954), *Russian Volunteer Fleet v. United States*, 282 U.S. 481 (1931), *Wong Wing*, 163 U.S. 228, and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), showed that the Fourth Amendment applied to the search of the respondent's property abroad. *Verdugo-Urquidez*, 494 U.S. at 270–71. Those decisions, the Court explained, "establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial ties with this country." *Id.* at 271. The respondent, however, was "an alien who has had no previous significant voluntary connections with the United States, so these cases avail him not." *Id.* The Court saw no reason to deviate from its "emphatic" "rejection of extraterritorial application of the Fifth Amendment." *Id.* at 269 (citing *Eisentrager*, 339 U.S. at 770). The Extraterritorial Plaintiffs similarly do not claim they have any "previous significant voluntary connection with the United States," and so the Fifth Amendment does not apply. *See id.*; ECF No. 189 ¶¶ 50–83, 153–202.

In *Ibrahim*, the Ninth Circuit considered whether the plaintiff, a Malaysian citizen who was lawfully present in the United States as a Ph.D. student at Stanford

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

University, could raise a Fifth Amendment challenge to her placement on the Government's terrorist watch lists after she had flown to Kuala Lumpur for an academic conference. *Ibrahim*, 669 F.3d 983. The Government argued that the plaintiff had forfeited that option by voluntarily leaving the United States. *Id.* at 996. But the panel explained that "[u]nder *Verdugo-Urquidez*, the inquiry is whether the alien has voluntarily established a connection with the United States, not whether the alien has voluntarily left the United States." *Id.* The plaintiff's Fifth Amendment challenge could therefore proceed, despite her lack of physical presence. *Id.* at 997. The Extraterritorial Plaintiffs, in contrast, do not allege they had any previous "significant voluntary connection" to the United States at the time they were allegedly subjected to metering. *See* ECF No. 189 ¶¶ 153–202. Thus, the Fifth Amendment did not apply to them under *Verdugo-Urquidez* or *Ibrahim* at the time of their alleged injuries.

Even assuming *arguendo* that the Fifth Amendment applied to the Extraterritorial Plaintiffs while they were outside the United States, they still fail to state a cognizable Fifth Amendment claim. Where plaintiffs premise their procedural due process challenge on having a protected interest in a statutory entitlement, "the protections of the Due Process Clause . . . extend only as far as the plaintiffs' statutory rights." *Graham*, 149 F.3d at 1001; *id.* at 1001 n.2; *Stanley v. Gonzalez*, 476 F.3d 653, 660 (9th Cir. 2007) ("To assert a procedural due process claim under the Fifth Amendment, a plaintiff must first establish a constitutionally protected interest. The plaintiff must have more than a unilateral expectation of it; instead, she must have a legitimate claim of entitlement."); *see Goss*, 419 U.S. at 572. The Extraterritorial Plaintiffs here claim protected interests in being "processed at a POE and granted meaningful access to the asylum process" according to 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), 1225(b)(2), and 8 C.F.R. § 235.3(b)(4). ECF No. 189 ¶¶ 226, 283–93. But as explained above, those statutory provisions do not apply to aliens

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

abroad. *See supra* at I.A. The Extraterritorial Plaintiffs do not claim a protected
interest in any other independent sources from which a protected interest might be
discerned. *See Goss*, 419 U.S. at 572; ECF No. 189 ¶¶ 225–26, 283–93. Thus, even
if the Fifth Amendment applied to them, any Extraterritorial Plaintiff who was
prevented from immediately crossing the border at the time and place of his or her
choosing was not deprived of a protected interest at all. *See* ECF No. 189 ¶¶ 153–
202; *Kerry v. Din*, 135 S. Ct. 2128, 2132 (2015) (Scalia, J., plurality) ("Although
the amount and quality of process that [the Supreme Court's] precedents have
recognized as 'due' under the Clause has changed considerably since the founding,
it remains the case that *no* process is due if one is not deprived of 'life, liberty, or
property.'" (internal citations omitted)); *Serra v. Lappin*, 600 F.3d 1191, 1196 (9th
Cir. 2010) ("[T]he Due Process Clause protects only against deprivation of existing
interests in life, liberty or property."). The Extraterritorial Plaintiffs fail as a matter
of law to state a procedural due process claim under the Fifth Amendment. *See*
Fed. R. Civ. P. 12(b)(6); *Navarro*, 250 F.3d at 732.

**E. The Extraterritorial Plaintiffs Fail to State INA Claims or Non-
*Refoulement* Claims.**

The Extraterritorial Plaintiffs argue that Defendants' alleged conduct is
independently actionable under various provision of the INA and Defendants' non-
*refoulement* obligations under the Convention Relating to the Status of Refugees,
July 28, 1951, 189 U.N.T.S. 150 ("1951 Convention"), the Protocol Relating to the
Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267 ("1967 Protocol"), the
International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S.
171 ("ICCPR"), the Convention Against Torture and Other Cruel, Inhuman or
Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 114 ("CAT"),
and the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980). ECF No.
189 ¶¶ 244–255, 294–303. Plaintiffs also assert that "Defendants' conduct is
actionable under the Alien Tort Statute, 28 U.S.C. § 1350, which authorizes

DEFS' MEMO. IN SUPPORT OF MOT. TO
                                  PARTIALLY DISMISS SECOND AM. COMPL.
                                  Case No. 3:17-cv-02366-BAS-KSC

declaratory and injunctive relief." *Id.* ¶ 298.

Neither their INA claims nor the non-*refoulement* claims are actionable as presented. As Court already ruled, Plaintiffs "may not" seek judicial review of Defendants' conduct "independently" of the APA's judicial review framework. ECF No. 166 at 44; *see id.* at 31 ("The Complaint asserts two APA claims against the Defendants."); *id.* at 34–41 (evaluating Plaintiffs' independent INA claim under the APA's section 706(1) framework). Thus, the Extraterritorial Plaintiffs' INA claims must be evaluated under the APA, as the Court described, or not at all. *Id.* at 31; *see Webster v. Doe*, 486 U.S. 592, 607 n.* (1988) (Scalia, J., dissenting) ("While a right to seek judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless *explicitly* excluded."); *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000) (citing Justice Scalia's *Webster* dissent approvingly and ruling that "§ 706 of the APA functions as the default judicial review standard"); ECF No. 166 at 45. Those INA claims fail for the reasons discussed above. *Supra* at I.A.

The Extraterritorial Plaintiffs' non-*refoulement* claims also fail as a matter of law because the United States does not have a non-*refoulement* obligation to aliens outside its borders. *Sale*, 509 U.S. at 180–87. As to the treaties themselves, neither the 1967 Protocol, the ICCPR, nor the CAT are self-executing, which means none of them is independently enforceable.[6] *See Medellin v. Texas*, 552 U.S. 491, 505 n.2 (2008); *Sluss v. U.S. Dept. of Justice, Int'l Prisoner Transfer Unit*, 898 F.3d 1242, 1249 (D.C. Cir. 2018) ("Non-self-executing treaties are much like federal statutes that do not supply a private cause of action."); *see also Yuen Jin v.*

---

[6] The United States has never acceded to the 1951 Convention, *see I.N.S. v. Stevic*, 467 U.S. 407, 416 n.9 (1984), which means it is enforceable only to the extent that the 1967 Protocol is enforceable. Plaintiffs seem to acknowledge this. *See* ECF No. 189 ¶ 230.

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

*Mukasey*, 538 F.3d 143, 159 (2d Cir. 2008) ("[E]ven if treaties were self-executing, there is a strong presumption against inferring individual rights from international treaties."). The 1967 Protocol "is not self-executing" and therefore "does not have the force of law in American courts." *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009). The ICCPR neither "confer[s] individual rights," nor is it self-executing, and it therefore "d[oes] not itself create obligations enforceable in the federal courts." *Serra*, 600 F.3d at 1196–97. The CAT "is not self-executing and by itself does not have the status of law within the United States."[7] *Barapind v. Gov't of Republic of India*, 844 F.3d 824, 831 (9th Cir. 2016).

Further, while the Refugee Act of 1980 allows the Attorney General, and subsequently the Secretary, to grant asylum to aliens physically present or arriving in the United States, such claims may be adjudicated only defensively before an immigration judge or affirmatively before USCIS. *See* Refugee Act of 1980, Pub L. No. 96-212, § 201(b); 8 U.S.C. § 1252(a)(4); *Dhakal v. Sessions*, 895 F.3d 532, 536–37 (7th Cir. 2018) (overview of affirmative and defensive asylum claims); ECF No. 189 ¶ 232. Thus, the Refugee Act of 1980 does not provide Plaintiffs any independent cause of action enforceable in this Court. *Sale*, 509 U.S. at 172–74 (explaining that "there is no provision in the [INA] for the conduct of [removal and former exclusion] hearings outside the United States"); *id.* at 175–76 (Refugee Act of 1980 "did nothing to change the presumption that [covered] aliens would . . . be found only within United States territory"). Neither the cited treaties nor the

---

[7] Article 3 of the CAT has been implemented domestically by regulation. *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No, 105-277, Div. G., Title XXII, § 2242(b), 112 Stat. 2681 (1998) (codified at 8 U.S.C. § 1231 note). But those regulations state that "there shall be no judicial appeal or review of any action, decision, or claim raised under the [CAT] . . . except as part of the review of a final order of removal pursuant to section 242 of the [INA]." 8 C.F.R. § 208.18(e)(1); *id.* § (e)(2); *see also* 8 U.S.C. § 1252(a)(4). Thus, the CAT does not create any cause of action enforceable in this Court.

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

Refugee Act of 1980 provides the Extraterritorial Plaintiffs with a private cause of action enforceable in this Court. Any claim for relief based upon them must be dismissed under Rule 12(b)(6). *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988) ("Dismissal [under Rule 12(b)(6)] can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.").

Finally, the Alien Tort Statute has no bearing on this case. The ATS gives district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. But the Extraterritorial Plaintiffs have not brought a civil action for a tort, and so the ATS does not give the Court jurisdiction over their claims. *See* ECF No. 189 ¶¶ 244–303; *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004) (referring to the ATS as "strictly jurisdictional"); *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011) (noting the ATS "has been interpreted as a jurisdiction statute only"). Even if the Extraterritorial Plaintiffs had raised tort claims, Defendants' alleged conduct does not come close to the type of egregious "violations of the law of nations" even potentially within the ATS's grant of jurisdiction. *Compare, e.g.*, *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) (allowing wrongful death claim to proceed against Paraguayan police supervisor alleged to have "deliberate[ly] tortured" an individual in Paraguay "under color of official authority"). Thus, the Extraterritorial Plaintiffs are incorrect that the ATS confers the Court with jurisdiction over any part of the SAC.

## II. The Political Question Doctrine Precludes Consideration of Defendants' Coordination with a Foreign Nation to Regulate Border Crossings.

All Plaintiffs allege that Defendants have coordinated with the government of Mexico to "prevent" individuals in Mexico from crossing into the United States. *See* ECF No. 189 ¶¶ 3, 7, 50–83. Although it is unclear whether Plaintiffs intend to predicate any of their claims on these allegations specifically, their requests for

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

1   relief, if granted, would prohibit Defendants from "coordinating" with Mexican

2   government officials as they carry out their statutory responsibility to manage the

3   flow of traffic across the border. *See, e.g.*, ECF No. 189 ¶¶ 50–60 (alleging

4   "collaboration with the Mexican government" as part of the alleged "Turnback

5   Policy") *and* ¶¶ 304.f (requesting an order enjoining Defendants "from continuing

6   to implement the Turnback Policy").

7          Such allegations and the corresponding relief Plaintiffs seek are squarely

8   predicated on a political question: whether and to what extent it is lawful for the

9   United States to (allegedly) collaborate with the government of Mexico to control

10  the flow of travel across the countries' shared border. *E.g. id.* ¶ 7. That question

11  falls within the political question doctrine, and all claims and requests for relief

12  that would require resolution of that question are outside the Court's jurisdiction.[8]

13  *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir. 2007).

14         The political question doctrine "excludes from judicial review those

15  controversies which revolve around policy choices and value determinations

16  constitutionally committed for resolution to the halls of Congress or the confines of

17  the Executive Branch," *Japan Whaling Ass'n v. American Cetacean Society*, 478

18  U.S. 221, 230 (1986), as well as the "specific tactical measures allegedly taken" to

19  implement those policy choices, *Bancoult v. McNamara*, 445 F.3d 427, 436 (D.C.

20  Cir. 2006) ("[J]ust as we cannot review the decision to establish a base in the

21  ─────────────────

22  [8] Plaintiffs also allege the government of Mexico has acted unlawfully. *See, e.g.*,
    ECF No. 189 ¶¶ 44–45, 52–54, 74–75, 83, 96–97, 110, 156–59, 163–68, 175–76,

23  186, 197–200. But Mexico is not a defendant. Even if it were, the act of state

24  doctrine bars the issuance of declaratory or injunctive relief relating to those
    allegations. *See Underhill v. Hernandez*, 168 U.S. 250, 252 (1897); *Sea Breeze*

25  *Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1069 (9th Cir. 2018) (The act of state

26  doctrine bars suit where "(1) there is an official act of a foreign sovereign
    performed within its own territory; and (2) the relief sought or the defense

27  interposed in the action would require a court in the United States to declare

28  invalid the foreign sovereign's official act.").

DEFS' MEMO. IN SUPPORT OF MOT. TO
                                   PARTIALLY DISMISS SECOND AM. COMPL.
                                   Case No. 3:17-cv-02366-BAS-KSC

Indian Ocean . . . we cannot review the manner in which that decision was carried out."). The Supreme Court has identified six independent tests, "listed in descending order of both importance and certainty," to determine whether a nonjusticiable political question exists:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962); *Alperin v. Vatican Bank*, 410 F.3d 532, 545 (9th Cir. 2005); *see Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality). Only one test, not all six, needs to be satisfied to establish the existence of a nonjusticiable political question. *bin Ali Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017); *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005).

Here, Plaintiffs' allegations and requests for relief are squarely outside the Court's jurisdiction under the first and most important *Baker* test: whether there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker*, 369 U.S. at 217. Foreign-relations matters are clearly committed by Constitution to the Executive Branch, particularly as they relate to the United States' efforts to manage the flow of travel across the border. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

1  conduct of our foreign relations.'"); *Harisiades v. Shaughnessy*, 342 U.S. 580,

2  588–89 (1952) ("It is pertinent to observe that any policy toward aliens is vitally

3  and intricately interwoven with contemporaneous policies in regard to the conduct

4  of foreign relations . . . ."); *see supra* at I.B. Plaintiffs allege that the United States

5  government has been and is "coordinating" with Mexican government officials to

6  manage border crossings. *See, e.g.*, ECF No. 189 ¶¶ 3, 7, 50–83, 86–87, 96, 98–

7  102, 108–10, 114, 116. But the decisions whether, when, why, and how to engage

8  with another country are:

> wholly confided by our Constitution to the political departments of the
> government, Executive and Legislative. They are delicate, complex,
> and involve large elements of prophecy. They are and should be
> undertaken only by those directly responsible to the people whose
> welfare they advance or imperil. They are decisions of a kind for which
> the Judiciary has neither aptitude, facilities nor responsibility and have
> long been held to belong in the domain of political power not subject to
> judicial intrusion or inquiry.

15  *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

16      In short, the Federal Government's purported coordination with a foreign

17  nation to control the flow of traffic on a shared border, including the underlying

18  tactics taken to implement that decision, is a quintessential example of a policy

19  choice that is "constitutionally committed" to a coordinate branch of government:

20  the Executive. *Japan Whaling Ass'n*, 478 U.S. at 230; *Bancoult*, 445 F.3d at 436.

21  The Court does not have jurisdiction to declare unlawful or enjoin that alleged

22  conduct under the first *Baker* test. *See Corrie*, 503 F.3d at 982.

## III.    Al Otro Lado's Claims Fail as a Matter of Law.

24      Al Otro Lado, a nonprofit legal services organization, raises Claims 1, 2, 3,

25  and 5, in its own capacity. *See* ECF No. 189 ¶¶ 17–23, 244–82, 294–303. But the

26  statutes, regulations, and treaties the organization cites pertain exclusively to

27  "aliens" or "refugees." *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii),

28  1225(b)(2); 8 C.F.R. § 235.3(b)(4); 1951 Convention, Art. 33. Al Otro Lado is

neither. *See* 8 U.S.C. § 1101(a)(3), (a)(42) (defining "alien" and "refugee" as "any *person*" who meets certain conditions (emphasis added)); 1951 Convention, Art. I.1 (defining a "refugee" as "any *person*" who meets certain conditions (emphasis added)). Thus, although the Court previously ruled that the organization has constitutional and statutory standing, all of Al Otro Lado's claims must now be dismissed under Rule 12(b)(6). *See Jafarzadeh v. Nielsen*, 321 F.Supp.3d 19, 34–35 (D.D.C. 2018) ("[T]he question whether relief is in fact available under federal law is not part of the [Article III] redressability analysis. Rather, it is part of the Rule 12(b)(6) inquiry into whether plaintiffs have a valid cause of action.").

## IV.    The Territorial Plaintiffs' Re-Pleaded Claims Fail as a Matter of Law.

The Territorial Plaintiffs raise the same two APA claims as the Extraterritorial Plaintiffs, predicated on the same provisions of law but paired with different factual allegations: they each claim that CBP failed to refer them for further proceedings *after* they allegedly crossed the border and expressed an intent to seek asylum or a fear of return, rather than being allegedly subjected to metering while physically present in Mexico. ECF No. 189 ¶¶ 119–51, 244–303. The Court already addressed a motion to dismiss relating to these five Plaintiffs, so Defendants address only briefly why dismissal of their claims is warranted.[9]

### A.  Abigail's, Beatrice's, and Carolina's Section 706(1) Claims Fail as a Matter of Law.

Abigail's, Beatrice's, and Carolina's re-pleaded section 706(1) claims

---

[9] Although the Court indicated it would be inappropriate for Defendants to reargue claims and issues already addressed in the Court's August 20 opinion outside of a timely motion for reconsideration, *see* ECF No. 188 at 2 n.1, Defendants note that they sought to preserve their right to file such a motion when Plaintiffs sought additional time to file their First Amended Complaint. *See* ECF No. 169 at 2 n.1. Defendants raise these arguments in good faith to address the Territorial Plaintiffs' claims in light of the Court's August 20 opinion and to preserve those issues for appeal.

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

should be dismissed under Rule 12(b)(6) because they allege they withdrew their applications for admission. *See* ECF No. 189 ¶¶ 119–37; 8 C.F.R. § 235.4. Where an application for admission is withdrawn, CBP no longer has a duty to "inspect[]," "refer," or "detain[]" the alien under 8 U.S.C. §§ 1225(a)(3), 1225(b)(1)(A)(ii), and 1225(b)(2)(A). *See* 8 U.S.C. § 1225(a)(4); 8 C.F.R. § 235.4; *Norton*, 542 U.S. at 64; *Hells Canyon Preservation Council*, 593 F.3d at 932. While these three Territorial Plaintiffs allege their withdrawals were obtained by coercion, they do not identify any provision of law under which CBP would continue to have a duty to "inspect," "refer," or "detain" them after their applications were withdrawn.[10] ECF No. 189 ¶¶ 203–23, 256–69. They accordingly fail to state a section 706(1) claim. *See Norton*, 542 U.S. at 64; *Hells Canyon Preservation Council*, 593 F.3d at 932.

### B. The Territorial Plaintiffs' Section 706(2) Claims Fail Because Defendants Have Not Taken Final Agency Action.

Like the Extraterritorial Plaintiffs, the Territorial Plaintiffs' section 706(2) claims fail because Defendants have not taken final agency action to "deny" anyone the opportunity to cross the border. *See* 5 U.S.C. § 704; ECF No. 166 at 49–55. The SAC and the documents incorporated by reference show that that Defendants *have not* sanctioned a "widespread pattern or practice of denying and unreasonably delaying asylum seekers' access to the asylum process." *See supra* at I.C; ECF No. 189 ¶¶ 65, 68 n.56; Ex. 2, at 2; Ex. 6, at 1; OIG Report at 6; *see also* ECF No. 166 at 50. The Territorial Plaintiffs' section 706(2) claims fare no better than before and must accordingly be dismissed for lack of final agency action. 5 U.S.C. § 704.

Defendants also note that this lack of a policy to "deny access to the asylum

---

[10] Defendants continue to maintain their position that the law requires an alien's decision to withdraw his or her application for admission to be voluntary.

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

process" and the differences in the Territorial Plaintiffs' allegations of Defendants'
"practices" shows that their claims are not amenable to classwide adjudication. *See
Lightfoot*, 273 F.R.D. at 326 ("The question is not whether a constellation of
disparate but equally suspect practices may be distilled from the varying
experiences of the class; rather, Plaintiffs must first identify the 'policy or custom'
they contend violates [the law] and then establish that the 'policy or custom' is
common to the class."); ECF No. 189 ¶¶ 85–106 (failing to allege the existence of
an overarching agency action that joins together the various "practices"). Because
the individual claims are moot and the class allegations are insufficiently pleaded
with respect to those claims, dismissal is appropriate. Defendants will address
Plaintiffs' class allegations further as appropriate.

## CONCLUSION

This is not a case about preventing aliens from entering the United States. It
is a case about CBP's exercise of its inherent and statutory authority to allow aliens
without travel documents to cross the border only if the port has the operational
capacity to process their applications for admission. CBP's alleged actions are
lawful. The Court should dismiss the SAC for the reasons stated above.

1     Dated: November 29, 2018       Respectfully submitted,

2

3                           JOSEPH H. HUNT
                           Assistant Attorney General

4                           Civil Division

5                           AUGUST E. FLENTJE

6                           Special Counsel

7                           WILLIAM C. PEACHEY

8                           Director, Office of Immigration Litigation –

9                           District Court Section

10                          GISELA A. WESTWATER

11                          Assistant Director

12                          */s/ Alexander J. Halaska*

13                          ALEXANDER J. HALASKA

14                          Trial Attorney
                          U.S. Department of Justice

15                          Office of Immigration Litigation
                          District Court Section

16                          P.O. Box 868, Ben Franklin Station

17                          Washington, D.C. 20044
                          Tel: (202) 307-8704 | Fax: (202) 305-7000

18                          alexander.j.halaska@usdoj.gov

19

20                          *Counsel for Defendants*

21

22

23

24

25

26

27

28

          DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

## <u>CERTIFICATE OF SERVICE</u>

Case No. 3:17-cv-02366-BAS-KSC

I certify that on November 29, 2018, I served a copy of the foregoing document by filing it document with the Clerk of Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all attorneys of record.

> */s/ Alexander J. Halaska*
> Alexander J. Halaska
> Trial Attorney
> United States Department of Justice
> Civil Division
> Office of Immigration Litigation – District Court Section
> P.O. Box 868, Ben Franklin Station
> Washington, D.C. 20044
> Tel: (202) 307-8704 | Fax: (202) 305-7000
> alexander.j.halaska@usdoj.gov
>
> *Counsel for Defendants*

DEFS' MEMO. IN SUPPORT OF MOT. TO
PARTIALLY DISMISS SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC