1  LATHAM & WATKINS LLP

2  ~~Wayne S. Flick (Bar No. 149525)~~
    ~~wayne.s.flick@lw.com~~

3    Manuel A. Abascal (CA Bar No. 171301)
    *manny. abascal@lw.~~com~~ corn*

4  ~~James H~~
    Michaela R. ~~Moon~~Laird (CA Bar No. ~~268215)~~

5    ~~james.moon@lw.com~~

6  ~~Kristin P. Housh (Bar No. 286651)~~
    ~~kristin.housh@lw.com~~

7  ~~Robin A. Kelley (Bar No. 287696)~~309194)
    ~~robin.kelley~~ *michaela.laird*@lw.com

8  355 South Grand Avenue, Suite 100
   Los Angeles, California 90071-1560

9  Telephone: +1.213.485.1234
   Facsimile: +1.213.891.8763

10 SOUTHERN POVERTY LAW CENTER

11    Melissa Crow (DC Bar No. 453487)
    *melissa.crow@spkenter.org*

12    (admitted pro-hac vice)
   1666 Connecticut Avenue NW

13 Suite 100 Washington, DC 20009
   Telephone: +1.202.355.4471

14 Facsimile: +1.404.221.5857

15 *Additional counsel listed on next page*

16 *Attorneys for Plaintiffs*

17

18 ~~AMERICAN IMMIGRATION~~          ~~CENTER FOR CONSTITUTIONAL~~
   ~~COUNCIL~~                       ~~RIGHTS~~

19 ~~Melissa Crow (*pro hac vice* pending)~~   ~~Baher Azmy (*pro hac vice* pending)~~
   ~~mcrow@immcouncil.org~~              ~~bazmy@ccrjustice.org~~

20 ~~Karolina Walters (*pro hac vice* pending)~~  ~~Ghita Schwarz (*pro hac vice* pending)~~
   ~~kwalters@immcouncil.org~~            ~~gschwarz@ccrjustice.org~~

21 ~~Kathryn Shepherd (*pro hac vice* pending)~~  ~~Angelo Guisado (*pro hac vice* pending)~~
   ~~kshepherd@immcouncil.org~~           ~~aguisado@ccrjustice.org~~

22 ~~1331 G Street, NW, Suite 200~~        ~~666 Broadway, 7th Floor~~
   ~~Washington, DC  20005~~             ~~New York, NY 10012~~

23 ~~Telephone: +1.202.507.7523~~        ~~Telephone: +1.212.614.6464~~
   ~~Facsimile: +1.202.742.5619~~        ~~Facsimile: +1.212.614.6499~~

24

25 ~~*Attorney for Plaintiffs*~~

26      **UNITED STATES ~~DISTRICTCOURT~~DISTRICT COURT**

27      **~~CENTRAL~~SOUTHERN DISTRICT OF CALIFORNIA**

28

1

2   AL OTRO LADO, INC., a California
    corporation; ABIGAIL DOE,
3   BEATRICE DOE, CAROLINA DOE,
    DINORA DOE, INGRID DOE and
4   JOSE DOE, ROBERTO DOE, MARIA
    DOE, JUAN DOE, URSULA DOE,
5   VICTORIA DOE, BIANCA DOE,
    EMILIANA DOE, AND CESAR DOE
6   individually and on behalf of all others
    similarly situated,
7

8       Plaintiff, Plaintiffs,

9   v.

10  JOHN F KIRSTJEN M.
    KELLY NIELSEN, Secretary, United
11  States Department of Homeland
    Security, in his her official capacity;
12
    KEVIN K. MCALEENAN,
13
    Commissioner, United States Customs
14

15

16

17  and Border Protection, in his official
    capacity; TODD C. OWEN, Executive
18  Assistant Commissioner, Office of Field
    Operations, United States Customs and
19  Border Protection, in his official
    capacity; and DOES 1-25, inclusive,
20
    Defendant. Defendants.
21

22

23

24

25

26

27

28

Case No.
23:17-cv-511102366-BAS-KSC

*Honorable Cynthia A. Bashant*

**SECOND AMENDED**

**COMPLAINT FOR**

**DECLARATORY AND**

**INJUNCTIVE RELIEF FOR]:**

(1)   **VIOLATION OF THE**

      **IMMIGRATION AND**

      **NATIONALITY ACT, 8**

      **U.S.C. § 1101, *ET SEQ.***

(2)   **VIOLATION OF THE**

      **ADMINISTRATIVE**

      **PROCEDURE ACT, 5 U.S.C.**

      **§ 551, *ET SEQ.***

(3)   **VIOLATION OF THE FIFTH**

      **AMENDMENT TO THE**
      **UNITED STATES**
      **CONSTITUTION**
      **(PROCEDURAL DUE**
      **PROCESS)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(4)    **VIOLATION OF THE *NON-REFOULEMENT* DOCTRINE**

**CLASS ACTION**

CENTER FOR CONSTITUTIONAL
RIGHTS
    Baher Azmy (NY Bar No. 2860740)
    bazmy@ccrjustice.org
    (admitted pro hac vice)
    Ghita Schwarz (NY Bar No. 3030087)
    gschwarz@ccrjustice.org
    (admitted pro hac vice)
    Angelo Guisado (NY Bar No. 5182688)
    aguisado@ccrjustice.org
    (admitted pro hac vice)
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Mary Bauer (VA Bar No. 31388)
    mary.bauer@spkenter.org
    (admitted pro hac vice)
1000 Preston Avenue
Charlottesville, VA 22903
    Sarah Rich (GA Bar No. 281985)
    sarah.rich@spkenter.org
    (admitted pro hac vice)
Rebecca Cassler (MN Bar No. 0398309)
    rebecca.cassler@spkenter.org
    (pro hac vice forthcoming)
150 East Ponce de Leon Avenue Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113)
    kwalters@immcounciLorg
    (admitted pro hac vice)
1331 G Street, NW, Suite 200
Washington, DC 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

# I.    **INTRODUCTION**

Plaintiff Al Otro Lado, Inc. ("Al Otro Lado"), a non-profit legal services organization, and Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, Ingrid Doe and Jose, Roberto Doe, Maria Doe, Juan Doe, Ursula Doe, Victoria Doe, Bianca Doe, Emiliana Doe, and Cesar Doe ("Class Plaintiffs"), acting on their own behalf and on behalf of all similarly situated individuals, allege as follows:

1.    Class Plaintiffs are noncitizens who have fled grave harm in their countries to seek protection in the United States. All of them sought to access the U.S. asylum process by presenting themselves at Ports official ports of Entry entry ("POEs," or individually, "POE") along the U.S.-Mexico border, but were denied such access by or at the instruction of to seek asylum in the United States, allege as follows:1.    U.S. Customs and Border Protection ("CBP") officials have systematically violated U.S. law pursuant to a policy initiated by Defendants or practices effectively ratified by Defendants in contravention of U.S. and binding international human rights law by refusing to allow individuals, including Class Plaintiffs   who present themselves at POEs along the U.S.-Mexico border and assert their intention to apply for asylum or a fear of returning to their home countries   to seek protection in the United States law.

2.    CBP is violating the law by utilizing various tactics   including misrepresentations, threats and intimidation, verbal abuse and physical force, and coercion   to deny asylum seekers, including Class Plaintiffs, Since 2016 and continuing to this day, CBP has engaged in an unlawful, widespread pattern and practice of denying asylum seekers access to the asylum process. at POEs on the U.S.-Mexico border through a variety of illegal tactics. These tactics include lying; using threats, intimidation and coercion; employing verbal abuse and applying physical force; physically obstructing access to the POE building; imposing unreasonable delays before granting access to the asylum process; denying

outright access to the asylum process; and denying access to the asylum process in a racially discriminatory manner. Since the presidential election, CBP officials have, for example, misinformed asylum seekers that they could not apply for asylum because "Donald Trump just signed new laws saying there is no asylum for anyone," coerced asylum seekers into signing forms abandoning their asylum claims by threatening to take their children away, threatened to deport asylum seekers back to their home countries (where they face persecution) if they persisted in their attempts to seek asylum, and even forcefully removed asylum seekers from POEs. In March 2018, four Guatemalan asylum seekers at an El Paso POE, were denied access to the asylum process after CBP officials told them that "Guatemalans make us sick." As recently as September 2018, CBP denied access to an asylum seeker who was four months pregnant and a victim of sexual violence. These practices all violate U.S. law, which requires that asylum seekers "shall" have access to the asylum process.

3.   ~~The prevalence and persistence of CBP's illegal practice of denying asylum seekers access to the U.S. asylum process has been observed by Plaintiff Al Otro Lado and Class Plaintiffs and has been well documented as occurring along the entire U.S.-Mexico border through comprehensive reporting by nongovernmental organizations, such as Human Rights First, Amnesty International, and Human Rights Watch; other experts working in the U.S.-Mexico border region; as well as numerous news outlets, including The Washington Post, The New York Times, and USA Today.~~ In addition, beginning around 2016, high-level CBP officials, under the direction or with the knowledge or authorization of the named Defendants (the "Defendants"), adopted a formal policy to restrict access to the asylum process at POEs by mandating that lower-level officials directly or constructively turn back asylum seekers at the border (the "Turnback Policy") contrary to U.S. law. In accordance with the Turnback Policy, CBP officials have used and are continuing to use various

_2_

methods to unlawfully deny asylum seekers access to the asylum process based on purportedElbut ultimately untrueD assertions that there is a lack of "capacity" to process them. These methods include coordinating with Mexican immigration authorities and other third parties to implement a "metering," or waitlist, system that creates unreasonable and life-threatening delays in processing asylum seekers; instructing asylum seekers to wait on the bridge, in the pre-inspection area, or at a shelter until there is adequate space at the POE; or simply asserting to asylum seekers that they cannot be processed because the POE is "full" or "at capacity." On information and belief, the claims of a lack of capacity are false.

4. ~~CBP's illegal conduct is occurring as a humanitarian crisis drives vulnerable people experiencing persecution in their home countries to seek refugee protection in the United States. Asylum seekers, including Class Plaintiffs, have fled persecution, violence and death, and face grave and immediate danger to their lives if denied access to the asylum process — a system specifically designed to protect refugees like them. CBP's unlawful practice of turning asylum seekers away from POEs is forcing asylum seekers, including Class Plaintiffs, to return to Mexico and other countries where they remain susceptible to serious harm such as kidnapping, rape, trafficking, torture or even death.~~ Both Defendants' widespread practice of denying access to the asylum process and their formal Turnback Policy are designed to serve the Trump administration's broader, publicly proclaimed goal of deterring individuals from seeking access to the asylum process. Rather than changing existing law, the Administration is simply not following it. The Turnback Policy also reflects the Trump administration's significant antipathy to the fundamental humanitarian principles embodied in asylum laws, as well as to the Central and South American populations seeking access to the asylum process in the United States.

5. In the spring of 2018, and in response to the anticipated arrival of a sizeable number of asylum seekers who had traveled together on the dangerous

journey North in a so-called "caravan," high-level Trump administration officials publicly and unambiguously proclaimed the existence of their policy to intentionally restrict access to the asylum process at POEs in violation of U.S. law. Attorney General Jefferson B. Sessions pledged that asylum seekers would not "stampede" our borders and announced a related "Zero Tolerance" policy to prosecute all who enter the country unlawfully, and thereby to separate them from their children (the very threat a number of Plaintiffs received when attempting to seek asylum). Around the same time, United States Department of Homeland Security ("DHS") Secretary Kirstjen Nielsen characterized the asylum process—mandated by U.S. statute and international law—as a legal "loophole" and publicly announced a "metering" process designed to restrict—and to constructively deny—access to the asylum process through unreasonable and dangerous delay.

6.      Indeed, President Trump offered a public, full-throated and racially-discriminatory defense of his administration's aggressive implementation of the Turnback Policy and the related, widespread CBP practice of denying access to the asylum process, by referring to asylum seekers as "criminals" and "animals" seeking to "infest" and "invade" the United States, and by specifically stating, via tweet, that the United States "must bring them back from where they came" and must "escort them back without going through years of legal maneuvering."

7.      Soon afterward, CBP officials implemented the Turnback Policy through a tactic of asserting a "lack of capacity" to process asylum-seekers and by coordinating with Mexican officials to prevent or delay asylum seekers from reaching inspection points at POEs, even as CBP officials knew or should have known of the dangerous conditions of rampant crime and violence by gangs and cartels on the Mexican side of the border. The unreasonable delays imposed on asylum seekers—which are done pursuant to the Trump administration's broader

goal of deterring future asylum seekers from presenting at the border at all—also amount to a constructive denial of access to the asylum process.

8.     As detailed more fully below, the Turnback Policy comes from high-level U.S. government officials and is having the intended effect of severely restricting—and constructively denying—access to the asylum process at POEs. Indeed, an October 2018 report by DHS's Office of Inspector General ("OIG") concluded that CBP has been "regulating the flow of asylum-seekers at ports of entry," and that by limiting the volume of asylum seekers entering at POEs, the government has prompted some individuals "who would otherwise seek legal entry into the United States to cross the border illegally.[1]

9.     Many desperate asylum seekers, faced with the consequences of the Turnback Policy and unlawful CBP practices, have felt compelled to enter the United States outside of POEs, often by swimming across the Rio Grande or paying smugglers exorbitant sums to transport them, to reach safety as quickly as possible.

5.10.  On information and belief, CBP's conduct pursuant to the Turnback Policy and other unlawful actspractices were performed (and continue to be performed) at the instigation, under the control or authority of, or with the direction, knowledge, consent, direction or acquiescence of, the Defendants named in this action ("Defendants"). By refusing to follow the law, Defendants are engaged in an officially sanctioned policy or practice that hashave caused, and will continue to cause, Class Plaintiffs and Al Otro Lado concrete and demonstrable injuries and irreparable harm.

---

[1]    U.S. Dep't of Homeland Sec., Office of the Inspector Gen., OIG-18-84, Special Review — Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy 5-6 (2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/0IG-18-84-Sep18.pdf [hereinafter OIG Report].

5

11.   Each of the Class Plaintiffs has been subject to Defendants' pattern and practice of denying access to the asylum process and/or to the Turnback Policy.

6.12.  Defendants have deprived Class Plaintiffs and similarly situated individuals of their statutory and ~~regulatory~~international-law rights to apply for asylum, violated their due process rights under the Fifth Amendment to the United States Constitution, and violated the United States' obligations under international law to uphold the principle of *non-refoulement*. Defendants' Turnback Policy and other unlawful practices also constitute unlawful agency action that should be set aside and enjoined pursuant to the Administrative Procedure Act, 5 U.S.C. § 706. Each Class Plaintiff has attempted to access the asylum process and would seek to do so again, but for Defendants' systematic, illegal ~~practice~~Turnback Policy and other unlawful practices at issue in this action, which ~~has deprived them of such~~have impeded their access.

7.13.  Defendants have caused injury to Plaintiff Al Otro Lado by frustrating its ability to advance and maintain its central institutional mission and forcing the organization to divert substantial portions of its limited time and resources away from its various programs in Los Angeles, California, and Tijuana, Mexico, to counteract ~~CBP's~~the effects of the Turnback Policy and Defendants' other unlawful practices.

8.14.  Despite persistent advocacy by Al Otro Lado and other advocates, and despite Class Plaintiffs' desperate need and right to seek asylum without delay in the United States, CBP shows no signs of abating its illegal ~~practice~~policy and practices. Accordingly, Al Otro Lado and Class Plaintiffs require the intervention of this Court to declare that ~~CBP's~~Defendants' conduct violates U.S. and international law, to enjoin Defendants from ~~circumventing their legal obligations~~continuing to violate the law, and to order Defendants to implement procedures to ensure effective compliance with the law, including, without

6

limitation, oversight and accountability in the ~~inspecting~~inspection and processing of asylum seekers. Absent the Court's intervention, CBP's unlawful conduct will continue to imperil the lives and safety of ~~numerous~~countless vulnerable asylum seekers.

~~9.     In addition, because Class Plaintiffs face imminent and irreparable injury if they are not afforded access to the asylum process, they seek immediate injunctive relief in the form of a temporary restraining order ordering Defendants to allow Class Plaintiffs to enter the United States to pursue their asylum claims. Plaintiff Al Otro Lado and Class Plaintiffs also seek permanent injunctive relief to ensure that Defendants no longer deny other asylum seekers the rights afforded to them under U.S. and international law.~~

## II.     JURISDICTION AND VENUE

~~10.~~15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1350. Defendants have waived sovereign immunity for purposes of this suit pursuant to 5 U.S.C. § 702. The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

~~11.~~16. Venue is proper in this district under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred at or in the vicinity of the San Ysidro POE. All Defendants are sued in their official capacity. ~~Plaintiff Al Otro Lado is an organization that resides and is incorporated in Los Angeles, California~~.

## III.     PARTIES

### A.     Plaintiffs

~~12.~~17. Plaintiff Al Otro Lado is a non-profit, non-partisan organization incorporated in California~~,~~ and ~~was~~ established in 2014. Al Otro Lado is a legal services organization serving indigent deportees, migrants, refugees and their families, principally in Los Angeles, California, and Tijuana, Mexico. Al Otro Lado's mission is to coordinate and to provide screening, advocacy, and legal

7

representation for individuals in asylum and other immigration proceedings, to seek redress for civil rights violations, and to provide assistance with other legal and social service needs. Defendants have frustrated Al Otro Lado's mission and have forced Al Otro Lado to divert significant resources away from its other programs to counteract CBP's illegal practice of turning ~~away~~back asylum seekers at POEs.

~~13.~~18. Through its ~~Refugee Program~~Border Rights Project in Tijuana, Mexico, Al Otro Lado assists individuals seeking protection from persecution in the United States. In response to CBP's unlawful ~~practice~~policy and practices, Al Otro Lado has had to expend significant organizational time and resources and alter entirely its previously used large-scale clinic model. For example, Al Otro Lado previously held large-scale, mass-advisal legal clinics in Tijuana that provided a general overview on asylum laws and procedures. This type of assistance (similar to the Legal Orientation Program of the Executive Office for Immigration Review) only was workable when CBP allowed asylum seekers into the United States in accordance with the law.

~~14.~~19. Since 2016, however, CBP's illegal conduct has compelled Al Otro Lado to expend significant time and resources to send representatives to Tijuana from Los Angeles multiple times per month for extended periods to provide more individualized assistance and coordination of legal and social services, including individual screenings and in-depth trainings to educate volunteer attorneys and asylum seekers regarding CBP's ~~practice~~unlawful policy and practices and potential strategies to pursue asylum in the face of CBP's tactics. Whereas Al Otro Lado previously was able to accommodate several dozen attorneys and over 100 clients at a time in its large-scale clinics, Al Otro Lado has been forced to transition to an individualized representation model where attorneys are required to work with asylum seekers one-on-one and provide direct representation. Al Otro Lado has expended (and continues to expend) significantly more resources

8

recruiting, training and mentoring pro bono attorneys to help counteract CBP's unlawful ~~practice~~policy and practices. Nevertheless, even asylum seekers provided with such individualized pro bono representation are being turned ~~away~~back by CBP in violation of the law.

~~15.~~20. Al Otro Lado also has spent time and resources advocating that CBP provide asylum seekers with access to the asylum process and cease using unlawful tactics to circumvent its legal obligations. For example, Al Otro Lado representatives have filed numerous complaints with the U.S. government detailing examples of CBP's unlawful ~~practice~~policy and practices depriving asylum seekers of access to the asylum process.

~~16.~~21. Such diversion of Al Otro Lado's time and resources negatively impacts its other programs. For example, Al Otro Lado has not been able to pursue funding for or otherwise advance the following programs: (1) its Deportee Reintegration Program through which Al Otro Lado assists deportees who struggle to survive in Tijuana, many of whom have no Mexican identity documents or health coverage, and may not even speak Spanish; and (2) its Cross-Border Family Support Program through which Al Otro Lado assists families with cross-border custody issues, and helps connect family members residing in the United States to social, legal, medical and mental health services. ~~Other programs that have been impacted include Al Otro Lado's Deportee Financial Literacy Program, Deportee Education Fund, Refugee Mental Health Program and Opioid Recovery Program, among others~~Al Otro Lado has all but ceased its programmatic work with deportees and families separated by deportation due to the diversion of resources caused by CBP's unlawful actions.

~~17.~~22. In addition, the constraints on Al Otro Lado's limited time and resources ~~has~~have negatively impacted its operations in Los Angeles, including delaying the opening and expansion of its Los Angeles office through which it coordinates "Wraparound" services for low-income immigrants in Los Angeles.

9

The increased need for on the ground support in Tijuana has impacted Al Otro Lado's ability to satisfy its clinical obligations for low-income immigrants at the Wellness Center, located on the grounds of the Los Angeles County+USC Medical Center, and to conduct outreach to provide free legal assistance to homeless individuals in Los Angeles to allow them to better access permanent supportive housing, employment and educational opportunities.

18.23. Al Otro Lado continues to be harmed by Defendants because CBP's illegal practice at conduct at or in the vicinity of the border frustrates its organizational mission and forces Al Otro Lado to divert resources from its other objectives. If Al Otro Lado had not been compelled to divert resources to address CBP's unlawful conduct at the U.S.-Mexico border, it would have directed these resources toward its other programs to further the advancement of its core mission.

19.24. Plaintiff Abigail Doe ("A.D.") is a female native and citizen of Mexico. She is the mother of two children under the age of ten. A.D.[2] Abigail and her family have been targeted and threatened with death or severe harm in Mexico by a large drug cartel that had previously targeted her husband, leaving her certain she would not be protected by local officials. A.D. Abigail fled with her two children to Tijuana, where they presented themselves at the San Ysidro POE. On behalf of herself and her children, A.D. Abigail expressed her fear of returning to Mexico and her desire to seek asylum in the United States. CBP officials coerced A.D. Abigail into recanting her fear and signing a form withdrawing her application for admission to the United States. As a result of this coercion, the form falsely states that A.D. Abigail does not have a credible fear of returning to Mexico. As a result of Defendants' conduct, A.D. Abigail and her children were unable to access the asylum process and were forced to return to Tijuana, where they remain at the time

_____

[2]   The ages listed for children of Abigail Doe, Beatrice Doe, Carolina Doe, and Dinora Doe are as they were at the time the initial Complaint was filed.

the initial Complaint was filed, they remained in fear for their lives. ~~A.D. and her children would like to present themselves again for asylum but, based on their experience and the experience of others with CBP's practice at the U.S.-Mexico border, she understands that they would likely be turned away again. A.D. and her children are currently living in temporary housing in Tijuana and can no longer remain in Mexico and have no place else to turn for safety but~~ Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Abigail and her children into the United States.

~~20.~~25. Plaintiff Beatrice Doe ~~("B.D.")~~ is a female native and citizen of Mexico. She is the mother of three children under the age of sixteen. ~~B.D.~~Beatrice and her family have been targeted and threatened with death or severe harm in Mexico by a dangerous drug cartel; she was also subject to severe domestic violence. ~~B.D.~~Beatrice fled with her children and her nephew to Tijuana, where they presented themselves once at the Otay Mesa POE and twice at the San Ysidro POE. On behalf of herself and her children, ~~B.D.~~Beatrice expressed her fear of returning to Mexico and her desire to seek asylum in the United States. CBP officials coerced ~~B.D.~~Beatrice into recanting her fear and signing a form withdrawing her application for admission to the United States. As a result of this coercion, the form falsely states that ~~B.D.~~Beatrice and her children have no fear of returning to Mexico. As a result of Defendants' conduct, ~~B.D.~~Beatrice and her children were unable to access the asylum process and were forced to return to Tijuana, where ~~they remain~~ at the time the initial Complaint was filed, they remained in fear for their lives. ~~B.D.~~While she was sheltered in Tijuana, her abusive spouse located her and coerced her and her children ~~would like to present themselves again for asylum but, based on their experience and the experience of others with CBP's practice at the U.S.-Mexico border, she understands that they would likely be turned away again. B.D. and her children are currently living in~~

temporary housing in Tijuana and can no longer remain in Mexico and have no place else to turn for safety but the United States to return home with him.

21.26. Plaintiff Carolina Doe ("C.D.") is a female native and citizen of Mexico. She is the mother of three children. C.D.Carolina's brother-in-law was kidnapped and dismembered by a dangerous drug cartel in Mexico, and after the murder, her family also was targeted and threatened with death or severe harm. C.D.Carolina fled with her children to Tijuana, where they presented themselves at the San Ysidro, POE. On behalf of herself and her children, C.D.Carolina expressed her fear of returning to Mexico and her desire to seek asylum in the United States. CBP officials coerced C.D.Carolina into recanting her fear on video and signing a form withdrawing her application for admission to the United States. As a result of thisofthis coercion, the form falsely states that C.D.Carolina and her children have no fear of returning to Mexico. As a result of Defendants' conduct, C.D.Carolina and her children were unable to access the asylum process and were forced to return to Tijuana, where they remainat the time the initial Complaint was filed, they remained in fear for their lives. C.D. and her children would like to present themselves again for asylum but, based on their experience and the experience of others with CBP's practice at the U.S.-Mexico border, she understands that they would likely be turned away again. C.D. and her children are currently living in temporary housing in Tijuana and can no longer remain in Mexico and have no place else to turn for safety butFollowing the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Carolina and her children into the United States.

22.27. Plaintiff Dinora Doe ("D.D.") is a female native and citizen of Honduras. D.D.Dinora and her eighteen-year-old daughter have been targeted, threatened with death or severe harm, and repeatedly raped by MS-13 gang members. D.D.Dinora fled with her daughter to Tijuana, where they presented themselves at the Otay Mesa, POE on three occasions. D.D.Dinora expressed her

fear of returning to Honduras and her desire to seek asylum in the United States. CBP officials misinformed ~~D.D.~~ Dinora about her rights under U.S. law and denied her the opportunity to access the asylum process. As a result of Defendants' conduct, ~~D.D.~~ Dinora and her daughter were forced to return to Tijuana, where ~~they remain~~ at the time the initial Complaint was filed, they remained in fear for their lives. ~~D.D. and her daughter would like to present themselves again for asylum but, based on their experience and the experience of others with CBP's practice at the U.S.-Mexico border, she understands that they would likely be turned away again. D.D. is currently living in temporary housing with her daughter in Tijuana and can no longer remain in Mexico and have no place else to turn for safety but~~ Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Dinora and her daughter into the United States.

~~23.~~ 28. Plaintiff Ingrid Doe ~~("I.D.")~~ is a female native and citizen of Honduras. ~~She is the mother of~~ At the time the initial Complaint was filed, she had two children and ~~is currently~~ was pregnant with her third child. ~~I.D.~~ Ingrid's mother and three siblings were murdered by 18th Street gang members in Honduras. After the murders, 18th Street gang members threatened to kill ~~I.D~~ Ingrid. ~~I.D.~~ Ingrid and her children were also subject to severe domestic violence. ~~I.D.~~ Ingrid fled with her children to Tijuana, where they presented themselves at the Otay Mesa POE and at the San Ysidro POE. On behalf of herself and her children, ~~I.D.~~ Ingrid expressed her fear of returning to Honduras and her desire to seek asylum in the United States. CBP officials misinformed ~~I.D.~~ Ingrid about her rights under U.S. law and denied her the opportunity to access the asylum process. As a result of Defendants' conduct, ~~I.D.~~ Ingrid and her children were forced to return to Tijuana, where ~~they remain~~ at the time the initial Complaint was filed, they remained in fear for their lives. ~~I.D. and her children would like to present themselves again for asylum but, based on their experience and the experience of others with CBP's~~

13

practice at the U.S.-Mexico border, she understands that they would likely be turned away again. I.D. is currently living in temporary housing with her children in Tijuana and can no longer remain in Mexico and have no place else to turn for safety but Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Ingrid and her children into the United States.

24.   Plaintiff Jose Doe ("J.D.") is a male native and citizen of Honduras. J.D. was brutally attacked by 18th Street gang members in Honduras. The 18th Street gang also murdered several of his family members and threatened to kidnap and harm J.D.'s two daughters. J.D. fled Honduras and arrived in Nuevo Laredo, Mexico, where he was accosted by gang members. J.D. presented himself at the Laredo, Texas POE the next day. J.D. expressed his fear of returning to Honduras and his desire to seek asylum in the United States. CBP officials misinformed J.D. about his rights under U.S. law and denied him the opportunity to access the asylum process. As a result of Defendants' conduct, J.D. was forced to return to Nuevo Laredo where he again was approached by gang members. J.D. fled to Monterrey, Mexico, where he remains in fear for his life. J.D. would like to present himself again for asylum but, based on his experience and the experience of others with CBP's practice at the U.S.-Mexico border, he understands that he would likely be turned away again. J.D. is currently staying temporarily with his wife's relatives in Monterrey, Mexico and is afraid to return to Honduras. J.D. can no longer remain in Mexico and have no place else to turn for safety but the United States.

29.   Plaintiff Roberto Doe is a male native and citizen of Nicaragua. Fearing for his life and the lives of his family members, Roberto fled Nicaragua due to threats of violence from the Nicaraguan government and paramilitaries allied with the government. Roberto sought access to the asylum process by presenting himself at the Hidalgo, Texas POE. When he encountered CBP officials

14

in the middle of the bridge, he told them that he wanted to seek asylum in the United States. CBP officials denied Roberto access to the asylum process by telling him the POE was full and that he could not enter. Mexican officials then escorted Roberto back to Mexico. At the time of the filing of the First Amended Complaint, Roberto desired to return immediately to the Hidalgo POE to seek asylum, but based on his experiences and the experiences of others with CBP's practices at the U.S.-Mexico border, he understood that he would likely be turned away again. After the filing of the First Amended Complaint, Roberto did return to the Hidalgo POE, where Mexican officials detained him as he was walking onto the international bridge to seek access to the asylum process in the United States. Roberto remains in the custody of the Mexican government. On information and belief, his *refoulement* to Nicaragua is imminent. He can no longer remain in Mexico and has no place else to turn for safety but the United States.

30.    Plaintiff Maria Doe is a female native and citizen of Guatemala and a permanent resident of Mexico. She was married to a Mexican citizen, with whom she has two children who were both born in Mexico. Since Maria left her husband, who was abusive and is involved with cartels, two different cartels have been tracking and threatening her. Maria and her children fled and sought access to the asylum process by presenting themselves at the Laredo, Texas POE. When Maria encountered CBP officials in the middle of the bridge, she told them that she and her children wanted to seek asylum in the United States. CBP officials told them to wait on the Mexican side of the bridge. There, two Mexican officials told Maria that U.S. officials would not let her and her children cross the bridge, but that they could help her if she paid a bribe. Having no money to pay the bribe, Maria traveled with her children to Reynosa, Mexico. There, accompanied by an American lawyer, they sought access to the asylum process by presenting themselves at the Hidalgo POE. On the Mexican side of the bridge leading to the Hidalgo POE, a Mexican official threatened to destroy Maria's identity documents

15

if she and her children did not leave the bridge. Two weeks later, Maria and her children, accompanied by the same American lawyer, again sought access to the asylum process by presenting themselves at the Hidalgo POE. When Maria encountered CBP agents at the middle of the bridge, she told them that she and her children wanted to seek asylum in the United States. Mexican officials then forced Maria and her children off the bridge. Although Maria and her lawyer repeatedly told CBP officials that she and her children wanted to seek asylum in the United States, the CBP officials denied Maria and her children access to the asylum process. At the time the First Amended Complaint was filed, Maria and her children desired to return immediately to a POE to seek asylum, but based on their experience and the experiences of others with CBP's practices at the U.S.-Mexico border, she understood that they would likely be turned away again. Maria and her children remained in Mexico, where their lives were in danger. They could no longer remain in Mexico and had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Maria and her children into the United States.

31.     Plaintiff Juan Doe is a male native and citizen of Honduras. Plaintiff Ursula Doe is a female native and citizen of Honduras. Juan and Ursula are husband and wife and together have two children, twin thirteen-year-old boys. They fled Honduras with their sons after receiving death threats from gangs. Juan, Ursula, and their children sought access to the asylum process by presenting themselves at the Laredo POE. When Juan, Ursula, and their children reached the middle of the bridge to the POE, CBP officials denied them access to the asylum process by telling them the POE was closed and that they could not enter. Juan, Ursula, and their children subsequently tried to seek access to the asylum process by presenting themselves at the Hidalgo POE, but Mexican officials stopped them just as they were entering the pedestrian walkway on the Reynosa bridge and

16

threatened to deport them to Honduras if they did not leave. At the time the First Amended Complaint was filed, Juan, Ursula, and their children desired to return immediately to the Hidalgo POE to seek asylum, but based on their experience and the experiences of others with CBP's practices at the U.S.-Mexico border, they understood that they would likely be turned away again. At that time, Juan, Ursula, and their children resided in Reynosa, Mexico, where they remained in fear for their lives. They could no longer remain in Mexico and had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Juan, Ursula, and their children into the United States.

32.     Plaintiff Victoria Doe is a sixteen-year old female native and citizen of Honduras. Victoria has been threatened with severe harm and death by members of the 18th Street gang for refusing to become the girlfriend of one of the gang's leaders. Fearing for her life, Victoria fled to Mexico where she gave birth to her son. Victoria and her son sought access to the asylum process by presenting themselves at the San Ysidro POE. When Victoria expressed her desire to seek asylum in the United States, CBP officers denied her access to the asylum process by stating that she could not apply for asylum at that time and telling her to speak to a Mexican official without providing any additional information. At the time the First Amended Complaint was filed, Victoria desired to return immediately to the San Ysidro POE to seek asylum on behalf of herself and her son, but based on her experience and the experience of others with CBP's practices at the U.S.-Mexico border, she understood that she would likely be turned away again. At that time, Victoria and her son were residing in a shelter in Tijuana, but could no longer remain in Mexico because of threats from gangs who continued to target them in Mexico. They had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Victoria and her child into the United States.

33.    Plaintiff Bianca Doe is a transgender woman who is a native and citizen of Honduras. Bianca has been subjected to extreme and persistent physical and sexual assault, as well as discrimination and ongoing threats of violence in Honduras and Mexico City, where she subsequently moved, because she is a transgender woman. Fearing for her safety based on numerous threats and harassment, including at the hands of Mexican police, Bianca fled to Tijuana and sought access to the asylum process by presenting herself at the San Ysidro POE. CBP officers denied Bianca access to the asylum process by stating that she could not apply at that time because they were at capacity. Bianca returned to the POE the next day. She was given a piece of paper with the number "919," placed on a waiting list, and told that she would have to wait several weeks to proceed to the POE. Feeling desperate and unsafe, Bianca attempted to enter the United States without inspection by climbing a fence on a beach in Tijuana. Once over the fence, a U.S. Border Patrol officer stopped Bianca, who expressed her desire to seek asylum in the United States. The U.S. Border Patrol officer told Bianca that there was no capacity in U.S. detention centers and threatened to call Mexican police if Bianca did not climb the fence back into Mexico. Terrified, Bianca returned to Mexico. Bianca subsequently sought access to the asylum process by again presenting herself at the San Ysidro POE. She was told, once again, that CBP had no capacity for asylum seekers. At the time the First Amended Complaint was filed, Bianca desired like to return immediately to the San Ysidro POE to seek asylum, but based on her experience and the experience of others with CBP's practice at the U.S.-Mexico border, she understood that she would likely be turned away again. At that time, Bianca was residing in a shelter in Tijuana where she feared further violence as a transgender woman. She could no longer remain in Mexico and had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate Bianca's entry into the United States.

34.     Plaintiff Emiliana Doe is a transgender woman and a native and citizen of Honduras. Emiliana was subjected to multiple sexual and physical assaults, kidnapping, discrimination, as well as threats of severe harm and violence in Honduras because she is a transgender woman. Fearing for her life, she made an arduous and dangerous journey to Mexico, where she was raped repeatedly and threatened with death. After arriving in Tijuana, Emiliana sought access to the asylum process by presenting herself at the San Ysidro POE and stating her intention to apply for asylum in the United States. She was given a piece of paper with the number "1014" on it, placed on a waiting list, and told to return in six weeks. Feeling desperate and unsafe, Emiliana returned to the POE just a few weeks later. CBP officers denied Emiliana access to the asylum process by telling her that there was no capacity for asylum seekers and instructing her to wait for Mexican officials. At the time the First Amended Complaint was filed, Emiliana desired like to return immediately to the San Ysidro POE to seek asylum, but based on her past experience with CBP's practice at the U.S.-Mexico border, she understood that she would likely be turned away again. At that time, Emiliana was residing in a hotel in Tijuana where she feared further violence as a transgender woman. She suffers from serious health issues caused by a stroke two years ago, could no longer remain in Mexico, and had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate Emiliana's entry into the United States.

35.     Plaintiff Cesar Doe is an eighteen-year old male native and citizen of Honduras. Cesar has been threatened numerous times with severe harm and death and kidnapped by members of the 18th Street gang. Fearing for his life, Cesar fled Honduras and traveled to Tijuana. Cesar sought access to the asylum process by presenting himself at the San Ysidro POE, but was intercepted by individuals belonging to "Grupo Beta." Cesar was told he would be placed on a waitlist, but

19

instead was detained for twelve days by Mexican immigration under threat of deportation to Honduras. After an individual at a local shelter secured Cesar's release from detention, he returned to the San Ysidro POE and was placed on a waitlist. After a few weeks, Cesar again sought access to the asylum process by presenting himself at the San Ysidro POE, but CBP officers refused to accept him. A few weeks later, he returned to the San Ysidro POE, but members of Grupo Beta intercepted him and threatened to call Mexican immigration officials and child protective services. A staff member from Plaintiff Al Otro Lado intervened and escorted Cesar back to the shelter. At the time the First Amended Complaint was filed, Cesar desired to return immediately to the San Ysidro POE to seek asylum, but based on his experience and the experiences of others with CBP's practices at the U.S.-Mexico border, he understood that he would likely be turned away again. At that time, Cesar wass residing in a shelter in Tijuana, could no longer remain in Mexico because of crime, violence and threats from gangs, and had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate Cesar's entry into the United States.

## B.    Defendants

25.36. Defendant ~~John F. Kelly~~Kirstjen Nielsen is the Secretary of ~~the United States Department of Homeland Security ("DHS")~~DHS. In this capacity, ~~he~~she is charged with enforcing and administering U.S. immigration laws. ~~He~~She oversees each of the component agencies within DHS, including CBP, and has ultimate authority over all CBP policies, procedures and practices. ~~He~~She is responsible for ensuring that all CBP officials perform their duties in accordance with the Constitution and all relevant laws.

26.37. Defendant Kevin K. McAleenan is ~~Acting~~the Commissioner of CBP. In this capacity, he has direct authority over all CBP policies, procedures and practices, and is responsible for ensuring that all CBP interactions with asylum

seekers are performed in accordance with the Constitution and all relevant laws. Defendant McAleenan oversees a staff of more than 60,000 employees, manages a budget of more than $13 billion, and exercises authority over all CBP operations.

27.38. Defendant Todd C. Owen is the Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO"). OFO is the largest component of CBP and is responsible for border security, including immigration and travel through U.S. POEs. Defendant Owen exercises authority over 20 major field offices and 328 POEs. Defendant Owen oversees a staff of more than 29,000 employees, including more than 24,000 CBP officials and specialists, and manages a budget of more than $5.2 billion. Defendant Owen is responsible for ensuring that all OFO officials perform their duties in accordance with the Constitution and all relevant laws.

28.39. Does 1 through 25, inclusive, are sued herein under fictitious names inasmuch as their true names and capacities are presently unknown to Al Otro Lado and Class Plaintiffs. Al Otro Lado and Class Plaintiffs will amend this complaint to designate the true names and capacities of these parties when the same have been ascertained. Al Otro Lado and Class Plaintiffs are informed and believe, and on that basis allege, that Does 1 through 25, inclusive, were agents or alter egos of Defendants, or are otherwise responsible for all of the acts hereinafter alleged. Al Otro Lado and Class Plaintiffs are informed and believe, and on that basis allege, that the actions of Does 1 through 25, inclusive, as alleged herein, were duly ratified by Defendants, with each Doe acting as the agent or alter ego of Defendants, within the scope, course, and authority of the agency. Defendants and Does 1 through 25, inclusive, are collectively referred to herein as "Defendants."

## IV.    FACTUAL BACKGROUND

### A.    Humanitarian Crisis South of the U.S.-Mexico Border

29.40. In recent years, children and adults have fled horrendous persecution in their home countries and arrived at POEs along the U.S.-Mexico border to seek

protection in the United States through the asylum process. ~~The~~While asylum seekers travel to the U.S.-Mexico border from all across the world, including from Haiti, Cuba, Venezuela and Iraq, the vast majority of these individuals come from Guatemala, Honduras and El Salvador, an area often termed Central America's "Northern Triangle."

~~30.    These~~41.    The Northern Triangle governments are known for corruption,[3] including having corrupt police forces filled with gang-related members.[4] Furthermore, the "penetration of the state by criminal groups" is responsible, at least in part, for the fact that as many as 95% of crimes go unpunished.[3] in those countries.[5]

---

[3]    See Christina Eguizabal et al., Woodrow Wilson Center Reports on the Americas No. 34, Crime and Violence in Central America's Northern Triangle, ~~The Wilson Ctr., 2 (2015~~: How U.S. Policy Reponses are Helping, Hurting, and Can be Improved 2 (7015),https://www.wilsoncenter.org/sites/default/files/FINAL%20PDF ~~https://www.wilsoncenter.org/sites/default/files/FINAL%20PDF_CARSI%2OREPORT~~ CARSI%2DREPORT 0.pdf~~+~~; see also U.S. Dep't of State, Bureau of ~~—~~ Democracy, Human Rights & Labor, Country Reports on Human Rights Practices for 2017, https://www.state.gov/j/drl/r1s/hrrpt/humanrightsreport/ index.htm#wrapper (noting "widespread government corruption" is a significant human rights issue in El Salvador, Guatemala, and Honduras).

[4]    "Over the past five years, at least 435 members of the [Salvadoran] armed forces were fired for being gang members or having ties to gangs . . . ~~.~~Another 39 aspiring police officers were expelled from the National Public Security Academy over the same period, of which 25 'belonged to' the Mara Salvatrucha, or MS13, while 13 were from the Barrio 18 gang. Nine more active, police, officers were also dismissed for alleged ~~gang~~an ties over the five years."[" Mimi Yagoub, 480 Gang Members ~~Infiltrated El~~Infiltratecr El Salvador Security Forces: Report, InSight Crime (Feb. 22, 2016), ~~http~~https://www.insightcrime.org/ news~~-briefs~~/brief/did-480-gang-members-infiltrate-el-salvador-security-forces/ (citation omitted).

[3]    ~~Eguizabal et al., supra note 1, at 2.~~

[5]    Eguizabal et al., supra note 3, at 2.

31.42. The "pervasive and systematic levels of violence" associated with the increasing reach and power of gangs in the Northern Triangle have been well documented.[46] Those fleeing the Northern Triangle cite "violence [from] criminal armed groups, including assaults, extortion, and disappearances or murder of family members,"[57] as reasons for their flight. These armed groups operate with impunity due to their influence and control over the governments of Northern Triangle countries, which have repeatedly proven to be unable or unwilling to protect their citizens.[68] The degree of violence suffered by people in the Northern Triangle has been compared to that experienced in war zones.[79]

---

[46]   UNHCR, Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico, 15 (2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html [hereinafter Women on the Run]; see also Int'l Crisis Grp., Latin America Report No. 64, El Salvador's Politics of Perpetual Violence 8-11 (2017), hops://d2071 andvipOwj .cloudfront.net/064-el-salvador-s-politics-of-perpetual-violence.pdf.

[5]  Id[7]  Women on the Run, supra note 6, at 15; see Refugees Intl, Closing Off Asylum at the U.S.-Mexico Border 7 (2018), https://static1.squarespace.com/static/506c8eale4bOld9450dd53f5/t/5b86d0a18825 lbbfd495ca3b/1535561890743/U.S.-Mexico+Border+Report+-+August+2018+-+FINAL.pdf [hereinafter Closing Off Asylum]; Intl Crisis Grp., Latin America Report No. 62, Mafia of the Poor: Gang Violence and Extortion in Central America 7 (2017), https://d2071andvipOwj.cloudfront.net/062-mafia-of-the-poor_O.pdf.

[6]  Id.[8]  Women on the Run, supra note 6, at 16 (finding that citizens of Northern Triangle countries are "murdered with impunity"); id. at 23 (finding that 69% of women interviewed tried relocating within their own countries at least once before fleeing and indicating that 10M% "stated that the police or other authorities were the direct source of their harm"); Closing off Asylum, supra note 7, at 7 ("[T]here is considerable evidence that officials in each of the Northern Triangle countries have extremely limited capacity — and in many cases limited will — to protect those at grave risk.").

[79]   Medecins Sans Frontieres (Doctors Without Borders), Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis, 6 (2017), https://www.doctorswithoutborders.org/sites/usa/files/msfhttps://www.msforg/sites/msforg/files/msf forced-to-flee-central-americas- northern-triangle_e.pdf [hereinafter Forced to Flee].

23

32.   This violence and corruption is not limited to the Northern Triangle, but also is experienced by individuals fleeing Mexico. Mexico has faced a drastic rise in criminal activity since the early 2000s that is attributed to organized criminal groups and has been accompanied by increases in violence and corruption.[8] Although the northern half of Mexico was often considered the most dangerous, recent reports reveal an increase in violence in the central and southern states of Mexico, particularly in Guerrero, Michoacan, and the State of Mexico.[9] Along with the increase in violence and organized criminal activity, it is well documented that the police and armed forces operate with impunity in Mexico, leaving victims unable to resort to their own government for protection.[10] Indeed, "[i]n some regions of Mexico the state has become so closely identified with criminal gangs and drug cartels that these criminal organizations do not need to corrupt the state — they essentially 'are' part of the state."[11]

---

[8]  Dominic Joseph Pera, *Drugs Violence and Public [In] Security: Mexico's Federal Police and Human Rights Abuse,* 2-4, 7 (Justice in Mex. Working Paper Series Paper No. 1, 2015), https://justiceinmexico.org/wp-content/uploads/2015/12/151204_PERA_DOMINIC_DrugViolenceandPublicInsecurity_FINAL.pdf; *see* U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices for 2014,* https://www.state.gov/j/drl/rls/hrrpt/2014humanrightsreport/index.htm?year=2014&dlid=236702#wrapper.

[9]  *See, e.g., U.S.* Dep't of State, Bureau of Diplomatic Sec., *Mexico 2015 Crime and Safety Report: Mexico City,* https://www.osac.gov/pages/ContentReportDetails.aspx?cid=17114 (reporting that a "common practice is for gangs to charge 'protection fees' or add their own tax to products and services with the threat of violence for those who fail to pay").

[10]  *See* Pera, *supra* note 8, at 4 ("Drug trafficking organizations have infiltrated government positions in many areas, and their influence over state personnel has dramatic implications.").

[11]  Alberto Diaz-Cayeros *et al.*, *Caught in the Crossfire: The Geography of Extortion and Police Corruption in Mexico,* 3-4 (Stanford Ctr. for Int'l Dev., Paper No. 545, 2015), http://scid.stanford.edu/publications/caught-crossfire-geography-extortion-and-police-corruption-mexico.

33.43. In addition, Central American women and children often flee severe domestic violence. and sexual abuse.[10] Women report prolonged instances of physical, sexual, and psychological domestic violence, and most of their accounts demonstrate that the authorities in their home countries were either unable or unwilling to provide meaningful assistance.[12][11] Abusive partners are often members or associates of criminal armed groups.[13][12] Abusers frequently threaten women with harm to their parents, siblings or children if they try to leave.[14][13] Some women who fled their countries have heard from family members back home that their abusers continue to look for them.[14] In addition, "[s]exual harassment and the threat of sexual violence by gangs shapes the everyday lives of women and girls," in the Northern Triangle, and experts estimate that rape and torture of girls is "extremely widespread."[15]

---

[10]   Kids in Need of Def. & Human Rights Ctr. Fray Matias de Cordova, *Childhood Cut Short: Sexual and Gender-based Violence Against Central American Migrant and Refit gee Children* 12-20 (2017), htVs://supportkind.org/wp-content/uploads/2‑017/06/Childhood-Cut-Short-KMD-SGBV-Report_June2017.pdf [hereinafter *Childhood Cut Short]* (describing sexual and gender-based violence against children and young women in the Northern Triangle).

[12][11]   *Women on the Run, supra* note 4.6, at 25. The women interviewed described repeated rapes and sexual assaults as well as violent physical abuse that included: "beatings with hands, a baseball bat and other weapons; kicking; threats to do bodily harm with knives; and repeatedly being thrown against walls and the ground." *Id.*

[13][12]   *Id.*

[14][13]   *Id.* at 27.

[14]   *Id.*

[15]   *Id.* Childhood Cut Short, supra note 10, at 17.

25

34.44.After fleeing their home countries, children and adults face an arduous and dangerous journey to the United States.[16] The situation along the popular migration routes to the United States has been termed a "humanitarian crisis" because of the extraordinary violence faced by those making the journey.[17] In 2015 and 2016, 68% of migrants from the Northern Triangle region experienced violence, including sexual assault, on their journeys through Central America and Mexico.[18] Mexico has faced a drastic rise in criminal activity since the early 2000s that is attributed to cartels and has been accompanied by increases in violence and corruption.[19] The rate of violence continues to rise; 2017 was the

---

[16]   *See* ~~id.~~*Women on the Run, supra* note 6, at 43-45 (describing extortion, sexual violence, and physical violence); *see also* Rodrigo Dominguez Villegas, *Central American Migrants and "La Bestia": The Route, Dangers, and Government Responses,* Migration Info. Source (Sept. 10, 2014), ~~http://www.migrationpolicy.org/article/central-american-migrants-and-%E2%80%9Cla-bestia%E2%80%9D-route-dangers-and-government-responses~~ httTs://www.migratioppolicy.org/article/central-american-migrants-and-%E2%80%9Cla-bestia%E2%80u/o9D-route-dangers-and-government-responses(listing "injury or death from unsafe travelling conditions, gang violence, sexual assault, extortion, kidnapping, and recruitment by organized crime" as dangers faced on the journey to the United States).

[17]   *See* ~~Eguízábal~~Eguizabal et al., *supra* note ~~1,~~3, at 3.

[18]   *See Forced to Flee, supra* note ~~7,~~9, at 11. Close to half (44%) of the migrants reported being hit, 40% said they had been pushed, grabbed or asphyxiated, and 7% said they had been shot. *Id.* Nearly one-third (31.4%) of women and 17.2% of men surveyed during that same time period had been sexually abused during their journeys. *Id.* at 12.

[19]   Dominic Joseph Pera, *Drugs Violence and Public [In] Security: Mexico's Federal Police and Human Rights Abuse,* 2-4, 7 (Justice in Mex. Working Paper Ser. Vol. 14, No. 1, 2015), https://justiceinmexico.org/wp-content/uploads/2015/12/151204_PERA_DOMINIC_DrugViolenceandPublicIn security_FINAL.pdf; *see* U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor *Country Reports on Human Rights Practices for 2017 (Mexico),* http://www.state.gov/j/drl/r1s/hrrpt/humanrightsreport/index.htm?year=2017&dlid=277345.

deadliest year on record in Mexico.[20] Although the northern half of Mexico was often considered the most dangerous, recent reports reveal an increase in violence in the central and southern states of Mexico, particularly in Guerrero, Michoacan, and the State of Mexico.[21] The U.S. State Department currently advises "no travel"—its highest level of travel warning, which also applies in active war zones like Syria, Afghanistan, and Yemen—to five Mexican states due to high crime rates.[22] Human rights groups report that since mid-2017, "the dangers facing refugees and migrants in Mexico have escalated."[23] Perpetrators of violence against migrants "include[] members of gangs and other criminal organizations, as well as members of the Mexican security forces.[19]

---

[20]   Human Rights First, *Mexico: Still Not Safe for Refugees and Migrants* 1 (2018), https://www.humanrightsfirst.org/sites/default/files/Mexico_Not_Safe.pdf [hereinafter *Mexico: Still Not Safe*].

[21]   *See, e.g.*, U.S. Dep't of State, Bureau of Diplomatic Sec., *Mexico 2015 Crime and Safety Report: Mexico City,* https://www.osac.gov/pages/ContentReport Details.aspx?cid=17114 (reporting that a "common practice is for gangs to charge 'protection fees' or add their own tax to products and services with the threat of violence for those who fail to pay"); *see also* Human Rights First, *Dangerous Territory: Mexico Still Not Safe for Refugees* 4 (2017), http://www .humanrightsfirst.org/sites/default/files/HRF-Mexico-Asylum-System-rep.pdf[her einafter *Dangerous Territory]* ("Human rights monitors stressed that there is a large presence of transnational gangs in southern Mexico, which have easy acces s to those fleeing gang persecution in the Northern Triangle.") (citations omitted).

[22]   U.S. Dep't of State Bureau of Consular Affairs *Mexico Travel Advisory* (Aug. 22, 2018), https://iravel.state.gov/content/travel/en/traveladvisories/ traveladvisories/mexico-travel-advisory.html [hereinafter *Mexico Travel Advisory]*.

[23]   *Mexico: Still Not Safe, supra* note 20, at 1; *see also Dangerous Territory, supra* note 21, at 3 ("Human rights monitors report an increase in kidnappings, disappearances, and executions of migrants and refugees in recent years.").

[19]   *Id.* at 5.

"[24] Along with the increase in violence and organized criminal activity, it is well documented that the police and armed forces operate with impunity in Mexico, leaving victims unable to resort to the government for protection.[25] Indeed, "[i]n some regions of Mexico the state has become so closely identified with criminal gangs and drug cartels that these criminal organizations do not need to corrupt the state—they essentially 'are' part of the state."[26] Thus, the initial mistrust and inability to rely upon government authorities for protection that leads many to flee their home countries accompanies them along their journeys.[20] through Mexico.[27]

45.    Furthermore, migrants seeking international protection have a small chance of receiving it in Mexico. Amnesty International reports that "the Mexican government is routinely failing in its obligations under international law to protect those who are in need of international protection, as well as repeatedly violating

---

[24] *Forced to Flee, supra* note 9, at 5; *see also Closing Off Asylum, supra* note 7, at 9 (explaining that when crossing Mexico, migrants suffer "abuses at the hands of organized crime, exploitative smugglers, and predatory state security and police").

[25] *See* Pera, *supra* note 19, at 4 ("Drug trafficking organizations have infiltrated government positions in many areas, and their influence over state personnel has dramatic implications."); Ximena Suarez et al., Wash. Office on Latin Am., *Access to Justice for Migrants in Mexico: A Right That Exists Only on the Books,* 24-27, 30-31 (2017), https://www.wola.org/wp-content/uploads/2017/07/Access-to-Justice-for-Migrants_July-2017.pdf [hereinafter *Access to Justice]* (documenting Mexican authorities' unwillingness to investigate crimes against migrants).

[26] *Access to Justice, supra* note 25, at 30-31; Alberto Diaz-Cayeros et al., *Caught in the Crossfire: The Geography of Extortion and Police Corruption in Mexico,* 3-4 (Stanford Ctr. for Int'l Dev., Working Paper No. 545, 2015), https://globalpoverty.stanford.edu/sites/default/files/publications/545wp_0.pdf.

[20][27] *See, e.g.,* Villegas, *supra* note 16 (referencing documentation of "the abuse of power by various Mexican authorities, including agents from the National Migration Institute, municipal governments, and state police" against individuals traveling to the U.S. border).

the *non-refoulement* principle."[28]

35.46. In addition, Mexico's northern border region is ~~particularly plagued~~ particularly plagued with crime and violence, presenting renewed dangers for asylum seekers just as they approach their destination.[21][29] The state of Tamaulipas, which borders South Texas cities including Laredo, McAllen, and

[28]   Amnesty Intl, *Overlooked, Under-Protected Mexico's Deadly* Refoulement *of Central Americans Seeking Asylum* 2 (2018), https://www.amnesty.org/ download/Documents/AMR4176022018ENGLISH.PDF; *see id.* at 8-20 (describing the multiple layers of institutional failure leaving refugees and asylum seekers vulnerable to *refoulement* in Mexico); *accord* Francisca Viand-Walsh et al., Refugees Intl, *Putting Lives at Risk: Protection Failures Affecting Hondurans and Salvadorans Deported from the United States and Mexico* 11-12 (2018), https://static1.squarespace.com/static/506c8eale4b01 d9450dd53f5/t/5a849f81c830250842098d87/1518641035445/Norther n+Triangl e+-+Refugees+International.pdf; *Dangerous Territory, supra* note 21, at 4-9.

[21][29]   *See* ~~U.S. Dep't of State, *Mexico Travel Warning* (Dec. 8, 2016), https:// trave l.state.gov/content/passports/en/alertswarnings/mexico-travel-warning.html~~*Mexic o Travel Advisory, supra* note 22 (reporting violent crime and an increase in homicide ~~,~~ in the state of ~~Baja~~Bata California (~~including~~encompassing ~~border~~towns Tijuana and Mexicali)~~;~~ criminal compared to 2016; widespread violent crime and gang activity ~~and violence~~ in the state of Chihuahua (~~including Ciudad Juarez); violence and criminal activity, including homicide, armed robbery, carjacking, kidnapping, extortion, and sexual assault~~encompassing border town Ciudad Juarez); widespread violent crime and limited law enforcement capacity to prevent and respond to crime in the state of Coahuila (particularly ~~along the highways between Piedras Negras and Nuevo Laredo~~in the northern part of the state); that the state of Sonora (~~including~~encompassing border town Nogales) is a key region in the international ~~drug~~and human trafficking trades; and common violent crime, including homicide, armed robbery, carjacking, kidnapping, extortion, and sexual assault in the state of Tamaulipas (~~including~~encompassing border towns Matamoros, Nuevo Laredo, and Reynosa), where ~~state and municipal~~ law enforcement capacity to respond to violence is limited ~~to nonexistent in most parts of~~throughout the state).

29

Brownsville, is on the U.S. State Department's "no travel" list.[30] Most of Mexico's other border states, including Sonora, Chihuahua, Coahuila, and Nuevo Leon, are classified at Level 3, "Reconsider Travel," due to the prevalence of violent crime and gang activity.[31] The most pervasive problems migrants face in Mexico's northern border states include disappearances, kidnappings, rape, trafficking, extortion, ~~execution and~~ execution and sexual and labor exploitation by state and non-state actors.[~~22~~32]

 Recently, the situation at the border has worsened: smugglers have increased their prices, cartel members have increased their surveillance and control of areas around border crossings, and the number of migrants kidnapped and held for ransom has increased.[~~23~~33] Even migrants in the immediate vicinity of a POE are at risk of violence and exploitation.[34] Those who seek refuge in shelters may be in

---

[30]  *Id.*

[31]  *Id.*

[~~22~~32]  B. Shaw Drake et al., Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers* ~~Human Rights First,~~ 16 (2017),~~ḷ hops~~ https://www.humanrightsfirst. org/ sites/default/files/hrf-crossing-the-line-report.pdf [hereinafter *Crossing the Line*].

[~~23~~33]  *Id.*

[34]  Josiah Heyman & Jeremy Slack, *Blockading Asylum Seekers at Ports of Entry at the US-Mexico Border Puts Them at Increased Risk of Exploitation, Violence, and Death,* Ctr. for Migration Stud. (June 25, 2018), http://cmsny.org/publications/heyman-slack-asylum-poe/#_ednrefl1.pdf ("When asylum-seekers are turned away by US authorities, they return to areas around the Mexican-side POEs. These are characteristically busy zones of businesses, restaurants, bars, discos, drug sellers, hustlers, and commercial sex work, although each border port has its own characteristics. They are areas that increase the vulnerability and exploitability of non-Mexican migrants with little knowledge and few resources.").

particular danger. Some shelters are infiltrated by organized crime, while others have been the sites of recent vandalism, burglary, threats, and kidnapping.[35]

36.   By rejecting asylum seekers47. By turning back individuals who seek to access the asylum process by presenting themselves at POEs on the U.S.-Mexico border, Defendants are forcing them to return to the dangerous conditions that drove them to flee their countries in the first place.[24][36]

### B.   Defendants' Systematic, Illegal Practice Policy and Widespread Practices of Denying Asylum Seekers Access to the Asylum Process

37.   Since at least the summer of48. Starting in 2016 and continuing to the present, CBP officials, at or under the direction or with the knowledge and acquiescence or authorization of Defendants, have consistently and systematically preventedrestricted the number of asylum seekers arriving atwho can access the U.S. asylum process through POEs along the U.S.-Mexico border from accessing

---

[35]   Id.; Wash. Office on Latin Am. et al., *Situation of Impunity and Violence In Mexico's Norther Border Region* 2-4 (Mar. 2017), https://www.wola.org/wp-content/uploads/2017/04/Situation-of-Inmunity-and-Violence-in-Mexicos-northern-border-LAWG-WOLA-KBI.pdf.

[24]   Id.[36]   *Crossing the Line, supra* note 32, at 16; *see also* B. Shaw Drake, Human Rights First, *Violations at the Border: The El Paso Sector*, Human Rights First, 2-3 (2017), http://www.humanrightsfirst.org/sites/default/files/hrf-violations-at-el-paso-border-rep.pdfhttps://www.humanrightsfirst.org/resource/violations-border-el-paso-sector (explaining the risks facing asylum seekers who are turned awayback at U.S. POEs, including being deported back to their home countries where they face persecution).

the U.S. asylum process.²⁵ ³⁷

~~CBP's illegal practice, which violates U.S. and international law, has been documented in hundreds of cases at POEs~~ That has been accomplished both through the Turnback Policy that seeks to restrict access to the asylum process and also through widespread practices across the U.S.-Mexico border also designed to deny access to the asylum process.

---

²⁵ ³⁷  There is anecdotal evidence that CBP officials began unlawfully dissuading asylum seekers from pursuing their claims or flatly refusing them entry to the United States even prior to 2016. *See* ~~American~~ Sara Campos & Joan Friedland, Am. Immigration Council, *Mexican and Central American Asylum and Credible Fear ˏ Claims: Background and Context,* 10 (2014), ~~https://www.americanimmigrationcouncil.org/sites/default/files/research/asylum_andcredible_fear~~ https://www.ameKican immigrationcouncir. org/sites/default/files/researcb/asylum_and_credible_fear_ claims_final_0.pdf (reporting that Mexican asylum seekers arriving in El Paso "expressed a fear of persecution [but] were told by CBP that the U.S. doesn't give Mexicans asylum, and they [we]re turned back"); *see also* U.S. Comm'n on ~~Intl~~ Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations,* 54 (2005), https://www.uscirf .gov/sites/default/files/resources/stories/pdf/asylum_seekersNolume J.pdf [hereinafter *2005 USCIRF Report*] (reporting that two groups of asylum seekers who arrived at the San Ysidro POE were "improperly refused entry to the United States for . . . lacking ~~proper~~ roper documentation and [were] 'pushed back' . . . without [being] refer[red] . . . to secondary inspection" and without a "record of the primary inspection" being created); *see also* Human Rights Watch, *"You Don't Have Rights Here": US Border Screening. and Returns of Central Americans to Risk of Serious Harm,* 2, 8 (2014), https://www.hrw.org/~~report/2014/10/16/you-dont-have-rights-here/us-border-screening-and-returns-central-americans-risk~~ sites/default/files/reports/us1014_web_0.pdf [hereinafter *"You Don't Have Rights Here"*] (concluding that the "cursory screening [conducted by CBP officials] is failing to effectively identify [asylum seekers]" and reporting that some "border officials acknowledged hearing [non-citizens'] expressions of fear but pressured them to abandon their claims").

32

49. Al Otro Lado and Class Plaintiffs, as well as numerous nongovernmental organizations[38] and news outlets,[39] have documented thousands of cases in which CBP officials have arbitrarily denied and/or unreasonably delayed access to the asylum process to individuals seeking asylum by presenting themselves at POEs along the U.S.-Mexico border.[40] The Turnback Policy and CBP's other widespread, unlawful practices have been documented at POEs spanning the length of the U.S.-Mexico border, including POEs in San Ysidro, California; Otay Mesa, California; Tecate, California;

[38] *See, e.g., Crossing the Line, supra* note 32; Amnesty Int'l, *Facing Walls: USA and Mexico's Violation of the Rights of Asylum Seekers* 19-22 (2017), https://www.amnestyusa.org/wp-content/uploads/2017/06/USA-Mexico-Facing-Walls-REPORT-ENG.pdf [hereinafter *Facing Walls*]; *"You Don't Have Rights Here", supra* note 37, at 2, 4.

[39] Joshua Partlow, *U.S. Border Officials Are Illegally Turning Away Asylum Seekers, Critics Say,* Wash. Post (Jan. 16, 2017), https://www.washingtonpost.com/world/the_americas/us-border-officials-are-illegally-turning-away-asylum-seekers-critics-say/2017/01/16/f7f5c54a-c6d0-11e6-acda-59924caa2450_story.html?noredirect=on&utm_term=.ed5c3100d451; Caitlin Dickerson & Miriam Jordan, *'No Asylum Here': Some Say U.S. Border Agents Rejected Them,* N.Y. Times (May 3, 2017), https://www.nytimes.com/2017/05/03/us/asylum-border-customs.html; Rafael Carranza, *Are Asylum Seekers Being Turned Away at the Border?,* USA Today (May 4, 2017, 10:55 PM), https://www.azcentral.com/story/news/politics/immigration/2017/05/05/asylum-seekers-being-turned-away-border/309398001/.

[40] Amnesty Intl, *USA: 'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States* 17 (2018), https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF [hereinafter *You Don't Have Any Rights Here*] ("While there are no official statistics on how many people CBP has illegally turned away without processing their asylum requests, Amnesty International has received numerous secondary reports from NGOs indicating that CBP has forced thousands of asylum-seekers to wait in Mexico — including families with children, mostly from Central America.").

33

Calexico, California; San Luis, Arizona; Nogales, Arizona; El Paso, Texas; Del Rio, Texas; Eagle Pass, Texas; El Paso, Texas; Laredo, Texas; and Roma, Texas; Hidalgo, Texas, among others; Los Indios, Texas; and Brownsville, Texas.

38.   CBP's practice of denying asylum seekers access to the asylum process has been well documented.[26] Al Otro Lado and Class Plaintiffs, as well as numerous non-governmental organizations[27] and news outlets,[28] have documented

[26]   *See, e.g.*, Borderland Immigration Council, *Discretion to Deny: Family Separation*, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S. Mexico Border, 12 (2017), https:// media.wix.com/ugd/e07ba9_72743e60ea6d4e3aa796becc71e3b0fe.pdf (reporting that "it is commonplace for asylum seekers to be placed in expedited removal proceedings and summarily deported . . ., despite expressing fear"); U.S. Comm'n on Int'l Religious Freedom, Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal, 20 (2016) (reporting that despite findings and recommendations in a 2005 study relating to primary inspection, USCIRF observers in 2016 continued to find "several examples of non-compliance with required procedures" in CBP primary inspection interviews); see also 2005 USCIRF Report, supra note 25, at 54 (finding that, in approximately half of the inspections observed, inspectors failed to read the proper advisals regarding asylum to the non-citizen and that "in 15 percent of [the] cases [ ] where an arriving [non-citizen] expressed a fear of return to the inspector, that [non-citizen] was not referred" for a credible fear interview).

[27]   *See, e.g., Crossing the Line, supra* note 22; Amnesty Intl, *Facing Walls: USA and Mexico's Violation of the Rights of Asylum Seekers,* 19-22 (2017), https://www.amnestyusa.org/reports/facing-walls-usa-mexicos-violation-rights-asylum-seekers/ [hereinafter *Facing Walls]; "You Don't Have Rights Here," supra* note 25, at 2, 4.

[28] Joshua Partlow, *U.S. Border Officials Are Illegally Turning Away Asylum Seekers, Critics Say,* Wash. Post (Jan. 16, 2017), https://www.washingtonpost.com/world/the_americas/us-border-officials-are-illegally-turning-away-asylum-seekers-critics-say/2017/01/16/f7f5c54a-c6d0-11e6-acda-59924caa2450_story.html?utm_term=.83c7aed8fc6c; Caitlin Dickerson & Miriam Jordan, *'No Asylum Here': Some Say U.S. Border Agents Rejected Them,* N.Y. Times (May 3, 2017), haps ://www.nytime s. com/2017/05/03/us/asylum-border-customs.html; Rafael Carranza, *Are Asylum Seekers Being Turned Away at the Border?,* USA Today (May 5, 2017), https://www.usatoday.com/story/news/politics/2017/05/05/asylum-seekers-turned-away/311552001/.

34

well over 100 cases in which CBP officials have failed to comply with U.S. and international law and arbitrarily denied access to the asylum process to asylum seekers presenting themselves at POEs along the U.S. Mexico border.

**1.  ~~Defendants Have Violated Each of the Class Plaintiffs' Rights to Seek Asylum~~ Initiation of the Turnback Policy**

*Plaintiff  Abigail Doe*

39.   A.D. is a native and citizen of Mexico. She is the mother of two children under the age of ten, with whom she previously lived in Central Mexico. In May 2017, A.D.'s husband disappeared after he refused to allow drug cartel members to use his tractor-trailer to transport drugs.

40.   When A.D. reported her husband's disappearance to governmental authorities, members of the drug cartel abducted her, held her at gunpoint, and threatened to kill her and her children if she continued to investigate her husband's disappearance. One cartel member told A.D. that she had to leave if she wanted to live. Fearing for her life, A.D. fled to Tijuana with her children to seek asylum in the United States.

41.   After arriving in Tijuana, A.D. and her children immediately went to the San Ysidro POE, where she informed CBP officials of her intent to apply for asylum and her fear of returning to Mexico. CBP officials repeatedly misinformed A.D. that she did not qualify for asylum. One CBP official threatened that her children would be taken away from her if they allowed her to cross the border and again misinformed her that only the Mexican government could help her.

42.   CBP officials coerced A.D. into signing a document in English which she could not read and did not understand. The document stated that she did not have a fear of returning to Mexico and was withdrawing her application for admission. CBP officials then instructed A.D. to say that she had agreed to accept the assistance of the Mexican government and used a video camera to record her

statement. A CBP official then took A.D. and her children back to Mexico and left them to fend for themselves.

43.   The statements CBP coercively obtained from A.D. were and are still false; A.D. does fear returning to and staying in Mexico and does not intend to seek assistance from the Mexican government because she believes such efforts would be futile.

44.   A.D. and her children would like to present themselves again to seek asylum but, based on their experience and the experience of others with CBP's practice at POEs, she understands that they would likely be turned away again or that CBP would take her children away from her.

45.   A.D. and her children are currently staying in temporary housing in Tijuana, where A.D. continues to fear for her life and the lives of her children. A.D. can no longer remain in Mexico and has no place else to turn for safety but the United States.

***Plaintiff Beatrice Doe***

46.   B.D. is a native and citizen of Mexico. In May 2017, B.D. fled her hometown in Mexico with her three children, ages seven, eleven and fifteen, and her nephew. B.D.'s nephew was targeted by the Zetas, a Mexican drug cartel that controls most of Southern Mexico, for failing to pay a fee that the Zetas demanded from all individuals who worked in the market. The Zetas threatened to kill B.D.'s nephew and to harm his family if he did not pay the fees. The cartel also pressured B.D.'s nephew to join their forces and threatened to increase the fee if he refused. On two occasions when B.D.'s nephew failed to pay the fees, the Zetas beat him up.

47.   B.D. herself suffered severe domestic violence at the hands of her husband. In May 2017, she reported his abuse to two government agencies. When Mexican government officials subsequently requested that B.D.'s husband meet

1    with them, he responded that he would continue to do what he wanted with B.D. and his children. Terrified, B.D. left their house the same day.

2    48.   B.D. fled with her children and nephew and traveled to Tijuana in
3    order to seek asylum in the United States. Initially, B.D. and her family went to the
4    Otay Mesa POE. When B.D. expressed their intent to seek asylum, a CBP official
5    told her that asylum-related services were not provided at that port, and directed
6    her to go to the San Ysidro POE. B.D. and her family then attempted twice to
7    request asylum at the San Ysidro POE, but CBP officials turned them away both
8    times.

9    49.   The first time B.D. and her family presented themselves at the San
10   Ysidro POE, she explained that their lives were at risk in Mexico and that she was
11   afraid of her husband. CBP officials misinformed her that the U.S. government
12   had no obligation to help her or her family, that they did not have a right to enter
13   the United States because they were not born there, and that she should seek help
14   from the Mexican government.

15   50.   Another CBP official then threatened to take B.D.'s nephew away
16   from her and to put her in jail if she refused to sign an English document which
17   she did not understand. Believing that she had no other option, she signed the
18   document. CBP officials then escorted B.D. and her family out of the POE.

19   50.   Internal CBP documents reveal that CBP officials at the highest
20   levels mandated turnbacks at POEs along the U.S.-Mexico border.[41]

21   51.   The statement CBP coercively obtained from B.D. were and are still
22   false; B.D. and her children do fear returning to and staying in Mexico. Evidence
23   of a Turnback Policy, at least regarding the San Ysidro POE, exists starting in

24   [41]  These documents, produced during the limited discovery that took place while
25        this case was pending in the U.S. District Court for the Central District
         of California, relate exclusively to POEs under the responsibility of the
26        Laredo Field Office and the San Ysidro POE. Additional discovery
         could reveal further details regarding the contours of the Turnback
27        Policy.

28

37

May 2016. In an email dated May 29, 2016, the Watch Commander at the San Ysidro POE notes that "[t]he Asylee line in the pedestrian building is not being used at this time, there is a line staged on the Mexican side." In an email sent roughly a month later, the same individual reiterated that "[i]t's even more important that when the traffic is free-flowing that the limit line officers ask for and check documents to ensure that groups that may be seeking asylum are directed to remain in the waiting area on the Mexican side."

52. ~~The next day, B.D. and her family returned to the San Ysidro POE. A CBP official who recognized B.D. from the day before misinformed her that she had no right to enter the United States or seek asylum, and that she would be put in jail for three years if she returned to the POE. After another CBP official separately threatened to transfer B.D.'s nephew to Mexican authorities and return him to Southern Mexico, CBP officials again escorted B.D. and her family out of the San Ysidro POE.~~ CBP's collaboration with the Mexican government to turn back asylum seekers at the San Ysidro POE was formalized in a document issued on an unspecified date after July 15, 2016, which provides:

> In coordination with the GoM [Government of Mexico] we have identified two (2) periods throughout the day to intake asylum claims into our custody (8am and 4 pm). At each period, we intake approximately [redacted] applicants, with a daily intake total of approximately [redacted] applicants. If an applicant does not meet these intake time periods, they are requested to remain in-line in Mexico until the next intake period. . . . In order to control the flow of asylees in their area, the GoM has instituted a numerical process by giving asylum applicants numbers with intake dates in the order of their arrival. The applicants are also given the locations of humanitarian shelters in Tijuana where they receive food and shelter until their intake date. The implementation of this process was developed by the GoM.

53. ~~B.D. and her children would like to present themselves again for asylum, but based on their experience and the experience of others with CBP's~~

38

practice at POEs, she understands that they would likely be turned away again or put in jail as the CBP officials threatened. On December 6, 2016, the Director of Field Operations at CBP's San Diego Field Office confirmed that the Turnback Policy remained in effect:

> Metering continues at both San Ysidro and Calexico POEs the numbers are adjusted based on space availability and ERO [ICE's Office of Enforcement and Removal Operations] movement of detainees from the ports. Mexican immigration is handling the metering process before the OTMs [Other Than Mexicans] arrive at the port of entry; no issues on our end with aliens being turned away.

54.   B.D. and her children are currently staying in temporary housing in Tijuana, where B.D. continues to fear for her life and the lives of her children. B.D. can no longer remain in Mexico and has no place else to turn for safety but the United States. On information and belief, other CBP Field Offices also implemented the Turnback Policy. Although certain port directors periodically suspended the Turnback Policy, they never abandoned it. Moreover, direct turnbacks of asylum seekers—via misrepresentations about the availability of asylum, intimidation, and coercion, among other tactics—continued in practice even during periods of formal suspension of the policy.

***Plaintiff Carolina Doe***

55.   C.D. is a native and citizen of Mexico. In May 2017, C.D. fled her hometown in Mexico with her three children, ages nine, fifteen and eighteen, after her brother-in-law, a high-ranking police official, was kidnapped, tortured and killed by members of a drug trafficking cartel. His dismembered body was found in garbage bags in a cemetery. C.D.'s husband witnessed the kidnapping and showed C.D. a picture of one of the men who was involved. Drug cartel members threatened C.D.'s husband after the murder, and C.D. and her husband saw the van used in the kidnapping drive by their house twice. Two men followed C.D. and her daughters on way home from work, and several men came to their home at

night. C.D. was terrified and hid with her daughters in the bathroom because she feared for her life and the lives of her daughters. Evidence that a border-wide Turnback Policy was authorized at the highest levels of CBP, including by Defendant and now-Commissioner Kevin McAleenan, exists as of November 2016. In an email communication dated November 12, 2016, the Assistant Director Field Operations for the Laredo Field Office instructed all Port Directors under his command to follow the mandate of the then-CBP Commissioner and Deputy Commissioner:

56.   In May 2017, C.D. fled in the middle of the night with her daughters and traveled to Tijuana in order to seek asylum in the United States. C.D. and her daughters presented themselves at the San Ysidro POE, and C.D. explained that they were afraid of returning to Mexico and wanted to seek asylum. CBP officials locked them in a room overnight at the San Ysidro POE. In the morning, a CBP official told C.D. that she would not be granted asylum and misinformed her that the protection she was seeking in the United States could be provided by the Mexican authorities. The CBP official threatened to take away C.D.'s fifteen-year-old U.S. citizen daughter and put her in foster care, and told C.D. that if she did not want her daughter taken away from her, then she had to make a statement on video that she was not afraid of returning to Mexico

> At the request of C-1 [then CBP Commissioner R. Gil Kerlikowski] and C-2 [then CBP Deputy Commissioner Kevin McAleenan], you are to meet with your INM [Institute Nacional de Mig.racion, Mexico's immigration agency] counterpart and request they control the flow of aliens to the port of entry. For example, if you determine that you can only process 50 aliens at a time, you will request that INM release only 50.
>
> If INM cannot or will not control the flow, your staff is to provide the alien with a piece of paper identifying a date and time for an appointment and return then [sic] to Mexico. This is similar to what

San Diego is doing. We understand the alien may express a fear of returning to Mexico and we will address as the situation dictates.[42]

56.    This email directive was promptly implemented by the Laredo Field Office, which encompasses the Brownsville, Del Rio, Eagle Pass, Hidalgo, Laredo, Progreso, Rio Grande, and Roma, Texas POEs and covers nearly 400 miles of the Texas-Mexico border. According to an internal email dated November 22, 2016, "Our instructions from Service Headquarters and LFO [Laredo Field Office] is that we will only accept 'what we can handle/process'. All others will be turned back to Mexico with an appointment date/time if possible." Other email correspondence from CBP officials at the Laredo, Hidalgo and Roma POEs indicates that individuals turned back did not receive appointment notices.

57.    The ~~CBP officials coerced C.D. into recanting her fear on video. C.D. initially did not respond as the CBP officials instructed her to do because the responses they told her to say were not true. C.D. was afraid and wanted to respond that she was very scared to return to Mexico. One of the CBP officials repeated that the only way C.D. and her daughters would be able to leave voluntarily without her U.S. citizen daughter being taken away from her was if C.D. stated on video that she was not scared. Having been locked in a room overnight, C.D. was tired and scared and felt like she was in jail. The CBP officials continued to coerce her until she finally did what they told her to do, believing she had no choice.~~ directive was memorialized in a memorandum from the Laredo Field Office dated January 13, 2017. The memorandum directs that "metering" procedures—i.e. procedures to regulate and restrict the access of asylum seekers to POEs—be implemented once case processing numbers exceed a certain (redacted)

[42]   An email sent the following day clarified that this directive was to apply only to Central Americans. In practice, however, individuals of many other nationalities have also been affected.

41

number, that such procedures are to be conducted "at the middle of the bridge," and that "all foreign nationals seeking a benefit are given an appointment window to return for processing." The Laredo Command Center is required to provide hourly updates to "local upper management," among others, who must also be notified once normal operations resume.

58.    ~~The CBP officials also coerced C.D. into signing a document in English which she could not read and did not understand. The document stated that she did not have a fear of returning to Mexico and was withdrawing her application for admission. The statements CBP coercively obtained from C.D. were and are still false; C.D. does fear returning to and staying in Mexico~~In the months that followed, asylum seekers from Central America and elsewhere continued to seek access to the U.S. asylum process by presenting themselves at POEs along the U.S.-Mexico border, but many were turned back by, at the instruction of, or with the knowledge of CBP officials.

59.    ~~Several days after CBP turned away C.D. and her daughters at the POE, C.D. made arrangements for her U.S. citizen daughter to cross into the United States. C.D. and her other two children would like to present themselves again for asylum, but based on their experience and the experience of others with CBP's practice at POEs, she understands that they would likely be turned away again.~~

On June 13, 2017, in questioning before the House Appropriations Committee, John P. Wagner, the Deputy Executive Assistant Commissioner for OFO, admitted that CBP officials were turning back asylum applicants at POEs

42

along the U.S.-Mexico border.[43] When asked to comment on the numerous press reports that CBP officers at POEs had been "turning away individuals attempting to claim credible fear," Mr. Wagner acknowledged that CBP had indeed engaged in turnbacks, and argued the practice was justified by a lack of capacity.[44]

Mr. Wagner also stated on the record that because POEs "do not have the kind of space to hold large volumes of people," CBP "worked a process out with

---

[43] *Department of Homeland Security Appropriations for 2018 Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 115th Cong. 289-90 (2017) (testimony of John P. Wagner, Deputy Executive Assistant Comm'r, Office of Field ()aerations, Customs and Border Protection), https://www.gpo.gov/fdsys/ pkg/CFMG-115hhrg27050/pdf/CHRG-115hhrg27050.pdf [hereinafter *Wagner Testimony*].

[44] Congresswoman Roybal-Allard asked:
> It is my understanding that CBP is legally required to process credible fear claims when they are presented, and it is not authorized to turn back individuals claiming fear even temporarily. In addition to commenting on those allegations, what steps can be taken or have been taken to ensure this is not occurring or continuing to occur at the ports of entry, such as, is there training or other guidance, reminding CBP personnel how they are required to treat individuals who express fear?

Mr. Wagner responded:
> Sure. It was a question really of the space available to process people. And our facilities were at capacity to be able to take more people in, go through the processing, and turn them over to ICE after that. And the building was full, and we could not humanely and safely and securely hold any more people in our space.

The Congresswoman later clarified:
> "So it wasn't an issue of officers not knowing what the law was. It was more of an issue of capacity?" And Mr. Wagner responded; "It was an issue of capacity and being able to put people into the facility without being overrun or having unsafe and unsanitary conditions."

*Id.*

---

43

the Mexican authorities to be able to limit how many people a day could come across the border into [CBP's] facility to be processed."[45]

60. ~~C.D. and her two children are currently staying in temporary housing in Tijuana, where C.D. continues to fear for her life and the lives of her children. C.D. can no longer remain in Mexico and has no place else to turn for safety but the United States.~~

***Plaintiff Dinora Doe***

Following dozens of turnbacks of asylum seekers in San Ysidro in December 2017, the CBP Field Operations Director in charge of the San Ysidro POE acknowledged and defended the turnbacks, stating: "So they weren't being allowed into the port-of-entry. We said, 'we're at capacity, so wait here.' It's because of our detention space limitation, we were at capacity."[46]

### 2. High Level Officials' Public Confirmation and Escalation of the Turnback Policy and CBP's Aggressive Implementation

61. ~~D.D. is a native and citizen of Honduras. MS-13 gang members repeatedly threatened to kill D.D. and her then-seventeen-year-old daughter if they did not leave their house. After receiving the third threat, they fled to another city where they remained in hiding.~~

In late April 2018, following an arduous, widely-publicized journey, a group of several hundred asylum seekers—referred to in the press as a"caravan"—arrived at the San Ysidro POE. As they approached the United States, President Trump posted a series of messages on Twitter warning of the dangers posed by the group, including one indicating that he had instructed DHS "not to let these large Caravans of people into our Country."[47]

---

[45] *Id.*
[46] *You Don't Have Any Rights Here, supra* note 40, at 16.
[47] Donald J. Trump (@realDonaldTrump) Twitter (Apr. 2, 2018, 4:02 AM)
    https://twitter.com/realDonaldTrump/status/980762392303980544.

44

62.   ~~When D.D. and her daughter subsequently returned home, three MS-13 members held them captive for three days and repeatedly raped each of them in front of the other~~Thereafter, the highest-ranking officials in the Department of Justice and DHS publicly and unambiguously proclaimed the existence of a Turnback Policy. CBP continued to buttress the Turnback Policy through the practices described above, including misrepresentations, threats and intimidation, verbal abuse and physical force, coercion, outright denials of access, and physically obstructing access to POEs.

63.   ~~When D.D. and her daughter finally escaped, they fled to a shelter in Mexico. However, after being threatened by MS-13 gang members again in Mexico, they knew they had to leave.~~ Attorney General Sessions, refusing to acknowledge that some of the caravan members might have legitimate claims to asylum under U.S. law, characterized the caravan's arrival as "a deliberate attempt to undermine our laws and overwhelm our system."[48] Upon the caravan's arrival, CBP officials indicated—in accordance with the Turnback Policy—that they had exhausted their capacity to process individuals traveling without proper documentation.[49]

64.   ~~On three separate occasions in August 2016, D.D. and her daughter went to the Otay Mesa POE and expressed their intent to seek asylum in the United States. Each time, CBP officials turned them away.~~As the caravan was approaching the United States, Attorney General Sessions announced that all

[48]   Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Statement on Central America 'Caravan', (Apr. 23, 2018), https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-statement-central-american-caravan.

[49]   Kirk Semple & Miriam Jordan, *Migrant Caravan of Asylum Seekers Reaches U.S. Border*, N.Y. Times (Apr. 29, 2018), https://www.nytimes.com/2018/04/29/world/americas/mexico-caravan-trump.html.

45

individuals who crossed the U.S.-Mexico border illegally would be criminally prosecuted.[50] Following the arrival of the caravan, he  pronounced that "[p]eople are not going to caravan or otherwise stampede our border," and reiterated his commitment to prosecuting illegal border crossers.[51]

65. ~~During D.D.'s first attempt, CBP officials misinformed her that there was no asylum in the United States and escorted D.D. and her daughter outside the POE.~~On May 15, 2018, DHS Secretary Kirstjen Nielsen likewise publicly and unambiguously confirmed the existence of the Turnback Policy, dismissing the United States' legal obligation to receive and process asylum seekers at U.S. borders as a legal "loophole":

> We are "metering," which means that if we don't have the resources to let them [asylum-seekers] in on a particular day, they are going to have to come back. They will have to wait their turn and we will process them as we can, but that's the way that the law works. Once they come into the United States, we process them. We have asked Congress to fix this loophole. It's a huge gaping hole that we need to fix because it is so abused.[52]

66. ~~During her second attempt later the same day, one CBP official misinformed~~ D.D. ~~that there was no asylum available in the United States for Central Americans and that if they returned to the POE, they would be handed over to Mexican authorities and deported to Honduras.~~Trump himself continued to

---

[50]  "Press Release, U.S. Dep't of Justice, Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[51]  U.S. Attorney Gen. Jefferson B. Sessions, Remarks Discussing the Immigration Enforcement Actions of the Trump Administration (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[52]  *Secretary Nielsen Talks Immigration, Relationship with Trump*, Fox News (May 15, 2018), https://video.foxnews.com/v/5785340898001/?#sp=show-clips.

46

publicly pronounce the importance of the Turnback Policy, through tweets, including direct statements that promote the direct violation of the law:

- June 24, 2018: "When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came."[53]

- June 30: "When people come into our Country illegally, we must IMMEDIATELY escort them back out without going through years of legal maneuvering."[54]

- July 5: "When people, with or without children, enter our Country, they must be told to leave without our Country being forced to endure a long and costly trial. Tell the people, 'OUT,' and they must leave, just as they would if they were standing in your front lawn."[55]

67. ~~During her third attempt the next morning, a CBP official misinformed~~ ~~D.D.~~ ~~that she could pass through the POE, but would have to leave her daughter behind. When~~ ~~D.D.~~ ~~insisted that she and her daughter had a right to apply for asylum, CBP officials escorted them out of the POE.~~Meanwhile, CBP officials continue to turn back asylum seekers who seek access to the U.S. asylum process by presenting themselves at POEs. Predictably, the Turnback Policy has caused and continues to cause many asylum seekers, desperate to avoid danger on the Mexican side of the border, to seek to enter the United States outside POEs

[53] Donald J. Trump (@realDonaldTrump) Twitter (Apr. 24, 2018, 8:02 AM) https://twitter.com/realdonaldtrump/status/1010900865602019329?lang=en.

[54] Donald J. Trump (@realDonaldTrump) Twitter (June 30, 2018, 12:44 PM) https://twitter.com/realdonaldtrump/status/1013146187510243328?lang=en.

[55] Donald J. Trump (@realDonaldTrump) Twitter (July 5, 2018, 7:08 AM) https://twitter.com/realDonaldTrump/status/1014873774003556354; Donald J. Trump (@realDonaldTrump) Twitter (July 5, 2018, 7:16 AM) https://twitter.com/realDonaldTrump/status/1014875575557804034.

and thereafter be arrested and prosecuted for unlawful entry and in many cases forcibly separated from their children.

68. ~~D.D. and her children would like to present themselves again for asylum but, based on their experience and the experience of others with CBP's practice at POEs, she understands that they would likely be turned away again or separated from each other.~~In recent months, Commissioner McAleenan and other high-level CBP officials have openly acknowledged that the Turnback Policy remains in effect, and that the United States is actively collaborating with Mexico to reduce the flow of asylum seekers.[56]

69. ~~D.D. and her daughter are currently staying in Tijuana. In June 2017, D.D. received a call from a person connected to the MS-13 gang trying to identify her location in Mexico. D.D. continues to fear for her life and the life of her daughter. D.D. can no longer remain in Mexico and has no place else to turn for safety but the United States.~~A high-level CBP officer reiterated the contours of the Turnback Policy in a meeting with immigrant rights groups in El Paso on June 27, 2018 and confirmed that it was being applied border-wide.[57]

*~~Plaintiff  Ingrid Doe~~*

---

[56] *See, e.g.*, CBP Comm'r Kevin McAleenan, Statement on Operations at San Ysidro Port of Entry (April 29, 2018), https://www.cbp.gov/newsroom/speeches-and-statements/statement-commissioner-kevin-mcaleenan-operations-san-ysidro-port (explaining that "individuals [without appropriate entry documentation] may need to wait in Mexico as CBP officers work to process those already within our facilities"); Molly Hennessy-Fiske, *Border Protection Commissioner Talks 'Zero Tolerance,' Family Separations and How To Discourage Immigration*, L.A. Times (June 11, 2018) http://www.latimes.com/nation/la-na-border-patrol-immigration-20180611-htmlstory.html ("We're not denying people approaching the U.S. border without documents. We're asking them to come back when we have the capacity to manage them.").

[57] *You Don't Have Any Rights Here*, *supra* note 40, at 17.

70. ~~I.D. is a native and citizen of Honduras. I.D. has two children and is pregnant and expecting her third child in September.~~ Notably, a September 27, 2018 report from the OIG ("OIG Report"), attached as Exhibit A, references the policy under which CBP systematically restricts access to the asylum process at POEs and confirms the policy was directed by DHS. The OIG Report states the existence of a "CBP guidance" which indicates that "[w]hen the ports of entry are full . . . [CBP] officers should inform individuals that the port is currently at capacity and that they will be permitted to enter once there is sufficient space and resources to process them."[58] Although this "guidance" states that CBP officers "may not discourage individuals from waiting to be processed," some officers in El Paso informed OIG investigators that they advise asylum seekers to "return later."[59] Also, according to the report, while "[u]nder the Zero Tolerance Policy, the Government encouraged asylum-seekers to come to U.S. ports of entry[,] . . .[a]t the same time, CBP reported that overcrowding at the ports of entry caused them to limit the flow of people that could enter."[60] The report elaborates that "CBP was regulating the flow of asylum-seekers at ports of entry through 'metering,' a practice CBP has utilized at least as far back as 2016 to regulate the flow of individuals at ports of entry.[61]

71. ~~18th Street gang members murdered I.D.'s mother and three siblings.~~ ~~They also threatened to kill~~ ~~I.D.~~

[58] *OIG Report, supra* note 1, at 6.
[59] *Id.* at 7.
[60] *Id.* at 5.
[61] *Id.* at 5-6; *see id.* at 6-7 (describing CBP's "metering" practice at POEs, explaining that "CBP officers stand at the international line out in the middle of the footbridges," checking pedestrians' travel documents, and preventing asylum-seekers from crossing the international line until space is "available . . . to hold the individual while being processed").

49

DHS's response to the OIG Report confirms that CBP has engaged in "queue management practices . . . directed by [Defendant Nielsen].[62] The response also confirms that "CBP's processes and policies at ports of entry may require some individuals who do not have travel documents to wait at the International Boundary prior to entering the United States."[63]

72. ~~For several years, I.D. and her children were subject to severe abuse by her partner and the father of her son and the child that she is expecting. I.D.'s partner regularly raped I.D., sometimes in front of her children. He would also burn and beat I.D. One day, I.D.'s partner put a gun to I.D.'s head and threatened to kill her.~~ In addition, officials from the Mexican immigration agency, *Instituto Nacional de Migracion* ("INM"), have confirmed the existence of an agreement with CBP under which INM assists with the Turnback Policy by hindering asylum seekers' access to POEs. For example, as reported in the Amnesty International report released on October 11, 2018, the INM head delegate in the Mexican state of Baja California reportedly expressed doubt about CBP's claims of capacity constraints and "voiced his frustration that [CBP was] making INM do [its] dirty work."[64] The INM delegate stated:

> [T]hat CBP requested INM to remove . . . 20 asylum-seekers from the turnstiles [at the San Ysidro POE], as well as the rest of the [April 2018] caravan members from the plaza at El Chaparral, where they were camping on the Mexican side of the port-of-entry. Implicit in the CBP request, the INM delegate said, was that such detentions could result in INM deporting those asylum-seekers who were not legally present in Mexico:[65]

73. ~~In June 2017, I.D. fled with her children to Tijuana, where they presented themselves at the Otay Mesa POE to seek asylum in the United~~

---

[62] *Id.* at 19-20.

[63] *Id.* at 20.

[64] *You Don't Have Any Rights Here, supra* note 40, at 23.

[65] *Id.* at 23.

~~States.~~ Later, on June 14, 2018, a senior Mexican immigration official in Sonora reportedly stated that US officials had requested INM to detain and check the papers of the asylum-seekers whom CBP was pushing back to the Mexican side of the Nogales border crossing. The INM official relayed also that he understood the request by US authorities implicitly to be for INM to deport asylum-seekers without legal status in Mexico to their home countries from which they had fled.[66]

74.   ~~When they arrived at the Otay Mesa POE, I.D. approached CBP officials and expressed her intent to seek asylum. The CBP officials misinformed I.D. that they could not help her at the Otay Mesa POE and that she must go to the San Ysidro POE.~~ Also in June 2018, Mexican immigration officials told human rights researchers that "CBP officers were calling Mexican immigration to collect any individuals at the border line, including asylum seekers, who attempted to approach the port of entry to request protection and did not have visas or other documentation." As a result, asylum seekers were physically prevented from reaching the POE to request protection.[67]

---

[66]  *Id.* at 21; see also *id.* at 22 ("On the Mexico side of the bridges in July 2018, three Mexican immigration officials informed [a] US immigration lawyer . . . that they were screening asylum-seekers and preventing their access to US ports-of-entry upon the request of CBP. One of the Mexican officials told her: `Yes, it's a collaborative program that we're doing with the Americans.' The immigration officials were detaining non-Mexicans who lacked valid Mexican transit visas, and threatened them with deportation if they returned to the bridge. At the mid-point of the bridge, CBP again screened those who were able to pass through the Mexican immigration filter, and forced them to wait on the half of the bridge closer to Mexico. According to [the U.S. immigration lawyer], the Mexican immigration officers informed her that when asylum seekers crossed onto the bridge without valid Mexican travel documents, CBP officers called on Mexican immigration officials to remove them from the bridge.").

[67]  Human Rights First, *Zero-Tolerance Criminal Prosecutions: Punishing Asylum Seekers and Separating Families* 8 (2018), https://www.humanrights first.org/resource/zero-tolerance-criminal-prosecutions-punishing-asylum-seekers -and-separating-families [hereinafter *Zero-Tolerance Criminal Prosecutions*].

51

75.    ~~I.D. immediately went to the San Ysidro POE with her children, approached several CBP officials, and expressed her intent to seek asylum. One of the officials misinformed I.D.~~ ~~that there was no asylum and that she could not pass through the POE because she did not have any documents. I.D. again stated that she wanted to seek asylum and that she could not go back to Honduras because she and her children would be killed. The CBP official responded that there was a new law in the United States that meant that there was no more asylum. Another CBP official then escorted~~ ~~I.D. and her children out of the port.~~ Statements from on-the-ground CBP officials further confirm the continued existence of a high-level Turnback Policy. In El Paso, a CBP official blocking asylum seekers' path to the POE on the bridge explained that he was "following directions. And this is not even local directions."[68] On a separate occasion, CBP officials in El Paso, including supervisors, told a non-profit worker that they were turning back asylum seekers because they "ha[d] orders not to let anybody in," that "this is a policy across the border," and that "[i]t's an order from [U.S. Attorney General Jeff] Sessions."[69]

76.    ~~I.D. and her children would like to present themselves again for asylum but, based on their experience and the experience of others with CBP's practice at POEs, I.D. understands that they would likely be turned away again.~~ Recent official government statements acknowledging the policy assert a "lack of capacity" to process the flow of asylum seekers at the southern border. In fact, and in accordance with a central goal of the Turnback Policy to deter future asylum seekers from presenting themselves at the U.S. border, CBP's own

[68]    Robert Moore, *Border Ag_ents Are Using a New Weapon Against Asylum Seekers,* Tex. Monthly (June 2, 2018),Ihttps://www.texasmonthly.com/politics/immigrant-advocates-question-legality-of-latest-federal-tactics/.

[69]    Declaration of Taylor Levy in Support of the State of Wash. at 8, Washington v Trump, No. 18-939-MJP (W.D. Wash. July 2, 2018), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/AnotherNews/Press_Releases/ motion%20declarations%201-33.pdf.

statistics indicate that there has not been a particular surge in numbers of asylum seekers coming to POEs. From January through September 2018, the number of people without legal status attempting to enter the United States from Mexico, including asylum seekers, has stayed at roughly the same level as over the previous five years. During those five years, U.S. authorities regularly processed asylum seekers without the delays that CBP has imposed in 2018.[70] Based on available statistics, Amnesty International has characterized the "supposedly unmanageable number of asylum claims" as "a fiction."[71]

77.   ~~I.D. and her children are currently staying in a shelter in Tijuana, where I.D. continues to fear for her life and the lives of her children. I.D. can no longer remain in Mexico and has no place else to turn for safety but the United States.~~In fact, there is substantial evidence that calls into question the claims of a lack of capacity. There is evidence to suggest such claims are false and instead are designed to effectuate the broader policy goal of restricting access to the asylum process, according to governmental and non-governmental sources. In early 2018, senior CBP and ICE officials in San Ysidro, California, stated in interviews that "CBP has only actually reached its detention capacity a couple times per year and during 'a very short period' in 2017."[72] The OIG Report notes that while CBP justifies the official "metering" policy by citing a lack of capacity to process asylum seekers, "the OIG team did not observe severe overcrowding at the ports of entry it visited."[73] Human rights researchers visiting seven POEs in Texas in June 2018 reported that "[t]he processing rooms visible in the ports of entry . . .

[70]   *Southwest Border Migration FY2018, U.S.* Customs & Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration (last visited Oct. 10, 2018).

[71]   *You Don't Have Any Rights Here, supra* note 40, at 14.

[72]   *Id.* at 15 (citing an interview with ICE's Assistant Field Office Director at Otay Mesa Detention Center on May 1, 2018, and an interview with the CBP Field Officer Director in San Diego on January 5, 2018).

[73]   *OIG Report, supra* note 1, at 8.

appeared to be largely empty."[74] CBP's "capacity" excuse appears to be a cover for a "deliberate slowdown" of the rate at which the agency receives asylum seekers at POEs.[75]

**Plaintiff Jose Doe**

78.   ~~J.D. is a native and citizen of Honduras. J.D. operated a small banana business in Honduras. 18th Street gang members began targeting his business for extortion and brutally attacked J.D. with a machete when he fell behind on payments. 18th Street later targeted another business J.D. established.~~On October 10, 2018, CBP rejected thirty-two asylum seekers including small children and pregnant women at the C6rdoba International Bridge between Ciudad Juarez and El Paso, Texas. CBP stopped the individuals and told them that there was no capacity to take them in, including the pregnant women who were some of the most vulnerable people in the group. However, only two or so hours later, CBP officers in the middle of the bridge received orders to let all thirty-two individuals in belying the initial assertion of a lack of capacity. Similarly, in Nogales, Arizona, recently CBP abruptly switched from processing six asylum seekers per day—citing a lack of capacity to take any more—to twenty asylum seekers per day. "The sudden change in processing capability points more to an administrative decision than to an increase in capacity which would more likely happen gradually."[76]

---

[74]   *Zero-Tolerance Criminal Prosecutions, supra* note 67, at 9.

[75]   Adam Isacson et al., Wash. Office on Latin Am., *"Come Back Later": Challenges for Asylum Seekers Waiting at Ports of Entry* 3 (2018), https://www.wola.org/wp-content/uploads/2018/08/Ports-of-Entry-Report_PDFvers-3.pdf [hereinafter *Come Back Later*]; Debbie Nathan, *Desperate Asylum-Seekers Are BeingTurned Away by U.S. Border Agqnts Claiming There's "No Room",* The Intercept (June 16, 2018, 8:37 AM), https://theintercept.com/2018/06/16/immigration-border-asylum-central-america/ (reporting that a shelter manager in the El Paso area familiar with CBP's and ICE's local processing facilities "can't imagine they are overtaxed").

[76]   *Come Back Later, supra* note 75, at 5.

79.    ~~In 2016, 18th Street kidnapped and killed his wife's cousin after she resisted the gang, and threatened to kidnap and sexually assault J.D.'s two teenage daughters. 18th Street also killed two of his wife's uncles~~<u>By restricting the number of individuals who can seek access to the asylum process—particularly given manifestly grave dangers asylum seekers face while waiting on the Mexican side of the border—the Turnback policy operates as a constructive denial of access to the asylum process. The denial threatens grave harm to vulnerable individuals waiting in very dangerous conditions on the Mexican side of the border</u>.

80.    In ~~June 2017, J.D. fled Honduras and took many buses through Honduras and Guatemala to avoid detection. J.D. arrived in Nuevo Laredo and was accosted by multiple gang members. J.D. presented himself at the Laredo, Texas POE the next day after this terrifying encounter, and he explained that he was afraid of returning to Honduras and wanted to seek asylum. CBP officials at the POE misinformed J.D. that he needed a visa to apply for asylum and told him that there was no one to handle his application. CBP officials sent J.D. back to Nuevo Laredo, where he again was approached by gang members~~<u>addition, an assertion of a lack of capacity is not a lawful basis to deny the non-discretionary duty to provide access to the asylum process</u>.

81.    ~~J.D. would like to present himself again to seek asylum but, based on his experience and the experience of others with CBP's practice at POEs, he understands that he would likely be turned away again.~~<u>Other U.S. government entities have raised concerns about CBP's treatment of asylum seekers. In 2016, for example, the bipartisan U.S. Commission on International Religious Freedom</u>

noted some CBP officers' "outright skepticism, if not hostility, toward asylum claims."[77]

82. ~~J.D. is currently staying temporarily with his wife's relatives in Monterrey, Mexico where he continues to fear for his life. J.D. cannot remain in Mexico and has no place to turn for safety but the United States.~~ Congress has also signaled concern over CBP's treatment of asylum seekers at the border. "While proposing over $58 billion in federal funding for DHS agencies, the House Appropriations Committee in July 2018 called on DHS to 'ensure that the United States is meeting its legal obligations, to include reminding field officers and agents about CBP's legal responsibilities to ensure that asylum-seekers can enter at POEs [ports-of-entry].'"[78]

**~~2.    CBP Officials Have Systematically Denied Numerous Other Asylum Seekers Access to the Asylum Process~~**

83. ~~Class Plaintiffs' experiences reflect a systematic and persistent practice by CBP that has unlawfully denied numerous other asylum seekers access to the U.S. asylum process.~~ As detailed below, Plaintiffs Bianca, Emiliana, Cesar, Roberto, Maria, Ursula, and Juan were each subject to the Turnback Policy when CBP officials told them there was no capacity to process them and/or that they had

[77] *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* 2 (2016) (reporting that despite findings and recommendations in a 2005 study relating to primary inspection, USCIRF observers in 2016 continued to find "several examples of non-compliance with required procedures" in CBP primary inspection interviews); *see also 2005 USCIRF Report, supra* note 37, at 54 (finding that, in approximately half of the inspections observed, inspectors failed to read the proper advisals regarding asylum to the non-citizen and that "in 15 percent of [the] cases [ ] where an arriving [non-citizen] expressed a fear of return to the inspector, that [non-citizen] was not referred" for a credible fear interview).

[78] *You Don't Have Any Rights Here, supra* note 40, at 11 (citing Staff of H.R. Comm. on Appropriations, 115th Cong., Rep. on Department of Homeland Security Appropriations Bill, 2019 4, 26 (Comm. Print 2018), haps ://docs.house.gov/meetings/AP/AP00/20180725/108623/11MKP-115-AP00-2018 0725-SD004.pdf [hereinafter *Bill Report Draft]*).

to wait an unreasonable or indeterminate amount of time in very dangerous conditions on the Mexican side of the border before they could access the asylum process. Plaintiffs Victoria, Cesar, Maria, Ursula, and Juan were each subject to the Turnback Policy when CBP officials told them to speak to a Mexican official (Victoria) or when Mexican officials intercepted them (Cesar, Maria, Ursula, Juan) and interfered with their ability to access the U.S. asylum process.

**C.** ~~C.~~ **CBP Officials' Unlawful Practices Have Denied Hundreds of Asylum Seekers Access to the Asylum Process**

84.     Starting in or around mid-2016 and continuing to the present, CBP officials ~~have carried out Defendants' systematic practice of denying~~also have been engaging in other unlawful, widespread practices to deny asylum seekers access to the ~~U.S. asylum process by relying on certain categories of tactics, including~~asylum process—independently or as a part of or incident to the Turnback Policy. These practices include the use of misrepresentations~~;~~; threats and intimidation~~;~~; coercion; and verbal and physical abuse~~, and coercion~~; denying outright access to the asylum process; physically obstructing access to the POE; forcing asylum seekers to wait unreasonable or indeterminate amounts of time before being processed; and racially discriminatory denials of access. Asylum seekers and advocates have experienced and/or witnessed firsthand CBP's illegal conduct.

**1.** ~~a.~~ **Misrepresentations**~~:~~

85.     CBP officials misinform asylum seekers ~~of~~with the following misrepresentations, among others: that the United States is no longer providing asylum; that President Trump signed a new law that ended asylum in the United States; that the law providing asylum to Central Americans ~~recently~~ ended; that Mexicans are no longer eligible for asylum; that the United States is no longer accepting mothers with children; that the United States got rid of the law that allowed for asylum for children; that asylum seekers cannot seek asylum at the

POE, but must go to the U.S. Consulate in Mexico instead; that visas are required to cross at a POE; and that asylum seekers must obtain a "ticket" from a Mexican government agency (Grupo Beta)first speak with Mexican immigration officials before they will be allowed to enter the United States to seek asylum; that there is not "space" for additional asylum seekers to enter; that there are "too many people"; that the port is "full"; that the shelters or detention centers where asylum seekers will be held are "full"; that there are too few officials in the port to process asylum seekers; that asylum seekers must wait for people to leave before they can enter; and that by coming to the POE, asylum seekers are in a "federal zone" and therefore they must leave.

86.   Class Plaintiffs A.D., B.D., D.D., I.D., and J.D.Abigail, Beatrice, Dinora, Ingrid, Victoria, Bianca, Emiliana, Roberto, Ursula, and Juan each experienced this practice. D.D.Dinora and I.D.Ingrid both were told asylum was no longer available in the United States. A.D.Abigail was told that only the Mexican government could help her. B.D.Beatrice was told that the U.S. government had no obligation to help her and that she had no right to enter the United States. J.D. was told, falsely, that he needed a visa in order to apply for asylumVictoria and Bianca were told they needed to speak with Mexican officials. When Bianca, Emiliana, and Roberto approached CBP officials to apply for asylum, they were told they could not apply because the ports were "full." Ursula and Juan were told that the POE was "closed" even though it was mid-afternoon.

## 2.   b. Use of Threats and Intimidation:

87.   CBP officials threaten and intimidate asylum seekers in the following ways: threatening to take asylum seekers' children away from them if they did not leave the POE; threatening to separate children from parents if they did not accept voluntary departure; threatening to detain and to deport asylum seekers to their home countries if they persisted in their claims; threatening to call Mexican immigration or otherwise turn asylum seekers over to the Mexican government if

they do not leave the POE; threatening to ban asylum seekers from the United States for life if they continued to pursue asylum; and blockingthreatening to bring criminal charges against asylum seekers from entering the CBP office andif they refused to leave the POE; threatening to use a taser or let dogs loose if theyasylum seekers refused to go back to Mexico; and threatening to call Mexican immigration officers if asylum seekers did not leave the POE.

88.     Class Plaintiffs A.D., B.D.Abigail, Beatrice, and C.D.Carolina each experienced this practice  and were threatened that if they tried to cross and pursue their asylum claims, U.S. government officials would take their children away or separate their families. Additionally, D.D.Dinora was threatened that if she and her daughter returned to the POE, they would be deported to Honduras. B.D.Beatrice was told that if she returned to the POE, she would be put in jail for three years.

### 3.     c. Use of Verbal and Physical Abuse:

89.     As part of their systematic practice of denying asylum seekers arriving at POEs access to the U.S. asylum process, CBP officials also regularly resort toresortto verbal and even physical abuse.90.        For, including, for example, CBP officials have resorted to the following verbal and physical abuseby: grabbing an asylum seeker's six-year-old daughter's arm and throwing her down onto the ground; holding a gun to an asylum seeker's back and forcing her out of the POE; knocking a transgender asylum seeker to the ground and stepping on her neck; telling an asylum seeker she was scaring her five-year-old son by persisting in her request for asylum and accusing her of being a bad mother; laughing at an asylum-seeking mother and her three children and mocking the asylum seeker's thirteen-year-old son who has cerebral palsy; and yelling profanities at an asylum-seeking mother and her five-year-old son, throwing her to the ground, and forcefully pressing her cheek into the pavement.; making very derogatory comments about an asylum seeker's country of origin ("Fuck Honduras"); denying four asylum seekers on five consecutive days because

59

"Guatemalans make us sick"; repeatedly and angrily yelling at asylum seekers to make them leave the POE; inquiring whether an asylum seeker was pregnant, and when the answer was negative, saying "that was good because they did not want more children in the United States"; grabbing the arms of an asylum seeker hard enough to leave bruises, bending them behind her back in order to drag her back to Mexico, and also physically dragging her child back to Mexico; grabbing another asylum seeker by the shoulders hard enough to leave bruises and dragging her out of the POE with her seven-year-old watching and yelling "leave my mommy alone!"; pushing an asylum seeker while she was holding her infant daughter; and pushing another asylum seeker while she was holding her three-year-old son. One asylum seeker reported that she sought mental health treatment to process how she was treated after being forcibly dragged out of the POE and back to Mexico with her two children.

91.90. Class Plaintiffs D.D.Dinora and B.D.Beatrice both experienced this practice. One CBP official pulled D.D.Dinora inside a gate at the POE to try to separate her from her daughter. Later, as CBP officials escorted D.D.Dinora and her daughter out of the POE, one of the CBP officials tried to drag D.D.Dinora by her arm. B.D.Beatrice also experienced rough treatment and cried out in pain when a CBP official forcefully searched her for drugs.

**4.   d. Use of Coercion:**

92.91. CBP officials resort to coercion to deny asylum seekers arriving at POEs access to the U.S. asylum process, including: coercing asylum seekers into recanting their fear on video; and coercing asylum seekers into withdrawing their applications for admission to the United States.

93.92. Class Plaintiffs A.D., B.D.Abigail, Beatrice and C.D.Carolina each experienced this  practice of coercion. Each was coerced to sign a form, written in English and not translated, which they did not understand, that stated they were voluntarily withdrawing their claims for asylum on the groundsground that they

did not fear returning to Mexico. The forms CBP officials coerced them to sign were and still are false: ~~A.D., B.D. and C.D.~~. At the time the initial Complaint in this case was filed, Abigail, Beatrice and Carolina still ~~have~~had a grave fear of persecution in Mexico.

### 5.    Outright Denial of Access

93.    In some cases, CBP officials simply turn asylum seekers away from POEs without any substantive explanation. For example, CBP officials have indicated that a particular POE is not receiving any asylum seekers; that asylum seekers should *"vete"* (go away); that asylum seekers must leave; that asylum seekers will not be allowed to enter the United States; that there is no help for asylum seekers at the POE; and that asylum seekers simply must "move aside" to allow other pedestrian traffic to pass. In other cases, CBP officials simply ignore people who indicate a desire to seek asylum, or flatly refuse to look at their identity documents.

94.    ~~CBP officials' use of various tactics, including misrepresentations, threats and intimidation, verbal and physical abuse, and coercion, at the POEs along the U.S.-Mexico border further evidence a systematic practice of denying asylum seekers access to the U.S. asylum process.~~Victoria and Cesar both experienced this practice. When Victoria told  a CBP official she wanted to seek asylum, the official responded that she could not do so at that time. When Cesar tried to present himself at a POE and stated his intent to apply for asylum, CBP officials refused to let him proceed to the POE.

### 6.    Physically Blocking Access to the POE

95.    In recent months, CBP officials at numerous POEs have begun preliminarily checking pedestrian travelers' documents at makeshift or permanent "pre-checkpoints" housed under tarps or in tents at or near the U.S.-Mexico

border.[79] The CBP officials do not permit asylum seekers to walk past the pre-checkpoint to enter the POE building, forcing them to remain on the Mexican side of the border just inches away from the United States.

96.     On information and belief, CBP sometimes enlists Mexican officials to act as their agents in blocking asylum seekers' access to POEs. In the Rio Grande Valley, for example, Mexican officials have intercepted asylum seekers as they were approaching turnstiles at bridge entrances on the Mexican side. Without passing through the turnstile, an asylum seeker cannot walk across the bridge to the POE to seek protection in the United States. Mexican officials also reportedly meet CBP officials in the middle of bridges to escort asylum seekers away from the border and back into Mexico, where they are often detained or deported to dangerous conditions in their home countries.

97.     CBP physically blocked Roberto, Maria, Ursula, and Juan from accessing the asylum process by stopping them at pre-checkpoints at the border and refusing to let them pass. In addition, Cesar was intercepted by Mexican officials outside the POE and pushed into a corner to prevent him from approaching the POE. Mexican officials physically escorted Roberto and Maria away from CBP officials stationed at the border and detained them to block their

---

[79]   *See, e.g.,* Hannah Wiley, *Critics Say New Barriers on Border Bridge Are Meant to Deter Asylum-Seekers,* Tex. Trib. (Oct. 1, 2018), https.://www.texpstribune .org/2018/10/01/border-asylum-port-of-entry-texas-mexico/; Meredith Hoffman, *The Horrible Conditions Endured by Migrants Hoping to Enter the US Legally,* VICE (July 3, 2018), https://www.vice.com/en_us/article/59qny3/ m igrants-hoping-to-get-us-asylum-forced-to-wait-on-bridge; John Burnett, *After Traveling 2,000 Miles for Asylum, This Family's Journey Halts at a Bridge,* NPR (June 15, 2018), https://www.npr.org/2018/06/15/620310589/ aAer-a-2-000-mile-asylum-journey-family-is-turned-away-before-reaching-u-s-so il; Molly Hennessy-Fiske, *Caught in Limbo, Central American Asylum-Seekers Are Left Waiting on a Bridge Over the Rio Grande,* L.A. Times (June 7, 2018), http://www.latimes.com/nation/la-na-asylum-seeking-families-border-bridges-20 180605-story.html; Moore, *supra* note 68.

access to the POE. Mexican officials also blocked Maria, Juan, and Ursula from reaching the POE by preventing them from walking onto the sidewalk leading to the POE. CBP officials witnessed Mexican officials block Maria's access and, when Maria's lawyer questioned them about it, CBP officials refused to intervene.

### 7. Waitlists and Unreasonable Delays

98.    By its own admission, CBP officials force asylum seekers to wait for days, weeks or indefinitely in Mexico before allowing them to access the asylum process.

99.    CBP officials process a limited number of asylum seekers per day, even when dozens are waiting. At some POEs, CBP appears to process a fixed number of asylum seekers—often two, three, or four. On some days, CBP officials do not process any asylum seekers.

100.   CBP officials also routinely tell asylum seekers approaching POEs that in order to apply for asylum, they must get on a list or get a number. The lists are typically managed by Mexican immigration officials or other third parties based in Mexico. CBP officials will not permit asylum seekers to enter the United States until their number is called, which can take days, weeks or longer. Often, the people managing the lists only give out new numbers during particular hours of the day, and so are inaccessible to asylum seekers who are unable to locate them. Despite diligent efforts, some individuals have reportedly been unable to get their names on the lists due to the list managers' biases against the individuals' ethnicity, sexual orientation or gender identity.

101.   As a result of these practices, asylum-seeking men, women and children wait endlessly on or near bridges leading to POEs in rain, cold, and blistering heat, without sufficient food or water and with limited bathroom access. They sleep outside for many nights in a row, sometimes for a week or more. The entire time they are waiting to be processed, the asylum seekers are at risk of harm from either persecutors that have followed them from their home countries, or

from gang violence and other criminal threats prevalent along the Mexico side of the U.S.-Mexico border.

102.   Bianca, Emiliana, and Cesar experienced this practice because they were required to get on a list in order to access the asylum process. Bianca, Emiliana, and Roberto were told they would have to wait an indeterminate and unreasonable amount of time before they could seek asylum—Bianca was told she would have to wait "multiple weeks"; Emiliana was told to come back in six weeks; Roberto was told he would have to wait for "hours, days, or weeks". In addition, Bianca, Emiliana, and Maria were merely told to stand aside and wait for an indeterminate period of time. Ursula and Juan were told they had to "wait their turn," without any indication of what that meant.

### 8.   Racially Discriminatory Denials of Access

103.   In March 2018, CBP officials at the midpoint of the Paso Del Norte Bridge separating Ciudad Juarez, Mexico and El Paso, Texas, rejected four Guatemalan asylum seekers' requests to access the asylum process on five consecutive days because according to CBP, "Guatemalans make us sick."

104.   On information and belief CBP agents racially profile individuals crossing on bridges, stopping and asking for identification documents from darker-skinned Central American-appearing individuals while allowing lighter-skinned individuals to pass.

105.   Cesar was subject to this practice. When he approached the POE to apply for asylum, he was placed in a group with only other Central Americans, away from the Africans and Mexicans, after which he was arrested, detained, and threatened with deportation.

106.   All of the above-referenced tactics served to deny asylum seekers access to the U.S. asylum process.

**D.    Documentation from Experts and NGOs Confirms the Prevalence and Persistence of the Turnback Policy and CBP's Other Unlawful Practices**

95.    The prevalence and persistence of CBP's illegal practice has been heavily documented by non107.    Non-governmental organizations and other experts working in the U.S.-Mexico border region have extensively documented the devastating consequences of CBP's unlawful Turnback Policy and other unlawful practices designed to restrict or deny access to the asylum process.

108.   In June 2017, Amnesty International, a non-profit human rights organization, published a report on CBP's ongoing practice of turning back asylum seekers at the U.S.-Mexico border entitled *Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers.*[80] In compiling the report, Amnesty International interviewed more than 120 asylum seekers as well as approximately 25 government officials and 40 civil society organizations. The report documents numerous instances in which CBP officials denied asylum seekers access to the asylum system at five different POEs along the U.S.-Mexico border. The report details the following conduct:

      a.    CBP officials coerce asylum seekers into recanting their fear of persecution on videotape and threaten to deport them back to their home countries if they do not comply;

      b.    CBP officials tell asylum seekers that they will first have to get a "ticket" from Mexican authorities before seeking asylum;

      c.    CBP officials coerce asylum seekers into signing a voluntary return paper under the threat that, if they do not, then they will be deported and will never be allowed into the United States; and

---

[80] *See Facing Walls, supra* note 38.

> d.   CBP officials tell Mexican asylum seekers that there is no more asylum for Mexicans.

109.   In October 2018, Amnesty International issued a subsequent report entitled USA: 'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States,[81] documenting CBP's continuing practice of turnbacks at POEs in California, Arizona and Texas, and concluding that, in 2017 and 2018, the U.S. government had "intensified a systematic and dangerous de facto policy of illegal pushbacks against asylum seekers, in order to prevent them from requesting protection at official U.S. ports-of-entry." In addition to the conduct outlined above, the report details the following:

> a.   CBP used "slowdown" tactics to force asylum seekers to wait for days or weeks in Mexico before allowing them to seek protection at POEs;
>
> b.   At several POEs, CBP officials temporarily stopped receiving any asylum seekers;
>
> c.   CBP erected temporary checkpoints in the centers of international bridges to Mexico at various POEs, where CBP officers instructed pedestrians without valid Mexican travel documents to return to Mexico or called Mexican officials to remove such individuals from the bridge.

110.   In August 2018, the Washington Office on Latin America ("WOLA"), a non-profit human rights research and advocacy organization, published a thorough report entitled *'Come Back Later': Challenges for Asylum Seekers Waiting at Ports of Entry.*[82] *WOLA's* report, based on years of documentary research and a visit to the U.S.-Mexico border in June 2018, details the following developments:

> a.   There has recently been "a marked slow-down" in CBP's processing of asylum seekers at POEs, leading to long lines of

---

[81]   *You Don't Have Any Rights Here, supra* note 40.

[82]   *Come Back Later, supra* note 75.

66

individuals and families waiting to present themselves to seek asylum;

h.     In June 2018, CBP officials at the Nogales POE had allowed a backlog of 113 people, including 48 families, who were waiting in Nogales, Mexico to present themselves to seek asylum;

c.     CBP officials "have positioned themselves on the [physical] border, pre-screening people before they are allowed to enter U.S. territory and repeatedly denying asylum-seekers entry into the country, forcing them to wait days or even weeks in hot and in some areas dangerous Mexican border towns";

d.     CBP officials at smaller POEs tell asylum seekers that they no longer process asylum claims at those POEs, and that the migrants must travel to larger POEs many miles away; and

e.     Mexican government officials block access to the McAllen POE on the Reynosa side, and detain asylum seekers who lack the proper travel documents to be in Mexico.

96. 111.  In May 2017, Human Rights First, a respected non-governmental organization, published an Exhaustive Report exhaustive report entitled, "Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers."[29 83] In that report, Human Rights First details firsthand accounts of CBP officials turning away back asylum seekers without referring them for further screening or immigration court proceedings at POEs across the U.S.-Mexico border. The report details the following conduct:

a.     CBP officials simply ignore requests by individuals to seek asylum;

---

[29 83] *See Crossing the Line, supra* note 22. 32.

b.    CBP officials give false information about U.S. laws and procedures, such as saying that "the United States is not giving asylum anymore" and "[President] Trump says we don't have to let you in";

c.    CBP officials mock and intimidate asylum seekers;

d.    CBP officials impose a "gauntlet" and "charade" of procedures, including a "ticketing" system, to discourage asylum seekers; and

e.    CBP officials coerce asylum seekers into denouncing any fear of persecution.

97.112.    Despite the complete lack of statistics or recordkeeping on CBP's  failure to comply with the law, Human Rights First's Report references more than 125 cases of CBP turning awayback individuals and families seeking asylum at POEs along the U.S.-Mexico border between November 2016 and April 2017. This is likely a small fraction of the number of asylum seekers beingwho were illegally denied access to the asylum process during that period.

98.    In June 2017, Amnesty International, a non-profit human rights organization, published a report on CBP's ongoing practice of turning away asylum seekers at the U.S.-Mexico border entitled "Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers."30 In compiling the report, Amnesty International interviewed more than 120 asylum seekers as well as approximately 25 government officials and 40 civil society organizations. The report documents numerous instances in which CBP officials denied asylum seekers access to the asylum system at five different POEs along the U.S.-Mexico border. The report details the following conduct:

---

30 See Facing Walls, supra note 27.

68

a. CBP officials coerce asylum seekers into recanting their fear of persecution on videotape and threaten to deport them back to their home countries if they do not comply;

113. In July 2018, Human Rights First supplemented its 2017 report with an issue brief documenting researchers' visits to seven international bridges in June 2018, at Hidalgo, Texas; Brownsville, Texas; Roma, Texas; Progreso, Texas; Laredo, Texas; and El Paso, Texas. The researchers found:

a. At all seven bridges visited, "CBP installed new checkpoints at the international border line" where "agents conduct document screening ahead of the processing center" and regularly turn back asylum seekers;

b. CBP officials tell asylum seekers that they will first have to get a "ticket" from Mexican authorities before seeking asylum;agents tell asylum seekers at the bridges that the POE is "full" or "at capacity," which leaves asylum seekers "stranded for days or weeks in dangerous or difficult conditions";

c. CBP officials coerce asylum seekers into signing a voluntary return paper under the threat that, if they do not, then they will be deported and will never be allowed into the United States; andAsylum seekers whom CBP fails to process "face extreme heat, lack of food, water, and bathroom facilities, [and] in some areas, they also face grave dangers and risks," particularly kidnapping;

d. CBP officials tell Mexican asylum seekers that there is no more asylum for Mexicans.A shelter in Tijuana, Mexico, was broken into and set on fire "likely because a group of transgender women were seeking refuge there after being turned away several times by [CBP]"; and

69

          e.     CBP officers tell asylum seekers that they cannot cross at the Stanton Street Bridge POE in El Paso, Texas.[84]

99.114.     From ~~October~~December 2016 to the present, the Women's Refugee Commission, a non-profit organization that advocates for women and children fleeing violence and persecution, has investigated and documented numerous instances in which CBP officials have turned asylum seekers away and refused to process them at ~~four~~various POEs along the U.S.-Mexico border, including POEs in San Ysidro and Calexico, California; Nogales and San Luis, Arizona; ~~McAllen, Texas~~Santa Teresa, New Mexico; and El Paso, Laredo, and McAllen, Texas. The Women's Refugee Commission has documented the following conduct:

          a.     CBP officials tell asylum seekers there is no space for them;

          b.     CBP officials tell asylum seekers that the policies have changed and that they no longer qualify for asylum;

          c.     CBP officials threaten to call Mexican immigration authorities to remove asylum seekers from the POEs;

          d.     CBP officials ~~forcibly remove~~threaten asylum seekers ~~from the POEs; and~~with prolonged detention in the U.S. if they pursue their asylum claims;

          e.     CBP officials threaten physical force to remove asylum seekers from the POEs;

          f.     CBP officials forcibly remove asylum seekers from the POEs;

          g.     CBP officials tell asylum seekers to go away~~.~~;

          h.     CBP officials tell asylum seekers that they must coordinate with Mexican immigration authorities in order to be processed;

---

[84] *Zero-Tolerance Criminal Prosecutions, supra* note 67, at 8-9.

i.      CBP officials, in coordination with Mexican officials and agents, filter out asylum seekers who lack valid travel documents;

j      CBP officials deny asylum seekers the right to apply for asylum at certain POEs; and

k.      CBP places officials, and sometimes semi-permanent structures, at the middle of international bridges to pre-screen migrants.

100.115.  From October 2016 through the present, the Project in Dilley, which provides pro bono legal services to mothers and children detained at the South Texas Family Residential Center in Dilley, Texas, has identified more than 50100 asylum-seeking mothers who were turned awayback by CBP officials at POEs along the U.S.-Mexico border, including POEs in San Ysidro, California; McAllenCalexico, California; San Luis, Arizona; Nogales, Arizona; El Paso, Texas; Del Rio, Texas; Eagle Pass, Texas; Laredo, Texas; and Eagle PassRoma, Texas; McAllen, Texas; Los Indios, Texas; and Brownsville, Texas. The Project in Dilley has documented the following conduct:

a.      CBP officials tell asylum seekers that asylum law is no longer in effect;

b.      CBP officials tell asylum seekers that they have orders to send away everyone who is seeking asylum;

c.      CBP officials tell asylum seekers they cannot seek asylum because there is no more spacethat the POE is full and that they must wait to be processed, causing some asylum seekers to wait days or weeks without access to shelter, food, water, or bathrooms;

d.      CBP officials threaten to deport asylum seekers to their home countries; and

e.   CBP officials use physical force to remove asylum seekers from POEs, including by handcuffing them, throwing them to the ground, shoving them and dragging them out of the POEs.

101.116.   Since December 2015, representatives of Plaintiff Al Otro Lado have accompanied more than 160 asylum seekers to the San Ysidro POE. Several representatives have witnessed firsthand and/or otherwise documented the tactics employed by CBP to prevent asylum seekers from accessing the U.S. asylum process. Al Otro Lado representatives have documented the following conduct:

a.   CBP officials tell asylum seekers they have to apply for asylum at the U.S. Consulate in Mexico or the U.S. Embassy in their home countries;

b.   CBP officials tell asylum seekers that they must first obtain a "ticket" from Mexican immigration in order to seek asylum;

c.   CBP officials tell asylum seekers that they are not processing asylum seekers at that POE and they must go to another POE to be processed;

d.   CBP officials tell asylum seekers that they cannot seek asylum at that time and must be put on a waiting list;

e.   CBP officials require asylum seekers to register with migrant shelters in Mexico which control the flow of asylum seekers to the POEs;

f.   CBP officials tell asylum seekers that they do not qualify for asylum; and

fg.   CBP officials coerce asylum seekers into withdrawing their asylum claims, including by threatening that they will be deported if they do not do so.;

> h.     CBP officials threaten asylum seekers with forced separation from their children, prolonged detention, and eventual deportation;
>
> i.     CBP officials subject asylum seekers to verbal abuse and degradation during the inspection process;
>
> j.     CBP officials ask asylum seekers to present paperwork they are not required to present; and
>
> k.     CBP officials threaten U.S. attorneys attempting to assist asylum seekers with *ultra vices* removal to Mexico.

~~102.~~ 117. On January 13, 2017, various non-governmental organizations submitted an administrative complaint to DHS' Office for Civil Rights and Civil Liberties ("CRCL") and ~~Office of Inspector General ("OIG").[31]~~ the O1G.[85] The administrative complaint provided specific examples of CBP turning ~~away~~back asylum seekers at POEs along the U.S.-Mexico border and urged CRCL and OIG to conduct a prompt and thorough investigation into this illegal practice and take swift corrective action.

~~103.   Despite this administrative complaint, Defendants' illegal practice continues. In fact, CBP has acknowledged its illegal practice in sworn testimony before Congress.~~ On June 13, 2017, in questioning before the House Appropriations Committee, the Executive Assistant Commissioner for CBP's OFO

---

[31] [85] *See* ~~American~~Am. Immigration Council at al., Complaint Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border~~,~~ 1-2 (Jan. 13, 2017), ~~https://www.americanimmigrationcouncil.org~~https://www.american immigrationcounclorg/sites/default/files/general_litigation/cbp_ systemic_~~denial~~deni al of entry _ to_ asylum~~─~~ seekers~~─~~ advocacy_document.pdf.

73

admitted that CBP officials were turning away asylum applicants at POEs along the U.S.-Mexico border.[32]

118.  Meanwhile, Defendants' illegal turnbacks continue. In fact, as previously noted, CBP has acknowledged its Turnback Policy in sworn testimony before Congress.[86]

**E.    Defendants' Policy and Practices Have Denied Each of the Class Plaintiffs Access to the Asylum Process**

*Plaintiff Abigail Doe*

119.  Abigail is a native and citizen of Mexico. She is the mother of two children under the age of ten, with whom she previously lived in Central Mexico. In May 2017, Abigail's husband disappeared after he refused to allow drug cartel members to use his tractor-trailer to transport drugs.

120.  When Abigail reported her husband's disappearance to governmental authorities, members of the drug cartel abducted her, held her at gunpoint, and threatened to kill her and her children if she continued to investigate her husband's disappearance. One cartel member told Abigail that she had to leave if she wanted to live. Fearing for her life, Abigail fled to Tijuana with her children to seek asylum in the United States.

121.  After arriving in Tijuana, Abigail and her children immediately sought access to the asylum process by presenting themselves at the San Ysidro POE. At the POE, Abigail informed CBP officials of her intent to apply for asylum and her fear of returning to Mexico. CBP officials repeatedly misinformed Abigail that she did not qualify for asylum. One CBP official threatened that her children

---

[32] *Hearing on the Immigration and Customs Enforcement and Customs and Border Protection F.Y. 2018 Budgets*, Before the Subcomm. on Homeland Sec. of the H. Appropriations Comm., 115th Cong. (2017) (statement of John Wagner, Executive Assistant Comm'r for CBP's Office of Field Operations).

[86]  *Wagner Testimony, supra* note 43, at 289-90.

would be taken away from her if they allowed her to cross the border and again misinformed her that only the Mexican government could help her.

122.   CBP officials coerced Abigail into signing a document in English which she could not read and did not understand. The document stated that she did not have a fear of returning to Mexico and was withdrawing her application for admission. CBP officials then instructed Abigail to say that she had agreed to accept the assistance of the Mexican government and used a video camera to record her statement. A CBP official then took Abigail and her children back to Mexico and left them to fend for themselves.

123.   The statements CBP coercively obtained from Abigail were and are still false; Abigail does fear returning to and staying in Mexico and believes seeking assistance from the Mexican government would be futile.

124.   Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Abigail and her children into the United States.

***Plaintiff Beatrice Doe***

125.   Beatrice is a native and citizen of Mexico. In May 2017, Beatrice fled her hometown in Mexico with her three children, ages seven, eleven and fifteen, and her nephew. Beatrice's nephew was targeted by the Zetas, a Mexican drug cartel that controls most of Southern Mexico, for failing to pay a fee that the Zetas demanded from all individuals who worked in the market. The Zetas threatened to kill Beatrice's nephew and to harm his family if he did not pay the fees. The cartel also pressured Beatrice's nephew to join their forces and threatened to increase the fee if he refused. On two occasions when Beatrice's nephew failed to pay the fees, the Zetas beat him up.

126.   Beatrice herself suffered severe domestic violence at the hands of her husband. In May 2017, she reported his abuse to two government agencies. When Mexican government officials subsequently requested that Beatrice's husband

meet with them, he responded that he would continue to do what he wanted with Beatrice and his children. Terrified, Beatrice left their house the same day.

127.   Beatrice fled with her children and nephew and traveled to Tijuana in order to seek access to the asylum process in the United States. Initially, Beatrice and her family sought access to the asylum process by presenting themselves at the Otay Mesa POE. When Beatrice expressed their intent to seek asylum, a CBP official told her that asylum-related services were not provided at that port, and directed her to go to the San Ysidro POE. Beatrice and her family then attempted twice to seek access to the asylum process at the San Ysidro POE, but CBP officials turned them away both times.

128.   The first time Beatrice and her family presented themselves at the San Ysidro POE, she explained that their lives were at risk in Mexico and that she was afraid of her husband. CBP officials misinformed her that the U.S. government had no obligation to help her or her family, that they did not have a right to enter the United States because they were not born there, and that she should seek help from the Mexican government.

129.   Another CBP official then threatened to take Beatrice's nephew away from her and to put her in jail if she refused to sign an English document which she did not understand. Believing that she had no other option, she signed the document. CBP officials then escorted Beatrice and her family out of the POE.

130.   The statements CBP coercively obtained from Beatrice were and are still false; Beatrice and her children fear returning to and staying in Mexico.

131.   The next day, Beatrice and her family returned to seek access to the asylum process by presenting themselves at the San Ysidro POE. A CBP official who recognized Beatrice from the day before misinformed her that she had no right to enter the United States or seek asylum, and that she would be put in jail for three years if she returned to the POE. After another CBP official separately threatened to transfer Beatrice's nephew to Mexican authorities and return him to

Southern Mexico, CBP officials again escorted Beatrice and her family out of the San Ysidro POE.

132.   Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Beatrice and her children into the United States.

***Plaintiff Carolina Doe***

133.   Carolina is a native and citizen of Mexico. In May 2017, Carolina fled her hometown in Mexico with her three children, ages nine, fifteen and eighteen, after her brother-in-law, a high-ranking police official, was kidnapped, tortured and killed by members of a drug trafficking cartel. His dismembered body was found in garbage bags in a cemetery. Carolina's husband witnessed the kidnapping and showed Carolina a picture of one of the men who was involved. Drug cartel members threatened Carolina's husband after the murder, and Carolina and her husband saw the van used in the kidnapping drive by their house twice. Two men followed Carolina and her daughters on her way home from work, and several men came to their home at night. Carolina was terrified and hid with her daughters in the bathroom because she feared for her life and the lives of her daughters.

134.   In May 2017, Carolina fled in the middle of the night with her daughters and traveled to Tijuana in order to seek access to the asylum process in the United States. Carolina and her daughters presented themselves at the San Ysidro POE, and Carolina explained that they were afraid of returning to Mexico and wanted to seek asylum. CBP officials locked them in a room overnight at the San Ysidro POE. In the morning, a CBP official told Carolina that she would not be granted asylum and misinformed her that the protection she was seeking in the United States could be provided by the Mexican authorities. The CBP official threatened to take away Carolina's fifteen-year-old U.S. citizen daughter and put her in foster care, and told Carolina that if she did not want her daughter taken

away from her, then she had to make a statement on video that she was not afraid of returning to Mexico.

135. The CBP officials coerced Carolina into recanting her fear on video. Carolina initially did not respond as the CBP officials instructed her to do because the responses they told her to say were not true. Carolina was afraid and wanted to respond that she was very scared to return to Mexico. One of the CBP officials repeated that the only way Carolina and her daughters would be able to leave voluntarily without her U.S. citizen daughter being taken away from her was if Carolina stated on video that she was not scared. Having been locked in a room overnight, Carolina was tired and scared and felt like she was in jail. The CBP officials continued to coerce her until she finally did what they told her to do, believing she had no choice.

136. The CBP officials also coerced Carolina into signing a document in English which she could not read and did not understand. The document stated that she did not have a fear of returning to Mexico and was withdrawing her application for admission. The statements CBP coercively obtained from Carolina were and are still false; Carolina does fear returning to and staying in Mexico.

137. Several days after CBP turned back Carolina and her daughters at the POE, Carolina made arrangements for her U.S. citizen daughter to cross into the United States. Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Carolina and her other children into the United States.

***Plaintiff Dinora Doe***

138. Dinora is a native and citizen of Honduras. MS-13 gang members repeatedly threatened to kill Dinora and her then-seventeen-year-old daughter if they did not leave their house. After receiving the third threat, they fled to another city where they remained in hiding.

139.   When Dinora and her daughter subsequently returned home, three MS-13 members held them captive for three days and repeatedly raped each of them in front of the other.

140.   When Dinora and her daughter finally escaped, they fled to a shelter in Mexico. However, after being threatened by MS-13 gang members again in Mexico, they knew they had to leave.

141.   On three separate occasions in August 2016, Dinora and her daughter sought access to the asylum process by presenting themselves at the Otay Mesa POE and expressing their intent to seek asylum in the United States. Each time, CBP officials turned them away

142.   During Dinora's first attempt, CBP officials misinformed her that there was no asylum in the United States and escorted Dinora and her daughter outside the POE.

143.   During her second attempt later the same day, one CBP official misinformed Dinora that there was no asylum available in the United States for Central Americans and that if they returned to the POE, they would be handed over to Mexican authorities and deported to Honduras.

144.   During her third attempt the next morning, a CBP official misinformed Dinora that she could pass through the POE, but would have to leave her daughter behind. When Dinora insisted that she and her daughter had a right to apply for asylum, CBP officials escorted them out of the POE.

145.   Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Dinora and her daughter into the United States.

### Plaintiff Ingrid Doe

146.   Ingrid is a native and citizen of Honduras. At the time the initial Complaint was filed, Ingrid had two children and was pregnant with her third child.

79

147.   18th Street gang members murdered Ingrid's mother and three siblings. They also threatened to kill Ingrid.

148.   For several years, Ingrid and her children were subject to severe abuse by her partner and the father of her son and the child that she was expecting. Ingrid's partner regularly raped Ingrid, sometimes in front of her children. He would also burn and beat Ingrid. One day, Ingrid's partner put a gun to Ingrid's head and threatened to kill her.

149.   In June 2017, Ingrid fled with her children to Tijuana, where they sought access to the asylum process by presenting themselves at the Otay Mesa POE.

150.   When they arrived at the Otay Mesa POE, Ingrid approached CBP officials and expressed her intent to seek asylum. The CBP officials misinformed Ingrid that they could not help her at the Otay Mesa POE and that she must go to the San Ysidro POE.

151.   Ingrid immediately went to the San Ysidro POE with her children to present herself and seek access to the asylum process. She approached several CBP officials, and expressed her intent to seek asylum. One of the officials misinformed Ingrid that there was no asylum and that she could not pass through the POE because she did not have any documents. Ingrid again stated that she wanted to seek asylum and that she could not go back to Honduras because she and her children would be killed. The CBP official responded that there was a new law in the United States that meant that there was no more asylum. Another CBP official then escorted Ingrid and her children out of the port.

152.   Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Ingrid and her children into the United States.

***Plaintiff Roberto Doe***

153.   Roberto is a native and citizen of Nicaragua. Roberto fled Nicaragua in early September 2018 after receiving targeted threats of violence from the Nicaraguan government and paramilitaries allied with the government.

154.   Roberto traveled through Mexico and arrived in Reynosa, Tamaulipas on September 29, 2018. On October 2, 2018, he sought access to the asylum process by presenting himself at the Hidalgo POE. Roberto was part of a group of six Nicaraguan nationals and one Honduran who were waiting in line. The group approached the U.S. immigration officials who were standing at the middle point of the bridge that divides the United States from Mexico, and told the U.S. officials that they wanted to seek asylum in the United States.

155.   One of the U.S. officials responded that he had to talk to his office and made a call on his radio in English. He then directed Roberto and the rest of the group to stand to one side. After that, the U.S. official informed the group that they could not enter the POE, which was "all full." The U.S. official indicated that the group might have to wait for "hours, days, or weeks" before he could seek asylum.

156.   A short while later, a female U.S. official made another call, and Roberto heard her say in Spanish that someone would come and pick up some people. A few minutes later, a Mexican immigration official arrived and asked to see the group members' papers. After Roberto and the rest of the group handed over their papers, the Mexican official instructed them to come with him. One of the Nicaraguans asked the U.S. official to help them, saying that the Mexican immigration officials would deport them. The U.S. official responded that he did not care and did nothing.

157.   The Mexican immigration official took Roberto and the rest of the group to the Mexican side of the bridge, where he left them in an office with Mexican immigration officials. While the group waited, various officials spoke on

the phone. Roberto heard one of the officials say that they needed seven or eight spaces for the next deportation transport.

158.   Eventually, the Mexican officials confiscated the asylum seekers' phones and escorted them to a small bathroom, where they were forced to wait, crowded together, for about an hour. While they were waiting, a Mexican official entered the bathroom and told them that they did not have the right to apply for asylum in the United States, and that it was a crime to try to do so. The Mexican official indicated that he was in communication with the U.S. authorities and that if they came back to the bridge and attempted to seek asylum, the U.S. officials would turn them over to the Mexican authorities and they would be deported to Nicaragua. The Mexican officials subsequently returned their papers and directed them to leave.

159.   At the time the First Amended Complaint was filed, Roberto desired to return immediately to the Hidalgo POE to seek access to the asylum process, but based on his past experience with CBP's practices at the U.S.-Mexico border, he feared that he would be turned away again and deported to Nicaragua. Defendants subsequently agreed to allow Roberto to access the asylum process if he returned to the Hidalgo POE. Roberto returned to the bridge on October 18, 2018, and as he was about to walk onto the pedestrian footbridge to walk to the POE, Mexican immigration officials detained him. Roberto has been in Mexican government custody since that date, and on information and belief, his *refoulement* to Nicaragua is imminent.

***Plaintiff Maria Doe***

160.   Maria is a citizen of Guatemala and a permanent resident of Mexico. She was married to a Mexican man and has two children who were born in Mexico.

161.   Maria lived in Chiapas, Mexico for seven years with her husband and children. Maria left her husband, who was very abusive toward her and her

82

children, after learning that he was involved with cartels. After she left, the cartels began searching for Maria and her children. For about two years, Maria and her children searched for a safe place to live, in Guatemala and in Mexico, but the cartels invariably found them and went after them. Maria's ex-husband remains involved with cartels and continues to threaten Maria and her children.

162.   In September 2018, Maria traveled with her children to Nuevo Laredo, Mexico. On September 10, 2018, Maria and her children sought access to the asylum process by presenting themselves at the Laredo POE around 8:00p.m. As they approached the midpoint of the bridge to the United States, CBP officials stopped Maria and her children and asked to see their identification. Maria told the U.S. officials that she wanted to seek asylum in the United States. The U.S. officials told her to wait on the Mexican side of the bridge until they called her.

163.   After a few minutes, two Mexican officials walked toward her from the Mexican side of the bridge. The Mexican officials told Maria that the United States officials would not let her cross the bridge, but that they could help if she paid them $1,500 for herself and her children. Maria did not have money to pay the bribe, and instead traveled with her children to Reynosa, Mexico, to try to cross a different bridge to the United States.

164.   After Maria arrived in Reynosa, she did not feel safe going to the bridge immediately. While staying at a shelter in Reynosa, Maria met an American lawyer who agreed to accompany her to the Hidalgo POE.

165.   On September 19, 2018, Maria and her children, accompanied by the American lawyer, sought access to the asylum process by presenting themselves at the Hidalgo POE. They walked up to the bridge in Reynosa. They were at the turnstile at the entrance to the bridge and had only taken a few steps when a Mexican immigration official demanded to see their identification documents. After Maria gave him their documents, the Mexican official started screaming that Maria was abusing her Mexican residence by trying to cross the bridge to seek

asylum. He warned her that he would rip up her identity documents if she did not leave the bridge. Although Maria and her lawyer maintained that she had the right to seek asylum, she and her children left the bridge for fear that the Mexican official would hurt them or destroy their documents and deport them to Guatemala.

166.   Maria and her children returned to the shelter for two weeks before attempting to seek access to the asylum process again. On October 9, 2018, Maria and her children, again accompanied by the American lawyer, sought access to the asylum process by presenting themselves at the Hidalgo POE for the second time. When they arrived at the middle of the bridge, Maria started to tell the U.S. officials that she sought asylum. At that moment, however, a Mexican immigration officer grabbed Maria's arm and demanded to see her papers. Maria told the Mexican officer that she was a legal resident of Mexico with two Mexican children and showed him her papers. The officer told her that the Mexican residency permit did not allow her to go to the United States, and he ordered her to go to a station on the Mexican side of the border. Although Maria and the lawyer insisted that Maria had a right to seek asylum in the United States, the Mexican official called for backup.

167.   Meanwhile, the American lawyer explained to the U.S. officials standing at the bridge that Maria wanted to seek asylum and that she and her children were in danger. The U.S. officials said that what was happening had nothing to do with them.

168.   The Mexican officials took Maria to an office at the foot of the bridge and separated her from her children and the lawyer. They took Maria into a small room and told her that if she came back to the Hidalgo POE, they would revoke her Mexican residency.

169.   At the time the First Amended Complaint was filed, Maria feared for her life in Mexico and desired to return to a POE to seek access to the asylum

84

process, but based on her past experiences with CBP's practices at the U.S-Mexico border, she feared that she and her children would be turned away again or deported to Guatemala. Maria and her children feared for their lives in Mexico. After they arrived in Reynosa, they received multiple phone calls from blocked numbers, which Maria believes were from cartel members trying to track her location. On or around October 8, 2018, Maria's ex-husband called her directly and threatened her.

170.   Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Maria and her children into the United States.

***Plaintiffs Ursula Doe and Juan Doe***

171.   Ursula and Juan are natives and citizens of Honduras. They are a married couple with two children. They left Honduras with their children in August 2018 out of fear for their lives and the lives of their children.

172.   Ursula saw members of a Honduran gang kill her brother in 2014. The gang knows she witnessed the murder and have repeatedly warned Ursula and Juan of harm to their family. Gang members have called the family, gone to their house, and threatened to hurt their children.

173.   Ursula and Juan fled Honduras with their children to seek access to the asylum process in the United States. They traveled to Mexico, where they were robbed at gunpoint by three men who took all their money. Eventually they made it to Nuevo Laredo, Mexico, in late September 2018.

174.   The day after they arrived in Nuevo Laredo, Ursula, Juan, and their children went to the international bridge around 2:00 pm and sought access to the asylum process by presenting themselves at the Laredo POE. When they arrived at the middle of the bridge, U.S. officials told them they could not pass because the port was closed. Although Juan insisted that they wanted to request asylum, one of

85

the officials said that they had to wait their turn, the port was closed, and they could not pass.

175.   Ursula, Juan, and their children subsequently traveled to Reynosa to seek access to the asylum process by presenting themselves at the Hidalgo POE. They went to the bridge in Reynosa with their children around 5:00 a.m. Shortly after they passed through the turnstile, a Mexican official grabbed their documents and ordered them to walk with him back to Mexico.

176.   The Mexican official took Ursula and Juan to a waiting room. A different Mexican official took Juan aside and warned him that he and his family could be deported. Ursula, Juan, and their children were forced to wait all day without much food or water. Around 6:00 or 7:00 p.m., they were allowed to leave.

177.   At the time the First Amended Complaint was filed, Ursula and Juan desired to seek access to the asylum process in the United States, but based on their past experience with CBP's practice at the U.S.-Mexico border, they feared that they would be turned away again or deported to Honduras. At that time, they feared for their lives in Reynosa.

178.   Defendants subsequently made arrangements to facilitate the entry of Juan, Ursula, and their children into the United States.

***Plaintiff Victoria Doe***

179.   Victoria is a sixteen-year old female native and citizen of Honduras. She is an unaccompanied minor and the mother of a one-year old child. In 2017, members of the infamous 18th Street gang held her at gunpoint and threatened her with death if she did not submit herself sexually to the leader of the gang. Fearful for her life, she was able to flee to a separate part of Honduras. Shortly thereafter, the very same gang members followed her and repeated the same threats, demanding that she submit and become the property of the gang.

180.   Victoria came to Tijuana with a refugee caravan in April 2018, intending to seek asylum in the United States. She lived in a migrant shelter for four months but was in constant fear of murder and other crime and was threatened by male strangers on a number of occasions. She was also fearful that she would be forced into sex trafficking as the 18th Street Gang had attempted.

181.   On October 8, 2018, Victoria sought to access the asylum process by presenting herself at the San Ysidro POE, despite her fears that she and her son would be subject to the U.S. child separation policy. When she arrived, she informed the CBP officials of her intent to apply for asylum and her fear of returning to Honduras. In response, the CBP official told her that she could not apply for asylum at that time, and that she had to speak with a Mexican officer instead. The CBP official did not give further instruction as to which Mexican officer or where to locate the officer.

182.   At the time the First Amended Complaint was filed, Victoria desired to return immediately to seek access to the asylum process by presenting herself at the San Ysidro POE, but based on her past experience with CBP's practice at the U.S.-Mexico border, she understood that she would likely be turned away again. Victoria was fearful of remaining in Tijuana, for her life and the life of her son. She could not remain and believed seeking assistance from the Mexican government would be futile.

183.   Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Victoria and her child into the United States.

***Plaintiff Bianca Doe***

184.   Bianca is a native and citizen of Honduras. She is a transgender woman. Bianca suffered physical violence and extreme discrimination while in Honduras because she is transgender. She was targeted by the infamous MS-13

gang who tried to recruit her. Rather than join, and fearing for her life, she fled Honduras on April 2, 2018.

185.   Bianca arrived in Tapachula, Mexico and then later Mexico City, where she faced much of the same harassment and discrimination, including by police and federal officials. Eventually she reached Tijuana on September 19, 2018. She proceeded to seek access to the asylum process by presenting herself at the San Ysidro POE. CBP officials informed her that she could not apply for asylum because they were "full." Instead, they told her to seek assistance from Mexican workers in white shirts. She did not see any and returned to a local shelter where she was staying.

186.   Bianca returned the following day to seek access to the asylum process at the San Ysidro POE. She identified the Mexican workers in white shirts who informed her that they handled the asylum "waitlist" process. She was given a number, "919" which reflected her place on the waitlist. The Mexican workers told her that when her number was called she would be able proceed to the POE. She was informed that she would have to wait multiple weeks.

187.   Desperate for her life, her safety, and with little resources, on or about September 28th, 2018, at 1:00 a.m. Bianca approached the U.S.-Mexico border fence abutting the beach and climbed over the fence into U.S. territory. Eventually a U.S. Border Patrol guard spotted her on U.S. soil and demanded that she climb back over the fence and into Mexico or else he would call the Mexican authorities.

188.   On October 8, 2018, Bianca attempted once again to seek access to the asylum process by presenting herself at the San Ysidro POE. At the POE CBP official "Soto" denied Bianca's request to seek asylum, again informing her that they were "full." He instructed Bianca to stand aside and wait for a Mexican official. No Mexican official came and she left.

189.   At the time the First Amended Complaint was filed, Bianca desired to return immediately to seek access to the asylum process by presenting herself at

88

the San Ysidro POE, but based on her past experience with CBP's practice at the U.S.-Mexico border, she understood that she would likely be turned away again. Bianca was fearful of remaining in Tijuana. She could not remain and believed seeking assistance from the Mexican government would be futile.

190.   Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate Bianca's entry into the United States.

***Plaintiff Emiliana Doe***

191.   Emiliana is a native and citizen of Honduras. She is a transgender woman. She was threatened with violence and death by transnational drug dealers and gang members in Honduras. She was raped on multiple occasions by police officers. In May 2017, she was kidnapped and held for three days, and eventually thrown out of a moving car. In April 2018, she was abducted by four drug dealers, beaten for over six hours, pistol whipped, thrown out of a moving truck, and ordered to sell drugs. She was refused medical attention because she is transgender.

192.   Emiliana fled Honduras on June 5, 2018 and embarked on the arduous journey through Mexico, where she was again repeatedly raped and threatened with death. She eventually reached Tijuana in September 2018. Emiliana intended to seek access to the asylum process in the United States, but was unsure how. She spoke with a stranger who was also attempting to apply for asylum who informed her that she needed to get on the "waiting list." She proceeded to the seek access to the asylum process by going to the San Ysidro POE and speaking with two women who gave her a number, "1014," which reflected her place on a waitlist. They told Emiliana to come back in six weeks.

193.   Given the dangers in Tijuana, particularly to transgender women, Emiliana could not wait six weeks and instead on October 8, 2018, she sought access to the asylum process by presenting herself at the San Ysidro POE to ask for asylum. When she informed a CBP official that she wished to seek asylum in

89

the United States, he responded that she could not because they were "full," and instead ordered her to wait off to the side until a Mexican immigration official could come over. No official ever came.

194.   At the time the First Amended Complaint was filed, Emiliana desired to return immediately to seek access to the asylum process by presenting herself at the San Ysidro POE, but based on her past experience with CBP's practice at the U.S.-Mexico border, she understood that she would likely be turned away again. Emiliana was fearful of remaining in Tijuana. She could not remain and believed seeking assistance from the Mexican government would be futile.

195.   Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate Emiliana's entry into the United States.

***Plaintiff Cesar Doe***

196.   Cesar is a native and citizen of Honduras. Earlier in 2018, the 18th Street gang demanded that he join the gang at threat of death. He refused. The gang later kidnapped him and kept him in an abandoned house in the mountains. He was able to escape, and fled Honduras the next day.

197.   Cesar reached Tijuana on August 1, 2018 with the intention of seeking access to the asylum process in the United States. Cesar approached the plaza immediately before the San Ysidro POE where he was approached by members of "Grupo Beta." Grupo Beta informed him that he would need to go through them to apply for asylum. They explained that they would put him on a list and give him a number, and only when his number was called could he apply for asylum.

198.   Soon thereafter, Grupo Beta began racially segregating individuals into three groups: Africans, Central Americans, and Mexicans. They placed Cesar in the Central America group and then Mexican officials arrested him and placed him into detention. Cesar was detained for twelve days and Mexican officials

90

threatened to deport him on multiple occasions. A local shelter eventually secured Cesar's release from detention.

199.   Continuing to fear for his life in Tijuana, Cesar returned to the San Ysidro POE to seek access to the asylum process, and he spoke with Grupo Beta. He was eventually placed on the waitlist and given number "740." After waiting a few weeks, Cesar sought access to the asylum process by presenting himself at the San Ysidro POE with two staff members from Al Otro Lado. Cesar informed CBP officials that he intended to seek asylum in the United States and that he feared return to his home country. The CBP officials refused to let him pass or seek asylum.

200.   After waiting another few weeks, in September 2018 Cesar sought access to the asylum process once again by presenting himself at the San Ysidro POE. Members of Grupo Beta intercepted him and threatened to call Mexican immigration officials and child protective services on him. The individuals pushed Cesar toward the corner the plaza near the POE and called Mexican immigration. A staff member from Al Otro Lado escorted Cesar back to the shelter.

201.   At the time the First Amended Complaint was filed, Cesar desired to return immediately to seek access to the asylum process by presenting himself at the San Ysidro POE, but based on his past experience with CBP's practice at the U.S.-Mexico border, he understood that he would likely be turned away again. Cesar was fearful of remaining in Tijuana. He could not remain and believed seeking assistance from the Mexican government would be futile.

202.   Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate Cesar's entry into the United States.

# V.   LEGAL BACKGROUND

## A.   U.S. Law Requires that ~~Individuals Be Provided a~~Asylum Seekers Who Present Themselves at POEs Have Meaningful ~~Opportunity~~Access to ~~Seek~~the Asylum ~~in the United States~~ Process

~~104.~~203.    U.S. law requires CBP to give individuals who present themselves at ~~a POE~~POEs and express a desire to apply for asylum or a fear of persecution in their home countries the opportunity to seek protection in the United States~~.~~ without unreasonable delay.

~~105.~~204.    Specifically, the Immigration and Nationality Act ("INA") and its implementing regulations set forth a variety of ways in which such individuals may seek protection in the United States. *See, e.g.,* 8 U.S.C. § 1157 (admission of refugees processed overseas); 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1231(b)(3) (restriction of removal to a country where individual's life or freedom would be threatened); 8 C.F.R. §§ 208.16-18 (protection under the Convention Against Torture).

~~106.~~ 205. The INA provides that any noncitizen "who is physically present in the United States or who arrives in the United States" has a statutory right to apply for asylum, irrespective of such individual's status. 8 U.S.C. § 1158(a)(1). The INA also specifies processes that must be followed when an individual states a desire to seek asylum or expresses a fear of returning to his or her home country. *See* 8 U.S.C. § 1158(d)(1) ("The Attorney General shall establish a procedure for the consideration of asylum applications filed [by individuals physically present in the United States or who arrive in the United States].") Under the INA, CBP must either:

a.    Refer the asylum seeker for a credible fear interview *(see* 8 U.S.C. § 1225(b)(1))~~; or~~

b.   Place the asylum seeker directly into regular removal proceedings by issuing a Notice to Appear ("NTA"), which will then allow the asylum seeker to pursue his or her asylum claim before an immigration judge *(see* 8 U.S.C. §§ 1125~~1225~~(b)(2), 1229, ~~1129~~1229a)~~.~~; or

c.   Parole the asylum seeker temporarily into the United States for urgent humanitarian reasons or significant public benefit *(see* 8 U.S.C. § 1182(d)(5)(A)).

~~107.~~206.   The U.S. government ~~has admitted~~recognized that the duty to allow a noncitizen access to the asylum process is "not discretionary." *See, e.g.,* Federal Defendant's Reply Brief in Support of Motion for Summary Judgment and Dismissal for Lack of Jurisdiction, cited in *Munyua v. United States,* No. 03-4538, 2005 U.S. Dist. LEXIS 11499, at *16-19 (N.D. Cal. Jan. 10, 2005) ("[D]efendant acknowledges that [the immigration officers] did not have the discretion to ignore a clear expression of fear of return or to coerce an alien into withdrawing an application for admission").

~~108.~~207.   CBP is responsible for the day-to-day operation of POEs along the U.S.-Mexico border. CBP's obligations include inspecting and processing individuals who present themselves at POEs to enable them to pursue their claims for asylum in the United States. CBP officials themselves are not authorized to evaluate, grant or reject an individual's asylum claim.

~~109.~~208.   All noncitizens arriving at POEs along the U.S.-Mexico border must be inspected by CBP officials. *See* 8 U.S.C. § 1225(a)(3) ("All [noncitizens] ~~. . .~~ who are applicants for admission or otherwise seeking admission . . . ***shall be inspected*** by immigration officers.") (emphasis added). During inspection, CBP officials must determine whether a noncitizen may be admitted to the United States. *See* 8 U.S.C. § 1182(a) (specifying grounds of inadmissibility). In order to make this determination, CBP scrutinizes an individual's entry documents. *See* 8

93

U.S.C. § 1181(a) (outlining documentation requirements for the admission of noncitizens into the United States). Asylum seekers often flee their countries on very short notice and thus frequently lack valid entry documents. Once a CBP official makes a determination of inadmissibility, the individual becomes subject to removal from the United States.

110.209.    CBP officials must then place the noncitizen into either expedited removal proceedings under 8 U.S.C. § 1225(b) or regular removal proceedings under 8 U.S.C. § 1229.

111.210.    Expedited removal proceedings involve a more streamlined process than regular removal proceedings and are reserved for people apprehended at or near the border. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (permitting certain persons who are seeking admission at the border to the United States to be expeditiously removed without a full immigration judge hearing). However, Congress included important safeguards in the expedited removal statute in an effort specifically to protect asylum seekers.

112.211.    The INA unequivocally states that if a noncitizen placed in expedited removal proceedings "indicates either an intention to apply for asylum . . . or a fear of persecution, the [CBP] officer ***shall*** refer the [noncitizen] for an interview by an asylum officer." 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). The requirement to refer an asylum seeker placed in expedited removal proceedings to an asylum officer is ***mandatory.***

113.212.    Likewise, the applicable regulations promulgated under the INA reinforce that if an individual in expedited removal proceedings asserts an intention to apply for asylum or a fear of persecution, then "the inspecting officer ***shall not*** proceed further with removal of the [noncitizen] until the [noncitizen] has been referred for an interview by an asylum officer." 8 C.F.R. § 235.3(b)(4) (emphasis added).

114.213.    Importantly, CBP officials must read a form to noncitizens subject to expedited removal advising them of their right to speak to an asylum officer if they express a desire to apply for asylum or a fear of returning to their home countries. *See* 8 C.F.R. § 235.3(b)(2)(i); DHS Form I-867A.

115.214.    Affirming that the CBP officials themselves are not authorized to adjudicate asylum claims, the regulations specifically charge ***asylum officers*** from U.S. Citizenship and Immigration Services with making initial determinations as to whether there is a "significant possibility" that an individual can establish eligibility for asylum. *See* 8 C.F.R. § 235.3(b)(4); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii). This is because asylum officers are trained in the often complicated and evolving law surrounding asylum, and thus are uniquely positioned to conduct such interviews, which themselves require particular interviewing and assessment skills as well as comprehension of the social and political contexts from which asylum seekers flee. In fact, the INA specifically defines "asylum officer" as an immigration officer who "has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 1158." 8 U.S.C. § 1225(b)(1)(E).

116.215.    Applicants who establish that they have a "significant possibility" of proving their eligibility for asylum receive positive credible fear determinations. They are taken out of the expedited removal system altogether and placed into regular removal proceedings, where they have the opportunity to submit an asylum application, develop a full record before an Immigration Judge, appeal to the Board of Immigration Appeals, and seek judicial review of an adverse decision. 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. §§ 235.6(a)(1)(ii), (iii).

117.216.    Alternatively, CBP officials may place noncitizens directly into regular removal proceedings by issuing an NTA. 8 U.S.C. §§ 1225(b)(2), 1229(a)(1), 1229a. Once in regular removal proceedings, the asylum seeker can

submit an asylum application and must receive a full hearing before an Immigration Judge, file an administrative appeal with the Board of Immigration Appeals, and seek judicial review. 8 U.S.C. § 1229a(a)(1) ("An ~~immigration judge~~immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.").

217.   At the discretion of the DHS Secretary, an individual may also be temporarily paroled into the United States for urgent humanitarian reasons or significant public benefit. When the purposes of such parole have been served, the individual must be returned to the custody from which he was paroled, after which his case will continue to be handled in the same manner as that of any other applicant for admission to the United States. 8 U.S.C. § 1182(d)(5)(A).

~~118.~~218.   Despite these prescribed procedures, CBP has implemented a policy and regularly employs a variety of egregious ~~tactics~~practices (including those described above) that have one unlawful result: directly or constructively depriving Class Plaintiffs, and the asylum seekers they represent, of ~~any~~meaningful access to the asylum process, and ~~stripping them of~~thereby violating their right to seek asylum under U.S. law.

219.   Acknowledging the illegality of the Trump administration's ongoing pushbacks of asylum seekers at the border, the House Appropriations Committee called on DHS in July 2018 to "ensure that the United States is meeting its legal obligations, to include reminding field officers and agents about CBP's legal responsibilities to ensure that asylum-seekers can enter at POES."[87]

**B.    Defendants Have No Authority Under the INA to Turn Back a Noncitizen Seeking Admission ~~Away~~ at a POE**

~~119.~~220.   CBP's authority is limited to that granted by Congress in the INA. Nothing in the INA authorizes Defendants, through their officers and employees, to turn ~~away~~back a noncitizen who seeks admission at a POE.

---

[87] *Bill Report Draft, supra* note 78, at 4.

120.221.    When inspecting a noncitizen who arrives at a POE, CBP officials must follow the procedures mandated by Congress in 8 U.S.C. § 1225. Pursuant to this section, CBP officials are limited to the following possible actions with respect to any arriving noncitizen who is not clearly and beyond a doubt entitled to be admitted:

    a.    Place arriving noncitizens who are inadmissible under one of two grounds specified by statute in expedited removal proceedings pursuant to 8 U.S.C. § 1225(b)(1)(A)(i);

    b.    Refer any noncitizen placed in expedited removal proceedings who expresses either an intent to apply for asylum or a fear of persecution if returned to his or her home country to an asylum officer for a credible fear interview pursuant to 8 U.S.C. §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B);

    c.    Place "other" arriving noncitizens (*i.e.,* those who are not placed in expedited removal proceedings under 8 U.S.C. § 1225(b)(1)(A) and who are neither crewmen ~~or~~nor stowaways) in removal proceedings under 8 U.S.C. § 1229a pursuant to 8 U.S.C. § 1225(b)(2);

    d.    Follow other removal procedures with respect to noncitizens suspected of being inadmissible on terrorism or related security grounds pursuant to 8 U.S.C. § 1225(c); or

    e.    Accept from the noncitizen a voluntary (*i.e.,* non-coerced) withdrawal of her application for admission pursuant to 8 U.S.C. § 1225(a)(4) and 8 C.F.R. § 235.4.

121.222.    Defendants, through their officers ~~and~~, employees, and agents, act without authority and in violation of the law when they ~~turn away~~directly deny an individual access to the U.S. asylum process at a POE.

223.   Defendants, through their officers, employees, and agents, act without authority and in violation of the law when they constructively deny an individual's access to the asylum process by unreasonably delaying their ability to present themselves at a POE.

224.   Moreover, Defendants' Turnback Policy is *ultra vires.*

**C.   Class Plaintiffs Are Entitled to Procedural Due Process Rights Under the Fifth Amendment to the U.S. Constitution**

~~122.~~225.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. Amend. V. In addition, where Congress has granted statutory rights and has directed an agency to establish a procedure for providing such rights, the Constitution requires the government to establish a fair procedure and to abide by that procedure. In the asylum context, U.S. law mandates that asylum seekers be provided with such process. Multiple courts have recognized that such procedural rights are critical in the asylum context and can result in life or death decisions, because applicants wrongly denied asylum can be subject to death or other serious harm in their home countries. *See, e.g., Marincas v. Lewis,* 92 F.3d 195, 203 (3d Cir. 1996) ("The basic procedural rights Congress intended to provide asylum applicants . . . are particularly important because an applicant erroneously denied asylum could be subject to death or persecution if forced to return to his or her home country.").

~~123.~~226.   The INA and its implementing regulations provide Class Plaintiffs with the right to be processed at a POE and granted meaningful access to the asylum process. *See, e.g.,* 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), 1225(b)(2). By systematically turning away asylum seekers presenting themselves at POEs along the U.S.-Mexico border or unreasonably delaying their inspections—and thus directly or constructively

98

denying them access to the asylum process, Defendants have failed to comply with the due process procedures for processing asylum seekers under the INA and its implementing regulations.

### D. The *Non-Refoulement* Doctrine Under International Law Requires Implementation and Adherence to a Procedure to Ensure Prompt Access to Asylum

~~124.~~227.    The United States is obligated by a number of treaties and protocols to adhere to the duty of *non-refoulement — a* duty that prohibits a country from returning or expelling an individual to a country where he or she has a well-founded fear of persecution and/or torture and that requires processes that ensure fair and efficient administration of the asylum process.

~~125.~~228.   The Office of the United Nations High Commissioner for Refugees ("UNHCR") has described *non-refoulement* as "the cornerstone of international refugee protection," and notes that it is "of particular relevance to asylum-seekers."[88] The primary treaty source for the duty of *non-refoulement* is the 1951 Convention on the Rights of Refugees. Article 33 of the Convention prohibits a state from returning "a refugee *in any manner* whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."[89] As UNHCR has explained, the Treaty's emphasis on "any manner" of *refoulement* reflects a state duty to avoid using direct or indirect ways of subjecting a person to a risk of return to persecution.[90]

229.   In addition, the duty of *non-refoulement* extends not only to a person's country of origin, "but also to any other place where a person has reason

---

[88]   *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol,* UNHCR (Jan. 26, 2007), http://www.unhcr.org/4d9486929.pdf.

[89]   1951 Refugee Convention, Art. 33 (emphasis added).   [90]

[90]   *Id. at* 7.

99

to fear threats to his or her life or freedom related to one or more of the grounds set out in the 1951 ~~Refugee Convention, Art. 33.~~ Convention, or from where he or she risks being sent to such a risk."[91] Accordingly, a state must not only prevent return to danger, it must take affirmative measures to prevent a risk of harm by "adopt[ing] a course that does not result in [asylum seekers] removal, directly or indirectly, to a place where their lives or freedom would be in danger."[92] This includes "access to the territory and to *fair and efficient* asylum procedures."[93]

230.   The United States adopted the protections of Article 33 by signing onto the 1967 Protocol Relating to the Status of Refugees, which incorporated Articles 2-34 of the 1951 Convention.

~~126.~~231.      The prohibition against *refoulement* is likewise central to other treaties ratified by the United States, including the International Covenant on Civil and Political Rights ("ICCPR") and the Convention Against Torture ("CAT"), both of which prohibit returning an individual to harm and obligate the United States to implement and follow legal procedures to protect refugees' right to *non-refoulement.* ~~See ICCPR, Art. 13; CAT, Art. 3.~~[94]

~~127.~~232.      In order to effectuate an asylum seeker's right to *non-refoulement,* the United States is obligated to implement and follow procedures to ensure that his or her request for asylum be duly and efficiently considered. The United States implemented this legal obligation with the passage of the 1980 Refugee Act, which established a procedure for a noncitizen physically present in the United States or at a land border or POE to apply for asylum. ~~See Refugee Act of 1980, Pub. L. No. 96-212, § 201(b), 94 Stat. 102 (1980).~~[95]

---

[91]   Id. at 3 (citing UNHCR, Note on Non-Refoulement (EC/SCP/2), 1977 ¶4).
[92]   *Id. at If* 8.
[93]   [93]Id. (emphasis added).
[94]   *See* ICCPR, Art. 13; CAT, Art. 3.
[95]   *See* Refugee Act of 1980, Pub. L. No. 96-212, § 201(b), 94 Stat. 102 (1980).

128.233.    In practice, the duty of *non-refoulement* covers not only those refugees and asylum seekers already present inside the country, but also those who present themselves at POEs along the U.S. border. The duty requires U.S. officials such as Defendants to consider the claims ofprocess those seeking to cross the U.S. border and not to deny themor unreasonably delay their access to aan efficient, lawful process to present a claim for asylum.

129.234.    The norm of *non-refoulement* is specific, universal and obligatory. It is so widely accepted that it has reached the status of *jus cogens — a* norm not subject to derogation. Indeed, in 1996, the United Nations Executive Committee on the International Protection of Refugees explicitly concluded that the *non-refoulement* principle had achieved the status of a norm "not subject to derogation." Executive Committee Conclusion No. 79, *General Conclusion on International Protection* (1996).[96] The principle was recognized as such in the 1984 Cartagena Declaration on Refugees; was included in a portion of the Refugee Convention from which derogation is not permitted; and has been recognized by bodies, including the Inter-American Commission on Human Rights and the Organization of American States General Assembly.

130.235.    Defendants' policy and actions to actively or constructively deny Class Plaintiffs, and the asylum seekers they represent, access to the U.S. asylum process violate their binding and enforceable obligations under international law.

## VI.    CLASS ACTION ALLEGATIONS

131.236.    Class Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and all other persons similarly situated. The proposed class is defined as follows:

---

[96]    Executive Committee Conclusion No. 79, *General Conclusion on International Protection* (1996).

All noncitizens who ~~present~~seek or will seek to access the U.S. asylum process by presenting themselves at a POE along the U.S.-Mexico border~~, assert an intention to seek asylum or express a fear of persecution in their home countries,~~ and are denied access to the U.S. asylum process by or at the instruction of CBP officials.

~~132.~~237.     The class is so numerous that joinder of all members is impracticable. CBP's misconduct toward asylum seekers at POEs along the U.S.-Mexico border has been the focus of monitoring, reporting and advocacy by numerous well-respected non-governmental organizations. These organizations have investigated and documented ~~hundreds~~thousands of examples of asylum seekers being turned ~~away~~back by CBP officials. Many more asylum seekers ~~have~~ likely have been the victims of this unlawful conduct as these abuses often go unreported. Asylum seekers who are turned ~~away~~back at the border are continuously moving and relocating, also making joinder impracticable.

~~133.~~238.     There are questions of law and fact that are common to the class. The class alleges common harms: ~~a violation` of the class members' statutory right to~~denial of access to the ~~U.S.~~ asylum process~~, procedural due process rights and~~ at POEs along the U.S.-Mexico border and a violation of the right not to be returned to countries where they fear persecution. The class members' entitlement to these rights is based on a common core of facts. All members of the proposed class have attempted to seek asylum by presenting themselves at a POE along the U.S.-Mexico border. All of them have expressed a fear of ~~return to their home countries~~persecution or a desire to apply for asylum, or would have done so but for the conduct of Defendants. These facts entitle all of them to the opportunity to seek asylum. Yet each class member has been and likely will again be unlawfully denied access to the U.S. asylum process by CBP. Moreover, all class members raise the same legal claims: that U.S. ~~immigration laws and the Constitution require~~law requires CBP officials at POEs to give them meaningful access to the asylum process. Their shared common facts will ensure

that judicial findings regarding the legality of the challenged practices will be the same for all class members. Should Class Plaintiffs prevail, *all* class members will benefit; each of them will be entitled to a prompt, lawful inspection at a POE along the U.S.-Mexico border and an opportunity to seek asylum.

134.239.    Class Plaintiffs' claims are typical of the claims of the class. Class Plaintiffs and class members raise common legal claims and are united in their interest and injury. All Class Plaintiffs, like all class members, are asylum seekers to whom CBP officials unlawfully denied, whether actively or constructively, access to the U.S. asylum process after they presented themselves at POEs along the U.S.-Mexico border. Class Plaintiffs and class members are thus victims of theofthe same, unlawful course of conduct.

135.240.    Class Plaintiffs are adequate representatives. Class Plaintiffs seek relief on behalf of the class as a whole and have no interest antagonistic to other members of the class. Class Plaintiffs' mutual goal is to declare Defendants' challenged policies and practices unlawful and to obtain declaratory and injunctive relief that would cure this illegality. Class Plaintiffs seek a remedy for the same injuries as the class members, and all share an interest in having a meaningful opportunity to seek asylum. Thus, the interests of the Class Plaintiffs and of the class members are aligned.

136.241.    Class Plaintiffs are represented by attorneys from the American Immigration CouncilSouthern Poverty Law Center, the Center for Constitutional Rights, the American Immigration Council, and Latham & Watkins LLP. Counsel have a demonstrated commitment to protecting the rights and interests of noncitizens and, together, have considerable experience in handling complex and class action litigation in the immigration field. Counsel have represented numerous classes of immigrants and other victims of systematic government misconduct in actions in which they successfully obtained class relief.

137.242.    Defendants have acted or refused to act on grounds that are generally applicable to Class Plaintiffs and the class. Defendants have failed to provide Class Plaintiffs and class members with meaningful access to the U.S. asylum process. Defendants' actions violate Class Plaintiffs' and class members' statutory, regulatory and constitutional rights to access to the asylum process. Declaratory and injunctive relief are appropriate remedies.

138.243.    In the absence of a class action, there is substantial risk that individual actions would be brought in different venues, creating a risk of inconsistent injunctions to address Defendants' common conduct.

## FIRST CLAIM FOR RELIEF

### DECLARATORY AND INJUNCTIVE RELIEF

### AGAINST ALL DEFENDANTS

### (VIOLATION OF THE RIGHT TO SEEK ASYLUM UNDER THE IMMIGRATION AND NATIONALITY ACT)

139.244.    Al Otro Lado and Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

140.245.    INA § 208(a)(1) (8 U.S.C. § 1158(a)(1)) gives any noncitizen who is physically present in or who arrives in the United States a statutory right to seek asylum, regardless of such individual's immigration status.

141.246.    When a noncitizen presents himself or herself at a POE and indicates an intention to apply for asylum or a fear of persecution, CBP officials must refer the noncitizen for a credible fear interview under 8 U.S.C. § 1225(b)(1)(A)(ii) and 8 C.F.R. § 235.3(b)(4), or, in accordance with 8 U.S.C. § 1225(b)(2), place the noncitizen directly into regular removal proceedings under 8 U.S.C. § 1229(a)(1).

142.247.    Class Plaintiffs presented themselves at U.S. POEs along the U.S.-Mexico border and either asserted an intention to apply for asylum and/or a

fear of persecution in their countries of origin or would have done so but for the Defendants' conduct. Nevertheless, CBP officials did not refer Class Plaintiffs to an asylum officer for credible fear interviews pursuant to 8 U.S.C. § 1225(b)(1)(A)(ii), or, in accordance with 8 U.S.C. § 1225(b)(2), place Class Plaintiffs directly into regular removal proceedings pursuant to 8 U.S.C. § 1229(a)(1).

143.248.    Instead, in direct contravention of the INA, CBP officials engaged in unlawful tactics that prevented, including the implementation of the Turnback Policy, that actively or constructively denied Class Plaintiffs from accessing' access to the statutorily prescribed asylum process and forced them to return to Mexico.

144.249.    CBP officials' treatment of Class Plaintiffs at the POEs and the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction and/or acquiescence of Defendants.

145.250.    As a result of Defendants' violations of the INA, Class Plaintiffs have been damaged — through the active or constructive denial of access to the asylum process and by being forced to return to Mexico or other countries where they face threats of further persecution.

146.251.    As a result of Defendants' violations of the INA, Plaintiff Al Otro Lado has been damaged — namely its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at or near POEs along the U.S.-Mexico border.

147.252.    Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their statutory rights. Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from

continuing to engage in the unlawful policy and practices and policies alleged herein.

148.253.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in any case involving an actual controversy.

149.254.    An actual controversy has arisen and now exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other. Class Plaintiffs and Al Otro Lado contend that Defendants' Turnback Policy, as well as the conduct and practices carried out in reliance on it, as alleged in this Second Amended Complaint, violate the INA. On information and belief, Defendants contend that thetheir Turnback Policy, conduct and practices are lawful.

150.255.    Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

## SECOND CLAIM FOR RELIEF

### DECLARATORY RELIEF AND INJUNCTIVE RELIEF

### AGAINST ALL DEFENDANTS

### (VIOLATION OF SECTION 706(1) OF THE ADMINISTRATIVE PROCEDURE ACT)

151.256.    Al Otro Lado and Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

152.257.    The Administrative Procedure Act ("APA") (5 U.S.C. § 551, *et. seq.)* authorizes suits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. The APA also provides relief for a failure to

act: "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

153.   CBP officials have failed to take actions mandated by the following statutes and implementing regulations in violation of the APA:

- 8 U.S.C. § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, *may apply for asylum. . . .")* (emphasis added);

258.   CBP officials, at the instigation, under the control or authority of, or with the direction, knowledge, consent, or acquiescence of Defendants, have engaged in an unlawful widespread pattern or practice of denying and unreasonably delaying asylum seekers' access to the asylum process by, among other tactics: lying; using threats, intimidation and coercion; employing verbal abuse and applying physical force; physically blocking access to POE buildings; imposing unreasonable delays before granting access to the asylum process; denying outright access to the asylum process; and denying access to the asylum process in a racially discriminatory manner.

259.   CBP officials, at the instigation, under the control or authority of, or with the direction, knowledge, consent, or acquiescence of Defendants, have also adopted and implemented the Turnback Policy, restricting access to the asylum process at POEs by mandating that CBP officers directly or constructively turn back asylum seekers at the border based on purported "capacity" constraints.

260. Through this conduct, CBP officials have failed, in violation of the APA, to take actions mandated by the following statutes and implementing regulations:

- 8 U.S.C. § 1225(a)(1)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or

transit through the United States **shall be inspected by immigration officers.")** (emphasis added);

- 8 U.S.C. § 1225(b)(1)(A)(ii) ("If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible . . . and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, **the officer shall refer the alien for an interview by an asylum officer . . . .")** (emphasis added);

- 8 U.S.C. § 1225(b)(2) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."); and

- 8 C.F.R. § 235.3(b)(4) ("[T]heIf an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer **shall not proceed further** with removal of the alien **until the alien has been referred for an interview by an asylum officer . . . .")** (emphasis added); and.

  - 8 C.F.R. § 235.4 ("The alien's decision to withdraw his or her application for admission must be made voluntarily . . . .").

154.  In addition, CBP officials have acted in excess of their statutorily prescribed authority and without observance of the procedures required by law in violation of the APA. *See 5 U.S.C. §§ 706(2)(C), (D).* Congress mandated the various procedures that Defendants are authorized to follow when inspecting individuals who seek admission at POEs. *See* 8 U.S.C. § 1225. None of these procedures authorizes a CBP official to turn back a noncitizen seeking asylum at a POE.

155.  In turning Class Plaintiffs and purported class members away at POEs along the U.S.-Mexico border without following the procedures mandated by the

~~INA, CBP officials have acted and continue to act in excess of the authority granted~~ them by Congress and without observance of procedure required by law.

~~156.   CBP's treatment of Class Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction or acquiescence of Defendants.~~

261. Through this conduct, CBP officials have also failed, in violation of the APA, to take the above-listed mandated actions without unreasonable delay.

~~157.~~262.   Defendants' repeated and pervasive ~~failure to act and the actions taken in excess of their authority~~failures to act, and/or to act within a reasonable time, which denied and/or unreasonably delayed Class Plaintiffs' access to the statutorily prescribed asylum process, constitute unlawfully withheld ~~or~~and unreasonably delayed agency action~~, is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law,~~ and therefore ~~gives~~give rise to federal jurisdiction and ~~mandates~~mandate relief under the APA.

~~158.~~263.   As a result of the acts constituting violations of the APA, Class Plaintiffs have been damaged through the denial and/or unreasonable delay of access to the asylum process and by being forced to return to and/or wait in Mexico~~ or other countries~~, where they face threats of further persecution.

~~159.~~264.   As a result of the acts constituting violations of the APA, Plaintiff Al Otro Lado has been damaged — namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

~~160.~~265.   Defendants' ~~practices~~Turnback Policy and widespread pattern or practice have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their statutory and regulatory rights. Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged

herein, and therefore seek injunctive relief restraining Defendants from continuing to engage in the unlawful practices alleged herein.

~~161.~~266.   Al Otro Lado and Class Plaintiffs have exhausted all available administrative remedies and have no adequate remedy at law.

~~162.~~267.   Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in any case involving an actual controversy.

~~163.~~268.   An actual controversy has arisen and now exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other. Class Plaintiffs and Al Otro Lado contend that Defendants' ~~conduct and practices~~Turnback Policy and sanctioning of CBP's unlawful widespread pattern or practice at POEs along the U.S.-Mexico border, as alleged in this Complaint, violate the APA. On information and belief, Defendants contend that the ~~conduct and practices~~Turnback Policy and widespread pattern or practice are lawful.

~~164.~~269.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

### THIRD CLAIM FOR RELIEF

### DECLARATORY RELIEF AND INJUNCTIVE RELIEF

### AGAINST ALL DEFENDANTS

### (VIOLATION OF SECTION 706(2) OF THE ADMINISTRATIVE PROCEDURE ACT—AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY AND WITHOUT OBSERVANCE OF PROCEDURES REQUIRED BY LAW)

270.   Al Otro Lado and Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

110

271.   Under the APA, "the reviewing court shall . . . hold unlawful and set aside agency action, finding, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right [and/or] without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D).

272.   Defendants, through implementation of the Turnback Policy and sanctioning of CBP's unlawful widespread pattern or practice of denying and unreasonably delaying asylum seekers' access to the asylum process, have acted in excess of their statutorily prescribed authority and without observance of the procedures required by law in violation of section 706(2) of the APA. *See 5 U.S.C. §§ 706(2)(C), (D).* Congress mandated the various procedures that Defendants and their officers, employees, and agents are authorized and required to follow when inspecting individuals who seek admission at POEs. *See* 8 U.S.C. § 1225. Regulations implementing section 1225 also establish the required procedures for inspection of individuals who seek admission at POEs. *See* 8 C.F.R. § 235.3(b)(4). None of these procedures authorizes a CBP official to turn back a noncitizen seeking asylum at a POE, at the physical U.S.-Mexico border, or any place in between.

273.   In turning back Class Plaintiffs and purported class members at POEs or along the U.S.-Mexico border without following the procedures mandated by the INA and its implementing regulations, CBP officials have acted and continue to act in excess of the authority granted to them by Congress and without observance of procedure required by law.

274.   The Turnback Policy is a policy authorized by Defendants with the purpose of restricting and unreasonably delaying asylum seekers' access to the U.S. asylum process on the basis of purported capacity constraints at U.S. POEs. Defendants' own statements and communications, as well as a report of the DHS Office of Inspector General, confirm Defendants ordered the Turnback Policy and

its implementation by CBP. The Turnback Policy thus constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2).

275.   Furthermore, each instance where Defendants, through their officers, employees, and agents, directly or constructively deny Class Plaintiffs or purported class members access to the asylum process constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2).

276.   As a result of the acts constituting violations of the APA, Class Plaintiffs have been damaged through the denial, restriction, and/or unreasonable delay of access to the asylum process and by being forced to return to and/or wait in Mexico where they face threats of further persecution and/or other serious harm.

277.   As a result of the acts constituting violations of the APA, Plaintiff Al Otro Lado has been damaged—namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

278.   Defendants' Turnback Policy and widespread pattern or practice have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their statutory and regulatory rights. Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy alleged herein.

279.   Al Otro Lado and Class Plaintiffs have exhausted all available administrative remedies and have no adequate remedy at law.

280.   Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in any case involving an actual controversy.

281.   An actual controversy has arisen and now exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other. Class Plaintiffs and Al Otro Lado contend that Defendants' Turnback Policy and sanctioning of CBP's unlawful widespread pattern or practice at POEs along the U.S.-Mexico border, as alleged in this Complaint, violate the APA. On information and belief, Defendants contend that the Turnback Policy and widespread pattern or practice are lawful.

282.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

## FOURTH CLAIM FOR RELIEF

## DECLARATORY RELIEF AND INJUNCTIVE RELIEF

## AGAINST ALL DEFENDANTS

## (VIOLATION OF PROCEDURAL DUE PROCESS)

165.283.   Al Otro Lado and Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

166.284.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. Amend. V.

167.285.   Congress has granted certain statutory rights to asylum seekers, such as Class Plaintiffs and the asylum seekers they represent, and has directed DHS to establish a procedure for providing such rights. The Due Process Clause thus requires the government to establish a fair procedure and to abide by that procedure.

168.286.   As set forth above, the INA and its implementing regulations provide Class Plaintiffs the right to be processed at a POE and granted meaningful

113

access to the asylum process. *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225225(b)(1)(B), 1225(b)(2); *see also* 8 C.F.R. § 235.3(b)(4).

169.287.    By adopting the Turnback Policy and using a variety of tactics to turn awayback asylum seekers at POEs along the U.S.-Mexico border, CBP officials have denied Class Plaintiffs access to the asylum process and failed to comply with procedures set forth in the INA and its implementing regulations.

170.288.    CBP officials' treatment of Class Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction or acquiescence of Defendants.

171.289.    By denying Class Plaintiffs' access to the asylum process, Defendants have violated Class Plaintiffs' procedural due process rights under the Fifth Amendment to the U.S. Constitution.

172.290.    As a result of the Defendants' violations of the Fifth Amendment to the U.S. Constitution, Class Plaintiffs have been damaged through the denial of access to the asylum process and by being forced to return to Mexico or other countries where they face threats of further persecution.

173.   As a result of Defendants' violations of the Fifth Amendment to the U.S. Constitution, Al Otro Lado has been damaged — namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

174.291.    Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their constitutional rights. Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from engaging in the unlawful policy, conduct and practices alleged herein.

175.292.     An actual controversy exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other. Class Plaintiffs and Al Otro Lado contend that Defendants' conduct and practices Turnback Policy and sanctioning of CBP's unlawful widespread pattern or practice at POEs along the U.S.-Mexico border, as alleged in this the Complaint, violate the Fifth Amendment to the United States Constitution. On information and belief, Defendants contend that the conduct and practices Turnback Policy and widespread pattern or practice are lawful.

176.293.     Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

## FOURTHFIFTH CLAIM FOR RELIEF
## DECLARATORY RELIEF AND INJUNCTIVE RELIEF
## AGAINST ALL DEFENDANTS
## (VIOLATION OF THE *NON-RE FOULEMENTREFOULEMENT* DOCTRINE)

177.  Al Otro Lado and 294. Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

178.295.     CBP officials have systematically denied, or unreasonably delayed, access to the asylum process by Class Plaintiffs, and the asylum seekers they represent, access to the asylum system, in violation of customary international law reflected in treaties which the United States has ratified and implemented: namely, the specific, universal and obligatory norm of *non-refoulement,* which has also achieved the status of a *jus cogens* norm, and which forbids a country from returning or expelling an individual to a country where he or she has a

115

well-founded fear of persecution and/or torture, whether it is her home country or another country.

296.   The duty of *non-refoulement* also requires the adoption of procedures to ensure prompt, efficient, and unbiased access to the asylum process.

179.297.   CBP officials' treatment of Class Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction or acquiescence of Defendants.

180.298.   Defendants' conduct is actionable under the Alien Tort Statute, 28 U.S.C. § 1350, which authorizes declaratory and injunctive relief.

181.299.   As a result of the acts constituting violations of *the jus cogens* norm of *non-refoulement,* Class Plaintiffs have been damaged through denial or unreasonable delay of access to the asylum process and by being forced to return to Mexico or other countries where they face threats of further persecution.

182.300.   As a result of the acts constituting violations of the norm of *non-refoulement,* Al Otro Lado has been damaged — namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

183.301.   Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further denialsinfringement of the protections afforded to them under international law. Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from engaging in the unlawful conduct and practices alleged herein.

184.302.   An actual controversy exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other. Class Plaintiffs and Al Otro Lado contend that Defendants' conduct and practicesTurnback Policy, as well as

116

the widespread pattern or practice carried out in reliance on it, as alleged in this Complaint, violate the norm of *non-refoulement*. On information and belief, Defendants contend that thetheir policy, conduct and practices are lawful.

185.303.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

### **PRAYER FOR RELIEF**

186.304.   WHEREFORE, Plaintiff Al Otro Lado and Class Plaintiffs respectfully request that the Court:

a.   Issue an order certifying a class of individuals pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2);

b.   Appoint the undersigned as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

c.   Issue a judgment declaring that Defendants' policies,Turnback Policy, as well as the practices, acts and/or omissions described herein, give rise to federal jurisdiction;

d.   Issue a judgment declaring that Defendants' policies,Turnback Policy, as well as the practices, acts and/or omissions described herein, violate one or more of the following:

(1)   The Immigration and Nationality Act, based on violations of 8 U.S.C. §§ 1158 and 1225;

(2)   TheSection 706(1) of the Administrative Procedure Act, based on violations ofthe unlawful withholding and unreasonable delay of agency action mandated by 8 U.S.C. §§ 1158,§ 1225 and 8 C.F.R. §§ 235.3, 235.4§ 235.3;

117

(3)    Section 706(2) of the Administrative Procedure Act;

(4)    The Due Process Clause of the Fifth Amendment; and

(45)    The duty of *non-refoulement* under international law;

e.    Issue injunctive relief requiring Defendants to comply with the laws and regulations cited above;

f.    Issue injunctive relief prohibiting Defendants, and any of their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them or on their behalf, from continuing to implement the Turnback Policy and from engaging in the unlawful policies, practices, acts and/or omissions described herein at POEs along the U.S.-Mexico border;

g.    Issue injunctive relief requiring Defendants to implement procedures to provide effective oversight and accountability in the inspection and processing of individuals who present themselves at POEs along the U.S.-Mexico border and indicate an intention to apply for the purpose of seeking asylum or assert a fear of persecution in their home countries;

h.    Award Plaintiffs their reasonable attorneys' fees, costs and other expenses pursuant to 28 U.S.C. § 2412, and other applicable law; and

i.    Grant any and all such other relief as the Court deems just and equitable.

Dated: July 12, 2017 November 7, 2018    LATHAM & WATKINS LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

~~Wayne S. Flick~~
~~Manual~~Manuel A. Abascal
~~James H. Moon~~
~~Kristin P. Housh~~
~~Robin A. Kelley~~Michaela R. Laird

By: ~~/s/ *Manual A. Abascal*~~ *Manuel A. Abascal* Manuel A. Abascal *Attorneys for Plaintiffs*

119

1

## **CERTIFICATE OF SERVICE**

2       I hereby certify that I electronically filed the foregoing with the Clerk of the

3   Court for the Southern District of California by using the CM/ECF system on

4   November 13, 2018. I certify that all participants in the case areregistered

5   CM/ECF users and that service will be accomplished by the CM/ECF system.

6

7                                                  /s/ Manuel A. Abascal

8                                                  Manuel A. Abascal
                                                   LATHAM & WATKINS LLP
9                                                  355 South Grand Avenue Suite 100
                                                   Los Angeles, California 90071-1560
10                                                 (213) 485-1234
                                                   manny. abascal@lw.com
11
                                                   *Attorneys for Plaintiffs*
12

13                                                 ~~*Attorneys for Plaintiffs*~~

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                        .                          120