1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**SOUTHERN DISTRICT OF CALIFORNIA**

8

9
10
11
12
13
14

AL OTRO LADO, INC.; ABIGAIL
DOE, BEATRICE DOE, CAROLINA
DOE, DINORA DOE, INGRID DOE,
ROBERTO DOE, MARIA DOE,
JUAN DOE, ÚRSULA DOE,
VICTORIA DOE, BIANCA DOE,
EMILIANA DOE, AND CÉSAR
DOE, individually and on behalf of all
others similarly situated,

15
16

Plaintiffs,

v.

17
18
19

KEVIN MCALEENAN, Acting
Secretary of U.S. Department of
Homeland Security, in his official
capacity, *et al.*,

20

Defendants.

21

Case No. 17-cv-02366-BAS-KSC

**AMENDED ORDER GRANTING
IN PART AND DENYING IN
PART DEFENDANTS' MOTION
TO DISMISS THE SECOND
AMENDED COMPLAINT[1]**

**[ECF No. 192]**

22
23
24
25
26

     In this case, Organizational Plaintiff Al Otro Lado, Inc. ("Al Otro Lado"), an organization that helps individuals seek asylum in the United States, and thirteen Individual Plaintiffs—Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, Ingrid Doe, Roberto Doe, Maria Doe, Juan Doe, Úrsula Doe, Victoria Doe, Bianca Doe, Emiliana Doe, and César Doe—challenge conduct that they allege is "designed to

27
28

---

[1] This Amended Order amends certain citations in the Court's July 29, 2019 order.  (ECF No. 278.)  It is substantively identical to the July 29, 2019 order.

serve the Trump [A]dministration's broader, publicly proclaimed goal of deterring individuals from seeking access to the asylum process." (ECF No. 189 Second Am. Compl. ("SAC") ¶ 4.)  According to Plaintiffs, U.S. Customs and Border Protection ("CBP") officials "have systematically restricted the number of asylum seekers who can access the U.S. asylum process through POEs along the U.S.-Mexico border." (*Id*. ¶ 48.)  Plaintiffs seek to hold various Defendant federal officials[2] that have authority over immigration enforcement liable in their official capacities for an alleged pattern or practice by CBP officers of denying asylum seekers at ports of entry ("POEs") along the U.S.-Mexico border access to the U.S. asylum process, and an alleged formalized policy designed for the same end, which Plaintiffs refer to as the Turnback Policy.

In the months following the Court's grant in part and denial in part of Defendants' motion to dismiss the original complaint, *see Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284 (S.D. Cal. 2018), Plaintiffs filed the operative Second Amended Complaint ("SAC").  Like the original complaint, Plaintiffs allege in the SAC that since late 2016 there is an alleged pattern and practice amongst CBP officials at POEs along the U.S-Mexico border to "deny[] asylum seekers access to the asylum process" "through a variety of illegal tactics."  (SAC ¶ 2.)  Five original Individual Plaintiffs—Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, and Ingrid Doe (the "Original Individual Plaintiffs")—once more allege that

---

[2] The SAC names the following Defendants in their official capacities: (1) Kirstjen M. Nielsen, Secretary, U.S. Department of Homeland Security ("DHS"), (2) Kevin McAleenan, Commissioner, U.S. Customs and Border Protection ("CBP"), and (3) Todd C. Owens, Executive Assistant Commissioner, Office of Field Operations, U.S. CBP.  (SAC ¶¶ 36–39.)  In the time since the SAC's filing in November 2018, at least two defendants have changed.  Pursuant to Rule 25(d), the Court hereby substitutes (1) Kevin McAleenan as Acting Secretary of DHS in place of Nielsen and (2) John P. Sanders as the Acting Commissioner of CBP.  Defendants shall notify the Court in the event any further substitution is warranted.

they were subjected to these tactics when CBP officials denied them access to the U.S. asylum process at various POEs.[3]  Unlike the original complaint, the SAC now alleges that as early as 2016, Defendants were implementing a policy to restrict the flow of asylum seekers at the San Ysidro POE.  Plaintiffs allege that Defendants formalized this policy in spring 2018 in the form of the border-wide Turnback Policy, an alleged "formal policy to restrict access to the asylum process at POEs by mandating that lower-level officials directly or constructively turn back asylum seekers at the border," including through pretextual assertions that POEs lack capacity to process asylum seekers.  (*Id.* ¶¶ 3, 48–83.)  Eight new Individual Plaintiffs—Roberto Doe, Maria Doe, Juan and Úrsula Doe, Victoria Doe, Bianca Doe, Emiliana Doe, and César Doe (the "New Individual Plaintiffs")—have joined this lawsuit, alleging that they were subjected to this Turnback Policy.  Both the illegal tactics and the alleged Turnback Policy have resulted in many asylum seekers, particularly those from Central America, who present themselves at POEs along the U.S.-Mexico border being "turned back by" and "at the instruction of" CBP officials.  (*Id.* ¶ 58.)

Based on the conduct alleged, Plaintiffs press claims for violations of various Immigration and Nationality Act ("INA") provisions, which Plaintiffs call "the U.S. asylum process."   In connection with the alleged INA violations, Plaintiffs assert claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(1), 706(2), and claims directly under the Fifth Amendment Due Process Clause for alleged procedural due process violations.  All Plaintiffs further assert claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, on the ground that the alleged

---

[3] For reasons unknown to the Court, Original Individual Jose Doe was dropped from this suit in the First Amended Complaint ("FAC") filed nearly two months after the Court's prior dismissal order and he is not a plaintiff to the SAC filed a month after the FAC.  (ECF Nos. 176, 189.)

conduct violates a duty of non-*refoulement*, which Plaintiffs contend is an international law norm that "forbids a country from returning or expelling an individual to a country where he or she has a well-founded fear of persecution and/or torture[.]" Defendants move to dismiss the SAC under Rule 12(b)(6) for failure to state a claim. (ECF Nos. 192, 238.) Plaintiffs oppose. (ECF No. 210.) The parties presented oral argument to the Court. (ECF No. 259; ECF No. 260, Hr'g Tr.) In addition to the parties' submissions, six amicus briefs have been submitted with the Court's permission. (ECF Nos. 215, 216, 219, 221, 223.)[4]

For the reasons herein, the Court grants in part and denies in part Defendants' motion to dismiss the SAC.

## BACKGROUND

### I. Statutory and Regulatory Background

8 U.S.C. § 1158(a)(1) is this case's statutory bedrock. It provides that:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States

---

[4]The briefs are: (1) *Amicus Curiae* Brief of the States of California, Connecticut, the District of Columbia, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington in support of Plaintiffs, (ECF No. 215-1); (2) *Amicus Curiae* Brief of Amnesty International in Opposition to Defendants' Motion to Dismiss, (ECF No. 216-1); (3) *Amicus* Brief of Certain Members of Congress in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Second Amended Complaint, (ECF No. 219-1); (4) Brief of Certain Immigration Law Professors as *Amici Curiae* in Support of Plaintiffs' Opposition to Defendants' Motion to Partially Dismiss the Second Amended Complaint, (ECF No. 221-1); (5) *Amicus Curiae* Brief of Nineteen Organizations Representing Asylum Seekers, (ECF No. 223-2); and (6) Brief of *Amici Curiae* Kids in Need of Defense, *et al*., in Support of Plaintiffs' Opposition to Motion to Dismiss, (ECF No. 225-1).)

after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or. . . section 1225(b)[.]

8 U.S.C. § 1158(a)(1).

This case turns on the Section 1225(b) asylum procedure that Section 1158 incorporates. Section 1225 sets forth, in relevant part, certain inspection duties of immigration officers, which undergird additional specific duties that arise when certain aliens express an intent to seek asylum in the United States or a fear of persecution.

Section 1225(a) establishes the general inspection duty: "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission . . . to . . . the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). In language that echoes Section 1158(a)(1), Section 1225(a) defines as an "applicant for admission" "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival including an alien who is brought to the United States after having been interdicted in international or United States waters)[.]" 8 U.S.C. § 1225(a)(1). An implementing regulation more broadly defines "arriving alien" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport." 8 C.F.R. § 1.2. By regulation, "application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise" provided. 8 C.F.R. § 231.1(a).

Section 1225(b) sets forth two sets of procedures that apply to aliens "arriving

– 5 –

in the United States." First, pursuant to the procedure under Section 1225(b)(1), an arriving alien may be summarily "removed from the United States without further hearing or review" "if an immigration officer determines" that the alien "is inadmissible" for making certain fraudulent or misleading representations or for not having valid entry or travel documents. 8 U.S.C. § 1225(b)(1)(A)(i); *Thuraissigiam v. U.S. Dep't of Homeland Sec.*, 917 F.3d 1097, 1100 (9th Cir. 2019) (citing, *inter alia*, 8 U.S.C. § 1182(a)(6)(C) and 8 U.S.C. § 1182(a)(7)). Section 1225(b)(1)'s removal mandate, however, does not apply if "the alien indicates either an intention to apply for asylum under section 1158 [] or a fear of persecution." *Id.* Instead, "[i]f the immigration officer determines that an alien" is "inadmissible" for making certain fraudulent or misleading representations or for not having valid entry or travel documents "*and* the alien indicates either an intention to apply for asylum under section 1158 [] or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer[.]" 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). An implementing regulation governing this expedited removal procedure imposes an analogous obligation. 8 C.F.R. § 235.3(b)(4). In these circumstances, the immigration officer must refer the alien to an "asylum officer," who is statutorily required to be "an immigration officer who has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 1158 of this title," and "is supervised by an officer who," *inter alia*, "has had substantial experience adjudicating asylum applications." 8 U.S.C. § 1225(b)(1)(E).

In contrast with the Section 1225(b)(1) procedure, Section 1225(b)(2) establishes the procedure for "inspection of other aliens." 8 U.S.C. § 1225(b)(2). "Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission," the alien "shall be detained for a proceeding under [8 U.S.C. §] 1229a" (the general "removal proceedings" provision) "if the examining immigration officer

determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted[.]"  8 U.S.C. § 1225(b)(2)(A).  Subparagraph (C) provides that "in the case of an alien described in subparagraph (A) who is arriving on land . . . from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a[.]"  8 U.S.C. § 1225(b)(2)(C).  In relevant part, Subparagraph (B) provides that "[s]ubparagraph (A) shall not apply to an alien—(ii) "to whom paragraph (1) applies"—*i.e.* aliens who are subject to the procedure in 8 U.S.C. § 1225(b)(1).  8 U.S.C. § 1225(b)(2)(B)(ii).  Consistent with Section 1225(b)(2)'s instruction that asylum applicants are channeled through the Section 1225(b)(1) procedure, Section 1225(b)(2) does not elaborate on any asylum procedure.

During the Section 1225 admission process, "[a]n alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States."  8 U.S.C. § 1225(a)(4).  By regulation, "the alien's decision to withdraw his or her application for admission must be made voluntarily[.]" 8 C.F.R. § 235.4.

## II.    Factual Allegations

### A.    Allegations Regarding Defendants

Defendants are U.S. government officials sued in their official capacity who exercise authority over CBP in various capacities.  The Defendant Secretary of Homeland Security (the "Secretary") "has ultimate authority over all CBP policies, procedures, and practices."  (SAC ¶ 36.)  The Secretary "is responsible for ensuring that all CBP officials perform their duties in accordance with the Constitution and all relevant laws."  (*Id.*)  The Defendant CBP Commissioner "has direct authority over all CBP policies, procedures, and practices."  (*Id.* ¶ 37.)  Defendant oversees a

staff of more than 60,000 employees and "exercises authority over all CBP operations." (*Id.*)  The Defendant Executive Assistant Commissioner ("EAC") of CBP's Office of Field Operations oversees "the largest component of CBP and is responsible for border security, including immigration and travel through U.S. POEs," for which the EAC oversees a staff of "more than 24, 000 CBP officials and specialists[.]" (*Id.* ¶ 38.)  Plaintiffs also sue 25 Doe Defendants who "were agents or alter egos of Defendants, or [who] are otherwise responsible for all of the acts" alleged. (*Id.* ¶ 39.)  Defendants allegedly have denied access to the U.S. asylum process to noncitizens fleeing "grave harm in their countries to seek protection in the United States" "in contravention of U.S. and international law" pursuant to (1) "a policy initiated by Defendants"—the Turnback Policy—and (2) "practices effectively ratified by Defendants." (*Id.* ¶ 1.)  The Court describes Plaintiffs' allegations regarding each.

### 1.    Alleged Pattern and Practice of Illegal Tactics

"Since 2016 and continuing to this day, CBP has engaged in an unlawful, widespread pattern and practice of denying asylum seekers access to the asylum process at POEs on the U.S.-Mexico border through a variety of illegal tactics." (SAC ¶¶ 2, 84.)  CBP officials have carried out this practice through misrepresentations, threats and intimidation, verbal and physical abuse, and coercion. (*Id.* ¶¶ 84–106.)  For example, CBP officials are alleged to turn away asylum seekers by falsely informing them that the U.S. is no longer providing asylum, that President Trump signed a new law ending asylum, that a law providing asylum to Central Americans ended, that Mexican citizens are not eligible for asylum, and that the U.S. is no longer accepting mothers with children for asylum. (*Id.* ¶¶ 85–86.)  CBP officials allegedly intimidate asylum seekers by threatening to take away their children if they do not renounce a claim for asylum and by threatening to deport asylum seekers. (*Id.* ¶¶ 87–88.)  CBP officials allegedly force

asylum seekers to sign forms in English, without translation, in which the asylum seekers recant their fears of persecution. (*Id.* ¶¶ 91–92.) CBP officials are alleged to instruct some asylum seekers to recant their fears of persecution while being recorded on video. (*Id.*) In some instances, CBP officials have "simply turn[ed] asylum seekers away from POEs without any substantive explanation." (*Id.* ¶¶ 93–94.) Other alleged tactics include: (1) CBP officers physically block access to the POE, including by "CBP sometimes enlist[ing] Mexican officials to act as their agents"; (2) CBP officials impose "a fixed number of asylum seekers" per day and place asylum seekers on a waiting list that results in "asylum-seeking men, women and children wait[ing] endlessly on or near bridges leadings to POEs in rain, cold, and blistering heat, without sufficient food or water and with limited bathroom access"; and (3) racially discriminatory denials of access by CBP officers, including by denying asylum seekers from specific countries access to POEs and allowing "lighter-skinned individuals to pass." (*Id.* ¶¶ 95–106.) Plaintiffs point to numerous reports by non-governmental organization and "other experts working in the U.S.-Mexico border region" as corroborating the existence and use of these tactics by CBP officers. (*Id.* ¶¶ 107–08, 110–111, 113–16.)

### 2. The Alleged "Turnback Policy"
#### a. Nascent Stages

Plaintiffs allege that "evidence of a Turnback Policy" exists as early as May 2016, at least insofar as it concerns the San Ysidro POE, a POE that figures prominently in the SAC and the Plaintiffs' allegations. (SAC ¶¶ 51–53, 60; *see also id.* ¶¶ 16, 25–26, 28, 32–35, 48 & n.37.) Plaintiffs point to a communication from the "Watch Commander at the San Ysidro POE" indicating that "[t]he Asylee line in the pedestrian building is not being used at this time," with a follow-up communication indicating that "it's even more important that when the traffic is free-flowing that the limit line officers ask for and check documents to ensure that groups

that may be seeking asylum are directed to remain in the waiting area on the Mexican side."  (*Id*. ¶ 51.)   At the time, CBP allegedly "collaborat[ed] with the Mexican government to turn back asylum seekers at the San Ysidro POE," collaboration that was allegedly formalized in July 2016 and confirmed in December 2016.  (*Id*. ¶¶ 52–53.)

A border-wide policy allegedly existed as early as November 2016 because the Assistant Director of Field Operations for the Laredo Field Office "instructed all Port Directors under his command to follow the mandate of the then-CBP Commissioner and Deputy Commissioner" to request that Mexico's immigration agency "control the flow of aliens to the port of entry."  (*Id*. ¶ 55.)   Under this mandate, the Commissioner allegedly directed that "if you determine that you can only process 50 aliens, you will request that [Mexico's immigration agency] release only 50," and if the agency "cannot or will not control the flow," then CBP staff "is to provide the alien with a piece of paper identifying a date and time for an appointment and return then [sic] to Mexico."  (*Id*.)  This directive "was promptly implemented" at POEs along the Texas-Mexico portion of the U.S.-Mexico border and "memorialized in January 2017."  (*Id*. ¶¶ 56, 57.)  Plaintiffs allege that in a June 13, 2017 hearing before the House Appropriations Committee, John P. Wagner, the Deputy Executive Assistant Commissioner for CBP's Office of Field Operations, admitted that CBP officials were turning back asylum seekers at POEs along the U.S-Mexico border and argued that "the practice was justified by a lack of capacity."  (*Id*. ¶ 59.)  The CBO Field Operations Director in charge of the San Ysidro POE similarly acknowledged and defended the turnbacks in December 2017.  (*Id*. ¶ 60.)

### b.  Alleged Formalization and High-Level Recognition

The alleged border-wide policy to turnback asylum seekers through false assertions of lack of capacity took on a new life in spring 2018 "following an

arduous, widely-publicized journey" of "a group of several hundred asylum seekers"—dubbed by the press as a "caravan"—who "arrived at the San Ysidro POE." (*Id.* ¶ 61.) "President Trump posted a series of messages on Twitter warning of the dangers posed by the group, including one indicating that he had instructed DHS 'not to let these large Caravans of people into our Country.'" (*Id.* (citations omitted).)

Around this time, high-level Trump Administration officials unambiguously proclaimed, "the existence of their policy to intentionally restrict access to the asylum process at POEs in violation of U.S. law." (*Id.* ¶¶ 5, 62.) Then-U.S. Attorney General Jeff Session "characterized the caravan's arrival as 'a deliberate attempt to undermine our laws and overwhelm our system.'" (*Id.* ¶ 63.) Following the arrival of the "caravan," "CBP officials indicated—in accordance with the Turnback Policy—that they had exhausted their capacity to process individuals traveling without proper documentation." (*Id.* ¶¶ 7, 64, 67.) On May 15, 2018, then-Secretary of Homeland Security Kirstjen Nielsen "characterized the asylum process . . . as a legal 'loophole' and publicly announced a 'metering' process designed to restrict— and constructively deny—access to the asylum process through unreasonable and dangerous delay." (*Id.* ¶¶ 5, 65.) President Trump made a number of tweets throughout June and July 2018 that further confirmed the alleged Turnback Policy, including statements that "[w]hen somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came from," and "we must IMMEDIATELY escort them back without going through years of maneuvering." (*Id.* ¶ 66.) Plaintiffs point to numerous other confirmations of the existence of the alleged Turnback Policy, designed and implemented by U.S. officials, including statements by then-CBP Commissioner McAleenan in April 2018 indicating that "individuals [without appropriate entry documentation] may need to wait in Mexico as CBP officers work to process those already within our

1   facilities"; a September 27, 2018 report from the Office of the Inspector General (the

2   "OIG Report"); and statements by Mexican immigration officials, one of whom

3   allegedly complained that "[CBP] was making [the Mexican immigration agency]

4   do [CBP's] dirty work." (*Id.* ¶¶ 68–76 & nn. 56–71.)

5

6       According to Plaintiffs, the asserted capacity concerns used to justify the

7   alleged Turnback Policy are a pretextual and false "cover for a deliberate slowdown

8   of the rate at which agency receives asylum seekers at POEs." (*Id.* ¶¶ 3, 76–83.)

9   They allege that "CBP's own statistics indicate that there has not been a particular

10  surge in [the] numbers of asylum seekers coming to POEs." (*Id.* ¶ 76.) Amnesty

11  International has allegedly characterized capacity concerns as "a fiction" based on

12  the available statistics. (*Id.* (citation omitted).) Plaintiffs point to statements by

13  "senior CBP and ICE officials in San Ysidro, California" in early 2018, in which the

14  officials stated that "CBP has only actually reached its detention capacity a couple

15  times per year and during 'a very short period' in 2017." (*Id.* ¶ 77.) Plaintiffs further

16  note that in the OIG Report, "the OIG team did not observe severe overcrowding at

17  the ports of entry it visited." (*Id.*) And "[h]uman rights researchers visiting seven

18  POEs in Texas in June 2018 reported that '[t]he processing rooms visible in the

19  [POE] . . . appeared to be largely empty.'" (*Id.* (citations omitted).) Plaintiffs

20  otherwise point to anecdotal accounts for specific POEs, which Plaintiffs allege

21  show "abrupt" changes in assertions of a lack of capacity at POEs and CBP officers

22  allowing some asylum seekers to cross—sometimes in the span of a few hours. (*Id.*

23  ¶ 78.) For example, CBP officials at the Nogales, Arizona POE abruptly switched

24  from processing 6 asylum seekers a day, based on assertions of lack of capacity, to

25  20 asylum seekers a day. (*Id.*) And, of course, there are the alleged experiences of

26  the eight New Individual Plaintiffs, which provide a further gloss on the Turnback

27  Policy. (*Id.* ¶ 83.)

28

## B.   The Plaintiffs

The challenge to Defendants' alleged conduct is pressed by Organizational Plaintiff Al Otro Lado and thirteen Individual Plaintiffs.  For the purposes of this order, the Court refers to the Individual Plaintiffs as two groups: the Original Individual Plaintiffs and the New Individual Plaintiffs.[5]  As the Court has noted, Organizational Plaintiff Al Otro Lado and the Original Individual Plaintiffs have been parties since this case's inception.  The Court will not retrace in great detail the allegations pertaining to these Plaintiffs.  The Court, however will provide relatively more detail regarding the New Individual Plaintiffs because this order is the first occasion to do so.

### 1.   Organizational Plaintiff Al Otro Lado

Al Otro Lado is a non-profit California legal services organization established in 2014, which provides services to indigent deportees, migrants, refugees, and their families. (SAC ¶ 17.)  Al Otro Lado alleges that the Defendants' alleged conduct has frustrated its ability to advance and maintain its "central" and "organizational mission" because Al Otro Lado has had "to divert substantial" time and resources away from its programs "to counteract the effects of the Turnback Policy and Defendants' other unlawful practices."  (*Id.* ¶¶ 12–13, 17–23.)

---

[5] In their present motion to dismiss, Defendants divide the Individual Plaintiffs into two groups.  Defendants refer to the Original Individual Plaintiffs as "Territorial Plaintiffs" on the ground that the SAC's allegations show that all Original Individual Plaintiffs were in a POE at the time they were allegedly denied access to the asylum process. (ECF No. 192-1 at 1–2.)  In contrast, Defendants refer to all New Individual Plaintiffs as "Extraterritorial Plaintiffs," based on Defendants' view that these Individual Plaintiffs' allegations show that "they experienced the purported 'Turnback Policy' when they approached the border to the territorial United States at the San Ysidro, Laredo, or Hidalgo [POEs] but were prevented by CBP officers or Mexican immigration officials from physically crossing the international boundary."  (*Id.* at 2.)  The Court declines to use Defendants' labeling.

### 2.   Original Individual Plaintiffs

Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe are natives and citizens of Mexico, who fled to Tijuana, Mexico where they attempted to access the U.S. asylum process at various points in May 2017, due to violence they experienced at the hands of drug cartels.  (SAC ¶¶ 24–26, 119–121, 125–127, 133–134.)  They allege that CBP officers at the San Ysidro and Otay Mesa POEs located along the California-Mexico portion of the U.S.-Mexico border coerced them into signing English language forms in which they recanted their fears of returning to Mexico and withdrew their applications for admission.  (*Id.* ¶¶ 24–26, 122–123, 128–130, 135–136.)   Plaintiffs Dinora Doe and Ingrid Doe are natives and citizens of Honduras, who fled to Tijuana, Mexico after violence they experienced at the hands of criminal gangs and Ingrid experienced severe abuse from her partner.  (*Id.* ¶¶ 27– 28, 138–140, 147–149.)  Dinora presented herself at the Otay Mesa POE three times in August 2016 but was told "there was no asylum in the United States," including specifically "for Central Americans," and that she "would be handed over to Mexican authorities and deported to Honduras."  (*Id.* ¶¶ 27, 141–144.)  Ingrid presented herself at the Otay Mesa and San Ysidro POEs, where CBP officers told her and her children that they could not seek asylum in the United States.  (*Id.* ¶¶ 28, 149–151.)  Based on developments that occurred after the original complaint's filing and which the Court determined did not moot this case, *Al Otro Lado, Inc.*, 327 F. Supp. 3d at 1295, 1302–04, the Original Individual Plaintiffs allege that "Defendants made arrangements to facilitate" their "entry . . . into the United States."  (SAC ¶¶ 24–28, 124, 132, 137, 145, 152.)

### 3.   New Individual Plaintiffs

Plaintiffs Juan and Úrsula Doe, husband and wife, are natives and citizens of Honduras, who fled Honduras "with their sons after receiving death threats from gangs." (SAC ¶¶ 31, 171–72.)  They presented themselves at the Laredo POE in late

September 2018, but when they "reached the middle of the bridge to the POE, CBP officials denied them access to the asylum process by telling them the POE was closed and that they could not enter." (*Id.* ¶¶ 31, 173–74.)

Plaintiff Roberto Doe is a native and citizen of Nicaragua, who alleges that he fled Nicaragua due to threats of violence "from the Nicaraguan government and paramilitaries allied with the government." (*Id.* ¶¶ 29, 153.) Roberto presented himself at the Hidalgo, Texas POE in October 2018, where he encountered CBP officials in the middle of the bridge between Mexico and the United States, who he told that he wanted to seek asylum in the United States. (*Id.* ¶¶ 29, 154.) The officials "t[old] him the POE was full and that he could not enter." (*Id.* ¶¶ 29, 155.) After the FAC was filed in October 2018, Roberto returned to the Hidalgo POE "where Mexican officials detained him as he was walking onto the international bridge to seek access to the asylum process in the United States" and he "remains in the custody of the Mexican government." (*Id.* ¶¶ 29, 159.)

Plaintiff Maria Doe is a native and citizen of Guatemala and permanent resident of Mexico. (*Id.* ¶¶ 30, 160.) Maria "left her husband, who was abusive and is involved with cartels[.]" (*Id.* ¶¶ 30, 161.) Since she left him, "two different cartels have been tracking and threatening her," and located her despite her attempts to find a "safe place to live" in both Guatemala and Mexico. (*Id.* ¶¶ 30, 161.) Maria and her two children presented themselves at the Laredo, Texas POE on September 10, 2018. (*Id.* ¶¶ 30, 162.) However, "[w]hen Maria encountered CBP officials in the middle of the bridge, [and] she told them that she and her children wanted to seek asylum in the United States," the CBP officials told them to wait on the Mexican side of the bridge. (*Id.* ¶¶ 30, 162.)

Plaintiff Bianca Doe is a transgender woman who is a native and citizen of

Honduras.  (*Id.* ¶¶ 33–34, 184, 191.)  Bianca "has been subjected to extreme and persistent physical and sexual assault, as well as discrimination and ongoing threats of violence in Honduras and Mexico City . . . because she is a transgender woman[.]" (*Id.* ¶¶ 33, 184–85.)  Bianca presented herself at the San Ysidro POE on September 19, 2018, where "CBP officers . . . stat[ed] that she could not apply at that time because they were at capacity."  (*Id.* ¶¶ 33, 185.)  Bianca returned the next day and "was given a piece of paper with the number '919,' placed on a waiting list, and told that she would have to wait several weeks to proceed to the POE."  (*Id.* ¶¶ 33, 186.) On September 28, 2018, Bianca "attempted to enter the United States without inspection by climbing a fence on a beach in Tijuana[,]" but "once over the fence, a U.S. Border Patrol officer stopped [her]" and she "expressed her desire to seek asylum in the U.S."  (*Id.* ¶¶ 33, 187.)  "The U.S. Border Patrol Officer told [her] that there was no capacity in U.S. detention centers and threatened to call Mexican police if [she] did not climb the fence back into Mexico."  Bianca did so.  Bianca presented herself "again" at the San Ysidro POE on October 8, 2018.  (*Id.* ¶¶ 33, 188.)  "She was told, once again, that CBP had no capacity for asylum seekers."  (*Id.* ¶¶ 33, 188.)

Plaintiff Emiliana Doe is a transgender woman and a native and citizen of Honduras.  (*Id.* ¶¶ 34, 191.)  She "was subjected to multiple sexual and physical assaults, kidnapping, and discrimination, as well as threats of severe harm and violence in Honduras because she is a transgender woman."  (*Id.* ¶ 34.)  After fleeing Honduras in June 2018, Emiliana reached Tijuana in September 2018 and presented herself at the San Ysidro POE, where a stranger told her she would need to get on "the waiting list" to apply for asylum.  (*Id.* ¶ 192.)  After going to the San Ysidro POE and speaking with two women, "[s]he was given a piece of paper with the number '1014' on it, placed on a waiting list, and told to return in six weeks."  (*Id.* ¶¶ 34, 192.)  On October 8, 2018, "[f]eeling desperate and unsafe, Emiliana returned to the POE just a few weeks later," but "CBP officers . . . t[old] her that there was

1   no capacity for asylum seekers and instruct[ed] her to wait for Mexican officials."
2   (*Id*. ¶¶ 34, 193.)

3

4       Plaintiff César Doe is a native and citizen of Honduras.  (*Id*. ¶¶ 35, 196.)
5   "César has been threatened numerous times with severe harm and death and
6   kidnapped by members of the 18th street gang."  (*Id*. ¶¶ 35, 196.)  He alleges, *inter*
7   *alia*, that on one occasion, he "present[ed] himself at the San Ysidro POE" "with
8   two staff members from Al Otro Lado" "but CBP officers refused to accept him."
9   (*Id*. ¶¶ 35, 199.)

10

11      Plaintiff Victoria Doe is a 16-year old native and citizen of Honduras.  (*Id*. ¶¶
12  32, 179.)  She "has been threatened with severe harm and death by members of the
13  18th street gang for refusing to become the girlfriend of one of the gang's leaders."
14  (*Id*. ¶¶ 32, 179.)  Victoria fled to Mexico where she gave birth to a son.  (*Id*. ¶¶ 32,
15  179.)  Victoria and her son arrived in Tijuana as part of a "refugee caravan" and went
16  to the San Ysidro POE on October 8, 2018.  (*Id.* ¶¶ 32, 180.)  "When Victoria
17  expressed her desire to seek asylum in the United States, CBP officers . . . stat[ed]
18  that she could not apply for asylum at that time and t[old] her to speak to a Mexican
19  official without providing any additional information."  (*Id.* ¶¶ 32, 181.)  Except for
20  Roberto Doe, all New Individual Plaintiffs allege that "following the filing of the
21  First Amended Complaint in this case, Defendants made arrangements to facilitate
22  the[ir] entry . . . into the United States."  (SAC ¶¶ 30–35.)

23

24  **III.   Procedural Synopsis**

25      Organizational Plaintiff Al Otro Lado and, on behalf of themselves and a
26  putative class, the Original Individual Plaintiffs commenced this action against
27  Defendants on July 12, 2017 in the United States District Court for the Central
28  District of California.  (ECF No. 1.)  After the Central District transferred the action

1   to this Court on November 29, 2017, Defendants renewed their motion to dismiss

2   the original complaint in its entirety.  (ECF No. 135.)

3

4        The Court granted Defendants' motion in part.  *Al Otro Lado, Inc. v. Nielsen*,

5   327 F. Supp. 3d 1284 (S.D. Cal. 2018).  In relevant part, the Court dismissed the

6   Section 706(1) APA claims of Plaintiffs Abigail Doe, Beatrice Doe, and Carolina

7   Doe to the extent they sought to compel relief under 8 C.F.R. § 235.4 for allegedly

8   being coerced into withdrawing their applications for admission.  *Id.* at 1314–15.

9   The Court also dismissed Plaintiffs' Section 706(2) APA claims based on an alleged

10  "pattern or practice" because the Court was not convinced that Plaintiffs had

11  plausibly alleged facts to "support[] the inference that there is an overarching policy"

12  and, consequently, had failed to identify a final agency action.  *Id*. at 1320.  The

13  Court granted Plaintiffs leave to amend their Section 706(2) claims.  *Id.* at 1321.  The

14  Court otherwise denied Defendants' motion to dismiss on all other grounds.  *Id.* at

15  1295–1304 (rejecting Defendants' argument that the entire case was moot because

16  Defendants had allowed original Individual Plaintiffs to be processed for admission

17  at a POE after filing of the case); *id*. at 1306–08 (rejecting Defendants' argument

18  that the United States had not waived sovereign immunity for ATS claims on the

19  ground that Section 702 of the APA provides a "broad waiver of sovereign immunity

20  for claims against the United States for nonmonetary relief"); *id.* at 1311–13

21  (rejecting Defendants' argument that Plaintiffs cannot challenge an alleged pattern

22  or practice of alleged CBP officer denials of access to the asylum process under

23  Section 706(1) of the APA).

24

25       In November 2018, Plaintiffs filed the operative Second Amended Complaint,

26  a pleading that raises claims largely identical to those in the original complaint albeit

27  upon an expanded set of factual allegations and with some refinement.  (SAC ¶¶

28  244–303.)  All Individual Plaintiffs seek to press their claims on behalf of a putative

1    class of "noncitizens who seek or will seek to access the U.S. asylum process by

2    presenting themselves at a POE along the U.S.-Mexico border and are denied access

3    to the U.S. asylum process by or at the instruction of CBP officials." (*Id.* ¶¶ 1, 236–

4    43.)  Once more, Plaintiffs seek only declaratory and injunctive relief.  (*Id.* at 100.)

5

6                          **LEGAL STANDARDS**

7          Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a

8    short and plain statement of the claim showing that the pleader is entitled to relief,"

9    in order to "give the defendant fair notice of what the. . . claim is and the grounds

10    upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting

11    *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A defendant may test the sufficiency of

12    a complaint on several grounds, including on the ground that the court lacks subject

13    matter jurisdiction over the complaint or that the complaint fails to state a claim for

14    relief.  Fed. R. Civ. P. 12(b)(1), (6).

15

16          A Rule 12(b)(1) motion tests whether a court possesses subject matter

17    jurisdiction to adjudicate the claims in the action.  Fed. R. Civ. P. 12 (b)(1); *Savage*

18    *v. Glendale Union High Sch.*, 343 F.3d 1036, 1039–40 (9th Cir. 2003), *cert. denied*,

19    541 U.S. 1009 (2004).  As is relevant here, a Rule 12(b)(6) motion that asserts lack

20    of jurisdiction due to the alleged presence of a political question in a case is "more

21    appropriately construed as a Rule 12(b)(1) motion[.]"  *Corrie v. Caterpillar*, 503

22    F.3d 974, 982 (9th Cir. 2007); *Yellen v. United States*, Civ. No. 14-00134 JMS-KSC,

23    2014 WL 2532460, at *1 (D. Haw. June 4, 2014) (same).  Thus, although Defendants

24    nominally raise a Rule 12(b)(6) motion, the Court construes their motion on this

25    issue as raised under Rule 12(b)(1).  When a party asserts a Rule 12(b)(1) challenge

26    limited to the pleadings, as Defendants do here, the Court accepts Plaintiffs' factual

27    allegations as true and draws all reasonable inferences in Plaintiffs' favor to

28    determine whether the allegations are sufficient to invoke federal jurisdiction.  *Pride*

1  *v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013).

2

3       A Rule 12(b)(6) motion tests whether the allegations, even if true, fail to state
4  a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6); *N. Star Int'l v.*
5  *Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  To survive a Rule 12(b)(6)
6  motion, a plaintiff is required to set forth "enough facts to state a claim for relief that
7  is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility
8  when the plaintiff pleads factual content that allows the court to draw reasonable
9  inferences that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,
10 556 U.S. 662, 678 (2009) (citation omitted).  To assess the legal sufficiency of a
11 complaint, the court accepts as true the complaint's factual allegations and construes
12 them in the light most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467
13 U.S. 69, 73 (1984).  A court may consider materials properly submitted as part of
14 the complaint. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

15

16                              **DISCUSSION**

17       Defendants' motion to dismiss raises a variety of arguments for why the SAC
18 should be dismissed in whole or in part, some of which are familiar and others of
19 which are new.  The Court distills Defendants' arguments into four overarching
20 parts.  First, Defendants argue that the Court lacks jurisdiction under the political
21 question doctrine to consider certain factual allegations or grant certain forms of
22 relief.  Second, and forming the bulk of Defendants' motion to dismiss, is a set of
23 arguments that Plaintiffs fail to state Sections 706(1) and 706(2) APA claims.  Third,
24 Defendants seek dismissal of the New Individual Plaintiffs' Fifth Amendment Due
25 Process Clause claims, principally on the ground that the Fifth Amendment does not
26 apply extraterritorially.  Fourth, Defendants seek dismissal of Plaintiffs' ATS claims.
27 The Court considers each set of arguments in turn.

28

# I.       The Political Question Doctrine

Defendants argue that that the political question doctrine bars judicial review of "Defendants' coordination with a foreign nation to regulate border crossings." (ECF No. 192-1 at 25.)   Pointing to allegations in the SAC regarding interactions between U.S. and Mexican government officials, Defendants argue that granting Plaintiffs' request to enjoin the alleged Turnback Policy "would prohibit Defendants from 'coordinating' with Mexican government officials as they carry out their statutory responsibility to manage the flow of traffic across the border."  (*Id.* at 25–26, 28 (citing SAC ¶¶ 3, 7, 50–83, 86–87, 96, 98–102, 108–10, 114, 116).)   The Court rejects Defendants' political question doctrine argument at this juncture.

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'"  *Zivotofsky v. Clinton*, 566 U.S. 189, 194–95, (2012) (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)).   The "political question doctrine" is a recognized "narrow exception" to the Judiciary's Article III responsibility.   *Id.* at 195 (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).   The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch[.]"  *Japan Whaling Ass'n*, 478 U.S. at 230.   As such, "[t]he political question doctrine concerns the jurisdictional 'case or controversy requirement' of Article III of the Constitution, . . . and the Court must address it '*before* proceeding to the merits[.]'"  *Ahmed Salem Bin Ali Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017) (citing first *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 215 (1974) and quoting second *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005)) (emphasis added).   If a political question is inextricable from a case, the doctrine "prevents a plaintiff's claims from proceeding to the merits."  *Ahmed Salem Bin Ali Jaber*, 861 F.3d at 245 (citing *Baker v. Carr*, 369 U.S. 186, 211

1   (1962)).

2

3       There are at least six different "formulations" for determining whether a case

4   presents a political question that is understood to deprive a federal court of subject

5   matter jurisdiction.  *Baker*, 369 U.S. at 217.  As Defendants recognize, a case need

6   only present one formulation for a political question to preclude jurisdiction.  *Ahmed*

7   *Salem Bin Ali Jaber*, 861 F.3d at 245 (citing *Schneider v. Kissinger*, 412 F.3d 190,

8   194 (D.C. Cir. 2005)).  The only formulation on which Defendant rely here is that

9   there is a "textually demonstrable constitutional commitment of the issue to a

10  coordinate political department[.]"  *Baker*, 369 U.S. at 217.

11

12      In particular, Defendants contend that this case presents the political question

13  "whether and to what extent it is lawful for the United States to (allegedly)

14  collaborate with the government of Mexico to control the flow of travel across the

15  countries' shared border[.]" (ECF No. 192-1 at 26.)  Viewed in this light, Defendants

16  contend that "Plaintiffs' allegations and requests for relief are squarely outside the

17  Court's jurisdiction" under the first *Baker* formulation because "[f]oreign-relations

18  matters are clearly committed by [the] Constitution to the Executive Branch,

19  particularly as they relate to the United States' efforts to manage the flow of travel

20  across the border." (*Id*. at 27.)  For this reason, Defendants argue that "[t]he Court

21  does not have jurisdiction to declare unlawful or enjoin [the alleged coordination

22  with Mexican government officials][.]"  (*Id.* at 28.)  The Court disagrees with

23  Defendants' view about the questions this case presents and, thus, rejects

24  Defendants' argument that the political question doctrine precludes this Court from

25  reviewing Plaintiffs' claims or granting corresponding relief.

26

27      The Court acknowledges that "[t]he exclusion of aliens is 'a fundamental act

28  of sovereignty' by the political branches[.]" *Trump v. Hawaii*, 138 S. Ct. 2392, 2407

– 22 –

(2018) (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950)).  The Executive possesses a recognized power "to regulate the entry of aliens into the United States" through its "inherent" "executive power to control the foreign affairs of the nation[.]"  *Knauff*, 338 U.S. at 542; *E. Bay Sanctuary Covenant v. Trump*, No. 18-17274, —F.3d—, 2018 WL 8807133, at *4 (9th Cir. Dec. 7, 2018). The Executive's foreign affairs powers are understood to "derive from the President's role as 'Commander in Chief,' [the President's] right to 'receive Ambassadors and other public Ministers,' and [the President's] general duty to 'take Care that the Laws be faithfully executed'[.]"  *E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *4 (internally citing U.S. Const. art. II, § 2, cl. 1 (referring to President as "Commander in Chief") and *id.* § 3 (President's power to receive ambassadors) and further citing *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003)).  But the Executive's recognized power over foreign affairs under Article II of the Constitution is not exercised in a constitutional vacuum.  By virtue of Article I, Congress possesses certain powers that render the admission or exclusion of aliens and foreign affairs an intimately legislative matter, including the specific constitutionally enumerated legislative powers "'[t]o establish an uniform rule of Naturalization,' to 'regulate Commerce with foreign Nations,' and to 'declare War[.]'"  *E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *4 (internally citing U.S. Const. art. I § 8, cl. 4 (uniform naturalization rule power), *id.* § 8, cl. 3 (foreign commerce power), *id.* § 8, cl. 11 (war power)).  For this reason, it is indisputable that "'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens."  *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)).

The claims asserted in this case undercut Defendants' invocation of the political question doctrine.  Plaintiffs' claims primarily concern alleged violations of various INA provisions and an implementing regulation through alleged denials of

access to the U.S. asylum process and an alleged policy and pattern or practice of denying asylum seekers access to the U.S. asylum process.  (SAC ¶¶ 203–223 (describing statutory and regulatory scheme that applies to asylum seekers); *id.* ¶¶ 256–69 (APA Section 706(1) claims based on certain INA provisions and implementing regulation); *id.* ¶¶ 270–82 (APA Section 706(2) claims premised on certain INA provisions and implementing regulation); *id.* ¶¶ 283–93 (Fifth Amendment Due Process Clause claims premised on certain INA provisions and implementing regulation).)  Federal courts have the power to "review the political branches' action to determine whether they exceed the constitutional or statutory scope of their authority."  *E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *5 (citing *Hawaii*, 138 S. Ct. at 2419).

Although Plaintiffs' claims concern immigration, the statutory questions the claims raise do not task the Court with, nor require the Court to engage in a freewheeling inquiry into the wisdom of immigration policy choices.  *See Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 165–66 (1993) (noting that "the wisdom of the policy choices made by Presidents Reagan, Bush, and Clinton is not a matter for our consideration.  We must decide only whether Executive Order No. 12807, 57 Fed. Reg. 23133 (1992), which reflects and implements those choices, is consistent with § 243(h) of the INA.").  When "Congress has expressed its intent regarding an aspect of foreign affairs" through a legislative command and a court is asked to "evaluate the Government's compliance" with that command, the court "is 'not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy . . . should be.'"  *Ctr. for Bio. Diversity v. Mattis*, 868 F.3d 803, 823 (9th Cir. 2017) (quoting *Zivotofsky*, 566 U.S. at 196).  "Instead, a court must engage in the 'familiar judicial exercise' of reading and applying a statute, conscious of the purpose expressed by Congress."  *Id.* (quoting *Zivotofsky*, 566 U.S. at 196).  In this case, resolution of Plaintiffs' claims

turns on whether Defendants' alleged conduct complies with or violates the relevant INA provisions and implementing regulation. It is well within this Court's Article III province and duty to resolve these claims.

The Court acknowledges that there are some allegations that touch on alleged coordination with Mexican government officials.[6] (SAC ¶¶ 3, 7, 50–60.) The coordination, however, is merely an outgrowth of the alleged underlying conduct by U.S. officials. Based on the statutory claims in this case, review of such conduct does not present a nonjusticiable political question. Accordingly, the Court denies Defendants' present motion to dismiss based on the political question doctrine. Defendants may reassert their political question doctrine challenge "[i]f it becomes clear at a later stage that resolving any of the plaintiffs' claims requires" resolution of an asserted political question over which this Court might lack subject matter jurisdiction. *Al-Tamimi v. Adelson*, 916 F.3d 1, 14 (D.C. Cir. 2019).

_____

[6] As Defendants point out (ECF No. 192-1 at 26 n.8), there are also allegations that concern alleged (mis)conduct by Mexican government officials. (SAC ¶¶ 29–31, 35, 44–45, 52–54, 74–75, 83, 96–97, 110, 156–59, 163, 166, 175–76, 197, 199–200.) Defendants argue that the act of state doctrine bars the issuance of declaratory or injunctive relief relating to these allegations. (ECF No. 192-1 at 26 n.8.) The Court does not agree. The act of state doctrine "bars a suit where '(1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act.'" *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1069 (9th Cir. 2018) (quoting *Credit Suisse v. U.S. Dist. Court*, 130 F.3d 1342, 1346 (9th Cir. 1997)). The act of state doctrine does not bar the claims in this case because the Court is not asked to declare that any official acts of the Mexican government are unlawful. Instead, pursuant to U.S. law, Plaintiffs challenge the legality of conduct by U.S. officials. Although these officials have allegedly instructed Mexican officials to take certain conduct in furtherance of the challenged Turnback Policy, the Court can assess the legality of the U.S. officials' alleged conduct and order any corresponding relief pursuant to the statutory provisions at issue in this case without contravening the act of state doctrine.

**II.     Administrative Procedure Act Claims**

The bulk of Defendants' motion to dismiss concerns the Plaintiffs' APA claims.  (ECF No. 192-1 at 6–18, 28–31; ECF No. 238 at 2–12.)  Defendants' multipronged challenge to Plaintiffs' APA claims consists of several arguments: (A) Organizational Plaintiff Al Otro Lado cannot state APA claims based on the INA provisions at issue as a "non-profit legal services organization," (B) (1) the repleaded Section 706(1) claims of Plaintiffs Abigail, Beatrice, and Carolina Doe fail because they allegedly withdrew their applications for admission and (2) the Section 706(1) claims of all New Individual Plaintiffs fail because the relevant INA provisions and implementing regulation underlying their claims for relief "do not apply to individuals in Mexico," and (C) Plaintiffs' Section 706(2) APA claims fail because (1) Plaintiffs do not identify final agency action, (2) Plaintiffs challenge discretionary conduct over which the APA forecloses judicial review, and (3) Plaintiffs have not plausibly alleged an unlawful agency action.  The Court considers Defendants' arguments in turn and rejects each of them.

**A.     Al Otro Lado's APA Claims**

For a second time, Defendants challenge Al Otro Lado's ability to assert APA claims premised on violations of the INA provisions and regulations at issue.  (ECF No. 192-1 at 28; ECF No. 238 at 20.)  Defendants contend that Al Otro Lado's APA claims must be dismissed under Rule 12(b)(6) for failure to state a claim because whereas the statutory and regulatory provisions pertain exclusively to aliens or refugees, Al Otro Lado is merely a "non-profit legal services organization[.]"  (ECF No. 192-1 at 28; ECF No. 238 at 20.)  Defendants' argument simply reconfigures Defendants' prior argument that Al Otro Lado falls outside the zone of interests of the relevant INA provisions.  The Court squarely rejected Defendants' argument in the prior dismissal order.  *See Al Otro Lado*, *Inc.*, 327 F. Supp. 3d at 1298–1302.  Defendants identify no basis for the Court to depart from its prior decision.

However, in the time since the Court's prior dismissal order, the Ninth Circuit has issued a decision that strengthens the Court's prior rejection of Defendants' challenge to Al Otro Lado's APA claims in this case.  Specifically, in *East Bay Sanctuary Covenant v. Trump*, —F.3d—, 2018 WL 8807133 (9th Cir. Dec. 7, 2018), the government argued that various organizations, including Organizational Plaintiff Al Otro Lado who is also a plaintiff in that case, fell outside the zone of interests of certain INA provisions, including 8 U.S.C. § 1158, as "legal services organizations" and therefore could not challenge a rule promulgated by the Department of Justice and the Department of Homeland Security ("DHS"), coinciding with a presidential proclamation, which together purported to make aliens who entered the United States at a place other than at a POE ineligible to apply for asylum in the United States.  *Id.* at *3–4, *8–10.  The Ninth Circuit rejected the government's zone of interest argument, reasoning that "the Organizations' interest in aiding immigrants seeking asylum is consistent with the INA's purpose to 'establish[] . . . [the] statutory procedure for granting asylum to refugees.'"  *Id.* at *16 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 427 (1987)).  The Court noted that "[w]ithin the asylum statute, Congress took steps to ensure that pro bono legal services of the type that the Organizations provide are available to asylum seekers."  *Id.* (citing 8 U.S.C. § 1158(d)(4)(A)–(B)).  The Ninth Circuit also determined that the INA, taken as a whole, otherwise supports the inference that Congress intended eligibility for organizations like the ones in *East Bay Sanctuary Covenant* to bring suit.  *Id.* (identifying various INA provisions expressly referring to nongovernmental organizations as giving such organizations "a role in helping immigrants navigate the immigration process").  The Ninth Circuit's reasoning in *East Bay Sanctuary Covenant* is equally applicable to this case and reinforces the Court's prior rejection of Defendants' challenge to Al Otro Lado's APA claims.[7]

---

[7] In the time since both the Court's ruling and *East Bay Sanctuary Covenant*,

### B.   Section 706(1) APA Claims

The Court has previously discussed the principles governing Section 706(1) APA claims.   Under Section 706(1), a court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).  A Section 706(1) claim "can only proceed where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) [hereinafter "*SUWA*"]."); *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).  The "limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law." *SUWA*, 542 U.S. at 65.  Because of this limitation, courts "have no authority to compel agency action merely because the agency is not doing something we may think it should do." *Zixiang Li v Kerry*, 710 F.3d 995, 1004 (9th Cir. 2013).

---

one out-of-circuit district court has described this Court's prior zone of interests analysis as a "limited circumstance[]" for "organizations advocating for clients[.]" *De Dandrade v. United States Dep't of Homeland Sec.*, 367 F. Supp. 3d 174, 189 (S.D.N.Y. 2019) ("In the limited circumstances in which district courts determined organizations advocating for clients fell within the INA's zone of interest, the provisions of the INA at issue did not concern naturalization.").  The *De Dandrade* court in part misreads this Court's prior analysis, which did not turn on whether Al Otro Lado has clients that fall within the zone of interests of the relevant INA provisions.  The Court identified this as a potentially separate basis for Al Otro Lado to assert APA claims, but on which Al Otro Lado *did not rely*.  *Al Otro Lado*, *Inc.*, 327 F. Supp. 3d at 1301 n.7.  In any event, as *East Bay Sanctuary Covenant* confirms, it is not necessary for an organization to premise its APA claims for the underlying INA provisions at issue in this case on the ground that the organization is representing specific clients seeking asylum.  *See E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *15–16.  Indeed, in *East Bay Sanctuary Covenant*, the Ninth Circuit expressly found that the organizations lacked third-party standing to assert claims on behalf of asylum seeker clients, yet concluded that the organizations possessed both Article III standing and fell within the INA's zone of interests in their capacity as legal organizations that assist asylum seekers.  *Compare id. with id.* at *12.

Plaintiffs assert claims under Section 706(1) claims based on 8 U.S.C. § 1225(a)(3), § 1225(b)(1)(A)(ii), 1225(b)(2)(A), and 8 C.F.R. § 235.3(b)(4).  (SAC ¶¶ 256–69).  In broad terms, Section 1225(a)(3) imposes a mandatory duty for immigration officers to inspect "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission . . . to . . . the United States[.]"  8 U.S.C. § 1225(a)(3).  Section 1225(b)(1)(A)(ii) imposes on an immigration officer a duty to refer an alien who indicates either an intention to apply for asylum under section 1158 or a fear of persecution for an asylum interview under 8 U.S.C. § 1225(b)(1)(B) with an asylum officer.  8 U.S.C. § 1225(b)(1)(A)(ii).  In turn, 8 C.F.R. § 235.3(b)(4) imposes an analogous regulatory duty on the inspecting officer.  For all other aliens, Section 1225(b)(2)(A) imposes on an immigration officer a duty to detain the alien for general removal proceedings under 8 U.S.C. § 1229a.  8 U.S.C. § 1225(b)(2)(A).

Defendants raise two dismissal arguments that together concern the Section 706(1) claims of ten Individual Plaintiffs.  Defendants first move to dismiss the repleaded Section 706(1) claims of Original Individual Plaintiffs Abigail, Beatrice and Carolina Doe because these Plaintiffs allegedly withdrew their applications for admission.  (ECF No. 192-1 at 5.)  Second, Defendants argue that all New Individual Plaintiffs fail to state Section 706(1) claims because the statutory and regulatory provisions at issue "do not apply to individuals located in Mexico."  (*Id.* at 6–11.) The Court considers each argument in turn.

### 1.      Repleaded Section 706(1) Claims of Certain Plaintiffs

Plaintiffs Abigail Doe, Beatrice Doe, and Carolina Doe once more each allege that, on one of the occasions they sought asylum at a POE, CBP officials coerced them into signing documents which stated that they lacked a fear of persecution and were withdrawing their applications for admission.  (SAC ¶¶ 24–26, 122–23, 129–30, 136.)  Carolina further alleges that CBP officers coerced her into recanting her

1    fear on video.  (*Id*. ¶¶ 26, 135.)

2

3         Based on their coercion allegations, Plaintiffs claimed in the original

4    complaint that "CBP officials failed to take actions mandated" by, *inter alia*, 8

5    C.F.R. § 235.4, the regulation which states that "[t]he alien's decision to withdraw

6    his or her application for admission must be made voluntarily."  (ECF No. 1 ¶ 153.)

7    In the prior dismissal order, the Court dismissed Plaintiffs Abigail Doe, Beatrice

8    Doe, and Carolina Doe's Section 706(1) claims insofar as the claims sought to

9    compel agency action under 8 C.F.R § 235.4, reasoning that "[t]he regulation does

10   not require CBP officers to determine whether a withdrawal was made voluntarily,

11   and it does not specify what CBP officers must do if a withdrawal was not."  *Al Otro*

12   *Lado*, *Inc.*, 327 F. Supp. 3d at 1314.  The Court stated that "[t]his determination does

13   not affect the Court's conclusion that these Plaintiffs have otherwise stated Section

14   706(1) claims regarding their alleged denial of access to the asylum process in the

15   United States."  *Id.* at 1315.  Plaintiffs Abigail Doe, Beatrice Doe, and Carolina Doe

16   thus understandably replead Section 706(1) claims based on the alleged failure of

17   immigration officers to inspect and refer them for asylum interviews or to otherwise

18   detain them for a removal proceeding.  (SAC ¶¶ 256, 260.)

19

20        Notwithstanding the Court's prior ruling expressly permitting Plaintiffs

21   Abigail Doe, Beatrice Doe, and Carolina Doe's Section 706(1) claims to proceed

22   and the fact that no Plaintiff now alleges Section 706(1) claims based on 8 C.F.R. §

23   235.4, (*see* SAC ¶ 260), Defendants argue that these Plaintiffs' Section 706(1) claims

24   must be dismissed because these Plaintiffs withdrew their applications for

25   admission.  (ECF No. 192-1 at 29–30.)  Citing 8 U.S.C. § 1225(a)(4) and 8 C.F.R. §

26   235.4—the statutory and regulatory provisions that authorize an alien to voluntarily

27   withdraw an application for admission and "depart immediately from the United

28   States"—Defendants argue that there is no continuing duty to inspect, refer, or detain

1    an alien who has withdrawn her application.  (ECF No. 192-1 at 30.)

2

3         Defendants' dismissal argument mistakes the Court's prior conclusion

4    regarding a judicial inability to compel relief under 8 C.F.R. § 235.4 with an inability

5    of the Court to otherwise compel discrete "agency action unlawfully withheld."  5

6    U.S.C. § 706(1).  As should have been clear from the Court's prior order, the inability

7    to compel Section 706(1) relief under 8 C.F.R § 235.4 does not preclude relief under

8    8 U.S.C. § 1225(a)(3), 8 U.S.C. § 1225(b)(1)(A)(ii), and 8 C.F.R. § 235.3(b)(4) in

9    this case.  The parties agree that the mandatory duties to inspect all aliens and refer

10    certain aliens seeking asylum are discrete actions for which this Court can compel

11    Section 706(1) relief under 8 U.S.C. § 1225(a)(3), 8 U.S.C. § 1225(b)(1)(A)(ii), and

12    8 C.F.R. § 235.3(b)(4).  In view of the parties' agreement regarding these duties, the

13    Court does not understand Defendants' present dismissal argument.

14

15         Under the provisions that form the basis of the repleaded Section 706(1)

16    claims, an immigration officer must inspect an alien applying for admission and if

17    the alien is inadmissible for making misrepresentations or lacking proper

18    documentation and states an intent to seek or apply for asylum, the officer must refer

19    the alien for a credible fear interview.  As even Defendants do not dispute, Plaintiffs

20    Abigail Doe, Beatrice Doe, and Carolina Doe's allegations plausibly show that CPB

21    officers failed to take the discrete actions an immigration officer must take during

22    the admission process for aliens like these Plaintiffs, who allege that they asserted

23    an intent to apply for asylum and a fear of persecution.  (SAC ¶¶ 24–26, 122–23,

24    129–30, 134–36.)  All parties also agree that 8 C.F.R § 235.4 requires that an alien

25    voluntarily withdraw an application.  Taking these Plaintiffs' factual allegations of

26    coercion as true, these Plaintiffs did not voluntarily withdraw their applications for

27    admission.  Thus, the mandatory duties to inspect and refer or detain were plausibly

28    "unlawfully withheld" such that these Plaintiffs may seek Section 706(1) relief.

Accordingly, the Court denies Defendants' latest attempt to dismiss Plaintiff Abigail Doe, Beatrice Doe, and Carolina Doe's Section 706(1) claims.[8]

## 2.   New Individual Plaintiffs' Section 706(1) Claims

As noted, all Plaintiffs' Section 706(1) claims are premised on alleged failures of CBP officers to take actions mandated by 8 U.S.C. § 1225(a)(3), 8 U.S.C. § 1225(b)(1)(A)(ii), 8 U.S.C. § 1225(b)(2), and 8 C.F.R. § 253.3(b)(4).  (SAC ¶ 260.) Two interlocking arguments are central to Defendants' dismissal challenge to the New Individual Plaintiffs' Section 706(1) claims.  First, Defendants contend that the text of the underlying statutory and regulatory provisions "do not apply to individuals in Mexico."  (ECF No. 192-1 at 6–11; ECF No. 238 at 1–7.)  Second, Defendants contend that, unlike the Original Individual Plaintiffs' allegations, the New Individuals Plaintiffs' allegations show that these latter Plaintiffs were in Mexico when they were allegedly turned away.  (ECF No. 192-1 at 2 & n.2, 6–11; ECF No. 238 at 1–7.)  The Court finds it prudent to outline the SAC's allegations and then to address whether the allegations are sufficient to state claims for Section 706(1) relief under a proper construction of the relevant INA statutory and regulatory provisions.

---

[8] In opposition to Defendants' motion to dismiss the SAC, Plaintiffs state in a footnote that they "respectfully disagree with and preserve for appeal the Court's conclusion that it cannot compel relief under Section 706(1) based on Defendants' alleged violation of 8 C.F.R. § 235.4[.]"  (ECF No. 210 at 34 n.30.)  The Court does not understand how Plaintiffs have preserved an issue for appeal (1) which they chose not to replead in their Section 706(1) claims and (2) for which Plaintiffs offer no argument based on an application of the legal standards that govern a Section 706(1) claim to the text of 8 C.F.R. § 235.4.  In any event, to the extent Plaintiffs' assertion is animated by a concern that the Court would dismiss the repleaded Section 706(1) claims on the grounds Defendants raise, this Order moots that concern.

### a.   New Individual Plaintiffs' Factual Allegations

As a threshold matter, Plaintiffs dispute whether the Court can even resolve Defendants' challenge to the New Individual Plaintiffs' Section 706(1) claims at this juncture.  (ECF No. 210 at 4–5.)  Plaintiffs contend that Defendants' argument calls for the Court to improperly find facts at the pleading stage, "specifically, that the new Individual Plaintiffs were standing in Mexico when they confronted CBP officers."  (ECF No. 210 at 4.)  According to Plaintiffs, the SAC "does not actually state that any Plaintiffs were in Mexico territory when CBP turned them back," and thus the Court must "assume that all Individual Plaintiffs were on U.S. soil when Defendants turned them back."  (*Id.* at 4–5.)  This argument is echoed by *Amici* Immigration law Professors.  (ECF No. 221-1 at 4–5.)

Implicit in Plaintiffs' argument is the notion that the Court should assume facts essential to their ability to state Section 706(1) claims to compel agency action pursuant to 8 U.S.C. § 1225(a)(3), § 1225(b)(1)(A)(ii), 1225(b)(2)(A), and 8 C.F.R. § 235.3(b)(4).   The Court cannot do this.   "Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable theory or where the complaint presents a cognizable legal theory *yet fails to plead essential facts under that theory*."  *C.B. v. Sonora Sch. Dist.*, 691 F. Supp. 2d 1123, 1128 (E.D. Cal. 2009) (citing *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984)) (emphasis added).  And this Court has recognized, "[d]espite the deference the Court must pay to the plaintiff's allegations, it is not proper for the Court to assume that the [plaintiff] can prove facts that [he or she] has not alleged.'"  *Tinoco v. San Diego Gas & Elec. Co.*, 327 F.R.D. 651, 657 (S.D. Cal. 2018) (quoting *Associated Gen. Contractors of Cal, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983)) (alterations in original).  Tellingly, both sides expressly rely on the SAC's allegations to argue whether the relevant INA provisions embrace the New Individual Plaintiffs.  (ECF No. 192-1 at 7, 8, 9, 11; ECF No. 210 at 4.)  Thus, the

1   Court rejects Plaintiffs' threshold dispute.

2

3          The Court turns to a key concession that undergirds Defendants' argument.

4   Defendants concede that a POE is within the U.S.  (*See* ECF No. 192-1 at 11 ("[A]s

5   the regulation says, an 'arriving alien' is an 'applicant for admission' *at a port of*

6   *entry*, *all of which are located within the territorial United States*." (quoting 8 C.F.R.

7   §§ 1.2, 235.3(b)(4), 8 U.S.C. § 1225(a)(1)) (emphasis added).)  Defendants further

8   argue that a POE is not a "geographic area," but instead a discrete facility.  (ECF No.

9   238 at 5–6.)  Defendants ground this argument in a Ninth Circuit decision regarding

10  a conviction for illegal entry under 8 U.S.C. § 1325—a statutory provision that

11  criminalizes an alien's entry into the United States at any time or place other than as

12  designed by immigration officers—for entry at a place other than a POE.  *See United*

13  *States v. Aldana*, 878 F.3d 877, 880–82 (9th Cir. 2017) ("[T]here is no indication

14  that DHS intended to change the meaning of 'port of entry' [in 8 C.F.R. § 235.1(a)]

15  to refer to geographical areas, as opposed to specific facilities where an alien could

16  apply for entry.") (upholding convictions under Section 1325(a)(1) for unlawful

17  entry in the United States based in part on 8 C.F.R. § 235.1(a)).

18

19          Under Defendants' own view, any New Individual Plaintiff who has

20  sufficiently alleged that he or she was "at a POE" has stated Section 706(1) claims

21  for the various INA provisions and implementing regulation that form the basis of

22  Plaintiffs' claims.  Defendants' dismissal argument should therefore fail on its own

23  terms for New Individual Plaintiffs Victoria Doe, Bianca Doe, Emiliana Doe, and

24  César Doe.  These four New Individual Plaintiffs offer allegations that, on one or

25  more occasion, they were "at a POE" and requested asylum, but CBP officers

26  refused.  (SAC ¶¶ 32–35, 181, 185, 187, 193, 199.)  As Plaintiffs observe, (ECF No.

27  210 at 7), the preposition "at" is a "function word" used "to indicate presence or

28  occurrence    in,   on,   or   near."        *See*    Merriam-Webster    Dictionary,

https://www.merriam-webster.com/dictionary/at (last accessed May 2, 2019). Although Defendants would like these New Individual Plaintiffs to plead additional factual allegations, the word "at" can plausibly embrace the inference that these New Individual Plaintiffs are not subject to Defendants' challenge.[9]

The remaining four New Individual Plaintiffs, however, offer allegations that defeat such an inference. New Individual Plaintiffs Roberto Doe, Maria Doe, and Juan and Úrsula Doe allege that they "sought access to the asylum process by presenting" themselves at the Hidalgo, Texas POE and Laredo, Texas POE and "encountered CBP officials in the middle of the bridge" between Mexico and the U.S. POE and "told them" they "wanted to seek asylum in the United States." (SAC ¶¶ 29–31, 154–55, 162, 174.) The CBP officials, however, allegedly denied Roberto Doe access "by telling him the POE was full and that he could not enter," told Maria Doe to wait on the Mexican side of the border where she was told "U.S. officials would not let her and her children cross the bridge," and told Juan and Úrsula Doe that "the POE was closed and that they could not enter." (*Id.* ¶¶ 155, 162, 174.) These allegations squarely call on the Court to address Defendants' arguments regarding the proper construction of the statutory and regulatory provisions in this case and to apply that construction to the factual allegations.

### b.      Scope of the Relevant Provisions

The starting point of statutory interpretation is the statute's language. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985). "[I]f the statutory

---

[9] Even if the Court did not draw the inference that New Individual Plaintiffs Victoria Doe, Bianca Doe, Emiliana Doe, and César Doe were sufficiently "at a POE" for the purposes of Defendants' present motion, the Court's analysis regarding the scope of the statutory and regulatory provision similarly applies to their allegations and Section 706(1) claims.

language is plain," a court "enforce[s] it according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (citing *Hardt v. Reliance Standard Life Ins. Co*., 560 U.S. 242, 251 (2010)).  A court interprets a statute "to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (citation omitted).  This process of statutory interpretation proceeds "with reference to the statutory context, structure, history, and purpose, 'as well as overall common sense.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)).   Two statutory provisions are relevant to Defendants' motion to dismiss: 8 U.S.C. § 1158(a)(1)'s general provision for asylum and 8 U.S.C. § 1225's articulation of certain immigration officer duties.  The Court considers the relevant statutory text in light of these principles.

### (1)    8 U.S.C. § 1158(a)(1)

Although Plaintiffs do not premise their Section 706(1) claims to compel agency action on 8 U.S.C. § 1158(a)(1), both sides anchor their statutory analysis in this provision.  Under Section 1158(a)(1)'s plain language, two classes of aliens may apply for asylum: (1) any alien "who is physically present in the United States" and (2) any alien "who arrives in the United States."   Applying the rule against surplusage, the Court must presume that the phrases "mean different things." *Duncan*, 533 U.S. at 174.[10]  The parties' dispute turns on whether the New Individual

---

[10] The Court recognizes that the rule against surplusage "is not absolute." *Lamie v. U.S. Tr*., 540 U.S. 526, 536 (2004).  A court need not apply the rule when its application would be "at the expense of [the statute's] more natural reading, the structure of the [statutory provision], and the structure of the Act." *Tima v. AG, United States*, 903 F.3d 272, 278 (3d Cir. 2018).  Defendants appear to argue against application of the rule and insist that Section 1158(a)(1)'s phrases are "not surplusage" but together "ensure that any alien within the United States may apply for asylum[.]"  (ECF No. 238 at 4.)  For reasons the will become clear, the Court does not agree with Defendants' arguments regarding the full scope of the provisions.  And the Court cannot find that application of the rule against surplusage

1  Plaintiffs fall within the second class of aliens.

2

3      Defendants argue that any Plaintiffs on Mexican soil cannot qualify as an alien
4  who was "arriving in the United States."  Defendants' opening brief largely does not
5  offer meaningful analysis regarding Section 1158(a)(1), except to contend that a
6  plain language reading of the statute shows that it does not apply to the New
7  Individual Plaintiffs.  (ECF No. 192-1 at 7–8.)  In the face of Plaintiffs' statutory
8  analysis, however, Defendants advance three arguments.  First, Defendants contend
9  that "the use of the present simple tense creates a nexus between the alien's ability
10  to apply for asylum and the alien's current physical presence (or arrival) in the
11  United States." (ECF No. 238 at 2.)  Defendants observe that the phrase "alien who
12  arrives in" is still linked with the geographic location of the United States.  Second,
13  Defendants argue that the presumption against extraterritorial application of federal
14  statutes forecloses application of Section 1158 to conduct that occurs outside the
15  United States.  (*Id.* at 3.)  Third, Defendants argue that Congress has enacted a
16  separate scheme to deal with refugee claims for persons outside the United States.
17  (*Id*. at 3–4.)  The Court rejects each of Defendants' arguments and, in doing so, the
18  Court concludes that Congress included aliens in the process of arriving in the United
19  States in Section 1158(a)(1)'s general authorization to apply for asylum.

20

21          **(a)     The Statute's Present Tense (Con)Text**

22      Defendants argue that the statute's use of the phrase "alien who arrives in" is
23  linked with a geographic location because "use of the present simple tense creates a
24  nexus between the alien's ability to apply for asylum and the alien's current physical
25  presence (or arrival) in the United States."  (ECF No. 238 at 2.)  Although Plaintiffs

26  _____

27  contravenes Section 1158(a)(1)'s natural reading as identifying two different classes
28  of aliens who may apply for asylum, one of which includes aliens who are not
   physically in the United States but are in the process of doing so.

assert that "arrives in" "must mean something different than geographic presence in the United States[,]" (ECF No. 210 at 8), Plaintiffs do not so much dispute that Section 1158(a)(1)'s use of "arrives in" has a geographic focus.  Rather, Plaintiffs' fundamental contention is that the statute's use of the present tense embraces an alien who is in the process of arriving in the United States.  (*Id.* at 7.)  According to Plaintiffs, the "natural meaning" of "arrives in," as used in the statute, encompasses "someone who is in the process of 'arriv[ing] in' the United States[.]"  (*Id.*)  Based on this reading, Plaintiffs argue that "because all Individual Plaintiffs were arriving in the United States, they are covered by" this provision.  (*Id.*)  The Court agrees.

"Congress' use of a verb tense is significant in construing statutes."  *United States v. Wilson*, 503 U.S. 329, 333 (1992) (collecting statutes).  Although neither side raises this point, it bears noting that Congress has enacted the Dictionary Act to guide interpretation of congressional statutes.  Pursuant to the Act, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise—words used in the present tense include the future as well as the present."  1 U.S.C. § 1.  This provision of the Dictionary Act has been applied to the INA.  *See Carrillo de Palacios v. Holder*, 651 F.3d 969, 976 (9th Cir. 2011) (citing 1 U.S.C. § 1).  When accounting for the rule against surplusage, application of the Dictionary Act readily leads to the conclusion that Section 1158(a)(1)'s use of the present tense of "arrives" plainly covers an alien who may not yet be in the United States, but who is in the process of arriving in the United States through a POE.

This reading is buttressed by statutory provisions that Section 1158(a)(1) expressly incorporates.  Section 1158(a)(1) references the Section 1225 procedure for aliens seeking asylum at the border.  8 U.S.C. § 1158(a)(1).  In relevant part, Section 1225(b)(1)(A)(ii) requires an immigration officer to refer an inadmissible alien "*who is arriving* in the United States" and who expresses a fear of persecution

or "an intention to apply for asylum" for an interview with an asylum officer.  8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added).  The use of the present progressive, like use of the present participle, denotes an ongoing process.  *See United States v. Balint*, 201 F.3d 928, 933 (7th Cir. 2000) [U]se of the present progressive tense, formed by pairing a form of the verb 'to be' and the present participle, or '-ing' form of an action verb, generally indicates continuing action."); *Laube v. Allen*, 506 F. Supp. 2d 969, 980 (M.D. Ala. 2007) (observing that a statute's use of the present participle "denotes action that is continuing or progressing"); *cf. Khakhn v. Holder*, 371 Fed. App'x 933, 937 (10th Cir. 2010) (finding use of the present participle phrase "applying for adjustment" in section 1104(g) of the LIFE Act as "unambiguous" that an alien who "is no longer applying for adjustment of status under the LIFE Act" cannot prevent reinstatement of a prior deportation order). Section 1225(b)(1)(A)(ii) therefore reinforces the conclusion that Congress intended to authorize aliens in the process of arriving into the United States to apply for asylum under Section 1158(a)(1).  *See E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 844 (N.D. Cal. 2018) (observing that "[a]sylum is a protection granted to foreign nationals already in the United States *or at the border* who meet the international law definition of a 'refugee.'" (emphasis added)).

Although Defendants focus on the "geographic nexus" that Section 1158(a)(1) creates with the United States, they ignore its use of the present tense.  In fact, Defendants' opening briefing expressly rewrites the statutory provision into the past tense to seek dismissal of the New Individual Plaintiffs' claims: "[n]one of the Extraterritorial Plaintiffs alleges he or she was 'physically present in' the United States or *had 'arrive[d] in' the United States* when subjected to Defendants' alleged conduct." (ECF No. 192-1 at 8 (brackets in original and emphasis added).)  In reply, Defendants similarly argue for a past tense revision.  (ECF No. 238 at 2 (purporting to argue about the meaning of the statute's "present simple tense" yet citing *Matter*

*of F-P-R*, 24 I. & N. Dec. 681, 683 (BIA 2008) for the proposition that "'last *arrival* in' at 8 C.F.R. § 1208.4(a)(2)(ii) . . . mean[s] the alien's most recent coming or crossing into the United States *after having traveled* from somewhere outside of the country." (emphasis added)).)  Defendants' argument must fail because it invites the Court to do what it cannot: "[w]e are not at liberty to rewrite the words chosen by Congress."  *United States v. Vargas-Amaya*, 389 F.3d 901, 906 (9th Cir. 2004).

Were the statute's text not enough, as *Amici* Immigration Law Professors observe, there is relevant legislative history on Congress's intent in adopting the term "arriving alien," as reflected in a statement by Representative Lamar Smith, Chairman of the House Judiciary Committee's Subcommittee on Immigration and Claims.  (ECF No. 221-1 at 11.)  In particular, Representative Smith observed that the term "was selected specifically by Congress in order to provide a flexible concept that would include all aliens who are in the process of physical entry past our borders[.]. . . . 'Arrival' in this context should not be considered ephemeral or instantaneous but, consistent with common usage, as a process.   An alien apprehended at any stage of this process, whether attempting to enter, at the point of entry, or just having made entry, should be considered an 'arriving alien' for the various purposes in which that term is used in the newly revised provisions of the INA."  *Implementation of Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 105th Cong. 17–18 (1997).  Despite Defendants' attempt to dismiss this legislative history, (ECF No. 238 at 6), it confirms the propriety of the Court's conclusion that the statute's use of the present tense encompasses aliens in the process of arriving.  *See Daniel v. Nat'l Park Serv*., 891 F.3d 762, 775 (9th Cir. 2018) ("[T]he legislative history 'confirms what we have concluded from the text alone.'" (quoting *Mohamad v. Palestinian Auth*., 566 U.S. 449, 460 (2012))).

(b)   **Presumption Against Extraterritoriality**

Faced with the statute's text, Defendants turn to the statutory canon of the presumption against extraterritoriality to argue that "the right codified at section 1158(a)(1)" simply cannot extend "to persons outside the United States borders" because this would be "in direct contravention of Supreme Court precedent and in violation of the presumption against extraterritoriality." (ECF No. 238 at 3 (citing *Sale*, 509 U.S. at 173–74; *E.E.O.C. v. Arabian Am. Oil Co*., 499 U.S. 244, 248 (1991) ("It is a longstanding principal of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." (internal quotation marks omitted)).) The Court does not find Defendants' argument persuasive.

The presumption against extraterritoriality is what its name suggests—a presumption. Application of the presumption is a two-step process, which may reveal that Congress has rebutted the presumption for an entire statutory provision or that the presumption is displaced in the context of a particular case's facts. Under the first step, a court considers "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco, Inc. v. European Cmty*., 136 S. Ct. 2090, 2101 (2016). Second, if the statute does not clearly indicate an intent that it applies extraterritorially, the court must consider "whether the case involves a domestic application of the statute . . . by looking to the statute's 'focus.'" *Id.* at 2101. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

1   Defendants fail to actually apply the framework to Section 1158.  The Court

2   will not undertake the task of doing Defendants' work for them, particularly when

3   Defendants effectively seek to rely on the presumption as a bar to application of

4   Section 1158 to the New Individual Plaintiffs.  This is not how the presumption

5   works.

6

7   In any event, the Court finds that the presumption is rebutted in this case.

8   First, as Plaintiffs contend (ECF No. 210 at 8–9), "[i]mmigration statutes, by their

9   very nature, pertain to activity at or near international borders.  It is natural to expect

10  that Congress intends for laws that regulate conduct that occurs near international

11  borders to apply to some activity that takes place on the foreign side of those

12  borders." *United States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005).  A reading

13  of Section 1158(a)(1), when placed into context, shows that Congress intended the

14  statute to apply to asylum seekers in the process of arriving.  The Court concludes

15  that the statute's language sufficiently displaces the presumption.  *See RJR Nabisco,*

16  *Inc*., 136 S. Ct. at 2102 (observing that "[w]hile the presumption can be overcome

17  only by a clear indication of extraterritorial effect, an express statement of

18  extraterritoriality is not essential.  'Assuredly context can be consulted as well.'"

19  (quoting *Morrison v. Nat'l Australian Bank Ltd*., 561 U.S. 247, 265 (2010))).  Even

20  if the Court proceeded to the second step of the extraterritoriality analysis, the factual

21  allegations of this case concern the conduct of U.S. officials acting from within the

22  United States or from areas over which the U.S. exercises sovereignty, whether the

23  Court looks at the alleged Turnback Policy or the alleged acts of individual CBP

24  officers standing on the U.S. side of the international bridge between Mexico and

25  the United States.  As the Court has discussed, Section 1158(a)(1) incorporates

26  Section 1225, which in turns places a focus on immigration officers who process

27  arriving aliens.  Thus, even if the New Individual Plaintiffs had not crossed into the

28  United States when they were attempting admission and expressed to CBP officers

1    an intent to seek asylum in the United States, they have alleged conduct occurring in

2    the United States that is a focus of the relevant statutory provisions when viewed in

3    context.  Thus, this case involves a permissible territorial application of Section

4    1158.

5

6                    (c)      8 U.S.C. § 1157(c) Refugee Admission Process

7         Finally, for the first time in reply, Defendants point to 8 U.S.C. § 1157(c) to

8    argue that this Court should not read Section 1158(a)(1) to encompass aliens who

9    are not yet in the United States.  (ECF No. 238 at 3–4, 16.)  According to Defendants,

10   under Section 1157(c), "a process already exists for accepting applications for

11   refugee status from persons outside the United States."  (ECF No. 238 at 3–4, 16.)

12   Defendants argue that "to adopt Plaintiffs' interpretation of Section 1158 would

13   render section 1157 redundant."  (*Id.* at 4.)  The Court does not share Defendants'

14   view.

15

16        Even a cursory review of Section 1157 shows that the statute establishes a

17   fundamentally different and separate scheme for admission of refugees into the

18   United States in the case of "humanitarian concerns" or "national interest."  8 U.S.C.

19   § 1157(a)(1).  The number of admissions is limited to "such number as the President

20   determines, before the beginning of the fiscal year and after appropriate consultation,

21   is justified by humanitarian concerns or is otherwise in the national interest."  8

22   U.S.C. § 1157(a)(2).  Section 1157(c) permits the Attorney General, subject to the

23   numerical limitation, to "admit any refugee who is not firmly resettled in any foreign

24   country, is determined to be of special humanitarian concern to the United States,

25   and is admissible. . . as an immigrant."  8 U.S.C. § 1157(c)(1).  Notably, Section

26   1157 does not refer to the asylum procedures set forth in Section 1158(a)(1), nor

27   does Section 1157 concern Section 1225's focus on inspection of arriving aliens.

28   These textual differences blunt the force of Defendants' argument that reading

Section 1158(a)(1) in the manner the Court has would improperly render Section 1157 redundant, particularly in this case.  No New Individual Plaintiff seeks relief under Section 1157.  In contrast, their allegations plausibly show that they were arriving aliens and thus may avail themselves of the procedural protections available under Sections 1158 and 1225.  Accordingly, the Court rejects Defendants' Section 1157(c) argument.

*     *     *

In sum, the Court concludes that Section 1158(a)(1)'s plain language, properly construed, embraces any New Individual Plaintiffs whose allegations show that they were in the process of arriving in the United States at the time of the challenged conduct.  With this construction in mind, the Court turns to the statutory provisions pursuant to which the New Individual Plaintiffs seek to compel Section 706(1) relief.

**(2)      8 U.S.C. § 1225**

The core of the New Individual Plaintiffs' Section 706(1) APA claims lies in certain mandatory duties that 8 U.S.C. § 1225 imposes on an immigration officer.  As a threshold matter, Plaintiffs' opposition to Defendants' motion to dismiss is silent on dismissal of the New Individual Plaintiffs' Section 706(1) claims insofar as the claims are premised on 8 U.S.C. § 1225(b)(2)(A), a provision that requires detention of aliens not otherwise covered under 8 U.S.C. § 1225(b)(1) and who have not shown that they are entitled to admission clearly and beyond a doubt.  (*Compare* ECF No. 192-1 at 9–10 *with* ECF No. 210 at 5–9.)  Thus, the Court construes Defendants' motion to dismiss as unopposed insofar as Defendants seek dismissal of Plaintiffs' Section 706(1) claims.  The Court limits its analysis to the statutory and regulatory duties to inspect and refer asylum seekers under 8 U.S.C. § 1225(a)(3), 8 U.S.C. § 1225(b)(1)(A)(ii), and 8 C.F.R. § 235.3(b)(4).  Many of the previously articulated statutory construction principles applied to Section 1158(a)(1)

– 44 –

carry over and lead the Court to a similar interpretation of these provisions.

### (a)    Statutory Duty to Inspect

Section 1225 establishes that "[a]ll aliens . . . who are applicants for admission or *otherwise seeking admission* or readmission to or transit through the United States shall be inspected by immigration officers."  8 U.S.C. § 1225(a)(3) (emphasis added).  Section 1225(a)(3) provides a stronger textual argument that the duty to inspect applies to aliens who may not yet be in the territorial United States.  Referring to the statute, albeit in passing, the Ninth Circuit has observed that "[a]ll applicants for admission, whether they are at the border or already physically present inside the country, must 'be inspected by immigration officers' who will determine their admissibility."  *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1118 (9th Cir. 2007) (quoting 8 U.S.C. § 1225(a)(3)).  This interpretation makes sense because Section 1225(a)(3)'s duty to inspect reaches beyond "applicants for admission" to encompass aliens who are "otherwise seeking admission."  8 U.S.C. § 1225(a)(3).

Defendants fail to explain how, as a textual matter, Section 1225(a)(3)'s use of the phrase "otherwise seeking admission . . . to. . . the United States" does not include aliens who may be located outside the United States, but who are in the process of seeking admission to the United States.  Instead, Defendants contend that the New Individual Plaintiffs were not seeking admission "in the manner prescribed by statute and regulation."  (ECF No. 192-1 at 8 (citing 8 U.S.C. § 1225(a)(1), 8 C.F.R. § 235.1(a)).)  Defendants point to a regulation, which provides that "[a]pplication to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise designated in this section."  8 C.F.R. § 235.1(a).  All New Individual Plaintiffs, however, allege that they sought admission to the United States by presenting him or herself to a CBP officer at a U.S. POE.  (SAC ¶¶ 29–35, 154–56,

162, 165–67, 174–75, 181, 185, 187–88, 193, 199.)  Plaintiffs do not allege that the POE was not open, but rather that CBP officers told them that the POE purportedly did not have "capacity" to accept applications from asylum seekers.  (*Id.* ¶¶ 83, 85–86, 93– 94, 95–97, 98–102, 103–05, 153–202.)   These allegations plausibly show that these Plaintiffs were seeking admission into the United States.  Defendants' challenge to any Section 706(1) claims premised on the duty to inspect therefore fails.

### (b)     Statutory and Regulatory Duties to Refer

Section 1225(b)(1)(A)(ii) provides that:

> If an immigration officer determines that *an alien* (other than an alien described in subparagraph (F)) *who is arriving in the United States* or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added).

Unlike Section 1225(a)(1), Section 1225(b)(1)(A)(ii) uses the present progressive phrase "to be arriving."  This phrase plainly encompasses aliens who are in the process of arriving in the United States.  As the Court has discussed, Defendants' challenge to the New Individual Plaintiffs' Section 706(1) claims largely turns on rewriting the statute into the past tense.  Properly applying the statute's use of the phrase alien "who is arriving in the United States" to the allegations of the New Individual Plaintiffs blunts Defendants' argument.  This is equally true for the four New Individual Plaintiffs who allege that they were crossing the international bridge to the physical POE and were stopped midway on the bridge, yet who told the CBP officers that they wanted to seek asylum in the United States.

The plain language of DHS's own implementing regulations sweeps more

broadly.   8 C.F.R. § 235.3(b)(4) imposes an analogous regulatory duty on the inspecting officer not to proceed further with removal of an alien subject to the expedited removal provisions if the alien indicates an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to his or her country.  8 C.F.R. § 235.3(b)(4).  Two additional regulations directly bear on the scope of 8 C.F.R. § 235.3(b)(4).  By regulation, the expedited removal provisions of the INA apply to "arriving aliens, as defined in 8 C.F.R. 1.2."  8 C.F.R. § 235.3(b)(1)(i).  8 C.F.R. § 1.2 in turn defines "arriving alien" to mean, in relevant part, "an applicant for admission coming or *attempting to come into the United States at a port-of-entry*[.]"  8 C.F.R. § 1.2 (emphasis added).  "A regulation should be construed to give effect to the natural and plain meaning of its words."  *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004) (quoting *Crown Pacific v. Occupational Safety & Health Review Comm'n*, 197 F.3d 1036, 1038 (9th Cir. 1999)).   Here, by including aliens "attempting to come into the United States at a [POE]," the regulation is broader than 8 U.S.C. § 1225(a)(1)'s definition of "applicant for admission."   And these regulations indicate that DHS—contrary to Defendants' current position in this litigation—interprets the statutory obligations under Section 1225 to apply to aliens who have not yet come into the United States, but who are "attempting to" do so.  As the Court has already determined, the New Individual Plaintiffs were in the process of seeking admission into the United States or otherwise attempting to do so.  Their allegations plainly show that they expressed an intent to seek asylum in the United States to a CBP officer.  Thus, the Court concludes that the New Individual Plaintiffs have stated a claim for relief under the mandatory duties reflected in 8 U.S.C. § 1225(b)(1)(A)(ii) and 8 C.F.R. § 235.3(b)(4).

## C.    Plaintiffs' Section 706(2) APA Claims

Under Section 706(2) of the APA, a reviewing court must "hold unlawful and

1   set aside agency action, findings, and conclusions found to be . . . arbitrary,

2   capricious, an abuse of discretion, or otherwise not in accordance with law; contrary

3   to constitutional right, power, privilege, or immunity; in excess of statutory

4   jurisdiction, authority, or limitations, or short of statutory right; [or] without

5   observance of procedure required by law."  5 U.S.C. § 706(2)(A)–(D).

6

7         Plaintiffs assert Section 706(2) APA claims based on three sets of allegations.

8   (SAC ¶¶ 270–82.)   First, Plaintiffs challenge the alleged Turnback Policy and

9   "sanctioning of CBP's unlawful widespread pattern or practice of denying and

10  unreasonably delaying asylum seekers' access to the asylum process" under Sections

11  706(2)(C) and 706(2)(D). (Id. ¶¶ 272, 274.)  Plaintiff allege that the Turnback Policy

12  is a final agency action under 5 U.S.C. § 704.  (Id. ¶ 274.)   Second, Plaintiffs

13  challenge the alleged turnbacks of Individual Plaintiffs and class members "at POEs

14  or along the U.S.-Mexico border without following the procedures mandated by the

15  INA and its implementing regulations" as unlawful conduct by CBP officials.  (Id. ¶

16  273.)  Plaintiffs allege that each instance when Defendants directly or constructively

17  deny Class Plaintiffs or purported class members access to the asylum process

18  constitutes a final agency action under 5 U.S.C. § 704.  (Id. ¶ 275.)  Third, like the

19  original complaint, Plaintiffs allege that Defendants have a pattern and practice of

20  unlawfully turning back asylum seekers at POEs.

21

22        Defendants raise three arguments for dismissal of Plaintiffs' Section 706(2)

23  claims.  First, Defendants argue that Plaintiffs fail to identify final agency action to

24  state APA claims for either the alleged Turnback Policy, the alleged widespread

25  pattern or practice of denying access to the asylum process, or any individual

26  turnbacks.   Second, Defendants challenge the Section 706(2) claims of New

27  Individual Plaintiffs allegedly in Mexico at the time of their injuries.  Defendants

28  argue that "metering is lawful" based on the Executive's "inherent power" to control

the Nation's foreign affairs and two statutory provisions that Defendants contend "authorize CBP officers to keep the [POEs] from being overwhelmed by an unsafe number of pedestrians at a given time." (ECF No. 192-1 at 9–12 (relying on 8 U.S.C. § 1103(a)(3) and 6 U.S.C. § 202(2), (8).)  Tucked into Defendants' "metering is lawful" argument is Defendants' third argument that the asserted breadth of Defendants' authority under the same two statutory provisions makes Defendants' conduct unreviewable under the APA.  The Court addresses the arguments and rejects them all.

### 1.    Final Agency Action

The APA limits judicial review to agency action in the form of "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  An agency action must be "reviewable by statute" or be a "final agency action for which there is no other adequate remedy[.]"  5 U.S.C. § 704; *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017).

Two conditions must be satisfied for an agency action to be final: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *United States Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  "In determining whether an agency's action is final, we look to whether [a] the action amounts to a definitive statement of the agency's position or [b] has a direct and immediate effect on the day-to-day operations of the subject party, or [c] if immediate compliance with the terms is expected."  *Or. Nat. Desert Ass'n v. United States Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (internal quotations

1    and citations omitted).  The focus is "on the practical and legal effects of the agency

2    action."  *Id.*

3

4         "[A]gency action . . . need not be in writing to be final and judicially

5    reviewable" pursuant to the APA.  *Al Otro Lado, Inc.*, 327 F. Supp. 3d at 1319

6    (quoting *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015)).  An unwritten

7    policy can still satisfy the APA's pragmatic final agency action requirement.  *See*

8    *Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008)

9    (reviewing challenge to an agency's "decision . . . to adopt [an unwritten] policy of

10   disclosing confidential information without notice" because such a policy was

11   "surely a consummation of the agency's decisionmaking process" that impacted the

12   plaintiff's rights); *R.I.L.-R*, 80 F. Supp. 3d at 174–176 (determining that plaintiffs

13   had shown a reviewable unwritten "DHS policy direct[ing] ICE officers to consider

14   deterrence of mass migration as a factor in their custody determinations" as

15   underlying the plaintiffs' detention).  "[A] contrary rule 'would allow an agency to

16   shield its decisions from judicial review simply by refusing to put those decisions in

17   writing.'"  *R.I.L.-R*, 80 F. Supp. 3d at 184 (quoting *Grand Canyon Tr. v. Pub. Serv.*

18   *Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003)); *see also Aracely, R. v.*

19   *Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) ("Despite Defendants' assertions

20   to the contrary, agency action need not be in writing to be judicially reviewable as a

21   final action.").

22

23        There are, of course, limitations on whether challenged agency action is

24   properly characterized as a policy, even if the policy is alleged to be unwritten.  A

25   plaintiff may not simply attach a policy label to disparate agency practices or

26   conduct.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 870, 890 (1990); *Bark v. U.S.*

27   *Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (concluding that although the

28   plaintiffs "have attached a [policy] label to their own amorphous description of the

[agency's] practices," "a final agency action requires more."); *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 326 (D.D.C. 2011) ("The question is not whether a constellation of disparate but equally suspect practices may be distilled from the varying experiences of the class; rather, Plaintiffs must first identify the 'policy or custom' they contend violates [the law] and then establish that the 'policy or custom' is common to the class.").

The parties dispute whether Plaintiffs have shown the existence of final agency action for their Section 706(2) claims. Insofar as Plaintiffs seek to state Section 706(2) claims for individual turnbacks, the Court has already advised Plaintiffs that individual turnbacks—which fundamentally concern alleged failures by CBP officers to discharge certain mandatory statutory duties—are appropriately considered under Section 706(1). *See Al Otro Lado, Inc*., 327 F. Supp. 3d at 1309 (citing *Rosario v. United States Citizenship & Immigration Servs.*, No. C15-0813JLR, 2017 WL 3034447, at *7 n.6 (W.D. Wash. July 18, 2017); *Leigh v. Salazar*, No. 3:13-cv-00006-MMD-VPC, 2014 WL 4700016, at *4 (D. Nev. Sept. 22, 2014) (construing a Section 706(2) claim regarding an agency's alleged failure to act as in fact a Section 706(1) claim)). This admonition applies equally to individual turnbacks that allegedly occurred because of the Turnback Policy. Thus, the Court limits its present analysis to whether the Turnback Policy and the alleged pattern or practice of illegal tactics by CBP officers constitute final agency action sufficient for Plaintiffs to state an APA claim.

### a.   Alleged Turnback Policy

In the wake of the Court's dismissal of Plaintiffs' previous Section 706(2) claims, Plaintiffs have revised their factual allegations and their Section 706(2) policy claim. Plaintiffs disavow a policy of categorical denials of access to the asylum system. (ECF No. 210 at 10–11.) Instead, Plaintiffs contend that

1   "Defendants, high-level agency officials, have adopted a policy mandating that CBP
2   officers at POEs drastically restrict the flow of asylum seekers at POEs along the
3   U.S.-Mexico border by turning them back to Mexico when they present themselves
4   for inspection, based on the false claims of 'capacity constraints.'"  (*Id.*)  Plaintiffs
5   have sufficiently alleged the existence of such a policy that constitutes a final agency
6   action.

7

8       Plaintiffs allege that the Turnback Policy originated in 2016, was formalized
9   in 2018 as a culmination of the agency's decision-making process, and is being
10  actively implemented along the border.  (SAC ¶¶ 48–83 (explaining the initiation
11  and development of the Turnback Policy, based on publicly available materials and
12  limited discovery from CBP).)   Plaintiffs point to various instances of U.S.
13  government officials' acknowledgement of a policy concerning the ability of
14  noncitizens to access asylum when they present themselves at the U.S-Mexico
15  border.  The SAC cites a DHS Office of Inspector General report indicating that
16  DHS has embraced a policy to limit access to the asylum process.  (SAC ¶¶ 70–71.)
17  The SAC identifies statements from President Trump, former U.S. Attorney General
18  Jeff   Sessions,   then-DHS   Secretary   Kirstjen   Nielsen,   then-Commissioner
19  McAleenan, and other CBP employees, all of which are plausibly read to show the
20  existence of the alleged Turnback Policy.  (SAC ¶¶ 60–66, 68–69, 71, 75.)  The SAC
21  otherwise contains extensive allegations of alleged turnbacks of asylum seekers by
22  CBP officers at POEs along U.S.-Mexico border based on assertions of lack of
23  capacity, all of which plausibly point to the existence of an unwritten policy.  (*See*
24  SAC ¶¶ 49, 75, 77–78, 83–201.)

25

26      Defendants' arguments that Plaintiffs fail to establish a final agency action
27  miss the mark.  For one, despite arguing that Plaintiffs have simply attached a
28  "policy" label to Defendants' alleged conduct, Defendants' briefing leaves the

1    distinct impression that Defendants concede the existence of a policy from which
2    Plaintiffs' alleged injuries flow.   Whereas Plaintiffs refer to this policy as the
3    "Turnback Policy," Defendants refer to the challenged conduct as one of "metering."
4    (ECF No. 192-1 at 11–15; ECF No. 238 at 9–12.)   Second, Defendants recycle an
5    argument that they raised in their first motion to dismiss Plaintiffs' Section 706(2)
6    claims.   Defendants argue once more that Plaintiffs have not plausibly alleged a
7    policy of categorical denials of asylum at POEs along the U.S-Mexico border.   (ECF
8    No. 192-1 at 16, 30.)   The Court previously dismissed Plaintiffs' Section 706(2)
9    claims on this basis.   But, as Plaintiffs expressly argue in opposition (ECF No. 210
10   at 10–11), they do not claim that the Turnback Policy is a policy to categorically
11   deny asylum seekers entry into the United States.   Instead, Plaintiffs allege this is a
12   policy aimed at deterring or limiting asylum seekers from seeking asylum in the
13   United States.   Defendants' argument therefore lacks force based on the current
14   pleadings.   Third, Defendants challenge Plaintiffs' reliance on statements by U.S.
15   government officials as premised on a "limited selection of Defendants' own
16   statements and communications[.]"   (ECF No. 192-1 at 16–17.)   Defendants'
17   argument is ostensibly based on the notion that there are other statements by U.S.
18   government officials that would defeat or undermine Plaintiffs' claims regarding the
19   Turnback Policy.   Such a merits challenge is inappropriate at this stage.
20   Accordingly, the Court concludes that Plaintiffs have adequately identified a final
21   agency action in the form of the Turnback Policy.

22
23               **b.    Alleged Pattern and Practice**

24        Defendants move to dismiss Plaintiffs' Section 706(2) claims insofar as the
25   claims concern the allegations that Defendants have "sanctioned" a practice and
26   pattern of denying access to the asylum procedure in the United States.   Defendants
27   contend that "alleged misrepresentations, threats, intimidation, verbal and physical
28   abuse, coercion, 'unreasonable delays,' and racially discriminatory denial of access"

are not final agency action because they "are not plausibly attributable to a DHS or CBP Policy." (ECF No. 238 at 8.) In previously dismissing Plaintiffs' Section 706(2) claims, the Court observed that allegations regarding this conduct could not state a Section 706(2) claim because Plaintiffs failed to connect the conduct to any "unwritten policy" of Defendants. *Al Otro Lado*, 327 F. Supp. 3d at 1319. The Court, however, does not find that this previous conclusion controls here. Plaintiffs expressly allege that the pattern and practice of unlawful tactics and the Turnback Policy "are designed" together to serve the Trump Administration's "broader goal" of deterring asylum seekers from accessing the asylum process and the allegations show both co-existing. (SAC ¶¶ 2, 4, 48, 51–60, 84–106.) Plaintiffs' allegations regarding a "sanctioned" pattern and practice of CBP officers using certain tactics to deny access to the asylum process dovetail with Plaintiffs' allegations that the Turnback Policy is based on false assertions of lack of capacity. Accordingly, the Court finds that Plaintiffs' allegations of an alleged pattern and practice are directly linked with the alleged Turnback Policy such that it is not proper to dismiss Plaintiffs' Section 706(2) claims as to the alleged pattern and practice.

## 2.    Asserted Unreviewable Agency Discretion

Defendants point to 8 U.S.C. § 1103(a)(1) and 6 U.S.C. § 202 as "especially authoriz[ing] CBP officers to keep the ports from being overwhelmed by an unsafe number of pedestrians at a given time," thus requiring dismissal of Plaintiffs' Section 706(2) claims. (ECF No. 192-1 at 13–14.) Defendants argue that the New Individual Plaintiffs "make no attempt . . . to square the breadth of Defendants' authority to meter under these statutes with the APA's prohibition on judicial review of agency action 'committed to agency discretion by law.'" (ECF No. 192-1 at 14 (quoting 5 U.S.C. § 701(a)(2)).) Because the APA precludes review of "agency action . . . committed to agency discretion by law," 5 U.S.C. § 701(a)(2), the Court must consider this argument before addressing the merits of Plaintiffs' claim that the

1  alleged Turnback Policy is unlawful.

2

3      Section 1103 establishes the powers and duties of the Secretary of Homeland

4  Security.   As a general matter, "[t]he Secretary of Homeland Security shall be

5  charged with the administration and enforcement of this chapter and all other laws

6  relating to the immigration and naturalization of aliens[.]"  8 U.S.C. § 1103(a)(1).

7  Defendants point to Section 1103(a)(3) in particular, which provides that the

8  Secretary "shall establish such regulations; prescribe such forms of bond, reports,

9  entries, and other papers; issue such instructions; and *perform such other acts as he*

10 *deems necessary for carrying out his authority under the provisions of this chapter*."

11 8 U.S.C. § 1103(a)(3) (emphasis added).  6 U.S.C. § 202 in turn provides, in relevant

12 part, that "[t]he Secretary shall be responsible for" "[s]ecuring the borders, territorial

13 waters, ports, terminals, waterways, and air, land, and sea transportation systems of

14 the United States, including managing and coordinating those functions transferred

15 to the Department [of Homeland Security] at ports of entry."  6 U.S.C. § 202(2).  "In

16 carrying out" this responsibility, the Secretary is responsible for "ensuring the

17 speedy, orderly, and efficient flow of lawful traffic and commerce."  6 U.S.C. §

18 202(8).  According to Defendants, Section 1103(a) and 202 are so broad, that they

19 do not offer any standard against which the challenged conduct may be evaluated

20 under the APA.  (ECF No. 192-1 at 14–15.)

21

22      "[A]t the outset, there is reason to be skeptical of [Defendants'] position[.]"

23 *Weyerhaeuser Co. v. United States Fish & Wildlife Serv*., 139 S. Ct. 361, 370 (2018)

24 (Roberts, C.J.).  There exists a "strong presumption that Congress intends judicial

25 review of administrative action."  *Bowen v. Mich. Acad. of Family Physicians*, 476

26 U.S. 667, 670 (1986); *see also Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1652–

27 53 (2015) ("[L]egal lapses and violations occur, and especially so when they have

28 no consequence.  That is why this Court has so long applied a strong presumption

favoring judicial review of administrative action."). "The presumption may be rebutted only if the relevant statute precludes review, 5 U.S.C. § 701(a)(1), or if the action is 'committed to agency discretion by law,' § 701(a)(2)." *Weyerhaeuser Co.*, 139 S. Ct. at 370. The exception in Section 701(a)(2) is read "quite narrowly, restricting to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see also Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 494 (9th Cir. 2018) (noting only "rare" agency actions fit this "narrow" committed-to-agency-discretion exception to judicial reviewability). Defendants have failed to show that judicial review is precluded under the relevant statutes.

Sections 1158 and 1225 cannot be nullified by general statutory provisions regarding the Secretary's authority unless Congress clearly intended so. *See BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 766 (9th Cir. 2018) ("[W]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987))). Congress has already determined how immigration officers are to "manage the flow" of arriving aliens who express to an immigration officer an intention to apply for asylum or a fear of persecution. Section 1225 imposes mandatory obligations to inspect all aliens who are applicants for admission or otherwise seeking admission and further imposes certain screening duties for asylum seekers. Notably, 8 U.S.C. § 1103(a)(1) expressly charges the Secretary with the enforcement of "all other laws relating to the immigration," which certainly includes the provisions at issue in this case.

In the face of these specific statutes, Defendants endeavor to argue that any

1   constraints on their authority under 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225 are
2   not at issue in this case and thus these statutory provisions do not bear on the
3   Secretary's asserted exercise of discretionary authority under 8 U.S.C. § 1103(a)(3)
4   and 6 U.S.C. § 202(2).  Defendants first contend that because the New Individual
5   Plaintiffs were not in the United States at the time of their alleged injuries, Plaintiffs'
6   argument that "Sections 1158 and 1225 limit the scope of the Secretary's authority
7   under 8 U.S.C. § 1103(a)(3) and 6 U.S.C. § 202" "has no force."  (ECF No. 238 at
8   9.)  Insofar as Defendants raise this argument against the Turnback Policy, this
9   argument fails because, at a minimum, Plaintiff Al Otro Lado—a domestic
10  Plaintiff—joins the Individual Plaintiffs in challenging Defendants' conduct.  The
11  argument otherwise fails because the Court has rejected Defendants' underlying
12  premise regarding the scope of Sections 1158 and 1225 in relation to the New
13  Individual Plaintiffs.

14

15        Defendants further argue that the interpretative canon that specific statutes
16  limit general statutes "does not apply here, because the processes mandated by
17  Section 1225 do not implicate the authority conferred by Sections 1103(a)(3) and
18  202." (ECF No. 238 at 10.)  This argument makes no sense.  There is no logical way
19  to treat the Secretary's asserted authority and charge to secure the border as mutually
20  exclusive from the procedures Section 1225 mandates.  Section 202(2) expressly
21  refers to "ports."  6 U.S.C. § 202(2).  Both Sections 1185(a)(1) and 1225 refer to
22  aliens who arrive in the United States, including at a "port of arrival."  Defendants
23  elsewhere argue that applications for admission must be made at ports of entry.  8
24  C.F.R. § 235.1(a) ("[a]pplication to lawfully enter the United States shall be made
25  in person to a U.S. immigration officer at a U.S. port-of-entry."); (ECF No. 192-1 at
26  9 (citing 8 C.F.R. § 235.1(a)).  Thus, the relevant INA provisions governing the
27  duties of immigration officers with respect to aliens who seek admission at POEs
28  plainly bear on how the Secretary may exercise whatever authority the Secretary has

to manage POEs.  Defendants conspicuously do not argue that these provisions do not provide a means to assess the legality of Defendants' conduct.

Accordingly, the Court rejects Defendants' argument that Plaintiffs' Section 706(2) claims are unreviewable on the asserted basis of discretion committed to the agency.  Whatever authority the Secretary may possess pursuant to the general grants of authority in Sections 1103(a)(1) and 202(2) over the "flow of traffic" across the border, Congress's general allowance for the Secretary to "perform such other acts as [she] deems necessary for carrying out" her authority to administer and enforce the INA, 8 U.S.C. § 1103(a)(3), cannot entail the authority to rewrite specific congressional mandates or to pretend that such mandates do not exist.  "The power of executing the laws . . . does not include a power to revise clear statutory terms that turn out not to work in practice," and it is thus a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014).

### 3.    The Unlawfulness of the Alleged Turnback Policy

The core of Plaintiffs' Section 706(2) claims is that the alleged Turnback Policy is "in excess of statutory jurisdiction, authority, or limitations" and "without observance of procedure required by law."  (SAC ¶¶ 271–72 (citing 5 U.S.C. § 706(2)(C), (D)).)  In particular, Plaintiffs claim that the alleged Turnback Policy contravenes the congressionally-established procedure set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225.

Plaintiffs offer two principal theories why the alleged policy violates the procedures that Congress established in these provisions.  First, Plaintiffs contend that Defendants' alleged conduct acting pursuant to the Turnback Policy is *ultra*

*vires* because it "ignore[s] the mandatory procedures to inspect and process asylum seekers that Congress has put in place." (ECF No. 210 at 17.)  Second, Plaintiffs contend that the alleged Turnback Policy is unlawful because it is "impermissibly aimed at deterrence" and "based on false claims of lack of capacity." (*Id.* at 20.)  Although Plaintiffs treat these theories as distinct bases to find the alleged Turnback Policy unlawful, (*id.* at 16–22), the Court finds that they cannot be disentangled from each other.  Construing them together, the Court concludes that Plaintiffs have sufficiently alleged that the Turnback Policy is unlawful.[11]

As an initial matter, Defendants resist application of 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225 to assess the legality of the alleged Turnback Policy. Defendants reiterate their argument that the challenged conduct is entirely lawful under 8 U.S.C. § 1103(a)(3) and 6 U.S.C. § 202 because 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225 have "no force as to the Extraterritorial Plaintiffs and the putative class members they seek to represent" who, according to Defendants, "do not allege that they were ever present in the United States." (ECF No. 238 at 9.)  These arguments falter at this juncture for reasons the Court has already discussed.  8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225 qualify the authority set forth in 8 U.S.C. § 1103(a)(3) and 6 U.S.C. § 202.

Next, relying on Sections 1103(a)(3) and 202(2), Defendants contend that there are valid reasons why CBP officers cannot unwaveringly adhere to the procedures set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225.  According to Defendants, "port management is a complex task[.]" (ECF No. 192-1 at 13.)

---

[11] Because the Court concludes that these theories are together sufficient for Plaintiffs to state Section 706(2) claims, the Court declines to address Plaintiffs' alternative and third argument that the alleged Turnback Policy is unlawful because it unreasonably delays the processing of asylum seekers. (ECF No. 210 at 22–23.)

Defendants contend that "CBP necessarily could not 'secure' or 'manage' a port if, in addition to its other mission responsibilities, *any* alien without appropriate travel documents could cross the border whenever she chooses and immediately trigger Defendants' statutory duties to 'inspect[],' 'refer,' or 'detain[]' her under section 1225." (*Id.* (emphasis in original).)  Defendants argue the Sections 1103(a)(3) and 202(2) authorize CBP officers "to permit an alien without appropriate travel documentation to cross the border *only if the port has the capacity to safely and humanely process her application for admission and hold her for further proceedings*," (ECF No. 192-1 at 13 (emphasis added)), and "especially authorize CBP officers to keep ports from being overwhelmed by an unsafe number of pedestrians entering at any time," (*id*).  Consistent with this view about their authority over "port management," Defendants urge the Court to conclude that the alleged conduct does not occur *ultra vires*, exceed the scope of their authority, or without observance of the procedure required by law.  (*Id*.)

The Court acknowledges that it is entirely possible that there may exist potentially legitimate factors that prevent CBP officers from immediately discharging the mandatory duties set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225.  Even Plaintiffs acknowledge as much.  (ECF No. 210 at 21.)  And the Court acknowledges that federal agencies and the individuals who lead them can face co-existing obligations that Congress has chosen to place on the agency, obligations that may at times be viewed as competing with each other and competing for the resources an agency has.

The problem with Defendants' reliance on Sections 1103(a)(3) and 202(2) is that Plaintiffs allege that the asserted concerns over capacity are merely a pretext to avoid discharging the duties set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225 and deter asylum seekers from seeking asylum in the United States.  Plaintiffs offer

numerous factual allegations on this point.  (SAC ¶¶ 4–6, 48, 61, 66, 72–73, 76–78, 109, 111, 274.)  And, contrary to Defendants' suggestion regarding complex port management, Plaintiffs contend that Defendants' Turnback Policy "screen[s] out asylum seekers from other applications for admission approaching POEs and send[s] them back to an uncertain fate in Mexico[.]"  (ECF No. 210 at 17.)  In other words, the purported exercise of authority under Sections 1103(a)(3) and 202(2) specifically targets asylum seekers—not any other aliens who may be crossing into the United States through POEs.

In the face of these allegations, Defendants challenge the sufficiency of Plaintiffs' deterrence allegations as a factual matter by largely relying on materials outside of the pleadings.  (ECF No. 192-1 at 15; ECF No. 238 at 10.)  Indeed, in their opening brief, Defendants argue that "[t]he record before the Court shows clearly that the Secretary and her designees have deemed it necessary to manage the flow of pedestrian traffic when port resources are strained."  (ECF No. 192-1 at 15 (citing Exs. 1–6).)  There is no "record" before the Court on a Rule 12(b)(6) motion, but rather the Court is limited to a review of the pleadings and any documents attached to them.  *United States v. Ritchie*, 342 F.3d 903, 907–09 (9th Cir. 2003).  Defendants' reliance on non-pleadings materials underscores that Defendants' arguments about the truthfulness of Plaintiffs' deterrence allegations are fundamentally merits arguments that the Court cannot resolve at this stage.[12]

Assuming the truth of Plaintiffs' deterrence allegations, the remaining issue is whether an alleged motive to deter asylum seekers from seeking asylum in the United States is unlawful.  Plaintiffs argue that it is.  Plaintiffs' fundamental

---

[12] For this reason, the Court also rejects Defendants' attempt to direct the Court to factual assertions made in a declaration filed in a different case.  (ECF No. 192-1 at 5, 13.)

contention is that "[t]he plain language and intent of the INA's asylum provision unambiguously preclude Defendants from adopting a policy or otherwise engaging in a practice of denying individuals access to the U.S. asylum process at POEs, even if Defendants prevent those asylum seekers from physically crossing the U.S.-Mexico border." (ECF No. 210 at 17.)  On this issue, Defendants argue that Plaintiffs offer nothing more than a "legal conclusion." (ECF No. 238 at 11.)  The Court, however, finds nothing conclusory about Plaintiffs' assertions of illegality.

Congress has enacted a scheme that mandates inspection of all aliens seeking admission to the United States and mandates referral to an asylum officer of asylum seekers who present themselves at a POE and indicate their intention to apply for asylum or a fear of persecution.  8 U.S.C. § 1225(a)(3); 8 U.S.C. § 1225(b)(1)(A)(i). Although this statutory scheme treats asylum seekers differently, it does so only in the sense that such aliens are to be promptly identified and their asylum claims are to be appropriately considered.  As Plaintiffs and *Amici* Immigration Law Professors observe (ECF No. 210 at 19; ECF No. 221-1 at 5–6), the "uniform asylum policy" driving the 1980 Refugee Act, an act which replaced the previous *ad hoc* refugee and asylum system, was "[a] fundamental belief that the granting of asylum is inherently a humanitarian act distinct from the normal operation and administration of the immigration process." Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 Fed. Reg. 30674-01, 30675 (July 27, 1990) (to be codified at 8 CFR Parts 3, 103, 208, 236, 242, and 253) (emphasis added); *see also E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *3 (observing that "[i]n 1980, Congress codified our obligation to receive persons who are 'unable or unwilling to return to' their home countries 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.' (quoting 8 U.S.C. §§ 1101(a)(42), 1158(b)(1))). Congress's intent to prescribe a uniform asylum procedure remains reflected in the

current asylum procedure.   8 U.S.C. § 1158; 8 U.S.C. § 1225; *see also E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *3.

Turning back prospective asylum applicants pursuant to an alleged executive policy that seeks to deter asylum seekers through false assertions of lack of capacity is plausibly inconsistent with and violative of the scheme Congress enacted.  This conclusion follows from a comparison of Section 1157 and Section 1158.  Although Defendants have elsewhere pointed to Section 1157 as a purported limitation on the extraterritorial scope of 8 U.S.C. § 1158(a)(1), Defendants overlook a key distinction between Sections 1157 and 1158 that cuts against the lawfulness of adopting a policy to deter asylum seekers.   Section 1157 expressly authorizes the President to set numerical limits for aliens who may be admitted as refugees into the United States on an annual basis.  8 U.S.C. § 1157(a)(2).  Neither Section 1158(a)(1), nor Section 1225(b), however, establishes numerical limits on the total number of aliens who may seek asylum pursuant to the asylum procedure these statutes establish.  *See* 8 U.S.C. § 1158; 8 U.S.C. § 1225.  Pretextual assertions of "lack of capacity" to turn away asylum seekers who seek access to a POE and express an intent to apply for asylum directly to a CBP officer suggest the existence of an unlawful *de facto* numerical limit on the number of asylum applicants that finds no support in Section 1158 or Section 1225.  The imposition of such a limit, through false assertions of lack of capacity, surely violates the scheme Congress enacted, particularly when contrasted with the separate scheme in Section 1157.  *See Util. Air Regulatory Grp.*, 573 U.S. at 327 ("The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration.  But it does not include a power to revise clear statutory terms that turn out not to work in practice.").

Defendants nevertheless question that even if "any alleged metering is

– 63 –

1   'motivated by deterrence,' such an aim would not be inappropriate."  (ECF No. 238

2   at 11–12 n.8.)  Most curiously, Defendants support this assertion by citing "Aliens

3   Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for

4   Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018)," a rule for which the Ninth

5   Circuit upheld a preliminary injunction barring its enforcement.  *See E. Bay*

6   *Sanctuary Covenant v. Trump*, No. 18-17274, —F.3d—, 2018 WL 8807133, at *19–

7   20 (9th Cir. Dec. 7, 2018), *stay denied by*, *Trump v. E. Bay Sanctuary Covenant*, 139

8   S. Ct. 782, 2018 WL 6713079 (U.S. Supreme Court Dec. 21, 2018).

9

10  In *East Bay Sanctuary Covenant*, the Ninth Circuit affirmed a preliminary

11  injunction barring implementation of a Rule promulgated by the Secretary of DHS

12  and the Attorney General.  The Rule provided that "[f]or applications filed after

13  November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a

14  presidential proclamation or other presidential order suspending or limiting the entry

15  of aliens along the southern border with Mexico that is issued pursuant to [§

16  1182(f)]." 83 Fed. Reg. 55,952 (to be codified at 8 C.F.R. § 208.13(c)(3) (DHS) and

17  8 C.F.R. § 1208.13(c)(3) (DOJ)).   The Rule coincided with a presidential

18  proclamation suspending the "entry of any alien into the United States across the

19  international boundary between the United States and Mexico," but exempting from

20  that suspension "any alien who enters the United States at a port of entry and properly

21  presents for inspection."  Addressing Mass Migration Through the Southern Border

22  of the United States, 83 Fed. Reg. 57,661, 57,663 (Nov. 9, 2018).

23

24  In relevant part, the *East Bay Sanctuary Covenant* majority found the Rule

25  likely to be unlawful under Section 706(2)(A) because the Rule "is inconsistent with

26  § 1158(a)(1)."  *E. Bay Sanctuary Covenant*, 2018 WL 8807133, at *18.  Although

27  the majority noted that "[r]ather than restricting who may apply for asylum, the rule

28  of decision facially conditions only who is eligible to receive asylum," the majority

1   found this to be a distinction without a difference. *Id.* The majority concluded that:

2   "the technical differences between applying for and eligibility for asylum are of no

3   consequence to a refugee when the bottom line—no possibility of asylum—is the

4   same." *Id.* The majority acknowledged that "[w]e are acutely aware of the crisis in

5   the enforcement of our immigration laws," but concluded that "the Attorney General

6   may not abandon [a congressional] scheme because he thinks it is not working well.

7   . . . but continued inaction by Congress is not a sufficient basis under our Constitution

8   for the Executive to rewrite our immigration laws." *Id.* at *20.

9

10      The key lesson of *East Bay Sanctuary Covenant* is that the Executive cannot

11  "amend the INA"—specifically Section 1158—through executive action to establish

12  a procedure at variance with the scheme Congress chose. *Id.* Much like the

13  challenged rule in *East Bay Sanctuary Covenant*, Defendants' alleged Turnback

14  Policy directly concerns the statutory scheme for asylum seekers that Congress has

15  established. The Turnback Policy directly concerns the Section 1225(b)(1) aspect

16  of this procedure for aliens seeking admission to the United States. As Plaintiffs

17  persuasively argue, there is no room for deterrence under the scheme Congress has

18  enacted. An alleged policy that is premised on and implements such a motive

19  contravenes the clear purpose, intent, and text of the statutory scheme that enables

20  aliens arriving at POEs, including those in the process of doing so, to apply for

21  asylum. Accordingly, the Court concludes that Plaintiffs have stated Section 706(2)

22  claims premised on the unlawfulness of the alleged Turnback Policy.

23

24  **III.    The New Individual Plaintiffs' Fifth Amendment Due Process Claims**

25      The Fifth Amendment's Due Process Clause provides that "[n]o person shall

26  . . . be deprived of life, liberty, or property, without due process of law." U.S. Const.

27  amend. V. The Individual Plaintiffs assert a protected Fifth Amendment due process

28  interest in the various provisions of the INA that allows aliens to seek asylum in the

United States.  (SAC ¶¶ 225–26, 283–93.)  Specifically, the Individual Plaintiffs allege that they possess "the right to be processed at a POE and granted meaningful access to the asylum process" under 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), and 8 C.F.R. § 235.3(b)(4).  Defendants' motion to dismiss presents two issues.  First, the Court must revisit the propriety of judicial review of Plaintiffs' constitutional claims independently of the APA.  Second, the Court must turn to the merits of Defendants' dismissal arguments, in which Defendants contend that the New Individual Plaintiffs seek to impermissibly apply the Constitution extraterritorially and, alternatively, the New Individual Plaintiffs were not denied any process that these Plaintiffs claim was due.  The Court addresses each issue in turn.

### A.   Non-APA Judicial Review of Constitutional Claims

In its prior dismissal order, the Court determined that "[w]hile a right to seek judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless explicitly excluded." *Al Otro Lado*, 327 F. Supp. 3d at 1316.  The parties dispute what the Court's prior ruling should mean for the INA and Fifth Amendment Due Process Clause claims that Plaintiffs raise independently of the APA.  Plaintiffs request that, to the extent the Court believes it resolved the issue of reviewability of these claims in its prior dismissal order, the Court should revise its previous order pursuant to Rule 54(b) to clarify that Plaintiffs' INA and Fifth Amendment due process claims may be reviewed even if Plaintiffs cannot state APA claims.  (ECF No. 210 at 26.)  Defendants argue that Plaintiffs "offer no reason to depart from the correct application of the APA to this case" and expressly argue that the Court "should also reject Plaintiffs' request to adjudicate their freestanding INA claims under the concept of 'nonstatutory review' instead of the APA."  (ECF No. 238 at 18.)

As an initial matter, the Court clarifies that its prior statement regarding the scope of judicial review flowed from the nature of the parties' prior dismissal briefing.  Defendants did not move to dismiss Plaintiffs' constitutional claims on the merits, but rather limited their merits briefing to the sufficiency of Plaintiffs' APA claims.  Plaintiffs in turn presented arguments regarding their APA claims, yet in doing so, relied on case law regarding liability under 42 U.S.C. § 1983.  Faced with this briefing, the Court's prior dismissal analysis necessarily turned on the APA's strictures.

The present motion to dismiss briefing alters the calculus.  The parties have briefed the merits of Plaintiffs' constitutional due process claims, implicitly assuming that the Court can and should review those claims independently of the APA's strictures.   Although Defendants argue that Plaintiffs cannot raise freestanding INA claims independently of the APA's strictures, Defendants conspicuously do not make a similar argument with respect to Plaintiffs' Fifth Amendment Due Process claims in their opening brief.  (*Compare* ECF No. 192-1 at 18–22 (dismissal arguments regarding Plaintiffs' due process claims) *and* ECF No. 238 at 15 *with* ECF No. 192-1 at 23 (arguing that "Extraterritorial Plaintiffs' INA claims must be evaluated under the APA, as the Court described, or not at all.").)[13]

---

[13] Defendants argue for the first time in their reply brief that even if the Plaintiffs state procedural due process claims, review of these claims must proceed under the APA.  (ECF No. 238 at 15.)  The apparent reason for this argument is the assumption that if Plaintiffs fail to state a claim in accordance with the APA's strictures (*i.e.*, final agency action, identification of discrete agency action for Section 706(1) claims, *etc.*), then this Court cannot address the merits of Plaintiffs' constitutional claims.  This argument underscores for the Court that non-APA review of Plaintiffs' constitutional claims is appropriate.

1    Guided by more recent precedent, the Court finds it necessary to clarify the
2    propriety of judicial review independently of the APA's strictures.  The Court's prior
3    dismissal order observed that, at times, courts have resolved only APA claims
4    concerning agency action, even when a plaintiff asserts constitutional claims
5    premised on statutory provisions that underlie the APA claims.  *See Graham v. Fed.*
6    *Emergency Mgmt. Agency*, 149 F.3d 997, 1001 n.2 (9th Cir. 1998) ("declin[ing] to
7    address the plaintiffs' Fifth Amendment claim and affirm[ing] the district court's
8    denial of this claim" because "plaintiffs' due process claim is premised on their
9    assertion that they 'have a statutory entitlement to the [individual and family grant]
10   disaster assistance program'" and thus "they may obtain all the relief they request
11   under the provisions of the APA."); *Al Otro Lado*, *Inc.*, 327 F. Supp. 3d at 1316
12   (relying on *Graham*).

14   Recently, the Ninth Circuit has made clear that although "the APA is the
15   general mechanism by which to challenge final agency action," "this does not mean
16   that the APA forecloses other causes of action."  *Sierra Club v. Trump*, 929 F.3d
17   670, 699 (9th Cir. 2019).  And relying on *Navajo Nation v. Department of the*
18   *Interior*, 876 F.3d 1144 (9th Cir. 2017)—a case that figured prominently in the
19   Court's prior determination that the APA waives the United States' sovereign
20   immunity for any claims for nonmonetary relief, whether asserted under the APA or
21   not—*Sierra Club* instructs that *Navajo Nation* as well as an earlier Ninth Circuit
22   decision "clearly contemplate that claims challenging agency actions—particularly
23   constitutional claims—may exist wholly apart from the APA.'"  *Sierra Club*, 929
24   F.3d at 699 (also relying on *Presbyterian Church v. United States*, 870 F.2d 518 (9th
25   Cir. 1989) for this proposition).  Thus, the Court concludes that review of the New
26   Individual Plaintiffs' constitutional claims, independently of their APA claims, is
27   appropriate.

28

1

### B. The New Individual Plaintiffs State Due Process Claims

2

The New Individual Plaintiffs' claims, like those of the other Individual

3 Plaintiffs, are fundamentally procedural due process claims. "The requirements of

4 procedural due process apply to the deprivation of interests encompassed by [the

5 Due Process Clause's] protection of liberty and property." *Bd. of Regents v. Roth*,

6 408 U.S. 564, 569 (1972). "To assert a procedural due process claim under the Fifth

7 Amendment, [a plaintiff] must first establish a constitutionally protected interest."

8 *Stanley v. Gonzales*, 476 F.3d 653, 660 (9th Cir. 2007); *Foss v. Nat'l Marine*

9 *Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998) (noting that "[t]he threshold

10 question" in a procedural due process claim is whether the plaintiff has a

11 constitutionally protectible interest). "[T]he plaintiff must have more than a

12 unilateral expectation of it; instead, she must have a legitimate claim of entitlement."

13 *Serra v. Lappin*, 600 F.3d 1191, 1196 (9th Cir. 2010). If the plaintiff shows the

14 existence of a constitutionally protected interest, the plaintiff must further establish

15 "a denial of adequate procedural protections." *Foss*, 161 F.3d at 588.

16

17

Defendants do not contest that if any New Individual Plaintiff sufficiently

18 alleges that he or she was in the United States, such a New Individual Plaintiff may

19 assert a Fifth Amendment Due Process Clause claim against Defendants' alleged

20 conduct. Indeed, "[i]t is well established that aliens legally within the United States

21 may challenge the constitutionality of federal and state actions." *Ibrahim v. Dep't*

22 *of Homeland Sec.*, 669 F.3d 983, 994 (9th Cir. 2012). Thus, to the extent any New

23 Individual Plaintiffs sufficiently plead that they were in the United States at the time

24 of their alleged injuries, Defendants' argument, by its own terms, does not apply.

25

26

With respect to the remaining New Individual Plaintiffs, Defendants raise two

27 arguments for why they fail to state Fifth Amendment Due Process Clause claims.

28 Defendants first argue that these New Individual Plaintiffs possess no protected

1   interests under the Due Process Clause in the INA statutory and regulatory

2   provisions in this case because "the Fifth Amendment does not apply to aliens

3   outside the United States[.]" (ECF No. 192-1 at 18.) Second, Defendants argue that

4   "[e]ven assuming *arguendo* that the Fifth Amendment applie[s] to [these] Plaintiffs

5   while they were outside the United States, they still fail to state a cognizable Fifth

6   Amendment claim." (*Id.* at 21.)

7

8                      **1.      The Fifth Amendment Applies**

9           Defendants' principal challenge to the New Individual Plaintiffs' Fifth

10  Amendment Due Process Clause claims is that "the Fifth Amendment does not apply

11  to aliens outside the United States, particularly where they do not allege they have

12  any previous voluntary connection to the United States." (ECF No. 192-1 at 18;

13  ECF No. 238 at 14–15.) Defendants' challenge raises a threshold issue about the

14  proper scope and application of the Constitution.

15

16          As an initial matter, the Court rejects Defendants' formalistic, territorial

17  argument that the Due Process "Clause's reference to 'person[s],' while broad, does

18  not include non-resident aliens outside the United States." (ECF No. 192-1 at 19

19  (citing *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)).) Defendants' reliance on

20  *Eisentrager* is understandable because there is language in the decision that places a

21  constitutional premium on territorial presence in the United States, suggesting that

22  such presence is the only basis for a noncitizen to receive constitutional protection

23  that a federal court in turn has the power to enforce. *See Eisentrager*, 339 U.S. at

24  771 ("[I]n extending constitutional protections beyond the citizenry, the Court has

25  been at pains to point out that it was the alien's presence within its territorial

26  jurisdiction that gave the Judiciary power to act."); *id.* at 777–78 ("[T]hese prisoners

27  at no relevant time were within any territory over which the United States is

28  sovereign, and the scenes of their offense, their capture, their trial and their

1   punishment were all beyond the territorial jurisdiction of any court of the United

2   States.").

3

4   The Supreme Court, however, squarely rejected bright-line rules regarding the

5   extraterritorial application of the Constitution in *Boumediene v. Bush*, 553 U.S. 723

6   (2008).  In *Boumediene*, the Supreme Court permitted alien plaintiffs who the U.S.

7   government had designated as enemy combatants and who were detained at the

8   United States Naval Station in Guantanamo, Cuba to seek habeas relief.  In doing so,

9   the Supreme Court rejected the government's proposed bright-line rule that the

10  plaintiffs were not entitled to seek habeas relief as aliens who had committed acts

11  outside the United States as a "formal sovereignty-based test."  *Id.* at 764.  The

12  Supreme Court stated that "questions of extraterritoriality turn on objective factors

13  and practical concerns, not formalism." *Id.*  To resolve such questions, the Supreme

14  Court directed the federal courts to examine the "'particular circumstances, the

15  practical necessities, and the possible alternatives which Congress had before it' and,

16  in particular, whether judicial enforcement of the provision would be 'impracticable

17  and anomalous.'"  *Id.* at 759 (quoting, *inter alia*, *Reid v. Covert*, 354 U.S. 1, 74–75

18  (1957) (Harlan, J., concurring)).

19

20  Defendants rely heavily on *United States v. Verdugo-Urquidez*, 494 U.S. 259

21  (1990), and *Ibrahim v. Department of Homeland Security*, 669 F.3d 983 (9th Cir.

22  2012), to argue that the New Individual Plaintiffs must nevertheless allege a "prior

23  significant voluntary connection" with the United States to receive protection under

24  the Fifth Amendment Due Process Clause.  The Court briefly discusses these cases

25  and then explains why they do not foreclose the New Individual Plaintiffs' claims.

26

27  In *Verdugo-Urquidez*, the Supreme Court addressed the question "whether the

28  Fourth Amendment applies to the search and seizure by United States agents of

property that is owned by a nonresident alien and located in a foreign country." 494 U.S. at 261.  The Court held that the "nonresident alien" plaintiff in that case had "no previous significant voluntary connection with the United States" and therefore had no right to assert a Fourth Amendment challenge to the searches and seizures of his property by United States agents in Mexico.  *Id.* at 271 (emphasis added).  In *Ibrahim*, the Ninth Circuit expressly relied on *Verdugo-Urquidez* to permit a Malaysian citizen who was precluded from entering the U.S., who had previously been in the U.S. for four years on a student visa and who alleged that she was mistakenly placed on a No-Fly List and other terrorist watchlists, to raise Fourth and Fifth Amendment claims against the federal government.  The Ninth Circuit expressly observed that "the border of the United States is not a clear line that separates aliens who may bring constitutional challenges from those who may not." *Ibrahim*, 669 F.3d at 995 (collecting cases including *Boumediene*).  The Ninth Circuit held that, "[u]nder *Boumediene* and *Verdugo*, we hold that Ibrahim has 'significant voluntary connection' with the United States.  She voluntarily established a connection to the United States during her four years at Stanford University while she pursued her Ph.D.  She voluntarily departed from the United States to present the results of her research at a Stanford-sponsored conference.  The purpose of her trip was to further, not to sever, her connection to the United States, and she intended her stay abroad to be brief." *Id.* at 997.  Defendants contend that because the New Individual Plaintiffs lack a "previous voluntary significant connection" with the United States, they have no protected due process interests.

The fundamental problem with Defendants' reliance on the "previous voluntary significant connection" test set forth in *Verdugo-Urquidez* and applied in *Ibrahim* is that the test does not constitute a ceiling on the application of the Constitution to aliens.  Plaintiffs direct this Court to the Ninth Circuit's recent decision in *Rodriguez v. Swartz*, 899 F.3d 719 (9th Cir. 2018), a case in which the

1   panel majority relied on *Boumediene* to conclude that an alien located outside the

2   United States could press a Fourth Amendment claim against a U.S. border officer

3   who, standing on the U.S. side of the border, allegedly shot and killed a Mexican

4   teenager located on the Mexican side of the border.   The *Rodriguez* majority

5   underscored that "[n]either citizenship nor voluntary submission to American law is

6   a prerequisite for constitutional rights[,]" rather, "citizenship is just one of several

7   non-dispositive factors to consider."   899 F.3d at 729.   The *Rodriguez* majority

8   determined that *Verdugo-Urquidez*'s "voluntary significant connection" test did not

9   apply in the circumstances of the case because "unlike the American agents in

10   *Verdugo-Urquidez*, who acted on Mexican soil, Swartz [the defendant U.S. border

11   officer] acted on American soil" and "[j]ust as Mexican law controls what people do

12   there, American law controls what people do here." *Id.* at 731 (brackets added).  The

13   *Rodriguez* majority underscored that "[t]he practical concerns in *Verdugo-Urquidez*

14   about regulating conduct on Mexican soil also do not apply here."   *Id.*

15

16      Defendants passingly refer to *Boumediene* only once in their opening brief

17   and do not acknowledge *Rodriguez*.   (ECF No. 192-1 at 19–20 (observing that

18   *Ibrahim* cites *Boumediene*); *id.* at 18–22 (full argument regarding extraterritorial

19   application without reference to *Rodriguez*.)  Faced with Plaintiffs' opposition brief,

20   Defendants attempt to limit the scope and application of *Boumediene* in this case.

21   Defendants first contend that "*Boumediene* is the only case extending a

22   constitutional right to 'noncitizens detained by our Government in territory over

23   which another country maintains *de jure* sovereignty.'" (ECF No. 238 at 13 (quoting

24   *Boumediene*, 553 U.S. at 770).)  Defendants then argue that "this Court must follow"

25   "pre-*Boumediene* law holding that the Due Process Clause does not extend to aliens

26   without property or presence in the sovereign territory of the United States[.]"  (*Id.*)

27

28      The Court rejects both of Defendants' arguments.   For one, *Rodriguez* alone

renders Defendants' first argument factually erroneous.  Defendants' erroneous argument appears to stem from Defendants' attempt to dismiss *Rodriguez* as irrelevant in a footnote.  (ECF No. 238 at 14 n.9 (stating that "[i]f any Ninth Circuit case applies here, it is *Ibrahim*, not *Rodriguez*.").)  The Court does not understand Defendants' dismissive argument.  *Rodriguez* is as much binding precedent on this Court as is *Ibrahim*.  And *Rodriguez*, applying *Boumediene*, indicates that *Verdugo-Urquidez*'s "previous voluntary significant connection" test—and, by extension, *Ibrahim*'s application of that test—do not alone control the question of constitutional protection for aliens, particularly when the challenged conduct concerns the conduct of U.S. officers acting on U.S. soil.  *Rodriguez*, 899 F.3d at 731.  Second, and more critically, Defendants' attempt to limit *Boumediene* simply ignores *Boumediene*'s analysis.  *Boumediene* expressly rejected a reading of *Eisentrager* that would establish a "formalistic, sovereignty-based test" and expressly narrowed *Eisentrager*'s reach, observing that "the United States lacked both *de jure* sovereignty and plenary control" over the area where the petitioner prisoners were located and "[n]othing in *Eisentrager* says that *de jure* sovereignty is or has ever been the only relevant consideration in determining the geographic reach of the Constitution or of habeas corpus."  *Boumediene*, 553 U.S. at 763–64.  Thus, both *Boumediene* and *Rodriguez* apply here.

Appropriately relying on both *Boumediene* and *Rodriguez*, Plaintiffs persuasively argue that there is nothing "'impracticable [or] anomalous' in applying elementary due process protection at the U.S. border."  (ECF No. 210 at 25.)  For one, as an objective matter, the New Individual Plaintiffs' allegations do not show conduct occurring wholly in foreign territory.  Defendants attempt to argue that "[t]he United States does not have *de jure* or *de facto* sovereignty over Mexican border towns[.]"  (ECF No. 238 at 14.)  Insofar as Plaintiffs' constitutional claims concern the Turnback Policy, allegedly formed by high-level federal officials,

Defendants' argument falters on its own terms because surely such a policy was not developed in Mexican border towns. (*See* SAC ¶ 287 (referring to Turnback Policy as violation procedural due process rights); *id.* ¶¶ 50–60.)  Insofar as the New Individual Plaintiffs' constitutional claims concern individual turnbacks, all New Individual Plaintiffs offer allegations regarding conduct of CBP officers who presumably were located on U.S. soil.

The allegations of the four New Individual Plaintiffs who were stopped in the middle of the international bridge between Mexico and the United States and denied access by the CBP officers on the U.S. side of the bridge also concerns conduct occurring on territory subject to U.S. sovereign authority. (SAC ¶¶ 29–31, 154, 162, 173–74.)  Defendants cite an 1886 U.S.-Mexico treaty, (ECF No. 238 at 14), which expressly provides that "[i]f any international bridge have been or shall be built across either of the rivers named, *the point on such bridge exactly over the middle of the main channel as herein determined shall be marked by a suitable monument, which shall denote the dividing line for all the purposes of such bridge*, notwithstanding any change in the channel which may thereafter supervene." Convention Between the United States of America and the United States of Mexico Touching the International Boundary Line Where It Follows the Bed of the Rio Grande and the Rio Colorado, U.S.-Mex., arts. I, IV, Nov. 12, 1884, 24 Stat. 1011, 1886 WL 15138, at *2.  New Individual Plaintiffs Roberto Doe, Maria Doe, and Juan and Úrsula Doe allege that they "sought access to the asylum process by presenting [themselves]" at the Hidalgo, Texas POE and Laredo, Texas POE and "encountered CBP officials in the middle of the bridge" between Mexico and the U.S. POE and "told them" they "wanted to seek asylum in the United States." (SAC ¶¶ 29–31, 154–55, 162, 174.)  Pursuant to the very treaty on which Defendants rely, these allegations plausibly show conduct by CBP officers occurring on the U.S. side of the international bridge subject to U.S. sovereignty.

Second, as Plaintiffs argue, "the practical necessities" also warrant application of the Due Process Clause in this case. (ECF No. 210 at 25–26.) The New Individual Plaintiffs' claims concern alleged denials of procedural due process by U.S. immigration officers upon whom Congress has placed certain statutory obligations, all in furtherance of the asylum protections Congress has also chosen to extend to certain "arriving aliens" that express an intent to apply for asylum or fear of persecution. And their claims concern adoption of an alleged policy that aims to impede access to the statutorily-mandated asylum procedure. The lesson of *Boumediene* is that the political branches do not enjoy the prerogative to "switch the Constitution on or off at will[.]" *Boumediene*, 553 U.S. at 765. Appropriately applying *Boumediene* and *Rodriguez*, the Court rejects Defendants' threshold argument that none of the New Individual Plaintiffs can even avail themselves of the Fifth Amendment in this case.

### 2. Plaintiffs Have Plausibly Alleged Denials of Procedural Due Process

For the reasons set forth in the Court's statutory analysis, the Court can swiftly reject Defendants' second dismissal argument. Defendants concede that "[w]here plaintiffs premise their procedural due process challenge on having a protected interest in a statutory entitlement, 'the protections of the Due Process Clause . . . extend only as far as the plaintiffs' statutory rights.'" (ECF No. 192-1 at 21 (quoting *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1001 & n.2 (9th Cir. 1998)).) This concession all but forecloses dismissal of the New Individual Plaintiffs' due process claims at this juncture. Congress has the power to prescribe the terms and conditions upon which aliens may come to this country. *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). "In the enforcement of [congressional] policies, the Executive Branch of the Government must respect the procedural safeguards of due process[.]" *Id.* at 767. Here, as the Court has discussed in its

construction of the relevant statutory provisions, Congress has plainly established procedural protections for aliens like the New Individual Plaintiffs in this case, who allege that they were in the process of arriving to the United States and expressed an intent to seek asylum.  The New Individual Plaintiffs have plausibly alleged that immigration officers failed to discharge their mandatory duties under the relevant provisions.  Consequently, the Court concludes that the New Individual Plaintiffs have stated procedural process claims and the Court denies Defendants' motion to dismiss these claims.

## IV.   ATS Claims

The ATS provides in full that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  All Individual Plaintiffs and Al Otro Lado seek to raise ATS claims for Defendants' alleged "violation of the non-*refoulement* doctrine."   (SAC ¶¶ 294–303.)   Plaintiffs specifically allege that:

> CBP officials have systematically denied, or unreasonably delayed, access to the asylum process by Class Plaintiffs, and the asylum seekers they represent, in violation of customary international law reflected in treaties which the United States has ratified and implemented: namely, the specific, universal and obligatory norm of non-*refoulement*, which has also achieved the status of a *jus cogens* norm, and which forbids a country from returning or expelling an individual to a country where he or she has a well-founded fear of persecution and/or torture . . .

(*Id.* ¶ 295.)  Plaintiffs contend that Defendants' alleged violations have caused them harm by forcing them to return to Mexico or other countries where they face threats of further persecution.  (*Id.* ¶ 296.)  Al Otro Lado also raises ATS claims for these alleged violations on the ground that its core mission is harmed through resource diversion.  (*Id.* ¶ 300.)

1    As a preliminary matter, Defendants argue that Plaintiffs' "non-*refoulement*
2  claims are [not] actionable as presented" based on the Court's prior ruling that
3  "Plaintiffs 'may not' seek judicial review of Defendants' conduct 'independently' of
4  the APA's judicial review framework." (ECF No. 192-1 at 23.) Defendants misstate
5  the Court's prior ruling, which did not speak to the Court's jurisdiction over
6  Plaintiffs' ATS claims.  The ATS is a "strictly jurisdictional statute" in its own right
7  that "creates no new causes of action."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713,
8  742 (2004); *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011) (noting the
9  ATS "has been interpreted as a jurisdiction statute only").  Thus, independently of
10 the APA, the relevant issue is whether Plaintiffs can state claims under the ATS over
11 which the Court has jurisdiction.

12

13 **A.    No Jurisdiction Exists for Al Otro Lado's ATS Claims**

14    Insofar as Defendants move to dismiss ATS claims that Organizational
15 Plaintiff Al Otro Lado raises, (ECF No. 192-1 at 28 (citing SAC ¶¶ 294–303)), the
16 Court finds that such claims must be dismissed for lack of subject matter jurisdiction
17 because"Al Otro Lado is corporation." (ECF No. 238 at 20.) Although the fact that
18 Al Lado Lado is a corporation does not preclude Al Otro Lado's assertion of APA
19 claims, its status as a corporation has jurisdictional consequences under the ATS.

20

21    Under its plain language, the ATS provides for federal jurisdiction only over
22 civil actions "by an alien." 28 U.S.C. §1350.  Thus, irrespective of the substantive
23 cause of action that underlies an asserted ATS claim, a federal court lacks
24 jurisdiction under the ATS over claims asserted by anyone or anything other than an
25 alien.  *See Serra v. Lappin*, 600 F.3d 1191, 1198 (9th Cir. 2010) ("The ATS admits
26 no cause of action by non-aliens."); *Yousuf v. Samantar*, 552 F.3d 371, 375 n.1 (4th
27 Cir. 2009) ("To the extent that any of the claims under the ATS are being asserted
28 by plaintiffs who are American citizens, federal subject-matter jurisdiction may be

17cv2366

1  lacking."); *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995) (same); *Sikhs for*

2  *Justice Inc. v. Indian Nat'l Cong. Party*, 17 F. Supp. 3d 334, 345 (S.D.N.Y. 2014)

3  ("[J]urisdiction is inapplicable because Plaintiff Sikhs is not an 'alien' under the

4  ATS[.]"); *S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 113 (D.D.C. 2012)

5  ("[T]he American corporate Plaintiffs, as non-aliens, lack standing to bring claims

6  under the ATS"); *Presbyterian Church of Sudan v. Talisman Energy, Inc*., 453 F.

7  Supp. 2d 633, 661 (S.D.N.Y. 2006) (concluding that an institutional plaintiff that is

8  a United States corporation "is not an alien and may not bring suit under the ATS."),

9  *aff'd*, 582 F.3d 244 (2d Cir. 2009).  Al Otro Lado is concededly not an alien.

10 Accordingly, the Court grants Defendants' motion to dismiss Organizational

11 Plaintiff Al Otro Lado's ATS claims lack of jurisdiction.

12

13       **B.**    **The Individual Plaintiffs' ATS Claims**

14      Defendants initially moved to dismiss the ATS claims of only the New

15 Individual Plaintiffs and Al Otro Lado.  (ECF No. 192-1 at 22–25.)  In reply,

16 Defendants extend the scope of their motion to dismiss Plaintiffs' ATS claims to

17 encompass the Original Individual Plaintiffs as well.  (ECF No. 238 at 16–18.)  To

18 resolve Defendants' present motion, the Court will not venture beyond Defendants'

19 actual arguments.  Reviewing these arguments, the Court finds that Defendants have

20 failed to show that the ATS claims must be dismissed at this juncture.

21

22       **1.**    **The Asserted Law of Nations Norm**

23      Defendants first argue that (1) the ATS "has no bearing in this case" because

24 Plaintiffs "have not brought a civil action for a tort[.]"  (ECF No. 192-1 at 25, ECF

25 No. 238 at 16–17.)  Defendants point to the ATS's use of the word "tort" and argue

26 that Plaintiffs have no ATS claim here because they have not sued for a "tort."  (ECF

27 No. 192-1 at 25, ECF No. 238 at 16–17.)  Defendants' argument misconstrues the

28 ATS.

By its terms, the ATS "enable[s] federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Sosa*, 542 U.S. at 712.  For this reason, it should not be disputed that "[t]he ATS 'grants jurisdiction over two types of claims: those for violations of a treaty of the United States, and those for violations of the law of nations.'" *Aragon v. Ku*, 277 F. Supp. 3d 1055, 1064 (D. Minn. 2017) (quoting 14A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3661.2 (4th ed., Apr. 2017 Update)); *see also Al-Tamimi*, 916 F.3d at 11 (recognizing that "[a]n ATS claim . . . incorporates the law of nations").  When a plaintiff seeks to plead an ATS claim based on an alleged violation of the law of nations, the plaintiff must identify an international norm that is "specific, universal, and obligatory." *Sosa*, 542 U.S. at 732.  As a general matter, "[c]ourts ascertain customary international law 'by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.'" *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714–15 (9th Cir. 1992) (quoting *United States v. Smith*, 18 U.S. 153, 160–61 (1820)).

Plaintiffs allege that the duty of non-*refoulement* is a *jus cogens* norm recognized by the law of nations.  (SAC ¶¶ 227–35.)[14]  And, in opposition to

---

[14] "As defined in the Vienna Convention on the Law of Treaties, a *jus cogens* norm, also known as a 'peremptory norm' of international law, 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'" *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679).  Courts determine whether a *jus cogens* norm exists by looking to the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law, but courts must make the additional determination "whether the international community recognizes the norm as one 'from which no derogation is permitted.'"

dismissal, Plaintiffs elaborate on these allegations under the applicable standard, locating the asserted *jus cogens* norm in (1) a range of fundamental international treaties, including Article 33 of the Convention on the Status of Refugees and its Protocol ("Refugee Convention"), Article 13 of the International Covenant on Civil and Political Rights ("ICCPR"), and Article 3 of the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment ("CAT"); (2) statements by international law bodies, including the Executive Committee of the United Nations High Commissioner for Refugees (UNHCR); and (3) international law commentators. (ECF No. 210 at 27–30.) Defendants simply fail to grapple with Plaintiffs' allegations or arguments on whether non-*refoulement* is a norm that is recognized by the law of nations.[15]

The only somewhat applicable argument Defendants raise is that "even if the Extraterritorial Plaintiffs had raised tort claims, Defendants' alleged conduct does

---

*Id.* (quoting *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 940 (D.C. Cir. 1988)).

[15] None of Defendants' dismissal arguments grapples with the Plaintiffs' fundamental contention that non-refoulement is a *jus cogens* norm whose violation is actionable. Defendants initially moved to dismiss the "non-*refoulement* claims" of the New Individual Plaintiffs allegedly in Mexico at the time of their alleged injuries on three grounds. First, Defendants argued that each of the treaties the SAC identifies is not independently enforceable and separately analyzed each treaty. (ECF No. 192-1 at 23–24.) Second, Defendants argued that the Refugee Act of 1980 does not provide Plaintiffs with any independent cause of action in this Court because the Act only allows claims to be adjudicated defensively before an immigration judge or affirmatively before USCIS. (*Id.* at 24.) These arguments elide the ATS claims that Plaintiffs have actually pleaded. Plaintiffs' opposition brief expressly observes that Defendants' opening brief fundamentally misconstrues Plaintiffs' ATS claims. (ECF No. 210 at 27.) And the SAC is fairly clear in alleging Plaintiffs' theory that the duty of non-*refoulement* is a *jus cogens* norm whose violation is actionable—not that each individual treaty cited in the SAC is a separate basis for Plaintiffs' ATS claims.

1    not come close to the type of egregious 'violations of the law of nations' even
2    potentially within the ATS's grant of jurisdiction."  (ECF No. 192-1 at 25 (citing
3    *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) as "allowing wrongful death
4    claim to proceed against Paraguayan police supervisor alleged to have 'deliberate[ly]
5    tortured' an individual in Paraguay 'under color of official authority'").  The inquiry
6    under the ATS, however, does not turn on subjective assertions about whether the
7    challenged  conduct  is  "egregious"  or  not.    The  Court  can  only  understand
8    Defendants' current briefing to concede, at this stage, the core contention underlying
9    Plaintiffs' ATS claims that there exists a recognized duty of non-*refoulement* that
10   qualifies as an international law norm under the law of nations.

11

12              **2.       The INA Does Not "Preempt" Plaintiffs' ATS Claims**

13         Defendants' second argument is that the existence of a "comprehensive and
14   exclusive scheme of legislation" under the INA "preempt[s] the enforcement of a
15   freestanding international law norm of non-*refoulement* in this Court."  (ECF No.
16   238 at 17–18.)  Curiously, Defendants raise this argument while arguing in the same
17   breath that the New Individual Plaintiffs fall outside the scope of the relevant INA
18   provisions in this case.  If this latter argument is to be credited, then there is no
19   comprehensive and exclusive scheme under which these Plaintiffs could seek relief
20   and Defendants' argument collapses.

21

22         In any event, the Court has already rejected Defendants' argument.  The Court
23   expressly stated in the prior dismissal order, "[t]o the extent that Defendants contend
24   that the ATS claims must be dismissed because a remedy is available under domestic
25   law, the Court rejects that argument.  'Contrary to defendants' argument, there is no
26   absolute  preclusion  of  international  law  claims  by  the  availability  of  domestic
27   remedies for the same alleged harm.'"  *Al Otro Lado, Inc*., 327 F. Supp. 3d at 1307
28   n.10 (quoting *Hawa Abdi Jama v. United States INS*, 22 F. Supp. 2d 353, 364 (D.N.J.

1998)).  Defendants' latest assertion of their prior argument under a "preemption" label overlooks *Jama*'s express recognition that "there is nothing in the [ATS] which limits its applications to situations where there is no relief available under domestic law" and *Jama*'s conclusion that "[t]here is no reason why plaintiffs cannot seek relief on alternative grounds."  *Jama*, 22 F. Supp. 2d at 364.  Defendants otherwise direct the Court to cases in which federal courts rejected an alien's attempt to rely on international law norms to seek immigration relief and, in doing so, stated that "[w]here a controlling executive or legislative act does exist, customary international law is inapplicable."  *Cortez-Gastelum v. Holder*, 526 Fed. App'x 747, 749 (9th Cir. 2013); *Galo-Garcia v. INS*, 86 F.3d 916, 918 (9th Cir. 1996).  Defendants' reliance on this caselaw underscores for the Court that, at a minimum, Plaintiffs may plead their ATS claims as alternative claims in the event that their INA-based claims fail.  *See* Fed. R. Civ. P. 8(a)(3) ("A pleading that states a claim for relief must contain . . . a demand for the relief sought, which may include relief in the alternative or different types of relief."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency.").  Thus, the Court rejects Defendants' "preemption" argument.

\*   \*   \*

Nevertheless, the Court observes that Plaintiffs do not cite a single case in which another federal court has recognized that the duty of non-*refoulement* is actionable through a federal court's ATS jurisdiction.  The paucity of such caselaw should at least give this Court pause on whether it is appropriate to recognize the particular ATS cause of action the Individual Plaintiffs raise in this case.  Having reviewed Defendants' present dismissal arguments, however, the Court cannot conclude that it lacks jurisdiction over the Individual Plaintiffs' ATS claims.  Because the ATS is a jurisdictional statute, Defendants are not foreclosed from challenging the Plaintiffs' ATS claims at a later stage.  *See* Fed. R. Civ. P. 12(h)(3)

(recognizing that subject matter jurisdiction can be assessed "at any time"); *see also Baloco v. Drummond Co.*, 767 F.3d 1229, 1234 (11th Cir. 2014) (affirming dismissal of ATS claims under Rule 12(b)(1)); *Best Med. Belg., Inc. v. Kingdom of Belg.*, 913 F. Supp. 2d 230, 236 (E.D. Va. 2012) ("The [ATS] is jurisdictional in nature and also subject to challenge by a Rule 12(b)(1) motion."); *In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1354 (S.D. Fla. 2011) (observing that "a complaint that fails to sufficiently plead the elements of an ATS claim is analyzed under Rule 12(b)(1)").

## CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion to dismiss the SAC. The Court **GRANTS** Defendants' motion as follows:

1.      The Court **DISMISSES WITHOUT LEAVE TO AMEND** the Section 706(1) claims of the New Individual Plaintiffs for alleged failures to take agency action required by 8 U.S.C. § 1225(b)(2)(A).

2.      The Court **DISMISSES WITH PREJUDICE** Organizational Plaintiff Al Otro Lado's ATS claim for lack of subject matter jurisdiction.

The Court otherwise **DENIES** Defendants' motion to dismiss the SAC. Defendants **SHALL ANSWER** the SAC **no later than August 16, 2019**. Given the length of time this case has been pending at the motion to dismiss stage, the Court will not grant extensions of the deadline.

The Court **WITHDRAWS** the previously docketed July 29, 2019 order (ECF No. 278) and **REPLACES** it with this Amended Order. Because the Amended Order is substantively the same, the Court does not alter any deadlines.

**IT IS SO ORDERED.**

**DATED:  August 2, 2019**

**Hon. Cynthia Bashant
United States District Judge**

17cv2366