JOSEPH H. HUNT
Assistant Attorney General
WILLIAM C. PEACHEY
Director
GISELA A. WESTWATER (NE 21801)
Assistant Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
SAIRAH G. SAEED (IL 6290644)
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorneys
United States Department of Justice, Civil Division
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | |
| v. | Hon. Cynthia A. Bashant |
| Kevin K. McALEENAN, Acting Secretary of Homeland Security; Mark A. MORGAN, Acting Commissioner, U.S. Customs and Border Protection; and Todd C. OWEN, Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection; in their official capacities, | **DEFENDANTS' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| *Defendants** | |

---

* Acting Secretary McAleenan and Acting Commissioner Morgan are automatically substituted for their predecessors in office pursuant to Federal Rule of Civil Procedure 25(d).

## DEFENDANTS' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendants hereby answer the allegations in Plaintiffs' Second Amended Complaint (ECF No. 189) ("SAC"). Defendants generally deny all allegations except those specifically admitted. Defendants' inclusion of the text, headings, and footnotes of Plaintiffs' allegations is done solely for the convenience of the Court and the parties and should not be understood as either an admission of or agreement with those allegations.

## I. INTRODUCTION

1.      Class Plaintiffs are noncitizens who have fled grave harm in their countries to seek protection in the United States. All of them sought to access the U.S. asylum process by presenting themselves at official ports of entry ("POEs," or individually, "POE") along the U.S.-Mexico border, but were denied such access by or at the instruction of U.S. Customs and Border Protection ("CBP") officials pursuant to a policy initiated by Defendants or practices effectively ratified by Defendants in contravention of U.S. and international law.

**Answer:** Defendants admit that the individual Plaintiffs in this action are not citizens of the United States. Defendants admit that the individual Plaintiffs seek to represent a class, but deny that any class has been certified in this action. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations that each individual Plaintiff fled grave harm in his or her country to seek protection in the United States. Defendants admit that some, but not all, individual Plaintiffs presented themselves within ports of entry along the U.S.-Mexico border, were found to be inadmissible, and asserted an intention to apply for asylum or a fear of persecution. Defendants deny that they have "denied" the individual Plaintiffs "access" to the asylum process. Defendants deny any remaining allegations in this paragraph.

2.      Since 2016 and continuing to this day, CBP has engaged in an unlawful,

widespread pattern and practice of denying asylum seekers access to the asylum process at POEs on the U.S.-Mexico border through a variety of illegal tactics. These tactics include lying; using threats, intimidation and coercion; employing verbal abuse and applying physical force; physically obstructing access to the POE building; imposing unreasonable delays before granting access to the asylum process; denying outright access to the asylum process; and denying access to the asylum process in a racially discriminatory manner. Since the presidential election, CBP officials have, for example, misinformed asylum seekers that they could not apply for asylum because "Donald Trump just signed new laws saying there is no asylum for anyone," coerced asylum seekers into signing forms abandoning their asylum claims by threatening to take their children away, threatened to deport asylum seekers back to their home countries (where they face persecution) if they persisted in their attempts to seek asylum, and even forcefully removed asylum seekers from POEs. In March 2018, four Guatemalan asylum seekers at an El Paso POE, were denied access to the asylum process after CBP officials told them that "Guatemalans make us sick." As recently as September 2018, CBP denied access to an asylum seeker who was four months pregnant and a victim of sexual violence. These practices all violate U.S. law, which requires that asylum seekers "shall" have access to the asylum process.

**Answer:** Defendants deny the allegations in the first sentence of this paragraph. With respect to the allegations in the second sentence of this paragraph, Defendants deny that CBP has sanctioned the use of lying, threats, intimidation, coercion, verbal abuse, outright denial of access to the asylum process, or denial of access to the asylum process in a racially discriminatory manner. Defendants admit that CBP officers are permitted to lawfully use physical force according to agency policy, but deny that they have sanctioned the use of physical force as part of an unlawful, widespread pattern and practice of denying asylum seekers access to the asylum process at ports of entry along the U.S.-Mexico border. Defendants admit

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

that they have used physical access controls at the border, but deny that such physical access controls are illegal or done for the purpose of denying anyone access to the asylum process. Defendants admit that CBP officers at ports of entry have at times instructed aliens without entry documents to wait in Mexican territory until the port has capacity to process them for admission, but deny that any delays are unreasonable or unlawful. With respect to the allegations in the third sentence of this paragraph, Defendants are aware of at least one occasion where CBP officers forcibly removed individuals from a port of entry without properly processing them, but state that such conduct is and was against agency policy; Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in the third sentence. Defendants deny the allegations in the fourth sentence of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the allegations in the fifth sentence of this paragraph. With respect to the allegations in the sixth sentence of this paragraph, Defendants admit that certain of this conduct runs afoul of CBP's statutory duty to process certain aliens' applications for admission, but deny that "all" such conduct violates U.S. law.

3.      In addition, beginning around 2016, high-level CBP officials, under the direction or with the knowledge or authorization of the named Defendants (the "Defendants"), adopted a formal policy to restrict access to the asylum process at POEs by mandating that lower-level officials directly or constructively turn back asylum seekers at the border (the "Turnback Policy") contrary to U.S. law. In accordance with the Turnback Policy, CBP officials have used and are continuing to use various methods to unlawfully deny asylum seekers access to the asylum process based on purported—but ultimately untrue—assertions that there is a lack of "capacity" to process them. These methods include coordinating with Mexican immigration authorities and other third parties to implement a "metering," or waitlist, system that

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

creates unreasonable and life-threatening delays in processing asylum seekers; instructing asylum seekers to wait on the bridge, in the pre-inspection area, or at a shelter until there is adequate space at the POE; or simply asserting to asylum seekers that they cannot be processed because the POE is "full" or "at capacity." On information and belief, the claims of a lack of capacity are false.

**Answer:** Defendants deny the allegations in the first sentence of this paragraph. With respect to the remaining allegations in this paragraph, Defendants admit that metering or queue management practices are implemented to ensure that a port has sufficient capacity to safely and securely process all travelers and to temporarily hold those found to be inadmissible. Defendants deny that CBP's assertions of a lack of capacity are untrue. Defendants admit that they have at times communicated with Mexican government officials or other third parties regarding the ports' capacities to process aliens without entry documents. Defendants deny any remaining allegations in this paragraph.

4.     Both Defendants' widespread practice of denying access to the asylum process and their formal Turnback Policy are designed to serve the Trump administration's broader, publicly proclaimed goal of deterring individuals from seeking access to the asylum process. Rather than changing existing law, the Administration is simply not following it. The Turnback Policy also reflects the Trump administration's significant antipathy to the fundamental humanitarian principles embodied in asylum laws, as well as to the Central and South American populations seeking access to the asylum process in the United States.

**Answer:** Defendants deny the allegations in this paragraph.

5.     In the spring of 2018, and in response to the anticipated arrival of a sizeable number of asylum seekers who had traveled together on the dangerous journey North in a so-called "caravan," high-level Trump administration officials publicly and unambiguously proclaimed the existence of their policy to intentionally

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

restrict access to the asylum process at POEs in violation of U.S. law. Attorney General Jefferson B. Sessions pledged that asylum seekers would not "stampede" our borders and announced a related "Zero Tolerance" policy to prosecute all who enter the country unlawfully, and thereby to separate them from their children (the very threat a number of Plaintiffs received when attempting to seek asylum). Around the same time, United States Department of Homeland Security ("DHS") Secretary Kirstjen Nielsen characterized the asylum process—mandated by U.S. statute and international law—as a legal "loophole" and publicly announced a "metering" process designed to restrict—and to constructively deny—access to the asylum process through unreasonable and dangerous delay.

**Answer:** Defendants deny the allegations in the first sentence of this paragraph. Defendants deny that former Attorney General Jeff Sessions' May 7, 2018 statement refers to Defendants' metering/queue management practices at ports of entry along the U.S.-Mexico border and aver that the statement speaks for itself. Defendants deny that former Secretary of Homeland Security Kirstjen Nielsen's May 15, 2018 statement reflects a "design[]" to restrict or deny access to the asylum process and aver that the statement speaks for itself. Defendants deny any remaining allegations in this paragraph.

6.    Indeed, President Trump offered a public, full-throated and racially discriminatory defense of his administration's aggressive implementation of the Turn-back Policy and the related, widespread CBP practice of denying access to the asylum process, by referring to asylum seekers as "criminals" and "animals" seeking to "infest" and "invade" the United States, and by specifically stating, via tweet, that the United States "must bring them back from where they came" and must "escort them back without going through years of legal maneuvering."

**Answer:** Defendants deny Plaintiffs' characterization of the President's cited statements and aver that those statements speak for themselves. Defendants deny

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

any remaining allegations in this paragraph.

7.     Soon afterward, CBP officials implemented the Turnback Policy through a tactic of asserting a "lack of capacity" to process asylum-seekers and by coordinating with Mexican officials to prevent or delay asylum seekers from reaching inspection points at POEs, even as CBP officials knew or should have known of the dangerous conditions of rampant crime and violence by gangs and cartels on the Mexican side of the border. The unreasonable delays imposed on asylum seekers—which are done pursuant to the Trump administration's broader goal of deterring future asylum seekers from presenting at the border at all—also amount to a constructive denial of access to the asylum process.

**Answer:** Defendants deny that CBP has implemented a "Turnback Policy," and aver instead that CBP has issued guidance permitting ports of entry along the U.S.-Mexico border to implement metering procedures based on their operational capacities when necessary or appropriate to facilitating orderly processing and maintaining the security of the port and safe and sanitary conditions for the traveling public. *See* Ex. 1, Memorandum from Todd C. Owen, Executive Assistant Commissioner, Office of Field Operations, to the Directors of Field Operations for El Paso, Laredo, San Diego, and Tucson (Apr. 27, 2018) ("Owen Memo"). Defendants deny any remaining allegations in this paragraph.

8.     As detailed more fully below, the Turnback Policy comes from high-level U.S. government officials and is having the intended effect of severely restricting—and constructively denying—access to the asylum process at POEs. Indeed, an October 2018 report by DHS's Office of Inspector General ("OIG") concluded that CBP has been "regulating the flow of asylum-seekers at ports of entry," and that by limiting the volume of asylum seekers entering at POEs, the government has prompted some individuals "who would otherwise seek legal entry into the United

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

States to cross the border illegally."[1]

**Answer:** Defendants deny the allegations in the first sentence of this paragraph. Defendants deny that Plaintiffs' characterization of the cited OIG Report is accurate and aver that the Report speaks for itself. Defendants deny any remaining allegations in this paragraph.

9.     Many desperate asylum seekers, faced with the consequences of the Turnback Policy and unlawful CBP practices, have felt compelled to enter the United States outside of POEs, often by swimming across the Rio Grande or paying smugglers exorbitant sums to transport them, to reach safety as quickly as possible.

**Answer:** Defendants deny that they have implemented a "Turnback Policy" or have sanctioned unlawful practices. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

10.     On information and belief, CBP's conduct pursuant to the Turnback Policy and other unlawful practices were and continue to be performed at the instigation, under the control or authority of, or with the direction, knowledge, consent or acquiescence of Defendants. By refusing to follow the law, Defendants have caused, and will continue to cause, Class Plaintiffs and Al Otro Lado concrete and demonstrable injuries and irreparable harm.

**Answer:** With respect to the allegations in the first sentence of this paragraph, Defendants deny that they have implemented a "Turnback Policy" or that CBP has sanctioned the use of unlawful practices. Defendants admit that they are aware of the ports' metering/queue management practices, but deny that such practices are

---

[1] U.S. Dep't of Homeland Sec., Office of the Inspector Gen., OIG-18-84, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 5–6 (2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf [hereinafter *OIG Report*].

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

unlawful. With respect to the allegations in the second sentence of this paragraph, Defendants deny that they are "refusing to follow the law." Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations that Defendants have caused the individual Plaintiffs and Al Otro Lado any injuries or harm.

11.     Each of the Class Plaintiffs has been subject to Defendants' pattern and practice of denying access to the asylum process and/or to the Turnback Policy.

**Answer:** Defendants deny that they have implemented a "Turnback Policy" or a "pattern and practice of denying access to the asylum process" and therefore deny the allegations in this paragraph.

12.     Defendants have deprived Class Plaintiffs and similarly situated individuals of their statutory and international-law rights to apply for asylum, violated their due process rights under the Fifth Amendment to the United States Constitution, and violated the United States' obligations under international law to uphold the principle of non-refoulement. Defendants' Turnback Policy and other unlawful practices also constitute unlawful agency action that should be set aside and enjoined pursuant to the Administrative Procedure Act, 5 U.S.C. § 706. Each Class Plaintiff has attempted to access the asylum process and would seek to do so again, but for Defendants' systematic, illegal Turnback Policy and other unlawful practices at issue in this action, which have impeded their access.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

13.     Defendants have caused injury to Plaintiff Al Otro Lado by frustrating its ability to advance and maintain its central institutional mission and forcing the organization to divert substantial portions of its limited time and resources away

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

from its various programs in Los Angeles, California, and Tijuana, Mexico, to counteract the effects of the Turnback Policy and Defendants' other unlawful practices.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

14.    Despite persistent advocacy by Al Otro Lado and other advocates, and despite Class Plaintiffs' desperate need and right to seek asylum without delay in the United States, CBP shows no signs of abating its illegal policy and practices. Accordingly, Al Otro Lado and Class Plaintiffs require the intervention of this Court to declare that Defendants' conduct violates U.S. and international law, to enjoin Defendants from continuing to violate the law, and to order Defendants to implement procedures to ensure effective compliance with the law, including, without limitation, oversight and accountability in the inspection and processing of asylum seekers. Absent the Court's intervention, CBP's unlawful conduct will continue to imperil the lives and safety of countless vulnerable asylum seekers.

**Answer:** Defendants deny the allegations in this paragraph.

## II. JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1350. Defendants have waived sovereign immunity for purposes of this suit pursuant to 5 U.S.C. § 702. The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

16.    Venue is proper in this district under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred at or in the vicinity of the San Ysidro POE. All Defendants are sued in their official capacity.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit that all Defendants are sued in their official capacities. Defendants deny the remaining allegations in this paragraph.

### III. PARTIES

**A.   Plaintiffs**

17.    Plaintiff Al Otro Lado is a non-profit, non-partisan organization incorporated in California and established in 2014. Al Otro Lado is a legal services organization serving indigent deportees, migrants, refugees and their families, principally in Los Angeles, California, and Tijuana, Mexico. Al Otro Lado's mission is to coordinate and to provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings, to seek redress for civil rights violations, and to provide assistance with other legal and social service needs. Defendants have frustrated Al Otro Lado's mission and have forced Al Otro Lado to divert significant resources away from its other programs to counteract CBP's illegal practice of turning back asylum seekers at POEs.

**Answer:** Defendants admit that Al Otro Lado, Inc., is a non-profit corporation incorporated in California in 2014. Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

18.    Through its Border Rights Project in Tijuana, Mexico, Al Otro Lado assists individuals seeking protection from persecution in the United States. In response to CBP's unlawful policy and practices, Al Otro Lado has had to expend significant organizational time and resources and alter entirely its previously used large-scale clinic model. For example, Al Otro Lado previously held large-scale, mass-advisal legal clinics in Tijuana that provided a general overview on asylum

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

laws and procedures. This type of assistance (similar to the Legal Orientation Program of the Executive Office for Immigration Review) only was workable when CBP allowed asylum seekers into the United States in accordance with the law.

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

19.     Since 2016, however, CBP's illegal conduct has compelled Al Otro Lado to expend significant time and resources to send representatives to Tijuana from Los Angeles multiple times per month for extended periods to provide more individualized assistance and coordination of legal and social services, including individual screenings and in-depth trainings to educate volunteer attorneys and asylum seekers regarding CBP's unlawful policy and practices and potential strategies to pursue asylum in the face of CBP's tactics. Whereas Al Otro Lado previously was able to accommodate several dozen attorneys and over 100 clients at a time in its large-scale clinics, Al Otro Lado has been forced to transition to an individualized representation model where attorneys are required to work with asylum seekers one-on-one and provide direct representation. Al Otro Lado has expended (and continues to expend) significantly more resources recruiting, training and mentoring pro bono attorneys to help counteract CBP's unlawful policy and practices. Nevertheless, even asylum seekers provided with such individualized pro bono representation are being turned back by CBP in violation of the law.

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

20.     Al Otro Lado also has spent time and resources advocating that CBP provide asylum seekers with access to the asylum process and cease using unlawful tactics to circumvent its legal obligations. For example, Al Otro Lado representatives have filed numerous complaints with the U.S. government detailing examples of

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

CBP's unlawful policy and practices depriving asylum seekers of access to the asylum process.

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of this paragraph. With respect to the allegations in the second sentence of this paragraph, Defendants admit only that at least one individual associated with Al Otro Lado has filed complaints with DHS relating to CBP officers' alleged actions at land ports of entry along the U.S.-Mexico border.

21.     Such diversion of Al Otro Lado's time and resources negatively impacts its other programs. For example, Al Otro Lado has not been able to pursue funding for or otherwise advance the following programs: (1) its Deportee Reintegration Program through which Al Otro Lado assists deportees who struggle to survive in Tijuana, many of whom have no Mexican identity documents or health coverage, and may not even speak Spanish; and (2) its Cross-Border Family Support Program through which Al Otro Lado assists families with cross-border custody issues, and helps connect family members residing in the United States to social, legal, medical and mental health services. Al Otro Lado has all but ceased its programmatic work with deportees and families separated by deportation due to the diversion of resources caused by CBP's unlawful actions.

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

22.     In addition, the constraints on Al Otro Lado's limited time and resources have negatively impacted its operations in Los Angeles, including delaying the opening and expansion of its Los Angeles office through which it coordinates "Wraparound" services for low-income immigrants in Los Angeles. The increased need for on-the-ground support in Tijuana has impacted Al Otro Lado's ability to satisfy its clinical obligations for low-income immigrants at the Wellness Center,

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

located on the grounds of the Los Angeles County+USC Medical Center, and to conduct outreach to provide free legal assistance to homeless individuals in Los Angeles to allow them to better access permanent supportive housing, employment and educational opportunities.

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

23.    Al Otro Lado continues to be harmed by Defendants because CBP's illegal conduct at or in the vicinity of the border frustrates its organizational mission and forces Al Otro Lado to divert resources from its other objectives. If Al Otro Lado had not been compelled to divert resources to address CBP's unlawful conduct at the U.S.-Mexico border, it would have directed these resources toward its other programs to further the advancement of its core mission.

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

24.    Plaintiff Abigail Doe is a female native and citizen of Mexico. She is the mother of two children under the age of ten.[2] Abigail and her family have been targeted and threatened with death or severe harm in Mexico by a large drug cartel that had previously targeted her husband, leaving her certain she would not be protected by local officials. Abigail fled with her two children to Tijuana, where they presented themselves at the San Ysidro POE. On behalf of herself and her children, Abigail expressed her fear of returning to Mexico and her desire to seek asylum in the United States. CBP officials coerced Abigail into recanting her fear and signing a form withdrawing her application for admission to the United States. As a result of this coercion, the form falsely states that Abigail does not have a credible fear of returning to Mexico. As a result of Defendants' conduct, Abigail and her children

---

[2] The ages listed for children of Abigail Doe, Beatrice Doe, Carolina Doe, and Dinora Doe are as they were at the time the initial Complaint was filed.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

were unable to access the asylum process and were forced to return to Tijuana, where at the time the initial Complaint was filed, they remained in fear for their lives. Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Abigail and her children into the United States.

**Answer:** Defendants admit the allegations in the first, second, and last sentences of this paragraph. With respect to the third through seventh sentences of this paragraph, Defendants admit that CBP officers encountered Abigail and her children inside the San Ysidro port of entry on May 24, 2017. Defendants aver that Abigail did not have entry documents and that she told CBP officers that she wanted to go live with family in San Clemente, California. Defendants admit that Abigail signed a Form I-275, Withdrawal of Application for Admission/Consular Notification, on May 24, 2017, which has the legal effect of withdrawing her application for admission. Defendants deny that they coerced Abigail into signing this document. Defendants admit that the Form I-275 is written in English, but aver that Abigail's processing was conducted in Spanish. Defendants deny all remaining allegations in this paragraph.

25.    Plaintiff Beatrice Doe is a female native and citizen of Mexico. She is the mother of three children under the age of sixteen. Beatrice and her family have been targeted and threatened with death or severe harm in Mexico by a dangerous drug cartel; she was also subject to severe domestic violence. Beatrice fled with her children and her nephew to Tijuana, where they presented themselves once at the Otay Mesa POE and twice at the San Ysidro POE. On behalf of herself and her children, Beatrice expressed her fear of returning to Mexico and her desire to seek asylum in the United States. CBP officials coerced Beatrice into recanting her fear and signing a form withdrawing her application for admission to the United States. As a result of this coercion, the form falsely states that Beatrice and her children have no fear of returning to Mexico. As a result of Defendants' conduct, Beatrice

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

and her children were unable to access the asylum process and were forced to return to Tijuana, where at the time the initial Complaint was filed, they remained in fear for their lives. While she was sheltered in Tijuana, her abusive spouse located her and coerced her and her children to return home with him.

**Answer:** Defendants admit the allegations in the first two sentences of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of this paragraph. With respect to the fourth through eighth sentences of this paragraph, Defendants admit that CBP officers encountered Beatrice and her children inside the San Ysidro port of entry on May 25, 2017. Defendants aver that Beatrice did not have entry documents, and that she stated that she wanted a work permit to enter the United States and live in San Diego. Defendants aver that Beatrice expressed no fear of returning to Mexico and requested to voluntarily return to Mexico, which CBP permitted. Defendants aver that Beatrice's processing was conducted in Spanish. Defendants deny that they coerced Beatrice into withdrawing her application for admission. Defendants deny the remaining allegations in this paragraph.

26.     Plaintiff Carolina Doe is a female native and citizen of Mexico. She is the mother of three children. Carolina's brother-in-law was kidnapped and dismembered by a dangerous drug cartel in Mexico, and after the murder, her family also was targeted and threatened with death or severe harm. Carolina fled with her children to Tijuana, where they presented themselves at the San Ysidro, POE. On behalf of herself and her children, Carolina expressed her fear of returning to Mexico and her desire to seek asylum in the United States. CBP officials coerced Carolina into recanting her fear on video and signing a form withdrawing her application for admission to the United States. As a result of this coercion, the form falsely states that Carolina and her children have no fear of returning to Mexico. As a result of De-

fendants' conduct, Carolina and her children were unable to access the asylum process and were forced to return to Tijuana, where at the time the initial Complaint was filed, they remained in fear for their lives. Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Carolina and her children into the United States.

**Answer:** Defendants admit the allegations in the first two sentences and the last sentence of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of this paragraph. With respect to the fourth through eighth sentences of this paragraph, Defendants admit that CBP officers encountered Carolina and her children inside the San Ysidro port of entry on May 17, 2017. Defendants aver that Carolina did not have entry documents, and that she stated that she was coming from Guerrero, Mexico, and wanted to live in the Portland, Oregon area with family. Defendants admit that Carolina signed a Form I-275, Withdrawal of Application for Admission/Consular Notification, on May 18, 2017, which has the legal effect of withdrawing her application for admission. Defendants admit that the Form I-275 is written in English, but aver that Carolina's processing was conducted in Spanish. Defendants deny that they coerced Carolina into withdrawing her application for admission. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

27.     Plaintiff Dinora Doe is a female native and citizen of Honduras. Dinora and her eighteen-year-old daughter have been targeted, threatened with death or severe harm, and repeatedly raped by MS-13 gang members. Dinora fled with her daughter to Tijuana, where they presented themselves at the Otay Mesa, POE on three occasions. Dinora expressed her fear of returning to Honduras and her desire to seek asylum in the United States. CBP officials misinformed Dinora about her rights under U.S. law and denied her the opportunity to access the asylum process.

As a result of Defendants' conduct, Dinora and her daughter were forced to return to Tijuana, where at the time the initial Complaint was filed, they remained in fear for their lives. Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Dinora and her daughter into the United States.

**Answer:** Defendants admit the allegations in the first and last sentences of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

28.    Plaintiff Ingrid Doe is a female native and citizen of Honduras. At the time the initial Complaint was filed, she had two children and was pregnant with her third child. Ingrid's mother and three siblings were murdered by 18th Street gang members in Honduras. After the murders, 18th Street gang members threatened to kill Ingrid. Ingrid and her children were also subject to severe domestic violence. Ingrid fled with her children to Tijuana, where they presented themselves at the Otay Mesa POE and at the San Ysidro POE. On behalf of herself and her children, Ingrid expressed her fear of returning to Honduras and her desire to seek asylum in the United States. CBP officials misinformed Ingrid about her rights under U.S. law and denied her the opportunity to access the asylum process. As a result of Defendants' conduct, Ingrid and her children were forced to return to Tijuana, where at the time the initial Complaint was filed, they remained in fear for their lives. Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Ingrid and her children into the United States.

**Answer:** Defendants admit the allegations in the first two sentences and the last sentence of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

29.    Plaintiff Roberto Doe is a male native and citizen of Nicaragua. Fearing for his life and the lives of his family members, Roberto fled Nicaragua due to threats

17

of violence from the Nicaraguan government and paramilitaries allied with the government. Roberto sought access to the asylum process by presenting himself at the Hidalgo, Texas POE. When he encountered CBP officials in the middle of the bridge, he told them that he wanted to seek asylum in the United States. CBP officials denied Roberto access to the asylum process by telling him the POE was full and that he could not enter. Mexican officials then escorted Roberto back to Mexico. At the time of the filing of the First Amended Complaint, Roberto desired to return immediately to the Hidalgo POE to seek asylum, but based on his experiences and the experiences of others with CBP's practices at the U.S.-Mexico border, he understood that he would likely be turned away again. After the filing of the First Amended Complaint, Roberto did return to the Hidalgo POE, where Mexican officials detained him as he was walking onto the international bridge to seek access to the asylum process in the United States. Roberto remains in the custody of the Mexican government. On information and belief, his refoulement to Nicaragua is imminent. He can no longer remain in Mexico and has no place else to turn for safety but the United States.

**Answer:** Defendants admit the allegations in the first sentence of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**30.**     Plaintiff Maria Doe is a female native and citizen of Guatemala and a permanent resident of Mexico. She was married to a Mexican citizen, with whom she has two children who were both born in Mexico. Since Maria left her husband, who was abusive and is involved with cartels, two different cartels have been tracking and threatening her. Maria and her children fled and sought access to the asylum process by presenting themselves at the Laredo, Texas POE. When Maria encountered CBP officials in the middle of the bridge, she told them that she and her children wanted to seek asylum in the United States. CBP officials told them to wait on

the Mexican side of the bridge. There, two Mexican officials told Maria that U.S. officials would not let her and her children cross the bridge, but that they could help her if she paid a bribe. Having no money to pay the bribe, Maria traveled with her children to Reynosa, Mexico. There, accompanied by an American lawyer, they sought access to the asylum process by presenting themselves at the Hidalgo POE. On the Mexican side of the bridge leading to the Hidalgo POE, a Mexican official threatened to destroy Maria's identity documents if she and her children did not leave the bridge. Two weeks later, Maria and her children, accompanied by the same American lawyer, again sought access to the asylum process by presenting themselves at the Hidalgo POE. When Maria encountered CBP agents at the middle of the bridge, she told them that she and her children wanted to seek asylum in the United States. Mexican officials then forced Maria and her children off the bridge. Although Maria and her lawyer repeatedly told CBP officials that she and her children wanted to seek asylum in the United States, the CBP officials denied Maria and her children access to the asylum process. At the time the First Amended Complaint was filed, Maria and her children desired to return immediately to a POE to seek asylum, but based on their experience and the experiences of others with CBP's practices at the U.S.-Mexico border, she understood that they would likely be turned away again. Maria and her children remained in Mexico, where their lives were in danger. They could no longer remain in Mexico and had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Maria and her children into the United States.

**Answer:** Defendants admit that Maria is a native and citizen of Guatemala and that she is the mother of two minor children who were born in Mexico. Defendants admit the allegations in the last sentence of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**31.**     Plaintiff Juan Doe is a male native and citizen of Honduras. Plaintiff Úrsula Doe is a female native and citizen of Honduras. Juan and Úrsula are husband and wife and together have two children, twin thirteen-year-old boys. They fled Honduras with their sons after receiving death threats from gangs. Juan, Úrsula, and their children sought access to the asylum process by presenting themselves at the Laredo POE. When Juan, Úrsula, and their children reached the middle of the bridge to the POE, CBP officials denied them access to the asylum process by telling them the POE was closed and that they could not enter. Juan, Úrsula, and their children subsequently tried to seek access to the asylum process by presenting themselves at the Hidalgo POE, but Mexican officials stopped them just as they were entering the pedestrian walkway on the Reynosa bridge and threatened to deport them to Honduras if they did not leave. At the time the First Amended Complaint was filed, Juan, Úrsula, and their children desired to return immediately to the Hidalgo POE to seek asylum, but based on their experience and the experiences of others with CBP's practices at the U.S.-Mexico border, they understood that they would likely be turned away again. At that time, Juan, Úrsula, and their children resided in Reynosa, Mexico, where they remained in fear for their lives. They could no longer remain in Mexico and had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Juan, Úrsula, and their children into the United States.

**Answer:** Defendants admit the allegations in the first three sentences and the last sentence of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**32.**     Plaintiff Victoria Doe is a sixteen-year old female native and citizen of Honduras. Victoria has been threatened with severe harm and death by members of the 18th Street gang for refusing to become the girlfriend of one of the gang's leaders. Fearing for her life, Victoria fled to Mexico where she gave birth to her son.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

Victoria and her son sought access to the asylum process by presenting themselves at the San Ysidro POE. When Victoria expressed her desire to seek asylum in the United States, CBP officers denied her access to the asylum process by stating that she could not apply for asylum at that time and telling her to speak to a Mexican official without providing any additional information. At the time the First Amended Complaint was filed, Victoria desired to return immediately to the San Ysidro POE to seek asylum on behalf of herself and her son, but based on her experience and the experience of others with CBP's practices at the U.S.-Mexico border, she understood that she would likely be turned away again. At that time, Victoria and her son were residing in a shelter in Tijuana, but could no longer remain in Mexico because of threats from gangs who continued to target them in Mexico. They had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Victoria and her child into the United States.

**Answer:** Defendants admit the allegations in the first and last sentences of this paragraph. Defendants admit that Victoria gave birth to a son in Mexico. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**33.** Plaintiff Bianca Doe is a transgender woman who is a native and citizen of Honduras. Bianca has been subjected to extreme and persistent physical and sexual assault, as well as discrimination and ongoing threats of violence in Honduras and Mexico City, where she subsequently moved, because she is a transgender woman. Fearing for her safety based on numerous threats and harassment, including at the hands of Mexican police, Bianca fled to Tijuana and sought access to the asylum process by presenting herself at the San Ysidro POE. CBP officers denied Bianca access to the asylum process by stating that she could not apply at that time because they were at capacity. Bianca returned to the POE the next day. She was

given a piece of paper with the number "919," placed on a waiting list, and told that she would have to wait several weeks to proceed to the POE. Feeling desperate and unsafe, Bianca attempted to enter the United States without inspection by climbing a fence on a beach in Tijuana. Once over the fence, a U.S. Border Patrol officer stopped Bianca, who expressed her desire to seek asylum in the United States. The U.S. Border Patrol officer told Bianca that there was no capacity in U.S. detention centers and threatened to call Mexican police if Bianca did not climb the fence back into Mexico. Terrified, Bianca returned to Mexico. Bianca subsequently sought access to the asylum process by again presenting herself at the San Ysidro POE. She was told, once again, that CBP had no capacity for asylum seekers. At the time the First Amended Complaint was filed, Bianca desired like to return immediately to the San Ysidro POE to seek asylum, but based on her experience and the experience of others with CBP's practice at the U.S.-Mexico border, she understood that she would likely be turned away again. At that time, Bianca was residing in a shelter in Tijuana where she feared further violence as a transgender woman. She could no longer remain in Mexico and had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate Bianca's entry into the United States.

**Answer:** Defendants admit the allegations in the first and last sentences of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

34.    Plaintiff Emiliana Doe is a transgender woman and a native and citizen of Honduras. Emiliana was subjected to multiple sexual and physical assaults, kidnapping, discrimination, as well as threats of severe harm and violence in Honduras because she is a transgender woman. Fearing for her life, she made an arduous and dangerous journey to Mexico, where she was raped repeatedly and threatened with death. After arriving in Tijuana, Emiliana sought access to the asylum process by

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

presenting herself at the San Ysidro POE and stating her intention to apply for asylum in the United States. She was given a piece of paper with the number "1014" on it, placed on a waiting list, and told to return in six weeks. Feeling desperate and unsafe, Emiliana returned to the POE just a few weeks later. CBP officers denied Emiliana access to the asylum process by telling her that there was no capacity for asylum seekers and instructing her to wait for Mexican officials. At the time the First Amended Complaint was filed, Emiliana desired like to return immediately to the San Ysidro POE to seek asylum, but based on her past experience with CBP's practice at the U.S.-Mexico border, she understood that she would likely be turned away again. At that time, Emiliana was residing in a hotel in Tijuana where she feared further violence as a transgender woman. She suffers from serious health issues caused by a stroke two years ago, could no longer remain in Mexico, and had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate Emiliana's entry into the United States.

**Answer:** Defendants admit the allegations in the first and last sentences of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

35.    Plaintiff César Doe is an eighteen-year old male native and citizen of Honduras. César has been threatened numerous times with severe harm and death and kidnapped by members of the 18th Street gang. Fearing for his life, César fled Honduras and traveled to Tijuana. César sought access to the asylum process by presenting himself at the San Ysidro POE, but was intercepted by individuals belonging to "Grupo Beta." César was told he would be placed on a waitlist, but instead was detained for twelve days by Mexican immigration under threat of deportation to Honduras. After an individual at a local shelter secured César's release from detention, he returned to the San Ysidro POE and was placed on a waitlist. After a few

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

weeks, César again sought access to the asylum process by presenting himself at the San Ysidro POE, but CBP officers refused to accept him. A few weeks later, he returned to the San Ysidro POE, but members of Grupo Beta intercepted him and threatened to call Mexican immigration officials and child protective services. A staff member from Plaintiff Al Otro Lado intervened and escorted César back to the shelter. At the time the First Amended Complaint was filed, César desired to return immediately to the San Ysidro POE to seek asylum, but based on his experience and the experiences of others with CBP's practices at the U.S.-Mexico border, he understood that he would likely be turned away again. At that time, César was residing in a shelter in Tijuana, could no longer remain in Mexico because of crime, violence and threats from gangs, and had no place else to turn for safety but the United States. Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate César's entry into the United States.

**Answer:** Defendants admit the allegations in the first and last sentences of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

## B.    Defendants

**36.**    Defendant Kirstjen Nielsen is the Secretary of DHS. In this capacity, she is charged with enforcing and administering U.S. immigration laws. She oversees each of the component agencies within DHS, including CBP, and has ultimate authority over all CBP policies, procedures and practices. She is responsible for ensuring that all CBP officials perform their duties in accordance with the Constitution and all relevant laws.

**Answer:** Defendants deny that Kirstjen Nielsen is the current Secretary of Homeland Security and aver instead that Kevin K. McAleenan is the Acting Secretary of Homeland Security. Defendants admit the remaining allegations in this paragraph.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**37.**     Defendant Kevin K. McAleenan is the Commissioner of CBP. In this capacity, he has direct authority over all CBP policies, procedures and practices, and is responsible for ensuring that all CBP interactions with asylum seekers are performed in accordance with the Constitution and all relevant laws. Defendant McAleenan oversees a staff of more than 60,000 employees, manages a budget of more than $13 billion, and exercises authority over all CBP operations.

**Answer:** Defendants admit that Kevin K. McAleenan is the Commissioner of CBP, but aver that Mr. McAleenan is currently serving as the Acting Secretary of Homeland Security. Defendants aver that Mark A. Morgan is CBP's Chief Operating Officer and is the Senior Official Performing the Duties of the Commissioner. Defendants admit the remaining allegations in this paragraph.

**38.**     Defendant Todd C. Owen is the Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO"). OFO is the largest component of CBP and is responsible for border security, including immigration and travel through U.S. POEs. Defendant Owen exercises authority over 20 major field offices and 328 POEs. Defendant Owen oversees a staff of more than 29,000 employees, including more than 24,000 CBP officials and specialists, and manages a budget of more than $5.2 billion. Defendant Owen is responsible for ensuring that all OFO officials perform their duties in accordance with the Constitution and all relevant laws.

**Answer:** Defendants admit the allegations in this paragraph.

**39.**     Does 1 through 25, inclusive, are sued herein under fictitious names inasmuch as their true names and capacities are presently unknown to Al Otro Lado and Class Plaintiffs. Al Otro Lado and Class Plaintiffs will amend this complaint to designate the true names and capacities of these parties when the same have been ascertained. Al Otro Lado and Class Plaintiffs are informed and believe, and on that basis allege, that Does 1 through 25, inclusive, were agents or alter egos of Defendants, or are otherwise responsible for all of the acts hereinafter alleged. Al Otro Lado

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

and Class Plaintiffs are informed and believe, and on that basis allege, that the actions of Does 1 through 25, inclusive, as alleged herein, were duly ratified by Defendants, with each Doe acting as the agent or alter ego of Defendants, within the scope, course, and authority of the agency. Defendants and Does 1 through 25, inclusive, are collectively referred to herein as "Defendants."

**Answer:** Defendants admit that the Second Amended Complaint purports to sue unnamed CBP officers, but deny that unnamed CBP officers are proper defendants in this action. Defendants further aver that Plaintiffs have not perfected service on any unnamed CBP officers. Defendants deny any remaining allegations in this paragraph.

## IV. FACTUAL BACKGROUND

### A.    Humanitarian Crisis South of the U.S.-Mexico Border

**40.**    In recent years, children and adults have fled horrendous persecution in their home countries and arrived at POEs along the U.S.-Mexico border to seek protection in the United States through the asylum process. While asylum seekers travel to the U.S.-Mexico border from all across the world, including from Haiti, Cuba, Venezuela and Iraq, the vast majority of these individuals come from Guatemala, Honduras and El Salvador, an area often termed Central America's "Northern Triangle."

**Answer:** With respect to the allegations in the first sentence of this paragraph, Defendants admit that many adults and children have arrived at ports of entry along the U.S.-Mexico border and have expressed an intention to seek asylum or a fear of persecution; Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence. With respect to the allegations in the second sentence of this paragraph, Defendants admit that many aliens who enter the United States along the U.S.-Mexico border and then express a fear of return or a desire to apply for asylum are citizens of countries from all across

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

the world, but lack knowledge or information sufficient to form a belief as to the truth of the allegation that the "vast majority" of such persons "come from" Guatemala, Honduras, and El Salvador.

**41.**     The Northern Triangle governments are known for corruption,[3] including having corrupt police forces filled with gang-related members.[4] Furthermore, the "penetration of the state by criminal groups" is responsible, at least in part, for the fact that as many as 95% of crimes go unpunished in those countries.[5]

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and its footnotes.

**42.**     The "pervasive and systematic levels of violence" associated with the

---

[3] See Christina Eguizábal et al., Woodrow Wilson Center Reports on the Americas No. 34, *Crime and Violence in Central America's Northern Triangle: How U.S. Policy Reponses are Helping, Hurting, and Can be Improved* 2 (2015), https://www.wilsoncenter.org/sites/default/files/FINAL%20PDF_CARSI%20REPORT_0.pdf+; *see also* U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor, *Country Reports on Human Rights Practices for 2017*, https://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm#wrapper (noting "widespread government corruption" is a significant human rights issue in El Salvador, Guatemala, and Honduras).

[4] "Over the past five years, at least 435 members of the [Salvadoran] armed forces were fired for being gang members or having ties to gangs . . . Another 39 aspiring police officers were expelled from the National Public Security Academy over the same period, of which 25 'belonged to' the Mara Salvatrucha, or MS13, while 13 were from the Barrio 18 gang. Nine more active police officers were also dismissed for alleged gang ties over the five years." Mimi Yagoub, *480 Gang Members Infiltrated El Salvador Security Forces: Report*, InSight Crime (Feb. 22, 2016), https://www.insightcrime.org/news/brief/did-480-gang-members-infiltrate-el-salvador-security-forces/ (citation omitted).

[5] Eguizábal et al., supra note 3, at 2.

increasing reach and power of gangs in the Northern Triangle have been well documented.[6] Those fleeing the Northern Triangle cite "violence [from] criminal armed groups, including assaults, extortion, and disappearances or murder of family members,"[7] as reasons for their flight. These armed groups operate with impunity due to their influence and control over the governments of Northern Triangle countries, which have repeatedly proven to be unable or unwilling to protect their citizens.[8] The degree of violence suffered by people in the Northern Triangle has been compared to that experienced in war zones.[9]

**Answer:** Defendants presently lack knowledge or information sufficient to

---

[6] UNHCR, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico* 15 (2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html [hereinafter Women on the Run]; *see also* Int'l Crisis Grp., Latin America Report No. 64, *El Salvador's Politics of Perpetual Violence* 8–11 (2017), https://d2071andvip0wj.cloudfront.net/064-el-salvador-s-politics-of-perpetual-violence.pdf.

[7] *Women on the Run*, *supra* note 6, at 15; see Refugees Int'l, *Closing Off Asylum at the U.S.-Mexico Border* 7 (2018), https://static1.squarespace.com/static/506c8ea1e4b01d9450dd53f5/t/5b86d0a188251bbfd495ca3b/1535561890743/U.S.-Mexico+Border+Report+-+August+2018+-+FINAL.pdf [hereinafter *Closing Off Asylum*]; Int'l Crisis Grp., Latin America Report No. 62, *Mafia of the Poor: Gang Violence and Extortion in Central America* 2 (2017), https://d2071andvip0wj.cloudfront.net/062-mafia-of-the-poor_0.pdf.

[8] *Women on the Run*, *supra* note 6, at 16 (finding that citizens of Northern Triangle countries are "murdered with impunity"); *id.* at 23 (finding that 69% of women interviewed tried relocating within their own countries at least once before fleeing and indicating that 10% "stated that the police or other authorities were the direct source of their harm"); *Closing off Asylum*, supra note 7, at 7 ("[T]here is considerable evidence that officials in each of the Northern Triangle countries have extremely limited capacity – and in many cases limited will – to protect those at grave risk.").

[9] Médecins Sans Frontières (Doctors Without Borders), *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis* 6 (2017), https://www.msf.org/sites/msf.org/files/msf_forced-to-flee-central-americasnorthern-triangle_e.pdf [hereinafter *Forced to Flee*].

form a belief as to the truth of the allegations in this paragraph and its footnotes.

43.     In addition, Central American women and children often flee severe domestic violence and sexual abuse.[10] Women report prolonged instances of physical, sexual, and psychological domestic violence, and most of their accounts demonstrate that the authorities in their home countries were either unable or unwilling to provide meaningful assistance.[11] Abusive partners are often members or associates of criminal armed groups.[12] Abusers frequently threaten women with harm to their parents, siblings or children if they try to leave.[13] Some women who fled their countries have heard from family members back home that their abusers continue to look for them.[14] In addition, "[s]exual harassment and the threat of sexual violence by gangs shapes the everyday lives of women and girls," in the Northern Triangle, and experts estimate that rape and torture of girls is "extremely widespread."[15]

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and its footnotes.

---

[10] Kids in Need of Def. & Human Rights Ctr. Fray Matías de Córdova, *Childhood Cut Short: Sexual and Gender-based Violence Against Central American Migrant and Refugee Children* 12–20 (2017), https://supportkind.org/wpcontent/uploads/2017/06/Childhood-Cut-Short-KIND-SGBVReport_June2017.pdf [hereinafter Childhood Cut Short] (describing sexual and gender-based violence against children and young women in the Northern Triangle).

[11] *Women on the Run*, *supra* note 6, at 25. The women interviewed described repeated rapes and sexual assaults as well as violent physical abuse that included: "beatings with hands, a baseball bat and other weapons; kicking; threats to do bodily harm with knives; and repeatedly being thrown against walls and the ground." *Id.*

[12] *Id.*

[13] *Id.* at 27.

[14] *Id.*

[15] *Childhood Cut Short*, *supra* note 10, at 17.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**44.**     After fleeing their home countries, children and adults face an arduous and dangerous journey to the United States.[16] The situation along the popular migration routes to the United States has been termed a "humanitarian crisis" because of the extraordinary violence faced by those making the journey.[17] In 2015 and 2016, 68% of migrants from the Northern Triangle region experienced violence, including sexual assault, on their journeys through Central America and Mexico.[18] Mexico has faced a drastic rise in criminal activity since the early 2000s that is attributed to cartels and has been accompanied by increases in violence and corruption.[19] The rate of violence continues to rise; 2017 was the deadliest year on record in Mexico.[20]

---

[16] *See Women on the Run*, *supra* note 6, at 43-45 (describing extortion, sexual violence, and physical violence); see also Rodrigo Dominguez Villegas, *Central American Migrants and "La Bestia": The Route, Dangers, and Government Responses*, Migration Info. Source (Sept. 10, 2014), https://www.migrationpolicy.org/article/central-american-migrants-and-%E2%80%9Cla-bestia%E2%80%9D-routedangers-and-government-responses (listing "injury or death from unsafe travelling conditions, gang violence, sexual assault, extortion, kidnapping, and recruitment by organized crime" as dangers faced on the journey to the United States).

[17] *See* Eguizábal et al., *supra* note 3, at 3.

[18] *See Forced to Flee*, *supra* note 9, at 11. Close to half (44%) of the migrants reported being hit, 40% said they had been pushed, grabbed or asphyxiated, and 7% said they had been shot. Id. Nearly one-third (31.4%) of women and 17.2% of men surveyed during that same time period had been sexually abused during their journeys. *Id.* at 12.

[19] Dominic Joseph Pera, *Drugs Violence and Public [In]Security: Mexico's Federal Police and Human Rights Abuse*, 2–4, 7 (Justice in Mex. Working Paper Ser. Vol. 14, No. 1, 2015), https://justiceinmexico.org/wpcontent/uploads/2015/12/151204_PERA_DOMINIC_DrugViolenceandPublicInsecurity_FINAL.pdf; see U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor, *Country Reports on Human Rights Practices for 2017 (Mexico)*, http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2017 &dlid=277345.

[20] Human Rights First, *Mexico: Still Not Safe for Refugees and Migrants* 1 (2018),

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

Although the northern half of Mexico was often considered the most dangerous, recent reports reveal an increase in violence in the central and southern states of Mexico, particularly in Guerrero, Michoacán, and the State of Mexico.[21] The U.S. State Department currently advises "no travel"—its highest level of travel warning, which also applies in active war zones like Syria, Afghanistan, and Yemen—to five Mexican states due to high crime rates.[22] Human rights groups report that since mid-2017, "the dangers facing refugees and migrants in Mexico have escalated."[23] Perpetrators of violence against migrants "include[] members of gangs and other criminal organizations, as well as members of the Mexican security forces."[24] Along with the increase in violence and organized criminal activity, it is well documented that the police and armed forces operate with impunity in Mexico, leaving victims unable to

---

https://www.humanrightsfirst.org/sites/default/files/Mexico_Not_Safe.pdf [hereinafter *Mexico: Still Not Safe*].

[21] *See, e.g.*, U.S. Dep't of State, Bureau of Diplomatic Sec., *Mexico 2015 Crime and Safety Report: Mexico City*, https://www.osac.gov/pages/ContentReportDetails.aspx?cid=17114 (reporting that a "common practice is for gangs to charge 'protection fees' or add their own tax to products and services with the threat of violence for those who fail to pay"); *see also* Human Rights First, *Dangerous Territory: Mexico Still Not Safe for Refugees* 4 (2017), http://www.humanrightsfirst.org/sites/default/files/HRF-Mexico-Asylum-System-rep.pdf [hereinafter Dangerous Territory] ("Human rights monitors stressed that there is a large presence of transnational gangs in southern Mexico, which have easy access to those fleeing gang persecution in the Northern Triangle.") (citations omitted).

[22] U.S. Dep't of State, Bureau of Consular Affairs, *Mexico Travel Advisory* (Aug. 22, 2018), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html [hereinafter *Mexico Travel Advisory*].

[23] *Mexico: Still Not Safe*, *supra* note 20, at 1; *see also Dangerous Territory*, *supra* note 21, at 3 ("Human rights monitors report an increase in kidnappings, disappearances, and executions of migrants and refugees in recent years.").

[24] *Forced to Flee*, *supra* note 9, at 5; *see also Closing Off Asylum*, *supra* note 7, at 9 (explaining that when crossing Mexico, migrants suffer "abuses at the hands of organized crime, exploitative smugglers, and predatory state security and police").

31

resort to the government for protection.[25] Indeed, "[i]n some regions of Mexico the state has become so closely identified with criminal gangs and drug cartels that these criminal organizations do not need to corrupt the state—they essentially 'are' part of the state."[26] Thus, the initial mistrust and inability to rely upon government authorities for protection that leads many to flee their home countries accompanies them along their journeys through Mexico.[27]

**Answer:** Defendants admit that the U.S. Department of State currently advises "No Travel" for five Mexican states. Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and its footnotes.

45.    Furthermore, migrants seeking international protection have a small chance of receiving it in Mexico. Amnesty International reports that "the Mexican government is routinely failing in its obligations under international law to protect those who are in need of international protection, as well as repeatedly violating the

---

[25] *See* Pera, *supra* note 19, at 4 ("Drug trafficking organizations have infiltrated government positions in many areas, and their influence over state personnel has dramatic implications."); Ximena Suárez et al., Wash. Office on Latin Am., *Access to Justice for Migrants in Mexico: A Right That Exists Only on the Books*, 24–27, 30–31 (2017), https://www.wola.org/wp-content/uploads/2017/07/Access-to-Justice-for-Migrants_July-2017.pdf [hereinafter Access to Justice] (documenting Mexican authorities' unwillingness to investigate crimes against migrants).

[26] *Access to Justice*, *supra* note 25, at 30–31; Alberto Díaz-Cayeros et al., *Caught in the Crossfire: The Geography of Extortion and Police Corruption in Mexico*, 3–4 (Stanford Ctr. for Int'l Dev., Working Paper No. 545, 2015), https://globalpoverty.stanford.edu/sites/default/files/publications/545wp_0.pdf.

[27] *See, e.g.*, Villegas, *supra* note 16 (referencing documentation of "the abuse of power by various Mexican authorities, including agents from the National Migration Institute, municipal governments, and state police" against individuals traveling to the U.S. border).

non-refoulement principle."[28]

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and its footnotes.

46.    In addition, Mexico's northern border region is particularly plagued with crime and violence, presenting renewed dangers for asylum seekers just as they approach their destination.[29] The state of Tamaulipas, which borders South Texas cities including Laredo, McAllen, and Brownsville, is on the U.S. State Department's "no travel" list.[30] Most of Mexico's other border states, including Sonora, Chihuahua, Coahuila, and Nuevo León, are classified at Level 3, "Reconsider

---

[28] Amnesty Int'l, *Overlooked, Under-Protected, Mexico's Deadly Refoulement of Central Americans Seeking Asylum* 2 (2018), https://www.amnesty.org/download/Documents/AMR4176022018ENGLISH.PDF; *see id.* at 8–20 (describing the multiple layers of institutional failure leaving refugees and asylum seekers vulnerable to refoulement in Mexico); *accord* Francisca Vigaud-Walsh et al., Refugees Int'l, *Putting Lives at Risk: Protection Failures Affecting Hondurans and Salvadorans Deported from the United States and Mexico* 11–12 (2018), https://static1.square space.com/static/506c8ea1e4b01d9450dd53f5/t/5a849f81c830250842098d87/1518 641035445/Northern+Triangle+-+Refugees+International.pdf; *Dangerous Territory*, *supra* note 21, at 4–9.

[29] *See Mexico Travel Advisory*, *supra* note 22 (reporting violent crime and an increase in homicide in the state of Baja California (encompassing border towns Tijuana and Mexicali) compared to 2016; widespread violent crime and gang activity in the state of Chihuahua (encompassing border town Ciudad Juarez); widespread violent crime and limited law enforcement capacity to prevent and respond to crime in the state of Coahuila (particularly in the northern part of the state); that the state of Sonora (encompassing border town Nogales) is a key region in the international and human trafficking trades; and common violent crime, including homicide, armed robbery, carjacking, kidnapping, extortion, and sexual assault in the state of Tamaulipas (encompassing border towns Matamoros, Nuevo Laredo, and Reynosa), where law enforcement capacity to respond to violence is limited throughout the state).

[30] *Id.*

Travel," due to the prevalence of violent crime and gang activity.[31] The most perva-sive problems migrants face in Mexico's northern border states include disappear-ances, kidnappings, rape, trafficking, extortion, execution and sexual and labor ex-ploitation by state and non-state actors.[32] Recently, the situation at the border has worsened: smugglers have increased their prices, cartel members have increased their surveillance and control of areas around border crossings, and the number of migrants kidnapped and held for ransom has increased.[33] Even migrants in the im-mediate vicinity of a POE are at risk of violence and exploitation.[34] Those who seek refuge in shelters may be in particular danger. Some shelters are infiltrated by orga-nized crime, while others have been the sites of recent vandalism, burglary, threats, and kidnapping.[35]

**Answer:** Defendants admit that the U.S. Department of State recommends "No Travel" for the Mexican state of Tamaulipas and "Reconsider Travel" for the

---

[31] *Id.*

[32] B. Shaw Drake et al., Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers* 16 (2017), https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-linereport.pdf [hereinafter *Crossing the Line*].

[33] *Id.*

[34] Josiah Heyman & Jeremy Slack, *Blockading Asylum Seekers at Ports of Entry at the US-Mexico Border Puts Them at Increased Risk of Exploitation, Violence, and Death*, Ctr. for Migration Stud. (June 25, 2018), http://cmsny.org/publications/hey-man-slack-asylum-poe/#_ednref11.pdf ("When asylum-seekers are turned away by US authorities, they return to areas around the Mexican-side POEs. These are char-acteristically busy zones of businesses, restaurants, bars, discos, drug sellers, hus-tlers, and commercial sex work, although each border port has its own characteris-tics. They are areas that increase the vulnerability and exploitability of non-Mexican migrants with little knowledge and few resources.").

[35] *Id.*; Wash. Office on Latin Am. et al., *Situation of Impunity and Violence In Mex-ico's Norther Border Region* 2–4 (Mar. 2017), https://www.wola.org/wpcontent/up-loads/2017/04/Situation-of-Impunity-and-Violence-in-Mexicosnorthern-border-LAWG-WOLA-KBI.pdf.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

Mexican states of Sonora, Chihuahua, Coahuila, and Nuevo León. Defendants admit the allegations in the first sentence of this paragraph only to the extent they are consistent with the U.S. Department of State's travel advisories. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and its footnotes.

47.     By turning back individuals who seek to access the asylum process by presenting themselves at POEs on the U.S.-Mexico border, Defendants are forcing them to return to the dangerous conditions that drove them to flee their countries in the first place.[36]

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and its footnotes.

**B.    Defendants' Policy and Widespread Practice of Denying Asylum Seekers Access to the Asylum Process**

48.     Starting in 2016 and continuing to the present, CBP officials, at or under the direction or with the knowledge and acquiescence or authorization of Defendants, have systematically restricted the number of asylum seekers who can access the U.S. asylum process through POEs along the U.S.-Mexico border.[37] That

---

[36] *Crossing the Line*, *supra* note 32, at 16; *see also* B. Shaw Drake, Human Rights First, *Violations at the Border: The El Paso Sector* 2–3 (2017), https://www.humanrightsfirst.org/resource/violations-border-el-paso-sector (explaining the risks facing asylum seekers who are turned back at U.S. POEs, including being deported back to their home countries where they face persecution).

[37] There is anecdotal evidence that CBP officials began unlawfully dissuading asylum seekers from pursuing their claims or flatly refusing them entry to the United States even prior to 2016. See Sara Campos & Joan Friedland, Am. Immigration Council, *Mexican and Central American Asylum and Credible Fear Claims: Background and Context* 10 (2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/asylum_and_credible_fear_claims_final_0.pdf (reporting that Mexican asylum seekers arriving in El Paso "expressed a fear of persecution [but]

has been accomplished both through the Turnback Policy that seeks to restrict access to the asylum process and also through widespread practices across the U.S.-Mexico border also designed to deny access to the asylum process.

**Answer:** With respect to the allegations in the first sentence of this paragraph, Defendants deny Plaintiffs' characterizations of Defendants' conduct and deny that they have implemented a "Turnback Policy," but admit that CBP officials, at times since 2016, have implemented metering/queue management procedures at land ports of entry along the U.S.-Mexico border to ensure that the ports had sufficient capacity to safely process all individuals and temporarily hold those found to be inadmissible. Defendants deny the allegations in the second sentence of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this paragraph and its footnote.

---

were told by CBP that the U.S. doesn't give Mexicans asylum, and they [we]re turned back"); *see also* U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* 54 (2005), https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/Volume_I.pdf [hereinafter *2005 USCIRF Report*] (reporting that two groups of asylum seekers who arrived at the San Ysidro POE were "improperly refused entry to the United States for . . . lacking proper documentation and [were] 'pushed back' . . . without [being] refer[red] . . . to secondary inspection" and without a "record of the primary inspection" being created); *see also* Human Rights Watch, *"You Don't Have Rights Here": US Border Screening and Returns of Central Americans to Risk of Serious Harm* 2, 8 (2014), https://www.hrw.org/sites/default/files/reports/us1014_web_0.pdf [hereinafter *"You Don't Have Rights Here"*] (concluding that the "cursory screening [conducted by CBP officials] is failing to effectively identify [asylum seekers]" and reporting that some "border officials acknowledged hearing [non-citizens'] expressions of fear but pressured them to abandon their claims").

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

49.     Al Otro Lado and Class Plaintiffs, as well as numerous nongovernmental organizations[38] and news outlets,[39] have documented thousands of cases in which CBP officials have arbitrarily denied and/or unreasonably delayed access to the asylum process to individuals seeking asylum by presenting themselves at POEs along the U.S.-Mexico border.[40] The Turnback Policy and CBP's other widespread, unlawful practices have been documented at POEs spanning the length of the U.S.-Mexico border, including POEs in San Ysidro, California; Otay Mesa, California; Tecate, California; Calexico, California; San Luis, Arizona; Nogales, Arizona; El Paso, Texas; Del Rio, Texas; Eagle Pass, Texas; Laredo, Texas; Roma, Texas; Hidalgo, Texas; Los Indios, Texas; and Brownsville, Texas.

---

[38] *See, e.g.*, *Crossing the Line*, *supra* note 32; Amnesty Int'l, *Facing Walls: USA and Mexico's Violation of the Rights of Asylum Seekers* 19–22 (2017), https://www.amnestyusa.org/wp-content/uploads/2017/06/USA-Mexico-Facing-Walls-REPORT-ENG.pdf [hereinafter *Facing Walls*]; *"You Don't Have Rights Here"*, *supra* note 37, at 2, 4.

[39] Joshua Partlow, *U.S. Border Officials Are Illegally Turning Away Asylum Seekers, Critics Say*, Wash. Post (Jan. 16, 2017), https://www.washingtonpost.com/world/the_americas/us-border-officials-are-illegally-turning-awayasylum-seekers-critics-say/2017/01/16/f7f5c54a-c6d0-11e6-acda-59924caa2450_story.html?noredirect=on&utm_term=.ed5c3100d451; Caitlin Dickerson & Miriam Jordan, *'No Asylum Here': Some Say U.S. Border Agents Rejected Them*, N.Y. Times (May 3, 2017), https://www.nytimes.com/2017/05/03/us/ asylum-border-customs.html; Rafael Carranza, *Are Asylum Seekers Being Turned Away at the Border?*, USA Today (May 4, 2017, 10:55 PM), https://www.azcentral.com/story/news/politics/immigration/2017/05/05/asylum-seekers-being-turned-away-border/309398001/.

[40] Amnesty Int'l, *USA: 'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States* 17 (2018), https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF [hereinafter *You Don't Have Any Rights Here*] ("While there are no official statistics on how many people CBP has illegally turned away without processing their asylum requests, Amnesty International has received numerous secondary reports from NGOs indicating that CBP has forced thousands of asylum-seekers to wait in Mexico – including families with children, mostly from Central America.").

**Answer:** With respect to the allegations in the first sentence of this paragraph, Defendants admit only that Al Otro Lado, the individual Plaintiffs, and several NGOs and news outlets purport to have documented "thousands" of cases of CBP officials arbitrarily denying or unreasonably delaying individuals' access to the asylum process at ports of entry along the U.S.-Mexico border. With respect to the remaining allegations in this paragraph, Defendants deny that they have implemented a "Turnback Policy" and deny that they have sanctioned the use of unlawful practices at ports of entry along the U.S.-Mexico border.

### 1.  Initiation of the Turnback Policy

**50.**   Internal CBP documents reveal that CBP officials at the highest levels mandated turnbacks at POEs along the U.S.-Mexico border.[41]

**Answer:** Defendants deny that CBP officials at the highest levels have "mandated turnbacks" at ports of entry along the U.S.-Mexico border, and deny the allegations in this paragraph to the extent they are inconsistent with the cited documents.

**51.**   Evidence of a Turnback Policy, at least regarding the San Ysidro POE, exists starting in May 2016. In an email dated May 29, 2016, the Watch Commander at the San Ysidro POE notes that "[t]he Asylee line in the pedestrian building is not being used at this time, there is a line staged on the Mexican side." In an email sent roughly a month later, the same individual reiterated that "[i]t's even more important that when the traffic is free-flowing that the limit line officers ask for and check documents to ensure that groups that may be seeking asylum are directed to remain in the waiting area on the Mexican side."

---

[41] These documents, produced during the limited discovery that took place while this case was pending in the U.S. District Court for the Central District of California, relate exclusively to POEs under the responsibility of the Laredo Field Office and the San Ysidro POE. Additional discovery could reveal further details regarding the contours of the Turnback Policy.

**Answer:** Defendants deny the allegations in the first sentence of this paragraph. Defendants admit that the description of and quotations from the referenced emails are accurate. *See* Ex. 1 to Defs.' Mot. to Dismiss the SAC (ECF No. 192-3).

52. CBP's collaboration with the Mexican government to turn back asylum seekers at the San Ysidro POE was formalized in a document issued on an unspecified date after July 15, 2016, which provides:

> In coordination with the GoM [Government of Mexico] we have identified two (2) periods throughout the day to intake asylum claims into our custody (8am and 4 pm). At each period, we intake approximately [redacted] applicants, with a daily intake total of approximately [redacted] applicants. If an applicant does not meet these intake time periods, they are requested to remain in-line in Mexico until the next intake period. . . . In order to control the flow of asylees in their area, the GoM has instituted a numerical process by giving asylum applicants numbers with intake dates in the order of their arrival. The applicants are also given the locations of humanitarian shelters in Tijuana where they receive food and shelter until their intake date. The implementation of this process was developed by the GoM.

**Answer:** Defendants deny Plaintiffs' characterizations in this paragraph and admit only that this paragraph accurately quotes portions of the referenced document, which, in its entirety, speaks for itself. *See* Ex. 2 to Defs.' Mot. to Dismiss the SAC (ECF No. 192-4).

53. On December 6, 2016, the Director of Field Operations at CBP's San Diego Field Office confirmed that the Turnback Policy remained in effect:

> Metering continues at both San Ysidro and Calexico POEs the numbers are adjusted based on space availability and ERO [ICE's Office of Enforcement and Removal Operations] movement of detainees from the ports. Mexican immigration is handling the metering process before the OTMs [Other Than Mexicans] arrive at the port of entry; no issues on our end with aliens being turned away.

**Answer:** Defendants admit only that this paragraph accurately quotes portions of the referenced emails, which, in their entireties, speak for themselves. *See* Ex. 3

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

to Defs.' Mot. to Dismiss the SAC (ECF No. 192-5). Defendants deny that these emails constitute evidence of a "Turnback Policy." Defendants deny any remaining allegations and characterizations in this paragraph.

**54.** On information and belief, other CBP Field Offices also implemented the Turnback Policy. Although certain port directors periodically suspended the Turnback Policy, they never abandoned it. Moreover, direct turnbacks of asylum seekers—via misrepresentations about the availability of asylum, intimidation, and coercion, among other tactics—continued in practice even during periods of formal suspension of the policy.

**Answer:** Defendants deny the allegations in the first and second sentences of this paragraph. Defendants aver that CBP has issued guidance permitting ports of entry along the U.S.-Mexico border to implement metering procedures based on their operational capacities when necessary or appropriate to facilitating orderly processing and maintaining the security of the port and safe and sanitary conditions for the traveling public. *See* Ex. 1, Owen Memo. Defendants admit that, on at least one occasion, a CBP officer at a land port of entry along the U.S.-Mexico border used verbal abuse or physical force, but deny that such conduct was or is consistent with agency policy. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations that CBP officers used "misrepresentations," "intimidation," and "coercion," but also aver that such conduct is inconsistent with agency policy. *See, e.g.*, Ex. 1, Owen Memo.

**55.** Evidence that a border-wide Turnback Policy was authorized at the highest levels of CBP, including by Defendant and now-Commissioner Kevin McAleenan, exists as of November 2016. In an email communication dated November 12, 2016, the Assistant Director Field Operations for the Laredo Field Office instructed all Port Directors under his command to follow the mandate of the then-CBP Commissioner and Deputy Commissioner:

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

At the request of C-1 [then CBP Commissioner R. Gil Kerlikowski] and C-2 [then CBP Deputy Commissioner Kevin McAleenan], you are to meet with your INM [Instituto Nacional de Migración, Mexico's immigration agency] counterpart and request they control the flow of aliens to the port of entry. For example, if you determine that you can only process 50 aliens at a time, you will request that INM release only 50.

If INM cannot or will not control the flow, your staff is to provide the alien with a piece of paper identifying a date and time for an appointment and return then [sic] to Mexico. This is similar to what San Diego is doing. We understand the alien may express a fear of returning to Mexico and we will address as the situation dictates.[42]

**Answer:** Defendants deny the allegations in the first sentence of this paragraph. Defendants admit that this paragraph and the first sentence of footnote 42 accurately quotes and describes portions of the referenced emails, which, in their entireties, speak for themselves. *See* Ex. 4 to Defs.' Mot. to Dismiss the SAC (ECF No. 192-6). Defendants deny that these emails constitute evidence of a "Turnback Policy." Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of footnote 42.

56.    This email directive was promptly implemented by the Laredo Field Office, which encompasses the Brownsville, Del Rio, Eagle Pass, Hidalgo, Laredo, Progreso, Rio Grande, and Roma, Texas POEs and covers nearly 400 miles of the Texas-Mexico border. According to an internal email dated November 22, 2016, "Our instructions from Service Headquarters and LFO [Laredo Field Office] is that we will only accept 'what we can handle/process'. All others will be turned back to Mexico with an appointment date/time if possible." Other email correspondence from CBP officials at the Laredo, Hidalgo and Roma POEs indicates that individuals turned back did not receive appointment notices.

---

[42] An email sent the following day clarified that this directive was to apply only to Central Americans. In practice, however, individuals of many other nationalities have also been affected.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** With respect to the allegations in the first sentence of this paragraph, Defendants admit that the Laredo Field Office encompasses the Brownsville, Del Rio, Eagle Pass, Hidalgo, Laredo, Progreso, Rio Grande, and Roma ports of entry and cover nearly 400 miles of the Texas-Mexico border, but deny that all ports of entry in the Laredo Field Office provided individuals with a "piece of paper identifying a date and time for an appointment." Defendants admit that the second and third sentences of this paragraph accurately quote portions of the referenced emails, which, in their entireties, speak for themselves. Defendants admit the allegations in the fourth sentence of this paragraph.

57.     The directive was memorialized in a memorandum from the Laredo Field Office dated January 13, 2017. The memorandum directs that "metering" procedures—i.e. procedures to regulate and restrict the access of asylum seekers to POEs—be implemented once case processing numbers exceed a certain (redacted) number, that such procedures are to be conducted "at the middle of the bridge," and that "all foreign nationals seeking a benefit are given an appointment window to return for processing." The Laredo Command Center is required to provide hourly updates to "local upper management," among others, who must also be notified once normal operations resume.

**Answer:** Defendants admit that this paragraph accurately quotes portions of the referenced document, which, in its entirety, speaks for itself. *See* Ex. 8 to Defs.' Mot. to Dismiss the SAC (ECF No. 192-8). Defendants deny Plaintiffs' characterizations in this paragraph to the extent they are inconsistent with the content of the cited document.

58.     In the months that followed, asylum seekers from Central America and elsewhere continued to seek access to the U.S. asylum process by presenting themselves at POEs along the U.S.-Mexico border, but many were turned back by, at the instruction of, or with the knowledge of CBP officials.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** Defendants admit only that many aliens who lacked entry documents, some of whom were from Central America and some of whom may have later sought asylum in the United States, sought to enter the ports of entry in the months following January 2017, and that on at least one occasion, an individual arrived at a port of entry and was not properly processed.

59.     On June 13, 2017, in questioning before the House Appropriations Committee, John P. Wagner, the Deputy Executive Assistant Commissioner for OFO, admitted that CBP officials were turning back asylum applicants at POEs along the U.S.-Mexico border.[43] When asked to comment on the numerous press reports that CBP officers at POEs had been "turning away individuals attempting to claim credible fear," Mr. Wagner acknowledged that CBP had indeed engaged in turnbacks, and argued the practice was justified by a lack of capacity.[44] Mr. Wagner

---

[43] *Department of Homeland Security Appropriations for 2018 Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 115th Cong. 289–90 (2017) (testimony of John P. Wagner, Deputy Executive Assistant Comm'r, Office of Field Operations, Customs and Border Protection), https://www.gpo.gov/fdsys/pkg/CHRG-115hhrg27050/pdf/CHRG-115hhrg27050.pdf [hereinafter Wagner Testimony].

[44] Congresswoman Roybal-Allard asked:

It is my understanding that CBP is legally required to process credible fear claims when they are presented, and it is not authorized to turn back individuals claiming fear even temporarily. In addition to commenting on those allegations, what steps can be taken or have been taken to ensure this is not occurring or continuing to occur at the ports of entry, such as, is there training or other guidance, reminding CBP personnel how they are required to treat individuals who express fear?

Mr. Wagner responded:

Sure. It was a question really of the space available to process people. And our facilities were at capacity to be able to take more people in, go through the processing, and turn them over to ICE after that. And the building was full, and we could not humanely and safely and securely hold any more people in our space.

The Congresswoman later clarified:

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

also stated on the record that because POEs "do not have the kind of space to hold large volumes of people," CBP "worked a process out with the Mexican authorities to be able to limit how many people a day could come across the border into [CBP's] facility to be processed."[45]

**Answer:** Defendants admit that Mr. Wagner testified on June 13, 2017, before the House Committee on Appropriations, Subcommittee on Homeland Security. Defendants aver that Mr. Wagner's testimony speaks for itself and deny Plaintiffs' characterizations in this paragraph to the extent they are inconsistent therewith.

**60.**    Following dozens of turnbacks of asylum seekers in San Ysidro in December 2017, the CBP Field Operations Director in charge of the San Ysidro POE acknowledged and defended the turnbacks, stating: "So they weren't being allowed into the port-of-entry. We said, 'we're at capacity, so wait here.' It's because of our detention space limitation, we were at capacity."[46]

**Answer:** Defendants admit that this paragraph accurately quotes the cited Amnesty International report, but presently lack knowledge or information sufficient to form a belief as to whether the Amnesty International report accurately quotes the Director of the San Diego Field Office. Even assuming the report accurately quotes the Director of the San Diego Field Office, Defendants deny that he acknowledged or defended any "turnbacks."

---

"So it wasn't an issue of officers not knowing what the law was. It was more of an issue of capacity?" And Mr. Wagner responded: "It was an issue of capacity and being able to put people into the facility without being overrun or having unsafe and unsanitary conditions."

*Id.*

[45] *Id.*

[46] *You Don't Have Any Rights Here*, *supra* note 40, at 16.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.   High Level Officials' Public Confirmation and Escalation of the Turnback Policy and CBP's Aggressive Implementation

**61.**   In late April 2018, following an arduous, widely-publicized journey, a group of several hundred asylum seekers—referred to in the press as a "caravan"—arrived at the San Ysidro POE. As they approached the United States, President Trump posted a series of messages on Twitter warning of the dangers posed by the group, including one indicating that he had instructed DHS "not to let these large Caravans of people into our Country."[47]

**Answer:** Defendants admit that in April 2018, a group of more than 100 aliens without entry documents arrived in Tijuana with the stated intention of seeking asylum in the United States. Defendants deny the allegations in the second sentence of this paragraph because Plaintiffs have misquoted the cited April 2, 2018 tweet. Defendants aver that the cited tweet states, in relevant part: "Mexico has the absolute power not to let these large 'Caravans' of people enter their country."

**62.**   Thereafter, the highest-ranking officials in the Department of Justice and DHS publicly and unambiguously proclaimed the existence of a Turnback Policy. CBP continued to buttress the Turnback Policy through the practices described above, including misrepresentations, threats and intimidation, verbal abuse and physical force, coercion, outright denials of access, and physically obstructing access to POEs.

**Answer:** Defendants deny that they implemented a "Turnback Policy" and therefore deny the allegations in this paragraph.

**63.**   Attorney General Sessions, refusing to acknowledge that some of the

---

[47] Donald J. Trump (@realDonaldTrump) Twitter (Apr. 2, 2018, 4:02 AM) https://twitter.com/realDonaldTrump/status/980762392303980544.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

caravan members might have legitimate claims to asylum under U.S. law, characterized the caravan's arrival as "a deliberate attempt to undermine our laws and overwhelm our system."[48] Upon the caravan's arrival, CBP officials indicated—in accordance with the Turnback Policy—that they had exhausted their capacity to process individuals traveling without proper documentation.[49]

**Answer:** Defendants admit that Plaintiffs have accurately quoted from one portion of the former Attorney General's statement, but deny Plaintiffs' characterization of that statement. Defendants aver that the former Attorney General's statement, in its full context, speaks for itself. Defendants admit, as the cited *New York Times* article indicates, that the San Ysidro port of entry in late April 2018 reached its capacity to process individuals without entry documents, but deny that those statements are false or part of any "Turnback Policy."

64.     As the caravan was approaching the United States, Attorney General Sessions announced that all individuals who crossed the U.S.-Mexico border illegally would be criminally prosecuted.[50] Following the arrival of the caravan, he pronounced that "[p]eople are not going to caravan or otherwise stampede our border," and reiterated his commitment to prosecuting illegal border crossers.[51]

[48] Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Statement on Central America 'Caravan', (Apr. 23, 2018), https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-statement-central-american-caravan.

[49] Kirk Semple & Miriam Jordan, Migrant Caravan of Asylum Seekers Reaches U.S. Border, N.Y. Times (Apr. 29, 2018), https://www.nytimes.com/2018/04/29/world/americas/mexico-caravan-trump.html.

[50] Press Release, U.S. Dep't of Justice, Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegalentry.

[51] U.S. Attorney Gen. Jefferson B. Sessions, Remarks Discussing the Immigration Enforcement Actions of the Trump Administration (May 7, 2018), https://www.jus-

**Answer:** Defendants admit the allegations in this paragraph; however, Defendants deny that these allegations are relevant to this litigation, because, by their own terms, they pertain to individuals who crossed the border illegally, rather than individuals who lawfully arrived at ports of entry.

65.     On May 15, 2018, DHS Secretary Kirstjen Nielsen likewise publicly and unambiguously confirmed the existence of the Turnback Policy, dismissing the United States' legal obligation to receive and process asylum seekers at U.S. borders as a legal "loophole":

> We are "metering," which means that if we don't have the resources to let them [asylum-seekers] in on a particular day, they are going to have to come back. They will have to wait their turn and we will process them as we can, but that's the way that the law works. Once they come into the United States, we process them. We have asked Congress to fix this loophole. It's a huge gaping hole that we need to fix because it is so abused.[52]

**Answer:** Defendants admit that this paragraph accurately quotes ports of former Secretary Nielsen's May 15, 2018 statements, which, in their entireties, speak for themselves. Defendants deny that these statements "unambiguously" confirm the existence of a "Turnback Policy." Defendants deny any remaining allegations in this paragraph.

66.     Trump himself continued to publicly pronounce the importance of the Turnback Policy, through tweets, including direct statements that promote the direct violation of the law:

- June 24, 2018: "When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from

tice.gov/opa/speech/attorney-general-sessions-delivers-remarksdiscussing-immigration-enforcement-actions.

[52] *Secretary Nielsen Talks Immigration, Relationship with Trump*, Fox News (May 15, 2018), https://video.foxnews.com/v/5785340898001/?#sp=showclips.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

where they came."[53]

- June 30: "When people come into our Country illegally, we must IMMEDIATELY escort them back out without going through years of legal maneuvering."[54]

- July 5: "When people, with or without children, enter our Country, they must be told to leave without our Country being forced to endure a long and costly trial. Tell the people, 'OUT,' and they must leave, just as they would if they were standing in your front lawn."[55]

**Answer:** Defendants admit that the quoted excerpts are accurate, but deny that they constitute evidence of a "Turnback Policy" or that they relate to Defendants' metering or queue management practices.

**67.** Meanwhile, CBP officials continue to turn back asylum seekers who seek access to the U.S. asylum process by presenting themselves at POEs. Predictably, the Turnback Policy has caused and continues to cause many asylum seekers, desperate to avoid danger on the Mexican side of the border, to seek to enter the United States outside POEs and thereafter be arrested and prosecuted for unlawful entry and in many cases forcibly separated from their children.

**Answer:** Defendants deny that they have continued to turn back individuals as a matter of agency policy, and aver instead that CBP has issued guidance permitting ports of entry along the U.S.-Mexico border to implement metering procedures based on their operational capacities when necessary or appropriate to facilitating

---

[53] Donald J. Trump (@realDonaldTrump) Twitter (Apr. 24, 2018, 8:02 AM) https://twitter.com/realdonaldtrump/status/1010900865602019329?lang=en.

[54] Donald J. Trump (@realDonaldTrump) Twitter (June 30, 2018, 12:44 PM) https://twitter.com/realdonaldtrump/status/1013146187510243328?lang=en.

[55] Donald J. Trump (@realDonaldTrump) Twitter (July 5, 2018, 7:08 AM) https://twitter.com/realDonaldTrump/status/1014873774003556354;   Donald   J. Trump (@realDonaldTrump) Twitter (July 5, 2018, 7:16 AM) https://twitter.com/realDonaldTrump/status/1014875575557804034.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

orderly processing and maintaining the security of the port and safe and sanitary conditions for the traveling public. *See* Ex. 1, Owen Memo. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that the implementation of metering procedures causes aliens without entry documents to cross the border unlawfully.

68.    In recent months, Commissioner McAleenan and other high-level CBP officials have openly acknowledged that the Turnback Policy remains in effect, and that the United States is actively collaborating with Mexico to reduce the flow of asylum seekers.[56]

**Answer:** Defendants deny that they have implemented a "Turnback Policy" or that a "Turnback Policy" remains or is in effect. Defendants aver that CBP's April 29, 2018 metering guidance has not been withdrawn or superseded. Defendants admit that Defendant McAleenan released a statement on April 29, 2018, which states that "CBP will communicate with Mexican authorities for operational awareness on this issue of capacity within CBP facilities as appropriate."

69.    A high-level CBP officer reiterated the contours of the Turnback Policy in a meeting with immigrant rights groups in El Paso on June 27, 2018 and confirmed that it was being applied border-wide.[57]

---

[56] *See, e.g.*, CBP Comm'r Kevin McAleenan, Statement on Operations at San Ysidro Port of Entry (April 29, 2018), https://www.cbp.gov/newsroom/speeches-and-statements/statement-commissioner-kevin-mcaleenan-operationssan-ysidro-port (explaining that "individuals [without appropriate entry documentation] may need to wait in Mexico as CBP officers work to process those already within our facilities"); Molly Hennessy-Fiske, *Border Protection Commissioner Talks 'Zero Tolerance,' Family Separations and How To Discourage Immigration*, L.A. Times (June 11, 2018) http://www.latimes.com/denying people approaching the U.S. border without documents. We're asking them to come back when we have the capacity to manage them.").

[57] *You Don't Have Any Rights Here*, *supra* note 40, at 17.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** Defendants deny that they have implemented a "Turnback Policy." Defendants aver that CBP has issued guidance permitting ports of entry along the U.S.-Mexico border to implement metering procedures based on their operational capacities when necessary or appropriate to facilitating orderly processing and maintaining the security of the port and safe and sanitary conditions for the traveling public. *See* Ex. 1, Owen Memo. Defendants presently lack knowledge or information sufficient to form a belief as to whether the Amnesty International report cited in footnote 57 accurately summarizes the statements of the "high-level CBP officer" in the June 2018 meeting in El Paso.

70.    Notably, a September 27, 2018 report from the OIG ("OIG Report"), attached as Exhibit A, references the policy under which CBP systematically restricts access to the asylum process at POEs and confirms the policy was directed by DHS. The OIG Report states the existence of a "CBP guidance" which indicates that "[w]hen the ports of entry are full . . . [CBP] officers should inform individuals that the port is currently at capacity and that they will be permitted to enter once there is sufficient space and resources to process them."[58] Although this "guidance" states that CBP officers "may not discourage individuals from waiting to be processed," some officers in El Paso informed OIG investigators that they advise asylum seekers to "return later."[59] Also, according to the report, while "[u]nder the Zero Tolerance Policy, the Government encouraged asylum-seekers to come to U.S. ports of entry[,] . . . [a]t the same time, CBP reported that overcrowding at the ports of entry caused them to limit the flow of people that could enter."[60] The report elaborates that

---

[58] *OIG Report*, *supra* note 1, at 6.

[59] *Id.* at 7.

[60] *Id.* at 5.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

"CBP was regulating the flow of asylum-seekers at ports of entry through 'metering,' a practice CBP has utilized at least as far back as 2016 to regulate the flow of individuals at ports of entry."[61]

**Answer:** With respect to the allegations in the first sentence of this paragraph, Defendants admit that an OIG report issued on September 27, 2018, mentions that OFO had implemented metering procedures at some ports of entry along the U.S.-Mexico border at the same time the zero tolerance policy was in effect. Defendants deny that the OIG report characterizes CBP's metering procedures as "systematically restrict[ing] access to the asylum process at [ports of entry]," and aver instead that the OIG report states that "CBP officials informed the OIG team that CBP instituted metering to address safety and health hazards that resulted from overcrowding at ports of entry." Defendants admit the allegations in the second sentence of this paragraph. Defendants admit that this guidance states that CBP officers may not discourage individuals from waiting to be processed. Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations that some officers in El Paso advised asylum seekers to return later. Defendants admit the allegations in the fourth and fifth sentences of this paragraph and the allegations in the parenthetical in footnote 61.

71.     DHS's response to the OIG Report confirms that CBP has engaged in "queue management practices . . . directed by [Defendant Nielsen]."[62] The response also confirms that "CBP's processes and policies at ports of entry may require some

---

[61] *Id.* at 5–6; *see id.* at 6–7 (describing CBP's "metering" practice at POEs, explaining that "CBP officers stand at the international line out in the middle of the footbridges," checking pedestrians' travel documents, and preventing asylum-seekers from crossing the international line until space is "available . . . to hold the individual while being processed").

[62] *Id.* at 19–20.

individuals who do not have travel documents to wait at the International Boundary prior to entering the United States."[63]

**Answer:** Defendants admit the allegations in this paragraph, and aver that DHS's response, in its entirety, speaks for itself. Defendants aver that DHS's response to the OIG report also explains that CBP's metering/queue management procedures "are in place to protect the health and safety of both travelers and CBP employees in the port area and to ensure appropriate balance of resources across CBP's multiple critical missions at ports of entry. CBP policy does not require that the individual leave the line and prohibits officers from requiring individuals to leave or turning individuals seeking admission away. At its discretion, CBP may prioritize certain individuals with urgent needs such as those traveling with children, or individuals who may be pregnant or have other medical emergencies, to be processed, even when there otherwise may not be processing resources or holding capacity absent those urgent needs."

72.    In addition, officials from the Mexican immigration agency, Instituto Nacional de Migración ("INM"), have confirmed the existence of an agreement with CBP under which INM assists with the Turnback Policy by hindering asylum seekers' access to POEs. For example, as reported in the Amnesty International report released on October 11, 2018, the INM head delegate in the Mexican state of Baja California reportedly expressed doubt about CBP's claims of capacity constraints and "voiced his frustration that [CBP was] making INM do [its] dirty work."[64] The INM delegate stated:

> [T]hat CBP requested INM to remove . . . 20 asylum-seekers from the turnstiles [at the San Ysidro POE], as well as the rest of the [April 2018] caravan members from the plaza at El Chaparral, where they were

---

[63] *Id.* at 20.

[64] *You Don't Have Any Rights Here*, *supra* note 40, at 23.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

camping on the Mexican side of the port-of-entry. Implicit in the CBP request, the INM delegate said, was that such detentions could result in INM deporting those asylum-seekers who were not legally present in Mexico.[65]

**Answer:** Defendants admit that the allegations in this paragraph accurately quote the cited Amnesty International report, but presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

73.   Later, on June 14, 2018, a senior Mexican immigration official in Sonora reportedly stated that US officials had requested INM to detain and check the papers of the asylum-seekers whom CBP was pushing back to the Mexican side of the Nogales border crossing. The INM official relayed also that he understood the request by US authorities implicitly to be for INM to deport asylum-seekers without legal status in Mexico to their home countries from which they had fled.[66]

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph or its footnote.

74.   Also in June 2018, Mexican immigration officials told human rights

---

[65] *Id.* at 23.

[66] *Id.* at 21; *see also id.* at 22 ("On the Mexico side of the bridges in July 2018, three Mexican immigration officials informed [a] US immigration lawyer . . . that they were screening asylum-seekers and preventing their access to US ports-of-entry upon the request of CBP. One of the Mexican officials told her: 'Yes, it's a collaborative program that we're doing with the Americans.' The immigration officials were detaining non-Mexicans who lacked valid Mexican transit visas, and threatened them with deportation if they returned to the bridge. At the mid-point of the bridge, CBP again screened those who were able to pass through the Mexican immigration filter, and forced them to wait on the half of the bridge closer to Mexico. According to [the U.S. immigration lawyer], the Mexican immigration officers informed her that when asylum seekers crossed onto the bridge without valid Mexican travel documents, CBP officers called on Mexican immigration officials to remove them from the bridge.").

researchers that "CBP officers were calling Mexican immigration to collect any individuals at the border line, including asylum seekers, who attempted to approach the port of entry to request protection and did not have visas or other documentation." As a result, asylum seekers were physically prevented from reaching the POE to request protection.[67]

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**75.**    Statements from on-the-ground CBP officials further confirm the continued existence of a high-level Turnback Policy. In El Paso, a CBP official blocking asylum seekers' path to the POE on the bridge explained that he was "following directions. And this is not even local directions."[68] On a separate occasion, CBP officials in El Paso, including supervisors, told a non-profit worker that they were turning back asylum seekers because they "ha[d] orders not to let anybody in," that "this is a policy across the border," and that "[i]t's an order from [U.S. Attorney General Jeff] Sessions."[69]

**Answer:** Defendants deny that they have implemented a "Turnback Policy." Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations that individual CBP officers made the statements quoted in this

---

[67] Human Rights First, *Zero-Tolerance Criminal Prosecutions: Punishing Asylum Seekers and Separating Families* 8 (2018), https://www.humanrightsfirst.org/resource/zero-tolerance-criminal-prosecutions-punishing-asylumseekers-and-separating-families [hereinafter *Zero-Tolerance Criminal Prosecutions*].

[68] Robert Moore, *Border Agents Are Using a New Weapon Against Asylum Seekers*, Tex. Monthly (June 2, 2018), https://www.texasmonthly.com/politics/immigrant-advocates-question-legality-of-latest-federal-tactics/.

[69] Declaration of Taylor Levy in Support of the State of Wash. at 8, Washington v Trump, No. 18-939-MJP (W.D. Wash. July 2, 2018), https://agportals3bucket.s3.amazonaws.com/uploadedfiles/Another/News/Press_Releases/motion%20declarations%201-33.pdf.

paragraph, but in any event deny that they were made at the direction of higher-level CBP officials.

**76.** Recent official government statements acknowledging the policy assert a "lack of capacity" to process the flow of asylum seekers at the southern border. In fact, and in accordance with a central goal of the Turnback Policy to deter future asylum seekers from presenting themselves at the U.S. border, CBP's own statistics indicate that there has not been a particular surge in numbers of asylum seekers coming to POEs. From January through September 2018, the number of people without legal status attempting to enter the United States from Mexico, including asylum seekers, has stayed at roughly the same level as over the previous five years. During those five years, U.S. authorities regularly processed asylum seekers without the delays that CBP has imposed in 2018.[70] Based on available statistics, Amnesty International has characterized the "supposedly unmanageable number of asylum claims" as "a fiction."[71]

**Answer:** Defendants admit that CBP's metering/queue management procedures are implemented based on a lack of capacity at the ports of entry. Defendants deny that they have implemented a "Turnback Policy." Defendants deny that CBP's own statistics indicate that there has not been a surge of asylum seekers at ports of entry along the U.S.-Mexico border. Defendants aver instead that while the total number of inadmissible aliens apprehended at ports of entry along the U.S.-Mexico border increased slightly between FY2017 and FY2018, from 111,275 to 124,511, the total number of those inadmissible aliens who also asserted a claim of fear—*i.e.*, asylum seekers—*more than doubled*, from 17,284 to 38,269. *See* CBP, "Claims of

---

[70] *Southwest Border Migration FY2018*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration (last visited Oct. 10, 2018).

[71] *You Don't Have Any Rights Here*, *supra* note 40, at 14.

Fear: CBP Southwest Border and Claims of Credible Fear Total Apprehensions/Inadmissibles (FY2017–FY2018)," https://www.cbp.gov/newsroom/stats/sw-border-migration/claims-fear (last accessed Aug. 7, 2019). Defendants deny the remaining allegations in this paragraph.

77.     In fact, there is substantial evidence that calls into question the claims of a lack of capacity. There is evidence to suggest such claims are false and instead are designed to effectuate the broader policy goal of restricting access to the asylum process, according to governmental and non-governmental sources. In early 2018, senior CBP and ICE officials in San Ysidro, California, stated in interviews that "CBP has only actually reached its detention capacity a couple times per year and during 'a very short period' in 2017."[72] The OIG Report notes that while CBP justifies the official "metering" policy by citing a lack of capacity to process asylum seekers, "the OIG team did not observe severe overcrowding at the ports of entry it visited."[73] Human rights researchers visiting seven POEs in Texas in June 2018 reported that "[t]he processing rooms visible in the ports of entry . . . appeared to be largely empty."[74] CBP's "capacity" excuse appears to be a cover for a "deliberate slowdown" of the rate at which the agency receives asylum seekers at POEs.[75]

---

[72] *Id.* at 15 (citing an interview with ICE's Assistant Field Office Director at Otay Mesa Detention Center on May 1, 2018, and an interview with the CBP Field Officer Director in San Diego on January 5, 2018).

[73] *OIG Report*, *supra* note 1, at 8.

[74] *Zero-Tolerance Criminal Prosecutions*, *supra* note 67, at 9.

[75] Adam Isacson et al., Wash. Office on Latin Am., *"Come Back Later": Challenges for Asylum Seekers Waiting at Ports of Entry* 3 (2018), https://www.wola.org/wp-content/uploads/2018/08/Ports-of-Entry-Report_PDFvers-3.pdf [hereinafter *Come Back Later*]; Debbie Nathan, *Desperate Asylum-Seekers Are Being Turned Away by U.S. Border Agents Claiming There's "No Room"*, The Intercept (June 16, 2018, 8:37 AM), https://theintercept.com/2018/06/16/immigration-border-asylum-central-america/ (reporting that a shelter manager in the El Paso area familiar with CBP's

**Answer:** With respect to the allegations in the first and second sentences of this paragraph, Defendants deny that their claims of a lack of capacity are false. Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of this paragraph. Defendants admit that the OIG report states that the OIG team did not observe severe overcrowding at the ports of entry it visited, and aver that the OIG report also clearly states: "During our visits, OIG did not observe CBP turning away asylum-seekers while there was available space." Defendants admit that the Human Rights First report cited in footnote 74 states that "[t]he processing rooms visible in the ports of entry visited by Human Rights First appeared to be largely empty," but deny that the number of people in a processing room—*i.e.*, a waiting area—at a given moment is, by itself, necessarily sufficient to demonstrate a port's capacity. Defendants deny that their assertions of a lack of capacity are a "cover" for a deliberate slowdown of the rate at which the agency receives asylum seekers at ports of entry.

**78.** On October 10, 2018, CBP rejected thirty-two asylum seekers including small children and pregnant women at the Córdoba International Bridge between Ciudad Juarez and El Paso, Texas. CBP stopped the individuals and told them that there was no capacity to take them in, including the pregnant women who were some of the most vulnerable people in the group. However, only two or so hours later, CBP officers in the middle of the bridge received orders to let all thirty-two individuals in belying the initial assertion of a lack of capacity. Similarly, in Nogales, Arizona, recently CBP abruptly switched from processing six asylum seekers per day—citing a lack of capacity to take any more—to twenty asylum seekers per day. "The sudden change in processing capability points more to an administrative decision than to an increase in capacity which would more likely happen gradually."[76]

---

and ICE's local processing facilities "can't imagine they are overtaxed").

[76] *Come Back Later*, *supra* note 75, at 5.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** Defendants admit that metering procedures were in place at the El Paso port of entry on October 10, 2018. Defendants deny that the El Paso port of entry "rejected" any individuals from crossing into the port. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

79.     By restricting the number of individuals who can seek access to the asylum process—particularly given manifestly grave dangers asylum seekers face while waiting on the Mexican side of the border—the Turnback policy operates as a constructive denial of access to the asylum process. The denial threatens grave harm to vulnerable individuals waiting in very dangerous conditions on the Mexican side of the border.

**Answer:** Defendants deny that they are restricting the number of individuals who can seek access to the asylum process or that they are constructively denying anyone the opportunity to seek access to the asylum process and aver instead that CBP has issued guidance permitting ports of entry along the U.S.-Mexico border to implement metering procedures based on their operational capacities when necessary or appropriate to facilitating orderly processing and maintaining the security of the port and safe and sanitary conditions for the traveling public. *See* Ex. 1, Owen Memo. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

80.     In addition, an assertion of a lack of capacity is not a lawful basis to deny the non-discretionary duty to provide access to the asylum process.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

**81.**   Other U.S. government entities have raised concerns about CBP's treatment of asylum seekers. In 2016, for example, the bipartisan U.S. Commission on International Religious Freedom noted some CBP officers' "outright skepticism, if not hostility, toward asylum claims."[77]

**Answer:** Defendants admit only that this paragraph accurately quotes the cited portions of the Commission's report, which, in its entirety, speaks for itself. Defendants deny any remaining allegations in this paragraph.

**82.**   Congress has also signaled concern over CBP's treatment of asylum seekers at the border. "While proposing over $58 billion in federal funding for DHS agencies, the House Appropriations Committee in July 2018 called on DHS to 'ensure that the United States is meeting its legal obligations, to include reminding field officers and agents about CBP's legal responsibilities to ensure that asylum-seekers can enter at POEs [ports-of-entry].'"[78]

**Answer:** Defendants admit only that this paragraph accurately quotes from the House Committee report, which, in its entirety, speaks for itself. Defendants deny

---

[77] See U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* 2 (2016) (reporting that despite findings and recommendations in a 2005 study relating to primary inspection, USCIRF observers in 2016 continued to find "several examples of non-compliance with required procedures" in CBP primary inspection interviews); see also *2005 USCIRF Report*, *supra* note 37, at 54 (finding that, in approximately half of the inspections observed, inspectors failed to read the proper advisals regarding asylum to the non-citizen and that "in 15 percent of [the] cases [ ] where an arriving [non-citizen] expressed a fear of return to the inspector, that [non-citizen] was not referred" for a credible fear interview).

[78] *You Don't Have Any Rights Here*, *supra* note 40, at 11 (citing Staff of H.R. Comm. on Appropriations, 115th Cong., Rep. on Department of Homeland Security Appropriations Bill, 2019 4, 26 (Comm. Print 2018), https://docs.house.gov/meetings/AP/AP00/20180725/108623/HMKP-115-AP00-20180725-SD004.pdf [hereinafter *Bill Report Draft*]).

any remaining allegations in this paragraph.

**83.**     As detailed below, Plaintiffs Bianca, Emiliana, César, Roberto, Maria, Úrsula, and Juan were each subject to the Turnback Policy when CBP officials told them there was no capacity to process them and/or that they had to wait an unreasonable or indeterminate amount of time in very dangerous conditions on the Mexican side of the border before they could access the asylum process. Plaintiffs Victoria, César, Maria, Úrsula, and Juan were each subject to the Turnback Policy when CBP officials told them to speak to a Mexican official (Victoria) or when Mexican officials intercepted them (César, Maria, Úrsula, Juan) and interfered with their ability to access the U.S. asylum process.

**Answer:** Defendants deny that they have implemented a "Turnback Policy" and that any individual Plaintiff was subjected to a "Turnback Policy." Defendants aver that CBP has issued guidance permitting ports of entry along the U.S.-Mexico border to implement metering procedures based on their operational capacities when necessary or appropriate to facilitating orderly processing and maintaining the security of the port and safe and sanitary conditions for the traveling public. *See* Ex. 1, Owen Memo. Defendants lack knowledge or information sufficient to form a belief as to whether any individual Plaintiff sought to enter a particular port of entry during a period when the port was metering, whether any individual Plaintiff was instructed to speak to a Mexican government official, or whether any individual Plaintiff was intercepted by a Mexican government official.

**C.    CBP Officials' Unlawful Practices Have Denied Hundreds of Asylum Seekers Access to the Asylum Process**

**84.**     Starting in or around mid-2016 and continuing to the present, CBP officials also have been engaging in other unlawful, widespread practices to deny asylum seekers access to the asylum process—independently or as a part of or incident to the Turnback Policy. These practices include the use of misrepresentations; threats

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

and intimidation; coercion; and verbal and physical abuse; denying outright access to the asylum process; physically obstructing access to the POE; forcing asylum seekers to wait unreasonable or indeterminate amounts of time before being processed; and racially discriminatory denials of access. Asylum seekers and advocates have experienced and/or witnessed firsthand CBP's illegal conduct.

**Answer:** Defendants deny the allegations in the first sentence of this paragraph. With respect to the allegations in the second sentence of this paragraph, Defendants deny that they have sanctioned the use of lying, threats, intimidation, coercion, verbal or physical abuse, outright denial of access to the asylum process, or denial of access to the asylum process in a racially discriminatory manner in their management of the ports of entry, either as part of or independent of CBP's metering/queue management practices. Defendants admit that they have sanctioned the use of physical access controls at the border. Defendants admit that some individuals may be required to wait in Mexico before entering a port of entry, but deny that such wait times are unreasonable. Defendants deny any remaining allegations in this paragraph.

## 1.  Misrepresentations

**85.**  CBP officials misinform asylum seekers with the following misrepresentations, among others: that the United States is no longer providing asylum; that President Trump signed a new law that ended asylum in the United States; that the law providing asylum to Central Americans ended; that Mexicans are no longer eligible for asylum; that the United States is no longer accepting mothers with children; that the United States got rid of the law that allowed for asylum for children; that asylum seekers cannot seek asylum at the POE, but must go to the U.S. Consulate in Mexico instead; that visas are required to cross at a POE; that asylum seekers must first speak with Mexican immigration officials before they will be allowed to enter the United States to seek asylum; that there is not "space" for additional asylum

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

seekers to enter; that there are "too many people"; that the port is "full"; that the shelters or detention centers where asylum seekers will be held are "full"; that there are too few officials in the port to process asylum seekers; that asylum seekers must wait for people to leave before they can enter; and that by coming to the POE, asylum seekers are in a "federal zone" and therefore they must leave.

**Answer:** Defendants admit only that CBP officers have implemented metering/queue management practices based on the ports' operational capacities and have at times instructed aliens who lack entry documents to wait to enter until the port has the capacity to process their application for admission. Defendants deny that CBP officers' statements related to the ports' operational capacities are misrepresentations. Defendants deny that the use of "misrepresentations" is consistent with agency guidance. Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

86.    Class Plaintiffs Abigail, Beatrice, Dinora, Ingrid, Victoria, Bianca, Emiliana, Roberto, Úrsula, and Juan each experienced this practice. Dinora and Ingrid both were told asylum was no longer available in the United States. Abigail was told that only the Mexican government could help her. Beatrice was told that the U.S. government had no obligation to help her and that she had no right to enter the United States. Victoria and Bianca were told they needed to speak with Mexican officials. When Bianca, Emiliana, and Roberto approached CBP officials to apply for asylum, they were told they could not apply because the ports were "full." Úrsula and Juan were told that the POE was "closed" even though it was mid-afternoon.

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

## 2.    Threats and Intimidation

87.    CBP officials threaten and intimidate asylum seekers in the following ways: threatening to take asylum seekers' children away from them if they did not

leave the POE; threatening to separate children from parents if they did not accept voluntary departure; threatening to detain and to deport asylum seekers to their home countries if they persisted in their claims; threatening to ban asylum seekers from the United States for life if they continued to pursue asylum; threatening to bring criminal charges against asylum seekers if they refused to leave the POE; threatening to use a taser or let dogs loose if asylum seekers refused to go back to Mexico; and threatening to call Mexican immigration officers if asylum seekers did not leave the POE.

**Answer:** Defendants deny that the use of "threats and intimidation" is consistent with agency policy. Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

88.     Class Plaintiffs Abigail, Beatrice, and Carolina each experienced this practice and were threatened that if they tried to cross and pursue their asylum claims, U.S. government officials would take their children away or separate their families. Additionally, Dinora was threatened that if she and her daughter returned to the POE, they would be deported to Honduras. Beatrice was told that if she returned to the POE, she would be put in jail for three years.

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

### 3.     Verbal and Physical Abuse

89.     As part of their systematic practice of denying asylum seekers arriving at POEs access to the U.S. asylum process, CBP officials also regularly resort to verbal and even physical abuse, including, for example, by: grabbing an asylum seeker's six-year-old daughter's arm and throwing her down onto the ground; holding a gun to an asylum seeker's back and forcing her out of the POE; knocking a transgender asylum seeker to the ground and stepping on her neck; telling an asylum seeker she was scaring her five-year-old son by persisting in her request for asylum

and accusing her of being a bad mother; laughing at an asylum-seeking mother and her three children and mocking the asylum seeker's thirteen-year-old son who has cerebral palsy; yelling profanities at an asylum-seeking mother and her five-year-old son, throwing her to the ground, and forcefully pressing her cheek into the pavement; making very derogatory comments about an asylum seeker's country of origin ("Fuck Honduras"); denying four asylum seekers on five consecutive days because "Guatemalans make us sick"; repeatedly and angrily yelling at asylum seekers to make them leave the POE; inquiring whether an asylum seeker was pregnant, and when the answer was negative, saying "that was good because they did not want more children in the United States"; grabbing the arms of an asylum seeker hard enough to leave bruises, bending them behind her back in order to drag her back to Mexico, and also physically dragging her child back to Mexico; grabbing another asylum seeker by the shoulders hard enough to leave bruises and dragging her out of the POE with her seven-year-old watching and yelling "leave my mommy alone!"; pushing an asylum seeker while she was holding her infant daughter; and pushing another asylum seeker while she was holding her three-year-old son. One asylum seeker reported that she sought mental health treatment to process how she was treated after being forcibly dragged out of the POE and back to Mexico with her two children.

**Answer:** Defendants admit that, on at least one occasion, CBP officers at a land port of entry along the U.S.-Mexico border used verbal abuse or physical force, but deny that such conduct was or is consistent with agency policy. Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

90.   Class Plaintiffs Dinora and Beatrice both experienced this practice. One CBP official pulled Dinora inside a gate at the POE to try to separate her from her daughter. Later, as CBP officials escorted Dinora and her daughter out of the POE,

one of the CBP officials tried to drag Dinora by her arm. Beatrice also experienced rough treatment and cried out in pain when a CBP official forcefully searched her for drugs.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

### 4.    Coercion

**91.**    CBP officials resort to coercion to deny asylum seekers arriving at POEs access to the U.S. asylum process, including: coercing asylum seekers into recanting their fear on video; and coercing asylum seekers into withdrawing their applications for admission to the United States.

**Answer:** Defendants deny that the use of "coercion" is consistent with CBP policy. Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**92.**    Class Plaintiffs Abigail, Beatrice and Carolina each experienced this practice of coercion. Each was coerced to sign a form, written in English and not translated, which they did not understand, that stated they were voluntarily withdrawing their claims for asylum on the ground that they did not fear returning to Mexico. The forms CBP officials coerced them to sign were and still are false. At the time the initial Complaint in this case was filed, Abigail, Beatrice and Carolina still had a grave fear of persecution in Mexico.

**Answer:** Defendants admit that Abigail, Beatrice, and Carolina each withdrew their applications for admission, but deny that such withdrawals were coerced. Defendants admit that the Form I-275, Withdrawal of Application for Admission/Consular Notification, is written in English, but aver that Abigail's, Beatrice's, and Carolina's processing was conducted in Spanish. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of this paragraph.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

### 5.   Outright Denial of Access

**93.**   In some cases, CBP officials simply turn asylum seekers away from POEs without any substantive explanation. For example, CBP officials have indicated that a particular POE is not receiving any asylum seekers; that asylum seekers should "vete" (go away); that asylum seekers must leave; that asylum seekers will not be allowed to enter the United States; that there is no help for asylum seekers at the POE; and that asylum seekers simply must "move aside" to allow other pedestrian traffic to pass. In other cases, CBP officials simply ignore people who indicate a desire to seek asylum, or flatly refuse to look at their identity documents.

**Answer:** Defendants admit that, on at least one occasion, an individual arrived at a port of entry and was not properly processed, but deny that outright denial of access to the ports of entry is consistent with agency policy. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**94.**   Victoria and César both experienced this practice. When Victoria told a CBP official she wanted to seek asylum, the official responded that she could not do so at that time. When César tried to present himself at a POE and stated his intent to apply for asylum, CBP officials refused to let him proceed to the POE.

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

### 6.   Physically Blocking Access to the POE

**95.**   In recent months, CBP officials at numerous POEs have begun preliminarily checking pedestrian travelers' documents at makeshift or permanent "pre-checkpoints" housed under tarps or in tents at or near the U.S.-Mexico border.[79] The

---

[79] *See, e.g.,* Hannah Wiley, *Critics Say New Barriers on Border Bridge Are Meant*

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

CBP officials do not permit asylum seekers to walk past the pre-checkpoint to enter the POE building, forcing them to remain on the Mexican side of the border just inches away from the United States.

**Answer:** Defendants admit only the allegations in this paragraph.

**96.** On information and belief, CBP sometimes enlists Mexican officials to act as their agents in blocking asylum seekers' access to POEs. In the Rio Grande Valley, for example, Mexican officials have intercepted asylum seekers as they were approaching turnstiles at bridge entrances on the Mexican side. Without passing through the turnstile, an asylum seeker cannot walk across the bridge to the POE to seek protection in the United States. Mexican officials also reportedly meet CBP officials in the middle of bridges to escort asylum seekers away from the border and back into Mexico, where they are often detained or deported to dangerous conditions in their home countries.

**Answer:** Defendants admit that CBP officers communicate with Mexican officials regarding metering/queue management procedures. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

---

*to Deter Asylum-Seekers*, Tex. Trib. (Oct. 1, 2018), https://www.texastribune.org/2018/10/01/border-asylum-port-of-entry-texas-mexico/; Meredith Hoffman, *The Horrible Conditions Endured by Migrants Hoping to Enter the US Legally*, VICE (July 3, 2018), https://www.vice.com/en_us/article/59qny3/migrants-hopingto-get-us-asylum-forced-to-wait-on-bridge; John Burnett, *After Traveling 2,000 Miles for Asylum, This Family's Journey Halts at a Bridge*, NPR (June 15, 2018), https://www.npr.org/2018/06/15/620310589/after-a-2-000-mile-asylum-journeyfamily-is-turned-away-before-reaching-u-ssoil; Molly Hennessy-Fiske, *Caught in Limbo, Central American Asylum-Seekers Are Left Waiting on a Bridge Over the Rio Grande*, L.A. Times (June 7, 2018), http://www.latimes.com/nation/la-na-asylum-seeking-families-borderbridges-20180605-story.html; Moore, *supra* note 68.

**97.**     CBP physically blocked Roberto, Maria, Úrsula, and Juan from access-
ing the asylum process by stopping them at pre-checkpoints at the border and refus-
ing to let them pass. In addition, César was intercepted by Mexican officials outside
the POE and pushed into a corner to prevent him from approaching the POE. Mexi-
can officials physically escorted Roberto and Maria away from CBP officials sta-
tioned at the border and detained them to block their access to the POE. Mexican
officials also blocked Maria, Juan, and Úrsula from reaching the POE by preventing
them from walking onto the sidewalk leading to the POE. CBP officials witnessed
Mexican officials block Maria's access and, when Maria's lawyer questioned them
about it, CBP officials refused to intervene.

**Answer:** Defendants presently lack knowledge or information sufficient to
form a belief as to the truth of the allegations in this paragraph.

### 7.     Waitlists and Unreasonable Delays

**98.**     By its own admission, CBP officials force asylum seekers to wait for
days, weeks or indefinitely in Mexico before allowing them to access the asylum
process.

**Answer:** Defendants admit that, at times, aliens without entry documents,
some of whom may later seek asylum, may need to wait to enter the land ports of
entry along the U.S.-Mexico border until the ports have the operational capacity to
process their applications for admission. Defendants admit that some such aliens
may wait for days or weeks, but deny that the wait is indefinite. Defendants deny
any remaining allegations or characterizations in this paragraph.

**99.**     CBP officials process a limited number of asylum seekers per day, even
when dozens are waiting. At some POEs, CBP appears to process a fixed number of
asylum seekers—often two, three, or four. On some days, CBP officials do not pro-
cess any asylum seekers.

**Answer:** Defendants admit only that, on a given day, CBP officials permit as

1   many individuals who lack entry documents into the ports as operational capacity

2   permits, and that, on some days, a port may not have the capacity to process any

3   such individuals. Defendants deny any remaining allegations or characterizations in

4   this paragraph.

5

6   **100.**   CBP officials also routinely tell asylum seekers approaching POEs that

7   in order to apply for asylum, they must get on a list or get a number. The lists are

8   typically managed by Mexican immigration officials or other third parties based in

9   Mexico. CBP officials will not permit asylum seekers to enter the United States until

10   their number is called, which can take days, weeks or longer. Often, the people man-

11   aging the lists only give out new numbers during particular hours of the day, and so

12   are inaccessible to asylum seekers who are unable to locate them. Despite diligent

13   efforts, some individuals have reportedly been unable to get their names on the lists

14   due to the list managers' biases against the individuals' ethnicity, sexual orientation

15   or gender identity.

16   **Answer:** Defendants presently lack knowledge or information sufficient to

17   form a belief as to the truth of the allegations in the first and second sentences of this

18   paragraph. Defendants deny the allegations in the third sentence of this paragraph.

19   Defendants presently lack knowledge or information sufficient to form a belief as to

20   the truth of the allegations in the fourth and fifth sentences of this paragraph.

21   **101.**   As a result of these practices, asylum-seeking men, women and children

22   wait endlessly on or near bridges leading to POEs in rain, cold, and blistering heat,

23   without sufficient food or water and with limited bathroom access. They sleep out-

24   side for many nights in a row, sometimes for a week or more. The entire time they

25   are waiting to be processed, the asylum seekers are at risk of harm from either per-

26   secutors that have followed them from their home countries, or from gang violence

27   and other criminal threats prevalent along the Mexico side of the U.S.-Mexico bor-

28   der.

69

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**102.**   Bianca, Emiliana, and César experienced this practice because they were required to get on a list in order to access the asylum process. Bianca, Emiliana, and Roberto were told they would have to wait an indeterminate and unreasonable amount of time before they could seek asylum—Bianca was told she would have to wait "multiple weeks"; Emiliana was told to come back in six weeks; Roberto was told he would have to wait for "hours, days, or weeks". In addition, Bianca, Emiliana, and Maria were merely told to stand aside and wait for an indeterminate period of time. Úrsula and Juan were told they had to "wait their turn," without any indication of what that meant.

**Answer:** Defendants presently lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

### 8.   Racially Discriminatory Denials of Access

**103.**   In March 2018, CBP officials at the midpoint of the Paso Del Norte Bridge separating Ciudad Juarez, Mexico and El Paso, Texas, rejected four Guatemalan asylum seekers' requests to access the asylum process on five consecutive days because according to CBP, "Guatemalans make us sick."

**Answer:** Defendants deny that they have sanctioned the use of racially discrimination in their port management practices. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**104.**   On information and belief CBP agents racially profile individuals crossing on bridges, stopping and asking for identification documents from darker-skinned Central American-appearing individuals while allowing lighter-skinned individuals to pass.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**105.** César was subject to this practice. When he approached the POE to apply for asylum, he was placed in a group with only other Central Americans, away from the Africans and Mexicans, after which he was arrested, detained, and threatened with deportation.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**106.** All of the above-referenced tactics served to deny asylum seekers access to the U.S. asylum process.

**Answer:** Defendants deny they have sanctioned the widespread tactics alleged above to deny asylum seekers access to the asylum process.

**D.   Documentation from Experts and NGOs Confirms the Prevalence and Persistence of the Turnback Policy and CBP's Other Unlawful Practices**

**107.** Non-governmental organizations and other experts working in the U.S.-Mexico border region have extensively documented the devastating consequences of CBP's unlawful Turnback Policy and other unlawful practices designed to restrict or deny access to the asylum process.

**Answer:** Defendants deny that they have implemented a "Turnback Policy" or other unlawful practices designed to restrict or deny access to the asylum process. Defendants admit that non-governmental organizations and other individuals purport to have documented CBP's conduct at ports of entry along the U.S.-Mexico border.

**108.** In June 2017, Amnesty International, a non-profit human rights organization, published a report on CBP's ongoing practice of turning back asylum seekers at the U.S.-Mexico border entitled *Facing Walls: USA and Mexico's Violations*

*of the Rights of Asylum-Seekers.*[80] In compiling the report, Amnesty International interviewed more than 120 asylum seekers as well as approximately 25 government officials and 40 civil society organizations. The report documents numerous instances in which CBP officials denied asylum seekers access to the asylum system at five different POEs along the U.S.-Mexico border. The report details the following conduct:

    a. CBP officials coerce asylum seekers into recanting their fear of persecution on videotape and threaten to deport them back to their home countries if they do not comply;

    b. CBP officials tell asylum seekers that they will first have to get a "ticket" from Mexican authorities before seeking asylum;

    c. CBP officials coerce asylum seekers into signing a voluntary return paper under the threat that, if they do not, then they will be deported and will never be allowed into the United States; and

    d. CBP officials tell Mexican asylum seekers that there is no more asylum for Mexicans.

**Answer:** Defendants admit only that this paragraph describes select portions of the cited Amnesty International report, which speaks for itself.

**109.** In October 2018, Amnesty International issued a subsequent report entitled *USA: 'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States,*[81] documenting CBP's continuing practice of turnbacks at POEs in California, Arizona and Texas, and concluding that, in 2017 and 2018, the U.S. government had "intensified a systematic and dangerous de facto policy of illegal pushbacks against asylum seekers, in order

---

[80] *See Facing Walls, supra* note 38.

[81] *You Don't Have Any Rights Here, supra* note 40.

to prevent them from requesting protection at official U.S. ports-of-entry." In addition to the conduct outlined above, the report details the following:

    a. CBP used "slowdown" tactics to force asylum seekers to wait for days or weeks in Mexico before allowing them to seek protection at POEs;

    b. At several POEs, CBP officials temporarily stopped receiving any asylum seekers;

    c. CBP erected temporary checkpoints in the centers of international bridges to Mexico at various POEs, where CBP officers instructed pedestrians without valid Mexican travel documents to return to Mexico or called Mexican officials to remove such individuals from the bridge.

**Answer:** Defendants admit only that this paragraph describes select portions of the cited Amnesty International report, which speaks for itself.

110.    In August 2018, the Washington Office on Latin America ("WOLA"), a non-profit human rights research and advocacy organization, published a thorough report entitled *'Come Back Later': Challenges for Asylum Seekers Waiting at Ports of Entry*.[82] WOLA's report, based on years of documentary research and a visit to the U.S.-Mexico border in June 2018, details the following developments:

    a. There has recently been "a marked slow-down" in CBP's processing of asylum seekers at POEs, leading to long lines of individuals and families waiting to present themselves to seek asylum;

    b. In June 2018, CBP officials at the Nogales POE had allowed a backlog of 113 people, including 48 families, who were waiting in Nogales, Mexico to present themselves to seek asylum;

    c. CBP officials "have positioned themselves on the [physical] border, pre-screening people before they are allowed to enter U.S. territory and repeatedly denying asylum-seekers entry into the country, forcing them

---

[82] *Come Back Later*, *supra* note 75.

to wait days or even weeks in hot and in some areas dangerous Mexican border towns";

d. CBP officials at smaller POEs tell asylum seekers that they no longer process asylum claims at those POEs, and that the migrants must travel to larger POEs many miles away; and

e. Mexican government officials block access to the McAllen POE on the Reynosa side, and detain asylum seekers who lack the proper travel documents to be in Mexico.

**Answer:** Defendants admit only that this paragraph describes select portions of the cited WOLA report, which speaks for itself.

**111.** In May 2017, Human Rights First, a respected non-governmental organization, published an exhaustive report entitled, "Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers."[83] In that report, Human Rights First details firsthand accounts of CBP officials turning back asylum seekers without referring them for further screening or immigration court proceedings at POEs across the U.S.-Mexico border. The report details the following conduct:

a. CBP officials simply ignore requests by individuals to seek asylum;

b. CBP officials give false information about U.S. laws and procedures, such as saying that "the United States is not giving asylum anymore" and "[President] Trump says we don't have to let you in";

c. CBP officials mock and intimidate asylum seekers;

d. CBP officials impose a "gauntlet" and "charade" of procedures, including a "ticketing" system, to discourage asylum seekers; and

e. CBP officials coerce asylum seekers into denouncing any fear of persecution.

**Answer:** Defendants admit only that this paragraph describes select portions

---

[83] *See Crossing the Line, supra* note 32.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

of the cited Human Rights First report, which speaks for itself.

**112.** Despite the complete lack of statistics or recordkeeping on CBP's failure to comply with the law, Human Rights First's Report references more than 125 cases of CBP turning back individuals and families seeking asylum at POEs along the U.S.-Mexico border between November 2016 and April 2017. This is likely a small fraction of the number of asylum seekers who were illegally denied access to the asylum process during that period.

**Answer:** Defendants admit that they do not record the number of people instructed to wait in Mexico pursuant to their metering/queue management procedures. Defendants admit that the cited Human Rights First report purports to document more than 125 cases of CBP turning people back at ports of entry along the U.S.-Mexico border between November 2016 and April 2017; Defendants presently lack knowledge or information sufficient to form a belief as to the truth of that allegation and the remaining allegations in this paragraph.

**113.** In July 2018, Human Rights First supplemented its 2017 report with an issue brief documenting researchers' visits to seven international bridges in June 2018, at Hidalgo, Texas; Brownsville, Texas; Roma, Texas; Progreso, Texas; Laredo, Texas; and El Paso, Texas. The researchers found:

    a.  At all seven bridges visited, "CBP installed new checkpoints at the international border line" where "agents conduct document screening ahead of the processing center" and regularly turn back asylum seekers;

    b.  CBP agents tell asylum seekers at the bridges that the POE is "full" or "at capacity," which leaves asylum seekers "stranded for days or weeks in dangerous or difficult conditions";

    c.  Asylum seekers whom CBP fails to process "face extreme heat, lack of food, water, and bathroom facilities, [and] in some areas, they also face grave dangers and risks," particularly kidnapping;

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

d. A shelter in Tijuana, Mexico, was broken into and set on fire "likely because a group of transgender women were seeking refuge there after being turned away several times by [CBP]"; and

e. CBP officers tell asylum seekers that they cannot cross at the Stanton Street Bridge POE in El Paso, Texas.[84]

**Answer:** Defendants admit only that this paragraph describes select portions of the cited Human Rights First supplement, which speaks for itself.

**114.** From December 2016 to the present, the Women's Refugee Commission, a non-profit organization that advocates for women and children fleeing violence and persecution, has investigated and documented numerous instances in which CBP officials have turned asylum seekers away and refused to process them at various POEs along the U.S.-Mexico border, including POEs in San Ysidro and Calexico, California; Nogales and San Luis, Arizona; Santa Teresa, New Mexico; and El Paso, Laredo, and McAllen, Texas. The Women's Refugee Commission has documented the following conduct:

a. CBP officials tell asylum seekers there is no space for them;

b. CBP officials tell asylum seekers that the policies have changed and that they no longer qualify for asylum;

c. CBP officials threaten to call Mexican immigration authorities to remove asylum seekers from the POEs;

d. CBP officials threaten asylum seekers with prolonged detention in the U.S. if they pursue their asylum claims;

e. CBP officials threaten physical force to remove asylum seekers from the POEs;

f. CBP officials forcibly remove asylum seekers from the POEs;

g. CBP officials tell asylum seekers to go away;

---

[84] *Zero-Tolerance Criminal Prosecutions*, *supra* note 67, at 8–9.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

    h.  CBP officials tell asylum seekers that they must coordinate with Mexican immigration authorities in order to be processed;

    i.  CBP officials, in coordination with Mexican officials and agents, filter out asylum seekers who lack valid travel documents;

    j.  CBP officials deny asylum seekers the right to apply for asylum at certain POEs; and

    k.  CBP places officials, and sometimes semi-permanent structures, at the middle of international bridges to pre-screen migrants.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to whether the Women's Refugee Commission purports to have documented the conduct alleged in this paragraph.

**115.**  From October 2016 through the present, the Project in Dilley, which provides pro bono legal services to mothers and children detained at the South Texas Family Residential Center in Dilley, Texas, has identified more than 100 asylum-seeking mothers who were turned back by CBP officials at POEs along the U.S.-Mexico border, including POEs in San Ysidro, California; Calexico, California; San Luis, Arizona; Nogales, Arizona; El Paso, Texas; Del Rio, Texas; Eagle Pass, Texas; Laredo, Texas; Roma, Texas; McAllen, Texas; Los Indios, Texas; and Brownsville, Texas. The Project in Dilley has documented the following conduct:

    a.  CBP officials tell asylum seekers that asylum law is no longer in effect;

    b.  CBP officials tell asylum seekers that they have orders to send away everyone who is seeking asylum;

    c.  CBP officials tell asylum seekers that the POE is full and that they must wait to be processed, causing some asylum seekers to wait days or weeks without access to shelter, food, water, or bathrooms;

    d.  CBP officials threaten to deport asylum seekers to their home countries; and

e.  CBP officials use physical force to remove asylum seekers from POEs, including by handcuffing them, throwing them to the ground, shoving them and dragging them out of the POEs.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to whether the Project in Dilley has identified more than 100 asylum-seeking mothers who were "turned back" at the San Ysidro, Calexico, San Luis, Nogales, El Paso, Del Rio, Eagle Pass, Laredo, Roma, McAllen, Los Indios, and Brownsville ports of entry or whether the Project in Dilley purports to have documented the conduct alleged in this paragraph.

**116.**  Since December 2015, representatives of Plaintiff Al Otro Lado have accompanied more than 160 asylum seekers to the San Ysidro POE. Several representatives have witnessed firsthand and/or otherwise documented the tactics employed by CBP to prevent asylum seekers from accessing the U.S. asylum process. Al Otro Lado representatives have documented the following conduct:

a.  CBP officials tell asylum seekers they have to apply for asylum at the U.S. Consulate in Mexico or the U.S. Embassy in their home countries;

b.  CBP officials tell asylum seekers that they must first obtain a "ticket" from Mexican immigration in order to seek asylum;

c.  CBP officials tell asylum seekers that they are not processing asylum seekers at that POE and they must go to another POE to be processed;

d.  CBP officials tell asylum seekers that they cannot seek asylum at that time and must be put on a waiting list;

e.  CBP officials require asylum seekers to register with migrant shelters in Mexico which control the flow of asylum seekers to the POEs;

f.  CBP officials tell asylum seekers that they do not qualify for asylum;

g.  CBP officials coerce asylum seekers into withdrawing their asylum claims, including by threatening that they will be deported if they do

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

not do so;

h. CBP officials threaten asylum seekers with forced separation from their children, prolonged detention, and eventual deportation;

i. CBP officials subject asylum seekers to verbal abuse and degradation during the inspection process;

j. CBP officials ask asylum seekers to present paperwork they are not required to present; and

k. CBP officials threaten U.S. attorneys attempting to assist asylum seekers with ultra vires removal to Mexico.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to whether representatives of Al Otro Lado have accompanied more than 160 asylum seekers to the San Ysidro port of entry since December 2015 or whether they have documented the conduct alleged in this paragraph.

**117.** On January 13, 2017, various non-governmental organizations submitted an administrative complaint to DHS' Office for Civil Rights and Civil Liberties ("CRCL") and the OIG.[85] The administrative complaint provided specific examples of CBP turning back asylum seekers at POEs along the U.S.-Mexico border and urged CRCL and OIG to conduct a prompt and thorough investigation into this illegal practice and take swift corrective action.

**Answer:** Defendants admit the allegations in this paragraph.

**118.** Meanwhile, Defendants' illegal turnbacks continue. In fact, as previously noted, CBP has acknowledged its Turnback Policy in sworn testimony before

---

[85] *See* Am. Immigration Council at al., Complaint Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border 1–2 (Jan. 13, 2017), https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

Congress.[86]

**Answer:** Defendants deny they are engaging in "illegal turnbacks." Defendants deny that CBP or its employees acknowledged a "Turnback Policy" in sworn testimony before Congress.

**E.    Defendants' Policy and Practices Have Denied Each of the Class Plaintiffs Access to the Asylum Process**

*Plaintiff Abigail Doe*

**119.**   Abigail is a native and citizen of Mexico. She is the mother of two children under the age of ten, with whom she previously lived in Central Mexico. In May 2017, Abigail's husband disappeared after he refused to allow drug cartel members to use his tractor-trailer to transport drugs.

**Answer:** Defendants admit that Abigail is a native and citizen of Mexico and is the mother of two children who were minors at the time the original complaint was filed. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**120.**   When Abigail reported her husband's disappearance to governmental authorities, members of the drug cartel abducted her, held her at gunpoint, and threatened to kill her and her children if she continued to investigate her husband's disappearance. One cartel member told Abigail that she had to leave if she wanted to live. Fearing for her life, Abigail fled to Tijuana with her children to seek asylum in the United States.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**121.**   After arriving in Tijuana, Abigail and her children immediately sought access to the asylum process by presenting themselves at the San Ysidro POE. At

---

[86] *Wagner Testimony*, *supra* note 43, at 289–90.

the POE, Abigail informed CBP officials of her intent to apply for asylum and her fear of returning to Mexico. CBP officials repeatedly misinformed Abigail that she did not qualify for asylum. One CBP official threatened that her children would be taken away from her if they allowed her to cross the border and again misinformed her that only the Mexican government could help her.

**Answer:** Defendants admit that CBP officers encountered Abigail and her children without entry documents inside the San Ysidro port of entry on May 24, 2017, where she informed CBP officers that she wanted to go live with her family in San Clemente, California. Defendants deny all remaining allegations in this paragraph.

**122.** CBP officials coerced Abigail into signing a document in English which she could not read and did not understand. The document stated that she did not have a fear of returning to Mexico and was withdrawing her application for admission. CBP officials then instructed Abigail to say that she had agreed to accept the assistance of the Mexican government and used a video camera to record her statement. A CBP official then took Abigail and her children back to Mexico and left them to fend for themselves.

**Answer:** Defendants admit that Abigail signed a Form I-275, Withdrawal of Application for Admission/Consular Notification, on May 24, 2017, which has the legal effect of withdrawing her application for admission. Defendants admit that the Form I-275 is written in English, but aver that Abigail's processing was conducted in Spanish. Defendants admit that Abigail's withdrawal is video-recorded. Defendants deny all remaining allegations in this paragraph.

**123.** The statements CBP coercively obtained from Abigail were and are still false; Abigail does fear returning to and staying in Mexico and believes seeking assistance from the Mexican government would be futile.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** Defendants deny that they coerced Abigail into withdrawing her application for admission. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

124.   Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Abigail and her children into the United States.

**Answer:** Defendants admit the allegations in this paragraph.

*Plaintiff Beatrice Doe*

125.   Beatrice is a native and citizen of Mexico. In May 2017, Beatrice fled her hometown in Mexico with her three children, ages seven, eleven and fifteen, and her nephew. Beatrice's nephew was targeted by the Zetas, a Mexican drug cartel that controls most of Southern Mexico, for failing to pay a fee that the Zetas demanded from all individuals who worked in the market. The Zetas threatened to kill Beatrice's nephew and to harm his family if he did not pay the fees. The cartel also pressured Beatrice's nephew to join their forces and threatened to increase the fee if he refused. On two occasions when Beatrice's nephew failed to pay the fees, the Zetas beat him up.

**Answer:** Defendants admit that Beatrice is a native and citizen of Mexico and is the mother of three children who were minors at the time the original complaint was filed. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

126.   Beatrice herself suffered severe domestic violence at the hands of her husband. In May 2017, she reported his abuse to two government agencies. When Mexican government officials subsequently requested that Beatrice's husband meet with them, he responded that he would continue to do what he wanted with Beatrice and his children. Terrified, Beatrice left their house the same day.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

127. Beatrice fled with her children and nephew and traveled to Tijuana in order to seek access to the asylum process in the United States. Initially, Beatrice and her family sought access to the asylum process by presenting themselves at the Otay Mesa POE. When Beatrice expressed their intent to seek asylum, a CBP official told her that asylum-related services were not provided at that port, and directed her to go to the San Ysidro POE. Beatrice and her family then attempted twice to seek access to the asylum process at the San Ysidro POE, but CBP officials turned them away both times.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

128. The first time Beatrice and her family presented themselves at the San Ysidro POE, she explained that their lives were at risk in Mexico and that she was afraid of her husband. CBP officials misinformed her that the U.S. government had no obligation to help her or her family, that they did not have a right to enter the United States because they were not born there, and that she should seek help from the Mexican government.

**Answer:** Defendants admit that CBP officers encountered Beatrice and her children without entry documents inside the San Ysidro port of entry on May 25, 2017. Defendants aver that Beatrice stated that she wanted a work permit to enter the United States and live in San Diego. Defendants aver that Beatrice expressed no fear of returning to Mexico and requested to voluntarily return to Mexico. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

129. Another CBP official then threatened to take Beatrice's nephew away

from her and to put her in jail if she refused to sign an English document which she did not understand. Believing that she had no other option, she signed the document. CBP officials then escorted Beatrice and her family out of the POE.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of this paragraph. Defendants admit that Beatrice withdrew her application for admission, and that Beatrice's processing was conducted in Spanish.

**130.** The statements CBP coercively obtained from Beatrice were and are still false; Beatrice and her children fear returning to and staying in Mexico.

**Answer:** Defendants deny that they coerced Beatrice into withdrawing her application for admission. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**131.** The next day, Beatrice and her family returned to seek access to the asylum process by presenting themselves at the San Ysidro POE. A CBP official who recognized Beatrice from the day before misinformed her that she had no right to enter the United States or seek asylum, and that she would be put in jail for three years if she returned to the POE. After another CBP official separately threatened to transfer Beatrice's nephew to Mexican authorities and return him to Southern Mexico, CBP officials again escorted Beatrice and her family out of the San Ysidro POE.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**132.** Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Beatrice and her children into the United States.

**Answer:** Defendants admit the allegations in this paragraph.

*Plaintiff Carolina Doe*

**133.** Carolina is a native and citizen of Mexico. In May 2017, Carolina fled her hometown in Mexico with her three children, ages nine, fifteen and eighteen, after her brother-in-law, a high-ranking police official, was kidnapped, tortured and killed by members of a drug trafficking cartel. His dismembered body was found in garbage bags in a cemetery. Carolina's husband witnessed the kidnapping and showed Carolina a picture of one of the men who was involved. Drug cartel members threatened Carolina's husband after the murder, and Carolina and her husband saw the van used in the kidnapping drive by their house twice. Two men followed Carolina and her daughters on her way home from work, and several men came to their home at night. Carolina was terrified and hid with her daughters in the bathroom because she feared for her life and the lives of her daughters.

**Answer:** Defendants admit that Carolina is a native and citizen of Mexico and is the mother of three children who were nine, fifteen, and eighteen of age at the time the original complaint was filed. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**134.** In May 2017, Carolina fled in the middle of the night with her daughters and traveled to Tijuana in order to seek access to the asylum process in the United States. Carolina and her daughters presented themselves at the San Ysidro POE, and Carolina explained that they were afraid of returning to Mexico and wanted to seek asylum. CBP officials locked them in a room overnight at the San Ysidro POE. In the morning, a CBP official told Carolina that she would not be granted asylum and misinformed her that the protection she was seeking in the United States could be provided by the Mexican authorities. The CBP official threatened to take away Carolina's fifteen-year-old U.S. citizen daughter and put her in foster care, and told Carolina that if she did not want her daughter taken away from her, then she had to make a statement on video that she was not afraid of returning to Mexico.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** Defendants admit that CBP officers encountered Carolina and her children without entry documents inside the San Ysidro port of entry on May 17, 2017, at approximately 10:00 PM (Pacific). Defendants admit that Carolina was held at the port overnight. Defendants aver that, in the morning, Carolina stated that she was coming from Guerrero, Mexico, and wanted to live in the Portland, Oregon area with family. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**135.** The CBP officials coerced Carolina into recanting her fear on video. Carolina initially did not respond as the CBP officials instructed her to do because the responses they told her to say were not true. Carolina was afraid and wanted to respond that she was very scared to return to Mexico. One of the CBP officials repeated that the only way Carolina and her daughters would be able to leave voluntarily without her U.S. citizen daughter being taken away from her was if Carolina stated on video that she was not scared. Having been locked in a room overnight, Carolina was tired and scared and felt like she was in jail. The CBP officials continued to coerce her until she finally did what they told her to do, believing she had no choice.

**Answer:** Defendants admit that Carolina signed a Form I-275, Withdrawal of Application for Admission/Consular Notification, on May 18, 2017, which has the legal effect of withdrawing her application for admission. Defendants admit that the Form I-275 is written in English, but aver that Carolina's processing was conducted in Spanish. Defendants deny that they coerced Carolina into withdrawing her application for admission. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**136.** The CBP officials also coerced Carolina into signing a document in English which she could not read and did not understand. The document stated that she did not have a fear of returning to Mexico and was withdrawing her application

for admission. The statements CBP coercively obtained from Carolina were and are still false; Carolina does fear returning to and staying in Mexico.

**Answer:** Defendants admit that Carolina signed a Form I-275, Withdrawal of Application for Admission/Consular Notification, on May 18, 2017, which has the legal effect of withdrawing her application for admission. Defendants admit that the Form I-275 is written in English, but aver that Carolina's processing was conducted in Spanish. Defendants deny that they coerced Carolina into withdrawing her application for admission. Defendants deny all remaining allegations in this paragraph.

**137.** Several days after CBP turned back Carolina and her daughters at the POE, Carolina made arrangements for her U.S. citizen daughter to cross into the United States. Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Carolina and her other children into the United States.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of this paragraph. Defendants admit the allegations in the second sentence of in this paragraph.

***Plaintiff Dinora Doe***

**138.** Dinora is a native and citizen of Honduras. MS-13 gang members repeatedly threatened to kill Dinora and her then-seventeen-year-old daughter if they did not leave their house. After receiving the third threat, they fled to another city where they remained in hiding.

**Answer:** Defendants admit that Dinora is a native and citizen of Honduras. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**139.** When Dinora and her daughter subsequently returned home, three MS-13 members held them captive for three days and repeatedly raped each of them in

front of the other.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

140.   When Dinora and her daughter finally escaped, they fled to a shelter in Mexico. However, after being threatened by MS-13 gang members again in Mexico, they knew they had to leave.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

141.   On three separate occasions in August 2016, Dinora and her daughter sought access to the asylum process by presenting themselves at the Otay Mesa POE and expressing their intent to seek asylum in the United States. Each time, CBP officials turned them away.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

142.   During Dinora's first attempt, CBP officials misinformed her that there was no asylum in the United States and escorted Dinora and her daughter outside the POE.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

143.   During her second attempt later the same day, one CBP official misinformed Dinora that there was no asylum available in the United States for Central Americans and that if they returned to the POE, they would be handed over to Mexican authorities and deported to Honduras.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

144.    During her third attempt the next morning, a CBP official misinformed Dinora that she could pass through the POE, but would have to leave her daughter behind. When Dinora insisted that she and her daughter had a right to apply for asylum, CBP officials escorted them out of the POE.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

145.    Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Dinora and her daughter into the United States.

**Answer:** Defendants admit the allegations in this paragraph.

### *Plaintiff Ingrid Doe*

146.    Ingrid is a native and citizen of Honduras. At the time the initial Complaint was filed, Ingrid had two children and was pregnant with her third child.

**Answer:** Defendants admit the allegations in this paragraph.

147.    18th Street gang members murdered Ingrid's mother and three siblings. They also threatened to kill Ingrid.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

148.    For several years, Ingrid and her children were subject to severe abuse by her partner and the father of her son and the child that she was expecting. Ingrid's partner regularly raped Ingrid, sometimes in front of her children. He would also burn and beat Ingrid. One day, Ingrid's partner put a gun to Ingrid's head and threatened to kill her.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**149.**   In June 2017, Ingrid fled with her children to Tijuana, where they sought access to the asylum process by presenting themselves at the Otay Mesa POE.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**150.**   When they arrived at the Otay Mesa POE, Ingrid approached CBP officials and expressed her intent to seek asylum. The CBP officials misinformed Ingrid that they could not help her at the Otay Mesa POE and that she must go to the San Ysidro POE.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**151.**   Ingrid immediately went to the San Ysidro POE with her children to present herself and seek access to the asylum process. She approached several CBP officials, and expressed her intent to seek asylum. One of the officials misinformed Ingrid that there was no asylum and that she could not pass through the POE because she did not have any documents. Ingrid again stated that she wanted to seek asylum and that she could not go back to Honduras because she and her children would be killed. The CBP official responded that there was a new law in the United States that meant that there was no more asylum. Another CBP official then escorted Ingrid and her children out of the port.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**152.**   Following the filing of the initial Complaint in this case, Defendants made arrangements to facilitate the entry of Ingrid and her children into the United States.

**Answer:** Defendants admit the allegations in this paragraph.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

*Plaintiff Roberto Doe*

**153.** Roberto is a native and citizen of Nicaragua. Roberto fled Nicaragua in early September 2018 after receiving targeted threats of violence from the Nicaraguan government and paramilitaries allied with the government.

**Answer:** Defendants admit the allegations in the first sentence of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**154.** Roberto traveled through Mexico and arrived in Reynosa, Tamaulipas on September 29, 2018. On October 2, 2018, he sought access to the asylum process by presenting himself at the Hidalgo POE. Roberto was part of a group of six Nicaraguan nationals and one Honduran who were waiting in line. The group approached the U.S. immigration officials who were standing at the middle point of the bridge that divides the United States from Mexico, and told the U.S. officials that they wanted to seek asylum in the United States.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**155.** One of the U.S. officials responded that he had to talk to his office and made a call on his radio in English. He then directed Roberto and the rest of the group to stand to one side. After that, the U.S. official informed the group that they could not enter the POE, which was "all full." The U.S. official indicated that the group might have to wait for "hours, days, or weeks" before he could seek asylum.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**156.** A short while later, a female U.S. official made another call, and Roberto heard her say in Spanish that someone would come and pick up some people. A few minutes later, a Mexican immigration official arrived and asked to see the group

members' papers. After Roberto and the rest of the group handed over their papers, the Mexican official instructed them to come with him. One of the Nicaraguans asked the U.S. official to help them, saying that the Mexican immigration officials would deport them. The U.S. official responded that he did not care and did nothing.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**157.** The Mexican immigration official took Roberto and the rest of the group to the Mexican side of the bridge, where he left them in an office with Mexican immigration officials. While the group waited, various officials spoke on the phone. Roberto heard one of the officials say that they needed seven or eight spaces for the next deportation transport.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**158.** Eventually, the Mexican officials confiscated the asylum seekers' phones and escorted them to a small bathroom, where they were forced to wait, crowded together, for about an hour. While they were waiting, a Mexican official entered the bathroom and told them that they did not have the right to apply for asylum in the United States, and that it was a crime to try to do so. The Mexican official indicated that he was in communication with the U.S. authorities and that if they came back to the bridge and attempted to seek asylum, the U.S. officials would turn them over to the Mexican authorities and they would be deported to Nicaragua. The Mexican officials subsequently returned their papers and directed them to leave.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**159.** At the time the First Amended Complaint was filed, Roberto desired to return immediately to the Hidalgo POE to seek access to the asylum process, but

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

based on his past experience with CBP's practices at the U.S.-Mexico border, he feared that he would be turned away again and deported to Nicaragua. Defendants subsequently agreed to allow Roberto to access the asylum process if he returned to the Hidalgo POE. Roberto returned to the bridge on October 18, 2018, and as he was about to walk onto the pedestrian footbridge to walk to the POE, Mexican immigration officials detained him. Roberto has been in Mexican government custody since that date, and on information and belief, his refoulement to Nicaragua is imminent.

**Answer:** Defendants admit that they made arrangements to facilitate Roberto's entrance into the United States. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

### Plaintiff Maria Doe

**160.**   Maria is a citizen of Guatemala and a permanent resident of Mexico. She was married to a Mexican man and has two children who were born in Mexico.

**Answer:** Defendants admit that Maria is a citizen of Guatemala and that she is the mother of two minor children who were born in Mexico. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**161.**   Maria lived in Chiapas, Mexico for seven years with her husband and children. Maria left her husband, who was very abusive toward her and her children, after learning that he was involved with cartels. After she left, the cartels began searching for Maria and her children. For about two years, Maria and her children searched for a safe place to live, in Guatemala and in Mexico, but the cartels invariably found them and went after them. Maria's ex-husband remains involved with cartels and continues to threaten Maria and her children.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

162.    In September 2018, Maria traveled with her children to Nuevo Laredo, Mexico. On September 10, 2018, Maria and her children sought access to the asylum process by presenting themselves at the Laredo POE around 8:00 p.m. As they approached the midpoint of the bridge to the United States, CBP officials stopped Maria and her children and asked to see their identification. Maria told the U.S. officials that she wanted to seek asylum in the United States. The U.S. officials told her to wait on the Mexican side of the bridge until they called her.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

163.    After a few minutes, two Mexican officials walked toward her from the Mexican side of the bridge. The Mexican officials told Maria that the United States officials would not let her cross the bridge, but that they could help if she paid them $1,500 for herself and her children. Maria did not have money to pay the bribe, and instead traveled with her children to Reynosa, Mexico, to try to cross a different bridge to the United States.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

164.    After Maria arrived in Reynosa, she did not feel safe going to the bridge immediately. While staying at a shelter in Reynosa, Maria met an American lawyer who agreed to accompany her to the Hidalgo POE.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

165.    On September 19, 2018, Maria and her children, accompanied by the American lawyer, sought access to the asylum process by presenting themselves at the Hidalgo POE. They walked up to the bridge in Reynosa. They were at the turnstile at the entrance to the bridge and had only taken a few steps when a Mexican

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

immigration official demanded to see their identification documents. After Maria gave him their documents, the Mexican official started screaming that Maria was abusing her Mexican residence by trying to cross the bridge to seek asylum. He warned her that he would rip up her identity documents if she did not leave the bridge. Although Maria and her lawyer maintained that she had the right to seek asylum, she and her children left the bridge for fear that the Mexican official would hurt them or destroy their documents and deport them to Guatemala.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

166.    Maria and her children returned to the shelter for two weeks before attempting to seek access to the asylum process again. On October 9, 2018, Maria and her children, again accompanied by the American lawyer, sought access to the process by presenting themselves at the Hidalgo POE for the second time. When they arrived at the middle of the bridge, Maria started to tell the U.S. officials that she sought asylum. At that moment, however, a Mexican immigration officer grabbed Maria's arm and demanded to see her papers. Maria told the Mexican officer that she was a legal resident of Mexico with two Mexican children and showed him her papers. The officer told her that the Mexican residency permit did not allow her to go to the United States, and he ordered her to go to a station on the Mexican side of the border. Although Maria and the lawyer insisted that Maria had a right to seek asylum in the United States, the Mexican official called for backup.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

167.    Meanwhile, the American lawyer explained to the U.S. officials standing at the bridge that Maria wanted to seek asylum and that she and her children were in danger. The U.S. officials said that what was happening had nothing to do with them.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

168.   The Mexican officials took Maria to an office at the foot of the bridge and separated her from her children and the lawyer. They took Maria into a small room and told her that if she came back to the Hidalgo POE, they would revoke her Mexican residency.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

169.   At the time the First Amended Complaint was filed, Maria feared for her life in Mexico and desired to return to a POE to seek access to the asylum process, but based on her past experiences with CBP's practices at the U.S-Mexico border, she feared that she and her children would be turned away again or deported to Guatemala. Maria and her children feared for their lives in Mexico. After they arrived in Reynosa, they received multiple phone calls from blocked numbers, which Maria believes were from cartel members trying to track her location. On or around October 8, 2018, Maria's ex-husband called her directly and threatened her.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

170.   Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Maria and her children into the United States.

**Answer:** Defendants admit the allegations in this paragraph.

### Plaintiffs Úrsula Doe and Juan Doe

171.   Úrsula and Juan are natives and citizens of Honduras. They are a married couple with two children. They left Honduras with their children in August 2018 out of fear for their lives and the lives of their children.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** Defendants admit that Úrsula and Juan are natives and citizens of Honduras. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

172.   Úrsula saw members of a Honduran gang kill her brother in 2014. The gang knows she witnessed the murder and have repeatedly warned Úrsula and Juan of harm to their family. Gang members have called the family, gone to their house, and threatened to hurt their children.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

173.   Úrsula and Juan fled Honduras with their children to seek access to the asylum process in the United States. They traveled to Mexico, where they were robbed at gunpoint by three men who took all their money. Eventually they made it to Nuevo Laredo, Mexico, in late September 2018.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

174.   The day after they arrived in Nuevo Laredo, Úrsula, Juan, and their children went to the international bridge around 2:00 pm and sought access to the asylum process by presenting themselves at the Laredo POE. When they arrived at the middle of the bridge, U.S. officials told them they could not pass because the port was closed. Although Juan insisted that they wanted to request asylum, one of the officials said that they had to wait their turn, the port was closed, and they could not pass.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

175.   Úrsula, Juan, and their children subsequently traveled to Reynosa to seek access to the asylum process by presenting themselves at the Hidalgo POE.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

They went to the bridge in Reynosa with their children around 5:00 a.m. Shortly after they passed through the turnstile, a Mexican official grabbed their documents and ordered them to walk with him back to Mexico.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

176.   The Mexican official took Úrsula and Juan to a waiting room. A different Mexican official took Juan aside and warned him that he and his family could be deported. Úrsula, Juan, and their children were forced to wait all day without much food or water. Around 6:00 or 7:00 p.m., they were allowed to leave.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

177.   At the time the First Amended Complaint was filed, Úrsula and Juan desired to seek access to the asylum process in the United States, but based on their past experience with CBP's practice at the U.S.-Mexico border, they feared that they would be turned away again or deported to Honduras. At that time, they feared for their lives in Reynosa.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

178.   Defendants subsequently made arrangements to facilitate the entry of Juan, Úrsula, and their children into the United States.

**Answer:** Defendants admit the allegations in this paragraph.

### Plaintiff Victoria Doe

179.   Victoria is a sixteen-year old female native and citizen of Honduras. She is an unaccompanied minor and the mother of a one-year old child. In 2017, members of the infamous 18th Street gang held her at gunpoint and threatened her with death if she did not submit herself sexually to the leader of the gang. Fearful

for her life, she was able to flee to a separate part of Honduras. Shortly thereafter, the very same gang members followed her and repeated the same threats, demanding that she submit and become the property of the gang.

**Answer:** Defendants admit that Victoria is a native and citizen of Honduras, and that she was 16 years old and had a one-year-old child at the time the original Complaint was filed. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**180.** Victoria came to Tijuana with a refugee caravan in April 2018, intending to seek asylum in the United States. She lived in a migrant shelter for four months but was in constant fear of murder and other crime and was threatened by male strangers on a number of occasions. She was also fearful that she would be forced into sex trafficking as the 18th Street Gang had attempted.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**181.** On October 8, 2018, Victoria sought to access the asylum process by presenting herself at the San Ysidro POE, despite her fears that she and her son would be subject to the U.S. child separation policy. When she arrived, she informed the CBP officials of her intent to apply for asylum and her fear of returning to Honduras. In response, the CBP official told her that she could not apply for asylum at that time, and that she had to speak with a Mexican officer instead. The CBP official did not give further instruction as to which Mexican officer or where to locate the officer.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**182.** At the time the First Amended Complaint was filed, Victoria desired to return immediately to seek access to the asylum process by presenting herself at the

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

San Ysidro POE, but based on her past experience with CBP's practice at the U.S.-Mexico border, she understood that she would likely be turned away again. Victoria was fearful of remaining in Tijuana, for her life and the life of her son. She could not remain and believed seeking assistance from the Mexican government would be futile.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**183.**   Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate the entry of Victoria and her child into the United States.

**Answer:** Defendants admit the allegations in this paragraph.

### *Plaintiff Bianca Doe*

**184.**   Bianca is a native and citizen of Honduras. She is a transgender woman. Bianca suffered physical violence and extreme discrimination while in Honduras because she is transgender. She was targeted by the infamous MS-13 gang who tried to recruit her. Rather than join, and fearing for her life, she fled Honduras on April 2, 2018.

**Answer:** Defendants admit the allegations in the first and second sentences of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**185.**   Bianca arrived in Tapachula, Mexico and then later Mexico City, where she faced much of the same harassment and discrimination, including by police and federal officials. Eventually she reached Tijuana on September 19, 2018. She proceeded to seek access to the asylum process by presenting herself at the San Ysidro POE. CBP officials informed her that she could not apply for asylum because they were "full." Instead, they told her to seek assistance from Mexican workers in white

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

shirts. She did not see any and returned to a local shelter where she was staying.

**Answer:** Defendants lack knowledge or information sufficient to form a be-lief as to the truth of the allegations in this paragraph.

186.   Bianca returned the following day to seek access to the asylum process at the San Ysidro POE. She identified the Mexican workers in white shirts who in-formed her that they handled the asylum "waitlist" process. She was given a number, "919" which reflected her place on the waitlist. The Mexican workers told her that when her number was called she would be able proceed to the POE. She was in-formed that she would have to wait multiple weeks.

**Answer:** Defendants lack knowledge or information sufficient to form a be-lief as to the truth of the allegations in this paragraph.

187.   Desperate for her life, her safety, and with little resources, on or about September 28th, 2018, at 1:00 a.m. Bianca approached the U.S.-Mexico border fence abutting the beach and climbed over the fence into U.S. territory. Eventually a U.S. Border Patrol guard spotted her on U.S. soil and demanded that she climb back over the fence and into Mexico or else he would call the Mexican authorities. 188. On October 8, 2018, Bianca attempted once again to seek access to the asylum process by presenting herself at the San Ysidro POE. At the POE CBP official "Soto" denied Bianca's request to seek asylum, again informing her that they were "full." He in-structed Bianca to stand aside and wait for a Mexican official. No Mexican official came and she left.

**Answer:** Defendants lack knowledge or information sufficient to form a be-lief as to the truth of the allegations in this paragraph.

188.   At the time the First Amended Complaint was filed, Bianca desired to return immediately to seek access to the asylum process by presenting herself at the San Ysidro POE, but based on her past experience with CBP's practice at the U.S.-

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

Mexico border, she understood that she would likely be turned away again.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

189.   Bianca was fearful of remaining in Tijuana. She could not remain and believed seeking assistance from the Mexican government would be futile.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

190.   Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate Bianca's entry into the United States.

**Answer:** Defendants admit the allegations in this paragraph.

*Plaintiff Emiliana Doe*

191.   Emiliana is a native and citizen of Honduras. She is a transgender woman. She was threatened with violence and death by transnational drug dealers and gang members in Honduras. She was raped on multiple occasions by police officers. In May 2017, she was kidnapped and held for three days, and eventually thrown out of a moving car. In April 2018, she was abducted by four drug dealers, beaten for over six hours, pistol whipped, thrown out of a moving truck, and ordered to sell drugs. She was refused medical attention because she is transgender.

**Answer:** Defendants admit the allegations in the first and second sentences of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

192.   Emiliana fled Honduras on June 5, 2018 and embarked on the arduous journey through Mexico, where she was again repeatedly raped and threatened with death. She eventually reached Tijuana in September 2018. Emiliana intended to seek access to the asylum process in the United States, but was unsure how. She spoke with a stranger who was also attempting to apply for asylum who informed her that

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

she needed to get on the "waiting list." She proceeded to the seek access to the asylum process by going to the San Ysidro POE and speaking with two women who gave her a number, "1014," which reflected her place on a waitlist. They told Emiliana to come back in six weeks.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**193.** Given the dangers in Tijuana, particularly to transgender women, Emiliana could not wait six weeks and instead on October 8, 2018, she sought access to the asylum process by presenting herself at the San Ysidro POE to ask for asylum. When she informed a CBP official that she wished to seek asylum in the United States, he responded that she could not because they were "full," and instead ordered her to wait off to the side until a Mexican immigration official could come over. No official ever came.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**194.** At the time the First Amended Complaint was filed, Emiliana desired to return immediately to seek access to the asylum process by presenting herself at the San Ysidro POE, but based on her past experience with CBP's practice at the U.S.-Mexico border, she understood that she would likely be turned away again. Emiliana was fearful of remaining in Tijuana. She could not remain and believed seeking assistance from the Mexican government would be futile.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**195.** Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate Emiliana's entry into the United States.

**Answer:** Defendants admit the allegations in this paragraph.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

*Plaintiff César Doe*

**196.** César is a native and citizen of Honduras. Earlier in 2018, the 18th Street gang demanded that he join the gang at threat of death. He refused. The gang later kidnapped him and kept him in an abandoned house in the mountains. He was able to escape, and fled Honduras the next day.

**Answer:** Defendants admit the allegations in the first sentence of this paragraph. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**197.** César reached Tijuana on August 1, 2018 with the intention of seeking access to the asylum process in the United States. César approached the plaza immediately before the San Ysidro POE where he was approached by members of "Grupo Beta." Grupo Beta informed him that he would need to go through them to apply for asylum. They explained that they would put him on a list and give him a number, and only when his number was called could he apply for asylum.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**198.** Soon thereafter, Grupo Beta began racially segregating individuals into three groups: Africans, Central Americans, and Mexicans. They placed César in the Central America group and then Mexican officials arrested him and placed him into detention. César was detained for twelve days and Mexican officials threatened to deport him on multiple occasions. A local shelter eventually secured César's release from detention.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**199.** Continuing to fear for his life in Tijuana, César returned to the San Ysidro POE to seek access to the asylum process, and he spoke with Grupo Beta. He

was eventually placed on the waitlist and given number "740." After waiting a few weeks, César sought access to the asylum process by presenting himself at the San Ysidro POE with two staff members from Al Otro Lado. César informed CBP officials that he intended to seek asylum in the United States and that he feared return to his home country. The CBP officials refused to let him pass or seek asylum.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**200.** After waiting another few weeks, in September 2018 César sought access to the asylum process once again by presenting himself at the San Ysidro POE. Members of Grupo Beta intercepted him and threatened to call Mexican immigration officials and child protective services on him. The individuals pushed César toward the corner the plaza near the POE and called Mexican immigration. A staff member from Al Otro Lado escorted César back to the shelter.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**201.** At the time the First Amended Complaint was filed, César desired to return immediately to seek access to the asylum process by presenting himself at the San Ysidro POE, but based on his past experience with CBP's practice at the U.S.-Mexico border, he understood that he would likely be turned away again. César was fearful of remaining in Tijuana. He could not remain and believed seeking assistance from the Mexican government would be futile.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**202.** Following the filing of the First Amended Complaint in this case, Defendants made arrangements to facilitate César's entry into the United States.

**Answer:** Defendants admit the allegations in this paragraph.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

# V. LEGAL BACKGROUND

**A.    U.S. Law Requires that Asylum Seekers Who Present Themselves at POEs Have Meaningful Access to the Asylum Process**

**203.**    U.S. law requires CBP to give individuals who present themselves at POEs and express a desire to apply for asylum or a fear of persecution in their home countries the opportunity to seek protection in the United States without unreasonable delay.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit that aliens who are within a U.S. port of entry have a statutory right to apply for asylum under 8 U.S.C. § 1158. Defendants deny that aliens outside the United States have a statutory right to apply for asylum under 8 U.S.C. § 1158. Defendants admit that CBP has a legal obligation to resolve matters presented to it within a reasonable time, and aver that the inquiry into what constitutes reasonableness is highly fact-specific.

**204.**    Specifically, the Immigration and Nationality Act ("INA") and its implementing regulations set forth a variety of ways in which such individuals may seek protection in the United States. *See, e.g.*, 8 U.S.C. § 1157 (admission of refugees processed overseas); 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1231(b)(3) (restriction of removal to a country where individual's life or freedom would be threatened); 8 C.F.R. §§ 208.16–18 (protection under the Convention Against Torture).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit that 8 U.S.C. § 1157 applies to aliens who are outside the United States. Defendants admit that the remaining allegations in this paragraph provide examples of ways in which an alien might seek humanitarian protection in the United States.

**205.**    The INA provides that any noncitizen "who is physically present in the

United States or who arrives in the United States" has a statutory right to apply for asylum, irrespective of such individual's status. 8 U.S.C. § 1158(a)(1). The INA also specifies processes that must be followed when an individual states a desire to seek asylum or expresses a fear of returning to his or her home country. *See* 8 U.S.C. § 1158(d)(1) ("The Attorney General shall establish a procedure for the consideration of asylum applications filed [by individuals physically present in the United States or who arrive in the United States].". Under the INA, CBP must either:

   a. Refer the asylum seeker for a credible fear interview (*see* 8 U.S.C. § 1225(b)(1));

   b. Place the asylum seeker directly into regular removal proceedings by issuing a Notice to Appear ("NTA"), which will then allow the asylum seeker to pursue his or her asylum claim before an immigration judge (*see* 8 U.S.C. §§ 1225(b)(2), 1229, 1229a); or

   c. Parole the asylum seeker temporarily into the United States for urgent humanitarian reasons or significant public benefit (*see* 8 U.S.C. § 1182(d)(5)(A)).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit that, in general and subject to exceptions, aliens within the United States have a statutory right to apply for asylum under 8 U.S.C. § 1158(a)(1). Defendants admit that the INA directs the Attorney General to establish a procedure for the consideration of asylum applications filed under 8 U.S.C. § 1158(a). Defendants generally admit that an arriving alien who is inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or (a)(7) and who indicates either an intention to apply for asylum or a fear of persecution must be referred for a credible fear interview. *See* 8 U.S.C. § 1225(b)(1)(A)(ii). Defendants aver that the Court dismissed without leave to amend the individual Plaintiffs' section 706(1) claims that are based on subparagraph (b) of this paragraph.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**206.**   The U.S. government recognized that the duty to allow a noncitizen access to the asylum process is "not discretionary." *See, e.g.*, Federal Defendant's Reply Brief in Support of Motion for Summary Judgment and Dismissal for Lack of Jurisdiction, cited in *Munyua v. United States*, No. 03-4538, 2005 U.S. Dist. LEXIS 11499, at *16–19 (N.D. Cal. Jan. 10, 2005) ("[D]efendant acknowledges that [the immigration officers] did not have the discretion to ignore a clear expression of fear of return or to coerce an alien into withdrawing an application for admission").

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit that the federal government offered the quoted statement in a reply brief in a 2004 district court case, but aver that the alien in that case was at the San Francisco International Airport—*i.e.*, within a U.S. port of entry—during the relevant time period. *See* Federal Defs.' Reply Br. in Support of Mot. for Summ. J. and Dismissal for Lack of Jurisdiction (Dkt. No. 83), at 2–3, *Munyua v. United States*, No. 03-cv-4538 (N.D. Cal. Nov. 22, 2004). Defendants admit that they have no discretion to ignore a clear expression of fear or to coerce an alien into withdrawing an application for admission when that alien is inside a U.S. port of entry. Defendants deny that 8 U.S.C. §§ 1158(a) or 1225 impose a duty on CBP as to aliens outside the United States.

**207.**   CBP is responsible for the day-to-day operation of POEs along the U.S.-Mexico border. CBP's obligations include inspecting and processing individuals who present themselves at POEs to enable them to pursue their claims for asylum in the United States. CBP officials themselves are not authorized to evaluate, grant or reject an individual's asylum claim.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit the allegations in the first sentence of this paragraph. Defendants admit the allegations in the second sentence of this paragraph only to the extent that the phrase "at a

port of entry" refers to an individual who has crossed the international border into a port of entry. Defendants deny that the allegations in the third sentence of this paragraph are an accurate statement of law, and aver that 8 U.S.C. § 1225(b)(1)(E) governs who may act as an "asylum officer."

208.   All noncitizens arriving at POEs along the U.S.-Mexico border must be inspected by CBP officials. *See* 8 U.S.C. § 1225(a)(3) ("All [noncitizens] . . . who are applicants for admission or otherwise seeking admission . . . shall be inspected by immigration officers.") (emphasis added). During inspection, CBP officials must determine whether a noncitizen may be admitted to the United States. *See* 8 U.S.C. § 1182(a) (specifying grounds of inadmissibility). In order to make this determination, CBP scrutinizes an individual's entry documents. *See* 8 U.S.C. § 1181(a) (outlining documentation requirements for the admission of noncitizens into the United States). Asylum seekers often flee their countries on very short notice and thus frequently lack valid entry documents. Once a CBP official makes a determination of inadmissibility, the individual becomes subject to removal from the United States.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants generally admit the allegations in the first, second, third, and fifth sentences of this paragraph only insofar as they refer to an alien who has crossed the international border into the United States, and deny them to any other extent. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of this paragraph.

209.   CBP officials must then place the noncitizen into either expedited removal proceedings under 8 U.S.C. § 1225(b) or regular removal proceedings under 8 U.S.C. § 1229.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

the allegations in this paragraph as an inaccurate and incomplete statement of law.

**210.**   Expedited removal proceedings involve a more streamlined process than regular removal proceedings and are reserved for people apprehended at or near the border. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (permitting certain persons who are seeking admission at the border to the United States to be expeditiously removed without a full immigration judge hearing). However, Congress included important safeguards in the expedited removal statute in an effort specifically to protect asylum seekers.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions and characterizations, to which no response is required. To the extent the Court requires a response, Defendants admit that the INA speaks for itself.

**211.**   The INA unequivocally states that if a noncitizen placed in expedited removal proceedings "indicates either an intention to apply for asylum . . . or a fear of persecution, the [CBP] officer shall refer the [noncitizen] for an interview by an asylum officer." 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). The requirement to refer an asylum seeker placed in expedited removal proceedings to an asylum officer is ***mandatory***.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit the allegations in this paragraph. Defendants aver, however, that only aliens who are on U.S. soil are capable of being placed into expedited removal proceedings.

**212.**   Likewise, the applicable regulations promulgated under the INA reinforce that if an individual in expedited removal proceedings asserts an intention to apply for asylum or a fear of persecution, then "the inspecting officer shall not proceed further with removal of the [noncitizen] until the [noncitizen] has been referred for an interview by an asylum officer." 8 C.F.R. § 235.3(b)(4) (emphasis added).

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit the allegations in this paragraph. Defendants aver, however, that only aliens who are on U.S. soil are capable of being placed into expedited removal proceedings.

213.   Importantly, CBP officials must read a form to noncitizens subject to expedited removal advising them of their right to speak to an asylum officer if they express a desire to apply for asylum or a fear of returning to their home countries. *See* 8 C.F.R. § 235.3(b)(2)(i); DHS Form I-867A.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit the allegations in this paragraph, but aver that only aliens who are on U.S. soil are capable of being placed into expedited removal proceedings.

214.   Affirming that the CBP officials themselves are not authorized to adjudicate asylum claims, the regulations specifically charge asylum officers from U.S. Citizenship and Immigration Services with making initial determinations as to whether there is a "significant possibility" that an individual can establish eligibility for asylum. *See* 8 C.F.R. § 235.3(b)(4); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii). This is because asylum officers are trained in the often complicated and evolving law surrounding asylum, and thus are uniquely positioned to conduct such interviews, which themselves require particular interviewing and assessment skills as well as comprehension of the social and political contexts from which asylum seekers flee. In fact, the INA specifically defines "asylum officer" as an immigration officer who "has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 1158." 8 U.S.C. § 1225(b)(1)(E).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit

with respect to the allegations in the first sentence of this paragraph that only an asylum officer may make an initial determination as to whether there is a significant possibility that an individual can establish eligibility for asylum, but deny that an asylum officer is required by regulation or statute to be employed by U.S. Citizen-ship and Immigration Services (USCIS). With respect to the allegations in the sec-ond sentence of this paragraph, Defendants admit that asylum officers receive pro-fessional training in country conditions, asylum law, and interview techniques. De-fendants admit the allegations in the third sentence of this paragraph.

215.   Applicants who establish that they have a "significant possibility" of proving their eligibility for asylum receive positive credible fear determinations. They are taken out of the expedited removal system altogether and placed into reg-ular removal proceedings, where they have the opportunity to submit an asylum ap-plication, develop a full record before an Immigration Judge, appeal to the Board of Immigration Appeals, and seek judicial review of an adverse decision. 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. §§ 235.6(a)(1)(ii), (iii).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit the allegations in this paragraph only insofar as they are consistent with the cited statue and regulations and only insofar as they refer to aliens inside the United States.

216.   Alternatively, CBP officials may place noncitizens directly into regular removal proceedings by issuing an NTA. 8 U.S.C. §§ 1225(b)(2), 1229(a)(1), 1229a. Once in regular removal proceedings, the asylum seeker can submit an asylum ap-plication and must receive a full hearing before an Immigration Judge, file an ad-ministrative appeal with the Board of Immigration Appeals, and seek judicial re-view. 8 U.S.C. § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.").

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no

response is required. To the extent the Court requires a response, Defendants admit the allegations in this paragraph only insofar as it applies to aliens inside the United States.

**217.** At the discretion of the DHS Secretary, an individual may also be temporarily paroled into the United States for urgent humanitarian reasons or significant public benefit. When the purposes of such parole have been served, the individual must be returned to the custody from which he was paroled, after which his case will continue to be handled in the same manner as that of any other applicant for admission to the United States. 8 U.S.C. § 1182(d)(5)(A).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit the allegations in this paragraph only insofar as they apply to aliens inside the United States.

**218.** Despite these prescribed procedures, CBP has implemented a policy and regularly employs a variety of egregious practices (including those described above) that have one unlawful result: directly or constructively depriving Class Plaintiffs, and the asylum seekers they represent, of meaningful access to the asylum process, and thereby violating their right to seek asylum under U.S. law.

**Answer:** Defendants deny the allegations in this paragraph.

**219.** Acknowledging the illegality of the Trump administration's ongoing pushbacks of asylum seekers at the border, the House Appropriations Committee called on DHS in July 2018 to "ensure that the United States is meeting its legal obligations, to include reminding field officers and agents about CBP's legal responsibilities to ensure that asylum-seekers can enter at POES."[87]

**Answer:** Defendants admit that a draft of the 2019 Department of Homeland

---

[87] *Bill Report Draft*, *supra* note 78, at 4.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

Security Appropriations Bill contains this statement.

**B.     Defendants Have No Authority Under the INA to Turn Back a Noncitizen Seeking Admission at a POE**

**220.**   CBP's authority is limited to that granted by Congress in the INA. Nothing in the INA authorizes Defendants, through their officers and employees, to turn back a noncitizen who seeks admission at a POE.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants aver that the Executive has the constitutional and statutory authority and duty to control the border, and that the INA vests the Secretary of Homeland Security with the authority and duty to control the flow of travel across the border into the ports of entry.

**221.**   When inspecting a noncitizen who arrives at a POE, CBP officials must follow the procedures mandated by Congress in 8 U.S.C. § 1225. Pursuant to this section, CBP officials are limited to the following possible actions with respect to any arriving noncitizen who is not clearly and beyond a doubt entitled to be admitted:

    a.   Place arriving noncitizens who are inadmissible under one of two grounds specified by statute in expedited removal proceedings pursuant to 8 U.S.C. § 1225(b)(1)(A)(i);

    b.   Refer any noncitizen placed in expedited removal proceedings who expresses either an intent to apply for asylum or a fear of persecution if returned to his or her home country to an asylum officer for a credible fear interview pursuant to 8 U.S.C. §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B);

    c.   Place "other" arriving noncitizens (i.e., those who are not placed in expedited removal proceedings under 8 U.S.C. § 1225(b)(1)(A) and who are neither crewmen nor stowaways) in removal proceedings under 8 U.S.C. § 1229a pursuant to 8 U.S.C. § 1225(b)(2);

    d.  Follow other removal procedures with respect to noncitizens suspected of being inadmissible on terrorism or related security grounds pursuant to 8 U.S.C. § 1225(c); or

    e.  Accept from the noncitizen a voluntary (i.e., non-coerced) withdrawal of her application for admission pursuant to 8 U.S.C. § 1225(a)(4) and 8 C.F.R. § 235.4.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit the allegations in the first sentence of this paragraph. With respect to the remaining allegations in this paragraph, Defendants admit only that the INA and the legal authorities implementing it and interpreting it speak for themselves.

222.    Defendants, through their officers, employees, and agents, act without authority and in violation of the law when they directly deny an individual access to the U.S. asylum process at a POE.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions and characterizations, to which no response is required. To the extent the Court requires a response, Defendants admit only that an alien who is physically present in the United States or who arrives in the United States may apply for asylum.

223.    Defendants, through their officers, employees, and agents, act without authority and in violation of the law when they constructively deny an individual's access to the asylum process by unreasonably delaying their ability to present themselves at a POE.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions and characterizations, to which no response is required. To the extent the Court requires a response, Defendants deny they have constructively denied anyone access to the asylum process and aver instead that they permit aliens without entry documents to cross the border into a port of entry as the ports' processing capacities permit.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**224.**   Moreover, Defendants' Turnback Policy is *ultra vires*.

**Answer:** Defendants deny they have implemented a "Turnback Policy." Defendants aver that their metering/queue management procedures are not *ultra vires*.

## C.   Class Plaintiffs Are Entitled to Procedural Due Process Rights Under the Fifth Amendment to the U.S. Constitution

**225.**   The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. Amend. V. In addition, where Congress has granted statutory rights and has directed an agency to establish a procedure for providing such rights, the Constitution requires the government to establish a fair procedure and to abide by that procedure. In the asylum context, U.S. law mandates that asylum seekers be provided with such process. Multiple courts have recognized that such procedural rights are critical in the asylum context and can result in life or death decisions, because applicants wrongly denied asylum can be subject to death or other serious harm in their home countries. *See, e.g.*, *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) ("The basic procedural rights Congress intended to provide asylum applicants . . . are particularly important because an applicant erroneously denied asylum could be subject to death or persecution if forced to return to his or her home country.").

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit that Plaintiffs have accurately quoted the Due Process Clause, but deny that either the Fifth Amendment or the statutory right to apply for asylum extend extraterritorially.

**226.**   The INA and its implementing regulations provide Class Plaintiffs with the right to be processed at a POE and granted meaningful access to the asylum process. *See, e.g.*, 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii),

116

1225(b)(1)(B), 1225(b)(2). By systematically turning away asylum seekers present-ing themselves at POEs along the U.S.-Mexico border or unreasonably delaying their inspections—and thus directly or constructively denying them access to the asylum process, Defendants have failed to comply with the due process procedures for processing asylum seekers under the INA and its implementing regulations.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit that an alien who is physically present in the United States or who arrives in the United States may apply for asylum. Defendants deny that they are "systematically turning away asylum seekers presenting themselves at POEs along the U.S.-Mexico border or unreasonably delaying their inspections," and aver instead that CBP has granted the ports the discretion to implement metering/queue management proce-dures based on the ports' processing capacities when it is necessary or appropriate to facilitate orderly processing and to maintain the security of the port and safe and sanitary conditions for the traveling public. *See* Ex. 1, Owen Memo.

**D.    The *Non-Refoulement* Doctrine Under International Law Requires Im-plementation and Adherence to a Procedure to Ensure Prompt Access to Asylum**

**227.**    The United States is obligated by a number of treaties and protocols to adhere to the duty of *non-refoulement*—a duty that prohibits a country from return-ing or expelling an individual to a country where he or she has a well-founded fear of persecution and/or torture and that requires processes that ensure fair and efficient administration of the asylum process.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit that they are bound to adhere to the duty of non-*refoulement* insofar as they are ob-ligated by treaty, statute, or regulation.

**228.**    The Office of the United Nations High Commissioner for Refugees

("UNHCR") has described *non-refoulement* as "the cornerstone of international refugee protection," and notes that it is "of particular relevance to asylum-seekers."[88] The primary treaty source for the duty of non-refoulement is the 1951 Convention on the Rights of Refugees. Article 33 of the Convention prohibits a state from returning "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."[89] As UNHCR has explained, the Treaty's emphasis on "any manner" of refoulement reflects a state duty to avoid using direct or indirect ways of subjecting a person to a risk of return to persecution.[90]

**Answer:** Defendants admit only that Plaintiffs have accurately quoted certain portions of the cited 2007 UNHCR advisory opinion. Defendants aver that Article 33.1 of the 1951 Convention on the Rights of Refugees states in its entirety: "No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

229. In addition, the duty of *non-refoulement* extends not only to a person's country of origin, "but also to any other place where a person has reason to fear threats to his or her life or freedom related to one or more of the grounds set out in the 1951 Convention, or from where he or she risks being sent to such a risk."[91]

---

[88] *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol*, UNHCR (Jan. 26, 2007), http://www.unhcr.org/4d9486929.pdf.

[89] 1951 Refugee Convention, Art. 33 (emphasis added).

[90] *Id.* at 7.

[91] *Id.* at 3 (citing UNHCR, Note on Non-Refoulement (EC/SCP/2), 1977 ¶4).

Accordingly, a state must not only prevent return to danger, it must take affirmative measures to prevent a risk of harm by "adopt[ing] a course that does not result in [asylum seekers] removal, directly or indirectly, to a place where their lives or freedom would be in danger."[92] This includes "access to the territory and to fair and efficient asylum procedures."[93]

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit only that the 1951 Convention and the binding U.S. authorities interpreting it and implementing it speak for themselves.

**230.** The United States adopted the protections of Article 33 by signing onto the 1967 Protocol Relating to the Status of Refugees, which incorporated Articles 2-34 of the 1951 Convention.

**Answer:** Defendants admit that the United States adheres to Articles 2 through 34 of the 1951 Refugee Convention by virtue of its accession to the 1967 Protocol Relating to the Status of Refugees on November 1, 1968.

**231.** The prohibition against *refoulement* is likewise central to other treaties ratified by the United States, including the International Covenant on Civil and Political Rights ("ICCPR") and the Convention Against Torture ("CAT"), both of which prohibit returning an individual to harm and obligate the United States to implement and follow legal procedures to protect refugees' right to *non-refoulement*.[94]

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit only that the cited legal authorities and the binding U.S. authorities interpreting them

---

[92] *Id.* at ¶ 8.

[93] *Id.* (emphasis added).

[94] *See* ICCPR, Art. 13; CAT, Art. 3.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

1    speak for themselves.

2        **232.**    In order to effectuate an asylum seeker's right to *non-refoulement*, the

3    United States is obligated to implement and follow procedures to ensure that his or

4    her request for asylum be duly and efficiently considered. The United States imple-

5    mented this legal obligation with the passage of the 1980 Refugee Act, which estab-

6    lished a procedure for a noncitizen physically present in the United States or at a

7    land border or POE to apply for asylum.[95]

8        **Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no

9    response is required. To the extent the Court requires a response, Defendants admit

10   that U.S. statutory law, including the Refugee Act of 1980, and the binding U.S.

11   authorities interpreting it and implementing it speak for themselves.

12

13       **233.**    In practice, the duty of *non-refoulement* covers not only those refugees

14   and asylum seekers already present inside the country, but also those who present

15   themselves at POEs along the U.S. border. The duty requires U.S. officials such as

16   Defendants to process those seeking to cross the U.S. border and not to deny or un-

17   reasonably delay their access to an efficient, lawful process to present a claim for

18   asylum.

19       **Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no

20   response is required. To the extent the Court requires a response, Defendants admit

21   only that an alien who is physically present in the United States or who arrives in the

22   United States may apply for asylum.

23

24       **234.**    The norm of *non-refoulement* is specific, universal and obligatory. It is

25   so widely accepted that it has reached the status of *jus cogens*—a norm not subject

26

27   ────────────────

28   [95] *See* Refugee Act of 1980, Pub. L. No. 96-212, § 201(b), 94 Stat. 102 (1980).

to derogation. Indeed, in 1996, the United Nations Executive Committee on the International Protection of Refugees explicitly concluded that the *non-refoulement* principle had achieved the status of a norm "not subject to derogation."[96] The principle was recognized as such in the 1984 Cartagena Declaration on Refugees; was included in a portion of the Refugee Convention from which derogation is not permitted; and has been recognized by bodies, including the Inter-American Commission on Human Rights and the Organization of American States General Assembly.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny Plaintiffs' characterizations of the non-*refoulement* obligation and therefore deny the first and second sentences of this paragraph. Defendants aver that the cited authorities speak for themselves.

**235.** Defendants' policy and actions to actively or constructively deny Class Plaintiffs, and the asylum seekers they represent, access to the U.S. asylum process violate their binding and enforceable obligations under international law.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

## VI. CLASS ACTION ALLEGATIONS

**236.** Class Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and all other persons similarly situated. The proposed class is defined as follows:

> All noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a POE along the U.S.-Mexico border and are denied access to the U.S. asylum process by or at the instruction of

---

[96] Executive Committee Conclusion No. 79, *General Conclusion on International Protection* (1996).

CBP officials.

**Answer:** Defendants deny that Plaintiffs' proposed class definition satisfies the elements of Federal Rule of Civil Procedure 23.

**237.**   The class is so numerous that joinder of all members is impracticable. CBP's misconduct toward asylum seekers at POEs along the U.S.-Mexico border has been the focus of monitoring, reporting and advocacy by numerous well-respected non-governmental organizations. These organizations have investigated and documented thousands of examples of asylum seekers being turned back by CBP officials. Many more asylum seekers likely have been the victims of this unlawful conduct as these abuses often go unreported. Asylum seekers who are turned back at the border are continuously moving and relocating, also making joinder impracticable.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny that Plaintiffs' proposed class satisfies Rule 23(a)'s numerosity requirement.

**238.**   There are questions of law and fact that are common to the class. The class alleges common harms: denial of access to the asylum process at POEs along the U.S.-Mexico border and a violation of the right not to be returned to countries where they fear persecution. The class members' entitlement to these rights is based on a common core of facts. All members of the proposed class have attempted to seek asylum by presenting themselves at a POE along the U.S.-Mexico border. All of them have expressed a fear of persecution or a desire to apply for asylum, or would have done so but for the conduct of Defendants. These facts entitle all of them to the opportunity to seek asylum. Yet each class member has been and likely will again be unlawfully denied access to the U.S. asylum process by CBP. Moreover, all class members raise the same legal claims: that U.S. law requires CBP officials

at POEs to give them meaningful access to the asylum process. Their shared common facts will ensure that judicial findings regarding the legality of the challenged practices will be the same for all class members. Should Class Plaintiffs prevail, all class members will benefit; each of them will be entitled to a prompt, lawful inspection at a POE along the U.S.-Mexico border and an opportunity to seek asylum.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny that Plaintiffs' proposed class satisfies Rule 23(a)'s commonality requirement.

**239.**   Class Plaintiffs' claims are typical of the claims of the class. Class Plaintiffs and class members raise common legal claims and are united in their interest and injury. All Class Plaintiffs, like all class members, are asylum seekers to whom CBP officials unlawfully denied, whether actively or constructively, access to the U.S. asylum process after they presented themselves at POEs along the U.S.-Mexico border. Class Plaintiffs and class members are thus victims of the same, unlawful course of conduct.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny that Plaintiffs' proposed class satisfies Rule 23(a)'s typicality requirement.

**240.**   Class Plaintiffs are adequate representatives. Class Plaintiffs seek relief on behalf of the class as a whole and have no interest antagonistic to other members of the class. Class Plaintiffs' mutual goal is to declare Defendants' challenged policies and practices unlawful and to obtain declaratory and injunctive relief that would cure this illegality. Class Plaintiffs seek a remedy for the same injuries as the class members, and all share an interest in having a meaningful opportunity to seek asylum. Thus, the interests of the Class Plaintiffs and of the class members are aligned.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

that the individual Plaintiffs would be adequate representatives of the class Plaintiffs seek to represent.

**241.**   Class Plaintiffs are represented by attorneys from the Southern Poverty Law Center, the Center for Constitutional Rights, the American Immigration Council, and Latham & Watkins LLP. Counsel have a demonstrated commitment to protecting the rights and interests of noncitizens and, together, have considerable experience in handling complex and class action litigation in the immigration field. Counsel have represented numerous classes of immigrants and other victims of systematic government misconduct in actions in which they successfully obtained class relief.

**Answer:** Defendants admit that counsel for Al Otro Lado, Inc., and the individual Plaintiffs would be adequate class counsel.

**242.**   Defendants have acted or refused to act on grounds that are generally applicable to Class Plaintiffs and the class. Defendants have failed to provide Class Plaintiffs and class members with meaningful access to the U.S. asylum process. Defendants' actions violate Class Plaintiffs' and class members' statutory, regulatory and constitutional rights to access to the asylum process. Declaratory and injunctive relief are appropriate remedies.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny that Plaintiffs' proposed class satisfies Rule 23(b)(2). Defendants deny that Plaintiffs are entitled to the relief they seek

**243.**   In the absence of a class action, there is substantial risk that individual actions would be brought in different venues, creating a risk of inconsistent injunctions to address Defendants' common conduct.

**Answer:** Defendants deny the allegations in this paragraph.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FIRST CLAIM FOR RELIEF

### Declaratory and Injunctive Relief Against All Defendants

### (Violation of the Right to Seek Asylum Under the

### Immigration and Nationality Act)

**244.**   Al Otro Lado and Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**Answer:** Defendants repeat and incorporate by reference their answers to each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**245.**   INA § 208(a)(1) (8 U.S.C. § 1158(a)(1)) gives any noncitizen who is physically present in or who arrives in the United States a statutory right to seek asylum, regardless of such individual's immigration status.

**Answer:** Defendants admit the allegations in this paragraph insofar as they refer to an alien who has crossed the border into the United States. Defendants deny the allegations in this paragraph insofar as they refer to an alien who has not crossed the border into the United States.

**246.**   When a noncitizen presents himself or herself at a POE and indicates an intention to apply for asylum or a fear of persecution, CBP officials must refer the noncitizen for a credible fear interview under 8 U.S.C. § 1225(b)(1)(A)(ii) and 8 C.F.R. § 235.3(b)(4), or, in accordance with 8 U.S.C. § 1225(b)(2), place the noncitizen directly into regular removal proceedings under 8 U.S.C. § 1229(a)(1).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit only that the INA and its implementing regulations speak for themselves.

**247.**   Class Plaintiffs presented themselves at POEs and either asserted an

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

intention to apply for asylum or a fear of persecution in their countries of origin or would have done so but for the Defendants' conduct. Nevertheless, CBP officials did not refer Class Plaintiffs to an asylum officer for credible fear interviews pursuant to 8 U.S.C. § 1225(b)(1)(A)(ii), or, in accordance with 8 U.S.C. § 1225(b)(2), place Class Plaintiffs directly into regular removal proceedings pursuant to 8 U.S.C. § 1229(a)(1).

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**248.**   Instead, in direct contravention of the INA, CBP officials engaged in unlawful tactics, including the implementation of the Turnback Policy, that actively or constructively denied Class Plaintiffs' access to the statutorily prescribed asylum process and forced them to return to Mexico.

**Answer:** Defendants deny that they or any CBP officials have implemented a "Turnback Policy" or sanctioned the use of unlawful tactics. Defendants deny the remaining allegations in this paragraph.

**249.**   CBP officials' treatment of Class Plaintiffs at the POEs and the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction and/or acquiescence of Defendants.

**Answer:** Defendants deny the allegations in this paragraph.

**250.**   As a result of Defendants' violations of the INA, Class Plaintiffs have been damaged—through the active or constructive denial of access to the asylum process and by being forced to return to Mexico or other countries where they face threats of further persecution.

**Answer:** Defendants deny the allegations in this paragraph.

**251.**   As a result of Defendants' violations of the INA, Plaintiff Al Otro Lado has been damaged—namely its core mission has been frustrated and it has been

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at or near POEs along the U.S.-Mexico border.

**Answer:** Defendants deny the allegations in this paragraph.

252.   Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their statutory rights. Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

**Answer:** Defendants deny the allegations in this paragraph.

253.   Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in any case involving an actual controversy.

**Answer:** Defendants admit that this is an accurate statement of law, but deny the allegations in this paragraph as they apply to this claim for relief.

254.   An actual controversy has arisen and now exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other. Class Plaintiffs and Al Otro Lado contend that Defendants' Turnback Policy, as well as the conduct and practices carried out in reliance on it, as alleged in this Second Amended Complaint, violate the INA. On information and belief, Defendants contend that their Turnback Policy, conduct and practices are lawful.

**Answer:** Defendants admit that there is an actual controversy between Defendants and the individual Plaintiffs, as the individual Plaintiffs contend that Defendants' metering procedures are unlawful, and Defendants contend they are lawful. Defendants deny the remaining allegations in this paragraph.

255.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

**Answer:** Defendants deny that Plaintiffs are entitled to the relief they seek.

## SECOND CLAIM FOR RELIEF

### Declaratory Relief and Injunctive Relief Against All Defendants
### (Violation of Section 706(1) of the Administrative Procedure Act)

**256.**   Al Otro Lado and Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**Answer:** Defendants repeat and incorporate by reference their answers to each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**257.**   The Administrative Procedure Act ("APA") (5 U.S.C. § 551, *et. seq.*) authorizes suits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. The APA also provides relief for a failure to act: "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

**Answer:** Defendants admit that this is an accurate statement of law.

**258.**   CBP officials, at the instigation, under the control or authority of, or with the direction, knowledge, consent, or acquiescence of Defendants, have engaged in an unlawful widespread pattern or practice of denying and unreasonably delaying asylum seekers' access to the asylum process by, among other tactics: lying; using threats, intimidation and coercion; employing verbal abuse and applying physical force; physically blocking access to POE buildings; imposing unreasonable

delays before granting access to the asylum process; denying outright access to the asylum process; and denying access to the asylum process in a racially discriminatory manner.

**Answer:** Defendants admit that, in the course of implementing their metering procedures, CBP officers have utilized physical access controls at the ports of entry along the U.S.-Mexico border and have, at times, instructed aliens without entry documents that they must wait in Mexico until the port has sufficient capacity to process them for admission. Defendants deny the remaining allegations in this paragraph.

**259.**   CBP officials, at the instigation, under the control or authority of, or with the direction, knowledge, consent, or acquiescence of Defendants, have also adopted and implemented the Turnback Policy, restricting access to the asylum process at POEs by mandating that CBP officers directly or constructively turn back asylum seekers at the border based on purported "capacity" constraints.

**Answer:** Defendants deny the allegations in this paragraph.

**260.**   Through this conduct, CBP officials have failed, in violation of the APA, to take actions mandated by the following statutes and implementing regulations:

- 8 U.S.C. § 1225(a)(1)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States ***shall be inspected by immigration officers***.") (emphasis added);

- 8 U.S.C. § 1225(b)(1)(A)(ii) ("If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible . . . and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, ***the officer shall refer the alien for an interview by an asylum officer*** . . . .") (emphasis added);

- 8 U.S.C. § 1225(b)(2) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien

shall be detained for a proceeding under section 1229a of this title."); and

- 8 C.F.R. § 235.3(b)(4) ("If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer ***shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer*** . . . .") (emphasis added).

**Answer:** Defendants deny that they have implemented a "Turnback Policy" or an unlawful, widespread pattern or practice that violates these statutory provisions. Defendants deny that their metering practices violate these statutory provisions.

**261.**   Through this conduct, CBP officials have also failed, in violation of the APA, to take the above-listed mandated actions without unreasonable delay.

**Answer:** Defendants deny that any delay associated with the implementation of metering procedures is unreasonable.

**262.**   Defendants' repeated and pervasive failures to act, and/or to act within a reasonable time, which denied and/or unreasonably delayed Class Plaintiffs' access to the statutorily prescribed asylum process, constitute unlawfully withheld and unreasonably delayed agency action and therefore give rise to federal jurisdiction and mandate relief under the APA.

**Answer:** This paragraph consists of legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

**263.**   As a result of the acts constituting violations of the APA, Class Plaintiffs have been damaged through the denial and/or unreasonable delay of access to the asylum process and by being forced to return to and/or wait in Mexico, where they face threats of further persecution.

**Answer:** Defendants deny the allegations in this paragraph.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**264.**   As a result of the acts constituting violations of the APA, Plaintiff Al Otro Lado has been damaged—namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

**Answer:** Defendants deny the allegations in this paragraph.

**265.**   Defendants' Turnback Policy and widespread pattern or practice have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their statutory and regulatory rights. Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to engage in the unlawful practices alleged herein.

**Answer:** Defendants deny the allegations in this paragraph.

**266.**   Al Otro Lado and Class Plaintiffs have exhausted all available administrative remedies and have no adequate remedy at law.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

**267.**   Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in any case involving an actual controversy.

**Answer:** Defendants admit this is an accurate statement of law.

**268.**   An actual controversy has arisen and now exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other. Class Plaintiffs and Al Otro Lado contend that Defendants' Turnback Policy and sanctioning of

CBP's unlawful widespread pattern or practice at POEs along the U.S.-Mexico border, as alleged in this Complaint, violate the APA. On information and belief, Defendants contend that the Turnback Policy and widespread pattern or practice are lawful.

**Answer:** Defendants admit that there is an actual controversy between Defendants and the individual Plaintiffs, as the individual Plaintiffs contend that Defendants' metering procedures are unlawful, and Defendants contend they are lawful. Defendants deny the remaining allegations in this paragraph.

**269.**   Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

**Answer:** Defendants deny that Plaintiffs are entitled to the relief they seek.

## THIRD CLAIM FOR RELIEF
### Declaratory Relief and Injunctive Relief Against All Defendants
### (Violation of Section 706(2) of the Administrative Procedure Act—Agency Action in Excess of Statutory Authority and Without Observance of Procedures Required by Law)

**270.**   Al Otro Lado and Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**Answer:** Defendants repeat and incorporate by reference their answers to each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**271.**   Under the APA, "the reviewing court shall . . . hold unlawful and set aside agency action, finding, and conclusions found to be . . . in excess of statutory

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

jurisdiction, authority, or limitations, or short of statutory right [and/or] without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D).

**Answer:** Defendants admit that this is an accurate statement of law.

**272.** Defendants, through implementation of the Turnback Policy and sanctioning of CBP's unlawful widespread pattern or practice of denying and unreasonably delaying asylum seekers' access to the asylum process, have acted in excess of their statutorily prescribed authority and without observance of the procedures required by law in violation of section 706(2) of the APA. *See* 5 U.S.C. §§ 706(2)(C), (D). Congress mandated the various procedures that Defendants and their officers, employees, and agents are authorized and required to follow when inspecting individuals who seek admission at POEs. *See* 8 U.S.C. § 1225. Regulations implementing section 1225 also establish the required procedures for inspection of individuals who seek admission at POEs. *See* 8 C.F.R. § 235.3(b)(4). None of these procedures authorizes a CBP official to turn back a noncitizen seeking asylum at a POE, at the physical U.S.-Mexico border, or any place in between.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny they have implemented a "Turnback Policy." Defendants aver instead that CBP has issued guidance permitting ports of entry along the U.S.-Mexico border to implement metering procedures based on their operational capacities when necessary or appropriate to facilitating orderly processing and maintaining the security of the port and safe and sanitary conditions for the traveling public. *See* Ex. 1, Owen Memo. Defendants deny that the exercise of this discretion violates any of the cited provisions of law, and aver that the exercise of this discretion is authorized by the Executive's constitutional authority to control the border and Defendants' statutory authority to manage the ports of entry.

**273.** In turning back Class Plaintiffs and purported class members at POEs

or along the U.S.-Mexico border without following the procedures mandated by the INA and its implementing regulations, CBP officials have acted and continue to act in excess of the authority granted to them by Congress and without observance of procedure required by law.

**Answer:** Defendants deny they have "turned back" anyone at ports of entry along the U.S.-Mexico border, and aver instead that CBP has issued guidance permitting ports of entry along the U.S.-Mexico border to implement metering procedures based on their operational capacities when necessary or appropriate to facilitating orderly processing and maintaining the security of the port and safe and sanitary conditions for the traveling public. *See* Ex. 1, Owen Memo. Defendants deny they have acted in excess of statutory authority or without observance of procedures required by law.

**274.**   The Turnback Policy is a policy authorized by Defendants with the purpose of restricting and unreasonably delaying asylum seekers' access to the U.S. asylum process on the basis of purported capacity constraints at U.S. POEs. Defendants' own statements and communications, as well as a report of the DHS Office of Inspector General, confirm Defendants ordered the Turnback Policy and its implementation by CBP. The Turnback Policy thus constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2).

**Answer:** Defendants deny the allegations in this paragraph.

**275.**   Furthermore, each instance where Defendants, through their officers, employees, and agents, directly or constructively deny Class Plaintiffs or purported class members access to the asylum process constitutes a final agency action under 5 U.S.C. § 704 and a violation of 5 U.S.C. § 706(2).

**Answer:** Defendants deny the allegations in this paragraph.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**276.**   As a result of the acts constituting violations of the APA, Class Plain-tiffs have been damaged through the denial, restriction, and/or unreasonable delay of access to the asylum process and by being forced to return to and/or wait in Mex-ico where they face threats of further persecution and/or other serious harm.

**Answer:** Defendants deny the allegations in this paragraph.

**277.**   As a result of the acts constituting violations of the APA, Plaintiff Al Otro Lado has been damaged—namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

**Answer:** Defendants deny the allegations in this paragraph.

**278.**   Defendants' Turnback Policy and widespread pattern or practice have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their statu-tory and regulatory rights. Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy al-leged herein.

**Answer:** Defendants deny the allegations in this paragraph.

**279.**   Al Otro Lado and Class Plaintiffs have exhausted all available admin-istrative remedies and have no adequate remedy at law.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

**280.**   Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in any case involving an actual controversy.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** Defendants admit that this is an accurate statement of law.

281.   An actual controversy has arisen and now exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other. Class Plaintiffs and Al Otro Lado contend that Defendants' Turnback Policy and sanctioning of CBP's unlawful widespread pattern or practice at POEs along the U.S.-Mexico border, as alleged in this Complaint, violate the APA. On information and belief, Defendants contend that the Turnback Policy and widespread pattern or practice are lawful.

**Answer:** Defendants admit that there is an actual controversy between Defendants and the individual Plaintiffs, as the individual Plaintiffs contend that Defendants' metering procedures are unlawful, and Defendants contend they are lawful. Defendants deny the remaining allegations in this paragraph.

282.   Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

**Answer:** Defendants deny that Plaintiffs are entitled to the relief they seek.

## FOURTH CLAIM FOR RELIEF
### Declaratory Relief and Injunctive Relief Against All Defendants
### (Violation of Procedural Due Process)

283.   Al Otro Lado and Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**Answer:** Defendants repeat and incorporate by reference their answers to each and every allegation contained in the preceding paragraphs as if set forth fully herein.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**284.**   The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. Amend. V.

**Answer:** Defendants admit this is an accurate statement of law.

**285.**   Congress has granted certain statutory rights to asylum seekers, such as Class Plaintiffs and the asylum seekers they represent, and has directed DHS to establish a procedure for providing such rights. The Due Process Clause thus requires the government to establish a fair procedure and to abide by that procedure.

**Answer:** Defendants deny that Congress has granted any alien the statutory right to apply for asylum while he or she stands outside the United States. Defendants admit the remaining allegations in this paragraph only insofar as they relate to an alien standing inside the United States' borders.

**286.**   As set forth above, the INA and its implementing regulations provide Class Plaintiffs the right to be processed at a POE and granted meaningful access to the asylum process. *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii), 1225(b)(1)(B), 1225(b)(2); *see also* 8 C.F.R. § 235.3(b)(4).

**Answer:** This paragraph consists of Plaintiffs' legal conclusions, to which no response is required. To the extent the Court requires a response, Defendants admit only that the cited statutes and regulation speak for themselves.

**287.**   By adopting the Turnback Policy and using a variety of tactics to turn back asylum seekers at POEs along the U.S.-Mexico border, CBP officials have denied Class Plaintiffs access to the asylum process and failed to comply with procedures set forth in the INA and its implementing regulations.

**Answer:** Defendants deny the allegations in this paragraph.

**288.**   CBP officials' treatment of Class Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge,

consent, or acquiescence of Defendants.

**Answer:** Defendants deny the allegations in this paragraph.

**289.** By denying Class Plaintiffs' access to the asylum process, Defendants have violated Class Plaintiffs' procedural due process rights under the Fifth Amendment to the U.S. Constitution.

**Answer:** Defendants deny the allegations in this paragraph.

**290.** As a result of the Defendants' violations of the Fifth Amendment to the U.S. Constitution, Class Plaintiffs have been damaged through the denial of access to the asylum process and by being forced to return to Mexico where they face threats of further persecution.

**Answer:** Defendants deny the allegations in this paragraph.

**291.** Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further violations of their constitutional rights. Class Plaintiffs do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from engaging in the unlawful policy, conduct and practices alleged herein.

**Answer:** Defendants deny the allegations in this paragraph.

**292.** An actual controversy exists between Class Plaintiffs, on one hand, and Defendants, on the other. Class Plaintiffs contend that Defendants' Turnback Policy and sanctioning of CBP's unlawful widespread pattern or practice at POEs along the U.S.-Mexico border, as alleged in the Complaint, violate the Fifth Amendment to the United States Constitution. On information and belief, Defendants contend that the Turnback Policy and widespread pattern or practice are lawful.

**Answer:** Defendants admit that there is an actual controversy between De-

fendants and the individual Plaintiffs, as the individual Plaintiffs contend that Defendants' metering procedures are unlawful, and Defendants contend they are lawful. Defendants deny the remaining allegations in this paragraph.

**293.** Class Plaintiffs therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

**Answer:** Defendants deny the allegations in this paragraph.

## FIFTH CLAIM FOR RELIEF

### Declaratory Relief and Injunctive Relief Against All Defendants
### (Violation of the *Non-Refoulement* Doctrine)

**294.** Class Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**Answer:** Defendants repeat and incorporate by reference their answers to each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**295.** CBP officials have systematically denied, or unreasonably delayed, access to the asylum process by Class Plaintiffs, and the asylum seekers they represent, in violation of customary international law reflected in treaties which the United States has ratified and implemented: namely, the specific, universal and obligatory norm of non-refoulement, which has also achieved the status of a *jus cogens* norm, and which forbids a country from returning or expelling an individual to a country where he or she has a well-founded fear of persecution and/or torture, whether it is her home country or another country.

**Answer:** Defendants deny the allegations in this paragraph.

**296.** The duty of *non-refoulement* also requires the adoption of procedures

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

to ensure prompt, efficient, and unbiased access to the asylum process.

**Answer:** Defendants deny the allegations in this paragraph.

**297.**   CBP officials' treatment of Class Plaintiffs at the U.S.-Mexico border was inflicted at the instigation, under the control or authority, or with the knowledge, consent, direction or acquiescence of Defendants.

**Answer:** Defendants deny the allegations in this paragraph.

**298.**   Defendants' conduct is actionable under the Alien Tort Statute, 28 U.S.C. § 1350, which authorizes declaratory and injunctive relief.

**Answer:** Defendants deny the allegations in this paragraph.

**299.**   As a result of the acts constituting violations of the *jus cogens* norm of *non-refoulement*, Class Plaintiffs have been damaged through denial or unreasonable delay of access to the asylum process and by being forced to return to Mexico or other countries where they face threats of further persecution.

**Answer:** Defendants deny the allegations in this paragraph.

**300.**   As a result of the acts constituting violations of the norm of *non-refoulement*, Al Otro Lado has been damaged—namely, its core mission has been frustrated and it has been forced to divert substantial resources away from its programs to counteract CBP's unlawful practices at POEs along the U.S.-Mexico border.

**Answer:** Defendants deny the allegations in this paragraph.

**301.**   Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of violence and serious harm to Class Plaintiffs and further infringement of the protections afforded to them under international law. Class Plaintiffs and Al Otro Lado do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from engaging in the unlawful conduct and practices alleged herein.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

**Answer:** Defendants deny the allegations in this paragraph.

**302.** An actual controversy exists between Class Plaintiffs and Al Otro Lado, on one hand, and Defendants, on the other. Class Plaintiffs and Al Otro Lado contend that Defendants' Turnback Policy, as well as the widespread pattern or practice carried out in reliance on it, as alleged in this Complaint, violate the norm of *non-refoulement*. On information and belief, Defendants contend that their policy, conduct and practices are lawful.

**Answer:** Defendants deny the allegations in this paragraph.

**303.** Class Plaintiffs and Al Otro Lado therefore request and are entitled to a judicial determination as to the rights and obligations of the parties with respect to this controversy, and such a judicial determination of these rights and obligations is necessary and appropriate at this time.

**Answer:** Defendants deny Plaintiffs are entitled to the relief they seek.

## **PRAYER FOR RELIEF**

**304.** WHEREFORE, Plaintiff Al Otro Lado and Class Plaintiffs respectfully request that the Court:

    a. Issue an order certifying a class of individuals pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2);

    b. Appoint the undersigned as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

    c. Issue a judgment declaring that Defendants' Turnback Policy, as well as the practices, acts and/or omissions described herein, give rise to federal jurisdiction;

    d. Issue a judgment declaring that Defendants' Turnback Policy, as well as the practices, acts and/or omissions described herein, violate one or more of the following:

(1) The Immigration and Nationality Act, based on violations of 8 U.S.C. §§ 1158 and 1225;

(2) Section 706(1) of the Administrative Procedure Act, based on the unlawful withholding and unreasonable delay of agency action mandated by 8 U.S.C. § 1225 and 8 C.F.R. § 235.3;

(3) Section 706(2) of the Administrative Procedure Act;

(4) The Due Process Clause of the Fifth Amendment; and

(5) The duty of non-refoulement under international law;

e. Issue injunctive relief requiring Defendants to comply with the laws and regulations cited above;

f. Issue injunctive relief prohibiting Defendants, and any of their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them or on their behalf, from continuing to implement the Turnback Policy and from engaging in the unlawful practices, acts and/or omissions described herein at POEs along the U.S.-Mexico border;

g. Issue injunctive relief requiring Defendants to implement procedures to provide effective oversight and accountability in the inspection and processing of individuals who present themselves at POEs along the U.S.-Mexico border for the purpose of seeking asylum;

h. Award Plaintiffs their reasonable attorneys' fees, costs and other expenses pursuant to 28 U.S.C. § 2412, and other applicable law; and

i. Grant any and all such other relief as the Court deems just and equitable.

**Answer:** This paragraph consists of Plaintiffs' prayer for relief, to which no response is required. To the extent the Court requires a response, Defendants deny that Plaintiffs are entitled to any relief.

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

## AFFIRMATIVE DEFENSES

1.     This Court does not have jurisdiction to review Defendants' actions, certify a class, or grant declaratory or injunctive relief related to Defendants' implementation of 8 U.S.C. § 1225(b)(1). *See* 8 U.S.C. §§ 1252(a)(2)(A)(i)–(iv), (e); Defs.' Reply in Support of Mot. to Dismiss, at 5 n.4 (ECF No. 238); *see also, e.g.*, Am. Order on Defs.' Mot. to Dismiss, at 5 (ECF No. 280) ("This case turns on the Section 1225(b) asylum procedure that Section 1158 incorporates.").

DATED: August 16, 2019         Respectfully submitted,

                                JOSEPH H. HUNT
                                Assistant Attorney General

                                WILLIAM C. PEACHEY
                                Director

                                GISELA A. WESTWATER
                                Assistant Director

                                KATHERINE J. SHINNERS
                                Senior Litigation Counsel

                                */s/ Alexander J. Halaska*
                                ALEXANDER J. HALASKA
                                SAIRAH G. SAEED
                                Trial Attorneys
                                United States Department of Justice
                                Civil Division
                                Office of Immigration Litigation
                                District Court Section
                                P.O. Box 868, Ben Franklin Station
                                Washington, D.C. 20044
                                Tel: (202) 307-8704 | Fax: (202) 305-7000
                                alexander.j.halaska@usdoj.gov

                                *Counsel for Defendants*

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC

## CERTIFICATE OF SERVICE

I certify that on August 16, 2019, I served a copy of this document on the Court and all parties of record by filing it with the Clerk of the Court through the CM/ECF system, which will provide notice and an electronic link to this document to all counsel of record.

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

ANSWER TO SECOND AM. COMPL.
Case No. 3:17-cv-02366-BAS-KSC