MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.: 17-cv-02366-BAS-KSC |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR PROVISIONAL CLASS CERTIFICATION** |
| v. | |
| Kevin K. McAleenan,[1] *et al.*, | |
| Defendants. | ***PORTIONS FILED UNDER SEAL*** |
| | Hearing Date: October 28, 2019 |
| | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

[1] Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
  *mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA  22903
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

2

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................... 1

II.  FACTS COMMON TO THE PROVISIONAL CLASS .............................. 4

    A.  THE METERING POLICY ...................................................... 4

    B.  THE ASYLUM BAN ............................................................. 8

    C.  THE GOVERNMENT'S CONTEMPORANEOUS ADMISSIONS ... 11

III.  THE PROVISIONAL CLASS DEFINITION IS REASONABLE .............. 12

IV.  THE REQUIREMENTS OF FED. R. CIV. P. 23(A) ARE MET ............... 13

    A.  THE PROVISIONAL CLASS IS NUMEROUS .............................. 13

    B.  THERE ARE COMMON QUESTIONS OF LAW AND FACT ....... 16

    C.  TYPICALITY IS SATISFIED ................................................. 19

    D.  THE NAMED PLAINTIFFS AND COUNSEL ARE ADEQUATE ... 20

V.  RULE 23(B)(2) IS SATISFIED ....................................................... 22

VI.  THE PROVISIONAL CLASS IS ASCERTAINABLE ............................ 24

VII.  CONCLUSION ......................................................................... 25

i

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abdullah v. U.S. Sec. Assocs., Inc.*,
  731 F.3d 952 (9th Cir. 2013)......................................................................16

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001)......................................................................17

*Astiana v. Kashi Co.*,
  291 F.R.D. 493 (S.D. Cal. 2013)................................................................14

*Baby Neal v. Casey*,
  43 F.3d 48 (3d Cir. 1994)...........................................................................22

*Backhaut v. Apple Inc.*,
  2015 WL 4776427 (N.D. Cal. 2015)..........................................................25

*Bee, Denning, Inc. v. Capital Alliance Grp.*,
  2016 WL 3952153 (S.D. Cal. 2016) ..........................................................24

*Betts v. Reliable Collection Agency, Ltd.*,
  659 F.2d 1000 (9th Cir. 1981).....................................................................1

*Brantley v. Maxwell-Jolly*,
  656 F. Supp. 2d 1161 (N.D. Cal. 2009) .....................................................12

*Bresgal v. Brock*,
  843 F.2d 1163 (9th Cir. 1987).....................................................................13

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017)...............................................................24, 25

*Canales-Robles v. Peters*,
  2018 WL 4762899 (D. Or. 2018)................................................................20

*Carrillo v. Schneider Logistics, Inc.*,
  2012 WL 556309 (C.D. Cal.) ......................................................................13

*Civ. Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*,
  317 F.R.D. 91 (N.D. Cal. 2016) .................................................................14

*Cole v. City of Memphis*,
  839 F.3d 530 (6th Cir. 2016).......................................................................24

*Doe v. Nielsen*,
  357 F. Supp. 3d 972 (N.D. Cal. 2018) ..................................................23, 24

*E. Bay Sanctuary Covenant v. Trump*,
  349 F. Supp. 3d 838 (N.D. Cal. 2018) .........................................................2

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

*Ellis v. Costco Wholesale Corp.*,
     657 F.3d 970 (9th Cir. 2011) ................................................................ 16

*In re Facebook, Inc. PPC Advertising Litig.*,
     282 F.R.D. 446 (N.D. Cal. 2012) ........................................................ 14

*Hanlon v. Chrysler Corp.*,
     150 F.3d 1011 (9th Cir. 1998) .............................................................. 21

*Harris v. Palm Springs Estates, Inc.*,
     329 F.2d 909 (9th Cir. 1964) ................................................................ 14

*Inland Empire - Immigrant Youth Collective*,
     2018 WL 1061408 ................................................................................. 19

*J.L. v. Cissna*,
     2019 WL 415579 (N.D. Cal. 2019) ...................................................... 25

*Just Film, Inc. v. Merchant Servs., Inc.*,
     474 F. App'x 493 (9th Cir. 2012) ......................................................... 13

*Krueger v. Wyeth, Inc.*,
     310 F.R.D. 468 (S.D. Cal. 2015) ......................................................... 18

*LaReau v. Manson*,
     383 F. Supp. 214 (D. Conn. 1974) ...................................................... 20

*Leyva v. Buley*,
     125 F.R.D. 512 (E.D. Wash. 1989) ..................................................... 16

*Lucas v. Berg, Inc.*,
     212 F. Supp. 3d 950 (S.D. Cal. 2016) ................................................. 25

*Lyon v. ICE*,
     171 F. Supp. 3d 961 (N.D. Cal. 2016) ................................................. 23

*Lyon v. ICE*,
     300 F.R.D. 628 (N.D. Cal. 2014) ........................................................ 17

*Lyon v. ICE*,
     308 F.R.D. 203 (N.D. Cal. 2014) ........................................................ 23

*McCluskey v. Trustees of Red Dot Corp.*,
     268 F.R.D. 670 (W.D. Wash. 2010) .................................................... 15

*Meyer v. Portfolio Recovery Assocs., LLC*,
     707 F.3d 1036 (9th Cir. 2012) .............................................................. 13

*Ms. L. v. U.S. Immigration & Customs Enforcement ("ICE")*,
     2018 WL 8665001 (S.D. Cal. 2018) .................................... 14, 20, 23

*Nak Kim Chhoeun*,
     2018 WL 6265014 ................................................................................. 19

*Orantes-Hernandez v. Meese*,

685 F. Supp. 1488 (C.D. Cal. 1988) ........................................................ 23

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ................................................................. 19

*Plata v. Schwarzenegger*,
2005 WL 2932253 (N.D. Cal. 2005) ...................................................... 23

*Price v. City of Stockton*,
390 F.3d 1105 (9th Cir. 2004) ............................................................... 13

*Rodriguez v. Hayes*,
591 F.3d 1105 (9th Cir. 2010) .............................................. 16, 19, 20

*In re Rubber Chemicals Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) .......................................................... 14

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ................................................................ 14

*Saravia v. Sessions*,
280 F. Supp. 3d 1168 (N.D. Cal. 2017) ................................................ 24

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*,
559 U.S. 393 (2010) .............................................................................. 12

*Unknown Parties v. Johnson*,
163 F. Supp. 3d 630 (D. Ariz. 2016) .................................. 17, 19, 23, 24

*Vietnam Veterans of Am. v. C.I.A.*,
288 F.R.D. 192 (N.D. Cal. 2012) .......................................................... 25

*Von Colln v. Cty. of Ventura*,
189 F.R.D. 583 (C.D. Cal. 1999) .......................................................... 14

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........................................................................ 16, 22

*Walters v. Reno*,
145 F.3d 1032 (9th Cir. 1998) ......................................................... 22, 23

*Westways World Travel, Inc. v. AMR Corp.*,
218 F.R.D. 223 (C.D. Cal. 2003) .......................................................... 22

*In re Yahoo Mail Litig.*,
308 F.R.D. 577 (N.D. Cal. 2015) .......................................................... 14

*Zepeda v. INS*,
753 F.2d 719 (9th Cir. 1983) ................................................................ 13

**Other Authorities**

8 C.F.R. § 208.13(c)(4) .......................................................................... 18

Asylum Eligibility and Procedural Modifications, 84 Fed. Reg.

33,829, 33,830 (July 16, 2019)......................................................*passim*

Fed. R. Civ. P. 23........................................................................*passim*

Mary J. Kane, *Fed. Prac. & Proc. Civ.* (3d ed. 2018) ......................................17, 21

William B. Rubenstein, *Newberg on Class* (5th ed. 2018) ......................................23

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

# I.    INTRODUCTION

The Named Plaintiffs ("Named Plaintiffs" or "Plaintiffs") seek provisional class certification for the purposes of pursuing preliminary injunctive relief. Plaintiffs easily meet all of the requirements of Rules 23(a) and 23(b)(2). They seek certification of a cohesive class consisting of all non-Mexican noncitizens who were denied access to the U.S. asylum process before July 16, 2019 as a result of the Government's metering policy and continue to seek access to the U.S. asylum process.[2] All of the class members advance claims for violations of the Immigration and Nationality Act ("INA"), the Administrative Procedure Act ("APA"), the Due Process Clause of the Fifth Amendment, and the Alien Tort Statute ("ATS").

Their claims are based on a common nucleus of operative facts. Although discovery is ongoing, Plaintiffs have uncovered evidence that one aspect of the Turnback Policy alleged in their Second Amended Complaint—the metering policy—exists and has denied members of the provisional class access to the U.S. asylum process. Moreover, the discovery record produced thus far shows that there is no valid justification for the metering policy.

Each member of the provisional class makes the same arguments concerning the metering policy. The Government's metering policy singles out asylum seekers for treatment that applies to no other group of individuals seeking to enter the United States via the U.S.-Mexico border. As they approached Ports of Entry ("POEs") on the U.S.-Mexico border, members of the class were denied access to the U.S. asylum process by virtue of the border-wide implementation of the Government's metering

---

[2] For purposes of the concurrently filed motion for preliminary injunction, by this motion Plaintiffs seek to provisionally certify a subclass of the class alleged in their Second Amended Complaint. *See* Dkt. 189 at ¶ 236. "[A] class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5). A proposed subclass should be certified if it meets Rule 23's requirements. *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981). The provisional class includes noncitizens who currently reside in the United States that were metered prior to July 16, 2019 and have been denied meaningful access to the U.S. asylum process by the combined effect of the metering policy and the Asylum Ban.

policy. Under that policy, U.S. Customs and Border Protection ("CBP") officers do not inspect and process asylum seekers when they are in the process of arriving at POEs in the United States as the INA requires. *See* Dkt. 278 at 38-40, 42, 44-47. Instead, CBP officers block asylum seekers—and only asylum seekers—from crossing the international boundary line on the pathway to POEs. CBP officers inspect and process a limited number of asylum seekers at POEs, only sporadically, and generally based on their positions on lists of asylum seekers maintained by third parties in Mexico. When asylum seekers approach POEs without going through this waitlist process, CBP officers generally refuse to inspect and process them. Faced with this illegal conduct, the class members put their names on waitlists in Mexican border towns and waited weeks or months in dangerous and unsanitary conditions. The class members did so hoping that they would be one of the handful of asylum seekers on the waitlists allowed to present themselves at POEs on a particular day.

Then the Government pulled a bait-and-switch. After many of the class members had been waiting weeks or months due to the Government's metering policy, the Government issued an interim final rule (the "Asylum Ban") on July 16, 2019 that effectively denies access to the asylum process to any noncitizen who traveled through a third country before reaching the U.S.-Mexico border.[3] The Asylum Ban contains one limited exception that is relevant here—in order to avoid the bar on asylum eligibility, noncitizens must first seek protection from persecution or torture in a country through which they traveled en route to the United States and be denied such protection in a final judgment *before* seeking asylum in the United States.

This rule is not merely an additional administrative hurdle; it effectively

---

[3] The Asylum Ban bars non-Mexicans from "eligibility" for asylum, not from applying for asylum. However, "[t]o say that one may *apply* for something that one has no right to *receive* is to render the right to apply a dead letter. There simply is no reasonable way to harmonize the two." *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 857 (N.D. Cal. 2018).

denies any meaningful access to the U.S. asylum process to the class of individuals who were abiding by the rules of the Government's metering policy. Asylum seekers forced to "seek protection from persecution or torture," Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829, 33,830 (July 16, 2019) [hereinafter "Asylum Ban"], in Mexico before seeking asylum in the United States face delays of over two years caused by the chronic underfunding and understaffing of Mexican Commission for Refugee Assistance ("COMAR"), the Mexican agency charged with evaluating asylum applications. The class members, who are fleeing horrific violence and threats to their lives, cannot wait *years* before even being allowed to wait for asylum in the United States. They are living in migrant centers, in overcrowded group homes, and on the streets of Mexican towns, where they are vulnerable to abuse by criminal gangs and, in many cases, lack access to basic sanitation and medical services.

To make matters worse, CBP is forcing members of the provisional class to go through a charade by seeking asylum in Mexico. Provisional class members who were metered before July 16, by definition, have been in Mexico longer than a month, and are now barred from obtaining asylum in Mexico by that country's 30-day bar on asylum applications. Although it is possible to seek a waiver of the 30-day bar, it is nearly impossible to do without retaining legal counsel, which destitute asylum seekers cannot do. For all intents and purposes, nearly all provisional class members are unable to even apply for asylum in Mexico. Therefore, the combined effect of the Asylum Ban and the metering policy is that the class members are barred from seeking asylum in either Mexico (due to the 30-day rule) or the United States (due to the Asylum Ban).

Under the INA, which contains no cap on the number of asylum seekers that can present themselves at POEs, the class members were eligible for asylum when they arrived at the U.S.-Mexico border. But for the Government's illegal metering policy, the class members would have accessed the U.S. asylum process before the

MEMO OF P. & A. IN SUPP. OF MOT. FOR PROVISIONAL CLASS CERT.

Asylum Ban went into effect.  Instead, while the class members were waiting in Mexican border towns, the Government foreclosed their eligibility for asylum and thus effectively eliminated their ability to access the U.S. asylum process.  Now, regardless of whether class members are ever inspected and processed, they will be unable to access the U.S. asylum process.  The Government cannot pull such an immoral bait and switch.

The class members are subject to the metering policy and the Asylum Ban. They seek preliminary injunctive relief that will remedy the combined effect of these policies in a single stroke.  Provisional class certification is warranted.

## II.    FACTS COMMON TO THE PROVISIONAL CLASS

### A.    THE METERING POLICY

On April 27, 2018, CBP issued its metering policy, which was distributed to the four directors of field operations that oversee the operations of all POEs on the U.S.-Mexico border.  *See* Ex. 1.[4]  Under the metering policy, directors of POEs were empowered to "meter the flow of travelers at the land border."  *Id.*  When "metering" is in place, CBP officers tell "waiting travelers that processing at the port of entry is currently at capacity."  *Id.*

The Government subsequently confirmed the existence of the metering policy in a September 2018 report from the Office of the Inspector General of the U.S. Department of Homeland Security.  *See* Ex. 2 at 4.  The report concluded that, "while the Government encouraged all asylum-seekers to come to ports of entry to make their asylum claims, CBP managed the flow of people who could enter at those ports of entry through metering."  *Id*.

The Government's metering policy has a border-wide, systematic effect on asylum seekers.  Prior to the formalization of the metering policy, ███████████ ███████████████████████████████████████████████████████████████ .

---

[4] "Ex." refers to the exhibits to the Declaration of Stephen Medlock ("Medlock Decl."), which are filed concurrently with this motion.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.



See Ex. 3 at 12000.

." *Id.*

.

. *See* Ex. 4 at 12012-13.

*See* Ex. 5 at 12141.

At POEs on the U.S-Mexico border, the metering policy singles out asylum seekers and treats them differently from every other traveler arriving at a POE. At POEs, pedestrian traffic for non-asylum seekers flows freely—pedestrians cross into the United States sometimes through turnstiles and sometimes by stepping across a literal line on the ground; they then enter the POE's arrival hall, where they encounter a CBP officer. *See* Ex. 6 ¶¶ 5-6. The CBP officer inspects the pedestrian, who may be admitted into the country or sent to secondary inspection for additional questioning. *See id.* at ¶ 6. Under the metering policy, while other pedestrians flow freely across the international boundary en route to the arrival hall, CBP officers intercept asylum seekers at the international boundary. *See id.* at ¶ 6. These CBP officers instruct the asylum seekers to return to Mexico. *See id.* at ¶ 6. Plaintiffs have documented the existence of this metering policy through multiple declarations. *See* Ex. 7 ¶¶ 9-10; Ex. 8 ¶¶ 8-9; Ex. 9 ¶¶ 9-10; Ex. 10 ¶¶ 9-10; Ex. 11 ¶¶ 7-8; Ex. 12 ¶ 9; Ex. 13 ¶¶ 9-12; Ex. 14 ¶¶ 5-7; Ex. 15 ¶¶ 4-11; Ex. 16 ¶¶ 14-17; Ex. 17 ¶¶ 7-11; Ex. 18 ¶¶ 14-16 ; Ex. 19 ¶¶ 9-12 ; Ex. 20 ¶¶ 7-11; Ex. 21 ¶¶ 7-10; Ex. 22 ¶¶ 6-18; Ex. 23 ¶¶ 8-10; Ex. 24 ¶¶ 8-9; Ex. 25 ¶¶ 5-6. In Mexico, asylum

seekers contact local organizations to place themselves on waitlists. *See, e.g.*, Ex. 7 ¶¶ 9-10; Ex. 8 ¶¶ 8-9; Ex. 9 ¶¶ 9-10; Ex. 10 ¶¶ 9-10; Ex. 26 ¶¶ 6-7. These asylum seekers then spend week or months waiting for their names to be called along with hundreds of other asylum seekers. *See, e.g.*, Ex. 6-A at 5-13; Ex. 26 ¶¶ 7-10. These wait times can last months because, on average, no POE processes over 30 asylum seekers per day. Ex. 6-A at 5-13.

This is entirely different from the way that asylum seekers were inspected and processed at POEs prior to the implementation of the metering policy. Prior to the metering policy, asylum seekers could proceed past the international boundary to the entry halls or inspection stations at the POEs. *See* Ex. 6 ¶ 6. Asylum seekers were not forced to spend months on waitlists on the Mexican side of the border. *Id.*

The Government has used the metering policy to drastically cut the number of asylum seekers processed at POEs. *See* Ex. 6-A at 5-14; Ex. 6-B at 4-8; Ex. 6-C at 2-3; Ex. 6-D at 7. These processing levels cannot be justified by the capacity of particular POEs. For example, ██████████████████████████████████ ████████████████████████████████████████████████████ Ex. 27 at 11124, ████████████████████████████████ ████████████████████████ *Id.* at 11135. █████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ .



As shown above, ████████████████████████████████████ ████████████████████████████████████████, ████████████ ████████████████████████ ████████████ ████████████████████████.

Even when accounting for such factors as the need to house vulnerable migrant populations (such as juveniles) separately from other migrants, the Government has offered no valid justification for its decision to ████████████████████████ ████████████ ████████████ ████████.

The same trend can be seen border-wide. CBP's own statistics show that the Government has far more capacity to process asylum seekers than it is currently using. Between July 2015 and January 2017, before the Government implemented its formal border-wide metering policy, CBP processed 12,651 undocumented migrants per month. Ex. 28 ¶ 6(a). Between June 2018 and July 2019, CBP processed only 9,904 undocumented migrants per month, a 28% decrease. *Id.* ¶ 6(b)-(c).

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.



Undocumented Migrants Processed at Ports of Entry, October 2011-Present

This reduction in migrant processing cannot be explained by other factors. From 2015 to 2019, CBP's budget increased from $12.8 billion to $14.7 billion. Ex. 29 at fig. 2. In 2017 and 2018, the number of "frontline" CBP officers increased. Ex. 30 at 6. Moreover, in 2019, CBP is scheduled to complete a $741 million expansion of the San Ysidro POE, which includes an expansion of the secondary inspection and detention capabilities of the POE. Ex. 31 at 2. Moreover, after the Government implemented the Asylum Ban, which rendered many migrants ineligible for asylum, the number of undocumented migrants allowed to approach ports of entry increased to 13,313. Ex. 28 ¶ 7.

## B.    THE ASYLUM BAN

On July 16, 2019, the Attorney General and the Acting Secretary of Homeland Security promulgated an interim final rule providing that noncitizens who transit through another country prior to reaching the U.S.-Mexico land border are ineligible for asylum. *See* Asylum Ban at 33,830. The rule has three narrow exceptions: (1) noncitizens who applied for protection in one of the countries through which they traveled and were denied protection in a final judgment, (2) noncitizens who meet the definition of "victim of severe form of trafficking in persons," and (3) noncitizens who transited only through countries that are not parties to the 1951

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

Refugee Convention, the 1967 Refugee Protocol, or the Convention Against Torture. *Id.* at 33,834. The Asylum Ban does not apply to noncitizens who "enter[ed] or attempt[ed] to enter the United States across the southern border" before the promulgation of the rule. *Id.*

The Asylum Ban has especially pernicious effects when coupled with the metering policy. Due to the metering policy, approximately 26,000 asylum seekers have been forced to wait for protracted periods in Mexican border towns under dangerous conditions without access to basic resources. *See, e.g.*, Ex. 6 ¶ 7; Ex. 7 ¶ 17; Ex. 10 ¶ 17; Ex. 11 ¶ 12; Ex. 12 ¶ 11; Ex. 13 ¶ 14; Ex. 14 ¶ 9; Ex. 15 ¶ 11. Because migrant shelters are over capacity, asylum seekers, including families with young children, are forced to live on the street where temperatures regularly exceed 100 degrees. *See* Ex. 6 ¶ 7.[5]



Now the Government has pulled a bait and switch. After making the provisional class members wait for lengthy periods in the hope of accessing the U.S. asylum process, the Government is denying them meaningful access to the asylum process because they did not apply for and wait to receive protection in a country they traveled through to get to the United States first. For provisional class members

---

[5] Associated Press (Aug. 1, 2019), *available at* http://bit.ly/2KzNfJT.

1    stranded in Mexico, applying for protection in Mexico may be their only option now.

2    Applying for asylum in Mexico first will harm each of the members of the

3    provisional class.    To begin with, "[m]igrants traveling through Mexico are

4    frequently subject to abuses and human rights violations." Ex. 32 at 5-6.  Even

5    though it is likely that crimes against asylum seekers "are severely underreported,"

6    between 2012 and January 2018, Mexico's National Human Rights Commission

7    received "more than 3,000 complaints of abuses against migrants." *Id.* at 5-6.

8    Moreover, many asylum seekers in Mexico "are left unprotected due to lack of

9    access to full and fair procedures." Ex. 33 at 2.  COMAR, the Mexican agency

10   charged with processing asylum claims, has a total annual budget of $1.2 million, its

11   lowest level of funding in seven years—far less than the $59.6 million that the United

12   Nations has determined is needed to operate COMAR properly —and a staff of 63

13   people. Ex. 34 at 1-2; Ex. 35 at 4; Ex. 45 ¶ 19.  COMAR is "[b]uckling under surging

14   asylum applications" and has recently turned to the United Nations for assistance.

15   Ex. 34 at 1.  COMAR's employees are already "working up to 15 hours a day" to

16   process a backlog of over 16,300 asylum applications.  Ex. 36 at 1; Ex. 45 ¶ 19.

17   Even before the combination of the metering policy and the Asylum Ban forced

18   many more asylum seekers to lodge asylum applications with COMAR, it took the

19   agency over two years to process asylum applications (despite the fact that Mexican

20   law requires asylum applications to be processed in 45 days).  Ex. 37 at 1.

21   Furthermore, there is only one COMAR office on the U.S.-Mexico border, in

22   Tijuana, with just two staff members who are not authorized to decide cases on their

23   own. Ex. 44 ¶¶ 26-28. Although class members can apply for asylum at National

24   Institute for Migration ("INM") offices in other border cities, those offices have no

25   staff with specialized training in asylum, humanitarian protection, or working with

26   traumatized populations. *Id.* at ¶¶ 30-31. While their applications are pending,

27   migrants are not allowed to leave the Mexican state where they filed their

28   applications, and have to check in regularly with COMAR or INM to avoid

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

1  "abandonment" of their applications, which could lead to deportation. *Id.* at ¶ 32.

2  Requiring members of the provisional class to seek protection from
3  persecution or torture in Mexico first is a farce. All of the provisional class members
4  have been in Mexico for over 60 days. As a result, they are generally barred from
5  applying for asylum in Mexico by that country's 30-day bar on asylum applications.
6  Ex. 44 ¶¶ 34-36, 43-45; Ex. 45 ¶¶ 22-23. Although asylum seekers represented by
7  private attorneys may be able to seek a waiver of this 30-day bar, the provisional
8  class members generally do not have the resources to hire a private attorneys. *See,*
9  *e.g.*, Ex. 22 ¶ 6 ("I had nowhere to go and no money"); Ex. 18 ¶ 19 ("I go to bed
10  hungry"); Ex. 45 ¶ 23.

11  Therefore, the net effect of the Government's Asylum Ban and metering
12  policy is to force asylum seekers to apply for protection in a country where they are
13  barred from seeking asylum absent a waiver and where a massively underfunded
14  government agency staffed by a skeleton crew takes up to two years to process
15  asylum applications *before* they *might* be able to wait to access the U.S. asylum
16  process. For individuals who are fleeing persecution, waiting two years without
17  reliable access to employment and basic necessities to seek asylum in the United
18  States is not just irreparable harm; it is unconscionable and immoral.

19  **C.    THE GOVERNMENT'S CONTEMPORANEOUS ADMISSIONS**

20  The Government's contemporaneous statements show that the purpose of the
21  metering policy and Asylum Ban is to illegally deter asylum seekers from accessing
22  the U.S. asylum process. For instance, at a December 6, 2018 Congressional staff
23  briefing concerning metering at POEs on the U.S.-Mexico border, Judson W.
24  Murdock, II, the Acting Assistant Commissioner of CBP, justified the policy by
25  stating, "[t]he more we process, the more will come." Ex. 38 at 1. Similarly, in a
26  July 26, 2019 email, one of President Trump's chief immigration advisors, Stephen
27  Miller, stated, "My mantra has persistently been presenting aliens with multiple
28  unavoidable dilemmas to impact their calculus for choosing to make the arduous

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

1  journey to begin with." Ex. 39 at 2. Mr. Miller has been even more direct about his

2  intentions, stating that he "would be happy if not a single refugee foot ever again

3  touched America's soil." Ex. 40 at 6. President Trump has been more prosaic,

4  explaining, "They have to get rid of the whole asylum system because it doesn't

5  work. And, frankly, we should get rid of judges. You can't have a court case every

6  time somebody steps foot on our ground." Ex. 41 at 3; *see also* Ex. 42 at 24

7  ("Asylum is a ridiculous situation. . . . It's a big con job. That's what it is."); Ex.

8  43 at 24 ("How stupid can we be to put up with this? How stupid can we be? . . .

9  [T]he asylum program is a scam.").

10  ## III.  THE PROVISIONAL CLASS DEFINITION IS REASONABLE

11  Federal Rule of Civil Procedure 23 governs the certification and maintenance

12  of class actions. A plaintiff whose lawsuit meets the requirements of Rule 23 has a

13  "categorical" right "to pursue his claim as a class action." *Shady Grove Orthopedic*

14  *Assocs., P.A. v. Allstate Ins.*, 559 U.S. 393, 398 (2010). The "suit must satisfy the

15  criteria set forth in subdivision (a) [of Rule 23], and it must also fit into one of the

16  three categories described in subdivision (b) [of Rule 23]." *Id.*

17  A district court may enter class-wide preliminary injunctive relief, even

18  without certifying a class, so long as it finds that the putative class members will

19  face the same harm as plaintiffs. *See Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d

20  1161, 1178 n.14 (N.D. Cal. 2009). District courts "are empowered to grant

21  preliminary injunctions regardless of whether the class has been certified." *Id.*

22  (citation and quotation marks omitted) (granting class-wide preliminary injunction

23  to Medicaid recipients before class certification); *see also Price v. City of Stockton*,

24  390 F.3d 1105, 1117-18 (9th Cir. 2004) (affirming preliminary injunction that

25  benefitted displaced tenants beyond the named plaintiffs). *But see Zepeda v. INS*,

26  753 F.2d 719, 728 n.1 (9th Cir. 1983) ("Without a properly certified class, a court

27

28

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

12

1    cannot grant relief on a class-wide basis.").[6]

2        Courts may also "certify a provisional class for purposes of [a] preliminary

3    injunction." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1040 (9th

4    Cir. 2012); *see also Carrillo v. Schneider Logistics, Inc.*, 2012 WL 556309, at *9

5    (C.D. Cal.) ("[C]ourts routinely grant provisional class certification for purposes of

6    entering injunctive relief."), *aff'd*, 501 F. App'x 713 (9th Cir. 2012).

7        Out of an abundance of caution, Plaintiffs seek provisional certification of the

8    following class, for purposes of preliminary injunctive relief only:

9        All non-Mexican noncitizens who were denied access to the U.S.

10        asylum process before July 16, 2019 as a result of the Government's

11        metering policy and continue to seek access to the U.S. asylum process.

12    **IV.    THE REQUIREMENTS OF FED. R. CIV. P. 23(A) ARE MET**

13        **A.    THE PROVISIONAL CLASS IS NUMEROUS**

14        Federal Rule of Civil Procedure 23(a)(1) requires that the class be "so

15    numerous that joinder of all members is impracticable." "'Impracticability does not

16    mean impossibility'" but only "the difficulty or inconvenience of joining all

17    members of [the] class." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501 (S.D. Cal. 2013)

18    (quoting *Harris v. Palm Springs Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964)).

19        There is no "specific number of class members required for numerosity." *In*

20    *re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005). A

21    plaintiff does not need to specify the exact number of class members in order to

22

---

23    [6] Since *Zepeda* was decided, the Ninth Circuit has suggested that this single sentence
in the opinion may have been overruled and, in any case, should not be read broadly.

24    *See, e.g., Just Film, Inc. v. Merchant Servs., Inc.*, 474 F. App'x 493, 496 (9th Cir.
2012) (citing *Zepeda* and finding that "[t]he district court did not abuse its discretion

25    by finding sufficient evidence to support its preliminary injunction, which was
carefully tailored to maintain the status quo where class certification is pending and

26    the plaintiff has shown that a class-wide injunction is necessary to remedy the
alleged class-wide harm"); *Bresgal v. Brock*, 843 F.2d 1163, 1169-70 (9th Cir. 1987)

27    ("there is no general requirement that an injunction affect only the parties in the
suit").

28

1  certify a class.  *Ms. L. v. U.S. Immigration & Customs Enforcement ("ICE")*, 2018
2  WL 8665001, at *4 (S.D. Cal. 2018).

3      However, "courts generally find that the numerosity factor is satisfied if the
4  class comprises 40 or more members, and will find that it has not been satisfied when
5  the class comprises 21 or fewer." *In re Facebook, Inc. PPC Advertising Litig.*, 282
6  F.R.D. 446, 452 (N.D. Cal. 2012).  Where, as here, a plaintiff "seek[s] only
7  injunctive and declaratory relief, the numerosity requirement is relaxed and [the]
8  plaintiff[] may rely on [] reasonable inference[s] . . . that the number of unknown
9  and future members . . . is sufficient to make joinder impracticable."  *Civ. Rights*
10 *Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 317 F.R.D. 91, 100 (N.D. Cal. 2016) (internal
11 quotation marks and citations omitted); *see also In re Yahoo Mail Litig.*, 308 F.R.D.
12 577, 589-90 (N.D. Cal. 2015) ("In determining whether numerosity is satisfied, the
13 Court may consider reasonable inferences drawn from the facts before it.").

14     Here, joinder is clearly impracticable, because "general knowledge and
15 common sense indicate that [the provisional class] is large."  *Von Colln v. Cty. of*
16 *Ventura*, 189 F.R.D. 583, 590 (C.D. Cal. 1999).  The best current estimate of the
17 number of individuals in the provisional class is the number of individuals who are
18 currently on waitlists kept in towns on the Mexican side of the border, and who put
19 their names on those lists on or before July 16, 2019.  *See* Ex. 6-A at 2.[7]
20 Approximately 26,000 people are on waitlists in border towns due to the
21 Government's metering policy.  *Id.* at 1.  That number is under-inclusive.  For
22 instance, it does not include unaccompanied children, who are generally prohibited
23 from putting their names on these lists, and trans individuals who fear retaliation by

---

25 [7] When analyzing class certification, "[t]he court may consider whether the
26 plaintiff's proof is, or will likely lead to, admissible evidence."  *Sali v. Corona Reg'l*
   *Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018).  "But admissibility must not be
27 dispositive.  Instead, an inquiry into the evidence's ultimate admissibility should go
   to the weight the evidence is given at the class certification stage."  *Id.* (concluding
28 that district court abused its jurisdiction by refusing to consider declaration purely
   on the grounds of admissibility).

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

identifying their birth name and gender on these waitlists. Ex. 26 ¶¶ 8-10. Plaintiffs have also collected 19 declarations from members of the provisional class detailing the effects of the metering policy and Asylum Ban. *See* Exs. 7-25.

Additional factors commonly considered by courts when evaluating numerosity also compel the conclusion that class treatment is appropriate here. These factors include "(1) the judicial economy that will arise from avoiding multiple actions; (2) the geographic dispersion of members of the proposed class; (3) the financial resources of those [class] members; (4) the ability of the members to file individual suits; and (5) requests for prospective relief that may have an effect on future class members." *McCluskey v. Trustees of Red Dot Corp. Emp. Stock Ownership Plan & Tr.*, 268 F.R.D. 670, 674 (W.D. Wash. 2010) (citations omitted). While each of these factors weighs sharply in favor of provisional class certification, the second, third, and fourth factors are particularly instructive. Members of the provisional class are scattered in encampments and shelters in Mexican border cities. *See* Ex. 6-A at Fig. 1.



In many cases, they do not speak English, do not have any understanding of the U.S. legal system, and do not have the financial resources to retain legal counsel capable of pursuing complex litigation. *See, e.g.*, Ex. 22 ¶ 6 ("I slept on the ground with my son. . . I had nowhere to go and no money"); Ex. 18 ¶ 19 ("I go to bed hungry because

there is not enough food for dinner."); *see also* Ex. 6 ¶ 6; Ex. 6-A at 3; Ex. 19 ¶¶ 15-18; Ex. 20 ¶¶ 13-14; Ex. 21 ¶¶ 14-16. Thus, they lack any practical ability to file individual suits. *See, e.g.*, *Rodriguez v. Hayes*, 591 F.3d 1105, 1123 (9th Cir. 2010) (finding numerosity satisfied, in part, because of "the several practical concerns that would likely attend [prospective immigrant class members] were they forced to proceed alone."); *Leyva v. Buley*, 125 F.R.D. 512, 515 (E.D. Wash. 1989) (certifying class of migrant workers due to class members' limited knowledge of the legal system, limited or non-existent English language skills, and fear of retaliation). Accordingly, the provisional class is numerous.

## B.    THERE ARE COMMON QUESTIONS OF LAW AND FACT

Rule 23(a) next requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). However, all questions of law and fact do not need to be common to the proposed class in order to satisfy Rule 23(a). *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). Instead, commonality requires plaintiffs to demonstrate that their claims "depend upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality can be satisfied by a single common issue. *See, e.g.*, *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (commonality "does not . . . mean that *every* question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single *significant* question of law or fact.") (citations and internal quotation marks omitted).

When a plaintiff is seeking injunctive and declaratory relief, commonality is present "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Unknown Parties v. Johnson*, 163 F. Supp. 3d 630, 635 (D. Ariz. 2016) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001)). Such suits "by their very nature often present common questions satisfying Rule 23(a)(2)." 7A Mary J. Kane, *Fed. Prac. & Proc. Civ.* § 1763 (3d ed. 2018).

1    Furthermore, the fact that a policy is enforced in a less than uniform manner does

2    not negate a finding of commonality. *See Lyon v. ICE*, 300 F.R.D. 628, 642 (N.D.

3    Cal. 2014) ("The fact that the precise practices among the three [immigration

4    detention] facilities may vary does not negate the application of a constitutional floor

5    equally applicable to all facilities.").

6        For example, in *Unknown Parties v. Johnson*, a group of detainees at CBP

7    detention facilities in the U.S. Border Patrol's Tucson Sector sued the Secretary of

8    Homeland Security and the CBP Commissioner for violations of the Due Process

9    Clause of the Fifth Amendment. 163 F. Supp. 3d at 634. The plaintiffs sought

10   declaratory and injunctive relief, including an order compelling the Government to

11   provide the proposed class with beds; access to soap, toothbrushes, toothpaste, and

12   other sanitary supplies; clean drinking water and nutritious meals; reasonable

13   holding cell temperatures; and access to medical care. *Id.* The plaintiffs moved to

14   certify a class of "'all individuals who are now or in the future will be detained for

15   one or more nights at a CBP facility, including Border Patrol facilities, within the

16   Border Patrol's Tucson Sector.'" *Id.* The Government argued that the proposed

17   class lacked commonality, because plaintiffs were challenging "a number of

18   different conditions they allege were experienced by a variety of individuals . . . over

19   an unspecified period of time at eight different Border Patrol stations throughout the

20   Tucson Sector." *Id.* at 637. Because the plaintiffs "provide[d] numerous

21   declarations in which the putative class members attested to" system-wide

22   deprivation of their due process rights, the court found that the commonality

23   requirement was met and that "[p]laintiffs' contentions, if proven, would be

24   []capable of classwide resolution." *Id.*; *see also id.* at 638-39 (rejecting as

25   "irrelevant" Government's argument that "factual differences" in the treatment of

26   "the individual immigration detainees" negated commonality because plaintiffs

27   asserted claims based on "Sector-wide conditions of confinement").

28       So too here. It is undisputed that, on April 27, 2018, CBP's Office of Field

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

1    Operations promulgated the metering policy.  Ex. 1.[8]  This metering policy applies

2    to all POEs on the U.S.-Mexico border, meaning that any non-Mexican asylum

3    seeker who approaches a POE could be metered.  *See* Ex. 1.  Similarly, the Asylum

4    Ban applies to all non-Mexican asylum seekers who "enter[], attempt[] to enter, or

5    arrive[] in the United States across the southern land border on or after July 16,

6    2019." 8 C.F.R. § 208.13(c)(4).  Therefore, unless injunctive relief is granted, the

7    members of the provisional class will never be able to meaningfully access the U.S.

8    asylum process.  Ex. 46 at 2; *see also supra* at 8-10. Plaintiffs have presented

9    numerous declarations showing that the existence and effects of the metering policy

10   are systemic and capable of common proof.  *See, e.g.*, Ex. 6 ¶ 6; Ex. 7 ¶¶ 9-10; Ex.

11   8 ¶¶ 8-9; Ex. 9 ¶¶ 9-10; Ex. 10 ¶¶ 9-10; Ex. 11 ¶¶ 7-8; Ex. 12 ¶ 9; Ex. 13 ¶¶ 9-12;

12   Ex. 14 ¶¶ 5-7 ; Ex. 15 ¶¶ 4-11; Ex. 16 ¶¶ 14-17; Ex. 17 ¶¶ 7-11; Ex. 18 ¶¶ 14-16;

13   Ex. 19 ¶¶ 9-12 ; Ex. 20 ¶¶ 7-11; Ex. 21 ¶¶ 7-10; Ex. 22 ¶¶ 6-18; Ex. 23 ¶¶ 8-10.  The

14   Government's Answer contains no defenses that are specific to the Named Plaintiffs.

15   *See generally* Dkt. 283. Instead, the Government generally acknowledges the

16   existence of the April 27, 2018 metering policy, denies that it implemented the

17   metering policy with the intent of deterring asylum seekers, and asserts that the

18   metering policy was justified by purportedly limited capacity at particular POEs on

19   the U.S.-Mexico border.  *See* Dkt. 283 ¶¶ 7, 54, 67, 69, 79, 83, 226, 272, 273.

20   Therefore, there are numerous common questions of fact and law, including:

21        •    Whether the metering policy violates the INA;

22        •    Whether the metering policy violates the Due Process Clause of the

23             Fifth Amendment;

24        •    Whether the metering policy violates the ATS;

---

[8] Plaintiffs claim that the Government's illegal conduct in this case was far broader
than metering asylum seekers and that this broader Turnback Policy began as early
as 2016.  *See* Dkt. 189 at ¶¶ 2, 84.  Plaintiffs intend to seek certification of this
broader class at a later point in this case.  *See, e.g.*, *Krueger v. Wyeth, Inc.*, 310
F.R.D. 468, 473 (S.D. Cal. 2015) ("courts retain discretion to revisit class
certification throughout the legal proceedings").

- • Whether the Government has a valid justification for the metering policy; and

- • Whether the Government's proffered justification for the metering policy is pretextual.

As a result, Plaintiffs easily satisfy the commonality requirement here. *See, e.g.*, *Unknown Parties*, 164 F. Supp. 3d at 636-38; *Nak Kim Chhoeun*, 2018 WL 6265014, at *5 (commonality satisfied where "the central question in [the] case is whether the Government's policy of revoking proposed class members' release and re-detaining them without any procedural protections is unlawful"); *Inland Empire - Immigrant Youth Collective*, 2018 WL 1061408, at *8 (commonality satisfied where plaintiffs "challenge[d] Defendants' common termination policies and practices as categorically violating the APA and the Due Process Clause—not the agency's ultimate exercise of discretion with respect to each recipient.").

## C. TYPICALITY IS SATISFIED

Federal Rule of Civil Procedure 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." "[T]he typicality requirement is permissive and requires only that the representative's claims are reasonably coextensive with those of absent class members; they need not be substantially identical." *Rodriguez*, 591 F.3d at 1124 (quotation marks omitted). "The test of typicality is 'whether other members [of the class] have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citation omitted). Typicality is satisfied "'when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Rodriguez*, 591 F.3d at 1124 (quotation omitted).

Here, there is nothing unique or disparate about the Named Plaintiffs' claims against the Government. Like the remainder of the provisional class, the Named

Plaintiffs presented themselves at POEs on the U.S.-Mexico border but were turned away by CBP officers. *See* Ex. 15 ¶¶ 4-5. *See also* Ex. 7 ¶¶ 9-10; Ex. 8 ¶¶ 8-9; Ex. 9 ¶¶ 9-10; Ex. 10 ¶¶ 9-10; Ex. 11 ¶¶ 7-8; Ex. 12 ¶ 9; Ex. 13 ¶¶ 9-12; Ex. 14 ¶¶ 5-7 ; Ex. 16 ¶¶ 14-17; Ex. 17 ¶¶ 7-11.  For instance, Named Plaintiff Roberto Doe was turned away from the U.S.-Mexico border due to the metering policy and is now subject to the Asylum Ban.  *See* Ex. 15  ¶¶ 4-11.  Like the remainder of the provisional class, the Named Plaintiffs raise the same legal arguments that the metering policy violates Section 706(1) and 706(2) of the Administrative Procedure Act (and the Immigration and Nationality Act), the Due Process Clause of the Fifth Amendment, and the Alien Tort Statute.  *See* Dkt. 189 ¶¶ 203-235.  Furthermore, the mere fact that not all of the representatives of the provisional class were subject to both the metering policy and the Asylum Ban does not defeat typicality. "Class representation may change as circumstances change and develop during the span of litigation." *Canales-Robles v. Peters*, 2018 WL 4762899, at *5 (D. Or. 2018).  "[A] lack of an identified subclass representative may not be fatal, even at the certification stage." *Id.*  In cases such as this, where the nature of immigration enforcement may lead to a case that is "capable of repetition, yet evading review," *id.*, the dismissal of a subclass "on the ground of inadequate representation would be premature and contrary to the interests of justice." *Id.* at *6; *see also LaReau v. Manson*, 383 F. Supp. 214, 216-18 (D. Conn. 1974) (release of named plaintiffs in civil rights challenge to correctional center practices did not require dismissal of class action). Accordingly, the Named Plaintiffs' claims are typical of those of the provisional class. *See, e.g.*, *Ms. L.*, 2018 WL 8665001, at *7 (typicality satisfied when plaintiffs were "injured by the same course of conduct.").

### D. THE NAMED PLAINTIFFS AND COUNSEL ARE ADEQUATE

Federal Rule of Civil Procedure 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  This factor requires (1) that the proposed representative plaintiffs not have conflicts of interest

with the proposed class and (2) that the plaintiffs be represented by qualified or competent counsel. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Fed. Prac. & Proc. Civ.*, *supra*, § 1768.

Similarly, Federal Rule of Civil Procedure 23(g) is designed to "guide the court in assessing proposed class counsel as part of the certification decision." Fed. R. Civ. P. 23, Notes of Advisory Committee on 2003 Amendments. Fed. R. Civ. P. 23(g)(1)(A) provides that, in appointing class counsel, a court "must consider" the following: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Each of those requirements is satisfied here. Plaintiffs' counsel have investigated the Government's Turnback Policy and analyzed the legal basis for Plaintiffs' claims. They have also identified hundreds of additional victims of the Government's Turnback Policy, worked closely with non-governmental organizations to obtain relevant evidence concerning the metering policy and related practices, aggressively sought discovery from the Government, and were successful in defeating both of the Government's motions to dismiss.

Plaintiffs' counsel has extensive experience litigating complex litigation and class actions, including complex litigation related to the Government's immigration policies. *See* Medlock Decl. ¶¶ 4-5 (listing prior litigation experience of Plaintiffs' counsel). Together, the provisional class action and subject matter expertise of Plaintiffs' counsel qualify them to represent the Class. Plaintiffs' counsel have also committed substantial resources to this litigation, including retaining expert witnesses, e-discovery vendors, and trial graphics providers. *Id.* at ¶ 2. Collectively, over 40 attorneys have spent over 6,760.45 hours on this litigation through August

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

31, 2019. *Id.* at ¶ 6. Finally, Plaintiffs are aware of no conflicts amongst the provisional class.

## V.    RULE 23(B)(2) IS SATISFIED

Rule 23(b)(2) permits class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see also Wal-Mart*, 564 U.S. at 360 ("[t]he key to the [23](b)(2) class is 'the indivisible nature of the injunctive and declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'") (quotation omitted).

"'Generally applicable,'" as used in Rule 23(b)(2), means that the party opposing the class "'has acted in a consistent manner towards members of the class so that [its] actions may be viewed as part of a pattern of activity, or has established or acted pursuant to a regulatory scheme common to all class members.'" *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 238 (C.D. Cal. 2003) (quotation omitted). "Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998). Thus, it is sufficient if the defendant has adopted a pattern of activity that is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the defendant's conduct. *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994).

The mere existence of factual differences between some class members will not defeat a motion to certify a Rule 23(b)(2) class. *See Unknown Parties*, 163 F. Supp. 3d at 643 (rejecting argument that plaintiffs were "challeng[ing] . . . various practices amongst [multiple] facilities," because plaintiffs identified the "systemic nature of the conditions" at CBP detention facilities); *Walters*, 145 F.3d at 1047 ("the government's dogged focus on the factual differences among the class members

1    appears to demonstrate a fundamental misunderstanding of the rule").  Even if such

2    claims "may involve some individualized inquiries," the relevant question for

3    purposes of Rule 23(b)(2) is "the 'indivisible' nature of the claim alleged and the

4    relief sought."  *Ms. L.*, 2018 WL 8665001, at *9 (certifying Rule 23(b)(2) class);

5    *Lyon v. ICE*, 308 F.R.D. 203, 214 (N.D. Cal. 2014) (rejecting argument that ICE

6    facilities had different attributes, because "these differences do not negate the fact

7    that Plaintiffs seek relief that is applicable to . . . the entire class").  This is because

8    Rule 23(b)(2) "focuses on the defendant and questions whether the defendant has a

9    policy that affects everyone in the proposed class in a similar fashion."  William B.

10    Rubenstein, *Newberg on Class Actions* § 4:28 (5th ed. 2018).

11        Moreover, the "rights of the class under Rule 23(b)(2) are not measured solely

12    by the facts and circumstances of the named representatives."  *Lyon v. ICE*, 171 F.

13    Supp. 3d 961, 984 n. 17 (N.D. Cal. 2016); *see also Plata v. Schwarzenegger*, 2005

14    WL 2932253, at *6 (N.D. Cal. 2005) (citing a "few representative examples from

15    the testimonial and documentary evidence" not confined to named plaintiffs to

16    demonstrate inadequate medical care in California prisons); *Orantes-Hernandez v.*

17    *Meese*, 685 F. Supp. 1488, 1507 (C.D. Cal. 1988) (reviewing testimony from class

18    members, not just the named plaintiffs, to determine there was a procedural due

19    process violation).

20        For instance, in *Doe v. Nielsen*, a group of 87 Iranian Christians sued the

21    Department of Homeland Security for denying them entry into the United States.

22    357 F. Supp. 3d 972, 980-81 (N.D. Cal. 2018).  In their class certification motion,

23    plaintiffs argued that the Government's "uniform response" to their applications to

24    enter the United States was "sufficient to satisfy Rule 23(b)(2)."  *Id.* at 992.  The

25    court reasoned that, in the face of the Government's apparent uniform action,

26    "declaratory and injunctive relief [would] appl[y] equally to all members of the

27    proposed class and thus conform[ed] to Rule 23(b)(2)."  *Id.*

28        This case is even stronger than *Doe v. Nielsen*.  Here, Plaintiffs have evidence

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

of a uniform response through multiple declarations *plus* direct evidence that the Government adopted a common and systemic policy with respect to members of the provisional class *and* statistical evidence and contemporaneous admissions showing that the Government's justifications for its policies are a sham.  It is difficult to conceive of a stronger and more cohesive Rule 23(b)(2) class.  Plaintiffs' provisional Rule 23(b)(2) class should be certified.  *See, e.g.*, *Unknown Parties*, 163 F. Supp. 3d at 643 (injunctive relief claim that CBP systematically violated detainees' constitutional rights was "the quintessential type of claims that Rule 23(b)(2) was meant to address"); *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1205 (N.D. Cal. 2017) (Rule 23(b)(2) satisfied "[b]ecause a single injunction can protect all class members' procedural due process rights").

## VI.   THE PROVISIONAL CLASS IS ASCERTAINABLE

While the Ninth Circuit has not yet ruled on the issue, this Court has previously concluded that "ascertainability should not be required when determining whether to certify a class in the 23(b)(2) context."  *Bee, Denning, Inc. v. Capital Alliance Grp.*, 2016 WL 3952153, at *5 (S.D. Cal. 2016) (Bashant, J.).[9]  However, even if ascertainability is a requirement for a Rule 23(b)(2) class, the provisional class is readily ascertainable.   Rule 23 "does not impose a freestanding administrative feasibility requirement to class certification."  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017).  "Although a proposed class must be ascertainable in the sense that the proposed class must be sufficiently defined and not vague, 'ascertainability' is not a threshold requirement for class certification."  *J.L. v. Cissna*, 2019 WL 415579, at *7 (N.D. Cal. 2019).  Instead, ascertainability is only relevant to the extent it is implicated by Rule 23's enumerated requirements. *Briseno*, 844 F.3d at 1124 n.4 (citation omitted).

---

[9] *See also Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("The decisions of other federal courts and the purpose of Rule 23(b)(2) persuade us that ascertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief.").

1    Therefore, a proposed class is ascertainable if it can be defined using

2    "objective criteria." *Backhaut v. Apple Inc.*, 2015 WL 4776427, at *11 (N.D. Cal.

3    2015); *Lucas v. Berg, Inc.*, 212 F. Supp. 3d 950, 973 (S.D. Cal. 2016) ("[A] class is

4    not ascertainable where a court must investigate the merits of individual claims to

5    determine class membership, or if membership depends upon subjective factors such

6    as a prospective member's state of mind."). "Where the class definition proposed is

7    overly broad or unascertainable, the court has the discretion to narrow it." *Vietnam*

8    *Veterans of Am. v. C.I.A.*, 288 F.R.D. 192, 211-12 (N.D. Cal. 2012).

9    Here, members of the class can be determined using objective criteria.

10   Members of the provisional class attempted to present themselves at a port of entry

11   on the U.S.-Mexico border in order to seek asylum before July 16, 2019 but were

12   subjected to the Government's metering policy and turned back from the port of

13   entry. *See supra* at 5. The names of many members of the provisional class appear

14   on waitlists kept by the Mexican government and non-governmental entities at

15   Mexican border towns, including Matamoros, Reynosa, Nuevo Laredo, Juarez,

16   Nogales, Mexicali, and Tijuana. *See* Ex. 6A at 5-3. Where the names of class

17   members do not appear on a waitlist, their membership in the provisional class can

18   be established by declarations or records from immigration shelters. As a result, the

19   class is ascertainable.

20   **VII.  CONCLUSION**

21   For the foregoing reasons and those explained in the accompanying motion

22   for preliminary injunction, the Court should therefore provisionally certify the class.

23   Dated: September 26, 2019                    MAYER BROWN LLP
24                                                        Matthew H. Marmolejo
                                                          Ori Lev
25                                                        Stephen S. Medlock

26                                                 SOUTHERN POVERTY LAW
27                                                 CENTER
                                                          Melissa Crow
28

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mary Bauer
Sarah Rich
Rebecca Cassler

CENTER FOR CONSTITUTIONAL
RIGHTS
   Baher Azmy
   Ghita Schwarz
   Angelo Guisado

AMERICAN IMMIGRATION
COUNCIL
   Karolina Walters


By: */s/ Stephen M. Medlock*
   Stephen M. Medlock

*Attorneys for Plaintiffs*

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.

**CERTIFICATE OF COMPLIANCE WITH MEET-AND-CONFER**

**REQUIREMENT**

Pursuant to Section 4(A) of the Court's Standing Order for Civil Cases, this motion is made following the in-person conference of counsel that took place on September 19, 2019 at Mayer Brown LLP, 1999 K Street, N.W., Washington, D.C. 20006-1101. During this conference, the parties were unable to eliminate the need to file this motion.

Dated: September 26, 2019                    MAYER BROWN LLP

By */s/ Stephen M. Medlock*
*Attorney for Plaintiffs*

1

## CERTIFICATE OF SERVICE

2        I certify that I caused a copy of the foregoing document to be served on all

3 counsel via the Court's CM/ECF system.

4 Dated:  September 26, 2019                    MAYER BROWN LLP

5

6                                              By  /s/ Stephen M. Medlock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PROVISIONAL CLASS CERT.