MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:  +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Kevin K. McAleenan,[1] *et al.*,<br><br>Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 45 TO MOTION FOR PROVISIONAL CLASS CERTIFICATION** |

---

[1] Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
  *mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.561

# DECLARATION OF MICHELLE BRANÉ

I, Michelle Brané, hereby declare as follows:

1. I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction Prohibiting Government from Applying Asylum Ban to Provisional Class Members. If called as a witness, I could and would testify competently as follows.

**Professional Experience with the Mexican Asylum System.**

2. I am an attorney and am the Senior Director of the Migrant Rights and Justice program at the Women's Refugee Commission ("WRC"), a nonprofit advocacy organization based in the United States. I have worked at the WRC since 2006. In that capacity, I conduct research, develop policy recommendations, and advocate for the critical protection needs of women, children, and other vulnerable migrant populations seeking protections. Much of our work focused on US laws and policies affecting migrants and asylum seekers within and beyond its border but our scope includes access to asylum and refugee protections internationally. We have conducted specific research on border and asylum access in Europe and Mexico and have written reports on both. I write frequently on key issues concerning access to protection, immigration detention and reform, and have authored and overseen several WRC reports on migration and asylum issues in the US and abroad, including *Locking Up Family Values,* on family

detention; *Halfway Home*, on unaccompanied migrant children; *Prison for Survivors: The Detention of Women Seeking Asylum in the United States; Detained or Deported: What About My Children?,* a guide for detained and deported immigrant and undocumented parents*;* and *Betraying Family Values: How Immigration Policy at the United States Border is Separating Families*. In that same capacity, I have testified before Congress and the Inter-American Commission for Human Rights, have appeared in print and broadcast outlets to discuss migration and asylum issues, and have presented regularly at conferences, briefings, and professional trainings, including before the Human Rights Council and the United Nations High Commission.

3. I have more than 25 years' experience working on immigration and human rights issues. In 1994, I was a law clerk for the Executive Office of Immigration Review and, from 1995 to 1998, served as an attorney advisor with the Department of Justice Board of Immigration Appeals, where I specialized in asylum cases. I also worked at Lutheran Immigration and Refugee Service, where I developed and coordinated the Detained Torture Survivor Legal Support Network and the Legal Orientation Program, and was the Director of the Access to Justice Unit. From 1998 to 2000, I served as a Human Rights Officer for the Organization for Security and Cooperation in Europe, Bosnia Mission, contracted by the U.S. Department of State, where I was head of the Sarajevo Field Office.

4.     WRC's mission is to improve the lives and protect the rights of women, children and youth displaced by conflict and crisis. We research their needs, identify solutions and advocate for programs and policies to strengthen their resilience and drive change in humanitarian practice.  Our Migrant Rights and Justice ("MRJ") Program focuses on the right to seek asylum – with a particular focus on the right to seek asylum in the United States. We strive to ensure that refugees, including women and children, are provided with humane reception in transit and in the United States, given access to legal protections, and protected from exposure to gender discrimination or gender-based violence. The program produces resources for migrants, advocates, and governments, and researches and advocates for better policies in a variety of specific issue areas, including the rights of asylum seekers and refugees, immigration detention and alternatives, unaccompanied children, and gender-based violence.

5.     Since 1996, the MRJ team has made numerous visits to the US southwest border and Mexico's northern border, as well as to immigration detention centers for adult women and families and to shelters housing women and unaccompanied children primarily in the US but also internationally, including Mexico. MRJ has established a fluid relationship with the Mexican government by providing analysis and proposals for ensuring that their consular protection policies and policies for returning migrants address the protection needs of migrants while

also complying with US and Mexican law and international obligations. Beginning in fall 2018, MRJ intensified its work on promoting the rights of migrants and asylum seekers regionally to address the concerning developments that have resulted from the US government's efforts to deter and turn back asylum seekers and immigrants. In 2018 MRJ hired as a consultant a former Mexican government official to provide her expertise on Mexico's immigration and asylum laws and policies, and on regional dynamics.

6.    The MRJ team has made at least 6 visits to assess risks and protection gaps faced by migrants in Mexico, monitor conditions in Mexico's largest immigration station as well as in shelters run by civil society both in its Southern and Northern border. On these trips, WRC has met with key stakeholders and authorities. Mexican NGOs informed us on one of these visits that the WRC was the first NGO who managed to secure meetings with the Mexican government to discuss the Migration Protection Protocols. Earlier this year, WRC published *Migrant and Refugee Caravans: Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid;* and *Chaos, Confusion, and Danger: The Remain in Mexico Program in El Paso*.

7.    Furthermore, as a Professor of the Georgetown Law Human Rights Institute, in 2015, I led students in a fact-finding mission to Guatemala and southern Mexico to research access to protection for unaccompanied children in

Mexico, which resulted in the reports *The Cost of Stemming the Tide: How Immigration Enforcement Practices in Southern Mexico Limit Migrant Children's Access to International Protection;* and *Forced From Home: The Lost Boys and Girls of Central America.*

8. The statements in this declaration are based on my personal experience and knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

**There Are More Women, Children and Families Fleeing Persecution Living in Mexico than Ever Before.**

9. According to the Mexican Commission to Assist Refugees (*Comisión Mexicana de Ayuda a Refugiados*, or "COMAR") and the United Nations High Commissioner for Refugees ("UNHCR"), in 2019, the number of asylum claims filed in Mexico, which had reached 48,000 at the end of August, had more than tripled compared with the same period in 2018.[1] This is a growing trend. In the last four years, COMAR's caseload has increased 20-fold.[2] It is projected that, by the

---

[1] @AndresRSilva_, "Al cierre de agosto del 2018 se habían registrado en la COMAR 14562 solicitantes de la condición de refugiado mientras que al concluir el mes de agosto de este año ya se han registrado 48254 solicitantes lo que significa 3.3 veces el número del 2018.#COMAR", September 2, 2019, 10:59 pm, Twitter, https://twitter.com/AndresRSilva_/status/1168720069427388417.

[2] @MarkManly, "Secular trend: the most recent asylum stats show the number of Central Americans and Venezuelans seeking protection in Mexico continues to rise Number of new asylum-seekers in the 1st quarter of 2019 was → 82% higher than Q1 of 2018 → 2700% higher than Q1 of 2015. Data: COMAR", April 6, 2019, 3:24 pm, Twitter, https://twitter.com/MarkManly/status/1114609886799622144.

end of the year, at least 80,000 people will have applied for asylum in Mexico,[3] compared with the less than 30,000 that did so in 2018.[4]

10. UNHCR has stressed that this historic increase is driven by families fleeing violence in Central America. UNHCR has reported that 60% of those seeking asylum in Mexico are women or children (30% are children and 30% are women).[5]

**The Mexican Government Is Aggressively Enforcing Its Borders and Increasing Deportations, Which Limits Access to Asylum.**

11. Mexico has been more aggressively policing its borders over the past few years and has increased the apprehension, detention and deportation of migrants.

12. In the last 3 months, immigration control actions were further strengthened as a result of the agreement the Mexican government reached with

---

[3] Notimex, "La crisis migratoria obligará a unos 80,000 migrantes a pedir asilo en México en 2019", *El Economista,* June 20, 2019, https://www.eleconomista.com.mx/politica/La-crisis-migratoria-obligara-a-unos-80000-migrantes-a-pedir-asilo-en-Mexico-en-2019-20190620-0086.html.

[4] @MarkManly, "Just in: 2018 COMAR data show that the number of asylum claimants in Mexico jumped by 103%, to 29,600 people. Note that less than 15% of claimants came with the "caravans" - this is a longer term trend at work", January 11, 2019, 8:58 am, Twitter, https://twitter.com/MarkManly/status/1083724940417724417.

[5] @MarkManly, "Cada vez mas la "cara" de los flujos de refugiados en México es de mujer y joven. Las personas que solicitaron asilo en México en 2018 eran en su mayoría → mujeres → niñas → niños ¿La explicación? Las dinámicas de violencia que afectan a familias enteras en Centroamérica", April 13, 2019, 1:11pm, Twitter, https://twitter.com/MarkManly/status/1117113013599817728. @MarkManly, "Los perfiles de solicitantes de la condición de refugiado en México reflejan las dinámicas de violencia en Centroamérica: 30% son niñas y niños 30% son mujeres La mayoría vienen en familia", July 7, 2019, 7:26 am, https://twitter.com/MarkManly/status/1147829179376918528.

the Trump Administration to prevent the latter from imposing tariffs on Mexican exports to the US. In addition to the staff of the National Migration Institute (*Instituto Nacional de Migración*, or "INM"), Mexico deployed more than 25,000 members of the National Guard,[6] a recently created security force that was originally formed to combat crime. The activities of the INM and the National Guard have resulted in check-points that carry out arbitrary, discriminatory and, thus, illegal review of people's documents with the aim of apprehending immigrants.

13. WRC recently learned of a case in which the National Guard apprehended and detained a family who had been returned to Mexico by the US under the Migration Protection Protocols and was waiting to attend their hearing in the US. The WRC was concerned to note that the family was detained despite having provided evidence of being in the MPP program by showing the National Guards the documents they had received both from Mexican and US authorities. This lack of understanding and recognition of official documentation speaks either to the lack of knowledge the National Guard has of immigration proceedings or to a disregard to migrants' legal rights.

---

[6] Press conference of Mexican President Andrés Manuel López Obrador, September 6, 2019, https://www.youtube.com/watch?v=uiz35WsA4y8.

14. The press has reported that members of the National Guard have forcibly stopped people from approaching the US-Mexico border[7] in violation of Mexican and international laws protecting both the right to leave one's country, and the right to request asylum.

15. In June, WRC joined other organizations in condemning the National Guard for intimidating and threatening human rights defenders and service providers. National Guard agents have been patrolling shelters run by civil society groups and have threatened to call the INM to carry out immigration enforcement actions, in violation of Mexico's law.[8]

16. People who claim refugee status in Mexico who have been apprehended by INM or the National Guard or who present themselves at a Mexican port of entry are initially sent to immigration detention at least until they

---

[7] @APFMexico, "Mexican National Guard members prevent Central American migrants from crossing the Rio Bravo, in Ciudad Juarez, State of Chihuahua, #Mexico.#AFP Herika Martinez", June 21, 2019. 7:06 pm. Tweet. https://twitter.com/AFPMexico/status/1142207079601647617.

[8] https://www.wola.org/wp-content/uploads/2019/06/Statement-U.S.-NGOs-Denounce-National-Guard-Actions-in-Migration-Enforcement-at-U.S.-Mx-Border-6.27.19-2.pdf. Inaceptable el acoso a defensores de migrantes por parte de Guardia Nacional, https://redtdt.org.mx/?p=13879. @CDMSaltillo, "*URGENTE* Casas de migrantes del norte denunciamos hostigamiento de la Guardia Nacional en contra de defensores de derechos humanos de migrantes en Agua Prieta. Exigimos alto a esta criminalización @INAMI_mx @SEGOB_mx @M_OlgaSCordero @A_Encinas_R @CNDH @m_ebrard @SEDENAmx @SRE_mx" June 24, 2019, 7:32 pm, https://twitter.com/CDMSaltillo/status/1143663333964419073?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1143663333964419073&ref_url=https%3A%2F%2Fconexionmigrante.com%2F2019-%2F06-%2F26%2Factivistas-defensores-de-los-migrantes-denunciaron-ser-hostigados-por-la-guardia-nacional%2F.

receive a certificate from COMAR that their asylum application has been accepted and is under review. The possibility of being detained, for even part of their asylum proceeding, discourages people from applying for asylum or following up with their cases because detention conditions are unsafe and overly restrictive.

**The Mexican Asylum Agency Is Vastly Underfunded and Has Only One Office on the U.S.-Mexico Border.**

17. Until early this year, COMAR had only four offices in all of Mexico: three offices in southern Mexico and one in Mexico City. Due to the pressing immigration situation, it has since opened two additional offices. Even with this expansion, all of COMAR's offices struggle with insufficient human and material resources. Furthermore, recruiting specialized personnel is another significant challenge faced by COMAR. This information was confirmed to WRC by the head of COMAR.

18. The proposed COMAR budget for 2020 of 27 million pesos, or just under US$1.4 million, is woefully inadequate and continues a trend of neglect towards the agency and failure to address the needs of the increasing number of people seeking protection in Mexico. The 2020 budget is only a modest increase over the 2019 budget of 20 million pesos, or around US$1 million— which was the lowest budget in seven years. In 2019 and years prior, COMAR's budget actually decreased while the number of asylum applications skyrocketed (see above at ¶ 9). The head of COMAR has clearly stated that Mexico's asylum system needs a

budget of at least 117 million pesos per year or almost US$6 million—nearly six times the current budget and more than four times the 2020 budget—in order to operate effectively.[9] Considering that Mexican President Andrés Manuel López Obrador has prioritized fiscal austerity and severely cut the appropriations of all government offices, there is currently no expectation of any significant increase to COMAR's budget.

19.     COMAR employs only 63 employees around the entire country, and they report working ten to 15 hours a day to tackle their workload. Each employee is responsible for some 260 asylum applications.[10]

20.     In addition to understaffing for an unprecedented increase in asylum claims, the headquarters of COMAR were damaged by an earthquake that hit Mexico City two years ago, impeding staff access to the premises and their access to case files, leading to a temporary inability to process the already existing backlog of applications. COMAR started this year with 80% of its cases pending. By law, COMAR should process asylum claims within 45 business days, and can expand the process to 90 business days when there is a well-founded reason.

---

[9] Rodrigo Soberanes, "Comisión de Refugiados dice que su presupuesto para 2020 es insuficiente para atender a migrantes", *Animal Político,* September 11, 2019, https://www.animalpolitico.com/2019/09/comision-de-refugiados-dice-que-su-presupuesto-para-2020-es-insuficiente-para-atender-a-migrantes/.

[10] Julia Love, "ENFOQUE-Bloqueo de EEUU a peticiones de asilo pone en aprietos a México", *Reuters,* September 16, 2019, https://lta.reuters.com/articulo/inmigracion-mexico-eeuu-idLTAKBN1W11QL-OUSLT.

Nonetheless, almost all cases are currently routinely extended by default for 90 days or more, with some applications having been pending for up to two years.

21. In July of this year, COMAR opened an office in Tijuana, making it the first asylum processing office on Mexico's northern border. The office in Tijuana has only two employees. In August of 2019, a member of MRJ spoke with one of them, who shared that beyond understaffing and underfunding, the office is also struggling with severe bureaucratic and administrative burdens that further increase their inefficiency and prevent them from processing asylum claims in a timely fashion. The only other COMAR office in northern Mexico is in Monterrey, which was also opened this year and is nearly 140 miles from the nearest border cities of Nuevo Laredo and Reynosa.

**Mexico Has a 30-Day Bar on Asylum Applications, and Migrants Cannot File a Petition for Review Without a Lawyer.**

22. By law, people need to claim asylum in Mexico within 30 days of entering the country. Even though there is a waiver for those who can prove that it would have been impossible for them to present their claim before the deadline, waiver requests are usually rejected automatically. While some people have been able to legally challenge these rejections, due to the legal and bureaucratic complexities of the process they can do so only with legal representation. Thus, a significant number of asylum seekers have not been able to access international

protection in Mexico due to this deadline, leaving them vulnerable to apprehension and *refoulement*.

23. The MRJ team has identified that lack of information and difficulties accessing legal assistance create a protection gap for asylum seekers in Mexico. None of the people WRC interviewed had a clear, accurate or complete picture about their legal options and about immigration procedures. NGOs and UNHCR are making considerable efforts to increase their outreach to migrants to educate them about their rights. They are also undertaking considerable efforts to manage growing caseloads with limited personnel and budgets. While their efforts are life-changing for the people to whom they provide legal advice or representation, WRC observed that this is a possibility only a few people are able to access, while lack of information prevails. Organizations are strained by the increasing workload and cannot reach and inform most migrants.

**Mexico's Asylum System Limits Mobility within the Country.**

24. By law, asylum seekers must remain in the state where they presented their claim and are supposed to check in weekly at a COMAR or INM office. People who fail to check in are considered to have abandoned their application.

25. Mexican geographical mobility limitations tied to the asylum process also deter people in need of protection from presenting their claims or lead them to abandon the process. From interviews with asylum seekers, WRC identified that

most of them do not consider the southern part of Mexico as a safe haven due to its proximity to their countries of origin and the ease with which persecutors could find them. In addition to security issues in southern Mexico, many migrants are unable to survive or meet their basic needs there and prefer to go to central and northern Mexico where they can find work to support themselves while they wait for their case to be processed. This should not be considered evidence of economically motivated migration but a practical consideration of survival while going through a long process. For those wanting to find a way to support themselves while seeking safety, the asylum process and regularization process requirements to remain in Chiapas, Oaxaca or Tabasco—which are among the poorest states in Mexico—delays their independence and self-reliance, exacerbating their vulnerability and trauma.

26. WRC interviewed an asylum-seeking Nicaraguan woman in Tapachula who filed a petition for relocation within Mexico with COMAR, because her persecutor had found her and was threatening her. She was growing desperate because the process was taking too long and she feared for her life. Local service providers informed WRC that responses to petitions for relocation for security concerns usually take more than the three business days as established by law. For someone in fear for their life, these delays can be life-threatening.

27. People who decide to move for their own safety, regardless of this geographical limitation written into the law, face significant challenges to reopening their asylum applications and usually need legal advice or representation to be successful.

28. WRC has interviewed refugees who applied for asylum in Mexico but abandoned their cases out of frustration with COMAR's inefficiency and despair that access to asylum in Mexico is not feasible. COMAR has insufficient funding, minimal territorial presence, inefficient procedures and insufficient personnel with inadequate credentials. This has resulted in a significant backlog, extended processing times and resulted in flawed refugee status determinations.

29. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge and belief.

Executed September 25, 2019

_____

Michelle Brané