1  MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2       *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3  25th Floor
    Los Angeles, CA 90071-1503
4       Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5       *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6       (*pro hac vice*)
       *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
    Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10      Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11      *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                   **UNITED STATES DISTRICT COURT**
16             **SOUTHERN DISTRICT OF CALIFORNIA**

17
    Al Otro Lado, Inc., *et al.*,          | Case No.:  17-cv-02366-BAS-KSC
18
                                            | **PLAINTIFFS' MOTION FOR**
19              Plaintiffs,                 | **PRELIMINARY INJUNCTION**
                                            | **PROHIBITING GOVERNMENT**
20        v.                                | **FROM APPLYING ASYLUM BAN**
                                            | **TO PROVISIONAL CLASS**
21  Kevin K. McAleenan,[1] *et al.*,        | **MEMBERS**
22                                          | ***PORTIONS FILED UNDER SEAL***
                Defendants.
23                                          | Hearing Date: November 4, 2019
24
                                            | **NO ORAL ARGUMENT UNLESS**
25                                          | **REQUESTED BY THE COURT**
26  ───────────────────────────

27  [1] Acting Secretary McAleenan is automatically substituted for former Secretary
    Nielsen pursuant to Fed. R. Civ. P. 25(d).
28                                          MEMO OF P. & A. IN SUPP. OF MOT. FOR
                                                    PRELIMINARY INJUNCTION

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
  *mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA  22903
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

    A.    Defendants' Illegal Metering Policy .................................................. 2

    B.    The Asylum Ban and Its Legal Challenges ....................................... 4

    C.    Because of the Illegal Metering Policy, Provisional Class
             Members Have Been Deprived of Access to the Asylum
             Process Through Operation of the Asylum Ban ................................ 6

LEGAL STANDARD .......................................................................................... 8

ARGUMENT ....................................................................................................... 9

I.     BECAUSE PROVISIONAL CLASS MEMBERS WILL SUFFER
       IRREPARABLE INJURY AND ARE LIKELY TO SUCCEED ON
       THE MERITS, A PRELIMINARY INJUNCTION IS
       WARRANTED. .............................................................................................. 9

    A.    Provisional Class Members Will Suffer Irreparable Injury
             Absent Issuance of an Injunction Because They Will
             Improperly Lose Their Right to Have Their Asylum Claims
             Decided on the Merits. .................................................................... 9

    B.    Plaintiffs Are Likely to Succeed on the Merits of Their
             Underlying Claims Challenging the Government's Metering
             Policy and Individual Turnbacks ...................................................... 13

    C.    The Balance of Equities Tips Sharply in Provisional Class
             Members' Favor and an Injunction Is in the Public Interest. ............ 21

II.    THE ALL WRITS ACT INDEPENDENTLY AUTHORIZES THE
       COURT TO PREVENT THE GOVERNMENT FROM
       PREMATURELY EXTINGUISHING PROVISIONAL CLASS
       MEMBERS' CLAIMS THROUGH THE ASYLUM BAN. ....................... 23

III.   CONCLUSION ............................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdi v. Duke,*
  280 F. Supp. 3d 373 (W.D.N.Y. 2017) ............................................................ 10

*Adams v. United States,*
  317 U.S. 269 (1942) ...................................................................................... 23

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011)........................................................ 8, 14, 20, 24

*Apotex, Inc. v. FDA,*
  2006 WL 1030151 (D.D.C. Apr. 19, 2006) .................................................... 10

*Arctic Zero, Inc. v. Aspen Hills, Inc.,*
  2018 WL 2018115 (S.D. Cal. May 1, 2018) ................................................... 23

*Arizona Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014)......................................................................... 8, 9

*Astrazeneca Pharm. LP v. Burwell,*
  197 F. Supp. 3d 53 (D.D.C. 2016) .................................................................. 24

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins.
  Litig.),*
  770 F.2d 328 (2d Cir. 1985) ........................................................................... 24

*Barr v. E. Bay Sanctuary Covenant,*
  Case No. 19A230, 588 U.S. ___, 2019 WL 4292781 (2019) ........................... 2

*Bay Area Addiction Research & Treatment, Inc. v. City of Antioch,*
  179 F.3d 725 (9th Cir. 1999) ............................................................................ 9

*Bennett v. Spear,*
  520 U.S. 154 (1997) ....................................................................................... 20

*Boardman v. Pac. Seafood Grp.,*
  822 F.3d 1011 (9th Cir. 2016) .......................................................................... 9

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ............................................................................ 9

*California v. M&P Investments,*
  46 F. App'x 876 (9th Cir. 2002)...................................................................... 23

*Capital Area Immigrants' Rights Coalition v. Trump,*
  No. 1:19-cv-02117-TJK, 2019 WL 3436501 (D.D.C. 2019).............................. 2

*Cazun v. Attorney Gen. United States,*
  856 F.3d 249 (3d Cir. 2017) ........................................................................... 11

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014)...................................................................... 8

*E. Bay Sanctuary Covenant v. Barr*,
   385 F. Supp. 3d 922 (N.D. Cal. 2019), *order reinstated*, 391 F.
   Supp. 3d 974 (N.D. Cal. 2019)................................................................... 5

*E. Bay Sanctuary Covenant v. Barr*,
   391 F. Supp. 3d 974 (N.D. Cal. 2019) ........................................................ 5

*E. Bay Sanctuary Covenant v. Barr*,
   934 F.3d 1026 (9th Cir. 2019)...................................................................... 5

*E. Bay Sanctuary Covenant v. Trump*,
   349 F. Supp. 3d 838 (N.D. Cal. 2018) ...................................................... 11

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018)...................................................................... 22

*F.T.C. v. Dean Foods Co.*,
   384 U.S. 597 (1966) .................................................................................... 23

*Graham v. Fed. Emergency Mgmt. Agency*,
   149 F.3d 997 (9th Cir. 1998)...................................................................... 20

*Hamilton v. Nakai*,
   453 F.2d 152 (9th Cir. 1972)...................................................................... 23

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017)................................................................ 10, 11

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) .................................................................................... 11

*INS v. Stevic*,
   467 U.S. 407 (1984) .................................................................................... 11

*Kirwa v. Dep't of Defense*,
   285 F. Supp. 3d 21 (D.D.C. 2007) ............................................................ 10

*Klay v. United Healthgroup, Inc.*,
   376 F.3d 1092 (11th Cir. 2004)................................................................. 23

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011)...................................................................... 11

*Michael v. INS*,
   48 F.3d 657 (2d Cir. 1995) ........................................................................ 24

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................................... 22

*Partington v. Norris*,
   28 F.3d 107 (9th Cir. 1994).......................................................................... 9

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION.

*Ramirez v. U.S. Immigration & Customs Enf't,*
  310 F. Supp. 3d 7 (D.C. Cir. 2018) ..................................................... 22

*Saravia for A.H. v. Sessions,*
  905 F.3d 1137 (9th Cir. 2018) ........................................................... 8

*Securities and Exch. Comm'n v. G.C. George Sec., Inc.*
  637 F.2d 685 (9th Cir. 1981) ............................................................. 24

*Simula, Inc. v. Autoliv, Inc.,*
  175 F.3d 716 (9th Cir. 1999) ............................................................. 9

*Singleton v. Kernan,*
  2017 WL 4922849 (S.D. Cal. 2017) .................................................. 9

*Small v. Avanti Health Sys., LLC,*
  661 F.3d 1180 (9th Cir. 2011) ........................................................... 22

*Sy v. Holder,*
  337 F. App'x 487 (6th Cir. 2009) ...................................................... 11

*Textile Unlimited, Inc. v. A. BMH and Co.,*
  240 F.3d 781 (9th Cir. 2001) ............................................................. 8

*Villanueva-Bustillos v. Marin,*
  370 F. Supp. 3d 1083 (C.D. Cal. 2018) ............................................ 11

*Wagner v. Taylor,*
  836 F.2d 566 (D.C. Cir. 1987) .......................................................... 23

*Wakkary v. Holder,*
  558 F.3d 1049 (9th Cir. 2009) ........................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .............................................................. 8, 9, 21, 24

**Statutes**

5 U.S.C. § 701 ............................................................................................ 13

5 U.S.C. § 706 ............................................................................................ 19

8 U.S.C. § 1158 .................................................................................. *passim*

8 U.S.C. § 1225 .............................................................................. 7, 14, 19

8 U.S.C. § 1231 ........................................................................................... 11

28 U.S.C. § 1651 ............................................................................. 2, 23, 24

Administrative Procedure Act ......................................... 13, 14, 19, 20

**Other Authorities**

8 C.F.R. § 208.13 ......................................................................................... 4

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION.

8 C.F.R. § 274a.12 ............................................................................................ 11

8 C.F.R. § 1240.10 ........................................................................................... 11

84 Fed. Reg. 33,829 (July 16, 2019), *codified at* 8 C.F.R. §
   208.13(c)(4) ...................................................................................... *passim*

1465 U.N.T.S. 85 (1984) ................................................................................... 4

1967 Refugee Protocol, and the Convention Against Torture. 189
   U.N.T.S. 137 (1951) .................................................................................. 4

606 U.N.T.S. 267 (1967) ................................................................................... 4

Lindsay M. Harris, *Withholding Protection*, 50 COLUM. HUM. RTS. L.
   REV. 1, 77 n.147 (2019)............................................................................ 11

11A Wright & Miller, FED. PRAC. & PROC. § 2948.1 (3d ed.)............................ 9

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION.

v

# INTRODUCTION

After adopting a metering policy[2] that forces destitute asylum seekers to wait for protracted periods in dangerous Mexican border towns, the Government has taken yet another step to deny them access to the U.S. asylum process. Specifically, Defendants have attempted to pull the rug out from underneath law-abiding asylum seekers at the southern border by promulgating a new interim final rule (the "Asylum Ban," defined below), through which the Government effectively denies access to the U.S. asylum process to virtually all metered asylum seekers from countries other than Mexico. Critically, the very reason the provisional class members face application of the categorical prohibition in the Asylum Ban is the unlawful metering policy which forced them to wait in Mexico. These class members would have had their asylum claims heard under pre-existing law but for the illegal metering policy that is challenged in this case. Yet application of the Asylum Ban—and return to a class member's country of origin to face persecution—would effectively foreclose Plaintiffs' ability to challenge the metering policy. Plaintiffs seek a preliminary injunction to preserve the status quo and permit adjudication of their existing claims, by barring Defendants from applying the Asylum Ban to provisional class members, who were metered prior to the effective date of the Asylum Ban.

Provisional class members will suffer serious, irreparable injury if the Asylum Ban is applied to them. Once they become ineligible for asylum pursuant to the Asylum Ban, their ability to obtain relief in this case will be extinguished, depriving them of their continued right to litigate these pending claims and access the asylum

---

[2] Plaintiffs allege that CBP's metering of asylum seekers at the southern border, referred to in this brief as the "metering policy," is part of a broader Turnback Policy that is aimed at restricting the number of asylum seekers inspected and processed at ports of entry. Turnbacks occur through metering as well as other tactics, such as use of physical force and coerced withdrawal of a claim of fear at a port of entry ("POE"). For purposes of the preliminary relief sought in this motion, Plaintiffs' allegations focus only on metering. Plaintiffs do not, however, concede that the Turnback Policy referenced in their Second Amended Complaint is limited to metering.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

process. The balance of the equities tips sharply in favor of these class members, who attempted to follow the rules despite their fear and desperation, and sharply against the government, which illegally denied them access to the asylum process under the old rules. Finally, an injunction preventing application of the Asylum Ban to these class members is in the public interest.

To be clear, Plaintiffs are not challenging the Asylum Ban itself as part of this motion or in this case; those challenges are in active litigation already. *See Barr v. E. Bay Sanctuary Covenant*, Case No. 19A230, 588 U.S. ___, 2019 WL 4292781 (2019) ("Asylum Ban Order"); *Capital Area Immigrants' Rights Coalition v. Trump*, No. 1:19-cv-02117-TJK, 2019 WL 3436501 (D.D.C. 2019). Nor did Plaintiffs file this motion to seek a specific outcome in provisional class members' asylum cases. Rather, Plaintiffs seek to preserve the status quo through a prohibitory preliminary injunction or, in the alternative, via the Court's broad equitable power conferred by the All Writs Act, 28 U.S.C. § 1651(a), in order to preserve access to the asylum *process* for provisional class members pending this Court's determination on the merits of their claims challenging the Government's use of metering. Absent such modest judicial intervention, provisional class members are likely to be deemed categorically ineligible for asylum if they crossed into the United States after the Ban went into effect, even if they were illegally metered at a port of entry ("POE") before that date. That result would improperly extinguish meaningful relief on the claims challenging the metering policy that are under consideration by this Court.

## BACKGROUND

### A.    Defendants' Illegal Metering Policy

For at least the past year and a half, CBP officials have been "metering," or screening out asylum seekers approaching official POEs before they physically cross the U.S.-Mexico border. Ex. 1; Ex. 2 at 5-7; *see also* Am. Order Granting in Part and Den. in Part Defs.' Mot. to Dismiss the Second Am. Compl., Dkt. 280 ("Second Mot. to Dismiss Order"); Defs.' Ans. to Pls.' Second Am. Compl., Dkt. 283, at ¶¶ 3,

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

7, 54, 65, 67–69, 79, 83, 85, 226, 258, 272, 273.[3] This policy has led to a massive increase of migrants in Mexican border towns seeking to access the U.S. asylum process but prevented from doing so *by the U.S. government itself*. Ex. 3 ¶¶ 6-7.

Instead of inspecting and processing asylum seekers when they present themselves at POEs, as the law requires, Second Mot. to Dismiss Order, Dkt. No. 280, at 38-40, 42, 44-47 (explaining that the INA, 8 U.S.C. §§ 1158, 1225, requires that individuals "in the process of arriving in the United States" be inspected and processed and have the right to apply for asylum), under the metering policy Defendants block asylum seekers—and only asylum seekers—from crossing the international boundary line on the pathway to inspection stations at POEs. Ex. 2 at 5-7; Ex. 4 ¶¶ 3-8; Ex. 5 ¶¶ 4-5. Defendants inspect and process asylum seekers at POEs only sporadically, and generally based on their positions on lists maintained by third parties in Mexico. Ex. 2 at 6-7; Ex. 3 ¶¶ 5-6; Ex. 4 ¶¶ 6-11; Ex. 5 ¶ 5; Ex. 6 ¶ 19; Ex. 7 ¶ 18. Thus, any asylum seeker trying to enter the United States the "right way" must travel to the place in a Mexican border town where "the list" is maintained; put her name on the list; and then wait for weeks or months—vulnerable to kidnapping, trafficking, extortion, and violence—until CBP unilaterally decides it will inspect and process her. Ex. 3 ¶¶ 5-7; Ex. 6 ¶¶ 15-17, 19-20; Ex. 7 ¶¶ 15-18; Ex. 8 ¶¶ 5, 7, 9; Ex. 9 ¶¶ 8-9; Ex. 10 ¶¶ 10-11, 15-17; Ex. 11 ¶¶ 9-11, 17; Ex. 12 ¶¶ 10-11; Ex. 13 at 1; Ex. 14 ¶¶ 9-11, 13, 16; Ex. 15 ¶¶ 9-10; Ex. 16 ¶¶ 7-8, 12; Ex. 17 ¶¶ 8-10; Ex. 18 ¶¶ 6-9; Ex. 19 ¶¶ 6-8, 19-21; Ex. 20 ¶¶ 8-10; Ex. 21 ¶¶ 9-11; Ex. 22 ¶¶ 7-10; Ex. 23 at 2-5; Ex. 47 ¶¶ 7-10. When an asylum seeker tries to present herself at a POE without enrolling on the list—for example, if the person does not know about the list, has been denied access to the list,[4] or is simply desperate to

---

[3] "Ex." refers to the exhibits to the Declaration of Melissa Crow ("Crow Decl."), which are filed concurrently with this motion.

[4] The lists are generally the best and only option for asylum seekers in border towns who want to enter the United States legally. However, they are not without flaws;

MEMO OF P. & A. IN SUPP. OF MOT. FOR PRELIMINARY INJUNCTION

1    reach safety and cannot wait—CBP officers routinely turn her back to Mexico. *See,*

2    *e.g.*, Ex. 4 ¶¶ 9-10; Ex. 6 ¶ 15; Ex. 7 ¶ 16; Ex. 15 ¶¶ 9; Ex. 22 ¶ 8; Ex. 48 ¶ 5.

3    **B.    The Asylum Ban and Its Legal Challenges**

4        On July 16, 2019, the Departments of Justice and Homeland Security issued

5    a joint interim final rule, "Asylum Eligibility and Procedural Modifications," 84 Fed.

6    Reg. 33,829 (July 16, 2019) ("Asylum Ban"), *codified at* 8 C.F.R. § 208.13(c)(4),

7    that "forbids almost all Central Americans—even unaccompanied children—to

8    apply for asylum in the United States if they enter or seek to enter through the

9    southern border, unless they were first denied asylum in Mexico or another third

10   country." 2019 Asylum Ban Order (Sotomayor, J., dissenting).

11       Beyond the Central Americans that Justice Sotomayor mentioned in her

12   dissent, the new Asylum Ban bars all non-Mexicans "who enter[], attempt[] to enter,

13   or arrive[] in the United States across the southern land border on or after July 16,

14   2019" from eligibility for asylum in the United States unless they previously applied

15   for and received a final judgment denying them protection from persecution or

16   torture in a transit country or were subject to trafficking.[5] 8 C.F.R.

17   §§ 208.13(c)(4)(i), (ii). That includes people fleeing persecution from countries all

18   over the world, including Cuba, Venezuela, Haiti, Nicaragua, Cameroon, Russia,

19   and India. The Ban fails to consider the conditions or purpose of an individual's

20   journey through a third country, or her prospects for protection, rights or permanent

21   _____

22   because the lists are maintained by third parties (either Mexican government entities
     or private individuals), they are subject to abuse and corruption. Ex. 15 ¶ 7; Ex. 16
     ¶ 10. For example, it is often possible to pay the list-keeper for a better spot on the

23   list or for the ability to bypass the list altogether. Some list-keepers demand sexual
     favors in exchange for a place on the list. Ex. 4 ¶ 11. Others deny certain groups of

24   people, such as unaccompanied minors or black asylum seekers, access to the list
     altogether. Ex. 4 ¶¶ 9-10.

25   [5] The Ban also makes an exception for individuals who transited through countries
     that are not parties to the 1951 Refugee Convention, the 1967 Refugee Protocol, or

26   the Convention Against Torture. 8 C.F.R. 208.13(c)(4)(iii). However, Mexico, the
     only country adjoining the southern border of the United States, is a party to the

27   1951 Refugee Convention, the 1967 Refugee Protocol, and the Convention Against
     Torture. 189 U.N.T.S. 137 (1951), http://bit.ly/2kY1NKI; 606 U.N.T.S. 267 (1967),

28   http://bit.ly/2mge8Kc; 1465 U.N.T.S. 85 (1984), http://bit.ly/2mfxEXy.

1   legal status there.

2       On the day the Asylum Ban was implemented, four immigration legal and

3   social service organizations challenged the Ban in the U.S. District Court for the

4   Northern District of California and moved for a temporary restraining order seeking

5   to prevent implementation of the Asylum Ban nationwide. By consent of the parties,

6   the motion was converted to one for a preliminary injunction, which was granted on

7   July 24. *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922 (N.D. Cal. 2019),

8   *order reinstated*, 391 F. Supp. 3d 974 (N.D. Cal. 2019). The Ninth Circuit

9   subsequently stayed the injunction as to all jurisdictions other than its own, but

10  indicated that the district court retained jurisdiction to further develop the record in

11  support of a broader injunction. *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026

12  (9th Cir. 2019). Following supplemental briefing, the district court restored the

13  nationwide scope of the injunction on September 9. *E. Bay Sanctuary Covenant v.*

14  *Barr*, 391 F. Supp. 3d 974 (N.D. Cal. 2019). On September 11, 2019, the Supreme

15  Court stayed both the district court's July 24 and September 9 orders pending

16  disposition of the government's appeal in the Ninth Circuit and disposition of the

17  government's petition for a writ of certiorari, if sought. Asylum Ban Order. In light

18  of the Supreme Court's action, the Asylum Ban recently went into effect nationwide

19  with respect to all noncitizens who "enter[], attempt[] to enter, or arrive[] in" the

20  United States via the southern border on or after July 16, 2019. 8 C.F.R.

21  § 208.13(c)(4).

22      The Asylum Ban should not apply to Individual Plaintiffs and the provisional

23  class members they seek to represent—those subject to the metering policy before

24  July 16, 2019—given the text of the Ban and this Court's previous Order on

25  Defendants' Motion to Dismiss the Second Amended Complaint. The Ban targets

26  any noncitizen "who enters, attempts to enter, or *arrives in* the United States across

27  the southern land border on or after July 16, 2019." 8 C.F.R. § 208.13(c)(4)

28  (emphasis added). This Court has already held that the use of the present tense verb

5

"arrives in" is significant and "plainly covers an alien who may not yet be in the United States, but who is in the process of arriving in the United States through a POE." Second Mot. to Dismiss Order, Dkt. No. 280, at 38 (discussing 8 U.S.C. § 1158(a)(1)). Applying the Court's logic to the text of the Asylum Ban, the provisional class members who were metered at POEs prior to July 16, 2019 were in the process of "arriv[ing] in the United States" when they were turned back. The Asylum Ban should not apply to them, as they met the cut-off date for "arriv[ing]."

However, Plaintiffs understand that the Government does not accept the logic of this Court's ruling on the meaning of "arrives in," and presume that the Government will apply the Asylum Ban to provisional class members who physically enter the United States after July 16, even if they were previously turned back by metering before the Ban's effective date. *See* Ex. 25. Therefore, while Plaintiffs do not concede that the Asylum Ban *should* apply to the provisional class members, Plaintiffs file this Motion on the understanding that the Government *will* apply the Asylum Ban to them nonetheless.

C. **Because of the Illegal Metering Policy, Provisional Class Members Have Been Deprived of Access to the Asylum Process Through Operation of the Asylum Ban**

Based on the Government's presumed application of the Asylum Ban to thousands of migrants who arrived at the U.S.-Mexico border before July 16, 2019 and were illegally metered, provisional class members are now, as a result of metering, harmed by the Ban. The U.S. government, including Defendants in this case, has engaged in a cruel bait and switch to deny these migrants access to the asylum process. Prior to July 16, 2019, the official message from the U.S. government was that asylum seekers should enter the United States "the right way," by going to a POE on the southern border, instead of crossing without authorization through the desert or across the river. *See, e.g.*, Ex. 26 (quoting then-DHS Secretary Kirstjen Nielsen at a press conference: "As I said before, if you are seeking asylum,

go to a port of entry. You do not need to break the law of the United States to seek asylum."); *see also* Ex. 17 ¶ 16 ("I decided to keep waiting for our turn to cross because I wanted to do things the right way and follow the law."); Ex. 22 ¶ 9 ("We put our names on the list because we believed in the process."). But at the same time, and as Plaintiffs have alleged in detail, Defendants have been choking off access to POEs and illegally preventing asylum seekers from entering the United States to access the asylum process, as explained above. *See* Ex. 2 at 5-7.

The Asylum Ban applies to any noncitizen who "enters, attempts to enter, or arrives in the United States . . . on or after July 16, 2019." 8 C.F.R. § 208.13(c)(4). Thus, if an asylum seeker had presented herself at a POE before July 16, 2019, and CBP had complied with its mandatory duty to inspect and process her pursuant to 8 U.S.C. § 1225, the Asylum Ban would not apply to her today because she would have "enter[ed]" before the cut-off date.

Based on Defendants' acknowledgement that they engage in metering on a border-wide basis, Dkt. 283 at ¶¶ 3, 7, 54, 65, 67–69, 79, 83, 85, 226, 258, 272, 273; Ex. 1; Ex. 2 at 5-7, it is clear that a subset of non-Mexican class members—who are now ineligible for asylum under the Asylum Ban—were subjected to the metering policy *before* the Asylum Ban went into effect on July 16, 2019, and but for the metering policy, would have entered the United States before that date. These individuals are the members of the provisional class the Individual Plaintiffs seek to represent for purposes of this motion.[6] If the Asylum Ban is applied to this subset of class members before the Court's ultimate decision in this case, then those class members will be denied any chance to obtain effective relief. This motion seeks

---

[6] Some of these individuals have already crossed into the United States and have received some sort of process—whether they were subject to the Migrant Protection Protocols and returned to Mexico to await their hearings, detained pending resolution of their immigration cases, or released. *E.g.*, Ex. 21 ¶ 16; Ex. 22 ¶ 13; Ex. 48 ¶ 11. Plaintiffs contend that such individuals remain part of their provisional class, even though they have already reached the United States and are in immigration proceedings, because they have been denied access to the asylum process through application of the metering policy, in combination with the Asylum Ban. Dkt. 189 ¶ 236.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

injunctive relief to preserve those class members' eligibility for asylum, given that the Asylum Ban would not have affected them but for Defendants' illegal use of metering, which forced them to stay in Mexico longer than they otherwise would have.

### LEGAL STANDARD

By this motion, Plaintiffs seek a preliminary injunction to preserve the status quo and prevent the "irreparable loss of rights" before a final judgment on the merits. *Textile Unlimited, Inc. v. A. BMH and Co.*, 240 F.3d 781, 786 (9th Cir. 2001). Specifically, they seek an order preventing the government from applying the categorical Asylum Ban to provisional class members, who would have arrived in the United States prior to July 16, 2019, but for Defendants' illegal metering policy.

When moving for a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). A preliminary injunction may also issue where the plaintiff raises "serious questions going to the merits . . . and the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

In contrast to a mandatory injunction requiring a defendant to take affirmative steps, Plaintiffs here face a lower burden in obtaining this *prohibitory* injunction, grounded in the equitable powers of the court to preserve the status quo. *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060–61 (9th Cir. 2014). Courts have ample power to adjudicate the merits of a prohibitory preliminary injunction – and restore the status quo ante – when necessary to correct an injury already inflicted, and despite a defendant's attempt to subsequently foreclose relief on a plaintiff's

claims. *See Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 (9th Cir. 1999) ("The function of a preliminary injunction is to preserve the status quo *ante litem,* which is defined as the last, uncontested status which preceded the pending controversy.") (quotations omitted); *Partington v. Norris*, 28 F.3d 107 (9th Cir. 1994). If the Court has power to correct an injury *already* inflicted and adjudicate claims the defendant attempted to foreclose, *a fortiori*, the Court has power to *prevent* the government from limiting provisional class members' access to the full range of relief for which they would be eligible subject to a favorable ruling on the merits in this case. *See Arizona Dream Act*, 757 F.3d at 1069 (restoring to status quo ante DACA recipients' federal entitlement to drivers' licenses, putatively denied by application of Defendant-Governor's policy).

## ARGUMENT

I. **Because Provisional Class Members Will Suffer Irreparable Injury and Are Likely to Succeed on the Merits, A Preliminary Injunction is Warranted.**

    A. **Provisional Class Members Will Suffer Irreparable Injury Absent Issuance of an Injunction Because They Will Improperly Lose Their Right to Have Their Asylum Claims Decided on the Merits.**

Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *Singleton v. Kernan*, 2017 WL 4922849, at *3 (S.D. Cal. 2017) (quoting 11A Wright & Miller, FED. PRAC. & PROC. § 2948.1 (3d ed.). The irreparable harm "analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)). "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (*quoting Winter*, 555 U.S. at 22). The provisional class members plainly

1    satisfy the irreparable harm prong.

2            To begin, absent the judicial relief requested, provisional class members will

3    be deprived of their present entitlement to challenge the legality of the metering

4    policy—under the INA and the Due Process Clause—presently before the Court.

5    The loss of such a procedural right constitutes irreparable harm. *See Hernandez v.*

6    *Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (citation omitted); *Abdi v. Duke*, 280 F.

7    Supp. 3d 373, 404–06 (W.D.N.Y. 2017) (irreparable harm established where "full

8    and fair process afforded to them under the law" was denied); *cf. Kirwa v. Dep't of*

9    *Defense*, 285 F. Supp. 3d 21, 43 (D.D.C. 2007) (irreparable harm where government

10   "block[s] access to an existing legal avenue for avoiding removal"); *Apotex, Inc. v.*

11   *FDA*, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006) (irreparable harm where

12   government takes away "a statutory entitlement").  Only preservation of the status

13   quo would obviate that serious procedural injury.

14           In addition, provisional class members are asylum-seeking adults, children,

15   and families who have fled persecution in their home countries. *E.g.*, Ex. 5 ¶¶ 2-3;

16   Ex. 6 ¶¶ 2, 5, 12, 21; Ex. 7 ¶¶ 2, 4-5, 11-13, 20-22; Ex. 8 ¶¶  3-4, 7, 9; Ex. 9 ¶ 4;

17   Ex. 10 ¶¶ 4-8, 15-18; Ex. 11 ¶¶ 5-7; Ex. 12 ¶¶ 2-6, 16; Ex. 13 at 1; Ex. 14 ¶¶ 3-7, 11;

18   Ex. 15 ¶¶ 2-3, 11; Ex. 16 ¶¶ 2-6, 10, 13; Ex. 17 ¶¶ 2, 4-6, 15; Ex. 18 ¶¶ 2, 4, 10, 13; Ex.

19   19 ¶¶ 2, 4-5; Ex. 20 ¶¶ 2, 4-7; Ex. 21 ¶¶ 2, 5-8; Ex. 22 ¶¶ 2, 4, 11-12; Ex. 47 ¶¶ 7-

20   10; Ex. 48 ¶¶ 2-4, 12; Ex. 49 ¶¶ 2-6, 14. They offer harrowing portraits of the grave

21   dangers they fled, the fraught and extended journeys they undertook to reach the

22   U.S.-Mexico border, and the peril that awaits them now. *Id.* Without the requested,

23   immediate injunctive relief, provisional class members risk persecution, torture and

24   death if they are deported to their countries of origin without having their claims for

25   asylum considered on the merits.[7] *Id.* The loss of the right to seek asylum constitutes

26   _____

27   [7] As discussed above, Plaintiffs understand that the Government will apply the
     Asylum Ban to the provisional class members they seek to represent, but Plaintiffs

28   do not concede that the plain language of the Asylum Ban actually does apply to
     them. *See supra* at 5-6.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

irreparable harm, *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 864 (N.D. Cal. 2018), as do persecution, torture and death. *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) ("any deprivation of constitutional rights 'unquestionably constitutes irreparable injury'") (citation omitted); *Leiva-Perez v. Holder*, 640 F.3d 962, 970-71 (9th Cir. 2011) (holding that persecution on account of political opinion, in the form of extortion and beatings, "would certainly constitute irreparable harm"); *see also Villanueva-Bustillos v. Marin*, 370 F. Supp. 3d 1083, 1090 (C.D. Cal. 2018) (torture and death are irreparable harm).

Nor does the fact that the Asylum Ban allows two lesser forms of removal relief—withholding of removal and relief under the Convention Against Torture ("CAT")—negate a finding of irreparable injury, as both these forms of relief require a much higher quantum of proof than asylum and offer significantly fewer protections.[8] Unlike asylees, individuals granted withholding and CAT relief lack any pathway to permanent residency or citizenship and cannot petition for immediate family members to join them in the United States. *Cazun v. Attorney Gen. United States*, 856 F.3d 249, 252 n.3 (3d Cir. 2017) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987)). Although such individuals cannot be deported to the country where they fear persecution, they can be deported to another country. *See* 8 U.S.C. § 1231(b); 8 C.F.R. § 1240.10(f). In addition, they may not travel outside the United States, may be detained, and must pay a yearly renewal fee for an employment authorization document in order to maintain the right to work in the United States. *See* 8 C.F.R. § 274a.12(a)(10); Lindsay M. Harris, *Withholding Protection*, 50 COLUM. HUM. RTS. L. REV. 1, 77 n.147 (2019). In essence, even those

---

[8] To obtain withholding or CAT protection, a person must show a "reasonable possibility" of persecution, *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), or a "clear probability of persecution." *INS v. Stevic*, 467 U.S. 407 (1984). In practice, that means that whereas an individual must demonstrate only a 10% chance of persecution in his or her home country to obtain asylum, *Wakkary v. Holder*, 558 F.3d 1049, 1064 (9th Cir. 2009), for withholding and CAT, that figure jumps to 51%, *Stevic*, 467 U.S. at 412. *See Sy v. Holder*, 337 F. App'x 487, 492 (6th Cir. 2009).

individuals who succeed in meeting the higher burden of proof for withholding of removal and CAT relief are subject to substantial restrictions not applicable to asylees. Yet the only reason provisional class members are limited to seeking these inferior forms of protection is that they were subject to metering.

Neither can provisional class members satisfy the Asylum Ban's limited exceptions by applying for asylum in Mexico and waiting for a final judgment. First, provisional class members who were metered before July 16, 2019, by definition, have been in Mexico longer than a month, and are now barred from applying for asylum *in Mexico* by that country's 30-day bar on asylum applications. See Ex. 27 ¶¶ 34-37; Ex. 28, ¶ 22. Although it is possible to seek a waiver of the 30-day bar, it is nearly impossible to do so without legal counsel, which is expensive. Ex. 27 ¶¶ 35-36. For all intents and purposes, nearly all provisional class members are barred from even applying for asylum in Mexico.

Those class members who manage to file an asylum application in Mexico face delays of over two years caused by the chronic underfunding and understaffing of Mexico's Commission for Refugee Assistance ("COMAR"), the agency charged with adjudicating asylum applications. *Id.* ¶¶ 21-29. There is only one COMAR office on the U.S.-Mexico border, in Tijuana, with just two staff members who are not authorized to decide cases on their own. *Id.* ¶¶ 26-27. Although class members can apply for asylum at National Institute for Migration ("INM") offices in other border cities, those offices have little to no staff with specialized training in asylum or humanitarian protection. *Id.* ¶ 28. While their applications are pending, migrants are not allowed to leave the Mexican state where they filed their applications, and have to check in regularly with COMAR or INM to avoid "abandonment" of their applications, which could lead to deportation. *Id.* ¶ 32; Ex. 28 ¶¶ 24-28. Those class members who manage to apply for asylum in Mexico, who are fleeing horrific violence and threats to their lives, cannot wait years for a final judgment in Mexico before even being allowed to wait for asylum in the United States.

MEMO OF P. & A. IN SUPP. OF MOT. FOR PRELIMINARY INJUNCTION

1    If this Court finds for the provisional class members on the merits of their

2    claims, appropriate injunctive relief would include an order directing that those class

3    members who would have crossed the southern border prior to July 16 but for

4    Defendants' illegal conduct should have their asylum claims adjudicated based on

5    the law that was then in place. Such an order would be necessary to place those

6    individuals in the same position they would have been in had Defendants not

7    engaged in illegal metering. However, absent preliminary injunctive relief, the

8    Asylum Ban would deprive provisional class members of access to the asylum

9    process even if this Court ultimately rules in Plaintiffs' favor on the illegality of the

10   Government's metering policy. Once they lose the right to seek asylum based on the

11   law that existed at the time they arrived at a POE, it cannot effectively be restored.

12   That is clearly irreparable harm.

13   **B.    Plaintiffs Are Likely to Succeed on the Merits of Their Underlying**

14   **Claims Challenging the Government's Metering Policy and**

15   **Individual Turnbacks**

16   This Court's past decisions suggest that Plaintiffs have a strong likelihood of

17   success of the merits in this case. But such a victory would be hollow for provisional

18   class members if, in the interim, they are barred from asylum by the Asylum Ban,

19   despite the fact that they would have "enter[ed]" the United States before the Ban

20   went into effect *but for* Defendants' illegal actions. *See* 8 C.F.R. § 208.13(c)(4). In

21   its past orders granting in part and denying in part Defendants' motions to dismiss,

22   this Court already concluded that the political question doctrine does not bar review

23   of Plaintiffs' claims; that the challenged action is reviewable under 5 U.S.C.

24   § 701(a)(2) because it is not committed to agency discretion by law; and that

25   assuming the truth of the facts alleged in the Second Amended Complaint, Plaintiffs

26   have adequately pleaded violations of the Immigration and Nationality Act ("INA"),

27   the Administrative Procedure Act ("APA"), and the Due Process Clause. Second

28   Mot. to Dismiss Order, Dkt. No. 280 at 21-25, 47, 54-58, 65, 77. Plaintiffs are

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1   gathering the evidence necessary to prove their claims, and they are likely to succeed

2   on the merits. At the very least, under the *Cottrell* standard, Plaintiffs have raised

3   serious questions going to the merits of their underlying claims.

### 1.    Each Individual Turnback of an Asylum Seeker Violates the INA and Section 706(1) of the APA.

6   The Court has already made clear that it "agrees" with Plaintiffs'

7   understanding of Defendants' legal obligations under the INA. Dkt. 280 at 38. The

8   INA guarantees a right to apply for asylum to noncitizens who are "in the process of

9   arriving in the United States." *Id.* at 38-40 (citing 8 U.S.C. § 1158). The INA also

10  requires Defendants to inspect all noncitizens who are "arriving in the United States"

11  at a POE, even if they "may not yet be in the territorial United States." *Id.* at 44-46

12  (citing 8 U.S.C. § 1225). It further requires Defendants to refer for an interview with

13  an asylum officer all arriving noncitizens who indicate an intent to apply for asylum

14  or a fear of persecution. *Id.* at 46-47. Every failure to carry out their statutory

15  inspection and processing duties—what Plaintiffs have called a "turnback"—is

16  reviewable and actionable under Section 706(1) of the APA. *Id.* at 28.

17  Plaintiffs already have evidence to support their legal arguments and are in

18  the process of gathering more in discovery, which is currently underway. *Cf.* Dkts.

19  269, 275 (noting continued concerns with the pace of the Government's document

20  production; Dkt. 288 (granting motion to compel the Government's timely

21  production of documents). Most importantly, Defendants acknowledge that they are

22  "metering," or artificially limiting the numbers of asylum seekers they allow into

23  POEs along the southern border, and have been doing so since at least April 2018.

24  *See* Ex. 2 at 5-7 (discussing and describing metering practices); Ex. 1; Ex. 29

25  (indicating that a border-wide metering policy was authorized at the highest levels

26  of CBP in November 2016); Dkt. 283 at ¶¶ 3, 7, 54, 65, 67–69, 79, 83, 85, 226, 258,

27  272, 273. There has been significant press coverage of the existence and

28  consequences of metering. *See*, *e.g.*, Ex. 30-33. And Defendants' own public

statistics demonstrate that they have been limiting the number of "inadmissibles," or noncitizens "presenting themselves to seek humanitarian protection under our laws," to around 10,000 per month for at least the past year. *See* Ex. 34 (illustrating that the number of "inadmissibles" has fluctuated around 10,000 per month since October 2018, with two unexplained increases in May and August 2019).

Plaintiffs are also likely to succeed on their claim that the metering policy was adopted based on a desire to deter asylum seekers and artificially limit the number of asylum seekers inspected at POEs, as well as the related allegation that Defendants' claim of lack of capacity is pretextual. First, Defendants' own words, and those of others in the Trump administration, indicate an undeniable disdain for asylum seekers. For instance, at a December 6, 2018 Congressional staff briefing concerning metering at POEs on the U.S.-Mexico border, Judson W. Murdock, II, the Acting Assistant Commissioner of CBP, justified the policy by stating, "[t]he more we process, the more will come." Ex. 35 at 1. Similarly, in a July 26, 2019 email, one of President Trump's chief immigration advisors, Stephen Miller, stated, "My mantra has persistently been presenting aliens with multiple unavoidable dilemmas to impact their calculus for choosing to make the arduous journey to begin with." Ex. 36 at 2. Mr. Miller has been even more direct about his intentions, stating that he "would be happy if not a single refugee foot ever again touched America's soil." Ex. 37 at 6. President Trump has been more prosaic, explaining, "They have to get rid of the whole asylum system because it doesn't work. And, frankly, we should get rid of judges. You can't have a court case every time somebody steps foot on our ground." Ex. 38 at 3; *see also* Ex. 39 at 24 ("Asylum is a ridiculous situation. . . . It's a big con job. That's what it is."); Ex. 40 at 24 ("How stupid can we be to put up with this? How stupid can we be? . . . [T]he asylum program is a scam."). In accordance with these statements, the administration has focused significant efforts on overhauling Defendants' border policies to make U.S. asylum law a dead letter. The metering policy is one such effort by Defendants to end asylum—in this case,

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1    by shirking their statutory duties to inspect and process asylum seekers at POEs.

2        Second, publicly available data and the limited discovery produced strongly

3    support Plaintiffs' claim that Defendants' explanation of metering is pretextual.

4    Defendants have used metering to drastically cut the number of asylum seekers

5    processed at ports of entry. *See* Ex. 3 at 1, 4-12; Ex. 4 ¶ 12.  These processing levels

6    cannot be justified by the capacity of particular ports of entry. The Government's

7    metering policy has a border-wide, systematic effect on asylum seekers. P█████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████. *See* Ex. 41 at 12000.

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████*Id.*██████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████

19   ████████████████████████████████. *See* Ex. 42 at 12012-13.

20       For example, C████████████████████████████████████████

21   ████████████████████████████████████████████████████████ Ex. 43 at

22   11124, ████████████████████████████████████████████████████████████

23   ████████████████████*Id.* at 11135.████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26   █████████████████████████████████████

27

28

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION



As shown above, ████████████████████
████████████████████████████████████
████████████████████████████████████ .

Even when accounting for such factors as the need to house vulnerable migrant populations (such as juveniles) separately from other migrants, the Government has offered no valid justification for its decision to ██████████████████████
████████████████ .

The same trend can be seen border-wide. CBP's own statistics show that the Government has far more capacity to process asylum seekers than it is currently using. Between July 2015 and January 2017, before the Government implemented its border-wide metering policy, CBP processed 12,651 undocumented migrants per month. Ex. 23 at ¶ 6(a). Between June 2018 and July 2019, CBP processed only 9,904 undocumented migrants per month, a 28% decrease. Ex. 23 at ¶ 6(b)-(c). This reduction in migrant processing cannot be explained by other factors. From 2015 to 2019 CBP's budget increased from $12.8 billion to $14.7 billion. Ex. 44 at fig. 2. In 2017 and 2018, the number of "frontline" CBP officers increased. Ex. 45 at 6.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

Moreover, in 2019, CBP is scheduled to complete a $741 million expansion of the San Ysidro POE, which includes an expansion of the secondary inspection and detention capabilities of the POE. Ex. 46 at 2.



**Undocumented Migrants Processed at Ports of Entry, October 2011-Present**

Third, circumstantial evidence, including the observations of human rights advocates and DHS monitors, further bolsters Plaintiffs' claim of pretext. Ex. 23 at 5; Ex. 24 at 15 (Amnesty International report of an interview with high-level CBP officials in California, in which they stated that "CBP has only actually reached its detention capacity a couple times per year and during 'a very short period' in 2017"); *id.* at 23 (noting that in a conversation with Amnesty International, an INM [the Mexican immigration agency] delegate in Baja California expressed doubt about CBP's claims of capacity constraints); Ex. 2 at 8 ("[T]he OIG team did not observe severe overcrowding at the ports of entry it visited."). Under Defendants' illegal metering policy, only asylum seekers are screened out of the line of noncitizens awaiting inspection at ports of entry. Thus, by design, metering targets only asylum seekers and deprives them—and no other "applicants for admission"—of the statutorily-required inspection process. Ex. 2 at 6; Ex. 4 ¶¶ 5-8; Ex. 15 ¶ 9; Ex. 22

¶ 8; *see also* Dkt. 280 at 61.

Every individual who was metered over the past year and a half—*i.e.*, denied the inspection and processing the INA requires—experienced an individual "turnback" in violation of CBP's mandatory inspection and processing duties under the INA, which is actionable under the APA § 706(1). Given Defendants' acknowledgement that they are metering at POEs along the southern border, and the likelihood that Plaintiffs will ultimately prove that Defendants' capacity excuse is pretextual, Plaintiffs easily meet the standard of showing that they are likely to succeed on the merits of their INA and APA claims related to individual turnbacks.

## 2.    The Metering Policy Violates the INA and APA
### Section 706(2).

In its recent order, this Court signaled likely agreement with Plaintiffs' claim that the metering policy violates the INA and the APA, 5 U.S.C. § 706(2), because it is a final agency action that exceeds Defendants' statutory authority and is without observance of procedure required by law. Second Mot. to Dismiss Order, Dkt. No. 280, at 49-53 (final agency action), 58-65 (APA violation analysis). As explained above, the Court agreed that the INA, 8 U.S.C. § 1225, requires CBP to inspect and process all noncitizens "in the process of arriving" in the United States. *Id.* at 38, 45-46, 59. Therefore, Plaintiffs are likely to succeed on the merits of their claim that a policy setting out a different process across the entire border—particularly one that blatantly undermines the humanitarian purpose of the statutory asylum scheme—is incompatible with the INA's specific inspection mandate, and that it exceeds Defendants' general authority to implement the statute and manage ports of entry. In addition, the Court agreed with Plaintiffs that Defendants lack authority to adopt and implement such a policy for the purpose of deterring asylum seekers and intentionally limiting the number of asylum seekers who are inspected. *Id.* at 60-65.

Furthermore, even with the limited discovery completed to date, it is likely that Plaintiffs will succeed in substantiating their core factual allegations regarding

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

the metering policy. As detailed above, Defendants concede that they have a border-wide practice called "metering" that is memorialized in guidance distributed to all ports. *See supra* section A. They have implemented this guidance and they are in fact metering on a border-wide basis. Ex. 3 ¶ 6; Ex. 4 ¶¶ 6-8; Ex. 5 ¶ 4 (Hidalgo); Ex. 7 ¶ 14 (El Paso); Ex. 8 ¶ 5 (San Diego); Ex. 14 ¶ 10 (Brownsville); Ex. 22 ¶ 7 (Laredo); Ex. 23 at 2-5; Ex. 24 at 11, 15-22; Ex. 47 ¶ 8 (Calexico). Moreover, Defendants' guidance is written proof of a policy that, at a minimum, encompasses metering, and that satisfies the statutory definition of a "final agency action." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (defining "final agency action.") And lastly, as described in detail above, *supra* section A, Plaintiffs are likely to succeed in demonstrating that Defendants' claims of lack of capacity are pretextual and that the metering policy is based on the unlawful goal of deterring and restricting the number of asylum seekers who present themselves at POEs.

### 3.    The Metering Policy Violates the Due Process Clause.

Because Plaintiffs have statutory rights under the INA and Sections 706(1) and 706(2) of the APA, Dkt. 280 at 76, they cannot be deprived of those rights without due process, which this Court has already held protects them. As with the statutory claims, the Court has made clear that it agrees with Plaintiffs' understanding of the law underlying their constitutional claims. *Id.* at 69-77. If Plaintiffs show that Defendants "failed to discharge their mandatory duties under the relevant [statutory] provisions," Plaintiffs simultaneously prove a due process violation. *Id.* at 77. Plaintiffs have already established a likelihood of success on the merits of their statutory claims, thereby also establishing a likelihood of success on the merits of their due process claim.[9]

---

[9] If the Court concludes that Plaintiffs have not established a likelihood of success on the merits of their INA and APA claims, but that they have raised serious questions going to the merits of those claims under the *Cottrell* standard, then that finding should apply equally to the Plaintiffs' due process claims, which are grounded in the alleged statutory violations. *See* Dkt. 280, at 76 (citing *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1001 & n.2 (9th Cir. 1998)).

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

## C.    The Balance of Equities Tips Sharply in Provisional Class Members' Favor and an Injunction Is in the Public Interest.

In evaluating the final preliminary injunction factors—the balance of the equities and the public interest—a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the request for relief," and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 376-77.

The effect on Defendants of granting this injunction is minimal. It would require the government simply to ensure that provisional class members remain eligible for asylum, which would have been the case had they not been subject to Defendants' illegal metering policy. It is hard to envision how requiring the Government to apply decades-old law to an identified group of people who relied on it entails any meaningful injury.

On the other hand, the effect on provisional class members of *not* granting this injunction would be severe and immediate. While Plaintiffs believe that the Asylum Ban, by its terms, should not apply to provisional class members because, in accordance with this Court's prior opinions, they "attempt[ed] to enter, or arrive[d] in the United States" at the time that they were subject to turnbacks, the Government does not appear to interpret the Ban in this way. Ex. 25. If, as expected, the Government were to apply the Asylum Ban to members of the provisional class because they did not cross the southern border prior to July 16, 2019, then all provisional class members would be ineligible for asylum. *Id.* Absent the requested injunction, provisional class members who are inspected and processed will be ineligible for asylum under the Ban, although the only reason they are deemed subject to the Ban is the Government's illegal use of metering. They face deportation to countries where they fear grave harm. *See supra*, Part I; *see also* Ex. 5 ¶¶ 2-3; Ex. 6 ¶¶ 2, 5, 12, 21; Ex. 7 ¶¶ 2, 4-5, 11-13, 20-22; Ex. 8 ¶¶ 3-4, 7, 9; Ex. 9 ¶ 4; Ex. 10 ¶¶ 4-8, 15-18; Ex. 11 ¶¶ 5-7; Ex. 12 ¶¶ 2-6, 16; Ex. 13 at 1; Ex. 14 ¶¶ 3-7, 11; Ex.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

15 ¶¶ 2-3, 11; Ex. 16 ¶¶ 2-6, 10, 13; Ex. 17 ¶¶ 2, 4-6, 15; Ex. 18 ¶¶ 2, 4, 10, 13; Ex.
19 ¶¶ 2, 4-5; Ex. 20 ¶¶ 2, 4-7; Ex. 21 ¶¶ 2, 5-8; Ex. 22 ¶¶ 2, 4, 11-12; Ex. 48 ¶ 12.

Moreover, it is in the public interest to "ensur[e] that 'statutes enacted by [their] representatives' are not imperiled by executive fiat," or a combination of fiats, as in this case. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (citation omitted); *see also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011) ("[T]he public interest favors applying federal law correctly."); *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 33 (D.C. Cir. 2018) (finding that where agency discretion "has been clearly constrained by Congress[,] [t]he public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate").

As this Court recognized in its Second Motion to Dismiss Order, the government is required by statute to provide asylum seekers access to the U.S. asylum process. *See* 8 U.S.C. § 1158(a)(1) ("*Any* [noncitizen] who is physically present in the United States or who *arrives in* the United States . . . , irrespective of such [noncitizen's] status, may apply for asylum[.]") (emphasis added). To the extent Defendants' metering policy forecloses access to that statutorily guaranteed process through newly determined ineligibility criteria that affect provisional class members, the public interest is served by issuing a preliminary injunction that preserves their eligibility for asylum pending a determination on the merits of the metering policy. Finally, "preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm," clearly is in the public interest. *Nken v. Holder*, 556 U.S. 418, 436 (2009).

Thus, the balance of the equities and the public interest strongly favor granting preliminary injunctive relief to provisional class members.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1  **II.    The All Writs Act Independently Authorizes the Court to Prevent the**
2  **Government from Prematurely Extinguishing Provisional Class**
3  **Members' Claims Through the Asylum Ban.**

4    The All Writs Act ("AWA") separately authorizes the limited relief Plaintiffs
5  seek, in order to preserve the court's jurisdiction to adjudicate the claims before it
6  despite the government's attempt to extinguish them. See 28 U.S.C. § 1651(a)
7  (authorizing courts to "issue all writs necessary or appropriate in aid of their
8  respective jurisdictions and agreeable to the usages and principles of law"). The Act
9  encompasses a federal court's power "to preserve [its] jurisdiction or maintain the
10 status quo by injunction pending review of an agency's action through the prescribed
11 statutory channels," *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966), and it
12 "should be broadly construed," *Hamilton v. Nakai,* 453 F.2d 152, 157 (9th Cir. 1972)
13 to "achieve all rational ends of law," *California v. M&P Investments*, 46 F. App'x
14 876, 878 (9th Cir. 2002) (quoting *Adams v. United States,* 317 U.S. 269, 273 (1942)).

15    Whereas a "traditional" injunction requires a party to state a claim, an AWA
16 injunction requires only that a party point to a threat to the integrity of some ongoing
17 or prospective proceeding, or of some past order or judgment. *Klay v. United*
18 *Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004) (a court may enjoin almost
19 any conduct "which, left unchecked, would have . . . the practical effect of
20 diminishing the court's power to bring the litigation to a natural conclusion."). Thus,
21 to issue an AWA injunction—simply preserving the court's jurisdiction over the
22 pending metering-related claims—the Court need not satisfy itself that there is a
23 likelihood of success on the merits on those claims. *See Wagner v. Taylor*, 836 F.2d
24 566, 571-72 (D.C. Cir. 1987) (showing of irreparable injury suffices); *Arctic Zero,*
25 *Inc. v. Aspen Hills, Inc.*, 2018 WL 2018115, at *5 (S.D. Cal. May 1, 2018)
26 (distinguishing AWA injunction from traditional preliminary injunction).

27    Accordingly, the Ninth Circuit has explicitly permitted courts to enjoin
28 proceedings commenced after the federal court's assertion of jurisdiction, to ensure

23

1    adequate judicial review. *See Securities and Exch. Comm'n v. G.C. George Sec.,*

2    *Inc.* 637 F.2d 685, 687–88 (9th Cir. 1981) (AWA authorized district court to stay

3    administrative proceeding involving issues related to a settlement over which the

4    district court retained jurisdiction). The AWA is so broad as to authorize a district

5    court to enjoin parties from bringing parallel litigation if it would disrupt the proper

6    adjudication of pending cases before the court. *See In re Baldwin-United Corp.*

7    *(Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328 , 333 (2d Cir. 1985)[10]

8    And, it unambiguously applies in the immigration context. The Second Circuit has

9    used the All Writs Act to stay an order of deportation "in order to safeguard the

10   court's appellate jurisdiction," in order to preserve its ability to hear subsequent

11   appeals by the Petitioner. *Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995).

12          Thus, the Court is authorized under the AWA to issue the limited injunction

13   Plaintiffs seek merely to preserve its jurisdiction over the claims that have been

14   pending before the court for over three years, and to prevent the government from

15   unfairly and prematurely extinguishing those plausibly pled claims.

16   **III.    CONCLUSION**

17          Absent an injunction pursuant to either *Winter* or *Cottrell*, or an order pursuant

18   to the All Writs Act that preserves the status quo, provisional class members will

19   suffer irreparable harm. The court should issue an order preventing Defendants from

20   applying the Asylum Ban to provisional class members because they were illegally

21   metered before the effective date of the Asylum Ban.

22          WHEREFORE, Plaintiffs respectfully ask this Court to enter an injunction

23   preventing Defendants from applying the Asylum Ban to provisional class members

24

25   [10] Indeed, equitable powers under the AWA are so broad so as to authorize

26   preservation of the status quo, even while the predicate assertion of federal
     jurisdiction is contested, let alone as here, where it is undisputed. *See Astrazeneca*

27   *Pharm. LP v. Burwell*, 197 F. Supp. 3d 53 (D.D.C. 2016) ("If the court may
     eventually have jurisdiction of the substantive claim, the court's incidental equitable

28   jurisdiction . . . gives the court authority to impose a temporary restraint in order to
     preserve the status quo pending ripening of the claim for judicial review.").

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

who were metered prior to July 16, 2019.

Dated: September 26, 2019                    MAYER BROWN LLP
                                                Matthew H. Marmolejo
                                                Ori Lev
                                                Stephen S. Medlock

                                             SOUTHERN POVERTY LAW
                                             CENTER
                                                Melissa Crow
                                                Mary Bauer
                                                Sarah Rich
                                                Rebecca Cassler

                                             CENTER FOR CONSTITUTIONAL
                                             RIGHTS
                                                Baher Azmy
                                                Ghita Schwarz
                                                Angelo Guisado

                                             AMERICAN IMMIGRATION
                                             COUNCIL
                                                Karolina Walters


                                             By: */s/ Stephen M. Medlock*
                                                Stephen M. Medlock

                                             *Attorneys for Plaintiffs*

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1

**CERTIFICATE OF SERVICE**

2
      I certify that I caused a copy of the foregoing document to be served on all

3
counsel via the Court's CM/ECF system.

4
Dated:  September 26, 2019                          MAYER BROWN LLP

5

6
                                                         By  /s/ Stephen M. Medlock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28