1    MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2        *mmarmolejo@mayerbrown.com*
     350 S. Grand Avenue
3    25th Floor
     Los Angeles, CA 90071-1503
4        Ori Lev (DC Bar No. 452565)
         (*pro hac vice*)
5        *olev@mayerbrown.com*
         Stephen M. Medlock (VA Bar No. 78819)
6        (*pro hac vice*)
         *smedlock@mayerbrown.com*
7    1999 K Street, N.W.
     Washington, D.C. 20006
8    Telephone:  +1.202.263.3000
     Facsimile:   +1.202.263.3300
9
     SOUTHERN POVERTY LAW CENTER
10       Melissa Crow (DC Bar No. 453487)
         (*pro hac vice*)
11       *melissa.crow@splcenter.org*
     1101 17th Street, N.W., Suite 705
12   Washington, D.C. 20036
     Telephone: +1.202.355.4471
13   Facsimile: +1.404.221.5857

14   *Additional counsel listed on next page*
     *Attorneys for Plaintiffs*

15              **UNITED STATES DISTRICT COURT**

16              **SOUTHERN DISTRICT OF CALIFORNIA**

17

| 18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
|---|---|---|
| 19 | Plaintiffs, | |
| 20 | v. | **DECLARATION OF ADAM ISACSON** |
| 21 | Kevin K. McAleenan,[1] *et al.*, | |
| 22 | Defendants. | |
| 23 | | |

24

25

26

27  ─────────────────────

28  [1]  Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
    *mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

I, Adam Isacson, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

## I.    Experience

1.    I am over 18 and have personal knowledge of the facts herein.

2.    I am the Director for Defense Oversight at the Washington Office on Latin America ("WOLA"), a nonprofit research and advocacy organization based in Washington, D.C., that is committed to advancing human rights in the Americas. Since 2011, a significant part of my work has been focused on border security in the United States. I have visited the U.S.-Mexico border approximately 25 times and the Mexico-Guatemala border 4 times. Together with the Border Security and Migration program at WOLA, I have published dozens of reports, memos, and multimedia projects about the security efforts of U.S. agencies at the border and the resulting human impact. I earned a B.A. in Social Science from Hampshire College and an M.A. in International Relations from Yale University.

## II.    Conclusions

3.    Based on years of data and field research, I contend that U.S. Customs and Border Protection ("CBP") has more processing capacity than it is using. I further contend that CBP could boost its processing capacity further with modest investments for which Congress would be likely to appropriate money.

## III.    Methodology

4.    CBP does not publicly report monthly numbers of undocumented migrants processed at ports of entry before fiscal year 2017. Numbers going back to October 2011 can be derived, though, by reverse-engineering them from other CBP reports:

a.    CBP's monthly "Southwest Border Migration" reports, posted online at http://bit.ly/2mDr1fQ, provides an overall table of "CBP Southwest Border Total Apprehensions / Inadmissibles," combining numbers of undocumented

migrants apprehended between ports of entry and presenting at ports of entry (which CBP calls "inadmissibles");

    b.  I have saved screenshots of earlier "Southwest Border Migration" reports, in which the table goes back to fiscal year 2012, at https://defenseassistance.org/reports/127;

    c.  Border Patrol reports monthly numbers of undocumented migrants apprehended between ports of entry at http://bit.ly/2L9set3; and

    d.  Subtracting those apprehended between ports of entry from the larger "CBP Southwest Border Total Apprehensions / Inadmissibles" table provides the number of undocumented migrants processed at the ports of entry every month since October 2011.

## IV. Analysis

### A. CBP processed 28 percent more migrants per month at ports of entry before metering began.

  5.  First, official data tell us that CBP has, in the recent past, been able to process far more undocumented migrants at ports of entry than it has since the May 2018 imposition of border-wide "metering."

ISACSON DECLARATION



**Undocumented Migrants Processed at Ports of Entry, October 2011-Present**

CBP sources: http://bit.ly/2mDr1fQ · http://bit.ly/2L9set3

6.      Specifically:

a.      Between June 2018 and July 2019, when metering was in full force, CBP allowed an average of **9,904** undocumented migrants per month to approach ports of entry;

b.      Previously, between July 2015 and January 2017, CBP had sufficient capacity to allow an average of **12,651** undocumented migrants per month—including a high of 20,658 in October 2016—to approach the ports;

c.      During that earlier 19-month period, then, CBP was able to process **28 percent** more migrants per month than it did during the 13 months of peak metering; and

d.      Between July 2015 and the onset of metering in May 2018, CBP exceeded the metering period's June 2018-July 2019 monthly average 24 times.

7.      Further confirming that metering was responsible for ports of entry operating below their respective capacities between June 2018 and July 2019, the number of undocumented migrants allowed to approach ports of entry increased to 13,313 in August 2019.

ISACSON DECLARATION

8.    In addition, CBP's own statistics show that it had significantly more capacity than it was using in 2018 and 2019, a period of great demand as Central American children and families, many of them fleeing threats to their lives, came to the U.S.-Mexico border in very high numbers.

**The Same Chart, Showing Months Exceeding the June 2018-July 2019 Average**



**B.    Metering caused the share of undocumented migrants processed at ports of entry to fall as low as 8 percent, from an earlier average of 21 percent.**

9.    Second, metering shifted the burden of receiving asylum seekers away from ports of entry, and to the zones between ports of entry, leaving Border Patrol to apprehend a larger proportion of undocumented migrants.

10.    In May 2019, Border Patrol apprehended 132,859 migrants between ports of entry, the largest monthly total since 2007. Unlike 2007, though, when the migrant population was almost entirely single adults, more than two thirds of those migrants were children and parents seeking to be apprehended.

11.    That same month, CBP metered in just 11,396 undocumented migrants

at the ports of entry. That means ports of entry accounted for only **8 percent** of undocumented migrants taken into custody at the U.S.-Mexico border, the smallest proportion in the nearly eight years for which I have official data.

12.    In a typical month between October 2011 and August 2019, the ports of entry accounted for 21 percent of undocumented migrants taken into custody. During the June 2018-July 2019 metering period, that fell to 15 percent per month, and 9 percent during the months of heaviest migration (April-June 2019). Metering made crossing between ports of entry the option chosen by at least 85 percent of undocumented migrants, most of them asylum seekers.

**Undocumented Migrants Processed at Ports of Entry, as a Percentage of All Migrant Apprehensions and "Inadmissibles," October 2011-Present**



CBP sources: http://bit.ly/2mDr1fQ · http://bit.ly/2L9set3

C.    **Why don't ports of entry send protection-seeking migrants to processing centers, like Border Patrol does?**

13.    U.S. Border Patrol ("Border Patrol"), which receives the majority of protection-seeking migrants by apprehending them between ports of entry, faces the same short-term processing challenges that CBP does. Rather than limit processing capacity to the usually small number of holding cells at its stations, though, Border Patrol has sought appropriations to build processing centers that can handle a much

1  larger flow of people.

2      14.    At the Ursula Avenue Central Processing Facility in McAllen, Texas, a

3  new facility going online in El Paso, and smaller temporary facilities elsewhere,

4  Border Patrol at least theoretically is able to initiate asylum paperwork, verify family

5  relationships, check for communicable diseases and similar tasks within 72 hours,

6  after which protection-seeking migrants are handed off to ICE. These warehouse-

7  sized facilities can process thousands of migrants at a time.

8      15.    These processing facilities are not ideal solutions: congressional, media,

9  and non-governmental watchdogs have criticized conditions inside Ursula and other

10  facilities. But they are able to do something CBP has not: process large numbers of

11  people quickly, without any need for metering.

12      16.    I do not understand why CBP is not able to process more people at ports

13  of entry by simply busing them to processing facilities elsewhere in the border sector.

14  This seems like a low-cost solution that would obviate the need for metering. I have

15  brought up this "busing to processing centers" proposal in two off-the-record

16  conversations with CBP management this year, in Washington and San Diego, and

17  received no pushback.

18  **V.    WOLA Reports**

19      17.    Attached hereto as Exhibit A is a true and accurate copy of a WOLA

20  report entitled *"Come Back Later": Challenges for Asylum Seekers Waiting at Ports*

21  *of Entry* (the "Report").

22      18.    The Report was drafted at or near the date listed on the Report.  Drafting

23  the Report and reports is a regular practice of WOLA.

24      19.    The Report is kept in the regular course of WOLA's business on

25  WOLA's    website.    It    is    available    at    https://www.wola.org/wp-

26  content/uploads/2018/08/Ports-of-Entry-Report_PDFvers-3.pdf.

27      20.    Pursuant to Fed. R. Evid. 902(11), I certify that Exhibit A is an original

28

1  or copy of the Report.

2      I declare under penalty of perjury under the laws of the United States of

3  America that the proceeding declaration is true and correct.

4      Executed on this 24ʳ' day of September 2019 at Washington, D.C.

5

6

7                       Adam Isacson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**RESEARCH REPORT**

(AP Photo/ Gregory Bull)

## "COME BACK LATER": CHALLENGES FOR ASYLUM SEEKERS WAITING AT PORTS OF ENTRY

By Adam Isacson, Maureen Meyer, and Adeline Hite

**August 2018**

At the height of the Trump's "zero tolerance" immigration policy at the U.S.-Mexico border, Trump administration officials have justified the US's disgraceful detention and deportation policies under the pretext that these families and individuals are passing the border 'illegally,' that is, between ports of entry. Rightly so, the media has focused primarily on the consequences of detention, namely family-separation and the inhumane conditions in detention centers. Less scrutiny has been given to the inefficient and technically illegal practices occurring at ports of entry across the border. Officials at Customs and Border Protection (CBP) have been on the offensive in delaying and preventing the processing of families seeking to petition for asylum.

Ranging from leaving families out in the sun and heat for days as they wait to enter the U.S. to misinforming migrants on their rights to come onto US land and request asylum, CBP actions at ports of entry are escalating in severity and are threatening, if not already violating, various human rights laws. The distinction between those migrants entering the country 'fairly and legally' through the ports and those 'sneaking in' between the ports is a misguided comparison. Most migrants do not have the autonomy to choose the exact location in which they will attempt to enter the United States.  Obstacles varying from coyotes to gruesome conditions of gang and criminal violence throughout Mexico make it such that passing through a port of entry is not always an obvious or feasible choice for people fleeing.

Based on the intensive documentary research efforts of our border security and migration team throughout the past seven years, supplemented by a four-day visit to southern Arizona from June 19 to June 22, this report will detail the challenges for asylum seekers arriving at ports of entry and lay out recommendations for a more humane and efficient approach to securing the US border and confronting the humanitarian crisis emerging from Central America and Mexico. This report is the second segment in a three-part series that is comprised of the following topics: an overview of the zero tolerance policy that the Trump administration launched in April 2018 and its effects; a look at the dire situation of asylum-seekers at land ports of entry along the border; and, a recounting of the resulting separation of parents and children, and potential mass detention that may follow.

**Backlog at Ports of Entry**

Although most asylum-seekers continue to cross into the United States between ports of entry, risking prosecution and potential difficulties in their asylum claim, there has been an increase in asylum-seekers at the official border crossings and a marked slow-down by Customs and Border Protection (CBP) in processing them. At the time of WOLA's visit to Nogales, on the border between Arizona and Sonora, staff from the Kino Border Initiative—a Jesuit-run migrant service and advocacy organization—said that the number

of people waiting a turn to present themselves for asylum at that port of entry had reached 113, including 48 families, with additional asylum-seekers arriving almost daily. While the number of unaccompanied children and families waiting to be accepted at the ports, often for days, is a fraction of the approximately 781 children and family-unit members whom Border Patrol apprehended in June *between* ports of entry in the surrounding Tucson sector, more asylum-seekers are coming to the ports.[1]

The long lines may have resulted from the zero tolerance policy diverting asylum-seekers toward the ports of entry, or from CBP slowing down the rate at which it was receiving them at the ports. Probably both, but evidence points to a slowdown in CBP's reception of asylum seekers being more to blame for the backlogs on the Mexican side of the border. Border-wide, the number of unaccompanied children and family members admitted to the ports of entry, mainly for protection requests, plummeted by 42 percent from May to June.[2] This drop happened amid a much smaller 8 percent decline in child and family apprehensions between the ports. CBP appeared to be deliberately reducing its receptions of asylum-seekers just as the zero tolerance policy was intensifying.

The vulnerable population waiting to access the ports of entry is attempting to enter the United States the "right" way. At the height of the family-separation crisis, Homeland Security Secretary Kirstjen Nielsen tweeted, "You are not breaking the law by seeking asylum at a port of entry."[3] However, as WOLA and other organizations have documented, asylum seekers continue to face obstacles to legally seek protection in the U.S. In recent months CBP officers have positioned themselves at the border, pre-screening people before they are allowed to enter U.S. territory and repeatedly denying asylum-seekers entry into the country, forcing them to wait days or even weeks in hot and in some areas dangerous Mexican border towns for a chance to pursue protection in the United States.[4]

## Capacity Issues—Or a Deliberate Slowdown?

The 113-person backlog of asylum-seekers in Nogales is part of a border-wide phenomenon. Border organizations supporting migrants and asylum-seekers as well as the media have documented long lines at ports of entry in El Paso and McAllen, Texas; in San Diego, California; and elsewhere.[5]

In Tijuana, the *Los Angeles Times* has reported on the use of a "mysterious notebook", managed by asylum-seekers themselves, to inscribe the growing list of names of people waiting their turn.[6] In Nogales, where Mexican authorities limit the number of asylum-seekers who can wait at the gates of the port of entry for their turn, Kino Border Initiative and other advocates have set up a first-come-first-served system for access to the port, so that people can wait their turn in shelters instead of out in the open. Particularly vulnerable asylum seekers like minors who come without parents are often given priority.

WOLA was told that in some parts of the border, Mexican asylum-seekers are also given priority given the perceived risks for them of staying longer in the very country they are fleeing from.

At the gates of the Nogales port, right up against the borderline on the Mexican side, WOLA staff saw and spoke with some of the 19 people waiting on about as many mats laid out together on the concrete floor, in a corner next to the pedestrian waiting line. Parents, children, and unaccompanied minors were sitting on the mats, reading books and phones. Kids played with donated toys, while volunteers brought water and snacks. The waiting asylum-seekers are out in the open, under a roof but in 105-degree heat. The night before WOLA visited someone had stolen some of the food that had been left by volunteers. The families waiting at the port had been camped out for the past two nights, hoping that day would be the day that they would finally be admitted. As the flow of asylum-seekers continues to rise at ports of entry, CBP, whose Office of Field Operations manages ports of entry, made no apparent efforts to improve its capacity to receive them. Instead of increasing capacity to interview asylum-seekers, CBP has responded by shutting the ports of entry's doors to them. By law, an asylum-seeker has the right to petition U.S. officials for protection the moment he or she steps on U.S. soil. Since U.S. soil begins outside the port facility itself, yards away from the actual counters where pedestrian border-crossers undergo inspection, the agency has moved to keep people from admissibility documents from crossing the line and approaching those counters.

Land ports of entry now have CBP officers stationed at the borderline itself; if the border is a river, they now stand in the middle of bridges. They are checking documents and preventing asylum-seekers from setting a foot on the U.S. side. WOLA staff ran this gauntlet while crossing into the United States in Yuma and Nogales. At the Yuma port of entry, three CBP officers stood right inside the line, yelled "no pictures" and demanded to see our passports before letting us through. In Nogales, one CBP officer inspects passports through a cage-like turnstile whose rotation is blocked with an orange construction cone jammed between its bars and gate. CBP expects "that this will be a temporary situation," an agency spokesperson told *The Intercept*.

> "Depending upon port circumstances at the time of arrival, individuals presenting without documents may need to wait in Mexico as CBP officers work to process those already within our facilities. The number of inadmissible individuals we are able to process in a day varies based on the complexity of the cases, resources available, medical needs, translation requirements, holding/detention space, overall port volume and enforcement actions."[7]

At most ports of entry, CBP officers at the line are telling asylum-seekers to "come back later" when they seek to petition for protection in a way that does not violate U.S. laws 8 U.S.C. 1325 or 1326. In 2016 and 2017, advocates at the border documented numerous cases of CBP officers turning asylum seekers away by making false claims like "we're not doing asylum here."[8] Now, instead of being turned away definitively, the most common scenario is being told to come back later because the port of entry is full.

Advocates contend that the ports are not, in fact, full: that the CBP officers assigned to the line are lying in service of an administration that wants to restrict any immigration. "The numbers are down at our shelters. And if they're down at our shelters, they've got to be down at the government's facilities," Rubén Garcia of El Paso's Annunciation House shelter told *The Intercept.*[9] An advocate told WOLA staff that the port of entry in Nogales was only taking an average of six asylum-seekers per day, despite a backlog of one hundred thirteen waiting in Mexico, and even though the port's holding capacity is forty-seven.[10] However, since our visit, groups on the ground have informed WOLA that the Nogales port now processes almost 20 asylum seekers a day and the wait-time for families has dropped to only about a half-day or a few hours.  It is not clear how the port could so suddenly process triple the average amount of asylum seekers it was previously accepting a day. The sudden change in processing capability points more to an administrative decision than to an increase in capacity which would more likely happen gradually.

In other instances, border agents waiting at smaller ports of entry have told migrants that they no longer process asylum seekers and redirect them to larger ports that are as far as 50 miles away. However, all ports of entry are legally designated to accept asylum seekers and initiate a process for those seeking protection.

The larger national context feeds suspicions that CBP officers are being instructed to mislead, or to "slow-walk," asylum receptions. The current administration in Washington is led by a man who calls undocumented migrants an "infestation" and voices a desire to "bring them back from where they came" with no due process. Even during the Obama years, migration and border-security agencies openly voiced their doubts about whether Mexican and Central American families' asylum claims were legitimate; many believe that they are economic migrants coached by their smugglers to say "magic words" about fear of return in order to exploit "loopholes" in U.S. law.[11] It is valid to suspect that this climate is giving CBP officers a strong incentive to limit their reception of asylum-seekers.

Officials deny this and insist that the problem is capacity, and there is probably some truth to this. For example, the ports also hold and process individuals apprehended by agents while trying to enter through the port who may be involved in smuggling people or drugs

or other illicit activities. The real "capacity" problem, though, isn't physical holding space as much as personnel to process asylum- seekers.

CBP's Office of Field Operations is severely understaffed. "Ports of entry across the United States have 4,000 Port Officers less than the number needed to staff all ports of entry," reads a May 2018 analysis of personnel data by the Senate Homeland Security Committee's Democratic staff.[12] That means the agency only has 85 percent of the staff that it needs to do its job. Even though more than 90 percent of heroin and 80 percent of fentanyl is seized at the ports of entry, the report notes, the crossings are so understaffed that they must make do with personnel temporarily transferred from airports.[13]

> Ports of entry in the San Diego and Tucson areas, which together accounted for 57% of all opioid seizures by Port Officers between 2016 and 2017, have required CBP to assign temporary staff details to fulfill staffing needs at those locations. The practice of temporary details has become so systemic over the past two fiscal years that CBP has named it "Operation Overflow."

CBP officers are routinely working double shifts. "They are supposed to do their job with the same mental clarity and acuity, but when you work 16-hour days, days on end, it's a pretty difficult thing to do," Anthony Reardon, president of the National Treasury Employees Union, told the *Washington Post* in January.[14] In Nogales, the same local advocate who cited the port of entry's low ratio of asylum interviews to space to accommodate people inside noted that the facility is one of the most understaffed in CBP's whole system, with several employees temporarily seconded over from airports.[15]

Despite this personnel crisis, the Trump administration has few plans in place to increase CBP personnel or otherwise speed reception of asylum applicants at ports of entry. Though it seeks a 750-person increase in Border Patrol's authorized personnel strength, the 2019 Homeland Security budget request would only add 60 CBP officer positions at ports of entry.[16]

Although the administration is not seeking to increase port capacity, Congress is calling on CBP to ensure that asylum-seekers are properly processed. In the report accompanying DHS' Appropriations Bill for 2019, the House Committee on Appropriations calls on the agency to "take appropriate steps to ensure that the United States is meeting its legal obligations, to include reminding field officers and agents about CBP's legal responsibilities to ensure that asylum seekers can enter at POEs. CBP shall notify the Committee within 24 hours of any instance when holding facility limitations or other factors impede its ability to promptly accept and process individuals claiming credible or reasonable fear, including a description of its efforts to mitigate those limitations or factors."[17]

6

**Mexican government's response to asylum-seekers**



Mexican States To Which U.S. Authorities Deport Mexican Citizens

Source: Government of Mexico http://bit.ly/1g0FRRo

The Mexican government has mostly left alone the asylum-seekers stuck on the bridges or otherwise in border towns for weeks. However, advocates in Reynosa report that just over the last month, Mexican migration officials now stand at the entryway of the bridge that connects Mexico and the U.S. asking migrants for valid transit visas.[18] If migrants do not present official Mexican documents, those individuals are detained in Mexico. Advocates in this area believe this is a sign of increased collaboration between CBP and Mexican migration officials. In the past, the Mexican government had also been criticized for reported collaboration with CBP to prohibit asylum seekers from reaching the ports of entry.[19]

With security conditions especially precarious in many border towns, asylum-seekers who are part of the backlog are vulnerable to kidnapping and other violence at the hands of organized crime. In Nogales, while this hasn't happened to asylum-seekers, kidnappings of migrants do occur at the bus stop. The most common crime that migrants in Nogales cite is shakedowns and extortion at the hands of municipal police.[20]

The Trump administration's crackdown on migrants living in the United States without proper documentation has resulted in an increase in Mexicans being deported back to their home country, a country many of them haven't been to in decades.  Between January and May 2018, 93,365 Mexicans had been repatriated to Mexico, a 47 percent increase from the same period in 2017 (63,352).[21] Agents from Mexico's National Migration Institute

(Instituto Nacional de Migración, INM) told WOLA in Nogales that they estimated that a third of the deportees had spent three or more years in the United States. One Mexican at Kino Border Initiative's hospitality center had been in the U.S. for over two decades; he was leaving behind a three-month old daughter he had never met because he had been apprehended before she was born.

Other Mexicans are first time crossers.  We spoke with a group of eight Mexicans who had been repatriated to San Luis Rio Colorado and several reported that this was their first time trying to come to the United States. This included two tearful Mexican women who had crossed into the U.S. through the Mexicali area and had spent 30 days in detention.  As we mentioned in our report on zero tolerance, these women had been separated from their husbands in detention and returned to a city they had never been to without their belongings.  It would appear the women and the other Mexicans in their group of deportees had been subject to "lateral repatriation," officially termed the Alien Transfer Exit Program (ATEP).  While not applied as broadly as in the past, this program supposedly moves undocumented male migrants from the sector where they were detained to another location, often hundreds of miles away. The rationale is to disrupt the connection between migrants and the smugglers with whom they originally crossed, thus making it harder to attempt another border crossing. However, women are not supposed to be laterally repatriated nor should families be separated in the process.   Apart from the trauma inflicted on these women, returning them to a border city they do not know without their spouses or their belongings, including money, identification documents, and cell phones, can put them at greater risk of crime and impede their ability to return to their home communities.

In recent years the Mexican government has increased its reception and reintegration services for repatriated Mexicans.  The latest version of the INM's program, Somos Mexicanos, aims to coordinate different Mexican agencies' services for this population, including obtaining Mexican documents and identification numbers, support for bus tickets to their home communities, access to health services, and employment opportunities. While these efforts are important, the Mexican government continues to face resource shortages to fully support this population and the bulk of the services for deportees continues to be provided by migrant shelters or other organizations, often in coordination with the INM. As Mexico faces challenges in receiving an increased number of deportees from the United States, as will be discussed below, it is also under increasing pressure from the United States to receive more asylum seekers from Central America and elsewhere.

**Additional Measures to Limit Access to Asylum in the U.S.**

On his Twitter account, President Trump has made known that he would prefer that no migrants have access to asylum in the United States: "We cannot allow all of these people to invade our Country. When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came."[22] U.S. law guarantees due process for border-crossers, despite the Trump Administration's efforts to undermine this legal right. Still, the separation and long-term detention of families are just two of a larger set of policies and proposals that his administration is pursuing, or considering, to limit access to asylum or refugee status. Other measures include the following.

- **All but eliminating asylum for gang or domestic violence victims.** U.S. immigration courts are part of the Department of Justice, in the executive branch, which makes the attorney-general the ultimate arbiter of asylum cases and the precedents they set. On June 11, Attorney-General Sessions issued a sweeping decision severely restricting asylum for victims of gang violence or domestic abuse.[23] "Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum," it reads, contending that these statuses don't constitute membership in a "particular social group" eligible for asylum. Sessions' decision sweeps away fifteen years of jurisprudence. Asylum seekers from Central America and elsewhere will now bear an even greater burden of proof and be required to be very specific about the threat they face, the government's lack of will and inability to protect them, and how it applies to them as members of a class of people.

- **Stripping protections from unaccompanied children from Central American and perhaps other non-contiguous countries.** Under the 2008 Trafficking Victims Protection Reauthorization Act, children who arrive unaccompanied from all countries except Canada and Mexico are automatically transferred to the Office of Refugee Resettlement (of the Department of Health and Human Services), placed with a family member or sponsor, and given the right to an immigration hearing. (The law assumes some probability that they may be victims of human trafficking.) Unlike unaccompanied kids from Canada and Mexico, the Border Patrol or Office of Field Operations agents who detained them do not get to decide whether they credibly fear returning to their countries; that is up to the immigration court system. The Trump administration has repeatedly asked Congress to amend this statute so that Border Patrol and CBP personnel can quickly deport those unaccompanied Central American kids whom they judge to have no protection needs. As WOLA's work on screening for Mexican children at the border made clear, this would all but eliminate most children's ability to get a chance to make a claim for protection.[24]

- **Pressing Mexico to agree to be considered a "Safe Third Country" for Central American asylum-seekers.** Trump administration officials believe that most Central Americans seeking protection in the United States would be safe from threats in Mexico. In repeated bilateral exchanges, they have sought to convince Mexico to agree to status as a "safe third country," taking in the majority of asylum-seekers en route to the U.S. border. While Canada already holds this status, which has also been controversial, there are strong reasons why it would be problematic for Mexico.[25] Such an agreement with the United States assumes not only that Mexico is safe for asylum seekers but also that migrants have the ability to access protection in Mexico.  Migrants in transit through Mexico are frequently subject to crimes and abuse including kidnapping, extortion, robbery and sexual assault, and only 1 percent of denounced crimes against migrants actually result in a conviction of the person responsible.[26] At the same time, less than 10 percent of Central Americans apprehended in Mexico in 2017 requested protection in the country, due to fear, prolonged detention while claims are processed, lack of adequate information about their rights in Mexico, and inadequate access to legal assistance. In February 2014, Mexico's National Human Rights Commission issued a statement warning that the Mexican Commission of Assistance to Refugees (COMAR) was at risk of collapsing.[27] While UNHCR support and the work of migrant shelters and other organizations have increased Mexico's capacity to receive and process asylum seekers, this does not mean that the country has the capacity to receive everyone who crosses through its territory, nor should Mexico be pushed into an agreement so that the U.S. government can wash its hands of its international responsibility to accept asylum seekers and refugees.

  Apart from pressuring Mexico to accept this agreement, the Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B (Session's decision) released by DHS on July 11 for U.S. Citizenship and Immigration Services asylum officers calls on them to consider factors such as whether the person traveled through another country and "whether orderly refugee procedures were available to help" in any country the person crossed when exercising discretion to grant asylum.[28]

- **Denying asylum to all who cross improperly or whose journey takes more than two weeks.** On June 29 *Vox* revealed the existence of an internal Department of Justice memo "that would totally overhaul asylum policy in the United States."[29] The document, currently in the process of being evaluated, would automatically deny asylum to anyone who crosses the border improperly and is prosecuted for doing so. It would also deny asylum to anyone who spent more than two weeks in another country en route to the United States, or who traveled through more than one

country on his or her journey. This would disqualify all asylum-seekers who travel by land from anywhere other than Canada, Mexico, Guatemala, or Belize, as well as the thousands whose journey exceeds 14 days.

- **Ceasing to allow asylum applications at ports of entry.** An especially extreme proposal under consideration would make it impossible to petition for asylum at any place along the land border with Mexico. According to the *New York Times*, "Introduced this spring by members of the leadership of United States Customs and Border Protection, according to a government official with direct knowledge of the plan," the proposal "would allow hopeful refugees to apply for protection only from abroad, stranding them for much longer in the conditions they hope to escape."[30] It is impossible not to interpret this as a direct violation of the letter and intent of the 1951 UN Convention and Protocol Relating to the Status of Refugees as well as U.S. law which currently allows any individual in the United States or who arrives in the United States the right to apply for asylum, irrespective of their status.[31]

## Recommendations

- If all asylum-seekers are to be routed to the ports of entry, CBP must dramatically expand its capacity to receive the asylum-seekers who present themselves. This may include hiring trained contract professionals to conduct the preliminary interviews and building temporary holding space, with the expectation that wait times will consistently be less than 24 hours. Asylum-seekers should not be forced to wait in poor conditions on bridges or next to pedestrian walkways for days in order to be admitted into the United States.

- The situation of asylum-seekers at ports of entry places into even sharper relief the dire shortage of CBP officers. Any additional resources for hiring at CBP should prioritize the Office of Field Operations, which means the ports of entry, and not Border Patrol.

- The DHS Inspector General must investigate and report on the causes for the slow pace of asylum receptions at the ports, making clear whether it owes to nefarious practices or to a lack of capacity. Any allegations of illegal turnbacks of asylum seekers or CBP officers being instructed to make deliberately inaccurate statements about capacity in order to turn back asylum-seekers, should be investigated and sanctioned. If processing delays are due to a lack of capacity, the Inspector General should identify the shortfalls and suggest investments to address them, and Congress should supply prompt funding.

- Increase the number of trained, professional, impartial immigration judges as a way to reduce wait times and backlogs for asylum cases. The U.S. should also guarantee

access to legal representation for unaccompanied children in immigration proceedings, as no toddler should have to make an asylum claim alone.[32] Legislation such as the Fair Day in Court for Kids Act of 2018 (HR 2043), which would ensure that all unaccompanied minors are provided with an attorney for immigration proceedings, would be an important step in guaranteeing due process for this vulnerable population.[33]

## Endnotes

1. WOLA Defense Oversight Research Database, "Southwest Border Migration FY2018 (Washington: U.S. Customs and Border Protection)," Washington Office on Latin America, July 5, 2018, https://defenseoversight.wola.org/reports/127.
2. Ibid, "Southwest Border Migration FY2018 (Washington: U.S. Customs and Border Protection)".
3. Sec. Kirstjen Nielsen, "You are not break the law by seeking asylum at a port of entry," Twitter, July 17, 2018, https://twitter.com/SecNielsen/status/1008467318744240128.
4. (a) Maureen Meyer et al., "Situation of Impunity and Violence in Mexico's Northern Border Region," Washington Office on Latin America, March 2017, https://www.wola.org/wp-content/uploads/2017/04/Situation-of-Impunity-and-Violence-in-Mexicos-northern-border-LAWG-WOLA-KBI.pdf , (b) Human Rights First, "Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seeks," Human Rights First, May 2017, https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf.
5. (a) Robert Moore, "Border Agents Are Using a New Weapon Against Asylum Seekers," Texas Monthly, June 2, 2018, https://www.texasmonthly.com/politics/immigrant-advocates-question-legality-of-latest-federal-tactics, (b) Katy Vine, "What's Really Happening When Asylum-Seeking Families Are Separated," Texas Monthly, June 15, 2018, https://www.texasmonthly.com/news/whats-really-happening-asylum-seeking-families-separated/, (c) All Things Considered, "Asylum-Seekers Locked in Limbo at Backed-Up U.S.–Mexico Border," NPR, December 31, 2017, https://www.npr.org/2017/12/31/574892694/asylum-seekers-locked-in-limbo-at-backed-up-u-s-mexico-border.
6. Cindy Carcamo, "For many waiting in Tijuana, a mysterious notebook is the key to seeking asylum" Los Angeles Times, July 5, 2018, http://www.latimes.com/local/california/la-me-asylum-seekers-notebook-holds-key-to-entry-20180705-story.html.
7. Debbie Nathan, "Desperate Asylum-Seekers Are Being Turned Away by U.S. Border Agents Claiming There's "No Room,"" The Intercept, June 16, 2018, https://theintercept.com/2018/06/16/immigration-border-asylum-central-america/.
8. Dara Lind, "Trump keeps making it harder for people to seek asylum legally," Vox, June 5, 2018, https://www.vox.com/policy-and-politics/2018/6/5/17428640/border-families-asylum-illegal.
9. Ibid, Nathan.
10. WOLA Interview.
11. (a) Thomas D. Homan Director U.S. Immigration and Customs Enforcement, "Stopping the Daily Border Caravan: Time to Build a Policy Wall," U.S. House of Representatives Committee on Homeland Security Subcommittee on Border and Maritime Security, May 22, 2018, https://docs.house.gov/meetings/HM/HM11/20180522/108323/HHRG-115-HM11-Bio-HomanT-20180522.pdf, (b) WOLA Defense Oversight Research Database, "Audio file clip of Mark Morgan, Chief, U.S. Border Patrol," Washington Office on Latin America, https://defenseoversight.wola.org/clip/3244.
12. HSGAC Minority Staff Report, "Combating the Opioid Epidemic: Intercepting Illicit Opioids at Ports of Entry," United States Senate Committee on Homeland Security and Governmental Affairs, May 10, 2018, https://www.hsgac.senate.gov/imo/media/doc/Combating%20the%20Opioid%20Epidemic%20-%20Intercepting%20Illicit%20Opioids%20at%20Ports%20of%20Entry%20-%20Final.pdf.
13. U.S. Customs and Border Protection, "CBP Enforcement Statistics FY2018," U.S. Department of Homeland Security, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics.
14. Nick Miroff, "U.S. customs agency is so short-staffed, it's sending officers from airports to the Mexican border," Washington Post, January 19, 2018, https://www.washingtonpost.com/world/national-security/us-customs-agency-is-so-short-staffed-its-sending-officers-from-airports-to-the-mexican-border/2018/01/18/44420a94-fc77-11e7-a46b-a3614530bd87_story.html?utm_term=.0b7d96caed13.
15. WOLA Interview
16. U.S. Customs and Border Protection, "Budget Overview: Fiscal Year 2019 Congressional Justification," Department of Homeland Security, pp. CBP-OS-30, https://www.dhs.gov/sites/default/files/publications/U.S.%20Customs%20and%20Border%20Protection.pdf.

13

17. U.S. Congress, "Department Of Homeland Security Appropriations Bill, 2019,"
https://docs.house.gov/meetings/AP/AP00/20180725/108623/HMKP-115-AP00-20180725-SD004.pdf

18. WOLA correspondence with local advocate in Reynosa.

19. WOLA email correspondence with a local advocate.

20. WOLA Interview.

21. Subsecretaría de Población, Migración y Asuntos Religiosos de la Secretaría de Gobernación, "Boletín Mensual de Estadísticas Migratorias 2018," Unidad de Política Migratoria, June 2018,
http://www.politicamigratoria.gob.mx/es_mx/SEGOB/Boletines_Estadisticos.

22. Donald J. Trump, "We cannot allow all of these people to invade our Country….," Twitter, June 24, 2018,
https://twitter.com/realdonaldtrump/status/1010900865602019329?lang=en.

23. I&N Dec. 316 (A.G. 2018)

24. Natasha Pizzey, James Frederick, and WOLA, "Forgotten on 'La Frontera': Mexican Children Fleeing Violence Are Rarely Heard," Washington Office on Latin America, January 22, 2015,
https://www.wola.org/analysis/forgotten-on-la-frontera-mexican-children-fleeing-violence-are-rarely-heard/.

25. Citizens for Public Justice, "Safe Third Country Agreement: FAQ," CPJ, https://www.cpj.ca/safe-third-country-agreement-faq.

26. Ximena Suarez-Enriquez and Maureen Meyer, "WOLA Report: Access to Justice for Migrants in Mexico," Washington Office on Latin America, July 27, 2017, https://www.wola.org/analysis/access-justice-migrants-mexico-right-exists-books/.

27. Maureen Meyer et al., "Re: NGO Statement Opposing Mexico as a 'Safe' Third Country," Washington Office on Latin America, May 22, 2018, https://www.wola.org/wp-content/uploads/2018/05/NGO-Statement-on-U.S.-Mexico-STC-Agreement-5.22.18.pdf.

28. U.S. Citizenship and Immigration Services, "Policy Memorandum: Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B-,"U.S. Department of Homeland Security, July 11, 2018. https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2018/2018-06-18-PM-602-0162-USCIS-Memorandum-Matter-of-A-B.pdf.

29. Dara Lind, "Exclusive: Trump administration plan would bar people who enter illegally from getting asylum," Vox, June 29, 2018, https://www.vox.com/policy-and-politics/2018/6/29/17514590/asylum-illegal-central-american-immigration-trump.

30. Caitlin Dickerson, "Trump Administration Considers Unprecedented Curbs on Asylum for Migrants," July 18, 2018, https://www.nytimes.com/2018/07/18/us/immigration-asylum-children.html.

31. 8 U.S. Code § 1158– Asylum.

32. Tal Hoper, "Kids in immigration court: A maze with life and death consequences," CNN, July 1, 2018,

33. https://www.cnn.com/2018/06/30/politics/children-in-court/index.htmlKIND, "Fair Day in Court for Kids Act of 2018," February 28, 2018. https://supportkind.org/wp-content/uploads/2018/03/Fair-Day-in-Court-for-Kids-Act-of-2018-2-pager.pdf.