1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5     *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                  **UNITED STATES DISTRICT COURT**
16
                 **SOUTHERN DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | **DECLARATION OF BRIAN GRIFFEY** |
| Kevin K. McAleenan,[1] *et al.*, | |
| Defendants. | |

27  _____

28  [1] Acting Secretary McAleenan is automatically substituted for former Secretary
   Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
    *mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

GRIFFEY DECLARATION

1.  Attached hereto as Exhibit A is a true and accurate copy of a report by Amnesty International entitled "'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States" (the "Report").

2.  The report is based on research missions along the entire US–Mexico border conducted by Amnesty International researchers in January, April and May 2018. The research teams documented the situations of asylum seekers who sought to request protection at U.S. ports of entry, as well as the conduct of U.S. border and immigration authorities in facilitating and processing their asylum claims under U.S. law and international law and standards.

3.  Amnesty International researchers interviewed a total of 52 asylum-seekers along the US–Mexico border, including in all four US border states (California, Arizona, New Mexico, and Texas) and three Mexican border states (Baja California, Sonora, and Chihuahua). Among those 52 asylum-seekers were 27 men and 25 women, including 15 transgender women. Amnesty International interviewed 28 asylum-seekers inside ICE immigration detention facilities (in California, New Mexico, and Texas); 14 asylum-seekers in Mexico, including 12 who were turned away and two who were removed by the United States to Mexico; three asylum-seekers who were on parole at the time of the interview; and seven refugees who had been granted asylum.

4.  Amnesty International also interviewed 51 immigration lawyers, activists and other representatives of nongovernmental organizations (NGOs); as well as 23 government and other officials. Among those officials were 12 representatives of CBP or ICE, three US subcontractors at private detention facilities; six Mexican immigration officials; and two Mexican municipal government officials.

5.  Throughout 2018, Amnesty International conducted extensive follow-up research to corroborate first-hand accounts of asylum-seekers, through review of court documentation, legal filings and other official records, wherever possible, as well as follow-up correspondence and interviews with government officials, lawyers, and NGOs.

6.  The Report was published in October 2018. Drafting the Report and similar reports is a regular practice of Amnesty International.

7.  The Report is kept in the regular course of Amnesty International's business on its website. It is available at:
https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF.

8.  Pursuant to Fed. R. Evid. 902(11), I certify that Exhibit A is an original or copy of the Report.

09.24.19

Brian Griffey
Regional Researcher/Advisor (North America)
Amnesty International



# USA: 'YOU DON'T HAVE ANY RIGHTS HERE'

ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT
OF ASYLUM-SEEKERS IN THE UNITED STATES



Amnesty International is a global movement of more than 7 million people who campaign for a world where human rights are enjoyed by all.

Our vision is for every person to enjoy all the rights enshrined in the Universal Declaration of Human Rights and other international human rights standards.

We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and public donations.

© Amnesty International 2018
Except where otherwise noted, content in this document is licensed under a Creative Commons (attribution, non-commercial, no derivatives, international 4.0) licence.https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode

For more information please visit the permissions page on our website: www.amnesty.org Where material is attributed to a copyright owner other than Amnesty International this material is not subject to the Creative Commons licence.

First published in 2018 by Amnesty International Ltd.
Peter Benenson House, 1 Easton Street. London WC1X 0DW, UK

Index: AMR 51/9101/2018
Original language: English

**amnesty.org**



*Cover photo:*
*On 29 April 2018, at end of a month long journey north from Central America, a young boy looks from Playas de Tijuana through the border barrier between Mexico and the United States. The group of asylum seekers whom he traveled with is met by a solidarity march of people on the US side of the barrier.*
*© Amnesty International / Sergio Ortiz Borbolla*

# CONTENTS

**1. EXECUTIVE SUMMARY**      **4**

ILLEGAL PUSHBACKS      **5**

FAMILY SEPARATIONS      **6**

ARBITRARY AND INDEFINITE DETENTION      **7**

METHODOLOGY      **8**

KEY RECOMMENDATIONS      **9**

**2. ILLEGAL PUSHBACKS OF ASYLUM-SEEKERS AT THE US–MEXICO BORDER**      **11**

2.1 PUSHBACKS VIOLATE US AND INTERNATIONAL LAW      **12**

2.2 STATISTICS SHOW PUSHBACKS ARE UNNECESSARY      **14**

2.3 'WE CALL IT THE REOLVING DOOR': PUSHBACKS AT THE US-MEXICO BORDER      **15**

2.4 'ORDERS FROM WASHINGTON': ILLEGAL PUSHBACKS BECOME POLICY      **17**

    2.4.1 CALIFORNIA - MEXICO BORDER      **18**

    2.4.2 ARIZONA - MEXICO BORDER      **20**

    2.4.3 TEXAS - MEXICO BORDER      **21**

2.5 'IT SEEMS LIKE EVERYBODY WANTS TO KILL US': PUSHED INTO HARM'S WAY      **23**

2.6 EXTERNALIZATION: MEXICO NOT A 'SAFE COUNTRY' FOR ALL ASYLUM SEEKERS      **24**

**3. POLICY AND PRACTICE OF FAMILY SEPARATIONS CONSTITUTE TORTURE**      **27**

3.1 'A TOUGH DETERRENT': FAMILY SEPARATIONS INTENDED
TO PUNISH AND DETER ASYLUM CLAIMS      **28**

3.2 'I AM CRYING A LOT': SEVERE PAIN AND SUFFERING FROM FAMILY SEPARATIONS      **33**

3.3 'I DIED AT THE MOMENT': ACCOUNTS OF EXTREME ANGUISH
OF FAMILY SEPARATIONS      **36**

3.4 US AUTHORITIES SEPARATED MORE FAMILIES THAN PREVIOUSLY DISCLOSED      **42**

3.5 INEFFECTIVE REMEDIES: FAMILY DETENTION IS NO SOLUTION      **45**

**4. ARBITRARY AND INDEFINITE DETENTIONS OF ASYLUM SEEKERS**                48

4.1 'IT'S JUST ARBITRARY': BLANKET DENIALS OF PAROLE REQUESTS BY ICE         51

4.2 NONE OF US HAVE BEEN GIVEN PAROLE': ACCOUNTS
OF TRANSGENDER ASYLUM SEEKERS                                               53

    4.2.1 THE 'TRANS POD' AT CIBOLA COUNTY CORRECTIONAL CENTER      54

4.3 'THEY DON'T RESPECT BLACK PEOPLE HERE': ACCOUNTS
OF AFRICAN ASYLUM SEEKERS                                                   61

4.4 ALTERNATIVES TO DETENTION                                               66


**5. CONCLUSION**                                                           67

RECOMMENDATIONS                                                             67

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

2

# GLOSSARY

| TERM | DESCRIPTION |
|---|---|
| ASYLUM-SEEKER | An asylum-seeker is someone who has left their country seeking protection but has yet to be recognized as a refugee. During the time that their asylum claim is being examined, the asylum-seeker must not be forced to return to their country of origin. Under international law, being a refugee is a fact-based status, and arises before the official, legal granting of asylum. |
| CBP | Customs and Border Protection (CBP) is a law enforcement agency of the US Department of Homeland Security (DHS), operating in the border area and ports-of-entry of the United States. The US Border Patrol is part of CBP. |
| DHS | US Department of Homeland Security. |
| FAMILIY UNIT | Under DHS policies, the term "family unit" typically means "families." However, CBP in some cases uses the term "family unit" to mean "family members." Specific intended usage depends on context. |
| FISCAL YEAR | The US government classifies some official information by the Fiscal Year (FY), which runs from October 1 to September 30 of each year. |
| ICE | Immigrations and Customs Enforcement (ICE) is an agency of DHS, charged with carrying out detentions and deportations of asylum seekers and migrants. |
| INM | The Mexican government's National Institute of Migration (Instituto Nacional de Migración, or INM). |
| IRREGULAR ENTRY | Crossing into a country without a migration status that complies with requirements of domestic immigration legislation and rules. The term "irregular" refers only to a person's entry or stay. |
| MARA | Colloquial name commonly given to organized criminal groups from the Northern Triangle that are characterized by violent activities and generally associated with territorial control. |
| NORTHERN TRIANGLE | The region of Central America including El Salvador, Guatemala, and Honduras. |
| PORT-OF-ENTRY | Ports-of-entry are official customs border entry points into the United States, where travellers show their identification and travel documents and request entry. |
| PUSHBACKS | Pushbacks happen when people are forced back to the country they are trying to leave after crossing or seeking to cross a border, without an opportunity to request asylum or otherwise challenge their forced return. |
| REFOULEMENT | Forcible return of an individual to a country where they would be at risk of serious human rights violations (the terms "persecution" and "serious harm" are alternatively used). It is prohibited by international law to return refugees and asylum-seekers to the country they fled – this is known as the principle of *non-refoulement*. Indirect *refoulement* occurs when one country forcibly sends someone to another country that subsequently sends them to a third country where they risk serious harm; this is also prohibited under international law. |
| REFUGEE | Refugees are individuals who fled from their countries-of-origin due to a well-founded fear of persecution, from which their governments cannot or will not protect them. Asylum procedures are designed to determine whether someone meets the legal definition of a refugee. When a country recognizes an asylum-seeker as a refugee, it gives them international protection as a substitute for the protection of their home country. |
| USCIS | The US Citizenship and Immigration Services (USCIS) is an agency of DHS, charged with processing immigrant visa petitions, naturalization petitions, asylum applications, and refugee applications. |

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

3

# 1. EXECUTIVE SUMMARY

In 2017 and 2018, President Trump's administration has implemented immigration policies that have caused catastrophic irreparable harm to thousands of people, have spurned and manifestly violated both US and international law, and appeared to be aimed at the full dismantling of the US asylum system.

Those policies and practices have included, among others: (1) mass illegal pushbacks of asylum-seekers at the US–Mexico border; (2) thousands of illegal family separations, through which the Trump administration has deliberately and purposefully inflicted extreme suffering on families, ill-treatment which rose to the level of torture in some cases; and (3) increasingly arbitrary and indefinite detention of asylum-seekers, without parole, constituting cruel, inhuman or degrading treatment or punishment (ill-treatment) which is absolutely prohibited in international law.

Based on public statements by US government officials, those policies and practices were indisputably intended to deter asylum-seekers from requesting protection in the United States, as well as to punish and compel those who did seek protection to give up their asylum claims.

> *"They told me, 'you don't have any rights here, and you don't have any rights to stay with your son.' …For me I died at that moment. They ripped my heart out of me. …For me, it would have been better if I had dropped dead. For me, the world ended at that point. …How can a mother not have the right to be with her son?"*
>
> Valquiria, a 39-year-old Brazilian asylum-seeker, detained since March 2018, when US authorities forcibly separated her from her 6-year-old son, after they requested asylum at a port-of-entry in El Paso, Texas.

These are not isolated aberrations. The US Department of Homeland Security (DHS) has implemented these interrelated policies in unison: closing the borders to asylum-seekers, and pushing them back into harm's way; and making life so intolerable in immigration detention facilities, that asylum-seekers would think twice before requesting protection in the United States.

Fuelling these policies of cruelty with discriminatory and demonizing rhetoric, President Trump and his cabinet members have routinely called asylum-seekers "criminals," and denounced international standards on refugee protection as legal "loopholes" and "magic words" that the administration has professed its intention to abolish.

The Trump administration is waging a deliberate campaign of human rights violations against asylum-seekers, in order to broadcast globally that the United States no longer welcomes refugees. Simultaneously, the Trump administration is seeking to dismantle the US asylum system, including by narrowing definitions of who qualifies for protection – in violation of international law.

Setting a dangerous precedent, the US government's abrogation of its obligations under human rights and refugee law is undermining the international framework for refugee protection, grossly violating the right to seek asylum, and is inviting a race to the bottom by other countries.

# ILLEGAL PUSHBACKS

In 2017 and 2018, despite historic lows in the number of people seeking to enter the US without legal status, including asylum-seekers, the DHS border agency Customs and Border Protection (CBP) has implemented an illegal de facto policy of pushbacks of asylum-seekers along the entire US–Mexico border at official US border crossings (called "ports-of-entry"). Pushbacks of asylum-seekers are both illegal under US law and violate US obligations under international refugee law.

By turning away asylum-seekers at US ports-of-entry, the United States has grossly violated their right to seek asylum from persecution, and manufactured an emergency along the US–Mexico border. US authorities have forced thousands of asylum-seekers to queue on the Mexican side of the border – exposing them to risks of detention and deportation by Mexican immigration officials, and exploitation by criminal gangs. CBP personnel have also regularly turned away Mexican nationals seeking asylum in the United States, including unaccompanied minors.

Those mass pushbacks of asylum-seekers by CBP are plainly unlawful, and violate one of the most fundamental principles of international refugee law: the prohibition on *refoulement* (forcing people to a place where they might be at risk of serious human rights violations). This principle is incorporated into US law, which requires border and immigration authorities to receive and refer asylum-seekers for an interview with an asylum officer, in order to conduct individual assessments of any risks of persecution or torture that they may face upon return.

Two senior Mexican immigration officials independently informed Amnesty International that US authorities encouraged Mexico to detain and check the legal status of asylum-seekers whom CBP was forcing to wait in Mexico, with a potential view to deporting them to their countries-of-origin. Any such deportations would constitute indirect *refoulement* in violation of both US and Mexican authorities' legal obligations.

Amnesty International documented in two 2017 reports that the asylum-seekers arriving at the US–Mexico border are often in need of protection from persecution including targeted violence in their home countries, after perilous journeys to the southern US border. Many have fled from the Northern Triangle region of Central America (El Salvador, Guatemala and Honduras), where Amnesty International has documented human rights violations often waged against civilians by or with the acquiescence of their own governments.

The Trump administration has leveraged vague claims of "capacity" constraints, as an escape hatch to violate its legal obligations to receive and process asylum-seekers' requests for protection. There appears to be no official written or other record of interactions between CBP officers and asylum-seekers when CBP denies them the opportunity to claim asylum at US ports-of-entry. Yet CBP's actions have been public, consistent and synchronized at widely dispersed ports-of-entry, despite variations in the numbers of asylum-seekers requesting protection at each crossing.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

5

In parallel to its systematic campaign of illegal pushbacks along the US–Mexico border, the US government has sought to negotiate a "safe third country agreement" with Mexico. Under such an agreement, the United States would recognize Mexico as a safe destination country for all asylum-seekers, and stop accepting asylum claims at the US–Mexico border, except from those fearing persecution in Mexico itself.

Under both US and international law, however, the United States cannot legally adopt a "safe third country agreement" with Mexico, since it is not a uniformly safe country for all asylum-seekers. Amnesty International has documented Mexican immigration officials routinely deporting asylum-seekers to potential persecution in their countries-of-origin, in violation of Mexican and international law. Under US law, DHS authorities therefore must continue to receive and provide individualized and fair assessments of all requests for protection by asylum-seekers at US borders and on US territory.

# FAMILY SEPARATIONS

In November 2017 in California, DHS officials tore apart four Central American families at once in the same room: "You don't have any rights here," a DHS officer told an asylum-seeking father from El Salvador, when he protested the handcuffing of his 12-year-old son. In March 2018 in Texas, a DHS officer said the same phrase to an asylum-seeking mother from Brazil, while separating her from her son: "You don't have any rights here. And you don't have any rights to stay with your son." Both of those families had documents proving their family relationships, and presented themselves at official US ports-of-entry when requesting asylum from persecution in their countries-of-origin.

At first tested discretely in 2017, and then launched publicly in 2018, President Trump's administration implemented a policy of forcibly separating thousands of asylum-seeking families, in order to deter and punish those crossing irregularly into the United States. Under its so-called "zero-tolerance" policy, the US government claimed that family separations were a necessary result of criminally prosecuting all asylum-seekers and others who crossed the US–Mexico border irregularly (i.e. between official ports-of-entry). In reality, US authorities also separated many asylum-seekers who were not referred for criminal prosecution – including those who sought protection at official border crossings – yet has continued to deny and conceal the practice.

The US government has still not publicly disclosed the total number of families it forcibly separated in 2017 and 2018. In September 2018, however, CBP provided statistics to Amnesty International suggesting that the Trump administration separated approximately 8,000 "family units" – more than US authorities had previously admitted to separating. Those statistics still seemed to omit hundreds – if not thousands – of families separated at official ports-of-entry, or with non-parental relationships (including grandparents, among others).

In 2018, Amnesty International interviewed 15 asylum-seekers whom DHS agencies separated from their children, both prior to and following the introduction of the so-called "zero-tolerance" policy. Most of these families were separated without being informed of why, and despite having documentary evidence of their family relationships. In 13 of the 15 cases, DHS separated the families after they requested protection at official US ports-of-entry. When they spoke with Amnesty International, some of the separated parents and guardians were suffering from such extreme mental anguish that they wept uncontrollably as they recounted their experiences, sometimes only seconds or minutes into interviews.

Amnesty International researchers witnessed the extreme mental anguish those family separations caused, as well as instances of family separation being leveraged to compel a family to abandon their

asylum claim. In some of the cases documented by Amnesty International, the harmful practice of family separations satisfied the definitions of torture under US and international law.

"I believe that because of all of this I'm going through – the fear of going back to Brazil, the fear of being separated from my grandchild, all of this together, I can't stop thinking about it – that it's making me really sick," said Maria (55), who was separated from her grandson with disabilities, Matheus (17), after they requested asylum in New Mexico in August 2017. "I might need to go look for a psychologist. I don't remember things, and can't sleep …I start to talk about something and forget what I was saying. I am crying a lot also because I am still separated from Matheus."

Family separations violate multiple fundamental human rights at once, including the right to family unity, the right to liberty, and the right to freedom from torture and other ill-treatment. Both the prosecution of asylum-seekers for irregular entry, and the forcible separation of their families, also violated US obligations under international refugee law. Children's rights are also violated in multiple ways through family separations, including by exposing them to extreme and unnecessary trauma after being separated. In the cases documented by Amnesty International, it was clear that authorities did not consider children's best interests when separating them from their families.

# ARBITRARY AND INDEFINITE DETENTION

In 2017 and 2018, the US government has implemented an official policy of mandatory and indefinite detention of asylum-seekers, without parole, for the duration of their asylum claims.

The policy and practice of indefinitely detaining asylum-seekers, based solely on their migration status, constitute arbitrary detention in violation of US and international law. Indefinite detention without criminal charge is in violation of the UN Convention Against Torture, which the United States ratified and integrated into US law.

> *"I applied for parole, with all the documentation requested, but the request was denied. …I was not told the reason they denied my parole, just that it was denied. None of us have been given parole."*
>
> Alejandra, a 43-year-old transgender rights activist from El Salvador, detained by ICE since December 2017 at the Cibola County Correctional Center in New Mexico. ICE denied her parole three times in 2018, without justification.

Intended to deter and punish those who seek protection at the US–Mexico border, the US government expanded the use of indefinite detention of asylum-seekers both through blanket denials of parole requests by asylum-seekers in some regions, which a US federal court in July 2018 found likely to be arbitrary and illegal; and through its family separations policy, by which it detained parents individually without their children.

The US government has also sought legal authority to indefinitely detain unaccompanied children and families with children, despite it being unlawful in the United States and contrary to international standards.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

7

US authorities have leveraged the agony of prolonged detention in order to compel asylum-seekers to "voluntarily" give up their asylum claims, and accept deportation back to their countries-of-origin where they had fled persecution. That anguish of indefinite detention has often been amplified by family separations and inadequate conditions of detention, including routinely substandard health care that has contributed in some cases to asylum-seekers' deaths in immigration detention facilities.

In three of the four US states bordering Mexico, Amnesty International interviewed asylum-seekers being detained indefinitely after requesting protection, including separated family members, older people, and persons with acute health conditions and medical needs.

Amnesty International also documented the impact of arbitrary immigration detention on 15 transgender and gay asylum-seekers, who were detained for periods ranging from several months to over 2.5 years without parole. In some cases those individuals were denied parole despite acute health conditions and needs for specialized care, or following sexual assaults while in detention. Compounded by past trauma, substandard health care, and reportedly inadequate physical conditions, food and water, as well as discrimination based on sexual orientation, gender identity and/or ethnicity, Amnesty International found some of those asylum-seekers' experiences of indefinite detention had constituted ill-treatment.

# METHODOLOGY

In 2017 and 2018, Amnesty International conducted extensive baseline research on the situation of asylum-seekers in the United States and on the US–Mexico border, including through the review of legal files, review of national and international legal standards, and consultations with relevant civil society groups.

In January, April and May 2018, Amnesty International researchers conducted research missions along the entire US–Mexico border, from the Pacific Ocean to the Gulf of Mexico. The research teams documented not only the situations of asylum-seekers who sought to request protection at US ports-of-entry, but also the conduct of US border and immigration authorities in facilitating and processing their asylum claims under US law and international law and standards.

Amnesty International researchers interviewed a total of 52 asylum-seekers along the US–Mexico border, including in all four US border states (California, Arizona, New Mexico, and Texas) and three Mexican border states (Baja California, Sonora, and Chihuahua). Among those 52 asylum-seekers were 27 men and 25 women, including 15 transgender women. Amnesty International interviewed 28 asylum-seekers inside ICE immigration detention facilities (in California, New Mexico, and Texas); 14 asylum-seekers in Mexico, including 12 who were turned away and two who were removed by the United States to Mexico; three asylum-seekers who were on parole at the time of the interview; and seven refugees who had been granted asylum.

Amnesty International also interviewed 51 immigration lawyers, activists and other representatives of nongovernmental organizations (NGOs); as well as 23 government and other officials. Among those officials were 12 representatives of CBP or ICE, three US subcontractors at private detention facilities; six Mexican immigration officials; and two Mexican municipal government officials.

Throughout 2018, Amnesty International conducted extensive follow-up research to corroborate first-hand accounts of asylum-seekers, through review of court documentation, legal filings and other official records, wherever possible, as well as follow-up correspondence and interviews with government officials, lawyers, and NGOs.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

8

# KEY RECOMMENDATIONS

**TO THE US CONGRESS:**

- Exercise greater oversight of DHS agencies to: halt the illegal pushbacks of asylum-seekers at US ports-of-entry; curtail any executive overreach, especially this administration's attempts to separate and/or indefinitely detain asylum-seeking families and children; and end the arbitrary and indefinite detention of asylum-seekers, in violation of international law.

- Increase funding for immigration judges, and USCIS asylum and refugee officers.

- Pass legislation banning the separation and/or detention of families with children.

- Support and fund community-based alternatives to detention, such as the previous Family Case Management Program.

- Decriminalize irregular entry into the United States, in line with international standards, and ensure that administrative sanctions applied to irregular entry are proportionate and reasonable.

- Ratify the UN Convention on the Rights of the Child, which the United States signed in 1995 and is the only country in the world not to adopt.

**TO THE US DEPARTMENT OF HOMELAND SECURITY:**

### ILLEGAL PUSHBACKS

- Immediately stop turning away asylum-seekers at the US–Mexico border, both at and between official ports-of-entry.

- Discontinue all plans and actions that would require asylum-seekers at the US–Mexico border to wait in Mexico during pendency of their asylum claims.

### FAMILY SEPARATIONS AND DETENTION

- End detention of children, whether accompanied or unaccompanied, separated or held together with their family, as it is never in their best interest.

- Reunify, unconditionally, as quickly as possible and sparing no costs, any and all children who remain separated from their parents or guardians.

- Halt family separations in all circumstances, except following a rigorous determination of best interests of the child, which must be articulated to family members and recorded in the case files of those affected.

- Strengthen mechanisms and procedures to ensure that the separation of children of asylum-seekers and migrants occurs only when it is in their best interest, including improved safeguards for the determination of those best interests.

### DETENTION OF ASYLUM-SEEKERS

- Ensure that liberty is the default position, and that the detention of asylum-seekers and other people is exceptional and only resorted to when it is determined to be necessary and proportionate to a legitimate purpose, based on an assessment of the individual's particular circumstances.

- Resume and expand alternative-to-detention programs for all asylum-seekers, and particularly asylum-seeking families, including the Family Case Management Program.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

9

**TO THE US DEPARTMENT OF JUSTICE:**

- In line with US obligations under the international human rights treaties to which it is party: prohibit the practice of family separations; initiate a criminal investigation into the practice, and the harm it has caused to those subjected to it; hold accountable all those who authorized the practice; and grant compensation and other reparations to families who were separated, in order to ensure their rehabilitation, with specific attention to the needs of children.

- Abandon efforts to recognize Mexico as a safe country for all asylum-seekers, in violation of US and international law.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

10

© Amnesty International

# 2. ILLEGAL PUSHBACKS OF ASYLUM-SEEKERS AT THE US–MEXICO BORDER

In 2017 and 2018, the US government intensified a systematic and dangerous de facto policy of illegal pushbacks against asylum-seekers, in order to prevent them from requesting protection at official US ports-of-entry.

US officials call this *de facto* policy the "metering" of asylum claims. On 15 May 2018, DHS Secretary Kirstjen Nielsen confirmed in a television interview that the practice of turning away asylum-seekers from US borders is now effectively a policy, denouncing its legal obligation to receive and protect asylum-seekers at US borders as a legal "loophole":

> *"We are 'metering', which means that if we don't have the resources to let them [asylum-seekers] in on a particular day, they are going to have to come back. They will have to wait their turn and we will process them as we can, but that's the way that the law works. Once they come into the United States, we process them. We have asked Congress to fix this loophole. It's a huge gaping loophole that we need to fix because it is so abused."[1]*

CBP's turning-away of asylum-seekers has been despite public statements[2] from the US government that its official policy remained to receive all asylum claims presented at US ports-of-entry.

The US Congress has acknowledged the illegality of the Trump administration's ongoing pushbacks of asylum-seekers at the border. While proposing over $58 billion in federal funding for DHS agencies, the House Appropriations Committee in July 2018 called on DHS to "ensure that the United States is meeting its legal obligations, to include reminding field officers and agents about CBP's legal responsibilities to ensure that asylum-seekers can enter at POEs [ports-of-entry]."[3]

**The United States is prohibited from returning or turning away people to territories where their life or freedom would be threatened, whether directly or indirectly.**

---

1. DHS Secretary interview on Fox News (15 May 2018): http://www.foxnews.com/transcript/2018/05/15/giuliani-mueller-cant-indict-or-subpoena-president.html.
2. Statement on Twitter of DHS Secretary (17 June 2017): https://twitter.com/SecNielsen/status/1008467318744240128. See also, speech of Attorney-General Sessions (18 June 2018): https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-national-sheriffs-association-annual.
3. House of Representatives Committee on Appropriations, Report on DHS Bill 2019 (24 July 2018), at pp. 4 and 26. Available at: https://docs.house.gov/meetings/AP/AP00/20180725/108623/HMKP-115-AP00-20180725-SD004.pdf.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

11

© Amnesty International

# 2.1 PUSHBACKS VIOLATE US AND INTERNATIONAL LAW

Pushing asylum-seekers back to the countries they are trying to leave is both illegal under US law[4] and unlawful under international law. US law and international law provide for asylum-seekers to request protection either at official US ports-of-entry, or after they cross irregularly into the United States.[5]

The turning away of asylum-seekers violates the principle of *non-refoulement*, which is binding on all countries in the world under customary international law, and is integrated into US legislation. The principle of *non-refoulement* prohibits states from returning or turning away people to territories where their "life or freedom" would be threatened.[6] This is the cornerstone of all international law on refugees, and no state may violate this obligation under any circumstances.

In an authoritative advisory opinion on state obligations under refugee law,[7] the UN Refugee Agency (UNHCR) held that the principle of *non-refoulement* is violated in situations of non-admission at the border, and applies to returns not only to countries-of-origin, but also to "any other place" where a person has reason to fear for their life.[8] Most importantly, it holds that "States will be required to grant individuals seeking international protection access to the territory and to fair and efficient asylum procedures."[9]

The UN Convention Against Torture (CAT), which the United States has also ratified and incorporated into US law, similarly forbids *refoulement*.[10] In an elaboration of *non-refoulement* obligations under CAT, the UN Committee Against Torture stressed that:

> *"States parties should not adopt dissuasive measures or policies, such as detention in poor conditions for indefinite periods, refusing to process claims for asylum or unduly prolong them, […] which would compel persons in need of protection under Article 3 of the Convention to return to their country-of-origin in spite of their personal risk of being subjected there to torture and other cruel, inhuman or degrading treatment or punishment."[11]*

In conformity with those obligations, US law prohibits border authorities from pushing back asylum-seekers across any land border, and requires authorities to refer asylum-seekers to an asylum officer for an interview, in order to conduct individual assessments of any risks of persecution or torture that they may face upon return.[12]

---

4.  See 8 U.S.C. §1158–Asylum: https://www.law.cornell.edu/uscode/text/8/1158.
5.  See above at n. 4. See also, UN Convention Relating to the Status of Refugees (1951), 189 UNTS 137, available at http://www.unhcr.org/3b66c2aa10. Although the United States never ratified the 1951 Convention itself, it acceded to the 1967 Protocol, by which it became bound by Articles 2 to 34 of the 1951 Convention. Protocol relating to the Status of Refugees (1967), 606 UNTS 267.
6.  Article 33 of the 1951 Convention (ibid.) codifies the principle of non-refoulement by prohibiting returning an asylum-seeker "in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."
7.  The legal status of Advisory Opinions of the UNHCR is explained in the Statute of the Office of the UNHCR: http://www.unhcr.org/4d944e589.pdf. These are generally seen as guidance for compliance with the 1951 Convention.
8.  UNHCR, Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol, at para. 7: https://www.unhcr.org/4d9486929.pdf.
9.  Ibid., at para. 8.
10.   Article 3 of the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1984), G.A. Res. 39/46: "No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."
11.   UN Committee Against Torture, "General Comment No. 4 (2017) on the implementation of Article 3 of the Convention in the context of Article 22" (9 February 2018): "States parties should not adopt dissuasive measures or policies, such as detention in poor conditions for indefinite periods, refusing to process claims for asylum or unduly prolong them, or cutting funds for assistance programs to asylum-seekers, which would compel persons in need of protection under Article 3 of the Convention to return to their country-of-origin in spite of their personal risk of being subjected there to torture and other cruel, inhuman or degrading treatment or punishment." Available at: http://www.ohchr.org/Documents/HRBodies/CAT/CAT-C-GC-4_EN.pdf.
12.   See above at n. 4. See also, 8 U.S.C. §1225(a)(2) – Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing: https://www.law.cornell.edu/uscode/text/8/1225.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

12

# *The principle of non-refoulement is binding on all countries in the world under customary international law, and is integrated into US legislation.*



The US government is keenly aware of its obligations under US and international law to immediately receive any asylum-seekers who present themselves at its land borders and request international protection from persecution or other serious harm.[13] Through constant appeals to the US Congress, bemoaning asylum claims as so-called "loopholes" and "magic words," the Trump administration has implored lawmakers to relieve it of its obligations to protect asylum-seekers and refugees.[14] By doing so, the administration has plainly acknowledged that it is indeed bound by US asylum law, which regulates the relevant conduct of US border officials.


*One of several billboards erected by Amnesty International along the US–Mexico border. This mobile billboard is pictured approaching the Ciudad Juarez side of the Paso del Norte International Bridge to El Paso, Texas. (Amnesty International, May 2018).*

As part of its efforts to dismantle the US asylum system, the current US government has sought to codify refoulement through agency rulemaking, in a fashion that would violate both US and international law. In particular, the US Department of Justice was reported in the media as seeking to deny the right to seek asylum to all people (1) who cross irregularly into the United States before requesting asylum; (2) who travel through more than one country to reach the United States; or (3) who spend more than two weeks in any other country en route to the United States.[15] According to media reports, those proposed changes would exclude from the US asylum system even refugees who travel through countries that are unsafe for them or lack functioning systems to provide asylum or other effective protection. The Trump administration has also reportedly considered halting entirely the processing of asylum claims at ports-of-entry, and instead requiring asylum-seekers to request protection from abroad, including in the countries where their lives are at risk.[16]

Implementing those proposed changes through policies or regulations would violate US obligations under international law, and could exceed the authority of the Attorney General and the DHS Secretary under the Immigration and Nationality Act.[17] Yet even absent that regulatory wish list, the US government's increasingly frequent practice of turning away asylum-seekers at the US–Mexico border, whether directly or indirectly to potential harm, already plainly violates US obligations under both US immigration law and international refugee law.[18]

---

13.    See above at n. 4.
14.    Attorney General Jeff Sessions, Remarks to the Executive Office for Immigration Review (12 October 2017): "We also have dirty immigration lawyers who are encouraging their otherwise unlawfully present clients to make false claims of asylum providing them with the magic words needed to trigger the credible fear process." Available at: https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review.
15.    Vox, "Exclusive: Trump administration plan would bar people who enter illegally from getting asylum" (29 June 2018): https://www.vox.com/policy-and-politics/2018/6/29/17514590/asylum-illegal-central-american-immigration-trump.
16.    New York Times, "Trump Administration Considers Unprecedented Curbs on Asylum for Migrants" (18 July 2018): https://www.nytimes.com/2018/07/18/us/immigration-asylum-children.html.
17.    See above at n. 4.
18.    See above at n. 5.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

13

The practice of illegal pushbacks of asylum-seekers by CBP is now the subject of two major lawsuits against the Trump administration, filed by nongovernmental organizations (NGOs) and 17 US state governments, respectively.[19]

# 2.2 STATISTICS SHOW PUSHBACKS ARE UNNECESSARY

As of August 2018, DHS boasted that its border agency CBP employs more than 60,000 personnel in the United States.[20] DHS also commands one of the largest immigration detention systems in the world, with 211 places of detention[21] and the capacity to incarcerate approximately 40,000 people per day.[22]

To justify CBP's increasingly frequent illegal pushbacks of asylum-seekers, the US government has claimed that the daily number of asylum claims at US land border crossings is higher than ever before, and that the United States does not have the "capacity" with its current staff and detention infrastructure to fulfill its obligations under US and international refugee law.

DHS officials have repeatedly declined to provide Amnesty International with the actual numbers of asylum-seekers requesting protection at the US–Mexico border.[23] Based on available statistics, however, the supposedly unmanageable number of asylum claims appears to be a fiction. Regardless of the actual number, CBP is required under international law to consider the claims of all asylum-seekers, without discrimination.[24]

The Trump administration has presented a negative and false narrative of overwhelming numbers of asylum-seekers, in order to justify its illegal pushbacks and other efforts to undermine refugee protections. President Donald Trump himself has pushed this narrative through demonizing and discriminatory rhetoric, decrying asylum-seekers as dangerous "criminals"[25] and "animals,"[26] who are seeking to "infest"[27] and "invade"[28] the United States.

19.   WA v. Trump, States' Motion for Expedited Discovery, (13 July 2018): https://ag.ny.gov/sites/default/files/child_declarations.pdf; and news release on the approval of that motion: https://www.atg.wa.gov/news/news-releases/federal-judge-grants-ag-ferguson-s-request-expedite-family-separations-suit. See also, Al Otro Lado v. Duke, No. 2:17-cv-05111-JFW (JPRx) (C.D. Cal. filed July 12, 2017): https://www.americanimmigrationcouncil.org/litigation/challenging-customs-and-border-protections-unlawful-practice-turning-away-asylum-seekers.
20.   DHS statement, "The Life Saving Missions of CBP" (20 August 2018): https://content/govdelivery.com/accounts/USDHS/bulletins/2074f23.
21.   DHS Office of Inspector General, "ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements" (18 June 2018): https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.
22.   DHS, ICE Budget Overview FY2019: https://www.dhs.gov/sites/default/files/publications/ICE%20FY19%20CJ.pdf.
23.   Since January 2018, Amnesty International has repeatedly requested official statistics from DHS agencies on the monthly number of asylum-seekers who sought protection at the US–Mexico border, whether at official crossings or after crossing irregularly. Notably, those figures would not include those asylum-seekers whom CBP is summarily turning away at the US border after refusing to receive their claims, which CBP does not record. Yet it would nonetheless offer a snapshot of the supposed "capacity" of US authorities to receive asylum-seekers, beyond which it is apparently turning away hundreds or thousands of others. In January 2018, CBP's Field Office Director for the San Diego Sector declined to produce these statistics for his area of responsibility. The Executive Director of CBP's Office of Intergovernmental Public Liaison told Amnesty International for three months starting in February 2018 that he was working with field offices to obtain this requested data, before declining in May 2018 to provide the information without a Freedom of Information Act (FOIA) request. Amnesty International submitted a one-page FOIA request for the same information to DHS in June 2018, with a request for expedited processing due to the urgent humanitarian situation of those being pushed back along the US–Mexico border. The request for expedited processing was denied, and DHS informed Amnesty International that it would invoke an exception to further postpone its response time beyond what is typically required by agency policies. As of September 2018, DHS has still not provided any of the requested official statistics.
24.   UNHCR, "Protection of Asylum-Seekers in Situations of Large-Scale Influx" No. 22 (XXXII) 1981: https://www.unhcr.org/uk/excom/exconc/3ae68c6e10/protection-asylum-seekers-situations-large-scale-influx.html.
25.   Statement on Twitter of President Trump (18 June 2018): "Children are being used by some of the worst criminals on earth as a means to enter our country. Has anyone been looking at the Crime taking place south of the border. It is historic, with some countries the most dangerous places in the world. Not going to happen in the U.S." Available at: https://twitter.com/realdonaldtrump/status/1008708576628625408?lang=en.
26.   President Trump made the remark on 16 May 2018: "You wouldn't believe how bad these people are. These aren't people, these are animals, and we're taking them out of the country at a level and at a rate that's never happened before." Video available at: https://www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.
27.   Statement on Twitter by President Trump (19 Jun 2018): "Democrats are the problem. They don't care about crime and want illegal immigrants, no matter how bad they may be, to pour into and infest our Country, like MS-13." Available at: https://twitter.com/realDonaldTrump/status/1009071403918864385.
28.   Statement on Twitter by President Trump (June 21): "We cannot allow all of these people to invade our Country." Available at: https://twitter.com/realdonaldtrump/status/1010900865602019329?lang=en.

In reality, so far in 2018 the actual rate of people without legal status attempting to enter the US from Mexico – including asylum-seekers – has stayed at about the same level as over the previous five years.[29] During those previous five years, US authorities regularly received asylum claims without the undue delays that CBP has systematically imposed at the border in 2018.

In 2017, the number of people apprehended by US Border Patrol after crossing the US–Mexico border irregularly – that is, between official ports-of-entry – was the lowest on record in 46 years.[30] In 2018, the rate of apprehensions at the border remained at historic lows. President Trump publicly acknowledged in April 2018 the 46-year low in rates of people seeking to enter the US irregularly, yet called those numbers "still unacceptable."[31]

In addition to those historically low national statistics, DHS officials have individually provided Amnesty International with information that likewise suggested CBP's decision to turn away asylum-seekers has not always been a consequence of real capacity constraints. At the San Ysidro Port-of-Entry (POE), which is the busiest land border in the Western Hemisphere[32] and the site of frequent illegal pushbacks, senior CBP and ICE officials informed Amnesty International that CBP has only actually reached its detention capacity a couple of times per year[33] and during "a very short period" in 2017.[34] Nonetheless, in 2017 and 2018, CBP personnel frequently turned away even small numbers of asylum-seekers at San Ysidro and other ports-of-entry, without transparent explanations of why.

# 2.3 'WE CALL IT THE REVOLVING DOOR': PUSHBACKS AT THE US–MEXICO BORDER

In 2017 and early 2018, Amnesty International received reports of CBP illegally turning away asylum-seekers all along the US–Mexico border. While some such reports were isolated instances of abuse of authority, CBP has increasingly shut its doors to asylum-seekers entirely, citing usually unspecified "capacity" constraints as preventing their processing of asylum claims on any given day. A shelter coordinator in Tijuana informed Amnesty International that CBP personnel at the San Ysidro POE had in 2017 turned away about 20 unaccompanied minors whom his shelter hosted, without allowing them to claim asylum at the US border. From January to April 2018, CBP turned back at least five more children who were seeking asylum at the San Ysidro POE.[35] The shelter coordinator said that most of those unaccompanied minors were Mexican nationals who had fled from targeted violence in Guerrero and Michoacán, which the United States recognizes to be two of Mexico's most violent states.[36]

Amnesty International spoke briefly with one of those Mexican children at the shelter in January 2018 – a 17-year-old girl from Michoacán, who had fled for her life after she said cartels killed several of her relatives. She confirmed that CBP had turned her away at the San Ysidro POE, and said that Mexican immigration officials then informed her that Mexican asylum-seekers were not being accepted at that time. The Mexican officials gave her a piece of paper with contacts for a local shelter, and told her to return and

29. FY2018, ending on 31 September 2018: https://www.cbp.gov/newsroom/stats/sw-border-migration.
30. US Border Patrol, "Southwest Border Sector Apprehensions: FY1960–FY2017": https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Southwest%20Border%20Sector%20Apps%20FY1960%20-%20FY2017.pdf.
31. Statement on Twitter by President Trump (5 April 2018): https://twitter.com/realdonaldtrump/status/981859214380462081.
32. US General Service Administration website for San Ysidro Land Port-of-Entry: https://www.gsa.gov/about-us/regions/welcome-to-the-pacific-rim-region-9/land-ports-of-entry/san-ysidro-land-port-of-entry.
33. Interview with ICE's Assistant Field Office Director at Otay Mesa Detention Center, 1 May 2018.
34. Interview with CBP Field Office Director in San Diego, 5 January 2018.
35. Interview in Tijuana, 1 May 2018.
36. US Department of State, Mexico Travel Advisory (22 August 2018): https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.

try again another time,[37] before transporting her to the shelter. The shelter coordinator informed Amnesty International that CBP only later processed the girl's asylum claim when she returned to the port-of-entry accompanied by a US immigration lawyer, who helped her exercise her right to seek asylum in the United States.

Three shelters in Tijuana independently informed Amnesty International that Mexican nationals were more frequently turned away by CBP than other nationalities when they presented themselves at the border to request asylum. "We call it the revolving door system," one shelter coordinator said. He noted that Mexican women with children were those most frequently turned away, and suggested that it might be due to their lack of knowledge of the asylum system, or to CBP not wanting to process families. Mexican immigration officials told that shelter coordinator in late 2017 that they had a list for Mexican asylum-seekers waiting to exit Mexico.[38]

According to a women's shelter in Tijuana, CBP turned away about 25 Mexican women who were seeking asylum at the San Ysidro POE on 27 April 2018.[39] The shelter staff told Amnesty International that CBP personnel at San Ysidro had similarly declined to receive any asylum-seekers at all on several Sundays in 2018.

In late December 2017, CBP turned away dozens of asylum-seekers at the San Ysidro POE, mostly from Africa and Mexico. When 25 to 30 of the African asylum-seekers began sleeping in line in a plaza ("El Chaparral") on the Mexican side of the border crossing, Mexican municipal police cleared the plaza and arrested those remaining asylum-seekers.[40] Some stayed in shelters as they waited to again request asylum in the United States, according to shelter coordinators who met with Amnesty International the following week.[41]

In a meeting with Amnesty International on 5 January 2018, the CBP Field Operations Director in charge of the San Ysidro crossing defended those pushbacks by citing capacity constraints: "So they weren't being allowed into the port-of-entry. We said, 'we're at capacity, so wait here.' It's because of our detention space limitation, we were at capacity."[42] He added that CBP was not involved in or aware of the rationale for the Mexican response of sweeping the plaza and detaining the asylum-seekers.

While CBP maintained that there were very rarely circumstances in which they exceeded their capacity to receive asylum-seekers, it was nonetheless CBP's most frequent justification for regularly reported illegal pushbacks at the border.

The CBP Field Operations Director in San Diego told Amnesty International that a process exists to investigate and sanction CBP officials if they deny asylum-seekers the opportunity to present their claims. However, the official did not consider CBP pushbacks due to alleged capacity constraints to constitute such an offense, and declined to share with Amnesty International how many (if any) CPB personnel were sanctioned for illegal pushbacks in 2017.[43]

37.  She showed the piece of paper to Amnesty International.
38.  Interview in Tijuana, 1 May 2018.
39.  Interview with shelter staff, 30 April 2018. The shelter staffer witnessed approximately 50 Mexican women leave her shelter on 27 April with the intention of seeking asylum at the San Ysidro Port-of-Entry. She informed us that, from her understanding, only 25 of these 50 women appeared to have successfully presented themselves at the POE and were processed for asylum by CBP. Half of the women who left the shelter that morning to present themselves came back unsuccessful that day.
40.  San Diego Union Tribune, "Asylum-seekers overwhelming US processing in San Diego ports" (26 December 2017): http://www.sandiegouniontribune.com/news/immigration/sd-me-asylum-backlog-20171226-story.html.
41.  One staffer recalled their shelter having hosted 21 African asylum-seekers after the release of those arrested by municipal police, including men from Eritrea, Cameroon, DRC, Gambia, Ghana, Kenya, Sierra Leone, and Togo.
42.  Interview with CBP Field Office Director at CBP Field Office, San Diego, 5 January 2018.
43.  Interview with CBP Field Office Director at CBP Field Office, San Diego, 5 January 2018: "Where we substantiate the fact that somebody was denied or turned around once they made a credible fear case, then we have internal actions that we take during the disciplinary process and review. So there is a process for it. [...] I wouldn't be able to tell you that statistic, and it's probably not something that we would release at this point as far as numbers. Those are internal numbers of what we're doing with staff. That's not something our officers should be doing, turning people away."

# 2.4 'ORDERS FROM WASHINGTON': ILLEGAL PUSHBACKS BECOME POLICY

Since April 2018, US authorities have more systematically conducted mass illegal pushbacks of asylum-seekers along the entire US–Mexico border. CBP has used slowdown tactics to force asylum-seekers to wait for days or weeks in Mexico before being allowed to seek protection at US ports-of-entry. While there are no official statistics on how many people CBP has illegally turned away without processing their asylum requests, Amnesty International has received numerous secondary reports from NGOs indicating that CBP has forced thousands of asylum-seekers to wait in Mexico – including families with children, mostly from Central America. As CBP increasingly turned away asylum-seekers at multiple ports-of-entry, queues formed on the Mexican side of those crossings – exposing asylum-seekers to extreme temperatures, threats of deportation, and potential exploitation or violence by criminal gangs and smugglers.

By seeking to prevent asylum-seekers from entering US ports-of-entry, the US government appeared to assert an incorrect legal theory that CBP could escape its obligation to receive asylum-seekers' requests for protection, by physically restraining them on or around the border of US territory.[44] Even at the outermost perimeter of US territory, the turning away of asylum-seekers is a clear violation of international law.[45]



44.   In a 27 June 2018 meeting with immigrant rights groups in El Paso, the Commissioner of CBP confirmed to attendees that its practice of pushbacks was being implemented border-wide, supposedly due to capacity constraints at its ports-of-entry. An attendee at the meeting told Amnesty International that the Commissioner elaborated upon the policy, noting that CBP was prescreening asylum-seekers and others without legal status to enter the United States, apparently with the aim of preventing them from reaching the US ports-of-entry where they could claim asylum. See, "BNHR and BIC meet with US CBP Commissioner on Border Crisis," available at: http://bnhr.org/bnhr-and-bic-meet-with-us-cbp-commissioner-on-border-crisis/; and KFOX14, "Local immigrant advocacy groups meet with CBP Commissioner regarding border situation" (26 June 2018): https://kfoxtv.com/news/local/local-immigrant-advocacy-groups-meet-with-cbp-commissioner-regarding-border-situation.
45.   See Section 2.1 above.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

17

## 2.4.1 CALIFORNIA–MEXICO BORDER

The arrival of a large group of asylum-seekers at the San Ysidro Port-of-Entry on 29 April 2018 was a watershed moment, following which the frequency and scale of CBP's illegal pushbacks of asylum-seekers surged all along the US–Mexico border. After a month-long northern journey through Mexico in April, about 200 Central Americans traveling together in "caravan" arrived in Tijuana, intending to request asylum in the United States at the San Ysidro POE. Most of those asylum-seekers were families from the Northern Triangle of Central America; half of them were children; and approximately 15 percent of them were transgender individuals.[46]

Similar groups of asylum-seekers from the Northern Triangle have in recent years traveled together to the US–Mexico border, as a way to provide safe passage for people who often face exploitation, abuse or other violence along their journeys through Mexico. In May and November 2017, respectively, two smaller caravans with a combined total of approximately 125 asylum-seekers were quickly and efficiently received by CBP at the San Ysidro POE, who were expecting the groups' arrivals.[47]

With the April 2018 caravan, however, the Trump administration signaled the start of its *de facto* policy of illegal pushbacks of asylum-seekers into Mexico. President Trump seized on the optics of this larger group of asylum-seekers, and heckled the caravan on Twitter for four weeks prior to its arrival in Tijuana.[48] He cited it also as his justification for deploying the National Guard to the US–Mexico border,[49] even though the group planned to present themselves formally at an official US port-of-entry. The week before the caravan's arrival in Tijuana, the DHS Secretary issued two statements calling the asylum-seekers criminals, and threatening to prosecute and/or detain them indefinitely during the adjudication of their asylum claims, until DHS could deport them to their countries-of-origin.[50]

Amnesty International sent a team of researchers to monitor CBP's reception of the caravan participants on 29 April 2018, when they planned to request asylum at the US border.[51] Despite repeated requests for meetings in advance of the caravan's arrival, CBP authorities at both the San Diego Field Office and the San Ysidro Port-of-Entry declined to meet with Amnesty International, or to provide any information on their capacity or preparation to receive the asylum-seekers. When Amnesty International researchers requested an impromptu meeting with the officer-in-charge of the San Ysidro POE immediately prior to the caravan's arrival on 29 April, CBP's assistant port director accused Amnesty International of trying to "sneak into" the port to obtain information, and directed the researchers to leave the port.

A few hours later, CBP closed its doors entirely to approximately 150 asylum-seekers from the caravan as they approached the port-of-entry. This mass pushback occurred just minutes after a press conference held by caravan participants announcing their intention to request asylum, following which they marched to present themselves at the San Ysidro POE. Immediately prior to the caravan's arrival, CBP emailed a public statement to media announcing the closing of its doors to asylum-seekers due to "capacity" constraints,

---

46.   See, Amnesty International, "Faces of the asylum-seeker caravan" (10 May 2018): https://www.amnesty.org/en/latest/news/2018/05/americas-faces-of-the-migrant-caravan/.
47.   Correspondence with caravan organizers in 2017 and 2018.
48.   For instance, statement on Twitter by President Trump (3 April 2018): "The big Caravan of People from Honduras, now coming across Mexico and heading to our 'Weak Laws' Border, had better be stopped before it gets there. […]" Available at: https://twitter.com/realdonaldtrump/status/981121409807155200.
49.   US Presidential Memorandum for the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, "Securing the Southern Border of the United States" (4 April 2018); available at: https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-defense-attorney-general-secretary-homeland-security/.
50.   DHS statement, "Secretary Nielsen Statement on Arrival of Central American 'Caravan'" (25 April 2018; available at: https://www.dhs.gov/news/2018/04/25/secretary-nielsen-statement-arrival-central-american-caravan); and DHS statement, "Secretary Kirstjen M. Nielsen Statement on Central American 'Caravan'" (23 April 2018; available at: https://www.dhs.gov/news/2018/04/23/secretary-kirstjen-m-nielsen-statement-central-american-caravan).
51.   Amnesty International media advisory, "Amnesty International monitors treatment of asylum-seekers at US–Mexico border (26 April 2018): https://www.amnestyusa.org/press-releases/americas-amnesty-international-monitors-treatment-of-asylum-seekers-at-us-mexico-border.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

18

which nonetheless directed the asylum-seekers to present themselves "lawfully" at the closed port-of-entry, or face prosecution.[52]

This CBP announcement was in stark contrast with DHS Secretary Nielsen's statement the week before, which claimed that DHS was deploying additional asylum officers and other personnel to swiftly adjudicate the claims of those very same people from the caravan who were seeking asylum.[53]

Based on Secretary Nielsen's own statement, and given that the administration had been tracking the progress of the caravan through Mexico for a month, DHS clearly had the capacity to direct its resources accordingly, in order to accommodate the arrival of the group and receive those asylum-seekers in need of international protection at the US border.

After CBP's disastrous reception of the caravan of asylum-seekers in April and May 2018, CBP officials continued to systematically turn away asylum-seekers at the San Ysidro Port-of-Entry, and failed to adopt any clear measures to increase reception of asylum-seekers and the processing of their claims as legally required. When it resumed accepting some asylum requests, CBP received a maximum of only 20 to 40 asylum-seekers per day in May and June 2018, and sometimes fewer, according to NGOs active at the California–Mexico border.

By systematically turning away asylum-seekers at the San Ysidro POE, CBP forced them to continue to queue in Tijuana, even though the city is neither safe for all asylum-seekers, nor recognized as such by US authorities. CBP and INM officials effectually outsourced the management of the queue to the asylum-seekers themselves, who managed written lists of all those waiting to claim asylum.

By 8 May, the list of those waiting to claim asylum at San Ysidro POE had grown to 350 people.[54] A month later on 10 June, that number had climbed as high as 1,200 asylum-seekers who were stuck in limbo, according to activists in Tijuana who were informally monitoring the situation.[55] On 5 July, the Los Angeles Times reported that the list of asylum-seekers waiting in Tijuana to be received by CBP had grown to nearly 2,000 people.[56]

As of 20 August 2018, a US immigration lawyer at the Tijuana–San Diego border reported that the wait list for asylum-seekers at El Chaparral was still over 1,000 people. Asylum-seekers who attempted to present themselves to CBP and were not on the wait list were routinely turned away – including unaccompanied minors and others with heightened vulnerability, who received no differentiation or priority.



↑ 👁
*A group of mostly families waiting to request asylum, after being turned away by US authorities at the San Ysidro Port-of-Entry on 29 April 2018. Most of the asylum-seekers were families from the Northern Triangle of Central America. (Amnesty International)*

52.   CBP statement, "Statement from Commissioner Kevin McAleenan on Operations at San Ysidro Port-of-Entry" (29 April 2018): https://www.cbp.gov/newsroom/speeches-and-statements/statement-commissioner-kevin-mcaleenan-operations-san-ysidro-port.
53.   DHS statement, "Secretary Kirstjen M. Nielsen Statement on Central American 'Caravan'" (23 April 2018): "DHS, in partnership with DOJ, is taking a number of steps to ensure that all cases and claims are adjudicated promptly – including sending additional USCIS asylum officers, ICE attorneys, DOJ Immigration Judges, and DOJ prosecutors to the Southern border." Available at: https://www.dhs.gov/news/2018/04/23/secretary-kirstjen-m-nielsen-statement-central-american-caravan.
54.   A caravan organizer informed Amnesty International by SMS from Tijuana on 8 May 2018.
55.   A caravan organizer informed Amnesty International by email from Tijuana on 10 June 2018.
56.   Los Angeles Times, "For many waiting in Tijuana, a mysterious notebook is the key to asylum" (5 July 2018): http://www.latimes.com/local/california/la-me-asylum-seekers-notebook-holds-key-to-entry-20180705-story.html.

In June and August 2018, Amnesty International received reports from two human rights organizations active in Tijuana that Mexican immigration officials had begun checking the identity documents of some of those queuing outside the port-of-entry, and had detained some asylum-seekers with a view to their deportation.

In August 2018, INM reportedly detained and removed non-Mexican asylum-seekers from the physical line on the Mexican side of the port-of-entry, and in some cases processed them for removal from Mexico. In doing so, INM divided the asylum-seekers into three groups, sorted by nationality: Mexican asylum-seekers, Central American asylum-seekers, and other (mostly African) asylum-seekers. Non-Mexican asylum-seekers without legal status in Mexico were reportedly taken into custody and transferred to an INM detention center. Among them were a young man and an unaccompanied minor, who were staying at a local shelter and were released after the shelter intervened. The two were reportedly slated for removal, and INM had already initiated contact with the youths' consulate to begin repatriation, such that they likely would have been deported if not for the shelter's intervention. CBP turned away both boys at the San Ysidro POE in mid-September 2018, according to an immigration lawyer in Tijuana who was tracking their cases.

Amnesty International researchers in Mexico and the United States left messages for the INM delegate in Baja California in late August and early September 2018, requesting to discuss these reported incidents, but did not receive a response. Despite being aware of the risks faced by the asylum-seekers in Mexico, CBP continued to force them to stay in Mexico.

## 2.4.2 ARIZONA–MEXICO BORDER

When Amnesty International visited the DeConcini Port-of-Entry in Nogales, Arizona, on 4 May 2018, there were no known lines or delays in the processing of asylum-seekers at the border. The following week on 12 May, the aid organization Kino Border Initiative (KBI) reported that CBP had begun to make asylum seekers wait in Mexico, due to supposed space constraints within the port-of-entry. CBP officers at the turnstiles screened identification documents before allowing people into the entry hall of the POE. On 17 May 2018, KBI informed Amnesty International that CBP had finally ground receptions to a halt, a situation that escalated for the next 10 weeks, as CBP forced hundreds of asylum-seekers to wait in Mexico before being allowed to claim asylum.



According to KBI, from 20 May to 22 June, CBP processed an average of five to 10 asylum applications per day, and forced asylum-seekers to wait in lines ranging from 50 to 120 people on the Mexico side of the Nogales border crossing. Those in line endured summer temperatures sometimes exceeding 100 degrees Fahrenheit, as they waited for periods lasting from several days to more than two weeks.

While CBP forced those asylum-seekers to queue in extreme temperatures, the overall number of people without legal status to enter the United States who were processed at the port-of-entry appeared to drop from May to June, and was no higher than other months.[57]

↑ 👁

*Nogales-Mariposa Port of Entry in Nogales, Arizona. (Amnesty International, May 2018).*

57.  CBP statistics on "Southwest Border Inadmissibles by Field Office FY2018": http://www.cbp.gov/newsroom/stats/ofo-sw-border-inadmissibles.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

20

> *On 14 June 2018, a senior Mexican immigration official in Sonora informed Amnesty International that US officials had requested INM to detain and check the papers of the asylum-seekers whom CBP was pushing back to the Mexican side of the Nogales border crossing.*

The INM official relayed also that he understood the request by US authorities implicitly to be for INM to deport asylum-seekers without legal status in Mexico to their home countries from which they had fled.

At the end of July, CBP began temporarily to process asylum-seekers at more normal rates, following prolonged pressure from KBI and other groups providing humanitarian and legal assistance to asylum-seekers in Nogales.[58] Yet in the last week of August, CBP again began to slow its processing of asylum claims, and on 4 and 5 September declined to accept any asylum applications at all. In mid and late September, CBP was again forcing asylum-seekers to wait in Mexico for up to two weeks before allowing them to request asylum, processing an average of only two families per day according to KBI.

## 2.4.3 TEXAS–MEXICO BORDER

From May to August 2018, CBP systematically implemented its policy of illegal pushbacks at ports-of-entry all along the Texas border with Mexico, forcing asylum-seekers to wait in extreme heat, and often to return to potential harm and exploitation in some of Mexico's most dangerous cities.

On 12 to 14 June, Amnesty International observed asylum-seekers waiting in line to be received by CBP on the international bridge between Laredo, Texas, and Nuevo Laredo in Mexico. In what has become a common sight from El Paso to the Rio Grande Valley, three CBP officials stood at the middle point of the bridge, apparently to screen and prevent asylum-seekers from reaching the port-of-entry. Approximately 40 asylum-seekers from Latin America sat in a line on the bridge, forming a queue toward the Mexican side.

From May to August 2018, NGOs informed Amnesty International of similar scenes on multiple other international bridges along the US–Mexico border in Texas. CBP had erected temporary checkpoints in the centers of international bridges to Mexico in El Paso, Laredo, Roma, McAllen, and Brownsville. According to observers, the checkpoints were usually staffed by three CBP officers, who checked documents of primarily those approaching the border who appeared to be Latin American, and then denied asylum-seekers access to the ports-of-entry, instructing them instead to return to Mexico. Lines of asylum-seekers typically ranged from 20 to over 50 people, who waited for days or weeks in temperatures sometimes over 100 degrees Fahrenheit. In some cases, the US ports-of-entry were almost empty.

A legal coordinator at the organization Annunciation House in El Paso quoted CBP officers as expressing that they "have orders from Washington" and were implementing instructions from senior levels of the Trump administration: "We have orders not to let anybody in." "This is a policy across the border." "There is no room for them right now. You can wait in line. Once there is room they can come in." "It's an order from [Attorney General] Sessions."[59]

---

58.   Arizona Daily Star, "Director: Nogales port now keeping up with arrivals of asylum-seekers" (5 August 2018): http://www.tucson.com/news/local/director-nogales-port-now-keeping-up-with-arrivals-of-asylum/article74f16ca2-96d3-5b76-ab59-89941635c059.html.
59.   Declaration of Taylor Levy, Annunciation House (1 July 2018), pp. 2-16 (at pp. 8, 12): https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Another/News/Press_Releases/motion declarations 1-33.pdf.

On the Mexico side of the bridges, in July 2018, three Mexican immigration officials informed the US immigration lawyer Jennifer Harbury that they were screening asylum-seekers and preventing their access to US ports-of-entry upon the request of CBP. One of the Mexican officials told her: "Yes, it's a collaborative program that we're doing with the Americans." The immigration officials were detaining non-Mexicans who lacked valid Mexican transit visas, and threatened them with deportation if they returned to the bridge. At the mid-point of the bridge, CBP again screened those who were able to pass through the Mexican immigration filter, and forced them to wait on the half of the bridge closer to Mexico. According to Ms. Harbury, the Mexican immigration officers informed her that when asylum-seekers crossed onto the bridge without valid Mexican travel documents, CBP officers called on Mexican immigration officials to remove them from the bridge.

Ms. Harbury informed Amnesty International that she spoke with two Honduran mothers who were detained by Mexican immigration officials due to their lacking proper transit visas. One of the women was pregnant, and detained with her other young child for four days. The other mother was detained with her four children for seven days, and told by Mexican immigration officials that they would deport her family to Honduras if they returned to the bridge again.

At two ports-of-entry, US authorities temporarily stopped receiving any asylum claims. On 17 July, CBP officers stationed at the center of the Roma–Miguel Aleman international bridge informed Ms. Harbury that CBP no longer accepted asylum applications at the Roma POE, and that they were instructing asylum-seekers to travel to the Reynosa bridge (more than 60 miles away), potentially through dangerous cartel-controlled territory on the Mexican side of the border. On 17 August 2018, KBI informed Amnesty International that CBP and INM officials had closed the Laredo POE to asylum-seekers, and redirected them to the Eagle Pass POE. At the Eagle Pass POE, CBP reportedly told asylum-seekers to sign up on a waitlist managed by the municipal government. CBP was only reportedly processing six to seven people per day, as over 100 asylum-seekers waited in makeshift migrant shelters in Piedras Negras, some of whom were not allowed by municipal authorities to join the waitlist. Among them were families with small children, some of whom were sick and required medical attention at the local hospital. KBI reported that many of those asylum-seekers left Piedras Negras after being deterred by CBP and municipal authorities from requesting asylum at the port-of-entry.

As hundreds of asylum-seekers – including families and children – waited on the Mexico side of the international bridges for as long as three weeks, the security situations in those Mexican border cities in the Rio Grande Valley deteriorated precipitously.[60] In August 2018, the US Department of State issued a public statement advising against all travel to the Mexican side of the border in Tamaulipas State, due to widespread kidnappings, murder and other violence targeting civilians, from which law enforcement were unable to protect them.[61]

 →



*On 26 July, approximately 50 asylum-seekers queued on the McAllen–Reynosa bridge, waiting to present their requests for protection to US authorities at the McAllen Border Station. They were primarily families from Central America and Cuba, as well as one woman from China. Most had been camping on the bridge for five days, as temperatures climbed over 100 degrees Fahrenheit. (Photo: Jennifer Harbury)*

60.  According to emails from partners on the ground in Reynosa; media reports; and security risk updates from International SOS.
61.  US Department of State, Mexico Travel Advisory (22 August 2018): https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.

# 2.5 'IT SEEMS LIKE EVERYBODY WANTS TO KILL US': PUSHED INTO HARM'S WAY

In April and May 2018, Amnesty International documented in real time the negative consequences of CBP's refusal to receive requests for protection by asylum-seekers who had arrived in a "caravan" at the San Ysidro POE on the California–Mexico border on 29 April.

Amnesty International researchers visited a shelter in Tijuana for lesbian, gay, bisexual, transgender and intersex (LGBTI) people, which hosted a group of 32 Central American transgender asylum-seekers traveling with the caravan, whom CBP repeatedly turned away at the San Ysidro POE. In the early morning of April 30, after they were first turned away by CBP, two Guatemalan transgender women from the group were detained by municipal police near the port-of-entry in Tijuana. They spent over a day in jail with three other Latin American transgender women whom police had separately arrested on the street.

On 2 May, one of the two Guatemalan women, named Maritza, told Amnesty International about her experience: "The police said, 'Get in the patrol car.' And I told them: 'Why? But I'm doing nothing.' They asked me about my papers, and I did not have them. I told them that I came from the caravan, but they did not care. They put me in the patrol car." According to Maritza, the other Guatemalan woman from the caravan said she was beaten by the municipal police when detained, and had a wound on her neck in detention.[62]

On 6 May, a group of six armed men attacked and robbed a shelter where 11 LGBTI asylum-seekers were staying (including minors, and transgender women from the caravan), setting the door of the shelter on fire. The shelter's legal representative informed Amnesty International, that the men returned a few hours later shouting homophobic slurs at the asylum-seekers, and threatened to kill them if they did not leave the neighborhood. "It seems like everybody wants to kill us," the coordinator of the group of transgender asylum-seekers wrote on Facebook.[63] Following those death threats, 11 LGBTI asylum-seekers returned with a US immigration lawyer to the San Ysidro POE to request asylum. The group included trans women, as well as trans and gay unaccompanied minors. CBP officials claimed that they still lacked capacity to receive the group's asylum claims, and turned them away again despite the death threats they faced in Mexico, as well as the potential of detention and deportation by Mexican police.[64]

CBP's repeated illegal pushbacks of caravan members subjected those asylum-seekers in situations of heightened vulnerability to additional human rights violations while they waited in Mexico – in short, pushing refugees back into harm's way.

On 29 April, immediately after the mass pushback of asylum-seekers in the caravan, the head delegate in Baja California of the Mexican immigration agency, Instituto Nacional de Migración (INM), expressed doubt to Amnesty International about CBP's claims of capacity constraints, and voiced his frustration that they were making INM do their dirty work: "The Americans [CBP] don't give a shit about what's going on in that plaza today. They do care about what's going on at the border today, right there: those 20 they care about," he said referring to the 20 asylum-seekers whom INM had allowed to sit at the turnstiles outside of the entry hall where CBP authorities receive asylum-seekers' claims.

---

62.   She could not be immediately located for interview following her release.
63.   For a description of the incidents, see the account posted by the coordinator of the group of transgender asylum-seekers: https://www.facebook.com/flotte.roberto/posts/10159864577846337.
64.   See video posted by the US immigration lawyer Nicole Ramos: https://www.facebook.com/nicole.ramos.184/videos/10156551488728923.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

23

In a revelation of what would constitute a clear violation of US obligations under refugee law, the INM delegate informed Amnesty International that CBP requested INM to remove those 20 asylum-seekers from the turnstiles, as well as the rest of the caravan members from the plaza at El Chaparral, where they were camping on the Mexican side of the port-of-entry. Implicit in the CBP request, the INM delegate said, was that such detentions could result in INM deporting those asylum-seekers who were not legally present in Mexico.

"Everybody knows their [transit] visas are about to expire," the INM delegate elaborated. "If I go out there right now, and do an immigration sweep on the plaza," he estimated that 40 percent of the asylum-seekers would not have legal status to be in Mexico, and could be at risk of deportation.

Amnesty International's delegation told the INM delegate that clearing the plaza would constitute a gross violation of not only the right to seek asylum, but also the right to freedom of assembly, and potentially the prohibition on deporting asylum-seekers back to persecution in their countries-of-origin.

The delegate responded to Amnesty International: "If we allow a migrant camp to grow here, we will be Calais in six months. The French ended up burning down the thing!" he said, referring to the encampment of asylum-seekers in France in 2015 and 2016.





*A group of 20 asylum-seekers wait at the San Ysidro Port-of-Entry for US authorities to receive their asylum claims. (Amnesty International, April 2018).*

# 2.6 EXTERNALIZATION: MEXICO NOT A 'SAFE COUNTRY' FOR ALL ASYLUM SEEKERS

Amnesty International interview on 2 May 2018 with the directors of ICE's Otay Mesa Detention Center in San Diego, California:

**ICE Senior Detention and Deportation Officer:**

*"Why don't they [asylum-seekers] stay in Mexico, since it's a safe third country?"*

**Amnesty International researcher:**

*"It's not a safe country for all asylum-seekers, and it has not been declared as one by the Attorney General."*

**ICE Assistant Field Office Director:**

*"Well, it would make our job easier if it was."*

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

24

As the US government waged its systematic campaign of illegal pushbacks along the US–Mexico border in 2018, it simultaneously sought to negotiate a "safe third country agreement" (STCA) between the United States and Mexico.[65] Under such an agreement, the US Attorney General would recognize Mexico as a "safe" destination country for all asylum-seekers, implying that no asylum-seeker would be at risk of persecution or other serious human rights violation if returned to Mexico, or of *refoulement* from Mexico to other countries. This designation would authorize US border authorities to reject all protection requests of asylum-seekers arriving to the US from Mexico, except for those of Mexican nationals or others fearing persecution in Mexico itself.

Under US law, Mexico could be designated as a "safe third country" only if asylum-seekers would not have their "life or freedom" threatened in Mexico, and uniformly "would have access to a full and fair procedure for determining a claim to asylum."[66] The fatal problem with this US plan is that Mexico is not a uniformly safe country for all asylum-seekers.

In a January 2018 report,[67] Amnesty International found that Mexican immigration authorities at INM forcibly returned thousands of people from Honduras, El Salvador and Guatemala to their countries-of-origin, without considering the risks and threats to their lives and security upon return, violating international law and Mexican law in so doing. In a survey of 297 people who were detained by INM, 75 percent of those asylum-seekers told Amnesty International that INM did not inform them of their right to seek asylum in Mexico. This was despite the fact that Mexican law expressly requires this, and public officials assured Amnesty International that the requirement is complied with. Even more alarming, Amnesty International found that INM forcibly deported 40 percent of those people to their countries-of-origin, despite their explicitly requesting asylum in Mexico or expressing fear for their lives in their home countries.

Amnesty International has also documented frequent cases of asylum-seekers transiting through Mexico being subjected to discrimination, exploitation, sexual assault, murder or disappearance, and arrests and beatings by law enforcement authorities.[68]

The United States cannot lawfully adopt a "safe third country agreement" in order to turn away asylum-seekers at US ports-of-entry, when Mexico is clearly violating its own obligations to protect asylum-seekers and refugees. Mexico does not provide effective protection to all asylum-seekers, and thus cannot be considered or treated as a uniformly safe country for them. Under US law, DHS authorities must provide individualized and fair assessments of all asylum claims presented by people seeking protection at US borders and in US territory.[69] Accordingly, anyone seeking asylum in the United States must have her or his claim received and assessed fairly and impartially on its merits.

---

65.  See, for example, statements by: US Attorney-General Sessions (https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review); US Vice President Pence (https://www.whitehouse.gov/briefings-statements/remarks-vice-president-pence-u-s-department-homeland-security-u-s-customs-border-protection-employees-imperial-ca); and DHS Secretary Nielsen (above at note 50; and at https://www.dhs.gov/news/2018/07/11/readout-secretary-kirstjen-m-nielsen-s-meetings-guatemala).
66.  See above at n. 4.
67.  Amnesty International, "Mexico: Migration authorities unlawfully turning back thousands of Central Americans to possible death" (23 January 2018): https://www.amnesty.org/en/latest/news/2018/01/mexico-migration-authorities-unlawfully-turning-back-thousands-of-central-americans-to-possible-death.
68.  Amnesty International report, "Facing Walls: USA and Mexico Violations of the Rights of Asylum-seekers" (June 2017): https://www.amnestyusa.org/wp-content/uploads/2017/06/USA-Mexico-Facing-Walls-REPORT-ENG.pdf. See also, Amnesty International report, "No Safe Place: Salvadorans, Guatemalans and Hondurans seeking asylum in Mexico based on their sexual identity and/or gender orientation" (November 2017): https://www.amnestyusa.org/wp-content/uploads/2017/11/No-Safe-Place-Briefing-ENG-1.pdf. See also, Médecins Sans Frontières report, "Mexico: An unsafe country for thousands of refugees fleeing violence in Central America" (20 June 2018): https://www.msf.org/mexico-unsafe-country-thousands-refugees-fleeing-violence-central-america.
69.  See above at n. 4.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

25

Amnesty International opposes any national policies to automatically return asylum-seekers and refugees to a supposedly "safe third country" (a country where the person can presumably receive protection), because they undermine authorities' obligation to undertake individualized assessments of asylum claims and risks upon return to both the asylum-seeker's country-of-origin and the third country. Without an individualized assessment of each asylum-seeker's claim, there is a heightened risk of *refoulement* to ill-treatment, persecution or other irreparable harm, in violation of the asylum-seekers' human rights.[70] For that reason, Amnesty International opposed – and continues to oppose – the STCA between Canada and the United States.[71]

In a February 2018 report to the Human Rights Council, the UN Special Rapporteur on torture and other forms of cruel, inhuman or degrading treatment or punishment, likewise admonished governments for seeking to negotiate STCAs, and expressed his view that they were fundamentally illegal.[72]



*On 1 May 2018, asylum-seekers gather in El Chaparral, on the Mexican side of the San Ysidro Port-of-Entry between Tijuana and San Diego, after two days of waiting for US authorities to receive their asylum claims. (Amnesty International)*

70.  Amnesty International report, No Safe Refuge (2016); available at: https://www.amnesty.org/en/documents/eur44/3825/2016/en/ (at pp. 6-7).
71.  See, for example, Amnesty International Canada's joint lawsuit (available at: https://www.amnesty.ca/legal-brief/canadian-council-refugees-canadian-council-churches-amnesty-international-and-john-doe-v); report (June 2017: https://www.amnesty.ca/news/safe-third-country-agreement-must-be-suspended-say-canadian-council-refugees-and-amnesty); and letter (January 2017: https://www.amnesty.ca/news/amnesty-international-canada-must-strip-usa-"safe-third-country"-designation-refugees).
72.  Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, UN Doc. A/HRC/37/50 (26 February 2018), at para. 46: https://www.ohchr.org/Documents/Issues/Torture/A_HRC_37_50_EN.pdf.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

26

© Amnesty International

# 3. POLICY AND PRACTICE OF FAMILY SEPARATIONS CONSTITUTE TORTURE

On 6 April 2018, the Trump administration launched an industrial-scale campaign of forcibly separating thousands of children from their asylum-seeking family members, under its so-called "zero-tolerance" policy of criminally prosecuting adults who enter the United States irregularly.[73] Upon apprehension between official border crossings, DHS officials separated families, supposedly to refer the parents or guardians for criminal prosecution, while DHS designated their children as "unaccompanied alien children"[74] and transferred them to be placed in shelters.

As images exploded on news and social media of DHS holding hundreds of young children in cages, the Trump administration's forcible separation of their families sparked international outcry and broad condemnation from around the globe.[75]

The US government's punitive and coercive policy of family separations – followed by the detention of parents separately from their children – violates multiple fundamental human rights, including the right to family unity,[76] the right to liberty, and the right to freedom from torture and other ill-treatment, among others.[77] All of those rights are provided for in international human rights treaties, and incorporated into US law, including the requirement to prioritize the best interests of the child.[78] The prosecution of asylum-seekers for irregular entry, and the subsequent forcible separation of their families, plainly violate US obligations under refugee law,[79] and DHS policy on family unity.[80]

---

73.   Presidential memo on default detention of asylum-seekers (6 April 2018): https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-state-secretary-defense-attorney-general-secretary-health-human-services-secretary-homeland-security/. Statement of US Attorney General, "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry" (6 April 2018): https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

74.   TEDS Policy (2015), at Section 5.6 (Detention): "In those instances where a parent or legal guardian and a non-U.S. citizen child must be separated, the non-U.S. citizen child will be classified as a UAC and will be processed accordingly." Available at: https://www.cbp.gov/sites/default/files/assets/documents/2017-Sep/CBP%20TEDS%20Policy%20Oct2015.pdf.

75.   See, UN human rights agency (OHCHR) statement, "Children 'as young as one' involved in US separation of migrant families" (5 June 2018): https://news.un.org/en/story/2018/06/1011391. See also, OHCHR statement, "UN experts to US: 'Release migrant children from detention and stop using them to deter irregular migration'" (22 June 2018): https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=23245&LangID=E.

76.   An interference with the right to family life and family unity is arbitrary and a violation of that right if it is not both necessary and proportionate to a legitimate aim, and conducted in accordance with the law. See UN Human Rights Committee (HRC), Winata v. Australia, Communication No. 930/2000 (26 July 2001), para. 7.3, UN Doc. CCPR/C/72/D/930/2000 (2001). See also, HRC, General Comment No. 16, para. 4, UN Doc. HRI/GEN/1/Rev.1 at 21 (1994); and HRC, General Comment No. 31, UN Doc. CCPR/C/74/CRP.4/Rev.6 (2004), para. 6; and HRC, General Comment No. 34, UN Doc. CCPR/C/GC/34 (2011), para. 35.

77.   See above at n. 75.

78.   Arbitrary and punitive separations of children from their parents are never in the best interest of the child, and plainly violate US and international law. All 50 states, the District of Columbia, and US territories require consideration of a child's best interests in decisions about the child's custody. See Child Welfare Information Gateway, Determining the Best Interests of the Child (2012), https://www.childwelfare.gov/pubPDFs/best_interest.pdf. The best interest standard has been increasingly incorporated into immigration law and policy. Congress has incorporated the best interests of the child standard into multiple immigration law provisions respecting children. See, e.g., 8 U.S.C. § 1101(a)(27)(J) (incorporating a best interests finding into eligibility standards for special immigrant juveniles); Immigration and Naturalization Service, Guidelines for Children's Asylum Claims at 2, 6, 9 (Dec. 10, 1998) (applying "the internationally recognized 'best interests of the child' principle" to interview procedures for child asylum-seekers). Under a 2008 Congressional mandate, federal agencies that take unaccompanied children into custody must place them in the least restrictive setting that is in their best interests. 8 U.S.C. § 1232(c)(2). The United States signed the Convention on the Rights of the Child ("CRC") in 1995, though is the only country in the world that has not yet ratified it. As a signatory to the CRC, the United States is still prohibited under customary international law from acts that would defeat the object and purpose of treaty. See, Article 9 of the CRC, which specifically prohibits separating a child from its parents unless in exceptional circumstances not present in this case: https://www.ohchr.org/en/professionalinterest/pages/crc.aspx.

79.   Both criminal prosecutions and separations of asylum-seeking families for crossing the border irregularly violate specific prohibitions on those practices under refugee law and human rights law. See, Article 9 CRC (ibid.); and Article 31.1 Convention (1951), above at n. 18.

80.   TEDS Policy (2015), at Section 1.9: https://www.cbp.gov/sites/default/files/assets/documents/2017-Sep/CBP%20TEDS%20Policy%20

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

27

In June 2018, Amnesty International assessed the Trump administration's deliberate and punitive practice of forced family separations as having constituted torture under both US and international law.[81] To meet the definition of torture, an act must be: (1) intentional; (2) carried out or condoned by a government official; (3) inflicting severe pain or suffering, whether physical or mental; and (4) carried out for a specific purpose such as punishment, coercion, intimidation, or for a discriminatory reason.[82] The Trump administration's deliberate policy and practice of forcible family separations satisfies all of those criteria.

# 3.1 'A TOUGH DETERRENT': FAMILY SEPARATIONS INTENDED TO PUNISH AND DETER ASYLUM CLAIMS

Based on public statements by President Donald Trump and senior officials in his administration, there is overwhelming evidence of the deliberately coercive and punitive purpose of the Trump administration's policy and practice of forcible family separations. The scale, timing, and systematic nature of family separations by this administration – both at and between official ports-of-entry – demonstrate the policy was both directly authorized and condoned by the Trump administration.

The US government has repeatedly denied separating families when they requested asylum at official ports-of-entry, except in cases when DHS "is unable to determine the familial relationship," or "determines that a child may be at risk with the parent or legal guardian."[83] Through interviews with separated family members and with DHS authorities, however, Amnesty International documented the arbitrary application and exploitation of those justifications by DHS agencies to separate children, without demonstrating any factual basis of risk the children would face in the custody of their parents or guardians, and without demonstrating any misrepresentation of those family relationships.

In a June 2018 injunction on the practice, a federal judge also found that the US government had separated asylum-seeking families after they presented themselves at official ports-of-entry, without justification for those separations under either the facts or the law:

> "the record also reflects that the practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port-of-entry, not just those who cross into the country illegally."[84]

Oct2015.pdf. Significantly, referrals of asylum-seeking families for prosecution are discretionary, rather than a legal requirement under US law, making family separations unnecessary.
81.   Amnesty International statement, "USA: Policy of separating children from parents is nothing short of torture" (18 June 2018): https://www.amnesty.org/en/latest/news/2018/06/usa-family-separation-torture/.
82.   CAT (n. 10 above). The United States ratified the CAT in 1994 and has been bound by it since. The CAT prohibits the US government from engaging in any form of torture, as defined in Article 1(1). US Code consistently defines torture as follows: "'torture' means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control;" available at: https://www.law.cornell.edu/uscode/text/18/2340.
83.   DHS statement, "Myth vs. Fact: DHS Zero-Tolerance Policy" (18 June 2018): https://www.dhs.gov/news/2018/06/18/myth-vs-fact-dhs-zero-tolerance-policy. See also, CBP statement denying separation of asylum-seeking families at ports-of-entry, except in rare circumstances: https://www.cbp.gov/newsroom/national-media-release/cbp-addresses-false-claims-separation-those-seeking-asylum-us-ports. See also, statement of Attorney General Sessions (14 June 2018): "if the adults go to one of our many ports-of-entry to claim asylum, they are not prosecuted and the family stays intact pending the legal process." Available at: https://www.justice.gov/opa/speech/attorney-general-sessions-addresses-recent-criticisms-zero-tolerance-church-leaders.
84.   See, Ms. L. v. ICE, Case No.:18cv0428 DMS (MDD), Order Granting Plaintiffs' Motion for Class-Wide Preliminary Injunction (26 June 2018): https://cases.justia.com/federal/district-courts/california/casdce/3:2018cv00428/564097/83/0.pdf. For specific accounts by separated family members, in declarations submitted under the lawsuit, see: https://www.aclu.org/legal-document/ms-l-v-ice-plaintiffs-reply-support-motion-class-certification.

Since 2017, Amnesty International[85] and other human rights organizations[86] repeatedly alerted DHS and its oversight bodies to the recurring practice of arbitrary family separations in specific cases, which constituted serious violations of US laws and regulations as well as the human rights of those affected by the practice. The government's responses to Amnesty International's official correspondence and public expressions of concern were invariably dismissive, opaque, and at odds with the facts of cases documented, when they responded at all.

Since the start of President Trump's administration in January 2017, senior US officials have frequently promoted family separations as a viable strategy to deter families from seeking protection in the United States, which culminated in the formal adoption and application of the "zero-tolerance," under which thousands of families were separated unnecessarily and unlawfully.

As early as February 2017, the US government considered the use of family separations in order to "deter" asylum-seekers from coming to the United States.[87] Since then, the practice surged under the Trump administration, with the same restated objective of deterring asylum-seekers from coming to the United States to request international protection, or to compel them to give up their claims and return to their countries-of-origin where they had fled persecution.[88]

The Washington Post first reported that the US Border Patrol (part of CBP) piloted the "zero-tolerance" policy in Texas and New Mexico from July to November 2017. On 23 April 2018, the heads of CBP, ICE and US Customs and Immigration Services (all DHS agencies) reportedly recommended to DHS Secretary Nielsen the expansion of the policy all along the border, and promoted the forced separation of families through criminal prosecution as the "most effective" way to decrease the number crossing irregularly into the United States.[89]

On 17 April 2018, ICE revealed on its website that it had in August 2017 replaced an Obama-era policy called the "Parental Interests Directive" (2013), as it was simultaneously implementing DHS's pilot test of the "zero-tolerance" policy. The Trump administration's updated policy removed critical language prioritizing the protection of parental rights of non-US families in immigration enforcement proceedings.[90]

---

85.   Amnesty International Urgent Actions (see e.g. n. 140 below), official letters, email correspondence, phone conversations, and in-person meetings from November 2017 to June 2018.
86.   See joint report of WRC, LIRS and KIND, "Betraying Family Values: How Immigration Policy at the United States Border is Separating Families" (February 2017): https://www.lirs.org/assets/2474/lirs_betrayingfamilyvalues_feb2017.pdf. See also, joint complaint to the DHS Office for Civil Rights and Civil Liberties (CRCL) and the DHS Office of the Inspector General (OIG), submitted by WRC et al., "The Separation of Family Members Apprehended by or Found Inadmissible while in U.S. Customs and Border Protection (CBP) Custody at the U.S.-Mexico Border" (11 December 2017): https://www.womensrefugeecommission.org/images/zdocs/Family-Separation-Complaint-FINAL-PUBLIC-12-11-17.pdf.
87.   MSNBC, "Exclusive: Trump administration plans expanded immigrant detention" (3 March 2017): "Under the plan under consideration, DHS would break from the current policy keeping families together. Instead, it would separate women and children after they've been detained – leaving mothers to choose between returning to their country-of-origin with their children, or being separated from their children while staying in detention to pursue their asylum claim." Available at: https://www.msnbc.com/all-in/exclusive-trump-admin-plans-expanded-immigrant-detention.
88.   See also, two Attorney General statements of 7 May 2018, available at: https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions; and https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-association-state-criminal-investigative.
89.   See Washington Post, "Top Homeland Security officials urge criminal prosecution of parents crossing border with children" (26 April 2018): https://www.washingtonpost.com/local/immigration/top-homeland-security-officials-urge-criminal-prosecution-of-parents-who-cross-border-with-children/2018/04/26/a0bdcee0-4964-11e8-8b5a-3b1697adcc2a_story.html. To view a redacted version of the memo, see also, Open the Government, "Newly released memo reveals secretary of homeland security signed off on family separation policy" (24 September 2018): https://www.openthegovernment.org/node/5713.
90.   ICE policy, "Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities" (23 August 2013): https://web.archive.org/web/*/https://www.ice.gov/doclib/detention-reform/pdf/parental_interest_directive_signed.pdf. The 2013 version of ICE's Parental Interests Directive policy provided that: "ICE personnel should ensure that the agency's immigration enforcement activities do not unnecessarily disrupt the parental rights of both alien parents or legal guardians of minor children." On 29 August 2017, the Trump administration secretly replaced the policy, renaming it "Detention and Removal of Alien Parents or Legal Guardians," which provides as follows: "[ICE] personnel are responsible for the prompt and faithful execution of US immigration laws. In pursuing the enforcement of these laws against alien parents and legal guardians of a minor child(ren). [...] ICE personnel should remain cognizant of the impact enforcement actions may have on a lawful permanent resident (LPR) or U.S. citizen (USC) minor child(ren). This Directive in no way limits the ability of ICE personnel to make individual enforcement decisions on a case-by-case basis." The current version of the policy is available at: https://www.ice.gov/doclib/detention-reform/pdf/directiveDetainedParents.pdf. See also the 18 May 2018 fact sheet issued by ICE on the parental rights of parents in immigration detention: https://www.ice.gov/doclib/detention-reform/pdf/factSheetDetainedParents.pdf. For further analysis of the policy change, see the following analyses by the American Bar Association (https://www.americanbar.org/groups/litigation/committees/childrens-rights/practice/2018/updated-ice-policy-detention-removal-alien-parent-legal-guardian.html) and American Immigration Council (https://immigrationimpact.com/2018/04/19/parents-threatened-immigration-enforcement-policy).

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

29

In March 2018, Annunciation House and other immigrants' rights activists in the El Paso area presented evidence that the practice of family separations was ongoing at that time, weeks before the announcement of the "zero tolerance" policy.[91] Those groups reported that DHS declined to provide statistics on the number of families arbitrarily separated under the program.

DHS Secretary Nielsen has repeatedly denied a policy of separating families was ever in place, preferring to frame family separations as a law enforcement policy.[92] Yet during a Congressional hearing in January 2018, she confirmed that the intention of the draft version of the "zero-tolerance" policy was to target families, calling family separations one of "a variety of ways to enforce our laws to discourage parents from bringing their children here."[93]

As early as March 2017, then DHS Secretary John Kelly, who is now President Trump's chief of staff, discussed the potential adoption of a policy of family separation "in order to deter" families of migrants and asylum-seekers from coming to the United States.[94] In May 2018, just as the "zero-tolerance" policy was being brutally implemented, Mr. Kelly, this time speaking in his capacity as White House Chief of Staff, further defended family separations as a "technique" that "would be a tough deterrent – a much faster turnaround on asylum-seekers." He further elaborated upon a discriminatory motivation of the policy, which was to turn back asylum-seekers who would not "easily assimilate into the United States," due to their being "overwhelmingly rural people" from countries with low education standards, who "don't speak English" and "don't have skills."[95]

The dehumanizing rhetoric employed by President Trump and his cabinet similarly showcased the apparently discriminatory motivation of the "zero-tolerance" policy. President Trump,[96] Attorney General Session,[97] and DHS Secretary Nielsen[98] have routinely demonized asylum-seeking families as "criminals" and "smugglers," who were trafficking their own children.[99] President Trump has also described primarily Latin American asylum-seekers as "animals" and "criminals,"[100] while his administration ventured to detain their children in cages, and deport the parents and guardians to their countries-of-origin, with or without them.

In a report to the UN Human Rights Council in February 2018, the UN Special Rapporteur on torture denounced any authorities' "deliberate separation of family members" who are seeking asylum at borders, calling it "refoulement in disguise," which is "designed to coerce them to 'voluntarily' return to their country-of-origin" regardless of their protection needs.[101]

91.  See coalition press conference announcement, "Family Separation at the Border" (12 March 2018): https://groups.google.com/forum/#!topic/frontera-list/rv8RcH1RR0M.
92.  Statements on Twitter by DHS Secretary Nielsen (17 June 2017): "We do not have a policy of separating families at the border. Period"; "You are not breaking the law by seeking asylum at a port-of-entry"; "For those seeking asylum at ports-of-entry, we have continued the policy from previous Administrations and will only separate if the child is in danger, there is no custodial relationship between 'family' members, or if the adult has broken a law." Available at: https://twitter.com/SecNielsen/status/1008467318744240128.
93.  Senate Hearing with DHS Secretary Nielsen (16 January 2018): https://transcripts.cnn.com/TRANSCRIPTS/1801/16/cnr.04.html (transcript), and https://www.c-span.org/video/?c4709347/separation-families (video).
94.  CNN interview, "Kelly: DHS is considering separating undocumented children from their parents at the border" (7 March 2017): https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/.
95.  NPR interview with John Kelley (10 May 2018): https://www.npr.org/2018/05/10/609478998/john-kelly-despite-times-of-deep-frustration-no-regrets-taking-white-house-job (audio), and https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr (transcript).
96.  Statement on Twitter of President Trump (18 June 2018), at n. 25 above.
97.  Remarks of Attorney General Sessions (7 May 2018): "If you smuggle illegal aliens across our border, then we will prosecute you. If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law. If you don't like that, then don't smuggle children over our border." Available at: https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-association-state-criminal-investigative. See also, remarks of Attorney General Sessions (18 June 2018): "We do not want to separate children from their parents. We do not want adults to bring children into this country unlawfully, placing them at risk. But we do have a policy of prosecuting adults who flout our laws to come here illegally instead of waiting their turn or claiming asylum at any port-of-entry." Available at: https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-national-sheriffs-association-annual.
98.  Statement by DHS Secretary Nielsen (18 June 2018): "The kids are being used by pawns by the smugglers and the traffickers.": https://www.nytimes.com/2018/06/18/us/politics/dhs-kirstjen-nielsen-families-separated-border-transcript.html.
99.  See below at n. 148.
100.  See above at nn. 25 and 26.
101.  Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment (26 February 2018): https://www.ohchr.org/Documents/Issues/Torture/A_HRC_37_50_EN.pdf.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

30

In a public demonstration of how the Trump administration leveraged family separations to compel asylum-seekers to give up their claims, DHS stated on 23 June 2018 that it planned to reunite separated families only for purpose of deporting them to their countries-of-origin, yet would keep families separated while they pursued their asylum claims.[102] On 25 June 2018, news media reported allegations by Central American parents detained in Texas that ICE officials had coerced them into forfeiting their asylum claims, in exchange for promises of reunification with their recently separated children upon deportation to their countries-of-origin.[103] On 23 August 2018, two immigrant rights groups submitted a joint complaint to the DHS oversight bodies, detailing widespread and extreme coercive tactics used by DHS to compel separated families to give up their asylum claims, in exchange for the possibility of reunification.[104]

Amnesty International observed the merits hearing of an asylum case in May 2018, during which the immigration judge similarly leveraged the forced separation of a Brazilian grandmother named Maria, in order to deter her from pursuing her asylum claim further.[105] In the courtroom, Amnesty International researchers witnessed as the judge invited Maria to give up her asylum claim so that she could be deported to Brazil with her grandson, who has a developmental disability, instead of being deported without him after the judge would presumably deny her asylum claim.

"I want to make sure we close all the potential 'loopholes', if you will," the judge said.[106] Trump administration officials, including the judge's employer Attorney General Sessions, frequently use the term "loopholes" to describe meritless asylum claims, as the administration seeks to narrow the grounds on which asylum-seekers can receive protection in the United States.

In a letter to the Attorney General and DHS Secretary, the US Commission on Civil Rights expressed serious concern over the Trump administration's violation of legal due process, and its punitive use of family separations to "coerce parents into withdrawing what may be valid asylum applications or otherwise impairing their immigration proceedings, for fear of what may be happening to their children."[107]

The Commission further criticized the apparently discriminatory motivation of the policy, based on "animus directed at Mexican and Central American immigrants by the Administration, giving rise to questions of unwarranted discrimination on the basis of national origin." It concluded that the Trump administration's policy of punishing families who are "seeking asylum, fully within the parameters of our nation's immigration laws [...] is inhumane and against the best interests of the children," and "subverts the fair administration of justice and appears to discriminate against families on the basis of their national origin."[108]

Taken together, the *de facto* policy and practice of family separations by the Trump administration were clearly (1) intentional; (2) carried out and condoned by government officials; and (3) carried out for the specific purposes to deter asylum-seeking families from seeking protection in the United States, or to coerce those who already had sought asylum into giving up their claims. Satisfying the final element of the definition of torture, family separations also inflicted severe pain and suffering, particularly mental pain and suffering, with an apparently negative impact on physical health in some cases.

102.  DHS fact sheet on family separations and reunifications (23 June 2018): https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.
103.  Texas Tribune, "Kids in exchange for deportation: Detained migrants say they were told they could get kids back on way out of US" (24 June 2018): https://www.texastribune.org/2018/06/24/kids-exchange-deportation-migrants-claim-they-were-promised-they-could.
104.  Joint complaint of American Immigration Council (AIC) and American Immigration Lawyers Association (AILA), "The Use of Coercion by U.S. Department of Homeland Security (DHS) Officials Against Parents Who Were Forcibly Separated From Their Children" (23 August 2018): https://americanimmigrationcouncil.org/sites/default/files/general_litigation/the_use_of_coercion_by_u.s._department_of_homeland_security_officials_against_parents_who_were_forcibly_separated_from_their_children_public_fin_0.pdf.
105.  See below case of Maria and Matheus.
106.  Department of Justice, Executive Office for Immigration Review, audio recording of court hearing (10 May 2018).
107.  See, US Commission on Civil Rights, letter to Attorney General Sessions and DHS Secretary Nielsen (15 June 2018): https://www.usccr.gov/press/2018/06-15-18-letter.pdf.
108.  Ibid.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

31



## 3.2 'I AM CRYING A LOT': SEVERE PAIN AND SUFFERING FROM FAMILY SEPARATIONS

At its core, the Trump administration's "zero-tolerance" policy was intended to cause severe mental anguish for asylum-seeking families – first through family separations, and then through the indefinite detention of divided family members. Through the threat of indefinite family separations – traumatic for children and their parents alike – DHS pressured asylum-seeking families to give up their asylum claims, and accept "voluntary" deportation as a condition for reunification.[109]

Additionally, the Trump administration sought by separating families to impose on all asylum-seekers its policy of arbitrary and indefinite detention without parole, based solely on their migration status. As President Donald Trump and his cabinet have repeatedly complained, the illegality of detaining young children had prevented the indefinite detention of asylum-seeking families,[110] so the administration used family separations to detain the parents individually.

109.  See above at nn. 102 to 107.
110.  See below at nn. 158 and 181.

Children's rights are violated in multiple ways through family separations. The children are detained, before and/or after being separated from their families; then they are separated from their parents or guardians, violating their right to family unity; and finally they are exposed to extreme and unnecessary trauma after being separated, which may negatively impact upon their development and mental health.[111]

In the cases of family separation documented by Amnesty International, it was clear that the administration did not consider the best interests of the children, contrary to US obligations under international law.[112] The detention of children is never in their best interest, and their separation from parents is only lawful as a measure of last resort, such as when a child faces imminent harm.[113] Illustrating that family separations are not in the best interest of the children, the government admitted that it lost track of hundreds of other unaccompanied children who were transferred into the custody of foster families. In April 2018, a US government official responsible for the care of children separated from their families under the "zero tolerance" policy, informed Congress that his agency confirmed it had lost track of at least 1,475 unaccompanied children for whom it was responsible during the first quarter of FY2018.[114]

The UN Refugee Agency (UNHCR) has categorically called on all states to end the practice of immigration detention of children, and to maintain family unity through alternatives to detention.[115] The UN Special Rapporteur on torture has likewise stated that the detention of children is never in the child's best interest, and can constitute ill-treatment if the detention is due to their or their parents' immigration status.[116]

Resulting in further ill-treatment, there are consistent reports of sub-substandard conditions in many US detention facilities, such as forcing children to sleep on cement floors, constant light exposure during nighttime bed checks, open toilets, insufficient food and water, lack of bathing facilities, and extremely cold temperatures.[117]

111. On the immediate and long-term physical and mental health consequences of forcible separation of children from their families, see the district court's order in J.S.R v Sessions, Civ. No. 3:18-cv-01106-VAB, Order of July 13, 2018, at 6 (D. Conn.). See also, Jaana Juvonen and Jennifer Silvers, "Separating children from parents at the border isn't just cruel. It's torture." (Washington Post, 15 May 2018): https://www.washingtonpost.com/news/posteverything/wp/2018/05/15/separating-children-from-parents-at-the-border-isnt-just-cruel-its-torture.
112. See above at n. 78. See also, UN Committee on the Rights of the Child, General Comment No. 14 (2013): https://www2.ohchr.org/English/bodies/crc/docs/GC/CRC_C_GC_14_ENG.pdf.
113. Ibid, at paras 58-61: "Given the gravity of the impact on the child of separation from his or her parents, such separation should only occur as a last resort measure, as when the child is in danger of experiencing imminent harm or when otherwise necessary; separation should not take place if less intrusive measures could protect the child." UNHCR has stated that children "should in principal not be detained at all"; and "Children have the right to family unity [...] and the right not to be separated from their parents against their will." UNHCR, Guidelines on the Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers and Alternatives to Detention, 2012, para. 51. The UNHCR's Executive Committee has likewise concluded repeatedly that the maintenance of family unity is of utmost importance, particularly where the interests of children are at issue. The Committee has, for example, "[s]tressed that all action taken on behalf of refugee children must be guided by the principle of the best interests of the child as well as by the principle of family unity."
114. From October to December 2017, ORR was unable to reach or determine the whereabouts of approximately 20 to 25 percent of those whom it sought to contact directly or through their sponsors. Statement of Steven Wagner, Acting Assistant Secretary Administration for Children and Families, US Department of Health and Human Services (HHS) Before the Permanent Subcommittee on Investigations Committee on Homeland Security and Governmental Affairs, United States Senate (26 April 2018): https://www.hsgac.senate.gov/imo/media/doc/Wagner%20 Testimony.pdf. Information on the hearing is available at: https://www.hsgac.senate.gov/hearings/oversight-of-hhs-and-dhs-efforts-to-protect-unaccompanied-alien-children-from-human-trafficking-and-abuse. See also, Snopes, "Did the U.S. Government Lose Track of 1,475 Migrant Children?" (29 May 2018): https://www.snopes.com/fact-check/1475-immigrant-children-missing/.
115. UNHCR has also recently reiterated that its "position is that children should not be detained for immigration related purposes, irrespective of their legal/migratory status or that of their parents, and detention is never in their best interests. Appropriate care arrangements and community-based programmes need to be in place to ensure adequate reception of children and their families." United Nations High Commissioner for Refugees, "UNHCR's Position Regarding the Detention of Refugee and Migrant Children in the Migration Context, January 2017: http://www.refworld.org/docid/5885c2434.html, p. 2. See also, UNHCR, "UN Refugee Agency calls on States to end the immigration detention of children on the 25th anniversary of the Convention on the Rights of the Child" (20 November 2014): http://www.unhcr.org/news/press/2014/11/546de88d9/un-refugee-agency-calls-states-end-immigration-detention-children-25th.html.
116. UN Special Rapporteur on torture, Thematic Report on Torture and Ill-Treatment of Children Deprived of their Liberty, 5 March 2015 (UN Doc. A/HRC/28/68), at para. 80: https://www.ohchr.org/en/hrbodies/hrc/regularsessions/session28/documents/a_hrc_28_68_e.doc. The UN Committee on the Rights of the Child has also elaborated that the national origin or immigration status of children or their parents does not justify any restriction of their human rights (General Comment No. 22), and that: "the principle of non-discrimination, in all its facets, applies in respect to all dealings with separated and unaccompanied children. In particular, it prohibits any discrimination on the basis of the status of a child as being unaccompanied or separated, or as being a refugee, asylum-seeker or migrant" (General Comment No. 6, UN Doc. CRC/GC/2006/6, at para. 18).
117. American Academy of Pediatrics (AAP), Policy Statement: Detention of Immigrant Children (March 2017): http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

33

Medical professionals, medical associations, child welfare organizations, and courts have documented the serious and lasting harm to children arising from forcible separation from their parents, and from being held in detention even for short periods of time, let alone indefinitely.[118]

In a statement to the US Congress opposing family separation, the American Academy of Pediatrics warned: "We know that family separation causes irreparable harm to children. This type of highly stressful experience can disrupt the building of children's brain architecture. Prolonged exposure to serious stress – known as toxic stress – can lead to lifelong health consequences."[119]

In a statement in response to President Trump's executive order on 20 June 2018, the American Psychological Association likewise observed: "Decades of psychological research show that children separated from their parents can suffer severe psychological distress […]. The longer the parent and child are separated, the greater the child's symptoms of anxiety and depression become."[120]

Eighty-five days after being separated from his father Jose from El Salvador, 1-year-old Mateo was finally reunited on 8 February 2018 with his mother Olivia, who had been released on parole pending the adjudication of her separate asylum claim. Describing the psychological impact of forced separation on Mateo, his mother Olivia recalled that day they were reunited in a declaration filed with a lawsuit against ICE:

> *"When I took off his clothes he was full of dirt and lice. It seemed like they had not bathed him the 85 days he was away from us. […] M. is not the same since we were reunited. I thought that, because he is so young he would not be traumatized by this experience, but he does not separate from me. He cries when he does not see me. That behavior is not normal."[121]*

On the human right to family unity of family members who are not parent and child, the UN Committee on the Rights of the Child has observed that it is in the best interest of the child for authorities to consider the term "parents" to broadly include biological, adoptive or foster parents, where applicable, as well as children's extended family.[122]

Amnesty International documented two cases of children being separated from their grandmothers, whom the children called "mommy" despite their generational gap, which resulted in equally extreme trauma to both the children and adults.[123]

118. Institute for the History of Psychiatry at Weill Cornell, "Fact sheet: The Trauma of Childhood Separation" (2 July 2018): http://psych-history.weill.cornell.edu/pdf/Trauma_of_Separation.pdf; and http://psych-history.weill.cornell.edu/his_res/tcs.html.
119. AAP statement, "Opposing the Border Security and Immigration Reform Act" (18 June 2018): https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAPStatementOpposingBorderSecurityandImmigrationReformAct.aspx.
120. American Psychological Association (APA) statement, "Statement of APA President Regarding Executive Order Rescinding Immigrant Family Separation Policy" (20 June 2018): http://www.apa.org/news/press/releases/2018/06/family-separation-policy.aspx.
121. Declaration of Olivia Caceras (28 June 2018), WA v. USA, at pp. 69-73: https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Another/News/Press_Releases/motion%20declarations%201-33.pdf.
122. UN Committee on the Rights of the Child, General Comment No. 14 (2013): https://www2.ohchr.org/English/bodies/crc/docs/GC/CRC_C_GC_14_ENG.pdf.
123. See below case of Clara and Gabriela, and case of Maria and Matheus.

One year after her separation from her developmentally disabled grandson Matheus, a 55-year-old Brazilian woman named Maria told Amnesty International of the lasting traumatic impacts of the family separation on both her and Matheus.[124] Maria said she still had recurring bad memories and flashbacks from the moment of their separation:

> *"I might need to go look for a psychologist. I don't remember things, and can't sleep. I wake up during the nights, and can't go back to sleep. I start to talk about something and forget what I was saying. I am crying a lot also because I am still separated from Matheus."[125]*

Maria described symptoms that are common of post-traumatic stress disorder (PTSD), also listed in the Istanbul Protocol among those frequently experienced by victims of torture and other ill-treatment.[126]

On 11 and 18 August 2018, Maria visited Matheus in the custody of Connecticut State's Department of Children and Families. She informed Amnesty International that Matheus appeared to be very sad and depressed, and that his behavior and emotional state had changed radically from when they would frequently do activities together before their detention and separation. When she first saw him, almost a year after their separation, he was sick with a fever and sore throat, and was shivering from cold in a room with heavy air conditioning, wearing only shorts and a shirt. He immediately requested a sweater or jacket to stay warm. Maria said it was very saddening for her and Matheus to see each other during both her visits, since after they spent all day together, they felt they were reliving the separation after each visit: "We are suffering too much. It feels like he has just been thrown over there, and nobody has taken good care of him."[127]

Whereas children are often included in the asylum claims of their parents or guardians, US authorities categorize them as "unaccompanied alien children"[128] when they are separated from their asylum-seeking family units, and process their asylum cases separately. By separating families' legal claims for protection while separating the families themselves, DHS undermines due process and subverts the family members' respective asylum claims – contrary to the best interest of the child. Separations also undermine family rights under USCIS policies on asylum claims, which provide that "a dependent minor should not be interviewed without his or her parent present."[129]

While it is possible to reunify the asylum claims of the parents and children, this can be logistically difficult, due to lack of legal representation, the number of cases, and challenges parents face in contacting their children once separated, especially when the children are infants and unable to speak, often transported thousands of miles away from their parents after separation. Further undermining families' asylum claims, separations can result in only one family member retaining documents critical to establishing family members' identities or supporting their claims. Separation impedes the regular communication between children and parents that is critical for a child and parent to pursue a joint claim for protection.

Forcing children to undergo immigration proceedings alone, separated from their parents, severely restricts – and in some cases obliterates – their ability to achieve protection where their claims are factually linked to those of their parents, especially for very young children who are unable to articulate the claim at all.[130]

---

124. On 19 August 2018, Amnesty International spoke with Maria through the interpretation of her friend, whom she and her husband were staying with in Connecticut.
125. Ibid. Conversation by phone, 19 August 2018.
126. OHCHR, Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Istanbul Protocol"), 2004, HR/P/PT/8/Rev.1: https://www.ohchr.org/Documents/Publications/training8Rev1en.pdf.
127. Conversation by phone, 19 August 2018.
128. See above at n. 74.
129. USCIS, Affirmative Asylum Applications Manual (2016): https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/AAPM-2016.pdf.
130. ABA statement, "Separating families violates civil rights, won't work and is inhumane, ABA president says" (12 June 2018) : http://www.abajournal.com/news/article/separating_families_violates_civil_rights_wont_work_and_is_inhumane_aba_pre/.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

35

Because there is no right to counsel for immigration cases under US law, children – as young as babies – can find themselves in the surreal situation of having to articulate and defend a claim themselves in an immigration court.

## 3.3 'I DIED AT THAT MOMENT': ACCOUNTS OF EXTREME ANGUISH OF FAMILY SEPARATIONS

In 2018, Amnesty International interviewed 15 adults whom DHS agencies separated from their children, both prior to and following the introduction of the so-called "zero-tolerance" policy. Of those 15 adults, three were women (separated in 2016, 2017 and 2018, respectively), and 12 were men (four separated in 2017, and eight in 2018). The separations happened in all four US states along the US–Mexico border (California, Arizona, New Mexico, and Texas), at the hands of both CBP and ICE personnel.

In all of those cases, prior to being separated, the families had requested asylum and expressed their fear of return to their countries-of-origin. In 13 of the 15 cases, DHS separated the families after they requested protection at official US ports-of-entry. The other two parents were separated by DHS after crossing irregularly into the United States between official ports-of-entry, and requesting protection from US Border Patrol (part of CBP).

According to the adults, in none of those cases did DHS personnel explain to the families the reasons for the separations at the time that they happened, or allow them to defend their custodial right to family unity. DHS personnel simply separated the families – in some cases through the use or threat of physical force.

Consistent with the Trump administration's rhetoric seeking to brand asylum-seeking families as criminals who are trafficking their own children, some of the adults were later informed that they were separated from their children due to doubts by DHS personnel about the validity of their family relationships. Yet DHS authorities never asked the parents and guardians to prove their family relationships or guardianship prior to separating them from their children.

Most of these families were separated despite having documentary evidence of their identities and family relationships in their possession at the time that they presented themselves to request asylum at official ports-of-entry. That evidence included passports, national identification cards, birth certificates, and court orders designating legal guardianship, among other official documents.

When they spoke with Amnesty International, many of the separated parents and guardians were suffering from such extreme mental anguish that they wept uncontrollably as they recounted their experiences, sometimes only seconds or minutes into the interviews. They expressed visible agony describing the emotional harm caused to them and their children through the forcible separations, and their sense of helplessness to protect their children from whatever awaited them alone in US custody. In several of the cases, the parents agonized that the separations had broken their children's trust in them, and damaged their family relationships.

## CASE OF VALQUIRIA & ABEL (BRAZIL)

### 'THEY RIPPED MY HEART OUT OF ME. …FOR ME, THE WORLD ENDED AT THAT POINT.'

Valquiria (39) and her son Abel (7) requested asylum at the Paso del Norte POE in El Paso, Texas, on 16 March 2018. After one night together in CBP detention, DHS forcibly separated them on 17 March, without giving any reason, and transferred Valquiria to an ICE detention facility in El Paso.[131]

Valquiria said that she and Abel had fled Brazil after receiving repeated death threats from drug traffickers in 2017 and 2018, whom she had denounced for dealing drugs daily in front of her home. She claimed they were selling drugs in coordination with local police, and said they would kill her and her son no matter where they fled to in Brazil, and would do so "without pity" if Valquiria sought help from police in another part of Brazil.

On 27 March, a US asylum officer found that her story was credible and justified her fear that she and her son could be killed if they returned to Brazil. The asylum officer noted in her report that Abel was "processed as an unaccompanied minor child," that his whereabouts were "unknown," and that he was not included on Valquiria's asylum claim, despite her having requested asylum for both of them together. There was no explanation as to why Valquiria was separated from her son, even though she had their identifying documents, and the ICE file recognized their family relationship.

On 10 May 2018, Amnesty International interviewed Valquiria in detention, where she wept as she recounted the moment that DHS authorities separated her from Abel. In deep despair, Valquiria told Amnesty International of how the separation from her son had lessened her will to live:

> *"They left me one night with my son, and the following day they said they were going to separate my son and then they took him away from me. […] I told them, 'for the love of god, please don't separate us.' And they told me, 'you don't have any rights here, and you don't have any rights to stay with your son.' […] For me I died at that moment. They ripped my heart out of me. […] For me, it would have been better if I had dropped dead. For me, the world ended at that point. Not knowing where my son was, what he was doing. […] It was the worst feeling a mother could have. […] They just told me I didn't have the right to be with my son. How can a mother not have the right to be with her son? […] It feels like I have lost half of my life, now that they have removed my son out of it."*

Abel has since been released to his father in the United States, who is also seeking asylum. On 10 September 2018, Valquiria lost her asylum claim and began the appeals process, still in immigration detention and separated from Abel. According to her lawyer, the judge decided that the police officers who were working with drug traffickers were acting in their private capacities, and said that Valquiria and Abel should have relocated within Brazil, irrespective of the traffickers' threats to kill them wherever they fled.

---

131. Interview with Valquiria conducted on 10 May 2018 at ICE's El Paso Processing Center, in El Paso, Texas.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

37

## CASE OF CLARA & GABRIELA (HONDURAS)

### 'I AM OLD AND I CAN'T TAKE IT ANYMORE. ...I'M VERY DESPERATE AND SAD.'

Clara, a 63-year-old grandmother from Honduras, requested asylum with her 14-year-old granddaughter Gabriela on 18 November 2016, at the Paso del Norte Port-of-Entry in El Paso, Texas. Clara had raised Gabriela since she was 2.5 years old, and their bond was so close that Gabriela called her grandmother "mommy."[132]

In October 2016, the MS-13 transnational gang (Mara) in Honduras demanded Clara give up her granddaughter to one of its members as a wife. When Clara refused and shielded Gabriela, the gang threatened to kill them both and burn down their home. Clara and her granddaughter immediately fled Honduras, having known of others who had been killed by the gang after seeking assistance from police or moving to other parts of the country.

Clara told Amnesty International that CBP agents separated her from Gabriela two days after they sought asylum at the port-of-entry in Texas. After their separation, Clara spent over 1.5 years alone in an ICE immigration detention facility in Texas.

ICE subjected Clara to prolonged detention despite having diagnosed her upon detention as having high blood pressure, and a history of hypertension and multiple other serious health conditions, for which her casefile indicated she was routinely taking nine medications while in detention.

Clara appeared frail and faint as she told Amnesty International in an anguished voice of how much she and Gabriela missed each other since being separated. Trembling in fear as she spoke, Clara said she would be killed if returned to her home country of Honduras, with or without her granddaughter.

As she told her story to Amnesty International, Clara voiced exhaustion from pursuing her asylum claim at her older age, while in detention for over 1.5 years:

> "I raised my grandchild since she was little, and they wanted my grandchild to be their wife – the Mara, in Honduras. When I brought her, she was 14, and now she is 16. [...] I got in at the bridge on the 18th [of November 2016, at the port-of-entry]. She stayed with me on the 19th. And they took her away on the 20th. [...] They didn't tell me why they were taking her. They just told me they were going to separate her from me. I brought her mother's birth certificate, because her mother is my daughter. [...] They had the girl for three months in a shelter. [...] I start thinking about other things, because if they send me back, what am I going to do? I'm going to die in Honduras. From the things that are happening, from the violence. [...] I just can't take it anymore. I am old and I can't take it anymore. I'm 63 years old. There are days that I'm very desperate and sad. I would like to be with my family. It's been a very long time I haven't seen my family. So my granddaughter calls me mommy. And she told me [by phone], 'mommy, I want to be with you on mother's day.' [crying] She just wants to be with me. I am very sad."

132. Interview with Clara (pseudonym) conducted on 10 May 2018 at ICE's El Paso Processing Center, in El Paso, Texas. Amnesty International also reviewed documentation in her case file, including medical information recorded therein.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

38

After Clara lost her appeal in May 2018, ICE deported her back to Honduras without her granddaughter Gabriela.

In August 2018, Amnesty International spoke by phone with Clara's daughter in Houston, who gained custody of Gabriela after she spent several months in a shelter. "For my daughter, her grandmother is the same as her mother," she said. "She is very depressed and needs psychological help." Following Clara's deportation to Honduras, her daughter informed Amnesty International that Clara had to go into hiding in another village: "She is living in another place, so that the Mara will not find her. She is very sad and depressed, and has been sick."[133]

## CASE OF MARIA & MATHEUS (BRAZIL)

### 'WE ARE SUFFERING TOO MUCH. …I AM CRYING A LOT.'

On 25 August 2017, Maria (55) and her grandson with disabilities Matheus (17) requested asylum at the Santa Teresa Port-of-Entry in New Mexico, near El Paso, Texas. Maria presented her identification and proof of her legal guardianship over Matheus at the port-of-entry, yet DHS nonetheless separated them as they transferred Maria to ICE custody for detention.[134]

 

*Maria, with her niece and grandson Matheus (right), in undated photo.*

"Mommy!" Matheus screamed out to his grandmother as they were separated. "Mommy, don't let them take me!" DHS sent Matheus first to a shelter, and then to child protection services in Connecticut State. Neither in immigration court proceedings, nor in Maria's asylum case file, did authorities question her legal guardianship over Matheus.

Maria had raised Matheus since he was 3 years old, when his mother (Maria's daughter) abandoned him due to his physical and developmental disabilities, including epilepsy and autism. In Brazil, Matheus was beaten by teaching staff at his school for children with special needs. Maria showed Amnesty International a photo of Matheus after he came home one day, curled in a fetal position with bruises and bandages. She burst into tears clutching the image, her face flushed red and inflamed, weeping uncontrollably.

133. Conversation by phone, 20 August 2018.
134. Interview with Maria conducted on 10 May 2018 at ICE's El Paso Processing Center, in El Paso, Texas. Amnesty International also monitored the merits hearing in Maria's asylum case on the same day, and reviewed documentation in her case file. Following Maria's release on parole, Amnesty International conducted a follow-up interview with her by phone.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

39

After Maria got the principal at Matheus's school fired, she received repeated death threats from the principal's police officer brother. Maria and Matheus fled their home to seek asylum in the United States, where Maria's husband lived. The local prosecutor told Maria he could not protect her from the death threats of the police officer, she said.

As she addressed the immigration judge deciding her case, Maria cried and gasped at times, her face turning red from apparent stress:

> "I will die if I go back to Brazil. […] I am sure that if I go back to Brazil, he will kill me. […] When he came to my house to threaten me, […] he told me he was a police officer. […] He was very upset. He was very angry, because his sister was losing her job because of what I said on the radio, and he said he was going to kill me for that."

ICE diagnosed Maria upon detention with dangerously high blood pressure. She became ill and had to be rushed to the hospital on 4 May. The following week, she told Amnesty International that her health was deteriorating in detention, and had been made worse by her separation from her grandchild. Whenever she spoke with Matheus by phone, he would cry loudly and plea to her, "mommy, why won't you come for me?"

In her immigration court hearing, Maria also told the judge of how her separation from Matheus had contributed to her deteriorating health. She spoke in court, through her tears:

> "I have high blood pressure, very high blood pressure. As a matter of fact, on May 4th, I got very, very sick. It was around 2 a.m. when they had to take me to the hospital. When I got there, my blood pressure was extremely high – it was like 180 or 200, something like that. And then the doctors gave me four pills of 20mg each, and that would not work, and the blood pressure would not go down. And then I started to feel like my body was getting numb, and I was very sick. Am not feeling very good, not doing so good. Right now, I've not been able to control my blood pressure. It's been very, very high. I believe that because of all of this I'm going through – the fear of going back to Brazil, the fear of being separated from my grandchild, all of this together, I can't stop thinking about it – that it's making me really sick, and my blood pressure is not going down. […] I can't stop thinking about that. I just want to fight for him, and to take care of him."

The immigration judge rejected Maria's asylum claim on 3 July 2018, claiming the police officer who plotted to kill Maria and Matheus was not acting in an official capacity, and that his death threats did not rise to the level of persecution.[135] Following substantial media coverage of her and Matheus's story in both the US[136] and Brazilian[137] media, a Congressional representative of Texas successfully pressured authorities to release Maria on parole. On 12 July 2018, DHS released Maria from detention pending the appeal of her asylum claim, following which she moved to Connecticut to reunite with Matheus and her husband.[138]

---

135. Court decision, dated 3 July 2018, Judge William Lee Abbott.
136. Texas Tribune, "A grandmother seeking asylum was separated from her disabled grandson at the border. It's been 10 months" (13 June 2018): https://www.texastribune.org/2018/06/13/immigrant-child-asylum-disabilities-separated-grandmother-border.
137. Epoca, "Crianças apartadas dos pais" (21 June 2018): https://epoca.globo.com/brasil/noticia/2018/06/criancas-apartadas-dos-pais.html.
138. Hartford Courant, "Released From Federal Detention, A Brazilian Grandmother Comes to Connecticut to Find Her Grandson" (27 July 2018): http://www.courant.com/news/connecticut/hc-news-brazilian-grandmother-child-20180725-story.html.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

40

# CASES OF FOUR FATHERS & THEIR CHILDREN (EL SALVADOR & HONDURAS)

## 'I'D RATHER DIE THAN BE SEPARATED FROM MY SON!'

On 16 November 2017, CBP and ICE personnel in San Diego simultaneously separated four Central American fathers from their respective children when transferring them from CBP to ICE custody, without any justification based on the facts of the cases or under the law. All but one of the families had presented themselves to CBP at the San Ysidro POE, while the last crossed irregularly into the United States and requested protection from the US Border Patrol.[139]



↑ 👁

*Jose and Mateo in Tijuana, Mexico, on 10 November 2017, prior to requesting asylum at the San Ysidro Port-of-Entry (Pueblo Sin Fronteras).*

Immediately after their families were separated, Amnesty International began campaigning[140] for the four fathers' release and reunification with their children, and interviewed them in detention at Otay Mesa Detention Center on 5 January 2018, accompanied by a lawyer who was assisting on their cases. During the detention visits, Amnesty International reviewed the four fathers' case files, including their identification documents proving their paternity of their children, which they had presented to authorities when each family requested asylum. Three of the four fathers were visibly traumatized, and broke into tears at points while providing their accounts to Amnesty International.

Despite all the fathers' refusal to be separated from their children, three of the fathers surrendered their children under duress and threats of force. The fourth refused and his child was violently removed from his arms, while he pleaded to the DHS officials, "I'd rather die than be separated from my son!" The father told Amnesty International that he only let go of his son to avoid the DHS official causing him physical harm. Protesting that authorities were keeping his 12-year-old son handcuffed, another father asked a DHS official: "Why are you doing this? He's a minor!" The official responded, "you don't have any rights here."

In a 5 January 2018 meeting with Amnesty International, the director of ICE's Otay Mesa Detention Center defended the fact that ICE did not give any of the fathers a reason why they were being separated from their children:

---

139. Interview with four fathers conducted on 7 January 2018 at ICE's Otay Mesa Detention Center in San Diego, California. Amnesty International also reviewed documentation in the four fathers' case files; copies of their identity documents; and signed written statements from the four fathers provided in Spanish through an intermediary organization in November 2017.
140. Amnesty International, Urgent Action (22 November 2017): https://www.amnestyusa.org/wp-content/uploads/2017/11/uaa25617.pdf. Amnesty International researchers also raised the four fathers' cases with CBP and ICE officials (as well as DHS oversight bodies) by formal letter, emails, phone calls, and in meetings with senior ICE officials at the Otay Mesa Detention Center in January and May, and at ICE headquarters in June 2018.
141. Email from ICE, dated 21 November 2017.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

41

> "'I'm going to separate you from your child' – that's the end of the
> discussion. The process is the process. All we can say is, 'hey, we are
> concerned about the validity of your relationship with the child.'"

Yet in none of the four fathers' cases did CBP or ICE express such concerns prior to the separations,
making such claims only afterward when defending their actions.

After fleeing targeted violence in El Salvador, one father Jose and his son Mateo joined a caravan of
approximately 50 asylum-seekers, who together requested protection at the San Ysidro Port-of-Entry
on 12 November 2017. The other seven of the eight families in that caravan, also from the Northern
Triangle of Central America, were swiftly released by DHS as they awaited consideration of their
asylum claims.

When Amnesty International raised the four fathers' cases with DHS, ICE officials claimed that both
ICE and CBP were unable to confirm a family relationship between Jose and Mateo, supposedly
because Jose was unable to provide identifying documents proving his paternity, and his son Mateo
was too young to speak. For that reason, ICE claimed: "Out of concern for the child's safety and
security, ERO transferred the child to the Department of Health and Human Services (HHS) Office
of Refugee Resettlement (ORR) for placement."[141] That account by ICE clearly conflicted with
information provided by CBP personnel, who confirmed that CBP and ICE had their identification
documents all along.[142]

In January 2018, prior to Jose having his scheduled parole interview, the director of ICE's Otay Mesa
Detention Center deemed Jose to be a flight risk, and declined to release him on parole. Amnesty
International and organizations working on Jose's case believed the parole denial to be potentially
retaliatory, following considerable public attention on Jose's case.[143] In July 2018, ICE finally released
Jose from immigration detention, following prolonged efforts by his legal team.

# 3.4 US AUTHORITIES SEPARATED MORE FAMILIES THAN PREVIOUSLY DISCLOSED

Immediately following the Trump administration's announcement of its "zero-tolerance policy for criminal
illegal entry," DHS agencies began forcibly separating thousands of families at the US–Mexico border, vastly
expanding and accelerating the practice compared to preceding months. Yet even prior to this policy and
the outcry it was met with, the US government had already separated potentially thousands more families
at the border since 2017, without adequate oversight or accountability. The total number of families forcibly
separated, and the trauma they have endured under this abusive practice, are still coming to light.

In September 2018, CBP informed Amnesty International that the US Border Patrol separated 6,022
"familiy units" between 19 April and 15 August 2018[144] – more than US authorities had previously admitted

---

142.  Email from CBP, dated 12 December 2017.
143.  New York Times editorial, "Trump Administration Considers Separating Families to Combat Illegal Immigration" (21 December 2017):
https://www.nytimes.com/2017/12/21/us/trump-immigrant-families-separate.html.
144.  Emails to Amnesty International, dated 24 August and 11 September 2018, from the Executive Director and the Chief of Staff of CBP's
Office of Intergovernmental Public Liaison. CBP provided Amnesty International with some statistics that conflicted with other statistics posted
on its website – raising questions of whether the number of "family units" separated by CBP referred to the number of (1) whole families, or (2)
individual family members. CBP did not adequately clarify the statistics it provided prior to this report's publication. DHS agencies use several
conflicting definitions of the term "family units." For instance, the DHS and HHS draft regulations on "Apprehension, Processing, Care, and
Custody of Alien Minors and Unaccompanied Alien Children" (7 September 2018), define "family units" as the whole family group: "Family
unit means a group of two or more aliens consisting of a minor or minors accompanied by his/her/their adult parent(s) or legal guardian(s)."

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

42

to separating under the "zero tolerance" policy.[145] US authorities have still not publicly disclosed how many of those families were seeking asylum from persecution. Neither have authorities released complete statistics on the number of families the Trump administration separated prior to April, including during the pilot run of its family separations policy from July to November 2017 in Texas and New Mexico. DHS informed the Congressional Research Service (CRS) and news media that it had separated 1,768 families between October 2016 and February 2018, prior to the "zero-tolerance" policy.[146]

The total of those available statistics suggests that DHS forcibly separated approximately 8,000 "family units" in 2017 and 2018 with the number of family separations skyrocketing under the "zero-tolerance" policy. Those figures do not include the period from 1 March to 18 April 2018, and apparently exclude an unknown number of families who were separated after requesting asylum at official US ports-of-entry, which DHS has not shared accurate records on, such that there could be considerable underreporting.

The director of ICE's Otay Mesa Detention Center near San Diego, California, informed Amnesty International in January 2018 that ICE does not record all family separations in the cases of those presenting at ports-of-entry, regardless of whether they were separated by CBP prior to transferring custody to ICE, or were separated jointly by CBP and ICE during that transfer of custody. In September 2018, CBP informed Amnesty International that it had only recorded the separation of 36 family units at US ports-of-entry between 1 October 2017 and 31 July 2018, out of a total of 18,142 "inadmissible" family units (including asylum-seekers) who were processed during that period.[147] Due to the unlikeliness of such a low number (36), Amnesty International immediately sought clarification of how it was calculated. According to CBP, the thousands of families whom the US government has publicly admitted to separating – including those 36 family units separated at ports-of-entry – do not include any cases of so-called "fraud."

The Trump administration has frequently alleged that the US asylum system is full of fraud, and sought to justify the separation of asylum-seeking families by claiming that they were actually gang members fraudulently trafficking children.[148] In reality, DHS statistics suggest that traffickers may account for only 0.1

(See: https://www.gpo.gov/fdsys/pkg/FR-2018-09-07/pdf/2018-19052.pdf.) Likewise, CBP's National Standards on Transport, Escort, Detention, and Search (TEDS Policy, October 2015), also define "family units" as whole family groups: "Family Unit: A group of detainees that includes one or more non-United States citizen juvenile(s) accompanied by his/her/their parent(s) or legal guardian(s), whom the agency will evaluate for safety purposes to protect juveniles from sexual abuse and violence." (See TEDS, at p. 28: https://www.cbp.gov/sites/default/files/assets/documents/2017-Sep/CBP%20TEDS%20Policy%20Oct2015.pdf.) In contrast, CBP uses the term differently in its periodically updated public statistics on "Southwest Border Migration" – defining "family units" as the total number of individuals in families, rather than the whole family group: "Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member by the U.S. Border Patrol." According to Internet Archive, CBP added this definition to its statistics website on 20 September 2018. (See: https://www.cbp.gov/newsroom/stats/sw-border-migration.) The use of "family units" to mean individual people who arrive with families, rather than their whole family groups, conflicts with the definition of the term under DHS policies, and may be intended to inflate the apparent number of families seeking to cross the US–Mexico border, for political purposes.

145. CRS report, "The Trump Administration's 'Zero Tolerance' Immigration Enforcement Policy" (20 July 2018): https://fas.org/sgp/crs/homesec/R45266.pdf; and NBC News, "Trump admin ran 'pilot program' for separating migrant families in 2017" (29 June 2018), available at: https://www.nbcnews.com/storyline/immigration-border-crisis/trump-admin-ran-pilot-program-separating-migrant-families-2017-n887616. See also: New York Times, "Hundreds of Immigrant Children Have Been Taken From Parents at U.S. Border" (20 April 2018), available at https://www.nytimes.com/2018/04/20/us/immigrant-children-separation-ice.html; Reuters, "Exclusive: Nearly 1,800 families separated at US–Mexico border in 17 months through February" (8 June 2018), available at https://www.reuters.com/article/us-usa-immigration-children-exclusive/exclusive-nearly-1800-families-separated-at-u-s-mexico-border-in-17-months-through-february-idUSKCN1J42UE; and Associated Press, "DHS reports about 2,000 minors separated from families" (16 June 2018), available at https://apnews.com/3361a7d5fa714ea4b028f0a29db1cabc.
146. Amnesty International interviewed 12 asylum-seekers who presented themselves at US ports-of-entry, and numerous media reports relayed accounts of such family separations at much higher numbers. For instance, see Associated Press, "DHS reports about 2,000 minors separated from families" (16 June 2018): https://apnews.com/3361a7d5fa714ea4b028f0a29db1cabc.
147. Email to Amnesty International, dated 24 August 2018, from the Executive Director and the Chief of Staff of CBP's Office of Intergovernmental Public Liaison. In contrast, the CBP website indicated that 40,638 "family units" were processed at US ports-of-entry during the same period – a difference of approximately 23,000, which suggests CBP interchangeably uses the term "family units" to refer to both entire families, and the number of individuals within those families (see above at n. 144).
148. DHS Secretary Nielsen claimed in June 2018 that asylum-seeking parents are actually gang members fraudulently trafficking their own children: "The kids are being used by pawns by the smugglers and the traffickers. Again, let's just pause to think about this statistic: 314 percent increase in adults showing up with kids that are not a family unit. Those are traffickers, those are smugglers. That is MS-13. Those are criminals and those are abusers." Washington Post, "Kirstjen Nielsen's mighty struggle to explain separating families at the border, annotated" (19 June 2018): https://www.washingtonpost.com/news/the-fix/wp/2018/06/19/kirstjen-nielsen-tries-to-explain-separating-families-at-the-border-annotated/?utm_term=.e3bb641012b7#annotations:14814492.



IN LESS THAN 4 MONTHS,
THE TRUMP ADMINISTRATION SEPARATED OVER
6,000 FAMILY UNITS

percent of asylum-seeking families apprehended after crossing irregularly into the United States in FY2017. In the first five months of FY2018, the rate was supposedly higher at 0.61 percent, but is still statistically insignificant.[149] Those rates also only reflect the recorded *justifications* made by DHS for family separations, rather than criminal prosecutions or other statistics that could support such accusations under a more rigorous standard of proof.

In 2018, CBP has increasingly claimed to separate families for reasons of "fraud" (in 46 cases in Fiscal Year 2017, versus 191 cases in just the first five months of Fiscal Year 2018).[150] Yet the circumstances CBP defined as "fraud" were often simply being a family member other than a parent. Hence, hundreds or thousands more families may have been separated, whom CBP does not count in its statistics after designating their relationships as "fraudulent."

CBP informed Amnesty International that families separated for reasons of "fraud" included: (1) grandparents and others who "do not fit the definition of immediate family member"; (2) those whose birth certificates and other documents CBP could not verify through consulates; and (3) those who were otherwise unable to prove their family relationships.[151] Amnesty International has documented cases in which DHS made demonstrably false claims of asylum-seeking families' being unable to prove their family relationships, even when documentary evidence proved those relationships beyond doubt.[152]

The Trump administration had also sought to justify the separation of families on the basis of its "zero-tolerance" policy to criminally prosecute all irregular adult migrants for the purpose of deterrence, which itself violates international standards. In reality, Syracuse University's TRAC program found that law enforcement authorities only prosecuted one adult out of 4,537 apprehended with families at the border

149. Washington Post, "How to mislead with statistics, DHS Secretary Nielsen edition" (18 June 2018): https://www.washingtonpost.com/news/politics/wp/2018/06/18/how-to-mislead-with-statistics-dhs-secretary-nielsen-edition.
150. CRS report, above at n. 145.
151. Email to Amnesty International, dated 24 August 2018, from the Executive Director and the Chief of Staff of CBP's Office of Intergovernmental Public Liaison.
152. See above cases of four fathers and their children.
153. The TRAC report observed: "If this was true, and if these Border Patrol records are accurate, it would appear most separations through at least April of this year took place for entirely different reasons than the rationale the Administration has given. This is also indicated by the deportation figures of those arrested, mentioned above, revealing that several hundred parents were deported apparently without their children during April of this year alone." See report of Syracuse University TRAC program, "New Details on Border Patrol Arrests" (27 June 2018): http://trac.syr.edu/immigration/reports/518/. Analysis confirmed by TRAC co-director Susan B. Long (in email of 1 August 2018).

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

44

after crossing irregularly in April 2018.[153] Additionally, less than one-third of all adults apprehended crossing the border irregularly were ultimately referred for prosecution (whether with or without families).[154] These statistics demonstrate that hundreds or potentially thousands of families were needlessly and arbitrarily separated from their family members and detained, without facing the criminal prosecutions that were the supposed justification for those separations.

Hundreds of those forcibly separated parents and guardians were then deported to their countries-of-origin without their children, over 300 of whom have still not been reunited.[155]

# 3.5 INEFFECTIVE REMEDIES: FAMILY DETENTION IS NO SOLUTION

Despite global outrage over family separations under the "zero-tolerance" policy, the Trump administration never disavowed its damaging policy and practice of family separations, nor adequately repaired or compensated the harm it inflicted upon thousands of families through those practices.

Instead, the Trump administration has sought to continue to separate asylum-seeking families whenever possible.

On 20 June 2018, President Trump capitulated to political pressure in the United States by signing an executive order[156] that he claimed would end the practice of family separation. In reality, however, the order did the following:

- It left open the possibility of separating families, as US authorities were doing arbitrarily for at least a year prior to the rescinded policy of mandatory separations;

- It did nothing to reunite the over 2,600 children who remained forcibly separated from their parents;

- It did not stop the policy of prosecuting adults seeking safety who crossed over borders irregularly; and

- It mandated the indefinite detention of children with their parents while their claims for asylum were being adjudicated, which is unlawful in the US under the 1997 *Flores* Settlement Agreement,[157] which controls the treatment of migrant children in immigration detention and US custody, and threatens further harm to children and families.[158]

The Department of Homeland Security (DHS) issued a series of statements after President Trump's executive order, making clear that family separations would continue in the foreseeable future, including while asylum-seekers awaited the outcome of their cases. In one of those statements on 21 June, the day

---

154. Report of Syracuse University TRAC program, "'Zero Tolerance' at the Border: Rhetoric vs. Reality" (24 July 2018): http://trac.syr.edu/immigration/reports/520/.
155. See above at n. 153. See also, Ms. L. v. ICE (above at n. 84), Joint Status Report (6 September 2018): https://www.pacermonitor.com/public/filings/DFL3I2BI/Ms_L_v_US_Immigration_and_Customs_Enforcement__casdce-18-00428__0213.0.pdf.
156. President Trump's Executive Order of 20 June 2018: https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/.
157. Flores Settlement Agreement, available at: https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf.
158. Ibid. Specifically, the Executive Order provided: "The Attorney General shall promptly file a request with the U.S. District Court for the Central District of California to modify the Settlement Agreement in Flores v. Sessions, CV 85-4544 ('Flores settlement'), in a manner that would permit the Secretary, under present resource constraints, to detain alien families together throughout the pendency of criminal proceedings for improper entry or any removal or other immigration proceedings. [...] This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations."

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

45

after the executive order, CBP confirmed that it would continue to separate children from their parents under the same conditions of so-called "safety" concerns,[159] which Amnesty International previously found the US government to have abusively utilized in the arbitrary separation of families without adequate justification. (See cases above in Section 3.) The Department of Homeland Security issued another statement on 23 June 2018, that suggested it did not plan to reunite separated families unless and until deporting them to their countries-of-origin, and that it would continue to keep them separated while they sought asylum in the US.[160]

Citing the 23 June statement by DHS, among other evidence, a US federal court on 26 June 2018 ordered the Trump administration to halt and remedy the harm caused by its family separations policy. Namely, it directed the administration to: (1) reunite the thousands of children and parents it had forcibly separated; (2) halt deportations of those parents who were not yet reunited with their children; and (3) stop family separations at official US border crossings unless absolutely necessary to protect the child from imminent harm.[161]

That injunction did not address the US government's stated intention to impose indefinite detention on asylum-seeking families, which was the unlawful remedy proposed by President Trump's executive order as an alternative to family separations.

On 9 July 2018, however, another federal judge rejected[162] the federal government's formal request to modify the *Flores* Settlement Agreement, to permit the indefinite detention of children in immigration detention facilities. *Flores* requires the release of children from immigration detention facilities, whether accompanied or unaccompanied, as soon as possible and within no longer than 20 days.

Undeterred, the Trump administration attempted again in September 2018 to eviscerate the protection of children under *Flores*. On 7 September, US authorities published proposed regulations[163] to implement the *Flores* settlement agreement. Instead of further institutionalizing child welfare protections and rights, these proposed regulations would effectively terminate Flores' substantive protections for migrant children in immigration detention and US custody. If adopted, these regulations would permit the indefinite detention of children with their parents, restrict the opportunities for children to be released on parole, and authorize a self-licensing scheme under which the US government could certify its own family detention facilities, including in prisons that fail to meet the current minimum standards for keeping children safe. Of note, the regulations themselves cite family detention as an "effective enforcement tool."

Amnesty International has thoroughly documented the traumatic consequences of families being subjected to immigration detention in the United States, whether for indefinite[164] or shorter[165] periods of time.

On 17 July 2018, two doctors who serve as subject matter experts for the DHS Office for Civil Rights and Civil Liberties sent a letter to the Senate's Whistleblower Protection Caucus, voicing their opposition to the

159. CBP statement, "CBP's Statement on Implementing the President's Executive Order Affording Congress the Opportunity to Address Family Separation" (21 June 2018): "[…] as was the case prior to implementation of the zero tolerance policy on May 5, family units may be separated due to humanitarian, health and safety, or criminal history in addition to illegally crossing the border." Available at: https://www.cbp.gov/newsroom/speeches-and-statements/cbps-statement-implementing-presidents-executive-order-affording.
160. DHS fact sheet on family separations and reunifications (23 June 2018): https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.
161. See, Ms. L. v. ICE (above at n. 84), Order Granting Plaintiffs' Motion for Class-wide Preliminary Injunction: https://int.nyt.com/data/documenthelper/58-federal-judge-rules-on-immigra/425f7ff96a5dcb98ecce/optimized/full.pdf.
162. US District Court for Central District of California, Case No.CV 85-4544-DMG (AGRx), Order Denying Defendants' "Ex Parte Application for Limited Relief from Settlement Agreement" (9 July 2018): https://www.justsecurity.org/wp-content/uploads/2018/07/flores.order_.0709.pdf.
163. DHS and HHS draft regulations on "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children" (7 September 2018): https://s3.amazonaws.com/public-inspection.federalregister.gov/2018-19052.pdf.
164. Amnesty International, "Urgent Action Victory! Four Families Ordered Released From Detention" (18 August 2017): https://www.amnestyusa.org/urgent-actions/urgent-action-victory-four-families-ordered-released-from-detention-usa-ua-59-17/.
165. Amnesty International statement, "Fifteen-year-old Girl and Father Released after Amnesty International USA Delivers Petitions to ICE"

use and expansion of family detention. Based on their findings over years of visits and inspections at family detention facilities, the doctors found family detention to uniformly harm the health of all detained families, and particularly the health of children.[166]

As of September 2018, the US government has still not accounted for or reunified all of the families it separated previously.[167] Moreover, it continues to seek to deport families upon reunification, without adopting any measures of reparation to address the serious psychological and/or physical harm caused to individuals who were unlawfully separated under the government's recent policy and practice of family separations.

(23 March 2018): https://www.amnestyusa.org/press-releases/fifteen-year-old-girl-and-father-released-after-amnesty-international-usa-delivers-petitions-to-ice. See also, Amnesty International, "Urgent Action: Family Seeking Asylum Detained at Berks" (9March 2018), Doc. No. AMR 51/8030/2018: https://www.amnesty.org/download/Documents/AMR5180302018ENGLISH.pdf.
166.  Letter of Dr. Allen and Dr. McPherson to the Senate Whistleblowing Caucus (17 July 2018): http://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf.
167.  See above at nn. 144 and 153. See also, Ms. L. v. ICE, Joint Status Report (6 September 2018), at n. 155 above.

# 4. ARBITRARY AND INDEFINITE DETENTION OF ASYLUM-SEEKERS

Central to the Trump administration's efforts to deter and punish those who seek protection at the US–Mexico border has been its policy of increasing the use of mandatory and indefinite detention of asylum-seekers, without parole, for the duration of their asylum claims. By definition, this Trump administration policy constitutes arbitrary detention under international law.[168] Indefinite detention without criminal charge is always in violation of the UN Convention Against Torture, which the United States ratified and integrated into US law.[169]

The administration's desire to indefinitely detain asylum-seekers has also been a core part of its parallel policies of illegal pushbacks (supposedly due to detention capacity constraints at ports-of-entry) and family separations (as a strategy to avoid releasing asylum-seeking families from detention).

Immediately upon taking office, the Trump administration adopted an unambiguous policy of arbitrary detention of asylum-seekers. In a January 2017 executive order on "border security and immigration enforcement improvements," President Trump ordered the default detention of all asylum-seekers, without parole except in rare circumstances.[170] In a memorandum on 6 April 2018 (the same day as the "zero-tolerance" policy was announced), President Trump reaffirmed and expanded his 2017 order on the mandatory detention and denial of parole to asylum-seekers.[171] In a 2018 budget request, the Trump administration projected an increase in its average daily population (ADP) in immigration detention by over 23 percent to 47,000 in 2019.[172]

Following President Trump's order in 2017, at least five ICE Field Offices issued blanket denials of nearly 100 percent of parole requests by asylum-seekers, where they had previously granted parole in more than 90 percent of cases. A federal court in July 2018 ruled in a preliminary injunction that the US government's practice of blanket parole denials was likely arbitrary and illegal.[173]

168. The UN Working Group on Arbitrary Detention, in its Revised Deliberation No. 5 on deprivation of liberty of migrants, stated in February 2018: "Detention in the course of migration proceedings must be justified as reasonable, necessary and proportionate in the light of the circumstances specific to the individual case. Such detention is permissible only for the shortest period of time, it must not be punitive in nature and must be periodically reviewed as it extends in time. [...] Alternatives to detention must be sought to ensure that the detention is resorted to as an exceptional measure." See, UN Working Group on Arbitrary Detention, Revised Deliberation No. 5 on deprivation of liberty of migrants, UN Doc. (7 February 2018): https://www.ohchr.org/Documents/Issues/Detention/RevisedDeliberation_AdvanceEditedVersion.pdf. See also, statement of the UN Working Group on Arbitrary Detention, "Migrant detention must be 'last resort', UN rights group underlines in its Revised Deliberation on deprivation of liberty of migrants" (26 February 2018): https://www.ohchr.org/SP/NewsEvents/Pages/DisplayNews.aspx?NewsID=22710&LangID=E.
169. Conclusions and recommendations of the Committee against Torture: United States of America, UN Doc. CAT/C/USA/CO/2, 18 May 2006, para. 22: http://www.refworld.org/docid/453776c60.html.
170. Executive Order 13767, "Border Security and Immigration Enforcement Improvements" (25 January 2017): https://www.whitehouse.gov/presidential-actions/executive-order-border-security-immigration-enforcement-improvements. See also, DHS, "90-day Progress Report to the President on Executive Order 13767: Border Security and Immigration Enforcement Improvements" (25 April 2017), "Section 11: Parole, Asylum, and Removal," at pp. 8-9: https://assets.documentcloud.org/documents/3553905/Borderreport.pdf.
171. See, "Presidential Memorandum for the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security" (6 April 2018): https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-state-secretary-defense-attorney-general-secretary-health-human-services-secretary-homeland-security.
172. DHS, "ICE Budget Overview FY2019," at p. 40: "The cumulative ADP at the end of FY 2017 was 38,106 (36,628 adult and 1,476 families). [...] FY 2019 ADP is now expected to reach 47,000, an increase of 23 percent over FY 2017." Available at: https://www.dhs.gov/sites/default/files/publications/ICE%20FY19%20CJ.pdf.
173. Those five ICE Field Offices were in: Detroit (covering Michigan and Ohio); El Paso (covering New Mexico and West Texas); Los Angeles; Newark (covering New Jersey); and Philadelphia (covering Pennsylvania). The case reviewed statistics on more than 800 decisions on parole

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

48

Under international standards that the United States has adopted and agreed to be bound by, the indefinite detention of asylum-seekers based solely on their migration status constitutes arbitrary detention, in violation of US obligations under international human rights law[174] and refugee law.[175]

In a July 2017 report on its country visit to the United States in October 2016, the UN Working Group on Arbitrary Detention found that even prior to the Trump administration, "immigrants were subject to mandatory detention under punitive conditions," with parole requests "routinely denied," which "could result in asylum-seekers revoking their legitimate immigration claims."[176]

The Working Group on Arbitrary Detention concluded:

> "the current [US] system of detaining immigrants and asylum-seekers is, in many cases, punitive, unreasonably long, unnecessary, costly when there are alternative community-based solutions, especially for children and families, not based on an individualized assessment of the necessity and proportionality of detention, carried out in degrading conditions, and a deterrent to legitimate asylum claims."[177]

Following the Trump administration's announcement of even harsher asylum policies in early 2017, the Working Group expressed "concern that the executive order and implementing memorandum lay the groundwork for expanding the existing detention system by increasing the number of individuals subject to immigration detention," which would "worsen the situation."[178]

The Working Group further voiced that it was "deeply disturbed" by reports of DHS's desire to conduct family separations as a deterrent and punitive policy, and "gravely concerned" that such a policy would result in the detention of parents or guardians, while their children would be remanded to the custody of the government or third-party sponsors.[179]

In the Trump administration's crusade to abolish legal protections for asylum-seekers, DHS has specifically sought legal authorization to indefinitely detain unaccompanied children and families with children.[180] That expanded power would effectively allow the government to arbitrarily detain all asylum-seekers, without

---

requests in those Field Offices, from February to September 2017. All the plaintiffs passed credible fear screenings, meaning US asylum officers had found their fear of persecution to be credible, and likely to result in successful asylum claims. Order of the US District Court for the District of Columbia, in Damus v. Nielsen, No. 18–578 (JEB), 2018 WL 3232515 (dated 2 July 2018), at pp. 27-38: https://ecf.dcd.uscourts.gov/cgi-bin/show_public_doc?2018cv0578-34.

174. Report of the Working Group on Arbitrary Detention on its visit to the United States of America (17 July 2017), UN Doc. A/HRC/36/37/Add.27, at paras. 26-28, 32: "the mandatory detention of immigrants, especially asylum-seekers, is contrary to international human rights and refugee rights standards" (at para. 26): http://ap.ohchr.org/documents/dpage_e.aspx?si=A/HRC/36/37/Add.2. Under international law, asylum-seekers are presumed to be eligible for international protection unless and until proven otherwise following a full, fair and effective asylum determination procedure. Asylum-seekers should not be detained except a measure of last resort, which must be necessary and proportionate to achieve a legitimate aim, after all other non-custodial alternatives have proven or been deemed insufficient in an individual's specific case. The detention of asylum-seekers or migrants solely on the basis of their migration status, without particular legitimate legal justifications of detention that are specific to the individual, constitutes arbitrary detention under international law.

175. UNHCR, Guidelines on the Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers and Alternatives to Detention (2012); at paras. 14, 18, 21, 32. UNHCR, which is the international agency charged with supervising treaties for the protection of refugees, has affirmed in its Guidelines on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention ("Guidelines"), that under Article 31, "the detention of asylum-seekers should be a measure of last resort, with liberty being the default position." According to the UNHCR, detention is only justifiable when it is "necessary in the individual case, reasonable in all the circumstances and proportionate to a legitimate purpose," with the sole legitimate purposes being protecting "public order, public health or national security." The UNHCR specifically states that: "Detention that is imposed in order to deter future asylum-seekers, or to dissuade those who have commenced their claims from pursuing them, is inconsistent with international norms. Furthermore, detention is not permitted as a punitive – for example, criminal – measure or a disciplinary sanction for irregular entry or presence in the country. Apart from constituting a penalty under Article 31 of the 1951 Convention, it may also amount to collective punishment in violation of international human rights law."

176. See above at n. 174, at paras. 27-28.

177. Ibid, para. 87.

178. Ibid, para. 25.

179. Ibid, para. 41.

180. See, "DHS Statement on President Trump Visit to Border Wall Prototypes" (13 March 2018): https://www.dhs.gov/news/2018/03/13/dhs-statement-president-trump-visit-border-wall-prototypes.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

49

exception. Currently, the United States is not legally allowed to indefinitely detain children or families with children, and must instead release them as soon as possible during the adjudication of their asylum claims.[181]

In practice, US authorities have leveraged the agony of prolonged detention to compel asylum-seekers to "voluntarily" give up their asylum claims, and accept deportation back to their countries-of-origin where they had fled persecution. That practice constitutes refoulement under international law. The anguish of indefinite detention has often been amplified by family separations and inadequate conditions of detention, including routinely substandard medical care that has contributed in some cases to asylum-seekers' deaths in immigration detention facilities.[182]

Amnesty International has documented frequent efforts by ICE to compel asylum-seekers to sign their own deportation papers (in some cases in languages they could not read), including in the cases of asylum-seekers from Brazil, El Salvador, Ghana, Iraq, and Mexico. In 2017 and 2018, Amnesty International also documented multiple reports of LGBTI asylum-seekers accepting "voluntary" deportation, in order to escape the anguish and ill-treatment of indefinite immigration detention.[183]

In a February 2018 report to the Human Rights Council, the UN Special Rapporteur on torture and other forms of cruel, inhuman or degrading treatment or punishment elaborated on how arbitrary and indefinite detention of asylum-seekers can "very quickly, if not immediately" constitute ill-treatment in cases of individuals who are in situations of heightened vulnerability. The Special Rapporteur observed this to be particular the case for asylum-seekers who are: "children, women, older people, persons with disabilities, medical conditions, or torture trauma, and members of ethnic or social minorities including lesbian, gay, bisexual, transgender and intersex (LGBTI) persons."[184]

In Section 3 of this report on family separations, Amnesty International identified cases of children, women, older people, and persons with disabilities or acute medical conditions who were adversely impacted by forced separations from their family members, and the subsequent trauma and ill-treatment resulting therefrom as they languished in indefinite detention.

Amnesty International has also extensively documented the impact of arbitrary immigration detention on LGBTI asylum-seekers, in particular. In 2018, Amnesty International interviewed 15 LGBTI asylum-seekers who were detained for periods ranging from several months to over 2.5 years without parole. In some cases those individuals were denied parole despite acute health conditions and need for specialized care, or following repeated sexual assaults while in detention.

---

181. See, Women's Refugee Commission, "The Flores Settlement & Family Separation at the Border" (15 June 2018): https://www. womensrefugeecommission.org/images/zdocs/WRC-Backgrounder-Flores-Settlement-and-Family-Separation.pdf.
182. See the Case of Roxana below. Rights organizations have also demonstrated through medical analysis of ICE's own records that inadequate medical conditions in US immigration detention have been the most common reason for detainees deaths in detention: https://www.aclu.org/news/report-links-poor-medical-care-deaths-ice-detention. See also, Human Rights Watch, "Mother Sues over Death of Toddler Released from US Immigration Detention" (29 August 2018): https://www.hrw.org/news/2018/08/29/mother-sues-over-death-toddler-released-us-immigration-detention.
183. For instance, see the story of "Cristel," in the Amnesty International report "No Safe Place" (November 2017), at n. 68 above. On 10 August 2017, a group of 17 LGBTI asylum-seekers presented themselves at the Nogales Port-of-Entry in Arizona. Four of those 17, including three gay men and one transgender woman, signed their own deportation papers to escape the agony of US immigration detention. (Message on 5 April 2018 from the coordinator of the group, Nakai Flotte with the organization Diversidad Sin Fronteras: https://www.facebook.com/diversidadsinfronteraz/.) The coordinator of the group told Amnesty International: "The gay men saw that they were not going to survive in Otera," referring to Otera County Processing Center, an immigration detention center where the gay asylum-seekers were detained after requesting asylum. The coordinator of the group said that gay men with feminine gender expression had frequently reported getting assaulted, ridiculed, and harassed in the facility for being gay. Of the three who chose "voluntary" deportation instead of staying in immigration detention, two sought safety in Mexico, and the third went missing upon his return to El Salvador. "His family was killed, so he was very vulnerable," the coordinator said. (Meeting on 1 May 2018 with Nakai Flotte, Diversidad Sin Fronteras.)
184. UN Human Rights Council, "Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment" (26 February 2018), UN Doc. A/HRC/37/50; available at: https://www.ohchr.org/Documents/Issues/Torture/A_HRC_37_50_EN.pdf.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

50

# 4.1 'IT'S JUST ARBITRARY': BLANKET DENIALS OF PAROLE REQUESTS BY ICE

Senior officials in ICE's El Paso and San Diego Field Offices confirmed to Amnesty International that there was a default policy of mandatory immigration detention, without consideration of humanitarian parole.

In the San Diego sector, an Assistant Field Office Director, who reviewed and decided on parole requests, told Amnesty International: "All asylum applicants are put in for expedited removal, except for family units when there's no space for them. [...] All single adults get placed into custody. The default is immigration detention, and *not measuring flight risk* [emphasis added]. The process is expedited removal."[185]

In the El Paso sector, an Assistant Field Office Director informed Amnesty International he had received explicit instructions from ICE headquarters in Washington, DC, that there was a presumption of detention in all asylum cases. He later declined to share those instructions, due to an ongoing lawsuit against his Field Office related to its blanket denials of parole requests. Nonetheless, he informed Amnesty International:

> *"These people [asylum-seekers] are not illegally entering the country; they're presenting themselves at a port-of-entry and claiming fear. Yet they need to be detained."*[186]

From February to September 2017, the El Paso Field Office issued blanket denials of 100 percent of parole requests it received from asylum-seekers in New Mexico and West Texas.[187]

Between March and May 2018, five immigration lawyers[188] representing asylum-seekers under the jurisdiction of ICE's El Paso Field Office independently informed Amnesty International that they had stopped submitting parole requests, since they were being arbitrarily denied in all cases. One of the lawyers, who represented numerous asylum-seekers at Cibola County Correctional Center in New Mexico, informed Amnesty International:

> *"Among hundreds of detainees at Cibola who are asylum-seekers, not a single one was granted parole. Every single one is qualified as a flight risk uniformly, without consideration of their individual cases. All the parole denials are stamped as a 'flight risk.' There are no criteria; it's just arbitrary. Whether people have medical issues or US-citizen parents, there is no differentiation in any way. In the case of one client who needed a surgery, ICE wouldn't even provide a confirmation of receipt of more than 100 pages of medical risk documents, as part of a request for humanitarian parole."*[189]

Under a class-action lawsuit against ICE for its blanket denials of parole requests, the El Paso Field Office Director, Ms. Diane Witte, confirmed in a written declaration that her office had categorically denied one asylum-seeking woman's parole request because she was "a recent entrant and thus presented a flight risk."

---

185. Interview at Otay Mesa Detention Center (5 January 2018).
186. Interview at Cibola County Correctional Center (8 May 2018).
187. See, Order of the US District Court for the District of Columbia, in Damus v. Nielsen, No. 18–578 (JEB), 2018 WL 3232515 (dated 2 July 2018), at pp. 31: https://ecf.dcd.uscourts.gov/cgi-bin/show_public_doc?2018cv0578-34.
188. Two located in New Mexico, and three in Texas.
189. Phone conversation with Allegra Love, Santa Fe Dreamers Project (2 March 2018).

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

51



The federal judge overseeing the case cited Ms. Witte's statement as evidence of ICE's apparently illegal policy of arbitrary parole denials:

> "This reasoning [of Ms. Witte] is contrary to the very concept of giving each applicant an 'individualized determination,' as 'recent entry' is a categorical characteristic of most, if not all, asylum-seekers. For the El Paso Field Office to conclude that such entry is, itself, sufficient to demonstrate flight risk strongly suggests that it is not conducting the particularized assessments required by the [Parole] Directive. [...] The record indicates that, instead, they are subject to a de facto 'no-parole' reality, under which detention has become the default option."[190]

On 2 July 2018, in light of ICE's apparently illegal denial of asylum-seekers' parole requests, the judge ordered a class-wide preliminary injunction requiring all five ICE Field Offices in question to conduct individual reassessments of each asylum case since February 2017, in order to ensure the claimants were not wrongfully denied humanitarian parole after passing their credible fear interviews.

The judicial order was applicable to all asylum-seekers who had been denied parole by those Field Offices, until the final order of their removal, including during the appeals process. The order also reaffirmed that the Parole Directive requires individually reasoned decisions, not just blanket or pro forma denials (as with

190. Order of the US District Court for the District of Columbia, in Damus v. Nielsen, No. 18–578 (JEB), 2018 WL 3232515 (dated 2 July 2018), at pp. 35-36: https://ecf.dcd.uscourts.gov/cgi-bin/show_public_doc?2018cv0578-34.

check-box forms utilized by the El Paso Field Office, among others). The obligation for the parole reviews was on Field Office Directors, such as Ms. Witte, unless delegated otherwise.

Following the decision, numerous asylum-seekers were released from detention facilities under the jurisdiction of those five ICE Field Offices. Yet others remained in detention, still without individualized assessments or reasoned decisions in response to their parole requests, including in cases documented by Amnesty International (see case of Alejandra below).

In February 2018, the US Supreme Court voided a Ninth Circuit Court of Appeals decision granting asylum-seekers in the western United States access to bond hearings after six months of detention. As a result, most asylum-seekers now face the possibility of indefinite detention, without access to humanitarian parole (by ICE) or bond hearings (by immigration courts), regardless of whether they crossed regularly or irregularly into the US to request asylum.[191]

# 4.2 'NONE OF US HAVE BEEN GIVEN PAROLE': ACCOUNTS OF TRANSGENDER ASYLUM-SEEKERS

Amnesty International documented in its November 2017 report, *No Safe Place*,[192] how LGBTI asylum-seekers from the Northern Triangle of Central America are subjected to disproportionately high rates of persecution and targeted violence, from which authorities in their home countries routinely fail to protect them, forcing them to seek asylum abroad.

Transgender women are especially vulnerable to death threats from gangs; sexual violence and exploitation; human trafficking; and arbitrary detention and abuse by law enforcement authorities. Along their journeys north to seek safe haven in Mexico or the United States, many face the same threats of violence and exploitation as they fled in the Northern Triangle.[193]

Upon requesting asylum at the US–Mexico border, transgender asylum-seekers encounter a new set of challenges and abuses, exposing them to heightened risks of ill-treatment in the US system of indefinite immigration detention. Such abuses include physical, verbal and sexual violence; inadequate medical care; and detention in inappropriate facilities, whether confined to solitary cells against their will, or in cases of transgender women being held in all-male facilities based on their designated biological sex.[194]

On 7 May 2018, Amnesty International interviewed a transgender woman named Monica from Honduras, who was denied parole by the director of ICE's Otay Mesa Detention Center even after twice being sexually assaulted in an all-male detention unit at the facility.[195]

On 24 May, 4 June and 26 September, Amnesty International spoke by phone with an asylum-seeking transgender woman in detention named Nicol, also from Honduras. After seeking asylum in the United States from sexual assault and other physical violence she fled in Honduras, she reported suffering ill-treatment and serious instances of discrimination at ICE's immigration detention facility in Port Isabel, Texas. She was subsequently transferred to the specialized transgender unit at ICE's Cibola County Correctional Center, where she continued to face ill-treatment and abuse. Nicol suffers from bipolar disorder, and informed Amnesty International that she had not received medications or been able to speak

191. SCOTUS, Jennings v. Rodriguez, Opinion dated 27 February 2018: www.scotusblog.com/wp-content/uploads/2017/02/15-1204bsacLegomskyAndYale-Loehr.pdf.
192. Amnesty International report, "No Safe Place" (November 2017), at n. 68 above.
193. Ibid. See also, Amnesty International report, "Home Sweet Home?" (October 2016): https://www.amnesty.org/en/documents/amr01/4865/2016/en/; and Amnesty International report, "Facing Walls" (June 2017), at Section 5.3 (see n. 68 above).
194. See "No Safe Place" at n. 68 above.
195. See the case of Monica, below.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

53

with a psychologist during her first month at Cibola. She was then sexually assaulted while in detention at Cibola's transgender facility, following which she had to be hospitalized. According to media reports, her depression grew extreme, and she became suicidal in detention. A lawyer at the Cibola facility confirmed those accounts by email to Amnesty International.[196]

## 4.2.1 THE 'TRANS POD' AT CIBOLA COUNTY CORRECTIONAL CENTER

Out of a network of over 200 immigration detention facilities in the United States,[197] ICE has only one specialized immigration detention unit for LGBTI people. It is the so-called "Trans Pod" located at the Cibola County Correctional Center in Milan, New Mexico, which is privately operated by the for-profit prison corporation CoreCivic, under contract with ICE.



Under the jurisdiction of ICE's El Paso Field Office, the Trans Pod exclusively accommodates asylum-seekers who identify as transgender women. With a capacity of 60, the Trans Pod is a facility that only transgender women can transfer into, and only upon request. Almost all of the transgender women asylum-seekers at Cibola in 2018 were from the Northern Triangle or Mexico.[198]



*Four transgender women in Phoenix, Arizona, who had recently been granted asylum from persecution based on their gender identity. All of them were previously detained in Cibola County Correctional Center. (Amnesty International, May 2018).*

Amnesty International acknowledges ICE for having a specialized facility for transgender women asylum-seekers and working to implement rights-respecting policies concerning gender identity and sexual orientation.[199] Yet the very existence of the Trans Pod is also emblematic of the excessive use of jails to unnecessarily detain asylum-seekers, including those with acute needs and heightened vulnerability, who suffer inordinately in immigration detention and should instead be paroled pending the adjudication of their asylum claims.

ICE contracted the Cibola detention facility to detain asylum-seekers in October 2016, just months after the US Department of Justice's Federal Bureau of Prisons terminated its contract with the same private detention facility, following years of reportedly substandard medical care.[200]

On 7 and 8 May 2018, an Amnesty International delegation visited the Cibola County Correctional Center. During the visit, Amnesty International met with the ICE supervisor, as well as CoreCivic's warden and staff of the facility, and toured the Trans Pod with those representatives and the supervising doctor, employed by the health care subcontractor, Correct Care Solutions.

196. Email from lawyer at Cibola facility on 31 July 2018. See, See Arizona Public Media, "Transgender Asylum-seeker Says She Was Sexually Assaulted in Detention" (12 July 2018): https://www.azpm.org/p/home-articles-news/2018/7/12/133102-transgender-asylum-seeker-says-she-was-sexually-assaulted-in-detention/. See also, Arizona Public Media, "Transgender Asylum-seeker from Honduras Expected to Be Paroled" (17 August 2018): https://www.azpm.org/p/home-articles-news/2018/8/17/135262-detained-transgender-asylum-seeker-from-honduras-expected-to-be-paroled/.
197. See above at n. 21.
198. According to ICE, the Trans Pod was holding 32 asylum-seekers as of 8 May, and 29 as of 1 August 2018. Closer to 50 detainees had been detained at the Trans Pod, prior to the parole of 14 asylum-seekers on 26 July. Those releases were the first to follow a federal court order addressing blanket denials of paroles by the El Paso Field Office, among others.
199. The ICE supervisor at Cibola informed Amnesty International that the Trans Pod was conceived of and designed in line with ICE's 2015 Transgender Care Memo: https://www.ice.gov/sites/default/files/documents/Document/2015/TransgenderCareMemorandum.pdf.
200. See, for example, Washington Post, "The Justice Department Closed this Troubled Private Prison – Immigration Authorities Are Reopening It" (27 October 2016): https://www.washingtonpost.com/world/national-security/the-justice-department-closed-this-troubled-private-prison-immigration-authorities-are-reopening-it/2016/10/27/6e52855e-9b87-11e6-a0ed-ab0774c1eaa5_story.html.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

54

During and prior to the visit to Cibola, Amnesty International researchers separately interviewed 12 transgender women who were either currently (three) or previously (nine) detained at Cibola. Of those 12 women, six of them complained of inadequate and unresponsive health care being provided at the facility, including all three of the women detained in the Trans Pod when Amnesty International interviewed them.

The most serious problem identified by those interviewed were delays in the provision of anti-retroviral (ARV) drugs to new detainees with HIV upon their arrival at the facility; and the timing of when hormones, ARV drugs, and other medications were provided. For instance, several noted there was an inconsistent schedule for the dispensation of medicines; and that drugs, including strong dosages of hormones, would frequently be provided in the middle of the night, by nurses and guards who woke the detainees at 1:00 a.m. and then again a few hours later at 5:00 a.m. for breakfast. Those interviewed also similarly reported the unresponsiveness of nurses to written requests for examinations or other treatment – especially for palliative care (pain relief) – with some requests for examinations or treatment being answered by medical personnel three days or two weeks later, and other times not at all.

During Amnesty International's meetings at Cibola and subsequent tour of its Trans Pod on 8 May, the delegation raised the medical concerns relayed by current and former detainees at the facility with the ICE supervisor, CoreCivic warden, and Correct Care Solutions supervising doctor. All three representatives acknowledged that they had previously received complaints about the scheduling of health care services and unresponsiveness of some nurses to requests for care, including psychological care for which interpretation was often reportedly unavailable. The warden said that he would raise those concerns again with the medical staff, to ensure that they had been adequately addressed. However, he added that there is little CoreCivic can do to address complaints about medical professionals, including doctors and psychologists, noting: "There's a grievance process, yet the medical unit is very good and they audit very well. We had a meeting with medical; and that's the grievance process."

Amnesty International reviewed the report of the first and only ICE audit of the Cibola facility, conducted in January 2018, and found that the report contained no information or findings related to medical services provided in the Trans Pod of the facility. It likewise did not include any mention of the complaints that the CoreCivic warden, Correct Care Solutions supervising doctor, and ICE supervisor acknowledged having previously received regarding health care services at the facility.[201]

In a June 2018 meeting with Amnesty International, an ICE official at its headquarters confirmed that ICE had identified through its own inspections the same problems documented by Amnesty International: "Everything you've identified I've also identified [...] including the dispensation of infectious disease medications, etcetera. They are not a platinum provider," the official confirmed with reference to Correct Care Solutions, the medical vendor and service provider at Cibola.

On 8 June, Amnesty International wrote a follow-up letter to CoreCivic and Correct Care Solutions to request information on what remedial measures they would adopt to address the aforementioned concerns, and to improve the health care being provided at the Cibola facility. Amnesty International also requested details of what urgent measures their management would adopt to ensure that asylum-seekers detained at the Cibola facility would have regular access to adequate and timely health care while in custody at the facility, especially those individuals living with sexually transmitted infections (STIs) or other conditions requiring specialized medical care. Neither of the companies responded.

---

201. Office of Detention Oversight, Compliance Inspection for the Cibola County Correctional Center (9–11 January 2018): https://www.ice.gov/doclib/foia/odo-compliance-inspections/cibolaCountyCorrectionalCenterComplianceInspectionMilanNmJan09_11_2018.pdf.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

55

## CASE OF ALEJANDRA (EL SALVADOR)

**'AS AN OLDER TRANS WOMAN, AND AS A FIGHTER FOR LGBT RIGHTS, I AM A FIGHTER ALL THE WAY UNTIL THE LAST DAY THAT I AM ON THIS EARTH.**

Alejandra is a 43-year-old transgender rights activist from El Salvador. After years of beatings and attacks due to her transgender identity, Alejandra fled El Salvador and requested asylum at the US–Mexico border on 26 November 2017. She transferred on 8 December to the Trans Pod at Cibola, where she has been detained ever since.

"I presented myself to American immigration at the San Ysidro Port-of-Entry at 9:00 a.m. on 26 November 2017. And that is when my martyrdom began," Alejandra told Amnesty International. "As an older trans woman, and as a fighter for LGBT rights, I am a fighter all the way until the last day that I am on this earth."

Alejandra fought for the rights of transgender women in El Salvador as an activist for over a decade. Targeting her based on her transgender identity, Alejandra said she was sexually assaulted by both the Salvadoran military and the Mara. Members of the



Alejandra (Family photo, San Salvador, undated).

Mara also beat Alejandra five times between 2013 and 2016, leaving scars on her scalp, face and leg, which she showed to Amnesty International researchers. Law enforcement officials in El Salvador would not protect Alejandra, forcing her to flee for her life.

On 8 May, when Amnesty International interviewed Alejandra in detention, she voiced concerns about the inadequate and unresponsive medical care that she and other trans women received at the Cibola facility, including long delays in the provision of medical examinations and pain relief. Alejandra has a treatable but serious medical condition. After reviewing her medical records, her lawyer said it appeared medical staff at Cibola had not treated Alejandra as medically necessary while in detention.

"We make requests for medical examinations, and they don't respond or give us an examination for 15 days," Alejandra told Amnesty International in May.

On 8 June, Amnesty International issued an Urgent Action on Alejandra's case, after she informed her lawyer that she had been experiencing extreme headaches, vomiting and nosebleeds for the preceding 11 days. Alejandra said that she had requested medical care six times during that period, though had not yet received a medical examination in the infirmary. (Alejandra's medical emergency raised questions about the claims of the ICE supervisor at Cibola, who wrote on 1 June that ICE had already addressed Amnesty International's concerns related to health care provision and that they were no longer problems.) [202]

202. Amnesty International, Urgent Action, "USA – Free Trans Asylum-seeker from Detention: Alejandra" (8 June 2018): https://www.amnesty.org/en/documents/amr51/8514/2018/en/.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

56

An immigration judge denied Alejandra's request for asylum on 15 June, and ordered her to be removed from the United States. On the same day, ICE denied Alejandra's request for humanitarian parole, despite her apparently deteriorating health and urgent need of adequate care. On 19 June, ICE responded to a letter of concern from Amnesty International on Alejandra's case, asserting that she was "receiving adequate and appropriate medical care."

According to Alejandra's lawyer, however, she has still not had her health situation correctly diagnosed, and was not consistently or correctly being treated. As she appealed the decision, Alejandra's lawyer continued to request her urgent release on humanitarian parole during her appeal, in order to obtain the specialized medical care she needs to treat her disease.

"I applied for parole, with all the documentation requested, but the request was denied. […] I was not told the reason they denied my parole, just that it was denied. None of us have been given parole." Alejandra told Amnesty International, that if she were released on humanitarian parole: "First I want to go run and hug my niece. We would like to live together."

On 26 July 2018, ICE's El Paso Field Office denied parole to Alejandra for a third time, despite her precarious health condition and her need for specialized care. Amnesty International reviewed the June and July letters from ICE denying Alejandra's parole requests, both of which were based on a supposed "flight risk." The determination of her flight risk appeared to ignore her intention to live with her transgender niece, who had already won asylum in April 2018.

None of the parole denial letters offered any more than checked boxes to communicate the grounds of denial, which plainly fell short of the individually reasoned assessments required under the Parole Directive. When an ICE official emailed the June 2018 parole denial letter to Alejandra's lawyer, he sent it with the wrong asylum-seeker's name on the check-box form, apparently having copy-and-pasted the letter from another detainee's parole rejection. (He then quickly re-sent the denial letter with Alejandra's name instead.) The 26 July denial letter used the same check-box form without any reasoned decision, apparently in violation of the 2 July Federal Court injunction that ordered ICE's El Paso Field Office to reassess all parole requests on an individualized basis with reasoned decisions. Alejandra's lawyer informed Amnesty International that she never received any such rationale from ICE.

In contrast, other asylum-seekers with similar health conditions had their humanitarian parole requests approved following the injunction in July 2018, specifically recognizing needs for specialized care.

"I am prepared for anything. I have learned to win and I have learned to lose," Alejandra said.

# CASE OF MONICA (HONDURAS)

### 'I SLIT MY WRISTS, BECAUSE I WAS IN SUCH A STATE OF DEPRESSION.'

At Cibola on 7 May 2018, Amnesty International interviewed a 21-year-old transgender woman named Monica from Honduras, who had been held in immigration detention since March 2017.

Even after twice being sexually assaulted in a male detention facility at ICE's Otay Mesa Detention Center, ICE denied her request for parole. She was again denied parole upon her transfer to the Trans Pod at Cibola. In both cases, ICE claimed she was a "flight risk."[203] On 29 May 2018, Monica won her asylum claim and was finally released from detention.

At first Monica was detained at the Otay Mesa Detention Center, with 10 to 12 transgender women in an otherwise all-male detention facility. She was informed only in November 2017 that she had the option to move to Cibola, yet was told that it could impact her asylum case. Monica was later held with straight men who bullied and assaulted her. In December 2017, Monica said she was raped twice by a male inmate in her detention unit. She reported the rapes to ICE and the police, and was taken to the hospital, where a rape kit test was performed.[204]

Monica blamed ICE for her having been sexually assaulted by another detainee: "Trans women should not be put in segregation, and should not be put in a pod where they are the only trans women with all these men. Because the rooms over there are with two people, and this is the reason that I was sexually assaulted by another inmate."

Despite having been assaulted twice in detention, ICE denied Monica's parole request, deeming her to be a "flight risk." From 15 January to 2 February, Monica was held in segregation in Otay Mesa. From the trauma of twice being sexually assaulted at Otay Mesa, and still denied parole, Monica told Amnesty International that the agony of protracted detention in an all-male immigration detention facility pushed her to attempt suicide:

> "In February, I don't remember when, but I slit my wrists because I was in such a state of depression. […] At the moment when I did it, I was not thinking. I just remember at that moment, I was going to shave my legs, and so many things came to my mind, so many sufferings I'd gone through, that when I came back to consciousness, I was just lying there with so much blood in my cell. […] And when ICE saw this, they transferred me to here [at Cibola]."

After her attempted suicide, ICE put Monica in a safety cell for three days; and then transferred her to the Trans Pod at Cibola.

---

203. Amnesty International confirmed the incidents of sexual assault with Monica, her lawyers in California and New Mexico, and the ICE director of the Otay Mesa Detention Center where she was assaulted. They also confirmed that the incidents were referred to local law enforcement authorities for investigation. Amnesty International also reviewed a 21 December 2017 email from her lawyer to ICE officials with details of the case and a parole request, in the days following one of the incidents.
204. Email from Monica's lawyer to ICE officials, dated 21 December 2017.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

58

When Amnesty International met with the director of ICE's Otay Mesa Detention Center on 2 May 2018, who had denied Monica's parole request, he confirmed the incidents described by Monica and her lawyers, yet appeared to cast blame on Monica for the sexual assaults.[205]

After being denied parole for a second time at Cibola, Monica said the conditions of detention caused her to suffer there as well: "At Cibola, you have to die for the doctors to pay attention to you. What they do is they say you have to make a request." After numerous requests, Monica said it took approximately 20 days before the doctors and nurses at Cibola initiated ARV medications to treat her HIV. She also complained of an erratic schedule of treatment, consistent with others whom Amnesty International interviewed: "The nurses come sometimes at 8 a.m., sometimes at 1 a.m. The medical attention needs to improve, and the medical officers."

According to Monica, the health care at Cibola was so poor that her epileptic roommate in the Trans Pod signed her own deportation papers in May 2018, out of fear for her life:

> "Since they don't treat us if I am dying of some pain – I will just die, and they will not treat us. My roommate has epilepsy. She is new. She had an epileptic attack, and the guards acted like it was a joke. They were laughing, until they saw how scared and concerned I was. I was even crying, because I could see how much she was in danger on the ground. So they called a doctor, but while this was happening, they just talked amongst themselves, and were chatting while she was on the ground. The rest of us started helping her, and they brought a stretcher. She is in segregation now. Because of her experience, they got her to sign her deportation papers. Last week she had the seizure. She talks to me quite a bit, and she told me the reason she was signing the deportation papers was that she was frustrated she was not getting the treatment she needed, and that they did not appreciate the seriousness of her situation."[206]

Amnesty International raised this case with ICE and CoreCivic officials the day after hearing of the incident. The officials expressed alarm and inquired internally about the case, though did not share their findings with Amnesty International.

Despite her serious concerns about the inadequate health care at Cibola, Monica also said that Cibola was a safe space for transgender women: "We are treated as women. I see the difference here in Cibola: it doesn't always feel like detention. They made a garden for us, where we plant things. So for a moment, we can forget all the many things we have gone through and suffered.

---

205. Interview with Joe Greene, ICE's Assistant Field Office Director at Otay Mesa Detention Center (2 May 2018): "We had to transfer that case over to Cibola two or three months ago. There was some speculation on the assault itself. That person [Monica] wanted to be in certain units. Sexual encounters are prohibited, so corrective actions are taken – including segregation. […] The other party typically says it was consensual in sexual assault allegations. There are not cameras in bathrooms or physical cells, so those are the vulnerable areas." At the time of the interview, he indicated there were approximately 15 to 20 transgender asylum-seekers being held in all-male detention facilities at Otay Mesa. Earlier in 2018, he said the maximum number of transgender detainees in the facility was approximately 30, but that many either were released on bond or transferred to Cibola.

206. In a related but separate case in August 2017, an asylum-seeking transgender woman named Mirna also reportedly signed her deportation papers to leave Cibola, "due to her critical health conditions." The transgender rights activist Nakai Flotte said Mirna "was fainting every day. Her pain was so strong that she signed her own self-deportation. She only lasted a week in detention – she couldn't handle the pain. She was pulling her hair out. She said they gave her some medication, but it wasn't adequate to treat her levels of pain." Conversation on 1 May 2018 with Nakai Flotte, from Diversidad Sin Fronteras.

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

59

## CASE OF ROXANA (HONDURAS)

### 'SHE ASKED TO THE SEE THE DOCTOR, BUT THEY DIDN'T GIVE HER ACCESS.'

On 25 May 2018, a 33-year-old Honduran trans woman named Roxana Hernandez died in ICE custody at a hospital in New Mexico, 16 days after she requested asylum at the US–Mexico border.

Out of the 32 asylum-seekers in the trans contingent of the April 2018 "caravan" of asylum-seekers,[207] Roxana was one of about 10 who were living with HIV. Roxana's death highlights the risks faced by asylum-seekers who are trans and living with HIV in the US immigration detention system.

CBP turned away Roxana at the US–Mexico border with numerous other trans asylum-seekers on 29 April and again on 6 May. CBP then allowed Roxana to request asylum on 9 May, but detained her for five days by in CBP detention facilities known as the "*hielera*" (ice box) due to the low temperatures and rough sleeping conditions.

A trans woman named Stacy, who was subsequently detained at Cibola and traveled with Roxana through Mexico to the US border, told a lawyer at Cibola that Roxana became more ill while detained by CBP:



Roxana Hernandez in Tutitlan, Mexico, April 2018. (Luc Forsyth for BuzzFeed News)

> "We were together for the entire journey to the US–Mexico border. She didn't tell me on the journey that she had an illness but I could tell that she was sick. When we entered Chaparral [port-of-entry], she was ok, when we were put in the hielera she started coughing a lot, had much pain in her whole body. When she ate she would vomit and had diarrhea from the food. [...] She asked to the see the doctor but they didn't give her access. She didn't get medical care until she arrived at Cibola. She was in the hielera five days. When she arrived at Cibola she was very sick."[208]

ICE issued a statement on May 25, noting that Roxana was transferred to an area hospital the day after she arrived at Cibola, "with symptoms of pneumonia, dehydration and complications associated with HIV," and that she remained in intensive care until the day she died.[209] ICE declined repeated requests from Amnesty International to provide any more information than in the statement about her treatment in detention and ultimate cause of death.

---

207. See, Section 2 above.
208. Statement taken by lawyer at Cibola, and shared by email on 30 May 2018 with consent for public use.
209. See, ICE statement, "ICE detainee from Honduras passes away in New Mexico hospital" (25 May 2018): https://www.ice.gov/news/releases/ice-detainee-honduras-passes-away-new-mexico-hospital.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

60

CBP informed Amnesty International that Roxana "received a medical evaluation from an off-site local medical facility and was cleared for travel and detention before being transferred [on May 13] to the custody of ICE." However, CBP did not respond to two follow-up written requests by Amnesty International for information on the location, temperature and conditions in which Roxana was held by CBP; and for more information about the medical assessment she received in light of the conflicting account from Stacy that Roxana was denied health care by CBP and ICE prior to her arrival at Cibola with extreme symptoms.

According to the lawyer in Cibola, other women detained in the Trans Pod (including Alejandra, see above) became extremely distressed following Roxana's death, and contemplated giving up their asylum claims out of fear that they would die in immigration detention. Stacy, the woman who traveled with Roxana from Mexico to Cibola, informed the lawyer: "She had HIV and died from complications from the *hielera*. Since she died, I've dreamed about her being at my side; we were always together through Mexico. Because of what happened, I feel bad and am afraid that the same could happen to me, since I have HIV."[210]

In an interview with a journalist while still traveling through Mexico, Roxana said that she contracted HIV in Honduras after previously being deported by the United States, where she was then sexually assaulted by criminal gangs who threatened her life and forced her again to flee persecution in the country.[211]

# 4.3 'THEY DON'T RESPECT BLACK PEOPLE HERE': ACCOUNTS OF AFRICAN ASYLUM-SEEKERS

In the cases of three African asylum-seekers, Amnesty International documented credible and consistent claims of discriminatory treatment they said they faced on the basis of race and nationality, during protracted immigration detention in ICE facilities.

Compounded by reportedly inadequate physical conditions, food and water, as well as substandard medical care, Amnesty International found their experiences of discrimination and prolonged and indefinite detention to constitute ill-treatment, which is prohibited absolutely in international law.

210. Statement taken by lawyer at Cibola, and shared by email on 30 May 2018.
211. Buzzfeed News, "A Transgender Woman Who Was Part Of The Migrant Caravan Has Died In ICE Custody" (31 May 2018): https://www.buzzfeed.com/adolfoflores/a-transgender-woman-who-was-part-of-the-migrant-caravan-has.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

61

## CASE OF SADAT (GHANA)

### 'I'M TIRED OF THE PROLONGED DETENTION …I FEEL SOMETIMES LIKE, 'I JUST CAN'T!'

Sadat (32) sought asylum at the US–Mexico border, after fleeing homophobic attacks against him in his native Ghana. Following his request for asylum in January 2016, ICE held Sadat in immigration detention for over 2.5 years, until he was finally released on humanitarian parole on 25 July 2018.

Sadat called Amnesty International from detention in Pearsall, Texas, on 18 May 2018, and voiced the mental anguish he was experiencing due to indefinite immigration detention as he pursued his asylum claim:

> *"I'm tired of the prolonged detention. To be honest, I feel sometimes like 'I just can't, I just can't!' I am living in panic, I am unsure of what will happen."*[212]



Sadat pictured in July 2018, immediately after being released by ICE from the South Texas Detention Complex in Pearsall, Texas. (Alicia Perez)

While his asylum claim was still being adjudicated, US authorities sought to forcibly return Sadat to Ghana, where he claimed to face human rights violations by both law enforcement and the criminal groups he fled.

On 18 June 2018, Sadat's attorney informed Amnesty International that ICE was taking Sadat onto a plane at the airport, from where they hoped to deport him to Ghana while his lawyers continued to adjudicate his asylum claim: "Sadat just called …they took him all the way up to the plane then pulled him out of line at the last minute."[213]

Sadat said he felt the ill-treatment to which ICE subjected him in protracted detention – including the attempts to forcibly deport him back to the persecution he fled – was rooted in racial discrimination against him as an African:

> *"I don't mind waiting for the case, but I feel discrimination toward me and the rest of the Africans. We don't get any kind of relief – no bond. All that they say [in the Texas facility] is that they are going to send us back to Africa. In Georgia too, all they would tell me is 'we are going to send you back to Africa.'"*[214]

Sadat fled Ghana in 2015 after being beaten by members of a vigilante group, which he said burned down his house and beat his uncle three days later as Sadat was in hiding. The vigilantes identified Sadat as gay after beating and interrogating his gay friend and intimate partner, and posting a video of

212. Phone call to Amnesty International from detention on 18 May 2018.
213. Email from lawyer of Sadat, dated 18 June 2018.
214. Phone call from detention on 18 May 2018.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

62

that beating on the leader's Facebook page. The group re-posted the video in April 2017, which received over 53,000 views, further exposing Sadat as a gay man. Same-sex sexual acts remain a criminal offense in Ghana, and the police consistently fail to prosecute and punish attacks on the lesbian, gay, bisexual and transgender (LGBT) community.[215]

Despite the possibility that Sadat would continue to face persecution, imprisonment, and threats to his life if returned there, US authorities denied his parole requests and sought his deportation, claiming he failed to prove that he still faced threats in Ghana. Sadat's family mailed him a video as evidence of the ongoing threats of persecution he faces, yet ICE removed the video from the package his family sent, without informing him. In rejection of Sadat's appeal in November 2017, the immigration judge stated that even though ICE officers withheld this evidence, Sadat failed to reach out to his family to confirm that they had sent it.

Sadat went on hunger strike twice in December and February 2018 to protest the poor conditions of prolonged detention that he suffered. His lawyers provided Amnesty International with written documentation in February 2018 of specific instances of ICE personnel retaliating against Sadat in response to his hunger strikes.[216]

"All I am asking for is my case to be reopened," he said. "They never really listened to the evidence in my case. All I am asking is that they reopen my case and consider the evidence."[217]

In a 12 July 2018 decision to reopen Sadat's case, the Board of Immigration Appeals found that Sadat "has submitted new evidence regarding the prominent nature of his claim in both the United States and in Ghana, along with evidence that his return to Ghana may be met with a lack of adequate safety protocols."

As he now fights to win his asylum claim in freedom, Sadat said his goals on parole are to live a full life in freedom: "my dream is to go back to school, and to start a foundation to help homeless kids and other people in need."[218]





*On 25 July, Sadat was released from the South Texas Detention Complex, after being held for more than 2.5 years in ICE's immigration detention system while pursuing his asylum claim. (Amnesty International)*

215.  US Department of State, "Ghana 2017 human rights report" (15 March 2018): https://www.state.gov/documents/organization/277249.pdf. See also, Human Rights Watch, "Ghana: Discrimination, Violence against LGBT People" (8 January 2018): https://www.hrw.org/news/2018/01/08/ghana-discrimination-violence-against-lgbt-people.
216.  Email from lawyer of Sadat, dated 22 February 2018. Those instances of retaliation included: placing him in a disciplinary cell; shouting at and threatening him with deportation to Africa, despite his stay of removal; writing reports in his case file of his "bad attitude"; insulting him and saying they were tired of feeding him with their tax money; and denying access to medical services when he got the flu.
217.  Phone call from detention on 18 May 2018.
218.  Ibid.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

**63**

## CASE OF JULES (DRC)

### 'YOU CAN'T PUT ANYONE THERE WHO IS AN IMMIGRANT.'

Jules (36) fled from the Democratic Republic of Congo (DRC) in September 2014, after escaping from a rebel military group that he said had kidnapped, tortured and enslaved him to perform manual labor.

When Amnesty International interviewed Jules at Cibola County Correctional Center on 7 May 2018, he had just won his asylum claim on 10 April. He was released on parole soon after the interview. The Trump administration subsequently appealed his asylum victory, and sought to challenge the basis of persecution from which he had sought asylum. Jules had already been detained for almost 1.5 years in multiple ICE detention facilities, since he first requested asylum at the US–Mexico border on 4 January 2017.

Jules described how he and other Africans had suffered in ICE's immigration detention facilities, due to both the poor conditions of detention and the racial discrimination they face at the hands of ICE personnel.

> *"They don't respect the black people here [at Cibola]. Sometimes they ask us, 'In Africa, do you run with the lions?' There is also physical abuse: If you challenge their behavior, they punish you and put you in the shoe [isolation], and they keep you from going outside, or from interacting with others, for 15 or 20 days."*

Nonetheless, Jules said his treatment in Cibola was much better than in Alabama, where both the poor physical conditions and racial discrimination he faced were much more extreme.

> *"Alabama is so, so, so bad. You can't put anyone there who is an immigrant. You don't see the sun. Never. […] They put you in the cell, and it is too cold, at night you cannot sleep. They don't give you blankets or coats. We were held with criminals, we were mixed with them. […] In Alabama, if you want to be good, you have to have someone give you money. You have to buy food to survive. The people starve and suffer in that place."*

Jules's lawyer said to him during Amnesty International's interview, expressing concern about his treatment in the Etowah County Detention Center in Alabama: "Then you just showed up here, and you had lost so much weight. Your skin was yellow. I started crying when I saw you, because I became so afraid for the guys who are still there in Etowah."

In Cibola, he said he had received medication for sleep and psychological care for the trauma he still lived with from his experience in the DRC. In contrast, he said immigration detention at ICE's notorious Etowah and Sierra Blanca facilities[219] had constantly re-traumatized him, based on his experience in captivity in the DRC: "Everything in detention is not good. In Africa, we have never seen anything like this. I was four months with no coat in Sierra Blanca."

---

219. See joint report of RAICES and Texas law schools, "'I was treated like an animal': Abuses Against African Detainees at the West Texas Detention Facility" (22 March 2018): https://law.utexas.edu/clinics/2018/03/22/abuses-at-wtdf/. See also, AL.com, "Inside Etowah County jail" (22 March 2018): https://www.al.com/news/birmingham/index.ssf/2018/08/suspect_sought_in_armed_robber.html; and Daily Beast, "'The Worst Place Ever' Is ICE's Etowah County Detention Center in Alabama" (8 June 2018): https://www.thedailybeast.com/the-worst-place-ever-is-ices-etowah-county-detention-center-in-alabama.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

64

## CASE OF BOKOLE (DRC)

### 'THE WAY THEY TREAT US, I CANNOT SURVIVE FOR LONG.'

On 8 May, Amnesty International interview Bokole, a 30-year-old member of an opposition party in the DRC. In June 2017, he sought asylum in the United States from political persecution that he said he faced in the DRC. Bokole's last hearing was on 31 January 2018, and on 22 March the government denied his asylum claim. As of September 2018, he remained in detention as he pursued his appeal.

After he first requested asylum, Bokole said he was shocked to be confined in mandatory and indefinite detention after seeking protection:

> *"I told them my story, but they put me in detention. I did not know it was going to be like this. There is nothing good here; everything is bad. The condition is not good. I have never been in a jail like this before. The way they treat us, I cannot survive for long. The officers don't respect us for who we are – because of our skin. There is lots of racial discrimination here. When one guard passes, he waves his hand in front of his nose, as though to say, 'you smell.' Mostly it is psychological abuse. The way we are exposed to sickness, not being able to go outside. We need the wind. And the water we are using is not good enough to shower or drink."*

Bokole said he contracted tuberculosis while in detention at Cibola in April 2018, yet he claimed not to have received adequate medical treatment for his condition since that time. After visiting a specialist at an area hospital, Bokole said the doctor instructed authorities to provide him with a very specific treatment, yet he was not getting it.

> *"I need a professional who will save my life, because I feel that I am in danger. I need special treatment, which they are not giving me here. They are giving me a tablet at the wrong time, with horrible food. If you are taking this tablet, you need to eat good food. They give us no respect. If I have to take it in the morning, they come in the afternoon, or at the middle of the night. The food they are giving us is making us sick; when I go to the bathroom, I see blood [in my feces]. I have complained to the doctors many times, but they offer me no solutions. I have explained to my lawyer. I am so scared, that maybe I am going to lose my life. I will be happy if I get the right treatment for this sickness. It is the first time I have been sick like this."*

Amnesty International raised Bokole's case with the CoreCivic warden and ICE supervisor at Cibola. The ICE supervisor confirmed he was aware of Bokole's complaints, but said he thought they were meritless: "Yes, he's got a medical condition. He has something on his lung, which is treated as TB [tuberculosis]. He is upset about the treatment, and is going on hunger strike."

USA: 'YOU DON'T HAVE ANY RIGHTS HERE'
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

65

# 4.4 ALTERNATIVES TO DETENTION

Under international law, alternatives to detention must always be expressly considered before resorting to immigration detention – particularly in the cases of asylum-seekers, who may experience heightened vulnerability in a detention setting, including due to traumatic past experiences.

Amnesty International has long advocated for effective alternatives to immigration detention, since detention is rarely necessary or proportionate to achieve legitimate objectives. [220]

The US government has previously found that people participating in its alternative-to-detention programs appeared at their immigration hearings in 99.6 percent of cases. In 2017, the Trump administration terminated the Family Case Management Program ("FCMP"), even though it was 99-percent effective in ensuring that asylum-seeking parents and their children appeared at their immigration court hearings – by helping them to find legal representation, guiding them through the court system, and connecting them with other community resources.[221]

The United States can and must renew those efforts to implement humane and rights-respecting policies that neither unnecessarily detain asylum-seekers who request protection in the United States, nor separate families through criminal prosecutions of irregular entry, which ought instead to be addressed through administrative procedures.

Alternatives to detention can include reporting requirements, parole or an affordable bond, and supervision programs operated by community-based organizations. Reporting requirements should not be unduly onerous, invasive, or difficult to comply with, especially for families and those of limited financial means. Conditions of release should be subject to review by an immigration judge.

Underscoring the arbitrariness of immigration detention in the United States as it is currently applied, a Syracuse University program released statistics in July 2018 confirming that the likelihood and cost of being released on bond from immigration detention appeared to depend primarily on the geographical location of the court deciding.[222]

In July 2017, the UN Working Group on Arbitrary Detention urged the US government to "put an end to the mandatory detention of immigrants and asylum-seekers because of their irregular status," and immediately "allow alternative forms of custody of immigrants and asylum-seekers, such as case-management-based release of individuals into the custody of family members or other community sponsors, non-monetary parole and release on recognizance."[223]

220. Amnesty International policy paper, "Irregular Migrants and Asylum-seekers: Alternatives to Immigration Detention" (April 2009): https://www.amnesty.org/download/Documents/48000/pol330012009en.pdf.
221. Women's Refugee Commission, "Backgrounder: Family Case Management Program": https://www.womensrefugeecommission.org/images/zdocs/Backgrounder-FCMP.pdf.
222. See, TRAC data on arbitrary variations of bond amounts, depending on jurisdiction: http://trac.syr.edu/immigration/reports/519.
223. Report of the Working Group on Arbitrary Detention on its visit to the United States of America (17 July 2017), at para. 92. See n. 174 above.

# 5. CONCLUSION

In its first year-and-a-half, President Trump's administration has deliberately adopted immigration policies that have caused catastrophic harm to thousands of asylum-seekers along the US–Mexico border. The United States is bound under international law by the principle of non-refoulement, which prohibits states from returning or turning away people to territories where their life or freedom would be threatened. Yet the US government has flagrantly violated this legal obligation through routine pushbacks of asylum-seekers at the US–Mexico border, and by using the threats of indefinite detention and family separation to compel asylum-seekers to return to a risk of serious human rights violations.

The severe mental anguish of family separations, which US officials intentionally imposed upon asylum-seekers to coerce them to give up their claims and deter other asylum-seekers, amounts to torture. In September 2018, CBP informed Amnesty International that it had forcibly separated over 6,000 family units from just 19 April to 15 August 2018 – more than it previously divulged – and confirmed that this number excluded countless other families whose separations were not recorded. The government also separated 1,800 family units earlier in 2017 and 2018. Hence, approximately 8,000 family units have been separated so far by this administration, and this figure likely excludes hundreds – if not thousands – of other separated families.

Congress and the US Department of Justice should rigorously investigate officials who authorized the Trump administration's de facto policy of family separations, and hold them to account.

Congress should also exercise increased oversight on CBP's illegal pushbacks of asylum-seekers along the US–Mexico border, which also constitute refoulement. Mexico is not a uniformly safe country for all asylum-seekers, and any treatment of it as such through the blanket rejection of asylum claims at US ports-of-entry would be in violation of international law. Senior Mexican immigration officials in two of the six Mexican states bordering the United States independently informed Amnesty International that the US government encouraged them to detain and check the legal status of asylum-seekers whom the US was forcing to wait in Mexico, with a potential view to their deportation. If true, this would constitute a gross violation of international refugee law.

# RECOMMENDATIONS

### TO CONGRESS:

- Exercise greater oversight of DHS agencies to: halt the illegal pushbacks of asylum-seekers at US ports-of-entry; curtail any executive overreach, especially in its attempts to separate and/or indefinitely detain asylum-seeking families and children; and end the arbitrary and indefinite detention of asylum-seekers, in violation of international law.

- Request regular information to ensure DHS promptly accepts and processes all individuals seeking asylum.

- Increase funding for immigration judges, and USCIS asylum and refugee officers.

- Decline to fund ICE's planned expansion of immigration detention, especially in light of ill-treatment experienced by asylum-seekers in detention.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

67

- Decline to fund CBP operations, absent rigorous external oversight of CBP field operations and US Border Patrol.

- Pass legislation banning the separation and/or detention of families with children.

- Pass legislation to provide for a presumption against detention of asylum-seekers, and to ensure the right to judicial review and due process in case of detention.

- Support and fund community-based alternatives to detention, such as the previous Family Case Management Program.

- Decriminalize irregular entry into the United States, in line with international standards, and ensure that administrative sanctions applied to irregular entry are proportionate and reasonable.

- Ratify the UN Convention on the Rights of the Child, which the United States signed in 1995 and is the only country in the world not to ratify.

- Press the federal government to halt negotiations with Mexico regarding a "safe third country agreement," which would be in violation of both US and international law.

## TO THE US DEPARTMENT OF HOMELAND SECURITY:

### DETENTION OF ASYLUM-SEEKERS

- Ensure that liberty is the default position, and that the detention of asylum-seekers and other people is exceptional and only resorted to when it is determined to be necessary and proportionate to a legitimate purpose, based on an assessment of the individual's particular circumstances.

- Record any exceptional denials of parole in asylum-seekers' case files with individualized and reasoned justifications for those decisions.

- End detention of children, whether accompanied or unaccompanied, separated or held together with their family, as it is never in their best interest.

- Resume and expand alternative-to-detention programs for all asylum-seekers, and particularly asylum-seeking families, including the Family Case Management Program.

- Exercise both CBP's and ICE's authorities to grant humanitarian parole to asylum-seekers, unless absolutely necessary to detain them, and then only with reasoned decisions identifying demonstrable risks faced or posed by the individual as a basis for denying paroled.

- Increase funding of oversight initiatives by DHS custody programs, specifically for the purpose of review and improvement of humanitarian conditions in immigration detention facilities.

- Address and improve inadequate conditions of immigration detention, including: health care; food quality; interpretation services; and discriminatory treatment by custodial personnel.

- Improve health care services at the Cibola County Correctional Center.

- Improve ICE's implementation of the 2015 Transgender Care Memo in detention facilities.

- Improve conditions in CBP's temporary processing facilities at the US–Mexico border (including those known as the "ice box" or hielera).

### *FAMILY SEPARATIONS AND DETENTION*

- Immediately release all asylum-seeking families detained in US immigration detention facilities, especially at unlicensed family immigration detention facilities.

- Reunify, unconditionally, as quickly as possible and sparing no costs, any and all children who remain separated from their parents or guardians.

- Halt family separations in all circumstances, except following a rigorous determination of best interests of the child, which must be articulated to family members and recorded in the case files of those affected.

- Strengthen mechanisms and procedures to ensure that the separation of children of asylum-seekers and migrants occurs only when it is in their best interest, including improved safeguards for the determination of those best interests.

### *ILLEGAL PUSHBACKS*

- Immediately stop turning away asylum-seekers at the US–Mexico border, both at and between official ports-of-entry.

- Bolster CBP capacity as necessary to receive immediately all asylum claims presented at US ports-of-entry.

- Halt negotiations with Mexico for a "safe third country agreement."

- Discontinue all plans and actions that would require asylum-seekers at the US–Mexico border to wait in Mexico during pendency of their asylum claims.

- Discontinue efforts to hold "credible-fear interviews" directly at US ports-of-entry, which would deny asylum-seekers access to legal advice and representation.

- Publicly affirm, including through public signage at US ports-of-entry, that asylum-seekers are legally allowed to enter the United States and request protection.

- Halt issuing derogatory public statements suggesting all asylum-seekers and migrants are "criminals" or other pejorative terms.

### *OVERSIGHT MECHANISMS*

- Facilitate on-site inspections by DHS Office of the Inspector General at ports-of-entry in order to prevent, and hold authorities accountable for, the turning away of asylum-seekers.

- Invite and cooperate with an investigation by DHS Office of the Inspector General into reports that US authorities have encouraged INM officials to screen, detain and deport asylum-seekers from Mexico, after CBP has refused to receive their asylum requests.

- Ensure impartial, prompt and effective investigations into all allegations of illegal pushbacks, arbitrary detention (including in cases of blanket parole denials), forcible family separations, deportation of asylum-seekers to harm, and other abuses of authority.

- Ensure that all those found to be responsible for abuses of authority are held to account, and that victims are granted full reparations for the harm they have endured.

**USA: 'YOU DON'T HAVE ANY RIGHTS HERE'**
ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES
Amnesty International

**69**

**TO THE DEPARTMENT OF JUSTICE:**

- In line with US obligations under the international human rights treaties to which it is party: prohibit the practice of family separations; initiate a criminal investigation into the practice, and the harm it has caused to those subjected to it; hold accountable all those who authorized the practice; and grant compensation and other reparations to families who were separated, in order to ensure their rehabilitation, with specific attention to the needs of children.

- Abandon efforts to recognize Mexico as a "safe third country" for all asylum-seekers, in violation of US and international law.

# AMNESTY INTERNATIONAL IS A GLOBAL MOVEMENT FOR HUMAN RIGHTS.

# WHEN INJUSTICE HAPPENS TO ONE PERSON, IT MATTERS TO US ALL.

## CONTACT US

 info@amnesty.org

 +44 (0)20 7413 5500

## JOIN THE CONVERSATION

 www.facebook.com/AmnestyGlobal

 @AmnestyOnline

# USA: 'YOU DON'T HAVE ANY RIGHTS HERE'

## ILLEGAL PUSHBACKS, ARBITRARY DETENTION & ILL-TREATMENT OF ASYLUM-SEEKERS IN THE UNITED STATES

In 2017 and 2018, the Trump administration has deliberately adopted immigration policies that have caused catastrophic harm to thousands of people, have spurned and manifestly violated both US and international law, and appeared to be aimed at the full dismantling of the US asylum system.

Those policies and practices have included, among others: (1) mass illegal pushbacks of asylum-seekers at the US–Mexico border; (2) thousands of illegal family separations, through which the Trump administration has deliberately and purposefully inflicted extreme suffering on families, ill-treatment which constituted torture in some cases; and (3) increasingly arbitrary and indefinite detention of asylum-seekers, without parole, constituting cruel, inhuman or degrading treatment or punishment (ill-treatment) which is absolutely prohibited in international law.

In September 2018, US authorities informed Amnesty International that they had forcibly separated over 6,000 family units from just 19 April to 15 August 2018 – more than ever previously divulged – and confirmed that this number excludes countless other families whose separations were not recorded. In total, the Trump administration separated more than 8,000 family units so far, which Congress and the US Department of Justice must act immediately to remedy and prevent from ever happening again, including by holding authorities accountable.

Index: AMR 51/9101/2018
October 2018

**amnesty.org**

