JOSEPH H. HUNT
Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
SAIRAH G. SAEED (IL 6290644)
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Kevin K. McALEENAN,* Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*,<br><br>*Defendants* | Case No. 3:17-cv-02366-BAS-KSC<br><br>Hon. Cynthia A. Bashant<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 294)**<br><br>Special Briefing Schedule Ordered |

---

* Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Federal Rule of Civil Procedure 25(d).

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ................................................................................. 1

STATEMENT ....................................................................................... 3

    I.   The July 16, 2019 Interim Final Rule ........................................ 3

    II.  CBP's Metering/Queue Management Practices ........................... 5

    III. Plaintiffs' Motions for Provisional Class Certification and
        Preliminary Injunction .......................................................... 6

ARGUMENT ......................................................................................... 6

    I.   The INA Prohibits this Court from Granting Plaintiffs' Motion
        for Preliminary Injunction. ..................................................... 6

    II.  Plaintiffs Are Not Entitled to a Preliminary Injunction. ............ 10

        A.  Plaintiffs' Requested Injunction Cannot Be Issued in This
            Litigation. .................................................................. 10

        B.  The Government's Policies Are Lawful .............................. 11

            1.   The IFR Is Consistent with the Asylum Statute ........... 11

            2.   CBP's Metering Practices Are Lawful ....................... 13

        C.  Considerations of Irreparable Harm and the Equities Strongly
           Favor the Government, not Plaintiffs. ................................ 21

    III. The Court Cannot Grant Relief Under the All Writs Act. ........... 24

CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

## Federal Cases

*Agostini v. Felton*,
    521 U.S. 203 (1997)....................................................................................21

*Aguilar v. ICE*,
    510 F.3d 1 (1st Cir. 2007)..........................................................................10

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ................................................................ 2, 11

*Almeida-Sanchez v. United States*,
    413 U.S. 266 (1973).....................................................................................19

*Am. Immigration Lawyers Ass'n v. Reno*,
    199 F.3d 1352 (D.C. Cir. 2000)..................................................................2, 9

*Barr v. East Bay Sanctuary Covenant*,
    No. 19A230, 2019 WL 4292781 (U.S. Sept. 11, 2019) ...................... 1, 5, 23

*Boumediene v. Bush*,
    553 U.S. 723 (2008).....................................................................................21

*Capital Area Immigrants' Rights Coalition v. Trump*,
    No. 19-cv-2117, 2019 WL 3436501 (D.D.C. July 24, 2019).............. 4, 9, 23

*Carroll v. United States*,
    267 U.S. 132 (1925).....................................................................................19

*De Beers Consol. Mines v. United States*,
    325 U.S. 212 (1945).................................................................................10, 11

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ....................................................................25

*East Bay Sanctuary Covenant v. Barr*,
    385 F. Supp. 3d 922 (N.D. Cal. July 24, 2019)............................................4

*East Bay Sanctuary Covenant v. Barr*,
    391 F. Supp. 3d 974 (N.D. Cal. Sept. 9, 2019) ...........................................5

*East Bay Sanctuary Covenant v. Barr*,
    934 F.3d 1026 (9th Cir. 2019) ...................................................................4

*East Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ...................................................................23

*Fook Hong Mak v. INS*,
    435 F.2d 728 (2d Cir. 1970) ...................................................................13

*Garcia de Rincon v. Dep't of Homeland Security*,
    539 F.3d 1133 (9th Cir. 2008) ...................................................................8

*Graham v. Fed. Emergency Mgmt. Agency*,
    149 F.3d 997 (9th Cir. 1998) ...................................................................20

*Hamama v. Adducci*,
    912 F.3d 869 (6th Cir. 2018) ...................................................................8

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ...................................................................21

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987) ........................................................... 3, 11, 23

*J.E.F.M. v. Lynch*,
    837 F.3d 1026 (9th Cir. 2016) ...................................................................2, 9

*Johnson v. Eisentrager*,
    339 U.S. 762 (1950) ...................................................................21

*Kaimowitz v. Orlando, Fla.*,
    122 F.3d 41 (11th Cir. 1997) ........................................................... 10, 11

*Kalubi v. Ashcroft*,
    364 F.3d 1134 (9th Cir. 2004) ...................................................................12

*Kiyemba v. Obama*,
    555 F.3d 1022 (D.C. Cir. 2009) ...................................................................19

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ...................................................................19

iii

*Lopez v. Davis*,
    531 U.S. 230 (2001)................................................................13

*Meyer v. Portfolio Recovery Associates, LLC*,
    707 F.3d 1036 (9th Cir. 2012) .........................................10

*Michael v. INS*,
    48 F.3d 657 (2d Cir. 1995) ..............................................25

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)..........................................................18

*Munaf v. Geren*,
    553 U.S. 674 (2008)..........................................................10

*Nken v. Holder*,
    556 U.S. 418 (2009).........................................................23

*Pa. Bureau of Correction v. U.S. Marshals Service*,
    474 U.S. 34 (1985)............................................................25

*Pena v. Lynch*,
    815 F.3d 452 (9th Cir. 2016) ........................................4, 8

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999)............................................................8

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993).................................................. 14, 20

*Securities and Exchange Commission v. G.C. George Securities, Inc.*,
    637 F.2d 685 (9th Cir. 1981) .........................................25

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953)..........................................................19

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2013) .......................................11

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950)..........................................................19

DEFS.' OPP'N TO PLS.' MOT.
FOR PRELIM. INJ.
Case No. 3:17-cv-02366-BAS-KSC

*United States v. Cortez,*
    449 U.S. 411 (1981)...........................................................................21

*United States v. Novak,*
    476 F.3d 1041 (9th Cir. 2007) .........................................................25

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990).........................................................................21

*Vazquez Perez v. Decker,*
    No. 18-cv-10683, 2019 WL 4784950 (S.D.N.Y. Sept. 30, 2019).................8

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008)............................................................ 2, 10, 11, 21

*Yakus v. United States,*
    321 U.S. 414 (1944).........................................................................10

## **Federal Statutes**

6 U.S.C. § 202 ........................................................................................19

8 U.S.C. § 1103(a)(1) ..............................................................................19

8 U.S.C. § 1103(a)(3) ..............................................................................19

8 U.S.C. § 1158(a)(1) ........................................................................... 3, 19

8 U.S.C. § 1158(b)(1)(A) ...................................................................... 11, 23

8 U.S.C. § 1158(b)(2)(C) ....................................................................... 3, 12

8 U.S.C. § 1225(a)(1) ..............................................................................17

8 U.S.C. § 1225(a)(3) ..............................................................................17

8 U.S.C. § 1231(b)(3)(A) ...........................................................................3

8 U.S.C. § 1252(a)(2)(A) ................................................................... *passim*

8 U.S.C. § 1252(a)(5) .......................................................................... 2, 9, 23

8 U.S.C. § 1252(b)(9) .......................................................................... 2, 9, 23

8 U.S.C. § 1252(e)(1) ......................................................................... 2, 8, 9, 22

8 U.S.C. § 1252(e)(2) ................................................................8

8 U.S.C. § 1252(e)(3) ............................................................ 9, 25

8 U.S.C. § 1252(f)(1) ...............................................................7

28 U.S.C. § 1651 ................................................................. 2, 24

## Federal Regulations

8 C.F.R. § 1208.16(c) ..............................................................3

8 C.F.R. § 208.30(e)(5)(iii) .........................................................4

8 C.F.R. § 235.1(a) ................................................................18

## Acts of Congress

Illegal Immigration Reform and Immigrant Responsibility Act,
    Pub. L. No. 104–208, Div. C, 110 Stat. 3009–690 (Sept. 30, 1996)............20

Refugee Act of 1980,
    Pub. L. No. 96–212, 94 Stat. 105 (Mar. 17, 1980) .......................20

## Administrative Rules and Decisions

Asylum Eligibility and Procedural Modifications,
    84 Fed. Reg. 33,829 (July 16, 2019) ................................... *passim*

*Matter of Pula*,
    19 I&N Dec. 467 (BIA 1987) ........................................................12

## Legislative Materials

S. Rep. No. 96-256 (1979) ........................................................20

## Other Authorities

19 J. Moore & G. Pratt, Moore's Federal Practice § 204.02[4] (3d ed.
    1998) ........................................................................24

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2947 (3d ed.) ..............10

# **INTRODUCTION**

This Court should deny Plaintiffs' request for an extraordinary injunction barring Defendants from applying—to thousands of aliens—an interim final rule governing asylum eligibility that, just weeks ago, the Supreme Court permitted to go into effect nationwide and without limitation. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019) ("IFR" or "Rule"); Order, *Barr v. East Bay Sanctuary Covenant*, No. 19A230, 2019 WL 4292781 (U.S. Sept. 11, 2019). That Rule, which became effective July 16, 2019, provides that, "with limited exceptions, an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection in a third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States is ineligible for asylum." 84 Fed. Reg. at 33,830. The Rule also requires asylum officers and immigration judges to apply this new bar on asylum eligibility in expedited removal. *Id.* A district judge enjoined the Rule nationwide, but the Supreme Court stayed that injunction in full. Order 1. Despite that ruling, and despite the fact that nothing in the pleadings here pertains to the IFR, Plaintiffs here—including Al Otro Lado, a party that unsuccessfully opposed the government's stay request in *East Bay*—ask this Court to again enjoin the government from applying the Rule to a huge number of aliens.

The Court should deny that request. The Motion for Preliminary Injunction, at bottom, challenges the substantive standard that the government will apply to the putative provisional subclass members' asylum applications and the procedures that implement that standard during expedited removal, but the Immigration and Nationality Act ("INA") divests this Court of jurisdiction to review those claims. Challenges to the expedited removal system can be raised only in the U.S. District Court for the District of Columbia, and claims arising from the adjudication of an asylum application in regular removal proceedings may be raised only in a petition for review of a final order of removal in the appropriate court of appeals. 8 U.S.C.

§§ 1252(a)(2)(A)(i)–(iv), (a)(5), (b)(9), (e)(1); *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1357 (D.C. Cir. 2000) ("*AILA*"); *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016). The statute—which Plaintiffs omit from their briefs—is fatal to their request, and the Court can deny the Motion under section 1252 alone.

The Motion also fails on the merits, under either *Winter* or *Cottrell*. Both the IFR and the government's metering/queue management practices are lawful, so Plaintiffs are unlikely to succeed, or even show "serious questions," on their claims against the Rule or those practices. Plaintiffs also present a flatly incorrect view of the evidence. The exhibits attached to their Motion show that in January 2019, U.S. Customs and Border Protection ("CBP") was on track to *exceed* the number of asylum applicants it processed compared to FY 2018, not that it "cut" those numbers, as Plaintiffs claim. PI Br. 16 (ECF No. 294-1). Further, the equities favor the government, not Plaintiffs. The government would be irreparably harmed if, just weeks after the Supreme Court permitted the Rule to go into effect, it were enjoined from applying a Rule that aims to better deploy our vastly overburdened asylum resources by prioritizing claims for asylum that are the most urgent and by deprioritizing those that are less urgent—such as the claims of aliens who could seek protection in a third country. In contrast, the putative provisional subclass members would lose only their eligibility for a purely discretionary benefit, while retaining their ability to seek withholding of removal or protection under the Convention Against Torture ("CAT").

Finally, the All Writs Act ("AWA"), 28 U.S.C. § 1651, does not provide a basis to grant Plaintiffs' Motion. The AWA allows courts to issue writs "in aid of" their jurisdiction, but Plaintiffs do not explain how this Court would lose jurisdiction without a preliminary injunction. Even then, the INA prohibits courts from using the AWA to issue the very relief that section 1252 prohibits.

The Court should deny Plaintiffs' Motion.

DEFS.' OPP'N TO PLS.' MOT. FOR  PRELIM. INJ.
Case No. 3:17-cv-02366-BAS-KSC

# STATEMENT

## I.  The July 16, 2019 Interim Final Rule

Although an alien who is physically present or who arrives in the United States generally has a statutory right to apply for asylum, the decision whether to grant asylum is entirely discretionary. 8 U.S.C. § 1158(a)(1); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). As part of this discretion, the Attorney General and the Secretary "may by regulation establish additional limitations and conditions, consistent with [section 1158], under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C). The United States has a separate mandatory duty to grant an alien withholding of removal when he faces a probability of persecution in another country on a protected ground, *see id.* § 1231(b)(3)(A), or provide the alien protection under the CAT when he faces a probability of torture in another country, *see* 8 C.F.R. § 1208.16(c); *see Cardoza-Fonseca*, 480 U.S. at 428 n.6 ("Asylum and withholding of deportation are two distinct forms of relief.").

Consistent with the discretion and authority granted by the statute, the Attorney General and the Acting Secretary issued the Rule on July 16, 2019. Subject to limited exceptions, the Rule establishes a mandatory bar on asylum eligibility for an alien who enters or attempts to enter the United States across the southern border, but who did not apply for protection from persecution or torture where it was available in at least one third country through which the alien transited en route to the United States. 84 Fed. Reg. at 33,835. The Rule requires asylum officers and immigration judges to apply this new bar on asylum eligibility when conducting and reviewing credible-fear screening during expedited removal. *Id.* at 33,830. This means that when an alien in expedited removal is ineligible for asylum under the third-country-transit bar, the asylum officer will make a negative credible-fear determination. The asylum officer will then apply "the long-established reasonable-fear standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted." *Id.* at 33,837. If the asylum officer makes a positive

reasonable-fear determination, the alien is placed into regular removal proceedings under section 1229a for further consideration of the withholding or CAT claims. *Id.*; *see* 8 C.F.R. § 208.30(e)(5)(iii). If the asylum officer makes a negative credible- or reasonable-fear determination, the alien may appeal either or both determinations to an immigration judge. 84 Fed. Reg. at 33,838. Consistent with the statute, the immigration judge's determination is not appealable to either the Board of Immigration Appeals ("BIA") or an Article III court. 8 U.S.C. § 1252(a)(2)(A)(iii); *see Pena v. Lynch*, 815 F.3d 452, 455 (9th Cir. 2016). The Rule does not change the standards for obtaining withholding of removal or CAT protection, through which the United States satisfies its non-refoulement obligations. 84 Fed. Reg. at 33,830, 33,837–38; *e.g.*, *Cardoza Fonseca*, 480 U.S. at 429 (referring to the former withholding of removal statute 8 U.S.C. § 1253(h), not the asylum statute, as "the counterpart" of Article 33.1).

Multiple organizations, including Al Otro Lado, challenged the Rule in other district courts. *See, e.g.*, *Capital Area Immigrants' Rights Coalition v. Trump*, No. 19-cv-2117 (D.D.C.) ("*CAIR*"); *East Bay Sanctuary Covenant v. Barr*, No. 19-cv-4073 (N.D. Cal.). The U.S. District Court for the District of Columbia denied a motion for a temporary restraining order against the IFR on July 24, 2019, ruling that the plaintiffs in that case had not shown irreparable harm and noting the court's "strong doubts that the Interim Rule exceeds the Attorney General's authority under section 1158(b)(2)(C)." *CAIR*, No. 19-cv-2117, 2019 WL 3436501 (D.D.C. July 24, 2019) (transcript of oral ruling). The U.S. District Court for the Northern District of California, however, issued a nationwide preliminary injunction against the Rule later the same day. *East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 4d 922 (N.D. Cal. July 24, 2019). The government appealed, and the Ninth Circuit stayed the injunction as to all jurisdictions but its own, ruling that the record at that time did not support the injunction's nationwide scope. *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026 (9th Cir. 2019). The district court restored the nationwide scope of

DEFS.' OPP'N TO PLS.' MOT.
FOR PRELIM. INJ.
Case No. 3:17-cv-02366-BAS-KSC

the injunction on September 9, 2019. *East Bay Sanctuary Covenant v. Barr*, 391 F. Supp. 3d 974 (N.D. Cal. Sept. 9, 2019). Two days later, the Supreme Court stayed the district court's injunctive orders, allowing the Rule to go into effect nationwide without limitation. *East Bay*, No. 19A230, 2019 WL 4292781.

## II. CBP's Metering/Queue Management Practices

CBP's Office of Field Operations ("OFO") is the largest component of the largest law enforcement agency in the United States. Officers stationed at the ports of entry have a variety of responsibilities, from anti-terrorism to trade inspection to drug interdiction to agriculture protection. *See* Ex. 1,[1] at 13; Ex. 2 ¶ 11; Ex. 3 ¶ 9. OFO is also responsible for inspecting and processing inadmissible aliens who enter the ports entry along the U.S.-Mexico border. *See* 8 U.S.C. § 1225(a)(3). Aliens who are found inadmissible because they lack sufficient documents or attempt to enter by fraud or willful misrepresentation are placed into expedited removal. *Id.* § 1225(b)(1)(A)(i). Aliens in expedited removal who claim a fear of return to their country of origin are screened by an asylum officer, *id.* § 1225(b)(1)(A)(ii), and if they have a credible or reasonable fear of return, they are mandatorily detained for further consideration of their application for relief, *id.* § 1225(b)(1)(B)(ii).

Since 2016, there has been a significant surge in the number of inadmissible aliens arriving at land ports of entry along the southwest border. Ex. 4, at 2–3. The proportion of those inadmissible aliens who expressed a fear of return more than doubled from FY 2017 to FY 2018. *Id.* Ports within the San Diego Field Office alone saw a 187% increase during that time period. Ex. 5, at 1. The border ports have seen such high volumes of inadmissible aliens that OFO has, at times, been forced temporarily to detain them in unsecured office space, such as hallways, conference rooms and small offices, instead of dedicated hold rooms. Ex. 6, at 289–90.

To address these issues, CBP's Executive Assistant Commissioner for Field

---

[1] "Ex." refers to the exhibits to the Declaration of Alexander J. Halaska.

DEFS.' OPP'N TO PLS.' MOT. FOR PRELIM. INJ.
Case No. 3:17-cv-02366-BAS-KSC

Operations issued a memo in April 2018 that provides guidance for ports to "meter the flow of travelers at the land border to take into account the port's processing capacity." Metering Memo 1 (ECF No. 283-1). This authority is to be exercised "[w]hen necessary or appropriate to facilitate orderly processing and [to] maintain the security of the port and safe and sanitary conditions for the traveling public." *Id.* The metering guidance, by its terms, does not permit OFO to refuse to process an inadmissible alien. *Id.* Rather, it expressly instructs that "[o]nce a traveler is in the United States, he or she must be fully processed." *Id.* "At no point may an officer discourage a traveler from waiting to be processed, claiming a fear of return, or seeking any other protection." *Id.*; Ex. 7 ¶ 3.

## III. Plaintiffs' Motions for Provisional Class Certification and Preliminary Injunction

Plaintiffs filed Motions for Provisional Class Certification and a Preliminary Injunction on September 26, 2019. Without specifically naming a putative subclass representative, Plaintiffs ask the Court to provisionally certify a subclass that consists of "[a]ll non-Mexican noncitizens who were denied access to the U.S. asylum process on or before July 16, 2019, as a result of the Government's metering policy and continue to seek access to the asylum process," Class Cert. Br. 13 (ECF No. 293-1), and to enjoin the government "from applying the [Rule] to provisional class members who were metered prior to July 16, 2019," PI Br. 24–25.

## ARGUMENT

The Court should deny Plaintiffs' Motion for Preliminary Injunction.

## I. The INA Prohibits this Court from Granting Plaintiffs' Motion for Preliminary Injunction.

Together, Plaintiffs' Motions for Provisional Class Certification and Preliminary Injunction ask this Court to prevent DOJ and DHS from applying the IFR to approximately 26,000 unnamed putative subclass members' asylum claims—some of which will be adjudicated in expedited removal proceedings under section 1225(b)(1), and some in regular removal proceedings under section 1229a. *See* Class

6

Cert. Br. 13–14. Regardless of whether Plaintiffs can otherwise meet the preliminary injunction standards of either *Winter* or *Cottrell* or the class certification requirements of Rules 23(a) and 23(b) (which they cannot), the INA's jurisdictional provisions bar this Court from granting the injunction Plaintiffs seek.

 ***Expedited Removal Proceedings.*** To start, the INA divests this Court of jurisdiction to review or issue relief relating to expedited removal orders, including jurisdiction to enjoin DOJ or DHS from applying the Rule to the asylum claims of putative provisional subclass members who are or will be in expedited removal proceedings. The statute states that "no court" shall have jurisdiction to review: (i) "any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of" an expedited removal order; (ii) a "decision by the Attorney General to invoke the provisions" of section 1225(b)(1); (iii) "the application of such section to individual aliens," including their credible fear determinations; or (iv) the "procedures and policies adopted by the Attorney General to implement the provisions of" section 1225(b)(1). 8 U.S.C. § 1252(a)(2)(A)(i)–(iv). Notably, while subsections (i), (ii), and (iv) allow for judicial review in accordance with 1252(e), subsection (iii) includes no such carve-out. This means that no court, including this Court, has jurisdiction to review "the application of" the IFR to any putative provisional subclass members who may have already gone through expedited removal. *A fortiori*, that means that this Court lacks jurisdiction to enjoin the application of the IFR to putative provisional subclass members who *will* be placed in expedited removal proceedings.

 The INA also divests courts of jurisdiction to "enjoin or restrain the operation of the provisions of part IV of this subchapter" (*i.e.*, 8 U.S.C. §§ 1221–32), "other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) "prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–123[2], but specifies that this ban does not extend

to individual cases." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–82 (1999). The injunction that Plaintiffs seek, however, would enjoin or restrain the operation of section 1225(b)(1)(B) by reading into it a prohibition on applying mandatory asylum bars in expedited removal. *See* PI Br. 24–25. Such a classwide injunction that "create[s] out of thin air a requirement . . . that does not exist in the statute" restrains operation of the statute, and is therefore prohibited by section 1252(f)(1). *Hamama v. Adducci*, 912 F.3d 869, 879 (6th Cir. 2018); *Vazquez Perez v. Decker*, No. 18-cv-10683, 2019 WL 4784950, at *6 (S.D.N.Y. Sept. 30, 2019). Sections 1252(a)(2)(A) and (f)(1) divest the Court of jurisdiction to review or enjoin on a classwide basis the application of the IFR in expedited removal proceedings.

Even where another provision in section 1252 allows for judicial review, it is very limited in scope. Section 1252(e) begins by stating: "Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection . . . ." 8 U.S.C. § 1252(e)(1). The first "subsequent paragraph" of section 1252(e) allows for sharply circumscribed judicial review of a habeas petition filed by an alien with an expedited removal order, where a court can assess only whether the petitioner is an alien; whether the petitioner was issued an expedited removal order; and whether the petitioner has been admitted as a lawful permanent resident or a refugee, or has been granted asylum. *Id.* § 1252(e)(2); *Pena*, 815 F.3d at 455 (citing *Garcia de Rincon v. Dep't of Homeland Security*, 539 F.3d 1133, 1139 (9th Cir. 2008)). Plaintiffs have not raised habeas claims, so that carve-out to section 1252(e)(1) is wholly inapplicable here. The other "subsequent paragraph" of section 1252(e) allows for so-called "systemic" review of "determinations made under section 1225(b) of this title and its implementation," but only in actions filed in the U.S. District Court for the District of Columbia within 60 days of the

agency action at issue. 8 U.S.C. § 1252(e)(3). Those challenges are limited to determining whether the statute or regulations are constitutional, and whether the regulations or other guidelines are consistent with the statute or other law. *AILA*, 199 F.3d at 1359 (citing 8 U.S.C. §§ 1252(e)(3)(A), 1252(g)). Plaintiffs' challenge to the IFR's application, however, was not filed in the District of Columbia, nor was it filed within 60 days of the Rule's July 16, 2019 effective date, so section (e)(3) does not help Plaintiffs, either. (In a properly-filed challenge to the IFR, the court declined to grant relief because the plaintiffs there had not shown irreparable harm, and because the court had "strong doubts that the Interim Rule exceeds the Attorney General's authority under section 1158(b)(2)(C)." *CAIR*, No. 19-cv-2117, 2019 WL 3436501.) Thus, sections 1252(a)(2)(A), (f)(1), and (e) wholly preclude this Court from granting Plaintiffs' Motion, and no other provisions of the INA allow for review here.[2]

***Regular Removal Proceedings.*** The INA also precludes district-court review of the asylum claims of putative provisional subclass members in regular removal proceedings. The statute states that a petition for review filed in the appropriate court of appeals "shall be the sole and exclusive means for judicial review of an order of removal," 8 U.S.C. § 1252(a)(5), and that judicial review of "all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order," *id.* § 1252(b)(9). "Taken together, § 1252(a)(5) and § 1252(b)(9) mean that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the PFR process." *J.E.F.M.*, 837 F.3d at 1031; *see also Aguilar v. ICE*,

---

[2] Even if Plaintiffs could bring their Motion here, the statute, in addition to prohibiting the relief Plaintiffs seek, would also prohibit the Court from certifying Plaintiffs' putative subclass. 8 U.S.C. § 1252(e)(1)(B) ("no court may . . . certify a class under Rule 23 of the Federal Rules of Civil Procedure"); *AILA*, 199 F.3d at 1359 (referring to section 1252(e)(1)(B) as a "prohibition on class actions"). In section 1252(e), "Congress meant to allow litigation challenging the new system by, and only by, aliens against whom the new procedures had been applied." *Id.* at 1359–60.

510 F.3d 1, 9 (1st Cir. 2007). Sections 1252(a)(5) and (b)(9) sweep up Plaintiffs' arguments about the substantive standard that should be applied to their future asylum claims and channel them into the appropriate courts of appeals for consideration along with any final orders of removal. The INA's jurisdictional provisions thus preclude this Court from even reaching the merits of Plaintiffs' Motion—let alone granting it. *See Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("A difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction.").

## II. Plaintiffs Are Not Entitled to a Preliminary Injunction.

Plaintiffs' Motion also fails on the merits. A preliminary injunction is "an extraordinary and drastic remedy" that is "never awarded as of right." *Munaf*, 553 U.S. at 689 (citing *Yakus v. United States*, 321 U.S. 414, 440 (1944)). Such an injunction "may not issue when it is not of the same character as that which may be granted finally and when it deals with matter outside the issues in the underlying suit." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2947 (3d ed.). The party seeking a preliminary injunction "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) (applying *Winter* standard).

### A. Plaintiffs' Requested Injunction Cannot Be Issued in This Litigation.

As a threshold matter, the injunction Plaintiffs seek may not be issued in this case. District courts "should not issue an injunction when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit." *Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2947. Preliminary injunctions are intended to preserve a court's post-judgment remedial powers, not to grant relief that could not be part of any final judgment. *See De Beers Consol. Mines v. United States*, 325 U.S. 212, 219 (1945) (the issuance of preliminary relief "presupposes or assumes . . .

1    that a decree may be entered after a trial on the merits enjoining and restraining the

2    defendants from certain future conduct"). Here, Plaintiffs seek to enjoin the applica-

3    tion of a Rule that pertains to the procedures and substantive standards governing

4    asylum claims in removal and expedited removal proceedings. But this case centers

5    on CBP's conduct at ports of entry. *E.g.*, Second Am. Compl. ¶¶ 2–3. The Court

6    could not enjoin the IFR as part of any final judgment in this case because the legality

7    of the standards and processes used by asylum officers and immigration judges is

8    not at issue. And because it could not enjoin the IFR at the end of this litigation, the

9    Court also may not do so on a preliminary basis. *See De Beers Consol. Mines*, 325

10   U.S. at 219; *Kaimowitz*, 122 F.3d at 43.

**B. The Government's Policies Are Lawful.**

12         Even if Plaintiffs could get past the threshold hurdles addressed above, they

13   would also need to demonstrate that they are likely to succeed on the merits of their

14   claims, *Winter*, 555 U.S. at 20, or, if they can show that "the 'balance of hardships

15   tips *sharply* in [their] favor,'" that there are serious questions going to the merits of

16   their arguments, *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th

17   Cir. 2013) (quoting *Cottrell*, 632 F.3d at 1135). They cannot make either showing.

18   Both the IFR and CBP's metering/queue management practices are lawful. Indeed,

19   the Supreme Court only a few weeks ago applied the stay standard and concluded

20   that lower-court orders enjoining the IFR must be stayed.

**1. The IFR Is Consistent with the Asylum Statute.**

22         The INA makes clear that asylum is always a matter of executive "discretion"

23   and never a matter of "entitlement." *Cardoza-Fonseca*, 480 U.S. at 428 n.6; 8 U.S.C.

24   § 1158(b)(1)(A). The asylum statute also makes clear that the Attorney General and

25   the Secretary may exercise their discretion through categorical rules, not just case-

26   by-case adjudications, by granting the Attorney General and the Secretary the au-

27   thority, "by regulation," to "establish additional limitations and conditions, con-

28   sistent with this section, under which an alien shall be ineligible for asylum." *Id.*

11

1   § 1158(b)(2)(C).

2       The IFR is well within the Executive's discretionary authority. To start, the

3   Rule is consistent with the discretionary nature of asylum and the authority to adopt

4   new eligibility bars. The Attorney General and the Acting Secretary determined, in

5   the exercise of discretion, that aliens who fail to apply for protection in at least one

6   third country through which they transited, subject to some exceptions, should not

7   be granted the discretionary benefit of asylum because they "chose not to seek pro-

8   tection at the earliest possible opportunity." 84 Fed. Reg. at 33,839. Congress's

9   broad delegation of authority to establish additional eligibility bars requires only that

10  those bars be "consistent with" section 1158. 8 U.S.C. § 1158(b)(2)(C). That de-

11  scribes the Rule. The Rule bars asylum eligibility for aliens who fail to seek asylum

12  at the first available opportunity, and instead wait to reach their preferred destination

13  of the United States, rendering doubtful the validity and urgency of the alien's claim.

14  The Rule also aims to relieve the "extraordinary strain" on the United States' asylum

15  system, while simultaneously furthering the humanitarian purposes of the asylum

16  statute by prioritizing the claims of aliens with no other countries to turn to. 84 Fed.

17  Reg. at 33,831. Nothing in section 1158 precludes such a regulation.

18      The Rule is also consistent with BIA precedent recognizing that an alien's

19  attempts to seek asylum in a third country are relevant to the discretionary determi-

20  nation whether to grant asylum in the United States. *See Matter of Pula*, 19 I&N

21  Dec. 467, 473–74 (BIA 1987) (adverse factors supporting denial of asylum include

22  "whether the alien passed through other countries or arrived in the United States

23  directly from his country, whether orderly refugee procedures were in fact available

24  to help him in any country he passed through, and whether he made any attempts to

25  seek asylum before coming to the United States"); *see also Kalubi v. Ashcroft*, 364

26  F.3d 1134, 1140 (9th Cir. 2004) (noting that forum shopping might be "part of the

27  totality of circumstances that sheds light on a request for asylum in this country").

28      The IFR adopts a categorical rather than a case-by-case approach, but that,

12

too, is consistent with the asylum statute. If the Attorney General and the Acting Secretary may take account of the alien's attempts to obtain asylum in a third country on a case-by-case basis, settled principles of administrative law dictate that they may do so categorically, as well. *Lopez v. Davis*, 531 U.S. 230, 243–44 (2001) ("[E]ven if a statutory scheme requires individualized determinations, which this scheme does not, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." (internal quotation marks omitted)); *see Fook Hong Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (upholding INS's authority to "determine[] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration").

Plaintiffs do not seriously challenge the IFR's legality, focusing instead on the legality of Defendants' metering policy. *See* PI Br. 6–8, 13–20. They are unlikely to succeed on that argument, too, but their failure to show that the IFR is unlawful should preclude the Court from granting the sweeping relief they request—barring application of that lawful Rule to thousands of aliens.

### 2. CBP's Metering Practices Are Lawful.

Plaintiffs also have not made the merits showing needed on their metering challenge. Plaintiffs argue that they are likely to show on the merits that "the metering policy was adopted based on a desire to deter asylum seekers and artificially limit the number of asylum seekers inspected at POEs," PI Br. 14–18; that OFO's metering/queue management practices are "incompatible with the INA's specific inspection mandate" and "exceed[] the scope of Defendants' general authority to implement the statute and manage the ports of entry," *id.* at 19–20; and that the metering guidance violates the Due Process Clause, *id.* at 20. But they are not likely to prevail—and have not even established "serious questions"—on any of these claims.

*First*, Plaintiffs are not likely to demonstrate that the metering guidance was issued to deter aliens from seeking asylum in the United States, or that the ports are

13

"artificially" limiting their intakes. *Id.* at 15–18. Plaintiffs cite statements of the President and White House senior officials indicating a "disdain for asylum seekers," *id.* at 15, but they present no evidence actually linking those statements to the issuance of the metering guidance. Plaintiffs argue that an Acting Assistant Commissioner's statement that "[t]he more we process, the more will come," is indicative of a deterrence motive, *id.*, but it is wholly unclear how that statement, offered without any context, indicates an agency-wide intent to deter people from seeking asylum. Rather, the statement facially pertains to the number of people the ports are attempting to process, and that is exactly the issue that the metering guidance is intended to address. *See* Metering Memo 1 (allowing the ports to "elect to meter the flow of travelers at the land border to take into account the port's processing capacity"). A statement that is fully consistent with metering's port management goal does not justify the injunction sought here, especially given that CBP has engaged in metering for many years. And even if metering were done for deterrence purposes, a policy that seeks to deter irregular migration would be lawful. *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 163–64, 165 (1993) (approving determination to return Haitians apprehended on the high seas to address an "exodus [that had] expanded dramatically," overburdening screening facilities and "pos[ing] a . . . danger to thousands of persons embarking on long voyages in dangerous craft," and explaining that the "wisdom of the policy choices . . . is not a matter for our consideration").

Plaintiffs are also not likely to show that OFO is "artificially" or pretextually lowering the number of new intakes at ports of entry because their arguments rest on fundamentally incorrect readings of the evidence. For example, Plaintiffs claim that a "January 2019 Queue Management report shows that the Laredo Field Office ███████████████████████████████████████████████ the El Paso Field Office ███████████████████ the Tucson Field Office ████████ ███████████, and the San Diego Field Office ████████████████." PI Br. 16 (redacted). This is incorrect. The figures in the Field Queue Management Reports

1 ██████████████████████████████████████████████

2 ██████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ████████████████.[3] Thus, the cited Report actually shows that by January 22,

5 2019—only 31% of the way through FY 2019 (113 days)—the Laredo Field Office

6 ██████████████████████████████████████████████

7 ███████████████████, the El Paso Field Office ████████████

8 ██████████████████, the Tucson Field Office ████████████

9 ██████████████████, and the San Diego Field Office ████████

10 ██████████████████ Plaintiffs' Exhibit 42 shows that as of January

11 22, 2019, OFO was on track to *exceed* its FY 2018 numbers, not that it "cut" them.

12 The chart Plaintiffs present on page 17 also does not appear to be supported

13 by the cited source material. For example, the chart purports to show that the

14 Brownsville port of entry ████████████████████████████

15 ██████ PI Br. 17. ████████████████████████████████

16 ██████████████████████████████████████████████

17 ██████████████████████████ *See* Pls.' Ex. 42, at 3. ████████

18 ██████████████████████████████████████████████

19 ██████████████████████████████████████████████

20 ████████ It is unclear whether those are the data points that Plaintiffs intend the

21 chart to illustrate, but without an explanation of their methodology, the Court should

22 give that chart no weight. And, even assuming that the chart is rooted in an accurate

23 count of the number of people processed, it still would not accurately convey the

24 _____

25 [3] This is obvious when one compares Field Queue Management Reports from different dates—for example, the Reports from January 22, 2019 (ECF No. 294-44),

26 and February 22, 2019 (Ex. 8). ████████████████████████████

27 ██████████████████████████████████████████████

28 ██████████████████████████████████████████████

15

Brownsville port of entry's "utilization" because it wrongly assumes that the port can process ███████████████████████████████████████. PI Br. 16–17.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████, as the Contingency Plan contemplates. Pls.' Ex. 43, at AOL-DEF-00011134–35; Ex. 3 ¶ 12. The Plan is designed to respond to urgent and emergent situations along the border, and its implementation comes at the significant expense of other port operations. *Id.*

Plaintiffs also point to the increase in CBP's budget from $12.8 billion in 2015 to $14.7 billion in 2019, and the increase in staffing at the ports from 2017 to 2018, as evidence that OFO is not processing as many inadmissible aliens as Plaintiffs believe it could. PI Br. 17–18. But the cited budget figures include all of CBP, not just OFO, and the increase in funding coincides with the increase in unlawful border crossers that Border Patrol processes. *See* Pls.' Ex. 44, at 3. And, as a 2018 report from the Senate Minority Staff explains, the increase in front-line officers at the ports has been used to combat the opioid crisis (and even then, the increase still may not be enough). *See* Ex. 1, at 1–2, 4, 13–14. As the Senate staff explained:

> Because the majority of opioids enter though ports of entry, the opioid epidemic has placed considerably more strain on law enforcement officers and other per-sonnel who staff ports of entry than at areas of the border between ports of entry. Port Officers, who are also responsible for conducting admissibility in-terviews, inspecting goods, people, and cargo for illicit materials or trade vio-lations, and for collecting customs fees, are taking on the additional burden of the volume of seizures that the epidemic has created. In particular, the increase in fentanyl seizures has forced CBP to make a dramatic shift in its operations and safety precautions. While seizures of other opioids have remained steady, their already high volume has required CBP to continually devote significant resources over the past several years towards interdicting them.

*Id.* at 13. The notion that OFO is not fully utilizing its resources is unfounded.

Plaintiffs also point to the September 2018 and September 2019 OIG Reports as evidence that metering is pretextual. *See* PI Br. 18; Pls.' Mot. to Suppl. 1–2 (ECF

No. 300-1). But the September 2018 Report states that the OIG "did not observe severe overcrowding at ports of entry it visited." Pls.' Ex. 2, at 8. That means that metering is working, not that it is pretextual. If the ports are not severely over-crowded, then CBP officers remain free to accomplish all of their mission responsi-bilities without focusing on crowd control, and the individuals in custody are not being kept in overcrowded and unsanitary hold rooms. Moreover, while the Septem-ber 2019 OIG Report includes descriptions of aliens being unlawfully sent back to Mexico, the Report further states that OIG "could not corroborate that CBP manag-ers issued a specific instruction to Tecate Port personnel in the 2017–2018 time pe-riod to start returning and redirecting asylum seekers." ECF No. 300-2, at 8. Thus, while the Tecate Report describes instances of unlawful conduct that must be ad-dressed, it also states that OIG did not find evidence corroborating the allegation that CBP or OFO leadership instructed officers to return inadmissible aliens to Mexico in contravention of agency policy or federal law. *Id.* The Report also shows that DHS's oversight procedures can adequately investigate and identify instances of of-ficer misconduct.

For all of these reasons, Plaintiffs are unlikely to show based on the evidence that they have presented that metering is facially unlawful or that OFO is pretextu-ally limiting its intake. And regardless of any further discovery, Plaintiffs are not likely to succeed on their section 706(1) claim because section 1225 does not impose any duties on CBP with regard to an alien standing in Mexico. The INA states: "All aliens (including crewman) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). But aliens standing in Mexico are simply not "applicants for admission," nor are they "seeking admission" in the man-ner that would trigger CBP's duties. *See* 8 U.S.C. § 1225(a)(1) ("An alien present *in the United States* who has not been admitted or who arrives *in the United States* . . . shall be deemed for purposes of this chapter an applicant for admission." (emphasis

added)); 8 C.F.R. § 235.1(a) (application "to lawfully enter the United States shall be made in person to a U.S. immigration officer *at a U.S. port-of-entry*" (emphasis added)). Section 1225(b) does not apply either, because an alien cannot be placed in expedited removal if he is not in the United States. If Congress intended to extend the Executive's inspection and processing duties to aliens standing in another country, it would have said so. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010).

Moreover, metering is lawful because, even if section 1225 did impose obligations on immigration officers with regard to aliens in Mexico, there are "legitimate factors" here "that prevent CBP officers from immediately discharging the mandatory duties" under sections 1158 and 1225. Second MTD Op. 60. For example, perhaps the single biggest factor affecting the ports' rate of intake is "throughput," or the rate at which third-parties transfer mandatory detainees from the ports to longer-term detention. Ex. 2 ¶ 8; Ex. 3 ¶ 5; Ex. 6, at 290 ("ICE is in need of more beds, because the reason CBP was in the position they were in, [is] because I couldn't take custody of everybody."). If other agencies do not move people from the ports, then OFO will remain at or near capacity, even without bringing in more people from the queues. Ex. 2 ¶ 8; Ex. 3 ¶ 5. Even if OFO were to somehow increase its holding capacity, as suggested, Pls.' Ex. 23 ¶¶ 13–16, that would not obviate the need for metering, since an increase in holding capacity does not equate to an increase in throughput. Another prominent factor affecting the ports' rate of intake is the demographic of individuals already in custody. For example, OFO generally tries to keep family units together during short-term detention, but because of agency policy generally prohibiting adult males and females from being detained together, or unaccompanied children from being detained with unrelated adults, or people with contagious conditions from being detained with people without those conditions, the demographics of a hold room will dictate whether the port can take in more people from the queue. *See* Ex. 9 §§ 4.1–4.4, 4.7; Ex. 2 ¶ 10. To ensure sanitary conditions,

18

OFO might also account for the time detainees have already spent in custody and the expected time of the next pickup when determining how many new people to bring in from the queues. *Id.* ¶ 9. These are legitimate, ever-changing reasons why CBP implements metering procedures.

**Second**, Plaintiffs are not likely to succeed on the argument that metering exceeds the scope of Defendants' statutory authority or is incompatible with 8 U.S.C. § 1225. PI Br. 19–20. The Constitution and the INA grant the Executive the authority and duty to manage the flow of trade and travel through ports of entry. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973); *Carroll v. United States*, 267 U.S. 132, 154 (1925) ("Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in[.]"). Controlling the manner and pace of travel into the ports of entry is thus "a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953); *Kleindienst v. Mandel*, 408 U.S. 753, 765–67 (1972); 6 U.S.C. § 202 (2), (8); 8 U.S.C. §§ 1103(a)(1), (a)(3). This includes the power to regulate the pace at which pedestrians enter the ports, particularly the individual Plaintiffs here, who do not have prior statutory authorization to enter the United States with a visa or otherwise.

The asylum statute does not compel a different conclusion because it simply does not apply outside the country's borders. *See* 8 U.S.C. § 1158(a)(1) (allowing "[a]ny alien who is physically present *in the United States* or who arrives *in the United States*" to apply for asylum (emphasis added)); *Kiyemba v. Obama*, 555 F.3d 1022, 1030–31 (D.C. Cir. 2009) (noting that "refugees apply from abroad; asylum applicants apply when already here"), *vacated on other grounds*, 559 U.S. 131 (2010). Nothing in section 1158 suggests otherwise. The first iteration of the asylum

DEFS.' OPP'N TO PLS.' MOT.
FOR PRELIM. INJ.
Case No. 3:17-cv-02366-BAS-KSC

statute directed the Attorney General to establish a procedure by which "an alien physically present in the United States or at a land border or port of entry" might apply for asylum. Refugee Act of 1980, Pub. L. No. 96–212, § 201(b), 94 Stat. 105 (Mar. 17, 1980). This provision did not apply to aliens outside the United States. *See* S. Rep. No. 96-256, at 9 (1979) ("As amended by the committee, the bill establishes an asylum provision in the Immigration and Nationality Act for the first time by improving and clarifying the procedures for determining asylum claims filed by aliens who are *physically present in the United States*." (emphasis added)). Even if the 1980 provision were ambiguous, Congress conspicuously removed the "at a land border" language from the asylum statute in 1996, dispelling any doubt as to whether aliens who stand outside the territorial frontier have a statutory a right to apply for asylum. *See* Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104–208, Div. C, § 604(a), 110 Stat. 3009–690 (Sept. 30, 1996). The asylum statute, by its very terms, applies only to aliens "*in* the United States."

Moreover, if the stated desire to seek asylum in the United States were to give an alien in transit to the United States, but still outside the country's borders, a statutory right to enter on demand, regardless of the government's capacity to process them for admission, the Supreme Court would have reached a fundamentally different outcome in *Sale*, where it allowed the government to *affirmatively* intercept an alien in transit to the United States, "pre-screen" him to determine whether he "is a refugee," and sail him back to Haiti, if not. 509 U.S. at 160–61.

***Third***, Plaintiffs are not likely to succeed on their procedural-due-process claim. *See* PI Br. 20. Where, as here, Plaintiffs premise their procedural-due-process challenge on having a protected interest in a statutory entitlement, the Due Process Clause's protections "extend only as far as the plaintiffs' statutory rights." *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1001 & n.2 (9th Cir. 1998). As explained above, Plaintiffs have no statutory rights under sections 1225 or 1158 while standing in Mexico. Their procedural-due-process challenge also fails because

the Fifth Amendment does not apply in Mexico. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (the Court's "rejection of extraterritorial application of the Fifth Amendment" in *Johnson v. Eisentrager*, 339 U.S. 762, 770 (1950), "was emphatic"). The Supreme Court's decision in *Boumediene v. Bush* does not say otherwise. The *Boumediene* Court drew on *Eisentrager* when discussing the test for determining the Constitution's extraterritorial reach, certainly, 553 U.S. 723, 726 (2008), but the Court did not *sub silentio* overrule *Eisentrager*'s "emphatic" statement that the Fifth Amendment does not apply to aliens abroad. *Boumediene* should not be read any broader than its specific context relating to law-of-war detainees at Guantanamo Bay. *Id.* at 771. Even if this Court believes that *Boumediene* calls *Eisentrager* into question, it should leave to the Supreme Court "the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quotation marks omitted). *Eisentrager* remains good law. Plaintiffs are unlikely to succeed, and have not even raised "serious questions," on any of their claims.

## C. Considerations of Irreparable Harm and the Equities Strongly Favor the Government, not Plaintiffs.

The party seeking a preliminary injunction must show that the balance of equities tips in his favor, that the injunction sought is in the public interest, and that he would suffer irreparable harm without the injunction. *Winter*, 555 U.S. at 20.

All of these factors favor the government because Plaintiffs' injunction would cause direct, irreparable injury to the United States and the public. First, the injunction would frustrate the "wide public interest in effective measures to prevent" irregular migration at the southern border. *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). The United States has experienced an "overwhelming surge" of unlawful crossings at the southern border, 84 Fed. Reg. at 33,840, and the IFR represents the Executive's coordinated effort to address that surge. Second, the injunction would undermine "sensitive and weighty interests of . . . foreign affairs," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010), by preventing the implementation of

a Rule that is designed to "facilitate ongoing diplomatic negotiations" with regional partners, 84 Fed. Reg. at 33,840. Third, the injunction would frustrate the government's and the public's strong interest in a well-functioning asylum system. "Immigration courts received over 162,000 asylum [claims] in FY 2018, a 270 percent increase from five years earlier." *Id.* at 33,838. That burden is "extreme" and "unsustainable," and the IFR seeks to address it by "encourag[ing] those fleeing genuine persecution to seek protection as soon as possible and dissuade those with non-viable claims." *Id.* at 33,831, 33,838, 33,842.

The injunction would also impose a crushing burden on government agencies not parties to this litigation. CBP does not maintain records of who has been metered, so the burden could fall to asylum officers and immigration judges to inject ad hoc fact-finding procedures into what should be an *expedited* removal process to identify the estimated 26,000 putative provisional subclass members who may enter the United States at different points in time, at different ports of entry or different parts of the border, submit asylum applications affirmatively or defensively in different administrative contexts, and be interviewed by different asylum officers or appear before different immigration judges. *See* Ex. 10 ¶¶ 3–4. Plaintiffs claim that the putative provisional subclass members are identifiable by "objective criteria," such as the waitlists, records from migrant shelters in Mexico, or the aliens' own statements. Class Cert. Br. 25. But Defendants cannot verify any of those representations, so that could only encourage a wave of fraudulent claims of being subjected to metering. Putting aside the INA's express prohibition on that relief, 8 U.S.C. §§ 1252(a)(2)(A), (e)(1), these burdens are not "minimal" or "modest." PI Br. 2, 21.

At the same time, the Rule does not impose a significant burden on the putative provisional subclass members. The IFR potentially denies them a purely discretionary benefit, and it allows them to seek other forms of protection in the United States, including withholding of removal (through which the United States satisfies its non-refoulement obligations) and CAT protection. Plaintiffs claim that the Rule

imperils the INA by Executive fiat, PI Br. 22 (quoting *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018)), but the Supreme Court has already permitted the Rule to go into effect nationwide, without limitation. *East Bay*, No. 19A230, 2019 WL 4292781.

Plaintiffs' argument that an injunction is necessary to prevent aliens from being "'wrongfully removed'" is also not well-taken. PI Br. 22 (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)); *see id.* at 10–11 (arguing that the putative provisional subclass members will be "deported to their countries of origin without having their claims for asylum considered on the merits"). As an initial matter, anyone in regular removal proceedings may raise this claim in those proceedings, and *only* in those proceedings. *See supra* Part I (discussing §§ 1252(a)(5), (b)(9)). For those in expedited removal, Congress set forth a limited mechanism for review, and aliens who sought review pursuant to that mechanism had their claim for relief rejected by the proper court. *See CAIR*, No. 19-cv-2117, 2019 WL 3436501. That claim should not be relitigated in this improper forum. Further, asylum is a purely discretionary benefit, not an entitlement, *Cardoza-Fonseca*, 480 U.S. at 428 n.6; 8 U.S.C. § 1158(b)(1)(A), and it ordinarily makes little sense to describe the denial of a discretionary benefit as an irreparable harm. That is especially so when "[o]nly a small minority" of asylum claims are meritorious to begin with. 84 Fed. Reg. at 33,831.

Moreover, an alleged "wrongful removal" would be an entirely self-inflicted injury that should not give rise to injunctive relief. Class members have all had the opportunity since July 16 to seek relief in Mexico to comply with the terms of the IFR, and Plaintiffs concede this is a remedy that can still be sought. *See* PI Br. 12 ("it is possible to seek a waiver of [Mexico's] 30-day bar"). If Mexico were to reject their claims, then the putative class members can present that evidence to the appropriate agency decisionmaker. *See* 84 Fed. Reg. at 33,831, 33,843. Plaintiffs cannot refuse to even attempt to comply with the IFR—by declining to seek relief as it lays out—and then assert that the IFR, rather than their own failure to take action, caused

DEFS.' OPP'N TO PLS.' MOT. FOR PRELIM. INJ. Case No. 3:17-cv-02366-BAS-KSC

their injury.[4] The Supreme Court considered similar claims regarding Mexican law but nonetheless stayed the district court's nationwide injunction. *See* Resp'ts' Opp'n to App. for Stay 28–29, *Barr v. East Bay Sanctuary Covenant*, No. 19A230 (U.S. Sept. 4, 2011). And even class members who refuse to take the steps laid out in the IFR remain eligible for other non-discretionary forms of relief in the United States, such as withholding of removal and CAT protection. Considerations of the hardships and the balance of the equities weigh strongly in Defendants' favor, not Plaintiffs.

## III.  The Court Cannot Grant Relief Under the All Writs Act.

The Court does not have the authority under the All Writs Act, 28 U.S.C. § 1651, to grant Plaintiffs' broad injunction against the application of the IFR. The AWA allows courts to issue writs "necessary or appropriate in aid of their respective jurisdictions." *Id.* But Plaintiffs do not explain how the IFR would erode this Court's jurisdiction over the Second Amended Complaint. They state in a conclusory fashion that the IFR would "prematurely extinguish[] th[eir] plausibly pled claims." PI Br. 24. But the factual and legal challenges Plaintiffs raised in the Second Amended Complaint relating to OFO's conduct at ports of entry along the U.S.-Mexico border are separate and distinct from the collateral challenge Plaintiffs make here on the implementation of the Rule. *Compare, e.g.*, SAC ¶¶ 2–3, *with* PI Br. 10–13. The All Writs Act "cannot enlarge a court's jurisdiction" from what it otherwise would be. 19 J. Moore & G. Pratt, Moore's Federal Practice § 204.02[4] (3d ed.) (cited in *Clinton v. Goldsmith*, 526 U.S. 529, 535 (1999)).

None of the cases that Plaintiffs cite supports an opposite conclusion because, in those cases, the writs actually aided in the preservation of the courts' current or

---

[4] The subclass members' claims that they are barred from seeking asylum in Mexico are speculative and should not be credited when they refuse to seek relief in Mexico as the IFR requires. Indeed, the only putative subclass members Plaintiffs identify who attempted to apply for asylum in Mexico "abandoned their cases," ECF No. 294-30 ¶ 28, even though Plaintiffs' own evidence shows that they may still be eligible, *see* ECF No. 294-29 ¶¶ 34–36, (noting that Mexican immigration officials can waive what they describe as a 30-day registration requirement for good cause).

eventual jurisdiction. *See Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) ("[T]he All Writs Act empowers federal courts of appeal to stay orders of deportation in order to safeguard the court's appellate jurisdiction."); *Securities and Exchange Commission v. G.C. George Securities, Inc.*, 637 F.2d 685, 687–88 (9th Cir. 1981) (ruling that the AWA authorizes district courts "to enjoin a party from attempting to relitigate a cause of action relating to the same subject matter of an earlier action"). Here, in contrast, the Court does not have jurisdiction in the first instance over the substantive standards governing the putative provisional subclass members' asylum applications, so the All Writs Act does not apply.

Further, the INA expressly divests the Court of authority under the AWA to issue the order Plaintiffs seek. The statute's divestment of jurisdiction over the expedited removal process applies "[n]otwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28 . . . and sections 1361 *and 1651 of such title*." 8 U.S.C. § 1252(a)(2)(A) (emphasis added); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1083 (9th Cir. 2014) ("As a general matter, 'notwithstanding' clauses nullify *conflicting* provisions of law."); *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007) (en banc) ("The Supreme Court has indicated as a general proposition that statutory 'notwithstanding' clauses broadly sweep aside potentially conflicting laws."). Moreover, the fact that the INA channels jurisdiction to other courts precludes a conclusion that jurisdiction must be aided in *this* Court. *See* 8 U.S.C. § 1252(e)(3). Although the AWA "empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Pa. Bureau of Correction v. U.S. Marshals Service*, 474 U.S. 34, 43 (1985). Thus, even if the AWA did apply, the INA divests the Court of authority to issue the order Plaintiffs seek.

## **CONCLUSION**

The Court should deny Plaintiffs' Motion for Preliminary Injunction.

DATED: October 10, 2019                    Respectfully submitted,


JOSEPH H. HUNT
Assistant Attorney General
Civil Division


WILLIAM C. PEACHEY
Director


KATHERINE J. SHINNERS
Senior Litigation Counsel


*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
SAIRAH G. SAEED
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

DEFS.' OPP'N TO PLS.' MOT.
FOR PRELIM. INJ.
Case No. 3:17-cv-02366-BAS-KSC

1

## **CERTIFICATE OF SERVICE**

No. 17-cv-02366-BAS-KSC

I hereby certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.


DATED: October 10, 2019       Respectfully submitted,

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

DEFS.' OPP'N TO PLS.' MOT.
FOR PRELIM. INJ.
Case No. 3:17-cv-02366-BAS-KSC