# DEFENDANTS' EXHIBIT 1

U.S. Senate, Committee on Homeland Security & Governmental Affairs, Minority Staff, "Combating the Opioid Epidemic: Intercepting Illicit Opioids at Ports of Entry" (May 10, 2018)

*Al Otro Lado, Inc., et al. v. Kevin McAleenan, et al.*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.)

# HSGAC

MINORITY STAFF REPORT

# COMBATING THE OPIOID EPIDEMIC:

## Intercepting Illicit Opioids at Ports of Entry



**UNITED STATES SENATE**
Committee on Homeland Security & Governmental Affairs
Ranking Member Claire McCaskill

May 10, 2018

# *COMBATING THE OPIOID EPIDEMIC:*
## INTERCEPTING ILLICIT OPIOIDS AT PORTS OF ENTRY

**EXECUTIVE SUMMARY:**

U. S. Customs and Border Protection (CBP) plays a vital role in interdicting illicit narcotics before they can enter the United States.  This role is particularly important given the rise of the opioid epidemic and the increasing use of fentanyl, which is overwhelmingly produced outside the United States.

At the request of Ranking Member Claire McCaskill, the Democratic staff of the Senate Committee on Homeland Security and Governmental Affairs examined the efforts of CBP officers to interdict illicit opioids entering the United States.  The investigation found that CBP Officers at ports of entry (Port Officers) play a key role in stopping opioids and that CBP has significant shortages of Port Officers that may be compromising efforts to seize additional opioids before they can reach U.S. communities.

Currently, CBP collects data and statistics on opioid seizures made by its two primary law enforcement components, the Office of Field Operations, which controls operations at ports of entry, and Border Patrol, which maintains security between ports of entry.  This report summarizes and analyzes data relating to the number and amount of opioid seizures at ports of entry over the last five years.

**Key findings include:**

- **The vast majority of all opioids interdicted by CBP are seized at ports of entry.**  Between 2013 and 2017, approximately 25,405 pounds, or 88% of all opioids seized by CBP, were seized at ports of entry.  Ports of entry located along the southern border are most active as those seizures accounted for 75% of all opioids seized at ports of entry during the same five year period.

- **Fentanyl seizures are rapidly increasing, and most occur at ports of entry.**  In a single year, the amount of fentanyl seized by CBP more than doubled, from 564 pounds in 2016 to 1,370 pounds in 2017.  85% of all CBP fentanyl seizures took place at ports of entry.

- **Large shipments of fentanyl entering the United States are seized at the ports of entry on the southern border, while a greater number of small shipments are interdicted in the international mail.**  Officers at ports of entry on the southern border seized 75% of the total poundage of fentanyl seized across all ports of entry between 2016 and 2017.  Port Officers at international mail facilities had more than five times as many fentanyl seizures at mail facilities as Port Officers at land ports of entry.

- **Both mail and express carrier fentanyl seizures have increased over the past two years.**  When fentanyl is delivered through the international mail, a greater number of small shipments are sent through the U.S. Postal Service and larger amounts are shipped though express carriers like UPS, DHL, and Fed Ex.  Although CBP depends on package data provided by express shippers in order to target packages likely to contain opioids and contraband, this information can be incomplete.  While CBP has the authority to issue fines to compel shippers to provide complete data, express shippers have successfully negotiated $26 million in such penalties between 2014 and 2016 down to just $4 million.



HSGAC
MINORITY

- **Staffing shortages at ports of entry may be compromising interdiction efforts.** Ports of entry across the United States have 4,000 Port Officers less than the number needed to staff all ports of entry.  Ports of entry in the San Diego and Tucson areas, which together accounted for 57% of all opioid seizures by Port Officers between 2016 and 2017, have required CBP to assign temporary staff details to fulfill staffing needs at those locations.  The practice of temporary details has become so systemic over the past two fiscal years that CBP has named it "Operation Overflow."

- **The opioid epidemic places disproportionate demands on Port Officers relative to other border security law enforcement officers.**  In its proposed FY 2019 budget, the Administration proposes to dramatically increase staffing at Border Patrol and Immigration and Customs Enforcement, but add no additional officers at ports of entry.  This prioritization of other border security enforcement components over Office of Field Operations ignores the important role that Port Officers play in stemming the opioid crisis.

Port Officers are, in the majority of cases, the last line of defense in preventing illicit opioids from entering the United States.  To help stem the opioid crisis, increasing resources and staffing at ports of entry is critical.  On February 15, 2018, Ranking Member McCaskill introduced The Border and Port Security Act, a bill that would authorize CBP to hire an additional 500 Port Officers each year until they meet the goals calculated in their workload staffing model.  This legislation is a critical step in providing ports of entry with the resources they need to stop opioids before they can reach communities across the United States.

## I. BACKGROUND AND METHODOLOGY

In 2016, approximately 116 people in the United States died every day from an opioid-related drug overdose, amounting to over 42,000 fatalities in in a single year.[1]  While many addicts still use heroin and over-the-counter opiates, the emergence of fentanyl has rapidly increased the deadliness of the opioid epidemic.[2]  The Centers for Disease Control and Prevention examined opioid overdoses in ten states, including Missouri, and found more than half of the deaths attributable to opioid overdoses tested positive for fentanyl.[3]

Most cases of fentanyl-related death or overdose are linked to illicitly produced fentanyl, 90% of which is produced in China.[4]  Fentanyl is extremely powerful, with a lethal dose for the average adult male amounting to only two milligrams.[5]  Most of the Chinese fentanyl is produced in unauthorized, unmonitored labs before it is shipped to Mexico or the United States.[6]  Once it crosses the United States border, and sometimes before, it is often mixed with other

---

[1] Department of Health and Human Services, *About the Epidemic* (https://www.hhs.gov/opioids/about-the-epidemic/index.html) (accessed May 1, 2018).

[2] Centers for Disease Control and Prevention, *Synthetic Opioid Data* (https://www.cdc.gov/drugoverdose/data/fentanyl.html) (accessed May 1, 2018).

[3] Centers for Disease Control and Prevention, *Fentanyl involved in over half of opioid overdose deaths in 10 states* (https://www.cdc.gov/media/releases/2017/s1027-fentanyl-deaths.html) (accessed May 1, 2018).

[4] Drug Enforcement Administration, *2017 National Drug Threat Assessment* (DEA-DCT-DIR-040-17) (Oct. 2017) ; Centers for Disease Control and Prevention, *Fentanyl* (https://www.cdc.gov/drugoverdose/opioids/fentanyl.html) (accessed May 1, 2018).

[5] Drug Enforcement Administration, *2017 National Drug Threat Assessment* (DEA-DCT-DIR-040-17) (Oct. 2017).

[6] In addition to supplying the United States with fentanyl, China is a major supplier of fentanyl and fentanyl-related compounds to Canada and Mexico.  Drug Enforcement Administration, *2017 National Drug Threat Assessment* (DEA-DCT-DIR-040-17) (Oct. 2017).



substances.[7]  Fentanyl is often combined with other substances or masked as heroin, oxycodone, and other opioids.[8]  In fact, according to DEA, "[i]t is increasingly more common for fentanyl to be mixed with adulterants and diluents and sold as heroin, with no heroin present in the product."[9]

Unlike heroin and fentanyl, prescription opioids do not generally flow into the United States from other countries.  Most abused prescription opioids are obtained through a physician or from a friend or relative.[10]  When prescription opioid abusers are unable to acquire or afford prescription opioids they may switch to heroin or other opioids, which can be cheaper alternatives.[11]  According to the National Institute on Drug Abuse, "[n]early 80 percent of Americans using heroin (including those in treatment) reported misusing prescription opioids first."[12]

U. S. Customs and Border Protection (CBP) is the component within the Department of Homeland Security (DHS) responsible for ensuring the safety of United States borders by inspecting goods and people before they enter the United States at ports of entry and stopping people and goods from crossing illegally between ports of entry.  Because of this, CBP is in a unique position to stop illicit narcotics before they enter the United States and make it to drug markets across the country.  While CBP is not the only governmental entity in the United States charged with seizing opioids, its control of cross border traffic gives it a unique perspective of how opioids produced outside of the country enter the United States.

CBP has two main law enforcement components that are responsible for interdicting illicit materials and unauthorized individuals before they can enter the United States.  The Office of Field Operations employs CBP Officers (Port Officers) at over 300 ports of entry across the United States.[13]  Ports of entry include land border crossings, cargo ports, international mail facilities, and airports.  Port Officers are responsible for interviewing individuals seeking entry into the United States for admissibility and inspecting goods, vehicles, and cargo for illicit material or customs violations.  The Border Patrol also plays an important role in drug seizure efforts and is responsible for the areas along the border that are between ports of entry.  Border Patrol Agents also have certain authorities to interdict people and goods within 100 miles of the border.  To identify trends and monitor efficacy of its interdiction efforts, CBP maintains data and statistics on opioid seizures made by its two primary law enforcement components, OFO and the Border Patrol.

At the request of Ranking Member Claire McCaskill, Democratic staff of the Senate Committee on Homeland Security is conducting ongoing congressional oversight over efforts by DHS to stem the opioid crisis.  Minority staff recently examined data maintained by CBP on

---

[7] National Institute on Drug Abuse, *Fentanyl* (http://www.drugabuse.gov/drugs-abuse/fentanyl) (accessed May 1, 2018).

[8] Drug Enforcement Administration, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Jan. 9, 2018); Enforcement Administration, *2017 National Drug Threat Assessment* (DEA-DCT-DIR-040-17) (Oct. 2017).

[9] Drug Enforcement Administration, 2017 *National Drug Threat Assessment* (DEA-DCT-DIR-040-17) (Oct. 2017).

[10] Drug Enforcement Administration, *2017 National Drug Threat Assessment* (DEA-DCT-DIR-040-17) (Oct. 2017).

[11] Drug Enforcement Administration, *2017 National Drug Threat Assessment* (DEA-DCT-DIR-040-17) (Oct. 2017).

[12] National Institute on Drug Abuse, *Heroin* (https://www.drugabuse.gov/publications/drugfacts/heroin) (accessed May 1, 2018).

[13] Customs and Border Protection, *At Ports of Entry* (https://www.cbp.gov/border-security/ports-entry) (accessed May 1, 2018).



HSGAC
MINORITY

opioid seizures made by its two primary law enforcement components, the Office of Field Operations, and the Border Patrol.[14] The Office of Field Operations provided seizure data for heroin, fentanyl, morphine, oxycodone, hydrocodone, and codeine.[15] Border Patrol included information regarding only heroin, fentanyl, and morphine. In addition to seizure data, CBP briefed Committee staff on several occasions regarding drug interdiction statistics, technology, and law enforcement staffing trends.[16] Additionally, the Drug Enforcement Administration (DEA) briefed the minority staff twice to provide information on underlying epidemic trends nationally and in Missouri.[17]

Unless stated otherwise, seizures of narcotics refer to seizures by CBP (including Border Patrol and the Office of Field Operations), and does not refer to other law enforcement agencies such as DEA, or state and local law enforcement. Data cited relating to years are for the fiscal, not calendar, year.

Opioid seizures made by the Border Patrol will be described in a forthcoming report.

## II. THE VAST MAJORITY OF ALL OPIOIDS INTERDICTED BY CBP ARE SEIZED AT PORTS OF ENTRY

There are two primary ways that illicit opioids, including fentanyl, are smuggled into the United States: (1) through ports of entry such as land border crossings, cargo ports, and airports, and (2) through international mail, via private carriers or the U.S. Postal Service. Despite the increasing role that international mail is playing in supplying illicit opioids, over the past five fiscal years the vast majority of illicit opioids have consistently entered the United States through ports of entry.[18]

Between 2013 and 2017, CBP seized 28,931 pounds of opioids.[19] Approximately 25,405 pounds, or 88% of all opioids seized by CBP, were seized at ports of entry.[20] Ports of entry located along the southern border are most active as those seizures accounted for 75% of all opioids seized at ports of entry during the same five year period.[21]

---

[14] Letter from Kevin K. McAleenan, Commissioner, Customs and Border Protection, to Ranking Member Claire McCaskill and Chairman Ron Johnson (Dec. 7, 2017). Subsequent to CBP's December 7, 2017 response, CBP provided additional data on December 8, 2017, February 6, 2018, and February 13, 2018. All references to information and data provided by CBP in response to Ranking Member McCaskill and Chairman Johnson's November 7, 2017 request will subsequently be cited as: *CBP 2013 - 2017 Opioid Seizure Data*.

[15] Unless otherwise indicated, throughout this report, the term "opioids" refers to illicit opioids including heroin, fentanyl, and morphine. Prescription opioids were not included because they are typically not smuggled into the United States like other illicit opioids. Because of this, CBP Officers at ports of entry seize only a small amount of prescription opioids and Border Patrol seizes so few prescription opioids that it does not track their seizures.

[16] Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Minority Staff (Dec. 5, 2017); Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Dec. 15, 2017); Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Jan. 18, 2018); Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Jan. 19, 2018); Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Feb. 15, 2018).

[17] Drug Enforcement Administration, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Jan. 9, 2018); Drug Enforcement Administration, Briefing with Senate Committee on Homeland Security and Governmental Affairs Minority Staff (Feb. 1, 2018).

[18] *CBP 2013 - 2017 Opioid Seizure Data*.

[19] *CBP 2013 - 2017 Opioid Seizure Data*.

[20] *CBP 2013 - 2017 Opioid Seizure Data*.

[21] Unless otherwise indicated, for the purposes of this report, references to the southern border refer to sectors or field offices along the United States border with Mexico. *CBP 2013 - 2017 Opioid Seizure Data*.



By opioid type, these southern border ports of entry accounted for 81% of heroin and 75% of fentanyl seized across all ports of entry between 2013 and 2017.[22] (See figure 1.) Port Officers in the San Diego, Laredo, and Tucson areas seized the most opioids of all southern ports of entry and accounted for 71% of the fentanyl, heroin, and morphine seized across all ports of entry during 2016 and 2017.[23] Significantly, the share of opioids seized at these three ports of entry increased from 61% in 2016 to 83% in 2017.[24] Ports of entry in the San Diego area contributed most to this increased share of interdicted opioids with a 43% increase in opioid seizures by weight during 2016 and 2017.[25]

**Figure 1**



---

[22] CBP only began consistently monitoring fentanyl seizures in 2016. *CBP 2013 - 2017 Opioid Seizure Data.*

[23] *CBP 2013 - 2017 Opioid Seizure Data.*

[24] *CBP 2013 - 2017 Opioid Seizure Data.*

[25] *CBP 2013 - 2017 Opioid Seizure Data.*



### III.      FENTANYL SEIZURES ARE RAPIDLY INCREASING, AND MOST OCCUR AT PORTS OF ENTRY

The amount of fentanyl seized has increased significantly, especially at ports of entry. In a single year, the amount of fentanyl seized by CBP more than doubled, from 564 pounds in 2016 to 1,370 pounds in 2017.[26] During this same period, the amount of fentanyl seized at ports of entry increased by 159%, from 459 pounds in 2016 to 1,189 pounds in 2017.[27] The vast majority of these fentanyl seizures by CBP took place at ports of entry. During 2016 and 2017, 85% of all fentanyl seized by CBP was seized at ports of entry.[28] See Figure 2.

**Figure 2**



---

[26] *CBP 2013 - 2017 Opioid Seizure Data.*

[27] *CBP 2013 - 2017 Opioid Seizure Data.*

[28] *CBP 2013 - 2017 Opioid Seizure Data.*

Fentanyl seizures at ports of entry can largely be broken down into two categories: (1) fentanyl that enters through land ports of entry on the southern border, and (2) fentanyl that is shipped through the international mail. Seizures at ports of entry on the southern border alone made up the majority of these seizures, constituting 64% of all fentanyl seized by CBP during 2016 and 2017.[29] See Figure 3.

**Figure 3**



---

[29] CBP 2013 - 2017 Opioid Seizure Data.

A. **Fentanyl seizures at land ports of entry on the southern border are greater in weight but smaller in number than seizures at mail facilities.**

During 2016 and 2017, Port Officers at land ports of entry on the southern border seized 85 packages, but accounted for 75% of the total weight seized across all ports of entry.[30] See figures 4 and 5. Aside from seizures at international mail facilities and land ports of entry, only seven fentanyl seizures took place at other ports of entry during 2016 and 2017.[31] Although large volumes of fentanyl are seized at land ports of entry on the southern border, these seizures tend to be lower in purity, sometimes with purity as low as 7%.[32] According to DEA, "[T]he smaller volumes seized after arriving in the mail directly from China can have purities over 90 percent and be worth much more than the fentanyl seized at the [southern border]."[33]

**Figure 4**



---

[30] *CBP 2013 - 2017 Opioid Seizure Data.*

[31] *CBP 2013 - 2017 Opioid Seizure Data.*

[32] Drug Enforcement Administration, *2017 National Drug Threat Assessment* (DEA-DCT-DIR-040-17) (Oct. 2017).

[33] Drug Enforcement Administration, *2017 National Drug Threat Assessment* (DEA-DCT-DIR-040-17) (Oct. 2017).

**Figure 5**



B.   **Port Officers at mail inspection facilities seize the largest number of individual packages containing fentanyl.**

The largest number of individual seizures at ports of entry occur at international mail inspection facilities. Port Officers have the responsibility for the inspection and interdiction of packages and cargo at all international mail inspection facilities, including those for the United States Postal Service (USPS), and those for private shippers. In 2017, Port Officers had more than five times as many fentanyl seizures at mail facilities as at land ports of entry. *See Figure 6.* The vast majority of seizures of fentanyl take place through the international mail, which includes private shippers and the USPS, while land port of entry seizures are primarily made in automobiles, including personal vehicles and trucks. *See Figure 6.*

**Figure 6**



The prevalence of sending opioids, especially fentanyl, through the mail has increased because fentanyl is so powerful that a small amount can be worth a significant sum of money.[34] Illicit fentanyl producers in China use the international mail, including USPS, for a number of reasons, including the fact that very few international packages entering the country by postal service are inspected. Additionally, fentanyl is not expensive to produce in China and there are very few barriers to entry for manufacturers wishing to enter the market.[35] In 2017, after years of

---

[34] Drug Enforcement Administration, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Jan. 9, 2018).

[35] Drug Enforcement Administration, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Jan. 9, 2018).

unregulated production and distribution, the Chinese government took steps to ban some types of fentanyl, making its production illegal.36  While these efforts and the cooperation between Chinese and United States officials have helped slow the distribution of some types of fentanyl, the illicit production of fentanyl continues in China.37

    **C.**    **Mail seizures for the USPS are greater in number than express consignment seizures, but smaller in weight.**

There are two types of international mail categories monitored by CBP, the mail sent via the USPS (often referred to as "regular mail"), and mail sent via private shipper.  Private shippers, also known as "express consignment" shippers, include private shippers like FedEx Corporation (FedEx), United Parcel Service (UPS), and DHL Express U.S. (DHL).  Each of these entities ship packages to their own facilities where CBP employs officers who are responsible for inspecting select packages.  During 2016 and 2017, Port Officers at regular mail facilities seized more individual fentanyl shipments than Port Officers did at express consignments facilities.38  By contrast, Port Officers seized more than twice as much fentanyl by weight from express consignments than from regular mail during the same time period.39  See figures 7 and 8.

**Figure 7**     **Figure 8**




Notably, seizures at both express consignment and regular mail facilities represent only a fraction of the fentanyl that is flowing through the international mail system.  This is because few international mail packages are physically inspected by CBP.40  During 2016 alone, USPS handled

---

36 Senate Permanent Subcommittee on Investigations, *Combatting the Opioid Crisis: Exploiting Vulnerabilities in International Mail*, 115th Cong. (Jan. 25, 2018).

37 Senate Permanent Subcommittee on Investigations, *Combatting the Opioid Crisis: Exploiting Vulnerabilities in International Mail*, 115th Cong. (Jan. 25, 2018); Drug Enforcement Administration, *2017 National Drug Threat Assessment* (DEA-DCT-DIR-040-17) (Oct. 2017).

38 *CBP 2013 - 2017 Opioid Seizure Data.*

39 *CBP 2013 - 2017 Opioid Seizure Data.*

40 Senate Permanent Subcommittee on Investigations, *Hearing on Combatting the Opioid Crisis: Exploiting Vulnerabilities in International Mail*, 115th Cong. (Jan. 25, 2018).



over 600 million pieces of international inbound mail, including letters, small packets, and packages.[41]  This is in addition to the over 59 million packages sent via express carriers in 2015, a figure that ballooned to over 65 million in 2016.[42]  To inspect and monitor all of these packages, CBP employs less than 400 Port Officers at international mail facilities across the United States.[43]  Due to this volume of packages, and a lack of resources, Port Officers do not physically search each package entering the United States.  In fact, on average, Port Officers only inspect 100 of the 1.3 million inbound international packages that USPS handles per day.[44]

  D.  **Both mail and express carrier fentanyl seizures have increased over the past two years.**

  The number and weight of fentanyl seizures by Port Officers at mail processing facilities has increased significantly over the past two fiscal years.  During 2016 and 2017, the number of individual seizures of fentanyl at regular mail facilities increased by 345%, from 51 to 227 seizures, while the number of individual seizures at express consignment facilities increased by 195%, from 40 to 118.[45]  See figure 7. Likewise, when measured by weight, during 2016 and 2017, Port Officers seized 408% more fentanyl shipped via express consignment and 180% more via regular mail.[46]  See figure 8.

  According to CBP, the number of seizures by Port Officers at mail facilities for 2018 is on track to surpass seizures from both 2016 and 2017.[47]  The marked increase in seizures by Port Officers at mail facilities represents both the increased focus by CBP on interdicting fentanyl in mail shipments, but also reveals that black market producers in China and elsewhere are taking advantage of this vulnerability.  While CBP has dedicated additional resources to mail facilities, it cannot make up for the fact that Port Officers lack the resources to search all incoming packages, and largely relies on package data that can be incomplete or non-existent.  In 2017, less than 40% of packages sent through the USPS had advanced data that is provided to CBP for targeting purposes.[48]  While packages sent via express carriers are required to provide advanced data, this data can be incomplete.  For example from 2014 through 2016, CBP issued over five thousand penalties for incomplete manifest information and assessed over $26 million in fines.  However, express shippers successfully negotiated penalties down to just over $4 million.[49]

---

[41] Government Accountability Office, *International Mail Security: Costs and Benefits of Using Electronic Data to Screen Mail Need to Be Assessed* (GAO-17-606) (Aug. 2017).

[42] Senate Permanent Subcommittee on Investigations, *Combatting the Opioid Crisis: Exploiting Vulnerabilities in International Mail*, 115th Cong. (Jan. 25, 2018).

[43] Letter from Kevin K. McAleenan, Commissioner, Customs and Border Protection, to Ranking Member Claire McCaskill and Chairman Ron Johnson (Jan. 19, 2018)

[44] Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Jan. 19, 2018).

[45] *CBP 2013 - 2017 Opioid Seizure Data*.

[46] *CBP 2013 - 2017 Opioid Seizure Data*.

[47] Senate Permanent Subcommittee on Investigations, *Combatting the Opioid Crisis: Exploiting Vulnerabilities in International Mail*, 115th Cong. (Jan. 25, 2018).

[48] Senate Permanent Subcommittee on Investigations, *Combatting the Opioid Crisis: Exploiting Vulnerabilities in International Mail*, 115th Cong. (Jan. 25, 2018).

[49] Response to Post-Hearing Questions for the Record Submitted to Executive Assistant Commissioner Robert Perez, Customs and Border Protection,  *Hearing on Stopping the Shipment of Synthetic Opioids: Oversight of U.S. Strategy to Combat Illicit Drugs* (May 25, 2017).



### IV. STAFFING SHORTAGES AT PORTS OF ENTRY MAY BE COMPROMISING INTERDICTION EFFORTS.

Because the majority of opioids enter though ports of entry, the opioid epidemic has placed considerably more strain on law enforcement officers and other personnel who staff ports of entry than at areas of the border between ports of entry. Port Officers, who are also responsible for conducting admissibility interviews, inspecting goods, people, and cargo for illicit materials or trade violations, and for collecting customs fees, are taking on the additional burden of the volume of seizures that the epidemic has created. In particular, the increase in fentanyl seizures has forced CBP to make a dramatic shift in its operations and safety precautions. While seizures of other opioids have remained steady, their already high volume has required CBP to continually devote significant resources over the past several years towards interdicting them.

Statistics on the flow of opioids through the southern border are particularly relevant to policies to secure the border. Because ports of entry are the primary entry point for opioids, not other areas along the border with Mexico, a border wall would do little to impede their transport into the United States. Rather, a physical barrier is more likely to place additional strain on ports of entry as those few shipments that once passed between ports of entry would instead be diverted through them. To impede the flow of opioids across the southern border, increasing resources at ports of entry would assist the Port Officers who already seize the majority of opioids, and who, with more resources, could increase efficacy.

#### A. The ports of entry with some of the largest seizure rates have experienced staffing shortages.

As noted earlier in this report, the ports of entry with the largest volume in weight of opioid seizures fall along the southern border. For example, in addition to operating some of the busiest ports of entry, the San Diego field office consistently seized the most fentanyl, heroin, and morphine by weight, accounting for 39% of all fentanyl, heroin, and morphine seized by Port Officers during 2016 and 2017.[50] Despite the disproportionate volume of opioid seizures at southern border ports of entry, CBP has failed to allocate sufficient permanent staff to ports of entry that experience heavy traffic and significant seizures, such that Port Officers have been temporarily detailed to certain ports of entry each quarter for the past two fiscal years.

Between 2016 and 2017, Port Officers in the San Diego and Tucson areas interdicted more opioids than all other ports of entry combined, accounting for 57% of all opioids seized by ports of entry, including 75% of all fentanyl and 61% of all heroin seized.[51] Despite these large seizures, CBP has used temporary details to fill staffing gaps at ports of entry in these areas since November 1, 2015.[52] The staffing need was so pronounced that CBP addressed it with its own mission name, "Operation Overflow."[53] According to CBP, "[t]o assist with the staffing shortages the Office of Field Operations Headquarters solicits Temporary Duty personnel to support San Diego and Tucson Field Offices through Operation Overflow."[54] With the exception of its first two

---

[50] *CBP 2013 - 2017 Opioid Seizure Data.*

[51] *CBP 2013 - 2017 Opioid Seizure Data.*

[52] Letter from Kevin K. McAleenan, Commissioner, Customs and Border Protection to Ranking Member Claire McCaskill (Jan. 5, 2018).

[53] Letter from Kevin K. McAleenan, Commissioner, Customs and Border Protection to Ranking Member Claire McCaskill (Jan. 5, 2018).

[54] Letter from Kevin K. McAleenan, Commissioner, Customs and Border Protection to Ranking Member Claire McCaskill (Jan. 5, 2018).



HSGAC
MINORITY

and a half months, Operation Overflow sent between 80 and 200 Port Officers per quarter to San Diego and Tucson field offices for the past two fiscal years.[55]

Temporary details remove resources from other ports of entry that also need staffing.[56] Given CBP's reliance on Port Officers as the primary means of detecting vehicles and cargo containing opioids, whether through targeting, officer intuition, or interviews, prolonged details could create vulnerabilities at other ports of entry.

---

[55] Letter from Kevin K. McAleenan, Commissioner, Customs and Border Protection to Ranking Member Claire McCaskill (Jan. 5, 2018).

[56] House Subcommittee on Border and Maritime Security, Testimony Submitted for the Record of Anthony M. Reardon, National Treasury Employees Union, *Hearing on On the Line: Border Security from and Agent and Officer Perspective*, 115th Cong. (Jan. 9, 2018).

B.   **Staffing shortages directly affect CBP's ability to detect and interdict narcotics.**

Across the United States, ports of entry have been experiencing critical staffing shortages for the past several years.[57] CBP's workload staffing model for ports of entry is part of a "three-pronged strategy that maximizes existing resources, identifies our staffing needs, and explores funding sources to support our staffing needs."[58] According to this model, to meet current staffing needs and to fully and adequately staff all ports of entry, CBP needs to hire over 4,000 Port Officers.[59] However, currently, the staffing authorization for the Office of Field Operations only allows it to hire another 1,328 Port Officers.[60] Even if CBP hires all the Port Officers that it is authorized to, it will be more than 2,700 positions short of the staffing goals that they actually need to fully and adequately staff ports of entry. *See* figure 9.

**Figure 9**

**Port Officer 2018 Staffing Levels**

Optimal Staffing Level: 27,187
Authorized Staffing: 24,475     Shortfall: 2,712
Current Staffing: 23,147        Shortfall: 1,328

Number of Personnel

Despite the hard work of all CBP law enforcement officers, criminal organizations are finding new and covert ways to smuggle drugs across the border and through ports of entry. According to DEA, a drug courier may cross dozens of times before they are caught or may not

---

[57] Department of Homeland Security, Office of Inspector General, *DHS is Slow to Hire Law Enforcement Personnel* (OIG-17-05) (Oct. 31, 2016).

[58] Customs and Border Protection, *Resource Optimization Strategy* (accessed May 1, 2018) (www.cbp.gov/border-security/ports-entry/resource-opt-strategy).

[59] Email from Congressional Affairs, Customs and Border Protection, to Senate Committee on Homeland Security and Governmental Affairs Minority Staff (May 4, 2018).

[60] Email from Congressional Affairs, Customs and Border Protection, to Senate Committee on Homeland Security and Governmental Affairs Minority Staff (May 4, 2018).

be caught at all.[61]  While seizure data from CBP is valuable in understanding opioid flows into the United States, the data only represents the drugs that CBP is able to catch.

Currently CBP does not have technology that screens all packages, cargo, or vehicles.[62]  Rather, CBP's ability to detect narcotics hidden on individuals, in vehicles, or comingled with shipments of goods currently relies heavily on targeting intelligence and officer training and experience.[63]  According to CBP, achieving 100% screening would entail significant man-hours to review all scans, and technology that it does not have.[64]  Because the majority of opioids entering the United States do so though ports of entry, and CBP's ability to detect and interdict opioids and other suspicious goods relies entirely on the presence of Port Officers, staffing shortages directly affect CBP's ability to detect and interdict opioids before they can reach the United States.  CBP's current shortage of over 4,000 Port Officers is directly influencing operations and staffing these positions could increase CBP's ability to interdict opioids.

In its proposed FY 2019 budget, the Administration proposes to dramatically increase staffing at Border Patrol and Immigration and Customs Enforcement, but add no additional officers at ports of entry.[65]  This prioritization of other border security enforcement components over Office of Field Operations ignores the important role that Port Officers play in stemming the opioid crisis.  By CBP's own calculation, ports of entry are understaffed by thousands of officers, and according to its own data, Port Officers seize the overwhelming majority of opioids.

---

[61] Drug Enforcement Administration, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Jan. 9, 2018).

[62] Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Jan. 18, 2018).

[63] Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Jan. 18, 2018).

[64] Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Staff (Jan. 18, 2018).

[65] Department of Homeland Security, Customs and Border Protection, *Fiscal Year 2019 Congressional Justification* (Feb. 2018).

