# DEFENDANTS' EXHIBIT 6

Excerpts of the Testimony of Carla L. Provost, John P. Wagner, and Thomas D. Homan Before the U.S. House of Representatives Subcommittee on Homeland Security (June 13, 2017)

*Al Otro Lado, Inc., et al. v. Kevin McAleenan, et al.*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.)

# DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS FOR 2018

# HEARINGS

BEFORE A

## SUBCOMMITTEE OF THE

## COMMITTEE ON APPROPRIATIONS

## HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

SUBCOMMITTEE ON HOMELAND SECURITY

**JOHN R. CARTER, Texas,** *Chairman*

| | |
|---|---|
| JOHN ABNEY CULBERSON, Texas | LUCILLE ROYBAL-ALLARD, California |
| CHARLES J. FLEISCHMANN, Tennessee | HENRY CUELLAR, Texas |
| ANDY HARRIS, Maryland | DAVID E. PRICE, North Carolina |
| STEVEN M. PALAZZO, Mississippi | C. A. DUTCH RUPPERSBERGER, Maryland |
| DAN NEWHOUSE, Washington | |
| SCOTT TAYLOR, Virginia | |

NOTE: Under committee rules, Mr. Frelinghuysen, as chairman of the full committee, and Mrs. Lowey, as ranking minority member of the full committee, are authorized to sit as members of all subcommittees.

VALERIE BALDWIN, KRIS MALLARD, LAURA CYLKE, and CHRISTOPHER ROMIG,
*Subcommittee Staff*

## PART 2

### DEPARTMENT OF HOMELAND SECURITY

| | Page |
|---|---|
| **Coast Guard Requirements, Priorities, and Future Acquistion Plans** ............................................................... | **1** |
| **United States Department of Homeland Security** .......... | **73** |
| **Immigration and Customs Enforcement and Border Protection** .......................................................................... | **207** |



Printed for the use of the Committee on Appropriations

U.S. GOVERNMENT PUBLISHING OFFICE

27–050                    WASHINGTON : 2017



TUESDAY, JUNE 13, 2017.

## IMMIGRATION AND CUSTOMS ENFORCEMENT AND CUSTOMS AND BORDER PROTECTION FISCAL YEAR 2018 BUDGET REQUEST

### WITNESSES

**CARLA L. PROVOST, ACTING CHIEF, UNITED STATES BORDER PATROL**
**JOHN P. WAGNER, DEPUTY EXECUTIVE ASSISTANT COMMISSIONER, OFFICE OF FIELD OPERATIONS**
**THOMAS D. HOMAN, ACTING DIRECTOR, IMMIGRATION AND CUSTOMS ENFORCEMENT**

Mr. CARTER [presiding]. I am going to call this subcommittee to order. Welcome, everybody. We are glad everyone is here.

And I want to welcome our panel of witnesses. Today we have John Wagner, executive assistant commissioner of CBP for field operations. Chief Carla Provost, acting chief of the Border Patrol. And Thomas Homan, acting director of ICE. Welcome each and every one of you. We appreciate very much your coming here on this important issue.

This subcommittee is holding a hearing on the budget request of two DHS components, ICE and CBP. And this is for couple of reasons. The first is practical. Chairman Freylinghuysen wants all appropriations bills reported out of full committee before the August recess. And given the late submissions for the 2018 budget request, we are operating on a compressed schedule in order to meet this objective.

Having both components also provides an opportunity to hear how they operate jointly, and how those operations have a direct impact on the assumptions underlying their budget requests.

Let me state at the outset that I support the proposed budget increases for both CBP and ICE. Thankfully, illegal immigration is down. However, the border is still vulnerable and gaining operational control remains an imperative.

In my opinion, technology solutions that improve situational awareness and infrastructure that slows illegal crossings makes the country safer. Too often the discussion about border security revolves around illegal immigration, which is certainly part of the story.

The rest of the story is that illegal immigrants can exploit vulnerabilities in the nation's border, and if they can do it, so can terrorists, drug smuggling, and human trafficking organizations. This is unacceptable.

It is time to change the dynamic and the budget request for CBP and ICE is a start in the right direction. The fiscal year 2018 budget request for CBP is $13.9 billion, an increase of $1.7 billion over the amount provided in fiscal year 2017. This includes over $1.7 billion for new physical infrastructure.

208

There are legitimate questions about the request that require answers. For example, spending is proposed for various types of barriers, but it's unclear where they will be located, or if they can be executed in fiscal year 2018.

Likewise, we need an understanding why more emphasis has not been placed on technology and personnel at ports of entry. This is where a vast majority of the illicit drugs and currency enter the United States.

The fiscal year 2018 budget request for ICE is $7.6 billion in discretionary spending, an increase of $1.1 billion over fiscal year 2017. The largest share of the increase supports the detention and removal of an additional 12,055 adult aliens, resulting from robust interior enforcement.

This subcommittee needs to understand if the change in policies and force structure will actually enable this level of enforcement as well as the methodology used to calculate the cost for enforcement and removal operations.

Before I turn to our witnesses for their statements, the text of which will be included in the record, I would like to recognize the distinguished ranking member, Ms. Roybal-Allard, for any remarks she may wish to make.

Ms. ROYBAL-ALLARD. Thank you, Mr. Chairman. And welcome, Director Homan, Chief Provost, and Deputy Executive Assistant Commissioner Wagner.

When the secretary appeared before this subcommittee a few weeks ago I noted that his job was among the most challenging in government. Much of that challenge——

Mr. CARTER. We don't hear you on the mike.

Ms. ROYBAL-ALLARD. When the secretary appeared before this subcommittee a few weeks ago, I noted that his job was among the most challenging in government. Much of that challenge stems from the difficult mission of your agencies.

One of the greatest challenges is enforcing our immigration laws, while at the same time adhering to our American values. One of the responsibilities of this subcommittee is to provide the oversight of where and how your agencies use taxpayer dollars. There will be times we will disagree on funding priorities, as well as policies, interpretation of law and enforcement priorities, just as I disagreed with some of the prior administration's.

Among those disagreements is the President's proposed border wall, because it isn't enough just to ask whether an investment improves homeland security. We must also consider the fact that each additional segment of physical barrier at the border comes at the expense of important priorities, both inside and outside of the department.

We must ask whether the incremental benefits outweigh the detrimental effects, including the cost and the trade-offs.

Another responsibility of this subcommittee is to hold accountable your agencies and any personnel who violate the trust we and you have placed in them. For example, CBP and ICE have significant authority not only over criminal aliens but in the treatment of extremely vulnerable individuals, children and families they apprehend, many of whom are fleeing severely traumatic circumstances.

209

Emphasizing the need for CBP and ICE to ensure such individuals are treated fairly and humanely and according to appropriate standards is this subcommittee's obligation and should not be interpreted as being at odds with valuing the mission of your agencies.

A further area of disagreement is on immigration enforcement. I completely disagree with the aggressive posture called for by the President's executive orders. One sentence in the witness testimony particularly struck me in this regard. It says, and I quote "The stepped-up enforcement of our nation's immigration laws in the interior of the United States is critically important to the national security and public safety of the United States," end of quote.

There is no disagreement that we should be removing dangerous individuals, but interior arrests of non-criminals are up 157 percent over the last year. That is not required for national security or public safety, and it has real cost to families and communities all over this country.

One example of those costs is in Los Angeles, where there is an old battery recycling plant. For decades this facility has exposed nearby residents to harmful toxins such as lead and arsenic, impairing the health of their children for the rest of their lives. Some 100,000 people are still at risk from this contamination.

The county has organized volunteers to go door to door in these communities to inform and gather health information, but many of the residents are so frightened of being separated from their families, health professionals fear residents will be too afraid to talk to volunteers.

Also because of current immigration policies, people are afraid to report serious crimes, including domestic violence, and they are less willing to come forward as witnesses to crimes.

Teachers are telling me that children are being traumatized and afraid to go to school, or to just go out and play, for fear their parents will be gone when they return home. The trauma that is being inflicted on entire communities throughout our country cannot be overstated.

This is a moral question as much as it is a legal one. And members of the panel, just as other law enforcement entities have discretion to enforce our laws, you too have discretion in enforcing our immigration laws fairly and justly.

Furthermore, I hope as we discuss these and other important issues, we will all avoid unnecessary and misleading rhetoric suggesting that Secretary Jeh Johnson and the previous administration did not work to protect our borders and enforce our laws.

I hope we will respect efforts of the prior administration to faithfully enforce the law as they understood it, including the efforts of the men and women of CBP and ICE who served during that administration. To try and discredit them only serves to undermine the respect and confidence the American people have in their government and its determination to keep them safe.

I also hope that, given the importance of your mission, when we have areas of disagreement on homeland security investments and policy, it does not call into question the commitment we all share as Americans to defend and protect our country.

210

Mr. Chairman, I know that this is approach that you take in leading this subcommittee, and I very much respect and appreciate your patriotism and your commitment to protecting our homeland.

Thank you, Mr. Chairman, thank you members of the panel, and I look forward to our discussion this morning.

Mr. CARTER. We are pleased to have the ranking member of the full committee, Mrs. Lowey, here today. Mrs. Lowey, would you like to make a statement?

Mrs. LOWEY. Thank you, Mr. Chairman. And I would like to thank Chairman Carter, Ranking Member Roybal-Allard, for holding this important hearing, and I want to thank you to our distinguished panelists for being here this morning.

As we wade further into this condensed appropriations season, I have been struck by the notable and at times shocking decreases and eliminations in this administration's budget. I am stunned yet again, but this time by the increases proposed for both ICE and CBP, which are part and parcel of the un-American mass deportation policy this administration is pursuing.

For ICE, the budget requests $1 billion for a surge in detention beds, an increase of $186 million to hire 1,000 additional immigration enforcement officers and 600 support staff. For CBP the budget requests $1.6 billion for, in my judgment, President Trump's boondoggle of a wall, an unnecessary and unreasonably expensive proposition that is based on nothing more than a campaign promise and will not keep us safe.

I want to make something perfectly clear. Democrats will not accept a penny of funding for a new deportation force or a border wall. It appears President Trump and the administration did not take note of the recently enacted bipartisan spending bill in which neither of these items was funded.

If President Trump actually wants the government to function and wants annual appropriation bills enacted into law then he must abandon these outrageous requests.

In addition, President Trump has spoken and tweeted extensively regarding his draconian plan to detain and deport as many people as possible. Let me give you just one example of how unconscionable and unacceptable this approach is.

Last week a young man from my district, Diego Pumonacanella, was detained by ICE. Diego was brought to the United States as a minor by a parent and by all accounts was an upstanding member of the community. This summer Diego was planning to graduate from high school, but instead was separated from his mother, detained on the day of his senior prom, and is now due to be deported.

We have worked to foster a diverse community where people of all backgrounds build a brighter future together. The removal of this teenager violates the fundamental trust between law enforcement and our community.

Increased immigration enforcement of nonviolent offenders—I mention that again because nonviolent offenders, especially targeted at children like Diego, has a chilling effect on these critical relationships. This radical enforcement policy makes us all less safe.

211

As I told Secretary Kelly when he testified before this sub-
committee last month, the budget does not reflect the serious na-
ture of the threats we face. It is time we move on from campaign
rhetoric and start focusing on what is needed to truly keep Amer-
ican families safe. Thank you.

Thank you, Mr. Chairman.

Mr. CARTER. Thank you, Mrs. Lowey.

All right. We are ready to hear from you on your opening state-
ments. Those opening statements. If you submitted an opening
statement, everybody has got a copy of it. What you need to say,
you need to condense it down to about 5 minutes, and the rest of
what you have to say of course will be entered into the record.

So Ms. Provost.

Ms. PROVOST. Thank you, Chairman Carter, Ranking Member
Roybal-Allard.

As the acting chief of the United States Border Patrol, I am hon-
ored and privileged to appear before you today to discuss the Presi-
dent's fiscal year 2018 budget. As America's border agency, U.S.
Customs and Border Protection is responsible for securing Amer-
ica's borders against all threats, while facilitating the flow of lawful
people and goods entering the United States.

Today I will discuss how we are using the resources provided by
Congress efficiently and effectively, and talk about how the Presi-
dent's fiscal year 2018 budget request supports CBP's continued
commitment to securing our borders by maintaining the right bal-
ance of people, technology and infrastructure, often referred to as
the three-legged stool.

As an evolution from the three-legged stool, we rely on four inter-
dependent master capabilities of domain awareness, impedance
and denial, access and mobility, and mission readiness.

Domain awareness is provided through technology that helps de-
tect, identify and classify. Impedance and denial is provided
through border walls designed to deny and deter illicit cross-border
activity.

Access and mobility is added infrastructure of access and patrol
roads that enhance our response capabilities. And finally, mission
readiness is provided through the border patrol agents and their
training and tools that provide the law enforcement response.

Our operational capabilities are reinforced by Congress's ongoing
support of investments in technology and equipment. Radios are es-
sential for frontline agents, officers and pilots. Border patrol agents
may not deploy to the field without a functioning radio.

On that, I would be remiss if I did not express our gratitude to
Congress for your strong support in fiscal year 2017 in this area.
However, nearly 72,000 units of CBP's radio inventory are obsolete
and/or have exceeded their useful life.

The 2018 budget requests $44 million to purchase secure modern
communication assets in order to achieve maximum interoper-
ability and functionality. The budget also includes $34.8 million for
the tactical aerostats and relocatable towers program to provide
border patrol agents with advanced surveillance technology over a
wide area.

The budget includes $22.4 million for integrated fixed towers, op-
erations and maintenance, and $17.4 million for procurement, con-

212

struction and improvements. These and other proven border secu-
rity technologies help the U.S. Border Patrol fulfill our mission
every day.

To fulfill the mandate of executive order 13767, border security
and immigration enforcement improvements, the budget funds an
increase of $100 million to begin hiring 5,000 additional border pa-
trol agents, beginning with 500 agents from current appropriated
staffing levels.

The budget seeks further increase of $23.2 million to fund the
initial hiring of 94 additional air and marine operations personnel.
This initial hiring surge develops the foundation to increase oper-
ational control along the border.

The budget also includes an increase of $17.5 million to support
efforts to attract qualified candidates and expedite the hiring proc-
ess. CBP recruiters will participate in thousands of recruiting
events, including those for veterans and transitioning military per-
sonnel as a top priority.

With that, I can assure you that our agency is committed to hir-
ing people who have the highest standards of integrity, both per-
sonally and professionally.

The budget also includes $25 million to enhance U.S. Border Pa-
trol's operational mobility program. This positively impacts our
agents' morale, and we are very thankful for the continued dedica-
tion of members of Congress to working collaboratively with us to
find solutions to this complicated challenge.

Also included in the budget in support of the executive order is
$1.6 billion for a border barrier system, support infrastructure and
personnel, and $975 million for border security technology assets
and equipment.

CBP has begun taking appropriate steps to deploy a border wall
first where it is needed most. The budget provides for 32 miles of
new border barrier system and 28 miles of new levee wall system
in the Rio Grande Valley sector, where we have a critical oper-
ational requirement, as well as 14 miles of secondary replacement
barrier system in the San Diego sector.

Coordination and cooperation among all federal, state, local, trib-
al and binational law enforcement agencies, as well as with the
public and private sectors that have a stake in our mission, is para-
mount. The border environment is dynamic and requires continual
adaptation.

This budget supports the border patrol's dedicated men and
women, who continue to meet daily challenges with integrity and
commitment.

In closing, I would only add that it is my belief that border patrol
agents are among the most dedicated and committed law enforce-
ment personnel in America. And we are the finest border security
force in the world. It is an honor to work with them, as well as to
be their advocate here today.

Thank you for the opportunity to appear before you and for your
continued support of CBP. I look forward to your questions.

[The information follows:]

213



TESTIMONY OF

**CARLA PROVOST**
Acting Chief
U.S. Border Patrol
U.S. Customs and Border Protection

and

**JOHN WAGNER**
Deputy Executive Assistant Commissioner
Office of Field Operations
U.S. Customs and Border Protection

BEFORE

House Appropriations Committee
Subcommittee on Homeland Security

ON

"Fiscal Year 2018 Budget Request"

June 13, 2017
Washington, DC

214

**Introduction**

Chairman Carter, Ranking Member Roybal-Allard, Members of the Subcommittee, it is an honor
to appear before you today. As America's unified border agency, U.S. Customs and Border
Protection (CBP) protects the United States from terrorist threats and prevents the illegal entry of
inadmissible persons and contraband, while facilitating lawful travel and trade. CBP works
tirelessly to detect illicit trafficking of people, drugs, weapons, and money, while facilitating the
flow of cross-border commerce and tourism. The President's Fiscal Year (FY) 2018 Budget
includes $13.9 billion to help enable CBP to achieve our complex mission with the right
combination of talented and dedicated personnel, intelligence-driven and risk-based strategies,
collaborative partnerships, and advanced technology.

The border environment in which CBP works is dynamic and requires continual adaptation to
respond to emerging threats and rapidly changing conditions. We are proud of CBP's dedicated
men and women, who have advanced CBP's situational awareness of the border environment, and
who continue to meet these challenges with integrity and commitment.

Two years ago CBP announced the *CBP Vision and Strategy 2020*, CBP's first comprehensive
strategic plan for our agency in nearly a decade. The plan acknowledges the complexity of the
CBP mission in an increasingly challenging border environment and provides a roadmap for the
way forward by focusing efforts on collaboration, innovation, and integration in meeting our
mission goals to:

- combat terrorism and transnational crime;
- advance comprehensive border security and border management;
- enhance U.S. economic competitiveness by enabling trade and travel; and
- promote organizational integration, innovation, and agility.

The last mission goal listed above – promote organizational integration, innovation, and agility –
has led us over the last year to make many changes and much progress as we restructure our fiscal,
operational, and institutional management to better align our resources with our missions.

To promote organizational efficiencies within CBP, it was announced two years ago that CBP
would realign the agency's headquarters structure to better support our personnel in fulfilling
CBP's critical mission. These changes emphasize the delegation of authority, more defined and
accountable decision-making, and improved span of control for management. While CBP's
operational offices – Office of Field Operations (OFO), U.S. Border Patrol (USBP), Air and
Marine Operations (AMO), and the Office of Trade (OT) – remain as key Offices within CBP, the
new structure identifies and addresses the strengths and weaknesses of our most critical
infrastructure, and supports working towards integrated and comprehensive solutions to issues and
challenges. We measure the success of this effort by our ability to support the front lines – our
ability to identify requirements and to manage resources effectively. CBP's realignment is
allowing us to streamline process flows and create efficiencies for the agency.

215

**Implementing the President's Executive Orders**

As President Trump has stated, "Homeland Security is in the business of saving lives, and that mandate will guide our actions." Through a series of Executive Orders (EOs), the President has taken steps to enhance border security, promote public safety, minimize the threat of terrorist attacks by foreign nationals, and protect American workers from unfair foreign competition. The FY 2018 Budget proposes significant investments to support all of those goals while implementing the EOs.

In January, the President signed the Executive Order entitled *Border Security and Immigration Enforcement Improvements* (EO 13767). Included in the Budget is a total of $2.6 billion in enhancements in high-priority border security technology, tactical infrastructure, assets, and equipment, including $1.6 billion for a border wall system and support infrastructure and personnel; $975 million for border security technology, assets, and equipment. Additionally, the Budget provides $100 million to hire 500 additional Border Patrol Agents (BPA), the initial hiring surge for the 5,000 additional agents required by this EO.

The Budget also includes $55 million to help CBP implement initiatives directed by EO 13780, *Protecting the Nation from Foreign Terrorist Entry into the United States*, specifically to improve intelligence and targeting capabilities related to the screening and vetting of immigration populations and international travelers, in accordance with Section 5 of the EO.[1] These resources will also support the efforts related to EO 13767.

Finally, the Budget includes $30 million to help CBP meet the legislative mandates to implement the Trade Facilitation and Trade Enforcement Act (TFTEA), as well as the *Omnibus Report on Significant Trade Deficits* called for by EO 13786.

**Securing America's Borders**

Along the more than 5,000 miles of border with Canada; 1,900 miles of border with Mexico; and approximately 95,000 miles of shoreline, CBP is responsible for preventing the illegal entry of people and contraband at and between the Ports of Entry (POEs). CBP's USBP and AMO agents patrol our Nation's borders and associated airspace and maritime approaches to prevent illegal entry of people and goods into the United States. CBP officers (CBPOs) and agriculture specialists (CBPAS) are multi-disciplined and perform the full range of inspection, intelligence analysis, examination, and law enforcement activities relating to the arrival and departure of persons, conveyances, and merchandise at air, land, and sea POEs.

EO 13767 directs executive departments and agencies to deploy all lawful means to secure the Nation's Southern border, prevent further illegal immigration into the United States, and repatriate aliens with final orders of removal swiftly, consistently, and humanely. EO 13767 also establishes the foundation for securing our Southern border by directing the tools, resources, and policy goals for CBP's dedicated men and women who are responsible for preventing illegal immigration, drug smuggling, human trafficking, and acts of terrorism. In accordance with existing law, CBP has

---

[1]Sec. 5. "Implementing Uniform Screening and Vetting Standards for All Immigration Programs" per https://www.whitehouse.gov/the-press-office/2017/03/06/executive-order-protecting-nation-foreign-terrorist-entry-united-states

216

already begun to take all appropriate steps to plan, design, and construct a physical wall, using the materials and technology that will most effectively achieve operational control of the Southern border.

The FY 2018 Budget provides $1.6 billion for 32 miles of new border wall system and 28 miles of new levee wall in Rio Grande Valley Sector, as well as 14 miles of secondary border wall system in San Diego Sector. Tactical infrastructure, including physical barriers, has long been a critical component of CBP's multi-layered and risk-based approach to securing our Southern border. It is undeniable that border barriers have enhanced – and will continue to enhance – CBP's operational capabilities by creating persistent impedance, and facilitating the deterrence and prevention of successful illegal entries. CBP plans to deploy border wall system in a multi-phased approach that meets USBP's operational requirements, safeguards national security and public safety, and is the result of thorough analysis of threat, cost, and mission effectiveness.

The land along the border between the United States and Mexico is extremely diverse, consisting of desert landscape, mountainous terrain, and urban areas. Today we have several types of barriers, to include steel bollard and levee wall, along nearly one-third, or 654 miles, of the Southwest border.

CBP is prioritizing investments and geographic areas across the Southwest border, leveraging the USBP's annual, full spectrum requirements analysis process to identify needs related to domain awareness, impedance and denial, access and mobility, and mission readiness. Throughout the planning, designing, and construction process, CBP will complete project, budget, real estate, and environmental planning to ensure available resource capacity. CBP will leverage expertise in federal acquisition to maximize transparency and accountability and to ensure the most effective and efficient solutions are deployed to meet requirements, in accordance with the established DHS acquisition framework and acquisition review board oversight.

CBP is seeking to build on the successes of and lessons learned from the installation and operation of existing barriers to deploy a system that addresses dynamic cross-border threats. CBP is working with industry and partnering with the U.S. Army Corp of Engineers to potentially incorporate additional alternative barrier designs that may include a concrete base or other innovative solutions into our border barrier toolkit. Border barrier and levee wall systems are comprehensive solutions that include a concentrated combination of various types of infrastructure such as wall, fence, all-weather roads, lighting, enforcement cameras, and other related technology. The strategic deployment of these capabilities along the border will provide USBP's frontline agents with the tools they need to deter and prevent successful illegal entries.

CBP is committed to ensuring that all stakeholder communities, to include Congress, federal partners, state, local, and tribal officials, and the impacted communities, are informed throughout this process.

*Response to Migrant Surges*

Thanks to this Subcommittee's support, the Nation's long-term investment in border security has produced significant and positive results. With the support and direction of President Trump and Secretary Kelly, we are already seeing an unprecedented improvement in the posture of our

3

217

Southwest border. Since January 2017, the number of illegal aliens we have apprehended on the Southwest border has drastically decreased, indicating a significant decrease in the number of aliens attempting to illegally enter the country. The number of illegal aliens apprehended in April 2017 was more than 60 percent lower than January apprehensions and close to 70 percent lower than the same time last year.[2]

During FY 2016, over 415,816 illegal aliens from Central America and Mexico – including over 137,614 unaccompanied alien children (UAC) and alien families – were apprehended along our Southwest border. While more than 16,000 family units were apprehended at the border in December of 2016, only 1,119 family units were apprehended in April of 2017.[3]

Although the numbers have recently declined, UAC and other immigrant flows are difficult to predict and another surge is always a possibility. The simple fact is that now is the time to make further, substantial improvements to our southwest border security, as these could be fleeting improvements if the perception of our southern border security returns to what it was before January 2017. We must remain prepared for apprehension numbers to climb again as quickly as they have fallen.

*Investments in Mobile Tactical Equipment*

CBP's border security mission regularly requires BPAs and CBPOs to operate in diverse and remote locations where tactical communication, transportation, and surveillance capabilities are essential to coordinating mission activities and protecting the safety of CBP law enforcement personnel. For agents and officers operating in remote areas, their radios are often their only means of communication to coordinate activities or request assistance. For USBP, radios are the single most essential piece of equipment for frontline agents – a BPA may not deploy to the field without a functioning radio.

CBP operates and maintains a tactical radio inventory of more than 70,000 units, utilized by CBP's frontline law enforcement personnel. More than 25,000 units of CBP's radio inventory have exceeded their useful life and are no longer supported by the manufacturer. The FY 2018 Budget seeks $29.3 million to purchase the equipment for USBP and AMO Tactical Air Land and Marine Enterprise Communications (TALMEC), including the acquisition of modern and secure radio and satellite communication technology that will provide communication reliability and security for CBP frontline law enforcement and flexibility for agents and officers to communicate with state and local law enforcement agencies as well as Mexican authorities.

The FY 2018 Budget includes $60.3 million to provide for the acquisition of vehicles. CBP's vehicle lifecycle management process[4] is especially important as vehicles become older and less reliable, while mission demands continue. Reductions in vehicle performance and/or reliability may place an undue burden on law enforcement personnel executing mission requirements. These investments, to include recapitalizing aging radios and vehicles, will enable agents to respond to and resolve incidents and incursions more efficiently, effectively and safely.

---

[2] Per https://www.cbp.gov/newsroom/stats/sw-border-migration
[3] Per https://www.cbp.gov/newsroom/stats/sw-border-migration
[4] The General Services Administration's recommended vehicle replacement standard is five years.

218

*Technology Investments between Ports of Entry*

The FY 2018 Budget will also enable the continued deployment of proven, effective technology to strengthen border security operations between the ports – in the land, air, and maritime environments. With the deployment of fixed and mobile surveillance capabilities, CBP can gain situational awareness remotely, direct a response team to the best interdiction location, and warn them of any additional danger otherwise unknown along the way. Investment in this area will support CBP's efforts to implement the President's EOs on border security and to maintain operational control of the Southern border through improved situational awareness.

CBP's Tactical Aerostats and Re-locatable Towers Program, originally part of the Department of Defense (DOD) Re-use program, uses a mix of aerostats, towers, cameras, and radars to provide USBP with advanced surveillance capabilities over a wide area. This technology has proven to be a vital asset in increasing CBP's ability to detect, identify, classify, and track illegal activity. Furthermore, since initial deployment, these systems have been responsible for the detection of more than 180,000 illegal border incursions of aliens and smugglers, leading to the seizure of approximately 180 tons of narcotics and related contraband headed towards our Nation's cities and neighborhoods. As of April 2017, USBP agents, with the assistance of existing aerostats and re-locatable towers, have seized 62 tons of narcotics, and caught more than 20,000 illegal border crossers detected in aerostat locations during FY 2017. The FY 2018 Budget includes $34.8 million in FY 2018 for the Tactical Aerostats and Re-locatable Towers Program to fund continued operations and maintenance costs.

Another proven border security technology, Integrated Fixed Towers (IFT), assists BPAs in detecting, tracking, identifying, and classifying items of interest along our Nation's borders through a series of fixed surveillance towers and equipment that display information on workstations in command and control centers. CBP requires $22.4 million in FY 2018 for the IFT program for operations and maintenance. In addition, CBP proposes $17.4 million in FY 2018 for procurement, construction, and improvements towards the IFT program.

Remote Video Surveillance Systems (RVSS) are another fixed technology asset used in select areas along the Southwest and Northern borders. These systems provide short-, medium-, and long-range persistent surveillance mounted on stand-alone towers, or other structures. The RVSS uses cameras, radio, and transmitters to send video to a control room. This enables a control room operator to remotely detect, identify, classify and track targets using the video feed. The RVSS deployment planned as part of the Arizona Technology Plan is now complete, and CBP is presently working to expand the RVSS capability to other high-priority areas along the Southwest border. The FY 2018 Budget includes $20.0 million in FY 2018 to sustain RVSS. An additional $46.2 million is provided for procurement, construction, and improvements. This funding will be used to support the deployment of the RVSS capability to the Rio Grande Valley Sector.

Mobile Video Surveillance Systems (MVSS) consist of short- and medium-range mobile surveillance equipment that is mounted on USBP vehicles. An agent deploys with the system, which helps agents detect, track, identify, and classify items of interest using the MVSS video feed. The agent observes activity on the video monitors to detect intrusions and assist other agents in responding to those intrusions. The FY 2018 Budget includes $3.2 million to provide operation

219

and sustainment for MVSS, and an additional $1.6 million for procurement, construction, and improvements to fulfill operational needs on the Southern and Northern borders.

As we continue to deploy border surveillance technology and other operational assets, particularly along the Southwest border, the Subcommittee's support of these investments allows CBP the flexibility to shift more frontline personnel from detection duties to interdiction of illegal activities on our borders. The FY 2018 budget supports CBP's border security mission by increasing and enhancing border security technology including mobile assets, air and marine capabilities, and initiatives to increase efficiency and effectiveness.

**Securing and Expediting Trade and Travel**

At our Nation's 328 land, air, and sea POEs, CBP prevents dangerous people and contraband from entering the United States, while facilitating the lawful flow of international trade and travel by using a combination of personnel, technology, intelligence, risk information, targeting, and international cooperation. CBP extends the U.S. zone of security beyond our physical borders through bilateral cooperation with other nations, private-sector partnerships, expanded targeting, and advance scrutiny of information on people and goods seeking to enter this country.

CBP's travel and trade security operations use a risk-based approach, applying rigorous information analysis and targeting to identify the greatest threats and risks. CBP proposes an increase of $54.9 million in FY 2018 for improved intelligence and targeting capabilities, including an increase of $14.5 million to expand staffing at CBP's National Targeting Center (NTC). This increase will also enhance NTC analytical modeling capabilities and provide for additional equipment. The NTC operates 24 hours a day with the mission of collaborating with federal, state, local, and international partners to effectively identify, target, screen, and interdict inbound and outbound passengers and cargo across all international modes of transportation that pose a threat to national security, public safety, agriculture, lawful trade, and safe travel. Effective targeting and interdiction prevents inadmissible high-risk passengers, cargo, and agriculture / bioterrorism threats from reaching U.S. POEs, thereby extending our border security initiatives outward and making our borders the last line of defense rather than the first line of defense.

The FY 2018 Budget continues substantial investment in Non-Intrusive Inspection (NII) technology that enables CBP to detect materials that pose significant nuclear and radiological threat. Utilizing Radiation Portal Monitors (RPMs), as well as Radiation Isotope Identification Devices, and Personal Radiation Detectors, which are deployed nationwide at our POEs, CBP is able to scan 100 percent of all mail and express consignment mail and parcels; 100 percent of all truck cargo and personally owned vehicles arriving from Canada and Mexico; and nearly 100 percent of all arriving maritime containerized cargo for the presence of radiological or nuclear materials.

Using NII imaging equipment, CBPOs can also examine cargo conveyances such as sea containers, commercial trucks, and rail cars, as well as privately owned vehicles, for the presence of contraband without physically opening or unloading them. NII technologies – both radiological detection and imaging – are force multipliers that enable CBP to screen or examine a larger portion of the stream of commercial traffic while facilitating the flow of legitimate trade, cargo, and passengers.

6

220

In FY 2016, CBP utilized more than 300 large-scale (LS) NII systems to image approximately 6.5 million cargo or conveyances across CBP's 328 land, sea, and air POEs, resulting in CBPOs seizing more than 355,000 pounds of narcotics and more than $3.9 million in U.S. currency. More than 8,000 additional officers at a labor cost of approximately $1 billion would have been required if physical examinations were conducted. The Budget proposes $109.2 million to build upon prior year investments and will be used to recapitalize the current small-scale (SS) and LS NII technology fleet. This funding will allow CBP to remain on track to ensure the NII fleet is operating within its service life by FY 2024, and will help CBP continue to use NII to safely, quickly, and effectively detect a wide range of contraband imported using a variety of conveyances, thereby facilitating lawful trade and travel.

As mentioned above, another key role played by CBP in securing our borders is the interdiction of narcotics. In FY 2016, CBPOs and BPAs seized and/or disrupted more than 3.3 million pounds of narcotics across the country[5] including approximately 46,000 pounds of methamphetamine and 4,800 pounds of heroin. CBP heroin seizures by weight rose 43 percent from approximately 4,217 pounds in FY 2012 to approximately 5,981 pounds in FY 2015. The majority of heroin seizures occur at the Southwest border: 82 percent of all CBP heroin seizures between FYs 2012-2016. CBP seizures of fentanyl remain relatively small compared to heroin, but have significantly increased over the past three years, from approximately two pounds seized in FY 2013 to approximately 440 pounds seized in FY 2016. Fentanyl is the most frequently seized illicit synthetic opioid, but CBP has also encountered various types of fentanyl analogues.[6]

CBP seizures of cocaine have remained steady between FYs 2012-2016 averaging approximately 200,000 pounds of cocaine seized each fiscal year. By funding the right mix of people, technology, and infrastructure, the FY 2018 Budget will help CBP continue to work to secure our borders and keep illegal narcotics out of the hands of the American people.

CBP also has the responsibility to enhance the Nation's economic competitiveness and security by efficiently and effectively processing goods and people across our borders. This is crucial to promoting job growth and helping the private sector remain globally competitive today and in the future. The FY 2018 Budget includes $263.3 million for OT to support CBP's implementation of TFTEA; implement the President's EO 13785, *Establishing Enhanced Collection and Enforcement of Antidumping and Countervailing Duties and Violations of Trade and Customs Laws*; and meet other needs to fulfill our trade mission outlined below.

CBP proposes an increase of $29.8 million to support 140 new positions to provide for new services mandated by TFTEA, which was enacted on February 24, 2016. The law specifies new trade facilitation and enforcement operational requirements, organizational changes, and new authorities and services. One of the most impactful pieces of trade legislation for CBP in more than a generation, TFTEA includes substantial changes to trade enforcement, particularly in the area of Anti-dumping and Countervailing Duties; establishing processes for investigating claims

---

[5] FY 2016 Border Security Report, U.S. Customs and Border Protection,
https://www.cbp.gov/sites/default/files/assets/documents/2016-Dec/CBP-fy2016-border-security-report.pdf
[6] These include: acetylfentanyl, butyrylfentanyl, beta-hydroxythiofentanyl, para-fluorobutyrylfentanyl, pentanoylfentanyl, alpha-methyl acetylfentanyl, para-fluoroisobutyrylfentanyl, para-fluorofentanyl, carfentanil, furanylfentanyl, and most recently benzodioxolefentanyl, acrylfentanyl, and methoxyacetylfentanyl.

221

of evasion of anti-dumping orders; using donations of technology from the private sector for enforcing intellectual property rights; and simplifying drawback processing to spur domestic manufacturing and exports.

Another substantial mandate within TFTEA is the Enforce and Protect Act (EAPA), which allows a party to submit an allegation of dumping circumvention to CBP, and grants CBP new authorities to make adverse decisions against an importer based on the lack of response or an incomplete response to an inquiry. CBP is mandated to initiate and pursue EAPA allegations within certain timeframes, and demand for these services is growing despite the lack of necessary staffing. There are many other substantial mandates which CBP must implement. These 140 new positions will enable OT to fully address TFTEA mandates in both a timely manner and without impacting the core mission and operations of CBP's trade mission.

Also with the strong support of this Subcommittee, CBP is completing the development of core trade processing capabilities in the Automated Commercial Environment (ACE). ACE is the "Single Window" through which all import and export data are reported by industry to more than 47 partner government agencies, eliminating more than 200 different forms and streamlining trade processes. In FY 2018 ACE will transition from development to sustainment. To facilitate this transition CBP proposes an increase of $45.1 million in FY 2018 for ACE Core Functionality. This includes $9.1 million for software sustainment; $12.2 million to provide ACE disaster recovery to ensure continuity of operations through the use of a robust "cloud solution"; $11.3 million to decommission code currently on legacy ACE; and $12.5 million to International Business Machines (IBM) SRO, which provides infrastructure, software, and management support critical to the continued operation and maintenance of the ACE system.

CBP recognizes how critical our trade enforcement and facilitation role is in protecting our Nation's economic security. We are working to ensure a fair and competitive trade environment where the benefits of trade compliance exceed the costly consequences of violating U.S. trade law. In FY 2016, we supported domestic producers of products ranging from steel plates to solar panels to crawfish by collecting $1.5 billion in cash deposits to secure anti-dumping duties on $14 billion of imported goods. We continually seek to develop and implement ways to improve our business processes and strengthen our engagement with our international and private-sector partners. To this end, CBP proposes $2.3 million in FY 2018 to expand trade transformation initiatives, including professional development initiatives and enhancing trade enforcement programs. Sharpening Trade Expertise is an enterprise-wide professional development initiative dedicated to strengthening the expertise of all employees engaged in the trade mission. Through targeted development and training programs, Sharpening Trade Expertise provides CBP trade staff with the support, engagement, and preparation needed for an ever-changing trade environment future.

**Integrated Operations**

We have been a key participant in the Department of Homeland Security's (DHS) Unity of Effort initiative, which aims to change the way DHS makes decisions within the Department and conducts operations. As part of this initiative, CBP is the lead component for DHS Joint Task Force-West (JTF-W), and a participating component in JTF-East, led by the U.S. Coast Guard and JTF-Investigations, led by U. S. Immigration and Customs Enforcement (ICE). The JTFs, launched as a pilot by DHS in early 2015, are strategically guided by the Southern Border and

8

222

Approaches Campaign Plan, which enhances the Department's operational approach to addressing comprehensive threat environments in a unified, integrated way. The FY 2018 Budget also realigns funding for 32 positions and $6.2 million to JTF-W to better address the threats posed by Transnational Criminal Organizations (TCOs) to the safety and security of the United States. This funding will help ensure these unique collaborative efforts have the resources they need.

CBP has also been an active participant in the Joint Requirements Council. The Council consists of senior leaders from DHS components, and is organized in order to identify and recommend investments to maximize efficiency and enhance mission capabilities.

CBP's commitment to risk-based, intelligence-driven operations enables us to focus resources on a wide array of diverse threats ranging from networks of terrorism and transnational crime to individuals attempting illegal entry; from the illicit movement of weapons to the introduction of agricultural pests and diseases; from trafficking in drugs, weapons, and people to the transit of prohibited, restricted, and unsafe goods. CBP's application of risk management principles has enabled sound, timely operational planning and focused tactical execution against these diverse threats. CBP will continue to evolve our integrated risk management approach to remain agile and adaptable in supporting operational priorities.

The FY 2018 Budget supports an increase of $3.1 million to fill 40 positions with the expertise needed to expand CBP's Office of Intelligence's (OI) mission critical operational capabilities and to align priorities with CBP's intelligence enterprise. The additional positions will augment the existing staff to support OI's ability to provide products on current threats, initiatives, and intelligence. Additionally, this support would enable CBP to develop agency-wide depth of knowledge aligned with Intelligence Community functions, including Counter-Intelligence, Confidential Human Source, Security, and Training.

The FY 2018 Budget provides $1.4 million for OI's training division, $900,000 for salaries and benefits and $500,000 to fund Interagency Agreements and contractor support for delivery of content in various intelligence disciplines as well as travel associated with classes scheduled at field locations and at the Intelligence and Targeting Center of Excellence (ITCE) at the CBP Advanced Training Center in Harpers Ferry, West Virginia. The funding will support the maintenance of a self-sustaining and cost effective curriculum design and instruction team that will be able to meet the intelligence training requirements of the CBP workforce from all operational component offices in an effective and timely manner.

The FY 2018 Budget also calls for investments in air and marine capabilities to help AMO meet flight hour goals and readiness rates. CBP's comprehensive border security operations include the use of coordinated and integrated air and marine capabilities to detect, interdict, and prevent acts of terrorism and the unlawful movement of people, illegal drugs, and other contraband toward or across the borders of the United States. During FY 2016, CBP's Air and Marine Operations contributed to 4,303 arrests and the apprehension of 55,923 individuals, as well as the interdiction of 221,707 pounds of cocaine in the transit zone. AMO increases CBP's situational awareness, enhances our detection and interdiction capabilities, and extends our border security zones, offering greater capacity to stop threats prior to reaching the Nation's borders. These assets provide multi-domain awareness for our partners across DHS, as well as critical aerial and maritime surveillance, interdiction, and operational assistance to our ground personnel.

223

CBP's layered approach to border security relies on a variety of resources, including fixed wing, rotary, and unmanned aircraft systems in the air domain, and patrol and interdiction vessels in the maritime environment. These assets provide critical aerial and maritime surveillance, interdiction, and operational assistance to our ground personnel and multi-domain awareness for DHS.

The FY 2018 Budget seeks an increase of $23.2 million to fund the initial hiring of 94 additional AMO personnel, to include 61 Air Interdiction Agents and 33 support personnel. This request will support implementation of the President's EOs on border security and the Secretary's subsequent February 20, 2017 memo, "Implementing the President's Border Security and Immigration Enforcement Improvement Policies." This increase is required to facilitate the increased operational tempo required to gain operational control of the Southern border. The positions are required to directly support the increased USBP and ICE agents provided in the Budget.

The FY 2018 Budget also seeks significant investments in our aircraft fleet. For example, the Budget includes $55.5 million in FY 2018 to purchase two KA-350CER multirole enforcement aircraft (MEA). The MEA is the optimal sensor-equipped aircraft for surveillance operations in regions such as the Southern border, Northern border, and maritime environments where terrain, weather and distance pose significant obstacles to border security operations. The MEA further serve as a force multiplier for law enforcement and emergency response personnel, facilitating the rapid-response deployment of equipment, canines and people.

The Budget includes $14.1 million in FY 2018 to purchase one UH-60 Medium Lift Helicopter (MLH). UH-60 Black Hawk helicopters are critical to border security operations, being the only helicopters with medium lift capability (8 agents with full gear). The UH-60 are rugged enough to support interdiction and life-saving operations in very hostile environments, and at high altitudes in the dessert, over open water, and in extreme cold.

The FY 2018 Budget also includes $43.4 million to purchase Light Enforcement Helicopters (LEH) in FY 2018. The LEH is a multi-mission helicopter used for aerial surveillance; providing tactical support; the transport and insertion of frontline personnel responding to illegal border incursions; serving search and arrest warrants; and patrol of high risk areas. These aircraft will help CBP carry out the President's EOs on border security, and enhance the physical security of our Northern, Southern, and maritime borders by providing improved air surveillance and support capabilities to USBP and our law enforcement partners.

The FY 2018 Budget includes $18.1 million to fund the transition to AMO's new national maintenance contracts and improve the availability of critical aircraft systems and engines and flight hour increases associated with operation of new and upgraded aircraft. This includes $4.2 million to transition from the current national maintenance contract to a follow-on contract; $7.1 million to address safety, parts, and labor shortfalls; $5 million to increase maintenance for certain critical aircraft systems and engines; and $1.8 million for the operational tempo increases associated with newly delivered Medium Lift Helicopter and Multi-Role Enforcement Aircraft.

The FY 2018 Budget also proposes an increase of $2.5 million for the Small Unmanned Aircraft Systems (SUAS) program. USBP requires a SUAS capability that can surveil locations between the POEs in remote, isolated, and inaccessible portions of the Nation's borders based on risk-

10

224

based operational needs. The SUAS needs to provide ground reconnaissance, surveillance and tracking capabilities to support the USBP surveillance tasks of predicting, detecting, tracking, identifying and classifying suspected items of interest. The ability to persistently and discreetly surveil remote areas along portions of the border is critical to USBP's ability to secure the border.

Additionally, the FY 2018 Budget provides support for the Tethered Aerostat Radar System program. The $41.2 million requested will provide for the annual system operations, system upkeep, maintenance and supply of government personnel, and real property needs such as site and facility leases and expenses, for the full program. This funding will sustain the steady-state operations of the system while also retiring major threats from technical and program risks to system operations and health stemming from aging technology, diminishing manufacturing sources, and emerging regulatory requirements.

As physical barriers are erected, the various threats will inevitably adapt. Thus, the FY 2018 Budget also includes $8.9 million for the Cross Border Tunnel Threat (CBTT) program. The CBTT program will strengthen border security effectiveness between POEs by diminishing the ability of TCOs to gain access into the United States through cross-border tunnels and the illicit use of underground municipal infrastructure. The CBTT program will acquire technologies and services that will close capability gaps, reducing the ability of TCOs to smuggle drugs, money, and people across the border. The CBTT program will invest in system procurement, including testing and evaluation, IT security, and engineering change proposals. These systems will help CBP predict potential tunnel locations; detect the presence of suspected tunnels and tunneling activities as well as project the trajectory of a discovered tunnel; confirm a tunnel's existence and location through mapping and measurements; and facilitate secure information sharing across all stakeholders.

**Mission Support**

The FY 2018 Budget funds an increase of $100 million to begin hiring the 5,000 additional BPAs mandated by EO 13767 and supports the hiring of an additional 500 agents from current staffing levels. This initial hiring surge develops the foundation to increase operational control in certain key areas along the border.

The Budget also includes an increase of $17.5 million to support efforts to continue and expand process improvements and add capacity to frontline hiring by focusing on efforts to attract qualified candidates and expedite their progress through the CBP hiring process. These improvements include $2.2 million for recruiting and marketing strategies, $8.0 million for our Hiring Transformation / Hubs program, and $7.3 million for additional applicant processing. This funding supports the hiring activities that meet the objectives and intent of the EOs on border security, and is based on a multiyear hiring plan.

In pursuit of our hiring goals, CBP recruiters will participate in thousands of recruiting events, seeking to reach a diverse spectrum of applicants. We have developed a significant expertise identifying events and communications strategies that support implementation of our recruitment and marketing strategy. Recruitment at events for veterans and transitioning military personnel is a top priority. CBP will further refine data analysis techniques to identify and quantify the best

225

opportunities for recruitment success, and continue to leverage online hiring services as a low-cost means of identifying and reaching a wider pool of qualified applicants.

CBP's new frontline hiring process has led to significant reductions in the average time-to-hire-from 469 days in January 2016 to March 2017's average time-to-hire of fewer than 300 days. Indeed, many successful applicants are now able to move through the hiring process in approximately 160 days. Funding will provide the increase in contract services, and technology needed to continue this transformational effort and expand the new process across the entire frontline position applicant pool. As of April 2017 HRM is now processing all applicants through an expedited hiring model. We have made significant progress in reducing the time to hire.

CBP is also actively working to minimize attrition and fill positions in less desirable locations. The FY 2018 Budget includes $30 million to support operational mobility, developmental assignments, and leadership relocations. Implementing a stable relocation program for the CBP workforce will help meet operational requirements and help to alleviate the lack of mobility significantly contributing to increased attrition across the workforce. CBP is thankful for the continued dedication of Members of Congress to working collaboratively with CBP to come up with solutions to this complicated challenge.

Congress has directed the Department to evaluate ways to improve the statutorily required polygraph program to improve the efficiency of the hiring process. Per the Congressional directive from the Explanatory Statement accompanying the FY 2017 Consolidated Appropriations Act concerning the alternative polygraph trial, CBP has also established a six-month pilot program that will allow the agency to establish a sample of applicant testing that can be measured against comparable data points from the previous test. This pilot was developed in collaboration with the National Center for Credibility Assessment which governs all federal polygraph programs.

Before making any determination to either continue with the piloted test or return to the previous test, CBP will carefully evaluate these metrics and measures to ensure CBP maintains its high standard of integrity for future applicants, and report to Congress per the directive. While the exam is a change in format, it retains all of the critical test topics of the previous exam and maintains CBP's commitment to high integrity standards for its personnel. CBP and the Department support the "Anti-Border Corruption Reauthorization Act of 2017," which was ordered reported as S. 595 by the Senate Homeland Security and Governmental Affairs Committee on May 17, 2017, and reported as H.R. 2213 by the House Homeland Security Committee on May 16, 2017. We thank the Members of Congress for your continued support as we seek to hire the men and women who will fulfill CBP's complex and crucial mission in the months and years to come.

**Legislative Proposals**

Finally, the FY 2018 Budget highlights some of the legislative priorities we hope to achieve with the help of Congress. For example, the Administration will submit legislative language to the relevant authorizing committees to enact the proposal to eliminate Brand USA and redirect the $10 Electronic System for Travel Authorization (ESTA) surcharges to CBP for passenger processing expenses. CBP has also submitted a legislative proposal to create an $8 Electronic Visa Update

226

System (EVUS) user fee based on a fee analysis that would function similarly to the ESTA operational processing fee. Once the authorizing proposal is enacted, CBP will no longer require appropriated funding to support the EVUS program.

CBP will also provide a legislative proposal to decrease the shortfall between the costs of CBP's immigration inspection activities and the collections received. Per the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), passenger inspection fee collections fund customs inspection activities that are mandated by law. The fee levels set in current law do not fully cover CBP's costs. CBP's funding strategies also include seeking Congressional support for a legislative proposal to increase current Immigration Inspection User Fees to recover more of the costs associated with providing immigration inspection services.

**Conclusion**

In closing, the challenges facing CBP and our Nation are considerable, but we have outstanding men and women working at CBP who are committed to protecting our Homeland and the American people. The FY 2018 President's Budget recognizes the serious and evolving threats and dangers our Nation faces each day. With the support of Congress, CBP continues to secure our Nation's borders, and promote international commerce and tourism, through a multi-layered approach using a variety of tools.

We want to thank the Members of this Subcommittee for your continued strong support of CBP. Thank you for the opportunity to appear before you today. We look forward to your questions.

227



**Carla L. Provost**
Acting Chief
*U.S. Border Patrol*
*U.S. Customs and Border Protection*

Carla L. Provost is the Acting Chief of the U.S. Border Patrol, located in Washington DC.

Acting Chief Provost entered on duty with the U.S. Border Patrol on January 8, 1995, as a member of U.S. Border Patrol Class 277. Her first assignment as a Border Patrol agent was at the Douglas Station in the Tucson Sector. She was subsequently promoted to Supervisory Border Patrol Agent in 1998, and to Field Operations Supervisor in 2001.

In 2006, she transferred to the Yuma Sector as Assistant Chief Patrol Agent. In 2009, she became the Patrol Agent in Charge of the Wellton Station in the Yuma Sector, and in 2011, she was appointed to the SES position of Deputy Chief Patrol Agent of the El Paso Sector.

In 2013, Acting Chief Provost became the Chief Patrol Agent of the El Centro Sector, where she led 1,200 employees and oversaw all operations within her area of responsibility. In 2015, she became the Deputy Assistant Commissioner of the Office of Professional Responsibility, where she oversaw compliance with all CBP-wide programs and policies relating to corruption, misconduct, or mismanagement. In 2016, Ms. Provost was selected as the Deputy Chief of the U.S. Border Patrol.

Among Acting Chief Provost's many accomplishments in her distinguished career, is her successful standup of CBP's Use of Force Center of Excellence, newly named the Law Enforcement Officer/Agent Safety and Compliance Directorate (LESC), which is responsible for the development and articulation of all CBP use of force policies and provides the agency with comprehensive and operational Use of Force programs. Acting Chief Provost also led the CBP-wide implementation of Comprehensive Use of Force Policy/Law Training, with 100 percent compliance by all CBP law enforcement-covered employees in support of the newly released Use of Force Policy. Acting Chief Provost served as an instructor for bike patrol units, firearms training, and post-academy law while stationed at the Tucson Sector, and while at the Yuma Sector, she directed sector budgets and human resources, and later oversaw all station operations.

Prior to joining the U.S. Border Patrol, Acting Chief Provost served for 2 1/2 years as a police officer with the Riley County Police Department in Manhattan, Kansas. She earned a Master of Science degree in National Resource Strategy from the Industrial College of the Armed Forces at the National Defense University in Washington, D.C., and a Bachelor of Science degree in Sociology/Criminal Justice from Kansas State University.

228

Mr. CARTER. Mr. Wagner.

Mr. WAGNER. Thank you, Chairman Carter, Ranking Member Roybal-Allard, and members of the subcommittee. It is an honor to appear before you today. This committee has been a great supporter of CBP, which has really helped the men and women of our organization achieve a complex mission.

So as deputy executive assistant commissioner in the office of field operations, I am responsible for more than 29,000 employees, including more than 24,000 CBP officers and CBP agriculture specialists at our nation's 300-plus ports of entry in the air, land and sea environments.

These dedicated men and women use state-of-the-art technology, intelligence, risk information and targeting results, coupled with their well honed law enforcement techniques and skills to prevent dangerous people and contraband from entering the United States. They do all this while enabling the movement of legitimate international trade and travel.

The fiscal year 2018 budget supports these efforts by ensuring the men and women of CBP have the resources they need to get the job done. Last fiscal year, CBP officers inspected over 390 million travelers and arrested over 8,000 individuals wanted for serious crimes.

CBP officers also stopped nearly 275,000 inadmissible aliens from entering the United States, which was an increase of 7.6 percent from fiscal year 2015.

The reasons for this range from immigration violations to criminal violations and national security concerns. The fiscal year 2018 budget, which includes funding to improve intelligence and targeting capabilities related to the screening and vetting of immigration populations to international travelers will enhance CBP's ability to secure our borders and keep America safe.

The budget requests include an increase of $14.5 million to expand staffing at CBP's National Targeting Center by 93 positions. Sixty-three of these positions are CBP officers and the remaining are support positions to conduct activities such as the vetting of travelers and cargo, as well as our counter-network activities.

The National Targeting Center operates 24 hours a day, 7 days a week. Their mission is to effectively identify passengers and cargo that may pose a threat in all international modes of transportation and ensure those threats are addressed in a sufficient manner at the earliest possible opportunity.

Effective targeting and interdiction prevents inadmissible high-risk passengers, cargo and agriculture, as well as bioterrorism threats from reaching the United States. This ensures our borders are the last line of defense rather than the first.

The budget request also includes $54.9 million for the National Targeting Center to build up better analytical systems and enhance vetting platforms to support—in support of our counter-network strategy.

In the area of non-intrusive inspection technology, the fiscal year 2018 budget proposes $109.2 million to build upon prior years' investments in our current small-scale and large-scale fleet. CBP officers use this technology to scan for the presence of radiological or nuclear materials in 100 percent of mail and express consignment

229

mail and parcels, 100 percent of truck cargo, and personally owned vehicles arriving from Canada and Mexico, and nearly 100 percent of all arriving maritime containerized cargo.

CBP officers also use this technology to examine cargo conveyances such as sea containers, commercial trucks, and railcars and privately owned vehicles for the presence of contraband without physically opening or unloading them.

Fiscal year 2016, CBP utilized over 300 large-scale nonintrusive inspection systems to image approximately 6.5 million cargo or conveyances in the land, air and sea ports of entry, resulting in our seizing of over 355,000 pounds of narcotics and more than $3.9 million in U.S. currency.

More than 8,000 additional officers, at a labor cost of approximately $1 billion would have been required if physical examinations had been conducted.

The fiscal year 2018 proposed funding will allow CBP to remain on track to ensure our nonintrusive inspection fleet is operating within its service life by fiscal year 2024. The funding will support replacement of 52 large-scale systems and about 600 small-scale systems.

We will deploy these systems where they are best supported by the operational needs and the physical environment. CBP will deploy mostly what we call Z portal systems, that have a proven track record of reliably helping our officers detect contraband at the borders.

So I want to thank members of the subcommittee for your continued support of CBP and for the opportunity to appear before you today, and I am happy to answer any of your questions.

[The information follows:]

230



TESTIMONY OF

CARLA PROVOST
Acting Chief
U.S. Border Patrol
U.S. Customs and Border Protection

and

JOHN WAGNER
Deputy Executive Assistant Commissioner
Office of Field Operations
U.S. Customs and Border Protection

BEFORE

House Appropriations Committee
Subcommittee on Homeland Security

ON

"Fiscal Year 2018 Budget Request"

June 13, 2017
Washington, DC

231

**Introduction**

Chairman Carter, Ranking Member Roybal-Allard, Members of the Subcommittee, it is an honor to appear before you today. As America's unified border agency, U.S. Customs and Border Protection (CBP) protects the United States from terrorist threats and prevents the illegal entry of inadmissible persons and contraband, while facilitating lawful travel and trade. CBP works tirelessly to detect illicit trafficking of people, drugs, weapons, and money, while facilitating the flow of cross-border commerce and tourism. The President's Fiscal Year (FY) 2018 Budget includes $13.9 billion to help enable CBP to achieve our complex mission with the right combination of talented and dedicated personnel, intelligence-driven and risk-based strategies, collaborative partnerships, and advanced technology.

The border environment in which CBP works is dynamic and requires continual adaptation to respond to emerging threats and rapidly changing conditions. We are proud of CBP's dedicated men and women, who have advanced CBP's situational awareness of the border environment, and who continue to meet these challenges with integrity and commitment.

Two years ago CBP announced the *CBP Vision and Strategy 2020,* CBP's first comprehensive strategic plan for our agency in nearly a decade. The plan acknowledges the complexity of the CBP mission in an increasingly challenging border environment and provides a roadmap for the way forward by focusing efforts on collaboration, innovation, and integration in meeting our mission goals to:

- combat terrorism and transnational crime;
- advance comprehensive border security and border management;
- enhance U.S. economic competitiveness by enabling trade and travel; and
- promote organizational integration, innovation, and agility.

The last mission goal listed above – promote organizational integration, innovation, and agility – has led us over the last year to make many changes and much progress as we restructure our fiscal, operational, and institutional management to better align our resources with our missions.

To promote organizational efficiencies within CBP, it was announced two years ago that CBP would realign the agency's headquarters structure to better support our personnel in fulfilling CBP's critical mission. These changes emphasize the delegation of authority, more defined and accountable decision-making, and improved span of control for management. While CBP's operational offices – Office of Field Operations (OFO), U.S. Border Patrol (USBP), Air and Marine Operations (AMO), and the Office of Trade (OT) – remain as key Offices within CBP, the new structure identifies and addresses the strengths and weaknesses of our most critical infrastructure, and supports working towards integrated and comprehensive solutions to issues and challenges. We measure the success of this effort by our ability to support the front lines – our ability to identify requirements and to manage resources effectively. CBP's realignment is allowing us to streamline process flows and create efficiencies for the agency.

232

**Implementing the President's Executive Orders**

As President Trump has stated, "Homeland Security is in the business of saving lives, and that mandate will guide our actions." Through a series of Executive Orders (EOs), the President has taken steps to enhance border security, promote public safety, minimize the threat of terrorist attacks by foreign nationals, and protect American workers from unfair foreign competition. The FY 2018 Budget proposes significant investments to support all of those goals while implementing the EOs.

In January, the President signed the Executive Order entitled *Border Security and Immigration Enforcement Improvements* (EO 13767). Included in the Budget is a total of $2.6 billion in enhancements in high-priority border security technology, tactical infrastructure, assets, and equipment, including $1.6 billion for a border wall system and support infrastructure and personnel; $975 million for border security technology, assets, and equipment. Additionally, the Budget provides $100 million to hire 500 additional Border Patrol Agents (BPA), the initial hiring surge for the 5,000 additional agents required by this EO.

The Budget also includes $55 million to help CBP implement initiatives directed by EO 13780, *Protecting the Nation from Foreign Terrorist Entry into the United States*, specifically to improve intelligence and targeting capabilities related to the screening and vetting of immigration populations and international travelers, in accordance with Section 5 of the EO.[1] These resources will also support the efforts related to EO 13767.

Finally, the Budget includes $30 million to help CBP meet the legislative mandates to implement the Trade Facilitation and Trade Enforcement Act (TFTEA), as well as the *Omnibus Report on Significant Trade Deficits* called for by EO 13786.

**Securing America's Borders**

Along the more than 5,000 miles of border with Canada; 1,900 miles of border with Mexico; and approximately 95,000 miles of shoreline, CBP is responsible for preventing the illegal entry of people and contraband at and between the Ports of Entry (POEs). CBP's USBP and AMO agents patrol our Nation's borders and associated airspace and maritime approaches to prevent illegal entry of people and goods into the United States. CBP officers (CBPOs) and agriculture specialists (CBPAS) are multi-disciplined and perform the full range of inspection, intelligence analysis, examination, and law enforcement activities relating to the arrival and departure of persons, conveyances, and merchandise at air, land, and sea POEs.

EO 13767 directs executive departments and agencies to deploy all lawful means to secure the Nation's Southern border, prevent further illegal immigration into the United States, and repatriate aliens with final orders of removal swiftly, consistently, and humanely. EO 13767 also establishes the foundation for securing our Southern border by directing the tools, resources, and policy goals for CBP's dedicated men and women who are responsible for preventing illegal immigration, drug smuggling, human trafficking, and acts of terrorism. In accordance with existing law, CBP has

---

[1]Sec. 5. "Implementing Uniform Screening and Vetting Standards for All Immigration Programs" per https://www.whitehouse.gov/the-press-office/2017/03/06/executive-order-protecting-nation-foreign-terrorist-entry-united-states

2

233

already begun to take all appropriate steps to plan, design, and construct a physical wall, using the materials and technology that will most effectively achieve operational control of the Southern border.

The FY 2018 Budget provides $1.6 billion for 32 miles of new border wall system and 28 miles of new levee wall in Rio Grande Valley Sector, as well as 14 miles of secondary border wall system in San Diego Sector. Tactical infrastructure, including physical barriers, has long been a critical component of CBP's multi-layered and risk-based approach to securing our Southern border. It is undeniable that border barriers have enhanced – and will continue to enhance – CBP's operational capabilities by creating persistent impedance, and facilitating the deterrence and prevention of successful illegal entries. CBP plans to deploy border wall system in a multi-phased approach that meets USBP's operational requirements, safeguards national security and public safety, and is the result of thorough analysis of threat, cost, and mission effectiveness.

The land along the border between the United States and Mexico is extremely diverse, consisting of desert landscape, mountainous terrain, and urban areas. Today we have several types of barriers, to include steel bollard and levee wall, along nearly one-third, or 654 miles, of the Southwest border.

CBP is prioritizing investments and geographic areas across the Southwest border, leveraging the USBP's annual, full spectrum requirements analysis process to identify needs related to domain awareness, impedance and denial, access and mobility, and mission readiness. Throughout the planning, designing, and construction process, CBP will complete project, budget, real estate, and environmental planning to ensure available resource capacity. CBP will leverage expertise in federal acquisition to maximize transparency and accountability and to ensure the most effective and efficient solutions are deployed to meet requirements, in accordance with the established DHS acquisition framework and acquisition review board oversight.

CBP is seeking to build on the successes of and lessons learned from the installation and operation of existing barriers to deploy a system that addresses dynamic cross-border threats. CBP is working with industry and partnering with the U.S. Army Corp of Engineers to potentially incorporate additional alternative barrier designs that may include a concrete base or other innovative solutions into our border barrier toolkit. Border barrier and levee wall systems are comprehensive solutions that include a concentrated combination of various types of infrastructure such as wall, fence, all-weather roads, lighting, enforcement cameras, and other related technology. The strategic deployment of these capabilities along the border will provide USBP's frontline agents with the tools they need to deter and prevent successful illegal entries.

CBP is committed to ensuring that all stakeholder communities, to include Congress, federal partners, state, local, and tribal officials, and the impacted communities, are informed throughout this process.

*Response to Migrant Surges*

Thanks to this Subcommittee's support, the Nation's long-term investment in border security has produced significant and positive results. With the support and direction of President Trump and Secretary Kelly, we are already seeing an unprecedented improvement in the posture of our

3

234

Southwest border. Since January 2017, the number of illegal aliens we have apprehended on the Southwest border has drastically decreased, indicating a significant decrease in the number of aliens attempting to illegally enter the country. The number of illegal aliens apprehended in April 2017 was more than 60 percent lower than January apprehensions and close to 70 percent lower than the same time last year.[2]

During FY 2016, over 415,816 illegal aliens from Central America and Mexico – including over 137,614 unaccompanied alien children (UAC) and alien families – were apprehended along our Southwest border. While more than 16,000 family units were apprehended at the border in December of 2016, only 1,119 family units were apprehended in April of 2017.[3]

Although the numbers have recently declined, UAC and other immigrant flows are difficult to predict and another surge is always a possibility. The simple fact is that now is the time to make further, substantial improvements to our southwest border security, as these could be fleeting improvements if the perception of our southern border security returns to what it was before January 2017. We must remain prepared for apprehension numbers to climb again as quickly as they have fallen.

*Investments in Mobile Tactical Equipment*

CBP's border security mission regularly requires BPAs and CBPOs to operate in diverse and remote locations where tactical communication, transportation, and surveillance capabilities are essential to coordinating mission activities and protecting the safety of CBP law enforcement personnel. For agents and officers operating in remote areas, their radios are often their only means of communication to coordinate activities or request assistance. For USBP, radios are the single most essential piece of equipment for frontline agents – a BPA may not deploy to the field without a functioning radio.

CBP operates and maintains a tactical radio inventory of more than 70,000 units, utilized by CBP's frontline law enforcement personnel. More than 25,000 units of CBP's radio inventory have exceeded their useful life and are no longer supported by the manufacturer. The FY 2018 Budget seeks $29.3 million to purchase the equipment for USBP and AMO Tactical Air Land and Marine Enterprise Communications (TALMEC), including the acquisition of modern and secure radio and satellite communication technology that will provide communication reliability and security for CBP frontline law enforcement and flexibility for agents and officers to communicate with state and local law enforcement agencies as well as Mexican authorities.

The FY 2018 Budget includes $60.3 million to provide for the acquisition of vehicles. CBP's vehicle lifecycle management process[4] is especially important as vehicles become older and less reliable, while mission demands continue. Reductions in vehicle performance and/or reliability may place an undue burden on law enforcement personnel executing mission requirements. These investments, to include recapitalizing aging radios and vehicles, will enable agents to respond to and resolve incidents and incursions more efficiently, effectively and safely.

---

[2] Per https://www.cbp.gov/newsroom/stats/sw-border-migration
[3] Per https://www.cbp.gov/newsroom/stats/sw-border-migration
[4] The General Services Administration's recommended vehicle replacement standard is five years.

4

235

*Technology Investments between Ports of Entry*

The FY 2018 Budget will also enable the continued deployment of proven, effective technology to strengthen border security operations between the ports – in the land, air, and maritime environments. With the deployment of fixed and mobile surveillance capabilities, CBP can gain situational awareness remotely, direct a response team to the best interdiction location, and warn them of any additional danger otherwise unknown along the way. Investment in this area will support CBP's efforts to implement the President's EOs on border security and to maintain operational control of the Southern border through improved situational awareness.

CBP's Tactical Aerostats and Re-locatable Towers Program, originally part of the Department of Defense (DOD) Re-use program, uses a mix of aerostats, towers, cameras, and radars to provide USBP with advanced surveillance capabilities over a wide area. This technology has proven to be a vital asset in increasing CBP's ability to detect, identify, classify, and track illegal activity. Furthermore, since initial deployment, these systems have been responsible for the detection of more than 180,000 illegal border incursions of aliens and smugglers, leading to the seizure of approximately 180 tons of narcotics and related contraband headed towards our Nation's cities and neighborhoods. As of April 2017, USBP agents, with the assistance of existing aerostats and re-locatable towers, have seized 62 tons of narcotics, and caught more than 20,000 illegal border crossers detected in aerostat locations during FY 2017. The FY 2018 Budget includes $34.8 million in FY 2018 for the Tactical Aerostats and Re-locatable Towers Program to fund continued operations and maintenance costs.

Another proven border security technology, Integrated Fixed Towers (IFT), assists BPAs in detecting, tracking, identifying, and classifying items of interest along our Nation's borders through a series of fixed surveillance towers and equipment that display information on workstations in command and control centers. CBP requires $22.4 million in FY 2018 for the IFT program for operations and maintenance. In addition, CBP proposes $17.4 million in FY 2018 for procurement, construction, and improvements towards the IFT program.

Remote Video Surveillance Systems (RVSS) are another fixed technology asset used in select areas along the Southwest and Northern borders. These systems provide short-, medium-, and long-range persistent surveillance mounted on stand-alone towers, or other structures. The RVSS uses cameras, radio, and transmitters to send video to a control room. This enables a control room operator to remotely detect, identify, classify and track targets using the video feed. The RVSS deployment planned as part of the Arizona Technology Plan is now complete, and CBP is presently working to expand the RVSS capability to other high-priority areas along the Southwest border. The FY 2018 Budget includes $20.0 million in FY 2018 to sustain RVSS. An additional $46.2 million is provided for procurement, construction, and improvements. This funding will be used to support the deployment of the RVSS capability to the Rio Grande Valley Sector.

Mobile Video Surveillance Systems (MVSS) consist of short- and medium-range mobile surveillance equipment that is mounted on USBP vehicles. An agent deploys with the system, which helps agents detect, track, identify, and classify items of interest using the MVSS video feed. The agent observes activity on the video monitors to detect intrusions and assist other agents in responding to those intrusions. The FY 2018 Budget includes $3.2 million to provide operation

236

and sustainment for MVSS, and an additional $1.6 million for procurement, construction, and
improvements to fulfill operational needs on the Southern and Northern borders.

As we continue to deploy border surveillance technology and other operational assets, particularly
along the Southwest border, the Subcommittee's support of these investments allows CBP the
flexibility to shift more frontline personnel from detection duties to interdiction of illegal activities
on our borders. The FY 2018 budget supports CBP's border security mission by increasing and
enhancing border security technology including mobile assets, air and marine capabilities, and
initiatives to increase efficiency and effectiveness.

**Securing and Expediting Trade and Travel**

At our Nation's 328 land, air, and sea POEs, CBP prevents dangerous people and contraband from
entering the United States, while facilitating the lawful flow of international trade and travel by
using a combination of personnel, technology, intelligence, risk information, targeting, and
international cooperation. CBP extends the U.S. zone of security beyond our physical borders
through bilateral cooperation with other nations, private-sector partnerships, expanded targeting,
and advance scrutiny of information on people and goods seeking to enter this country.

CBP's travel and trade security operations use a risk-based approach, applying rigorous
information analysis and targeting to identify the greatest threats and risks. CBP proposes an
increase of $54.9 million in FY 2018 for improved intelligence and targeting capabilities,
including an increase of $14.5 million to expand staffing at CBP's National Targeting Center
(NTC). This increase will also enhance NTC analytical modeling capabilities and provide for
additional equipment. The NTC operates 24 hours a day with the mission of collaborating with
federal, state, local, and international partners to effectively identify, target, screen, and interdict
inbound and outbound passengers and cargo across all international modes of transportation that
pose a threat to national security, public safety, agriculture, lawful trade, and safe travel. Effective
targeting and interdiction prevents inadmissible high-risk passengers, cargo, and agriculture /
bioterrorism threats from reaching U.S. POEs, thereby extending our border security initiatives
outward and making our borders the last line of defense rather than the first line of defense.

The FY 2018 Budget continues substantial investment in Non-Intrusive Inspection (NII)
technology that enables CBP to detect materials that pose significant nuclear and radiological
threat. Utilizing Radiation Portal Monitors (RPMs), as well as Radiation Isotope Identification
Devices, and Personal Radiation Detectors, which are deployed nationwide at our POEs, CBP is
able to scan 100 percent of all mail and express consignment mail and parcels; 100 percent of all
truck cargo and personally owned vehicles arriving from Canada and Mexico; and nearly 100
percent of all arriving maritime containerized cargo for the presence of radiological or nuclear
materials.

Using NII imaging equipment, CBPOs can also examine cargo conveyances such as sea
containers, commercial trucks, and rail cars, as well as privately owned vehicles, for the presence
of contraband without physically opening or unloading them. NII technologies – both radiological
detection and imaging – are force multipliers that enable CBP to screen or examine a larger
portion of the stream of commercial traffic while facilitating the flow of legitimate trade, cargo,
and passengers.

237

In FY 2016, CBP utilized more than 300 large-scale (LS) NII systems to image approximately 6.5
million cargo or conveyances across CBP's 328 land, sea, and air POEs, resulting in CBPOs
seizing more than 355,000 pounds of narcotics and more than $3.9 million in U.S. currency. More
than 8,000 additional officers at a labor cost of approximately $1 billion would have been required
if physical examinations were conducted. The Budget proposes $109.2 million to build upon prior
year investments and will be used to recapitalize the current small-scale (SS) and LS NII
technology fleet. This funding will allow CBP to remain on track to ensure the NII fleet is
operating within its service life by FY 2024, and will help CBP continue to use NII to safely,
quickly, and effectively detect a wide range of contraband imported using a variety of
conveyances, thereby facilitating lawful trade and travel.

As mentioned above, another key role played by CBP in securing our borders is the interdiction of
narcotics. In FY 2016, CBPOs and BPAs seized and/or disrupted more than 3.3 million pounds of
narcotics across the country[5] including approximately 46,000 pounds of methamphetamine and
4,800 pounds of heroin. CBP heroin seizures by weight rose 43 percent from approximately 4,217
pounds in FY 2012 to approximately 5,981 pounds in FY 2015. The majority of heroin seizures
occur at the Southwest border: 82 percent of all CBP heroin seizures between FYs 2012-2016.
CBP seizures of fentanyl remain relatively small compared to heroin, but have significantly
increased over the past three years, from approximately two pounds seized in FY 2013 to
approximately 440 pounds seized in FY 2016. Fentanyl is the most frequently seized illicit
synthetic opioid, but CBP has also encountered various types of fentanyl analogues.[6]

CBP seizures of cocaine have remained steady between FYs 2012-2016 averaging approximately
200,000 pounds of cocaine seized each fiscal year. By funding the right mix of people,
technology, and infrastructure, the FY 2018 Budget will help CBP continue to work to secure our
borders and keep illegal narcotics out of the hands of the American people.

CBP also has the responsibility to enhance the Nation's economic competitiveness and security by
efficiently and effectively processing goods and people across our borders. This is crucial to
promoting job growth and helping the private sector remain globally competitive today and in the
future. The FY 2018 Budget includes $263.3 million for OT to support CBP's implementation of
TFTEA; implement the President's EO 13785, *Establishing Enhanced Collection and
Enforcement of Antidumping and Countervailing Duties and Violations of Trade and Customs
Laws*; and meet other needs to fulfill our trade mission outlined below.

CBP proposes an increase of $29.8 million to support 140 new positions to provide for new
services mandated by TFTEA, which was enacted on February 24, 2016. The law specifies new
trade facilitation and enforcement operational requirements, organizational changes, and new
authorities and services. One of the most impactful pieces of trade legislation for CBP in more
than a generation, TFTEA includes substantial changes to trade enforcement, particularly in the
area of Anti-dumping and Countervailing Duties; establishing processes for investigating claims

[5] FY 2016 Border Security Report, U.S. Customs and Border Protection,
https://www.cbp.gov/sites/default/files/assets/documents/2016-Dec/CBP-fy2016-border-security-report.pdf
[6] These include: acetylfentanyl, butyrylfentanyl, beta-hydroxythiofentanyl, para-fluorobutyrylfentanyl,
pentanoylfentanyl, alpha-methyl acetylfentanyl, para-fluoroisobutyrylfentanyl, para-fluorofentanyl, carfentanil,
furanylfentanyl, and most recently benzodioxolefentanyl, acrylfentanyl, and methoxyacetylfentanyl.

7

238

of evasion of anti-dumping orders; using donations of technology from the private sector for
enforcing intellectual property rights; and simplifying drawback processing to spur domestic
manufacturing and exports.

Another substantial mandate within TFTEA is the Enforce and Protect Act (EAPA), which allows
a party to submit an allegation of dumping circumvention to CBP, and grants CBP new authorities
to make adverse decisions against an importer based on the lack of response or an incomplete
response to an inquiry. CBP is mandated to initiate and pursue EAPA allegations within certain
timeframes, and demand for these services is growing despite the lack of necessary staffing.
There are many other substantial mandates which CBP must implement. These 140 new positions
will enable OT to fully address TFTEA mandates in both a timely manner and without impacting
the core mission and operations of CBP's trade mission.

Also with the strong support of this Subcommittee, CBP is completing the development of core
trade processing capabilities in the Automated Commercial Environment (ACE). ACE is the
"Single Window" through which all import and export data are reported by industry to more than
47 partner government agencies, eliminating more than 200 different forms and streamlining trade
processes. In FY 2018 ACE will transition from development to sustainment. To facilitate this
transition CBP proposes an increase of $45.1 million in FY 2018 for ACE Core Functionality.
This includes $9.1 million for software sustainment; $12.2 million to provide ACE disaster
recovery to ensure continuity of operations through the use of a robust "cloud solution"; $11.3
million to decommission code currently on legacy ACE; and $12.5 million to International
Business Machines (IBM) SRO, which provides infrastructure, software, and management support
critical to the continued operation and maintenance of the ACE system.

CBP recognizes how critical our trade enforcement and facilitation role is in protecting our
Nation's economic security. We are working to ensure a fair and competitive trade environment
where the benefits of trade compliance exceed the costly consequences of violating U.S. trade law.
In FY 2016, we supported domestic producers of products ranging from steel plates to solar panels
to crawfish by collecting $1.5 billion in cash deposits to secure anti-dumping duties on $14 billion
of imported goods. We continually seek to develop and implement ways to improve our business
processes and strengthen our engagement with our international and private-sector partners. To
this end, CBP proposes $2.3 million in FY 2018 to expand trade transformation initiatives,
including professional development initiatives and enhancing trade enforcement programs.
Sharpening Trade Expertise is an enterprise-wide professional development initiative dedicated to
strengthening the expertise of all employees engaged in the trade mission. Through targeted
development and training programs, Sharpening Trade Expertise provides CBP trade staff with the
support, engagement, and preparation needed for an ever-changing trade environment future.

**Integrated Operations**

We have been a key participant in the Department of Homeland Security's (DHS) Unity of Effort
initiative, which aims to change the way DHS makes decisions within the Department and
conducts operations. As part of this initiative, CBP is the lead component for DHS Joint Task
Force-West (JTF-W), and a participating component in JTF-East, led by the U.S. Coast Guard and
JTF-Investigations, led by U. S. Immigration and Customs Enforcement (ICE). The JTFs,
launched as a pilot by DHS in early 2015, are strategically guided by the Southern Border and

8

239

Approaches Campaign Plan, which enhances the Department's operational approach to addressing comprehensive threat environments in a unified, integrated way. The FY 2018 Budget also realigns funding for 32 positions and $6.2 million to JTF-W to better address the threats posed by Transnational Criminal Organizations (TCOs) to the safety and security of the United States. This funding will help ensure these unique collaborative efforts have the resources they need.

CBP has also been an active participant in the Joint Requirements Council. The Council consists of senior leaders from DHS components, and is organized in order to identify and recommend investments to maximize efficiency and enhance mission capabilities.

CBP's commitment to risk-based, intelligence-driven operations enables us to focus resources on a wide array of diverse threats ranging from networks of terrorism and transnational crime to individuals attempting illegal entry; from the illicit movement of weapons to the introduction of agricultural pests and diseases; from trafficking in drugs, weapons, and people to the transit of prohibited, restricted, and unsafe goods. CBP's application of risk management principles has enabled sound, timely operational planning and focused tactical execution against these diverse threats. CBP will continue to evolve our integrated risk management approach to remain agile and adaptable in supporting operational priorities.

The FY 2018 Budget supports an increase of $3.1 million to fill 40 positions with the expertise needed to expand CBP's Office of Intelligence's (OI) mission critical operational capabilities and to align priorities with CBP's intelligence enterprise. The additional positions will augment the existing staff to support OI's ability to provide products on current threats, initiatives, and intelligence. Additionally, this support would enable CBP to develop agency-wide depth of knowledge aligned with Intelligence Community functions, including Counter-Intelligence, Confidential Human Source, Security, and Training.

The FY 2018 Budget provides $1.4 million for OI's training division, $900,000 for salaries and benefits and $500,000 to fund Interagency Agreements and contractor support for delivery of content in various intelligence disciplines as well as travel associated with classes scheduled at field locations and at the Intelligence and Targeting Center of Excellence (ITCE) at the CBP Advanced Training Center in Harpers Ferry, West Virginia. The funding will support the maintenance of a self-sustaining and cost effective curriculum design and instruction team that will be able to meet the intelligence training requirements of the CBP workforce from all operational component offices in an effective and timely manner.

The FY 2018 Budget also calls for investments in air and marine capabilities to help AMO meet flight hour goals and readiness rates. CBP's comprehensive border security operations include the use of coordinated and integrated air and marine capabilities to detect, interdict, and prevent acts of terrorism and the unlawful movement of people, illegal drugs, and other contraband toward or across the borders of the United States. During FY 2016, CBP's Air and Marine Operations contributed to 4,303 arrests and the apprehension of 55,923 individuals, as well as the interdiction of 221,707 pounds of cocaine in the transit zone. AMO increases CBP's situational awareness, enhances our detection and interdiction capabilities, and extends our border security zones, offering greater capacity to stop threats prior to reaching the Nation's borders. These assets provide multi-domain awareness for our partners across DHS, as well as critical aerial and maritime surveillance, interdiction, and operational assistance to our ground personnel.

240

CBP's layered approach to border security relies on a variety of resources, including fixed wing, rotary, and unmanned aircraft systems in the air domain, and patrol and interdiction vessels in the maritime environment. These assets provide critical aerial and maritime surveillance, interdiction, and operational assistance to our ground personnel and multi-domain awareness for DHS.

The FY 2018 Budget seeks an increase of $23.2 million to fund the initial hiring of 94 additional AMO personnel, to include 61 Air Interdiction Agents and 33 support personnel. This request will support implementation of the President's EOs on border security and the Secretary's subsequent February 20, 2017 memo, "Implementing the President's Border Security and Immigration Enforcement Improvement Policies." This increase is required to facilitate the increased operational tempo required to gain operational control of the Southern border. The positions are required to directly support the increased USBP and ICE agents provided in the Budget.

The FY 2018 Budget also seeks significant investments in our aircraft fleet. For example, the Budget includes $55.5 million in FY 2018 to purchase two KA-350CER multirole enforcement aircraft (MEA). The MEA is the optimal sensor-equipped aircraft for surveillance operations in regions such as the Southern border, Northern border, and maritime environments where terrain, weather and distance pose significant obstacles to border security operations. The MEA further serve as a force multiplier for law enforcement and emergency response personnel, facilitating the rapid-response deployment of equipment, canines and people.

The Budget includes $14.1 million in FY 2018 to purchase one UH-60 Medium Lift Helicopter (MLH). UH-60 Black Hawk helicopters are critical to border security operations, being the only helicopters with medium lift capability (8 agents with full gear). The UH-60 are rugged enough to support interdiction and life-saving operations in very hostile environments, and at high altitudes in the dessert, over open water, and in extreme cold.

The FY 2018 Budget also includes $43.4 million to purchase Light Enforcement Helicopters (LEH) in FY 2018. The LEH is a multi-mission helicopter used for aerial surveillance; providing tactical support; the transport and insertion of frontline personnel responding to illegal border incursions; serving search and arrest warrants; and patrol of high risk areas. These aircraft will help CBP carry out the President's EOs on border security, and enhance the physical security of our Northern, Southern, and maritime borders by providing improved air surveillance and support capabilities to USBP and our law enforcement partners.

The FY 2018 Budget includes $18.1 million to fund the transition to AMO's new national maintenance contracts and improve the availability of critical aircraft systems and engines and flight hour increases associated with operation of new and upgraded aircraft. This includes $4.2 million to transition from the current national maintenance contract to a follow-on contract; $7.1 million to address safety, parts, and labor shortfalls; $5 million to increase maintenance for certain critical aircraft systems and engines; and $1.8 million for the operational tempo increases associated with newly delivered Medium Lift Helicopter and Multi-Role Enforcement Aircraft.

The FY 2018 Budget also proposes an increase of $2.5 million for the Small Unmanned Aircraft Systems (SUAS) program. USBP requires a SUAS capability that can surveil locations between the POEs in remote, isolated, and inaccessible portions of the Nation's borders based on risk-

241

based operational needs. The SUAS needs to provide ground reconnaissance, surveillance and tracking capabilities to support the USBP surveillance tasks of predicting, detecting, tracking, identifying and classifying suspected items of interest. The ability to persistently and discreetly surveil remote areas along portions of the border is critical to USBP's ability to secure the border.

Additionally, the FY 2018 Budget provides support for the Tethered Aerostat Radar System program. The $41.2 million requested will provide for the annual system operations, system upkeep, maintenance and supply of government personnel, and real property needs such as site and facility leases and expenses, for the full program. This funding will sustain the steady-state operations of the system while also retiring major threats from technical and program risks to system operations and health stemming from aging technology, diminishing manufacturing sources, and emerging regulatory requirements.

As physical barriers are erected, the various threats will inevitably adapt. Thus, the FY 2018 Budget also includes $8.9 million for the Cross Border Tunnel Threat (CBTT) program. The CBTT program will strengthen border security effectiveness between POEs by diminishing the ability of TCOs to gain access into the United States through cross-border tunnels and the illicit use of underground municipal infrastructure. The CBTT program will acquire technologies and services that will close capability gaps, reducing the ability of TCOs to smuggle drugs, money, and people across the border. The CBTT program will invest in system procurement, including testing and evaluation, IT security, and engineering change proposals. These systems will help CBP predict potential tunnel locations; detect the presence of suspected tunnels and tunneling activities as well as project the trajectory of a discovered tunnel; confirm a tunnel's existence and location through mapping and measurements; and facilitate secure information sharing across all stakeholders.

**Mission Support**

The FY 2018 Budget funds an increase of $100 million to begin hiring the 5,000 additional BPAs mandated by EO 13767 and supports the hiring of an additional 500 agents from current staffing levels. This initial hiring surge develops the foundation to increase operational control in certain key areas along the border.

The Budget also includes an increase of $17.5 million to support efforts to continue and expand process improvements and add capacity to frontline hiring by focusing on efforts to attract qualified candidates and expedite their progress through the CBP hiring process. These improvements include $2.2 million for recruiting and marketing strategies, $8.0 million for our Hiring Transformation / Hubs program, and $7.3 million for additional applicant processing. This funding supports the hiring activities that meet the objectives and intent of the EOs on border security, and is based on a multiyear hiring plan.

In pursuit of our hiring goals, CBP recruiters will participate in thousands of recruiting events, seeking to reach a diverse spectrum of applicants. We have developed a significant expertise identifying events and communications strategies that support implementation of our recruitment and marketing strategy. Recruitment at events for veterans and transitioning military personnel is a top priority. CBP will further refine data analysis techniques to identify and quantify the best

242

opportunities for recruitment success, and continue to leverage online hiring services as a low-cost means of identifying and reaching a wider pool of qualified applicants.

CBP's new frontline hiring process has led to significant reductions in the average time-to-hire-from 469 days in January 2016 to March 2017's average time-to-hire of fewer than 300 days. Indeed, many successful applicants are now able to move through the hiring process in approximately 160 days. Funding will provide the increase in contract services, and technology needed to continue this transformational effort and expand the new process across the entire frontline position applicant pool. As of April 2017 HRM is now processing all applicants through an expedited hiring model. We have made significant progress in reducing the time to hire.

CBP is also actively working to minimize attrition and fill positions in less desirable locations. The FY 2018 Budget includes $30 million to support operational mobility, developmental assignments, and leadership relocations. Implementing a stable relocation program for the CBP workforce will help meet operational requirements and help to alleviate the lack of mobility significantly contributing to increased attrition across the workforce. CBP is thankful for the continued dedication of Members of Congress to working collaboratively with CBP to come up with solutions to this complicated challenge.

Congress has directed the Department to evaluate ways to improve the statutorily required polygraph program to improve the efficiency of the hiring process. Per the Congressional directive from the Explanatory Statement accompanying the FY 2017 Consolidated Appropriations Act concerning the alternative polygraph trial, CBP has also established a six-month pilot program that will allow the agency to establish a sample of applicant testing that can be measured against comparable data points from the previous test. This pilot was developed in collaboration with the National Center for Credibility Assessment which governs all federal polygraph programs.

Before making any determination to either continue with the piloted test or return to the previous test, CBP will carefully evaluate these metrics and measures to ensure CBP maintains its high standard of integrity for future applicants, and report to Congress per the directive. While the exam is a change in format, it retains all of the critical test topics of the previous exam and maintains CBP's commitment to high integrity standards for its personnel. CBP and the Department support the "Anti-Border Corruption Reauthorization Act of 2017," which was ordered reported as S. 595 by the Senate Homeland Security and Governmental Affairs Committee on May 17, 2017, and reported as H.R. 2213 by the House Homeland Security Committee on May 16, 2017. We thank the Members of Congress for your continued support as we seek to hire the men and women who will fulfill CBP's complex and crucial mission in the months and years to come.

**Legislative Proposals**

Finally, the FY 2018 Budget highlights some of the legislative priorities we hope to achieve with the help of Congress. For example, the Administration will submit legislative language to the relevant authorizing committees to enact the proposal to eliminate Brand USA and redirect the $10 Electronic System for Travel Authorization (ESTA) surcharges to CBP for passenger processing expenses. CBP has also submitted a legislative proposal to create an $8 Electronic Visa Update

243

System (EVUS) user fee based on a fee analysis that would function similarly to the ESTA operational processing fee. Once the authorizing proposal is enacted, CBP will no longer require appropriated funding to support the EVUS program.

CBP will also provide a legislative proposal to decrease the shortfall between the costs of CBP's immigration inspection activities and the collections received. Per the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), passenger inspection fee collections fund customs inspection activities that are mandated by law. The fee levels set in current law do not fully cover CBP's costs. CBP's funding strategies also include seeking Congressional support for a legislative proposal to increase current Immigration Inspection User Fees to recover more of the costs associated with providing immigration inspection services.

**Conclusion**

In closing, the challenges facing CBP and our Nation are considerable, but we have outstanding men and women working at CBP who are committed to protecting our Homeland and the American people. The FY 2018 President's Budget recognizes the serious and evolving threats and dangers our Nation faces each day. With the support of Congress, CBP continues to secure our Nation's borders, and promote international commerce and tourism, through a multi-layered approach using a variety of tools.

We want to thank the Members of this Subcommittee for your continued strong support of CBP. Thank you for the opportunity to appear before you today. We look forward to your questions.

244



**John P. Wagner**
Deputy Executive Assistant Commissioner
Office of Field Operations
U.S. Customs and Border Protection

John P. Wagner became Deputy Executive Assistant Commissioner, Office of Field Operations (OFO), on April 6, 2014.  He has been assigned to U.S. Customs and Border Protection (CBP) at Headquarters in Washington DC since 1999, and has worked on numerous policy and operational issues.

Mr. Wagner has been a leader in developing many of OFO's successful business transformation efforts.  These include the deployment of the internationally acclaimed Global Entry program and the Automated Passport Control kiosks for international travelers.

OFO includes nearly 29,000 employees with more than 22,000 CBP Officers and CBP Agriculture Specialists that protect U.S. borders. An annual operating budget of $3.2 billion provides for operations at 328 ports of entry, and many programs that support the national security, immigration, customs, and commercial trade-related missions of CBP.

A native of Long Island, NY, Mr. Wagner graduated from the State University of New York at Albany, with a Bachelors of Arts degree in Psychology. He began his Federal law enforcement career in 1991 when he joined the U.S. Customs Service as a Customs Inspector.

245

Mr. Wagner worked at the New York/New Jersey seaport and the Port of Laredo, TX before being assigned to Headquarters. He is a graduate of the Senior Executive Fellows course at the JFK School of Government at Harvard University.

246

Mr. CARTER. Thank you, Mr. Wagner.

Mr. Homan.

Mr. HOMAN. Thank you, sir. I want to read my opening statement that I took time myself to pen this past week.

Chairman Carter, Ranking Member Roybal-Allard and distinguished members of the subcommittee. Thank you for the opportunity to appear before you today to present the President's fiscal year 2018 budget for U.S. Immigration and Customs Enforcement.

Our mission is to protect America from cross-border crime and illegal immigration that threaten national security and public safety. To carry out our mission, ICE focuses on immigration enforcement, preventing terrorism, and combating transnational criminal threats.

The President's fiscal year 2018 budget request for ICE includes $7.9 billion to help ICE meet our mission requirements and to make much-needed investments in immigration enforcement, criminal investigations, workforce expansion and training.

Before we talk dollars and cents, I want to take this opportunity to speak to you about the outstanding men and women of ICE. Just a few weeks ago I joined Americans from across the country to observe national police week in honor of fallen law enforcement officers who gave their lives in the line of duty.

I walked by the marble walls of the National Law Enforcement Officers Memorial, which holds the names of 20,000 men and women who lost their lives protecting others. Among those are the names of 52 officers and agents who served within ICE.

Tragically, two names were added this past year, deportation officer Brian Beliso and Special Agent Scott McGuire. I met their families, their wives, their children, their parents, who will endure the pain of their loss for a lifetime.

Police week and similar occasions bring us together in shared respect for law enforcement officers who serve and protect us, but too often that respect does not seem to extend to the honorable men and women of ICE.

Unfortunately, the men and women of this law enforcement agency are unfairly vilified for simply doing their jobs. These are good and decent people who leave their families every day to enforce laws they are sworn to uphold, willfully putting themselves in harm's way to keep our communities and our nation safe.

ICE is a professional law enforcement agency focused on public safety and national security, and we enforce laws like every other federal law enforcement agency, state and local. And yet, unlike most other agencies, we do this despite a constant deluge of biased attacks against ICE personnel by those who disagree with the laws we enforce.

While I recognize that people have the right to protest what they don't agree with, I want to emphasize to the public and to the media and to this committee that ICE officers don't write the laws. They enforce laws as enacted by Congress and signed into law by the President. They do not make up policy on the street.

As I said, people have the right to protest, but ICE officers also have rights. ICE officers have the right to do their job professionally without interference. They have a right to uphold the oath they took to enforce the laws of this great nation. They have the

in front of them. They do what
they do because they love what is behind them.

247

right to end their shift safely and return to their families every
day. And they have a right to be proud of the enormous contribu-
tion they make to our safety and security.

We are all blessed to live in the greatest country on earth, and
I can't blame anybody who would want to live here. But we are
also a country built on a foundation of the rule of law. Those who
choose to enter this country illegally, which is a crime, a federal
crime, or to overstay a visa have knowingly chosen to break the
law.

Meanwhile, millions of people who have become permanent mem-
bers of our society through our generous legal channels, they show
their respect for the rule of law and for the American people.

Even so, aliens who are subject to the removal process under the
law receive extensive due process at great expense to the American
taxpayer. If an alien is issued a notice to appear at the OCN immi-
gration judge at taxpayer expense, they will have an interpreter
provided to them at taxpayer expense during their hearings.

If they claim fear of returning to their home country, they will
have every opportunity to pursue that claim. If unsuccessful, the
alien can appeal the ruling to the Board of Immigration Appeals,
a U.S. circuit court of appeals, and even the Supreme Court in
some cases.

However, once an alien has pursued the extent of their due proc-
ess rights, and a federal judge issues a final order of removal, it
is ICE's job to enforce that order. If a federal judge's decision is not
enforced, there is absolutely no integrity in this entire system.

If you love this country, you must respect its laws and respect
those who keep you safe. ICE officers do not do what they do be-
cause they hate what is standing in front of them. They do what
they do because they love what is behind them.

To that end, ICE welcomes the additional resources requested in
the President's fiscal year 2018 budget request, which will allow us
to better fulfill our national security and public safety mission.

During his first 2 weeks in office, President Trump signed a se-
ries of executive orders that laid out the policy groundwork for the
department and ICE to carry out the critical work of securing our
borders, enforcing our immigration laws and ensuring that individ-
uals who pose a threat to national security or public safety cannot
enter or remain in the United States.

The President's budget, if funded by Congress, would provide the
additional resources, tools and personnel needed to begin imple-
menting these policies. Reflecting the administration's priorities,
the President's budget for ICE reflects a $1.2 billion increase over
fiscal year 2017 enacted budget. This increase in funding is critical
for ICE to meet its mission needs.

The President's budget also supports an expansion of our work-
force by adding 1,000 law enforcement officers, as well as investiga-
tive support staff, including attorneys, to support the increased
operational tempo.

The request would also maintain HSI's critical operations abroad
and enhance efforts to target and combat dangerous gangs and
other criminal organizations.

248

    I want to thank you again for the opportunity to testify today
and for your continued support of ICE. I look forward to answering
any question you may have at this time.
    [The information follows:]

249



## U.S. Immigration and Customs Enforcement

STATEMENT

OF

THOMAS D. HOMAN

ACTING DIRECTOR
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
DEPARTMENT OF HOMELAND SECURITY


Regarding
The Fiscal Year 2018 President's Budget Request



UNITED STATES HOUSE OF REPRESENTATIVES
COMMITTEE ON APPROPRIATIONS
SUBCOMMITTEE ON HOMELAND SECURITY

TUESDAY, JUNE 13, 2017

250

### INTRODUCTION

Chairman Carter, Ranking Member Roybal-Allard, and distinguished Members of the Subcommittee:

Thank you for the opportunity to appear before you today to present the Fiscal Year (FY) 2018 President's Budget for U.S. Immigration and Customs Enforcement (ICE). I look forward to discussing our priorities for the upcoming fiscal year and highlighting our continued efforts to ensure we make the most efficient and effective use of the resources you provide to carry out our vital homeland security mission.

A few weeks ago, Americans across the country honored fallen law enforcement officers during National Police Week. It is a deeply moving experience to view the memorial wall in Washington, D.C., which contains 20,000 names – the names of men and women who lost their lives protecting others. Among them are 52 officers and agents who served in ICE or one of its predecessor agencies, killed in the line of duty. Tragically, two names were added this past year: Deportation Officer Brian P. Beliso and Special Agent J. Scott McGuire. I met their families— wives, children, and parents, who will endure the pain of their lost heroes for a lifetime.

There are many, many more outstanding people in ICE's 20,000-strong workforce, of which I am privileged to serve as Acting Director – the first to come from the ranks of ICE. Together, ICE promotes homeland security and public safety through broad enforcement of approximately 400 federal laws governing border control, customs, trade, and immigration.

The FY 2018 President's Budget for ICE includes $7.6 billion in discretionary funding, reflecting a $1.2 billion increase from the FY 2017 enacted budget. Additionally, the Budget estimates $377 million in budget authority derived from mandatory fees, bringing total estimated spending authority to $7.9 billion. This increase in funding is critical for ICE to meet its mission needs. Simply put, the men and women of ICE need the requested resources and tools to do their work. The FY 2018 Budget will support current efforts and enable ICE to make much-needed investments in the following core areas: immigration enforcement, criminal investigations, workforce expansion and training, and the information technology needed to meet the security challenges of the 21st century.

### ENFORCING IMMIGRATION LAWS

Our immigration enforcement efforts are led by the more than 6,000 law enforcement officers of Enforcement and Removal Operations (ERO). These dedicated officers enforce our nation's immigration laws in a fair and effective manner by identifying, arresting, detaining, and removing removable aliens. To ensure the national security and public safety of the United States, and the faithful execution of the immigration laws, our officers may take enforcement action against any removable alien encountered in the course of their duties who is present in the U.S. in violation of immigration law. They work very hard and I am proud of what they are accomplishing.

251

During his first two weeks in office, President Trump signed a series of Executive Orders (EOs) that laid the policy groundwork for the Department and ICE to carry out the critical work of securing our borders, enforcing our immigration laws, and ensuring that individuals who pose a threat to national security or public safety cannot enter or remain in the United States. The FY 2018 Budget, if funded by Congress, would provide the additional resources, tools, and personnel needed to begin implementing these policies.

These EOs establish the Administration's policy of effective border security and immigration enforcement through the faithful execution of the laws passed by Congress. The orders implement new policies designed to stem illegal immigration and facilitate the identification, apprehension, detention, and removal of removable aliens. Under these new directives, ICE will no longer exempt entire classes or categories of removable aliens from potential enforcement. Those in violation of immigration law are subject to arrest, detention, and, if issued a final order by an immigration judge, removal from the United States.

The stepped up enforcement of our Nation's immigration laws in the interior of the United States is critically important to the national security and public safety of the United States. To successfully meet operational needs, the funding increases included in the FY 2018 President's Budget are badly needed. Aliens who illegally enter the United States, or even those who overstay or otherwise violate the terms of their visas, have violated our nation's laws and can pose a threat to national security and public safety. This is particularly true for aliens who engage in criminal conduct in the United States.

Under prior enforcement priorities, approximately 345,000, or 65 percent, of the fugitive alien[1] population were not subject to arrest or removal. President Trump's EOs have changed that. As a result, ICE arrests are up 38 percent since the same time period last year, charging documents issued are up 47 percent, and detainers issued are up 75 percent. Thus far in this fiscal year, through May 15, 2017, ERO has removed 144,353 aliens from the United States and repatriated them to 176 countries around the world; these are aliens who posed a danger to our national security, public safety, or the integrity of the immigration system. Of those removed, 54 percent (78,301) had criminal convictions. ERO has also issued 78,176 detainers and 63,691 charging documents; maintained an average daily population of 39,610 in detention; and monitored an average of 70,044 participants daily under the Intensive Supervision Appearance Program (ISAP) III contract or Alternatives to Detention (ATD) program.

Furthermore, abolishment of the Priority Enforcement Program and re-establishment of the Secure Communities program, combined with the expansion of the 287(g)[2] program, is expected to result in significant increases to interior apprehensions and removals. As of June 3, 2017, there were 968,773 individuals on ICE's non-detained docket with final orders of removal, of which 177,496 were convicted criminals. In order to safely and securely carry out this mission across the Nation, ERO will require additional deportation officers to handle this increased workload. The FY 2018 Budget supports hiring an additional 850 deportation officers to enforce our immigrations laws.

---

[1] Fugitive alien refers to illegal immigrants who have ignored and evaded deportation orders.
[2] 287g refers to Section 287(g) of the Immigration and Nationality Act

3

252

With the increased enforcement activity, additional detention capacity will be necessary to implement EO 13768, *Enhancing Public Safety in the Interior of the United States*. Specifically, the budget includes nearly $4.9 billion to expand detention capacity to support an average daily adult population of 48,879 and an average daily family population of 2,500, for a total of 51,379 beds. The budget also includes an increase of $129 million for transportation costs associated with the increased detention population, and an increase of $57.4 million for the contract ATD program to sustain 79,000 average daily participants.

Additional resources will also be necessary in FY 2018 to ensure that ICE carries out its lawful duties in the prosecution of cases before the U.S. Department of Justice's (DOJ) immigration courts. At the end of FY 2016, there were more than 520,000 pending immigration cases nationally. In FY 2017, the ICE Litigation workload is expected to grow to more than 650,000 cases, a 26 percent increase from the previous fiscal year. Further, DOJ has redeployed additional immigration judges (IJs) to border locations to address the backlog of detainee cases and the Administration's enforcement priorities. The requested resources would enable ICE's Office of the Principal Legal Advisor (OPLA) to meet the demands of an increasing IJ corps and immigration court docket. An inadequate augmentation of attorney resources will result in ICE's enforcement efforts failing to meet the Administration's objectives and enacted immigration laws.

Finally, the FY 2018 Budget includes an additional $1 million to expand the newly-created Victims of Immigration Crime Engagement Office (VOICE) to assist the victims of crimes committed by removable aliens. Due to Privacy Act protections, victims have traditionally encountered difficulty obtaining information on removable alien perpetrators, including whether they are in ICE custody and ICE's enforcement actions against them. The VOICE office will make it easier for victims to receive this information, to the extent permitted by law, so that they are adequately informed about the outcome of their case.

### COMBATING TRANSNATIONAL CRIMINAL ORGANIZATIONS

Homeland Security Investigations (HSI's) investigators protect the United States against terrorists and other criminal organizations through criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration. As the largest investigative arm of DHS, HSI utilizes its broad legal authorities to investigate immigration and customs violations, including those related to export control, human rights abuses, narcotics, weapons and contraband smuggling, financial crimes, cybercrime, human trafficking and smuggling, child exploitation, intellectual property infringements, transnational gangs, immigration document and benefit fraud, and worksite enforcement. The FY 2018 Budget maintains HSI's critical operations abroad, supports hiring of an additional 150 domestic special agents and increases our efforts to target and combat dangerous transnational gangs and other criminal organizations.

Last year, HSI investigations led to the disruption or dismantlement of hundreds of transnational criminal organizations (TCOs). HSI made more than 32,709 criminal arrests, including arrests of more than 4,606 transnational gang members. HSI also seized 1.5 million pounds of narcotics, made 2,203 seizures for violations of U.S. export laws and regulations, and seized nearly $541 million in currency and monetary instruments. Additionally, HSI identified

4

253

and assisted more than 2,000 crime victims, including 435 human trafficking victims and more than 820 child exploitation victims.

During the last two decades, transnational organized crime has expanded dramatically in size, scope, and impact, which poses a significant threat to national and international security. HSI takes very seriously the threat to national security that transnational organized crime represents, and HSI targets TCOs at every critical location in the cycle: internationally, in cooperation with foreign counterparts, where transnational criminal and terrorist organizations operate; at our nation's physical border and ports of entry, in coordination with U.S. Customs and Border Protection (CBP), where the transportation cells attempt to exploit America's legitimate trade, travel, and transportation systems; and in cities throughout the United States, where criminal organizations earn substantial profits off the smuggling of aliens and illicit goods.

As directed by the President's Executive Order 13773, *Enforcing Federal Law with Respect to Transnational Criminal Organizations and Preventing International Trafficking*, HSI will continue to give a high priority and devote sufficient resources to dismantling transnational criminal organizations and subsidiary organizations. HSI will continue to focus on cooperative work and data sharing with other federal agencies, as well as work with foreign counterparts by sharing intelligence and law enforcement information when appropriate and permitted by law.

To investigate TCOs impacting Southwest Border security, HSI has assigned more than 1,500 special agents and almost 150 intelligence research specialists to Southwest Border offices, to include the Border Enforcement Security Task Forces (BESTs), which provide a comprehensive regional response to the growing threat to border security, public safety, and national security. This includes border security at land, maritime, and international airports. In FY 2016, drug smuggling investigations, conducted by the five HSI Special Agent in Charge offices along the Southwest Border, resulted in 10,438 criminal arrests, 7,151 indictments, 6,098 convictions, and 2,570 administrative immigration arrests.

In addition to leveraging domestic assets, ICE works closely with attaché personnel deployed to 66 offices in 49 countries worldwide. These personnel are uniquely positioned to utilize established relationships with host country law enforcement, including Transnational Criminal Investigative Units (TCIUs). These TCIUs are composed of DHS-trained host country counterparts who have the authority to investigate and enforce violations of law in their respective countries. Since our law enforcement officers working overseas do not possess general law enforcement or investigative authority in most host countries, the use of TCIUs enables HSI to promote direct action on its investigative leads while respecting the sovereignty of the host country and cultivating international partnerships. These efforts, often thousands of miles from the U.S.-Mexico border in countries like Colombia and Panama, act as an outer layer of security for our Southwest Border.

Terrorism remains one of the most significant threats our law enforcement faces in protecting the homeland. Following the November 13, 2015 terrorist attacks in Paris, HSI International Operations special agents joined other DHS Components to support official requests for assistance from French and Belgian investigators. Specifically, HSI obtained information on financial transactions and social media account data for individuals linked to the

5

254

investigation, including those responsible for perpetrating the attacks. This effort contributed to the identification of hundreds of European Union-based individuals with financial links to the Paris attacks.

Our counterterrorism and anti-criminal exploitation efforts seek to prevent terrorists and other criminals, such as human rights violators, from exploiting the Nation's immigration system. HSI's overstay analysis efforts provide timely, relevant, and credible information on entry, exit, and immigration overstay status of visitors to the United States in order to enhance security, facilitate legitimate trade and travel, and ensure the integrity of the immigration system, all while protecting the privacy of visitors.

HSI is also the second-largest contributor of federal agents to the Federal Bureau of Investigations-led Joint Terrorism Task Forces (JTTF), which benefit from HSI agents' investigative expertise and broad enforcement authorities. ICE will continue its participation in more than 100 JTTFs, supporting and complementing their counterterrorism investigations with HSI's unique immigration and trade-based authorities. Additionally, HSI oversees the Human Rights Violators and War Crimes Center, which fosters an agency-wide approach to pursue human rights and war crimes violators by bringing together the resources of the various U.S. Government agencies that have a role in dealing with these offenders.

Finally, HSI's Visa Security Program (VSP) helps identify terrorists, criminals and other aliens ineligible for a visa prior to their travel or application for admission to the United States. VSP differs from other U.S. Government screening efforts in that it leverages its capabilities through in-person interviews, and works with international law enforcement partners to investigate suspect travelers, enhance existing information, and identify previously unknown threats, instead of simply denying visas and any potential travel. In FY 2016, HSI expanded VSP operations to an additional 5 strategically-important visa-issuing posts and reviewed more than 2.2 million visa applications, including approximately 8,600 cases in which visas were refused for a variety of reasons, including for suspected connection to terrorism or terrorist organizations.

### GROWING OUR WORKFORCE

Because of the vital funding increases ICE received in the FY 2016 and FY 2017 appropriations bills, the agency has been able to aggressively hire front-line operational and support staff. In FY 2016, ICE hired 498 law enforcement officers (LEOs) and 202 attorneys to enforce our immigration laws and investigate transnational criminal organizations. From the beginning of FY 2017, we have hired 357 LEOs and 114 attorneys who will continue to carry out the mission of ICE.

The FY 2018 Budget includes $185 million to hire an additional 1,000 law enforcement officers and 605 investigative support staff to support the increased operational tempo called for by EO 13768, *Enhancing Public Safety in the Interior of the United States*. This funding would allow ICE to hire the first ten percent of the total 10,000 law enforcement officers directed by the EO, as well as associated and support staff. This includes the previously mentioned 850 deportation officers and 150 special agents.

255

### INVESTING IN INFORMATION TECHNOLOGY AND INFRASTRUCTURE

The tools required to carry out the agency's operations are just as important as the resources needed to fulfill ICE's enforcement and investigative missions. The FY 2018 Budget includes $53 million to fund the deployment and modernization of ICE's information technology applications – systems infrastructure that support our front-line personnel and improves information sharing with the Department of Homeland Security (DHS) and partner organizations. The requested funds will also enable ICE to refresh our information technology infrastructure; and complete an ongoing migration effort to a new Investigative Case Management (ICM) system.

ICE relies on the availability of these mission-essential systems to perform critical functions across the enterprises. These systems, in turn, rely on modern and up-to-date infrastructure to ensure operational readiness and optimal performance.

### CONCLUSION

ICE will continue to play a critical role in fulfilling the DHS national security, border security, and public safety missions. To that end, the FY 2018 President's Budget ensures that ICE has the resources to support Administration and DHS-wide priorities. Thank you again for the opportunity to testify today and for your continued support of ICE. I look forward to answering any questions you have at this time.

256

*Office of Public Affairs*
**U.S. Department of Homeland Security**

# BIOGRAPHY



**U.S. Immigration
and Customs
Enforcement**

### Thomas D. Homan
Acting Director

Thomas D. Homan is the acting Director for U.S.
Immigration and Customs Enforcement, the principal
investigative agency of the Department of Homeland
Security.  He became acting Director on January 30, 2017.

In his capacity as acting Director, Mr. Homan advances ICE's
mission to promote homeland security and public safety
through the criminal and civil enforcement of approximately
400 federal laws governing border control, customs, trade and
immigration.

Since 2013, Mr. Homan has served as the executive associate
director of ICE Enforcement and Removal Operations (ERO).
In this capacity, he led ICE's efforts to identify, arrest, detain, and remove illegal aliens,
including those who present a danger to national security or are a risk to public safety, as well as
those who enter the United States illegally or otherwise undermine the integrity of our
immigration laws and our border control efforts.

Mr. Homan is a 33-year veteran of law enforcement and has nearly 30 years of immigration
enforcement experience. He has served as a police officer in New York; a U.S. Border Patrol
agent; a special agent with the former U.S. Immigration and Naturalization Service; as well as
supervisory special agent and deputy assistant director for investigations at ICE. In 1999, Mr.
Homan became the assistant district director for investigations (ADDI) in San Antonio, Texas,
and three years later transferred to the ADDI position in Dallas, Texas.

Upon the creation of ICE, Mr. Homan was named as the assistant agent in charge in Dallas. In
March 2009, Mr. Homan accepted the position of assistant director for enforcement within ERO
at ICE headquarters and was subsequently promoted to deputy executive associate director of
ERO.

Mr. Homan holds a bachelor's degree in criminal justice and received the Presidential Rank
Award in 2015 for his exemplary leadership and extensive accomplishments in the area of
immigration enforcement.

*U.S. Immigration and Customs Enforcement (ICE) is the largest investigative arm of the Department of Homeland Security. ICE
is comprised of three integrated divisions that form a 21st. century law enforcement agency with broad responsibilities for a
number of key homeland security priorities. For more information, visit:* **www.ICE.gov.**

Current as of January 31, 2017

257

Mr. CARTER. Thank you, Mr. Homan.

We are going to start with our line of questioning. We are going to have a timer on. There will be a little leeway, but I just looked through the list of questions I have got and every one of them needs to be answered. I am sure that we won't get to all of them, but we will submit all of them for an answer because everything that I am concerned about I think everybody else is also concerned about. These are answers that we need to have.

We are a current event in today's world and we have to remember we are a current event and we have to really do serious inquiry. I will begin.

Chief Provost, there has been a lot of discussion about how to achieve operational control of the border. How do you define the requirements for operational control of the border? Please discuss them. Do you have a fully validated requirement that is driving the request for funding in fiscal 2018 budget?

Ms. PROVOST. Thank you for the question, Chairman Carter. So operational control is not something new to the border patrol. As I know you know, we have been utilizing this term for numerous years. We created operational control.

And for us, in its simplest state it is being able to impede and deny entry. If there is an entry made, having a situational awareness until our agents can respond in a time-bound response and come to a law enforcement resolution. That is the simplest term of it.

The four master capabilities I spoke to in my opening statement, of domain awareness, impedance and denial, access and mobility and mission readiness are key to reaching op-con. As you know, the border is very dynamic and there is no one-size-fits-all.

As we go across the border in different areas, it may be a different mixture of those four master capabilities, but experience is that this works for us.

From the time that I joined the border patrol in 1995, we have been utilizing these tools to meet that requirement. So operational control is key. Those four master capabilities are the key to the success of operational control and the right balance in the right places along the border.

Mr. CARTER. Because there are requirements that are fully validated right now that are driving this request.

Ms. PROVOST. We utilize the capabilities gap analysis process to identify gaps in simplest of terms along the border, and the C-GAP process is a continuous process for a reason. As we apply resources to one area of the border, as you know it may impact other areas of the border.

And through that process we have validated the requirement. And we have different requirements across the border in all of these areas. And as I said before, it is a continuous process, so it is ever-changing and we continue to evaluate the border throughout the year, every year.

Mr. CARTER. Well, this next question has multiple parts.

Ms. PROVOST. Okay.

Mr. CARTER. And we will try to keep track of them.

Ms. PROVOST. Okay.

258

Mr. CARTER. The budget includes $1.6 billion for planning, design and construction of 74 miles of various types of physical barriers, including levee wall, bollard fencing, and potentially a cement wall. Tell us more of your plans for border infrastructure, what types of structures do you propose, and where will they be located strategically.

Where do you anticipate the longest length of barrier? Where does it not make sense to build a wall rather than a fence? From the time you get funds, how long before you start putting steel in the ground? That one I put an X by. That is important.

Do you expect to use multiple contract vehicles as well as contractors? Can the entire $1.6 billion be put on contract by September 30th, 2018? Please be specific as to those projects you can put on contract and address the situation in Texas, where land is mostly privately owned. Lots of parts.

Ms. PROVOST. Okay. I will do my best to make sure I hit all of them, sir.

So yes, the $1.6 billion that we have requested for fiscal year 2018, as you have stated we have 28 miles of levee wall that we are asking for, and that really fills the gaps where we have current wall in the Rio Grande Valley sector, and then another 32 miles that we are working within a 52-mile area of determining, making final determination of where that goes. And then as you stated, we also have the secondary wall in San Diego.

Through our C-GAP process we have validated that that is our priority area to go in fiscal year 2018. I think it is very clear that the Rio Grande Valley sector has been an area of exploitation for bad actors in the last couple of years, for us certainly a high priority in an area where we are lacking a lot of infrastructure in general.

So that is an extremely important area for us as well, as well as replacement in San Diego, in an area that has been breached over 800 times. The current fence that is in that area is insufficient, and that is a high risk area for us in the aspect that they have returned on numerous occasions. Traffic returns to that area.

Transnational criminal organizations will go to the area of easiest access, logistical support, quickest vanishing times, so that is why that area is key to us. And through our planning process that is where we came with—to that area of wall.

For the longest barrier, it would be those 32 miles in the Rio Grande Valley sector area. The 28 miles is broken up and filling some gaps, along with the gates, which thank you very much for the funding in 2017 to support those. Thank you to the committee for those gates. That is imperative for the operations of our agents on the ground in Rio Grande Valley.

There are certainly, and you have heard the secretary say that there are areas where a wall does not make sense. A prime example would be in the Big Bend national forest area. There are areas where there are natural barriers and there is no requirement for us for a wall there. There are other areas as well, some of the lakes throughout the Texas border with Mexico.

So we are taking all of that into consideration as we go through our analysis process of where we have a requirement for impedance and denial.

259

You asked about the funds and the contracting. Obviously I am no contract specialist, but I know that our team is working very, very closely if given the funding.

So first let me address the prototypes. It is my understanding that we are working to a late summer timeframe for those prototypes to be in for some analysis and review and see how those would possibly add to our toolkit, different barriers. That of course is for this year.

For next year, if—we are working towards diligently if we receive the funding to be able to start in March or April of 2018. Beyond that I would refer you—I would say I think it would benefit us to have some of our specialists come back and brief their staff more in-depth because that is not my area of subject matter expertise.

Mr. CARTER. Well, if that is necessary then would you get them to answer this question for us?

Ms. PROVOST. Of course, sir, I will.

Mr. CARTER. Because these are large amounts of money.

Ms. PROVOST. Certainly.

Mr. CARTER. These are important projects. We don't want to be sitting with pots of money out there for long periods of time.

And then the question about the Texas situation. We pride ourselves in Texas on our property rights because we entered this country reserving our property rights, which is very rare as it pertains to the other 50 states. Therefore, we violently fight for our property rights.

Ms. PROVOST. Certainly. I apologize that I missed that.

Mr. CARTER. There is combination of areas down there. If a landowner is not willingly going to enter into a contract to sell you the land then you are going to have to go to court to use condemnation proceedings, eminent domain, to be able to go forward.

And those are long—having tried those myself—long, drawn out. And I can say from at least my personal experience very boring to try. But they take time. Time really defines that.

Ms. PROVOST. Yes, sir. If I may, just quickly on that. As I know you know, it is always our—CBP always works—tries to work with the landowner to come to a resolution. Condemnation is not where we want to go to, and we will work diligently with all of the stakeholders to try to come to a resolution that works for the landowners first and foremost.

Mr. CARTER. Very good. And to finish up this area, a question, a vital question. Congress provided funds for 40 miles of replacement fencing. You answered some of this. When will you begin construction on the replacement fencing, and do you know the exact locations that you want this fencing?

Ms. PROVOST. Yes, sir. For the fiscal year 2017 replacement fencing, first, thank you very much. That is going to be hugely beneficial for our agents on the line and their officer safety and being able to replace some outdated fence.

So San Diego, El Paso and El Centro are the areas that we are placing that new—or excuse me, putting that replacement fence in. So those are the priority areas of old, outdated fencing that is not working for us. It is a risk to the agents for numerous reasons. It is in areas that they have breaches quite often and this would be a huge positive impact for our agents.

260

So we are going—first and foremost we have 14 miles in San Diego of primary wall, replacement, two miles in El Centro, and 24 miles in El Paso that we are replacing.

Mr. CARTER. Very good.

Ms. Roybal-Allard.

Ms. ROYBAL-ALLARD. Thank you. I think there are more questions then we have time for. But I would like to start with ICE detention and funding.

Director Homan, the ICE budget requests $3.6 billion for an average daily detention population of 51,379. This includes 48,879 adults and 2,500 individuals in family detention. That is an increase of more than 12,000 adult detention beds over the fiscal year 2017 level of 36,824.

Meanwhile, the current average daily population of adults in detention is under 34,000. Do you currently think that ICE has a requirement for the 51,379 detention beds in fiscal year 2018, and if so, what is that based on? Is it a rough estimate or does ICE have a methodology tying detention beds to a particular staffing level, pace of enforcement activity or target population?

Mr. HOMAN. That budget is built on the assumption of a full year continuing resolution for 2017, along with enhancments for provisional personnel and beds that weren't funded in fiscal year 2017.

Why do we think we need 51,000 beds? When the team got together and looked at, you know, their model, I think 51,000 is a good number, and let me tell you why.

Part of the new executive order—what has changed in January under new executive orders, we have opened the aperture up to who is—who we are looking for, who we are looking to arrest and detain or remove. Under the old administration, unless you were a fugitive after 1/1/14, you were off the table. You weren't a priority, we weren't looking for them.

Now we have got 345,000 aliens who were in the country illegally with a final order of removal that—as required by a judge, are now people we are looking for.

Our arrests right now are up 50 percent because that aperture has been opened. Our detainers are up over 75 percent. And these are people we put a detainers on that will eventually come to our custody.

Secure Communities is back, which means we put a detainer on anybody that is illegally in the United States. And 287G, we expect that program, which almost nearly doubled in size, we expect it to nearly triple in size by the end of the year. That is a force multiplier for more law enforcement officers to bring illegal aliens into our custody.

OPLA has over half a million cases on the docket. They expect to have close to a million by the end of the year. These are also folks that will eventually come into our detention.

Recalcitrant countries was an issue under the last administration. We had 23, 24 countries that we couldn't get travel documents from. Through a lot of hard work for the ICE staff here in headquarters, we are down to 11 countries now, so we got 12, 13 countries back to the table issuing travel documents for thousands of people we are trying to remove.

261

And overstays. Those overstays, you know, between 600,000, and 700,000 overstays in this country that were not a priority, under this new executive order they are. So you can see hundreds of thousands of illegal aliens with final orders, that already had the due process, are now back on the table for law enforcement.

So the intake of new cases for detention are very high. Clearly you can justify 51,000 beds.

Ms. ROYBAL-ALLARD. So we are basically talking about young people like Diego that Mrs. Lowey was talking about now, that everyone is pretty much being targeted, if I understand. That is what you mean by the open aperture?

Mr. HOMAN. The executive orders open the aperture, yes, but we still prioritize criminals and national security threats first. But we look for fugitives that had due process, that had been ordered removed by a federal judge. We have to remove them. That is our job. And those that reenter the country have to be removed. That is a felony.

When you get formally removed from the country, reenter illegally, that is a felony.

Ms. ROYBAL-ALLARD. I understand that but I just wanted get some clarification.

Also in May, the average population in family detention was under 600. The three family detention facilities ICE currently maintains represent fixed cost. That means that we are paying the full rate for 2,500 beds, no matter how many beds are filled.

What are your plans for family detention going forward, and will ICE continue to pay for family detention capacity that isn't being used?

Mr. HOMAN. The answer to the last question is it is not—I don't think we should be paying for family beds we are not using. We are meeting now, as of last week we are meeting with the vendors for family detention to talk about the future use of family detention.

My goal is to certainly decrease the funding needed for those beds. I think those beds should come at a cheaper price and we are working on that now. Family detention I think is a valuable tool we have. I think family detention serves a purpose. At one time they were full and we weren't allowed to take anybody into custody in family detention.

But it is a consequence for illegal activity. And family detention gives us an opportunity to identify who these folks are, make sure that we put them on some sort of reporting when they are released. They get a full medical so we are not releasing women and children with chickenpox, measles, and we deal with lots of medical issues coming in.

So I think it is a necessary tool to figure out who these people are and should they be released. Most will claim fear and have a hearing in front of the CIS. Some don't get fear, which means if their claims are denied then these are people who we will remove straight from the detention facility to their homeland. So I think it is a valuable tool we have got to sustain.

Ms. ROYBAL-ALLARD. Now I believe the average length of stay in family detention is currently around 10 days, and this is largely due to a federal district court determination that the detention of

262

families with children cannot exceed 20 days unless facilities are
state licensed and non-secure.

When I discussed this with Secretary Johnson during last year's
hearing, he said the department was pursuing state licensure but
it was unclear whether the facilities would eventually be non-se-
cure.

What is the current status of pursuing state licensing for family
detention facilities, and what, if any, are your plans to satisfy the
district court's requirement that family detention be non-secure?

Mr. HOMAN. Of the two family detention centers in Texas, first
of all, Karnes did receive a provisional license. When the facility
in Dilley was seeking license a grassroots organization in Texas
filed an injunction. And the state was looking to—from licensing
them, so it went to the court process.

Licensing did pass the Texas Senate but it stalled in the House,
so it is on hold. We will continue to try to get licensing for those
facilities. Berks facility in Pennsylvania does have a license. But
the ruling by the court says that it averages 20 days for those
who—for children to be detained for 20 days.

So we will continue to operate within the judge's—the district
court's finding and make sure that on average they are in the facil-
ity less than 20 days, unless they are found not to have a fear
claim and we are likely to remove them. They may stay in longer.
But we will abide by the terms of the circuit court decision.

Ms. ROYBAL-ALLARD. One of the things that disturbed me was to
hear that ICE plans to end the family case management pilot pro-
gram, which has only been fully underway for approximately a
year. It seems premature to me to pull the plug on a pilot that
seems to be working so far.

What have been the specific results of the pilot, and what kind
of formal evaluation has ICE carried out? It is my understanding
that appearance rates for the participants have been much higher
than for families in the traditional ATD program.

Are there lessons learned from the pilot that could productively
be incorporated into the ATD program?

Mr. HOMAN. You are right, it is a pilot. It was a pilot and we—
it was a $12 million pilot, the cost for a full year. But on the
metrics of showing up for their hearings and so forth, the metrics
are no different. Very similar to those on traditional ATD.

So when you look at the cost, you know, an average day on the
family case management program is $35, almost $36 a day and a
typical ATD ICE app is $4 a day. That is eight times the cost of
a traditional ATD, which had the same result at the end prac-
tically, off by one or two percentage points.

So for the same reason we are here today talking about a budget,
I think as long as it doesn't change the metrics of who has shown
up in court, as long as they both are equally successful and one is
$4 and the other one is $36, we decided that we were going to go
with the cheaper alternative.

Ms. ROYBAL-ALLARD. Can you provide us with that informa-
tion——

Mr. HOMAN. Yes, ma'am.

Ms. ROYBAL-ALLARD [continuing]. To the committee? I would ap-
preciate it.

263

Mr. CARTER. I am going to continue in the order that people arrived. Mr. Fleischmann.

Mr. FLEISCHMANN. Thank you, Mr. Chairman. And to each and every one of our witnesses I want to thank you all for appearing before us today. And I really appreciate the fact that you have been so laudatory of your employees. Thank you very much. They do a very difficult job and—for our country and I appreciate that so much.

I have a question for Mr. Wagner. First of all, I was very pleased to see a proposed increase in funding for nonintrusive inspection systems at land ports of entry. I have a two-part question, sir.

Do you have any idea how much contraband goes undetected through our land ports of entry on an annual basis? By several reports, the use of NII is responsible for 90 percent of those interdictions in secondary screening.

Then my final question would be, do you think it would make sense to deploy such proven technology at pre-primary to ensure 100 percent screening of all passenger vehicles, sir?

Mr. WAGNER. I don't have an answer to how much goes undetected, but I can certainly agree with the high percentage of narcotics that we do intercept using the technology. It is something we have built up the systems over the last probably 15 years to 20 years or so at our ports of entry.

It is incredibly useful technology. It is an incredible resource-saver and really the safe and efficient way to examine a vehicle or a cargo container. It is really a tremendous asset.

Now whether we could deploy them into a pre-primary type environment, I think it is as much about the facility constraints or the logistics of doing so, or to figure out the time sensitivities and how much traffic and the through-put we could get.

We are looking at some things with commercial truck traffic and being able to run trucks through—100 percent through the scanning to look at what the impact would be and whether could we actually accomplish that in the right amount of time.

For passenger vehicles, I think the logistics of doing so would be a challenge. I think operationally we like to be able to do that. It is just the time and the resources that would be needed as well as the physical layout of where to put that equipment in those vehicle lanes. But it is certainly a strategy that would be worth talking about some more.

Mr. FLEISCHMANN. Thank you.

Would either of the other witnesses like to supplement to his answer?

Ms. PROVOST. Not specific to the ports but as you know, we use NII as well at our checkpoints and they have certainly been a benefit to us in the border patrol as well.

Mr. FLEISCHMANN. Thank you very much.

Mr. Chairman, I know a lot of people want to ask so I will yield back, sir.

Mr. CARTER. Thank you.

Mrs. Lowey.

Mrs. LOWEY. Thank you very much, Mr. Chairman.

And Director Homan, before I asked my question I want to say I really appreciated your eloquent statement regarding the good

264

and decent people of ICE. And I also appreciated your saying that
the ICE officers don't write the laws. They are charged with enforc-
ing the laws, and I get that as well and I appreciate it.

Director Homan, ICE has been the target of significant criticism
in recent months regarding enforcement actions at and near sen-
sitive locations—churches, schools, courthouses. Since the begin-
ning of the year could you share with us how many times has su-
pervisory approval been given for enforcement actions at sensitive
locations? How many times have such actions occurred without su-
pervisory approval, based on exigent circumstances?

Mr. HOMAN. Well, that is an easy answer. Zero. As far as I am
concerned, as far as the information I have available to me, nobody
has been arrested at a school, no one has been arrested at a hos-
pital.

Now courthouses aren't a part of the sensitive location policy.
Courthouses is a place we should be arresting people, and let me
tell you why.

When I came in this building today, there are metal detectors
and security guards to keep the staff and congressmen safe in this
building. The judges have the same thing in courthouses. Why
would I not want the same thing for the men and women of ICE
to arrest a criminal alien behind the wire when they know we don't
have weapons?

The only people we arrest in courthouses are those that are a
threat to public safety. We don't arrest witnesses. We don't arrest
victims. We go to a courthouse looking for one person that has a
public safety conviction, to arrest them in a safe location. That is
my job, to keep my officers safe, so that is the best place to arrest
them.

And as far as the churches and the schools, I see the media re-
ports too. Here is a situation what is happening. You go to a big
city like Los Angeles or New York, where the aliens are being in-
structed by many people not to answer their doors, not to work
with us, not to answer our questions, there are county jails that
won't give us access to the jails.

I have to arrest these people. That is my job. So we are going
to arrest them in the public. That is my job. We have to arrest
them. If I can't get it in the privacy, security and safety of a jail
then I have got to go to their home or wait for them to leave their
home.

If you are in a big city like Los Angeles or New York and you
pull a car over to arrest a target, chances are you are going to be
within two blocks of a school, a church or something. So all of a
sudden the media says we arrested somebody dropping the child off
at school. No, we arrested them three blocks near the school, near
a place of worship, going to church, doesn't make any difference
whether he is arriving or departing or waiting at the bus stop on
the way to school, he is a target. Is that correct?

Mr. HOMAN. Your question, there are a lot of factors to consider.
Is he arrested in a parking lot, school? We probably wouldn't do
that. Is he——

Mrs. LOWEY. I mean, this is a student who is obeying the law.
And I can remember many discussions—I have worked on this
issue a long time—not 33 years, long as you have—and the whole

265

idea here—which I agree with—that if people are disrupting the
public, if they have committed a crime, if they are a danger to the
community. But here if you have a student who is walking to
school, waiting at a bus stop, you have somebody who is ready to
arrest them. Is that correct?

Mr. HOMAN. I want to make something clear. The case you are
talking about, no one knew there was a problem. The officers, you
know, certainly aren't going to go and arrest somebody just so he
can't go to a prom. That is not what we do.

You know, Americans expect us to foster compliance with the
law. And to do that, we have got to have, you know, a robust and
diversified enforcement. There should be no one that violates the
law. And this young gentleman, by entering the country illegally,
committed a crime. That is a crime, 8 USC 1325. He committed a
crime by entering this country illegally.

He had due process through several channels of judicial process,
had his day in court, as due process, and was ordered removed. So
we are talking about somebody that has had his due process. He
lost his case. And because we don't like the results of that case, we
forget about it. Well, if we—there would be no integrity in the sys-
tem if we don't uphold the rulings of a judge. I don't know where
else in the American justice system any other agency is told to ig-
nore a judge's ruling. It doesn't happen anyplace else but in our
context.

I think it is important—this is a country of laws. We need to
stand by the laws. The country I grew up in, if you are violating
the law, he should be uncomfortable. He should be looking over his
shoulder if he is in this country in violation of the law and has
been ordered removed. He should be worried that he is going to be
arrested. There should be no population of persons that are in this
country illegally, violated the law, then had a final decision from
a judge, to feel comfortable that he doesn't have to worry about
somebody arresting them.

The IRS doesn't want to audit everybody, but we all know it is
a possibility. The highway patrol can't arrest everybody for speed-
ing, but we speed, we know it is a possibility we could be stopped.
It should be no different with immigration enforcement. We are a
law enforcement agency that enforces the law. And we shouldn't
play favorites.

Mrs. LOWEY. How many—within the New York area, how many
individuals are you pursuing, roughly?

Mr. HOMAN. In New York, I have no idea.

Mrs. LOWEY. Well, what I am trying to get to—I am assuming
there is a priority. And for many years that I have been involved
in this issue, if there are people that really are dangerous to the
welfare of their community, if they have committed a felony, if they
have committed a crime, there is a priority. And I just wondered
where a student who is going to school working hard, hopefully get
to work, where is he on a priority list?

Mr. HOMAN. Our priority is threats to community safety, public
safety, criminal aliens. After that, along with that, national secu-
rity——

266

Mrs. LOWEY. So you have arrested everybody who is a threat to the community, public safety, so you are going after a student who is graduating and is law-abiding?

Mr. HOMAN. It is not law-abiding. He violated the law and was told by an immigration judge you must leave. And he failed to do so. And——

Mrs. LOWEY. To be continued. My time is up.

Mr. HOMAN. You know, you can help me, ma'am. Let's talk about New York state. If I had access to the county jails, if people honored the detainers, I could arrest people in the safety and statute of a county jail. But since I can't, I have to go to the neighborhoods. That is what puts fear in the immigrant community is my officers knocking on doors in their neighborhoods.

If I had access to the county jail, I would have less officers in the community. If I had access to the county jail, I could arrest the bad guy in the county jail and not go to a home where I am probably going to find other people here illegally that I am going to take into custody.

So all these folks that don't want us in county jails, they need to think about how they are putting their communities at risk. Number one, the criminal alien is going to go back in that community, and I don't think the immigrant community wants a child molester or somebody who has been arrested six times for DUI in their communities. I don't. I think they want the communities to be safe, too.

So the more access I have to the jails, the more detainers that are honored, the less the situation you described will be happening.

Mrs. LOWEY. Thank you. Thank you, Mr. Chairman.

Mr. CARTER. Mrs. Lowey, when I was a senior in high school and graduated from high school, on the way to graduation, one of my best friends was stopped for a routine police stop for having a busted tail light. And he had a warrant for his arrest for parking tickets. And they arrested him. And the reason I know this is because the 700 of us in our class took up a collection. And we paid his parking tickets so he could graduate. So that had nothing to do with immigration.

Mr. RUPPERSBERGER. That is a good Texas story.

Mr. CARTER. It is true. And I would give you his name, but he is still alive and he probably doesn't want me to.

Mrs. LOWEY. Is he a judge?

Mr. CARTER. No, he is not a judge, but he is a very prominent guy. Let's see who is next. Mr. Newhouse?

Mr. NEWHOUSE. Thank you, Mr. Chairman and Ranking Member. Also want to thank Director Homan and Deputy Commissioner Wagner, as well as Chief Provost for being here, discussing your budget priorities. I also want to express my thanks to the men and women that you represent and for the efforts that they put forth everyday to keep our country safe, so if you could relay that message, I would be thankful.

Just got a couple of questions. First of all, for Mr. Wagner and Ms. Provost, certainly I believe one of the ways to patrol and protect our borders is through the use of technology. And I think you both have talked about that a little bit this morning, specifically the small unmanned aerial systems, or UAS's, have the ability to

267

support your efforts, both CBP mission and operations, in I think
very safe and practical ways. They can be more effective certainly
than a manned piece of equipment that also can get into environ-
ments where you wouldn't want to send something else that may
be a higher value asset.

So tell me how far off are we where technology and CBP can rap-
idly deploy a UAS to support immediate CBP operations and fill a
significant gap in operational surveillance that exists today?

Ms. PROVOST. Certainly, if I may. First and foremost, from the
Border Patrol side of the house, we are very excited to start pilot-
ing and utilizing small UAS's. And appreciate the funding support
that we received in 2017 and the request we have for 2018, as well.

Certainly this is a tool that benefits our men and women on the
ground. This is something that we have been working on with our
partners in Air and Marine operations for some time. And we have
reached a point where we think these small UAS's are going to be
very beneficial for our men and women on the ground, something
that they can deploy and literally see what is over the next hill,
which of course impacts officer safety and whether or not you know
you have a group of individuals that may be armed or may not be,
so that type of situational awareness for our men and women on
the front line, it is a wonderful tool for them.

For UAS's in general, the larger ones, as well, Air and Marine
operations support us in that venue for detection capability and
they have proven beneficial to us over the years. And certainly it
is a technology that we continue to utilize and continue to request
support for due to the benefits that we have seen in previous years.

Mr. NEWHOUSE. Good, good. Thank you. I also want to note the
critical role at CBP plays in our trade and economic successes, with
the responsibility for the entry of goods in the United States. When
it comes to the implementation of the Trade Facilitation and Trade
Enforcement Act, that is a huge responsibility. I can only imagine
the daunting task, the thousands of containers and trucks and
every other vehicle that comes into our country.

But protecting that fair and competitive environment is very im-
portant. And as you work on that, could you briefly talk about
some of the challenges you see and specifically how we can help
you?

Mr. WAGNER. Sure, I think the challenges are in the volume, like
you mentioned, of goods coming in and trying to sift and sort out
what we would have concerns with and, you know, expediting the
ones we don't have concerns about. And it is trying to strike that
balance between when things get held up for inspection and when
we build a simplified, automated path to enter the country. And
really, that is what we focus on, you know, using a lot of advanced
information, using our national targeting center to build systems to
triage through all of the volumes and reams of information we have
access to and try to point out the things we have concerns with.

Now, how do we come up with better ways to identify what those
concerns are? It is going to be based on intelligence, going to be
based on past practice, practical experience, and information we re-
ceive from either the law enforcement community, intelligence com-
munity, or right from the trade community themselves, as well,

268

and trying to find ways to address what those concerns may be at any point in that process of that container coming to the U.S.

Sometimes it is of such concern we might ask for it to be inspected overseas before it is even put onboard the ship and headed this way. Other times it is going to be at the port of entry we are going to open it and inspect it there. Other times it might be at a different premises where we do that.

So I know there is requests in the budget for additional staff in our office of trade to help with some of the expertise and the rule-making and the analysis of information and regulatory work to be able to do that. So I think it is covered for now in what the budget request includes.

Mr. NEWHOUSE. Okay, yeah. Well, we continue to look forward to ways that we can be of assistance in that. Director Homan, first of all, thanks for your comments about the role and the job of your ICE agents. Appreciate it. It is a difficult task. Sometimes you probably feel like you are sweeping sand into the ocean, but—talked a little bit about some of the concerns that have been raised around the country from some of the previous questions.

And I just wanted to allow you to highlight, first of all, those individuals who have DACA status. And just to be honest with you, I come from an area that many of my local schools, my communities, certainly there is a—I guess you could say a higher level of concern and fear, really, in a large part of the population. So could you possibly give us a little insight into ICE's enforcement priorities as it relates to particularly that DACA population?

Mr. HOMAN. DACA recipients are not a target of enforcement. They maintained their deferred status. There has been reports of us arresting DACA recipients, a few, and in each of those cases, they have violated the terms of their deferred action, which means they committed a crime and did something to violate the status. So we are not as part of our operations targeting anybody in DACA status that is fulfilling their obligation within the deferred action requirements.

Mr. NEWHOUSE. Good, thank you very much for that clarification. Thank you, Mr. Chairman. I yield back my time.

Mr. CARTER. Mr. Cuellar.

Mr. CUELLAR. Thank you, Mr. Chairman. First of all, I want to thank all of you all. I know you all have a difficult job, and I appreciate what you all do. I have had the opportunity to honor Border Patrol agents for the work that they have done, CBP officers for the new customer service that they have been providing. I need to work now on ICE, and maybe we can work on that, Tom.

But I really appreciate your men and women. I know it is difficult. I want to ask a local question, Mr. Wagner, dealing with Laredo. As you know, back in May 21st, less than a month ago, there was severe weather that damaged the World Trade Bridge. The World Trade Bridge, as you know, is the largest cargo bridge that we have in the country. Typically we get 14,000 trailers a day. That is over 2 million trucks a year through the Laredo bridges. And that is over $204 billion. And 51 percent of all the trucks coming into the state of Texas come through one port and that is Laredo.

269

It did—and I met with Hagerson, with Greg Alvarez, and—of course everybody knows Mr. Hagerson. And of course, Mr. Skinner, great leadership that you have down there. And we met with the private sector, see how we can move this along.

What I am asking is, as we try to get the capacity—because we are not at 100 percent capacity—it is going to take a while—I am concerned about the technology and the infrastructure and make sure that FDA is also responsive. But if we are going to rebuild this again, let's do it right. And I am asking you all to—or asking you to see if you can put the latest non-intrusive technology, because if there is any port that brings money to our Treasury, it is the port of Laredo.

So I am just asking you, what are your plans to add the—to put it back into capacity? And what is the—if you can please give us the latest technology that you have there, because I have been hearing that we are not going to get the best technology and like to give you that opportunity.

Mr. WAGNER. Sure, let me check into what technology we have scheduled for the rebuild. It may be a case where we are just trying to get it up and running and get back to restore full operations from that really devastating storm. Thankfully, the port of entry was closed at the time when that storm hit, because it did quite tremendous damage to that operation. And we agree, it is an incredibly important crossing for us, you know, the busiest for truck crossings that we have, and we just can't afford to have it out of operation.

So that being said, we are looking at some new truck screening technology. We are looking at piloting some things a little south of you, down in the valley. But let me make sure we do have a plan to upgrade that.

Mr. CUELLAR. Why don't we sit down maybe later and we can——

Mr. WAGNER. And I will talk with Mr. Higgerson again, because we had spoken last week about what some of those plans involved. And, you know, what is the right technology we can put back into building this out to be a state-of-the-art port.

Mr. CUELLAR. All right, thank you. Chief Provost, let me ask you a couple questions. Air and Marine. My experience with air and marine, with all due respect to the folks who work there, is when we were trying to get an alternative base for one of the UAVs, you know, from Corpus—not taking anything away from Corpus—said find another place, because there was issues—I think they were landing only, what, 60 percent or less in Corpus. They came up, but they ended up 200, 300 miles away from the border. It is not exactly what I had in mind.

Then lately they have been trying to move away from Laredo away from the border. And I keep saying, hey, you are supposed to be at the border. I know San Antonio, and I represent—it is a beautiful place, but try to stay at the border.

Then finally the last thing is, in talking to Border Patrol—and I have spent a lot of time with the Border Patrol, since I live there—they have been—a lot of complaints—I mean, there is a lot of complaints that air marine will work 8:00 to 5:00, but then at night time—and, Judge, you have been there and I have been

270

there—and I think everybody has been there at night—I don't
think it is fair to the men and women in green to be there at night
time and have Air and Marine say, oh, for whatever reason we are
not going to work at night time.

I think if our men are going to be out there at night time, Border
Patrol, then Air and Marine should be providing that support.
Now, Operation Phalanx, which I hope that you all do—and I think
we added the money—I hope that you all do push that—National
Guard is ready to do that, the Texas Guard is ready to do that. But
I just have a problem with the Air and Marine saying they are not
going to do any work at night time.

Ms. PROVOST. So we work very closely with Air and Marine at
headquarters. And we provide a requirement to Air and Marine an-
nually of flight hours that we need across the entire border. And
it is true that they do not have the capability to meet our full re-
quirement.

Of the flight hours that they have, they have consistently over
the years provided the majority of those hours to the border secu-
rity mission and in support of Border Patrol operations. But those
hours have not been able to meet our full requirement. Thus why
it is very important in relation to their requests within the budget,
your support there is much appreciated to assist them in having
more capability to meet those requirements that we have for the
border security mission.

We are working very closely with them. The commissioner had
us convene a working group. We are bringing in our agents from
the field, as well as headquarters personnel, to try to address some
of these issues better. In relation to Operation Phalanx, as you
mentioned, that has been a huge support for us in the past with
National Guard support and certainly benefited us. We are com-
mitted to continuing to work with Department of Defense, if that
meets their requirement, to help support our mission. We will work
with them in that arena going forward.

Mr. CUELLAR. Mr. Chairman, just on the levee, since that is in
my district, can I ask a quick question? I got a few seconds left.

Mr. CARTER. Yes, you may.

Mr. CUELLAR. Okay, on the levee, as you know, that is on my
southern part of my area. Back some years ago, Senator Cornyn,
myself, JD Salinas, the county judge, and myself came up with this
idea about the levee. Now there is some folks who are saying that
FEMA and the International Boundary Water Commission, be-
cause we are looking at this for flooding, they are saying—and
maybe you can provide this information at a later time—they are
saying that all the levee requirements have been met, there is the
flooding requirement have been met. I would like to maybe follow
up, because my time is up, talk to you about the issue of FEMA,
the International Boundary and Water Commission, and of course
then issues with the Valley Wildlife Corridor and the Santa Ana
National Wildlife Refuge, Bentsen-Rio Valley Grande, because we
don't—and the World Birding Center, I just don't want them to be
on the other side of the levee or how we are going to address that
issue on that.

So I know my time is up. I want to be cognizant. But I do want
to follow up on the levee, because I—like I said, we came up with

271

this idea, but now there are some folks who are saying that there is really no need for the flooding rationale. And that was one of the reasons why agreed to that back 8 years ago, whenever that came up with.

Ms. PROVOST. Just quickly—and I will ensure that we come and brief you in more detail on this—just want to, of course, reaffirm that we are committed and we work very closely with IBWC and all of the partners in any location to ensure whether it is environmental, flooding, on the land issues that we work hand-in-hand with them and we are committed to doing that going forward, we will get you a more in-depth brief.

Mr. CUELLAR. If you can have them come in, because they are saying something else. Thank you, Mr. Chairman.

Ms. PROVOST. Okay, all right.

Mr. CARTER. And I have a real interest in that, too, so we would like to be included in that conversation in my office.

Ms. PROVOST. Yes, sir.

Mr. CARTER. Mr. Taylor? I believe it is Mr. Taylor. Mr. Taylor.

Mr. TAYLOR. Thank you, Mr. Chairman. I just want to reiterate what my colleagues have already said, that we truly appreciate all the work that—the hard work that the men and women do at each one of your places, of course. It is thankless. Sometimes you get maligned for just doing your job. And we appreciate you, and I think if laws need to be changed, we should do that, right? You guys just enforce it. So I appreciate you.

Director Homan, a couple quick things on the—when does ICE anticipate obligating fiscal year 2017 funding for expansion of beds? Do you have a master plan that identifies specific locations? And what factors would you use to identify those locations?

Mr. HOMAN. We have been working on the expansion plan. We have—right now we have access to over 40,000 beds. We were actually at 42,000 in detention back in November, I think. We have identified beyond that 20,000 more beds that would be available that we could bring online. But what we are trying to do is, for our ICE dedicated and owned facilities, we would like to expand that. That is a long-term plan, because they have PBNDS 2011 standards. So right now, about 60 percent of our populations are in ICE owned and dedicated facilities, the plan is to get up to like 80 percent by the end of next year.

But we do have about 20,000 beds we have identified that could be turned on. But of course, the biggest issue is they have to be appropriate. They have got to have—good medical care, good mental health care. They have got to meet the standards—at least the U.S. marshal standards. For a lot of these beds that we can bring on are going to be beds. We keep aliens in custody less than 7 days, so standards can be a little bit less than what we have in PBNDS 2011, but we have a plan that we can execute.

Mr. TAYLOR. What is the factors that you use to identify locations?

Mr. HOMAN. We try to get as many as we can near the southern border, because it is easier for the quick removals and it is more cost-effective to remove somebody from Texas. Right now, we are trying to build a hub and spoke model. We are working with some contractors on doing the hub and spoke model. You know, we need

272

beds in New York, because we arrest people in New York, we arrest people in every major metropolitan area.

But we got to get them more hub and spoke, so we get people to a transit site. So when we do removal flight, instead of flying to eight different locations to pick people up to remove them, as they get closer to the removal process, we go to a hub and remove them from the hub. That is something we are currently drawing up the plans on now.

Mr. TAYLOR. One quick follow-up on the use of the GPS bands that use to monitor. Are they effective, efficient and will they replace the need for some beds, as well?

Mr. HOMAN. Detention is always best if you want removal, because if we have custody of them and they get order removal, we can remove them. Ankle bracelets can help make them accountable to show up in immigration court. But in the end, if they choose to cut the bracelet off, we have to go find them, and many times we don't find them.

So I will say, detention is always the best if you want a removal. I mean, it just makes sense. Ankle bracelet is the second best option. So we certainly do—we are over 70,000 ATD people now, so it is certainly an alternative for those we can't detain. Maybe have a health issue that we can't address in detention and we will release them on ankle bracelet. And let's say, it has got good response rate for showing up in immigration court. But when it comes to removal, it is much less than the detention.

Mr. TAYLOR. Thank you. Chief Provost, quickly, when I was down at the border recently, I saw about six or seven different types of fencing or wall throughout the different—you know, the border. And with the exception of, of course, Mr. Cuellar's area, with McAllen with the levee in it, is there sort of a standard practice now or desired fencing? Because some of them, of course, were very easily penetrated and some of them were not. Is there a best practice, best standard that we are going to use moving forward?

Ms. PROVOST. So I believe you saw the product of numerous years and various attempts at different barrier systems, and depending upon funding and all different things throughout the years. Of what we currently have in our toolkit, the steel bollard wall is a preferred wall. And as the prototypes come out, we support innovation—as I said before, the wall that we put in, for instance, the secondary wall in San Diego, when we put it in, worked at that timeframe, but they have—the TCOs have become more advanced, more advanced technology—makes it easier to breach. So we look forward to seeing what comes out of the prototypes and if we can add to that toolkit for options, since the border is very different and different areas require different type of barrier.

Mr. TAYLOR. Thank you, Mr. Chairman.

Mr. CARTER. Mr. Ruppersberger.

Mr. RUPPERSBERGER. Yeah, I want to thank you all for being here. And it is a shame that you have to defend a lot of these things that are occurring in our country. I blame Congress for where we are right now. Our Senate passed an immigration bill without amnesty, and we couldn't get it on the floor in the House. So we have to keep trying, because this issue is splitting our country.

273

And we know a lot of the things that are alleged to have happened isn't who we are as Americans. But I really respect the fact—I was a former police officer when I was going to law school in Ocean City, Maryland, in the summer. I was a prosecutor for 9 years. So I understand law enforcement and where you are. And you have to stand behind your people, and they are putting their lives on the line. They are in dangerous situations. And you have a mission. And you have bosses. And the boss you have right now is the President of the United States, who won his election a lot on the visual wall issue, where Mexico was going to pay. I don't think that is going to happen.

And, you know, we all know that there are other—there is other technology that can do a lot better than a wall in certain situations and a wall might work or not work. But I want to get into this and get to the port real quick, because I represent the port of Baltimore.

Where a lot of these problems are, and I think if I was advising this President, is with what you have to do, it is—you have a reputation as bad guys coming to get, breaking up families, you are doing what you think is your job, because you are being ordered to do that. If I was advising the President, I think he could help bring this country together by saying that we are going after the bad guys, and that is what you have said.

And yet my office—and I am sure other offices—are getting complaints that if you have a DWI and you are arrested, you are gone, and your family can stay here. You are breaking up families. And DWI or traffic is not really considered to be the type of people that I think are hurting our country.

And so I want to ask you this—and then I want to get to the port—as far as we are concerned on ICE, what is your exact policy? If you pick somebody up who has a DWI, is that enough to have them taken away, put in jail, and sent back to their country? What is the policy?

Mr. HOMAN. If they are illegally in the United States, yes.

Mr. RUPPERSBERGER. Everybody is illegal. There are 11 million. So that is an issue you can use on every time you arrest somebody. What is the actual policy? Because——

Mr. HOMAN. If someone has a conviction of a DUI, I consider them a public safety threat and they should be removed.

Mr. RUPPERSBERGER. Okay, so that is the policy? How about a traffic violation?

Mr. HOMAN. That is less of a priority, but if they are in a country illegally, they should be removed if they have had the due process.

Mr. RUPPERSBERGER. There are 11 million illegals in this country. So that is not going to ultimately solve the problem. But I don't think that is your problem, because you have been hired to enforce. And I understand that. And again, I feel that you shouldn't be defending it. I mean, we are the policymakers. The President is the President of the United States. And I am saying this. I respect that you have a job and a mission, until you are told otherwise that you have to move forward with that.

Now, you do have an obligation as the boss to make sure—and same if you are a police chief or sheriff or whatever—that your people, when you have the power of arrest, that you do it the right

274

way, that you are not abusive or anything of that nature. That is
your mission right there and you have to do that, and I understand
that.

So I just want to say this, that, you know, Congress has to do
something. Eleven million illegals in this country, we are not
going to have everybody leave. I mean, and how we handle things,
we are going to be judged down the road. And the quicker that we
can resolve this, the better. But that is not your issue.

But let me get to the port of Baltimore——

Mr. HOMAN. Sir, can I address one comment you made? The one
comment you made, which I hear all the time is, ICE separating
families. When an American family, U.S. citizen family, when
someone gets arrested, that family gets separated by law enforce-
ment. It isn't the fault of law enforcement that people get sepa-
rated. It is the fault of the perpetrator.

So if someone entered this country illegally and knows he is in
the country illegally, and is found to be in the country illegally, or-
dered removed from the country, and chooses to have a child in
this country that is a U.S. citizen by virtue of his birth, he put him-
self in that position. So ICE is not separating that family.

If we allow every illegal alien who entered this country and give
birth to a U.S. citizen, and all of a sudden now we can't separate
families, he gets to stay, then you lost control of the border.

Mr. RUPPERSBERGER. You are doing your job. I understand that.
It is up to us to decide where we are going as Congress. And we
have not been able to follow through on this.

Politically, look, unfortunately, we have a lot of politics in this
country. We are split. I hope my—I try to be partisan—I mean, bi-
partisan—and I think, really, you should be American first and Re-
publican, Democrat second. On both sides of the aisle, we are not
real good at that at this point. And this issue has to be resolved.

And let me get to the port real quick. You know, there are other
areas other than the southern border. And I agree that we must
be able to work and protect our borders, as all countries need to,
and that is for the safety of our country. Now, there are other
ways, though, that illegal drugs, arms, contraband, and even weap-
ons of mass destruction can come in. I know that there are 47 mil-
lion 20-foot containers that are processed through American ports
on an annual basis. That is a lot. And this opens up the oppor-
tunity for bad guys to bring in a lot of serious issues that we have
there.

Now, again, I represent the port of Baltimore, which every port
is a huge economic engine for wherever they are located. And the
coastal ports right now are coping with severe shortage in Customs
and Border Protection agents. And it is compromising security, re-
ducing throughout and limiting hours of operation.

Now, I have been told that in order to maintain full service at
the port—say the Port of Baltimore, that I represent, we will need
to subsidize homeland security for additional personnel. And these
agreements are being negotiated through the reimbursable services
program known as 599 program. I don't know if you are familiar
with it or not. Okay.

Now, in my opinion, this is an unreasonable request. Transfer-
ring these costs for the federal government to the state and local

275

governments I think is outrageous. You know, we swore an oath to protect our Constitution and defend our country. That is what the federal government does. That is why we pay federal taxes.

And when we pay these taxes, we expect protection from our federal government. Now, your agents have the experience to thwart terrorist attacks better than probably state and local, maybe—I shouldn't say that. Maybe they are good at it, too. But we need you there. We need to have your expertise.

The President's budget request more than $300 million to assist Customs and Border Protection to staff up. However it is unclear where those agents are going to be assigned. I believe all ports should be staffed on a fair and level playing field, and the Port of Baltimore is seeing major growth, especially with the Panama Canal issues that are happening.

My question. Can you clarify how much of this supplemental funding will go towards additional Customs and Border Patrol staff at domestic ports, specifically ports that are expanding, since the reopening of the Panama Canal? Number two, is there available equipment which could effectively—and Cuellar got into this for a while—could be a force multiplier? In other words, what technology do you need so that we can make do with fewer agents?

And I know there is technology, like with the containers to try to find out if there is nuclear weapons or those type of things.

Mr. WAGNER. So there is no—in the 2018 budget request, there is no increase in staffing for the ports of entry. We are currently operating at about 1,400 vacancy rate based on the positions that were provided to us in 2014, the 2,000 extra. That is based on our workload staffing model. That is an annual assessment we do of the workload and how many hours it takes to do that work.

There is still a current shortfall above and beyond the 1,400 of about 2,500 positions based on that workload assessment. So we are in agreement on the need for staffing. We are in agreement that we have a large number of vacancies that we are trying to fill right now. And we need to fill those before we can come back and ask for more above and beyond that. We need to do a better job at filling those vacancies.

Now, as far as the reimbursable services agreements, what those allow us to do is to provide services above and beyond what we are already providing. So if an entity comes to us and says, we would like expanded service at this location for this purpose, what would it cost us to pay the overtime of the officers to be there to do that? It allows us to provide that cost to see if it fits in with that business entity's operating model.

Mr. RUPPERSBERGER. And that is my rule. I believe that should be the federal government paying for it. But I understand that is not your call. You need the money and you are just implementing.

Mr. WAGNER. Right, it is just a way for us to——

Mr. RUPPERSBERGER. It comes back to Congress again.

Mr. WAGNER. It is a way for us to expand the service that we probably have to deny, just because we can't stretch the resources that far.

Mr. RUPPERSBERGER. I understand.

276

Mr. WAGNER. And then as far as the equipment, let me get back to you on what we have on the Port of Baltimore and what we have got lined up for there.

Mr. RUPPERSBERGER. Okay, got it. Make sure you get back.

Mr. WAGNER. I will.

Mr. RUPPERSBERGER. Okay, got it. Thank you. Yield back.

Mr. CARTER. Palazzo.

Mr. PALAZZO. Thank you, Mr. Chairman. And I just want to echo the comments made by many of my colleagues thanking you for your service and your sacrifice and trying to keep American families safe and enforcing the law and maintaining integrity. I think that is an awesome and expected approach from your organization.

Can I ask—and this is in general for any of the three—what is—when I was on the homeland security authorizing committee, we talked about operational control. What percentage of operational control do we have on our borders at this time? I think it was below 50 percent a couple years ago, but I am not sure.

Ms. PROVOST. So the Border Patrol over the last couple of years had moved away from operational control to a risk methodology, where we began looking at the border as whether or not an area was low, medium or high risk. Kind of building from where we used to work off of OPCON. As a whole, from the Border Patrol perspective, we are at a medium risk across the southwest border. Each different AOR falls into a different area.

Mr. PALAZZO. So what actually does the medium risk mean? I mean, you know, you are missing 50 percent of all crossings or what——

Ms. PROVOST. It is a mixture of quantitative and qualitative, so we look at numbers, of course. And similar to—as Chairman Carter stated, when we talk border security, and operational control of the border, it isn't just immigration flow, illegal immigration flow. There are many other factors in there. So we take those——

Mr. PALAZZO. And can you expand on that? That was another question I would have is, what are the types of threats crossing our border? I mean, we always seem to be thinking of the people coming across to work in nurseries or, you know, to find jobs in some form of agricultural community. But what are some of the other threats that we as Americans should be aware of? And that is why we need to secure our border and protect Americans and our families.

Ms. PROVOST. So we have many criminal aliens, meaning individuals who have beyond—to Mr. Homan's point, the fact that they are violating the law by entering the country illegally, they have committed some other crime, as well.

So those individuals, of course, are our top priority for us if we come in contact with criminal aliens to get them prosecuted and properly removed.

Mr. PALAZZO. So there is drug trafficking, there is sex trafficking——

Ms. PROVOST. There is drug trafficking.

Mr. PALAZZO. There is gun trafficking.

Ms. PROVOST. Yes, sir.

277

Mr. PALAZZO. There is all kinds of threats coming across our border. What about foreign nationals and possible people that are, you know, may want to do us harm? Have you all apprehended any?

Ms. PROVOST. We have. Those numbers are small. But that is something that is a top priority for us. And we work very closely with our partners at ICE and DOJ, Department of Justice, as well, when it comes to any individuals of specific interest there, yes.

Mr. PALAZZO. You mentioned—so there is authorization and appropriations for 5,000 additional agents. And you mentioned hiring surge. How long is it going to take your agency to advertise, identify, vet, train 5,000 additional agents?

Ms. PROVOST. That is a very good question. And of course, for fiscal year 2018, we have asked for funding to support the hiring of 500 additional Border Patrol agents. Similar to what Mr. Wagner stated, we are below where we had been at our highest level, with our 21,370. We are down about 1,800 agents right now.

So that with an additional 5,000 is going to take us a little bit of time to do. But we are ramping up our recruitment and our hiring efforts, have been working very closely with our human resource management team and some of the funding that you all have provided has been supporting that effort.

It is a top priority for us to ensure that we get the best quality people and ensure that we have no lowering of standards. So it is going to take us a little bit of time to do that. Five hundred is a good start for us in fiscal year 2018.

Mr. PALAZZO. Thanks, Chief. And one of the reasons I asked that is because I know that the National Guard has been utilized on past occasions. And I think the National Guard still has probably an active role, and I think it started with Operation Jumpstart, with President Bush, and then President Obama also added additional National Guard members.

And I think when you said surge, I am thinking the surge that we did in Iraq and Afghanistan with National Guard troops. And we were extremely successful in turning the tide of the war in both of those countries. And I see in the Guards, what, 400,000 people in the National Guard, 300,000 in reserve component. I see a resource just sitting there for you to—I mean, I know they can't do law enforcement functions, but they can do everything else. They can do intelligence, surveillance, reconnaissance. They can do vertical and horizontal construction.

I mean, I think that is just a huge augmentation that is sitting there, ready and waiting, and all you have to do is ask.

Ms. PROVOST. They certainly have supported us in the past. And they currently support us in many fashions. To your point, ultimately, we need to get to where we have the Border Patrol agents with that law enforcement capability on the border to be able to reach that operational control we are talking about.

Mr. PALAZZO. Right. And that is the long-term solution. And I would just like to continue to argue, look at the National Guard. I know whether it is Air or Army National Guard or any state, you would have thousands of people volunteering immediately to come down there and to help secure our border in any form or fashion. And because they have served overseas and they are willing to protect Americans here at home, as well. So, thank you.

278

Mr. CARTER. Mr. Price.

Mr. PRICE. Thank you, Mr. Chairman. Welcome to all of you. Mr. Homan, I would like to focus in on the question of enforcement priorities and what kind of discretion the agency has in determining whom to detain and deport.

I have supported efforts for years. And at one point I was chairman and then ranking member of this subcommittee, supported efforts for years, like the priority enforcement program that utilizes what we acknowledge are limited immigration enforcement resources to prioritize individuals who have committed serious crimes and who pose an immediate threat to their communities.

And I am not saying that provides a free pass to anybody, but it does assume that the discretion that you have will be exercised in this direction. President Trump has said much the same thing, that he wants to focus on deporting dangerous criminals. But I would say there is a good deal less focus in the actual way enforcement has gone.

I understand earlier this morning you said that the budget will allow you to interpret—to implement Trump's enforcement priorities. Maybe interpret is the right word. We maybe need a reiteration of what you take those priorities to be.

According to your own recently released data, 21,360 immigrants were arrested from January through March. That is an increase of 32.5 percent from the same period in 2016. The arrest of immigrants with no criminal records more than doubled during this timeframe. In the Atlanta ICE field office, which covers my state, there were nearly 700 arrests of these immigrants with no records, as compared to 137 arrests during the same period in 2016.

So even at this accelerated rate, deportations are only a fraction of the millions who are here illegally. There will always be that situation. Therefore, priorities must be set. Discretion, whether recognized or not, will be exercised.

The President has said there will be priorities. Yet I am baffled by Secretary Kelly's portrayal of the department's action, as if he had no discretion whatsoever, that he is simply following the law. He got pretty defensive about this. I am quoting him here. "If lawmakers do not like the laws we are charged to enforce, that we are sworn to enforce, then they should have the courage and the skills to change those laws. Otherwise they should shut up and support the men and women on the frontlines."

Believe me, Congress isn't trying to antagonize the secretary. We are simply acknowledging, as we have ever since the beginning of this department, that discretion exists, discretion is necessary, discretion is being used. What we want to know is how. Isn't discretion of some sort inevitable? We are not going to deport every immigrant. What can you tell us about your current guiding criteria for the exercise of discretion? What is your order—what is the order of removal strategy? And if you and the secretary believe Congress must, quote "change the laws" to give you discretion, what do you suggest we do?

Mr. HOMAN. Well, as I testified earlier, the priorities within the executive order are listed. We prioritize criminals and national security threats first. Then we look at fugitives, those who entered the country illegally, been ordered removed by an immigration

279

judge—which means they have had their day in court and their due process—have been ordered removed by a federal judge, and they fail to depart. We call them immigration fugitives. They are someone that are also a priority, which weren't a priority in the past administration, unless they became a fugitive after January 1, 2014. And that took over 400,000 people off the table who had their day in court that we basically weren't looking for.

Also, those that have been ordered removed were removed and re-entered to the United States, which is a federal felony. They are also priorities. The aperture is open, so when we find illegal aliens, first of all, we are not out doing sweeps or raids looking for illegal aliens. We go out looking for the targets I just described to you, but if we find somebody here in the country illegally, we are going to put them in front of an immigration judge. That is our job. And I think it is the right thing to do.

As far as the numbers you quoted, there has been a significant increase in non-criminal arrests because we weren't allowed to arrest them in the past administration. We were arresting criminals, so you see an uptick in criminals a little bit. Moderate. But you see more of an uptick in non-criminals because we are going from zero to 100 under a new administration.

And when we talk about non-criminals and criminal aliens in the United States, most of the criminal aliens we find in the interior of the United States, they entered as a non-criminal. If we wait for them to violate yet another law against the citizens of this country, then it is too late. We shouldn't wait for them to become a criminal. But once they do, we will prioritize them. But non-criminal enforcement is important because if there is no consequence to illegal activity and entering this country, as long as you can get by the Border Patrol, the fine men and women of the Border Patrol—I served them, honored to wear the green a long time ago—we can't send the message, get by the Border Patrol, get in the interior, as long as you don't go break another law, you are home free? Then you are never going to gain control of the border.

Mr. PRICE. But that—by that standard, you are talking about every immigrant in the country without papers.

Mr. HOMAN. As I said earlier, if you are in this country illegally and you committed a crime by entering this country, you should be uncomfortable. You should look over your shoulder. And you need to be worried.

Mr. PRICE. So what is this prioritization of people who have committed serious crimes? What does it mean? Does it mean anything?

Mr. HOMAN. Absolutely. We still prioritize criminal national security threats. And what we are saying is, but no population is off the table. When you start taking entire populations off the table, then you have destroyed the foundation of law enforcement.

I mean, if we don't enforce the law, then that is not the country I grew up in, sir. If you violate the law, you should be held accountable. And the reason Congress passed laws is to protect this country. And like I said, if we don't—we are a sovereign country. We need to decide who comes in and out of this country. If we don't hold people accountable for entering this country illegally, then what are we all doing?

280

Mr. PRICE. Well, this isn't a question of securing the borders. I think we agree on that premise. It is a question of how our enforcement resources, limited resources—actually, pretty severely limited resources, when you consider 11 million people here without papers—you know, how are those to be deployed? And are we to set any priorities at all in terms of the danger to the community posed by certain classes of individuals?

It seems to me you are saying both things here. You are saying, yes, we are prioritizing those dangerous folks, but by the way, we are going after everybody.

Mr. HOMAN. I mean, we do prioritize who goes first, who should we look at first. Prioritization doesn't mean, okay, here is what we are looking for and everybody else forget about. We look for these people first, but these people should be on the table.

I mean, it is meaningful enforcement. We do prioritize. The numbers speak for themselves. But if we are really serious about criminal aliens and making sure we get them off the street, then Congress can certainly help me dealing with sanctuary cities that don't want to help us with criminal aliens, give me access to jails that don't want to help me remove criminal aliens, and doing things that helps me put the men and women of ICE—put them in a safer position. Rather than the arrest of the illegal aliens and criminal aliens in a county jail, in the safety and security of county jail, they have to go knock on a door.

And it is only a matter of time before one of the men and women of ICE don't go home at night because they had to go arrest a criminal alien in a home rather than getting them in a county jail in a sanctuary city that the sanctuary city is—are a danger to the men and women of ICE. And so you can certainly help me if we want to target more criminals. Congress is certainly positioned to help me do that.

Mr. PRICE. These are limited resources. These are hard choices, I would grant you. But it seems to me over the years there has been a bipartisan agreement for the most part that people who pose a danger of the community should be on the priority list for enforcement, for detention, and deportation.

And the notion that, on the other hand, everybody is a danger, you seem to be suggesting that it is almost an indiscriminate danger posed by the entire immigrant population, then you are talking about for every dollar that is diverted toward that larger population, you are talking about a dollar that is not spent going after dangerous people. And so governing is about hard choices. And we are looking for some specific indication of how you are making those choices.

And if the law needs to be changed to address your priorities, then how should we change it?

Mr. HOMAN. First of all, I want to be clear, we do prioritize criminals and national security threats. We prioritize. Which means they are more important to us. They come first. But prioritization doesn't mean everybody else is off the table, we don't take any action. There has to be enforcement of immigration law on the borders or we are going—you can't argue with the fact that—that the operational tempo we have right now has had a sig-

281

nificant impact on illegal immigration on the southern border. It is working.

I have been doing this for 33 years. If there is not a consequence to deterrence the illegal activity is not going to cease. We finally have that and it is working. So we do prioritize criminals and national security threats, but again, when you enter this country, sir, illegally, you are violating the laws of this country. It is a crime. You need to be held accountable.

We will certainly make sure they get their due process. They will see a judge. We spend billions of dollars a year on border security, detention, immigration judges, attorneys. And at the end, when a federal judge makes a decision, that decision needs to mean something or the whole system has no integrity. That is what I am trying to explain. So prioritization absolutely does happen.

As far as legislation to keep the men and women of ICE safer, in my opinion, sanctuary cities are a danger to law enforcement officers. It is a danger to communities. Jails that don't honor our detainers. Jails—Cook County, Chicago, Chicago has significant criminal rates right now. It is the history of this city. They got—crime is running rampant. Are they doing everything they can to solve their crime issue? No. Why not? Because ICE officers, federal law enforcement officers aren't allowed to enter Cook County jail.

Federal law enforcement can't walk into Cook County jail to talk to somebody that is, number one, illegally in the United States, committed a crime entering these United States illegally, and committed yet another crime against a citizen, and my officers aren't allowed to go in the jail to apprehend that subject so he doesn't go back on the street to reoffend. Recidivism rate runs around, what, 40 percent to 55 percent. They are going to reoffend.

So there are certainly things Congress can do to help me keep the men and women of ICE safe, keep our communities safe, and drive down the crime rate.

Mr. PRICE. Mr. Chairman, I am sure my time is expired. Sanctuary cities, as you know, is a very loose, porous term that applies to lots of situations. Let me just say that if the idea is that ICE should have access to knowledge and access beyond just knowledge, to people who have committed serious crimes who are being released from our penal system, then you get no quarrel from me and I think from most people.

But if you are suggesting that in various other ways local law enforcement needs to be the long arm of ICE, you know as well I do that will compromise their access and their work with local communities. It will make their job infinitely more difficult. And there is plenty of good law enforcement to that effect.

Thank you, Mr. Chairman.

Mr. CARTER. Thank you, Mr. Price. I am going to go to Mr. Culberson next. And I am going to have to surrender the chair to Mr. Culberson. I have got to leave. We have gone over. Everybody but Mr. Fleischmann has gone over our 5 minutes today. And I intended that. You are a very important part of what we do in this department. And thank you for what you do, all of you. I can tell you from experience of 35 years that it is dangerous for an officer to approach a resident. In fact, I believe more officers are killed or injured going to domestic disturbances than probably any other sin-

282

gle events, when they are just fighting in the house, and yet the
officer gets killed.

And so when you make it unfortunate that the only way they can
do their job is go interfere with families, they are at higher risk
sometimes than any other place where they go and do their job.
So—in defense of what Mr. Homan is saying, I agree with him.
And it makes absolutely no sense to me over my experience of mul-
tiple jails that I had oversight over, that they don't allow people to
interview in jails.

But that is a different question. And I wanted to end by saying
I agree with everything you had to say. I have got to go. God bless
you. Thank you for what you do.

Mr. Culberson, thank you.

Mr. CULBERSON [presiding]. Thank you, Judge.

Director Homan, Commissioner Wagner, Chief Provost, I want to
thank you on behalf of the people of the United States for your
service in protecting us. Director Homan, you are exactly right. We
are a nation of laws. And if the law is not enforced, if there is no
consequence to illegal activity, there is no way to get it under con-
trol.

I am reminded of the very first inscription on the first coin ever
minted in the Republic of Mexico was liberty and law, because our
liberty does depend on law enforcement. And deeply appreciate the
commitment of each and every one of your officers have to keeping
us all safe by enforcing the law.

And a great example of that is the fact that I have seen just from
the President's open and very close direction that the law is going
to be enforced and the border secured that I have seen numbers
that illegal crossings have declined by as much as 70 percent since
January. Is that accurate?

Ms. PROVOST. Those numbers have declined dramatically. The
lowest numbers we have seen in several years.

Mr. CULBERSON. It is encouraging that the President's executive
order—that the border will be secured and the laws enforced and
that countries that refuse to issue travel documents to people that
are in the United States illegally that are going to be deported,
that countries that will not issue travel documents to those individ-
uals, that that is going to be a pre-condition to any negotiation or
discussion with those countries.

And I heard you mention, Director Homan, that there used to be
23 to 24 recalcitrant countries, and that is now down to about 11,
just enforcing the law, just common sense. Works.

And the definition of sanctuary cities is actually very clear cut.
There was a law passed, David, in 1996 that the—was passed for
the specific purpose of stopping sanctuary cities from shielding peo-
ple in the country illegally. It is title eight of the U.S. Code, section
1373, and it says in pertinent part that federal, state or local gov-
ernment entity or official may not prohibit or—and here is the key
part—in any way restrict sharing information about people in their
custody, their immigration status, with federal authorities.

When Kate Steinle was murdered last summer, it affected me
and I know everyone in the country very, very deeply. I chair the
Commerce, Justice, Science Appropriations Subcommittee. Have
worked for years to see that our border is secured and our law is

283

enforced. And when I discovered 1373, I worked quietly and very effectively with Attorney General Loretta Lynch—and this is not widely known—but I persuaded her last summer to change Department of Justice policy last July, and the Department of Justice issued new guidelines that they notified—DOJ notified every county, city, and state in the country that if they did not comply with 1373, they were considered a sanctuary jurisdiction and they would forfeit all their federal law enforcement grant money.

Mr. PRICE. Will the gentleman yield?

Mr. CULBERSON. Yes, sir.

Mr. PRICE. I understand very well what is in the law. And I understand very well the obligation of local jurisdictions to share information with immigration authorities about criminals who have been in custody who are being released. And the whole origin of the focus on dangerous criminals, you may remember years ago came when we found that tens of thousands of people were being released from America's prisons at all levels without immigration even knowing who they were. This was with—I remember ICE Commissioner Julie Myers' testimony and the aftermath of that, this was the beginning of this effort.

But when I say sanctuary cities is a very porous definition, I am referring to some pretty significant experience in the state of North Carolina and other places where people use that term to cover all sorts of exercises of discretion by local law enforcement that local law enforcement testifies very convincingly that it needs.

Mr. CULBERSON. Yeah, we are not talking about making local law enforcement that arm of federal law enforcement. And specifically this is a very narrow and precise definition that local and state jurisdictions cannot interfere in any way with sharing information with federal authorities about illegals in their custody.

So I made certain that the previous administration, Attorney General Lynch, changed the Department of Justice's federal grant policy and notified every jurisdiction in the country that unless they comply 100 percent of the time with 1373, that they would lose their eligibility for federal law enforcement grants and that policy with all the jurisdictions were notified last summer. They had a chance to cure it. They did not do it.

And when the new administration came in—and frankly, one of the principal reasons that President Trump won the election was his promise to the country that our laws would be enforced, our border would be secure, our nation will be respected again, that the flag, our men and women in uniform and the military and our men and women in uniform in law enforcement will be respected.

Law enforcement is the foundation of all our liberties. And the Department of Justice inspector general at my request certified the top 10 sanctuary jurisdictions in the country, which includes the entire state of California, so this summer, the state of California will lose a minimum of $68 million, $69 million in federal law enforcement grant money, unless they repeal their state law shielding illegal aliens in state jails, in state prisons in California.

The state of Connecticut will lose all their federal law enforcement grant money this summer unless they repeal their law. New Orleans already changed their policy. As you said, the recalcitrant countries that refused to issue travel documents have already

284

changed their policy. New Orleans has folded, and they have changed their sanctuary policy.

Miami-Dade changed their policy, so they agreed that if—they didn't want to lose the federal money. New York City will lose $15 million this summer. Philadelphia will lose $1.7 million this summer. Cook County will lose a minimum of $3.7 million this summer. Milwaukee will lose about $1 million. And Clark County, Nevada, will lose $1.7 million.

Receiving federal money is not—you know, receiving federal model is optional. And the policy that I was able to institute as chairman of the CGS Subcommittee and that President Trump and Attorney General Sessions and the President of the United States have now broadened to homeland security grants, as well, if you want federal money, follow federal law. It is very simple. We do this with our kids. My money, my rules. This is very simple.

So, Director Homan, I wanted to ask you. I have given you a copy of the memo that I am prepared to list the initial 10 sanctuary jurisdictions that I already had certified as ineligible for federal law enforcement grants. Under the President's executive order, how many additional jurisdictions are you—do you believe that you could identify that are in violation of 1373 that would no longer be eligible for federal law enforcement grants or homeland security grants?

Mr. HOMAN. I don't have that number in front of me, but I think it is well over 100 that have some sort of policy where they don't honor detainers or allow us access to the jails. I have to get back to you on the exact number.

Mr. CULBERSON. And you are in the process of identifying those right now so that they could be certified by the attorney general?

Mr. HOMAN. Yes. We got what we call the declined detainer report, which was a requirement through the executive order that we started. We pulled it back because there was some data issues with it. We have been meeting with the National Sheriff's Association the last few weeks. We are really close to a final product. And that will help us identify those jurisdictions that don't cooperate.

Mr. CULBERSON. And it is important to note that the California judge that blocked temporarily President Trump's executive order on enforcing our immigration laws, who was appointed by President Obama, this judge in California explicitly upheld the ability of the administration to enforce section 1373, this law that the attorney general, at my request, used to certify these initial 10. There is about—you say 100 sanctuary jurisdictions that you are working on right now to—if I could, as soon as you have that list available, if you would share it with me, I would be grateful, because I will be sure to help you expedite the certification of those jurisdictions so they don't—it is their choice.

If they want to shield criminal illegal aliens in their custody from being deported from the United States, don't ask for federal money. Those days are over. You cannot receive federal money and shield dangerous criminals from being deported. I very grateful to you for the good work that you do to protect people of the United States and your officers and doing all that you can to help ensure that there are no more Kate Steinles. It means a great deal.

285

Mr. HOMAN. Thank you very much for the comments and thank you for your work, but I would be remiss if—it is not really me. It is the 20,000 American patriots that work for ICE that put their lives on the line every day to uphold the laws of this country. So thanks to them.

Mr. CULBERSON. We deeply appreciate each and every one of you. And we have got your back. Thank you very much.

Dr. Harris.

Dr. HARRIS. Thank you very much. And also, you know, thanks to you as members of the law enforcement community of the United States, you don't get as much appreciation some days as you deserve.

Acting Director Homan, I think I will leave the committee and write a letter to the President suggesting they take the word acting from in front of your title, because you obviously have a command of what needs to be done. And I see—you know, you are a former law enforcement—local jurisdiction, I guess New York City I think it said in your biography.

In your mind, is there this dichotomy between the way the rank-and-file law enforcement want to think about cooperating with ICE and the way the political leadership does? You know, I am in a jurisdiction—my resident county executive decided he wants to be a sanctuary jurisdiction. So he doesn't want to cooperate with local ICE. And I agree with you, I think that makes it more dangerous.

But I understand the political grandstanding. I get it. At the local level, when you talk to the men and women who are out on the streets every day trying to protect us, trying to protect Americans, do they also resent interacting with ICE? Or do they actually welcome the fact that there is some part of law enforcement that they are entrusted with, there is some part you are entrusted with, and that the cooperation should exist between those two?

Mr. HOMAN. I can't speak for every street cop. I was a law enforcement officer, patrolman, not New York City, upstate New York. However, in my 33 years, the officer on the street wants to work with ICE. When they run into someone that is a criminal, a threat to the community, if they have an option of removing that threat, not only from the community, but from the United States, most law enforcement officers want to take that opportunity.

And I will tell you, even though there are some restrictions in some counties and some cities about cooperation, I can tell you for a fact we have—we are working with some sheriffs and some chiefs and not on record, but they may not honor the detainers, but they are going to call us before they release somebody. They are trying to do the right thing out of really tough situations.

So I think a law enforcement officer, to want to go into a life of law enforcement and put a badge on your chest every day, I think the rule of law means something to these people. And——

Dr. HARRIS. No, thank you. Look, I agree with that. Everyone knows—I mean, I am the son of immigrants. My parents came to this country because it was the country of the rule of law, which separates us from a lot of other countries in the world.

Mr. HOMAN. And many of my law enforcement officers came in as immigrants or they are children of immigrants, but they did the right thing. They followed the law. They become citizens. And that

286

is all we are asking. I mean, the country I grew up in, law enforcement was respected and revered. And the constant every morning reading in the press about ICE officers and separating families and putting fear in communities, it is unfair to the men and women that chose to serve their country.

Dr. HARRIS. Sure. No, you know that Gustavo Torres, you know, over at CASA, basically said you terrorize people. I mean, basically called our law enforcement terrorists. It is stunning, just stunning to me. I want to thank you. Again, thank you for the service and the service of the men and women who serve under you.

You know, with regards to this idea of dangerous criminals, not dangerous criminals, gee, if somebody gets caught drunk driving, maybe we should just look the other way. You are aware that according to the CDC study in 2011, you drive drunk 80 times before you are caught, 80 times. So in fact, someone who is in this country illegally who is caught drunk driving has probably threatened Americans 80 times by getting behind the wheel. And this is CDC. This is not made up.

That is someone who came to this country and decided to repetitively break the law. And I am just going to disagree with the people who think that we should someone turn the other way, because that is a minor crime of some kind. It is not. It might be minor until they kill someone. And then all of a sudden, you know, it is too late for the outrage.

Mr. HOMAN. Two points. I hear a lot of folks say, well, it is just a misdemeanor compared to a felony. Well, look, if I had my choice, I had someone who committed a white-collar bank fraud that is a felony or someone that committed a public safety misdemeanor, the misdemeanor is more important to me to get them off the street, first of all.

And second of all, people say, well, it is just a misdemeanor. It really doesn't mean anything. Well, that depends on what side of that misdemeanor you are on. If you are a victim of that misdemeanor, if you are a victim of identity theft or theft of your vehicle or assault, that is a misdemeanor, if you are a victim of that, if you are on that side of that misdemeanor, it is certainly meaningful.

Dr. HARRIS. And not only that, I would offer that people who commit serious crimes aren't always arrested for the serious crime. I mean, that is the broken window policy in New York. I mean, you have to—if you want to eliminate crime generally, you have to have more or less a zero tolerance. And I appreciate that you are going to have that.

Now, I do want to end on just one topic. This idea of sanctuary campuses. Because, you know, just to extend what Mr. Culberson has talked about, you know, jurisdictions that take federal dollars and then choose not to cooperate with federal law enforcement, obviously we have this issue now of these universities who issue fairly global statements, University of Pennsylvania, you can go—you can search it online, just basically say, look, we are not going to allow ICE on campus, basically.

And it doesn't say only to go after someone who is a DACA or a potential DACA. It is just, no, they are not allowed on campus. So I have a question for you. Where else are you not allowed to go,

287

which is a relatively public place? I mean, it is just curious that, you know, these urban universities, they spread over large parts of—so there are zones where you are not allowed to actually physically be present, according to their policies? Are there other places in general where you are not allowed to be?

Mr. HOMAN. Well, sir, as far as campuses, if they want to call themselves sanctuary campus and won't allow us to go arrest a public safety threat, national security threat, then we will just get a warrant to go on campus anyways.

I have seen a lot of media reports where schools are—you know, high schools and elementary schools are going to create a policy where ICE is not allowed to arrest anybody on campus, that is where the mixed messaging is coming from. We don't arrest people in schools, in grade schools and high schools. We don't do it.

So who is putting the fear in the immigrant communities? These groups that are mixed messaging what ICE does. There is no reason to pass a policy that ICE won't arrest somebody in elementary school. We wouldn't do it anyways. And that is why I have a sense of location policies.

Like I said, the 20,000 men and women that work for ICE, they are law enforcement professionals, but they have hearts. Do they feel bad about what is going on in central America? Yeah. I have been to Central America. Those countries aren't as nice. The United States is much nicer. And I can't blame anybody from wanting to come here.

But you can't want to be a part of this country and not respect our laws. You can't have it both ways. You want to be a part of this country? Follow the law. Respect the law. And we will accept that. But you can't have it both ways. You can't say I want to be a part of the greatest country on Earth, but I want to ignore their laws. You can't have it both ways. That is not the America I grew up in.

Dr. HARRIS. Thank you all very much. And I yield back.

Mr. CULBERSON. Thank you very much, Dr. Harris.

I just can't tell you how much we—the people of the United States I know appreciate what you have just said is so true. We trust the good hearts and the good sense of our men and women in uniform, each and every one of you. We are so grateful for your service, whether you be in the military or in law enforcement. We trust your good hearts and your good sense to do the right thing for the right reasons.

That is the America we grew up in. What a comfort. That is precisely why Donald Trump won this election. One of the major reasons. People want to see the laws enforced and our men and women in uniform respected.

I wanted to ask if you could, Director Homan, about the—an inspector general's report that came out under the previous administration regarding fingerprints and individuals who had been in the country illegally that DHS fingerprint database against which aliens are checked was incomplete. And according to the inspector general, the incomplete database under the previous administration, there were at least 858 individuals from countries of concern who were granted U.S. citizenship, despite the fact that these individuals lied about having alternate identities, made fraudulent

288

statements, or concealed important information from adjudicators.
These individuals had been ordered deported or removed under
their alternate identities.

Yet when they concealed their identity, these individuals, be-
cause of the incomplete database under the previous administra-
tion, were granted citizenship. The inspector general reported that
some of these individuals went on to hold security clearances, and
one even worked in law enforcement. I wanted to ask you, sir, be-
cause the law as I understand it says that these individuals, once
DHS identifies these folks, that you can refer them to the Depart-
ment of Justice for revocation proceedings, and it is mandatory for
DOJ to revoke their citizenship and to deport them.

Of those that were investigated, under, again, the previous ad-
ministration, the inspector general said only 28 cases have been re-
ferred to the Department of Justice for revocation proceedings, and
ICE decided to administratively close another 90 cases, again,
under the previous administration. So under President Trump's
leadership, the law is going to be enforced, our men and women in
uniform respected, our nation of laws is going to be restored as the
foundation for all our liberty, does ICE plan to investigate all of the
remaining individuals identified in that inspector general's report,
and any other individual that obtained naturalization through
fraud or concealment of their identity?

And if you could tell us how many of those you are going to refer
to the DOJ and keep me posted so I can help back you up as chair-
man of the Commerce, Justice, Science Appropriations Sub-
committee to ensure these folks are revoked, have their citizenship
revoked and are deported.

Mr. HOMAN. Of course. I would have to get an update on where
we are at on that initiative. I know we are working very closely
with CIS to identify those folks. And of course, again, we have to
prioritize who is within that group, so those that may be in a posi-
tion to affect national security or some sort of critical infrastruc-
ture, they will be dealt with first.

But I am surprised by the numbers you presented of cases that
are administratively closed. That is something I will take back with
me today and I will get back to you on that by—I certainly
think——

Dr. HARRIS. Thank you.

Mr. HOMAN. Yep. We are certain looking into and leaning for-
ward on that.

Dr. HARRIS. Thank you very much. Ms. Roybal-Allard.

Ms. ROYBAL-ALLARD. Thank you, Mr. Chairman. First of all, let
me just say that I have law enforcement in my own family. So I
have firsthand knowledge of the dedication and the courage of law
enforcement officers, the dangers that they face, and the sacrifices
that not only they make, but their families.

But that doesn't mean that we as elected officials and members
of Congress shouldn't question, challenge, get clarification, or rec-
ommendations on policies and laws. And as policymakers, we
shouldn't need to apologize for doing so.

And the fact is that as was mentioned by another member of this
committee, part of the reason that we are in this situation is be-

289

cause Congress itself isn't doing its job. Much of this could be addressed by passing comprehensive immigration reform.

And the result of not doing what we have an obligation to do results in some of the things that Mr. Culberson has said, which really goes in many ways contrary to the very thing that we are trying to do. Taking federal money away from local law enforcement is only going to make it harder for law enforcement to go after the real criminals, the murderers, the rapists, the drug lords. And so this is just an example of what the consequences are of Congress not doing its job.

Having said that, many of the questions that I have, have already been asked. But I would like to ask you, Mr. Wagner, regarding the issue of credible fear claims and CBP policies. The number of individuals and families attempting to cross our southern border has decreased over the last several months, but many of those still coming are desperately fleeing violence in their homes and their countries, violence that is often directly targeted at them and their families.

CBP southwest border apprehensions in the second quarter of this fiscal year were 56 percent lower than the first quarter. However, the number of credible fear applications dropped by only 21 percent, and the percentage of positive credible fear determinations was largely unchanged at 77 percent. Earlier this year, there was a significant number of reports of CBP officers at ports of entry turning away individuals attempting to claim credible fear. This was documented in the press and more recently in a report by Human Rights First based on firsthand interviews.

According to that report, some of the individuals turned away were subsequently subjected to kidnapping, rape and robbery. In some cases, individuals were allegedly being told they are not welcome, while in other cases asylum seekers were instructed to try again another day when the port was less busy.

It is my understanding that CBP is legally required to process credible fear claims when they are presented, and it is not authorized to turn back individuals claiming fear even temporarily. In addition to commenting on those allegations, what steps can be taken or have been taken to ensure this is not occurring or continuing to occur at the ports of entry, such as, is there training or other guidance, reminding CBP personnel how they are required to treat individuals who express fear?

Mr. WAGNER. Sure. It was a question really of the space available to process people. And our facilities were at capacity to be able to take more people in, go through the processing, and turn them over to ICE after that. And the building was full, and we could not humanely and safely and securely hold any more people in our space.

The ports of entry converted administrative space to be able to hold people in as comfortable a manner as we could. You know, we converted a lot of space to be able to do that. The ports of entry just do not have the kind of space to hold large volumes of people during the processing and then holding them until they are picked up.

So we worked a process out with the Mexican authorities to be able to limit how many people a day could come across the border

290

into our facility to be able to be processed. But it was not a question of us not wanting to do it. It was a question of us not having the space to be able to do it safely and humanely and providing space in Mexico for them to wait until the space freed up on our side to be able to move people into it.

Ms. ROYBAL-ALLARD. Okay. And can you elaborate a little bit more on some of the contingency plans you have established to mitigate the limiting factors that you just talked about?

Mr. WAGNER. So like we demonstrated, working with Border Patrol and with ICE, that we could set up temporary facilities, like we did in Tornillo and Donna, Texas, that we can quickly set up temporary space to house people humanely and securely while they are awaiting processing and then waiting to be picked up. Those facilities are not needed right now, so they have been taken down, but we are well prepared to be able to set them up on fairly short notice should a surge of migrants return to the southwest border.

Ms. ROYBAL-ALLARD. So it wasn't an issue of officers not knowing what the law was. It was more of an issue of capacity?

Mr. WAGNER. It was an issue of capacity and being able to put people into the facility without being overrun or having unsafe and unsanitary conditions. But I can tell you, we converted a lot of administrative space, such as this room, to temporarily house people for a day or so, so they could await being processed and await going through those procedures we need to do before we hand them off to ICE.

You know, we converted a lot of space. We had people sleeping in hallways and conference rooms and building temporary showers and temporary bathing facilities for people to be able to do that.

Ms. ROYBAL-ALLARD. Okay. And, Director Homan, we have heard that in most cases ICE is no longer paroling individuals with positive credible fear determinations while they await an asylum hearing. Is that accurate? And if so, can you explain the rationale for detaining these individuals seeking asylum? And to the extent that ICE is placing a heavier burden on detained persons to show they are not a flight risk or a risk to the community, what is the standard for how that can be demonstrated?

Mr. HOMAN. If I could, just expanding on John Wagner's statement, you know, that is why we are here today, about the budget, ICE is in need of more beds, because the reason CBP was in the position they were in, because I couldn't take custody of everybody. We were full. So that is why they had to make contingency plans and that didn't help anybody, which is one of the reasons we are asking for more beds and situations like that.

As far as parole, the instructions are to follow the rule of law. People will be paroled if they can establish their identity that they are not a flight risk or safety risk. A lot of these people who get credible fear show up at ports, they don't have a passport, they don't want to provide addresses where they are going. We can't verify their addresses.

So if we can verify they are not a public safety threat, and they are not a flight risk, they will be paroled, but, you know, many times they are not able to do that. And that is their burden. So the law hasn't changed——

Ms. ROYBAL-ALLARD. Is there a standard?

291

Mr. HOMAN. No, again, it was lack of bed space and under prior administration we took an easier stance. Now, you know, my instructions to the field is follow the law. If they can establish identity, if they can establish where they are going, and we can verify that, and they are not a threat to community, then parole is an option. But we got to make sure we know who they are and where they are going and they are not a threat.

Mr. CULBERSON. Thank you. Dr. Harris.

Dr. HARRIS. Thank you very much.

Mr. Homan, how many counties in the United States are what you consider sanctuary counties? I guess if we define them as not cooperating with detainer requests.

Mr. HOMAN. You know, I should know that number. I just don't. I think it is well over 100 we have identified, but I can get back to you.

Dr. HARRIS. Okay, if you can get back to me, I would appreciate it.

Mr. HOMAN. I have that on my desk, so I can get back to you before the end of the day.

Dr. HARRIS. Please, if you can. You know, I find it is interesting, because the claim is made that the sanctuary counties have lower crime. And that will fit just perfectly with Mr. Culberson's position, because if you have less crime, you don't need federal money. I mean, federal money is kind of scarce. You know, if you want to be a sanctuary jurisdiction and claim you have less crime, that is great. Let's send less federal money there. More for the other jurisdictions.

Mr. HOMAN. What I think is even more significant, sir, is those jurisdictions that don't allow me access to their jails. But on the other hand, they get SCAAP funding from DOJ for housing people in the country illegally. It does not make sense to me that one hand of the government wants to give them money to hold them, the other hand of government is not allowed access to the jails.

Dr. HARRIS. No, I agree. I know——

Mr. CULBERSON. Will the gentleman yield? For the record, I want to make it clear that the policy I had instituted last summer cuts off SCAAP funding, Byrne JAG funding, and COPS funding to every sanctuary jurisdiction in the United States. If you want federal money, follow federal law.

Dr. HARRIS. Thanks. Again, Mr. Homan, the idea of visa overstays, I mean, the list—you know, fiscal year 2016, I mean, you have visa overstays from countries in the hundreds from countries that have rampant terrorist activity or terrorist training grounds. What is the—what is ICE doing to find and repatriate individuals who have overstayed their visas? Because I think in some cases from some countries, this could really be a threat.

Mr. HOMAN. We get data from CBP and from SEVIS on those that overstay their visas. They are prioritized within homeland security investigations. They will look at a series of factors which I can't discuss here. And what makes them a priority for national security, they will take those cases for further investigation and immediate action.

Those that don't rise to that level of national security are given to our law enforcement support center, fugitive operations center in

292

Burlington, Vermont, to run through databases to see if they have
criminal history and see if they are a danger to the community,
and they will be prioritized.

A lot of them that don't fall within those ranks were not worked
over the past years. I have committed to this secretary that is
something we are going to do now. So non-immigrant visa
overstays are now something that we are going to be actively work-
ing. HSI will take the priority cases, national security. ERO will
take public safety first. But everybody else will be on the table.

Dr. HARRIS. And is it—I mean, how successful are you at finding
the people who are visa overstays? I assume that if you are a ter-
rorist and you come here on a visa overstay, you are going to make
yourself hard to find. I mean, is it—how successful can we be in
finding the people who don't want to be found when there are visa
overstay?

Mr. HOMAN. Actually, we just did an operation where we tar-
geted—I think it was 1,500 visa overstays. I mean, you are right.
Some of them have left the country, but there is no report on it.
And some have adjusted their status in the records, CIS were not
caught up. Many we can't find. Many—they are in the wind.

Anybody that rises to the level we think has a national security
concern or public safety concern, they are worked right away. We
will pull out all stops to try to locate them. And the targeting cen-
ter is very good at that. I can't say we arrest them all, but we take
a serious look at that.

But I would say, out of all the visa overstays, many are in the
wind. And we are looking for them. And there—you know, a lot of
them come to the country with no intent of leaving. Of course, they
came here and overstayed a visa, because rather than crossing a
border, they can do it that way, which we have learned our lessons
from 9/11 about——

Dr. HARRIS. Absolutely.

Mr. HOMAN [continuing]. In regard to visas.

Dr. HARRIS. No, thank you very much. And yield back.

Mr. CULBERSON. Thank you, Dr. Harris.

Mr. PRICE. Thank you, Mr. Chairman. I want to seek a little fur-
ther clarification on this sanctuary cities question. I think it will
be to our benefit to have that. But I want to make a couple of
points before I do that.

First of all, I want to associate myself with Ms. Roybal-Allard's
comments about the high esteem and respect in which we hold our
military, our law enforcement, including immigration enforcement.
That is not what our questions are about, and I think it is not such
a good idea to suggest otherwise or imply otherwise.

I, as a representative of a district in North Carolina known for
low crime rates and for effective law enforcement, regularly confer
with law enforcement. I think I am considered a strong supporter.
Had a meeting with law enforcement from around the district, oh,
about a month ago, and I must say, the questions I raised about
so-called sanctuary cities and how vague that definition is, those
come from those people. That is the source of my questions. This
isn't something I just dreamed up. They are also, by the way, very
concerned about the administration's proposed cuts in grant fund-
ing under FEMA and many other issues.

293

But, please, the questions we raise about the rule of law and about law enforcement are not about whether we respect law enforcement or respect the sacrifices and the risks that people take. I hope everybody understands that.

Secondly——

Mr. HOMAN. Sir, can I respond to that?

Mr. PRICE. In just a moment. Secondly, the rule of law. There have been some suggestion here today that the law is the law is the law. Well, the rule of law is a basic principle of this country, and again, we take this principle—with our House democracy partnership, we take this in to work with legislatures in developing countries all over the world.

But the rule of law has many aspects. Yes, it is about maintaining border security. It is about maintaining a legal and safe immigration system. The rule of law is also about respecting the roles of law enforcement at various levels, taking seriously questions about when there might be tensions or might be conflicts between the duties, the priorities of local law enforcement and federal law enforcement, including immigration enforcement. That is a legitimate discussion under the rubric of the rule of law.

The rule of law is also about being honest and clear about what discretion exists under the law and insisting on accountability for the way that discretion is being exercised. That is what my questions were about. No question this is a part of elaborating what the rule of law means and should mean in our country.

Now, speaking of the law, we have talked about 8 USC 1373, sanctuary cities. It prohibits policies that prevent communications with ICE about immigration status. My understanding is that complying with a detainer request is not required under the law. It is not a violation of 8 USC 1373. That doesn't mean that it shouldn't be done, but we need to make clear about what is in the law.

And just underscores my point, what sanctuary cities means, how it is defined is a matter of some dispute and some question. So that brings me to my question, which is basically what do you have in mind here? The easy case, the easy case for all of us, I expect, is the felon who has done his time and who is released, there is no question I should know about that person and that—I would expect in almost every case, a detainer will be placed and deportation will be sought.

There are some not so easy cases, though. And at the end of that spectrum would be somebody picked up for a routine traffic violation. Are you looking to be informed about that person? Are you looking to issue a detainer against that person, someone apprehended in that kind of way? Or are people caught up in sweeps where some criminal activity might be involved, but they are also innocent bystanders, and so on? There are some difficult cases here.

And rather than dismissing them, I think we need some clarity and some accountability of what—if the administration is going to change not just the law, but the implementation and the interpretation of the law, we have a perfect right, indeed, we have an obligation to ask what that means.

Mr. HOMAN. Well, I can respond to the first part of your question, sir. In no way did I suggest or imply that anybody on this

294

committee does not respect the law enforcement work at ICE. If you heard during my oral statement, I think I put the blame pretty much squared on the groups in the media, mixed messaging what we are doing. I respect everybody on this committee.

But I must say, during opening statements in this committee, I heard two things, what ICE is doing is un-American, and un-American enforcement are exactly the words, and unconscionable. That is what I take difference to, is that the men and women of ICE are very American and what they are doing is not un-American. They are enforcing the laws enacted by this Congress.

On the rule of law accountability, we certainly want to be held accountable. And as I have explained before, we do prioritize what we do. You know, criminals in recent—criminals and public safety threats and national security threats still are the priority. And we make sure they are a priority.

When the E.O. was first rolled out, we did an operation in five states, and I came up on the Hill here and met with like 50 congressional representatives that claimed that we were just out arresting anybody we could find. I showed them the same numbers. I can tell you today, 75 percent of those people we arrested had a criminal history. So the men and women of ICE are executing the mission within the priorities.

And as far as prosecutorial discretion, the men and women of ICE exercise prosecutorial discretion every day. I can mention one operation we did in California on MS–13 gang members. And other people during the service of those warrants were found that weren't gang members, but they were illegally in the United States, several of them were recent mothers, had babies in arms, we didn't take them into custody. We did mail out NTA (Notice to Appear).

When we were out arresting, last year, family groups and UACs that have final orders during Operation Border Guard and Border Resolve, you heard about us out arresting these families, destroying communities. What you didn't hear was that 27 families we walked away from, because they had infants—breast-feeding infants. So the men and women of ICE exercise prosecutorial discretion every day.

Mr. PRICE. I am very—I commend you for that answer. Of course you do. And it is commonsense. It is compassion. And it is absolutely necessary to exercise that kind of discretion. My only point in raising this was to say, okay, if discretion is being exercised, then it is not off-limits to ask you about it.

Mr. HOMAN. No, sir.

Mr. PRICE. Or to question the priorities. And it is not an answer to say, well, we are just enforcing the law. If you don't like what we are doing, change the law. That is not—you know, the appropriate response here is to tell me what you just told me about the way you have exercised discretion. And we can talk about the basis on which you are doing that.

Mr. HOMAN. I don't think I have made a statement if you don't like the law, change it. What I said——

Mr. PRICE. I am referring to your secretary's comment.

Mr. HOMAN. Well, I stand by the secretary. He is committed to the rule of law and he stands by the men and women of ICE and

295

CBP. They—look, no one is looking for an apology. I guess we are
all looking for recognition that what the men and women of our
agencies do is extremely dangerous. They are enforcing the laws.
And they are true Americans. And to use comments like un-Amer-
ican enforcement and unconscionable, I think it is unfortunate
that—you know, we can't—I am not saying, sir, anybody in this
committee is vilifying the men and women of law enforcement. But
all you got to do is pick up the paper every day and read the stories
about CBP and ICE about what we do.

And I am just trying to get the message out, it is just as impor-
tant to educate people what we don't do as to educate them what
we do, do, because there is prioritization, there is a mission. We
are—you know, our job is to execute the mission within the frame-
work provided us. I don't decide what that framework is. You
know, again, I don't write the laws. I didn't write the executive or-
ders. Our job is to execute the mission within the framework pro-
vided us. And I think we are doing pretty close to a perfect job of
that.

Mr. PRICE. I appreciate your acknowledgement that no one here
is casting aspersions on the character or motives of your men and
women in uniform. We, I think, uniformly respect their role and re-
spect their patriotism and all the sacrifices they are making daily.
Could you address my sanctuary cities matter?

Mr. HOMAN. Sanctuary cities, I think, in my opinion, raises seri-
ous officer safety and community safety issue. For every person
that I can't arrest in a county jail in a sanctuary city means that
a law enforcement officer has to knock on the door of a home to
arrest somebody that has a criminal history when they could have
arrested them in the safety and security and privacy of a county
jail.

Mr. PRICE. Okay, but my question had to do with what you have
in mind here in terms of whom you are seeking information on,
whom you are looking to issue detainers. And you remember, I
raised the question about people picked up in—for minor traffic
violations or people picked up incidentally in the process of a
sweep, something of that sort.

Mr. HOMAN. We will issue detainers on anybody in the country
illegally. What I would like, though, is especially those who are
public safety threat to get that information quickly. So what I don't
want is someone that is a public safety threat to walk out of that
county jail and hit the street when they could have been handed
to our custody. So the new detainer form that has been issued looks
for those who are in the country illegally.

What action we take on that detainer depends on the—you know,
the case and the factors within that case. But we are looking to en-
force immigration law. Of course, our priority is the criminals first,
but if you are asking me are we going to put detainers on people
that have not been convicted of a crime, yes, we will.

Mr. PRICE. And the implications of that for you expect of local
law enforcement and whom you might choose to label a sanctuary
city, pin that label on?

Mr. HOMAN. I think that—first of all, I don't think sanctuary cit-
ies is defined just strictly under 1373. I think sanctuary cities—I
take a much broader definition of sanctuary cities that those that

296

don't cooperate—like, they can share information with us, but they are less willing to turn these people over to us, I call that not co-operating, cooperation——

Mr. PRICE. All right, but who are those people? That is the question. Who are those people? What is the universe here?

Mr. HOMAN. Sir, it depends—if you are in Cook County, it is everybody. It is criminal aliens and non-criminals. If you are in California, they will turn over people that are significant criminals, maybe murder and rape, but for aggravated assault, armed robbery, we don't see those people. Everybody jurisdiction is different on what level cooperation they give us.

Mr. PRICE. I am understanding. I understand that. What I am asking you is, what is your expectation? And how are you going to identify non-cooperation in terms of a sanctuary city's concept? What is your expectation, your demand of these localities?

Mr. CULBERSON. Well, if I could, Mr. Price, if I may, Director Homan, very quickly, if the gentleman would yield, the law says they cannot—local jurisdictions cannot interfere in any way. So 99 percent compliance with the request for information with federal authorities is not sufficient. It is 100 percent required.

Mr. PRICE. I understand that the law is about communications, not about detainer requests. What I am asking is what is ICE's expectation going to be about the communications request? Is this going to be a broad sweep, anyone that comes into touch with the law enforcement? Is it going to be something more focused on people coming out of the penal system or something in between?

Mr. CULBERSON. If I may, Director Homan, to help with this, because I did the legal research on this personally to figure this out, David, and the federal grant program—excuse me, the federal law that you are attempting to enforce has to have some reasonable relationship to the federal grant program. In this case, I have got jurisdiction over all the federal law enforcement grant money. 1373 was passed for the purpose of ensuring cooperation and communication between federal and local law enforcement. So you can tie, for example—it is actually up to ICE and the secretary's discretion to identify those jurisdictions that are not cooperating——

Mr. PRICE. That is exactly my question. What is the——

Mr. CULBERSON. If you are not cooperating, you render yourself ineligible for federal grants.

Mr. PRICE. And is not cooperating just something for which there is no definition available at present? Or can we anticipate what this is going to look like?

Mr. CULBERSON. Director and the secretary have that discretion.

Mr. HOMAN. If we know there is somebody in the country illegally in violation of the law, we place the detainer on them, we expect cooperation with that law enforcement agency. Now, we do have discretion. Not everybody we have—that we look out in a county jail we will take custody of. Again, you have got limited resources. We want the criminals first. But a lot of people released from the county jails may have an arrest without a conviction. That is as important as a conviction, I think so.

We got to remember, we are talking about a county jail. They are in the county jail for some reason. So they are in the county jail

297

because they violated some municipal law or some crime, so these
are people we are interested in.

So, again, my job is to enforce the immigration law. So I cer-
tainly would like anybody that is in the county jail that is in viola-
tion of immigration law to be turned over to me with the priority
on criminals. Now, if a jurisdiction comes to me—like I explained
earlier, they don't honor a detainer, they are going to call me on
the significant criminal for the release and they are not going to
hold them the minute past they normally will, but they are going
to call us, certainly I would welcome that. That is better that noth-
ing.

But I would like full cooperation. I mean, for 60 years, every law
enforcement agency in this country accepted detainers. It only has
arisen in the last 2 years. So I certainly would like people to help
me enforce the law. I mean—we are not asking them to be immi-
gration officers. We are asking them for communication on some-
body that is here in violation of the law that can be turned over
to us to take action.

Mr. PRICE. I know our time is expiring here, but of course, we
understand what you just expressed in terms of what your prior-
ities would be. I do think it leaves a lot of uncertainty, though, as
to what you might label uncooperation and what therefore might
bring a municipality or a county under the label of a sanctuary ju-
risdiction and therefore put in jeopardy their support for various
programs that they value.

Speaking of the rule of law, part of the rule of law is predict-
ability and certainty and accountability. And I hope we are not
looking for an overly broad discretion on the part of ICE to slap
that label on a jurisdiction. I think, in fact, we have a right to ex-
pect and demand a precise notion of what you regard as permis-
sible behavior under the law and what would lead you to designate
a sanctuary city.

Right now, I can just tell you, there is lots of uncertainty and
anxiety about this among municipalities that have a wide range of
practice. It is not—one size does not fit all. And so going forward,
we are going to need some clarity on this.

Mr. CULBERSON. Thank you, Mr. Price. I can tell you that the
1373, the definition of sanctuary cities is, in the first instance, very
clear under 1373 that local and state jurisdictions cannot interfere
in any way. So it is a 100 percent compliance requirement that 100
percent of the time state and local jurisdictions have to share infor-
mation with ICE.

Under the directive that the President has issued, the—this is all
designed to encourage cooperation. And all of us I know respect law
enforcement. All the laws that we pass are designed to encourage
local and federal law enforcement officers to communicate, cooper-
ate, because the goal is public safety, which we are all devoted to.
We are all here to make sure that our constituents and our fellow
citizens are safe and secure. And we deeply appreciate your com-
mitment to that and, again, it is the local jurisdiction's decision to
walk away from the federal money. If they choose to—if they want
to be a sanctuary city, that is their decision. Just don't ask for fed-
eral money. Those days are over.

Yes, ma'am?

298

Ms. ROYBAL-ALLARD. I just want to emphasize what is being said. We really do need clarification as to what is going to be considered a sanctuary city, because I know that, for example, some of the cities in California may cooperate if somebody is in jail, just as Mr. Homan has said, they will do that, but they have refused to—when they stop somebody for other reasons, a traffic violation or something, they have refused to ask if that person or anybody that happens to be in the vehicle or wherever they are at, for their immigration status. And in some cases, where police have said, no, we are not going to ask people about their immigration status because then they are not going to want to work with us with crimes, they have been tagged as a sanctuary city, where they may cooperate in the jails, but they will not cooperate by asking immigration status when they stop.

So to me, that is just another example of why we need clarity as to what designates a sanctuary city.

Mr. CULBERSON. Director Homan.

Mr. HOMAN. I understand the confusion. And, sir, I am not trying to avoid the question. DHS leadership is working with DOJ leadership to try to come up with an operational meaning of what we are going to consider for operational reasons the sanctuary cities. So that is still in discussion.

As soon as we, you know, get closer to clarity, we certainly will share it with you, but that is something that we are struggling with, right? We all understand 1373, but operationally what does it mean to us? So DHS is working with DOJ to come up with some sort of clear operational instructions to law enforcement agency on what a sanctuary city is and how we define it.

Mr. CULBERSON. But it begins with cooperation.

Mr. HOMAN. It begins with cooperation. And one thing I can, sir, to 1373, not only sharing the information, but allow us access to the jails.

Mr. CULBERSON. Right.

Mr. HOMAN. Because secure communities—if someone gets arrested and they take their fingerprints, those fingerprints are bounced off DHS databases. We will drop a detainer on someone we have a record on. However, if you are illegally in the United States, you never were encountered by the Border Patrol or ICE before, we are not going to get a feedback from DHS database. So you can be in the country illegally, and we won't have your fingerprints.

That is why we need access to the jails to talk about people who when they came into custody they claim they were foreign born. We need to talk to those folks and find out, do you have status or not have status? Because a lot of criminal aliens we have not encountered before, so we need to make sure we get into the jails and talk to these folks who are lacking the biometric information to make sure we don't release those folks to the street, too.

So information sharing has to include access to the jails, because a lot of people—we call them foreign born no match. We don't know who they are. We need to get in there and do an interview and find out who they are.

299

Mr. CULBERSON. So I think it is fair to say we all agree that the starting point is cooperation and sharing information 100 percent of the time. Director Homan, is that basically accurate?

Mr. HOMAN. Yes.

Mr. CULBERSON. So if jurisdiction fails to cooperate, fails to share information 100 percent of the time, they are going to be considered a sanctuary jurisdiction under the guidelines issued by the DOJ last summer. I had this done last summer. I just didn't make a lot of waves about it.

And by the way, the other part of the policy that DOJ put in place at my request is that local law enforcement agencies have to certify under oath that they are cooperating 100 percent of the time or they are in violation of the False Claims Act, which is a felony punishable by 5 years in prison. Therefore, the city of Santa Clara—Santa Clara County, which was a party to the litigation that led to the order of the judge in San Francisco, did not even apply for SCAAP funding, COPS funding, or Byrne JAG funding. They dropped their application because they knew they were a sanctuary jurisdiction. They didn't even bother to ask for the federal money. And that is their decision. If you want to protect criminal illegal aliens in your custody, don't ask for federal money, because you are not going to get it.

One final question, if you could, Director Holman. In addition to identifying for all of us those 100 jurisdictions that you consider sanctuaries—because the goal here is to protect lives, so there is no more Kate Steinles. How many jurisdictions like Santa Clara County either did not apply for federal funding or changed their policy, like Miami-Dade or New Orleans? And I want to thank for the record the county commissioners in Miami-Dade County and the city council in New Orleans for changing their policy to cooperate, because that is saving lives, isn't it?

Mr. HOMAN. Yes, I have to get back to the information. I know we have had some jurisdictions come back to the table and are now cooperating, especially after the first iteration of the declined detainer report went out. So we will definitely get back to you that information, who is now cooperating, when they weren't, and what changed since the executive order.

I know we track that, because we report on the declined detainer report, at least the last iteration, so I will get back to you as soon as we can on that information.

Mr. CULBERSON. And I want to stress, Ms. Roybal-Allard and Mr. Price, the goal is for these jurisdictions to change their policy. We don't want them to walk away from their federal money. We want them to protect lives and property by changing their policy and cooperating. That is the goal. It is the goal we all share.

Mr. HOMAN. Absolutely. And my goal is, again, protecting lives. I mean, I need to do everything I can for every law enforcement agent and officer that works for ICE to lessen the risk of their jobs. If they can arrest a criminal alien inside the safety of a jail rather than knocking on a door, that is the right thing to do, not only for public safety, but for the officer safety.

Mr. CULBERSON. But we deeply appreciate your service to the country, each and every one of you, and please convey to your officers, the men and women in the field that you represent how

300

strongly this subcommittee supports their work, how much we ad-
mire and appreciate them, and God bless you. And thank you very
much for all that you do.

  We will have additional records that will be submitted—addi-
tional questions that will be submitted for the record from Chair-
man Carter and members of the subcommittee. With that, the com-
mittee is adjourned. Thank you very much.