# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, *et al.*,<br>    *Plaintiffs,*<br><br>v.<br><br>Kevin McAleenan, *et al.*,<br>    *Defendants.* | No. 3:17-cv-02366-BAS-KSC |

### DECLARATION OF RANDY HOWE

I, Randy Howe, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows, relating to the above-captioned matter:

1. I am currently the Executive Director for Operations, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I have been employed in this role since October 2017. I began my career in 1988 with the legacy U.S. Immigration and Naturalization Service. During my 30 years of federal service, I have held various leadership positions, including Area Port Director, Buffalo; Assistant Director for Border Security; and Border Security Coordinator. Immediately prior to assuming my current role, I served as Director of Field Operations for the Preclearance Office. In my current position, I oversee more than 23,000 employees, with operations at 20 major field offices, 328 POEs, and 16 Preclearance locations.

2. I am familiar with the case of *Al Otro Lado v. McAleenan*. I understand that plaintiffs have only raised allegations related to the San Ysidro, Otay Mesa, Laredo, and Hidalgo ports of entry. I understand that, notwithstanding this fact, that plaintiffs are requesting that OFO conduct discovery from all ports of entry along the southwest border. I make this

1

declaration to explain why such discovery would be burdensome and would be unlikely, in my opinion, to uncover additional relevant information regarding controlling the flow of individuals entering the United States at land ports of entry along the southwest border, known as metering or queue management.

3. In my role as the Executive Director for Operations, I am responsible for executing the missions of CBP generally and, more particularly, OFO. The CBP mission includes the enforcement of the customs, immigration, and agriculture laws of the United States, as well as hundreds of other U.S. laws, on behalf of numerous federal agencies, at the border. OFO is the primary law enforcement agency responsible for the security of the U.S. border at its ports of entry (POEs), and its preclearance locations outside of the United States, while facilitating lawful international trade and travel.

4. At the POEs, CBP officers ensure that all persons and merchandise seeking to enter the United States comply with all U.S. laws, including immigration, customs, and agriculture laws, as well as laws enforced on behalf of other federal agencies. In addition, CBP officers inspect incoming cargo on a daily basis to ensure that it complies with all appropriate agricultural laws, trade laws, and other requirements. On any average day in Fiscal Year 2018, OFO processed 1,133,914 incoming passengers and pedestrians; 285,925 incoming privately owned vehicles; and 81,438 truck, rail, and sea containers. CBP officers are thus the first line of protection at the POEs against any number of unpredictable threats that seek to do America harm.

5. OFO has an extremely wide variety of missions, all of which further OFO's primary mission of protecting the security of the country. For instance, at POEs, OFO works to facilitate trade and travel; to detect narcotics and other public safety threats; to detect contraband and other threats to the country's economic resources; and to process aliens

who are determined to be inadmissible, including those who lack documents sufficient for lawful entry to the United States. None of these mission sets can therefore easily be halted or diminished, and they all need to be balanced at each POE at any given time and must be carefully tailored to the POE's needs at that moment. Each field office along the southwest border, and each land POE within those field offices, has a unique operating environment and unique resource and staffing requirements. Thus, each field office and POE need to be proactive in constantly reevaluating and directing their limited resources to appropriately meet the needs of each mission.

6. Currently, CBP is facing an unprecedented surge of individuals entering illegally and arriving at ports of entry without documents. CBP has encountered more than 109,000 individuals in the last month alone, which is over 5,000 more individuals than were a encountered the month prior. This is the highest monthly total in well over a decade and we are not even halfway through an unprecedented fiscal year. It is unprecedented because these aliens, mainly consisting of family units, require appropriate treatment to address their unique needs. The resources required to provide appropriate treatment to this unprecedented surge has placed a significant strain on CBP operations and resources, as officers and agents must devote significant manpower, money, and facilities, to processing and holding. Specifically, OFO has reallocated several hundred officers to the southwest border to assist the U.S. Border Patrol. At many POEs, therefore, OFO is operating with additional decreased staffing, which places an additional significant strain on resources.

7. If all the POEs along the southwest border were required to respond to discovery in this case, OFO would face additional operational burdens across the southwest border. I understand that, in order to respond to a discovery request, individual custodians at a particular POE would need to search for and identify the locations of responsive files, in

3

both hard copy and electronic form. Depending on the number of custodians at a particular POE and the number and location of such files, such a search could require an extensive search and a significant amount of time. Additionally, while I understand that CBP's eDiscovery Team will generally collect electronically stored information from custodians' email and hard drives, individual custodians may have to provide input into locations of responsive email folders or specific terminology likely to lead to responsive documents. Those custodians may also need to review any electronically stored information collected by the eDiscovery Team to determine whether any responsive materials were missed during the collection. Lastly, I understand that, once documents have been collected, individuals with knowledge of the substance of a particular document may need to review the document to determine whether it is appropriate to produce it or whether redactions must be applied. Depending on the nature of a particular document, this may involve multiple individuals or even individuals at multiple ports of entry.

8. Additionally, I understand that discovery in this case may involve the preservation and production of video. The preservation of specific video footage is incredibly burdensome, as an individual officer must manually review footage for a particular incident, and then manually preserve the incident.

9. In other words, conducting discovery requires a significant amount of resources, and would likely require the POEs to pull officers from their regular duties in order to ensure that the agency appropriately responded to a particular request. OFO may already have to pull officers off the line at the four ports of entry currently at issue in this case in order to respond to discovery requests. Were each port of entry along the southwest border required to do the same, it would have a significant negative impact on OFO operations along the southwest border, which would, in turn, diminish OFO's effectiveness at executing its

national security mission. These risks are particularly acute given the current constraints on OFO's operations.

10. Additionally, because each POE is in regular contact with OFO headquarters, including with regard to the implementation of Executive Assistant Commissioner Todd Owen's April 2018 memorandum, discovery from all ports of entry is not, in my opinion, likely to yield significant additional relevant information beyond what is currently being collected from OFO headquarters. Email communications from the field regarding metering or queue management procedures which may occur at the ports of entry will be collected as part of the discovery from headquarters custodians. Therefore, discovery from all of the POEs on the southwest border would be largely duplicative and would not, in my opinion, be likely to uncover significant additional relevant information than what would be contained in documents collected from OFO headquarters. Thus, to require each port of entry along the southwest border to engage in discovery would impose a significant operational burden for what is likely to be largely duplicative documents.

11. I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 24 day of May, 2019.

Randy Howe
Executive Director, Operations
Office of Field Operations
U.S. Customs and Border Protection