1           United States District Court

2        for the Southern District of California

3                                )
    AL OTRO LADO, Inc., et al.,  )
4                                )   No. 17cv2366-BAS
          Plaintiffs,            )
5                                )   November 5, 2019
              v.                 )
6                                )   San Diego, California
    KIRSTJEN NIELSEN, Secretary, )
7   U.S. Department of Homeland  )
    Security, in her official    )
8   capacity, et al.,            )
                                 )
9        Defendants.

10
                  TRANSCRIPT OF MOTION HEARING
11           BEFORE THE HONORABLE CYNTHIA BASHANT
                  United States District Judge
12
    APPEARANCES:
13
    For the Plaintiffs:     MAYER BROWN LLP
14                              STEPHEN M. MEDLOCK
                                Attorney at Law
15
                           THE CENTER FOR CONSTITUTIONAL RIGHTS
16                              BAHER AZMY
                                ANGELO R. GUISADO
17                              Attorneys at Law

18                         SOUTHERN POVERTY LAW CENTER
                                MELISSA E. CROW
19                              REBECCA CASSLER
                                Attorneys at Law
20
    For the Defendants:    U.S. DEPARTMENT OF JUSTICE
21                              SCOTT GRANT STEWART
                                ALEXANDER JAMES HALASKA
22                              Attorneys at Law

23  Court Reporter:        Dana Peabody, RDR, CRR
                           District Court Clerk's Office
24                         333 West Broadway, Suite 420
                           San Diego, California 92101
25                         DanaPeabodyCSR@gmail.com

|   | |
|---|---|
| 1 | San Diego, California, November 5, 2019 |
| 2 | * * * |
| 3 | THE CLERK:  Calling matter number 1, 17cv2366, Al Otro |
| 4 | Lado, et al., versus McAleenan, et al., on calendar for motion |
| 09:59   5 | hearing. |
| 6 | THE COURT:  Counsel, state your appearances for the |
| 7 | record, please. |
| 8 | MR. AZMY:  Baher Azmy, A-Z-M-Y, for the plaintiffs. |
| 9 | MS. CROW:  Melissa Crow for the plaintiffs. |
| 09:59  10 | MR. MEDLOCK:  Stephen Medlock for plaintiffs. |
| 11 | MS. CASSLER:  Rebecca Cassler for the plaintiffs. |
| 12 | MR. GUISADO:  Angelo Guisado for the plaintiffs. |
| 13 | MR. STEWART:  Good morning, Your Honor.  Scott Stewart |
| 14 | for the defendants. |
| 10:00  15 | MR. HALASKA:  Alexander Halaska for the defendants. |
| 16 | THE COURT:  Okay, good morning.  Have a seat, and I'll |
| 17 | tell you a little bit about my thoughts. |
| 18 | I'd like to start with the jurisdictional issue.  I can |
| 19 | tell you, I think the jurisdictional issue is the biggest |
| 10:00  20 | hurdle in the petitioner's motions, so I'd like to focus first |
| 21 | and maybe primarily on that issue. |
| 22 | I think both parties missed the mark a little bit. |
| 23 | First of all, I agree with petitioners that I'm not being |
| 24 | asked to rule on the legality of what everyone's referring to |
| 10:00  25 | as the asylum ban in this case.  And I'm prepared to assume for |

1    the purposes of this motion that the asylum ban is an

2    appropriate exercise of the Court's discretion.  I really don't

3    think that's before me at this point; but second, I don't know

4    that I really have to reach the issue of metering either.  I

5    don't know that I have to -- there seems to be a lot in

6    petitioner's motion about the legality of the metering and how

7    it's illegal.  I think that also may be an issue for a later

8    day.

9        I think what I'm being asked to decide at this point is

10   whether the government is misinterpreting and extending this

11   asylum ban in another attempt, as the plaintiff's been saying

12   all along, that the government's trying to deny a class of

13   people access to the asylum process.

14       So in other words, the petitioners have been alleging all

15   along that there's this scheme to deprive a class access to the

16   asylum process, and now they're claiming the government is

17   taking this additional step by misapplying the asylum ban to

18   this subclass of individuals even though they clearly arrived

19   at the port of entry before July 16th.

20       So and all I'd be asked to find in this particular set of

21   motions is whether these individuals arrived before July 16th,

22   and I think I've kind of already crossed that bridge in my

23   earlier order.

24       So my limited question is, does any provision of

25   particularly 1252 strip me of jurisdiction from finding that

1   the government is misapplying the asylum ban to those who

2   arrived at the port of entry before July 16th?

3        And I can tell you, even though the government has used

4   pretty much a kitchen-sink approach to this, kind of throwing

10:02   5   any possible lack of jurisdiction argument, the main question I

6   have is, all of these sections in 1252 raise an issue of

7   implementation of a policy or implementation of 1225, and so my

8   biggest question in all of this boils down to:  What does

9   implementation mean?  Am I simply interpreting the regulations

10:02   10   to make sure they are correctly implemented, and if so, do I

11   not have any jurisdiction?

12        And so that's what I'd like each side to focus on.  We can

13   eventually go through each of the other things that the

14   government says, take jurisdiction away from me, although I

10:03   15   think that it's less of a compelling argument as far as, you

16   know, for example, 1252(f) and 1252(g) and 1252(a)(5) and

17   (b)(9).  We can talk about those, but I'm more concerned with

18   the 1252(a) and (b) that talk about implementation of this

19   policy.

10:03   20        So I think I'd like to start there, and then I have other

21   questions before we go along.  That's where I'd like to start.

22   We can take either side.  Since it's your motion, petitioners,

23   we can start with the petitioners.

24            MS. CROW:  Good morning, Your Honor.

10:03   25            THE COURT:  Good morning.

5

1          MS. CROW:  I'm going to address your questions on the

2    jurisdictional front, and then my colleague, Baher Azmy, will

3    address the nature of the relief.

4          THE COURT:  Okay.  When we get to the nature of the

10:03    5    relief, I have other questions, but let's talk about just

6    jurisdiction at this point since that's my biggest question.

7          MS. CROW:  Sure.

8       I'd like to start by saying that none of the myriad INA

9    provisions that the government has cited preclude jurisdiction

10:04   10    in this case.  The purpose of plaintiff's motion for

11    preliminary injunction is to preserve meaningful access to the

12    asylum process for provisional class members, access to which

13    they would have been entitled at the time that they were

14    metered.

10:04   15       Our motion is not intended to dictate whether these

16    individuals should be put into expedited removal or to ensure a

17    particular outcome in an individual case.

18       I'll turn first to 8 USC 1252(a)(2)(A).  And the government

19    has cited various provisions of (a)(2)(A).  All of these

10:04   20    provisions either bar review of the government's decision to

21    invoke the expedited removal provisions of the INA or they bar

22    review of credible-fear determinations and orders of expedited

23    removal in individual cases.

24       In this case, plaintiffs don't take a position on how

10:05   25    provisional class members should be processed.  In our first

1    and second amended complaints, we explicitly stated that the

2    government has three options when individuals present at a port

3    of entry and express a fear of returning to their country of

4    origin:  They can be put into expedited removal proceedings,

10:05    5    they can be put directly into regular removal proceedings, or

6    they can be paroled into the United States.

7        Plaintiffs also take no position on any substantive

8    decisions going to the merits of their asylum claims.

9        With respect to those provisional class members whom the

10:05    10   government does decide to put into expedited removal,

11   plaintiffs seek to preserve the opportunity to have their

12   asylum claims adjudicated on the merits as opposed to receiving

13   an automatic denial of credible fear.

14       With respect to 8 USC 1252(a)(2)(A)(iv), that provision

10:06    15   bars judicial review of policies and procedures designed to

16   implement 1225(b)(1), as Your Honor noted.

17       But in this case, plaintiffs only challenge the

18   government's metering policy, not decisions about the legality

19   of the asylum bans provisions on expedited removal.

10:06    20       As Your Honor noted previously, the legality of the asylum

21   ban is immaterial in this case.

22           THE COURT:  What about the metering?  Do I have to

23   reach that issue?

24           MS. CROW:  Only insofar as one of the requirements for

10:06    25   preliminary injunction under Rule 65 is likelihood of success

1    on the merits.  My colleague will talk about an alternative

2    route that Your Honor could elect to take under the All Writs

3    Act, which doesn't require a likelihood of success on the

4    merits.

10:07    5        Would you like me to address the metering issue now?

6            THE COURT:  No, you can go ahead -- stick with the

7    jurisdiction.

8        I mean, going back to the implementation of the policy, is

9    this an implementation of the policy?

10:07    10           MS. CROW:  An implementation of 1225?

11           THE COURT:  1225(b)(1), yes.

12           MS. CROW:  I don't believe so, Your Honor.  1225(b)(1)

13    relates only to expedited removal, and many of the members of

14    the provisional class are not in expedited removal.

10:07    15       What plaintiffs are seeking to do in this case is to ensure

16    that provisional class members can go through the process,

17    whether it be expedited removal straight into regular removal

18    proceedings under Section 240, paroled, what have you, and the

19    government regularly exercises all of those options.

10:08    20           THE COURT:  So what you're saying is even though -- I

21    think it's (4)(A)(iv) says policies and procedures adopted to

22    implement 1225(b)(1) is not applicable because 1225(b)(1) may

23    or may not be implicated.  Is that what you're saying?

24           MS. CROW:  Correct, correct.

10:08    25       And I would also argue -- I would just reemphasize that

1  we're focused on access to the process, not outcome of the

2  process.

3          THE COURT:  Right.  I'm not really -- I mean, I guess

4  the argument is, I'm not really reviewing their policies and

10:08  5  procedures, I'm interpreting it.  Is that correct?

6          MS. CROW:  Correct.  Yes.

7          THE COURT:  Okay.

8          MS. CROW:  Yes, we want to make sure that individuals

9  actually have the opportunity to go through the expedited

10:09  10  removal process and receive a determination on the merits

11  rather than an automatic denial.

12          THE COURT:  I understand that.  I'm just trying to

13  interpret the whole jurisdictional statute.  It's a little bit

14  of a morass.

10:09  15          MS. CROW:  Yes, Your Honor.

16          THE COURT:  Okay.

17          MS. CROW:  With Your Honor's permission, I'd like to

18  turn to some of the other jurisdictional provisions that the

19  government has cited.

10:09  20          THE COURT:  Sure.

21          MS. CROW:  So 1252(e)(1) specifies the limited

22  circumstances under which a court may grant equitable relief in

23  an action pertaining to an order to exclude a noncitizen in

24  accordance with 1225(b)(1).  But here, as I said before,

10:09  25  plaintiffs seek only to rectify the adverse impact of the

1    government's metering policy on provisional class members'

2    meaningful access to the asylum process whether or not they're

3    in expedited removal.  Again, we don't seek review of

4    individual orders of expedited removal, and we're not

10:09    5    challenging the validity of the expedited removal system

6    pursuant to 1252(e)(3).

7        THE COURT:  Again, we have that implementation.

8    Challenges to the implementation of 1225(b).

9        MS. CROW:  Right, we're actually seeking to preserve

10:10   10    the implementation of 1225(b) and to ensure the robust process

11    to which these class members are entitled given that, as

12    Your Honor has ruled previously, they were arriving in the

13    United States at the time they were turned back, at the time

14    they were metered.  8 USC 1252(f)(1) prohibits federal courts

10:10   15    from granting class-wide injunctive relief against the

16    operation of 1221 through 1232.

17        THE COURT:  Yeah, I don't really think that's

18    applicable.  I think you're not asking to enjoin it, you're

19    asking to go forward with it.

10:11   20        MS. CROW:  Right, we're seeking to enjoin violations

21    of those provisions, not to enjoin or restrain any of those

22    provisions, and the supreme court was quite clear in Jennings

23    versus Rodriquez that that is permissible.

24        And then finally, with respect to 8 USC 1252(b)(9) and

10:11   25    (a)(5), those provisions relate to regular removal proceedings.

1    Specifically (b)(9) bars judicial review only where legal

2    questions arise from a noncitizen's removal proceedings under

3    8 USC Section 1229(a) of the act.

4         But as the supreme court and the Ninth Circuit have said,

10:11   5    (b)(9) is not applicable to claims that are independent of or

6    collateral to the removal process.  And here the issues do not

7    arise from removal proceedings, but rather from the

8    government's unlawful metering policy.  As I said, many

9    provisional class members have not even been inspected and

10:11   10    processed, much less put into removal proceedings.

11         (A)(5) bars judicial review of an Order of Removal.  But,

12    again, we're seeking only to preserve access to the statutory

13    process that provides for consideration of asylum claims on the

14    merits, not to effect the outcome of that process, which may or

10:12   15    may not result in a final Order of Removal.

16              THE COURT:  Okay.  Thank you.

17         Response on the jurisdictional issue only, and then we can

18    get to the merits.

19              MR. STEWART:  Thank you, Your Honor.

10:12   20         At the outset, Your Honor, I think an overarching theme I

21    want to make on the jurisdictional collection of issues is that

22    I respectfully disagree with the premise that the relief that

23    would be -- that the plaintiffs are asking to be ordered here

24    would be anything other than an injunction of application of

10:12   25    the rule, and that's quite a critical feature.

1   THE COURT:  But the rule itself -- I mean, when the

2   rule was passed, the government knew they had all these people

3   that were waiting in Mexico, and they didn't say to include

4   these people, they -- the rule itself says it doesn't apply to

10:13   5   anyone arriving after July 16th, so it's not enjoining the

6   rule, it's adopting the rule.  It's saying the rule says it

7   doesn't apply to people who arrive before July 16th.

8   MR. STEWART:  Your Honor, respectfully, that argument

9   is not correct.

10:13   10   THE COURT:  Why?

11   MR. STEWART:  Because it says the rule bars applies to

12   people who enter after that date.  The provisional class

13   members would be people who are entering after the July 16th

14   effective date.

10:13   15   THE COURT:  Well, I mean, we obviously disagree.  I've

16   already issued that.

17   MR. STEWART:  Understood, Your Honor.  We do

18   respectfully disagree with that point.

19   THE COURT:  That's fine.

10:13   20   MR. STEWART:  And preserve our position there.

21   THE COURT:  Sure.

22   MR. STEWART:  What I want to emphasize, Your Honor, is

23   by issuing an injunctive relief at this preliminary stage, the

24   Court would be enjoining application of a rule that governs

10:13   25   procedural and substantive standards both in expedited removal

1    proceedings and in asylum proceedings.  The INA is quite clear

2    in its approach to these jurisdictional issues to how judicial

3    review occurs or doesn't occur in both proceedings.  It's very

4    channeled.  It's very, in some circumstances, quite limited,

10:14    5    and what the Court would be doing would be issuing relief that

6    conflicts with the standards enacted by Congress as to both

7    expedited removal and full removal proceedings.  Expedited

8    removal proceedings are subject to, in many cases, no judicial

9    review whatever or only very narrowly channeled judicial

10:14   10    review, principally a systemic sort of a challenge under

11    1252(e)(3).  The application of an expedited removal -- the

12    expedited removal statute is not something that could be

13    judicially reviewable.

14           THE COURT:  I agree, but we don't have any orders of

10:14   15    removal at this point.  There hasn't even been a hearing about

16    it.  It's just a matter of interpreting this new asylum ban and

17    who it applies to.

18           MR. STEWART:  Again, I respectfully disagree,

19    Your Honor, and the issue is this:  If the Court could not

10:14   20    review the application of the rule -- of the rule -- of

21    expedited removal proceedings, it can't, kind of, preemptively

22    bar the use of that rule in those expedited removal

23    proceedings.  The expedited removal proceedings use the

24    rule -- the principles and rules in place at the time, and if

10:15   25    the Court bars, though, it's an improper district court

1    preemptive review essentially.

2              THE COURT:  Let me ask you this, sort of a

3    hypothetical:  Let's say this asylum ban applies on its face

4    only to people from Honduras.  And the government takes the

10:15    5    position that even though it applies only to people from

6    Honduras, we're going to apply it to all people from Central

7    America.  Can a court review that?  Say that's not what it

8    says?  It says Honduras only, and you're applying it to people

9    from Central America?

10:15    10              MR. STEWART:  There are channels to undertake review

11    of these decisions, Your Honor.  One is the systemic challenge

12    saying, like, this is not consistent with a statute or, you

13    know, whatever, I mean, there's a similar statute.

14              THE COURT:  But I mean, it's not talking about whether

10:15    15    the rule is wrong.  It's not saying that the government can't

16    pass a rule applying something to Hondurans.  It's saying the

17    application, the way the government -- the position the

18    government is taking to apply this law is not what the rule

19    says.

10:16    20              MR. STEWART:  Again, Your Honor, that would be, I

21    think, something that would have to be used in one of the

22    review schemes that Congress actually allowed, District of

23    Columbia District Court review, raising an individual

24    credible-fear proceedings, those sorts of things.  I think it

10:16    25    has to -- this is a very, very channeled review scheme.  And I

1    would emphasize that the similar approach persists in the full

2    removal proceeding context, Your Honor.  I mean, aliens who end

3    up in full removal proceedings can seek judicial review and

4    make claims regarding the rule.  But it's not proper to seek --

10:16    5    again, and this is a critical point, and this is why I want to

6    emphasize it -- is that it's not proper to go to a district

7    court and seek -- a non-DC district court certainly,

8    Your Honor, to seek an injunction of application of a rule

9    governing procedural and substantive asylum standards,

10:17    10    particularly for a large number of aliens, Your Honor, after

11    the supreme court has been faced with this rule, received

12    extensive state briefing on the rule, heard a great many

13    arguments, similar to those raised by the plaintiffs here,

14    including by Al Otro Lado itself, and said hey, this rule can

10:17    15    go into effect, and it can go into effect for a considerable

16    amount of time.

17         THE COURT:  I'm fine with that.  That's not the issue

18    that's in front of me right now.  The issue is not whether the

19    rule can go into effect.  The issue is what does the rule say?

10:17    20         MR. STEWART:  And the rule says that it applies to

21    people who enter after July 16th.

22         THE COURT:  It does?

23         MR. STEWART:  Yes, and that -- and that's -- there's a

24    reason, Your Honor, that the plaintiffs gesture at the "is

10:17    25    arriving" language and briefly suggest oh, maybe the rule by

1   its terms doesn't actually apply to the provisional class, but

2   they don't even believe that.  That's why they spent 24 and a

3   half pages, whatever it is, actually seeking to enjoin

4   application of the rule.  Because they -- that's -- they

5   realize that what Your Honor would be doing would be, in fact,

6   enjoining the rule.

7       Other than that, Your Honor, I think the government has hit

8   in its brief the points about just the limitedness of the

9   review that this court can conduct, you know, to the extent any

10  review can be conducted in these cases, and it cannot -- it

11  does not have jurisdiction to review anything related to the

12  rule, which is what the plaintiffs attacked in their motion for

13  a preliminary injunction.

14          THE COURT:  Okay.  Anything further on jurisdiction?

15          MS. CROW:  Thank you, Your Honor.  Just a few quick

16  points.

17      First of all, contrary to what the government just argued,

18  we are seeking to -- we are not seeking to enjoin application

19  of the rule, we're seeking to prevent metering from adversely

20  affecting the provisional class members in this case.

21      I would note that the evidence in the record establishes

22  that the U.S. Government actually slowed down processing of

23  asylum-seekers in the month that preceded the implementation of

24  the asylum ban.

25          THE COURT:  But, again, going back, do I have to find

16

1    that for this?  I mean, isn't it much simpler than that for

2    this particular issue?  Don't I just -- aren't I just deciding

3    whether the rule says it applies to people who arrived at the

4    port of entry after July 16th only, and these people

10:19   5    didn't -- did arrive at the port of entry before July 16th?  I

6    mean, I have that right.  Isn't that all I have to decide for

7    this particular motion?

8         MS. CROW:  Yes, I think so, Your Honor.

9    The final point I would make is that the supreme court did

10:19  10    not weigh in on who exactly is subject to the rule.  Thanks.

11        THE COURT:  Okay.  Let's talk about the underlying

12    issue, and I have some specific questions both for the

13    plaintiff, and then I have some specific questions for the

14    defense.

10:20  15    With respect to the plaintiff, I seem to be repeating

16    myself, but, again, my question is:  Do I have to reach the

17    metering issue?  Can I just find that the common question

18    that's presented in this case is whether those individuals who

19    are metered did arrive in the United States before July 16th,

10:20  20    even if metering was lawful?  Can I make that a common question

21    in this case?

22        MR. AZMY:  Thank you, Your Honor.

23    The answer to that is yes, but if I could just take a

24    moment to walk you through the various ways you could rule in

10:20  25    favor of the order we seek.

1        THE COURT:  Okay.  And then, just so you know, the

2   other question I have, I think you have a problem with your

3   class representative.  At this point, you only have Roberto,

4   and I think he has some unique issues; for example, I think the

10:20    5   claim is that he was arrested in Mexico before he arrived, so

6   he may or may not have arrived at the port of entry under my

7   definition of "arrived," and I think it may make him an

8   inadequate representative, but I do agree that you can amend

9   the complaint.  It looks like you have some other individuals

10:21   10   who may be appropriately named individuals, so we can -- I'd be

11   interested in your thoughts on that.

12        MR. AZMY:  Okay.  Thank you, Your Honor.

13      So let me address three things first.  Just to reinforce

14   why we are not challenging, as the government continues to

10:21   15   insist, the asylum ban; second, how relief would operate under

16   the traditional preliminary injunction standard; and third, an

17   alternative way to provide relief along the lines that you've

18   suggested, which we think would flow from the All Writs Act and

19   would not require looking at the legality of the metering

10:21   20   policy.

21      So we are not challenging the legality of the asylum ban.

22   That is separately under challenge that will be reviewed by the

23   Ninth Circuit in one month, and regardless of what, say, the

24   supreme court ultimately determines about whether or not the

10:22   25   asylum ban is consistent with the INA or not some time in June,

1    the harm that we are challenging flows directly from the

2    metering policy.

3    Take two sets of individuals.  Imagine Christina who

4    arrives at a port of entry today and will after meeting be

10:22    5    subject to the asylum ban.  She is not a class member, and

6    she -- is not a class member and would have no basis to

7    challenge the metering policy because it was the asylum ban

8    that caused her harm.

9    And take Gloria, a Honduran citizen, who arrived at the

10:22    10    port of entry, like so many of our provisional class members,

11    including 17 individuals who filed affidavits in this case,

12    arrived June 15th and was metered.

13    Under Your Honor's order, she was arriving in the

14    United States prior to the asylum ban, but it was only the

10:23    15    metering policy that caused her harm, not the asylum ban.

16    So we're very focused on the metering policy, and under the

17    preliminary injunction standard, before we go to your narrower

18    standard, the way this would work is if the metering policy's

19    unlawful, as we believe we've shown a likelihood of showing

10:23    20    based on the evidence that we've accumulated, it would be

21    outrageous to permit this presumptive illegality; that is,

22    denial of access to the asylum process from months ago to class

23    members and to subject them to new rules that do not consider

24    the merits of the asylum claim, the categorical bar of the

10:23    25    asylum ban only because of the metering policy.

1    So if it's illegal, it becomes unfair, and we would just

2    ask to do the really -- the narrowest kind of injunction,

3    status quo, anti-injunction or prohibitory injunction, which

4    they're called in the Ninth Circuit, which is basically a nunc

10:24    5    pro tunc kind of analysis, put everyone back to the position

6    they would have been, say, July 14th but for the illegality.

7        THE COURT:  So are you saying -- because you seem to

8    be saying, and correct me if I'm wrong, that if I don't want to

9    reach the metering policy, I have to go under the All Writs

10:24    10    Act?  Is it possible that I could just find that this is a

11    subclass of -- I mean, your complaint is fairly broad.  It does

12    focus a lot on the metering, but it also says there are a lot

13    of things that denied these people access to the asylum

14    process, and here is one way they're denying access to the

10:24    15    asylum process, is they're construing this statute or this rule

16    that says July 16th to apply to people it doesn't apply to.

17    Can I just find that that is -- there's a likelihood of success

18    on those merits as opposed to the metering?

19        MR. AZMY:  Yeah, Your Honor, I think -- so we are at

10:25    20    the same point, and let me reinforce the point before we talk

21    about how we get there technically.  Yes, we're at the same

22    point, which is that the asylum ban shouldn't apply to class

23    members because as Your Honor said, you understand the

24    argument.  The terms of the asylum ban only apply to people who

10:25    25    arrived in after July 16th.  You've already found --

1    THE COURT:  Already found --

2    MR. AZMY:  -- provisional class members as a matter of

3    law and judicial decree -- that binds the government -- that

4    they arrived in before.  So you could just simply interpret the

10:25    5    asylum ban not to cover our class members.

6    You know, alternatively, you could use the All Writs Act

7    because there's a way in which the government's interpretation

8    of the asylum ban, were they to apply the asylum ban to our

9    plaintiffs, they would be running headlong into an order of

10:26    10    this court.  That would be illegal.  And so the All Writs Act

11    would prevent them.

12    I think both avenues are plausible for the Court.

13    THE COURT:  Okay.

14    MR. AZMY:  And I'm going to ask my colleague,

10:26    15    Steve Medlock, to address the class cert question.

16    THE COURT:  Okay.

17    MR. MEDLOCK:  Good morning, Your Honor.

18    With respect to Roberto DOE, we understand your concerns;

19    however, if you look at the factual record, Exhibit 15 to our

10:26    20    opening class certification brief, Roberto DOE testifies that

21    he approached the Reynoso Hidalgo Port of Entry on October 2nd,

22    2018.  When he got to the midpoint of the bridge, he met a CBP

23    officer.  The CBP officer told him that the port was full and

24    that he should return to Mexico as a result.  That is, under

10:27    25    your prior motion to dismiss opinion, arriving in the

1    United States.  And as we point out in our reply brief, Roberto

2    DOE is actually a very apt class representative because

3    he -- we now know that the excuse that he was given on that day

4    in October 2018 was false.  The Reynoso Hidalgo Port of Entry

10:27    5    was operating very far below total capacity for detention and

6    throughput of noncitizens arriving in that port of entry.

7        So we believe that Roberto DOE is an adequate and typical

8    representative of the class.

9            THE COURT:  Okay.

10:27    10            MR. MEDLOCK:  Thank you.

11            THE COURT:  Thank you.

12        And just so you know, the focus of my questions -- and you

13    can deal with those issues as well, but the question I have for

14    you on the preliminary injunction, you've got all these

10:28    15    declarations that detail why you have limited capacity at the

16    ports to process asylum-seekers, how you've implemented this

17    metering where border patrol officers stand at the

18    International Boundary Line and inform an alien the port

19    capacity is at its limit and access is not immediately

10:28    20    available, and then you say that the government of Mexico is

21    responsible for keeping the list of who comes in.

22        What's missing is how border patrol decide who to process,

23    who to let back in.  I mean, presumably it's someone who's on

24    the government of Mexico's list.  Someone can't just walk up

10:28    25    and say hey, I want to be in front of everyone else.  You only

22

1    take people that the government of Mexico tell you is on the

2    list or that someone tells you is on the list.  How do you

3    decide who gets the limited space?  How does that work?

4            MR. STEWART:  I believe it's just when there's

10:28    5    processing available, folks who are on the list are sent up,

6    and we kind of take them as we find them from there,

7    Your Honor.

8            THE COURT:  But you don't take someone who just shows

9    up and says hey, I'm here, I want to be taken in.  You say is

10:29   10    this someone that's on the list, right?  I mean, you only allow

11    people who are on a list somewhere.  You don't just allow

12    anyone to come across.  You've got ten spaces, and you take ten

13    individuals.  How do you decide who those ten individuals are?

14            MR. STEWART:  Can I confer?  I just want to make sure

10:29   15    I get something right, Your Honor.

16            THE COURT:  Sure, absolutely.  It apparently is a more

17    complicated question than I thought it was.

18            MR. STEWART:  Right.

19        My understanding, Your Honor, there's -- I don't know that

10:31   20    there is an ironclad, this is the answer.  It may vary a little

21    bit.  But the Mexican immigration agency will bring people up

22    once there's been a communication that, you know, there is

23    capacity.

24            THE COURT:  Ten spots.

10:31   25            MR. STEWART:  There's also, you know, sometimes -- in

23

1    other circumstances, people will arrive, will show up outside

2    of a port of entry, and perhaps they're a vulnerable

3    population, and there might be a decision to bring them into

4    the port at that time and process them, so I don't

10:31    5    have -- there's not a -- I think a uniform answer to your

6    question, which is why it's a little -- takes a little work

7    to --

8                THE COURT:  Okay.  And the other question I have is,

9    why wouldn't this work in consumer class actions?  All the time

10:31    10    they say someone who bought something is a member of the class,

11    and we have people come forward, and they show they bought the

12    product or they fill out a form with an affidavit that says I

13    bought the product, and that makes them a member of the class.

14    I mean, we're always trying to figure out who the members of

10:32    15    the class are.  Why wouldn't it work if I just ordered the

16    government to allow a potential class member to prove they're a

17    member of the class in order to have the asylum ban apply to

18    them?  They can offer proof of a list or they can offer -- it

19    seems like there's any variety of ways that we can -- you know,

10:32    20    that's one of the big concerns the government has is how are we

21    going to know who's part of this class and who's not part of

22    this class.  And even though I think ascertainability is not

23    necessary for the class cert, it's certainly necessary for the

24    preliminary injunction part if we're going to figure out who

10:32    25    we're going to order gets this relief.

1        But it seems to me there's any variety of ways we can do

2    that either from a list or requiring people to do it or

3    requiring an affidavit.  I don't know why that would be any

4    different than any other class action that I certify.

10:32    5        MR. STEWART:  Right.  I think there are a number of

6    problems, Your Honor.  One is this is an area that,

7    unfortunately, invites a lot of fraud, misrepresentation.

8        THE COURT:  That's always the case.  In a consumer

9    class action, you can have fraud.  Someone says they get $100

10:33    10    if they bought the product, and they have to come up with a

11    receipt, and the argument is always well, they can get a

12    fraudulent receipt or they can claim $100 when they didn't

13    actually buy the product.  Why is that any different than this?

14        MR. STEWART:  It also gets in the difference into the

10:33    15    issue of commonality, Your Honor, and I think -- I mean, this

16    is sort of a distinction between, say, the washing machine

17    example.  It gets into our point about under this Court's

18    orders and under even plaintiff's theory of pretext, there are

19    legitimate factors that would allow metering, and the

10:33    20    difficulty is that that requires an individualized

21    determination, and you can't say oh, all of these folks who

22    showed up at this time, even if we could declare we knew them

23    and all that kind of a thing, all of them were subject to these

24    factors or other factors, and that requires an individualized

10:33    25    determination that would be impossible to do on a class-wide

25

1    basis.

2          THE COURT:  I'm not following you.  What would be the

3    individual determination?  All the individual determination

4    would be is did you arrive before July 16th or didn't you

10:34  5    arrive before July 16th.

6          MR. STEWART:  If this court were to hold that metering

7    were categorically unlawful, that would be the result of that

8    ruling, Your Honor.  The difference between a washing machine

9    is if I'm looking at a faulty washing machine from afar, I

10:34 10    can -- I can see there's a defect there.  It doesn't work.  It

11    has a problem.  If I'm looking at metering from afar, I can't

12    tell what the factor is that caused somebody to be metered.

13    Was it something that -- you know, was it based on this kind of

14    a capacity concern?  Was it based on this sort of admission

10:34 15    concern?

16          THE COURT:  But going back to my original question all

17    along, if I only find that this individual was metered, they

18    were told you have to wait in Mexico, they were told.  They

19    arrived at the port of entry, and they were told you have to

10:34 20    wait, and they waited.  And those individuals arrived at the

21    port of entry before July 16th.  The only question is, were

22    they?  Not were they appropriately metered or was it lawful or

23    unlawful.  Just, did they arrive at the port of entry?  That's

24    really -- it seems like it's a much simpler question.

10:35 25          MR. STEWART:  But you would be ordering us not to

1    apply the asylum rule to those folks, Your Honor.

2              THE COURT:  Because I'm finding that they arrived at

3    the port of entry.

4              MR. STEWART:  And that -- and again, that's in the

10:35    5    teeth of the supreme court's ruling.  And it would be embodying

6    that prior ruling to some extent, Your Honor, but it's --

7    again, it gets into the validity of the metering question.  You

8    would be resolving the validity of metering.  If the Court was

9    even -- say the port had even what the plaintiffs would concede

10:35    10    was capacity, and then somebody was metered.  You would be

11    saying that the person who was metered and said hey, you've got

12    to come back another day, that that person should not get the

13    rule applied to them even though under plaintiff's theory,

14    there was not another good option.  There was a legitimate

10:35    15    reason to say to that person come back.

16              THE COURT:  Why can't I find theoretically the

17    metering was lawful?  The asylum ban was lawful.

18    Everything -- all the rules are lawful.  It's just that the

19    government is not applying the rules appropriately.  What the

10:36    20    government is saying is metering is fine.  You were at

21    capacity, you couldn't bring anyone.  You could only bring a

22    certain number of people in, but those people arrived at the

23    port of entry.  I mean, they arrived, and they came, and they

24    said I'm here, I'm at the port of entry, I'm ready to enter,

10:36    25    and then you said wait.  And I'm prepared to assume you said

1   wait appropriately because you didn't have enough room, but

2   they arrived at the port of entry, so then you passed another

3   law saying people are banned if they arrived at the port of

4   entry after July 16th, and all I'm saying is they arrived

10:36   5   before July 16th, so it doesn't apply to them.

6           MR. STEWART:  And I understand the logic of what

7   you're saying, Your Honor.  It's the logic that --

8           THE COURT:  In the earlier opinion.  I understand you

9   disagree with that earlier opinion, so my question is now,

10:37   10   moving on, why do I have to find -- why do I have to reach the

11   metering issue at this time?

12           MR. STEWART:  Again, Your Honor, because it's -- you

13   know, we disagree that somebody entered or attempted to enter

14   or did anything that would have taken them out of the

10:37   15   application of the rule at that time.  And, again, I understand

16   that Your Honor may not agree with that.

17           THE COURT:  Okay.  Anything else about either class

18   cert or the preliminary injunction?

19           MR. STEWART:  I think -- I want to make sure I hit a

10:37   20   few points, Your Honor.

21       As an initial matter, I do agree that the named plaintiff

22   representative has real issues.  We've identified them in our

23   brief.  Your Honor has identified some too.  Your Honor did

24   raise the prospect of amending the complaint.  The government

10:37   25   would like to be able to file a response in an opposition to a

28

1    motion for leave to amend the complaint, Your Honor, if that

2    were -- if that were the route that they wanted to go.

3        As we've explained, the rule is not part of this case.

4    This case is two and a half years in.  This is a new,

5    significant development.  There's plainly -- there are plainly

6    class representative problems.  We're deep into discovery.  All

7    the normal features that counsel says, a serial amendment deep

8    into the case are things that we should be able to address,

9    Your Honor, so I would put that out there as a preliminary

10   thing that we would want to be able to address.

11       Other points I want to just make clear, Your Honor.

12   I -- some of these are going to hit themes that we've already

13   discussed a little bit, but the fact is that the supreme court

14   was faced with a great many of the arguments advanced here,

15   that the rule was going to end asylum at the southern border,

16   that it was impossible, very, very difficult or futile or

17   life-threatening to apply in Mexico.

18           THE COURT:  Did they address the issue of whether

19   someone arrived at the port of entry on July 16th or not,

20   before or after July 16th?

21           MR. STEWART:  It didn't because the language of the

22   rule is pretty clear, and I mean, again, it wasn't -- it wasn't

23   a difficult issue that needed to be presented at the time,

24   but --

25           THE COURT:  So as far as whether someone who was

10:38

10:38

10:38

10:38

10:39

1    metered arrived at the port of entry was not an issue that was

2    discussed in the supreme court at all?

3         MR. STEWART:  Metering was not -- was not something

4    that was resolved there, Your Honor.

10:39    5         THE COURT:  I mean, it seems to me the government

6    could have solved all this, if they really wanted to, by

7    putting it in the rule someone who was metered before July 16th

8    arrived -- make something that says that it applies to people

9    who were metered, people who were waiting in Mexico, but they

10:39   10   didn't say that.  It just said arrived at the port of entry.

11        MR. STEWART:  Your Honor, I think the language of the

12   rule is clear, and I think that your prior ruling is simply

13   wrong as to the arrival issue, and the government maintains

14   that position, and if Your Honor holds otherwise, that will be

10:39   15   an injunction against the rule.  You may disagree, but that is

16   the fact of the matter in the government's position.

17        THE COURT:  Okay.

18        MR. STEWART:  Other than that, Your Honor, I do want

19   to hit -- I will emphasize this:  The supreme court knew that

10:39   20   this would be applied for a long time to people who would be

21   showing up at ports of entry and arriving in the United States

22   for months.  It knows that many people strike out with the hope

23   of getting asylum and making their way into this country and

24   that that was going to change for people who were en route or

10:40   25   hadn't made it yet.  It let the rule go into effect.  I'd

10:40

1    emphasize that there's not really a good claim here for

2    emergency relief by the plaintiffs.  They haven't moved for

3    emergency relief so far.  It's an improper form of emergency

4    relief to seek injunction of a rule that's not even part of the

5    case where they, by their own admission, are not asking this

6    Court to enjoin at the end of the litigation.  They just claim

7    any injunction against the rule whatever, but that would be the

8    effect of the rule, and because it's not part of the case,

9    because it can't be something enjoined as to final relief, it

10:40

10   cannot be enjoined now.

11          THE COURT:  But the case was about the government

12   improperly using rules, techniques, tactics to prevent people

13   from having access to the asylum process.  Isn't that directly

14   what this case is about?

10:41

15          MR. STEWART:  It's about CBP's alleged conduct at

16   ports of entry, and it's a very broad, captious way to say that

17   a rule that -- that reflects the agency head's ability to adopt

18   asylum eligibility standards that apply in removal proceedings

19   and otherwise is just a denial of access to the system.  People

10:41

20   still have access to the asylum system.  They need to follow

21   the strictures of the rule.  They need to actually try to seek

22   relief in a third country --

23          THE COURT:  What about the argument that because the

24   government told them to wait and they would have access to the

10:41

25   system in the United States, they lost the right to claim in

1    Mexico because Mexico requires that you claim asylum within 30

2    days of arrival, and they didn't do that because they were

3    relying on what the government told them to do, which is to

4    wait in Mexico and they would have access to the asylum

5    process?

6              MR. STEWART:   I disagree with the prospect that the

7    government promised them access to the asylum system.   That's

8    not something that can be included on a sweeping basis,

9    certainly.   It's a statement -- our suggestion would be that

10   it's a statement that when somebody shows up, we don't have

11   capacity at this time, you will need to come back later.   It's

12   not necessarily a guarantee of anything at a particular time,

13   particularly given asylum is a discretionary benefit.   No one's

14   entitled to it, Your Honor.

15             THE COURT:   No, but it was basically put your name on

16   a list, and then we'll bring you across when it's your turn.

17             MR. STEWART:   And the rules that will apply in the

18   asylum system at that time will be the ones that apply, and

19   if -- again, this is the logic of the rule, Your Honor.   Part

20   of it is that we have an overburdened, overstrained asylum

21   system, and this is a discretionary benefit, and we need to put

22   some bumpers on it to make sure it's used in the most effective

23   way, and these folks who spent a long time in Mexico could, but

24   in many cases do not, pursue opportunities for relief there.

25        Even the plaintiffs acknowledge -- they try to go back on

```
      1    this a little bit in one of their reply briefs, that it's
      2    possible to get a waiver from what they say is the 30-day bar.
      3    It's inexcusable that they don't have a class representative
      4    who's tried to do that, who has tried to see how that system
10:43 5    would work, and that's part of the logic of the rule,
      6    Your Honor, is that people are not using the opportunities
      7    available to them and are instead coming to their preferred
      8    destination and forum shopping for what they like as the most
      9    congenial country to be in.
10:43 10            THE COURT:  And they were also told get your name on a
      11   list, and you'll be able to come back, right?
      12            MR. STEWART:  Again, it's not a guarantee of any
      13   particular result, Your Honor.  We do not have an obligation as
      14   to those folks.
10:43 15       The other things I would mention, Your Honor, is that there
      16   is, as I've said, a real problem for class-wide relief.  The
      17   Court cannot declare metering to be categorically unlawful.
      18   Legitimate factors can support it.  Again, I understand
      19   Your Honor's point about interpretation of the rule.  We
10:43 20   respectfully disagree.
      21       And the last thematic point and kind of overarching point
      22   that I'd hit, Your Honor, is that it is a real problem to issue
      23   the relief plaintiffs request because it would be rewarding
      24   precisely the problem that this rule tries to address, which is
10:44 25   people who don't use the opportunities available.
```

1          Beyond those points, Your Honor, what I'd emphasize is that

2     on the merits, we stand by our previous arguments regarding the

3     legality of metering.  Whatever the plaintiffs try to show with

4     respect to pretext, nothing gets remotely close to showing

10:44    5     something that would allow categorical, class-wide relief, and

6     the evidence is spotty and has all sorts of problems, does not

7     show remotely what they would need for this kind of relief.

8          The supreme court has considered the same equitable factors

9     and has made its decision as to the rule being able to go into

10:44   10    effect for a significant period of time.

11         And the last point or two I would mention, Your Honor, is

12    that the All Writs Act is inapt here.  This is not a question

13    of the Court losing jurisdiction or the case mooting out or

14    that kind of a thing.  The challenges to metering, there's no

10:45   15    indication the Court would lose its ability to address the

16    legality of metering.

17              THE COURT:  Wouldn't it, however -- I mean, everyone

18    keeps talking about this being a narrow form of metering, but

19    the complaint alleges that a certain class of people are denied

10:45   20    access to the asylum process, and if the asylum ban were

21    applied to this subclass of people, it would moot out that

22    issue whether they were denied access to the asylum process or

23    not because it would say well, now we've passed a new rule, and

24    the rule says you're out of the class because now you've got an

10:45   25    asylum ban in place.

34

1    MR. STEWART:  I mean, I'm not sure I completely follow

2  Your Honor.

3    THE COURT:  Well, I guess my argument is I had a

4  class -- we had a group in this complaint when it was

10:46   5  originally filed that included people from Central America.

6  And now suddenly a law has been passed, and you're saying now

7  all those people from Central America are taken out of the

8  class.

9    MR. STEWART:  Again, there's no indication that there

10:46  10  are not going to be class members who continue to try to -- or

11  cutative class members, people who will --

12    THE COURT:  It doesn't even matter about the metering

13  anymore if you're correct.  They're just taken out of -- cut

14  out of the class now, right?  I mean, isn't that what your

10:46  15  argument is, is that they're no longer part of this case?

16    MR. STEWART:  Again, it's hard to say as to who would

17  be in that class.  Again, I'm not completely sure I'm

18  following, but I think what I would say, Your Honor, is I don't

19  follow the mootness concern.  I mean, by the plaintiff's own

10:46  20  claim, there are 26,000 folks who would be subject to this.

21  This is not kind of a one-class-member or two-class-members

22  thing where somebody just kind of disappears every few days and

23  you need some other measure to have the case be heard.

24    So I would just respectfully disagree that there is a

10:47  25  mootness problem, and I would mention, Your Honor, that the PI

1    here -- and this, I think, goes to an overarming point.  The PI

2    in this case, the preliminary injunction, challenges only the

3    metering thing, the metering approach, the metering decisions.

4    It doesn't go to the broader issues.  I mean, the plaintiffs

10:47    5    specifically disclaim that in footnotes -- as to -- in a

6    footnote as to their broader challenge, so this is

7    about -- this is about that.

8        One other point, Your Honor, is that on the wait list, I

9    would mention CBP doesn't control who goes on the wait list,

10:47    10    so, again, this is not that completely, kind of engineered

11    process in I think the way potentially suggested earlier.

12        With those points, Your Honor, I would emphasize the other

13    matters hit in our brief.

14        THE COURT:  Thank you.

10:47    15    Counsel.

16        MR. AZMY:  Your Honor, if I could address what I think

17    we would call the administrability question about how an order

18    would be administered.  I mean, I think our position is for the

19    government to say that they wouldn't know how to administer

10:48    20    this rule is at some level absurd.  Metering is a government

21    policy.  They rely on it every day.  Exhibit 1 to our motion is

22    a metering guidance from April 27th, 2018, the Ramos

23    declaration, describes how the government relies on the

24    metering list every day to figure out who can come in, and it

10:48    25    just strikes us as absurd for the government to now say -- to

1    walk away from their comprehensive knowledge of how metering
2    works and how lists work when the Court would ask them to
3    comply with the law.
4        And we simply agree that this is the kind of order the
5    courts issue all the time.  Judge Sabraw did it in the family
6    separation context in the June 26th order ordering the
7    government to identify all children under five within 14 days.
8    I'm not sure I fully understood the government's argument about
9    how the supreme court has already, you know, sort of signaled
10   that -- their approval of the asylum ban rule.  I mean, even if
11   they have, they've done that prospectively, not retroactively,
12   and I think what we're all saying here is they cannot apply
13   contrary to an interpretation of the INA, it cannot apply
14   retroactively, so in a way, Your Honor's ruling would be
15   consistent with general supreme court principles.
16       On the point about rewarding, sort of, bad behavior, not
17   only is that practically unrealistic, I think it has things
18   entirely upside down.  These class members did as Your Honor
19   suggested, rely on representations from the United States
20   Government that they would have access to the asylum process if
21   they waited.
22       I heard the government to say the United States didn't make
23   them a promise that they would have access.  That would be even
24   worse.  Because they have to have access to the asylum process.
25   They relied on the government's representations, and the

10:50

1    government has now issued a new rule doubling down on the other

2    rules and pulling the rug out from under them despite their

3    lawful compliance with the government's metering policy that we

4    ultimately believe was unlawful and which is causing the harm

5    in this case.

6        And we, again, for all the reasons I've said before, are

7    not seeking to enjoin the asylum ban, just the unlawful effects

8    of metering and to prevent an interpretation of the asylum ban.

9    That is inconsistent with the law that this Court has already

10:51

10    found applies in this case and, therefore, to the provisional

11    class members.

12        I think my colleague has -- both my colleagues have

13    something else to say.

14            MS. CROW:  Your Honor, we agree that the provisional

10:51

15    class members did rely upon the government's representation

16    that they would ultimately have access to the asylum process.

17    And the best evidence of that is that they did not enter

18    between ports of entry.  Had they done so, they would have been

19    in the United States by the time the asylum ban was

10:51

20    implemented.  And there would be no dispute as to whether it

21    applied to them, but they instead decided to follow the rules

22    and to wait it out or try to wait it out.

23        In terms of the government's reference to the 30-day bar on

24    applications for asylum in Mexico, those waiver requests are

10:51

25    routinely rejected.  It's a very complex legal process, and

38

1   it's virtually impossible to prevail without assistance of a

2   lawyer which most provisional class members don't have the

3   resources to afford.  There are very few pro bono attorneys in

4   Mexico.

10:52   5       The other issue is that getting that 30-day bar denial

6   itself takes time because the Mexican asylum system is so

7   overburdened, and there are two declarations about that process

8   in our materials.

9       The other thing I would just note is that we don't know for

10:52   10  sure that a 30-day bar denial would actually count as the final

11  judgment of denial that the defendants require under the asylum

12  ban.  It may not be enough, which would mean that you would

13  have to appeal the higher authorities, and class members

14  certainly aren't equipped to do that.

10:52   15      In terms of asylum being a discretionary remedy, that's

16  true, but the government is conflating section 1225(b) of the

17  act, which imposes mandatory obligations to inspect and process

18  individuals at ports of entry with a discretionary form of

19  relief.  We're not insisting that each provisional class member

10:53   20  is entitled to asylum at a port of entry, but rather that they

21  have access to the process.

22      And just a few more notes on ascertainability.  The

23  government has already changed its procedures during

24  credible-fear interviews to include additional questions

10:53   25  regarding whether someone should be subject to the asylum ban,

39

1    so it doesn't seem overly onerous to ask a few more questions

2    about when somebody was turned away or metered at a port of

3    entry.

4        In addition to the family separation context, I would

10:53    5    mention another decision by this Court in Lopez-Venegas versus

6    Johnson.  That was a 2013 lawsuit alleging that border patrol

7    agents and ICE officers routinely pressured undocumented

8    immigrants to sign voluntary return orders, and if an

9    individual signed such an order, they would forfeit their right

10:54   10    to a hearing before an immigration judge and usually be

11    expelled to Mexico within hours.  There was a settlement in

12    2014 pursuant to which certain class members who had been

13    expelled from the U.S. pursuant to this process were permitted

14    to return and reunite with their families.  Again, that was a

10:54   15    very labor-intensive process.  But the minimum requirement for

16    proving membership in a class was simply a declaration from the

17    affected individual as Your Honor proposed.

18        MR. MEDLOCK:  Just briefly on the provisional class

19    certification issues, counsel raised the issue of commonality.

10:54   20    But the Ninth Circuit has been clear in the Mazza decision that

21    as little as one common issue is all that is required for a

22    showing of commonality.

23        And in this case, I think at a minimum, there are two

24    questions, as you have put it:  First, what is the

10:55   25    definite -- what is the definition of the term "arriving in"

1    under the INA; and second, when did the provisional class

2    members arrive in the United States?

3        And those questions are common to all class members, and

4    the Court -- although I certainly disagree with the couple of

5    breezy sentences that my friend on the other side had about our

6    data, those -- you don't need to get to those issues to show

7    commonality here.

8        And in addition, I believe counsel said it's inexcusable

9    that we do not have a class representative who sought relief in

10    Mexico.  In fact, if you look at Roberto DOE's declaration in

11    support of the reply for provisional class certification, he

12    did just that.  So I don't know if it would be inexcusable or

13    not, but our class representative did just that.

14        And then finally, as my colleagues point out on

15    ascertainability, it's a common issue in 23(b)(3) classes

16    for -- I think we've all been there.  We fill out the form

17    online to say whether we were part of the data breach or

18    whether we bought the product that was allegedly price fixed,

19    and then there's some additional proof.

20        But importantly, this is not a 23(b)(3) class, so I don't

21    think you need to get there.  It's a 23(b)(2) class.  And this

22    Court has been pretty clear that ascertainability is not an

23    element of a 23(b)(2) class.  I think your opinions in Bee,

24    Denning versus Capital Alliance Group and McCurley versus Royal

25    Seas Cruises.

41

```
 1            THE COURT:  I agree, but when you get to the point of
 2   the preliminary injunction, you have to decide who it is
 3   applying to and who it is not.
 4            MR. MEDLOCK:  And I agree, and I think my co-counsel
 5   have already answered the question on that.
 6        Thank you, Your Honor.
 7            THE COURT:  Thank you.  Anything further?
 8            MR. STEWART:  Briefly, Your Honor.
 9            THE COURT:  Sure.
10            MR. STEWART:  Just to note, Your Honor, on the access
11   to the process point, the government -- our position would be
12   nobody is entitled to a specific form of the asylum process at
13   a given time.  The regulatory rules changed from one point to
14   another.  Those can be applied now when people enter at a later
15   time or enter after the bar, even if they approach the port of
16   entry at a previous time.  They're not guaranteed a particular
17   outcome or a particular presence or absence of certain bars,
18   and we would stick by that point.
19        Other than that, nothing additional.  Thank you.
20            THE COURT:  Okay.  The matter is submitted.  Thank you
21   very much.
22            MR. MEDLOCK:  Thank you.
23                         ---o0o---
24
25
```

10:57 (lines 5, 10, 15, 20)

42

1                          C-E-R-T-I-F-I-C-A-T-I-O-N

2

3        I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5

6        Dated November 17, 2019, at San Diego, California.

7

8
                              /s/ Dana Peabody_____
9                             Dana Peabody,
                              Registered Diplomate Reporter
10                            Certified Realtime Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25