# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

Al Otro Lado, Inc., *et al.*,

                    Plaintiffs,

    v.

Kevin K. McAleenan, *et al.*,

                    Defendants.

Case No.: 17-cv-02366-BAS-KSC

**ORDER:**

**(1) GRANTING PLAINTIFFS' MOTION FOR PROVISIONAL CLASS CERTIFICATION (ECF No. 293);**

**AND**

**(2) GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 294)**

Before the Court are Plaintiffs' Motion for Provisional Class Certification and Plaintiffs' Motion for a Preliminary Injunction. (Mot. for Provisional Class Certification, ECF No. 293; Mot. for Prelim. Inj., ECF No. 294.) These Motions identify a subclass of asylum-seekers caught in the legal bind created by Defendants' previous policies at the southern border and a newly-promulgated regulation known as the Asylum Ban. The Asylum Ban requires non-Mexican nationals who enter, attempt to enter, or arrive at a port of entry ("POE") at the southern border on or after July 16, 2019 to first seek asylum in Mexico, subject to narrow exceptions. Plaintiffs ask the Court to prevent the Government Defendants from applying the Asylum Ban to a class of non-Mexican nationals who were prevented from making direct claims

for asylum at POEs before July 16, 2019 and instructed to instead wait in Mexico pursuant to the Government's own policies and practices.

The putative class members in this case did exactly what the Government told them to do: they did not make direct claims for asylum at a POE and instead returned to Mexico to wait for an opportunity to access the asylum process in the United States. Now, the Government is arguing that these class members never attempted to enter, entered, or arrived at a POE before July 16, 2019, and, therefore, the newly promulgated Asylum Ban is applicable to them.

The Court disagrees.  Because the Court finds that members of the putative class attempted to enter a POE or arrived at a POE before July 16, 2019, and that as such, the Asylum Ban by its terms does not apply to them, the Court **GRANTS** Plaintiffs' Motions.

## I.    BACKGROUND

Plaintiffs filed their initial complaint in the underlying action on July 12, 2017 in the Central District of California.  (Compl., ECF No. 1.)  The case was subsequently transferred to the Southern District of California.  (ECF Nos. 113, 114.) The Court provides a brief overview of the action's lengthy litigation history below.

### A.    Overview of the Litigation

Plaintiffs' putative class action complaint alleges that Customs and Border Protection ("CBP") uses various unlawful tactics, "including misrepresentation, threats and intimidation, verbal abuse and physical force, and coercion" to systematically deny asylum seekers access to the asylum process.  (Compl. ¶ 2.) Defendants moved to dismiss the Complaint on December 14, 2017.  (ECF No. 135.) In its order on the motion, the Court found that organizational Plaintiff Al Otro Lado had standing to bring the case and that the case was not moot, even though some named Plaintiffs had received an asylum hearing.  *See Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1296–1304 (S.D. Cal. 2018).  The Court further denied requests to dismiss the lawsuit based on sovereign immunity and held that Plaintiffs

17cv2366

had adequately alleged a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), to "compel agency action unlawfully withheld." (*Id.* at 1304–05, 1309–10.)

However, the Court dismissed the § 706(1) claims brought by Plaintiffs Abigail Doe, Beatrice Doe and Carolina Doe to the extent they sought to compel relief under 8 C.F.R. § 235.4 for allegedly being coerced into withdrawing their applications for admission. *Id.* at 1314–15 (concluding that § 235.4 did not require CBP to take "discrete agency action" to determine whether a withdrawal was made voluntarily). The Court also dismissed Plaintiffs' § 706(2) claims based on an alleged "pattern or practice" because Plaintiffs had not alleged facts to plausibly "support [] the inference that there is an overarching policy" to deny access to the asylum process, and thus had not identified a "final agency action" reviewable under this provision of the APA. *Id.* at 1320. The Court granted Plaintiffs leave to amend their § 706(2) claims. *Id.* at 1321.

Plaintiffs then filed a First Amended Complaint ("FAC") on October 12, 2018, followed by a Second Amended Complaint ("SAC") on November 13, 2018. (ECF Nos. 176, 189). The amended complaints added allegations regarding the Government's purported "Turnback Policy," which included a "metering" or "waitlist" system in which asylum seekers were instructed "to wait on the bridge, in the pre-inspection area, or at a shelter"—or were simply told that "they [could not] be processed because the [POE] is 'full' or 'at capacity[.]'" (SAC ¶ 3.) Plaintiffs contend that CBP officials "routinely tell asylum seekers approaching POEs that in order to apply for asylum, they must get on a list or get a number" and that CBP prevents asylum-seekers from coming to the POE "until their number is called which can take days, weeks or longer." (*Id.* ¶ 100.) Some individuals are prevented from registering on the lists due to discrimination based on race, sexual orientation, or gender identity by the Mexican officials or third parties managing the lists. (*Id.*) Plaintiffs allege that CBP's rationale for this system—that the POEs did not have the

17cv2366

capacity to process the asylum claims—is a pretext to serve "the Trump administration's broader, public proclaimed goal of deterring individuals from seeking access to the asylum process." (*Id.* ¶¶ 3, 5; *see also id.* ¶¶ 72–83.)

Defendants moved to dismiss the SAC on November 29, 2018. (ECF No. 192.) Following briefing—including six amicus briefs filed in support of Plaintiffs' arguments[1]—and oral argument, the Court largely denied Defendants' motion to dismiss the SAC. *See Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168 (S.D. Cal. 2019). First, the Court denied Defendants' Motion to Dismiss the SAC with respect to the amended § 706(2) allegations, finding that:

> Unlike the original Complaint, the SAC now alleges that as early as 2016, Defendants were implementing a policy to restrict the flow of asylum seekers at the San Ysidro Port of Entry. Plaintiffs allege that Defendants formalized this policy in spring 2018 in the form of the border-wide Turnback Policy, an alleged "formal policy to restrict access to the asylum process at POEs by mandating that lower-level officials directly or constructively turn back asylum seekers at the border," including through pretextual assertions that POEs lack capacity to process asylum seekers.

*Id.* at 1180 (citing SAC ¶¶ 3, 48–93).

The Court also rejected, without prejudice, Defendants' argument that the SAC raised issues barred by the political question doctrine because they implicated "Defendants' coordination with a foreign national to regulate border crossings." *Id.* at 1190–93. The Court found that although some allegations "touch on coordination with Mexican government officials[,]" this coordination was "merely an outgrowth of the alleged underlying conduct by U.S. Officials." *Id.* at 1192

Finally, the Court rejected Defendants' arguments that Plaintiffs located on Mexican soil were not "arriving in" the United States for purposes of asylum. *Id.* at 1199–1201 (citing 8 U.S.C. § 1158(a)(1) (applicants for asylum include "[a]ny alien who is physically present in the United States or who arrives in the United States") and 8 U.S.C. § 1225(b)(1)(A)(ii) (requiring an immigration officer to refer for an

---

[1] Amicus briefs were filed in support of Plaintiffs by: (1) twenty states; (2) Amnesty International; (3) certain members of Congress; (4) certain immigration law professors; (5) nineteen organizations representing asylum seekers; and (6) Kids In Need of Defense ("KIND").

17cv2366

asylum interview certain individuals who are "arriving in the United States")).  The Court found that the plain language and legislative histories of these statutes supported the conclusion that the statute applies to asylum seekers in the process of arriving.  *Id.* at 1199–1201.  Furthermore, the Court concluded that the allegations in the SAC plausibly showed that Plaintiffs were in the process of arriving in the United States at the time they attempted to raise their asylum claims at POEs.  *Id.* at 1203.

Defendants then answered the Complaint on August 16, 2019.  (ECF No. 283).

## B.     The Asylum Ban

On July 16, 2019, the Government issued a joint interim final rule entitled "Asylum Eligibility and Procedural Modifications," widely known as the "Asylum Ban."  84 Fed. Reg. 33,829 (July 16, 2019), *codified at* 8 C.F.R. § 208.13(c)(4).  In relevant part, Asylum Ban provides the following:

> (c) Mandatory denials—
>
> > (4) Additional limitation on eligibility for asylum. Notwithstanding the provisions of § 208.15, any alien who enters, *attempts to enter, or arrives* in the United States across the southern land border *on or after July 16, 2019*, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:
> >
> > (i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country.

*Id.*  (emphasis added).  Although the initial implementation of this new regulation was enjoined by the Northern District of California, the Supreme Court subsequently stayed the district court's injunction of the Asylum Ban on September 11, 2019, without explanation, "pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such a writ is sought."  *Barr v. East Bay Sanctuary Covenant*, ___S. Ct. ___, 2019 WL 4292781 (Sept. 11, 2019) (mem.).  Thus, at present,

5

non-Mexican asylum-seekers who entered, attempted to enter, or arrived at the United States-Mexico border after July 16, 2019 must first seek and be denied asylum in Mexico to establish eligibility for asylum in the United States.[2]

Due to the Government's metering policies, these individuals were prevented from crossing through POEs and were instead instructed to "wait their turn" in Mexico for U.S. asylum processing.[3]   Many understood this to be a necessary and sufficient way to legally seek asylum in the United States.[4]   Their understanding of the process, under the law that existed at the time of they sought asylum at the southern border, was correct.

Plaintiffs argue the Asylum Ban would, if applied to non-Mexican asylum-seekers who were metered at the border *before* July 16, 2019, preclude these individuals from accessing any asylum process altogether due to circumstances entirely of the Government's making.   Mexico's Commission to Assist Refugees, the administrative agency responsible for processing asylum claims, requires that applicants for asylum submit their petitions within 30 days of entering Mexico.  (*See* Decl. of Alejandra Macias Delgadillo ¶¶ 34–37, Ex. 27 to  Mot. for Prelim. Inj., ECF No. 294-27; Decl. of Michelle Brané ¶ 22, Ex. 28 to Mot. for Prelim. Inj., ECF No. 294-28.)  However,  because the Asylum Ban was not promulgated until after the time these individuals were subject to metering, none of the members of the putative

---

[2] The regulation provides two alternative circumstances in which an individual will still be considered eligible for asylum in the United States even though he or she cannot demonstrate compliance with subsection (i): (1) if an individual can show that he or she is a victim of trafficking; or (2) if the countries through which an individual traveled in transit to the United States were not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.  *See* 8 C.F.R. § 208.13(c)(4)(ii)–(iii). Neither exception is relevant to the instant action.

[3] *See, e.g.*, Decl. of Roberto Doe ¶¶ 4–6, Ex. 5 to Mot. for Prelim. Inj., ECF No. 294-7; Decl. of K-S ¶¶ 15--16, Ex. 6 to Mot. for Prelim. Inj., ECF No. 294-8; Decl. of S.N. ¶¶ 14–16, Ex. 7 to Mot. for Prelim. Inj., ECF No. 294-9; Decl. of Dora Doe ¶¶ 6–9, Ex. 13 to Mot. for Prelim. Inj., ECF No. 294-15; Decl. of Jordan Doe ¶ 9, Ex. 15 to Mot. for Prelim. Inj., ECF No. 294-17; Decl. of B.B. ¶ 8, Ex. 22 to Mot. for Prelim. Inj., ECF No. 294-24; Decl. of Mowha Doe ¶ 8, Ex. 49 to Mot. for Prelim. Inj., ECF No. 294-47.

[4] *See, e.g.*, Decl. of K-S ¶ 16; Decl. of S.N. ¶ 17; Decl. of China ¶ 9, Ex. 9 to Mot. for Prelim. Inj., ECF No. 294-11; Decl. of Jordan Doe ¶ 9; Decl. of A.V.M.M. ¶ 8, Ex. 17 to Mot. for Prelim. Inj., ECF No. 294-19.

class attempted to exhaust Mexico's asylum procedures within the 30-day window. In short, should the Asylum Ban apply to these individuals, the situation would effectively be this: Based on representations of the Government they need only "wait in line" to access the asylum process in the United States, the members of the putative class may have not filed an asylum petition in Mexico within 30 days of entry, thus unintentionally and irrevocably relinquishing their right to claim asylum in Mexico and, due to the Asylum Ban, their right to claim asylum in the United States.[5]

Thus, Plaintiffs seek to provisionally certify a subclass of the original class consisting of "all non-Mexican noncitizens who were denied access to the U.S. asylum process before July 16, 2019 as a result of the Government's metering policy and continue to seek access to the U.S. asylum process[.]" (Mot. for Provisional Class Certification at 13.)  Plaintiffs further request that the Court preliminarily enjoin Defendants from applying the Asylum Ban to provisional class members who were metered prior to July 16, 2019.  (Mot. for Prelim. Inj. at 24–25.)

Defendants argue that this Court has no jurisdiction to issue the requested relief in either Motion under a variety of provisions in the Immigration and Nationality Act ("INA") and because the subject of Plaintiffs' injunction is not of the same character as the underlying lawsuit.  As to the merits of Plaintiffs' Motions, Defendants contend that Plaintiffs are not entitled to an injunction because the Government's metering policies are lawful, the balance of equities tips sharply in favor of the Government, and Plaintiffs have failed to satisfy any of the prerequisites to class certification under Federal Rule of Civil Procedure 23.  For the reasons explained below, the Court rejects Defendants' arguments.

---

[5] Plaintiffs note that Mexico's 30-day limitation to file petitions for asylum is subject to a waiver for good cause.  However, appealing untimeliness determinations on the basis of the waiver "are often decided on legal formalities" that generally require the legal expertise of an attorney, which very few of those waiting in Mexico have the means to retain.  (Decl. of Alejandra Macias Delgadillo ¶¶ 35–36; Decl. of Michelle Brané ¶ 22.)

7

17cv2366

## II.    JURISDICTION

Defendants challenge the Court's jurisdiction to grant the requested relief, citing to various provisions of 8 U.S.C. § 1252 that preclude jurisdiction in certain contexts.  Before turning to the specific subsections, it is necessary to clarify the factual and legal framework within which this Order operates.  First, it is important to identify what precise question the Court has been asked to decide—and what it has *not* been asked to decide—on Plaintiffs' two Motions.  Plaintiffs ask that the Court enjoin the Government from applying the Asylum Ban to them because they arrived at POEs before July 16, 2019.  Plaintiffs do not make a facial challenge to the Asylum Ban's legality by asking the Court to pass upon the constitutionality of the regulation as an exercise of the Executive Branch's powers.  Plaintiffs' request also does not require the Court to make any determinations about the merits of their asylum claims, review removal proceedings (expedited or otherwise), or determine the legitimacy of any orders of removal.

Second, Defendants' challenge to jurisdiction in this case calls into question bars on courts' inherent powers of equity.  It is undisputed that Congress can restrict a federal courts' traditional equitable discretion.  *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194–95 (1978).  "However, because of the long and established history of equity practice, 'we do not lightly assume that Congress has intended to depart from established principles [of equitable discretion].'"  *Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*, 367 F.3d 1108, 1112 (9th Cir. 2004) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982)).  Therefore, "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."  *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *see also United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001) (holding that trial courts' equitable discretion "is displaced only by a clear and valid legislative command") (internal quotations omitted); *Rodriguez v. Hayes*, 591 F.3d 1105, 1120

8

(9th Cir. 2010) ("[T]raditional equitable powers can be curtailed only by an unmistakable legislative command.").

Turning to Defendants' specific challenges to the Court's jurisdiction, Defendants make two arguments. First, Defendants argue that various subsections of 8 U.S.C. § 1252 divest this Court of jurisdiction to review the implementation of the Asylum Ban. (Opp'n to Prelim. Inj. Mot. at 6–10, ECF No. 307.) Second, Defendants argue that the requested injunction is improper because it is not of the same character as the underlying lawsuit and deals with matter lying wholly outside the issues in the suit. (*Id.* at 10–11.) The Court rejects both arguments for the reasons discussed below.

### A.  Bars to Jurisdiction Under 8 U.S.C. § 1252

The provisions of 8 U.S.C. § 1252 deprive this Court of jurisdiction over certain cases. Defendants take a scattershot approach, arguing that multiple subsections are applicable to Plaintiffs' requests and thus the court has no jurisdiction to reach the issues raised. The Court disagrees.

> 1.  The relief requested does not arise from, pertain to, or otherwise relate to pending removal proceedings or removal orders.

Several subsections of § 1252 limit judicial review of claims and questions that relate to removal proceedings or existing orders of removal. Defendants argue that §§ 1252(a)(2)(A)(i), 1252(g), 1252(a)(5), and 1252(b)(9) all strip this Court of jurisdiction.[6]

---

[6] *See* 8 U.S.C. § 1252(a)(2)(A)(i) (precluding jurisdiction over causes or claims "arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)"); § 1252(a)(5) (directing that "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e)"); § 1252(b)(9) ("Judicial review of all questions of law and fact, including interpretation and application of statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."); 8 U.S.C. § 1252(e)(1)(A) (divesting courts' jurisdiction to issue equitable relief "in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1)[,]" with exceptions); § 1252(g) (barring exceptions, "no court shall have jurisdiction to hear any cause or claim by or on behalf of an alien arising from the decision or action by the

9

1    Section 1252(a)(2)(A)(i) prohibits "a direct challenge to an expedited removal

2    order." *Pena v. Lynch*, 815 F.3d 452, 455 (9th Cir. 2016); *see also Jennings v.*

3    *Rodriguez*, 138 S. Ct. 830, 841 (2018) (§ 1252(b)(9) did not apply where respondents

4    were not asking for review of an order of removal, challenging the decision to detain

5    them or seek removal, or challenging the process for determining removability);

6    *M.M.M. on Behalf of J.M.A. v. Sessions*, 347 F. Supp. 3d 526, 532 (S.D. Cal. 2018)

7    (§ 1252(a)(2)(A)(i) did not apply where plaintiffs did not have final removal orders

8    and where they were "not challenging the Government's ultimate decision to detain

9    or remove them").

10    Section 1252(g), by its terms, applies to only the three discrete actions that the

11    Attorney General may take—to commence proceedings, adjudicate cases, or execute

12    removal orders. *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S.

13    471, 482 (1999).   It does not refer to "all claims arising from deportation

14    proceedings." *Id.*

15    Finally, the prohibitory language in § 1252(a)(5) and § 1252(b)(9) "mean[s]

16    that any issue—whether legal or factual—arising from any removal-related activity

17    can be reviewed only through the PFR [petition for review] process." *J.E.F.M. v.*

18    *Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) (emphasis omitted).   However, §

19    1259(b)(9) "excludes from the PFR process any claim that does not arise from

20    removal proceedings.  Accordingly, claims that are independent of or collateral to the

21    removal process do not fall within the scope of § 1252(b)(9)." *Id.* at 1032; *see also*

22    *Jennings*, 138 S. Ct. at 841.  The question is not whether the challenged action "is an

23    action taken to remove an alien but whether the legal questions in this case arise from

24    such an action." *Jennings*, 138 S. Ct. at 841 n.3.

25    The Government does not allege that any Plaintiff is in removal proceedings

26    or that a final order of removal has been issued as to any Plaintiff.  Likewise, Plaintiffs

27

28    Attorney General to commence proceedings, adjudicate cases or execute removal orders against
       any alien under this chapter").

17cv2366

do not request review of an order of removal, challenge the decision to seek removal, or contest any step that has been taken by the Government to determine their removability, including a decision to commence or adjudicate proceedings. (*See* Mot. for Prelim. Inj. at 2 (stating that Plaintiffs did not "file this motion to seek a specific outcome in provisional class members' asylum cases")).)  In fact, the very relief Plaintiffs seek is to commence such proceedings and have their asylum claims adjudicated by being granted access to the asylum process.

Defendants have not alleged that any final removal orders have been issued as to any Plaintiff, or that Plaintiffs' requests challenge any such orders per subsection (a)(2)(A), implicate the discrete actions outlined in subsection (g), or arise from actions taken to remove these aliens under subsections (a)(5) and (b)(9).  Thus, the Court finds that these provisions do not preclude its jurisdiction over the claims raised in Plaintiffs' Motions.

### 2. The Asylum Ban does not implement the expedited removal statute (8 U.S.C. § 1225(b)).

Two subsections in § 1252 prohibit judicial review of policies, regulations, or procedures issued or adopted by the Attorney General "to implement 8 U.S.C. § 1225(b)(1)."[7]  Defendants claim that § 1225(b)(1) is implicated because of the possibility that some Plaintiffs "will be adjudicated in expedited removal proceedings under section 1225(b)(1), and some in regular removal proceedings under section 1229a."  (Opp'n to Mot. for Prelim. Inj. at 6–7.)

Although the Asylum Ban's limitation on eligibility requirements may derivatively affect certain aspects of the expedited removal process authorized in

---

[7] *See* 8 U.S.C. § 1252(a)(2)(A)(iv) (providing courts have no jurisdiction to review "procedures or policies adopted by the Attorney General to implement the provisions of § 1225(b)(1)" except as provided in subsection (e)); § 1252(e)(3)(A)(ii) (limiting judicial review to the United States District Court for the District of Columbia to determine "whether a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement" 8 U.S.C. § 1225(b)(1) is inconsistent with the statute or otherwise unlawful).

17cv2366

§ 1225(b)(1), the Asylum Ban does not *implement* § 1225(b)(1).  *See E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1118–19 (N.D. Cal. 2018), *appeal filed*, Nos. 18-17274, 18-17436 (9th Cir. Dec. 26, 2018).  Rather, the Asylum Ban implements the asylum eligibility requirements stated in the asylum statute, 8 U.S.C. § 1158.

Section 1158 states that asylum may be granted "to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section."  8 U.S.C. § 1158(b)(1)(A).  The Asylum Ban, housed in the Code of Federal Regulations under Part 208 ("Procedures for Asylum and Withholding of Removal"), Section 208.13 ("Establishing Asylum Eligibility"), appears to be one such procedure.  The Ban itself is characterized not as an additional procedure for expedited removal, but as an "Additional limitation on eligibility for asylum."  *See* 8 C.F.R. § 208.13(c)(4).  Nothing in the language of the Ban discusses § 1225(b)(1), cites to § 1225(b)(1), or otherwise indicates that it implements expedited removal under § 1225(b)(1).  Thus, the Court sees no basis for concluding that the Asylum Ban implements expedited removal.  *See Kucana v. Holder*, 558 U.S. 233, 252 (2010) ("[T]he textual limitations upon a law's scope are no less a part of its purpose than its substantive authorizations.") (quoting *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (plurality op.)).

An analysis of the relevant provisions of § 1252 leads to the same conclusion.  Nothing in the language of § 1252, including in § 1252(a)(2)(A)(iv) and § 1252(e)(3)(A)(ii), precludes judicial review of regulations implementing asylum eligibility requirements under 8 U.S.C. § 1158.  Courts must interpret congressional language barring jurisdiction precisely.  *Cheng Fan Kwok v. INS*, 392 U.S. 206, 212 (1968) (holding that a statute affecting federal jurisdiction "must be construed both with precision and with fidelity to the terms by which Congress has expressed its wishes").  "[W]here Congress includes particular language in one section of a statute

but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009).  Thus, in these provisions, where Congress sought to limit judicial review of policies, procedures, and regulations made under only § 1225(b)(1), the Court must presume that Congress intentionally excluded § 1158 from this jurisdictional bar.  *See E. Bay Sanctuary Covenant*, 354 F. Supp. at 1118–19.

Further, the regulatory scheme for immigration law already includes a separate section discussing the implementation of the expedited removal system.  *See* 8 C.F.R. Part 235 (Inspection of Persons Applying for Admission).  These regulations specify the record an immigration officer must create during the expedited removal process and the advisements that the officer must give to individuals subject to expedited removal.  *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1081 (9th Cir. 2011) (citing 8 C.F.R. §§ 235.3, 1235.3 ("Inadmissible aliens and expedited removal")); *see also Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 43 (D.D.C. 1998) (Part 235 "regulate[s] how the inspecting officer is to determine the validity of travel documents, how the officer should provide information to and obtain information from the alien, and how and when an expedited removal order should be reviewed"), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000).  Courts have identified these regulations as the "implementing regulations" for the expedited removal system.  *See id.* at 43–45 (applying § 1252(e)(3) to bar claims challenging regulations in Part 235).

A decision from the District Court for the District of Columbia illustrates when a rule or policy implements § 1225(b)(1).  In *Grace v. Whitaker*, asylum applicants challenged new credible fear policies, established by the Attorney General's decision in *Matter of A-B-*, for asylum applications based on domestic or gang violence.  344 F. Supp. 3d 96, 108–10 (D.D.C. 2018), *appeal docketed*, No. 19-5013 (D.C. Cir. Jan. 30, 2019).  In finding that § 1252(e)(3)(A)(ii) conferred jurisdiction on the D.C. District Court to hear the challenge, the court focused on the fact that the Attorney

13

General's decision in *Matter of A-B-* "went beyond" asylum and "explicitly address[ed] 'the legal standard to determine whether an alien has a credible fear of persecution' under 8 U.S.C. § 1225(b)." *Id.* at 116 (citing *Matter of A-B-*, 27 I. & N. Decl. 316, 320 n.1 (A.G. 2018)). Further, in *Matter of A-B-*, the Attorney General expressly directed immigration judges and asylum officers to "analyze the requirements as set forth" in the decision and stated that generally, claims of domestic or gang-related violence would often fail to satisfy the credible fear standard. The District Court cited this direction as evidence that the decision constituted a "written policy directive" or "written policy guidance" about expedited removal such that it was brought "under the ambit of section 1252(e)(3)." *Id.* Thus, the court concluded that "[b]ecause the Attorney General cited section 1225(b) and the standard for credible fear determinations when articulating the new general legal standard, the Court finds that *Matter of A-B-* implements section 1225(b) within the meaning of section 1252(e)(3)." *Id.*

Conversely, here, the Asylum Ban contains no similar explicit invocation of § 1225 or articulation of the credible fear standard such that the Court can conclude that this regulation falls within the ambit of § 1252(e)(3). As stated above, the regulation is framed as an additional limitation on asylum eligibility and makes no reference to the expedited removal statute or the procedures contained therein. Therefore, the Asylum Ban does not "implement" § 1225(b).

Defendants have not demonstrated how determinations about asylum eligibility constitute an "implement[ation]" of § 1225(b), the statute governing expedited removal. *See East Bay Sanctuary Covenant*, 354 F. Supp. at 1118–19. Hence, the Court does not find that § 1252(a)(2)(A)(iv) or § 1252(e)(3)(A)(ii) divests it of jurisdiction to hear challenges to the Asylum Ban's applicability in this case.

14

17cv2366

3.    The Court is not being asked to determine the lawfulness of the Asylum Ban.

Several statutes also prohibit the judicial review of certain regulations.[8]  Here, the Court is not reviewing the Asylum Ban such that these statutes apply.

Plaintiffs are not asking the Court to allow a class action challenge to the implementation of § 1225 or the Asylum Ban, to enjoin the operation of either provision, or to determine whether the Asylum Ban itself is constitutional, consistent with the Immigration and Nationality Act ("INA"), or otherwise lawful.  Instead, Plaintiffs request that the Court enjoin the Government's improper application of the Asylum Ban—the constitutionality of which is the subject of other lawsuits—outside the confines of its self-imposed limitations on its scope, *i.e.*, to those who arrived in the United States before July 16, 2019.

In other words, Plaintiffs ask the Court to enjoin the Government from taking actions not authorized by the Asylum Ban or, in fact, by any implementing regulation or statute.  The Court's authority to do so is well-recognized.  *See, e.g.*, *Rodriguez*, 591 F.3d at 1120 ("Where, however, a petitioner seeks to enjoin conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of part IV . . . and § 1252(f)(1) therefore is not implicated.") (quoting *Ali v. Ashcroft*, 346 F.3d 873, 886 (9th Cir. 2003)), *vacated on unrelated ground sub nom.*, *Ali v. Gonzales*, 421 F.3d 795 (9th Cir. 2005).

4.    The Court is not reviewing the Attorney General's decision to invoke or apply expedited removal to individual cases.

Various subsections of § 1252 also prevent the Court from reviewing decisions by the Attorney General to "invoke expedited removal proceedings" or the

---

[8] *See* 8 U.S.C. § 1252(a)(2)(A)(iv) and 1252(e)(3)(A)(ii) (prohibiting review of regulations implementing expedited removal and limiting determinations about a regulation's constitutionality, consistency with the INA, and general lawfulness to the United States District Court for the District of Colombia); § 1252(f)(1) (divesting the courts of "jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated").

17cv2366

application of expedited removal in individual cases.[9]  *See, e.g.*, *In re Li*, 71 F. Supp. 2d 1052, 1061 (D. Haw. 1999) ("Section 1252(a)(2), entitled Matters not subject to judicial review, provides that no court shall have jurisdiction to review the application of section 1225(b)(1) *to individual aliens*.") (citing 8 U.S.C. § 1252(a)(20(A)(iv)) (emphasis added).  Here, neither party has alleged that there has been any such decision to invoke expedited removal or apply expedited removal to individual Plaintiffs.  Instead, Defendants argue that this provision, particularly subsection (iii), divests this Court of jurisdiction "to enjoin the application of the [Asylum Ban] to putative provisional subclass members who *will* be placed in expedited removal proceedings."  (Opp'n to Mot. for Prelim. Inj. at 7.)

Defendants offer no support for the proposition that any relevant subsection of § 1252 seeks to prevent review of any issue because the Attorney General will invoke expedited removal as to Plaintiffs in the future.  Further, as stated before, Plaintiffs do not seek review of any decision to place them in expedited removal proceedings. The Court's determination at the injunction stage, therefore, is not a "review" of decisions related to expedited removal, and these sections do not apply to divest this Court of jurisdiction regarding Plaintiffs' Motions.

5.    Plaintiffs do not raise systemic challenges to expedited removal.

The Court also finds that the jurisdictional bar under 8 U.S.C. § 1252(e)(3) does not apply to  Plaintiffs' claims.  This provision states that judicial review of "determinations under section 1225(b) of this title and its implementation" may only be brought in the U.S. District Court for the District of Columbia, and limits those actions to questions about whether a regulation "issued to implement such section [1225(b)]" is constitutional, inconsistent with other provisions of the Immigration

---

[9] *See* 8 U.S.C. § 1252(a)(2)(A)(ii) ("[N]o court shall have jurisdiction to review . . . a decision by the Attorney General to invoke the provisions of [§ 1225(b)(1)]"); § 1252(a)(2)(A)(iii) ("[N]o court shall have jurisdiction to review "the application of [§ 1225(b)(1)] to individual aliens," including credible fear determinations); § 1252(a)(2)(A)(iv) (courts have no jurisdiction to review "procedures or policies adopted by the Attorney General to implement the provisions of § 1225(b)(1)").

and Nationality Act ("INA"), or "is otherwise in violation of the law." *See* 8 U.S.C. § 1252(e)(3)(A)(i)–(ii).

The provision, entitled "Challenges on validity of the system," limits its jurisdictional reach only to actions calling into question the legality of the expedited removal process itself. *See Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1120 (N.D. Cal. 2019), *reversed on other grounds*, *Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. 2019). The challenges that are subject to the circumscribed jurisdiction in subsection (e)(3) must therefore target the process of removal directly, not target other circumstances incidental to removal, such as access to the asylum process. *See Padilla v. U.S. Immigration & Customs Enf't*, 387 F. Supp. 3d 1219, 1227 (W.D. Wash. 2019) ("[Section] 1252(e)(3) is addressed to challenges to the removal *process* itself, not to detentions attendant upon that process."), *appeal filed*, No. 19-35565 (9th Cir. July 2, 2019).

In *Innovation Law Lab*, the Northern District found the plaintiffs' challenge to the Migrant Protection Protocols ("MPP")—namely, that MPP did not apply to them—was not a challenge to the expedited removal system under § 1252(e)(3). *Id.* at 1119–20. Similarly, here, Plaintiffs are not raising a systemic challenge to any part of the expedited removal process. As Plaintiffs state, they do not seek to challenge, either as individual cases or systemically, Defendants' discretion to place them in expedited removal proceedings. (*See* Reply in Supp. of Mot. for Prelim. Inj. at 10–11 ("Plaintiffs take no position on whether provisional class members should be put into expedited removal, or instead placed directly into regular removal proceedings or paroled into the United States."), ECF No. 313.) Rather, they are challenging the Government's application of a specific condition of asylum eligibility to Plaintiffs themselves, regardless of the type of removal proceedings in which they are currently placed or will be placed in the future. *See Olivas v. Whitford*, No. 14-CV-1434-WQH-BLM, 2015 WL 867350, at *8 (S.D. Cal. Mar. 2, 2015) ("Plaintiff's challenge is not subject to 8 U.S.C. section 1252(e)(3) because it is not a challenge to the

17cv2366

validity of expedited removal proceedings pursuant to section 1225(b)(1).”). Accordingly, the Court finds that § 1252(e)(3) does not bar the relief requested in Plaintiffs' Motions.

In sum, this Court finds that none of the cited subsections of 8 U.S.C. § 1252 divest this Court of jurisdiction to decide the issues raised by Plaintiffs' Motions.

**B.    Different Character From the Underlying Suit**

Defendants argue that the request for a preliminary injunction must be denied because Plaintiffs are seeking relief that is of a different character and deals with matter lying wholly outside the issues in the suit.  The Court disagrees.

“A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally.” *See Kaimowitz v. Orlando*, 122 F.3d 41, 43 (11th Cir. 1997) (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)).  To determine whether the preliminary and final relief are of the same character, “there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint.” *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (adopting the rule in *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)). This requires “a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself.” *Id.*

The Court finds that a sufficient nexus exists between Plaintiffs' request for an injunction of the Asylum Ban and the claims in the SAC.  In their SAC, Plaintiffs allege numerous violations of the law based on CBP's “unlawful, widespread pattern and practice of denying asylum seekers access to the asylum process at POEs with the United States border through a variety of illegal tactics.”  (SAC ¶ 2.)  For example, according to Plaintiffs, Defendants are “[i]mposing unreasonable delays before granting access to the asylum process” and “denying outright access to the asylum process.” (*Id.*)  In the Prayer for Relief, Plaintiffs include a request that the Court certify a class and issue injunctive relief requiring Defendants to comply with the

INA, the APA, the Due Process Clause of the Fifth Amendment and the duty of *non-refoulement* under international law.  (SAC, Prayer for Relief, ¶ 3.)

In the instant Motions, Plaintiffs request that the Court require Defendants to comply with the limited scope of the Asylum Ban to preserve their access to the asylum process.  This relates to the allegations in the SAC, described above, regarding Defendants' denial of Plaintiffs' right to asylum access.  *See Williams v. Navarro*, No. 3:18-CV-01318-DMS (RBM), 2019 WL 2966314, at *4 (S.D. Cal. July 9, 2019) ("The character of relief requested in the Motion, i.e., increased law library access, relates to conduct alleged in the Complaint, i.e., denial of the right to law library access.").  Indeed, Plaintiffs' claims regarding the Asylum Ban and Plaintiffs' underlying claims in their SAC are so intertwined that denying Plaintiffs' Motion for Preliminary Injunction could effectively eviscerate the asylum claims Plaintiffs seek to preserve in their underlying suit.

Thus, Plaintiffs are not seeking relief that is of a different character than that sought in the SAC, and a preliminary injunction can be appropriately granted.

## C.    All Writs Act

Alternatively, the Court finds that the All Writs Act ("AWA"), 28 U.S.C. § 1651, authorizes this Court to issue injunctive relief to preserve its jurisdiction in the underlying action.  The AWA allows Article III courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).  The AWA provides this Court with the ability to construct a remedy to right a "wrong [which] may [otherwise] stand uncorrected." *United States v. Morgan*, 346 U.S. 502, 512 (1954).  In the context of administrative law, the AWA allows court "to preserve [its] jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966).

17cv2366

Plaintiffs claim the AWA independently authorizes this Court to grant injunctive relief to prevent the claims in the SAC from being "prematurely extinguished" by the application of the Asylum Ban.  (Mot. For Prelim. Inj. at 23.)  Defendants argue that the AWA is not a source of this Court's authority to grant the requested relief because: (1) the Court "does not have jurisdiction in the first instance over the substantive standards governing the putative provisional subclass members' asylum applications"; (2) Plaintiffs have not shown how application of the Asylum Ban affects the Court's jurisdiction over the claims in the SAC; and (3) the INA divests this Court of jurisdiction over the expedited removal process.  (Opp'n to Mot. for Provisional Class Certification at 24–25,  ECF No. 308.)  The Court does not find Defendants' arguments persuasive.

First, Defendants misidentify the source of the Court's jurisdiction for purposes of the AWA.  Jurisdiction over the claims in the SAC arises not from the substantive standards governing the subclass's asylum applications, but from the statutory and constitutional questions over Defendants' issuance of policies and practices barring access to the asylum process.  The Government does not argue that this Court lacks jurisdiction in the underlying lawsuit concerning the Government's metering practices.  Therefore, jurisdiction has already been independently conferred on this Court.  *See Hamilton v. Nakai*, 453 F.2d 152, 157 (9th Cir. 1971) (§ 1651 "does not confer original jurisdiction, but rather, prescribes the scope of relief that may be granted when jurisdiction otherwise exists").

Second, as Plaintiffs argue, the improper application of the Asylum Ban affects this Court's jurisdiction because it would effectively moot Plaintiffs' request for relief in the underlying action by extinguishing their asylum claims. Should the Asylum Ban be applied to Plaintiffs, these individuals' asylum claims would be foreclosed, as would any claim and request for relief regarding their right to access the asylum process.  As a result, an order from this Court finding metering practices unlawful and requiring Defendants to comply with the law at the time of the metering

17cv2366

1  would provide no remedy.  Thus, the metering practices, if found unlawful, are the
2  type of wrong that may otherwise stand uncorrected without the invocation of the
3  AWA, as contemplated by the Supreme Court.  *See Morgan*, 346 U.S. at 512.

4       Hence, to preserve its jurisdiction over the underlying claims in the SAC, the
5  Court finds that it possesses the authority under the AWA to issue an injunction
6  preserving the status quo in this case and allow this Court to resolve the underlying
7  questions of law before it.  *See United States v. N.Y. Tel. Co.*, 434 U.S. 159, 173
8  (1977) (holding that the AWA allows a federal court to "avail itself of all auxiliary
9  writs as aids in the performance of its duties, when the use of such historic aids is
10 calculated in its sound judgment to achieve the ends of justice entrusted to it").

11 ## III.   CLASS CERTIFICATION

12      Concurrent with their request for a preliminary injunction, Plaintiffs request
13 that the Court provisionally certify a subclass consisting of "all non-Mexican
14 noncitizens who were denied access to the United States Asylum process before July
15 16, 2019 as a result of the Government's metering policy and continue to seek access
16 to the U.S. asylum process."  (Mem. of P. & A. in support of ("ISO") Mot. for
17 Provisional Class Certification at 13, ECF No. 293-1.)  The Court is inclined to
18 modify this subclass to consist of

19/20/21
> all non-Mexican asylum-seekers who were unable to make a direct asylum claim at a U.S. POE before July 16, 2019 because of the Government's metering policy, and who continue to seek access to the U.S. asylum process.

22 *See Victorino v. FCA US LLC*, 326 F.R.D. 282, 301–02 (S.D. Cal. 2018) ("[D]istrict
23 courts have the inherent power to modify overbroad class definitions.")

24      The Court may provisionally certify a class for purposes of a preliminary
25 injunction.  *Meyer v. Portfolio Recovery Assoc., LLC*, 707 F.3d 1036, 1043 (9th Cir.
26 2012).  However, "[t]he class action is 'an exception to the usual rule that litigation
27 is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart*
28 *Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  Therefore, Plaintiffs have the burden

of meeting the threshold requirements of Federal Rule of Civil Procedure 23(a). *Meyer*, 77 F.3d at 1041.

Rule 23(a) provides that a class may be certified only if:

(1) the class is so numerous that joinder of members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition to meeting the 23(a) requirements, a class action must fall into one of the categories laid out in Rule 23(b).  Fed. R. Civ. P. 23(b). Plaintiffs move for provisional certification under Rule 23(b)(2).

### A.    Fed. R. Civ. P. 23(a)

#### 1.    Numerosity

Plaintiffs claim that as of August 2019, there were 26,000 asylum seekers either on waitlists or waiting to get on those waitlists in 12 Mexican border cities. (*See* Decl. of Stephanie Leutert ¶¶ 4, 7, Ex. A, Ex. 6 to Mot. for Provisional Class Certification, ECF No. 293-8.)  The numerosity requirement is generally satisfied when the class contains 40 or more members, a threshold far exceeded in this case. *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007).  Defendants do not contest that Plaintiffs have met the numerosity requirement in this case.  Further, a class of 26,000 individuals is large enough on its face that individual joinder of all class members would be impracticable.  Rule 23(a)(1) is, therefore, satisfied.

#### 2.    Commonality

The commonality requirement requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  "What matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quotations omitted).

17cv2366

"All questions of fact and law need not be common to satisfy the [commonality requirement]. The existence of shared legal issues with divergent factual predicates is sufficient." *Meyer*, 707 F.3d at 1041 (quotations omitted). "The common contention 'must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* at 1041–42 (quoting *Dukes*, 564 U.S. at 350).

In this case, Plaintiffs argue that the common question capable of generating a common answer involves whether the metering is statutorily and constitutionally legal. (Mem. of P. & A. ISO Mot. for Provisional Class Certification at 18–19.) Defendants argue that this requires individual determinations of whether there was capability to process the asylum applications at each POE for each class member at the time they sought asylum. (Opp'n to Mot. for Provisional Class Certification at 17, ECF 308.)

The Court sees the common question differently. The common question raised by the instant preliminary injunction and class certification motions is whether Defendants are improperly construing the Asylum Ban to apply to those class members who attempted to enter or arrived at a U.S. POE before July 16, 2019. Even assuming the Government's metering practice was legal, the fact remains that the members of the proposed subclass intended to apply for asylum at a U.S. POE and yet were required, pursuant to the Government's policy, to wait their turn in Mexico. The Court can determine, in one fell swoop, whether class members attempted to enter or arrived in the United States such that the Asylum Ban is inapplicable to them. This is a common issue for all subclass members. Thus, the Court finds the requirement of Rule 23(a)(2) has been met.

### 3.   Typicality

In general, the claims of the representative parties "need not be substantially identical" to those of all absent class members and need only be "reasonably co-

extensive" in order to qualify as typical. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998*), overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 464 U.S. 338 (2011).  "The test of typicality is 'whether other members [of the class] have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citation omitted).

Defendants contend that the named Plaintiffs in this action have not and will not be injured "in the manner in which they claim the putative subclass members have been or will be injured."  (Opp'n to Mot. for Provisional Class Certification at 11.) Defendants allege that the named individual Plaintiffs are either Mexican nationals to whom the Asylum Ban does not apply or eventually entered and were processed before July 16, 2019.  (*Id.* at 11–12.)  Further, Defendants claim that Roberto Doe, the one named Plaintiff whose case does not suffer from the above deficiencies, has not provided "sufficient information to establish that he is subject to the" Asylum Ban.  (*Id.* at 12–13.)

The Court finds that, contrary to Defendants' assertions, the Declaration of Roberto Doe contains such sufficient information.  Roberto Doe alleges that he is a national of Nicaragua and traveled through Mexico to reach the United States' southern border.  (Decl. of Roberto Doe ¶¶ 2–4.)  He attests that on October 2, 2018, he presented himself to U.S. immigration officials at the Reynosa-Hidalgo POE with a group of Nicaraguan nationals and requested asylum.  (*Id.* ¶ 4.)  He then alleges that U.S. officials told him the POE was "all full" and that he would have to wait "hours, days, or weeks" before he would have the opportunity to apply before contacting the Mexican authorities to remove them from the POE.  (*Id.* ¶¶ 5–6.)  While waiting in Mexico, he applied for asylum but was denied due to the 30-day time bar and was subsequently deported from Mexico.  (Suppl. Decl. of Roberto Doe ¶ 7, Ex. 2 to

17cv2366

Reply ISO Mot. for Provisional Class Certification, ECF No. 315-3.)  He still seeks to apply for asylum in the United States.  (*Id.*)

Because Roberto Doe claims he came to a U.S. POE from a country other than Mexico to seek asylum, attempted to make a direct claim for asylum at a POE before July 16, 2019 but was turned away due to the metering policy, and still intends to seek asylum in the United States, the Court finds that he has provided sufficient information to satisfy the test of typicality for the purposes of Rule 23.

### 4.    Adequacy of Representation

For the class representative to adequately and fairly protect the interests of the class, two criteria must be satisfied.  "First, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class."  *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).  Defendants do not contest the adequacy of the representation in this case.

Pursuant to its own assessment, the Court finds no evidence that the proposed class representatives have any antagonistic or conflicting interests with the unnamed members of the class, and counsel has shown that they are qualified and willing to prosecute this action vigorously.  (*See* Decl. of Stephen Medlock ISO Mot. for Provisional Class Certification ¶¶ 2–6, ECF No. 293-2.)  Thus, the requirements of Rule 23(a)(4) have been met.

### B.    Fed. R. Civ. P. 23(b)(2)

Plaintiffs seek certification under subsection (b)(2), which allows the court to certify a class if it finds that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to a (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that

17cv2366

it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (quotation omitted).  "In other words, Rule 23(b)(2) applies only when a single injunctive or declaratory judgment would provide relief to each member of the class." *Id.*

In this case, a single preliminary injunctive or declaratory judgment would provide that each member of the subclass does not fall within the Asylum Ban.  The conduct of the Government, therefore, can be enjoined or declared unlawful as to all members of the subclass.  Hence, Plaintiffs have shown that the requirements of Rule 23(b)(2) have been met.

Defendants make an additional argument that the requirements of Rule 23(b)(2) are not met because the class is not ascertainable.  Specifically, they contend that "there is no reliable way to confirm the date when individuals first sought to present themselves at ports to seek access to the U.S. asylum process."  (Opp'n to Mot. for Provisional Class Certification at 23.)

Although the Ninth Circuit has yet to expressly address the ascertainability requirement in the context of Rule 23(b)(2), courts in this Circuit have held that it does not apply.  *See In re Yahoo Mail Litig.*, 308 F.R.D. 577, 597 (N.D. Cal. 2015) (distinguishing (b)(2) actions from (b)(3) actions in finding that ascertainability was not required under the former); *Inland Empire-Immigrant Youth Collective v. Nielsen*, No. EDCV 17-2048 PSG (SHKx), 2018 WL 1061408, at *12 (C.D. Cal. Feb. 26, 2018) (same); *see also Hernandez v. Lynch*, No. EDCV 16-00620-JGB (KKx), 2016 U.S. Dist. LEXIS 191881, at *43 n.17 (C.D. Cal. Nov. 10, 2016) ("Courts have held that ascertainability may not be required with respect to a class seeking injunctive relief.").   This Court has itself noted in previous opinions that "ascertainability should not be required when determining whether to certify a class in the Rule 23(b)(2) context." *Bee, Denning, Inc. v. Capital Alliance Group*, No. 13-

CV-2654-BAS (WVG), 14-cv-2915-BAS (WVG), 2016 WL 3952153 at *5 (S.D. Cal. July 21, 2016).[10]

The Court notes, however, that even if the class was required to satisfy the ascertainability requirement, "it would be satisfied because it is 'administratively feasible' to ascertain whether an individual is a member." *Inland Empire-Immigrant Youth Collective*, 2018 WL 1061408, at *12 (citing *Greater L.A. Agency on Deafness, Inc. v. Reel Servs. Mgmt. LLC*, No. CV 13–7172 PSG (ASx), 2014 WL 12561074, at *5 (C.D. Cal. May 6, 2014)).

Defendants' arguments to the contrary do not alter this conclusion. Defendants allege that because they do not maintain a systematic record of encounters at the limit line, the class is not ascertainable. Specifically, Defendants state the Government of Mexico, and not the U.S. Government, was responsible for implementing a process to monitor asylum-seekers (Opp'n to Mot. for Provisional Class Certification at 24) and CBP officers who metered asylum-seekers at the limit line "do not memorialize the encounter in any way." (Decl. of Randy Howe ¶¶ 4–5, Ex. 4 to Opp'n to Mot. for Provisional Class Certification, ECF No. 308-5.)

Ironically, however, the class is based on a system established to facilitate the Defendants' metering policy. As the system currently stands, when a port is allegedly at capacity, asylum-seekers are informed that access to the POE "is not immediately available" and that they will be permitted to enter "once there is sufficient space and resources to process them." (Decl. of Randy Howe ¶ 2; CBP Metering Guidance Memorandum, Ex. 5 to Opp'n to Mot. for Provisional Class Certification, ECF No. 308-6.) Further, Defendants do not address, let alone challenge, that Grupo Beta, a

---

[10] The absence of an ascertainability requirement "does not obviate the basic requirement that Plaintiffs provide a clear class definition under Rule 23(c)(1)(B)." *In re Yahoo Mail Litig.*, 308 F.R.D. at 597–98 (citing Fed.R.Civ.P. 23(c)(1)(B) ("An order that certifies a class action must define the class and the class claims, issues, or defenses . . . . ")). However, Defendants do not argue that the definition of the class proposed by Plaintiff is so unclear as to fail to satisfy Rule 23(c)(1)(B). In any event, "[a] precise class definition is less important in cases in which plaintiffs are attempting to certify a class for injunctive relief because the representative plaintiffs may move the Court to enforce compliance." *Conant v. McCaffrey*, 172 F.R.D. 681, 693 (N.D. Cal. 1997).

service run by the Mexican Government's National Institute of Migration, maintains a formalized list of asylum-seekers, communicates with CBP regarding POE capacity, and transports asylum-seekers from the top of the list to CBP. (Decl. of Nicole Ramos ¶ 7, Ex. 26 to Mot. for Provisional Class Certification, ECF No. 293-28; Decl. of J.R. ¶ 11, Ex. 14 to Mot. for Prelim. Inj., ECF No. 294-16 (alleging waitlist "was controlled by Mexican immigration officials, and they were in touch with U.S. officials who would ask every day for a certain number of people to present themselves at the U.S. offices").)

Therefore, CBP relied on these lists to facilitate the process of metering, which was premised on the idea that those individuals who were metered would have to wait—but were not precluded from—applying for asylum in the United States. Despite this, Defendants now take the position, without contradicting claims that they themselves relied on the lists for purposes of metering, that the waitlists are "subject to fraud and corruption and are not themselves reliable means of ascertaining class membership." (Opp'n to Mot. for Provisional Class Certification at 34.)

The Court does not find Defendants' position persuasive. Class members are defined by a completely objective criteria: whether these individuals were prohibited from requesting asylum at a U.S. POE and instead required to place themselves on a waitlist and effectively "take a number" before July 16, 2019 pursuant to the U.S. Government's metering policy. Class membership can be determined by cross-checking a class members' name with the names included on these waitlists. Surely the Government can determine, taking into account the delay in processing asylum claims at each POE, which individuals listed arrived before July 16, 2019, the Asylum Ban's effective date. Alternatively, individuals could be required to submit proof (either by list or declaration) that he or she is a member of the class in order to get the relief sought. *See In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 116 ("The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement.") (internal quotations omitted); *see also Inland Empire-*

*Immigrant Youth Collective*, 2018 WL 1061408, at *13 ("That some administrative effort is required does not preclude certification."). Thus, even if ascertainability is required under Rule 23(b)(2), the Court finds that the proposed class satisfies this requirement.

Because Plaintiffs have met the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2), the Court finds certification of a subclass is appropriate. Accordingly, the Court **GRANTS** Plaintiffs' Motion for Provisional Class Certification consisting of all non-Mexican noncitizens who sought unsuccessfully to make a direct asylum claim at a U.S. POE before July 16, 2019, were instead required to wait in Mexico due to the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process.

## IV.   PRELIMINARY INJUNCTION

The Court now turns to Plaintiffs' Motion for Preliminary Injunction. Plaintiffs request that the Court enjoin the newly passed Asylum Ban, 8 C.F.R. § 208.13(c)(4)(i), from applying to members of the provisionally certified class who arrived before the regulation's stated date of effect.

"A preliminary injunction is a matter of equitable discretion and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "Crafting a preliminary injunction is 'an exercise of discretion and judgment often dependent as much on the equities of a given case as the substance of the legal issues it presents.'" *Azar*, 911 F.3d at 582 (quoting *Trump v. Int'l Refugee Assistance Project*, __U.S. __, 137 S. Ct. 2080, 2087 (2017)). "'The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward.'" *Id.*

In order to obtain a preliminary injunction, the plaintiff must establish: (1) that he or she is likely to succeed on the merits; (2) that he or she is likely to suffer

irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Winter*. 555 U.S. at 20. "When the government is a party, the last two factors merge." *Azar*, 911 F.3d at 575 (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

A preliminary injunction can take two forms. *Marlyn Nutraceuticals Inc. v. Mucus Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009). "'A mandatory injunction orders a responsible party to take action,' while '[a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits.'" *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (quoting *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012)). "The 'status quo' refers to the legally relevant relationship *between the parties* before the controversy arose." *Id.* at 1061. When the Government seeks to revise a policy, it is affirmatively changing the status quo, and any injunction ordering that the new policy not take effect is a prohibitory injunction. *Id.* A mandatory injunction is particularly disfavored and requires heightened scrutiny. *Marlyn Nutraceuticals*, 571 F.3d at 878; *Ariz. Dream Act Coalition*, 757 F.3d at 1060.

The Plaintiffs in this case seek a prohibitory injunction. The Government has passed a regulation which affirmatively changes the status quo. Plaintiffs are seeking an injunction ordering that this new policy not be applied to a small subclass of asylum seekers. As such, the heightened scrutiny is not applicable to Plaintiffs' Motion.

## A.    Likelihood of Success on the Merits

The wording of the Asylum Ban is clear. It is only applicable to aliens who enter, attempt to enter, or arrive in the United States after July 16, 2019. *See* 8 C.F.R. § 208.13(c)(4)(i) (applying additional limitation on asylum eligibility to "any alien

30

1   who enters, attempts to enter, or arrives in the United States across the southern land
2   border on or after July 16, 2019").

3       In its most recent order in this case, this Court concluded that class members
4   "who may not yet be in the United States, but who [are] in the process of arriving in
5   the United States through a POE[,]" were "arriving in the United States" such that
6   the statutory and regulatory provisions at issue applied to them.  *See Al Otro Lado*,
7   394 F. Supp. at 1199–1205.  Adopting and applying the same reasoning here, the
8   Court concludes that the Asylum Ban, by its express terms, does not apply to those
9   non-Mexican foreign nationals in the subclass who attempted to enter or arrived at
10   the southern border *before* July 16, 2019 to seek asylum but were prevented from
11   making a direct claim at a POE pursuant to the metering policy.

12       "A regulation should be construed to give effect to the natural and plain
13   meaning of its words."  *Bayview Hunters Point Cmty. Advocates v. Metro. Transp.*
14   *Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004) (quoting *Crown Pac. v. Occupational*
15   *Safety & Health Review Comm'n*, 197 F.3d 1036, 1038 (9th Cir. 1999)).  Construing
16   the Asylum Ban consistent with this principle, the Court finds that Plaintiffs are likely
17   to succeed on the merits of their claim that the Asylum Ban does not apply to them.

18       The Government knowingly and intentionally implemented the Turnback
19   Policy at its POEs before July 16, 2019.  The Government also knew that, pursuant
20   to this policy, CBP turned away many asylum-seekers who had approached a United
21   States POE but could not cross the international boundary because they were required
22   to wait in Mexico as a condition to accessing the asylum process in the United States.
23   Despite this knowledge, the Government decided to issue a regulation applying only
24   from July 16, 2019 forward.  The Government could have enacted the Asylum Ban
25   without specifying a time period, and thus imposed it on those subject to the metering
26   procedures of the Turnback Policy.  It could have also enacted the Asylum Ban with
27   language specifying that it would be effective retrospectively to those metered at the
28   border before the date the regulation was adopted.  The Government chose to do

17cv2366

neither. Instead, although the regulation clearly states that it applies only to aliens who entered, attempted to enter, or arrived on or after July 16, 2019, the Government is now attempting to apply the Asylum Ban beyond its unambiguous constraints to capture the subclass of Plaintiffs who are, by definition, not subject to this rule.

The Government's position that the Asylum Ban applies to those who attempted to enter or arrived at the southern border seeking asylum before July 16, 2019 contradicts the plain text of their own regulation. Thus, the Court finds that Plaintiffs are likely to succeed on this issue on the merits.

## B.    Irreparable Harm

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Coalition*, 757 F.3d at 1068. "Because intangible injuries generally lack an adequate legal remedy, 'intangible injuries [may] qualify as irreparable harm.'" *Id.* (quoting *Rent-A-Ctr, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). One potential component of irreparable harm in an asylum case can be the claim that the individual is in physical danger if returned to his or her home country. *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011).

In this case, the provisionally certified subclass came to the southern border seeking asylum, claiming that they faced physical danger, torture or death if returned to their country of origin.[11]

CBP officers prevented asylum-seekers from crossing the international line to U.S. soil on the basis that the POE was at capacity, and CBP guidance instructed officers to inform individuals "that they will be permitted to enter once there is sufficient space and resources to process them." (OIG Special Review at 6, Ex. 2 to Mot. for Prelim. Inj., ECF No. 294-4.)  In other words, these asylum seekers

---

[11] *See, e.g.*, Decl. of Roberto Doe ¶ 3; Decl. of S.N. ¶ 5; Decl. of Bianka Doe ¶ 3, Ex. 8 to Mot. for Prelim. Inj., ECF No. 294-10; Decl. of Djamal Doe ¶ 3, Ex. 12 to Mot. for Prelim. Inj., ECF No. 294-14; Decl. of Jordan Doe ¶ 3; Decl. of S.M.R.G. ¶ 4, Ex. 16 to Mot. for Prelim. Inj., ECF No. 294-20; Decl. of B.B. ¶ 4; Decl. of Mowha Doe ¶¶ 3–6.

17cv2366

understood their access to asylum in the United States to be premised on their willingness to wait in Mexico.  In reliance on this representation by the U.S. Government, they did so.  (*See* Decl. of B.B. ¶ 9 ("We put our names on the list because we believed in the process.").)

The Government—in a shift that can be considered, at best, misleading, and at worst, duplicitous—now seeks to change course.  Although these individuals had already attempted to seek asylum in the United States and returned to Mexico only at the instruction of the Government, the Government intends to construe the fact that they were waiting in Mexico on or after July 16, 2019 as a failure to arrive in the United States before that date, thus subjecting them to the asylum eligibility bar contained in the Asylum Ban.

As such, the Government argues that the members of the subclass must first seek asylum in Mexico before they will be permitted to make a claim for asylum in the United States.  *See* 8 C.F.R. § 208.13(c)(4)(i) (requiring foreign nationals to apply for asylum in at least one country through which they transited to the United States, "and receive[]a final judgment denying the alien protection in such country").  Again, however, based on the representations of the Government, these individuals have not done so because they believed that the process to receive an asylum hearing in the United States required only that they place themselves on a waitlist.  As a result, they are now subject to Mexico's 30-day window for submitting asylum petitions and will likely be unable to meet the requirements of Asylum Ban.  (Mot. for Prelim. Inj. at 12 ("[P]rovisional class members who were metered before July 16, 2019, by definition, have been in Mexico longer than a month, and are now barred from applying for asylum in Mexico by that country's 30-day bar on asylum applications."); *see also* Suppl. Decl. of Roberto Doe ¶ 7.).  By extension, should the Asylum Ban be imposed on them, they will also lose their right to claim asylum in the United States.

33

17cv2366

Plaintiffs are simply seeking an opportunity to have their asylum claims heard. Failure to grant this preliminary injunction and return Plaintiffs to the status quo before the Asylum Ban went into effect, giving rise to the instant controversy, would therefore lead Plaintiffs to suffer irreparable harm.

## C.    Balance of Equities/Public Interest

While the Court must consider the public interest in preventing asylum-seekers from being improperly denied their access to the asylum process—particularly when the resulting ban could result in their removal to countries where they could face substantial harm—the Court is also mindful of the Government's position that it has a limited capacity to process all asylum-seekers in a timely fashion. Defendants argue that the Asylum Ban was passed in response to these limitations and that a preliminary injunction could complicate the Government's ability to deal with these issues, slowing the asylum process for others.

However, ultimately the Court finds the balance of equities and public interest tips in Plaintiffs' favor for two reasons. First, the putative subclass relied on the Government's representations. They returned to Mexico reasonably believing that if they followed these procedures, they would eventually have an opportunity to make a claim for asylum in the United States. But for the Government's metering policy, these asylum-seekers would have entered the United States and started the asylum process without delay. Similarly, but for the Government's current attempt to apply the Asylum Ban to them, these individuals could have their asylum claims adjudicated under the law in place at the time of their metering, which did not include the requirement that they first exhaust asylum procedures in Mexico. But because they did as the Government initially required and waited in Mexico, the Government is now arguing that they did not enter, attempt to enter, or arrive in the United States before July 16, 2019 and are now subject to this additional eligibility limitation. This situation, at its core, is quintessentially inequitable.

1    Second, as discussed above, if the Asylum Ban was meant to apply to those

2 individuals waiting for their asylum hearing in Mexico due to the metering policy,

3 the regulation could simply have said so.  The fact that the Government is now so

4 broadly interpreting a regulation that could have, but did not, include those who were

5 metered, also leads the Court to include that the balance of equities tips in favor of

6 Plaintiffs.

7    The Court concludes Plaintiffs have clearly shown a likelihood of success on

8 the merits and irreparable harm, and that the balance of equities and public interest

9 fall in their favor.  Hence, the Court **GRANTS** Plaintiffs' Motion for a Preliminary

10 Injunction.

### D.    Scope of the Injunction

12    "[T]he scope of injunctive relief is dictated by the extent of the violation

13 established, not by the geographical extent of the plaintiff."  *Califano v. Yamasaki*,

14 442 U.S. 682, 702 (1979).  In the immigration context, moreover, courts "have

15 consistently recognized the authority of district courts to enjoin unlawful policies on

16 a universal basis." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir.

17 2018) (citing cases).

18    Unlike *East Bay Sanctuary*, however, nationwide injunctive relief is not

19 necessary in this case to offer complete redress.  Rather, the scope of the injunctive

20 relief is limited by the class definition. *See All. to End Repression v. Rochford*, 565

21 F.2d 975, 980 (7th Cir. 1977) ("If, however, the suit is based on the constitutionality

22 of a statute as applied or of a general practice, as is the case here, then the scope of

23 the appropriate remedy can be defined more clearly by reference to the definition of

24 the plaintiff class.").[12]  The injunctive relief in this case would apply only to the class

---

[12] In fact, critics of the universal or nationwide injunction endorse the use of Rule 23(b)(2) class actions when injunctive relief limited to the named plaintiff "proves too narrow."  Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 475–76 (2017) ("Indeed, if federal courts were to end the practice of issuing national injunctions, and instead were to issue only plaintiff-protective injunctions, it would become easier to see the rationale for the Rule 23(b)(2) class action as a means of achieving broad injunctive relief.").

certified in this case, defined in Section III, *supra*.  The preliminary injunction therefore does not restrain nationwide effect of the Asylum Ban; it restrains only the effect of the Ban on those members of the provisionally certified class who fall outside the Ban's stated parameters.

## V.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiffs' Motion for Provisional Class Certification (ECF No. 293).  The Court provisionally certifies a class consisting of "all non-Mexican asylum-seekers who were unable to make a direct asylum claim at a U.S. POE before July 16, 2019 because of the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process."

Furthermore, the Court **GRANTS** Plaintiffs' Motion for a Preliminary Injunction (ECF No. 294) and orders the following: Defendants are hereby **ENJOINED** from applying the Asylum Ban to members of the aforementioned provisionally certified class and **ORDERED** to return to the pre-Asylum Ban practices for processing the asylum applications of members of the certified class.

**IT IS SO ORDERED.**

**Dated: November 19, 2019**

**Hon. Cynthia Bashant**
**United States District Judge**

36

17cv2366