JOSEPH H. HUNT
Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV
SAIRAH G. SAEED (IL 6290644)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4067 | Fax: (202) 305-7000
sairah.g.saeed@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' MEMORANDUM IN SUPPORT OF AMENDED MOTION TO SEAL EXHIBITS FILED IN SUPPORT OF AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION (ECF No. 294) AND** |
| CHAD F. WOLF,* Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | |

---

* Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Federal Rule of Civil Procedure 25(d).

**PROVISIONAL CLASS CERTIFI-
CATION (ECF No. 293)**

# INTRODUCTION

Pursuant to Section VI(D) of the Protective Order (ECF No. 276), Section 2.j of the Electronic Case Filing Administrative Policies and Procedures Manual, and the Order Denying Without Prejudice the Parties' Motions to Seal (ECF No. 332 at 9-10), Defendants file this amended motion with the Court for leave to seal certain Exhibits filed in support of and in opposition to Plaintiffs' Motion for Preliminary Injunction and Plaintiffs' Motion for Provisional Class Certification, and portions of the parties' briefs that rely on those exhibits. The sensitive law enforcement information Defendants are seeking to seal constitutes details about the physical layout and operations of land ports of entry that expose vulnerabilities of those ports. Public release of such information compromises the ports' operations and exposes ports to higher risk of criminal activity—such as drug and weapons trafficking—which in turn threatens the public health and safety of the United States. Defendants also seek to seal internal agency email addresses, disclosure of which could subject Defendants to hacking and other cyber security threats.

# BACKGROUND

Plaintiffs filed Motions for Provisional Class Certification (ECF No. 293) and a Preliminary Injunction ("PI Motion") (ECF No. 294) on September 26, 2019. Those Motions relied on documents that Defendants designated as "Confidential" or "Highly Confidential – Attorneys' Eyes Only" under the Protective Order. Plaintiffs moved to seal those exhibits and the portions of their briefs that relied on the Confidential or Highly Confidential Information contained therein on September 26, 2019. *See* ECF No. 290. On September 27, 2019, Defendants submitted in support of Plaintiffs' Motion to File Under Seal declarations from Randy Howe, Executive Director for Operations, Office of Field Operations ("OFO"), U.S. Customs and Border Protection ("CBP") (ECF No. 297-1), and Rodney H. Harris, Deputy Assistant Director of Field Operations, Border Security, Laredo Field Office, OFO, CBP (ECF No. 297-2), to show that there are compelling reasons to keep those documents sealed.

The Court ordered Defendants to file their opposition to Plaintiffs' Motion for Preliminary Injunction by October 10, 2019. *See* ECF No. 299. Defendants supported their opposition brief with Confidential and Highly Confidential information. The Parties' Motions to Seal were denied, with prejudice, by this Court. ECF No. 332. However, the Court's Order stated that the parties may file amended motions that provide further support for sealing the exhibits at issue. *See* ECF No. 332 at 9. Accordingly, for the reasons described below, Defendants request that the Court keep under seal the following exhibits to prevent public disclosure of information that can be used to circumvent law enforcement operations, threaten the integrity and security of ports of entry into the United States, and create cyber security risks:

(1) "Confidential" "Field Queue Management Report" emails which include the following:

    a. March 14, 2019 spreadsheet with the title "Laredo Field Office" (AOL-DEF-00012407 – AOL-DEF-00012410). *See* Reply ISO Mot. for Prelim. Inj. Ex. 6 (ECF No. 313-6); *see also* ECF No. 332 at 2 n.2(12).

    b. March 6, 2019 internal email with the subject line "Field Office Queue Management Report March 6, 2019" (AOL-DEF-12335 – AOL-DEF-00012336). *See* Reply ISO Mot. for Prelim. Inj. Ex. 5 (ECF No. 313-5); *see also* ECF No. 332 at 2 n.2(11).

    c. February 22, 2019 internal email with the subject line "Field Queue Management Report February 22, 2019" (AOL-DEF-00012236–41), which is marked "Confidential." *See* Opp'n to Mot. for Preliminary Inj. Ex. 8 (ECF No. 307-9); *see also* ECF No. 332 at 2 n.2(10).

    d. February 2, 2019 internal email with the subject line "LFO Queue Management Report for February 2, 2019" (AOL-DEF-00038929). *See* Reply ISO Mot. for Prelim. Inj. Ex. 1 (ECF No. 313-1); *see also* ECF No. 332 at 2 n.2(9).

e.  January 22, 2019 internal email with the subject line "Field Office Queue Management Report 1.22.2018" (AOL-DEF-00012012 – 12017). *See* Pls.' Mot. for Prelim. Inj. Ex. 42 (ECF No. 294-44); *see also* Pls.' Mot. for Provisional Class Certification Ex. 4. (ECF No. 293-6); *see also* ECF No. 332 at 2 n.2(2).

f.  December 21, 2018 internal email with the subject line "LFO Queue Management Report for December 21, 2018 @1000 hours CST" (AOL-DEF-00038927). *See* Reply ISO Mot. for Prelim. Inj. Ex. 2 (ECF No. 313-2); *see also* ECF No. 332 at 2 n.2(8).

g.  December 20, 2018 internal email with the subject line "LFO Queue Management Report for December 20, 2018" (AOL-DEF-00038923). *See* Reply ISO Mot. for Prelim. Inj. Ex. 3 (ECF No. 313-3); *see also* ECF No. 332 at 2 n.2(7).

h.  December 19, 2018 internal email with the subject line "LFO Queue Management Report for December 19, 2018" (AOL-DEF-00038931). *See* Reply ISO Mot. for Prelim. Inj. Ex. 4 (ECF No. 313-4); *see also* ECF No. 332 at 2 n.2(6).

i.  October 2, 2018 internal email and attachment with the subject line "Field Office Queue Management 10.02.18" (AOL-DEF-00027614 – AOL-DEF-00027615). *See* Reply ISO Mot. for Provisional Class Certification Ex. 1 (ECF No. 316-2); *see also* ECF No. 332 at 2 n.2(13).[1]

---

[1] Plaintiffs attached the October 2, 2018 email to their class certification reply papers, *see* ECF No. 316-2, but it appears that the parties inadvertently omitted that document from their Joint Motion to Seal Portions of Plaintiffs' Preliminary Injunction and Class Certification Reply Papers (ECF No. 305). However, the Court understood that Defendants intended the October 2, 2018 email to be included in the motions to seal. *See* Order 2 n.2(13).

(2) "Highly Confidential/Attorneys' Eyes Only" e-mail chain, dated February 25, 2018, with the subject line "CBP_MCAT_REPORT for February 25, 2018" (AOL-DEF-00012000—12001). *See* Pls.' Mot. for Provisional Class Certification Ex. 3 (ECF No. 293-5); *see also* Pls.' Mot. for Prelim. Inj. Ex. 41 (ECF No. 294-43); *see also* ECF No. 332 at 2 n.2(1).

(3) "Highly Confidential/Attorneys' Eyes Only" "Laredo Field Office Mass Migration Contingency Plan" (AOL-DEF-00011122–232). *See* Pls.' Mot. for Provisional Class Certification Ex. 27 (ECF No. 293-29); *see also* Pls.' Mot. for Prelim. Inj. Ex. 43 (ECF No. 294-45); *see also* ECF No. 332 at 2 n.2(4).

(4) "Highly Confidential/Attorneys' Eyes Only" February 8, 2019 email chain to CBP leadership (AOL-DEF-0012141—43). *See* Pls.' Mot. for Provisional Class Certification Ex. 5 (ECF No. 293-7); *see also* ECF No. 332 at 2 n.2(3).

(5) Email addresses of CBP employees contained in the above-listed documents.

(6) The portions of the parties' briefs that rely on these documents.

## ARGUMENT

As previously set forth in the September 26 declarations of Randy Howe and Rodney Harris, and in the attached supplemental declarations of Randy Howe and John Buckley, Director of the Security and Technology Division at the Office of Information Technology of CBP, there are compelling reasons to keep the information in the above-listed documents under seal. Specifically, the information, if disclosed, could be used to circumvent law enforcement operations along the southwest border and create cyber security risk.

### *Legal Standards*

Although there is "a general right to inspect and copy public records and documents," *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), a party

4

may still overcome the presumption of access. *Heldt v. Guardian Life Ins. Co. of America*, No. 16-cv-885, 2018 WL 5920029, at *1 (S.D. Cal. Nov. 13, 2018). The presumption of access is "based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). Thus, when the documents to be protected are "more than tangentially related to the merits," parties must show compelling reasons to keep those documents sealed and the "compelling reasons" standard applies. *Heldt*, 2018 WL 5920029 at *1 (quoting *Ctr. for Auto Safety*, 809 F.3d 1092, 1096–98); *see also McCurley v. Royal Seas Cruises, Inc.*, No. 17-cv-296, 2018 WL 3629945, at *2 (S.D. Cal. July 31, 2018). Compelling reasons include "when [] 'court files might [] become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). "In certain circumstances, courts have allowed the *government* to file under seal material that contains confidential and sensitive government information that might endanger or undermine law enforcement's activities . . . where the government identifies the particular harm that may result from the specific disclosure." *Music Grp. Macao Commercial Offshore Ltd. v. Foote*, No. 14-CV-03078-JSC, 2015 WL 3993147, at *3 (N.D. Cal. June 30, 2015) (internal citations omitted; emphasis in original); *see Hesterberg v. United States*, No. C-13-01265 JSC, 2013 WL 6057068, at *2 (N.D. Cal. Nov. 15, 2013) (finding compelling reasons to seal portions of documents that could "empower criminal suspects who come in contact with . . . officers because they will be able to predict the officer's actions.").

As shown below, Defendants' request to file law-enforcement-sensitive materials under seal satisfies the "compelling reasons" standard. Defendants maintain that the lesser "good cause" standard should apply in this context, however. *Heldt*,

2018 WL 5920029 at *1 (quoting *Ctr. for Auto Safety, LLC*, 809 F.3d 1092, 1096–98 (9th Cir. 2016) ("When the underlying motion does not surpass the tangential relevance threshold, the 'good cause' standard applies."). That is because the presumption of access applies to "materials on which a court relies in determining the litigants' substantive rights." *United States v. Kravetz*, 706 F.3d 47, 54 (1st Cir. 2013) (cited with approval in *Ctr. for Auto Safety*, 809 F.3d at 1100, 1102). Here, the interest in public access is minimal because the Court did not rely on the information that the parties sought to seal when deciding Plaintiffs' motions.

Defendants acknowledge that the information contained in the documents is relevant to the merits of the parties' claims and defenses with respect to Defendants' metering/queue management practices. Yet in its Order Granting Plaintiffs' Motions for Provisional Class Certification and Preliminary Injunction, the Court did not rely on or reference any of the information, or the arguments made by the parties with respect to that information. *See generally* Order Granting Plaintiffs' Motions for Provisional Class Certification and for Preliminary Injunction ("PI Order"), ECF No. 330. The Court instead decided the motions for preliminary injunction and provisional class certification on its construction of the "Asylum Eligibility and Procedural Protections" interim final rule, 84 Fed. Reg. 33,829 (July 16, 2019). PI Order at 5, 23, 30-33. As the material Defendants are seeking to seal was not relevant to the Court's decision on the underlying motions, the public interest in judicial accountability is minimal. *See Network Appliance v. Sun Microsysts. Inc.,* No. 07-cv-06053, 2010 WL 841274, at *2 (N.D. Cal. Mar. 10, 2010) ("Here, although the documents in question are attached to a dispositive motion, they had no bearing on the resolution of the dispute on the merits and are therefore more akin to the 'unrelated,' non-dispositive motion documents the Ninth Circuit contemplated in *Kamakana*."); *see also Algain v. Maybelline, LLC,* Civil No. 12cv3000 AJB (DHB), 2014 WL 690410, *2 (S.D. Cal. Feb. 21, 2014) ("Unless the denial of a motion for class certification would constitute the death knell of a case, 'the vast majority of courts within

this circuit' treat motions for class certification as non-dispositive motions to which the 'good cause' sealing standard applies," (quoting *Dugan v. Lloyds TSB Bank, PLC,* No. 12–cv–02549–WHA (NJV), 2013 WL 1435223, *1 (N.D. Cal. Apr. 19, 2013)).

Accordingly, this motion should be governed by the good cause standard. Further, Defendants, have provided specific information regarding the harm that could occur if the information is disclosed. *See Am. Auto. Ass'n of N. California, Nevada & Utah v. Gen. Motors LLC*, No. 17-CV-03874-LHK, 2019 WL 1206748, at *1 (N.D. Cal. Mar. 14, 2019). The public interest in the information at issue is far outweighed by the interest in confidentiality. *See Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010).

### *Documents Defendants Seek to Seal*

First, the Court should seal the "Laredo Field Office Mass Migration Contingency Plan" (Mass Migration Plan) which is marked "Highly Confidential/Attorneys' Eyes Only" (AOL-DEF-00011122–232). *See* Pls.' Mot. for Provisional Class Certification Ex. 27 (ECF No. 293-29); *see also* Pls.' Mot. for Prelim. Inj. Ex. 43 (ECF No. 294-45).

> [T]he Mass Migration Plan is a contingency plan designed to ensure that the Laredo Field Office has the appropriate resources to address a possible influx of aliens. This Mass Migration Plan, like all of OFO's contingency plans, provides operational and strategic details for responding to a potential influx or other emergency. While this particular plan is no longer in effect, many of the operational details in this plan, such as the maximum holding capacities at particular ports, methods for converting ages of the port into temporary holding areas, and the staffing and resource contingency planning, remain pertinent and are incorporated into existing contingency planning. Therefore, by its very nature, this document could be exploited by hostile groups seeking to exploit these details.

Declaration of Randy Howe ("Howe Decl.") ¶ 18. The sensitive nature of the information contained within the document warrants filing this document under seal. *Cf. Motley v. City of Fresno, California*, No. 15-cv-905, 2016 WL 1060144, at *2 (E.D.

Cal. Mar. 17, 2016) (court should evaluate the specific facts of the law enforcement sensitive document to determine whether it should be sealed); *see BofI Fed. Bank v. Erhart*, No. 15CV2353 BAS (NLS), 2016 WL 4150983, at *2 (S.D. Cal. Aug. 5, 2016) (same). The accompanying Declaration of Randy Howe lays out in great detail the harm that would certainly occur if the Laredo Field Office Mass Migration Contingency Plan was unsealed.

As explained in Executive Director Howe's declaration, the Mass Migration plan:

> provides detailed information, for each port of entry in the Laredo Field Office, about staffing needs during an influx, how such staffing needs will shift in the face of an influx, and the allocation of other resources during an influx[.] The Mass Migration Plan details how many staff may be required to process individuals arriving at the port, how many cells may be able to hold such individuals, and the specific technical and physical resources required to process such individuals. For instance, the plan details the number of holding cells available at each port of entry in the Field Office, as well as the maximum capacity of these cells. The plan also details the areas of each port that may be used as overflow holding cells, if needed, the approximate time it may take officers to process cases during at influx, and assumptions about the technological and other resources required to maintain that rate of processing. Taken together, these details show the maximum number of individuals that a port can process and hold in a crisis situation, using all of its resources to the maximum level.

Howe Decl. ¶ 19. Armed "[w]ith knowledge of this number, a hostile actor could essentially shut down the port's operations by directing even five additional individuals to run through the vehicle lanes, for instance. The hostile actor could then take advantage of this crippling of operations to smuggle drugs, weapons, or other contraband into the port." *Id.* In addition:

> the plan [] provides details regarding each port of entry's triggers for requesting assistance from interagency partners, such as Border Patrol, CBP's Air and Marine Operations, and ICE, as well as which specific neighboring ports of entry and Border Patrol stations to contact for assistance. Thus, hostile actors could use this information to also overwhelm those neighboring ports

of entry and stations, in order to further exploit the crisis.

*Id.* ¶ 20. Further, "[t]he risk of vulnerability is particularly high in Texas' Rio Grande Valley (an area covered by the Laredo Field Office)." *Id.* ¶ 21. In this area, "there are five POEs over a 100 mile stretch of border. The information in the Mass Migration Plan for these five POEs could easily be utilized by DTOs [Drug Trafficking Organizations] and TCOs [Transnational Criminal Organizations][2] to easily route contraband into the U.S. through or away from specific POEs, by exploiting different operational vulnerabilities at different locations." *Id.* Specifically:

> the plan details the specific overflow areas that each POE may utilize in the event of an influx, as well as the capacity of those areas. The plan also details the specific processing times, and the assumptions underlying those processing times, at various POEs in the Field Office. Thus, this plan provides hostile actors with specific information as to how many individuals it would take to overwhelm a particular port, compared with the number of individuals it would take to overwhelm another port.

*Id.* Additionally "[t]he relatively close proximity of these ports make it easy for hostile actors to shift their resources with such knowledge of OFO's capacities, methods of responding to incidents, and staffing capabilities." *Id.* For these reasons, "[p]ublic release of the Mass Migration Plan thus has a very real potential to cause serious harm to CBP's ability to secure the ports of entry in the Rio Grande Valley." *Id.* Also, "[t]he Mass Migration Plan [] contains phone numbers for CBP internal operation and command centers, as well as contact information for CBP employees, state and local partners, and the Mexican government." *Id.* ¶ 23. If "hostile actors obtain this information, they could use it to threaten or harass these individuals, or to distract these individuals from their primary duties (for instance, by calling in fake or phone threats) and enabling the hostile actor to utilize that distraction to its advantage." *Id.*

---

[2] *See* Howe Decl. ¶ 3.

Second, the Court should seal the above-listed email chains containing CBP's Office OFO Field Queue Management Reports and the Queue Management Reports themselves. OFO's Field Queue Management Reports "compile data from the OFO Field Office on the southwest border." Howe Decl. ¶ 6. The Reports "are provided on a daily basis to OFO and CBP leadership and provide raw data points on a number of factors that impact the operations of southwest border ports of entry." *Id.*

The sensitive nature of this law enforcement information warrants filing these document under seal. *Cf. Motley*, No. 15-cv-905, 2016 WL 1060144, at *2 (court should evaluate the specific facts of the law enforcement sensitive document to determine whether it should be sealed); *see BofI Fed. Bank*, No. 15CV2353 BAS (NLS), 2016 WL 4150983, at *2 (same).

As explained in the accompanying Declaration of Randy Howe, the Queue Management Reports "are generated strictly for internal CBP and DHS use, and are used for maintaining awareness of any resource or operational vulnerabilities at the various ports of entry (POEs) along the southwest border." Howe Decl. ¶ 6. "The main operational vulnerabilities or resource constraints that these Queue Management reports highlight is the total number of individuals in custody at a particular port, as well as the percentage of total holding capacity that port has reached based on the number of individuals in custody." *Id.* ¶ 7. This information is important for CBP leadership to know because "high numbers of individuals in custody may be caused by any number of factors, such as changes in migrant flows that need to be monitored; potential difficulties in transferring individuals out of CBP custody, which may need to be addressed with CBP's interagency partners; or other operational or resource issues that may require action. *Id.* In addition, "this information may also reveal operational vulnerabilities or weaknesses that could be exploited if released publicly. While the number of individuals in custody at a particular port of entry is not the only factor affecting a port's total capacity to process individuals, it impacts how a port of entry manages its resources." *Id.* ¶ 8. For example, "if a port

has a high number of individuals in custody, or if individuals in custody have been held for an extended period of time, port management may need to reallocate staffing and other resources towards addressing these capacity issues." *Id.* ¶ 8. This involves "addressing the needs of individuals in custody, and attempting to move those individuals out of the POE." *Id.* Specifically:

> if a port has a high number of individuals in custody, officers at the port must devote significant time and energy towards ensuring that these individuals have adequate food and water, and are housed in sanitary conditions. OFO policy requires that officers conduct welfare checks at regular intervals for individuals in custody. Officers must also provide individuals in custody with meals and snacks, as well as ensure that any children are adequately supervised. Additionally, if a port is operating at a high capacity, or if individuals have been in custody for a long period of time, officers must work to transfer these individuals out of CBP custody, by working with U.S. Immigration and Customs Enforcement (ICE), the U.S. Department of Health and Human Services (HHS), and other partners, to secure transportation.

*Id.* ¶ 9. "[A]ddressing the needs of individuals in custody, and attempting to move those individuals out of the POE, takes officers away from other inspection and enforcement duties including detecting and seizing drug and other contraband." *Id.* As a result, "the port [is] more vulnerable to outside threats such as drugs, weapons, contraband, and individuals attempting to enter the port without inspection, such as by running through vehicle lanes." *Id.* One drug in particular, "[f]entanyl . . . is difficult to detect, as it is easily concealed in small packages and other small compartments." *Id.* As "most of the cocaine, heroin, foreign-produced marijuana, and foreign-produced methamphetamine available in the United States enters through the southwest border," the American people are also more vulnerable to drugs if the port is vulnerable to this threat. *Id.* When "a port has fewer individuals in custody, the port will be able to allocate more resources towards other mission sets, such as seizing drugs, weapons, and other contraband." *Id.* ¶ 10. For these reasons, "publicly releasing port-level capacity data, especially covering a period of several days or

weeks, would provide outside entities with a picture of when certain entities are operating below, at, or above capacity[], and thus how resources may be allocated at those ports." *Id.* ¶ 11. Taken together, "[t]his data, combined with other publicly available data, such as seasonal migration trends and the number of individuals encountered or found inadmissible in certain areas, could be exploited by DTOs, TCOs, and other hostile actors." *Id.* In particular, "if a TCO or smuggling organization had knowledge that a particular port consistently operated at or above capacity for a period of several days or several weeks, the TCO or smuggling organization could utilize that information, along with other information in its possession or gleaned from other sources, to develop a picture of when the port's resources may be strained, and reallocate its own resources to exploit this vulnerability." *Id.* Likewise, "if a TCO or smuggling organization had knowledge that a particular port consistently operated *below* capacity for a period of time, the TCO or smuggling organization cold reallocate its own resources towards *creating* capacity constraints at that particular POE." *Id.* For example, "if a TCO gained knowledge that a particular port was operating at capacity during a certain month of the year, or during certain days in the month, the TCO could specifically wait until that period of time to send additional levels of drugs or other contraband to that port, or by instructing a group of individuals to enter without inspection, such as by running through the vehicle lanes." *Id.* Specifically, "if a TCO had knowledge that a particular POE had been operating at 30% of its capacity for two weeks, it could further harm port operations by instructing a large group of individuals to attempt to enter without inspection." *Id.* Similarly, "if a smuggling organization had knowledge that a particular POE had been operating at 30% of its capacity for two weeks, it could [] instruct a large group to enter without inspection, creating a diversion of OFO resources towards that group, and away from other priority missions." *Id.*

Third, the Court should keep sealed the e-mail chain, dated February 25, 2018, with the subject line "CBP_MCAT_REPORT for February 25, 2018" (AOL-DEF-

00012000—12001) which is Marked "Highly Confidential/Attorneys' Eyes Only."[3] *See* Pls.' Mot. for Provisional Class Certification Ex. 3, ECF No. 293-5) Pls.' Mot. for Prelim. Inj. Ex. 41, ECF No. 294-43.  As with the Field Queue Management Reports, the sensitive nature of this law enforcement information warrants filing this document under seal. *Cf. Motley v. City of Fresno, California*, No. 15-cv-905, 2016 WL 1060144, at *2; *see BofI Fed. Bank*, 2016 WL 4150983, at *2.

The Declaration of Randy Howe lays out in great detail the harm that would certainly occur if the MCAT Report email was unsealed. The MCAT "operates out of CBP headquarters" and "provides daily reports to CBP leadership on the number of individuals apprehended or found inadmissible along the southwest border, the demographics of those individuals (e.g., family units or unaccompanied minors), as well as information relating to the capacity of various CBP facilities and the immigration system overall." Howe Decl. ¶ 13.  "These reports provide senior leadership at CBP, DHS, and other agencies with detailed information about migration trends impacting the system as a whole, and make appropriate decisions about the allocation of resources and the potential need for policy or operational change." *Id.* The "degree of detail contained in these reports . . . is such that it would also provide hostile actors with a clear picture of system-wide operational vulnerabilities that could be exploited." *Id.* ¶ 14. For example, "the MCAT reports provide detailed information regarding the number of individuals apprehended or found inadmissible in certain areas along the southwest border, as well as information about the capacity of CBP to hold these individuals, and ICE's capacity to transfer such individuals out

---

[3] Defendants have been redacting the email address for the CBP Commissioner as law-enforcement privileged, and no party has taken issue with this practice.  Plaintiffs filed the redacted MCAT Report email with their motions for preliminary injunction (*see* Pls.' Mot. for Provisional Class Certification Ex. 3, ECF No. 293-5) and provisional class certification (*see* Pls.' Mot. for Prelim. Inj. Ex. 41, ECF No. 294-43).

DEFS.' AMENDED MOT. TO FILE
UNDER SEAL
Case No. 3:17-cv-02366-BAS-KSC

of CBP custody." *Id.* This information pertains to "individual CBP facilities (e.g., POEs or Border Patrol stations)." *Id.* Because this data is provided at the "facility-level" it "can easily be exploited and manipulated to cripple CBP operations and other overall system." *Id.* ¶ 15. In particular, "the MCAT report shows that Port A has a capacity of (for instance) 75, but that Port B has a capacity of 20. It also shows that Station A has a capacity of (for instance) 300, but Station B has a capacity of 150." *Id.* This information could be used by "a hostile actor [to] cripple operations at all four of these facilities by staging a mass incursion of 200 individuals through the vehicle lanes at Port A, and by sending multiple groups totaling 400 people to be apprehended near Station A." *Id.* In addition, "smaller groups of 30 and 200, respectively" could be sent "to Port B and Station B." *Id.* Thus, "the operations at all four locations would be overwhelmed." *Id.* Also, "[t]he information on the number of individuals apprehended or found inadmissible in certain areas also provides a detailed picture of which areas of the southern border may be facing resource constraints." *Id.* ¶ 16. For example, "if a particular Border Patrol station or POE, or even a particular Border Patrol Sector or OFO Field Office is facing a significant influx of individuals apprehended or encountered, agents and officers in those locations must devote a significant portion of their time to processing those individuals, ensuring that those individuals receive appropriate treatment, and transporting those individuals to and out of CBP facilities." *Id.* Because "CBP has a finite number of employees," having "more agents and officers focused on the individuals already in custody" means that there are fewer agents and officers" "available to actually patrol and secure the border, particularly in remote areas of the southwest border." *Id.* For instance, "during the unprecedented influx of aliens apprehended between the ports of entry this summer, 40-60% of Border Patrol agents were diverted from their primary mission of patrolling the border to ensure that individuals in custody received appropriate treatment." *Id.* Likewise, "OFO . . . sent several hundred officers to assist in processing and providing humanitarian care, diverting these officers away from

DEFS.' AMENDED MOT. TO FILE
UNDER SEAL
Case No. 3:17-cv-02366-BAS-KSC

1    their primary mission of protecting the border." *Id.* "DTOs and TCOs often target

2    areas with high numbers of individuals in custody[]" " as areas in which to attempt

3    to smuggle large loads of drugs," because there are fewer agents and officers con-

4    ducting enforcement duties in those areas. *Id.* And, "[c]onversely, smugglers often

5    send large groups of individuals to areas that consistently have *lower* numbers of

6    individuals in custody, thereby *creating* significant – and urgent – staffing needs in

7    that particular area that can be further exploited." *Id.* If, for example, "the MCAT

8    reports for a period of several weeks revealed that the Rio Grande Valley (RGV)

9    Border Patrol Sector was consistently over capacity, but the Del Rio Border Patrol

10   Sector was consistently under capacity, a DTO or TCO could make a calculated de-

11   termination to send large groups of aliens to Del Rio, overwhelming the area." *Id.* ¶

12   17. Concurrently, "the entity could send large quantities of drugs to RGV, knowing

13   that it was already overwhelmed and operating at its maximum capacity." *Id.* In ad-

14   dition, "the entity could . . . use past data on patterns and trends of capacity numbers

15   to specifically target certain areas in this way." *Id.* Therefore, "the entity could use

16   this information to essentially cripple CBP's ability to secure and defend the border." 

17   *Id.*

18        Fourth, the Court should keep sealed a February 8, 2019 email chain to CBP

19   Leadership, marked "Highly Confidential/Attorneys' Eyes Only" (AOL-DEF-

20   0012141—43). *See* Pls.' Mot. for Provisional Class Certification Ex. 5 (ECF No.

21   293-7). This information "must be kept confidential" because it "provides CBP

22   leadership with detailed information about the number of individuals in custody on

23   a particular day, information about the demographics of those particular individuals,

24   as well as specific areas of operational concern for the agency." Howe Decl. ¶ 24.

25   Specifically, "[t]he original email was sent directly to CBP leadership, and shows

26   the agency email addresses of the individuals who received the message." *Id.* In ad-

27   dition, "[o]ther parts of the email chain provide the opinions and reactions of certain

28   individuals to the information presented to them." *Id.* "While agency email addresses

are, at times, released to the public, such releases are usually limited in nature and for a specific purpose." *Id.* ¶ 25. This is because "[t]he widespread publication of agency email addresses leaves personnel susceptible to spam, malware, phishing, and other cyber security vulnerabilities." *Id.; see* Declaration of John Buckley ("Buckley Decl.") *generally.* Further, "[g]iven the fluid and often time-sensitive nature of CBP operations, it is critical that CBP personnel have the ability to receive information in a timely manner, including over email." *Id.* Things like "[s]pam or malware can thus dramatically interfere with CBP's ability to execute its mission." *Id.* Also, "the publication of individual email addresses opens these individuals up to harassment and potential threats to their safety." *Id.* Therefore, "it is critically important that this information be protected from widespread release to the public." *Id.* In addition, "release of the substance of this email chain would provide hostile actors with information about a particular set of facts that the MCAT determined to be sufficient enough to warrant notification to CBP leadership to determine the best way to address or mitigate those facts." *Id.* ¶ 26. Therefore, "[t]his information . . . provides insight into the agency's operations . . . [and] reactions of specific individuals to this information, thus alerting outside entities as to why these facts are important and the concerns associated with those facts . . . [which] would [also] given those actors better context about the significance of the underlying information and facts presented, and provide further opportunities for exploitation of these potential vulnerabilities." *Id.* As with the above described documents, the sensitive nature of this law enforcement information warrants filing this document under seal. *Cf. Motley v. City of Fresno, California*, No. 15-cv-905, 2016 WL 1060144, at *2; *see BofI Fed. Bank v. Erhart*, No. 15CV2353 BAS (NLS), 2016 WL 4150983, at *2 (S.D. Cal. Aug. 5, 2016) (same). The Declaration of Randy Howe lays out in great detail the harm that would certainly occur if this email was unsealed.

*The Risk to Border Security Constitutes*
*A Compelling Reason to Seal All Documents at Issue*

As set forth above, public disclosure of the Laredo Field Office Mass Migration Contingency Plan, the Field Office Queue Management Reports, and the MCAT Reports would release details about the operations of ports of entry (as well as CBP operations between the ports of entry) that can compromise border security. This risk of harm caused by the release of these details is an even more significant interest than store security and employee safety, which was enough for the Court to seal documents in *Bell v. Home Depot USA, Inc.*, No. 212CV02499GEBCKD, 2015 WL 6082460, at *2 (E.D. Cal. Oct. 15, 2015). If all of these documents were released at the same time, the "risk would be particularly acute[]" and would have "the potential to reveal a large amount of critical operational data that could be exploited by hostile actors seeking to harm CBP operations and undermine the agency's ability to secure the border." Howe Decl. ¶¶ 22, 27. This is because, "the Queue Management and MCAT reports provide port-specific data regarding migration trends, capacity, and other operational constraints." *Id.* ¶ 22. "Hostile actors could use this information, combined with the detailed contingency plans details contained in the Mass Migration Plan, to come up with detailed plans for how to circumvent operations at different POEs." *Id.* For example, "if a DTO gained, through the MCAT and Queue Management reports, knowledge that a particular POE frequently operat[ed] at a certain capacity during a particular period of time, and also gained knowledge of the specific steps the port may take to address such a contingency, the DTO would have a very clear picture as to the specific actions it needed to take to cripple the port's operations." *Id.* "Because all of the information in these documents consists of such detailed operational information, it is not possible to meaningfully segregate or redact any information for purposes of filing other portions of the documents publicly." *Id.* ¶ 27. In *Bell*, the court stated: "the Security SOPs sought to be sealed contain Home Depot's security protocols in opening and closing its stores, the disclosure of which

could threaten its stores' security and its employees' safety." *Bell*, 2015 WL 6082460, at *2 (comparing *In re Google Inc. Gmail Litigation*, No. 13–MD–02430–LHK, 2013 WL 5366963, at *3 (N.D. Cal. Sept. 25, 2013)). Similarly, here, the information sought to be sealed involves security protocols and information along the southwest border of the United States which "could irreparably harm" the mission of CBP along the southwest border of the United States and threaten public health and safety, by allowing increased drug and weapons trafficking. *See Bell*, 2015 WL 6082460, at *1.

The security considerations here are akin to those raised in regards to the sealing of an exhibit in *United States ex rel. Kelly v. Serco, Inc.* that "specifically reference[d] locations, technical specifications and operational capabilities of restricted Homeland Security microwave communications systems along the United States border, used to provide technological assistance to federal agents tasked with monitoring and securing the border." No. 11CV2975 WQH-RBB, 2014 WL 12675246, at *2 (S.D. Cal. Dec. 22, 2014) (citation omitted).  The Court ultimately found that "national security interests are a compelling reason for filing documents under seal[]," and because "the[] exhibits [at issue] contained sensitive technical information, such as specific tower locations and frequencies . . . public dissemination of this information could be used by persons seeking to do harm to the United States." *Id.* at *4.  Additionally, the court determined "that [the] compelling reason outweighs the traditional right of access." *Id.*  Here, the Laredo Field Office Mass Migration Plan contains sensitive and specific information about "maximum holding capacities at particular ports, methods for converting areas of the port into temporary holding areas, and . . . staffing and resource contingency planning. Howe Decl. ¶ 18.

### The Risk to U.S. Cyber Security Constitutes
### A Compelling Reason to Seal Email Address of CBP Employees

Finally, the Court should keep sealed the email addresses of CBP employees

in all of the above listed documents.[4] As detailed in the Buckley Declaration, in addition to CBP employees' privacy interests, as outlined by the Court (*see* ECF No. 332 at 7), there are genuine security concerns regarding the disclosure of CBP employees' email addresses. Dissemination of "the email addresses of CBP employees . . . can create significant cyber security threats to both the individual employee and CBP as a whole." Buckley Decl.¶ 3. For example, "once an employee's email address is publicized, malicious actors can engage in social engineering to obtain confidential information from that employee" through the "use of deception to manipulate individuals into divulging confidential or personal information that may be used for fraudulent purposes." *Id.* ¶ 4. One form of social engineering, called phishing, involves "sending emails purporting to be from reputable sources with the goal of influencing or gaining personal information such as passwords or financial information." *Id.* ¶ 4.a. Another form of social engineering, called sphear phishing, is "a type of highly targeted phishing attack that focuses on a specific individual or organization." *Id.* ¶ 4.b.

Further, "other cyber security threats can [also] occur once an employee's email address is released to the public." *Id.* ¶ 5. One example of a cyber security attack is a denial of service (DoS) attack. *Id.* ¶ 5.a. "[A] DoS is a security event that happens when an attacker prevents legitimate users from accessing specific computer systems, devices, services or other IT resources[,] [t]he purpose of [which] is to flood servers, systems, or networks with traffic to overwhelm the victim's resources and make it difficult or impossible for legitimate users to access them." *Id.*

---

[4] The Court has already permitted the redaction of CBP employees' phone numbers and cell phone numbers. ECF No. 332 at 10. For this reason, Defendants limit their argument to email addresses to which the Court did not apply the same standard. Should the Court deny Defendants' request to retain confidentiality for the emails in their entirety, Defendants respectfully request permission to redact these email addresses.

Another example of a cyber security attack is doxing. *Id.* ¶ 5.b. "[D]oxing occurs when a malicious actor publishes private personal information, usually for purposes of public humiliation, stalking, identity theft, or targeting an individual for harassment." *Id.* Swatting is another example of a cyber security attack. *Id.* ¶ 5.c. "[S]watting is a harassment tactic in which a malicious actor deceives emergency services into sending policy or emergency response teams to another person's address." *Id.* Yet another example of a cyber security attack involves ransomeware. *Id.* ¶ 5.d. "[R]ansomeware is malicious software designed to block access to a computer system until a sum of money is paid." *Id.* Finally, spam emails are another example of a cyber security attack. *Id.* ¶ 5.e. "[S]pamming occurs when disruptive online messages are sent repeatedly[], and "spam emails [] hinder an agency's ability to communicate with its employees due to the volume of email traffic and strains on the agency's IT capacities." *Id.*

These security threats are not hypothetical. "Cyber attacks against the U.S. are on the rise." Buckley Decl. ¶ 6. A Government Accountability Office report determined "that between 2006 and 2015, cyberattacks involving systems supporting the federal government increased over 1,300% from 5,500 to over 77,000." *Id.*; *see* GAO-16-501, Information Security: Agencies Need to Improve Controls over Selected High-Impact Systems (May 2016). In fact, "[t]he Office of Personnel Management discovered it was the victim of a cyber attack in April 2015." Buckley Decl. ¶ 6. As a result of this attack, "[h]ackers stole personal information belonging to 21.5 million federal employees and their families, friends, and former employers." *Id.* And these hackers "were able to compromise the entire OPM network by exploiting the credentials of one single contractor." *Id.* ¶ 7. It is clear, based on this information, that "[p]ublication of CBP employees' email addresses therefore poses a substantial risk to the safety and welfare of the individual employee and CBP." *Id.* ¶ 8. It is for this reason that "any documents in this case that contain such information should be filed under seal and kept confidential." *Id.* Should the Court find

that sealing of this information is not warranted, Defendants would ask, "[a]lterna-tively, that the Court . . . permit Defendants to redact email addresses before the underlying documents are publicly released." *Id.*

As with the above-described documents, the sensitive nature of this law en-forcement information warrants filing this document under seal. *Cf. Motley*, 2016 WL 1060144, at *2; *see BofI Fed. Bank*, 2016 WL 4150983, at *2. The Buckley declaration lays out in great detail the ways in which law enforcement personnel and CBP would be left unprotected and vulnerable if CBP employee email addresses were released to the public.

For the same reasons discussed above, the Court should seal the portions of the parties' briefs that discuss this Confidential or Highly Confidential Information to keep that Information protected.

<u>**CONCLUSION**</u>

For good cause or the compelling reasons discussed above, in the previously submitted Motions to Seal and supporting response (*see* ECF Nos. 290, 297, 305, and 311), and in the previously submitted declarations (*see* ECF Nos. 297-1, 297-2, and 311-3), the Court should seal these sensitive documents and the portions of the parties' briefs that rely on them.

December 5, 2019                Respectfully submitted,

                               JOSEPH H. HUNT
                               Assistant Attorney General
                               Civil Division

                               WILLIAM C. PEACHEY
                               Director

                               KATHERINE J. SHINNERS
                               Senior Litigation Counsel

                               */s/ Sairah G. Saeed*

DEFS.' AMENDED MOT. TO FILE
UNDER SEAL
Case No. 3:17-cv-02366-BAS-KSC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SAIRAH G. SAEED
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4067 | Fax: (202) 305-7000
sairah.g.saeed@usdoj.gov

*Counsel for Defendants*

DEFS.' AMENDED MOT. TO FILE
UNDER SEAL
Case No. 3:17-cv-02366-BAS-KSC

# <u>CERTIFICATE OF SERVICE</u>

No. 17-cv-02366-BAS-KSC

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: December 5, 2019          Respectfully submitted,

*/s/ Sairah G. Saeed*
SAIRAH G. SAEED
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4067 | Fax: (202) 305-7000
sairah.g.saeed@usdoj.gov

*Counsel for Defendants*

DEFS.' AMENDED MOT. TO FILE
UNDER SEAL
Case No. 3:17-cv-02366-BAS-KSC