MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER PROHIBITING APPLICATION OF ASYLUM COOPERATIVE AGREEMENT RULE TO PROVISIONAL CLASS MEMBERS** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | |
| | Hearing Date: January 6, 2020 |
| | ***PORTIONS FILED UNDER SEAL*** |

---

[1]    Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

1

2

**NO ORAL ARGUMENT UNLESS
REQUESTED BY THE COURT**

3

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................... 1

BACKGROUND .......................................................................................... 5

    A.    Defendants' Illegal Metering Policy ...................................... 5

    B.    The ACA Rule ................................................................... 7

    C.    Because of the Illegal Metering Policy, ACA Provisional Class
           Members Have Been Deprived of Access to the U.S. Asylum
           Process Through Operation of the ACA Rule .................................. 11

LEGAL STANDARD ................................................................................ 12

ARGUMENT ............................................................................................. 13

I.    Because ACA Provisional Class Members Will Suffer Irreparable
     Injury and Are Likely to Succeed on the Merits, A TRO is Warranted. ...... 13

    A.    ACA Provisional Class Members Will Suffer Irreparable Injury
           Absent Issuance of an Injunction Because They Will Lose Their
           Right to Access the Asylum Process in the United States.................. 14

    B.    The ACA Rule Does Not Apply to Class Members and They
           are Likely to Succeed on the Merits of Their Underlying Claims
           Challenging the Government's Metering Policy and Individual
           Turnbacks. ...................................................................... 16

    C.    The Balance of Equities Tips Sharply in ACA Provisional Class
           Members' Favor, and a TRO Is in the Public Interest....................... 17

II.    THE ALL WRITS ACT INDEPENDENTLY AUTHORIZES THE
     COURT TO PREVENT THE GOVERNMENT FROM
     PREMATURELY EXTINGUISHING PROVISIONAL CLASS
     MEMBERS' CLAIMS THROUGH THE ACA RULE. ............................. 19

III.    CONCLUSION ............................................................................. 20

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Abdi v. Duke*,
    280 F. Supp. 3d 373 (W.D.N.Y. 2017) ...................................................................15

*Al Otro Lado, Inc. v. McAleenan*,
    394 F. Supp. 3d 1168 (S.D. Cal. 2019)...............................................1, 10, 16, 17

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...................................................................13, 20

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ...................................................................14

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ...................................................................13

*E. Bay Sanctuary Covenant v. Trump*,
    349 F. Supp. 3d 838 (N.D. Cal. 2018) ...................................................................15

*F.T.C. v. Dean Foods Co.*,
    384 U.S. 597 (1966)...................................................................20

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ...................................................................15

*Nken v. Holder*,
    556 U.S. 418 (2009)...................................................................19

*Saravia for A.H. v. Sessions*,
    905 F.3d 1137 (9th Cir. 2018) ...................................................................13

*Singleton v. Kernan*,
    2017 WL 4922849 (S.D. Cal. Oct. 31, 2017) ...................................................................14

*Synopsys, Inc. v. AzurEngine Techs., Inc.*,
    401 F. Supp. 3d 1068 (S.D. Cal. 2019)...................................................................13

*Textile Unlimited, Inc. v. A..BMH and Co., Inc.*,
    240 F.3d 781 (9th Cir. 2001) ...................................................................12

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977)...................................................................20

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...........................................................................................18, 20

**Statutes**

5 U.S.C. § 701(a)(2)..................................................................................................17

8 U.S.C. § 1158(a)(1)........................................................................................6, 10, 19

8 U.S.C. § 1158(a)(2)(A).............................................................................................7

8 U.S.C. § 1225..........................................................................................................6

28 U.S.C. § 1651(a) ........................................................................................2, 5, 19, 20

**Other Authorities**

Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16,
  2019) (codified at 8 C.F.R. § 208.13(c)(4)).............................................................1

Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under
  the Immigration and Nationality Act, 84 Fed. Reg. 63,994 (Nov. 19, 2019)..2, 3, 8, 10, 14, 16

Agreement between the Government of the United States of America and the
  Government of the Republic of Guatemala on Cooperation Regarding the
  Examination of Protection Claims, 84 Fed. Reg. 64,095 (Nov. 20, 2019)...........................2, 9

Camilo Montoya-Galvez, *U.S. reaches yet another asylum deal in Central
  America, this time with Honduras*, CBS News (Sept. 25, 2019),
  https://cbsn.ws/2sJeqfW..........................................................................................7

Fox News, *Chad Wolf gives first TV interview as acting DHS chief on 'Fox &
  Friends'* (Nov. 26, 2019), https://bit.ly/34SPSPH...................................................4

Hamed Aleaziz, *Trump Wants To Start Deporting Asylum-Seekers To Honduras
  By January*, BuzzFeed News (Nov. 25, 2019), https://bit.ly/2rWXiD5 ...................................4

Hamed Aleaziz, *The Trump White House Wants 'Safe Third Country' Deals with
  Central American Countries By October*, Buzzfeed News (Sept. 9, 2019),
  http://bit.ly/33Sn88w ..............................................................................................7

Reuters, *Shifting Asylum 'Burden,' U.S. Sends Guatemala First Honduran
  Migrant*, N.Y. Times (Nov. 21, 2019) .................................................................2, 9

Reuters, *U.S. Sends First Salvadoran Back to Guatemala Under Asylum Deal*,
  N.Y. Times (Dec. 3, 2019)........................................................................................2

Twitter (Nov. 20, 2019),
  https://twitter.com/tedhesson/status/1197284043525705729 ..................................9

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

Twitter (Nov. 30, 2019), https://twitter.com/ajplus/status/1200884455637958656........................9

U.S. Dep't of State, El Salvador Travel Advisory (Oct. 1, 2019),
    https://bit.ly/2RmXRRj ........................................................................................14

U.S. Dep't of State, El Salvador 2018 Human Rights Report,
    https://bit.ly/366T36J ..........................................................................................15

U.S. Dep't of State, Guatemala 2018 Human Rights Report,
    https://bit.ly/33SdSBp ......................................................................................9, 15

U.S. Dep't of State, Honduras 2018 Human Rights Report,
    https://bit.ly/2DPN4XO ......................................................................................15

U.S. Dep't of State, Guatemala Travel Advisory (Feb. 28, 2019),
    https://bit.ly/389Ltdq .........................................................................................14

U.S. Dep't of State, Honduras Travel Advisory (June 24, 2019),
    https://bit.ly/33TJero ..........................................................................................14

U.S. Dep't of State, Northern Triangle and Mexico Country Conditions (May 23,
    2019), https://bit.ly/2LrafMq ..............................................................................14

United Nations High Commissioner for Refugees, *Statement on new U.S. asylum
    policy* (Nov. 19, 2019), https://bit.ly/2PkUh7y ......................................................19

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

**INTRODUCTION**

Defendants are doing it again. On November 19, 2019, this Court issued a preliminary injunction prohibiting application of the Asylum Ban[2] to a class of individuals who attempted to access the U.S. asylum process prior to the Asylum Ban's July 16, 2019 effective date but were denied such access by the Defendants' illegal metering policy, which Plaintiffs are challenging in this case.[3] Order Granting Pls.' Mot. for Provisional Class Certification and Granting Pls.' Mot. for Prelim. Inj. (hereinafter, "PI Order"), Dkt. 330. Now, Defendants are again trying to cut off access to the asylum process through a new rule that contains nearly identical language to the Asylum Ban.

In the PI Order on the Asylum Ban, the Court reaffirmed its previous holding that individuals who would have entered the United States at a port of entry ("POE") but for the Government's metering policy were "arriving in the United States" and thus entitled to inspection under the Immigration and Nationality Act ("INA"). *See Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1199-1205 (S.D. Cal. 2019). The Court then held that the Asylum Ban could not apply to such individuals who were subject to metering before July 16, 2019 because it was limited to individuals who "arrive[] in the United States across the southern land border on or after July 16, 2019." PI Order, at 30-31 (quoting 8 C.F.R. § 208.13(c)(4)(i)). Therefore, the Asylum Ban, "by its express terms, does not apply to those non-Mexican foreign

---

[2]    The "Asylum Ban" is an interim final rule published by the government on July 16, 2019, that precludes asylum eligibility for all individuals who transited through a third country before reaching the United States at the southern land border. Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019) (codified at 8 C.F.R. § 208.13(c)(4)).

[3]    Plaintiffs allege that CBP's metering of asylum seekers at the southern border, referred to in this brief as the "metering policy," is part of a broader Turnback Policy that restricts the number of asylum seekers inspected and processed at ports of entry. Turnbacks occur through metering as well as other tactics, such as use of physical force and coerced withdrawal of a claim of fear at a port of entry ("POE"). For purposes of the preliminary relief sought in this motion, Plaintiffs' allegations focus only on metering. Plaintiffs do not, however, concede that the Turnback Policy is limited to metering.

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP. RESTRAINING ORDER

nationals in the subclass who attempted to enter or arrived at the southern border *before* July 16, 2019." *Id.* at 31.

The Court enjoined Defendants from applying the Asylum Ban to class members, relying on its power to issue prohibitory injunctions to preserve the status quo, PI Order at 30, and on its broad power under the All Writs Act to preserve its own jurisdiction, *id.* at 19-20, and repeatedly noting the unfairness of the Government's bait-and-switch for these asylum seekers. *Id.* at 1, 2, 7, 23, 33-35.

On the same day the Court issued its injunction, the Government launched yet another assault in its systematic dismantling of the U.S. asylum system—this time through a new Interim Final Rule ("Asylum Cooperative Agreement (ACA) Rule" or "Rule") that would render nearly all migrants currently waiting at the U.S.-Mexico border, including class members covered by this Court's Asylum Ban injunction, ineligible for asylum in the United States, and would send them to Guatemala, Honduras, El Salvador, or some other third country to seek protection.[4] The Government will implement this Rule by publishing "asylum cooperative agreements" ("ACAs") with specific third countries in the Federal Register; it has already published its agreement with Guatemala and has begun sending asylum seekers to that country.[5] The ACA Rule makes no exceptions for asylum seekers who were metered or otherwise turned back at the U.S.-Mexico border prior to its

---

[4]     Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 Fed. Reg. 63,994 (Nov. 19, 2019). The ACA Rule does not even allow those noncitizens to whom it is applied to seek other forms of protection in the United States, including withholding of removal or protection under the Convention Against Torture. *See id.* at 64,000.

[5]     Agreement between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims, 84 Fed. Reg. 64,095 (Nov. 20, 2019) (hereinafter, "Guatemala Asylum Cooperation Agreement" or "Guatemala ACA"). Press reports indicate that at least one Honduran and one Salvadoran have been sent to Guatemala. *See* Reuters, *U.S. Sends First Salvadoran Back to Guatemala Under Asylum Deal*, N.Y. Times (Dec. 3, 2019), https://nyti.ms/34QlZ2M (reporting that one Salvadoran and two Hondurans were sent back on the same flight); Reuters, *Shifting Asylum 'Burden,' U.S. Sends Guatemala First Honduran Migrant*, N.Y. Times (Nov. 21, 2019), https://nyti.ms/2OQwYn2.

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

effective date; the only ACA published so far similarly makes no such exceptions.

Aside from its shocking cruelty, the blind eye it turns to country conditions in Central America, and its obvious abandonment of U.S. asylum law and international obligations (which Plaintiffs do not challenge here), the ACA Rule suffers from precisely the same legal infirmity as the Asylum Ban. By its very terms, the ACA Rule should not apply to provisional class members who were metered before its effective date (hereinafter, "ACA provisional class members")—like the Asylum Ban, it applies to asylum seekers who "arrive at a U.S. port of entry . . . on or after the effective date of the rule." 84 Fed. Reg. at 63,994. And yet the Government is already sending asylum seekers to Guatemala and will continue to do so unless this Court intervenes.

As with the Asylum Ban, the very reason ACA provisional class members face application of the ACA Rule is the unlawful metering policy that forced them to wait in Mexico. These class members would have had access to the U.S. asylum process under pre-existing law *but for* the illegal metering policy that is challenged in this case. Ex. 13 ¶¶ 9, 11; Ex. 14 ¶¶ 7-8; Ex. 15 ¶¶ 10-12, 14; Ex. 16 ¶¶ 8-10, 13; Ex. 17 ¶¶ 8-9; Ex. 18 ¶¶ 17-18, 20; Ex. 19 ¶¶ 9-12, 14. ACA provisional class members are once again "caught in the legal bind created by Defendants' previous policies at the southern border and a newly-promulgated regulation." PI Order at 1. And as with the Asylum Ban, the Government will have been "at best, misleading, and at worst, duplicitous" if it applies the ACA Rule to people the Government itself forced to wait in Mexico. *Id.* at 33. Like the Asylum Ban, the "plain text" of the ACA Rule is "clear" and does not apply to ACA provisional class members metered before its effective date because they had, in fact, "arrive[d] in" the United States by that date. *Id.* at 30, 32.

Yet asylum seekers who arrived at the border before the ACA Rule went into effect are at risk of being sent to Guatemala—and indeed may be among those

already sent to Guatemala—thereby denying them access to the U.S. asylum process.[6] Defendant Acting Secretary Wolf announced publicly that the Department of Homeland Security intends to remove asylum seekers to Honduras as well;[7] media reports indicate that ongoing discussions with the Honduran government are meant to culminate in the implementation of an asylum cooperation agreement by January 2020.[8] Application of the ACA Rule—and removal of ACA provisional class members to Guatemala or other third countries—effectively forecloses Plaintiffs' ability to challenge the metering policy. Plaintiffs seek a temporary restraining order ("TRO") to preserve the status quo and permit adjudication of their existing claims by barring Defendants from applying the ACA Rule to ACA provisional class members who were subject to metering prior to the effective date of the ACA Rule.

ACA provisional class members will suffer serious, irreparable injury if the ACA Rule is applied to them. Once they are removed to Guatemala or some other third country pursuant to the Rule, their ability to obtain relief in this case will be extinguished, depriving them of their continued right to litigate these pending claims and access the U.S. asylum process. The balance of the equities tips sharply in favor of these class members, who attempted to follow the rules despite their fear and desperation, and sharply against the Government, which illegally denied them access to the U.S. asylum process under the old rules. Finally, a TRO preventing application of the ACA Rule to these class members is in the public interest.

As with their previous motion regarding the Asylum Ban, Plaintiffs are not challenging the ACA Rule itself. Nor did Plaintiffs file this motion to seek a specific outcome in ACA provisional class members' asylum cases. Rather, Plaintiffs seek

---

[6]    *See supra* n. 5.

[7]    Fox News, *Chad Wolf gives first TV interview as acting DHS chief on 'Fox & Friends'* (Nov. 26, 2019), https://bit.ly/34SPSPH.

[8]    Hamed Aleaziz, *Trump Wants To Start Deporting Asylum-Seekers To Honduras By January*, BuzzFeed News (Nov. 25, 2019), https://bit.ly/2rWXiD5.

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

to preserve the status quo through a prohibitory TRO or, in the alternative, via the Court's broad equitable power conferred by the All Writs Act, 28 U.S.C. § 1651(a), in order to ensure that ACA provisional class members have access to the U.S. asylum *process* pending this Court's determination on the merits of their claims challenging the Government's use of metering. Absent such modest judicial intervention, ACA provisional class members are likely to be deemed ineligible to apply for asylum in the United States if they crossed into the United States after the ACA Rule went into effect, even if—as with the Asylum Ban—they were "unable to make a direct asylum claim at a U.S. POE before [November 19, 2019] because of the Government's metering policy." PI Order, at 21. That result would improperly extinguish meaningful relief on the claims challenging the metering policy that are under consideration by this Court.

## BACKGROUND

### A.    Defendants' Illegal Metering Policy

The facts concerning the Government's metering policy are recounted in Plaintiffs' September 26, 2019 motions for preliminary injunction and provisional class certification, which are incorporated herein. *See* Dkts. 293, 294; *see also* Ex. 21 (Dec. of N. Ramos). Plaintiffs will not repeat them here.

However, since the September 26, 2019 motions, Plaintiffs have uncovered disturbing evidence in the form of deposition testimony from a whistleblower that confirms that the ostensible rationale for the metering policy is false:

- ███████████████████████████████████████████████
  ███████████████████████████████████████████████
  ██████ Ex. 1 ("WB Dep.") at 99:19-100:9.

- ███████████████████████████████████████████████
  ███████████████████████████ *Id.* at 101:3-6.

- ███████████████████████████████████████████████

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

██████████ *Id.* at 153:24-154:1.

- In testimony that completely undermines the Government's various arguments about the definition of the term "arriving in" and variations thereon as they are used in 8 U.S.C. §§ 1158(a)(1) and 1225, *see* Dkts. 192-1 at 6-11, 238 at 2-6, ████████████████████████████████████████████ WB Dep. at 96:3-97:18.

- ████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* at 174:14-176:22.

- ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* at 243:22-244:23.

███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████ Ex. 2 (WB Dep. Ex. 14) at AOL-DEF-00205421. ████ ███████████████████████████████████████████████ ██████ Ex. 3 (WB Dep. Ex. 19) at 6-7. ████████████

██████████████████████████████████ *Id.* at 4.[9] ██████

████████████████████████████████████████████████████

██████████████████████████ *Id.* at 4.

## B.    The ACA Rule

Throughout at least the summer and fall of 2019, then-Acting Secretary of Homeland Security Kevin McAleenan was engaged in negotiations with various Central American countries to secure agreements that would enable the U.S. government to remove asylum seekers to those countries and deny them access to the U.S. asylum process.[10] The INA permits such agreements with "safe third countries" that provide noncitizens "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A). Prior to the recent negotiations, the U.S. government had only ever concluded one safe third country agreement, with Canada.[11]

On November 19, 2019, Defendants published the ACA Rule in the Federal Register, and it went into effect that same day.[12] The Rule announces that "the United



[9] ████████████████████████████████████████████████

(WB Ex. 6) at AOL-DEF-00170588; Ex. 7 (WB Ex. 7) at AOL-DEF-00086901; Ex. 8 (WB Ex. 8) at AOL-DEF-00088203; Ex. 9 (WB Ex. 9) at AOL-DEF-00050965; Ex. 10 (WB Ex. 10) at AOL-DEF-00195860.

[10] *See, e.g.,* Camilo Montoya-Galvez, *U.S. reaches yet another asylum deal in Central America, this time with Honduras,* CBS News (Sept. 25, 2019), https://cbsn.ws/2sJeqfW; Hamed Aleaziz, *The Trump White House Wants 'Safe Third Country' Deals with Central American Countries By October,* Buzzfeed News (Sept. 9, 2019), http://bit.ly/33Sn88w.

[11] Agreement Between the Government of the United States and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, Can.-U.S., Dec. 5, 2002, Can. Treaty Series 2004/2.

[12] *Supra,* n.4.

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

States recently signed bilateral ACAs with El Salvador, Guatemala, and Honduras," and outlines the procedures for "threshold determinations as to whether aliens are ineligible to apply for asylum under those three ACAs, and any future ones." 84 Fed. Reg. at 63,995. Any asylum seekers who are deemed to be covered by a safe third country agreement (other than with Canada) will be "prohibited from applying for asylum in the United States," *id.* at 63,999, and will not be eligible for withholding of removal or protection under the Convention Against Torture. *Id.* at 64,000. The Rule applies "prospectively to aliens who arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after the effective date of the rule." *Id.* at 63,995.

The ACA Rule denies access to the U.S. asylum process. The Rule determines "whether an alien may even *apply* for asylum." 84 Fed. Reg. at 63,996. For each class member who has survived the metering process—either by waiting for their number to be called at a port of entry or by crossing the U.S.-Mexico border between ports of entry out of desperation—Defendants will "conduct a threshold screening" to determine whether an ACA bars an individual from applying for asylum in the United States. *Id.* at 63,998. If the asylum seeker is not a citizen of the purportedly "safe" third country with which the United States has signed an ACA, and fails to affirmatively state and establish that it is more likely than not that she would be persecuted on account of a protected ground, or tortured, in that third country, then the Government may remove her to that third country rather than grant her access to the U.S. asylum process. *Id.* Such individuals will have *no* access to asylum or any other form of protection in the United States. *Id.* at 63,998, 64,000.

The day after publishing the ACA Rule, on November 20, 2019, the Department of Homeland Security published the Guatemala ACA in the Federal

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

Register.[13] The first person was removed to Guatemala the day after that,[14] not even aware of his destination until he was boarding the plane and asked where it was headed.[15]

On the same day the Guatemala ACA went into effect, a guidance document was leaked to the media.[16] This guidance, dated November 19, 2019, bears the seal and logo of U.S. Customs and Border Protection. *See* Ex. 11. According to the guidance, the Guatemala ACA currently applies only to Hondurans and Salvadorans who seek access to the U.S. asylum process and "arrived or entered the U.S. on or after the effective date of the [Guatemala] ACA"—*i.e.*, November 20, 2019. *Id.* at 10. However, the Guatemala ACA itself does not limit the nationalities of individuals who can be removed to that country. *See* 84 Fed. Reg. 64,095. Thus, any non-Guatemalan asylum seeker can be sent back to Guatemala, a country that, according to the U.S. State Department, "remains among the most dangerous countries in the world" and has an "alarmingly high murder rate."[17] The State Department's most recent Country Reports on Human Rights Practices indicate that rape, femicide, violence against women, human trafficking, violence against LGBTI individuals and gang recruitment of displaced children are serious problems in Guatemala.[18] *See also* Ex. 13 ¶ 7 (assaulted and robbed in Guatemala); Ex. 15 ¶ 8 (robbed twice by Guatemala police); Ex. 16 ¶ 7 (witnessed gangs threatening people

---

[13]    *See supra*, n.5.

[14]    Reuters, *Shifting Asylum 'Burden,' U.S. Sends Guatemala First Honduran Migrant*, N.Y. Times (Nov. 21, 2019), https://nyti.ms/2OQwYn2.

[15]    AJ+ (@ajplus), Twitter (Nov. 30, 2019), https://twitter.com/ajplus/status/1200884455637958656

[16]    *See* Ted Hesson (@tedhesson), Twitter (Nov. 20, 2019), https://twitter.com/tedhesson/status/1197284043525705729.

[17]    U.S. Dep't of State, Overseas Security Advisory Council, "Guatemala 2019 Crime & Safety Report" (Feb. 28, 2019), at 2, https://bit.ly/36gGjuz.

[18]    U.S. Dep't of State, Guatemala 2018 Human Rights Report, at 16, 18, 21-22, https://bit.ly/33SdSBp.

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP. RESTRAINING ORDER

in Guatemala); Ex. 17 ¶¶ 12-13 (same gangs exist in Guatemala and El Salvador and can communicate easily); Ex. 18 ¶ 9 (same gangs exist in Guatemala and Honduras); Ex. 19 ¶ 7 (gangs in Guatemala affiliated with gangs in El Salvador).  The Reports also note UNHCR's finding that "identification and referral mechanisms for potential asylum seekers were inadequate" in Guatemala, leaving asylum seekers at risk of deportation to the countries they fled.[19]

The ACA Rule should not apply to ACA provisional class members—individuals subject to the metering policy before November 19, 2019—given the text of the Rule and this Court's previous rulings on Defendants' Motion to Dismiss the Second Amended Complaint and Plaintiffs' Motion for Preliminary Injunction. The ACA Rule targets any noncitizen "who *arrive[s] at* a U.S. port of entry, or enter[s] or attempt[s] to enter the United States between ports of entry, on or after the effective date of the rule," *i.e.*, November 19, 2019. 84 Fed. Reg. at 63,995 (emphasis added). This Court has already held that the use of the present tense verb "arrive" is significant and "plainly covers an alien who may not yet be in the United States, but who is in the process of arriving in the United States through a POE." *Al Otro Lado*, 394 F. Supp. 3d at 1200 (discussing 8 U.S.C. § 1158(a)(1)). The Court applied that logic to the Asylum Ban, enjoining Defendants from applying the Ban to provisional class members metered before it went into effect. PI Order, at 31, 36. Applying the Court's logic to the text of the ACA Rule, the ACA provisional class members who were metered at POEs prior to November 19, 2019, were in the process of "arriv[ing] in the United States" when they were turned back. The Rule should not apply to them, as they met the cut-off date for "arriv[ing]." *See* Ex. 13 ¶¶ 9, 11 (middle of September, 2019); Ex. 14 ¶ 7 (Oct. 14, 2019); Ex. 15 ¶¶ 10, 14 (July 2-3, 2019); Ex. 16 ¶¶ 8, 13 (Oct. 14, 2019); Ex. 17 ¶ 8 (July 5, 2019); Ex. 18 ¶¶ 17, 20 (July 28, 2019); Ex. 19 ¶¶ 9-11, 14 (July 3-4, 2019).

---

[19]    Guatemala 2018 Human Rights Report at 13.

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

### C.    Because of the Illegal Metering Policy, ACA Provisional Class Members Have Been Deprived of Access to the U.S. Asylum Process Through Operation of the ACA Rule

Based on the Government's planned application of the ACA Rule to thousands of migrants who arrived at POEs along the U.S.-Mexico border before November 19, 2019 and were illegally metered, ACA provisional class members are now, as a result of metering, harmed by the Rule.[20] The U.S. government, including Defendants, has engaged in another cruel bait-and-switch to deny these migrants access to the U.S. asylum process. Prior to November 19, 2019, application of the Government's metering policies meant that "these individuals were prevented from crossing through POEs and were instead instructed to 'wait their turn' in Mexico for U.S. asylum processing." PI Order, at 6; *see also* Ex. 13 ¶ 9 (told to get a number); Ex. 14 ¶¶ 7-8 (same); Ex. 15 ¶ 11; Ex. 16 ¶¶ 9-10; Ex. 17 ¶¶ 8-9; Ex. 18 ¶¶ 16-18; Ex. 19 ¶¶ 9-12. Compliance with metering was "understood . . . to be a necessary and sufficient way to legally seek asylum in the United States." PI Order, at 6; *see also* Ex. 13 ¶ 9 ("He told us that we had to go to the COESPO office and ask for asylum to get a number to be able to cross."); Ex. 14 ¶ 8 ("I registered for the asylum waiting list because that is what I was told to do."); Ex. 15 ¶ 12 ("I registered myself on the asylum waitlist because I wanted to do things the right way. I did not want to break the law."); Ex. 16 ¶ 10 ("I put my name on the waiting list at the COESPO office because that's what I was told to do."); Ex. 17 ¶¶ 8-9 (summarizing their understanding); Ex. 18 ¶¶ 16-18 ("After asking around, my daughter was told by

---

[20]    During a December 4, 2019 telephonic meet and confer between Plaintiffs' counsel and Defendants' counsel on this Motion and other pending matters, Defendants' counsel did not disclaim, in response to direct inquiries from Plaintiffs' counsel, that the ACA Rule would be applied to individuals metered before November 19, 2019. *See* Ex. 12 (Dec. of S. Medlock). Like the Asylum Ban, the ACA Rule contains no such carve-out—the Government applied the Asylum Ban to individuals who were metered before the Ban went into effect, and Plaintiffs expect the Government will do the same with the ACA Rule.

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP. RESTRAINING ORDER

other asylum seekers that this is what we had to do in order to present ourselves before U.S. immigration officials to request asylum."); Ex. 19 ¶ 12 ("We put our name on the waitlist at El Chaparral San Ysidro port of entry because we thought this was the only way that we could enter the United States.").

Based on Defendants' acknowledgement that they engage in metering on a border-wide basis, Dkt. 283 at ¶¶ 3, 7, 54, 65, 67–69, 79, 83, 85, 226, 258, 272, 273, it is clear that a subset of class members—who will likely be deemed ineligible to apply for asylum under the ACA Rule—were subjected to the metering policy *before* the Rule went into effect on November 19, 2019, and *but for* the metering policy, would have entered the United States before that date. *See* Ex. 13 ¶¶ 9, 11; Ex. 14 ¶¶ 7-8; Ex. 15 ¶¶ 10-12, 14; Ex. 16 ¶¶ 8-10, 13; Ex. 17 ¶¶ 8-9; Ex. 18 ¶¶ 17-18, 20; Ex. 19 ¶¶ 9-12, 14. These individuals are the members of the ACA provisional class the Individual Plaintiffs seek to represent for purposes of this motion. If the ACA Rule is applied to this subset of class members before the Court's ultimate decision in this case, then those class members will be denied any chance to obtain effective relief. In addition, applying the ACA Rule to ACA provisional class members—who were metered prior to its effective date and thus, had previously "arrived in" the United States—would violate the plain language of the Rule. This motion seeks injunctive relief to preserve ACA provisional class members' eligibility for asylum in the United States, given that the Rule would not have affected them but for Defendants' illegal use of metering, which forced them to stay in Mexico longer than they otherwise would have, and to ensure that the Rule is not applied in a manner inconsistent with the Court's prior holding.

## LEGAL STANDARD

By this motion, Plaintiffs seek a temporary restraining order to preserve the status quo and prevent the "irreparable loss of rights" before a final judgment on the merits. *Textile Unlimited, Inc. v. A..BMH and Co., Inc.*, 240 F.3d 781, 786 (9th Cir.

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

2001). Specifically, they seek an order preventing the government from applying the ACA Rule to ACA provisional class members, who would have had access to the U.S. asylum process prior to November 19, 2019, but for Defendants' illegal metering policy.

"The standard for obtaining a temporary restraining order is identical to the standard for obtaining a preliminary injunction." *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1072, (S.D. Cal. 2019). When moving for a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). A preliminary injunction may also issue where the plaintiff raises "serious questions going to the merits . . . and the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

As this Court previously observed, a prohibitory injunction "preserves the status quo," which is defined as "the legally relevant relationship *between the parties* before the controversy arose." PI Order, at 30 (quoting *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014)). This TRO motion, like the preliminary injunction motion Plaintiffs filed regarding the Asylum Ban, involves a prohibitory injunction to prevent a "regulation which affirmatively changes the status quo," *id.*, from altering the relationship between provisional class members and the government. Therefore, heightened scrutiny does not apply. *Id.*

## ARGUMENT

### I.    Because ACA Provisional Class Members Will Suffer Irreparable Injury

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

**and Are Likely to Succeed on the Merits, A TRO is Warranted.**

### A. ACA Provisional Class Members Will Suffer Irreparable Injury Absent Issuance of an Injunction Because They Will Lose Their Right to Access the Asylum Process in the United States.

Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *Singleton v. Kernan*, 2017 WL 4922849, at *3 (S.D. Cal. Oct. 31, 2017) (quoting 11A Wright & Miller, FED. PRAC. & PROC. § 2948.1 (3d ed.)). The irreparable harm "analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)). The ACA provisional class members plainly satisfy the irreparable harm prong.

Absent the judicial relief requested, ACA provisional class members will be deprived of their present entitlement to challenge the legality of the metering policy, as well as their statutory and constitutional right to access the U.S. asylum process.[21]

---

[21]     The fact that class members sent to a third country will purportedly have access to some process for seeking protection in that country is of no import to the irreparable harm they will suffer should the ACA Rule be applied to them. *See* 84 Fed. Reg. at 63,994 (noting that the third country is supposed to "provide access to a full and fair procedure for determining the alien's protection claim"). The right to access the asylum process in the United States is materially different from, and clearly preferable to, a right to seek some form of protection in Guatemala, Honduras, or El Salvador. Class members had a right to access the asylum process *in the United States* when they arrived at the U.S.-Mexico border—a right which Defendants ignored and violated. Should the ACA Rule be applied to these class members, their right will be thoroughly extinguished. Although the Government's own assessments of Northern Triangle countries throw into doubt its classification of these countries as "safe," Plaintiffs are not challenging that decision with this motion. *See, e.g.*, U.S. Dep't of State, El Salvador Travel Advisory (Oct. 1, 2019), https://bit.ly/2RmXRRj (warning travelers to "[e]xercise increased caution" due to violent crime and gang activity throughout the country); U.S. Dep't of State, Honduras Travel Advisory (June 24, 2019), https://bit.ly/33TJero (classifying entire country as "Reconsider Travel"); U.S. Dep't of State, Northern Triangle and Mexico Country Conditions (May 23, 2019), https://bit.ly/2LrafMq (discussing high rates of homicide, disappearance, extortion); U.S. Dep't of State, Guatemala Travel Advisory (Feb. 28, 2019), https://bit.ly/389Ltdq (warning travelers to "[e]xercise increased caution" in some parts of the country and "reconsider travel" in the rest);

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP. RESTRAINING ORDER

Here, as with their prior motion regarding the Asylum Ban, Plaintiffs are simply seeking an "opportunity to have their asylum claims heard" in the United States, which the Government prevented through application of its illegal metering policy. PI Order, at 34. Applying the Court's Asylum Ban analysis to this nearly identical situation, "[f]ailure to grant this [motion] and return Plaintiffs to the status quo" would similarly "lead Plaintiffs to suffer irreparable harm." *Id.*; *see also E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 864 (N.D. Cal. 2018) ("Congress has determined that the right to bring an asylum claim *is* valuable," and the loss of such a right is a "real harm[.]"); *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) ("the deprivation of constitutional rights 'unquestionably constitutes irreparable injury'" (internal quotation marks omitted)); *Abdi v. Duke*, 280 F. Supp. 3d 373, 406 (W.D.N.Y. 2017) (irreparable harm established where "full and fair process afforded to them under the law" was denied). Only preservation of the status quo would obviate that serious procedural injury.

Irreparable harm is accentuated because of the Government's "misleading" and "duplicitous" policy shifts on asylum. PI Order, at 33. ACA provisional class members have been waiting, and were waiting in Mexico as of November 19, 2019, "only at the instruction of the Government." *Id.*; *see also* Ex. 13 ¶¶ 9-12 (waiting since September 2019); Ex. 14 ¶¶ 7-8, 10-11 (October 2019); Ex. 15 ¶¶ 10-16 (early July 2019); Ex. 16 ¶¶ 8-13 (October 2019); Ex. 17 ¶¶ 8-9 (early July 2019); Ex. 18 ¶¶ 17-18, 20 (late July 2019); Ex. 19 ¶¶ 9-12, 14 (early July 2019). Now, having followed the Government's metering instructions, ACA provisional class members

---

U.S. Dep't of State, El Salvador 2018 Human Rights Report, https://bit.ly/366T36J (discussing unlawful killings and torture by security forces, forced disappearances by military personnel, widespread corruption, impunity for violence against women and girls, state violence against LGBTI individuals, and "the worst forms of child labor"); U.S. Dep't of State, Guatemala 2018 Human Rights Report, https://bit.ly/33SdSBp (discussing widespread corruption, human trafficking, violence against LGBTI individuals and members of other marginalized groups, and child labor); U.S. Dep't of State, Honduras 2018 Human Rights Report, https://bit.ly/2DPN4XO (discussing arbitrary and unlawful killings, torture, arbitrary arrest or detention, and violence against multiple marginalized groups).

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

find themselves facing the complete and total loss of "their right to claim asylum in the United States." PI Order, at 33.

If this Court grants Plaintiffs' motion, appropriate injunctive relief would include an order directing that those class members who would have crossed the southern border prior to November 19 but for Defendants' illegal conduct should have their asylum claims adjudicated in the United States based on the law that was then in place. Such an order would be necessary to place those individuals in the same position they would have been in had Defendants not engaged in illegal metering. Absent temporary injunctive relief, the ACA Rule would deprive ACA provisional class members of access to the U.S. asylum process even if this Court ultimately rules in Plaintiffs' favor on the illegality of the Government's metering policy. Once they lose the right to seek asylum based on the law that existed at the time they arrived at a POE, it cannot effectively be restored.

**B.      The ACA Rule Does Not Apply to Class Members and They are Likely to Succeed on the Merits of Their Underlying Claims Challenging the Government's Metering Policy and Individual Turnbacks.**

The wording of the ACA Rule is clear. It applies "prospectively" to noncitizens "who arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after the effective date of the rule." 84 Fed. Reg. at 63,995. As this Court has repeatedly made clear, class members "who may not yet be in the United States, but who [are] in the process of arriving in the United States through a POE" are "arriving in the United States," and are therefore covered by statutory and regulatory provisions that use the present tense verb "arrive" and variations thereon. *Al Otro Lado*, 394 F. Supp. 3d at 1199-1205; PI Order, at 31.

As in the Court's decision on Plaintiffs' motion for a preliminary injunction preventing Defendants from applying the Asylum Ban to class members who were

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

subject to metering before the Asylum Ban went into effect, once again Plaintiffs are likely to succeed on the merits of their argument that the ACA Rule does not apply to them, based on the plain language of the Rule itself. *See* PI Order, at 31; *see also* Ex. 13 ¶¶ 9, 11 (subject to metering in middle of September 2019); Ex. 14 ¶ 7 (Oct. 14, 2019); Ex. 15 ¶¶ 10, 14 (July 2-3, 2019); Ex. 16 ¶¶ 8, 13 (Oct. 14, 2019); Ex. 17 ¶¶ 8-9 (July 5, 2019); Ex. 18 ¶¶ 17-18, 20 (July 28, 2019); Ex. 19 ¶¶ 9-12, 14 (July 3-4, 2019).

This Court's past decisions also suggest that Plaintiffs have a strong likelihood of success on the merits of their underlying challenges to the Turnback Policy.[22] The facts and legal arguments supporting that likelihood of success are discussed at length in Plaintiffs' September 26, 2019 motion for preliminary injunction, *see* Dkt. 294-1, at 13-20, and are summarized very briefly here. First, each individual turnback of an asylum seeker violates the INA and is actionable under Section 706(1) of the Administrative Procedure Act ("APA") because asylum seekers have a right to inspection and processing, Defendants have acknowledged they are "metering," and Plaintiffs will show that Defendants' explanation for metering is pretextual and based on an impermissible desire to deter asylum seekers. Second, the metering policy violates the INA and Section 706(2) of the APA because it is a final agency action that exceeds Defendants' statutory authority and is without observance of procedure required by law. Finally, to the extent the metering policy violates the INA, and the APA, it also violates the Due Process Clause.

### C.    The Balance of Equities Tips Sharply in ACA Provisional Class

---

[22]    For example, in its past orders granting in part and denying in part Defendants' motions to dismiss, this Court already concluded that the political question doctrine does not bar review of Plaintiffs' claims; that the challenged action is reviewable under 5 U.S.C. § 701(a)(2) because it is not committed to agency discretion by law; and that assuming the truth of the facts alleged in the Second Amended Complaint, Plaintiffs have adequately pleaded violations of the INA, the Administrative Procedure Act, and the Due Process Clause. *Al Otro Lado*, 394 F. Supp. 3d at 1190-93, 1205, 1209-12, 1215, 1221-22.

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

**Members' Favor, and a TRO Is in the Public Interest.**

In evaluating the final TRO factors—the balance of the equities and the public interest—a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation marks omitted).

As with the Asylum Ban, application of the ACA Rule to ACA provisional class members who were subject to metering before it went into effect, "at its core, is quintessentially inequitable." PI Order, at 34. ACA provisional class members "relied on the Government's representations." *Id.*; *see also* Ex. 13 ¶ 9; Ex. 14 ¶¶ 7-8; Ex. 15 ¶ 11; Ex. 16 ¶¶ 9-10; Ex. 17 ¶¶ 8-9; Ex. 18 ¶¶ 16-18; Ex. 19 ¶¶ 9-12. Having done so, they now find themselves subject to a new policy that attempts to strip them of their right to access the U.S. asylum process, a policy that applies to them *only* because they waited in Mexico as they were told to do. The effect on Plaintiffs of *not* granting the requested TRO would be severe and immediate. If, as expected, the Government applies the Rule to members of the ACA provisional class because they did not cross the southern border prior to November 19, 2019, then all ACA provisional class members will be ineligible for asylum and sent forthwith to Guatemala or some other country where they never intended to seek asylum. *See* Ex. 13 ¶ 13 (discussing fears of being sent to Guatemala); Ex. 14 ¶ 11 (same); Ex. 15 ¶ 16 (discussing same fears and noting that ACA Rule "seems very unfair to me because I have been waiting so long for my turn to go to the bridge and ask for asylum in the United States"); Ex. 16 ¶ 15 (discussing same fears); Ex. 17 ¶¶ 12-13 (same); Ex. 18 ¶ 9 (same); Ex. 19 ¶ 7 (same).

Moreover, as this Court recognized in its Second Motion to Dismiss Order, the government is required by statute to provide asylum seekers access to the U.S.

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

asylum process. *See* 8 U.S.C. § 1158(a)(1) ("*Any* [noncitizen] who is physically present in the United States or who *arrives in* the United States . . . , irrespective of such [noncitizen's] status, may apply for asylum[.]") (emphasis added). To the extent Defendants' metering policy forecloses access to that statutorily guaranteed process through newly established ineligibility criteria that affect ACA provisional class members, the public interest is served by issuing a TRO that preserves their eligibility for asylum pending a determination on the merits of the metering policy. Finally, "preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm," clearly is in the public interest.[23] *Nken v. Holder*, 556 U.S. 418, 436 (2009); *see also* Ex. 13 ¶ 13; Ex. 14 ¶ 11; Ex. 15 ¶ 16; Ex. 16 ¶ 15; Ex. 17 ¶¶ 12-13; Ex. 18 ¶ 9; Ex. 19 ¶ 7.

Thus, the balance of the equities and the public interest strongly favor granting a TRO to ACA provisional class members.

## II.    The All Writs Act Independently Authorizes the Court to Prevent the Government from Prematurely Extinguishing Provisional Class Members' Claims Through the ACA Rule.

As the Court concluded when issuing a preliminary injunction on the Asylum Ban, the All Writs Act ("AWA") separately authorizes the limited relief Plaintiffs seek, in order to preserve the court's jurisdiction to adjudicate the claims before it despite the government's attempt to extinguish them. *See* 28 U.S.C. § 1651(a) (authorizing courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"); *see also*

---

[23]    Analysis by UNHCR and various U.S.-based non-governmental organizations concludes that the three countries with which the Government has so far signed ACAs—Guatemala, Honduras, and El Salvador—are not safe and may present "life threatening dangers" for migrants sent there by Defendants, including the risk of *refoulement* to their home countries. *See* United Nations High Commissioner for Refugees, *Statement on new U.S. asylum policy* (Nov. 19, 2019), https://bit.ly/2PkUh7y; Ex. 20 (Dec. of Daniella Burgi-Palomino), at 4-7 (report by non-governmental organizations regarding civil society concerns with ACAs).

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

PI Order, at 19-21. The Act encompasses a federal court's power "to preserve [its] jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels," *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966), and "provides this Court with the ability to construct a remedy to right a 'wrong [which] may [otherwise] stand uncorrected.'" PI Order, at 19 (quoting *United States v. Morgan*, 346 U.S. 502, 512 (1954)).

Permitting the ACA Rule to apply to ACA provisional class members who have pending claims in this Court would improperly nullify the Court's prior holding that class members have already, as a matter of law, "arrived in" the United States. *See United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) (federal court has power "to issue such commands under the [AWA] as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction"). In addition, improper application of the IFR, like the Asylum Ban, would extinguish Plaintiffs' ability to access the U.S. asylum process and effectively moot most of Plaintiffs' claims. Any order from the Court finding metering unlawful would be a dead letter. As such, the AWA authorizes the Court to preserve its own jurisdiction over Plaintiffs' underlying claims. PI Order, at 20.

## III. CONCLUSION

Absent a temporary restraining order pursuant to either *Winter* or *Cottrell*, or an order pursuant to the All Writs Act that preserves the status quo, ACA provisional class members will suffer irreparable harm.

WHEREFORE, Plaintiffs respectfully ask this Court to enter a temporary restraining order preventing Defendants from applying the ACA Rule to ACA provisional class members who were subject to metering prior to November 19, 2019.

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

Dated: December 6, 2019

MAYER BROWN LLP
  Matthew H. Marmolejo
  Ori Lev
  Stephen S. Medlock

SOUTHERN POVERTY LAW
CENTER
  Melissa Crow
  Sarah Rich
  Rebecca Cassler

CENTER FOR CONSTITUTIONAL
RIGHTS
  Baher Azmy
  Ghita Schwarz
  Angelo Guisado

AMERICAN IMMIGRATION
COUNCIL
  Karolina Walters


By: */s/ Stephen M. Medlock*
      Stephen M. Medlock

*Attorneys for Plaintiffs*

MEMO OF P. & A. IN SUPP. OF MOT. FOR TEMP.
RESTRAINING ORDER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the foregoing document to be served on all
counsel via the Court's CM/ECF system.

Dated:  December 6, 2019                    MAYER BROWN LLP


By  */s/ Stephen M. Medlock*