1  MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone: +1.202.263.3000
   Facsimile: +1.202.263.3300

9  SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.: 17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | **EXHIBIT 20 TO MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | **DECLARATION OF DANIELLA BURGI-PALOMINO** |

---

[1] Acting Secretary Wolf is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

## DECLARATION OF DANIELLA BURGI-PALOMINO

I, Daniella Burgi-Palomino, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I am the co-director of the Latin America Working Group (LAWG), where I currently lead our campaigns to protect migrants and refugees. I have worked for over twelve years on the protection of migrant rights in the U.S.-Mexico-Central America corridor with a variety of civil society organizations and foundations. I am a U.S. citizen older than 18 years of age.

2. LAWG's mission is to ensure that U.S. policies advance human rights, peace, and social, environmental, and economic justice in Latin America and the Caribbean. To achieve this mission, we work with coalition partners and allied organizations to educate policymakers and the public.

3. In the course of my work over the last three years, I have led fact-finding delegations to monitor the human rights, security, corruption and migration situation in Guatemala, Honduras, and El Salvador. As a part of these delegations, I have met with U.S. and foreign government officials, civil society organizations, migrant shelter staff, and international humanitarian organizations. Assessing the impacts of U.S. immigration and foreign policy on the human rights of asylum seekers, migrants, and refugees has been a central focus of these delegations. One of the policies we have monitored closely on these delegations and also via dialogue with civil society, international organizations and governments is the "safe third country" agreements, characterized by the Department of Homeland Security (DHS) as "Asylum Cooperative Agreements" (ACAs) between the United States and these three Central American governments.

4. The culmination of my on-the-ground and other research analyzing the "safe third country" agreements can be found in the report I authored, *"Forced Return to Danger: Civil Society Concerns with the Agreements Signed between the United States and Guatemala, Honduras, and El Salvador,"* published in conjunction with the AFL-CIO, Alianza Americas, the Center for Gender and Refugee Studies, Kids in Need of Defense, the Women's Refugee

Commission, and the Washington Office on Latin America. In the *Forced Return to Danger* report, I outline the disturbing impacts of the agreements on asylum seekers' protection and well-being, and the likelihood that they will violate U.S. and international refugee law. The memo highlights the ways in which the agreements completely ignore the distinct but concerning realities that fuel forced migration and displacement of thousands of individuals from Guatemala, Honduras, and El Salvador.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 5th day of December 2019 at Washington, DC.

Daniella Burgi-Palomino



# Forced Return to Danger

## Civil Society Concerns with the Agreements Signed between the United States and Guatemala, Honduras, and El Salvador

**December 5, 2019**

This memo lays out civil society concerns with the signed safe third country agreements between the United States and the countries of Guatemala, El Salvador, and Honduras. Taken together, these agreements serve as one more measure to effectively shut the door to asylum seekers at the U.S.-Mexico border and throughout the region. Far from addressing the forced migration from the region as the Department of Homeland Security (DHS) claims, these agreements will only further trap families, men, women, and children in precarious conditions without any meaningful access to protection.

Over 55,000 asylum seekers, including pregnant women, children, and members of the LGBTQ+ community are currently being denied access to U.S. territory to claim asylum and are in situations of serious danger at the U.S.-Mexico border as a result of the so-called "Migrant Protection Protocols" ("Remain in Mexico") policy and the illegal practice of metering.[i] Moreover, a recently enacted "Interim Final Rule", or third country transit ban, prohibits all individuals who have traveled through another country before reaching the United States from applying for asylum apart from extremely limited exceptions.[ii] These policies follow earlier efforts by the Trump Administration to bar from asylum individuals entering the United States between ports of entry and to significantly reduce the eligibility of domestic and gang violence survivors to access asylum, reversing long-standing legal precedent.[iii] They also follow the ongoing practice of separating families to deter them from claiming asylum.[iv] The safe third country agreements, referred to by DHS as "Asylum Cooperative Agreements" (ACAs), compound the negative impacts of all of these policies and externalize the U.S. border further south, exporting U.S. domestic and international responsibilities to countries that do not have the capacity to protect asylum seekers. They also send the message that the governments of the region should cooperate with the United States in efforts to prevent freedom of movement or restrict an individual's right to seek protection.

One of the most egregious aspects of these agreements is that in prioritizing the signing and implementation of these unworkable accords, the U.S. government has lessened and undercut its diplomatic efforts to urge the three governments to address corruption, strengthen the rule of law, and provide basic services to their citizenry—in effect reducing diplomacy that would address the root causes of forced migration.

*What's in a Name? Safe Third Country Agreements*

The complete lack of transparency with which these agreements have been negotiated is extremely troubling. As of the end of October 2019, all three countries had signed Asylum Cooperative Agreements (ACAs) with the United States.[v] The ACAs are accompanied by "border security arrangements" and "biometric data sharing program (BDSP) arrangements," with all three countries, and in Guatemala and Honduras with temporary worker programs via the Department of Labor (DOL).[vi] To date, the Asylum Cooperative Agreement with Guatemala is the only one to have been publicly posted by DHS as of November 18, 2019, after having been signed in July 2019.[vii] The other agreements and their annexes have not yet been made public by DHS or by governments in the region. On November 19, 2019, DHS published an "Interim Final Rule" (IFR, subsequently referred to as "the rule") establishing the framework for implementation and background for all three current and future ACAs entered into between the United States and countries other than Canada. Specific guidance to implementing agencies has not yet been made public by DHS.[viii] Guidance for U.S. Citizenship and Immigration Services (USCIS) asylum staff on the implementation of the Guatemala ACA was leaked to the media.[ix]

Although DHS refers to the agreements with Guatemala, Honduras, and El Salvador by different names, the actions they propose point to the framework of "safe third country" agreements. From the published rule and U.S.-Guatemala agreement, and copies of the El Salvador and Honduras ACAs leaked to the media,[x] all three agreements refer to the transfer of asylum seekers from the United States to a "third" country, not consisting of the individual's country of origin or habitual residence, where the individual could find protection. According to the United Nations High Commissioner for Refugees (UNHCR), such transfers via bilateral agreements refer to a "safe third country" concept.[xi] Moreover, the rule also refers to the ACAs alternatively as "safe third country agreements."[xii]

The leaked guidance to asylum officers for the Guatemala ACA refer to the agreement applying to individuals who sought asylum at the U.S.-Mexico border on or after Nov. 19, 2019 at a port of entry or in between ports of entry and who are adult nationals from El Salvador or Honduras.[xiii] It is yet unclear if the other ACAs will have similar guidance. Notably, the only exceptions to the agreement with Guatemala are for unaccompanied children, and individuals with a valid visa or other valid admission document to the United States.[xiv] An additional exception are people who, under the discretion of USCIS, are considered that it is in the public interest to grant them asylum in the United States.

According to the rule, unaccompanied children will not be forced to seek asylum in Guatemala, El Salvador, or Honduras under these agreements, consistent with longstanding U.S. law recognizing that unaccompanied children should be given access to protection in the country where they arrive and should not be then sent across borders to seek asylum elsewhere.[xv] However, unaccompanied children, other than those from Mexico, will continue to be subject to the third country transit ban which seeks to bar them from asylum if they transited another country prior to arriving in the United States with narrow exceptions. In this sense, while the safe third country agreements do not target unaccompanied children, the Administration's policies nonetheless have a grave impact on unaccompanied children's

2

access to asylum, and place them at risk of return to persecution or even death in their countries of origin.

It is also unclear how these agreements will be funded. While recent announcements by DHS suggest funding for the implementation of these agreements will come from some restored U.S. assistance for Central America,[xvi] exact amounts and sources of this funding, and whether the Congress has been notified, remain unclear. There is no publicly available information about the newly announced funding to strengthen Guatemala's asylum system,[xvii] plans to strengthen that of El Salvador and Honduras, or how these proposals fit in with this restoration of some funding to the Central America region. Moreover, civil society organizations in the United States or the region, including humanitarian organizations and shelters that would care for deported migrants, have not been consulted in the negotiations of the agreements.

The State Department's apparent absence in the design, negotiation, and signing of the agreements, and in their future implementation given that the State Department, not DHS, is the U.S. government's foreign policy arm, is also concerning. These agreements are just one more example of how DHS is assuming a greater role in foreign policy-making in Central America.

Media reports have alluded to the involvement of the UNHCR with DHS in the implementation of the ACAs.[xviii] DHS has also repeatedly framed its policies as a part of the UNHCR's strategy of strengthening protection systems in the region.[xix] However, the UNHCR has publicly stated that it is not a party to any of the bilateral ACAs between the United States and Guatemala, Honduras and El Salvador.[xx]

*Concerns under U.S. and International Refugee Law*

Disturbingly, all three of the agreements invoke the 1951 Refugee Convention, although if implemented, the agreements are likely to violate international refugee law. While there is no requirement that asylum seekers have to seek asylum in the first country they encounter or that asylum seekers can choose where they seek asylum, their preferences on where to seek asylum should be considered.[xxi] Moreover, according to the UNHCR, transfer agreements such as the ACAs cannot be considered appropriate if they cannot guarantee that asylum seekers: will be protected against *refoulement*, or a return to danger; have access to basic services and human rights commensurate under the 1951 Convention; receive fair and efficient processing for refugee determination, and are able to enjoy asylum.[xxii]

Removing individuals from the U.S.-Mexico border, barring them from seeking protection in the United States, and forcibly sending them to seek asylum in any of these countries violates the principle of *non-refoulement* or an individual's right to not be returned to a country where they have reason to fear persecution. As the UNHCR has stated, the agreements increase the likelihood that asylum seekers would be returned to countries where they are not safe and may face "life-threatening dangers."[xxiii] The United States is going against international law by ignoring that the most basic requirement for any

3

agreement that implies the transfer of asylum seekers to a country different from where they claimed asylum is to ensure that refugees will receive full and adequate protection there.[xxiv]

The limited mechanism for individuals to challenge being sent to a third country falls far short of living up to international or longstanding U.S. standards. Under it, individuals who can establish that they "more likely than not would suffer persecution on account of a protected ground" in the third country to which the United States would send them cannot be sent to that country to seek protection.[xxv] The burden, however, is on the applicant as they must affirmatively express fear, and the standard of proof is high as they must show that they would suffer persecution in the third country by "a preponderance of the evidence." The rule itself signals that few asylum seekers will be able to meet this burden because the third country "did not prompt" the asylum claim.[xxvi] Even those who succeed in meeting the burden for a specific country face being sent to another third country with which the United States has executed an asylum agreement. Moreover, per the rule, throughout this entire process asylum seekers will not be allowed to access legal counsel before being transferred to a third country to claim asylum.

Finally, the rule and accompanying documents consistently point to the U.S. Immigration & Nationality Act (INA) as a justification for the agreement. However, the INA establishes that a "safe third country" is one where the individual will not be persecuted and where they will have access to "full and fair procedure for determining asylum."[xxvii] Additional reasons for why neither of these two requirements can be met for any of the three countries are explained in the subsequent section.

### *Concerns Related to Safety & Institutional Capacity in Guatemala, Honduras, & El Salvador*

These agreements ignore the distinct but concerning realities that fuel the forced migration and displacement of thousands of individuals from Guatemala, Honduras, and El Salvador to the United States and other countries in the region every year that would make protecting the longer-term safety and human rights of returned asylum seekers to these countries a serious challenge, if not impossible. Transferring individuals to countries in such close proximity of their home countries would potentially place asylum seekers within close distances of their perpetrators and increase the possibility that these actors would find them. The agreements also ignore the weak or inexistent state of institutions that would mean that returned asylum seekers would not be able to access international protection, reintegration services, or justice in these countries. Existing systems and civil society efforts to receive deported migrants, which are currently insufficient in all three countries, would be further overwhelmed. Individuals returned to one of these countries under the agreements would likely be exposed to additional risks. They would have very little to no access to protection and if any crimes against them are committed, investigations by governmental authorities are not likely to proceed. Experts in the region have publicly criticized the agreements and warned of their respective countries' inability to protect their own nationals, let alone asylum seekers and refugees, or to efficiently and fairly process claims.[xxviii]

**Honduras**

Honduras ranks among the top four countries with the highest homicide rates in Latin America, with around 40 homicides per every 100,000 individuals in 2018.[xxix] Rates are slightly greater in the two principal cities to which deported migrants are currently returned to including: Tegucigalpa (41.25 homicides per 100,000 inhabitants) and San Pedro Sula (45.51 homicides per 100,000 inhabitants).[xxx] In 2018, a woman was killed in Honduras every 18 hours.[xxxi] Moreover, 25 LBGTQ+ individuals were murdered in 2018, adding to the 303 who have been murdered since 2009.[xxxii] The International Labor Organization has expressed deep concern at the large number of anti-union crimes in Honduras, among them many death threats and murders, including the assassination of another trade unionist in November 2019.[xxxiii] Gangs such as MS-13 and Barrio 18 exercise strict territorial control over neighborhoods, particularly in urban areas where turf lines have been hardening, making it dangerous for families and youth to cross into different neighborhoods, including for everyday purposes such as attending school. At least 190,000 individuals were internally displaced in Honduras due to violence from organized crime and gangs.[xxxiv]

In 2019, the total number of deported migrants to Honduras from the United States and Mexico has already exceeded totals for 2018.[xxxv] Current programs to respond to deported migrants in Honduras are unable to support even the current flow of individuals and are limited to reception centers near airports to receive deportees from the United States and to centers along the border to receive deportees from Mexico. Civil society organizations providing services to deportees have had limited or no access to these centers.[xxxvi] There are no comprehensive governmental programs to support migrants' reintegration into society and to ensure that they do not fall prey once again to dangerous situations that may lead to increased internal displacement or remigration. Case management models that follow up with deported migrants to identify individuals' protection needs, provide psychosocial support, and offer vocational training for young people to have economic opportunities upon return are run by a limited number of churches, NGOs, and international organizations and are already overburdened.[xxxvii] An additional group of deported asylum seekers from other countries under the ACAs would overwhelm these already overloaded systems.

Collusion between organized crime and corrupt authorities is systemic. President Juan Orlando Hernández' brother was found guilty in October 2019 of drug trafficking by a New York jury. Prosecutors labeled the president as a co-conspirator and presented evidence that he had received drug cartel money for his presidential campaign, revealing use of the army and police under his watch to traffic drugs in the country.[xxxviii] Deeply ingrained corruption in Honduras has meant that fewer resources are available to provide health, education, and other public services. Human rights defenders and journalists continue to face ongoing threats and risks due to their work, including for their participation in social protests. If citizens cannot access justice for human rights violations and fear turning to corrupt police forces and authorities, asylum seekers returned there would face the same violence and impunity, if not greater.

5

The UNHCR has stated that Honduras does not have a recent history of asylum processing.[xxxix] Only 80 individuals sought asylum in Honduras in all of 2018[xl] and the 2018 State Department human rights report on Honduras mentions significant delays in processing any asylum claims in Honduras, but provides no information on the overall figure of claims.[xli] Recently there have been cases of Nicaraguans who attempted to seek asylum in Honduras but in the process were killed due to the lack of safe conditions in the country and their perpetrators finding them there.[xlii]

**Guatemala**

Over 33,000 Guatemalans fled their country and sought asylum in the United States in 2018 to escape persecution from which their government failed to protect them and over 85,000 Guatemalan asylum applications are pending resolution worldwide.[xliii] More than 242,200 people were internally displaced in Guatemala as of December 2017.[xliv] Violence perpetuated by state security forces, gangs, organized crime, and transnational companies drives displacement of communities and especially affects indigenous communities in Guatemala. In 2018, Guatemala recorded 3,881 homicides at a rate of 22.4 per every 100,000 inhabitants.[xlv]

Gangs and other organized criminal groups have a strong presence in Guatemala's cities, and increasingly in rural areas as well. Gangs use robbery, extortion, forced recruitment, and sexual violence to control the territories in which they operate.[xlvi] Gang members frequently force girls and young women into sexual relationships; resistance can lead to violent retribution or even death.[xlvii]

Sexual violence is widespread in Guatemala, and girls are especially vulnerable. Of the 6,262 cases of sexual violence investigated in the first nine months of 2018, 90 percent of the victims were women and girls and over 60 percent were under the age of 18.[xlviii] More than 100 cases of violence against women and girls are reported in Guatemala each day, and the actual number of incidents is likely much higher as many continue to go unreported.[xlix]

Civil society organizations report that assassinations of LGBTQ+ individuals have increased in 2019.[l] Human rights defenders, including indigenous and other community leaders who defend their lands against the development of infrastructure or extractive projects are also at particular risk in Guatemala, one of the most dangerous countries in the world for environmental defenders.[li] At least five union activists were murdered in Guatemala in 2018, and union leaders and members reported 882 crimes to the Office of Crimes Against Trade Unionists, including coercion, kidnapping, and murder, yet there were only two convictions.[lii] Poverty continues to be a driver of international migration. Guatemala has the highest poverty rate in Latin America according to recent data from the World Bank, followed directly by Honduras.[liii] In recent years, climate change has also contributed to individuals' flight from the country.[liv]

These factors combined with weakened anti-corruption efforts, recent steps to close the space for civil society organizations, and overall impunity for human rights violations committed[lv] have influenced an individual's decision to flee the country and would mean that asylum seekers returned to Guatemala from other countries would be exposed to all of these human rights violations as well.

6

Publicly available total numbers of deported migrants to Guatemala from the United States and Mexico through September 2019 are close to surpassing totals for all of 2018.[lvi] The few reintegration programs that exist to follow up with deported unaccompanied children or individuals are run by civil society organizations and remain wholly insufficient to address the need for reintegration services across the country.

Contrary to an apparent recent "certification" conducted by DHS and the Department of Justice, there is sufficient evidence pointing to a very weak asylum system in Guatemala. Between January 2018-August 1, 2019, Guatemala received about 466 asylum claims and decided only 43 of these cases,[lvii] and in 2018 the State Department reported "both migration and police authorities [there] lacked adequate training concerning the rules for establishing refugee status."[lviii] Only 3 asylum officers in the country interview asylum applicants, and only 12 officials in the country work on asylum cases at all.[lix]

**El Salvador**

Homicide rates in El Salvador were ranked as the second highest in Latin America in 2018, with 51 homicides per 100,000 inhabitants.[lx] While there have been recent reports of decreases in the homicide rate in 2019, there are reports of increases in enforced disappearances.[lxi] Over one third of women experienced some form of sexual and gender-based violence in the last year.[lxii] Less than one tenth of cases of violence against women end in a conviction, pointing to widespread impunity.[lxiii] Femicides continue unabated with 365 women murdered in 2018[lxiv] and, in 2017, the femicide rate was the highest in the region according to the United Nations.[lxv] In addition, 19 transgender individuals were murdered in 2018 and six transgender women have been murdered in 2019 already.[lxvi] Not a single case of the 600 transgender women murdered from 1993 to January 2019 has been solved.[lxvii] In 2018, more than 280,000 individuals were reportedly internally displaced in El Salvador.[lxviii] Recent U.S. State Department human rights reports highlight "allegations of unlawful killings of suspected gang members and others by security forces; forced disappearances by military personnel; and torture by security forces".[lxix]

There is not much publicly available information regarding the Salvadoran asylum system. Local media recently reported that only a single officer works directly with asylum claims in all of El Salvador.[lxx] According to the 2018 State Department human rights report, as of July 31st, 2018, only four asylum requests had been submitted, with three resulting in denial and one still under consideration at the time.[lxxi]

***Concerns with Border Security, Intelligence-Sharing, and Temporary Work Arrangements***

Agreements with Guatemala, Honduras, and El Salvador also consider expanding border security and intelligence-sharing efforts with U.S. support throughout the region via the "border security and bio-metric data-sharing" arrangements. The potential effect that the presence of DHS officials in border areas between each of the countries may have on the freedom of movement of migrants and asylum seekers is concerning. There have already been reports of the presence of U.S. Immigration and Customs

7

Enforcement (ICE) and Customs and Border Protection (CBP) officials in Guatemala[lxxii] and the Salvadoran government deploying police officers and soldiers for migration enforcement to its border with Guatemala.[lxxiii] It is unclear what the goals of these operations are or how information collected from migrants' documentation will be utilized. Moreover, collaborating with abusive local law or migration enforcement officials in these countries without addressing corruption within them could lead to increases in human rights violations against migrants.

The impact that potential new, bio-metric information-sharing initiatives between DHS and the Central American governments may have on families and children's rights to leave their country and seek protection is also worrying. To date there have been no details on the potential DNA-testing that the bio-metric agreements would entail, how they would be conducted in the countries, and what guidelines would accompany the sharing of information collected. The Inter-American Commission on Human Rights (IACHR) recently expressed concern over migrant DNA collection and the risks it would pose to the rights to privacy and the use of personal data.[lxxiv] Information collected and submitted to databases to target parents and children should not lead to obstacles to access asylum in the United States.

The agreements with Guatemala and Honduras also consider establishing temporary agricultural (H2-A) and non-agricultural (H2-B) worker programs via the U.S. Department of Labor (DOL). These programs may provide options for individuals in need of economic opportunities in these two countries, but they should first be reformed to address the structural flaws and gaps in protection that have led to extensive exploitation of guestworkers. There is ample evidence that the seasonal H2-A and H2-B visa programs, as currently structured, have been rife with abuse and have been poorly regulated in the United States and the countries of origin of guestworkers.[lxxv] Under U.S. law, both programs tie visa holders to a specific employer. This prevents workers from seeking another employer if they are denied the wages promised, if they experience substandard labor conditions or are abused in other ways by their employer. There have been multiple cases of fraud documented in the recruitment of temporary workers from Mexico and Guatemala to such programs in the United States.[lxxvi] Further, labor rights of the citizens in these countries are not respected and regulated. For example, Honduras is among the most dangerous countries in the world for union leaders.[lxxvii] Without improved protections, these guestworker initiatives will likely channel migrants into poorly regulated programs that are rife with abuse, then return them directly back to the same conditions in their home countries.

Addressing the root causes of forced migration from the region must include access to decent work at home, including efforts to elevate worker rights and labor standards, quell anti-union violence, and promote community-based anti-poverty initiatives that serve as alternatives to migration. Initiatives must respect labor rights and the rights of communities to their land. To this end, instead of solely promoting temporary worker programs, longer-term investments should focus on promoting freedom of association, prioritizing employment and educational opportunities, and strengthening development strategies that address the specific needs of women and girls, among others.[lxxviii] Temporary work visas should not be promoted as an alternative to access asylum.

*Recommendations*

The United States must not abdicate its responsibility to provide protection to those who seek it. Actions proposed under the Asylum Cooperative Agreements (ACAs), and potentially the border-security agreements, constitute a burden-shifting approach that far from alleviating protection concerns in the region, will only further fuel the ongoing refugee crisis. The safe third country agreements form a part of the Trump Administration's deeply flawed approach to address the refugee crisis from Central America at the U.S.-Mexico border and throughout the region that must be reversed. The ACAs should be suspended and the United States should instead, restore full access to asylum and due process for those seeking protection at our border.

In the meantime, transparency continues to be a major issue for the future implementation of these agreements. The potential for migrants' rights violations under their implementation is great and oversight actions are urgently needed.

**To Congress:**
- Publicly oppose the Asylum Cooperative Agreements (ACAs), raising questions about their legality and that of the "interim final rule" published November 19, 2019. Speak out against the start of the implementation of the ACA in Guatemala.[lxxix] Publicly recognize them as illegal "safe third country" agreements and call on DHS to stop pressuring countries in the region to prevent their citizens or others from seeking international protection.
- Conduct vigorous oversight including the following actions:
  - Request from DHS and the Department of State copies of the full texts of the Asylum Cooperative Agreements, as well as the border security, and bio-metric data sharing agreements, including their annexes, funding and implementation guidance and timelines. Request briefings from both agencies on implementation details and timelines.
  - Request from DHS and the Department of Justice documentation of any "certification" of working asylum systems in Guatemala, Honduras, and El Salvador and assessments made to ensure asylum seekers' safety and protection of rights upon transfer to specific locations within each country.
  - Request from the Department of Labor copies of the temporary agricultural and non-agricultural agreements, their annexes, funding and implementation plans.
- Withhold funding to implement the ACAs that is not related to support for international humanitarian organizations, such as to the UN Refugee Agency to carry out its protection mandate.
- Visit reception centers for deported migrants and civil society shelters in Guatemala, Honduras, and El Salvador to monitor the implementation of agreements.

**To the Department of State:**
- Publish copies of the agreements and provide information on the roles of implementing agencies or future programming related to the ACAs, border security and bio-metric data sharing agreements.
- Publish monthly reports on the implementation of the agreements, including returns by port of entry, nationality, gender, and age.

**To the Department of Homeland Security:**
- Publish copies of the agreements and provide information on the roles of implementing agencies or future initiatives related to ACAs, border security, and bio-metric data sharing agreements.
- Publish monthly reports on the implementation of the agreements, including returns by port of entry, nationality, gender, and age.

**Contact:** Daniella Burgi-Palomino, Co-director, Latin America Working Group (LAWG), Dburgipalomino@lawg.org

---

[i] Testimony of Mark Morgan Acting Commissioner U.S. Customs and Border Patrol", U.S. Senate Committee on Homeland Security and Governmental Affairs, https://www.hsgac.senate.gov/imo/media/doc/Testimony-Morgan-2019-11-13.pdf

[ii] "Asylum Eligibility and Procedural Modifications", Federal Register, July 16, 2019, https://www.federalregister.gov/documents/2019/07/16/2019-15246/asylum-eligibility-and-procedural-modifications

[iii] "Backgrounder and Briefing on Matter of A-B-," Center for Gender and Refugee Studies, August, 2018. https://cgrs.uchastings.edu/matter-b/backgrounder-and-briefing-matter-b

[iv] "WRC files complaint with DHS OIG and CRCL regarding 'Remain in Mexico'," Women's Refugee Commission, August 20, 2019. https://www.womensrefugeecommission.org/news/press-releases-and-statements/3632-wrc-files-complaint-with-dhs-oig-and-crcl-regarding-remain-in-mexico

[v] For DHS Press Releases on the Agreements see DHS Press Release Honduras Sept 27th, DHS Press Release Sept. 25th, Guatemala-July 22nd, July 30th, Aug. 5th, May 31st, May 31st Bilateral Agreement, DHS Factsheet, Oct. 28th https://www.dhs.gov/sites/default/files/publications/fact_sheet_on_agreements_10-28-19.pdf

[vi] Ibid

[vii] "Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims", Department of Homeland Security, November 20, 2019. https://s3.amazonaws.com/public-inspection.federalregister.gov/2019-25288.pdf?utm_source=federalregister.gov&utm_medium=email&utm_campaign=pi+subscription+mailing+list

[viii] "Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act", Federal Register, November 19, 2019. https://www.federalregister.gov/documents/2019/11/19/2019-25137/implementing-bilateral-and-multilateral-asylum-cooperative-agreements-under-the-immigration-and

[ix] "US-Guatemala Asylum Cooperation Agreement (ACA) Threshold Screening": Guidance for Asylum Officers and Asylum Office Staff" U.S. Citizenship and Immigration Services, November 19, 2019. https://fingfx.thomsonreuters.com/gfx/mkt/12/8962/8874/ACA%20Guatemala.pdf

[x] "Honduras acepta ser 'tercer país seguro' para cubanos y nicaragüenses", Univisión, 9 de septiembre de 2019. https://www.univision.com/noticias/inmigracion/honduras-acepta-ser-tercer-pais-seguro-para-cubanos-y-nicaraguenses

[xi] "Legal Considerations regarding access to protection and a connection between the refugee and the third country in the context of return or transfer to safe third countries" United Nations High Commissioner for Refugees, April 2018. https://www.refworld.org/docid/5acb33ad4.html

[xii] "Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act", Federal Register, November 19, 2019. https://www.federalregister.gov/documents/2019/11/19/2019-25137/implementing-bilateral-and-multilateral-asylum-cooperative-agreements-under-the-immigration-and and "Immigration and Nationality Act 208", Department of Homeland Security, https://www.dhs.gov/xlibrary/assets/training/xus/crcl/asylumseekers/crcl_asylum/pdfs/Immigration%20and%20Nationality%20Act%20208.pdf, and "Guidelines Regarding New Regulations Providing for the Implementation of Asylum Cooperative Agreements", Department of Justice, November 19, 2019. https://www.dhs.gov/xlibrary/assets/training/xus/crcl/asylumseekers/crcl_asylum/pdfs/Immigration%20and%20Nationality%20Act%20208.pdf

[xiii] "US-Guatemala Asylum Cooperation Agreement (ACA) Threshold Screening": Guidance for Asylum Officers and Asylum Office Staff" U.S. Citizenship and Immigration Services, November 19, 2019.

[xiv] "Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims", Department of Homeland Security, November 20, 2019.

[xv] 8 USC Section 1158 (a)(2)(E)

[xvi] "Trump Administration Announces Resumption of Foreign Aid for Central American Countries to Address Illegal Migration," Department of Homeland Security, October 17, 2019. https://www.dhs.gov/news/2019/10/17/trump-administration-announces-resumption-foreign-aid-central-american-countries and "United States Resumes Targeted U.S. Foreign Assistance for El Salvador,

Case 3:17-cv-02366-BAS-KSC   Document 346-10   Filed 12/09/19   PageID.23954
       Page 15 of 17

Guatemala, and Honduras", U.S. Department of State, October 16, 2019. https://www.state.gov/united-states-resumes-targeted-u-s-foreign-assistance-for-el-salvador-guatemala-and-honduras/

xvii Department of Homeland Security. "Statement from the Department of Homeland Security following the Acting Secretary's appearance at Georgetown University this morning." October 7, 2019. https://www.dhs.gov/news/2019/10/07/statement-department-homeland-security-following-acting-secretary-s-appearance

xviii "Trump to reinstate $150M in aid to Central America", Washington Examiner, October 15, 2019. https://www.washingtonexaminer.com/news/trump-reinstating-150m-in-aid-to-central-america

xix "Assessment of the Migrant Protection Protocols (MPP)", Department of Homeland Security, October 28, 2019. https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf and Testimony of Mark Morgan Acting Commissioner U.S. Customs and Border Patrol", U.S. Senate Committee on Homeland Security and Governmental Affairs.

xx "Statement on new U.S. asylum policy", United Nations High Commissioner for Refugees, November 19, 2019.https://www.unhcr.org/5dd426824?fbclid=IwAR2kbGZrz3E7zCpf9ji2-08GFHfqAIq1xWr6UPFr5jE03Wga7nyYzeABDPM

xxi "Guidance Note on bilateral and/or multilateral transfer agreements of asylum seekers", United Nations High Commissioner for Refugees, May 2013. https://www.refworld.org/docid/51af82794.html

xxii Ibid

xxiii "Statement on new U.S. asylum policy", United Nations High Commissioner for Refugees, November 19, 2019.

xxiv See previously referenced "Legal Considerations regarding access to protection and a connection between the refugee and the third country in the context of return or transfer to safe third countries" United Nations High Commissioner for Refugees, April 2018.

xxv See Section V, C of the interim final rule, "Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act", Federal Register, November 19, 2019.

xxvi Ibid

xxvii "Immigration and Nationality Act 208", Department of Homeland Security, https://www.dhs.gov/xlibrary/assets/training/xus/crcl/asylumseekers/crcl_asylum/pdfs/Immigration%20and%20Nationality%20Act%20208.pdf

xxviii "Guatemala "tercer país seguro", no tan seguro para migrantes," Associated Press, July 13, 2019, https://www.apnews.com/78d8f540f6a74a5191bd78f032b86306; El Salvador sin capacidad para recibir a solicitantes de asilo, dice experto," El Salvador.com, November 20, 2019. https://www.elsalvador.com/noticias/nacional/el-salvador-sin-capacidad-para-recibir-a-solicitantes-de-asilo-dice-experto/642018/2019/; La Pastoral de Movilidad Humana CEG, Facebook, November 15 2019.; https://m.facebook.com/story.php?story_fbid=2683767648332644&id=321801504529282

xxix "InSight Crime's 2018 Homicide Round-Up", Insight Crime, January 22, 2019. https://www.insightcrime.org/news/analysis/insight-crime-2018-homicide-roundup/

xxx 'En siete puntos baja tasa de homicidios en San Pedro Sula y Tegucigalpa" La Prensa, 20 de diciembre de 2019. https://www.laprensa.hn/sucesos/1244049-410/siete-puntos-baja-tasa-homicidios-san-pedro-sula-tegucigalpa

xxxi "Honduras ante enormes desafíos por persistente violencia machista hacia la mujer," La Prensa, January 25, 2019. https://www.laprensa.hn/honduras/1253346-410/honduras-ante-enormes-desaf%C3%ADos-por-persistente-violencia-machista-hacia-la-mujer

xxxii "Centro de Monitoreo de Medios," Cattrachas, Accessed November 20, 2019. http://cattrachas.org/index.php/es/observatorio

xxxiii "Congressmembers Schakowsky, Pocan, McGovern, and Garcia Denounce Assassination of Honduran Trade Unionist," Office of Cogresswoman Jan Schakowsky, November 19, 2019. https://schakowsky.house.gov/press-releases/congressmembers-schakowsky-pocan-mcgovern-and-garcia-denounce-assassination-of-honduran-trade-unionist/

xxxiv "Honduras", Internal Displacement Monitoring Centre, http://www.internal-displacement.org/countries/honduras

xxxv "Reseña," Conmigho. https://www.conmigho.hn/

xxxvi LAWG fact-finding delegation to Honduras, Oct. 2019

xxxvii LAWG fact-finding delegation to Honduras, Oct. 2019

xxxviii "Former Honduran Congressman Tony Hernández Convicted In Manhattan Federal Court Of Conspiring To Import Cocaine Into The United States And Related Firearms And False-Statements Offenses", The United States Attorney's Office Southern District of New York, October 18, 2019. https://www.justice.gov/usao-sdny/pr/former-honduran-congressman-tony-hern-ndez-convicted-manhattan-federal-court-conspiring

xxxix "Posición del ACNUR frente a la implementación del 'acuerdo de asilo' bilateral entre Honduras y EE. UU.," October 23, 2019. https://www.acnur.org/noticias/press/2019/10/5db06d9a4/posicion-del-acnur-frente-a-la-implementacion-del-acuerdo-de-asilo-bilateral.html

xl "Expanding Operations in Central America 2019", The United Nations High Commissioner for Refugees, 2019. http://reporting.unhcr.org/sites/default/files/UNHCR%20Expanding%20Operations%20in%20Central%20America%20-%20February%202019.pdf

xli "2018 Country Reports on Human Rights Practices: Honduras", U.S. Department of State, 2018. https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/honduras/

xlii LAWG fact-finding delegation to Honduras, Oct. 2019

xliii "Global Trends Forced Displacement in 2018", The United Nations High Commissioner for Refugees, 2018. https://www.unhcr.org/en-us/statistics/unhcrstats/5d08d7ee7/unhcr-global-trends-2018.html

xliv "Guatemala," Internal Displacement Moderating Centre. http://www.internal-displacement.org/countries/guatemala

xlv "InSight Crime's 2018 Homicide Round-Up", Insight Crime, January 22, 2019.

xlvi "Directrices de elegibilidad para la evaluación de las necesidades de protección internacional de los solicitantes de asilo procedentes de Guatemala," UNHCR. https://www.acnur.org/fileadmin/Documentos/BDL/2018/11658.pdf?file=fileadmin/Documentos/BDL/2018/11658

xlvii Thomas Boerman and Jennifer Knapp, "*Gang Culture and Violence Against Women in El Salvador, Honduras, and Guatemala*," Immigration Briefings Issue 17-03, March 2017, p. 8

xlviii Ramos, Jerson, "*Niños y Niñas de 10 a 14 Años, los Más Vulnerables ante la Violencia Sexual*," Publinews, October 5, 2018, https://www.publinews.gt/gt/noticias/2018/10/05/guatemala-violencia-sexual-inacif.html; See also official statistics from the Public Prosecutor's Office and Guatemalan National Institute of Forensic Sciences (Inacif),https://www.inacif.gob.gt/index.php/datos-numericos/informacion-anual; Procurador de los Derechos Humanos de Guatemala, Informe Anual Circunstanciado de Actividades y Situación de Derechos Humanos 2017, https://www.pdh.org.gt/biblioteca-digital-informes-informes-anuales/

xlix Gordillo, Ivan, "Más de 100 Denuncias por Violencia Contra la Mujer se Reciben en Promedio Cada Día," Publinews, July 24, 2017, https://www.publinews.gt/gt/noticias/2018/07/24/denuncias-por-violencia-contra-la-mujer-en-aumento.html; Palma, Claudia, Cada 46 Minutos se Comete una Violación, Prensa Libre, May 16, 2016, http://www.prensalibre.com/guatemala/justicia/cada-46-minutos-se-comete-una-violacion

l Informe de Situación de Derechos Humanos de Población LGBTI en Guatemala, 2019, LAMBDA, Observatorio de DDHH, Red Legal y su Observatorio Derechos Humanos VIH y PEMAR

li United Nations Special Rapporteur on the Situation of Human Rights Defenders, They Spoke Truth to Power and were Murdered in Cold Blood, 2016, https://www.protecting-defenders.org/sites/protecting-defenders.org/files/environmentaldefenders_0.pdf.

lii 'Annual report on anti-union violence: Guatemala. 2018", Red de Defensores de Derechos Laborales de Guatemala, 2018. contraviolehttp://contraviolenciaantisindical.org/slim/documentos/Report_REDLG_2018.pdfnciaantisindical.org/slim/documentos/Report_REDLG_2018.pdf

liii "Latin America and the Caribbean", World Bank Group: Poverty and Equity, October 2018. https://databank.worldbank.org/data/download/poverty/33EF03BB-9722-4AE2-ABC7-AA2972D68AFE/Global_POVEQ_LAC.pdf

liv "Food Security and Emigration: Why People flee and the impact on family members left behind in El Salvador, Guatemala and Honduras", World Food Programme, August 2017. https://docs.wfp.org/api/documents/WFP-0000022124/download/?_ga=2.213960087.102193405.1503476858-197666741.1485441955

lv "Situación de las personas defensoras de derechos humanos en Guatemala: Entre el compromiso y la adversidad" Procurador de los Derechos Humanos, Naciones Unidas Derechos Humanos Oficina del Alto Comisionado, https://www.oacnudh.org.gt/images/CONTENIDOS/ARTICULOS/PUBLICACIONES/Informe_personas_defensoras.pdf

lvi "Resumen General de Guatemaltecos Deportados Vía Aérea y Terrestre", Gobierno de la República de Guatemala: Ministro de Gobernación, Dirección General de Migración, 2018. http://igm.gob.gt/wp-content/uploads/2017/09/RESUMEN-ANUAL-DE-GUATEMALTECOS-DEPORTADOS-V%C3%8DA-A%C3%89REA-Y-TERRESTRE-2018.pdf

lvii "¿Tercer país seguro? Guatemala no está en capacidad de atender un aumento de solicitudes de asilo", Univision, 3 de agosto de 2019. https://www.univision.com/noticias/inmigracion/tercer-pais-seguro-el-sistema-de-asilo-rudimentario-de-guatemala-carece-de-capacidad-dicen-expertos

lviii "2018 Country Reports on Human Rights Practices: Guatemala", U.S. Department of State, 2018. https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/guatemala/

lix "¿Tercer país seguro? Guatemala no está en capacidad de atender un aumento de solicitudes de asilo", Univision, 3 de agosto de 2019. https://www.univision.com/noticias/inmigracion/tercer-pais-seguro-el-sistema-de-asilo-rudimentario-de-guatemala-carece-de-capacidad-dicen-expertos

lx "InSight Crime's 2018 Homicide Round-Up", Insight Crime, January 22, 2019.

lxi "Disappeared in El Salvador: The return of a Cold War nightmare", The Washington Post, October 19, 2019. https://www.washingtonpost.com/world/the_americas/disappeared-in-el-salvador-amid-a-cold-war-nightmares-return-a-tale-of-one-body-and-three-grieving-families/2019/10/19/d806d19a-e09d-11e9-be7f-4cc85017c36f_story.html?wpmm=1

lxii "Policía asegura que cifra de feminicidios en El Salvador ha bajado un 18 % en lo que va de 2018", El Salvador.com, 10 de diciembre de 2018. https://www.elsalvador.com/noticias/nacional/este-ano-han-ocurrido-81-feminicidios-menos-a-comparacion-del-ano-pasado/547726/2018/

lxiii "Sexual and Gender-based Violence (SGBV) & Migration Fact Sheet", KIND, LAWG & WRC, December 2018. https://www.lawg.org/wp-content/uploads/SGBV-Fact-Sheet-December-2018.pdf

lxiv "Una mujer ha sido asesinada por día en lo que va del año en El Salvador," Moneda, February 14, 2019. https://www.elsalvador.com/noticias/nacional/una-mujer-ha-sido-asesinada-por-dia-en-lo-que-va-del-ano-en-el-salvador/568115/2019/

lxv ONU pide a El Salvador amplificar prevención de violencia contra niñas y mujeres", La Prensa Gráfica, 8 de marzo de 2019. https://www.laprensagrafica.com/elsalvador/ONU-pide-a-El-Salvador-ampliar-prevencion-de-violencia-contra-ninas-y-mujeres-20190308-0279.html

lxvi "Organización LGBTI de El Salvador pide investigar crimen de deportada por EEUU", Reuters, 22 de febrero de 2019. https://lta.reuters.com/articulo/derechos-elsalvador-lgbt-idLTAKCN1QB2JP and
"Trans community leader found murdered in El Salvador," Manila Bulletin, November 10, 2019. https://news.mb.com.ph/2019/11/10/trans-community-leader-found-murdered-in-el-salvador/

lxvii "En El Salvador hay un genocidio de las personas LGBTI", Agencia Presentes, 14 de enero de 2019. http://agenciapresentes.org/2019/01/14/karla-avelar-en-el-salvador-hay-un-genocidio-de-las-personas-lgbti/

[lxviii] "El Salvador", Internal Displacement Monitoring Centre, http://www.internal-displacement.org/countries/el-salvador

[lxix] El Salvador 2018 Human Rights Report", U.S. Department of State, 2018. https://www.state.gov/wp-content/uploads/2019/03/EL-SALVADOR-2018.pdf

[lxx] "El Salvador Signs Agreement to Accept Asylum Seekers the US Won't Protect" El Faro, 21 de septiembre de 2019. https://elfaro.net/en/201909/el_salvador/23667/El-Salvador-Signs-Agreement-to-Accept-Asylum-Seekers-the-US-Won%E2%80%99t-Protect.htm

[lxxi] El Salvador 2018 Human Rights Report", U.S. Department of State, 2018

[lxxii] "Civil Society Organizations Express Deep Concern Over U.S. Efforts to Externalize Border Enforcement to Guatemala", June 13, 2019. https://www.lawg.org/wp-content/uploads/Civil-Society-Organizations-Express-Deep-Concern-to-U.S.-Efforts-to-Externalize-Border-Enforcement-to-Guatemala-6.13.19-updated.pdf

[lxxiii] "El Salvador Ramps Up Security to Stop Migrants", NPR, September 29, 2019. https://www.npr.org/2019/09/29/765480416/el-salvador-ramps-up-security-to-stop-migrants

[lxxiv] "IACHR expresses concern over migrant DNA collection and policies restricting the mobility of migrant persons in the United States", Interamerican Commission for Human Rights, November 1, 2019. https://www.oas.org/en/iachr/media_center/PReleases/2019/279.asp

[lxxv] The New American Slavery: Invited To The U.S., Foreign Workers Find A Nightmare", BuzzFeed News, July 24, 2015. https://www.buzzfeednews.com/article/jessicagarrison/the-new-american-slavery-invited-to-the-us-foreign-workers-f

[lxxvi] "No Way To Treat A Guest: Why The H-21 Agricultural Visa Program Fails U.S. and Foreign Workers", Farmworker Justice, https://www.farmworkerjustice.org/sites/default/files/documents/7.2.a.6%20fwj.pdf

[lxxvii] "2019 ITUC Global Rights Index: The World's Worst Countries for Workers", International Trade Union Confederation, 2019, https://www.ituc-csi.org/IMG/pdf/2019-06-ituc-global-rights-index-2019-report-en-2.pdf

[lxxviii] "Recommendations for U.S. Engagement to Address Migration from and Displacement within the Northern Triangle of Central America 2019", https://www.lawg.org/wp-content/uploads/All-logos-Recommendations-for-U.S.-Engagement-to-Address-Migration-from-and-Displacement-within-the-Northern-Triangle-of-Central-America.pdf

[lxxix] "Shifting asylum 'burden,' U.S. sends Guatemala first Honduran migrant," Reuters, November 21, 2019. https://www.reuters.com/article/us-usa-immigration-guatemala/u-s-sends-guatemala-first-honduran-migrant-under-asylum-deal-idUSKBN1XV1WM