JOSEPH H. HUNT
Assistant Attorney General, Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
SAIRAH G. SAEED (IL 6290644)
ARI NAZAROV (CT 414491)
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER (ECF No. 344)** |
| Chad F. WOLF,* Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | Special Briefing Schedule Ordered |
| *Defendants* | |

---

* Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Federal Rule of Civil Procedure 25(d).

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... ii

GLOSSARY .................................................................................................. vi

INTRODUCTION ...........................................................................................1

STATEMENT ..................................................................................................3

    I.   CBP's Metering Guidance and Plaintiffs' Challenge to It ...........................3

    II.  The ACA Rule ..........................................................................................5

    III. Plaintiffs' Motions for Temporary Restraining Order and
         Provisional Class Certification ...............................................................6

ARGUMENT ...................................................................................................7

    I.   The Court Lacks Jurisdiction to Issue Plaintiffs' Requested
        Injunction. ................................................................................................7

    II.  Plaintiffs' Motion Fails on the Merits. ...................................................13

        A.  The ACA Rule Plainly Applies to the Provisional Class
            Members, and the Government's Metering Practices Are
            Lawful. ................................................................................................13

            1.   The ACA Rule Applies to Aliens—Like the Putative
                 Provisional Class Members—Who Cross the Border On
                 or After November 19. .................................................................13

            2.   CBP's Metering Practices Are Lawful..........................................17

        B.  Considerations of Irreparable Harm and the Equities Strongly
            Favor the Government. .........................................................................20

    III. The Court Cannot Grant Relief Under the All Writs Act. .........................25

CONCLUSION ..............................................................................................25

# TABLE OF AUTHORITIES

**Federal Cases**

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967)...................................................................................9

*Al Otro Lado, Inc. v. McAleenan*,
    394 F. Supp. 3d 1168 (S.D. Cal. July 29, 2019)........................... 6, 14, 15, 16

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...............................................................13

*Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*,
    366 F.3d 692 (9th Cir. 2004) .................................................................13

*Bourdon v. DHS*,
    940 F.3d 537 (11th Cir. 2019) ................................................................8

*Bridges v. Wixon*,
    326 U.S. 135 (1945)...............................................................................19

*Bridges v. Wixon*,
    326 U.S. 135 (1954)...............................................................................24

*Clinton v. Goldsmith*,
    526 U.S. 529 (1999)...............................................................................25

*East Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) .................................................................23

*EEOC v. Arabian American Oil Co.*,
    499 U.S. 244 (1991)...............................................................................16

*Graham v. Fed. Emergency Mgmt. Agency*,
    149 F.3d 997 (9th Cir. 1998) .................................................................19

*Hamama v. Adducci*,
    912 F.3d 869 (6th Cir. 2018) .............................................................. 2, 12

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)...................................................................................21

*In re Li,*
    71 F. Supp. 2d 1052 (D. Haw. Oct. 8, 1999)....................................................15

*Jimenez-Mora v. Ashcroft,*
    86 F. App'x 527 (3d Cir. 2004) ........................................................................8

*Kiyemba v. Obama,*
    555 F.3d 1022 (D.C. Cir. 2009)......................................................................15

*Kucana v. Holder,*
    558 U.S. 233 (2010)........................................................................................11

*Landon v. Plasencia,*
    459 U.S. 21 (1982)..........................................................................................24

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990)........................................................................................11

*McNary v. Haitian Refugee Center, Inc.,*
    498 U.S. 479 (1991)..........................................................................................8

*Nken v. Holder,*
    556 U.S. 418 (2009)........................................................................................23

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,*
    810 F.3d 631 (9th Cir. 2015) ..........................................................................18

*Pakootas v. Teck Cominco Metals, Ltd.,*
    646 F.3d 1214 (9th Cir. 2011) ..........................................................................8

*Poursina v. U.S. Citizenship & Immigration Servs.,*
    936 F.3d 868 (9th Cir. 2019) .................................................................... 11, 12

*Reno v. Catholic Social Servs., Inc.,*
    509 U.S. 43 (1993)............................................................................................2

*Sale v. Haitian Centers Council, Inc.,*
    509 U.S. 155 (1993).................................................................................. 16, 17

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953)........................................................................................19

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

*Spencer Enters., Inc. v. United States*,
    345 F.3d 683 (2003) ...................................................................................11

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990)..................................................................................24

*United States v. Vowell*,
    9 U.S. 368 (1810).....................................................................................15

*Vartelas v. Holder*,
    566 U.S. 257 (2012).................................................................................17

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982).................................................................................20

*Zadvydas v. Davis*,
    533 U.S. 678 (2001).................................................................................24

*Zhu v. Gonzales*,
    411 F.3d 292 (D.C. Cir. 2005).................................................................11

**Federal Statutes**

1 U.S.C. § 1 ...................................................................................................16

5 U.S.C. § 706(1) ..................................................................................... 6, 18

5 U.S.C. § 706(2) ..........................................................................................7

6 U.S.C. § 211(g)(3).....................................................................................19

8 U.S.C. § 1103(a)(1)....................................................................................19

8 U.S.C. § 1103(a)(3)....................................................................................19

8 U.S.C. § 1158(a)(1)................................................................... 3, 14, 18, 24

8 U.S.C. § 1158(a)(2)(A) ...................................................................... *passim*

8 U.S.C. § 1158(a)(3)............................................................................ 5, 7, 24, 25

8 U.S.C. § 1158(b)(2)(C) ............................................................................25

8 U.S.C. § 1225(a)(1)............................................................................ 3, 15, 16

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

8 U.S.C. § 1225(a)(3) ...................................................................... 15, 17

8 U.S.C. § 1225(b)(1)(A)(ii) .................................................... *passim*

8 U.S.C. § 1252(a)(2)(B)(ii) ................................................... 7, 11

8 U.S.C. § 1252(f)(1) ..........................................................................12

28 U.S.C. § 1651 ...................................................................................25

**Treaties, Conventions, Protocols, and Agreements**

Asylum Claims Made by Aliens Arriving from Canada at Land Border
 Ports-of-Entry, 69 Fed. Reg. 69,490 (Nov. 29, 2004) ......................................5

Implementation of the Agreement Between the Government of the United
 States of America and the Government of Canada Regarding Asylum
 Claims Made in Transit and at Land Border Ports-of-Entry, 69 Fed.
 Reg. 69,480 (Nov. 29, 2004) .............................................................5

**Administrative Rules and Decisions**

Asylum Eligibility and Procedural Modifications,
 84 Fed. Reg. 33,829 (July 16, 2019) ...........................................20

Implementing Bilateral and Multilateral Asylum Cooperative Agreements
 Under the Immigration and Nationality Act,
 84 Fed. Reg. 63,994 (Nov. 19, 2019) .................................... *passim*

**Other Authorities**

19 J. Moore & G. Pratt, Moore's Federal Practice § 204.02[4] (3d ed.) .................25

Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/arrive
 (last accessed Dec. 9, 2019) ...........................................................15

The American Heritage Dictionary of the English Language (3d ed. 1992).............8

# GLOSSARY

The following abbreviations are used in this brief:

1.    **Class Cert. Br.** refers to Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Provisional Class Certification (ECF No. 352-1).

2.    **Opp'n Ex.** refers to the exhibits attached to the Declaration of Alexander J. Halaska in Support of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order (filed concurrently).

3.    **PI Order** refers to the Court's Order Granting Plaintiffs' Motion for Provisional Class Certification and Granting Plaintiffs' Motion for Preliminary Injunction (ECF No. 330).

4.    **SAC** refers to the Second Amended Complaint (ECF No. 189).

5.    **TRO Br.** refers to Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order Prohibiting Application of Asylum Cooperative Agreement Rule to Provisional Class Members (ECF No. 344-1).

6.    **TRO Ex.** refers to the exhibits attached to the Declaration of Melissa Crow in Support of Plaintiffs' Motion for Temporary Restraining Order (ECF No. 344-2).

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

# INTRODUCTION

This Court should deny Plaintiffs' request for extraordinary injunctive relief barring the government from applying a critical Rule implementing clear congressional authorization to remove aliens to third countries that have entered into a bilateral agreement with the United States to offer a full and fair procedure for considering the protection claims of aliens seeking asylum. *See* Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 Fed. Reg. 63,994 (Nov. 19, 2019) (ACA Rule); 8 U.S.C. § 1158(a)(2)(A). The ACA Rule, issued to combat the ongoing crisis at our southern border, is "intended to aid the United States in its negotiations with foreign nations on migration issues," particularly the development of "a regional framework with other countries to more equitably distribute the burden of processing the protection claims of the hundreds of thousands of irregular migrants" who come to the United States every year to seek asylum. 84 Fed. Reg. at 63,997. The Rule implements 8 U.S.C. § 1158(a)(2)(A) by creating a process by which Department of Homeland Security (DHS) immigration officers may apply Asylum Cooperative Agreements (ACAs) "to aliens who arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after" November 19, 2019. *Id.* at 63,994.

Plaintiffs now ask this Court to issue an injunction ordering that a provisional class of aliens cannot be subject to removal to a third country under this Rule because, but for the allegedly "unlawful metering policy that forced them to wait in Mexico," they would have arrived in the United States prior to the Rule's effective date, and therefore could not have been removed to a third country under the Rule. *See* TRO Br. 3, 16–17. The Court should Plaintiffs' reject this flawed request.

To start, the Court lacks jurisdiction, under 8 U.S.C. §§ 1158(a)(3) and 1252(a)(2)(B)(ii), to determine whether the government may properly apply the ACA Rule to provisional class members. First, section 1158(a)(3) is clear: "[n]o court shall have jurisdiction to review any determination of the Attorney General

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

under" section 1158(a)(2)(A). 8 U.S.C. § 1158(a)(3). That latter section provides that an alien may not apply for asylum if the government "determines that the alien may be removed, pursuant to a bilateral or multilateral agreement," to a third country where his "life or freedom would not be threatened" on a protected ground and where he would have "access to a full and fair procedure for determining a claim for asylum or equivalent temporary protection," unless the government "finds that it is in the public interest for the alien to receive asylum in the United States." *Id.* § 1158(a)(2)(A). Second, section 1252(a)(2)(B)(ii) makes clear that "no court shall have jurisdiction to review" any "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this sub-chapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." Sections 1158(a)(2)(A) and 1158(a)(3) leave the decision whether to apply an ACA wholly within the Executive Branch's discretion, so section 1252(a)(2)(B)(ii) bars jurisdiction here. These two provisions strip district courts of jurisdiction to review any decision that is specified to be unreviewable and the process used to make such decisions, which leaves this Court without authority to enjoin the prospective application of the Rule to aliens who are subject to it. On top of these jurisdictional bars, Plaintiffs' claim is not ripe. The Rule establishes a process. Until a class member has that process applied to him, the Court cannot evaluate his claim. *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 (1993). And even if Plaintiffs' claims were ripe, the Court lacks authority under 8 U.S.C. § 1252(f)(1) to issue the injunction Plaintiffs seek, because it grafts onto the expedited removal statute a prohibition on applying section 1158(a)(2)(A) and its implementing regulations to aliens who were subject to metering when no such prohibition exists. *See Hamama v. Adducci*, 912 F.3d 869, 879–80 (6th Cir. 2018).

Plaintiffs are also wrong on the merits. The Rule by its terms applies "to aliens who arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after" November 19, 2019, 84 Fed. Reg. at 63,994—

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

regardless of whether the alien reached a Mexican border town (or texted his or her name onto a waitlist) before that date. Plaintiffs' view to the contrary conflicts with the Rule's text. There is no basis for exempting 21,000+ aliens from the Rule based on a flawed extraterritorial reading of the asylum or expedited removal statutes. *See* Class Cert. Br. 6. Those statutes apply to aliens "in the United States," not to aliens in Mexico. 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), 1225(b)(1)(A)(ii).

Further, Plaintiffs' requested injunctive relief would irreparably harm the United States. The ACA Rule is a core component of the Executive Branch's foreign-policy initiatives to manage the ongoing surge of migration at our southern border. It does so by facilitating ongoing diplomatic negotiations with foreign countries regarding migration issues, and delays or changes to its functioning could harm the United States' negotiating position by creating uncertainty about the regulatory framework for implementing ACAs. 84 Fed. Reg. at 64,005. Enjoining the Rule—the legality of which is not even challenged here—for 21,000+ aliens who did not enter the United States before the Rule was issued would usurp the Executive Branch's constitutional role in conducting foreign affairs.

The Court should deny Plaintiffs' Motion.

## STATEMENT

### I.    CBP's Metering Guidance and Plaintiffs' Challenge to It

Plaintiffs' operative Second Amended Complaint challenges Customs and Border Protection's (CBP) purported "unlawful, widespread pattern and practice of denying asylum seekers access to the asylum process" at ports of entry along the U.S.-Mexico border "through a variety of illegal tactics." SAC ¶ 2. One of those alleged "tactics"—the only one at issue here, TRO Br. 1 n.3—is CBP's metering guidance. In general, when a port implements the metering guidance, a CBP officer stands as close to the U.S.-Mexico border as operationally feasible and briefly scans pedestrians' travel documents. *See* Opp'n Ex. 1. Pedestrians who present documents that appear to be facially legitimate are permitted to cross the border, enter the port

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

building, and proceed to a primary inspection lane. *See* Opp'n Ex. 1. Aliens without
sufficient documents may be instructed to wait until the port has sufficient opera-
tional resources, taking into account the port's other mission responsibilities, to pro-
cess the travelers' resource-intensive applications for admission. *See* Opp'n Ex. 1.
Neither the Immigration and Nationality Act (INA) nor CBP's metering guidance
permits a CBP officer to return an alien on U.S. soil to Mexico without being pro-
cessed once the alien asserts an intention to apply for asylum. *See* 8 U.S.C.
§ 1225(b)(1)(A)(ii); Opp'n Ex. 1.

In Mexican border towns, where large groups of waiting aliens queued outside
the ports, "Mexican authorities and civil society groups responded" by "creating in-
formal waitlists." Opp'n Ex. 2 at 1. According to research conducted by Plaintiffs'
expert witness, the waitlists are maintained by Mexico's national immigration
agency (INAMI or Grupo Beta), Mexico's State Population Council (COESPO),
Mexico's Civil Protection agency, Mexican municipal government entities, immi-
gration shelters in Mexico, or the individuals on the lists themselves. Opp'n Ex. 2 at
5–14. Many aliens add their names to the waitlists without ever approaching a port
of entry or interacting with a CBP officer; they go instead to the list holder when
they reach the border town. TRO Ex. 13 ¶ 9 ("a Mexican police officer stopped us"
and "told us that we had to go the COESPO office . . . to get a number"); TRO Ex.
14 ¶ 7 ("we were instead stopped by Mexican officials" who "pointed to the office
where you can register to get on the asylum waiting list"); TRO Ex. 15 ¶ 11 ("I went
directly from the bus station to the office where you register to get a number on the
asylum waitlist."); TRO Ex. 16 ¶ 9 ("Grupos Beta then took us to the office where
we got our numbers."). One immigration shelter even allows travelers to add them-
selves to its list long before they reach the border by messaging their name and photo
to the shelter via encrypted messaging. Opp'n Ex. 2 at 11. CBP plays no role in
creating, managing, or maintaining the waitlists. Opp'n Ex. 2 at 1; TRO Ex. 21 ¶ 9
("Grupo Beta sets the rules for who can be added to the list in Tijuana.").

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

## II.    The ACA Rule

Congress granted the Attorney General and the Secretary of Homeland Security the authority to remove an alien, "pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A). When the government "determines" that the listed conditions are satisfied, and does not "find[] that it is in the public interest for the alien to receive asylum in the United States," the alien is barred from applying for asylum in this country: Section 1158(a)(1)—the provision permitting an alien who "is physically present in the United States or who arrives in the United States" to apply for asylum—"shall not apply." *Id.* "No court shall have jurisdiction to review any determination" made under section 1158(a)(2)(A). *Id.* § 1158(a)(3).

The Attorney General and the Acting Secretary of Homeland Security issued the ACA Rule on November 19, 2019, "to provide a general mechanism" to implement all existing and future ACAs (except the 2002 U.S-Canada Agreement[1]). 84 Fed. Reg. at 63,996. The Rule "is intended to aid the United States in its negotiations with foreign nations on migration issues," particularly as the United States "seeks to develop a regional framework with other countries to more equitably distribute the burden of processing the protection claims of the hundreds of thousands of irregular

---

[1] The United States entered into an agreement with Canada in 2002 and implemented it by regulation in 2004. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 Fed. Reg. 69,480 (Nov. 29, 2004); Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 Fed. Reg. 69,490 (Nov. 29, 2004).

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

migrants" who come to the United States every year to seek asylum. *Id.* at 63,997. The Rule permits immigration officers to apply agreements under section 1158(a)(2)(A), including bilateral ACAs recently entered into with El Salvador, Guatemala, and Honduras, to "aliens who arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after" November 19, 2019. *Id.* at 63,994.

DHS is currently applying the Rule in only two Border Patrol sectors in Texas to aliens who entered unlawfully between ports of entry. Opp'n Ex. 3 ¶¶ 9–10.

## III. Plaintiffs' Motions for Temporary Restraining Order and Provisional Class Certification

Plaintiffs filed their TRO Motion and exhibits on December 6 and 9, 2019, and their Provisional Class Certification Motion on December 11, 2019, seeking to enjoin the government from applying the ACA Rule to "[a]ll asylum seekers who were unable to make a direct claim at a U.S. POE before November 19, 2019 because of the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process." Class Cert. Br. 6. Citing this Court's prior orders, Plaintiffs argue that because the putative provisional class members wished to cross into the United States and apply for asylum before the Rule's effective date, the class members "[were] 'arriving in the United States,'" and therefore are covered by statutory and regulatory provisions that use the present tense verb 'arrive' and variations thereon." TRO Br. 16 (quoting *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1199–1205 (S.D. Cal. July 29, 2019), and PI Order 31). Plaintiffs do not challenge the ACA Rule itself, TRO Br. 4, or the government's decision to enter into ACAs with Guatemala, Honduras, or El Salvador, TRO Br 14 n.21.

Plaintiffs also argue that they are likely to succeed on their metering challenge. TRO Br. 17. They claim that the individual Plaintiffs "have a right to inspection and processing" that can be compelled under the Administrative Procedure Act (APA), 5 U.S.C. § 706(1); that metering "exceeds Defendants' statutory authority

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

1    and is without observance of procedure required by law" and may be set aside under

2    the APA, 5 U.S.C. § 706(2); and that metering violates the Due Process Clause "to

3    the extent" that it violates the INA. TRO Br. 17.

## ARGUMENT

5        The Court should deny Plaintiffs' TRO Motion. The Court lacks jurisdiction

6    to review any determinations made under section 1158(a)(2)(A), and Plaintiffs'

7    claims are not ripe. The ACA Rule by its terms applies to provisional class members.

8    And the equities and considerations of irreparable harm favor Defendants.

9    **I.    The Court Lacks Jurisdiction to Issue Plaintiffs' Requested Injunction.**

10        This Court lacks jurisdiction under two separate sections of the INA—

11    8 U.S.C. §§ 1158(a)(3) and 1252(a)(2)(B)(ii)—over Plaintiffs' claim that the ACA

12    Rule "does not apply" to them. TRO Br. 16.

13        *First*, under 8 U.S.C. § 1158(a)(3), the Court lacks jurisdiction under over

14    Plaintiffs' challenge to the government's determination that the ACA Rule applies

15    to provisional class members. The Departments promulgated the Rule under section

16    1158(a)(2)(A), which strips an alien of asylum-application eligibility if the govern-

17    ment "determines that the alien may be removed, pursuant to a bilateral or multilat-

18    eral agreement, to a" third country "in which the alien's life or freedom would not

19    be threatened on account of" a protected ground, "and where the alien would have

20    access to a full and fair procedure for determining a claim to asylum or equivalent

21    temporary protection, unless the Attorney General [or the Secretary] finds that it is

22    in the public interest for the alien to receive asylum in the United States." 8 U.S.C.

23    § 1158(a)(2)(A). Congress squarely provided that "[n]o court shall have jurisdiction

24    to review any determination of the Attorney General [or the Secretary] under" sec-

25    tion 1158(a)(2)(A). *Id.* § 1158(a)(3). The phrase "any determination" in section

26    1158(a)(3) refers to any of the things the government "determines" under section

27    1158(a)(2)(A)—including the determination that an alien "may be removed, pursu-

28    ant to a multilateral or bilateral agreement," in the first place. The Court thus lacks

jurisdiction to review the government's determination to apply the ACA Rule to provisional class members.

Further, because Congress prohibited judicial review when the government "determines that [an] alien may be removed" under an ACA, Congress also divested the Court of authority to enjoin the government from engaging in the Rule's process to make those determinations. *See Jimenez-Mora v. Ashcroft*, 86 F. App'x 527, 530 (3d Cir. 2004) (section 1158(a)(3) bars review of "challenges to the process of deciding"). Congress's use of the word "determines" in section 1158(a)(2)(A), coupled with the judicial review bar at section 1158(a)(3) of any "determination" made under section 1158(a)(2)(A), means that Congress shielded from review not just a final "determination," but the "method for reaching that final decision." *Bourdon v. DHS*, 940 F.3d 537, 542 (11th Cir. 2019). To "determine" means to "establish or ascertain definitely, as after consideration, investigation, or calculation." The American Heritage Dictionary of the English Language 509 (3d ed. 1992). The definition thus "encompasses making a final decision—*and* the method for reaching that final decision." *Bourdon*, 940 F.3d at 542. Thus, "[n]o federal court shall have jurisdiction" over the government's determination that the ACA Rule applies to provisional class members. And "[b]ecause the words" in section 1158(a)(3) "are '[n]o Federal court shall have jurisdiction,' the statute means that no federal court shall have jurisdiction." *Pakootas v. Teck Cominco Metals, Ltd.*, 646 F.3d 1214, 1220 (9th Cir. 2011).

Plaintiffs may suggest that *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), forecloses this reading of the statue. They would be wrong. *McNary* held that, absent "clear congressional language mandating preclusion of federal jurisdiction," a statute prohibiting judicial review of a "determination respecting an application" for an immigration benefit did not also preclude review of "an action alleging a pattern or practice of procedural due process violations" in the administration of the benefit program. *Id.* at 483–84, 491–92. Here, Plaintiffs ask the Court to review only the government's determination that provisional class members are aliens "who

arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after" November 19, 2019, and are thus subject to the ACA Rule. 84 Fed. Reg. at 63,995; TRO Br. 16. Their challenge is thus fundamentally different than the one in *McNary*, because they are not seeking review of a process; they are seeking to enjoin the determination to apply that process to them in the first place. *See* TRO Br. 16–17.

Regardless, even if the Court were to hold that *McNary* applies, the Supreme Court has limited that decision's application where, as here, Plaintiffs' claims are not ripe. In *Reno v. Catholic Social Services, Inc.*, the Court explained that "[t]he presumption of judicial review is subject to an implicit limitation: 'injunctive and declaratory judgment remedies . . . are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy "ripe" for judicial resolution.'" 509 U.S. at 57 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967)). The ripeness doctrine, which is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction," *id.* at 57 n.18, ensures that the effects of administrative action must "have been 'felt in a concrete way by the challenging parties'" before the courts are involved, *id.* at 57 (quoting *Abbot Laboratories*, 387 U.S. at 148–49). Typically, "a class member's claim would ripen only once he took the affirmative steps that he could take before [the government] . . . appl[ies] the regulation to him." *Catholic Social Servs., Inc.*, 509 U.S. at 59.

Plaintiffs claim that relief is necessary because the ACA Rule "denies [them] access to the asylum process," TRO Br. 8, but they point to no actual or imminent denial of such access under the ACA Rule. Nor can they. The provisional class of "all" aliens subject to metering at ports of entry on the U.S.-Mexico border, Class Cert. Br. 6, will not categorically have the Rule applied to them because the government is not currently applying the Rule to all aliens who cross the border. DHS is currently applying the ACA Rule only in the El Paso and Rio Grande Valley Border

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

Patrol sectors, and only to aliens who cross the border between ports of entry. Opp'n Ex. 3 ¶¶ 9–10. Between November 21 and December 9, only about 40 aliens have had the ACA Rule applied to them. Opp'n Ex. 3 ¶ 4. Plaintiffs offer no evidence that any of those aliens was subjected to metering before they entered the United States, nor that putative provisional class members are about to cross the border between ports of entry into the two Texas Border Patrol sectors. Nor do they provide evidence that Roberto Doe, the only potential class representative that Plaintiffs identify, is "t[aking] the affirmative steps that he c[an] take" to enter the United States at all— let alone between ports of entry into those two sectors—such that the government could *possibly* apply the Rule to him. *Catholic Social Servs., Inc.*, 509 U.S. at 59; Class Cert. Br. 11. The most recent evidence shows the opposite—that Roberto is "living in hiding in a Latin American country," Roberto Doe Decl. ¶ 7 (ECF No. 316-3), far from the U.S-Mexico border.

Further, regardless of where and to whom DHS applies the ACA Rule, the Rule does not categorically render all aliens who cross the border after November 19 statutorily ineligible to apply for asylum. Rather, it establishes the *process* by which immigration officers make that determination. *See* 84 Fed. Reg. at 64,008 (requiring asylum officers to "conduct a threshold screening interview" related to ACA eligibility "[w]hen [the] immigration officer has made an initial determination" that an alien "appears to be subject" to an ACA). The terms of the relevant ACA are what affect an alien's eligibility to apply for asylum in the United States. Further, even if an alien is found amenable to an ACA, that does not automatically mean that he will be removed to the signatory country, since the "application of an ACA remains within the discretion of the screening officer and DHS, which may conclude nonetheless that 'it is in the public interest for the alien to receive asylum in the United States.'" *Id.* at 63,998 (quoting 8 U.S.C. § 1158(a)(2)(A)). The ACA Rule also requires DHS to determine (if an alien affirmatively indicates a fear) whether an alien's life or freedom would be threatened on account of a protected ground or

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

tortured in the signatory country, and prohibits removal if it would. *Id.* at 63,999. Thus, regardless of the ACA Rule's current scope, Plaintiffs' claim that the ACA Rule "denies [class members] access to the U.S. asylum process" is not ripe, TRO Br. 8, since the Rule does not categorically render aliens who enter the United States after its effective date ineligible to apply for asylum. *See* Opp'n Ex. 3 ¶¶ 4–7. Class members must "t[ake] the affirmative steps that [they] c[an] take," *Catholic Social Servs.*, 509 U.S. at 59, and wait until "the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990), before their challenge becomes ripe for judicial review.

*Second*, under section 1252(a)(2)(B)(ii), the Court lacks jurisdiction to enjoin the government from evaluating an alien for ACA-amenability. Congress divested this Court of jurisdiction to review "any . . . decision or action of the Attorney General or the Secretary of Homeland Security that authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title."[2]  8 U.S.C.  § 1252(a)(2)(B)(ii). Such decisions must be "specified under [8 U.S.C. §§ 1151–1378] to be in the discretion" of the Secretary. *Kucana v. Holder*, 558 U.S. 233, 239 (2010). And the fact that the specific provision does not use the word "discretion" does not mean section 1252(a)(2)(B)(ii) does not apply. *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005). Rather, section 1252(a)(2)(B)(ii) applies if the judgment to be rendered is, by statute, "entirely within [the] judgment or conscience" of the Secretary. *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 690 (2003). The statute simply must "vest[] the government with authority to make a discretionary decision." *Poursina v. USCIS*, 936 F.3d 868, 871 (9th Cir. 2019).

Section 1158(a)(2)(A), coupled with section 1158(a)(3), does just that. The

---

[2] Plaintiffs are not asking for "relief" under section 1158(a), *see* TRO Br. 4, so the final clause of section 1252(a)(2)(B)(ii) does not render that provision inapplicable.

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

statute provides that an alien may be removed to a third country "if the Attorney General determines that the alien may be removed pursuant to a bilateral or multilateral agreement" to that country, that "the alien's life or freedom would not be threatened" on account of a protected ground, and "the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A). This grant of authority does not provide any statutory standard to apply—it calls for the exercise of "'expertise and judgment unfettered by any statutory standard whatsoever.'" *Poursina*, 936 F.3d at 872 (quoting *Zhu*, 411 F.3d at 295). And section 1158(a)(3) categorically bars review of the exercise of that expertise and judgment. The decision to apply section 1158(a)(2)(A) to a specific alien, through the Rule or otherwise, is thus "'entirely discretionary'" and covered by section 1252(a)(2)(B)(ii). *See Poursina*, 936 F.3d at 872.

But even if the Court were not divested of jurisdiction, it still is barred by 8 U.S.C. § 1252(f)(1) from issuing Plaintiffs' injunction. That provision states that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221–32] . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." The proposed injunction rewrites 8 U.S.C. § 1225(b)(1)(B)(v) to read that a "'credible fear of persecution' means that there is a significant possibility" that an alien "could establish eligibility for asylum under section 1158 of this title," *except that section 1158(a)(2)(A) and any implementing regulations shall not apply to an alien who has been metered.* Such requirements "that do not exist in the [challenged] statute" enjoin operation of section 1225(b)(1)(b)(v) as written, and are thus prohibited under section 1252(f)(1). *See Hamama*, 912 F.3d at 879–80.

The Court does not have jurisdiction to enjoin the government from applying the ACA Rule to provisional class members.

## II. Plaintiffs' Motion Fails on the Merits.

Plaintiffs are not entitled to preliminary injunctive relief even if the Court finds that it has the authority to issue an injunction. Plaintiffs cannot "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Nor can Plaintiffs show that there are "at least serious questions on the merits." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

### A. The ACA Rule Plainly Applies to the Provisional Class Members, and the Government's Metering Practices Are Lawful.

Plaintiffs' merits claims fail because they cannot show that "the ACA Rule does not apply to them, based on the plain language of the Rule itself," and cannot succeed on "their underlying challenges to the Turnback Policy." TRO Br. 17.

#### 1. The ACA Rule Applies to Aliens—Like the Putative Provisional Class Members—Who Cross the Border On or After November 19.

The ACA Rule by its terms plainly applies to provisional class members. The Rule applies "*prospectively* to aliens who arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after" November 19, 2019. 84 Fed. Reg. at 63,994 (emphasis added). Provisional class members fall within that text. The provisional class comprises aliens who "were unable to make a direct asylum claim at a U.S. [port of entry] before November 19, 2019 because of the U.S. Government's metering policy, and who continue," after November 19, "to seek access to the U.S. asylum process." Class Cert. Br. 6. The class thus consists of aliens who were outside of the United States on or after November 19 and who will therefore enter the United States (if at all) only on or after that date—which is to say, they are plainly covered by the Rule. There is no textual basis for deciding otherwise. *See Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004) ("A regulation should be construed to give effect to the

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

natural and plain meaning of its words.").

This Court previously held that the July 16, 2019 Transit Rule does not apply to an analogous class because those aliens "attempted to enter or arrived at the southern border *before* July 16, 2019 to seek asylum," PI Order 31, and that the Transit Rule applies only to those who attempted to enter or arrived "*after*" July 16, PI Order 32 (emphasis added). Defendants respectfully disagree with that reasoning and maintain that the Court should not extend it here. *See* TRO Br. 16. Provisional class members may have attempted to enter the United States before November 19, 2019, but they will *also* enter or attempt to enter after that date. Nothing in the ACA Rule (or the Transit Rule) suggests that only an alien's first attempt at entry counts, and nothing makes prior attempts at entry relevant. The ACA Rule applies (for example) to an alien who entered at the southern border in August 2019, left the United States in September 2019, and then again entered at the southern border in December 2019. It likewise applies (for example) to an alien who attempted to enter in August 2019 and again attempted to enter in December 2019. It does not matter that an alien entered, attempted to enter, or arrived *before* November 19: the Rule makes no exception for such an alien when the alien enters or attempts to enter on or after November 19. The Rule covers provisional class members.

In any event, Defendants maintain that this Court's motion-to-dismiss reasoning is incorrect and cannot support the injunction here. Aliens who approach a port of entry to seek asylum but never enter the United States are not covered by the asylum or expedited removal statutes. The statutes do not provide a right to apply for asylum to—or a duty on U.S. officials to process—aliens who are standing outside of the United States who wish to seek asylum and so are purportedly "in the process of arriving in the United States." *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1199. The asylum statute entitles only an alien "who is physically present *in* the United States or who arrives *in* the United States" to apply for asylum. 8 U.S.C. § 1158(a)(1) (emphases added); *see Kiyemba v. Obama*, 555 F.3d 1022, 1030–31

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

(D.C. Cir. 2009) ("refugees apply from abroad; asylum applicants apply when already here"), *vacated on other grounds*, 559 U.S. 131 (2010); *In re Li*, 71 F. Supp. 2d 1052, 1061 (D. Haw. Oct. 8, 1999) ("Congress did not provide aliens outside the United States with a right to an asylum hearing."). The statutory language speaks only to aliens who are inside the United States' borders.

This Court held that the present-tense statutory phrase "arrives in" shows that arrival is not a discrete event of physically being within the United States, but is instead a process that begins before arrival: someone who approaches the border with an intent to apply for asylum is someone who "arrives in" the United States, because they are "in the process of arriving in" the United States. *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1199–1203. But section 1158(a)(1) does not speak to a *process* of arrival; it speaks to "physical presen[ce] *in*" and "arriv[al] *in*" the United States. To "arrive" means "to reach a destination," not simply to be near it. Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/arrive (last accessed Dec. 9, 2019); *United States v. Vowell*, 9 U.S. 368, 372 (1810) (vessel within a customs collection district still had not "arrive[d] at the port of entry"). The statute's use of the simple present tense creates a nexus between an alien's right to apply for asylum and his current physical presence or arrival "*in* the United States." The use of the present tense clearly speaks to the present moment of arrival, not a potential arrival in the future.

Section 1225 confirms that the right to apply for asylum attaches only when an alien is within the United States, and that aliens who are outside of the country's borders have not arrived in the United States. The government's obligation to inspect aliens, which triggers its obligation to permit aliens "to apply for asylum under section 1158," 8 U.S.C. § 1225(b)(1)(A)(ii), applies only when an alien is "present *in* the United States" or "arrives *in* the United States," *id.* § 1225(a)(1) (emphasis added). Indeed, aliens cannot apply for asylum in expedited removal until they are actually "inspected by immigration officers," *id.* § 1225(a)(3); *see id.*

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

§ 1225(b)(1)(A)(ii) (aliens must be "inspect[ed]" before they can be "refer[red] . . . for an [asylum] interview"). And an alien cannot be "inspected" until he is "present in the United States . . . or [] arrives in the United States." *Id.* § 1225(a)(1).

The presumption against extraterritoriality supports this understanding. It is settled that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991). Applying this principle in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), the Supreme Court concluded that INA procedures concerning exclusion and asylum do not apply beyond our borders because they plainly do not contemplate any extraterritorial application. *See id.* at 174. Sections 1158 and 1225 contain no clear statement of extraterritorial application—indeed, as explained above, those provisions by their terms apply only to aliens who are inside U.S. territory. The presumption against extraterritoriality also defeats the Dictionary Act's general rule that "the present tense include[s] the future as well as the present," 1 U.S.C. § 1: that general rule would give the asylum statutes extra- territorial effect, by conferring sweeping rights on those who are outside our borders when there is no clear statement to that effect and when the statute indeed says otherwise. And the presumption against extraterritoriality likewise defeats this Court's view that other phrases in section 1225—such as references to an alien who "is arriving in" the United States or is "otherwise seeking" admission—encompass aliens who are not within the United States. *See Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1203–05.

The Court also erred when it reasoned that the statutory reference to an alien "who is physically present in the United States" already covers aliens in the United States, so the rule against surplusage dictates that the reference to any alien "who arrives in the United States" must apply to another group of aliens—including "an alien who may not yet be in the United States, but who is in the process of arriving in the United States" through a port of entry. *Id.* at 1199–1200. The reference to an

alien "who arrives" is not surplusage. Congress included both phrases in section 1158(a)(1) to ensure that aliens in ordinary removal proceedings (the alien who "is physically present in") and aliens in expedited removal (the alien "who arrives in") both may apply for asylum within those proceedings, which was an important clarifying measure after Congress enacted major immigration legislation in 1996 that modified deportation and exclusion hearings into removal and expedited removal proceedings. *See, e.g.*, *Vartelas v. Holder*, 566 U.S. 257, 261–63 (2012) (discussing proceedings before and after that legislation); *Sale*, 509 U.S. at 174–76 (both deportable and excludable aliens would presumptively "continue to be found only within United States territory").

Plaintiffs argue that the instances described in the DHS Office of Inspector General's report of CBP officers at the Tecate port of entry returning aliens on U.S. soil to Mexico after they arrived in the United States and asserted an intention to apply for asylum "completely undermine[]" the government's statutory arguments. TRO Br. 6. Not so. Those acts—which are not in line with CBP's metering guidance, Opp'n Ex. 1, and which Defendants have always acknowledged are unlawful—highlight exactly the distinction that the statutes make: CBP must inspect and process an alien "who arrives in the United States." *E.g.*, 8 U.S.C. § 1225(a)(3); *see also* TRO Ex. 3 at 6 ("Consistent with the INA, CBP regularly circulated guidance throughout 2017–2019, instructing employees that, once an asylum applicant is on U.S. soil, officers must accept that individual for processing."). CBP has no obligation to inspect or process an alien who is not "in the United States." 8 U.S.C. § 1225(a)(3).

The ACA Rule applies by its terms to provisional class members.

### 2. CBP's Metering Practices Are Lawful.

Plaintiffs also are not likely to succeed on their metering challenge.[3] Plaintiffs

---

[3] The Court must address Plaintiffs' likelihood of success on their metering challenge before it considers the ACA Rule, since metering is the nexus between the

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

first argue that "each individual turnback" is unlawful under 5 U.S.C. § 706(1) "because asylum seekers have a right to inspection and processing, Defendants have acknowledged that they are 'metering,' and Plaintiffs will show that Defendants' explanation for metering is pretextual and based on an impermissible desire to deter asylum seekers." TRO Br. 17. They are wrong. As discussed above, U.S. officials have no obligation under the asylum or expedited removal statutes to inspect or process an alien in Mexico. Those obligations attach only when an alien is "in the United States." 8 U.S.C. §§ 1158(a)(1), 1225(b)(1)(A)(ii). Plaintiffs are also not likely to show that metering is "pretextual" or based on an "impermissible desire to deter asylum seekers." TRO Br. 17. The evidence shows that metering is a simply a tool each port may use to efficiently manage its resources. Opp'n Ex. 1; Opp'n Ex. 4 at 9–18 (no deterrence motive). *see also* TRO Ex. 3 at 6 ("Consistent with the INA, CBP regularly circulated guidance throughout 2017–2019, instructing employees that, once an asylum applicant is on U.S. soil, officers must accept that individual for processing."). And even if metering were based on a "desire to deter asylum seekers," there is nothing unlawful about that motive. *See Sale*, 155 U.S. at 163–64 (approving decision to interdict and return aliens on the high seas to address an "exodus" that had "expanded dramatically," overburdening screening facilities and "pos[ing] a . . . danger to thousands of persons embarking on long voyages in dangerous craft," and explaining that the "wisdom of the policy choices . . . is not a matter for [the Supreme Court's] consideration").

Plaintiffs next argue that metering violates 5 U.S.C. § 706(2) because it "ex-

---

arguments in the TRO Motion and the claims in the Second Amended Complaint. *See* TRO Br. 11 (class members "are now, as a result of metering, harmed by the Rule"); *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (preliminary relief requires "a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint" (internal quotation marks omitted)).

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

ceeds Defendants' statutory authority and is without observance of procedure required by law." TRO Br. 17. This is wrong. Metering is well within the Executive Branch's constitutional authority to control the border. "Aliens seeking entry from contiguous lands obviously can be turned back at the border without more." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953). Congress has also authorized the Secretary to "issue such instructions[] and perform such other acts as he deems necessary for carrying out his authority under" the immigration laws, 8 U.S.C. §§ 1103(a)(3), (a)(1), including his subordinates' duties to "deter and prevent terrorists and terrorist weapons from entering the United States at such ports of entry; conduct inspections at ports of entry to safeguard the United States from terrorism and illegal entry of persons; prevent illicit drugs, agricultural pests, and contraband from entering the United States;" and "facilitate and expedite the flow of legitimate travelers and trade," 6 U.S.C. § 211(g)(3). Plaintiffs do not identify what procedure they believe Defendants have not observed by issuing the metering policy. *See* TRO Br. 17. In any event, metering is lawful for the reasons discussed above.

Plaintiffs finally argue that metering "also violates the Due Process Clause." TRO Br. 17. They are wrong. Where, as here, Plaintiffs premise their procedural-due-process challenge on having a protected interest in a statutory entitlement, the Due Process Clause's protections "extend only as far as the plaintiffs' statutory rights." *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1001 & n.2 (9th Cir. 1998), *abrogated on other grounds*, *Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010). As explained above, Plaintiffs have no statutory rights under sections 1158 or 1225 while standing in Mexico. Their procedural-due-process challenge also fails because the Fifth Amendment does not apply in Mexico. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (the Court's "rejection of extraterritorial application of the Fifth Amendment" in *Johnson v. Eisentrager*, 339 U.S. 762, 770 (1950), "was emphatic"); *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring) (noting that "an alien obviously brings with him no constitutional

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

1    rights"). Plaintiffs are not likely to succeed on their metering challenge.

2    **B. Considerations of Irreparable Harm and the Equities Strongly Favor the Government.**

4    The party seeking preliminary injunctive relief must show that the balance of
5    equities tips in its favor, that the injunction is in the public interest, and that it would
6    suffer irreparable harm without the injunction. *Winter*, 555 U.S. at 20. The Court
7    "'should pay particular regard for the public consequences'" of injunctive relief. *Id.*
8    at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). These
9    factors strongly favor the government.

10    First, the injunction would frustrate the "wide public interest[s] in effective
11    measures to prevent" irregular migration at the southern border, *United States v.*
12    *Cortez*, 449 U.S. 411, 421 n.4 (1981), and a well-functioning asylum system. The
13    United States has experienced an "overwhelming surge" of unlawful crossings at the
14    southern border over the past decade. Asylum Eligibility and Procedural Modifica-
15    tions, 84 Fed. Reg. 33,829, 33,840 (July 16, 2019). This surge has led to a backlog
16    of *more than 987,000 cases* before the immigration courts (including about 467,000
17    defensive asylum cases) and more than 340,800 affirmative asylum applications. 84
18    Fed. Reg. at 63,995. Only a small percentage of those claims ever succeed. *Id.* at
19    63,996. In the meantime, immigration detention centers are pushed to capacity. *Id.*
20    at 63,995. The Departments use a tremendous amount of resources apprehending
21    and detaining aliens who cross the border unlawfully or arrive at ports of entry. *Id.*
22    The "strain on the U.S. immigration system, and the wait times for aliens seeking to
23    process legitimate claims through the U.S. asylum system, is extreme." *Id.* at 63,996.
24    The ACA Rule aims to alleviate those burdens by creating a standing administrative
25    process by which the United States can determine whether an alien is subject to one
26    of its diplomatically-negotiated ACAs, thereby distributing the burden of addressing
27    irregular migration to willing regional partners. The injunction Plaintiffs seek would
28    undermine the Executive Branch's coordinated efforts to address this surge because

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

it would prevent the government from even *considering* whether an alien is amenable to an ACA in the first instance.

Second, the injunction would interfere with "sensitive and weighty interests of . . . foreign affairs." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010). The ACA Rule is a critical prong of the United States' ongoing efforts to "develop a regional framework with other countries to more equitably distribute the burden of processing the protection claims of the hundreds of thousands of irregular migrants who now seek to enter the United States every year and claim a fear of return." 84 Fed. Reg. at 63,997. In some cases, the terms of ACAs "have been contingent on the signing countries exchanging diplomatic notes certifying that each country has put in place the legal framework necessary to effectuate and operationalize the agreement." *Id.* at 64,005. Enjoining the ACA Rule could destabilize those efforts and weaken the United States' negotiating position by creating uncertainty about the regulatory framework that the United States has put into place to operationalize current or future agreements. *Id.* It would also risk damaging long-term U.S. relations with Mexico, El Salvador, Guatemala, and Honduras as they work to cooperatively address the enormous flow of aliens through these countries to the southern border. *Id.*

And as with the Court's earlier injunction, an injunction of the ACA Rule would burden the government significantly. CBP sensibly does not maintain records of who has been metered (since metering is based on resource constraints). *See* Howe Decl. ¶¶ 4–6 (ECF No. 307-8). The burden of the injunction would again fall to asylum officers to inject ad hoc fact-finding procedures into what should be in many cases an *expedited* removal process to identify the estimated 21,000+ provisional class members who will enter the United States at different points in time, at different ports of entry or different parts of the border, submit asylum applications affirmatively or defensively in different administrative contexts, and be interviewed by different asylum officers or appear before different immigration judges. Class Cert.

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

Br. 6; TRO Br. 8 (admitting that class members have crossed the border illegally). Plaintiffs again argue that provisional class members can be identified by "objective criteria" such as waitlists. Class Cert. Br. 6, 16. But that does not mitigate the burden because, even if Defendants had the lists,[4] they would still have to engage in burdensome fact-finding to determine whether an applicant was subjected to metering. As Plaintiffs have made clear, the waitlists—which CBP plays no role in maintaining—are susceptible to corruption. *E.g.*, TRO Ex. 21 ¶ 12. The government thus has an interest in verifying an individual's claimed class membership even if his name appears on a list. As Plaintiffs have also argued, the waitlists are under-inclusive. *Id.* at 3; Transit Rule Class Cert. Br. 14–15 (ECF No. 293-1). The government would thus be required to question the substantial number of aliens who will likely claim to be class members but do not appear on a list. The waitlists are also over-inclusive, since they include the names of aliens who never approached a port of entry and so were never subjected to metering in the first place. *E.g.*, Opp'n Ex. 2 at 11 (list includes people who electronically messaged their names to the list-holder before ever reaching the border); TRO Ex. 15 ¶ 11 ("I went directly from the bus station to the office where you register to get a number on the asylum waitlist.").[5] With or without the lists, the burden of identifying class members is substantial.

At the same time, the ACA Rule does not impose a significant burden on class

---

[4] Almost two months after arguing that the government could ascertain class members' identities using the waitlists, *see* ECF No. 316 at 10, Plaintiffs have not provided the government with any list besides the one attached to their prior briefing, Halaska Decl. ¶ 6.

[5] Plaintiffs believe that the class should include all aliens on the waitlists "regardless of whether they first physically approached the border." Class Cert. Br. 6. That interpretation is incompatible with this Court's reasoning, which states that an alien is covered by the asylum and expedited removal statutes if he is "in the process of arriving in the United States *through a POE*." *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1200 (emphasis added). Physically approaching a port of entry on the U.S.-Mexico border is thus a fundamental feature of provisional class membership.

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

members. The Rule simply establishes a process by which the government will determine whether an alien is subject to an ACA and will thus be removed to a country where his "life or freedom would not be threatened on account of" a protected ground and where he may "access a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A). Plaintiffs argue that applying the ACA Rule would "strip them of their right to access the U.S. asylum process" that "the government is required by statute to provide." TRO Br. 18–19. This is incorrect, since the statute creating the asylum process specifically says that an alien is ineligible to apply when the government decides to remove him pursuant to an ACA. 8 U.S.C. § 1158(a)(2)(A). Plaintiffs who cross into the United States are still able to access the asylum process that the statute creates.

Plaintiffs also argue that the ACA Rule risks "'wrongfully remov[ing]'" them to another country where they might face "'substantial harm.'" TRO Br. 19 (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)). But the aliens to whom the ACA Rule is being applied—those who cross illegally into two Texas Border Patrol sectors, Opp'n Ex. 3—do not risk "wrongful" removal, since they do "not have standing to assert a right to cross the border illegally, to seek asylum or otherwise." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018). Moreover, even if an alien is found amenable to an ACA after undergoing the Rule's process—which is not guaranteed, *see* 84 Fed. Reg. at 64,008–09—the Rule requires DHS (upon the alien's affirmative indication) to evaluate whether it is more likely that not that the alien would be persecuted on a protected ground or tortured in the signatory country, *id.* at 64,009. Purported wrongful removals are not a risk under the Rule.

Plaintiffs also argue that injunctive relief is necessary to maintain 'the legally relevant relationship between the parties before the controversy arose.'" TRO Br. 13 (quoting PI Order 30). But it is Plaintiffs who seek to alter the status quo. Plaintiffs have always defined their claimed "relationship" with the U.S. government by reference to the asylum statute. *E.g.*, SAC ¶ 226; TRO Br. 10, 18–19 (all citing 8 U.S.C.

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

§ 1158(a)(1)). Yet the provision establishing a right to apply for asylum "shall not apply" when DHS decides to remove an alien under the terms of an ACA. 8 U.S.C. § 1158(a)(2)(A). There can be no serious claim that the ACA Rule is what changes Plaintiffs' legal relationship with the U.S. government when any legal relationship was always made contingent by statute on the applicability of an ACA.

And, of course, provisional class members do not have a legal relationship with the U.S. government. The asylum statute applies only "*in* the United States," 8 U.S.C. § 1158(a)(1), not in Mexico. And an "alien obviously brings with him no constitutional rights." *Bridges*, 326 U.S. at 161 (Murphy, J., concurring); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative."); *Verdugo-Urquidez*, 494 U.S. at 275 (stating as an "undoubted proposition" that "the Constitution does not create, nor do general principals of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory"); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citing *Verdugo-Urquidez*, 494 U.S. at 269, for the proposition that the "Fifth Amendment's protections do not extend to aliens outside the territorial boundaries").

Plaintiffs are similarly wrong that they need an injunction to preserve putative class members' "continued right to litigate [their] pending claims" in this case. TRO Br. 4. As noted, Plaintiffs' claim that ACA Rule would deny provisional class members access to the asylum process and "effectively moot" their claims, TRO Br. 20, is undercut by the fact that their right to apply for asylum was always contingent on the applicability of an ACA. *See* 8 U.S.C. §§ 1158(a)(2)(A), (a)(3). And, notably, if it were necessary to be near the U.S.-Mexico border to litigate this case, then Plaintiffs would not hold out Roberto Doe—a person who is "hiding in a Latin American country," Roberto Decl. ¶ 7—as an adequate class representative whose claims are typical of the class members'. Class Cert. Br. 11.

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

Considerations of harm and the equities weigh strongly in Defendants' favor.

## III.  The Court Cannot Grant Relief Under the All Writs Act.

This Court cannot enjoin the ACA Rule under the All Writs Act, 28 U.S.C. § 1651. The All Writs Act allows courts to issue writs "necessary or appropriate in aid of their respective jurisdictions." *Id.* Plaintiffs argue that such a writ is necessary because application of the ACA Rule would "extinguish Plaintiffs' ability to access the U.S. asylum process and effectively moot most of Plaintiffs' claims." TRO Br. 20.; *see also* PI Order 20 (reasoning that AWA authority springs from the government's "issuance of policies and practices barring access to the asylum process"). But Plaintiffs' argument ignores the fact that their right to "access the U.S. asylum process" before they cross the border was always contingent on section 1158(a)(2)(A). Moreover, provisional class members never had a right to any particular set of asylum-application or asylum-eligibility rules, *e.g.*, 8 U.S.C. § 1158(b)(2)(C) (permitting the government to establish "additional limitations and conditions" on asylum eligibility), and especially not a right against being evaluated for amenability to an ACA, *id.* §§ 1158(a)(2)(A), (a)(3). And, because this Court does not have jurisdiction to prevent the government from evaluating an alien for amenability under an ACA within the asylum process, *id.* § 1158(a)(3), it cannot use the All Writs Act to "enlarge [its] jurisdiction" to do just that, 19 J. Moore & G. Pratt, Moore's Federal Practice § 204.02[4] (3d ed.) (cited in *Clinton v. Goldsmith*, 526 U.S. 529, 535 (1999)).

## CONCLUSION

The Court should deny Plaintiffs' TRO Motion.

//

//

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

DATED: December 17, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

EREZ REUVENI
Assistant Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC

1

## <u>CERTIFICATE OF SERVICE</u>

2

No. 17-cv-02366-BAS-KSC

3      I certify that I served a copy of this document on the Court and all parties by

4 filing this document with the Clerk of the Court through the CM/ECF system, which

5 will provide electronic notice and an electronic link to this document to all counsel

6 of record.

7

8 DATED: December 17, 2019            Respectfully submitted,

9

10                                                */s/ Alexander J. Halaska*

11                                        ALEXANDER J. HALASKA
                                          Trial Attorney

12                                        United States Department of Justice

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' OPP'N TO PLS.' MOT. FOR TRO
Case No. 3:17-cv-02366-BAS-KSC