MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:  +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | **EXHIBIT 10 TO PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | *FILED UNDER SEAL* |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.561

OFFICE OF INSPECTOR GENERAL

# Investigation of Alleged Violations of Immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel


Homeland Security

**September 26, 2019**
**OIG-19-65**

AOL-DEF-00615546

# DHS OIG HIGHLIGHTS
## Investigation of Alleged Violations of Immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel

**September 26, 2019**

## Why We Did This Special Review

Following a referral from the U.S. Office of Special Counsel (OSC) to the U.S. Department of Homeland Security (DHS) on August 23, 2018, the DHS Office of Inspector General (OIG) reviewed three allegations of immigration law violations at the Tecate, California, Port of Entry. We issued this report to DHS on July 9, 2019, and DHS provided a copy of the report to OSC on September 17, 2019.

## What We Recommend

This report contains no recommendations.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov.

## What We Found

We substantiated, in whole or in part, all three factual allegations referred to DHS by OSC.

First, we found that contrary to Federal law and U.S. Customs and Border Protection (CBP) policy, CBP officials at the Tecate, California, Port of Entry returned some asylum applicants from inside the United States back to Mexico and instructed those individuals to go to other ports of entry to make their asylum claims. However, we did not substantiate the allegation that managers instructed officers to do this or that it was the Port's standard practice.

Second, we found that Tecate and other ports of entry use a practice known as "metering" or "queue management" to prevent overcrowding at the ports. We identified three concerns with how CBP implemented this practice at Tecate, including that the Port generally refers most asylum seekers to go to other ports, despite representing Tecate as open to "all travelers."

Finally, we found that Tecate officials do not create records when they instruct individuals to go to other ports to make their asylum claims.



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

July 9, 2019

| | |
|---|---|
| MEMORANDUM FOR: | The Honorable Randolph D. Alles<br>Deputy Under Secretary for Management<br>Department of Homeland Security |
| FROM: | Jennifer Costello *[signature: Jennifer J. Costello]*<br>Acting Inspector General |
| SUBJECT: | Investigation of alleged violations of immigration laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection personnel (OSC File No. DI-18-5034) |

We write to provide the results of the Office of Inspector General's (OIG) investigation into the whistleblower disclosures raised to the U.S. Office of Special Counsel (OSC) concerning possible violations of immigration law at the Tecate, California, Port of Entry by U.S. Customs and Border Protection (CBP), Office of Field Operations (OFO) personnel.

In July 2018, CBP Officer ███████████, who consented to the release of ██ name by OSC as well as the OIG, raised several concerns regarding asylum-processing practices at the Tecate Port of Entry, where ██ is assigned. OSC relayed the following three allegations:

1. Since 2016, CBP managers have instructed CBP officers to physically escort asylum seekers arriving at the Tecate Port of Entry back to Mexico and to direct those asylum seekers to the San Ysidro Port of Entry.

2. In July 2018, CBP managers at the Tecate Port of Entry established a practice where CBP officers stand at the United States international border with Mexico to physically deny asylum seekers entry onto U.S. soil and instead direct those individuals to the San Ysidro Port of Entry.

3. CBP officers at the Tecate Port of Entry do not maintain a record or physical documentation when encountering asylum seekers.[1]

After OSC referred this complaint to DHS on August 23, 2018, the OIG agreed to investigate the allegations.

---

[1] During ██ interviews with the OIG, ███████ also raised concerns that ██ may have suffered whistleblower retaliation because of these and other disclosures. Because ██ further stated that ██ had submitted a complaint to OSC detailing ██ concerns, the OIG did not undertake an investigation into the alleged retaliation.



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

The OIG substantiated, in whole or in part, each of the three factual allegations:

1. First, we found instances of CBP officials returning some asylum applicants to Mexico after they had already entered the United States, and instructing those individuals to go to other ports to make their asylum claims. While we determined this occurred, and that it is contrary to Federal law and CBP policy requiring that asylum seekers present in the United States be accepted for processing, we were unable to substantiate that managers specifically instructed ▮▮▮ or others to engage in the practice, or that it was otherwise the Port's standard practice.

2. Second, we found that at many ports of entry along the Southwest border, CBP has used a practice known as "metering" or "queue management" to prevent overcrowding within the port. When metering is in place, officers stand at a "limit line" position at or near the U.S.-Mexico border and prevent asylum seekers or others without travel documents from entering onto U.S soil until there is available space and resources to process them.[2] Certain ports have used metering at least as far back as 2016, and the Port of Tecate (Tecate) adopted the practice on or around July 9, 2018. However, while other ports allow asylum seekers to enter once there is available space, Tecate generally does not. Instead, when most individuals expressing an intent to apply for asylum arrive at Tecate's limit line position, officers inform them that they need to travel to other ports in order to have their claims processed. Because metering is the subject of pending litigation, the OIG expresses no opinion on the legality or propriety of the practice.

3. Finally, we confirmed that Tecate personnel do not document when they redirect asylum applicants at the limit line, or when they return asylum applicants who are already present in the United States back to Mexico.

In the course of this investigation and other related OIG work, we interviewed 24 current and former CBP officials (ten officers, five supervisory officers, and

---

[2] We use the terms "asylum seeker" or "asylum applicant" interchangeably to refer to an individual who has approached or crossed the U.S.-Mexico border and expressed to DHS personnel a fear of persecution or torture in their home country or any other statement of intent to apply for asylum in the United States.

2



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

nine management officials),[3] and reviewed Federal law and regulations, relevant litigation filings, CBP guidance, and records and emails collected from CBP. We performed this work between August 2018 and March 2019.[4]

## BACKGROUND

Tecate is a relatively small port of entry, located in a remote area approximately 40 miles east of the much larger San Ysidro, California Port of Entry. Tecate is classified as a "Class A Port of Entry," which means it is supposed to be capable of accepting all travelers, including asylum seekers.[5] According to ▇▇▇▇▇ and most other witnesses, due to its location, very few asylum seekers come to Tecate. However, despite the low volume, Tecate personnel stated that the Port is not equipped to handle the asylum applicants that do arrive there, noting the Port lacks detention space and officers trained in processing asylum claims. Moreover, unlike other ports that are open 24 hours per day, Tecate closes at 11:00 pm, so individuals taken into custody there must be transferred to another facility once Tecate closes.

Accordingly, for the past several years, the larger ports of San Ysidro and Calexico have handled most asylum processing within OFO's San Diego Field Office because they have more officers trained in asylum intake than other ports in the region. Throughout this time, when asylum seekers came to Tecate and other smaller ports in the region, officers generally were expected to "accept" them, meaning they would take the individuals into custody, initiate some basic processing, and then transport the individuals to the larger ports to complete the asylum processing. However, in some cases, officers apparently would not accept the asylum seekers and instead would instruct them to travel on their own through Mexico to San Ysidro or Calexico.[6]

---

[3] In accordance with Section 7(b) of the *Inspector General Act of 1978*, as amended, OIG is not identifying witnesses by name in this report other than ▇▇▇▇▇▇▇, who provided consent to the disclosure of ▇▇ identity. *See* 5 U.S.C. App. § 7(b).

[4] Our work was delayed due to the government shutdown that began on December 22, 2018, and lasted through January 25, 2019.

[5] *See* CBP, *Tecate Port of Entry Information*, https://www.cbp.gov/contact/ports/tecate-class-california-2505; CBP, *Port of Entry Class Definitions*, https://www.cbp.gov/travel/international-visitors/visa-waiver-program/port-classes.

[6] The San Diego Field Office includes the Tecate, San Ysidro, Calexico, Otay Mesa, and Andrade Ports of Entry. CBP documents from the San Diego Field Office identify San Ysidro and Calexico as the two hub ports for asylum seekers. However, most officials at Tecate indicated that they refer asylum seekers just to San Ysidro, presumably because it is much closer to Tecate than Calexico.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

[REDACTED] alleged that sometime in either late 2017 or early 2018, CBP managers at Tecate specifically instructed officers to stop accepting asylum seekers for even limited processing.[7] At that time, Tecate officers generally did not stand at the U.S.-Mexico border, so asylum applicants first encountered CBP officers once they were inside the Port of Tecate processing building where officers inspect each pedestrian traveler seeking to enter the United States. At Tecate, that position, referred to as "pedestrian primary" or "primary," is located approximately 200 feet inside the U.S. once a traveler crosses the U.S.-Mexico border. [REDACTED] alleged that when travelers reached that position and expressed an intent to apply for asylum, CBP officers or supervisors would escort them back to Mexico, and instruct them to travel through Mexico to the San Ysidro Port of Entry if they wanted to apply for asylum. [REDACTED] also alleged that, later in the summer of 2018, Tecate began placing officers at a limit line position near the U.S.-Mexico border and began "redirecting" asylum seekers to San Ysidro from that position rather than from inside the Port.

As used in this report, "redirect" means the practice of intercepting asylum seekers at a port's limit line position and instructing them to go to another port to apply for asylum. "Return and redirect" means the practice of sending asylum seekers from inside a port back into Mexico with instructions to go to another port to apply for asylum. The distinction between redirecting asylum seekers from the limit line versus returning and redirecting them from inside the port has potential legal significance. Returning asylum seekers to Mexico from inside a port violates Federal law and CBP policy, which require officers to accept and process asylum seekers who are physically present in the United States. The permissibility of redirection at the limit line position is the subject of ongoing litigation, and remains undecided.

## FINDINGS AND ANALYSIS

The OIG could not corroborate that CBP managers issued a specific instruction to Tecate Port personnel in the 2017-2018 time period to start returning and redirecting asylum seekers. However, we did find that in specific instances, both before and after that time, Tecate personnel returned some asylum seekers who were already present in the United States back to Mexico and redirected them to other ports. The OIG also corroborated that Tecate began redirecting asylum seekers from a limit line position in July 2018. Finally, we determined that both before and after the limit line was established, Tecate officers did not create records when sending asylum applicants to other ports.

---

[7] The OSC referral says this began in 2016, but [REDACTED] twice told the OIG that [REDACTED] believed it was late 2017 or early 2018, and that [REDACTED] was unsure of the source of OSC's date.

AOL-DEF-00615551



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

### A. The OIG substantiated that CBP officers have returned some asylum seekers present in the U.S. to Mexico, and redirected those individuals to other ports

According to ▇▇▇, during an in-person muster[8] in late 2017 or early 2018, a Tecate supervisor verbally instructed officers that the Port would no longer accept asylum seekers, and that officers should either return them to Mexico themselves, or should call a supervisor to do it for them. ▇ said ▇ asked the supervisor for a written instruction and was told there was none. Apart from ▇▇▇, no other officers, including those with whom ▇▇▇ recommended we speak, recalled receiving any instruction to return asylum seekers from Tecate to Mexico.[9]

Nonetheless, documents reviewed by the OIG and nearly every witness interviewed during this investigation, including Tecate's former Port Director, two former Assistant Port Directors, and multiple supervisory officers, corroborated that at various times and for various reasons, Tecate returned some asylum seekers to Mexico and redirected them to the San Ysidro Port of Entry through Mexico.[10] One witness believed that Tecate may have returned and redirected some asylum seekers as far back as 2016, and the earliest document we identified discussing Tecate returning an asylum seeker to Mexico is from February 2017.[11]

Many witnesses also acknowledged that returning and redirecting asylum applicants who have crossed onto U.S. soil violates Federal law and CBP policy. Under the Immigration and Nationality Act (INA), with limited exceptions, "[a]ny alien who is physically present in the United States . . . may apply for

---

[8] Within CBP, "musters" are verbal or written instructions that often set forth, reinforce, or clarify CBP policy or guidance.

[9] We are aware that some witnesses may have chosen to be less than forthcoming regarding a practice most witnesses acknowledged as improper. However, even witnesses who admitted that some asylum seekers had been returned to Mexico and/or raised concerns with us regarding the limit line position – and who, therefore, could be reasonably expected to be forthcoming on this issue – did not recall any specific instruction to return asylum applicants to Mexico.

[10] The witnesses we interviewed were familiar with the practice of returning and redirecting asylum applicants, and distinguished it from situations where travelers voluntarily agree to withdraw their request for admission to the United States by completing form I-275 (Withdrawal of Application for Admission) and returning to Mexico.

[11] We collected documents from 2016 to present.

5



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

asylum."[12] Further, "[a]n alien present in the United States who has not been admitted" "shall be inspected by immigration officers."[13] Consistent with the INA, CBP regularly circulated guidance throughout 2017-2019, instructing employees that, once an asylum applicant is on U.S. soil, officers must accept that individual for processing.

In spite of the legal and policy requirements, Tecate personnel we spoke with offered a few justifications for why they or others would return and redirect asylum applicants to other ports. First, many officers and management cited the Port's lack of holding space and personnel trained in processing asylum claims, and the challenges with transferring individuals when the Port closed at the end of the day. For example, one Tecate officer said the Port would usually (but not always) accept individuals or small groups of asylum seekers, but would instruct large groups that they needed to go to San Ysidro to be processed because Tecate did not have space to hold them. Second, Tecate personnel also noted that they believed some asylum seekers came to Tecate in an effort to skip the lines they had encountered at other ports of entry. According to these individuals, there was a time when other ports of entry (primarily, San Ysidro) had a limit line position in place, but Tecate did not, and individuals who became tired of waiting at those other ports would travel to Tecate to try to get into the U.S. more quickly. When Tecate officers encountered those individuals at pedestrian primary, they would instruct them to go back to the port where they had already been waiting. According to these officials, Tecate would have otherwise soon become overwhelmed with asylum seekers the Port could not accommodate.

Consistent with witness testimony, the OIG identified emails confirming some instances of Tecate returning and redirecting asylum seekers in 2017. However, the emails also suggest that it was not the Port's regular practice to do so and that Port management did not permit it. For example:

- In May 2017, Tecate's Port Director wrote to a San Diego Field Office official that, "Our guidance to our supervisors is that we do not return anybody that expresses fear in returning back to Mexico, we will process them and transport them to San Ysidro." That Port Director told the OIG that while he had been aware of a couple instances of asylum seekers being returned to Mexico and redirected to another port, he had issued

---

[12] 8 U.S.C. § 1158(a)(1); *see also Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1510 (11th Cir. 1992) (stating that § 1158(a) is "unambiguous" and permits aliens to apply for asylum if they are "within the United States or at United States' borders or ports of entry").

[13] 8 U.S.C. §§ 1225(a)(1),(3).

6



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

verbal guidance to his staff that the practice was not permissible and should cease.[14]

- In an August 2017 email noting that a Guatemalan family had been returned to Mexico from Tecate, a former Assistant Port Director informed the Port's eight supervisory officers, "I would like to remind you all that we do not send any credible fear or asylum cases to another port for processing. I find it concerning that an officer feels he can make this kind of decision without consulting a supervisor."[15]

However, there is some evidence that it may have become more permissible to return and redirect asylum seekers at Tecate in late 2017:

- In December 2017, the same former Assistant Port Director emailed the then Port Director expressing confusion that Tecate had accepted a group of asylum seekers who had arrived there and stated, "I thought we were sending anyone claiming credible fear down the hill?" When interviewed by the OIG, that former Assistant Port Director confirmed that he was stating his understanding at the time that Tecate was returning asylum seekers to Mexico and redirecting them "down the hill" to San Ysidro.[16] That Assistant Port Director also told the OIG that he had been aware that one particular former supervisory officer would return asylum applicants back to Mexico with some regularity.[17]

- In March 2018, at a time when there was an acting Port Director, a supervisory officer drafted an internally inconsistent muster for an Assistant Port Director. First, the muster states that all asylum applicants encountered at primary must be taken into custody and

---

[14] Neither the OIG nor the Port Director were able to locate any emails or other written guidance the Port Director sent to Port staff, stating asylum seekers had to be processed. However, one officer we interviewed specifically recalled receiving guidance to that effect from the Port Director.

[15] One supervisor who received the email told the OIG that the former Assistant Port Director's representation that Tecate did not send asylum cases to other ports was not accurate. The supervisor said he understood the message to mean that supervisors, not officers, should be making the decision regarding returning asylum seekers to Mexico and redirecting them to other ports. However, another supervisor who also received that same email maintained that the Port's policy was to accept asylum applicants encountered at pedestrian primary.

[16] The OIG did not locate any email indicating the then Port Director responded to this question. During his interview, the then Port Director said he had a different interpretation of this email. He thought the Assistant Port Director meant that the Port would accept asylum applicants and then officers would drive them to San Ysidro to complete the intake process.

[17] The OIG attempted to schedule an interview with the former supervisory officer, who is now retired, but he did not respond to our messages.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

processed. However, it also states that "redirected applicants" could be "return[ed] to Mexico" with supervisory notification, and the document's author told the OIG that "redirected applicants" included asylum applicants. Therefore, as drafted, the muster required officers to take asylum applicants into custody and process them, but it also allowed officers to return asylum seekers already on U.S soil back to Mexico. The muster did not provide any explanation regarding when it would be permissible to return and redirect asylum applicants.[18]

Despite what appears to be an increasing openness to return and redirect asylum applicants beginning in December 2017, we found no documentary evidence of Tecate actually doing so between then and July 2018 when the limit line was established. To the contrary, we identified emails reflecting instances of Tecate accepting and processing asylum applicants in April and June 2018.

Although the timing of the December 2017 email and the March 2018 draft muster coincide with ▮▮▮▮ allegation, they do not directly confirm that Tecate's approach to asylum seekers fundamentally changed in late 2017 or early 2018. Nor did any witnesses corroborate ▮▮ claim that an instruction was given to stop accepting asylum applicants at that time. Consequently, while we substantiate that Tecate did improperly return and redirect some asylum seekers in the past, we cannot substantiate ▮▮▮▮ allegation that it became the Port's standard practice in late 2017 or early 2018.

### B. The OIG substantiated that officers at Tecate stand at the limit line to prevent asylum seekers from entering the Port

The OIG corroborated ▮▮▮▮ allegation that, in July 2018, CBP managers at Tecate instituted the practice of positioning officers near the U.S.-Mexico international border, or limit line, in order to stop asylum seekers and others without appropriate travel documents from crossing the line and, instead, redirecting them to the San Ysidro Port of Entry.[19]

---

[18] The supervisor believed that this draft muster was eventually issued to Tecate personnel, but he was unable to provide documentation confirming that it was.

[19] We also corroborated that, as noted in OSC's referral letter, Tecate's limit line position is outside of the view of security cameras. The lack of camera coverage in that location is most likely due to the fact that there was little need to record that area before the limit line was established (since CBP personnel did not generally stand or interact with travelers there). Tecate officials did not install cameras there after establishing the limit line.

AOL-DEF-00615555



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

CBP's practice of placing officers at the limit line to check travelers' documents as they approach ports of entry along the southwest border – often referred to as "metering" or "queue management" – is well known and fully acknowledged by DHS and CBP leadership.[20] CBP has instituted metering at various times and locations in recent years, and in April 2018, OFO leadership issued a "Metering Guidance" memo, which informed the field offices along the southwest border that:

> When necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public, DFOs [Directors of Field Operations] may elect to meter the flow of travelers at the land border to take into account the port's processing capacity. Depending on port configuration and operating conditions, the DFO may establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible. DFOs may not create a line specifically for asylum-seekers only, but could, for instance, create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents.

The guidance further stated:

> Ports should inform the waiting travelers that processing at the port is currently at capacity and CBP is permitting travelers to enter the port once there is sufficient space and resources to process them. At no point may an officer discourage a traveler from waiting to be processed, claiming fear of return, or seeking any other protection. Officers may not provide tickets or appointments or otherwise schedule any person for entry. Once a traveler is in the United States, he or she must be fully processed.

---

[20] *See, e.g., Oversight of U.S. Customs and Border Protection: Hearing Before S. Comm. on the Judiciary,* 115th Cong. (Dec. 11, 2018) (statement of Kevin K. McAleenan, Commissioner, U.S. Customs and Border Protection) ("[W]e call it queue management, we're balancing based on our capacity, based on our responsibility to manage lawful trade and travel to carry out our counter-narcotics mission, our other security missions our agriculture protection mission and still process people arriving without documents efficiently and in any given day, there are only three to four ports of entry out of the 26 on our southwest border that actually have any backup at all."); *The Ingraham Angle: Secretary Nielsen talks immigration, relationship with Trump* (Fox News television broadcast May 15, 2018) ("We are 'metering', which means that if we don't have the resources to let them [asylum seekers] in on a particular day, they are going to have to come back. They will have to wait their turn and we will process them as we can, but that's the way that the law works. Once they come into the United States, we process them.").

AOL-DEF-00615556



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

After OFO issued this guidance, Tecate Port management established the limit line position on or about July 9, 2018. Every officer, supervisor, and management official interviewed by the OIG regarding metering at Tecate confirmed that the practice was in place and ongoing at the time of our review.

Initially, there was confusion among some officers regarding their obligations while manning the limit line position. For example, three officers recalled instances of asylum seekers being returned to Mexico from primary after Tecate established the limit line position. The individuals had made it past the officers screening travelers at the limit line, were encountered at pedestrian primary, and from there were told that they would have to return to Mexico and go to another port to present their asylum claim. Several officers mentioned that this may have happened because officers did not understand the Port's procedures for the limit line position. In an apparent effort to address that, Tecate's current Port Director, who assumed the role in late August 2018, issued a muster on September 5, 2018 providing guidance to officers on manning the limit line.[21] According to the muster:

> The line is not specifically for asylum-seekers, it is based on legitimate operational needs, and it's designated for those with appropriate travel documents and those without such documents. Due to the facility and operating hour limitations, this necessitates that we re-direct asylum seekers to our processing hubs in Calexico West or San Ysidro PedWest. Under no circumstances will an asylum applicant be denied entry into the U.S. Please re-direct all applicants to the San Ysidro Pedestrian West (PedWest) facility or Calexico West for proper intake and processing.

The muster also explained to officers that, "on a case-by-case basis, discretion should be exercised when encountering a humanitarian situation." Finally, the muster clarified that the Port could not return and redirect any asylum seekers who happened to make it past the limit line: "Any applicant for asylum encountered on primary (e.g.; pedestrian/vehicle) should be taken into custody, escorted to the security office, and transported to the San Ysidro PedWest facility for proper intake and processing."

The witnesses generally confirmed that, consistent with the muster, officers at Tecate's limit line now redirect most asylum seekers to San Ysidro, although, based on humanitarian concerns, they may accept certain individuals on a case-by-case basis, such as unaccompanied children or asylum seekers who

---

[21] In February 2019, the Port Director issued a more detailed muster with similar guidance that remains in place to date.

10



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

may be injured or are in apparent immediate danger. Yet, given Tecate's remote location, the witnesses confirmed that relatively few asylum seekers have come to Tecate since the Port established the limit line.[22]

The OIG expresses no position on the legality of metering as that question is squarely pending before the courts.[23] However, the OIG identified three concerns regarding how Tecate is metering. First, CBP inaccurately publicly represents Tecate as "a designated port of entry for all travelers,"[24] even though the Port generally does not accept asylum seekers. While Tecate may have legitimate asylum processing limitations, if it truly cannot or will not accept most asylum seekers, it is misleading to represent itself as open to all travelers. Similarly, neither OFO's April 2018 Metering Guidance, nor leadership's public statements about metering, contemplate shutting down entire ports to asylum seekers. Rather, they indicate that individual ports may "meter the flow of travelers" for safety and security reasons, and that asylum seekers may have to "wait their turn" or "come back" another day. Indeed, OFO's Metering Guidance instructs ports to tell waiting travelers that "processing at the port is currently at capacity," but does not say that ports may decide they have no capacity to accept asylum applicants at all.[25]

Second, we note that officers manning the limit line at Tecate do not stand directly on the U.S.-Mexico boundary line, but instead are typically about 10 feet inside the line on the U.S. side.[26] When at the limit line position, officers generally stand just inside a security fence at Tecate, but according to Port management, a sidewalk on the outside of the fence is where U.S. territory begins. Tecate's limit line positioning near, but not directly on, the border is consistent with OFO's April 2018 Metering Guidance memo, which only requires officers to be "as close to the U.S.-Mexico border as operationally feasible," and there may be safety or other practical concerns justifying that positioning. However, the result is that when Tecate's limit line officers stop

---

[22] In fact, some officers reported encountering no asylum seekers while they were working at the limit line.

[23] See *Washington v. United States*, No. 18-cv-1979 (S.D. Cal. June 26, 2018) (transferred from Western District of Washington on Aug. 28, 2018); *Al Otro Lado, Inc. v. Nielsen*, No. 17-cv-2366 (S.D. Cal. July 12, 2017) (transferred from Central District of California on Nov. 22, 2017).

[24] See CBP, *Tecate Port of Entry Information*, https://www.cbp.gov/contact/ports/tecate-class-california-2505; CBP, *Port of Entry Class Definitions*, https://www.cbp.gov/travel/international-visitors/visa-waiver-program/port-classes.

[25] Tecate's Port Director did not unilaterally decide to close the Port to most asylum seekers. San Diego Field Office leadership was involved with, and may have directed, this approach.

[26] The OIG has also observed similar positioning of limit line officers at other ports of entry in California and Texas.

11



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

individuals who indicate an intent to apply for asylum, those individuals most likely have already crossed onto U.S. soil, and are thus technically physically present in the United States. As discussed in the previous section, this means that those individuals may have a right under Federal law and CBP policy to apply for asylum, and not be returned and redirected to other ports.

Finally, the OIG also has concerns regarding how Tecate may be specifically handling Mexican national asylum seekers. Redirecting Mexican asylum seekers requires them to remain in and travel through the very country in which they claim they are subject to persecution. This could be considered contrary to Federal law prohibiting the U.S. from returning individuals to a country in which they claim to have a credible fear of persecution or torture.[27] OFO's Metering Guidance and Tecate's metering muster contain no specific instructions on how to handle Mexicans.[28] As a result, Tecate does not appear to have a consistent approach to handling Mexican asylum applicants. Some Tecate officers indicated that they would accept and process any Mexican asylum applicants, yet other officers and managers stated that nationality is not taken into account when redirecting at the limit line, and so Mexican nationals are redirected like any other asylum seekers.

### C. The OIG substantiated that officers do not create records when redirecting asylum seekers to other ports

The OIG substantiated that officers at the Tecate Port of Entry generally do not track or record in any way when they redirect asylum seekers at the limit line, or when they return and redirect asylum seekers to Mexico from pedestrian primary.[29]

All officers, supervisors, and managers we questioned regarding record-keeping practices confirmed that no records are created when redirecting asylum seekers from the limit line, as CBP Commissioner Kevin K. McAleenan also indicated during congressional testimony last year.[30] Given the directly

---

[27] See 8 U.S.C. § 1231(b)(3)(A) & note; 8 C.F.R. §§ 208.16-.17; see also Innovation Law Lab v. Nielsen, 366 F.Supp.3d 1110, 1126 (N.D. Cal. April 8, 2019), stay granted by Innovation Law Lab v. McAleenan, 924 F.3d 503 (9th Cir. May 7, 2019).

[28] In contrast, when San Ysidro was metering in 2016, its muster instructed personnel that all Mexican credible fear cases should proceed to primary for processing.

[29] Tecate officials do create records once they accept asylum applicants. Specifically, they begin asylum processing in CBP's computer systems, and officials at San Ysidro finish the processing once Tecate officers transport the individuals there.

[30] In response to former Senator Jeff Flake's question, "OK, but do you have any information or [sic] the people who register I assume they sign some document as they are metered at a port of entry how many of them then turn up being apprehended between ports of entry?", McAleenan

AOL-DEF-00615559



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

applicable ongoing litigation related to metering, we express no opinion on whether CBP is required to keep records when it redirects asylum seekers from the limit line.

Similarly, the witnesses who acknowledged that CBP returned asylum seekers to Mexico from primary all confirmed that records generally were not created when that occurred.[31] As noted above, returning asylum applicants who are in the United States to Mexico and declining to process their applications at that location is contrary to 8 U.S.C. § 1158(a)(1), 8 U.S.C. § 1225, and CBP policy. As such, there likely may be additional violations of other legal obligations when engaging in that practice, including certain record keeping requirements.[32]

## CONCLUSION

The OIG found that, contrary to Federal law and CBP policy, CBP officials at Tecate returned some asylum applicants from inside the United States back to Mexico in order to redirect those individuals to other ports. The OIG also substantiated that in July 2018, Tecate began manning a limit line position near the U.S.-Mexico border in order to prevent asylum seekers or others without travel documents from entering the port and, instead, redirecting most asylum seekers to San Ysidro. Lastly, the OIG confirmed that Tecate personnel do not document when they redirect asylum applicants to other ports of entry from the limit line, or when they returned and redirected asylum applicants from pedestrian primary.

---

stated, "They actually don't assign [sic] a document, they're not recorded when they approach the line the initial time." *Oversight of U.S. Customs and Border Protection: Hearing Before S. Comm. on the Judiciary*, 115th Cong. (Dec. 11, 2018) (statement of Kevin K. McAleenan, Commissioner, U.S. Customs and Border Protection).

[31] The OIG identified occasional emails reflecting instances of Tecate returning and redirecting asylum seekers from primary, but this appears to be the exception, and not the rule. Tecate officials were not instructed to record these situations in email, and do not appear to have regularly done so.

[32] *See, e.g.*, 8 C.F.R. § 235.3(b)(4) (providing that an "examining immigration officer shall record sufficient information in the sworn statement to establish and record that the alien has indicated such intention, fear, or concern, and to establish the alien's inadmissibility").

AOL-DEF-00615560



**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

## Appendix A
## Objective, Scope, and Methodology

DHS OIG was established by the *Homeland Security Act of 2002* (Public Law 107-296) by amendment to the *Inspector General Act of 1978*.

We conducted this review in response to a referral from the U.S. Office of Special Counsel of three alleged violations of law at the Tecate, California, Port of Entry by U.S. Customs and Border Protection (CBP) personnel. We conducted this review between August 2018 and March 2019. We interviewed ten officers, five supervisory officers, and nine management officials, including three current or former Tecate Port Directors, and four current or former Tecate Assistant Port Directors. In addition to reviewing Federal law and regulations, relevant litigation filings, CBP guidance, and other records, we also collected, searched, and reviewed emails from twelve key officials.

We conducted this special review in accordance with the DHS OIG Special Reviews Group's quality control standards and the *Quality Standards for Federal Offices of Inspector General* issued by the Council of the Inspectors General on Integrity and Efficiency. These standards require that we carry out work with integrity, objectivity, and independence, and provide information that is factually accurate and reliable. This report reflects work performed by the DHS OIG Special Reviews Group pursuant to Section 2 of the *Inspector General Act of 1978*, as amended. Specifically, this report provides information about possible violations of law at the Tecate, California, Port of Entry for the purpose of keeping the Secretary of DHS and Congress fully and currently informed about problems and deficiencies relating to the administration of DHS programs and operations and the necessity for and progress of corrective action. This report is designed to promote the efficient and effective administration of, and to prevent and detect fraud, waste, and abuse in, the programs and operations of DHS.

AOL-DEF-00615561



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix B
## Report Distribution

**Department of Homeland Security**

Secretary
Deputy Secretary
Under Secretary for Management
Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Under Secretary, Office of Strategy, Policy, and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs

**U.S. Customs and Border Protection**

CBP Commissioner

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees

AOL-DEF-00615562

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Hotline
> 245 Murray Drive, SW
> Washington, DC 20528-0305