JOSEPH H. HUNT
Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV
SAIRAH G. SAEED (IL 6290644)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4067 | Fax: (202) 305-7000
sairah.g.saeed@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
**(San Diego)**

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' RESPONSE IN SUPPORT OF PLAINTIFFS' MOTION TO SEAL PORTIONS OF PLAINTIFFS' TEMPORARY RESTRAINING ORDER PAPERS** |
| CHAD F. WOLF,* Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | |

---

[*] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Federal Rule of Civil Procedure 25(d).

# DEFENDANTS' RESPONSE IN SUPPORT OF PLAINTIFFS' MOTION TO FILE UNDER SEAL

Defendants hereby respond in support of Plaintiffs' Motion to Seal Portions of their Temporary Restraining Order Papers (ECF No. 342) to provide additional reasons for sealing the confidential documents and testimony that were attached to Plaintiffs' Motion. As set forth in the previously filed Declarations of Randy Howe, Executive Director for Operations, Office of Field Operations (OFO) (ECF No. 340-3) and John Buckley, Director of the Security and Technology Division at the Office of Information Technology of CBP (ECF No. 340-4) there are compelling reasons to seal these exhibits and testimony, as well as any portions of the parties' briefs that rely on them. The sensitive law enforcement information Defendants are seeking to seal includes information about operations of land ports of entry that expose vulnerabilities of those ports. Public release of such information would compromise the ports' operations and expose ports to higher risk of criminal activity—such as drug and weapons trafficking—which in turn would threaten the public health and safety of the United States. These documents also contain sensitive and private information concerning witnesses and law enforcement personnel, disclosure of which would compromise those witnesses' and employees' privacy interests and could lead to threats, intimidation, or harassment. Finally, the disclosure of internal agency e-mail addresses and other personally identifiable information contained in the testimony and exhibits could subject Defendants to hacking and other cyber security threats.

## BACKGROUND

Plaintiffs filed a Motion for Temporary Restraining Order on December 6, 2019 (ECF No. 344). This Motion relied on documents that Defendants designated as "Confidential" or "Highly Confidential – Attorneys' Eyes Only" or that are otherwise protected under the Protective Order. Plaintiffs moved to seal those exhibits and the portions of their brief that relied on this information on December 6, 2019. *See* ECF No. 344. For the reasons described below, Defendants request that the
1    DEFS.' RESPONSE IN SUPPORT OF
     PLS.' MOT. TO SEAL
     Case No. 3:17-cv-02366-BAS-KSC

Court keep under seal the following exhibits to prevent public disclosure of information that can be used to circumvent law enforcement operations, threaten the integrity and security of ports of entry into the United States, and create cyber security risks:

(1) Portions of the transcript of a deposition of a CBP whistleblower conducted on November 21, 2019. *See* Mot. for TRO Ex. 1 (ECF No. 344-3).[1]

(2) Portions of a letter dated August 23, 2018, from the U.S. Department of Homeland Security's Office of Special Counsel to then-Secretary of Homeland Security Kirstjen Nielsen that contain the CBP whistleblower's identity and identifying information. *See* Mot. for TRO Ex. 2 (ECF No. 344-4).

(3) Portions of the unredacted September 26, 2019 Report of the Department of Homeland Security Office of the Inspector General that reveal the whistleblower's identity.[2]

(4) Portions of the statement of a CBP officer that contain information about the identities of witnesses who are law enforcement personnel. *See* Mot. for TRO Ex. 4 (ECF No. 344-6).

(5) Confidential "Field Queue Management Report" emails which include the

---

[1] As explained in Plaintiffs' Motion, the entirety of the deposition transcript was treated as confidential during the 30-day period following its receipt. Pls.' Mem at 2. Defendants have since reviewed the transcript, and have designated only certain portions of that transcript as Protected Material that Defendants seek to retain under seal. Defendants attach hereto as Exhibit 1 a table that sets forth the pages and lines of the specific excerpts of the transcript that Defendants are seeking to seal and the reasons supporting that request.

[2] The whistleblower's identity was inadvertently previously disclosed. Defendants intend to file a motion seeking to remove the unredacted version of this report from elsewhere on the public docket and replace it with a redacted version to protect the whistleblower's identity.

following:

    a. March 21, 2019 internal e-mail with the subject line "Field Office Queue Management Report March 21, 2019" (AOL-DEF-0008760 – AOL-DEF-00087161). *See* Mot. for TRO Ex. 5 (ECF No. 344-7).

    b. June 16, 2018 internal e-mail with the subject line "SWB Queue Management Update" (AOL-DEF-00170598). *See* Mot. for TRO Ex. 6 (ECF No. 344-8).

    c. May 2, 2019 internal e-mail with the subject line "Field Office Queue Management Report May 2, 2019" (AOL-DEF-00086900 – AOL-DEF-00086901). *See* Mot. for TRO Ex. 7 (ECF No. 344-9).

    d. February 5, 2019 internal e-mail with the subject line "Field Office Queue Management Report February 5, 2019" (AOL-DEF-00088202 – AOL-DEF-00088203). *See* Mot. for TRO Ex. 8 (ECF No. 344-10).

    e. January 10, 2019 internal e-mail with the subject line "Field Office Queue Management Report 1.10.2018" (AOL-DEF-00050964 – AOL-DEF-00050965). *See* Mot. for TRO Ex. 9 (ECF No. 344-11).

    f. December 26, 2018 internal e-mail with the subject line "Field Office Queue Management Report 12.26.2018" (AOL-DEF-00195859 – AOL-DEF-00195860). *See* Mot. for TRO Ex. 10 (ECF No. 344-11).

(6) The portions of the parties' briefs that discuss the information contained in these documents.

## ARGUMENT

There are compelling reasons to keep the information in the above-listed documents under seal. Specifically, the information, if disclosed, could be used to circumvent law enforcement operations along the southwest border, create cyber

security risks, or threaten or intimidate whistleblowers, other witnesses, or law enforcement personnel.

## *Legal Standards*

Although there is "a general right to inspect and copy public records and documents," *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), a party may still overcome the presumption of access. *Heldt v. Guardian Life Ins. Co. of America*, No. 16-cv-885, 2018 WL 5920029, at *1 (S.D. Cal. Nov. 13, 2018). The presumption of access is "based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). Thus, when the documents to be protected are "more than tangentially related to the merits," parties must show compelling reasons to keep those documents sealed and the "compelling reasons" standard applies. *Heldt*, 2018 WL 5920029 at *1 (quoting *Ctr. for Auto Safety*, 809 F.3d 1092, 1096–98); *see also McCurley v. Royal Seas Cruises, Inc.*, No. 17-cv-296, 2018 WL 3629945, at *2 (S.D. Cal. July 31, 2018). Compelling reasons include "when [] 'court files might [] become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). "In certain circumstances, courts have allowed the *government* to file under seal material that contains confidential and sensitive government information that might endanger or undermine law enforcement's activities . . . where the government identifies the particular harm that may result from the specific disclosure." *Music Grp. Macao Commercial Offshore Ltd. v. Foote*, No. 14-CV-03078-JSC, 2015 WL 3993147, at *3 (N.D. Cal. June 30, 2015) (internal citations omitted; emphasis in original); *see Hesterberg v. United States*, No. C-13-01265 JSC, 2013 WL

6057068, at *2 (N.D. Cal. Nov. 15, 2013) (finding compelling reasons to seal portions of documents that could "empower criminal suspects who come in contact with . . . officers because they will be able to predict the officer's actions."). As shown below, Defendants' request to file law-enforcement-sensitive materials under seal satisfies the "compelling reasons" standard.

Defendants have provided specific information regarding the harm that could occur if the information is disclosed. *See Am. Auto. Ass'n of N. California, Nevada & Utah v. Gen. Motors LLC*, No. 17-CV-03874-LHK, 2019 WL 1206748, at *1 (N.D. Cal. Mar. 14, 2019). The public interest in the information at issue is far outweighed by the interest in confidentiality. *See Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010).

*The Risk to Border Security Constitutes A Compelling Reason to Seal Specific Information About Port Capacity and Processing, Including the Information Contained in Field Office Queue Management Reports*

The Court should seal the above-listed email chains containing CBP's OFO Field Queue Management Reports, the Queue Management Reports themselves, the discussion of the Reports' contents contained in the whistleblower's deposition transcript, and other discussions concerning specific information about the capacities of and processing at ports of entry.

OFO's Field Queue Management Reports "compile data from the OFO Field Offices on the southwest border." Howe Decl. ¶ 6. The Reports "are provided on a daily basis to OFO and CBP leadership and provide raw data points on a number of factors that impact the operations of southwest border ports of entry." *Id.* The sensitive nature of this law enforcement information warrants filing these documents under seal. *Cf. Motley*, No. 15-cv-905, 2016 WL 1060144, at *2 (court should evaluate the specific facts of the law enforcement sensitive document to determine whether it should be sealed); *see BofI Fed. Bank*, No. 15CV2353 BAS (NLS), 2016 WL 4150983, at *2 (same). As explained in the Declaration of Randy Howe, the

Queue Management Reports "are generated strictly for internal CBP and DHS use, and are used for maintaining awareness of any resource or operational vulnerabilities at the various ports of entry (POEs) along the southwest border." Howe Decl. ¶ 6.

"The main operational vulnerabilities or resource constraints that these Queue Management reports highlight is the total number of individuals in custody at a particular port, as well as the percentage of total holding capacity that port has reached based on the number of individuals in custody." *Id.* ¶ 7. This information is important for CBP leadership to know because "high numbers of individuals in custody may be caused by any number of factors, such as changes in migrant flows that need to be monitored; potential difficulties in transferring individuals out of CBP custody, which may need to be addressed with CBP's interagency partners; or other operational or resource issues that may require action. *Id.* In addition, "this information may also reveal operational vulnerabilities or weaknesses that could be exploited if released publicly.

While the number of individuals in custody at a particular port of entry is not the only factor affecting a port's total capacity to process individuals, it impacts how a port of entry manages its resources." *Id.* ¶ 8. For example, "if a port has a high number of individuals in custody, or if individuals in custody have been held for an extended period of time, port management may need to reallocate staffing and other resources towards addressing these capacity issues." *Id.* ¶ 9. This involves "addressing the needs of individuals in custody, and attempting to move those individuals out of the POE." *Id.* Specifically:

> [I]f a port has a high number of individuals in custody, officers at the port must devote significant time and energy towards ensuring that these individuals have adequate food and water, and are housed in sanitary conditions. OFO policy requires that officers conduct welfare checks at regular intervals for individuals in custody. Officers must also provide individuals in custody with meals and snacks, as well as ensure that any children are adequately supervised. Additionally, if a port is operating at a high capacity, or if individuals have been in custody for a long period of time, officers must work to

transfer these individuals out of CBP custody, by working with U.S. Immigration and Customs Enforcement (ICE), the U.S. Department of Health and Human Services (HHS), and other partners, to secure transportation.

*Id.* ¶ 9. "[A]ddressing the needs of individuals in custody, and attempting to move those individuals out of the POE, takes officers away from other inspection and enforcement duties including detecting and seizing drug[s] and other contraband." *Id.* As a result, "the port [is] more vulnerable to outside threats such as drugs, weapons, contraband, and individuals attempting to enter the port without inspection, such as by running through vehicle lanes." *Id.*

As "most of the cocaine, heroin, foreign-produced marijuana, and foreign-produced methamphetamine available in the United States enters through the southwest border," the American people are also more vulnerable to drugs if the port is susceptible to this threat. *Id.* One drug in particular, "[f]entanyl . . . is difficult to detect, as it is easily concealed in small packages and other small compartments." *Id.* When "a port has fewer individuals in custody, the port will be able to allocate more resources towards other mission sets, such as seizing drugs, weapons, and other contraband." *Id.* ¶ 10.

For these reasons, "publicly releasing port-level capacity data, especially covering a period of several days or weeks, would provide outside entities with a picture of when certain entities are operating below, at, or above capacity[], and thus how resources may be allocated at those ports." *Id.* ¶ 11. Taken together, "[t]his data, combined with other publicly available data, such as seasonal migration trends and the number of individuals encountered or found inadmissible in certain areas, could be exploited by DTOs, TCOs, and other hostile actors." *Id.* In particular, "if a TCO or smuggling organization had knowledge that a particular port consistently operated at or above capacity for a period of several days or several weeks, the TCO or smuggling organization could utilize that information, along with other information in its possession or gleaned from other sources, to develop a picture of when the port's

resources may be strained, and reallocate its own resources to exploit this vulnerability." *Id.* Likewise, "if a TCO or smuggling organization had knowledge that a particular port consistently operated *below* capacity for a period of time, the TCO or smuggling organization cold reallocate its own resources towards *creating* capacity constraints at that particular POE." *Id.*

For example, "if a TCO gained knowledge that a particular port was operating at capacity during a certain month of the year, or during certain days in the month, the TCO could specifically wait until that period of time to send additional levels of drugs or other contraband to that port, or by instructing a group of individuals to enter without inspection, such as by running through the vehicle lanes." *Id.* ¶ 12. Specifically, "if a TCO had knowledge that a particular POE had been operating at 30% of its capacity for two weeks, it could further harm port operations by instructing a large group of individuals to attempt to enter without inspection." *Id.* Similarly, "if a smuggling organization had knowledge that a particular POE had been operating at 30% of its capacity for two weeks, it could [] instruct a large group to enter without inspection, creating a diversion of OFO resources towards that group, and away from other priority missions." *Id.*

Accordingly, public disclosure of the Field Office Queue Management Reports, or any other specific information about a port's capacity, would release details about the operations of ports of entry (as well as CBP operations between the ports of entry) that could compromise border security. This risk of harm caused by the release of these details is an even more significant interest than store security and employee safety, which was enough for the Court to seal documents in *Bell v. Home Depot USA, Inc.*, No. 212CV02499GEBCKD, 2015 WL 6082460, at *2 (E.D. Cal. Oct. 15, 2015). "Because all of the information in these documents consists of such detailed operational information, it is not possible to meaningfully segregate or re-

dact any information for purposes of filing other portions of the documents publicly." *Id.* ¶ 27.[3] In *Bell*, the court stated: "the Security SOPs sought to be sealed contain Home Depot's security protocols in opening and closing its stores, the disclosure of which could threaten its stores' security and its employees' safety." *Bell*, 2015 WL 6082460, at *2 (comparing *In re Google Inc. Gmail Litigation*, No. 13–MD–02430–LHK, 2013 WL 5366963, at *3 (N.D. Cal. Sept. 25, 2013)). Similarly, here, the information sought to be sealed involves information regarding the southwest border of the United States which "could irreparably harm" the mission of CBP along the southwest border of the United States and threaten public health and safety, by allowing increased drug and weapons trafficking. *See Bell*, 2015 WL 6082460, at *1.

The security considerations here are akin to those raised in regards to the sealing of an exhibit in *United States ex rel. Kelly v. Serco, Inc.* that "specifically reference[d] locations, technical specifications and operational capabilities of restricted Homeland Security microwave communications systems along the United States border, used to provide technological assistance to federal agents tasked with monitoring and securing the border."  No. 11CV2975 WQH-RBB, 2014 WL 12675246, at *2 (S.D. Cal. Dec. 22, 2014) (citation omitted).  The Court ultimately found that "national security interests are a compelling reason for filing documents under seal[]," and because "the[] exhibits [at issue] contained sensitive technical information, such as specific tower locations and frequencies . . . public dissemination of this information could be used by persons seeking to do harm to the United States." *Id.* at *4.  Additionally, the court determined "that [the] compelling reason outweighs the traditional right of access." *Id.* The fact that the contents of the Field

---

[3] Should this Court find that sealing of the Field Queue Management Reports in their entirety is not warranted, Defendants respectfully seek the Court's permission to provide supplemental briefing as to why at least some portions of the field queue management reports should be filed under seal.

Queue Management e-mails contain sensitive law enforcement information which could be used by bad actors warrants filing these document under seal. *Cf. Motley*, 2016 WL 1060144, at *2; *see BofI Fed. Bank*, 2016 WL 4150983, at *2.

For the same reasons discussed above, the Court should seal the portions of the parties' briefs that discuss this information to keep that information protected.

### *The Risk to U.S. Cyber Security and to Personal Privacy of CBP Employees Constitutes Compelling Reasons to Seal Email Addresses and Other Contact Information of CBP Employees*

The Court should also keep sealed the personal and work email addresses and other contact information of CBP employees in all of the above-listed documents. The Court has already permitted the redaction of CBP employees' phone numbers and cell phone numbers based on their privacy interests. ECF No. 332 at 7, 10. Further, as detailed in the Buckley Declaration, there are genuine security concerns regarding the disclosure of CBP employees' email addresses. Dissemination of "the email addresses of CBP employees . . . can create significant cyber security threats to both the individual employee and CBP as a whole." Buckley Decl. ¶ 3. For example, "once an employee's email address is publicized, malicious actors can engage in social engineering to obtain confidential information from that employee" through the "use of deception to manipulate individuals into divulging confidential or personal information that may be used for fraudulent purposes." *Id.* ¶ 4. One form of social engineering, called phishing, involves "sending emails purporting to be from reputable sources with the goal of influencing or gaining personal information such as passwords or financial information." *Id.* ¶ 4.a. Another form of social engineering, called sphear phishing, is "a type of highly targeted phishing attack that focuses on a specific individual or organization." *Id.* ¶ 4.b.

Further, "other cyber security threats can [also] occur once an employee's email address is released to the public." *Id.* ¶ 5. One example of a cyber security attack is a denial of service (DoS) attack. *Id.* ¶ 5.a. "[A] DoS is a security event that

happens when an attacker prevents legitimate users from accessing specific computer systems, devices, services or other IT resources[,] [t]he purpose of [which] is to flood servers, systems, or networks with traffic to overwhelm the victim's resources and make it difficult or impossible for legitimate users to access them." *Id.* Another example of a cyber security attack is doxing. *Id.* ¶ 5.b. "[D]oxing occurs when a malicious actor publishes private personal information, usually for purposes of public humiliation, stalking, identity theft, or targeting an individual for harassment." *Id.* Swatting is another example of a cyber security attack. *Id.* ¶ 5.c. "[S]watting is a harassment tactic in which a malicious actor deceives emergency services into sending policy or emergency response teams to another person's address." *Id.* Yet another example of a cyber security attack involves ransomeware. *Id.* ¶ 5.d. "[R]ansomeware is malicious software designed to block access to a computer system until a sum of money is paid." *Id.* Finally, spam emails are another example of a cyber security attack. *Id.* ¶ 5.e. "[S]pamming occurs when disruptive online messages are sent repeatedly[], and "spam emails [] hinder an agency's ability to communicate with its employees due to the volume of email traffic and strains on the agency's IT capacities." *Id.*

These security threats are not hypothetical. "Cyber attacks against the U.S. are on the rise." Buckley Decl. ¶ 6. A Government Accountability Office report determined "that between 2006 and 2015, cyberattacks involving systems supporting the federal government increased over 1,300% from 5,500 to over 77,000." *Id.*; *see* GAO-16-501, Information Security: Agencies Need to Improve Controls over Selected High-Impact Systems (May 2016). In fact, "[t]he Office of Personnel Management discovered it was the victim of a cyber attack in April 2015." Buckley Decl. ¶ 6. As a result of this attack, "[h]ackers stole personal information belonging to 21.5 million federal employees and their families, friends, and former employers." *Id.* And these hackers "were able to compromise the entire OPM network by exploit-

1  ing the credentials of one single contractor." *Id.* ¶ 7. It is clear, based on this infor-
2  mation, that "[p]ublication of CBP employees' email addresses therefore poses a
3  substantial risk to the safety and welfare of the individual employee and CBP." *Id.*
4  ¶ 8. It is for this reason that "any documents in this case that contain such infor-
5  mation should be filed under seal and kept confidential." *Id.* Should the Court find
6  that sealing of this information is not warranted, Defendants would ask, "[a]lterna-
7  tively, that the Court . . . permit Defendants to redact email addresses before the
8  underlying documents are publicly released." *Id.*

9  As with the above-described documents, the sensitive nature of this law en-
10 forcement information warrants filing this document under seal. *Cf. Motley*, 2016
11 WL 1060144, at *2; *see BofI Fed. Bank*, 2016 WL 4150983, at *2. The Buckley
12 declaration lays out in great detail the ways in which law enforcement personnel and
13 CBP would be left unprotected and vulnerable if CBP employee email addresses
14 were released to the public.

15 For the same reasons discussed above, the Court should seal the portions of
16 the parties' briefs that discuss this Confidential or Highly Confidential Information
17 to keep that Information protected.

18 ***Important Public Policy Considerations Constitute a Compelling Reason***
19 ***to Seal the Identifying Information of the Whistleblower and Witnesses to the Whistleblower Investigation***

20 The Court should also seal any identifying information regarding the whistle-
21 blower and witnesses to the investigation contained in Exhibits 1, 2, 3, and 4 to
22 Plaintiffs' Temporary Restraining Order Motion. *See* ECF No. 344-3 to 344-6. In
23 addition to the reasons provided above for sealing CBP employees' e-mail addresses,
24 and the privacy concerns outlined by the Court in its Order concerning the parties'
25 previous sealing motions (*see* ECF No. 332 at 7-8), case law supports sealing this
26 information. The Special Master in *Hewlett-Packard Co. S'holder Derivative Litig.*
27 recommended sealing similar whistleblower identifying information in a criminal
28 investigation because "the case law is clear that, while public access to court records

is important, some documents are not subject to the public right of access because they have traditionally been kept secret for important policy reasons." *In re Hewlett-Packard Co. S'holder Derivative Litig.,* No. 12-CV-6003, 2015 WL 8570883, at *6 (N.D. Cal. Nov. 18, 2015), *report and recommendation adopted*, No. 12-CV-6003-CRB, 2015 WL 8479543 (N.D. Cal. Dec. 10, 2015), *aff'd*, 716 F. App'x 603 (9th Cir. 2017) (internal citations omitted). The Special Master in *Hewlett-Packard* explained that important public policy considerations including interference with an investigation, "by making the whistleblower a target of intimidation or harassment" was a "compelling reason[]" constituting "court files [] becom[ing] a vehicle for improper purposes." *Id.* (internal citations omitted). Similar public policy reasons support sealing identifying information regarding witnesses to the whistleblower investigation.

### *There is a Compelling Public Interest In Keeping Law Enforcement Techniques and Procedures Confidential*

The Court should also seal portions of the transcript attached at Exhibit 1 to Plaintiffs' TRO Motion that reveal or tend to reveal law enforcement techniques and methods. *In re Dep't of Investigation of City of N.Y.*, 856 F.2d 481, 484 (2d Cir. 1988). Revelation of these methods could allow others to circumvent those techniques or exploit their knowledge hereof. As the Howe Declaration states (in reference to the Laredo Field Office Migration Contingency Plan) this kind of information "could be exploited by hostile groups", if available to them. Howe Decl. ¶ 18. "Hostile actors" that obtain such sensitive law enforcement information can "shift their resources" accordingly. *Id.* Thus, it is in the public interest to keep confidential records that "reveal techniques that, if known, could enable criminals to educate themselves about law enforcement methods." *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 777 (9th Cir. 2015) (discussing FOIA exemption for law-enforcement techniques and methods); *see also Bowen v. U.S. Food & Drug Admin.*, 925 F.2d 1225, 1229 (9th Cir. 1991) (same).

## CONCLUSION

For the compelling reasons discussed above and in Plaintiffs' Motion to Seal Portions' of their Temporary Restraining Order papers, the Court should seal the above-listed sensitive documents and portions of the parties' briefs that discuss them.

December 23, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

*/s/ Sairah G. Saeed*
SAIRAH G. SAEED
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4067 | Fax: (202) 305-7000
sairah.g.saeed@usdoj.gov

*Counsel for Defendants*

# CERTIFICATE OF SERVICE

No. 17-cv-02366-BAS-KSC

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: December 23, 2019           Respectfully submitted,

*/s/ Sairah G. Saeed*
SAIRAH G. SAEED
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4067 | Fax: (202) 305-7000
sairah.g.saeed@usdoj.gov

*Counsel for Defendants*