JOSEPH H. HUNT
Assistant Attorney General, Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-8259 | Fax: (202) 305-7000
katherine.j.shinners@usdoj.gov
ARI NAZAROV (CT 414491)
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorneys

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*,<br><br>            *Plaintiffs*,<br><br>        v.<br><br>Chad F. WOLF,* Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*,<br><br>            *Defendants* | Case No. 3:17-cv-02366-BAS-KSC<br><br>Hon. Cynthia A. Bashant<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PROVISIONAL CLASS CERTIFICATION (ECF No. 352)**<br><br>Hearing Date: January 13, 2020 |

---

\* Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Federal Rule of Civil Procedure 25(d).

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

GLOSSARY.................................................................................... vi

INTRODUCTION ..............................................................................1

STATEMENT ....................................................................................2

   I.   CBP Engages in Metering at Particular Ports of Entry When Necessary to Protect the Safety and Security of the Port and Travelers. ...................................................................................2

   II.  The Asylum Statute and the ACA Rule ........................................4

   III. Plaintiffs' Motions for Temporary Restraining Order and Provisional Class Certification ...................................................5

ARGUMENT ....................................................................................6

   I.   There is No Common Question Capable of Driving Resolution of the Litigation...........................................................................7

       A.  There is No Common Question Because the ACA Rule is Not Relevant to Plaintiffs' Claims and Because Each Putative Class Member's Factual Circumstances Vary in Material Ways. ...................................................................8

       B.  There is No Common Question Related to the Legality of Metering. ......................................................................12

   II.  The Named Plaintiffs Are Not Typical or Adequate Representatives of the Putative Proposed Class...........................17

       A.  The Named Plaintiffs Either Entered the United States Before November 19, 2019, or Are Not Currently Seeking to Enter the United States. ..................................................17

       B.  The Named Plaintiffs' Claims are Not Typical of those of the Putative ACA Class............................................................18

       C.  The Individual Plaintiffs are Not Adequate Representatives................21

   III. Plaintiffs' Proposed Class Does not Satisfy Rule 23(b)(2). .........................22

CONCLUSION ................................................................................25

# <u>TABLE OF AUTHORITIES</u>

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983)..................................................................... 20

*Civil Rights Educ. & Enf't Ctr. v. RLJ Lodging Tr.,*
    2016 WL 314400 (N.D. Cal. Jan. 25, 2016)..................................23

*Comcast Corp. v. Behrend,*
    133 S. Ct. 1426 (2013)............................................................ 7, 13

*Durmic v. J.P. Morgan Chase Bank, NA,*
    2010 WL 5141359 (D. Mass. Dec. 10, 2010) ..............................17

*E. Texas Motor Freight Sys. Inc. v. Rodriguez,*
    431 U.S. 395 (1977)............................................................. 17, 21

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011) .......................................................22

*Flores v. Sessions,*
    2017 WL 6060252 (C.D. Cal. June 27, 2017)...............................15

*Fotta v. Trustees of United Mine Workers of Am.,*
    319 F.3d 612 (3d Cir. 2003) ................................................. 12, 17

*Gaston v. Exelon Corp.,*
    247 F.R.D. 75 (E.D. Pa. 2007) ....................................................16

*Gen. Tel. Co. v. Falcon,*
    457 U.S. 147 (1982)............................................................... 7, 19

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) .............................................. 8, 21

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992) ................................................ 19, 21

*Harper v. Law Office of Harris & Zide LLP,*
    2016 WL 2344194 (N.D. Cal. May 4, 2016)...................................7

*Kiyemba v. Obama,*
    555 F.3d 1022 (D.C. Cir. 2009)..................................................10

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
    350 F.3d 1018 (9th Cir. 2003) ........................................................20

*Lucas v. Breg, Inc.*,
    212 F. Supp. 3d 950 (S.D. Cal. 2016) ............................................25

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................. 20, 21

*Marcus v. BMW of North America, LLC*,
    687 F.3d 583 (3d Cir. 2012) ...........................................................19

*Meyer v. Portfolio Recovery Associates, LLC*,
    707 F.3d 1036 (9th Cir. 2012) ....................................................... 23

*Molski v. Gleich*,
    318 F.3d 927 (9th Cir. 2003) ..........................................................22

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*,
    926 F.3d 528 (9th Cir. 2019) ..................................................... 20, 22

*Nguyen Da Yen v. Kissinger*,
    70 F.R.D. 656 (N.D. Cal. 1976) ...................................................... 8

*Orantes-Hernandez v. Smith*,
    541 F. Supp. 351 (C.D. Cal. 1982) ..................................................6

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ..........................................................16

*Preiser v. Newkirk*,
    422 U.S. 395 (1975) ........................................................................22

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ...................................................7

*Rhodes v. Cracker Barrel Old Country Store, Inc.*,
    213 F.R.D. 619 (N.D. Ga. 2003) ...................................................17

*Rutledge v. Elec. Hose & Rubber Co.*,
    511 F.2d 668 (9th Cir. 1975) ............................................................7

*Schulken v. Washington Mut. Bank*,
 2012 WL 28099 ......................................................................................22

*Stanford v. Home Depot U.S.A., Inc.*,
 2008 WL 7348181 (S.D. Cal. May 27, 2008) ...............................20

*Tolmasoff v. General Motors, LLC*,
 2016 WL 3548219 (E.D. Mich. June 30, 2016) ..........................23

*Torres v. Goddard*,
 314 F.R.D. 644 (D. Ariz. 2010) ...................................................21

*United Steel Workers v. ConocoPhillips Co.*,
 593 F.3d 802 (9th Cir. 2010) ..........................................................7

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011)........................................................... 7, passim

*Williams v. Agilent Technologies*,
 2004 WL 2780811 (N.D. Cal. Dec. 3, 2004) ..............................17

*Wolin v. Jaguar Land Rover N. Am., LLC*,
 617 F.3d 1168 (9th Cir. 2010) ..................................................... 19

*Xavier v. Philip Morris USA Inc.*,
 787 F. Supp. 2d 1075 (N.D. Cal. 2011)........................................24

## <u>STATUTES</u>

8 U.S.C. § 1158(a)(1)................................................................ 4, 5, 10

8 U.S.C. § 1158(a)(2)(A) ............................................................ 1, 4, 5

8 U.S.C. § 1225(b)(1)(A)(ii) ...............................................................3

## <u>FEDERAL RULES OF CIVIL PROCEDURE</u>

Fed. R. Civ. P. 23(a)............................................................................7

Fed. R. Civ. P. 23(a)(3)......................................................................19

Fed. R. Civ. P. 23(b)(2)......................................................... 7, passim

Federal Rule of Civil Procedure 25(d)................................................1

1

# **<u>REGULATIONS</u>**

83 Fed. Reg. 55934 ...................................................................................26

84 Fed. Reg. 63,994 ...............................................................................1, 5

84 Fed. Reg. 64,095 ..................................................................................5

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

# **GLOSSARY**

The following abbreviations are used in this brief:

1.    **Class Cert. Br.** refers to Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Provisional Class Certification (ECF No. 352-1).

2.    **Class Cert. Ex.** refers to the exhibits attached to the Declaration of Stephen M. Medlock in Support of Plaintiffs' Motion for Provisional Class Certification (ECF No. 352-2).

3.    **Class Cert. Opp. Ex.** refers to the exhibits attached to the Declaration of Katherine J. Shinners in Support of this Opposition (filed herewith).

4.    **MTD Order** refers to the Court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 278).

5.    **PI Br.** refers to Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction (ECF No. 294-1).

6.    **PI Opp. Ex.** refers to exhibits attached to the declaration of Alexander J. Halaska in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 307-1).

7.    **PI Order** refers to the Court's Order Granting Plaintiffs' Motion for Provisional Class Certification and Granting Plaintiffs' Motion for Preliminary Injunction (ECF No. 330).

8.    **SAC** refers to the Second Amended Complaint (ECF No. 189).

9.    **TRO Br.** refers to Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order Prohibiting Application of Asylum Cooperative Agreement Rule to Provisional Class Members (ECF No. 344-1).

10.    **TRO Ex.** refers to the exhibits attached to the Declaration of Melissa Crow in Support of Plaintiffs' Motion for Temporary Restraining Order (ECF No.

344-2).

11.     **TRO Opp.** refers to Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order (ECF No. 357).

12.     **TRO Opp. Ex.** refers to the exhibits attached to the Declaration of Alexander J. Halaska in Support of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order (ECF No. 357-1).

13.     **TRO Reply Ex.** refers to the exhibits attached to the Declaration of Stephen M. Medlock in Support of Plaintiffs' Reply in Support of Motion for Temporary Restraining Order (ECF No. 368-1).

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

# **INTRODUCTION**

This Court should deny Plaintiffs' request to certify a provisional class in aid of extraordinary injunctive relief barring the government from applying a critical rule. The Rule that Plaintiffs seek to enjoin implements clear congressional authorization to remove aliens to safe third countries that have entered into bilateral agreements with the United States to offer a full and fair procedure for considering the protection claims of aliens seeking asylum. *See* Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 Fed. Reg. 63,994 (Nov. 19, 2019) (ACA Rule); 8 U.S.C. § 1158(a)(2)(A). The ACA Rule, issued to combat the ongoing crisis at our southern border, is "intended to aid the United States in its negotiations with foreign nations on migration issues," particularly the development of "a regional framework with other countries to more equitably distribute the burden of processing the protection claims of the hundreds of thousands of irregular migrants" who come to the United States every year to seek asylum. 84 Fed. Reg. at 63,997. The Rule implements 8 U.S.C. § 1158(a)(2)(A) by creating a process by which department of Homeland Security (DHS) immigration officers may apply Asylum Cooperative Agreements (ACAs) "to aliens who arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after" November 19, 2019. *Id.* at 63,994.

Plaintiffs ask this Court to issue an injunction ordering that a provisional class of aliens cannot be subject to the process for removal to a third country under this Rule because they allegedly would have claimed asylum in the United States before the Rule's effective date, but for the "metering policy" under which U.S. Customs and Border Protection (CBP) manages the flow of individuals without travel documents into U.S. ports of entry. Rather than advancing their claims and focusing on whether the class alleged in their complaint can be certified, Plaintiffs continue to seek to certify so-called "subclasses" to enjoin application to large swaths of people of the very rules that the government is enacting to address the surge of migration

that metering is employed to manage.

The Court should deny Plaintiffs' request. Classwide injunctive relief is improper for reasons set forth in Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order, and it is also improper because Plaintiffs cannot meet the requirements to certify a class under Rule 23. First, Plaintiffs' claimed "common" questions in fact require highly individualized inquiries into each class member's circumstances and experience in approaching the border before November 19, 2019, as well as into the justification for a decision to employ metering at any given port of entry on any given day. Second, none of the individual named Plaintiffs are members of the class and they do not have standing to seek the injunctive relief sought through their motions. Accordingly, their claims are not typical of the class and they are not adequate class representatives. Finally, Plaintiffs' proposed provisional class cannot be maintained under Rule 23(b)(2) because the preliminary injunctive relief they seek does not align with the final injunctive relief they seek in their Complaint, and because individualized factfinding would be required to apply the requested relief to class members.

## **STATEMENT**

### I.    CBP Engages in Metering at Particular Ports of Entry When Necessary to Protect the Safety and Security of the Port and Travelers.

Plaintiffs' operative complaint challenges CBP's purported "unlawful, widespread pattern and practice of denying asylum seekers access to the asylum process" at ports of entry along the U.S.-Mexico border "through a variety of illegal tactics." SAC ¶ 2. One of those alleged "tactics"—the only one at issue here—is CBP's metering guidance. *See* Class Cert. Br. 6. "Metering," or queue management, is the process by which CBP manages the flow of pedestrian traffic into land border POEs. Class Cert. Opp. Ex. 1 ¶ 2. In general, when a port conducts metering, a CBP officer stands as close to the U.S.-Mexico border as operationally feasible and briefly scans pedestrians' travel documents. *See* Class Cert. Opp. Ex. 1 ¶ 3; Class Cert. Opp. Ex.

2. Pedestrians who present documents that appear to be facially legitimate are permitted to cross the border, enter the port building, and proceed to primary inspection. *See* Class Cert. Opp. Ex. 1 ¶ 2; Class Cert. Opp. Ex. 2. Aliens without such documents may be instructed to wait until the port has sufficient operational resources, taking into account the port's other mission responsibilities, to safely process and detain them. *See* Class Cert. Opp. Ex. 1 ¶ 2.

Under CBP's metering guidance, metering actions may be taken "[w]hen necessary or appropriate to facilitate orderly processing and [to] maintain the security of the port and safe and sanitary conditions for the traveling public." Class Cert. Opp. Ex. 2. The guidance thus allows Directors of Field Operations ("DFO") to elect to use metering as necessary. *Id.* The decision to implement metering is dependent on a variety of ever-changing factors, including the ports' holding capacities, the ports' throughputs, the characteristics and demographics of individuals already in custody, and the resources available for processing and inspection in light of CBP's other mission responsibilities. Class Cert. Opp. Ex. 3 ¶¶ 6–11; PI Opp. Ex. ¶¶ 3–10. CBP's metering guidance does not permit a CBP officer to return an alien who has arrived on U.S. soil to Mexico without being processed. *See* 8 U.S.C. § 1225(b)(1)(A)(ii); Class Cert. Opp. Ex. 2; TRO Reply Ex. 1 at 239:3-21, 263:13-18.

According to Plaintiffs' evidence, in Mexican border towns, where groups of waiting aliens began to queue, "Mexican authorities and civil society groups responded" to these physical lines of people by "creating informal waitlists." Class Cert. Opp. Ex. 4 at 1; Class Cert. Ex. 11 ¶ 52. The waitlists are maintained by Mexico's national immigration agency (INAMI or Grupo Beta), Mexico's State Population Council (COESPO), Mexico's Civil Protection agency, Mexican municipal government entities, immigration shelters in Mexico, or the individuals on the lists themselves. Class Cert. Opp. Ex. 4 at 5–14. According to Plaintiffs' submitted evidence, many aliens add their names to the waitlists without ever approaching a port

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

of entry or interacting with a CBP officer; they go directly to the list holder as soon as they reach the border town. *E.g.*, TRO Ex. 13 ¶ 9 ("a Mexican police officer stopped us" and "told us that we had to go the COESPO office . . . to get a number"); TRO Ex. 14 ¶ 7 ("we were instead stopped by Mexican officials" who "pointed to the office where you can register to get on the asylum waiting list"); TRO Ex. 15 ¶ 11 ("I went directly from the bus station to the office where you register to get a number on the asylum waitlist."). According to research by Plaintiffs' expert, one immigration shelter even allows individuals to add themselves to its list long before they reach the border by messaging the shelter their name and photo via encrypted messaging. Class Cert. Opp. Ex. 4 at 11. CBP plays no role in creating, managing, or maintaining the waitlists. *Id.* at 1; TRO Ex. 21 ¶ 9. The ports may simply notify the list holders of their capacities to process additional travelers, and the list holders send travelers to the ports. Class Cert. Opp. Ex. 4 at 5–14; TRO Ex. 21 ¶¶ 8, 9.

## II.    The Asylum Statute and the ACA Rule

Once an alien is inside the United States, he or she may generally apply for asylum: "Any alien who is physically present in the United States or who arrives in the United States . . . may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1). But Congress granted the Attorney General and the Secretary of Homeland Security the authority to remove an alien,

> pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection.

8 U.S.C. § 1158(a)(2)(A). When the government "determines" that the listed conditions are satisfied, and does not "find[] that it is in the public interest for the alien to

receive asylum in the United States," the alien is categorically barred from applying for asylum in this country. *Id.* Under those circumstances, Section 1158(a)(1)—the provision permitting an alien who "is physically present in the United States or who arrives in the United States" to apply for asylum—"shall not apply." *Id.*

The Attorney General and the Acting Secretary of Homeland Security issued the ACA Rule on November 19, 2019, to "provide a general mechanism" to implement existing and future ACAs as described in 8 U.S.C. § 1158(a)(2)(A).[1] 84 Fed. Reg. at 63,996. The Rule "is intended to aid the United States in its negotiations with foreign nations on migration issues," particularly as the United States "seeks to develop a regional framework with other countries to more equitably distribute the burden of processing the protection claims of the hundreds of thousands of irregular migrants" who come to the United States every year to seek asylum. *Id.* at 63,997. The Rule permits immigration officers to apply agreements entered into pursuant to section 1158(a)(2)(A), including bilateral ACAs recently entered into with El Salvador, Guatemala, and Honduras,[2] to "aliens who arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after" November 19, 2019. *Id.* at 63,994.

## III.   Plaintiffs' Motions for Temporary Restraining Order and Provisional Class Certification

Plaintiffs filed their TRO Motion on December 6 and 9, 2019, and their Provisional Class Certification Motion on December 11, 2019, seeking to enjoin the government from applying the ACA Rule to "[a]ll asylum seekers who were unable

---

[1] The 2002 U.S-Canada Agreement is not covered by the ACA Rule and has a separate implementing regulation.

[2] To date, the only agreement that is subject to the ACA rule and has entered into force is the United States' agreement with Guatemala. *See* Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims, 84 Fed. Reg. 64,095 (Nov. 20, 2019) (Guatemala ACA).

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

to make a direct claim at a U.S. POE before November 19, 2019 because of the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process." Class Cert. Br. 6.[3] Plaintiffs state that this class includes any individuals "who put their names on waitlists in Mexican border towns *regardless of whether they first physically approached the border.*" *Id.* (emphasis added). Plaintiffs claim that they need relief because application of the ACA Rule to the Putative ACA Class "effectively forecloses Plaintiffs' ability to challenge the metering policy." Class Cert Br. 6. Plaintiffs do not challenge the ACA Rule itself, TRO Br. 4, or the government's decision to enter into ACAs with Guatemala, Honduras, or El Salvador, TRO Br 14 n.21. Instead, they argue that the ACA Rule does not, by its terms, apply to the Putative ACA Class. Class Cert Br. 5; TRO Br. 3. Plaintiffs assert that, because the Putative ACA Class members were subject to metering before the ACA Rule's effective date—November 19, 2019—they "arrive[d] in" the United States or "arrive[d] at a U.S. port of entry" before that time. TRO Br. 3; Class Cert Br. 5. Plaintiffs argue that this means they should not be subject to the ACA Rule, regardless of when they ultimately entered the United States. *Id.*

## ARGUMENT

The Court should deny Plaintiffs' request to certify the Putative ACA Class because the proposed class does not meet the requirements of Federal Rules of Civil Procedure 23(a) or 23(b)(2). To certify any class, including a "provisional class," Plaintiffs must first establish the four required elements set forth in Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the [named plaintiffs] are typical of the claims or defenses of the class; and (4) the [named plaintiffs] will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 370 (C.D. Cal.

---

[3] To distinguish this putative class from other proposed or certified classes, Defendants refer to this putative class as the "Putative ACA Class."

DEFS.' OPP'N TO PLS.' MOT. FOR PROVISIONAL CLASS CERTIFICATION Case No. 3:17-cv-02366-BAS-KSC

1982) (for a provisional class to be certified, "plaintiffs must demonstrate that the four requirements of Federal Rule of Civil Procedure 23(a) have been satisfied."). "[A]ctual, not presumed, conformance with Rule 23(a) [is] indispensable." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982). If all of the prerequisites of Rule 23(a) are satisfied, a court must also find that the plaintiff "satisf[ies] through evidentiary proof" one of the three subsections of Rule 23(b). *Harper v. Law Office of Harris & Zide LLP*, 2016 WL 2344194, at *3 (N.D. Cal. May 4, 2016) (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179-80 (D.D.C. 2015) (provisional classes must meet the requirements of Rule 23). Plaintiffs who propose certification under Rule 23(b)(2)—as Plaintiffs do—must show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The party seeking class certification bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met." *United Steel Workers v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010). Failure to meet "any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

Here, Plaintiffs have not met their burden to demonstrate that there are common questions capable of resolving their class claims, that the named Plaintiffs are typical or adequate representatives, nor that their requested injunctive relief is appropriate under Rule 23(b)(2).

## I.    There is No Common Question Capable of Driving Resolution of the Litigation.

To satisfy Rule 23(a)(2)'s commonality prerequisite, the proposed class members must "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Plaintiffs cannot satisfy their burden by merely alleging that all of the proposed class members have "suffered a violation of the same provision of law"

or by raising some "common questions." *Id.* The commonality "language is easy to misread, since any competently crafted class complaint literally raises common 'questions.'" *Id.* Rather, the proposed class members' claims must depend upon a common contention, the determination of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Thus, "what matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* Although "[t]he existence of shared legal issues with divergent factual predicates is sufficient [to establish commonality]," *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), commonality cannot be established where there is wide factual variation requiring individual adjudications of each class member's claims. *See Nguyen Da Yen v. Kissinger*, 70 F.R.D. 656, 663–64 (N.D. Cal. 1976). Further, for certification under Rule 23(b)(2), Plaintiffs must show that "relief is available to the class as a whole" and that the challenged conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360. Plaintiffs have not met their burden to demonstrate that the individual, temporal, and geographical factual variations in this case are immaterial to class members' entitlement to relief. *See id.* Accordingly, they cannot satisfy the commonality prerequisite, which is fatal to their bid for class certification.

### A. There is No Common Question Because the ACA Rule is Not Relevant to Plaintiffs' Claims and Because Each Putative Class Member's Factual Circumstances Vary in Material Ways.

Plaintiffs posit that there are "at least two common questions" presented by this case. The first, they say, is "Did the provisional class members 'arrive in' the United States for purposes of asylum?" Class Cert Br. 9. The second question—which, under Plaintiffs' argument, is dependent on the answer to the first—is "Did the Defendants improperly construe the ACA Rule to apply to class members that

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

arrived in the United States prior to November 19, 2019?" *Id.* Neither of these questions is capable of generating common answers that can "drive the resolution of the litigation" and are "central to the validity of each one of the claims." *See Wal-Mart Stores*, 564 U.S. at 350. First, the scope and applicability of the ACA Rule is not relevant to the underlying claims in this case and thus cannot drive the resolution of this litigation. Second, there are highly material factual variations in the circumstances of the members of the Putative ACA Class that render it impossible for this litigation to render common answers to either question.

Plaintiffs claim in this motion and their TRO motion that the ACA Rule does not apply to the Putative ACA Class because they "arrive[d] in the United States," or "arrive[d] at a U.S. port of entry" before the Rule's effective date. TRO Br. 3; Class Cert. Br. 5. Both of Plaintiffs' so-called "common questions" thus address their theory of the ACA Rule's applicability and scope. Class Cert Br. 9. Yet the operative complaint in this case does not challenge the ACA Rule, seek to enjoin it, or claim that the Defendants are improperly applying it to certain groups of people. *See generally* SAC. Instead, the complaint primarily seeks to enjoin so-called "Turnback" practices and an alleged "Turnback Policy" that includes metering or queue management conducted in accordance with CBP's metering guidance. *See* SAC ¶¶ 3-4, 304(d)-(f). The question whether the ACA rule should apply to the Putative ACA Class is not instructive as to whether Defendants have engaged in a "Turnback Policy," whether metering or queue management is unlawful, or whether an injunction of such practices is warranted. *See, e.g.*, SAC ¶ 304 (Prayer for Relief). So the "common" questions that Plaintiffs propose cannot drive resolution of their lawsuit and cannot form the basis for certification of a subclass. The common questions that satisfy Rule 23(a)(2) must be capable of "resolv[ing] an issue that is *central to the validity of each one of the claims* in one stroke." *Wal-Mart Stores*, 564 U.S. at 350. Whether class members are properly subject to the ACA Rule under that Rule's terms has no bearing on whether the alleged practices violate the Immigration and

Nationality Act, the Administrative Procedure Act, the Due Process Clause, or the principle of non-refoulement (assuming those claims are actionable).  *See* SAC ¶¶ 244-303 (listing claims for relief).[4]

Even if these two questions were central to the claims in the underlying suit, they are not capable of common resolution. Whether and when someone "arrives in" the United States is dependent on his individual factual circumstances. Plaintiffs define their proposed class broadly to include any "asylum seeker who [was] unable to make a direct asylum claim at a U.S. POE before November 19, 2019 because of the U.S. Government's metering policy, and who continue[s] to seek access to the U.S. asylum process." Class Cert Br. 6. This includes even those who did not "physically approach[] the border" but put their names on waitlists. *Id.* The question whether such individuals arrived in the United States before November 19, 2019, cannot be answered on a common basis.

Defendants continue to maintain that "arrives in the United States" denotes physical presence in the United States, and that the asylum and expedited removal statutes do not cover those who are outside the country's borders. *See* 8 U.S.C. § 1158(a)(1); *Kiyemba v. Obama*, 555 F.3d 1022, 1030–31 (D.C. Cir. 2009) (noting that "refugees apply from abroad; asylum applicants apply when already here"), *vacated on other grounds*, 559 U.S. 131 (2010); TRO Opp. 14-17. Accordingly, only

---

[4] Plaintiffs may argue that the answer to the question whether a putative class member "arrives in the United States" for purposes of the asylum statute, 8 U.S.C. § 1158(a)(1), is relevant to their underlying metering challenge as well as to the question of ACA applicability. As discussed just below, this is still not a common question based on the factual variations in putative class members' situations. Further, it is also not central to the validity of Plaintiffs' underlying challenge to metering. That is because, under Plaintiffs' reasoning, even if an alien is deemed to have arrived in the United States such that there is a duty to inspect and process them, "there may exist potentially legitimate factors that prevent CBP officers from immediately discharging" any duties to process those individuals. MTD Order 60; *see also infra* Section I.B.

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

if the putative class member actually set foot on U.S. soil before November 19, 2019, would he have arrived in the United States before that date. This Court has disagreed with Defendants' position, previously holding that those who are "in the process of arriving" through a port of entry have arrived in the United States for purposes of the asylum statute. MTD Order 38, 44. But even under this reasoning, the answer to the question whether each class member arrived in the United States will depend on what each class member did and where each class member stood. The evidence proffered by Plaintiffs demonstrates just some of the wide factual variation among the individuals in Plaintiffs' putative class in this respect:

- Named Plaintiff Roberto Doe—whom Plaintiffs offer as a class representative, *see* Class Cert. Br. 11, but whom Defendants do not concede has standing to represent the Putative ACA Class, *see infra* Section II—claims that he "attempted to present [him]self at the Reynosa-Hidalgo Port of Entry" on October 2, 2018, and approached U.S. Officials standing at the "exact middle point of the bridge that divides the United States from Mexico." Class Cert. Opp. Ex. 5 ¶ 4; *see also* MTD Order 35.

- Other putative class members were allegedly stopped by Mexican officials when they were seeking to cross bridges into the United States. *See* TRO Ex. 13 ¶ 9 ("a Mexican police officer stopped us" and "told us that we had to go the COESPO office . . . to get a number").

- Other putative class members did not seek to enter through a port of entry, but allegedly sought to cross the border illegally before being stopped by Mexican officials. TRO Ex. 14 ¶ 7 ("I did not know that it was possible to ask for asylum at a port of entry. . . . [w]e tried to cross the border in downtown Ciudad Juarez . . . . However, we were instead stopped by Mexican officials" who "pointed to the office where you can register to get on the asylum waiting list").

11

- Other putative class members allegedly reached a border town but never approached a port of entry or the border. *See* TRO Ex. 15 ¶ 11 ("I went directly from the bus station to the office where you register to get a number on the asylum waitlist.").

- Other putative class members may not have even come close to the United States, but instead allegedly put their names on waitlists from afar via text message. *See* Class Cert. Opp. Ex. 4 at 11.

Examining these factual variations is essential to answering the questions Plaintiffs pose, and the answer to those questions will vary depending on the class members' circumstances. This is precisely the type of individualized inquiry that precludes classwide claims and a finding of commonality. *See Fotta v. Trustees of United Mine Workers of Am.*, 319 F.3d 612, 619 (3d Cir. 2003) (finding no commonality where the district court would have to determine whether the defendant wrongfully withheld or wrongfully delayed payment for each class member).

**B. There is No Common Question Related to the Legality of Metering.**

Plaintiffs argue in the alternative that the legality of metering constitutes a common question sufficient to support class certification.  Class Cert Br. 9-10. As Defendants have previously explained, this is incorrect. Here, there is no common question because the Court would have to examine each instance of metering/queue management at each port of entry to determine whether such action is justified by "potentially legitimate factors." MTD Op. 60. Plaintiffs themselves argue that the Court will need to look at these justifications to determine whether metering is lawful. TRO Br. 17; *see also* Class Cert Br. 10 (asserting that "common questions" include whether there is a "valid justification for the metering policy" and whether the "proffered justification for the metering policy is pretextual"[5]).

---

[5] The remaining "common questions" Plaintiffs list are simply whether the metering policy violates the law. Class Cert Br. 10. Yet, under Plaintiffs' own theory, the

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

Although Defendants maintain that Plaintiffs' claims cannot succeed because metering is categorically lawful, under Plaintiffs' theory, the inquiry into whether metering is lawful turns on whether there is a "valid justification" for implementing metering procedures. Class Cert. Br. 10. This question, however, is not answerable by reference to broad generalizations about the utilization of holding capacity of different ports of entry at different times, nor to the deposition testimony of a single CBP Officer who worked at a single port of entry during the relevant time period. *See* Class Cert Br. 2, 4. Instead, the Court must examine each implementation of metering at each port of entry on every day—or even every hour—to determine whether its implementation has a "valid justification" based on the many dynamic factors at each particular port that influence its ability to process additional aliens without documents sufficient for lawful entry to the United States. Thus, there is no common question capable of generating answers that are common to the class and will "drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350.

As Defendants have previously argued, metering is within the Executive Branch's clear authority, and even Plaintiffs concede that metering may be appropriate under certain circumstances. *E.g.*, Defs.' Mot. to Dismiss Sec. Am. Compl. 6, 11-14 (ECF No. 192); MTD Order 60. Further, although Defendants respectfully disagree with the Court's ruling on the extraterritorial reach of the asylum statute and related procedures, *see* MTD Order 37–44, there remain factual disputes and factual variations as to whether certain named Plaintiffs fall within the Court's defined scope of the statute's application. Regardless of when the duties to inspect and

---

question of valid justification is an antecedent question to each. *See* TRO Br. 17; PI Br. 19. In any event, Plaintiffs do not identify the legal standards they believe govern their claims or explain how any underlying legal questions are capable of classwide resolution. This precludes a finding of commonality, because "the class determination . . . involves considerations that are enmeshed in the factual and legal issues comprising the . . . cause of action." *Comcast Corp. v Behrend*, 569 U.S. 27, 33 (2013).

process aliens under the asylum and expedited removal statutes arise, however, both the Court and Plaintiffs have acknowledged that "there may exist potentially legitimate factors that prevent CBP officers from immediately discharging" those duties. *Id.* at 60. Thus, for each of Plaintiffs' "common questions" on metering, the Court would at least have to examine the specific circumstances surrounding the metering of each putative class member to determine whether metering was justified at that time. Further, as explained in the metering guidance, the Field Office's decision as to whether to meter "take[s] into account the port's processing capacity." Class Cert. Opp. Ex. 2. And processing capacity differs by port and is influenced by a variety of fluid factors, which includes the port's physical holding capacity, but also other factors such as CBP staffing and resources, enforcement actions at the port, and the constant balancing of CBP's missions. *See* Class Cert. Opp. Ex. 3 ¶¶ 6, 10-11; PI Opp. Ex. 3 ¶ 9. Thus, the decisions made—potentially on a daily basis—by Directors of Field Operations across the border would need to each be separately addressed to determine whether metering was lawful under this Court's order on Defendants' motion to dismiss. So there is no common answer to the central question raised by Plaintiffs' Motions: was metering justified at any time before November 19, 2019, at any Port of Entry along the U.S.-Mexico border?

For example, as explained in the accompanying Declaration of Mariza Marin, the capacity of the San Ysidro and Otay Mesa ports of entry must be analyzed daily to evaluate the reasons for metering and the ports' processing capacity. These ports' capacities to "process aliens without documents sufficient for lawful entry to the United States is dependent, *inter alia*, upon there being space in the short-term hold rooms at each of those respective ports to hold such aliens pending their transfer to U.S. Immigration and Customs Enforcement (ICE), the U.S. Department of Health and Human Services (HHS), or another federal agency." Class Cert. Opp. Ex. 3 ¶ 6. "Additionally, the capacity of CBP's short-term hold rooms is impacted by the characteristics and demographics of individuals being detained." *Id.* ¶ 10. For example,

the detention of family units may take up significantly more holding space than would be required for adult single males or females, *id.*, and indeed there has been litigation and review of conditions at other holding facilities that reinforces the pressure to maintain capacity limits. *See Flores v. Sessions*, 2017 WL 6060252, at *6 (C.D. Cal. June 27, 2017). The analysis of whether a port was justified in metering would also need to take into account the port's resource allocations, which "are complex and ever-changing." Class Cert. Opp. Ex. 3 ¶ 11. "[M]anagers at the San Ysidro and Otay Mesa POEs must account for the magnitude and diversity of operations at each of these POEs, and strategically allocate, and at times, re-allocate finite resources to ensure that mission needs, initiatives, and priorities are met." *Id.* The detailed analysis of the San Ysidro POE's holding and processing capacity for the period of July 1 to 2, 2019, demonstrates the searching, specific inquiry required to fully examine CBP's justifications for metering. *Id.* ¶ 12. The same searching inquiry would be required for other POEs, although each POE has unique operating constraints. For example, as described in the declaration of Deputy Assistant Director Harris of the Laredo Field Office, the capacity of the Laredo and Hidalgo POEs are also affected by various fluid factors, including whether there is "a spike in arrests at a particular POE" that requires the need to use short-term hold rooms for individuals subject to criminal prosecution. PI Opp. Ex. 3 ¶ 9 (ECF No. 307-4).

Plaintiffs' own expert allows that "[p]ort capacity is a fluid number" and that various factors play into whether a port has capacity to process individuals without travel documents. Class Cert Ex. 11 ¶ 61. Plaintiffs nonetheless claim there is a "common method" for analyzing capacity across the various ports along the U.S.-Mexico border. *Id.* ¶ 62; Class Cert Br. 3, 10. Yet their analysis—despite showing a "wide variation in utilized capacity levels among the ports of entry"—glosses over these same variations and focuses only on physical holding capacity. Class Cert Ex. 11 ¶¶ 64, 23(h). All Plaintiffs offer is an analysis that some ports of entry were below their holding capacity at some times. *Id.* ¶ 23(h). This analysis fails to account for

the fluid factors that, even Plaintiffs acknowledge, affect operational capacity, and simply ignores factors other than holding capacity that may affect a port's ability to process individuals without travel documents. Accordingly, this analysis cannot support a finding of commonality. *See Gaston v. Exelon Corp.*, 247 F.R.D. 75, 82, 83 (E.D. Pa. 2007) (commonality not met where statistical evidence of impact did not address all circumstances applicable to all class members). Further, the "testimony" that Plaintiffs claim "confirms that the ostensible rationale for the metering policy is false," Class Cert Br. 2, relates to only one line officer's experience at one port of entry. Class Cert. Ex. 1 at 99-101.[6] Thus, even if credited (and Defendants do not agree that it should be credited), this testimony does not, and cannot, demonstrate what circumstances existed at other ports. this testimony does not, and cannot, demonstrate what circumstances existed at other ports. Plaintiffs use generalities in an attempt to obscure the importance of such circumstance-specific and port-specific inquiries. *See* Class Cert. Br. 2, 3-4, 15. But these inquiries are crucial to evaluating the validity of any capacity justification and the reasonableness of the "delay" in processing individuals who claim fear or express a desire to seek asylum, and thus in assessing the legality of CBP's metering practices as to the putative class.

It is clear that, unlike in the civil-rights cases Plaintiffs cite, Class Cert. Br. 8-9, the existence of a general policy of metering cannot alone support a finding of commonality. This is because the Court cannot determine that metering practices under the April 2018 metering guidance are implemented for categorically unlawful reasons. Under Plaintiffs' own theory, the legality of the practices depends on the validity of the justifications for invoking it. *See supra* at 12. This is thus not a case where "either [the policy and practice] is unlawful as to every [class member] or it is not." *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014). Here, the lawfulness of

---

[6] The whistleblower is a CBP Officer who has been stationed at the Tecate Port of Entry during the relevant time period. Class Cert. Ex. 1 at 53:22-54:11.

metering and of any resulting "delay" in processing may differ for individual puta-tive class members or for groups of putative class members, depending on the port and the timing. *See, e.g.*, *Williams v. Agilent Technologies*, 2004 WL 2780811, at *5 (N.D. Cal. Dec. 3, 2004) (no commonality because decisions on termination and discipline of employees were made at many different locations by many different managers); *Rhodes v. Cracker Barrel Old Country Store, Inc.,* 213 F.R.D. 619, 676 (N.D. Ga. 2003) (decision-making process scattered over 450 stores in 41 states pre-cluded commonality in employment decisions); *Fotta*, 319 F.3d at 619 (no common-ality where court would have to determine whether defendant wrongfully withheld or wrongfully delayed payment for each class member). Because the determination of the lawfulness of Defendants' metering conduct—under Plaintiffs' theory—de-pends on a variety of different factual analyses, Plaintiffs have not demonstrated commonality.

## II.    The Named Plaintiffs Are Not Typical or Adequate Representatives of the Putative Proposed Class.

Further, no named Plaintiff is a member of the Putative ACA Class, and thus Plaintiffs have also failed to meet their burden to demonstrate typicality or adequacy of representation under Rules 23(a)(3) and (4). "It is axiomatic that a plaintiff cannot represent a class of which he or she does not qualify as a member." *Durmic v. J.P. Morgan Chase Bank, NA*, 2010 WL 5141359, at *4 (D. Mass. Dec. 10, 2010) (citing *E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403–04 (1977)). And even if Roberto Doe—the only named Plaintiff that Plaintiffs even point to as a po-tential representative—were a class member, he lacks standing to seek an injunction of the ACA Rule because he has not shown imminent injury as a result of the Rule.

### A. The Named Plaintiffs Either Entered the United States Before Novem-ber 19, 2019, or Are Not Currently Seeking to Enter the United States.

Most named individual Plaintiffs entered, or in some cases re-entered, the United States for processing well before November 19, 2019. Abigail Doe entered on July 15, 2017; Carolina Doe entered on July 15, 2017; Dinora Doe entered on

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

July 18, 2017; Ingrid Doe entered on July 15, 2017; Maria Doe entered on October 18, 2018; Ursula and Juan Doe entered on October 19, 2018; Victoria Doe entered on October 18, 2018; Bianca Doe entered on October 18, 2018; Emiliana Doe entered on October 18, 2018; and Cesar Doe entered on October 18, 2018. *See* Class Cert. Opp. Exs. 7-17. These Plaintiffs thus all made "direct asylum claims" before November 19, 2019, and are not members of the Putative ACA Class. *See* Class Cert. Br. 6.

The only remaining individual Plaintiffs are Beatrice Doe and Roberto Doe. Plaintiffs have not provided any evidence on the current whereabouts of Beatrice Doe. The only named Plaintiff they hold up as a potential class representative is Roberto Doe. Class Cert Br. 11. Roberto Doe claims that he attempted to present himself at the Hidalgo, Texas port of entry on October 2, 2018, but that he was told by a U.S. official that the port was full. Class Cert. Opp. Ex. 5 ¶¶ 4-5. Roberto Doe was deported from Mexico in 2018 or 2019. Class Cert. Opp. Ex. 6 ¶ 7. Before this, Roberto Doe had illegally entered the United States at least three times without inspection and had been ordered removed from the country. Class Cert. Opp. Exs. 18-23. According to a declaration that Plaintiffs submitted with their prior class certification reply brief, as of October 21, 2019, Roberto Doe was living in an undisclosed Latin American country. Class Cert. Opp. Ex. 6 ¶ 7. Roberto Doe stated at that time that he "intend[s] to seek access to the U.S. asylum process as soon as possible." *Id.* ¶ 6. There is no evidence that Roberto Doe has concrete plans to do so. There are thus no named Plaintiffs that are subject to the Rule who have concrete plans to seek asylum in the United States.

### B. The Named Plaintiffs' Claims are Not Typical of those of the Putative ACA Class.

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement "assure[s] that the interest of the named representative aligns with

the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* This requirement "derives its independent legal significance from its ability to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 598 (3d Cir. 2012) (internal quotation omitted). Thus, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class member." *Falcon*, 457 U.S. at 156. A class certification motion "should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citations omitted).

Here, Plaintiffs have not identified any named Plaintiff who has been or will be injured in the manner in which they claim the putative subclass members have been or will be injured. *See Wolin*, 617 F.3d at 1175. Plaintiffs brought this lawsuit to enjoin metering/queue management and other alleged practices, SAC ¶ 304, but the injury sought to be redressed in Plaintiffs' motions is different. Here, Plaintiffs seek to preclude the application of the ACA Rule to certain individuals who were subject to metering/queue management and will now be subject to the Rule. Class Cert. Br. 6. The named individual Plaintiffs cannot benefit from this injunctive relief and are not (and never were) members of the proposed class. This dooms their request for class certification.

The only individual Plaintiff that Plaintiffs point to and who might claim to be part of the class is Roberto Doe. But there is scant evidence that Roberto Doe truly "continue[s] to seek access to the U.S. asylum process," as required to be a member of the class or to suffer any claimed injury from the ACA rule. *See* Class

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

Cert Br. 6. Although the Court previously ruled that Roberto Doe's declarations "provide sufficient information to satisfy the test of typicality" with respect to a prior provisional class, PI Order at 24-25, Defendants maintain that Roberto Doe's supplemental declaration is insufficient to show that he "continue[s] to seek access to the U.S. asylum process" or has standing to pursue relief on behalf of the class. Plaintiffs have provided only vague statements from Roberto Doe that he intends to seek asylum "as soon as possible," but there is no evidence to show that Roberto Doe has any concrete plans to do so. He apparently remains in an undisclosed Latin American country, and has not made any efforts to seek asylum in the United States.

This lack of demonstrated, imminent injury from the Rule is fatal to a finding of typicality. A purported class representative must establish standing to be deemed a proper representative of the class. *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 532-33 (9th Cir. 2019). If the named Plaintiffs cannot establish "the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *Id.* In a putative class action, the class representatives must allege *and* show that they were personally injured, "'not that the injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Stanford v. Home Depot U.S.A., Inc.*, 2008 WL 7348181 at *7 (S.D. Cal. May 27, 2008) (quoting *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003)). And standing requires that the injury be "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) ("The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both "real and immediate," not conjectural or hypothetical") (internal quotations omitted). A declarant's "profession of an inten[t]" to do something "is simply not enough." *Lujan*, 504 U.S. at 564. "Such 'some day' intentions—without any

1  description of concrete plans, or indeed any specification of *when* the some day will
2  be—do not support of a finding of the "actual or imminent injury that our cases
3  require." *Id.*

4         Thus, Plaintiffs have not established that any named individual Plaintiff has
5  been, or will imminently be, injured by the Rule.[7] Most of the named Plaintiffs made
6  asylum claims long before November 19, 2019, and there is no evidence that the
7  remaining individual Plaintiffs have any concrete plans to seek asylum in the United
8  States such that they could possibly be affected by the ACA Rule. The named Plain-
9  tiffs' claims are thus not typical of those of the class because the named Plaintiffs
10  cannot establish the requisite "case or controversy" needed for Article III standing
11  to pursue their requested preliminary injunctive relief. Their lack of standing also
12  represents a "unique defense" that threatens to preoccupy the litigation and likewise
13  precludes a finding of typicality. *Hanon*, 976 F.2d at 508–09. Accordingly, Plaintiffs
14  have not met their burden to demonstrate typicality under Rule 23(a)(3).

15     **C. The Individual Plaintiffs are Not Adequate Representatives.**

16         For similar reasons, the individual named Plaintiffs are not adequate repre-
17  sentatives of the class under Rule 23(a)(4). The adequacy of representation is based
18  on: (1) whether the named plaintiffs and their counsel have any conflicts of interest
19  with other class members; and (2) whether the named plaintiffs and their counsel
20  will prosecute the action vigorously on behalf of the class. *Hanlon*, 150 F.3d at 1021.
21  As explained above, the named Plaintiffs will "suffer[] no injury" as a result of the
22  practices they seek to enjoin and thus are "simply not eligible to represent a class of
23  persons who [will] allegedly suffer injury." *E. Texas Motor Freight Sys.*, 431 U.S.
24  at 403–04. "[O]ne who is not a member of the defined class cannot serve as a repre-
25  sentative plaintiff." *Torres v. Goddard*, 314 F.R.D. 644, 656 (D. Ariz. 2010). As

---

27  [7] Even if Roberto Doe could demonstrate standing, his claims are not typical of those
28  putative class members who never even approached a port of entry. *See supra* at 11-
    12.

21

1    explained above, a class cannot be certified if the class representative lacks standing

2    as to his individual claim. *NEI Contracting*, 926 F.3d at 533 (class decertification is

3    required when it is determined that representative plaintiff lacks standing). To hold

4    otherwise would allow courts to issue advisory opinions in the absence of a case or

5    controversy before it. "A federal court has neither the power to render advisory opin-

6    ions nor 'to decide questions that cannot affect the rights of litigants in the case be-

7    fore them.'" *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975).

8         Even leaving aside this fundamental defect of lack of standing, there is no

9    evidence that the named Plaintiffs would vigorously represent the interests of the

10   class. The nature of class certification under Rule 23(b)(2) amplifies the need to

11   confirm the commitment of the class representatives, because members of a Rule

12   23(b)(2) class are not afforded the right to opt out of the class and are bound by any

13   judgment. *Molski v. Gleich*, 318 F.3d 927, 947 (9th Cir. 2003). Here, the named

14   Plaintiffs never had standing to represent the proposed class, and there is no reason

15   to believe that they will vigorously represent that class. *See Ellis v. Costco Wholesale*

16   *Corp.*, 657 F.3d 970, 986 (9th Cir. 2011) (concluding that former employees are not

17   adequate representatives of a class of current employees seeking injunctive relief);

18   *Schulken v. Washington Mut. Bank*, 2012 WL 28099, at *5 & N.2 (N.D. Cal. Jan. 5,

19   2012) (analogizing Rule 23(a)(4) analysis to a standing analysis). Accordingly, the

20   Court also should deny Plaintiffs' Motion based on inadequate representation.

21   **III.    Plaintiffs' Proposed Class Does not Satisfy Rule 23(b)(2).**

22        Plaintiffs' proposed class also fails Rule 23(b)(2). First, Rule 23(b)(2) pro-

23   vides that a class action is appropriate when "the party opposing the class has acted

24   or refused to act on grounds generally applicable to the class," and the representa-

25   tives are seeking "*final injunctive relief* or corresponding declaratory relief." Fed.

26   R. Civ. P. 23(b)(2) (emphasis added); *see also* Wright & Miller, *Federal Practice*

27   *and Procedure* § 1775 (3d ed.). Although the Ninth Circuit has allowed this rule to

28   support certification of a provisional class for the issuance of preliminary injunctive

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

relief, "final injunctive relief must be appropriate." *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). Plaintiffs' proposed provisional class does not pass this test. Here, Plaintiffs seek to enjoin application of the ACA Rule to individuals who were metered before its effective date. That relief would not be appropriate as a final injunction in this case, because Plaintiffs' complaint does not challenge the ACA Rule or ask the Court to enjoin it. *See* SAC ¶ 304 (asking the Court to enjoin metering require oversight procedures). Accordingly, the Court should decline to certify the Putative ACA Class under Rule 23(b)(2). *See Tolmasoff v. General Motors, LLC*, 2016 WL 3548219 (E.D. Mich. June 30, 2016) (denying certification of provisional class for purposes of preliminary injunctive relief where the complaint did not seek, or support a grant of, prospective injunctive relief).

Second, the provisional class does not qualify for certification under Rule 23(b)(2) because administering the TRO would require identification of class members through individualized factfinding. Typically, in a Rule 23(b)(2) class action:

> any relief obtained on behalf of the class . . . does not require distribution to the class. . . . [I]t is usually unnecessary to define with precision the persons entitled to enforce compliance. *Newberg on Class Actions* § 3.7 (5th ed.) (citation omitted). Identification of individual class members is not required; to the contrary, the fact that class members are difficult or impossible to identify individually supports class certification under Rule 23(b)(2).

*The Civil Rights Educ. & Enf't Ctr. v. RLJ Lodging Tr.*, 2016 WL 314400, at *5 (N.D. Cal. Jan. 25, 2016). Plaintiffs' motion flunks the requirements of Rule 23(b)(2). First, as discussed above, *supra* Section I.B, the factual variations among the class and the implementation of metering bear on each class member's entitlement to relief. Second, and independently, Plaintiffs' preliminary-injunctive-relief class is not suitable for certification under Rule 23(b)(2) because the relief they seek cannot be applied generally to all aliens seeking asylum regardless of their factual circumstances. Instead, Plaintiffs are seeking relief from the ACA Rule only for

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

those aliens who were subject to metering before its effective date. Thus, it is extremely important to be able to determine who those individuals are, because "[i]f a plaintiff class wins, any relief must be reasonably limited to those who are entitled to it." *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1091 (N.D. Cal. 2011). If the Court were to grant the relief Plaintiffs request, individualized factfinding would be necessary to prevent overbroad administration of that relief to those who have no entitlement to it.

In this case, Plaintiffs seek provisional certification of a class of individuals that were subject to metering before November 19, 2019, and that they claim comprises 21,000 or more individuals. Class Cert Br. 6, 7. Although the date on which individuals were subject to metering provides an objective way to define the provisional class, there is no reliable way to readily confirm the date when individuals first sought to present themselves at ports to seek access to the U.S. asylum process. CBP does not keep records of individuals who have not yet entered the United States and are subject to metering. *See generally* Class Cert. Opp. Ex. 1. Rather, CBP personnel who stand at the international boundary line to facilitate metering have only brief, normally entire verbal encounters with individuals who approach the Port of Entry, and those occur while the alien is on Mexican soil. *See id.* ¶¶ 2, 4. If these officers are presented with documents by individuals approaching the port, the officers conduct "basic visual document examinations" and "generally do not obtain biographical information about the traveler or memorialize the encounter in any way, whether that be the date, time, or other factual specifics about the encounter." *Id.* ¶ 4. Thus, were someone to assert that that they had been encountered at the limit line on a particular date, "CBP would have no way to either confirm or refute that individual's own statements." *Id.* ¶ 5.

Because CBP (quite reasonably) does not keep records demonstrating whether and when an individual was subject to metering, the government cannot resort to reliable records to determine who is a class member. Thus, if the Court were to grant

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

the relief Plaintiffs request, the government would have to engage in additional fact-finding to determine whether an individual was subject to metering. This amounts to an "investigat[ion] of the merits of individual claims to determine class member-ship." *See Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 973 (S.D. Cal. 2016). Although the Court previously held that certain waitlists maintained at certain ports or decla-rations could be sufficient to determine class membership, PI Order at 28, this does not obviate the need for factfinding. First, the waitlists are maintained by a variety of different groups and are inadequate to accurately identify class members. *E.g.*, Class Cert. Ex. 11 ¶¶ 52-54. Further, Plaintiffs' counsel has declined to obtain such waitlists. TRO Opp. 22 n. 4. Moreover, obtaining information from class members themselves requires investigation. The attached declaration of Ashley B. Caudill-Mirillo specifically addresses efforts to identify class members for the previously-certified provisional class, but provides insight into the type of work that would be required to determine whether an individual was subject to metering. Class Cert. Opp. Ex. 24. That is, an asylum officer determining whether an individual is amena-ble to an ACA will need to individually question the individual to determine whether and when he was subject to metering. Class Cert. Opp. Ex. 24 ¶¶ 3-4. Moreover, the asylum officer would have few means to confirm or refute the truth of an individual's assertions that he may have been subject to metering before November 19, 2019. And to rely solely on sworn statements to determine class membership would invite fraudulent claims in an environment where there is a strong incentive to manufacture claims. *See Aliens Subject to a Bar on Entry Under Certain Presidential Proclama-tions; Procedures for Protection Claims*, 83 Fed. Reg. 55934, 55935 (Nov. 9, 2018) (only 17% of all completed positive credible fear screenings resulted in a grant of asylum). Accordingly, Defendants respectfully maintain that a Rule 23(b)(2) class is inappropriate under these circumstances.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Provisional Class Certification.

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

DATED: December 30, 2019          Respectfully submitted,


                                  JOSEPH H. HUNT
                                  Assistant Attorney General
                                  Civil Division


                                  WILLIAM C. PEACHEY
                                  Director


                                  */s/ Katherine J. Shinners*
                                  KATHERINE J. SHINNERS
                                  Senior Litigation Counsel
                                  United States Department of Justice
                                  Civil Division
                                  Office of Immigration Litigation
                                  District Court Section
                                  P.O. Box 868, Ben Franklin Station
                                  Washington, D.C. 20044
                                  Tel: (202) 598-8259 | Fax: (202) 305-7000
                                  katherine.j.shinners@usdoj.gov


                                  ALEXANDER J. HALASKA
                                  ARI NAZAROV
                                  Trial Attorneys

                                  *Counsel for Defendants*

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

## **CERTIFICATE OF SERVICE**

No. 17-cv-02366-BAS-KSC

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: December 30, 2019        Respectfully submitted,


                                */s/ Katherine J. Shinners*
                                KATHERINE J. SHINNERS
                                Senior Litigation Counsel
                                United States Department of Justice

DEFS.' OPP'N TO PLS.' MOT. FOR
PROVISIONAL CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC