MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>             Plaintiffs,<br><br>     v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>             Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**<br><br>***PORTIONS FILED UNDER SEAL***<br><br>Hearing Date: March 3, 2020 (Special Briefing Schedule Requested)<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................. 1

II.     FACTS COMMON TO THE CLASS ................................................... 6

        A.      THE ORIGINS OF DEFENDANTS' TURNBACK POLICY ............ 6

        B.      CBP LEADERSHIP IMPLEMENTED A POLICY
                DESIGNED TO TURN BACK ASYLUM SEEKERS ...................... 10

        C.      PORTS OF ENTRY ADOPTED POLICIES DESIGNED TO
                TURN BACK ASYLUM SEEKERS ............................................ 12

        D.      THE SYSTEMIC EFFECT OF DEFENDANTS' CONDUCT ......... 17

        E.      DEFENDANTS INTEND TO DETER ASYLUM SEEKERS .......... 19

III.    LEGAL STANDARD ........................................................................ 21

IV.     THE REQUIREMENTS OF FEDERAL RULE OF CIVIL
        PROCEDURE 23(A) ARE MET ....................................................... 22

        A.      THE CLASS IS NUMEROUS ................................................ 22

        B.      THERE ARE COMMON QUESTIONS OF LAW AND FACT ...... 24

        C.      TYPICALITY IS SATISFIED ................................................ 29

        D.      THE NAMED PLAINTIFFS AND COUNSEL ARE
                ADEQUATE ...................................................................... 30

V.      RULE 23(B)(2) IS SATISFIED ...................................................... 32

VI.     ASCERTAINABILITY IS NOT A FACTOR IN RULE 23(B)(2)
        CASES ........................................................................................... 34

VII.    CONCLUSION ............................................................................... 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
  731 F.3d 952 (9th Cir. 2013) ............................................................................25

*Al Otro Lado, Inc. v. McAleenan*,
  2019 WL 6134601 (S.D. Cal. 2019) ..................................................24, 30, 34

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001) ............................................................................25

*Astiana v. Kashi Co.*,
  291 F.R.D. 493 (S.D. Cal. 2013) ......................................................................22

*Baby Neal v. Casey*,
  43 F.3d 48 (3d Cir. 1994) ..................................................................................32

*Bee, Denning, Inc. v. Capital Alliance Grp.*,
  2016 WL 3952153 (S.D. Cal. 2016) .................................................................34

*Boumediene v. Bush*,
  553 U.S. 723 (2008) .............................................................................................3

*Civ. Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*,
  317 F.R.D. 91 (N.D. Cal. 2016) .......................................................................22

*Civil Rights Educ. & Enf't Ctr. v. RLJ Lodging Tr.*,
  2016 WL 314400 (N.D. Cal. 2016)...................................................................34

*Cole v. City of Memphis*,
  839 F.3d 530 (6th Cir. 2016) ............................................................................34

*Comcast Corp. v. Behrend*,
  596 U.S. 27 (2013) .............................................................................................28

*Doe v. Nielsen*,
  357 F. Supp. 3d 972 (N.D. Cal. 2018) ..............................................................33

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................................................................24

*In re Estate of Marcos Human Rights Litig.*,
   25 F.3d 1467 (9th Cir. 1994) ................................................................. 3

*In re Facebook, Inc., PPC Advert. Litig.*,
   282 F.R.D. 446 (N.D. Cal. 2012) .......................................................... 22

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................................... 31

*Harris v. Palm Springs Alpine Estates, Inc.*,
   329 F.2d 909 (9th Cir. 1964) ................................................................. 22

*Hernandez v. Lynch*,
   2016 WL 7116611 (C.D. Cal. 2016) ..................................................... 34

*Ibrahim v. DHS*,
   669 F.3d 983 (9th Cir. 2012) ................................................................. 3

*Inland Empire - Immigrant Youth Collective v. Nielsen*,
   2018 WL 1061408 (C.D. Cal. 2018) ..................................................... 28

*Lerwill v. Inflight Motion Pictures, Inc.*,
   582 F.2d 507 (9th Cir. 1978) ................................................................. 31

*Leyva v. Buley*,
   125 F.R.D. 512 (E.D. Wash. 1989) ....................................................... 24

*Lujan v. Cabana Mgmt., Inc.*,
   284 F.R.D. 50 (E.D.N.Y. 2012) ........................................................... 28

*Lyon v. ICE*,
   171 F. Supp. 3d 961 (N.D. Cal. 2016) ................................................. 33

*Lyon v. ICE*,
   300 F.R.D. 628 (N.D. Cal. 2014) .......................................................... 25

*Lyon v. ICE*,
   308 F.R.D. 203 (N.D. Cal. 2015) .......................................................... 33

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ................................................................. 21

*McCluskey v. Trustees of Red Dot Corp. Emp. Stock Plan & Tr.*,
   268 F.R.D. 670 (W.D. Wash. 2010) ..................................................... 23

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

*McCurley v. Royal Seas Cruises, Inc.*
   331 F.R.D. 142 (S.D. Cal. 2019) ....................................................... 34

*Ms. L. v. U.S. Immigration & Customs Enf't,*
   2018 WL 8665001 (S.D. Cal. 2018) ........................................... 22, 33

*Munyua v. United States,*
   2005 WL 43960 (N.D. Cal. 2005) ...................................................... 7

*Nak Kim Chhoeun v. Marin,*
   2018 WL 6265014 (C.D. Cal. 2018) ................................................ 28

*Orantes-Hernandez v. Meese,*
   685 F. Supp. 1488 (C.D. Cal. 1988) ............................................... 33

*Parsons v. Ryan,*
   754 F.3d 657 (9th Cir. 2014) ........................................................... 29

*Plata v. Schwarzenegger,*
   2005 WL 2932253 (N.D. Cal. 2005) ............................................... 33

*Rodriguez v. Hayes,*
   591 F.3d 1105 (9th Cir. 2010) ............................................... 24, 29, 30

*Rodriguez v. Swartz,*
   899 F.3d 719 (9th Cir. 2018) ............................................................. 3

*In re Rubber Chem. Antitrust Litig.,*
   232 F.R.D. 346 (N.D. Cal. 2005) .................................................... 22

*Sali v. Corona Reg'l Med. Ctr.,*
   909 F.3d 996 (9th Cir. 2018) ........................................................... 21

*Saravia v. Sessions,*
   280 F. Supp. 3d 1168 (N.D. Cal. 2017) .......................................... 34

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.,*
   559 U.S. 393 (2010) ....................................................................... 21

*Sosa v. Alvarez-Machain,*
   542 U.S. 692 (2004) ......................................................................... 3

*Unknown Parties v. Johnson,*
   163 F. Supp. 3d 630 (D. Ariz. 2016) ......................................*passim*

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

*Von Colln v. Cty. of Ventura*,
  189 F.R.D. 583 (C.D. Cal. 1999) ....................................................... 23

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..................................................... 3, 24, 25, 32

*Walters v. Reno*,
  145 F.3d 1032 (9th Cir. 1998) ........................................................ 32

*Westways World Travel, Inc. v. AMR Corp.*,
  218 F.R.D. 223 (C.D. Cal. 2003) .................................................... 32

*In re Yahoo Mail Litig.*,
  308 F.R.D. 577 (N.D. Cal. 2015) .................................................... 22

**Statutes, Rules and Regulations**

8 C.F.R. § 1.2 (2011) ......................................................................... 2

8 C.F.R. §100.4 .................................................................................. 1

8 C.F.R. § 235.3(b)(4) ....................................................................... 7

82 Fed. Reg. 8,793 (Jan. 25, 2017) ................................................. 20

82 Fed. Reg. 8,977 (Jan. 27, 2017) ................................................. 20

82 Fed. Reg. 13209 (Mar. 6, 2017) ................................................. 20

83 Fed. Reg. 55,934 (Nov. 9, 2018) ............................................... 20

83 Fed. Reg. 57,661 (Nov. 9, 2018) ............................................... 20

84 Fed. Reg. 21,229 (May 8, 2019) ................................................ 20

84 Fed. Reg. 33,829 (July. 16, 2019) ............................................. 20

84 Fed. Reg. 47,148 (Sept. 9, 2019) ............................................... 20

84 Fed. Reg. 62,280 (Nov. 14, 2019) ............................................. 20

84 Fed. Reg. 62,374 (Nov. 14, 2019) ............................................. 20

84 Fed. Reg. 69,640 (Dec. 19, 2019) ............................................. 20

84 Fed. Reg. 3665 (Feb. 7, 2019) ................................................... 20

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

5 U.S.C. § 701 ................................................................................................ 28

5 U.S.C. § 702 .................................................................................................. 5

5 U.S.C. § 706(1) ............................................................................................. 3

5 U.S.C. § 706(2) .......................................................................................... 3, 9

8 U.S.C. § 1158(a)(1) ................................................................................. 5, 28

8 U.S.C. § 1225 ..................................................................................... 6, 18, 27

8 U.S.C. § 1225(a)(1) ............................................................................. 2, 5, 28

8 U.S.C. § 1225(a)(3) ............................................................................. 2, 5, 28

8 U.S.C. § 1225(b) ........................................................................................... 7

8 U.S.C. § 1225(b)(1) ...................................................................................... 7

8 U.S.C. § 1225(b)(1)(A)(i) ..................................................................... 5, 28

8 U.S.C. § 1225(B)(1)(A)(ii) ................................................................. 2, 5, 28

8 U.S.C. § 1225(b)(2) ...................................................................................... 7

8 U.S.C. § 1229 ................................................................................................ 7

8 U.S.C. § 1229a .............................................................................................. 7

28 U.S.C. § 1350 .............................................................................................. 3

Fed. R. Civ. P. 23 ............................................................................... 21, 31, 32

Fed. R. Civ. P. 23(a) ............................................................................. 5, 22, 24

Fed. R. Civ. P. 23(a)(1) ................................................................................. 22

Fed. R. Civ. P. 23(a)(2) ............................................................................ 24, 25

Fed. R. Civ. P. 23(a)(3) ................................................................................. 29

Fed. R. Civ. P. 23(a)(4) ................................................................................. 30

Fed. R. Civ. P. 23(b)(2) ........................................................................... *passim*

Fed. R. Civ. P. 23(b)(3) ................................................................................... 6

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

Fed. R. Civ. P. 23(g) ................................................................. 31

Fed. R. Civ. P. 23(g)(1)(A) ....................................................... 31

**Other Authorities**

7A Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal
Practice & Procedure* § 1763 (3d ed. 2019) ................................ 25, 31

Donald Trump, *Watch Donald Trump Announce His Candidacy for
U.S. President*, PBS NewsHour (Jun. 16, 2015),
http://bit.ly/2NmWFus ............................................................ 20

*Human Smuggling at the U.S.-Mexico Border*, Hearing Before the S.
Homeland Sec. and Governmental Affairs Comm., 116th Cong.
(June 26, 2019), https://tinyurl.com/wzorwct .................................. 26

*Implementation of Title III of the Illegal Immigration Reform and
Immigrant Responsibility Act of 1996: Hearing Before the
Subcomm. on Immigration and Claims of the H. Comm. on the
Judiciary*, 105th Cong. 17 (1997) ............................................. 2

Nicole Narea, *Trump Says Most Asylum Seekers Don't Show Up for
their Court Hearings. A New Study Says 99% Do.*, Vox (Jan. 10,
2020), https://tinyurl.com/wjuvga4 ............................................. 21

TRAC Immigration, *Record Number of Asylum Cases in FY 2019*
(Jan. 8, 2020), https://tinyurl.com/wogkdqb .................................. 21

U.S. Customs & Border Protection, *Class A, B, or C Port of Entry*
(Apr. 18, 2014), https://tinyurl.com/wo2msu4 ................................ 1

U.S. Customs & Border Protection, *Temporary Protected Status
Designated Country: Haiti* (Nov. 1, 2019),
https://tinyurl.com/ybej4n2u .................................................... 8

2 William B. Rubenstein, *Newberg on Class Actions* § 4:28 (5th ed.
2019) ............................................................................. 33

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

1

## I.    INTRODUCTION

This Court should certify a class consisting of all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A port of entry ("POE")[2] on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of U.S. Customs and Border Protection ("CBP") officials on or after January 1, 2016.  In addition, the Court should certify a sub-class consisting of all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016.

All class and sub-class members advance claims based on a common nucleus of operative facts.  Defendants single out asylum seekers for treatment that applies to no other group of individuals seeking admission to the U.S. at POEs on the southern border. As a result, members of the class and sub-class were denied inspection and access to the U.S. asylum process by or at the direction of CBP officers.  In 2016, this conduct began as a set of disparate practices that included lying to asylum seekers, using threats, intimidation, and physical force to obstruct access to the POE, and imposing unreasonable delays before granting access to the U.S. asylum process. *See* Dkt. 189 at ¶ 2.

By April 2018, Defendants formalized these practices into a policy, the "Turnback Policy," that applies to all asylum seekers arriving at Class A POEs on the U.S.-Mexico border, and specifically includes Defendants' metering policy. *See* Ex. 27.  Under the metering policy, CBP employs lies regarding the capacity of POEs to refuse to inspect and process asylum seekers as the INA requires. *See* Dkt. 278 at

---

[2] "Class A" refers to POEs that are designated for the entry of all travelers, including asylum seekers.  *See* Ex. 1 at 75:18-76:8; U.S. Customs & Border Protection, *Class A, B, or C Port of Entry* (Apr. 18, 2014), https://tinyurl.com/wo2msu4; 8 C.F.R. §100.4.  Class A POEs on the U.S.-Mexico border include, among others, San Ysidro, Otay Mesa, Tecate, Calexico, Nogales, El Paso-Paso Del Norte, Eagle Pass, Laredo, Hidalgo, and Brownsville.  *See* Ex. 1 at 76:12-78:14.  "Ex." refers to the exhibits to the Declaration of Stephen Medlock ("Medlock Decl."), which are filed concurrently with this motion.

38-40, 42, 44-47.  Even though the INA contains no limit on the number of asylum seekers who may be inspected and processed at POEs, Defendants have applied this policy to impose artificial ceilings and foregone opportunities to increase the capacity of POEs to inspect and process asylum seekers.  CBP officers inspect and process a limited number of asylum seekers at POEs, only sporadically, and generally based on their positions on "waitlists" maintained by third parties in Mexico. When asylum seekers approach POEs without going through this waitlist process, CBP officers generally refuse to inspect and process them. Faced with this denial of access, the class and sub-class members put their names on waitlists in Mexican border towns.

This is illegal.  Defendants' conduct violates the Immigration and Nationality Act ("INA"), the Administrative Procedure Act ("APA"), the Due Process Clause of the Fifth Amendment, and the Alien Tort Statute ("ATS").  Barring an exception that is not relevant here, Defendants have a duty to inspect and process any noncitizen who "arrives in" the U.S. or is "otherwise seeking admission," and to refer for an asylum interview any asylum seeker who "is arriving in" the U.S. 8 U.S.C. §§ 1225(a)(1), (a)(3), (b)(1)(A)(ii).  In addition, any noncitizen who "arrives in" the U.S. may apply for asylum. *Id.* at 1158(a)(1). This includes noncitizens "attempting to come into the United States at a [POE]."  8 C.F.R. § 1.2 (2011) (defining "arriving alien").[3]  Defendants have failed to execute their mandatory duty to inspect and process arriving noncitizens, and are acting outside the statutory bounds set by Congress in the INA by turning back asylum seekers, and only asylum

---

[3] *See also Implementation of Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 105th Cong. 17-18 (1997) (Feb. 3, 1997 correspondence of Rep. Lamar Smith, Subcomm. Chairman, to Immigration and Naturalization Services: "The term 'arriving alien' was selected specifically by Congress in order to provide a flexible concept that would include all aliens who are in the process of physical entry past our borders. . . . An alien apprehended at any stage of this process, whether attempting to enter, at the point of entry, or just having made entry, should be considered an 'arriving alien' for the various purposes in which that term is used[.]").

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

seekers, at the southern border. Dkt. 280 at 38. As a result, the class members have been harmed by agency action (Defendants' Turnback Policy) and Defendants' withholding of mandatory agency action (the refusal to inspect and refer arriving asylum seekers). *See* 5 U.S.C. §§ 706(1)-(2). Moreover, Defendants' denial of inspection and processing to noncitizens seeking asylum at the international boundary between the U.S. and Mexico violates the due process clause of the Fifth Amendment. Dkt. 280 at 70-77.[4] Finally, Defendants' conduct violates the Alien Tort Statute, 28 U.S.C. § 1350, because returning or expelling an individual to a country where he or she has a well-founded fear of persecution violates a "specific, universal, and obligatory" norm of international law known as the principle of *non-refoulement. See Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) (quoting *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994)); Dkt. 210 at 27-28; Dkt. 189 at ¶¶ 227-35, 294-303; Dkt. 280 at 79-83.

Recognizing that class certification is not a pleading stage inquiry, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), Plaintiffs have built a substantial, contemporaneous, and uncontradicted record showing that Defendants adopted and are carrying out a border-wide policy of denying noncitizens arriving at POEs on the U.S.-Mexico border access to the U.S. asylum process. CBP leadership testified that ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████. Ex. 2 at 262:2-22 (testifying that ██████████████████████████████ ████████████████████); Ex. 1 at 170:8-171:13 (same). In addition, CBP personnel

---

[4] *See also Boumediene v. Bush*, 553 U.S. 723, 727 (2008) (when determining the geographic reach of the Fifth Amendment's due process clause "extraterritoriality questions turn on objective factors and practical concerns, not formalism"); *Ibrahim v. DHS*, 669 F.3d 983, 995 (9th Cir. 2012) ("the border of the United States is not a clear line that separates aliens who may bring constitutional challenges from those who may not."); *Rodriguez v. Swartz*, 899 F.3d 719, 729 (9th Cir. 2018) (applying three factors to determine territorial scope of Constitutional right: (1) citizenship and status of the claimant, (2) the nature of and location where the Constitutional violation occurred, and (3) the practical obstacles inherent in enforcing the claimed right).

turned away and denied access to the U.S. asylum process to numerous asylum seekers who were actually **standing on U.S. soil**.  Ex. 3 at 96:11-97:18; Ex. 1 at 172:4-175:12; Ex. 4 at 547; Ex. 5 at 042-043; Ex. 2 at 93:1-94:20 (███████

███████████████████████████████████████████████████████

████████████████████████).  Under the INA, which contains no cap on the number of asylum seekers who can present themselves at POEs or apply for asylum, the class members were entitled to inspection and access to the asylum process when they arrived at POEs on the U.S.-Mexico border, but were unlawfully denied both these rights.

There is no statutory authorization for turning back asylum seekers, nor any valid justification for Defendants' conduct.  Deposition testimony and internal CBP documents show that Defendants' argument that they lack the capacity to inspect and process asylum seekers at POEs on the U.S.-Mexico border is simply untrue. POEs on the U.S.-Mexico border routinely denied individuals access to the U.S. asylum process even when they were processing **zero** asylum seekers. Ex. 3 at 98:22-99:24.  Moreover, multiple CBP officers understood these capacity excuses to be a "lie" that was "obvious to everybody that was implementing [the metering] policy" because Defendants, in fact, "intentionally . . . den[ied] and block[ed] asylum to persons and families in order to block the flow of asylum applicants" and create "a chilling [e]ffect[] to all others attempting entry into the United States." Ex. 3 at 99:25-100:24, 101:3-6; Ex. 6 at 132; Ex. 15 at 115-126.

The unrebutted testimony of Plaintiffs' expert, Stephanie Leutert, a recognized authority on conditions at the border whom even Defendants cite in their prior briefs in this case, *see* Dkt. 357 at 4, corroborates the discovery record. Ex. 7 at ¶ 88-91.  Ms. Leutert reviewed ████████████████████████████

████████████████████████, which the Executive Assistant Commissioner of CBP admits ████████████████████████

████████████████████. *See* Ex. 7 at Table. 7; Ex. 2 at 189:8-17, 190:20-

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

1  191:6. Analyzing these ████████ Ms. Leutert concludes that █████████

2  ████████████████████████████████████████████████████ Ex. 7 at ¶ 88.

3  Defendants have offered no meaningful response to Ms. Leutert's expert report.

4  Defendants failed to designate a class certification expert and have not pointed to

5  any contemporaneous data that would justify the widespread turnbacks of asylum

6  seekers at Class A POEs on the U.S.-Mexico border.

7     Accordingly, the class and sub-class easily meet all the requirements of Rules

8  23(a) and 23(b)(2).

9     ***Numerosity.***  Joinder is impractical in this case because thousands of

10  noncitizens have been denied access to the U.S. asylum process at Class A POEs on

11  the U.S.-Mexico border.

12     ***Commonality.***  There are multiple questions of fact and law that are common

13  to the class.  These include: (1) whether Defendants are misinterpreting 8 U.S.C. §§

14  1158(a)(1) and 1225(a)(1), (a)(3), and (b)(1)(A)(ii), to apply only to individuals who

15  are physically present in the U.S.; (2) whether Defendants denied noncitizens

16  arriving at Class A POEs on the U.S.-Mexico border access to the U.S. asylum

17  process; (3) whether class members have been "adversely affected or aggrieved" by

18  agency action taken by Defendants, 5 U.S.C. § 702; (4) whether Defendants

19  "unlawfully withheld or unreasonably delayed" mandatory agency action; (5)

20  whether Defendants denied class members due process in violation of the Fifth

21  Amendment; (6) whether Defendants' conduct violated the universal and obligatory

22  international norm of *non-refoulement*, (7) whether Defendants' turnbacks are *ultra*

23  *vires*, and (8) whether the Turnback Policy was adopted and implemented based on

24  pretext and an unlawful desire to deter asylum seekers.  While Defendants argue that

25  there are different conditions at POEs that may result in Defendants' Turnback

26  Policy being implemented slightly differently along the border, these differences are

27  insufficient to defeat commonality.  All class members were denied access to the

28  asylum process at Class A POEs on the U.S.-Mexico border as a result of a border-

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

wide policy that was implemented regardless of differences between POEs.

*Typicality.* The named plaintiffs' claims are typical of the class. They presented themselves at Class A POEs on the U.S.-Mexico border. They were denied access to the U.S. asylum process. In all cases, CBP refused to inspect and process them in accordance with 8 U.S.C. § 1225, which requires that "arriving" noncitizens be inspected and that those stating a desire to seek asylum or a fear of persecution be given access to the U.S. asylum process. Although Defendants argue that class members' asylum claims may be of differing strength, this argument misses the point. Plaintiffs and the class are not seeking a ruling on the merits of their asylum claims, they are merely seeking access to the U.S. asylum process— *i.e.*, a chance to make their cases on the merits. *See* Dkt. 189 at ¶¶ 1-3. Because each of the named plaintiffs and class members was or will be denied access to the U.S. asylum process, their claims are typical.

*Adequacy.* The named plaintiffs and class counsel are adequate. The named plaintiffs have no conflicts of interest with the class members. They are seeking the same declaratory and injunctive relief based on the same set of facts. Plaintiffs' counsel has extensive experience litigating immigration-related class actions.

*Rule 23(b)(2).* Plaintiffs also satisfy the requirements of Rule 23(b)(2). Since each of the class members raises the same legal claims and seeks the same remedies based on the same basic facts, this Court can issue an injunction that addresses the entire class in one fell swoop. Defendants attempt to read the ascertainability requirement for Rule 23(b)(3) classes into this Rule 23(b)(2) class. They are wrong. This Court has been clear that the ascertainability test does not apply to Rule 23(b)(2) class actions.

Accordingly, the Court should certify the class and sub-class.

## II.    FACTS COMMON TO THE CLASS

### A.    THE ORIGINS OF DEFENDANTS' TURNBACK POLICY

There is no cap on the number of asylum seekers who may arrive in the United

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

States in a particular period of time. Ex. 8 at 4:24-5:2 ("There are limits on the number of refugees, but there aren't limits on the number of people who can seek asylum. Anyone who wants to seek asylum can seek asylum."). Defendants concede CBP officers have a mandatory duty to inspect all noncitizens "arriving" at POEs. Dkt. 280 at 31. A CBP officer's duty to allow noncitizens access to the U.S. asylum process is similarly "not discretionary." *Munyua v. United States*, 2005 WL 43960, at *6 (N.D. Cal. 2005) (citing 8 U.S.C. § 1225(b); 8 C.F.R. § 235.3(b)(4)). Defendants agree with Plaintiffs that when an applicant for admission arrives at a POE and asserts a fear of return to his or her home country or an intention to apply for asylum, a CBP officer *must* either refer the asylum seeker for an interview with an asylum officer, *see* 8 U.S.C. § 1225(b)(1), or place the asylum seeker directly into regular removal proceedings, which will then allow the asylum seeker to pursue his or her asylum claim before an immigration judge, *see* 8 U.S.C. §§ 1225(b)(2), 1229, 1229a; Dkt. 280 at 31 (noting Defendants' agreement).

Despite these statutory requirements, in 2016 Defendants began using various means to turn back asylum seekers who were arriving at Class A POEs on the U.S.-Mexico border. These tactics included lies regarding the capacity of the POE, threats and intimidation, and the use of physical force to block access to the POE. *See, e.g.*, Ex. 9 at ¶¶ 9-19; Ex. 10 at ¶¶ 9-22; Ex. 11 at ¶¶ 13-29; Ex. 12 at ¶¶ 8-18; Ex. 13 at ¶¶ 11-18; Ex. 14 at ¶¶ 10-23. Between April and June 2018, Defendants formalized and standardized these tactics into a policy that directed POEs to deny asylum seekers access to the U.S. asylum process based on trumped-up capacity excuses. *Infra* at 12-16.

Defendants attempt to spin these facts into a narrative in which CBP was merely responding to an influx of asylum seekers in the best manner possible using stretched resources. In Defendants' telling, they began "metering," i.e., telling asylum seekers arriving at the POE to return to the port later, due to an increase of migrants from Haiti who were arriving at the San Ysidro, California POE ███

1   2 ██████████████████████████████████████████████. Ex.

2   16 at 857 (noting that "████████████████████████████

3   ████████████████████████"); Ex. 2 at 100:7-10.  But, for several reasons,

4   this story is full of holes and cannot mask Defendants' actual motivation to simply

5   exclude migrants from seeking asylum in the U.S.

6        ***First***, this was not the first time that CBP had been faced with an increased

7   number of Haitian asylum seekers arriving in the U.S.  *See* Ex. 18 at 354-55; Ex. 19

8   at 916. In 2012, 39 Haitians crossed the Mona Passage between Hispaniola and

9   Puerto Rico. Ex. 18 at 354-55. In 2013, the number of crossings increased 4,512%

10  when 1,760 Haitian migrants attempted to enter the U.S. via Puerto Rico. *Id.* at 355.

11  Rather than using metering, CBP placed these individuals into expedited removal

12  proceedings and, by October 2014, the flow of Haitian asylum seekers to Puerto

13  Rico decreased by 80 percent. *Id.* at 355. ***Second***, ███████████████████

14  ████████████████████████████████████████████. Ex. 17 at

15  023. ████████████████  CBP dealt with the increased number of Haitian

16  asylum seekers at San Ysidro by █████████████████████████████

17  ████████████████████████████████. *Id.* ***Third***, POE management ████████

18  ███████████████████████████████████████████████████████████████

19  █████████████. On May 26, 2016, port management wrote to CBP leadership,

20  ███████████████████████████████████████████████████████████████

21  ██████. Ex. 20 at 338-39. Port management █████████████████████████

22  ███████████████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████████████████

24  ███████████████████████████████████████████████████████████████

25  █████████████. *Id.* at 339.  Port management *did not* ██████████████████

26  ███████████████████████████████████████████████. *Id.*; *see also* Ex. 17 at

27  023; Ex. 21 at 099 (████████████████████████████████████████████████

28  ████████████████████).

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

"Metering" was not an appropriate response to the increased number of Haitian asylum seekers at the San Ysidro POE.[5]  In an October 6, 2016 letter, ████

████████████████████████████████████████

██████████████████████████████████████. Ex. 22 at 742.

████████████████████████████████████████

█████████████████████████████████████ *Id.*

Moreover, Defendants' attempt to recast this narrative ignores the contemporaneous intent of CBP's leadership. CBP leaders believed—with no concrete information about the underlying merits of their claims—that ████████

████████████████████████. *See* Ex. 23 at 629.  On August 9, 2016, Deputy Commissioner Kevin McAleenan, ████████████████████████

████████████████████████████, wrote "████████████████

████████████████████████████████████████

████████████████████." *Id.* at 629.  In an October 18, 2016 email, McAleenan was

████████████████████████████████████████

████████████████████. Ex. 24 at 116.  He lamented the fact that ████████████

████████████████████████████████████████

*Id.*  He believed that ████████████████████████

████████████████████████████████ *Id.* Mark Morgan, who is now the Commissioner of CBP, agreed and explained that "████████████████

██████." *Id.*  It was this belief that all asylum seekers were ████████████

████████, and an accompanying fear of ████████████████████████, that would come to motivate the metering policy during McAleenan's tenure as Commissioner of CBP and Acting Homeland Security Secretary.

---

[5] Plaintiffs argue alternative legal theories as to why the Turnback Policy is unlawful under 5 U.S.C. § 706(2), including that turnbacks are categorically unlawful because they exceed CBP's statutory authority, and alternatively, even if they may be lawful in some circumstances, they are unlawful when, as here, they are based on pretext and an unlawful deterrence motive.

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

**B.    CBP LEADERSHIP IMPLEMENTED A POLICY DESIGNED TO TURN BACK ASYLUM SEEKERS**

Shortly following Mr. McAleenan's emails disclosing his fear of Haitian asylum seekers being released into the U.S., Defendants began tightening the capacity of POEs to process asylum seekers.  On January 25, 2017, President Trump issued an Executive Order directing CBP and DHS to end parole and release of asylum seekers into the U.S. to the greatest extent possible. *See* Ex. 25 at 004-5. Pursuant to this Executive Order, CBP █████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████. *Id.* at 005; *see also* Ex. 25 at 430; Ex. 1 at 95:9-16.

On April 24, 2018, CBP Commissioner McAleenan expressed to his colleagues his fear that ██████████████████████████████████████ ████████████████████████████████. Ex. 26 at 758.  He used this opportunity to ████████████████████████████████████████████████████████████ ████████████████████████████████ *Id.* at 758.[6]  On April 25, 2018, Todd Owen, Executive Assistant Commissioner of CBP for the Office of Field Operations, responded, "██████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████." *Id.* at 757.  Two days later, on April 27, 2018, Mr. Owen issued CBP's metering policy, which was distributed to the four directors of field operations that oversee the operations of all POEs on the U.S.-Mexico border.  *See* Ex. 27.  Under the metering policy, POE directors were empowered to "meter the flow of travelers at the land border." *Id.*  When "metering" is in place, CBP officers tell "waiting travelers that processing at the port of entry is currently at capacity." *Id.*  Therefore, "while the Government encouraged all asylum-seekers to come to ports of entry to

---

[6] "Queue management" is a synonym for metering. *See* Ex. 1 at 176:18-22; Ex. 2 at 43:2-6.

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

make their asylum claims, CBP managed the flow of people who could enter at those ports of entry through metering." Ex. 28 at 057.

There was no need for the metering policy. ███████████████

████████████████████████████████████████████████

████████████████████████████████ Ex. 29 at 825. As of April 28, 2018, ████████████████████████████

███████████████████████. Ex. 30 at 054. And all POEs on the U.S.-Mexico border were operating at ███████████ detention capacity from April 27-29, 2018. *See* Ex. 31 at 695; Ex. 32 at 128; Ex. 33 at 289. The San Ysidro POE, ████████

████████████████████████████████████████████████

██████████████████████, could have easily processed these migrant caravan members in an expeditious manner. *See* Ex. 34 at 246.

Then, on June 5, 2018, Secretary of Homeland Security Kirstjen Nielsen ████████████████████████████████████████████████

████████████████ Ex. 35 at 455. ███████████████████████

████████████████████████████████████████, *id.* at 457, ███████

████████████████████████████████████████████████

████████████████████. *Id.* at 456.[7]

Around the same time that CBP leadership "███████████████

████████████████████████████████████████████████

██████████████████" Ex. 36 at 768. This change was significant. ███████

████████████████████████████████████████████████

██████████████████. *See, e.g.*, Ex. 2 at 185:9-20; Ex. 37 at 740-43 (███████

---

[7] The ████████████████████████████████████ makes little sense when considered in the context of how the metering policy was implemented. When Defendants began enforcing the metering policy, they ███████████████████████████

████████████████ Ex. 3 at 122:1-10. CBP clearly has the ability to ████████
*See* Ex. 1 at 135:14-136:4
(CBP occasionally ████████████████████████████████████████).

1    ███████████████████████████████████). On the other hand, ██████████

2    ████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████

4    ███████████████████████████████████. Ex. 2 at 74:11-76:15, 189:8-191:6.

5    These policies continue to be in effect today. *See* Ex. 38 at 303-08 (██████████

6    ████████████████████████████████████████).

7    **C.    PORTS OF ENTRY ADOPTED POLICIES DESIGNED TO**

8    **TURN BACK ASYLUM SEEKERS**

9    Shortly after the ████████████████████████████ was issued,

10   all POEs began to deploy CBP officers to ███████████████████████████

11   ██████████████████████████████████. Ex. 39 at 370,

12   372. This deployment has been haphazard and has prioritized blocking asylum

13   seekers over CBP officer safety. *See* Ex. 3 at 171:20-172:20.  As one CBP officer

14   testified:

15   Q.    ████████████████████████████████████████████

16   ████████████████████████████?

17   A.    Yes.

18   Q.    ██████████████████████████████████?

19   A.    Yes.

20   Q.    ████████████████████████████████████████████

21   ████████████████?

22   A.    Yes.

23   *Id.* at 172:14-23.

24   CBP officers stationed at these "control points" inform asylum seekers that

25   the POE is at "capacity" and that asylum seekers should return to Mexico.  Ex. 1 at

26   170:8-171:13; Ex. 2 at 262:2-21.  In some instances, asylum seekers are told that

27   they should make contact with particular groups on the Mexican side of the border,

28   such as the Mexican humanitarian migrant aid agency, Grupo Beta. *See* Ex. 40 at

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

513 ("███████████████████████████████████████████████");

Ex. 41 at 231 ("█████████████████████████████████████████████

████████████████████████████████████████████████████████

████"). Instead of ███████████████████████, POEs have implemented ca████

███████████████████. *See, e.g.*, Ex. 42 at 453.  For example, in 2018, CBP

leadership at the Hidalgo, Texas POE told Senator Patrick Leahy that ████████

██████████████████████████████████████████ Ex. 42 at 453; *see*

*also* Ex. 22 at 742 (San Ysidro POE instituted a "███████████████████████

█████████████.").  Likewise, the Deputy Commander of CBP's ███████████

believed that agency guidance mandates "████████████████████████████

████."  Ex. 43 at 597.

Unsurprisingly, the processing levels at POEs cannot be justified by the

capacity of particular POEs.  For example, ████████████████████████████

██████████████████████████████████████████████████████████

████," Ex. 44 at 200, states that the ████████ POE "████████████████████

██████████████████████████." *Id.* at 213.  However, daily data compiled

and kept by █████████ shows that the ████████ POE came nowhere close to

processing this number of cases per day.  By way of example, the MCAT data shows

that the ████████ POE was processing far fewer than ████████████ per day

in the first quarter of 2019.

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.



SOURCES: AOL-DEF-00012012; AOL-DEF-00012022; AOL-DEF-00012033; AOL-DEF-00012041; AOL-DEF-00012051; AOL-DEF-00012061; AOL-DEF-00012071; AOL-DEF-00012081; AOL-DEF-00012099; AOL-DEF-00012109; AOL-DEF-00012119; AOL-DEF-00012129; AOL-DEF-00012144; AOL-DEF-00012154; AOL-DEF-00012164; AOL-DEF-00012175; AOL-DEF-00012186; AOL-DEF-00012196; AOL-DEF-00012206; AOL-DEF-00012217; AOL-DEF-00012227; AOL-DEF-00012236; AOL-DEF-00012246; AOL-DEF-00012256; AOL-DEF-00012266; AOL-DEF-00012284; AOL-DEF-00012307; AOL-DEF-00012317; AOL-DEF-00012335; AOL-DEF-00012345; AOL-DEF-00012355; AOL-DEF-00012365; AOL-DEF-00012376; AOL-DEF-00012394; AOL-DEF-00012404; AOL-DEF-00011024

In the limited instances where a POE decides to inspect and process asylum seekers, they rely on waitlists maintained by authorities or shelters on the Mexican side of the border. *See* Ex. 45 at 967. As an officer at the San Ysidro POE explained, port management would " ███████████████████████████████████████ ███████████████████████████████████," and "███████████████████████████ ███████████." *Id.* The Mexican list-keepers then reference waitlists to determine which asylum seekers will be allowed to return to the POE to seek asylum. *See* Ex. 46 at ¶ 7; *see also* Ex. 40 at 513; Ex. 41 at 231.

In many cases, asylum seekers are metered and turned back to Mexico when they are actually standing on U.S. soil. On September 26, 2019, the DHS Office of Inspector General issued a report that concluded that "contrary to Federal law and [CBP] policy, CBP officials at the Tecate, California [POE] returned some asylum applicants from inside the United States back to Mexico and instructed those individuals to go to other [POEs] to make their asylum claims." Ex. 4 at 547; *see also* Ex. 47 at 421 (███████████████████████████████████████

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.



). A whistleblower also testified that "in most cases" asylum seekers crossed the limit line onto U.S. soil before interacting with him at a queue management point. Ex. 3 at 96:11-97:18. CBP's Executive Assistant Commissioner, Todd Owen, conceded, "

" before metering them. Ex. 2 at 151:11-17, 152:16-155:2. And, even when CBP officers are stationed at

. *Id.* at 93:1-94:18. Consequently, even the Executive Assistant Commissioner of CBP would not rule out the possibility that

. *Id.* at 94:9-20.

At the same time, smaller Class A POEs

Ex. 39 at 370.

. Ex. 3 at 154:2-155:8, 120:17-122:22; *see also* Ex. 48 at 643-44 (

); Ex. 49 (

); Ex. 50 (same); Ex. 51 (same).

The line officers within CBP understand that the purpose of this turnback policy is to deter asylum seekers from attempting to enter the U.S. Ex. 52 at 673 (

);

Ex. 53 at 3 (

); Ex. 54 at 783 (

); Ex. 55 at 881 (

); Ex. 56 at 004 (

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

██████████████████████████████████). Indeed, POEs have continued
to ████████████████████████████████████████████████████████████
███████████████████████████████████████████████. *See, e.g.*,
Ex. 57 at 633.  In fact, ████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████ Ex. 58 at 457; Ex. 3 at 155:9-18.

CBP officers also realize that the "capacity" excuse is an "obvious . . . lie"
and that Defendants' policy is "a solution in search of a problem." Ex. 3 at 99:19-
101:2, 153:24-154:1; Ex. 15 at 110 (email to CBP Commissioner: "The employees
would like you to provide them the proper authority and sections of law that allows
them to . . . prevent [asylum seekers] from entering the U.S. after presenting
themselves for inspection and requesting asylum. . . . [T]he agency is claiming
publicly that they are not conducting these activities when they really are."); Ex. 6
at 132.

Further evidencing this deterrence motivation, CBP has refused to implement
contingency plans that could considerably increase the capacity of POEs to process
asylum seekers.  For instance, in November 2018, Pete Flores, an official in CBP's
San Diego Field Office, ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████. Ex. 59 at 473; Ex. 60 at 469. DHS Secretary Kirstjen
Nielsen ████████████████████████. Ex. 61 at 247.  Rather than ████████████████
████████████████████████████████, Secretary Nielsen directed t ██████████
████████████████████████████████████████████████████████████████
██████████████████████ *Id.*

Similarly, in August 2018, Ryan Koseor, the Deputy Commander of CBP's
███████████████████, was tasked to █████████████████████████████████████
████████████████████████████████████████████████████████████████

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

1   ██████████████████. Ex. 62 at 802. However, CBP Commissioner McAleenan

2   █████████████████████████████████████████████████████████████████████████

3   ███████████████████████████ *Id.* Mariza Marin, a Watch Commander at the San

4   Ysidro POE, ██████████████████████████████████████████████████████████████

5   ██████████████████████████ *Id.*

6   **D.    THE SYSTEMIC EFFECT OF DEFENDANTS' CONDUCT**

7   Defendants' Turnback Policy has a border-wide, systemic effect on asylum

8   seekers. Prior to the formalization of the metering policy, on November 27, 2017,

9   CBP ████████████████████████████████████████████████████. *See*

10  Ex. 63 at 12000. The purpose of ███████ is to "████████████████████████

11  █████████████████████████████████████████████████████████████████████████

12  ███████████████████████████████████████." *Id.* ████████████████████████

13  █████████████████████████████████████████████████████████████████████████

14  █████████████████████████████████████████████████████████████████████████

15  ██████████████████████████████████████████. Ex. 2 at 190:20-

16  191:6. Plaintiffs' expert, Ms. Leutert, conducted a detailed analysis of these records.

17  *See* Ex. 7 at ¶¶ 61-91. ████████████████████████████████████████████████

18  █████████████████████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████. *Id.* To

20  begin with, "████████████████████████████████████████████████████████████

21  ██████████████████." *Id.* at ¶ 63. In the rare cases where ████████████████

22  ████████████████████████████████████. *Id.* at ¶¶ 90-91.

23  Plaintiffs have documented the consistent implementation of the Turnback

24  Policy and metering through multiple declarations. *See* Ex. 64 at ¶ 6; Ex. 65 at ¶¶

25  9-10; Ex. 66 at ¶¶ 8-9; Ex. 67 at ¶¶ 9-10; Ex. 68 at ¶¶ 9-10; Ex. 69 at ¶¶ 7-8; Ex. 70

26  at ¶ 9; Ex. 71 ¶¶ 9-12; Ex. 72 at ¶¶ 5-7; Ex. 73 at ¶¶ 4-11; Ex. 74 at ¶¶ 14-17; Ex. 75

27  at ¶¶ 7-11; Ex. 76 at ¶¶ 14-16; Ex. 77 at ¶¶ 9-12; Ex. 78 at ¶¶ 7-11; Ex. 79 at ¶¶ 7-

28  10; Ex. 80 at ¶¶ 6-18; Ex. 81 at ¶¶ 8-10; Ex. 9 at ¶¶ 9-19; Ex. 10 at ¶¶ 9-22 ; Ex. 11

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

at ¶¶ 13-29; Ex. 12 at ¶¶ 8-18; Ex. 13 at ¶¶ 11-18; Ex. 14 at ¶¶ 10-23 ; Ex. 82 at ¶ 6; Ex. 83 at ¶ 4; Ex. 84 at ¶ 3; Ex. 85 at ¶ 3; Ex. 86 at ¶ 3; Ex. 87 at ¶¶ 3-5; Ex. 88 at ¶¶ 2-4; Ex. 97 at ¶¶ 4-5, 7-11; Ex. 98 at ¶¶ 8-9; Ex 99 at ¶¶ 3-12; Ex. 100 at ¶¶ 10-13; Ex. 101 at ¶¶ 5-11; Ex. 102 at ¶¶ 5-9; Ex. 103 at ¶¶ 8-13.  In Mexico, asylum seekers contact local organizations to place themselves on waitlists.  *See, e.g.*, Ex. 65 at ¶¶ 9-10; Ex. 66 at ¶¶ 8-9; Ex. 67 at ¶¶ 9-10; Ex. 68 at ¶¶ 9-10; Ex. 69 at ¶¶ 6-7.  These asylum seekers then spend week or months waiting for their names to be called along with hundreds of other asylum seekers.  *See, e.g.*, Ex. 64-A at 5-13; Ex. 46 at ¶¶ 7-10.  These wait times can last months because, on average, no POE processes over 30 asylum seekers per day. Ex. 64-A at 5-13.

This is entirely different from the way that asylum seekers were inspected and processed at POEs prior to the implementation of the Turnback Policy.  Prior to that Policy, asylum seekers could proceed past the international boundary to the entry halls or inspection stations at the POEs, where they would be inspected and referred for further process in compliance with 8 U.S.C. § 1225.  *See* Ex. 64 at ¶ 6.  Asylum seekers were not forced to spend months on waitlists on the Mexican side of the border.  *Id*.

CBP's own statistics show that the Government has far more capacity to process asylum seekers than it is currently using.  Between July 2015 and January 2017, before Defendants standardized their border-wide Turnback Policy, CBP processed an average of 12,651 undocumented migrants per month. Ex. 89 at ¶ 6(a). Between June 2018 and July 2019, CBP processed an average of only 9,904 undocumented migrants per month, a 28% decrease.  *Id.* ¶ 6(b)-(c).  Despite this drop in undocumented migrants, the Turnback Policy persisted.



Due to the Turnback Policy, tens of thousands of asylum seekers have been forced to wait for protracted periods in Mexican border towns under dangerous conditions without access to basic resources. *See, e.g.*, Ex. 64 at ¶ 7; Ex. 65 at ¶ 17; Ex. 68 at ¶ 17; Ex. 69 at ¶ 12; Ex. 70 at ¶ 11; Ex. 71 at ¶ 14; Ex. 72 at ¶ 9; Ex. 73 at ¶ 11. Because migrant shelters—unlike POEs—are actually over capacity, asylum seekers, including families with young children, are forced to live on the street where temperatures regularly exceed 100 degrees in the summer and can plummet below freezing in the winter. *See* Ex. 64 at ¶ 7.

## E.    DEFENDANTS INTEND TO DETER ASYLUM SEEKERS

The Turnback Policy, including metering, is a key part of the Government's overall effort to deter asylum seekers. Beginning in 2017, Defendants have enacted

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

a series of executive orders[8], administrative rules[9], and presidential proclamations[10] aimed at deterring asylum seekers and denying them access to the U.S. asylum process.

These policy changes are no surprise. On June 16, 2015, Presidential Candidate Donald Trump stated, "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with [them]. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people." Donald Trump, *Watch Donald Trump Announce His Candidacy for U.S. President*, PBS NewsHour (Jun. 16, 2015), http://bit.ly/2NmWFus. More recently, President Trump stated, "They have to get rid of the whole asylum system because it doesn't work. And, frankly, we should get rid of judges. You can't have a court case every time

---

[8] *See, e.g.*, Exec. Order No. 13767, 82 Fed. Reg. 8,793 (Jan. 25, 2017) (calling for building a physical wall on U.S.-Mexico border, construction of new detention facilities, returning asylum seekers to Mexico, and restricting use of parole with respect to asylum seekers); Exec. Order No. 13769, 82 Fed. Reg. 8,977 (Jan. 27, 2017) (denying all immigration benefits to migrants from certain "terrorist" countries); Exec. Order No. 13780, 82 Fed. Reg. 13209 (Mar. 6, 2017) (denying asylum benefits to refugees from Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen, subject to certain exceptions).

[9] *See, e.g.*, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018) (banning migrants that entered the U.S. between POEs from accessing U.S. asylum process); Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July. 16, 2019) (third-country transit rule); Removal of 30-Day Processing Provision for Asylum Application-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47,148 (Sept. 9, 2019) (extending time period for issuance of employment authorization to asylum applicants); Asylum Application, Interview, and Employment Authorization for Applicants, 84 Fed. Reg. 62,374 (Nov. 14, 2019) (making it more difficult for asylum seekers to receive employment authorization in the U.S.); U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280 (Nov. 14, 2019) (charging asylum seekers a fee for filing application); Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69,640 (Dec. 19, 2019) (expanding bars to asylum for migrants with certain types of criminal convictions and ending automatic review of discretionary denials of asylum).

[10] *See, e.g.*, Proclamation No. 9822, 83 Fed. Reg. 57,661 (Nov. 9, 2018) (banning migrants from seeking asylum in any location other than a port of entry); Proclamation No. 9842, 84 Fed. Reg. 3665 (Feb. 7, 2019) (same); Proclamation No. 9880, 84 Fed. Reg. 21,229 (May 8, 2019) (same).

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

somebody steps foot on our ground." Ex. 90 at 3; *see also* Ex. 91 at 24 ("Asylum is a ridiculous situation. . . . It's a big con job. That's what it is."); Ex. 92 at 24 ("How stupid can we be to put up with this? How stupid can we be? . . . [T]he asylum program is a scam.").[11] President Trump's immigration advisor, Stephen Miller, stated, "My mantra has persistently been presenting aliens with multiple unavoidable dilemmas to impact their calculus for choosing to make the arduous journey to begin with." Ex. 93 at 2. Mr. Miller has been even more direct about his intentions, stating that he "would be happy if not a single refugee foot ever again touched America's soil." Ex. 94 at 6.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs the certification and maintenance of class actions. A plaintiff whose lawsuit meets the requirements of Rule 23 has a "categorical" right "to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 559 U.S. 393, 398 (2010). The "suit must satisfy the criteria set forth in subdivision (a) [of Rule 23] . . . , and it also must fit into one of the three categories described in subdivision (b) [of Rule 23]." *Id*.[12] Courts refer to the Rule 23(a) factors as "numerosity, commonality, typicality, and adequacy of representation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

Rule 23(b)(2) permits class certification when "the party opposing the class

---

[11] President Trump's belief that the U.S. asylum process is a "scam" is, in part, based on the mistaken assumption that less than 2% of asylum seekers show up for their hearings in U.S. immigration court. *See* Nicole Narea, *Trump Says Most Asylum Seekers Don't Show Up for their Court Hearings. A New Study Says 99% Do.*, Vox (Jan. 10, 2020), https://tinyurl.com/wjuvga4. A recent study shows that 98.7% of non-detained asylum seekers attended their immigration hearings. TRAC Immigration, *Record Number of Asylum Cases in FY 2019* (Jan. 8, 2020), https://tinyurl.com/wogkdqb.

[12] When analyzing class certification, "[t]he court may consider whether the plaintiff's proof is, or will likely lead to, admissible evidence." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018). "But admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Id.* (concluding that the district court abused its jurisdiction by refusing to consider declaration purely on the grounds of admissibility).

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

## IV.    THE REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 23(A) ARE MET

### A.    THE CLASS IS NUMEROUS

The class and sub-class are both sufficiently numerous to satisfy Federal Rule of Civil Procedure 23(a)(1), requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Impracticability does not mean impossibility" but only "the difficulty or inconvenience of joining all members of [the] class."  *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501 (S.D. Cal. 2013) (quoting *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964)).

There is no "specific number of class members required for numerosity."  *In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005).  A plaintiff does not need to specify the exact number of class members in order to certify a class.  *Ms. L. v. U.S. Immigration & Customs Enf't*, 2018 WL 8665001, at *4 (S.D. Cal. 2018).

However, "courts generally find that the numerosity factor is satisfied if the class comprises 40 or more members, and will find that it has not been satisfied when the class comprises 21 or fewer."  *In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012). Where, as here, a plaintiff "seek[s] only injunctive and declaratory relief, the numerosity requirement is relaxed and [the] plaintiff[] may rely on [] reasonable inference[s] . . . that the number of unknown and future members . . . is sufficient to make joinder impracticable."  *Civ. Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 317 F.R.D. 91, 100 (N.D. Cal. 2016) (internal quotation marks and citations omitted); *see also In re Yahoo Mail Litig.*, 308 F.R.D. 577, 589-90 (N.D. Cal. 2015) ("In determining whether numerosity is satisfied, the Court may consider reasonable inferences drawn from the facts before it.").

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

Here, joinder is clearly impracticable, because "general knowledge and common sense indicate that [the class] is large." *Von Colln v. Cty. of Ventura*, 189 F.R.D. 583, 590 (C.D. Cal. 1999) (internal quotation marks and citations omitted). The best indication of the number of individuals in the class is the number of individuals who are or have been on waitlists kept in towns on the Mexican side of the border. *See* Ex. 64-A at 2; Ex. 7 at ¶ 78. Between October 2018 and November 2019, at least 22,000 people put their names on an asylum waitlist in Ciudad Juarez, Mexico; from April 2018 to December 2019, 35,460 people placed their names on the waitlist in Tijuana, Mexico. *See* Ex. 7 at ¶ 78. The sum—57,460— is under-inclusive. It includes only two Mexican border towns. Furthermore, it likely does not include most Black asylum seekers or unaccompanied children, who are often prohibited from putting their names on waitlists, or transgender individuals who fear retaliation by identifying their birth name and gender on these waitlists. Ex. 46 at ¶¶ 8-10. Plaintiffs have also collected dozens of declarations from members of the class detailing the effects of turnbacks. *See* Exs. 65-88, 97-103.

Additional factors commonly considered by courts when evaluating numerosity also compel the conclusion that class treatment is appropriate here. These factors include "(1) the judicial economy that will arise from avoiding multiple actions; (2) the geographic dispersion of members of the proposed class; (3) the financial resources of those [class] members; (4) the ability of the members to file individual suits; and (5) requests for prospective relief that may have an effect on future class members." *McCluskey v. Trustees of Red Dot Corp. Emp. Stock Ownership Plan & Tr.*, 268 F.R.D. 670, 674 (W.D. Wash. 2010) (internal quotation marks and citations omitted).

While each of these factors weighs sharply in favor of class certification, the second, third, and fourth factors are particularly instructive. Members of the class and sub-class are scattered in encampments and shelters in Mexican border cities. *See* Ex. 64-A at Fig. 1. Members of the class seek and will seek access to the asylum

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

process at POEs all along the U.S.-Mexico border.  *See id.*

In many cases, they do not speak English, do not have any understanding of the U.S. legal system, and do not have the financial resources to retain legal counsel capable of pursuing complex litigation. *See, e.g.*, Ex. 80 at ¶ 6 ("I slept on the ground with my son . . . I had nowhere to go and no money"); Ex. 76 at ¶ 19 ("I go to bed hungry because there is not enough food for dinner."). Thus, they lack any practical ability to file individual suits. *See, e.g.*, *Rodriguez v. Hayes*, 591 F.3d 1105, 1123 (9th Cir. 2010) (finding numerosity satisfied, in part, because of "the several practical concerns that would likely attend [prospective immigrant class members] were they forced to proceed alone."); *Leyva v. Buley*, 125 F.R.D. 512, 515 (E.D. Wash. 1989) (certifying class of migrant workers due to class members' limited knowledge of the legal system, limited or non-existent English language skills, and fear of retaliation). Accordingly, the class and sub-class are numerous. *Al Otro Lado, Inc. v. McAleenan*, 2019 WL 6134601, at *12 (S.D. Cal. 2019) (Dkt. 330 at 22) (finding that subset of class proposed in this motion satisfied numerosity requirement).

## B.    THERE ARE COMMON QUESTIONS OF LAW AND FACT

Rule 23(a) next requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "What matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks omitted).

However, all questions of law and fact do not need to be common to the proposed class in order to satisfy Rule 23(a). *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). Instead, commonality requires plaintiffs to demonstrate that their claims "depend upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims

in one stroke." *Wal-Mart*, 564 U.S. at 350. Commonality can be satisfied by a single common issue. *See, e.g.*, *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (commonality "does not . . . mean that *every* question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single *significant* question of law or fact.") (internal quotation marks omitted).

When a plaintiff is seeking injunctive and declaratory relief, commonality is present "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Unknown Parties v. Johnson*, 163 F. Supp. 3d 630, 635 (D. Ariz. 2016) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001)). Such suits "by their very nature often present common questions satisfying Rule 23(a)(2)." 7A Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice & Procedure* § 1763 (3d ed. 2019). Furthermore, the fact that a policy is enforced in a less than uniform manner does not negate a finding of commonality. *See Lyon v. ICE*, 300 F.R.D. 628, 642 (N.D. Cal. 2014) ("The fact that the precise practices among the three [immigration detention] facilities may vary does not negate the application of a constitutional floor equally applicable to all facilities.").

For example, in *Unknown Parties v. Johnson*, a group of detainees at CBP detention facilities in the U.S. Border Patrol's Tucson Sector sued the Secretary of Homeland Security and the CBP Commissioner for violations of the Due Process Clause of the Fifth Amendment. 163 F. Supp. 3d at 634. The plaintiffs sought declaratory and injunctive relief, including an order compelling the Government to provide the proposed class with beds; access to soap, toothbrushes, toothpaste, and other sanitary supplies; clean drinking water and nutritious meals; reasonable holding cell temperatures; and access to medical care. *Id.* The plaintiffs moved to certify a class of "all individuals who are now or in the future will be detained for one or more nights at a CBP facility, including Border Patrol facilities, within the Border Patrol's Tucson Sector." *Id.* (internal quotation marks omitted). The Government argued that the proposed class lacked commonality, because plaintiffs

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

1    were challenging "a number of different conditions they allege were experienced by

2    a variety of individuals . . . over an unspecified period of time at eight different

3    Border Patrol stations throughout the Tucson Sector." *Id.* at 637 (internal quotation

4    marks omitted).  Because the plaintiffs "provide[d] numerous declarations in which

5    putative class members attest[ed] to" system-wide deprivation of their due process

6    rights, the court found that the commonality requirement was met and that

7    "[p]laintiffs' contentions, if proven, would be []capable of classwide resolution." *Id.*;

8    *see also id.* at 638-39 (rejecting as "irrelevant" Government's argument that "factual

9    differences" in the treatment of "the individual immigration detainees" negated

10   commonality because plaintiffs asserted claims based on "Sector-wide conditions of

11   confinement").

12        So too here.  It is undisputed that, on April 27, 2018, CBP's Office of Field

13   Operations promulgated the metering policy.  Ex. 27.  This metering policy applies

14   to all POEs on the U.S.-Mexico border, meaning that any asylum seeker who

15   approaches a POE could be metered.  *See id.*  There is no dispute that, ████████

16   ████████████████████████████████████████████████████████████

17   ████.  Ex. 1 at 170:8-171:13; Ex. 2 at 262:2-21.  These officers inform noncitizens

18   at the border that the POE is full and that they should return to Mexico to await

19   processing and inspection at an unspecified later date.  Ex. 1 at 170:8-171:13; Ex. 2

20   at 262:2-21.  And, as Randy Howe, the Executive Director of CBP's Office of Field

21   Operations, testified before the U.S Senate's Homeland Security and Governmental

22   Affairs Committee on June 26, 2019:

23        Q.    I want to go back and talk about metering at the ports of entry. .

24              . . Is it happening across all ports of entry?

25        A.    Thank you, Senator.  Yes, it is. . . .

26   *Human Smuggling at the U.S.-Mexico Border: Hearing Before the S. Homeland Sec.*

27   *and Governmental Affairs Comm.*, 116th Cong., C-SPAN (June 26, 2019),

28   https://tinyurl.com/wzorwct; *see also* Ex. 1 at 13:7-17 (Mr. Howe affirming that he

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

1    ██████████████████████████████████████).  Defendants do not dispute

2    that in several cases asylum seekers on U.S. soil were metered and turned back to

3    Mexico. *See supra* at 13-14. Plaintiffs have also presented numerous declarations

4    showing that the existence and effects of turnback, including metering, are systemic

5    and capable of common proof.  *See, e.g.*, Ex. 64 at ¶ 6; Ex. 65 at ¶¶ 9-10; Ex. 66 at

6    ¶¶ 8-9; Ex. 67 at ¶¶ 9-10; Ex. 68 at ¶¶ 9-10; Ex. 69 at ¶¶ 7-8; Ex. 70 at ¶ 9; Ex. 71

7    ¶¶ 9-12; Ex. 72 at ¶¶ 5-7; Ex. 73 at ¶¶ 4-11; Ex. 74 at ¶¶ 14-17; Ex. 75 at ¶¶ 7-11;

8    Ex. 76 at ¶¶ 14-16; Ex. 77 at ¶¶ 9-12; Ex. 78 at ¶¶ 7-11; Ex. 79 at ¶¶ 7-10; Ex. 80 at

9    ¶¶ 6-18; Ex. 81 at ¶¶ 8-10; Ex. 9 at ¶¶ 9-19; Ex. 10 at ¶¶ 9-22 ; Ex. 11 at ¶¶ 13-29;

10   Ex. 12 at ¶¶ 8-18; Ex. 13 at ¶¶ 11-18; Ex. 14 at ¶¶ 10-23 ; Ex. 82 at ¶ 6; Ex. 83 at ¶

11   4; Ex. 84 at ¶ 3; Ex. 85 at ¶ 3; Ex. 86 at ¶ 3; Ex. 87 at ¶¶ 3-5; Ex. 88 at ¶¶ 2-4.

12   Furthermore, Plaintiffs' expert, Stephanie Leutert, has conducted a rigorous

13   analysis of ████████████████████████████████████████████████████

14   ████████████████████████████.  *See* Ex. 7 at ¶¶ 61-91.  Her analysis shows that

15   metering occurs regardless of the capacity of a POE. *Id.* at ¶ 91. Therefore, capacity

16   is not a justification for Defendants' turnbacks; indeed, capacity appears to be

17   irrelevant to whether a POE is turning back asylum seekers.

18   As they have done before, Defendants will suggest that commonality is not

19   satisfied because whether metering is justified by capacity constraints must be

20   analyzed with respect to each asylum seeker.  This is not the case for at least three

21   reasons.  *See* Dkt. 308 at 17-22.  *First*, Defendants' argument is irrelevant because

22   turnbacks, including metering, are illegal regardless of Defendants' proffered

23   justification for them.  *See* Dkt. 280 at 65 ("[T]he Executive cannot 'amend the INA'

24   . . . through executive action to establish a procedure at variance with the scheme

25   Congress chose."); *id.* at 38, 45-46, 59 (8 U.S.C. § 1225 requires CBP to inspect and

26   process all noncitizens "in the process of arriving" in the United States); Dkt. 294-1

27   at 19-20; Dkt. 210 at 17-22. *Second*, Ms. Leutert's analysis shows that metering, a

28   form of turnbacks, has been occurring across the border regardless of the capacity

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

of a POE. *See* Ex. 7 at ¶¶ 61-91. *Third*, Defendants' argument is entirely anecdotal and entitled to no weight because it is not a "rigorous analysis" of commonality. *See Comcast Corp. v. Behrend*, 596 U.S. 27, 33-34 (2013); *see also Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 63 (E.D.N.Y. 2012) (refusing to credit a party's "conclusory or cookie-cutter statements"). Rather than citing contemporaneous documents or data to support their capacity argument, Defendants and their deposition witnesses *assume* that capacity concerns *might* differ between POEs. That is simply not enough.

Therefore, there are numerous common questions of fact and law, including: (1) whether Defendants are misinterpreting 8 U.S.C. §§ 1158(a)(1) and 1225(a)(1), (a)(3), and (b)(1)(A)(ii) to apply only to individuals who are physically present in the U.S.; (2) whether Defendants denied noncitizens arriving at Class A POEs on the U.S.-Mexico border access to the U.S. asylum process; (3) whether class members have been "adversely affected or aggrieved" by agency action taken by Defendants, 5 U.S.C. § 701; (4) whether Defendants "unlawfully withheld or unreasonably delayed" mandatory agency action; (5) whether Defendants denied class members due process in violation of the Fifth Amendment; (6) whether Defendants' conduct violated the universal and obligatory international norm of *non-refoulement*, (7) whether Defendants' turnbacks are *ultra vires*, and (8) whether the Turnback Policy was adopted and implemented based on pretext and an unlawful desire to deter asylum seekers. As a result, Plaintiffs easily satisfy the commonality requirement here. *See, e.g.*, *Unknown Parties*, 163 F. Supp. 3d at 636-38; *Nak Kim Chhoeun v. Marin*, 2018 WL 6265014, at *5 (C.D. Cal. 2018) (commonality satisfied where "the central question in [the] case is whether the Government's policy of revoking proposed class members' release and re-detaining them without any procedural protections is unlawful"); *Inland Empire - Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *8 (C.D. Cal. 2018) (commonality satisfied where plaintiffs "challenge[d] Defendants' common termination policies

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

1  and practices as categorically violating the APA and the Due Process Clause—not

2  the agency's ultimate exercise of discretion with respect to each recipient.") (internal

3  quotation marks omitted).

4  ## C.    TYPICALITY IS SATISFIED

5  Federal Rule of Civil Procedure 23(a)(3) requires that "the claims . . . of the

6  representative parties [be] typical of the claims . . . of the class."    Fed. R. Civ. P.

7  23(a)(3).    "[T]he typicality requirement is permissive and requires only that the

8  representative's claims are reasonably coextensive with those of absent class

9  members; they need not be substantially identical." *Rodriguez*, 591 F.3d at 1124

10  (internal quotation marks omitted).    "The test of typicality is 'whether other

11  members [of the class] have the same or similar injury, whether the action is based

12  on conduct which is not unique to the named plaintiffs, and whether other class

13  members have been injured by the same course of conduct.'" *Parsons v. Ryan*, 754

14  F.3d 657, 685 (9th Cir. 2014) (citation omitted).  Typicality is satisfied "'when each

15  class member's claim arises from the same course of events, and each class member

16  makes similar legal arguments to prove the defendant's liability.'" *Rodriguez*, 591

17  F.3d at 1124 (internal quotation marks omitted).

18  Here, there is nothing unique or disparate about the Named Plaintiffs' claims

19  against Defendants. Like the remainder of the class and sub-class, the Named

20  Plaintiffs presented themselves at POEs on the U.S.-Mexico border but were turned

21  away by CBP officers.  *See* Ex. 73 at ¶¶ 4-5.  *See also* Ex. 65 at ¶¶ 9-10; Ex. 66 at

22  ¶¶ 8-9; Ex. 67 at ¶¶ 9-10; Ex. 68 at ¶¶ 9-10; Ex. 69 at ¶¶ 7-8; Ex.70 at ¶ 9; Ex.71 at

23  ¶¶ 9-12; Ex. 72 at ¶¶ 5-7; Ex. 74 at ¶¶ 14-17; Ex. 75 at ¶¶ 7-11.  For instance, Named

24  Plaintiff Roberto Doe was turned away from the U.S.-Mexico border due to the

25  metering policy.  *See* Ex. 73 at ¶¶ 4-11; *see also* Ex. 95 at ¶¶ 3-6.  Like the remainder

26  of the class and sub-class, the Named Plaintiffs raise the same legal arguments that

27  the Turnback Policy, including metering, violates the INA, Section 706(1) and

28  706(2) of the APA, the Due Process Clause of the Fifth Amendment, and the Alien

1    Tort Statute. *See* Dkt. 189 ¶¶ 203-235.

2          For instance, Named Plaintiff Roberto Doe fits precisely into the class and

3    subclass definitions. He is a Nicaraguan citizen. Ex. 73 at ¶ 2. Fearing death threats

4    from government-aligned paramilitaries, he traveled from Nicaragua to Reynosa,

5    Mexico. *Id.* at ¶¶ 3-4. After arriving in Reynosa, he attempted to present himself at

6    the Hidalgo POE. *Id.* at ¶ 4. On October 2, 2018, Roberto Doe was denied access

7    to the U.S. asylum process due to Defendants' metering policy. *Id.* at ¶ 5. A CBP

8    officer at the mid-point of the bridge refused to inspect and process him, claiming

9    that the POE was "full." *Id.* This CBP officer's statement was a lie. An October 2,

10   2018 email sent to then-Acting Commissioner of CBP, Kevin McAleenan,

11   confirmed that ███████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ███████████████████████████████████████████. Ex. 96 at

14   614-15. After being metered, Roberto Doe was forced to return to Mexico. Ex. 73

15   at ¶ 10. Then he was placed into deportation proceedings by the Mexican

16   government. Dkt. 189 ¶ 159. Since being released from Mexican custody, Roberto

17   Doe has continued to seek access to the asylum process in the U.S. *See* Ex. 95 at ¶

18   6. As a result, Roberto Doe's claims are co-extensive with those of the other

19   members of the class and subclass. Typicality is satisfied. *Rodriguez*, 591 F.3d at

20   1124; *Al Otro Lado*, 2019 WL 6134601, at *13 (Dkt. 330 at 23-35) (finding that

21   Roberto Doe satisfied typicality requirement); *see also* Exs. 9-13 (declarations from

22   additional named plaintiffs documenting turnbacks prior to the formalization of the

23   Turnback Policy through metering); Exs. 97-103 (declarations from additional

24   named plaintiffs documenting turnbacks after the formalization of Turnback Policy

25   through metering).

26   **D.    THE NAMED PLAINTIFFS AND COUNSEL ARE ADEQUATE**

27          Federal Rule of Civil Procedure 23(a)(4) requires that "the representative

28   parties will fairly and adequately protect the interests of the class." To be adequate,

1   "[f]irst, the named representatives must appear able to prosecute the action
2   vigorously through qualified counsel, and second, the representatives must not have
3   antagonistic or conflicting interests with the unnamed members of the class." *Lerwill*
4   *v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978); *see also Hanlon*
5   *v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds*
6   *by Wal-Mart*, 564 U.S. 338. "[O]nly a conflict that goes to the very subject matter
7   of the litigation will defeat a party's claim of representative status." Wright, Miller,
8   & Kane, *supra*, § 1768. Similarly, Federal Rule of Civil Procedure 23(g) is designed
9   to "guide the court in assessing proposed class counsel as part of the certification
10  decision." Fed. R. Civ. P. 23, Notes of Advisory Committee on 2003 Amendments.
11  Fed. R. Civ. P. 23(g)(1)(A) provides that, in appointing class counsel, a court "must
12  consider" the following: (i) the work counsel has done in identifying or investigating
13  potential claims in the action; (ii) counsel's experience in handling class actions,
14  other complex litigation, and the types of claims asserted in the action; (iii) counsel's
15  knowledge of the applicable law; and (iv) the resources that counsel will commit to
16  representing the class.

17      Each of those requirements is satisfied here. Plaintiffs' counsel have
18  investigated Defendants' Turnback Policy and analyzed the legal basis for Plaintiffs'
19  claims. They have also identified hundreds of additional victims of Defendants'
20  Turnback Policy, worked closely with non-governmental organizations to obtain
21  relevant evidence concerning the Turnback Policy and related practices,
22  aggressively sought discovery from Defendants, were successful in defeating both
23  of Defendants' motions to dismiss, and won a preliminary injunction that is currently
24  being litigated before the Ninth Circuit. *See generally* Dkts. 263, 280, 284, 286,
25  288, 330.

26      Plaintiffs' counsel have extensive experience litigating complex litigation and
27  class actions, including complex litigation related to Defendants' immigration
28  policies. *See* Medlock Decl. ¶¶ 4-5 (listing prior litigation experience of Plaintiffs'

counsel). Together, the class action and subject matter expertise of Plaintiffs' counsel qualify them to represent the Class. Plaintiffs' counsel have also committed substantial resources to this litigation, including retaining testifying and non-testifying expert witnesses, e-discovery vendors, and trial graphics providers. *Id.* at ¶ 2. Collectively, over 40 attorneys have spent over 8,000 hours on this litigation through December 31, 2019. *Id.* at ¶ 6. Finally, Plaintiffs are aware of no conflicts amongst the class and subclass.

## V.    RULE 23(B)(2) IS SATISFIED

"The key to the [Rule 23](b)(2) class is 'the indivisible nature of the injunctive and declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (citation omitted). Therefore, class certification is appropriate where the party opposing the class "'has acted in a consistent manner towards members of the class so that [its] actions may be viewed as part of a pattern of activity, or has established or acted pursuant to a regulatory scheme common to all class members.'" *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 240 (C.D. Cal. 2003) (citation omitted). "Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998). Thus, it is sufficient if the defendant has adopted a pattern of activity that is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the defendant's conduct. *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994).

The mere existence of factual differences between some class members will not defeat a motion to certify a Rule 23(b)(2) class. *See Unknown Parties*, 163 F. Supp. 3d 630, 643 (D. Ariz. 2016) (rejecting argument that plaintiffs were "challeng[ing] . . . various practices amongst [multiple] facilities," because plaintiffs identified the "systemic nature of the conditions" at CBP detention facilities)

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

(internal quotation marks omitted); *Walters*, 145 F.3d at 1047 ("the government's dogged focus on the factual differences among the class members appears to demonstrate a fundamental misunderstanding of the rule"). Even if such claims "may involve some individualized inquiries," the relevant question for purposes of Rule 23(b)(2) is "the 'indivisible' nature of the claim alleged and the relief sought." *Ms. L. v. ICE*, 2018 WL 8665001, at *9 (S.D. Cal. 2018) (certifying Rule 23(b)(2) class); *Lyon v. ICE*, 308 F.R.D. 203, 214 (N.D. Cal. 2015) (rejecting argument that ICE facilities had different attributes, because "these differences do not negate the fact that Plaintiffs seek relief that is applicable to . . . the entire class"). This is because Rule 23(b)(2) "focuses on the defendant and questions whether the defendant has a policy that affects everyone in the proposed class in a similar fashion." 2 William B. Rubenstein, *Newberg on Class Actions* § 4:28 (5th ed. 2019).

Moreover, the "rights of the class under Rule 23(b)(2) are not measured solely by the facts and circumstances of the named representatives." *Lyon v. ICE*, 171 F. Supp. 3d 961, 984 n. 17 (N.D. Cal. 2016); *see also Plata v. Schwarzenegger*, 2005 WL 2932253, at *6 (N.D. Cal. 2005) (citing a "few representative examples from the testimonial and documentary evidence" not confined to named plaintiffs to demonstrate inadequate medical care in California prisons); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1507 (C.D. Cal. 1988) (reviewing testimony from class members, not just the named plaintiffs, to determine there was a procedural due process violation).

For instance, in *Doe v. Nielsen*, a group of 87 Iranian Christians sued the Department of Homeland Security for denying them entry into the United States. 357 F. Supp. 3d 972, 980-81 (N.D. Cal. 2018). In their class certification motion, plaintiffs argued that the Government's "uniform response" to their applications to enter the United States was "sufficient to satisfy Rule 23(b)(2)." *Id.* at 992. The court reasoned that, in the face of the Government's apparent uniform action, "declaratory and injunctive relief [would] appl[y] equally to all members of the

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

proposed class and thus conform[ed] to Rule 23(b)(2)." *Id.*

This case is even stronger than *Doe v. Nielsen*. Here, Plaintiffs have evidence of a uniform response through multiple declarations *plus* direct evidence that Defendants adopted a common and systemic policy with respect to members of the class *and* statistical evidence and contemporaneous admissions showing that Defendants' justifications for its policies are a sham. It is difficult to conceive of a stronger and more cohesive Rule 23(b)(2) class. Plaintiffs' Rule 23(b)(2) class should be certified. *See, e.g.*, *Unknown Parties*, 163 F. Supp. 3d at 643 (injunctive relief claim that CBP systematically violated detainees' constitutional rights was "the quintessential type of claims that Rule 23(b)(2) was meant to address"); *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1205 (N.D. Cal. 2017) (Rule 23(b)(2) satisfied "[b]ecause a single injunction can protect all class members' procedural due process rights").

## VI. ASCERTAINABILITY IS NOT A FACTOR IN RULE 23(B)(2) CASES

While the Ninth Circuit has not yet ruled on the issue, this Court has previously concluded that "ascertainability should not be required when determining whether to certify a class in the 23(b)(2) context." *Bee, Denning, Inc. v. Capital Alliance Grp.*, 2016 WL 3952153, at *5 (S.D. Cal. 2016) (Bashant, J.); *McCurley v. Royal Seas Cruises, Inc.* 331 F.R.D. 142, 162 n.11 (S.D. Cal. 2019) (Bashant, J.) ("ascertainability is not a free-standing requirement of class certification"); *Al Otro Lado*, 2019 WL 6134601, at *14 (Dkt. 330 at 25) ("Although the Ninth Circuit has yet to expressly address the ascertainability requirement in the context of Rule 23(b)(2), courts in this Circuit have held that it does not apply.").[13] "Identification of individual class members is not required; to the contrary, the fact that class

---

[13] *See also Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("The decisions of other federal courts and the purpose of Rule 23(b)(2) persuade us that ascertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief."); *Hernandez v. Lynch*, 2016 WL 7116611, at *30 (C.D. Cal. 2016) ("Courts have held that ascertainability may not be required with respect to a class seeking injunctive relief.").

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

members are difficult or impossible to identify individually supports class certification under Rule 23(b)(2)." *Civil Rights Educ. & Enf't Ctr. v. RLJ Lodging Tr.*, 2016 WL 314400, at *5 (N.D. Cal. 2016). As a result, the ascertainability requirement does not apply to the class and sub-class.

## VII. CONCLUSION

For the foregoing reasons, the Court should certify a class consisting of all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A POE on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of CBP officials on or after January 1, 2016. The Court should also certify a sub-class consisting of all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016.

Dated: January 14, 2020

MAYER BROWN LLP
    Matthew H. Marmolejo
    Ori Lev
    Stephen S. Medlock

SOUTHERN POVERTY LAW CENTER
    Melissa Crow
    Sarah Rich
    Rebecca Cassler

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy
    Ghita Schwarz
    Angelo Guisado

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters

By: */s/ Stephen M. Medlock*

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stephen M. Medlock

*Attorneys for Plaintiffs*

36

**CERTIFICATE OF COMPLIANCE WITH MEET-AND-CONFER**

**REQUIREMENT**

Pursuant to Section 4(A) of the Court's Standing Order for Civil Cases, this motion is made following a telephone conference of counsel that took place on January 7, 2020.  During this conference, the parties were unable to eliminate the need to file this motion.

Dated:  January 14, 2020                              MAYER BROWN LLP


                                                     By  */s/ Stephen M. Medlock*
                                                     *Attorney for Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2
    I certify that I caused a copy of the foregoing document to be served on all

3
counsel via the Court's CM/ECF system.

4
Dated:  January 14, 2020            MAYER BROWN LLP

5

6
                                        By * /s/ Stephen M. Medlock*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO OF P. & A. IN SUPP. OF
MOT. FOR CLASS CERT.