MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>              Plaintiffs,<br><br>     v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>              Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 8 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**AOL-DEF-00217179 to AOL-DEF-00217247**<br><br>*FILED UNDER SEAL* |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

```
 1              United States District Court

 2          for the Southern District of California

 3                                    )
        AL OTRO LADO, Inc., et al.,   )
 4                                    )   No. 17cv2366-BAS
             Plaintiffs,              )
 5                                    )   May 10, 2019
                 v.                   )
 6                                    )   San Diego, California
        KIRSTJEN NIELSEN, Secretary,  )
 7      U.S. Department of Homeland   )
        Security, in her official     )
 8      capacity, et al.,             )

 9          Defendants.

10

11                TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE CYNTHIA BASHANT
12               United States District Judge

        APPEARANCES:
13
        For the Plaintiffs:    MAYER BROWN LLP
14                               MATTHEW H. MARMOLEJO
                                 Attorney at Law
15
                               THE CENTER FOR CONSTITUTIONAL RIGHTS
16                               BAHER AZMY
                                 ANGELO R. GUISADO
17                               Attorneys at Law

18                             SOUTHERN POVERTY LAW CENTER
                                 MELISSA E. CROW
19                               SARAH MARION RICH
                                 REBECCA CASSLER
20                               Attorneys at Law

21      For the Defendants:    U.S. DEPARTMENT OF JUSTICE
                                 ALEXANDER JAMES HALASKA
22                               GISELA ANN WESTWATER
                                 Attorneys at Law
23
        Court Reporter:        Dana Peabody, RDR, CRR
24                             District Court Clerk's Office
                               333 West Broadway, Suite 420
25                             San Diego, California 92101
                               DanaPeabodyCSR@gmail.com
```

| | |
|---|---|
| 1 | San Diego, California, May 10, 2019 |
| 2 | * * * |
| 3 | THE CLERK: Calling matter number 1, 17cv2366, Al Otro |
| 4 | Lado, Inc., et al. versus Nielsen, on calendar for motion |
| 10:01 5 | hearing. |
| 6 | THE COURT: Counsel, state your appearances for the |
| 7 | record, please. |
| 8 | MR. MARMOLEJO: Your Honor, Matthew Marmolejo, Mayer |
| 9 | Brown, LLP, for plaintiffs. |
| 10:01 10 | MR. AZMY: Your Honor, Baher Azmy, A-Z-M-Y, for the |
| 11 | plaintiffs, along with my colleague Angelo Guisado. |
| 12 | MS. CROW: And Melissa Crow, along with my colleagues |
| 13 | Sarah Rich and Rebecca Cassler, for the plaintiffs. |
| 14 | MS. WESTWATER: Good morning, Your Honor. |
| 10:02 15 | Gisela Westwater. I am here from Department of Justice on |
| 16 | behalf of the defendants. |
| 17 | MR. HALASKA: Alexander Halaska, also from the |
| 18 | Department of Justice, for defendants. |
| 19 | MS. WESTWATER: This is our agency counsel. |
| 10:02 20 | THE COURT: Let me tell you -- this is going to be a |
| 21 | little bit stream of consciousness, but let me tell you, sort |
| 22 | of, where I sort of stand at this point in time, and maybe that |
| 23 | will help focus your arguments. |
| 24 | First of all, I don't really see that the political |
| 10:02 25 | question doctrine bars review of the issues. It seems to me |

1    that the issues at this point raised in the complaint are

2    whether the defendants have complied with the statutes that

3    govern the border patrol activity.  So I don't really see that

4    as being an issue.

10:02    5        With respect to 706(1), I mean, to a certain extent, I feel

6    like I've already ruled on some of these issues already.  And

7    we're at the stage where I have to assume the truth of the

8    plaintiffs' allegation, so assuming the truth of the

9    plaintiffs' allegations, that they were coerced into

10:03    10    withdrawing their applications for admission, it seems to me

11    that the fact that they then withdrew their applications for

12    admission doesn't make it moot.  At this point they've at least

13    alleged that they were coerced into doing so.

14        With respect to the extraterritorial -- the arguments about

10:03    15    extraterritoriality over the new plaintiffs, it seems to me

16    that some of the new plaintiffs, there are allegations, again,

17    assuming they are true, that the individuals were at the port

18    of entry.  So to the extent there are allegations that the

19    individuals were at the port of entry, that doesn't seem to me

10:03    20    to be an issue.

21        With respect to the ones who were not at the port of entry,

22    who were maybe coming over the bridge, I agree that there are

23    some limits, some extraterritorial limits.  I think that at

24    this point, when I look at it, the issue is going to be whether

10:04    25    they were arriving at the port of entry, whether they were

1    seeking admission to the port of entry, and I think probably

2    there are sufficient allegations at this point to meet that

3    burden, but I certainly welcome argument on that issue.

4        With respect to 706(2), first of all, I'm not entirely

10:04    5    clear why you need 706(2) if you've got 706(1), but be that as

6    it may, I still have some trouble with it.  To the extent there

7    are allegations that there's this, you know, pattern and

8    practice, I think I really addressed that in the first motion

9    to dismiss.

10:04    10    To the extent there are allegations of individual

11    turnbacks, I think that's a 706(1), not a 706(2).

12    So that leaves me with this turnback policy, or whatever

13    you want to call it, turnback policy or metering policy or

14    whatever it is.  It seems to me that there is an allegation

10:05    15    that there's a policy which the defendants are not denying, and

16    I think the real question I have is whether that policy

17    is -- whether the allegations say that it is based on motive to

18    deter people from seeking asylum that is then decreasing the

19    number -- basically, it's a de facto limit on the number of

10:05    20    asylum seekers.

21    Because to the extent the plaintiffs are alleging there's a

22    policy that limits the number of asylum seekers, I think that's

23    barred under the statute or at least I think that implication

24    can be made.  There are limits on the number of refugees, but

10:05    25    there aren't limits on the number of people who can seek

AOL-DEF-00217182

1  asylum.  Anyone who wants to seek asylum can seek asylum, at

2  least that's the way I read the statutes.

3      With respect to the Fifth Amendment extraterritoriality, I

4  think it does apply under Boumediene, B-O-U-M-E-D-I-E-N-E, and

10:06   5  Rodriguez.  I think those are both applicable.

6      With respect to the state claims under the ATS, you know, I

7  have some real concerns about identifying a brand-new cause of

8  action under the ATS, and I am concerned about the

9  implications, for example, for an alien who is denied asylum or

10:06  10  denied refugee status, and under the INA, do they then get to

11  claim this AT -- this, you know, new cause of action as a way

12  to kind of do an end run around the INA?  And I think the

13  plaintiffs can obtain all the relief they seek under the INA,

14  and I just don't think at this point -- but I'll certainly

10:06  15  listen to it.  When you talk about an international norm, it's

16  got to be specific, universal, and obligatory.  I think you

17  have the specific.  Universal, you're a little further away.

18  And the obligatory, I'm really struggling.

19      So that's sort of where I stand right now to give you an

10:07  20  idea of what my thoughts are, and then I'll take argument from

21  there, and I think I'd like to hear from the defense first

22  since it's their motion.

23          MS. WESTWATER:  Okay, thank you.  Well, good morning.

24  Thank you.

10:07  25      Seeing how the Court has laid out -- I actually had a

1  document that we were wanting to present to the Court, which is

2  actually the CBP's metering guidance because since this

3  Court -- since this case has started, I think plaintiffs

4  incorporated by reference -- first, they referred to, and then

5  they incorporated by reference in their second amended

6  complaint, some emails talking about metering.  But since then,

7  the government has formalized its metering guidance in a

8  memorandum.  And since we believe some of that will be talked

9  about and will be fleshed out, what is this metering guidance,

10  I'd like to present that.  We've already produced it in

11  discovery.

12        THE COURT:  I'll tell you what you can do:  You can

13  present it, but I'm not going to reach the issue of whether

14  it's proper for me to consider it at this stage of the

15  proceedings.  I need some time to think about that and

16  take a look at what's alleged in the complaint and whether it's

17  actually incorporated by reference.  So I will give plaintiffs

18  the opportunity, if they want to, to argue that it should not

19  be considered at the motion-to-dismiss stage, but I'll let you

20  present it with the understanding that it may or may not be

21  considered at this stage of the proceedings.

22        MS. WESTWATER:  Yes, Your Honor.  And we don't believe

23  it's actually anything inconsistent perhaps with what we've

24  already had.  It is simply more put together and jelled

25  together.

1    Starting off with the political question, I think putting

2  that together, we believe it also goes together with a lot of

3  other cases.  So if you read Baker versus Carr, which is really

4  the quintessential case on political question, it limits -- it

10:09    5  gives you a little outline of what are political questions, but

6  one of them is really operational decisions that are open to

7  discretion.  And we believe that is really what CBP's metering

8  policy is.  They claim it a turnback or actually, guidance,

9  which we say is the guidance memo, really is.  You know, CBP,

10:09   10  if you look here on the southern border, you know, they are

11  responsible for inspecting vehicles.  They are responsible for

12  car lanes.  They are responsible for inspecting individuals.

13  On a given day, you know, there's thousands of people and

14  trucks and buses and cars that pass through the southern ports.

10:09   15  And so CBP has to decide every day how many lanes are we going

16  to have for inspecting vehicles?  How many lanes are we going

17  to have for inspecting goods?  And they have to determine how

18  many people are going to be in secondary inspection.  They're

19  required to look for smuggling of goods.  They're required to

10:10   20  look for bad visas.  They're required --

21    THE COURT:  The problem with all this is there's no

22  statute that says you have to -- if someone comes to the port

23  of entry, say, X, you have to refer them to secondary, and then

24  an allegation saying they were not following what they're

10:10   25  supposed to do because if someone comes, you're supposed to do

1    this, and in this case, there's an allegation that there's a

2    statute that says "you must do this" that they are not

3    following.

4                MS. WESTWATER:  That's where we would disagree.

10:10    5    Actually, plaintiffs' claims are you must process more people

6    without documents per day, and their claim is we want the Court

7    to get in and tell you, CBP -- I mean, they're complaining that

8    there aren't enough people there.  They're not taking people

9    without documents.

10:10    10                THE COURT:  It's way more than that that's alleged.

11    It's way more than that.  I mean, they're alleging -- there's

12    an active policy of discouraging by saying it's closed, you

13    can't come through, we're not processing people -- asylum

14    applications anymore, Trump has done away with asylum, there's

10:11    15    no -- Mexicans can't seek asylum, Central Americans can't seek

16    asylum.  There's a lot more than just metering.

17                MS. WESTWATER:  And I'm referring, Your Honor,

18    specifically for metering, to the individuals who are not yet

19    in the United States.  And so to the degree -- so I would kind

10:11    20    of put your other claims, and we'll talk about those ones that

21    we find -- we've sort of referred to as the territorial

22    plaintiff, but as far as the idea that an individual can bring

23    suit to force the United States to add more resources to the

24    processing of alien -- of travelers who do not have documents,

10:11    25    to the detriment of CBP's other missions, that is something we

1    feel is foreclosed by the Ninth Circuit case Graham as well as,

2    we believe, the Delmonte court -- case, the Delmonte case this

3    Court had referred to earlier.  We believe all of those

4    decisions where plaintiffs are challenging what resources and

10:12   5    saying that they're a false capacity claims, the Court can't

6    get into.  CBP goes to Congress with a budget.  Congress in

7    statutes has given CBP a wide range of missions.  And under

8    8 USC 1101 as well as 6 USC 202, CBP has the authority and the

9    discretion to balance its internal resources consistent with

10:12   10   what has been given by Congress to figure out where to process

11   these.

12       THE COURT:  So are you basically saying the Court has

13   no authority to consider the legality of government officials

14   in the immigration context ever?

10:12   15       MS. WESTWATER:  No, Your Honor, only to the degree

16   where this is saying CBP needs to move them -- needs to accept

17   individuals without travel documents across the border faster

18   and that this Court should get into whether or not CBP is not

19   taking people to its full capacity, which are some of the

10:13   20   claims that plaintiffs have made.

21       So we would say, first of all, an individual outside of the

22   United States who is not on U.S. soil has no right to cross the

23   border.  All of their rights, as we've said, attach once that

24   individual has his or her foot on U.S. soil, and that's very

10:13   25   clear from Movimiento as well as the Cuban American Bar

1    Association case.  Those all go over the history of the

2    importance of being on U.S. soil and so not being outside the

3    border.

4            THE COURT:  Seeking admission.

10:13    5            MS. WESTWATER:  No, when you read the text as it's

6    used in the INA, and as it's been construed by the Supreme

7    Court in Sale, as well as in other cases, "being at the border"

8    refers to being in the area of the port of entry.  It does not

9    mean being outside the border.

10:14    10            THE COURT:  Even if the allegations are that the

11    border patrol is going out there and saying you may not enter,

12    you may not come any closer, you may not approach?

13            MS. WESTWATER:  Yes, Your Honor.  The United States

14    has closed its borders when it has required to in response to

10:14    15    security situations, when people are coming across the border,

16    when they're storming.  It has the authority to do so in other

17    cases.  An individual who is not on U.S. soil, it is very clear

18    from Sale, I would also say from the Haitian Refugee Center

19    cases, as well as from the Cuban American Bar Association case,

10:14    20    those individuals, they are directly outside of the

21    United States, not yet on U.S. soil, and you will find those

22    cases find it is the putting of your foot on the soil that

23    makes the difference, even if you are interacting with U.S.

24    individuals.

10:15    25        We would say the cases that the Court was relying on to

1  find extraterritorial application, such as Boumediene and

2  Rodriguez, are very different.  Boumediene itself is, and the

3  Supreme Court stipulated, that its decision was based on the

4  fact that these individuals were in U.S. custody.

10:15    5        THE COURT:  What about the extent that there are new

6  plaintiffs that allege they were at the port of entry?  Your

7  argument is not applying to them.  Is that correct?

8        MS. WESTWATER:  So our argument is that in the

9  complaint, they have not sufficiently alleged facts that they

10:15   10  were on U.S. soil.

11        THE COURT:  "At the port of entry" is not on U.S.

12  soil?

13        MS. WESTWATER:  We do not believe that the language

14  they have used -- we believe in the complaint they are very

10:15   15  unclear about their language, and we believe under Iqbal and

16  Twombly that they have to be more clear if they are asserting

17  that they were in the United States at the time of those

18  interactions.

19     We believe that the Court, even though this is a motion to

10:16   20  dismiss, under Iqbal and Twombly, no longer has to fill the

21  gaps and infer facts that are not there.

22     So while you would take facts that are in the complaint,

23  and on that -- those assume that they're true facts, facts that

24  are not in the complaint, this Court does not have a duty and

10:16   25  in fact, cannot infer those facts in order to help plaintiffs

AOL-DEF-00217189

 1   make their claim.

 2       To the degree, however, that the Court finds that they were

 3   in the United States, the United States --

 4           THE COURT:  I wouldn't be finding they were in the

10:16   5   United States.  I would be finding that the plaintiffs have

 6   alleged they were in the United States.

 7           MS. WESTWATER:  Yes, Your Honor.  Yes, Your Honor.  To

 8   the degree the Court finds that plaintiffs have adequately

 9   alleged that certain individuals were in the United States, on

10:16  10   U.S. soil, at the time that they made these claims and were

11   turned back, the United States would say that was -- that is

12   not consistent with CBP's policy and that an individual who is

13   on U.S. soil would be processed under the statutes in

14   accordance with any claims that they've made.

10:17  15       We believe that any of those individuals -- as we have

16   said, we don't believe any of the individuals, so the

17   territorial or if there's what we claim is an extraterritorial

18   plaintiff, but if the Court finds that they've adequately

19   alleged they were actually in the United States, we would say

10:17  20   that those claims are moot because they have already received

21   any relief.

22       The difference here where we would -- we believe they

23   haven't stated a policy or a pattern and practice.  We don't

24   feel their claims are sufficient because what they've taken are

10:17  25   just amorphous, sort of a constellation of things that are not

1  related, and tried to make them into a pattern and practice

2  claim.

3      We believe, as the Court has, sort of, said, that these

4  would be individual claims, but the problem here is if they are

10:18  5  individual claims, then there is no relief, and the Court had

6  said earlier well, they can't get injunctive relief because

7  they're already here, and they've already been processed, so

8  the only type of relief that you would normally think for

9  somebody who has already arrived and been processed would be

10:18  10  perhaps some sort of damages, which is not what plaintiffs are

11  seeking.

12      THE COURT:  Isn't there something, sort of,

13  fundamentally inconsistent with the government's position that

14  we have no obligation to these plaintiffs, we have no

10:18  15  obligation to admit them, and yet we've facilitated their

16  admission, we facilitated their entry into the United States?

17  Isn't that sort of fundamentally inconsistent?

18      MS. WESTWATER:  Well, for the first groups of

19  plaintiffs, we were very clear that what they were alleging,

10:18  20  such as that they'd been given misinformation or that somehow

21  they had been coerced while on U.S. soil, that those were

22  things that, if true, we believed were not consistent with

23  CBP -- with the INA, with U.S. policy.  So we do not find that

24  inconsistent.

10:19  25      And for the second group of individuals, the fact that the

1    United States would facilitate -- the United States in their

2    metering policy -- it's very important to recognize it is not a

3    policy that bars individuals without documents from crossing

4    the border.  It is a management tool that is applied when a

10:19    5    port of entry has reached its capacity to safely and under

6    sanitary conditions process individuals.

7        The United States does not manage the queue in Mexico, and

8    it was Mexican officials who found that it was very unsanitary

9    to have a thousand people waiting in line on foot for who knows

10:19    10    how long waiting to be processed.

11        The United States' policy is simply that as capacity opens

12    up, ports are able to take in individuals, but to the degree

13    they can no longer do so safely and effectively, and protecting

14    the travelers as well as CBP, they may then tell individuals to

10:20    15    wait, and that is the claim, so we don't feel it's inconsistent

16    to then say, when somebody has filed suit and threatens a

17    preliminary injunction, that we would actually process

18    individuals and prioritize these individuals when we have

19    capacity.

10:20    20        And that is what the United States committed to do.  That

21    does not in any way say that an individual has a right to

22    enter, and as we said, I believe the Supreme Court is very

23    clear in Sale that an individual who is not on our shores does

24    not have any right to cross.

10:20    25        THE COURT:  Sale is pretty different factually.

1    MS. WESTWATER:  Well, it is, but if you go to -- if

2  you read the Cuban American Bar Association case, actually it

3  is very clear in bringing -- to the very much -- the discussion

4  about foot on U.S. soil and the importance of that, as well as

10:21    5  the Haitian Refugee cases.  So while you might find Sale is

6  different, if you really read those cases in their full

7  context, you'll see they're not.  And as far as plaintiffs'

8  claim to try and say that the non-refoulement is somehow

9  granting them -- granting individuals a right, what they're

10:21   10  doing is taking and turning on its head something that says

11  once an individual's in the United States, the United States

12  may not return them to a place where they have fear and turning

13  that to say that's now an affirmative right.

14     Well, again, Sale dealt with this.  If you'll read in Sale,

10:21   15  they're referring to how, I think it was, one of the delegates

16  from Sweden specifically read into the record that

17  non-refoulement does not place an obligation on countries

18  towards anyone who is not on their territory.

19     You can also go, and there are other cases that also

10:21   20  reiterate this.  I think it was non -- I think it's the

21  Movimiento case, which also discusses specifically that

22  non-refoulement does not create a right for an individual who

23  is outside the United States to enter.  But what's more, in

24  order to find a cause of action for that, you would

10:22   25  have -- where the Court looked previously for the Alien Tort

1    Statute, so 8 USC 1350, the difference there is if you read the

2    case law, it is very clear, yes, it is only -- it is limited to

3    really very limited types of cases.  Under Sosa the Supreme

4    Court found, you know, they can only be piracy, torture, crimes

10:22    5    against ambassadors.

6            THE COURT:  I don't disagree with you on that, and I

7    think I told you in the tentative that I tend to agree with you

8    on the Alien Tort Statute, but I'm more interested in the INA

9    and the violations of that.  I mean, it seems to me that in its

10:22    10    enforcement of the INA, the Department of Homeland Security

11    defines "an arriving alien," what is an arriving alien, and it

12    seems under their statutes, these allegations meet that

13    definition.  This is someone arriving in the United States.  It

14    includes people in the process of arriving.

10:23    15            MS. WESTWATER:  Well, actually, Your Honor, the

16    difference there is because it is always referring to

17    individuals at a port of entry, but it might be an individual

18    who has crossed onto U.S. soil and is going to be inspected.

19    So even if you read that, the case law and the statutes, the

10:23    20    definitions, are very clear.  At a port of entry -- if you read

21    Mezei or you read Knauff, or, I think, maybe Knauff for

22    Americans' pronunciation, those cases are very clear.  They use

23    the same language, but those individuals were on U.S. soil, and

24    so why are they using that language, "arriving at" or "at"?  It

10:23    25    is because we have, if you do immigration cases, the entry

1    fiction; that as long as you're in the port of entry and we are

2    inspecting you, you are at the border.  You are not

3    officially -- you have not effectuated entry into the

4    United States.  And that is why we can also take a person at

10:24    5    the port of entry and we parole them.

6    THE COURT:  I'm laughing because I hear every week in

7    this court cases of drug smuggling where the people haven't

8    even made it to the inspection booth yet, before they're

9    waiting in line, and the government argues they have brought

10:24    10    drugs into the United States because they're in line, getting

11    ready to enter the United States.

12    MS. WESTWATER:  Well, but that is because they're

13    getting ready to effectuate.

14    THE COURT:  They're arriving in the United States.

10:24    15    MS. WESTWATER:  But they're on U.S. soil, Your Honor,

16    and so that goes to the whole language where they are saying

17    you are arriving in the United States, you are attempting to

18    enter the United States, but you are on U.S. soil.  And so the

19    language is being used to refer to is, sort of, you have a

10:24    20    bubble around the port of entry where you're attempting to

21    enter.  And that is why we have -- I think in our brief, my

22    colleague Mr. Halaska, who wrote it, did a very good job at

23    pointing out the difference of why in the prior regime, you

24    used to have aliens who were inadmissible, and so they would be

10:25    25    expelled or excluded.  We'd have exclusion proceedings.  And if

1    you read Mezei and Knauff, those are individuals who we were

2    considering to be excluding, but they were actually on U.S.

3    soil.

4        And then we have other individuals who have already been

10:25    5    into the United States, so people who might have crossed

6    illegally, not come through a port of entry, or individuals who

7    crossed some other way and were found in the United States.

8    Those individuals were then removed from the United States or

9    were deported from the United States.  And there was a big

10:25    10    dichotomy in the language, which is reflected in the language

11    that you're referring to.  And now we have removal proceedings,

12    but we still have this historical language which refers to,

13    sort of, people at the port of entry, which means on U.S. soil,

14    who are attempting to arrive, which means attempting to go to

10:25    15    be inspected, and individuals who are, what we consider,

16    arriving aliens, but all of those individuals, and I believe if

17    you look at the case law, it's very clear, they're on U.S.

18    soil.  And the United States was very clear when it signed,

19    even to the non-refoulement agreements at the U.N. Convention,

10:26    20    that it was not self-executing, and the United States has

21    executed -- or has implemented those through its statutes and

22    the INA.

23        This is just another reason also why the Alien Tort Statute

24    wouldn't apply because under the Alien Tort Statute, again,

10:26    25    even if it is jus cogens, so something has risen to the level

1    of binding international law, it is not binding in the U.S. if

2    it's contrary to U.S. law, and I think you can get that -- the

3    case is escaping me, but in one of cases that was cited in the

4    brief.  And so it was the one that had to do with the Foreign

10:26    5    Sovereign Immunity Act.  I think it was Chen.

6        Anyway, and so when you look at that, the United States,

7    under the INA, has made very clear that those obligations do

8    not apply unless an individual is on U.S. soil.  And again, I

9    think this explanation of what it means to be arriving at a

10:27    10    port of entry is very clear just from the case law and the way

11    that they describe it.

12        I think the Supreme Court rejected it, but also if you look

13    in the Haitian Refugee cases, Refugee Center cases, out of the

14    Eleventh Circuit, there's a very clear description of even the

10:27    15    same terms that the plaintiffs are relying on here, and they do

16    a good job of distinguishing them and saying why there are

17    actually no rights for individuals outside the United States

18    based on that same terminology.

19        So as I said, then, based upon those claims, we believe

10:27    20    plaintiffs have not stated a claim for a policy or practice.

21    We believe, in fact --

22        THE COURT:  Kind of going back to your U.S. soil

23    argument, doesn't the U.S. have sovereignty over the portion of

24    the bridge where the border patrol agents go?  I mean, isn't

10:28    25    that --

 1    MS. WESTWATER:  So the United States -- if somebody is

 2 on the U.S. -- has crossed on the bridges, just as even here,

 3 San Ysidro or some of the local ports, there's a boundary line,

 4 and it's demarcated, and there is also on the bridge.  And so

10:28    5 if an individual is on the Mexico side of the bridge, the

 6 United States does not have sovereignty over the Mexican side

 7 of the bridge, but if an individual is on the U.S. side of the

 8 bridge, then that individual will be processed under the INA.

 9    THE COURT:  And is on U.S. soil?

10:28   10    MS. WESTWATER:  We would consider that to be on

11 U.S. -- if you read the Cuban American Bar Association case,

12 we'll say there's some extra limits, but we are not haggling

13 over that.  If somebody is on the U.S. side of the bridge, we

14 will consider that, for those individuals, to then be processed

10:28   15 under the INA.

16    THE COURT:  So do border patrol officers go into

17 Mexico and tell people in Mexico what the rules are at the port

18 of entry?

19    MS. WESTWATER:  So at several of the

10:29   20 different -- where there's large -- where there are capacity

21 issues, so at some ports of entry, there may be no problems

22 with capacity.  There may not be that many people coming.

23 There may not be that many individuals coming without

24 documents, and so I don't want to use the words "asylum

10:29   25 seekers" because until somebody has actually come into the

AOL-DEF-00217198

1    United States and expressed fear, CBP does not know.  These are

2    people coming without documents who take longer to process, so

3    if you're coming across the border in a port of entry and

4    you're in your car and you have a passport or you have a visa,

10:29    5    CBP is allowed to have so many seconds or minutes, depending on

6    the circumstances, to process each of those people so that that

7    line is not so long.

8        Same thing for goods coming through in a truck, right,

9    because if you make trucks wait too long, that could violate

10:29    10    some of our international trade agreements.  So they're very

11    cognizant of times.  A person who comes to the border and comes

12    to the port of entry and wants to enter, but has no documents

13    is going to take a long time because that individual is -- per

14    se, they're inadmissible.  They have no basis to authorize them

10:30    15    to come.  So CBP knows they're going to have to process this

16    person in some way that is going to take more than processing

17    the other individuals.

18            THE COURT:  So I'm still waiting for the answer to my

19    question.  Do border patrol agents go across the bridge and go

10:30    20    past the U.S. Border and go into Mexico and tell people down

21    there what's going on, or do they stay on the U.S. side?

22            MS. WESTWATER:  They generally stay on the U.S. side,

23    although they might be right at it or they might -- they're

24    right there, but often, in some of the ports of entry, it is

10:30    25    the Mexican government has officials who are actually

1    doing -- control of exit, knowing that they do not want lines

2    of hundreds or thousands.

3          THE COURT:  The reason I ask is to the extent the

4    plaintiffs are alleging Plaintiff A came across the

10:30    5    International Bridge, was met by a border patrol agent, talked

6    to the border patrol agent, and the border agent said no, you

7    can't cross, isn't that de facto at that point on U.S. soil,

8    the allegations again?

9          MS. WESTWATER:  No, Your Honor.  Yesterday I was at

10:31    10    San Ysidro.  There's a line.  There's a sally port, a little

11    turnstile.  The turnstile is on the Mexican side, but before

12    the turnstile is allowed to turn, the United States Border

13    Patrol agent -- or CBP agent, excuse me, could look at the

14    person's identification to make sure that they have

10:31    15    identification before the person is able to come through the

16    turnstile.

17          There's other sorts of controls that individuals can have,

18    as far as gates, to ensure that before an individual comes onto

19    U.S. soil, that they have the sort of documentation that

10:31    20    they're required to have.  Otherwise, they would not be able to

21    come through the gate.  What happens and how the line is

22    managed on the other side of the gate, so on Mexican territory,

23    that is not managed by the United States.

24          THE COURT:  What if someone's standing at the

10:31    25    turnstile and says, "I'm seeking asylum"?  Isn't there an

10:32

1    obligation at that point to refer them for asylum?  Are you

2    saying that because they're standing on the other side of the

3    turnstile, that this law that requires that someone who seeks

4    asylum -- it doesn't apply to those people?  Is that what

5    you're saying?

6            MS. WESTWATER:  Yes, Your Honor.  And I think that's

7    consistent with international law, with U.S. law, and I believe

8    if you read -- if you really read -- that is consistent, yes,

9    there is -- until a person is in the United States, they are

10:32
10    not able to claim asylum under U.S. law, but the U.S. has a

11    provision for individuals who are not on U.S. soil and wish to

12    seek protection, and that's called Refugee Protections, and

13    that is a different statute, and individuals can go to their

14    consulates in their own countries or in a third country, and

10:32
15    they can seek refugee status.  And the United States, in fact,

16    does not require -- unlike other countries, the United States

17    does not require an individual to leave his or her country in

18    order to apply for refugee status.  They may do so in their own

19    country, and so no, Your Honor, an individual who is in a

10:33
20    foreign country does not have a right to apply for asylum.  And

21    actually --

22            THE COURT:  At the port of entry can't come in and

23    say -- be arriving at the United States and say, "I'm here, and

24    I'm applying for asylum"?

10:33
25            MS. WESTWATER:  And that is not at a port of entry.

1    As we've said, under the United States law and terminology and

2    case law, "at a port of entry" means you are on U.S. soil.  So

3    an individual outside a U.S. port of entry, no, may not claim

4    asylum.  Those INA procedures and rights that CBP -- the

10:33    5    procedures CBP must follow, those all accrue when the

6    individual -- yes, those all accrue when the individual crosses

7    on to the United States.

8              THE COURT:  Okay.

9              MS. WESTWATER:  May I just confer with my colleague

10:34    10    for a moment, Your Honor?

11             THE COURT:  Sure.

12             MS. WESTWATER:  And as my colleague, I'm sorry,

13    pointed out, and I should say, CBP is not denying that an

14    individual may ever enter.  So metering is directing

10:34    15    individuals to wait until CBP has the capacity to process these

16    individuals safely and securely.  Having too many individuals

17    just waiting around to be processed at the port of entry

18    presents a danger to CBP officers, to other travelers, but also

19    can be leading to unsanitary conditions, overcrowding.

10:34    20        I found it significant that plaintiffs pointed to -- I

21    don't know if it was maybe an OIG or a document to support

22    their case that CBP wasn't taking enough people.  The document

23    did not say that there were nobody there or that they were

24    under capacity.  It simply said they did not see overcrowding.

10:35    25    Wouldn't we think that's a success?  When there's overcrowding,

1    we have other lawsuits, we have other problems regarding

2    sanitary conditions, regarding safety.  Those reports did not

3    say that there were not people being processed at the port.

4         And if you look at the different policy or different emails

10:35    5    that were referenced by the plaintiffs in their complaint or

6    even the up-to-date 2018 metering guidance is very clear that

7    individuals are not to be discouraged from coming.  They're not

8    to be told that, "There's no asylum, you may never come here."

9    Instead, the policy is to process all travelers in a safe and

10:35    10    efficient way that keeps healthy conditions for everyone.  And

11    so whatever policy CBP may have or -- it is a policy that

12    is -- it's a guidance here, so we would say it's not a policy.

13    We believe under the cases we've cited that the Court shouldn't

14    get into are we -- should we accept 25 today and 3,000

10:36    15    tomorrow.

16         THE COURT:  No, but as I said, the complaint alleges

17    more than that, and I understand what you're saying is that's

18    not true, but isn't that sort of a premature argument?  We're

19    talking about a motion to dismiss at this stage.  Whether it's

10:36    20    true or not, they get to prove up whether you can prove that or

21    not.

22         MS. WESTWATER:  Well, to the degree they have

23    individual claims, "This happened to me, you told me to go

24    away."

10:36    25         THE COURT:  They're saying more than that.  They're

 1   saying this is happening across the U.S. Border because there

 2   is this policy that's unwritten that is telling border patrol

 3   agents, "Keep as many out as you can."  It's more than just the

 4   metering.  They're alleging more than that.

10:36    5          MS. WESTWATER:  And we believe those are different

 6   claims.

 7          THE COURT:  They're not.  They're claiming it's all

 8   part of the same policy.

 9          MS. WESTWATER:  And I, again, would say, Your Honor --

10:37   10          THE COURT:  And I think --

11          MS. WESTWATER:  -- that's a constant.

12          THE COURT:  You're saying that's not true, but I'm

13   saying this is a motion-to-dismiss stage, and I'm saying what

14   do they say, and is that enough?

10:37   15          MS. WESTWATER:  Well, we would say, as I've said, this

16   is an amorphous policy that they're claiming.  They're taking a

17   constellation of things.  So some of their claims are things

18   that on their face are not even unlawful.  So one of the claims

19   was a plaintiff and her daughter were detained.  Okay.  Any

10:37   20   alien who comes undocumented, inadmissible, is going to be

21   detained.  It was telling somebody that they would be detained.

22      So I'm not sure, but that would seem to say that telling

23   somebody that you're going to do what you're required to do by

24   statute is now deterring somebody, and that is part of this

10:37   25   procedure.  It is telling an individual that they would not be

1  detained with their nephew, which CBP does not detain women and

2  children with a male, depending on what the age is or

3  unrelated.  Those are all things that they've taken,

4  Your Honor, to claim part of this amorphous policy.

10:38    5        THE COURT:  What they're claiming is, I agree, an

6  amorphous policy.  They're saying there is this policy to

7  deter, and then they give examples.  Here are a whole bunch of

8  examples of how that policy is being implemented.  Isn't that

9  enough at the motion-to-dismiss stage?

10:38   10        MS. WESTWATER:  No, Your Honor, we believe under the

11  case law regarding APA and being able to challenge, sort of,

12  amorphous policies that fails to state a claim.  It also is

13  belied by the fact of how many individuals are coming.  Last

14  month there were 10,000 people, inadmissible people, being

10:38   15  processed along the southern border.

16        THE COURT:  But you're getting to facts again, and

17  this is a motion-to-dismiss stage.  You're trying to prove up

18  whether it's true or not.

19        MS. WESTWATER:  But those were also facts of the

10:38   20  plaintiffs.  Those were facts that the plaintiffs had

21  incorporated in their reference.  Maybe not last month's

22  statistics, but more recent statistics, which also show

23  thousands of individuals have been coming.  And this is just at

24  the ports of entry.  So I'm not referring to the other 80- or

10:39   25  90,000 that were coming through other places.  And so that is

1   belied by that.

2       So I think the case law is very clear.  I think if we look

3   at Graham, which is a Ninth Circuit case, I think if you look

4   at Lujan, you look at Norton, you see that it really fails to

10:39   5   state a claim to take all of these unrelated things and try to

6   pull them together.

7       Now, that does not mean that they haven't stated individual

8   claims, which is sort of what the Court had said earlier in the

9   first round, and so maybe if there's some relief that this

10:39   10   Court finds has made these not moot, but we do find that there

11   is simply not enough to pull these together to allege some sort

12   of deterrent policy.

13       Now, regarding the individuals who are in the

14   United States, we would -- that would be different for an

10:39   15   individual outside the United States.  It is also if there's a

16   challenge to the guidance of metering, to metering individuals,

17   we would say that individual day-to-day operations, those

18   operational decisions about how many people do you let in a

19   day, those capacity decisions cannot be reviewed by the Court.

10:40   20       We would say under, as we have said, the political question

21   doctrine, also under just the APA guidance that we've been

22   citing, because courts cannot, I think, as Graham said, get

23   into the day-to-day operations.

24       If there's a problem with how CBP is carrying out overall

10:40   25   allocating its resources, which is really what Graham goes

1    into, that is better left either with Congress or with the

2    executive itself.  That's not for the Court to get into

3    day-to-day management.

4              THE COURT:  I should ask you, and I'll ask both sides,

10:40    5    whether you think the Innovation Law Lab has any bearing on

6    this case, the latest case from the Ninth Circuit on asylum,

7    the one that just came out, the one that says you can send

8    asylum seekers back to Mexico.  Well, it doesn't really say

9    that because of the procedural posture of the case, but I'm

10:41   10    trying to remind you of the case.

11              MS. WESTWATER:  Yes, that helped, Your Honor.

12         We don't specifically see that it does.  We do think that

13    any of its discussion of immigration rights I think are

14    consistent with what we are saying, but otherwise, I don't

10:41   15    think those are the -- I don't think that case is the first one

16    to say we're not relying on it, and we don't think it says

17    anything inconsistent with what we're saying here today,

18    Your Honor.

19         And I would just like to reiterate that we think any

10:41   20    extraterritorial application of the Constitution, the Fifth

21    Amendment, we would say, really only under Boumediene, we think

22    that was clearly set aside by the Supreme Court under the facts

23    of those case, which are individuals in detention.

24         And that would actually bring me to two of the cases this

10:42   25    Court relied on in its earlier decision, which would be RILR

1    and Araceli R.  Both of those cases were very different in that

2    they referred to individuals who were in the United States and

3    were in detention.  So deterrence claims regarding to

4    individuals who were in the United States and are in detention

10:42    5    are very different than simply a claim -- than deterrence of

6    individuals who are not in the United States.

7    And as we said, we do not believe that CBP's policy as it's

8    been -- different documents that we've shown in any way shows

9    that deterrence is what's taking place and that people are not

10:42   10    being allowed to come in, but to the degree they are not

11    individuals in U.S. custody, we believe those cases do not

12    apply.

13    For an individual who is in the United States, there would

14    be perhaps more of an application of those cases, but those

10:43   15    cases are very different in themselves also because they were

16    all alleging one specific act.  Each of those cases had one,

17    not a constellation of things, of ways that deterrence was

18    being somehow used.  They had a specific claim, and it was a

19    claim that referred to detention.  And the Court in both of

10:43   20    those cases found it was because detention itself is so

21    regulated or -- under the Constitution and under the case law

22    that deterrence was not an appropriate factor unless it was

23    criminal detention, but we don't believe that those cases have

24    any broader implication to here where there's simply a

10:43   25    discussion of the processing of travelers after they've crossed

1    on to U.S. soil, but we also believe they are not useful here

2    in the fact that the types of policies -- I think in RILR, the

3    government, the United States, there admitted that deterrence

4    was a factor that could be considered.

10:44   5        So we believe that is very different, and in that set, it

6    was not some sort of a policy that was claimed to be exhibited

7    through unrelated, very different types of claims of how this

8    policy came about, but also not through conduct that on its

9    face is legitimate.

10:44   10       So plaintiffs have not claimed these separate acts:

11   Detaining somebody; telling somebody they're going to be

12   detained; telling them they're not going to be detained with

13   their nephew; what INA provision, what law, what regulation,

14   does that violate.  And so they're taking many actions which in

10:44   15   themselves are not violative of any provision and using those

16   to try and pull together simply to show an intent behind them

17   that somehow now is supposed to make one policy that,

18   therefore, this Court is supposed to review.  And we would say

19   that this has failed to state a claim, and this is the type of

10:45   20   claim specifically that on a mass policy level the courts have

21   said is simply not enough, but that does not mean, much as this

22   Court found, and I believe much as in Graham, the Court there,

23   the Ninth Circuit, also found, though, that the individual

24   claims could go forward, but not some sort of broader policy

10:45   25   claim.

1      Let me just have one moment.

2      Unless Your Honor has any questions, thank you.

3             THE COURT:  Why don't you start by talking about

4    Innovation Lab.

10:46    5             MR. AZMY:  We divided the arguments.

6             THE COURT:  That's fine.

7             MS. CROW:  Good morning, Your Honor.  May it please

8    the Court:

9      In response to your question about Innovation Law Lab

10:46   10    versus Nielsen, we do think it has some bearing on this case in

11    a couple of ways.  First of all, in that case --

12             THE COURT:  Nondissent.  You like what Fletcher has to

13    say, I'm sure.

14             MS. CROW:  We did, but that actually isn't the part of

10:46   15    the case that I was going to talk about this morning.

16      In the principal opinion, in Judge O'Scannlain's opinion,

17    he referred to Section 235(a)(3) of the Immigration and

18    Nationality Act, which is also 8 USC 1225(a)(3), as an

19    exhaustive inspection regime for all non-U.S. citizens seeking

10:47   20    admission to the United States.

21      And that is quite consistent with our reading of

22    8 USC 1225(a)(3), which applies to two groups of noncitizens

23    who must be inspected:  applicants for admission and then a

24    catchall category of noncitizens who are, quote, otherwise

10:47   25    seeking admission.

AOL-DEF-00217210

1        An "applicant for admission" is defined in 1225(a)(1) as a

2   noncitizen who is, quote, present in the U.S. who has not been

3   admitted or a noncitizen who arrives in the U.S.

4        The Ninth Circuit has defined "arrives in" to include

10:47  5   someone at the border, and that case was Ortega-Cervantes

6   versus Gonzales, which is cited in our brief.

7        But even if the plaintiffs in our case are not

8   covered -- they're not characterized as applicants for

9   admission, which we think they are, they must be covered by the

10:48  10   phrase "otherwise seeking admission" because otherwise that

11   language would be superfluous.  So that's one key part.

12        More substantively, though -- just one moment.  The Court

13   did acknowledge, and this may have been Judge Watford, that the

14   plaintiffs in that case did face a risk of harm if returned to

10:48  15   Mexico, but found that that risk was somewhat tempered by the

16   Mexican government's agreement to give them humanitarian status

17   and to give them work permits and to generally comply with

18   their obligations under international law.

19        In this case, of course, we have no such guarantees from

10:48  20   the Mexican government.

21        I would also note that in the context of "remain in

22   Mexico," there is a fear-determination process, which we think

23   is woefully inadequate, and in the interest of full disclosure,

24   we are counsel in that case as well.

10:49  25        So we've alleged that it's woefully inadequate.  I believe

1    Judge Watford made that clear in his opinion, but in this case,

2    Your Honor, the plaintiffs aren't subject to any kind of

3    screening process, so the risk of harm is much greater than in

4    the context of "remain in Mexico."

10:49   5              THE COURT:  Okay.

6              MS. CROW:  Slight change of plans, Your Honor.

7              THE COURT:  Okay.

8              MS. CROW:  I'm going to turn back to the statute more

9    generally --

10:49  10              THE COURT:  Okay.

11              MS. CROW:  -- and speak a bit about the statutory

12    scheme that Congress enacted which provides specific procedural

13    protections to people fleeing persecution who are either in the

14    United States or who arrive at its borders seeking refuge.

10:50  15         As we explained in our brief, the asylum framework includes

16    two key sections of the Immigration and Nationality Act:

17    8 USC 1158, which sets forth the right to apply for asylum and

18    also particular processes that must be followed to facilitate

19    such applications; and then also 8 USC 1225, which requires

10:50  20    immigration officers to inspect all noncitizens arriving at the

21    border, as we've already discussed, and refer those seeking

22    asylum for further process.

23         That's exactly what the plaintiffs in this case seek:

24    access to the asylum process.

10:50  25              THE COURT:  What about the defense argument that

1    their -- the only allegations are that they were being delayed

2    or that they're slowing it down or that they're limiting the

3    number in a given day or given hour and that that is not

4    required under statute?

10:51    5    MS. CROW:  Your Honor, the government would have us

6    believe that the government is merely making people wait in

7    line as you would at the Department of Motor Vehicles, which

8    can be a cumbersome process, it can take a long time, but you

9    have to wait until you get to the front.

10:51    10    That is, in fact, how ports are supposed to work.  CBP

11    officers, as I said, are supposed to inspect anyone who shows

12    up on a given day, as required by 8 USC 1225(a)(3), even though

13    some of them might have to wait a long time.

14    In fact, what's actually going on is that people are turned

10:52    15    away outright or they're referred to a wait list or they're

16    told to get on a wait list, which is dysfunctional and corrupt.

17    Certain categories of individuals are denied access to the

18    list.  Those have included LGBT asylum seekers, unaccompanied

19    minors, and most recently, black asylum seekers.

10:52    20    THE COURT:  Is any of that alleged in the complaint?

21    MS. CROW:  We do allege that the wait list is

22    dysfunctional.

23    THE COURT:  I think that's a little bit more than

24    dysfunctional.

10:52    25    MS. CROW:  Yes, more evidence about this has surfaced

 1   recently, and we were looking forward to the discovery process

 2   to learn more about that.

 3       It's also true that -- and I believe we did allege this in

 4   the complaint -- that Mexican government officials are

10:52  5   implicated in the keeping of the wait list, which effectively

 6   means that Mexican asylum seekers have to seek the permission

 7   of their government to leave the country when they fear

 8   persecution.

 9       And as an aside, Your Honor, and we did not know this at

10:53 10   the time we filed the second amended complaint, but we've

11   recently received evidence that higher slots on the wait list

12   can be obtained in exchange for money and in exchange for

13   sexual favors.

14       THE COURT:  None of this is in front of me.

10:53 15       MS. CROW:  No, it's not.

16       Anyway, but our fundamental argument is that by turning

17   people away, the government is effectively depriving them of

18   access to the asylum process.

19       And that is true for a number of reasons.

10:53 20       First of all, it's true because the government's own data,

21   as we alleged in our brief, indicates that claims of capacity

22   are pretextual.

23       From January through September of 2018 the number of people

24   without valid travel documents who were attempting to enter the

10:54 25   United States from Mexico, which includes asylum seekers,

1   stayed at roughly the same level as over the past five years,

2   and during those five years, CBP regularly processed these

3   individuals without the delays that we've now seen.

4       In early 2018, senior CBP and ICE officials in San Ysidro

10:54   5   indicated in an interview with Amnesty International that CBP

6   has only actually reached its detention capacity a couple of

7   times per year and during one short period in 2017, and we also

8   cite a letter from members of Congress regarding a briefing

9   that occurred with Hill staff by DHS officials.

10:54   10          THE COURT:  Are you arguing that there is, sort of, a

11   final action or policy under 706(2)?  Is that what you're

12   covering right now?  I'm not sure who's covering what.

13          MS. CROW:  Right, I'm arguing that and that -- yes.

14          THE COURT:  Okay.

10:55   15          MS. CROW:  We're arguing that this is, in fact, a

16   deprivation of access to the process and not simply a directive

17   or an instruction to people that they have to wait in line.

18       Migrants face grave harm in Mexico, and that's evidenced by

19   the experiences of two of our plaintiffs.  Beatrice Doe was a

10:55   20   victim of domestic abuse.  She was actually pursued by her

21   persecutor while she was waiting in Tijuana to cross, and she

22   was lured back to her hometown.

23          THE COURT:  I guess my concern is under 706(2), and I

24   think I stated this the first time around in my first order, is

10:55   25   there's sort of all these individual claims, each of which I

1    think there's -- you've made a valid, at least at this stage,

2    claim, but the question is whether this is a policy basically

3    and whether you've alleged enough to make it a final agency

4    action, and as opposed to under 706(1), which is just

10:56    5    individual turnback, the challenges to the individual

6    turnbacks, and I guess the only policy I see is the metering or

7    the turnback policy, which is the government, and I understand

8    you're arguing there's more to it than that, but how is this a

9    final agency action?  How do you get under the 706(2) with all

10:56    10    these allegations?

11            MS. CROW:  Well, Your Honor, assuming that you find

12    that there is a policy, and we've alleged in our complaint that

13    there is, and we've cited a lot of evidence.

14            THE COURT:  When you talk about "is a policy," I don't

10:56    15    think I have any trouble finding that there is a turnback or a

16    metering policy.  The question is what policy are you asking me

17    to find from this complaint?

18            MS. CROW:  Right.  We believe that the turnback policy

19    is broader than metering.  We define it as a directive by

10:56    20    high-level government officials to systematically limit the

21    number of asylum seekers inspected and processed at ports of

22    entry along the U.S./Mexico Border for the purpose of denying

23    access to the asylum process and deterring future asylum

24    seekers.

10:57    25            The tactics employed by the government include metering,

1    but are not limited to metering.

2        And the email correspondence that we cited from the

3    government goes back to 2016, which is when the incidents that

4    were outlined in our initial complaint happened.

10:57    5        THE COURT:  So let's say you win on the 706(2).  What

6    agency action would I be setting aside?  The metering policy

7    or -- I mean, there has to be a specific final agency action

8    that I'm -- that I'm ruling on in this case.  What would I

9    order?

10:57    10        MS. CROW:  So we would ask you to enjoin the policy

11    whereby government officials are systematically restricting the

12    number of the asylum seekers who are inspected and processed

13    for these unlawful purposes, as I've outlined it.

14        We believe that more information about the precise contours

10:58    15    of the policy will come out in discovery, but we've alleged

16    what we can based on the information we have, which includes --

17        THE COURT:  So are you saying that the capacity issues

18    could be a lawful consideration, but you have alleged they're

19    simply inapplicable in this case because the motive is

10:58    20    deterrence?

21        MS. CROW:  Your Honor, the motive is twofold.  The

22    motive is -- the primary motive is depriving people of access

23    to the asylum process.  We believe that high-level statements

24    by high-level government officials bolster our claim that this

10:58    25    is also for the purpose of deterrence, but at a minimum, they

1    bolster the validity of the plausibility of our allegations.

2        THE COURT:  Okay.  Are you saying that it could be a

3    lawful consideration if the high-level government conduct

4    wasn't saying true motive is to keep people out, is deterrence?

10:59    5        MS. CROW:  I don't think so, Your Honor, because the

6    statutory obligations are mandatory.  CBP is required to

7    inspect noncitizens seeking admission under 1225(a)(3), and in

8    the event that they are intending to seek asylum or they have a

9    fear of persecution --

10:59   10        THE COURT:  So if a million people arrived at the

11   border tomorrow and said, "We are all seeking asylum," the

12   government would have an obligation to hear every one of them

13   right away, is what you're saying?

14        MS. CROW:  Not right away, Your Honor, "without

10:59   15   unreasonable delay."

16        THE COURT:  So that goes back to my original question.

17   You could consider lawful capacity issues if there were

18   a million people at the border, and you simply didn't have the

19   capacity to hear all of them in a reasonable amount of time.

10:59   20   They didn't have any -- there's no allegations of deterrence,

21   there's no allegations, it's just the government saying, "We're

22   trying to do this as fast as we can."

23        MS. CROW:  The government needs to act in a manner

24   that complies with its mandatory statutory obligations, and

11:00   25   under the facts of this case, as exemplified by the

1   plaintiffs -- what happened to the plaintiffs, they are not

2   doing that.

3           THE COURT:  Okay.

4           MS. CROW:  Your Honor, I was going to talk more about

11:00  5   why the obligations of the government under the statute apply

6   to people who are arriving in the United States.

7           THE COURT:  Okay.

8           MS. CROW:  So, as indicated, on page 11 of the amicus

9   brief from immigration law professors' representative Lamar

11:01  10  Smith who, at the time of the 1996 law was the chair of the

11  House Judiciary Committee Subcommittee on Immigration and

12  Claims, described Congress' reasoning behind the use of the

13  term "arriving alien" in the following way:  He said the term

14  "arriving alien" was selected specifically by Congress in order

11:01  15  to provide a flexible concept that would include all aliens who

16  are in the process of physical entry past our borders

17  regardless of whether they are at a designated port of entry,

18  on a seacoast, or at a land border.  "Arrival" in this context

19  should not be considered ephemeral or instantaneous, but

11:01  20  consistent with common usage as a process.

21          THE COURT:  But I mean, there are limits to this,

22  right?  I mean, if someone makes up their mind this morning,

23  "I'm going to the port of entry, and I'm packing up," and

24  they're not arriving at the port of entry, so at what point do

11:01  25  you say they are arriving?

1    MS. CROW:  So for purposes of the government's motion

2  to dismiss, in this case, all we need to look at is the facts

3  presented by the plaintiffs in this case.  And all of them were

4  arriving -- were noncitizens arriving at the border who would

11:02   5  be in an inspection station at a port of entry but for CBP's

6  obstructive conduct.

7    THE COURT:  So if CBP went down to Mexico in my

8  original order and stopped people down in Mexico, would that

9  count as well?

11:02  10    MS. CROW:  Your Honor, that isn't at issue in this

11  case because it's not a situation presented by any of our

12  plaintiffs.  If and when we move on to class certification, you

13  know, we will present a class definition that hopefully will

14  capture --

11:02  15    THE COURT:  I should ask this question at this point,

16  just to make sure I get it on the record:  There's a lot of

17  conduct by Mexican officials alleged in the complaint.  You are

18  not premising any of your claims on conduct by Mexican

19  government officials.  Is that correct?

11:03  20    MS. CROW:  No, Your Honor, we're not asking you to

21  enjoin the conduct of Mexican government officials.

22    So one more note on the issue of arriving.  I'll just note,

23  also, the language of 8 CFR 1.2, which defines "an arriving

24  alien" as "an applicant for admission coming or attempting to

11:03  25  come into the United States at a port of entry," which, as we

1    read it, covers asylum seekers en route to the United States.

2        I'd like to respond to something that the defendants raised

3    for the first time in their reply brief and also alluded to in

4    today's argument.

11:03    5        Defendants seem to argue that the language of 8 USC 1158

6    means that people have to be in the United States, so 1158,

7    which is the provision about the right to apply for asylum,

8    covers both individuals who are physically present in the U.S.

9    and who arrive in the U.S.

11:04   10        First of all, the argument in their reply brief seems to

11   be, as far as we understand it, based on the drafting history

12   of a different statute.

13        But regardless of that, the plaintiffs' reading is a lot

14   more straightforward, and we're arguing that the statute means

11:04   15   what it says.  Prevailing case law establishes that "physical

16   presence" is not a term of art and should be interpreted based

17   on its plain meaning.

18        And I'm happy to provide some cases if that would be

19   helpful to Your Honor.

11:04   20            THE COURT:  Cases that say it should be based on its

21   plain meaning?  I don't need that.

22            MS. CROW:  All right.  Anyway, the other point I

23   wanted to address is one that they raised this morning as well

24   about the Refugee Admissions Program that's addressed in

11:05   25   8 USC 1157.  That program relates to refugee resettlement,

1    which is completely separate and distinct from the asylum

2    process under 1158.

3         Refugee resettlement involves the selection and transfer of

4    refugees from a country in which they have sought protection to

11:05    5    a third country, which could be the United States.

6              THE COURT:  Although I think it's interesting that the

7    refugee resettlement places numbers and the asylum does not.

8              MS. CROW:  Precisely, and that's an important

9    distinction, Your Honor, because --

11:05   10              THE COURT:  It's fair to assume, then, that Congress

11   didn't intend to limit the number.

12              MS. CROW:  Correct, and I would note that Congress has

13   repeatedly rejected such limits, most recently in January of

14   this year.

11:05   15         So refugee resettlement is a discretionary program that is

16   operated by countries with the assistance of the United Nations

17   High Commissioner for Refugees.  The president has discretion

18   to designate particular categories of refugees that the U.S.

19   will accept, and as you said, the number of refugees is capped

11:06   20   now at 30,000 for fiscal year 2019.

21         And I would note that overseas refugee processing is not

22   available in any of the northern triangle countries.

23         Asylum, by contrast, imposes an obligation on the U.S. to

24   grant asylum to anyone who arrives in the U.S. and meets the

11:06   25   refugee definition.

1        Defendants also cited Mezei and Knauff versus Shaughnessy.

2   We believe that those cases aren't as definitive, as the

3   government suggests, about the question of whether somebody has

4   to be standing in U.S. territory.  They use the language "at

11:06    5   the border."

6        In terms of our APA claim, going back to the 706(1), 706(2)

7   distinction, Your Honor has already acknowledged with respect

8   to the initial plaintiffs that CBP has a mandatory duty under

9   8 USC 1225 to perform discrete agency actions; namely,

11:07   10   inspecting and processing them, and Your Honor found further

11   that CBP's failure to fulfill this duty is actionable under

12   706(1).

13        Assuming that Your Honor agrees that the new plaintiffs are

14   also arriving aliens for the reasons that we've outlined, they

11:07   15   would also be covered by 706(1).

16        But we've also pleaded the existence of the turnback policy

17   and included a claim under 706(2) because we believe that both

18   the policy itself and the individual turnbacks, viewed

19   collectively, are ultra vires because they exceed CBP's

11:07   20   statutorily prescribed authority and violate the Immigration

21   and Nationality Act.

22        For the reasons that I've explained, and a few more that

23   I'll add, they're also arbitrary and capricious under 706(2).

24        Even if you find that there's no mandatory duty that's

11:08   25   actionable under 706(1), Your Honor can still enjoin the

1    government's conduct under 706(2), which doesn't depend on the

2    existence of a mandatory duty.

3        I think I hit most of the arbitrary and capricious reasons

4    when we were speaking before.

11:08    5        I will note the gravity of the situation in Mexico again,

6    and on the subject of arbitrariness and capriciousness, I will

7    note that the turnback policy and individual turnbacks have the

8    rather perverse result of encouraging unlawful behavior;

9    namely, entry between ports of entry, which the government has

11:08   10   consistently said that it wants to discourage, and also

11   smuggling.

12       If Your Honor has no further questions, I will turn the

13   podium over to my co-counsel.

14           THE COURT:  And he's going to talk about?

11:08   15           MR. AZMY:  I can explain.

16           THE COURT:  I want to make sure that -- what are you

17   going to talk about because I'll save some of my questions for

18   you.

19           MS. CROW:  He's going to talk about Sale, Your Honor,

11:09   20   political question, Alien Tort Statute --

21           THE COURT:  Okay.

22           MS. CROW:  -- and --

23           THE COURT:  That's fine.  I'll save my questions.

24           MS. CROW:  -- and due process.  Thank you, Your Honor.

11:09   25           THE COURT:  Thank you.

AOL-DEF-00217224

1        MR. AZMY:   Thank you, Your Honor.

2     Before I get to Sale, and because there's been a lot of

3  complicated technical parsing provisions of the INA because the

4  government seeks -- they want to do that to render our

5  plaintiffs extraterritorial, I thought it was important to

6  ground us in the purpose of the Refugee Act, which Congress has

7  said is meant to reflect a historical policy of the

8  United States to respond to the urgent needs of persons subject

9  to persecution in their homelands.

10     And as Your Honor knows, the Refugee Act was designed to

11  implement the global commitment in the 1951 Refugee Convention

12  to prevent horrors of World War II, which I would note

13  includes, to its lingering regret, the State Department cable

14  to German Jews outside a New York port on the boat St. Louis

15  that they, quote, must await their turn on a waiting list.

16     And humanitarian crises are the purpose of asylum law, not,

17  as we allege the defendants think, an exception to it, nor is

18  there any security exception to Congressional commands.

19     So before I get to Sale, I just want to make a couple of

20  observations:  First, as a matter of fact, Your Honor does not

21  have to accept the government's characterization that -- an

22  inference that our plaintiffs were one foot on the Mexican

23  border as opposed to one foot on the U.S. Border.  All our

24  Tijuana plaintiffs allege they were at the port of entry.  All

25  our Texas plaintiffs allege they were in the middle of the

1    bridge.  And we concede that is somewhat ambiguous because we

2    don't entirely know with precision what part of a ruler, a

3    one-foot ruler, they were on.

4        And part of the reason it's ambiguous is, I think the

11:11    5    United States, the CBP, has continually shifted the inspection

6    points to make it ambiguous, and so that leads me to a couple

7    of points about the law.

8        Congress fully anticipated the ambiguity in creating a

9    comprehensive statutory and implementing an international law

11:11    10    scheme that contemplates that the border is itself ambiguous,

11    what the Supreme Court has called the limitrophe, where the

12    United States is back and forth, and to recognize that asylum

13    seekers come here exhausted, traumatized, confused, tired,

14    sick, poor, you could say, and that they're entitled to a

11:12    15    presumption from the statute.

16        And as Your Honor was suggesting, it cannot be the law that

17    CBP officials can stand on the U.S. side of the border and

18    physically tell asylum seekers they must have to turn around

19    while welcoming everyone else that has papers.  That cannot be

11:12    20    consistent with the law.

21        And if I heard the Department of Justice correctly, it

22    today just said in open court that the United States has closed

23    its borders.

24        THE COURT:  I think what her point was, in the past

11:12    25    they have closed the borders, and that's something that they

1    were allowed to do as part of their discretion in the executive

2    branch.

3           MR. AZMY:  Fair enough, Your Honor.  But of course, we

4    allege this is a kind of de facto practice of closing the

5    borders.  And, you know, we've cited a number of instances

6    reflecting high-level policymaking -- policymakers who wish to

7    limit asylum seekers because of antipathy to the process.

8           So let me turn to Sale and sort of clear that brush away.

9           As Your Honor suggested, it's a very narrow decision driven

10    by unique factual circumstances.  The basic proposition is it

11    involved the question of whether a now abrogated INA statute

12    governing the conduct of the Attorney General specifically

13    applied on the high seas.  So first the high seas was integral

14    to the Court's decision and to the actual holding.  They cite

15    the notion of the high seas at least four times, and it

16    expressly concluded that the border is something different.

17    This is at page 159 of the Sale decision.  "The INA offers

18    these statutory protections only to aliens who reside in," the

19    government's view, "or have arrived at the border of the

20    United States."  And that does not mean inside the

21    United States.

22           With respect to the Haitians, the Court goes on, "For 12

23    years, in one form or another, the interdiction program

24    challenged here has prevented Haitians, such as respondents,

25    from reaching our shores and invoking these protections."

1    So it imagines that individuals in our plaintiffs'

2    circumstances are not barred by this principle of

3    extraterritoriality.

4        I also would want to in further support of our position in

11:14  5    Sale, at 163 of the opinion, the Court examined what the

6    term -- and pardon my French in advance, although I'm not going

7    to curse -- the term "refouler" was synonymous with "return,"

8    which was the position of the Haitians, that you cannot return

9    us to Haiti.

11:14  10   The Court said, actually, refouler means repulse, repel

11   with denial, reject, refuse, rebuff, or to shut out or exclude

12   from something.  So that didn't apply to returning Haitians

13   interdicted in the middle of the high seas, but it would apply

14   to our plaintiffs.

11:15  15   Just a couple of quick points about due process.

16       I think, as Your Honor suggested, it's unambiguous that

17   Rodriguez controls.  It clearly holds that U.S. agents acting

18   on U.S. soil with cross-border effects -- the Constitution

19   applies to U.S. actions on U.S. soil with cross-border effects.

11:15  20   The government conceded that CBP officials -- CBP officials

21   were on U.S. soil when they were repelling individuals, so it

22   clearly controls.

23       And just quickly, with respect to Boumediene, it is not

24   limited to detention of the suspension clause.  The whole point

11:15  25   of Boumediene was to wipe away the kind of bright line

1   territorial rules that the government uses, and I would just

2   stress that both Rodriguez and Ibrahim, the case they cite,

3   adopt Boumediene.

4            THE COURT:  To the extent you talk about Ibrahim, what

11:16   5   significant -- I mean, the government does a lot about the

6   significant voluntary connection.  What significant voluntary

7   connection do the new individual plaintiffs have to the U.S.?

8            MR. AZMY:  Your Honor, just so -- I think what Ibrahim

9   suggests is post-Boumediene.  Voluntary connections can be one

11:16   10   of the practical circumstances in the impractical and anomalous

11   framework, but it is not itself a requirement.

12       And we know that for two reasons:  First, if it were,

13   Boumediene would have come out entirely differently because, I

14   dare say, the petitioners' there connection to the

11:16   15   United States were not voluntary; and second, Rodriguez itself

16   explains neither citizenship nor voluntary submission to

17   American law is a prerequisite to constitutional rights.

18       I think it just made sense that Ibrahim focuses on

19   voluntary connections given the petitioners.

11:17   20       So just quickly, what it means, that due process applies,

21   it means that this statutory entitlements under the INA cannot

22   be -- plaintiffs cannot be deprived of them without due process

23   of law.

24       So even if, for example, this Court were to find no final

11:17   25   agency action, the due process clause would still apply and

1    prevent any kind of arbitrary deprivations of statutory rights;

2    say, for example, the use of denial of asylum for purposes of

3    deterrence.  So the claims, for now, are coterminous, but due

4    process is an independent claim, in our view.

11:17    5    THE COURT:  Do I need to even delve into the

6    extraterritorial reach of the due process -- I mean of the

7    Fifth Amendment?  Can't I resolve plaintiffs' claims, due

8    process claims, by looking at whether the underlying INA

9    provisions include them?

11:18    10    MR. AZMY:  Yes, Your Honor, I think the due process

11    claim -- whether or not it applies -- that is, if Your Honor

12    finds that -- I'm sorry.  Are you saying that the --

13    THE COURT:  The extraterritorial, whether the due

14    process clause that applies is extraterritorial.  I'm not sure

11:18    15    I even have to reach that.  Or do I?

16    MR. AZMY:  I don't think you do, Your Honor.  I think

17    they're slightly different tests, for whatever reason.  I think

18    the statutory test is looking, parsing the statutory language,

19    and the constitutional test happens to be this flexible one.

11:18    20    And I'm not going to stand here and say that this doctrine

21    is super coherent.  It is what it is, but given what it is, I

22    think we'd urge you to decide that both govern the plaintiffs

23    in this case.

24    And just quickly with political question before I get to

11:19    25    ATS, we agree completely with Your Honor that we are not

AOL-DEF-00217230

1    seeking to question any discretionary judgment or interaction

2    between U.S. officials and Mexican officials.  We're seeking

3    simply to enforce a statutory duty, which the Supreme Court has

4    said over and over again is not a political question.

11:19    5        Most recently, in the Zivotofsky versus Clinton case,

6    which, after all, was a case involving enormously sensitive

7    matters, the Court said it's not a political question for the

8    State Department to comply with a federal statute requiring the

9    listing of a U.S./Israeli citizen's place of birth in his

11:19    10   passport as Jerusalem, which contravened 60 years of State

11   Department policy and terrified the State Department because it

12   would deeply affect their diplomatic relationships because they

13   didn't -- it was their policy not to recognize Jerusalem as

14   part of Israel.  And nevertheless, the Court said this is not a

11:20    15   problem.  As a matter of separation of powers, you have to

16   apply the statute.

17       And with respect to the resources question, as I think

18   Your Honor was suggesting, courts order compliance with law all

19   the time.  And then it's up to the defendant to figure out how

11:20    20   to comply with law.

21       It is true that Your Honor might not want to put in an

22   actual order an order that they spend money, but that's not

23   how, as Your Honor knows far better than I, how court

24   injunctions work.

11:20    25       So last but not least, the --

1        THE COURT:  The Alien Tort Statute.

2        MR. AZMY:  -- the curious Alien Tort Statute.

3     So as I think Your Honor is aware, it's a jurisdictional

4  statute to which Congress has authorized the federal courts to

5  develop common law causes of actions arising out of a law of

6  nations or customary international law, and as Your Honor

7  recognized, it has to be specific, universal, and obligatory.

8  I believe we have demonstrated that has reached that status.

9        THE COURT:  Are there specific instances of the norm

10  being enforced against government officials in the

11  United States and other countries?  I mean, how is it

12  obligatory?  How do you demonstrate that it's obligatory?

13        MR. AZMY:  Well, I think "obligatory" is sort of a

14  term of art about how the norm is non-dirigible; that is, there

15  aren't exceptions to it.  I think that's what the term

16  "obligatory" gets when you think about the other kinds of norms

17  that have met that high-level status.

18     So it is obligatory based on treaties, the Refugee

19  Convention, the Convention Against Torture, and the ICCPR.

20     Given the universal conduct of nations, it would be

21  considered obligatory that the United States would abide by its

22  obligation, just as all other countries have to, so that we're

23  not rendered an outlier in this universal scheme of

24  international law.

25     And for what it's worth, you know, commentators also

1    recognize that it's obligatory.

2              THE COURT:  Am I correct that there is not a single

3    other federal court that has recognized this as a specific

4    universal and obligatory norm, the duty of non-refoulement as

11:22    5    a --

6              MR. AZMY:  I think that's probably right, Your Honor,

7    and so it would be -- it would be a first, but I think it would

8    also be a principled application of the Alien Tort Statute,

9    just as the courts did in Filártiga in recognizing other norms.

11:22    10   That's sort of, I think, the process of how the norms should

11   work.

12             THE COURT:  Can you get all the relief that you're

13   seeking under the INA?  Is there anything different that you're

14   getting under the Alien Tort Statute?

11:22    15             MR. AZMY:  We would argue that the refoulement duty is

16   slightly broader to the extent that it requires, you know, very

17   efficient processing, but I think there's not a dramatic

18   difference.

19             THE COURT:  Other than a nice statement by me that

11:23    20   there's this obligation by our country to do this.

21             MR. AZMY:  It would be a nice and important statement,

22   Your Honor, for sure.  And, you know, we need some of those.

23   So but just -- you had a question at the outset, so what would

24   it mean if someone were denied asylum?  Would that violate --

11:23    25             THE COURT:  I was a little concerned about that.

AOL-DEF-00217233

         1          MR. AZMY:  The answer is that would not violate the

         2   norm of non-refoulement because that individual was given a

         3   process, and that's not sort of a repulsion or a genuine

         4   refusal.  The norm includes the opportunity --

11:23    5          THE COURT:  A due process, sort of, right?

         6          MR. AZMY:  Exactly, and that's, you know, what we're

         7   broadly saying is --

         8          THE COURT:  So you're saying they wouldn't -- if

         9   they're denied asylum under the INA, they wouldn't have any

11:23   10   fallback ATS claim?

        11          MR. AZMY:  Exactly, exactly, just like if they're

        12   denied -- just as we say we don't necessarily have a right to

        13   an appositive result under the INA, just access to the process.

        14      And if I could just -- oh, just quickly on the preemption

11:24   15   argument, I think it may be true that a comprehensive

        16   regulatory scheme in the INA might preempt customary

        17   international law as such, and all the cases that the

        18   government cites involves an individual who is in deportation

        19   proceedings and simply cites a provision of the customary

11:24   20   international law to oppose or override an INA provision, and

        21   the courts say I can't do that.

        22      I think it's difficult when you have a federal statute

        23   authorizing the courts to look at federal common law, and I'm

        24   not aware of a principle where one statute can preempt another.

11:25   25      And if I just might close in the way as my colleague

1    mentions -- is there something else?  Oh, yeah, I've been asked

2    to remind the Court about the Court's East Bay decision in the

3    Ninth Circuit, which I think simply reinforces that the

4    government can't do -- and that case involved a formal attempt

11:25    5    to amend the INA, and what we're alleging here is this is a

6    de facto attempt to amend the INA, and the executive branch has

7    no authority to do that.  They have to go back to Congress.

8        If I could say just one last word about Boumediene, and

9    full disclosure, as my co-counsel said about the Innovation Law

11:25    10    Lab, we're counsel in that case.  There's a reason the

11    government -- as the government stresses, that the Court in

12    Boumediene focused so much on the de facto control over

13    Guantanamo.  And that wasn't a technical reason.  I think it

14    was a fundamental reason because the Court was concerned that

11:26    15    if U.S. law didn't apply there, then no law would apply there,

16    and the Court, as a normative principle, said that can't

17    happen, but I think, fundamentally, that's what the government

18    is suggesting here.  Just as in Boumediene, the Court said

19    there cannot be prisons beyond the law.  I think the principle

11:26    20    here is that there cannot be a border without law subject

21    exclusively to the discretion of executive officials.

22        THE COURT:  Thank you.

23        MR. AZMY:  Thank you.

24        MS. WESTWATER:  Your Honor, if I may just respond to a

11:26    25    few of my colleagues' comments.

1          THE COURT:  Sure.

2          MS. WESTWATER:  First, we just want to return to the

3     idea that metering is a guidance.  It is not refusing to allow

4     individuals to come across the line.

11:27   5          THE COURT:  Again, you're arguing facts.  We're

6     talking about what they've alleged.  They've alleged in this

7     case that it is.

8          MS. WESTWATER:  Actually, they haven't, Your Honor.

9     They referred to waiting, to individuals being told to get in

11:27   10    line.

11         THE COURT:  No, they allege that this is a policy

12    across the board to keep people from seeking asylum.  That's

13    what they allege.

14         MS. WESTWATER:  Well, we would also like to then look

11:27   15    at some of their numbers that plaintiffs put forward, and the

16    same numbers relative of individuals who were processed before

17    this alleged policy are still processed.  The reason, you know,

18    the -- and that in itself calls into question the whole

19    validity of their even claiming that there is some --

11:27   20         THE COURT:  Great arguments for your summary judgment

21    motion.

22         MS. WESTWATER:  All right.  So we also -- although I

23    think the Court touched on this, the question is also that, you

24    know, the plaintiffs do make a lot of allegations as to the

11:28   25    dangers in Mexico or as to individuals and what is going on in

1    Mexico.  And we would say that, you know, individuals, as we

2    have said, have an ability to avail themselves of the

3    protections of the Mexican government while they're in Mexico.

4         So the real question we would ask this Court to then focus

11:28    5    on is the rights of an alien who has entered the United States.

6         And again, we would turn to why an individual has to

7    have -- be standing on U.S. soil.

8         And we go back to a couple different provisions.

9         First, we do believe that Knauff and Mezei matter because

11:29    10   the same words that plaintiffs are using at a port of entry --

11   those were the words used from Mezei and from Knauff, and both

12   of those individuals were on U.S. soil.  They were seeking to

13   enter.  Seeking admission.  They were on U.S. soil.

14        These are terms of art as they are used in immigration law,

11:29    15   and, therefore, they have never been used.  Plaintiffs haven't

16   cited any cases where they have been used to refer to a person

17   who is not on U.S. soil.  And there is a bright line, and that

18   bright line is U.S. soil.

19        So we disagree.  At least some of plaintiffs, at least,

11:29    20   claim they were -- such as one in Mexico -- one in Texas claim

21   that they were approaching the middle of the bridge, which, to

22   us, would still indicate they were on Mexican territory.

23        So to the degree that the Court finds plaintiffs have not

24   clearly stated that they were on U.S. territory, we urge the

11:30    25   Court to very much look -- and in our brief we've cited the

1    language of 1225(a)(1), which says, "An alien present in the

2    United States who has not been admitted or who arrives in the

3    United States, whether or not at a designated port of entry,

4    shall be deemed for purposes of this chapter an applicant for

11:30    5    admission."

6        And those are the definitions of who are the people who are

7    going to have the full panoply of rights under the INA.

8        We also respond to the claims of plaintiffs regarding an

9    obligation that they say CBP has to process aliens without

11:31    10    unreasonable delay.

11        Plaintiffs have not cited actually a citation

12    for the without-reasonable-delay claim, let alone for allowing

13    the individuals to -- that does not apply to crossing the

14    border, which plaintiffs have put together.  We, again, say

11:31    15    there are no standards.

16        Whether the Court considers it under political question, we

17    don't think the Court has to.  We think the APA also makes

18    clear that where there is no standard, that the Court is not to

19    get into the day-to-day operations of the agency and their

11:31    20    resource allocations.

21        We would ask the Court also to look at Ahmed, which is

22    another case out of the Southern District of New York, where a

23    Court was asked to determine whether -- I think it was DHS --

24    should station people overseas to process various benefits.

11:32    25        THE COURT:  I agree, the timing isn't in the statute,

1    but they do say, "You shall refer the alien for an interview by

2    an asylum officer," and they're alleging in their complaint

3    that they are not, the government is not referring people

4    for --

11:32    5    MS. WESTWATER:  Well, the question is, Your Honor, we

6    believe, to the degree that those have individuals who are in

7    the United States, their claims were -- those claims might be

8    different.

9    We're simply saying for an individual who is outside the

11:32    10    United States, there is -- plaintiffs have not pointed to any

11    language except for what they claim are these words,

12    "attempting to arrive in the United States," to claim that

13    there is some sort of extraterritorial right.

14    We would look at -- refer the Court also to the specific

11:32    15    language in Sale, which I believe plaintiffs were

16    trying -- were referring to in order to say that these terms

17    regarding refoulement, regarding asylum apply

18    extraterritorially.

19    In Sale the Supreme Court specifically said, "The text of

11:33    20    Article 33 thus fits with Edwards' understanding that

21    'expulsion' would refer to a refugee already admitted into a

22    country and that 'return' would refer to a refugee already

23    within the territory, but not yet resident there.  Thus the

24    protocol was not intended to govern parties' conduct outside of

11:33    25    their national borders."

1    And the Supreme Court then cites the Haitian Refugee Center

2    case, which is from the Eleventh Circuit, which we would refer

3    the Court to then for further discussion as to the importance

4    of territoriality and being on the soil.

11:33    5    And in further analysis, the Court in Sale said that,

6    "There is no change in the 1980 amendment, however, that could

7    only be explained by an assumption that Congress also intended

8    to provide for the statute's extraterritorial application."

9    So we would find that there's no basis under the INA to

11:33   10    find under the interpretations of the Supreme Court that there

11    is an extraterritorial right.

12         THE COURT:  And you're still saying that it's not

13    enough to say they were at the port of entry, that that's not

14    enough of an allegation?

11:34   15         MS. WESTWATER:  We believe, based on the clear

16    parsing, I think, that we've done well in the brief as to the

17    language of plaintiffs and what they've referred, that it is

18    not.

19    We would urge the Court, however, if it does make a -- if

11:34   20    it finds that that is sufficient, that the Court would be clear

21    that that is sufficient to say that they were in the

22    United States.

23    We believe in any decision issued by this Court, it should

24    be clear that -- we would hope that you would not find there's

11:34   25    an extraterritorial right for aliens who are outside on Mexican

1    territory.

2        And we would find -- as far as the Alien Tort Statute, we

3    would point this Court to Cortez-Gastelum, which is a Ninth

4    Circuit case from 2013, as well as Siderman, Ninth Circuit,

11:35    5    1992.  And they both say that, "Where controlling legislation

6    exists, customary international law does not apply."

7        And those were both referring to even where there's

8    jus cogens, so where it is considered binding international

9    law, if there is contrary U.S. law that fills that area, then

11:35    10    that is what controls, even if it is --

11        THE COURT:  But can't they make allegations in the

12    alternative?  I mean, don't the Federal Rules of Civil

13    Procedure allow someone to say this and this, and if I don't

14    win on this, then I go forward on this?

11:35    15        MS. WESTWATER:  But we believe the ATS claim -- we

16    believe they haven't appropriately alleged a claim that could

17    fall under the Alien Tort Statute, first, because we don't

18    believe it has risen to the level of jus cogens, but even if it

19    had, we believe that the U.S. law, as discussed in Sale, as in

11:35    20    Haitian Refugee Center, under those cases, it's clear that that

21    is not the norm in the United States, and that is not what the

22    INA refers to.

23        So we believe plaintiffs simply haven't shown any right

24    that applies extraterritorially to an alien seeking to cross

11:36    25    the border.

AOL-DEF-00217241

1      If, however, this Court finds, nonetheless, that there are

2  plaintiffs who were in the United States or that there were

3  plaintiffs who have the ability to challenge the metering

4  policy or the metering guidance anyway, we would still say that

11:36  5  as far as a metering policy and how fast the United States must

6  process or how long an alien can wait -- we would say that that

7  is, as we said -- there is no standard for the Court to get

8  involved in those sorts of day-to-day decisions, and we would

9  say that under the APA, there is also no cause of action.

11:36  10      Regarding a broader claim, we believe -- as far as a

11  turnback policy, we believe that's very similar to -- I think

12  it's in Bark.  It has some great language about plaintiffs

13  taking a bunch of different actions and trying to put them all

14  together in a programmatic challenge, and we would say that

11:37  15  plaintiffs have taken a constellation.  Some of them may be

16  that they had been inappropriately metered from the U.S. side

17  of the border.  Some might be that they were told they'd be

18  detained.  We say those are all too different to allege a

19  common policy.  We believe it fails a standard under Iqbal, but

11:37  20  we also feel under the different cases for the APA that it

21  fails to state a policy.

22      It may, however, this Court found earlier in its earlier

23  decision, state individual claims.  So if the Court finds that

24  there are any individual claims stating that -- due process

11:38  25  rights under the INA, so as to their statutory rights under the

1    INA, that individuals were not appropriately processed, that

2    those go forward.

3       We have stated -- I believe we stated before we still

4    believe that those are moot because we believe that all of the

11:38    5    individuals have received all the relief they could.  They're

6    not seeking financial damages, so, therefore, for individuals

7    who have already been processed, we believe that the Court

8    could offer no remedy to those individuals.

9       THE COURT:  What about the case law out there in class

11:38    10    action cases that don't allow corporations to go out and pay

11    off the individuals to get rid of the class action case to moot

12    the class action case?  And that happens.  You have a class

13    action, you have five individual plaintiffs, and the

14    corporation pays off the five individual plaintiffs, and then

11:38    15    says, "Oh, we took care of them, so there was no class

16    anymore."  The courts have said no, you can't do that.  Isn't

17    that what you're trying to argue here?

18       MS. WESTWATER:  Well, Your Honor, I think that may be

19    more in the line of another -- of a case where plaintiffs have

11:39    20    been able to show a policy that's applied across the border,

21    such as maybe in a RILR where the government was admitting it

22    was -- and not necessarily because it was admitting.  The Court

23    also found there was evidence, but the Court found there was

24    one factor that was being applied in one type of decision

11:39    25    always.

1      This, obviously, can't be the claims here.  Plaintiffs

2  admit there are 10,000 people a month who are coming -- they

3  don't all claim that they have the same experiences with CBP.

4  They're very different experiences.  They simply have not

11:39   5  distilled one action at one time that's similar and binds these

6  individuals together.

7      Based on that, we don't see that that has risen to the

8  level of being able to -- yes, later on we would challenge

9  class claims, but we believe, even now, to allege a pattern and

11:40  10  practice, as is required under just the case law that we've

11  read, even under a 706(1), to be compelling the future actions,

12  and so that is a little difficult because we don't believe that

13  a claim that doesn't meet the standard, that isn't cohesive,

14  just because they try to bring it as a class action, therefore,

11:40  15  should survive at this stage.  And so that is really -- you

16  know, our position is, you know, if we were to go forward on

17  the individual claims, that could then -- plaintiffs could have

18  more discovery and defendants into exactly what happened to

19  these individuals and what allegations there are.

11:40  20      But the problem at the end of the day is these are so

21  separate and different, they turn on the individuals.  What is

22  the relief?

23      A declaration could be an advisory opinion.  If it's

24  really -- as they've made, it is not a policy.  The advisory

11:40  25  opinion is improper for the Court.  And what relief would it

1   give to others?

2       As they've alleged it, these seem to be various actions

3   over different periods of time, different ports, by different

4   people, and there's no consistency to it.

11:41   5       The only consistency -- I think this takes us to some of

6   the cases we've cited -- is something they put a label on it.

7       And that's the problem, is putting a label on something.

8   That seems to be the sort of conclusory allegations that Iqbal

9   says don't survive.

11:41   10      And that's, more or less, what we're raising as far as

11  going forward, that there's simply the type of relief that

12  plaintiffs would then be seeing, a declaration or an

13  injunction, the injunction to follow the law seems very awkward

14  to process people, which the individuals were all processed.

11:41   15  And plaintiffs don't really say that they aren't being

16  processed.  It seems to be that they're deterring them or

17  saying things that the individuals don't like.  So it just

18  leaves a real conundrum for the Court, we believe, in

19  fashioning an appropriate relief.

11:42   20          THE COURT:  Thank you.

21          MR. AZMY:  Very briefly.

22          THE COURT:  Sure.

23          MR. AZMY:  Two quick substantive points and a

24  housekeeping matter.

11:42   25      Just quickly, with respect to Sale, I think one reason you

AOL-DEF-00217245

1    barely see Sale cited in the Federal Reporter is it's all over

2    the place and heavily criticized, and the piece that counsel

3    read about the Refugee Act is dicta.  And the ultimate holding

4    relates to the high seas and is limited to the particular

11:42    5    statute at issue there and not 1225, which references "at the

6    border" and "arriving," as my colleague said.

7         Second, my co-counsel wanted me to stress that the

8    unreasonable delay argument comes both from 706(1) or under the

9    arbitrary and capricious analysis under 706(2), and you'll find

11:43   10    that in our briefing.

11         And just quickly on the housekeeping matter, we just object

12    to the introduction into the record of the metering guidance.

13    We disagree that it's incorporated because the document wasn't

14    attached.  We didn't have advanced notice.

11:43   15         And in any event, we allege that any content in that memo

16    is pretextual, and the arguments about capacity are pretextual

17    and false, and so, at most, it would create a disputed issue of

18    fact later.

19         THE COURT:  Okay.  Thank you.  The matter is

11:43   20    submitted.

21                        ---000---

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3        I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5

6        Dated May 20, 2019, at San Diego, California.

7

8
                              /s/ Dana Peabody_____
9                             Dana Peabody,
                              Registered Diplomate Reporter
10                            Certified Realtime Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AOL-DEF-00217247