MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  mmarmolejo@mayerbrown.com
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  olev@mayerbrown.com
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  smedlock@mayerbrown.com
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:  +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  melissa.crow@splcenter.org
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Chad F. Wolf,[1] *et al.*, <br><br> Defendants. | Case No.: 17-cv-02366-BAS-KSC <br><br> **EXHIBIT 10 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> **Declaration of Beatrice Doe in support of Plaintiffs' Motion for Class Certification** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

LATHAM & WATKINS LLP
  Manuel A. Abascal (Bar No. 171301)
  *manny.abascal@lw.com*
  Wayne S. Flick (Bar No. 149525)
  *wayne.s.flick@lw.com*
  James H. Moon (Bar No. 268215)
  *james.moon@lw.com*
  Robin A. Kelley (Bar No. 287696)
  *robin.kelley@lw.com*
  Faraz R. Mohammadi (Bar No. 294497)
  *faraz.mohammadi@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

AMERICAN IMMIGRATION COUNCIL
Melissa Crow (*pro hac vice* pending)
  mcrow@immcouncil.org
Karolina Walters (*pro hac vice* pending)
  kwalters@immcouncil.org
Kathryn Shepherd (*pro hac vice* pending)
  kshepherd@immcouncil.org
1331 G Street, NW, Suite 200
Washington, DC 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (*pro hac vice* pending)
  bazmy@ccrjustice.org
Ghita Schwarz (*pro hac vice* pending)
  gschwarz@ccrjustice.org
Angelo Guisado (*pro hac vice* pending)
  aguisado@ccrjustice.org
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Elaine C. Duke, *et al.*, <br><br> Defendants. | Case No.: 2:17-cv-5111 JFW (JPRx) <br> Hon. John F. Walter (Courtroom 7A) <br><br> **DECLARATION OF BEATRICE DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Hearing Date: December 11, 2017 <br> Hearing Time: 1:30 p.m. <br><br> Pre-Trial Conf.: July 20, 2018 <br> Trial: July 31, 2018 |

# DECLARATION OF BEATRICE DOE

I, BEATRICE DOE, hereby declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters. Because I am scared for my safety, I am submitting this declaration using a pseudonym so I do not reveal my true identity and my current whereabouts. Further, I have withheld particular dates and names of places because I am afraid that my persecutors may be able to identify me and will harm me or my family as a result.

2. I am a native and citizen of Mexico. I am 33 years old. I have three children. They are seven years old, eleven years old, and fifteen years old.

3. On May 24, 2017, I fled Southern Mexico with my three children and my nephew. My nephew is like a son to me because I have raised him since he was about three years old. His parents abandoned him shortly after he was born and he lived with his grandmother for about two years before coming to live with me.

4. For about the past year, my nephew was targeted by the Zetas, a dangerous drug cartel in Mexico that controls much of Southern Mexico including the place where we are from. My nephew worked with a group of young men selling goods. In the state in which I am from in Southern Mexico, the Zetas demand money from people who work in the market. The Zetas demand that the people in the market pay this fee, which they call the *cuota* ("fee"), in order to be able to work. If they fail to pay the *cuota*, then the Zetas will kill them for failing to obey and to use them as examples to others in the community.

5. The Zetas threatened my nephew by saying that if he did not pay the fees that they would beat him up or cut him into pieces and put him in a plastic bag. He paid the fees for about a year. He was afraid that if he did not continue to pay, that the men would kill him. The Zetas also threatened to harm his family

1

alleging that they knew where to find them. They made these threats to my nephew so that he would continue to make payments.

6. After about six months, the demands for the fees became more frequent, and they increased the amount he had to pay. When he was not able to pay, the Zetas told him they would kill him and his family to punish him. This happened around the same time that they began to pressure him into joining them. My nephew understood this to mean that they wanted him to work for them. Again, the Zetas told him that if he did not join them, that they would beat him up and increase the fees. The Zetas beat up my nephew on at least two separate occasions for not being able to pay the increased fees amount. He was reluctant to tell me that the Zetas had beaten him because he knew how worried I would be. I did not see the bruises on his body until several days later. I feel responsible for him and treat him like he is my own son. When I learned that the Zetas were targeting him, I was very concerned and was not able to sleep at night. I was afraid that they would hurt him again.

7. To escape this violence, my children, my nephew and I all fled Southern Mexico to seek asylum in the United States. My nephew told me that the Zetas are looking for him in Southern Mexico. One of the young men who worked with him called him after we unsuccessfully tried to seek asylum and told him that the Zetas already knew that he fled and were looking for him to kill him.

8. We also fled Southern Mexico because I suffered terrible domestic violence at the hands of my husband, the father of my children. In May, 2017, I reported my husband to the Office of Integral Development for Families (*Desarrollo Integral de la Familia*– "DIF") and to the office of the Municipal Agent (*Agente Municipal*) for the domestic violence. I reported him because I could not stand his abuse any longer and wanted to protect my children. He would beat me regularly, several times a month. I often had bruises on my body. These agencies called him to present himself to speak about the situation, but he told

2

them that he would continue to do what he wanted with me and his children. I was afraid that the beatings would worsen as a result of making a report to the authorities. I left my house that same day and stayed at my mother's house. Two days after I reported my husband, we left Southern Mexico and started our journey to Tijuana, where I intended to ask for asylum in the United States.

9. We first attempted to seek asylum on May 25, 2017. We went to the Otay Mesa Port of Entry. We walked up to the port and stood in line to enter. We passed by the first security post. A man standing in a black uniform motioned for us to go into one of two lines. He did not ask for any documents, and he did not say anything to us. We passed through the turnstile and then encountered two immigration officers in blue uniforms. One of the officers stood to the side and did not say anything. The other officer asked for our documents. I told him that we were from Mexico and showed him my Mexican identification card. He told me that we needed other documents in order to enter the United States. He told me to wait while he got another officer.

10. When the next officer came to talk to us, I told him that we wanted to apply for asylum. This officer was also dressed in a blue uniform. I told him that we were being threatened and wished to request asylum in the United States. He listened to me and said that they did not provide that type of service at the Otay Mesa Port of Entry, but that we should go to the San Ysidro Port of Entry instead. One of the officers escorted us to the gate, and we left the Otay Mesa Port. As we were leaving, the same officer who asked for my identification said that the officers were tired of poor people coming to the United States.

11. We then took a taxi cab to the San Ysidro Port. The taxi driver pointed to the entrance of the Port and told us where to go. We proceeded to the Port until we encountered a large gate. There were immigration officers in blue uniforms. We got in line. One of the immigration officers asked for our documents, and I handed him my Mexican identification card. He asked me what

3

we were doing there and what we wanted. I told him that we needed help because my life and the lives of my children and my nephew were in danger in Mexico. I told him that I was afraid of my husband.

12. The immigration officer told me that many people from Veracruz, Guerrero, Michoacan, and other states in Mexico had done the same exact thing – come to the United States to ask for help. He asked me why we had to go to the United States, and said that Mexico has 32 states and that we could have gone to any of those states to be safe. He told me that the United States government had no obligation to help us. He also told me that we did not have a right to enter the United States because we were not born in the United States. He told me that I had no rights. He told me that I should be asking for help from the Mexican government.

13. This officer then led us into an office. Next, a female immigration officer in a blue uniform walked into the room. She put gloves on and put my children behind me. She told me to put my hands on my head. She spread my legs and patted me down. When she did this, I cried out in pain. My husband had beaten the side of my body, and the bruises were still fresh. She did the same to my children. She told me to remove all accessories. She checked my hair as if she was checking my hair for lice. She told me that she was checking my hair, which was in a bun, for drugs. She told me it was for national security. She made sure that I did not have anything sharp. She also checked our bags for drugs.

14. This officer did the same to my children. The officer instructed the children to take off their sweaters and to empty their pockets. The officer also took away the children's belts.

15. The officer then took us to a separate room next door. There were two women and two men in this room. They all were speaking in English. The officers asked us again why we were trying to go to the United States. I explained

4

that we were fleeing violence and that we wished to ask for asylum in the United States.

16. I gave the officer each of my children's birth certificates. The officer then asked about my nephew. I told the officer that he was my nephew. She replied that I had probably kidnapped him. She said that if I did not provide documentation proving that he was my nephew, that they would take him away from me.

17. The officer then took a picture of me. I explained again that we were trying to leave Mexico because we had been threatened and because I had suffered domestic violence and was afraid for my life. The woman with the gloves on – the one who had searched me and my children before – was walking around the room saying that "it was always the same."

18. As the immigration officers were interrogating me, another mother and her two small children were brought into the room. A different female officer also searched this mother and her children. The officer searched the mother by touching her private parts and was aggressive. The mother was crying.

19. Next, the officer took my fingerprints and told me that we were now going to speak to another officer. We sat and waited while the other mother in the room was being harshly interrogated, in the same way. After about thirty minutes, a male immigration officer came into the room and told us to follow him. They took my nephew away to another room to talk to him separately.

20. My nephew told me later that the immigration officers asked him a lot of questions about where his parents were, where he was from and how long he had been living with me. The immigration officers asked my nephew if he was willing to enter the United States if I stayed in Mexico. He said no and that he wanted to stay with me. They told my nephew that if he still wanted to cross to the United States, they were going to place him in the custody of Mexican authorities. My nephew told the officers that he was afraid to go back to Mexico. The

5

immigration officers told him all the same things they had already told me – that it did not matter that we were afraid, and that there were many other places for him to live in Mexico.

21. The immigration officers asked me for my husband's name and told me that they were going to take my nephew away from me unless I signed a document that they placed in front of me. The officers told me that if I signed the document, I would still have the opportunity in the future to get a work visa in the United States. They said I did not have a right to be there, but if I insisted, that I was going to go to jail. They said that for my own good, I should sign the document and that it would not affect my record. When I asked the immigration officer what he meant by "record," he started banging on the table and yelled at me that I had to sign the document. I was afraid and felt that I did not have another option but to sign the document. I told the officer that I did not understand what I was signing because the document was in English and I only speak Spanish. The only words I understood on the form were my name and the names of my children and my nephew.

22. After I signed the document, the immigration officer took us from the room, returned our belongings to us, and handed me the document that I had just signed. As we left, he said that we were already in Tijuana and that we would be safe there. We were then escorted to another office with Mexican immigration officials, and we returned to Tijuana.

23. The same day, just a few hours after leaving the San Ysidro Port of Entry, my nephew received a phone call from a friend in Southern Mexico who told him that the Zetas were looking for him and that he should be careful. I called my sister in Southern Mexico and explained what had happened. She told us to go back to the Port of Entry and try again.

24. The next day, on May 26, 2017, we again went to the San Ysidro Port of Entry very early in the morning to try for the third time to seek asylum in the

6

United States. I saw one of the same female immigration officers wearing a blue uniform that I had seen the day before. The female officer recognized me and said, "You again!?" The female immigration officer asked me how I could assure her that my children were not going to become delinquents in the United States. She told us that we had no right to ask for asylum, and no right to enter the United States. She told me that if I tried to return, I would be put in jail for three years. I told her that we were afraid to return to Mexico because we feared for our lives. She said that this did not matter.

25. They took us to a different office, and they separated my nephew from my children and me. More officers spoke to my nephew separately. I could not hear what they were saying, but afterwards, he told me that they had again threatened to transfer him to Mexican authorities and return him to Southern Mexico. Later, they gave us food and then escorted us out of the office and back to Mexico. We were very tired.

26. We returned to Tijuana, where we stayed in a shelter because we have no money. Two weeks ago, the people who run the shelter said we could not stay there any longer. A lawyer from Al Otro Lado found a place for us to stay temporarily, but we cannot live here much longer. I cannot support myself in Mexico because my children and I must remain in hiding to protect our lives.

27. I am afraid with every day that passes that the Zetas, or my husband, will find us in Tijuana. My husband has called me since I have been in Tijuana and told me that he knows I am here. Because it only took us about one day to travel to Tijuana, we are very vulnerable staying here. I would like to try to cross again with my family and ask for asylum in the United States, where my family and I will be safe. But I am afraid that if I try a fourth time, they will turn us away again or put me in jail.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2017 at Tijuana, Mexico.

_BEATRICE Doe_
Beatrice Doe

## CERTIFICATION

I, Hilda Gissela Bonilla, declare that I am fluent in the English and Spanish languages. On July 7, 2017, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2017 at Tijuana, Mexico.

_[signature]_
Hilda Gissela Bonilla