MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  mmarmolejo@mayerbrown.com
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  olev@mayerbrown.com
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  smedlock@mayerbrown.com
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:  +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  melissa.crow@splcenter.org
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 11 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Declaration of Carolina Doe in support of Plaintiffs' Motion for Class Certification** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

| | |
|---|---|
| 1 | **LATHAM & WATKINS LLP** |
| 2 | Manuel A. Abascal (Bar No. 171301) |
| | *manny.abascal@lw.com* |
| 3 | Wayne S. Flick (Bar No. 149525) |
| | *wayne.s.flick@lw.com* |
| 4 | James H. Moon (Bar No. 268215) |
| | *james.moon@lw.com* |
| 5 | Robin A. Kelley (Bar No. 287696) |
| | *robin.kelley@lw.com* |
| 6 | Faraz R. Mohammadi (Bar No. 294497) |
| 7 | *faraz.mohammadi@lw.com* |
| | 355 South Grand Avenue, Suite 100 |
| 8 | Los Angeles, California 90071-1560 |
| | Telephone: +1.213.485.1234 |
| 9 | Facsimile: +1.213.891.8763 |

AMERICAN IMMIGRATION COUNCIL
Melissa Crow (*pro hac vice* pending)
  mcrow@immcouncil.org
Karolina Walters (*pro hac vice* pending)
  kwalters@immcouncil.org
Kathryn Shepherd (*pro hac vice* pending)
  kshepherd@immcouncil.org
1331 G Street, NW, Suite 200
Washington, DC 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (*pro hac vice* pending)
  bazmy@ccrjustice.org
Ghita Schwarz (*pro hac vice* pending)
  gschwarz@ccrjustice.org
Angelo Guisado (*pro hac vice* pending)
  aguisado@ccrjustice.org
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.: 2:17-cv-5111 JFW (JPRx) |
| Plaintiffs, | Hon. John F. Walter (Courtroom 7A) |
| v. | **DECLARATION OF CAROLINA DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| Elaine C. Duke, *et al.*, | |
| Defendants. | Hearing Date: December 11, 2017 |
| | Hearing Time: 1:30 p.m. |
| | Pre-Trial Conf.: July 20, 2018 |
| | Trial: July 31, 2018 |

# DECLARATION OF CAROLINA DOE

I, Carolina Doe, hereby declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters. Because I fear for my safety, I am submitting this declaration using a pseudonym so I do not reveal my true identity and my current whereabouts. Further, I have withheld particular dates and names of places because I am afraid that my persecutors may be able to identify me and will harm me or my family as a result.

2. I am a female Mexican national and was born in 1979. I have three children, one of whom is a U.S. citizen. They are 9, 15 and 18 years old. Until recently, we lived in Southern Mexico.

3. In May 2017, my brother-in-law (my husband's brother) was kidnapped, tortured and killed by members of a drug trafficking cartel. There are two primary criminal organizations in the state in which I live in Southern Mexico that traffic drugs and that are in a war with each other. These groups regularly kidnap and murder civilians and especially police officers, which is why I believe that members of a drug trafficking cartel targeted my brother-in-law. Also, my brother-in-law had already been kidnapped and severely beaten about one year before, in May 2016. During that incident, the cartel members told my brother-in-law that if he ceased investigating their activities, that they would leave him alone. However, he continued because that is his job.

4. One day at the police station, several of my husband's coworkers ran to him while he was working and told him that his brother, my brother-in-law, was being kidnapped. My husband ran to where his brother was being taken away in a van, just across the street from where he worked. My husband tried to follow the van but the men in the van started shooting at him. My brother in law's

1

dismembered body was found the same day he was kidnapped in garbage bags in a cemetery. They targeted my brother-in-law because, like my husband, he was a police officer. Police officers are frequently targeted by the cartels in our community. We filed a police report the same day that my brother-in-law's body was found. There was no substantial investigation.

5. My husband is a police officer in Southern Mexico. One day after my brother-in-law was killed, my husband came home and showed me a picture on his phone of two men. He told me that one of these individuals in the picture was one of the men who had killed his brother. My husband recognized these men because the two men were former police officers who had defected and were now working for one of the cartels.

6. After my brother-in-law was kidnapped and murdered by the cartel, members of a different cartel threatened my husband, both in person and over the phone. We knew that the threats were from the second, different, cartel because they demanded to know intelligence about the first cartel who had killed my brother-in-law. I think that many people believe that police officers such as my husband have information.

7. The threats to my husband were related to my brother-in-law's murder. In particular, in May 2017, at my brother-in-law's funeral, members of the other cartel approached my husband and demanded to know more information about the cartel members who had kidnapped his brother. The cartels want to have as much information as possible because information is power. They told my husband that if he did not provide the information they had requested, he would meet the same fate as his brother had: killed and put in bags. The next evening, my husband and I saw a van drive by our house at least twice. It was the same van that had been used to kidnap my brother-in-law.

8. My husband went into hiding at his parents' house because he was afraid for his life.

2

9. Several days later, members of one of the cartels threatened me when I was in town taking care of business. They demanded to know where my husband was, and they reminded me that I had three girls. I understood this to be a threat to my children and me.

10. Later that day, my children and I were followed by two men when I left work. My children were with me at work that day because I was afraid for our safety and I wanted them close. They were waiting outside of my work and followed us as we rode home on the bus. I was frightened and got off at a different stop instead of traveling to our normal stop to return home. The men followed us off the bus and into a restaurant. They sat down next to us at the restaurant and took pictures of us. The men then left the restaurant, and we immediately took a taxi home.

11. The next evening, two cars stopped in front of my house, and five men got out. Two of the men came onto my property while the other three men waited outside. The two men used flashlights to search through the windows of my home to see if anyone was inside. I hid with my daughters in the bathroom so that the men would not see us. I was terrified and feared for my life and the lives of my daughters.

12. Based on these incidents and the threats my family received, I decided to flee with my children. We did not file another police report because we did not think that the police would carry out an investigation, especially after no one had been arrested following my brother-in-law's murder. Also, we were afraid that the cartels would harm us in retaliation for bringing charges.

13. My husband also fled but did not tell anyone where he was going out of fear for our family. The cartel members were actively looking for my husband, so we decided to flee separately, in the hope that my daughters and I would be safer. My daughters and I packed two bags and left in the middle of the night on May 17, 2017. We took a bus to Mexico City and a plane to Tijuana the same day.

3

When we arrived in Tijuana, we went immediately to the San Ysidro Port of Entry. We arrived at the San Ysidro Port of Entry at approximately 6:30 p.m.

14. My daughters and I walked for a long time on a bridge with a tunnel. At the end of the bridge, there was a door with approximately six officers all wearing dark navy blue uniforms. The officers asked me where we were going. I told the officers that I wanted to apply for asylum. The officers directed us to an area with cubicle stations.

15. There were other officers waiting at the cubicle stations who all had the same uniform. One of the officers looked at my documents, including my U.S. citizen daughter's U.S. birth certificate, her expired identification card from Portland, Oregon, and her U.S. passport, which was also expired. After I explained what had happened to my family and that we were afraid of returning, I was taken to another room where a female immigration officer took my fingerprints and searched us.

16. The officer then took my three children and me to a separate room. Another officer came by and locked us in the room. No one explained to us what was happening. We waited for someone to come back to the room but no one came. We were exhausted having fled in the middle of the night, so we went to sleep. The room only had mats on the floor and did not have beds.

17. The next morning, on May 18, 2017, I was taken to a large room with a table. Two male officers sat on one side of the table. My children were told to wait outside the room. The two men asked me questions in Spanish regarding why I came from Southern Mexico, and I again explained what happened to my family and me. The two men searched on the Internet regarding information about how my brother-in-law was killed to confirm what I had told them, and one of them mentioned an article he found about the murder that said my brother-in-law had two brothers. I believed that the officer understood that my husband was also in danger.

Case 3:17-cv-02366-BAS-KSC Document 390-13 Filed 01/14/20 PageID.20840 Page 10 of 411
Case 2:17-cv-05111-JFW-JPR Document 98-4 Filed 11/13/17 Page 6 of 9 Page ID #:1411
Page 8 of 11

18. The two officers then talked amongst themselves in English, which I did not understand as I only speak Spanish. One of the officers told me that based on his experience, I would not receive asylum. He said that the protection I was seeking in the United States could be provided by the Tijuana authorities.

19. The officer then asked if anyone was waiting to pick up my 15-year-old U.S. citizen daughter after she crossed. I explained that her godfather, who is a permanent resident, lived in Portland, Oregon. The officer said that my daughter would not be taken to Portland, Oregon, and only would be taken as far as Los Angeles, California. I explained that I could contact my daughter's godfather to make arrangements, but the officer told me that the state would take her and place my daughter in foster care until she turned 18. The officers did not give me the opportunity to contact my daughter's godfather, and I did not want her separated from her sisters and me and placed in foster care.

20. The officer then told me that if I was granted asylum, I could get my daughter out of foster care, but that he was certain I would not be granted asylum and that I would be deported. He said that I would not be allowed to return to the United States for 10 years and therefore would not be able to see my daughter until she became an adult.

21. The officer then told me that there was a way that I could get out of there voluntarily so that my daughter would not be taken from me and placed in foster care. He told me that unless I wanted them to take my daughter from me, I had to make a statement on video showing that I was not afraid of returning to Southern Mexico.

22. I did not want my daughter, who is only 15 years old, to be taken from me and placed alone in foster care. I felt like I had no choice but to do what the officer told me to avoid being separated from my daughter.

23. The two officers then went over the questions that they were going to ask me on video and told me how to answer each question. One of the officers

5

read the questions from a laptop he had on the table. They recorded me using a laptop. He asked me if I was scared to go back to Mexico, and I responded, "Yes." He stopped me and instructed me to respond "No" to all of the questions if I wanted to get out voluntarily and prevent the state from taking my minor U.S. citizen daughter and putting her in foster care. The officers then went over the questions with me twice and made me practice the answers before they turned on the video camera.

24. Next, they turned on the video camera on the laptop and asked me the same set of questions for a third time. I did not respond as they had instructed me to do because the responses they told me to say were not true. I was afraid and wanted to respond that I was very scared to return to Mexico. The officer then repeated that the only way we could leave voluntarily was if I stated confidently on video that I was not scared.

25. I was tired and scared. We had been locked in a room overnight, and I felt like we were in jail. I did not think that I would be allowed to leave with all of my daughters unless I did as they said. I believed I had no choice but to do what they wanted or else my daughter would be taken from me. They continued to pressure me to say what they wanted on video. I finally did what they told me to do, and the officers were satisfied with my responses.

26. The officers then made me sign a document in English that had my picture on it. The officers did not read the document to me in Spanish, nor did they explain to me what the document meant. The one officer who said he was certain I would not be granted asylum told me if I signed the document, it would keep me from violating the law. I agreed to sign the document because I did not want to violate the law and because I believed that my minor daughter would be taken from me if I did not sign it.

27. I did not understand what I was signing, or what the document said. I only understood that signing these documents was the only way to prevent them from taking my daughter away from me.

28. I was very anxious and scared because I knew that we could not return to Southern Mexico. My children and I fled our home in the middle of the night because we were in fear for our lives. If we are forced to return to Southern Mexico, I fear that we will meet the same fate as my brother-in-law: tortured, mutilated, and killed. I am also worried that these men may find us in Tijuana. It is this fear that I wished to explain to U.S. Immigration, including on the video, but the officers kept telling me that I did not qualify for asylum and that my daughter would be taken away from me if I did not sign the document.

29. After I signed the document, the officers brought my 18-year-old daughter into the room. They told her that she had to sign the document that they placed in front of her. She cannot read English either. They did not read the form to her in Spanish or explain to her what the form meant. After leaving the San Ysidro Port of Entry that day, my children and I went into hiding in a shelter in Tijuana. We stayed in a shelter because we could not afford to stay anywhere else. A few days after we left the port, I made arrangements with a family friend in San Diego who came to Tijuana and walked my U.S. citizen daughter across the border to the United States. My daughter is currently living with her aunt in Portland, Oregon.

30. Two weeks ago, the people who run the shelter in Tijuana told me that my children and I could not stay there any longer. A lawyer from Al Otro Lado found a place for us to stay temporarily, but we cannot live here much longer.

31. I am afraid of staying in Mexico with my daughters because of the threats that my family has received. We are not safe here. I have not seen or heard from my husband in several weeks, and I fear for his safety. I want to apply for asylum in the United States to save my family and me. However, I am afraid that

if we try to cross again, the officials will again turn us away or try to take my other children from me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2017 at Tijuana, Mexico.

*Carolina Doe*
Carolina Doe

## CERTIFICATION

I, Hilda Gissela Bonilla, declare that I am fluent in the English and Spanish languages. On July 7, 2017, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2017 at Tijuana, Mexico.

*Hilda Gissela Bonilla*
Hilda Gissela Bonilla

8