MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  mmarmolejo@mayerbrown.com
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  olev@mayerbrown.com
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  smedlock@mayerbrown.com
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:  +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  melissa.crow@splcenter.org
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Chad F. Wolf,[1] *et al.*, <br><br> Defendants. | Case No.: 17-cv-02366-BAS-KSC <br><br> **EXHIBIT 14 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> **Declaration of Jose Doe in support of Plaintiffs' Motion for Class Certification** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

| | |
|---|---|
| LATHAM & WATKINS LLP | |
| Manuel A. Abascal (Bar No. 171301) | |
| *manny.abascal@lw.com* | |
| Wayne S. Flick (Bar No. 149525) | |
| *wayne.s.flick@lw.com* | |
| James H. Moon (Bar No. 268215) | |
| *james.moon@lw.com* | |
| Robin A. Kelley (Bar No. 287696) | |
| *robin.kelley@lw.com* | |
| Faraz R. Mohammadi (Bar No. 294497) | |
| *faraz.mohammadi@lw.com* | |
| 355 South Grand Avenue, Suite 100 | |
| Los Angeles, California 90071-1560 | |
| Telephone: +1.213.485.1234 | |
| Facsimile: +1.213.891.8763 | |

| AMERICAN IMMIGRATION COUNCIL | CENTER FOR CONSTITUTIONAL RIGHTS |
|---|---|
| Melissa Crow (*pro hac vice* pending) | Baher Azmy (*pro hac vice* pending) |
|   *mcrow@immcouncil.org* |   *bazmy@ccrjustice.org* |
| Karolina Walters (*pro hac vice* pending) | Ghita Schwarz (*pro hac vice* pending) |
|   *kwalters@immcouncil.org* |   *gschwarz@ccrjustice.org* |
| Kathryn Shepherd (*pro hac vice* pending) | Angelo Guisado (*pro hac vice* pending) |
|   *kshepherd@immcouncil.org* |   *aguisado@ccrjustice.org* |
| 1331 G Street, NW, Suite 200 | 666 Broadway, 7th Floor |
| Washington, DC 20005 | New York, NY 10012 |
| Telephone: +1.202.507.7523 | Telephone: +1.212.614.6464 |
| Facsimile: +1.202.742.5619 | Facsimile: +1.212.614.6499 |

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Elaine C. Duke, *et al.*, <br><br> Defendants. | Case No.: 2:17-cv-5111 JFW (JPRx) <br> Hon. John F. Walter (Courtroom 7A) <br><br> **DECLARATION OF JOSE DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Hearing Date: December 11, 2017 <br> Hearing Time: 1:30 p.m. <br><br> Pre-Trial Conf.: July 20, 2018 <br> Trial: July 31, 2018 |

# DECLARATION OF JOSE DOE

I, JOSE DOE, hereby declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters. Out of fear for my life and the lives of my children and other family members, I am submitting this declaration using a pseudonym so I do not reveal my true identity and my current whereabouts. Further, I have withheld particular dates and names of places because I am afraid that my persecutors may be able to identify me and will harm me or my family as a result.

2. I am a 42-year old male national and citizen of Honduras. I am currently residing in an apartment with a member of my wife's family in Monterrey, Mexico. This is temporary housing; I cannot stay indefinitely. I am staying here because I am not able to afford to live anywhere else. I also have no legal status in Mexico and cannot work. I left Honduras because my family and I were threatened by the notorious 18th Street Gang ("18th Street"). I am afraid to return to Honduras.

3. Before I left, I lived in a town on the outskirts of San Pedro Sula, Honduras, with my wife, our two daughters (now ages 15 and 20), and our son (now age 8). My wife's nephew (now 17) also stayed with us. My wife and I were never formally married, but have lived together as man and wife for many years and are fully committed to each other.

4. For many years, I operated a small family business selling bananas from a pushcart in my neighborhood. Sometime in 2012, 18th Street began targeting my business for extortion. The gang told me that if I did not make weekly payments they would harm me or my family. After this demand, I paid the organization weekly in order to continue running my business and out of fear for my life. Though I made the extortion payments for many months, I eventually fell

1

behind. Because of this, 18th Street members surrounded me and brutally attacked me with a machete, hacking at my arms, legs, and head. I thought I was going to die. I have visible scars along my arms and skull to this day.

5. I could not report the attack to the police because in my neighborhood, the police often work with the 18th Street and do not protect people from the gang. This is well-known in Honduras. After recovering from the attack, I avoided the gang by not selling along my usual business route. My wife and I opened a small juice business near our house to augment our income. By 2014, 18th Street members learned about our juice business and again began demanding payments, this time imposing a daily payment requirement. They told me that they would hurt me again or harm my family if I did not pay. I was very frustrated and scared.

6. The 18th Street also harassed my wife's cousin, a 20-year-old woman who lived nearby. In 2016, she was kidnapped and found dead after resisting the gang. The 18th Street previously murdered two of my wife's uncles. The 18th Street also extorted money from another relative that owned a small grocery store. Their presence in our lives was steady and terrifying.

7. In August 2016, the 18th Street threatened to kidnap my two teenage daughters. The gang told me and one of my relatives that they wanted to make my two daughters "women" of the 18th Street, meaning that they would be affiliated with the gang as "girlfriends" of members and subjected to sexual violence at their hands. After this time, the gang would frequent the house asking for them. After the murder of my wife's cousin, we did not let our daughters or son leave the house for fear that the same thing would happen to them. We kept our daughters sequestered in the house at all times. Again, we could not turn to the police because they are very corrupt and take payments from the gang to look the other way. The police would not have done anything to protect us.

2

8. In November 2016, a former member of the gang came up to me on the street and told me that 18th Street was planning to come to my house that evening, kill me, and kidnap my daughters. Fearing for our lives, my wife, my three children, and my nephew all immediately fled our home in Honduras for the U.S. border. We took more than a dozen buses to evade the 18th Street, and eventually reached Nuevo Laredo, Mexico on November 21, 2016.

9. My wife, my children, my nephew, and I all presented ourselves at the Laredo Port of Entry as a family and jointly requested political asylum. U.S. immigration officials told us in a very aggressive tone that we should instead apply for asylum in Mexico and told us that only Mexico could help us. We repeated our desire to apply for asylum in the United States many times, but we were rejected each time. Eventually, after at least a half hour, authorities relented and allowed all six of us to enter the office inside the port entrance.

10. Once inside the office, immigration officers asked us for our basic identifying information. During this questioning, I explained that I was not my daughters' or son's biological father but technically their stepfather. This led one officer to yell out "what are we going to do with him, he is not part of the family?" This hurt me very much, as I have been the only father in my children's lives since my daughters were thirteen and six years old, respectively, and my son just four months old. They refer to me as their father, and along with their mother, I am their legal guardian.

11. The officers then separated me from my family, took them into a separate room, and told me to take off my belt and shoes, handcuffing my wrists and shackling my ankles. After some time had passed, immigration officers escorted me past the room where my family was waiting. As I walked by, my family saw me in shackles, causing my youngest daughter to cry. This was the last time I ever saw them.

3

12. I was interviewed by U.S. officials for many hours. I affirmed my desire to apply for asylum because I do not feel safe anywhere in Honduras. Throughout the interview, the immigration officer told me that I should not feel safe in America, that gangs exist there as well, and that what happened to me in Honduras could also happen to me in the United States. I reaffirmed my desire to apply for asylum in the United States, along with my family.

13. I was eventually sent to a detention center in Texas, where I stayed for four months. I was given a Credible Fear Interview, which I passed. I remained in detention thereafter. On May 5, 2017, I had an asylum merits hearing, at which I was unrepresented. I was unable to present any evidence because I was detained and I did not have a lawyer. I was denied asylum and other forms of relief. Both the judge and the government attorney told me that I should just go back to Honduras and that because my claim was related to gangs I would definitely lose any appeal. This made me feel hopeless and, without any attorney to guide me, I believed what they told me and decided not to appeal. Having now spoken with my attorneys, I wish to reopen my case, and pursue a claim for asylum.

14. While I was in detention, I learned that very soon after passing their Credible Fear Interviews, my wife, our children, and nephew had been released in the United States pending adjudication of their asylum claims. My wife, three children, and nephew are all now living in Texas. I am thankful that they are all safe in the United States.

15. I was deported to Honduras on May 26, 2017, without any of my documents. I was terrified that because I was sent back to Honduras, the gang would find me. I am certain that were I to return to my neighborhood, the gang would seek retribution against me for taking my children to safety and keeping my daughters from being their "women".

4

16. I also believe that, in retribution for my fleeing, the gang would seek vengeance on me and my family. I think this would be more severe than what they have already done to me—I believe they would kill me. I have heard stories of gangs meting out such violence for people who escape or otherwise resist the gang. In our neighborhood in 2015, 18th Street forced two girls to abandon the area and flee. They returned after a few months, unable to stay anywhere else. Within a month, 18th Street murdered them. I am afraid that if I were forced to return, I would suffer the same fate. I am also afraid that, because the gang has such extensive reach throughout the country, that there is nowhere I could safely hide. Because of this, I cannot safely return to Honduras. Scared for my life, within days of being returned to my town, I fled the country.

17. I again traveled through Honduras and Guatemala, again taking many buses to avoid detection. I returned to Nuevo Laredo on June 22, 2017, and was immediately surrounded by multiple menacing individuals who approached me in a threatening manner. I do not know who they were exactly, but I believe them to be members of a drug cartel. They asked me for my "clave," which I understood to mean identification or code, to prove that I lived in Nuevo Laredo. I had no such identification, and, because I was an outsider, I felt extremely threatened and that my life was in danger. I was able to flee by getting into a taxi.

18. The day after this terrifying encounter, on June 23, 2017, I presented myself at the Laredo Port of Entry for a second time. I immediately informed the U.S. immigration officer at the gate that I wished to apply for asylum. Multiple other officers overheard this request and informed me that I could not pass because no one was in the office to handle my application. They also told me that I needed a visa to apply for asylum, and without one I would have to remain in Mexico. I refused to leave, and instead stayed and continued to assert my desire to apply for asylum.

5

19. After about ten minutes, the immigration officers relented and escorted me inside. Once inside, an immigration officer again told me that in order to apply for asylum, I needed a visa: not a tourist or commercial visa, but a special type of visa without which I could not apply for asylum. I have never heard of such a visa. When I informed them that I was represented by counsel, he told me that perhaps my lawyers could help me obtain such a visa. I was then sent back to Nuevo Laredo, where I was again approached by aggressive individuals who asked for my "clave." I felt extremely unsafe and took the first available bus to Monterrey, approximately two hours away. I am currently staying with relatives of my wife, though I cannot stay much longer because the house is cramped and I do not have the status to live legally in Mexico.

20. I want to renew my asylum application. I cannot go back to Honduras because the 18th Street will kill me as retribution for fleeing. It is also very dangerous in Nuevo Laredo, and I am afraid that U.S. immigration officials will again turn me away. If that happens, given my prior experiences, I believe I would be in severe danger of harm in Nuevo Laredo.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2017 at Monterrey, Mexico.

_____
Jose Doe

### CERTIFICATION

I, Angelo Romans-Taylor Guisado, declare that I am fluent in the English and Spanish languages. On July 7, 2017, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2017 at Monterrey, Mexico.

_____
Angelo Romans-Taylor Guisado