1  MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
    (*pro hac vice*)
5    *olev@mayerbrown.com*
    Stephen M. Medlock (VA Bar No. 78819)
6    (*pro hac vice*)
    *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:  +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
    (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
          **UNITED STATES DISTRICT COURT**
16
          **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,            Case No.:  17-cv-02366-BAS-KSC

19            Plaintiffs,
                              **EXHIBIT 18 TO**
20      v.                    **PLAINTIFFS' MOTION**
                              **FOR CLASS**
21  Chad F. Wolf,[1] *et al.*,  **CERTIFICATION**

22            Defendants.
                              **AOL-DEF-00002262 to AOL-**
23                            **DEF-00002608**

24

25

26

27  ──────────────────────
28  [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
   McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

S. Hrg. 115–295

## FENCING ALONG THE SOUTHWEST BORDER

# HEARING

BEFORE THE

## COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS UNITED STATES SENATE

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

APRIL 4, 2017

Available via the World Wide Web: http://www.fdsys.gov/

Printed for the use of the
Committee on Homeland Security and Governmental Affairs



# FENCING ALONG THE SOUTHWEST BORDER

AOL-DEF-00002263

S. Hrg. 115–295

# FENCING ALONG THE SOUTHWEST BORDER

# HEARING

BEFORE THE

## COMMITTEE ON
## HOMELAND SECURITY AND
## GOVERNMENTAL AFFAIRS
## UNITED STATES SENATE

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

APRIL 4, 2017

Available via the World Wide Web: http://www.fdsys.gov/

Printed for the use of the
Committee on Homeland Security and Governmental Affairs



U.S. GOVERNMENT PUBLISHING OFFICE

27–015 PDF                    WASHINGTON : 2018

AOL-DEF-00002264

COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

RON JOHNSON, Wisconsin, *Chairman*

| | |
|---|---|
| JOHN McCAIN, Arizona | CLAIRE McCASKILL, Missouri |
| ROB PORTMAN, Ohio | THOMAS R. CARPER, Delaware |
| RAND PAUL, Kentucky | JON TESTER, Montana |
| JAMES LANKFORD, Oklahoma | HEIDI HEITKAMP, North Dakota |
| MICHAEL B. ENZI, Wyoming | GARY C. PETERS, Michigan |
| JOHN HOEVEN, North Dakota | MAGGIE HASSAN, New Hampshire |
| STEVE DAINES, Montana | KAMALA D. HARRIS, California |

CHRISTOPHER R. HIXON, *Staff Director*
GABRIELLE D'ADAMO SINGER, *Chief Counsel*
BROOKE N. ERICSON, *Deputy Chief of Staff for Policy*
MICHELLE D. WOODS, *U.S. Government Accountability Office Detailee*
SERVANDO H. GONZALES, *U.S. Customs and Border Protection Detailee*
MARGARET E. DAUM, *Minority Staff Director*
STACIA M. CARDILLE, *Minority Chief Counsel*
J. JACKSON EATON, *Minority Senior Counsel*
JOEL F. WALSH, *Minority Professional Staff Member*
TIMOTHY J. BRENNAN, *Minority National Institute of Standards and Technology Detailee*
LAURA W. KILBRIDE, *Chief Clerk*
BONNI E. DINERSTEIN, *Hearing Clerk*

(II)

AOL-DEF-00002265

# C O N T E N T S

———

| | Page |
|---|---|
| Opening statements: | |
| Senator Johnson ............................................................................ | 1 |
| Senator McCaskill ........................................................................ | 2 |
| Senator Lankford .......................................................................... | 18 |
| Senator Carper ............................................................................. | 20 |
| Senator Heitkamp ........................................................................ | 24 |
| Senator Harris ............................................................................. | 27 |
| Senator Hoeven ........................................................................... | 30 |
| Senator Daines ............................................................................. | 34 |
| Prepared statements: | |
| Senator Johnson ............................................................................ | 41 |
| Senator McCaskill ........................................................................ | 42 |

## WITNESSES

### TUESDAY, APRIL 4, 2017

| | Page |
|---|---|
| David V. Aguilar, Former Acting Commissioner of U.S. Customs and Border Protection at the U.S. Department of Homeland Security ............................. | 5 |
| Ronald S. Colburn, Former Deputy Chief of U.S. Border Patrol at U.S. Customs and Border Protection at the U.S. Department of Homeland Security .. | 8 |
| Terence M. Garrett, Ph.D., Professor and Chair, Public Affairs and Security Studies Department, The University of Texas Rio Grande Valley .................. | 10 |

### ALPHABETICAL LIST OF WITNESSES

| | Page |
|---|---|
| Aguilar, David V.: | |
| Testimony ..................................................................................... | 5 |
| Prepared statement ..................................................................... | 47 |
| Colburn, Ronald S.: | |
| Testimony ..................................................................................... | 8 |
| Prepared statement ..................................................................... | 51 |
| Garrett, Terence M., Ph.D.: | |
| Testimony ..................................................................................... | 10 |
| Prepared statement ..................................................................... | 56 |

### APPENDIX

| | Page |
|---|---|
| Majority Staff Report ...................................................................... | 76 |
| Minority Staff Report ...................................................................... | 181 |
| Howard Buffett statement referenced by Senator Heitkamp ................ | 188 |
| Tohono O'odham Nation statement referenced by Senator Heitkamp ...... | 192 |
| Gangs Beyond Borders report referenced by Senator Harris .............. | 195 |
| Statements submitted for the Record: | |
| Gerald Dickinson, Assistant Professor of Law, University of Pittsburgh School of Law .............................................................................. | 309 |
| National Immigration Forum ........................................................ | 314 |
| Texas Civil Rights Project ............................................................ | 321 |
| Patricia Elena Vidaurri, Land Owner and Citizen of the United States of America .................................................................................. | 325 |
| Responses to post-hearing questions for the Record | |
| Mr. Aguilar ................................................................................... | 327 |
| Mr. Colburn .................................................................................. | 332 |
| Dr. Garrett ................................................................................... | 335 |

(III)

AOL-DEF-00002266

AOL-DEF-00002267

# FENCING ALONG THE SOUTHWEST BORDER

---

### TUESDAY, APRIL 4, 2017

U.S. SENATE,
COMMITTEE ON HOMELAND SECURITY
AND GOVERNMENTAL AFFAIRS,
*Washington, DC.*

The Committee met, pursuant to notice, at 9:36 a.m., in room SD–342, Dirksen Senate Office Building, Hon. Ron Johnson, Chairman of the Committee, presiding.

Present: Senators Johnson, Portman, Lankford, Hoeven, Daines, McCaskill, Carper, Tester, Heitkamp, Peters, Hassan, and Harris.

### OPENING STATEMENT OF CHAIRMAN JOHNSON

Chairman JOHNSON. Good morning. This hearing will come to order. I want to welcome the witnesses. Thank you for your testimony. I am looking forward to your oral testimony and answering a lot of the questions we are going to have.

This hearing is obviously called, "Fencing Along the Southwest Border." I ask Unanimous Consent (UC) for my written statement to be entered into the record.[1]

I do want to relay a couple of quotes that were in my written testimony.

One came from Secretary John Kelly. When Secretary Kelly testified before this Committee in January, he said, "the number one threat to the Nation is that we do not have control of our borders. Without control, every other kind of threat—drugs, illegal immigrants, counterfeit manufactured goods and pharmaceuticals, diseases, terrorists, and the list goes on—can enter at will, and it does."

Further, Chief Morgan, the Chief of the U.S. Border Patrol (USBP) under President Obama, testified before this Committee in November 2016 that fencing does work and that we need more of it.

I was in Israel shortly before Christmas, and we inspected their fence along their Southern Border—143 miles—and they constructed it in about 2 years at a total cost of about $2.9 million per mile. According to Israeli officials, they cut their illegal immigrant crossings from 16,000 to 18. So, again, I think there is ample evidence that fencing, when put in the right places and when it is properly designed, absolutely works.

The purpose of this hearing, though, is to lay out the reality. We obviously have limited resources. President Trump has issued a

---

[1] The prepared statement of Senator Johnson appears in the Appendix on page 41.

(1)

AOL-DEF-00002268

2

couple of Executive Orders (EOs). The Border Security and Immigration Enforcement Executive Order instructs the Administration to take all appropriate steps to plan, design, and construct a physical wall, to identify and plan for long-term funding requirements, and release a study on security of the border within 180 days.

Now, what I am focusing on with that is the planning, designing, identifying, and releasing a study on border security within 180 days. To me, Congress has a real role here, and the purpose of this hearing is to lay out the reality—take a look at where fencing will work and what is the best type of fencing. When I was in Israel, talking to Prime Minister Benjamin Netanyahu, he told me that there are three problems with fencing: tunnels, tunnels, and tunnels.

So, it is not a panacea. It requires a layered approach. But, this is our 22nd hearing on securing our border. This is a top priority of this Committee. I am hoping every Member on this Committee realizes that there is real risk—there is real danger in not having a secure border. And, we have held hearings about some of the victims of people coming to this country illegally, because we do not have a secure border.

So, I hope we can agree that we do need to provide far greater border security. We have to make that commitment to do it. But, I also hope we can agree that, while there are a lot of different opinions, there are a lot of challenges to building that border security—to building walls and to building fences—and that is really kind of what this hearing is all about—is to kind of lay out the reality and discuss those challenges, so we can have informed public policy, in terms of what we need to do to secure our border.

So, with that, I will turn it over to my Ranking Member, Senator McCaskill.

### OPENING STATEMENT OF SENATOR MCCASKILL[1]

Senator MCCASKILL. Thank you, Mr. Chairman, and let me publicly apologize to the witnesses, to the Chairman, and to the Committee for being tardy this morning. That is rude, and I apologize.

There is no one on this Committee—and I do not think there is anyone in the Senate or in America—that does not want our borders to be secure. I think we can all agree on that.

But, the other interesting point is, I have not met anyone—either a Border Patrol Agent (BPA) or a fellow Member of Congress, who actually have said that they think the most effective way to do that is to build a continuous concrete wall along the entirety of the Southern Border. I have not met anyone who says that is the best use of our resources, in terms of securing our border, and the only one who keeps talking about it is President Trump. And, I want to point out that while this hearing is called "Fencing Along the Southwest Border," you never hear President Trump talk about the efficacy of fencing. You never hear President Trump indicate in his Executive Orders or anywhere else that he wants to look at this in a complex, holistic fashion to figure out what is the combination of things we need to do. Is it more resources at the ports of entry (POEs)? Is it more resources, in terms of Border Patrol? Is it more

---

[1] The prepared statement of Senator McCaskill appears in the Appendix on page 42.

3

resources, in terms of U.S. Immigration and Customs Enforcement (ICE)? Is it more technology? Is it some sections of wall and maybe some sections of fencing?

I think all of us are open to a variety of ways, and I think the thing we should be doing is listening to the people who are tasked with securing the border, and they are the first ones to tell you that it makes no sense to do a continuous wall along our Southern Border.

So, with that beginning, I think it is important, at this hearing, that we stay focused on a couple of basics. What is the wall that the President is proposing going to look like? What is it going to cost? How is Mexico going to reimburse the American taxpayers for the billions of dollars they are being asked to spend on the wall?

Since the beginning of this Congress, the Committee has conducted ongoing oversight of the Department of Homeland Security (DHS) and its plans to construct a concrete border wall. I have asked my staff to report to this Committee and the taxpayers on the results of our oversight of the wall to date.

Based on information provided by U.S. Customs and Border Protection (CBP) officials to Committee staff, the wall that President Trump has promised could cost nearly $70 billion. That works out to more than $200 for every man, woman, and child in the United States of America. I am not sure that is a cost the American taxpayer is willing to bear, especially when they were told that Mexico would be paying for the wall—not the American people.

The Department has told us that they plan to use funds intended to acquire remote video surveillance for the prototypes of the concrete wall. The $20 million they are using to do the prototypes came out of the very fund that all of the Border Patrol Agents told me they needed more of. In fact, it was to buy the remote video surveillance equipment that they proudly showed me they had put together themselves, which allowed them to see a more broad area along the Rio Grande River and allowed them to be more effective in catching the smugglers that were bringing people across the river illegally.

When I asked Border Patrol agents over and over again, "What do you need?", they told me they needed technology and, yes, some additional fencing—and I think the Chairman and I agree that some additional fencing or wall may be appropriate. But, they definitely said that they needed technology more than they needed additional wall. And so, it is ironic that the prototype for the wall is coming out of the very fund that they say they need the most.

And, what about the big question that I would like to spend some time on today: the cost of acquiring the land that is going to be needed to build the wall. Two-thirds of the U.S.-Mexico border is private and State-owned land. Some of this land has been in people's families for generations.

I am not sure everyone realizes what a time-consuming process this would be. According to CBP, along one stretch of the border—mostly in South Texas—400 land acquisitions were needed to build some of the border fencing and security that is in place now. Of those 400 acquisitions, they had to file 330 condemnation lawsuits—eminent domain—which, by the way, you say that word in rural Missouri, and you better run, because somebody is going

AOL-DEF-00002270

4

to have their shotgun out. It is really controversial for the government to be seizing land, and that is what this is about—the government seizing private land.

Over three hundred condemnation lawsuits were filed. Most of them were filed in and around 2008. And, of those 330 condemnation cases, more than 90 of them are still pending today—nearly a decade later. This is not going to be quick. It is not going to be easy—and it is going to be very expensive.

According to CBP, the government spent $78 million on land acquisition for the existing fencing—and those were the parcels that were the easiest to acquire. Going to people who do not have a lot of money and trying to buy them off—that is the easy part. The harder part is convincing people that own thousands of acres of expensive farmland—and what that means to them.

Nobody can tell me how much it is going to cost to seize all of the land that will have to be seized to build what President Trump has promised the American people. It is going to take $21 million or more just to resolve the pending cases left over from 2008.

In the course of prepping for this hearing, we talked to a lot of different landowners in South Texas, who were not happy about how they were treated by the government back when existing fencing was built a decade ago. One of these people is a gentleman from Brownsville, Texas, whose family runs a farming operation in the area. He had the misfortune of living in a house that was too close to the Rio Grande River, which is the international border. In some cases, there is a mile or two of land between where fencing was built and the river, and that is how this man's house—and some of the most fertile land in the world—ended up on the wrong side of the fence.

When the government came knocking on his door, this Brownsville farmer was offered just a few thousand dollars for the narrow strip of land where an 18-foot-tall fence would eventually be built. He was not offered any money for the dozens of acres of farmland that would be trapped between the fence and the Rio Grande River. When he went to take out a loan on his valuable land to send his three girls to college, the bank told him that his farmland was now worthless and they would not lend him any money for his children's education.

The horrible part of this story is, not only does he have to pass through a gate every time to go home—it is an 18-foot fence—he has to go through a gate just to go to the house. Think how isolated you would feel.

But, here is the worst part: A few weeks ago, the house caught on fire. The Brownsville farmer told my staff that the fire marshal could not get through the fence to save his house from the flames, and it burnt to the ground—even though he had been promised that local emergency services would have the code to the gate. So, he lost the value of his land and now he has lost his home, because of the fence or the wall.

Regardless of how you feel about President Trump's wall, Mr. Chairman, that is not how we should treat people that are landowners in this country. American families need to be treated with dignity and respect and need to be fairly compensated for any land that is taken from them.

AOL-DEF-00002271

5

I will be the first one to tell you that we need to enforce the immigration laws that we have on the books and provide DHS officials with the tools and resources they need to secure the border. And, maybe, that means they need some portions of a wall built in some places. But, if we are going to pay to build this thing, we need to be honest about some of the true costs to the American people. Let us start, today, by speaking frankly about how much it is going to cost, how difficult it will be to acquire the land, how long that will take, and the impacts on the American landowners along the border—and whether all of those costs justify the benefit that we will receive.

Thank you, Mr. Chairman, and I look forward to hearing from the witnesses.

Chairman JOHNSON. Thank you, Senator McCaskill.

As I mentioned, there will be challenges. By the way, those cases that were unresolved—92 of those are because we could not identify who the owners are. So, yes, there are all kinds of challenges, which is what the purpose of this hearing is: to lay out these realities.

The tradition of this Committee is to swear in witnesses, so if you will all rise and raise your right hand? Do you swear that the testimony you will give before this Committee will be the truth, the whole truth, and nothing but the truth, so help you, God?

Mr. AGUILAR. I do.

Mr. COLBURN. I do.

Mr. GARRETT. I do.

Chairman JOHNSON. Please be seated.

Our first witness is David Aguilar. Mr. Aguilar is a former Acting Commissioner of U.S. Customs and Border Protection. Mr. Aguilar served as Chief of the U.S. Border Patrol from 2004 to 2010 and as Acting Commissioner of CBP from 2011 to 2012. Mr. Aguilar.

## TESTIMONY OF DAVID V. AGUILAR,[1] FORMER ACTING COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION AT THE U.S. DEPARTMENT OF HOMELAND SECURITY

Mr. AGUILAR. Good morning. Thank you. Mr. Chairman, Ranking Member McCaskill, and distinguished Members of the Committee. I am honored to appear before you today to testify on issues associated with securing the Southern Border of the United States, to include what has obviously taken center stage in the ongoing border security discussion: construction of a physical wall along the Southwest Border, what I will refer to mostly as "infrastructure" required along the Southwest Border.

My testimony is informed by my 35-year career as a Border Enforcement Officer and Department of Homeland Security Executive. I served as an agent in multiple Border Patrol sectors, including as the Chief of the Tucson Sector at the time when unlawful entries into the United States across our border with Mexico were at an all-time high.

My views also reflect my experience as the former Acting Commissioner of U.S. Customs and Border Protection, the Deputy Com-

---

[1] The prepared statement of Mr. Aguilar appears in the Appendix on page 47.

AOL-DEF-00002272

6

missioner of CBP, and the National Chief of the United States Border Patrol. It was during my tenure as National Chief that we developed and implemented our Nation's first-ever National Southwest Border Strategy, doubled the size of the Border Patrol, constructed over 650 miles of border infrastructure, and initiated the organized application of technology along the entirety of the Southwest Border with Mexico.

Maintaining a safe and secure environment along the U.S.-Mexico border is absolutely critical. A safe and orderly border that is predicated on the strong rule of law deprives criminal organizations, drug cartels, and criminal individuals the opportunity to thrive. It is absolutely important. It also provides a solid foundation for trade and economic development between Mexico and the United States as well as provides for improved security and quality of life in our border communities and throughout our Nation.

Illegal border crossings have dropped dramatically. Our border communities are some of the safest cities and communities in the United States. Trade between our two nations is thriving. The barriers and infrastructure built and expanded between 2005 and 2011 along the border absolutely played a large part in the enhanced control of the Southwest Border. Now, we have done much to secure the border, but there is still much more to do.

Borders are dynamic—significant challenges remain and new ones are developing. Drug trafficking into the United States is still a major problem, as is the illegal flow of bulk cash and firearms to Mexico from the United States. These criminal activities are the principal causes of the violence that has afflicted Mexico.

Border fences, walls, and tactical infrastructure are absolutely a definitive part of the border security solution. Those of us with firsthand knowledge and security experience at the U.S.-Mexico border understand that infrastructure, technology, and personnel are critical aspects of the solution that will ensure enhanced control over the entire border. Walls, fences, and vehicle barriers are an integral part of a border enforcement system. Their purpose is to impede, deter, and slow down the illegal flow of people and vehicles across our land borders between the ports of entry. Properly designed, properly placed, and supported, this type of physical infrastructure creates an environment which enhances the Border Patrol's enforcement capabilities and its efforts to detect, deter, identify, classify, respond to, and resolve illegal border activity.

There is no restriction that would bar DHS from constructing additional fencing or other barriers along the border, provided that the Secretary concludes such construction is necessary to achieve control of the border.

Congress has also provided the Secretary broad authority to waive "all legal requirements" that may impede construction of border barriers and roads.

Many issues will have to be taken into account: federally protected lands, private lands, Native American lands, and environmental concerns. But, it is important to note that there is nothing more destructive to environmentally sensitive land and quiet communities than the uncontrolled illegal flow of people, smugglers, vehicles, and criminal organizations. The placement of fences and deterrent infrastructure in previously uncontrolled parts of the border

AOL-DEF-00002273

7

has actually allowed for the rejuvenation of areas that had previously been devastated due to heavy illegal pedestrian and vehicular traffic. Fences, barriers, walls, and technology have been instrumental to the Border Patrol's successes on the border. But, we must not forget that personnel and technological capabilities are an absolutely vital part of integrated border control strategies.

Barriers in infrastructure—along with significant increases in Border Patrol personnel, improved detection and surveillance capabilities, and the strategic deployment of resources to support iterative border control strategies—have gotten us to where we are: improved control of the border. But, again, I reiterate, more needs to be done.

President Trump has directed the Secretary of DHS to develop a strategy to obtain and maintain complete operational control of the Southern Border. I believe walls, fences, and border infrastructure will definitively be a part of what the Border Patrol will be identifying as current requirements. The Secretary's findings should inform what types of barriers should be constructed, where they should be constructed, and construction priorities.

There are multiple threats that must be addressed at the U.S.-Mexico border. These include trafficking of drugs, trafficking of arms, contraband within legal trade, and money laundering. The criminal organizations that work to defeat our border enforcement efforts are too often solely looked upon as drug-smuggling and human-smuggling organizations.

These same organizations will provide illegal access into our country for anyone willing to pay the going price. Our military men and women are fighting the enemy on foreign ground. We have hardened our airports and ports of entry, making it extremely difficult to get to us by air. But, we must act responsibly in addressing our borders.

Ladies and gentlemen, since the Border Patrol began building infrastructure—fences, walls, and vehicle barriers—along our Nation's border, there has been an endless debate on its value. Border Patrol agents and the Border Patrol as an organization all agree that properly constructed, placed, and supported physical infrastructure is essential to border security.

Thank you for this opportunity, and I look forward to answering any questions that you might have of us.

Chairman JOHNSON. Thank you, Mr. Aguilar.

Our next witness is Ron Colburn. Mr. Colburn is the former Deputy Chief of the U.S. Border Patrol. Mr. Colburn served in that role from 2007 to 2009. He helped oversee the effort to double the size of the Border Patrol and the deployment of more than $1 billion worth of technology and tactical infrastructure designed to bolster border enforcement efforts. Prior to being named Deputy Chief, Mr. Colburn served as the Chief Patrol Agent of the Yuma Sector, where he made significant improvements toward securing that sector. Mr. Colburn.

AOL-DEF-00002274

8

**TESTIMONY OF RONALD S. COLBURN,[1] FORMER DEPUTY CHIEF OF THE U.S. BORDER PATROL AT U.S. CUSTOMS AND BORDER PROTECTION AT THE U.S. DEPARTMENT OF HOMELAND SECURITY**

Mr. COLBURN. Thank you and good morning. Chairman Johnson, Ranking Member McCaskill, and distinguished Members of the Committee, I am honored to be here, today and humbled to be invited by you to testify before the Homeland Security and Governmental Affairs Committee (HSGAC) regarding "Fencing Along the Southwest Border."

I will begin by describing some of my experience with and knowledge of the history of tactical infrastructure—also known as fences and barriers—pertaining to the international boundary between the United States and Mexico.

Thirty-five years ago, in southeastern Arizona, I was building border fence with a post hole digging tool, a wire-stretching tool, a heavy coil of barbed wire, and a very good pair of leather gloves. Alone, and with no backup, my partner and I dug post holes and strung wire in Douglas, Arizona—standing just inches from Mexico.

Three or four strands of barbed wire would not halt people from crossing or stop the smugglers from defeating our own efforts the very next night with a simple pair of wire cutters. But, it marked the border. It was our "line in the sand."

We have come a long way since the days of steel posts and strings of barbed wire. In 1995, a U.S. Army construction battalion replaced expanded metal and chain link fencing in another Arizona border town, where I found myself in command. That year, we arrested an astounding 116,000 foreign-born nationals illegally attempting to cross the border in just that station area alone. Countless tens of thousands got away from our sparse staff of 62 agents. That was our "thin green line."

Then came the attack on September 11, 2001 (9/11). After the horrendous, deadly attacks on American soil by foreign-born terrorists, the American people strongly communicated to Congress, to the Administration, and to the media that they wanted our Nation protected first and foremost at our borders.

In 2005, I found myself serving as the Chief of the Yuma Border Patrol Sector in southwestern Arizona and the very southeastern portion of California. About 450 agents covered that approximately 125-mile stretch of the border. They were working 8 to 12 hour shifts—overlapping—covering the border 24/7.

During my first year as the Chief of Yuma, we arrested 138,000 foreign-born nationals attempting to cross the border illegally from Mexico. They crossed under the cover of darkness and during broad daylight. They crossed in vast and overwhelming numbers. They crossed into Yuma and the urban centers where they could escape quickly. And, they were led by unscrupulous smugglers who brought them across the Colorado River—a water boundary—remote desert, and towering mountains, where the temperatures can skyrocket to 120 degrees or more.

We seized nearly 36,000 pounds of drugs that were driven or backpacked into the United States just in Yuma alone. There were

---

[1] The prepared statement of Mr. Colburn appears in the Appendix on page 51.

AOL-DEF-00002275

9

over 200 attacks by border bandits recorded by us that year. We counted 1,800 victims, mostly from Mexico. The criminal gangs and lone bandits from Mexico preyed on their own—robbing, raping, and murdering fellow countrymen, including women and children. Many of these people were staging to enter from Mexico or in the process of entering illegally, led by guides that were actually working in concert with the bandits and sharing the take from those robberies and assaults. Assaults on border law enforcement personnel numbered in the hundreds just in that stretch of the border. Yuma had become the most dangerous stretch of the border at that time.

So, in response to this, the Yuma Sector became the "proof of concept" that America can protect and control its border when the proper mix of resources are placed almost instantaneously. The Secretary of Homeland Security prudently and thoughtfully exercised his legislated waiver authority in consideration of certain environmental regulations, which posed a hindrance to construction initiatives.

Nine hundred men and women from the National Guard, supporting "Operation Jump Start," descended upon the border in the Yuma area. We built border barriers—fence—along the entire stretch of the Yuma Sector. The Army Corps of Engineers and contractors built double pedestrian fencing, vehicle barriers, and what is known as "floating fence" in the Imperial Sand Dunes Park region. The style and material used depended on the geographic and demographic challenges. We doubled the Border Patrol Agent manpower, and we added sensors and communications technology.

Violent bandit activity went from that record 200 attacks the year before—and over 1,800 victims—to zero after the fence was built in Yuma. The number of violent assaults on Border Patrol Agents also declined drastically.

Before fence, Yuma Border Patrol recorded 2,706 "drive-throughs" in a 1-year period. This is where smugglers load up vehicles with their contraband—be it drugs, people, or weapons—and simply drive across the open, unfettered border. They cross the river in shallow places, destroying wilderness landscape along the way. They lose themselves in urban areas and traffic once reaching paved roads. And, of those 2,706 "drive-throughs", we recorded a mere 13 captures and "turnbacks." All of the rest got away, and we do not know what they brought into the United States.

But, after fence, the next year, only six vehicles even attempted to enter the United States at any place other than a designated port of entry—and none of them got away. We captured or turned back all of them. So, it went from 2,706 down to 6. Impressive.

By 2008, Yuma Sector arrests of illicit border crossers and traffickers had dwindled, from over 138,000 my first year there as Chief down to 8,363. The known attempts to enter and the "got-aways" dwindled to an equally minimal number, compared to the hundreds of thousands that entered and evaded arrest in the previous years.

I do encourage you to ask those Border Patrol Agents in the field. They know. I recently completed a comprehensive tour of the border, myself, in South Texas, receiving robust "state of the border" briefings and updates by several Border Patrol Chiefs and their

AOL-DEF-00002276

10

staffs. I have spoken with the majority of Border Patrol leadership that covers the Southwestern Border in recent days.

The bottom line: When I ask them about fence, every one of them responds: "Yes, build new barriers where needed, improve existing fence, and maintain timely repairs when breached by criminals or damaged by the elements."

Threats change. The transnational criminal organizations (TCOs) simply will not go away. They try methods to defeat the fence, but it persistently impedes their ease of entry and their ability to quickly ingress into border communities and the interior of the United States. It gives the protectors of our borders the time to detect and respond to that illegal activity. It preserves the environment in the border wild lands.

This system-of-systems approach, implemented broadly and rapidly, is what makes tactical infrastructure—border fence—so valuable as a part of the solution.

Thank you, esteemed Members of the Committee. God bless the men and women of the U.S. Border Patrol, and I remain ready to continue this dialogue.

Chairman JOHNSON. Thank you, Mr. Colburn.

Our final witness is Dr. Terence M. Garrett. Dr. Garrett currently serves as professor and chairman of the Public Affairs and Security Studies Department at The University of Texas Rio Grande Valley (UTRGV). He has authored numerous publications on eminent domain. Dr. Garrett is a military veteran and received the National Defense and Air Force Achievement Medals for his service. Dr. Garrett.

**TESTIMONY OF TERENCE M. GARRETT, PH.D.,[1] PROFESSOR AND CHAIR, PUBLIC AFFAIRS AND SECURITY STUDIES DEPARTMENT, THE UNIVERSITY OF TEXAS RIO GRANDE VALLEY**

Dr. GARRETT. Good morning, and thank you, Chairman Johnson, Ranking Member McCaskill, and the rest of the distinguished Senators on the Committee for inviting me here, today to speak to you about the topic of fencing along the Southwest Border. Please note that my testimony and other remarks today before you are my responsibility and may or may not reflect the views of and are independent of my employer, The University of Texas Rio Grande Valley.

So, one of the things I am interested in discussing, first off, is the cost to the U.S. taxpayer for the border wall itself. I have seen reports anywhere between a few billion dollars up to $40 billion, in a Massachusetts Institute of Technology (MIT) story that was printed by the *New York Times*.

The public of the United States is not in favor. The Pew Research Center shows that 39 percent of those polled were in favor of a fence or thought the wall was important to build, while 59 percent did not think the wall was important. The final cost to U.S. taxpayers for the construction of Trump's border wall remains to be seen. It will be up to you, of course.

---

[1] The prepared statement of Dr. Garrett appears in the Appendix on page 56.

11

Bids will likely have to be extended—and they have been—for wall building contractors to develop a clearer understanding for government officials in charge of the project.

Now, I can tell you directly about past experience with the building of the wall in the Rio Grande Valley, as an example of this. In the past, government contracts of now-existing border fence placements illustrate how corporations have benefited from the building of the border fence. Boeing's Secure Border Initiative network (SBInet), for example, received $7.5 million per mile—out of 110 miles—for constructing an 18-foot-high fence in the Rio Grande Valley (RGV) during the period of 2006 to 2009.

In South Texas, the border fence was placed in areas where wildlife refuges, landowners, farmers, and ranchers were located, resulting in properties being apprehended by provisions of the Secure Fence Act of 2006, which was made reference to.

So, the next thing I want to talk to you about is the account of eminent domain issues at the university I was at previously, the University of Texas at Brownsville and Texas Southmost College (UTB/TSC). I have archived Dr. Juliet Garcia's personal statement archived at the University of Texas (UT). I am going to read some pieces from it.

The President of the University of Texas at Brownsville and Texas Southmost College, Dr. Juliet Garcia, refused to sign a U.S. Customs and Border Protection document requesting right of entry in October 2007. She did not sign the document for the following reasons:

First, there was a risk to our property investment, because the government sought access to land from levees to buildings in the very heart of our campus, adjacent to the student union and the Life and Health Sciences building. The right of entry was meant to support preparations for the building of a fence that would jeopardize campus security.

And, on that point, Mr. Ben Reyna, formerly of the U.S. Marshals Service, was our adviser on this.

There had been no opportunity for genuine public input. UTB/TSC has become a key player in the promotion of industry, especially ecotourism and reclamation of important wildlife areas, inclusive of thousands of acres of the Bahia Grande area. Many have worked for decades to design a campus that is respectful of the natural and rich environment of this special ecological zone.

Finally, the right of entry jeopardized the important historical heritage of the campus. The university campus encompasses several significant historical sites, including historic Fort Brown and Fort Texas.

In January 2008, UTB/TSC was sued in Federal court by the Federal Government. On July 31, 2008, a final agreement was reached with DHS. CBP dropped condemnation actions. The university enhanced its own fencing, a 10-foot-high fence with high-tech devices—paid for by the State of Texas, by the way—and agreed to establish a center to study border issues, including security.

I was part of President Garcia's strategy team, and we went to Rancho El Cielo, which is a biological research station 300 miles south of Brownsville, Texas—near Gomez Farias, Mexico—along

AOL-DEF-00002278

12

with UTB/TSC faculty and administrators and UT System attorneys. We considered what we had accomplished, in terms of winning a victory, we thought of as being in the best interests of the students, faculty, and citizens of South Texas. However, other citizens along the Rio Grande did not fare as well.

DHS produced a document entitled, "Environmental Impact Statement for Construction, Maintenance, and Operation of Tactical Infrastructure for the Rio Grande Valley Sector," dated November 2007. This document laid out the strategy for land condemnation proceedings against the citizens of the Rio Grande Valley. The fence went primarily in areas where landowners were economically—mostly citizens whose primary language was Spanish and who had lower levels of education attainment. Wealthy landowners, whose primary language was English and had higher education levels, were spared, and this was brought out in a *Washington Post* report. And, we had faculty, Jude Benavides and Jeff Wilson, who conducted a 2010 demographic study on disparities associated with the proposed U.S.-Mexico border wall in Cameron County, Texas, in "Southwestern Geographer" in 2010, and they found out that there was collusion to actually go after the poor, who would not resist.

Judge Hanen, as mentioned previously—320 eminent domain cases wound up in his court, and 91 remain open. When Trump signed his Executive Order last month, calling for his big, beautiful wall, Hanen knew what that would mean. As he said to National Public Radio (NPR): "What I thought was, 'Oh, this is going to be a lot more work for us,' Hanen said. It is going to be a lot of headache. The people in South Texas—there are a lot of hard feelings about the wall."

My time is running out, but I have a few quotes here.

"You show me a 50-foot wall, and I will show you a 51-foot ladder at the border. That is the way the border works." that is from Janet Napolitano, former Governor of Arizona, in 2005.

Deputy spokesman for the National Border Patrol Council (NBPC) and Local 3307, Rio Grande Valley, Chris Cabrera, recalled recently: "We came with this 18-foot wall, and the very next day they had 19-foot ladders. It got to the point where we had so many ladders at the station that they told us to stop bringing the ladders in. It was just insane, the number of ladders. We had hundreds upon hundreds."

Cameron County Sheriff, Omar Lucio, says, "It is a waste of money. It is not going to work. I do not care what Trump is saying."

I will stop at this point.

Chairman JOHNSON. Thank you, Dr. Garrett.

Senator MCCASKILL. Thank you.

Chairman JOHNSON. Let me first start with cost. I hear a lot of estimates, and, again, they are all projections. But, let us take a look at some actual costs. Again, I will refer people to our Committee's report[1] on my trip to Israel: 143 miles worth of fence, constructed between 2011 and 2013, at an average cost of $2.9 million per mile.

---

[1] The Majority staff report appears in the Appendix on page 76.

AOL-DEF-00002279

13

Now, you can have some inflationary cost increases, but, again, $2.9 million per mile. It is a pretty effective fence—from 16,000 illegal crossings down to 18—1–8.

By the way, if you would like your Minority report to be entered into the record, I am happy to do so. I know you are talking about 270 acres of land being purchased at an average cost of about $42,600. Depending on how you purchase that land—whether you do it in furlough versus chain—660 feet by 66—or square acres—somewhere the cost per mile of acquiring that land—based on that, it would be $340,000 to $1 million. So, tack on $1 million to 2.9 for the total cost of a 2,000-mile wall—and I do not think anybody here in this hearing room is—maybe they are—suggesting 2,000 miles. We are looking at the right kind of fencing in the right places. But, even that would be less than $8 billion—somewhere between $5 and $8 billion. So, again, I want to be talking about real costs.

Mr. Aguilar, the 650 miles of current fencing—again, I am waiting on the study, and it will be interesting when we have real information from DHS with their evaluation and what the real recommendation will be. Can you just give me your evaluation of the current fencing? About 350 miles of that is pedestrian fencing and about 300 miles is vehicle fencing. How good is it? How much needs to be replaced? In your estimation, how much more would need to be built?

Mr. AGUILAR. So, the existing fence right now has been absolutely critical to get us to where we are today—at the level of control that exists along our border with Mexico. But, again, I need to reiterate that it is the fence, the technology, and the personnel that is needed in order to be responsive to any kind of breaching attempt that is done—whether it is with a 19-foot ladder or otherwise—"otherwise" being the tunneling, the ultralights flying overhead, the catapulting that is happening, and the bridging of the fences. All of these things are, in fact, happening.

We cannot forget, though, that the purpose of the fence is to deter, to impede, and to, basically, create more time and distance for the officers to be able to responsibly react and take the actions necessary.

So, of the existing fence that is out there now, there is quite a bit of it that needs to be replaced, and the reason for that is what Chief Colburn and I as well as other Border Patrol Agents did. We actually built those fences back when we did not have the support of the American public, as I put it. So, a lot of it needs to be replaced.

Now, as to how much is required, that is going to depend on the chiefs that are in the field right now, which is exactly the position that we took—that I took as the National Chief of the Border Patrol—I was going to chiefs in the field, asking them what they needed, where they needed it, what the type of fencing was, and what the purpose and rationale was, taking into account the very difficult decisions that we knew were going to be taking place—eminent domain—heart-wrenching. I was born, bred, and raised in Texas—not unlike Montana, not unlike Oklahoma, not unlike Missouri, where some of these are very touching situations and very hard.

AOL-DEF-00002280

14

But, I have to say that the oath that people like Mr. Colburn and I took was not to Texas, was not to South Texas, and was not to southern Arizona. It was to the country. It was what was most needed to be done to protect the country—the United States—in the best way that we could. That is what we are looking for now to move forward.

Chairman JOHNSON. You talked about the goal being to impede—to deter. In Israel, their fence is about a 15-foot fence, and the whole design—first of all, you can see through it, which is an important design consideration.

Mr. AGUILAR. Yes.

Chairman JOHNSON. I think that is important. But, the whole purpose of it was to give them about a 5-minute response time.

Mr. AGUILAR. Exactly.

Chairman JOHNSON. And, that is what they have: a 5-minute response time. So, it is built with very thick rebar. It cannot be cut through and it cannot just be clipped. You would have to have a pretty good saw. It takes time, so that you have enough time for the border patrol in Israel to respond. Is that basically the primary goal of the fencing?

Mr. AGUILAR. Absolutely, it is to deter and impede the flow and create that time and distance, which are critically important.

Now, depending on where you are building the fence, it could be minutes, it could be hours, and, in some cases, the Border Patrol could need longer than that to impede, in order to take the appropriate actions.

Chairman JOHNSON. You are talking about the specific challenges in Texas. I am not going to identify the Members of Congress, but I have spoken with Texas Congress Members in the House, who say that levees would really work well and are actually supported by the public. Can you speak to that as part of the solution?

Mr. AGUILAR. That was a very unique situation that we took in Texas. The levees, as we probably all have heard, are critically important for the flooding of the Rio Grande. And, the actions that we took as part of the Border Patrol back then—the sitting chiefs basically identified the Rio Grande at South Texas as requiring fencing. We worked with the local community on an ongoing basis and spoke to them at length about what could be done.

What we literally did is, we took the existing dirt levees, cut them down the middle, and abutted against them—reinforced the existing levees with concrete—in some areas as high as 20 or 30 feet. Above those levees, after we set that abutted concrete, we built the walls that needed to be built on top of that to continue from the deterrence perspective.

It worked very well. It was a community effort—community of the locals, community of the Border Patrol as an organization, and DHS.

Chairman JOHNSON. So, do you think that would be a solution in larger areas of Texas?

Mr. AGUILAR. There will be some areas that can be accommodated like that. One of the things that I am absolutely sure that DHS, CBP, and especially the Border Patrol will be doing going for-

AOL-DEF-00002281

15

ward on this is working with the local communities—as we did back then.

Dr. Juliet Garcia, I worked with her personally on an ongoing basis. I met with her three or four times at the University of Texas in Brownsville on building and accommodating what we eventually built at UTB.

Chairman JOHNSON. Mr. Colburn, in your testimony, you are relating direct experience, similar to Israel—16,000 to 18—similar types of dramatic numbers, in terms of fencing barriers actually working. I have a little time left here. Of the 650 miles, how much do you think needs to be replaced? How much more do you think has to be built? And, we are not going to hold you to it, because we are going to wait for the DHS study—but, some sort of general feel.

Mr. COLBURN. I will answer it in two parts. First, the collection of chiefs of the nine Southwest Border sectors all jointly say that they need more fencing, as well as repairs and improvements on existing fencing.

That said, just to name some mileage in Yuma Sector—the sector that I served for a period of time as Chief—when the fence was started—they currently have over 63 miles of primary fence and 9 miles of what is called secondary fence behind some of that primary fence. They have over 28 miles of all-weather roads. So, when we talk about infrastructure, sometimes it is not just a barrier. It is to give access.

We added nearly 9 miles of permanent lighting, which actually the community of San Luis Rio Colorado, Mexico, was very appreciative of—crime went down in Mexico as well. We added 44½ miles of permanent vehicle barriers of a couple of different styles, and we even had 9 miles of tertiary fence—in the flanks of the San Luis port of entry, three rows of fencing.

That just gives an example of what is necessary. I think that the gates and bridges that were built along the Colorado River, where there are also ditches and irrigation usage of the water for farming, we added 18 vehicle gates and one bridge to the bridges already existing. We even added water wells for access by the agricultural land users.

Chairman JOHNSON. So, basically, what you just rattled off there and what I have in my briefing—about a couple hundred miles of different forms of fencing—how long is Yuma Sector in total?

Mr. COLBURN. 125 miles.

Chairman JOHNSON. OK.

Mr. COLBURN. So, because it is overlapping, it exceeds that. And, uniquely, the Imperial Sand Dunes National Monument area has the floating fence, and I know you have probably—you can go online and see. It is quite unique and quite effective. In 2008, we lost a brave Border Patrol Agent, Luis Aguilar, because there was no fence.

I was quoted by the Army Corps of Engineers, when they published their book on fencing, on the front cover, as saying, "That will never happen again there," because of that floating fence.

Chairman JOHNSON. By the way, Israel has technology for sand as well. It works quite well. Senator McCaskill.

Senator MCCASKILL. Thank you.

16

I think additional fencing is essential and repairing fencing that is in place is essential, but a couple of things came out in the Chairman's questions, and one is the issue of situational awareness—that if you cannot see through and you do not have the technology to look over, then you are really handcuffing, in my opinion—and I would like to know if you, Mr. Aguilar, and you, Mr. Colburn, would agree that you are handcuffing the Border Patrol Agents, because they cannot see and respond quickly enough if, in fact, this is a concrete wall that you cannot see through and cannot see over. Would that be a fair assessment, as to why we need to be aware of situational awareness as we make these decisions?

Mr. AGUILAR. Situational awareness at the border, regardless of what kind of infrastructure is built south of the border, in the case of Mexico, is absolutely essential for the safety of the officers, for reactionary time, for planning, and for taking the appropriate actions at the right time. That is why you will hear every Border Patrol Agent say that there will definitively be a need for infrastructure supported by personnel and supported by technology.

Senator MCCASKILL. Technology.

Mr. AGUILAR. There is technology now that can give us that overhead capability. There are tethered drones that will stay up for weeks at a time that will give you a view, not just of the wall, but north and south as to what is coming at you, the actions to take, and the safest actions to take.

Senator MCCASKILL. And, when they cannot fly, they can use those elevated night vision goggles—even at night—to get the situational awareness they need.

Mr. AGUILAR. That is correct. Yes, ma'am.

Senator MCCASKILL. That is the technology we are talking about.

I would point out that the prototypes that are being built are walls. We took $20 million out of the technology fund that would have provided more of that situational awareness, and we are building prototypes of walls—not fencing, but walls. And, what I am concerned about is that we are headed down a path toward an outcome without fully considering what would be the most effective use of the American taxpayer dollar, as it relates to securing the border. And, that is what I have tried to hammer on—and I think the Chairman and I agree on a lot of that.

Let me talk to Dr. Garrett for a moment about land acquisitions. Is the government likely to run into resistance if they attempt to condemn more property from Texas landowners?

Mr. GARRETT. Almost certainly. In fact, I did not get all of the way through, but when you are talking about River Bend Golf Course, which is a retirement community with hundreds of homes—and very valuable—we call them "winter Texans"—when they come down. They will probably fight it, even though they came out in the *Washington Post* and the owners said, "Well, we will try to work with CBP." But, basically, the implication was, "We will fight them." So, they have the resources to fight, and that was kind of the point where I was going with the university case. There are other places along the border—Cimarron Development south of Mission, Texas—that previously did not get the wall. Also, you are talking about hundreds of more miles with private landowners that have yet to be——

AOL-DEF-00002283

17

Senator McCASKILL. And, they are all entitled to a jury trial, correct?

Mr. GARRETT. They are all entitled to a jury trial. And, if I can say something on the levees—if I can add something—Kristian Hernandez, in "the Monitor," he looked at the cost, and he actually quotes Representative Michael McCaul, the Chairman of the House Homeland Security Committee, which basically—first of all, Ramon Garcia, the county judge, and the mayor of McAllen came out with a letter that said, in effect, "We are against the wall. However, if you are going to build a wall, we would like to have levee infrastructure similar to what we had in 2007."

Now, we are talking about over 30 miles of levee infrastructure, according to the article, and it would cost $12 million per mile for a total cost of $378.93 million out of President Trump's $2.6 billion proposal.

Senator McCASKILL. And, that is just for levee in that one——

Mr. GARRETT. That is just for the levee sections in Hidalgo County.

Senator McCASKILL. OK. Historically, has the government underestimated the time and the expense of land acquisition, when it comes to acquiring the land necessary to build barriers?

Mr. GARRETT. Yes, absolutely. It has been over—Judge Hanen has had many years of cases before him. I was asked by *Time* magazine a few years ago about it, and the needle has not moved very much. And, the problem for the judge is, eminent domain cases take a lot of his time, and it appears to me that he also deals with criminal activities along the border. Why is he spending time and taxpayer money defending—or working with lawsuit defenses on behalf—for the plaintiffs, when, in fact, would he not be better spending his time dealing with people who are apprehended and engaged in criminal activities on the border?

Senator McCASKILL. What can you tell me—the fencing that has been installed in Brownsville, it is right on the southern tip of Texas. It must be, obviously, a dangerous place, because it is so close to the Mexican border. What is the security situation like in Brownsville?

Mr. GARRETT. Brownsville, itself, is the least criminal-ridden or, violent community in all of Texas, according to the "Texas Tribune." They looked at U.S. Department of Justice (DOJ) data, and actually, corresponding roughly with about the time of the war on drugs in Mexico by President Felipe Calderón, the border cities began to see a precipitous drop in violence within those communities. So, how can you prove the fence works when, in fact, we had a partner in Mexico, dealing with some of these criminal organizations? And, what has happened is, crime has dropped on the U.S. side of the border.

Senator McCASKILL. When you were Commissioner of Customs and Border Protection, Mr. Aguilar, I think you ranked personnel first, infrastructure second, and technology third. It is my understanding that you would now rank it: technology first, personnel second, and infrastructure third?

Mr. AGUILAR. The ranking now is technology definitively first just about anywhere along the border.

Senator McCASKILL. Right.

18

Mr. AGUILAR. Infrastructure and personnel will be going back and forth depending on the area——

Senator MCCASKILL. Where you are.

Mr. AGUILAR [continuing]. Where you are going to be placing it.

Senator MCCASKILL. Would you agree with that assessment, Mr. Colburn?

Mr. COLBURN. Yes. To borrow a famous two-word term from many lawyers, "It depends." It really does depend on the topography, the demographics, the geographics, and also the climate. So, there are times when manpower has the greatest value assigned, other times where the tactical infrastructure does, and other times when it is technology.

It is a chain that cannot be broken, though, so without the tactical infrastructure, we will still not have accomplished border security. With it—along with the technology and manpower—I feel that we will finally see that light at the end of the tunnel, and we can secure all of the border—not just Yuma, not just other stretches, but all of it.

Senator MCCASKILL. Thank you. Thank you all.

Chairman JOHNSON. Senator Lankford.

## OPENING STATEMENT OF SENATOR LANKFORD

Senator LANKFORD. Thank you, Mr. Chairman.

Senator MCCASKILL. Just 1 second. Could I ask that the report be issued into the record[1]—the one you referenced?

Chairman JOHNSON. Sure.

Senator MCCASKILL. Thank you. Sorry, I forgot.

Chairman JOHNSON. Without objection.

Senator LANKFORD. Mr. Colburn, you have had a unique experience, in that you were at a location in Yuma, saw the high crime rate, saw the large number of people crossing illegally, saw the vehicular traffic, and could not do anything about it. A wall goes up, and then you saw the very significant drop in illegal crossings at that spot—as well as vehicles and people.

Let me get some specific questions to you on some of this. What did you see as far as delays? There has been a lot of conversation about land acquisition. We had delays in construction, permitting, road access and such. What did you see in delays? What were the causes of those delays? And, did construction move in some areas, while they working out the delays in other spots?

Mr. COLBURN. The delays in Yuma were not as significant compared to, say, South Texas, and significantly, a lot of that has to do with the fact that, along that 125-mile stretch of the border, 96 percent of the land adjoining Mexico on the U.S. side is federally, publicly stewarded lands. So, it was the Bureau of Reclamation within the Department of Interior (DOI), it was the National Park Service (NPS), and it was the Bureau of Land Management (BLM). It was Department of Defense (DOD), with the Barry M. Goldwater Bombing Range. So, it was a variety of Federal and publicly stewarded land.

That does bring in environmental considerations, but when I mentioned earlier about rapidly layering on manpower, technology,

---

[1] The Minority report appears in the Appendix on page 181.

AOL-DEF-00002285

19

and tactical infrastructure, that is what made Yuma that case in point—was we were able to get that together quickly.

There are places, because of private ownership—as we have been discussing—that are more challenging—as well as there are places where the terrain, geographics, and climate will be more costly. Levees will cost more than some of the barriers that we were putting in in Yuma at the tune of $1.1 million a mile. So, compared to the $5 million per mile in South Texas, it was rather efficient in the desert areas of Yuma for much of that part of it. Not everywhere, though. We do have roughly 20 miles of river boundary. People forget. They think of Arizona as all land boundary. But, the Colorado River does separate, not just the States of California and Arizona, but also Baja California Norte and Sonora. So, it is an international boundary marked by water.

What the smugglers were doing there—they were building bridges with sandbags, and their engineering was amazing. Overnight, very squared, very level, and just inches below the surface of the water, so that the bridges could not be detected off of the reflecting angle of the sun in the early morning hours. They could drive a number of vehicles laden with drugs across in the early darkness hours. They were building those in one night. Talk about how sometimes you do not have a technical solution? Well, now they have technology that can detect it, and they have barriers that can keep them from freely driving over the levees and across the bridges.

But, we still had to wade into the river with machetes and slit each bag of sand. So, as they built it during the night, we tore it down during the day. And, that is what finally defeated them. It became too cost-inefficient for the organized crime groups to continue building one overnight. So, sometimes rudimentary force—muscle—wading into the river with a knife and slitting open bags is the solution.

As both the Chief and I have mentioned, there it is not a cookie-cutter solution anywhere along the border. Each sector—even within each sector—we find different combinations of resources that solve that problem. But, certainly in Yuma, we had it easier, because of the publicly stewarded lands.

Senator LANKFORD. Mr. Aguilar, talk to me about the technologies. That is one of the prime areas to be able to innovate on first. What technology is needed? And, what do we have that we need more of? Or, what do we not have that we need to put in place?

Mr. AGUILAR. The technologies have been an absolutely critical part of anything done anywhere along the border. The type of technology that we are talking about is a technology that will give you situational awareness—persistent situational awareness anywhere that agents are going to be interested in what is happening along the border.

Today, we have integrated fixed towers (IFTs), which started way back when Chief Colburn and I were in the field. We have remote video surveillance systems. We have mobile surveillance capability systems.

Senator LANKFORD. Hold on. Slow down. Towers, how frequent? Let us get more specific as we are talking through this. When you

AOL-DEF-00002286

20

talk about towers, how frequently do you need those? You have a 2,000-mile border. Is that every 2 miles? Is that every 5 miles? Or is that every 500 feet?

Mr. AGUILAR. Let me step back. Not the towers, because, basically, again, it goes back to the type of geography to decide where we are deploying the kind of capability we are looking for.

In Arizona, for example, when I was the Chief of the Border Patrol, we lined out the exact number of towers that had a viewshed that had the capability to cover an entire area. But, along with that, we had some problems, because we had, for example, the Tohono O'odham Nation for 75 miles of the border of the Tucson Sector where I was Chief—bottom line is, we were not allowed, because of the sovereignty of the Tohono O'odham Nation, to build that type of technological capability.

But, today, there are technological capabilities that could now basically give that same type of situational awareness—tethered drones that basically are going to have viewsheds of 7 or 8 miles wide—maybe even higher. So, in areas where we cannot put an integrated fixed tower or a remote video surveillance system—and, by the way, the integrated fixed towers have the capability of a viewshed of 8, 10, 12, or 13 miles, depending on where they are placed—line of sight for infrared capability, line of sight for Doppler radar and line of sight for cameras—very high quality, high-fidelity cameras.

So, it all depends on where you are going to be placing them. There are plans in place by the Border Patrol for the entirety of the Southwest Border.

Now, we also have to take into account that, as an example, integrated fixed towers, which work very well in Arizona, will not work as well in South Texas. The reason for that is the vegetation, the density, and the triple canopies. So, all of those things need to be taken into account.

But, the chiefs are aware of what they need. There are designs out there that, basically, have been put in place for that.

Senator LANKFORD. Great. Thank you.

Chairman JOHNSON. Senator Carper.

**OPENING STATEMENT OF SENATOR CARPER**

Senator CARPER. Thank you. Gentlemen, welcome this morning. Particularly, Mr. Aguilar and Mr. Colburn, thank you for your service to our country in many different roles. Dr. Garrett, welcome. We are delighted that you are here.

I am channeling my father this morning. My dad used to say to my sister and me, when we would do some bone-headed stunt—he used to say, "Just use some common sense. Just use some common sense." We did not have much of it. He said it a lot.

I am also channeling a woman who once came to one of my town hall meetings years ago when I was a Congressman, and it was on budget—how do we reduce the budget deficit, which was $1.4 trillion about 8 years ago. Today, it is over $400 billion—$1.4 trillion is down to about $400 billion—still way too much. So, we are talking about spending money that we really do not have for a wall.

But, I remember at this town hall meeting, a woman said to me—we were talking about whether or not revenues could be a

21

part of the deficit reduction plan, and she said, "I do not mind paying more taxes. I just do not want you to waste my money."

"I just do not want you to waste my money." And, I am very mindful of that, as we think about the combination of tools that we use to make our borders more secure.

Another one of my guiding principles in life is to find out what works and do more of that. Find out what works and do more of that. And, I think one of the common themes that comes from this discussion here this morning is that there is no one answer. There may be several answers. There may be several answers for the same area of the border.

Another point that has not been mentioned—one of the reasons why, I think, we saw, Mr. Colburn, that precipitous drop in illegal immigration in the Yuma Sector is, the folks from Mexico are no longer coming to the United States in such great numbers. In fact, as you know, there are more people going back into Mexico from the United States than there are Mexicans coming into the United States, which is a big help, and that says to me—well, what are some ways that we could convince people—where most of the illegal immigration is coming from today—what could we do to convince people in Guatemala, Honduras, and El Salvador not to come up here. And, one of the things we could do, as the Chairman knows and as Claire knows—the reason why they come to this country is because their lives are miserable. Their lives are unsafe. There are conditions of misery. We are complicit in their misery, because of all of the drugs that we buy that are trafficked through their countries. Well, why do we not do something to help in that regard?

There is help on the way. It is called "Alliance for Prosperity," and it is literally taking "Plan Colombia", something that has worked over the last 20 years, and replicating it, with respect to those 3 countries. The funding for that plan is, I do not know, about $500 to $600 to $700 million a year. If we would just take half of the money that we are talking about spending for a wall, we could fund the "Alliance for Prosperity" for the next two decades, which is how long we have been funding "Plan Colombia", which has worked.

The last thing I want to say is about illegal immigration reform—immigration reform. I am not interested in, basically, saying to people that are here illegally, "Well, you can just stay. We will just provide immunity for you guys and let you stay." I am not interested in doing that. Most Americans are not interested in doing that. We passed comprehensive immigration reform here in the Senate, oh, gosh, 5, 6, 7, 8 years ago that did not do that, but, actually, did give people that were here who played by the rules, got in line, worked, paid taxes, and spoke English—we gave them a pathway to a legal status. I think that probably makes some sense. I think a guest worker program makes some sense. And, Senator Johnson and I talked about this more than a few times. A lot of the people that are down there, they want to come here and go to work and want to be able to go back home—maybe for good—and we do not give them a very good opportunity to do that, because when they get over here, they get stuck and they cannot go back.

AOL-DEF-00002288

22

The last thing I want to say is on force multipliers. We have mentioned some of the force multipliers that make sense, and I have been down on the border from San Diego, where I used to be stationed in the Navy, all of the way almost to Brownsville, where we used to fly out of—Brownsville and Kingsport, but—Kingsville. But, I have talked to hundreds of Border Patrol officers and said, "What do you think we ought to be doing?" And, I am just going to mention some of the answers they have given me—and some of them we have heard here, today.

Not just helicopters, but helicopters are great. Not just drones, but drones can be great. Not just fixed-wing aircraft, but they can be great. But, let us make sure they have the right kind of surveillance equipment inside of the aircraft—the Vehicle and Dismount Exploitation Radar (VADER) system, which is actually one of a number of packages that works very well. But, I used to go out in Navy
P–3 Orion airplanes out over the ocean with my crew—a 13-man crew—looking for people that were lost, ships that were sunk, or whatever, with binoculars. Good luck. And, when we have a great system, like VADER, and we have the aircraft, the drones, and the fixed-wing aircraft, for God's sake, let us make sure the surveillance aircraft is equipped with that technology.

What have I heard that works? Drones with proper surveillance packages. Horses in areas with high grass. And, helicopters, as I mentioned earlier. Motion detectors sometimes make a lot of sense. Mobile and stationary observation towers with the right kind of observation surveillance equipment on board.

Better intelligence. We have not talked about better intelligence, but that is certainly a good point. Mobile and stationary observation towers. Cooperative agreements with landowners along the border. Someone mentioned lighting. Those are all things that work someplace along the border.

And, I have just given you a stream of consciousness here. Mr. Aguilar, just react very briefly to some of what you have heard. Does any of it make sense?

Mr. AGUILAR. Everything that you have just lined out there, plus more, Senator, is exactly what any Border Patrol Agent that has served on our Southern Border—or our Northern Border, for that matter—will identify as needs and requirements. It is how you put that package together that is critically important. It is those capabilities added—placed against the requirements that the agents in the field have.

So, yes, absolutely all of those things, plus other things that are constantly being developed—situational awareness, for example. Situational awareness capabilities that exist that should be applied so that—terrain change, as an example. From an intelligence perspective, agents need to know when, in a remote or very rural area of operation, terrain change has occurred—to notify them that, "Hey, you need to be paying attention to this and taking those kinds of efforts."

Senator CARPER. Good. Thank you.

Mr. Colburn, one of the things I did not mention is, walls work. I have been to Israel. They work. But, walls can be tunneled under and climbed over. Fences work, and, as we have gone along, we

AOL-DEF-00002289

23

have figured out how to make better fences. So, I am not saying that those are bad ideas. In some places, they work great. But 1,900 miles of walls? Really?

Mr. Colburn, I am almost out of time. Please, briefly.

Mr. COLBURN. One other item that I——

Senator CARPER. I just wanted you to react to my stream-of-consciousness ideas—force multipliers.

Mr. COLBURN. You have listed some very good ones, and your sources being the Border Patrol Agents—as I said in my opening remarks, ask the agents, and they will tell you.

Consequences—a system of consequences is extremely important. If there are no consequences for illegal acts, then it encourages return.

Deterrence. The end game, of course, in the end, is to make the criminal organizations that now own the movement of people along the border—and drugs and weapons and cash—and create an environment where they believe they can no longer get away with it.

Senator CARPER. OK.

Mr. COLBURN. And, you do that through all of those kinds of resourcing, and the right amount of it in the right place.

Senator CARPER. Thank you, Mr. Colburn.

Very briefly, Dr. Garrett, please. Just react to the diatribe I just went through.

Mr. GARRETT. Yes, I would say I have a colleague, Dr. Correa-Cabrera, who is over at the Woodrow Wilson International Center for Scholars. Last year, she was on a $200,000 U.S. State Department grant studying a human-trafficking route—on the eastern route from El Salvador, Guatemala, and Honduras through Mexico. She is a great expert. She actually interviewed traffickers in prisons in those countries and provided a report to the U.S. State Department. That kind of intelligence, getting to your point, is very valuable, I would think, in terms of understanding the connections between transnational criminal organizations, which have begun diversification—which is another one of her specialty areas—in drug trafficking, in human trafficking, and in petrochemicals—hydrocarbons.

So, it seems to me, we are doing our country a disservice if we do not utilize resources like that—like the Wilson Center and like U.S. State Department grants. Those are the kinds of things that we need to have to improve our intel.

Senator CARPER. All right. I am out of time. Thank you, Dr. Garrett.

I would just say, in conclusion, Mr. Chairman and colleagues, we have a lot of tools in our toolbox. We need to be using them. A wall and a fence, is that part of the toolbox? Yes, it is. But, to spend $15 to $25 billion, at a time when we have a budget deficit of over $400 billion, is unwise, is unneeded, and is unaffordable.

Thank you so much.

Chairman JOHNSON. Just really quickly—as I stepped out for a couple of minutes—in your stream-of-consciousness diatribe—your words, not mine—did you mention cutting down vegetation, like the carrizo cane? Was that part of the——

AOL-DEF-00002290

24

Senator CARPER. I did not. That is one of the—I think, as Mr. Aguilar or somebody said, there are other ideas. I think, in many places, that is good.

Chairman JOHNSON. That would be a good one. Senator Heitkamp.

Senator CARPER. Let us not use Agent Orange. Been there, done that. [Laughter.]

Chairman JOHNSON. We will use some good tools.

Senator CARPER. Very good.

## OPENING STATEMENT OF SENATOR HEITKAMP

Senator HEITKAMP. Thank you, Mr. Chairman.

Let me first start out by saying that there has been—we have had a number of kind of hearings and discussions. There has been no one to come before this body and suggest that we need to build a concrete wall completely across the border. No one. Not one person—no matter what political persuasion and no matter how they represented their political thoughts in the last election.

So, I just wish we could get beyond it, so we could actually talk about what we need to do on the border, because all of us share the same goal, which is border security. Border security protects, not only this country, but has a way of protecting people to the south. I do not think there is any doubt about it.

And so, I have visited the Southern Border—actually, I am known kind of on this Committee as being the person who always reminds people that we have a very large Northern Border that we need to pay attention to, but I have spent a lot of time on the Southern Border, and I have talked to locals and people on the Southern Border who think that this is crazy—what we do here, because no one really engages the local people, who see it every day, and talks to them about strategy and what needs to be done. And so, I want to just make that point that, as Senator McCaskill, the Ranking Member, I think, eloquently—talking to the personnel who actually are responsible for border security—in her opening comments talked about we need to spend a lot more time with the people who live on and who study the Southern Border.

To that end, I have a couple of pieces of testimony that I would like to submit for the record. One is from the Tohono O'odham tribe,[1] which has people on both sides, and you know well the work that has been done to build relationships there. They are deeply concerned about whether those traditional collaborations will, in fact, be disrupted. They have some great ideas on helping with roads and with other infrastructure on the reservation that will help them help the Border Patrol and the Department of Homeland Security to secure the border.

Also, I have a statement from Howard G. Buffett, who has done a tremendous amount of work, not only as a rancher down there, but also looking at border security and trying to understand all of the dynamics. And so, I would ask that these two documents be submitted for the record.[2]

---

[1] The statement of Tohono O'odham Nation appears in the Appendix on page 192.
[2] The statement of Howard Buffett appears in the Appendix on page 188.

25

Chairman JOHNSON. Sure. Without objection. But, I also just want to interject. When you say nobody is talking to them, that is what this hearing is about—and we had Howard Buffett testify before this Committee as well. So, we are definitely trying to do that—exactly what you——

Senator HEITKAMP. There is no one on this panel who actually is a Southern Border——

Chairman JOHNSON. Well, again, we have had 22 hearings on this.

Senator HEITKAMP. Right.

Chairman JOHNSON. So, we definitely are talking to them, and we will be doing that.

Senator HEITKAMP. But, would the Chairman agree that not one person has come in front of this Committee suggesting that we build a wall on the entire length of the border?

Chairman JOHNSON. Again, we are discussing the challenges involved here, and we——

Senator HEITKAMP. And, we keep dancing around it, but the reality is——

Chairman JOHNSON. We are talking to people on the border as well, because we had Howard Buffett testify before this Committee.

Senator HEITKAMP. We would go a lot further if we actually just acknowledged that there are ways to secure the border other than simply building a wall.

So, I have a couple of questions. How much private land will need to be secured by eminent domain to build a wall along the entire Southern Border? Do we know?

Mr. AGUILAR. As far as mileage goes, I do not think any one of us would put a number on that. I can tell you that, in Texas, it would be quite a bit. In places like Arizona, a lot of it is going to be federally owned lands—State-owned lands—so we would work in coordination with them.

Senator HEITKAMP. I think we have talked a lot already about how barriers can slow the development—create a deterrence. But, we know that there needs to be additional assets—especially personnel and technology. And, I think, until we see the report, I do not think that we really will have a clear idea on how we deploy all of those resources. And, I think, Mr. Colburn and Mr. Aguilar, I think both of those factors have come up completely in your testimony, which means take a look at the terrain, take a look at where you are, take a look at what is possible and what is not possible, and make sure that we have a border strategy that is smart and that does not spend money where we do not need to spend money just because we promised something during a political campaign.

Finally, I think one thing that has not been talked about here is the role of Mexico. I think we all understand Mexico is not going to pay for this wall if it gets built. But, there is a critical role that our neighbor to the south plays, in terms of border enforcement. And so, I am curious about how you see Mexico playing in border enforcement, because it seems to me that Mexico must be a critical partner in any effort on our shared border.

The migration spikes that we are seeing are originating in Central America, as Senator Carper pointed out, not Mexico. But, people are traveling through Mexico to get there. So, what do we need

26

from Mexico that they are not doing now to forge a relationship to stop the traffic? And, I would include, not only migration of people, but also drug enforcement.

Mr. AGUILAR. So, as it relates to Mexico, first and foremost, I think I would say the relationship between Mexico and the United States is unprecedented. We have never had the level of relationship that we have with Mexico now—in a very positive way. As we speak today, the relationships, the strategies being put forth, the efforts, the joint intelligence, the sharing, and the liaison—all of those things have been improved dramatically.

Now, as with Canada, we need to do more of that. Those relationships need to continue to be solidified even beyond.

Senator HEITKAMP. But, you would agree that our relationship—law enforcement to law enforcement—with Canada is far different than our relationship with law enforcement——

Mr. AGUILAR. Oh, absolutely. Look, not too long ago, Senator, Mexico used to say, "Treat us more like you treat Canada, not like you treat Mexico." I think we are getting closer to that, because of the evolution of where we were to where we have gotten. I often say that, when I first came into the Border Patrol in 1978, the last people that you would think about calling were the Mexicans when something happened on the border. Today, they are the first ones we call when we have a situation. And, you are absolutely right, in that Mexico is pretty much at the place that we were 30 years ago with our Southern Border. Their Southern Border is getting overrun—not by people that want to stay in Mexico, but by those who want to get to the United States. There is absolutely more that needs to be done by them, with our assistance, on their Southern Border. There is more that needs to be done by the United States and Canada in Guatemala, El Salvador, and Honduras, in order to increase the rule of law, civil society, health, education, all of these things.

So, that is exactly what we should be talking about, but we constantly focus on the wall—as we should be focusing on our borders. But, it needs to be a very systematic approach across the entire breadth of what is causing the problems.

Senator HEITKAMP. I certainly look forward to the Department of Homeland Security's report, and I hope they do include a strategy for collaboration with tribal entities that serve on both sides of the border—but also the Mexican officials. But, we need to be realistic about that relationship—and it is not Canada. I think we can all agree on that.

Mr. AGUILAR. If I might, because I think this is critically important, first and foremost, talk to the agents—talk to the Border Patrol—and I assure you that they are absolutely engaged with the communities. Now, they cannot please everybody within the communities, but, if there is any—especially Federal—law enforcement agency that has their thumb on the feel of what is going on with the communities, it is the Border Patrol. We spend a lot of time making sure that we have dealt with them, that we understand their needs, understand their concerns, and build the relationships. So, when the tough decisions were being made, all of those things were being taken into consideration.

AOL-DEF-00002293

27

Chairman JOHNSON. And, just to point out, we had a hearing last week with the heads of the unions of the agents. We have, on a bipartisan basis, a group of staff going down and talking right down to the folks who are the boots on the ground. But, Senator Heitkamp, when we talk about the insecurity of the Mexican-Central American border, I remember our Congressional Delegation (CODEL) in Guatemala, where you could basically walk across the—we are here at the Border Patrol entry point, and you can basically walk across the boats.

Senator HEITKAMP. Right. They are swimming across. But, also, Mr. Chairman, I want to remark about the great work that the Department of Homeland Security is doing in those communities to try and provide technological solutions—stopping buses—all of the issues, especially as it relates to human trafficking. So, that was a great trip. I hope we can do something like that again.

Chairman JOHNSON. Of course. Our guide was General Kelly, so he knows what he is talking about. Senator Harris.

### OPENING STATEMENT OF SENATOR HARRIS

Senator HARRIS. Thank you.

Mr. Aguilar, thank you for your service. According to the strategic plan from 2012 through 2016 of CBP, my understanding is that the priorities include, in this order: first, preventing terrorists and weapons from entering the United States; second would be managing risk, which includes the adoption of technology and all you have talked about, in terms of situational awareness; and third would be disrupting and degrading transnational criminal organizations.

Before I was elected Senator, I was the Attorney General (AG) of California, and one of the first trips that I took after being elected back in 2011 was down to the border with Mexico. I surveyed the tunnels and the border. I saw photographs of tunnels with walls as smooth as the walls in this Committee room, lined with air-conditioning and lighting, which made an obvious point very clear: that there is a large investment of money by the transnational criminal organizations—we estimate up to $3 billion a year—in creating an infrastructure for them to be able to do their business, which is the trafficking of guns, drugs, and human beings. Would you agree with that?

Mr. AGUILAR. Absolutely, yes.

Senator HARRIS. And, in fact, I commissioned a report shortly thereafter, which I, Mr. Chairman, would like to submit in the record.[1]

Chairman JOHNSON. Without objection.

Senator HARRIS. "Gangs Beyond Borders," which highlights the concern that California has about the transnational criminal organizations.

One of the things that we learned in documenting this report is that trafficking takes place because there has been an investment in that, as we have discussed. But, trafficking includes not really necessarily things coming across the border on foot, but also

---

[1] The report referenced by Senator Harris appears in the Appendix on page 195.

AOL-DEF-00002294

28

through tunnels and by air. In fact, we document hundreds of ultralight aircraft flights for the purposes of trafficking.

So, back to the point then of this wall. We also document, for example, the use of panga boats, and, Mr. Colburn, you talked about the waterways that are used for trafficking.

Do you agree that if the United States invests billions of dollars in wall infrastructure, the cartels will simply invest more in underground tunnels and water and aerial approaches?

Mr. AGUILAR. Yes. Yes, they will, and that gets to the issue of what is making them do that.

Senator HARRIS. Right.

Mr. AGUILAR. It is the dollars. It is the draw. It is the draw of illegal immigrants into this country. It is the draw of people seeking asylum—political refugees. It is the draw of the narcotics coming into this country.

Senator HARRIS. Well, let us be clear about that. When we are talking about the trafficking of guns, of drugs, and of human beings—there have been many people, including, I believe, the Secretary of the Department of Homeland Security, that have acknowledged that a major draw—especially in terms of the trafficking of drugs—is America's insatiable appetite for narcotics. Would you agree with that?

Mr. AGUILAR. Yes, absolutely.

Senator HARRIS. Right, so that is not about immigrants creating that appetite. The appetite exists in the United States, and just basic principles of capitalism tell us that wherever there is a demand, there will be a supply. Would you agree with that?

Mr. AGUILAR. Absolutely.

Senator HARRIS. So, when we are talking about this and we are looking at the amount of money that it takes, in terms of our need, to keep our border secure from the trafficking of drugs, guns, and human beings, can you tell me what you believe the priorities should be, in terms of the government funding CBP in its noble effort to keep our borders secure—and, in particular, secure from the trafficking of illegal substances into the United States that harm Americans in a very direct way?

Mr. AGUILAR. Well, if you take a look at funding, specifically through a silo of CBP—and that is all that we are talking about, CBP prioritization?

Senator HARRIS. Yes, just CBP. Yes, please.

Mr. AGUILAR. Because, if you go beyond that, there are other priorities before CBP.

Senator HARRIS. Sure.

Mr. AGUILAR. But, as it relates to CBP, right now, given the current environment that we face on the border, it is technology—and, depending on where you go from there, it is infrastructure and personnel.

Now, Senator, one of our primary examples of success is, in fact, California, when it comes to infrastructure. As young agents, we both worked an area known as the "soccer field."

Senator HARRIS. Oh, yes.

Mr. AGUILAR. It was a soccer field. It was American territory that was ceded to Mexico. We could not go in there as a two-man team. We had to, literally, go in there with a tremendous amount

AOL-DEF-00002295

29

of support, because we had ceded—smugglers operated there. Today, on the soccer field, we have multi-million-dollar homes. We have thriving commercial businesses. We have malls in that area.

Senator HARRIS. Right, but this is because of the work that happened many years ago.

Mr. AGUILAR. Yes.

Senator HARRIS. And, I applaud you for that work, but I think we agree—and your testimony has made clear—that times have changed——

Mr. AGUILAR. Absolutely.

Senator HARRIS [continuing]. Because of the reordered priorities, which have been quite successful.

Tell me something. The last major hiring surge of CBP agents occurred during your tenure, correct?

Mr. AGUILAR. Yes.

Senator HARRIS. And, that surge and the corresponding rise in the tactics of cartels to infiltrate CBP led Congress, while you were there, I believe, to institute polygraph testing for new border agents. Is that correct?

Mr. AGUILAR. That is correct.

Senator HARRIS. And, in August 2012, you testified to the House Committee on Oversight and Government Reform (OGR) about CBP's efforts to prevent and detect corruption and misconduct in its workforce, and specifically you said, "Background and periodic investigations as well as polygraph examinations are consistent with, and form the basis of, a comprehensive workforce integrity plan." Do you still believe that to be true?

Mr. AGUILAR. Yes.

Senator HARRIS. And so, President Trump issued this Executive Order mandating the hiring of 5,000 new Border Patrol officers, which would result in a 25-percent force increase. Would it not be a threat to officer safety and public safety to loosen the processes by which we determine who should be eligible and qualified to enter the force?

Mr. AGUILAR. There is not a law enforcement officer—not just a Border Patrol Agent—that would not say that lowering qualifications—lowering standards is unacceptable.

Senator HARRIS. Right.

Mr. AGUILAR. Now, we have learned a lot from that time frame, where we basically doubled the size of the Border Patrol. The Border Patrol is much larger. They have the, benefit of all of the hard lessons learned—the school of hard knocks. There are things that can be implemented. There are things that we did right and things that we could have done much better.

What you are referring to, I believe, Senator, is taking a look now—which I actually applaud—leadership taking a look at what it is that has been done in the past and what can we do better. But, at the forefront of that, we should not, in any way, reduce standards or qualification requirements.

Senator HARRIS. Thank you. I appreciate that. And, I know you know that one of the concerns that we have is, given the amount of money that the transnational criminal organizations—Sinaloa and other cartels—have invested in making sure that they can profit from their illegal activities—is to do a number of

things—being creative around how they will get over and under ground to be able to transport their wares. But also, they have, in their history—and based on their business model—a real incentive to compromise agents at the border. And so, we have to make sure that we have the highest standards, so that we can make sure that we are hiring agents, such as yourself and Mr. Colburn, who years before were being creative in helping to secure our borders. I thank you for your service.

Mr. AGUILAR. We are in lockstep on that, Senator.

Senator HARRIS. Thank you.

Chairman JOHNSON. Thank you, Senator Harris.

I just have to point out, based on what you said, that there are probably far more areas of agreement on this Committee—which is what we are trying to do. I will refer you—before you became a Senator, on November 23, 2015, we issued a report after 13 hearings and 3 roundtables on border security. Our key finding in the report—and I am just going to read it—"America's insatiable demand for drugs"—the same words you used. "America's insatiable demand for drugs, coupled with smugglers' insatiable demand for profits, is one root cause, perhaps the root cause, preventing the achievement of a secure border." So, I am in total agreement with you. It is our insatiable demand for drugs that is destroying public institutions in Central America—crime-ridden—the impunity and the corruption. That is something we really have to address. This is incredibly complex, but I think there are a lot of areas of agreement. I think we are finding that today, in this hearing, finding what we need to do to secure our border, but also understanding——

Senator HARRIS. Cause and effect.

Chairman JOHNSON. "We have seen the enemy, and it is us." Right?

Senator HARRIS. Thank you. I appreciate that.

Chairman JOHNSON. Senator Hoeven.

**OPENING STATEMENT OF SENATOR HOEVEN**

Senator HOEVEN. Thank you, Mr. Chairman.

I would ask that each of the witnesses talk for just a minute, in terms of this balance or mix of infrastructure—meaning a wall, technology, and personnel. Talk about your perception of the strengths and weaknesses of each and the steps you would take to address it right away and in what priority. Mr. Aguilar, if you want to start?

Mr. AGUILAR. Sure. Thank you, Senator. Technology at the current time, in the current environment, with current needs is going to reflect the highest needs that the Border Patrol has for several reasons. It gives you situational awareness. It gives you intelligence—immediate juridical line intelligence—and it gives you the capability to respond in an effective manner and in a safe manner.

Senator HOEVEN. And, when you say that, do you mean unmanned aerial systems (UAS)? Do you mean sensors? Communications? Define some of——

Mr. AGUILAR. It is a combination of those things, dependent on what area of the border you are talking about. We have areas, for example, that both of us worked in Nogales, Arizona, where the

31

canyons are basically so close together that an IFT tower will not work. A remote video surveillance system will not work. But, a helicopter can only fly for, I think it is, 2 hours. For Black Hawks, 2 to 3 hours. Whereas, a drone, a tethered drone—can stay up for weeks at a time. Or, if you place a relocatable tower with the capabilities of Doppler radar to detect movement, that has a high-fidelity camera that can go 7 or 8 miles and detect a person—whether he is carrying a bundle, a gun, a weapon, a longarm, and so forth. These are the things that come into play.

So, it is the packaging of those capabilities that do exist by the way of technology, identifying what best fits the area of the border that is of interest, from an operational perspective, and placing it.

Now, part of that is going to be also asking if that package of technology requires infrastructure to do that slowdown, if you will—and create that efforts of time and distance and, in addition to that, the personnel to respond to it. And, by the way, that personnel response may be in a Black Hawk, because of the area that is so remote and rural.

So, it is all of these things. As the Chairman said, it is very complex. There is not a "one-size-fits-all" for the border.

Senator HOEVEN. So, is the Department of Homeland Security—General Kelly and the planners—are they approaching this in that holistic way?

Mr. AGUILAR. I can assure you that they are doing that, absolutely. That is what we have historically done. That is what they will continue to do.

Senator HOEVEN. And then, throw in the metrics piece, too—measuring results and knowing what our success rate is out there.

Mr. AGUILAR. Absolutely. And, that, again, is going to be a big part of the technological capabilities, because it will give you that situational awareness of what is happening, when it happened, what the results were, and what are the actions needed to take for any continued interest in that area of operation.

Senator HOEVEN. And, you need those metrics to know where you have to adjust, improve, and strengthen your effort, right?

Mr. AGUILAR. Absolutely. Yes, sir.

Senator HOEVEN. Mr. Colburn, your thoughts on the same question and how you would manage—I mean, this is a huge logistics challenge, so how would—if you are king of the world and running it, how are you going to do it?

Mr. COLBURN. At the risk of being a bit redundant with what Chief Aguilar said—we actually worked together off and on through about three decades, so sometimes we tend to think a lot alike. But, I will take strengths first and just say simply that the right mix rapidly deployed—and that is all of the above that we have discussed—so rather than elaborating further. When it comes to strengths, it is all of the above.

For the weaknesses—the missing link. Without tactical infrastructure, then it is too weak. Without the right amount of manpower, it is too weak. And, without the right mix of technology, it is too weak. The links in the chain have to be equally strong, and it has to be the right mix. And, it is not going to be the same in San Diego as it is in Rio Grande Valley in South Texas.

AOL-DEF-00002298

32

Lastly, we have talked about how the transnational criminal organizations have created their own business flexibility models. They are not the old—as we used to call them—"mom-and-pop" smugglers of 30 years ago. Now, the TCOs—the cartels—own the border. They are the gatekeepers, they are the plaza watchers, and they control who plies their trade there through a hierarchy of smuggling and gang systems that report up their chain to them—very much like a large corporation or a government.

That said, we talked about CBP and what they need in the silo of CBP. One thing I have confidence in Secretary General Kelly as well as the chiefs in the Border Patrol and the leadership of CBP for, is that they will not ask for more than what they need. But, they do need to be given exactly what they need to secure the border. And, that was my challenge in Yuma, and the way I put it to both the American people, the Administration, and Congress at the time was, it was not about empire building. It was about asking for the right mix, but bringing it on—and bringing it on quickly, and it made a difference. But, out of 2,000 miles, that was 125 miles.

Senator HOEVEN. Again, how do you know when you have the right mix?

Mr. COLBURN. You go to the professionals in the field, and they walk it yard by yard, as they have done. They assess it, and they identify what they think they need, compared to the kind of—foliage-penetrating radar did not exist in 2005 for the capabilities or uses of the Border Patrol that exist now. So, when we talk about next year's technology, and we talk about the challenges of, say, toward, in South Texas versus, say, in Arizona—now they have created foliage-penetrating radar at the ground level—not just from the air. So, fortunately for all of us, the technology evolves. And, I know you will hear this from the Secretary, himself. If you can get the right combination—less expensive is always better. I am a taxpayer, too. That is why I say that it should be just what you need, not more than what you need—and off-the-shelf and integratable. It has to be integratable, so that it can be replaced or added to and have an impact that way—whether it is in South Texas or California—if it can be integrated.

Senator HOEVEN. Right, and you have to have a way to measure results, something that we agreed to, so you know whether you have the right asset mix out there, the right deployment level, and so forth, right? I mean, that is really the way—you can have the expert tell you what you should do, but you have to have somebody to measure what you are doing.

Mr. COLBURN. Some of the metrics are easy and some of them are not so easy, and that is what I have found in the law enforcement world, in general. I remember speaking to an organization in Arizona, the Arizona Association of Chiefs of Police (AACOP), a few years ago, and at the end of my presentation on the state of the border in Arizona, one of the municipal chiefs of the largest municipality in Arizona raised his hand, during the question-and-answer period and said, "So, Chief Colburn, when will you finally get absolute control of your border in Yuma?" And, I said, "Chief, when will you finally stop all crime in Phoenix?" And, he thought about that for a minute and shook his head, and said, "Now I get it."

AOL-DEF-00002299

33

Crime will never go away, and they will not stop trying. But, we can create a deterrent stature that will stop them. We have come a long ways.

Senator HOEVEN. But, to create good policy in the whole immigration area, we need to understand exactly what we are doing on the border. We need to have some agreed-upon metrics, so that everybody does not come in with a different story about what the results are—I mean, get some kind of baseline—some kind of agreement on what is going on. And, that is why the metrics are a very important part of doing this.

Mr. COLBURN. Yes, and you are absolutely right. They have to be universally the same and consistently measured that way—or they are useless.

Senator HOEVEN. Right.

Mr. COLBURN. And, the chiefs demand——

Senator HOEVEN. And, to foster some understanding in the public, right?

Mr. COLBURN. Yes.

Senator HOEVEN. We need it so that they really know what is going on there. I think it is not only important, in terms of national security, but also in terms of creating and building support for good policy.

Professor, I wanted to get to you. I know I am over my time, and we have a pretty rough Chairman on this Committee, so I have to be careful here.

Chairman JOHNSON. Yes, you do.

Senator HOEVEN. But, please share just a thought or two briefly.

Mr. GARRETT. OK. I want to kind of turn it around a little bit and look at it slightly differently. Obviously, I cannot address what they have. However, what about economic security on the U.S. side of the border? When we escalate the trade war or when we put the affront of the actual physical barrier—the wall—in front of Mexicans that come over to South Texas, California, and other places—I can tell you, the last time the wall went up, we lost millions in the Valley, and in terms of people coming over directly. That is the fear this time around. In fact, the mayor of South Padre Island is just terrified that Mexicans will not come over this upcoming week for Santa Semana. We are going to lose all kinds of money because of fear of coming over—because of the rhetoric coming out from President Trump, primarily.

And also, the mayor of McAllen, he says the same thing. He says that the effect of a trade war with Mexico would cascade beyond lost jobs in the U.S. plants. Downtown stores would lose business, lay off workers, and close up shop. Mexican investors would likely sell off their U.S. properties, leading to plummeting real estate values.

McAllen, Texas—all along the Valley—because of what has happened since 2006, lots of Mexican nationals have bought property on the U.S. side, along the Rio Grande—and, in particular, about one-half of South Padre Island, which is a resort community that depends heavily on tourism from Mexico, half of the properties there are owned by Mexican nationals.

So, the idea is, if we terrify the Mexicans sufficiently, it could cause a real problem for us along the Rio Grande border.

AOL-DEF-00002300

34

Senator HOEVEN. Thank you.
Chairman JOHNSON. Senator Daines.

**OPENING STATEMENT OF SENATOR DAINES**

Senator DAINES. Thank you, Mr. Chairman.

I was struck by this press release that came out from U.S. Customs and Border Protection on March 8, which mentioned that we saw a 40-percent drop in illegal Southwest Border crossings from January to February. My understanding is that was far outside normal seasonal trends. So, there is something—it is not just within the statistical variation. Something has changed in the process—in the system. Typically, the January to February change is actually an increase of 10 to 20 percent. And yet, the numbers reported by CBP say that it was a 40-percent drop. That breaks a 20-year trend. I am curious, Mr. Aguilar, why?

Mr. AGUILAR. This has actually happened before, Senator, and let me just update that. March 8, I believe you said it was.

Senator DAINES. Yes.

Mr. AGUILAR. As of March 31—5 days ago, whatever it is—it is actually up to a 67-percent drop, compared to last year.

Senator DAINES. So these are the February numbers updated further?

Mr. AGUILAR. Yes.

Senator DAINES. OK. So, if CBP issued another press release, you would say that they have updated the February numbers. It was not a 40-percent drop. It is now a 67-percent drop?

Mr. AGUILAR. Right.

Senator DAINES. Is that going to come out with another release?

Mr. AGUILAR. I am sure it will.

Senator DAINES. OK.

Mr. AGUILAR. I am sure it will. They should.

Senator DAINES. My interest is even more piqued, let us say.

Mr. AGUILAR. Absolutely. And, we have lived this before. This has happened before. As it relates to immigration, especially, when the United States stands strong and takes certain actions—substantive actions—and substantive may be something—as, primarily, the current Administration saying, "We are going to do this," and something substantive happens to do that. This Administration has said, "We are going to address illegal immigration." ICE has started working in the interior—unlike other times. So, that message resonates.

The problem is that it does not hold for long, unless those substantive actions continue. We saw this under the Immigration Reform and Control Act of 1986 (IRCA), under President Reagan, when IRCA was passed. It dropped overnight. We saw this on the border, when we took effective actions in California. We built infrastructure, we added Border Patrol Agents, and we threw them in, literally, overnight. There was a shift over to Arizona. We saw this in Arizona, when we added agents to Nogales—we were both there—and it shifted over to New Mexico and El Paso. But, then what happens? When you cannot maintain that, it defaults right back to where it was.

In the Border Patrol, specifically, when we started down the path of strategic application of resources, there were three things that

AOL-DEF-00002301

35

we talked about: We have to go into an area and gain the control that is needed. Once you gain the control that is needed by way of metrics, then you have to be able to maintain and sustain that control—and then continue the expansion. So, it was gain, maintain, and expand.

So, there has to be substantive actions—substantive decisions to hold what it is that you are doing.

Senator DAINES. So, what are the one or two things that we need to do now to ensure that we do hold this—maintain, as you said—this dramatic decrease in illegal crossings?

Mr. AGUILAR. Well, what we are talking about here is addressing the border—the needs of the border and the needs of the Border Patrol, as identified by the current chiefs in the field: technology, infrastructure, personnel in the right mix, in the areas that they need it.

In addition to that—and this is a whole other hearing, Senator Johnson. You and I have talked about this. The supporting entities to the Border Patrol—what happens when an unaccompanied alien child (UAC) is apprehended by the Border Patrol—or a family unit? There has to be a system in place where it can be handed off, so they can get right back to the border. But, now that is not the case.

And then, our Executive Office for Immigration Review (EOIR) system—or immigration judges—are overwhelmed and are docketing cases 8, 10, 15 years from now on people that need to have immigration hearings. It is all of these things combined.

Senator DAINES. So, we are here, today to talk about physical infrastructure—a wall. Clearly, a wall and some kind of physical barriers are a means to an end. The end is to reduce the number of illegal crossings. If you were to prioritize—I am going to ask all of you this question to think about. If you were to prioritize where this Committee—where Congress should place its efforts—because you mentioned, for example, the backlog with judges is one part of this equation—what would you tell us? I recognize we need to be able to do more than just one thing at a time. But, if there were two or three things we should prioritize in stacked, ranked order, to reduce the number of illegal crossings, what would they be?

Mr. AGUILAR. Prioritize and—this is the way I would answer that question. Prioritize a system that can have the impact. That system has to begin with the Border Patrol, given the current environment. There are things happening now that have to be addressed. So, begin with the Border Patrol—its needs and its requirements—and then take a look at the supporting entities for the Border Patrol.

And, by the way, somewhere in that system—and this is up to this body and the House of Representatives—you have to take a look at what it is we do, from an immigration requirement, in this country. Is it comprehensive immigration reform? All of these things are part of that systematic approach that needs to be taken. But, if we are going to look at the immediate border, it is Border Patrol-centric requirements and the supporting entities to the Border Patrol. By that, I mean ICE support, the Department of Health and Human Services (HHS) support, the Office of Response and Restoration (OR&R) support, and EOIR support. That right there

AOL-DEF-00002302

36

would be a border-centric approach that would make a world of difference.

It is not the entire solution, by the way, because there is so much more that needs to be done.

Senator DAINES. Thank you. I am going to run out of time. There is so much to talk about here. But, back to the topic at hand, as it relates to physical barriers on the border, what is left for Congress to do to get this infrastructure built?

Mr. AGUILAR. Fund. Fund, appropriate, and——

Senator DAINES. So, the authority exists.

Mr. AGUILAR. The authority exists.

Senator DAINES. We have all of the legal authority. The constraint is funding?

Mr. AGUILAR. Funding and identification from the Border Patrol, CBP, and DHS as to what the requirements are, yes—and fund those requirements.

Senator DAINES. I am out of time. Mr. Chairman, thank you. You probably all wanted to answer the top three, right?

Chairman JOHNSON. Go ahead and answer, but then we will cut it at that.

Senator DAINES. Mr. Chairman, I want to give everybody a chance to——

Mr. GARRETT. Can I answer?

Senator DAINES. Go ahead. Mr. Colburn, do you want to answer it as well?

Mr. COLBURN. Yes, please.

Senator DAINES. OK.

Mr. GARRETT. I would say that we need to have a hemispheric policy, first and foremost. We need to stem the flow of migrants coming across. I think that is far more important than trying to stanch the bleeding once they come into this country. So, if we were able to use diplomacy, use resources—economic and political—to stabilize these regimes—and, second, I would say, to reduce drug consumption in the United States—I think we have all touched on that today—on this side of the border, which is a driving economic reason. So, I would give you those as the two top things we need to do.

Senator DAINES. I am very encouraged by Secretary Kelly. When he thinks about this, he thinks as U.S. Southern Command (SOUTHCOM) leadership. He brings a much more systemic view of this. And, when you talk about the Southern Border, Secretary Kelly says, "Well, it starts 1,500 miles to the south."

Mr. GARRETT. Absolutely.

Senator DAINES. The point you are making—Mr. Colburn, please.

Mr. COLBURN. Thank you. The question that you posed to us actually I asked just recently during my comprehensive border tour, in which I was able to get state-of-the-border briefings by a number of chiefs—not all nine of the Southwest border chiefs, but most of them. And, every one of them said relatively the same thing in speculation. There is historically—predictably—a surge in crossings come January—or mid-January forward, if you look back decades—and yet that did not occur this year.

Senator DAINES. Right.

AOL-DEF-00002303

37

Mr. COLBURN. They said that they thought there was actually a psychological impact—that there is this symbolic holding of one's breath by the transnational criminal organizations and by the governments of Mexico, Guatemala, El Salvador, and Honduras, because of the new Administration in place—and that it does not mean that they will not at some point decide, "OK, I think we can continue plying our illegal trade." But, there is this, I will call it, "symbolic" or "symptomatic" holding of one's breath corporately across the organizations—and they have slowed down. They are watching and waiting to see if Congress, the American people, and the Administration have the will to follow through with completing it. And, if we do, then we may see this as a continuing down trend of crossings—deterrence.

Senator DAINES. There are early reasons for hope right now, but I know many Americans are just so frustrated by this fundamental lack of enforcing the rule of law. And, perhaps, that change in tone and tenor will be it—again, it is a complicated system. We have talked about it at length. There are multiple variables here. But, let us just say that I think we are off to a better start.

Mr. COLBURN. If I may—sorry—another thought occurred to me just now. Something else that is historically unprecedented has occurred over the last 2 years, where Mexico deported more Central Americans—from Guatemala, Honduras, and El Salvador—than the United States did. That is very symbolic. My personal history with Mexico is sending teams to train those protectors, Grupo Beta, the rescuers. It was always easier to call the Mexican people and their government leadership as a constituency—it is always to provide support from the United States of America's government when it is saving lives and rescuing people. So, we always started that way with Grupo Beta and rescuing.

But, actually, the late Deputy Assistant Attorney General, I believe his name was Nemesio Lugo, who has since been assassinated by the cartels, turned to me over lunch one day and said, "We have a real problem on the Southern Border because they are remaining in Mexico and looking for work in Mexico instead of going forward." So, Mexico is beginning to experience the economic drive that—there are seven billion people in the world, and five billion of them want to come to America, because of that economic drive. And, Mexico is beginning to experience that, too.

So, I think we can continue to partner with them and the other countries, and as General Kelly said, "It starts beyond our borders."

Senator DAINES. Thank you for your candid and insightful comments today. Much appreciated.

Thank you, Mr. Chairman.

Chairman JOHNSON. Thank you, Senator Daines.

I would just summarize kind of what I am hearing. Dr. Garrett, you said to "stem the flow." Overall, I think you have to end the incentives for illegal immigration. There is a host of them: our insatiable demand for drugs—I mean the fact that people are coming here for the opportunities in America—so have a functioning guest worker program. I would say to end the length of the adjudication problem, which is incentivizing children from Central America to take the very dangerous journey. We had a surge of flow from

38

Brazil, and Secretary Chertoff sent those folks right back, and it ended the flow. So, I think you focus your attention on how you stop the incentives for illegal immigration.

I just have one final point and a question, because Dr. Garrett talked a little bit about the reduction in crime in the border cities. In Wisconsin, Al Capone had a really nice vacation spot on an island, and he did not create a whole lot of crime up there. He wanted to keep law enforcement's attention off of him. And, as I have been on the border and I have talked to sheriffs, that is kind of their explanation, too. I was actually surprised that there is not a whole lot of crime at the border—again, they really do not want law enforcement paying a whole lot of attention to what they are doing in those towns. I would just ask Mr. Aguilar and Mr. Colburn: Is that an accurate assessment?

Mr. AGUILAR. The sheriffs know their areas, but I lived the chaotic borders of the late 1980s, early 1990s, and so forth. Crime was rampant. Crime was absolutely rampant. There was everything from stolen vehicles—Senator Hoeven asked about metrics. One of the metrics that we actually used, which may sound a little ridiculous—but it was things we were watching. Ladies could not put clothing out to dry in their backyards because it was stolen. When that stopped happening, we said, "Wow, something is happening here." Merchants could not keep their doors open to their stores, because the smugglers were taking over the stores. That is a localized metric.

The associated criminal activity with an uncontrolled border is very high. Breakings into homes—into ranchers' homes—these things went on and on and on.

Chairman JOHNSON. So, what happened? Why is crime reduced then?

Mr. AGUILAR. The increase in personnel—Border Patrol personnel—the increase in infrastructure, and the increase in technology. Those are the things that, basically, lowered the criminal activity.

Chairman JOHNSON. Mr. Colburn, do you want to chime in on that at all?

Mr. COLBURN. I will just add that I remember 30 years ago patrolling the border—and I was the new guy as a supervisor, who had just arrived in 1 of my 10 duty stations. And, as we were patrolling the border, we came across what I would describe now as a palatial estate, with high walls around it, on the U.S. side, just within view of the border. And, as we drove by, the journeyman veteran agent that was riding with me said, "Yes, that is the house that dope built." A lot of those groups that are investing in America are the cartels. A major shootout in San Diego a few months ago was cartel on cartel in a bedroom neighborhood.

So, part of the risk, of course, is as they are killing each other in Mexico, and right across from McAllen, Texas, in the Rio Grande Valley, South Texas, some of the most violent warfare-like fighting is going on, as we speak—where gun battles last 8, 10, or 12 hours overnight, blockading and burning vehicles——

Chairman JOHNSON. Which, by the way, is exactly what we hear from the people on the border. They are hearing all that gunfire and they are hearing those battles.

AOL-DEF-00002305

39

Mr. COLBURN. Most of what I get—I am still a member of the—as a private citizen and consultant in retirement from the Border Patrol, I am a member of the intelligence and information community, but I get open-source information. And, what is going on in Mexico—the violence of the cartels makes the Colombians of the 1980s look like amateurs. It makes the Islamic State of Iraq and Syria (ISIS) and the Taliban look like amateurs. That is how brutal they are. It is almost a contest to see who can out-brutalize each other.

Chairman JOHNSON. I do not even want to mention the brutality I have heard.

Dr. Garrett, we will let you close it out here.

Mr. GARRETT. OK. So, in Brownsville—UTB, our campus, has actually been hit by three bullet rounds, but they were from the Mexican Army, in a shootout. We were actually in an academic affairs committee meeting when Tony Tormenta of the Gulf Cartel, was taken out by the Mexican military. The Mexican military has been very instrumental, in terms of battling the groups very violently. That is where the violence is taking place. It is not taking place over on the U.S. side primarily. Most of it is in Mexico, unfortunately.

Chairman JOHNSON. Again, I will attribute that to—I will call it the "Al Capone syndrome."

Senator McCaskill, do you have anything else?

Senator MCCASKILL. No.

Chairman JOHNSON. Again, I want to thank the witnesses. I think this has been an incredibly interesting hearing—again, our 22nd. We are going to keep laying out these realities, and I appreciate you contributing to that effort.

The hearing record will remain open for 15 days until April 19 at 5 p.m. for the submission of statements and questions for the record. This hearing is adjourned.

[Whereupon, at 11:33 a.m., the Committee was adjourned.]

AOL-DEF-00002307

# A P P E N D I X

---

**Opening Statement of Chairman Ron Johnson**
*Fencing Along the Southwest Border*
**Tuesday, April 4, 2017**

*As prepared for delivery:*

Good morning and welcome. In January, the president signed an executive order that, among other things, calls on the Department of Homeland Security to "secure the southern border of the United States through the immediate construction of a physical wall on the southern border."

To fulfill this mandate, the department is seeking various proposals on infrastructure prototypes. These prototypes include both concrete walls and other materials, such as the bollard-style fencing used along parts of the border in California and Arizona today.

The purpose of these additional border barriers is to gain control over the southwest border. As Secretary Kelly testified to the committee in January, "the number one threat to the nation is that we do not have control of our borders. Without control, every other kind of threat—drugs, illegal migrants, counterfeit manufactured goods and pharmaceuticals, diseases, terrorists, and the list goes on—can enter at will, and does." I look forward to welcoming Secretary Kelly to our committee once again tomorrow to explain the department's acquisition strategy and budget requests for fiscal years 2017 and 2018.

Before we discuss future strategies and funding, however, it is important that we reflect on the lessons learned from the last major construction project on the border. Today we will hear from two witnesses with extensive experience in these efforts. These witnesses will help us examine the current barriers and infrastructure along the southwest border, including the types of fencing that proved to be the most effective in deterring and disrupting border threats. We will also explore how additional barriers will assist the department in fulfilling its mission. The purpose of the original 650 miles of fencing was to provide "persistent impedance," an important tool to slow unlawful border crossers down and enable Border Patrol agents to make apprehensions. The purpose of the newly proposed construction project is to fulfill the administration's commitment to finally gain control over our southwest border. It is important that we carefully evaluate what type of infrastructure is best suited to that objective.

As Secretary Kelly and other witnesses have told this committee, fencing is not a panacea. We need a layered approach to border security, one that includes technology, manpower, a commitment to the rule of law, and the elimination of incentives for illegal immigration. But it should also be obvious, as the Obama administration's chief of the U.S. Border Patrol testified before the committee, that fencing does work and we need more of it.

The department has the legal authority to construct additional fencing along the southwest border. This committee will continue to work with the department to ensure that we make smart choices that enhance our defenses against the networks that traffic in drugs, in people and, potentially, in those seeking to cause us harm.

I thank our witnesses for being here today, and I look forward to your testimony.

(41)

42

**U.S. Senate Committee on Homeland Security and Governmental Affairs
Hearing on "Fencing Along the Southwest Border"
April 4, 2017**

**Ranking Member Claire McCaskill**

**<u>Opening Statement</u>**

Chairman Johnson, the title of today's hearing is "Fencing Along the Southwest Border." Although there are important lessons to be learned from the fencing that has already been constructed at the Southwest border, I think it's important to remind everyone that President Trump isn't talking about building a *fence*. It's a ***WALL***. It says so very explicitly in the President's January 25 executive order. It says so in the Requests for Proposals that Customs and Border Protection released last month. And, so, before we get this hearing started, I hope we can all agree to speak frankly. This is not a *fence* we're talking about. It's a ***WALL***.

Now, what will that wall look like? How much is it going to cost? Exactly how is Mexico going to reimburse American taxpayers for the billions of dollars they are already being asked to spend on the wall? The Administration has not provided the American people with answers to these important questions.

Since the beginning of this Congress, this Committee has been conducting ongoing oversight of the Department of Homeland Security and its plans to construct

AOL-DEF-00002309

43

a concrete border wall. I have asked my staff to report to this Committee and the taxpayers on the results of our oversight of The Wall to date.

Based on information provided by Customs and Border Protection officials to Committee staff, the wall that President Trump has promised could cost nearly $70 billion. That works out to more than $200 for every man, woman, and child in the United States. And I'm not sure that's a cost the American taxpayer is willing to bear, especially when we were told day after day that Mexico would be paying for the wall – <u>not</u> the American people.

The Department has told us that they plan to use funds intended to acquire remote video surveillance for prototypes of the concrete wall. I was down at the border in February and I spent a lot of time with Border agents. And I asked each Border Patrol agent, "What do you need from us? What will make you better able to do your job?" Time and time again, they told me they needed technology. Technology was the thing that was going to make them better at their job. And now the Department is taking money from video surveillance to use for wall prototypes.

And what about the cost of acquiring all of that land that's going to be needed to build the wall? Approximately two-thirds of the U.S.-Mexico border is private and state-owned land. Some of this land has been in people's families for generations. And I don't think President Trump realizes what a time-consuming – and expensive – process the land acquisition piece of this project is going to be.

AOL-DEF-00002310

44

According to CBP, along one stretch of the border – mostly in south Texas – 400 land acquisitions were needed to build some of the fencing that's in place now. Of those 400 acquisitions, 330 condemnation lawsuits had to be filed by the Department of Justice. Most of the lawsuits were filed in and around 2008. And of those 330 condemnation cases, more than 90 are still pending today, nearly a decade later. This is not going to be the quick and easy process that President Trump says it's going to be.

And it's not going to be cheap either. According to CBP, the Government has spent about $78 million on land acquisition for existing fencing. And those were the parcels that were the easiest to acquire. It's going to take $21 million or more to resolve the cases that are still pending. And nobody I've asked can tell me just how much it's going to cost to seize the rest of the land that will be needed to build the wall that President Trump has ordered.

In the course of preparing for this hearing, my staff talked to a number of different landowners in south Texas who weren't happy about how they were treated by the government back when existing fencing was being built a decade ago. One of those people is a gentleman from Brownsville, Texas, whose family runs a farming operation in the area. This person had the misfortune of living in a house that was too close to the Rio Grande River, which is the international border with Mexico in much of South Texas. In some cases, there's a mile or two of land

AOL-DEF-00002311

45

between where fencing was built and the river, and that's how this man's house –
and some of the most fertile land in the world – ended up on the wrong side of the
fence.

When the government came knocking on his door in 2006, this Brownsville
farmer was offered just a few thousand dollars for the narrow strip of land where an
18-foot-tall fence would eventually be built. He wasn't offered any money for the
dozens of acres of farmland that would be trapped between the fence and the Rio
Grande River.  When he went to take out a loan to send his 3 girls to college, he
wasn't able to do so – the fence had made his property virtually worthless.

In this particular case, in order to access the portion of his property that was
south of the fence, including his house, he had to enter a code on a keypad and then
a gate would swing open.  Can you imagine having to pass through an 18-foot-tall
fence just to access the land and the house that you own?  Think how isolated you'd
feel – how cut off from the rest of the country you would be.  For this person in
Brownsville, those concerns became very real just a few weeks ago when the house
that he lived in burned to the ground.  The Brownsville farmer told my staff that the
fire marshal couldn't save his house from the flames because, despite the assurances
of the federal government when the fence was built, the local emergency services
department had never been given the code to open the gate in the fence.

AOL-DEF-00002312

46

Regardless of how you feel about President Trump's wall, Mr. Chairman, that's just not how people should be treated. American families need to be treated with dignity and respect, and they need to be fairly compensated for any land that is taken from them.

I'll be the first one to tell you that we need to enforce the immigration laws that we have on the books and provide DHS officials with the tools and resources they need to secure the border. And maybe that means they need a wall. But if we're going to pay to build this thing, we need to be honest about some of the true costs to the American people. Let's start today by speaking frankly about how much it's going to cost, how difficult it will be to acquire the land, and some of the impacts on American landowners on the border – and whether the benefits of a wall justify those costs.

Thank you Mr. Chairman, and I look forward to hearing from the witnesses.

AOL-DEF-00002313

47

**Written Statement for the Record**
**Submitted by David V. Aguilar to the**
**U.S. Senate Homeland Security and Governmental Affairs Committee**
**Hearing on Fencing Along the Southwest Border**
**April 4, 2017**

Mr. Chairman, Ranking Member McCaskill, distinguished members of the Committee.  I am honored to appear before you today to testify on issues associated with securing the southern border of the United States, to include what has taken center stage in the ongoing border security discussion – construction of a physical wall along the Southwest border.

My testimony is informed by my 35-year career as a Border Enforcement Officer and Department of Homeland Security Executive.  I served as an Agent in multiple Border Patrol sectors, including as the Chief of the Tucson Sector at the time when unlawful entries into the United States across our border with Mexico were at an all-time high.

My views also reflect my experience as the former Acting Commissioner of U.S. Customs and Border Protection (CBP), Deputy Commissioner of U.S. Customs and Border Protection, and National Chief of the U.S. Border Patrol.  It was during my tenure as National Chief, that we developed and implemented our nation's first-ever National Southwest Border Strategy, doubled the size of the Border Patrol, constructed over 650 miles of border infrastructure, and initiated the organized application of technology along our border with Mexico.

Maintaining a safe and secure environment along the U.S. – Mexico border is critical.  A safe and orderly border that is predicated on the strong rule of law deprives criminal organizations, drug cartels, and criminal individuals the opportunity to thrive.  It also provides a solid foundation for trade and economic development between Mexico and the United States and provides for improved security and quality of life in our border communities and throughout our nation.

**Today's Southwest Border Security Challenges**

Illegal border crossings have dropped dramatically, our border communities are some of the safest cities and communities in the United Sates, and trade between our two nations is thriving.  The barriers and infrastructure built and expanded between 2005 and 2011 along the border played a large part in the enhanced control of our southwest border. We have done much to secure the border but there is much more to do.

Borders are dynamic, significant challenges remain, and new ones are developing. Drug trafficking into the United States is still a major problem, as is the illegal flow of bulk cash and firearms to Mexico from the United States.  These criminal activities are the principal causes of the violence that has afflicted Mexico.

Border fences, walls, and tactical infrastructure, are a definitive part of the border

1

AOL-DEF-00002314

48

security solution. Those of us with first-hand knowledge and security experience at the U.S. – Mexico border understand that infrastructure, technology and personnel are critical aspects of the solution that will ensure enhanced control over the entire border. Walls, fences and vehicle barriers are an integral part of a border enforcement system. Their purpose is to impede, deter, and slow down the illegal flow of people and vehicles across our land borders between the ports of entry. Properly designed, placed and supported, this type of physical infrastructure creates an environment which enhances the Border Patrol's enforcement capabilities and its efforts to detect, deter, identify, classify, respond, and resolve illegal border entries.

**The Department of Homeland Security's (DHS) Current Fencing Authority**

The statute which authorizes DHS to deploy barriers along the international borders is Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and supporting amendments. The Secure Fence Act of 2006 (Public Law 109 367) directed the Secretary of Homeland Security to establish operational control of the border to prevent unlawful entries into the United States between the ports of entry. The act also provided the Secretary of Homeland Security the authority to construct fencing and security improvements in the border area from the Pacific Ocean to the Gulf of Mexico. The executive order on Border Security and Immigration Enforcement Improvements issued on January 25, 2017 by President Trump restates the authorities included in the Secure Fence Act and explicitly directs the Secretary to take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border. There is no restriction that would bar DHS from constructing additional fencing or other barriers along the border provided that the Secretary concludes such construction is essential to achieve control of the border.

Congress has also provided the Secretary broad authority to waive "all legal requirements" that may impede construction of barriers and roads. Despite these authorities, challenges remain, including:

- Environmental Considerations
  - There are numerous federally endangered or threatened species living along the border.
  - In Arizona for example, 85% of the land along the border are Federal lands set aside to protect wilderness and wildlife, such as Organ Pipe Cactus National Monument and the Cabeza Prieta National Wildlife Refuge.
- Land Ownership
  - Most of the land along the Texas border is privately owned. Landowners will have to be compensated for use of their lands for either construction or construction access. Eminent domain may have to be exercised to take land required for the construction of border infrastructure.
  - While the Federal Government does have a 60-foot easement (the Roosevelt Reservation) along the border (except in Texas), this will be insufficient to

2

AOL-DEF-00002315

49

construct certain types of barriers, access roads, and apply supporting technology (e.g. double fencing with a patrol lane between them).

- Tribal Autonomy
  o The Tohono O'odham nation occupies 75 miles of the U.S.-Mexico border in Arizona.
  o The U.S. Government will need to reach agreement with this Native American nation to construct barriers on their land.

**The Border Patrol's Experience with Barriers at the Border**

The above noted issues will have to be taken into consideration. But it is important to note that there is nothing more destructive to environmentally sensitive land and quiet communities than the uncontrolled illegal flow of people, vehicles, smugglers, and criminal organizations. The placement of fences and deterrent infrastructure in previously uncontrolled parts of the border have actually allowed for the rejuvenation of areas that had previously been devastated due to heavy illegal pedestrian and vehicular traffic. Fences, barriers, and walls have been instrumental to the Border Patrol's successes on the border. But we must not forget that personnel and technological capabilities are a vital part of an integrated border-control strategy. Situational awareness, observation/surveillance capabilities, and Border Patrol resources are essential in order to be able to promptly respond to detected border incursions.

As of May 2015, DHS had installed 353 miles of primary pedestrian fencing and 300 miles of vehicle fencing along the U.S.-Mexico border. These barriers – along with significant increases in Border Patrol personnel, improved detection and surveillance capabilities and the strategic deployment of resources to support iterative border control strategies – have significantly improved control of the border. Migrant apprehensions at the border have decreased significantly, dropping from nearly 1.7 million in Fiscal Year 2000 to 408,870 in fiscal year 2016. In the first quarter (Oct-Dec) of the current fiscal year, the Border Patrol apprehended 136,670 individuals at the U.S.-Mexico border.

President Trump directed the Secretary of Homeland Security to develop a strategy within 180 days to obtain and maintain complete operational control of the southern border. I believe walls, fences, and border infrastructure will definitely be a part of what the Border Patrol will be identifying as current requirements. The Secretary's findings should inform what types of barriers should be constructed, where they should be constructed, and construction priorities.

**Other Considerations**

There are multiple threats that must be addressed at the U.S.-Mexico border. These include trafficking of drugs, trafficking of arms, contraband within legal trade, and money laundering. The criminal organizations that work to defeat our border enforcement efforts are too often solely looked upon as drug and human smuggling organizations.

3

AOL-DEF-00002316

50

These same organizations will provide illegal access into our country for anyone willing
to pay the going price. Our military men and women are fighting the enemy on foreign
ground. We have enemies that will pay any price to get to us and our way of life. We
have hardened our airports and ports of entry making it extremely difficult to get to us by
air. We must responsibly address our borders.

**Conclusion**

Since the Border Patrol first began building infrastructure (fences, walls, vehicle
barriers) along our nation's border there has been endless debate on its' value. Border
Patrol Agents and the Border Patrol as an organization agree that properly constructed,
placed, and supported physical infrastructure is essential to border security.

Thank you for the opportunity to provide testimony to this committee as you consider
how to support the Department of Homeland Security in meeting its critical mission of
achieving a higher level of control, from all threats, at the U.S.-Mexico border.  I look
forward to your questions.

4

AOL-DEF-00002317

51

**OPENING REMARKS AND WRITTEN TESTIMONY OF**

**RONALD S. COLBURN**

**DEPUTY CHIEF, U.S. BORDER PATROL (RETIRED)**

**BEFORE THE**

**UNITED STATES SENATE**

**COMMITTEE ON**

**HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS**

**HEARING ON**

**"FENCING ALONG THE SOUTHWEST BORDER"**

**APRIL 4, 2017**

52

Chairman Johnson, Ranking Member McCaskill and distinguished Members of the Committee, I am honored and humbled to be invited to testify today before the committee on Homeland Security and Governmental Affairs regarding "Fencing Along the Southwest Border."

I will describe some of my experience and knowledge of the history of tactical infrastructure, also known as fences and barriers, pertaining to the international boundary between the United States of America and Mexico.

Thirty-five years ago, in southeastern Arizona, I was building border fence with a post hole digging tool, a wire-stretching tool, a heavy coil of barbed wire and a good pair of leather gloves. Alone, and with no backup, my partner and I dug post holes and strung wire in Douglas, Arizona, standing inches away from Mexico.

Three or four strands of barbed wire would not halt people from crossing, or stop smugglers from defeating our efforts with a simple pair of wire cutters. But, it marked the border; our "line in the sand."

We've come a long way since the days of steel posts and strings of barbed wire. In 1995, a U.S. Army construction battalion replaced expanded metal and chain link fencing in another Arizona border town, where I found myself in command, at the time. That year, we arrested an astounding 116,000 illegal aliens in that one station's area of responsibility. Countless tens of thousands made it past our sparsely staffed "thin green line."

Then, 9-11-2001 came. After the horrendous, deadly attacks on American soil by foreign born terrorists, the American people strongly communicated to Congress, the Administration, and the media that they wanted our nation protected at our borders.

In 2005, I found myself serving as the Chief of the Yuma Border Patrol Sector, a stretch of the border that spanned southwestern Arizona and southeastern California.

1

AOL-DEF-00002319

53

About 450 Agents covered the approximate 125 mile border with Mexico in the Yuma area, working overlapping 8 to 12 hour rotations, 24-seven.

During my first year as Chief of Yuma, we arrested over 138,000 foreign nationals attempting to cross our border from Mexico. They crossed under the cover of darkness, and during broad daylight. They crossed in vast and overwhelming numbers, into Yuma, and were led by unscrupulous smugglers across the Colorado River, remote desert and towering rocky mountain ridges, where summer temperatures can push upwards of 120 degrees.

We seized nearly 36,000 pounds of drugs driven or backpacked into the USA, and there were over 200 attacks by border bandits that year. We counted eighteen hundred victims, mostly from Mexico. The criminal gangs and lone bandits from Mexico preyed on their own; robbing, raping and murdering fellow countrymen, women and children, who were staging to enter, or during the act of crossing the border. Frequently, the guides acted in concert with the bandits, sharing in "the take." Assaults on border law enforcement personnel numbered in the hundreds. Yuma had become the most violent stretch of the border.

So, in response to this, Yuma Sector became the "proof of concept" that America can protect and control its border, when the proper mix of resources are placed almost instantaneously. The Secretary of Homeland Security prudently, and thoughtfully exercised his legislated waiver authority in consideration of certain environmental regulations which posed a hindrance to construction initiatives.

Nine hundred men and women of the National Guard, supporting Operation Jump Start, descended upon the border in the Yuma area. We built border barriers –fence—along the entire stretch of the border in Yuma Sector. The Army Corps of Engineers, and contractors built double pedestrian fencing; vehicle barriers, and what is known as "floating fence" in the Imperial Sand Dunes. The style and materiel used depended on the geographic and demographic challenges. We doubled the Border Patrol Agent manpower, and added additional sensor and communications technology.

2

AOL-DEF-00002320

54

Violent bandit activity went from the record 200 attacks and over 1,800 victims the year before, to <u>zero</u>, after fence. The number of violent assaults on Border Patrol Agents also declined drastically.

<u>Before fence</u>: Yuma Border Patrol recorded 2,706 known "drive-throughs" in a one year period. This is where smugglers load up vehicles with their contraband of drugs and people, and simply drive across the open, unfettered border, and cross the river in shallow places, destroying wilderness landscape along the way. They lose themselves in urban areas and traffic once reaching paved roads. Of the 2,706 drive-throughs, we recorded a mere 13 captures and turn backs. The rest all got away, with no idea what or who they brought in.

<u>After fence</u>: Only six vehicles attempted to enter, at other than a designated port of entry. None got away – we captured or turned back all of them. From 2,706, down to six. Impressive results.

By 2008, Yuma Sector arrests of illicit border crossers and traffickers had dwindled from over 138,000 down to 8,363. The known attempts to enter and the got-aways dwindled to an equally minimal number compared to the hundreds of thousands that entered and evaded arrest in previous years.

I encourage you to ask the Border Patrol Agents in the field. They know. I recently completed a comprehensive tour of the border in south Texas, receiving robust "state of the border" updates from some of the Border Patrol Chiefs and their staffs. I have spoken with the majority of Border Patrol leadership covering the Southwestern states in recent days.

Bottom line: when I ask them about fence, every one of them responds: "Yes, build new barriers, where needed; improve existing fence, and maintain timely repairs when breached by criminals, or damaged by the elements."

Threats change; the transnational criminal organizations will not simply go away. They try methods to defeat the fence, but it persistently impedes their ease of entry and ability to quickly ingress into border communities and the interior of the United States. It gives the protectors of our borders the time to detect and respond to the illegal activity. It preserves the environment in the border wild lands.

3

AOL-DEF-00002321

55

This system-of-systems approach, implemented broadly and rapidly is what makes tactical infrastructure, border fence, so valuable as part of the solution.

Thank you, esteemed Members of this Committee.  God bless the men and women of the U.S. Border Patrol.

I remain ready to continue a dialogue regarding this topic.

4

AOL-DEF-00002322

56

**Please note:** Due to the strict time constraints for me to compose a complete and proper testimonial statement, I submit the following previously prepared academic conference paper to the United States Senate Homeland Security and Governmental Affairs Committee – Senator Ron Johnson, Chair; Senator Claire McCaskill, Ranking Member. – Dr. Terence Michael Garrett, March 31, 2017

**American Society for Public Administration 2017 Conference Atlanta, Georgia March 17-21, 2017.** Session - Monday, March 20, 2017 at 8:00 AM - 9:30 AM.

**Session/Panel Title:** Social Equity, Economic Integration, and Political Responses to Immigration Issues between Mexico and the United States

**Paper Title:** *Where there's a wall there's a way: The end (?) of democratic discourse regarding immigration and border security policy*

**Author:** Terence M. Garrett, Ph.D.
Professor and Chair of the Public Affairs and Security Studies Department
The University of Texas Rio Grande Valley
One West University Blvd., BPOD1 Room 1.120C
Brownsville, Texas 78520
Tel. 1+956.882.8825; Fax 1+956.882.8893
Email: terence.garrett@utrgv.edu

**BIO:**
Terry Garrett (Ph.D., University of Oklahoma, 1997) has doctoral field concentrations in public administration, comparative politics, and international relations within the academic discipline of political science. Dr. Garrett is currently department chair and professor of Public Affairs and Security Studies (PASS) at the University of Texas Rio Grande Valley, having previously served as department chair in the Government Department at the University of Texas at Brownsville (UTB) (2010-2012), provost fellow for leadership (2010) at UTB, and Master of Public Policy & Management (MPPM) graduate adviser (2007-2010; 2013 to present), and is currently Master of Public Affairs (MPA) adviser in Public Policy for the UTRGV PASS Department. Dr. Garrett serves on University of Texas System Chancellor (Admiral) McRaven's Texas National Security Network (TNSN) as a member of the TNSN steering committee. Prior to entering a twenty plus year career in academe, Terry Garrett was a military technician (excepted civil service) in the Oklahoma Air National Guard and was a veteran of the First Gulf War having served as an active duty non-commissioned officer in the United States Air Force as a communications center operator (September 1990 to March 1991 with a top secret security clearance for cryptologic communications security management, AFSC 49171), He received the National Defense and Air Force Achievement medals for his service. Terry Garrett was honorably discharged in October 1992.

AOL-DEF-00002323

57

**Abstract:** Border walls have become part and parcel to corporate strategies to garner profits in the new era of post-911 insecurity. Combined with pre-911 agribusiness, service industry and other corporate-industrial expansion including encouraging the "ongoing" recruiting of undocumented cheap labor, the twin corporate policy directives are achieving profits at the expense of the people migrating from Latin America. Building on previous work, the authors analyze the problems created by corporations, complicit government agencies and elected officials in terms of maintaining a status quo that effectively exploits communities from both sides of the US/Mexico border. Policy alternatives are developed, offered and examined to alleviate the continuing misery that affects people living on both sides of the border using critical and postmodern theoretical frameworks.

2

AOL-DEF-00002324

58



**Figure 1:** Tweet produced by Republican presidential candidate Donald J. Trump, April 16, 2015

**Introduction: Defining the Problem of "Walls" in the USA Border Security Context**

As of March 16, 2017, President Trump proposed an initial investment towards border security and the wall. Elements include a $2.6 billion "down payment" for the border wall, the hiring of 1,000 Immigration Customs Enforcement (ICE) agents and 500 Customs and Border Protection agents – all under his proposed budget (Fandos, March 16, 2017, para. 1, 8). The fate of funding Trump's wall now rests with Congress as part of the overall appropriations process. Additionally, the proposed budget will have cuts made in other agencies in the Department of Homeland Security (DHS) including the Transportation Safety Administration (TSA) and the Federal Emergency Management Agency (FEMA) (para. 10). The border wall between Mexico and the USA is now under consideration for being constructed, or being extended, once again.

Walls have long been used as a solution to address public policy situations such as national security, economic security, and the prevention of an influx of migrants to cross into sovereign territory. Questions arise as to how effective walls are in terms of addressing security and migration issues. Garrett (2012) notes that "Justification for increased national or 'homeland' security in the wake of the 'war on terrorism' and September 11 brought about a fusion with the anti-migration policy proponents who have

3

AOL-DEF-00002325

59

used the events to politically force the US Government to procure land for fencing in the region, through the authority of the 2005 Real ID Act and the 2006 Secure Fence Act passed by Congress and signed into law by President Bush, in the hopes of attaining a more secure border with Mexico and to prevent a terrorist attack sometime in the future" (pp.74-5). Garrett and Storbeck (2011) submit that walls – such as the USA-Mexico border fence in the Rio Grande Valley – represent potential harm to the people dwelling in the region, portraying the 110-mile long wall as "the consequences of U.S. wall-building policies in terms of semiotics [Baudrillard's *simulacra*], space [Foucault's *heterotopias*], and subjectivity [Agamben's *homo sacer*] (p. 530). We see a continuation of the policy of "wall building," at least rhetorically, with the president-elect of the USA. There are political, economic, psychological, and social consequences for this wall as there are for others.

In addition to the political consequences, there are economic issues associated with the border wall related to migration policy. Garrett (2013) makes the case that …

> The general lack of a substantive debate over the relative merits of effective governmental policies on immigration and border security is indicative of the power of the market spectacle. The two market-based solutions:
>
> (1) bring in the undocumented workers for their cheap (and exploited) labor; or
>
> (2) keep the undocumented workers out by constructing border fences and accumulating surveillance equipment – preclude any viable alternative strategies such as, for example, providing legal entry for workers that reflect more accurately their true impact on society or providing support to workers in their own country of origin.
>
> Worker products that are relatively inexpensive and plentiful appear to come into conflict with corporate interests in border security whereby extensive apparatuses are manufactured and systematically maintained. Cheap labor and lucrative government contracts trump effective and socially meaningful dialogue (p.34).

The market "spectacle" is explained as being the …

> …heir to all the weakness of the project of Western philosophy, which was an attempt to understand activity by means of the categories of vision. Indeed, the spectacle reposes on an incessant deployment of the very technical rationality to which that philosophical tradition gave rise. So far from realizing philosophy, the spectacle philosophizes reality, and turns the material life of everyone into a universe of speculation (Debord, 1967/1994, pp. 17-18, adapted from Garrett, 2013, p. 33).

4

AOL-DEF-00002326

60

And now integrated in society as …

> …The spectacle has spread itself to the point where it now permeates all reality. It was easy to predict in theory what has been quickly and universally demonstrated by practical experience of economic reason's relentless accomplishments: that the globalisation of the false was also the falsification of the globe (Debord, 1988, p.6).

We take a position in this paper that exploitation of labor – that primarily from immigrants from Mexico, Honduras, El Salvador, and Guatemala – is part and parcel of the phenomenon of globalization. The wall is a symbolic obstruction, used in all manner to hinder, if not stop, migrants from entering the USA. The wall cannot completely prohibit determined migrants. The wall can be, and is, used to as an apparatus (Agamben, 2009) or simulacrum (Baudrillard, 2006) to convince Americans that they are secure, whether they are or are not. The border wall is an outgrowth of the society of the spectacle – and is a spectacle.

### Background: Where There's a Wall, There's a Way?

The terrorist attacks of September 11, 2001 provided the impetus for the building of the border wall – combining fear with policy to enable construction through the passage of federal laws. The 2006 Secure Fence Act and the 2005 REAL ID Act were passed to enable the Secretary of Homeland Security to build approximately 650 miles of fence along the US-Mexico border by overriding environmental and property laws already passed into law as well as requiring passports, or land-based passport cards, for re-entry into the USA by its citizens. The pressure on private land owners, particularly in Texas, brought about changes to the Secure Fence Act. According to Dinah Bear, former White House Counsellor, then-Senator Kay Bailey Hutchison (R-TX) sponsored and passed an amendment to the 2006 law in 2007 "to give the Secretary of Homeland discretion in the fence's location [and she] crafted language that made the 700-mile mandate a floor, not a ceiling," meaning that "Trump can build more than 700 miles if he wants to…" (del Bosque, November 18, 2016, para. 7). The result is that while Texas land owners along the US-Mexico border won temporary relief from the initial border fence construction, the 2007 amendment enabled further future construction through 2010 before government contracts expired.

5

AOL-DEF-00002327

61

From 2011 to 2017 no further wall building effectively took place. The Obama administration had in place a border fence mostly inherited from policies implemented in the Bush administration. The border security policy of the USA consisted of the fence along with increased surveillance apparatuses and an increased number of Customs and Border Protection (CBP) agents to 21,370 deployed along the US-Mexico border by 2015, although the employees' union for the CBP Rio Grande Valley sector leadership wanted an additional 5,000 personnel in testimony to Congress (National Border Patrol Council. March 17, 2015, para. 13). The addition of 5,000 CBP agents for border security was coincidentally the number cited by Republican presidential candidate Donald J. Trump that found its way eventually into an executive order for construction of the border wall. The National Border Patrol Council was one of the first government employee unions to back Mr. Trump in March 2016 and viewed the new wall as a "vital tool" to control undocumented border crossers (Morrissey, November 18, 2016). ICE agents are represented by the National Immigration and Customs Enforcement Council that "represents 5,000 immigration officers and law enforcement support staff" out of nearly 20,000 employees (Valverde, January 26, 2017, para. 7). Once Donald J. Trump was inaugurated on January 20, 2017, the CBP and ICE unions have the president they endorsed.

The resulting executive order by President Trump on January 25, 2017 is now in effect as law to build more fence, or a wall, although Congress has to authorize funding for said wall applicable here as …

Sec. 2. Policy. It is the policy of the executive branch to:
(a) secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism; [and]…
Sec. 3. Definitions. (a) "Asylum officer" has the meaning given the term in section 235(b)(1)(E) of the INA (8 U.S.C. 1225(b)(1)).
(b) "Southern border" shall mean the contiguous land border between the United States and Mexico, including all points of entry.
(c) "Border States" shall mean the States of the United States immediately adjacent to the contiguous land border between the United States and Mexico.
(d) Except as otherwise noted, "the Secretary" shall refer to the Secretary of Homeland Security.
(e) "Wall" shall mean a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier.

6

AOL-DEF-00002328

62

The cost of new border wall is yet unclear, although there is an estimate that the "cost of a border wall is potentially enormous, with initial estimates ranging from a few billion dollars to $14 billion. And that's just for constructing the wall or fence; it does not include a range of other expenses, from maintenance to border patrol agents to purchasing private property from Texas landowners" (Bade and Bresnahan, January 5, 2016, para. 10). Complicating factors for constructing a new wall include a "yet-to-be-released" Government Accountability Office (GAO) report that "estimates the cost of a single layer fence at $6.5 million per mile, or $10.4 million per mile for a double-layer fence" (para. 23). Senator Majority Leader, Mitch McConnell, estimates the border wall will cost between $12-$15 billion (LoBianco, Raju and Barrett, January 26, 2017). As of February 9, 2017, an internal Trump administration report has determined that the cost of the border wall will be between $21.6 billion and $25 billion and take up to three and one half years to complete (Ainsley, February 9, 2017 – see breakdown in **Figure 2** below). The largest estimate for border wall construction is from a Massachusetts Institute of Technology Review estimate of between $27 billion to $40 billion for one thousand miles (New York Times, February 25, 2017). The USA public is not in favor of the wall as a recent Pew Center Poll shows that 39% of those surveyed were in favor, or thought the wall was important to build, while 59 percent did not think the wall was important (Sulis, January 6, 2017). At this point in time, the task of determining the final monetary cost of the border wall is difficult and will likely take years before the total is complete.

| Phases – Dates | Miles of Coverage and Location | Estimated Cost |
|---|---|---|
| **Phase one:** September 2017 | 26 miles (42 Kilometers) near San Diego, California; El Paso, Texas; and in Texas's Rio Grande Valley | $360 million |
| **Phase two:** Dates as yet unknown, presumably after September 2017 | 151 miles (242 km) of border in and around the Rio Grande Valley, Texas; Laredo, Texas; Tucson, Arizona; El Paso, Texas and Big Bend, Texas | $11-15 million per mile |
| **Phase three:** Dates as yet unknown – final completion date – end of 2020 | Unspecified 1,080 miles (1,728 km) – effectively the remainder of Mexico/US border | $11-15 million per mile |

**Figure 2:** Trump Administration Internal Cost Estimate Report - $21.6 billion (low estimate) total for the Proposed Border Wall (*Source*: Based on Ainsley, February 9, 2017)

7

AOL-DEF-00002329

63

The final cost to US taxpayers for the construction of the Trump administration's border wall remains to be seen. Bids will likely have to be extended for wall building contractors to develop a clearer understanding for government officials in charge of the project.

In the past government contracts of now existing border fence placements illustrate how corporations have benefited from the building of the border fence. Boeing SBI-Net, for example, received $7.5 million per mile – out of a total of 110 miles – for constructing an 18-foot high fence in the Rio Grande Valley during the period of 2006 to 2009 (Garrett and Storbeck, 2011) in order to make substantial profits (Garrett, 2012). In south Texas, the border fence was placed in areas where wildlife refuges, landowners, farmers and ranchers were located resulting in properties being apprehended by provisions of the Secure Fence Act of 2006 that granted overriding authority of property and environmental laws previously passed by Congress and given to the Secretary of the Department of Homeland Security. The fence and other security devices such as surveillance cameras, drones and other aerial devices provide lucrative profits to corporations and still do not entirely prevent migrants from crossing the US-Mexico border. The ability to acquire cheaper undocumented workers who enter the US illegally from other nations is still maintained. The twin pillars of the security state apparatus build up and the ongoing underground labor market contribute to current USA border security and migration policies that benefit corporations thereby precluding any policy change for the foreseeable future other than the current status quo – as the powerful interests dominate public discourse (Garrett, 2013). With the new administration installed in office as of January 2017, nothing will likely change. The new wall – or rather the extension of the pre-existing wall – means more corporate profits at the expense of migrants crossing the border and making it more difficult but not insurmountable. And a genuine public discussion of the consequences of existing border security and migration policies will be shunted aside and displaced by the spectacle of the wall.

One of the consequences of the "renewed" building of the border wall is the alienation of the Mexican government by the Trump administration as demonstrated somewhat in **Figure 1** (above).

8

64

Republican presidential candidate Trump referred to Mexican immigrants as rapists, promised to build a

wall to keep them out, and pledged to deport those Mexican migrants who had crossed into the USA

illegally (Ahmed, January 25, 2017). Additionally, candidate and now-president Trump made statements

to the effect that Mexico would pay for the construction of the border wall, primarily with a twenty

percent tax on goods imported from Mexico to the United States, although economists and market

analysts have stated that USA citizens would pay for the costs through higher prices passed on to

consumers and not Mexico (See, for example, Krugman, January 30, 2017; Bryan, January 29, 2017; and,

Jacobs, Rushe, and Agren, January 27, 2017). Mexico is the USA's third largest trading partner behind

China and Canada. Both economies would suffer as a result of raising tariffs in this manner and the

NAFTA treaty would be effectively moot as a result.

   The border wall proposal has not gone over well in Mexico since it was introduced. Mexico's

President Nieto declared, "I regret and condemn the United States' decision to continue with the

construction of a wall that, for years now, far from uniting us, divides us," as he cancelled his state visit to

Washington, DC to meet with President Trump (Ahmed, January 25, 2017, para. 5). *New York Times*

reporter Azam Ahmed notes that "The perceived insults endured [against Mexico] during the campaign

had finally turned into action. Decades of friendly relations between the nations — on matters involving

trade, security and migration — seemed to be unraveling" (para. 7). President Trumps' border wall

proposal is viewed by the Mexican government as an affront that may have damaged relations

permanently.

### "The Wall" Critical Theory Framework: Agamben, Baudrillard, Foucault and Debord

   *The society whose modernization has reached the stage of the integrated spectacle is characterized*
*by the combined effect of five principal features: incessant technological renewal; integration of*
*state and economy; generalized secrecy, unanswerable lies; an eternal present.* – Guy Debord,
1988, "Comments on *The Society of the spectacle.*" (para. 19)

  In previous work, Garrett and Storbeck (2011) analyzed the border wall constructed in the Rio

Grande Valley region of Texas using a theoretical construct based on concepts of semiotics, space and

subjectivity relying primarily on the works of Jean Baudrillard (2006), Michel Foucault (1970; 1980;

9

AOL-DEF-00002331

65

2007; and, 2008) and Giorgio Agamben (1995; 2005; 2007; and, 2009). Specifically, we created the
border wall concept as simulacrum, space-created heterotopias, and migrants and citizens in border
regions (Mexican and USA) as *homo sacer* – people "the other" who may be sacrificed without rights in
the current state of exception – or the perception of the nation-state under siege to justify policies to keep
out "the other" (See also Pope and Garrett, 2012). These theories will be explained briefly in the
discussion that follows. In addition to the previous work, we will examine current political, social, and
economic circumstances with the border wall that has been reprised by the Trump administration to
include an analysis of Debord's (1967/1994; 1988) concept of the society of the spectacle – which we
believe is central to knowing the phenomenon.

We employed Jean Baudrillard's (2006) theoretical concept, the simulacrum, which signifies that an
image that is intended as real, and may in fact exist, can become *hyperreal* – or something that in reality it
is not. Garrett and Storbeck (2011) submit the theoretical notion that the 18-foot high border fence
constructed in the Rio Grande Valley is represented or portrayed by government officials and others
sympathetic to the "wall" as a symbol of security based on events surrounding the 9/11 terrorist attacks –
although the terrorists did not cross the USA-Mexico border. Conversely, those people dwelling in the
region directly affected by the wall see or perceive it as a threat to their security and well-being. The
transitory interpretation of the border fence is captured in Figure 3 below as ...

**Figure 3. 9/11 and the Border Wall Become Hyperreal, Simulacra**

| |
|---|
| *it* [the image] is the reflection of a profound reality; (the image is a good appearance) |
| *The border fence is the image of homeland security.* |
| *it* masks and denatures a profound reality; (it is an evil appearance) |
| *The border wall is the image of oppression: loss of land, detrimental to society and commerce—leading to despair and fear.* |
| *it* masks the absence of a profound reality; (it plays at being an appearance) |
| *The border fence/wall gives the impression of a sense of security at the expense of those victimized by its presence in the lower Rio Grande Valley.* |
| *it* has no relation to any reality whatsoever; (it is no longer of the order of appearance) |
| *The border fence in its 18-foot-high physical construction does not lead to real security (if it is at all completely possible)—agents on the ground, electronic surveillance methods, better international immigration and national security policies are proven more effective [leading to:]* |
| *it is its own pure simulacrum* |
| *The simulacrum or "hyperreal" becomes real. 9/11 (itself having become a simulacrum) makes other hyperreal actions possible, such as the border fence. The proposed border fence becomes a* |

10

66

> *manifestation of "security" based on the fears of another "9/11" by placing a physical structure to impede or stop illegal immigration/terrorism; in reality, it represents a porous and temporary barrier to delay crossing into the United States.*

*Source*: [(Originally Figure 2, Storbeck and Garrett, 2011, p. 535.) Adapted from Baudrillard (1981/2006), Garrett (2010), and Noe (2002).]

The border wall, as such, is complex in terms of theoretical interpretation. Baudrillard's concept is utilized here to capture one key element of the border wall – its symbolism. With regard to the Trump administration's border wall – nothing has changed in terms of semiotics.

We could be criticized – and we expect to be – for our analysis of the wall using different theoretical concepts. We welcome the criticism but that will not impede us. There are other elements to describe, explain and assess the phenomenon of the border wall. We ask the rhetorical question: Why should we limit ourselves to one theory when realistically we have to approach phenomenon in a manner that takes into full account its meaning – how it represents itself to us? So, for Garrett and Storbeck (2011) the next element for consideration and explanation is the theoretical concept of the border wall as a heterotopia (Foucault, 1970; Garrett, 2012). The border wall in the Rio Grande Valley has displaced land from farmers, ranchers, and people who dwell in the area in that the wall is mostly distant from the Rio Grande. In some instances, the border wall, which mostly follows the levee system designed to prevent flooding in the region, is as far as 1.5 miles away from the river. Land is effectively lost and the federal government through the US Army Corp of Engineers and the Department of Homeland Security have designed a wall that slices through private land holdings in many places in south Texas. The land between the wall and the Rio Grande becomes what we call a *heterotopia* – the other place – or land that is rendered useless or a no-man's land …

> We see that in the name of state security, or homeland security, people with long-cherished familial relations and friendships with neighbors across the border in Mexico are having their way of life and existence challenged by the fence structure. While there has always been an element of distance drawn on the international border, the new 18-foot-high concrete-embedded border wall with increased surveillance—where it is built and where it does not exist—complicates and devalues the space between Mexico and the United States. The heterotopia of the distance between

11

67

> the steel pikes of the border wall and the actual border, centered in the middle of the Rio Grande, becomes a place where people will be shut out of their land, livestock and wildlife are cut off from access to water, and, most important, the people along both sides of the river are more effectively being stopped from daily economic, social, and political interaction. (Garrett and Storbeck, 2011, p. 542.)

The distance between the Rio Grande and where the actual wall is built remains an important element for consideration as to whom will suffer the consequences of the wall's placement. So, whether the area in question is along the Rio Grande – where actually the midpoint of the river is the border between the state of Texas in the USA and Mexico – or in areas such as where New Mexico, Arizona and California meet Mexico on land also by treaty, the wall re-presents a place where no one may dwell, or a place that is neither sacred or profane in its vicinity. The security apparatus whether wall, cameras, drones, aerial blimps or paramilitary troops on the ground, guards against the incursion of *the other*: undocumented border crossers of whatever whereabouts in the world attempting to gain physical entrance into the USA.

The next aspect of Garrett and Storbeck's (2011) and Pope and Garrett's (2012) analysis of the wall is the immediate policy issue for which the border wall is and was designed: to keep out the other, or what we refer to as the *homo sacer* – those who may be sacrificed and are without rights as human beings (Agamben, 1995). The current state of exception (Agamben, 2005) allows the USA state to declare that the nation is under a state of siege and since the Bush administration after the terrorist attacks of 9/11, through the Obama administration, and finally to the Trump administration, to declare a state of emergency authorizing public law and policies to strip the rights of undocumented border crossers from Latin America, China, or other parts of the globe. Laws in the USA such as the REAL ID Act of 2005, the Secure Fence Act of 2006 and now the Executive Order signed by Trump to provide for further construction of the border wall and enable the USA government to institute security measures such as the increased "para-militarization" of the USA-Mexico border through the massing of over 20,000 Customs and Border Patrol agents among other strategies and tactics.

The reincarnation, or reintroduction, of the border wall has brought about a concern that was always "there" – to be observed – but we missed and failed to capture in the original analysis although we discussed the matter before the final article (Garrett and Storbeck, 2011). We realize now that the key

12

AOL-DEF-00002334

68

element of any discussion of the border wall must center on Debord's (1967/1994) concept of the society of the spectacle. While the public is susceptible – indeed, is held hostage – to the spectacle, the accentuation of Republican candidate Trump and the current president through the use of social media, Twitter especially, is unprecedented. To have a complete theoretical analysis of the border wall we insights from Debord include …

> *Spectacular government*, which now possesses all the means necessary to falsify the whole of production and perception, is the *absolute master of memories* just as it is the unfettered master of plans which will shape the most distant future. It reigns unchecked; it executes its summary judgments. It is in these conditions that a parodic end of the division of labor suddenly appears, with carnivalesque gaiety, all the more welcome because it *coincides with the generalized disappearance of all real ability*. A financier can be a singer, a lawyer a police spy, a baker can parade his literary tastes, *an actor can be president*, a chef can philosophize on cookery techniques as if they were landmarks in universal history. Anyone can join the spectacle, in order publicly to adopt, or sometimes secretly practice, an entirely different activity from whatever specialism first made their name. *Where 'media status' has acquired infinitely more importance than the value of anything one might actually be capable of doing, it is normal for this status to be readily transferable; for anyone, anywhere, to have the same right to the same kind of stardom* (1988, para. 17, italics added for emphasis).

President Trump with his obsessive use of social media via Twitter is an exemplar of spectacular government and the wherewithal to become a star.  Those victims of the spectacle who are enthralled with the idea of a border wall – its falsifying perception – are sensitized and conditioned as the majority of the American public are rendered incapable of exercising what is in their own best political and economic self-interest. The billionaire star of *The Apprentice*, businessman, entrepreneur and six-time filer of bankruptcies becomes president of the USA. The wall is simply one spectacle-manifestation of the society of the spectacle and its latest and one of the best perpetrators. This is not a recent phenomenon, rather the society of the spectacle is ongoing.

**Courses of Action: The Border Wall as Art and Resistance to the Spectacle**

> "*You show me a 50-foot wall and I'll show you a 51-foot ladder at the border…That's the way the border works.*" – Janet Napolitano, former Governor of Arizona in 2005 (Lacy, July 19, 2011, para. 5)

> "*A person who thinks only about building walls, wherever they may be, and not building bridges, is not Christian. This is not the gospel.*" – Pope Francis (Burke, February 16, 2016)

13

AOL-DEF-00002335

69

The construction of a ladder generally is not considered a work of art, rather the ladder is used by some migrants to cross into the USA. In the Rio Grande Valley, where the 18-foot high border was constructed, crude ladders are constructed to enable the passage of undocumented border crossers as shown in Figure 4 below. Art professor and "no border wall" advocate, Mr. Scott Nichol, has followed the development of the border wall in the Rio Grande Valley for years, employing his camera to make photographs depicting the false sense of security of the construction of the border wall and the struggle by migrants crossing from mostly Latin America into the USA.

**Figure 4: Ladder on the Border Wall in the Rio Grande Valley circa 2016**



*Source*: Photograph by Scott Nichol (n.d.) used by permission.

Ladders are one means to go over the border wall. There are other options. Some may simply climb over in opportunistic places.  One may go under the wall via tunnels. Another may buy a plane ticket and over stay a visa. The possibilities to migrate to the USA are endless. Where there's a wall, there's still a way to get past.

Art sometimes reflects actual experience in life. In 2000 and 2005 artistic reflection and renditions of the conflict over the border were conducted by performers one of whom sent a cloud full of names of migrants who died trekking from Mexico into the USA. Another performing artist made a visual impression by shooting a man from a cannon in Tijuana, Mexico across the border to San Diego, California (Sheren, 2009). Art, in this case, was designed to draw attention to the plight of undocumented

14

AOL-DEF-00002336

70

border crossers moving across Mexico into the USA. The general working principles for these works was to draw public attention to the spectacle of the society of the spectacle.

In another vein, Gretchen Baer, an artist who does her work painting murals on the Mexican side of the border wall in Sonora, states…

> I have always been a big believer in using anything and everything as a public canvas. Turning something that isn't art into art inspires and empowers people. For one small Mexican town, we turned the border wall into a giant kids' mural. The wall represents all that Americans fear about Mexico. The kids of Naco, Sonora, have responded with the world's longest kids painting of flowers, hearts, suns and colorful kid stuff. Now the wall is coming down and replaced. But love trumps hate…. Build a bigger wall and we will paint a bigger mural! (January 25, 2017, para. 2).

The resistance to the wall here signifies a desire not to be overtaken and overwhelmed by the circumstances of the wall separating communities along the Mexico-USA border. There are those who dwell on the border refusing to accept the spectacle manifested in their own neighborhoods.

Protest marches ensued shortly after the executive order to build the wall on the Mexico-USA border and suspend immigration for 30 days from seven predominantly Muslim countries – Iran, Iraq, Libya, Somalia, Sudan, Syria and Yemen (Davis, January 25, 2017). In New York City, hundreds marched in protest against the border wall and immigration ban enabled by President Trump's executive order. In Washington Park, chants of "No ban! No wall! This is our New York!" And "Say it loud, say it clear, refugees are here to stay" as well as "No hate! No fear! Immigrants are welcome here!" (Marino and Perez, January 25, 2017, para. 2-3). Similar marches occurred around the USA in San Francisco, San Diego, California, Chicago, Illinois, Buffalo and New York City, New York, Pittsburgh, Pennsylvania, Austin and Brownsville, Texas and many other events were held throughout the USA include over 2,000 who protested Trump's border wall and ban at his resort in West Palm Beach, Florida (Yahoo! News, February 5, 2017). The border wall spectacle has created momentum for resistance. Whether it will have an effect and continue remains to be seen.

**Discussion and Conclusion: An Assessment of the Border Wall**

15

71

The border wall project continues while it seemingly was stalled for the most part between the Bush and Trump administrations. The government contracts that were not quite completed during the Bush administration were permitted to be completed during the first term of the Obama administration. One of the main talking points for the Trump presidential campaign, and, indeed, the prior Republican primary, was the construction of the border wall. Even though the majority of the USA public was clearly opposed to the further construction of the wall, the fact of the matter is that candidate Trump was able to successfully use the issue along with an array of other policy changes to successfully motivate enough voters and garner the presidency in November 2016.

The society of the spectacle continues. While we have established that the border wall is a combination of simulacrum and heterotopia designed to create *homo sacer* on both sides of the Mexico-USA border, the fetishizing of production becomes the reality that creates the condition of a presidential candidate embodying the characteristics to get elected on a platform containing a plank that the American public does not want, but a plurality of voters in his party wanted to have. Mexico will never pay for the border wall, despite the urgings of President Trump, who, while as a businessman sent a bill for a wall he constructed in Scotland to the locals in 2008 who resisted his business interests and they did not pay (Bennhold, November 25, 2016). Mr. Trump at the time had promised economic development in northeastern Scotland, but a local government official has a perspective as to what happened and what will happen in the USA under a Trump presidency …

> "If America wants to know what is coming, it should study what happened here. It's predictive," said Martin Ford, a local government representative. "I have just seen him do in America, on a grander scale, precisely what he did here. He suckered the people and he suckered the politicians until he got what he wanted, and then he went back on pretty much everything he promised" (Bennhold, November 25, 2016, para. 10).

If President Trump's wall goes forward, it still will not stop undocumented border crossers from entering the USA. Economic and political job seekers and refugees will continue to arrive in USA territory. The overall issue of the wall will be that corporate interests will be able to bid on lucrative government contracts to build the border wall. Affected government agencies such as ICE and CPB will continue to press for further wall development, as it coincides with their interest to militarize the Mexico-US border

16

AOL-DEF-00002338

72

along with further personnel, and electronic surveillance – both on the ground and aerial in scope. Corporations such as Boeing SBI-Net and others will press the Congress to fund the wall and create government contracts. The fact that undocumented border crossers will not be stopped will mean that migrants will endure further hardships in order to improve their economic livelihood (Garrett, 2013). Nothing will change in that regard.

The implementation of the border wall will mean that border dwellers who have not already been impacted by the wall will suffer the consequences of its construction. Private landowners, farmers, ranchers, national parks and refuges and other sensitive environmental areas are in the wake of the proposed border wall. Additionally, the Mexican government will not pay for the wall. Any taxes imposed, whether 20 percent or some other amount, will be passed along to USA consumers who will pay for the projects. Trade agreements such as the North American Free Trade Agreement (NAFTA) will be placed in jeopardy and perhaps rendered moot. The economics of the wall construction may have a permanent detrimental effect on the USA and Mexican relations.

In terms of resisting the society of the spectacle, resistance groups will continue – whether artistic or through social movements that protest. These efforts are a few of the last vestiges of democratic discourse regarding the border wall and are peripheral to the policy. There is little hope that elected officials will thwart the border wall spectacle as there are too many corporate interests that have influence on the Congress. Partisanship does not seem to matter. The public record shows that Democrats and Republicans in Congress are susceptible to industries who want to obtain lucrative government contracts to build and maintain the wall through campaign donations and lobbying. Therefore, the prognosis for the construction of at least some sections of the border wall to go forward look positive. There will likely be an extension of the current border wall.

The border wall will be a waste of public money in the USA to the point that the costs will run between $21 billion to $25 billion. This aspect is part and parcel to the society of the spectacle. The policy objectives it aims to appease will not be met as actual security will not be achieved. Undocumented border crossers may be delayed but ultimately they will not be impeded from entering the USA – as is the

17

AOL-DEF-00002339

73

case from the 2006-2009 border wall construction. The same goes for potential terrorists who would not

attempt to cross the border into the USA from Mexico due to the current level of paramilitary presence of

the CPB, ICE, and other federal law enforcement agencies. The evidence is from the 9-11 attacks where

none of the 19 hijackers came into the USA via the Mexican border and the fact that no known terrorists

have ever crossed into the USA using that venue. The overall migration and border security situation in

the western hemisphere will worsen before the society of the spectacle and its policy element, the border

wall project, is rendered useless.

**References**

Agamben, G. 1995. Homo sacer: *Sovereign power and bare life* (Daniel Heller-Roazen, Trans.). Stanford, CA: Stanford University Press.

Agamben, G. 2005. *State of exception* (K. Attell, Trans.). Chicago: University of Chicago Press.

Agamben, G. 2007. *Profanations* (J. Fort, Trans.). New York: Zone Books.

Agamben, G. 2009. *What is an apparatus? And other essays* (D. Kishik & S. Pedatella, Trans.). Stanford: Stanford University Press.

Ahmed, A. January 25, 2017. As Trump orders wall, Mexico's president considers canceling U.S. trip. *The New York Times*. Retrieved 1/26/17 at https://nyti.ms/2ktMun5.

Ainsley, J.E. February 9, 2017. Exclusive - Trump border 'wall' to cost $21.6 billion, take 3.5 years to build: internal report. *Reuters*. Retrieved 2/10/17 at http://www.reuters.com/article/us-usa-trump-immigration-wall-exclusive-idUSKBN15O2ZN.

Bade, R. and Bresnahan. J. January 5, 2017. House GOP, Trump team hatch border wall plan. *Politico*. Retrieved 1/6/17 at http://www.politico.com/story/2017/01/house-gop-trump-border-wall-233237.

Baer, G. January 25, 2017. Artists along the U.S.- Mexico Border. *La Frontera*. Retrieved 1/30/17 at https://borderartists.com/2017/01/09/gretchen-baer/.

Baudrillard, J. 2006. *Simulacra and simulation* (S.F. Glaser, Trans.). Ann Arbor: University of Michigan Press. (Original work published in 1981)

Bennhold, K. November 25, 2016. In Scotland, Trump built a wall. Then he sent residents the bill. *The New York Times*. Retrieved 2/11/17 at http://nyti.ms/2fYGljw.

Bryan, B. January 29, 2017. There are a lot of problems with Trump's 20% border tax idea. *Business Insider*. Retrieved 2/10/17 at http://www.businessinsider.com/problems-with-trumps-20-mexican-border-tax-idea-2017-1.

18

AOL-DEF-00002340

74

Burke, D. January 16, 2016. Pope suggests Trump 'is not Christian.' *CNN*. Retrieved 2/11/17 at http://www.cnn.com/2016/02/18/politics/pope-francis-trump-christian-wall/.

Davis, J.H. January 25, 2017. Trump blocks Syrian refugees and orders Mexican border wall to be built. *The New York Times*. Retrieved 2/11/17 at https://nyti.ms/2ktUvwa.

Debord, G. 1967/1994. *The society of the spectacle* (translated by D. Nicholson-Smith). New York, NY: Zone Books.

Debord. G. 1988. Comments on *The Society of the spectacle*. Retrieved 12/23/16 at http://libcom.org.libcom.org/files/Comments%20on%20the%20Society%20of%20the%20Spectacle.pdf.

del Bosque, M. November 18, 2016. Trumps border wall may spark another epic land dispute in Texas. *Texas Observer*. Retrieved 11/18/16 at https://www.texasobserver.org/border-wall-trump-land-dispute/

Fandos, N. March 16, 2017. Trump's border wall gets billions in budget proposal. *The New York Times*. Retrieved 3/16/17 at https://nyti.ms/2m3E4YQ.

Foucault, M. 1970. *The order of things: An archaeology of the human sciences*. New York: Random House.

Foucault, M. 1980. *Power/knowledge: Selected interviews and other writings, 1972–1977* (C. Gordon, Ed.; C. Gordon, L. Marshall, J. Mepham, & K. Soper, Trans.). Harlow, UK: Longman.

Foucault, M. 2007. *Security, territory, population: Lectures at the College de France, 1977–1978* (M. Senellart, Ed., & G. Burchell, Trans.). NewYork: Palgrave Macmillan.

Foucault, M. 2008. Of other spaces. In M. Dehaene & L. De Cauter (Eds.), *Heterotopia and the city: Public space in a postcivil society* (pp. 87–102). London: Routledge. (Original work published in 1967)

Garrett, T.M. 2010. A critique of the U.S. Department of Homeland Security and the border wall in the Rio Grande Valley. In M. Kearney & A.N. Zavaleta (Eds.), *Continuing studies in Rio Grande Valley history* (pp. 305–324). Brownsville: University of Texas at Brownsville.

Garrett, T.M. and Storbeck, J.E. 2011. The DHS border fence in the Rio Grande Valley: Semiotics, space, and subjectivity. *Administrative Theory & Praxis*, 33/4, pp. 530–548.

Garrett, T.M. 2012. Colonization in South Texas: Fences, heterotopias and emplacements. *International Journal of Social Economics*, 39/10 pp. 742 – 749.

Garrett, T.M. 2013. Market spectacle: Immigration policy along the US/Mexico border. *International Journal of Social Economics*, 41/1 pp. 32 – 41.

Jacobs, B., Rushe, D., and Agren, D. January 27, 2017. Trump-Mexico relations hit new low after 20% border wall tax mooted. *The Guardian*. Retrieved 2/10/17 at https://www.theguardian.com/world/2017/jan/26/trump-calls-for-20-tax-on-mexican-imports-to-pay-for-border-wall.

Krugman, P. January 30, 2017. Building a wall of ignorance. *The New York Times*. Retrieved 2/1/17 at https://nyti.ms/2jJ0Xh9.

19

75

Lacy, M. July 19, 2011. Arizona officials, fed up with U.S. efforts, seek donations to build border fence. *The New York Times*. Retrieved 2/10/17 at http://www.nytimes.com/2011/07/20/us/20border.html.

LoBianco,T., Raju, M. and Barrett, T. January 26, 2017. McConnell: Border wall will cost $12B-$15B. *CNN*. Retrieved 2/4/17 at http://www.cnn.com/2017/01/26/politics/border-wall-costs-republican-retreat/.

Marino, J., and Perez, C. January 25, 2017. Hundreds gather for 'emergency' anti-Trump protest. *New York Post*. Retrieved 2/11at http://nypost.com/2017/01/25/hundreds-gather-for-emergency-anti-trump-protest/.

Morrissey, K. November 18, 2016. Border Patrol union welcomes Trump's proposed wall as a 'vital tool.' *Los Angeles Times*. Retrieved 11/20/16 at http://www.latimes.com/local/lanow/la-me-san-diego-border-patrol-wall-20161118-story.html

Noe, L.J. 2002. 9–11 as nostalgia: Implications for public administration theory and practice. *Administrative Theory & Praxis*, 24: 572–606.

National Border Patrol Council. March 17, 2015. Testimony of Chris Cabrera before Senate HSGAC Committee. Retrieved 1/30/17 at http://www.bpunion.org/index.php/newsroom/special-reports/1771-cabrera-testimony-hsgac

Pope, P. and Garrett, T.M. 2012. America's *homo sacer*: Examining U.S. deportation hearings and the criminalization of illegal immigration. *Administration & Society*. 45(2): 167–186.

Sheren. I. 2009. Performing Migration: Art and Site-Specificity at the U.S.-Mexico Border. THE *International Journal of the Arts in Society*. 4(2): 351-364.

Sulis, R. January 6, 2017. Less than half the public views border wall as an important goal for U.S. immigration policy. *Pew Research Center*. Retrieved 2/11/17 at http://www.pewresearch.org/fact-tank/2017/01/06/less-than-half-the-public-views-border-wall-as-an-important-goal-for-u-s-immigration-policy/#comments.

*The New York Times*. February 25, 2017. The immigration facts Donald Trump doesn't like. Retrieved 2/27/17 at https://nyti.ms/2lHqCl9.

Trump, D.J. January 25, 2017. Executive order: Border security and immigration enforcement improvements. The White House: Office of the Press Secretary.

Valverde, M. January 26, 2017. Donald Trump was not 'unanimously endorsed' by ICE, border patrol. *PolitiFact*. Retrieved 1/30/17 at http://www.politifact.com/truth-o-meter/statements/2017/jan/26/donald-trump/trump-claims-unanimous-endorsement-ice-border-patr/.

*Yahoo! News*. At least 2,000 march on Trump's Florida resort. Retrieved 2/11/17 at https://www.yahoo.com/news/least-2-000-march-trumps-florida-resort-041259651.html?ref=gs.

**Notes**

---

[i] Governor Napolitano later became Secretary of the Department of Homeland Security under the Obama Administration.

20

76



RON
JOHNSON
U.S. SENATOR

# THE STATE OF AMERICA'S BORDER SECURITY

**Senator Ron Johnson,** Chairman

**Committee on Homeland Security and Governmental Affairs**

**United States Senate**



**114th Congress**

**November 23, 2015**

## MAJORITY STAFF REPORT

AOL-DEF-00002343

77

## Table of Contents

**Executive Summary** .................................................................................................................3
    *Key Highlights* ...................................................................................................................7
**Part I: The U.S. – Mexico Border** ...............................................................................15
Physical Barriers and Technological Detection Capabilities in the Sectors ..................16
    *Fencing and Infrastructure* ..........................................................................................17
    *Technologies* .................................................................................................................22
Experiences on the Border ............................................................................................28
    *Border Patrol* ...............................................................................................................28
    *Local Law Enforcement* ...............................................................................................29
    *Local Landowners* .......................................................................................................30
Transnational Crime at the Southwest Border ..............................................................31
    *Cartels* .........................................................................................................................31
    *Drug Smuggling* ...........................................................................................................32
    *Human Smuggling and Trafficking* ..............................................................................34
    *Gangs, Criminal Aliens, and Special Interest Aliens* ..................................................35
**Part II: The U.S. – Canada Border** .............................................................................36
U.S. – Canada Joint Operations ....................................................................................38
Threats to the Northern Border .....................................................................................39
    *Terrorism* .....................................................................................................................39
    *Drug Smuggling* ...........................................................................................................43
    *Human Smuggling and Trafficking* ..............................................................................44
    *Threats on Tribal Lands* ..............................................................................................44
**Part III: The Maritime Border** ....................................................................................46
Agency Collaboration and Joint Missions .....................................................................46
Threats along the Maritime Border ................................................................................48
    *The Atlantic Coast and Caribbean* ..............................................................................50
    *The Pacific Coast* .........................................................................................................52
    *The Great Lakes* ...........................................................................................................54
    *U.S. Ports* ....................................................................................................................54
**Part IV: U.S. Ports of Entry** .......................................................................................56
Visa Waiver Program .....................................................................................................56

1

78

Refugee Resettlement ..................................................................................................59

Biometric Entry-Exit Program ....................................................................................61

Preclearance Agreements.............................................................................................64

**Part V: Understanding the Root Causes of Immigration**............................................66

Central American Migration to the U.S. .....................................................................67

    *HHS Response*........................................................................................................68

    *DOJ Response* .......................................................................................................70

    *DHS Response* .......................................................................................................71

    *Mexico Response*...................................................................................................74

    *U.S. Assistance to Central America and the Dependency on Remittances*.........75

Unauthorized Immigrant Populations .........................................................................77

    *Demographics of the Foreign-Born and Native Born Population*........................79

    *Labor Participation and Incentives* .....................................................................81

**Conclusion and Recommendations for Proposed Legislation** ...................................83

**Appendix A: Key Findings of Fact from Border Security Hearings and Roundtables**.........94

**Appendix B: Key Findings of Central America Trip** ................................................99

**Appendix C: Acronyms** ............................................................................................103

2

AOL-DEF-00002345

79

## Executive Summary

For decades, politicians from both parties have vowed to secure our national borders and fix our broken immigration system.  Unfortunately, the tough talk has yielded little, if any, real or lasting results.

Since the 1986 comprehensive immigration reform that promised to fix the problem once and for all, Congress has passed dozens of laws promising significant reform while the illegal immigrant population has steadily grown from a supposedly 3.5 million in 1986 to approximately 11 million today.

Since becoming Chairman of the Senate Committee on Homeland Security and Governmental Affairs, I have made border security a top priority.  The Committee has held 13 hearings and 3 roundtables related to the subject and visited the southwest border, northern border, and Central America. Our efforts represent the necessary first step in solving any problem: a sincere attempt to fully understand and properly define it.

Despite dedicated and often heroic efforts from both the U.S. Customs and Border Protection (CBP) and local law enforcement, the accumulated testimony and information the Committee has gathered yields an inescapable conclusion: America's borders are not secure.  This current state of affairs is clearly unacceptable.  A secure border is not only a prerequisite to a functioning legal immigration system, but it is essential to maintaining national security and protecting public health and safety.

To understand how porous our borders truly are, consider testimony from former Drug Czar General Barry McCaffrey and Rear Admiral Peter Brown stating we are interdicting less than 10 percent of drugs crossing our land borders and only 11-18 percent crossing our maritime borders.  These metrics not only reveal the lack of a secure border, they also point to a root cause—perhaps THE root cause—of the problem: America's insatiable demand for drugs.

This demand fueled the rise of drug cartels and transnational criminal organizations that have grown and expanded their product lines to include most forms of illegal drugs and human trafficking.  Sex trafficking is extensive and the drug cartels often use economic migrants as a diversion for even higher value drug and human smuggling.  As product moves through Central America the drug cartels have dramatically weakened the public institutions and rule of law within those nations.  The resulting corruption and criminal impunity enjoyed by gangs and extortion racketeers have led to high murder rates, destroyed economic opportunity, and created significant incentives to migrate to America—the so called "push factors" of illegal immigration.

Although significant, these push factors pale in comparison to the pull factors, or incentives, that fuel illegal immigration.  Even during periods of slow economic growth, the opportunities that abound in America relative to other countries are the most powerful incentives for both legal and illegal immigration. The significant wage gaps that exist between America and our southern neighbors are the metrics that prove the point.

3

AOL-DEF-00002346

80

While economic opportunity is the single greatest incentive, we have created numerous other incentives within our laws, regulations, and through the lack of enforcement. We create sanctuary cities where criminals are able to avoid deportation and allow our welfare and tax systems to be abused by non-U.S. citizens. Combined with the 2008 Human Trafficking bill containing extended adjudication rights to unaccompanied minors from non-contiguous countries, President Obama's Deferred Action on Childhood Arrivals (DACA) sparked the dramatic upsurge in unaccompanied children from Central America arriving at the southwest border staring in 2012.

Regardless of whether or not these laws, regulations, and executive actions actually apply to individuals, the reality is that illegal immigrants are allowed to stay in America. Through the use of social media, that fact is widely known and becomes its own powerful incentive for even more illegal immigration.

In order to secure our borders we must clearly identify and eliminate these incentives. One way to eliminate an incentive would be to immediately return those who illegally cross our borders to their country of origin. Both current and former DHS officials have seen firsthand that expedited removal of illegal immigrants works as a deterrent. The surge of 30,000 immigrants from Brazil in 2005 was virtually stopped in its tracks by responding to it with expedited removal. As this example illustrates, we know what works and we simply need the political will and commitment to implement smart policy.

But the problem remains multi-faceted and complex. Unfortunately, the Administration has declared it will oppose a process of incremental progress insisting instead it will only support comprehensive reform. The last three decades of failed attempts to secure our borders and fix a horribly broken legal immigration system lend very little credence to a compressive approach. It's well past time to begin identifying individual problems and enacting solutions on a step-by-step basis.

This report provides a summary of findings from the Committee's border security hearings, as well as a primer on key border security issues and recommendations for "first step" reforms that could begin improving security at our borders. The Committee has already begun crafting and passing a number of these initial reforms. Six bills related to border security have been reported out of Committee, one of which was recently signed into law.

Based on the information gathered by the Committee, the report presents the following findings:

1.  Despite spending more than $100 billion over the last decade to fund security measures along the border, the border is still not secure. America's insatiable demand for drugs, coupled with smugglers insatiable demand for profit, is one root cause (perhaps THE root cause) preventing the achievement of a secure border.

2.  In certain areas and aspects, the border has become more dangerous and lawless over the years. The porous border has made the U.S. more vulnerable to criminal and potential terrorist activity.

4

AOL-DEF-00002347

81

3.  To truly secure our border, we must identify and eliminate—or at least drastically reduce—the incentives for illegal immigration. Some key incentives driving unlawful migration are the opportunity to work and the security in knowing that, upon illegal entry, you will probably be able to remain in the U.S.

    a.  The wage gap, or the difference between wages in the United States and countries south of the U.S.-Mexico border, is a driving factor for migration to the U.S. and will remain a factor for a very long time.

    b.  Both current and former DHS officials agree that expedited removal of illegal immigrants works as a deterrent. Unfortunately, the current Administration is not removing illegal immigrants, including unaccompanied minors, on an expedited basis.

    c.  Due to powerful incentives, immigration of unaccompanied minors from Central America has exceeded that of Mexican unaccompanied minors. To combat this, both pull and push factors should be analyzed and addressed.

Until the political will exists on a bipartisan basis to solve these problems, comprehensive reforms to the state of our border security and immigration system will be difficult, if not impossible, to achieve. There are, however, piecemeal steps we can take now to prepare for bigger reforms down the road. These steps will not provide total border security, but they will move us in the direction of making our borders more secure. This report presents as recommendations the following reforms that the Chairman believes, with leadership and cooperation from both parties, can be achieved this Congress:

A.  Require adequate metrics to measure border security across all U.S. borders—land, air, and sea, with appropriate oversight and transparency.

B.  Ensure sufficient safeguards are in place in both the U.S. Refugee Resettlement Program and Visa Waiver Program.

C.  Initiate a concentrated public relations campaign to dissuade all Americans, but in particular young people, from using and becoming addicted to drugs.

D.  Reform the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) to eliminate incentives for illegal immigration.

E.  Provide Border Patrol agents access to federal lands.

F.  Require DHS to examine the threats on the northern border.

G.  Call on the Chief of the Border Patrol to move agents to areas of high risk.

5

AOL-DEF-00002348

82

H. Provide and maintain adequate manpower on our border and satisfy hard to fill vacancies at our ports of entry.

I. Complete the Congressionally mandated fencing requirement along the southwest border and understand our country's fencing needs and other border security assets to determine what more is necessary.

J. Require each border security technology acquisition program to demonstrate it has an approved baseline for costs, schedule, and performance.

K. Ensure that successful state and local programs, such as Operation Stonegarden, are used appropriately and efficiently to maximize manpower at and near U.S. borders.

L. Cut off federal funding for sanctuary cities that release criminal aliens into local communities, endangering public safety, and provide immunity to law enforcement officers so that courts cannot prevent them from honoring federal detainers.

M. Ensure the continuation of current Border Patrol programs, such as Operation Streamline, that provide penalties to recent border crossers in order to reduce recidivism.

N. Emphasize intelligence-based strategies at our borders.

O. Authorize the Department's preclearance agreements.

The Chairman is hopeful that this report will provide useful and authoritative information to the public and elected officials regarding a path forward on border security and immigration reform.

6

AOL-DEF-00002349

83

<u>Key Highlights</u>

*1. Despite spending more than $100 billion over the last decade to fund security measures along the border,[1] the border is still not secure. America's insatiable demand for drugs, coupled with smugglers insatiable demand for profit, is one root cause (perhaps the root cause) preventing the achievement of a secure border.*

The Department of Homeland Security has pointed to a declining number of apprehensions along the southwest border as an indicator of success in controlling the border and deterring would-be trespassers.[2] However, this does not paint a comprehensive picture of security at the border.

For one, apprehension data alone ignores the drug smuggling threat along our borders. Americans' insatiable demand for drugs is largely driving this trade. Despite spending $25 billion annually on our war on drugs,[3] some estimates state that more than 60 percent of illegal crossings are related to drugs.[4] According to the Drug Enforcement Agency (DEA), the "new face of organized crime in America" is "[t]he growing relationship between Mexican-based drug cartels and domestic street gangs, coupled with ... an unlimited supply of illegal guns."[5] In addition to being the key drivers of the drug trade, the Mexican cartels have become experts at evading the Border Patrol. A former U.S. official testified that CBP "seizes just 5-10 percent of the illegal drugs smuggled across the border, and interdicts less than 1 percent of the $20 billion plus laundered to Mexico each year."[6] Regarding the maritime border, the U.S. Coast Guard testified that it only interdicts 11 to 18 percent of the estimated drug flow into the U.S.[7]

Moreover, independent experts believe that apprehension rates along the southwest border are somewhere between 40 and 55 percent.[8] In some sectors, Border Patrol agents and local law

---

[1] *See* Lisa Seghetti, CONG. RESEARCH SERV., DHS BORDER SECURITY AND IMMIGRATION ENFORCEMENT STRATEGY, APPROPRIATIONS, AND METRICS 4–6 (2014) (on file with Majority Staff) (noting that from FY2006 through FY2013, Congress appropriated $86 billion to CBP and in total about $131 billion on "enforcement-related spending.").
[2] *Remarks by Secretary of Homeland Security Jeh Johnson, Border Security in the 21st Century*, U.S. DEP'T OF HOMELAND SECURITY (Oct. 9, 2014), http://www.dhs.gov/news/2014/10/09/remarks-secretary-homeland-security-jeh-johnson-border-security-21st-century.
[3] *See* Lisa N. Sacco & Kristin Finklea, CONG. RESEARCH SERV., R 41535, REAUTHORIZING THE OFFICE OF NATIONAL DRUG CONTROL POLICY: ISSUES FOR CONSIDERATION 11 (2014).
[4] Data provided by the U.S. Department of Homeland Security during bipartisan STAFFDEL to the Tucson, Arizona Sector (Feb. 2015).
[5] *All Hands on Deck: Working Together to End the Trafficking and Abuse of Prescription Opioids, Heroin, and Fentanyl Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of John "Jack" Riley, Acting Deputy Administrator, Drug Enforcement Agency).
[6] *Securing the Border: Assessing the Impact of Transnational Crime: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of General Barry R. McCaffrey, USA (RET.), Former Director, Office of National Drug Control Policy).
[7] *See Securing the Border: Understanding Threats and Strategies for the Maritime Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of Rear Admiral Peter J. Brown, Assistant Commander for Response Policy, U.S. Coast Guard).
[8] Bryan Roberts, Edward Alden, John Whitley, *Managing Illegal Immigration to the United States: How Effective is Enforcement?,* COUNCIL ON FOREIGN RELATIONS 2–3 (2013) ("The Obama administration has not offered, and Congress has failed to insist on, any accountability for the effectiveness of these huge enforcement expenditures).

7

AOL-DEF-00002350

84

enforcement estimated interdiction rates to be between 30 and 40 percent.[9]  In other sectors, agents estimated they caught one-in-three in areas with a fence, and only one-in-20 in areas where no fence was present.[10]  Of the 2,000 mile U.S-Mexico land border, only 653 miles, or less than 33 percent, is fenced.[11]  Finally, at a Committee hearing, a witness testified that agents who reported more than 20 "got-aways" had to verify their report with a supervisor and would likely face retribution.[12]  Senior officials at DHS have denied this assertion.[13]

It is clear from these numbers and statements that the border is still not secure, and continues to be taken advantage of by cartels and other transnational criminal organizations (TCOs) seeking to smuggle humans and drugs unlawfully into the country.

> ### 2.  *In certain areas and aspects, the border has become more dangerous and lawless over the years.  The porous border has made the U.S. more vulnerable to criminal and potential terrorist activity.*

The Committee has heard numerous anecdotes suggesting the border has become more dangerous and lawless over the years.  For example, a local law enforcement official testified that cartels are responsible for numerous crimes in border towns, including home invasions, felony vehicle evasions, extortion, and sexual assault.[14]  He also explained that violent transnational gangs, such as Mara Salvatrucha (MS-13), operate on both sides of the border and since 2011 the number of MS-13 members encountered at the border has increased each year.[15]

One rancher testified before the Committee that parks that were previously used for recreation are no longer used for that purpose, because they have simply become too dangerous.[16]  The same rancher told the Committee about his irrigation district workers being shot at by cartel members attempting to scare them off to allow the gangs to smuggle drugs across the border.[17]  Others who live in border regions spoke of similar experiences.  One witness testified that a neighboring farmer witnessed smugglers cutting holes in his fence and then driving 46 trucks

---

[9] Majority Staff observations during Senators Johnson, Carper, and Sasse CODEL to the Texas Rio Grande Valley Sector (Feb. 2015); *see also Ongoing Migration from Central America: An Examination of FY2015 Apprehensions: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Chris Cabrera, National Border Patrol Council).

[10] Majority Staff observations during bipartisan STAFFDEL to the Tucson, Arizona Sector (Feb. 2015).

[11] U.S. CUSTOMS AND BORDER PROTECTION OFFICE OF ADMINISTRATION & OFFICE OF BORDER PATROL, FACILITIES MANAGEMENT & ENGINEERING DIRECTORATE BORDER PATROL FACILITIES & TACTICAL INFRASTRUCTURE PROGRAM MANAGEMENT OFFICE (2015) (on file with Committee staff).

[12] *See Securing the Southwest Border: Perspectives from Beyond the Beltway: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015).

[13] *Securing the Border: Understanding Threats and Strategies for the Northern Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015).

[14] *Securing the Border: Assessing the Impact of Transnational Crime: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Benny Martinez, Chief Deputy Sheriff, Brooks County, Texas).

[15] *Id.*

[16] *See Securing the Southwest Border: Perspectives from Beyond the Beltway: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Othal E. Brand, Farmer, McAllen, Texas).

[17] *Id.*

8

85

loaded with drugs across his property.[18]  That farmer was later told by a property appraiser that
the value of his property had decreased significantly, due to its proximity to the border.  Illegal
immigration and drug smuggling are obvious deterrents to potential investors.[19]

The National Border Patrol Council estimates that criminal aliens—individuals who have
committed crimes in the U.S., served time in jail, and have been deported—constitute 10 to 20
percent of those who are apprehended at the border.[20]  The July 2, 2015 murder of Kathryn
Steinle in San Francisco, California by a criminal alien that had been deported five times with
seven prior felony convictions has brought renewed attention to criminals entering and remaining
in the U.S.[21]  According to ICE, between January 1, 2014 and June 30, 2015, there have been
16,495 detainers issued that have not been honored in approximately 200 local "sanctuary"
jurisdictions.[22]  Of those who were released after an ICE detainer was not honored in the first
eight months of 2014, "approximately 1,900 were later rearrested 4,300 more times on 7,500
different charges."[23]  Between FY2010 and FY2014, 121 criminal aliens were released into the
U.S. and "were subsequently charged with a homicide-related offense," according to U.S.
Immigration and Customs Enforcement (ICE) Director Sarah Saldana.[24]

While drug smuggling and illegal entry represent important threats to our porous borders, there is
also a concern that terrorists may be able to exploit these weaknesses to enter the U.S.
undetected.[25]  Experts have strong disagreements on the likelihood of terrorists transiting the
southwest border, but the potential for exploitation is real, given the changing dynamics and
backgrounds of the individuals being apprehended at the southwest border in the last few years.[26]
Apprehensions include individuals from Iraq, Syria, Pakistan, and Egypt.[27]

---

[18] *Id.* (statement of Howard G. Buffett, Chairman and CEO, Howard G. Buffer Foundation and Arizona
Landowner).
[19] *Id.*
[20] Response to Questions for the Record from Shawn Moran, Vice President, National Border Patrol Council,
*Deferred Action on Immigration: Implications and Unanswered Questions: Hearing Before the S. Comm. on
Homeland Security & Governmental Affairs,* 114th Cong. (2015) ("These are not economic immigrants in search of
a better life. These are hardened criminals who are facing real jail time").
[21] Michelle Moons, *Breaking: Pier 14 Murder Suspect Had Been Deported 5 Times With 7 Felonies,* BREITBART
(July 3, 2015), http://www.breitbart.com/texas/2015/07/03/breaking-pier-14-murder-suspect-had-been-deported-5-
times-with-7-felonies/.
[22] Letter to the Honorable Kelly Ayotte, Senator, Senate Homeland Security & Governmental Affairs, from the
Honorable Sarah R. Saldana, Director, U.S. Immigration and Customs Enforcement (Aug. 14, 2015).
[23] Jessica Vaughn, *Protect the Public, not Criminal Immigrants,* NAT'L REVIEW (July 8, 2015),
http://www.nationalreview.com/article/420898/illegal-alien-criminal-steinle (data from Jan. 1, 2014-Aug. 31, 2014).
[24] Joel Gehrke, *ICE Failed to Deport 121 Convicts Now Facing Murder Charges,* NATIONAL REVIEW (June 15,
2015), http://www.nationalreview.com/article/419781/ice-failed-deport-121-convicts-now-facing-murder-charges-
joel-gehrke (citing a letter from Sarah Saldana, Director, Immigration and Customs Enforcement).
[25] TEXAS DEP'T OF PUBLIC SAFETY, OPERATION STRONG SAFETY REPORT TO THE 84TH TEXAS LEGISLATURE AND
OFFICE OF THE GOVERNOR 2 (2015) (Unclassified Version).
[26] *U.S. Northern Command and Southern Command: Hearing Before the S. Comm. on Armed Services,* 114th Cong.
(2015) (statement of General John F. Kelly, U.S. Southern Command)
[27] TEXAS DEP'T OF PUBLIC SAFETY, OPERATION STRONG SAFETY REPORT TO THE 84TH TEXAS LEGISLATURE AND
OFFICE OF THE GOVERNOR 2 (2015) (Unclassified Version); *see also American's Heroin Epidemic at the Border:
Local, State, and Federal Law Enforcement Efforts to Combat Illicit Narcotic Trafficking: Hearing Before the S.
Comm. on Homeland Security and Governmental Affairs,* 114th Cong. (2015) (statement of Brandon Judd, President,
National Border Patrol Council).

9

AOL-DEF-00002352

86

As to the northern border, "the U.S.-Canada border is the longest common border in the world."[28]  Due to its length and the relatively low number of agents patrolling it, experts believe that vulnerabilities could be exploited.[29]  In 2011, Alan Bersin, former CBP Commissioner, told the Senate Judiciary Committee that regarding terrorism, "it's commonly accepted that the more significant threat comes from the U.S.-Canada border."[30]  In FY2014, the Blaine sector in Washington State alone apprehended migrants from 32 different countries.[31]  Finally, there is also the possibility that terrorists may exploit legal avenues to enter and remain in the U.S.  For example, in 2011 the U.S. discovered two Iraqi refugees were plotting to send missiles, cash, and sniper rifles to insurgents to kill American soldiers abroad.[32]  Other potential vulnerabilities include the Visa Waiver Program, student visas, and visa overstays.

3.  **To truly secure our border, we must identify and eliminate—or at least drastically reduce—the incentives for illegal immigration.  Some key incentives driving unlawful migration are the opportunity to work and the security in knowing that, upon illegal entry, you will be able to remain in the U.S.**

a.  *The wage gap, or the difference between wages in the United States and countries south of the U.S.-Mexico border, is a driving factor for migration to the U.S. and will remain a factor for a very long time.*

"The main economic factor influencing migration is the wage gap, or the difference between what a potential migrant can earn in the U.S. compared to the migrant's home country. Differences in average wages for similar workers between developed and developing countries constitute the single largest price distortion remaining in global markets."[33]  Over the last several decades, migrant survey data suggested that the wage gap based on actual labor market outcomes in the U.S. and Mexico was approximately $7 to $1, if valued at the commercial exchange rate.[34]  Today, this gap has fallen to as low as $5 to $1.[35]  However, this wage gap is expected to continue to be above $3 to $1 until 2075.[36]  The wage gap between the U.S. and Central

---

[28] U.S. DEP'T OF HOMELAND SECURITY, NORTHERN BORDER STRATEGY 4 (2012), http://www.dhs.gov/xlibrary/assets/policy/dhs-northern-border-strategy.pdf.
[29] Garrett Graff, *Fear Canada: The Real Terrorist Next Door,* POLITICO MAGAZINE (Oct. 16, 2014), http://www.politico.com/magazine/story/2014/10/fear-canada-not-mexico-111919.html#.VSYmIpN0eYM.
[30] *Improving Security and Facilitating Commerce at America's Northern border and Ports of Entry: Hearing Before the S. Subcomm. on Immigration, Refugees and Border Security of the S. Comm. on the Judiciary,* 112th Cong. (2011) (statement of Alan Bersin, Commissioner, U.S. Customs and Border Protection).
[31] Majority Staff observations during bipartisan STAFFDEL to the Blaine, Washington Sector (Aug. 2015).
[32] *See, e.g.,* James Gordon Meek and Brian Ross, *Terrorists Once Used Refugee Program to Settle in U.S.,* ABC NEWS (Nov. 18, 2015), http://abcnews.go.com/International/terrorists-refugee-program-settle-us/story?id=35252500.
[33] Bryan Roberts, Edward Alden, John Whitley, *Managing Illegal Immigration to the United States: How Effective is Enforcement?,* COUNCIL ON FOREIGN RELATIONS 8 (2013) (citing Michael Clemens, Claudio E. Montenegro, and Lant Pritchett, *The Place Premium: Wage Differences for Identical Workers across the U.S. Border,* CENTER FOR GLOBAL DEVELOPMENT (2008)).
[34] Bryan Roberts, Edward Alden, John Whitley, *Managing Illegal Immigration to the United States: How Effective is Enforcement?,* COUNCIL ON FOREIGN RELATIONS 8 (2013).
[35] *Id.*
[36] *Id.* at 9.

10

AOL-DEF-00002353

87

American countries in terms of income is larger than the wage gap between the U.S. and Mexico.[37] According to economists, people will relocate if the ratio is above $2 to $1.[38]

Therefore, the incentive to enter the U.S. for work will continue far into the future. If immigrants cannot find a lawful path to enter the U.S. where they will receive higher wages, they will enter the U.S. unlawfully.

>    b. *Both current and former DHS officials agree that expedited removal of illegal immigrants works as a deterrent. Unfortunately, the current Administration is not removing illegal immigrants, including unaccompanied minors, on an expedited basis.*

Both DHS Secretary Jeh Johnson and former DHS Secretary Michael Chertoff recognize that those seeking to unlawfully migrate to the U.S. are highly responsive to incentives and disincentives. During the Committee's DHS Budget Hearing, Secretary Johnson admitted, "you have to show the population in Central America that you are sending people back."[39]

In 2005, a large number of Brazilians sought to enter the U.S. illegally due to a change in Mexican policy in which the government suspended a visa requirement for Brazilians, allowing easy travel.[40] According to one account, the number of Brazilians detained at the U.S.-Mexico border tripled from the previous year to more than 30,000.[41] In response, DHS dedicated bed space, detained, and expedited the removal of Brazilians.[42] According to Secretary Chertoff:

>    "The word spread surprisingly swiftly; within its first thirty days, the operation had already begun to deter illegal border crossings by Brazilians. In fact, the number of Brazilians apprehended dropped by 50%. After 60 days, the rate of Brazilian illegal immigration through this sector was down 90%, and it is still significantly depressed all across the border. In short, we learned that a concentrated effort of removal can actually discourage illegal entries by non-Mexicans on the southwest border."[43]

Secretary Johnson has seen similar results. Recently, organized smugglers in the Dominican Republic have taken advantage of a U.S. policy that eliminated expedited removal of Haitians after the 2010 earthquake by smuggling Haitian immigrants to Puerto Rico.[44] By the end of

---

[37] *Id.* at Appendix 2: Wage Gap and Other Trends in Central American Source Countries, http://www.cfr.org/immigration/managing-illegal-immigration-united-states/p30658.
[38] Michael Clemens, Claudio E. Montenegro, and Lant Pritchett, *The Place Premium: Wage Differences for Identical Workers across the U.S. Border,* CENTER FOR GLOBAL DEVELOPMENT (2008).
[39] *See The Homeland Security Department's Budget Submission for Fiscal Year 2016: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[40] Chris Kraul & Nicole Gaouttte, *No-Visa Agreement Backfired on Mexico,* L.A. TIMES (Sept. 14, 2005), http://articles.latimes.com/2005/sep/14/world/fg-mexbrazil14.
[41] *Id.*
[42] *Comprehensive Immigration Reform II: Hearing Before the S. Comm. on Judiciary,* 109th Cong. (2005) (statement of Michael Chertoff, Secretary, U.S. Department of Homeland Security).
[43] *Id.*
[44] *See Securing the Border: Understanding Threats and Strategies for the Maritime Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015); U.S. COAST GUARD, MARITIME BORDER SECURITY (2015) (on file with Majority Staff).

11

AOL-DEF-00002354

88

FY2013, 1,760 Haitian migrants attempted to enter the U.S. through the Mona Passage, as compared to 39 Haitians in FY2012.[45] In FY2014, 1,994 Haitian migrants made the same dangerous attempt.[46] DHS resumed expedited removal in October 2014 for non-criminal Haitian migrants who landed on U.S. Territories in Puerto Rico and the islands of the Mona Passage.[47] After the first removal, Haitian maritime flow in the Mona Passage decreased by 80 percent.[48] In the first three quarters of FY2015, only 277 Haitian migrants attempted to enter the U.S. via the Mona Passage compared to 1,430 for the same period in FY2014.[49]

Similarly, after the President's December 17, 2014 announcement regarding the U.S.'s change in policy towards Cuba, Cuban migration increased, as many feared that the current "wet-foot, dry-foot" policy—allowing any Cuban reaching U.S. land to stay and pursue citizenship, while those caught at sea are returned to Cuba[50]—would end. Prior to the President's announcement, from December 1-16, 2014, the Coast Guard interdicted 80 Cubans.[51] After the President's announcement, from December 17-31, 2014 the Coast Guard interdicted 419 Cubans—a 423 percent increase.[52] To address this, the Coast Guard deployed direct repatriation and immediately began sending those interdicted in the waterways back to Cuba.[53] As a result, Cuban interdictions fell to 254 from January 1-21, 2015 and have returned to normal levels.[54]

While employing expedited removal at our maritime border has kept Cuban migration at normal levels, due to the U.S. wet-foot, dry-foot policy, Cubans may not be removed once they reach U.S. soil. As a result, Cubans arriving at U.S. POEs has increased by 78 percent since the President's announcement.[55]

> c. *Due to powerful incentives, immigration of unaccompanied minors from Central America has exceeded that of Mexican unaccompanied minors. To combat this, both pull and push factors should be analyzed and addressed.*

In FY2012, more than 24,000 unaccompanied alien children (UACs) were apprehended at the U.S.-Mexico border.[56] In FY2014, that number grew to nearly 69,000.[57] Also in FY2014, for the first time, the number of UACs from Northern Triangle Countries—El Salvador, Guatemala,

---

[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] Data Provided to Majority Staff by the U.S. Customs and Border Protection (Sept. 15, 2015); *see* Miriam Jordan, *U.S. News: More Cubans Migrate to U.S.*, WALL STREET JOURNAL (Sept. 21, 2015).
[56] *Securing the Border: Understanding and Addressing the Root Causes of Central American Migration to the United States: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Alan D. Bersin, Acting Assistant Secretary and Chief Diplomatic Officer, Office of Policy, U.S. Department of Homeland Security).
[57] *Id.*

12

89

and Honduras—exceeded the number of UACs from Mexico.[58]  The Committee heard that many factors led to the increased migration of unaccompanied minors from Central America, and these factors can be attributed to both the conditions of violence in Central America, as well as accurate and inaccurate perceptions regarding the American immigration system.[59]

According to the El Paso Intelligence Center (EPIC), factors leading to this increased migration include the perception of U.S. policy that led people to believe they would be able to remain in the U.S.[60]  Policies contributing to this pull factor include the President's DACA, DHS's catch and release policies, and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA).[61]  Meanwhile, factors contributing to the push factor include violence, extortion, and lack of opportunities in the Northern Triangle.[62]

The ability of persons from noncontiguous countries to stay in the U.S. pending a hearing has led to campaigns in which smugglers claim that the U.S. is issuing a new "permiso" for minors reaching the U.S.[63]  In reality, when unaccompanied minors are apprehended by Border Patrol they are released in the U.S. with a notice to appear (NTA) in court.  At this point, many assume that they are "home free" and that "by the time they need to appear, there is going to be an amnesty or legalization."[64]  According to one Committee witness, from July 2014 through February 2015, 62 percent of the children who were ordered to appear before an immigration judge for a hearing failed to show up.[65]  All of them were ordered deported, but ICE's recent enforcement priorities make removal highly unlikely.[66]  Since 2009, DHS has apprehended approximately 122,700 unaccompanied children from El Salvador, Guatemala, and Honduras, but has only repatriated approximately 7,700, or 6 percent.[67]  In this case, reality reinforces perception.[68]

---

[58] U.S. CUSTOMS AND BORDER PROTECTION, SOUTHWEST BORDER UNACCOMPANIED ALIEN CHILDREN, http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children.
[59] *Securing the Border: Understanding and Addressing the Root Causes of Central American Migration to the United States: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 114th Cong. (2015); *The 2014 Humanitarian Crisis at our Border: A Review of the Government's Response to Unaccompanied Minors One Year Later: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 114th Cong. (2015).
[60] EL PASO INTELLIGENCE CENTER, MISPERCEPTIONS OF U.S. POLICY KEY DRIVER IN CENTRAL AMERICAN MIGRANT SURGE (2014) (finding that children from El Salvador, Guatemala, and Honduras arrived in large numbers after hearing rumors that the U.S. Government would stop issuing free passes or *permisos* after June 2014).
[61] Section 235 of TVPRA codified expedited removals for children from contiguous countries and mandated the transfer of children from non-contiguous countries to the Department of Health and Human Services. Pub. L. No. 110-457 (2008).
[62] *See Securing the Border: Understanding and Addressing the Root Causes of Central American Migration to the United States: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015).
[63] *Id.* (statement of Roger F. Noriega, Visiting Fellow, American Enterprise Institute and Former Assistant Secretary for Western Hemisphere Affairs, U.S. Department of State).
[64] *See id.*
[65] *Id.* (statement of William Kandel, Analyst in Immigration Policy, Congressional Research Service).
[66] *See The 2014 Humanitarian Crisis at our Border: A Review of the Government's Response to Unaccompanied Minors One Year Later: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015).
[67] Data provided to Majority Staff by U.S. Department of Homeland Security (Oct. 20, 2015).
[68] *Ongoing Migration from Central America: An Examination of FY2015 Apprehensions: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Kimberly M.

13

AOL-DEF-00002356

90

In response to this humanitarian crisis, the Administration has proposed a $1 billion aid package largely focused on the Northern Triangle, advocating that investing in Central American communities can decrease the need to migrate and significantly reduce the business of human smugglers.[69] Absent new accountability and reforms in Central America, experts question the value of additional resources.[70] In many of these countries, "police and prosecutors are often incapable of, or prevented from, carrying out their law enforcement responsibilities," according to an expert at the Woodrow Wilson International Center for Scholars.[71] This is often the result of "fear or intimidation by criminal networks," but also from corruption of the state.[72]

For example, Guatemalan Vice President Roxana Baldetti resigned earlier this year amid a corruption scandal in which officials allegedly "defrauded the state of millions of dollars by taking bribes to charge lower customs duties."[73] On September 2, 2015, Guatemalan President Otto Perez Molina also resigned, just days before a new election, due to implications of his involvement.[74] Shortly thereafter he was jailed in Guatemala City.[75] Meanwhile, at a Committee hearing, one witness testified that Honduras recently "saw millions of dollars stolen from its national hospital system by the very people charged with overseeing the system."[76]

A recent GAO report highlighted concerns with the effectiveness of assistance the U.S. is *already* providing to Central America.[77] For example, in El Salvador GAO observed a computer lab filled with computers recently provided by the U.S. Agency for International Development (USAID) but no teachers in the classrooms.[78] Apparently, the Salvadoran Ministry of Education had not yet provided salaries for the teachers.[79] GAO concluded that such ineffectiveness "could lead to higher levels of migration to the United States, which is not only potentially costly in terms of U.S. taxpayer resources but costly and dangerous to the migrants and their families."[80]

---

Gianopoulos, International Affairs and Trade, U.S. Government Accountability Office) (explaining that children use social media to let those in their home countries know they made it to and were able to remain in the U.S.).
[69] WHITE HOUSE, FACT SHEET: PROMOTING PROSPERITY, SECURITY AND GOOD GOVERNANCE IN CENTRAL AMERICA, https://www.whitehouse.gov/the-press-office/2015/01/29/fact-sheet-promoting-prosperity-security-and-good-governance-central-ame.
[70] *See Securing the Border: Understanding and Addressing the Root Causes of Central American Migration to the United States: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of Eric L. Olson, Associate Director, Woodrow Wilson International Center for Scholars).
[71] *Id.*
[72] *Id.*
[73] *Guatemala Vice President Roxana Baldetti Resigns Amid Corruption Scandal,* NY DAILY NEWS (May 8, 2015), http://www.nydailynews.com/news/world/guatemala-vice-president-resigns-corruption-scandal-article-1.2216056.
[74] Rafael Romo & Greg Botelho, *Otto Perez Molina Out as Guatemalan President, Ordered to Jail,* CNN (Sept. 3, 2015), http://www.cnn.com/2015/09/03/americas/guatemala-president-arrest-warrant/.
[75] *Id.*
[76] *See Securing the Border: Understanding and Addressing the Root Causes of Central American Migration to the United States: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of Eric L. Olson, Associate Director, Woodrow Wilson International Center for Scholars).
[77] GOV'T ACCOUNTABILITY OFFICE, GAO-15-707, CENTRAL AMERICA: IMPROVED EVALUATION EFFORTS COULD ENHANCE AGENCY PROGRAMS TO REDUCE UNACCOMPANIED CHILDREN MIGRATION (2015).
[78] *Id.*
[79] *Id.*
[80] *Id.* at 41.

14

AOL-DEF-00002357

91

**Part I: The U.S.-Mexico Border**

Each of the nine sectors of the U.S.-Mexico border has unique terrain and faces endemic challenges.[81]  For example, the RGV sector border is in the middle of the Rio Grande, a narrow, often shallow, and easily navigable river.  Smugglers cross the Rio Grande by foot, raft, or, in some locations, vehicles.[82]  This makes enforcement and security quite daunting.  In Arizona, two mountain ranges provide concealment for smugglers and illegal crossers.  Additionally, protected lands, including national forests, wildlife refuges, military training ranges, and a Native American Reservation, restrict access to approximately 80 percent of the border in the Tucson and Yuma sectors.[83]

**Figure 1: Nine Sectors of the U.S.-Mexico Border**



Image provided by DHS.

Securing one high-risk sector usually leads to shifting pressures on other borders sectors.  For example, San Diego was previously one of the most highly trafficked areas for illegal crossers between ports of entry.[84]  In the mid-1990s, added personnel and other infrastructure resources such as fencing through *Operation Gatekeeper* in the San Diego sector decreased total

---

[81] Nine border sectors abut the U.S.-Mexico border: San Diego, El Centro, Yuma, Tucson, El Paso, Big Bend, Del Rio, Laredo, and Rio Grande Valley. U.S. CUSTOMS AND BORDER PROTECTION, OFFICE OF BORDER PATROL – SECTORS AND STATIONS, http://ecso.swf.usace.army.mil/maps/SectorP.pdf.

[82] On a CODEL in South Texas, Chairman Johnson observed a truck drive across a shallow portion of the Rio Grande River.

[83] U.S. CUSTOMS AND BORDER PROTECTION, OFFICE OF INTELLIGENCE, ARIZONA INTELLIGENCE OVERVIEW (2015) (on file with Majority Staff).

[84] U.S. CUSTOMS AND BORDER PROTECTION, SAN DIEGO SECTOR CALIFORNIA, http://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/san-diego-sector-california ("During the seventies, illegal alien traffic steadily increased, rising to more than 100,000 in 1973 and more than 250,000 by 1976. In 1986, the sector recorded its highest number of apprehensions in a single year – more than 628,000. . . San Diego was the busiest sector for illegal entries, accounting for more than 40 percent of nationwide apprehensions in the early nineties.").

AOL-DEF-00002358

92

apprehensions by 95 percent.[85]  These efforts to halt illegal crossers in San Diego did not reduce
the overall flow of illegal activity.  Instead, the flow shifted to Arizona in the El Paso and Tucson
sectors.[86]  Today, RGV is the busiest sector for illegal crossers between ports of entry, and was at
the epicenter of last year's UAC crisis.[87]

**Figure 2: Timeline of Southwest Border Apprehensions by Sector 1980-2014**



Physical Barriers and Technological Detection Capabilities in the Sectors

DHS has worked to address these challenges through deploying various different technologies
and tactical infrastructure along the southwest border, including nearly 700 miles of fencing, 70
miles of border lighting, 11,863 border sensors to detect illicit migration, 107 aircraft from the
Office of Air and Marine, 8 unmanned aerial systems, 84 vessels patrolling waterways on the

---

[85] *San Diego Fence Provides Lessons in Border Control*, NPR (Apr. 6, 2006),
http://www.npr.org/templates/story/story.php?storyId=5323928.
[86] H. COMM. ON HOMELAND SECURITY, U.S. HOUSE OF REPRESENTATIVES, BLUEPRINT FOR SOUTHERN BORDER
SECURITY 2 (2014).
[87] U.S. CUSTOMS AND BORDER PROTECTION, SOUTHWEST BORDER UNACCOMPANIED ALIEN CHILDREN,
http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children.

16

AOL-DEF-00002359

93

southwest border, and other new surveillance tools.[88]  Each sector has different physical barriers
and technological solutions to address its unique terrain challenges.

*Fencing and Infrastructure*

While sometimes cost prohibitive, fencing, where appropriate, is an important and necessary tool
in securing our borders.  In 1993, Sandia Laboratory issued a study that concluded multiple
barriers were needed to stop and delay illegal border crossers in San Diego.[89]  The study
determined that "[a] three-fence barrier system with vehicle patrol roads between the fences and
lights will provide the necessary discouragement."[90]

Shortly thereafter, the Border Patrol, with the assistance of the U.S. Department of Defense's
(DOD) Army Corps of Engineers, commenced the first fencing along our southwest border, with
a 10-foot-high, welded-steel fence covering approximately 14 miles of the San Diego sector.[91]

Under the Illegal Immigration Reform and Responsibility Act of 1996 (IIRIRA), Congress
instructed immigration authorities to construct barriers along our international borders to deter
unauthorized crossers.[92]  Specifically, immigration authorities were instructed to supplement the
14-mile "Sandia fence" in San Diego with two additional layers of fencing.[93]  However, resulting
environmental concerns and litigation significantly delayed the fulfillment of this requirement.[94]
DHS has still not completed this project.[95]  Today, of its 60 mile border, the San Diego sector
has 46 miles of primary fence, 13 miles of which include secondary fencing.[96]

Building off the San Diego fence lessons, Congress amended IIRIRA in the REAL ID Act of
2005 to authorize the DHS Secretary "to waive 'all legal requirements' necessary to ensure
expeditious construction" of security barriers at the U.S. border.[97]  DHS has executed five
environmental waivers related to fence construction along the southwest border to expedite

---

[88] *Remarks by Secretary of Homeland Security Jeh Johnson, Border Security in the 21st Century*, U.S. DEP'T OF
HOMELAND SECURITY (Oct. 9, 2014), http://www.dhs.gov/news/2014/10/09/remarks-secretary-homeland-security-
jeh-johnson-border-security-21st-century.
[89] Michael John Garcia, CONG. RESEARCH SERV., R 43975, BORDER SECURITY: THE SAN DIEGO FENCE (2007).
[90] *Id.*
[91] Michael John Garcia, CONG. RESEARCH SERV., R 43975, BARRIERS ALONG THE U.S. BORDERS: KEY AUTHORITIES
AND REQUIREMENTS 4 (2015).
[92] *Id.* at 1; Pub. L. No. 104-208, div. C, §102(a)-(c) (1996).
[93] *Id.* at 7; Pub. L. No. 104-208, div. C, §102(a)-(c) (1996).
[94] Michael John Garcia, CONG. RESEARCH SERV., R 43975, BORDER SECURITY: THE SAN DIEGO FENCE 4 (2007).
[95] Michael John Garcia, CONG. RESEARCH SERV., R 43975, BARRIERS ALONG THE U.S. BORDERS: KEY AUTHORITIES
AND REQUIREMENTS 7, 22 (2015) (while IIRIRA Section 102(c) expressly authorized the waiver of the Endangered
Species At and the National Environmental Policy Act, other federal laws remained applicable to border
construction projects); *see also* Michael John Garcia, CONG. RESEARCH SERV., R 43975, BORDER SECURITY: THE
SAN DIEGO FENCE (2007).
[96] No triple layered fencing currently exists at the San Diego sector. Majority Staff observations during bipartisan,
bicameral STAFFDEL to the San Diego Sector (Aug. 2015).
[97] Michael John Garcia, CONG. RESEARCH SERV., R 43975, BARRIERS ALONG THE U.S. BORDERS: KEY AUTHORITIES
AND REQUIREMENTS 22 (2015); Pub. L. No. 109-13, div. B, § 102 (2005).

17

AOL-DEF-00002360

94

construction.[98]  But, issues remain.  For example, during the Secure Border Initiative project, land acquisition problems prevented DHS from meeting its goals to complete fencing projects on time.[99]  Most fencing in California, Arizona, and New Mexico was built on federal land, but in Texas, DHS had to purchase most of the land from private individuals.[100]

In 2006, IIRIRA was amended again by the Secure Fence Act, which called for the deployment of roughly 850 miles of "at least 2 layers of reinforced fencing, [and] the installation of additional physical barriers, roads, lighting, cameras, and sensors" along five stretches of the southwest border.[101]  Shortly thereafter, the Consolidated Appropriations Act of 2008 modified the Secure Fence Act to allow for the construction of not less than 700 miles of fence and gave the DHS Secretary waiver authority that reads in part: "nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location."[102]

Today, according to DHS, there is approximately 652.6 miles of front-line fencing on the southwest border: 352.8 miles of primary fence,[103] 36 miles of secondary fencing,[104] and 299.8 miles of vehicle barrier fence.[105]  The U.S.-Mexico border is nearly 2,000-miles long.  DHS is short of the statutory requirements to construct fencing of "not less than 700 miles of the southwest border."[106]  According to the Congressional Research Service (CRS), while there is no deadline for the completion of the fencing, "changes in DHS's border enforcement strategy and prioritization of resources" appears to have halted further construction of fencing along the U.S.-Mexico border.[107]

---

[98] U.S. CUSTOMS AND BORDER PROTECTION OFFICE OF ADMINISTRATION & OFFICE OF BORDER PATROL, FACILITIES MANAGEMENT & ENGINEERING DIRECTORATE BORDER PATROL FACILITIES & TACTICAL INFRASTRUCTURE PROGRAM MANAGEMENT OFFICE (2015) (on file with Committee Staff).
[99] *Observations on Deployment Challenges: Hearing Before the House Comm. on Homeland Security,* 110th Cong. (2008) (statement of Richard M. Stana, Director, Homeland Security and Justice Issues, Government Accountability Office).
[100] N. C. Aizenman, *Border Fence Would Slice Through Private Land,* WASH POST (Feb. 16, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/02/15/AR2008021503303.html.
[101] Michael John Garcia, CONG. RESEARCH SERV., R 43975, BARRIERS ALONG THE U.S. BORDERS: KEY AUTHORITIES AND REQUIREMENTS 8–9 (2015); Pub. L. No. 109-367, §3(2006).
[102] Pub. L. No. 110-161, div. E, §564(a) (2008).
[103] Primary fence is designed to prevent (or at least slow down) people on foot from crossing the border and disable a vehicle traveling 40 miles per hour.
[104] Secondary fence is also known as "double-layered fencing." Of the double-layered fencing approximately 9 miles is located in the Yuma, Arizona sector; 13 miles is located in the El Paso, Texas sector; and 13 miles is located in the San Diego, California sector.
[105] Vehicle barrier fence consists of barriers used primarily in remote areas to prohibit vehicles engaged in drug trafficking and human smuggling operations to cross the border.  These fences can be easily navigated by those on foot.
[106] Pub. L. No. 104-208, div. C, §102(a)-(c) (1996), as amended by Pub. L. No. 109-13, div. B, §102 (2005); Pub. L. No. 109-367, §3 (2006); and Pub. L. No. 110-161, div. E, §564(a) (2008).
[107] Michael John Garcia, CONG. RESEARCH SERV., R 43975, BARRIERS ALONG THE U.S. BORDERS: KEY AUTHORITIES AND REQUIREMENTS 2 (2015).

18

AOL-DEF-00002361

95

Many interpret the Consolidated Appropriations Act of 2008 as having eliminated the requirement of double-layered fencing, now only calling for "a single layer of reinforced fencing."[108]  This, of course, does not prohibit additional layers of fencing.[109]  The Act also provides more flexibility in regards to fencing location and border infrastructure.[110]

The construction of border infrastructure is complex.  Prior to erecting additional fencing, Border Patrol has to 1) determine the environmental impact of the fence; 2) acquire land; and, when possible, 3) secure assistance of the National Guard or U.S. Army Corps of Engineers to reduce labor costs.[111]


**Figure 3: Examples of Fencing Styles**



Bollard Fencing in Tucson Sector (left); Legacy Fencing in Tucson Sector (middle); Vehicle Barrier Fence – Normandy in El Centro Sector (right).  Images provided by DHS.

Border Patrol determines which fencing style is appropriate based on the topography of each area.[112]  DHS considers primary fencing prototypes based on the ability to disable a vehicle traveling 40 miles per hour, its effects on animal migratory patterns, and costs.[113]  Similarly, DHS builds secondary fencing in areas with large populations.  Border Patrol believes that pedestrian fencing is necessary in populous cities because illicit crossers can easily blend into the community before they can be apprehended.[114]  Since Border Patrol's strategy prioritizes fencing and personnel resources in or near border cities, illegal traffic has shifted to remote areas.[115]  Border Patrol claims that this approach disrupts traditional crossing routes in border cities or along highways and redirects illegal crossers to terrain where Border Patrol agents have a tactical advantage and more time to apprehend the illegal crosser.[116]

---

[108] *Id.* at 9.
[109] *Id.*
[110] *Id.* at 9–10.
[111] Chad C. Haddal, Yule Kim, Michael John Garcia, CONG. RESEARCH SERV., RL 33659, BORDER SECURITY: BARRIERS ALONG THE U.S. INTERNATIONAL BORDER (2009).
[112] GOV'T ACCOUNTABILITY OFFICE, GAO-09-244R, SECURE BORDER INITIATIVE FENCE CONSTRUCTION COSTS 6 (2009).
[113] *Id.*
[114] *The Rise of the Mexico Drug Cartels and U.S. National Security: Hearing Before the House Comm. on Oversight and Government Reform,* 111th Cong. (2009) (statement of Todd Owen, Acting Deputy Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection).
[115] *Securing the Southwest Border: Perspectives from Beyond the Beltway: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of Mark Dannels, Sheriff, Cochise County, Arizona).
[116] U.S. CUSTOMS AND BORDER PROTECTION OFFICE OF ADMINISTRATION & OFFICE OF BORDER PATROL, FACILITIES MANAGEMENT & ENGINEERING DIRECTORATE BORDER PATROL FACILITIES & TACTICAL INFRASTRUCTURE PROGRAM MANAGEMENT OFFICE (2015) (on file with Committee staff).

19

AOL-DEF-00002362

96

To date, CBP has spent approximately $2.3 billion on fencing.[117] Fencing costs vary based on the type of terrain, materials used, land acquisition, contractors, and the need to meet an expedited schedule.[118] Whether fencing is built on public or private land drives cost differences, as well as whether the fencing is primary fencing or vehicle barrier fencing (see Figure 3).[119]

Private land acquisition remains the primary driver of delay in completing border fencing.[120] According to DHS, out of the approximately 400 cases in which the government needed to acquire land, 330 required legal means to acquire property through condemnation proceedings because the landowner would not voluntarily sell to the government (126 cases), ownership was unknown (11 cases), or the government underwent "friendly" condemnation cases in which there was no dispute on price, but titles were not fully cleared by the government or the court because of multiple landowners (193 cases).[121] Of these 330 cases, 136 remain open.[122] DHS estimates that it could cost an additional $50 million to settle these cases.[123] These cases include a class action suit in south Texas challenging the location of 40 border gates. Until this case is settled, large gaps in fencing will remain.[124]

During previous projects, Border Patrol agents and DOD personnel built fencing to save money on labor costs.[125] However, during the Secure Border Initiative fencing projects, DHS subcontracted to private companies because using Border Patrol agents removed them from their primary responsibility and DOD informed DHS that it would no longer be able to provide military personnel to build border fencing.[126] Fencing constructed by private contractors is generally more expensive than fencing built by the Border Patrol or the military.[127] In 2009, a GAO report found that in a 70-mile fence project, where 40 percent of the fencing was built by Border Patrol and DOD personnel, taxpayers paid $2.8 million per mile.[128] Conversely, in a 65-mile project completed solely by private contractors, the average cost was $5.1 million per mile.[129]

---

[117] Id.
[118] GOV'T ACCOUNTABILITY OFFICE, GAO-09-244R, SECURE BORDER INITIATIVE FENCE CONSTRUCTION COSTS 7 (2009); GOV'T ACCOUNTABILITY OFFICE, GAO-08-131T, SECURE BORDER INITIATIVE: OBSERVATIONS ON SELECTED ASPECTS OF SBINET PROGRAM IMPLEMENTATION (2007).
[119] GOV'T ACCOUNTABILITY OFFICE, GAO-09-244R, SECURE BORDER INITIATIVE FENCE CONSTRUCTION COSTS 8 (2009) (explaining that by design, it is less expensive to construct vehicle fencing).
[120] GOV'T ACCOUNTABILITY OFFICE, GAO-09-896, SECURE BORDER INITIATIVE TECHNOLOGY DEPLOYMENT DELAYS PERSIST AND THE IMPACT OF BORDER FENCING HAS NOT BEEN ASSESSED 19 (2009).
[121] See id. at 20; see also U.S. CUSTOMS AND BORDER PROTECTION OFFICE OF ADMINISTRATION & OFFICE OF BORDER PATROL, FACILITIES MANAGEMENT & ENGINEERING DIRECTORATE BORDER PATROL FACILITIES & TACTICAL INFRASTRUCTURE PROGRAM MANAGEMENT OFFICE (2015) (on file with Committee staff).
[122] Id.
[123] Id.
[124] U.S. CUSTOMS AND BORDER PROTECTION OFFICE OF ADMINISTRATION & OFFICE OF BORDER PATROL, FACILITIES MANAGEMENT & ENGINEERING DIRECTORATE BORDER PATROL FACILITIES & TACTICAL INFRASTRUCTURE PROGRAM MANAGEMENT OFFICE (2015) (on file with Committee staff).
[125] GOV'T ACCOUNTABILITY OFFICE, GAO-09-244R, SECURE BORDER INITIATIVE FENCE CONSTRUCTION COSTS 7 (2009).
[126] Id.
[127] Id. at 8.
[128] Id.
[129] Id.

AOL-DEF-00002363

97

A life-cycle cost study estimated that the "deployment, operations, and future maintenance for tactical infrastructure will total $6.5 billion."[130] However, the completion of fencing has led to untold economic developments on both sides of the border, greatly enhancing the economies of border communities.[131] CBP has reported that fences have a lifespan of approximately 20 years and a large portion of its maintenance funding is to repair breaches in the fence.[132] As of May 2009, DHS reported 3,363 breaches, with an average cost of $1,300 to repair.[133] According to GAO, "the fewest breaches occurred in the bollard-style fencing, while more occurred in wire mesh fence."[134] With the move towards bollard-style fencing, fence cutting has decreased.[135] Today, a growing cost for CBP is clearing the vegetation growth surrounding fences.[136]

While fencing can reduce or impede illegal entry, it alone cannot secure the border.[137] Cartels and other TCOs are creative in their efforts to circumvent border deterrents. Since 1990, ICE and Border Patrol have discovered more than 150 tunnels along the U.S.-Mexico border, 56 of which have been located in the San Diego sector.[138] The Sinaloa Cartel is particularly notorious for their elaborate tunnels, most recently constructing a mile-long air-conditioned tunnel in central Mexico for their boss, El Chapo Guzman, to escape prison.[139] Importantly, Border Patrol in not aware of any people being smuggled across the border via the tunnels.[140] Instead, due to the large investments made by the cartels, these tunnels are primarily used to smuggle high value narcotics.[141]

---

[130] Gov't Accountability Office, GAO-09-896, Secure Border Initiative Technology Deployment Delays Persist and the Impact of Border Fencing Has Not Been Assessed 19, 23 (2009) (this estimate includes deployment and operations and future maintenance costs for all tactical infrastructure, including, among other things, the fence, road, and lighting).

[131] Majority Staff observations during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015).

[132] Id. at 23.

[133] Id. While these are the latest figures available to the Committee, Majority Staff recently requested that GAO provide updates to these figures.

[134] Id.

[135] U.S. Customs and Border Protection Office of Administration & Office of Border Patrol, Facilities Management & Engineering Directorate Border Patrol Facilities & Tactical Infrastructure Program Management Office (2015) (on file with Committee staff).

[136] Id.

[137] The Rise of the Mexico Drug Cartels and U.S. National Security: Hearing Before the House Comm. on Oversight and Government Reform, 111th Cong. (2009) (statement of Todd Owen, Executive Director, Cargo and Conveyance Security, Office of Field Operations, U.S. Customs and Border Protection).

[138] Sophisticated U.S.-Mexico 'Drug Tunnels' Discovered, BBC (July 13, 2012), http://www.bbc.com/news/world-latin-america-18823975; see also Candice Nguyen, Go Inside Secret Border Tunnel Near San Diego, NBC (Apr. 30, 2015), http://www.nbcsandiego.com/news/local/San-Diego-Border-Tunnel-Go-Inside-Video-301822991.html (reporting Border Patrol discovered a sophisticated tunnel with a rail-cart system near the San Ysidro port of entry); Majority Staff observations during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015) (San Diego has the best terrain for tunneling of all the southwest border sectors and the majority of these tunnels are 80 feet deep).

[139] See Christopher Woody, 'El Chapo' Guzman's Role in the Global Cocaine Trade is Becoming Clearer, McPherson Sentinel (Aug. 16, 2015), http://www.mcphersonsentinel.com/article/ZZ/20150816/BUSINESS/308169989/-1/news.

[140] Majority Staff observations during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015).

[141] Id.

AOL-DEF-00002364

98

An alternative to pedestrian fencing includes a virtual border fence comprised of highly integrated fixed sensor towers. In 2005, DHS attempted to deploy such a system under the Secure Border Initiative-network (SBI*net*), but after repeated technical problems, cost overruns, and scheduled delays in 2009, Secretary Napolitano froze funding, except for ongoing deployment in Arizona.[142]

Beyond fencing, Border Patrol has requested funding to construct all-weather roads, gates, lighting and electrical systems, low-water crossings, bridges, drainage structures, as well as vegetation and debris removal in various sectors.[143]

*Technologies*

As discussed above, in 2009, DHS largely suspended SBI*net*, a networked system of sensors, radars, and tactical communications.[144] Today, after spending approximately $1 billion, close to 53 miles of coverage, out of the 387-mile Mexico-Arizona border, exists.[145]

The Alternative [Southwest] Border Technology Plan, or Arizona Technology Plan, replaced SBI*net*.[146] The plan called for various technology capabilities across Arizona, including Integrated Fixed Towers (IFT), Remote Video Surveillance Systems (RVSS), Mobile Surveillance Capability (MSC), Mobile Video Surveillance Systems (MVSS), Agent-Portable Surveillance Systems, Thermal Imaging Devices, and Unattended Ground Sensors (UGS).[147] IFT, RVSS, and MSC constituted approximately 97 percent of the plan's estimated costs.[148] "According to CBP," as GAO reported, "the majority of these technologies will provide the mission benefits of improved situational awareness and agent safety," as well as "help enhance the ability of Border Patrol agents to detect, identify, deter, and respond to threats along the border."[149]

---

[142] *After SBInet- The Future of Technology on the Border: Hearing Before the House Subcomm. on Border and Maritime Security of the Comm. on Homeland Security,* 112th Cong., (2011) (statement of Mark Borkowski, Michael Fisher, and Nicale Kostelnik, U.S. Department of Homeland Security).
[143] GOV'T ACCOUNTABILITY OFFICE, GAO-09-896, SECURE BORDER INITIATIVE TECHNOLOGY DEPLOYMENT DELAYS PERSIST AND THE IMPACT OF BORDER FENCING HAS NOT BEEN ASSESSED 22-23 (2009).
[144] *See, supra* note 142; *see also* U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff).
[145] *Id.; see also* GOV'T ACCOUNTABILITY OFFICE, GAO-14-411T, ARIZONA BORDER SURVEILLANCE TECHNOLOGY PLAN ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND ASSESS EFFECTIVENESS 1 (2014); GOV'T ACCOUNTABILITY OFFICE, GAO-12-22, ARIZONA BORDER SURVEILLANCE TECHNOLOGY MORE INFORMATION ON PLANS AND COSTS IS NEEDED BEFORE PROCEEDING 2 (2011).
[146] *Id.* at 7; *see also* U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff).
[147] U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff); GOV'T ACCOUNTABILITY OFFICE, GAO-15-171SP, HOMELAND SECURITY ACQUISITIONS MAJOR PROGRAM ASSESSMENTS REVEAL ACTIONS NEEDED TO IMPROVE ACCOUNTABILITY 44 (2015).
[148] GOV'T ACCOUNTABILITY OFFICE, GAO-14-411T, ARIZONA BORDER SURVEILLANCE TECHNOLOGY PLAN ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND ASSESS EFFECTIVENESS 2 (2014).
[149] *Id.* at 9.

AOL-DEF-00002365

99

### Figure 4: Integrated Fixed Towers



IFT with images transmitted to a Border Patrol station.  Images provided by DHS.

IFTs contain surveillance equipment, such as "ground surveillance radars and surveillance cameras mounted on fixed [] towers."[150] Originally, the Arizona Technology Plan called for six IFTs, but Border Patrol currently is funded for three.[151] One IFT has been located in Nogales, Arizona.[152] Border Patrol has determined that locating a tower in the Tohono O'odham Nation—stretching 74 miles across the U.S.-Mexico border—is their highest priority.[153] Therefore, DHS plans to delay funding for an additional tower for approximately 18 months while environmental and tribal negotiations are worked out.[154] DHS has indicated that it does not plan to deploy IFTs on the northern border because the geography is not suitable for radar use.[155]

### Figure 5: Remote Video Surveillance System



RVSS with images transmitted to Border Patrol station.  Images provided by DHS.

RVSS constitutes 30- to 90-foot towers with two pairs of cameras each—these cameras provide multiple color and infrared images.[156] RVSS differs from IFTs in that it lacks radars.[157] RVSS is remotely controlled by Border Patrol with images transmitted to their stations.[158] The purpose of this technology is to "monitor large areas of the international border or critical transit

---

[150] *Id.* at 8.
[151] GOV'T ACCOUNTABILITY OFFICE, GAO-15-171SP, HOMELAND SECURITY ACQUISITIONS MAJOR PROGRAM ASSESSMENTS REVEAL ACTIONS NEEDED TO IMPROVE ACCOUNTABILITY 45 (2015).
[152] U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff);
[153] *Id.*
[154] *Id.* (Note, the time estimate of 18 months was provided in May, 2015).
[155] Questions for the Record Submitted by the Honorable Jeh Johnson, Secretary, U.S. Department of Homeland Security, *The Homeland Security Department's Budget Submission for Fiscal Year 2015: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 113th Cong. (2014).
[156] GOV'T ACCOUNTABILITY OFFICE, GAO-14-368, ARIZONA BORDER SURVEILLANCE TECHNOLOGY PLAN ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND ASSESS EFFECTIVENESS 8 (2014).
[157] GOV'T ACCOUNTABILITY OFFICE, GAO-14-411T, ARIZONA BORDER SURVEILLANCE TECHNOLOGY PLAN ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND ASSESS EFFECTIVENESS 2 (2014).
[158] GOV'T ACCOUNTABILITY OFFICE, GAO-14-368, ARIZONA BORDER SURVEILLANCE TECHNOLOGY PLAN ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND ASSESS EFFECTIVENESS 8 (2014).

AOL-DEF-00002366

100

routes."[159] Although originally proposed for Arizona, RVSS has been re-prioritized for the RGV, Texas sector.[160] Additional RVSS technology is deployed in the San Diego and Blaine, Washington sectors[161] and is scheduled to be deployed on the northern border in the Swanton Sector.[162]

**Figure 6: Mobile Surveillance Capability and Mobile Video Surveillance Systems**



MSC (left) and MVSS (right). Images provided by DHS.

MSC consists of a truck carrying a mounted camera and radar.[163] MVSS, also known as a "Scope Truck," is similar, but consists only of a camera, and no radar.[164] Secretary Johnson recently emphasized that MSC is a priority for his agency.[165] The current MSC fleet consists of 49 systems in Arizona with plans to locate more in Texas.[166] While the Arizona Technology Plan originally called for MVSS, these systems have also been relocated to RGV to address the change in threat to that sector.[167] MVSS is also located in other sectors along the border, including the San Diego sector.[168]

Agent portable surveillance systems are "ground-sensing radar and surveillance system[s]" mounted on tripods that are "operated by Border Patrol agents where truck-mounted systems are unable to be deployed."[169] Thermal image devices provide Border Patrol the ability to see "up to 5 miles in areas that are dimly lit or in total darkness."[170] The feed from this device can be

---

[159] *Id.*

[160] U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff).

[161] On the northern border, the Blaine Sector has 32 RVSS and is the only sector with a fiber optic camera system. Majority Staff observations during bipartisan STAFFDEL to the Blaine, Washington Sector (Aug. 2015).

[162] Questions for the Record Submitted by the Honorable Jeh Johnson, Secretary, U.S. Department of Homeland Security, *The Homeland Security Department's Budget Submission for Fiscal Year 2015: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 113th Cong. (2014).

[163] GOV'T ACCOUNTABILITY OFFICE, GAO-14-368, ARIZONA BORDER SURVEILLANCE TECHNOLOGY PLAN ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND ASSESS EFFECTIVENESS 8 (2014).

[164] *Id.*

[165] *See FY16 Department of Homeland Security Budget: Hearing Before the S. Subcomm. on Homeland Security of the Comm. on Appropriations,* 114th Cong, (2015).

[166] U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff).

[167] *Id.*

[168] Majority Staff observations during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015).

[169] GOV'T ACCOUNTABILITY OFFICE, GAO-14-368, ARIZONA BORDER SURVEILLANCE TECHNOLOGY PLAN ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND ASSESS EFFECTIVENESS 8 (2014).

[170] *Id.*

24

AOL-DEF-00002367

101

shown on agent laptops.[171] Finally, UGS are buried underground across the border and are used to detect movement.[172] This is a fairly inexpensive option for very remote areas.[173] However, UGS are subject to false alarms, such as animals triggering the alarm or sensor dysfunctions.[174] In Arizona, CBP intended to procure UGS with Imaging Sensors (IS); however, problems of inadequate bandwidth in its current radio frequencies arose during testing.[175] CBP will not procure UGS with IS technology until it resolves these issues.[176]

**Figure 7: Other Technologies**



Agent-Portable Surveillance System (left) and Thermal Imaging Device (right).

Importantly, while several delays have occurred in implementing the Arizona Technology Plan, DHS has realized some taxpayer savings.  CBP initially estimated that the total life-cycle costs of the new plan would be about $1.5 billion for Arizona.[177]  However, the Department saved 75 percent on its IFT contract.[178]  These savings have allowed DHS to procure other resources, such as tactical aerostats, which, for the most part, have been located in the RGV sector.[179]  Aerostats have high-definition cameras with 10 miles of visibility, depending on the wind.  However, smuggling is so pervasive that it is difficult for agents to address everything aerostats detect.[180]  Despite detection success, aerostats also experience weather and maintenance

---

[171] U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff).
[172] GOV'T ACCOUNTABILITY OFFICE, GAO-14-368, ARIZONA BORDER SURVEILLANCE TECHNOLOGY PLAN ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND ASSESS EFFECTIVENESS 8 (2014).
[173] U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff).
[174] Robert Lee Maril, *The Fence: National Security, Public Safety, and Illegal Immigration along the U.S.-Mexico Border*, TEXAS TECH UNIVERSITY PRESS 99 (2011) (stating that, according to Border Patrol agents, in 2005 false alarms ranged from 50 to 80 percent).
[175] GOV'T ACCOUNTABILITY OFFICE, GAO-14-368, ARIZONA BORDER SURVEILLANCE TECHNOLOGY PLAN ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND ASSESS EFFECTIVENESS 12 (2014).
[176] *Id.*
[177] U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff); GOV'T ACCOUNTABILITY OFFICE, GAO-12-22, ARIZONA BORDER SURVEILLANCE TECHNOLOGY MORE INFORMATION ON PLANS AND COSTS IS NEEDED BEFORE PROCEEDING 7–8 (2011).
[178] *The Arizona Border Surveillance Technology Plan and its Impact on Border Security: Hearing Before the House Subcomm. on Border and Maritime Security of the Comm. on Homeland Security,* 113th Cong., (2014) (statement of Mark Borkowski, Assistant Commissioner and Chief Acquisition Executive, Office of Technology Innovation and Acquisition, Department of Homeland Security).
[179] U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff).
[180] *See Securing the Border: Fencing, Infrastructure, and Technology Force Multipliers: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs,* 114th Cong. (2015);

25

AOL-DEF-00002368

102

challenges and are only operational 60 percent of the time.[181]  It is estimated that each Aerostat currently costs $5 million, per year, to operate and maintain.[182]

**Figure 8: Tactical Aerostat**



Images provided by DHS.

While Border Patrol has begun experimenting with tactical aerostats to locate illegal pedestrian crossers, CBP's Office of Air and Marine (OAM) deploys tethered aerostat radar systems (TARS) to identify and locate illegal aircraft crossing the border.[183]  OAM has six TARS located along the U.S.-Mexico border, as well as two additional TARS located in the Florida Keys and Puerto Rico, which provides OAM with persistent surveillance of the air environment along the southwest border.[184]

OAM also utilizes the Predator B UAS for detection capabilities, particularly with the advent of attaching a Vehicle and Dismount Exploitation Radar (VADER) to the UAS.  OAM currently operates four VADERs and is scheduled to acquire two additional VADERs by the end of 2016.[185]  VADER monitors movement on the ground and is very precise; however, if the target is static, VADER will not see it.[186]  Since 2012, sensor data obtained from VADER is streamed to the Air and Marine Operations Center (AMOC).[187]

**Figure 9: Predator B Land Mission UAS**



Image provided by DHS.

OAM has UAS Ground Control Stations in Corpus Christi, Texas; Sierra Vista, Arizona; Grand Forks, North Dakota; and Jacksonville, Florida.  OAM currently possesses nine Predator B UAS,

---

[181] Majority Staff observations during Senators' Johnson, Carper, and Sasse CODEL to the Texas Rio Grande Valley Sector (Feb. 2015).
[182] U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff).
[183] Id.
[184] Id.
[185] Data Provided to Majority Staff by the U.S. Customs and Border Protection (Sept. 9, 2015).
[186] Majority Staff observations during bipartisan STAFFDEL to the Tucson, Arizona Sector (Feb. 2015).
[187] OFFICE OF INSPECTOR GENERAL, DEPARTMENT OF HOMELAND SECURITY, OIG-15-17, 90-DAY STATUS UPDATE TO RECOMMENDATIONS FROM U.S. CUSTOMS AND BORDER PROTECTION'S UNMANNED AIRCRAFT SYSTEMS PROGRAM DOES NOT ACHIEVE INTENDED RESULTS OR RECOGNIZE ALL COSTS OF OPERATIONS (2015).

AOL-DEF-00002369

103

eight of which are operational.[188]  Six of these are assigned to the southwest border, with two used for maritime operations, and the other two are assigned to the northern border.[189]  The Predators have slanted cameras that provide 10 mile coverage and a laser illuminator that allows Border Patrol agents with night vision goggles to locate illegal crossers.  The aircraft can remain airborne for up to 21 hours; however approximately 30 percent of UAS missions are cancelled due to weather conditions.[190]

In December, the DHS Office of Inspector General (OIG) issued a report that found that the UAS program has not achieved satisfactory or expected results.[191]  Specifically, the OIG found that CBP's unmanned aircrafts were "not meeting flight hour goals" and the estimated cost to operate the program was "$12,255 per flight hour."[192]  Ultimately, the OIG concluded, "CBP has invested significant funds in a program that has not achieved the expected results, and it cannot demonstrate how much the program has improved border security."[193]

The Department has disputed the findings of the OIG report in Committee hearings, asserting that the UAS contributes to many apprehensions that are not directly credited unless the aircraft follows the illegal crosser until the apprehension is made.[194]  Instead, unattended aircrafts are often used to detect illegal crossings, notify Border Patrol, and continue flying to other locations of potential illegal activity.[195]  In Arizona, this makes sense, as it often takes illegal crossers days to get through the mountains, giving agents more time and opportunity to make an apprehension.  Moreover, the UAS are often used in drug interdiction operations, and CBP points out that as of August 2015, UAS has interdicted over 68,000 pounds of contraband (cocaine and marijuana), with a retail value of over $547 million, or $126,000 per flight hour.[196]

In order to leverage intelligence resources, DHS collaborates with DOD through the Joint Interagency Task Forces.[197]  In addition, DOD has deployed National Guard troops to assist with surveillance efforts and to provide training on recent technologies during Operation Jump Start and Operation Phalanx.[198]  In 2012, DOD deployed 1,200 National Guard troops to the U.S.-

---

[188] Majority Staff observations during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015).
[189] *Id.*
[190] U.S. CUSTOMS AND BORDER PROTECTION, OFFICE OF AIR AND MARINE, CORPUS CHRISTI PRESENTATION (2015) (on file with Majority Staff).
[191] OFFICE OF INSPECTOR GENERAL, DEPARTMENT OF HOMELAND SECURITY, OIG-15-17, U.S. CUSTOMS AND BORDER PROTECTION'S UNMANNED AIRCRAFT SYSTEM PROGRAM DOES NOT ACHIEVE INTENDED RESULTS OR RECOGNIZE ALL COSTS OF OPERATIONS (2014).
[192] *Id.*
[193] *Id.*
[194] *Securing the Border: Fencing, Infrastructure, and Technology Force Multipliers: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of  Randolph Alles, Assistant Commissioner, Office of Air and Marine, U.S. Customs and Border Protection).
[195] Quantitatively, this is logged as "detection," not "apprehension," even if it results in an apprehension. *Id.*
[196] Data Provided to Majority Staff by the U.S. Customs and Border Protection (Aug. 28, 2015).
[197] *Homeland Threats and Agency Reponses: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 112th Cong., (2012) (statement of Janet Napolitano, Secretary, U.S. Department of Homeland Security).
[198] *Boots on the Ground and Eyes in the Sky: How to Best Utilize the National Guard to Achieve Operational Control: Hearing Before the House Subcomm. on Border and Maritime Security of the Comm. on Homeland Security,* 112th Cong., (2012) (statement of Ronald Vitiello and Martin Vaughan, U.S. Department of Homeland Security).

27

104

Mexico border. Specifically, the National Guard has assisted CBP's OAM and Border Patrol to expand their aerial capabilities by providing military electronic sensor systems that far exceed CBP's ground-based and mobile systems.[199] CBP has been flying the Predator B UAS with DOD's VADER at the southwest border.[200] Moreover, the tactical Aerostats and TARS mentioned above come from DOD. Currently, DHS is in receiving ownership of over 3,900 items of excess DOD technology, including Marcbot, which are robots used in San Diego for tunnel detection, and Advanced Radar Surveillance Systems (ARSS).[201]

Finally, when examining U.S. border technology, it is important to consider that smugglers are also leveraging the latest technology. Recently, a drone transporting more than six pounds of methamphetamine crashed in the San Diego sector.[202] Arizona and San Diego are seeing an increasing use of "short landers" and "Ultralight Aircraft" (ULAs) described as "flying lawnmowers," used to fly over fences and drop illegal drugs.[203] Alarmingly, cartels have begun to use minors to fly ULAs due to their light weight and the unlikelihood of their prosecution.[204]

Experiences at the Border

*Border Patrol*

DHS has devoted a growing number of resources to the southwest border, including increasing the number of Border Patrol agents (those that operate between ports of entry) from 8,617 in 2000 to 18,127 in 2014[205] and Office of Field Operations (OFO) officers (those that operate at ports of entry) from 4,667 in 2003 to 6,323 in 2015.[206]

In 2011, former DHS Secretary Janet Napolitano said that "the border is better now than it has ever been."[207] Similarly, DHS Secretary Johnson points to a declining number of apprehensions along the southwest border as a key indicator of border security.[208] For example, DHS apprehensions totaled 479,000 for FY2014, down from approximately 1.6 million apprehensions

---

[199] *Homeland Threats and Agency Reponses: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 112th Cong., (2012) (statement of Janet Napolitano, Secretary, U.S. Department of Homeland Security).
[200] *Id.*
[201] U.S. CUSTOMS AND BORDER PROTECTION, BORDER TECHNOLOGY INTRODUCTION (2015) (on file with Majority Staff).
[202] Laura McVicker, *Drone Carrying Meth Crashed Near San Ysidro Port of Entry*, NBC SAN DIEGO (Jan. 22, 2015), http://www.nbcsandiego.com/news/local/Drone-Carrying-Meth-Crashes-Near-San-Ysidro-Port-of-Entry-289353601.html.
[203] ARIZONA HIGH INTENSITY DRUG TRAFFICKING AREA, THREAT ASSESSMENT 2014 62 (2014).
[204] Majority Staff observations during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015).
[205] *Remarks by Secretary of Homeland Security Jeh Johnson, Border Security in the 21st Century*, U.S. DEP'T OF HOMELAND SECURITY (Oct. 9, 2014), http://www.dhs.gov/news/2014/10/09/remarks-secretary-homeland-security-jeh-johnson-border-security-21st-century.
[206] Majority Staff observations during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015).
[207] Jennifer Epstein, *Janet Napolitano: Border security better than ever*, POLITICO (Mar. 25, 2011), http://www.politico.com/news/stories/0311/51925.html.
[208] *Remarks by Secretary of Homeland Security Jeh Johnson, Border Security in the 21st Century*, U.S. DEP'T OF HOMELAND SECURITY (Oct. 9, 2014), http://www.dhs.gov/news/2014/10/09/remarks-secretary-homeland-security-jeh-johnson-border-security-21st-century.

AOL-DEF-00002371

105

in FY2000.[209]  However, as a report issued by Dr. Coburn emphasizes, "[t]he apprehensions figure for FY2014 follows a three-year trend of steady increases in the number of apprehensions since FY2011, when DHS data shows that Southern border apprehensions hit a low of 327,000."[210]  Moreover, experts point out that even if apprehensions have decreased, there is limited information of the role immigration enforcement has played in this decline.[211]

Apprehension rates might also be down due to a lack of effectiveness on the southwest border. According to independent experts, apprehension rates along our southwest border are 40 to 55 percent.[212]  Most Border Patrol agents and local law enforcement estimated interdiction rates in the RGV to be 30 to 40 percent.[213]  In the Tucson sector, Border Patrol agents predicted they caught one-in-three in areas where there was a fence and one-in-20 where no fence was present, which is often in the remote mountainous areas.[214]

Finally, it is unclear as to the impact that misreported apprehension data has had on the final numbers.[215]  Border Patrol agents claim that the difference in their experiences and those reported by DHS are due to manipulation of these statistics.[216]  Specifically, a Border Patrol agent testified to the Committee that agents faced retribution for reporting more than 20 footprints—a key indicator of "got-aways."[217]

*Local Law Enforcement*

While Border Patrol agents provide a key level of security at our border, their efforts are often buttressed by local law enforcement.  The relationship and connectivity between local law enforcement, landowners, and Border Patrol is vital and cannot be overstated.

Operation Stonegarden, a grant program operated through the Federal Emergency Management Agency (FEMA), provides funding to state and local governments to increase operational capacity at the U.S. border.[218]  While those who use the program have emphasized its success, it

---

[209] *Id.* slide 26
[210] Senator Tom Coburn, *A Review of the Department of Homeland Security's Missions and Performance* (Jan. 2015).
[211] Bryan Roberts, Edward Alden, John Whitley, *Managing Illegal Immigration to the United States: How Effective is Enforcement?*, COUNCIL ON FOREIGN RELATIONS 2 (2013) ("The Obama administration has not offered, and Congress has failed to insist on, any accountability for the effectiveness of these huge enforcement expenditures.").
[212] *Id.* at 3.
[213] *Securing the Southwest Border: Perspectives from Beyond the Beltway: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Chris Cabrera, Border Patrol Agent, Rio Grande Valley Sector, U.S. Customs and Border Protection).
[214] Majority Staff observations during bipartisan STAFFDEL to the Tucson, Arizona Sector (Feb. 2015).
[215] According to the Border Patrol Council, Border Patrol Agents are required to submit apprehension numbers to supervisors.  Moreover, staff has been told that agents are instructed to count illegal crossers not caught by border patrol agents as "pending law enforcement resolution" rather than as a "got away."
[216] *Securing the Southwest Border: Perspectives from Beyond the Beltway: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Chris Cabrera, National Border Patrol Council).
[217] *Id.*
[218] HOMELAND SECURITY GRANTS, OPERATION STONEGARDEN, http://www.homelandsecuritygrants.info/GrantDetails.aspx?gid=21875.

29

AOL-DEF-00002372

106

is important to ensure that the program is being utilized effectively to achieve its intended and important goals. Moreover, illegal activity at the southwest border stretches beyond the border communities themselves. Brooks County, Texas, which operates a checkpoint more than 70 miles from the border, reported 443 deaths related to illegal immigrants in the past six years.[219]

States have also deployed significant resources to increase manpower at U.S. borders.[220] For example, former Texas governor Rick Perry's Operation Strong Safety deployed the Texas Department of Public Safety to the border, which, according to a recent report, was effective.[221]

It is also important to emphasize the other resource impacts our insecure border has on local communities. When local law enforcement and Border Patrol agents catch more people, jails fill up. Prosecutors refuse to prosecute interdictions below a certain drug possession level due to heavy demands on resources. Captured illegal crossers need to he housed and provided medical care, which is also fiscally impactful on local budgets. When considering new federal border security measures, more boots on the ground is an important component, but not a solution to be considered in isolation.

*Local Landowners*

Some landowners experience significant damages to their property due to illegal crossers. Their fences have been battered, either from pedestrian illegal crossers or by stolen vehicles. Landowners are responsible for repair costs, some totaling up to $100,000 a year.[222]

Landowners also face threats of break-ins and violence. Firearms, ammunition, cash, jewelry, and small electronics have all been reported stolen. One Arizona sheriff told the Committee about a rancher who lives in his jurisdiction that has had his home broken into four or five times.[223] That same rancher has also encountered scouts for the cartel sitting on his property, adding even more fear to his situation.[224] According to several witnesses at a Committee hearing, scouts face little to no fear of retribution for their presence or assistance to the cartels.[225]

---

[219] *Securing the Border: Assessing the Impact of Transnational Crime: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of Benny Martinez, Chief Deputy Sheriff, Brooks County, Texas); *see also Texas' Brooks County is 'Death Valley' for Migrants,* NBC NEWS (July 9, 2014), http://www.nbcnews.com/storyline/immigration-border-crisis/texas-brooks-county-death-valley-migrants-n152121.
[220] *See generally Securing the Border: Assessing the Impact of Transnational Crime: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[221] TEXAS DEP'T OF PUBLIC SAFETY, OPERATION STRONG SAFETY REPORT TO THE 84TH TEXAS LEGISLATURE AND OFFICE OF THE GOVERNOR 2 (2015) (Unclassified Version).
[222] Statement by Fred Cappadona, Double C Cattle Co., South Texans' Property Rights Association Roundtable, during Senators' Johnson, Carper, and Sasse CODEL to the Texas Rio Grande Valley Sector (Feb. 2015).
[223] *Securing the Southwest Border: Perspectives from Beyond the Beltway: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of Mark Dannels, Sheriff, Cochise County, Arizona).
[224] *Id.*
[225] *See Securing the Border: Assessing the Impact of Transnational Crime: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (Elizabeth Kempshall, Executive Director, Arizona HIDTA stated, "it has been a challenge for us to prosecute the scouts" due to the lack of laws specific to them, while Benny Martinez, Chief Deputy Sheriff of Brooks County, Texas confirmed "a good percentage of [scouts] walk.").

30

AOL-DEF-00002373

107

Cartels have also threatened violence against landowners for contacting the Border Patrol. For example, in 2010, Robert Krentz, a prominent rancher in Cochise County, Arizona, was killed by an illegal crosser on his property.[226]

Committee witnesses who live on the border have said that an important metric to determine whether our border is secure is not quantitative, but rather qualitative: the border is secure when landowners on the border have a reasonable expectation that they can leave their homes and ranches and their property will not be battered or vandalized.[227]

<u>Transnational Crime at the Southwest Border</u>

*Cartels*

Cartels have evolved from smaller, primarily family run smuggling groups to multinational entities.[228] The cartels are often equipped with weapons, communications and surveillance equipment, and other paramilitary capabilities that compete with U.S. law enforcement.[229] To protect their routes, cartels invest heavily in enforcement.[230] According to a Committee witness, scouts wear "camouflage uniforms with padded boots for non-tracker, with $2,500 solar-powered, encrypted satellite phones, with AK-47s."[231]

According to a Texas Department of Public Safety (DPS) report, "cartels have also been effective in corrupting U.S. law enforcement officials at all levels, which not only facilitates organized crime, but undermines the public trust in law enforcement."[232] Specifically, officials at DHS are very aware of attempts by drug trafficking organizations (DTOs) "to infiltrate the CBP workforce through conspired hiring operations and aggressive targeting" of agents.[233] According to the Arizona High Intensity Drug Trafficking Area (HIDTA):

---

[226] Randal Archibold, *Ranchers Alarmed by Killing near Border*, NY TIMES (Apr. 4, 2010), http://www.nytimes.com/2010/04/05/us/05arizona.html.
[227] *Securing the Southwest Border: Perspectives from Beyond the Beltway: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Mark Dannels, Sheriff, Cochise County, Arizona).
[228] Response to Questions for the Record from Shawn Moran, *Deferred Action on Immigration: Implications and Unanswered Questions: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015).
[229] Diane Washington Valdez, *Report: Mexican Drug Cartels Adopting Military Tactics*, EL PASO TIMES (Aug. 7, 2011), http://www.elpasotimes.com/ci_18632455.
[230] Shannon K. O'Neil, *Two Nations Indivisible: Mexico, The United States, and the Road Ahead* 127 (Oxford University Press 2013).
[231] *Securing the Border: Assessing the Impact of Transnational Crime: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of General Barry R. McCaffrey, USA (RET.), Former Director, Office of National Drug Control Policy).
[232] TEXAS DEP'T OF PUBLIC SAFETY, OPERATION STRONG SAFETY REPORT TO THE 84TH TEXAS LEGISLATURE AND OFFICE OF THE GOVERNOR 2 (2015) (Unclassified Version).
[233] GOV'T ACCOUNTABILITY OFFICE, GAO-13-59, BORDER SECURITY: ADDITIONAL ACTIONS NEEDED TO STRENGTHEN CBP EFFORTS TO MITIGATE RISK OF EMPLOYEE CORRUPTION AND MISCONDUCT 2 (2012).

AOL-DEF-00002374

108

> "The Sinaloa Cartel is considered the most influential and strongest cartel in Mexico, as it maintains an extensive corruption network at the local, state, and Federal level, giving it more political and judicial cover to protect and secure drug trafficking activities. Historically, Sinaloa Cartel operatives maintained a greater ability to adapt to law enforcement challenges and foresee potential changes in the drug market more effectively than other Mexican cartels."[234]

From FY2005 through FY2012 GAO found tha, "144 current or former CBP employees were arrested or indicted for corruption," representing "less than 1 percent of the entire CBP workforce per fiscal year."[235] In 2014, Secretary Johnson "delegated to CBP the authority to investigate its employees for alleged criminal misconduct."[236] On June 29, 2015, the Homeland Security Advisory Council issued an interim report that found that corruption among Border Patrol agents and officers "*may* be increasing" and that "arrests for corruption of CBP personnel far exceed, on a per capita basis, such arrests at other federal law enforcement agencies."[237]

Local law enforcement officials and public officials have also been found guilty of taking bribes from drug traffickers.[238] And, corruption is not limited to the U.S. Recently, 14 Mexican "Federales" were arrested for running a kidnapping operation near the Texas border that targeted Mexican businessmen.[239]

*Drug Smuggling*

Cartels smuggle illicit drugs into the U.S., and rely on U.S.-based gangs to distribute the drugs throughout the U.S.[240] More than 90 percent of all cocaine entering the country transits the Mexican-Central American corridor from countries further south.[241] "Mexico remains the primary foreign source of marijuana and methamphetamine destined for U.S. markets and is also

---

[234] ARIZONA HIGH INTENSITY DRUG TRAFFICKING AREA, THREAT ASSESSMENT 2015, 11 (2015); *see also DEA Maps Show Kingpin 'El Chapo' Guzman's Cartel Controls Nearly the Entire U.S. Drug Market*, FORBES (Nov. 10, 2015), http://www.forbes.com/sites/doliaestevez/2015/11/10/dea-maps-show-kingpin-el-chapo-guzmans-cartel-controls-nearly-the-entire-u-s-drug-market/.
[235] *Id.* at 8.
[236] U.S. DEP'T OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, CBP BORDER SECURITY REPORT FISCAL YEAR 2014 (2014).
[237] HOMELAND SECURITY ADVISORY COUNCIL, INTERIM REPORT OF THE CBP INTEGRITY ADVISORY PANEL 6 (2015).
[238] Shannon K. O'Neil, *Two Nations Indivisible: Mexico, The United States, and the Road Ahead* 131 (Oxford University Press 2013).
[239] Ildefonso Ortiz, *14 Mexican Federales Arrested for Running Kidnapping Crew Near Texas Border*, BREITBART (Mar. 7, 2015), http://www.breitbart.com/texas/2015/03/07/14-mexican-cops-arrested-for-running-kidnapping-crew-near-texas-border/.
[240] EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF NATIONAL DRUG CONTROL POLICY, NATIONAL SOUTHWEST BORDER COUNTERNARCOTICS STRATEGY 34 (2013); U.S. DEP'T OF JUSTICE NAT'L DRUG INTELLIGENCE CENTER, NATIONAL DRUG THREAT ASSESSMENT 11 (2011).
[241] EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF NATIONAL DRUG CONTROL POLICY, NATIONAL SOUTHWEST BORDER COUNTERNARCOTICS STRATEGY 1 (2013).

AOL-DEF-00002375

109

a source and transit country for heroin."[242]  Observations from Border Patrol agents suggest there has also been a recent rise in cocaine, meth, and heroin deriving directly from Mexico.[243]

Mexican DTOs are known to use minors as young as 12 years old to smuggle drugs between and through POEs.[244]  In FY2014, Arizona apprehended 39 minors as pedestrians "with illicit drugs taped to their bodies, concealed within clothing, or in bags."[245]  DTOs also recruit high school and middle school students—the majority of which are U.S. citizens—believing students "are less likely to be identified by law enforcement" and if identified will not be prosecuted.[246]

Mexican DTOs have become experts at evading the Border Patrol.  According to General McCaffrey, former Director of the White House's Office of National Drug Control Policy, the Border Patrol seizes just 5 to 10 percent of the illegal drugs smuggled across the border.[247]  The decreasing cost of drugs in the U.S., particularly heroin, illustrates the point.

**Figure 10**



ILLEGAL DRUG PRICES
NATIONAL AVERAGE PRICE PER GRAM, INFLATION ADJUSTED DOLLARS

In 2012:
Heroin: $465
Methamphetamine: $194
Cocaine: $186
Marijuana: $13.38

Office of National Drug Policy

---

[242] *Id.*

[243] While refusing to draw a direct inference, Border Patrol agents pointed out that since states have begun to legalize marijuana, drugs smuggled into this U.S. have shifted being predominately marijuana to harder drugs.

[244] *See* Evelio Contreras, *Inside the Life of a Drug-Trafficking Teen,* CNN (Aug. 13, 2015), http://www.cnn.com/2015/08/12/us/inside-the-life-of-a-drug-trafficking-teen/index.html?eref=rss_latest (documenting how the Los Zetas gang forced a 12-year-old illegal immigrant living on the Texas side of the border to smuggle drugs for them).

[245] ARIZONA HIGH INTENSITY DRUG TRAFFICKING AREA, THREAT ASSESSMENT 2015 56 (2014).

[246] *Id.; see also* Lourdes Medrano, *Along Key Stretch of US-Mexico Border More Kids Running Drugs,* THE CHRISTIAN SCIENCE MONITOR (July 16, 2013), http://www.csmonitor.com/USA/Justice/2013/0716/Along-key-stretch-of-US-Mexico-border-more-kids-running-drugs; *Securing the Southwest Border: Perspectives from Beyond the Beltway: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).

[247] *Securing the Border: Assessing the Impact of Transnational Crime: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of General Barry R. McCaffrey, USA (RET.), Former Director, Office of National Drug Control Policy).

33

AOL-DEF-00002376

110

Between the POEs, smuggling groups use "an extensive system of scouts armed with radios, solar-powered radio repeaters, cellular telephones, and weapons situated on high points along drug trafficking routes."[248]  This type of structure provides smugglers with a high level of situational awareness of law enforcement presence on both sides of the border.

At the POEs, cartels have begun smuggling drugs in smaller packages and using deep concealment to increase their likelihood of success.  Officers at the Otay Mesa POE in the San Diego sector have found drugs hidden in batteries, gas tanks, jalapeno jars, and fire extinguishers.[249]  Media reports indicate cartels have concealed drugs in "frozen sharks, sprinkled on donuts, and crammed into cucumbers."[250]

*Human Smuggling and Trafficking*

To enter the U.S., more than 90 percent of immigrants hire coyotes that control the routes from Mexico to the U.S.  Coyotes move illegal immigrants across the border and into the interior of the U.S. through a series of stash houses.[251]  Coyotes often use energy drinks to keep people awake as they are smuggled across the border and frequently leave behind or "sacrifice" those incapable of keeping pace.[252]  Moreover, at a Committee Hearing a Border Patrol agent testified that coyotes use migrants as a diversion in order to sneak higher value drugs across the border.[253]  For example, rather than directing unaccompanied children and families to bridges and ports of entry along the Rio Grande where they could immediately and safely seek asylum, coyotes forced them to take the more dangerous route across the river, tying up Border Patrol agents and leaving the border unguarded.[254]

Sex trafficking organizations also use coyotes to transport victims across the border en route to destinations throughout the U.S.[255]  According to the Texas DPS report, "[c]artels, gangs, and international sex trafficking organizations have worked closely together for many years now, uncharacteristically crossing traditional rivalries in order to traffic drugs and people for large profits."[256]

---

[248] *Id.* (statement of Elizabeth Kempshall, Executive Director, Arizona Region of the Southwest Border, High Intensity Drug Trafficking Area, Office of National Drug Control Policy).
[249] Majority Staff observations during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015).
[250] *See* Christopher Woody, *'El Chapo' Guzman's Role in the Global Cocaine Trade is Becoming Clearer,* MCPHERSON SENTINEL (Aug. 16, 2015), http://www.mcphersonsentinel.com/article/ZZ/20150816/BUSINESS/308169989/-1/books/?Start=1.
[251] TEXAS DEP'T OF PUBLIC SAFETY, OPERATION STRONG SAFETY REPORT TO THE 84TH TEXAS LEGISLATURE AND OFFICE OF THE GOVERNOR 29 (2015) (Unclassified Version).
[252] Majority Staff observations during Senators' Johnson, Carper, and Sasse CODEL to the Texas Rio Grande Valley Sector (Feb. 2015).
[253] *Ongoing Migration from Central America: An Examination of FY2015 Apprehensions: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of Chris Cabrera, National Border Patrol Council).
[254] *Id.*
[255] TEXAS DEP'T OF PUBLIC SAFETY, OPERATION STRONG SAFETY REPORT TO THE 84TH TEXAS LEGISLATURE AND OFFICE OF THE GOVERNOR 34 (2015) (Unclassified Version).
[256] *Id.*

AOL-DEF-00002377

111

*Gangs, Criminal Aliens, and Special Interest Aliens*

Violent transnational gangs such as MS-13 and Los Zetas have a stronghold in border states such as Texas, while the Hells Angel Motorcycle Club (HAMC) controls Arizona.[257] These gangs "maintain a buyer and seller relationship with Mexican DTOs."[258]

Moreover, the number of criminal aliens coming into the U.S. has increased. The Border Patrol Council estimates that the number of individuals who have committed crimes in the U.S., served time in a jail here, and have been deported constitute 10 to 20 percent of those apprehended.[259] As an example, on March 6, 2015, Border Patrol agents in the Laredo sector arrested an illegal immigrant from Mexico convicted of murder in 1992 in Jacksonville, Florida.[260] "The subject was sentenced to 20 years and was released in 2002, after serving 10 years."[261] Different reports indicates there are somewhere between 200-300 sanctuary jurisdictions in this country in which local governments refuse to assist in the enforcement of our immigration laws. The recent shooting of a young woman in San Franeisco, California by a criminal alien that had been deported five times with seven prior felony convictions has brought renewed attention to criminals entering and remaining in the U.S., largely as a result of sanctuary policies.[262]

Finally, legitimate concerns remain that terrorists could exploit our country's southwest border to enter the U.S. undetected.[263] While the likelihood of a terrorist group using the southwest border as an entry point to complete a terrorist attack is an area of debate, the potential for exploitation should be taken seriously given that there was a 70 percent increase from FY2013 to FY2014 in OTMs crossing the border.[264] This included individuals from Iraq, Syria, and Egypt.[265] According to Border Patrol agents on the ground, 51 percent of all Border Patrol apprehensions are currently OTMs.

---

[257] *Id.* at 1; ARIZONA HIGH INTENSITY DRUG TRAFFICKING AREA, THREAT ASSESSMENT 2014 22 (2014) (HAMC is known to be involved in murder, drug trafficking, prostitution, weapons trafficking, extortion, arson, and vehicle-theft offenses).

[258] *Id.* at 24; FBI NATIONAL GANG INTELLIGENCE CENTER, 2011 NATIONAL GANG THREAT ASSESSMENT; DEP'T OF HOMELAND SECURITY, MEXICO: CROSS-BORDER GANGS AND THEIR MEXICAN DRUG CARTEL AFFILIATIONS (2011).

[259] Response to Questions for the Record from Shawn Moran, Vice President, National Border Patrol Council, *Deferred Action on Immigration: Implications and Unanswered Questions: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) ("These are not economic immigrants in search of a better life. These are hardened criminals who are facing real jail time.").

[260] *Laredo Sector Border Patrol Agents Arrest an Undocumented Immigrant from Mexico Convicted of Murder,* U.S. CUSTOMS AND BORDER PROTECTION (Mar. 6, 2015), http://www.cbp.gov/newsroom/local-media-release/2015-03-06-000000/laredo-sector-border-patrol-agents-arrest.

[261] *Id.*

[262] Michelle Moons, *Breaking: Pier 14 Murder Suspect Had Been Deported 5 Times With 7 Felonies,* BREITBART (July 3, 2015), http://www.breitbart.com/texas/2015/07/03/breaking-pier-14-murder-suspect-had-been-deported-5-times-with-7-felonies/.

[263] TEXAS DEP'T OF PUBLIC SAFETY, OPERATION STRONG SAFETY REPORT TO THE 84TH TEXAS LEGISLATURE AND OFFICE OF THE GOVERNOR 1 (2015) (Unclassified Version).

[264] Brandon Darby, *Leaked CBP Report Shows Entire World Exploiting Open US Border,* BREITBART (Aug. 3, 2014), http://www.breitbart.com/texas/2014/08/03/leaked-cbp-report-shows-entire-world-exploiting-open-us-border/.

[265] *Id.*

35

AOL-DEF-00002378

112

### Part II: The U.S. – Canada Border

The United States and Canada share the longest common land border in the world.[266]  The binational border is 5,525 miles long.[267]  According to the U.S. Census Bureau, the continental border along the 49th parallel from Washington State to Maine is almost 4,000 miles.[268]

Each day, more than 350,000 people and $2 billion in trade cross the U.S.-Canada border.[269]  Canada is the United States' largest trading partner, with over 120 operating POEs along the U.S.-Canada border.[270]  The busiest ports are located in Detroit, Michigan; Buffalo, New York; and Blaine, Washington.[271]  Additionally, CBP has nine pre-clearance locations at Canadian airports to assist in processing the estimated 750 daily commercial flights to the U.S., as well as pre-inspection locations at Canadian rail stations.[272]

The Border Patrol divides the northern border into eight sectors: Blaine, Spokane, Havre, Grand Forks, Detroit, Buffalo, Swanton, and Houlton.  Each sector's terrain is different and the challenges are evolving.  For example, in the Great Lakes region, TCOs use small vessels during the summer and snowmobiles during the winter to transport illicit contraband.[273]  Similarly, in Washington State and Maine, dense forests and open waters provide criminals cover, making it difficult for authorities to detect cross-border illegal activity.[274]  CBP deploys different technologies such as UAS, ground and water sensors, "buckeyes"[275] and trail cameras with live feeds to maintain domain awareness in areas that are difficult to patrol.[276]

---

[266] U.S. DEP'T OF HOMELAND SECURITY, NORTHERN BORDER STRATEGY 4 (2012).
[267] U.S. DEP'T OF COMMERCE, CENSUS BUREAU, THE 2012 STATISTICAL ABSTRACT 225 ( 2012) (including the Alaska-British Columbia-Yukon Territory portion).
[268] *Id.*
[269] *Protecting our Northern Border: Enhancing Collaboration and Building Local Partnerships: Hearing Before the S. SubComm. on the Efficiency and Effectiveness of Federal Programs and the Federal Workforce of the Comm. on Homeland Security & Governmental Affairs*, 113th Cong. (2013) (statement of Christopher Richards, Havre Sector Chief Patrol Agent, U.S. Border Patrol); *Fact Sheet: Beyond the Border Facilitating Travel at the United States-Canada Border*, U.S. DEP'T OF HOMELAND SECURITY (Dec. 6, 2011), http://www.dhs.gov/news/2011/12/06/fact-sheet-beyond-border-facilitating-travel-united-states-canada-border.
[270] *Id.*
[271] Majority Staff observations during a staff briefing on the northern border presented by the U.S. Department of Homeland Security (Apr. 2015).
[272] *Protecting our Northern Border: Enhancing Collaboration and Building Local Partnerships: Hearing Before the S. SubComm. on the Efficiency and Effectiveness of Federal Programs and the Federal Workforce of the Comm. on Homeland Security & Governmental Affairs*, 113th Cong. (2013) (statement of Christopher Richards, Havre Sector Chief Patrol Agent, U.S. Border Patrol); Majority Staff observations during bipartisan STAFFDEL to the Blaine, Washington Sector (Aug. 2015).  For a discussion on preclearance operations, see Part IV.
[273] *Id.*
[274] Majority Staff observations during bipartisan STAFFDEL to the Blaine, Washington Sector (Aug. 2015).
[275] Buckeyes are off the shelf technology designed for hunters that consist of portable cameras with motion sensors that, when triggered, connect to a cell tower and send images to the agent's phone, revealing what triggered the camera.  This saves significant resources, as agents are prevented from checking on a sensor that was triggered by animals or other non-threat sources.
[276] *Protecting our Northern Border: Enhancing Collaboration and Building Local Partnerships: Hearing Before the S. SubComm. on the Efficiency and Effectiveness of Federal Programs and the Federal Workforce of the Comm. on Homeland Security & Governmental Affairs*, 113th Cong. (2013) (statement of Christopher Richards, Havre Sector Chief Patrol Agent, U.S. Border Patrol).

36

113

**Figure 11: Eight Sectors of the U.S.-Canada Border**



Image provided by DHS.

There is currently no fencing on the northern border. Instead, the demarcation line between the two countries is often marked by a ditch, approximately six inches deep.[277]

**Figure 12: The U.S.-Canada Border Demarcation in Blaine, Washington**



Image taken during bipartisan STAFFDEL to the Blaine, Washington Sector (Aug. 2015)

There are currently 2,093 Border Patrol agents and 3,600 Office of Field Operations officers stationed on the northern border.[278] DHS believes that current staffing numbers are sufficient to manage and address northern security threats, because illegal crossing apprehensions and drug smuggling volumes at the northern border are much lower than at the U.S.-Mexico border.[279] Additionally, agents have more time and resources to target each threat, as well as better information sharing with Canada.[280]

While both the northern and southwest borders are highly active, crossing volumes are different. For example, in FY2014, northern border officers apprehended 3,338 individuals for attempting to enter the U.S. illegally, while agents patrolling the southwest border reported a total of 479,371 apprehensions.[281]

---

[277] Majority Staff observations during bipartisan STAFFDEL to the Blaine, Washington Sector (Aug. 2015).
[278] Data provided to Majority Staff by the U.S. Department of Homeland Security (April 8, 2015) (as a comparison, there are 2,500 Border Patrol agents stationed in the San Diego sector alone).
[279] Id.
[280] Id.
[281] U.S. BORDER PATROL, STATS AND SUMMARIES, http://www.cbp.gov/newsroom/media-resources/stats?title=sector+profile. The Majority Staff notes that DHS has refused to release figures for FY2015.

37

AOL-DEF-00002380

114

**Table 1. Comparison of Apprehensions at U.S. Borders FY2011-FY2014[282]**

| Sector | FY2011 | FY2012 | FY2013 | FY2014 |
|---|---|---|---|---|
| Northern Border Total | 6,123 | 4,210 | 3,230 | 3,338 |
| Southwest Border Total | 327,577 | 356,873 | 414,397 | 479,371 |

Also in FY2014, the U.S.-Canada border recorded a slightly greater volume of trucks and trains, while the southwest border processed more buses, personal vehicles, and pedestrian crossings.[283]

**Table 2. Recorded Crossing at Both U.S. Borders in FY2014[284]**

| Border POEs | Trucks | Trains | Buses | Personal Vehicles | Pedestrians |
|---|---|---|---|---|---|
| Northern | 5,802,211 | 28,643 | 103,749 | 31,979,736 | 423,605 |
| Southwest | 5,414,568 | 10,414 | 213,780 | 69,623,693 | 41,223,292 |

<u>U.S. – Canada Joint Operations</u>

Currently, to secure, monitor, and manage the northern border, the United States and Canada coordinate efforts through the Beyond the Border Initiative (BTB).[285] The key priorities of BTB are: 1) identifying and addressing threats before they reach the U.S.-Canada border; 2) facilitating legitimate trade; 3) integrating cross-border law enforcement efforts; and 4) coordinating approaches to critical infrastructure and cybersecurity.[286] This approach enhances law enforcement cooperation, provides the framework to address security gaps, and ensures that lawful trade and travel are not significantly affected by increased security measures.[287] BTB enables DHS to improve the allocation of resources, because operation chiefs coordinate with their Canadian counterparts to avoid duplicating patrol and surveillance efforts.[288]

Since 2011, the BTB Initiative has institutionalized several information and intelligence sharing mechanisms. DHS states that these air, land, and maritime mobile partnerships provide a greater penetration of intelligence, affording U.S. and Canadian law enforcement agencies an advantage point to disrupt terrorist and transnational criminal activity before it reaches the U.S.-Canada border.[289]

Since 1997, intelligence-driven law enforcement teams have been responsible for securing the northern border.[290] Currently, there are 24 Integrated Border Enforcement Team (IBET)

---

[282] *Id.*
[283] BUREAU OF TRANSPORTATION STATISTICS, BORDER CROSSING/ENTRY DATA: QUERY DETAILED STATISTICS (2014), http://transborder.bts.gov/programs/international/transborder/TBDR_BC/TBDR_BCQ.html.
[284] *Id.*
[285] U.S. DEP'T OF HOMELAND SECURITY, FACT SHEET: BEYOND THE BORDER UNITED STATES-CANADA LAW ENFORCEMENT COOPERATION (2011).
[286] U.S. DEP'T OF HOMELAND SECURITY, BEYOND THE BORDER IMPLEMENTATION REPORT 4 (2013).
[287] Observations presented at Canada Institute, Wilson Center, *Beyond the Border Implementation Report Update*, (2014), http://www.wilsoncenter.org/event/beyond-the-border-implementation-report-update.
[288] Data provided to Majority Staff by the U.S. Department of Homeland Security (April 8, 2015).
[289] *Id.*
[290] EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF NATIONAL DRUG POLICY CONTROL, NATIONAL NORTHERN BORDER COUNTERNARCOTICS STRATEGY 12 (2014).

38

AOL-DEF-00002381

115

locations, with the majority monitoring the Great Lakes region, including four that are operated by American and Canadian personnel.[291] The five law enforcement agencies contributing to IBETs efforts are: 1) CBP; 2) ICE; 3) U.S. Coast Guard; 4) the Royal Canadian Mounted Police (RCMP); and 5) the Canada Border Service Agency (CBSA).[292]

In addition, since 2005, Border Enforcement Security Taskforces (BESTs) have been investigating criminal activity at, near, and across the U.S.-Canada and U.S.-Mexico borders, as well as maritime seaport locations.[293] At a Committee hearing a DHS official testified that "[c]urrently, ICE Homeland Security Investigations (HSI) has 37 BEST units located across 16 states and Puerto Rico," four on the northern border, 14 on the southwest border, and 19 maritime seaport locations.[294] According to DHS, these ICE-led operations are successful because they leverage the efforts and resources of more than 150 federal, state, local, tribal, and international law enforcement agencies.[295] Specifically, BESTs have been recognized for infiltrating and dismantling TCOs operating in vulnerable areas of upstate New York.[296]

While DHS states that inter-agency partnerships are critical to secure the northern border, a 2011 GAO report found that the Department needs to increase oversight to ensure its components are coordinating and sharing information.[297] For example, northern border state and local law enforcement officials, as well as their Canadian counterparts, complained that Border Patrol, ICE the U.S. Forest Service, and the DEA do not always share information on operations, which leads to duplication and inconsistent compliance with the numerous cross-border agreements to confront threats.[298]

Threats to the Northern Border

*Terrorism*

In 2011, then CBP Commissioner Alan Bersin, told the Senate Judiciary Committee regarding terrorist threats, "[i]t's commonly accepted that the more significant threat comes from the U.S.-Canada border."[299] More recently, witnesses before HSGAC echoed Bersin's testimony, stating

---

[291] U.S. DEP'T OF HOMELAND SECURITY, BEYOND THE BORDER: A SHARED VISION FOR PERIMETER SECURITY AND ECONOMIC COMPETITIVENESS (2015), http://www.dhs.gov/beyond-border.
[292] U.S. DEP'T OF HOMELAND SECURITY, NORTHERN BORDER STRATEGY 10 (2012).
[293] U.S. DEP'T OF HOMELAND SECURITY, FACT SHEET: BEYOND THE BORDER UNITED STATES-CANADA LAW ENFORCEMENT COOPERATION (2011).
[294] *See Securing the Border: Understanding Threats and Strategies for the Maritime Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Peter Edge, Executive Associate Director, Homeland Security Investigations, U.S. Immigration and Customs Enforcement).
[295] EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF NATIONAL DRUG POLICY CONTROL, NATIONAL NORTHERN BORDER COUNTERNARCOTICS STRATEGY 11 (2014).
[296] *Id.* at 30.
[297] GOV'T ACCOUNTABILITY OFFICE, GAO-11-508T, BORDER SECURITY: DHS PROGRESS AND CHALLENGES IN SECURING THE U.S. SOUTHWEST AND NORTHERN BORDERS 14 (2011).
[298] *Id.* at 15.
[299] *Improving Security and Facilitating Commerce at America's Northern border and Ports of Entry: Hearing Before the S. Subcomm. on Immigration, Refugees and Border Security of the S. Comm. on the Judiciary*, 112th Cong. (2011) (statement of Alan Bersin, Commissioner, U.S. Customs and Border Protection).

AOL-DEF-00002382

116

that a terrorist trying to cross the border into the U.S. would be able to enter the country much more easily from the north than from the south.[300]

In 1997, Gazi Ibrahim Abu Mezer entered the U.S. near the Blaine, Washington POE.[301] After being returned three times, the FBI eventually detained him during a counter-terrorism raid in Brooklyn, New York, after being tipped off that Mezer planned to detonate a bomb in a New York City subway station.[302] Similarly, in 1999, Ahmed Ressam, a.k.a. the millennium bomber, was stopped at Port Angeles, Washington (also located in the Blaine sector) with components used to produce a bomb.[303] After admitting that he was planning to bomb the Los Angeles International Airport, he was sentenced to 37 years in prison for terrorist activity.[304] In FY2014, the Blaine sector alone apprehended migrants from 32 different countries.[305]

Recently, Canada has been struggling to confront radicalization and homegrown terrorism.[306] On February 3, 2015 the RCMP charged three men for recruiting and facilitating the terrorist activity of the Islamic State in the Levant (ISIL).[307] One is in custody, while the other two were charged in absentia, as authorities presume that they have left for Syria.[308] In addition, Quebec and Ontario have been reporting an exodus of young men and women heading to Syria and Iraq to fight for ISIL.[309] For example, in February, responding to Islamic extremism propaganda, four young men and two female teenagers left Montreal.[310] Police and community leaders are now scrambling to prevent further radicalization and recruitment.[311] In March, CBSA arrested a man in Toronto for plotting to bomb the U.S. Consulate and several other buildings in the Toronto financial district.[312]

---

[300] *Securing the Border: Assessing the Impact of Transnational Crime: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of General Barry R. McCaffrey, USA (RET.), Former Director, Office of National Drug Control Policy); *id* (statement of John P. Torres, Former Acting Director, U.S. Immigration and Customs Enf't).
[301] U.S. DEP'T OF JUSTICE, GAZI IBRAHIM ABU MEZER, http://www.justice.gov/oig/special/9803/brbrp2.htm.
[302] Gilbert M. Gaul & Mary Pat Flaherty, *Potential Bomber Shows Resolve in Trips to U.S.*, WASH. POST (Oct. 7, 2001), http://www.washingtonpost.com/archive/politics/2001/10/07/potential-bomber-shows-resolve-in-trips-to-us/5c43eb16-673d-4135-9d08-7baf080bb628/.
[303] FBI, MILLENNIUM PLOT/AHMED RESSAM, http://www.fbi.gov/about-us/history/famous-cases/millennium-plot-ahmed-ressam.
[304] *Id.*
[305] Majority Staff observations during bipartisan STAFFDEL to the Blaine, Washington Sector (Aug. 2015).
[306] Garrett Graff, *Fear Canada: The Real Terrorist Next Door*, POLITICO MAGAZINE (Oct. 16, 2014), http://www.politico.com/magazine/story/2014/10/fear-canada-not-mexico-111919.html#.VSYmlpN0eYM.
[307] *See* Stewart Bell, *Undercover Informant Infiltrated a Suspected ISIS Recruiting Network in Ottawa, Leading to Arrest*, NATIONAL POST (Feb. 4, 2015), http://news.nationalpost.com/news/canada/undercover-rcmp-informant-infiltrated-a-suspected-isis-recruiting-network-in-ottawa-leading-to-arrest.
[308] *Id.* Maguire is reported to have died fighting in Syrian in January, 2015.
[309] Allan Woods, *Quebec Stunned by Exodus of Four Young Men, Two Women to Join Islamic State*, THE STAR CANADA (Feb. 27, 2015), http://www.thestar.com/news/canada/2015/02/27/quebec-stunned-by-exodus-of-four-young-men-two-women-to-join-islamic-state.html.
[310] *Id.*
[311] *Id.*
[312] Steward Bell, *ISIS Sympathizer Arrested After Plotting to Bomb U.S. Consulate in Toronto: CBSA*, NAT'L POST (Mar. 11, 2015), http://news.nationalpost.com/news/canada/isis-sympathizer-arrested-after-plotting-to-bomb-u-s-consulate-in-toronto-cbsa.

40

AOL-DEF-00002383

117

Historically, security observers have argued that Canada represents a substantial vulnerability, because it provides immigrant visas to individuals who pose a significant threat.[313] Witnesses testified before the Committee that if someone gets into Canada, they will most likely be able to enter the U.S.[314] However, the Canadian government has changed its approach to national and border security after two recent acts of homegrown terrorism. The wake-up call came from both the 2013 detention of two men for conspiring to derail a VA Rail Canada train en route to New York City, and the 2014 Parliament shooting where a military guard was killed during an attack.[315]

Responding to this new reality, in January 2015 Prime Minister Harper introduced a new Anti-Terrorism Act to broaden the powers of the intelligence and law enforcement officers, which was signed into law on June 18, 2015.[316] Essentially, Bill C-51 1) criminalizes publishing terrorist propaganda; 2) creates a no-fly list of suspected terrorists; and 3) allows intelligence and law enforcement agencies to share information on known or suspected terrorists with foreign counterparts.[317] DHS believes this law will improve cross-border counterterrorism efforts by legalizing the implementation of a no-fly list that limits known and suspected terrorists' access to North America and enabling Canadian intelligence units to dismantle terrorist cells operating mostly in Ontario and Quebec.[318] To this end, the Canadian government is revoking the passports of approximately 130 citizens who have joined violent terrorist groups in Syria and Iraq, and is gathering evidence to prosecute more than 80 recently radicalized citizens and permanent residents who have returned to Canada after engaging in terrorist-related activities overseas.[319]

The Canadian government also plans to implement a screening system to deny those with a criminal background or on a terrorist watchlist from entering Canada.[320] According to DHS, by the end of 2015 or early 2016, Canada will be prepared to fully implement its Electronic Travel Authorization (eTA), which will require all visitors, except Americans, to submit their biographic information before they board a Canada-bound airplane.[321] Once implemented, all travelers will be screened against Canadian and American watchlists.[322]

---

[313] THE 9/11 COMMISSION REPORT 81 (2004).
[314] *Securing the Border: Assessing the Impact of Transnational Crime: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[315] *Muslim Leader: Canada Terror Attack a 'Wake-Up Call',* CBN NEWS (Oct. 29, 2014), http://www.cbn.com/cbnnews/world/2014/October/Muslim-Leader-Speaks-Out-against-Canada-Attacks/.
[316] *PM Announces Anti-Terrorism Measures to Protect Canadians,* OFFICE OF THE PRIME MINISTER (Jan. 30, 2015), http://pm.gc.ca/eng/news/2015/01/30/pm-announces-anti-terrorism-measures-protect-canadians; PARLIAMENT OF CANADA, ANTI-TERRORISM ACT 2015, http://www.parl.gc.ca/legisinfo/BillDetails.aspx?billId=6842344&Language=E&Mode=1.
[317] *Id.*
[318] Data provided to Majority Staff by the U.S. Department of Homeland Security (April 8, 2015).
[319] Doug Mataconis, *The Attack on Canada's Parliament and the 'Lone Wolf' Terrorist,* THE CHRISTIAN SCIENCE MONITOR (Oct. 23, 2014), http://www.csmonitor.com/USA/Politics/Politics-Voices/2014/1023/The-attack-on-Canada-s-Parliament-and-the-lone-wolf-terrorist.
[320] DEP'T OF CITIZENSHIP AND IMMIGRATION CANADA, ELECTRONIC TRAVEL AUTHORIZATION (eTA) (2012).
[321] Data provided to Majority Staff by the U.S. Department of Homeland Security (April 8, 2015).
[322] *Id.*

41

AOL-DEF-00002384

118

eTA efforts will complement the current bi-national effort to deny a visa or asylum status to criminals and known or suspected terrorists. Since 2014, Canadian immigration officials have been sharing biographic and biometric information on visa applicants with DHS and the State Department.[323] Previously, Canadian immigration officers would issue visas to individuals from a country of interest without consulting American law enforcement and intelligence databases.[324] This initiative will reduce visa fraud and enable Canada to deny asylum or an immigrant visa to individuals who could pose a threat.[325]

The nexus between known or suspected terrorists in eastern Canada and the northern parts of the U.S. represent a significant national security threat.[326] Communities in Minnesota and New York, which are adjacent to Ontario and Quebec, have recently experienced apprehensions of individuals on terrorist charges. For example, on November 26, 2014, two men in Minneapolis, Minnesota were charged with recruiting and conspiring to provide support to ISIL.[327] Similarly, on September 17, 2014, a man in Rochester, New York was arrested on similar charges after the FBI provided evidence showing that he attempted to recruit fighters and funds for ISIL.[328]

Recently, the U.S. and Canada, to prevent terrorist and criminal travel, agreed to share more information on travelers crossing the northern border through land POEs.[329] Under the border data exchange program, CBP and CBSA share each traveler's biographic data.[330] Essentially, by compiling this information, an entry into Canada constitutes an exit from the U.S. Currently, border officials are collecting information on third country nationals, but the scope of the program will be extended to include American and Canadian citizens by the end of 2015.[331] Canada will implement a similar program at air POEs, by requiring airlines to present a manifest of all passengers departing the country.[332]

---

[323] DEP'T OF CITIZENSHIP AND IMMIGRATION CANADA, CANADA/U.S. INFORMATION SHARING TREATY SUMMARY, (2013).
[324] Id.
[325] Id.
[326] Garrett Graff, Fear Canada: The Real Terrorist Next Door, POLITICO MAGAZINE (Oct. 16, 2014), http://www.politico.com/magazine/story/2014/10/fear-canada-not-mexico-111919.html#.VSYmIpN0eYM.
[327] Paul McEnroe, 2 Minneapolis Men Charged with Attempting to Aid Terrorists, STAR TRIBUNE (Nov. 26, 2014), http://www.startribune.com/local/minneapolis/283857371.html.
[328] Pierre Thomas & Mike Levine, New York Man Charged with Trying to Recruit ISIS Fighters in US, ABC NEWS (Sept. 16, 2014) http://abcnews.go.com/US/york-man-charged-recruit-isis-fighters-us/story?id=25552426.
[329] Data provided to Majority Staff by the U.S. Department of Homeland Security (April 8, 2015).
[330] Canada-U.S. Border Program Could Identify El Cheats, Terrorist, CBC NEWS (Jan. 27, 2014), http://www.cbc.ca/news/politics/canada-u-s-border-program-could-identify-ei-cheats-terrorists-1.2512972.
[331] Jim Bronskill, Many Visitors to Canada Will Pay $7 Fee Beginning Next Year Under Security Plan, CTV NEWS (June 20, 2014), http://www.ctvnews.ca/canada/many-visitors-to-canada-will-pay-7-fee-beginning-next-year-under-security-plan-1.1879146.
[332] Canada-U.S. Border Program Could Identify El Cheats, Terrorist, CBC NEWS (Jan. 27, 2014), http://www.cbc.ca/news/politics/canada-u-s-border-program-could-identify-ei-cheats-terrorists-1.2512972.

42

AOL-DEF-00002385

119

*Drug Smuggling*

While Canada does not face the same drug threat as Mexico, TCOs exploit border security gaps on the northern border to transport drugs and other illicit goods.[333] Currently, criminal groups on the northern border smuggle ecstasy and high potency marijuana into the U.S. and transport cocaine, firearms, cash, and meth from Mexico and South America through the U.S. and into Canada.[334]

Previously, Canada's high potency marijuana, known as Canadian British Columbia Bud (BC Bud), had a stronghold in the U.S., as it was able to compete against Mexico's commercial grade marijuana.[335] However, with the legalization of marijuana in several western states and the surge in U.S. local indoor production of high potency marijuana, the Canadian market has largely been replaced by the domestic market, evidenced by the decline at the Washington-British Columbia border of BC Bud seizures.[336] However, it is also possible that "Southeast Asia growers have moved their marijuana operations from Canada to Washington State in an effort to avoid potential border control problems during transport."[337]

Canada is the top foreign producer and "primary source of MDMA [commonly known as ecstasy] in North America."[338] The majority of Canadian ecstasy is produced in British Columbia, with FY2014 seizures totaling more than 48 kilograms.[339] Washington State's I-5 corridor "it the main transportation route into the Pacific Northwest and into British Columbia, Canada," where MDMA travels south and cocaine, firearms, and cash travel north—often offered in direct exchange.[340] Mexican criminal groups are the predominant transporters of cocaine into and through Washington.[341] Recently, Washington State has seen an uptick in unlawful crossers transporting drugs while dressed in camouflage, mimicking tactics seen on the southwest border and indicating cartel involvement (most likely the Sinaloa Cartel).[342]

Like Mexican DTOs, their Canadian counterparts constantly reevaluate their smuggling operations to evade U.S. law enforcement.[343] For example, in FY2013, 75 percent of the seized marijuana on the northern border was interdicted in the Swanton sector, which includes

---

[333] EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF NATIONAL DRUG CONTROL POLICY, NATIONAL NORTHERN BORDER COUNTERNARCOTICS STRATEGY 4 (2014).
[334] NORTHWEST HIGH INTENSITY DRUG TRAFFICKING AREA, THREAT ASSESSMENT AND STRATEGY FOR PROGRAM YEAR 2015 (2014).
[335] *Id.* at 23.
[336] *Id.* at 20.
[337] *Id.* at 25.
[338] *Securing the Border: Understanding Threats and Strategies for the Northern Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of David Rodriguez, Director, Northwest High Intensity Drug Trafficking Area).
[339] *Id.*
[340] *Id.* (providing an example in which law enforcement dismantled a group that "regularly delivered 50,000 [ecstasy] pills to wholesalers in New York and Boston, returning with cash and several kilos of cocaine.").
[341] NORTHWEST HIGH INTENSITY DRUG TRAFFICKING AREA, THREAT ASSESSMENT AND STRATEGY FOR PROGRAM YEAR 2015 33 (2014).
[342] Majority Staff observations during bipartisan STAFFDEL to the Blaine, Washington Sector (Aug. 2015).
[343] *Id.*

43

AOL-DEF-00002386

120

Vermont, New Hampshire, and part of New York, while in FY2014, 68 percent of the marijuana was seized in the Spokane sector, specifically in the states of Montana, Idaho, and Washington.[344]

*Human Smuggling and Trafficking*

According to the State Department's 2014 Trafficking in Persons Report, Canadian born and other foreign girls and women, mostly from East Asia and Eastern Europe, are exploited in sex trafficking along the U.S.-Canada border.[345]  In preparation for the 2014 Super Bowl in New Jersey, an intelligence report advised that Canada-based traffickers would move their victims from major cities such as Montreal, Toronto, Quebec City, and Ottawa to supply demand during the event.[346]

Generally, highways along the U.S.-Canada border, including Highway 401, have been used to move victims into the U.S.[347]  To address this, DHS implemented a 2012 U.S.-Canada Memorandum Of Understanding (MOU).[348]  The agreement formalized an information sharing mechanism on human trafficking, migrant smuggling networks, and suspected perpetrators.[349]

*Threats on Tribal Land*

Concerns have been raised over the challenges faced by tribal lands directly adjacent or in close proximity to the U.S.-Canada border.[350]  In Montana, Minnesota, Michigan, and New York, some Native American reservations are located directly on the U.S.-Canada border, while in Washington State, Wisconsin, Maine, and North Dakota, reservations are situated within a few miles of the international boundary.[351]  TCOs have used these lands to smuggle immigrants, narcotics, and other illicit goods.[352]  For example, in 1998, U.S. and Canadian authorities dismantled a human smuggling ring operated by 47 Chinese immigrants and members of the St. Regis Mohawk Reservation in upstate New York.[353]  U.S. authorities estimated that more than 3,600 Chinese immigrants were smuggled into the U.S. through this corridor, and that individuals paid as much as $47,000 for the trip from China to the United States.[354]  Similarly,

---

[344] U.S. CUSTOMS AND BORDER PROTECTION, SECTOR PROFILES FY2011-FY2014.
[345] U.S. DEP'T OF STATE, TRAFFICKING IN PERSONS REPORT 125 (2014).
[346] U.S. DEP'T OF STATE, HUMAN SMUGGLING AND TRAFFICKING CENTER, SITUATIONAL AWARENESS: POSSIBLE SEX TRAFFICKING DURING SUPER BOWL XLVII 1 (2014).
[347] *Id.*
[348] U.S. Embassy in Ottawa, *U.S., Canada Cooperate to Fight Cross-Border Crime* (Mar. 7, 2012) http://canada.usembassy.gov/news-events/2012-news-and-events/march-2012/7-march-2012-u.s.-canada-cooperate-to-fight-cross-border-crime.
[349] *Id.*
[350] Tim Johnson, *Indian Reservations on both U.S. Borders Become Drug Pipelines*, MCCLATCHY (June 16, 2010), http://www.mcclatchydc.com/2010/06/16/96003/indian-reservations-on-both-us.html.
[351] EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF NATIONAL DRUG POLICY CONTROL, NATIONAL NORTHERN BORDER COUNTERNARCOTICS STRATEGY 30 (2014).
[352] *Id.*
[353] Steven Holmes, *Ring is Cracked in Smuggling of Illegal Chinese Immigrants*, NY TIMES (Dec. 11, 1998), http://www.nytimes.com/1998/12/11/nyregion/ring-is-cracked-in-smuggling-of-illegal-chinese-immigrants.html.
[354] *Id.*

44

AOL-DEF-00002387

121

Mexican drug cartels are using these areas to evade northern border law enforcement authorities.[355]  For example, in 2010, the DEA found 82,000 marijuana plants in tribal lands located in Washington State.[356]

American and Canadian tribes are also involved in, or turn a blind eye to, cigarette smuggling from the U.S. to Canada.[357]  The black market for this illicit good is conservatively estimated to generate more than a billion dollars, rivaling profits of other low-end narcotics.[358]  Specifically, black market dealers capitalize on Canada's high tax on tobacco products.  In some provinces Canadians pay as much as $64 USD per carton; the average black market dealer sells a carton of 200 cigarettes for less than $7 USD.[359]

A 2011 GAO report found that because of a lack of DHS guidance, in some northern border communities, tribal officials: 1) were not clear on what suspicious activity they should report; 2) how to report it; and 3) to whom they should contact to report incidents.[360]  GAO stated that consistent coordination with local and tribal law enforcement officers could help identify terrorists and other criminals attempting to exploit the security gaps at the border.[361]

---

[355] Amy Harris, *Marijuana Growers Find Cover on Tribal Lands*, SEATTLE TIMES (Aug. 23, 2011), http://www.seattletimes.com/seattle-news/marijuana-growers-find-cover-on-tribal-lands/.
[356] *Id.*
[357] William Marsden, *Canada's Boom in Smuggled Cigarettes: Indian Tobacco Factories, Organized Crime Control a Billion-Dollar Black Market*, THE CENTER FOR PUBLIC INTEGRITY (May 19, 2014), http://www.publicintegrity.org/2009/03/27/2913/canadas-boom-smuggled-cigarettes.
[358] *Id.*
[359] *Id.*
[360] GOV'T ACCOUNTABILITY OFFICE, GAO-11-508T, BORDER SECURITY: DHS PROGRESS AND CHALLENGES IN SECURING THE U.S. SOUTHWEST AND NORTHERN BORDERS 16 (2011).
[361] *Id.*

45

AOL-DEF-00002388

122

**Part III: The Maritime Border**

Protecting America's coastlines is integral to our border security strategy. The United States coastline, which includes the Atlantic Coast, Caribbean, Pacific Coast, and Great Lakes region, measures 95,471 miles—one of the longest coastlines in the world.[362] According to the U.S. Coast Guard, the strategy for a secure maritime border takes on a layered approach and addresses illicit activity far from the U.S. shores.[363] According to CBP's Office of Air and Marine (OAM), a secure maritime border has: 1) maritime domain awareness; 2) law enforcement information; 3) response capability and capacity; 4) unity of effort; and 5) small vessel accountability.[364]

Agency Collaboration and Joint Missions

OAM and the Coast Guard frequently conduct joint missions. This is done through leveraging OAM's more than 250 aircraft and over 280 marine vessels.[365] For example, in December 2013, OAM and the Coast Guard worked together to interdict a panga boat, or, a small, outboard-powered fishing boat, off the coast of Southern California that was attempting to smuggle 1,500 pounds of marijuana.[366] OAM Air Interdiction Agents first spotted the panga from their Multi-Role Enforcement Aircraft.[367] OAM then deployed a Black Hawk helicopter, and the Coast Guard deployed a Jayhawk helicopter to track the suspect vessel.[368] At the same time, three OAM interceptor vessels and the Coast Guard cutter Blackfin also responded, heading to the panga's location.[369] OAM and the Coast Guard were able to apprehend the vessel, the three persons on board, and the marijuana, which had an estimated street value of $675,000.[370]

Earlier this year, an OAM Black Hawk helicopter fired warning shots at a panga boat off the coast of La Jolla, California.[371] The Coast Guard had first spotted the boat and requested OAM assistance in stopping it.[372] After the vessel failed to yield, OAM fired the warning shots, which prompted the panga boat to stop, resulting in its apprehension by two CBP Midnight Express interceptor boats.[373]

---

[362] NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, HOW LONG IS THE U.S. SHORELINE?, http://oceanservice.noaa.gov/facts/shorelength.html.
[363] *See Securing the Border: Understanding Threats and Strategies for the Maritime Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[364] *Id.*
[365] U.S. CUSTOMS AND BORDER PROTECTION, FROM THE AIR AND SEA, http://www.cbp.gov/border-security/air-sea.
[366] *CBP and Coast Guard Stop 1,500 Pound Marijuana Smuggling Attempt Off Southern California Coastline,* U.S. CUSTOMS AND BORDER PROTECTION (Dec. 20, 2013), http://www.cbp.gov/newsroom/local-media-release/2013-12-20-000000/cbp-and-coast-guard-stop-1500-pound-marijuana.
[367] *Id.*
[368] *Id.*
[369] *Id.*
[370] *Id.*
[371] Michelle Moons, *Warning Shots Fired at Panga Boat from CBP Helicopter Off CA Coast,* BREITBART (Jan. 19, 2015), http://www.breitbart.com/california/2015/01/19/warning-shots-fired-at-panga-boat-from-cbp-helicopter-off-ca-coast/.
[372] *Id.*
[373] *Id.*

46

AOL-DEF-00002389

123

Another way in which these two components work together is through the use of OAM's UAS program. This operation is overseen by the Common Unmanned Aircraft Systems Joint Program Office, which was formed by OAM and the Coast Guard to address common requirements. Recently, OAM finished a deployment of a UAS in El Salvador that netted $362 million in contraband.[374] These joint operations allow OAM to use drone technologies to track and stay with suspects until Coast Guard assets are able to apprehend them.

As noted above, two of OAM's eight operational UAS are dedicated for maritime use. In partnership with the Coast Guard, OAM developed a maritime variant of the Predator B called the Guardian, with the purpose of increasing reconnaissance, surveillance, targeting, and acquisition capabilities in maritime operating environments.[375] These Guardians were modified with "the addition of a Raytheon SeaVue Marine Search Radar and an Electro-optical/infrared sensor that is optimized for maritime operations."[376]

In 2012, GAO issued a report that found that there were opportunities to improve the use of both OAM and the Coast Guard's air and marine assets.[377] The report states that "OAM could benefit from taking additional steps to better ensure that its mix and placement of resources meets mission needs and addresses threats."[378] The report also found that "OAM has not documented its analyses to support its resource mix and placement across locations."[379] Of the four recommendations from that 2012 report, three remain open.[380]

ICE HSI teams also work with OAM and the Coast Guard to prevent illegal immigration and drug trafficking through America's maritime borders. In March 2014, the three agencies worked together to seize two men and a "go-fast" boat transporting 533 pounds of cocaine, 22 nautical miles southeast of Vieques, Puerto Rico.[381] The shipment had an estimated street value of $5.7 million.[382] The boat was first spotted by the Coast Guard, and the apprehension was conducted by an OAM marine unit that also had an ICE special agent on board.[383] According to OAM, intelligence is crucial for maritime interdictions, particularly on the northern border where illicit traffic is less frequent.[384]

---

[374] *Securing the Border: Fencing, Infrastructure, and Technology Force Multipliers: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of Randolph Alles, Assistant Commissioner, Office of Air and Marine, U.S. Customs and Border Protection).
[375] U.S. CUSTOMS AND BORDER PROTECTION, GUARDIAN UAS MARITIME VARIANT PREDATOR B, http://www.cbp.gov/sites/default/files/documents/guardian_b_6.pdf.
[376] *Id.*
[377] GOV'T ACCOUNTABILITY OFFICE, GAO-12-518, OPPORTUNITIES EXIST TO ENSURE MORE EFFECTIVE USE OF DHS'S AIR AND MARINE ASSETS (2012).
[378] *Id.* at passim.
[379] *Id.* at 28.
[380] *Id.*
[381] *Federal Authorities Seize $5.7 Million in Cocaine, Detain Two Smugglers,* U.S. DEP'T OF JUSTICE, U.S. ATTORNEY'S OFFICE, DISTRICT OF PUERTO RICO (Mar. 18, 2014), http://www.justice.gov/usao-pr/pr/federal-authorities-seize-57-million-cocaine-detain-two-smugglers.
[382] *Id.*
[383] *Id.*
[384] Majority Staff observations during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015); Majority Staff observations during bipartisan STAFFDEL to the Blaine, Washington Sector (Aug. 2015).

AOL-DEF-00002390

124

The U.S. is also a partner in Operation Martillo (Hammer), which is a "U.S., European, and Western Hemisphere effort targeting illicit trafficking routes in coastal waters along the Central American isthmus."[385] Fourteen countries are currently participating in the operation.[386] According to U.S. South Command, "[a]s of March 2015, Operation Martillo has resulted in the disruption of over 400 metric tons of cocaine over the past four years, denying drug traffickers $8 billion in potential revenue."[387] The U.S. contribution to this program "includes U.S. Navy and Coast Guard vessels, aircraft from U.S. federal law enforcement agencies, and military and law enforcement units from various nations."[388]

In June 2015, OAM agents working as part of Operation Martillo assisted in detecting five separate trafficking incidents that resulted "in the interdiction of more than 5,900 pounds of cocaine, worth more than $441.8 million."[389] Similarly, in November 2014, a Coast Guard Law Enforcement Detachment Team (LEDET) was involved in the interdiction of $35 million worth of cocaine in an Operation Martillo event off the shores of Puerto Rico.[390]

Threats along the Maritime Border

While illegal immigration through America's maritime borders is not as widespread as it is through the southwest border, "[t]housands of people try to enter this country illegally every year using maritime routes, many via smuggling operations."[391] The U.S. Coast Guard recently testified in front of the Committee that illegal immigration is heavily influenced by U.S. policy and perceptions of U.S. policy.[392]

According to DHS, while the number of migrant interdictions has remained somewhat steady over the last two decades, these numbers represent a significant drop from its peak in the early 1990s.[393] From 1991 to 1995, the Coast Guard interdicted over 120,000 migrants from 23 countries.[394] In 1994, the Coast Guard responded to two mass migrations from Haiti and Cuba, in which 63,000 migrants were rescued and prevented from illegally entering the U.S.[395]

---

[385] U.S. participation is led by Joint Interagency Task Force South. UNITED STATES SOUTHERN COMMAND, OPERATION MARTILLO (2015), http://www.southcom.mil/newsroom/Pages/Operation-Martillo.aspx.
[386] These countries are Belize, Canada, Colombia, Costa Rica, El Salvador, France, Guatemala, Honduras, the Netherlands, Nicaragua, Panama, Spain, the United Kingdom, and the United States. Chile has also contributed to the operation. Id.
[387] Id.
[388] Id.
[389] CBP P-3 Crew Detects Cocaine Runs Reaching 2.9 Tons, U.S. CUSTOMS AND BORDER PROTECTION (June 11, 2015), http://www.cbp.gov/newsroom/local-media-release/2015-06-11-000000/cbp-p-3-crew-detects-cocaine-runs-reaching-29-tons.
[390] Operation Martillo Drug Bust Results in $35 Million of Cocaine, U.S. COAST GUARD (Nov. 29, 2014), http://www.uscgnews.com/go/doc/4007/2426390/Operation-Martillo-drug-bust-results-in-35-million-of-cocaine-.
[391] U.S. COAST GUARD, ALIEN MIGRANT INTERDICTION, http://www.uscg.mil/hq/cg5/cg531/AMIO/amio.asp.
[392] See Securing the Border: Understanding Threats and Strategies for the Maritime Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs, 114th Cong. (2015) (statement of Rear Admiral Peter J. Brown, Assistant Commander for Response Policy, U.S. Coast Guard).
[393] U.S. COAST GUARD, ALIEN MIGRANT INTERDICTION, http://www.uscg.mil/hq/cg5/cg531/AMIO/amio.asp.
[394] Id.
[395] Id.

48

AOL-DEF-00002391

125

| Table 3. Comparison of Apprehensions at U.S. Borders FY2011-FY2014[396] | | | | |
|---|---|---|---|---|
| Sector | FY2011 | FY2012 | FY2013 | FY2014 |
| **Northern Border Total** | **6,123** | **4,210** | **3,230** | **3,338** |
| **Southwest Border Total** | **327,577** | **356,873** | **414,397** | **479,371** |
| Maritime Border | 6,552 | 3,685 | 3,162 | 3,942 |
| Coast Guard | 2,474 | 2,955 | 2,094 | 3,587 |
| **Total Maritime** | **9,026** | **6,640** | **5,256** | **7,529** |

The Coast Guard and OAM have joint responsibility for maritime drug interdiction. The Coast Guard's mission is to reduce the supply of drugs by denying smugglers the use of air and maritime routes in a seven million square-mile area called the Transit Zone, which includes the Caribbean Sea, the Gulf of Mexico, and the Eastern Pacific Ocean.[397] Meanwhile, CBP's OAM patrols the 12 mile area directly off the U.S. coasts and provides its air and marine assets to assist in securing the Transit Zone.[398] Both components "coordinate[] closely with other federal agencies and countries within the region to disrupt and deter the flow of illegal drugs."[399]

The Coast Guard "accounts for nearly 56 [percent] of all U.S. government seizures of cocaine each year."[400] In FY2014, the Coast Guard seized 93 vessels, 108,534 pounds of marijuana, and 198,636 pounds of cocaine.[401] Already in FY2015, the Coast Guard has seized 72 vessels, 31,224 pounds of marijuana, and 147,268 pounds of cocaine.[402]

In a previous hearing, the Committee heard former drug czar Barry McCaffrey estimate that the overall interdiction rate of drugs coming across our land borders is somewhere between 5 to 10 percent.[403] Similarly, the Coast Guard is only able to target approximately 30 percent of the illegal drugs it is aware of, resulting in the interdiction of only 11 to 18 percent of the maritime

---

[396] Table 3 apprehensions at the southwest border, northern border, and maritime border represent those recorded by the U.S. Border Patrol. *See* UNITED STATES BORDER PATROL TOTAL ILLEGAL ALIEN APPREHENSIONS BY MONTH, http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20Apps%20by%20Sector%20and%20 Area%2C%20FY2000-FY2014_0.pdf. Since the U.S. Coast Guard also interdicts a significant number of migrants at our maritime border, a full representation of maritime apprehensions adds these two data points together. *See* U.S. COAST GUARD MARITIME MIGRANT INTERDICTIONS, http://www.uscg.mil/hq/cg5/cg531/AMIO/FlowStats/currentstats.asp.

[397] THE WHITE HOUSE, TRANSIT ZONE OPERATIONS, https://www.whitehouse.gov/ondcp/transit-zone-operations.

[398] Majority Staff observations during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015).

[399] U.S. COAST GUARD, DRUG INTERDICTION, http://www.uscg.mil/hq/cg531/drug_interdiction.asp.

[400] U.S. COAST GUARD, ENFORCEMENT BRANCH, http://www.uscg.mil/d8/enforcement//.

[401] U.S. COAST GUARD, COAST GUARD DRUG REMOVAL STATISTICS, http://www.uscg.mil/hq/cg5/cg531/Drugs/stats.asp (updated as of April 30, 2015).

[402] *Id.*

[403] *Securing the Border: Assessing the Impact of Transnational Crime: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015); *see also Securing the Border: Fencing, Infrastructure, and Technology Force Multipliers: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).

49

AOL-DEF-00002392

126

known drug flow toward the U.S.[404]  However, when it does set itself on a known target, the Coast Guard is 85 to 90 percent successful in completing the interdiction.[405]

As for CBP, in FY2014, "OAM's P-3 aircraft flew 6,000 hours of counter-narcotics missions in the drug Transit Zone between South America and the U.S."[406]  These missions resulted in the seizure or disruption of "126,489 pounds of cocaine with a value of nearly $9.4 billion."[407]

*The Atlantic Coast and the Caribbean*

The Atlantic coastline and the Gulf of Mexico make up a large and important part of America's maritime borders.  Due to this coast's proximity to the Caribbean and many of the other small island nations, many migrants attempt to enter the U.S. through maritime routes.  In addition, recent pressures in Central and South America have shifted some of the drug trade to the Caribbean, increasing the need for border protection in these regions.

Most migrants attempting to enter the U.S. illegally via maritime routes come from Cuba, the Dominican Republic, and Haiti.[408]  One factor that has led to the large number of apprehensions along the maritime border is the United States' "wet-foot, dry-foot" policy, which allows any Cuban reaching U.S. land to stay and pursue citizenship, while those caught at sea are returned to Cuba.[409]  This policy, formally known as the U.S.-Cuba Immigration Accord, was written into law in 1995 as an amendment to the 1966 Cuban Adjustment Act.[410]  Without this policy, Cuban migrants would be processed similar to other foreign nationals caught illegally in the country and would be subject to deportation.[411]

Cubans seeking to make it to America use many different methods, including hiring organized smugglers, homemade boats, or even clinging to inner tubes and hoping to float to the U.S. mainland.[412]  In the maritime setting, these migrants travel from Cuba across the Florida Straits, seeking to reach South Florida.[413]  With the recent shift in the relationship between Cuba and the U.S., many Cubans are attempting to migrate to America, fearing that America will soon change

---

[404] U.S. COAST GUARD, MARITIME BORDER SECURITY (2015) (on file with Majority Staff); *Western Hemisphere Drug Interdiction Efforts: Hearing Before the House SubComm. on Coast Guard and Marine Transportation of the Comm. on Transportation and Infrastructure*, 114th Cong. (2015).
[405] *Id.*
[406] U.S. CUSTOMS AND BORDER PROTECTION, OFFICE OF AIR AND MARINE FACT SHEET, https://www.cbp.gov/sites/default/files/documents/oam-factsheet-20150701.pdf.
[407] *Id.*
[408] U.S. COAST GUARD, ALIEN MIGRANT INTERDICTION, http://www.uscg.mil/hq/cg5/cg531/AMIO/amio.asp.
[409] Jefferson Morley, *U.S.-Cuba Migration Policy*, WASH POST (July 27, 2007), http://www.washingtonpost.com/wp-dyn/content/article/2007/07/27/AR2007072701493.html.
[410] Pub. Law No. 89-732 (1996).
[411] *Cuban Migrants Continue Deadly Hide-and-Seek*, REUTERS (June 12, 2015), http://www.voanews.com/content/cuban-migrants-continue-deadly-hide-and-seek/2819281.html.
[412] Frances Robles, *In Rickety Boats, Cuban Migrants Again Flee to U.S.*, NY TIMES (Oct. 9, 2014), http://www.nytimes.com/2014/10/10/us/sharp-rise-in-cuban-migration-stirs-worries-of-a-mass-exodus.html.
[413] *Id.*

50

AOL-DEF-00002393

127

its wet-foot, dry-foot policy.[414]  Prior to the President's announcement, from Dec. 1-16, 2014, the Coast Guard interdicted 80 Cubans.[415]  After the President's announcement, from Dec. 17-31, 2014 the Coast Guard interdicted 419 Cubans—a 423 percent increase.[416]  The Coast Guard deployed direct repatriation and immediately began sending those interdicted in the waterways back to Cuba.[417]  As a result, Cuban interdictions have returned to normal levels in the maritime setting.[418]

While Cuban migration has leveled off in the maritime setting where direct repatriation may be employed, it has drastically increased at U.S. POEs, where Cubans are able to gain admittance and remain in the U.S.  In fact, on a recent Congressional Delegation (CODEL) to Central America, Members on the Committee heard that 50 Cubans a day are caught transiting Honduras on their way to the U.S. and approximately 90 percent of the Special Interest Aliens caught in Honduras are Cuban nationals.[419]

The Dominican Republic has also "historically been a major source country for undocumented migrants attempting to enter the U.S."[420]  These immigrants enter Puerto Rico by crossing the Mona Passage, which is a "body of water between the Dominican Republic and Puerto Rico."[421]  They are then smuggled to the U.S. by gangs in Yolas, which are homemade fishing vessels.[422]

In 2010, following the earthquake in Haiti, the U.S. ceased its policies of expedited removal of Haitians illegally arriving in the U.S.[423]  By 2013, migrant smuggling organizations in the Dominican Republic caught wind of this change in U.S. policy and began taking Haitian immigrants to Puerto Rico via the Mona Passage.[424]  In fact, by the end of FY2013, 1,760 Haitian migrants attempted to enter the U.S. through the Mona Passage, as compared to 39 Haitians in FY2012.[425]  In FY2014, 1,994 Haitian migrants made the same dangerous attempt in smuggling ventures, directly resulting in the death of 29 Haitians at sea.[426]  On October 6, 2014, DHS resumed expedited removal for non-criminal Haitian migrants who landed on U.S. Territories in Puerto Rico and the islands of the Mona Passage.[427]  After the first removal,

---

[414] *Cuban Migrants Continue Deadly Hide-and-Seek*, REUTERS (June 12, 2015),
http://www.voanews.com/content/cuban-migrants-continue-deadly-hide-and-seek/2819281.html.
[415] U.S. COAST GUARD, MARITIME BORDER SECURITY (2015) (on file with Majority Staff).
[416] *Id.*
[417] *Id.*
[418] *Id.*
[419] Observations during Johnson-Carper CODEL to Central America (Oct. 2015).
[420] U.S. COAST GUARD, ALIEN MIGRANT INTERDICTION, http://www.uscg.mil/hq/cg5/cg531/AMIO/amio.asp.
[421] *Id.*
[422] *Id.*
[423] *See Securing the Border: Understanding Threats and Strategies for the Maritime Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015)
[424] *Surge of Migrants Being Smuggled to Puerto Rico,* CBS NEWS (July 26, 2014),
http://www.cbsnews.com/news/surge-of-migrants-being-smuggled-to-united-states-through-puerto-rico/.
[425] *See Securing the Border: Understanding Threats and Strategies for the Maritime Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[426] *Id.*
[427] *Id.*

AOL-DEF-00002394

128

Haitian maritime flow in the Mona Passage decreased by 80 percent.[428]  In the first three quarters of FY2015, only 277 Haitian migrants attempted to enter the U.S. via the Mona Passage, as compared to 1,430 for the same period in FY2014.[429]

The Coast Guard has recognized that "[t]he Caribbean region is home to some of the most indebted nations in the world" and the "[l]ack of economic resources in the region continues to be a major factor in the failure to prevent contraband from entering the international supply chain."[430]  This "lack of state control and jurisdictional coordination challenges over vast areas of maritime borders" creates opportunities for TCOs "to smuggle and traffic drugs, weapons, and people."[431]  In fact, as early as 2012, Members of the U.S. Senate recognized that there was the potential for an increase in drug trafficking in the Caribbean due to increased security efforts in Mexico, Central America, and the Eastern Pacific.[432]

In 2011, approximately four percent of cocaine brought to the U.S. transited through the Caribbean.[433]  This increased to 16 percent by the end of 2013.[434]  TCOs such as Mexico's Sinaloa Cartel or the Italian 'Ndrangheta are becoming more entrenched in the Caribbean as drug flow in the region increases.[435]  These groups work with local counterparts, who are often paid a percentage of the shipment or in commodities such as guns.[436]

*The Pacific Coast*

The sheer magnitude of the Eastern Pacific Ocean, equivalent in size to the continental U.S., creates many challenges for maritime domain awareness and interdictions.[437]  Migrants smuggled via maritime routes are typically found 60 to 70 miles up the coast of California.[438]  Smugglers have no regard for the safety of these migrants.  For example, when smugglers discovered OAM could figure out the number of migrants who had absconded based on counting the life vests deserted in the water, smugglers ceased distributing life vests to migrants—many of whom cannot swim.[439]  Additionally, smugglers may require migrants to hug the engines of their panga boats, preventing OAM from shooting the engine and safely stopping the boat.[440]

---

[428] *Id.*
[429] *Id.*
[430] UNITED STATES COAST GUARD, WESTERN HEMISPHERE STRATEGY (2014), http://www.uscg.mil/seniorleadership/docs/uscg_whem_2014.pdf (citing C. Ward, *Regional Threats: Security Capacity Imperatives in the Caribbean*, Joint Force Quarterly, 2010, 26-31).
[431] *Id.*
[432] *Id.* (citing United States Senate Caucus on International Narcotics Control, *Preventing a Security Crisis in the Caribbean*, (2012), http://www.drugcaucus.senate.gov/sites/default/files/caribbean%20drug%20report.pdf).
[433] *Full Circle: An Old Route Regains Popularity with Drugs Gangs*, THE ECONOMIST (May 24, 2014), http://www.economist.com/news/americas/21602680-old-route-regains-popularity-drugs-gangs-full-circle.
[434] *Id.*
[435] *Id.*
[436] *Id.*
[437] *See Securing the Border: Understanding Threats and Strategies for the Maritime Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015)
[438] Data provided to Majority Staff during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015).
[439] *Id.*
[440] *Id.*

AOL-DEF-00002395

129

As another example, on June 18, 2015, Marine Interdiction Agents from OAM encountered a vessel off the California Coast near Encinitas.[441] Agents hailed the vessel and ordered the pilot to yield, but the vessel failed to comply, even after warning shots were fired.[442] After the failure to comply, the marine interceptor vessel and the smuggling vessel collided, resulting in the capsizing of the smuggling vessel.[443] Twenty Mexican migrants were thrown into the water, and one woman was later pronounced dead at a local hospital.[444] All 20 people were suspected of attempting to enter the U.S. illegally.[445]

The vast majority of drugs enter the U.S. through the U.S.-Mexico land border; however, some cartels have started using panga boats to move drugs across the U.S. maritime border.[446] Mexico's Sinaloa Cartel smuggles marijuana on 50-foot vessels, which are loaded with cargo as far south as the port of Mazatlán, and then smuggled up the Pacific coast deep into California.[447] Smugglers using longer-range boats and semi-submersible vessels have also begun taking advantage of the remote coasts of Northern California, and have landed as far north as Santa Cruz, 350 nautical miles north of San Diego.[448] In July 2015, the Coast Guard in Northern California seized six tons of cocaine from a semi-submersible vessel in the Pacific Ocean, to date, the largest bust in Coast Guard history.[449]

Earlier this year, the Oregon HIDTA released a report, which describes the threat that Oregon, as a Pacific Coast state, faces from maritime drug trafficking.[450] The HIDTA report concludes that there is a lack of intelligence when it comes to the use of maritime smuggling, and that the threat posed by maritime smuggling is "undoubtedly larger than law enforcement is aware."[451] Washington State also faces unique maritime threats, with small U.S. islands located on the open waters in close proximity to Canada. If a Canadian vessel is able to penetrate these islands, those on board can catch a ferry to the mainland with very little interaction with U.S. law enforcement.[452]

---

[441] Christian De La Rosa, *Woman Dies after CBP, Suspected Smuggling Boats Collide*, FOX 5 SAN DIEGO (June 18, 2015), http://fox5sandiego.com/2015/06/18/woman-dies-after-cbp-suspected-smuggling-boats-collide/.
[442] *Id.*
[443] *Id.*
[444] *Id.*
[445] *Id.*
[446] *Western Hemisphere Drug Interdiction Efforts: Hearing Before the House SubComm. on Coast Guard and Marine Transportation of the Comm. on Transportation and Infrastructure*, 114th Cong. (2015).
[447] *Drug Smugglers Take to the High Seas to Avoid Border Patrol*, NY POST (Feb. 24, 2014), http://nypost.com/2014/02/24/drug-smugglers-take-to-the-high-seas-to-avoid-border-patrol/.
[448] *Id.*
[449] Lisa Fernandez, *Record Bust: Coast Guard Seizes 5 Tons of Cocaine Valued at $181 M*, NBC SOUTHERN CALIFORNIA (Aug. 6, 2015), http://www.nbclosangeles.com/news/california/US-Coast-Guard-in-Alameda-Seizes-6-Tons-12000-Pounds-of-Cocaine-Valued-at-181-Million-Largest-Bust-in-History--320897421.html.
[450] OREGON HIGH INTENSITY DRUG TRAFFICKING AREA, PROGRAM YEAR 2016 THREAT ASSESSMENT AND COUNTER-DRUG STRATEGY (2015).
[451] *Id.*
[452] Majority Staff observations during bipartisan STAFFDEL to the Blaine, Washington Sector (Aug. 2015).

53

AOL-DEF-00002396

130

*The Great Lakes*

There are three Border Patrol sectors that encompass the Great Lakes: Grand Forks, Detroit, and Buffalo. These sectors have unique challenges regarding illegal migration and drug trafficking. For example, Canadian smugglers often use smaller airports along the Great Lakes for quick drop-offs before turning around and heading back to Canada, making it difficult for CBP to apprehend these smugglers.[453] Additionally, Mexican-based TCOs now operate in the Great Lakes region, including the Sinaloa Cartel, Los Zetas, and the Tijuana Cartel.[454]

In 2012, DHS released its Northern Border Strategy, which in part focused on the Great Lakes.[455] The report states that "as the shared internal waters of sovereign nations, the Great Lakes provide equal opportunity access to both countries."[456] The report noted that "[t]he vast maritime border with Canada and the open access that small vessels have in the Great Lakes provide an additional conduit for potential exploitation."[457] In order to address this challenge, DHS has implemented the Small Vessel Security Strategy (SVSS), which develops and leverages a partnership with the small vessel community, as well as the public and private sectors.[458]

The ShipRider program is also integral to enforcement of the Great Lakes borders.[459] The U.S.-Canada ShipRider program is a "cooperative approach to combating cross border crime" on U.S.-Canada shared waters.[460] The program "involves vessels jointly crewed by specially trained and designated Canadian and U.S. law enforcement officers who are authorized to enforce the law on both sides of the international boundary line."[461] This cooperative effort allows law enforcement officials to secure the border "from threats to national security, as well as prevent cross-border smuggling and trafficking."[462]

*U.S. Ports*

America's extensive port system is one of its most valuable assets, but also one that faces numerous threats and weaknesses. From 2004 to 2013, American ports witnessed a 128 percent

---

[453] *Drug Bust in Michigan's Thumb Exposes Use of Tiny Airports by Canadian Smugglers*, AP (May 15, 2011), http://www.toledoblade.com/local/2011/05/15/Drug-bust-in-Michigans-Thumb-exposes-use-of-tiny-airports-by-Canadian-smugglers.html.
[454] U.S. DEP'T OF JUSTICE NATIONAL DRUG INTELLIGENCE CENTER, NATIONAL DRUG THREAT ASSESSMENT 2011 (2011), http://www.justice.gov/archive/ndic/pubs44/44849/44849p.pdf .
[455] U.S. DEP'T OF HOMELAND SECURITY, NORTHERN BORDER STRATEGY (2012).
[456] *Id.*
[457] *Id.* at 12 (highlighting the challenges of deciphering between bad actors and the commercial trade, recreational boaters, ice fishermen, and snowmobilers that also utilize the Great Lakes).
[458] U.S. DEP'T OF HOMELAND SECURITY, SMALL VESSEL SECURITY STRATEGY (2008), https://www.dhs.gov/xlibrary/assets/small-vessel-security-strategy.pdf.
[459] U.S. DEP'T OF HOMELAND SECURITY, FACT SHEET: BEYOND THE BORDER: UNITED STATES – CANADA LAW ENFORCEMENT COOPERATION (2011), http://www.dhs.gov/news/2011/12/06/fact-sheet-beyond-border-united-states-%E2%80%93-canada-law-enforcement-cooperation.
[460] ROYAL CANADIAN MOUNTED POLICE, CANADA-U.S. SHIPRIDER, http://www.rcmp-grc.gc.ca/ibet-eipf/shiprider-eng.htm.
[461] *Id.*
[462] *Id.*

54

AOL-DEF-00002397

131

growth rate, processing the second-most cargo of any port system in the world, second only to China.[463]

In an attempt to improve security at America's ports, the Security and Accountability for Every Port Act (SAFE Port Act) was passed by Congress in 2006 and signed into law by President George W. Bush.[464]  The Act codifies a number of programs to improve the security of U.S. ports.[465]  These programs include additional requirements for maritime facilities, the establishment of Interagency Operations Centers, a Port Security Grant Program, a Container Security Initiative (CSI), and a Customs Trade Partnership against Terrorism.[466]  The Act also created the Domestic Nuclear Detection Office (DNDO) within DHS, and appropriated funds toward the Integrated Deepwater System Program, a long-term Coast Guard modernization program.[467]

A 2007 GAO report on the SAFE Port Act found that federal agencies have improved overall port security in numerous ways.[468]  For example, GAO noted that the Act "increased requirements for the scope and frequency" of Coast Guard inspection of ports, leading to a doubling in the frequency of both announced and unannounced inspections.[469]  However, GAO also found that "agencies face resource constraints and other challenges" in meeting the Act's requirements.[470]

---

[463] INTERNATIONAL ASSOCIATION OF PORTS AND HARBORS, WORLD CONTAINER TRAFFIC DATA 2014, http://www.iaphworldports.org/LinkClick.aspx?fileticket=A7oMk7mR0a4%3d&tabid=4879.
[464] Pub. L. No. 109-347 (2006).
[465] Id.
[466] Id. Under CSI, CBP stations U.S. officers in 29 countries to work with host country counterparts to identify and inspect potentially high-risk shipments before they reach the U.S.  Today, more than 80 percent of maritime containerized cargo destined to the U.S. originates in or transits through a CSI port and is screened prior to being laden aboard a U.S. bound vessel.
[467] Id.
[468] GOV'T ACCOUNTABILITY OFFICE, GAO-08-126T, THE SAFE PORT ACT: STATUS AND IMPLEMENTATION ONE YEAR LATER (2007).
[469] Id. at 6.
[470] Id. at passim.

AOL-DEF-00002398

132

**Part IV: U.S. Ports of Entry**

The only lawful way to enter the U.S. is through an air, land, or sea port of entry. Upon reaching a POE, CBP OFO officers inspect passengers and cargo to ensure threats do not enter the U.S.[471] Working with other countries, the U.S. has established trusted traveler programs to expedite the processing of low-risk passengers and cargo.[472] For passengers, these programs include SENTRI[473] on the southwest border, NEXUS[474] on the northern border and Global Entry[475] at airports. For cargo, FAST is available at 17 POEs on the northern border and 17 POEs on the southwest border.[476]

Despite these programs, significant staffing is needed to process heavy volumes of traffic to ensure commerce is not impeded. Therefore, manpower remains a concern across POEs. In FY2013 Congress appropriated to CBP additional funding to hire 2,000 officers.[477] However, due to attrition and the time it takes to bring on new officers, CBP has only realized a net gain of approximately 818 officers.[478]

While discussions of U.S. land and sea POEs are examined above, air POEs located across our country are also highly active entry points into the U.S.

Visa Waiver Program

In 1986, Congress established the Visa Waiver Program (VWP) as a pilot program under the Immigration Reform and Control Act.[479] The main objective of the program was to facilitate tourism and short-term business travel with allies.[480] Prior to VWP, foreign nationals traveling to the U.S. for a short-term visit needed a nonimmigrant "B" visa, requiring an in-person interview at a U.S. consulate or embassy.[481] On October 30, 2000, with bipartisan support, Congress made permanent VWP in the Visa Waiver Permanent Program Act.[482]

---

[471] U.S. CUSTOMS AND BORDER PROTECTION, OPERATIONS, http://www.cbp.gov/border-security/ports-entry/operations.
[472] U.S. CUSTOMS AND BORDER PROTECTION, TRUSTED TRAVELER PROGRAMS, https://www.cbp.gov/travel/trusted-traveler-programs.
[473] U.S. CUSTOMS AND BORDER PROTECTION, SECURED ELECTRONIC NETWORK FOR TRAVELER'S RAPID INSPECTION (SENTRI), https://help.cbp.gov/app/answers/detail/a_id/184/~/secured-electronic-network-for-travelers-rapid-inspection-(sentri).
[474] U.S. CUSTOMS AND BORDER PROTECTION, NEXUS PROGRAM DESCRIPTION, http://www.cbp.gov/travel/trusted-traveler-programs/nexus/nexus-overview.
[475] U.S. CUSTOMS AND BORDER PROTECTION, GLOBAL ENTRY, http://www.cbp.gov/travel/trusted-traveler-programs/global-entry.
[476] U.S. CUSTOMS AND BORDER PROTECTION, FREE AND SECURE TRADE PROGRAM (FAST) FACT SHEET, http://www.cbp.gov/sites/default/files/documents/ofo_fast_final_file_3.pdf.
[477] Pub. L. No. 133-76.
[478] Data Provided to Majority Staff by the U.S. Customs and Border Protection (June 2, 2015).
[479] Pub. L. No. 99-603 (1986).
[480] GOV'T ACCOUNTABILITY OFFICE, GAO-12-599T, ADDITIONAL ACTIONS NEEDED TO MITIGATE RISKS AND STRENGTHEN OVERSTAY ENFORCEMENT 2 (2012).
[481] U.S. CUSTOMS AND BORDER PROTECTION, VISA WAIVER PROGRAM REQUIREMENTS, http://www.dhs.gov/visa-waiver-program-requirements
[482] Pub. L. No. 106-396 (2000).

AOL-DEF-00002399

133

The terrorist attacks of September 11, 2001 and the plot by Richard Reid, also known as the Shoebomber, in December 2001 motivated Congress to modernize VWP's security requirements.[483] In 2007, Congress passed the Implementing the 9/11 Commission Recommendations Act requiring the Director of National Intelligence to produce intelligence reports to assess the threats from VWP countries and more reporting on lost or stolen passports.[484] As part of this modernization, on January 12, 2009, DHS deployed the Electronic System for Travel Authorization (ESTA), an online portal to pre-approve VWP travelers for travel to the U.S.[485]

At a hearing, the Committee heard that ESTA "is an example of how U.S agencies effectively use information collected from visitors in advance of travel to prevent terrorists and serious criminals from boarding a flight headed to the United States."[486] A witness from the State Department explained that passengers from VWP countries must receive ESTA approval before traveling, which:

> "involves filling out an online questionnaire with biographic information and paying an administrative fee, after which, similar to a visa application, ESTA screens against interagency databases for watchlisted individuals. If there is a positive match, DHS may deny the authorization, meaning the individual cannot utilize the VWP to board a U.S.-bound air or sea carrier."[487]

If approved, ESTA authorization is valid for multiple trips to the U.S. up to 90 days in duration for a period of two years.[888] Once a traveler arrives to the U.S., biometric data is collected by CBP at the port of entry, prior to admission into the country.

VWP countries are required to sign agreements with the U.S. to share information related to terrorists and criminals.[489] The information sharing agreements initiated under VWP increase the understanding of global security threats as well as the unique threat profiles of both VWP members and at times, non-VWP members.[490] Witnesses at a Committee hearing testified that "[w]ithout the leverage that VWP provides, the U.S government likely would not receive the same amount and quality of information."[491]

---

[483] Pub. L. No. 107-56 (2001).
[484] Pub. L. No. 110-53 (2007).
[485] U.S. CUSTOMS AND BORDER PROTECTION, ELECTRONIC SYSTEM FOR TRAVEL AUTHORIZATION, https://esta.cbp.dhs.gov/esta/.
[486] GOV'T ACCOUNTABILITY OFFICE, GAO-12-599T, ADDITIONAL ACTIONS NEEDED TO MITIGATE RISKS AND STRENGTHEN OVERSTAY ENFORCEMENT 2 (2012).
[487] Id.
[488] U.S. CUSTOMS AND BORDER PROTECTION, ESTA – LENGTH OF APPROVAL, https://help.cbp.gov/app/answers/detail/a_id/1126/~/esta---length-of-approval.
[489] See Visa Waiver Program: Additional Actions Needed to Mitigate Risks and Strengthen Overstay Enforcement: Hearing Before the S. SubComm. on Immigration, Refugees, and Border Security of the Comm. on the Judiciary, 112th Cong. (2012) (Testimony of Rebecca Gambler and Michael J. Courts, Government Accountability Office).
[490] Id.
[491] Visa Waiver Program: Implications for U.S. National Security: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs, 114th Cong. (2015) (statement of Mark Koumans & Maureen Dugan, U.S. Department of Homeland Security).

57

AOL-DEF-00002400

134

Under the 2007 Act, DHS and its VWP partners are required to check passports against INTERPOL's Lost or Stolen Documents database.[492] In November 2014, DHS added data fields to the ESTA application.[493] These upgrades have arguably improved the security of the travel ecosystem by encouraging common security standards for travel documents.[494]

However, in a 2011 report, GAO stated that in 2010, two percent, or 364,000 VWP visitors, boarded airplanes and arrived in the U.S. without proper ESTA clearance.[495] Given that ESTA is the security backbone to screen VWP travelers for security risks, this is a significant vulnerability.[496] DHS now notes that it has implemented new safeguards, including re-vetting ESTA applications every 24 hours.[497]

Moreover, in the wake of the terror attacks in Paris, Brussels, and Copenhagen, the growing number of Western foreign fighters traveling to Syria and Iraq, and the surge of Syrian refugees entering Europe, there have been calls for oversight of VWP in the context of terrorist travel.[498] The visa-less nature of VWP raises concerns because terrorists not yet flagged by U.S. or foreign intelligence could enter or re-enter the U.S. within their two-year ESTA period with little interactions with U.S. authorities.[499]

On August 6, 2015, Secretary Johnson announced the Department's intention to implement additional security requirements to enhance VWP.[500] As part of the new directive, foreign nationals from the 38 existing member countries[501] and new candidate countries will be required to use an e-passport in order to visit the U.S. under the visa free program, which are harder to tamper with as it contains the electronic photograph, full name, and birthday of the foreign

---

[492] Pub. L. No. 110-53 (2007).

[493] The data fields include additional passport data, contact information, other potential names or alias, parents' name(s), and employment information.  U.S. CUSTOMS AND BORDER PROTECTION, STRENGTHENING SECURITY OF THE VWP THROUGH ENHANCEMENTS OF ESTA, http://www.cbp.gov/travel/international-visitors/esta/enhancements-to-esta-faqs; U.S. DEP'T OF HOMELAND SECURITY, PRIVACY IMPACT ASSESSMENT UPDATE FOR THE ELECTRONIC SYSTEM FOR TRAVEL AUTHORIZATION (ESTA) 2 (2014), http://www.dhs.gov/sites/default/files/publications/privacy-pia-update-cbp-esta-11032014.pdf.

[494] Letter to the Honorable Ron Johnson, Chairman, Senate Homeland Security & Governmental Affairs, from the Honorable Jeh Johnson, Secretary, U.S. Department of Homeland Security (Mar. 20, 2015).

[495] GOV'T ACCOUNTABILITY OFFICE, GAO-11-335, DHS HAS IMPLEMENTED THE ELECTRONIC SYSTEM FOR TRAVEL AUTHORIZATION, BUT FURTHER STEPS NEEDED TO ADDRESS POTENTIAL PROGRAM RISKS 18 (2011).

[496] GOV'T ACCOUNTABILITY OFFICE, GAO-12-599, ADDITIONAL ACTIONS NEEDED TO MITIGATE RISKS AND STRENGTHEN OVERSTAY ENFORCEMENT 5 (2012).

[497] Data provided to Majority Staff by the U.S. Department of Homeland Security (Aug. 28, 2015).

[498] Brian Naylor, *Critics Worry Visa Waiver Could Allow Foreign Fighters To Slip in*, NPR (Feb. 2, 2015), http://www.npr.org/2015/02/02/383214948/critics-point-out-weakness-of-visa-waiver-program;

[499] Letter from the Honorable Ron Johnson, Kelly Ayotte, and Thomas Carper, to the Honorable Jeh Johnson, Secretary, U.S. Department of Homeland Security(Mar. 2, 2015).

[500] *Statement by Secretary Jeh C. Johnson on Intention to Implement Security Enhancements to the Visa Waiver Program*, U.S. DEPARTMENT OF HOMELAND SECURITY (Aug. 6, 2015), http://www.dhs.gov/news/2015/08/06/statement-secretary-jeh-c-johnson-intention-implement-security-enhancements-visa.

[501] The countries the U.S. currently has VWP agreements with are: Andorra, Australia, Austria, Belgium, Brunei, Chile, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Monaco, The Netherlands, New Zealand, Norway, Portugal, Singapore, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, Taiwan, United Kingdom.

AOL-DEF-00002401

135

national.[502]  In addition, VWP member countries will have to use the INTERPOL Lost and
Stolen Documents database to screen all travelers crossing their borders and allow more U.S.
federal air marshals on flights departing to the United States.[503]

Finally, DHS estimates that approximately five million of the current 11 million illegal
immigrants in the U.S. are visa overstays.[504]  While DHS claims that the overstay rate of VWP
countries is collectively less than one percent, the Department has not released data on the
individual overstay rate of VWP countries, despite repeated requests for such information by
Congress.[505]  In its 2011 report, GAO indicated that in 8,200 of 34,700 cases, or roughly one-
quarter of VWP cases, ICE's Counterterrorism and Criminal Exploitation Unit (CTCEU) could
not locate the suspected overstay.[506]  Based on this percentage, the Majority Staff believes it fair
to conclude that today, close to a million passengers who entered the U.S. through VWP cannot
be found.

<u>Refugee Resettlement</u>

Each year the President, after consultation with Congress, sets an annual ceiling for the number
of refugees the U.S. will admit.[507]  For the past several years, the ceiling has been set at 70,000
refugees.[508]  The President recently announced plans to raise the refugee ceiling to 85,000 for
FY2016 and to 100,000 for FY2017.[509]  Moreover, the President has announced that of the
85,000 refugees that will be admitted into the U.S. in FY2016, 10,000 will come from Syria.[510]
Due to vetting, interviews, and required screenings, it takes on average between 18 and 24
months from the time a refugee is referred to the U.S. to their admittance into the country.[511]

---

[502] *Id.* This means that if you change the picture of a lost or stolen passport, it will not match with official biographic
records.
[503] Michael S. Schmidt, *Tougher Standards Set for U.S. Visa Waivers, Citing Militant Threat*, NY TIMES (Aug. 6,
2015), http://www.nytimes.com/2015/08/07/world/middleeast/us-visa-waiver-program-europe-radicalization-isis-
syria-iraq.html?_r=0.  Changes such as these have been recommended to DHS by key members of Congress. *See*
Letter from Senators Ron Johnson, Kelly Ayotte, and Thomas Carper, to the Honorable Jeh Johnson, Secretary, U.S.
Department of Homeland Security (Mar. 2, 2015).
[504] *FACT SHEET: Modes of Entry for the Unauthorized Migrant Population*, PEW RESEARCH CENTER (May 22,
2006), http://www.pewhispanic.org/2006/05/22/modes-of-entry-for-the-unauthorized-migrant-population/; *see also*
Alison Siskin, CONG. RESEARCH SERV., RL 32221, VISA WAIVER PROGRAM (2014).
[505] *See, generally,* GOV'T ACCOUNTABILITY OFFICE, GAO-08-967, VISA WAIVER PROGRAM: ACTIONS ARE NEEDED
TO IMPROVE MANAGEMENT OF THE EXPANSION PROCESS, AND TO ASSESS AND MITIGATE PROGRAM RISKS (2008).
[506] GOV'T ACCOUNTABILITY OFFICE, GAO-11-335, DHS HAS IMPLEMENTED THE ELECTRONIC SYSTEM FOR TRAVEL
AUTHORIZATION, BUT FURTHER STEPS NEEDED TO ADDRESS POTENTIAL PROGRAM RISKS (2011).
[507] Andorra Bruno, CONG. RESEARCH SERV., RL 31269, REFUGEE ADMISSIONS AND RESETTLEMENT POLICY 1
(2015).
[508] *Id.* at 2.
[509] U.S. Dep't of State, U.S. Dep't of Homeland Security, U.S. Dep't of Health and Human Services, Proposed
Refugee Admissions for Fiscal Year 2016 Report to Congress Submitted on Behalf of the President of the United
States to the Committees on the Judiciary United States Senate and United States House of Representatives (2015).
[510] *White House: US Preparing to Accept at Least 10,000 Syrian Refugees in FY2016*, AP (Sept. 10, 2015),
http://bigstory.ap.org/article/db01f145696043bc8a264c47319bfd19/white-house-us-preparing-accept-least-10000-
syrian-refugees.
[511] The Impact of ISIS on the Homeland and Refugee Resettlement: *Hearing Before the S. Comm. on Homeland
Security & Governmental Affairs,* 114th Cong. (2015) (statement of Anne C. Richard, Assistant Secretary for
Population, Refugees, and Migration, U.S. Department of State).

AOL-DEF-00002402

136

Various federal agencies are involved in the U.S. Refugee Resettlement Program. Put simply, the U.S. Department of State is charged with processing the refugees while overseas, the U.S. Department of Homeland Security determines eligibility for admission into the country, and the U.S. Department of Health and Human Services assists in the resettlement, placement, and support of the refugees.

ISIS's violence in Syria and Iraq has created a large population of vulnerable, displaced Syrian and Iraqi citizens. Over 4 million registered Syrian refugees have left the conflict region.[512] As of August 2015, 121,535 Syrians have arrived in Europe, seeking asylum,[513] while 1,682 Syrians were admitted to the U.S. as refugees in FY2015.[514]

According to the State Department, refugees go through a rigorous screening process in order to be granted access to the United States,

> All refugees undergo multiple security checks in order to be approved for U.S. resettlement. Refugees are subject to the highest level of security checks of any category of traveler to the United States. The screening includes involvement of the National Counterterrorism Center (NCTC); the FBI's Terrorist Screening Center; DHS; the Department of Defense; and other agencies. Most of the details of the security checks are classified. At the same time, refugees complete a health screening.[515]

At a Committee hearing, witnesses from both the State Department and DHS stated that the vetting for refugees, particularly Syrian refugees, was more rigorous than for any other migrant seeking to legally come to the country.[516] However, in February, FBI Assistant Director Michael Steinbach told the House Homeland Security Committee that he was concerned about the risks associated with bringing in Syrian refugees, due to our lack of on the ground collection and thus incomplete databases.[517] FBI Director Comey echoed this concern during HSGAC's annual "Threats to the Homeland" hearing in October, admitting that the U.S. faces deficits when it

---

[512] The UN Refugee Agency's Syria Regional Refugee Response Inter-agency Information Sharing Portal, http://data.unhcr.org/syrianrefugees/regional.php.
[513] Drew Desilver, *Europe's Asylum Seekers: Who They Are, Where They're Going, and Their Chances of Staying,* PEW RESEARCH CENTER (Sept. 30, 2015), http://www.pewresearch.org/fact-tank/2015/09/30/europes-asylum-seekers-who-they-are-where-theyre-going-and-their-chances-of-staying/.
[514] Haeyoun Park, *Paris Attacks Intensify Debate Over How Many Syrian Refugees to Allow into the U.S.,* N.Y. TIMES (Nov. 16, 2015), http://www.nytimes.com/interactive/2015/10/21/us/where-syrian-refugees-are-in-the-united-states.html?_r=0.
[515] U.S. Dep't of State, *Background Briefing on the Mechanics of the United States Refugee Admissions Program,* (Sept. 11, 2015) http://www.state.gov/r/pa/prs/ps/2015/09/246843.htm.
[516] The Impact of ISIS on the Homeland and Refugee Resettlement: *Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of Anne C. Richard, Assistant Secretary for Population, Refugees, and Migration, U.S. Department of State and Leon Rodriguez, Director, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security).
[517] *Countering Violent Islamist Extremism: The Urgent Threat of Foreign Fighters and Homegrown Terror: : Hearing Before the H. Comm. on Homeland Security,* 114th Cong. (2015) (statement of Michael Steinbach, Assistant Director, Federal Bureau of Investigation).

60

AOL-DEF-00002403

137

comes to vetting Syrian refuges.[518] NCTC Director Rasmussen expressed concerns at both hearings explaining that the U.S. does not have the traditional diplomatic, military, and intelligence footprint in Syria to provide law enforcement with lists of known or suspected terrorists.[519] Thus, while the U.S. may have a system that ensures that all databases are touched during the vetting process, "you can only review against what you have."[520]

Biometric Entry-Exit Program

Terrorists have exploited the U.S. immigration system to enter and remain in the U.S., often by entering the country lawfully but then unlawfully remaining in the country after their visa expired.[521] To address this, Congress has passed eight statutes mandating some form of an entry-exit system to track those transiting the country.[522] In 2004, the 9/11 Commission Report recommended DHS "complete, as quickly as possible, a *biometric* entry-exit screening system."[523] That year, DHS "fully implemented a biometric air *entry* solution into existing inspection booths"[524] and fully deployed a biometric land entry system in 2005.[525] To date, DHS has spent approximately $1 billion on the implementation of a biometric entry-exit program; however, a biometric exit solution still does not exist.[526]

Non-U.S. citizens or legal permanent residents seeking to travel to the U.S. either obtain a temporary visa at a U.S. consulate abroad or enter through the VWP (see above).[527] All arriving travelers that are not previously cleared through CBP's preclearance program (see below) are

---

[518] *Threats to the Homeland: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Nicholas J. Rasmussen, Director, National Counterterrorism Center, Office of the Director of National Intelligence).
[519] *Id.* ("the intelligence picture we have of this particular conflict zone is not as rich as we would like it to be."); *see also Countering Violent Islamist Extremism: The Urgent Threat of Foreign Fighters and Homegrown Terror: Hearing Before the H. Comm. on Homeland Security*, 114th Cong. (2015) (statement of Nicholas J. Rasmussen, Director, National Counterterrorism Center, Office of the Director of National Intelligence).
[520] *Threats to the Homeland: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Nicholas J. Rasmussen, Director, National Counterterrorism Center, Office of the Director of National Intelligence).
[521] THE 9/11 COMMISSION REPORT 527–528 (2004).
[522] *See* Pub. L. No. 104-208 (1996); Pub. L. No. 106-215 (2000); Pub. L. No. 106-396 (2000); Pub. L. No. 107-56, (2001); Pub. L. No. 107-173 (2002); Pub. L. No. 108-458 (2004); Pub. L. No. 110-53 (2007); Pub. L. No. 113-76 (2013).
[523] THE 9/11 COMMISSION REPORT 389 (2004) (emphasis added).
[524] *Fulfilling A Key 9/11 Commission Recommendation: Implementing Biometric Exit, Hearing Before the House SubComm. on Border and Maritime of the Comm. on Homeland Security*, 113th Cong. (2013) (statement of David Hayman, John Wagner, and John P. Woods, U.S. Department of Homeland Security), *available at* http://www.dhs.gov/news/2013/09/26/written-testimony-cbp-and-ice-house-homeland-security-subcommittee-border-and.
[525] U.S. DEP'T OF HOMELAND SECURITY, U.S.-VISIT UPDATE: DHS COMPLETES FOUNDATION OF BIOMETRIC ENTRY SYSTEM, http://www.fosterglobal.com/news/BiometricEntrySystem.pdf.
[526] *See Securing the Border: Biometric Entry and Exit at our Ports of Entry: Public Roundtable Before the Comm. on Homeland Security & Governmental Affairs*, 114th Cong (2015).
[527] Lisa Seghetti, CONG. RESEARCH SERV., R 43356, BORDER SECURITY: IMMIGRATION INSPECTIONS AT PORTS OF ENTRY 6 (2015).

AOL-DEF-00002404

138

"subject to inspection [] by a CBP officer prior to entering the United States."[528]  Travelers may
also "be selected through risk-based screening or at random" for further scrutiny.[529]

When a passenger makes an airline reservation, a Passenger Name Record (PNR) is created
which includes, among other things, the passenger's itinerary, name, date of birth, and passport
details.[530]  The airline is required to provide to CBP the PNR up to and continuously within 72
hours in advance of travel so that CBP can begin to build a manifest of the passenger.[531]  For
international flights to the U.S., carriers must transmit passenger and crew manifests to CBP's
Advance Passenger Information System (APIS) before departure, prior to securing the aircraft
doors, to confirm the passenger actually got on the plane.[532]  Both "PNR and APIS data [] are
forwarded to CBP's National Targeting Center (NTC), where they are vetted against intelligence
and law enforcement databases." [533]  Thereafter, the data is sent to the Arrival and Departure
Information System (ADIS) to "be held for matching against departure records.[534]  ADIS is a
*biographic* database that reads identity documents, such as a traveler's name, date of birth,
nationality, gender, and passport number.[535]  APIS data sent to ADIS "allows DHS to identify air
travelers who may have overstayed their visas."[536]  Entry-exit data is also stored in a *biometric*
database, known as the Automated Biometric Identification System (IDENT).  IDENT is a fully
biometric database and includes biographic information, biometric data (all 10 fingerprints), and
a report regarding a person's previous immigration record.[537]

DHS has utilized several different pilot programs to implement a biometric exit solution.  From
2004 to 2007 DHS placed biometric collection kiosks inside secure checkpoints and biometric
collection mobile devices in departure gate areas at 12 airports and two seaports.[538]  However, a
series of GAO reports during this time period highlighted concerns with the pilot.[539]

---

[528] *Id.; see also* U.S. CUSTOMS AND BORDER PROTECTION, CBP SEARCH AUTHORITY,
http://www.cbp.gov/travel/cbp-search-authority.
[529] *Id.*
[530] *See Securing the Border: Biometric Entry and Exit at our Ports of Entry: Public Roundtable Before the Comm.
on Homeland Security & Governmental Affairs,* 114th Cong (2015).
[531] Lisa Seghetti, CONG. RESEARCH SERV., R 43356, BORDER SECURITY: IMMIGRATION INSPECTIONS AT PORTS OF
ENTRY 9 (2015).
[532] *Id.; see also Eleven Years Later: Preventing Terrorists from Coming to America: Hearing Before the House
SubComm. on Border and Maritime of the Comm. on Homeland Security,* 112th Cong. (2012) (statement of Kevin
McAleenan, Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection).
[533] Lisa Seghetti, CONG. RESEARCH SERV., R 43356, BORDER SECURITY: IMMIGRATION INSPECTIONS AT PORTS OF
ENTRY 10 (2015).
[534] *Implementation of an Entry-Exit System: Still Waiting After All These Years: Hearing Before the House Comm.
on the Judiciary,* 113th Cong. (2013) (statement of David Heyman, Assistant Secretary for Policy, Department of
Homeland Security).
[535] Lisa Seghetti, CONG. RESEARCH SERV., R 43356, BORDER SECURITY: IMMIGRATION INSPECTIONS AT PORTS OF
ENTRY 22 (2015).
[536] *Id.* at 27.
[537] *Id.* at 23.
[538] *Id.* at 26.
[539] GOV'T ACCOUNTABILITY OFFICE, GAO 04-586, HOMELAND SECURITY: FIRST PHASE OF VISITOR AND
IMMIGRATION STATUS PROGRAM OPERATING, BUT IMPROVEMENTS NEEDED (2004); GOV'T ACCOUNTABILITY
OFFICE, GAO-05-202, HOMELAND SECURITY: SOME PROGRESS MADE, BUT MANY CHALLENGES REMAIN ON U.S.
VISITOR AND IMMIGRANT STATUS INDICATOR TECHNOLOGY PROGRAM (2005); GOV'T ACCOUNTABILITY,

62

139

Specifically, GAO found that, on average, only 24 percent of travelers subject to the pilot complied with the exit procedure.[540]

In 2009, DHS employed a departure biometric pilot program at Atlanta International Airport and Detroit Metropolitan Airport, collecting digital fingerprints of non-U.S. citizens at boarding gates.[541] Despite concluding that the pilot generally confirmed that biometric exit data could be collected, in 2010, DHS adopted a plan to focus in the near-term on enhanced biographic data collection and analysis to identify potential overstays, and to invest in research and development of emerging biometric technology to be employed in a future exit system.[542]

In 2013, CBP and the DHS Science and Technology Directorate (S&T) announced their plan to develop a test facility to examine biometric technology and operational concepts to advance a biometric exit program at air and sea ports.[543] Also in 2013, "CBP and S&T initiated a joint Air Entry/Exit Re-Engineering (AEER) Apex project" to test both processes and technologies "to determine how and when a biometric air exit concept would be feasible."[544] For example, at the test facility, S&T is currently testing the efficacy of three biometric technologies—fingerprint, retinal scan, and facial recognition equipment—and potential approaches to implement the technologies at U.S. airports.[545] Based on the best performing concepts and operations, in FY2016, DHS plans to initiate a field trial at one U.S. airport.[546]

Meanwhile, in July 2015, CBP launched its testing of "an enhanced mobile device to collect biometric exit data from a limited number of foreign national air travelers departing the U.S. at Hartsfield-Jackson Atlanta International Airport."[547] As to the land border, CBP plans to initiate

---

[540] GAO-06-296, HOMELAND SECURITY: RECOMMENDATIONS TO IMPROVE MANAGEMENT OF KEY BORDER SECURITY PROGRAM NEED TO BE IMPLEMENTED (2006); GOV'T ACCOUNTABILITY OFFICE, GAO 07-1044T, HOMELAND SECURITY: PROSPECTS FOR BIOMETRIC US-VISIT EXIT CAPABILITY REMAIN UNCLEAR (2007).
[540] GOV'T ACCOUNTABILITY OFFICE, GAO-06-296, HOMELAND SECURITY: RECOMMENDATIONS TO IMPROVE MANAGEMENT OF KEY BORDER SECURITY PROGRAM NEED TO BE IMPLEMENTED 45 (2006).
[541] DHS Begins Test of Biometric Exit Procedures at Two U.S. Airports, U.S. DEP'T OF HOMELAND SECURITY (May 29, 2009), http://www.dhs.gov/news/2009/05/29/dhs-begins-test-biometric-exit-procedures-two-us-airports.
[542] U.S. DEP'T OF HOMELAND SECURITY, COMPREHENSIVE BIOMETRIC AIR EXIT PLAN, FISCAL YEAR 2012 REPORT TO CONGRESS 3 (2012).
[543] See Securing the Border: Biometric Entry and Exit at our Ports of Entry: Public Roundtable Before the Comm. on Homeland Security & Governmental Affairs, 114th Cong. (2015) (statement of John Wagner, Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection).
[544] Fulfilling a Key 9/11 Commission Recommendation: Implementing Biometric Exit: Hearing Before the H. SubComm. on Border and Maritime Security of the H. Comm. on Homeland Security, 113th Cong. (2013) (statement of U.S. Customs and Border Protection & U.S. Immigration and Customs Enforcement).
[545] Data provided to Majority Staff by the U.S. Customs and Border Protection during a tour of the U.S. Department of Homeland Security Science & Technology facility in Maryland (Aug. 11, 2015).
[546] Id.; see also Securing the Border: Biometric Entry and Exit at our Ports of Entry: Public Roundtable Before the Comm. on Homeland Security & Governmental Affairs, 114th Cong. (2015) (statement of Arun Vemury, Chief, AEER Pilot, Directors of Science & Technology, U.S. Department of Homeland Security).
[547] CBP Begins Testing an Enhanced Handheld Mobile Device to Collect Biometric Data, U.S. CUSTOMS AND BORDER PROTECTION (July 14, 2015), http://www.cbp.gov/newsroom/national-media-release/2015-07-14-000000/cbp-begins-testing-enhanced-handheld-mobile-device.

AOL-DEF-00002406

140

a facial recognition biometric pilot for pedestrians exiting the U.S. at the Otay Mesa POE in the San Diego sector by early December 2015.[548]

Preclearance Agreements

The U.S. also operates a number of preclearance facilities at airports in foreign countries. According to DHS, "Preclearance is the process by which CBP officers stationed abroad screen and make admissibility decisions about passengers and their accompanying goods or baggage heading to the U.S. before they leave a foreign port."[549] Committee witnesses have testified as to the benefits of preclearance, in that it helps expand our borders and provide important information to CBP officers prior to persons entering the country.[550] This effectively adds an additional layer of defense.

Preclearance travelers go through customs, immigration, and agriculture inspections all before leaving the foreign port.[551] The Transportation Security Administration (TSA) requires that the screening of both passengers and their property at foreign preclearance airports conforms to U.S. aviation security screening standards.[552] This ensures that, upon the arrival to the U.S., passengers can disembark without needing to be rescreened.[553]

The purpose of this process is to enable "CBP to stop potential threats before they arrive on U.S. soil."[554] At a Committee briefing, CBP explained that current preclearance agreements save the U.S. $25 million in detention costs annually.[555] In addition, preclearance helps streamline border procedures by reducing congestion at POEs as well as facilitating travel between U.S. ports and those foreign ports that are equipped for preclearance. Moreover, CBP has entered into public-private partnerships with foreign ports that enable the foreign port to fund up to 85 percent of CBP's preclearance operations.

Currently, preclearance is available at most major Canadian airports.[556] There are also preclearance locations in Aruba, Bermuda, the Bahamas, Ireland, and the United Arab Emirates.[557]

---

[548] Majority Staff observations during bipartisan, bicameral STAFFDEL to the San Diego Sector (Aug. 2015).
[549] U.S. CUSTOMS AND BORDER PROTECTION, PRECLEARANCE LOCATIONS, http://www.cbp.gov/border-security/ports-entry/operations/preclearance.
[550] *See Securing the Border: Understanding Threats and Strategies for the Northern Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[551] *DHS Announces Intent to Expand Preclearance to 10 New Airports,* U.S. DEP'T OF HOMELAND SECURITY (May 29, 2015), http://www.dhs.gov/news/2015/05/29/dhs-announces-intent-expand-preclearance-10-new-airports.
[552] *Id.*
[553] *Id.*
[554] U.S. Dep't of Homeland Security, *DHS Announces Intent to Expand Preclearance to 10 New Airports,* PRESS RELEASE (May 29, 2015), http://www.dhs.gov/news/2015/05/29/dhs-announces-intent-expand-preclearance-10-new-airports.
[555] U.S. CUSTOMS AND BORDER PROTECTION, PRECLEARANCE OPERATIONS: OVERVIEW BRIEF (2015) (on file with Majority Staff).
[556] U.S. CUSTOMS AND BORDER PROTECTION, PRECLEARANCE LOCATIONS, http://www.cbp.gov/border-security/ports-entry/operations/preclearance.

AOL-DEF-00002407

141

On May 29, 2015, Secretary Johnson announced the U.S.'s intention "to enter into negotiations to expand air preclearance options to ten new foreign airports, located in nine separate countries: Belgium, the Dominican Republic, Japan, the Netherlands, Norway, Spain, Sweden, Turkey, and the United Kingdom."[558] According to the Department, CBP coordinated with TSA and the State Department to identify these new airports "and prioritized them based on the greatest potential to support security and travel facilitation."[559] Last year, approximately 20 million passengers traveled to the U.S. from these 10 airports.[560]

DHS is also interested in expanding preclearance to other modes of transportation. On March 16, 2015, DHS Secretary Jeh Johnson and Canadian Minister of Public Safety and Emergency Preparedness Steve Blaney signed the Agreement on Land, Rail, Marine, and Air Transport Preclearance, which will provide the legal framework to locate CBP and CBSA personnel to offer preclearance at more locations and modes of transportation in both countries.[561] Essentially, this agreement will: 1) provide security updates that accurately reflect the post 9/11 operating environments; 2) enable preclearance at cruise, rail, and ferry terminals that currently only receive pre-inspection;[562] 3) allow CBP and CBSA officers to carry firearms and restraining devices at preclearance locations;[563] and 4) "enable the exploration of co-location at small and remote ports."[564] To implement, both the U.S. and Canada would have to enact legislation.

---

[557] The airports are: Calgary International Airport, Edmonton International Airport, Halifax Stanfield International Airport, Montreal-Pierre Elliott Trudeau International Airport, Ottawa Macdonald-Cartier International Airport, Toronto Pearson International Airport, Vancouver International Airport, Winnipeg James Armstrong Richardson International Airport (Canada), Bermuda International Airport (Bermuda), Grand Bahama International Airport, Lynden Pindling International Airport (The Bahamas), Queen Beatrix International Airport (Aruba), Dublin Airport, Shannon Airport (Ireland), Abu Dhabi Airport, Dubai International Airport (United Arab Emirates). *Id.*
[558] *DHS Announces Intent to Expand Preclearance to 10 New Airports*, U.S. DEP'T OF HOMELAND SECURITY (May 29, 2015), http://www.dhs.gov/news/2015/05/29/dhs-announces-intent-expand-preclearance-10-new-airports. (The 10 airports are: Brussels Airport, Belgium; Punta Cana Airport, Dominican Republic; Narita International Airport, Japan; Amsterdam Airport Schipol, Netherlands; Oslo Airport, Norway; Madrid-Barajas Airport, Spain; Stockholm Arlanda Airport, Sweden; Istanbul Ataturk Airport, Turkey; London Heathrow Airport, Manchester Airport, UK).
[559] *Id.*
[560] *Id.*
[561] U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATE AND CANADA SIGN PRECLEARANCE AGREEMENT, (2015), http://www.dhs.gov/news/2015/03/16/united-states-and-canada-sign-preclearance-agreement.
[562] While CBP conducts preclearance at Canadian airports, it currently only provides "pre-inspection" at Canadian rail stations. Amtrak estimates that full preclearance could save the passenger 10 to 20 minutes per trip from Canada to the U.S. by eliminating the required Customs stop in Blaine, Washington. Majority Staff observations during bipartisan STAFFDEL to the Blaine, Washington Sector (Aug. 2015).
[563] Currently CBP officers stationed in Canada are not permitted to carry their firearms and must rely on Canadian police if assistance is needed.
[564] U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATE AND CANADA SIGN PRECLEARANCE AGREEMENT, (2015), http://www.dhs.gov/news/2015/03/16/united-states-and-canada-sign-preclearance-agreement.

65

142

### Part V: Understanding the Root Causes of Immigration

In FY2014, more than 479,000 people were apprehended along the southwest border, more than 3,300 people were apprehended at the northern border, and more than 7,500 were apprehended across the maritime border.[565] Moreover, countless people entered the U.S. lawfully at a port of entry but have since overstayed their visas. While these numbers may be somewhat down from the late 1990s and early 2000s when infrastructure, technology, and manpower at our borders were virtually nonexistent, they still remain high. And, given the powerful pull factors in this country, migration to the U.S. will remain high for a very long time.

For starters, the wage gap, or the difference between what a migrant can earn in this country as compared to his home country, remains "the main economic factor influencing migration."[566] As this gap sits at approximately $5 to $1 in Mexico and perhaps as much as $8 to $1 in Central American countries, we can expect migration to the U.S. to continue as people seek the opportunity to work and make money for their families.[567]

Moreover, U.S. policies create powerful pull factors that incentivize people to illegally migrate to the country. As an example, due to current law the U.S. is unable to immediately repatriate unaccompanied minors from noncontiguous countries.[568] Instead, the minor must first receive an immigration hearing. In practice, once these minors receive their immigration hearings and a final order of removal is rendered, the federal government does not prioritize their removal. In fact, since 2009, DHS has apprehended 122,700 unaccompanied children from El Salvador, Guatemala, and Honduras, but ICE has only repatriated approximately 7,700, or 6 percent.[569] In the last several years this powerful signal has resulted in a substantial influx of Central Americans unlawfully migrating to and remaining in the U.S.[570]

---

[565] *See* UNITED STATES BORDER PATROL TOTAL ILLEGAL ALIEN APPREHENSIONS BY MONTH, http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20Apps%20by%20Sector%20and%20 Area%2C%20FY2000-FY2014_0.pdf. Since the U.S. Coast Guard also interdicts a significant number of migrants at our maritime border, a full representation of maritime apprehensions adds these two data points together. *See* U.S. COAST GUARD MARITIME MIGRANT INTERDICTIONS, http://www.uscg.mil/hq/cg5/cg531/AMIO/FlowStats/currentstats.asp.
[566] Bryan Roberts, Edward Alden, John Whitley, *Managing Illegal Immigration to the United States: How Effective is Enforcement?*, COUNCIL ON FOREIGN RELATIONS 8 (2013) (citing Michael Clemens, Claudio E. Montenegro, and Lant Pritchett, *The Place Premium: Wage Differences for Identical Workers across the U.S. Border*, CENTER FOR GLOBAL DEVELOPMENT (2008)).
[567] *Id.* at 9, Appendix 2: Wage Gap and Other Trends in Central American Source Countries, http://www.cfr.org/immigration/managing-illegal-immigration-united-states/p30658.
[568] Section 235 of TVPRA codified expedited removals for children from contiguous countries and mandated the transfer of children from non-contiguous countries to the Department of Health and Human Services. Pub. L. No. 110-457 (2008).
[569] *See The 2014 Humanitarian Crisis at our Border: A Review of the Government's Response to Unaccompanied Minors One Year Later: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015); *Ongoing Migration from Central America: An Examination of FY2015 Apprehensions: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015).
[570] U.S. CUSTOMS AND BORDER PROTECTION, SOUTHWEST BORDER UNACCOMPANIED ALIEN CHILDREN, http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children.

AOL-DEF-00002409

143

Central American Migration to the U.S.

In 2014, unaccompanied minors attempted to cross the southwest border in alarming numbers. From FY2009 to FY2013, CBP officers apprehended mostly Mexican minors attempting to enter the U.S.[571] However, in FY2014 and for the first time, the number of UACs from El Salvador, Guatemala, and Honduras unlawfully entering the U.S. exceeded the number of UACs from Mexico.[572] In FY2015, apprehensions of UACs slightly declined, however numbers began to increase in July, and by August monthly apprehensions surpassed that of FY2014.

**Table 4. Unaccompanied Alien Children Encountered by CBP[573]**

| Country | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
|---------|---------|---------|---------|---------|---------|---------|---------|
| El Salvador | 1,221 | 1,910 | 1,394 | 3,314 | 5,990 | 16,404 | 9,389 |
| Guatemala | 1,115 | 1,517 | 1,565 | 3,835 | 8,068 | 17,057 | 13,589 |
| Honduras | 968 | 1,017 | 974 | 2,997 | 6,747 | 18,244 | 5,409 |
| **Total** | **3,304** | **4,444** | **3,933** | **10,146** | **20,805** | **51,705** | **28,387** |

DHS, the State Department, and USAID currently have several programs that attempt to stem the flow of Central American migrants to the U.S.-Mexico border. These efforts are focused on confronting the perceptions of U.S. immigration law, dismantling human smuggling networks, and tackling the corruption and citizen security in Central America.[574] The Administration argues that investing in Central American communities can decrease the need for those countries' citizens to migrate and significantly reduce the business of human smugglers, run by coyotes.[575] To that end, the Administration has proposed a $1 billion aid package aimed at confronting the root causes of the 2014 UAC surge.[576] However, the U.S. has provided billions of dollars in assistance in the past (see Table 7), and CBP continues to report large numbers of migrants attempting to enter the U.S.[577]

While some outside experts report that the spike in UACs last summer was generated by startling levels of drug and gang-related violence in Central America, according to an EPIC report, perceptions of U.S. immigration policy that led people to believe they would be able to remain in

---

[571] Id.
[572] Id.
[573] Id.
[574] Remarks by the President on Border Security and Immigration Reform, THE WHITE HOUSE (June 30, 2014), https://www.whitehouse.gov/the-press-office/2014/06/30/remarks-president-border-security-and-immigration-reform.
[575] Unaccompanied Alien Minors: Pressing the Administration for a Strategy: Hearing Before the House SubComm. on the Western Hemisphere of the Comm. on Foreign Relations, 113th Cong. (2014) (statement of Roberta S. Jacobson, Assistant Secretary, Bureau of Western Hemisphere Affairs, U.S. Department of State).
[576] WHITE HOUSE, FACT SHEET: PROMOTING PROSPERITY, SECURITY AND GOOD GOVERNANCE IN CENTRAL AMERICA, https://www.whitehouse.gov/the-press-office/2015/01/29/fact-sheet-promoting-prosperity-security-and-good-governance-central-ame.
[577] Douglas Farah, Five Myths about the Border Crisis, WASH POST (Aug. 8, 2014), http://www.washingtonpost.com/opinions/five-myths-about-the-border-crisis/2014/08/08/1ec90bea-1ce3-11e4-ab7b-696c295ddfd1_story.html.

AOL-DEF-00002410

144

the U.S. also drove the surge.[578] Such policies include the President's DACA, DHS's catch and release policy, and the TVPRA of 2008.[579] For example, according to interviews conducted by GAO, Guatemalans believe they will be eligible for DACA or amnesty provided in comprehensive immigration reform, while Hondurans told GAO they believed "migrant minors, mothers traveling with minors, and pregnant women" can remain in the U.S.[580] On a recent CODEL to Central America the President of Honduras warned Members of the Committee to be very clear in the laws that they draft, as ambiguities will be exploited by coyotes.

*HHS Response*

Pursuant to the TVPRA, children from noncontiguous countries that unlawfully enter the U.S. must be transferred to HHS within 72 hours of apprehension while waiting for an immigration court hearing; they cannot be immediately repatriated to their home countries.[581] According to HHS Office of Refugee Resettlement (ORR), between October 1, 2013 and August 31, 2015, HHS released a total of 77,220 UACs to sponsors in the United States.[582]

**Table 5. States Accommodating UACs[583]**

| State | FY2014 | FY2015* | Total |
|---|---|---|---|
| Texas | 7,416 | 2,769 | 10,185 |
| California | 5,842 | 3,061 | 8,903 |
| New York | 5,956 | 2,229 | 8,185 |
| Florida | 5,447 | 2,485 | 7,932 |
| Maryland | 3,885 | 1,497 | 5,382 |
| Virginia | 3,886 | 1,375 | 5,261 |
| Wisconsin | 84 | 33 | 117 |
| **All States** | **53,550** | **23,670** | **77,220** |

* FY2015 as of August 31, 2015

ORR believes its responsibility to track and retain custody of UACs ends when the child is released to the sponsor.[584] ORR officials argue that sponsors are responsible for ensuring UACs

---

[578] EL PASO INTELLIGENCE CENTER, MISPERCEPTIONS OF U.S. POLICY KEY DRIVER IN CENTRAL AMERICAN MIGRANT SURGE (2014) (Children from El Salvador, Guatemala, and Honduras arrived in large numbers after hearing rumors that the U.S. Government would stop issuing free passes or *permisos* after June 2014).

[579] Section 235 of TVPRA codified expedited removals for children from contiguous countries and mandated the transfer of children from non-contiguous countries to the Department of Health and Human Services. Pub. L. No. 110-457 (2008).

[580] GOV'T ACCOUNTABILITY OFFICE, GAO-15-707, CENTRAL AMERICA: IMPROVED EVALUATION EFFORTS COULD ENHANCE AGENCY PROGRAMS TO REDUCE UNACCOMPANIED CHILDREN MIGRATION 10 (2015).

[581] *Id.*

[582] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OFFICE OF REFUGEE RESETTLEMENT, UNACCOMPANIED CHILDREN RELEASED TO SPONSORS BY STATE, http://www.acf.hhs.gov/programs/orr/programs/ucs/state-by-state-uc-placed-sponsors. Unfortunately, data provided by the U.S. Department of Homeland Security (DHS), U.S. Department of Justice (DOJ), and U.S. Department of Health and Human Services (HHS) is inconsistent and fails to match up.

[583] *Id.*

[584] Data provided to Majority Staff by the Office of Refugee Resettlement (June 23, 2015).

AOL-DEF-00002411

145

attend their court hearing and notifying DHS and the DOJ's Executive Office for Immigration Review (EOIR) if the UAC relocates to a different address.[585] The lack of follow-up and secondary screening by has led to some dangerous situations for these unaccompanied minors.[586] For example, press reports have revealed situations in which a 13-year-old boy was forced to work rather than attend school to pay off his smuggling debt and eventually became homeless.[587] In another case, a 14-year-old Salvadoran girl was placed with distant relatives who later passed her on to other relatives that abused her.[588] And, finally, a 16-year-old Honduran girl was released to a man who had her smuggled in and then molested her.[589]

On June 16, 2015, ORR issued two new requests for proposals (RFPs) for contracts to aid UACs.[590] The first RFP seeks multiple regional contractors who have the capability to provide legal services to UACs. These selected contractors would be responsible for 1) managing the "Know Your Rights" presentations;[591] 2) legal screening procedures to identify UACs that meet the criteria for immigration relief; 3) securing pro-bono legal counsel for hearings before EOIR; and 4) at times directly representing UACs.[592] ORR began the contracting process on August 1, 2015, for a period of three years.[593]

For the second RFP, contractors will be responsible for supporting child advocate programs in Brownsville; Houston; Chicago; Newark; New York City; Washington, DC; Baltimore; Phoenix; San Antonio; and Miami.[594] ORR will spend $31 million for legal services and direct representation, which, combined with other programs, will total $58 million in FY2015.[595] As for the child advocate program, ORR will spend $3.5 million between FY2015 and FY2017.[596]

[585] *Id.*
[586] Molly Hennessy-Fiske, *Young Immigrants Placed in Sponsor Homes are at Risk of Abuse, Experts Say*, LA TIMES (Aug. 18, 2015), http://www.latimes.com/nation/la-na-immigrant-sponsors-20150818-story.html.
[587] *Id.*
[588] *Id.*
[589] *Id.*
[590] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, DIVISION OF ACQUISITION MANAGEMENT (ON BEHALF OF THE OFFICE OF REFUGEE RESETTLEMENT), REQUEST FOR PROPOSAL, RFP 15-233-SOL-00264 (June 15, 2015); U.S. DEP'T OF HEALTH AND HUMAN SERVICES, DIVISION OF ACQUISITION MANAGEMENT (ON BEHALF OF THE OFFICE OF REFUGEE RESETTLEMENT), REQUEST FOR PROPOSAL, RFP 15-233-SOL-00327 (June 15, 2015).
[591] "Know Your Rights" (KYRs) presentations provide information to UACs on why they are in custody, the various forms of immigration legal relief, the sponsorship process, the various government agencies involved in the child's immigration case, and what to expect at immigration court. This information is provided to UACs via a cartoon video. ORR also funds legal service providers local to the shelters to provide these KYRs to UACs.
[592] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIVISION OF ACQUISITION MANAGEMENT (ON BEHALF OF THE OFFICE OF REFUGEE RESETTLEMENT), REQUEST FOR PROPOSAL, RFP 15-233-SOL-00264 (June 15, 2015).
[593] *Id.*
[594] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, DIVISION OF ACQUISITION MANAGEMENT (ON BEHALF OF THE OFFICE OF REFUGEE RESETTLEMENT), REQUEST FOR PROPOSAL, RFP 15-233-SOL-00327 (June 15, 2015).
[595] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIVISION OF ACQUISITION MANAGEMENT (ON BEHALF OF THE OFFICE OF REFUGEE RESETTLEMENT), REQUEST FOR PROPOSAL, RFP 15-233-SOL-00264 (June 15, 2015).
[596] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, DIVISION OF ACQUISITION MANAGEMENT (ON BEHALF OF THE OFFICE OF REFUGEE RESETTLEMENT), REQUEST FOR PROPOSAL, RFP 15-233-SOL-00327 (June 15, 2015).

AOL-DEF-00002412

146

However, earlier this year the Senate Appropriations Committee rejected a $50 million request by the Administration to pay for legal help for UACs.[597]  During a HSGAC hearing ORR was questioned about their authority to pay for legal counsel, as federal law calls on HHS to ensure that unaccompanied minors receive counsel to the greatest extent practicable but at no expense to the government.[598]  ORR asserted it believes it has the authority to pay for counsel, but it has an obligation to rely on pro bono services to the greatest extent possible.[599]

*DOJ Response*

EOIR is responsible for adjudicating immigration cases as well as removal proceedings.[600]  According to EOIR, since July 18, 2014, the agency has been prioritizing the cases of: 1) unaccompanied children; 2) adults with a child or children who are a part of DHS's Alternative to Detention program (ATD); 3) adults with a child or children who are detained; and 4) recent border crossers who are detained.[601]  Additionally, EOIR has set the goal for scheduling UAC's first master calendar hearing no less than 10 days and no more than 21 days from the date of their issued NTA.  For adults with children and those in the ATD program, EOIR attempts to have them appear before an immigration judge no less than 10 days and no more than 28 days from when DHS released them on parole with a NTA.[602]

EOIR began tracking UAC removals in July 2014, establishing a new case recording system that coincided with the agency's announcement of its revised adjudication priorities in response to the UAC surge.[603]  EOIR data from July 18, 2014 through August 25, 2015 shows that DHS issued 38,211 NTAs to UACs that unlawfully crossed the U.S. border in the past two fiscal years.[604]  As of August 25, 2015, EOIR has processed 31,035 cases requiring UACs to appear before an immigration judge for their initial master hearing.[605]

Of these cases, 14,613 cases have been completed, of which in 7,571 cases the judge ordered the UAC removed.[606]  Of these removal orders, 6,611 were rendered in absentia, meaning that the UAC did not show up to the hearing.[607]  Decisions rendered in absentia proceed to a final order of removal, generally clearing the legal hurdles for ICE to begin the UAC's removal

---

[597] *Led by Shelby, Senate Blocks Legal Fund for Immigrant Children*, AP (June 10, 2015), http://www.al.com/news/index.ssf/2015/06/led_by_shelby_senate_blocks_le.html.
[598] *See The 2014 Humanitarian Crisis at our Border: A Review of the Government's Response to Unaccompanied Minors One Year Later: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[599] *Id.*
[600] *Id.* (statement of Juan P. Osuna, Director, Executive Office of Immigration Review, U.S. Department of Justice).
[601] Adults without children are eligible for expedited removal and do not need to go in front of an EOIR judge unless they claim a certain protection, such as asylum.
[602] *Id.*
[603] *Securing the Border: Understanding and Addressing the Root Causes of Central American Migration to the United States: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of William Kandel, Analyst in Immigration Policy, Congressional Research Service).
[604] Data provided to Majority Staff by the Executive Office for Immigration Review (Sept, 1 2015).
[605] *Id.*
[606] *Id.*
[607] *Id.*

70

AOL-DEF-00002413

147

proceedings. However, ICE has not repatriated most UACs with a final order of removal, claiming instead it prioritizes the repatriations of higher value targets, such as criminal aliens.[608]

*DHS Response*

On November 20, 2014 Secretary Johnson issued a memorandum on enforcement priorities, as part of a larger package of executive actions announced by the President.[609] Currently, ICE's highest priority is the removal of individuals who represent a threat to U.S. national security, border security, and public safety.[610] Priority 1 removals include illegal aliens engaged in or suspected of terrorism or espionage and illegal aliens convicted or with a violent criminal record.[611] Priority 2 encompasses illegal aliens convicted of three or more misdemeanors and illegal aliens who overstay their visas.[612] Lastly, Priority 3 generally targets illegal aliens with a final order of removal issued after December 31, 2013.[613]

**Table 6. UAC Removals by Country of Citizenship, FY2009-FY2015[614]**

| Country | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|---|---|---|
| El Salvador | 96 | 117 | 136 | 136 | 159 | 190 | 167 |
| Guatemala | 534 | 520 | 515 | 626 | 661 | 686 | 519 |
| Honduras | 352 | 326 | 297 | 430 | 461 | 503 | 339 |
| **Total** | **982** | **963** | **948** | **1,192** | **1,281** | **1,379** | **1,025** |

Since 2009, DHS has apprehended 122,700 unaccompanied children from El Salvador, Guatemala, and Honduras, but ICE has only repatriated approximately 7,700, or 6 percent.[615] ICE was asked during a Committee hearing what signal is sent to people in Central America that as an unaccompanied child, if you reach the U.S., you have more than a 90 percent chance of being able to stay.[616] ICE did not answer the question.[617] According to El Salvador officials, "when a potential migrant hears from someone in the United States who has managed to arrive and remain there undocumented, the communications can strongly influence their decision on

---

[608] *See The 2014 Humanitarian Crisis at our Border: A Review of the Government's Response to Unaccompanied Minors One Year Later: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[609] U.S. DEP'T OF HOMELAND SECURITY, MEMORANDUM TO THOMAS S. WINKOWSKI, ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, R. GIL KERLIKOWSKE, COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION, LEON RODRIGUEZ, DIRECTOR, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, AND ALAN D. BERSIN, ACTING ASSISTANT SECRETARY FOR POLICY, FROM JEH CHARLES JOHNSON, SECRETARY OF HOMELAND SECURITY, POLICIES FOR THE APPREHENSION, DETENTION, AND REMOVAL OF UNDOCUMENTED IMMIGRANTS (Nov. 20, 2014).
[610] *Id.*
[611] *Id.*
[612] *Id.*
[613] *Id.*
[614] Data provided to Majority Staff by the Department of Homeland Security (July 25, 2015).
[615] *See The 2014 Humanitarian Crisis at our Border: A Review of the Government's Response to Unaccompanied Minors One Year Later: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015); *Ongoing Migration from Central America: An Examination of FY2015 Apprehensions: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[616] *Id.*
[617] *Id.*

AOL-DEF-00002414

148

whether to migrate."[618]  GAO recently testified as a Committee hearing that children use social media to let those in their home countries know they made it to and were able to remain in the U.S., further incentivizing others to embark on the dangerous journey to the United States.[619]

In June 2014, DHS started to challenge perceptions of U.S. immigration policy.  Secretary Johnson warned Central American parents that their "child will not benefit from DACA if they come here now," reminding Central Americans that "DACA is for those who came here 7 years ago."[620]  DHS's "Danger Awareness Campaign" aimed to dissuade parents from sending their children with smugglers warning that: 1) "the journey is too dangerous;" 2) "children will not get legal papers if they [arrive in the U.S.]"; and 3) children "are the future—let's protect them."[621]

The advertisements targeted communities in El Salvador, Guatemala, and Honduras, as well as American cities with significant Central American populations such as Houston, Los Angeles, Miami, and New York.[622]  In total, taxpayers spent approximately $1 million on billboards, TV commercials, and radio announcements between June 30 and October 12, 2014.[623]  A recent GAO report has called for more review on the effectiveness of these campaigns before continuing them.[624]  According to GAO, DHS and the State Department's lack of review as to whether these campaigns have been effective is not only costly for the U.S. taxpayer, but also costly to unaccompanied minors and their families who ignore the campaigns and risk their lives to make the dangerous journey to the U.S.[625]  Despite this, in August 2015 DHS announced a new $1.2 million campaign called "Know the Facts" to emphasize that pursuant to U.S. law and policy immediate deportations will be a priority.[626]

Other DHS efforts include working with the State Bureau of Population, Refugees, and Migration (PRM) to employ a new refugee program to provide a legal alternative to parents who

---

[618] Gov't Accountability Office, GAO-15-707, Central America: Improved Evaluation Efforts Could Enhance Agency Programs to Reduce Unaccompanied Children Migration 11 (2015).
[619] *Ongoing Migration from Central America: An Examination of FY2015 Apprehensions: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Kimberly M. Gianopoulos, International Affairs and Trade, U.S. Government Accountability Office).
[620] Transcript of DHS Secretary Jeh Johnson's Press Conference at U.S. Customs and Border Protection Headquarters. U.S. Dep't of Homeland Security (July 12, 2014), http://www.dhs.gov/transcript-dhs-secretary-johnson's-press-conference.
[621] U.S. Customs and Border Protection, CBP Addresses Humanitarian Challenges of Unaccompanied Child Migrants, http://www.cbp.gov/border-security/humanitarian-challenges.
[622] *Feds Launch Campaign to Discourage Migrants from Dangerous Trek to U.S.*, CBS News (July 3, 2014), http://www.cbsnews.com/news/federal-officials-launch-campaign-to-discourage-migrants-from-making-dangerous-trek-to-u-s/.
[623] *Id.*
[624] *See* Gov't Accountability Office, GAO-15-707, Central America: Improved Evaluation Efforts Could Enhance Agency Programs to Reduce Unaccompanied Children Migration 40–41 (2015).
[625] *See id* ("Carrying out ineffective campaigns could lead to higher levels of migration to the United States, which is not only potentially costly in terms of U.S. taxpayer resources but costly and dangerous to the migrants and their families.").
[626] Marty Graham, *U.S. Ads Target Illegal Immigration from Central America*, Reuters (Aug. 18, 2015), http://www.reuters.com/article/2015/08/18/us-usa-border-ads-idUSKCN0QN26920150818.  Ironically, the Majority Staff notes that these are not the facts and that it is actually highly unlikely that unaccompanied minors from Central America will be deported, as indicated by the statistics provided above.

72

AOL-DEF-00002415

149

wish to bring their children to the U.S.[627] On November 14, 2014, Vice President Biden announced the in-country refugee/parole program for minors in El Salvador, Guatemala, and Honduras with parents lawfully present in the U.S.[628] This program allows individuals living in the U.S. to request a refugee visa for unmarried children under the age of 21.[629] Additionally, if the second parent in Central America is lawfully married to the parent in the U.S., the second parent will be included with the child's petition, making the second parent a candidate for refugee and parole status.[630]

Pursuant to this program, a parent under one of the following categories can request program access: 1) Lawful Permanent Resident; 2) Temporary Protected Status; 3) Parolee, granted for at least a year; 4) DACA recipient; 5) Deferred Action recipient, granted for at least a year; 6) Deferred Enforced Departure recipient; and 7) Withholding of Removal grantee.[631] The Administration allocated 4,000 refuge visas for this program out of the 70,000 globally available. According to the State Department, as of September 14, 2015, processing centers have received 4,253 applications: 3,636 in El Salvador, 532 in Honduras, and 85 in Guatemala.[632]

Finally, on June 24, 2015, Secretary Johnson announced a change to family detention practices.[633] Due to the TVPRA and *Flores Agreement*, DHS is unable to immediately repatriate or hold unaccompanied minors in detention facilities. However, adults may be immediately repatriated and family units can be detained. At a Committee Hearing, Secretary Johnson attributed the decline in the migration of unaccompanied minors this year to the reduction in the repatriation times for the adults, increased returning flights, and expanded family unit detention space.[634]

Despite this recognition, two month later Secretary Johnson announced the Department's plans to release on bond detained family units able to present a credible fear case.[635] According to DHS, the family's bond will be set "at a level that is reasonable and realistic, taking into account

---

[627] *Unaccompanied Alien Minors: Pressing the Administration for a Strategy: Hearing Before the House SubComm. on the Western Hemisphere of the Comm. on Foreign Relations*, 113th Cong. (2014) (statement of Roberta S. Jacobson, Assistant Secretary, Bureau of Western Hemisphere Affairs, U.S. Department of State).

[628] Ricardo Zuniga, *Promoting Prosperity and Security in Central America*, THE WHITE HOUSE (Nov. 14, 2014) https://www.whitehouse.gov/blog/2014/11/14/promoting-prosperity-and-security-central-america.

[629] U.S. DEP'T OF STATE, OFFICE OF BUREAU OF POPULATION, REFUGEES, AND MIGRATION, IN-COUNTRY REFUGEE/PAROLE PROGRAM FOR MINORS IN EL SALVADOR, GUATEMALA, AND HONDURAS WITH PARENTS LAWFULLY PRESENT IN THE UNITED STATES (2014),
http://www.state.gov/j/prm/releases/factsheets/2014/234067.htm.

[630] *Id.*

[631] Data provided to Majority Staff by U.S. Department of State's Office of Bureau of Population, Refugees and Migration (Sept. 22, 2015).

[632] *Id.*

[633] U.S. DEP'T OF HOMELAND SECURITY, STATEMENT BY SECRETARY JEH C. JOHNSON ON FAMILY RESIDENTIAL CENTERS, http://www.dhs.gov/news/2015/06/24/statement-secretary-jeh-c-johnson-family-residential-centers.

[634] *See The Homeland Security Department's Budget Submission for Fiscal Year 2016: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (Statement of Jeh Johnson, Secretary, U.S. Department of Homeland Security).

[635] U.S. DEP'T OF HOMELAND SECURITY, STATEMENT BY SECRETARY JEH C. JOHNSON ON FAMILY RESIDENTIAL CENTERS, http://www.dhs.gov/news/2015/06/24/statement-secretary-jeh-c-johnson-family-residential-centers.

AOL-DEF-00002416

150

ability to pay, while also encompassing risk of flight and public safety."[636] The Department still appears to recognize that a recent ruling prohibiting *all* detention of illegal immigrant families can actually entice more illegal immigration.[637] According to DHS in filings with the court, "the proposed remedies could heighten the risk of another surge in illegal migration across our Southwest border by Central American families, including by incentivizing adults to bring children with them on their dangerous journey as a means to avoid detention and gain access to the interior of the United States."[638] DHS and the State Department have stated it is too early to determine whether the recent increase in apprehensions at the border is related to this new policy.

*Mexico Response*

In FY2015, CBP apprehended 28,387 unaccompanied minors from Central America, somewhat down from FY2014 levels.[639] However, it is unclear how impactful U.S. efforts have been in reducing the flow.[640] According to research conducted by GAO, "individuals in El Salvador, Guatemala, and Honduras give more credence to what they hear from relatives and friends than to what they hear on the radio and television."[641] Instead, many experts point to Mexico's increased efforts to detain illegal migrants crossing the Mexico-Guatemala border as a major reason behind lower apprehension numbers at the U.S.-Mexico border in FY2015.[642]

According to Mexico's Ministry of Interior, from January 1 to August 31, 2015, Mexico detained 96,830 adults and 22,400 minors from El Salvador, Guatemala, and Honduras. These figures represent a 64 percent increase in adults and 49 percent increase in minors compared to the same period in the previous year, in which Mexico apprehended 58,930 Central American adults and 15,049 unaccompanied minors.[643]

In 2014, the State Department reprogrammed $80 million to help Mexico build up its border patrol forces and capabilities to better manage its southern border.[644] While the Mexican Government has significantly increased its presence at the Mexico-Guatemala border, it still faces many challenges.[645] For example, on a recent CODEL to Central America, Members of the

---

[636] *Id.*
[637] Stephen Dinan, DHS Admits New Surge of Illegal Immigrant Families, Wash Times (Aug. 7, 2015), http://www.washingtontimes.com/news/2015/aug/7/dhs-admits-new-surge-illegal-immigrant-families/.
[638] *Id.*
[639] U.S. CUSTOMS AND BORDER PROTECTION, SOUTHWEST BORDER UNACCOMPANIED ALIEN CHILDREN, http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children.
[640] *See* GOV'T ACCOUNTABILITY OFFICE, GAO-15-707, CENTRAL AMERICA: IMPROVED EVALUATION EFFORTS COULD ENHANCE AGENCY PROGRAMS TO REDUCE UNACCOMPANIED CHILDREN MIGRATION 36 (2015).
[641] *Id.*
[642] GOV'T ACCOUNTABILITY OFFICE, GAO-15-707, CENTRAL AMERICA: IMPROVED EVALUATION EFFORTS COULD ENHANCE AGENCY PROGRAMS TO REDUCE UNACCOMPANIED CHILDREN MIGRATION 4 (2015). ("Recent data indicate the pace of migration from Central America remains high, though fewer migrants are being apprehended in the United States.").
[643] *Id.*
[644] *Id.*
[645] Douglas Farah and Carl Meacham, *Alternative Governance in the Northern Triangle and Implications for U.S. Foreign Policy: Finding Logic within Chaos*, CENTER FOR STRATEGIC & INTERNATIONAL STUDIES (Sept. 21, 2015), http://csis.org/event/alternative-governance-northern-triangle-and-implications-us-foreign-policy-finding-logic-with

AOL-DEF-00002417

151

Committee visited the Guatemala-Mexico border and witnessed a number of rafts, in broad daylight, being utilized to transport contraband from Guatemala to Mexico.

Moreover, some observers suggest that increased UAC apprehensions in the U.S. in August and September could be a result of smugglers finally finding new routes to avoid detection in Mexico. This may explain why the Yuma and Big Bend sectors are seeing very large increases in UACs, as compared to FY2014, as human smugglers begin to change their routes.

*U.S. Assistance to Central America and the Dependency on Remittances*

Including State Department and USAID regional programs, from FY2014 to FY2015, Congress appropriated $754.8 million in bilateral assistance to El Salvador, Guatemala, and Honduras.[646]

Also, established in 2008 to assist Central American nations combatting TCOs, the Central America Regional Security Initiative (CARSI) provides equipment, technical assistance, and counternarcotic training to identify and dismantle TCOs and drug cartels.[647] In FY2014, most of CARSI's $161.5 million budget was spent in El Salvador, Guatemala, and Honduras.[648]

Moreover, in 2006, El Salvador received a $461 million five-year compact through the Millennium Challenge Corporation (MCC)[649] to invest in education, public services, and transportation infrastructure in its least developed region located near the border with Guatemala and Honduras.[650] Additionally, in 2014, El Salvador secured another $277 million compact to fund a project to connect a border-crossing corridor with Honduras and to fund reforms aimed at attracting foreign direct investment.[651]

While Guatemala has not received an MCC compact, in 2014 the MCC board approved a $28 million threshold program to support policies aimed at developing public-private partnerships and to enhance the education system to meet 21st century workforce demands.[652] Finally, Honduras secured a $205 million five-year grant in 2005 to fund transportation projects and to improve rural development.[653] This grant was not renewed because the government did not

---

[646] U.S. DEP'T OF STATE, CONGRESSIONAL BUDGET JUSTIFICATIONS FOR FOREIGN OPERATIONS AND RELATED PROGRAMS, FISCAL YEAR 2016 (2015), http://www.state.gov/s/d/rm/rls/ebs/2016/.
[647] U.S. DEP'T OF STATE, OFFICE OF WESTERN HEMISPHERE PROGRAMS (INL/WHP), http://www.state.gov/j/inl/whp//.
[648] Peter J. Meyer, Clare Ribando Seelke, Maureen Taft-Morales, and Rhonda Margesson, CONG. RESEARCH SERV., R 43702, UNACCOMPANIED CHILDREN FROM CENTRAL AMERICA: FOREIGN POLICY CONSIDERATIONS (2015).
[649] In 2004, Congressed established the Millennium Challenge Corporation (MCC) to provide economic assistance to developing countries committed to investing in its society, principles of economic freedom, and good governance.
[650] MILLENNIUM CHALLENGE CORPORATION, EL SALVADOR COMPACT, https://www.mcc.gov/where-we-work/program/el-salvador-compact.
[651] MILLENNIUM CHALLENGE CORPORATION, EL SALVADOR INVESTMENT COMPACT, https://www.mcc.gov/where-we-work/program/el-salvador-investment-compact.
[652] MILLENNIUM CHALLENGE CORPORATION, GUATEMALA THRESHOLD PROGRAM, https://www.mcc.gov/where-we-work/program/guatemala-threshold-program.
[653] Maria Rizza Leonzon, *No MCC Aid Renewal for Honduras*, DEVEX (Jan. 7, 2011), https://www.devex.com/news/no-mcc-aid-renewal-for-honduras-72002.

75

AOL-DEF-00002418

152

address corruption. However, in 2013, the MCC approved a $15.6 million threshold program to build Honduras's public finances management capacity.[654]

A recent GAO report highlighted concerns with the effectiveness of current U.S. assistance.[655] Specifically, GAO examined an interagency agreement between the State Department and DOJ to train Honduran prosecutors and found upon its visit to Honduras that there were no active prosecutors trying cases in Tegucigalpa, the country's capitol.[656] In El Salvador, GAO observed "a computer lab filled with computers recently provided by USAID but with no teacher present."[657] Apparently, the Salvadoran Ministry of Education had not yet provided salaries for the teachers.[658]

**Table 7. U.S. Assistance to El Salvador, Guatemala, and Honduras[659]**
FY2012-FY2016 in million dollars*

| Country/Program | FY2012 (expended) | FY2013 (expended) | FY2014 (expended) | FY2015 (allocated) | FY2016 (requested) | |
|---|---|---|---|---|---|---|
| El Salvador | 54 | 50 | 44.5 | 46.6 | 119.2 | |
| Guatemala | 102.6 | 91.2 | 88.1 | 107.2 | 220.6 | |
| Honduras | 93.2 | 91.6 | 78.0 | 71.2 | 163 | |
| USAID regional | N/A | N/A | N/A | 49.2 | 64.5 | |
| State regional | N/A | N/A | N/A | N/A | 127.1 | |
| CARSI | Incl. | Incl. | Incl. | 270 | 286.5 | |
| **Total** | **250** | **232.8** | **210.6** | **544.2** | **980.9** | **2,218.5** |

*FY2012 to FY2014 figures include aid provided by the State Department, USAID, DHS, and the Inter-American Foundation.  FY2015 to FY2016 figures only include funds from the State Department and USAID.

In an op-ed published earlier this year, Vice President Biden wrote about the Administration's response to the large migration from Central America in 2014 stating, "The challenges ahead are formidable. But if the political will exists, there is no reason Central America cannot become the next great success story of the Western Hemisphere."[660]  Showing their commitment to improving conditions in El Salvador, Guatemala, and Honduras, on November 14, 2014, the presidents of the Central American countries announced the Plan of the Alliance for Prosperity in the Northern Triangle.[661]  The four goals of the plan are to: 1) stimulate the private sector; 2) develop opportunities for the people of Central America; 3) improve public safety and access to

[654] MILLENNIUM CHALLENGE CORPORATION, THRESHOLD PROGRAM (2013), https://www.mcc.gov/pages/docs/story/story-cbj-fy2015-threshold-program.
[655] GOV'T ACCOUNTABILITY OFFICE, GAO-15-707, CENTRAL AMERICA: IMPROVED EVALUATION EFFORTS COULD ENHANCE AGENCY PROGRAMS TO REDUCE UNACCOMPANIED CHILDREN MIGRATION (2015).
[656] Id. at 39.
[657] Id.
[658] Id.
[659] Id.
[660] Joseph R. Biden Jr., Joe Biden: A Plan for Central America, NY TIMES (Jan. 29, 2015), http://www.nytimes.com/2015/01/30/opinion/joe-biden-a-plan-for-central-america.html?_r=0.
[661] PLAN OF THE ALLIANCE FOR PROSPERITY IN THE NORTHERN TRIANGLE: A ROAD MAP (2014).

AOL-DEF-00002419

153

the justice system; and 4) strengthen institutions to increase people's trust in the state.[662] Each country is responsible for contributing $5 billion to fund these initiatives.[663]

In January, the Administration released its FY2016 budget request to implement the "U.S. Strategy for Engagement in Central America."[664] The budget requests a total of $1.005 billion for Central America, the majority of which is allocated for programs in El Salvador, Guatemala, and Honduras.[665]

During the last two years, El Salvadorans, Guatemalans, and Hondurans living abroad, mostly in the U.S., sent over $25.1 billion to relatives in their countries of origin.[666] In 2014, remittances accounted for 16.8 percent of the GDP ($4.2 billion) in El Salvador, 9.9 percent ($5.5 billion) in Guatemala, and 17.7 percent ($3.44) billion in Honduras.[667] However, the numbers might be higher because each Central Bank uses a different methodology and some might not record all transfers processed through private accounts.[668] One theory by DHS and the State Department for the recent surge at the border is that children and family units are now traveling to the U.S. when a family member already in the U.S. sends them money to make the journey.

<u>Unauthorized Immigrant Populations</u>

In general, illegal immigration occurs in two ways: either "when immigrants cross the U.S. border without authorization, or when they overstay a legal visa after it expired."[669]

As of 2014, the Pew Research Center estimates the population of illegal immigrants in the U.S. to be 11.3 million, or 3.5 percent of the total U.S. population of 316.1 million.[670] In 2007 the

---

[662] *Id.*

[663] *Slowing Migrants to U.S. will Cost $15 Billion, Guatemala says*, BLOOMBERG (Jan. 26, 2015), http://www.bloomberg.com/news/articles/2015-01-26/slowing-migrants-to-u-s-will-cost-15-billion-guatemala-says.

[664] THE WHITE HOUSE, FACT SHEET: PROMOTING PROSPERITY, SECURITY AND GOOD GOVERNANCE IN CENTRAL AMERICA (2015) https://www.whitehouse.gov/the-press-office/2015/01/29/fact-sheet-promoting-prosperity-security-and-good-governance-central-ame.

[665] Of the $1 billion requested, $24 million is allocated for programs in Belize, Costa Rica, Nicaragua, and Panama. U.S. DEP'T OF STATE, CONGRESSIONAL BUDGET JUSTIFICATIONS FOR FOREIGN OPERATIONS AND RELATED PROGRAMS, FISCAL YEAR 2016 (2015) http://www.state.gov/s/d/rm/rls/ebs/2016/.

[666] Manuel Orozco, Laura Porras, and Julia Yansura, *Trends and Remittances to Latin America and the Caribbean in 2014", Inter-American Dialogue* 5 (Inter-American Dialogue 2015), http://www.thedialogue.org/wp-content/uploads/2015/06/TrendsinremittancesIn2014forLatinAmericaandtheCaribbeanFINAL.pdf; *see also* World Bank, *Personal Remittances, Received (% of GDP)*, http://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS.

[667] *Id.*

[668] GOV'T ACCOUNTABILITY OFFICE, GAO-06-210, INTERNATIONAL REMITTANCES: DIFFERENT ESTIMATION METHODOLOGIES PRODUCE DIFFERENT RESULTS (2006).

[669] Jeffrey S. Passel and D'Vera Cohn, *Unauthorized Immigrant Totals Rise in 7 States, Fall in 14*, PEW RESEARCH CENTER 14 (Nov. 18, 2014), http://www.pewhispanic.org/2014/11/18/unauthorized-immigrant-totals-rise-in-7-states-fall-in-14/.

[670] Jens Manuel Krogstad & Jeffrey S. Passel, *5 Facts about Illegal Immigration in the U.S.*, PEW RESEARCH CENTER (July 24, 2015), http://www.pewresearch.org/fact-tank/2015/07/24/5-facts-about-illegal-immigration-in-the-u-s/. In January 2013 it is estimated that there were 13.1 million lawful permanent residents (LPRs), making up 4.14 percent of the U.S. population and 11.3 million illegal residents, making up 3.54 percent of the U.S. population.

77

154

illegal population peaked at 12.2 million, or 4 percent of the U.S. population, and declined during the recent recession.[671] In 2012, unauthorized immigrants made up about a quarter of the foreign-born population of approximately 42 million.[672]

In 2012, more than half of the unauthorized immigrant population—approximately 60 percent—lived in the following six states: California, Florida, Illinois, New Jersey, New York, and Texas.[673] Also of note, today African, Guatemalan and Salvadoran immigrants "have a substantial presence in the Washington, DC, metropolitan area."[674] At the opposite end of the spectrum, in 2012 fewer than 5,000 unauthorized immigrants lived in Maine, Montana, North Dakota, South Dakota, Vermont, and West Virginia.[675]

According to some estimates, between 2008 and 2012, approximately 8.1 million unauthorized immigrants were born in Mexico and other Central America countries (71 percent); 1.5 million from Asia (13 percent); 817,000 from South America (7 percent); 455,000 from Europe, Canada, or Oceania (4 percent); 317,000 from Africa (3 percent); and 225,000 from the Caribbean (2 percent).[676] While Mexicans constitute a majority of unauthorized immigrants (52 percent in 2012), their numbers have declined in recent years.[677] As the number of people unlawfully in the

---

779,929 LPRs naturalized to become U.S. citizens, resulting in 18 million naturalized citizens. That same year the U.S. saw approximately 3.9 million births (12.4 per 1,000) and 2.6 million deaths (8.2 per 1,000). U.S. DEP'T OF HOMELAND SECURITY, ESTIMATES OF THE LAWFUL PERMANENT RESIDENT POPULATION IN THE UNITED STATES: JANUARY 2013, https://www.dhs.gov/sites/default/files/publications/ois_lpr_pe_2013.pdf; As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled, PEW RESEARCH CENTER (Sept. 3, 2014), http://www.pewhispanic.org/2014/09/03/as-growth-stalls-unauthorized-immigrant-population-becomes-more-settled; U.S. DEP'T OF HOMELAND SECURITY, U.S NATURALIZATIONS: 2013, http://www.dhs.gov/sites/default/files/publications/ois_natz_fr_2013.pdf; CENTER FOR DISEASE CONTROL AND PREVENTION, BIRTH DATA, http://www.cdc.gov/nchs/births.htm; CENTER FOR DISEASE CONTROL AND PREVENTION, DEATHS AND MORTALITY, http://www.cdc.gov/nchs/fastats/deaths.htm.
[671] Jeffrey S. Passel and D'Vera Cohn, Unauthorized Immigrant Totals Rise in 7 States, Fall in 14, PEW RESEARCH CENTER 6 (Nov. 18, 2014), http://www.pewhispanic.org/2014/11/18/unauthorized-immigrant-totals-rise-in-7-states-fall-in-14/.
[672] Id. at 14; UNITED STATES CENSUS BUREAU, STATE & COUNTY QUICKFACTS: USA, http://quickfacts.census.gov/qfd/states/00000.html.
[673] Jeffrey S. Passel and D'Vera Cohn, Unauthorized Immigrant Totals Rise in 7 States, Fall in 14, PEW RESEARCH CENTER 6 (Nov. 18, 2014), http://www.pewhispanic.org/2014/11/18/unauthorized-immigrant-totals-rise-in-7-states-fall-in-14/; see also Jie Zong and Jeanne Batalova, Frequently Requested Statistics on Immigrants and Immigration in the United States, MIGRATION POLICY INSTITUTE (Feb. 26, 2015), http://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states.
[674] Marc R. Rosenblum and Ariel G. Ruiz Soto, An Analysis of Unauthorized Immigrants in the United States by Country and Region of Birth, MIGRATION POLICY INSTITUTE 1 (2015), http://www.migrationpolicy.org/research/analysis-unauthorized-immigrants-united-states-country-and-region-birth (meanwhile, Hondurans are largely located in Texas, Florida, and the Southeast).
[675] Jeffrey S. Passel and D'Vera Cohn, Unauthorized Immigrant Totals Rise in 7 States, Fall in 14, PEW RESEARCH CENTER 7 (Nov. 18, 2014), http://www.pewhispanic.org/2014/11/18/unauthorized-immigrant-totals-rise-in-7-states-fall-in-14/.
[676] Jie Zong and Jeanne Batalova, Frequently Requested Statistics on Immigrants and Immigration in the United States, MIGRATION POLICY INSTITUTE (Feb. 26, 2015), http://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states.
[677] Jeffrey S. Passel and D'Vera Cohn, Unauthorized Immigrant Totals Rise in 7 States, Fall in 14, PEW RESEARCH CENTER 9, 18 (Nov. 18, 2014), http://www.pewhispanic.org/2014/11/18/unauthorized-immigrant-totals-rise-in-7-states-fall-in-14/.

AOL-DEF-00002421

155

U.S. from Mexico declined, the "unauthorized immigrant populations from South America, Europe, and Canada held steady" and the "unauthorized immigrant populations from Asia, Central America and the rest of the world" increased.[678]

From 2009 to 2012, seven states saw an increase in their unauthorized immigrant population: Florida, Idaho, Maryland, Nebraska, New Jersey, Pennsylvania, and Virginia.[679] For example, "[i]n Maryland, the estimated number of unauthorized immigrants grew to 250,000 in 2012, compared with 220,000 in 2007."[680] In 14 states, the populations of unauthorized immigrants decreased from 2009 to 2012: Alabama, Arizona, California, Colorado, Georgia, Illinois, Indiana, Kansas, Kentucky, Massachusetts, Nevada, New Mexico, New York, and Oregon.[681] In 13 of these states, this decline was due to a decrease in illegal immigrants migrating from Mexico.[682] Illegal populations also decline when immigrants move to other states, "when fewer new immigrants arrive, when a greater number decide to leave the country or through deaths."[683]

*Demographics of the Foreign-Born and Native Born Population*

According to the Department of Labor, "the demographic composition of the foreign-born labor force differs from the native-born labor force."[684] In 2014, the foreign born labor force had more men and working adults between the ages of 25 to 54, as compared to the native-born labor force.[685] On the other hand, in 2014, "23.8 percent of the foreign-born labor force age 25 and over had not completed high school, compared with 4.6 percent of the native-born labor force."[686] The proportion of foreign-born (34.2 percent) and native-born (38.2 percent) persons holding a bachelor's degree or higher was more comparable.[687] From 2013 to 2014, the unemployment rate of foreign-born workers declined from 6.9 percent to 5.6 percent and fell for the native-born from 7.5 percent to 6.3 percent.[688]

According to the Congressional Budget Office (CBO), the labor force is expected to expand more slowly in the future than in the 1980s and 1990s, slowing potential output.[689] Overall,

---

[678] *Id.; see also* Marc R. Rosenblum and Ariel G. Ruiz Soto, *An Analysis of Unauthorized Immigrants in the United States by Country and Region of Birth*, MIGRATION POLICY INSTITUTE 6 (2015), http://www.migrationpolicy.org/research/analysis-unauthorized-immigrants-united-states-country-and-region-birth.
[679] Jeffrey S. Passel and D'Vera Cohn, *Unauthorized Immigrant Totals Rise in 7 States, Fall in 14*, PEW RESEARCH CENTER 11 (Nov. 18, 2014), http://www.pewhispanic.org/2014/11/18/unauthorized-immigrant-totals-rise-in-7-states-fall-in-14/.
[680] *Id.*
[681] *Id.* at 12.
[682] *Id.*
[683] *Id.*
[684] U.S. DEP'T OF LABOR, LABOR FORCE CHARACTERISTICS OF FOREIGN-BORN WORKERS (2014), http://www.bls.gov/news.release/forbrn.nr0.htm.
[685] *Id.* (foreign-born men: 58.1 percent; native-born men: 52.2 percent; foreign-born ages 25-54, 74.3 percent; native-born ages 25-54, 62.7 percent).
[686] *Id.*
[687] *Id.*
[688] *Id.*
[689] CONGRESSIONAL BUDGET OFFICE, THE BUDGET AND ECONOMIC OUTLOOK: 2015 TO 2025 4 (2015), https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/49892-Outlook2015.pdf.

AOL-DEF-00002422

156

CBO predicts that "growth in the potential labor force will be held down by the ongoing retirement of the baby boomers; by a relatively stable labor force participation rate among working-age women, after sharp increases from the 1960s to the mid-1990s; and by federal tax and spending policies set in current law."[690] The labor force participation rate has dropped in recent years, and is expected to continue to do so. CBO estimates that by the end of 2019, the labor force participation rate will decline to 62 percent, most importantly due to the continued retirement of the baby-boomer generation.[691]

Today, the U.S. is currently at a fertility rate of 1.9.[692] According to one study, "as the eighty-million-strong baby-boomer generation [retires]. . . .The sixty-million Generation Xers that follow will . . . leave[] approximately five million open jobs by 2018."[693] Many other countries are facing decreasing fertility rates as well.[694] Japan's declining birth rate, for example, is expected to result in less than 20 million people by 2050, from its peak of 127.5 million in 2005.[695] Even Mexico is facing a decline in birthrates, forcing the country to import farm workers from Guatemala.[696] If current fertility rates in Europe remain constant, the total population of the continent will go from 738 million in 2015 to 646 million by the end of the century.[697]

Social Security is greatly affected by the number of workers in the labor force. While the number of workers paying into Social Security has risen, it has not risen to the level of the number of people retiring. In 1940, there were 35.4 million workers supporting 222,000 retirees, or 160 workers for every pensioner.[698] By 1950, the ratio fell to 16.5 workers for every retiree, by 1980, 3.2 workers for every retiree, and by 2010, 2.9 workers were paying for the benefits of each retiree.[699] The Social Security Administration predicts that by 2034, the ratio of workers-to-retirees will fall to just 2.1 workers for every retiree as a result of retiring baby boomers and declining fertility rates.[700] As the worker-to-retiree ratio drops, the tax burden increases.[701]

---

[690] *Id.*
[691] *Id.* at 43.
[692] United Nations, *World Population Prospects The 2015 Revision* (New York, 2015).
[693] Shannon K. O'Neil, *Two Nations Indivisible: Mexico, The United States, and the Road Ahead* 57 (Oxford University Press 2013) (citing Barry Bluestone and Mark Melnik, *After the Recovery: Help Needed the Coming Labor Shortage and How People in Encore Careers Can Help Solve It* (Civic Ventures, 2010)).
[694] S. Philip Morgan, *Is Low Fertility a Twenty-First Century Demographic Crisis?* 2 (Demography 2003) (Just 3 percent of the world's population lives in countries that are not seeing fertility decline).
[695] UNITED NATIONS POPULATION DIVISION, REPLACEMENT MIGRATION: JAPAN, http://www.un.org/esa/population/publications/migration/japan.pdf.
[696] Miriam Jordan, *U.S., Mexico Increasingly Competing for Farm Labor*, WALL STREET JOURNAL (Jan. 23, 2015), http://www.wsj.com/articles/u-s-mexico-increasingly-competing-for-farm-labor-1422043153 (citing the birthrate in Mexico to be 2.05 children per woman); *see also* Shannon K. O'Neil, *Two Nations Indivisible: Mexico, The United States, and the Road Ahead* 57 (Oxford University Press 2013) ("After 2020, somewhere between one hundred thousand and two hundred thousand fewer Mexicans will be coming of age each year compared to 2010. This translates to at least a half million to a million fewer Mexican looking for jobs in the 2020s. The thirty-year wave of supply-led migration between the United States and Mexico has now passed, and will likely never happen again").
[697] United Nations, *World Population Prospects The 2015 Revision* (New York, 2015).
[698] SOCIAL SECURITY ONLINE, RATIO OF SOCIAL SECURITY COVERED WORKERS TO BENEFICIARIES CALENDAR YEARS 1940-2010, http://www.ssa.gov/history/ratios.html.
[699] *Id.*
[700] SOCIAL SECURITY ADMINISTRATION, THE FUTURE OF SOCIAL SECURITY (2008).

AOL-DEF-00002423

157

*Labor Participation and Incentives*

In 2013, the foreign born share of the U.S. civilian labor force "accounted for nearly 17 percent (26.2 million) of the 158.6 million workers in the civilian labor force."[702] From 1990 to 2013, "the percentage of foreign-born workers in the civilian labor force more than tripled, from 5 percent to 17 percent."[703] As to wages, "[i]n 2014, the median usual weekly earnings of foreign-born, full-time wage and salary workers ($664) were 81.0 percent of the earnings of their native-born counterparts ($820).[704]

In 2012, 8.1 million illegal immigrants "were working or looking for work," accounting for 5.1 percent of the civilian labor force.[705] In testimony before the Committee, Pew stated that "[u]nauthorized immigrants are more likely than the overall U.S. population to be of working age."[706] Pew estimates that of the 11.2 million unauthorized immigrants in 2012, only 800,000 are children and approximately 150,000 are over 65—half of which remain in the labor force despite being of retirement age.[707] "Among the states, the share of unauthorized immigrants in the labor force is highest in Nevada (10.2 percent in 2012)," followed by California (9.4 percent) and Texas (8.9 percent).[708]

According to another study, in 2013, of the 7,741,185 unauthorized population in the workforce nationwide, 704,726 (9.1 percent) worked in managerial or professional specialty roles; 1,157,583 (15 percent) worked in technical, sales and administrative support; 2,128,729 (27.5 percent) worked in services, such as janitors, maids, housekeepers, groundskeepers; 731,347 (9.4 percent) worked in farming, forestry, and fishing; 1,175,890 (15.2 percent) worked in precision production, craft, and repair; and 1,671,511 (21.6 percent) worked as operators, fabricators, and laborers.[709]

Of course, the numbers and percentages vary by state. In Wisconsin, for example, of the 61,254 unauthorized population in the workforce in 2013, 9,538 (15.6 percent) of the unauthorized

---

[701] THE TAX FOUNDATION, SOCIAL SECURITY AND MEDICARE TAX RATES, 1937-2009.

[702] Jie Zong and Jeanne Batalova, *Frequently Requested Statistics on Immigrants and Immigration in the United States,* MIGRATION POLICY INSTITUTE (Feb. 26, 2015), http://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states.

[703] *Id.*

[704] U.S. DEP'T OF LABOR, LABOR FORCE CHARACTERISTICS OF FOREIGN-BORN WORKERS (2014), http://www.bls.gov/news.release/forbrn.nr0.htm.

[705] Jeffrey S. Passel and D'Vera Cohn, *Unauthorized Immigrant Totals Rise in 7 States, Fall in 14,* PEW RESEARCH CENTER 8 (Nov. 18, 2014), http://www.pewhispanic.org/2014/11/18/unauthorized-immigrant-totals-rise-in-7-states-fall-in-14/.

[706] *Securing the Border: Defining the Current Population Living in the Shadows and Addressing Future Flows: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs,* 114th Cong. (2015) (statement of Jeffrey S. Passel, PH.D., Senior Demographer, Hispanic Trends Project, Pew Research Center).

[707] Data provided to Majority Staff by Pew Research Center.

[708] Jeffrey S. Passel and D'Vera Cohn, *Unauthorized Immigrant Totals Rise in 7 States, Fall in 14,* PEW RESEARCH CENTER 8 (Nov. 18, 2014), http://www.pewhispanic.org/2014/11/18/unauthorized-immigrant-totals-rise-in-7-states-fall-in-14/.

[709] CENTER FOR MIGRATION STUDIES, ESTIMATES OF THE UNAUTHORIZED POPULATION FOR STATES, http://data.cmsny.org/.

AOL-DEF-00002424

158

population worked in farming, forestry, and fishing and 16,450 (26.9 percent) worked as operators, fabricators, and laborers.[710] On the other hand, In Delaware, of the 14,852 unauthorized population in the workforce, 2,524 (17 percent) worked in managerial or professional specialty roles and 2,792 (18.8 percent) worked in technical, sales, and administrative support roles.[711]

> "The main economic factor influencing migration is the wage gap, or the difference between what a potential migrant can earn in the U.S. compared to the migrant's home country. Differences in average wages for similar workers between developed and developing countries constitute the single largest price distortion remaining in global markets."[712]

Over the last several decades, migrant survey data suggested that the wage gap based on actual labor market outcomes in the U.S. and Mexico was approximately $7 to $1, if valued at the commercial exchange rate.[713] Today, this gap has fallen to as low as $5 to $1.[714] However, this wage gap is expected to continue to be above $3 to $1 until 2075.[715] The wage gap between the U.S. and Central American countries in terms of income is larger than the wage gap between the U.S. and Mexico.[716] According to economists, people will relocate if the ratio is above $2 to $1.[717]

---

[710] *Id.*

[711] *Id.*

[712] Bryan Roberts, Edward Alden, John Whitley, *Managing Illegal Immigration to the United States: How Effective is Enforcement?*, COUNCIL ON FOREIGN RELATIONS 8 (2013) (citing Michael Clemens, Claudio E. Montenegro, and Lant Pritchett, *The Place Premium: Wage Differences for Identical Workers across the U.S. Border,* CENTER FOR GLOBAL DEVELOPMENT (2008)).

[713] Bryan Roberts, Edward Alden, John Whitley, *Managing Illegal Immigration to the United States: How Effective is Enforcement?*, COUNCIL ON FOREIGN RELATIONS 8 (2013).

[714] *Id.*

[715] *Id.* at 9.

[716] *Id.* at Appendix 2: Wage Gap and Other Trends in Central American Source Countries, http://www.cfr.org/immigration/managing-illegal-immigration-united-states/p30658.

[717] Michael Clemens, Claudio E. Montenegro, and Lant Pritchett, *The Place Premium: Wage Differences for Identical Workers across the U.S. Border,* CENTER FOR GLOBAL DEVELOPMENT (2008).

AOL-DEF-00002425

159

<u>Conclusion and Recommendations for Proposed Legislation</u>

It cannot be overstated: our borders are not secure.  According to DHS Secretary Jeh Johnson, we will not even have 100 percent situational awareness, much less operational control of our borders, by the time this Administration leaves office.[718]  Rather than stall important reforms that will make our country safer, the Chairman encourages the Administration to work with Congress toward important, incremental improvements at our border.

This report makes the following recommendations for improving border security on America's southwest, northern, and maritime borders, as well as at our ports of entry.  To truly secure our borders, we must identify, eliminate, or drastically reduce the incentives for illegal immigration.  We also must add more boots on the ground, tactical infrastructure, and technology across all our border sectors.  This report does not propose major reforms to America's border security policies.  Instead, it offers a list of realistic, important steps toward continuous improvement that the Chairman believes could be achieved in the upcoming months.

• Require adequate metrics to measure border security across all U.S. borders—land, air, and sea, with appropriate oversight and transparency.

Over the course of the Committee's border security hearing series, the Majority Staff found it challenging to obtain basic and consistent information from DHS.  One way to improve border security is to properly define the problem.  Therefore, DHS should utilize metrics that truly define the threats across all of our borders.  In order to ensure appropriate oversight, GAO should confirm the adequacy of these metrics and the data used to arrive at these metrics should be made available to the academic and law enforcement community, as well as the general public.  Ultimately, understanding these threats will help inform both elected officials and the public as to what exactly our border security problems are.  Getting this information now will put us on an important path towards solving our immigration problems in the future.

Earlier this year, the Chairman introduced a bill outlining important metrics DHS should utilize and provide to the public in order to fully define the security across our borders.  This bill cleared the Committee on a bipartisan basis.  However, a small group of Democrats are currently preventing this bill from proceeding, noting that it is not comprehensive immigration reform and therefore should not advance.

• Ensure sufficient safeguards are in place in both the U.S. Refugee Resettlement Program and Visa Waiver Program.

After the horrific attacks in Paris, both citizens and elected official across the country have called for a review of U.S. security programs.  Particular focus had been on the U.S. Refugee Resettlement Program and the Visa Waiver Program.[719]  In November, the House passed a veto-

---

[718] *See The Homeland Security Department's Budget Submission for Fiscal Year 2016: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[719] The Impact of ISIS on the Homeland and Refugee Resettlement: *Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).

83

AOL-DEF-00002426

160

proof bipartisan bill that would require supplemental certifications and background investigations on certain refugees before they are admitted to the United States. Other Members are considering legislation to update the security safeguards in the Visa Waiver Program, particularly since the known attackers in Paris were nationals of countries that are part of the program.

Earlier this year, the President announced plans to raise the refugee ceiling to 85,000 for FY2016 and to 100,000 for FY2017.[720] During a hearing focused on the topic, Chairman Johnson pointed out to the Director of U.S. Citizenship and Immigration Services (USCIS) that this plan would increase the agency's caseload by 21 percent and 43 percent, respectively.[721] USCIS was questioned whether the management solution to this increase would be to streamline the vetting process.[722] To provide the American public with assurances that the U.S. will not short-circuit the vetting process, the Chairman introduced the Senate companion to the house-passed legislation mentioned above. As this bill advances and new information regarding U.S. vulnerabilities emerges, the Chairman is considering amending the bill to also include Visa Waiver Program enhancements.

- Initiate a concentrated public relations campaign to dissuade all Americans, but in particular young people, from using and becoming addicted to drugs.

America's insatiable demand for drugs is one root cause (perhaps the root cause) preventing the achievement of a secure border. And yet, we have not had a significant, nationwide ad campaign regarding the harms associated with drug abuse since Ronald Regan's "Campaign Against Drug Abuse" in the 1980s.[723] While appropriate safeguards are needed to identify the costs and expected results of such campaigns, it is important that the public understands the risks associated with drugs use. Further, we must begin to break down the stigma associated with drug use so people feel free to talk about their struggles and seek recovery options.

This year, the Committee has explored, and will continue to explore, how the country's heroin epidemic has devastated communities across the nation. In New Hampshire, the Committee heard a father tell the story of his young daughter's heroin addiction.[724] The father explained that for too long his family kept their daughter's addiction quiet, ashamed that this was happening to them.[725] In November, the Committee traveled to Arizona to understand both how heroin is crossing into the country and how its effects impact the Phoenix community. The Committee also plans to travel to Milwaukee for an upcoming field hearing, as statistics show

---

[720] U.S. Dep't of State, U.S. Dep't of Homeland Security, U.S. Dep't of Health and Human Services, Proposed Refugee Admissions for Fiscal Year 2016 Report to Congress Submitted on Behalf of the President of the United States to the Committees on the Judiciary United States Senate and United States House of Representatives (2015).
[721] *Id.*
[722] *Id.*
[723] *Campaign Against Drug Abuse*, WETA (Sept. 14, 1986),
http://www.pbs.org/wgbh/americanexperience/features/primary-resources/reagan-drug-campaign/.
[724] *All Hands on Deck: Working Together to End the Trafficking and Abuse of Prescription Opioids, Heroin, and Fentanyl Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Doug Griffin, Father of Courtney Griffin).
[725] *Id.*

84

AOL-DEF-00002427

161

that between 2008 and 2012, heroin overdose deaths in Wisconsin tripled.[726] The first step in problem solving is to admit that you have one. The Committee will continue to work to bring public awareness to this issue.

- Reform the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) to eliminate incentives for illegal immigration.

Children entering the U.S. from Mexico and Canada are screened within 48 hours.[727] Upon determining that a child does not qualify for asylum or is not a victim of human trafficking, DHS can then offer the minor voluntary removal or expedite their repatriation.[728]

Conversely, pursuant to the TVPRA, children from noncontiguous countries such as El Salvador, Guatemala, and Honduras, must be transferred to HHS within 72 hours of apprehension while waiting for an immigration court hearing; they cannot be immediately transferred back to their home countries.[729] HHS releases under parole authority over 90 percent of UACs into the interior of the country to relatives and sponsors living in the U.S.[730]

Institutionalizing a single, consistent procedure to process all UACs can reduce the incentive to embark on the dangerous journey to the United States. DHS resources are better utilized when legislation is consistent with how we treat those who unlawfully enter the U.S. While some also advocate for additional immigration judges to resolve the crisis, a clearly defined definition of an unaccompanied minor can simplify processing procedures and increase the number of expedited removals, while continuing to protect victims of human trafficking. Moreover, additional judges are of little value if minors are not showing up for their court dates.

As unaccompanied minors and family units arriving at the southwest border is again on the rise, the Chairman is considering legislation that would allow for the expedited removal of all illegal crossers in order to discourage children and families from taking the dangerous, sometimes deadly journey, through Central America and Mexico and across the southwest border.

Not only would eliminating an incentive to migrate illegally to the U.S. protect the lives of many children and families, it would also ensure that the very people who are eager to seek opportunity remain in and improve their own countries. The Migration Policy Institute estimates that close to one in five Salvadorans and approximately one in 15 Guatemalans and Hondurans already reside in the U.S.[731] On a recent CODEL to Central America, the president of Honduras told the

---

[726] DEA Strategic Intelligence Section, *National Heroin Threat Assessment*, U.S Dep't of Justice, Drug Enforcement Administration, DEA-DCT-DIR-022-15 at 44 (April 2015).
[727] Pub. L. No. 110-457 (2008).
[728] *Id.*
[729] *Id.*
[730] Dara Lind, *Thousands of Children are Fleeing Central America to Texas-Alone*, VOX (June 4, 2014), http://www.vox.com/2014/6/4/5773268/children-migration-central-america-texas-unaccompanied-alien-children-border-crisis.
[731] Marc R. Rosenblum, *Unaccompanied Child Migration to the United States: The Tension between Protection and Prevention*, MIGRATION POLICY INSTITUTE 12-13 (2015), http://www.migrationpolicy.org/research/unaccompanied-child-migration-united-states-tension-between-protection-and-prevention.

AOL-DEF-00002428

162

delegation that witnessing his people leave their country for opportunities in the U.S. was a "slap in the face." Meanwhile, the President-elect in Guatemala argued for a renewed sense of nationalism in his country to motivate his people to remain in and fight for Guatemala.

- Provide Border Patrol agents access to federal lands.

Various federal land agencies have different missions, guidelines, and management plans regarding CBP access to federal land under their respective jurisdictions, which has historically slowed or impeded CBP—and its predecessor agency—in conducting border security operations on such land.[732] In Arizona, 80 percent of the border has restricted access due to national forests, wildlife refuges, military training ranges, and a Native American Reservation.[733]

In 2006, in an attempt to resolve ongoing conflicts between federal land managers and CBP over access to federal lands, DHS, the U.S. Department of the Interior (DOI) and the U.S. Department of Agriculture (USDA) entered into a nationwide MOU concerning border security operations on federal lands.[734] However, the MOU has not worked as intended, causing delays and impediments that threaten the security of our border.

For example, a 2011 GAO report found that "14 of the 26 Border Patrol stations along the southwestern border reported experiencing delays" in operations due to the time it took land managers to complete environmental and historic assessments.[735] In 2010, GAO cited a case where Border Patrol needed to improve a road so that a truck could relocate an underground sensor, but the federal land agency took eight months to perform a historic property assessment.[736] In another example, Border Patrol was required to wait four months for land managers to make a decision to approve the relocation of a mobile surveillance system to a different location.[737] By the time the land manager completed the environmental assessments, "illegal traffic had shifted to other areas."[738] During this delay, Border Patrol agents lost their ability to detect illegal crossers within a seven-mile radius."[739]

At a Committee mark-up, the Committee considered a bill introduced by Senator McCain that would provide Border Patrol agents access to federal lands in the Tucson and Yuma sectors. While the Majority Staff recommends expanding this bill to all border sectors, the Chairman

---

[732] E.g., GOV'T ACCOUNTABILITY OFFICE, GAO-11-38, SOUTHWEST BORDER: MORE TIMELY BORDER PATROL ACCESS AND TRAINING COULD IMPROVE SECURITY OPERATIONS AND NATURAL RESOURCE PROTECTION ON FEDERAL LANDS 22 (2010).
[733] U.S. CUSTOMS AND BORDER PROTECTION, OFFICE OF INTELLIGENCE, ARIZONA INTELLIGENCE OVERVIEW (2015) (on file with Majority Staff).
[734] Memorandum of Understanding Among U.S. Department of Homeland Security and U.S. Department of the Interior and U.S. Department of Agriculture Regarding Cooperative National Security and Counterterrorism Efforts on Federal Lands along the United States' Border (Mar. 2006).
[735] GOV'T ACCOUNTABILITY OFFICE, GAO-11-573T, SOUTHWEST BORDER: BORDER PATROL OPERATIONS ON FEDERAL LANDS 10 (2011).
[736] GOV'T ACCOUNTABILITY OFFICE, GAO-11-38, SOUTHWEST BORDER: MORE TIMELY BORDER PATROL ACCESS AND TRAINING COULD IMPROVE SECURITY OPERATIONS AND NATURAL RESOURCE PROTECTION ON FEDERAL LANDS 24 (2010).
[737] Id. at 23.
[738] Id.
[739] Id.

AOL-DEF-00002429

163

supports a piecemeal approach to this solution. Importantly, an amendment offered by Senator Heitkamp called for a GAO study to consider the impacts of this access and implications for applying this bill across all border sectors. The bill passed the Committee on a bipartisan basis.

• Require DHS to examine the threats on the northern border.

During the Committee's hearing on the northern border, a clear pattern emerged—the northern border is far from secure, and this insecurity poses various threats to America. Experts have testified that it is "commonly accepted" that the more significant terrorist threat comes from the U.S.-Canada border.[740] Canadian cities have seen a recent increase in terrorist threats, as illustrated by the incident in October 2014, in which a Canadian soldier on duty was killed at the National War Memorial in Ottawa.[741]

Additionally, the northern border presents significant opportunities for those looking to smuggle illicit narcotics into America. A significant portion of the U.S.-Canada border is remote, dense forest, making it easier for drug traffickers to cross the border undetected.[742] Investigations have shown that drug traffickers are utilizing these rural areas, as not only does the terrain provide natural concealment, but law enforcement agencies lack cross-border detection equipment such as radar in those areas.[743]

In addition to threats from terrorists and drug traffickers, the U.S.-Canada border is also transited by human smugglers and traffickers. DHS HSI and Canadian law enforcement recently intercepted an operation that involved the trafficking of young Romanian women through the northern border.[744]

Because the threats at the northern border significantly differ from the threats associated with the southwest border, Congress should call on the Department to conduct a threat analysis specifically on the northern border. The Chairman joined Senators Ayotte, Heitkamp, and Peters in introducing a bill that required this threat assessment. This bill unanimously passed the Committee and is set to unanimously clear the Senate in the upcoming weeks.

• Call on the Chief of the Border Patrol to move agents to areas of high risk.

Over time, different sectors of the border experience different levels of activity. San Diego was previously one of the most highly trafficked areas of the border, but added resources and fencing

---

[740] *Improving Security and Facilitating Commerce at America's Northern border and Ports of Entry: Hearing Before the S. Subcomm. on Immigration, Refugees and Border Security of the S. Comm. on the Judiciary,* 112th Cong. (2011) (statement of Alan Bersin, Commissioner, U.S. Customs and Border Protection).
[741] *Securing the Border: Understanding Threats and Strategies for the Northern Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015) (statement of Richard Hartunian, U.S. Attorney for the Northern District of New York, U.S. Attorney's Office, U.S. Department of Justice).
[742] *Id.* (statement of David Rodriguez, Northwest High Intensity Drug Trafficking Area (HIDTA), Office of National Drug Control Policy.
[743] *Id.*
[744] *Id.* (statement of Richard Hartunian, U.S. Attorney for the Northern District of New York, U.S. Attorney's Office, U.S. Department of Justice).

87

164

shifted focus away from that sector (see Figure 2).[745] The Tucson sector then became the most heavily trafficked area until the recent influx in children from Central America, which made the Rio Grande Valley the busiest sector.[746]

Given the ever-changing levels of traffic in the different sectors, the Chief of Border Patrol should have the ability to move agents to the areas that are in the most need of more agents. By allowing this, Border Patrol can ensure that the sectors of the border that require the most attention are getting the manpower needed in order to ensure the security of the border.

- Provide and maintain adequate manpower on our border and satisfy hard to fill vacancies at our POEs.

One of the main problems with securing the border is the lack of manpower.[747] The National Border Patrol Council has testified at three Committee hearings that an additional 5,000 agents are needed in order to fully secure the northern and southwest borders.[748] At another Committee hearing, witnesses spoke about Operation Strong Safety, in which Texas Governor Rick Perry deployed the Texas Department of Public Safety to the border.[749] According to the Texas DPS report and witness testimony, the operation was extremely successful.[750]

Today, both officer and agent positions remain open on both the northern and southwest border, as well as across our POEs. Members of the Committee have expressed concerns during Committee hearings about the need to fill these positions.[751] In FY2013, Congress appropriated to the Department additional funding to hire 2,000 officers at our POEs. However, due to attrition and the time it takes to bring on new officers, CBP has only realized a net gain of 818 officers. CBP should consider creative options to fill these positions, including utilizing partnerships with the Department of Defense, the National Guard, and state and local governments.

---

[745] *San Diego Fence Provides Lessons in Border Control*, NPR (Apr. 6, 2006), http://www.npr.org/templates/story/story.php?storyId=5323928.
[746] H. COMM. ON HOMELAND SECURITY, U.S. HOUSE OF REPRESENTATIVES, BLUEPRINT FOR SOUTHERN BORDER SECURITY (2014).
[747] *Securing the Southwest Border: Perspectives from Beyond the Beltway: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Chris Cabrera, National Border Patrol Council).
[748] *Id.; see also Deferred Action on Immigration: Implications and Unanswered Questions: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Shawn Moran, Vice President, National Border Patrol Council); *Ongoing Migration from Central America: An Examination of FY2015 Apprehensions: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Chris Cabrera, National Border Patrol Council).
[749] *See generally Securing the Border: Assessing the Impact of Transnational Crime: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015).
[750] *Id.;* TEXAS DEP'T OF PUBLIC SAFETY, OPERATION STRONG SAFETY REPORT TO THE 84TH TEXAS LEGISLATURE AND OFFICE OF THE GOVERNOR (2015) (Unclassified Version).
[751] *Securing the Border: Understanding Threats and Strategies for the Northern Border: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong. (2015) (statement of Senator Heidi Heitkamp).

88

AOL-DEF-00002431

165

To begin to address this problem, the Chairman introduced a bill with Senators Flake, McCain, and Schumer that would require CBP and DOD to identify separating service members with duties that are transferable to CBP officer duties and make them aware of job opportunities within CBP.  This bill also requires that the agencies use existing authorities to expeditiously hire these separating service members to fill open CBP officer positions at U.S. ports of entry.  The Border Jobs for Veterans Act of 2015 passed the Committee and Senate by unanimous consent.  Shortly thereafter, a companion bill cleared the House and Senate and was signed into law.

- Complete the Congressionally-mandated fencing requirement along the southwest border and understand our country's fencing needs and current assets to determine what more is necessary.

The U.S.-Mexico border is nearly 2,000-miles long.  Today, according to DHS, there is approximately 653 miles of front-line fencing on the southwest border: 353 miles of primary fence, 36 miles of secondary fencing, and 300 miles of vehicle barrier fence.  To reach its statutory requirement to construct fencing "along not less than 700 miles of the southwest border,"[752] deploying additional fencing is necessary.  As the Department does not appear to be prioritizing resources to complete this Congressional mandate,[753] it is imperative that Congress continue to provide oversight to ensure additional fencing is deployed.

Moreover, it is important to understand where current fencing exists along the southwest border, what fencing is most effective, and what fencing needs to be repaired.  Many of these questions were asked at a Committee hearing but adequate answers could not be provided in an unclassified setting.[754]  More information should be provided to the Committee and the public at large on our fencing and tactical infrastructure needs.  The Committee has called on GAO to study this important issue and awaits that report to determine next steps.

- Require each border security technology acquisition program to demonstrate it has an approved baseline for cost, schedule, and performance.

At several hearings, the Committee heard how technology acts as an important force multiplier towards border security enforcement.[755]  However, since 2005, GAO has identified DHS's acquisition management as an activity on their "High Risk List."[756]  In March 2014, GAO found that CBP had a schedule for seven programs within the Arizona Technology Plan—and "four of

---

[752] Pub. L. No. 104-208, div. C, §102(a)-(c) (1996), as amended by Pub. L. No. 109-13, div. B, §102 (2005); Pub. L. No. 109-367, §3 (2006); and Pub. L. No. 110-161, div. E, §564(a) (2008).
[753] Michael John Garcia, CONG. RESEARCH SERV., R 43975, BARRIERS ALONG THE U.S. BORDERS: KEY AUTHORITIES AND REQUIREMENTS 9 (2015).
[754] *See Securing the Border: Fencing, Infrastructure, and Technology Force Multipliers: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[755] *See, e.g.*, *Securing the Border: Fencing, Infrastructure, and Technology Force Multipliers: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs,* 114th Cong. (2015) (statement of Ronald Vitiello, Deputy Chief, Office of Border Patrol, U.S. Customs and Border Prot.).
[756] GOV'T ACCOUNTABILITY OFFICE, GAO-15-171SP, HOMELAND SECURITY ACQUISITIONS: MAJOR PROGRAM ASSESSMENTS REVEAL ACTIONS NEEDED TO IMPROVE ACCOUNTABILITY 1 (2015).

89

AOL-DEF-00002432

166

the programs would not meet their originally planned completion dates."[757] Additionally, the status of the Integrated Fixed Tower program's initial operational capability date moved from the end of FY2013 to the end of FY2015.[758] While full operational capability was scheduled to occur by September 2015, the date has now been pushed back seven years to March 2022.[759]

At a Committee hearing, GAO testified that "CBP has identified the mission benefits of its surveillance technologies such as improved situational awareness and agent safety."[760] However, per GAO recommendations, "CBP needs to develop and implement performance measures and analyze data it is now collecting to be able to fully assess the contributions of its technologies to border security."[761]

There is a clear need for DHS to acquire and implement technologies in a timely manner, which, to date, has not occurred. Technology and other force multipliers play an important role in securing the border, and will reach their maximum effectiveness if they are both acquired and installed in accordance with set timelines. Once the technologies are installed, there should be stated and achievable performance metrics that will determine whether these technologies are meeting their performance thresholds.

Senator McCain recently introduced a bill requiring that each border security technology acquisition program demonstrate that it has a cost, schedule, and performance baseline approved by the relevant DHS authority, and who also certifies that each program meets the thresholds. This bill was unanimously approved by the Committee.

- Ensure that successful state and local programs, such as Operation Stonegarden, are used appropriately and efficiently to maximize manpower at and near U.S. borders.

Operation Stonegarden, a grant program operated through FEMA, has proven beneficial to those who live and work at the border.[762] The program provides funding to state and local governments to increase operational capacity at the border as well as enhance coordination among local, state, and federal enforcement agencies. However, in order to ensure that Operation Stonegarden remains successful, it is important to confirm that funds are used

---

[757] GOV'T ACCOUNTABILITY OFFICE, GAO-15-595T, BORDER SECURITY: PROGRESS AND CHALLENGES IN DHS'S EFFORTS TO IMPLEMENT AND ASSESS INFRASTRUCTURE AND TECHNOLOGY 3 (2015) *in Securing the Border: Fencing, Infrastructure, and Technology Force Multipliers: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs,* 114th Cong. (2015) (statement of Rebecca Gambler, Director, Homeland Sec. and Justice, Gov't Accountability Office).

[758] *Id.*

[759] *Id.*

[760] *Securing the Border: Fencing, Infrastructure, and Technology Force Multipliers: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs,* 114th Cong. (2015) (statement of Rebecca Gambler, Director, Homeland Sec. and Justice, Gov't Accountability Office).

[761] *Id.*

[762] *See Securing the Southwest Border: Perspectives from Beyond the Beltway: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015); *see also* U.S. CUSTOMS AND BORDER PROTECTION, PERFORMANCE AND ACCOUNTABILITY REPORT, FISCAL YEAR 2013, 12 (2014) ("Stonegarden funds increase operational capabilities for multijurisdictional law enforcement entities, promoting a layered, coordinated approach to law enforcement.").

AOL-DEF-00002433

167

appropriately for actual border security functions. To that end, the Majority Staff will continue
to conduct oversight on the use of these funds.

- Cut off federal funding for sanctuary cities that release criminal aliens into local
  communities, endangering public safety, and provide immunity to law enforcement officers
  so that courts cannot prevent them from honoring detainers.

At a Committee hearing, ICE testified that it is not repatriating unaccompanied minors that
unlawfully entered the country last summer because it prioritizes its resources on criminal
aliens.[763] However, recently a young woman was shot by a criminal alien who had been
deported five times and had seven felony convictions.[764] ICE testified that in that particular case,
the criminal alien was released because San Francisco did not honor the ICE detainer.[765] In fact,
the criminal alien located to San Francisco because of its lenient enforcement policies.[766]

Sanctuary jurisdictions that do not cooperate with the enforcement of federal immigration laws
or do not honor federal immigration detainers should not receive federal funding. Moreover,
legislation should be passed that provides immunity to jurisdictions that honor federal detainers
and hold criminal aliens until ICE can pick them up. This is necessary, as recent court decisions
have led many jurisdictions to release criminal aliens due to liability concerns.

In October, the Senate considered a bill offered by the Chairman, along with Senators Vitter,
Toomey, Grassley, Cruz, Cornyn, Sullivan, Perdue, Isakson, Rubio, and Barrasso, that cut off
federal funding of certain grants for jurisdictions that follow sanctuary city policies.
Unfortunately, the Democrats chose to block this important reform.

- Ensure the continuation of current Border Patrol programs, such as Operation Streamline, that
  provide penalties to recent border crossers in order to reduce recidivism.

Border Patrol has created a Consequence Delivery System guide to demonstrate what
consequences are most effective in reducing recidivism for various types of unlawful crossers.
According to the guide, voluntary returns and similar programs are the least effective and
efficient.[767] On the other hand, programs that emphasize expedited removal have been shown to

---

[763] *See The 2014 Humanitarian Crisis at our Border: A Review of the Government's Response to Unaccompanied
Minors One Year Later: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong.
(2015).
[764] Michelle Moons, *Breaking: Pier 14 Murder Suspect Had Been Deported 5 Times With 7 Felonies*, BREITBART
(July 3, 2015), http://www.breitbart.com/texas/2015/07/03/breaking-pier-14-murder-suspect-had-been-deported-5-
times-with-7-felonies/.
[765] *See The 2014 Humanitarian Crisis at our Border: A Review of the Government's Response to Unaccompanied
Minors One Year Later: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs*, 114th Cong.
(2015).
[766] Jonah Lustig and Emily Shapiro, *San Francisco Pier Shooting Suspect Francisco Sanchez Allegedly Used
Federal Agent's Gun, Sources Say*, ABC NEWS (July 8, 2015), http://abcnews.go.com/US/san-francisco-pier-
shooting-suspect-francisco-sanchez-meant/story?id=32281587
[767] U.S. CUSTOMS AND BORDER PROTECTION, PERFORMANCE AND ACCOUNTABILITY REPORT, FISCAL YEAR 2013,64
(2014).

AOL-DEF-00002434

168

be extremely effective and efficient. According to CBP, recidivism has decreased each year since the implementation of the Consequence Delivery System in 2011.[768]

Operation Streamline expedites the criminal processing of illegal border crossers by allowing groups to have their charges heard at the same time, often resulting in jail time.[769] According to the Consequence Delivery System, Operation Streamline has shown itself to be the most effective and efficient with those who are apprehended for the first time, those who have been apprehended two or three times, and those who are a "persistent alien."[770] In addition, Operation Streamline has shown itself to be highly effective and efficient with suspected smugglers, targeted smugglers, and criminal aliens.[771] Despite its successes, the Committee has recently been notified that the DOJ has indicated that Operation Streamline should no longer apply to first time border crossers.[772]

Policies that eliminate or reduce incentives for illegal immigration should be continued, not limited. Therefore, at a future mark-up, the Committee will consider a bill the Chairman introduced with Senators Flake, McCain, and Grassley that expresses the Sense of the Senate that Operation Streamline is a successful program that should continue to apply to first time border crossers.

- Emphasize intelligence-based strategies at our borders.

The Committee has heard that smugglers recruit high school and middle school students because they believe students are less likely to be identified by law enforcement and this age group will not be prosecuted.[773] Smuggling networks also utilize scouts who operate along both sides of the border with impunity, notifying smugglers of when to cross.[774] To get to the source of the problem, DHS should use intelligence-based strategies to investigate, arrest, and prosecute scouts and smugglers. DHS should also impose heavier penalties for smugglers who utilize minors to carry out their criminal activity.

- Authorize the Department's preclearance agreements.

DHS components and the American intelligence community benefit from preclearance partnerships. By posting immigration and customs officials in foreign countries, DHS expands

---

[768] *Id*
[769] Lisa Seghetti, CONG. RESEARCH SERV., R 43356, BORDER SECURITY: IMMIGRATION ENFORCEMENT BETWEEN PORTS OF ENTRY 8 (2014).
[770] U.S. CUSTOMS AND BORDER PROTECTION, TUCSON SECTOR: CONSEQUENCE DELIVERY SYSTEM GUIDE, FY2014 (2015) (on file with Majority Staff).
[771] *Id*
[772] Letter from Leon N. Wilmot, Sheriff, Yuma County to the Honorable Jeff Flake (Aug. 19, 2014), http://www.flake.senate.gov/public/_cache/files/9d45f51e-521b-42e1-9df8-407e5d24388f/flake-jeff-re-operation-streamline-08192014.pdf. This letter was subsequently confirmed by Customs and Border Protection.
[773] *See Securing the Southwest Border: Perspectives from Beyond the Beltway: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs,* 114th Cong. (2015).
[774] On a CODEL in South Texas, Chairman Johnson, Ranking Member Carper, and Senator Sasse observed a presumed scout perched along the Mexican side of the Rio Grande.

92

AOL-DEF-00002435

169

America's virtual borders to the point of departure. Preclearance operations help U.S. law enforcement authorities better understand threats emanating from participating countries and identify terrorists and criminals before they arrive at a U.S. port of entry.[775]

In addition, preclearance operations increase efficiencies because foreign travelers are screened and cleared abroad, reducing immigration lines and transit times at major international airports in the United States.[776] In 2013, 69.6 million foreign travelers visited the United State, representing a 2.6 million increase from FY2012, a growth pattern of about four percent expected to continue through 2018.[777]

By reducing the number of foreign travelers that need to be processed at U.S. ports of entry, DHS components can allocate resources to target high-risk travelers. However, Congress should ensure that the 10 new international airports DHS is considering expanding preclearance agreements to meet the same rigorous standards as U.S. airports prior to approving them for such operations. The Committee recently took up and passed a bill that would address this issue.

---

[775] *The Abu Dhabi Pre-Clearance Facility: Implications for U.S. Businesses and National Security, Hearing Before the House SubComm. on Terrorism, Nonproliferation, and Trade of the Comm. on Foreign Affairs,* 113th Cong (2013) (statement of Kevin McAleenan, Acting Deputy Commissioner, U.S. Customs and Border Protection).
[776] *DHS Announces Intent to Expand Preclearance to 10 New Airports,* U.S. DEP'T OF HOMELAND SECURITY (May 29, 2015), http://www.dhs.gov/news/2015/05/29/dhs-announces-intent-expand-preclearance-10-new-airports.
[777] Mark Johanson, *US Received Record Number of Visitors in 2012 Thanks to These 15 Countries,* INT'L BUSINESS TIMES (June 11, 2013), http://www.ibtimes.com/us-received-record-number-visitors-2012-thanks-these-15-countries-1300347.

AOL-DEF-00002436

170

**Appendix A: Key Findings of Fact from Border Security Hearings and Roundtables**

2/04/2015 — *Deferred Action on Immigration: Implications and Unanswered Questions*
- Individuals granted deferred action under the President's executive actions will receive a Social Security number, which is a permanent identifier that enables individuals to receive Social Security and Medicare benefits.
- Questions remain regarding what financial benefits will flow to non U.S. citizens; how DHS plans to combat against fraudulent documents; and the adequacy of background checks.
- If past is prologue, the President's unilateral actions create the potential for renewed surges at our borders, similar to the surge of minors last summer in response to DACA.

3/10/2015 — *Visa Waiver Program: Implications for U.S. National Security*
- The Visa Waiver Program was designed to ease travel and promote commerce and today is utilized by 40 percent of travelers to America, or 19 million visitors annually.
- However, with the rising concern of Western foreign fighters, the U.S. and European Union Members must work together to prevent terrorist travel and address vulnerabilities: the Government Accountability Office (GAO) has found loopholes that have allowed travelers to arrive in the U.S. without proper approval and identified ICE's inability to locate individuals who overstay their 90 day visa free period.

3/17/2015 — *Securing the Southwest Border: Perspectives from Beyond the Beltway*
- Four out of five witnesses testified: the southwest border is not secure.
- Chris Cabrera, a Border Patrol agent in the Rio Grande Valley sector testified that we are only interdicting 30 to 40 percent of illegal crossers, contrary to testimony from U.S. Border Patrol leaders, claiming interdiction rates of over 70 percent.
- Cabrera also testified that Border Patrol agents have "a lot of problems" accessing Federal lands and Native American Reservations, which drug smugglers and coyotes use to their advantage. According to Cabrera, smugglers "know exactly what we can and cannot do, where we can and cannot go, and they exploit it."
- Cochise County, Arizona Sheriff Mark Dannels confirmed that due to limited resources, some local jurisdictions along the border will not prosecute smugglers possessing less than 500 pounds of marijuana.
- Sheriff Dannels also testified that drug traffickers often use teenagers to smuggle drugs, as it is unlikely that minors will be prosecuted.
- Many witnesses raised the issue of collaboration: the federal, state, and local levels of government need to work together.

3/17/2015 — *Central American Ministers of Northern Triangle (Member Roundtable)*
- In 2013, remittances from the U.S. accounted for 16.4 percent of the Gross Domestic Product (GDP) in El Salvador, 10 percent in Guatemala, and 16.9 percent in Honduras.
- Central American Ministers are strongly supportive of receiving $1 billion in aid from the U.S. and believe now is the time to invest in Central America.

94

AOL-DEF-00002437

171

*3/24/2015 —U.S. Ambassadors to Central America (Member Roundtable)*

- Plan Colombia (a partnership between the U.S. and Colombia) worked because of strong leadership and the political will to solve the problem of crime and terrorism. Corruption is still present (if not rampant) in Central American countries. According to the Ambassador from Guatemala, "corruption is killing Guatemala; there is no confidence in government."
- According to the Ambassadors, the wage differential between the U.S. and Central American countries is as high as $8 to $1.

*3/24/2015 — Securing the Border: Understanding the Presence of Transnational Crime*

- According to former drug czar General Barry McCaffrey, the U.S. is only interdicting 5 to 10 percent of illegal drugs crossing our southwest border.
- McCaffrey also testified that in 1,000 communities, 200 major metropolitan areas, "the principle threat to the American people and organized crime comes out of Mexican cartels."
- Benny Martinez, Chief Deputy Sheriff of Brooks County, Texas asserted "until the United States is serious about securing the border, the transnational criminal organizations will continue to operate on the border and within small communities throughout the major cities of the Nation."
- Several witnesses confirmed there is a difference in equivalence between problems in Mexico and problems in Canada, and importantly, "there is first-rate intelligence cooperation between Canadian and U.S. authorities."
- Witnesses also confirmed that it is extremely difficult to prosecute scouts that are apprehended and "a very good percentage of them walk."

*3/25/2015 — Securing the Border: Understanding and Addressing the Root Causes of Central American Migration to the United States*

- More than 50,000 unaccompanied minors and a similar number of families from Central America were apprehended in FY2014, three times more than in FY2009.
- While numbers are down this year—they are still significantly higher than pre-2012 levels.
- Before the Administration's DACA announcement, fewer than 5,000 Central American minors arrived at the border annually (3,304 in 2009; 4,444 in 2010; 3,933 in 2011).
- According to the Congressional Research Service, 62 percent of unaccompanied minors failed to show up for their court date from July 2014 through February 2015.
- A former Assistant for Latin America and the Caribbean at USAID quoted a journalist who interviewed dozens of people in Guatemala in the summer of 2014, "Coyotes may appear to be uniformed and unsophisticated smugglers, but they pay close attention to U.S. immigration laws. One smuggler asserted, quote, 'Obama has helped us with the children because they are able to stay in the United States. That is the reason so many children are coming.'"
- Another witness testified that human smuggling is a $6 billion business.

95

AOL-DEF-00002438

172

*3/26/2015 — Securing the Border: Defining the Current Population Living in the Shadows and
Addressing Future Flows*
- Many witnesses agreed: the wage gap is a primary incentive for illegal immigration.
- According to the Pew Research Center, in 2012 the illegal population stood at 11.2 million.
- Of the 11.2 million, 8.1 million people are working or looking for work.
- Witnesses testified that a good guest worker program is flexible, market driven, allows for circularity and portability, and ensures more interior enforcement.

*4/22/2015 — Securing the Border: Understanding Threats and Strategies for the Northern
Border*
- Experts testified that the northern border threats are different from those of the southwest border, as there are less illegal crossings and better information sharing with Canada.
- The U.S.-Canada border is a "vast, over-5,000-mile border, with incredibly diverse terrain" and "areas that are tremendously porous." The government appears to be addressing this vulnerability through "working closely with the Canadians."
- We should continue working with Canada to improve information sharing, particularly as it relates to information on the U.S. and Canadian watchlist and no-fly lists, which today are separate and not shared.

*4/28/2015 — Securing the Border: Biometric Entry and Exit at our Ports of Entry* (Public
Roundtable)
- While DHS has implemented biometric entry, biometric exit is still being developed and no timeline for completion has been provided.
- It will be expensive and more difficult to fully implement biometric exit along our air, sea, and land ports of entry, but biometrics will offset the costs with the added benefit and security of catching things such as name misspellings and forged documents that biographic information will not.

*4/29/2015 — The Homeland Security Department's Budget Submission for Fiscal Year 2016*[778]
- Secretary Johnson recognizes that those migrating from Central America are "very market-sensitive" and that "you have to show the population in Central America that you are sending people back."
- Secretary Johnson attributed the decline in the migration of unaccompanied minors this year to the reduction in the repatriation times for the adults, increased returning flights, and expanded family unit detention space, expressing the Department's interest in expanding detention centers, saying that "detention is appropriate in many circumstances."
- Secretary Johnson admitted that the U.S. will not achieve "100 percent situational awareness" of our borders before the end of this Administration.

---

[778] While border security was significantly discussed during this hearing, the Committee does not count this towards the number of border hearings held, as this is an annual hearing to discuss various Homeland Security issues.

AOL-DEF-00002439

173

*5/13/2015 — Securing the Border: Fencing, Infrastructure, and Technology Force Multipliers*
- In 2006 Congress mandated DHS construct at least 700 miles of reinforced fencing across the 2,000 mile U.S.-Mexico border but DHS has only constructed 653 miles; half of which is primary fencing and half of which is vehicle barrier fencing.
- DHS considers the location and type of fencing across the border "law enforcement sensitive," making it difficult for Congress and the public at large to fully understand our country's fencing resources and future needs.
- Previous legislation has provided DHS with waiver authorities from environmental and other laws but does not waive the constitution or people's claims during condemnation cases.

*7/07/2015 — The 2014 Humanitarian Crisis at our Border: A Review of the Government's Response to Unaccompanied Minors One Year Later*
- Since 2009, DHS has apprehended approximately 122,700 unaccompanied children from El Salvador, Guatemala, and Honduras, but we have only repatriated approximately 7,700, or 6 percent.[779]
- ICE claims it is prioritizing the deportation of criminal aliens over unaccompanied minors, but current events indicate many criminal aliens are being released by sanctuary cities and avoiding ICE deportation.
- ICE could not dispute that it sends a strong signal to those living in Central America when those illegally entering the U.S. are able to remain.
- The number of unaccompanied minors unlawfully entering the U.S. this fiscal year is down because "Mexico is doing a far better job of policing its southern border, increasing their apprehensions by 79 percent."
- HHS says its responsibility to track and retain custody of unaccompanied minors ends when the child is released to the sponsor. This lack of follow-up and secondary screening has led to dangerous situations for children.

*7/15/2015 — Securing the Border: Understanding Threats and Strategies for the Maritime Border*
- The maritime border constitutes the U.S.'s longest border, and yet we have very little domain awareness of this environment.
- Multiple federal agencies, including various components within DHS, work in partnerships to secure the maritime border.
- According to the U.S. Coast Guard, it only interdicts 11 to 18 percent of the estimated drug flow entering the U.S. from our maritime borders.
- U.S. policies create direct incentives and disincentives for illegal immigration. For example, when the U.S. temporarily suspended expedited removal for Haitians, the illegal entry of Haitians spiked until expedited removal was re-employed.

---

[779] At the time of the hearing, 109,000 unaccompanied minors from Central America had been apprehended and ICE figures indicated we had only repatriated just over 6,000, or 5.7 percent. The figure above has been updated to reflect FY2015 data.

AOL-DEF-00002440

174

*9/14/2015 —All Hands on Deck: Working Together to End the Trafficking and Abuse of Prescription
Opioids, Heroin, and Fentanyl*

- Heroin is not produced in America but instead is manufactured outside the country and smuggled across the U.S. border via Mexican Cartels, particularly the Sinaloa Cartel.
- According to the DEA, "The growing relationship between Mexican-based drug cartels and domestic street gangs, coupled with … an unlimited supply of illegal guns, has really created the perfect storm for law enforcement."
- To deter drug trafficking, CBP "interdict[s] heroin in all modes, air, land, and sea, and in both the travel and cargo environments."
- Several witnesses talked about the need for increased information sharing, with the DEA suggesting that "bad guys really count on law enforcement not talking to each other and not connecting the dots."
- Ultimately, we must target criminal organizations, not addicts.

*10/21/2015 — Ongoing Migration from Central America: An Examination of FY2015
Apprehensions*

- Although the apprehensions of UACs were down 50 percent in FY2015, this is no cause for celebration. We still apprehended 30,000 UACs and 40,000 family groups this fiscal year.
- A representative of the U.S. Conference of Catholic Bishops recognized that when children leave Central America, the countries are "losing their best and their brightest, and it's tragic."
- According to GAO, "Social media outlets enable migrants who arrive in the Unites States to share messages and pictures with families in their home countries. This can serve as a powerful and influential endorsement of the decision to migrate."
- Another witnesses testified that we are "very far" from having low enough levels of corruption and a strong enough rule of law to provide for opportunities lacking in Central America.

*11/23/2015 — America's Heroin Epidemic at the Border: Local, State, and Federal Law
Enforcement Efforts to Combat Illicit Narcotic Trafficking*

- According to the Arizona HIDTA, "Arizona is a primary entry point, trafficking corridor and distribution hub for drugs transported from Mexico to the United States by the Sinaloa Cartel."
- Mexican DTOs are highly sophisticated—an Arizona sheriff testified that "Aside from the normal use of human backpackers (mules), clandestine tunnels, and vehicles, the trafficking organizations have resorted to the use of ultra light aircraft which cannot be detected by normal radar, cloned vehicles appearing to be law enforcement or other legitimate companies, and most recently the use of catapults which hurl bundles of marijuana into the U.S. to awaiting co-conspirators."
- One key indicator of the increased supply of drugs into this country is the significant price drop in heroin, nationwide.  In 1981, the average price per gram of pure heroin was $3,260 (in 2012 U.S. dollars) by 2012 the price per gram decreased to $465 (in 2012 U.S. dollars).

98

175

**Appendix B: Key Findings of Central America Trip**

*Guatemala*

*International Bridge between Guatemala and Mexico Borders:*
- While the bridge had a check point at the Mexico side, contraband crossed the river on both sides of the bridge with impunity.
- The thriving contraband trade across the river indicates that the Mexico-Guatemala border is totally open and uncontrolled.
- The border checkpoint is only used if doing so is to the person's advantage.
- According to Mexican immigration officials, approximately 2,000 individuals use the formal crossing point, while thousands use informal alternatives.

*Guatemalan Migrant Repatriation Center*
- Members of Congress watched 136 Guatemalan adults (31 of which were women) offload an ICE flight from the U.S. to a "Welcome Center" in Guatemala.
- The Welcome Center was clean, professional, and well managed, and the Guatemalans were given clothing, food, and transportation.
- Non-Governmental Organizations (NGOs) representatives waited outside the center to provide assistance and information to the deportees and their families.
- During the re-orientation speech the Guatemalans were told "it doesn't matter how poor or rich, small or big, your country is, this is still your motherland. Remember that you have to love your country. Please consider that before attempting to leave for the United States." Upon this statement, the Guatemalans erupted in applause.

*El Rufugio de la Ninez, Guatemala City*
- This home without an address protected little girls—the youngest age 11— who had been victims of trafficking and were prepared to testify against their trafficker.
- This particular shelter was designed to house 20-25 girls, but 40 girls were currently living there. The average age of the girls was 14. Cribs were also located in this shelter.
- What the Members of Congress saw were a bunch of little girls, playing board games, hugging everyone as they entered the shelter, and joyfully singing.
- The girls can only stay at the shelter until they are 18 years old. The programs offered there attempt to prepare them for an independent life if they cannot be returned to their hometown to live with their families.

*Meeting with Catholic Relief Services (CRS) in Guatemala*
- Guatemala should leverage the Catholic Church to help its citizens. The church is a way out for those who are part of the gangs.
- Civil society and NGOs should get U.S. funding. There is a concern when you give funding to government officials that it will not be used effectively.
- While broad concepts of funding transportation, economic opportunity, and education have been outlined, there needs to be more granular detail of which programs and organizations will actually receive U.S. funding.

99

AOL-DEF-00002442

176

*Meeting with Guatemala President-Elect Jimmy Morales*
- Morales won his election on Oct. 25, by 70 percent of the vote on an anticorruption platform.
- President-Elect Morales has a keen intellect and understands what he needs to do. He recognizes that impunity is a national problem and must be dealt with quickly.
- Morales plans to re-instill civic love for country and a nationalistic pride. He believes Guatemalans must love Guatemala in order to fix it and plans to create opportunities that ensure that his people want to stay in Guatemala.
- Morales also talked about reforming the public ministry, tax administration, general controller, and prisons. He said they had the will, just needed the patience.

*Final Guatemala Takeaways:*
- People pay smugglers, up front, $10,000-$15,000 for three tries to get into America. Most children are able to remain once they reach the U.S.—the U.S. repatriates about 700 Guatemalan UACs a year. Due to U.S. law, UACs spend 4-5 years in the U.S. going through the courts system, at a cost of approximately $100 million a year per child.
- There is an 80 percent chance that a girl will be assaulted during her journey to the U.S.
- We must stop incentivizing Guatemalan children from leaving their home country. It is not compassionate to incentive a country to de-populate itself.
- Those migrating to the U.S. to seek opportunities are the ones who want a stable, secure system.
- In Guatemala there are the extortionists that prey on the middle and lower class and drug cartels that generally want to be left alone. In fact, in some cases drug lords have provided security in certain regions. One of the first things that must be done is to solve the layers of violence and corruption in Guatemala.
- Guatemala also suffers from its lack of capability to collect money in order to fund its budget. Businesses may not be paying their fair share, although they argue this is because they are concerned about where their money goes when they give it to the government.

*Honduras*

*Honduran National Police, Special Interagency Response Force (TIGRES)*
- Both the U.S. and Colombians are providing advisors to train the Honduran National Police
- The Honduran National Police is very small, with only 10,000 police officers for a population of close to 9 million. As a comparison, New York City has a similar sized population with 35,000 police officers.
- 90 percent of the Honduran National Police's budget goes towards salaries, often forcing officers to pay for their own uniforms and bullets. Low salaries and extra expenses could incentive the police to work with the drug cartels.
- Women were well-represented in the TIGRES training and historically have always been a part of the Honduran National Police.
- The Honduran government's policy to shoot down known "narco planes" has actually hampered its progress in deterring traffickers.

100

AOL-DEF-00002443

177

*Model Police Precinct, Tegucigalpa*
- At this model police precinct, the U.S. has helped the Hondurans create an economic, educational, community safe zone where Hondurans felt confident they could trust the police. This is a valid strategy that has been successfully implemented in this particular community.
- Again, Colombians are working with the U.S. to assist the Hondurans.
- Model police precincts are vital, as security is the first condition for a successful society.
- When Members asked Honduran children about their dreams, they all talked about future professions *in* Honduras.  No one said they dreamed of migrating to the U.S.
- One 12-year-old stated: "the youth of Honduras decide what this country is going to be."
- These children knew what they wanted but a conversation later with the Honduran adults in the community made it clear that we need a clear path forward on better education.  Funding to Central America should be spent on teachers and schools.
- Honduran mothers and teachers argued that their society is losing its family values and respect for one another because men and children are migrating to the United States. The pillars of a healthy society are disintegrating.

*U.S. Customs and Border Protection Road Checkpoint*
- CBP and ICE have vetted units in Honduras in which one agent trains 30-50 Hondurans on conducting border checkpoints.
- Impressive technology is being using in Honduras, such as technology that slows down traffic in order to scan vehicles to locate illicit drugs and occupants.
- While the checkpoint was impressive, there is a concern that this will just redirect the flow of illegal contraband and people to somewhere else.
- At this checkpoint Members were told that Hondurans caught close to 50 Cubans a day. Close to 90 percent of the "Special Interest Aliens" caught in Honduras are Cuban nationals. Honduras has a catch and release policy.
- During the observation, Members witnessed the Hondurans pull two females from a bus, suspected of trying to unlawfully migrate to the U.S.  Both were sent to Child Protective Services in Honduras.

*Don Bosco Vocational School, Tegucigalpa*
- This vocational program provided Hondurans with skills and training to help them obtain internships and jobs.
- For programs like this to really work, you need a growing, successful economy.  In order for economies to grow, you need security.
- One business owner mentioned that he gets 1,400 applications per vacancy. This demonstrates that Honduras's economy is not growing at a significant rate to keep up with the increasing number of young adults who are joining the workforce each year.

*Private Sector Roundtable*
- In order for businesses to be successful, they need the government to provide security and infrastructure.  For example, agriculture requires roads and tourism requires that people who travel to the country feel safe.

AOL-DEF-00002444

178

- Honduras also may have access to geothermal electricity. If the country can find ways to tap into that and have cheap power, there is the potential for manufacturing.
- The business class in Honduras is prepared to pay their fair share, but they want transparency in where their tax dollars go.
- Of a country of close to 9 million, only 100,000 are registered with the country's tax administration.

*Meeting with Honduran President Juan Orlando Hernandez*
- President Hernandez said it was a "slap in the face" to him personally that so many people would want to flee his country.
- President Hernandez expressed that he did not want to see children leave Honduras and that the U.S. needs to be clearer when developing its laws. Unclear laws create mixed messages, which coyotes misrepresent and use to encourage children and families to migrate.
- The President also talked about how the country was improving under his leadership, with the economy growing at 2.8 percent and the murder rate decreasing.

*Briefing and Tour at Soto Cano Base*
- Honduras is falling victim to the trafficking of serious weapons, such as RPGs.
- Hand guns appear to be moving from the U.S. to Central America. Meanwhile Honduras is sending marijuana southbound (not northbound).
- The Honduran military does not have control of an eastern state slightly larger than Connecticut. Drug trafficking organizations take advantage of this situation and fill the power vacuum created by the lack of government presence.

*Final Honduras Takeaways*
- There are not major differences from the Northern Triangle (Honduras, Guatemala, and El Salvador) and Costa Rica and Belize. The real difference between the countries is marketing.
- American workers, the state department, and all the agencies represented in Honduras are doing extraordinary work that they care about.
- Unfortunately, often the goal in Honduras is to divert the flow of illicit drugs away from the country. While this will help Honduras, it ultimately will harm the country where the flow is redirected to.

AOL-DEF-00002445

179

## Appendix C: Acronyms

| | |
|---|---|
| ADIS | Arrival and Departure Information System |
| AEER | Air Entry/Exit Re-Engineering |
| AMOC | Air and Marine Operations Center |
| AMSP | Area Maritime Security Plan |
| AoR | area of responsibility |
| ARSS | Advanced Radar Surveillance System |
| ATD | DHS Alternative to Detention program |
| BC Bud | Canadian British Columbia Bud, a type of marijuana |
| BEST | Border Enforcement Security Taskforce |
| BTB | Beyond the Border Initiative |
| CARSI | Central America Regional Security Initiative |
| CBO | Congressional Budget Office |
| CBP | Customs and Border Protection |
| CBSA | Canada Border Service Agency |
| CODEL | Congressional Delegation |
| CTCEU | U.S. ICE Counterterrorism and Criminal Exploitation Unit |
| DACA | Deferred Action on Childhood Arrivals |
| DEA | Drug Enforcement Administration |
| DHS | Department of Homeland Security |
| DNDO | DHS Domestic Nuclear Detection Office |
| DOI | Department of the Interior |
| DOJ | Department of Justice |
| DPS | Department of Public Safety |
| DTO | drug trafficking organization |
| EOIR | Executive Office for Immigration Review |
| EPIC | El Paso Intelligence Center |
| ESTA | Electronic System for Travel Authorization |
| eTA | Electronic Travel Authorization |
| FAST | Free and Secure Trade |
| FEMA | DHS Federal Emergency Management Agency |
| FY | Fiscal Year |
| GAO | U.S. Government Accounting Office |
| GDP | Gross Domestic Product |
| HAMC | Hells Angel Motorcycle Club |
| HHS | Department of Health and Human Services |
| HIDTA | High Intensity Drug Trafficking Area |
| HSI | ICE Homeland Security Investigation team |
| IBET | Integrated Border Enforcement Team |
| ICE | U.S. Immigration and Customs Enforcement |
| ICMLEO | Integrated Cross-border Maritime Law Enforcement Operation |
| IDENT | Automated Biometric Identification System |
| IFT | Integrated Fixed Tower |
| IIRIRA | Illegal Immigration Reform and Responsibility Act of 1996 |

AOL-DEF-00002446

180

| IS | Imaging Sensor |
|---|---|
| ISIL | Islamic State in the Levant |
| JIATF | Joint Interagency Task Force |
| LEDET | U.S. Coast Guard Law Enforcement Detachment Team |
| LPR | lawful permanent resident |
| MCC | Millennium Challenge Corporation |
| MDMA | 3,4-methylenedioxy-methamphetamine, commonly known as ecstasy |
| MOU | Memorandum Of Understanding |
| MS-13 | Mara Salvatrucha |
| MSC | Mobile Surveillance Capability |
| MVSS | Mobile Video Surveillance System |
| NGO | Non-Governmental Organization |
| NTA | Notice to Appear |
| NTC | CBP National Targeting Center |
| OAM | CBP Office of Air and Marine |
| ORR | HHS Office of Refugee Resettlement |
| OTM | other-than-Mexicans |
| PED | Processing, Exploitation, and Dissemination |
| PNR | Passenger Name Record |
| POE | port of entry |
| PRM | State Bureau of Population, Refugees, and Migration |
| RCMP | Royal Canadian Mounted Police |
| RFP | request for proposal |
| RGV | Rio Grande Valley |
| RPG | Rocket-Propelled Grenade |
| RVSS | Remote Video Surveillance System |
| SAFE Port Act | Security and Accountability for Every Port Act |
| SBInet | Secure Border Initiative-network |
| SENTRI | Secured Electronic Network for Traveler's Rapid Inspection |
| S&T | DHS Science and Technology Directorate |
| TARS | tethered aerostat radar system |
| TCO | Transnational Criminal Organization |
| TECS | Treasury Enforcement Communication System |
| TVPRA | William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 |
| UAC | Unaccompanied Alien Children |
| UAS | unmanned aircraft systems |
| UGS | Unattended Ground Sensor |
| USAID | U.S. Agency for International Development |
| USCIS | U.S. Citizenship and Immigration Services |
| USD | U.S. Dollars |
| USDA | Department of Agriculture |
| VADER | Vehicle and Dismount Exploitation Radar |
| VWP | Visa Waiver Program |

104

AOL-DEF-00002447

181



# HSGAC
MINORITY STAFF REPORT ON THE

# SOUTHERN BORDER WALL

Soaring Cost Estimates and Lack of Planning Raise Fundamental
Questions About Administration's Key Domestic Priority

U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Member's Office
www.hsgac.senate.gov/wall-report

AOL-DEF-00002448

182

**HS**GAC

# SOUTHERN BORDER WALL

### Soaring Cost Estimates and Lack of Planning Raise Fundamental
### Questions about Administration's Key Domestic Priority

On January 25, 2017, President Donald Trump issued an executive order on border security and immigration enforcement. The President ordered the executive branch "to secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism."[1]

The Democratic staff of the Senate Committee on Homeland Security and Governmental Affairs is conducting ongoing oversight of the U.S. Department of Homeland Security (DHS) and its plans to construct a border wall. Democratic members and staff have repeatedly questioned the Trump Administration regarding the plans and costs of the border wall in nomination and oversight hearings, agency briefings, and investigative request letters. At the request of Ranking Member Claire McCaskill, this staff report summarizes information provided to the Committee to date.

KEY FINDINGS INCLUDE:

- **There is no reliable estimate of the cost of construction of the full border wall, but extrapolated estimates place the construction cost of the wall and associated technology and infrastructure at nearly $70 billion. That amounts to a total cost to every American man, woman, and child of over $200. A cost-benefit analysis of the project is not complete.**

- **The projected cost of construction for every mile is rapidly increasing to as much as $36.6 million per mile. This does not include the costs of acquiring the land on which the wall will be built. It also does not include the maintenance costs of border barrier, which may total nearly $150 million per year.**

- **The Department cannot provide a cost estimate of the anticipated land acquisition to the Committee. In the past, the U.S. government spent at least $78 million to acquire land where fencing is currently in place.**

- **When the U.S. government has been forced to go to court, the costs of land acquisition can be much higher; in past land condemnation cases involving border fencing, the government spent more than $11 million on acquiring 271 acres of land from private landowners, an average price of $42,600 per acre. In one case in Cameron County, Texas, a landowner was initially offered $233,000 for 3.1 acres. After a three-year legal battle, the government eventually paid at least $4.7 million, a nearly 2,000 percent increase over the initial offer.**

- **Litigation to acquire the land to build the wall may last a decade or longer. Of the more than 300 condemnation cases related to past border fencing efforts filed before a district judge in Texas, the vast majority of which were filed in 2008, over 90 condemnation cases remain unresolved and fence has not been built in those locations.**

- **Concrete prototypes of the wall will be paid for by slashing the budget for mobile video surveillance.**

---

[1] Exec. Order 13767, 82 Fed. Reg 8793 (Jan. 25, 2017).

AOL-DEF-00002449

183

## NO RELIABLE COST ESTIMATE

No reliable estimate of the cost of construction for the full border wall currently exists. In January 2017, U.S. Customs and Border Patrol (CBP) informed Democratic staff that "it is premature to provide cost estimates without official US Border Patrol fence requirements to include precise fence locations."[2]

DHS Secretary John Kelly recently testified before the Committee, stating:

> **"There's no way I can give the committee an estimate of how much this will cost. I mean, I don't know what it will be made of, I don't know how high it will be, I don't know if it's going to have solar panels on each side and what the one side's going to look like and how it's going to be painted -- have no idea. So I can't give you any type of an estimate."[3]**



*PHOTO: Secretary Kelly testifies before Senate Homeland Security & Governmental Affairs Committee*

---

[2] E-mail from Office of Legislative Affairs, U.S. Department of Homeland Security, to Democratic Staff (Jan. 25, 2017).
[3] Senate Committee on Homeland Security and Governmental Affairs. Testimony of General John F. Kelly, USMC (Ret.), *Hearing on Border Security and Public Safety* (Apr. 5, 2017).

**HSGAC**

AOL-DEF-00002450

184

According to the Government Accountability Office, primary pedestrian fencing in the past has cost $6.5 million per mile; however, DHS notes there are "other factors" that may increase costs not included in that calculation. Agency officials explained:

> "The factors include but are not limited to real estate acquisition cost, risks associated with new construction in areas where there is currently no fence and the increased cost and risk of building fence on the south side of the Levee system in the flood plain. Other assumptions that will have to be considered are future market fluctuations (e.g. increased fuel costs, labor, raw materials, etc.). It is also important to note that estimates can fluctuate as USBP requirements are reviewed and finalized."[4]

## PROJECTED PER-MILE COSTS RAPIDLY INCREASING

CBP officials have provided select summary budget numbers to Committee staff that provide some information on projected wall construction costs. In the short term, DHS intends to reprogram $20 million to construct multiple wall prototypes, devise wall design standards, and conduct real estate and environmental planning. This will also fund design for a levee wall and a new border barrier system in the Rio Grande Valley, and complete an enforcement zone in San Diego.[5]

CBP also briefed that the Administration's Fiscal Year (FY) 2017 supplemental budget request for $999 million would continue real estate and environmental planning and design for high priority areas. If funded, DHS will also construct 34 new miles of levee wall and border barrier system in the Rio Grande Valley, replace 14 miles of existing fencing in the San Diego sector, and build 14 miles of new border barriers in the San Diego sector.[6] CBP also briefed that the DHS budget blueprint for FY 2018 will request approximately $2.6 billion to construct approximately 71 miles of new border barrier and associated technology and infrastructure in the Rio Grande Valley, Tucson, and/or El Paso sectors.[7]



AVERAGE COST PER MILE OF BORDER BARRIER

The per-mile cost of construction is increasing in each fiscal year. The per-mile cost of the construction extrapolated from the FY 2017 supplemental request totals $16.1 million per mile and FY 2018 totals over $36.6 million per mile. DHS officials have been unable to provide expected land acquisition costs for the additional construction.[8]

[4] E-mail from Office of Legislative Affairs, U.S. Department of Homeland Security, to Democratic Staff (Jan. 25, 2017).
[5] U.S. Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Committee Staff (Mar. 27, 2017).
[6] Id.
[7] Id.
[8] Id.

**HS**GAC

AOL-DEF-00002451

185

## CONSTRUCTION COST MAY TOTAL $70 BILLION

The per-mile cost derived from information provided by DHS would result in a total cost of the construction of the border wall of nearly $70 billion. CBP officials stated that only 127 miles of the border are considered unsuitable for construction. This includes 33 miles of bluffs in Big Bend Sector, 59 miles of lakes in Texas, and 35 miles in the Pacific Ocean and Gulf of Mexico.[9] At $36.6 million per mile, a 1,827 mile border wall could cost more than $66.9 billion. That amounts to a total cost to every American man, woman, and child of over $200 for border wall construction.

In addition to the calculation derived from FY 2018 budget numbers, Democratic staff has also calculated that wall construction could cost at least over $64 billion and possibly over double that amount from information included in the contracting documents for the wall prototype. The cost presented in the two Requests for Proposal ranges from $200,000 to $500,000 for a single wall prototype 30 feet long.[10] The lower cost range to construct a barrier would total at least $64 billion if the prototype cost was applied to the full length of the border.

## COST-BENEFIT ANALYSIS IS NOT COMPLETE



Although the Department has begun the acquisition process for wall prototypes, the Department has not completed a cost-benefit analysis for the project. A cost-benefit analysis is a quantitative method of assessing if a government project or policy is desired "when it is important to take a long view of future effects and a broad view of possible side-effects."[11] In her nomination hearing, Elaine Duke, the nominee to become Deputy Secretary of the DHS, testified that a cost-benefit analysis "is in progress."[12] CPB has informed the Democratic staff that the "U.S. Border Patrol is in the planning and development stage for a larger cost-benefit analysis."[13]

Effectiveness of existing fencing will be an important component in the cost-benefit analysis conducted by the Department. The Government Accountability Office (GAO) has determined that CBP has not developed metrics that can be used to systematically measure the effectiveness of fencing in preventing the illegal entry of people, drugs, and other contraband into the United States.[14]

*PHOTO: DHS Deputy Secretary Elaine Duke at Senate Homeland Security and Governmental Affairs Committee hearing*

---

[9] Id.
[10] FedBizOpps.Gov, Design-Build Structure, (March 17, 2017) (online at https://www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=f61a65538f383ec3ed9cac3c9e21d6f1&_cview=0); FedBizOpps.Gov, Other Border Wall RFP, (March 17, 2017) (https://www.fbo.gov/index?s=opportunity&mode=form&id=c0cce0b2ef8a09fb22dc251ea14ca0d1&tab=core&_cview=0).
[11] Office of Management and Budget, Circular A-94, Guidelines and Discount Rates for Benefit-Cost Analysis of Federal Programs.
[12] Testimony of Elaine C. Duke, Hearing on Nomination of Elaine C. Duke to be Deputy Secretary, U.S. Department of Homeland Security (Mar. 8, 2017).
[13] E-mail from Office of Legislative Affairs, U.S. Department of Homeland Security, to Democratic Staff (Apr. 3, 2017).
[14] Government Accountability Office, Southwest Border Security: Additional Actions Needed to Better Assess Fencing's Contributions to Operations and Provide Guidance for Identifying Capability Gaps (GAO-17-331) (Feb. 2017).

**HSGAC**

186

## WALL MAINTENANCE MAY COST NEARLY $150 MILLION EACH YEAR

The Department may not be properly accounting for the costs of maintaining the border barrier. GAO has found that, in major DHS acquisition projects, "sustainment costs can account for more than 80 percent of total costs."[15] CBP informed the Democratic staff that "Projected annual tactical infrastructure (TI) maintenance costs are unknown until the full complement of requirements has been determined and design for each requirement has been finalized."[16] CBP currently maintains 654 miles of existing border fence and has informed the Democratic staff that it spends, on average, as much as "$55 million per year to maintain and repair all of its tactical infrastructure, at the cost of $85,000 per mile."[17] These costs are associated with access roads, gates, light posts, drainage systems, acres of vegetation and other attendant infrastructure.[18] It is logical that a barrier wall would have greater maintenance costs than fence, however, if the existing maintenance costs are applied to the 1,173 miles of unfenced suitable border the yearly maintenance costs would total $99.7 million for the new areas of construction, totaling nearly $150 million for maintenance along the entire border each year.

## REQUIRED LAND IS OWNED BY PRIVATE INDIVIDUALS

The Democratic staff of the Committee has obtained extensive information concerning the difficulty in acquiring land necessary for barrier wall construction. CBP has acknowledged to the Democratic staff: "Real estate acquisition for border fence construction is a very complex issue."[19] In her nomination hearing, Elaine Duke testified that land acquisition "is an important concern, and we expect that to be a major issue if additional wall is constructed."[20]

CBP has explained that in the past, the government had to initiate approximately 400 land acquisitions for more than 200 miles of fence.[21] Of those 400 acquisitions, 330 condemnations of property were required. In 122 cases, the government and the landowners could not reach an agreement on the fair market value of the seized property.[22] The vast majority of those cases were filed in 2008.[23] According to CBP, the U.S. government has spent at least $78 million to acquire land where existing fencing is in place.[24]

CBP has not provided additional information to the Democratic staff regarding the condemnation cases. In order to obtain greater insight into past land condemnation cases involving border fencing, Democratic staff has reviewed information collected by NPR regarding more than 300 cases filed before a district judge in Texas.[25] NPR found 167 cases that have been resolved. Using NPR's data,

[15] U.S. Government Accountability Office, *Homeland Security Acquisitions: DHS Should Better Define Oversight Roles and Improve Program Reporting to Congress* (GAO-15-292) (Mar. 2015).
[16] E-mail from Office of Legislative Affairs, U.S. Department of Homeland Security, to Democratic Staff (Apr. 3, 2017).
[17] E-mail from Office of Legislative Affairs, U.S. Department of Homeland Security, to Democratic Staff (Jan. 25, 2017).
[18] Id.
[19] Id.
[20] Testimony of Elaine C. Duke, *Hearing on Nomination of Elaine C. Duke to be Deputy Secretary, U.S. Department of Homeland Security* (Mar. 8, 2017).
[21] E-mail from Office of Legislative Affairs, U.S. Department of Homeland Security, to Democratic Staff (Jan. 25, 2017).
[22] Id.
[23] Id.
[24] U.S. Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Committee Staff (Mar. 27, 2017).
[25] *Landowners Likely to Bring More Lawsuits as Trump Moves on Border Wall*, NPR (Feb. 23, 2017).

**HS**GAC

AOL-DEF-00002453

187

Democratic staff has calculated that, of those resolved cases, the longest legal challenge lasted over eight years. The government spent more than $11 million on acquiring the 271 acres of land. In total, the U.S. government paid an average price per acre of $42,600. In one case in Cameron County, Texas, a landowner was initially offered $233,000 for 3.1 acres. After a three-year legal battle, the government eventually paid at least $4.7 million, a nearly 2,000 percent increase over the initial offer.[26]

The remaining condemnation cases were required to establish land ownership.[27] CBP has informed Committee staff that in over 90 instances, condemnation cases remain unresolved nearly 10 years later and fence has not been built in those locations.[28] The potential liability of the pending condemnation cases is $21 million.[29]

Committee staff have been briefed by CBP that they anticipate land acquisition to last 12-24 months. CBP informed the Committee staff that they believe it is "too early to say" the cost of the land acquisition.[30] CBP informed the Committee staff that they cannot provide an upper cost estimate on costs until they "start investigating land acquisition."[31] CBP informed the Committee staff that they have not yet begun title research for the land.[32] The agency anticipates it will need to hire 12 attorneys due to "an unprecedented increase in legal support in real property, procurement, fiscal law, as well as overall programmatic support to advance the construction of a physical wall."[33]

## PAYING FOR WALL CONSTRUCTION WITH MONEY FROM TECHNOLOGY PROGRAMS

The Democratic staff has been informed that the $15 million reprograming for the wall prototypes are funds being spent from the Mobile Video Surveillance System (MVSS) within CBP.[34] This program provides Border Patrol with short and medium range mobile surveillance equipment mounted on telescoping poles.[35] The solicitations for wall prototypes do not include technology components. In responding to an industry question on their RFP, CBP confirmed that "no technology descriptions are required to be included in the Phase I response."[36]

Secretary Kelly testified on the importance of mobile surveillance before this Committee:

> "[A] physical barrier in and of itself will not do the job. It has to be really a layered defense. If you were to build a wall from the Pacific to the Gulf of Mexico, you would still have to back that wall up with patrolling by human beings, by sensors, by observation devices."[37]

[26] Landowners on border say they were shortchanged, Associated Press (Oct. 15, 2012).
[27] E-mail from Office of Legislative Affairs, U.S. Department of Homeland Security, to Democratic Staff (Jan. 25, 2017).
[28] U.S. Customs and Border Protection, Briefing with Senate Committee on Homeland Security and Governmental Affairs Committee Staff (Mar. 27, 2017).
[29] Id.
[30] Id.
[31] Id.
[32] Id.
[33] U.S. Department of Homeland Security, Fiscal Year 2017 Budget Amendment Congressional Justification.
[34] Id.
[35] U.S. Department of Homeland Security, Mobile Surveillance Capability (online at https://www.dhs.gov/keywords/mobile-surveillance-capability).
[36] FedBizOpps.Gov, Other Border Wall RFP, (March 31, 2017) (online at https://www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=c9917a847cbcbffa19a67d3cd9fa03&_cview=0).
[37] Senate Committee on Homeland Security and Governmental Affairs, Testimony of General John F. Kelly, USMC (Ret.), Hearing on Nomination of General John F. Kelly, USMC (Ret.) to be Secretary, U.S. Department of Homeland Security (Jan. 10, 2017).

**HSGAC**

188

**Statement for the Record**
**U.S. Senate Homeland Security and Government Affairs Committee Hearing:**
**"Fencing Along the Southwest Border"**
**Submitted by Howard G. Buffett, Chairman and CEO of the Howard G. Buffett Foundation**

April 4, 2017

Chairman Johnson, Ranking Member McCaskill and Members of the Committee: Thank you for the opportunity to submit this Statement for the Record on the important topic of "Fencing Along the Southwest Border."

**Background**
I am submitting these comments based on my experience as a border property landowner in both Texas and Arizona. In Texas, our private family foundation owns a farm with .75 mile frontage along the Rio Grande River. In Arizona, we own two ranches that run parallel to the U.S./Mexico border—one runs parallel along 4.5 miles of the border and the other runs parallel along 1.5 miles of border. In addition we own a farm in Arizona located 56 miles north of the border, which is also impacted by illegal border crossings: drug smugglers break down loads near our farm and sometimes cross our property.

My statements also, in part, reflect my experience as a volunteer Deputy Commander of the Cochise County Sheriff's Office. I have participated on patrols along the border, and I have assisted in entering and clearing so-called "stash houses" where undocumented aliens (UDA's) regroup after crossing, or smugglers hide and repackage drugs. In Texas, I have ridden on river patrol boats with both the Texas Department of Safety and the U.S. Border Patrol.

I believe three factors are crucial to any discussion of barriers along the border:

1) Variable geography. Our two ranches in Arizona, only 32 miles apart, have very different geographical and topographical features from each other. Our ranch along the Rio Grande border, meanwhile, is completely different from our Arizona properties. No one style of fencing or wall would be effective even among our three properties, much less the entire border. However, in many situations, proper barriers are critical to border enforcement.

2) One of the least appreciated factors affecting border fence or wall design is the need to address seasonal flooding. People often think of border regions as hot and dry; in Arizona, during the annual rainy season huge volumes of water pour down from the surrounding basins and any structure must take this into account.

3) A uniform concrete wall over the length of the border could provide Mexican drug cartels with a tactical advantage and could threaten law enforcement officer safety. For example, in some areas along our property where old landing mat (solid sheets) are used as fencing material today, it blocks Border Patrol agents from seeing into Mexico. That allows cartel scouts to utilize small holes in the fence (or stand on ladders and watch) to track Border Patrol movements while they gather groups of smugglers or UDA's to send across the border at opportune times. In fact, in these spots it is not uncommon for the scouts to leave ladders placed up against the fence for long periods of time because BP cannot see them.

1

AOL-DEF-00002455

189

**Experiences at Three Border Properties in Two States**

*RIO GRANDE CITY, TEXAS*

The Rio Grande follows a serpentine course creating fingers of land in Texas, with the banks in some spots covered in 12-foot tall grass and in others adjoining open farm land. The engineering challenge of creating a solid barrier would be complicated and perhaps impossible. Our farm buildings are approximately four-tenths of a mile from the river, and floods have pushed water levels in these buildings as high as 5 feet. Building barriers in our area would divide properties in ways that would make some land unusable. In addition, on our farm we pump water directly from the Rio Grande to irrigate our crops; a wall could prohibit regular access to our irrigation pumps for operation and maintenance. Securing the necessary land through eminent domain is likely to be contentious, time consuming and expensive. A wall would also impact access to the river affecting fishermen, parks, recreational areas, and local businesses. You can ask U.S. citizens to make these sacrifices for the greater good of our country but not if the solution proposed is ineffective, inefficient, is unfair or if there are better alternatives. A fence (not a wall) could be effective in some locations, but it would first require a serious cost/benefit analysis compared to other deterrent options.

*NACO ARIZONA*

Our Naco, Arizona ranch is an example of a border area that needs more resources and yet a solid wall would not improve security at the border. This area would benefit from improving and upgrading existing fence structures.

The Naco ranch is located on the operational area of responsibility (AOR) seam between Douglas and Naco Border Patrol Stations. Today, this property has two Border Patrol tower structures for cameras, as well as ground cameras and sensors. We have Border Patrol agents regularly traversing our property by vehicle, foot, ATVs and horses. Our Naco ranch has eight different types of fencing running parallel along our 4.5 miles of deeded and leased property. Some fencing is very poorly designed and we have video surveillance from our property that shows drug traffickers returning to Mexico scaling the fence in seconds. Hydrology is a major concern: our ranch experiences significant seasonal flooding which requires large flood gates built into the fence structure that are opened during monsoon season and left open for as long as four months. These gates are similar in size to a small garage door; the gates closest to our main property measure 7 feet 6 inches tall and 7 feet wide.

For years a Mexican cartel scout has operated just across the border from our ranch on a hill 400 feet above ground elevation. The scout has a permanent dwelling, communications, and surveillance equipment. This scout assists the cartel in moving drugs into the U.S. by relaying Border Patrol movements and reporting them to the smugglers. There are many such scouts. A far more effective strategy than a wall would be to figure out how to neutralize these scouts, who help direct smugglers across any kind of barrier. The area also has an operating railroad approximately one quarter of a mile inside the Mexican border which is used occasionally to disguise cartel activity or assist in cartel movements. Building a concrete wall would further help to obscure this activity.

In the Naco area, my belief is upgrading and replacing all of the existing fence from the east side of the base of the Huachuca Mountains to the east side of Douglas with PV1 fence (combined pedestrian and vehicle barrier fencing created from tall angled steel tubes with large plates on top) would provide a significant improvement and would be a worthwhile investment. PV1 fencing also offers another advantage: the flood gate system has been redesigned and improved. The new design provides more flexibility during the monsoon season while allowing Border Patrol to open the gates without using fork lifts or other heavy equipment.

2

AOL-DEF-00002456

190

The current project as described in the 2016 DHS budget in the Naco AOR (Zone 30), is replacing approximately 7.5 miles of inferior fencing with PV1 fencing at $5.96 million per mile. At the conclusion of the current fence replacement project, the Naco AOR, which covers 32.6 miles of border, will have approximately 16 miles of PV1 fencing in place. An additional investment of approximately $98.93 million would allow for the conversion of the balance of the 16.6 miles to PV1 fencing.

The Douglas AOR from the Naco/Douglas seam to the end of the existing fence East of Douglas is 17.5 miles with approximately 10 miles of PV1 fence in place, leaving 10 miles to upgrade at an estimated cost of $59.6 million. I recommend extending this fence an additional 4 miles east to force the traffic further away from the urban areas, which would require an additional $23.84 million. The estimated $182.37 million cost to complete the Naco and Douglas fencing would be a strategic investment to disrupt the Mexican cartel activity, would be much more effective than the current fence, and would be superior (and likely significantly cheaper) than building a wall.

*SONOITA ARIZONA*
Our Sonoita, Arizona ranch is in the San Rafael Valley, a remote area with rugged terrain. The San Rafael Valley is a significant smuggling corridor and the area should receive a priority status because of the remote and challenging topography and the amount of illegal traffic we see crossing our ranch. However, due to terrain and hydrology issues, I believe additional air assets, stationary and mobile surveillance equipment (including acrostats), K- 9 units and agents would be a much more effective use of resources than a wall or PV1 fencing.

 The run-off from the Huachuca mountain basin regularly damages our steel fences, some of which have three- feet deep concrete footings and have been pushed over flat at times from the water flow. The majority of our ranch fencing in the areas typically affected by water flow have special swing gates, allowing water to push them open. This keeps cattle in but it does not keep people out. It also requires constant maintenance and if we fall behind or are unaware of debris collected against the fence, the fencing is damaged. These same challenges would apply to any structure along this area of the border.

This ranch has creek beds and valleys that at the highest points have 100-foot sidewalls which conceal human activity. This ranch is surrounded by hundreds of square miles of U.S. Forestry Service land with no other private property in close proximity. Border Patrol is currently installing eight camera towers in this area (some at least 3 miles from the border) which will enhance their ability to identify human traffic, but I do not believe these cameras will have the vantage point of detecting human activity in the deep crevices that wind through the hundreds of acres of our ranch and adjacent public lands.

Currently, there is "Normandy" fencing along a stretch of our ranch's border with Mexico. Normandy fencing is only a few feet tall and made up of welded iron barriers; it keeps vehicles out but it is not designed to keep people out. I think as vehicle barriers go, it is sufficient. I do not believe there is any positive cost/benefit justification for constructing a wall or PV1 fencing in San Rafael Valley, because I do not see how it will significantly increase apprehensions or drug seizures.  The most effective strategy is to increase methods allowing for better detection followed by improved response time.

This area is particularly challenging in terms of response time with limited road infrastructure.  In all cases, determined smugglers will figure out a way to defeat a wall.  Unless you dramatically increase the number of agents patrolling along this remote border, smugglers will have time to successfully breach any structure.

3

AOL-DEF-00002457

191

Depending on the engineering and design, building fences here could be a higher cost than the construction of the replacement fencing in the Naco area. Using the $5.96 million per mile construction number from the 2016 DHS budget, the 24 miles that run between the west base of the Huachuca mountains and the east base of the Patagonia mountains would cost approximately $143 million. However, the road conditions, remote location and hydrology could mean the costs could run higher. It would require significant deep piling to maintain the integrity of the fence in high water flow areas as well as significant gate structures to account for the speed and power of the water flow. The gates in the new PV1 are improved, but from a practical standpoint, it would likely mean these gates would need to remain open during the monsoon season, which would amount to little additional enforcement capabilities during that 4 month period. Alternatively, Border Patrol agents would have to devote valuable time to fence and debris management taking the agents away from enforcement responsibilities. Additionally, some of the roads are not adequate to support the transportation of the construction equipment so the roads would need to be upgraded and widened, and I anticipate that in this area there would be fierce opposition from environmental and conservation organizations.

**Recommendations**

Any physical barrier solution needs to take into account the context, costs, and practical value.

- Install PV1 fence across the entire Naco AOR and link it up at the Naco/Douglas seam to east of Douglas. This would have a significant impact on reducing the drug mule activity and the drug vehicle drive-throughs in this area.
- Except in remote areas where existing vehicle barrier fencing is sufficient, I recommend replacing all existing fencing that is not PV1 fence with PV1 fence.
- There are areas where barriers are not practical and have significant negative environmental consequences or are not cost effective; in these areas assess and implement other more practical and cost effective measures.
- A solid wall would be a detriment to border enforcement because it does not allow our agents to view activity on the Mexican side of the border. No law enforcement agency would use tactics that provide their adversaries with an opportunity for concealment.
- Do not ignore Mother Nature. Anyone without direct experience along our southern border runs the risk of underestimating the natural flow of water - all it takes is one extreme weather event to undo months of work and millions of dollars of investment.
- Currently it is estimated that 385 miles of pedestrian/vehicle fence exist and 301 miles of vehicle barrier exists for a total of 686 miles of physical barrier. It is very likely that there are additional areas of the border that could benefit from installing PV1 fencing or upgrading current vehicle barriers. This should be identified and implemented.
- In place of a wall I recommend increasing air support, horse patrol, river patrol, K-9 units and keeping BP stations fully staffed (currently every station in Tucson sector has significant deficiencies in staff).

I again thank the Committee for this opportunity to submit this Statement of Record which is based on my own experiences and observations on the U.S./Mexico border.

4

AOL-DEF-00002458

192



TOHONO O'ODHAM NATION
OFFICE OF THE
CHAIRMAN AND VICE CHAIRMAN

EDWARD D. MANUEL                    VERLON M. JOSE
CHAIRMAN                            VICE CHAIRMAN

O'ODHAM HA-WE:HEJED
*"For the People"*



April 3, 2017

Senator Heidi Heitkamp
516 Hart Senate Office Building
Washington, DC 20510

Re: The Impacts of the Proposed Border Wall on the Tohono O'odham Nation

Dear Senator Heitkamp:

On behalf of the Tohono O'odham Nation (Nation), thank you for inviting the Nation to share our comments and concerns regarding the proposal to construct a wall on the southwest border in preparation for the Senate Homeland Security & Governmental Affairs Committee's hearings this week.

The Nation has 34,000 tribal members, with citizens living on both sides of the more than 60 miles of the U.S.-Mexican border on the southern boundary of our reservation lands. As a result, the Nation has extensive, first-hand experience dealing with the wide array of security, enforcement, cultural, environmental, and other issues the United States is now grappling with. Indeed, the Nation's police force typically spends more than half of its time on border-related issues, unfortunately drawing our limited law enforcement resources away from serving our reservation communities. Over the past decade, the Nation has spent an average of $3 million of tribal funds annually on border security and enforcement. During this time, the Nation has worked closely with Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE) to improve border security. The Nation has several agreements with CBP and ICE already in place, it leads a multi-agency, on-reservation tribal-federal HIDTA task force, and has actively worked with CBP to facilitate enhanced border security measures.

The O'odham and our ancestors have lived in this area since time immemorial. No one is more familiar with the lands along this stretch of the border than the Tohono O'odham. Based on our knowledge of this area, and our extensive experience working on border security, the Nation has actively supported the construction of vehicle barriers, patrol roads, and on-reservation CBP operating bases that are now in place on our border. It is equally clear to us that construction of a wall simply will not further the objective of securing the border. In many places along our border a wall is not physically practical due to the ruggedness of the terrain, steep mountain slopes, and large washes that flood multiple times a year. Further, even where a wall could be built, most of the border on the Nation is in remote locations where undocumented immigrants will simply be able to climb over the

P.O. BOX 837, SELLS, ARIZONA 85634        PHONE: 520.383.2028        FAX: 520.383.3379

193

wall or tunnel under it without being detected. The Nation is formally opposed to a wall on its border. Resolution No. 17-053, http://www.tolc-nsn.org/docs/actions17/17053.pdf.

We believe the construction of a wall along the Nation's border will waste taxpayer money that would be much better spent on more effective security measures. In particular, funding for the Integrated Fixed Tower systems, interagency communications equipment, and other enhanced technology to improve surveillance, such as laptop computers in tribal police cars, and providing for additional federal and tribal law enforcement personnel, facilities and equipment, would be both more effective and more cost-efficient.

For example, the Nation's police and other first responders have no radio coverage in 35% of the reservation, including much of the remote border area, and currently lack the interoperability to directly communicate by radio with CBP and other law enforcement partners on the reservation. The Nation desperately needs funding to eliminate these dangerous public safety radio coverage gaps and to allow the Tohono O'odham Department of Public Safety to communicate directly with all its law enforcement partners. These measures would better achieve the overarching goal of increased border security, with fewer negative impacts to tribal lands.

Presently, the Nation's already deteriorated roads suffer further damage from extensive use by heavy CBP vehicles, which are the primary users of many reservation roads, including those leading to on-reservation CBP bases the Nation has authorized over the last several years. The Nation's roads used by CBP are in in very bad condition, with cracks, broken pavement, and large potholes, resulting from the fact that appropriations for BIA road repair and maintenance has been seriously inadequate for years. The poor condition of these roads makes high-speed use impossible for law enforcement, and undermines the ability of CBP and the Nation to respond to emergencies and support mission critical operations. The poor road conditions also create safety hazards for our citizens who live along the border and make it difficult for tribal members to undertake simple day-to-day activities like commuting to work or school, or traveling to the grocery store or the doctor's office. The Nation and CBP would like to work together to improve the road conditions, but appropriations law prevents CBP from spending funds for a purpose for which specific appropriations have been made to another agency (BIA). Last Congress, Senator McCain introduced an amendment to the Tribal Law and Order Reauthorization & Amendments Act (TLORA) that would allow CBP to transfer funds to BIA for road repair, but the TLORA as amended was not enacted into law. Legislation that would authorize CBP to use its funds or transfer funds to BIA to repair the damage done to the Nation's roads by CBP vehicles would certainly increase the ability of CBP and the Nation to secure the border.

The Nation also is extremely concerned about the negative impacts a physical wall will have on our cultural and religious rights, and on our environment. Our tribal members need to be able to cross the border for cultural and ceremonial reasons, to visit family, to obtain governmental services such as healthcare, and for other purposes. The wall also will significantly impact wildlife and plants along the border. The wall will prevent wildlife from conducting natural migrations essential for their survival, injure endangered species such as the jaguar, and destroy culturally significant and endangered plants. Additionally, the wall will interfere with the Nation's vital water resources, such as the Vamori Wash, which is a large wash that crosses the border. We are concerned that during heavy rains, the wall will essentially act as a dam across Vamori Wash, which will flood the border road and border communities.

AOL-DEF-00002460

194

Finally, the Nation has significant concerns about the lack of meaningful or timely consultation with tribes and border communities regarding the border wall. Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), as amended, and pursuant to the Department of Homeland Security (DHS) Tribal Consultation Policy, DHS is required to consult with tribes in a timely manner prior to taking actions that may impact tribes. IIRIRA Section 102(b)(1)(C); DHS Tribal Consultation Policy, II.B. and III.A. Although the Nation has had meetings with DHS and CBP in Washington, D.C. and at the Border Patrol's Tucson Sector, the Nation has not received any details from DHS and CBP about proposals for constructing the wall. These consultation requirements are not just feel-good requirements -- in addition to the Nation's expertise relating to its own border lands, the Nation has a federally-protected property right in its reservation lands. Construction of a wall without the Nation's consent will compromise these property rights and raises serious constitutional concerns. For these reasons, we urge DHS and CBP to take the time to engage in serious, meaningful consultation with the Nation before making a final decision about construction of a physical wall along our border or implementing other aspects of Executive Order 13767.

Under Section 102(c) of the IIRIRA, the DHS Secretary has the authority to "waive all legal requirements" (including, for example, environmental laws) that he determines necessary to ensure expeditious construction of barriers along the border. In 2008, the Secretary issued a Section 102 waiver for a large portion of the southern border in California, New Mexico, Texas and Arizona, including the Nation's border with Mexico. The Nation is deeply concerned that the Administration will move forward under the existing waiver without meaningful consultation with the Nation as required under the IIRIRA.

Executive Order 13767 also directs the Secretary to enter into agreements under Section 287(g) of the Immigration and Nationality Act (INA), 8 U.S.C. 1357(g), allowing state and local law enforcement officers to perform the functions of federal immigration officers. Executive Order 13767, Section 10. In addition to numerous concerns and civil rights litigation over the misuse of this authority by state law enforcement during prior administrations, the Nation is very concerned that 287(g) jurisdictions may attempt to unlawfully use such agreements to extend state authority onto the Nation's trust lands without the Nation's consent. Therefore, any 287(g) agreement that may impact the Nation's jurisdiction over its lands or its sovereignty must preserve the Nation's authority.

The Nation is committed to working with the Administration on a government-to-government basis and continuing our longstanding working relationships with CBP and ICE to improve border security. The safety and wellbeing of our tribal members is of paramount importance to the Nation, and the construction of a wall will have substantial negative impacts on the O'odham way of life. The Nation has significant experience and knowledge regarding the most effective forms of border security, and it is our firm belief that a wall is not the answer to improving border security. Thank you again for the opportunity to provide our thoughts and concerns on this important issue.

Sincerely,

Chairman Edward D. Manuel

P.O. Box 837, Sells, Arizona 85634        Phone: 520.383.2028        Fax: 520.383.3379

AOL-DEF-00002461

195



# Gangs Beyond Borders

## California and the Fight Against Transnational Organized Crime

March 2014

**Kamala D. Harris**
**California Attorney General**

AOL-DEF-00002462

196

# Gangs Beyond Borders

## California and the Fight Against Transnational Organized Crime



March 2014

**Kamala D. Harris**
**California Attorney General**

AOL-DEF-00002463

197



# Message from the Attorney General



California is a leader for international commerce. In close proximity to Latin America and Canada, we are a state laced with large ports and a vast interstate system. California is also leading the way in economic development and job creation. And the Golden State is home to the digital and innovation economies reshaping how the world does business.

But these same features that benefit California also make the state a coveted place of operation for transnational criminal organizations. As an international hub, more narcotics, weapons and humans are trafficked in and out of California than any other state. The size and strength of California's economy make our businesses, financial institutions and communities lucrative targets for transnational criminal activity. Finally, transnational criminal organizations are relying increasingly on cybercrime as a source of funds – which means they are frequently targeting, and illicitly using, the digital tools and content developed in our state.

The term "transnational organized crime" refers to a range of criminal activity perpetrated by groups whose origins often lie outside of the United States but whose operations cross international borders. Whether it is a drug cartel originating from Mexico or a cybercrime group out of Eastern Europe, the operations of transnational criminal organizations threaten the safety, health and economic wellbeing of all Americans, and particularly Californians.

This is not a new threat – one of the first official trips I made as Attorney General in 2011 was to tour the United States-Mexico border and discuss strategies to combat transnational crime with state and local law enforcement. The following year, in 2012, we convened a working group to research and issue a report on human trafficking, an increasing activity of transnational criminal organizations. That report, *The State of Human Trafficking in California*, proposes innovative strategies to investigate and prosecute the perpetrators and victims of trafficking. But human trafficking is only one part of transnational crime operations.

198

This new report, *Gangs Beyond Borders: California and the Fight Against Transnational Organized Crime*, addresses all three emerging pillars of transnational criminal activity: the trafficking of drugs, weapons and human beings; money laundering; and high-tech crimes, such as digital piracy, hacking and fraud. It is the result of extensive research and consultation with federal, state, and local law enforcement, non-governmental organizations, and academia.

The report finds that while transnational organized crime is a significant problem, it is not insurmountable. In California, law enforcement at all levels of government have made major strides against these criminal groups, even in the face of declining resources. Law enforcement in foreign countries have made steady in-roads, as well, as demonstrated by the recent arrest in February 2014 of Joaquín "El Chapo" Guzmán Loera, the reputed head of Mexico's notorious Sinaloa Federation cartel. The report describes the strategies that are working and sets forth recommendations to combat transnational organized crime. A call for sustained law enforcement funding and collaboration between federal, state, and local governments are at the center of these recommendations.

As transnational criminal organizations evolve in the search for profits, California will continue to be an attractive target. *Gangs Beyond Borders* sheds light on this threat in our state and highlights effective approaches in the fight against transnational organized crime. I hope it will be a useful tool for law enforcement and the public.

Sincerely,

Attorney General Kamala D. Harris

199



# Transnational Organized Crime
# Special Project Team

**Kamala D. Harris**
Attorney General

| | |
|---|---|
| Jeff Tsai | Special Assistant Attorney General |
| Larry Wallace | Director, Division of Law Enforcement |
| Rei Onishi | Deputy Attorney General<br>Government Law Section |
| Leif Dautch | Deputy Attorney General<br>Appeals, Writs and Trials Section |
| Mateo Munoz | Director, Office of California-Mexico<br>Bilateral Relations |

### Advisory Work Group

| | |
|---|---|
| Kent Shaw | Chief, Bureau of Investigation |
| Darren Nelson | Analyst, CA State Threat Assessment Center |
| Anthony DaSilva | Deputy Attorney General<br>Appeals, Writs and Trials Section |
| Antonette Cordero | Deputy Attorney General<br>Civil Rights Enforcement Section |
| Jonathon Bertran-Harris | Associate Governmental Program Analyst |

AOL-DEF-00002466

200



# Acknowledgements

The Office of the Attorney General would like to offer its appreciation for the
assistance and consultation that a range of individuals and organizations have
provided in the research, preparation, writing, and production of this Report.

The assistance of a team from the California State Threat Assessment Center, which
included Ryan Stonebraker, Matthew Hawkins, and David Herbst, was instrumental
in organizing and analyzing intelligence information and trends.

The dedication of the men and women in California law enforcement to combatting
transnational criminal organizations has been the key to our success in disrupting and
dismantling these groups.  In particular, the Attorney General would like to acknowledge
the advice and help provided by the following individuals and their offices: Alameda
County Sheriff Gregory Ahern, Los Angeles High Intensity Drug Trafficking Area
("HIDTA") Director Roger Bass, Los Angeles Police Chief Charlie Beck, Citrus Heights
Police Chief Chris Boyd, Santa Barbara County Sheriff Bill Brown, San Diego
County District Attorney Bonnie Dumanis, Sacramento County Sheriff Scott Jones,
Campbell Police Sergeant Dan Livingston, San Diego and Imperial Counties HIDTA
Director Kean McAdam, Long Beach Police Chief Jim McDonnell, El Segundo Police
Lieutenant Carlos Mendoza, San Bernardino County District Attorney Michael Ramos,
Central Valley HIDTA Director William Ruzzamenti, Los Angeles County Sheriff John
Scott, Northern California Regional Intelligence Center Director Mike Sena, the
California Board of Equalization's Investigation and Special Operations Division
Chief Randy Silva, and Central Coast Gang Investigator Association Executive
Director Michael Walker.  Special commendation and thanks for research assistance
and consultation are also due to the Los Angeles County District Attorney's Office,
the Orange County District Attorney's Office, the Chula Vista Police Department,
the California Department of Business Oversight's Money Transmitters Division, the
California Department of Corrections and Rehabilitation, the Los Angeles Regional
Criminal Information Clearinghouse, and the CalGang Network System.

The Attorney General is grateful for the insight and support from California's law
enforcement associations, which represent the men and women who lead the fight
against transnational organized crime in our communities.  Our thanks in particular
go to the California State Sheriffs' Association, the California Police Chiefs'
Association, the California District Attorneys' Association, the California Narcotics
Officers' Association, and the California Peace Officers' Association.

201

Our efforts combatting transnational organized crime are shared with federal
law enforcement in California, and the Office of the Attorney General expresses
appreciation for case and research information provided by the United States
Attorneys' Offices for the Central and Southern Districts of California and the
U.S. Department of Justice's Criminal Division.  Additional federal support for the
preparation and production of this Report was generously provided by the U.S.
Department of Homeland Security (Homeland Security Investigations), the White
House's Office of National Drug Control Policy and National Security Council,
and the U.S. Treasury Department's Financial Crimes Enforcement Network.

Transnational organized crime reaches into California from abroad, and collaboration
with law enforcement partners and government entities outside of our state is vital.  This
Report benefited immensely from the insight and assistance from the staff and members
of the Southwest Border Anti-Money Laundering Alliance, a coalition made up of
the Attorneys General offices from Arizona, California, New Mexico, and Texas.
We also would like to acknowledge the cooperation from the Legal Attaché of the
Mexican Attorney General's Office.

Experts from academia, public policy institutions, and private industry provided
valuable research assistance in the development of the Report.  The Office of the
Attorney General would like to thank Richard Boscovich (Microsoft Corp. Digital
Crimes Unit), Professor Ami Carpenter (University of San Diego), Dr. Vanda
Felbab-Brown (Brookings Institution), David Finn (Microsoft Corp. Digital Crimes
Unit), Beth Givens (Privacy Rights Clearinghouse), Melissa Kriz (Fox Entertainment
Group, Inc.), Michael Robinson (Motion Picture Association of America, Inc.),
Professor Stefan Savage (University of California, San Diego), Professor David
Shirk (University of San Diego), Professor Pamela Starr (University of Southern
California), and Karen Thorland (Motion Picture Association of America, Inc.).

Finally, the Attorney General would like to acknowledge the hard work and dedication
of the many people in the California Department of Justice – including its Division of
Law Enforcement, Criminal Law Division, Public Rights Division, Civil Law Division,
and Communications and Imaging Resource Center – who made this Report possible.
Special thanks go to Guillermo Auyon, Danielle Ayers, Julie Basco, Sonia Bui,
Teresa Carnero, Erasmo Carrizosa, Joe Dominic, Jeremy Dunn, Oscar Estrella,
Geannie Franco, Jeanne Gahagan, Roy Giorgi, Kimberly Granger, Janette Gunther-
Allen, Michael Haroldson, Justin Ito, Val Jimenez, Dean Johnston, Dave King,
Ernesto Limon, Keith Lyon, Mark Mackler, Luis Marquez, Janet Mistchenko,
Tricia Morgensen, Robert Morgester, Michael Newman, Alex Nocon, Jessica Owen,
Charles Penn, Somerset Perry, Gloria Pingrey, Mitchell Pryor, Christina Rogers,
Vicki Sands, Karen Sandusky, Epifanio Sevillo, Peter Shear, Karen Sherwood,
Randy Sivilla, Robert Sumner, Mike Whitaker, Jon Wolff, and Michele Wong.

AOL-DEF-00002468

202



# Table of Contents

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i
Highlights of the 2014 Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii
Summary of Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Chapter 1 – Transnational Criminal Organizations: Structure and Operations . . . 1
   The Rise of Mexico-Based Drug Cartels . . . . . . . . . . . . . . . . . . . . . . . . . 2
   Asian and Eastern European Transnational Criminal Groups . . . . . . . . . . . . . 5
   Proliferation of Transnational Gangs . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   The Online Criminals: Transnational Hacking, Fraud, and Pirating Rings . . . . . . 7
   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Chapter 2 – California: A Hub for Transnational Criminal Activity . . . . . . . . . 9
   Drug Trafficking Is the Most Profitable Transnational
   Criminal Activity in California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   Trafficking Humans Is Almost as Profitable as Trafficking Drugs . . . . . . . . . . . 18
   California Is a Gateway in the Criminal Firearms Trade . . . . . . . . . . . . . . . . 20
   Money Laundering Corrupts California's Economy . . . . . . . . . . . . . . . . . . . 21
   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Chapter 3 – Transnational Criminal Organizations and California Gangs:
A Growing Threat to Public Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
   California Faces a Unique Threat of Spillover Violence from Mexico . . . . . . . . 28
   California Is Threatened by the Alliance of Transnational
   Criminal Organizations with Prison and Street Gangs . . . . . . . . . . . . . . . . 29
   The Criminal Alliances Have Sparked a Rash of Violence . . . . . . . . . . . . . . . 33
   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

AOL-DEF-00002469

203

Chapter 4 – New Challenges Facing Law Enforcement in
Combatting Drug Trafficking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
  New Technologies Facilitate Gang Activities . . . . . . . . . . . . . . . . . . . . . 35
  Increased Global Trade Has Made It Harder to Detect Illicit Trafficking . . . . . . 37
  Transnational Criminal Organizations Are Finding Alternatives to Ports of Entry . . . 39
  Globalization Creates New Money Laundering Threats . . . . . . . . . . . . . . . 47
  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Chapter 5 – High-Tech Crime: A New Frontier for
Transnational Criminal Organizations . . . . . . . . . . . . . . . . . . . . . . . . . 51
  Transnational Criminal Organizations Are Targeting Information
  Systems and Networks for Attack and Exploitation . . . . . . . . . . . . . . . . . 52
  Transnational Criminal Organizations Are Uniquely Positioned
  To Exploit High-Tech Criminal Opportunities . . . . . . . . . . . . . . . . . . . . 59
  Emerging High-Tech Crime Trends . . . . . . . . . . . . . . . . . . . . . . . . . . 63
  Virtual Currencies Offer New Tools for Money Laundering . . . . . . . . . . . . . 68
  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Chapter 6 – Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
  Trafficking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
  High-Tech Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
  Money Laundering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

AOL-DEF-00002470

204



# Executive Summary

Over the last century, few issues have grabbed the nation's attention like organized criminal activity. In particular, transnational organized crime – crime that reaches beyond borders – has been a topic frequently explored, and occasionally even glamorized, by the media and through film. But for the people of California, transnational organized crime is not simply a subject for the silver screen. It is an everyday reality associated with drug trafficking, sexual slavery, and shocking violence that affects nearly every community in the Golden State.

Transnational criminal organizations are self-perpetuating associations operating across national borders that use violence, corruption, and fraud to protect and disguise their illicit, profit-driven activities. This Report examines how these groups – with roots in places around the globe – have flocked to California to engage in an increasingly diverse range of criminal activities.

**Chapter One** looks into the varying nature of transnational criminal organizations, ranging in size and sophistication from corporation-like drug cartels and extremely violent transnational gangs to Internet-based hacking and financial fraud rings. These organizations are incredibly fluid and adaptive, and their profit-motivated operations run the gamut from traditional crimes – such as narcotics, weapons, or human trafficking – to complex money laundering schemes and specialized cybercrimes.

Like parasites, transnational criminal organizations whose operations extend into California thrive by exploiting their host's strengths. California's economy – a global leader owing to its shared border with Mexico and its status as a gateway for trade between the U.S. and East Asia – attracts hard-working immigrants from around the world and maintains highways and high-speed data networks that speed the flow of goods, people, and information throughout the state. **Chapter Two** explains how transnational criminal organizations have taken advantage of these factors in an attempt to transform California into a center of transnational organized crime. California is the nation's largest portal not only for drugs and human trafficking victims flowing *into* the U.S., but also for weapons and the laundered proceeds of illicit activity smuggled *out* of the U.S. – often through the very same trafficking routes.

i

AOL-DEF-00002471

205

The harm done by transnational criminal organizations to communities all across California is hard to overstate. Not only do these organizations threaten public health by driving the supply and distribution of harmful narcotics, but their alliances with violent prison and street gangs (a trend addressed at length in **Chapter Three**) have sparked a rash of violence in a period of otherwise declining criminal activity. Moreover, the substantial amount of illicit money moving through California's economy threatens the security of the state's financial institutions, local businesses, and communities, with an estimated $30 to $40 billion in illicit funds laundered through California commerce every year.

Transnational criminal organizations are increasingly taking advantage of new communications technology and the interconnectedness of the globalized world to further their trafficking activities in California. This creates new challenges for law enforcement, a topic explored in **Chapter Four**. But transnational organized crime in California extends beyond drugs, weapons, and human trafficking. In the 21st century, the problem posed by transnational criminal organizations threatens the security of computer and data networks, the integrity of online bank accounts, and the rights of intellectual property holders. By virtue of its population and knowledge-powered economy, California is the top target in the nation for this new generation of transnational criminal organizations – originating in significant numbers from Eastern Europe, but also Africa and China – whose purpose is to commit highly profitable hacking, fraud, and digital piracy crimes. This emerging cybersecurity threat is discussed in **Chapter Five**.

Recognizing the significant threat posed to California's economy and people by transnational criminal organizations, Attorney General Kamala D. Harris assembled a team of researchers, policy analysts, and law enforcement officials to identify the challenges these organizations create and to formulate recommendations to combat them in California most effectively (**Chapter Six**). This report is based on dozens of interviews with law enforcement officials, prosecutors, and policy experts, an in-depth review of state task force data, and research and investigation by the California Department of Justice.

## Highlights of the 2014 Report

- Mexico-based transnational criminal organizations are suspected of trafficking 70 percent of the U.S. supply of methamphetamine through the San Diego port of entry alone, making California the primary source for methamphetamine nationwide. In 2013, border authorities seized over 6,200 kilograms of methamphetamine entering California, a three-fold increase since 2009.

- The Sinaloa Federation cartel has emerged from the fragmented Mexican drug market as the dominant Mexico-based drug trafficking organization operating in

ii

AOL-DEF-00002472

206

California. Sinaloa is now responsible for trafficking the vast majority of Mexico-produced marijuana, methamphetamine, heroin, and cocaine through the Tijuana corridor into California.

- The public safety threat posed by Mexico-based drug trafficking organizations has been amplified as cartels have formed alliances with California prison and streetgangs to control trafficking routes, distribute drugs, and kidnap, extort, and kill as necessary to protect their criminal activities. The Mexican Mafia, for example, provides protection for members of numerous cartels both inside and outside prison, and various Hispanic Sureño and Norteño gangs in Southern and Northern California have teamed up with Sinaloa, La Familia Michoacana, The Knights Templar, and other Mexico-based drug trafficking organizations.

- With gang membership up 40 percent nationally between 2009 and 2011, California has seen higher levels of violent crime (particularly assault, extortion, home invasion robberies, homicide, intimidation, and shootings), as well as an increase in arrests for human trafficking offenses and significant seizures of drugs, weapons, and cash.

- Transnational criminal organizations are taking advantage of new communications technologies and social media to facilitate criminal activity, recruit new members, and intimidate or harass their rivals – even from inside prison walls. In 2011, for example, over 15,000 cell phones were seized from inmates in California prisons.

- Recent increases in the use of *panga* boats to smuggle drugs and people into California exemplify the constant tactical adaptation by transnational criminal organizations. Boats capable of carrying 12 tons of marijuana have landed as far north as Santa Cruz County, with a steady increase in *panga* sightings and landings throughout the Central Coast.

- Between 2009 and 2012, the number of intentional breaches of computer networks and databases in the U.S. jumped by 280 percent, with California's share leading the nation. Many of these breaches have been tied to transnational criminal organizations operating from Russia, Ukraine, Romania, Israel, Egypt, China, and Nigeria, among other places.

- In the 2012-2013 fiscal year, California state drug task forces disrupted or dismantled 140 drug, money-laundering and gang organizations, arrested nearly 3,000 individuals, rescued 41 drug-endangered children, confiscated 1,000 weapons, and seized nearly $28.5 million in U.S. currency in anti-narcotic law enforcement actions statewide. Federally-sponsored High Intensity Drug Trafficking Areas ("HIDTA") program task forces also identified 305 drug-related transnational

iii

AOL-DEF-00002473

207

criminal organizations operating in California, and 18 street and prison gangs with ties to these organizations.

- At the same time, state-led task forces charged with protecting California from transnational criminal organizations have suffered severe budget reductions over the last five years, with the number of operating task forces dropping from 55 in 2011 to just 17 in 2013.

## Summary of Recommendations

### Trafficking

- **The Legislature should amend California law to target the leaders of transnational criminal organizations operating in California:** California does not currently have any statutes that specifically target or punish supervisors, managers, or financers operating on behalf of transnational criminal organizations. California should fill this statutory void by enacting legislation similar to the federal Continuing Criminal Enterprise Act to directly attack the leadership of these organizations.

- **Federal, state, and local law enforcement should use California's State Threat Assessment System as a central hub for sharing information about transnational crime:** California presently lacks a unified system for collecting, analyzing, and sharing information regarding transnational organized crime. California's State Threat Assessment System (STAS) is uniquely positioned to act as that central hub for California's transnational crime information-sharing needs. In coordination with the Attorney General's Office, California's tribal, local, state, and federal law enforcement agencies should partner with STAS to share information about transnational criminal organizations across the state.

- **Federal, state, and local authorities should establish a unified maritime task force and associated radar network to counter maritime smuggling operations along California's coastline:** While several *regional* partnerships and a federal task force exist to address maritime smuggling operations along California's coast, California needs a multi-jurisdictional Maritime Task Force – that leverages expertise at the federal, state, and local levels – to combat the threat posed by *panga* vessel smuggling. California should also work with Coast Guard Officials to implement a network of high-intensity radar stations or sonar buoys strategically located along the coast to better detect maritime threats and coordinate law enforcement responses.

- **The Legislature and Governor should fund five additional Special Operations Units across California:** The increasingly sophisticated nature of transnational criminal organizations demands an equally sophisticated and coordinated

iv

208

response from law enforcement. The California Department of Justice's Bureau of Narcotics Enforcement, and related task forces and special operations units, were remarkably successful in targeting and dismantling transnational organized crime cells in California before severe budget cutbacks in 2011 limited their operational capacity. Restoring funding to special operations units in Sacramento, San Francisco, Riverside, Los Angeles, and San Diego is a necessary step in the fight against transnational organized crime in California.

- **The federal government should continue providing critical funding to support state and local law enforcement agencies in investigating and dismantling trafficking organizations:** In particular, Congress should maintain and increase funding levels for methamphetamine law enforcement grants through the U.S. Department of Justice's Community Oriented Policing Services (COPS) office. Additionally, the California Board of State and Community Corrections, which administers federal law enforcement grants from the Byrne Justice Assistance Grant Program, should restore the allocation of these funds to joint state-local task forces.

- **Federal, state, and local law enforcement agencies should increase operational coordination in combatting transnational criminal organizations:** Given the international scope of these trafficking networks, federal, state, and local law enforcement agencies in California must work together – at the investigatory and prosecutorial levels – to combat major transnational criminal organizations and their alliances with prison and street gangs.

## High-Tech Crimes

- **State and local authorities should develop public-private partnerships to leverage technology against transnational organized crime:** As the frequent target of transnational criminal schemes, the private sector is at the frontline defending against numerous high-tech threats. It is not surprising that it often has access to information and technologies that the government does not. By forming public-private partnerships, state and local authorities can leverage the private sector's comparative strengths to counter the ever-changing threats and tactics of transnational criminal organizations.

- **Businesses should adopt industry best practices designed to protect against cybercrime:** Lax cybersecurity practices, or the lack of any protections whatsoever, allow far too many breaches of computer networks and databases to happen in California. All entities, public and private, doing business in California should assume that they are a target and defend themselves accordingly by adopting the industry best practices identified in the Department of Justice's recently released report, *Cybersecurity in the Golden State* (*http://oag.ca.gov/cybersecurity*).

v

AOL-DEF-00002475

209

Money Laundering

- **The Legislature should amend California law to enable prosecutors to temporarily freeze the assets of transnational criminal organizations and their gang associates before the filing of an indictment:** Under current law, transnational criminal organizations are often given the equivalent of advance warning that their criminal proceeds and assets are about to be seized by law enforcement. That is because of a legal void that prevents the seizure of any assets until the filing of a formal criminal indictment. As a result, in cases where illicit assets are discovered before an indictment can be filed, criminals have the chance to remove their assets before they can be taken. This loophole must be eliminated by empowering law enforcement to temporarily freeze an organization's illicit proceeds or property in advance of a formal prosecution.

- **The Legislature should strengthen California's prohibition against financial transaction "structuring":** When it comes to proving that a financial transaction was "structured" to evade financial reporting requirements, California law imposes a special burden on prosecutors that federal law does not. To prove "structuring" under California law, prosecutors must show not only that transactions were organized to avoid mandatory reporting requirements, but also that such structuring was *intended* to disguise proceeds from illicit activities. This special burden on state and local prosecutors hampers the ability to disrupt money laundering schemes and should be eliminated.

- **California prosecutors need advanced training to combat sophisticated transnational money laundering schemes:** At the same time that budget reductions have curtailed investigatory and prosecutorial capacities, transnational criminal organizations are becoming more and more sophisticated in how they launder their illicit profits. A key to disrupting this sophisticated criminal activity is through equally sophisticated and aggressive prosecutions. Advanced training and technical assistance to state and local prosecutors investigating and prosecuting complex money laundering schemes is vital to building the capacity to bring these prosecutions.

- **State authorities should partner with their Mexican counterparts to share intelligence and disrupt the illicit flow of money across the border:** The ease with which large sums of money can be whisked across borders has never been greater. For this reason, it is critical that investigators and regulatory officials on both sides of the border have the most up-to-date information about cross-border currency flows and the people behind them and cooperate in disrupting money laundering schemes.

vi

AOL-DEF-00002476

210



# Introduction

Transnational organized crime in California is as diverse as it is complex. It involves a range of profit-motivated criminal activities perpetrated by an ever-increasing array of transnational criminal organizations, located both within California and abroad. These organizations have taken advantage of the technological revolution of the last two decades, as well as advancements in trade, transport, and global money transfers, to substantially increase the scale and profitability of their criminal activities in California.[1]

Unlike the large, hierarchically-organized international crime groups of the late 1980s and early 1990s, such as the well-known Medellín or Cali drug cartels, modern transnational criminal organizations are incredibly fluid and adaptive, and have diversified their criminal enterprises. Transnational criminal organizations varying in size, scope, and influence have now established a presence in virtually every one of California's major urban areas, as well as many smaller cities. They present a real and significant statewide threat to the economic and social fabric of California.

Their profit-driven operations run the gamut from more traditional crimes – such as narcotics, weapons, and human trafficking (the use of force, fraud, or coercion to exploit a victim for profit) – to complex money laundering schemes and sophisticated computer attacks designed to steal personal information and money (Figure 1). These crimes, and the transnational criminal organizations orchestrating them, exploit millions of Americans and impose costs estimated to be in the hundreds of billions of dollars annually.[2] Transnational criminal organizations are also constantly altering their illicit capabilities, refining and adapting their tactics in response to enhanced local, state, and federal law enforcement interdiction efforts.

Throughout this Report, we make reference to these groups and their criminal conduct in various ways – as "transnational gangs," "transnational criminal organizations," or the shorthand "TCOs," as well as "transnational organized crime." There is no singular or exclusive domestic or international definition of a transnational criminal organization and, in fact, the success these groups have enjoyed is due in part to the ambiguity of their organizational structures. However, transnational criminal organizations possess many common traits and Chapter One of this Report discusses those commonalities.

vii

AOL-DEF-00002477

211

Figure 1
Transnational Organized Crime in California



The Report is a broad review of transnational criminal activity in California. We analyze four types of transnational criminal organizations active in California (Mexico-based drug cartels, Asian and Eastern European transnational criminal groups, transnational gongs, and Internet-based hacking and fraud rings) and explore their operations in trafficking (drugs, human beings, and weapons), money laundering, and high-tech crime. At their core, the criminal operations conducted by these organizations all have international and domestic dimensions, directly impacting California and its residents.

viii

AOL-DEF-00002478

212



Chapter One

# Transnational Criminal Organizations – Structure and Operations

As defined by the National Security Council, transnational criminal organizations are self-perpetuating associations operating across national borders that use violence and corruption, and exploit transnational commerce and communications, to protect and disguise their illicit, profit-driven activities.[3] These organizations utilize a number of different organizational structures, including hierarchies, clans, networks, and cells, with many transnational criminal organizations evolving and adapting over time due to changing circumstances.[4] They may be tied together by ethnicity, territory, or even personal relationships, or they may share a focus on particular segments of the illicit marketplace.[5]

Transnational criminal organizations have a presence in virtually every major urban area in California, as well as in many smaller cities around the state. From South to North, transnational criminal organizations of varying types have permeated and penetrated California, finding a foothold throughout the state (Figure 2).

**Figure 2
TCO Hot Spots in California**



Source: CA State Threat Assessment Center (2014)

1

AOL-DEF-00002479

213

Transnational Criminal Organizations in California: Four Key
Organizational Structures

## 1. The Rise of Mexico-Based Drug Cartels

The dominant organizational structure of transnational criminal organizations operating
in California is the corporation-like drug trafficking organization. These organizations
are commonly referred to as "cartels," so we will use the terms interchangeably. Tradi-
tionally, these large cartels had rigid hierarchical structures, but analysts have identified
a general trend in recent years toward decentralized cells controlled by a governing
body as the "nerve center."[6]

The primary cartel-like transnational criminal organizations active in California are
Mexico-based transnational criminal organizations (commonly referred to as "Mexican
drug trafficking organizations"). Though Mexican drug trafficking organizations have
been in operation for more than a century, the last 20 years have witnessed a pro-
found change in the operation and control of the key trafficking routes to the United
States. The associated emergence of these organizations has been described as "the
greatest organizational drug threat to the nation."[7]

Following the dismantlement of the Medellín and Cali drug cartels by the Colombian
government in the late 1980s and early 1990s, the highly-profitable cocaine trafficking
routes to the United States were taken over by Mexican drug trafficking organizations,
particularly the Tijuana cartel (controlled by the Arellano Félix family and also known
as the Arellano Félix Organization) and the Juárez cartel (operated by the Carrillo
Fuentes family).[8]  However, in 2000, the administration of Mexican President Vincente
Fox, in consultation with the U.S. government, began to target high-level operatives –
first in the Tijuana cartel, and then in the Juárez cartel – that resulted in the capture or
death of several Félix and Fuentes family members.[9]  While successful in many respects,
this crackdown also resulted in fragmentation of the Mexican drug trafficking market,
leading to increased violence, not only between the larger drug trafficking
organizations and the government, but also among smaller "cartelitos" vying for a
share of the drug trafficking industry.

Out of this power vacuum, the Mexico-based drug trafficking organization known as
the Sinaloa Federation has emerged as the dominant transnational criminal organiza-
tion operating in California. Sinaloa – whose roots can be traced back to the breakup
of the Guadalajara cartel in the 1980s – is now responsible for the vast majority of
drug, weapons, and human trafficking across the California-Mexico border.[10]

Sinaloa and other Mexican drug cartels are adapting their corporate structures to better
leverage existing resources and alliances and expand the financial and geographic
scope of their enterprise. For example, Sinaloa – which has allied with the Gulf cartel,

2

AOL-DEF-00002480

214

Los Caballeros Templarios, and the Arellano Félix Organization – has adopted a decentralized, less-hierarchical structure, whereby leadership directs peripheral lieutenants to carry out operations in a "hub and spoke" manner.[11]

This "federation" of Sinaloa-affiliated cells, developed by the cartel's recently-arrested leader, Joaquín "El Chapo" Guzmán Loera, allows Sinaloa to maintain a presence in at least 17 Mexican states and 50 other countries throughout North, Central, and South America, Australia, Europe, Southeast Asia, and West Africa, with each subgroup enjoying significant autonomy in its business operations and ability to retain profits.[12]

Sinaloa is particularly active in Southern California, where it coordinates with Hispanic Sureño street gangs to distribute narcotics. The expansion of Sureño gang territories has also allowed the cartel to expand its influence to Northern California (notably, the San Jose area) and into neighboring states like Oregon, Nevada, and Arizona (Figure 3).[13]  This ever-increasing zone of influence has caused friction with existing regional gangs that had previously controlled trafficking routes, resulting in threats of violence, homicides, kidnappings, and extortion.[14]

Figure 3
Sinaloa Presence in California



AOL-DEF-00002481

215

## The Sinaloa Cartel: An Uncertain Future

Analysts trying to explain Sinaloa's rise over the past decade have argued that Sinaloa leaders received preferential treatment from the Mexican government while rivals were targeted. The Mexican government has strongly denied this claim. Others have suggested that Sinaloa took advantage of a Mexican government hotline intended to boost intelligence gathering on drug trafficking organizations in order to report the actions and locations of Sinaloa's rivals. While the July 15, 2013 arrest of Miguel Angel Trevino Morales, the leader of Sinaloa's main rival, Los Zetas, lent some credence to this theory, the recent crackdown on Sinaloa's senior leaders suggests that any preferential treatment has come to an end.



The most significant event in this regard was the arrest of Sinaloa's leader, Joaquín "El Chapo" Guzmán Loera. In the early morning hours of February 22, 2014, Mexican authorities arrested Guzmán in the Mexican resort city of Mazatlan. Since his 2001 escape from a Mexican prison, Guzmán had been the chief executive of Mexico's most powerful drug cartel and held the dubious distinction of being on both the annual Forbes list of billionaires and the D.E.A.'s "Most Wanted" list. He is named in federal drug trafficking indictments in California, New York, Illinois, and Texas, and faces charges in Mexico related to his 2001 escape and subsequent criminal activity.

Guzmán's arrest followed the takedown of several top Sinaloa operatives in late 2013 and early 2014, including the arrests of 10 mid-level cartel members in February 2014 alone. Information gleaned from those arrests led to the capture of Guzmán, who had been suspected of moving covertly between seven homes in Mazatlan through a series of underground tunnels connected to the city's sewer system.

While it is not immediately clear what impact the arrest will have on Sinaloa's operations, some experts predict that, in the short term, the cartel will continue business as usual, with Guzmán's partners, Ismael "El Mayo" Zambada and Juan Jose "El Azul" Esparragoza-Moreno, likely stepping into his role. Professor Pamela Starr of the University of Southern California, who studies U.S.-Mexico relations, doubts that Guzmán's arrest will cause significant operational upheaval in the short term. "Guzmán has been on the run for years, so it is unlikely he was still running Sinaloa's day-to-day operations." The future, however, is less certain. Starr predicts that Sinaloa's difficulty will be establishing a long-term leadership structure after El

4

216

Mayo and El Azul cycle through as transitional heads. Smaller drug trafficking organizations currently under the Sinaloa umbrella might try to establish their independence and grow their territory. For these reasons, Starr hypothesizes that "this is the beginning of the end for Sinaloa – how long it takes and how it happens remains to be seen."

The speculation about Sinaloa's possible decline raises the additional possibility of increased violence. Vanda Felbab-Brown, a senior fellow at the Brookings Institution, is concerned about a fragmented Mexican drug market – as occurred after the Mexican government's crackdown on the Tijuana and Juarez cartels in the early 2000s – in which organizations vie for control of Sinaloa's previously untouchable drug routes. While large cartels like Los Zetas – which suffered a decline following years of fighting the Sinaloa cartel, other rivals, and the Mexican government – are believed to lack the operational capacity or appetite for a powerplay, Felbab-Brown warns that drug-related violence will increase if smaller cartelitos see Guzmán's arrest as an opportunity to grow their enterprises.

Regardless of what might follow, both Starr and Felbab-Brown praise Guzmán's capture and what it symbolizes in the global effort to tackle transnational organized crime.

Sources: June S. Beittel, Mexico's Drug Trafficking Organizations: Source and Scope of the Violence, Congressional Research Service (April 15, 2013), pp. 9, 11-12; Vanda Felbab-Brown, Calderon's Caldron (Sept. 2011), Latin America Initiative at Brookings, p. 3; Alicia A. Caldwell & Katherine Corcoran, Mexico's Sinaloa Drug Chief Arrested, Associated Press (Feb. 22, 2014); Interview with Vanda Felbab-Brown (Feb. 24, 2014); Interview with Prof. Pamela Starr (Feb. 24, 2014); U.S. Department of Justice.

### 2. Asian and Eastern European Transnational Criminal Groups

Another type of transnational criminal organization is formed when criminals based abroad attempt to partner with their counterparts in U.S. immigrant communities in order to exploit access to U.S. markets and wealth. The result is a loose transnational confederation between a criminal ring abroad and an autonomous ring here in the U.S., tied together along ethnic lines. While much still remains unknown about these groups, many of them operate in California, which is home to large immigrant communities from around the world and a quarter of all immigrants who have come to the U.S.[15]

Eurasian transnational criminal groups arising from the 15 republics of the former Soviet Union and from central European countries maintain an active California presence in

5

AOL-DEF-00002483

217

areas including Burbank, Fresno, Glendale, Los Angeles, Sacramento, San Diego, and San Francisco. Known for their sophistication and violence, groups like Armenian Power are linked to cybercrime, financial fraud (such as identity theft and credit card crimes), auto theft, illegal gambling, and narcotics and human trafficking.[16]

Additionally, once confined to just a handful of urban areas with large Asian-American populations, Asian transnational criminal confederations, such as those involving the Tiny Rascal Gang and Asian Boyz, are expanding to communities in Fresno, Los Angeles, Orange, Sacramento, Santa Clara, and San Diego Counties where the growth in the number of new immigrants from Asia has been greatest. These criminal organizations engage in human and sex trafficking, drug and weapons smuggling, domestic marijuana cultivation, various forms of cybercrime, and even wildlife trafficking.[17]

Although tied together along ethnic lines, these confederations show little affection for those who share their ethnic identity when deciding whom to target. Indeed, immigrants who share ethnic ties with these criminal organizations are arguably the most vulnerable to victimization. For example, Armenian Power frequently targets members of the Armenian-American community for fraud and extortion, as it did in one Southern California fraud scheme described in Chapter Five. The special vulnerability of many immigrant communities underscores the urgent need for law enforcement to better understand Asian and Eastern European transnational criminal groups so that they can better protect some of California's most vulnerable citizens and residents.

### 3. Proliferation of Transnational Gangs

Transnational gangs are criminal street gangs operating in the U.S. with ties to gangs of the same ethnicity or nationality, or within the same umbrella gang, operating in other countries. They are linked to the prolific use of violence or the threat of violence to further their illicit activities in California. Like Mexico-based transnational criminal organizations, transnational gangs have exploited the benefits of an interconnected world to expand their increasingly sophisticated criminal activities to a global scale. While still principally engaged in narcotics trafficking (although on a smaller scale than Mexico-based drug trafficking organizations), these gangs deeply involve themselves in crimes ranging from money laundering and robbery to extortion and contract killings, as well as emerging crimes like intellectual property fraud and human trafficking. In addition to these profit-driven activities, transnational gangs perpetrate acts of violence to establish their reputation and status in California communities.

Transnational gangs vary in organizational sophistication, though they predominately follow a "hub and spoke" model, with a hierarchical, central point directing regional "clique" or *"clica"* leadership. They are increasingly working with other transnational criminal organizations, as well as California street and prison gangs (a dangerous union

6

AOL-DEF-00002484

218

examined in Chapter 3), and are coordinating their criminal activities across both state and international lines. The primary transnational gangs operating in California are:

- Mara Salvatrucha (or the shorthand "MS-13"): MS-13 is the largest and most violent transnational gang currently operating in California and has been recognized by the U.S. Department of Treasury as a transnational criminal organization. Originally founded in Los Angeles during the 1980s by Salvadoran immigrants, MS-13 began as an ethnic, protection-oriented street gang. A growing Salvadoran immigrant membership, coupled with mass deportations to Central America in the 1990s of MS-13 members convicted of certain crimes, helped transform this group into a transnational gang. According to recent U.N. estimates, MS-13 is now one of the world's fastest growing criminal organizations, with an international membership of at least 30,000, including 8,000 members in El Salvador, 7,000 in Honduras, and 5,000 in Guatemala.[18]

- 18th Street Gang: Another large criminal street gang, the 18th Street Gang was formed by Mexican immigrants in Los Angeles around 1959, with many members later deported in the 1990s to Mexico and Central American countries. Despite their similarities, the 18th Street Gang, sometimes referred to as M-18 or Barrio 18, is an historic rival of MS-13.

  The 18th Street Gang is a large organization with an international membership well over 30,000. According to U.N. estimates, 14,000 to 17,000 members are based in Guatemala, 8,000 to 10,000 live in El Salvador, and another 5,000 reside in Honduras.[19] Membership numbers in the U.S. are well into the thousands and cliques in different countries frequently collaborate or form alliances opportunistically. Similar to MS-13, the 18th Street Gang's domestic operations are based in California, with the majority of their operations in the greater Los Angeles or Southern California region (although operations have also been observed in northern California). Gang members also maintain close relationships with Mexico-based transnational criminal organizations.

## 4. The Online Criminals: Transnational Hacking, Fraud, and Pirating Rings

With the rise of a global society connected by the Internet, criminal rings organized to commit hacking, fraud, pirating and other high-tech crimes across borders have rapidly proliferated. These rings operate frequently from Eastern Europe, but also from places as diverse as West Africa and China, and specifically target the citizens, computer networks, and companies of prosperous countries like the U.S. They vary widely in size, sometimes partnering with "locals" in the target country. Just as often, however, they feel little need to form local partnerships, since the Internet allows them to oper-

7

219

ate remotely, and a lack of a physical presence in the country they are targeting helps them more easily evade detection and criminal prosecution.

Like other transnational criminal organizations, transnational hacking, fraud, and pirating rings are profit-driven. But unlike cartels and gangs, these rings do not commonly employ fear, violence, and terror as tools in their arsenal. Instead, their success hinges on operating anonymously and surreptitiously, relying on sophisticated tactics to steal information, harvest money, and move money across jurisdictions into their own bank accounts.

## Conclusion

Transnational criminal organizations have used their adaptability and fluid organizational structures to expand their networks of criminal activity to every corner of California. Mexican drug cartels, particularly Sinaloa, have been most successful in embedding themselves into the fabric of our urban communities by forming alliances with prison and street gangs for protection and distribution of illicit goods. However, transnational gangs and other organized criminal rings also pose serious threats to the physical and financial well-being of Californians.

8

AOL-DEF-00002486

220



Chapter Two

# California: A Hub for Transnational Criminal Activity

California is a global leader on a number of fronts and, unfortunately, transnational criminal activity is one of them (Figure 4). In 2012 alone, 305 drug-related transnational criminal organizations were found operating in the state, including Mexico-based drug cartels in at least 22 cities from Northern California to the southern border.[20] Based in part on its population and network of interstate highways connecting the western U.S., California is a major portal through which drugs flow to other U.S. states and cities, as well as Canada. California is also the top state in the U.S. for human trafficking, due in part to its proximity to the U.S. southwest border, robust economy, and large immigrant population.[21] Finally, with a gross domestic product of $2 trillion and substantial international trade activity, California's economic and financial infrastructure is often targeted for transnational criminal money laundering schemes.

Figure 4
Impact of Transnational Criminal Organizations in California



9

AOL-DEF-00002487

221

## Drug Trafficking Is the Most Profitable Transnational Criminal Activity in California

Mexico-based drug cartels generate billions of dollars annually by trafficking drugs into California, both for sale within the state and as a staging base for distribution around the country. As shown below in Figure 5, the distribution routes traditionally follow major interstate highways, which are the most efficient routes to California's major urban areas. Typically, narcotics flow from San Diego to Los Angeles, where they can either continue up the Interstate Highway 5 to the Bay Area and Sacramento or move eastward to various distribution points in the U.S. or Canada.

Figure 5
Primary Narcotics Trafficking Routes in California (2014)



Source: CA State Threat Assessment Center

### Transnational Criminal Organizations Traffic Processed Marijuana

Marijuana continues to be the most commonly trafficked and used narcotic in California.[22] As the Drug Enforcement Administration recently observed in its 2013 National Drug

10

222

Threat Assessment, Mexican drug trafficking organizations such as the Sinaloa cartel
continue to operate large outdoor marijuana growing fields in Mexico.

However, in response to interdiction efforts at the border, Mexican-based drug cartels are
increasingly growing marijuana on public land in California. This is forcing California to
contend with not only marijuana smuggled into the state, but also with marijuana grown
in California for distribution to other parts of the U.S. where prices tend to be higher.[23]

 In June 2013, following a month-long investigation by special agents of the California Department of Justice, officials arrested four suspected Sureño gang members in
Sacramento County and seized more than 7,000 marijuana plants and 100 pounds
of processed marijuana with an estimated street value of $2 million.[24]

Figure 6
Counties with Task Force Seizures of Processed Marijuana
in Excess of 1,000 Pounds
(FY 2012-2013)



11

223

In the 2012-2013 fiscal year (from the beginning of July to the end of June), the central and southern parts of California accounted for the vast majority of processed marijuana seizures. Los Angeles County alone accounted for 54 percent (or 43,090 pounds) of statewide seizures.

## Outdoor Marijuana Fields and Sophisticated Indoor Production Operations

The outdoor production of marijuana takes place primarily on public land in the Sacramento and San Joaquin Valleys, including within California's national forests, and creates a host of problems within the state. Worker exploitation is common, as the growing areas are often operated by Mexican nationals who are smuggled into the country and then forced to work to pay off a smuggling debt.[25]  In addition, outdoor marijuana fields produce significant environmental harms stemming from growers' use of pesticides, rodenticides, and fertilizers on the crops to expedite the growing process and protect the crops from insects or wild animals.[26]  Fires are also a threat particularly associated with outdoor cultivation. In August 2009, suspected Mexican drug trafficking organization workers tending to a 30,000-plant marijuana field in the Los Padres National Forest near Santa Barbara sparked a 136-square mile fire.[27]

In 2012-2013, Northern and Central California represented the most significant hot spots for outdoor marijuana cultivation. Of almost 1.5 million plants seized by state and local law enforcement in 2012-2013, the top five counties accounted for over 45 percent of the total statewide seizures.

Figure 7
Task Force Seizures of Outdoor Marijuana

| Counties With Most Seized Outdoor Marijuana (FY 2012-2013) | |
| --- | --- |
| 1.  Sacramento | 181,541 plants |
| 2.  Madera | 139,238 plants |
| 3.  Tulare | 129,899 plants |
| 4.  Shasta | 124,477 plants |
| 5.  Fresno | 93,476 plants |
| Statewide Total | 1,470,748 plants |

12

AOL-DEF-00002490

224



**Regional Impact: "The Inland Empire"**

The Central Valley remained the primary hot spot for outdoor marijuana cultivation, accounting for a staggering $7.52 billion in outdoor marijuana seizures. But the Inland Empire (Riverside and San Bernardino Counties), though not ranked among the most impacted counties, outpaced seizures in other traditional outdoor marijuana hot spots such as the "Emerald Triangle" (Mendocino, Humboldt, and Trinity Counties).

"Emerald Triangle":    86,213 plants seized
"Inland Empire":    142,515 plants seized

In response to demand for high-grade marijuana (which can sell for up to 30 times the price of low-grade marijuana), Mexico-based drug trafficking organizations, as well as Asian organized crime groups, are growing increasing amounts of high-grade marijuana in indoor facilities in Alameda, Santa Clara, San Benito and Merced counties, and in Mexico. The state is also experiencing heavy indoor marijuana cultivation activity in the Bay Area, which law enforcement has attributed to the growing presence of Asian transnational criminal organizations like the Asian Warriors.[28]  The top six counties account for approximately 80 percent of statewide totals, with Alameda, Santa Clara, and San Benito counties making up three of these jurisdictions.

Figure 8
Task Force Seizures of Indoor Marijuana

| Counties With Most Seized Indoor Marijuana (FY 2012-2013) | |
|---|---|
| 1.  Shasta | 11,138 plants |
| 2.  Mendocino | 5,211 plants |
| 3.  Merced | 4,155 plants |
| 4.  Alameda | 3,541 plants |
| 5.  Santa Clara | 3,153 plants |
| 6.  San Benito | 2,937 plants |
| Statewide Total | 37,949 plants |

13

225

Transnational Criminal Organization Methamphetamine Trafficking
Is on the Rise in California

California has also witnessed an increase in recent years in the availability of wholesale methamphetamine, particularly its most potent form, "ice," with the Sinaloa cartel driving supply.[29]  California is now the primary source for methamphetamine nationwide with as much as 70 percent of the U.S. foreign supply of methamphetamine being trafficked through the San Diego point of entry alone.[30]  Mexican drug trafficking organizations obtain multi-ton shipments of precursor chemicals, such as ephedrine and pseudo-ephedrine, from countries without strict chemical export regulations, like China or India. They then produce increasing amounts of methamphetamine in large "superlabs" inside Mexico,[31] a substantial percentage of which is destined for California.

 On October 8, 2013, agents from the Department of Justice-run Inland Crackdown Allied Task Force arrested four suspected members of La Familia Michoacána in San Bernardino County after seizing more than 100 pounds of methamphetamine, 9 pounds of cocaine, and half a pound of heroin. The street value of these narcotics totaled nearly $6 million.[32]  Officials alleged that transnational criminal organization members imported the drugs from Mexico and then distributed them to street gang dealers in California and other states.

> **La Familia Michoacána (LFM)**
>
> With historic roots in Michoacán, Mexico, where it began as a vigilante group, this Mexican drug trafficking organization is known for its use of extreme violence and pseudo-religious propaganda to justify its criminal activities. Prior to the recent establishment of Sinaloa's near monopoly on the U.S. illicit drug market, LFM was mainly associated with large-scale methamphetamine trafficking in California's Central Valley as well as outdoor public land marijuana fields in national forests throughout the state. However, due in part to the reported December 10, 2010, death of LFM's main leader, Nazario Moreno Gonzalez, in a two-day firefight with the Mexican Federal Police, LFM has been significantly weakened in both Mexico and California.
>
> Source: June S. Beittel, Mexico's Drug Trafficking Organizations: Source and Scope of the Violence, Congressional Research Service (Apr. 15, 2013), pp. 17-18.

According to the Office of National Drug Control Policy's National Methamphetamine and Pharmaceuticals Initiative, seizures of methamphetamine at points of entry along the U.S. southwest border have increased steadily over the past four years. As noted in Figure 9, methamphetamine seizures at California points of entry have more than tripled between 2009 and 2013 and now dwarf seizures in our sister border states.

14

226

Figure 9
Southwest Border Methamphetamine Seizures at Points of Entry (Kilograms)
(2009-2013)



Source: CA State Threat Assessment Center (data from Office of National Drug Control Policy, National
Methamphetamine and Pharmaceuticals Initiative)

Once "ice" has been smuggled into the state, two counties are now the destinations of
choice for distribution. In 2012-2013, Los Angeles County in the south and Merced
County in the Central Valley accounted for more than 66 percent of the "ice" seized in
California (Figure 10).

Figure 10
Task Force Seizures of Ice

| Counties With Most Seized Ice (FY 2012-2013) | |
|---|---|
| 1.  Los Angeles | 1,605 lbs. |
| 2.  Merced | 475 lbs. |
| 3.  Fresno | 206 lbs. |
| 4.  Riverside | 196 lbs. |
| 5.  Orange | 177 lbs. |
| 6.  San Mateo | 177 lbs. |
| Statewide Total | 3,146 lbs. |

15

AOL-DEF-00002493

227

In other schemes, transnational criminal organization operatives refine methamphet-
amine in labs here in California, a majority of which can be found in the Central
Valley. As with the cultivation of marijuana, these methamphetamine labs can cause
severe environmental damage by contaminating manufacturing locations with hazardous
chemicals. But meth labs pose an additional risk as well: they expose Californians to the
potential for explosions due to the hazardous, often flammable, chemicals used to
make methamphetamine. For example, in March 2012, officers in search of a stolen
Apple iPad entered a San Jose apartment[33] only to discover it was being used as a
"refining lab" by a suspected Mexico-based transnational criminal organization to
convert unrefined methamphetamine into the highly dangerous crystal methamphet-
amine.[34] Subsequent testing revealed extensive contamination of both the apartment
and adjacent residential units, which required substantial decontamination efforts.[35]

The rise in methamphetamine trafficking by drug cartels reinforces the need for robust
funding for law enforcement. In this regard, federal funding is critical. In the
Consolidated Appropriations Act of 2014 (Public Law No. 113-76), Congress
approved Fiscal Year 2014 appropriations totaling $7.5 million toward the creation
of a methamphetamine grant program. This timely and innovative program – which
will be administered by the Community Oriented Policing Services Office in the U.S.
Department of Justice – provides for competitive grants to state law enforcement agencies
to combat methamphetamine production and trafficking in their states. The California
Attorney General's Office and other state and national law enforcement leaders –
including those from Alabama, Kentucky, Mississippi, Missouri, Tennessee and the
National Narcotic Officers' Association Coalition – developed and advocated for the
program's creation.  And with the support and leadership of California's congressional
delegation, states received a critical federal funding stream to further fight the drug car-
tels' lucrative methamphetamine trafficking trade.  For California, this grant opportunity
comes at an important time when an aggressive law enforcement response is vital to
effectively combatting transnational criminal organizations.

### Trafficking of Prescription Drugs Across the California-Mexico Border Has Increased, While Cocaine Trafficking Has Decreased

As prescription drug abuse becomes one of the fastest growing drug problems in Califor-
nia and across the country, law enforcement officials have observed an increase in the
trafficking of pharmaceutical drugs (such as Hydrocodone, Oxycodone, Ritalin, Xanax,
Morphine, Alprazolam, Diazepam, and Benzodiazepine) across the California-Mexico
border.[36]  In some of these schemes, Mexican pharmacies fill prescriptions without a
legitimate prescription and the drugs are smuggled into California. The drugs are then
packaged and shipped via commercial mail services, frequently to customers who
ordered the drugs over the Internet.[37]  In recent years, border agents have seen an uptick
in seizure incidents involving prescription drugs.

16

AOL-DEF-00002494

228

 On September 11, 2012, border agents seized 637 Hydrocodone tablets, 198 Oxycodone tablets, 120 Ritalin tablets, 56 Morphine tablets, and $1,406 in U.S. currency when they stopped two women at the San Ysidro border crossing.[38] The women admitted that they were working with a Mexico-based transnational criminal organization that took orders over the Internet for prescription drugs, smuggled them from Tijuana to San Diego, and then shipped them throughout the U.S.[39] Such seizures have become commonplace.[40]

In other schemes, stolen or illegally-acquired prescription drugs are smuggled out of California to Mexican pharmacies for distribution by drug trafficking organizations in Mexico or back to the U.S. market.[41]

 In August, 2011, officials broke up such a ring with the arrest of 15 individuals operating a large U.S.-Mexico drug trafficking organization.[42] The group would acquire wholesale quantities of controlled pharmaceutical drugs such as OxyContin and Hydrocodone, and smuggle them to Mexico for sale. The cash was then brought back into the United States to finance criminal operations.[43] Border stops throughout the two-year investigation resulted in the seizure of 1,288 OxyContin pills, 9,500 Hydrocodone pills, and more than $66,000 in U.S. currency.[44]

While these narco-trafficking trends reflect a growing diversification of transnational criminal organizations, California has experienced a decline in the trafficking of cocaine into the state. Although Mexico-based drug trafficking organizations remain the primary wholesale suppliers of cocaine in the U.S., they have reduced their trafficking efforts in recent years as nationwide usage and demand have declined.[45] For example, cocaine seizures decreased by 50 percent in California in the last year, though county-level seizure data shows that cocaine remains a substantial problem in California. Los Angeles County topped the list with over 58 percent of statewide seizure totals.

Figure 11
Task Force Seizures of Cocaine

| Counties With Most Seized Cocaine (FY 2012-2013) | |
|---|---|
| 1.  Los Angeles | 1048 lbs. |
| 2.  Imperial | 457 lbs. |
| 3.  Riverside | 135 lbs. |
| 4.  Fresno | 68 lbs. |
| Statewide Total | 1,796 lbs. |

17

AOL-DEF-00002495

229

## Trafficking Humans Is Almost as Profitable as Trafficking Drugs

Transnational criminal organizations and gangs are also finding human trafficking to be a lucrative and growing criminal enterprise. In fact, human trafficking is believed to be one of the most profitable criminal activities, with estimates of profit ranging from $13,000 annually per forced laborer to as much as $100,000 or more annually per sex trafficking victim. According to the latest estimates from the U.S. Department of State, 27 million people are trafficked each year worldwide, with 18,000 to 20,000 victims in the U.S. alone.[46] Based on these figures, revenue from human trafficking could be as high as $32 billion per year worldwide and at least $9.5 billion annually in the U.S.[47] Transnational criminal organizations are motivated not only by these high profits, but also by a frequently held notion among criminals that human trafficking carries with it a lower risk of detection, allows for the renewable exploitation of their human "commodities," and risks lighter criminal punishment than narcotics trafficking.

### Types of Human Trafficking

**Sex Trafficking**
Sex trafficking is the act of forcing, coercing, or transporting a person for the purpose of a commercial sex act. These crimes are primarily committed against women and children. Sex trafficking can occur in residential brothels, brothels disguised as massage parlors, strip clubs, and via online escort services and street prostitution.

**Labor Trafficking**
Labor trafficking is the act of forcing a person to work for little or no money. It can include forced labor in underground markets and sweatshops, as well as legitimate businesses such as hotels, factories, restaurants, construction sites, farming, landscaping, nail salons, and traveling sales crews.

**Domestic Servitude**
A form of labor trafficking, domestic servitude often involves women who are forced to live and work in the homes of employers who confiscate their legal documents and prevent them from leaving. Domestic workers can be U.S. citizens, lawfully-admitted foreign nationals, or undocumented immigrants.

Source: Office of the Attorney General, The State of Human Trafficking in California (2012).

As highlighted in the California Department of Justice's *The State of Human Trafficking in California, 2012*, California is one of the states most affected by human trafficking, due in part to its proximity to the U.S. southwest border, its robust economy, and a large immigrant population.[48] Over the past two years, California's nine regional Human Trafficking Task Forces identified more than 1,300 human trafficking victims,

18

AOL-DEF-00002496

230

Figure 12
Human Trafficking Arrests Under California Law
(2001-2013)



Source: CA State Threat Assessment Center; CA DOJ, California Justice Information Services

though the actual number of victims statewide is almost certainly significantly larger.[49]
A majority of these victims, approximately 56 percent, were trafficked for the purpose
of sexual exploitation, while 21 percent were destined for forced labor.[50] Largely due
to increased public and law enforcement awareness of the issue, arrests under two
key human trafficking statutes – human trafficking for forced labor (CA Penal Code,
§236.1(a)) and sex trafficking of minors (CA Penal Code, §236.1(c)) – have
increased exponentially in the past six years, as shown in Figure 12.

Virtually all types of transnational criminal organizations in California participate in
human trafficking in one form or another. Asian and Eurasian transnational criminal
rings and gangs like the Asian Gangsters and Armenian Power are key facilitators of
domestic and international human trafficking in California, particularly sex trafficking.
They typically traffic victims of a similar ethnic background, using their cultural knowl-
edge and ties to ethnic communities to their advantage.

 In January 2013, special agents from the California Department of Justice, building off
an investigation by the FBI, arrested five suspects accused of running a human trafficking
network that spanned several northern California counties. Young women, aged 21 to
30, were trafficked from Mexico and sold for sex to as many as 20 clients in a single
day. The sex acts occurred in brothels identified in Chico, Stockton, Yuba City, Fairfield,
and Sacramento. In May 2013, three of the men pleaded no contest to conspiracy to
commit pimping and pandering charges and were sentenced to three years in prison.[51]

19

AOL-DEF-00002497

231

## California Is a Gateway in the Criminal Firearms Trade

Increasingly, firearms are being trafficked through California to Mexico-based transnational criminal organizations. Growing narcotics-related violence in Mexico since 2006 and the needs of Mexican criminal organizations to control lucrative drug trafficking routes, combined with restrictive firearms laws in Mexico, have led these organizations to source firearms outside of Mexico.[52] These organizations, specifically the Sinaloa cartel, Los Zetas, and the Gulf cartel, are the leading weapons traffickers in the U.S. They utilize their existing U.S.-based narcotics trafficking and money laundering infrastructures to facilitate weapons trafficking back to Mexico, with firearms frequently trafficked by the same couriers through the same routes.[53]

A recent study estimates that 252,000 guns cross the U.S.-Mexico border each year, with fewer than 15 percent seized.[54]   Although the firearms are not necessarily purchased in California due to California's own robust gun laws, this state is increasingly the gateway through which Mexico-based transnational criminal organizations move weapons obtained in other states via straw buyers to Mexico, making reverse use of existing drug trafficking routes.[55]  For example, over 20,000 firearms – predominantly handguns – were recovered in California in 2012 alone (Figure 13). These numbers are consistent with seizures in past years. These statistics signal the existence of a vast pool of weapons that could be at risk to enter the global arms trade.

Figure 13
Total Number of Firearms Recovered in California (2012)



Source: CA State Threat Assessment Center (data from U.S. DOJ, Bureau of Alcohol, Tobacco, Firearms and Explosives)

20

232

## Money Laundering Corrupts California's Economy

Just as California is a key portal for drugs to flow into the U.S. and Canada, it is also at the center of the reverse flow of billions of dollars of illicit bulk cash proceeds generated by transnational criminal organizations and their criminal associates. According to the El Paso Intelligence Center (EPIC), a federal central clearinghouse of data on currency and narcotics seizures, California is one of the top two states in which narco-dollars are seized and to which seized narco-dollars are destined.[56] As Figure 14 shows, cash is smuggled from California back to Mexico or points farther south – often through the same trafficking routes through which drugs, humans, or weapons were originally smuggled – or is laundered through any number of fraudulent schemes.[57] The flow of this illicit money not only fuels ongoing operations of transnational criminal organizations, but also supplies them with the means to expand and extend their influence across the globe.[58]

Figure 14
Bulk Cash Hubs and Routes



Source: U.S. Department of Homeland Security, *U.S.-Mexico Bi-National Crime Proceeds Study* (2010)

21

AOL-DEF-00002499

233

Money laundering is, by definition, a process designed to mislead law enforcement and mischaracterize the source and origin of the financial proceeds resulting from criminal activities, or "dirty money." The process typically begins by breaking up large amounts of money into smaller, less conspicuous sums, which are then deposited, or "placed," within the financial system. Through "layering," the money launderer then engages in transactions designed to distance the money from its original illicit source. For example, the funds might be wired through a series of shell corporation accounts

Figure 15
Typical Money Laundering Scheme



22

AOL-DEF-00002500

234

at various banks around the country, or disguised as payments for non-existent goods
or services. Finally, to complete the laundering process, the funds are invested in assets
such as real estate or business ventures, and thereby "integrated" into the legitimate
economy.[59]  To avoid detection by law enforcement, transnational criminal organiza-
tions frequently change tactics and engineer new schemes. They also outsource certain
functions, such as the transportation and laundering of illicit proceeds, to other entities
to minimize risk of loss or apprehension.[60]



**The Race Horses of Los Zetas**

In 2012, federal money laundering charges were brought against brothers Miguel
Angel Treviño Morales and Oscar Omar Treviño Morales, reputed leaders of Los
Zetas, and others. Together with a brother who resided in the U.S., the Treviños
used more than 400 American Quarter Horses, along with ranch properties, to
launder tens of millions of dollars in Zetas drug proceeds.

Since horse racing is legal, the drug money was cloaked in the guise of legal as-
sets. Moreover, because the highly prized horses could be easily sold, the assets
could be converted into cash whenever necessary. The Quarter Horses also gener-
ated legitimate-looking income in the form of horse race winnings during the inter-
vening time period. Various
shell companies and fictitious
persons were used to further
disguise the cartel members'
connection to the horses,
with business affairs of the
horse operation extending
into California, New Mexico,
Texas, and Oklahoma. So
far, at least three people have
been convicted and sentenced
to prison, including the U.S.-
based brother, Jose Treviño
Morales. The defendants have also been ordered to forfeit property worth $60 mil-
lion, which represents the amount of money traceable to their laundering activities.

Source: U.S. v. Miguel Angel Treviño Morales, (W.D. Tex, Dec. 4, 2012), Case No. A-
12CR-21085, U.S. Attorney's Office, Western District of Texas, Federal Prison Terms Hand-
ed Down in Multi-Million Dollar Money Laundering Conspiracy Involving Los Zetas Drug
Trafficking Proceeds, Extortion and Bribery (Sept. 5, 2013); U.S. DOJ, Federal Bureau of
Investigation.

23

235

Both federal and California law target money laundering by criminal enterprises. Some provisions prohibit financial transactions involving funds associated with illegal activities.[61] Other provisions criminalize the mere possession or transportation of illicit drug proceeds.[62] Both federal and state law also impose reporting requirements on financial institutions with respect to large transactions. For example, federal law requires financial institutions to report to financial regulators all currency transactions over $10,000, as well as multiple currency transactions that aggregate to be more than $10,000 in a single day.[63] And both federal and state law make it a crime to break up or "structure" financial transactions into amounts smaller than $10,000 for the purpose of avoiding federal mandatory reporting requirements.[64]

Yet, in addressing "structuring," there is an important difference in the legal tools that federal and state prosecutors can bring to bear. Whereas federal law does not require that the structured transactions be intended to hide the fact that money came from criminal activities or facilitates criminal activities,[65] California law requires that state prosecutors prove a money launderer intentionally structured a financial transaction to disguise that the proceeds were derived from a criminal activity or, alternatively, were structured to promote or further criminal activity.[66] That additional requirement imposes a special burden on California prosecutors, often obstructing successful prosecution. As discussed in this Report's Recommendations (Chapter Six), California law should be amended to remove this special burden.

## Scope of the Money Laundering Problem in California

The true scope of the money laundering problem in California is unknown. However, some experts estimate that approximately 1.5 to 2 percent of gross domestic product ("GDP")[67] is laundered annually.[68] Based on California's $2 trillion GDP in 2012,[69] approximately $30-40 billion could have been laundered in the state in 2012.

Uncertainty also plagues estimates of the amount of illicit cash proceeds smuggled from the U.S. to Mexico every year. Estimates range from $18 billion to as much as $39 billion.[70] For its part, California leads the nation in the number of seizures of currency, commonly referred to by law enforcement as "bulk cash."[71] The seizures of bulk cash increased by 40% in 2011 and remained relatively consistent in 2012 (Figure 16), possibly reflecting law enforcement's success in better detecting currency flowing over the border.

In 2010 and 2012, Mexico enacted a number of anti-money laundering provisions to combat the flow of illicit cash from the United States into Mexico by limiting foreign currency cash transactions. As a result of Mexico's enhanced efforts to combat money laundering, drug trafficking proceeds are now reportedly returning to the United States through ports of entry along the Mexican border, from San Ysidro to Calexico.[72]

24

AOL-DEF-00002502

236

Figure 16
Bulk Cash Seizures in California



Source: CA State Threat Assessment Center (data from EPIC)

Federal sources and California financial crime investigators along the border have
noted a substantial increase in cash imports from Mexico at certain points of entry in
Southern California.[73]  Individuals, claiming to be employees of money service busi-
nesses in Mexico (commonly referred to as *casas de cambio*), with substantial amounts
of bulk cash in duffle bags and backpacks have been witnessed crossing into Cali-
fornia from Mexico. After declaring the amount of cash the individual is bringing into
California to Customs and Treasury officials, the individual goes directly to nearby
financial institutions, kiosks, or ATMs to deposit the imported bulk cash.[74]  These trends
underscore the need for better cooperation among financial regulators and law enforce-
ment from the federal government, California, other states, and Mexico.  This Report's
Recommendations urge these officials to develop protocols to more effectively share
information and intelligence that could be used to disrupt illicit cross-border financial
flows. The Recommendations also emphasize the need to leverage existing partner-
ships for cooperation, such as the Southwest Border Anti-Money Laundering Alliance.
The Attorneys General of California, Arizona, New Mexico, and Texas established
the Alliance in 2010 to enhance and better coordinate investigations and intelligence
sharing related to money laundering in the U.S.-Mexico border region.[75]

25

AOL-DEF-00002503

237

---

### Asset Forfeiture: A Critical Weapon to Fight Money Laundering

The seizure of laundered money is essential to disrupting and dismantling transnational criminal operations. Currently, two provisions in California law enable state authorities to seize laundered money:

- **Criminal Asset Forfeiture Provision:** Money, monetary instruments, and property derived from criminal profiteering are subject to forfeiture under the California Control of Profits of Organized Crime Act. [Penal Code, §§ 186–186.8.]

- **Civil Narcotics-Related Asset Forfeiture Provision:** Money or other things of value (including real property) used to procure controlled substances or to facilitate specified narcotics offenses are subject to civil asset forfeiture. [Health & Safety Code, § 11470.]

Significantly, both of these provisions permit the seizure of criminal proceeds and assets only after the commencement of formal legal proceedings, such as the filing of a criminal complaint or indictment. This loophole allows transnational criminal organizations to safely remove assets that have been discovered by law enforcement, so long as formal legal proceedings have not yet begun. As discussed further in this Report's Recommendations (Chapter Six), this loophole must be closed. New legislation should amend California law to permit law enforcement to temporarily freeze an organization's illicit proceeds or property even if no formal prosecution has commenced yet.

---

## Conclusion

California has emerged as the epicenter of transnational criminal organization activity in the United States. This is due, in part, to a crackdown by the Mexican government on drug cartels and the resulting fragmentation of the trafficking market, with Sinaloa emerging as the dominant Mexico-based drug trafficking organization operating in California. Sinaloa has fueled methamphetamine and marijuana smuggling from Mexico, but domestic cultivation and production of both drugs in California has increased as well. Transnational criminal organizations are also facilitating weapons and human trafficking into and around California and are corrupting regional marketplaces and financial institutions through their multi-billion dollar money laundering practices.

26

AOL-DEF-00002504

238

 Chapter Three

# Transnational Criminal Organizations and California Gangs: A Growing Threat to Public Safety

The presence of transnational criminal organizations in California exacts a heavy price on the state. Transnational criminal organizations contribute significantly to violence and criminal activity here, much of it drug- or gang-related. The partnering between Mexico-based drug trafficking organizations and California's street and prison gangs has spread those problems throughout the state. Due in part to their coordination with Mexican trafficking organizations, street and prison gangs now account for an average of 48 percent of violent crime in many jurisdictions around the country and up to 90 percent in high trafficking regions along the U.S.-Mexico border, such as Arizona, California, and Texas.[76] With gang membership up 40 percent nationally between 2009 and 2011, California is at risk for violent crime, particularly assault, extortion, home invasion robberies, homicide, intimidation, shootings, and other violence associated with transnational criminal activity, as well as an increase in arrests for human trafficking offenses and significant seizures of drugs, weapons, and cash.[77] Even Mexico's efforts to crack down on drug trafficking below the border have further fragmented drug trafficking organizations and spurred an increase in narcotics-related violence, some of which has spilled over into California.

This drug trafficking and increased gang activity, as well as the violence such activity breeds, pose a serious public safety threat to Californians, particularly our youth. One Center for Disease Control and Prevention study found that 61 percent of 15- to 24-year-olds murdered in the City of Los Angeles between 2003 and 2008 were victims of gang violence.[78] In the City of Long Beach, the rate was almost 70 percent.[79] Moreover, a 2006 report from the California Department of Alcohol & Drug Programs found that the percentage of Californians using illicit drugs was 18 percent above the national average. More people died from drug abuse in California that year (4,290) than from any other preventable cause that year, including motor vehicle accidents (3,293) and firearms (3,094).[80] With about 40,000 drug-related emergency room visits every year, and an estimated $22.1 billion economic impact (when factoring in lost productivity, health care costs, prevention and treatment costs, criminal justice costs, and losses due to crime), illicit drug use poses a significant threat to California and its people.[81] The problem is of particular concern to California communities already facing significant challenges from poverty, homelessness, domestic gang activity, and high crime rates.[82]

27

AOL-DEF-00002505

239

## California Faces a Unique Threat of Spillover Violence from Mexico

Some reports suggest that the crackdown on large drug cartels in Mexico has sparked a rash of violence between cartels and the government and between rival *cartelitos*. Some of the violence has spilled over into border states like California. Out of this has emerged "a new generation of criminals, younger and more willing to break with the discipline maintained by traditional structures."[83] According to data released by the administration of former Mexican President Felipe Calderón, there were more than 47,500 organized crime-related homicides between December 2006 and September 2011, with a particular spike in violent crime in Juárez and Tijuana.[84]  Other estimates place the number of homicides during the Calderón

**Spillover Violence in California:
The Los Palillos Transnational Criminal Organization**

Fragmentation and intra-organization violence spawned cross-border formation of a new transnational criminal organization and violence in the San Diego border region. In 2002, Victor Rojas was a lieutenant in the Arellano-Felix Organization and was in charge of an enforcement cell that extorted, robbed, murdered and kidnaped people in Tijuana as part of the drug cartel operations. Victor's younger brother, Jorge, became a valuable and trusted member of the enforcement cell.

After his brother was killed by members of his own organization, Jorge Rojas fled Mexico to San Diego, where he re-established ties with associates with whom he had worked in the enforcement cell. Rojas became the leader of a new U.S.-based transnational criminal organization, Los Palillos, a rogue crew of drug traffickers, kidnappers, and murderers. Los Palillos were motivated by revenge and greed, and targeted victims who were believed to be linked to the Arellano-Felix Organization and to have large amounts of cash or drugs. Los Palillos' murders were particularly gruesome – multiple bodies shot, beaten and stuffed into SUVs and trunks of cars, and others dissolved in 55-gallon barrels filled with muriatic acid and caustic soda.

The San Diego District Attorney has charged defendant Jorge Rojas, leader of Los Palillos, with nine murders with special circumstances, making him eligible for the death sentence. Fourteen other alleged Los Palillos defendants are charged with at least one murder with special circumstances, also making them eligible for the death penalty. Three other defendants have pled out or were convicted at trial and sentenced to life without possibility of parole. On January 16, 2014, Rojas was convicted on four of the murder counts, while another member of Los Palillos, Juan Estrada-Gonzalez, was convicted on six counts of murder. The jury also found true special circumstance allegations in both cases, making Rojas and Estrada-Gonzalez eligible for the death penalty.

Source: *People v. Rojas, et al.*, (San Diego County Superior Court, Case No. SCD208824. Information sourced from People's Trial Brief, Group A.)

28

AOL-DEF-00002506

240

administration at closer to 65,000, or roughly 10,000 per year.[85] This violence has also spilled over the border, with conflicts between Mexican drug trafficking organizations resulting in homicides and kidnappings in California, Texas, and Arizona. Some analysts fear that the recent arrest of Sinaloa front man, Joaquín "El Chapo" Guzmán Loera, will destabilize the power structure and lead to increased violence in the Tijuana Corridor and beyond.



In February 2011, dozens of agents from the California Department of Justice arrested three defendants in Palmdale, California, in connection with a murder-for-hire plot. The defendants, Jorge Ernesto Sillas Rocha, Victor Manuel Magana Gonzalez, and Daniel Cepallo, were hired to assassinate five family members in California in retaliation for a trafficking-related financial debt owed to the Arellano-Félix Organization ("AFO"). The hit men were hired by Juan Francisco Sillas Rocha, a high-ranking AFO lieutenant apprehended by Mexican federal authorities in Tijuana in late 2011. In late 2013, the San Diego District Attorney's Office, which prosecuted this case, obtained convictions and sentences of incarceration for all three defendants (Sillas – 21 years; Magana – 15 years; and Cepallo – 5 years).[86]



In July 2010, Mexican authorities arrested two members of the Barrio Azteca gang, an El Paso-based street gang. They were accused of killing a U.S. consulate employee and her husband across the border in Juarez, Mexico, on behalf of the Juarez Cartel. 52 other gang members were also arrested in connection with the murders.[87]  On this side of the border, a U.S. border agent was shot and killed by traffickers in a Sinaloa-controlled drug corridor near Nogales, Arizona in December 2010.[88]

## California Is Threatened by the Alliance of Transnational Criminal Organizations with Prison and Street Gangs

In recent years, law enforcement officials in California have witnessed a disturbing new trend: increasing partnerships between transnational criminal organizations (particularly Mexico-based drug trafficking organizations) and prison gangs, like the Mexican Mafia, and Sureño street gangs. These alliances offer significant benefits to both parties. For the cartels, a partnership with a local gang in California allows them to:

- Coordinate the distribution of illicit goods in California without having to set foot on U.S. soil (and thus without placing themselves within the jurisdiction of U.S. law enforcement).

- Use gangs to collect drug proceeds, act as enforcers, launder money, smuggle weapons, commit kidnappings, and identify and scout possible undeveloped profit-generating criminal ventures.

- Use gang members who are U.S. citizens to cross the border with less law enforcement scrutiny.

29

AOL-DEF-00002507

241

- Take advantage of street gangs' detailed knowledge of their respective areas, connections to networks for the distribution and retail sale of illegal drugs, existing transportation routes (in the case of outlaw motorcycle gangs), familiarity with law enforcement tactics, and ability to respond quickly and effectively to changing local conditions.[89]

- Establish redundancies or alternative partnerships designed to minimize disruptions to operations resulting from law enforcement actions.

In exchange for their assistance, prison and street gangs are given a share of the drug proceeds and are allowed to bypass mid-level wholesale dealers and receive discounts of up to 50 percent on bulk drug purchases.

**The Mexican Mafia: A Threat Inside and Outside of Prison**

The Mexican Mafia (also known as "La Eme") is a prison gang founded in the 1950s to protect incarcerated Hispanic street gang members. By use of violence, the Mexican Mafia eventually gained power and control over illicit activities in the California prison system and currently controls much of the distribution of drugs in state prisons, county jails, and even in some federal prisons in California. As members were released from prison, they extended their influence outside of prison to control drug distribution, provide protection for affiliates, secure trafficking routes, and tax local dealers.

La Eme's current affiliates include:

- MS-13, whose name is actually a reference to "La Eme," the 13th letter in the alphabet

- Sinaloa and La Familia Michoacána cartels

- Southern California Sureño gangs, including Westside and Diablos of Escondido (San Diego County); Florencia 13 (F-13) gang (Los Angeles County), under the supervision of Arturo Castellanos, a Mexican Mafia member and the leader of F-13 who is serving a life term in Pelican Bay State Prison; 38th Street gang (Southeast Los Angeles); and Logan Heights, Del Sol, Lomita Village 70's, Shelltown, Southeast Locos, and Old Town National City gangs.

The Mexican Mafia's chief rival is La Nuestra Familia/Nuestra Raza – a prison gang with approximately 2,000 members in California prisons that exerts control over Northern California Hispanic ("Norteño") street gangs. However, Nuestra Familia has been significantly weakened by a number of recent law enforcement operations.

Sources: Indictment, U.S. v. Rodriguez-Landa (C.D. Cal. 2013), Case No. CR-13-0484; Indictment, U.S. v. Loreto, et al. (C.D. Cal. 2013), Case No. CR-13-0537.

30

AOL-DEF-00002508

242

Although transnational criminal organizations typically prefer to partner with gangs of the same ethnicity, they have consistently demonstrated that profits come above all else. Thus, they will sometimes partner with the criminal organizations that best achieve their goals regardless of their initial racial or ethnic preferences. Examples of ethnically-similar and dissimilar unions include:

- **Sinaloa** works with the Mexican Mafia, Sureños gangs, and transnational gangs like MS-13.[90]

- **La Familia Michocána** has ties to numerous types of gangs with diverse ethnic backgrounds: criminal street gangs (Bloods, Crips, Avenues, Norteños, and Sureños), prison gangs (Aryan Brotherhood, the Mexican Mafia, and La Nuestra Familia), and traditionally-white motorcycle gangs like the Hells Angels and Outlaw Motorcycle Gangs.

- **Aryan Brotherhood** is affiliated with the Mexican Mafia and Arellano-Félix Organization in drug, weapons, and stolen vehicle trafficking.[91]

- **MS-13** and other transnational gangs have become central players in narcotics and human trafficking in California, partnering with Mexico-based transnational criminal organizations and Sureños gangs to facilitate cross-border smuggling of people and drugs, sell drugs on the retail market, perform contract killings, and launder the proceeds through seemingly legitimate local businesses.[92]

- **Tiny Rascal Gang,** which was originally a gang of Cambodian juveniles, has grown to include Filipinos, Latinos, and African Americans. Their allies include Asian groups, such as Wah Ching, which originated in San Francisco in the early 1960s and is now one of the largest and most ruthless Chinese transnational criminal organizations operating in the U.S.[93]

- **Asian transnational criminal organizations** from Southeast Asian counties like Vietnam and Malaysia have ties to Asian street gangs operating in Santa Clara County, like the Asian Boyz, Asian Warriors, and Asian Gangsters.



**Sureños**

Sureño street gangs are Hispanic gangs that have traditionally been active in Southern California. On the streets, each gang (or "clique") maintains its own identity and is organizationally separate from other Sureños gangs. However, they are interconnected through their common loyalty to the Mexican Mafia on the streets and in prison. In recent years, Sureño gang activity has expanded into northern California and other western states, often sparking violent conflicts with existing gangs.

Source: National Gang Intelligence Center, National Gang Threat Assessment: Emerging Trends (2011), p. 12

31

AOL-DEF-00002509

243

## Case Study: La Familia Michoacána and the Mexican Mafia

 One of the most significant unions in recent years between a Mexico-based transnational criminal organization and a prison/street gang was the 2011 alliance between La Familia Michoacana ("LFM") and the Mexican Mafia. As outlined in the July 2013 indictment in *U.S. v. Rodriguez-Landa* (C.D. Cal. 2013), representatives of the Mexican Mafia entered into an agreement in April 2011 with LFM – historically one of the most significant Mexico-based methamphetamine trafficking organizations – to help LFM become a dominant distributor and seller of methamphetamine and marijuana in Southern California. Under the agreement, dubbed "The Project," the Mexican Mafia would protect LFM's drug shipments and sales, prevent other criminal gangs from taxing LFM's drug shipments and sales, collect drug debts owed to LFM, and provide protection to incarcerated LFM members in prison and jail. In exchange, LFM provided approximately $500,000 to Mexican Mafia leaders upfront, with a share in drug proceeds going forward and discounted rates on methamphetamine for Mexican Mafia members and associates.

Figure 17
"The Project"

**LFM** provided the **Mexican Mafia** with:
• $500,000 upfront
• Share of Drug Proceeds
• Discounted Rates on Meth

The **Mexican Mafia** provided **LFM** with:
• Protection of Meth Shipments and Routes
• Protection of Distribution Territory in Southern California
• Protection of LFM inmates
• Debt Collection

The **Mexican Mafia** distributed meth and marijuana to **Sureño** street gangs in Southern California on behalf of **LFM**.

**Sureño** street gangs deal meth and marijuana in Southern California Communities.

32

AOL-DEF-00002510

244



**"The Canadian Connection"**

Santa Clara County law enforcement officials broke up a unique criminal alliance in March 2009 when they arrested 14 people and seized 200 kilograms of cocaine being distributed through a joint partnership between la Familia Michoacana and a Vietnamese organization based out of Vancouver, British Columbia. In addition to trading pseudoephedrine (a precursor to methamphetamine) for cocaine, and swapping strains of marijuana, the organizations co-invested in shipments of narcotics throughout the U.S.

Source: Interview with a Deputy District Attorney in the Santa Clara County District Attorney's Office (Oct. 23, 2013).

### The Criminal Alliances Have Sparked a Rash of Violence

The deepening associations between Mexican drug trafficking organizations and gangs in California have, in turn, increased the potential for harm to California. Based on the best numbers currently available, there were approximately 4,897 gangs and 186,119 gang members in California in August 2013, making California one of the most gang-dense states in the country.[94] In particular, in 2011, two California counties, Los Angeles and San Bernardino, ranked first and third in the country in terms of the ratio of gang members to population (Figure 18).[95]

The rise of Mexico-based drug cartels at a time when gang involvement is at record highs jeopardizes an otherwise encouraging trend in the reduction of crime in recent years. While the state's homicide rate has reached its lowest level since 1966, nearly 30 percent of all killings committed in California from 2009 through 2012 – 1,911 homicides – were gang-related. For example, the City of San Jose reported a 300 percent increase in gang-related homicides between 2010 and 2011. Similarly, the City of Modesto reported a 213 percent increase in gang-related aggravated assaults between 2011 and August 2012, with corresponding increases in the number of both juvenile perpetrators and victims. Some California jurisdictions have reported that "gangs are responsible for at least 90 percent of [violent] crime."[96]

This is due in part to territorial battles as transnational criminal organizations and gangs expand their operations into new territories. For example, in order to expand their field of influence into Northern California, Mexican drug cartels sometimes rely on established connections with Sureña gangs based out of Southern California. However, the historic antipathy between Sureños and Norteños creates friction when Sureño gang members move into regions controlled by Norteños. This dynamic is seen in places like San Jose where, in January 2011, gang members working for a Mexican drug trafficking organization stormed

33

AOL-DEF-00002511

245

Figure 18
Gangs and Gang Members In California
Identified by Law Enforcement Agencies



Source: CalGang

a nightclub in an attempt to kidnap the owner over a drug debt.[97]  A shootout ensued
between rival gang affiliates, and three people were killed. Instances of such violence dem-
onstrate the impact of transnational criminal organizations and gangs competing to expand
the geographic scope of their drug distribution networks.

## Conclusion

Transnational criminal organization activity poses a significant public safety threat in
California. In particular, clashes between Mexican drug trafficking organizations over
control of profitable trafficking routes have led to increasing violence in Mexico, in Cal-
ifornia, and along the southwestern U.S. border. Transnational criminal organization
reliance on street and prison gangs for protection and distribution of illicit goods has
reenergized existing and dormant gang rivalries, leading to increased gang casualties
in an era of otherwise declining criminal activity.

34

AOL-DEF-00002512

246



Chapter Four

# New Challenges Facing Law Enforcement in Combatting Drug Trafficking

The increased presence of transnational criminal organizations in California has created new challenges for law enforcement. As discussed above, the relatively new alliances between transnational criminal organizations and California prison and street gangs give transnational criminal organizations both greater organizational stability and access to more territory. New forms of digital communications technology, such as smartphones, the Internet, and social media, have made it easier for criminal networks to coordinate their activities without detection and even to track their targets. Moreover, the process of globalization has outpaced the growth of global governance, creating massive opportunities for criminal organizations to grow their business. Finally, new trafficking strategies, including maritime smuggling, and the use of cross-border tunnels and ultra-light aircraft, pose new threats to law enforcement.

Despite these and other challenges, including massive budget cuts, law enforcement has made some important inroads against transnational criminal activity in California.

## New Technologies Facilitate Gang Activities

Not surprisingly, transnational criminal organizations and gangs have embraced mobile communications technologies, such as the Internet and cell phones, not just to recruit new members and expand their social networks, but also to build and operate criminal networks without the geographic proximity once needed for communication.

Even in California's prisons, inmates are increasingly using cell phones to coordinate criminal activities and to intimidate or harass other gang members or innocent people outside prison walls. In 2007, 1,400 illegal communications devices were confiscated from prisoners. By 2011, the number



**Social Media**

Transnational criminal organizations and gangs are increasingly using social media resources for propaganda, intimidation, recruitment, and communication. According to the National Gang Intelligence Center, Mexican cartels have posted hundreds of videos on social media depicting interrogations or executions of their rivals and countless video montages of luxury vehicles, weapons, and money set to songs that glorify the drug trafficking lifestyle.

Source: National Gang Intelligence Center, National Gang Threat Assessment: Emerging Trends (2011), p. 41.

35

247

of seizures had eclipsed 15,000, a 10-fold increase.[98] In 2010, there were 200 incidents directly traced back by the California Department of Corrections and Rehabilitation ("CDCR") Investigative Services Unit to inmates using cell phones to conduct criminal activities from inside CDCR institutions. In 2011, CDCR's Office of Victim and Survivor Rights and Services recorded 119 contacts made by CDCR inmates using cell phones to continue victimizing people from inside CDCR institutions.

To address this problem, CDCR implemented an 11-day pilot program in 2011 at two state prisons in Solano and Vacaville aimed at curbing the unauthorized use of cell phones. Using "managed access" technology to block or "jam" signals to unauthorized devices, officials were able to detect 2,593 illicit wireless devices in the prisons and 24,190 unauthorized communication attempts. "In one day on one yard in one institution, the system prevented 400 unauthorized devices and blocked 4,000 unauthorized communication attempts from those devices," resulting in a 64 percent increase in the use of authorized payphones.[99]

Building off the success of this pilot program, CDCR contracted with Global Tel*Link – a prison telephone company – to develop and implement a three-stage plan to install managed access systems in 34 prisons across the state by June 1, 2015. Phase 0 of this plan was completed on October 31, 2012, with jamming technology installed at Avenal State Prison. In Phase I of the plan, 17 additional adult facilities were retrofitted, with Phase II calling for installations in 16 more adult facilities by June 1, 2015.

The use and adoption of communications technology to engage in transnational criminal activity has continued to expand beyond just the use of cell phones. Drug wholesalers can now sell illegal drugs and prescription pills over the Internet and track their shipments online, alerting the intended recipients of these illegal drugs to a possible interception.[100] Some particularly sophisticated networks even use specialized hackers to encrypt and protect their communications from law enforcement.[101] Traffickers also take advantage of e-commerce and Internet banking to move money and pay suppliers and operatives without the risks associated with physical transfers of money. And human smugglers similarly make extensive use of e-mail, disposable cell phones, and encryption systems, while sex traffickers make sickening use of the Internet to "display the wares in the cyberspace equivalent of slave auctions."[102]

Even as communications technology has developed, some transnational criminal organizations and gangs, particularly prison gangs, have continued to use more traditional means to convey messages to their operatives. In one example, a member of the Mexican Mafia imprisoned in Pelican Bay State Prison issued a "kite," a small piece of paper containing instructions to Florencia-13, a Sureño street gang in Los Angeles (Figure 19).[103] The letter outlined rules concerning: (1) governance structure; (2) drug and prostitution schemes; (3) dispute resolution systems; (4) rules for contract killings; and (5) methods for identifying and punishing informants.[104]

36

AOL-DEF-00002514

248

Figure 19
"Kite" Issued by Imprisoned Mexican Mafia Leader



Source: U.S. Attorney's Office, Central District of California (2013)

## Increased Global Trade Has Made It Harder to Detect Illicit Trafficking

The past quarter century has witnessed unprecedented growth in global trade, finance, travel, and communication.[105] But the process of globalization has outpaced the growth of global governance, creating massive opportunities for criminal organizations to make their business prosper.[106] People and goods can move between countries more cheaply and efficiently than ever before, making it harder to distinguish between licit and illicit transfers.[107]

Taking advantage of these developments, transnational criminal organizations have "diversified, gone global and reached macro-economic proportions," with illicit goods frequently sourced from one continent, trafficked through another, and sold on a third.[108] In this way, the criminal underworld has become inextricably tied to the global economy, with transnational criminal organizations using trade, banking, and communications networks (whether shipping routes, financial centers, or the Internet) to traffic growing quantities of contraband.[111]

Transnational criminal organizations engaged in drug, human, and firearm trafficking have responded to globalization and increased international trade by adapting their strategies and methods to exploit the heavy cross-border flows of goods and

37

249

Figure 20
Growth in International Trade (1948-2008)



Source: Prof. Steve Suranovic, *International Trade: Theory and Policy* (2010)

people.[112]  Moreover, faced with enhanced border security regimens resulting from
the terrorist attacks of September 11, 2001, they have modified traditional forms of
concealment and developed new methods to evade detection at the California-Mexico
border.[113]  This increasing level of operational awareness and sophistication presents a
unique challenge for local, state, and federal law enforcement personnel in California.

### Transnational Criminal Organizations Mask Trafficking at Traditional Ports of Entry

Historically, the vast majority of all narcotics, weapons, and human smuggling by
transnational criminal organizations has been done over land, where transnational
organizations can exploit the high vehicle and pedestrian traffic at border crossings.
As a result, the most popular smuggling methods of Mexico-based criminal
organizations to traffic smaller quantities of narcotics into California have been
pedestrian couriers and privately-owned vehicles, particularly those with hidden
compartments in the engine, car frame, gas tank, trunk, tires, and seats.

For larger shipments, Mexico-based drug trafficking organizations have frequently used
commercial vehicles to move narcotics, weapons, and humans across the U.S. border.
By hiding drugs, weapons, or persons within otherwise legitimate freight transported by
commercial trucks, these traffickers have exploited opportunities arising from the growth
of legitimate international trade.

38

AOL-DEF-00002516

250

 In *U.S. v. Molinero* (C.D. Cal. 2013), a Mexico-based drug trafficking organization smuggled over a period of two years over 36 kilograms of heroin, over 30 kilograms of cocaine, and more than 2,400 pounds of methamphetamine inside PVC pipes. These pipes were further concealed in tractor trailer axles on commercial trucks driven across the border in Arizona and routed to Los Angeles for distribution.

 Similarly, in *U.S. v. Mendoza-Haro* (D. Colo. 2012), prosecutors alleged that Mexico-based traffickers transported methamphetamine and bulk cash between Colorado and California, in some instances hiding drugs in loads of milk and, in at least one instance, strapping cash to the body of a minor as he was driven from Colorado to California.

Although these smuggling methods remain popular, they are highly vulnerable to interdiction. Consequently, Mexican drug trafficking organizations have more recently begun to utilize a number of strategies to reduce the risks of detection and seizure:

- Lookouts, commonly known as *halcones*, are frequently used to monitor border crossings, recognize vulnerabilities of ports of entry, and detect periods of decreased law enforcement presence.

- Illegal drugs are sometimes transported in convoys, with lead cars intended to be inspected by border agents, thereby decreasing the chances that subsequent loads will be seized.

- Recently, cartels have begun to smuggle methamphetamine, cocaine, and heroin into the U.S. in liquid form. The narcotics are dissolved into liquid in Mexico, smuggled across the border, and then converted back to powder or crystalline form for distribution. Trafficking via this method can retain up to 90 percent purity or better, depending upon the capabilities of the conversion lab.

## Transnational Criminal Organizations Are Finding Alternatives to Ports of Entry

While land-based trafficking through ports of entry remains the most common trafficking strategy, transnational criminal organizations are increasingly shifting resources to maritime and air trafficking.[112] These trafficking methods include the use of *panga* boats and ultra-light aircraft, as well as cross-border tunnels, all of which have proven challenging for law enforcement to monitor or intercept.

### Pangas

Transnational criminal organizations are increasingly exploiting California's extensive coastline and beaches to smuggle narcotics and people into the state. *Pangas*, also

39

251

Figure 21
"Super Panga" Boat Found in Santa Barbara County



Source: Santa Barbara County Sheriff's Office (2013)

known as *lanchas*, are the primary maritime trafficking threat to California. These low profile fishing vessels – between 20 and 38 feet in length – are fast (over 40 knots), effective, and economical. Most importantly, due to their fiberglass construction and low profile, *pangas* are extremely difficult to detect by radar or night vision. This, coupled with the sheer size of California's coastline, means that most *panga* discoveries are made either through tips or by happenstance.

Typically, *pangas* are launched from coastal communities in Baja California, such as Rosarito Beach, with few crew members. The vessels then sail north, often to a staging area well within international waters, before moving at high speeds into California to offload their illicit cargo.[113] The Sinaloa cartel is the primary Mexican cartel conducting *panga* smuggling operations along California's coast. In recent months, U.S. Coast Guard crews and local officials have interdicted suspected Sinaloa-affiliated "super *panga*" vessels capable of carrying several thousand pounds of drugs. The super *panga* above was designed to carry as much as 10-12 tons of marijuana (Figure 21).

The increasing reliance on *panga*-based maritime smuggling by Mexico-based drug trafficking organizations is evidenced by seizure activity over the past several years. *Panga* boat interceptions doubled between 2009-2010 and 2010-2011, while *panga* drug seizures have increased significantly in recent years, with seizures of marijuana from *pangas* ballooning from 3,800 pounds in 2008 to 120,000 pounds in 2012.[114]

40

AOL-DEF-00002518

252

Figure 22
Panga Boat Smuggling Routes (2010-2013)



Source: CA State Threat Assessment Center

These statistics correspond with a period of decreasing marijuana seizures at land border crossings, suggesting a shift in the strategy of Mexican drug rings toward exploiting the vastness of the sea in order to smuggle drugs into the state.[115]

The majority of *panga* incidents before 2010 were confined to the Southern California coastline between San Diego and Los Angeles. However, there are now indications of *panga* operations that head further north along the coast beyond Ventura, Santa Barbara, and San Luis Obispo Counties, with landings reported as far north as Santa Cruz and Monterrey Counties (Figure 22).[116]

• *Santa Cruz County:* On September 30, 2013, a 20-foot *panga* wrecked off the shore of Four Mile Beach north of Santa Cruz. Eighty pounds of marijuana washed ashore, though officials suspected the craft was originally carrying considerably more.[117] This followed a similar incident on July 27, 2013, when a *panga* was discovered near Bonny Doon Beach in Santa Cruz carrying 1,200 pounds of marijuana valued at $2.1 million.[118]

41

AOL-DEF-00002519

253

- **San Luis Obispo County:** On September 11, 2013, San Luis Obispo County Sheriff deputies and state park rangers discovered a beached 30-foot *panga* vessel near San Simeon State Park Campground. In addition, officers found a 30-pound package of marijuana with a reported street value of $18,000. Investigators believe traffickers offloaded several thousands of pounds of marijuana from the boat the night before.[119]

- **Santa Barbara County:** The first confirmed *panga* landing in Santa Barbara County occurred in March 2010, when over one ton of marijuana was recovered.[120] However, review of a GPS device found on the *panga* revealed frequent trips to San Luis Obispo County.[121] Since then, Santa Barbara has experienced a steady increase in *panga* recoveries, with 8 *panga* incidents in 2011 and 21 *panga* incidents in 2012.[122] Officials state that about one out of every five *panga* boats intercepted contains human cargo.[123] Moreover, some intercepted *pangas* have been operated by unaccompanied juveniles, including one off the coast of Santa Barbara that contained three females aged 11, 14, and 17 years old.[124]



**Regional Threat: Panga Boats in Santa Barbara County**

On September 13, 2013, local, state, and federal law enforcement officials witnessed a group of 19 individuals offloading suspected bales of narcotics from a panga boat that came ashore in Goleta. Officers arrested 14 people and seized more than 2,000 pounds of marijuana as a result of the interdiction.

Figure 23
Seized Panga Boat in Santa Barbara County

Figure 24
Illegal Drugs Seized From Panga Boat

Source: Santa Barbara County Sheriff's Office

Source: Santa Barbara County Sheriff's Office

42

AOL-DEF-00002520

254

- *San Diego County:* In recent incidents, U.S. Coast Guard crews patrolling the San Diego coastline interdicted a super *panga* carrying 122 bales of marijuana weighing 2,900 pounds, and a *panga* that carried $210,000 worth of the drug "bath salts."[125]

### Pangas Pose New Dangers for Law Enforcement Officials

The use of *pangas* by Mexico-based drug trafficking organizations presents new threats to agents trying to prevent the flow of illicit goods into California. Interdiction efforts by the U.S. Coast Guard or local law enforcement officials have led to high-speed chases, with smugglers trying to dispose of their illegal cargo before being detained. In one tragic incident in December 2012, a Coast Guard Chief Petty Officer was killed off the coast of Santa Barbara when a Sinaloa-affiliated *panga* intentionally rammed an inflatable Coast Guard boat.[126] In another incident in October 2013, the Coast Guard apprehended a *panga* boat carrying 31 bales of marijuana (with a street value between $2 million and $3 million) after an extended high-speed chase off the shore of San Diego.[127]

### Cross-Border Tunnels

In contrast to cheap, often one-use *pangas*, cross-border tunnels are a significant investment for Mexico-based drug trafficking organizations. These organizations are increasingly exploiting specific areas underneath the California-Mexico border at places such as San Ysidro, Otay Mesa, and Calexico, due in part to limited law enforcement resources to counteract the subterranean threat.[128] Cross-border tunnels primarily facilitate multi-ton shipments of narcotics from Mexico to the U.S., but are also used for smuggling people. According to the U.S. Department of Homeland Security, approximately 169,000 pounds of narcotics, valued in excess of $200 million, have been seized from cross-border tunnels since 1990.[129] The Sinaloa cartel is the main Mexico-based transnational criminal organization suspected of constructing cross-border tunnels. Indeed, the vast majority of cross-border tunnels are discovered in California and Arizona, sites for Sinaloa-controlled territories.[130]

Cross-border tunnels range in sophistication from the rudimentary to highly sophisticated.[131] Sophisticated tunnels are extremely well-constructed and can stretch for more than 2,000 feet, using a system of ventilation, lighting, and rail.[132]

Since the 1990s, more than 161 cross-border tunnels have been discovered, with more than 75 detected since 2006.[133] According to DHS, cross-border tunneling activity has increased 80 percent since 2008, with California leading the nation in the number of sophisticated tunnels discovered.[134]

43

AOL-DEF-00002521

255



**Tijuana-San Diego Cross-Border Tunnel**

On October 30, 2013, officers from the San Diego Tunnel Task Force shut down a "super tunnel," with suspected links to the Sinaloa cartel, that spanned one-third of a mile between an industrial area of Tijuana and a warehouse just west of San Diego's Otay Mesa port of entry. The tunnel, one of more than 75 cross-border tunnels discovered by law enforcement over the last seven years, was 35 feet underground and equipped with lighting, ventilation, and an electric rail system. Officials also seized 17,000 pounds of marijuana and about 325 pounds of cocaine, with a combined street value of $12 million — marking the first time that authorities had seized cocaine in connection with a tunnel. Three Sinaloa associates were booked on federal drug charges, and officials made clear that the tunnel was shut down before it became fully operational.

Source: U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement

44

AOL-DEF-00002522

256

## Ultra-Light Aircraft

Ultra-light aircraft are single-pilot, three-wheeled platforms that use hang-gliders and single-propeller engines to fly in excess of 70 miles per hour. They are inexpensive and can exploit the vast airspace along rural stretches of the California-Mexico border to drop hundreds of pounds of narcotics at designated drop locations in agricultural fields, rural roads, or the desert in San Diego and Imperial Counties (Figure 25).

Since 2008, when the first eight sightings were reported, there have been more than 200 incidents involving ultra-lights. For example, on August 29, 2013, U.S. Customs and Border Protection agents found an abandoned ultra-light aircraft in the Southern California desert community of Niland, near the Mexican border. Agents found nearly 190 pounds of marijuana and 13 pounds of methamphetamine valued in excess of a half-million dollars still strapped to the aircraft.[135] While the frequency of ultra-light incursions is likely to increase in the near term, its significance as an emerging trafficking threat will not likely outpace *panga* maritime smuggling or cross-border tunnels given the cargo limitations of the aircrafts. However, as drone technology develops and becomes more widely available, law enforcement will have to be prepared to contend with these unmanned aerial trafficking threats.

Figure 25
Seized Ultra-Light Aircraft



Source: U.S. Department of Homeland Security, U.S. Customs and Border Protection

45

257

## Sustained Funding Is Critical to Continued Law Enforcement Success

Law enforcement officials in California have made significant inroads in tackling the new trafficking strategies developed and utilized by transnational criminal organizations. For example, in 2012-2013, California state drug task forces disrupted or dismantled 140 drug, money-laundering and gang organizations; arrested nearly 3,000 individuals, including 176 gang members; rescued 41 drug endangered children; confiscated 1,000 weapons; and seized nearly $28.5 million in U.S. currency in anti-narcotic law enforcement actions statewide.

Law enforcement agents have also disrupted and dismantled Sinaloa cells operating in California. For example, in "Operation Silver Fox," which began in January 2009, the California Department of Justice's Bureau of Narcotics Enforcement ("BNE") and the Imperial County Narcotic Task Force, District Attorney, and Sheriff conducted an 8-month investigation in San Bernardino, Los Angeles, and Imperial Counties that included more than 100 surveillance operations, 30 undercover meetings with Sinaloa cartel members and associates, and the execution of 6 search warrants. The operation led to indictments against 16 alleged Sinaloa members and the seizure of:

- 420 pounds of cocaine and 136 pounds of marijuana, with a combined street value of more than $19 million;

- $1.7 million in U.S. currency; and

- nine firearms, including seven handguns and two assault rifles.

A similar investigation by two Imperial Valley Task Forces, dubbed "Operation Kings X," resulted in 70 separate indictments, including the arrest of a top Sinaloa cartel member on charges of attempted kidnapping and extortion, and the seizure of 77,319 pounds of marijuana, 2,092 pounds of cocaine, 191 pounds of methamphetamine, 114 pounds of heroin, 35 vehicles, and more than $9.35 million.

The Inland Crackdown Allied Task Force has also had some success cracking down on Sinaloa activity in Southern California, including the September 2012 arrest of four Sinaloa associates in Riverside County in connection with a $1 million methamphetamine sale, and the November 2011 arrest of two Sinaloa associates in connection with a $1.8 million cocaine sale.

BNE also led a number of successful crackdowns involving prison and street gangs, most notably, "Operation Crimson Tide." Over the course of a two-year investigation spanning 23 counties and 13 correctional institutions, BNE significantly weakened Nuestra Familia, the chief rival prison gang to the Mexican Mafia, by arresting all of the organization's regional commanders.

46

258

Notable raids in the operation included:

(1) a June 2011 takedown of the San Joaquin Valley branch of the gang, in which more than 50 properties were raided and 101 suspects were arrested, including Gonzalo "Gunner" Esquivel and Felipe Gutierrez, whom agents described as "the highest-ranking [Nuestra Familia member] that we know of on the outside";

(2) the 2012 arrests of 15 additional members in San Jose and Santa Clara counties, including 7 female associates; and

(3) a May 2013 takedown, dubbed "Operation Snake Eyes," which resulted in the arrests of 47 Nuestra Familia members involved in a Salinas methamphetamine distribution ring.

In 2012, BNE suffered severe budget reductions and was forced to close down. As a result, the number of state task forces dropped from 55 in 2011 to just 17 in 2013, a 70 percent reduction in field operational capacity.

This reduction in law enforcement funding has adversely impacted the California Department of Justice's local drug interdiction and organized crime fighting activities statewide. Task forces led by the Department of Justice have played an integral role in fighting narco-trafficking gangs, and the continued growth of transnational criminal organizations warrants increased funding for task forces and associated Special Operations Units within the Department of Justice.

Sources: Office of the Attorney General, *Brown Announces 16 Indictments, 550 Pound Drug Seizure Following Infiltration of Sinaloa Cartel* (Aug. 26, 2009); San Diego and Imperial Counties High Density Drug Trafficking Area, *HIDTA Annual Report* (2012), p. 12; Indictment, *U.S. v. Esquivel* (E.D. Cal 2011); Don Thompson, *More Than 100 Arrested in Sting of Calif. Gang*, Bakersfield Now (Jun. 8, 2011).

## Globalization Creates New Money Laundering Threats

As globalization increases and California's participation in international trade continues to intensify, transnational criminal organizations have exploited the associated increase in the volume of goods and services crossing international boundaries to disguise, launder, and smuggle the money they reap from the sale of drugs and trafficking of persons. One example of this phenomenon is trade-based money laundering.

*47*

AOL-DEF-00002525

259

## California's International Commerce and Trade-Based Money Laundering Schemes

An integral part of the Pacific Rim economic community and, on its own, one of the world's largest economies, California is a major hub for international trade and commerce.[136] In 2012, international trade flowing through California's ports totaled $579.6 billion.[137] Los Angeles exported $121.3 billion worth of goods and imported $282.6 billion in foreign goods. Combined, Los Angeles' imports and exports represent more than 69 percent of California's total international port trade.[138]

California's substantial international trade provides a platform for complex trade-based money laundering schemes to flourish.[139] In these schemes, cash derived from criminal activity is laundered through trade and commerce transactions that appear to be legitimate.[140] While trade-based money laundering in the U.S. has not been studied systematically, some experts estimate it to be the most significant method used to launder money from the country. Not surprisingly, transnational criminal organizations are using it with increasing frequency.[141]

One mechanism used by these organizations to finance trade-based money laundering is the Black Market Peso Exchange (Figure 26). The scheme exemplifies a trend towards decentralizing and outsourcing money laundering functions to limit exposure to criminal liability.

In the Black Market Peso Exchange scheme, a transnational criminal organization's money laundering is outsourced to a Money Laundering Organization (Peso Broker), which helps finance an international trade transaction using cash derived from criminal activity, such as the sale of drugs. The Peso Broker arranges for the delivery of a trafficker's drug cash to a U.S. vendor to pay for goods ordered by a business customer based in Mexico. The trade goods are then shipped to Mexico and sold by the Mexican business customer. The Mexican business customer reimburses the Peso Broker, in pesos, for the dollars used to purchase the U.S. trade goods. The Peso Broker, in turn, pays the transnational criminal organization, in pesos, the amount of illicit drug money used to finance the international trade transaction.

In this way, the transnational criminal organization has transferred the narco-dollars from the U.S. to Mexico and, for a relatively small fee, has effectively converted the proceeds to Mexican pesos. The Mexican business has also reduced its costs in conducting an international trade transaction, thus increasing its profit margin. The Peso Broker has made a commission from both the transnational criminal organization and the Mexican business customer without exposing itself to criminal liability associated with the smuggling and distribution of narcotics. And the U.S. vendor, a business engaged in international trade and commerce, has generated a profitable cash transaction, increasing its market share over its competitors.

48

AOL-DEF-00002526

260

Figure 26
Trade-based Money Laundering Scheme



The laundering of cash drug proceeds through products and hard goods has come under scrutiny by law enforcement in California. In cases from 2010 to 2013, the federal government has prosecuted several Los Angeles-based international trade vendors and their owners who were engaged in laundering transnational criminal organization cash drug proceeds through the sale of silk flowers and toy bears. The three companies, Angel Toy Corporation, Woody Toys, Inc., and Peace and Rich, collectively laundered approximately $17.7 million in U.S. currency through trade-based money laundering schemes.[142]

All three vendors received significant amounts of bulk cash from third parties (drug money couriers) to pay for international orders by Mexican and Colombian businesses seeking delivery of toys and or silk flowers. Bulk cash deliveries in amounts exceeding $10,000 were then broken up into smaller amounts by the defendant businesses before being deposited to avoid triggering notice requirements by the banks to federal regulators. Angel Toy executed approximately 63 structured cash deposits, while Woody

49

AOL-DEF-00002527

261

Toys involved approximately 59, and Peace and Rich involved approximately 151. Anonymously structured cash bank deposits were funneled from various cities around the country, including New York City, Chicago, and Laredo, Texas, to the defendants' business bank accounts, with credit assigned to the international customers.

Due to the substantial amount of illicit drug proceeds flowing through the community and the willingness of some Los Angeles business owners to launder money on behalf of transnational criminal organizations, law enforcement officials consider Los Angeles and its many specialty business districts – the toy, jewelry, flower, garment and fashion districts – to be a "Mecca for narco-dollars" and a "target-rich environment" for money laundering.[143]

## Conclusion

The adaptability and fluidity of modern-day transnational criminal organizations ensures constant new challenges for law enforcement officials. Transnational criminal organizations in California are taking advantage of new technologies to communicate, recruit, propagandize, and intimidate. Transnational criminal organizations have also used the increase in global trade to mask their trafficking activities, increasingly relying on *panga* boats to transport drugs, weapons, and human cargo from Mexico up the coast into California. These organizations have further proven highly sophisticated in exploiting the complexities of international commerce to disguise, launder, and smuggle money made from the sale of drugs and trafficking of persons.

50

AOL-DEF-00002528

262



Chapter Five

# High-Tech Crime: A New Frontier for Transnational Criminal Organizations

The emergence of the Internet and of a global society linked together by high-speed information networks has transformed the ways in which businesses, governments, and individuals communicate and engage in commerce. Sellers on one side of the world can now advertise directly to buyers on another side of the world. Sales and financial transactions can take place instantaneously and anywhere there is an Internet connection. And goods and services themselves are increasingly being delivered digitally through the Internet. The benefits of these transformations for the global economy, and ultimately for consumers, have been dramatic. At the same time, these transformations have also given rise to a new set of dangers, as some of the same technologies that enable people across the globe to connect instantaneously with one another and exchange money or information also facilitate criminal exploitation:

- **Dangers posed to our information systems and networks.** Information systems and networks serve as the primary platform for our digital economy, while at the same time house the sensitive personal information of millions of consumers and citizens. Highly vulnerable to intrusion and manipulation, these systems and networks are regularly breached. As a result, millions have been subjected to identity theft and fraud, to say nothing of the severe damage this causes to the overall economy.

- **Dangers stemming from consumer vulnerability in the online marketplace.** As consumer trust in online commerce has grown, so also has criminal interest in exploiting that trust. The result is an explosion in Internet-reliant scams aimed at defrauding unsuspecting consumers. Every year, thousands of Americans report being victims of online marketing fraud schemes and suffering losses exceeding tens of millions of dollars as a result.[144] The losses of Californians are higher than those of residents of any other state.[145]

- **Dangers arising from Internet-enabled markets for illicit goods and content.** The Internet has helped foster new economic models fueling the sale and distribution of counterfeit goods, counterfeit pharmaceuticals, pirated entertainment content, illegal drugs, and child pornography. These markets not only enable criminals to profit

51

AOL-DEF-00002529

263

from illicit goods and content, but also further fuel the growth of the underlying illicit activities. The Mexican Attorney General estimated in 2009 that the total revenues from La Familia's sophisticated network for distributing counterfeit movies, music, and software could be more than $2 million a day.[146]

Eager to exploit these vulnerabilities in their quest for profit and power, organized crime has developed increasingly sophisticated techniques and patterns of organization. The result is a new generation of transnational criminal organizations that are more flexible, decentralized, and global than ever before.

## Transnational Criminal Organizations Are Targeting Information Systems and Networks for Attack and Exploitation

The digital infrastructure upon which consumers, businesses, and government all rely to store, process, and share information is highly vulnerable to attacks by sophisticated assailants operating remotely. Once breached, this infrastructure affords assailants the freedom to impersonate legitimate users, assume their privileges, and ultimately steal from them. According to the White House, cybercrime "costs consumers billions of dollars annually, threatens sensitive corporate and government computer networks, and undermines worldwide confidence in the international financial system."[147]

These dangers are particularly acute in California. By a large margin, California tops all states in the number of hacked systems, the number of computer systems infected by malware, the number of victims of Internet crimes, the losses suffered as a result of those crimes, and the number of victims of identity fraud. In addition, because of the outsized role new technologies and mass-media entertainment play in its information-based economy, California is particularly vulnerable when its networks become infected and its intellectual property is stolen.

In 2012, the Privacy Rights Clearinghouse recorded at least 331 breaches in the U.S. caused by criminals who were purposefully trying to compromise databases or networks.[148] Seventeen percent of these intentional breaches occurred in California – a far higher percentage than in any other state – which, in turn, contributed to putting at risk the sensitive personal information of at least 2.5 million Californians that year.[149] At the same time, 12.6 million U.S. adults – or 5.3 percent of the adult population – became victims of identity fraud in 2012. Costs associated with this pool of victims are estimated to be a staggering $21 billion.[150]

The data represented in Figure 27 shows that the problem is getting worse. Between 2009 and 2012, the number of intentional breaches in the U.S. jumped by 280 percent.[151] With new breaches now numbering in the hundreds per year, the rate of increase may be finally slowing, but it remains high. Between 2011 and 2012 alone,

52

AOL-DEF-00002530

264

Figure 27
Number of Intentional Data Breaches Designed to Compromise Systems
(2009-2012)



Source: Privacy Rights Clearinghouse

the number of breaches rose by 32 percent nationwide and by 27 percent
in California, while the number of identity fraud victims in the U.S. increased by
8 percent.[152]

## Information Systems and Networks Are Highly Vulnerable to Intrusion and Exploitation

When cybercrime first emerged, it was mostly orchestrated by people with strong
technical skills who primarily wanted to enhance their reputation and popularity
within a relatively small hacker network.[153] Those days are over. As the potential
profitability of cybercrime has become clearer, it has attracted a flood of individuals
and groups with more pecuniary motives.[154]

There are several ways in which criminals can engineer breaches of databases,
networks, and computer systems.

- In a **phishing** attack, a victim is tricked into giving an assailant system access by
  being directed to a website that purports to be that of the victim's financial institution.
  This website asks the unsuspecting victim to enter his account number, username,
  password, and other personal identification information. Although the website is
  in fact a fake, the victim frequently complies with the request because the website
  appears to be legitimate – complete with bank logos and legal disclaimers.

53

AOL-DEF-00002531

265

- An assailant may also trick a victim into installing **malware** – or malicious software – on a targeted computer system. This malware is usually installed surreptitiously after the victim is induced to click on an attachment or link embedded in an e-mail message. In one recent case, an e-mail appeared as if it were from the National Center for Missing and Exploited Children.[155] Once installed, malware can redirect information within a system to the assailant's computer. Some types of malware can log a user's keystrokes or record screen shots whenever a victim attempts to connect to a targeted financial website and enter account information.[156] Other types are even more sophisticated. "Web injects" associated with the Gozi virus and the Citadel botnet, for example, actually alter how the webpages of particular banks appear on infected computers in order to trick a victim into divulging sensitive information (Figure 28).[157]

Figure 28
Webpage Screen Shot of a "Web Inject"



Source: Microsoft Corporation

- **"Skimming"** is a type of attack that targets payment card networks in particular. It involves the installation of devices at credit/debit card terminals (usually located at gas stations or retail stores) that surreptitiously record card information as cards are swiped and PINs entered (Figure 29).

54

AOL-DEF-00002532

266

Figure 29
Skimmer Placed in a Gas Station Payment Terminal in Martinez, CA



Source: Northern California Computer Crimes Task Force

- Less technologically sophisticated, **breaches by insiders** occur when insiders abuse access privileges and supply sensitive information to criminals for a profit. Many breaches caused by insiders are never detected.

Once a victim's unique credentials are stolen, a criminal can use them to transact business instantaneously and from anywhere in the world. Criminals can withdraw cash, digitally transfer money to their own accounts, or purchase goods in exactly the same way as the legitimate account holder. All of this can happen before a victim even realizes his or her credentials have been stolen.

Because governments also rely heavily on unique identification numbers (e.g., Social Security numbers) to assign benefits or process taxes, a wide range of fraud becomes possible when government databases are breached or these numbers are otherwise stolen. Successful schemes have included billing the government for medical services never provided and pocketing another taxpayer's refund.[158] Through such high-tech fraud, large sums of taxpayer money may be siphoned off to criminals and away from its intended purposes.

## Botnets Pose an Additional Risk to Information Systems and Networks
The threat posed by digital infrastructure vulnerability is not limited to identity theft and associated fraud. Computer networks and systems themselves may also be hijacked and used to launch attacks against *additional* computer systems. The principal way in which this occurs is through a "botnet," or a network of computers infected with

55

AOL-DEF-00002533

267

malicious software – usually without the knowledge of the end-user. Computers may become infected when a user "inadvertently interacts with a malicious website advertisement, clicks on a malicious e-mail attachment, or downloads malicious software."[159] Once infected, "the malicious software establishes a secret communications link to a remote 'botmaster' in preparation to receive new commands to attack a specific target."[160] The computers can then be controlled by the botmaster to "operate in concert to disrupt or block Internet traffic for targeted victims, harvest information, or [] distribute spam, viruses, or other malicious code."[161] Because of their versatility, botnets such as Citadel (Figure 33) have been described as the "Swiss Army knives of the underground economy."[162] Moreover, because Citadel and similarly dangerous botnets concentrate in areas with substantial technology presence, California is uniquely affected. The Los Angeles and Silicon Valley areas in particular have suffered significant infections by malware linked to Citadel (Figure 30).

Figure 30
Hot Spot Locations of Malware Infections Linked to the Citadel Botnet



Source: Microsoft Corporation (2013)

56

268

By dramatically increasing the numbers of victims that can be targeted by a single scheme, botnets are a game-changer for criminals. Botnets enable criminals to launch millions of attacks against protected networks or computer systems and exploit vulnerabilities within hours, if not minutes. This ability to exponentially expand the pool of victims, in turn, can make otherwise unprofitable criminal strategies successful.[163] Botnets significantly increase the profitability of any scheme that depends on taking small amounts of money from large numbers of victims so as to avoid detection.[164]

In the same way, botnets increase the threat posed by transnational criminal organizations exponentially by allowing perpetrators based outside the country to reach out to millions of Americans at once through spam e-mail.[165]

## Transnational Criminal Organizations Are Fueling the Epidemic

Not surprisingly, transnational organized crime has tapped into this new criminal frontier. Cases strongly suggest that transnational criminal organizations are behind the biggest schemes to breach systems and exploit captured identification credentials.

 A particularly devastating phishing operation involved an Egypt-based transnational criminal organization that expanded its operations into California. The Egypt-based hackers used phishing tactics to obtain bank account numbers and related identification of U.S. bank customers. They then teamed up with three California-based individuals who supplied them with California bank accounts to which they could transfer stolen funds.[166] The individuals who opened the California accounts then withdrew these fraudulently obtained funds, which were eventually transferred to the original hackers in Egypt.[167] The multinational investigation into this crime, dubbed Operation Phish Phry, resulted in charges against 53 defendants in the U.S. (Figure 31). Most were

Figure 31

**OPERATION PHISH PHRY**

**STEP 1**
Egyptian hackers gain financial information through sending phishing emails that mimic actual bank emails.

**STEP 2**
California-based ringleaders recruit runners to create fraudulent bank accounts.

**STEP 3**
Runners in California, Nevada, and North Carolina set up fraudulent accounts.

**STEP 4**
After communicating via email and chatrooms, Egyptian hackers transfer funds from compromised accounts to fraudulent accounts.

**STEP 5**
Runners withdraw money from fraudulent accounts and transfer a percentage of stolen funds back to Egyptian hackers.

*57*

AOL-DEF-00002535

269

arrested and prosecuted in Southern California. Authorities in Egypt also charged 47 defendants linked to the scheme.[168]

 In *U.S. v. Drinkman* (D.N.J. 2013), one of the largest hacking and data breach cases ever, a confederacy of Eastern European criminals harvested over 160 million credit card numbers by attacking numerous companies around the world, including national retailer Wet Seal, Inc., which is headquartered in California.[169] Unique malware placed within the targeted payment networks allowed the organization to capture payment card credentials and other information in real time as the information moved through the network.[170]  The organization then sold the credentials on the black market (priced at $10 for American credit card numbers and $50 for European numbers) and the information was eventually used to make counterfeit payment cards.[171]  Losses from the scheme totaled in the hundreds of millions of dollars.[172]

 In 2009, members of the Armenian Power transnational criminal organization caused more than $2 million in losses when they installed skimming devices at several 99¢ Only Stores in Southern California, and then used the skimmed information to create counterfeit credit and debit cards.[173]

 In the largest Medicare fraud scheme ever committed by a single enterprise and criminally prosecuted by the U.S. Department of Justice, an Armenian-American transnational criminal organization, the Mirzoyan-Terdjanian Organization, used fraudulent Medicare billings to steal more than $163 million.[174]  After stealing the identities of real doctors, the organization set up phony clinics and applied to become Medicare providers. Once approved, the clinics used stolen information from beneficiaries from around the country to bill Medicare for services never provided. Although Medicare was able to identify and shut down many of the fake clinics, they were promptly replaced by new ones, often in another state.[175] In all, at least 118 bogus clinics were opened in 25 states.[176]  Many of the 73 defendants eventually prosecuted operated out of the Los Angeles area.[177]

As these cases suggest, transnational criminal organizations are leading efforts in California to target information systems and networks to steal identification credentials that can be converted into money. One of the largest global surveys on data breaches has found that in 2012 organized criminal groups were responsible for at least 55 percent of all incidents of unauthorized access to confidential information of a business or government entity by an external actor.[178]  Many of these criminal groups were transnational criminal organizations operating out of Eastern Europe that targeted businesses and governments in the U.S. and Western Europe.[179]

58

AOL-DEF-00002536

270

## Transnational Criminal Organizations Are Uniquely Positioned To Exploit High-Tech Criminal Opportunities

Like drug trafficking, high-tech crimes tend to be highly profitable – in many cases even more so than trafficking. For example, DVDs containing pirated software can be produced for just $0.50, but sold for more than $50.[180]  Credit card information linked to personal information about the owner can be obtained for as little as $10 and then exploited to reap hundreds or even thousands of dollars' worth of goods.

Yet, unlike drug trafficking, the risks to criminal organizations of much of this activity are comparatively low.[181]  High-tech crimes are often extremely difficult to detect. And even if prosecuted, offenders are likely to receive penalties that are lower by comparison to violent crimes and drug trafficking.[182]

Transnational criminal organizations are uniquely able to exploit the opportunities presented by the high-tech criminal frontier. Their ability to structure criminal activity transnationally in many cases makes them virtually immune from arrest or prosecution due to formidable obstacles that law enforcement often encounters when trying to track perpetrators from one country into a foreign jurisdiction.

Transnational criminal organizations also have greater access to the expertise, specialization, and coordination required to successfully pull off most high-tech crimes.[183]  And while in the past criminal cross-border cooperation was cumbersome, expensive, and vulnerable to law enforcement, the Internet and other advances in high-speed international communication have dramatically reduced these "transaction costs."  Now, far-flung criminal network operatives can exploit new criminal opportunities from their desktops without even having to leave their homes – let alone their home countries.[184]

### Outsourcing of Specialized Services Is Making the Technology of Cybercrime More Accessible

In the past, a criminal organization entering the cybercrime arena may have needed to possess a fairly high level of computer hacking skills. But increasingly the specialization needed to launch high-tech criminal attacks is being achieved by outsourcing – specifically, by purchasing highly specialized services online from the "dark market." Clandestine websites offer virtually any service needed to perpetrate high-tech crime. Pay-per-install services, for example, take malware and disseminate it by infecting computer and Internet systems for a price as low as $100 per 1,000 downloads. (See Figure 32.) Transnational criminal organizations are turning to this market with increasing frequency precisely because of the diversity of specialized and competitively-priced services offered. Buyers can even comparison shop to get the best price.[185]

59

AOL-DEF-00002537

271

Figure 32
Price List for Services Available on the "Dark Market"

| Offering | Price |
|---|---|
| Malware installation (pay-per-install) (targeting U.S.-based computers) | $100–150 (per 1,000 downloads) |
| Distributed Denial-of-Service (DDoS) Attack (1-hour) (1-week) | $10 $150 |
| Cheap e-mail spamming service | $10 (per 1 million e-mails) |
| ZeuS Botnet builder kit | $100 |
| Purchase of botnet capable of launching DDoS attack | $700 |
| Hacking Email (gmail.com account) (corporate email account) | $85–130 $500 |

Source: Max Goncharov, *Russian Underground 101*, Trend Micro Incorporated (2012)

This dark market offers hacking services that are not only highly specialized but that can even be customized to the particular target of the criminal enterprise. This customization promotes accessibility – particularly for non-specialists – and is enabling "a much wider range of people to become [high-tech crime] offenders, not just those with a special gift for computing."[186] In response to demand for these services, providers are offering ever more sophisticated products. For example:

*   Whether the service offered is a "distributed denial-of-service" attack, spamming, or pay-per-install, multiple options exist on the dark market for tailoring the service to the attacker's specific needs. For example, a distributed denial-of-service attack, in which a computer is used to attack a website by sending overwhelming data requests, is not only available for purchase, but can be tailored to persist as long as one month and as short as one hour.[187]

60

AOL-DEF-00002538

272

- Malware, botnets, and other products are increasingly being packaged with "a high degree of after-sales service."[188] The creator of the Citadel botnet, for example, uses a "customer relationship management" tool to communicate with "customers" who purchased a botnet "builder kit" about "updates to Citadel code, support with technical problems, and best practices in deploying, running, and defending their Citadel botnets."[189] According to Microsoft, the Citadel creator is "swift to add new features and fix bugs and has released multiple versions on a fast schedule to provide the Citadel botnet operators with the latest updates."[190] In addition, the Citadel creator collaborates with customers, inviting them to suggest new features and vote on which features should be implemented.[191]

Figure 33
Citadel Botnet Case



Source: Complaint, *Microsoft Corp. v. John Does 1–82*, No. 3:13-cv-319 (W.D.N.C. May 29, 2013)

61

AOL-DEF-00002539

273

## Not Just About the Money

Although most transnational organized cyber attacks are motivated by money, some appear to be triggered by malice or political ideology instead. While this small category of actors lacks the greed for money generally associated with transnational criminal organizations, these groups do share one important commonality: they operate transnationally to commit crimes and cause millions of dollars in damages.

"Anonymous," "Internet Feds," and "LulzSec" are some of the groups that have displayed such multifaceted motives. Beginning in late 2010, members of Anonymous targeted the websites of Visa, MasterCard, and PayPal in retaliation for those companies' refusal to process donations to Wikileaks. By bombarding them with distributed denial-of-service attacks, Anonymous was able to crash the companies' websites. In similar fashion, Anonymous temporarily brought down websites used by the Algerian and Tunisian governments.

In the first half of 2011, the groups Internet Feds and LulzSec went on a global cyber rampage by hacking into the computer systems of Fox Broadcasting Company, Nintendo, the U.S. Senate, PBS, Sony, and the publisher of the Chicago Tribune and the Los Angeles Times, among many others. In addition to stealing confidential information from the compromised servers, the attackers defaced websites and inserted a fake news article on the website of PBS's News Hour.

The attack on PBS was allegedly in retaliation for what was perceived as unfavorable news coverage about Wikileaks. According to a court document revealed during the 2012 prosecution of the groups' key members in the Central District of California, LulzSec's overall goal was to see the "raw, uninterrupted, chaotic thrill of entertainment and anarchy" and to provide stolen personal information "so that equally evil people can entertain us with what they do with it."

These groups are not the only ones whose motives extend beyond money. Others include anti-American hacker groups apparently originating from the Middle East. In September 2012, the "Izz ad-Din al-Qassam Cyber Fighters" launched a series of denial-of-service attacks against the websites of several major U.S. banks, allegedly out of indignation at an anti-Islam online video mocking the Prophet Muhammad. And in early 2013 the "Syrian Electronic Army" compromised the *New York Times* website and the Twitter feed of the Associated Press, among others, again apparently out of political motives.

Sources: U.S. Attorney's Office, Southern District of New York, *Six Hackers in the United States and Abroad Charged for Crimes Affecting Over One Million Victims,* news release (Mar. 6, 2012); Indictment at pp. 3-15, *United States v. Mosegue,* No. 1:11-cr-00666 (S.D.N.Y. Aug. 15, 2011); U.S. Attorney's Office, Central District of California, *Second Member of Hacking Group Sentenced to More Than a Year in Prison for Stealing Customer Information from Sony Pictures Computers,* news release (Aug. 8, 2013); Nicole Perlroth, *Attacks on 6 Banks Frustrate Consumers,* New York Times (Sept. 30, 2012).

62

AOL-DEF-00002540

274

Emerging High-Tech Crime Trends

Fraud in the Online Marketplace

The shift toward selling and buying goods online is one of the most significant transformations ushered in by the Internet. It would not be possible if consumers did not trust that goods they purchased online would be reliably delivered days later. But the same trust that helps fuel online commerce is also ripe for exploitation. One industry estimate in 2009 suggested that various online scams swindled more than $2 billion from U.S. companies and citizens.[192]

Criminals may trick a buyer into thinking he is part of a legitimate transaction. Once the buyer has made a payment – often for a high-value item, such as a car – the goods are never delivered.[193] To enhance the con, the criminals may make it appear as if a "third-party" agent is receiving the payment. These agents sometimes even maintain websites with online delivery tracking systems.[194]

A related type of fraud dupes victims into thinking they can acquire a large sum of money by paying a small amount in advance. Many Americans know this type of fraud from having received an unsolicited e-mail from a well-connected person who attempts to enlist them in a plot to smuggle millions of dollars out of Nigeria.[195] The solicitor asks only that the victim pay a small amount – often for a bribe – to secure a percentage of the millions in loot. Other versions of this fraud trick people into believing they have won a lottery and promise delivery of the winnings once the victim has paid the requisite taxes, legal fees, or escrow fees.[196] While these "advance fee" schemes have existed for decades, the Internet and other technologies have helped expand their reach exponentially.[197]

Because it is estimated that only one percent of people or businesses need to be duped for the fraud to be profitable, botnets frequently determine whether such schemes succeed.[198] For example, because most people no longer open – let alone act on – the spam e-mail messages that underlie phishing attacks and mass-marketing fraud, the profitability of these strategies is heavily dependent on whether huge numbers of spam messages can be sent out in a short period of time.[199] By employing multitudes of computers to automatically send millions of such e-mails, botnets make these schemes viable.[200] In one mass-marketing fraud case, botnets were employed to distribute spam aimed at fraudulently driving up the prices of certain stocks. Once the stock prices rose, the chief organizer of the worldwide conspiracy sold the stocks at the artificially inflated prices, reaping approximately $2.8 million.[201]

Data from the Internet Crime Complaint Center confirms that mass-marketing fraud schemes continue to be both widespread and highly profitable. In 2012, for example, thousands of Americans reported being victims of online auto fraud, with direct losses

63

AOL-DEF-00002541

275

> ### Illegal Online Gambling
>
> Debuting in the mid-1990s, online gambling illustrates the way in which transnational criminal organizations have used the Internet and cross-border havens to transform traditional criminal activity.
>
> Last June, the U.S. Attorney for the Southern District of California offered details about one case, which appeared to employ a common model. The case involved a transnational criminal organization that ran a corporation named Macho Sports. Macho Sports operated several sports gambling websites hosted on servers primarily located outside the U.S. The corporation was initially registered in Panama and later moved to Peru in 2008, where it set up the physical platform for its online gambling activities. California-based customers connected to gambling accounts through Macho Sports websites to place bets, while teams of "bookies" and "runners" in the Los Angeles and San Diego areas were used by Macho Sports to recruit customers, pay off winning bets, and collect on losing bets – sometimes violently. The enterprise earned millions of dollars, which were then laundered through check-cashing businesses that took part of the cut.
>
> Sources: Jerome P. Bjelopera & Kristin M. Finklea, *Organized Crime: An Evolving Challenge for U.S. Law Enforcement*, Congressional Research Service (2012), p. 11; Indictment at pp. 2-6, *United States v. Pariacarrero et al.*, No. 3:13-cr-02196 (S.D. Cal. June 13, 2013); U.S. Attorney's Office, Southern District of California, *Members of International Sports Gambling Ring Charged with Racketeering and Extortion*, news release (June 19, 2013).

exceeding tens of millions of dollars.[202]  Online scams involving housing rentals, timeshares, and various limited-time investment "opportunities" are also common, causing millions of dollars in reported losses nationwide in 2012.[203]  According to the Internet Crime Report, the losses Californians suffer as a result of these crimes top by a large margin the losses reported in any other state.[204]

As with other types of cybercrime, fraudulent mass-marketing schemes are increasingly perpetuated by transnational criminal organizations.[205]  Transnational criminal organizations based in Romania, for example, have orchestrated two of the biggest cases involving fraudulent online sales. In both cases, the Romanian organizations advertised high-value items for sale online, using Internet auction sites popular with

64

276

Americans, such as eBay or Cars.com.[206] The organizations instructed the buyers
where to wire payments. "Arrows," U.S.-based accomplices recruited to retrieve those
payments, then transmitted the funds to Romania.[207] Both schemes netted millions
of dollars, with the gains in one topping $10 million.[208] Many "advance fee" fraud
scams have also been linked to West African transnational criminal organizations,[209]
whose loosely connected cells are located not only in Africa but around the world.[210]
And an Israel-based transnational criminal organization employed a lottery scam over
several years to defraud hundreds of U.S. victims, mostly elderly, out of approximately
$25 million.[211]

## Counterfeit Goods and Pharmaceuticals

Online commerce not only makes it easier for consumers to shop and purchase goods,
but has also obviated the need for sellers targeting the U.S. market to be located in the
U.S. This, in turn, has created a significant regulatory hole, as government regulators
can no longer effectively regulate what consumers purchase simply by targeting the
U.S.-based entities that directly sell to consumers. Because of this regulatory hole,
myriad illicit markets have been able to emerge and thrive alongside online markets
for legitimate goods and services. Growth in the market for counterfeit goods and
pharmaceuticals has exploded as the Internet has helped link price-conscious consumers
in the U.S. with manufacturers in Asia that can produce increasingly sophisticated
goods at low cost. Other markets experiencing Internet-related growth involve illegal
drugs and child pornography. By directly linking suppliers to vast numbers of consumers
worldwide, online illicit markets help increase the profitability – and, therefore, the
growth – of criminal activity.

The new marketplace for counterfeit goods is dominated by transnational criminal
organizations. According to the United Nations Interregional Crime and Justice
Research Institute (UNICRI), "[c]ounterfeiting and piracy have long presented a tempting
target market for organized criminals." But especially in recent years, UNICRI notes,
transnational criminal organizations have moved "deliberately and in great numbers" to
grab control of supply chains and consolidate power over these rapidly growing black
markets.[212] For example, Italian transnational criminal organizations like the Neapolitan
Camorra have long played a major role in the production and distribution of counterfeit
luxury goods. With the massive growth of Chinese manufacturing, Italian transnational
criminal organizations are adapting by increasingly partnering with Chinese criminal
enterprises.[213] Pursuant to these partnerships, the Chinese enterprises manufacture the
products, while the Camorra sells and distributes them.[214]

Because the success of an Internet-based business model depends on attracting
sufficient numbers of customers to the counterfeiters' websites, counterfeiters may
outsource their advertising work to specialized transnational criminal organization that
deploy botnets. These botnets help counterfeiters reach millions through spam e-mail

65

AOL-DEF-00002543

277

and the sophisticated manipulation of search engine results.[215]  The success of these Internet-enabled counterfeiting networks has significant consequences. In the global pharmaceutical market, for example, sales for legitimate businesses that play by the rules decline, reducing incentives for expensive investments into potentially life-saving drugs.  In addition, since counterfeiters may dilute or misrepresent the active ingredients in counterfeit pharmaceuticals, recipients may not get the treatment they need, imperiling their health.[216]

### Digital Piracy

Today, the Internet provides virtually unfettered access to a range of intellectual property content. However, the creators of this content are also arguably more vulnerable than ever to having their works stolen and distributed without their consent. According to a recent study by the British brand-protection firm NetNames, the amount of Internet traffic used for copyright infringement in North America, Europe, and the Asia Pacific has grown nearly 160 percent from 2010 to 2012 and now accounts for 24 percent of total Internet traffic.[217]  In 2011, it was estimated that more than 17 percent of Internet traffic in the U.S. was infringing.[218]  While new digital services for the authorized dissemination of music, film, television, and software have proliferated,[219] services facilitating illicit distribution continue to evolve and thrive. Such services include cyber lockers, peer-to-peer networks, BitTorrent, streaming websites, and literally hundreds of mobile applications.[220]  Another major source of pirated content are China-based enterprises that produce and ship pirated DVDs with packaging that is often "shockingly sophisticated and nearly indistinguishable from legitimate product."[221]  These developments, in turn, have fostered astonishing growth in the global market for pirated digital content.  For example, in 2011, the global commercial value of pirated software is estimated to have reached $63.4 billion, more than double what it was in 2003.[222]

Contrary to the myth that illicit distribution services are only interested in helping to propagate content, these services are in fact primarily profit-driven. One business model offers paid subscriptions for the pirated content. Another model offers the content free, but profits by inducing consumers to click online ads. In either case, as consumers use these piracy services to view content or download software, they siphon revenues away from content creators and into the pockets of criminals. Given the importance of the music, television, and film industries in California, the economic damage within the state of such Internet-enabled digital piracy is disproportionately severe. While estimates of exact losses vary greatly, there is little doubt that over the years digital piracy has robbed creative industries based in California of hundreds of millions of dollars in revenue and jobs.

In addition to depriving intellectual property creators of their earnings, a further threat posed by the marketplace for digital piracy is the distribution of malware. More and

66

AOL-DEF-00002544

278



**La Familia Michoacána Branches Into Counterfeit Software**

One of the most alarming developments in piracy has been the entrance of some of Mexico's most dangerous transnational criminal organizations into the piracy market.

In March 2009, Mexican law enforcement cracked down on a counterfeit software ring run by La Familia Michoacána out of the Mexican state of Michoacán. The ring was producing counterfeit versions of software such as Microsoft Office and Xbox video games, complete with "FMM" stamps (for "Familia Morelia Michoacána") on the disks. The New York Times reported that La Familia was distributing the software "through thousands of kiosks, markets and stores in the region and demand[ing] that sales workers meet weekly quotas." Through sophisticated distribution networks such as this, it was estimated by the Mexican Attorney General that La Familia was potentially earning more than $2 million per day. How this figure has changed since 2009 is unknown.

Like La Familia, Los Zetas are widely reported to have counterfeiting operations within many Mexican states. The Zetas imprint their unique stamp – either a "Z" or a bucking bronco – on counterfeit CDs and DVDs they help produce and distribute.

Sources: Ashlee Vance, Chasing Pirates: Inside Microsoft's War Room, New York Times (Nov. 6, 2010); Francisco Gomez, Pirateria, el Otro Frente del Narco El Universal (Mar. 1, 2009), http://www.eluniversal.com.mx/nacion/166099.html, accessed on Jan. 2, 2014; Patrick Manner, Drug Cartels Take Over Mexican Black Market, Fox News Latino (Aug. 22, 2012); Motion Picture Association of America.

67

AOL-DEF-00002545

279

more, pirated content – whether downloaded or on a physical disk – is "laced" with malware that, once installed on a computer, can steal information or otherwise compromise that system.[223]  According to McAfee, 12 percent of sites known to distribute pirated content "are actively distributing malware to users who download [the] content."  Moreover, some of these sites appear to "have associations with known cyber crime organizations."[224]

## Virtual Currencies Offer New Tools for Money Laundering

New Internet-reliant technologies threaten to revolutionize the way in which transnational criminal organizations finance their activities and launder their proceeds. Until now, these organizations have had to sacrifice speed and profit margins in order to transfer money securely and secretly. For example, to avoid the registration and reporting requirements of banks and other international money transmitters, transnational criminal organizations avoid digital bank transfers in favor of physically transporting cash in bulk and participating in complicated trade-based money laundering schemes. These schemes are not only slow and subject to law enforcement interdiction, but also involve multiple "fees" to compensate launderers for their efforts and risk-taking. However, the emergence of new technologies over the last few years hints at a future in which speed and profit margins no longer need to be sacrificed in exchange for security and secrecy.

One example of these new technologies is the pre-paid, open-system stored-value cards such as "Green Dot" cards. Prepaid open-system cards allow their holder to connect to global debit and automated teller machine (ATM) networks. These prepaid cards often do not require the cardholder to open a bank account or verify his or her identity.[225] This lack of an accountholder relationship, coupled with the fact that the cards are not subject to any cross-border reporting requirements,[226] can enable a cardholder to transfer an unlimited amount of money across the global payment system anonymously.[227]

Perhaps the most notorious new technology in transnational criminal organization finance is virtual currency, a category that includes e-Gold, Liberty Reserve, and Bitcoin, as well as currencies used in online games that can be bought and exchanged for dollars.[228] These currencies are "virtual" because they operate like currency within their designated ecosystems, but lack the legal tender status of real currencies in any jurisdiction.[229] Virtual currencies can be used to quickly and confidently move illicit proceeds from one country to another. And as long as the government is unable to link virtual currency accounts or addresses to their owners, the identities of those sending and receiving the proceeds are effectively shielded. According to the U.S. Secret Service, "[t]hese attributes make [virtual] currencies a preferred tool of transnational criminal organizations for conducting their criminal activities, transmitting their illicit revenue internationally, and laundering their profits."[230]  The following examples illustrate this trend.

68

AOL-DEF-00002546

280

### e-Gold

Founded in 1996, e-Gold was a pseudonymous digital currency that was originally backed with gold coins stored in a safe deposit box in Florida. To open an e-Gold account, a person needed no more than a valid e-mail address. Once the account was established and funded, the account holder "could gain access through the Internet and conduct anonymous transactions with other e-Gold account holders anywhere in the world."[231] As a result, e-Gold "quickly became the preferred financial transaction method of transnational cyber criminals – particularly those involved in the trafficking of stolen financial information and [personally identifiable information] of U.S. citizens – and a tool for money laundering by cyber criminals."[232] At its peak, e-Gold moved more than $6 million each day for more than 2.5 million accounts.[233] In 2007, the federal government shut down e-Gold. Its owners pleaded guilty to charges of money laundering and operating an unlicensed money transmitting business.[234]

### Liberty Reserve

Incorporated in Costa Rica in 2006, Liberty Reserve S.A. for years operated one of the world's most widely used virtual currencies. It provided what it described as "instant, real-time currency for international commerce," but it was allegedly designed to intentionally help criminals conduct illegal transactions and launder the proceeds of their crimes. In particular, it permitted users to conduct financial transactions under *multiple* layers of anonymity.[235]

According to federal prosecutors, Liberty Reserve was one of the principal means by which cyber criminals from around the world, including credit card thieves and computer hacking rings, laundered their illicit proceeds.[236] Liberty Reserve's website offered a "shopping cart interface" that "merchant" websites could use to accept Liberty Reserve currency as payment.[237] The "merchants" who accepted Liberty Reserve currency were overwhelmingly engaged in criminal activities. They included traffickers in stolen credit card data, computer hackers for hire, and underground drug-dealing websites.[238]

With an estimated one million users worldwide, and more than 200,000 in the United States, Liberty Reserve processed more than 12 million financial transactions annually, with a combined value of more than $1.4 billion.[239] From 2006 to May 2013, Liberty Reserve is believed to have laundered in excess of $6 billion in criminal proceeds.[240]

In May 2013, federal prosecutors in New York charged Liberty Reserve and its founders with operating an unlicensed money transmitting business, and conspiring to commit money laundering.[241] The principal founder, as well as two other defendants, are pending extradition.[242] Another defendant has entered a guilty plea and two others are at large. The site has been shuttered and effectively put out of business.

AOL-DEF-00002547

281

Bitcoin and Silk Road

Unlike most other virtual currencies, such as e-Gold and Liberty Reserve, Bitcoin is a *decentralized* digital-payments system. In other words, there is no centralized repository or administrator who serves to mediate transactions. Instead, all users install the open-source software on their computing devices, thereby creating a peer-to-peer network through which Bitcoin transactions are conducted and bitcoin "balances" are independently calculated. Significantly, Bitcoin transactions are possible from anywhere in the world there is an Internet connection. They are irreversible once conducted, and have few, if any, fees.

Figure 35
Screenshot of Illicit Drugs For Sale on Silk Road Website



Bitcoin was established in 2009 and its popularity has grown wildly in the past two years. While its use in legitimate commerce is growing, its use in criminal financial transactions was illustrated by its adoption as the exclusive payment mechanism for Silk Road. Often referred to as the "eBay for drugs," Silk Road was an anonymous online market that sold everything from marijuana to prescription drugs to weapons (Figure 35). According to the FBI, it was "the most sophisticated and extensive criminal marketplace on the Internet."[243] One FBI inventory found 13,000 listings for controlled substances, 159 offerings for "services" (including a tutorial on hacking ATMs), as well as hundreds of offerings of hacked accounts and counterfeit IDs.[244] Between February 2011 and July 2013, this "dark market" served more than 100,000 customers and facilitated approximately $1.2 billion worth of transactions.

70

AOL-DEF-00002548

282

## Catching Up With Bitcoin

Ever since Bitcoin's emergence in 2009, businesses, government regulators, and criminals have all wondered how best to characterize it. Is it money? A security? Or perhaps it is better understood as a commodity? The answer to this question has significant real-world implications, basically determining what regulations – including disclosure requirements – apply to the entities that use and transmit it.

Under guidance issued by the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN), the federal Bank Secrecy Act and its various registration, record-keeping, and reporting requirements can apply to businesses that transmit not only real currency, but also "other value that substitutes for currency," such as Bitcoin. FinCEN guidance from March and December 2013 further clarified the scope of this regulation, explaining that any entity that serves as a digital currency administrator or as an intermediary for digital currency transmission is a money transmitter. Consequently, such entities are subject to FinCEN regulations, including its anti-money laundering compliance protocols and state licensure. Reflecting the significance of these regulations, U.S.-based entities that have attempted to skirt them have been shut down. For example, in May 2013, federal authorities seized a U.S. subsidiary of a leading Japanese-based Bitcoin exchange service, Dwolla, on the ground that it was operating as an unlicensed money transmitter. Despite these actions, hearings held over the last few months by the U.S. Senate and New York's top financial regulator underscore that real concerns remain about the best way to address the money laundering threat posed by Bitcoin.

In California, special state laws that protect against money laundering also have a clear role to play in curbing misuse of Bitcoin. In fact, there is a strong argument that the California Money Transmission Act already applies to businesses that electronically exchange and transmit Bitcoin because Bitcoin is "a medium of exchange." What is certain is that, if transnational criminal organizations turn to Bitcoin to launder their illicit proceeds from the state, regulatory scrutiny will intensify.

Sources: 31 C.F.R. § 1010.100(ff); U.S. Department of the Treasury, Financial Crimes Enforcement Network, Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013); FIN-2013-G001; Seizure Warrant, In Matter of Seizure of One Dwolla Account Case, No. 13-1162 (D. Md. 2013).

71

AOL-DEF-00002549

283

In October 2013, the federal government shut down Silk Road, arrested the principal operator – a U.S. citizen living in the Bay Area – and charged him with narcotics trafficking, computer hacking, and money laundering, among other crimes.[245] Top sellers and significant users in other locations around the world were also arrested. Most recently, in January 2014, federal authorities arrested a co-founder and chief executive of one of the Internet's most popular bitcoin-dollar exchangers for conspiring to sell and launder over $1 million in bitcoins in connection with Silk Road drug purchases.[246] Nonetheless, attempts to resurrect Silk Road continue.

## Conclusion

As information systems and networks, consumer bank accounts, and digital content have all become vulnerable to high-tech exploitation, organized crime has evolved to seize new profit opportunities. In this new world, identification credentials and intellectual property have become the primary targets for illicit acquisition and distribution, criminals can purchase data and highly specialized skills from each other on the "dark market," and cutting-edge technologies enable transnational criminal organizations to evade detection and protect their illicit gains from law enforcement authorities in ways that are still not adequately understood.

72

AOL-DEF-00002550

284



Chapter Six

# Recommendations

## Trafficking

**Recommendation**

The Legislature should amend California law to target the leaders of
transnational criminal organizations operating in California.

California has no statutory authority that specifically targets or punishes supervisors,
managers or financers who conduct operations locally on behalf of transnational
criminal organizations. Currently, high-level prison or street gang members who super-
vise, manage, or finance their local gang associates in the distribution and retail sales
of drugs are treated as "co-conspirators" or "aiders and abettors" of their underlings
and foot soldiers. However, other states and the federal government have enacted laws
that increase the punishment and seize the working capital of the prison or street gang
leaders who work on behalf of drug trafficking organizations.

For example, Congress enacted the Continuing Criminal Enterprise Act (Criminal Enter-
prise Act)[247] in an effort to combat drug cartels by directly attacking their leadership.[248]
Under the Criminal Enterprise Act (21 U.S.C. §848), a director of an illegal criminal
organization may be sentenced to prison for not less than twenty years to life without
the possibility of parole.[249]  In addition to lengthy incarceration, the Criminal Enterprise
Act authorizes the seizure of the director or manager's ill-gotten monetary gains,[250] thus
depriving the criminal organization of its working capital. And in statehouses, Maryland
and New Jersey passed laws similar to the Criminal Enterprise Act to increase the crimi-
nal liability of large-scale narcotics operators beyond that of their "employees."[251]

To more effectively combat transnational criminal organizations and their criminal gang
associates, the California Legislature should broaden existing law to increase criminal
penalties for organizers, supervisors, managers or financers of criminal enterprises. This
could be accomplished by amending current law to include a Criminal Enterprise Act
and to increase potential sentences and fines.  By doing so, law enforcement can more
effectively target the "shot-callers" of these criminal organizations and destabilize their
operations.

*73*

AOL-DEF-00002551

285

### Recommendation

Federal, state, and local law enforcement should use California's State Threat Assessment System as a central hub for sharing information about transnational crime.

California lacks a unified system for collecting, analyzing, and disseminating information about transnational organized crime. Police departments and task forces regularly maintain data related to the activities of known organized crime figures, but such data is rarely shared outside that immediate county or affected region. California's State Threat Assessment System (STAS) is uniquely positioned to act as the central hub for California's transnational crime information-sharing needs. The STAS already provides critical tactical and strategic intelligence about trends and emerging patterns relating to criminal activity statewide and ensures first responders and policymakers are provided with timely, accurate, and relevant situation awareness about transnational criminal tactics and techniques. In coordination with the Attorney General's Office, California's tribal, local, state, and federal law enforcement agencies should partner with the STAS to develop a platform to share information about transnational criminal organizations across the state.

### Recommendation

Federal, state, and local authorities should establish a unified maritime task force and associated radar network to counter maritime smuggling operations along California's coastline.

Various local, state, and federal law enforcement agencies coordinate their activities to interdict maritime smuggling operations along California's coast. These partnerships are often regional in nature and are typically established on an as-needed basis. California needs a new multi-jurisdictional Maritime Task Force – that leverages expertise at the federal, state and local levels – to combat the threat along its coastline, especially from *panga* vessel smuggling, and to coordinate strategy between affected counties. In addition to the creation of the Maritime Task Force, California should work with federal agencies to implement a network of high-intensity radar stations, sonar buoys, or other appropriate and effective technologies strategically located along the coast, like the large radar receiver recently placed at Carlsbad's Ponto Beach by federal officials, to better detect maritime threats and coordinate law enforcement responses.

74

286

## Recommendation

The Legislature and Governor should fund five additional Special Operations Units across California.

Transnational crime involves an increasingly decentralized array of international and domestic criminal actors conducting a range of trafficking, financial, and high-tech crimes. The sophisticated nature of these groups and their criminal activities requires an equally sophisticated and coordinated law enforcement response.

The multi-million dollar budget cuts in 2011 to the California Department of Justice's Bureau of Narcotics Enforcement resulted in cutbacks to numerous task forces and special operations units ("SOUs") across the state focused on drug-trafficking organizations and violent gangs. Despite these cuts, the one remaining SOU, operating out of Fresno, has been successful in combatting cartel and gang activity in the Central Valley. For example, in June 2011, the Fresno SOU completed a six-month investigation involving high ranking members of the Nuestra Familia prison gang and various Norteño street gangs that were selling cartel-supplied drugs in Merced and Madera counties.[252] The investigation led to the arrest of 101 suspects and the seizure of 27 weapons and $6.6 million in U.S. currency. Building off this crackdown, the Fresno unit opened 23 additional investigations and closed 14 of them in 2012 and 2013. During these investigations, agents debriefed informants and cooperators and learned that Nuestra Familia was working with Mexican drug cartels, including La Familia Michoacana and the New Milenio Cartel (an off-shoot of Sinaloa), to distribute drugs in the Central Valley, provide protection on the street and in prison, and even commit fire bombings and murders.[253]

Given the success of the Fresno SOU, California would benefit greatly from adding a SOU in each of the Division of Law Enforcement's regional offices in Sacramento, San Francisco, Riverside, Los Angeles, and San Diego. With a relatively modest total budget of $7.5 million, these five new teams would help local and federal authorities build cases against the most dangerous transnational criminal organizations operating in California.

## Recommendation

The federal government should continue providing critical funding to support state and local law enforcement agencies in investigating and dismantling trafficking organizations.

In California, methamphetamine trafficking has reached staggering levels. The overwhelming majority of the foreign supply of methamphetamine flows through California's port-of-entry border in San Diego. Amongst the U.S. states that share a border with Mexico, methamphetamine seizures in California dwarf the seizures of our sister states by a factor of five.

75

287

Based on the advocacy of the California Attorney General's Office and other state and national law enforcement leaders, Congress appropriated $7.5 million in January 2014 for state law enforcement grants to be administered by the U.S. Department of Justice's Community Oriented Policing Services (COPS) Office to target methamphetamine production and trafficking. These funds will help state law enforcement agencies directly combat one of the most lucrative and dangerous activities perpetrated today by transnational criminal organizations. In California, which suffers disproportionately from foreign- and domestic-refined methamphetamine trafficking by drug cartels, grant funds will support close collaboration between the California Department of Justice's Division of Law Enforcement and local agencies in investigating and dismantling the organizations behind the methamphetamine epidemic in the hardest-hit and underserved communities. But, sustained funding is crucial to law enforcement's ability to make a lasting impact against methamphetamine trafficking. Congress is preparing to consider appropriations for Fiscal Year 2015, and it should continue to fund at or above current levels the resources for this critical federal methamphetamine grant program.

Of equal importance is the restoration of federal funds for other task forces focused on combatting transnational criminal organizations. For several years, federal funding through the Byrne Justice Assistance Grant Program ("Byrne JAG") has enabled the California Department of Justice to lead task forces across the state composed of federal, state, and local law enforcement. In California, the Board of State and Community Corrections administers the distribution of Byrne JAG funding. For California's 2013-2014 Fiscal Year, the Board awarded the Department of Justice $2.1 million, which helped support 17 joint state-local task forces. However, this represents a 46 percent reduction from the $3.9 million in funding awarded to the Department of Justice in Fiscal Year 2009-2010. Because of the critical role played by these highly trained joint state-local task forces in responding to drug trafficking activities, the Board should fully restore funding for these task forces at their 2009-2010 level.

### Recommendation

Federal, state, and local law enforcement agencies should increase operational coordination in combatting transnational criminal organizations.

Given the international scope of trafficking networks, local, state and federal law enforcement agencies in California must coordinate to combat major transnational criminal organizations such as the Sinaloa cartel. This coordination should be focused on operations and capacity building.

Operational coordination allows law enforcement agencies to better utilize limited resources and leverage prosecutorial authority under state and federal law. Potential

76

AOL-DEF-00002554

288

projects could include: (1) improvements to intelligence exchange and information shar-
ing involving state task forces and federally-sponsored HIDTA teams; (2) partnerships
between state law enforcement officials and the National Park Service and U.S. Forest
Service to combat marijuana cultivation on public land; and (3) coordination between
state and federal public health and corrections officials to reduce demand for drugs traf-
ficked by transnational criminal organizations.

In addition to operational coordination, capacity building is essential to ensure that
expertise is developed to combat transnational criminal organizations. Thus, state
officials should support existing federal government programs designed to enhance
Mexico's capacity to combat transnational crime. The foundation for this cooperation
was laid in August 2013 with the signing of a Memorandum of Understanding between
the California Department of Justice and the U.S. Department of State's Bureau of Interna-
tional Narcotics and Law Enforcement Affairs. This agreement provides the framework for
cooperation between California and the State Department on training and advising foreign
legal personnel, and on assisting judicial reform and police training initiatives in other countries.

## High-Tech Crime

### Recommendation

**State and local authorities should develop public-private partnerships to
leverage technology against transnational crime.**

Because it is so often targeted by transnational criminal schemes, the private sector
is usually the best source of information about high-tech threats. Additionally, in the
realm of technology, the private sector is often in a better position than government to
develop tools and techniques to combat criminal activity, especially new and emerg-
ing schemes used by transnational criminal organizations. Law enforcement should find
ways to take advantage of the resources available in the private sector to develop new
and innovative ways of countering ever-changing criminal threats and tactics.

### Recommendation

**Business should adopt industry best practices designed to protect against cybercrime.**

Lax cybersecurity practices, or the lack of any protections whatsoever, allow far too
many breaches of computer networks and databases to happen in California, result-
ing in billions of dollars in economic losses. To help guide businesses and other entities
throughout the state, the California Department of Justice earlier this year released *Cyberse-
curity in the Golden State* (http://oag.ca.gov/cybersecurity), a report exploring the serious
cyber-threats facing business and offering them practical guidance on how to minimize cyber

*77*

AOL-DEF-00002555

289

vulnerabilities. All entities, public and private, doing business in California should assume they are a target and consider and adopt the industry best practices identified in that report.

## Money Laundering

**Recommendation**

The Legislature should amend California law to enable prosecutors to temporarily freeze the assets of transnational criminal organizations and their gang associates before the filing of an indictment.

There is currently no provision in California law for the seizure of criminal proceeds and assets to prevent their dissipation prior to the filing of a criminal case or, in drug cases, prior to the filing of a civil asset forfeiture petition.[254] California law should be modified to allow for pre-indictment freezing of a transnational criminal organization's illicit proceeds or property to prevent their dissipation or disbursement. The ease with which money laundered in California is returned to Mexico via electronic or physical transportation often outpaces the ability of prosecutors to commence criminal proceedings to freeze transnational criminal organization assets.

Unlike California law, federal law authorizes a pre-indictment seizure of assets and property with or without prior notice.[255] The prosecution can request a temporary restraining order without notice if it can establish probable cause that, upon conviction, the property will be subject to forfeiture, and that notice will jeopardize the availability of the property for future forfeiture.[256] Alternatively, a federal prosecutor can request a noticed hearing where he or she must demonstrate that there is a substantial probability that the government will prevail on the issue of forfeiture, failure to allow seizure will result in the property being destroyed or removed from the jurisdiction, and the need to preserve the seized property outweighs the hardship on the opposing party.[257]

California prosecutors should be given equal authority to preserve assets and property prior to filing criminal cases. This could be accomplished by amending existing law by expanding the class of transnational "profiteering" activities subject to seizure. Preservation of such assets would, for example, assist in the recovery of the costs of disposing of toxic waste from, and cleaning up of sites damaged by, clandestine methamphetamine conversion labs. Lacking this authority, a transnational criminal organization's assets can quickly be removed from California prior to the commencement of formal legal proceedings.

*78*

AOL-DEF-00002556

290

## Recommendation

The Legislature should strengthen California's prohibition against financial transaction "structuring."

Federal law requires financial institutions to report to financial regulators all currency transactions over $10,000, as well as multiple currency transactions that aggregate over $10,000 in a single day.[258] Federal law makes it a crime to break up or "structure" financial transactions into amounts smaller than $10,000 for the purpose of avoiding the mandatory reporting requirements.[259] Federal law does not require that the structured transactions be intended to hide the fact that money came from criminal activities or to facilitate criminal activities.[260] The mere structuring of financial deposits, coupled with notice of the reporting requirements, is sufficient to charge a money launderer with a federal financial crime.

By contrast, California's laws require state prosecutors to prove a money launderer *intentionally* structured a financial transaction to disguise that the proceeds were derived from a criminal activity or, alternatively, were structured to promote or further criminal activity.[261] Requiring a prosecutor to establish a defendant's subjective intent in a structuring case enables transnational criminal organizations to conduct unmonitored transactions and launder their money with a reduced risk of state criminal liability.

California's anti-structuring statute should be amended so that breaking up financial transactions into smaller amounts for the purpose of avoiding the reporting requirements is, in and of itself, a criminal act.

## Recommendation

California prosecutors need advanced training to combat sophisticated transnational money laundering schemes.

Significant budget reductions have curtailed the investigatory and prosecutorial capacities of law enforcement agencies to combat transnational crime. Meanwhile, transnational criminal organizations have employed increasingly sophisticated schemes to launder their illicit profits. These emerging schemes require prosecutors to dissect complex international trade transactions and finance mechanisms in order to demonstrate criminal liability and successfully dismantle criminal organizations and syndicates.

The Department of Justice should leverage existing resources and partnerships to provide advanced training and technical assistance to prosecutors investigating complex money laundering schemes. Such training will expand the pool of trained and experi-

AOL-DEF-00002557

291

enced prosecutors in the fight against organized crime in California and enhance our ability to disrupt this criminal activity.

**Recommendation**

State authorities should partner with their Mexican counterparts to share intelligence and disrupt the illicit flow of money across the border.

Emerging money laundering strategies by Mexico-based transnational criminal organizations include the use of non-bank financial institutions such as money transmitters to deposit and transfer illicit funds into the financial system. Unregistered money transmitting businesses, which mask that they are in the business of transferring funds through the international financial system, present a challenge for tracking and prosecuting money laundering transactions.[262] For example, financial crime investigators have observed individuals who claim to be agents or employees of licensed money services businesses operating along the California-Mexico border entering California from Mexico with satchels full of bulk cash.[263] The investigators need to have available to them in real time an up-to-date database of registered agents and employees of California-licensed money service businesses and would benefit from having similar information available from money services businesses operating in Mexico.[264]

Bilateral anti-money laundering initiatives are underway in the U.S. and Mexico. For example, in October 2013, the Financial Crimes Enforcement Network (FinCEN) reached an agreement with Mexico's National Banking and Securities Commission to share information related to their respective responsibilities on fighting money laundering.[265] Reportedly, this marks the first time that FinCEN has entered a relationship with a regulator outside the U.S. to share information.[266]

Given California's pivotal role in cross-border transnational money laundering activities involving Mexico, California financial regulators and law enforcement officials should similarly partner with Mexico's Banking and Securities Commission to share intelligence in a timely manner about the methods, modus operandi, and trends and routes used by criminal organizations operating between California and Mexico and cross-border currency flows. California and Mexico should incorporate the latest technology to collect, analyze, and disseminate critical financial intelligence, including cross-border wire transactions.[267]

80

AOL-DEF-00002558

292



# Endnotes

### Introduction

[1] Andre Standing, *Transnational Organized Crime and the Palermo Convention: A Reality Check* (December 2010), International Peace Institute, p. 2.

[2] U.S. Department of Justice, *National Drug Intelligence Center, The Economic Impact of Illicit Drug Use on American Society*, 2011 (Apr. 2011), p. ix, 2011-Q0317-002, *http://www.justice.gov/archive/ndic/pubs44/44731/44731p.pdf*.

### Chapter 1

[3] National Security Council, *Strategy to Combat Transnational Organized Crime: Definition*, *http://www.whitehouse.gov/administration/eop/nsc/transnational-crime/definition*, accessed on Feb. 5, 2014.

[4] *Id.*

[5] United Nations Office on Drugs and Crime, *Digest of Organized Crime Cases* (2012), p. 13.

[6] United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* (2010), p. 3.

[7] U.S. Department of Justice, Drug Enforcement Administration, *National Drug Threat Assessment 2013* (May 2013), p. v.

[8] Bruce Bagley, *Drug Trafficking and Organized Crime in the Americas: Major Trends in the Twenty-First Century* (Aug. 2012), Woodrow Wilson International Center for Scholars, Latin American Program, p. 8.

[9] *Id.*; Federal Research Division, Library of Congress, *Organized Crime And Terrorist Activity in Mexico, 1999-2002* (Feb. 2003), p. 3, *http://www.loc.gov/rr/frd/pdf-files/OrgCrime_Mexico.pdf*.

[10] June S. Beittel, *Mexico's Drug Trafficking Organizations: Source and Scope of the Violence*, Congressional Research Service (Apr. 15, 2013), pp. 11-12.

[11] *Id.* at p. 3; Scott Stewart, *The Real 'El Chapo'*, Stratfor: Global Intelligence (Nov. 1, 2012), *http://www.stratfor.com/weekly/real-el-chapo*.

[12] *Id.* at p. 11; Samuel Logan, *Tracking the Sinaloa Federation's International Presence*, InSight Crime (Apr. 30, 2013), *http://www.insightcrime.org/news-analysis/tracking-the-sinaloa-federations-international-presence#ft30*.

[13] Interview with Santa Clara County Sheriff's Office Gang Expert (Oct. 22, 2013).

81

AOL-DEF-00002559

293

14  *Id.*

15  Hans Johnson & Marisol Cuellar Mejia, *Immigrants in California* (May 2013),
    *http://ppic.org/main/publication_show.asp?i=258*, accessed on February 7,
    2014.

16  California Department of Justice, Division of Law Enforcement, Bureau of
    Investigation, *Organized Crime in California 2010 Report*, pp. 31-34; James
    Finchenauer, *Russian Organized Crime in the United States*, National Institute of
    Justice, *http://www.ncjrs.gov/pdffiles1/nij/218560.pdf*.

17  California Department of Justice, Division of Law Enforcement, Bureau of
    Investigation, *Organized Crime in California 2010 Report*, pp. 14-15.

18  United Nations Office on Drugs and Crime, *Transnational Organized Crime in
    Central America and the Caribbean: A Threat Assessment* (Sept. 2012), p. 27,
    *http://www.unodc.org/documents/data-and-analysis/Studies/TOC_Central_
    America_and_the_Caribbean_english.pdf*.

19  *Id.* at p. 28.

Chapter 2

20  U.S. Department of Justice, National Drug Intelligence Center, *Situation Report: Cities
    Where Mexican Drug Trafficking Organizations Operate Within the United States* (April
    2010), pp. 5-6, *http://info.publicintelligence.net/NDIC-Cartels-in-US-Cities.pdf*.

21  California Department of Justice, *The State of Human Trafficking in California* (Nov.
    2012), p. 3, *https://oag.ca.gov/sites/all/files/pdfs/ht/human-trafficking-2012.pdf*;
    Coalition to Abolish Slavery and Trafficking, *A Serious Problem - Around the World
    and in the USA*, *http://castla.org/key-stat*, accessed on Feb. 6, 2014.

22  The White House, Office of National Drug Control Policy, State Profile, *California
    Drug Control Update* (Jan. 15, 2012), *http://www.whitehouse.gov/sites/default/
    files/docs/state_profile_-_california_0.pdf*, accessed on Feb. 6, 2014.

23  U.S. Department of Justice, Drug Enforcement Administration, *National Drug Threat
    Assessment Summary* (2013), p. 11.

24  *Office of the Attorney General, Attorney General Kamala D. Harris: DOJ Takes
    Down $2 Million Drug Operation in Sacramento County* (June 20, 2013),
    *https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-doj-
    takes-down-2-million-drug-operation*.

25  U.S. Department of Justice, National Drug Intelligence Center, *National Drug Threat
    Assessment 2011* (Aug. 2011), p. 30; Tim McGirk, *Mexican Drug Cartels Set Up
    Shop in California Parks*, Time Magazine (Aug. 22, 2009), *http://content.time.
    com/time/nation/article/0,8599,1917547,00.html*; National Drug Intelligence
    Center, *Marijuana and Methamphetamine Trafficking on Federal Lands Threat Assess-
    ment* (Feb. 2005), *http://www.justice.gov/archive/ndic/pubs10/10402/marijuan.
    htm*, accessed on Feb. 6, 2014.

82

294

26  U.S. Department of Justice, Central Valley California High Intensity Drug Trafficking Area, *Marijuana Production in California* (June 4, 2010), p. 4, *http://www. slocounty.ca.gov/Assets/DAS/DAAB/Marijuana_Production_in_California.pdf*, accessed on Aug. 5, 2013; Jerome Adamstein, *Environmental impact of marijuana-growing in California*, L.A. Times (Dec. 22, 2012), *http://framework.latimes. com/2012/12/22/environmental-impact-of-marijuana-growing-california/#/0*.

27  Tim McGirk, *Mexican Drug Cartels Set Up Shop in California Parks*, Time Magazine (Aug. 22, 2009), *http://content.time.com/time/nation/article/ 0,8599,1917547,00.html*.

28  Interview with Santa Clara County Sheriff's Office Gang Expert (Oct. 22, 2013).

29  U.S. Department of Justice, National Drug Intelligence Center, *National Drug Threat Assessment 2011* (Aug. 2011), p. 30; Office of the Attorney General, *Organized Crime in California, 2010 Annual Report to the Legislature*, at p. 24, *http://oag. ca.gov/sites/all/files/pdfs/publications/org_crime2010.pdf*.

30  *Id.*; National Methamphetamine & Pharmaceuticals Initiative, *Meth Update: Status and Factors Affecting the U.S.* (July 2013), pp. 3-5, accessed on Aug. 5, 2013; Jill Reploge and Fronteras, *San Diego Cracks Down on Mexican Meth, Seizures Expected to Surpass 2012 Records*, PBS Newshour (Aug. 6, 2013), *http://www. pbs.org/newshour/rundown/2013/08/san-diego-biggest-entry-point-for-mexican-meth.html*.

31  National Methamphetamine & Pharmaceuticals Initiative, *Meth Update: Status and Factors Affecting the U.S.* (July 2013), pp. 1-2; United Nations, Office on Drugs and Crime, *Transnational Organized Crime in Central America and the Caribbean: A Threat Assessment* (Sept. 2012), p. 44, *http://www.unodc.org/documents/ data-and-analysis/Studies/TOC_Central_America_and_the_Caribbean_english.pdf*, accessed on Aug. 6, 2013.

32  Associated Press, *State Agents Arrest 4 in Drug Cartel Investigation* (Oct. 9, 2013), available at: *http://losangeles.cbslocal.com/2013/10/09/state-agents-arrest-4-in-drug-cartel-investigation/*.

33  John Coté, *San Jose Meth Bust: 750 Lbs*, San Francisco Chronicle (Mar. 4, 2012), available at: *http://www.sfgate.com/crime/article/San-Jose-meth-bust-750-lbs-3379571.php*.

34  Interview with a Deputy District Attorney in the Santa Clara County District Attorney's Office (Oct. 23, 2013).

35  *Id.*

36  San Diego Regional Pharmaceutical Narcotic Enforcement Team (RxNET), *Annual Report* (2012), p. 7; Monica Garske and Tony Shin, *Dangerous 'Pharma-Cartels' Trafficking Painkillers'* (Oct. 24, 2012), *http://www.nbcsandiego.com/news/ local/Dangerous-Pharma-Cartels-Trafficking-Painkillers-172274811.html*.

37  San Diego Regional Pharmaceutical Narcotic Enforcement Team (RxNET), *Annual Report* (2012), p. 7.

83

AOL-DEF-00002561

295

[38] *Id.* at p. 10.

[39] *Id.*

[40] *Id.* at p. 11.

[41] *Id.*

[42] Office of the Attorney General, *Attorney General Kamala D. Harris Announces Dismantling of International Prescription Drug Trafficking Scheme* (Aug. 19, 2011), *http://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-announces-dismantling-international.*

[43] *Id.*

[44] *Id.*

[45] United Nations Office on Drugs and Crime, *World Drug Report 2013* (May 2013), p. 37, *http://www.unodc.org/unodc/secured/wdr/wdr2013/World_Drug_Report_2013.pdf,* accessed on Aug. 6, 2013; Bruce Bagley, *Drug Trafficking and Organized Crime in the Americas: Major Trends in the Twenty-First Century,* Woodrow Wilson International Center for Scholars, Latin American Program (Aug. 2012), p. 2.

[46] U.S. Department of Justice, *Trafficking in Persons Report: Introduction* (June 2013), p. 7, *http://www.state.gov/documents/organization/210737.pdf.*

[47] California Department of Justice, *The State of Human Trafficking in California* (November 2012), p. 63, *https://oag.ca.gov/sites/all/files/pdfs/ht/human-trafficking-2012.pdf*; International Labour Office, Special Action Programme to Combat Forced Labour, *ILO Global Estimate of Forced Labour* (June 2012), *http://www.ilo.org/wcmsp5/groups/public/@ed_norm/@declaration/documents/publication/wcms_182004.pdf.*

[48] California Department of Justice, *The State of Human Trafficking in California* (November 2012), p. 3, *https://oag.ca.gov/sites/all/files/pdfs/ht/human-trafficking-2012.pdf.*

[49] *Id.* at p. 47.

[50] *Id.* at p. 52.

[51] Office of the Attorney General, *Attorney General Kamala D. Harris Announces Sentencing in Transnational Human Trafficking Ring* (May 24, 2013), *https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-announces-sentencing-transnational-human.*

[52] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Project Gunrunner Fact Sheet, http://www.atf.gov/publications/factsheets/factsheet-project-gunrunner.html,* accessed on Feb. 7, 2014.

[53] *Id.;* Luis Astorga, *Arms Trafficking from the United States to Mexico: Divergent Responsibilities* (Mar. 2010), International Drug Policy Consortium, *IDPC Policy Briefing,* p. 2.

84

AOL-DEF-00002562

296

[54] Juan Carlos Garzon, et al., *The Criminal Diasporo: The Spread of Transnational Organized Crime and How to Contain its Expansion* (2013), p. 7, *http://www.wilsoncenter.org/sites/default/files/CRIMINAL_DIASPORA%20 %28Eng%20Summary%29_0.pdf.*

[55] Colby Goodman & Michel Marizco, *U.S. Firearms Trafficking to Mexico: New Data and Insights Illuminate Key Trends and Challenges* (Sept. 2010), Woodrow Wilson International Center for Scholars, Mexico Institute, at p. 192, *http://www.wilsoncenter.org/sites/default/files/Chapter%206-%20U.S.%20Fire-arms%20Trafficking%20to%20Mexico,%20New%20Data%20and%20Insights%20 Illuminate%20Key%20Trends%20and%20Challenges.pdf.*

[56] U.S. Department of the Treasury, (Dec. 2005), Tables 8 and 9, *www.treasury.gov/resource-center/terrorist-illicit-finance/Documents/mlta.pdf,* accessed on Aug. 8, 2013.

[57] U.S. Department of Homeland Security, *United States of America-Mexico Bi-National Criminal Proceeds Study,* (June 2010), *www.dhs.gov/xlibrary/assets/ cne-criminalproceedsstudy.pdf,* accessed on Feb. 7, 2014; U.S. Department of the Treasury, *U.S. Money Laundering Threat Assessment* (Dec. 2005), p. 33, *www. treasury.gov/resource-center/terrorist-illicit-finance/Documents/mlta.pdf.*

[58] Brien, et al., *A Bilateral Study on Money Laundering in the United States and Mex-ico* (May 2011), Columbia School of International and Public Affairs and Global Financial Integrity, ¶¶ 62-63, *www.sipa.columbia.edu/academics/workshops/ documents/RevisedReport/May24.pdf.*

[59] Financial Action Task Force, *www.Fatf-gafi.org.*

[60] U.S. Department of Homeland Security, United States of America-Mexico Bi-National Criminal Proceeds Study, (June 2010), *www.dhs.gov/xlibrary/assets/ cne-criminalproceedsstudy.pdf.*

[61] CA Pen. Code, § 186.10.

[62] CA Health & Safety Code, §§ 11370.6, 11370.9.

[63] 31 U.S.C. § 5313, and regulations thereunder.

[64] 31 U.S.C. § 5324; CA Pen. Code, § 14166.

[65] 31 U.S.C. § 5324, subd. (a)(3).

[66] CA Pen. Code, § 14166.

[67] GDP is a measure of a country's economic output as measured by the market value of all goods and services produced in a country. See U.S. Bureau of Labor Statis-tics, *Charting International Labor Comparisons* (Sept. 2012), p. 13.

[68] U.S. Senate Caucus on International Narcotics Control, *The Buck Stops Here: Improv-ing U.S. Anti-Money Laundering Practices: 2013 Senate Report* (Apr. 2013), p. 11.

[69] Center for Continuing Study of the California Economy, *Numbers in the News* (July 2013), at p. 1, *www.ccsce.com/PDF/numbers-July-2013-CA-Economy-Rankings-2012.pdf.*

AOL-DEF-00002563

297

[70] U.S. Senate Caucus on International Narcotics Control, *The Buck Stops Here: Improving U.S. Anti-Money Laundering Practices: 2013 Senate Report* (Apr. 2013), p. 11, citing National Drug Intelligence data; Brien, et al., *A Bilateral Study on Money Laundering in the United States and Mexico* (May 2011), Columbia School of International and Public Affairs and Global Financial Integrity, p. 4.

[71] El Paso Intelligence Center, National Seizure System, *Nationwide Bulk Cash Seizures*, FOIA 14-00002-F (Jan. 1, 2008 – Dec. 31, 2012).

[72] U.S. Department of the Treasury, Financial Crimes Enforcement Network, *Advisory: Newly Released Mexican Regulations Imposing Restrictions on Mexican Banks for Transactions in U.S. Currency* (June 21, 2010), *www.fincen.gov/statutes_regs/ guidance/pdf/fin-2010-a007.pdf*.

[73] Interview with Special Agent Ernesto Limon, California Department of Justice, California Anti-Money Laundering Alliance (Sept. 2013); Interview with New Mexico Money Laundering Task Force Investigator (Aug. 2013), Interview with Chula Vista Police Department, TEAM ONE, Task Force Investigator (Sept. 2013).

[74] *Id.*

[75] Southwest Border Anti-Money Laundering Alliance, *About Us*, *http://www.swballiance.org/about-us/*, accessed on Feb. 18, 2014.

Chapter 3

[76] National Gang Intelligence Center, *National Gang Threat Assessment: Emerging Trends* (2011), pp. 9, 15.

[77] *Id.* at pp. 9, 11, 15.

[78] Centers for Disease Control and Prevention, *Gang Homicides – Five U.S. Cities, 2003-2008* (Jan. 27, 2012), *http://www.cdc.gov/mmwr/preview/mmwrhtml/ mm6103a2.htm?s_cid=mm6103a2_w*.

[79] *Id.*

[80] California Department of Alcohol & Drug Programs, *Facts and Figures On Alcohol and Other Drugs* (Sept. 2006).

[81] *Id.*

[82] Office of National Drug Control Policy, *National Southwest Border Counternarcotics Strategy* (2013), p. 59, *http://www.whitehouse.gov/ondcp/southwestborder*.

[83] Juan Carlos Garzon, et al., *The Criminal Diaspora: The Spread of Transnational Organized Crime and How to Contain its Expansion* (2013), at p. 4, *http:// www.wilsoncenter.org/sites/default/files/CRIMINAL_DIASPORA%20%28Eng%20 Summary%29_0.pdf*.

[84] June S. Beittel, *Mexico's Drug Trafficking Organizations: Source and Scope of the Violence* (April 15, 2013), Congressional Research Service, at p. 23.

[85] *Id.* at p. 1.

86

298

[86] Office of the Attorney General, Attorney General Kamala D. Harris, *Suspects Arrested in Murder-for-Hire Plot Commissioned by Mexican Drug Cartel* (Feb. 17, 2011), *https://oag.ca.gov/news/press-releases/suspects-arrested-murder-hire-plot-commissioned-mexican-drug-cartel*.

[87] Daniel Borunda, *Barrio Azteca threat targets law officers*, El Paso Times (Mar. 25, 2010), *www.elpasotimes.com/ci_14753458*.

[88] CNN Wire Staff, *Border Agent Shot By Bandits Who Target Immigrants, Union Chief Says* (Dec. 15, 2010), *http://www.cnn.com/2010/CRIME/12/15/arizona.border.agent.killed*.

[89] U.S. House Committee on Homeland Security, *A Line in the Sand: Confronting the Threat at the Southwest Border* (2006), p. 14; National Gang Intelligence Center, *National Gang Threat Assessment: Emerging Trends* (2011), p. 27.

[90] Id. at p. 80.

[91] Federal Bureau of Investigation, Electronic Communication, 183-7396, *Aryan Brotherhood Prison Gang, Information Concerning RICO, Non-LCN, OC Type*, p. 56, UNCLASSIFIED; Kevin Johnson, *Drug Cartels Unite Rival Gangs to Work for Common Bad*, USA Today (Mar. 16, 2010), *http://usatoday30.usatoday.com/news/nation/2010-03-15-rival-gangs-drug-wars_N.htm*, accessed on Feb. 6, 2014.

[92] U.S. Department of Homeland Security, Customs and Border Protection, Office of Inspector General, *CBP's Strategy to Address Illicit Cross-Border Tunnels* (Sept. 2012), p. 2, OIG-12-132, *http://www.oig.dhs.gov/assets/Mgmt/2012/OIG_12-132_Sep12.pdf*; U.S. House Committee on Homeland Security, *A Line in the Sand: Confronting the Threat at the Southwest Border* (2006), pp. 15-16, *http://www.house.gov/sites/members/tx10_mccaul/pdf/Investigaions-Border-Report.pdf*.

[93] Matt Isaacs, *Twice Burned*, SF Weekly (June 14, 2000), *http://www.sfweekly.com/2000-06-14/news/twice-burned/full/*, accessed on Feb. 7, 2014; U.S. Department of Justice, National Drug Intelligence Center, *National Drug Threat Assessment 2011* (Aug. 2011), p. 27.

[94] Cal/Gang; National Gang Intelligence Center, *National Gang Threat Assessment: Emerging Trends* (2011), pp. 47-48.

[95] California County News, *New FBI Stats: Two CA Counties Rank 1st and 3rd in the Nation for Most Gang Members* (Oct. 25, 2011), *http://californiacitynews.type-pad.com/california_county_news/2011/10/new-fbi-stats-two-ca-counties-rank-1st-and-3rd-in-the-nation-for-most-gang-members.html*, accessed on Feb. 6, 2014.

[96] National Gang Intelligence Center, *National Gang Threat Assessment: Emerging Trends* (2011), p. 15.

[97] Interview with Santa Clara County Sheriff's Office Gang Expert (Oct. 22, 2013).

AOL-DEF-00002565

299

Chapter 4

[98] California Department of Corrections and Rehabilitation, *Contraband Cell Phones in CDCR Prisons and Conservation Camps* (April 2012) *http://www.cdcr.ca.gov/Contraband-Cell-Phones/docs/Contraband-Cell-Phone-Fact-Sheet-April-2012.pdf.*

[99] California State Assembly, *Assembly Committee Report for Senate Bill 26* (Aug. 17, 2011), p. 5, *http://www.leginfo.ca.gov/pub/11-12/bill/sen/sb_0001-0050/sb_26_cfa_20110816_163530_asm_comm.html.*

[100] Moises Naim, *Illicit: How Smugglers, Traffickers, and Copycats are Hijacking the Global Economy* (2006), pp. 77-78.

[101] *Id.*

[102] *Id.* at p. 102.

[103] Michael Montgomery, *How Imprisoned Mexican Mafia Leader Exerts Secret Control Over L.A. Street Gangs* (Sept. 19, 2013), *http://blogs.kqed.org/newsfix/2013/09/17/111570/secret-letter-from-mexican-mafia-gang-leader-to-la-street-gangs.*

[104] *Id.*

[105] United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* (2010), p. ii.

[106] *Id.* at pp. ii, 29.

[107] *Id.* at p. 29.

[108] *Id.* at p. ii.

[109] *Id.*

[110] Moises Naim, *Illicit: How Smugglers, Traffickers, and Copycats are Hijacking the Global Economy* (2006), p. 75.

[111] Jerome P. Bjelopera & Kristen M. Finklea, *Organized Crime: An Evolving Challenge for U.S. Law Enforcement*, Congressional Research Service (Jan. 6, 2012), p. 3.

[112] U.S. Department of Justice, National Drug Intelligence Center, *National Drug Threat Assessment 2010* (Feb. 2010), pp. 21, 23, *http://www.justice.gov/archive/ndic/pubs38/38661/movement.htm,* accessed on Feb. 8, 2014.

[113] Cynthia Lambery, *Panga Boats Running Drugs from Mexico are Pushing North, Landing on SLO County Beaches*, The Tribune (Dec. 1, 2012), *http://www.sanluisabispo.com/2012/12/01/2313653/panga-boats-running-drugs-from.html,* accessed on Feb. 8, 2014.

[114] Jeanette Steele, *Coast Guard Touts Drug Busts at Sea*, San Diego Union-Tribune (June 7, 2013), *http://www.utsandiego.com/news/2013/jun/07/coast-guard-drug-bust-sea-san-diego/,* accessed on Aug. 9, 2013; Cynthia Lambery, *Panga Boats Running Drugs from Mexico are Pushing North, Landing on*

AOL-DEF-00002566

300

*SLO County Beaches,* The Tribune (Dec. 1, 2012), *http://www.sanluisobispo. com/2012/12/01/2313653/panga-boats-running-drugs-from.html,* accessed on Aug. 9, 2013.

[115] El Paso Intelligence Center, National Seizure System, 20080101-20121231 *California-Specific Narcotics Data Land Crossings Only,* UNCLASSIFIED (Sept. 2013).

[116] *Id.;* CBS News, *Sinaloa Cartel Takes to the High Seas* (Dec. 12, 2012).

[117] Stephen Baxter, *Drug Smuggling Boat Wrecks, 80 Pounds of Pot Found North of Santa Cruz,* Santa Cruz Sentinel (Oct. 1, 2013), *http://www.mercurynews. com/central-coast/ci_24213384/drug-smuggling-boat-wrecks-80-pounds-pot-found?source=rss.*

[118] *Id.*

[119] Cal Coast News, *Panga Boart Beaches Near San Simeon Campground* (Sept. 11, 2013), *http://calcoastnews.com/2013/09/panga-boat-beaches-near-san-simeon-campground/.*

[120] Santa Barbara County Sheriff's Department, Special Investigations Bureau, *Transnational Organized Crime* (Sept. 19, 2013).

[121] *Id.*

[122] *Id.*

[123] Interview with Detective from Santa Barbara County Sheriff's Office (Oct. 15, 2013).

[124] Santa Barbara County Sheriff's Office, Special Investigations Bureau, *Transnational Organized Crime* (Sept. 19, 2013).

[125] Susan Shroder, *Panga Yields Nearly $1.8 million in Pot* (Feb. 5, 2013), *http://www.utsandiego.com/news/2013/Feb/05/about-one-point-eight-million-in-pot-on-panga.*

[126] U.S. Coast Guard News Release, *Chief Petty Officer Terrell Horne Dies During Law Enforcement Mission* (Dec. 3, 2010), *http://www.uscgnews.com/go/ doc/4007/1624215/PHOTOS-AVAILABLE-Chief-Petty-Officer-Terrell-Horne-dies-during-law-enforcement-mission.*

[127] Jennifer Jensen, *U.S. Coast Guard Intercepts 31 Bales of Marijuana After High-Speed Chase on the Ocean,* ABC10 News (Oct. 8, 2013), *http://www.10news.com/news/us-coast-guard-intercepts-31-bales-of-marijuana-after-high-speed-chase-on-the-ocean-10072013.*

[128] White House, Office of National Drug Control Policy, *National Southwest Border Counternarcotics Strategy* (2013), p. 69, *http://www.whitehouse.gov/sites/ default/files/ondcp/policy-and-research/southwest_border_strategy_2013.pdf.*

[129] U.S. Department of Homeland Security, Customs and Border Protection, Office of Inspector General, *CBP's Strategy to Address Illicit Cross-Border Tunnels* (Sept. 2012), p. 2, OIG-12-132, *http://www.oig.dhs.gov/assets/Mgmt/2012/ OIG_12-132_Sep12.pdf.*

89

301

[130] *Id.*

[131] *Id.* at pp. 2-3.

[132] *Id.* at p. 3.

[133] Jerome Bjelopera & Kristin Finklea, *Organized Crime: An Evolving Challenge for U.S. Law Enforcement* (January 2012), Congressional Research Service, p. 18, *http://www.fas.org/sgp/crs/misc/R41547.pdf*, accessed on Aug. 9, 2013; Office of National Drug Control Policy, *National Southwest Border Counternarcotics Strategy* (2013), p. 69, *http://www.whitehouse.gov/sites/default/files/ondcp/policy-and-research/southwest_border_strategy_2013.pdf*.

[134] U.S. Department of Homeland Security, Customs and Border Protection, Office of Inspector General, *CBP's Strategy to Address Illicit Cross-Border Tunnels* (Sept. 2012), p. 2, OIG-12-132, *http://www.oig.dhs.gov/assets/Mgmt/2012/OIG_12-132_Sep12.pdf*.

[135] Associated Press, *Ultralight Packed with Pot Found in S. Cal Desert*, Contra Costa Times (Aug. 9, 2013), *http://www.contracostatimes.com/california/ci_23972609/ultralight-packed-pot-found-s-cal-desert*, accessed on Sept. 20, 2013.

[136] California Department of Finance, *Foreign Trade Through California Ports, 1970-2012*, *www.dof.ca.gov/html/fs_data/latestecondata/documents/BBFORTRD_000.xls*, accessed on Aug. 10, 2013.

[137] *Id.*

[138] *Id.*

[139] Jennifer Shasky Calvery, Chief, Asset Forfeiture and Money Laundering Section, Criminal Division, U.S. Department of Justice, *Combating Transnational Organized Crime: International Money Laundering as a Threat to our Financial Systems* (Feb. 8, 2012).

[140] Financial Action Task Force - Groupe d'Action Financière, *Best Practices on Trade Based Money Laundering* (June 2008), p. 1.

[141] U.S. Senate Caucus on International Narcotics Control, *The Buck Stops Here: Improving U.S. Anti-Money Laundering Practices: 2013 Senate Report* (Apr. 2013), p. 19.

[142] *U.S. v. Angel Toy Corporation, et al.*, No. 2:10-CR-00718 (C.D. Cal. 2010); *U.S. v. Woody Toys, Inc., et al.*, No. 2:12-CR-00329 (C.D. Cal. 2012); *U.S. v. Peace and Rich, et al.* (Silk Flower Case), No. 2:13-CR-00107 (C.D. Cal. 2013).

[143] Interviews with Los Angeles Interagency Metropolitan Police Apprehension Crime Taskforce (LA IMPACT) officials and Assistant U.S. Attorney, Central District of California, Los Angeles (June-July 2013).

90

AOL-DEF-00002568

302

Chapter 5

144  National White Collar Crime Center, *2012 Internet Crime Report,* p. 8.

145  *Id.* at p. 24.

146  Francisco Gomez, *Pirateria, el Otro Frente del Narco,* El Universal (Mar. 1, 2009), *http://www.eluniversal.com.mx/nacion/166099.html,* accessed on Jan. 2, 2014.

147  The White House, *Strategy To Combat Transnational Organized Crime* (July 2011), p. 7.

148  Privacy Rights Clearinghouse, *Chronology of Data Breaches* (Dec. 31, 2013), *https://www.privacyrights.org/data-breach.* The list compiled by Privacy Rights Clearinghouse does not purport to be a complete listing of all breaches in a given year. Rather, it includes only breaches that have been reported in the news media, on government websites, and on blogs. For this reason, the list likely understates the actual number of breaches. For more information, please see: *https://www.privacyrights.org/data-breach-FAQ.*

149  California Department of Justice, *Attorney General's Data Breach Report 2012,* p. 7.

150  Office of the Attorney General, *Identity Theft, http://oag.ca.gov/idtheft* (reporting statistics from Javelin Strategy and Research, 2012 Identity Fraud Report).

151  Privacy Rights Clearinghouse, *Chronology of Data Breaches* (Dec. 31, 2013), *https://www.privacyrights.org/data-breach.*

152  *Id.;* Office of the Attorney General, *Identity Theft, http://oag.ca.gov/idtheft* (reporting statistics from Javelin Strategy and Research, 2012 Identity Fraud Report).

153  Clay Wilson, *Botnets, Cybercrime, and Cyberterrorism: Vulnerabilities and Policy Issues for Congress,* Congressional Research Service (2008), p. 9.

154  Jason Franklin, et al., *An Inquiry Into the Nature and Causes of the Wealth of Internet Miscreants* (2007), p. 1; Clay Wilson, *Botnets, Cybercrime, and Cyberterrorism: Vulnerabilities and Policy Issues for Congress,* Congressional Research Service (2008), p. 9.

155  Federal Bureau of Investigation, *APT Actors Send Spear-Phishing Email with Missing Children Theme,* Private Sector Advisory (Aug. 9, 2013).

156  Federal Bureau of Investigation, *Cyber Banking Fraud,* news release (Oct. 1, 2010); Complaint at p. 22, *Microsoft Corp. v. John Does 1–82,* No. 3:13-cv-319 (W.D.N.C. May 29, 2013).

157  Complaint at p. 23, *Microsoft Corp. v. John Does 1–82,* No. 3:13-cv-319 (W.D.N.C. May 29, 2013).

158  Federal Bureau of Investigation, *Fraud and Organized Crime Intersect,* news release (Oct. 13, 2010); Lizette Alvarez, *With Personal Data in Hand, Thieves File Early and Often,* New York Times (May 26, 2012).

91

AOL-DEF-00002569

303

[159] Complaint at p. 6, *Microsoft Corp. v. John Does 1–82*, No. 3:13-cv-319 (W.D.N.C. May 29, 2013).

[160] Clay Wilson, *Botnets, Cybercrime, and Cyberterrorism: Vulnerabilities and Policy Issues for Congress*, Congressional Research Service (2008), p. 5.

[161] *Id.*

[162] *Id.*

[163] United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* (2010) p. 204.

[164] *Id.*

[165] Jerome P. Bjelopera & Kristin M. Finklea, *Organized Crime: An Evolving Challenge for U.S. Law Enforcement*, Congressional Research Service (2012), p. 12.

[166] U.S. Attorney's Office, Central District of California, *Five Domestic Defendants Linked to International Computer Hacking Ring Conspiracy Guilty of Federal Fraud Charges*, news release (Mar. 26, 2011).

[167] Indictment at pp. 9–10, U.S. v. *Lucas et al.*, No. CR09-01005 (C.D. Cal. Sept. 30, 2009).

[168] Federal Bureau of Investigation, *One Hundred Linked to International Computer Hacking Ring Charged by United States and Egypt in Operation Phish Phry*, news release (Oct. 7, 2009).

[169] Second Superseding Indictment at pp. 4-11, *United States v. Drinkman et al.*, No. 1:09-cr-00626 (D.N.J. 2013).

[170] *Id.* at pp. 13–15.

[171] *Id.* at p. 16.

[172] Nathaniel Popper & Somini Sengupta, *U.S. Says Ring Stole 160 Million Credit Card Numbers*, New York Times (July 25, 2013).

[173] U.S. Attorney's Office, Central District of California, *Armenian Power Organized Crime Group Targeted in Federal Indictments That Allege Racketeering Offenses, Including Bank Fraud Schemes, Kidnappings, and Drug Trafficking*, news release (Feb. 16, 2011).

[174] Federal Bureau of Investigation, Fraud and Organized Crime Intersect, news release (Oct. 13, 2010).

[175] *Id.*

[176] *Id.*

[177] *Id.*

[178] Verizon, *2013 Data Breach Investigations Report*, pp. 20–21.

[179] *Id.* at pp. 15, 21–22.

[180] Gregory F. Treverton et al., *Film Piracy, Organized Crime, and Terrorism* (RAND 2009), p. 28; see also Rick Orlov, *Gangs Turning to Pirated DVDs, CDs To Cash In*, Daily News (July 7, 2009), p. A3.

AOL-DEF-00002570

304

181 Joshua Philipp, *Cybercrime the New Face of Organized Crime, Says Manhattan DA*, Epoch Times (May 14, 2013); International Mass-Marketing Fraud Working Group, *Mass-Marketing Fraud: A Threat Assessment* (June 2010), p. 13.

182 National Intellectual Property Rights Coordination Center, *Intellectual Property Rights Violations: A Report on Threats to United States Interests at Home and Abroad* (Nov. 2011), p. v; United Nations Interregional Crime and Justice Research Institute ("UNICRI"), *Confiscation of the Proceeds of IP Crime* (2013), p. 9.

183 International Mass-Marketing Fraud Working Group, *Mass-Marketing Fraud: A Threat Assessment* (June 2010), p. 12.

184 United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* (2010) pp. 203-204.

185 Max Goncharov, *Russian Underground 101*, Trend Micro Incorporated (2012), p. 18.

186 United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* (2010), p. 204.

187 Max Goncharov, *Russian Underground 101*, Trend Micro Incorporated (2012), p. 8.

188 Complaint at p. 8, *Microsoft Corp. v. John Does 1–82*, No. 3:13-cv-319 (W.D.N.C. May 29, 2013).

189 *Id.*

190 *Id.* at p. 10.

191 *Id.* at pp. 8-9.

192 Jeremy Kirk, *Advance Fee Fraud Scams Rise Dramatically in 2009*, Compuworld (Jan. 28, 2009).

193 National White Collar Crime Center, *2012 Internet Crime Report*, p. 8.

194 Ross Anderson, et al., *Measuring the Cost of Cybercrime* (2012), p. 15.

195 The connection to Nigeria is so frequent, in fact, that this type of scam is also known as a "419 fraud" after the applicable section in the Nigerian criminal code.

196 Ross Anderson et al., *Measuring the Cost of Cybercrime* (2012), pp. 15–16.

197 International Mass-Marketing Fraud Working Group, *Mass-Marketing Fraud: A Threat Assessment* (June 2010), p. 16

198 Blaise J. Bergiel, et al., *Internet Cross Border Crime: A Growing Problem*, Journal of Website Promotion, vol. 3, (2008), p. 135.

199 United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* (2010), p. 204.

200 International Mass-Marketing Fraud Working Group, *Mass-Marketing Fraud: A Threat Assessment* (June 2010), p. 16; UNODC, The Globalization of Crime: A Transnational Organized Crime Threat Assessment (2010), p. 204.

AOL-DEF-00002571

305

201  U.S. Attorney's Office, District of New Jersey, *Organizer of International Securities Fraud Ring Sentenced to Prison for Using Hackers to Falsely Inflate Stock Prices*, news release (May 13, 2013).

202  National White Collar Crime Center, *2012 Internet Crime Report*, p. 8.

203  *Id.* at pp. 14–15.

204  *Id.* at p. 24.

205  International Mass-Marketing Fraud Working Group, *Mass-Marketing Fraud: A Threat Assessment* (June 2010) pp. 4, 12, 14.

206  Indictment at pp. 2-3, *United States v. Butai, et al.*, No. 1:12-cr-00785 (E.D.N.Y. Jan. 9, 2013); Federal Bureau of Investigation, *Organized Romanian Criminal Groups Targeted by DOJ and Romanian Law Enforcement*, news release (July 15, 2011).

207  *Id.*

208  *Id.*

209  Federal Bureau of Investigation, *Consumer Alert: Online Rental Ads Could Be Phony* (July 29, 2009),
*http://www.fbi.gov/news/stories/2009/july/housingscam_072909*.

210  International Mass-Marketing Fraud Working Group, *Mass-Marketing Fraud: A Threat Assessment* (June 2010), p. 15.

211  U.S. Attorney's Office, Southern District of New York, *Manhattan U.S. Attorney Announces Extradition of Four Israeli Defendants Charged in Multi-Million-Dollar Phony 'Lottery Prize' Schemes*, news release (Jan. 4, 2012).

212  UNICRI, *Confiscation of the Proceeds of IP Crime* (2013), pp. 9, 13.

213  United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* (2010), p. 176; UNICRI, *Confiscation of the Proceeds of IP Crime* (2013), p. 11.

214  United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* (2010), p. 180.

215  Damon McCoy, et al., *PharmaLeaks: Understanding the Business of Online Pharmaceutical Affiliate Programs* (2012) p. 2.

216  United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* (2010), p. 184.]

217  David Price, NetNames, *Sizing the Piracy Universe* (Sept. 2013),
*www.copyrightalliance.org/sites/default/files/2013-netnames-piracy.pdf*.

218  *Id.*

219  Letter to Victoria A. Espinel from the Motion Picture Association of America, et al. (Aug. 10, 2012), pp. 1–2.

94

306

[220] National Intellectual Property Rights Center, *Intellectual Property Rights Violations: A Report on Threats to United States Interests at Home and Abroad* (Nov. 2011), p. 29.

[221] Letter to Stan McCoy from Motion Picture Association of America, Inc. (Sept. 14, 2012), p. 2.

[222] William Kerr & Chad Moutray, *Economic Impact of Global Software Theft on U.S. Manufacturing and Competitiveness* (Jan. 30, 2014), p. 5.

[223] Federal Bureau of Investigation, *Pirated Software May Contain Malware*, Consumer Alert (Aug. 1, 2013); National Intellectual Property Rights Center, *Intellectual Property Rights Violations: A Report on Threats to United States Interests at Home and Abroad* (Nov. 2011), p. 27.

[224] Paula Greve, *Digital Music and Movies Report: The True Cost of Free Entertainment* (2010) p. 10.

[225] Money Laundering Threat Assessment Working Group, *U.S. Money Laundering Threat Assessment* (Dec. 2005), p. 20.

[226] U.S. Senate Caucus on International Narcotics Control, *The Buck Stops Here: Improving U.S. Anti-Money Laundering Practices: 2013 Senate Report* (Apr. 2013), pp. 27-28; Jennifer Shasky Calvery, Chief, Asset Forfeiture and Money Laundering Section, Criminal Division, U.S. Department of Justice, *Combating Transnational Organized Crime: International Money Laundering as a Threat to our Financial Systems* (Feb. 8, 2012), p. 8.

[227] U.S. Department of Justice, National Drug Intelligence Center, *National Drug Threat Assessment 2009*, p. 50.

[228] *Id.*

[229] Statement of Jennifer Shasky Calvery before the U.S. Senate Committee on Banking, Housing, and Urban Affairs (Nov. 19, 2013), p. 2.

[230] Prepared Testimony of Edward Lowery III before the U.S. Senate Committee on Homeland Security and Governmental Affairs (Nov. 18, 2013), p. 3.

[231] *Id.*

[232] *Id.*

[233] Statement of the Hon. Mythili Raman before the U.S. Senate Committee on Homeland Security and Governmental Affairs (Nov. 18, 2013), p. 4.

[234] Prepared Testimony of Edward Lowery III before the U.S. Senate Committee on Homeland Security and Governmental Affairs (Nov. 18, 2013), p. 3.

[235] *U.S. v. Liberty Reserve S.A, et al.*, (S.D.N.Y. 2013), Case No. 13 CRIM 368.

[236] *Id.* at ¶¶ 9 and 21.

[237] *Id.* at ¶ 20.

[238] *Id.*

[239] *Id.* at ¶ 10.

[240] *Id.*

AOL-DEF-00002573

307

[241]  *Id.* at ¶43.

[242]  Statement of the Hon. Mythili Raman before the U.S. Senate Committee on Homeland Security and Governmental Affairs (Nov. 18, 2013), p. 4.

[243]  Sealed Complaint at p. 6, *United States v. Ulbricht* (S.D.N.Y. Sept. 27, 2013).

[244]  David Segal, *Eagle Scout. Idealist. Drug Trafficker?*, New York Times (Jan. 18, 2014).

[245]  Stuart Pfeifer, Shan Li, & Walter Hamilton, *End of Silk Road for Drug Users as FBI Shuts Down Illicit Website*, Los Angeles Times (Oct. 2, 2013).

[246]  U.S. Attorney's Office, Southern District of New York, *Manhattan U.S. Attorney Announces Charges Against Bitcoin Exchangers, Including CEO of Bitcoin Exchange Company, for Scheme to Sell and Launder over $1 Million in Bitcoins Related to Silk Road Drug Trafficking*, news release (Jan. 27, 2014).

Chapter 6

[247]  21 U.S.C. § 848

[248]  *Garrett v. United States* (1985) 471 U.S. 773, 781.

[249]  Steven Burnholtz, et al., *International Extradition in Drug Cases*, 10 N.C. J. Int'l L. & Com. Reg. 353, 358 (1985); see also 21 U.S.C. § 848, subd. (a)(1)(c).

[250]  21 U.S.C. §§ 848, 853.

[251]  Md. Criminal Law Ann. § 5-607, subd. (b)(1); N.J. Stat. § 2C:35-3 (2013).

[252]  Interview with Commander of the Fresno Special Operations Unit (Sept. 2013).

[253]  *Id.*

[254]  *People v. Green* (2004) 125 Cal.App.4th 360, 374, fn. 9 (["[Penal Code s]ection 186.11 gives the People no way to prevent the dissipation of assets before a complaint or indictment has been filed."]).

[255]  18 U.S.C. § 1963, subd. (d).

[256]  18 U.S.C. § 1963, subd. (d)(2).

[257]  18 U.S.C. § 1963, subd. (d)(l)(B)(iii).

[258]  31 U.S.C. § 5313, and regulations thereunder.

[259]  31 U.S.C. § 5324.

[260]  31 U.S.C. § 5324, subd. (a)(3).

[261]  CA Pen. Code, § 14166

[262]  *Id.*

[263]  Interview with CAMLA Task Force Commander, SAS, Ernesto Limon, CA DOJ (Sept. 2013).

[264]  *Id.*

[265]  FinCEN News Release (Oct. 24, 2013), *http://fincen.gov/news_room/nr/20131024.pdf.*

96

308

[266]  Statement of Jennifer Shasky Calvery, Director, Financial Crimes Enforcement
Network, Upon Signing a Memorandum of Understanding with Mexico's National
Banking and Securities Commission, Oct. 24, 2013, *http://fincen.gov/pdf/
Statement%20for%20MOU%20signing%20with%20CNBV.pdf*.

[267]  Celina B. Realuyo, *It's All About the Money: Advancing Anti-Money Laundering
Efforts in the U.S. and Mexico to Combat Transnational Organized Crime*, Wood-
row Wilson International Center for Scholars Mexico Institute (May 2012), p. 27.

97

AOL-DEF-00002575

309



# University of Pittsburgh

*School of Law*

Barco Law Building
3900 Forbes Avenue
Pittsburgh, PA 15260
Office: 412-624-2415
Email: gerald.dickinson@pitt.edu

April 4, 2017

The Honorable Ron Johnson                    The Honorable Claire McCaskill
Chairman                                     Ranking Member
340 Dirksen Senate Office Building           442 Hart Senate Office Building
Washington, DC 20510                         Washington, DC 20510

Dear Chairman Johnson and Ranking Member McCaskill:

It is with great pleasure that I submit this written testimony at the request of the Office of the
Ranking Member, Senator McCaskill. I am pleased that the Homeland Security and
Governmental Affairs Committee is devoting its April 4, 2017 hearing to an examination of
efforts to secure the southwest border through the construction of a wall. Further, as a law
professor who writes and teaches in the areas of constitutional property and land use, I take great
interest in the committee's focus on the legal authorities related to the wall construction along
the U.S.-Mexico border.

On March 5, 2017, I penned an op-ed in the Washington Post highlighting the eminent domain
conflicts that lie ahead if Congress approves funding for and the Executive Branch proceeds with
the construction of a physical wall.[1] I would like to focus your attention on several concerns
raised in the op-ed, specifically the application of the Fifth Amendment Takings Clause as well
as statutory requirements necessary to acquire the land to build the wall.

The Executive Order ordering the securing of the "southern border of the United States through
the immediate construction of a physical wall on the southern border" raises serious questions
regarding the use of federal eminent domain powers.[2] Countless private property owners, along
with local and state governments and Native American reservations, may be subject to lengthy
eminent domain disputes across approximately 1,300 miles of the border. Only about one-third
of the land the wall would sit on is owned by the federal government or by Native American
tribes, according to the Government Accountability Office. The rest of the border is controlled
by states and private property owners, especially along the Texas-Mexico border. A significant
portion of the land in Arizona is occupied by the Tohono O'odham Nation reservation extending
along 62 miles of the border.

The Takings Clause states that "nor shall private property be taken for public use, without just
compensation."[3] This longstanding prohibition against uncompensated takings has been applied
over the years to an increasing variety and types of eminent domain takings, such as building
highways, bridges, airports and dams to taking private property for purposes of urban renewal

1

310

and economic development. In 2005, the United States Supreme Court held, in *Kelo v. City of New London*, that a local government's exercise of eminent domain power in furtherance of economic development satisfied constitutional "public use" requirement.[4] This ruling was consistent with longstanding precedent giving deference to legislatures over matters of health, safety and general welfare. However, many in the broader public disagreed with the Supreme Court, which led to widespread outrage cutting across gender, racial, party and ideological lines.[5] In response to the ruling, forty-five states amended their eminent domain statutes to restrict or bar economic development takings, while eleven states changed their constitutions to provide greater constitutional protection for property. In fact, the U.S. House of Representatives passed a resolution denouncing the *Kelo* decision by a lopsided margin.[6]

Often times, when the affected litigant in a condemnation challenge is a sympathetic single-parcel homeowner like the one in the *Kelo* saga, as opposed to a commercial developer or owner of undeveloped land, state actors and the general public are more likely to resist or oppose federal takings doctrine where court rulings are perceived to threaten investments in single-family homes. By extension, eminent domain actions by the Executive Branch for purposes of building a wall that affects hundreds, if not thousands, of single-parcel homeowners, as well as ranchers, farmers and Native tribes along the southwest border, risks being perceived as federal overreach and abuse of private property rights on a level potentially exceeding the backlash from *Kelo*. Many single-parcel homeowners – the kind that brought outrage post-*Kelo* – are the kind of affected landowner-litigants that would probably draw intense public attention to the construction of the wall. Research also indicates that compensation awards in takings cases often fail to fully compensate owners (even for the fair market value required by the courts, much less their full losses), which will only exacerbate the harm likely to be caused by such a large takings project like the construction of a physical wall along the border.[7]

Indeed, the construction of a physical wall is unlikely to be completed without the exercise of federal eminent domain powers pursuant to the Declaration of Taking Act ("DTA")[8] and the General Condemnation Act ("GCA").[9] While the GCA gives the federal government the general power to exercise eminent domain, the DTA created a procedure to expedite the taking of title and possession of lands to enable the United States to begin construction work before final judgment. This expedited procedure has raised concerns amongst affected landowners as to whether the federal government will adequately negotiate or properly consult with landowners prior to, during or after condemnation proceedings. Congress mandates some level of negotiation between the federal government and the affected landowner of a property interest prior to the institution of eminent domain procedures.[10] The negotiation must be a bona fide effort.[11] Further, a federal court may direct additional negotiations as a condition precedent to condemnation if it finds negotiations inadequate.[12]

The Executive Order also references the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") which gives the Attorney General the authority to purchase or bring condemnation actions to acquire lands in the vicinity of the United States–Mexico border.[13] This federal statute became the focus of litigation in 2007 and 2008 under the Bush Administration when the Attorney General and Secretary of the Department of Homeland Security ("DHS") took just one of many actions to acquire easements or condemn land outright for the construction of fences along the southwest border of Texas pursuant to the Secure Fence

2

311

Act of 2006.[14] While the United States prevailed in condemning some land, the litigation and negotiation process for just one case took years to resolve. It was troublesome during some of these condemnation proceedings that the United States attempted to circumvent compliance with the federal law, which requires the United States to engage in some level of consultation with property owners, local and state governments and Native American tribes prior to the institution of eminent domain procedures.[15] Indeed, the mandatory language of the consultation clause inserted by Congress permits courts to find it proper to require compliance as a condition prior to entry onto the affected land.[16]

While federal courts have held such requirements to be valid, looming in the backdrop of this large-scale land acquisition for a wall is a lesser-known, but powerful and sweeping, authority under Section 102(c)(1) of the IIRIRA as amended by the REAL ID Act of 2005. Under the law, Congress gave the Secretary of DHS the power to waive all legal requirements that the Secretary determines necessary to ensure expeditious construction of barriers along the border.[17] The Secretary may selectively waive rules and regulations in every area of the law beyond the department's specialized expertise without giving any reason for the waiver. More concerning is that Congress also made the waivers unreviewable by federal courts except on constitutional grounds.[18] To put this "big waiver" power into perspective,[19] former Secretary of DHS Michael Chertoff issued five waivers nullifying 30 statutes that governed various rules, regulations and legal requirements along the border. These nullified laws included environmental protections, religious freedom restoration, administrative procedures, and Native American territory. Having given the Secretary authority to waive such requirements, Congress has raised serious constitutional concerns. In other words, the Secretary of DHS has been given, and exercised, such broad discretion that articulates no standard for exercising the authority and the ability to choose among a variety of federal laws to waive, on top of curtailing judicial review.[20]

The Supreme Court has only been asked several times to review the constitutionality of such a broad sweeping waiver power, and it declined to review at the time.[21] In fact, members of the House of Representatives filed an amicus brief in 2009 in support of a petition requesting the Supreme Court to review the waiver powers, stating the law "greatly undermines - and manifests an utter lack of respect for - the many laws that the *amici curiae* (and members of prior Congresses) have drafted, debated and defended."[22] Federal courts of appeals, likewise, have never reviewed such broad delegation of legislative power to the executive branch since they were stripped of such judicial review by Congress.[23] The only precedential rulings to date by federal district courts have held the waiver authority constitutional.[24]

Indeed, if construction of the wall begins and federal condemnation powers are employed to acquire land, we could be facing a constitutional showdown in the next several years. It is important to note that while the waiver authority may allow the DHS to forego negotiation and consultation requirements prior to instituting condemnation proceedings, this does not permit the DHS to waive and effectively circumvent the constitutional requirements of public use and limitations on uncompensated takings under the Fifth Amendment.[25] Thus, waiver of these negotiation and consultation requirements (which, in and of itself, would be a serious and concerning step) would still yield significant litigation along the border on the Takings Clause questions. To date, the DHS has not waived the statutory requirements of negotiation or consultation in condemnation proceedings along the border. However, given the magnitude of the proposed construction of a physical wall along approximately 1,300 miles of borderland, one

3

AOL-DEF-00002578

312

would expect that such power is already being contemplated by the Executive Branch, thus raising the possibility of a constitutional showdown. The combination of federal challenges over "big waiver" authority and federal exercises of eminent domain could trigger decades of court disputes before anything is built, while simultaneously sparking the potential for a backlash similar to the *Kelo* saga.

John F. Kelly, Secretary of DHS, will testify before this committee on April 5, 2017. It is imperative that members also raise questions concerning the use of eminent domain along the border and the extent to which the Secretary will exercise the broad powers authorized by Congress in constructing a physical wall.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Gerald S. Dickinson
Assistant Professor of Law
University of Pittsburgh School of Law

cc: The Honorable Tom Carper
The Honorable Steve Daines
The Honorable Michael Enzi
The Honorable Kamala Harris
The Honorable Margaret Hassan
The Honorable Heidi Heitkamp
The Honorable John Hoeven
The Honorable James Lankford
The Honorable John McCain
The Honorable Rand Paul
The Honorable Gary Peters
The Honorable Robert Portman
The Honorable Jon Tester

4

AOL-DEF-00002579

313

[1] Gerald S. Dickinson, *The biggest problem for Trump's border all isn't the money. It's getting the land*, WASH. POST, March 5, 2017.

[2] Exec. Order No. 13767, 82 FR 8793 (2017).

[3] U.S. Const. amend. V.

[4] Kelo v. City of New London, 545 U.S. 469 (2005).

[5] Ilya Somin, *Limits of Backlash: Assessing the Political Response to Kelo*, 93 MINN. L. REV. 2100 (2008).

[6] H.R. Res. 340, 109th Cong. 2005; 151 Cong. Rec. H5592–93 (daily ed. June 29, 2005) (enacted).

[7] Ilya Somin, THE GRASPING HAND: "KELO V. CITY OF NEW LONDON" AND THE LIMITS OF EMINENT DOMAIN, University of Chicago Press (2015).

[8] 40 U.S.C. § 3114.

[9] 40 U.S.C. § 3113.

[10] 8 U.S.C. § 1103(b)(3).

[11] United States v. Certain Interests in Property in County of Cascade, State of Montana, 163 F.Supp. 518, 524 (D.Mont. 1958).

[12] U.S. v. 1.04 Acres of Land, More or Less, 538 F.Supp.2d 995 (S.D. Tex. 2008) (*citing County of Cascade*, 163 F.Supp. 518, 524 (D.Mont.1958)).

[13] 8 U.S.C. § 1103.

[14] U.S. v. 1.04 Acres of Land, More or Less, 538 F.Supp.2d 995 (S.D. Tex. 2008).

[15] Consolidated Appropriations Act, 2008, Pub.L. No. 110–161, § 564, 121 Stat. 1844, 2090–91 (2007).

[16] 8 U.S.C. § 1103 note (Section 102(b)(1)(C)).

[17] The REAL ID Act of 2005 § 102 amended Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and both are codified at 8 U.S.C. § 1103 note.

[18] REAL ID Act § 102(c)(2)(A).

[19] David J. Barron & Todd D. Rakoff, *In Defense of Big Waiver*, 113 COLUM. L. REV. 265 (2013).

[20] 8 U.S.C. § 1103 note (c)(2)(A).

[21] Petition for Writ of Certiorari, Defenders of Wildlife v. Chertoff, 128 S.Ct. 2962 (2008) cert. denied, 128 S. Ct. 2962 (2008); Petition for Writ of Certiorari, County of El Paso v. Chertoff, 129 S. Ct. 2789 (2009) cert. denied 129 S.Ct. 2789 (2009).

[22] Brief of Fourteen Members of the U.S. House of Representatives as Amici Curiae in Support of Petitioners 128 S. Ct. 2962, (No. 07-1180) 2008 WL 1803435 (U.S.) *Amici* were House Committee Chairpersons, Members of the Committee on Homeland Security, and Members representing districts in states that border Mexico. They were Homeland Security Committee Chairman Bennie G. Thompson, Energy & Commerce Committee Chairman John D. Dingell, Transportation & Infrastructure Committee Chairman James L. Oberstar, Education and Labor Committee Chairman George Miller, Rules Committee Chairwoman Louise Slaughter, Veteran Affairs Chairman Bob Filner, Intelligence Committee Chairman Silvestre Reyes, Congressman Solomon Ortiz of Texas, Congressman Sam Farr of California, Congresswoman Sheila Jackson-Lee of California, Congresswoman Susan A. Davis of California, Congresswoman Hilda Solis of California, Congressman Raul M. Grijalva of Arizona, and Congresswoman Yvette D. Clarke of New York.

[23] 8 U.S.C. § 1103 note (c)(2)(A).

[24] Defenders of Wildlife v. Chertoff, 527 F. Supp. 119 (D.D.C. 2007) (finding waiver "valid delegation of authority" and thus constitutional); Save Our Heritage Org. v. Gonzales, 533 F. Supp. 2d 58, 63 (D.D.C. 2008) (holding "the Secretary's waiver authority is not an impermissible delegation of power to the Executive Branch and . . . is constitutional")

[25] Williams v. Rhodes, 393 U.S. 23, 29 (1968) (noting the powers of "Congress or the States…to legislate in certain areas … are always subject to the limitations that they may not be exercised in a way that violates other various provisions of the Constitution.").

AOL-DEF-00002580

314



**NATIONAL IMMIGRATION FORUM**

**Statement for the Record**

**U.S. Senate Homeland Security & Governmental Affairs Committee Hearing on**

**"Fencing Along the Southwest Border"**

**April 4, 2017**

The National Immigration Forum (Forum) advocates for the value of immigrants and immigration to the nation. Founded in 1982, the Forum plays a leading role in the national debate about immigration, knitting together innovative alliances across diverse faith, law enforcement, veterans, labor and business constituencies in communities across the country. Coming together under the Forum's leadership, these alliances develop and advocate for legislative and administrative policy positions. Through our policy expertise and work with diverse constituencies, the Forum works to uphold America's long-standing tradition as a nation of immigrants and build public support for comprehensive immigration reform, sound border security policies, balanced enforcement of immigration laws, and ensuring that new Americans have the opportunities, skills and status to reach their full potential.

<u>Introduction</u>

The National Immigration Forum thanks the Committee for the opportunity to provide its views on the matter of fencing and border security along the Southwest Border. While it is important to have effective barriers that promote safety along the Southwest Border, leading national security officials agree that having a 21st century immigration system that promotes safety and security, benefits American workers and our economy, and provides earned legalization for otherwise law-abiding undocumented immigrants would have the most significant impact in promoting security at our borders.[i] We urge the members of the Committee to address the on-going need to fix our broken and out-of-date immigration system.

We also urge the members of the Committee to consider the economic and cultural bridges that allow the Southwest Border region to thrive. The United States and Mexican border states together represent the world's 4th largest economy, with more than $500 billion in bilateral trade a year.[ii] Nearly six million jobs in the United States depend directly on trade with Mexico.[iii] From its people to its economy, the Southwest Border region depends on bridges, not walls. We must choose policies that keep us safe, but that also facilitate trade, tourism and the economic health of the United States.

Finally, we fully support effective barriers along our borders where necessary to keep our country safe, but a border wall is not the only solution. Congress should explore other equally effective but less costly measures to complement a border wall. The Department of Homeland Security (DHS) estimates that building a wall spanning the entire Southwest Border would cost about $21.6 billion, though other estimates put the figure as high as $31.2 billion just to build.[iv] It would also cost additional billions of dollars to maintain over the next ten years.[v]

1

315

Congress should also consider the views of people who live in the border regions. Residents in the Southwest Border know that their area is one of the safest regions in the country.[vi] Research has shown that 72 percent of border community residents in the United States oppose the construction of a wall.[vii] Some residents and experts have expressed opposition to a wall because of its significant cost to taxpayers,[viii] its damaging environmental and cultural impact,[ix] and the imposition it would pose on private property owners who live along the border and have owned their land for generations.[x] As San Diego Mayor Kevin Faulconer noted on January 25, 2017, his city already "[has] a safe and secure border… [and has] strong economic and cultural binational ties."[xi] We can continue to secure and enforce our borders while remaining a welcoming nation by choosing policies that are thoughtful, effective, and improve border management.

Build Fencing Where Needed

The Border Patrol identified a total of 652 miles of the Southwest Border in 2011 as operationally necessary for fencing and barriers.[xii] By 2015, the United States had built border fencing along 653 miles of the Southwest Border, including 353 miles of primary pedestrian fencing, 300 miles of vehicle fencing, 36 miles of secondary fencing behind the primary pedestrian fencing and 14 miles of tertiary pedestrian fencing behind the secondary fence.[xiii] Constructing a wall or fence along the entire 2,000 miles of the Southwest Border region is not cost effective. A one-size fits all solution for a diverse region, which runs along riverbanks, through remote deserts, marshlands, and hill country will not work. Furthermore, building a fence along the entire Southwest Border would require the government to pay for miles of private land,[xiv] particularly in Texas, that have been owned by families for generations and to obtain agreements from American Indians to access reservations.[xv] Already, the cost of building a wall along the Southwest Border is expected to range from \$21.6 billion to \$31.2 billion, not including the cost of maintaining the wall and other physical barriers over the years.[xvi]

Another reason a 2,000 mile wall or fence is not cost-effective is because the number of apprehensions at the border has dropped from about 1.6 million in FY 2000 to less than 416,000 in FY 2016.[xvii] This reduction represents a 75 percent decrease and is the lowest number of apprehensions since at least FY 1971.[xviii] Furthermore, on March 8, 2017, Secretary Kelly announced that border crossings along the Southwest border have fallen an additional 40 percent between January and February 2017.[xix] The drop is a continuation of the downward trend in border crossings that started in FY 2009. Between FY 2009 and FY 2014, the net migration to the United States from Mexico was negative with more people leaving and going to Mexico than entering the U.S. During this time, approximately 140,000 more Mexican immigrants decided to leave the U.S. for Mexico than came and stayed in the U.S.[xx] As the number of people crossing the border dropped, the amount spent by the Border Patrol per apprehension at the border increased almost 1,300 percent from \$630 per apprehension in FY 2000 to over \$8,760 per apprehension in FY 2016.[xxi] Investing in a wall or fencing along the Southwest border will not provide significant returns on border security because the number of people attempting to enter the United States is trending down.

Congress should provide funding to build a fence in the Southwest Border only where the use or placement of such a barrier is the most appropriate solution and fencing has not already been built. It is also important that Congress provide DHS with the discretion, after consultation with local communities, to determine whether a fence or wall is the most appropriate option to secure any area of the border. Border Patrol agents have stated that a fence, not a wall, is preferred, so that they can see the other side of the border and see *who* is on the other side to keep safe from criminals throwing rocks or armed with other weapons.[xxii] For those areas DHS does not deem appropriate for fencing, U.S. Customs and Border Protection (CBP) can attain

2

AOL-DEF-00002582

316

operational control of the border areas through the use of its current Border Patrol agents, which are at an all-time high at 21,370 Border Patrol agents,[xxii] and modern technology.

<u>Establish a Virtual Fence Where Effective</u>

CBP relies heavily on technology in order to secure the United States' borders and ports of entry. In 2015, CBP had at least 273 remote video surveillance systems with day and night cameras deployed on the Southwest Border.[xxiv] In addition, the agency used 49 mobile surveillance systems, which are truck-mounted infrared cameras and radar.[xxv] CBP has also applied mobile surveillance systems, remote video surveillance systems, thermal imaging systems, radiation portal monitors and license plate readers in the Southwest Border and operates at least 10 Predator B unmanned aerial drones, which provide surveillance of the border along Arizona, New Mexico and Texas.[xxvi] Congress should continue to support CBP's use of modern technology to build a virtual fence in areas on the Southwest Border in which a physical barrier is not the most appropriate solution to secure the border.

<u>Provide the Border Patrol with Greater Access and Visibility</u>

Another step to ensure safety at our borders is to eradicate the invasive and nonnative Carrizo cane and salt cedar plants along the Rio Grande Valley in Texas, which would provide the Border Patrol with greater visibility and access to the Rio Grande.[xxvii] As border communities residents like Dennis E. Nixon, the CEO of International Bank of Commerce in Laredo, Texas, have noted, the density of the Carrizo cane and salt cedar plants allows the plants to become a hiding place for immigrants and criminals who unlawfully enter the United States and, in that process, makes the Border Patrol and other law enforcement agents vulnerable to criminal groups.[xxviii]

These plants, which cover between 30,000 and 60,000 acres, must be removed from the riverbanks and re-populated with native prairie grasses that have limited growth potential and can be easily and economically maintained. Estimates indicate that it would cost approximately $200,000 to remove 700 acres of the Carrizo cane and salt cedar plants. The total cost to remove up to 60,000 acres of cane would be approximately $17.1 million.[xxix] Once the Carrizo cane and salt cedar plants are eradicated, the Border Patrol will have access to patrol the riverbank and full view of the area. Furthermore, the Border Patrol's visibility of the riverbank can be enhanced with more investments in modern technology: motion detectors, cameras, and infrared sensors. Unlike a wall or obstructive fence, which would limit physical access to the riverbanks and block Border Patrol agents' visibility, eradicating the Carrizo cane and salt cedar plants is a faster, more affordable and more effective approach to patrol and control the Rio Grande. This approach grants Border Patrol agents the physical access and visibility to protect the border.

3

AOL-DEF-00002583

317



A Border Patrol agent makes his way along the Carrizo cane in the U.S.-Mexico border. *Source: Courtesy of Reynaldo Leanos Jr., Texas Standard:* http://www.texasstandard.org/stories/this-invasive-species-is-a-threat-to-national-security/.

<u>Invest in Personnel and Infrastructure at Ports of Entry (POEs)</u>

CBP Office of Field Operations (OFO), which oversees the flow of commerce and immigrants at all 328 ports of entry in the United States, is understaffed. CBP OFO plays a critical role in the economic health and national security of our country. In FY 2016, CBP OFO welcomed more than 1 million travelers each day – or 390 million for the year - and processed a total of nearly $2.3 trillion in trade and more than 27 million cargo containers.[xxx] Yet, through FY 2014, CBP OFO identified a shortage of 3,811 OFO officers.[xxxi] The magnitude of the shortage is amplified by the fact that adding a single OFO officer to a port of entry would result in annual benefits of a $2 million increase in our country's Gross Domestic Product (GDO), $640,000 saved in opportunity costs and 33 jobs added to the economy.[xxxii]

We also need to invest in infrastructure at our ports of entry. The revenue gained from trade at the border generates jobs for Americans – nearly six million American jobs depend directly on trade with Mexico.[xxxiii] Yet, wait times to cross the border are often long, sometimes up to a 55 minute delay for commercial vehicles,[xxxiv] which can detract from commerce and lead to billions of dollars in spoiled goods and opportunity cost. Furthermore, research shows that because enforcement resources have been so focused *between* ports of entry, processing *at* ports of entry is often lacking. Individuals entering the United States without documentation through a land port have only about a 1 in 4 chance of being apprehended, compared to 90 percent for those entering between ports of entry.[xxxv] The understaffing also leaves land ports more susceptible to transnational drug, weapons and human smuggling. We believe that investment at our ports of entry, including in personnel and infrastructure, is an important aspect of border security and management.

4

AOL-DEF-00002584

318

<u>Develop New Border Security Metrics</u>

U.S. Customs and Border Protection (CBP) needs to adopt transparent metrics to measure border security. The lack of metrics has greatly contributed to the lack of clarity surrounding our nation's border security and dissemination of resources at the border. This has made it difficult for Congress to hold the agency accountable and to know what additional resources are needed, or perhaps not needed, to secure the Southwest Border. Congress must direct CBP to establish measures that assess achievement and progress at the border by *moving away* from input measures, such as how many Border Patrol agents are stationed on the border or how many people are apprehended at the border every year, and *into* outcome measures, such as the probability, or rate, of apprehension at the border and at-the-border deterrence rate.[xxxvi] Because input measures consist of the resources that are put into a process in order to achieve a goal, CBP needs to develop and use outcome measures to better assess achievement and progress at the border over time. This way, Congress will know how best to allocate resources at the border in order to achieve true border security.

<u>Conclusion</u>

The National Immigration Forum looks forward to working with the Committee to bring our immigration system up to 21st century standards. We thank the Committee for holding this hearing and considering the best policies to secure and enforce our borders while facilitating trade, tourism and the economic health of the United States. We support fencing or other barriers on the Southwest Border where appropriate. CBP has already built fencing or other physical barriers on the areas that they have determined are operationally necessary. We also support other policies that are thoughtful, effective, and improve border management, including investment in modern technology at the border, providing Border Patrol agents with greater access and visibility, investments at ports of entry and developing new border security metrics. In conclusion, one of the most important aspects to ensuring that our borders are secure is to pass legislation that would create a 21st-century immigration system.

[i] Chertoff, Michael, Janet Napolitano and Tom Ridge, "8th Anniversary of the Department of Homeland Security (DHS) Roundtable," interview by Andrea Mitchell, Georgetown University (March 2, 2011): https://www.dhs.gov/news/2011/03/02/8th-anniversary-roundtable-transcript .
[ii] Alcocer, Sergio M., "Managing the Mexico-U.S. Border: Working for a More Integrated and Competitive North America," *The Anatomy of a Relationship: A Collection of Essays on the Evolution of U.S.-Mexico Cooperation on Border Management*, Wilson Center Mexico Institute (June 2016): 25, https://www.wilsoncenter.org/sites/default/files/anatomy_border_evolution_us_mexico_cooperation.pdf .
[iii] Ibid.
[iv] Edwards Ainsley, Julia, "Exclusive – Trump Border 'Wall' To Cost $21.6 Billion, Take 3.5 Years To Build: Internal Report," Reuters (February 9, 2017): http://www.reuters.com/article/us-usa-trump-immigration-wall-exclusive-idUSKBN15O2ZN . Nowrasteh, Alex, "A Tax on Remittances Won't Pay for a Border Wall," CATO Institute (January 24, 2017): https://www.cato.org/blog/tax-remittances-wont-pay-border-wall .
[v] Bier, David, "A Wall is an Impractical, Expensive, and Ineffective Border Plan," CATO Institute (November 28, 2016): https://www.cato.org/blog/border-wall-impractical-expensive-ineffective-plan .
[vi] Aguilar, Julian and Alexa Ura, "Border Communities Have Lower Crime Rates," The Texas Tribune (February 23, 2016): https://www.texastribune.org/2016/02/23/border-communities-have-lower-crime-rates/ .

5

AOL-DEF-00002585

[vii] Corchado, Alfredo, "Border Poll: Part 1; Common Ground: Poll Finds U.S.-Mexico Border Residents Overwhelmingly Value Mobility, Oppose Wall," The Dallas Morning News (July 18, 2016): http://interactives.dallasnews.com/2016/border-poll/ .

[viii] Nowrasteh, "A Tax on Remmittances Won't Pay for a Border Wall."

[ix] "Border Security: Immigration Enforcement Between Ports of Entry," Congressional Research Service (April 19, 2016): 29-30, https://www.everycrsreport.com/files/20160419_R42138_5d9af339acc2a9ee18553a8f72acd989648be04d.pdf .

[x] "Completing Border Wall is Daunting Task in Texas, Where Most Land is Privately Owned," Fox News (January 1, 2016): http://www.foxnews.com/politics/2016/01/01/completing-border-wall-is-daunting-task-in-texas-were-most-land-is-privately.html .

[xi] Garrick, David, "Faulconer Gives 'Unwavering Support' to Ties with Mexico in Face of Trump Crackdown," The San Diego Union-Tribune (January 25, 2017): http://www.sandiegouniontribune.com/news/politics/sd-me-faulconer-border-20170125-story.html .

[xii] Testimony of Michael J. Fischer, Chief of the U.S. Border Patrol, U.S. Customs and Border Protection, "Does Administrative Amnesty Harm our Efforts to Gain and Maintain Operation Control of the Border?" House Committee on Homeland Security, Subcommittee on Border and Maritime Security, 112th U.S. Congress, 1st session, (October 4, 2011): https://www.dhs.gov/news/2011/10/04/written-testimony-cbp-house-homeland-security-subcommittee-border-and-maritime .

[xiii] "Border Security: Immigration Enforcement Between Ports of Entry," 15.

[xiv] "Completing Border Wall is Daunting Task in Texas, Where Most Land is Privately Owned."

[xv] Schmidt, Samantha, "A 75-Mile-Gap in Trump's Wall? A Tribe Says it Won't Let it Divide Its Land," The Washington Post (November 15, 2016): https://www.washingtonpost.com/news/morning-mix/wp/2016/11/15/a-75-mile-wide-gap-in-trumps-wall-a-tribe-says-it-wont-let-the-wall-divide-its-land/?utm_term=.1e95cee8cc30 .

[xvi] Bier, "A Wall is an Impractical, Expensive, and Ineffective Border Plan."

[xvii] "United States Border Patrol: Total Monthly Apps by Sector and Area, FY 2000 to FY 2016," U.S. Customs and Border Protection (October 2016): https://www.cbp.gov/sites/default/files/assets/documents/2016-Oct/BP%20Total%20Monthly%20Apps%20by%20Sector%20and%20Area%2C%20FY2000-FY2016.pdf .

[xviii] "Table 33. Aliens Apprehended: Fiscal Years 1925 to 2015," U.S. Department of Homeland Security (2015): https://www.dhs.gov/immigration-statistics/yearbook/2015/table33.

[xix] James, Mike, "Homeland Chief: Illegal Border Crossings Dip 40%," USA Today (March 8, 2017): http://www.usatoday.com/story/news/2017/03/08/homeland-security-boss-illegal-border-crossings-down-40/98935926/ .

[xx] Gonzalez-Barrera, Ana, "More Mexicans Leaving Than Coming to the U.S.," Pew Research Center (November 19, 2015): http://www.pewhispanic.org/2015/11/19/more-mexicans-leaving-than-coming-to-the-u.s/ .

[xxi] "United States Border Patrol: Enacted Border Patrol Program Budget by Fiscal Year," U.S. Customs and Border Protection (2016): https://www.cbp.gov/sites/default/files/assets/documents/2016-Oct/BP%20Budget%20History%201990-2016.pdf ; "United States Border Patrol: Total Monthly Apps by Sector and Area, FY 2000 to FY 2016," U.S. Customs and Border Protection (October 2016): https://www.cbp.gov/sites/default/files/assets/documents/2016-Oct/BP%20Total%20Monthly%20Apps%20by%20Sector%20and%20Area%2C%20FY2000-FY2016.pdf .

[xxii] Bronstein, Scott, Curt Devine and Drew Griffin, "Trump Wants a Wall. Border Experts Want a Fence," CNN (February 16, 2017): http://www.cnn.com/2017/02/16/politics/trump-border-wall/ .

[xxiii] "United States Border Patrol: Border Patrol Agent Nationwide Staffing by Fiscal Year," U.S. Customs and Border Protection (October 1, 2016): https://www.cbp.gov/sites/default/files/assets/documents/2016-Oct/BP%20Staffing%20FY1992-FY2016.pdf .

[xxiv] Breisblatt, Josh, "Border Security Is Not Just More Fences and Technology," National Immigration Forum (May 13, 2015): http://immigrationforum.org/blog/border-security-is-not-just-more-fences-and-technology/ .

[xxv] Trevizo, Perla, "Officials: Past Border Tech Efforts Failed, But This One Won't," Arizona Daily Star (December 26, 2015): http://tucson.com/news/local/officials-past-border-tech-efforts-failed-but-this-one-won/article_2192fa1f-47b6-5954-8575-8a74fe691820.html .

AOL-DEF-00002586

320

xxvi "Privacy Impact Assessment for the Aircraft Systems," U.S. Department of Homeland Security (September 9, 2013): 4, https://www.dhs.gov/sites/default/files/publications/privacy-pia-cbp-aircraft-systems-20130926.pdf .

xxvii Aguilar, Juan, "New Effort to Wipe Out Carrizo Cane Reignites Environmental Debate," *The Texas Tribune* (April 5, 2016): https://www.texastribune.org/2016/04/05/new-carrizo-eradication-effort-reignites-old-debat/ .

xxviii Nixon, Dennis E., "Common Sense Border Security: Thoughts from Dennis E. Nixon," (January 2017): 3, https://www.ibc.com/en-us/Newsroom/Documents/Common%20Sense%20Border%20Security%20Solutions.pdf .

xxix "Texas Spends $800 Million on Border Security, But Shorts Carrizo Cane Eradication Project," *The Texas Tribune* (June 15, 2016): http://valleycentral.com/news/local/texas-spends-800-million-on-border-security-but-shorts-carrizo-cane-eradication-project .

xxx "CBP Facilitates Record Level of Travelers and Modernizes Trade Systems in FY 2016," U.S. Customs and Border Protection (January 12, 2017): https://www.cbp.gov/newsroom/national-media-release/cbp-facilitates-record-level-travelers-and-modernizes-trade-systems .

xxxi "U.S. Customs and Border Protection's Workload Staffing Model," Office of Inspector General, Department of Homeland Security (July 2014): 4, https://www.oig.dhs.gov/assets/Mgmt/2014/OIG_14-117_Jul14.pdf .

xxxii "CBP's Role in Strengthening the Economy," U.S. Customs and Border Protection (May 2014): https://www.cbp.gov/sites/default/files/documents/Fact%20Sheet%20ROS%20CBP%20Strengthening%20Economy.pdf .

xxxiii Alcocer, "Managing the Mexico-U.S. Border," 25.

xxxiv Becker, Gary, "Move to Reduce Border Wait Times is Step Forward for Trade," U.S. Chamber of Commerce (January 19, 2016): https://www.uschamber.com/above-the-fold/move-reduce-border-wait-times-step-forward-trade .

xxxv "Without Strategy: America's Border Security Blunders Facilitate and Empower Mexico's Drug Cartels," Texas Border Coalition (January 12, 2012): 3, http://www.texasbordercoalition.org/Texas_Border_Coalition/Welcome_files/TBC%20Report-Without%20Strategy-Final.pdf

xxxvi "Measuring the Metrics: Grading the Government on Immigration Enforcement," Bipartisan Policy Center (February 2015): 15-18, http://bipartisanpolicy.org/wp-content/uploads/2015/02/BPC_Immigration_MeasuringEnforcement.pdf .

AOL-DEF-00002587

321



TEXAS
CIVIL RIGHTS
PROJECT

P.O. Box 219
Alamo, TX 78516
956.787.8171(p)    956.787.6348(f)
texascivilrightsproject.org

April 3, 2017

U.S. Senate Committee on Homeland Security & Governmental Affairs
340 Dirksen Senate Office Building
Washington, DC, 20510
(202) 224-4751

Re: TCRP's Congressional testimony regarding the impacts of additional fencing along the Texas-Mexico border

Dear Members of the U.S. Senate Committee on Homeland Security and Governmental Affairs:

The Texas Civil Rights Project ("TCRP") respectfully submits this statement for consideration before the U.S. Senate's Committee on Homeland Security and Governmental Affairs' hearing on fencing along the southwest border, scheduled for Tuesday, April 4, 2017.

Over the course of its 26-year history, TCRP has fought to empower Texas communities through legal advocacy, including those living on the U.S.-Mexico border. In particular, with offices in El Paso and the Rio Grande Valley, we have longstanding and direct connections with the residents of border communities. We share our expertise with you in hopes that you will fully appreciate the negative effects of additional fencing in Texas' border communities

Approximately 674,433 people live in El Paso and 1,305,782 in the Rio Grande Valley.[1] El Paso, combined with the larger Paso Del Norte metropolitan area, is home to the largest bilingual and binational work force in the Western Hemisphere.[2] In the Rio Grande Valley, the agriculture, manufacturing, and tourism industries rely on the daily flow of people back and forth between the U.S. and Mexico.[3] Last year alone, Texas' exports to Mexico exceeded 92 billion dollars.[4] Adding more fencing or other physical barriers to this shared border would not only irreparably damage the economic viability of these communities, but also threaten the human rights of U.S. citizens and other border residents.

In El Paso County alone, over 200 privately-owned parcels of land lie along the border.[5] In the Rio Grande Valley, privately-owned border properties number nearly 300.[6] Over 50 of these parcels house American-owned small businesses, including ranches, factories, and farms.[7] Many of these private citizens and small

---

[1] United States Census Bureau, Population and Housing Estimates https://www.census.gov/programs-surveys/popest.html (last visited April 3, 2017).
[2] "El Paso and Juarez know what happens when a wall divides two cities," Los Angeles Times, January 25, 2017, http://www.latimes.com/nation/la-na-trump-wall-el-paso-20170125-story.html
[3] Rio Grande Valley of South Texas, http://riograndevalleytx.us/ (last visited April 3, 2017).
[4] Department of Commerce, International Trade Administration, Texas Exports, Jobs & Foreign Investment, February 2017, http://www.trade.gov/mas/ian/statereports/states/tx.pdf.
[5] El Paso County Property Records, http://gis.elpasotexas.gov/pdnmapajs/
[6] Cameron County Property Records, http://www.cameroncad.org/eadclientdlv/propertymap.aspx; Hidalgo County Property Records, http://propaccess.hidalgoad.org/mapSearch/?cid=1.
[7] Based on TCRP's analysis of El Paso County's Property Records.

1

AOL-DEF-00002588



P.O. Box 219
Alamo, TX 78516
956.787.8171(p)  956.787.6348(f)
texascivilrightsproject.org

businesses were previously forced to relinquish their private property to the federal government when it embarked upon a fence-building project under the Secure Fence Act of 2006.[8] As the community is acutely aware, the resulting fence cost over 1.2 billion dollars and has not reduced unauthorized border crossings by any significant degree.[9] Building a new wall or additional fencing would further strip away the property rights of individual and business landowners without any evidence of increased utility.

Countless Texas families have already suffered the devastating effect of having their land taken by the federal government. Indeed, many communities are still reeling from the 2008 border fence construction, when homeowners were systematically offered wholly inadequate compensation for properties seized through eminent domain proceedings and subsequently saddled with government fences and security towers in their backyards.[10] After the construction of the fence, Border Patrol enforcement actions and constant fence repairs damaged so much private property that the government had to set up a special claims system to allow landowners to collect damages.[11]

The story of one of TCRP's clients, Ms. Eloisa Tamez, illustrates how local families were harmed by that first round of fence-related condemnation actions in 2008.[12] Ms. Tamez and her family, who are members of the Lipan Apache tribe, have lived in the community of El Calaboz, near Brownsville, for over five generations, since before Texas was even part of the United States. That land was their home, and there was no amount of money that could constitute "just compensation"—as required by the Constitution—when the government wanted to take it away from them.

Ms. Tamez's property is now bisected by a metal fence that has devalued her land irreparably. To visit the southern part of her land, which lies between the fence and the Rio Grande River, she must key-in an access code to go through the a gate in the fence. That fence on her property includes a gate that can be opened everyday illustrates that this fence was not truly aimed at stopping unauthorized border crossings, but rather serving as a political statement.

---

[8] A list of 334 fence-related eminent domain actions can be consulted at: https://docs.google.com/spreadsheets/d/1jkuxoIUctKQ_cnRoO2enww7rfs6nivd2LLAsxpUsHB0/edit#gid=1466917367.
[9] "Here's what we know about Trump's Mexico Wall," Bloomberg News, February 13, 2017, last updated March 29, 2017, https://www.bloomberg.com/graphics/2017-trump-mexico-wall/will-a-wall-be-effective/ (last visited April 3, 2017).
[10] See, for example, UNITED STATES OF AMERICA v. 0.07 ACRE OF LAND, more or less, et al ($1,200.00 settlement); UNITED STATES OF AMERICA v. 0.04 ACRE of LAND, MORE or LESS, et al ($1,250.00 settlement); UNITED STATES OF AMERICA v. 0.04 of Acres of Land, More or Less et al ($1,000.00 settlement); UNITED STATES OF AMERICA v. 0.23 ACRES OF LAND, more or less, situated in Hidalgo County, Texas et al ($1,000.00 settlement).
[11] United States Government Accountability Office, "Southwest Border: Issues Related to Private Property Damage," April 2015, available at: http://www.gao.gov/assets/670/669936.pdf.
[12] See United States v. 1.04 acres of land, more or less, situated in Cameron County, Texas, and Eloisa G. Tamez, et al., No. 1:08-CV-00044, Southern District of Texas, Brownsville Division.

2

323



TEXAS
CIVIL RIGHTS
PROJECT

P.O. Box 219
Alamo, TX 78516
956.787.8171(p)   956.787.6348(f)
texascivilrightsproject.org

The current administration's plan to expand the border wall would cost over 20 billion dollars,[13] and estimates have placed that figure as high as 40 billion dollars, although it is not clear whether these figures have taken into account the full price of providing just compensation to landowners.[14] As noted above, expanding the wall would also involve exercising eminent domain over hundreds of parcels of privately held land in Texas. Conversations with community members, increasingly reported by the press, show that border landowners overwhelmingly oppose new construction, and are determined to resist eminent domain actions.

In addition to the monetary impact, taking land away from Texan families also carries an incalculable human cost. Such is the case of a landowner in Sullivan City, who has owned land in the community of Los Ebanos for generations. She still lives on land that the government has tried to expropriate, and expressed it this way to TCRP attorneys:

> *When the government comes from Washington to take our land here in the border, they don't know us. They don't know our community. They don't know our neighbors. They don't know how hard our families have worked for generations, for decades, to own and preserve this land. Then one day they simply come and try to take whatever they want, trying to pay whatever they want. They are offering us $2,900.00 for over 1.2 acres of land! That is insulting! When the government treats us like that, we feel like they don't even consider us human. We feel like, to the government, we're worth nothing.*

It was clear in 2008, and it is clear today, that building a fence was not and is not an effective solution to unauthorized immigration--instead, it represents a political game, played with the property rights of some of the poorest communities in the country. For that reason, TCRP is prepared to represent landowners, particularly those from historically marginalized backgrounds, and use public education efforts to protect the rights of all Texans who call the borderlands their home. We honored this commitment in 2008 when we helped landowners on the border file defenses to eminent domain proceedings for the first round of fence building, and we will honor that commitment again now.

*********

Thank you for the opportunity to offer this testimony. If you have questions or desire additional information, please contact:

**Efrén C. Olivares**
*Racial and Economic Justice Director*

---

[13] "Trump border wall funding facing delay," BBC, March 29, 2017, http://www.bbc.com/news/world-us-canada-39434413 (last visited April 3, 2017).
[14] *Bad Math Props Up Trump's wall*, MIT Technology Review, October 18, 2016, available at: https://www.technologyreview.com/s/602494/bad-math-props-up-trumps-border-wall/ In the eminent domain actions instituted pursuant to the 2006 Secure Fences Act, the federal government paid over 11.5 million dollars in compensation to landowners. Summary compilation of cases available at: https://docs.google.com/spreadsheets/d/1jkuxoIUctKQ_cnRoO2cnww7rfs6nivd2LLAsxpUyHB0/edit?usp=sharing.

3

AOL-DEF-00002590

324



Texas Civil Rights Project
P.O. Box 219 | Alamo, TX 78516
T: 956.787.8171 ext. 121
cfren@texascivilrightsproject.org

**Brooke N. Bischoff**
*Attorney, Equal Justice Works Fellow*
Texas Civil Rights Project
O: (915) 532-3799 ext. 146
brooke@texascivilrightsproject.org

P.O. Box 219
Alamo, TX 78516
956.787.8171(p)     956.787.6348(f)
texascivilrightsproject.org

4

AOL-DEF-00002591

325

The Honorable Ron Johnson
Chairman
U.S. Senate Committee on Homeland Security & Governmental Affairs
340 Dirksen Senate Office Building
Washington, DC 20510

The Honorable Claire McCaskill
Ranking Member
U.S. Senate Committee on Homeland Security & Governmental Affairs
442 Hart Senate Office Building
Washington, DC 20510

Dear Members of the U. S. Senate Committee on Homeland Security and Governmental Affairs,

I am writing to you to express opposition to the border wall being proposed along the Texas Mexico
border. The proposed wall will be a detriment to the history of our family land as well as detrimental to
the memory of our ancestors who have worked hard to maintain this land for 266 years.

By way of background, our family land is very rich in history and was an original Spanish Land Grant
established in 1750 and was named Nuestra Senora de los Dolores land grant.  History books tell the story
of the land being established to raise cattle and became a very important port .  The ruins of the once
thriving community are still visible on the land and serve as a reminder of our rich history.  In addition,
there is a cemetery that served as the central burial ground for our ancestors and those who made this
important area of land a success. Included on the burial ground is our father Roberto J. Vidaurri.

My father Roberto J. Vidaurri was a very proud American and was proud of the fact that he was able to
maintain the legacy of his ancestors.  In addition to being a rancher, my father was a United States Marine
veteran and proudly served in World War II where he served and was wounded in the battle of Iwo Jima.
He received the esteemed Purple Heart Medal for combat wounds he received during the battle.

Our opposition to the border wall cuts to the fact that we have the privilege to own the land and have the
responsibility to continue to maintain the legacy of the land we have inherited from our ancestors.
Inclusive of that legacy includes maintaining the burial ground where our father and his ancestors are
interred. A border wall could potentially be built in an area that would forever prohibit us to visit our
fathers burial ground, but would also sacrifice sacred ground.

In addition, a border wall would restrict the access to the Rio Grande River.  The land is a farming ranch
and our family owns water rights from the State of Texas and a border wall would prohibit the acquisition
of water from the river to irrigate the crops.

Senators, thank you in advance for entering this letter into the record for the hearing on the border wall
and for taking the time to consider this opinion.  The wall will pose more problems for farmers and
ranchers and more importantly impede on the 266 year legacy of our land.

AOL-DEF-00002592

326

Sincerely,

Patricia Elena Vidaurri

Land Owner and Citizen of the United States of America


Electronic signature

AOL-DEF-00002593

327

**Post-Hearing Questions for the Record
Submitted to David Aguilar
From Senator Claire McCaskill**

**"Fencing Along the Southwest Border"**

**April 4, 2017**

Land Acquisition

During the hearing on April 4, 2017, hearing participants discussed the difficulty of acquiring tribal and private land for the building of fencing/border wall.

1) Is technology an adequate solution in areas where border wall can't be constructed due to land acquisition issues or environmental hazards?

   A. It is a given that border wall/infrastructure will not be able to be built in all areas along the border or even in areas where the Border Patrol may deem it necessary to enhance operational capabilities. Technology that provides situational awareness throughout the border enforcement zones where the Border Patrol identifies a need will provide a tremendous force multiplier which will enable the Border Patrol to undertake preventive and deterrence activities. The technology based situational awareness capabilities will provide the Border Patrol with the means to identify any breaching of the border that occurs, classify it as activity that needs to be addressed, and to take actions to timely resolve illegal border incursions. Technology will be of tremendous assistance.

2) What should CBP and the Department of Justice do to improve the process for notifying landowners of the need to procure their land for the wall, and to provide appropriate compensation for wall used for the border wall, as well as any land on their property adversely affected by the construction of a border wall?

   A. Eminent Domain is very procedural but to the degree possible outreach as early as possible in the process should be undertaken with the affected and potentially affected land owners and communities. Compensation should take into account the holistic effect on the land owners. It is not just the fair market value that affects the owners but in some cases, as we experienced in the past, eminent domain was exercised and land taken from families and family members that had been in the family lineage since Spanish Land Grants.

AOL-DEF-00002594

328

3) In your time at CBP what did you do to ensure that poor landowners had adequate legal representation when their land was condemned for the building of fence?

   A. The Department of Justice working with the Office of General Counsel at DHS and the Office of Chief Counsel at CBP handled all eminent domain takings.

<u>Feasibility and Effectiveness of the Wall</u>

4) How do you build an "impassable" wall that prevents all illegal border crossings?

   A. We must be realistic, an "impassable wall" cannot be built. The Border Patrol has never looked to build an "impassable wall". The Border Patrol looks at designing, building, and placing a wall or infrastructure not as an "impassable wall" but rather as a deterrent and secondly as a means to highly elevate the difficulty of breaching the border. In this manner the Border Patrol has a higher degree of control over the flow of illegal crossings of the border. Technology arrayed in support of border infrastructure and comprised of capabilities to detect, deter, identify, classify, and help in resolving an attempt at breaching a wall or interdicting subjects that have successfully defeated a physical wall/infrastructure is essential to a border enforcement system.

5) Is it possible to prevent 100 percent of all illegal entries into the United States?

   A. No

6) Do you both feel that a reinforced concrete wall is appropriate for the Border Patrol, or would a solid concrete wall in any way hinder Border Patrol agents' situational awareness?

   A. The Border Patrol will identify the type of wall/infrastructure that will best suit the operational environment where they feel infrastructure is required. The vast majority of the border will more than likely require infrastructure that will support visibility capabilities through the wall/infrastructure for operational requirements. Reinforced concrete wall may be appropriate in minimal areas along the border but I do not see it being applied in large measure along the border. In those areas where solid infrastructure may be required, the Border Patrol will more than likely identify and require technological capabilities to gain situational awareness as operationally required.

AOL-DEF-00002595

329

**Post-Hearing Questions for the Record**
**Submitted to the Mr. David Aguilar**
**From Senator Jon Tester**

**"Fencing Along the Southwest Border"**

**April 4, 2017**

1. When CBP is negotiating with Native American tribes regarding access to tribal lands, what are some of the usual sticking points for both parties?

   A. Sovereignty is the biggest issue when communicating or negotiating with Native American Tribes. They want to be included in all matters relating to activities or considerations being undertaken relative to their lands. This is not an unreasonable expectation. In my experience, outreach and communication as early as possible when contemplating activities or efforts which may in any manner affect Native American communities has been critical to negotiation processes and reaching agreements.

2. What does the process look like to get tribal agreement not just on physical barriers, but also on basic infrastructure such as roads?

   A. My experience with the Tohono O'dham Nation and the Mohawk Nation at Akwasasne is what I base my response to this question. The process requires consistent engagement with the highest political levels within the Native American communities and outreach to the populace. The political governing bodies place great emphasis on ensuring that their populations understand the reasoning, rationale, and requirements for US Government actions on their lands. The political bodies require information, time, and accessibility to US Government decision makers to assist them in communicating what is being asked of the Nations and their people. Accessiblity to Native American Nations' lands are a very sensitive matter. Statutory authority for access by US Border Patrol to Native American lands is unquestioned but they require notification, information, and explanation for operational concepts. Privacy and privacy protection of their populations and cultural activities are of great concern; therefore, operationally enhancing technology which provides situational awareness is always controversial and of high interest and concern.

AOL-DEF-00002596

330

3. Would you say that the relationship between U.S., tribal, and Mexican officials has been improving over the last several years?

    A. Relationships between the U.S. and the Tohono O'dham Nation has continued to improve dramatically since the late 1990's and the peak period of illegal cross border activities of the early 2000's. The Tucson Sector of the Border Patrol, as an example, has had a Tribal Liaison Agent assigned since the early 2000's and has made tremendous strides on building up relationships with the Tohono O'dham political bodies and the TO nation's communities.

4. Where do you believe the relationship stands today?

    A. The relationship is very good but needs to continue to be nurtured and improved especially in light of the potential for increased operational requirements that may need to be applied on the Nation. Continued outreach, attention to evolving concerns, and persistent communications are vital. The Border Patrol, rightfully, has built up capabilities and capacity around the Nation. Evolving operational necessity drove application of these resources. This was not done intentionally but resulted because the Nation refuses to allow certain technology and infrastructure (ie, IFT's, roadway building/improvement, barriers, ...) to be applied. This has resulted in a situation where the nation, due to lack of enforcement infrastructure and certain technology is more vulnerable to illegal incursions than immediately surrounding areas. Criminal organizations are taking and will continue to take advantage of this vulnerability.

Commissioner Aguilar, following up on your testimony, you said that "eminent domain may have to be exercised to take land required for the construction of border infrastructure."

And the President's budget proposal for fiscal year 2018 supports the addition of "20 attorneys under the Department of Justice to pursue federal efforts to obtain the land and holdings necessary for the southwest border and another 20 attorneys and support staff for immigration litigation assistance."

5. What are your thoughts about exercising eminent domain in order to take land away from private owners in order to build out border infrastructure?

    A. Eminent domain should be exercised as a last resort. The taking of private lands should be exercised only after very thorough consideration to all options which may avoid the need for the taking of private lands.

6. Do you believe that an additional 40 attorneys at the Department of Justice would be enough to expedite lawsuits that would likely arise if the federal government were to take people's land for them?

AOL-DEF-00002597

331

A. Respectfully, this question should be addressed to the Department of Justice and DHS Office of General Counsel.

7. There has been a lot of testing, studies, and work that the Border Patrol has already completed on border fencing. Do you believe they are currently able to pull an old plan off the shelf, dust it off, and implement it? If not, what has changed?

A. The Border Patrol and CBP have done a considerate amount of testing, studies, and planning on border fencing and infrastructure requirements but I believe that re-visiting the issue is important. The border has been transformed from the time that we built the original infrastructure and increased the size of the Border Patrol. While the threats remain constant, the criminal organizations, smuggling routes, and threats have evolved around the successes that our nation has had on our borders. It is important to evolve our border enforcement strategy to the current and evolving border challenges, threats, and concerns.

8. Could you estimate how much it has cost CBP in personnel hours and department budget to develop fencing plans over your tenure at CBP?

A. This is not a figure that I would venture to estimate without access to historical information I would need.

AOL-DEF-00002598

332

**Post-Hearing Questions for the Record**
**Submitted to Deputy Chief Ron Colburn**
**Senator John McCain**

**"Fencing Along the Southwest Border"**
**April 4, 2017**

1. Are there additional policies in place to review the hiring process to address the shortages in men and women at the border?
2. What additional policies and strategies should this committee consider in alleviating the shortages to secure our borders?
3. In your statement, you discussed improvements made along the stretch of the border in Yuma Sector. What has been the main contribution of Yuma Sector's drastic decrease in violent assaults?
4. Do you believe the border should be composed of a mix of technology and physical fence?
5. What additional sensor and communications technology should this committee consider in protecting our border?
6. You stated that transnational criminal organizations have tried different methods to defeat the fence. What are some of the methods that have been tried? What solutions did Yuma Sector implement to address these challenges?
7. Can you expand on the arrests and smuggling activities along the border?

**Witness responses to questions submitted for the record were not received**
**by time of printing.**

AOL-DEF-00002599

333

**Post-Hearing Questions for the Record
Submitted to Ronald Colburn
From Senator Claire McCaskill**

**"Fencing Along the Southwest Border"**

**April 4, 2017**

<u>Land Acquisition</u>

During the hearing on April 4, 2017, hearing participants discussed the difficulty of acquiring tribal and private land for the building of fencing/border wall.

1) Is technology an adequate solution in areas where border wall can't be constructed due to land acquisition issues or environmental hazards?

2) What should CBP and the Department of Justice do to improve the process for notifying landowners of the need to procure their land for the wall, and to provide appropriate compensation for wall used for the border wall, as well as any land on their property adversely affected by the construction of a border wall?

3) In your time at Border Patrol what did you do to ensure that poor landowners had adequate legal representation when their land was condemned for the building of fence?

4) How long do you estimate it will take to acquire the remaining land on the Texas/Mexico border and is acquisition of all of the land feasible?

<u>Cost-Benefit Analysis</u>

5) In your time at Border Patrol did you ever conduct a cost-benefit analysis for the use of fencing versus the use of technology on the border?

<u>Feasibility and Effectiveness of the Wall</u>

6) How do you build an "impassable" wall that prevents all illegal border crossings?

7) Is it possible to prevent 100 percent of all illegal entries into the United States?

8) Do you both feel that a reinforced concrete wall is appropriate for the Border Patrol, or would a solid concrete wall in any way hinder Border Patrol agents' situational awareness?

AOL-DEF-00002600

334

Witness responses to questions submitted for the record were not received
by time of printing.

**Post-Hearing Questions for the Record
Submitted to the Mr. Ron Colburn
From Senator Jon Tester**

**"Fencing Along the Southwest Border"**

**April 4, 2017**

1. When CBP is negotiating with Native American tribes regarding access to tribal lands, what are some of the usual sticking points for both parties?

2. What does the process look like to get tribal agreement not just on physical barriers, but also on basic infrastructure such as roads?

3. Would you say that the relationship between U.S., tribal, and Mexican officials has been improving over the last several years?

4. Where do you believe the relationship stands today?

5. There has been a lot of testing, studies, and work that the Border Patrol has already completed on border fencing. Do you believe they are currently able to pull an old plan off the shelf, dust it off, and implement it? If not, what has changed?

6. Could you estimate how much it has cost CBP in personnel hours and department budget to develop fencing plans over your tenure at CBP?

Witness responses to questions submitted for the record were not received
by time of printing.

AOL-DEF-00002601

335

**Post-Hearing Questions for the Record**
**Submitted to Dr. Terence Garrett**
**From Senator Claire McCaskill**

**"Fencing Along the Southwest Border"**

**April 4, 2017**

<u>Land Acquisition</u>

During the hearing on April 4, 2017, hearing participants discussed the difficulty of acquiring tribal and private land for the building of fencing/border wall.

1) Is technology an adequate solution in areas where border wall can't be constructed due to land acquisition issues or environmental hazards?

<u>Dr. Terence Garrett</u>: Perhaps. Technology is preferable than the confiscation of citizens' private property used for wall building. Walls have caused flooding – creating deaths and property damage – in Nogales, Sonora, Mexico as debris collected along the installed fencing with a flash flood. The indiscriminant building of walls along the Rio Grande that defeat levees and other structures established by the International Boundary Waters Commission – and mutually agreed to in total by both Mexico and the USA – must be adhered to under treaty obligations and not swayed or intimidated by Customs and Border Patrol or other Department of Homeland Security agencies. Also, endangered species such as black bears, jaguars, mountain lions, ocelots, jaguarondis, the Texas tortoise, and other animals clearly need to move across the borderlands to maintain healthy populations. Finally, the treaty with the Tohono O'odham Nation must be respected and honored by the USA government.

Be careful with technology! It does not always work. The IG for DHS and the GAO discovered massive fraud, waste and abuse in the Nogales sector from the Boeing SBI-Net contract (the company cost US taxpayers $1 billion – see the following link: http://www.cnn.com/2011/US/01/14/border.virtual.fence/ ). By the way, I noticed that my co-panelists, Mr. Colburn and Mr. Aguilar, now are consultants for technology firms.

2) What should CBP and the Department of Justice do to improve the process for notifying landowners of the need to procure their land for the wall, and to provide appropriate compensation for wall used for the border wall, as well as any land on their property adversely affected by the construction of a border wall?

<u>Dr. Terence Garrett</u>: There were several problems in the first fence land acquisition process. Armed CBP and other DHS agents would show up unannounced on people's door steps with legalistic documents that were demanded to be signed on site. The DHS held "fake" town hall meetings where when citizens would have the temerity to appear, their concerns were not listened to by federal agents. Rather, they were told and instructed as to what was going to occur. Along the Rio Grande in South Texas,

AOL-DEF-00002602

336

landowners who resisted were intimidated by CBP. Case in point [and anecdotally], Dr. Eloisa Tamez, a colleague and friend of mine at UTRGV and who is director of the graduate nursing program, refused to sign the survey/land acquisition documents. Her renter, a security guard in Brownsville who lived next door to her, was harassed repeatedly by CBP personnel when he came home from work late at night or in the early hours of the morning. They would pull him over and search his car on a regular basis and tell him to show his citizenship papers. Dr. Tamez believes this threatening behavior was intended to cause her to lose the renter and cause a loss of income for her. When CBP eventually took her .26 acre of land, the harassment stopped.

Federal Judge Hanen (South Texas District) had over 300 cases dealing with all sorts of land and land accessing issues. Any further building of fence without dealing honestly and forthrightly by the federal government in terms of just compensation will be magnified by the hundreds of miles of privately held land in Texas.

There is still plenty of anger and hostility in south Texas today with regard to the 2006-2009 wall project and how it was conducted. News of more land acquisition will generate far greater opposition if the border wall is extended or built in the region. The Texas Civil Rights Project, for example, is getting Texans ready for the next border wall, as shown partially below by TCRP's April 19, 2017 Campaign Newsletter:

RELEASE: Texas Civil Rights Project launches campaign to assist borderland property owners, oppose border wall

TCRP prepares to represent Texas landowners targeted by the federal government to build a border wall. The know your rights video offers concerned landowners assistance to ensure they receive fair treatment.

Alamo, TX — Today, the Texas Civil Rights Project launched a new campaign, including bilingual videos, to protect the civil rights of Texas landowners while delaying construction of a wall that is offensive to communities and ineffective as a matter of immigration policy.

TCRP will represent border landowners who will soon face eminent domain actions by the federal government attempting to build a border wall on their property. Our campaign will also involve training and deploying legal volunteers to ensure that landowners have the representation they deserve, particularly those who are poor and/or lack the skills to successfully navigate the judicial system.
As part of our outreach, TCRP's new videos detail, in English and Spanish, the protections landowners have under the U.S. Constitution to be notified in writing, provided just compensation, and heard by a jury of their peers to determine the value of their land before it is taken. TCRP will conduct know your rights trainings and distribute the video extensively across the Texas borderlands.
As an organization, TCRP was founded in the Texas borderlands to fight back against civil rights threats in that community — and later, across the state. With attorneys in the Rio Grande Valley and El Paso, TCRP is ready to protect residents

AOL-DEF-00002603

337

in the borderlands from the proposed border wall that threatens to divide and harm millions of residents.

Efrén Olivares, Racial and Economic Justice Director at the Texas Civil Rights Project, said:

"We are ready for a contested, protracted resistance alongside Texan landowners. Under the rules governing federal condemnation actions, a landowner who disagrees with the amount offered by the government has the right to request a jury trial. Our team at the Texas Civil Rights Project is ready to represent landowners, as well as train and deploy legal volunteers to ensure that all landowners have the representation and respect they deserve.
Ultimately, we know that the proposed border wall is the type of wrongheaded policy that threatens our community and distracts from the real issues facing our broken immigration system."

The Texas Civil Rights Project uses legal advocacy to empower Texas communities and create policy change. In its twenty-five year history, TCRP has brought thousands of strategic lawsuits, defending voting rights, fighting institutional discrimination, and reforming systems of criminal justice. Today — with dozens of high-caliber attorneys and professionals in Austin, Dallas, El Paso, Houston and the Rio Grande Valley, and an extensive network of pro bono counsel and community allies — TCRP is among the most influential civil rights organizations in the Lone Star State.

So, in addition to well-funded landowners, poorer Texans will be better prepared and represented for the next border wall.

3) How long do you estimate it will take to acquire the remaining land on the Texas/Mexico border and is acquisition of all of the land feasible?

Dr. Terence Garrett: With the 2006-2009 border wall project as a guide – roughly 650 miles previously – people along the border are now quite aware of the tactics and strategy that DHS used. The first time around, the DHS went after the poor, undereducated, and Spanish-speaking population in south Texas. The next time will be different. Federal parks and refuges will be relatively easy (Big Bend, etc.), although even there, environmental organizations will fight with all the legal resources they can muster. The DHS will be dealing with a public relations nightmare. Private lands will take twice as long to procure because landowners will be "lawyered up." The low hanging fruit of the first fence project was relatively easy. The next time around will be far more difficult. Judge Hanen's docket – and other judges – will be overwhelmed with lawsuits. Even with the 2005 REAL ID Act and the 2006 Secure Fence Act in place, we may be talking decades before any massive border wall project is ultimately resolved.

Cost-Benefit Analysis

338

4) Are you aware if CBP has ever conducted a cost-benefit analysis for the use of fencing versus the use of technology on the border?

   Dr. Terence Garrett: No. Perhaps this would be a good project for the Government Accountability Office. GAO should look at past costs in both categories for previous fencing in addition to potential future border wall applications. Another factor should be conducting an analysis of CBP and ICE personnel costs for overall border security.

Feasibility and Effectiveness of the Wall

5) How do you build an "impassable" wall that prevents all illegal border crossings?

   Dr. Terence Garrett: No one can build such a wall. It is not possible.

6) Is it possible to prevent 100 percent of all illegal entries into the United States?

   Dr. Terence Garrett: It is not possible. There will always be job and political asylum seekers coming to the USA no matter what policies are adopted.

7) Do you both feel that a reinforced concrete wall is appropriate for the Border Patrol, or would a solid concrete wall in any way hinder Border Patrol agents' situational awareness?

   Dr. Terence Garrett: Walls are not effective for border security. Congressman Henry Cuellar (D-TX) has noted "We can't come in with the new administration and have a very simplistic view that you have a 14th century solution to a 21st century problem." - See more at: http://www.rollcall.com/news/politics/cuellar-suggest-virtual-border#sthash.eRcDnQSr.dpuf

AOL-DEF-00002605

339

**Post-Hearing Questions for the Record
Submitted to the Dr. Terence Garrett
From Senator Jon Tester**

**"Fencing Along the Southwest Border"**

**April 4, 2017**

Commissioner Aguilar stated in his written testimony that "eminent domain may have to be exercised to take land required for the construction of border infrastructure."

Further, the President's budget proposal for fiscal year 2018 supports the addition of "20 attorneys under the Department of Justice to pursue federal efforts to obtain the land and holdings necessary for the southwest border and another 20 attorneys and support staff for immigration litigation assistance."

    1.   What are your thoughts about exercising eminent domain in order to take land away from private owners in order to build out border infrastructure?

<u>Dr. Terence Garrett</u>: Senator Tester, I will give you the same response that I gave to Senator McCaskill that also answers your question …

There were several problems in the first fence land acquisition process. Armed CBP and other DHS agents would show up unannounced on people's door steps with legalistic documents that were demanded to be signed on site. The DHS held "fake" town hall meetings where when citizens would have the temerity to appear, their concerns were not listened to by federal agents. Rather, they were told and instructed as to what was going to occur. Along the Rio Grande in South Texas, landowners who resisted were intimidated by CBP. Case in point [and anecdotally], Dr. Eloisa Tamez, a colleague and friend of mine at UTRGV and who is director of the graduate nursing program, refused to sign the survey/land acquisition documents. Her renter, a security guard in Brownsville who lived next door to her, was harassed repeatedly by CBP personnel when he came home from work late at night or in the early hours of the morning. They would pull him over and search his car on a regular basis and tell him to show his citizenship papers. Dr. Tamez believes this threatening behavior was intended to cause her to lose the renter and cause a loss of income for her. When CBP eventually took her .26 acre of land, the harassment stopped.

Federal Judge Hanen (South Texas District) had over 300 cases dealing with all sorts of land and land accessing issues. Any further building of fence without dealing honestly and forthrightly by the federal government in terms of just compensation will be magnified by the hundreds of miles of privately held land in Texas.

There is still plenty of anger and hostility in south Texas today with regard to the 2006-2009 wall project and how it was conducted. News of more land acquisition will generate far greater opposition if the border wall is extended or built in the region. The Texas Civil Rights Project,

AOL-DEF-00002606

340

for example, is getting Texans ready for the next border wall, as shown partially below by
TCRP's April 19, 2017 Campaign Newsletter:

> RELEASE: Texas Civil Rights Project launches campaign to assist borderland
> property owners, oppose border wall
>
> TCRP prepares to represent Texas landowners targeted by the federal government to
> build a border wall. The know your rights video offers concerned landowners
> assistance to ensure they receive fair treatment.
>
> Alamo, TX — Today, the Texas Civil Rights Project launched a new campaign,
> including bilingual videos, to protect the civil rights of Texas landowners while
> delaying construction of a wall that is offensive to communities and ineffective as a
> matter of immigration policy.
>
> TCRP will represent border landowners who will soon face eminent domain actions
> by the federal government attempting to build a border wall on their property. Our
> campaign will also involve training and deploying legal volunteers to ensure that
> landowners have the representation they deserve, particularly those who are poor
> and/or lack the skills to successfully navigate the judicial system.
>
> As part of our outreach, TCRP's new videos detail, in English and Spanish, the
> protections landowners have under the U.S. Constitution to be notified in writing,
> provided just compensation, and heard by a jury of their peers to determine the value
> of their land before it is taken. TCRP will conduct know your rights trainings and
> distribute the video extensively across the Texas borderlands.
>
> As an organization, TCRP was founded in the Texas borderlands to fight back against
> civil rights threats in that community — and later, across the state. With attorneys in
> the Rio Grande Valley and El Paso, TCRP is ready to protect residents in the
> borderlands from the proposed border wall that threatens to divide and harm millions
> of residents.
>
> Efrén Olivares, Racial and Economic Justice Director at the Texas Civil Rights
> Project, said:
>
> We are ready for a contested, protracted resistance alongside Texan landowners.
> Under the rules governing federal condemnation actions, a landowner who disagrees
> with the amount offered by the government has the right to request a jury trial. Our
> team at the Texas Civil Rights Project is ready to represent landowners, as well as
> train and deploy legal volunteers to ensure that all landowners have the representation
> and respect they deserve.
>
> Ultimately, we know that the proposed border wall is the type of wrongheaded policy
> that threatens our community and distracts from the real issues facing our broken
> immigration system."

341

The Texas Civil Rights Project uses legal advocacy to empower Texas communities and create policy change. In its twenty-five year history, TCRP has brought thousands of strategic lawsuits, defending voting rights, fighting institutional discrimination, and reforming systems of criminal justice. Today — with dozens of high-caliber attorneys and professionals in Austin, Dallas, El Paso, Houston and the Rio Grande Valley, and an extensive network of pro bono counsel and community allies — TCRP is among the most influential civil rights organizations in the Lone Star State.

So, in addition to well-funded landowners, poorer Texans will be better prepared and represented for the next border wall. The next eminent domain actions taken to build border infrastructure will be met with massive resistance – just in Texas alone.

2. Do you believe that an additional 40 attorneys at the Department of Justice would be enough to expedite lawsuits that would likely arise if the federal government were to take people's land from them?

Dr. Terence Garrett: Senator Tester, the answer is "no." The much bigger problem will be the federal district judges' caseloads that will go up dramatically along the USA/Mexico border with all the emininent domain cases and land accessability problems by landowners because of the wall.