MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Chad F. Wolf,[1] *et al.*, <br><br> Defendants. | Case No.:  17-cv-02366-BAS-KSC <br><br> **EXHIBIT 28 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> **AOL-DEF-00205051 to AOL-DEF-00205075** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

OFFICE OF INSPECTOR GENERAL

# Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy


Homeland Security

**September 27, 2018**

**OIG-18-84**

AOL-DEF-00205051



# DHS OIG Highlights

## Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy

**September 27, 2018**

## Why We Did This Special Review

In light of the heightened public and congressional interest in the Department of Homeland Security's separation of families at the southern border pursuant to the Government's Zero Tolerance Policy, the DHS Office of Inspector General (OIG) conducted unannounced site visits to U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement facilities in and around El Paso and McAllen, Texas on June 26–28, 2018. The following report describes OIG's observations in the field and its analysis of family separation data provided by the Department.

## What We Recommend

This report is observational and contains no recommendations.

**For Further Information:**

Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov.

# What We Observed

DHS was not fully prepared to implement the Administration's Zero Tolerance Policy or to deal with some of its after-effects. Faced with resource limitations and other challenges, DHS regulated the number of asylum-seekers entering the country through ports of entry at the same time that it encouraged asylum-seekers to come to the ports. During Zero Tolerance, CBP also held alien children separated from their parents for extended periods in facilities intended solely for short-term detention.

DHS also struggled to identify, track, and reunify families separated under Zero Tolerance due to limitations with its information technology systems, including a lack of integration between systems.

Finally, DHS provided inconsistent information to aliens who arrived with children during Zero Tolerance, which resulted in some parents not understanding that they would be separated from their children, and being unable to communicate with their children after separation.

# DHS' Response

Appendix B provides DHS' management response in its entirety.

*www.oig.dhs.gov*

OIG-18-84

AOL-DEF-00205052



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

September 27, 2018

MEMORANDUM FOR:    The Honorable Kevin K. McAleenan
Commissioner
U.S. Customs and Border Protection

Ronald D. Vitiello
Senior Official Performing the Duties of
the Director
U.S. Immigration and Customs Enforcement

FROM:    John V. Kelly
Senior Official Performing the Duties of the
Inspector General

SUBJECT:    Special Report – *Initial Observations Regarding Family
Separation Issues Under the Zero Tolerance Policy*

For your action is the final special report *Initial Observations Regarding Family
Separation Issues Under the Zero Tolerance Policy.* This special report reflects
work undertaken pursuant to our authorities and obligations under Section 2
of the *Inspector General Act of 1978*, as amended. Specifically, the Department
of Homeland Security (DHS) Office of Inspector General performed this work for
the purpose of promoting economy, efficiency, and effectiveness in the
administration of, and preventing fraud, waste, and abuse in, DHS' programs
and operations. This final special report addresses the technical comments and
incorporates the management response provided by your offices. This report is
observational and contains no recommendations.

Consistent with our responsibility under the *Inspector General Act of 1978*, as
amended, we will provide copies of our report to Congress and will post it on
our website for public dissemination.

Please call me with any questions, or your staff may contact Jennifer Costello,
Chief Operating Officer, at (202) 981-6000.

Attachment

*www.oig.dhs.gov*

AOL-DEF-00205053



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Background

On April 6, 2018, President Trump directed several Federal agencies, including the Department of Homeland Security (DHS), to report on their efforts to end a practice developed under prior administrations of releasing certain individuals suspected of violating immigration law into the United States pending resolution of their administrative or criminal cases — a practice sometimes referred to as "catch and release."[1] The same day, Attorney General Jeff Sessions directed all Federal prosecutors along the Southwest Border to work with DHS "to adopt immediately a zero-tolerance policy" requiring that all improper entry offenses be referred for criminal prosecution "to the extent practicable" (referred to throughout this report as the Zero Tolerance Policy).[2]

Within DHS, U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) played critical roles in implementing the Administration's Zero Tolerance Policy. CBP's Office of Field Operations (OFO) inspects all foreign visitors and goods entering at established ports of entry, while U.S. Border Patrol is responsible for apprehending individuals who enter the United States illegally between ports of entry. CBP transfers aliens in its custody to ICE, which is responsible for, among other duties, detaining certain aliens with pending immigration proceedings and deporting all aliens who receive final removal orders.

Before implementation of the Zero Tolerance Policy, when CBP apprehended an alien family unit attempting to enter the United States illegally, it usually placed the adult in civil immigration proceedings without referring him or her for criminal prosecution. CBP only separated apprehended parents from children in limited circumstances — *e.g.*, if the adult had a criminal history or outstanding warrant, or if CBP could not determine whether the adult was the child's parent or legal guardian. Accordingly, in most instances, family units either remained together in family detention centers operated by ICE while their civil immigration cases were pending,[3] or they were released into the United States with an order to appear in immigration court at a later date.

---

[1] Presidential Memorandum for the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security, April 6, 2018.

[2] Dept. of Justice, *Memorandum for Federal Prosecutors Along the Southwest Border*, April 6, 2018. Entering the United States without inspection and approval is a civil offense and may also result in criminal charges. *See* 8 United States Code (U.S.C.) §§ 1227 (civil grounds for removal), 1325 (crime of improper entry), 1326 (crime of reentry). The Department of Justice has the authority to decide whether and to what extent to prosecute Federal crimes.

[3] A Federal court has interpreted the *Flores* Agreement — a 1997 settlement that establishes minimum conditions for the detention, release, and treatment of children — to generally limit

AOL-DEF-00205054



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

The Zero Tolerance Policy, however, fundamentally changed DHS' approach to immigration enforcement. In early May 2018, DHS determined that the policy would cover alien adults arriving illegally in the United States with minor children. Because minor children cannot be held in criminal custody with an adult, alien adults who entered the United States illegally would have to be separated from any accompanying minor children when the adults were referred for criminal prosecution. The children, who DHS then deemed to be unaccompanied alien children,[4] were held in DHS custody until they could be transferred to the U.S. Department of Health and Human Services (HHS) Office of Refugee Resettlement, which is responsible for the long-term custodial care and placement of unaccompanied alien children.[5]

The Administration's Zero Tolerance Policy and the resulting family separations sparked intense public debate. On June 20, 2018, President Trump issued Executive Order 13,841, halting the practice of family separation. On June 26, 2018, a Federal court ordered the Government to reunify separated children and parents within 30 days.[6] On September 20, 2018, the Government reported to the court that it had reunified or otherwise released 2,167 of the 2,551 children over 5 years of age who were separated from a parent and deemed eligible for reunification by the Government.[7] The Government also

---

the time children can stay at such family centers to 20 days. *Flores v. Lynch*, 212 F. Supp. 3d 907, 914 (C.D. Cal. 2015). In July 2018, that Federal court denied the Government's request to modify the *Flores* Agreement to allow it to detain families for longer. *Flores v. Sessions*, 85-cv-4544 (C.D. Cal. July 9, 2018). However, in August 2018, another Federal court permitted families to remain in Government facilities together longer than 20 days if the adult waives the child's rights under the *Flores* Agreement. *Ms. L. v. ICE*, 18-cv-428 (S.D. Cal. Aug. 16, 2018). DHS and HHS recently proposed regulations that, if implemented, would terminate the *Flores* Agreement. 83 Fed. Reg. 45,486 (Sept. 7, 2018).

[4] An unaccompanied alien child is a child under 18 years of age with no lawful immigration status in the United States who has neither a parent nor legal guardian in the United States nor a parent nor legal guardian in the United States "available" to provide care and physical custody for him or her. 6 U.S.C. § 279(g)(2). As such, children traveling with a related adult other than a parent or legal guardian — such as a grandparent or sibling — are still deemed unaccompanied alien children.

[5] DHS must transfer unaccompanied alien children to HHS within 72 hours unless there are "exceptional circumstances." 8 U.S.C. § 1232(b)(3). There are special requirements for unaccompanied alien children from Mexico and Canada that may permit a different process, 8 U.S.C. § 1232(a)(2)(A), but if those requirements are not met, CBP must follow the same process established for unaccompanied alien children from other countries. 8 U.S.C. § 1232(a)(3).

[6] *Ms. L. v. ICE*, 18-cv-428 (S.D. Cal. June 26, 2018). The order required the Government to reunite children under the age of 5 with their families within 14 days, and children 5 years old and older within 30 days.

[7] The Government can also release a child to another family member or sponsor, or if the child turns 18. *Ms. L. v. ICE*, 18-cv-428 (S.D. Cal. Sept. 20, 2018). According to the Government, the remaining 402 children involved in the lawsuit that are still in HHS' care include 182 children

---

AOL-DEF-00205055



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

reported that it had reunited 84 of the 103 children under 5 years of age who were separated and initially deemed eligible for reunification.

In response to significant congressional and public interest related to the Zero Tolerance Policy, a multi-disciplinary team of DHS Office of Inspector General (OIG) attorneys, inspectors, and criminal investigators deployed to areas in and around El Paso and McAllen, Texas, to conduct unannounced visits at CBP and ICE facilities between June 26 and June 28, 2018.[8] This report describes the OIG team's observations in the field, as well as the team's review of family separation data provided by the Department. This report does not evaluate the merits of the Zero Tolerance Policy or family separations. Further, the report does not evaluate the Department's efforts to reunify separated families because those efforts took place after the OIG team's field visits. Observations from specific locations in the field are not necessarily generalizable. Appendix A provides more information on the scope and methodology of the review.

## Results of Review

The OIG's observations indicate that DHS was not fully prepared to implement the Zero Tolerance Policy, or to deal with certain effects of the policy following implementation. For instance, while the Government encouraged all asylum-seekers to come to ports of entry to make their asylum claims, CBP managed the flow of people who could enter at those ports of entry through metering, which may have led to additional illegal border crossings. Additionally, CBP held alien children separated under the policy for long periods in facilities intended solely for short-term detention.[9] The OIG team also observed that a lack of a fully integrated Federal immigration information technology system made it difficult for DHS to reliably track separated parents and children,

---

where the adult associated with the child is not eligible for reunification or is not currently available for discharge, and 220 children where the Government has determined the parent is not entitled to reunification under the lawsuit. In 134 of those 220 cases, the adult is no longer in the United States and has indicated an intent not to reunify with his or her child. *Ms. L. v. ICE*, 18-cv-428 (S.D. Cal. Sept. 20, 2018).

[8] In the Rio Grande Valley sector, which encompasses McAllen, the OIG team went to facilities operated by Border Patrol (McAllen Station and Ursula Central Processing Center), CBP OFO (Gateway International Bridge, Brownsville and Matamoros International Bridge, and Hidalgo ports of entry), and ICE Enforcement and Removal Operations (ERO) (Port Isabel Detention Center). In the El Paso sector, the team went to facilities operated by Border Patrol (Clint Station, Paso Del Norte Processing Center, and El Paso Station), CBP OFO (Paso del Norte International Bridge port of entry), and ICE ERO (El Paso Processing Center and Tornillo Processing Center).

[9] Notwithstanding this observation, OIG observed that the DHS facilities it visited appeared to be operating in substantial compliance with applicable standards for holding children. The detailed results of OIG's unannounced inspections of these facilities are described in a separate OIG report titled *Results of Unannounced Inspections of Conditions for Unaccompanied Alien Children in CBP Custody*.

AOL-DEF-00205056



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

---

raising questions about the Government's ability to accurately report on separations and subsequent reunifications. Finally, inconsistencies in the information provided to alien parents resulted in some parents not understanding that their children would be separated from them, and made communicating with their children after separation difficult.

Although this report does not make formal recommendations for corrective action, it highlights issues with DHS' handling of alien families that warrant the Department's attention. OIG anticipates undertaking a more in-depth review of some of these issues in future work.

## CBP Faced Resource and Other Challenges in Responding to the Effects of the Zero Tolerance Policy

Under the Zero Tolerance Policy, the Government encouraged asylum-seekers to come to U.S. ports of entry. At the same time, CBP reported that overcrowding at the ports of entry caused them to limit the flow of people that could enter. This may have led asylum-seekers at ports of entry to attempt illegal border crossings instead. Additionally, CBP officials said that because of limited processing capacity at HHS facilities and other factors, CBP held unaccompanied alien children for long periods in facilities intended for short-term detention.

<ins>CBP Regulated the Number of Asylum-Seekers Entering at Ports of Entry, Which May Have Resulted in Additional Illegal Border Crossings</ins>

While the Zero Tolerance Policy was in effect, Government officials — including the DHS Secretary and the Attorney General — publicly encouraged asylum-seeking adults to enter the United States legally through a port of entry to avoid prosecution and separation from their accompanying children.[10] However, at the same time, CBP was regulating the flow of asylum-seekers at ports of entry through "metering," a practice CBP has utilized at least as far

---

[10] *See, e.g.*, Press Briefing by Press Secretary Sarah Sanders and DHS Secretary Kirstjen Nielsen, June 18, 2018, https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sarah-sanders-department-homeland-security-secretary-kirstjen-nielsen-061818/ ("And finally, DHS is not separating families legitimately seeking asylum at ports of entry. If an adult enters at a port of entry and claims asylum, they will not face prosecution for illegal entry. They have not committed a crime by coming to the port of entry."); Dept. of Justice, *Attorney General Sessions Addresses Recent Criticisms of Zero Tolerance By Church Leaders*, June 14, 2018, https://www.justice.gov/opa/speech/attorney-general-sessions-addresses-recent-criticisms-zero-tolerance-church-leaders ("[I]f the adults go to one of our many ports of entry to claim asylum, they are not prosecuted and the family stays intact pending the legal process.").

AOL-DEF-00205057



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

back as 2016 to regulate the flow of individuals at ports of entry.[11] Although DHS asserts that the Zero Tolerance Policy and metering at ports of entry are distinct issues, CBP officials and aliens reported that the backlogs created by these competing directives likely resulted in additional illegal border crossings.

At the ports of entry the OIG team visited, pedestrian footbridges link the United States and Mexico, with the international line dividing the two countries running across the middle of the bridges. CBP's processing facilities are stationed on the U.S. side at the north ends of the bridges. To reach these facilities, an alien must cross the international line and walk a short distance across U.S. soil. When an asylum-seeker arrives at the processing facility, CBP officers examine the individual's identification and travel documents, conduct an initial interview, obtain fingerprints and photographs, and then seek placement of the individual with ICE, or HHS if an unaccompanied alien child is involved.

When metering, CBP officers stand at the international line out in the middle of the footbridges. Before an alien without proper travel documents (most of whom are asylum-seekers) can cross the international line onto U.S. soil,[12] those CBP officers radio the ports of entry to check for available space to hold the individual while being processed. According to CBP, the officers only allow the asylum-seeker to cross the line if space is available.[13] When the ports of entry are full, CBP guidance states that officers should inform individuals that the port is currently at capacity and that they will be permitted to enter once there is sufficient space and resources to process them. The guidance further states officers may not discourage individuals from waiting to be processed.

---

[11] CBP officials informed the OIG team that CBP instituted metering to address safety and health hazards that resulted from overcrowding at ports of entry. Whether this practice is permissible under Federal and/or international law is currently being litigated and OIG expresses no opinion here on the legality or propriety of the practice. *See, e.g.*, *Washington v. United States*, 18-cv-939 (W.D. Wash. 2018); *Al Otro Lado, Inc. v. Nielsen*, 17-cv-2366 (S.D. Cal. 2017).

[12] By law, once an individual is physically present in the United States, he or she must generally be allowed to apply for asylum, regardless of immigration status. *Immigration and Nationality Act*, 8 U.S.C. § 1158(a)(1). Federal law also generally prohibits the return of an alien to a country where he or she may face torture or persecution. *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 208.16-.17.

[13] The head of a nongovernmental organization who is familiar with the flow of asylum-seekers suggested to the OIG team that CBP meters individuals even when there is available space. Although OIG observed asylum-seekers being turned away at some of the ports of entry we visited, CBP claimed that the processing facilities were full at those times. During our visits, OIG did not observe CBP turning away asylum-seekers while there was available space.

AOL-DEF-00205058



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

However, some officers in El Paso informed the OIG team that they advise individuals to return later.[14]

Although the OIG team did not observe severe overcrowding at the ports of entry it visited, the team did observe that the space designated for holding asylum-seekers during processing is limited. Additionally, CBP policies limit how and whether certain classes of aliens can be detained in the same hold room, which further constrains the available space. For instance, mothers and their young children must be held separately from unaccompanied minors, who must be held separately from adult men. Depending on who is being held on a given day and the configuration of the hold rooms, the facility can reach capacity relatively quickly. At one port of entry the OIG team visited, CBP staff attempted to increase their capacity by converting former offices into makeshift hold rooms.

While the stated intentions behind metering may be reasonable, the practice may have unintended consequences. For instance, OIG saw evidence that limiting the volume of asylum-seekers entering at ports of entry leads some aliens who would otherwise seek legal entry into the United States to cross the border illegally. According to one Border Patrol supervisor, the Border Patrol sees an increase in illegal entries when aliens are metered at ports of entry. Two aliens recently apprehended by the Border Patrol corroborated this observation, reporting to the OIG team that they crossed the border illegally after initially being turned away at ports of entry. One woman said she had been turned away three times by an officer on the bridge before deciding to take her chances on illegal entry.[15]

<u>CBP Detained Unaccompanied Alien Children for Extended Periods in Facilities Intended for Short-Term Detention</u>

Absent "exceptional circumstances," the law generally permits CBP to hold unaccompanied alien children in its custody for up to 72 hours before transferring them to the HHS Office of Refugee Resettlement pending resolution of their immigration proceedings.[16] Moreover, CBP policy dictates, "[e]very effort must be made to hold detainees for the least amount of time" possible.[17] As a result, CBP facilities are not designed to hold people for long periods of time.

---

[14] Some media reports alleged that CBP was threatening asylum-seekers and giving them false information while metering. The OIG team was unable to confirm these allegations.
[15] The fact that both aliens and the Border Patrol reported that metering leads to increased illegal border crossings strongly suggests a relationship between the two. Based on the limited scope of this review, the OIG team could not corroborate these anecdotal observations with data or evaluate the effects in other sectors it did not visit.
[16] *See* 8 U.S.C. § 1232(b)(3).
[17] CBP, *National Standards on Transport, Escort, Detention, and Search* § 4.1 (October 2015).

AOL-DEF-00205059



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

The OIG team determined that CBP exceeded the 72-hour period in many instances. Data provided by CBP to OIG indicates that, during the week of the OIG's fieldwork (June 25 to June 29, 2018), 9 out of the 21 unaccompanied alien children (42 percent) who approached the ports of entry visited by OIG were held for more than 72 hours. The data further indicates that 237 out of 855 unaccompanied alien children (28 percent) apprehended by Border Patrol between ports of entry were detained for more than 72 hours at the facilities the OIG team visited. Although the average length of time unaccompanied alien children spent in custody during this period was 65 hours, one unaccompanied alien child remained in custody for 12 days (over 280 hours).

OIG also obtained a broader data set from CBP showing how long separated children were held in Border Patrol custody during the entire period the Zero Tolerance Policy was in effect (May 5 to June 20, 2018). As discussed further in the following section, OIG has concerns about the quality and reliability of this data set. Notwithstanding these concerns, the Border Patrol's data shows that the Rio Grande Valley sector exceeded the 72-hour time period for at least 564 children (44 percent of children detained during this time). This sector also held a child for 25 days, nearly three times longer than any other Southwest Border Patrol sector. The El Paso sector exceeded the 72-hour period for 297 children (nearly 40 percent of children detained in the sector during this time). All other sectors exceeded that period 13 percent of the time.[18]

**Figure 1: Length of Custody of Separated Unaccompanied Alien Children in Border Patrol Custody during Zero Tolerance Policy (May 5 – June 20, 2018)**

|  | 0–3 Days | 4 Days | 5+ Days | Max. Days in Custody |
|---|---|---|---|---|
| **Rio Grande Valley, TX** | 56.0% | 16.9% | 27.1% | 25 |
| **El Paso, TX** | 60.2% | 16.9% | 22.9% | 9 |
| **All Other Southwest Border Sectors** | 86.8% | 9.6% | 3.6% | 8 |
| **Total – All Sectors** | 67.1% | 14.5% | 18.4% | 25 |

*Source:* OIG-generated figures based on data obtained from Border Patrol

According to many Border Patrol officials with whom the OIG team met, HHS' inability to accept placement of unaccompanied alien children promptly

---

[18] The number of children held for more than 72 hours may be even higher than these figures, as the data received shows the dates — not the specific hours — that a child was apprehended and transferred from Border Patrol. A child held for 3 days could actually have been held for more than 72 hours depending on the time that he/she was apprehended and transferred. For example, if an unaccompanied alien child was booked in at 8:00 a.m. on June 1 and booked out at 9:00 a.m. on June 4, the unaccompanied alien child was in CBP custody for 73 hours, but would be identified in the data provided as having been in custody for just 3 days.

AOL-DEF-00205060



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

resulted in unaccompanied alien children remaining in CBP custody for
extended periods. CBP officials also cited other possible reasons for extended
detention, including the need to provide an unaccompanied alien child with
medical care or delays in transportation arrangements provided by ICE.
However, other evidence indicates that CBP officials may have inadvertently
omitted critical information from unaccompanied alien children placement
requests submitted to HHS, which could have also contributed to delays. For
instance, one CBP juvenile coordinator in the Rio Grande Valley sector, who is
responsible for assisting with the placement of unaccompanied alien children
with HHS, recalled HHS contacting him several times per day for necessary
information CBP failed to provide when initially submitting particular
placement requests. Another CBP juvenile coordinator in El Paso recalled a
similar experience. One Border Patrol official stated it would have been useful
to have an HHS employee on site to assist with the care and placement of
unaccompanied alien children.

Senior Border Patrol and OFO officials also reported that detaining
unaccompanied alien children for extended periods resulted in some CBP
employees being less able to focus on their primary mission. For instance,
instead of patrolling and securing the border, officers had to supervise and take
care of children.

## Information Technology and Data Issues Make It Difficult for DHS to Identify, Track, and Reunify Separated Families

The United States does not have a fully integrated Federal immigration
information technology system. As a result, Federal agencies involved in the
immigration process often utilize separate information technology systems to
facilitate their work. The OIG team learned that the lack of integration between
CBP's, ICE's, and HHS' respective information technology systems hindered
efforts to identify, track, and reunify parents and children separated under the
Zero Tolerance Policy. As a result, DHS has struggled to provide accurate,
complete, reliable data on family separations and reunifications, raising
concerns about the accuracy of its reporting.

<u>Lack of Integration between Critical Information Technology Systems
Undermines the Government's Ability to Efficiently Reunite Families</u>

ICE officers reported that when the Zero Tolerance Policy went into effect, ICE's
system did not display data from CBP's systems that would have indicated

AOL-DEF-00205061



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

whether a detainee had been separated from a child.[19] They explained that although CBP enters this family separation data into certain fields within its own system, those particular fields are not visible in ICE's system.[20] As a result, ICE officers at the Port Isabel Detention Center stated that when processing detainees for removal, officials initially treated separated adults the same as other detainees and made no additional effort to identify and reunite families prior to removal. Eventually, in early June 2018, Port Isabel officials began taking manual steps — such as interviewing detainees — to identify adults separated from their children.

Further compounding this problem, DHS' systems are not fully integrated with HHS' systems. For instance, while the Border Patrol's system can automatically send certain information to HHS regarding unaccompanied alien children who are apprehended after illegally crossing the border, OFO's system cannot.[21] Instead, for unaccompanied alien children who arrive at ports of entry, OFO officers must manually enter information into a Microsoft Word document, which they then send to HHS as an email attachment. Each step of this manual process is vulnerable to human error, increasing the risk that a child could become lost in the system.

On June 23, 2018, DHS announced that DHS and HHS had "a central database" containing location information for separated parents and minors that both departments could access and update.[22] However, OIG found no evidence that such a database exists. The OIG team asked several CBP and ICE field employees, as well as officials involved with DHS' reunification efforts at ICE Headquarters, if they knew of such a database, and they did not. Two officials suggested that the "central database" referenced in DHS' announcement is actually a manually-compiled spreadsheet maintained by HHS, CBP, and ICE personnel. According to these officials, DHS calls this spreadsheet a "matching table."

---

[19] ICE uses a system called the ENFORCE Alien Removal Module (EARM). CBP has two separate systems: (1) the Border Patrol uses a system called e3, and (2) OFO uses a system called SIGMA.

[20] At some point, CBP officials began using a free text field to record family separation information because that field is visible in ICE's system. However, that information was apparently not consistently recorded and is not searchable. Therefore, without reviewing individual files, ICE was unable to determine which aliens had been separated from their children.

[21] Although the Border Patrol's system can automatically send certain information to HHS, the Border Patrol apparently cannot later retrieve what it sent to HHS. To better understand the data inconsistencies discussed later in this report, the OIG team requested the data that the Border Patrol sent when it placed certain children with HHS. The Border Patrol said it does not store that data and therefore could not provide it to the OIG team.

[22] *See* DHS Fact Sheet: *Zero-Tolerance Prosecution and Family Reunification* (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

AOL-DEF-00205062



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

This matching table, however, was not created until after June 23, suggesting that it is not the "central database" referenced in the Department's June 23 announcement. Moreover, when the OIG team asked ICE for information that should have been accessible to ICE via the central database (*e.g.*, information on the current location of separated children), ICE did not have ready access to the information. Instead, ICE had to request the information from HHS. DHS has since acknowledged to the OIG that there is no "direct electronic interface" between DHS and HHS tracking systems.

<u>Lack of Access to Reliable Data Poses an Obstacle to Accurate Reporting on Family Separations</u>

In the course of this review, OIG made several requests to DHS for data relating to alien family separations and reunifications. For example, OIG requested a list of every alien child separated from an adult since April 19, 2018,[23] as well as basic information about each child, including the child's date of birth; the child's date of apprehension, separation, and (if applicable) reunification; and the location(s) in which the child was held while in DHS custody. It took DHS many weeks to provide the requested data, indicating that the Department does not maintain the data in a readily accessible format. Moreover, the data DHS eventually supplied was incomplete and inconsistent, raising questions about its reliability.

For instance, when DHS first provided family separation data from its own information technology systems, the list was missing a number of children OIG had independently identified as having been separated from an adult. When OIG raised this issue with the Department, CBP officials stated that they believed the errors were due to agents in the field manually entering data into the system incorrectly. Additionally, the data provided from DHS' systems was not always consistent with the data on the matching table that DHS and HHS use to track reunifications. For example, the DHS systems do not contain the date (if any) that each separated child and adult were reunited, while the matching table does.

Similarly, OIG identified 24 children who appeared in the DHS data set, but not on the matching table. When OIG requested additional information from the Department about these 24 children, the information provided revealed inaccuracies in the data DHS had previously provided to OIG. For example, the initial data set indicated that ICE had not yet removed a particular adult. The new information revealed that ICE had in fact removed the adult several weeks before it provided the initial data set to OIG. Additionally, while the initial data

---

[23] OIG selected this date because Border Patrol officials stated that they could not feasibly identify children who were separated before that date.

AOL-DEF-00205063



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

set identified two particular minors as having been separated from an adult, the new information indicated the minors entered the country unaccompanied. Nevertheless, CBP's and ICE's systems both continue to identify the minors as having been separated from an adult.

Despite these issues with the reliability of some of DHS' data, OIG was able to determine from other data maintained by ICE that 23 of the 24 children were properly left off the matching table. For example, the list derived from the DHS data contained separated families where the child had since been placed with a sponsor out of Office of Refugee Resettlement custody, as well as children who were separated from adults who were not parents or legal guardians. None of these cases met the criteria for inclusion on the matching table.

Regarding the one remaining child identified by OIG, OIG learned that DHS reunited the child with his parent in September. The circumstances surrounding the September reunification of this child with his parent raise questions about the accuracy of the Department's previous reporting on family separations and reunifications. For instance, on July 26, 2018, DHS declared that it had reunified all eligible parents in ICE custody with their children; yet this eligible parent was in ICE custody on that date, but was not reunified with his child until September.[24]

## Dissemination of Inconsistent or Inaccurate Information Resulted in Confusion among Alien Parents about the Separation and Reunification Process

The OIG team observed inconsistencies in the information provided to aliens who arrived with children, resulting in some parents not understanding that their children would be separated from them and/or being unable to communicate with their children after separation.

<u>Alien Parents Were Provided Inconsistent or Incorrect Information about Being Separated from Their Children</u>

CBP officials reported that, prior to separation, adult aliens accompanied by children were given an HHS flyer providing information about a national call

---

[24] *See* Tal Kopan, "Hundreds of Separated Children Not Reunited By Court-Ordered Deadline," *CNN*, July 26, 2018, <u>https://www.cnn.com/2018/07/26/politics/family-separations-deadline/index.html</u>.

AOL-DEF-00205064



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

center[25] and/or a "Next Steps for Families" flyer[26] produced jointly by DHS and
HHS. In English and Spanish, the Next Steps flyer explains the separation
process in four steps, and provides information on how to locate and speak
with one's child after separation. However, at the Port Isabel Detention Center,
one of the four detainees interviewed by the OIG team reported that she had
never seen the Next Steps flyer. The other three detainees reported that they
were only provided a copy *after* they had been separated from their children
and transferred to the ICE facility.

The OIG team also asked six individuals about the information provided to
them before or at the time they were separated from their children. Five of the
six said they did not receive any information. The sixth stated that when he left
the Border Patrol facility to appear in court for prosecution, a Border Patrol
Agent told him that his 5-year-old daughter would still be at the Border Patrol
facility when he returned. When he arrived at court, however, he was given a
short flyer that explained for the first time that he would be separated from his
child. After his court hearing, he was driven back to the same Border Patrol
facility, but not taken inside. Instead, he was placed on a bus to be transferred
to an ICE detention facility without his daughter.

<u>Detained Parents Reported Mixed Results in Locating and Speaking with Their
Children after Separation</u>

HHS maintains a toll-free number for aliens to call to obtain information about
their separated children. Although the OIG team observed flyers containing the
toll-free number at the Port Isabel Detention Center, staff reported that, at least
in one area with female detainees, ICE posted the flyer for the first time on
June 27, 2018 (a week after the Executive Order ending family separations). In
addition, posted flyers at Port Isabel and another detention facility in El Paso
failed to indicate that detainees must dial a unique code assigned to each
individual by the detention facility before dialing the HHS toll-free number.

One mother with whom the OIG team spoke stated she had previously tried to
call the toll-free number, but had not been able to get it to work. The team
assisted her with making the call, and she was able to speak with an operator
after holding for a couple of minutes. The HHS operator told the mother,
however, that she could not release information about the child because the
operator could not ascertain parentage over the telephone. The operator

---

[25] HHS's flyer (English version) is available at
https://www.acf.hhs.gov/sites/default/files/orr/orr_national_call_center_english_508.pdf.
[26] The "Next Steps for Families" flyer is available at
https://www.dhs.gov/sites/default/files/publications/18_0615_CBP_Next-Steps-for-
Families.pdf.

AOL-DEF-00205065



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

informed the mother that the child's aunt, who apparently had been identified as the child's sponsor in HHS' system, had information about the child.

While onsite at the Port Isabel Detention Center, the OIG team witnessed early efforts to facilitate enhanced communication between separated families. The Detention Center had begun offering free phone calls for separated parents trying to reach their children and had started installing computer tablets for video calls. While OIG spoke with several detainees who confirmed that they were permitted to make free phone calls to their children, a group of separated mothers in one dorm had not yet had a chance to make free calls. In addition to these efforts, ICE had contracted social workers to come to the Detention Center to prepare ICE officers for assisting parents as they reconnected with their children. The OIG team also observed HHS personnel at the Detention Center interviewing detainees and collaborating with ICE employees working on reunification efforts.

The team spoke with 12 adult aliens — some who were in ICE detention and others who had been released — about their experiences locating and communicating with their children after separation.[27] These individuals reported mixed results:

- Only 6 of the 12 individuals reported being able to speak with their children while in detention.

- Of the 6 who were able to speak with their children, 2 reported receiving assistance from ICE personnel and 4 reported receiving assistance from non-detained family members, legal representatives, or social workers.

- Of the 6 who were unable to speak with their children, none of them reported receiving any assistance from ICE. Five of the 6 also reported being unable to reach an operator on HHS' toll-free number or were told the number was not working. One of the 6 reported that he never received any information on how to make the call.

Several factors may have contributed to these mixed results. For instance, the OIG team observed that some adults expressed hesitation about requesting information from ICE officers. Some adults appeared to be unable to read Spanish or English, while others spoke indigenous dialects. In addition, important information about how to contact separated children was not always available. For example, a poster appearing throughout an ICE facility in El Paso directed detainees to a particular document on reunifications in the law library, but no ICE personnel could locate the document when OIG asked for it.

---

[27] The experiences of these adults reflect the types of issues some alien parents separated from children faced while in detention. This is not a statistical sample, and these individuals' experiences are not necessarily representative of what other alien parents encountered.

AOL-DEF-00205066



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Additionally, ICE personnel reported they were often unaware that adults in their custody had been separated from children, which likely impacted their ability to provide more assistance.

## Additional Observations

In addition to the issues identified previously, the OIG team made the following noteworthy observations during its fieldwork:

- A senior Border Patrol official stated that the resources required to increase prosecutions under the Zero Tolerance Policy hampered the Border Patrol's ability to screen possible fraudulent claims of parentage. In particular, it limited the resources that could be devoted to conducting interviews and other behavioral analyses typically undertaken by the Border Patrol to verify that an adult and child are related.

- Border Patrol does not currently conduct DNA testing to verify that an adult claiming to be the parent of an accompanying child is, in fact, the parent. As a result, Border Patrol is limited to confirming parentage with documentation provided by an adult or obtained from consular officials from the adult's home country, making detecting fraud and definitively proving parentage more difficult.

- Border Patrol agents do not appear to take measures to ensure that pre-verbal children separated from their parents can be correctly identified. For instance, based on OIG's observations, Border Patrol does not provide pre-verbal children with wrist bracelets or other means of identification, nor does Border Patrol fingerprint or photograph most children during processing to ensure that they can be easily linked with the proper file.

- CBP may have been able to avoid separating some families. In McAllen, Texas, many adults prosecuted under the Zero Tolerance Policy were sentenced to time served and promptly returned to CBP custody. Several officers at CBP's Central Processing Center in McAllen stated that if these individuals' children were still at the facility when they returned from court, CBP would cancel the child's transfer to HHS and reunite the family. However, CBP officials later arranged to have adults transferred directly from court to ICE custody, rather than readmitting them where they might be reunited with their children. According to a senior official who was involved with this decision, CBP made this change in order to avoid doing the additional paperwork required to readmit the adults.

AOL-DEF-00205067



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## OIG Analysis of DHS' Management Response

We have included a copy of DHS' Management Response in its entirety in appendix B. In its response, DHS raised concerns that the draft report conflated actions the Department took under the Zero Tolerance Policy with separate CBP efforts to manage the flow of asylum-seekers at ports of entry. In the final report, we have clarified how even though the two policies may have been implemented separately, their effects are interrelated. Similarly, to address DHS' comment that the draft report did not adequately account for factors that may have caused CBP to detain unaccompanied alien children beyond the 72-hour period generally permitted by Federal law, we have included additional factors that we observed during our fieldwork. The Management Response also states that the draft report failed to recognize the Department's efforts to reunify families separated under the Zero Tolerance Policy. However, as we note, the observations in this report are limited to June 26–28, 2018, before reunification efforts were underway. DHS also provided technical comments that OIG incorporated as appropriate.

AOL-DEF-00205068



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Objective, Scope, and Methodology

DHS OIG was established by the *Homeland Security Act of 2002* (Public Law
107-296) by amendment to the *Inspector General Act of 1978*.

The objective of this special report is to detail some of our observations from
field visits to CBP and ICE facilities in and around McAllen and El Paso, Texas,
that pertain to the separation of alien adults and children who entered the
United States at or between ports of entry together in order to claim asylum.
We selected facilities in and around McAllen, Texas, because the Rio Grande
Valley Border Patrol sector had more apprehensions of family units and
unaccompanied alien children than any other sector in April–May 2018. We
selected facilities in and around El Paso, Texas, because the El Paso Border
Patrol sector had the third-most apprehensions during that time as well as
active ports of entry. We conducted our unannounced field visits between June
26 and 28, 2018, at the following facilities:

Rio Grande Valley, Texas

       CBP Border Patrol facilities:
- McAllen Station;
- Ursula Central Processing Center;

       CBP OFO facilities:
- Gateway International Bridge POE;
- Brownsville and Matamoros International Bridge POE;
- Hidalgo POE.

       ICE ERO Facility:
- Port Isabel Detention Center.

El Paso, Texas

       CBP Border Patrol facilities:
- Clint Station;
- Paso del Norte Processing Center;
- El Paso Station;

       CBP OFO facility:
- Paso del Norte International Bridge POE;

       ICE ERO facilities:
- El Paso Processing Center;
- Tornillo Processing Center.

Throughout our visits, we spoke with approximately 50 CBP and ICE
employees, including line officers, agents, and senior management officials. We

AOL-DEF-00205069



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

met with 17 alien detainees (both adults and children) as well as parents who
had been separated from their children and subsequently released from ICE
custody. We also spoke with people in Mexico waiting for CBP officers to permit
them to enter the United States to make asylum claims. Additionally, we spoke
with CBP and ICE headquarters personnel in Washington, D.C., regarding
statistical tracking, Department policies, and the computer systems those
entities use to track individuals in their custody. We also reviewed relevant
directives, guidance, policies, and procedures, as well as documents and
communications related to the Zero Tolerance Policy implemented by DHS and
the Department of Justice in May 2018.

This special report was prepared according to the *Quality Standards for Federal
Offices of Inspector General* issued by the Council of the Inspectors General on
Integrity and Efficiency, and reflects work performed by the DHS OIG Special
Reviews Group and the Office of Inspections and Evaluations pursuant to
Section 2 of the *Inspector General Act of 1978,* as amended. Specifically, this
observational report provides information about CBP and ICE actions during
and after the implementation of the Zero Tolerance Policy for the purpose of
keeping the Secretary of DHS and Congress fully and currently informed about
problems and deficiencies relating to the administration of DHS programs and
operations and the necessity for corrective action. This report is designed to
promote the efficient and effective administration of, and to prevent and detect
fraud, waste, and abuse in, the programs and operations of DHS.

AOL-DEF-00205070



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## Appendix B
## DHS' Management Response to the Draft Report

U.S. Department of Homeland Security
Washington, DC 20528



September 14, 2018

MEMORANDUM FOR:   John V. Kelly
                  Senior Official Performing the Duties of the
                  Inspector General

FROM:             Jim H. Crumpacker, CIA, CFE
                  Director
                  Departmental GAO-OIG Liaison Office

SUBJECT:          Management's Response to OIG Draft Report: "Special Report
                  Observations Regarding Family Separation Issues Based on
                  Field Visits to Texas on June 26–28, 2018"
                  (Project No. 18-095-ISP-CBP)

Thank you for the opportunity to review and comment on this draft report. The U.S. Department of Homeland Security (DHS) appreciates the work of the Office of Inspector General (OIG) in planning and conducting its review and issuing this report.

U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) perform an essential role in securing our Nation's borders at and between ports of entry, and enforcing U.S. immigration law in the interior of the country. As part of securing our borders and enforcing immigration laws, both are committed to treating all people humanely. CBP and ICE officers and agents continually uphold the utmost professionalism while maintaining efficient border operations.

While the OIG's draft report provides valuable insights, including observations about the lack of information technology integration across key immigration systems, the report makes a critical category error by conflating prosecutions of adults crossing the border illegally between ports of entry ("Zero Tolerance Policy") with operational actions to manage the flow of asylum seekers at Ports of Entry through the process known as "queue management." These policies and operations are separate and distinct.

It is also important to note that the queue management practices the OIG assessed were undergoing pilot evaluation as directed by the Secretary of Homeland Security during the OIG field visits for this report. The OIG's repeated conflation of the Zero Tolerance

AOL-DEF-00205071



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Policy and queue management throughout the draft report, however, detracts from an accurate understanding of either issue. The incorporation of results or findings in the section of the report titled "Lack of Resources Caused CBP to Limit the Number of Asylum-Seekers Entering at Ports of Entry" does not relate to or support "Observations Regarding Family Separation." The practice of queue management does not result in Zero Tolerance-based prosecution or family separation at ports of entry, as it is lawful for family units to present themselves without documentation at ports of entry to claim asylum. Family units presenting themselves at ports of entry are only separated in limited circumstances, such as those acknowledged by the OIG in the introduction as predating Zero Tolerance—including an adult having criminal history or outstanding warrant, or a communicable disease, or if CBP cannot determine that the adult is a child's parent or legal guardian.

As noted in the draft report, CBP's processes and policies at ports of entry may require some individuals who do not have travel documents to wait at the International Boundary prior to entering the United States. These processes are in place to protect the health and safety of both travelers and CBP employees in the port area and to ensure appropriate balance of resources across CBP's multiple critical missions at ports of entry. CBP policy does not require that the individual leave the line and prohibits officers from requiring individuals to leave or turning individuals seeking admission away. At its discretion, CBP may prioritize certain individuals with urgent needs such as those traveling with children, or individuals who may be pregnant or have other medical emergencies, to be processed, even when there otherwise may not be processing resources or holding capacity absent those urgent needs.

The report notes that "CBP exceeded the 72-hour limit in many instances," referring to the statutory time frame for CBP to transfer an unaccompanied alien child to the custody of the Department of Health and Human Services (HHS). By doing so, the report implies that CBP did not perform its duties in a timely manner. However, the report does not recognize that in all but the rarest cases, CBP has completed all of its duties including processing unaccompanied alien children and making referrals to HHS, as appropriate. In fact, CBP sometimes performs custodial duties beyond the 72-hour limit due primarily to lack of available and timely placement on the part of HHS, and, in rare cases other extenuating circumstances, such as transportation delays or medical concerns – factors that OIG's report does not acknowledge. Indeed, the report omits many factors that might provide context to the larger issue of custodial responsibility, instead suggesting lack of diligence by CBP based solely on one official's recollection of HHS requests for more information. In reality, the care and transfer of unaccompanied alien children is a critical operational priority that is carefully and robustly managed by CBP.

In addition, the draft report provides no mention of the Department's significant accomplishments to reunify families. DHS coordinated with HHS, which deployed HHS staff to ICE detention locations to ensure that communication between the parents and

2

AOL-DEF-00205072



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

their children occurred. Despite the fact that the two Departments' tracking systems have no direct electronic interface, the government took exhaustive efforts to overcome this challenge and stand up a process to safely reunify families expeditiously in compliance with the June 26, 2018, decision in *Ms. L. v. ICE*.[1] These efforts included establishing a Special Operations Center staffed with personnel from both Departments. The Court in *Ms. L* also acknowledged the government's strides in facilitating communication.

Concerning the 24 children that were identified by your team, CBP and ICE further analyzed CBP and ICE data systems and worked with HHS to determine that the 24 children are appropriately not included in the data set because they were determined not to be the children of *Ms. L* class members based on valid reasons, as provided for in the *Ms. L* court order. These reasons included the parent's criminal history the fact that the child entered either unaccompanied or with a relative who was not their parent or legal guardian, the child was separated because the parent presented a danger to the child, or the child was reunified with his or her parents or legal guardians before the date of the court order.

Again, thank you for the opportunity to review and comment on this draft report. Technical comments were provided under separate cover. Please feel free to contact me if you have any questions. We look forward to working with you again in the future.

---

[1] *Ms. L. v. ICE*, No. 18-cv-428 (S.D. Cal.).

3

AOL-DEF-00205073



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix C**
**Report Distribution**

**<u>Department of Homeland Security</u>**

Secretary
Deputy Secretary
Under Secretary for Management
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO-OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Chief Human Capital Officer

**<u>Office of Management and Budget</u>**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**<u>Congress</u>**

Congressional Oversight and Appropriations Committees

AOL-DEF-00205074

## Additional Information and Copies

To view this and any of our other reports, please visit our website at:
www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General
Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click
on the red "Hotline" tab. If you cannot access our website, call our hotline at
(800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Hotline
> 245 Murray Drive, SW
> Washington, DC 20528-0305

AOL-DEF-00205075