JOSEPH H. HUNT
Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV (CT 414491)
DHRUMAN Y. SAMPAT
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation – District
Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA
# (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*,<br><br>  *Defendants* | Case No. 3:17-cv-02366-BAS-KSC<br><br>Hon. Cynthia A. Bashant<br><br>**DEFENDANTS' RESPONSE IN SUPPORT OF PLAINTIFFS' MOTION TO SEAL LIMITED PORTIONS OF PLAINTIFFS' TRO REPLY PAPERS [ECF No. 364]** |

Defendants hereby respond in support of Plaintiffs' Motion to Seal Limited Portions of Plaintiffs' TRO Reply Papers (ECF No. 364) to provide additional reasons for sealing the confidential documents and testimony that were attached to and referenced in Plaintiffs' TRO Reply. There are compelling reasons to seal these exhibits and testimony, as well as any portions of the parties' briefs that rely on them. The national security, diplomatic, and sensitive law enforcement information and communications which Defendants are seeking to seal includes information about operations of land ports of entry that expose vulnerabilities of those ports. Public release of such information will also have a chilling effect on open communications within the government and with foreign governments and would further compromise the ports' operations and expose ports to higher risk of criminal activity—such as drug and weapons trafficking—which in turn would threaten the public health and safety of the United States. These documents also contain sensitive and private information concerning witnesses and law enforcement personnel, disclosure of which would compromise those witnesses' and employees' privacy interests and could lead to threats, intimidation, or harassment.

## **BACKGROUND**

Plaintiffs filed a Reply in Support of their Motion for Temporary Restraining Order (TRO Reply) (ECF No. 368) on December 20, 2019. This TRO Reply relied on documents that the parties designated as "Confidential" or "Highly Confidential – Attorneys' Eyes Only" and are protected from disclosure under the Protective Order (ECF No. 276). On the same date, Plaintiffs moved to seal those exhibits and the portions of their brief that contained this confidential information. *See* ECF No. 364. Although the Court has since denied the underlying Motion for Temporary Restraining Order, *see* ECF No. 382, the Motion to Seal (ECF No. 364) remains pending.

For the reasons described below, Defendants provide additional support for the request that the Court allow the following TRO Reply exhibits, or portions

thereof, to be filed under seal to prevent public disclosure of information that could be used to circumvent or could otherwise compromise law enforcement operations, threaten the safety of witnesses and employees, and threaten the integrity and security of ports of entry into the United States:

1) Portions of TRO Reply Exhibit 1, the transcript of the December 13, 2019 deposition of Todd Owen, Executive Assistant Commissioner of U.S. Customs and Border Protection;[1]

2) TRO Reply Exhibit 4, Exhibit 34 to the deposition of Todd Owen;

3) TRO Reply Exhibit 5, Exhibit 47 to the deposition of Todd Owen;

4) TRO Reply Exhibit 6, Exhibit 30 to the deposition of Todd Owen;

5) Portions of TRO Reply Exhibit 10, a Report of the Department of Homeland Security Office of the Inspector General (DHS OIG), bearing the Bates numbers AOL-DEF-00615546 through AOL-DEF-00615563.[2]

---

[1] The entirety of the deposition transcript was treated as confidential during the 30-day period following its receipt. Protective Order ¶ V(B)(2)(b). Plaintiffs filed their Motion to Seal before that 30-day period had expired. Defendants have since reviewed the transcript and have designated only certain portions of that transcript as Protected Material that Defendants seek to retain under seal. Defendants attach hereto as Exhibit 1 a table that sets forth the specific excerpts of the transcript that Defendants are seeking to seal.

[2] Plaintiffs also sought to seal TRO Reply Exhibit 7, a document bearing the Bates numbers AOL-DEF-00703133 through AOL-DEF-00703139. Plaintiffs did not attach Exhibit 7 to their TRO Reply, however, due to a pending privilege claim that Defendants have since withdrawn. Accordingly, given that Exhibit 7 was never in fact attached to the TRO Motion or Reply papers, and the Court denied Plaintiffs' TRO Motion on unrelated grounds, any request to seal that document is moot. Accordingly, Defendants maintain their confidentiality assertions regarding the underlying document but are not providing herein additional argument in support of sealing.

## ARGUMENT

### A. Legal Standards

Although there is "a general right to inspect and copy public records and documents," *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), a party may still overcome the presumption of access. *Heldt v. Guardian Life Ins. Co. of America*, No. 16-cv-885, 2018 WL 5920029, at *1 (S.D. Cal. Nov. 13, 2018). The presumption of access is "based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). Thus, when the documents to be protected are "more than tangentially related to the merits," parties must show compelling reasons to keep those documents sealed. *Heldt*, 2018 WL 5920029 at *1 (quoting *Ctr. for Auto Safety*, 809 F.3d 1092, 1096–98); *see also McCurley v. Royal Seas Cruises, Inc.*, No. 17-cv-296, 2018 WL 3629945, at *2 (S.D. Cal. July 31, 2018). Compelling reasons include "when [] 'court files might [] become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). "In certain circumstances, courts have allowed the *government* to file under seal material that contains confidential and sensitive government information that might endanger or undermine law enforcement's activities . . . where the government identifies the particular harm that may result from the specific disclosure." *Music Grp. Macao Commercial Offshore Ltd. v. Foote*, No. 14-CV-03078-JSC, 2015 WL 3993147, at *3 (N.D. Cal. June 30, 2015) (internal citations omitted; emphasis in original); *see Hesterberg v. United States*, No. C-13-01265 JSC, 2013 WL 6057068, at *2 (N.D. Cal. Nov. 15, 2013) (finding compelling reasons to seal portions of documents that could "empower criminal suspects who come in contact with . . . officers because they will be able to predict the officer's actions."). As shown below, Defendants'

request to file law-enforcement-sensitive materials under seal satisfies the "compelling reasons" standard. Defendants have provided specific information regarding the harm that could occur if the information is disclosed. *See Am. Auto. Ass'n of N. California, Nevada & Utah v. Gen. Motors LLC*, No. 17-CV-03874-LHK, 2019 WL 1206748, at *1 (N.D. Cal. Mar. 14, 2019). The public interest in the information at issue is far outweighed by the interest in confidentiality. *See Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010). Indeed, the public interest in judicial accountability is minimal here, because the Court denied Plaintiffs' TRO Motion on grounds that do not relate to the exhibits the parties are seeking to seal. The presumption of access only applies to "materials on which a court relies in determining the litigants' substantive rights." *See United States v. Kravets*, 706 F.3d 47, 54 (1st Cir. 2013) (cited with approval in *Ctr. for Auto Safety*, 809 F.3d at 1100); *see also Network Appliance v. Sun Microsystems Inc.*, No. 07-v-006053, 2010 WL 841274, at *2 (N.D. Cal. Mar. 10, 2010) ("[T]he public interest in understanding the judicial system would appear to be less where, as here, the documents in question are irrelevant to the Court's decision.").

> **B.    The Risk to National Security and Border Security, and the Potential Chilling Effect on Agency Operations and International Relations with Mexico Constitute Compelling Reasons to Seal Information About Port Operations Discussed During the Deposition of Executive Assistant Commissioner Todd Owen.**

The Court should seal Todd Owen's deposition testimony and Deposition Exhibits 34 and 47 (TRO Reply Exhibits 1, 4, and 5). This testimony and documents reveal specific information about the operations of ports of entry, the ports' methodology for gathering information, internal decisionmaking processes, and communications with the Mexican government, the disclosure of which will harm border security and have a chilling effect on international relations and agency decisionmaking.

1  Since 2015, Todd Owen has been the Executive Assistant Commissioner, Office of Field Operations ("OFO"), U.S. Customs and Border Protection ("CBP"), U.S. Department of Homeland Security ("DHS"). *See* Declaration of Todd C. Owen (Jan. 29, 2020), attached as Exhibit 2 ("Owen Decl."). During his December 13, 2019 deposition, Mr. Owen testified about various sensitive topics, including CBP's cooperation and communications with the government of Mexico, internal decision making, and information about the techniques and operations used by CBP to maintain the integrity of the ports of entry and to combat fraud, criminal activity, and other threats to public safety and national security. *E.g.*, Owen Decl. ¶¶ 6; Owen Deposition Tr. 126:1-22; 127:1-8; 127:13-15; 128:16-22; 129:1-22; 130:1-19; 131:15-22; 132:1-8; 132:13-15; Owen Deposition Exs. 34, 47; Armijo Decl. ¶¶ 6-8. Public release of this deposition and relevant exhibits could cause injury by allowing bad actors such as smugglers and terrorists to modify their behavior to avoid detection by U.S. and Mexican authorities. *See United States ex rel. Kelly v. Serco, Inc.*, No. 11CV2975 WQH-RBB, 2014 WL 12675246, at *4 (S.D. Cal. Dec. 22, 2014) (granting the defendant's motion to seal various documents designated "For Official Use Only" by the United States Government because "national security interests are a compelling reason for filing documents under seal"); *McQuilliams v. Int'l Auto Logistics, LLC*, No. 2:14-CV-124, 2016 WL 4257362, at *1 (S.D. Ga. Aug. 11, 2016) (granting the parties' joint motions to file under seal where the parties "established that sealing these records is necessary to protect Defendant's proprietary information and information that implicates national security interests"); *Motley v. City of Fresno*, No. 15-cv-905, 2016 WL 1060144, at *2 (E.D. Cal. Mar. 17, 2016) (court should evaluate the specific facts of the law enforcement sensitive document to determine whether it should be sealed); *see BofI Fed. Bank v. Erhart*, No. 15CV2353 BAS (NLS), 2016 WL 4150983, at *2 (S.D. Cal. Aug. 5, 2016) (same).

For example, Mr. Owen explains that during his deposition he provided testimony under oath regarding regularly scheduled meetings that occur in a sensitive

compartmented information facility ("SCIF").  Owen Decl. ¶ 4; Owen Dep. Tr. 28:21-22; 29:1-5; 40:5-22; 42:2-4; 43:7-9; 45:20-22; 46:9-14; 47:5-8; 47:19-22; 48:1-4; 48:17-21.  A SCIF is a room designed and constructed to prevent outside access to the information being discussed.  SCIFs are used by law enforcement, military, and the intelligence and national security communities to hold meetings when sensitive compartmented information ("SCI") is discussed.  *Id*.  SCI is a type of classified information derived from sensitive intelligence sources, methods, and/or analytical processes.  *Id*.  Mr. Owen further writes that provided detailed information regarding the timing and attendance of regularly scheduled intelligence briefings at the SCIF.  Owen Decl. ¶ 5.  With this knowledge, bad actors could target senior CBP leadership at a specific location, date, and time.  *Id*.

Furthermore, Mr. Owen testified regarding CBP communications with officials from the Government of Mexico.  Owen Decl. ¶ 6; Owen Dep. Tr. 126:1-22; 127:1-8; 127:13-15; 128:16-22; 129:1-22; 130:1-19; 131:15-22; 132:1-8; 132:13-15.  The testimony and exhibits regarding such communications represent highly confidential diplomatic discussions between foreign governments.  Here, disclosure of the information obtained via those communications could have a chilling effect on the willingness of officials in both countries to have open, honest, and frank discussions regarding important security and border issues important to both countries.  Owen Decl. ¶¶ 6, 11-12.

Likewise, public disclosure of Owen Deposition Exhibit 34 (TRO Reply Exhibit 4), an internal CBP email that discusses specific facts regarding metering implementation at various ports, ports' operational readiness, and ports' cooperation with the government of Mexico, would compromise port operations and have an adverse effect on operational decisionmaking.  Owen Decl. ¶¶ 7-9.  Revealing the specific discretionary decisions made by OFO officials regarding the implementation of metering will permit outside entities to second-guess those discretionary decisions made in a fluid operational environment.  Owen Decl. ¶ 8. Public scrutiny of

each fluid decision may negatively influence officials' future decisionmaking and prevent them from making the best operational decisions. *Id.* ¶ 9. Further, public disclosure would have a chilling effect on OFO officials' open communication about operational vulnerabilities and decisions. Owen Decl. ¶ 10. Yet open and honest communication is critical to ensuring that OFO consistently makes decisions that are sound from an operational, legal, and policy perspective. *Id.* Public disclosure of such frank communications could have a chilling effect on OFOs' willingness to share information could limit the agency's ability to assess and make changes to ongoing operations. *Id.*

Further, disclosure of the information contained in Exhibit 34 about efforts taken by the Mexican government to manage the flow of travel across its borders will have a chilling effect on information-sharing and cooperation between the two nations. Owen Decl. ¶ 11. For instance, United States and Mexico regularly share information about ongoing law enforcement efforts and activities in Mexico and the United States, issues of particular note to both countries, cross-border safety or security threats, and migration trends. *Id.* The ports also regularly share logistical information related to cross-border traffic, such as vehicle wait times, computer outages or other issues impacting processing times, as well as infrastructure and other facilities issues. Owen Decl. ¶ 11. Accordingly, it is of critical importance that both OFO and their Mexican counterparts are able to share all relevant information in a frank, open, and honest manner, as it is critical that both OFO and the Mexican government have a full understanding of the operational picture on both sides of the border. Owen Decl. ¶ 11. Accordingly, officials from both countries must be able to share complete and accurate information, including personal opinions, at a sufficiently granular level, to ensure that both governments have sufficient information to make decisions in a fast-moving, often fluid environment. Owen Decl. ¶ 12, Disclosure of this information to the public, especially without any context for how the

1  information was obtained or developed, could have a chilling effect on the willing-
2  ness of officials in both countries to have open, honest, and frank discussions in the
3  future, and on the willingness to share complete and accurate information.  Owen
4  Decl. ¶ 12.

5       Public disclosure of Exhibit 47 to the Owen Deposition (TRO Reply Exhibit
6  5) would similarly have a chilling effect on investigations and compromise CBP's
7  ability to gather information as part of its law enforcement operations.  As explained
8  in the Declaration of Johnny L. Armijo, CBP Assistant Director of Field Operations,
9  San Diego, Exhibit 47 is an email that Assistant Director of Field Operations
10 (ADFO) Armijo received on July 3, 2018, from a Program Manager in the SDFO's
11 former Tactical Analytical Unit ("TAU").  *See* Declaration of Johnny L. Armijo ¶ 8
12 (Feb. 3, 2020), attached as Exhibit 3 ("Armijo Decl.").  In the email, the Program
13 Manager provided information that he gathered from the San Ysidro's POE's Ad-
14 missibility Enforcement Unit ("AEU") about aliens' views on the U.S. Department
15 of Justice's Zero-Tolerance Policy for Criminal Illegal Entry and CBP's use of me-
16 tering or queue management; described the methodology by which he gathered that
17 information; and assessed that information.  *Id*.  Public disclosure of the email would
18 cause a substantial chilling effect and impede CBP's law enforcement operations.
19 *Id*.  Mr. Armijo depends upon his subordinates—and especially those assigned to
20 specialty units such as the Intelligence Targeting Units, the Integrated Border Intel-
21 ligence Group, and other similar groups—to relay sensitive and/or confidential in-
22 formation to him in a full and forthright manner, just as Program Manger Arias did
23 in this email.  *Id*.  That reliance in his correspondence and communication with his
24 employees, Mr. Armijo writes, plays a critical role in his ability to assess opera-
25 tional vulnerabilities, ensure sound operational decisions, and plan for contingen-
26 cies.  *Id*.  Further, this line of communication is of heightened significance when the
27 information conveyed pertains to the San Ysidro POE, given the magnitude of that
28 port's operations and recent attempts by large groups of undocumented aliens to

forcefully breach the port of entry. Armijo Decl. ¶ 8.

Mr. Armijo concludes that because the email details the methodology that was used, public disclosure of the email would impede the SDFO's Integrated Border Intelligence Group, the SDFO's Intelligence Targeting Units, the SDFO itself, and CBP nationwide, ability to effectively gather similar information using a like and similar methodology in the future. *Id.*

The Court should also seal any portions of Owen's testimony containing discussion of CBP's OFO Field Queue Management Reports and the Queue Management Reports themselves, and other discussions concerning specific information about the capacities of and processing at ports of entry. *See* Owen Deposition Tr. 84:1-22; 85:1-7; 88:1-22; 89:6-22; 90:1-22; 91:1-5; 191:17-22. As set forth in the December 5, 2019 Declaration of Randy Howe, Executive Director for Operations, Office of Field Operations (OFO) ("Howe Decl."), attached as Exhibit 5, there are compelling reasons to seal such testimony, as well as any portions of the parties' briefs that rely on it. OFO's Field Queue Management Reports "compile data from the OFO Field Offices on the southwest border." Howe Decl. ¶ 6. The Reports "are provided on a daily basis to OFO and CBP leadership and provide raw data points on a number of factors that impact the operations of southwest border ports of entry." *Id.* The sensitive nature of this law enforcement information warrants filing these documents under seal. *Cf. Motley v. City of Fresno*, *supra*; *see BofI Fed. Bank v. Erhart*, *supra*. As explained in the Declaration of Randy Howe, the Queue Management Reports "are generated strictly for internal CBP and DHS use, and are used for maintaining awareness of any resource or operational vulnerabilities at the various ports of entry (POEs) along the southwest border." Howe Decl. ¶ 6.

"The main operational vulnerabilities or resource constraints that these Queue Management reports highlight is the total number of individuals in custody at a particular port, as well as the percentage of total holding capacity that port has reached

based on the number of individuals in custody." *Id.* ¶ 7. This information is important for CBP leadership to know because "high numbers of individuals in custody may be caused by any number of factors, such as changes in migrant flows that need to be monitored; potential difficulties in transferring individuals out of CBP custody, which may need to be addressed with CBP's interagency partners; or other operational or resource issues that may require action. *Id.*

In addition, "this information may also reveal operational vulnerabilities or weaknesses that could be exploited if released publicly. While the number of individuals in custody at a particular port of entry is not the only factor affecting a port's total capacity to process individuals, it impacts how a port of entry manages its resources." *Id.* ¶ 8. For example, "if a port has a high number of individuals in custody, or if individuals in custody have been held for an extended period of time, port management may need to reallocate staffing and other resources towards addressing these capacity issues." *Id.* ¶ 9. This involves "addressing the needs of individuals in custody, and attempting to move those individuals out of the POE." *Id.* Specifically:

> [I]f a port has a high number of individuals in custody, officers at the port must devote significant time and energy towards ensuring that these individuals have adequate food and water, and are housed in sanitary conditions. OFO policy requires that officers conduct welfare checks at regular intervals for individuals in custody. Officers must also provide individuals in custody with meals and snacks, as well as ensure that any children are adequately supervised. Additionally, if a port is operating at a high capacity, or if individuals have been in custody for a long period of time, officers must work to transfer these individuals out of CBP custody, by working with U.S. Immigration and Customs Enforcement (ICE), the U.S. Department of Health and Human Services (HHS), and other partners, to secure transportation.

*Id.* ¶ 9. "[A]ddressing the needs of individuals in custody, and attempting to move those individuals out of the POE, takes officers away from other inspection and en-

forcement duties including detecting and seizing drug[s] and other contraband." *Id.* As a result, "the port [is] more vulnerable to outside threats such as drugs, weapons, contraband, and individuals attempting to enter the port without inspection, such as by running through vehicle lanes." *Id.*

As "most of the cocaine, heroin, foreign-produced marijuana, and foreign-produced methamphetamine available in the United States enters through the southwest border," the American people are also more vulnerable to drugs if the port is susceptible to this threat. *Id.* One drug in particular, "[f]entanyl . . . is difficult to detect, as it is easily concealed in small packages and other small compartments." *Id.* When "a port has fewer individuals in custody, the port will be able to allocate more resources towards other mission sets, such as seizing drugs, weapons, and other contraband." *Id.* ¶ 10.

For these reasons, "publicly releasing port-level capacity data, especially covering a period of several days or weeks, would provide outside entities with a picture of when certain entities are operating below, at, or above capacity[], and thus how resources may be allocated at those ports." *Id.* ¶ 11. Taken together, "[t]his data, combined with other publicly available data, such as seasonal migration trends and the number of individuals encountered or found inadmissible in certain areas, could be exploited by DTOs, TCOs, and other hostile actors." *Id.* In particular, "if a TCO or smuggling organization had knowledge that a particular port consistently operated at or above capacity for a period of several days or several weeks, the TCO or smuggling organization could utilize that information, along with other information in its possession or gleaned from other sources, to develop a picture of when the port's resources may be strained, and reallocate its own resources to exploit this vulnerability." *Id.* Likewise, "if a TCO or smuggling organization had knowledge that a particular port consistently operated *below* capacity for a period of time, the TCO or smuggling organization cold reallocate its own resources towards *creating* capacity constraints at that particular POE." *Id.*

For example, "if a TCO gained knowledge that a particular port was operating at capacity during a certain month of the year, or during certain days in the month, the TCO could specifically wait until that period of time to send additional levels of drugs or other contraband to that port, or by instructing a group of individuals to enter without inspection, such as by running through the vehicle lanes." *Id.* ¶ 12. Specifically, "if a TCO had knowledge that a particular POE had been operating at 30% of its capacity for two weeks, it could further harm port operations by instructing a large group of individuals to attempt to enter without inspection." *Id.* Similarly, "if a smuggling organization had knowledge that a particular POE had been operating at 30% of its capacity for two weeks, it could [] instruct a large group to enter without inspection, creating a diversion of OFO resources towards that group, and away from other priority missions." *Id.*

Accordingly, public disclosure of the Field Office Queue Management Reports, or any other specific information about a port's capacity and operations, would release details about the operations of ports of entry (as well as CBP operations between the ports of entry) that could compromise border security. This risk of harm caused by the release of these details is an even more significant interest than store security and employee safety, which was enough for the Court to seal documents in *Bell v. Home Depot USA, Inc.*, No. 212CV02499GEBCKD, 2015 WL 6082460, at *2 (E.D. Cal. Oct. 15, 2015). "Because all of the information in these documents consists of such detailed operational information, it is not possible to meaningfully segregate or redact any information for purposes of filing other portions of the documents publicly." *Id.* ¶ 27. In *Bell*, the court stated: "the Security SOPs sought to be sealed contain Home Depot's security protocols in opening and closing its stores, the disclosure of which could threaten its stores' security and its employees' safety." *Bell*, 2015 WL 6082460, at *2 (comparing *In re Google Inc. Gmail Litigation*, No. 13–MD–02430–LHK, 2013 WL 5366963, at *3 (N.D. Cal. Sept. 25, 2013)). Similarly, here, the information sought to be sealed involves information

regarding the southwest border of the United States which "could irreparably harm" the mission of CBP along the southwest border of the United States and threaten public health and safety, by allowing increased drug and weapons trafficking. *See Bell*, 2015 WL 6082460, at *1. [3]

The security considerations discussed above are similar to those raised in regards to the sealing of an exhibit in *United States ex rel. Kelly v. Serco, Inc.* that "specifically reference[d] locations, technical specifications and operational capabilities of restricted Homeland Security microwave communications systems along the United States border, used to provide technological assistance to federal agents tasked with monitoring and securing the border." No. 11CV2975 WQH-RBB, 2014 WL 12675246, at *2 (S.D. Cal. Dec. 22, 2014) (citation omitted). The Court ultimately found that "national security interests are a compelling reason for filing documents under seal[]," and because "the[] exhibits [at issue] contained sensitive technical information, such as specific tower locations and frequencies . . . public dissemination of this information could be used by persons seeking to do harm to the United States." *Id.* at *4. Additionally, the court determined "that [the] compelling reason outweighs the traditional right of access." *Id.* The same compelling reasons warrant the sealing of sensitive details regarding the capacity and operations of ports of entry, which, if disclosed, could be exploited by bad actors to circumvent these operations. *Cf. Motley*, 2016 WL 1060144, at *2.

For the reasons discussed above, the Court should seal Exhibits 34 and 37 to the Owen Deposition (TRO Reply Exhibits 4 and 5), and the confidential portions of Mr. Owen's testimony (TRO Reply Exhibit 1), as well as any references thereto in the TRO Reply.

---

[3] Should this Court find that sealing of the Field Queue Management Reports in their entirety is not warranted, Defendants respectfully seek the Court's permission to provide supplemental briefing as to why at least some portions of the field queue management reports should be filed under seal.

13 DEFS.' RESPONSE IN SUPPORT OF PLS.' MOT. TO SEAL TRO REPLY
Case No. 3:17-cv-02366-BAS-KSC

### B. The Risk to Personal Privacy and Safety of CBP Employees Constitutes A Compelling Reason to Seal Email Addresses and Other Contact Information of CBP Employees

The Court should also keep sealed the personal and work email addresses and other contact information of CBP employees in all of the above-listed documents. Specifically, Mr. Owen's personal address –put on the record during the deposition – should be sealed because disclosure would allow individuals to invade Mr. Owen and his family's privacy and, if such individuals are bad actors, threaten his safety. Owen Decl. ¶ 3; Owen Dep. Tr. 11:3-10.  The Court should also seal the personal and work email addresses and other contact information of CBP employees in all of the above-listed documents. The Court has already permitted the redaction of CBP employees' phone numbers and cell phone numbers based on their privacy interests. ECF No. 332 at 7, 10.

Further, as detailed in the December 4, 2019 Buckley Declaration ("Buckley Decl.") from John Buckley the Director of Security and Technology Division at CBP, which is attached to this pleading as Exhibit 4, there are genuine security concerns regarding the disclosure of CBP employees' email addresses.  Dissemination of "the email addresses of CBP employees . . . can create significant cyber security threats to both the individual employee and CBP as a whole."  Buckley Decl.¶ 3. For example, "once an employee's email address is publicized, malicious actors can engage in social engineering to obtain confidential information from that employee" through the "use of deception to manipulate individuals into divulging confidential or personal information that may be used for fraudulent purposes." *Id. ¶* 4.  One form of social engineering, called phishing, involves "sending emails purporting to be from reputable sources with the goal of influencing or gaining personal information such as passwords or financial information." *Id. ¶* 4.a. Another form of social engineering, called sphear phishing, is "a type of highly targeted phishing attack that

focuses on a specific individual or organization." *Id.* ¶ 4.b.

Further, "other cyber security threats can [also] occur once an employee's email address is released to the public." *Id.* ¶ 5. One example of a cyber security attack is a denial of service (DoS) attack. *Id.* ¶ 5.a. "[A] DoS is a security event that happens when an attacker prevents legitimate users from accessing specific computer systems, devices, services or other IT resources[,] [t]he purpose of [which] is to flood servers, systems, or networks with traffic to overwhelm the victim's resources and make it difficult or impossible for legitimate users to access them." *Id.* Another example of a cyber security attack is doxing. *Id.* ¶ 5.b. "[D]oxing occurs when a malicious actor publishes private personal information, usually for purposes of public humiliation, stalking, identity theft, or targeting an individual for harassment." *Id.* Swatting is another example of a cyber security attack. *Id.* ¶ 5.c. "[S]watting is a harassment tactic in which a malicious actor deceives emergency services into sending policy or emergency response teams to another person's address." *Id.* Yet another example of a cyber security attack involves ransomeware. *Id.* ¶ 5.d. "[R]ansomeware is malicious software designed to block access to a computer system until a sum of money is paid." *Id.* Finally, spam emails are another example of a cyber security attack. *Id.* ¶ 5.e. "[S]pamming occurs when disruptive online messages are sent repeatedly[], and "spam emails [] hinder an agency's ability to communicate with its employees due to the volume of email traffic and strains on the agency's IT capacities." *Id.*

These security threats are not hypothetical. "Cyber attacks against the U.S. are on the rise." Buckley Decl. ¶ 6. A Government Accountability Office report determined "that between 2006 and 2015, cyberattacks involving systems supporting the federal government increased over 1,300% from 5,500 to over 77,000." *Id.*; *see* GAO-16-501, Information Security: Agencies Need to Improve Controls over Selected High-Impact Systems (May 2016). In fact, "[t]he Office of Personnel Management discovered it was the victim of a cyber attack in April 2015." Buckley Decl.

¶ 6. As a result of this attack, "[h]ackers stole personal information belonging to 21.5 million federal employees and their families, friends, and former employers." *Id.* And these hackers "were able to compromise the entire OPM network by exploiting the credentials of one single contractor." *Id.* ¶ 7. It is clear, based on this information, that "[p]ublication of CBP employees' email addresses therefore poses a substantial risk to the safety and welfare of the individual employee and CBP." *Id.* ¶ 8. It is for this reason that "any documents in this case that contain such information should be filed under seal and kept confidential." *Id.* Should the Court find that sealing of this information is not warranted, Defendants would ask, "[a]lternatively, that the Court . . . permit Defendants to redact email addresses before the underlying documents are publicly released." *Id.*

As with the above-described documents, the sensitive nature of this law enforcement information warrants filing this document under seal. *Cf. Motley*, 2016 WL 1060144, at *2; *see BofI Fed. Bank*, 2016 WL 4150983, at *2.

### C. *Important Public Policy Considerations Constitute a Compelling Reason to Seal the Identifying Information of the Whistleblower and Witnesses to the Whistleblower Investigation*

The Court should also seal any identifying information regarding the whistleblower and witnesses to the investigation contained in TRO Reply Exhibit 10, a DHS OIG Report bearing the Bates numbers AOL-DEF-00615546 through AOL-DEF-00615563. In addition to the reasons provided above for sealing CBP employees' addresses above, case law supports sealing this information. The Special Master in *Hewlett-Packard Co. S'holder Derivative Litig.* recommended sealing similar whistleblower identifying information in a criminal investigation because "the case law is clear that, while public access to court records is important, some documents are not subject to the public right of access because they have traditionally been kept secret for important policy reasons." *In re Hewlett-Packard Co. S'holder Derivative*

*Litig.,* No. 12-CV-6003, 2015 WL 8570883, at *6 (N.D. Cal. Nov. 18, 2015), *report and recommendation adopted*, No. 12-CV-6003-CRB, 2015 WL 8479543 (N.D. Cal. Dec. 10, 2015), *aff'd*, 716 F. App'x 603 (9th Cir. 2017) (internal citations omitted). The Special Master in *Hewlett-Packard* explained that important public policy considerations including interference with an investigation, "by making the whistleblower a target of intimidation or harassment" was a "compelling reason[]" constituting "court files [] becom[ing] a vehicle for improper purposes." *Id.* (internal citations omitted). Similar public policy reasons support sealing identifying information regarding witnesses to the whistleblower investigation.

## CONCLUSION

For the compelling reasons discussed above and in Plaintiffs' Motion to Seal Limited Portions of Plaintiffs' TRO Reply papers, the Court should seal the above-listed sensitive documents and testimony and the portions of the parties' briefs that discuss them. Should this Court find that sealing of the above listed sensitive documents in their entirety is not warranted, Defendants respectfully seek the Court's permission to identify more particular redactions to protect sensitive information from public disclosure.[4]

//
//

---

[4] In all cases, Defendants seek to redact or seal the personally identifying information of their employees from public disclosure.

| | |
|---|---|
| Dated: February 3, 2020 | Respectfully submitted, |
| | JOSEPH H. HUNT<br>Assistant Attorney General<br>Civil Division |
| | WILLIAM C. PEACHEY<br>Director |
| | KATHERINE J. SHINNERS<br>Senior Litigation Counsel |
| | */s/ Ari Nazarov*<br>ARI NAZAROV<br>Trial Attorney<br>U.S. Department of Justice<br>Civil Division<br>Office of Immigration Litigation<br>District Court Section<br>P.O. Box 868, Ben Franklin Station<br>Washington, D.C. 20044<br>Tel: (202) 514-4120 \| Fax: (202) 305-7000<br>ari.nazarov@usdoj.gov |
| | ALEXANDER J. HALASKA<br>DHRUMAN Y. SAMPAT<br>Trial Attorneys |
| | *Counsel for Defendants* |

# CERTIFICATE OF SERVICE

No. 17-cv-02366-BAS-KSC

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: February 3, 2020

Respectfully submitted,

*/s/ Ari Nazarov*
ARI NAZAROV
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000
ari.nazarov@usdoj.gov

*Counsel for Defendants*