JOSEPH H. HUNT
Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV (CT 414491)
DHRUMAN Y. SAMPAT(NJ 270892018)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation – District
Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
**(San Diego)**

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' UNOPPOSED MOTION TO SEAL PORTIONS OF THEIR OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | |

Defendants hereby move to Seal Portions of their Opposition to Plaintiffs' Motion for Class Certification (ECF No. 390) to provide reasons for sealing the confidential documents and testimony that are attached to and referenced in Defendants' Opposition to Plaintiffs' Motion For Class Certification. There are compelling reasons to seal these exhibits and testimony, as well as any portions of the parties' briefs that rely on them. The national security, diplomatic, and sensitive law enforcement information and communications which Defendants are seeking to seal include information about operations of land ports of entry that expose vulnerabilities of those ports. Public release of such information will also have a chilling effect on open communications within the government and with foreign governments and would further compromise the ports' operations and expose ports to higher risk of criminal activity—such as drug and weapons trafficking—which in turn would threaten the public health and safety of the United States. These documents also contain information concerning individual travelers that, if disclosed, would compromise their privacy interests.

Specifically, Defendants request to file under seal the following exhibits and testimony, as well as portions of the parties' brief that rely on them, to prevent public disclosure of information that could be used to circumvent or could otherwise compromise law enforcement operations, threaten the safety of witnesses and employees, threaten the integrity and security of ports of entry into the United States, and chill frank discussions that are crucial to agency operations and foreign relations:

1) Excerpts of the transcript of the December 13, 2019 deposition of Todd Owen, Executive Assistant Commissioner of U.S. Customs and Border Protection (Owen Deposition Tr. 45:7-9; 91:1-5; 218:14-18), at Defendants' Opposition Exhibit 2;[1]

---

[1] Although the entirety of the deposition transcript was treated as confidential during the 30-day period following its receipt, Protective Order ¶ V(B)(2)(b), Defendants have since reviewed the transcript and have designated only certain portions of that

2) Excerpts of the transcript of the January 28, 2020 deposition of Expert Witness Stephanie Leutert (Leutert Deposition TR.137:15-20; 156:20-157:20 and 159:4-164:14), at Defendants' Opposition Exhibit 26.[2]

3) October 6, 2016 memorandum prepared by CBP Office of Field Operations (OFO) Migration Coordination Center containing information on the Haitian Migration Surge within the San Diego Field Office from February 6, 2016 through October 6, 2016 (AOL-DEF-00020023-00020024), Defendants' Opposition Exhibit 6;

4) September 14, 2016 OFO Incident Management Division memorandum on the Haitian Migration Surge (AOL-DEF-00285232-0023523), Defendants' Opposition Exhibit 7;

5) November 16, 2016 SWB DFO/XD Panel Discussion PowerPoint presentation regarding mass migration dated (AOL-DEF-00018728), Defendants' Opposition Exhibit 8;

6) October 13, 2016 memorandum prepared by the OFO Incident Management Division (AOL-DEF-00219717-00219723), Defendants' Opposition Exhibit 9;

7) October 2016 PowerPoint presentation (AOL-DEF-00221166), Defendants' Opposition Exhibit 10;

8) Paragraph 12 of the February 10, 2020 Declaration of Deputy Assistant Director of Field Operations, Border Security, Laredo Field Office, Office of Field Operations Rodney Harris, Defendants' Opposition Exhibit 28;

9) October 2, 2018 email regarding "LFO Adverse Traffic" (AOL-DEF-00235700-000235703), Defendants' Opposition Exhibit 30;

---

transcript as confidential Protected Material.

[2] The entirety of Ms. Leutert's deposition transcript is treated as presumptively confidential under Protective Order ¶ V(B)(2)(b). Protective Order ¶ V(B)(2)(b).

10) February 8, 2019, email chain regarding CBP MCAT C-1 notes 2/8 (Hoffman email) (AOL-DEF- 00379492–93), Defendants' Opposition Exhibit 12.

## ARGUMENT

### A. Legal Standards

Although there is "a general right to inspect and copy public records and documents," *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), a party may still overcome the presumption of access. *Heldt v. Guardian Life Ins. Co. of America*, No. 16-cv-885, 2018 WL 5920029, at *1 (S.D. Cal. Nov. 13, 2018). The presumption of access is "based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). Thus, when the documents to be protected are "more than tangentially related to the merits," parties must show compelling reasons to keep those documents sealed. *Heldt*, 2018 WL 5920029 at *1 (quoting *Ctr. for Auto Safety*, 809 F.3d 1092, 1096–98); *see also McCurley v. Royal Seas Cruises, Inc.*, No. 17-cv-296, 2018 WL 3629945, at *2 (S.D. Cal. July 31, 2018). Compelling reasons include "when [] 'court files might [] become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). "In certain circumstances, courts have allowed the *government* to file under seal material that contains confidential and sensitive government information that might endanger or undermine law enforcement's activities . . . where the government identifies the particular harm that may result from the specific disclosure." *Music Grp. Macao Commercial Offshore Ltd. v. Foote*, No. 14-CV-03078-JSC, 2015 WL 3993147, at *3 (N.D. Cal. June 30, 2015) (internal citations omitted; emphasis in original); *see Hesterberg v. United States*, No. C-13-01265 JSC, 2013 WL 6057068, at *2 (N.D.

Cal. Nov. 15, 2013) (finding compelling reasons to seal portions of documents that could "empower criminal suspects who come in contact with . . . officers because they will be able to predict the officer's actions."). As shown below, Defendants' request to file law enforcement sensitive materials under seal satisfies the "compelling reasons" standard. Defendants have provided specific information regarding the harm that could occur if the information is disclosed. *See Am. Auto. Ass'n of N. California, Nevada & Utah v. Gen. Motors LLC*, No. 17-CV-03874-LHK, 2019 WL 1206748, at *1 (N.D. Cal. Mar. 14, 2019). The public interest in the information at issue is far outweighed by the interest in confidentiality. *See Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010).

### B. The Risk to Port and Border Security Presents Compelling Reasons to Seal Information About Port Capacity and Operations Discussed During the Depositions of Executive Assistant Commissioner Todd Owen and Expert Witness Stephanie Leutert.

The Court should seal the excerpts of Todd Owen's deposition testimony at pages 45, 91, and 218, as well as the excerpts of Stephanie Leutert's deposition testimony,[3] which reveal specific information about the capacity and operations of ports of entry, the disclosure of which will harm border security.

During his December 13, 2019 deposition, Mr. Owen testified about various sensitive topics. As relevant here, Defendants cite portions of Mr. Owen's testimony that discuss CBP's OFO Field Queue Management Reports and Migration Crisis Action Team (MCAT) Reports, which include specific information about the capacities of and processing at ports of entry. *See* Owen Deposition Tr. 45:7-9; 91:1-5. During her January 28, 2020 deposition, Ms. Leutert similarly testified regarding the contents of these reports and related information about port capacity. *See* Leutert

---

[3] Ms. Leutert's deposition transcript is presumptively confidential during the 30-day period following its receipt. *See* Protective Order ¶ V(B)(2)(b).

Deposition Tr. 137, 156.

As set forth in the February 12, 2020 Declaration of Randy Howe, Executive Director for Operations, Office of Field Operations (OFO) ("Howe Decl."), attached as Exhibit A, there are compelling reasons to seal such testimony, as well as any portions of the parties' briefs that incorporate it. OFO's Field Queue Management Reports "compile data from the OFO Field Offices on the southwest border." Howe Decl. ¶ 6. The Reports "are provided on a daily basis to OFO and CBP leadership and provide raw data points on a number of factors that impact the operations of southwest border ports of entry." *Id.* The sensitive nature of this law enforcement information warrants filing these documents under seal. *Cf. Motley v. City of Fresno*, *supra*; *see BofI Fed. Bank v. Erhart*, *supra*. As explained in the Declaration of Randy Howe, the Queue Management Reports "are generated strictly for internal CBP and DHS use, and are used for maintaining awareness of any resource or operational vulnerabilities at the various ports of entry (POEs) along the southwest border." Howe Decl. ¶ 6.

"The main operational vulnerabilities or resource constraints that these Queue Management reports highlight is the total number of individuals in custody at a particular port, as well as the percentage of total holding capacity that port has reached based on the number of individuals in custody." *Id.* ¶ 7. This information is important for CBP leadership to know because "high numbers of individuals in custody may be caused by any number of factors, such as changes in migrant flows that need to be monitored; potential difficulties in transferring individuals out of CBP custody, which may need to be addressed with CBP's interagency partners; or other operational or resource issues that may require action. *Id.*

In addition, "this information may also reveal operational vulnerabilities or weaknesses that could be exploited if released publicly. While the number of individuals in custody at a particular port of entry is not the only factor affecting a port's

total capacity to process individuals, it impacts how a port of entry manages its resources." *Id.* ¶ 8. For example, "if a port has a high number of individuals in custody, or if individuals in custody have been held for an extended period of time, port management may need to reallocate staffing and other resources towards addressing these capacity issues." *Id.* ¶ 9. This involves "addressing the needs of individuals in custody, and attempting to move those individuals out of the POE." *Id.* Specifically:

> [I]f a port has a high number of individuals in custody, officers at the port must devote significant time and energy towards ensuring that these individuals have adequate food and water, and are housed in sanitary conditions. OFO policy requires that officers conduct welfare checks at regular intervals for individuals in custody. Officers must also provide individuals in custody with meals and snacks, as well as ensure that any children are adequately supervised. Additionally, if a port is operating at a high capacity, or if individuals have been in custody for a long period of time, officers must work to transfer these individuals out of CBP custody, by working with U.S. Immigration and Customs Enforcement (ICE), the U.S. Department of Health and Human Services (HHS), and other partners, to secure transportation.

*Id.* ¶ 9. "[A]ddressing the needs of individuals in custody, and attempting to move those individuals out of the POE, takes officers away from other inspection and enforcement duties including detecting and seizing drug[s] and other contraband." *Id.* As a result, "the port [is] more vulnerable to outside threats such as drugs, weapons, contraband, and individuals attempting to enter the port without inspection, such as by running through vehicle lanes." *Id.*

As "most of the cocaine, heroin, foreign-produced marijuana, and foreign-produced methamphetamine available in the United States enters through the southwest border," the American people are also more vulnerable to drugs if the port is susceptible to this threat. *Id.* One drug in particular, "[f]entanyl . . . is difficult to detect, as it is easily concealed in small packages and other small compartments." *Id.* When "a port has fewer individuals in custody, the port will be able to allocate

1 more resources towards other mission sets, such as seizing drugs, weapons, and other
2 contraband." *Id.* ¶ 10.

3     For these reasons, "publicly releasing port-level capacity data, especially cov-
4 ering a period of several days or weeks, would provide outside entities with a picture
5 of when certain entities are operating below, at, or above capacity[], and thus how
6 resources may be allocated at those ports." *Id.* ¶ 11. Taken together, "[t]his data,
7 combined with other publicly available data, such as seasonal migration trends and
8 the number of individuals encountered or found inadmissible in certain areas, could
9 be exploited by DTOs, TCOs, and other hostile actors." *Id.* In particular, "if a TCO
10 or smuggling organization had knowledge that a particular port consistently operated
11 at or above capacity for a period of several days or several weeks, the TCO or smug-
12 gling organization could utilize that information, along with other information in its
13 possession or gleaned from other sources, to develop a picture of when the port's
14 resources may be strained, and reallocate its own resources to exploit this vulnera-
15 bility." *Id.* Likewise, "if a TCO or smuggling organization had knowledge that a
16 particular port consistently operated *below* capacity for a period of time, the TCO or
17 smuggling organization cold reallocate its own resources towards *creating* capacity
18 constraints at that particular POE." *Id.*

19     For example, "if a TCO gained knowledge that a particular port was operating
20 at capacity during a certain month of the year, or during certain days in the month,
21 the TCO could specifically wait until that period of time to send additional levels of
22 drugs or other contraband to that port, or by instructing a group of individuals to
23 enter without inspection, such as by running through the vehicle lanes." *Id.* ¶
24 12. Specifically, "if a TCO had knowledge that a particular POE had been operating
25 at 30% of its capacity for two weeks, it could further harm port operations by in-
26 structing a large group of individuals to attempt to enter without inspec-
27 tion." *Id.* Similarly, "if a smuggling organization had knowledge that a particular
28 POE had been operating at 30% of its capacity for two weeks, it could [] instruct a

large group to enter without inspection, creating a diversion of OFO resources towards that group, and away from other priority missions." *Id.*

Accordingly, public disclosure of the information contained in Field Office Queue Management Reports or similar MCAT Reports, or any other specific information about a port's capacity and operations, would release details about the operations of ports of entry (as well as CBP operations between the ports of entry) that could compromise border security. This risk of harm caused by the release of these details is an even more significant interest than store security and employee safety, which was enough for the Court to seal documents in *Bell v. Home Depot USA, Inc.*, No. 212CV02499GEBCKD, 2015 WL 6082460, at *2 (E.D. Cal. Oct. 15, 2015). "Because all of the information in these documents consists of such detailed operational information, it is not possible to meaningfully segregate or redact any information for purposes of filing other portions of the documents publicly." *Id.* ¶ 27. In *Bell*, the court stated: "the Security SOPs sought to be sealed contain Home Depot's security protocols in opening and closing its stores, the disclosure of which could threaten its stores' security and its employees' safety." *Bell*, 2015 WL 6082460, at *2 (comparing *In re Google Inc. Gmail Litigation*, No. 13–MD–02430–LHK, 2013 WL 5366963, at *3 (N.D. Cal. Sept. 25, 2013)). Similarly, here, the information sought to be sealed involves information regarding the southwest border of the United States which "could irreparably harm" the mission of CBP along the southwest border of the United States and threaten public health and safety, by allowing increased drug and weapons trafficking. *See Bell*, 2015 WL 6082460, at *1.

The security considerations discussed above are similar to those raised in regards to the sealing of an exhibit in *United States ex rel. Kelly v. Serco, Inc.* that "specifically reference[d] locations, technical specifications and operational capabilities of restricted Homeland Security microwave communications systems along the United States border, used to provide technological assistance to federal agents tasked with monitoring and securing the border." No. 11CV2975 WQH-RBB, 2014

WL 12675246, at *2 (S.D. Cal. Dec. 22, 2014) (citation omitted). The Court ultimately found that "national security interests are a compelling reason for filing documents under seal[]," and because "the[] exhibits [at issue] contained sensitive technical information, such as specific tower locations and frequencies . . . public dissemination of this information could be used by persons seeking to do harm to the United States." *Id.* at *4. Additionally, the court determined "that [the] compelling reason outweighs the traditional right of access." *Id.* The same compelling reasons warrant the sealing of sensitive details regarding the capacity and operations of ports of entry, which, if disclosed, could be exploited by bad actors to circumvent these operations. *Cf. Motley*, 2016 WL 1060144, at *2.

For the reasons discussed above, the Court should seal the confidential portions of Mr. Owen's and Ms. Leutert's testimony, as well as any references thereto in Defendants' Opposition.

### C. The Risk to Port and Border Security Also Presents a Compelling Reason to Seal the Exhibits Related to Haitian Migration Surge

The Court should also seal Defendants' Opposition Exhibits related to the Haitian Migration surge: An October 6, 2016 memorandum prepared by the OFO Migration Coordination Center (AOL-DEF-00020023-00020024) (Defendants' Exhibit 6); and a September 14, 2016 OFO Incident Management Division memorandum (AOL-DEF-00285232-0023523) (Defendants' Exhibit 7). As set forth in the February 11, 2020 Declaration of Vernon Foret, Executive Director for Operations, Office of Field Operations (OFO) ("Foret Decl."), attached hereto as Exhibit B, disclosure of these documents would compromise port security and CBP's ability to obtain information from and work with the Government of Mexico to jointly address threats to safety and security on the border, by revealing CBP's frankinternal assessments of operational vulnerabilities or weaknesses, law enforcement techniques, and communications with the government of Mexico. *See* Foret Decl. ¶¶ 6-10.

These exhibits constitute internal briefing documents that contain specific details regarding the surge in Haitian migrants arriving in San Diego in 2016. Foret Decl. at ¶ 5. The documents discuss the status of the response to the surge, operational perspectives on the issue, including a discussion of specific factors contributing to the surge. *Id.* The documents also discuss specific steps that both CBP and U.S. Immigration and Customs Enforcement ("ICE") had taken to attempt to manage the situation and sensitive discussions of resource, staffing, and budget constraints. *Id.* The documents also contain information from the Mexican government on flow of additional migrants to San Diego, requests for assistance, and shared information regarding perceived vulnerabilities and resource constraints. *Id.* Finally, these memoranda reveal the techniques and tactics that CBP utilized to obtain certain sensitive information. *Id.*

Revelation of operational vulnerabilities and resource constraints at ports of entry of the type included in these documents—such as the nature of foreign requests for assistance, impact of the migration surge on operations and mission requirements, resource allocations, and perspectives—would allow hostile actors such as TCOs or DTOs to take advantage of CBP's operational vulnerabilities and overwhelm operations. Foret Decl. ¶¶ 6-9. Revelation of CBP's communications with, and information shared by, the Mexican government, would similarly threaten law enforcement operations by discouraging the free sharing of information to conduct law enforcement operations at the shared border. *Id.* ¶ 9. Finally, revelation of the techniques and tactics CBP used to obtain sensitive information about the migration surge would provide "insight into how to avoid providing CBP with information, as well as information about how to evade law enforcement," and would "impede CBP's ability to effectively collect information using a like and similar method in the future." *Id.* ¶ 19.

For these reasons, the Court should seal Defendants' Opposition Exhibits 6 and 7, and the portions of the parties' briefs that reference the information contained

DEFS.' MEM. IN SUPPORT OF MOT. TO SEAL PORTIONS OF DEFENDANTS' CLASS CERT. OPPOSITION

therein.

### D. The Risk to Port and Border Security and Travelers' Privacy Interest Also Provide Compelling Reasons to Seal the November 2016 SWB DFO/XD PowerPoint Presentation

There are compelling reasons to seal SWB DFO/XD Panel Discussion PowerPoint presentation dated November 16, 2016, Defendants' Opposition Exhibit 8. The document was prepared for only internal OFO distribution, and discusses sensitive, detailed information about OFO's operations along the southwest border. Foret Decl. at ¶ 12. The intelligence outlined in this document has predictions on the number of migrants expected on the southwest border and capacity stress points for certain Field Offices. *Id*. The document also contains critical information on how to manage limited resources during migration surges and includes a discussion of subsequent deficiencies in transportation, staffing, and other mission needs. *Id.* at ¶ 13. The degree of detail contained in this document—about port physical capacity, anticipated capacity constraints, trends in inadmissible individuals—would provide hostile actors with a clear picture of system-wide operational vulnerabilities to manipulate. Foret Decl. at ¶ 14-16. For instance, knowing when and where more officers are focused on the individuals in custody than securing the border may provide drug cartels with important information as to times and location to smuggle large loads of drugs or other contraband. Foret Decl. at ¶ 16. These risks to port operations and border security alone present a compelling reason to seal this document.

Further, the document also contains photographs taken from various Field Offices of individuals in custody, disclosure of which would compromise those individuals' privacy interests. Foret Decl. at ¶¶ 12. This provides a separate basis for which the Court should seal the November 2016 PowerPoint.

### E. The Risk to Port and Border Security and to Law Enforcement Operations Provides Compelling Reasons to Seal Documents Related to Development of Processing Facility

There are compelling reasons to seal the exhibits that discuss the development of a processing facility to increase capacity: An October 13, 2016 memorandum prepared by the OFO Incident Management Division relating to a specific proposal to increase CBP and DHS's capacity to process and hold aliens encountered as part of the surge (AOL-DEF-00219717-00219723) (Defendants' Opposition Exhibit 9), and a PowerPoint presentation on same topic (AOL-DEF-00221166) (Defendants' Opposition Exhibit 10). Foret Decl. at ¶ 20. These documents contain sensitive information—such as information regarding the reasons why CBP and DHS determined it was necessary to increase physical capacity, and the granular operational details related to the implementation of that decision—that, if publicly revealed, could undermine law enforcement activities and would have a chilling effect on operational decisionmaking as well as information-sharing with Mexico. *Id.* at ¶¶ 21-22.

For instance, with respect to the decision to increase capacity, these documents reveal the specific reasons why CBP made such a decision, including assessment of the operational situation facing the agency and the strengths and weaknesses of this course of action. *Id.* at ¶ 22. Such a decision also included an assessment of anticipated actions and requests by the Mexican government, consideration of current and anticipated migration flow, as well as an assessment of the potential operational vulnerabilities facing both CBP and its interagency partners. *Id.* at ¶ 22. This information was shared in an open, frank, and an honest manner, to ensure that CBP and DHS leadership had all appropriate information before making a decision. *Id.* Publicly releasing this information, however, could lead to second-guessing of internal agency decisions and would discourage individuals from freely or honestly sharing similar information and assessments in the future. *Id.* In addition, publicly

1  disclosing information obtained from the government of Mexico could also have a
2  significant chilling effect on future exchanges with that nation. *Id.*

3       The granular operational details contained in this document—including the
4  physical layout of an anticipated facility, anticipated staffing, and resource needs—
5  provide an additional reason for its sealing, as such information can be misused by
6  hostile actors. Foret Decl. at ¶ 23. In particularly, the information-technology-re-
7  lated information in this document could be used by individuals seeking to hack or
8  otherwise harm CBP and DHS electronic systems of records. *Id.* Similarly, the cost
9  and staffing estimates reveal resource vulnerabilities that could also be exploited to
10 hinder operations. Foret Decl. at ¶ 23.

11      Finally, the October 13, 2016 memorandum, at page AOL-DEF-00219718,
12 also provides a detailed operational picture of the resources and operational capabil-
13 ities of OFO, U.S. Border Patrol, and ICE to work together in an emergency situa-
14 tion, as well as details into the technological resources needed to implement the plan.
15 Foret Decl. at ¶¶ 24-25. For instance, the plan describes the specific information
16 that OFO would collect from individuals upon intake, the specific processing forms
17 to be filled out for each alien, as well as specific language, translation and transpor-
18 tation needs. *Id.* A hostile actor could exploit any number of these factors to slow
19 down the process by hacking or otherwise interfering with CBP's electronic system
20 of records causing a delay in processing of aliens, or deliberately causing delays in
21 transportation. *Id.* Any of these actions would thus interfere with the streamlined,
22 emergent nature of processing envisioned by this plan, severely hindering the gov-
23 ernment's ability to utilize similar strategies in response to potential future surges.
24 *Id.* In sum, making these documents public would undermine law enforcement ac-
25 tivities, and the Court should thus allow them to be filed under seal.

### F. *The Risk to Port and Border Security Also Presents Compelling Reasons to Seal Portions of the Declaration of Rodney Harris*

There are compelling reasons to seal Paragraph 12 of the updated Declaration of Rodney Harris (Defendants' Opposition Exhibit 28). Harris' declaration contains specific details about the Laredo Field Office's Mass Migration Contingency Plan, and specifically the maximum number of individuals that a particular port can process and hold in a crisis. Foret Decl. at ¶ 26. With knowledge of this number, as well as the knowledge that this number was a result of the port expending the maximum amount of its resources, hostile actors could easily cripple operations instructing a larger number of individuals to run through the vehicle lanes or otherwise evade inspection. *Id.* They could then take advantage of the resulting diversion and smuggle drugs or contraband through that port. *Id.* In sum, sealing the declaration is appropriate because it contains sensitive information that could be used to undermine law enforcement activities.

### G. *The Risk to Port and Border Security Also Presents Compelling Reasons to Seal the February 2019 and October 2018 Emails Concerning Port Capacity.*

Next, the Court should seal the October 2018 and February 2019 emails (Defendants' Opposition Exhibits 30 and 12), both of which discuss details about port capacity and custody demographics. As also discussed in Part B above, "[p]ort-level capacity data, while one of only many factors impacting a port's total capacity to process individuals, is sensitive information that can be exploited by hostile actors." Foret Decl. ¶ 29; *see also* Howe Decl. ¶¶ 24-27. The public release of these emails and especially at once has the potential to reveal a large amount of critical operational data that could be exploited by hostile actors seeking to harm CBP operations and undermine the agency's ability to secure the border. Howe Decl. ¶ 27.

Additionally, both the February 2019 Hoffman email, and October 2018 Laredo Field Office Adverse Traffic email raise genuine security concerns regarding the disclosure of CBP employees' email addresses. As detailed in the February 11, 2020 Buckley Declaration ("Buckley Decl.") , the Director of Security and Technology Division at CBP, which is attached to this pleading as Exhibit C, there are genuine security concerns regarding the disclosure of CBP employees' email addresses. Dissemination of "the email addresses of CBP employees . . . can create significant cyber security threats to both the individual employee and CBP as a whole." Buckley Decl.¶ 3. For example, "once an employee's email address is publicized, malicious actors can engage in social engineering to obtain confidential information from that employee" through the "use of deception to manipulate individuals into divulging confidential or personal information that may be used for fraudulent purposes." *Id.* ¶ 4. One form of social engineering, called phishing, involves "sending emails purporting to be from reputable sources with the goal of influencing or gaining personal information such as passwords or financial information." *Id.* ¶ 4.a. Another form of social engineering, called sphear phishing, is "a type of highly targeted phishing attack that focuses on a specific individual or organization." *Id.* ¶ 4.b.

Further, "other cyber security threats can [also] occur once an employee's email address is released to the public." *Id.* ¶ 5. One example of a cyber security attack is a denial of service (DoS) attack. *Id.* ¶ 5.a. "[A] DoS is a security event that happens when an attacker prevents legitimate users from accessing specific computer systems, devices, services or other IT resources[,] [t]he purpose of [which] is to flood servers, systems, or networks with traffic to overwhelm the victim's resources and make it difficult or impossible for legitimate users to access them." *Id.* Another example of a cyber security attack is doxing. *Id.* ¶ 5.b. "[D]oxing occurs when a malicious actor publishes private personal information, usually for purposes

of public humiliation, stalking, identity theft, or targeting an individual for harassment." *Id.* Swatting is another example of a cyber security attack. *Id.* ¶ 5.c. "[S]watting is a harassment tactic in which a malicious actor deceives emergency services into sending policy or emergency response teams to another person's address." *Id.* Yet another example of a cyber security attack involves ransomeware. *Id.* ¶ 5.d. "[R]ansomeware is malicious software designed to block access to a computer system until a sum of money is paid." *Id.* Finally, spam emails are another example of a cyber security attack. *Id.* ¶ 5.e. "[S]pamming occurs when disruptive online messages are sent repeatedly[], and "spam emails [] hinder an agency's ability to communicate with its employees due to the volume of email traffic and strains on the agency's IT capacities." *Id.*

These security threats are not hypothetical. "Cyber attacks against the U.S. are on the rise." Buckley Decl. ¶ 6. A Government Accountability Office report determined "that between 2006 and 2015, cyberattacks involving systems supporting the federal government increased over 1,300% from 5,500 to over 77,000." *Id.*; *see* GAO-16-501, Information Security: Agencies Need to Improve Controls over Selected High-Impact Systems (May 2016). In fact, "[t]he Office of Personnel Management discovered it was the victim of a cyber attack in April 2015." Buckley Decl. ¶ 6. As a result of this attack, "[h]ackers stole personal information belonging to 21.5 million federal employees and their families, friends, and former employers." *Id.* And these hackers "were able to compromise the entire OPM network by exploiting the credentials of one single contractor." *Id.* ¶ 7. It is clear, based on this information, that "[p]ublication of CBP employees' email addresses therefore poses a substantial risk to the safety and welfare of the individual employee and CBP." *Id.* ¶ 8. It is for this reason that "any documents in this case that contain such information should be filed under seal and kept confidential." *Id.* Should the Court find that sealing of this information is not warranted, Defendants would ask, "[a]lternatively, that the Court . . . permit Defendants to redact email addresses before the

underlying documents are publicly released." *Id.*

As with the above-described documents, the sensitive nature of this law enforcement information warrants filing these documents under seal.

## **CONCLUSION**

For the compelling reasons discussed above the Court should seal the above-listed sensitive documents and testimony and the portions of the parties' briefs that discuss them. Should this Court find that sealing of the above listed sensitive documents in their entirety is not warranted, Defendants respectfully seek the Court's permission to identify more particular redactions to protect sensitive information from public disclosure.[4]

//
//

---

[4] In all cases, Defendants seek to redact or seal the personally identifying information of their employees from public disclosure.

17

DEFS.' MEM. IN SUPPORT OF MOT. TO SEAL PORTIONS OF DEFENDANTS' CLASS CERT. OPPOSITION

Dated: February 12, 2020     Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

*/s/ Ari Nazarov*
ARI NAZAROV
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000
ari.nazarov@usdoj.gov

ALEXANDER J. HALASKA
DHRUMAN Y. SAMPAT
Trial Attorneys

*Counsel for Defendants*

# CERTIFICATE OF SERVICE

No. 17-cv-02366-BAS-KSC

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: February 12, 2020          Respectfully submitted,

*/s/ Ari Nazarov*
ARI NAZAROV
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000
ari.nazarov@usdoj.gov

*Counsel for Defendants*