# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br> *Plaintiffs,* <br><br> v. <br><br> Chad Wolf, *et al.*, <br> *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) No. 3:17-cv-02366-BAS-KSC <br> ) <br> ) <br> ) <br> ) |

**DECLARATION OF VERNON FORET**

I, Vernon Foret, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am currently the Executive Director for Operations, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I have been employed in this role since January 2020. I have over 30 years of experience in the federal government to include 13 years with the U.S. Department of Agriculture, Animal and Plant Health Inspection Service and 17 years with CBP as an Area Port Director in New Orleans, Louisiana, Director of Field Operations in Miami, Florida, and Executive Director in CBP Headquarters in Washington, D.C. As the Executive Director for Operations, I oversee more than 23,000 employees, with operations at 20 major field offices, 328 POEs, and 16 Preclearance locations.

2. I make this declaration to support the filing under seal of several exhibits to Defendants' response to plaintiffs' Motion for Class Certification, specifically, AOL-DEF-00285232-00285233, AOL-DEF-00020023-00020024, AOL-DEF-00018728, AOL-DEF-00219717-

1

00219723, AOL-DEF-0022116, AOL-DEF-00235700-00235703, and portions of the updated declaration of Rodney Harris.

3. These documents all contain detailed information regarding CBP and DHS operations, including information obtained from foreign partners, information routinely shared within and among CBP and its interagency partners, and information obtained through sensitive law enforcement techniques and methods. These internal documents also contain frank and unvarnished assessments of operational vulnerabilities, the strengths and weaknesses of particular operational decisions, and assessments of operational and resources needs. The ability of OFO, as well as others within CBP, DHS, and across the executive branch, to share detailed operational information, including potential vulnerabilities and weakness, is of critical importance to ensuring that OFO is able to execute its mission of securing the borders and protecting the American public. The public release of such information undermines OFO's ability to execute that mission.

***Documentation Related to Haitian Migration Surge***

4. The first set of documents that need to be filed under seal consist of an October 6, 2016 memorandum prepared by the OFO Migration Coordination Center containing information on the Haitian Migration Surge within the San Diego Field Office from February 6, 2016 through October 6, 2016 (AOL-DEF-00020023-00020024), and a September 14, 2016 OFO Incident Management Division memorandum on the same general topic (AOL-DEF-00285232-0023523).

5. These documents are internal briefing documents that contain specific details regarding the surge in Haitian migrants arriving in San Diego in 2016. The documents discuss the factual background, the status of the response to the surge, and operational perspectives

2

on the issue, including a discussion of specific factors contributing to the surge, specific steps that both CBP and U.S. Immigration and Customs Enforcement (ICE) had taken to attempt to manage the surge, recommendations of specific actions and steps that could be taken to further mitigate the impacts of the surge, and discussions of resource, staffing, and budget constraints. These memoranda also contain detailed information reported from the Mexican government regarding the flow of additional migrants to San Diego, requests by the Mexican government to take certain actions, and information shared by the Mexican government regarding its own perceived vulnerabilities and resource constraints. The memoranda also discuss sensitive information obtained through other law enforcement techniques, and describe the methods and tactics by which this information was obtained. These memoranda were generated strictly for internal CBP and DHS use, and are of the type often forwarded to OFO and CBP leadership for their awareness and for future follow up action.

6. The main operational vulnerabilities or resource constraints that these memoranda highlight are foreign requests for assistance in daily operations and an assessment of the ability to effectively respond to such requests; summaries, opinions, and analysis of surge impact on operations tempo and mission requirements; utilization of allotted resources; and a discussion of future operations plans, perspectives, and opinions. It is important for CBP and OFO leadership to be aware of this information, in sufficient detail, to enable Agency leadership to make appropriate and effective decisions.

7. However, such information, if released publicly, would also reveal operational vulnerabilities or weaknesses that could be exploited by hostile actors. These documents contain opinions, recommendations, and internal data on staffing, budget, and other

resources constraints, and thus provide a specific snapshot of CBP operational capabilities and its ability to effectively respond to a migration surge. If a hostile actor such as a Transnational Criminal Organization (TCO) or Drug Trafficking Organization (DTO) learned this information, it could easily determine what types of factors OFO considers to be an operational vulnerability, and take advantage of such vulnerabilities to reallocate its resources appropriately towards those vulnerabilities, thereby overwhelming operations.

8. For example, these documents provide an explanation of why CBP considered a particular number of individuals arriving at a particular location at a given period of time to be a crisis. If a TCO had such information, it could easily instruct a similar number of individuals to, for instance, run through the vehicle lanes or otherwise evade inspection at that location, overwhelming the CBP facility and crippling operations. These documents also explain the specific steps that OFO and its interagency partners had taken to attempt to mitigate the ongoing surge. If revealed, these specific steps would essentially provide a TCO with a roadmap as to how CBP and DHS attempt to manage emergency situations. The TCO could then utilize this information to reconsider and reassess its own tactics to develop methods of evading such measures in the future.

9. These memoranda also include honest assessments of actual or perceived vulnerabilities within CBP and ICE operations, as well as assessment of what may be needed to address those vulnerabilities. They also include similar assessments and information from the Mexican government. It is critical that CBP, ICE, and others be able to openly and honestly assess these vulnerabilities and determine the most effective way to rectify them. However, if disclosed, this information would provide hostile actors with a picture of

DHS vulnerabilities, enabling such actors to exploit the same vulnerabilities in the future. Additionally, disclosure of these opinions and reactions to certain vulnerabilities is likely to inhibit CBP and DHS officials, as well as individuals within the Mexican government, from freely sharing such information in the future. If officials were to stop or limit the sharing information in an open and honest manner, it could significantly limit both the United States' and Mexico's ability to conduct law enforcement operations at our shared border, including limiting our ability to work together to address threats to safety and security

10. Lastly, these memoranda reveal the techniques and tactics that CBP utilized to obtain certain sensitive information, as well as the details of communications with the Mexican government. It is critical that CBP maintain its ability to obtain all relevant information, through various tactics, in order to ensure that the Agency has a complete picture of operational realities when making decisions. Public disclosure of its internal techniques and methods would give individuals insight into how to avoid providing CBP with information, as well as information about how to evade law enforcement. Public disclosure would thus impede CBP's ability to effectively collect information using a like and similar method in the future.

## *SWB DFO/XD PowerPoint Presentation*

11. The next document that needs to be filed under seal consists of a SWB DFO/XD Panel Discussion PowerPoint presentation (AOL-DEF-00018728), dated November 16, 2016.

12. This PowerPoint, prepared for internal OFO distribution only, discusses the operational and policy implications of migration at the southwest border, as it contains intelligence gathered on the 2016 migration flow, as well as data relating to the number of individuals

5

already encountered along the southwest border. The intelligence outlined in this document discusses predictions on the number of migrants encountered on the southwest border and anticipated capacity stress points for certain Field Offices along the southwest border. Specifically, the document shows historical trends in the number of individuals found inadmissible in the San Diego, Tucson, El Paso, and Laredo Field Offices, the maximum physical capacity for each Field Office, the number of individuals actually in custody in each Field Office, and the percentage of capacity reached in each Field Office. The document also contains photographs taken from each Field Office of individuals in custody.

13. The document also contains detailed information related to the development of a facility to increase CBP and DHS holding capacity, discussing the numbers of Haitian migrants to be processed, the resources and number of personnel to be used, and date that operational capacity will go into effect for emergency response operations. In addition to this, the document contains information on how to manage dwindling resources in light of migration surges, to include deficiencies in transportation, staffing, and other mission needs.

14. The degree of detail contained in this presentation is such that it would provide hostile actors with a clear picture of system-wide operational vulnerabilities and future plans that could be exploited. Specifically, this document identifies specific locations along the southwest border that CBP identified as being likely locations for the anticipated surge of migrants, and the corresponding impact such a surge could have on the physical capacity of the particular Field Office. Thus, this document reveals both sensitive

intelligence gathered for purposes of informing CBP operational actions, as well as information about the physical capacity of the various Field Offices.

15. The public release of information regarding physical capacity, as well as anticipated capacity constraints, could severely harm operations. This is true even for historical data, like that contained here. Information about the number of individuals found inadmissible in a particular Field Office, trends related to these numbers, as well as that Field Office's physical capacity to process and hold the individuals, reveals areas of potential vulnerability that can be exploited by TCOs, DTOs, or other hostile actors.

16. Specifically, this document provides detailed information about trends in the number of individuals found inadmissible across the southwest border, and also provides a corresponding snapshot of the impact of those numbers (as well as anticipated changes in those numbers) on each Field Office's physical capacity. Taken together, these data points can be manipulated to reveal the specific impact that a surge of a particular size would have in a particular area. For instance, this data could be used to determine that, when a particular Field Office faced an increase of a certain size in the number of individuals encountered over the previous fiscal year, that same Field Office found itself over capacity by a certain percentage. As explained in the December 2019 declaration of Randy Howe, when a particular Field Office is facing a significant influx of individuals apprehended or encountered, officers in those locations must devote a significant portion of their time to processing those individuals, ensuring that those individuals receive appropriate treatment, and transporting those individuals to and out of CBP facilities. Thus, with more officers focused on the individuals already in custody, there are fewer officers available to actually secure the border. OFO may also need to seek assistance

from other interagency partners, such as the U.S. Border Patrol (USBP), pulling agents away from their duties of patrolling between ports of entry. TCOs therefore often target areas with high numbers of individuals in custody, and thus fewer officers conducting enforcement duties, as areas in which to attempt to smuggle large loads of drugs or other contraband.

17. Additionally, this document provides intelligence about migration trends, including historical comparisons of these numbers and detailed information about the flow of migrants into San Diego. This raw data is created, prepared, and analyzed for internal CBP use, for situational awareness and for purposes of making informed decisions. The data itself reveals the Agency's priorities with regard to trends considered to be operationally important and the specific migration patterns of interest. The data is also gathered through various techniques and methods that are not disclosed to the general public and could easily be exploited if publicly revealed. This intelligence should therefore remain confidential.

18. This PowerPoint also describes CBP and DHS's reactions to the 2016 surge in Haitian migration, including details regarding actions taken to attempt to mitigate the impact of the surge. The operational details of this plan, including the anticipated and recommended timelines for taking certain actions, internal operational triggers related to transportation and processing times, and staffing and resource needs, all reveal sensitive internal details that can be exploited. Specifically, these details reveal the specific steps that CBP and DHS determined were necessary to attempt to mitigate the surge, any of which may become necessary in the future if faced with another surge. However, publicly revealing these steps, as well as the decisionmaking process that led to their

8

implementation and the assumptions underlying the decision, would enable TCOs, DTOs, and other hostile actors to essentially anticipate such steps in the future, giving these entities an ability to realign their own resources to thwart such actions.

19. Lastly, the photographs in this document should remain confidential, as they identify specific individuals in CBP custody. Revealing the identity of any of these individuals could potentially place them in harm's way, especially if they are going through the asylum process. Releasing these photographs without these individuals' consent would also undermine their own privacy interests.

*Documents Related to Development of Processing Facility*

20. The third set of documents that need to be filed under seal consist of an October 13, 2016 memorandum prepared by the OFO Incident Management Division relating to a specific proposal to increase CBP and DHS's capacity to process and hold aliens encountered as part of the surge (AOL-DEF-00219717-00219723), and a PowerPoint presentation on same topic (AOL-DEF-00221166).

21. These documents should be kept confidential, as they contain both background information regarding the reasons why CBP and DHS determined it was necessary to increase physical capacity, and the granular operational details related to the implementation of that decision.

22. With regards to the reasons behind the decision to increase capacity, this document reveals the specific reasons why CBP made such a decision, including an assessment of the operational situation facing the agency at the time and an assessment of the potential strengths and weaknesses of this course of action. Such a decision included an assessment of anticipated actions and requests by the Mexican government, an

9

assessment of the current and anticipated migration flow, as well as an assessment of the potential operational vulnerabilities facing both CBP and its interagency partners. It also made certain assumptions about the actions of CBP, interagency partners, and the Mexican government. This information was provided in an open, frank, and an honest manner, to ensure that CBP and DHS leadership had all appropriate information when determining whether to approve this undertaking. Publicly releasing this information, however, could lead to after-the-fact second guessing of the information presented, thereby discouraging individuals from freely sharing similar information in the future. Publicly disclosing information obtained from the government of Mexico could also have a significant chilling effect on future information-sharing with Mexico.

23. With regards to the granular operational details related to a facility that could increase physical capacity, this information includes a detailed description of the anticipated location of a particular facility, the physical layout of that facility; anticipated staffing, information technology (IT), and other resource needs to effectively utilize the facility; and the anticipated costs to building the facility. These granular operational details also should remain confidential, as they can also be exploited by hostile actors. The information about IT needs and capabilities, for instance, could be exploited by individuals looking to hack or otherwise harm CBP and DHS electronic systems of records and therefore cripple operations. Similarly, the cost and staffing estimates reveal resource vulnerabilities that could be exploited. If a TCO learned, for instance, that CBP anticipated it would need to deploy (for example) 15 officers to staff a facility of a particular size – taking those 15 officers away from their ordinary job duties at their normal duty stations – the TCO could then reallocate its own resources to create a

significantly larger surge in the future, potentially requiring the deployment of additional officers. The TCO could then take advantage of the resulting staffing gap at other locations to surge their own operations there, hindering operations and preventing CBP and DHS from effectively responding to a surge in the future.

24. Lastly, AOL-DEF-00219718 contains a detailed proposed Concept of Operations for processing aliens at any facility built to increase physical capacity in the emergent situation the agency faced in 2016. It describes detailed steps to be taken by OFO, USBP, and ICE, including assumptions about the time required to take certain actions and the resources required to complete certain actions. Even though this plan was developed in 2016, many of the operational details in this plan, such as the assumptions about timing and resource constraints, remain relevant to operations generally and can be incorporated into existing contingency planning. Therefore, by its very nature, this declaration could be exploited by hostile groups seeking to exploit these details.

25. This plan provides a detailed operational picture of the resources and operational capabilities of OFO, USBP, and ICE to work together in an emergency situation, as well as details into the technological resources needed to implement the plan. For instance, the plan describes the specific information that OFO would collect from aliens upon intake to the facility, the specific processing forms to be filled out for each alien, as well as specific language and translation needs. It also provides a detailed breakdown of the anticipated responsibilities of USBP and ICE in relation to transportation and other actions. A hostile actor could exploit any number of factors at different points in the process, by discovering how to slow down the process by hacking or otherwise interfering with CBP's electronic system of records, to understanding what specific

triggers may cause a delay in processing of aliens, to deliberately causing delays in transportation. Any of these actions would thus interfere with the streamlined, emergent nature of processing envisioned by this plan, severely hindering DHS' ability to utilize similar strategies in response to potential future surges.

*Declaration of Rodney Harris*

26. The next document that must be filed under seal is a portion of the updated Declaration of Rodney Harris, originally filed on October 10, 2019.

27. Rodney Harris' declaration contains specific details contained within the Laredo Field Office's Mass Migration Contingency Plan, specifically, the maximum number of individuals that a particular port can process and hold in a crisis situation, using all of its resources to the maximum level, including through repurposing various areas within the port of entry to hold individuals. With knowledge of this number, as well as the knowledge that this number was a result of the port expending the maximum amount of its resources, hostile actors could easily cripple operations at that particular port by instructing a larger number of individuals to, for instance, run through the vehicle lanes or otherwise evade inspection. The TCO could then take advantage of the fact that resulting resource diversion away from other priority mission sets to smuggle drugs or contraband through that port.

*Laredo Field Office Adverse Traffic Email (October 2, 2018)*

28. Lastly, AOL-DEF-00235700-000235703, is an email containing the Laredo Field Office's Southern Operations Command's "Adverse Action Traffic" report for October 3, 2018. This email provides a detailed breakdown of the number individuals determined to be inadmissible at four ports of entry in the Laredo Field Office on October 2, 2018, the

number of individuals in custody at those ports as of a particular time on October 3, 2018, and information about the demographics of those particular individuals (including age, gender, country of origin, whether they are part of a family unit, as well as any pertinent medical or criminal history information). This type of information is regularly circulated within OFO for situational awareness.

29. As explained in the December 2019 declaration of Randy Howe, port-level capacity data, while only one of many factors impacting a port's total capacity to process individuals, is sensitive information that can be exploited by hostile actors. Specifically, as explained in more detail in that declaration, a port which has a high number of individuals in custody, or if individuals in custody have been held for an extended period of time, may need to reallocate staffing and other resources towards addressing these capacity issues and ensuring that those in custody are held in safe and sanitary conditions. Additionally, if a port has a particularly high percentage of unaccompanied children, or individuals with specific medical needs, in custody, officers may need to devote additional attention to these individuals. This work of addressing the needs of individuals in custody, and attempting to move those individuals out of the POE, takes officers away from other inspection and enforcement duties including detecting and seizing drug and other contraband. This, in turn, makes the port more vulnerable to outside threats such as drugs, weapons, contraband, and individuals attempting to enter the port without inspection, such as by running through the vehicle lanes.

30. Therefore, public release of any of the above documents – and particularly publication of all of the documents at once – has the potential to reveal a large amount of critical

operational data that could be exploited by hostile actors seeking to harm CBP operations and undermine the agency's ability to secure the border.

31. For these reasons, the documents listed above, as well any charts, exhibits, or representations of information that contain information derived therefrom, should be filed under seal and kept confidential.

32. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this __11__ day of February, 2020.

_____
Vernon Foret
Executive Director – Operations
Office of Field Operations
U.S. Customs and Border Protection