JOSEPH H. HUNT
Assistant Attorney General, Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ARI NAZAROV (CT 414491)
DHRUMAN Y. SAMPAT (NJ 270892018)
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (ECF No. 390)** |
| Chad F. WOLF, Acting Secretary of Homeland Security; Mark A. MORGAN, Acting Commissioner, U.S. Customs and Border Protection; and Todd C. OWEN, Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, in their official capacities, *et al.*, | Special Briefing Schedule Ordered |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Defendants**

---

\* Acting Secretary Wolf and Acting Commissioner Morgan are automatically sub-
stituted as Defendants pursuant to Federal Rule of Civil Procedure 25(d).

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ................................................................................. 1

STATEMENT OF FACTS ......................................................................... 2

    A. DHS and CBP Are Responsible for Balancing Their Resources to Accomplish Multiple Critical Missions at U.S. Ports of Entry ................ 2

    B. Individual Ports of Entry Implement Metering Procedures to Ensure Sufficient Operational Capacity to Perform All of Their Congressionally-Mandated Responsibilities. .................................. 6

    C. CBP Implements Metering Practices for Operational Purposes, Not to Deter Aliens From Seeking Asylum in the United States. .............. 10

    D. There is No "Turnback Policy." ....................................... 12

    E. The Named Plaintiffs' Allegations. ................................... 13

ARGUMENT .................................................................................... 16

    I. Plaintiffs Cannot Establish Numerosity for the Broader Proposed Class. ....................................................................... 17

    II. Neither the Proposed Class Nor the Proposed Metering Sub-Class Present Common Questions of Law or Fact Capable of Class-Wide Resolution. ............................................... 19

        A. There is No Common Practice or Policy Challenged by the Proposed Broader Class. ............................................ 20

        B. The Metering Sub-Class Does Not Present Common Questions. ...................................................... 22

    III. The Named Plaintiffs' Claims Are Not Typical of the Putative Class or Sub-Class Members' Claims. ................................. 31

    IV. Plaintiffs Fail to Satisfy Rule 23(b)(2). ............................. 33

CONCLUSION ................................................................................. 35

# TABLE OF AUTHORITIES

**<u>Federal Cases</u>**

*Al Otro Lado, Inc. v. McAleenan*,
    394 F. Supp. 3d 1168 (S.D. Cal. 2019) ................................................. *passim*

*Almeida-Sanchez v. United States*,
    413 U.S. 266 (1973)...............................................................................22

*Arnold v. United Artists Theatre Circuit, Inc.*,
    158 F.R.D. 439 (N.D. Cal. 1994) ...........................................................17

*Betts v. Reliable Collection Agency, Ltd.*,
    659 F.2d 1000 (9th Cir. 1981) ................................................................19

*Carroll v. United States*,
    267 U.S. 132 (1925)...............................................................................22

*Cholakyan v. Mercedes-Benz, USA, LLC*,
    281 F.R.D. 534 (N.D. Cal. 2012) ...................................................... 34, 35

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).................................................................................28

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ............................................................ *passim*

*Gaston v. Exelon Corp.*,
    247 F.R.D. 75 (E.D. Pa. 2007) ..............................................................28

*Gen. Telephone Co. of the Northwest, Inc. v. EEOC*,
    446 U.S. 318 (1980)...............................................................................18

*Gen. Telephone Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982)......................................................................... 16, 31

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................................19

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ............................................................ 31, 32

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

*Harik v. Cal. Teachers Ass'n*,
    326 F.3d 1042 (9th Cir. 2003) .........................................................................18

*Independence Min. Co. v. Babbitt*,
    105 F.3d 502 (9th Cir. 1997) ...........................................................................23

*Lightfoot v. District of Columbia*,
    273 F.R.D. 314 (D.D.C. 2011) ........................................................ 20, 21, 34

*Marcus v. BMW of North America, LLC*,
    687 F.3d 583 (3d Cir. 2012) ............................................................................31

*McCurley v. Royal Seas Cruise, Inc.*,
    331 F.R.D. 142 (S.D. Cal. 2019) ............................................................ 17, 19

*Nguyen Da Yen v. Kissinger*,
    70 F.R.D. 656 (N.D. Cal. 1976) .....................................................................20

*Rutledge v. Elec. Hose & Rubber Co.*,
    511 F.2d 668 (9th Cir. 1975) ..........................................................................17

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993).........................................................................................30

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
    899 F.3d 1064 (9th Cir. 2018) ........................................................................33

*Telecomms. Research and Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984)........................................................... 23, 26, 32

*Underhill v. Hernandez*,
    168 U.S. 250 (1897).........................................................................................33

*United Steel Workers v. ConocoPhillips Co.*,
    593 F.3d 802 (9th Cir. 2010) ..........................................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................... *passim*

*Wang v. Chinese Daily News, Inc.*,
    737 F.3d 538 (9th Cir. 2013) ..........................................................................34

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

*Wolin v. Jaguar Land Rover N. Am., LLC,*
   617 F.3d 1168 (9th Cir. 2010) ........................................................31

**Federal Statutes**

5 U.S.C. § 706(1) ........................................................ 32, 35

5 U.S.C. § 706(2) ........................................................35

6 U.S.C. § 202 ........................................................3

6 U.S.C. § 211(c) ........................................................3

6 U.S.C. § 211(g) ........................................................3, 4

8 U.S.C. § 1103(a)(1) ........................................................3

8 U.S.C. § 1103(a)(3) ........................................................3

8 U.S.C. § 1158(a)(1) ........................................................22

8 U.S.C. § 1225(a)(1) ........................................................22

8 U.S.C. § 1225(b)(1)(A)(ii) ........................................................22

**Other Authorities**

5 James Wm. Moore, et al., *Moore's Federal Practice* § 23.22 ...........................18

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

# INTRODUCTION

The Court should deny Plaintiffs' Motion for Class Certification. Both the proposed class of individuals who "were or will be denied access to the U.S. asylum process by or at the instruction of U.S. Customs and Border Protection (CBP) officials on or after January 1, 2016," and the proposed sub-class of individuals who "were or will be denied access to the U.S. asylum process" as a result of CBP's metering policy during that same time, Mot. 1, are plagued with fatal deficiencies.

To start, Plaintiffs have long asserted that metering is one element of a broader "Turnback Policy" implemented along the entire U.S.-Mexico border. *See* Second Am. Compl. (SAC) ¶ 3 (ECF No. 189). But after months of far-reaching discovery, Plaintiffs' search for policies or practices that extend beyond metering has left them empty-handed. They identify only eight of their own declarants who claim that they were subjected to other disparate elements of the supposed "Turnback Policy," and they introduce no other evidence that could possibly support the existence of a common policy or practice other than metering. The proposed broader class thus falls far short of satisfying numerosity, commonality, and typicality, nor does it meet the cohesiveness requirement to certify an injunctive-relief class under Rule 23(b)(2).

That leaves Plaintiffs seeking certification of a metering sub-class. But the sub-class does not present questions capable of generating common, class-wide answers apt to drive the resolution of the litigation. Although southwest-border-wide metering guidance exists, the decision whether to implement metering procedures is left to the discretion of Field Office- or port-level managers, who are in the best position to determine whether metering is "necessary or appropriate to facilitate orderly processing and maintain the security of the port [of entry] and safe and sanitary conditions for the traveling public" based on the port's processing capacity. Ex. 1 at 1. Assuming that metering is not categorically lawful—as the government contends it is—the question whether metering is justified turns on the individual operational circumstances at the port at the time an individual was metered. The need for such

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

individualized adjudications prevents any finding of commonality.

For similar reasons, the named Plaintiffs' claims are not typical of the putative class members' claims. Defendants can present unique factual defenses for each individual Plaintiff concerning the operational circumstances at the relevant port of entry at the time of their alleged injury. Further, the named Plaintiffs' claims are not based on similar conduct as other putative class members. While the named Plaintiffs each physically crossed the U.S.-Mexico border into a port of entry or physically approached the border in an attempt to cross into a port of entry, many putative sub-class members never reached or approached the border. They were intercepted by Mexican officials before approaching a port, never approached a port of entry at all, or simply messaged their names onto border waitlists before ever reaching the border towns. The named Plaintiffs' claims are thus not typical of those of the class.

Finally, because the justification for the implementation of metering at various ports of entry requires an examination of individualized and dynamic factors and cannot be evaluated on a class-wide basis, the Court cannot enjoin or declare metering unlawful with respect to all of the class members, meaning that a Rule 23(b)(2) class is not appropriate. But even if Rule 23(b)(2) could support a metering sub-class—which it does not—the Administrative Procedure Act (APA) and Rule 23(b)(2) places significant limits on the scope of relief that the Court may grant to the class. Under Supreme Court and Ninth Circuit precedent, relief is limited to a prospective injunction of specific agency policies or a declaratory judgment regarding those policies—nothing more. Plaintiffs cannot use any certified class here as a basis to obtain relief as to unrelated government action not at issue in this litigation.

The Court should deny Plaintiffs' Motion.

## STATEMENT OF FACTS

**A.    DHS and CBP Are Responsible for Balancing Their Resources to Accomplish Multiple Critical Missions at U.S. Ports of Entry.**

Congress ordered the Secretary of Homeland Security and the Commissioner

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

of CBP to perform multiple critical missions at the United States' borders. The Secretary is "responsible for ... [s]ecuring the borders [and] ports," "managing and co-ordinating" all port "functions," and, in carrying out these and other responsibilities, "ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce." 6 U.S.C. § 202(2), (8). The Secretary is also "charged with the administration and enforcement of this chapter and all other laws relating to the immigration and natu-ralization of aliens," and he "shall ... perform such other acts as he deems necessary for carrying out his authority" under the law. 8 U.S.C. §§ 1103(a)(1), (a)(3). Con-gress ordered the Commissioner to (among other things): "ensure the interdiction of persons and goods illegally entering or exiting the United States"; "facilitate and expedite the flow of legitimate travelers and trade"; "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States, in cases in which such persons are entering, or have recently entered, the United States"; "safeguard the borders of the United States to protect against the entry of dangerous goods"; "enforce and administer all immigration laws ... including the inspection, pro-cessing, and admission of persons who seek to enter or depart the United States," and "the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States;" "enforce and administer the laws relating to agricultural import and entry inspection;" and "carry out other duties and powers prescribed by law or delegated by the Secretary." 6 U.S.C. § 211(c).

CBP's Office of Field Operations (OFO) is responsible for "coordinat[ing] the enforcement activities at U.S. Customs and Border Protection at United States air, land, and sea ports of entry." 6 U.S.C. § 211(g). OFO "shall coordinate" those activi-ties "to deter and prevent terrorists and terrorist weapons from entering the United States at such ports of entry"; "conduct inspections at such ports of entry to safeguard the United States from terrorism and illegal entry of persons"; "prevent illicit drugs,

agricultural pests, and contraband from entering the United States"; "facilitate and expedite the flow of legitimate travelers and trade"; "coordinate with" CBP's Office of Trade "with respect to [CBP's] trade facilitation and trade enforcement activities"; and "carry out other duties and powers prescribed by the Commissioner." *Id.*

These statutory obligations apply at all U.S. ports of entry, including all 25 Class A ports of entry on the U.S.-Mexico border, many of which have multiple crossing points and multiple vehicle and pedestrian lanes. Ex. 2 at 69:15–22. These 25 ports—which fall under the jurisdictions of the San Diego, Tucson, El Paso, and Laredo Field Offices[1]—must balance their scarce resources to ensure compliance with Congress's mandates. Since CBP was created in 2003, it has allocated its resources at all of its ports in order of four priority mission sets: (1) national security efforts, including detecting public-safety and identifying potential security threats, such as known or suspected terrorists, members of transnational criminal organizations, and other violent actors; (2) counter-narcotics and outbound operations, including targeting and examining increasing numbers of conveyances and travelers for potential smuggling of illicit narcotics, currency, and firearms; (3) economic security, including trade and cargo processing efforts to facilitate lawful commerce into the United States, while enforcing trade laws, protecting agriculture, and addressing anticompetitive elements in the supply chain; and (4) trade and travel facilitation, including managing flows of people and goods at pedestrian and vehicle

---

[1] The San Diego Field Office includes the San Ysidro, Tecate, Otay Mesa, Calexico West, Calexico East, and Andrade border ports of entry. *See* https://www.cbp.gov/contact/ports/field-office/san-diego. The Tucson Field Office includes the San Luis, Douglas, Naco, Sasabe, Lukeville, and Nogales border ports of entry. *See* https://www.cbp.gov/contact/ports/field-office/tucson. The El Paso Field Office includes the Santa Teresa, Columbus, Presidio, Tornillo, and El Paso border ports of entry. *See* https://www.cbp.gov/contact/ports/field-office/el-paso. The Laredo Field Office includes the Laredo, Roma, Del Rio, Brownsville, Eagle Pass, Hidalgo, Rio Grande City, and Progreso border ports of entry. *See* https://www.cbp.gov/contact/ports/field-office/laredo/.

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

1    lanes of entry for U.S. citizens, lawful permanent residents, Border Crossing Card
2    and visa holders, and others presenting documents sufficient for admission or other
3    lawful entry into the United States. Ex. 3 at 303–04; Ex. 2 at 218:14–18.

4         The "finite resources [OFO] ha[s] are directed amongst multiple mission pri-
5    orities in the ports of entry. The more you direct towards narcotics int[er]diction or
6    the counter-terrorism threat means there's less to do other things in, whether that's
7    the migrant processing, the trade enforcement, the agriculture mission. The full
8    scope of what [OFO] do[es] at the ports of entry, if you push resources in one area,
9    there will be less resources in other areas including migrant process[ing]." Ex. 2 at
10   75:13–22. Were OFO to divert resources away from its four priority mission sets,
11   the ports of entry, border communities, and in some instances national security and
12   the national economy would suffer significant negative consequences. CBP cannot
13   divert resources from its counter-terrorism and counter-narcotics mission sets. *Id.* at
14   76:9–15, 320:8–16; *see* Ex. 4 at 4 ("Ports of entry located along the southern border
15   are most active as those seizures accounted for 75% of all opioids seized at ports of
16   entry" from 2013 to 2017.); *id.* at 6 ("In a single year, the amount of fentanyl seized
17   by CBP [at ports of entry] more than doubled, from 564 pounds in 2016 to 1,370
18   pounds in 2017."); Ex. 3 at 304 (for FY 2019, showing 19% and 58% increases in
19   inbound seizures of methamphetamines and fentanyl, respectively, and a 34.6% in-
20   crease in the seizure of outbound currency from the previous fiscal year).

21        Moreover, pulling resources from OFO's trade and travel mission set would
22   be significantly disruptive to the ports and to local communities and economies.
23   "Most of the cross-border traffic on the southern border comes and goes with border
24   crossing cards. [OFO] would reduce travel lanes so you would have fewer booths
25   open. This would impact the business community as they crossed. This would im-
26   pact the school kids that cross every day. This would impact the people coming for
27   medical treatments, to do their business, to do their shopping. It [w]ould result in
28   longer wait times to cross the border if [OFO] pulled individuals from that mission

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

set." Ex. 2 at 320:20–321:8; *see also* Ex. 5 (noting that in FY 2019, California ports of entry inspected more than 31 million passenger vehicles, more than 1.4 million trucks, almost 55,000 buses, and almost 22 million pedestrians entering the U.S."). Diverting resources from OFO's economic security mission set also results in significant negative consequences. In the spring and summer of 2019, "when [CBP] reassigned 731 officers from [F]ield [O]perations from the ports of entry to assist the [B]order [P]atrol because of the migrant crisis that they were facing at that time, [OFO] saw cargo wait times in places like El Paso and San Ysidro go up from 45 minutes to over five hours." Ex. 2 at 321:9–18.

**B.    Individual Ports of Entry Implement Metering Procedures to Ensure Sufficient Operational Capacity to Perform All of Their Congressionally-Mandated Responsibilities.**

In 2016, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Ex. 6 at 023. The mass migration event was prompted by a confluence of factors, most notably Brazil's decision to cancel the Haitian nationals' temporary work permits following the 2016 Olympics, Ex. 2 at 313:15–314:5, and ██████████████████████████████, Ex. 6 at 023. By mid-September 2016, ███████████████████████████████████████████████████. Ex. 7 at 2.

The surge overwhelmed the ports of entry in the San Diego Field Office, ████████████████████████████████████. *See* Ex. 8 at 3. On a particular day in November 2016, the San Diego Field Office was holding ██████ in custody, well beyond its ██████ detention capacity across multiple facilities. *Id.* Other southwest border Field Offices were similarly stretched beyond capacity; the El Paso Field Office was using ████ of its detention capacity, and the Tucson Field Office was

using ███ of its detention capacity.[2] *Id.* Intelligence at that point indicated that an estimated ██████████ were then en route to the United States from Brazil. *Id.* ██████████, *see* Ex. 9 at 717, and the ports were forced to convert administrative and office space into temporary hold rooms as they attempted to accommodate the enormous influx of travelers that was overwhelming their resources, *see* Ex. 8 at 4–7 (████████████████████████████████████████████). ████████████████████████████████████████████ ████████████████████████████████████████████ Ex. 9 at 717.

The Department of Homeland Security (DHS) and CBP attempted to address the surge as best as it could by implementing or considering multiple plans of action. OFO deployed 100 additional CBP officers and 16 CBP employees fluent in Creole to the San Diego Field Office to support that Office's increased processing efforts. Ex. 6 at 023. OFO also utilized the Border Patrol's Imperial Beach Station and Barracks Five facilities to increase the San Diego Field Office's detention capacity. *Id.* It also used virtual interviews, a tool primarily used by Border Patrol, to allow CBP officers in other parts of the country to complete the initial processing for aliens in CBP custody. Ex. 2 at 111:1–113:11. Virtual interviews can increase the number of aliens CBP processes in a given time, but it does not affect the ports' throughput (meaning the movement of aliens from the ports to long-term detention facilities). "Without the accompanying detention space to hold [aliens], or the ability to turn

---

[2] Detention capacity, or physical capacity, refers to "the space within the detention cells." Ex. 2 at 74:12–14. OFO also considers its ports' operational capacity, a figure that "takes into consideration such things as the demographics of those in custody, the conditions of those in custody [], the ... sickness issues, the other operational priorities as to how the resources in the ports are being directed that day, all of these other day-to-day operational considerations which may keep a port from reaching the full physical space that they have." *Id.* at 74:12–22.

them over to ERO [ICE's Enforcement and Removal Operations], we would not increase the processing with any tool. You can't just process somebody. You have to have someplace to put them when the processing is done." *Id.* at 113:22–114:7.

DHS also took steps ████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████. Ex. 10 at 4; *see id.* at 1–9. The proposal called for ████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████. Ex. 9 at 719–20. ████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ *Id.* at 721.

Because these solutions were not optimal and OFO's hold rooms were overflowing, ports in the San Diego Field Office began to engage in metering (also known as queue management) as necessary to manage the high volume of aliens without documents sufficient for lawful entry. *See, e.g.*, Pls.' Ex. 41 (discussing implementation of metering at San Ysidro port of entry); Pls.' Ex. 54 (noting differences among ports with respect to whether and how the ports were engaging in metering in November 2016). Other ports followed suit once they began experiencing increased volumes of undocumented migrants. *E.g.*, Ex. 2 at 157:7–21 (explaining

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

1    that the Calexico, San Luis, and Nogales ports of entry began metering after San

2    Ysidro as a "direct response to the Haitian arrivals"). Defendants agree with Plain-

3    tiffs' witness Stephanie Leutert that metering was "███████████████████

4    ████" Pls.' Ex. 7 ¶ 47.

5        In April 2018, when another surge in migrants was expected at the southern

6    border, CBP issued a Metering Guidance memorandum to the four southwest border

7    Field Offices. *See* Ex. 1; Pls.' Ex. 34 (███████████████████████

8    ████████████████████████). The guidance states: "When

9    necessary or appropriate to facilitate orderly processing and maintain the security of

10   the port and safe and sanitary conditions for the traveling public, DFOs [Directors

11   of Field Operations] may elect to meter the flow of travelers at the land border to

12   take into account the port's processing capacity." Ex. 1 at 1. Because port operations

13   are fluid and can vary significantly between ports, and even between entry points at

14   the same port, OFO leaves the decision whether to implement metering procedures

15   to local decisionmakers. Ex. 2 at 69:15–22.

16       The guidance also states that "[d]epending on port configuration and operat-

17   ing conditions, the DFO may establish and operate physical access controls at the

18   borderline, including as close to the U.S.-Mexico border as operationally feasible."

19   Ex. 1 at 1. The guidance is clear that "[a]t no point may an officer discourage a

20   traveler from waiting to be processed, claiming a fear of return, or seeking any other

21   protection. ... Once a traveler is in the United States, he or she must be fully pro-

22   cessed." *Id.* Although there is evidence of specific and isolated instances in which

23   CBP officers at certain ports of entry have wrongly returned travelers to Mexico

24   after the travelers crossed the border, these instances do not accord with CBP policy.

25   Pls.' Ex. 4 at 2, 4 (stating that the DHS Office of the Inspector General (OIG), in

26   investigating such specific instances at the Tecate port of entry, "could not corrobo-

27   rate that CBP managers issued specific instructions" to do so, nor was it able "to

28   substantiate ... that it was otherwise the Port's standard practice."); Ex. 2 at 239:3–9

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

(these instances were "not directed by [CBP] management"); *id.* at 91:17–92:4 (turning back travelers who express a desire to seek asylum after they have crossed into the United States is against agency policy). Indeed, such instances are considered to be misconduct that should be reported to CBP's Office of Professional Responsibility or to DHS OIG. Ex. 2 at 91:17–22, 239:17–21.

Since 2018, there has been a continued and sustained migration of inadmissible aliens seeking to enter the ports, and an increase in the number of those aliens who are processed for expedited removal and express a fear of return. Pls.' Ex. 7 ¶¶ 78–80 (██████████████████████████████████████████); Ex. 11 at 2 (demonstrating that the percentage of inadmissible individuals processed by OFO on the U.S.-Mexico border for credible fear interviews rose from 16% to 31% in FY 2018); Ex. 12 at 492 (██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████). Indeed, in FY 2018, the number of individuals who are processed for expedited removal and claim a fear of return in the San Diego Field Office increased by 187% from the prior fiscal year. Ex. 13 at 1. Accordingly, ports continued to engage in metering/queue management as necessary based on their operational capacity, to ensure they meet their Congressionally-mandated missions.

**C.    CBP Implements Metering Practices for Operational Purposes, Not to Deter Aliens From Seeking Asylum in the United States.**

CBP's official guidance provides that metering is to be "done for operational purposes, not deterrence." Ex. 2 at 99:21–100:1. Metering procedures may be implemented "[w]hen necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public." Ex. 1 at 1. And, "CBP must carefully balance its space and resources to

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

ensure that each POE has sufficient capacity to address its mission sets, in order of priority, including the safety and expeditious processing of all travelers accessing the port." Ex. 3 at 303. The policy "was not desired to deter migrants from entering the U.S." Ex. 2 at 70:4–5. It is an "operational necessity" to be implemented "based on the capacity at the ports." *Id.* at 71:3–7. There is "[n]o other reason" for metering. *Id.* at 70:14–18.

Plaintiffs' cited evidence is not to the contrary, and at most shows that addressing operational needs through metering can lead to the obvious result of deterring others from entering when they may face metering at that particular port. ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ Pls.' Ex. 56 at 004. ████

████████████████████████████████████████████████████

██████████████████████████████████████████ *See id.* ███████

████████████████████████████████████████████████████

████████████████████████████████ . Given that San Ysidro is the busiest land border crossing in the Western Hemisphere,[3] ████████████████

████████ *id.*, it is logical to discuss the connections between various policies that could exacerbate that port's capacity constraints.

In any event, after collecting information on detainee sentiments in July 2018, a CBP official in the San Diego Field Office found that ████████████████

████████████████████████████ Pls.' Ex. 52 at 2. In fact, and contrary to Plaintiffs' characterization, *see* Mot. 15, the officer concluded after reviewing the

---

[3] U.S. Gen. Services Admin., "San Ysidro Land Port of Entry," https://www.gsa.gov/about-us/regions/welcome-to-the-pacific-rim-region-9/land-ports-of-entry/san-ysidro-land-port-of-entry (last visited Feb. 7, 2020).

records of interview sessions with detainees and speaking with other CBP officers

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Pls.' Ex. 52 at 3, not that they are being deterred from seeking asylum in the United States. This is corroborated by Plaintiffs' own expert witness, whose publication states that a recent downward shift in the volume of aliens approaching southwest border ports of entry is attributable "in large part" to policies other than metering. *See* Ex. 14 at 2–3; *see* Pls.' Ex. 64 ¶¶ 1, 3–4.

**D.    There is No "Turnback Policy."**

Plaintiffs challenge a "Turnback Policy," which they describe as a coordinated policy to deny access to the asylum process, and which they claim encompasses metering/queue management as described above, as well as unrelated instances of misconduct. *E.g.*, SAC ¶ 3. They claim to "have documented the consistent implementation of the Turnback Policy and metering through multiple declarations." Mot. 17–18. Yet they point to no evidence of any coordinated policy other than metering/queue management. Only eight of Plaintiffs' declarants claim that they were subjected to any aspects of the so-called "Turnback Policy" other than metering. *See* Pls.' Ex. 9 ¶¶ 9–19; Pls.' Ex. 10 ¶¶ 9–22; Pls.' Ex. 11 ¶¶ 13–29; Pls.' Ex. 12 ¶¶ 8–18; Pls.' Ex. 13 ¶¶ 11–18; Pls.' Ex. 14 ¶¶ 10–23; Pls.' Ex. 82 ¶ 6; Pls.' Ex. 83 ¶¶ 3–4. There is no evidence that the individual government actors involved in these allegations were acting pursuant to a coordinated policy.

The rest of the declarants' claims relate exclusively to metering and its implementation, including, as stated in the Second Amended Complaint (at ¶ 2), alleged "lies" about the ports' capacities, "physically obstructing access" to the ports, or "imposing unreasonable delays" before allowing an alien to access the ports. *See* Pls.' Ex. 64 ¶ 6 ("I have directly observed the implementation of the metering practice at ports of entry on the U.S.-Mexico border ... ."); Pls.' Ex. 65 ¶¶ 9–10; Pls.' Ex. 66 ¶¶ 8–9; Pls.' Ex. 67 ¶¶ 9–10; Pls.' Ex. 68 ¶¶ 9–10; Pls.' Ex. 69 ¶¶ 7–8; Pls.' Ex.

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

70 ¶ 9; Pls.' Ex. 71 ¶¶ 9–12; Pls.' Ex. 72 ¶¶ 5–7; Pls.' Ex. 73 ¶¶ 4–11; Pls.' Ex. 74 ¶¶ 14–17; Pls.' Ex. 75 ¶¶ 7–11; Pls.' Ex. 76 ¶¶ 14–16; Pls.' Ex. 77 ¶¶ 9–12; Pls.' Ex. 78 ¶¶ 7–11; Pls.' Ex. 79 ¶¶ 7–10; Pls.' Ex. 80 ¶¶ 6–18; Pls.' Ex. 81 ¶¶ 8–10; Pls.' Ex. 84 ¶ 3; Pls.' Ex. 85 ¶ 3; Pls.' Ex. 86 ¶ 3; Pls.' Ex. 87 ¶¶ 3–5; Pls.' Ex. 88 ¶¶ 2–4; Pls.' Ex. 97 ¶¶ 4–5; Pls.' Ex. 98 ¶¶ 8–9; Pls.' Ex 99 ¶¶ 3–12; Pls.' Ex. 100 ¶¶ 10–13; Pls.' Ex. 101 ¶¶ 5–11; Pls' Ex. 102 ¶¶ 5–9; Pls.' Ex. 103 ¶¶ 8–13.[4]

**E.    The Named Plaintiffs' Allegations.**

Plaintiffs have named 13 individuals as proposed class representatives. *See* SAC ¶¶ 24–35. Eight of these individuals' claims relate solely to metering or its implementation after issuance of the April 2018 Metering Guidance, at three of the 25 Class A ports of entry across the border:

Roberto Doe, a Nicaraguan national, claims that he arrived in Reynosa, Mexico, on September 29, 2018, and attempted to present himself at the Hidalgo port of entry on October 2, 2018. Pls.' Ex. 73 ¶¶ 2, 4. He saw "several U.S. immigration officials standing at the exact middle point of the bridge that divides the United States from Mexico," whom he approached and told he wanted to apply for asylum in the United States. *Id.* He claims that the officials told him to "stand to the side," and that "the port of entry was 'all full' and that [he] couldn't enter." *Id.* ¶ 5. Roberto was then escorted by a Mexican immigration official back to an office in Mexico, where he was eventually released and escorted to a migrant shelter. *Id.* ¶¶ 6–10. As of October 2019, Roberto was "living in hiding" in an undisclosed "Latin American country." Pls.' Ex. 95 ¶ 7.

Maria Doe, a Guatemalan citizen, claims that she arrived in Nuevo Laredo, Mexico, and "went to the port of entry" with her two children on September 10, 2018. Pls.' Ex. 97 ¶¶ 2, 4. When she and her children "approached the midpoint" of

---

[4] The government intends to move to strike these anonymous declarations based on Plaintiffs' refusal to allow the government to investigate the veracity of the declarants' allegations.

the bridge to the Laredo port of entry, she "was stopped by two United States immigration officials," who asked to see her identification. *Id.* ¶ 4. She showed the officials her identification and "told them that [she] wished to seek asylum in the United States. They told [her] to wait on the Mexican side of the bridge for [her] turn and they would call [her]." *Id.* She claims that she was then approached by two Mexican officials, who told her that they would arrange for her to cross the bridge" if she paid them $1,500. *Id.* ¶¶ 4–5. She claims that she did not have the money, and instead traveled to Reynosa, Mexico. *Id.* ¶ 5. On September 19, 2018, she claims that she crossed onto the bridge to the Hidalgo port of entry, but was stopped by a Mexican official, who demanded to see her documents. *Id.* ¶ 7. She left the bridge after "[t]he Mexican officials started screaming at" her. *Id.* She claims that she again approached the bridge on October 9, 2018, but was stopped by a Mexican official, who brought her and her children back to an office in Mexico and would not let her cross. *Id.* ¶¶ 9–12. Maria later crossed into the United States at San Ysidro on October 18, 2018. Ex. 15 at 343.

Married couple Úrsula and Juan Doe are Honduran citizens who arrived in Nuevo Laredo, Mexico, in late September 2018. Pls.' Ex. 101 ¶ 5. Úrsula and Juan claim that they encountered American officials standing in the middle of the bridge between Nuevo Laredo and the Laredo port of entry who told them that "they had to wait [their turn], the port was closed." *Id.* ¶ 6; SAC ¶ 174. About eight days later, Úrsula and Juan took a bus to Reynosa, Mexico. Pls.' Ex. 101 ¶¶ 5, 9. After about a week, they went to the Reynosa bridge at the Hidalgo port of entry and were stopped by a Mexican official before they reached the American officials standing in the middle of the bridge; the Mexican officials brought them back to an office in Mexico. *Id.* ¶ 9. Úrsula and Juan Doe later crossed into the United States at the Hidalgo port of entry on October 19, 2018. Ex. 16 at 214; Ex. 17 at 726–27.

Victoria Doe is a Honduran national who arrived in Tijuana in April 2018 and lived there for several months before approaching the San Ysidro port of entry on

October 8, 2018. Pls.' Ex. 100 ¶¶ 6, 9, 10; SAC ¶ 181. Victoria states that she approached "the gate" where she encountered two CBP officers, one of whom told her that she "had to speak to a Mexican officer" and could not apply for asylum at that time. Pls.' Ex. 100 ¶ 11. Victoria Doe and her young son later crossed into the United States at San Ysidro on October 18, 2018. Ex. 18 at 241–42.

Bianca Doe is a Honduran national who arrived in Tijuana in late September 2018. Pls.' Ex. 98 ¶¶ 2, 8. Bianca states that she presented herself at the San Ysidro port of entry and the "American guards" at the port told her that she "could not apply now because they were full." *Id.* ¶ 8; SAC ¶ 185. Bianca then put her name on a waitlist and received a number. Pls.' Ex. 98 ¶ 9. After attempting an illegal entry, Bianca again approached the port of entry on October 8, 2018, and was again told by a U.S. officer that she could not apply for asylum at that time. *Id.* ¶¶ 11–14. Bianca Doe later crossed into the United States at San Ysidro on October 18, 2018. Ex. 19 at 736–37.

Emiliana Doe is a Honduran national who arrived in Tijuana in late September 2018 and sometime thereafter decided to apply for asylum in the United States. Pls.' Ex. 103 ¶¶ 2, 8, 9. Emiliana states that she went to the border and asked people in a nearby office how to get on the waiting list; she received a number and was told to come back in six weeks. *Id.* ¶¶ 9, 11. On October 8, 2018, Emiliana approached the San Ysidro port of entry and was told by a CBP official that "everywhere was full and they could not accept any more people." *Id.* ¶ 12. Emiliana Doe later crossed into the United States at San Ysidro on October 18, 2018. Ex. 20 at 564–65.

César Doe is a Honduran national who arrived in Tijuana on August 1, 2018. Pls.' Ex. 99 ¶¶ 3–4; SAC ¶ 197. César states that he approached the San Ysidro port of entry but was first approached by "Grupo Beta" officials in the "plaza adjacent to the bridge that leads to the port" who informed him that he "would need to go through them to apply for asylum" by obtaining a number on a list. Pls.' Ex. 99 ¶ 4. César claims that a Mexican immigration officer then took him to a detention center,

where he was detained for around 12 days before being released to go to a Tijuana shelter. *Id.* ¶¶ 5–9. César subsequently obtained a number on the waiting list from a Grupo Beta officer. *Id.* ¶ 10. In September 2018, César approached the San Ysidro port of entry with two Al Otro Lado lawyers, who spoke with U.S. immigration officers and were told they "would not accept" César. *Id.* ¶ 11. César later crossed into the United States at San Ysidro on October 18, 2018. Ex. 21 at 487–88.

The remaining five individual Plaintiffs allege different types of conduct that they claim denied them access to the asylum process at two ports of entry (San Ysidro and Otay Mesa) in 2016 or 2017. Abigail, Beatrice, and Carolina allege that CBP officers at San Ysidro "coerced" them into withdrawing their applications for admission. *See* Pls.' Ex. 9 ¶¶ 14–15, 17–19; Pls.' Ex. 10 ¶ 21; Pls.' Ex. 11 ¶¶ 23–29. Abigail, Dinora, and Ingrid allege that they were lied to about the availability of asylum in the United States. Pls.' Ex. 9 ¶¶ 14–15; Pls.' Ex. 12 ¶ 9; Pls.' Ex. 13 ¶ 13. Beatrice, Dinora, and Ingrid allege that they were escorted out of the Otay Mesa port of entry after asserting their intentions to apply for asylum. *See* Pls. Ex. 10 ¶ 9; Pls.' Ex. 12 ¶¶ 15–17; Pls.' Ex. 13 ¶¶ 17–18. Abigail, Carolina, Dinora, and Ingrid were processed at the San Ysidro port of entry in July 2017. Ex. 22 at 051–54; Ex. 23 at 342–44; Ex. 24 at 85–86; Ex. 25 at 904–05.

## ARGUMENT

A party seeking class certification must satisfy the four elements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and (4) the class representatives will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). "[A]ctual, not presumed, conformance with Rule 23(a) [is] indispensable." *Gen. Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982). The party seeking certification must also satisfy one of the elements of Rule 23(b);

here, that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The party seeking class certification bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met." *United Steel Workers v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010). Failure to meet "any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

Plaintiffs seek to certify two classes. The first class is a class of "all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A port of entry ... on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [CBP] officials on or after January 1, 2016." Plaintiffs state that this class encompasses all individuals who were subject to metering practices as well as variety of other disparate practices. Plaintiffs also seek to certify a sub-class consisting of "all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016." Mot. 1. The Court should deny the Motion as to both proposed classes.

## I.    Plaintiffs Cannot Establish Numerosity for the Broader Proposed Class.

Numerosity requires the Court to determine whether the class is so numerous that it would make joinder impracticable. Fed. R. Civ. P. 23(a)(1). Whether joinder is impracticable "depends on the facts and circumstances of each case." *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994). "Generally, the numerosity factor is satisfied if the class comprises 40 or more members and courts will find that it has not been satisfied when the class comprises 21 or fewer.'" *McCurley v. Royal Seas Cruise, Inc.*, 331 F.R.D. 142, 167 (S.D. Cal. 2019) (brackets and quotation marks omitted).

Here, the government does not contest that there are enough individuals who

have been or will be subjected to CBP's metering policy since April 2018 (when the memorandum was issued) to satisfy the numerosity element as to the metering sub-class. However, beyond those subject to metering, Defendants contest numerosity as to the broadly-defined class of "all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A port of entry ... on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [CBP] officials on or after January 1, 2016." Mot. 1.

As discussed more comprehensively below, *see infra* at Part II, the class is best understood as separate from the metering sub-class, rather than as a broader class encompassing the metering sub-class. Metering is so distinct from the allegations of other "turnbacks" that the metering sub-class cannot properly be considered an actual "sub-class" of the more broadly-defined class. Indeed, Plaintiffs present only eight declarants whose factual claims suggest that they were "denied access to the U.S. asylum process" by measures other than metering, or by some early iteration of metering implemented prior to the issuance of the Metering Guidance—which, as Plaintiffs' own expert concedes, would not have been pursuant to a uniform agency policy. *See* Ex. 26 at 157:1–2 (conceding that ███████████████ ██████████████████████████████████████████); Pls.' Ex. 9 ¶¶ 9–19; Pls.' Ex. 10 ¶¶ 9–22; Pls.' Ex. 11 ¶¶ 13–29; Pls.' Ex. 12 ¶¶ 8–18; Pls.' Ex. 13 ¶¶ 11–18; Pls.' Ex. 14 ¶¶ 10–23; Pls.' Ex. 82 ¶ 6; Pls.' Ex. 83 ¶¶ 3–4. Although the numerosity requirement imposes no absolute limitations, the Supreme Court has explained that a class of 15 is too small to support numerosity. *See Gen. Telephone Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 330 (1980); *see also* 5 James Wm. Moore, et al., *Moore's Federal Practice* § 23.22 ("A class of 20 or fewer is usually insufficiently numerous ... [a] class of 41 or more is usually sufficiently numerous."); *see also Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003) (noting that the Ninth Circuit has declined to uphold classes of seven, nine, and ten members). By characterizing the class in this manner, Plaintiffs have improperly attempted to

piggy-back their disparate claims of individual officer misconduct onto their metering sub-class in an attempt to satisfy numerosity. But there is simply no evidence of a coordinated agency action besides metering, such that the Court could certify both classes. *See Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981) (The "subclass must independently meet the requirements of Rule 23 for the maintenance of a class action."). Thus, the broadly-defined class does not satisfy numerosity, and certification as to that proposed class must be denied. *McCurley*, 331 F.R.D. at 153 ("If the proposed class does not satisfy even one of these prerequisites, a court's Rule 23 analysis ends and certification must be denied.").

## II. Neither the Proposed Class Nor the Proposed Metering Sub-Class Present Common Questions of Law or Fact Capable of Class-Wide Resolution.

To satisfy Rule 23(a)(2)'s commonality requirement, the proposed class and sub-class members must "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quotation marks omitted). This does not mean that class members merely "suffered a violation of the same provision of law" or raise some common questions. *Id.*; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("it is insufficient to merely allege any common question"). Rather, class members' claims must depend upon a common contention, the determination of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Thus, "what matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* "In other words, Plaintiffs must have a common question that will connect many individual ... decisions to their claims for class relief." *Ellis*, 657 F.3d at 981. Although "[t]he existence of shared legal issues with divergent factual predicates is sufficient" to establish commonality, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), commonality cannot be established where there is wide factual variation requiring individual adjudications of

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

each class member's claims, *see Nguyen Da Yen v. Kissinger*, 70 F.R.D. 656, 663–64 (N.D. Cal. 1976). Where a plaintiff alleges that there is a "common pattern and practice that could affect the class *as a whole*," decisions made by local actors typically are insufficient to establish commonality amongst the entire class, "since 'demonstrating the invalidity of one [individual's] use of discretion will do nothing to demonstrate the invalidity of another's.'" *Ellis*, 657 F.3d at 983 & n.7 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 355–56)). And, commonality cannot be established by identifying "a constellation of disparate but equally suspect [alleged] practices ... distilled from the varying experiences of the class" and then asking the Court to enjoin them all as a "policy or custom." *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 326 (D.D.C. 2011). Plaintiffs cannot establish commonality for either proposed class.

### A.    There is No Common Practice or Policy Challenged by the Proposed Broader Class.

Plaintiffs do not even attempt to make the case for commonality with respect to the broader class, as they focus solely on their metering sub-class. *See* Mot. 26–29. With respect to the broader class, neither Plaintiffs nor their expert identify any common policy beyond metering that could unite their disparate claims of denial of access to the asylum process. *See id.*; Ex. 26 at 156:20–157:2 (acknowledging that ████████████████████████████████████████████████████████ ███████████████████████████████████████████████). The class encompasses individuals who were supposedly subjected to such disparate practices as lying; using threats, intimidation and coercion; employing verbal abuse and applying physical force; denying outright access to the asylum process; and denying access in a racially discriminatory manner.[5] SAC ¶ 2. Of the eight individuals whose

---

[5] Plaintiffs also allege that CBP denied aliens access to the asylum process by "physically obstructing access to the POE building" and "imposing unreasonable delays

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

allegations plausibly allege such conduct (six of whom are current or former Doe Plaintiffs), those actions are not alike, nor do they stem from a common course of conduct by the government. For example, Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, and Ingrid Doe allege that CBP officers at San Ysidro and Otay Mesa ports of entry told them that they did not qualify for asylum and that their children would be taken away from them, and in some cases that CBP officers pressured them to withdraw their applications for admission. Pls.' Ex. 9 ¶¶ 9–19; Pls.' Ex. 10 ¶¶ 9–22; Pls.' Ex. 11 ¶¶ 13–29; Pls.' Ex. 12 ¶¶ 8–18; Pls.' Ex. 13 ¶¶ 11–18. José Doe (who was dropped as a Doe Plaintiff without explanation after Plaintiffs amended their complaint) alleges that CBP officers at the Laredo port of entry told him that he needed a visa to apply for asylum and returned him from the port building back to Mexico. Pls.' Ex. 14 ¶¶ 10–23. One unnamed putative class member alleges that CBP officers at the Eagle Pass port of entry told him that he would be put in jail and have his daughter taken away. Pls.' Ex. 82 ¶ 6. And another unnamed putative class member alleges that a CBP officer at the San Ysidro port of entry used derogatory language when telling him to leave the port. Pls.' Ex. 83 ¶¶ 3–4. But there are no allegations of similar conduct occurring at any other ports of entry, nor is there any evidence that these instances of alleged officer misconduct are part of an agency-wide policy or practice. Accordingly, there is no common question that could unite these disparate allegations and drive the resolution of classwide claims. *See Lightfoot*, 273 F.R.D. at 326 ("The question is not whether a constellation of disparate but equally suspect practices may be distilled from the varying experiences of the class;

---

before granting access to the asylum process." SAC ¶ 2. The government understands those allegations, as well as allegations that CBP "lies" about the ports' capacities, as Plaintiffs' characterizations of metering. *See* Ex. 1 at 1 (noting that ports "may establish and operate physical access controls at the borderline," and that ports "should inform the waiting travelers that processing at the port is currently at capacity and CBP is permitting travelers to enter the port once there is sufficient space and resources to process them").

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

1    rather, Plaintiffs must first identify the 'policy or custom' they contend violates [the

2    law] and then establish that the 'policy or custom' is common to the class.").

3        **B.    The Metering Sub-Class Does Not Present Common Questions.**

4        There is also no common question uniting the claims of the metering sub-

5    class. Although all members of the proposed sub-class, by definition, were or will

6    be subjected to metering, under this Court's order on the government's motion to

7    dismiss, there is no question common to all of their claims because the Court would

8    have to examine each instance of metering/queue management at each port of entry

9    to determine whether such action is justified by "potentially legitimate factors." *Al*

10   *Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1212 (S.D. Cal. 2019).

11       Defendants maintain that metering is a categorically lawful exercise of the

12   Executive's constitutional and statutory authority to control the border. *See Almeida-*

13   *Sanchez v. United States*, 413 U.S. 266, 272 (1973); *Carroll v. United States*, 267

14   U.S. 132, 154 (1925) ("Travelers may be so stopped in crossing an international

15   boundary because of national self-protection reasonably requiring one entering the

16   country to identify himself as entitled to come in[.]"). Defendants also maintain that

17   the Executive's authority to meter is not constrained by 8 U.S.C. §§ 1158 or 1225,

18   since those statutes do not confer any rights on, nor create obligations toward, aliens

19   who are outside the country's borders. *See* 8 U.S.C. § 1158(a)(1) (referring to an

20   alien "who is physically present in the United States or who arrives in the United

21   States); *id.* § 1225(a)(1) (referring to an "alien present in the United States ... or who

22   arrives in the United States"); *id.* § 1225(b)(1)(A)(ii) (imposing obligations on an

23   immigration officer with regard to an alien "who is arriving in the United States").

24   But assuming that metering is not categorically lawful, the inquiry under this Court's

25   reasoning turns on whether individual instances of metering were justified by "po-

26   tentially legitimate factors" at the ports of entry that prevent CBP from immediately

27   discharging any duties towards putative class members. *Al Otro Lado, Inc.*, 394 F.

28

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

Supp. 3d at 1212; *see also* Pls.' Mem. in Support of Mot. for Provisional Class Certification 19 (ECF No. 293-1) (acknowledging that the legality of metering turns, at least in part, on whether there is a "valid justification" or whether the "proffered justification" for metering is "pretextual"). There is no dispute that the decision to implement metering procedures is within the discretion of the individual Directors of Field Operations or their port-level designees. *See* Ex. 1 at 1; Ex. 3 at 305; Ex. 2 at 324:22–325:4. And the operational issues—including detention space, population demographics influencing detention space, staffing, or security threats—that inform decisions to engage in metering/queue management differ among ports and by day. The Court would at least have to examine the specific circumstances surrounding the metering of each putative class member to determine whether metering was justified. *See Ellis*, 657 F.3d at 983 n.7; *see also Independence Min. Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (claims of unreasonable delay under 5 U.S.C. § 706(1), are governed by the fact-intensive *TRAC* factors[6]). Thus, there is no common question capable of generating answers that are common to the class and will "drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350.

For example, as explained in the accompanying declaration of Mariza Marin, an Assistant Field Office Director in OFO's San Diego Field Office, the detention and operational capacities of the San Ysidro and Otay Mesa Ports of Entry must be

---

[6] Those factors are: (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *Independence Min. Co.*, 105 F.3d at 507 n.7 (citing *Telecomms. Research and Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)).

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

analyzed on a daily basis to evaluate whether metering procedures are necessary. These ports' capacities to "process aliens without documents sufficient for lawful entry to the United States is dependent, *inter alia*, upon there being space in the short-term hold rooms at each of those respective ports to hold such aliens pending their transfer to [ICE], the U.S. Department of Health and Human Services (HHS), or another federal agency." Ex. 27 ¶ 6; Ex. 28 ¶ 9; Ex. 29 ¶¶ 6–7, 9. "Additionally, the capacity of CBP's short-term hold rooms is impacted by the characteristics and demographics of individuals being detained." Ex. 27 ¶ 10. For example, the detention of family units or unaccompanied children requires CBP to utilize significantly more holding space than would be required for adult single males or females. *Id.* Indeed, there has been litigation and review of conditions for children and families at other holding facilities that reinforces the need to ensure compliance with such requirements. *See, e.g.*, *Flores v. Sessions*, 2017 WL 6060252, at *6 (C.D. Cal. June 27, 2017). Similarly, OFO may be required to utilize significantly more detention space for vulnerable populations, such as LGBTQ or transgender individuals. Ex. 29 ¶ 7. The Court need only look to the detailed analysis of the San Ysidro port of entry's holding and processing capacity for the period of July 1–2, 2019, to understand how detailed the inquiry is to determine whether a port's use of metering on a given day is justified. *See* Ex. 27 ¶ 12 (providing in-custody demographics and port movements for July 1–2, 2019). The analysis of whether a port was justified in metering would also need to take into account the port's resource allocations, which "are complex and ever-changing," *id.* ¶ 11, and must take into account for rapid, unexpected increases in the number of individuals subject to detention, Ex. 29 ¶ 8. "[M]anagers at the San Ysidro and Otay Mesa POEs must account for the magnitude and diversity of operations at each of these POEs, and strategically allocate, and at times, re-allocate finite resources to ensure that mission needs, initiatives, and priorities are met." Ex. 27 ¶ 11; *see also* Ex. 5 (stating that in FY 2019, the San Diego Field Office "inspected more than 31 million passenger vehicles, more than 1.4 million trucks,

1    almost 55,000 buses, and almost 22 million pedestrians entering the U.S.," and that
2    narcotics seizures increased 24 percent, marijuana seizures increased 6 percent, co-
3    caine seizures increased 16 percent, heroin seizures totaled 2,560 pounds, and meth-
4    amphetamine seizures increased 66 percent).

5         None of Plaintiffs' arguments to the contrary demonstrate commonality. First,
6    Plaintiffs claim that the port-specific inquiry is "irrelevant because turnbacks, in-
7    cluding metering, are illegal regardless of Defendants' proffered justification for
8    them." Mot. 27. This is not correct and is inconsistent with this Court's ruling that
9    "potentially legitimate factors" may justify metering. *Al Otro Lado, Inc.*, 394 F.
10   Supp. 3d at 1212. As explained above, metering is a policy to regulate the pace of
11   pedestrian traffic across the border, not a policy of denying undocumented aliens
12   access to the ports. *See* Ex. 1 at 1 ("Ports should inform the waiting travelers that ...
13   CBP is permitting travelers to enter the port once there is sufficient space and re-
14   sources to process them. At no point may an officer discourage a traveler from wait-
15   ing to be processed, claiming fear of return, or seeking any other protection."). The
16   government maintains that metering is categorically lawful under its constitutional
17   and statutory authority to control the border. But assuming that class members have
18   a statutory right to be inspected and processed for admission before they cross the
19   border, the question is whether the agency's justifications for those delays are legit-
20   imate. *See Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1212. This is a port-specific inquiry
21   that cannot be resolved on class-wide basis. *See Ellis*, 657 F.3d at 983 n.7.

22        Second, Plaintiffs' expert argues that there is a "common method for analyz-
23   ing whether the capacity of a POE might justify turning back asylum seekers" by
24   [c]ompiling and analyzing" data contained in CBP's daily Migration Crisis Action
25   Team (MCAT) and Queue Management reports. Pls.' Ex. 7 ¶ 23.f; *see also* Mot. 17,
26   27–28. This is also incorrect. The MCAT and Queue Management reports provide a
27   snapshot of the number and percentage of aliens in custody, whether the port is re-
28   directing undocumented aliens to other ports of entry, and whether the port is facing

25

1   issues or challenges that warrant the attention of CBP headquarters at a particular

2   time on a given day. *See, e.g.*, Pls.' Ex. 49 (Field Queue Management Report for

3   March 21, 2019). But those reports are of limited value to the commonality inquiry

4   because, as even Plaintiffs' expert acknowledges, they only show █████████████

5   ██████████████████████████████████. Ex. 26 at 137:15–20; *see also* Ex. 2

6   at 80:2–5. The reports do not provide any insight, for example, into the port's coun-

7   ter-terrorism activities, its counter-narcotics activities, its trade inspections, its pe-

8   destrian and vehicle inspections, its staffing levels, ICE's ability to transfer individ-

9   uals from the ports, the demographics of the individuals in a port's custody, or any

10  of the other myriad factors that dictate the volume of undocumented aliens that CBP

11  can inspect and detain on a given day. In other words, the reports include no expla-

12  nations of "the reasons behind the numbers," Ex. 2 at 45:7–16, which is a critical

13  aspect of the *TRAC* analysis, *see* 750 F.2d at 80 (courts should consider, *inter alia*,

14  the effect of expediting delayed action on agency activities of a higher or competing

15  priority); *see also Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1212 (explaining that there

16  "may exist potentially legitimate factors" that justify the decision to meter). Simi-

17  larly, Plaintiffs' expert conceded that her report █████████████████████████

18  ████████████████████████████████. Ex. 26 at 159:4–164:14.

19      But even if the *only* relevant decision point were physical or detention capac-

20  ity—which it is not—Plaintiffs' analysis is still flawed and would result in them

21  asking this Court to manage intake volumes at 25 Class A ports on a daily basis,

22  which is the opposite of a court answering a common question susceptible to a single

23  answer. *See Wal-Mart Stores, Inc.*, 564 U.S. at 350. Plaintiffs argue that the justifi-

24  cation for metering can be adjudicated on a border-wide basis. *See* Mot. 27–28. Yet

25  their arguments both acknowledge and attempt to obfuscate the complexity of the

26  task of ascertaining a port's capacity on any given day. *See* Mot. 27; Pls.' Ex. 7 ¶ 69,

27  Table 5. For example, Plaintiffs' expert's analysis notes "████████████████████

28  ████████████████████████████" Pls.' Ex. 7 ¶ 64. The analysis

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

demonstrates that certain ports in different field offices ███████████ ██████████████ (*e.g.*, Eagle Pass; Port of El Paso; Douglas). *Id.* ¶ 68, Table 4. The analysis notes that the San Ysidro port of entry ██████████████████████ ████████████████████████████████████████████████████████████████ ██████. *Id.* ¶ 68, Table 4. Other ports—such as Andrade and Tecate— ████████ ██████████████████████████████████. *Id.* That is because these ports, unlike others, are very small, are not open 24 hours a day, and have very little holding space; accordingly, CBP officers at Andrade and Tecate redirect travelers without documents sufficient for lawful entry to larger ports. *See, e.g.*, Pls.' Ex. 4 at 3 (noting that "Tecate is a relatively small port of entry"; that, according to port personnel, Tecate "is not equipped to handle the asylum applicants that do arrive there" because it "lacks detention space and officers trained in processing asylum claims"; and that "unlike other ports that open 24 hours per day, Tecate closes at 11:00 pm, so individuals taken into custody there must be transferred to another facility once Tecate closes"); *see also* Pls.' Ex. 3 146:9–18 (agreeing that "[i]f asylum seekers were allowed to freely pass the limit line and go to the primary inspection point," that "would back up our operations very fast"). Accordingly, these ports' operational constraints must be analyzed differently from other ports'. Moreover, any conclusions drawn about these ports' capacities or whether metering (or redirecting) is appropriate at these ports could not apply to other ports that were not engaging in these practices or have different operational abilities.[7] Aggregating percentages across ports across a large time period glosses over these significant differences. For these reasons, Plaintiffs have failed to demonstrate that their claims can be evaluated based

---

[7] Thus, the deposition testimony of the CBP officer who has worked only at the Tecate port of entry during the relevant time period is limited to the officer's experience at that port and is not reflective of practices at, or capacities of, other ports. *See* Mot 16; Pls.' Ex. 3 at 53:22–54:11. Further, there is no named Plaintiff or witness who alleges being turned away from the Tecate or Andrade ports of entry.

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

on common proof. *See Gaston v. Exelon Corp.*, 247 F.R.D. 75, 82, 83 (E.D. Pa. 2007) (commonality not met where statistical evidence of impact did not address all circumstances applicable to all class members).[8]

Third, Plaintiffs argue that the government's argument "is entirely anecdotal and entitled to no weight because it is not a 'rigorous analysis' of commonality.'" Mot. 28 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013)). But Plaintiffs, not the government, are responsible for "'affirmatively demonstrat[ing] [their] compliance' with Rule 23" through a rigorous analysis. *Comcast Corp.*, 569 U.S. at 33 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350). Plaintiffs fail to meet their burden of establishing commonality under such a rigorous analysis because they do not explain how the Court can evaluate their claims under a common method of proof when there is no dispute that the implementation of metering procedures at individual ports is based on, and must be evaluated against, the ports' specific operating environments. *E.g.*, Ex. 2 at 324:22–325:4. As the Ninth Circuit explained, when the decisions complained of are made by local actors acting independently of one another, "Plaintiffs likely cannot show that this decisionmaking process affected the class as a whole, since 'demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's.'" *Ellis*, 657 F.3d at 983 n.7 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 355–56)). The fact that the government's "anecdotal" evidence—which includes deposition testimony from the author of the metering guidance and a named Defendant in this case, *see* Ex. 2 at

---

[8] Plaintiffs argue that the existence of metering controls when there are low numbers of travelers waiting to enter a port "shows that metering occurs regardless of the capacity of a [port]." Mot. 27 (citing Pls.' Ex. 7 ¶ 91). This is conclusory. The number of travelers waiting to enter a port is not indicative of its operational capacity at that time. Further, Plaintiffs present no evidence that the presence of officers at the limit line means that travelers without travel documents are being turned away pursuant to the Metering Guidance. *See* Pls.' Ex. 7 ¶¶ 59–60 & n.93 (indicating that travelers seeking to enter the Hidalgo port of entry did not approach the port, but went first to the shelter and were generally "processed [by CBP] the following day").

DEFS.' OPP'N TO PLS.' MOT. FOR CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

324:22–325:4—highlights a fatal gap in Plaintiffs' method of "common proof" does not mean that the government's evidence is not entitled to any weight; it means that Plaintiffs' "common proof" is not, in fact, common. And in any event, Plaintiffs are wrong. The government has offered declarations from relevant ports of entry detailing each port's operating environments and providing specific examples of their detention capacities. *See* Ex. 27 ¶ 12; Ex. 28 ¶ 12; Ex. 29 ¶¶ 8, 10–11. Plaintiffs fail to establish commonality.

Plaintiffs suggest that the Court can resolve on a class-wide basis whether metering is unlawful because 8 U.S.C. § 1158(a)(1) and 8 U.S.C. §§ 1225(a)(1), (a)(3), and (b)(1)(A)(ii) categorically apply to aliens outside of the United States and because metering is done for the purpose of deterring aliens from seeking asylum in the United States. Mot. 28. But those questions still do not establish commonality because, even though the Court has already interpreted sections 1158 and 1225 to apply extraterritorially—a conclusion that the government respectfully disagrees with—the Court still acknowledged "that it is entirely possible that there may exist potentially legitimate factors that prevent CBP officers from immediately discharging the mandatory duties set forth in" those statutes. *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1212. The Court explained that the government's capacity defense is "fundamentally [a] merits argument[]" that turns on the facts. *Id.* at 1213. As the government's evidence shows, those facts are specific to each port of entry and vary day to day. *See* Ex. 1 at 1, Ex. 3 at 305, *and* Ex. 2 at 324:22–325:4 (establishing that individual ports have discretion to implement metering procedures); *see* Ex. 27 ¶ 12; Ex. 28 ¶ 12; Ex. 29 ¶¶ 8, 10–11 (providing overview of different ports' operating environments and giving specific examples of in-custody demographics). Commonality is not satisfied where, as here, the merits of Plaintiffs' claims turn on the highly-variable factual circumstances unique to each port of entry. *Wal-Mart Stores, Inc.*, 564 U.S. at 355–56; *Ellis*, 657 F.3d at 983 n.7.

The question whether metering occurs to deter aliens from seeking asylum in

the United States is also not a common question apt to drive the resolution of this litigation for a separate reason: it is not material to Plaintiffs' claims. First, the Metering Guidance does not authorize ports to meter for deterrence purposes, and in fact prohibits the use of such procedures for that purpose. *See* Ex. 1 at 1 ("At no point may an officer discourage a waiting traveler from waiting to be processed, claiming a fear of return, or seeking any other protection."); Ex. 2 at 70:4–5 ("The policy "was not desired to deter migrants from entering the U.S."). Second, even if individual ports implemented metering procedures for deterrence purposes, an evaluation of the intent of individual decisionmakers across the entire southwest border when making port-management decisions is not conducive to class-action treatment, since it is necessarily an individualized inquiry.[9] *See Wal-Mart Stores, Inc.*, 564 U.S. at 358 ("Even if every single one of [the class members'] accounts is true, that would not demonstrate that the entire company" operates under the same policy); *Ellis*, 657 F.3d at 983 & n.7 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 355–56, for the proposition that "'demonstrating the invalidity of one [individual's] use of discretion will do nothing to demonstrate the invalidity of another's'").

Plaintiffs thus have not established commonality as to either proposed class.

---

[9] In any event, as the government has explained previously, deterring aliens from arriving at the border is not unlawful. In *Sale v. Haitian Centers Council, Inc.*, the government established a naval blockade and interdicted aliens departing from Haiti. 509 U.S. 155, 158 (1993). Aliens "who were identified as economic migrants were 'screened out' and promptly repatriated. Those who made a credible showing of political refugee status were 'screened in' and transported to the United States to file formal applications for asylum." *Id.* at 161–62. As the exodus expanded and over-burdened screening facilities, the government chose to "repatriate[e] them without giving them any opportunity to establish their qualifications as refugees." *Id.* at 163. The Supreme Court held that the government's actions were lawful because the statutes at issue—including the asylum statute and the statute governing exclusion proceedings (the precursor to expedited removal proceedings)—did not apply to aliens outside of the United States. *Id.* at 173–74 & n.29; *see also id.* at 159 & n.5 (noting that aliens who are "arriving at the border" and subject to exclusion proceedings are "located within the United States"). That would be lawful here, too.

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.  The Named Plaintiffs' Claims Are Not Typical of the Putative Class or Sub-Class Members' Claims.

Typicality requires a party to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement "assure[s] that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* This requirement "derives its independent legal significance from its ability to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 598 (3d Cir. 2012) (internal quotation omitted). Thus, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class member." *Falcon*, 457 U.S. at 156. Certification "should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citations omitted). A named plaintiff does not satisfy the typicality requirement when his "unique background and factual situation require him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class." *Id.*

Here, the named Plaintiffs' do not satisfy the typicality requirement for several reasons. First, the sub-class consists of aliens who were subjected to CBP's "metering policy," Mot. 1, *i.e.*, the April 27, 2018 Metering Guidance memorandum issued by Executive Assistant Commissioner Owen, *see* Mot. 10; *see also* Ex. 26 at 157:1–2 (Plaintiffs' expert's concession that ███████████████████ ██████████████████████████████████). Plaintiffs Abigail Doe,

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

Beatrice Doe, Carolina Doe, Dinora Doe, and Ingrid Doe allege that they were initially prevented from pursuing their asylum claims by purported CBP actions that took place *before* April 27, 2018. *See* Pls.' Exs. 9–13. This means that their claims are not typical of putative sub-class members' claims, which are rooted in the application of that policy.

Second, the government can raise unique factual defenses to each of the remaining Doe Plaintiffs' claims based on the "factual situation[s]" that existed at the ports on the dates they attempted to cross. *See Hanon*, 976 F.3d at 508; *Ellis*, 657 F.3d at 984. Plaintiffs hold out Roberto Doe as "typical" of the metering sub-class because he approached the Hidalgo port of entry on October 2, 2018, encountered a CBP officer at the mid-point of the bridge, and was told that he could not enter because the port, which had nine people in custody (representing 21% of its detention capacity) was "full." Mot. 30. In response, the government will point to evidence that on October 2, 2018, the Hidalgo port of entry processed a total of ███████████ █████████████████████████████████████████████████████ ████████████. *See* Ex. 30 at 701, 702. Thus, assuming that Roberto Doe had a statutory right to be processed at the time, the question whether CBP acted unlawfully *as to Roberto* depends on whether the government's delay in processing him was unreasonable in light of other congressionally-mandated activities occurring at the port that day, including the processing of other inadmissible aliens. *See* 5 U.S.C. § 706(1); *TRAC*, 750 F.2d at 80 (courts should consider, *inter alia*, the effect of expediting delayed action on agency activities of a higher or competing priority). This factual defense is unique to Roberto, and the government can raise other unique factual defenses to other named Plaintiffs' arrivals, too. The existence of such defenses defeats typicality. *See Ellis*, 657 F.3d at 984–85 (discussing unique factual defenses).

Third, there are number of factual variations amongst putative sub-class members that defeat typicality. For example, all of the Doe Plaintiffs who were subjected to the metering policy allege that they physically approached a port of entry on the

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

U.S.-Mexico border before being "turned back." *See* Pls.' Ex. 73 ¶ 4; Pls.' Ex. 97 ¶ 4; Pls.' Ex. 98 ¶ 8; Pls.' Ex. 99 ¶ 4; Pls.' Ex. 100 ¶ 10; Pls.' Ex. 101 ¶ 6; Pls.' Ex. 102 ¶ 5; Pls.' Ex. 103 ¶¶ 9–11. But many putative sub-class members never physically approached a port of entry. Some, like "Bianka Doe," allege that they were intercepted by Mexican officials before encountering a CBP official. Pls.' Ex. 72 ¶ 5. Others, like "China," went straight to a shelter when they arrived in a Mexican border town. Pls.' Ex. 78 ¶ 8. Others still may have simply messaged their name onto a waitlist before even arriving in a border town. *See* Ex. 14 at 11. Unlike the Doe Plaintiffs, these putative sub-class members are subject to the factual defense that they were never subjected to the metering policy at all, as well as potentially an act-of-state doctrine defense based on the Mexican government's decision to intercept them. *See* Ex. 1 at 1; *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897); *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1069 (9th Cir. 2018). In light of these multiple unique factual and legal defenses as to named Plaintiffs and putative sub-class members alike, Plaintiffs fail to establish typicality.

## IV.    Plaintiffs Fail to Satisfy Rule 23(b)(2).

Rule 23(b)(2) requires Plaintiffs to show that the government "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The "key" to the Rule 23(b)(2) class "is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc.*, 564 U.S. at 360 (citation omitted). The party seeking certification must show that "relief is available to the class as a whole" and that the challenged conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* Moreover, certification under Rule 23(b)(2) for purposes of injunctive relief is not appropriate when an individual ceases to be subject to the conduct complained of. *See Ellis*, 657

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

F.3d at 988 (The district court "must consider ... how to manage those members of the proposed class who are no longer ... employees. As the Supreme Court explained, only current employees have standing to seek injunctive relief."); *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) ("It appears that none of the named plaintiffs has standing to pursue injunctive relief on behalf of the class, as none of them is a current ... employee."); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 559 (N.D. Cal. 2012) (same, with regard to former car owners). A party does not satisfy Rule 23(b)(2) "by combining an array of remedies, some of which will benefit only certain subsets of the class, and contending that each member of the class can avail himself or herself of one or more of the proposed remedies." *Cholakyan*, 281 F.R.D. at 559.

Plaintiffs fail to satisfy Rule 23(b)(2) as to the proposed broader class because they fail to show that the government "has acted or refused to act on grounds that apply generally" that class. Fed. R. Civ. P. 23(b)(2). As discussed above, *supra* at Part II, there is no evidence that Defendants have acted generally to "coerce" all aliens across the U.S.-Mexico border into withdrawing their applications for admission, has denied access to the asylum process in a racially discriminatory manner, or taken any of the other myriad actions that Plaintiffs claim is part of the same general course of conduct. In other words, unlike in the civil rights cases Plaintiffs cite, Mot. 32–33, there is no evidence of a general "Turnback Policy" applicable to the broader class. In the absence of a common policy or practice, there is no injunctive relief that could be appropriate to address these disparate claims. Plaintiffs cannot simply offer "a constellation of disparate but equally suspect [alleged] practices ... distilled from the varying experiences of the class" and then ask the Court to enjoin them all as a "policy or custom." *Lightfoot*, 273 F.R.D. at 326.

Rule 23(b)(2) is also not satisfied as to the metering sub-class. Here, the justification for metering at various ports of entry requires an examination of individu-

alized and dynamic factors and cannot be evaluated on a classwide basis. Accordingly, the Court cannot "enjoin[] or declare[] [metering] unlawful ... as to all of the class members." *See Wal-Mart Stores, Inc.*¸564 U.S. at 360. But even if Rule 23(b)(2) were somehow met, there are important limits on the relief available to a 23(b)(2) class. First, injunctive relief is limited to aliens who are *currently* subject to CBP's metering practices, not aliens who may have been, but are no longer subject to those practices. *See id.* at 365; *Ellis*, 657 F.3d at 988 ("As the Supreme Court has explained, only current employees have standing to seek injunctive relief."). Since Rule 23(b)(2) is concerned with the scope of relief, not standing, this is true regardless of the Court's continuing exercise of jurisdiction over this case under an exception to the mootness doctrine. *See* ECF No. 166 at 22–25. Second, Rule 23(b)(2) and the APA also limit sub-class-wide relief to a single injunction of metering or a declaration that metering is unlawful, and nothing more. Certification is not authorized "when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant," so relief must be correspondingly limited. *Wal-Mart Stores, Inc.*, 564 U.S. at 360. And the APA authorizes courts only to "compel" agency action unlawfully withheld or delayed or to "hold unlawful and set aside agency action" it finds unlawful. 5 U.S.C. §§ 706(1), (2). Were the Court to certify a metering sub-class (which, for the reasons discussed above, it should not), the sub-class would not be entitled at the end of the litigation to pursue injunctions of unrelated government conduct for certain members of the sub-class, as Plaintiffs have twice done already. *See* Pls.' Mots. for Provisional Class Certification and Prelim. Injs. (ECF Nos. 293, 294, 344, 352). Rule 23(b)(2) does not allow a party to "combin[e] an array of remedies, some of which will benefit only certain subsets of the class, and contend[] that each member of the class can avail himself or herself of one or more of the proposed remedies." *Cholakyan*, 281 F.R.D. at 559.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Class Certification.

DEFS.' OPP'N TO PLS.' MOT. FOR CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

1    DATED: February 12, 2020              Respectfully submitted,

2
                                           JOSEPH H. HUNT
3                                          Assistant Attorney General
                                           Civil Division
4

5                                          WILLIAM C. PEACHEY
                                           Director
6

7                                          KATHERINE J. SHINNERS
                                           Senior Litigation Counsel
8

9                                          */s/ Alexander J. Halaska*
10                                         ALEXANDER J. HALASKA
                                           Trial Attorney
11                                         United States Department of Justice
                                           Civil Division
12                                         Office of Immigration Litigation
                                           District Court Section
13                                         P.O. Box 868, Ben Franklin Station
                                           Washington, D.C. 20044
14                                         Tel: (202) 307-8704 | Fax: (202) 305-7000
                                           alexander.j.halaska@usdoj.gov
15

16                                         *Counsel for Defendants*

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **CERTIFICATE OF SERVICE**

No. 17-cv-02366-BAS-KSC

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: February 12, 2020          Respectfully submitted,

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
United States Department of Justice

DEFS.' OPP'N TO PLS.' MOT. FOR
CLASS CERTIFICATION
Case No. 3:17-cv-02366-BAS-KSC