JOSEPH H. HUNT
Assistant Attorney General, Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ARI NAZAROV (CT 414491)
DHRUMAN Y. SAMPAT (NJ 270892018)
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
(San Diego)**

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **Exhibit 2 to Defendants' Opposition to Plaintiffs' Motion for Class Certification** |
| Chad F. WOLF, Acting Secretary of Homeland Security, *et al.*, in their official capacities, | Portions Filed Under Seal |
| *Defendants* | |

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--------------------------------x

AL OTRO LADO, INC., et al.,           :

              Plaintiffs,           : Case No.:

       vs.                           : 17-cv-02366-BAS-KSC

KEVIN K. MCALEENAN, et al.,           :

             Defendants.           :

--------------------------------x

DEPOSITION MARKED CONFIDENTIAL

DEPOSITION OF TODD OWEN

Washington, D.C.

Friday, December 13, 2019

9:40 a.m.

Job No.:  529549

Pages:  1 - 332

Reported by:  Elizabeth Mingione, RPR



Page 2

1

2              Deposition of TODD OWEN, held at the offices

3    of Mayer Brown, LLP, 1999 K Sreet, Northwest,

4    Washington, D.C., commencing at 9:40 a.m., Friday,

5    December 13, 2019, and taken down stenographically by

6    Elizabeth Mingione, Registered Professional Reporter

7    and Notary Public for the Commonwealth of Virginia.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Page 3

1  A P P E A R A N C E S   O F   C O U N S E L:

2  ON BEHALF OF PLAINTIFFS:

3          MAYER BROWN, LLP

4          Stephen M. Medlock, Esquire

5          Ori Lev, Esquire

6          1999 K Street, Northwest

7          Washington, DC 20006

8          (202) 263-3000

9          Smedlock@mayerbrown.com

10

11  ON BEHALF OF DEFENDANTS:

12          U.S. DEPARTMENT OF JUSTICE

13          Katherine J. Shinners, Esquire

14          David White, Esquire

15          Ben Franklin Station

16          PO Box 868

17          Washington, DC 20044

18          (202) 598-8259

19          Katherine.J.Shinner@usdoj.gov

20

21  (Appearances, Continued)

22



Page 4

1               A L S O   P R E S E N T

2               Louisa Slocum,  Esquire

3                  Rameez Burney

4       Karolina Walters, American Immigration Council

5                  Kristine King

6           Matthew Fenn (via phone, as indicated)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Page 5

1                    C O N T E N T S

2                 WITNESS:   TODD OWEN

3    EXAMINATION BY:                              PAGE

4    Mr. Medlock ...................................  9

5    Ms. Shinners ................................. 312

6    Mr. Lev ...................................... 322

7

8                      *    *    *

9

10                 DEPOSITION EXHIBITS

11                      TODD OWEN

12   NUMBER          DESCRIPTION                  PAGE

13   Exhibit 20   Notice of Deposition ............  19

14   Exhibit 21   Website Printout of Todd Owen

15        Description ..............................  49

16   Exhibit 22   U.S. Customs and Border Protection

17        Standard of Conduct, AOL-DEF-00669013 ....  51

18   Exhibit 23   Metering Guidance Memorandum, Date

19        Stamped April 27, 2018 ...................  63

20   Exhibit 24   E-mail from Randy Howe, June 19,

21        2018, AOL-DEF-00088501 ...................  81

22   (Exhibits Continued)



```
 1   NUMBER              DESCRIPTION                    PAGE

 2   Exhibit 25   E-mail from Robert Hood, August

 3        2, 2017, AOL-DEF-00328857 ................  100

 4   Exhibit 26   E-mail from Todd Owen, May 25,

 5        2016 AOL-DEF-00761338 ...................  104

 6   Exhibit 27   E-mail Chain, Sept. 13, 2016,

 7        AOL-DEF-00762746 ........................  123

 8   Exhibit 28   E-mail Chain from Todd Hoffman,

 9        Sept. 16, 2016, AOL-DEF-00762523 .........  132

10   Exhibit 29   E-mail from Katherine Stark, Sept. 7,

11        2016 AOL-DEF-00761290 ................... 135

12   Exhibit 30   E-mail Chain from Todd Owen, August

13        17, 2016, AOL-DEF-00761340 ............... 142

14   Exhibit 31   E-mail chain, Novemer 11, 2016,

15        AOL-DEF-00272936 ........................ 146

16   Exhibit 32   ***   Exhibit is removed ***

17   Exhibit 33   E-mail from Hector Mancha,

18        AOL-DEF-00081089 ........................ 162

19   Exhibit 34   E-mail from Beverly Good, Nov. 22,

20        2016, AOL-DEF-00032389 .................. 167

21   Exhibit 35   E-mail from Alberto Flores, November

22        14, 2016, AOL-DEF-00576607 ............... 174
```



Page 7

1   NUMBER            DESCRIPTION                    PAGE

2   Exhibit 36    ***  Exhibit is Removed ***

3   Exhibit 37    ***  Exhibit is Removed ***

4   Exhibit 38  E-mail from Valerie Boyd, June 5,

5         2018, AOL-DEF-00273293 ................. 196

6   Exhibit 39  Homeland Security Memo of June 5,

7         2018, AOL-DEF-00273294 ................. 199

8   Exhibit 40  Memo from Kevin McAleenan, August 1,

9         2018, AOL-DEF-00039620 ................. 213

10   Exhibit 41  Evaluation of Prioritization Queue

11        Management Pilot, AOL-DEF-00039621 ...... 213

12   Exhibit 42 Mark Morgan Memo, CBPALTR0000303 .. 213

13   Exhibit 43  Complaint fof Declaratory and

14        Injunctive Relief ...................... 220

15   Exhibit 44  E-mail Chain Aug. 14, 2017,

16        AOL-DEF-00723886 ....................... 223

17   Exhibit 45  Confidential Al Otro Lado Lawsuit

18        Document, AOL-DEF-00723887 ............. 225

19   Exhibit 46  E-mail from William Haralson,

20        March 15, 2017, NTEU 000132 ............ 229

21   Exhibit 47   Search Results Report and E-mail

22        from Eddie Arias, July 3, 2018 ......... 243



Page 8

1   NUMBER            DESCRIPTION                PAGE

2   Exhibit 48   Five-Page Document, Annotations ..  248

3   Exhibit 49   E-mail from David Atkinson,

4        March 19, 2019, NTEU-000110 ..............  255

5   Exhibit 50   Photograph of Mother and Child ...  291

6   Exhibit 51   Photograph of Bodies in Water ....  292

7   Exhibit 52   E-mail Chain, March 19, 2019,

8        AOL-DEF-00269970 .........................  293

9   Exhibit 53   E-mail Chain, March 19, 2019,

10        AOL-DEF-00270451 .........................  296

11

12

13

14            (Exhibits Attached to Transcript,

15             Except for Nos. 32, 36, 37 TBD)

16

17

18

19

20

21

22



Page 9

```
 1                    P R O C E E D I N G S

 2    Whereupon,

 3                    TODD OWEN,

 4                having been first duly sworn was

 5                examined and testified as follows:

 6                        -   -   -

 7                EXAMINATION CONDUCTED

 8        BY MR. MEDLOCK:

 9        Q.    Good morning, sir.

10        A.    Good morning.

11        Q.    Can you please state and spell your name

12    for the record.

13        A.    My name is Todd Owen, T-O-D-D, O-W-E-N.

14        Q.    Have you ever gone by any other names, sir?

15        A.    No.

16        Q.    Are you presently employed?

17        A.    Yes.

18        Q.    Where are you employed?

19        A.    With U.S. Customs and Border Protection,

20    Washington, D.C.

21        Q.    What is your -- if I refer to U.S. Customs

22    and Border Protection as CBP, you'll understand that?
```



Page 45

1       Q.    But you've seen reports called queue

2    management reports before?

3       A.    Yes.

4       Q.    And those are also drafted by the MCAT team

5    as well?

6       A.    Yes.

7       Q.    And those MCAT and queue management reports

8    operationally important for you, right?

9       A.    They provide an operational snapshot.

10      Q.    And are those operational snapshots useful

11   to you in your day-to-day business?

12      A.    To some degree.

13      Q.    And why are they useful to some degree?

14      A.    Because they again are just a snapshot in

15   time and are not very detailed.  So they often don't

16   give you the reasons behind the numbers.

17      Q.    But you do use them; is that right?

18      A.    I use them to, again, to give me some

19   visibility as to what's going on in the ports.

20      Q.    ███████████████████████████████████████

21   ██████████████████████████████████████████████

22   ██████████████████████████████████████████████



Page 69

1   border.

2       Q.    At the time this memorandum was issued,

3   what were the capacity -- what ports of entry were

4   capacity constrained that you felt justified the

5   issuance of this metering guidance?

6       A.    I don't recall specifically what ports, but

7   our primary gateway ports in the southwest border

8   began to experience capacity issues again throughout

9   2016.  Those would be the major ports, the San

10  Ysidros, the Calexico, Nogales, El Paso, Laredo,

11  Hidalgo off and on, Brownsville off and on.

12      Q.    And it's your assumption that those were

13  the ports that were capacity constrained at that time;

14  is that right?

15      A.    At that time, but again we have 26 ports

16  along the southwest border, 46 actual crossings.  A

17  port of entry may have multiple crossings.  El Paso

18  has four crossings.  At some point because of the

19  migrant situation which ebbs and flows, one of those

20  bridges might have capacity while the other three do

21  not.  It really is a very fluid situation at the ports

22  from port to port, day to day.



Page 70

1      Q.    Is it your position that the metering

2    policy was not motivated by a desire to deter asylum

3    seekers from entering the U.S.?

4      A.    The policy was not desired to deter

5    migrants from entering the U.S.  No, it was not.

6      Q.    And there was no communication that went to

7    any field office or port director that -- from you,

8    that would have led those field offices or port

9    directors to believe that the metering policy should

10   be used to deter asylum seekers; is that right?

11     A.    The metering policy, which again began in

12   2016, was used to address the capacity when we were

13   having large numbers of volumes.

14     Q.    And that's it?

15     A.    That's the reason we do the metering in the

16   ports of entry.

17     Q.    There's no other reason?

18     A.    No other reason.

19     Q.    So I shouldn't see any e-mails or

20   correspondence that would indicate there was another

21   reason; is that right?

22     A.    I can't speak for the whole agency.



Page 74

1        A.     No.  Disaster, no.

2        Q.     If somebody told you that the metering

3    policy created a humanitarian disaster, you would have

4    told them that's not correct; is that right?

5        A.     Well, I would tell them if that's their

6    opinion and I don't share that opinion.

7        Q.     Isn't it true that metering occurred at

8    ports of entry even when those ports have excess

9    capacity?

10       A.     You have to define capacity.

11       Q.     How do you define capacity?

12       A.     I define capacity as two parts.  There is

13   the physical capacity which is the space within the

14   detention cells.  Then there's the operational

15   capacity which takes into consideration such things as

16   the demographics of those in custody, the conditions

17   of those in custody T, the issues and sickness issues,

18   the other operational priorities as to how the

19   resources in the ports are being directed that day,

20   all of these other day-to-day operational

21   considerations which may keep a port from reaching the

22   full physical space that they have.





Page 75

1     Q.    So if a port decides to prioritize other

2     matters over processing migrants without proper travel

3     documents, they may have a lower operational capacity;

4     is that right?

5     A.    Could you repeat that question.

6     Q.    Sure.

7     A.    Trying to follow.

8     Q.    If as a policy matter a port decides that

9     they are going to prioritize other missions besides

10    inspecting and processing individuals that don't have

11    proper travel documents, that port will effectively

12    have a lower operational capacity; is that right?

13    A.    Correct.  The finite resources that we have

14    are directed amongst multiple priorities in the ports

15    of entry.  The more you direct towards narcotics

16    intradiction or the counter-terrorism threat means

17    there's less to do other things in, whether that's the

18    migrant processing, the trade enforcement, the

19    agriculture mission.  The full scope of what we do at

20    the ports of entry, if you push resources in one area,

21    there will be less resources in other areas including

22    migrant process.



Page 76

1    Q.    And if you wanted to intentionally lower

2    the operational capacity to process migrants, you

3    could assign more front-line officers to those other

4    missions; is that right?

5              MS. SHINNERS:  Objection.  Argumentative.

6    You can answer.

7    A.    The capacity drives the decisions.  And,

8    again, the capacity is not just the physical space but

9    the operational aspects of what's taking place.  There

10   are certain priority missions within CBP that we do

11   not pull officers off of to process the migrants.  We

12   will not sacrifice the counter-terrorism mission.  we

13   will not sacrifice the narcotics mission.

14             We would not reassign officers from those

15   key missions to process more migrants.

16   Q.    But you have a legal duty to process asylum

17   seekers, right?

18   A.    And we do.

19   Q.    And so but you won't sacrifice the

20   counter-terrorism mission and the narcotics mission to

21   process asylum seekers; is that right?

22   A.    I will not redirect resources from those



Page 80

 1          A.      Yes.

 2          Q.      The MCAT and queue management reports, do

 3   they list operational capacities in those reports?

 4          A.      They list the physical capacity in those

 5   reports.

 6          Q.      And do they give commentary occasionally on

 7   operational capacity issues?

 8          A.      Occasionally.

 9          Q.      And occasionally those MCAT reports will

10   say whether there are issues that are affecting the

11   port at the time; is that right?

12          A.      They may.

13          Q.      Okay.  Isn't it true that metering has

14   occurred at ports of entry even when those ports

15   reported that the number of asylum seekers that were

16   being processed had no impact on port operations?

17                  MS. SHINNERS:  Objection as to

18   characterization of form.  You can answer.

19          A.      I'm not sure I understand the question.

20          Q.      Sure.  The MCAT reports will occasionally

21   have a column that lists whether there is an impact to

22   port operations based on the number of migrants that



Page 91

1      A.    ████

2      Q.    ██████████████████████████████

3   █████████████████████████

4      A.    ██████████

5      Q.    ████████████████

6           MS. SHINNERS:  Objection.  Just to clarify,

7   you are stating what's listed in the report?

8      Q.    That's correct.  And then impact to port

9   operations it lists none; is that right?

10     A.    Yes.

11     Q.    Okay.  So there are in fact instances where

12   these snapshots that are taken by the MCAT, it lists

13   no impact to port operations.  And less than 100

14   percent physical capacity where there are individuals

15   being held at the boundary lines; is that right?

16     A.    Yes.

17     Q.    Okay.  Isn't it true that the metering

18   policy was being used to return individuals who

19   entered the U.S. back to Mexico?

20     A.    There were issues of misconduct where

21   individuals that had stepped foot on U.S. soil were

22   returned back.



Page 92

1      Q.    Those would be in instances of misconduct

2    where people weren't following the policy; is that

3    right?

4      A.    Yes.

5      Q.    As part of the metering policy, ports of

6    entry, directors of ports of entry on the U.S.-Mexico

7    border were able to create limit line positions; is

8    that right?

9      A.    In 2018, yes.

10     Q.    Okay.  So beginning of 2018 those limit

11   line positions were created by some ports of entry; is

12   that right?

13     A.    In 2018, we started to station officers at

14   the limit line.

15     Q.    Okay.  In some ports of entry were officers

16   a few feet back of the limit line?

17     A.    Yes.

18     Q.    Which ports of entry would those be?

19     A.    Tecate and Otay Mesa for a short period of

20   time.

21     Q.    Any others?

22     A.    Not that I'm aware of.



Page 99

1    That is the guidance from this.

2         Q.    Okay.  So my question was -- and maybe I

3    can ask it little bit better, the metering guidance

4    memo here in front of you does not take a position one

5    way or another in the written words that are used

6    about whether the policy is being driven by a

7    deterrence rationale?

8         A.    The memo states the policy's been written

9    to ensure the orderly processing and security and

10   safety of the ports.

11        Q.    Does it say that that's the only reason?

12             MS. SHINNERS:  Objection.  Document speaks

13   for itself.  You can answer.

14        A.    That is what's in the document.  There's no

15   reference to deterrents throughout the document.

16        Q.    So it's your view that the metering

17   guidance that is in this April 27, 2018 memorandum at

18   Exhibit 23, the exclusive reason for metering are the

19   operational reasons stated in the memorandum; is that

20   right?

21        A.    Yes.  The memo that I signed, the direction

22   for guidance or the direction for metering is done for



Page 100

1    operational purposes, not for deterrence.

2        Q.    We talked about this a little bit earlier,

3    some ports of entry began metering before April 2018;

4    is that right?

5        A.    We began metering in the early part of

6    2016.

7        Q.    In fact that metering started at the San

8    Ysidro Port of Entry?

9        A.    It started at San Ysidro to deal with the

10   influx of Haitians.

11       Q.    And that began in May 2016; is that right?

12       A.    It was the early part of '16, April, May.

13       Q.    Was it on Memorial Day?

14       A.    I believe it was before Memorial Day, but I

15   don't recall specifically.

16       Q.    All right.  Let me see if I can refresh

17   your recollection.

18                       -   -   -

19            (A document was marked as Deposition

20   Exhibit Number 25.)

21                       -   -   -

22            BY MR. MEDLOCK:



Page 111

1      Q.    Okay.  And when the reference to secure

2  additional workstations.  That refers to workstations

3  in the secondary inspection processing area, correct?

4            MS. SHINNERS:  Objection.  Foundation.

5  Continue.

6      A.    As I recall, at the time in 2016 the

7  permits, the I-94s were being issues out of the Old

8  Port building.  So in relation to the second bullet

9  and the third bullet, it would make sense to me that

10  they would have moved the processing of the I-94s out

11  of the Old Port building to Otay Mesa.

12      Q.    To make space.

13      A.    Which would have created more space in the

14  Old Port building.  Thus the reference to workstations

15  and such, as I recall.  In 2016, San Ysidro was

16  undergoing the construction.  Different parts of it

17  were being torn down.  We used temporary trailers for

18  a while.

19            We had a reduction in the overall

20  detention space.  And the port management was trying

21  to make work arounds throughout all of this

22  construction.



Page 112

1      Q.    There's a reference here to virtual

2  interviews.  What does that mean?

3      A.    Virtual interviews is something that Border

4  patrol primarily does where you can set up the migrant

5  seeker.  That initial Q and A, that a question and

6  answer, the sworn statement can be done through a

7  video conference with an officer or agent that is

8  stationed somewhere else.

9      Q.    CBP has utilized virtual interviews in the

10 past, hasn't it?

11     A.    Border Patrol primarily uses --

12     Q.    I understand they primarily use it, but

13 hasn't CBP done it?

14     A.    Well, CBP is border patrol.  We are one and

15 the same.

16     Q.    I'm sorry.  OFO has done it, has used it?

17     A.    We have done it in a much less extent.

18 Yes.

19     Q.    OFO has used virtual interviews at ports of

20 entry, correct?

21     A.    Correct.

22     Q.    OFO has used virtual interviews for



Page 113

1    individuals expressing incredible fear and

2    persecution, correct?

3        A.    To my recollection.

4        Q.    OFO has used virtual interviews for

5    secondary processing of asylum seekers at ports of

6    entry, correct?

7        A.    I believe so.

8        Q.    OFO has used virtual interviews to increase

9    the throughput of ports of entry with respect to

10   asylum seekers, correct?

11       A.    Correct.  Terms of the processing.

12       Q.    Virtual interviews are one way that OFO can

13   increase the throughput of a port of entry with

14   respect to asylum seekers, correct?

15       A.    Incorrect.  Virtual interviews are one way

16   to increase the processing, but not the throughput.

17       Q.    Okay.  So, but if I wanted to increase the

18   processing capacity of a port of entry, virtual

19   interviews are one tool that is available to me,

20   correct?

21       A.    The processing capability only.

22       Q.    Correct.  So if I wanted to process more



Page 114

1    asylum seekers, if that was my goal, virtual

2    interviews are a tool that is available to me?

3         A.    Without the accompanying detention space to

4    hold them, or the ability to turn them over to ERO, we

5    would not increase the processing with any tool.  You

6    can't just process somebody.  You have to have

7    someplace to put them when the processing is done.

8         Q.    My question more simple.  Virtual

9    interviews are a way of increasing the processing

10   capacity of a port of entry; is that right?

11        A.    You said increased throughput.

12        Q.    I was talking about processing though, just

13   processing?

14        A.    Virtual interviews can assist with the

15   processing.

16        Q.    They can increase the processing

17   capabilities of a port of entry; is that right?

18        A.    By diverting resources from other

19   activities.

20        Q.    Certainly.  But you could have somebody in

21   Detroit or Miami conduct a virtual interview at San

22   Ysidro using the virtual interview technology that's



Page 157

1        Q.    How about the standing meeting in the SCIF

2    with the commissioner and deputy commissioner?

3        A.    No.

4        Q.    It wouldn't have been discussed?

5        A.    Those meetings are intelligence driven, not

6    operationally.

7        Q.    So do you recall when ports of entry in

8    Texas began implementing metering in 2016?

9        A.    No.  I don't recall.

10       Q.    It would have been sometime after San

11   Ysidro did it though?

12       A.    Yes.  San Ysidro started and then --

13       Q.    What was the second port that was --

14       A.    I don't recall as the -- I believe it would

15   have likely have been Calexico, because the Haitians

16   moved then from Tijuana to Mexicali.  They then moved

17   to San Luis and then into Nogales.

18             So if I had to, to the best of my

19   recollection those were probably the next three that

20   would have started to metering, because the metering,

21   again, was a direct response to the Haitian arrivals.

22       Q.    In November 2016 when this decision in this



Page 218





Page 239

1          A.     I don't believe I was contacted as part of

2     that investigation.  I have seen the report.

3          Q.     And you know that DHS OIG did conclude that

4     part -- that as part of the way the metering policy

5     was implemented at the Tecate Port of Entry, that that

6     implementation broke the law?

7          A.     That implementation was not directed by

8     management.  And the OIG report found it was not the

9     standard protocols for the agency.

10         Q.     Let me ask you a question.  Do you take

11    responsibility for -- ultimate responsibility for what

12    happens at the ports of entry?

13         A.     Do I take ultimate --

14         Q.     Yeah.  For the actions of your officers?

15         A.     I am not -- I am the leader of field

16    operations.  And when our officers engage in

17    misconduct, they are held accountable for it.  As

18    those officers that have improperly returned people

19    back into Mexico after having been on U.S. soil, those

20    cases go to the OIG to OPR for investigation.  And if

21    found valid, they are held accountable.

22         Q.     Do you take responsibility for -- do you



Page 313

1    terms of accommodations that were made at the San

2    Ysidro port with respect to the Haitian migrant surge?

3              MR. LEV:  Objection.  Vague.  I don't know

4    what accommodations means.

5         Q.   Do you understand my question?

6         A.   I can talk about what processes we

7    implemented to address the Haitians.

8         Q.   That's fine.

9         A.   Okay.  So, to put this in context, the

10   migrants have undergone waves as they have come into

11   the United States.  In 2014, it was unaccompanied

12   alien children.  They were primarily entering between

13   the ports, which is a border responsibility.  It was

14   not an OFO issue.

15             So we really did not start to engage with

16   the high numbers of migrants until 2016.  So that

17   started in the early part of 2016 with the Haitians

18   that were leaving Brazil.  Historically, the

19   earthquake Haiti, destruction in Haiti.  Brazil opened

20   their doors to the Haitians.  They needed cheap labor

21   to build the venues for the Olympics.

22             By 2015, those venues were built.  They



Page 320

1          A.     Okay.

2          Q.     So can you explain, based on your knowledge

3     and your experience, in general any impacts on trade

4     and travel from -- if you divert resources, or if a

5     port of entry diverts resources from the facilitation

6     of trade or travel?

7                 MR. LEV:  Same objection.

8          A.     Okay.  From my knowledge, we prioritize our

9     mission sets within the ports of entry along the

10    guidance that we receive from the secretary.  So if we

11    had to divert officers from the counter-terrorism

12    mission, or if we had to divert officers to put more

13    officers towards the processing of undocumented

14    migrants, we would not pull them from the

15    counter-terrorism mission.  We would not pull them

16    from the narcotics intradiction mission.

17                So the two missions that they would be

18    pulled from, one would be the facilitation of lawful

19    trade and travel.  So those are folks who have lawful

20    documents to enter the country.  Most of the

21    cross-border traffic on the southern border comes and

22    goes with border crossing cards.



Page 321

1            We would reduce travel lanes so you would

2    have fewer booths open.  This would impact the

3    business community as they crossed.  This would impact

4    the school kids that cross every day.  This would

5    impact the people coming for medical treatments, to do

6    their business, to do their shopping.  It Would result

7    in longer wait times to cross the border if we pulled

8    individuals from that mission set.

9            If we pulled officers from the processing

10   cargo mission set, your summer produce would be

11   delayed.  All of your cargo processing would be

12   delayed.  In the summer -- the spring and summer of

13   2019, when we reassigned 731 officers from field

14   operations from the ports of entry to assist the

15   border patrol because of the migrant crisis that they

16   were facing at that time, we saw cargo wait times in

17   places like El Paso and San Ysidro go up from 45

18   minutes to over five hours.

19           Those are the types of real impacts that

20   we would experience if we diverted more resources away

21   from the trade and travel mission, from the economic

22   security mission to put towards the migrant



Page 324

1          A.    We decided the informal discussions -- and

2     it's not that it occurred, you know, at one meeting.

3     It was kind of ongoing discussions throughout 2017 as

4     we were no longer faced with the migrant numbers that

5     we were faced with in '16.

6               It was through those discussions that we

7     felt very fortunate that nothing terrible happened

8     based on creating space that was not designed to hold

9     people.

10         Q.    And did you rely on any documentation, data

11    in reaching these conclusions?

12         A.    We relied on our knowledge of what was a

13    safe condition to hold people in and not.

14         Q.    You talked a little bit earlier with

15    Mr. Medlock about the MCAT reports?

16         A.    Yes.

17         Q.    Did you undertake any activity to ascertain

18    whether the metering guidance you issued was being

19    implemented in a manner that was solely tied to

20    operational capacity at specific ports of entry?

21         A.    I'm not sure I understand the question.

22         Q.    The metering guidance, I believe you



Page 325

1    testified provided discretion to the port directors to

2    implement it as they deemed appropriate based on

3    capacity concerns, correct?

4         A.    Correct.

5         Q.    An individual port director might exercise

6    that discretion appropriately by limiting -- what you

7    would view I believe as appropriately by metering

8    migrants because the port was truly at its operational

9    capacity limit?

10        A.    Correct.

11        Q.    A port director might exercise that

12   discretion inappropriately by limiting migrants more

13   than is necessary due to capacity constraints at a

14   port, correct?

15        A.    Understood.

16        Q.    Did you ever undertake any sort of

17   oversight or analysis to ascertain whether port

18   directors were implementing the guidance in the first

19   form and not in the second form that I just discussed?

20        A.    Not at my level.  The four directors of

21   field operations have that responsibility to directly

22   oversee the day-to-day operations at their ports.  It

