JOSEPH H. HUNT
Assistant Attorney General, Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ARI NAZAROV (CT 414491)
DHRUMAN Y. SAMPAT (NJ 270892018)
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **Exhibit 27 to Defendants' Opposition to Plaintiffs' Motion for Class Certification** |
| Chad F. WOLF, Acting Secretary of Homeland Security, *et al.*, in their official capacities, | |
| *Defendants* | |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
(San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Kevin K. McALEENAN, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*,<br><br>*Defendants* | Case No. 3:17-cv-02366-BAS-KSC |

## DECLARATION OF MARIZA MARIN

I, Mariza Marin, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am the Assistant Director of Field Operations, San Diego, for U.S. Customs and Border Protection (CBP). I have been in this role since September of 2019.

2. In this capacity, I oversee the planning, directing, and timely execution of Border Security programs and other law enforcement activities in the land, air, and sea environments. I also provide managerial oversight in policy guidance, assure program implementation and compliance, and evaluate program effectiveness throughout CBP's San Diego Field Office. CBP's San Diego Field Office includes five land ports of entry (POEs). Further, I serve as the fourth-line supervisor for CBP's Admissibility Enforcement Units (AEUs) and Criminal Enforcement Units at the San Ysidro, Otay Mesa, and Calexico POEs. I have particularly detailed firsthand knowledge of operations of the AEU at the San Ysidro POE.

3. Prior to my current position, I held the position of the Assistant Port Director for Passenger Operations for the Otay Mesa POE since July of 2019; of Supervisory CBP Officer, Watch Commander, at the San Ysidro POE, since February of 2016, and as Supervisory CBP Officer at the San Ysidro POE since February of 2014. I have been employed by CBP since 2008.

1

4. I make this declaration to explain the factors relevant to determining the capacity of the San Ysidro and Otay Mesa POEs to process aliens without documents sufficient for lawful entry to the United States.

5. As an initial matter, it is impossible to state "the" capacity of the San Ysidro and Otay Mesa POEs to process aliens without documents sufficient for lawful entry to the United States.

6. The capacity of the San Ysidro and Otay Mesa POEs to process aliens without documents sufficient for lawful entry to the United States is dependent, *inter alia*, upon there being space in the short-term hold rooms at each of those respective ports to hold such aliens pending their transfer to U.S. Immigration and Customs Enforcement (ICE), the U.S. Department of Health and Human Services (HHS), or another federal agency. The short-term hold rooms at the San Ysidro POE are located within that POE's AEU, and have an aggregate designated capacity of approximately 300. The short-term hold rooms at the Otay Mesa POE located with that POE's AEU, and have an aggregate designated capacity of approximately 50. However, these short-term hold rooms are not used solely to hold individuals without documents sufficient for lawful entry to the United States. At the San Ysidro POE, for instance, these short-term hold rooms are used to detain *all* inadmissible and deportable aliens pending their processing and, where appropriate, their transfer to ICE, HHS, or other federal agencies, as well as all individuals subject to criminal prosecution awaiting transfer to the custody of third-party federal or state agencies. Thus, the number of individuals in CBP custody at the San Ysidro and Otay Mesa POEs impacts the space that OFO has at each of those POEs to process additional individuals without documents sufficient for lawful entry.

7. While the designated capacity of these short-term hold rooms generally sets an upper ceiling for CBP's holding capacity purposes, CBP's actual capacity to hold individuals in its short-term hold rooms at the San Ysidro and Otay Mesa POEs is generally lower than the designated capacity at any given time. CBP's actual capacity to hold individuals in its short-term hold rooms at the San Ysidro and Otay Mesa POEs is impacted by various factors. Many of those factors are fluid; many are out of CBP's control; and many cannot be planned for in advance.

8. The preeminent factor affecting capacity in CBP's short-term hold rooms at the San Ysidro and Otay Mesa POEs is throughput. CBP policy provides that detainees generally should not be held longer than 72 hours in CBP's short-term hold rooms. Heeding this policy, CBP

2

attempts to process all persons in CBP custody as expeditiously as possible, and to facilitate their transfer to another agency, as appropriate, without negating the Agency's overall mission or compromising the safety of individuals within its custody. However, CBP does not have control over the speed at which third-party federal and state agencies assume custody of detainees. That speed directly impacts whether CBP has space to process additional individuals who are subject to detention. Depending on third-party agencies' movement of individuals, or lack thereof, CBP's short-term hold rooms may remain at or near capacity even without CBP processing additional individuals.

9. CBP's short-term hold rooms were not intended to be used for long-term detentions. As in-custody times increase due to factors beyond CBP's control, CBP may deem it necessary to take steps to manage the flow of aliens without documents sufficient for lawful entry into the port of entry, in order to ensure that the short-term hold rooms remain safe and sanitary for those already in custody.

10. Additionally, the capacity of CBP's short-term hold rooms is impacted by the characteristics and demographics of individuals being detained. For example, CBP generally makes efforts to keep family units together in its short-term hold rooms. However, the demographics of a particular family unit may impact the amount of space that CBP has for other individuals. A family unit consisting of a father and a 5-year old son cannot, in general, be held with a family unit consisting of a mother and a 5-year old daughter, as CBP policy requires that adult males and females be held separately. Thus, each family unit would generally require a short-term hold room all to themselves, unless CBP had another family unit consisting of similar demographics. Additionally, it is CBP policy to hold unaccompanied alien children (UACs) separately from unrelated adults. Accordingly, there may be instances where a short-term hold room is deemed by CBP to be at capacity when it is being utilized by a single UAC or 1 family unit consisting of 2 individuals, regardless of that short-term hold room's designated holding capacity. Similarly, if an individual is determined to be a risk to others, for instance, because s/he has a significant medical condition such as a contagious disease, or a criminal history or known gang affiliations, that individual may require an entire short-term hold room to him/herself.

11. In addition, the capacity of the San Ysidro and Otay Mesa POEs to inspect and process aliens without documents sufficient for lawful entry is tied to resource allocations, which are complex and ever-changing. CBP's OFO is the largest component in CBP and is responsible

3

for border security—including anti-terrorism, immigration, anti-smuggling, trade compliance, and agriculture protection—while simultaneously facilitating the lawful trade and travel at U.S. ports of entry that are critical to our Nation's economy. The San Ysidro POE is the busiest land POE in the Western Hemisphere. For fiscal year 2019, through the end of August, the San Ysidro POE processed more than 11 million northbound pedestrians, more than 13 million northbound vehicles, and more than 34 million northbound travelers altogether. The Otay Mesa POE is the busiest commercial POE in California. For the fiscal year 2019, through the end of August, the Otay Mesa POE processed more than $31 billion worth of imported merchandise, more than $16 billion worth of exported merchandise, more than 6 million northbound vehicles, more than 3 million northbound pedestrians, and nearly 15 million travelers altogether. OFO managers at the San Ysidro and Otay Mesa POEs must account for the magnitude and diversity of operations at each of these POEs, and strategically allocate, and at times, re-allocate finite resources to ensure that mission needs, initiatives, and priorities are met.

12. I have reviewed pertinent records from the San Ysidro POE's AEU for July 1 and 2, 2019. I offer that information here to illustrate why the San Ysidro POE may be limited in its ability to process aliens without documents sufficient for lawful entry to the United States on any given day.

  a. The San Ysidro AEU Custody Log reflects that, as of 6 a.m. on July 1, 2019, the San Ysidro POE had 300 individuals in the short-term hold rooms at that POE's AEU.

  b. The San Ysidro AEU Custody Log reflects that, of those 300 individuals, there were 15 individuals who were part of 6 family units. In 1 of those family units, at least one of the family members had active chicken pox, and therefore, that family unit needed their own short-term hold room for the entirety of their time in CBP custody, to avoid exposing other individuals to contagious medical condition. Another one of those family units was comprised of a father and his 7-year old daughter. Because there were no similarly configured family units in custody at that time, that family unit would have required their own short-term hold room at that time and potentially for the entirety of their time in CBP custody. Another three individuals were pregnant females would not have been placed in short-term hold rooms with single detainees.

  c. The San Ysidro AEU Custody Log reflects that, of those 300 individuals, 265 individuals (approximately 85%) were in CBP's custody longer than 72 hours; 177

4

individuals (approximately 57%) had been CBP's custody for over 10 days; 133 individuals (approximately 43%) had been in CBP's custody for over 15 days; and 76 individuals (approximately 25%) had been in CBP's custody for 20 days or longer. The prolonged time that the majority of these individuals had spent in CBP custody reflects an overall lack of significant movement of individuals to the custody of third-party agencies in the weeks preceding July 1, 2019.

   d. On July 1, 2019, a total of 61 individuals were moved from CBP's custody at the San Ysidro POE.

   e. On July 1, 2019, the San Ysidro POE processed an additional 28 individuals from the queue.

   f. The San Ysidro AEU Custody Log reflects that, as of 6 a.m. on July 2, 2019, the San Ysidro POE had 285 individuals in custody in the short-term hold rooms at that POE's AEU.

   g. The San Ysidro AEU Custody Log reflects that, of those 285 individuals, there were 30 individuals who were part of 9 family units.

   h. The San Ysidro AEU Custody Log reflects that, of those 285 individuals, 237 individuals (approximately 83%) were in CBP's custody for over 72 hours; 171 individuals (approximately 60%) had been CBP's custody for over 10 days; 112 individuals (approximately 39%) had been in CBP's custody for over 15 days; and 51 individuals (approximately 18%) had been in CBP's custody for 20 days or longer.

   i. In addition to the foregoing data, I note that OFO at the San Ysidro POE would have had additional individuals in custody between 6 a.m. on July 1, 2019 and 6 a.m. on July 2, 2019. To illustrate, in the afternoon of July 1, 2019, OFO at the San Ysidro POE could have apprehended an individual for whom there was an outstanding warrant of arrest. That individual could have spent just a few hours in OFO custody at the San Ysidro POE before being picked up by the prosecuting federal or state agency. That individual's time in custody at the San Ysidro POE would not have been reflected in the records that I reviewed to make this declaration.

13. Even if OFO at the San Ysidro POE were to fashion new measures to increase its capacity to process aliens without documents sufficient for lawful entry, in all likelihood, OFO at the San Ysidro POE would reach its new, increased designated holding capacity almost

5

immediately and then need to continue metering the flow of aliens without documents sufficient for lawful entry.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 9th day of October, 2019.

_____
Mariza Marin
Assistant Director Border Security
San Diego Field Office
Office of Field Operations
U.S. Customs and Border Protection

6