JOSEPH H. HUNT
Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV (CT 414491)
DHRUMAN Y. SAMPAT
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation – District
Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' RESPONSE IN SUPPORT OF PLAINTIFFS' MOTION TO SEAL PORTIONS OF PLAINTIFFS' PROVISIONAL CLASS CERTIFICATION REPLY PAPERS [ECF No. 378]** |
| CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | |

Defendants hereby respond in support of Plaintiffs' Motion to Seal Portions of Plaintiffs' Provisional Class Certification Reply Papers (ECF No. 378) to provide additional reasons for sealing the confidential documents and testimony that were attached to and referenced in Plaintiffs' Provisional Class Certification Reply (ECF No. 380). There are compelling reasons to seal these exhibits and testimony, as well as any portions of the parties' briefs that rely on them.  The sensitive law enforcement information and communications that Defendants are seeking to seal includes information about operations of land ports of entry that expose vulnerabilities of those ports. Public release of such information will also have a chilling effect on open communications within the government and with foreign governments and would further compromise the ports' operations and expose ports to higher risk of criminal activity—such as drug and weapons trafficking—which in turn would threaten the public health and safety of the United States.  These documents also contain sensitive and confidential information concerning witnesses and law enforcement personnel, disclosure of which would compromise those witnesses' and employees' privacy interests and could lead to threats, intimidation, or harassment.

## **BACKGROUND**

Plaintiffs filed a Reply in Support of their Motion for Provisional Class Certification on December 20, 2019. ECF No. 380 ("ACA Class Certification Reply") The Reply relied on documents that the parties designated as "Confidential" or "Highly Confidential – Attorneys' Eyes Only" and are protected from disclosure under the Protective Order (ECF No. 276).  On the same date, Plaintiffs moved to seal those exhibits and the portions of their brief that contained this confidential information.  ECF No. 378 ("Motion to Seal").  Although the Court has since denied the underlying Motion for a class-wide Temporary Restraining Order for which Plaintiffs sought provisional class certification, *see* ECF No. 382, the Motion to Seal remains pending.

For the reasons described below, Defendants provide additional support for

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

the request that the Court allow the following ACA Class Certification Reply exhibits, or portions thereof, and the portions of the parties' briefing that discuss them, to be filed under seal to prevent public disclosure of information that could be used to circumvent or otherwise compromise law enforcement operations, threaten the safety of witnesses and employees, and threaten the integrity and security of ports of entry into the United States:

1) An annotated version of a June 5, 2018 Memorandum regarding Prioritization-Based Queue Management bearing the Bates numbers AOL-DEF-00041455-57 (ACA Class Certification Reply Exhibit 1);

2) Portions of the transcript of the December 13, 2019 deposition of Todd Owen, Executive Assistant Commissioner of U.S. Customs and Border Protection (ACA Class Certification Reply Exhibit 2)[1];

3) A July 9, 2018 email chain regarding Queue Management, bearing the Bates numbers AOL-DEF-00274915-16 (ACA Class Certification Reply Exhibit 3);

4) An October 25, 2018 Field Queue Management Report, bearing the Bates numbers AOL-DEF-00277740-43 (ACA Class Certification Reply Exhibit 4);

5) Portions of the transcript of the November 21, 2019 deposition of a U.S. Customs and Border Protection Officer (ACA Class Certification Reply

---

[1] The entirety of the deposition transcript was treated as confidential during the 30-day period following its receipt. Protective Order ¶ V(B)(2)(b). Plaintiffs filed their Motion to Seal before that 30-day period had expired. Defendants have since reviewed the transcript and have designated only certain portions of that transcript as Protected Material that Defendants seek to retain under seal. Defendants attach hereto as Exhibit 1 a table that sets forth the specific excerpts of the transcript that Defendants are seeking to seal.

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

Exhibit 5)[2];

6)    A July 3, 2018 email and related metadata, bearing the Bates numbers AOL-DEF-00205672-74 (ACA Class Certification Reply Exhibits 8 and 9);

7)    A November 22, 2016 email, bearing the Bates numbers AOL-DEF-00022783 (ACA Class Certification Reply Exhibit 10);

8)    An April 28, 2018 email, bearing the Bates number AOL-DEF-00566881 (ACA Class Certification Reply Exhibit 11).

## ARGUMENT

### A. Legal Standards

Although there is "a general right to inspect and copy public records and documents," *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), a party may still overcome the presumption of access. *Heldt v. Guardian Life Ins. Co. of America*, No. 16-cv-885, 2018 WL 5920029, at *1 (S.D. Cal. Nov. 13, 2018). The presumption of access is "based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). Thus, when the documents to be protected are "more than tangentially related to the merits," parties must show compelling reasons to keep those documents sealed. *Heldt*, 2018 WL 5920029 at *1 (quoting *Ctr. for Auto Safety*, 809 F.3d 1092, 1096–98); *see also McCurley v. Royal Seas Cruises, Inc.*, No. 17-cv-296, 2018 WL 3629945, at *2 (S.D. Cal. July 31, 2018). Compelling reasons include "when [] 'court files might [] become a vehicle for improper purposes,' such as the use of records to gratify private

---

[2] Plaintiffs filed a redacted version of this transcript on the public docket in accordance with Defendants' confidentiality designations.

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

spite, promote public scandal, circulate libelous statements, or release trade secrets."
*Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). "In
certain circumstances, courts have allowed the *government* to file under seal material
that contains confidential and sensitive government information that might endanger
or undermine law enforcement's activities . . . where the government identifies the
particular harm that may result from the specific disclosure." *Music Grp. Macao
Commercial Offshore Ltd. v. Foote*, No. 14-CV-03078-JSC, 2015 WL 3993147, at
*3 (N.D. Cal. June 30, 2015) (internal citations omitted; emphasis in original); *see
Hesterberg v. United States*, No. C-13-01265 JSC, 2013 WL 6057068, at *2 (N.D.
Cal. Nov. 15, 2013) (finding compelling reasons to seal portions of documents that
could "empower criminal suspects who come in contact with . . . officers because
they will be able to predict the officer's actions."). As shown below, Defendants'
request to file law-enforcement-sensitive materials under seal satisfies the "compel-
ling reasons" standard. Defendants have provided specific information regarding
the harm that could occur if the information is disclosed. *See Am. Auto. Ass'n of N.
California, Nevada & Utah v. Gen. Motors LLC*, No. 17-CV-03874-LHK, 2019 WL
1206748, at *1 (N.D. Cal. Mar. 14, 2019). The public interest in the information at
issue is far outweighed by the interest in confidentiality. *See Pintos v. Pac. Creditors
Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010). Indeed, the public interest in judicial ac-
countability is minimal here, because the Court did not address Plaintiffs' Motion
for Provisional Class Certification at all, having denied the related motion for tem-
porary injunctive relief without reference to the ACA Class Certification Reply Ex-
hibits. The presumption of access only applies to "materials on which a court relies
in determining the litigants' substantive rights." *See United States v. Kravets*, 706
F.3d 47, 54 (1st Cir. 2013) (cited with approval in *Ctr. for Auto Safety*, 809 F.3d at
1100); *see also Network Appliance v. Sun Microsystems Inc.*, No. 07-v-006053, 2010
WL 841274, at *2 (N.D. Cal. Mar. 10, 2010) ("[T]he public interest in understanding
the judicial system would appear to be less where, as here, the documents in question

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

are irrelevant to the Court's decision.").

**B. The Risk to Port and Border Security Constitutes a Compelling Reason to Seal the October 25, 2018 Field Queue Management Report and Any Similar Information Concerning Port Capacity and Operations.**

The Court should seal the October 25, 2018 Field Queue Management Report (ACA Class Certification Reply Exhibit 4) because it provides detailed operational information about ports of entry that could allow hostile actors to exploit resource or operational vulnerabilities. As set forth in the attached Declaration of Randy Howe, former Executive Director for Operations, Office of Field Operations (OFO) ("Howe Declaration"), attached hereto as Exhibit 2, there are compelling reasons to seal the Field Queue Management Report, as well as any portions of the parties' briefs that rely on it. OFO's Field Queue Management Reports "compile data from the OFO Field Offices on the southwest border." Howe Decl. ¶ 6. The Reports "are provided on a daily basis to OFO and CBP leadership and provide raw data points on a number of factors that impact the operations of southwest border ports of entry." *Id.* The sensitive nature of this law enforcement information warrants filing these documents under seal. *Cf. Motley v. City of Fresno*, No. 15-cv-905, 2016 WL 1060144, at *2 (E.D. Cal. Mar. 17, 2016) (court should evaluate the specific facts of the law enforcement sensitive document to determine whether it should be sealed); *see BofI Fed. Bank v. Erhart*, No. 15CV2353 BAS (NLS), 2016 WL 4150983, at *2 (S.D. Cal. Aug. 5, 2016) (same). As explained in the Howe Declaration, the Queue Management Reports "are generated strictly for internal CBP and DHS use, and are used for maintaining awareness of any resource or operational vulnerabilities at the various ports of entry (POEs) along the southwest border." Howe Decl. ¶ 6.

"The main operational vulnerabilities or resource constraints that these Queue Management reports highlight is the total number of individuals in custody at a particular port, as well as the percentage of total holding capacity that port has reached

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

based on the number of individuals in custody." *Id.* ¶ 7. This information is important for CBP leadership to know because "high numbers of individuals in custody may be caused by any number of factors, such as changes in migrant flows that need to be monitored; potential difficulties in transferring individuals out of CBP custody, which may need to be addressed with CBP's interagency partners; or other operational or resource issues that may require action. *Id.*

In addition, "this information may also reveal operational vulnerabilities or weaknesses that could be exploited if released publicly. While the number of individuals in custody at a particular port of entry is not the only factor affecting a port's total capacity to process individuals, it impacts how a port of entry manages its resources." *Id.* ¶ 8. For example, "if a port has a high number of individuals in custody, or if individuals in custody have been held for an extended period of time, port management may need to reallocate staffing and other resources towards addressing these capacity issues." *Id.* ¶ 9. This involves "addressing the needs of individuals in custody, and attempting to move those individuals out of the POE." *Id.* Specifically:

> [I]f a port has a high number of individuals in custody, officers at the port must devote significant time and energy towards ensuring that these individuals have adequate food and water, and are housed in sanitary conditions. OFO policy requires that officers conduct welfare checks at regular intervals for individuals in custody. Officers must also provide individuals in custody with meals and snacks, as well as ensure that any children are adequately supervised. Additionally, if a port is operating at a high capacity, or if individuals have been in custody for a long period of time, officers must work to transfer these individuals out of CBP custody, by working with U.S. Immigration and Customs Enforcement (ICE), the U.S. Department of Health and Human Services (HHS), and other partners, to secure transportation.

*Id.* ¶ 9. "[A]ddressing the needs of individuals in custody, and attempting to move those individuals out of the POE, takes officers away from other inspection and en-

6

forcement duties including detecting and seizing drug[s] and other contraband." *Id.* As a result, "the port [is] more vulnerable to outside threats such as drugs, weapons, contraband, and individuals attempting to enter the port without inspection, such as by running through vehicle lanes." *Id.*

As "most of the cocaine, heroin, foreign-produced marijuana, and foreign-produced methamphetamine available in the United States enters through the southwest border," the American people are also more vulnerable to drugs if the port is susceptible to this threat. *Id.* One drug in particular, "[f]entanyl . . . is difficult to detect, as it is easily concealed in small packages and other small compartments." *Id.* When "a port has fewer individuals in custody, the port will be able to allocate more resources towards other mission sets, such as seizing drugs, weapons, and other contraband." *Id.* ¶ 10.

For these reasons, "publicly releasing port-level capacity data, especially covering a period of several days or weeks, would provide outside entities with a picture of when certain entities are operating below, at, or above capacity[], and thus how resources may be allocated at those ports." *Id.* ¶ 11. Taken together, "[t]his data, combined with other publicly available data, such as seasonal migration trends and the number of individuals encountered or found inadmissible in certain areas, could be exploited by DTOs, TCOs, and other hostile actors." *Id.* In particular, "if a TCO or smuggling organization had knowledge that a particular port consistently operated at or above capacity for a period of several days or several weeks, the TCO or smuggling organization could utilize that information, along with other information in its possession or gleaned from other sources, to develop a picture of when the port's resources may be strained, and reallocate its own resources to exploit this vulnerability." *Id.* Likewise, "if a TCO or smuggling organization had knowledge that a particular port consistently operated *below* capacity for a period of time, the TCO or smuggling organization cold reallocate its own resources towards *creating* capacity constraints at that particular POE." *Id.*

For example, "if a TCO gained knowledge that a particular port was operating at capacity during a certain month of the year, or during certain days in the month, the TCO could specifically wait until that period of time to send additional levels of drugs or other contraband to that port, or by instructing a group of individuals to enter without inspection, such as by running through the vehicle lanes." *Id.* ¶ 12. Specifically, "if a TCO had knowledge that a particular POE had been operating at 30% of its capacity for two weeks, it could further harm port operations by instructing a large group of individuals to attempt to enter without inspection." *Id.* Similarly, "if a smuggling organization had knowledge that a particular POE had been operating at 30% of its capacity for two weeks, it could [] instruct a large group to enter without inspection, creating a diversion of OFO resources towards that group, and away from other priority missions." *Id.*

Accordingly, public disclosure of the Field Queue Management Reports, or any other specific information about a port's capacity and operations, would release details about the operations of ports of entry that could compromise border security. This risk of harm caused by the release of these details is an even more significant interest than store security and employee safety, which was enough for the Court to seal documents in *Bell v. Home Depot USA, Inc.*, No. 12-cv-02499, 2015 WL 6082460, at *2 (E.D. Cal. Oct. 15, 2015). In *Bell*, the court stated: "the Security SOPs sought to be sealed contain Home Depot's security protocols in opening and closing its stores, the disclosure of which could threaten its stores' security and its employees' safety." *Bell*, 2015 WL 6082460, at *2 (comparing *In re Google Inc. Gmail Litigation*, No. 13–MD–02430–LHK, 2013 WL 5366963, at *3 (N.D. Cal. Sept. 25, 2013)). Similarly, here, the information sought to be sealed involves information regarding the southwest border of the United States which "could irreparably harm" the mission of CBP along the southwest border of the United States and threaten public health and safety, by allowing increased drug and weapons trafficking. *See Bell*, 2015 WL 6082460, at *1.

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

For these reasons, the Court should seal the Field Queue Management Report and the portions of the parties' briefs that rely on it.

### C. The Risk to Port and Border Security and the Potential Chilling Effect on Agency Operations and International Relations with Mexico Constitute Compelling Reasons to Seal Information Discussed During the Deposition of Executive Assistant Commissioner Todd Owen.

The Court should seal the designated portions of Todd Owen's deposition testimony (ACA Class Certification Reply Exhibit 1).[3]  Since 2015, Todd Owen has been the Executive Assistant Commissioner, Office of Field Operations ("OFO"), U.S. Customs and Border Protection ("CBP"), U.S. Department of Homeland Security ("DHS"). *See* Declaration of Todd C. Owen (Jan. 29, 2020) ("Owen Decl."), attached as Exhibit 3. During his December 13, 2019 deposition, Mr. Owen testified about various sensitive topics, including CBP's cooperation and communications with the government of Mexico, field queue management reports, and other operational details. *E.g.*, Owen Decl. ¶¶ 6; Owen Deposition Tr. 126:1-22; 127:1-8; 127:13-15; 128:16-22; 129:1-22; 130:1-19; 131:15-22; 132:1-8; 132:13-15. Public release of this deposition testimony could have a chilling effect on open communication with Mexico about shared law enforcement operations and could cause injury by allowing bad actors such as smugglers and terrorists to modify their behavior to avoid detection by U.S. and Mexican authorities.  *See United States ex rel. Kelly v. Serco, Inc.*, No. 11-cv-2975, 2014 WL 12675246, at *4 (S.D. Cal. Dec. 22, 2014) (granting the defendant's motion to seal various documents designated "For Official Use Only" by the United States Government because "national security interests are

---

[3] The confidential portions of the Owen deposition were placed on the public docket in the pending Ninth Circuit appeal, due to the inadvertent failure of Defendants' counsel to move to seal before a 21-day provisional seal expired, but Defendants have moved to re-seal those portions of the deposition.  *See Al Otro Lado v. Wolf*, No. 19-56417, Dkt. 33, 54, 72 [under seal].

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

a compelling reason for filing documents under seal"); *McQuilliams v. Int'l Auto Logistics, LLC*, No. 2:14-CV-124, 2016 WL 4257362, at *1 (S.D. Ga. Aug. 11, 2016) (granting the parties' joint motions to file under seal where the parties "established that sealing these records is necessary to protect Defendant's proprietary information and information that implicates national security interests"); *Motley v. City of Fresno*, No. 15-cv-905, 2016 WL 1060144, at *2 (E.D. Cal. Mar. 17, 2016) (court should evaluate the specific facts of the law enforcement sensitive document to determine whether it should be sealed); *see BofI Fed. Bank v. Erhart*, No. 15CV2353 BAS (NLS), 2016 WL 4150983, at *2 (S.D. Cal. Aug. 5, 2016) (same).

For example, during his deposition, Mr. Owen discussed regularly scheduled meetings that occur in a sensitive compartmented information facility ("SCIF"). Owen Decl. ¶ 4; Owen Dep. Tr. 28:21-22; 29:1-5; 40:5-22; 42:2-4; 43:7-9; 45:20-22; 46:9-14; 47:5-8; 47:19-22; 48:1-4; 48:17-21. A SCIF is a room designed and constructed to prevent outside access to the information being discussed. Owen Decl. ¶ 4. SCIFs are used by law enforcement, military, and the intelligence and national security communities to hold meetings when sensitive compartmented information (SCI) is discussed. *Id.* SCI is a type of classified information derived from sensitive intelligence sources, methods, and/or analytical processes. *Id.* Mr. Owen further writes that provided detailed information regarding the timing and attendance of regularly scheduled intelligence briefings at the SCIF. Owen Decl. ¶ 5. With this knowledge, bad actors could target senior CBP leadership at a specific location, date, and time. *Id.*

Furthermore, Mr. Owen testified regarding CBP communications with officials from the Government of Mexico. Owen Decl. ¶ 6; Owen Dep. Tr. 126:1-22; 127:1-8; 127:13-15; 128:16-22; 129:1-22; 130:1-19; 131:15-22; 132:1-8; 132:13-15; 219:1-12. Here, disclosure of the information obtained via those communications could have a chilling effect on the willingness of officials in both countries to have open, honest, and frank discussions regarding important security and border

10

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

issues important to both countries.  Owen Decl. ¶¶ 6, 11-12.

Disclosure of Mr. Owen's testimony regarding field queue management reports should be sealed for the reasons discussed in Part B above. *See* Exhibit 1 (listing testimony concerning field queue management reports, including but not limited to transcript pages 84:1-22, 85:1-7, and 88:1-22).

For these reasons, the Court should seal the confidential portions of Mr. Owen's testimony and the portions of the parties' briefs that rely on it.

### D. Risks to Port and Border Security and the Potential Chilling Effect on Internal Communications Constitute Compelling Reasons to Seal Internal Operational Emails and Documents.

Likewise, the Court should seal internal CBP emails that discuss operational information and decision points about metering implementation and/or information-gathering techniques, such as the November 22, 2016 email chain, the April 28, 2018 email, the July 3, 2018 email and metadata, the July 9, 2018 email, and the annotated queue management memo (ACA Class Certification Reply Exhibits 10, 11, 8, 9, 3, and 1).  Public disclosure of such emails would compromise port operations and have an adverse effect on operational decisionmaking.  The November 22, 2016 email discusses specific facts regarding metering implementation at various ports, ports' operational readiness, and ports' cooperation with the government of Mexico, would compromise port operations and have an adverse effect on operational decisionmaking.  Owen Decl. ¶¶ 7-9.[4]  Revealing the specific discretionary decisions made by CBP officials regarding the implementation of metering would permit outside entities to second-guess those discretionary decisions, which are made in a fluid operational environment.  Owen Decl. ¶ 8. Public scrutiny of each fluid decision may negatively influence officials' future decisionmaking and prevent them from making the best operational decisions.  *Id.* ¶ 9.  Further, public disclosure would

---

[4] This November 22, 2016 email chain contains the same email as in Exhibit 34 to the Owen Deposition, which is discussed in the Owen Declaration.

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

have a chilling effect on OFO officials' open communication about operational vulnerabilities and decisions. Owen Decl. ¶ 10. Yet open and honest communication is critical to ensuring that OFO consistently makes decisions that are sound from an operational, legal, and policy perspective. *Id.* Public disclosure of such frank communications could have a chilling effect on OFOs' willingness to share information could limit the agency's ability to assess and make changes to ongoing operations. *Id.*

Further, disclosure of the information contained in the November 22, 2016 email about efforts taken by the Mexican government to manage the flow of travel across its borders would have a chilling effect on information-sharing and cooperation between the two nations. Owen Decl. ¶ 11. For instance, United States and Mexico regularly share information about ongoing law enforcement efforts and activities in Mexico and the United States, issues of particular note to both countries, cross-border safety or security threats, and migration trends. *Id.* The ports also regularly share logistical information related to cross-border traffic, such as vehicle wait times, computer outages or other issues impacting processing times, as well as infrastructure and other facilities issues. Owen Decl. ¶ 11. Accordingly, it is of critical importance that both OFO and their Mexican counterparts are able to share all relevant information in a frank, open, and honest manner, as it is critical that both OFO and the Mexican government have a full understanding of the operational picture on both sides of the border. Owen Decl. ¶ 11. Accordingly, officials from both countries must be able to share complete and accurate information, including personal opinions, at a sufficiently granular level, to ensure that both governments have sufficient information to make decisions in a fast-moving, often fluid environment. Owen Decl. ¶ 12. Disclosure of this information to the public, especially without any context for how the information was obtained or developed, could have a chilling effect on the willingness of officials in both countries to have open, honest, and frank discussions in the future, and on the willingness to share complete and

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

1  accurate information.  Owen Decl. ¶ 12.

2      These same concerns animate Defendants' request to seal similar information

3  contained in the April 28, 2018, and July 9, 2018 email. The July 9, 2018 email

4  (AOL-DEF-000274915-16) demonstrates ongoing agency evaluation of operations

5  and policy decisions, disclosure of which would compromise port operations and

6  have an adverse effect on operational decisionmaking.  *See* Owen Decl. ¶¶ 7-9.  The

7  April 28, 2018 email (AOL-DEF-0056881) reveals operational details about opera-

8  tions at the Roma port of entry, disclosure of which would reveal the specific dis-

9  cretionary decisions made by CBP officials regarding the implementation of meter-

10  ing and permit outside entities to second-guess those discretionary decisions made

11  in a fluid operational environment.  *See* Owen Decl. ¶ 8. Public scrutiny of each fluid

12  decision may negatively influence officials' future decisionmaking and prevent them

13  from making the best operational decisions.  *Id.* ¶ 9.  Further, public disclosure of

14  such communications about operational decisionmaking would have a chilling effect

15  on OFO officials' open communication about operational vulnerabilities and deci-

16  sions.  *Id.* ¶ 10.  Somewhat similarly, the annotated and highlighted version of the

17  June 5, 2018 Prioritization-Based Queue Management Memorandum that is attached

18  to Plaintiffs' ACA Class Certification Reply (ACA Class Certification Reply Exhibit

19  1)—the underlying memo is not confidential— reveals an individual agency em-

20  ployee's thought processes concerning the memo, disclosure of which would tend to

21  discourage frank discussion and assessments.

22      Likewise, public disclosure of the July 3, 2018 email and related metadata

23  (ACA Class Certification Exhibits 8 and 9) would similarly have a chilling effect on

24  communication and investigations and compromise CBP's ability to gather infor-

25  mation as part of its law enforcement operations.  As explained in the Declaration of

26  Johnny L. Armijo, CBP Assistant Director of Field Operations, San Diego, this doc-

27  ument is an email he received on July 3, 2018, from Program Manager of the SDFO's

28  former Tactical Analytical Unit ("TAU").  *See* Declaration of Johnny L. Armijo ¶ 8

13

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

(Feb. 3, 2020) ("Armijo Decl."), attached hereto as Exhibit 4. [5]  In the email, the Program Manager provided information that he gathered from the San Ysidro's POE's Admissibility Enforcement Unit ("AEU") about aliens' views on the U.S. Department of Justice's Zero-Tolerance Policy for Criminal Illegal Entry and CBP's use of metering or queue management; described the methodology by which he gathered that information; and assessed that information. *Id*. Public disclosure of the email would cause a substantial chilling effect and impede CBP's law enforcement operations. *Id*. Mr. Armijo depends upon his subordinates—and especially those assigned to specialty units such as the Intelligence Targeting Units, the Integrated Border Intelligence Group, and the former TAU—to relay sensitive and/or confidential information to him in a full and frank manner, just as was done in this email. *Id*. That line of communication, he indicates, plays a critical role in his ability to assess operational vulnerabilities, ensure sound operational decisions, and plan for contingencies. *Id*. Further, this is of heightened significance when the information conveyed pertains to the San Ysidro POE, given the magnitude of that port's operations. Armijo Decl. ¶ 8. Mr. Armijo concludes that because the email details the techniques that were used, "public disclosure of the email would impede the SDFO's Integrated Border Intelligence Group, the SDFO's Intelligence Targeting Units, the SDFO itself, and CBP nationwide['s] ability to effectively collect similar information using a like and similar methodology in the future." *Id*.

For these reasons, the Court should seal these internal communications and assessments and the portions of the parties' briefs that rely on them.

---

[5] This July 3, 2018 email is the same email as the email in Exhibit 47 to the Owen Deposition that is discussed in the Armijo Declaration.

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

### E. Important Public Policy Considerations and the Risk to Port and Border Security Constitute Compelling Reasons to Seal Portions of the Whistleblower's Deposition Transcript.

The Court should also seal portions of the deposition transcript of the CBP Officer who reported information that led an investigation by the Department of Homeland Security Office of the Inspector General (DHS OIG) (ACA Class Certification Reply Exhibit 5). First, it is important to seal the identifying information of the whistleblower and other witnesses, which is contained in that deposition transcript. *See, e.g.*, Exhibit 5 (identifying portions of the deposition transcript that reveal identities of CBP employees, witnesses, and the whistleblower, including but not limited to transcript pages 6:15-17; 18:1-5, 11-25; 19:2; 20:19-23). The Special Master in *Hewlett-Packard Co. S'holder Derivative Litig.* recommended sealing similar whistleblower identifying information in a criminal investigation because "the case law is clear that, while public access to court records is important, some documents are not subject to the public right of access because they have traditionally been kept secret for important policy reasons." *In re Hewlett-Packard Co. S'holder Derivative Litig.*, No. 12-CV-6003, 2015 WL 8570883, at *6 (N.D. Cal. Nov. 18, 2015), *report and recommendation adopted*, No. 12-CV-6003-CRB, 2015 WL 8479543 (N.D. Cal. Dec. 10, 2015), *aff'd*, 716 F. App'x 603 (9th Cir. 2017) (internal citations omitted). The Special Master in *Hewlett-Packard* explained that important public policy considerations including interference with an investigation, "by making the whistleblower a target of intimidation or harassment" was a "compelling reason[]" to seal such information. *Id.* (internal citations omitted). Similar public policy reasons support sealing identifying information regarding witnesses to the whistleblower investigation.

Second, for the reasons discussed in Part B above, the Court should seal any information in this deposition about confidential Field Queue Management Reports

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

or any discussions related to port capacity and security issues. *See* Exhibit 5 (identifying portions of the deposition transcript that reveal information related to queue management reports, including but not limited to transcript pages 108:5-14, 18-20; 109:8-25; 110:1-7, 20-25).

Third, the Court should also seal portions of the transcript attached at Exhibit 1 to Plaintiffs' TRO Motion that reveal or tend to reveal law enforcement techniques and methods. *See* Exhibit 5 (identifying portions of the deposition transcript that reveal information related to law enforcement techniques and methods, including but not limited to transcript pages 37:1-15); *In re Dep't of Investigation of City of N.Y.*, 856 F.2d 481, 484 (2d Cir. 1988). Revelation of these methods could allow others to circumvent those techniques or exploit their knowledge hereof. Thus, it is in the public interest to keep confidential records that "reveal techniques that, if known, could enable criminals to educate themselves about law enforcement methods." *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 777 (9th Cir. 2015) (discussing FOIA exemption for law-enforcement techniques and methods); *see also Bowen v. U.S. Food & Drug Admin.*, 925 F.2d 1225, 1229 (9th Cir. 1991) (same).

For these reasons, the Court should seal the confidential portion of the Gibbons deposition and the portions of the parties' briefs that rely on them.

## F. The Risk to Personal Privacy and Safety of CBP Employees Constitutes A Compelling Reason to Seal Email Addresses and Other Contact Information of CBP Employees in all Documents Sought to Be Sealed.

The Court should also keep sealed the personal and work email addresses and other contact information of CBP employees in all of the above-listed documents. Specifically, Mr. Owen's personal address –put on the record during the deposition – should be sealed because disclosure would allow individuals to invade Mr. Owen and his family's privacy and, if such individuals are bad actors, threaten his safety. Owen Decl. ¶ 3; Owen Dep. Tr. 11:3-10. The Court should also seal the personal

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

and work email addresses and other contact information of CBP employees in all of the above-listed documents. The Court has already permitted the redaction of CBP employees' phone numbers and cell phone numbers based on their privacy interests. ECF No. 332 at 7, 10.

Further, as explained by the Director of Security and Technology Division at CBP's Office of Information Technology, there are genuine security concerns regarding the disclosure of CBP employees' email addresses. *See* Declaration of John Buckly (Feb. 11, 2020) ("Buckley Decl."), attached hereto as Exhibit 6. Dissemination of "the email addresses of CBP employees . . . can create significant cyber security threats to both the individual employee and CBP as a whole." Buckley Decl. ¶ 3. For example, "once an employee's email address is publicized, malicious actors can engage in social engineering to obtain confidential information from that employee" through the "use of deception to manipulate individuals into divulging confidential or personal information that may be used for fraudulent purposes." *Id.* ¶ 4. One form of social engineering, called phishing, involves "sending emails purporting to be from reputable sources with the goal of influencing or gaining personal information such as passwords or financial information." *Id.* ¶ 4.a. Another form of social engineering, called sphear phishing, is "a type of highly targeted phishing attack that focuses on a specific individual or organization." *Id.* ¶ 4.b.

Further, "other cyber security threats can [also] occur once an employee's email address is released to the public." *Id.* ¶ 5. One example of a cyber security attack is a denial of service (DoS) attack. *Id.* ¶ 5.a. "[A] DoS is a security event that happens when an attacker prevents legitimate users from accessing specific computer systems, devices, services or other IT resources[,] [t]he purpose of [which] is to flood servers, systems, or networks with traffic to overwhelm the victim's resources and make it difficult or impossible for legitimate users to access them." *Id.* Another example of a cyber security attack is doxing. *Id.* ¶ 5.b. "[D]oxing occurs when a malicious actor publishes private personal information, usually for purposes

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

of public humiliation, stalking, identity theft, or targeting an individual for harass-ment." *Id.* Swatting is another example of a cyber security attack. *Id.* ¶ 5.c. "[S]wat-ting is a harassment tactic in which a malicious actor deceives emergency services into sending policy or emergency response teams to another person's address." *Id.* Yet another example of a cyber security attack involves ransomeware. *Id.* ¶ 5.d. "[R]ansomeware is malicious software designed to block access to a computer sys-tem until a sum of money is paid." *Id.* Finally, spam emails are another example of a cyber security attack. *Id.* ¶ 5.e. "[S]pamming occurs when disruptive online mes-sages are sent repeatedly[], and "spam emails [] hinder an agency's ability to com-municate with its employees due to the volume of email traffic and strains on the agency's IT capacities." *Id.*

These security threats are not hypothetical. "Cyber attacks against the U.S. are on the rise." Buckley Decl. ¶ 6. A Government Accountability Office report determined "that between 2006 and 2015, cyberattacks involving systems support-ing the federal government increased over 1,300% from 5,500 to over 77,000." *Id.*; *see* GAO-16-501, Information Security: Agencies Need to Improve Controls over Selected High-Impact Systems (May 2016). In fact, "[t]he Office of Personnel Man-agement discovered it was the victim of a cyber attack in April 2015." Buckley Decl. ¶ 6. As a result of this attack, "[h]ackers stole personal information belonging to 21.5 million federal employees and their families, friends, and former employers." *Id.* And these hackers "were able to compromise the entire OPM network by exploit-ing the credentials of one single contractor." *Id.* ¶ 7. It is clear, based on this infor-mation, that "[p]ublication of CBP employees' email addresses therefore poses a substantial risk to the safety and welfare of the individual employee and CBP." *Id.* ¶ 8. It is for this reason that "any documents in this case that contain such infor-mation should be filed under seal and kept confidential." *Id.* Should the Court find that sealing of this information is not warranted, Defendants would ask, "[a]lterna-tively, that the Court . . . permit Defendants to redact email addresses before the

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC

underlying documents are publicly released." *Id.*

Accordingly, the Court should permit the sealing of all information pertaining to employee information and email addresses.

## CONCLUSION

For the compelling reasons discussed above and in Plaintiffs' Motion to Seal Portions of their Provisional Class Certification Reply Papers, the Court should seal the above-listed sensitive documents and portions of the parties' briefs that discuss them. Should this Court find that sealing of the above listed sensitive documents in their entirety is not warranted, Defendants respectfully seek the Court's permission to identify more particular redactions to protect sensitive information from public disclosure.[6]

Dated: February 14, 2020                    Respectfully submitted,

                                            JOSEPH H. HUNT
                                            Assistant Attorney General
                                            Civil Division

                                            WILLIAM C. PEACHEY
                                            Director

                                            */s/ Katherine J. Shinners*
                                            KATHERINE J. SHINNERS
                                            Senior Litigation Counsel
                                            U.S. Department of Justice
                                            Civil Division
                                            Office of Immigration Litigation
                                            District Court Section
                                            P.O. Box 868, Ben Franklin Station
                                            Washington, D.C. 20044
                                            Tel: (202) 598-8259 | Fax: (202) 305-7000

---

[6] In all cases, Defendants seek to redact or seal the personally identifying information of their employees from public disclosure.

DEFS.' RESPONSE IN SUPPORT OF PLS.'
                                            MOT. TO SEAL CLASS CERT. REPLY
                                            Case No. 3:17-cv-02366-BAS-KSC

katherine.j.shinners@usdoj.gov

ALEXANDER J. HALASKA
ARI NAZAROV
DHRUMAN Y. SAMPAT
Trial Attorneys

*Counsel for Defendants*

DEFS.' RESPONSE IN SUPPORT OF PLS.'
MOT. TO SEAL CLASS CERT. REPLY
Case No. 3:17-cv-02366-BAS-KSC