| | |
|---|---|
| 1 | MAYER BROWN LLP |
| |   Matthew H. Marmolejo (CA Bar No. 242964) |
| 2 |   *mmarmolejo@mayerbrown.com* |
| | 350 S. Grand Avenue |
| 3 | 25th Floor |
| | Los Angeles, CA 90071-1503 |
| 4 |   Ori Lev (DC Bar No. 452565) |
| |   (*pro hac vice*) |
| 5 |   *olev@mayerbrown.com* |
| |   Stephen M. Medlock (VA Bar No. 78819) |
| 6 |   (*pro hac vice*) |
| |   *smedlock@mayerbrown.com* |
| 7 | 1999 K Street, N.W. |
| | Washington, D.C. 20006 |
| 8 | Telephone: +1.202.263.3000 |
| | Facsimile: +1.202.263.3300 |
| 9 | |
| | SOUTHERN POVERTY LAW CENTER |
| 10 |   Melissa Crow (DC Bar No. 453487) |
| |   (*pro hac vice*) |
| 11 |   *melissa.crow@splcenter.org* |
| | 1101 17th Street, N.W., Suite 705 |
| 12 | Washington, D.C. 20036 |
| | Telephone: +1.202.355.4471 |
| 13 | Facsimile: +1.404.221.5857 |

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.: 17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | **EX. 23 TO PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION** |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | **Class Member Declaration** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.401.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

## DECLARATION OF M.I.

I, M.I., hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am a national and citizen of Nicaragua. My date of birth is ▇. I am married and I have three children in Nicaragua, they are 1 year old, 4 years old, and 8 years old.

3. I participated in political protest and a work stoppage against the Nicaraguan government. After that, I faced threats of violence from government-aligned paramilitaries. During one protest, hooded paramilitaries confronted me. They told me to stop supporting the marches, showed me firearms, and told me that they were sent by important people in the government. Fearing for my life, in September 2018 I fled Nicaragua to seek political asylum in the United States.

4. I entered Mexico and got a permit to travel in Mexico temporarily. I traveled north through Mexico with a few other Nicaraguan asylum seekers and arrived in Reynosa, Mexico, on Saturday, September 29, 2018. On Tuesday, October 2, 2018 at around 3 or 4 PM, I went to the Reynosa Bridge leading to the U.S. port of entry with a group of six other men from Nicaragua and Honduras seeking asylum. In the middle of the bridge there was a line demarcating the border and a sign that marked the border between the United States and Mexico. There were 3 U.S. officials standing on the U.S. side just over the border. I walked just across the border to the U.S. side of the bridge. One of the U.S. officials, a woman, told me to go back over the Mexican side of the bridge. I told her that I was Nicaraguan and that I wanted to apply for asylum. She told me to move to the side, and I walked back to the Mexican side of the bridge.

5. One of the U.S. officials made a call on the radio and then told us that

"it was full" and that we would have to wait for hours, days, or weeks. They then made a second radio call, and about 3 minutes later, a Mexican immigration official appeared. The Mexican official asked for identity documents from us. We handed our documents to him. He ordered us to follow him back down the bridge to an office on the Mexican side. He gave our documents to another agent and made us wait. One of us tried to make a phone call for help on a cell phone, so they took all of our cell phones from us. They made us wait for over an hour. We heard them making phone calls asking if there was space on the next bus back for us, making us believe that they were going to deport us, even though we had legal permission to temporarily travel in Mexico.

6. The Mexican officials told us we could leave Mexico, but only by going south, not north. The Mexican officials told us we could not go to the United States and it was against the law to be at the bridge. The Mexican officials said they had notified the U.S. officials that we had already tried to cross the bridge. The Mexican officials said that if we tried again, the U.S. officials would immediately notify the Mexican officials and we would be turned over to Mexico and then deported, and our temporary travel permits would be nullified.

7. The Mexican officials eventually let us leave the office later that day. They left us right outside the office which is a dangerous area for migrants in Reynosa. Another Mexican official from the Tamaulipas Migrant Institute, which has an office nearby, saw us outside and came to talk to us. He said it was dangerous for us to be on the street like that. He called the police to have them escort us back to the migrant shelter where we had been staying.

8. I felt vulnerable staying in Reynosa, even more insecure than I felt in my country, where I feared for my life and fled. In Reynosa it felt like the laws were created by and for criminals. For example, there were problems at the Reynosa bus terminal with the Mexican military when we arrived. A Mexican

soldier told us that he could deport us if we wanted to, even though we had permission to travel in Mexico. He asked if we had the "code" to be there, referring to cartel "codes." I told him that we had permits to travel through Mexico. He took 400 pesos from us. He demanded the money with an aggressive tone. There were also problems with a taxi driver who took us to the migrant shelter. He was talking on the phone with many people in the 5 minute ride there. He said into the phone that he was "bringing some immigrants," as if to notify the person on the phone of our whereabouts He charged us each 200 pesos, which was a huge amount of money for a very short ride. We paid out of fear. I was afraid of the cartels in Reynosa. Many people in Reynosa told us that migrants have been kidnapped when they leave the migrant shelter.

9. When I was in Reynosa, I felt trapped in the shelter because it was so dangerous for migrants outside of the shelter. I was also afraid to go back to the Reynosa Bridge to ask for asylum because I was turned away the first time, and it seemed like I would be turned away again based on what happened the first time. I was also afraid to go back to the bridge to seek asylum again because the Mexican officials threatened they would deport me if I did that. I cannot return to my country because my life would be in danger if I went back.

10. Ultimately, about a week after getting rejected at the Reynosa Bridge, I decided to cross the Rio Grande into the United States in order to have the ability to apply for asylum. It was clear to me that it would not be possible to enter the United States at the bridge to seek asylum. With other Nicaraguans in my group, I encountered a delinquent from the cartel. He charged us a lot of money to cross the river, $300 each. We crossed in the middle of the night using an inflatable raft. I worried that I was going to die during the river crossing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 8, 2019, at Pine Prairie, Louisiana.



M.I.

DECLARATION OF ▮

I, ▮, am the individual referred to as M.I. in this action.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 8, 2019, at Pine Prairie, Louisiana.



CERTIFICATION

I, Jarron Brady, declare that I am proficient in the English and Spanish languages.

On January 8, 2019, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 8, 2019, at Pine Prairie, Louisiana

Jarron Brady