FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAR 5 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| AL OTRO LADO, a California corporation; ABIGAIL DOE; BEATRICE DOE; CAROLINA DOE; DINORA DOE; INGRID DOE; JOSE DOE; URSULA DOE; VICTORIA DOE; BIANCA DOE; JUAN DOE; ROBERTO DOE; CESAR DOE; MARIA DOE; EMILIANA DOE, individually and on behalf of all others similarly situated, | No. 19-56417 <br><br> D.C. No. 3:17-cv-02366-BAS-KSC Southern District of California, San Diego <br><br> ORDER |
| Plaintiffs-Appellees, | |
| v. | |
| CHAD F. WOLF, Acting Secretary, US Department of Homeland Security; MARK A. MORGAN, Acting Commissioner of U.S. Customs and Border Protection; TODD C. OWEN, Executive Assistant Commissioner, Office of Field Operations, United States Customs and Border Protection, in his official capacity, | |
| Defendants-Appellants. | |

Before: THOMAS, Chief Judge, and BERZON and BRESS, Circuit Judges.

BERZON, Circuit Judge:

Plaintiff Al Otro Lado is an organization dedicated to helping individuals

seek asylum in the United States. Along with thirteen Individual Plaintiffs

(collectively, "Al Otro Lado"), Al Otro Lado originally challenged in this case the government's policy of turning back asylum seekers at ports of entry on the southern border and telling them to return later to file for asylum, a policy the government refers to as "metering." Al Otro Lado's complaint alleges that asylum seekers are turned back to deter and discourage individuals from seeking access to the asylum process, and not, as the government maintains, because each port of entry lacks capacity to process additional asylum seekers.

The current motion does not directly concern the validity of the policy requiring asylum seekers to wait at or near the border for some time before their asylum applications can be filed and processed. Rather, this motion stems from the impact of a separate regulation, promulgated while this litigation was pending, on a subgroup of metered asylum seekers. That regulation, known variously as the "Third Country Transit Rule," "transit rule," and "asylum ban," ("the Rule"), provides, subject to narrow exceptions, that a noncitizen who "enters, attempts to enter, or arrives in the United States" at the southern border on or after July 16, 2019 is not eligible for asylum in the United States unless they applied for asylum in another country, such as Mexico, that they passed through on their way to the southern border. 8 C.F.R. § 208.13(c)(4).

The district court granted a preliminary injunction enjoining enforcement of the Rule against a provisionally certified class of plaintiffs who arrived at the

southern border seeking asylum before July 16, 2019 but were denied entry and prevented from making an asylum claim under the metering policy. The government appealed and moved this court for a stay of the injunction pending appeal. Because the government has not carried its burden of showing that a stay is warranted, we deny the motion.

## I.

Al Otro Lado's putative class action complaint alleges that Customs and Border Protection ("CBP") uses various unlawful tactics systematically to deny asylum seekers access to the asylum process at Ports of Entry ("POEs") on the southern border. The complaint challenges the Government's so-called "Turnback Policy," which includes a "metering" or "waitlist" system. Under that system, the complaint alleges, asylum seekers who arrive at or near the southern border of the United States are instructed "to wait on the bridge, in the pre-inspection area, or at a shelter," or are simply told that "they [could not] be processed because the POE is 'full' or 'at capacity.'" According to the complaint and Al Otro Lado's expert, under the government's current metering practices, "[w]hen a pedestrian approaches the U.S.-Mexico dividing line" without valid entry documents, CBP officers standing on the international line "often physically block their passage into U.S. territory by standing in the center of the pedestrian walkway."

Al Otro Lado introduced declarations in which asylum seekers from a

diverse set of countries and circumstances reported that they were turned away from the border under this metering policy and told to wait for an opportunity to submit their applications for asylum. Members of the provisionally certified class include Roberto Doe, who fled Nicaragua after the police threatened to kill him and burn down his business for participating in a strike against the government; M.G., a Cuban citizen seeking asylum because he was threatened and punched in the mouth by a political official for calling his government corrupt; and Jordan Doe, who fled Cameroon after his father was burned to death and he was imprisoned and tortured by military officers who accused him of being a separatist. They and the approximately 26,000 other members of the provisionally certified class approached the border to present themselves before July 16, 2019 because they "wanted to do things the right way," but were turned away.

The government does not now keep records of the people CPB officers turn back.[1] But other groups, with the United States government's knowledge and cooperation, have created waitlists. The district court determined that "[d]efendants do not . . . challenge[] that Grupo Beta, a service run by the Mexican

---

[1] Under the initial metering practices instituted around the end of 2016, CBP officials at one POE were instructed "to provide the alien with a piece of paper identifying a date and time for an appointment" "if possible." Although there were several documented instances of migrants being turned back at that time, "[n]one of the asylum seekers turned back from these ports of entry were provided with appointments."

Government's National Institute of Migration, maintains a formalized list of asylum-seekers, communicates with CBP regarding POE capacity, and transports asylum-seekers from the top of the list to CBP." The record also shows that non-profit groups, shelters, and small groups of asylum seekers maintain informal waitlists in different locations. At each POE, CBP asks the list-keeper in the area for a certain number of people each day based on the POE's alleged capacity, and the group then calls the appropriate number of people from the top of its list. The district court concluded that "CBP relied on these lists to facilitate the process of metering," and the record supports that conclusion.

On July 16, 2019, the Department of Homeland Security and the Department of Justice issued a joint interim final rule entitled "Asylum Eligibility and Procedural Modifications." 84 Fed. Reg. 33,829 (July 16, 2019), *codified at* 8 C.F.R. § 208.13(c)(4). In relevant part, the Rule provides:

> (c) Mandatory denials—
>
> (4) Additional limitation on eligibility for asylum. Notwithstanding the provisions of § 208.15, any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:
>
> (i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country.

8 C.F.R. § 208.13(c)(4).[2]

Al Otro Lado moved for a preliminary injunction to prevent enforcement of the Rule against provisional class members. It argued that if the Rule is applied to non-Mexican asylum seekers metered at the border before July 16, 2019, the Rule will long delay their ability to apply for asylum in the United States and, for a large proportion of the class members, could preclude them from accessing any asylum process altogether. This assertion has support in the record. As the district court recognized, "Mexico's Commission to Assist Refugees, the administrative agency responsible for processing asylum claims, requires that applicants for asylum submit their petitions within 30 days of entering Mexico." The district court then summarized the bleak result for plaintiffs:

---

[2] In separate litigation challenging the validity of the Rule, the Supreme Court on September 11, 2019 stayed a district court's preliminary injunction precluding application of the Rule "pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such a writ is sought." *Barr v. E. Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019) (mem.). This court heard argument on December 2, 2019 on the government's appeal of the injunction; the case is presently pending in this court. *E. Bay Sanctuary Covenant v. Barr*, No. 19-16487. We note that the outcome of the *East Bay* appeal could affect whether the issue before us remains a live dispute.

Contrary to the Dissent's suggestion, *see* Dissent at 18–21, the district court's injunction in this case is not precluded by the Supreme Court's stay of the injunction pending appeal in *East Bay*. That stay order, like any other, is not a definitive resolution of the merits, and it involved the substantive validity of the Rule, not application of the Rule, if substantively valid, to the provisionally certified class in the particular circumstances of this case.

[B]ecause the [Rule] was not promulgated until after the time these individuals were subject to metering, none of the members of the putative class attempted to exhaust Mexico's asylum procedures within the 30-day window. In short, should the [Rule] apply to these individuals, the situation would effectively be this: Based on representations of the Government they need only "wait in line" to access the asylum process in the United States, the members of the putative class may have not filed an asylum petition in Mexico within 30 days of entry, thus unintentionally and irrevocably relinquishing their right to claim asylum in Mexico and, due to the [Rule], their right to claim asylum in the United States.[3]

Although it is possible to seek a waiver of Mexico's 30-day bar, Al Otro Lado maintains that "it is nearly impossible to do so without legal counsel," which most asylum seekers cannot afford. Additionally, even if a waiver is granted, according to evidence submitted by Al Otro Lado, it often takes two years for a Mexican asylum claim to be fully adjudicated.

On November 19, 2019, the district court provisionally certified for purposes of a preliminary injunction a class consisting of "all non-Mexican asylum-seekers who were unable to make a direct asylum claim at a U.S. POE before July 16, 2019 because of the Government's metering policy, and who continue to seek access to

---

[3] Al Otro Lado asserts that "nearly all provisional class members are barred from even applying for asylum in Mexico." The government argued in the district court that class members could present evidence of Mexico's rejection of their asylum application, but made no representation that such a rejection would in its view satisfy the Rule, which requires a "final judgment" denying protection in another country. 8 C.F.R. § 2018.13(c)(4)(i). We do not decide whether Mexico's rejection of an asylum application under its 30-day bar would be a "final judgment" satisfying the Rule.

the U.S. asylum process."[4] It granted a preliminary injunction, ordering that "Defendants are hereby enjoined from applying the Asylum Ban to members of the aforementioned provisionally certified class and ordered to return to the pre-Asylum Ban practices for processing the asylum applications of members of the certified class."

On December 4, 2019, the government appealed the order granting the injunction, and asked the district court to stay the preliminary injunction pending appeal. The government simultaneously moved to expedite briefing on its stay motion. The district court denied the motion to expedite briefing and set a hearing on the briefing schedule for the stay motion for January 3, 2020, so the motion would not be decided before then.

Rather than wait for the district court's ruling on the stay motion, the government moved this court for a stay pending appeal on December 12, 2019, three weeks after the injunction issued.[5] This panel granted a temporary stay on

---

[4] The government does not challenge the district court's provisional certification of the class for purposes of the preliminary injunction. We have approved provisional class certification for purposes of preliminary injunction proceedings. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041–43 (9th Cir. 2012) (affirming provisional class certification for purposes of a preliminary injunction).

[5] A party may move this court for a stay pending appeal if it first sought a stay in the district court, and the court "denied the motion or failed to afford the relief requested." Fed. R. App. P. 8(a)(2)(A)(ii). We entertain the stay motion here even though the district court has not yet ruled on it, because the delay in the district court was sufficiently long to fall under Rule 8(a)(2)(A)(ii).

December 20, 2019, in an order that was "only intended to preserve the status quo until the substantive motion for a stay pending appeal can be considered on the merits." The panel specified that the temporary stay "does not constitute in any way a decision as to the merits of the motion for stay pending appeal."

The appeal of the preliminary injunction has been expedited. The briefing was completed on February 20, 2020. The case will be assigned to the next available oral argument panel for a decision on the merits of the appeal.

## II.

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926). "It is instead 'an exercise of judicial discretion,' and 'the propriety of its issue is dependent upon the circumstances of the particular case.'"[6] *Nken v. Holder*, 556 U.S. 418, 433

---

[6] The Dissent questions the district court's authority to grant the injunction in this case because the Rule is not challenged in Al Otro Lado's operative complaint. *See* Dissent at 17–23. But it then acknowledges the answer. *Id*. at 21–22. Having concluded that it would interfere with the court's jurisdiction for the Rule to extinguish some provisional class members' asylum claims while they sought access to the asylum process through their metering challenge (even if other metered asylum seekers' claims would survive), the district court properly issued an injunction under the All Writs Act. *See* 28 U.S.C. § 1651(a) (injunction may issue when "necessary or appropriate in aid of [the court's] jurisdiction"); *FTC v. Dean Foods Co.*, 384 U.S. 597, 604 (1966) (a court has "express authority under the All Writs Act to issue such temporary injunctions as may be necessary to protect its own jurisdiction"); *Michael v. INS*, 48 F.3d 657, 659 (2d Cir. 1995) (All Writs Act injunction of a prisoner's deportation proper to preserve the court's jurisdiction over the pending appeal). The district court also properly concluded

9

(2009) (quoting *Virginian Ry. Co.*, 272 U. S. at 672–73) (alteration adopted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34.

In deciding a motion to stay an order pending appeal, we consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (citation omitted). "The first two factors . . . are the most critical"; the last two are reached only "[o]nce an applicant satisfies the first two factors." *Id.* at 434–35.

Under the "sliding scale" approach we use, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The same sliding scale approach applies to the consideration of stays pending appeal. *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam). "If anything, a flexible approach is even *more*

---

that the operative complaint alleged an "unlawful, widespread pattern and practice of denying asylum seekers access to the asylum process." Because the injunction sought to preserve class members' access to the asylum process, there was a sufficient "relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint," *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015), that a preliminary injunction was a proper exercise of the court's equitable powers.

appropriate in the stay context." *Id*.

We first consider the government's showing on irreparable harm, then discuss the likelihood of success on the merits under the sliding scale approach, and finally, address the third and fourth elements together.

### A.

An applicant for a stay pending appeal must show that a stay is necessary to avoid likely irreparable injury to the applicant while the appeal is pending. *Nken*, 556 U.S. at 434. "[S]imply showing some possibility of irreparable injury" is insufficient. *Id.* (internal quotation marks omitted). The minimum threshold showing for a stay pending appeal requires that irreparable injury is likely to occur during the period before the appeal is likely to be decided. *Leiva-Perez v. Holder*, 640 F.3d at 968. Thus, under the sliding scale approach, a stay applicant's "burden with regard to irreparable harm is higher than it is on the likelihood of success prong, as she must show that an irreparable injury is the more probable or likely outcome." *Id*.

The government has made a weak showing that it will suffer harm over the requisite interim period. *See Nken*, 556 U.S. at 434. The injunction was in place for over three weeks before the government sought a stay pending appeal. It thus had available to it the best evidence of harms likely to occur because of the injunction: evidence of harms that *did* occur because of the injunction. Rather than submitting

evidence of actual burdens and delays it has experienced since the injunction issued, the government's declarations contain only estimates, assumptions, and projections.

The government estimates that identifying class members—that is, noncitizens who arrived at the border before July 16, 2019 and whose entry into the United States was refused by immigration officials—will burden the efficiency of the asylum interview process overall. It submitted a declaration by the Deputy Chief of the Asylum Division, Ashley Caudill-Mirillo, which projects that because DHS itself does not maintain lists of noncitizens who were metered, the only way to identify class members is for USCIS "to spend an additional estimated 15 to 30 minutes per person asking as many as 30 additional questions during each credible fear screening interview." The government asserts that the cumulative effect of an additional fifteen to thirty minutes per interview "would have a significant negative impact on credible fear processing times overall." The government does not represent that in any actual interview 15 to 30 minutes or 30 additional questions were devoted to whether the individual asylum applicant sought entry at a POE before July 16, 2019. Nor does it indicate what the "30 additional questions" might be.

We are dubious that taking the time necessary to make fairly simple factual determinations for a few months constitutes the sort of irreparable harm that can

support the grant of a stay pending appeal. "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)). Applying this principle, we recently held that "diversion of the [government] agencies' time, resources, and personnel from other pressing immigration adjudication and enforcement priorities" due to the need to ask additional questions and possibly review documentary evidence at bond hearings was "minimal" evidence of harm to the government. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (alterations adopted). The diversion of resources projected here is no more persuasive as significant irreparable harm than it was in *Hernandez*.

Even assuming that short term additional administrative delays can in some circumstances constitute irreparable harm, the record here does not show cognizable irreparable harm to the government over the relatively short period before the appeal of the preliminary injunction is resolved.[7] Any harm suffered is largely the result of the government's own failure to keep records of asylum

---

[7] We deny Al Otro Lado's motion to strike the Caudill-Mirillo and other declarations, Dkt. 23. Even including the challenged declarations, the government either does not show irreparable harm or makes a marginal showing, insufficient in light of the failure to make a particularly strong showing of likelihood of success on the merits. *See* section I.B., *infra*.

seekers who have been metered or to provide the asylum seekers with documentation of their attempt to seek asylum. *See* n.1, *supra.* That the government's asserted harm is largely self-inflicted "severely undermines" its claim for equitable relief. *See Hirschfeld v. Bd. of Elections in City of New York*, 984 F.2d 35, 39 (2d Cir. 1993). "[S]elf-inflicted wounds are not irreparable injury." *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995).

Al Otro Lado's second amended complaint challenging the government's metering policy was filed in November 2018, nine months before the Rule was issued in July 2019. The complaint alleged that the applicants arriving at the border seeking to enter the POEs to file asylum applications had a statutory right to do so. The government called in asylum seekers from the waitlists maintained by the Mexican government and others. In doing so, the government recognized—as its terms for the process, "metering" and "queue management," imply—the practical need to identify which applicants had appeared at the border and in what order rather than choosing each day from amassed crowds which individuals to permit to file asylum applications. But the government chose to implement the metering policy in a way that, it maintains, could now cause administrative burdens, because the government did not itself create or administer the waitlists and so cannot rely

on them definitively to identify class members. That deficiency was problematic even before the new Rule, and was avoidable and so self-inflicted. Any delay caused is therefore not irreparable harm that supports equitable relief.

In any event, the government's guesses concerning the likely burden of ascertaining class membership lack support in the record for several reasons. For one thing, the government could use the waitlists maintained by the Mexican government and others—waitlists it relied on to facilitate the metering policy—as a starting point in determining whether a noncitizen is part of the provisional class, even if the lists are "underinclusive." *See* Dissent at 57–59. Yet the government has declined to request copies of the waitlists or to use them. Those lists are, Al Otro Lado acknowledges, not entirely reliable. But the record establishes that the government has been using them in determining the order in which applicants for asylum are allowed to enter, submit their asylum applications, and undergo credible fear interviews. No reason appears why the lists are adequate for those purposes but must be entirely disregarded in identifying who came to the border when for purposes of complying with the district court's injunction.

Further, even apart from the availability of existing lists, the additional time it is likely to take during interviews to identify class members is almost surely considerably less than the government supposes. The government provides no basis, other than the supposition of some officials, for its estimation that such

interviews will take an additional fifteen to thirty minutes and require as many as 30 additional questions. Only Al Otro Lado submitted records from an actual credible fear interview that occurred while the injunction was in place. During that interview, USCIS determined that applicant was not a member of the provisional class by asking two questions.[8] More time may be needed to establish that someone who claims to be a member of the class actually is. But it is far from clear the degree to which that is so, and the total number of interviews likely to be affected before the appeal is decided is circumscribed.

The injunction is also unlikely to cause major additional delays because, once class members make it to the front of the line, they must be interviewed by an asylum officer regardless of whether the Rule is applied. The Rule affects only an applicant's eligibility for asylum. *See* 8 C.F.R. § 208.13(c)(4). Because class members fear persecution, they may still apply for withholding of removal or relief under the Convention Against Torture ("CAT"). 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(c); *see also* 8 C.F.R. § 208.30 (if the applicant is ineligible for asylum under the Rule, asylum officers must still refer the case to an IJ for consideration of withholding and CAT relief "if the alien establishes, respectively,

---

[8] Q: "What day did you cross the border from Mexico into the US?"
A: "10/27/2019."
Q: "Did you ever seek to enter the United States before that time? When?"
A: "No sir.".

a reasonable fear of persecution or torture"). The standards differ for asylum, withholding, and CAT relief, but they involve largely the same set of facts.[9]

Finally, the government offers only speculation that plaintiffs will cause further delays by requesting to reschedule their interviews. It offers no support for the statement in Caudill-Mirillo's declaration that "individuals are likely to seek to reschedule their credible fear interviews to obtain documentary evidence or to consult with an attorney to draft a declaration to submit in support of their assertion that they . . . are a member of the provisional class." As class members could gather this evidence in advance while they wait in Mexico if informed by public announcements of the need for such evidence, this delay is avoidable.

In sum, the government offered at best weak evidence that it will suffer significant overall delay in processing asylum applications at the border during the short period of time at issue. The government could significantly mitigate the harm created by its own recordkeeping practices by obtaining copies of the waitlists but has declined to do so. Thus, any administrative burdens the government faces in

---

[9] Because class members who have already had credible fear interviews should have been considered for withholding even if the Rule was applied to them, the government is unlikely to face an outsized additional burden in determining whether they are eligible for asylum with the preliminary injunction in place. These class members may still be in the process of having their claims reviewed, as an asylum officer's negative fear determination is reviewable by an IJ, 8 C.F.R. § 1208.30(g), and the IJ's determination is reviewable by the Ninth Circuit. *Andrade-Garcia v. Lynch*, 828 F.3d 829, 833 (9th Cir. 2016).

implementing the injunction are either not irreparable harm of the kind that could justify a stay pending appeal, or, "minimal" harm as in *Hernandez*. *See* 872 F.3d at 995. That the government's irreparable harm showing is at best marginal affects the level of likelihood of success on the merits it must demonstrate, as we next discuss.

## B.

Whether the government has failed to show any irreparable harm during the pendency of the appeal or has made only a minimal showing, it has not carried its burden to establish a sufficient likelihood of success on the merits.

An applicant for a stay pending appeal must make "a strong showing that he is likely to succeed on the merits." *Nken*, 556 U.S. at 434. Where, as here, the showing of irreparable harm is weak at best, the government must make a commensurately strong showing of a likelihood of success on the merits to prevail under the sliding scale approach. Only "a stronger showing of one element may offset a weaker showing of another." *Wild Rockies*, 632 F.3d at 1131; *Leiva-Perez*, 640 F.3d at 966 (applying sliding scale approach in the stay context).

The issue on appeal concerns the following statutory framework. Section 1158 creates a right to apply for asylum: "Any alien who is physically present in the Unites States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable,

18

section 1225(b) of this title." 8 U.S.C. § 1158(a)(1). Section 1225 imposes two key mandatory duties on immigration officers with respect to potential asylum seekers. First, immigration officers have a duty to inspect: "All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States *shall be inspected* by immigration officers." 8 U.S.C. § 1225(a)(3) (emphasis added). Second, immigration officers have a duty to refer *arriving* migrants seeking asylum to asylum officers for assessment of their asylum applications:

> If an immigration officer determines that an alien . . . who is *arriving in the United States* . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer *shall refer* the alien for an interview by an asylum officer under subparagraph (B).

8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added).

In its order denying the government's motion to dismiss the metering complaint, the district court observed that "arriv[ing] in the United States" triggers a noncitizen's right to be inspected, apply for asylum, and be referred to an asylum officer. *Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168, 1199–1205 (S.D. Cal. 2019). The district court concluded that "aliens in the process of arriving," such as class members—who approached the border, sought entry, but were turned away from a POE—are covered by the statutory asylum referral obligation. *Id.*

In its order granting a preliminary injunction, the district court incorporated its earlier legal ruling regarding the reach of the asylum referral obligation in section 1225. On that basis, the court held that the provisional class of plaintiffs did "arrive in the United States" before the effective date of the Rule, so the Rule does not apply to the adjudication of rights triggered by that arrival. The district court reached this conclusion without deciding the legality of the government's metering policy, which causes a delay between class members' arrival and the submission and determination of their asylum claim. Even if the asylum claim is processed after July 16, 2019, the court concluded, its consideration is governed by the law at the time the class member was originally "arriving in the United States."

The government argues that because class members were in Mexico on the effective date of the Rule, they will necessarily arrive in the United States after July 16, 2019, and the Rule by its plain terms will then apply. For the government to succeed on this argument, one of two things must be true: either the district court must be wrong that class members were "arriving in the United States" when they first attempted to enter and were turned back, or, if they were "arriving," the first arrival must no longer have any legal significance, so any second arrival—governed by the Rule—will be the only one that matters.

The government has not made a strong showing—let alone the especially strong showing required here in light of the weak irreparable harm

demonstration—that it is likely to succeed on either available theory. The district court's underlying statutory analysis is sufficiently sound and persuasive as to both the meaning of "arriving in the United States" and the legal significance of an arrival.

First, the district court's interpretation of "arrives in the United States" is likely correct. As the court observed, "[u]nder Section 1158(a)(1)'s plain language, two classes of aliens may apply for asylum: (1) any alien 'who is physically present in the United States' and (2) any alien 'who arrives in the United States.'" 394 F. Supp. 3d at 1199. "Applying the rule against surplusage," the court reasoned, we "must presume that the phrases 'mean different things.'" *Id.* (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). The district court also applied the Dictionary Act's provision that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise—words used in the present tense include the future as well as the present." *Id.* at 1200 (quoting 1 U.S.C. § 1). The court went on to reason that "accounting for the rule against surplusage, application of the Dictionary Act readily leads to the conclusion that Section 1158(a)(1)'s use of the present tense of 'arrives' plainly covers an alien who may not yet be in the United States, but who is in the process of arriving in the United States through a POE." *Id.*

This conclusion is reinforced, the district court observed, by the language of section 1225(b), the provision referenced in section 1158(a)(1). *See id*. Section 1225(b) requires an immigration officer to refer for an asylum interview any inadmissible noncitizen "*who is arriving* in the United States" and expresses a fear of persecution or the intention to apply for asylum. 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). The district court recognized that "[t]he use of the present progressive, like use of the present participle, denotes an ongoing process." 394 F. Supp. 3d at 1200 (citing *United States v. Balint*, 201 F.3d 928, 933 (7th Cir. 2000)).

The district court also noted that the legislative history is consistent with its interpretation of "arrives in" as denoting an ongoing process.

> Representative Lamar Smith, Chairman of the House Judiciary Committee's Subcommittee on Immigration and Claims . . . observed that the term "was selected specifically by Congress in order to provide a flexible concept that would include all aliens who are in the process of physical entry past our borders[.] . . . 'Arrival' in this context should not be considered ephemeral or instantaneous but, consistent with common usage, as a process. An alien apprehended at any stage of this process, whether attempting to enter, at the point of entry, or just having made entry, should be considered an 'arriving alien' for the various purposes in which that term is used in the newly revised provisions of the INA."

394 F. Supp. 3d at 1201 (quoting *Implementation of Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996: Hearing Before*

*the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 105th Cong. 17–18 (1997)).[10]

Historical changes to the statutory language further support the distinction between "physically present in" and "arrives in" the United States in section 1158. The Refugee Act of 1980 originally provided that any alien who is "physically present in the United States or *at a land border* or port of entry, irrespective of such alien's status," could apply for asylum. *See* 8 U.S.C. § 1158(a) (1980) (emphasis added). In 1996, Congress replaced "at a land border or port of entry" with "who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters)." 8 U.S.C. § 1158(a); Pub. L. No. 104-208, 110 Stat. 3009 (1996). As the Dissent recognizes, these "1996 amendments did not somehow work a major change in the law," Dissent at 31; both versions draw a distinction between an alien who is already "physically

_____

[10] The Dissent asserts that because Representative Smith, in language elided from the district court's block quotation and ours, described a person who "penetrated several hundred yards or even further into United States territory" as an example of an "arriving alien," the term must include only aliens within the United States. *See* Dissent at 37–38. But this reading is inconsistent with the comments themselves, which expressly recognize several "stage[s] of [the arriving] process," and that one such stage includes aliens "attempting to enter." *See Implementation of Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 105th Cong. 17–18 (1997).

present in the United States" on the one hand and arriving aliens on the other, including, in the earlier version, aliens "*at* a land border," in the process of arriving.

A person standing *at* the border is not necessarily *across* it, so the original statutory phrase, like the newer one, includes the penultimate stage in the process of arriving in the United States. Under the metering policy, CBP officers stationed just behind the limit line between Mexico and the United States interacted with individuals standing *at* the border; travelers with documentation were permitted to cross into the United States, while others without documentation—including provisional class members—were turned back. Provisional class members were both "at a land border" and "arriving" before being turned back.

The government's central contention as to why the district court's statutory interpretation is wrong is that the "statute confers a right to apply for asylum only on those who are within the United States." "A present-tense phrase like 'arrives in' speaks to the *present* moment of arrival, not some potential arrival in the future," the government argues. In support of its interpretation of "arrives in," the government relies principally on the presumption against extraterritoriality as reason to disregard the rule against surplusage, the Dictionary Act, section 1225's "arriving in" language, and the legislative history, which collectively led the district court to the opposite conclusion. The district court rejected application of

the presumption against extraterritoriality here, noting that "[i]t is natural to expect that Congress intends for laws that regulate conduct that occurs near international borders to apply to some activity that takes place on the foreign side of those borders," 394 F. Supp. 3d at 1202 (quoting *United States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005)), and that the text of sections 1158 and 1225 and the legislative history show that Congress "intended the statute to apply to asylum seekers in the process of arriving," even if they are not yet quite within our borders, *id.*

Notably, the district court's analysis does not authorize asylum seekers to submit an asylum application from outside the United States; it recognizes only that the statutory right to apply attaches once the asylum seeker is on the doorstep—"at a land border," in the words of the earlier iteration of the statute—in the process of arriving. Despite the Dissent's protestations, *see* Dissent at 28–30, this reading is fully consistent with the Supreme Court's observation that section 1158 "sets out the process by which refugees currently in the United States may be granted asylum," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1987); aliens do not actually submit an asylum application until after they have completed the process of arriving in the United States.

The district court's linguistic and contextual analysis has considerable force. Although it is likely correct, we need not decide at this juncture whether it is. We

need only determine whether, given the minimal—at best—showing of irreparable harm, the government has made a particularly strong showing that the district court's statutory interpretation will be disapproved on review of the preliminary injunction. That the government has most definitely failed to do.

As to the second government argument, the question is whether there is a particularly strong likelihood that the government will succeed in establishing on appeal that even if the class members did arrive and so had a statutory right to be considered for asylum under section 1158(a)(1), and although they were "arriving in the United States" and so should have been "refer[ed] . . . for an interview by an asylum officer," 8 U.S.C. § 1225(b)(1)(A)(ii), their right to asylum must be determined not as of the time they met the statutory requirements for consideration for asylum but as of the time they are ultimately allowed to enter.[11]

Under the statute as construed by the district court, *each* arrival triggers a right to apply for asylum and be interviewed by an asylum officer. The government does not maintain otherwise—that is, it does not dispute that the INA guarantees a

---

[11] We note that the government may be right that, because the class members were "metered," they will arrive a second time when they get to the top of the waitlist and are finally admitted and processed. And because the district court has not yet decided whether the delay in processing the class member's asylum requests and requiring them to stay in Mexico in the meanwhile is itself violative of their statutory or constitutional rights, we assume for present purposes that it was not. Neither of these considerations, however, affects whether the first arrival triggered a statutory right to be considered for asylum even if that consideration was not immediate.

right to apply for asylum to any noncitizen who arrives in the United States. Rather, aside from its disagreement with the district court's conclusion that class members did "arrive," the government's argument is that "[n]othing in the Rule suggests that only an alien's first attempt at entry counts, and nothing makes prior attempts at entry relevant."

The government does not have a strong chance of succeeding on this point. It is the INA, not the Rule, that makes an alien's first arrival legally significant. Under the district court's statutory interpretation, a class member's first arrival triggered a statutory right to apply for asylum and have that application considered. *See* 8 U.S.C. §§ 1158, 1225(a)(3), 1225(b)(1)(A)(ii); 394 F. Supp. 3d at 1203–05. Nothing in the INA or regulations suggests that a class member loses her statutory right to apply for asylum as of her arrival because there is a government-imposed delay between when she arrives and when her application is accepted and processed.[12] As the Rule was not in place at the time each class member's right to apply for asylum attached, it makes sense that it would not apply.

---

[12] The provisionally certified class is defined to include only those asylum seekers who were involuntarily turned away "and who continue to seek access to the U.S. asylum process." Thus, there can be no argument that class members abandoned their statutory right to submit an asylum claim. In contrast, the Dissent's hypothetical asylum seeker who is metered "and then returns to a United States port of entry many years later," *see* Dissent at 40–41, would likely have voluntarily abandoned their right to submit an asylum claim by waiting many years to return.

The government's premise—assuming acceptance of the district court's statutory interpretation of "arrives" and "arriving in the United States"—must be that any second arrival cancels out the statutory obligation that arose at the time of the original arrival to receive and process the class member's asylum application. No reasoning is provided to substantiate this cancellation theory. It is more likely that the first arrival is governed by the eligibility requirements at the time the right to be considered for asylum arose than that regulations imposed after the fact will cancel out the earlier eligibility. Put another way, class members will be governed by the Rule if they seek asylum based on a second arrival, but they also arrived earlier and, under the statute, were quite likely entitled to asylum consideration triggered by that arrival, even if that consideration was delayed. At least, the government has not made a showing that this statutory understanding is incorrect strong enough to counterbalance its weak irreparable harm evidence.

In sum, the government has not met its burden to make a sufficiently strong showing of a likelihood of success on the merits. Even if its weak showing of harm met the minimum threshold, the government has not made a sufficient showing of likelihood of success on the merits strong enough to warrant a stay pending appeal under the sliding scale approach. *See Nken*, 556 U.S. at 434; *Wild Rockies*, 632 F.3d at 1131.

## C.

"Because the Government has not 'satisfie[d] the first two factors,' we need not dwell on the final two factors—'harm to the opposing party' and 'the public interest.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018) (quoting *Nken*, 556 U.S. at 435). Even so, the balance of equities and public interest tip sharply in Al Otro Lado's favor.

The third factor, "whether issuance of the stay will substantially injure the other parties interested in the proceeding," *Nken*, 556 U.S. at 434, weighs heavily against granting the stay. In contrast to the showing of harm by the government, Al Otro Lado has offered ample evidence that enforcement of the Rule against the provisionally certified class would cause not only substantial but irreparable injury to them. *See id*. The class relied to their detriment on the government's representations. As the district court observed, "[t]hey returned to Mexico reasonably believing that if they followed these procedures, they would eventually have an opportunity to make a claim for asylum in the United States." The Rule would now make them ineligible for asylum in the United States, and they cannot in all probability pursue asylum in Mexico "because they did as the Government initially required and waited" for their number to be called.[13] We agree with the

---

[13] The government argues that this harm is self-inflicted because class members chose not to pursue asylum in Mexico. But the class members were not required to do so when they approached the POE to apply for asylum, and some class members face Mexico's time bar *because* they relied on the government's

district court that "[t]his situation, at its core, is quintessentially inequitable," and likely will substantially injure class members.

As to the fourth factor, aspects of the public interest favor both sides. The public has a "weighty" interest "in efficient administration of the immigration laws at the border." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982). "But the public also has an interest in ensuring that 'statutes enacted by [their] representatives' are not imperiled by executive fiat." *E. Bay Sanctuary*, 932 F.3d at 779 (quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers)). "We need go no further than this; when considered alongside the Government's failure to show irreparable harm, the final two factors do not weigh in favor of a stay." *Id.*

### III.

We emphasize that the question whether the injunction should be overturned—the merits of the ultimate appeal—is not before this motions panel. We are ruling only on the motion to stay the injunction pending appeal. "The decision whether to grant a stay is a 'probabilistic' endeavor. We discuss the merits of a stay request in 'likelihood terms,' and exercise a 'restrained approach to assessing the merits.'" *E. Bay Sanctuary Covenant v. Trump*, 18-17274, __ F.3d __ (9th Cir. 2020) (quoting *Sierra Club v. Trump*, 929 F.3d 670, 688 (9th Cir. 2019)).

---

representations that they could apply for asylum in the United States if they waited in line.

Judge Bress criticizes this restrained approach. *See* Dissent at 16, 27. But the "pre-adjudication adjudication" he advocates "would defeat the purpose of a stay, which is to give the reviewing court the time to 'act responsibly,' rather than doling out 'justice on the fly.'" *Leiva-Perez v. Holder*, 640 F.3d 962, 967 (9th Cir. 2011) (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)). Respecting the role of stay motions requires that we decline to usurp the role of the preliminary injunction merits panel—which, it bears noting, is itself engaged in a probabilistic analysis preliminary to the eventual consideration of any request for a permanent injunction. Although seeking the collapse of these sequential steps into one has become increasingly common, *see Barr v. E. Bay Sanctuary Covenant*, 140 S. Ct. 3, 6 (2019) (Sotomayor, J., dissenting); Stephen I. Vladeck, *The Solicitor General and the Shadow Docket*, 133 Harv. L. Rev. 123 (2019), premature determination of complex legal and factual issues will not in the long run produce well-considered and dependable judicial decision-making.

The government has not carried its burden of showing that a stay is warranted. Accordingly, we deny the motion.

*Al Otro Lado, et al v. Chad Wolf, et al*, No. 19-56417

BRESS, Circuit Judge, dissenting:

FILED

MAR 5 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

In a case that does not challenge it, the district court below partially enjoined an asylum rule that the Supreme Court just months ago ordered could go into effect pending appeal. *See Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019). How could this even happen?

This case, which was brought in 2017, is a challenge to certain U.S. Customs and Border Protection "metering" practices. Due to a massive influx of immigrants and severe resource constraints at the southern border, CBP through "metering" limits the number of aliens who can gain access to U.S. ports of entry at a given time. The plaintiffs are asylum seekers waiting in Mexico or other countries who claim that metering violates our asylum laws.

In July 2019, and years after this metering case was filed, the Attorney General and Acting Secretary of Homeland Security promulgated the "Third Country Transit Rule," which generally bars asylum for persons who did not previously seek protection in a third country through which they journeyed on their way to the United States. *See Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (2019), *codified at* 8 C.F.R. § 208.13(c)(4). This Rule was challenged in a separate lawsuit. After a district court in this circuit re-imposed a nationwide injunction blocking its implementation, the Supreme Court stayed the

injunction, and allowed the Rule to go into effect pending appeal. *East Bay*, 140 S. Ct. at 3.

Shortly after the Supreme Court's ruling in *East Bay*, the plaintiffs in this "metering" case—including Al Otro Lado, an advocacy group that was also a plaintiff in *East Bay*—asked the district court to enjoin the Third Country Transit Rule as to persons who were metered. The district court agreed and enjoined application of the Rule as to a 26,000-person subclass who were metered prior to July 16, 2019, the date that the Rule by its terms takes effect. Under the district court's injunction, the government may not apply the Third Country Transit Rule to these persons, even though under *East Bay* the Rule may otherwise be applied.

We originally granted a temporary stay of the district court's injunction, but my fine colleagues in the majority now unfortunately reverse course and deny a stay pending appeal. I would have granted the stay and so respectfully dissent. The majority's refusal to grant a stay is wrong on many levels and forces immigration officials to undertake an effectively impossible mission at our already overwhelmed border with Mexico. Particularly where the Supreme Court has recently stayed an injunction of the very same asylum Rule, one would expect the district court's subsequent injunction of that Rule to be airtight. Instead, and regrettably, both the district court's injunction and today's decision reflect cascading legal error, wreaking further havoc on a southern border already in crisis.

There was no basis for the district court to enjoin the Third Country Transit Rule in this metering case.  This case is not about the Third Country Transit Rule, the validity of which is not at issue.  And the plaintiffs have not shown a likelihood of success that metering is unlawful.  Indeed, a central premise of both the district court and the majority opinion is that metering *may well be legitimate*.  Lawsuits, even putative class actions, are not an opportunity to declare open season on the implementation of every new government policy that comes along that bears some tangential relationship to the subject matter of a case.  And courts cannot go around enjoining immigration rules in cases that do not challenge them, particularly where the Supreme Court has just allowed the rule to go into effect.  The district court below greatly exceeded its powers.

Even so, the Third Country Transit Rule plainly applies to the plaintiffs in this case, so that enjoining it as to them was legal error.  The Third Country Transit Rule applies to "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019."  8 C.F.R. § 208.13(c)(4).  When plaintiffs reach this country, they will be entering or arriving in the United States after that date; the Rule thus plainly covers them.  That should have been the end of this case or, more accurately, this issue, since this case is not about the Rule anyway.  The district court's decision holding otherwise, which the majority effectively endorses, is based on the theory that our asylum laws apply not only to

3

persons physically "in" the United States, but to persons outside the United States who are "in the processing of" arriving into it. That holding is unprecedented, contradicts the statutory text and settled law, and will create untold confusion in the interpretation of our asylum laws.

The immense problems of administration that the district court's injunction will create are entirely predictable. Even though neither the metering practices nor the Third Country Transit Rule have been invalidated—and both are presently in effect, the latter by order of the Supreme Court—some 26,000 persons who sought to enter the United States prior to July 16, 2019 and were unable to do so due to metering are now exempt from the Supreme Court's order in *East Bay*. Requiring the government to now apply different rules to this subclass, and even figuring out who such persons are, will be an enormous and arduous task, made only more difficult by the lack of documentation and the incredible strain under which our immigration system already labors. Today's decision will unfortunately cause only greater difficulty and confusion at a border that desperately needs neither.

The problems at our border with Mexico are among the most difficult of the day. Fair debates may be had about how to prioritize safety, humanitarian concerns, and costs. But the questions before us are legal ones. Under the factors that govern our review, we should have stayed the district court's injunction. I therefore respectfully dissent.

I

A

This putative class action lawsuit, filed in 2017, challenges CBP's practice of regulating the intake of aliens arriving at U.S. ports of entry from Mexico. In response to record numbers of aliens seeking entry into the United States and substantial overcrowding at southern ports of entry, CBP instituted a policy known as "metering" or "queue management." Metering policies limit the number of persons who can gain access to the ports of entry at a given time. When metering is in effect, CBP officers stand at the boundary line between our country and Mexico to limit the persons who may cross into the United States. Persons with valid documents are allowed into the port of entry, but persons who lack adequate documentation are not allowed in until the port of entry has capacity to accommodate them. Plaintiffs—a legal services organization named Al Otro Lado and a group of asylum seekers—claim that metering unlawfully denies access to the asylum process.

The allegations in plaintiffs' operative complaint and supporting materials reflect a far-reaching challenge to metering practices across our country's southern border. The formal metering policies at issue were implemented and enforced between 2016 and the present, though plaintiffs appear to challenge metering practices that may date back even farther. Plaintiffs challenge these policies at

"Class A" United States ports of entry at the United States-Mexico border, which include the following locations from California to Texas: San Ysidro, California; Otay Mesa, California; Calexico, California; San Luis, Arizona; Nogales, Arizona; El Paso, Texas; Del Rio, Texas; Eagle Pass, Texas; Laredo, Texas; Roma, Texas; Hidalgo, Texas; Los Indios, Texas; and Brownsville, Texas.  Some of these ports of entry, such as El Paso and Laredo, Texas are in more urban areas.  Others, such as Los Indios and Roma, Texas are in more remote areas of the vast expanse that makes up our country's border with Mexico.

Based on plaintiffs' allegations and supporting materials, persons from Mexico, Central and South America, and "all across the world," have journeyed to our southern border with the goal of gaining entry into the United States.  The record contains evidence that metering was applied to persons from a wide range of countries, including Haiti, Cuba, Venezuela, Iraq, Guatemala, Honduras, El Salvador, Russia, Angola, Cameroon, and the Congo.  Many of these persons do not have proper documentation.

Plaintiffs further allege that aliens have often approached the United States in large groups numbering in the hundreds and thousands.  For example, plaintiffs allege that from June 2016 to December 2016, "more than 15,000 Haitians migrated to Tijuana with the intent to seek protection in the United States."  Plaintiffs also allege that some formal metering policies were issued in response to an approaching

group of roughly 1,500 immigrants from Central America and Mexico in the spring of 2018.

When not allowed into the United States due to metering, plaintiffs allege that putative class members either leave the border area or remain in the vicinity of the border in the hope of being allowed to pursue entry into this country. For example, materials that plaintiffs submitted in connection with their instant request for a preliminary injunction indicate that in November 2018, there were 4,700 persons from Central America, and perhaps many more, waiting in the Tijuana area alone. A central point of disagreement between the majority and this dissent centers on the reliability of certain "waitlists" that have been created by various groups in Mexico. I will have more to say about the waitlists later.

While plaintiffs contend that metering unlawfully denies them access to the asylum process in the United States, the government maintains that metering is a necessary response to an overwhelming situation at the border. According to the government, in April 2019 alone, CBP encountered approximately 100,000 individuals seeking entry into the United States, often without documents. Randy Howe, CBP's Executive Director for Operations in the Office of Field Operations, described this surge in migration as "unprecedented" and as representing "the highest monthly total in well over a decade." It is the government's position that ports of entry were often stretched to the limits, with ever-increasing numbers of

aliens "surpass[ing] the physical capacity" of various ports and "result[ing] in a tremendous strain on all available local resources," including personnel. The government claims it authorized metering practices to manage the large inflow of persons safely and properly.

The government moved to dismiss plaintiffs' metering case, arguing that because asylum is only available to aliens "who [are] physically present in the United States or who arrive[] in the United States," 8 U.S.C. § 1158(a)(1), persons who had been metered—and who thus had not entered the United States—had no right to apply for asylum. For this reason, the government argued that plaintiffs could not challenge metering as a violation of the asylum laws.

The district court denied the government's motion. As discussed in greater detail below, the district court reasoned that our asylum laws extended not only to persons who were physically in the United States, but also aliens who were "in the process of arriving in the United States." *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1199–1203 (S.D. Cal. 2019). The district court thus held that plaintiffs had stated a claim and allowed their metering lawsuit to proceed.

Importantly, the district court has not determined whether metering is unlawful, either at any particular port of entry or across all ports of entry. Instead, the district court has "acknowledge[d] that it is entirely possible that there may exist potentially legitimate factors that prevent CBP officers from immediately

discharging the mandatory duties" in the asylum laws. *Id.* at 1212. Plaintiffs'

challenge to CBP's metering practices remains ongoing in the district court.

B

Meanwhile, on July 16, 2019, and approximately two years into this metering

case, the Attorney General and Acting Secretary of Homeland Security issued the

Third Country Transit Rule. *See Asylum Eligibility and Procedural Modifications*,

84 Fed. Reg. 33,829 (2019), *codified at* 8 C.F.R. § 208.13(c)(4). The Rule provides

that

> any alien who enters, attempts to enter, or arrives in the
> United States across the southern land border on or after
> July 16, 2019, after transiting through at least one country
> outside the alien's country of citizenship, nationality, or
> last lawful habitual residence in route to the United States,
> shall be found ineligible for asylum.

*Id.* The Rule does not apply to aliens who show that they applied for and were denied

protection in a third country through which they traveled en route to the United

States. *Id.* § 208.13(c)(4)(i). Nor does the Rule apply to asylum seekers who are

"victim[s] of a severe form of trafficking" or if "[t]he only countries through which

the alien transited en route to the United States were, at the time of transit, not parties

to" certain international agreements. *Id.* § 208.13(c)(4)(ii)-(iii). The Rule also does

not bar asylum seekers from applying for withholding of removal or for relief under

9

the Convention Against Torture. *Id.* § 208.13(c)(1).[1]

In a wholly separate lawsuit captioned *East Bay Sanctuary Covenant v. Barr*, several organizations, including Al Otro Lado, challenged the Third Country Transit Rule on various grounds. *See* 385 F. Supp. 3d 922 (N.D. Cal. 2019). Eight days after the Third Country Transit Rule was issued, a district court in our circuit entered a nationwide injunction blocking the Rule's implementation. *Id.* Notably, the issue of metering factored into the district court's injunction. As the district court explained:

> The Court notes one additional equitable consideration suggested by the administrative record. The administrative record contains evidence that the government has implemented a metering policy that "force[s] migrants to wait weeks or months before they can step onto US soil and exercise their right to claim asylum." At the same time, the record also indicates that Mexico requires refugees seeking protection to file claims within 30 days of entering the country. For asylum seekers that forfeited their ability to seek protection in Mexico but fell victim to the government's metering policy, the equities weigh particularly strongly in favor of enjoining a rule that would now disqualify them from asylum on a potentially unlawful basis.

*Id.* at 959 (record citations omitted).

The government sought a stay of the district court's injunction pending

---

[1] The district court and plaintiffs refer to the Rule as the "Asylum Ban." But the Rule does not ban asylum. I will therefore refer to the Rule as the Third Country Transit Rule, except when quoting to the district court or plaintiffs' submissions.

appeal.  Our court rejected the injunction's national reach and limited its scope to the Ninth Circuit only.  *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026 (9th Cir. 2019).  Shortly thereafter, the district court reissued its nationwide injunction.  *See East Bay Sanctuary Covenant v. Barr*, 391 F. Supp. 3d 974 (N.D. Cal. 2019).  At that point, and although the majority relegates it to a footnote, *see* Maj. Op. 5–6 n.2, the Supreme Court stepped in and by a 7-2 vote stayed the district court's orders "in full."  *Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019).

The Supreme Court thus allowed the Third Country Transit Rule to take effect over the objection of Al Otro Lado and others.  The Supreme Court stayed the district court's injunction "in full pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for writ of certiorari, if such writ is sought."  *Id.*  The government's appeal in *East Bay* remains pending in this court.

## C

Just fifteen days after the Supreme Court issued its order in *East Bay*, the plaintiffs in this metering case—including Al Otro Lado—sought a partial injunction of the very same Third Country Transit Rule that the Supreme Court had just recently allowed to go into effect pending appeal.  The plaintiffs sought this injunction on behalf of a subclass of some 26,000 non-Mexican aliens seeking asylum, who were allegedly denied access to U.S. ports of entry prior to July 16, 2019 because of CBP's

metering policies.

The plaintiffs did not purport to challenge the Third Country Transit Rule *per se*.  Instead, the plaintiffs claimed the Third Country Transit Rule should not apply to them.  As noted, that Rule applies to "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019." 8 C.F.R. § 208.13(c)(4).  The plaintiffs claimed the Rule should not apply to them because they had previously attempted to enter the United States prior to July 16, 2019, but were prevented from doing so due to metering.

In seeking an injunction, the plaintiffs likewise sought to certify a subclass of "approximately 26,000 asylum seekers," who are "scattered in encampments and shelters in Mexican border cities."  Consistent with their underlying challenge to metering policies across the southern border, the proposed 26,000-person subclass consists of aliens from all over the world who sought entry over a period of years at numerous points of entries at the United States-Mexico border.  This graphic from plaintiffs' class motion shows the breadth of the proposed subclass and U.S.-Mexico entry points that are implicated:



On November 19, 2019, the district court granted plaintiffs' motion and certified a subclass consisting of "all non-Mexican noncitizens who sought unsuccessfully to make a direct asylum claim at a U.S. [port of entry] before July 16, 2019, were instead required to wait in Mexico due to the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process." *Al Otro Lado, Inc. v. McAleenan*, 2019 WL 6134601, at *16 (S.D. Cal. Nov. 19, 2019). The district court also enjoined the Third Country Transit Rule as to this subclass. *Id.* at *16–20.

The district court reasoned that, although plaintiffs did not challenge the Third Country Transit Rule in their operative complaint, the court could nonetheless enjoin the Rule as to asylum seekers metered before July 16, 2019. *Id.* at *10. The district court held that the Rule "by its express terms, does not apply to those non-Mexican foreign nationals in the subclass who attempted to enter or arrived at the southern

13

border *before* July 16, 2019 to seek asylum but were prevented from making a direct claim at a [port of entry] pursuant to the metering policy." *Id.* at *17 (emphasis in original). The district court also relied on its earlier ruling on the government's motion to dismiss, in which it had held that the persons who had not yet entered the United States, but who were "'in the process of arriving in the United States through a [port of entry],'" were covered under the asylum statutes. *Id.* at *17 (quoting *Al Otro Lado*, 394 F. Supp. 3d at 1200).

On December 4, 2019, the government filed a motion in the district court for an emergency stay of the injunction pending appeal, requesting a ruling by December 11, 2019. After the district court signaled that it would not rule on the stay motion by the requested date, the government filed in this court a motion for stay pending appeal, along with an emergency motion for an administrative stay. Accompanying its motion, the government submitted declarations from Randy Howe, Executive Director for Operations, Office of Field Operations, U.S. Customs and Border Protection; Ashley Caudill-Mirillo, Deputy Chief of the Asylum Division with the U.S. Citizenship and Immigration Services (USCIS), U.S. Department of Homeland Security; and Sirce Owen, an Assistant Chief Immigration Judge in the Executive Office for Immigration Review. As described later, these declarations attested to the government's hardship in complying with the district court's injunction and the irreparable harm that the injunction causes.

On December 20, 2019, we granted the government's motion for a temporary stay, noting, among other things that "[p]rohibiting the government from applying the Rule to the proposed class members could cause complications at the border." *Al Otro Lado v. Wolf*, 945 F.3d 1223, 1224 (9th Cir. 2019). The court now goes in a different direction and allows the district court's injunction to go back into effect. Because this decision is wrong as a matter of law, I respectfully dissent.

## II

The following familiar factors govern the government's request for a stay of the district court's injunction pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*City & Cty. of S.F. v. USCIS*, 944 F.3d 773, 789 (9th Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 433–34 (2009)).

Usually—and nearly without fail—we analyze those factors in order. *See, e.g.*, *id.* at 790–807; *FTC v. Qualcomm Inc.*, 935 F.3d 752, 755–57 (9th Cir. 2019); *Sierra Club v. Trump*, 929 F.3d 670, 687–707 (9th Cir. 2019); *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 506–10 (9th Cir. 2019) (per curiam); *Lair v. Bullock*, 697 F.3d 1200, 1203–15 (9th Cir. 2012); *Golden Gate Restaurant Ass'n v. City & Cty. of S.F.*, 512 F.3d 1112, 1119–27 (9th Cir. 2008). In the classic recitation of the

factors governing a request for a stay, likelihood of success on the merits is listed first.  That is how the majority itself lays out the standard.  *See* Maj. Op. 10.

One will notice that the majority opinion inverts the traditional stay analysis, beginning with irreparable harm and demoting the merits to secondary status.  This is not accidental, but tactical.  We are told that because "[t]he government has made a weak showing that it will suffer harm" pending appeal, Maj. Op. 11, it must not make merely "a strong showing that [it] is likely to succeed on the merits," *Nken*, 556 U.S. at 434, but rather a showing that is "strong enough to counterbalance its weak irreparable harm evidence."  Maj. Op. 28.  By seemingly inflating the government's required showing, the majority trends toward a new, undefined standard that waters down the merits analysis.  And it is unclear how strong is "strong enough" in a case like this one, where the government's merits arguments are purely legal in nature, turning on the interpretation of statutes and regulations.

The sequencing of today's opinion can only reflect the majority's implicit acknowledgement that the government's case is strongest where it most matters, namely, the likelihood of success on the merits.  That explains the majority's tepid endorsement of the district court's merits analysis, which the majority only describes as "likely correct," "sufficiently sound," and having "considerable force."  Maj. Op. 20–21, 25.  The strength of the government's merits arguments likely explains why the majority feels the apparent need to elevate the government's burden on

likelihood of success on the merits before addressing them.  Hence the decision to lead with irreparable harm first.

The issuance of a stay "is to be guided by sound legal principles," and "those legal principles have been distilled into" the traditional four-factor test I quoted above, *Nken*, 556 U.S. at 434 (quotations omitted), not factors with new modifiers around them.  In this case, and under the governing standards, the government has made both "a strong showing that [it] is likely to succeed on the merits" and that it "will be irreparably injured absent a stay." *City & Cty. of S.F.*, 944 F.3d at 789.

### III

### A

I begin, as we usually do, with the merits.  But the merits of what exactly?  Not the merits of CBP's metering policies, which is what this lawsuit is actually about.  The legality of metering remains a live issue in the district court, with the district court acknowledging "it is entirely possible" that metering could be founded on "legitimate factors." *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1212.  Indeed, the district court issued its injunction "assuming the Government's metering practice was legal." *Al Otro Lado*, 2019 WL 6134601, at *13.  The majority opinion rests on the same assumption: "because the district court has not yet decided whether the delay in processing the class member[s'] asylum requests and requiring them to stay in Mexico in the meanwhile is itself violative of their statutory or constitutional

rights, we assume for present purposes that it was not."  Maj. Op. 26 n.11.

But if metering is potentially lawful and not even at issue in this preliminary injunction proceeding, on what basis could the district court partially enjoin the wholly separate and later-enacted Third Country Transit Rule, whose legality is not questioned here either?   Somehow a motion for preliminary injunction that challenges neither metering nor the Third Country Transit Rule has used the *prospect* of a challenge to the former as a justification for partially enjoining the latter.

The majority never explains why this is at all appropriate.  This metering case plodded along for years until the government enacted the Third Country Transit Rule.  Then, and not long after the ink had dried on an unsuccessful effort to obtain a preliminary injunction of that Rule, *see East Bay*, 140 S. Ct. at 3, the plaintiffs—including Al Otro Lado, a plaintiff from *East Bay* itself—tried to use this metering case to accomplish, in part, what *East Bay* thus far has not.  Under the circumstances and our case law, the district court's partial injunction of the Third Country Transit Rule exceeded the equitable powers of the federal courts.

We have made clear that "[a] court's equitable power lies only over the merits of the case or controversy before it," so that "[w]hen a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."  *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 632 (9th Cir. 2015).  That principle of law is well-accepted.  *See, e.g.*, *Alabama*

*v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 (11th Cir. 2005) ("To secure preliminary injunctive relief, a petitioner must demonstrate a substantial likelihood of prevailing on at least one of the causes of action he has asserted."); *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action."); *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.").  The district court's injunction easily fails this test, both because the Third Country Transit Rule was not otherwise at issue in this case, and because the district court's partial injunction of that Rule does not turn on the merits of plaintiffs' metering claims.

The district court apparently believed that our decision in *Pacific Radiation* was no obstacle to enjoining the Third Country Transit Rule because, in its view, "Plaintiffs' claims regarding the [the Rule] and Plaintiffs' underlying claims in their [Second Amended Complaint] are so intertwined that denying Plaintiffs' Motion for Preliminary Injunction could effectively eviscerate the asylum claims Plaintiffs seek to preserve in their underlying lawsuit."  *Al Otro Lado*, 2019 WL 6134601, at *10.  That is not correct.

19

For a federal court to issue an injunction, there must be "a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself." *Pac. Radiation*, 810 F.3d at 636. Here there is no claim in the operative complaint concerning the Third Country Transit Rule, which did not come along until years into this case. Under our precedent, moreover, "[t]he relationship between the preliminary injunction and the underlying complaint is sufficiently strong where the preliminary injunction would grant 'relief of the same character as that which may be granted finally.'" *Id.* (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)). In this case, the character of the relief sought in the motion for preliminary injunction is entirely different from that sought in the complaint: the complaint concerns *delays* in processing asylum seekers, whereas the Third Country Transit Rule concerns *eligibility requirements* for asylum itself.

The majority opinion asserts that the operative complaint and injunction both "sought to preserve class members' access to the asylum process." Maj. Op. 9 n.6. But the injunction is not about "access to the asylum process," but claimed entitlement to asylum itself, which is not at issue in this metering case. And even if it was, casting the complaint and injunction at such a high level of generality would undermine the limitations that *Pacific Radiation* imposes. Indeed, *Pacific Radiation* expressly rejected an effort to secure an injunction by "merely asserting that the

claims are related or incorporated into [the] complaint."  810 F.3d at 637.

The approach taken by the district court and majority opinion is therefore dramatic in its potential: in a case that does not challenge them, it would authorize injunctions of *any* current or future asylum-related rule, the application of which likewise "could" just as easily "eviscerate" plaintiffs' eventual asylum claims.  *Al Otro Lado*, 2019 WL 6134601, at *10.  And it would allow such injunctions on the assumption that the governmental conduct at issue in the case—here, metering—is lawful.  *Id.* at *11, 13.  The result is a mission creep nowhere authorized in our precedents, where an expansive and long-running lawsuit like this one can become the forum for challenging any future governmental action in the general subject area. That the majority implicitly blesses this vast expansion of the federal courts' injunctive powers in a footnote, Maj. Op. 9 n.6, is deeply troubling.

The majority and district court also justify the injunction under the All Writs Act, 28 U.S.C. § 1651, on the theory that the Third Country Transit Rule "would effectively moot Plaintiffs' request for relief in the underlying action by extinguishing their asylum claims."  *Al Otro Lado*, 2019 WL 6134601, at *11; Maj. Op. 9 n.6.  This is even farther afield and clearly incorrect.  This metering case does not concern plaintiffs' underlying asylum claims, which are not at issue here.  And the Third Country Transit Rule obviously does not moot this metering case because it has no effect on Mexican asylum seekers to whom the Rule does not apply.  Such

Mexican asylum seekers are both named plaintiffs and part of the putative class challenging CBP's metering practices.

The majority does not dispute this. Instead, it claims that the Third Country Transit Rule "would extinguish *some* provisional class members' asylum claims." Maj. Op. 9 n.6 (emphasis added). But neither the majority opinion nor the district court provide any authority for the remarkable proposition that the All Writs Act can be used as an all-purpose bulwark against mootness. If a party's claims become moot, a court lacks jurisdiction to decide them. *See, e.g.*, *Center for Biological Diversity v. Lohn*, 511 F.3d 960, 963 (9th Cir. 2007). And the All Writs Act only allows a court "to issu[e] process 'in aid of' its existing jurisdiction; the Act does not enlarge that jurisdiction." *Clinton v. Goldsmith*, 526 U.S. 529, 534–35 (1999).

The notion that the All Writs Act could be used to enjoin anything that would make even one of 26,000 provisional class members' claims moot reflects a sweeping theory of judicial power with no basis in principle or precedent. As the Supreme Court has explained in the context of similar statutory language in the Anti-Injunction Act, "[n]o case of this Court has ever held that an injunction to 'preserve' a case or controversy fits within the 'necessary in aid of its jurisdiction' exception." *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 641 (1977) (plurality opinion); *see also Charlton v. Estate of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988) (interpreting All Writs Act in light of Anti-Injunction Act precedent). The All Writs Act "is not

a grant of plenary power to federal courts." *Doe v. INS*, 120 F.3d 200, 205 (9th Cir. 1997) (quotations omitted).  Yet by today's decision, it is.

Because the district court could not enter *this* injunction in *this* case, that should be the end of the matter and the injunction should have been stayed for this reason alone.

B

But even assuming, as the majority does, that the likelihood of success on the merits should focus instead on whether the Third Country Transit Rule applies to the plaintiff subclass, the government has shown a strong likelihood of success on that front as well.

As I set forth above, the Third Country Transit Rule provides that

> any alien *who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019*, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence in route to the United States, shall be found ineligible for asylum.

8 C.F.R. § 208.13(c)(4) (emphasis added).  The district court held that this Rule did not apply to persons who had been metered prior to July 16, 2019.  *Al Otro Lado*, 2019 WL 6134601, at *17.  Its central reasoning was that the Rule "by its express terms, does not apply to those non-Mexican foreign nationals in the subclass who attempted to enter or arrived at the southern border *before* July 16, 2019 to seek asylum but were prevented from making a direct claim at a [port of entry] pursuant

23

to the metering policy." *Id.* (emphasis in original). In the district court's view, "[t]he Government's position that the Asylum Ban applies to those who attempted to enter or arrived at the southern border seeking asylum before July 16, 2019 contradicts the plain text of their own regulation." *Id.*

The majority and I at least appear to agree on one thing: this reasoning is definitely wrong. The Third Country Transit Rule applies to "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019." 8 C.F.R. § 208.13(c)(4). It includes anyone, including the plaintiffs in this case, who will be attempting to enter the United States after July 16, 2019. There is no exception for persons who *previously* tried to enter the United States and who were unable to do so, whether due to metering or any other reason. The district court was thus mistaken to believe that the Third Country Transit Rule "by its express" terms contains a carve-out for metered persons. It does not. As the majority thus concedes, "the government may be right that, because the class members were 'metered,' they will arrive a second time when they get to the top of the waitlist and are finally admitted and processed." Maj. Op. 26 n.11.

## C

The majority nevertheless refuses to stay the district court's injunction. Why? Notwithstanding the language of the Third Country Transit Rule, the majority holds that the government still has not shown a strong likelihood of success based on the

district court's earlier motion to dismiss ruling.  Maj. Op. 21–25.  In that ruling, the district court held that the asylum laws apply not only to persons physically present inside the United States, but also to persons "who [are] in the process of arriving in the United States through a [port of entry]."  *Al Otro Lado*, 394 F. Supp. 3d at 1200.  Extending this logic to plaintiffs' request to enjoin the Third Country Transit Rule, the district court held that persons who were metered had arrived in the United States prior to July 16, 2019, such that the Rule does not apply to them.  *Al Otro Lado*, 2019 WL 6134601, at *17.

As I will now explain, the majority's effective endorsement of the district court's unprecedented motion to dismiss ruling works a revolution in immigration law.  And the majority's related holding that our country's immigration laws are effectively frozen as of the time of metering, so that no new immigration eligibility requirement could apply to persons who had been metered, works an entirely new revolution beyond that.  The majority's twin determinations on this score contravene settled law, contradict our precedents, and wrongly allow a partial injunction of the very Third Country Transit Rule that the Supreme Court recently allowed to go into effect pending appeal.  *See East Bay*, 140 S. Ct. at 3.

1

An alien "who is physically present in the United States or who arrives in the United States" may apply for asylum.  8 U.S.C. § 1158(a)(1).  Another provision of

25

the statute provides that aliens may receive asylum screening if they are "arriving in the United States." *Id.* § 1225(b)(1)(A)(i)-(ii). Back when this case was about metering, the threshold legal issue before the district court at the motion to dismiss stage was whether metered persons could even claim a violation of the asylum laws, given that they had never physically entered the United States.

The district court held that they could. According to the district court, persons "'who may not yet be in the United States, but who [are] in the process of arriving in the United States through a [port of entry,]' were 'arriving in the United States' such that the statutory and regulatory provisions at issue applied to them." *Al Otro Lado*, 2019 WL 6134601, at *17 (quoting *Al Otro Lado*, 394 F. Supp. 3d at 1199–1205). To reach that conclusion, the district court reasoned that under the canon against surplusage, § 1158(a)(1)'s reference to a person "who arrives in the United States" must have a different meaning than someone "who is physically present in the United States." *Al Otro Lado*, 394 F. Supp. 3d at 1199–1200. Focusing then on the phrase "arrives in the United States," and while noting that "neither side raises th[e] point," the district court held that under the Dictionary Act, "'words used in the present tense include the future as well as the present.'" *Id.* at 1200 (quoting 1 U.S.C. § 1). From this the district court held that "Section 1158(a)(1)'s use of the present tense of 'arrives' plainly covers an alien who may not yet be in the United States, but who is the process of arriving in the United States through a [port of entry]." *Id.*

26

In its order partially enjoining the Third Country Transit Rule, the district court relied on this earlier motion to dismiss ruling to hold that the Rule did not apply to persons who were metered prior to July 16, 2019. *Al Otro Lado*, 2019 WL 6134601, at *17. It is important to see at the outset that whether or not the district court's motion to dismiss ruling is correct, its conclusion at the preliminary injunction stage did not follow: even if the plaintiffs had previously attempted to enter the United States prior to July 16, 2019, they are now attempting to enter it again *after* July 16, 2019. 8 C.F.R. § 208.13(c)(4). As such, the Third Country Transit Rule clearly applies to them, whether or not they previously "arrived in" or were in the "process of arriving in" the United States at some earlier point. I take up this issue further below when addressing the majority's apparent view that the immigration laws should be considered frozen as of the time plaintiffs were metered.

Regrettably, however, and with little independent reasoning of its own, the majority endorses the district court's motion to dismiss ruling. Maj. Op. 21–25. After describing the district court's reasoning, the majority with limited analysis states that "[t]he district court's linguistic and contextual analysis has considerable force" and "is likely correct." Maj. Op. 25.

In fact, however, the district court's reasoning at the motion to dismiss stage was not correct, and the majority errs in giving it any credit. At the very least, the government has made a strong showing that the district court's motion to dismiss

ruling was not sound.  This point should be very clear: neither the majority, the district court, nor the plaintiffs cite any authority for the proposition that our country's asylum laws apply to persons who are not physically located in the United States, but who are outside our borders yet "in the process of arriving in" the United States.  The district court's holding in this regard is unprecedented and runs counter to both the statutory text and established case law.

Before 1980, "there was no statutory basis for granting asylum to aliens who applied from within the United States." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1987).  In 1980, and as part of amendments to the Immigration and Nationality Act (INA), Congress separately addressed refugees applying for admission from outside the United States, as distinguished from asylum seekers asking for protection from within our borders.  *Id.*  As the Supreme Court has explained in describing these reforms, "Section 207, 8 U.S.C. § 1157, governs the admission of refugees who seek admission from *foreign* countries.  Section 208, 8 U.S.C. § 1158, sets out the process by which refugees *currently in the United States* may be granted asylum." *Id.* (emphasis added).

It has thus long been understood that unlike admission for refugees, *see* 8 U.S.C. § 1157 (imposing certain population caps for resettling refugees), asylum under § 1158 requires application from within the United States.  As we have explained, "Section 207 [8 U.S.C. § 1157] establishes the procedure by which an

alien *not* present in the United States may apply for entry as a refugee. . . . Section 208 [8 U.S.C. § 1158], on the other hand, sets out the procedures for granting asylum to refugees *within* the United States." *Yang v. INS*, 79 F.3d 932, 938 (9th Cir. 1996) (emphasis in original); *see also Singh v. Holder*, 649 F.3d 1161, 1167 (9th Cir. 2011) (en banc) ("Th[e] definition of a refugee contains no cross-reference to the procedural requirements for asylum, such as being physically present in the United States . . . ."); *Halaim v. INS*, 358 F.3d 1128, 1133 (9th Cir. 2004) ("Because they are physically present in the United States, however, Petitioners are applying for asylum and withholding of deportation only under Section 208 of the INA, 8 U.S.C. § 1158."); *Sadhvani v. Holder*, 596 F.3d 180, 183 (4th Cir. 2009) ("[T]he BIA did not abuse its discretion in denying relief based on the statutory requirement that one must be present in the United States to eligible for asylum."); *Kiyemba v. Obama*, 555 F.3d 1022, 1030 (D.C. Cir. 2009), *vacated by* 559 U.S. 131 (2010), *and judgment reinstated as amended*, 605 F.3d 1046 (D.C. Cir. 2010) ("[R]efugees apply from abroad; asylum applicants apply when already here[.]").

Consistent with the foregoing, the text, structure, and history of the INA all confirm that an alien who approaches a port of entry, but who does not enter the United States, is not covered by the asylum laws. The INA's asylum provisions are limited to aliens who are "physically present *in* the United States or who arrive[] *in* the United States" or "who [are] arriving *in* the United States." *See* 8 U.S.C.

§§ 1158(a)(1), 1225(b)(1)(B)(i)-(ii) (emphases added). This language unambiguously requires an alien to be *in* the United States to apply for asylum. The statute does not apply by its terms to someone who is "in the process of arriving" in the United States, but who is not yet here. One who "arrives in the United States," 8 U.S.C. § 1158(a)(1) is one who, at the very least, has crossed *into* the United States. *See, e.g.*, THE AMERICAN HERITAGE DICTIONARY 102 (3d ed. 1992) (defining "arrive" as "[t]o reach a destination"); THE OXFORD ENGLISH DICTIONARY 651 (2d ed. 1989) (defining "arrive" as "to come to land at, reach (a shore, port, etc.)" and "[t]o come to the end of a journey, to a destination, or to some definitive place"). When we say that a person "arrives" in a location, we mean he *reaches* that location, not that he is somewhere on his travels toward it. An alien thus "arrives in" the United States or he does not; there is no in-between.

The majority nevertheless relies on the district court's use of the canon against surplusage, which the district court held requires that "arrives in the United States" must mean something different than "physically present in the United States." Maj. Op. 21 (citing 8 U.S.C. § 1158(a)). The district court's surplusage analysis fails upon closer scrutiny. The Refugee Act of 1980 originally ordered the Attorney General to accept asylum applications from any alien "physically present in the United States or at a land border or port of entry, irrespective of such alien's status." 8 U.S.C. § 1158(a) (1980). The majority suggests without citation that this earlier

30

language covered "[a] person standing *at* the border," but who was "not necessarily *across* it." Maj. Op. 23 (emphasis in original). The majority identifies no court that has accepted this interpretation of the 1980 Act, nor does it address the fact that both the Supreme Court and this court have described the 1980 provision as applying to "refugees currently in the United States," *Cardozo-Fonseca*, 480 U.S. at 433, and "refugees *within* the United States," *Yang*, 79 F.3d at 938 (emphasis in original).

In the landmark Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009, Congress revised the statutory language in § 1158(a)(1), so that it now provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a); *see generally East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 757–58 (2018) (describing the IIRIRA changes to the statutory scheme). The 1996 amendments did not somehow work a major change in the law to enable persons who were outside the United States, but "in the process" of arriving into it, to apply for asylum.

Prior to 1996, our immigration laws set forth two types of expulsion proceedings: deportation and exclusion. *See Vartelas v. Holder*, 566 U.S. 257, 261 (2012); *Jama v. ICE*, 543 U.S. 335, 349 (2005); *Lezama-Garcia v. Holder*, 666 F.3d

518, 526 (9th Cir. 2011). In the 1996 immigration reforms, Congress "abolished the distinction between exclusion and deportation procedures and created a uniform proceeding known as 'removal.'" *Vartelas*, 566 U.S. at 262. Congress also created expedited removal proceedings for aliens "arriving in" the United States who seek to procure entry through fraudulent means or who lack proper documentation. 8 U.S.C. § 1225(b)(1)(A)(i). Congress further authorized the Attorney General to place in expedited removal proceedings certain persons who had been physically present in the United States for less than two years. *Id.* § 1225(b)(1)(iii). Nevertheless, most persons subject to expedited removal can request asylum and be referred for a credible fear interview "either at a port of entry or at such other place designated by the Attorney General." *Id.* § 1225(b)(1)(A)(ii), (B)(i).

Properly considered, the phrases "arrives in the United States," 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), or "arriving in the United States," *id.* § 1225(b)(1)(A)(i), did not extend our asylum laws to persons outside the physical boundaries of the United States. Instead, the point was to identify certain persons who could be subject to expedited removal, while ensuring that they could still pursue asylum. *Id.* § 1225(b)(1)(A)-(B); *see also Succar v. Ashcroft*, 394 F.3d 8, 13 (1st Cir. 2005) ("Congress established expedited removal proceedings for arriving non-citizens who are charged as inadmissible due to lack of proper documents or material misrepresentations at entry. Expedited removal proceedings provide little

32

opportunity for relief; however, aliens in this situation can seek asylum.") (quotations omitted).

Nothing in these changes suggested that from the perspective of whether the asylum applicant had to be located in the United States, there was a difference between a person "present in the United States" and one "who arrives in the United States." 8 U.S.C. § 1225(a)(1); *see also id.* § 1158(a)(1). A change of that magnitude, and particularly one made through the 1996 immigration reforms— widely regarded as placing important new limits on immigration, *see Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 494 (9th Cir. 2007) (en banc); *Avendano-Ramirez v. Ashcroft*, 365 F.3d 813, 819–20 (9th Cir. 2004)—would surely have been made quite explicitly. The district court's invocation of the canon against surplusage was therefore misplaced.

Not only was the district court incorrect to apply the canon against surplusage, its effort to do so led it to misapply the Dictionary Act, an error the majority unfortunately credits. Maj. Op. 21. The district court relied upon a provision in the Dictionary Act which states that "unless the context indicates otherwise," "words used in the present tense include the future as well as the present." 1 U.S.C. § 1. From this it concluded that "arrives in"—which it believed must have a different meaning than "physically present in"—had to include "an alien who may not yet be in the United States, but who is the process of arriving in the United States through

a [port of entry]." *Al Otro Lado*, 394 F. Supp. 3d at 1200.

The conclusion does not follow.  Courts cannot "invoke[] the Dictionary Act in an effort to convert an unambiguous verb tense into claimed ambiguity," and then use "that manufactured ambiguity as a stepping stone to altering the plain sense of a statute." *Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 775 (9th Cir. 2008).  Here, the district court used the Dictionary Act not to read "arrives" in both the present and future tense, but to change the entire definition of "arrives" to include the "process of arriving."  And if the phrase "arrives in" does refer to something in the future, there is no reason to limit that interpretation, as the district court did, to someone "in the process of arriving in" the United States, as opposed to someone who took some other antecedent step toward arriving in this country. The uncertainty of what it means to be "in the process of arriving" raises a host of interpretative and practical issues that the majority does not address.

In all events, if the district court had been consistent in its application of the Dictionary Act, it would have read "*is* physically present in the United States"—also framed in the present tense—to refer to the future as well.  8 U.S.C. § 1158(a)(1). But that would have erased the very distinction that the surplusage canon supposedly required.  There too, of course, the statute in the future tense would merely reflect the unremarkable proposition that one who *will be* physically present in the United States *will be able* to apply for asylum once they are here.  It would *not* mean that

34

one who is in the *process of* becoming physically present would have that same statutory right. This same logic applies to the phrase "arrives in" as well.

The district court believed, and the majority apparently agrees, that 8 U.S.C. § 1225(b) supported the district court's "in the process of" theory. Maj. Op. 21–22. As described above, § 1225(b)(1) references aliens "arriving in the United States." The district court held that this phrase supported its interpretation of § 1158(a)(1), because § 1225(b)'s "use of the present progressive, like use of the present participle, denotes an ongoing process." *Al Otro Lado*, 394 F. Supp. 3d at 1200.

The district court's (and majority's) reading collapses when § 1225 is read as a whole. *See, e.g.*, *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (quotations omitted). In this case, the very provision the district court relied upon states that "[i]f an immigration officer determines that an alien … who is arriving in the United States … is inadmissible, the officer shall order the alien *removed from the United States* without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added). For an alien to be "removed from the United States," the alien must of course have been *in* the United States in the first place.

There are various other aspects of § 1225 and § 1158 that likewise do not make sense if "arriving in" means something short of setting foot in the United

States.  Section 1225(b), for example, concerns the "inspection" of aliens "arriving in the United States."   Aliens must be screened in inspections, 8 U.S.C. § 1225(b)(1)(A), before proceeding to asylum interviews, *id.* § 1225(b)(1)(B). These inspections apply to any person "present in the United States" or "who arrives in the United States." *Id.* § 1225(a)(1).  There is no suggestion in § 1225 that CBP officers could inspect persons who did not enter the United States.   Under § 1158(a)(2)(B), to give another example, an alien must generally apply for asylum "within 1 year after the date of the alien's arrival in the United States."  It is unclear how this and other provisions would apply if arrival were an "ongoing process" that includes periods prior to entering the United States.  Maj. Op. 22.  The majority's endorsement of the district court's reasoning thus injects confusion in our immigration laws, with no basis in the statutory text.

Finally, relying upon the district court, the majority states that "the legislative history is consistent with its interpretation of 'arrives in' as denoting an ongoing process."  Maj. Op. 22–23 & n.10.  By "legislative history," the majority means the written statement of a single congressman, Representative Lamar Smith of Texas. *Al Otro Lado*, 394 F. Supp. 3d at 1201.  It is difficult to call this statement legislative history.  The statement is in fact a letter sent by Rep. Smith to the Director of the Immigration and Naturalization Service (INS) about a proposed INS rulemaking (the letter was later placed in the congressional record).  *See Implementation of Title III*

*of the Illegal Immigration Reform and Immigration Responsibility Act of 1996: Hearing Before the Subcomm. On Immigration and Claims of the H. Comm. On the Judiciary*, 105th Cong. (1997), at 13–28 (letter from Rep. Smith to INS). The letter also post-dates the enactment of the IIRIRA. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.").

Even assuming this is true legislative history, the usual warnings about its use would apply. *See Conroy v. Aniskoff*, 507 U.S. 511, 518–28 (1993) (Scalia, J., concurring). In this case, however, there is a more fundamental problem, which is that the majority block-quotes the district court's opinion discussing this "legislative history," Maj. 22, but the district court in quoting that material used an ellipsis to omit critical context from the quoted passage. The following is the full quote from Rep. Smith's letter. I have bolded the text that the district court (and majority) omit with an ellipsis; notably, most of that same material was italicized for emphasis in Rep. Smith's letter:

> The term 'arriving alien' was specifically selected by Congress in order to provide a flexible concept that would include all aliens who are in the process of physical entry past our borders, **regardless of whether they are at a designated port of entry, on a seacoast, or at a land border. *Thus, an 'arriving alien' will in many cases include an alien who, under the current interpretation of section 101(a)(13) of the INA definition of 'entry', would have been found to have made an 'entry.' In specific terms, an alien who has entered U.S. territory between***

37

> ports of entry on our land borders, or who has come ashore on a smuggling boat, should be considered an 'arriving alien' even if that alien has penetrated several hundred yards or even farther into United States territory and has been in that territory for several hours. 'Arrival' in this context should not be considered ephemeral or instantaneous, but, consistent with common usage, as a process. An alien apprehended at any stage of this process, whether attempting to enter, at the point of entry, or just having made entry, should be considered an 'arriving alien' for the various purposes in which that term is used in the newly revised portions of the INA.

*1997 IIRIRA Subcomm. Hrg.* at 17–18 (bold added; italics in original).

Rep. Smith was certainly not advocating for an interpretation of "arriving" that would accord asylum protection to persons who had not crossed into the United States. Instead, and consistent with what he later describes as "the pro-enforcement philosophy of" the INA, Rep. Smith sought to ensure that aliens who had "entered U.S. territory" and proceeded some ways *past* the border should still be treated as "arriving" in the United States and subject to the expedited procedures applicable to such persons. *Id.* at 17–19. That is the stated "context" of Rep. Smith's comments about the word "arrival"—"context" that the ellipsis eliminated. And that is why Rep. Smith elsewhere referred to "physical entry past our borders" and persons "having *crossed the border*." *Id.* at 17–18 (emphasis in original).

The majority opinion acknowledges (but does not re-produce) the "language elided from the district court's block quotation and ours," but maintains that my reading of Rep. Smith's letter is "inconsistent with [his] comments themselves."

38

Maj. Op. 22–23 n.10.  That is not correct.  As explained above, Rep. Smith was referring to "arrival" as a "process" that begins and continues *after* an alien has crossed the border.  Statements Rep. Smith made at the congressional hearing in which he submitted his letter only confirm what his letter plainly says.  *See, e.g.*, *1997 IIRIRA Subcomm. Hrg.* at 70 ("The problem that I hope you all will address when we get to that definition of arriving alien is the situation where you have someone crossing a land border perhaps in a vehicle, and as soon as they travel, they're going north or south or east or west; 2 hours later they're 120 miles in the interior.  Clearly, they're still an arriving alien, and you somehow need to have a broad enough net to catch those individuals and apply that definition to them.").

Rep. Smith's statement thus provides no support for the district court's unprecedented holding that persons who are not in the United States may invoke our asylum laws.  Because that holding was wrong, the injunction of the Third Country Transit Rule upon which it was based should have been stayed.

2

Of course, one does not need to agree with anything in the preceding section to conclude that the district court's injunction of the Third Country Transit Rule was improper.  As I have explained, the government correctly argues (and the majority seemingly agrees, Maj. Op. 26 n.11) that regardless of whether plaintiffs attempted to enter the United States prior to July 16, 2019, they would now be arriving again

39

after that date, so that the Third Country Transit Rule on its face applies to them. The majority therefore acknowledges that even if the district court's "arriving in" analysis were correct, the government would still succeed on the merits if plaintiffs' "first arrival" was not the proper focus, so that "any second arrival . . . governed by the Rule" is the "one that matters."  Maj. Op. 20.

The majority holds that the government has not made a sufficient showing in this respect either, on the theory that "[i]t is more likely that the first arrival is governed by the eligibility requirements at the time the right to be considered for asylum arose than that regulations imposed after the fact will cancel out the earlier eligibility."  Maj. Op. 27–28.  That is the direct effect of the district court's injunction as well, which ordered the government "to return to the pre-Asylum Ban practices for processing the asylum applications of members of the certified class."  *Al Otro Lado*, 2019 WL 6134601, at *20.  This, according to the majority, "makes sense."  Maj. Op. 27.

This reasoning will drastically destabilize the law at the border.  What the majority is apparently saying is that asylum eligibility rules should be frozen in time as of the point that the plaintiffs were first arriving at a port of entry (or, more accurately, in the process of arriving there).  The theory would extend to *any* change in the law after the plaintiffs were first metered.  The implications of this rule of law are significant.  By the logic of the majority's opinion, persons could be metered,

deported from Mexico, and then return to a United States port of entry many years later, demanding that any new developments in immigration law not apply to them. Indeed, *any* person who is "in the processing of arriving in" the United States would seemingly have a vested right to the eligibility requirements in place as of that time. This would atomize the process for applying immigration rules of supposed general applicability, with the law in constant flux depending upon the person being considered for admission. This would cause obvious and enormous problems of administration at the border.

The majority's determination that the Third Country Transit Rule should not apply because it was not "in place" "at the time each class member's right to apply for asylum attached" (the "first arrival"), Maj. Op. 26–27, also meets serious resistance from our cases. We have repeatedly held that a change in immigration law may apply to persons much farther along in immigration proceedings than the plaintiffs are here. As we explained long ago, where a "Petitioner had been eligible for the relief sought when he first applied for it" but "became ineligible by virtue of [a] change in the law," "[i]t is settled that when the law is changed before a decision is handed down by an administrative agency, the agency must apply the new law." *Talanoa v. INS*, 397 F.2d 196, 200 (9th Cir. 1968); *see also Vasquez-Zavala v. Ashcroft*, 324 F.3d 1105, 1108 (9th Cir. 2003) (rejecting petitioners' arguments based on allegedly "settled expectations" and applying change in law that was made

after petitioners filed their asylum application); *Ortiz v. INS*, 179 F.3d 1148, 1156 (9th Cir. 1999) (holding that new definition of "aggravated felony" that took effect after petitioners had filed an asylum application applied, and "[t]he fact that the [petitioners'] petition for asylum was filed prior to the effective date of the IIRIRA does not help them").  In these cases, the new law was "not in place" at the relevant time either, Maj. Op. 27, but that did not change the court's analysis.

To the extent the majority would allow new changes in the law to apply to ongoing asylum proceedings, as our precedent confirms can occur, the broader statements in the majority's opinion must give way to a more limited holding: that when an alien was previously "in the process of arriving" in the United States, the Third Country Transit Rule does not apply to that person.  But that returns us to the beginning, namely, that the Third Country Transit Rule does not exempt persons who previously attempted to enter the country.  And nothing in the INA says that when there are multiple "arrivals" over time, it is the first one, and not the later arrival in front of us (and immigration officials), that matters.

The majority would presumably agree that if an alien entered the United States prior to July 16, 2019, freely left the United States on her own accord, and then returned after July 16, 2019, the Third Country Transit Rule could apply to her.  That would be so notwithstanding her earlier pre-July 16, 2019 "arrival."  The majority would likewise seemingly agree that if an alien entered the United States prior to

July 16, 2019, was lawfully removed, and then attempted to arrive again after July 16, 2019, the Third Country Transit Rule could apply to that person too.

Then why is this case different?  The only possible reason could be that there is something wrong about the combination of the government's metering policies and the Third Country Transit Rule, namely, that the government turned people away through metering only to then subject them to a new asylum eligibility requirement. The district court was explicit on this point: it thought the government's metering policies had created a "legal bind" that was "at best, misleading, and at worst, duplicitous." *Al Otro Lado*, 2019 WL 6134601, at *1, 11.  The majority makes the same point, "agree[ing] with the district court that '[t]his situation, at its core, is quintessentially inequitable.'"  Maj. Op. 29.

The problem with these statements is that this entire injunction—and the majority's opinion refusing to stay it—is premised on the assumption that metering is not unlawful.  Maj. Op. 1–2, 26 n.11; *Al Otro Lado*, 2019 WL 6134601, at *11, 13.  And if metering *is* lawful, as the district court conceded may be the case, then the supposed "legal bind" and "quintessentially inequitable" government behavior are nothing of the sort, but rather a natural consequence of the government's valid enforcement of the immigration laws.  This really has now brought us back completely full circle: the injunction does not turn on whether metering is lawful. The majority and district court therefore cannot then smuggle into the analysis an

implicit and unproven judgment that metering is wrong.  And they certainly cannot do so on a classwide basis for all ports of entry at all times.

For all these reasons, the government has shown an overwhelming likelihood of success on the merits and the first stay factor thus tips decidedly in its favor.  I am unsure why the majority opinion suggests that I am criticizing what the majority views as its "restrained approach."  Maj. Op. 30.  The majority opinion is restrained only insofar as it fails to confront the obvious legal deficiencies in the district court's injunction.  The majority's citation of a law review article and the dissenting opinion in *East Bay* notwithstanding, *see* Maj. Op. 31 (citing *East Bay*, 140 S. Ct. at 6 (Sotomayor, J., joined by Ginsburg, J., dissenting), at this stage of the process, we not only may consider the likelihood of success on the merits, but are required to do so.  *Nken*, 556 U.S. at 433–34.  We often do so extensively, whether a stay is granted or denied.  *See, e.g.*, *City & Cty. of S.F.*, 944 F.3d at 790–805; *Sierra Club v. Trump*, 929 F.3d 670, 688–704 (9th Cir. 2019).  That the inquiry at this stage is probabilistic, Maj. Op. 30, does not mean we can shy away from it.

## IV

The second stay factor—irreparable harm—also weighs strongly in favor of the government.  *See Nken*, 556 U.S. at 424.  We have previously explained that the harm analysis "focuses on irreparability, irrespective of the magnitude of the injury." *City & Cty. of S.F.*, 944 F.3d at 806 (quoting *California v. Azar*, 911 F.3d 558, 581

(9th Cir. 2018)).  The majority opinion is thus incorrect to insist on a showing of "significant irreparable harm."  Maj. Op. 13.  That is not the governing standard. Here, however, the harm of complying with the district court's injunction is both irreparable and significant, requiring a stay of the injunction.

Although the majority does not mention it, the initial harm here is the government's inability to apply the Third Country Transit Rule to persons that the Rule covers, where the Supreme Court has already held that this Rule may be implemented pending appeal.  *See East Bay*, 140 S. Ct. at 3.  Citing an exponential increase in persons approaching our border and the fact that many asylum claims are later found to be "meritless," the Third Country Transit Rule sought to focus the country's immigration resources on those applicants who are more likely to present meritorious asylum claims.  *See* 84 Fed. Reg. at 33,839.  The district court's injunction thus disallows the government from denying asylum on a presently permitted ground.  This constitutes an irreparable harm.  *See City & Cty. of S.F.*, 944 F.3d at 806.  But in all events, it is not for us to debate whether the government's inability to enforce the Third Country Transit Rule creates such harm.  The Supreme Court—in staying an injunction of that very Rule—has already found that the government met its burden on the stay factors.  *East Bay*, 140 S. Ct. at 3.

The irreparable harm here, however, runs deeper.  Under the district court's injunction, the government is obligated to identify and treat differently an estimated

26,000 persons who were metered during a several-year period at various points of entry across our southern border. Many of these persons will lack proper documentation. While the Third Country Transit Rule may now be applied to everyone else entering this country, *see East Bay*, 140 S. Ct. at 3, officials at our already overburdened border will now face the additional task of exempting a 26,000-person subclass from the Rule.

To hear the majority tell it, this will be straightforward. All that is needed are "fairly simple factual determinations." Maj. Op. 12. The record refutes that characterization. The majority opinion turns on the government's supposed ability to rely upon certain lists of metered persons prepared by different groups in Mexico, lists the majority says border officials could use to identify those persons who had been metered prior to July 16, 2019. *Id.* at 14–15. The majority goes so far as to assert that the government has in fact relied on these lists in the past, and that the government's failure to create its own lists of metered aliens is the government's own fault. *Id.* at 13–14.

The record does not support these assertions. What the record instead reveals is that based on materials that *plaintiffs themselves* have put forward in this litigation—including expert opinion—the various lists are highly unreliable and underinclusive. The government represents that it does not view the lists as reliable. Given plaintiffs' own positions on the lists in this litigation, it cannot be that the

government should be expected to rely upon them in complying with the district court's order.

The district court's injunction does not require "fairly simple factual determinations." Maj. Op. 12. It instead creates an administrative dilemma of the highest order, across every port of entry at the United States-Mexico border. Although the majority dismisses it as "the supposition of some officials," Maj. Op. 15, the government has come forward with the declarations of high-ranking immigration personnel attesting to the serious problems of administration and delays that the district court's injunction will cause. The majority therefore errs in concluding that the government's showing of irreparable harm is "weak." *Id.* at 18. The record shows that the government has made a more than sufficient showing of irreparable harm, warranting a stay.

## A

I must first address the majority's claim that the irreparable harm here is "self-inflicted" based on "the government's own failure to keep records of asylum seekers who have been metered." Maj. Op. 13–14. In the majority's view, "[t]hat the government's asserted harm is largely self-inflicted 'severely undermines' its claim for equitable relief." *Id.* at 13. This position is not justified and improperly substitutes the court's judgment for that of immigration officials.

As an initial matter, nothing required the government to maintain lists of persons who approached the United States border but could not enter due to metering.  Neither plaintiffs nor the majority cite any statute, regulation, or other requirement imposing such a record-keeping obligation.  When rejecting the argument that plaintiffs' harm was self-inflicted because class members did not pursue asylum in Mexico, the majority holds that "the class members were not required to do so."  Maj. Op. 29 n.13.  It is unclear why this same rationale would not apply to the government's alleged failure to create lists of metered persons, which it was not required to do either.

Equally unavailing is the majority's claim that the government's harm is self-inflicted because it was foreseeable. Maj. Op. 13–14.  The chain of events that would make this true is far too unlikely.  The government would have had to presume that its metering practices, dating back many years, would be challenged and result in a novel decision holding that persons outside the United States could claim a violation of our asylum statutes.  The government would then have had to predict the enactment of the Third Country Transit Rule two years into this case.  And it would then have to envision that the Supreme Court would allow this Rule to go into effect pending appeal, *see East Bay*, 140 S. Ct. at 3, but that the Rule could then be partially enjoined in a metering lawsuit that does not directly challenge it.  It is hard to see how this unusual sequence could be regarded as foreseeable such that the

government must now be faulted for failing to prepare lists that it was not required to prepare in the first place.

Finally, the majority ignores evidence in the record as to the government's reasons for not creating such lists. As Randy Howe, Executive Director for Operations, Office of Field Operations, U.S. Customs and Border Protection, has explained, CBP officers' interactions with persons at the border line are "not intended to be a detailed encounter; memorializing a great deal of information at this time would be not only impracticable but potentially dangerous to the personnel and the port." As Mr. Howe explains in greater detail,

> Personnel at the limit line are in a constant or near-constant cycle of encountering dozens or hundreds of travelers a day, some of whom may be seeking to cause harm or evade the law. For these reasons, forcing limit line personnel to halt their present duties and memorialize the counter, when those travelers may or may not need interpretative assistance to engage in thorough dialogue, including collecting biographical information about that individual or family unit (along with at least some measure of verification), would weaken the operational posture of the remainder of the limit line and could pose a threat to safety.

The majority opinion tries to shift responsibility back to the government by referencing the fact that at "one [port of entry]" "around the end of 2016," CBP officials were instructed to provide aliens with pieces of paper identifying appointment times "if possible." Maj. Op. 12; *id.* at 4 n.1. The record shows that the government ultimately concluded that "giving out tickets would just lead to a lot

of fake tickets and a lot of misuse of [the] system." The government's official metering guidance thus prohibited the provision of any "tickets or appointments" or other means of scheduling persons for entry.

The difficulty the government would face in creating records of persons approaching the border during periods of metering was also exacerbated by evidence in the record of large groups of immigrants approaching U.S. ports of entry. Plaintiffs' expert witness claims, for example, that certain formal metering guidance was issued in response to "surge events," such as a large group of approximately 1,500 asylum seekers traveling through Mexico toward the United States in 2018. The majority opinion fails to appreciate the reality on the ground, which is that documenting large volumes of persons during periods of metering would raise significant logistical and other issues.

These safety and logistical issues easily distinguish this case from the cases the majority cites involving self-inflicted harms. In *Hirschfeld v. Board of Elections in City of New York*, 984 F.2d 35 (2d Cir. 1993), the court denied a stay because of the applicant's "inexcusable delay" in seeking it, which reflected a "misuse of the judicial process." *Id.* at 37–39. In *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846 (7th Cir. 2003), the court denied a stay of a licensing requirement because the applicant had not even sought the "readily available license" and "would incur no detriment by the act of applying" for it. *Id.* at 849–50. And in *Caplan v.*

*Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828 (3d Cir. 1995), the court held that the defendant law firm seeking an injunction could not show irreparable injury from its insurer settling a claim, because the law firm had contracted with the insurer to do just that. *Id.* at 839. These cases all involved easily foreseeable or readily avoidable harms. And none involved situations remotely as dynamic or difficult as the United States' border with Mexico.

### B

The majority asserts that because the government supposedly "relied on [the waitlists] to facilitate the metering policy," "[n]o reason appears why the lists are adequate for those purposes but must be entirely disregarded in identifying who came to the border when for purposes of complying with the district court's injunction." Maj. Op. 15. The record does not support either conclusion.

It is not accurate to claim, as the majority does, that "the record establishes that the government has been using [the waitlists] in determining *the order* in which applicants for asylum are allowed to enter, submit their asylum applications, and undergo credible fear interviews." Maj. Op. 15 (emphasis added). For this proposition the majority cites the report of plaintiffs' expert witness, Stephanie Leutert. But the relevant portions of that report, which may be found at pages ER 996–1001 of plaintiffs' excerpts of record, do not support the majority's statement.

After discussing metering practices generally and the creation of certain lists in Mexico, Ms. Leutert states that

> Once asylum seekers get on a waitlist, they have to wait until their number is called. Every day, a CBP official communicates the number of people that they will receive that day to an individual in Mexico. This exact process depends on the port of entry and the waitlist structure in each Mexican city. According to list managers in cities such as Ciudad Juárez, Ciudad Acuña, and Piedras Negras, CBP officers directly call the Mexican individuals who manage the lists.

As this passage shows, Ms. Leutert's report does not say that the government is relying upon the waitlists themselves (and certainly not all of them), but rather that when capacity frees up at a port of entry, CBP will contact some of the persons who allegedly manage the lists to let them know. The Leutert report also does not suggest, as the majority claims, that the government has been using the waitlists "in determining *the order* in which applications for asylum are allowed to enter." Maj. Op. 15 (emphasis added). Ms. Leutert offers no opinion as to whether CBP is relying upon persons managing the waitlists to provide names in a particular order. And there would be obvious questions whether Ms. Leutert would even have a basis to offer such an opinion, particularly across the many different ports of entry.

The majority also states that "[t]he district court concluded that 'CBP relied on these lists to facilitate the process of metering,' and the record supports this conclusion." Maj. Op. 4–5 (quoting *Al Otro Lado*, 2019 WL 6134601, at *15). What

the district court relied upon for this statement, and what the majority relies upon as well, are the declarations of Nicole Ramos of Al Otro Lado and J.R., an asylum-seeker from Cuba. *Id.* The majority provides no explanation as to why an employee of Al Otro Lado or a person seeking entry into this country can be the authority on what CBP does or does not rely upon. But even so, these declarations on their face do not support the notion that CBP has broadly relied on lists of metered persons that various outside groups have generated, or that it has relied on these lists to sequence entry of persons in any particular order.

Ms. Ramos, Al Otro Lado's Border Rights Project Director, states only that Grupo Beta maintains a list and that "CBP communicates its daily capacity to Grupo Beta, which uses that information to call the appropriate numbers from the top of the list." Ms. Ramos is here referring to only one group (Grupo Beta, a Mexican governmental entity) for one port of entry (Tijuana). Her declaration thus does not support the majority's description of what CBP supposedly does "[a]t each" port of entry. Maj. Op. 4. Nor does it support the majority's suggestion that CBP's purpose in contacting Grupo Beta was to receive asylum seekers in a certain order. Once again, that CBP would contact Grupo Beta to let it know about capacity at a border station is not the same as CBP relying upon the accuracy or ordering of Grupo Beta's list—a list that Ms. Ramos herself says was subject to "corruption," a point I will discuss further below.

J.R.'s declaration likewise does not support the majority. J.R. is a Cuban citizen who sought to enter the United States at Brownsville, Texas and was put on a waitlist. According to J.R., "[t]he list was controlled by Mexican immigration officials, and they were in touch with U.S. officials who would ask every day for a certain number of people to present themselves at the U.S. offices." J.R.'s declaration is limited to one port of entry and also does not support the majority's position that CBP "has been using [the waitlists] in determining the order in which applicants for asylum are allowed to enter." Maj. Op. 15.

Nor is it correct, as the majority opinion states, that through the use of the "terms" "metering and queue management," the "government recognized" and "impl[ied]" "the practical need to identify which applicants had appeared at the border and in what order." Maj. Op. 14. This point has little to do with whether the government previously relied upon waitlists that others generated. But even so, the terms "metering" and "queue management" do not have the implication that the majority suggests. To the contrary, government witnesses have explained that metering was not a "scheduling system," but a means of "controlling the flow based on our operation."

The upshot is that the government's ability to comply with the injunction without irreparable harm cannot depend upon what the government has already done (supposed reliance on the lists) or not done (alleged self-inflicted failure to create its

own lists). Instead, it must turn on whether the lists are themselves capable of being used to comply with the district court's order. I turn now to that issue.

C

Can waitlists that various groups in Mexico prepared be used to separate out the 26,000 class members from all other asylum seekers who would otherwise be subject to the Third Country Transit Rule? On this critical point, the majority says very little. It acknowledges that the lists are "not entirely reliable," but says there is no reason why the lists "must be entirely disregarded in identifying who came to the border when for purposes of complying with the district court's injunction." Maj. Op. 15. But the question is not whether the lists should be "entirely disregarded." It is whether the lists can be relied upon to any meaningful extent, so that the government would not be put to a significant burden of determining whether each asylum applicant is a class member. The record does not support the majority's apparent theory that the government can easily comply with the district court's injunction by relying upon the waitlists.

I conclude this based on materials that *plaintiffs themselves* have put forward, in an evident effort to support their underlying claims about metering. This includes, but is not limited to, the expert report of Stephanie Leutert, the Director of the Central America & Mexico Policy Initiative at the Strauss Center for International Security and Law at the University of Texas. The point here is not to credit any

55

particular evidence, but to show that the government should not be expected to rely upon the various lists when plaintiffs in this case have sharply impugned the integrity of those very lists.

At the outset, it is important to recognize that there is no single waitlist, but many different waitlists in many different locations along the Mexico border. This begins to show some of the serious problems with using the lists to comply with the district court's injunction. According to plaintiffs' expert, Ms. Leutert, waitlists are "in place in every city with waiting asylum seekers." Ms. Leutert formally identifies as of November 2019 twenty-two such waitlists, which were in place in eleven different border locations. According to her report, some areas have more than one list. Nuevo Laredo, opposite Laredo, Texas, has six different lists. Brownsville has three.

According to Ms. Leutert, lists are maintained by a variety of different groups, such as "the asylum seekers themselves, Mexican government officials, or humanitarian workers." The details vary in every location. For example, a Strauss Center report upon which plaintiffs and Ms. Leutert rely indicates that in Nuevo Laredo, six different shelters each operate their own list, with "[t]he shelters select[ing] which asylum seekers will cross" into the United States. In Tijuana, the list operating as of July 16, 2019 was a physical notebook containing tens of thousands of names, with asylum seekers themselves serving as "list managers." In

Reynosa, Mexico, and again based on the same report, approximately 3,600 asylum seekers are organized into different lists for single men, single women, families, and pregnant women.

As a result, and contrary to the apparent assumption in the majority's opinion, according to Ms. Leutert, the "asylum waitlists have no standardized procedure or structure," and "there is no standardized Mexican or U.S. regulation of the asylum waitlists nor their managers." That is the case even as to lists that the Mexican government maintains. Ms. Leutert reports that "[d]espite Mexican government entities managing the lists in certain cities, there does not appear to be any standardized guidance," which "is evidenced by the different list formats and processes in different cities even when the same federal government agency is running the asylum waitlist." The majority does not explain whether any or all of the different waitlists would indicate when a person was metered, much less reliably so across every border location.

Equally problematic, plaintiffs maintain that for many different reasons the waitlists are underinclusive of persons who were metered. A December 2018 Strauss Center report—which lists Ms. Leutert as the lead author—notes that various lists were not enacted until the summer of 2018, and so would evidently not capture persons metered before then. In addition, according to Ms. Leutert, "the lack of regulations means that some cities can stop asylum seekers from joining waitlists

57

altogether."  In a border town opposite Del Rio, Texas, for example, "the asylum waitlists for both individuals and families have been 'closed' since March 2019." There are other reasons the lists are underinclusive as well.  An August 2019 Strauss Center report (upon which Ms. Leutert also relies) describes that in Matamoros, Mexico, "there have been reports that asylum seekers who lack documentation and legal status in Mexico are being barred from signing up on the list, and are instead being deported."  There are other similar examples in the record involving other border locations.

Plaintiffs further put forward evidence that the lists are underinclusive for more malign reasons.  Ms. Leutert reports that there are "no controls to guarantee that these waitlists are being run transparently or without corruption," and that corruption is an issue.  Ms. Leutert recounts that "some list managers charge asylum seekers to get on the asylum waitlist, including in Piedras Negras, Reynosa, and Matamoros."  Ms. Leutert also relies upon a news article reporting that when an individual in Tijuana misses his number being called, the individual may be reassigned a new number at the end of the line.  Her expert report also recounts allegations in Tijuana "that black asylum seekers were at times excluded from waitlists, and as such would not be counted."

A declaration from Nicole Ramos, Al Otro Lado's Border Rights Director, gives deeper insight into some of these issues in Tijuana, where Grupo Beta runs the

list.  As with Ms. Leutert's expert report, the plaintiffs relied upon Ms. Ramos'
declaration in seeking the injunction at issue.The majority also specifically
references Grupo Beta's "'formalized list,'" thereby suggesting it is reliable.  Maj.
Op. 4.  But Ms. Ramos' declaration tells a different story.

An entire heading in Ms. Ramos' declaration is that "The Waitlist in Tijuana,
Mexico is Underinclusive."  Grupo Beta's rules "require that each asylum seeker
present identification, which has prevented asylum seekers who lack identification
from being added to the list."  Ms. Ramos reports that these requirements
"disproportionately affect Black migrants," who are less likely to possess identifying
documents.  Like Ms. Leutert, Ms. Ramos cites "numerous reports of corruption of
the list administered by Grupo Beta," including "several asylum seekers who paid
to have their names added to the list while still in South America."

Given everything plaintiffs have said about the various lists, it is difficult to
understand why the government should now be expected to rely upon them,
particularly for purposes of complying with a court order.  A declaration from
Ashley Caudill-Mirillo, the Deputy Chief of the Asylum Division with U.S.
Citizenship and Immigration Services (USCIS) who "oversee[s] all Asylum Offices
nationwide," explains that "[e]ven if USCIS had access to any lists[] purportedly
maintained by shelters or otherwise," "USCIS has no definitive way to verify the
accuracy or authenticity of any such lists."  As a result, Ms. Caudill-Mirillo attests,

"asylum officers would still need to question the interviewees to assess the veracity of any documentation provided and determine whether or not they are class members."

The Supreme Court has reminded us that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). The government personnel in charge of managing our borders and maintaining their safety are surely due some degree of deference on the operational issue of whether certain lists are reliable for determining if asylum seekers were metered prior to July 16, 2019. *See, e.g.*, *Tabbaa v. Chertoff*, 509 F.3d 89, 106 (2d Cir. 2007) ("[S]ome measure of deference is owed to CBP due to its considered expertise in carrying out its mission of protecting the border.").

The lists may be the product of well-meaning efforts to help those in need, or the unfortunate result of persons taking advantage of the downtrodden. But given plaintiffs' own positions on the various lists, I am hard-pressed to understand how the majority can conclude that the government can be expected to use them, so that its burden in complying with the district court's injunction would be minimal.

### D

With the lists unable to ease the government's burden, the enormity of the government's task in complying with the district court's injunction pending appeal

reveals itself in stark relief.  Just this Term, the Supreme Court reiterated that patrolling our border with Mexico is "a daunting task."  *Hernandez v. Mesa*, No. 17-1678, slip op. at 11 (S. Ct. Feb. 25, 2020).  Today's decision makes this work only more daunting.

Immigration officials at an already overburdened border must now somehow identify the 26,000 persons among the easily hundreds of thousands more who, per a court order, cannot be subject to the Third Country Transit Rule.  CBP officers must determine those asylum seekers who previously approached a port of entry and were turned away due to metering, a practice that took place over a period of years and at many different entry locations.  Immigration officers will have to make these determinations without reliable records of who previously approached border limit lines or when they may have done so.  And officials must undertake this effort at every United States port of entry across the southern border, as to persons who frequently lack proper documentation and who speak a diversity of languages.  As CBP's Randy Howe explains, "[w]ere any individual to come forward and assert that they had been encountered at the limit line, CBP would have no way to either confirm or refute that individual's own statements."

The result is that as immigration officials inspect people every day in locations from San Diego to Brownsville, they will have to undertake an entirely new and unfamiliar inquiry to determine if persons were previously metered.  The

government has submitted declarations from high-ranking immigration personnel attesting to the serious problems this will create at the border. This includes CBP's Mr. Howe, who oversees 23,000 immigration employees at 20 major field offices and 328 U.S. ports of entry. Based on his three decades of service in our country's immigration system, Mr. Howe explains that based on the lack of documentation, "there is no way for CBP to determine who may or may not have been encountered at the limit line historically. Indeed, there is no way to even calculate, with any degree of accuracy, how many individuals have been encountered in the limit line."

A declaration from Ashley Caudill-Mirillo, the USCIS official who oversees all Asylum Offices across the country, gives color to what immigration officers on the ground will need to do to even attempt to comply with the injunction. CBP officers at the border will be required to question asylum applicants to determine if they are members of the 26,000-person subclass. Ms. Caudill-Mirillo explains that this additional questioning will lengthen credible fear interviews, which in turn reduces the number of interviews that can be conducted, prolonging wait times at the border. Some applicants are likely to reschedule their interviews to obtain proof of past metering, and their interview slots may go then go unfilled. Because "[m]ost individuals are detained throughout the credible fear process," longer processing times will lead to longer periods of detention in Immigration and Customs Enforcement (ICE) or CBP custody.

Ms. Caudill-Mirillo further explains how additional problems arise when it comes to persons who already went through credible fear screening interviews, where the Third Country Transit Rule was applied but where the person has not yet been removed from the United States. In coordination with ICE, detained persons would need to be identified and then re-interviewed to determine if they are class members. If persons turn out to be class members, the credible fear interview process would need to be conducted anew. Ms. Caudill-Mirillo reports that USCIS in 2019 received over 100,000 credible fear referrals. Complying with the district court's injunction as to persons who had already gone through this process would only add to the irreparable harm.

The irreparable harm would extend to proceedings before immigration judges. As a separate declaration from Assistant Chief Immigration Judge Sirce Owen explains, if USCIS goes through the above-described process and issues a new negative credible fear determination, the applicant "will again be entitled to immigration judge review." Immigration judges will then be tasked with evaluating the applicant's membership in the subclass and conducting further reviews of credible fear determinations. The bottom line is that as the government's declarations amply demonstrate, the district court's injunction will have a domino effect at the border, imposing new and difficult requirements on an immigration system that is constantly struggling to keep up.

I disagree with the majority's refusal to recognize the irreparable harms that the government's declarations make plain, and which resonate based on any reasonable understanding of how our immigration process works. To cast off the declarations as the mere "supposition of some officials," as the majority does, Maj. Op. 15, fails to acknowledge that the government's declarants are high-ranking persons with a collective decades of experience dealing with some of the most intractable problems at our border. "[G]overnance of immigration and alien status is extensive and complex," and trained immigration officials play a "major role" in "determining the admissibility of aliens and securing the country's borders." *Arizona v. United States*, 567 U.S. 387, 395, 397 (2012). I therefore believe the views of the government declarants in this case should not be so lightly cast aside. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 27 (2008).

Nor is there anything wrong or insufficient in this context with declarations that set forth the anticipated effect of an injunction. *See id.* at 28 ("The lower courts failed properly to defer to senior Navy officers' specific, predictive judgments about how the preliminary injunction would reduce the effectiveness of the Navy's SOCAL training exercises."). To minimize the government's declarations as setting forth only "guesses concerning the likely burden of ascertaining class membership," as the majority does, does not seem at all fair. Maj. Op. 14–15. The majority does not question the declarants' qualifications or their explanation for how the district

court's injunction will generally affect processes at the border. The declarations are not based on guesswork, but the informed views of experienced personnel who set forth a valid and detailed basis for their stated concerns.

I also do not find persuasive the majority's quibbles with the government declarants' time estimates for the additional questioning of asylum applicants that the district court's injunction will necessitate. *See* Maj. Op. 12–13, 15–16. I find it difficult to substitute our judgment on such operational issues for that of immigration officials who have a greater on-the-ground understanding of how much time particular lines of questioning in asylum interviews will take. But the debate over minutes is not a helpful one, because it cannot be denied that the district court's injunction will require immigration officials to conduct an entirely new line of inquiry to reach an entirely new type of determination about past metering.

The majority notes that in one asylum interview, USCIS was able quickly to determine that the applicant was not a subclass member. Maj. Op. 15–16 & n.8. But in that case, the applicant clearly stated that he had not tried to enter the United States prior to October 2019, and so by his own admission was not a member of the class. *Id*. As the majority acknowledges with considerable understatement, "[m]ore time may be needed to establish that someone who claims to be a member of the class actually is." *Id.* at 16. Once it becomes widely known that persons can avoid the Third Country Transit Rule if they can claim they were metered prior to July 16,

2019, one can expect many people to claim class membership during their asylum interviews. Whether or not these assertions would be bona fide, the point is that they will take time for immigration officials to review and verify, at a substantial cost to the overall system.

The majority does not dispute that frustrating the government's ability to process persons at the border can create irreparable harm. *See, e.g.*, *Innovation Law Lab*, 924 F.3d at 510. Indeed, we previously granted an administrative stay in this case because "[p]rohibiting the government from applying [the Third Country Transit Rule] to the proposed class members could cause complications at the border." *Al Otro Lado v. Wolf*, 945 F.3d at 1224. Now, the majority claims that this case is akin to *Hernandez v. Sessions*, 872 F.3d 976 (9th 2017). Maj. Op. 13. The comparison to *Hernandez*, however, is inapt.

In *Hernandez*, we held that a district court did not abuse its discretion in entering an injunction that required immigration officials to consider a non-citizen's financial circumstances in setting the amount of bond. *Hernandez*, 872 F.3d at 982–83. We determined that the government had not demonstrated irreparable harm because the government already had discretion to consider a non-citizen's financial circumstances, and therefore "the district court's injunction imposes only a minor change on the preexisting bond determination process." *Id.* at 995. Considering

66

these financial circumstances was also "not overly complicated or complex." *Id.*
(quotations omitted).

As this description of the case shows, the majority is not correct that the
asserted diversion of resources in this case "is no more persuasive as significant
irreparable harm than it was in *Hernandez*." Maj. Op. 13. Suffice to say, requiring
the government to identify 26,000 persons at the southern border who were
previously metered at numerous ports of entry over a period of years is considerably
more complicated and burdensome than requiring the government to consider a non-
citizen's financial circumstances during bond hearings. *Hernandez*, unlike here, also
did not involve an injunction that imposed collateral consequences on other aspects
of the immigration system.

There is a recognized immigration crisis at our southern border. *City & Cty.
of S.F.*, 944 F.3d at 808 (Bybee, J., concurring); *East Bay Sanctuary Covenant*, 932
F.3d at 774. *Hernandez* did not implicate it; this case does. The government has
demonstrated that complying with the district court's injunction will create
irreparable harm.

V

The final stay factors are "whether issuance of the stay will substantially injure
the other parties interested in the proceeding" and "where the public interest lies."
*Nken*, 556 U.S. at 434. For the same reasons I have already set forth above, these

factors favor the government.  *See also Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("The government's interest in efficient administration of the immigration laws at the border is also weighty.").

The majority concludes otherwise based on harms plaintiffs claim they will experience from the Third Country Transit Rule and metering.  Maj. Op. 28–29.  But the validity of the Third Country Transit Rule is not at issue here, and the same arguments plaintiffs now make about the harm this Rule allegedly causes were also made in *East Bay*, where the Supreme Court stayed the injunction and allowed the Rule to go into effect.  With respect to metering, the majority repeats the point that the combination of metering and the Third Country Transit Rule creates a "'quintessentially inequitable'" situation.  Maj. Op. 29.  But the problem once again is that there has been no determination that metering is unlawful.

In a similar vein, the majority endorses the district court's view that class members "relied to their detriment on the government's representations," because class members "'returned to Mexico reasonably believing that if they followed these procedures, they would eventually have the opportunity to make a claim for asylum in the United States.'"  Maj. Op. at 29 (quoting *Al Otro Lado*, 2019 WL 6134601, at *19).  But there is no indication that the government informed persons who were metered that their asylum applications would be adjudged under the law that existed

at the time of metering.  The district court's analysis on this point again assumes that metering is invalid.  The injunction cannot be justified on that basis.

*     *     *

When the Supreme Court allows an immigration rule to go into effect nationwide pending appeal, it is not for litigants or lower courts to find creative and legally unjustified ways to circumvent that ruling.  The problems at our border are undeniable, but the policy issues they raise are committed to other branches of our government.  Our review is limited to evaluating immigration rules under law.  And in this case, the district court's injunction was wrong as a matter of law.  Because the injunction works a radical and improper expansion of our asylum laws and will create irreparable harm at a border that is already under great strain, the injunction should have been stayed pending appeal.  I respectfully dissent.