JOSEPH H. HUNT
Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV (CT 414491)
DHRUMAN Y. SAMPAT(NJ 270892018)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation – District
Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*,<br><br>        *Plaintiffs*,<br><br>        v.<br><br>CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*,<br><br>        *Defendants* | Case No. 3:17-cv-02366-BAS-KSC<br><br>Hon. Cynthia A. Bashant<br><br>**DEFENDANTS' CONSOLIDATED RESPONSE IN SUPPORT OF PLAINTIFFS' MOTION TO SEAL PORTIONS OF THEIR CLASS CERTIFICATION PAPERS (ECF No. 388) AND MOTION TO SEAL LIMITED PORTION OF REPLY (ECF No. 410).** |

# TABLE OF CONTENTS

**ARGUMENT** ..............................................................................................**2**

**I.**   **The Threat to Effective Law Enforcement Operations and Security Pro-
vides a Compelling Reason to Seal Internal Discussions that Reflect Op-
erational Details, Information Gathered from Intelligence and Foreign
Partners, and Candid Internal Assessments** ...............................................**3**

**II.**   **The Risk to Port and Border Security Provides a Compelling Reason to
Seal the Documents Relating to San Diego Admissibility Enforcement
Unit Operations** ...........................................................................................**8**

**III.**  **The Risk to Border Security and the Potential Chilling Effect on Agency
Operations and International Relations with Mexico Constitute Com-
pelling Reasons to Seal Portions of the Depositions of Randy Howe,
Todd Owen, the Whistleblower, and Other Exhibits** ..............................**11**

**IV.**  **The Field Queue Management Reports, MCAT Daily Briefs, and Docu-
ments Concerning Port Capacity and Operations Should Be Sealed Be-
cause They Contain Detailed Operational Information That Expose
CBP's Potential Vulnerabilities and Weaknesses** ....................................**16**

**V.**   **The Court Should Seal Identifying Information and Email Addresses of
Federal Government Employees and Law Enforcement Witnesses in All
Documents Sought to be Sealed** ...............................................................**23**

**VI.**  **The Interest in Protecting Ongoing Investigations Warrants Keeping
Exhibit 47 Under Seal Pending an Outcome of the Inquiry/Investiga-
tion.** ...........................................................................................**25**

**CONCLUSION** ..........................................................................................**25**

**CERTIFICATE OF SERVICE** ...............................................................**26**

i

# TABLE OF AUTHORITIES

## CASE LAW

*Am. Auto. Ass'n of N. California, Nevada & Utah v. Gen. Motors LLC*,
    2019 WL 1206748 (N.D. Cal. Mar. 14, 2019) ......................................3

*Bell v. Home Depot USA, Inc.*,
    No. 212CV02499, 2015 WL 6082460 (E.D. Cal. Oct. 15, 2015) ......................21

*Ctr. for Auto Safety v. Chrysler Group*, LLC,
    809 F.3d 1092 (9th Cir. 2016) ...................................................2

*Heldt v. Guardian Life Ins. Co. of Am.*,
    No. 16-CV-885-BAS-NLS, 2018 WL 5920029 (S.D. Cal. Nov. 13, 2018)..........2

*Hesterberg v. United States*,
    No. C-13-01265 JSC, 2013 WL 6057068 (N.D. Cal. Nov. 15, 2013) .................2

*In re Dep't of Investigation of City of N.Y.*,
    856 F.2d 481 (2d Cir. 1988)......................................................16

*In re Google Inc. Gmail Litigation*,
    No. 13–MD–02430–LHK, 2013 WL 5366963 (N.D. Cal. Sept. 25, 2013) ........22

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
    No. 12-CV-6003, 2015 WL 8570883 (N.D. Cal. Nov. 18, 2015), aff'd, 716 F.
    App'x 603 (9th Cir. 2017) .......................................................23

*Kamakana v. City & Cty. of Honolulu*,
    447 F.3d 1172 (9th Cir. 2006) ....................................................2

*McQuilliams v. Int'l Auto Logistics, LLC*,
    No. 2:14-CV-124, 2016 WL 4257362 (S.D. Ga. Aug. 11, 2016) ......................12

*Motley v. City of Fresno*,
    2016 WL 1060144 (E.D. Cal. Mar. 17, 2016) ............................. 13, 18

ii

*Music Grp. Macao Commercial Offshore Ltd. v. Foote*,
  No. 14-CV-03078-JSC, 2015 WL 3993147 (N.D. Cal. June 30, 2015)...............2

*Pintos v. Pac. Creditors Ass'n*,
  605 F.3d 665 (9th Cir. 2010) ...................................................................3

*United States ex rel. Kelly v. Serco, Inc.*,
  2014 WL 12675246 (S.D. Cal. Dec. 22, 2014) .......................................... 12, 22

*United States ex rel. Mikes v. Straus*,
  846 F.Supp. 21 (S.D.N.Y.1994) ...............................................................25

*United States ex rel. O'Keefe v. McDonnell Douglas Corp.*,
  902 F.Supp. 189 (E.D.Mo.1995).............................................................25

*United States v. Amodeo*,
  71 F.3d 1044 (2d Cir. 1995)......................................................................2

iii

Defendants hereby submit their consolidated response in support of Plaintiffs' Motion to Seal Portions of Plaintiffs' Class Certification Papers (ECF No. 388) and their Motion to Seal Limited Portions of their Class Certification Reply (ECF No. 410) to provide additional reasons for sealing Defendants' confidential documents, information, and testimony, and the portions of the parties' briefs that discuss them.

There are compelling reasons to seal this confidential material. The diplomatic and sensitive law enforcement information and communications which Defendants are seeking to seal includes information about operations of land ports of entry that exposes vulnerabilities of those ports. Additionally, Public release of the information will also have a chilling effect on open communications within the government and with foreign governments such as Mexico. The fact that some similar information has recently been unsealed in both this Court and the Ninth Circuit does not negate these harms. On the contrary, that fact that some similar information has been made public serves only to *increase* the harm that would result from public disclosure of this information.

Specifically, Defendants ask the Court to seal the following exhibits and testimony, as well as any portions of the parties' briefs that rely on them[1]: Exhibits No. 1-5, 7, 16, 17, 19-24,  26, 29-34, 36-37, 39-44; and 46-62 attached to Plaintiffs' Motion for Class Certification ("Class Certification Exhibits"); and Exhibits 2-6 attached to Plaintiffs' Reply in Support of their Motion for Class Certification ("Reply Exhibits").[2] The Court should allow these documents to remain under seal to prevent

---

[1] For the Court's convenience, Defendants are including a listing of all of the Exhibits addressed in this Response at Appendix A.

[2] In its March 12, 2020 Order, this Court denied a prior Motion to Seal with respect to Class Certification Exhibits 63 (email entitled "CBP_MCAT_REPORT for February 25, 2018) and 96 (email family entitled "Field Office Queue Management 10.02.18") *See* ECF No. 421.

1

public disclosure of information that could be used to circumvent or otherwise com-promise law enforcement operations, threaten the safety of witnesses and employ-ees, threaten the integrity and security of ports of entry into the United States, and chill frank discussions that are crucial to agency operations and foreign relations.

## **ARGUMENT**

Although there is "a strong presumption in favor of access to court records," a party seeking to seal judicial records can "overcom[e] this strong presumption by meeting the 'compelling reasons' standard." *Ctr. for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016). The presumption of access is "based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). Thus, when the documents to be protected are "more than tangentially related to the merits," parties must show compelling reasons to keep those documents sealed. *Heldt*, 2018 WL 5920029 at *1 (quoting *Ctr. for Auto Safety*, 809 F.3d 1092, 1096–98). Compelling reasons include "when [] 'court files might [] become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). "In certain circumstances, courts have allowed the *government* to file under seal material that contains confidential and sensitive government information that might endanger or undermine law enforcement's activities . . . where the government identifies the particular harm that may result from the specific disclosure." *Music Grp. Macao Commercial Offshore Ltd. v. Foote*, No. 14-CV-03078-JSC, 2015 WL 3993147, at *3 (N.D. Cal. June 30, 2015); *see Hesterberg v. United States*, No. C-13-01265 JSC, 2013 WL 6057068, at *2 (N.D. Cal. Nov. 15, 2013) (finding com-pelling reasons to seal portions of documents that could "empower criminal suspects

2

who come in contact with . . . officers because they will be able to predict the officer's actions.").

As shown below, Defendants' request to file law-enforcement-sensitive materials under seal satisfies the "compelling reasons" standard. This includes exhibits which show internal discussions that reflect operational details, information gathered from intelligence and foreign partners, and candid internal assessments of operations and policies. Defendants have submitted specific support to demonstrate the harm that could occur if the information is disclosed, including threats to sound operational decisionmaking, information-sharing, law enforcement operations, and the security of the border. *See Am. Auto. Ass'n of N. California, Nevada & Utah v. Gen. Motors LLC*, 2019 WL 1206748, at *1 (N.D. Cal. Mar. 14, 2019). The interest in confidentiality thus far outweighs any interest in public disclosure of the information at issue. *See Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010). Moreover, because some similar information has already been filed publicly, the government has a *heightened* interest in keeping these documents confidential. The more law enforcement sensitive information that is disclosed to the public, the more that such information can be analyzed, pieced together, and utilized by hostile actors seeking to harm the government's operations. In other words, the risk of serious harm increase with each piece of sensitive information released. Thus, the government's needs have become even more compelling in light of the fact that other documents have been unsealed.

## I. The Threat to Effective Law Enforcement Operations and Security Provides a Compelling Reason to Seal Internal Discussions that Reflect Operational Details, Information Gathered from Intelligence and Foreign Partners, and Candid Internal Assessments.

There are compelling reasons to seal the internal law enforcement communications contained in Class Certification Exhibits 17 (AOL-DEF-00020023-24), 20

3

(AOL-DEF-00243099), 21 (AOL-DEF-00243099-100), 22 (AOL-DEF-00046740-43), 23 (AOL-DEF-00372629), 24 (AOL-DEF-00525116), 29 (AOL-DEF-00041825), 56 (AOL-DEF-00036004), 59 (AOL-DEF-00028473), 60 (AOL-DEF-00028469), and 61 (AOL-DEF-0050247).   These emails contain detailed information regarding CBP and DHS operations, including information obtained from foreign partners, information shared within and among CBP and other agencies, and information obtained through sensitive law enforcement methods.  Declaration of Vernon Foret, Executive Director for Operations, Office of Field Operations (OFO), ¶ 3 ("Foret Decl."), attached as Exhibit A.  They also contain unvarnished assessments of the strengths and weaknesses of particular operational and policy decisions. *Id.*  If such assessments were disclosed, it would undermine the government's ability to engage in frank discussion about proposed actions and to share detailed operational information, including details about potential vulnerabilities and weaknesses, and therefore undermine OFO's ability to execute its mission of securing the border and protecting the American public.  Foret Decl. ¶ 3.[3]

For example, Class Certification Exhibit 23 is an email chain between individuals at DHS, CBP, and the U.S. Department of State relating to ongoing diplomatic discussions related to the 2016 Haitian migrant surge.  Foret Decl. ¶ 3.[4]  It also includes a discussion of operational details of a forthcoming visit by the Haitian

---

[3] Indeed, Class Certification Exhibits 24 and 59-61 contain discussions that are covered by the deliberative process privilege that Defendants have sought to claw back; the parties plan to file a Joint Motion for Determination of Discovery Dispute regarding that dispute at the end of March 2020.  But even if these discussions are not deemed privileged, or it is determined that the qualified privilege should yield, they are at a minimum entitled to confidential treatment.

[4] Defendants maintain that much of this discussion is protected from disclosure by the deliberative process privilege, and the parties have agreed to replace the original Exhibit 23 with a version that is redacted to protect those predecisional deliberations.

4

Ambassador to San Diego.  Foret Decl. ¶ 4-5.  This correspondence must remain confidential as it contains the personal opinions of various high-level officials within those agencies.  The ability of such officials to freely express such opinions is a critical part of the interagency process for responding to developing situations such as the 2016 Haitian migrant surge.  Foret Decl. ¶ 6.  If these opinions and insights were subjected to public disclosure, it would have a chilling effect on the willingness of high-level officials to share critically important information necessary to make sound and rational decisions in response to such critical situations in the future.  *Id.*

Likewise, Class Certification Exhibit 29 is an email chain from CBP's attaché in Mexico City providing on-the-ground updates regarding the April 2018 migrant caravan.  Foret Decl. ¶ 4.  The emails provide specific details about the caravan, the Mexican government's response, CBP interactions, maps, statistics, and other operational data helpful for planning an effective response to the migrant caravan.  Foret Decl. ¶ 7.  This information should remain confidential because if disclosed publicly it could harm the close operational cooperation between the two nations and encourage bad actors to take certain actions to recognize and circumvent certain law enforcement techniques used by the United States and Mexico.  *Id.* at ¶ 8-9.  Such evasion would be particularly catastrophic in a situation like that faced in April 2018 – the anticipated arrival of a large number of individuals in one location along the southern border.  *Id.* at ¶ 10.  In such situations, it was critical that CBP have accurate, specific, and actionable information about how to allocate its resources to prevent significant security vulnerabilities as the agency pulled resources away from other areas of the border, leaving them unprotected and vulnerable to threats.  *Id.* ¶ 10.  Agencies must be permitted to share such information without fear of public disclosure, because if hostile actors such as drug traffickers obtained it, those actors could better understand and exploit these border vulnerabilities to further disrupt the government's response to similar urgent situations.  *See id.*

5

Class Certification Exhibit 24 includes internal discussions among then-CBP Deputy Commissioner Deputy Commissioner Kevin McAleenan and other high-ranking officials within CBP relating to policy decisions concerning the 2016 Haitian migration surge. Foret Decl. ¶ 11.  The email includes internal discussions among CBP leadership regarding reactions to the policy, including reactions to perceived operational weaknesses and vulnerabilities.  Foret Decl. ¶ 11. This is sensitive information that includes an assessment of the operational challenges facing the agency at the time and a frank discussion of strengths and weaknesses of the chosen course of action. Foret Decl. ¶ 12. The email also includes assessments of anticipated actions by foreign government partners, of current and anticipated migration flow, and potential operational vulnerabilities facing both CBP and its interagency partners.  Foret Decl. ¶ 12.  This information was exchanged in an open, frank, and honest manner, and thus its public release would discourage agency officials from freely sharing similar information in the future.  *Id.*  Additionally, publicly disclosing information regarding foreign governments could have a significant chilling effect on those governments' willingness to share information with DHS and CBP.  Foret Decl. ¶ 12-13.

Class Certification Exhibit 56 similarly consists of such frank discussion and evaluation.  This email chain not only contains a discussion of specific operational details of the capacity of U.S. Immigration and Customs Enforcement (ICE) to accept family units from CBP's custody at the San Ysidro port of entry, but also CBP employees' reactions to ICE's operational proposals.  *Id.*  The operational information contained in this email chain reveals particular weaknesses that could be easily utilized hostile actors.  For instance, a smuggling organization could use this information about ICE's capability to move individuals out of CBP custody, including specific numbers that ICE anticipated it could transport under certain conditions, to direct a significantly larger group of family units to enter without inspection at San

6

Ysidro, overwhelming the ability of ICE to accept custody of the individuals, and thus guaranteeing release from custody. Foret Decl. ¶ 16. The officials' personal reactions to ICE's operational plan, and communications about that plan, should also be sealed, as it is of "critical importance that CBP and ICE are able to communicate freely and openly about operational decisions," because they must be able to share "complete and accurate information [in] a fast moving, ever-changing operational environment." Foret Decl. ¶ 17. Disclosure of these communications "will have a chilling effect on officials' willingness to share information in the future, which will severely impact the agencies' ability to make sound operational decisions." Foret Decl. ¶ 17.

Class Certification Exhibits 59 through 61 consist of an email chain discussing CBP's efforts to address the surge of migrants arriving at the San Ysidro port of entry in 2018. Foret Decl. ¶ 18. The emails include CBP's assessment of the challenges it was facing in responding to the surge, as well as resources needed from ICE to help address those challenges. *Id*. Exhibit 61 expands on the initial email chains in Exhibits 59 and 60 with an email from then-Deputy Commissioner McAleenan to various other CBP officials, relaying direction from the Secretary of DHS. Specifically, the direction includes the pursuit of two distinct policy proposals, as well as a discussion of goals for future policy implementation. Foret Decl. ¶ 19. The release of these emails could harm the interests of the United States. For example, Exhibit 61 reveals the specific factors of concern to CBP management at San Ysidro as it worked to address the surge, noting specific groups of individuals facing longer time in custody and requiring additional resources to process and transport. Foret Decl. ¶ 20. The email also reveals resource limitations involving transportation and detention capacity. *Id*. An actor hostile to the United States could use this information to send an additional large number of individuals matching these demographics to the port of entry, further straining resources at the port in order to

7

smuggle contraband into the port. *Id*. Also, if disclosed to the public, this information would have a chilling effect on the willingness of officials to communicate such policy decisions and policy goals further hampering their ability to execute such policy. Foret Decl. ¶ 21. In sum, the concerns expressed in the examples listed above provide compelling reasons for this Court to seal these exhibits.

## II. The Risk to Port and Border Security Provides a Compelling Reason to Seal the Documents Relating to San Diego Admissibility Enforcement Unit Operations.

There are compelling reasons to seal documents numbered as Class Certification Exhibits 16 (AOL-DEF-00328857-58), 19 (AOL-DEF-00029917), 40 (AOL-DEF-00090513), 41 (AOL-DEF-00517231), and 48 (AOL-DEF-00036343). These documents include detailed operational information specific to the processing and operational capacity of the San Diego Field Office, which could be used to circumvent enforcement operations.

For example, Exhibit 41, titled "Queue Management Brief Admissibility Enforcement Unit (AEU)," was prepared for internal CBP use to brief the Commissioner of CBP on the San Diego Field Office's state of readiness to respond to an approaching migrant caravan in October 2018. *See* Declaration of Johnny L. Armijo ¶¶ 5-6 (March 10, 2020), attached as Exhibit B ("March 2020 Armijo Decl."). It contains an assessment of the San Ysidro POE's resource limitations, including detailed information about how CBP ensures that its facilities remain safe and sanitary. *Id.* ¶ 7. It also contains comprehensive statistics and classifications of the number of inadmissible aliens processed through the San Ysidro, Otay Mesa, and Tecate POEs during 2018. *Id.* ¶ 8(a). When the statistics in Exhibit 41 are viewed together with the assessment of the San Ysidro POE's resource limitations, the document reveals operational vulnerabilities. *Id.* ¶ 8(b). Accordingly, the public release of this document would provide a hostile actor with substantial knowledge of the POEs'

8

resource limitations with respect to processing inadmissible aliens. *Id.* That hostile actor would then have a baseline to assess what number of inadmissible aliens would strain or overwhelm resources at each of these POEs, and could act accordingly. *Id.* As such, that individual could use this data to stage a mass incursion crippling CBP operations, or to gauge when CBP's resources may be reallocated towards providing appropriate care for individuals in its custody, conditions favorable for smuggling drugs, weapons, contraband, or aliens through these POEs. *Id.*

Likewise, Exhibit 48 (AOL-DEF-00036343), "Migrant Processing at the Limit Line – San Diego Field Office," contains detailed information about operations at the pedestrian limit lines for each of the five land POEs under the San Diego Field Office. Armijo Decl. ¶ 10. It contains specific information about the layout of the pedestrian limit line areas, including distance measurements and the presence or absence of infrastructures. *Id.* Also included are assessments of operational vulnerabilities and potential solutions to mitigate them. Armijo Decl. ¶ 10 Further, this document contains detailed information about operational protocols, including, most prominently, staffing of the limit line areas at each of the five land POEs. *Id.* The public release of Exhibit 48 could assist individuals who are planning to execute a terrorist attack at a POE or after crossing through a POE, attempting to smuggle drugs into the United States, or attempting to enter the United States using fraudulent documents. *Id.* ¶ 11. Finally, public release of this or similar documents could discourage CBP's management, from the field level to CBP OFO Headquarters, from assessing and candidly conveying operational vulnerabilities. *Id.* ¶ 12.

Class Certification Exhibits 19 and 40 are both "San Ysidro End of Day AEU Reporting" for particular dates in 2016. Armijo Decl. ¶ 13. These reports contain specific statistics for the San Ysidro POE for those particular dates, including the number and location of detainees in custody. Armijo Decl. ¶ 14. Also included are

9

the number of expedited removals, expedited removals with credible fear invocations, individuals placed in removal proceedings, and persons allowed to withdraw their applications for admission. *Id.* The exhibit also contains statistics on the number of inadmissible aliens processed virtually; numbers related to CBP's Tactical Terrorism Response Teams, and a breakdown by nationality of the number of aliens processed as expedited removals with credible fear invocations. *Id.* The public release of these exhibits, as with Exhibit 41, would provide hostile actors a sense as to the various POEs' resource limitations, allowing them to assess what number of inadmissible aliens would strain resources and act accordingly to smuggle drugs, weapons, contraband, or aliens. Armijo Decl. ¶¶ 8(b), 15.

Class Certification Exhibit 16 contains both internal CBP discussions related to the implementation of metering, and capacity numbers critical to border operations that should be kept confidential for the same reasons. *See* Declaration of Todd C. Owen (Jan. 29, 2020), attached as Exhibit F ("Owen Decl.") ¶¶ 8-10. Allowing disclosure of internal CBP emails, like this one, that discuss operational decisions, including decisions related to the implementation of metering, will permit outside entities to second-guess those discretionary decisions made in a fluid operational environment. Owen Decl. ¶ 8. Further, Exhibit 16 contains specific information about the capacities of and processing at ports of entry which, if disclosed publicly, as explained just above and further below (*supra* Part IV), "would provide outside entities with a picture of when certain entities are operating below, at, or above capacity[], and thus how resources may be allocated at those ports." Declaration of Randy Howe, Executive Director for Operations, Office of Field Operations (OFO) ¶ 11 (Feb. 12, 2020) ("Howe Decl."), attached as Exhibit D. Public disclosure of specific information about a port's capacity and operations, would release details about the operations of POEs (as well as CBP operations between POEs) that could compromise border security. In sum, the concerns expressed in the examples listed

above rise to provide compelling reasons for this Court to seal these exhibits.

Lastly, Exhibit 5 also contains information about queue management operations at the San Ysidro port of entry, as well as references to the number of individuals in custody on a particular day. For the reasons discussed here and further below, in section IV, this information, if disclosed, would compromise the security of operations at San Ysidro, and should remain confidential.

### III. The Risk to Border Security and the Potential Chilling Effect on Agency Operations and International Relations with Mexico Constitute Compelling Reasons to Seal Portions of the Depositions of Randy Howe, Todd Owen, the Whistleblower, and Other Exhibits.

For similar reasons, the Court should also seal portions of Class Certification Exhibits 1, 2, and 3—Randy Howe's 30(b)(6) January 9, 2020 deposition testimony; Executive Assistant Commissioner Todd Owen's December 13, 2019 deposition testimony, and the deposition testimony of a CBP Officer/Whistleblower taken on November 21, 2019[5]—as well as Class Certification Exhibits 26 (AOL-DEF-00041757-58), 36 (AOL-DEF-00060768-69), 37 (AOL-DEF-00027740-43), 39 (AOL-DEF-00190370-74), 42 (AOL-DEF-00036004-05), 44 (AOL-DEF-00058200-310), 52-53 (AOL-DEF-00205672-74), 54 (AOL-DEF-00022783-84), 55 (AOL-DEF-00566881), 57 (AOL-DEF-00038633-34), and 62 (AOL-DEF-000602802-03). These exhibits reveal specific information about the operations of ports of entry, the ports' methodology for gathering information, internal decision making processes, and communications with the Mexican government, the disclosure of which will harm border security and have a chilling effect on international relations and agency decision making.

As Mr. Howe explains in his March 11, 2020 Declaration ("Howe's March

---

[5] A table setting forth the portions of the testimony that Defendants have designated confidential is attached as Exhibit G.

2020 Decl."), attached as Exhibit C, Mr. Howe testified at his January 9, 2020 deposition about various sensitive topics, including how CBP currently and previously conducted queue management at various POEs along the Southern Border. Howe's March 2020 Decl. ¶ 3-4. This includes specific queue management operational methods at various POEs along the Southern Border, as well as the factors that port management considers when making such decisions. *Id*. During his testimony, Mr. Howe also read from, and interpreted, internal CBP documents discussing these operations. *Id*.

The operational details Mr. Howe provided in his January 2020 deposition, combined with other publicly available information, could harm operations at POEs. Howe's March 2020 Decl. ¶ 6. Specifically, Mr. Howe's testimony revealed the relevance of certain operational factors, such as port infrastructure and operating hours, in deciding whether, and how, to implement queue management. *Id*. This information, along with other publicly available data, can be used by hostile actors to obtain an operational snapshot of a specific port. *Id*. Next, these individuals could focus their resources appropriately to exploit perceived vulnerabilities at certain times of day and target certain physical areas at POEs they deem to be weak enough to manipulate. *Id*. In sum, public release of this type of information could cause injury by allowing bad actors such as smugglers and terrorists to modify their behavior to avoid detection by U.S. and Mexican authorities. *See United States ex rel. Kelly v. Serco, Inc.*, 2014 WL 12675246, at *4 (S.D. Cal. Dec. 22, 2014) (granting motion to seal various documents designated "For Official Use Only" by the United States Government because "national security interests are a compelling reason for filing documents under seal"); *McQuilliams v. Int'l Auto Logistics, LLC*, No. 2:14-CV-124, 2016 WL 4257362, at *1 (S.D. Ga. Aug. 11, 2016) (granting the parties' joint motions to file under seal where the parties "established that sealing these records is necessary to protect Defendant's proprietary information and information that

12

1    implicates national security interests"); *Motley v. City of Fresno*, 2016 WL 1060144,

2    at *2 (E.D. Cal. Mar. 17, 2016) (court should evaluate the specific facts of the law

3    enforcement sensitive document to determine whether it should be sealed).

4         In addition, Mr. Howe testified regarding CBP communications with officials

5    from the Government of Mexico. Howe's March 2020 Decl. ¶ 10-13. He also tes-

6    tified about certain individuals at the San Ysidro POE using a "specific technological

7    method" to communicate with their Mexican counterparts. *Id*. at ¶13. The testimony

8    regarding such communications represent highly confidential diplomatic discussions

9    between foreign governments. Howe's March 2020 Decl. ¶ 10 Here, disclosure of

10   the information obtained via those communications could have a chilling effect on

11   the willingness of officials in both countries to have open, honest, and frank discus-

12   sions regarding important security and border issues important to both countries.

13   Howe's March 2020 Decl. ¶ 11. Additionally, disclosure of the specific technology

14   used to communicate with Mexico would allow hostile actors to intercept and inter-

15   fere with that method of communication. *Id.* ¶ 13.

16        Mr. Howe also testified to the reason for changes made by certain ports to

17   their queue management practices since 2016. Howe's March 2020 Decl. ¶¶ 5, 8.

18   His discussion of specific facts regarding metering implementation at various ports,

19   ports' operational readiness, and ports' cooperation with the government of Mexico,

20   would compromise port operations and have an adverse effect on operational deci-

21   sionmaking. *Id.* As previously discussed, public scrutiny of each fluid decision may

22   negatively influence officials' future decisionmaking, including by chilling open and

23   honest communication about operational vulnerabilities, and preventing them from

24   making the best operational decisions. *Id.* Public disclosure of frank communica-

25   tions could have a chilling effect on CBP's willingness to share information and

26   limit the agency's ability to assess and make changes to ongoing operations. *Id.*

27

28                                          13

Todd Owen's deposition testimony[6] and Class Certification Exhibits 54 and 55 also reveal specific information about the operations of ports of entry, the ports' methodology for gathering information, internal decisionmaking processes, and communications with the Mexican government, the disclosure of which will harm border security and have a chilling effect on international relations and agency decisionmaking. During his December 13, 2019 deposition, Mr. Owen testified about various sensitive topics, including CBP's cooperation and communications with the government of Mexico, internal decision making, and information about the techniques and operations used by CBP to maintain the integrity of the ports of entry and to combat fraud, criminal activity, and other threats to public safety and national security. *E.g.*, Owen Decl. ¶¶ 6. Public release of this deposition and exhibits noted above would provide bad actors, such as smugglers and terrorists, with sufficient information to allow them to modify their behavior to avoid detection by U.S. and Mexican authorities. *Id.*

The testimony and exhibits regarding communications with Mexico represent highly confidential diplomatic discussions between foreign governments. Disclosure of the information obtained via those communications could have a chilling effect on the willingness of officials in both countries to have open, honest, and frank discussions regarding important security and border issues important to both countries. Owen Decl. ¶¶ 6, 11-12.

Likewise, public disclosure of Class Certification Exhibits 54 and 55—internal emails discussing the specifics of metering implementation at various ports would compromise operations and have an adverse effect on decisionmaking. Owen

---

[6] Defendants have since reviewed the transcript and have designated only certain portions of that transcript as Protected Material that Defendants seek to retain under seal. Defendants attach hereto as Exhibit H a table that sets forth the specific excerpts of the transcript that Defendants are seeking to seal.

14

Decl. ¶¶ 7-9.  Subjecting these discretionary decisions to public scrutiny will permit outside entities to second-guess those discretionary decisions and may negatively influence officials' future decisionmaking.  Owen Decl. ¶¶ 8-9.  Further, public disclosure would have a chilling effect on OFO officials' open communication about operational vulnerabilities and decisions.  Owen Decl. ¶ 10.

For the same reasons, the Court should seal Class Certification Exhibits 26, 36, 42, 57, and 62, which are all internal agency communications regarding operations.  Public disclosure of such frank communications could have a similarly chilling effect on OFOs' willingness to share information to inform decisionmaking, as well as reveal operational details that could be exploited by bad actors.  Howe's March 2020 Decl. ¶¶ 5, 6, 8.

Additionally, public disclosure of Class Certification Exhibits 52 and 53 would similarly have a chilling effect on investigations and compromise CBP's ability to gather information as part of its law enforcement operations.  As explained in the February 3, 2020 Declaration of Johnny L. Armijo ("Feb. 2020 Armijo Decl."), attached as Exhibit E, these exhibits relate to an email that Assistant Director of Field Operations (ADFO) Armijo received on July 3, 2018, from a Program Manager in the San Diego Field Office's former Tactical Analytical Unit ("TAU").  *See* Feb. 2020 Armijo Decl. ¶ 7.  In the email, the Program Manager provided information that he gathered from the San Ysidro's POE's Admissibility Enforcement Unit ("AEU") about aliens' views on the U.S. Department of Justice's Zero-Tolerance Policy for Criminal Illegal Entry and CBP's use of metering or queue management; described the methodology by which he gathered that information; and assessed that information.  *Id.*  Public disclosure of the email would cause a substantial chilling effect and impede CBP's law enforcement operations.  *Id.* at ¶ 8.  Mr. Armijo depends upon his subordinates—and especially those assigned to specialty units such as the Intelligence Targeting Units, the Integrated Border Intelligence Group, and

15

other similar groups—to relay sensitive and/or confidential information to him in a full and forthright manner, just as Program Manger Arias did in this email. *Id*. at ¶ 8(a). That reliance in his correspondence and communication with his employees, Mr. Armijo writes, plays a critical role in his ability to assess operational vulnerabilities, ensure sound operational decisions, and plan for contingencies. *Id*. Further, this the line of communication involved in Class Certification Exhibits 52 and 53 communication is of heightened significance, because it pertains to the San Ysidro POE, given the magnitude of the San Ysidro POE's operations and given the magnitude of that port's operations and recent attempts by large groups of undocumented aliens to forcefully breach the port of entry. *Id*. Armijo Decl. ¶ 8.

Finally, there are compelling reasons to seal portions of the deposition testimony of a CBP Officer/Whistleblower taken on November 21, 2019 (assigned number 3 in Plaintiffs' Motion to Seal Portions of Plaintiffs' Class Certification Papers (ECF No. 388)) during which specifics of metering implementation at various ports and ports' operational readiness was discussed along with law enforcement techniques and approaches. Such disclosure would compromise port operations and have an adverse effect on operational decisionmaking in addition to revealing law enforcement techniques and methods. *In re Dep't of Investigation of City of N.Y.*, 856 F.2d 481, 484 (2d Cir. 1988); Owen Decl. ¶¶ 7-9. Accordingly, for the compelling reasons listed above, this Court should seal the deposition testimony and exhibits noted above.

**IV.    The Field Queue Management Reports, MCAT Daily Briefs, and Documents Concerning Port Capacity and Operations Should Be Sealed Because They Contain Detailed Operational Information That Expose CBP's Potential Vulnerabilities and Weaknesses.**

There are compelling reasons to seal the Field Queue Management Reports, MCAT Daily Reports and Presentations, the email communications, and Plaintiffs'

16

expert report, filed as Class Certification Exhibits Nos. 5 (AOL-DEF-00014041-77), 7 (Leutert Report), 30-33 (AOL-DEF-00027054-55; AOL-DEF-00060695-96; AOL-DEF-00028127-30; AOL-DEF-00274287-91), 34 (AOL-DEF-00063246-47), 37 (AOL-DEF-00027740-43), 39 (AOL-DEF-00190370-74), 43 (AOL-DEF-00039597), 44 (AOL-DEF-00058200-310), 49 (AOL-DEF-00190370-74), 50 (AOL-DEF-00170598), and 51 (AOL-DEF-00086900-01), and Reply Exhibits 3 (AOL-DEF-00026892-00026896), 4 (AOL-DEF-00026897-2690), 5 (AOL-DEF-00026902-26906), and 6 (AOL-DEF-00018087).[7] All of these reports, email communications, and analyses, contain specific information about port capacity and operations that, if released—particularly if released en masse—would compromise port and border security.

As set forth in the February 12, 2020 Declaration of Randy Howe, former Executive Director for Operations, OFO ("Howe Decl."), attached as Exhibit D, OFO's Field Queue Management Reports "compile data from the OFO Field Offices

---

[7] In its March 12, 2020 Order, this Court denied a prior Motion to Seal with respect to the MCAT Report and Field Queue Management Report at Class Certification Exhibits 63 and 96, respectively. *See* ECF No. 421. Defendants are thus not seeking to seal those two specific reports; however, because each particular MCAT or Filed Queue Management Report contains different information from a particular date and time, Defendants still seek to prevent public disclosure of other reports from different dates to lessen the risk to port operations.

The Ninth Circuit has also unsealed a copy of Class Certification Exhibit 7, the Leutert Report, which contains aggregations, analyses, and a few, but not all, examples of specific numbers, from Field Queue Management. *See AOL et al. v. Wolf et al.,* Ninth Circuit Docket No. 19-56417 (October 24, 2020 order at Docket Entry No. 82). The Report was unsealed on the ground that it had already become subject to public reporting. *Id.* Defendants maintain their request to seal this document on the docket of this Court because each additional appearance or disclosure of this document increases the likelihood of harm from its publication.

17

on the southwest border." Howe Decl. ¶ 6.  The Reports "are provided on a daily basis to OFO and CBP leadership and provide raw data points on a number of factors that impact the operations of southwest border ports of entry." *Id.*  The sensitive nature of this law enforcement information warrants filing these documents under seal.  *Cf. Motley v. City of Fresno*, *supra*; *see BofI Fed. Bank v. Erhart*, *supra*.  As explained in the Declaration of Randy Howe, the Queue Management Reports "are generated strictly for internal CBP and DHS use, and are used for maintaining aware-ness of any resource or operational vulnerabilities at the various ports of entry (POEs) along the southwest border." Howe Decl. ¶ 6.

"The main operational vulnerabilities or resource constraints that these Queue Management reports highlight is the total number of individuals in custody at a par-ticular port, as well as the percentage of total holding capacity that port has reached based on the number of individuals in custody." *Id.* ¶ 7.  This information is im-portant for CBP leadership to know because "high numbers of individuals in custody may be caused by any number of factors, such as changes in migrant flows that need to be monitored; potential difficulties in transferring individuals out of CBP custody, which may need to be addressed with CBP's interagency partners; or other opera-tional or resource issues that may require action. *Id.*

In addition, "this information may also reveal operational vulnerabilities or weaknesses that could be exploited if released publicly.  While the number of indi-viduals in custody at a particular port of entry is not the only factor affecting a port's total capacity to process individuals, it impacts how a port of entry manages its re-sources." *Id.* ¶ 8.  For example, "if a port has a high number of individuals in cus-tody, or if individuals in custody have been held for an extended period of time, port management may need to reallocate staffing and other resources towards addressing these capacity issues." *Id.* ¶ 9.  This involves "addressing the needs of individuals

in custody, and attempting to move those individuals out of the POE." *Id.* Specifically:

> [I]f a port has a high number of individuals in custody, officers at the port must devote significant time and energy towards ensuring that these individuals have adequate food and water, and are housed in sanitary conditions. OFO policy requires that officers conduct welfare checks at regular intervals for individuals in custody. Officers must also provide individuals in custody with meals and snacks, as well as ensure that any children are adequately supervised. Additionally, if a port is operating at a high capacity, or if individuals have been in custody for a long period of time, officers must work to transfer these individuals out of CBP custody, by working with U.S. Immigration and Customs Enforcement (ICE), the U.S. Department of Health and Human Services (HHS), and other partners, to secure transportation.

*Id.* ¶ 9. "[A]ddressing the needs of individuals in custody, and attempting to move those individuals out of the POE, takes officers away from other inspection and enforcement duties including detecting and seizing drug[s] and other contraband." *Id.* As a result, "the port [is] more vulnerable to outside threats such as drugs, weapons, contraband, and individuals attempting to enter the port without inspection, such as by running through vehicle lanes." *Id.* When "a port has fewer individuals in custody, the port will be able to allocate more resources towards other mission sets, such as seizing drugs, weapons, and other contraband." *Id.* ¶ 10.

For these reasons, "publicly releasing port-level capacity data, especially covering a period of several days or weeks, would provide outside entities with a picture of when certain entities are operating below, at, or above capacity[], and thus how resources may be allocated at those ports." *Id.* ¶ 11. Taken together, "[t]his data, combined with other publicly available data, such as seasonal migration trends and the number of individuals encountered or found inadmissible in certain areas, could

19

be exploited by DTOs, TCOs, and other hostile actors." *Id.* Such actors could develop a picture of when the port's resources may be strained or which ports operated below capacity, and reallocate their own resources to exploit or create capacity constraints. *Id.* For example, "if a TCO gained knowledge that a particular port was [consistently] operating at capacity during a certain month of the year, or during certain days in the month, the TCO could specifically wait until that period of time to send additional levels of drugs or other contraband to that port, or by instructing a group of individuals to enter without inspection, such as by running through the vehicle lanes." *Id.* ¶ 12.

These same justifications support retaining the confidentiality of the MCAT Reports, and Class Certification Exhibits 39 and 44 as well as a portion of Class Certification Exhibit 5 that references the number of individuals in custody at the San Ysidro port of entry on a particular day. MCAT Reports and presentations are internal to DHS and contain detailed information about migration trends and capacity that "would provide hostile actors with a clear picture of system-wide operational vulnerabilities that could be exploited." Howe Decl. ¶14; *see generally* Howe Decl. ¶¶ 13-17. Exhibits 39 and 44 contain specific details about the Laredo Field Office's Mass Migration Contingency Plan, and specifically the maximum number of individuals that a particular port can process and hold in a crisis. Howe Decl. ¶ 18. With knowledge of this number, as well as the knowledge that this number was a result of the port expending the maximum amount of its resources, hostile actors could easily cripple operations instructing a larger number of individuals to run through the vehicle lanes or otherwise evade inspection. Howe Decl. ¶ 18. They could then take advantage of the resulting diversion and smuggle drugs or contra-band through that port. *Id.*

20

Lastly, Exhibit 5 references an internal OFO muster pursuant to Presidential Proclamation "Enhanced Vetting Capabilities and Processes for Detecting Attempted Entry by Terrorists or Other Public Safety Threats." This provides detailed guidance to CBP Officers about specific steps they should take with regards to individuals subject to this Proclamation. All of this information reveals specific operational details that, if disclosed, could be exploited by hostile actors to circumvent such processes and improperly access CBP information and databases. *Cf.* Howe Mar. 2020 Decl. ¶¶ 4-6, Armijo Dec. ¶ 8a.

In sum, publication of any of the above exhibits – and particularly publication of all of the documents at once – has the potential to reveal a large amount of critical operational data that could be exploited by hostile actors and enemy nations seeking to harm CBP operations and undermine the agency's ability to secure the border. Howe Decl. ¶ 27. Accordingly, public disclosure of the information contained in Field Office Queue Management Reports, MCAT Reports, or any other specific information about a port's capacity and operations such as is contained in these exhibits would release details about the operations of ports of entry (as well as CBP operations between the ports of entry) that could compromise border security. This risk of harm caused by the release of these details is an even more significant interest than store security and employee safety, which was enough for the Court to seal documents in *Bell v. Home Depot USA, Inc.*, No. 212CV02499, 2015 WL 6082460, at \*2 (E.D. Cal. Oct. 15, 2015). "Because all of the information in these documents consists of such detailed operational information, it is not possible to meaningfully segregate or redact any information for purposes of filing other portions of the documents publicly." *Id.* ¶ 27. In *Bell*, the court stated: "the Security SOPs sought to be sealed contain Home Depot's security protocols in opening and closing its stores, the disclosure of which could threaten its stores' security and its employees'

safety." *Bell*, 2015 WL 6082460, at *2 (comparing *In re Google Inc. Gmail Litigation*, No. 13–MD–02430–LHK, 2013 WL 5366963, at *3 (N.D. Cal. Sept. 25, 2013)). Similarly, here, the information sought to be sealed involves information regarding the southwest border of the United States which "could irreparably harm" the mission of CBP along the southwest border of the United States and threaten public health and safety, by allowing increased drug and weapons trafficking. *See Bell*, 2015 WL 6082460, at *1.

The security considerations discussed above are similar to those raised in regards to the sealing of an exhibit in *United States ex rel. Kelly v. Serco, Inc.* that "specifically reference[d] locations, technical specifications and operational capabilities of restricted Homeland Security microwave communications systems along the United States border, used to provide technological assistance to federal agents tasked with monitoring and securing the border." No. 11CV2975 WQH-RBB, 2014 WL 12675246, at *2 (S.D. Cal. Dec. 22, 2014) (citation omitted). The Court ultimately found that "national security interests are a compelling reason for filing documents under seal[]," a because "the[] exhibits [at issue] contained sensitive technical information, such as specific tower locations and frequencies . . . public dissemination of this information could be used by persons seeking to do harm to the United States." *Id.* at *4. That "compelling reason outweighs the traditional right of access." *Id.* The same compelling reasons warrant the sealing of sensitive details regarding the capacity and operations of ports of entry, which, if disclosed, could be exploited to circumvent these operations. *Cf. Motley*, 2016 WL 1060144, at *2.

Moreover, even if some Queue Management Reports, MCAT Reports, related emails, and certain aggregated analyses thereof, have been made public for various reasons, *see* ECF No. 321, each additional, distinct report, brief, or email has additional, specific information about port capacity and trends that has not already been disclosed. Accordingly, each additional, distinct report, brief or email that becomes

22

public further exposes port vulnerabilities by releasing additional, specific, and distinct operational information. That would in turn incrementally increase the likelihood that such information will or can be compiled and used to compromise border security.  Accordingly, the Court should seal these exhibits.

## V.    The Court Should Seal Identifying Information and Email Addresses of Federal Government Employees and Law Enforcement Witnesses in All Documents Sought to be Sealed.

There are compelling reasons to seal the identifying information of certain federal government employees and law enforcement witnesses contained in all of the exhibits addressed above, as well as in Class Certification Exhibits 4, 5, and 47.[8] The Court should thus also keep sealed the personal and work email addresses and other contact information of CBP employees in all of the above-listed documents. Owen Decl. ¶ 3.  The Court had already permitted the redaction of CBP employees' phone numbers and cell phone numbers based on their privacy interests, and recently permitted redaction of email addresses as well.  ECF No. 332 at 7, 10; ECF No. 421.

As the Court recognized in its recent order, there are compelling reasons to seal the email addresses of employees. The December 4, 2019 Buckley Declaration ("Buckley Decl."), attached hereto as Exhibit I, lays out the genuine security concerns regarding the disclosure of CBP employees' email addresses.  Buckley Decl. ¶¶ 3-8.  For example, "once an employee's email address is publicized, malicious actors can engage in social engineering to obtain confidential information from that employee" through the "use of deception to manipulate individuals into divulging confidential or personal information that may be used for fraudulent purposes." *Id.* ¶ 4.

---

[8] Defendants are not asserting confidentiality over Class Certification Exhibits 4 other than to redact the identifying information of the whistleblower, law enforcement witnesses and CBP employees subject to investigation and discipline.

23

Further, "other cyber security threats can [also] occur once an employee's email address is released to the public." *Id. ¶ 5.* These security threats are not hypothetical. "Cyber attacks against the U.S. are on the rise." Buckley Decl. ¶ 6. "[B]etween 2006 and 2015, cyberattacks involving systems supporting the federal government increased over 1,300% from 5,500 to over 77,000." *Id.*

Likewise, the Court should also seal any identifying information—including names—regarding the whistle blower, as well as the subject of and witnesses to the investigations reflected in Class Certification Exhibits 3, 4, 5, and 47.[9] In addition to the reasons provided above, and the privacy concerns outlined by the Court in its Order concerning the parties' previous sealing motions (*see* ECF No. 332 at 7-8), case law supports sealing this information. The Special Master in *Hewlett-Packard Co. S'holder Derivative Litig.*, recommended sealing whistleblower identifying information in a criminal investigation because "the case law is clear that, while public access to court records is important, some documents are not subject to the public right of access because they have traditionally been kept secret for important policy reasons." *In re Hewlett-Packard Co. S'holder Derivative Litig.*, No. 12-CV-6003, 2015 WL 8570883, at *6 (N.D. Cal. Nov. 18, 2015), report and recommendation adopted, No. 12-CV-6003- 5 CRB, 2015 WL 8479543 (N.D. Cal. Dec. 10, 2015), aff'd, 716 F. App'x 603 (9th Cir. 2017). Important public policy considerations including interference with an investigation, "by making the whistleblower a target of intimidation or harassment" was a "compelling reason[]" constituting "court files

---

[9] Defendants have reviewed the transcript, and have designated only certain portions of that transcript as Protected Material that Defendants seek to retain under seal. Defendants attach hereto as Exhibit G a table that sets forth the pages and lines of the specific excerpts of the transcript that Defendants are seeking to seal and the reasons supporting that request.

24

[] becom[ing] a vehicle for improper purposes." *Id*. Similar public policy reasons support sealing identifying information regarding witnesses to the whistleblower investigation as well as employees subject to investigation and potential discipline as in the case of the employee identified in Exhibit 5. Accordingly, Class Certification Exhibit 5 should be sealed.

## V. The Interest in Protecting Ongoing Investigations Warrants Keeping Exhibit 47 Under Seal Pending an Outcome of the Inquiry/Investigation.

There are compelling reasons to seal Class Certification Exhibit 47 (AOL-DEF-00205420-22) which is an August 23, 2018 Office of Special Investigations correspondence dealing with the whistleblower referral as it may jeopardize an ongoing investigation. *See, e.g., United States ex rel. Mikes v. Straus*, 846 F.Supp. 21, 23 (S.D.N.Y.1994) (declining to unseal filings where "disclosure of confidential investigative techniques, of information which could jeopardize an ongoing investigation . . ."); *United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 902 F.Supp. 189, 192 (E.D.Mo.1995) (declining to unseal documents that provided "some substantive details regarding the government's methods of investigation"). Accordingly, Class Certification Exhibit 47 should stay sealed.

## CONCLUSION

The Court should seal the above-listed sensitive documents and testimony and the portions of the parties' briefs that discuss them. Should this Court find that sealing of the above listed sensitive documents in their entirety is not warranted, Defendants respectfully seek the Court's permission to identify more particular redactions to protect sensitive information from public disclosure.[10]

---

[10] In all cases, Defendants seek to redact or seal the personally identifying information of their employees from public disclosure.

25

Dated: March 16, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel


*/s/ Ari Nazarov*
ARI NAZAROV
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000
ari.nazarov@usdoj.gov



ALEXANDER J. HALASKA
DHRUMAN Y. SAMPAT
Trial Attorneys

*Counsel for Defendants*

26

# CERTIFICATE OF SERVICE

No. 17-cv-02366-BAS-KSC

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: March 16, 2020                Respectfully submitted,

*/s/ Ari Nazarov*
ARI NAZAROV
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000
ari.nazarov@usdoj.gov

*Counsel for Defendants*

27

DEFS.' CONSOLIDATED MEM. IN
SUPPORT OF MOT. TO SEAL