# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, ) <br> *Plaintiffs*, ) <br> ) <br> ) <br> v. ) <br> ) <br> Chad Wolf, *et al.*, ) <br> *Defendants*. ) <br> _____) | No. 3:17-cv-02366-BAS-KSC |

**DECLARATION OF RANDY HOWE**

I, Randy Howe, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am currently the Director, Field Operations (Laredo), Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). Until January 18, 2020, I was the Executive Director for Operations, OFO in Washington, DC. I was employed as the Executive Director of Operations from October 2017 until my transfer to Laredo in January 2020. I began my career in 1988 with the legacy U.S. Immigration and Naturalization Service. During my 31 years of federal service, I have held various leadership positions, including Area Port Director, Buffalo; Assistant Director for Border Security; and Border Security Coordinator. Prior to becoming the Executive Director for Operations, I served as Director of Field Operations (DFO) for the Preclearance Office. As the Executive Director for Operations, I oversaw more than 23,000 employees, with operations at 20 major field offices, 328 Ports of Entry (POE), and 16 Preclearance locations.

1

2. I make this declaration to support the confidentiality markings that should be applied to certain portions of my 30(b)(6) deposition, taken on January 9, 2020.

3. During my deposition, I provided testimony on how CBP currently conducts and has historically conducted queue management at various ports of entry (POEs) along the southwest border, including the specific operational methods by which queue management is implemented as well as the factors that port management considers when making such decisions. During this testimony, I also read from, and interpreted, internal CBP documents discussing these operations.

4. This testimony should remain confidential, as it reveals specific details about operations at various POEs, such as how the ports managed, and currently manage, their resources and daily operations in a complex and ever-changing operational environment. The testimony discusses, in some detail, a multitude of variables that DFOs and Port Directors consider when making the discretionary determination as to whether and how queue management should be implemented. DFOs and Port Directors must have the ability to make this discretionary determination based on their own experience and their assessment of the available information, in order to ensure that they decision they make is sound from an operational and resource perspective. My testimony provides more context for the types of factors that DFOs and Port Directors may consider when making these decisions, and thus provides more insight into this discretionary process. However, public disclosure of this decision-making process would permit outside entities to second-guess or provide commentary on the process. Such after-the-fact second-guessing could have a chilling effect on a DFO or Port Director's future decision-making process, as he or she may be more sensitive to how such a decision may be seen by external entities in

the future. This could prevent a DFO or Port Director from making the best operational decision in the future, in favor of one that may be seen as more favorable by outside entities.

5. I also testified to changes made by certain ports to their queue management practices since 2016, as well as the motivations behind such changes. This information should also remain confidential, in order to ensure that OFO continues to have the ability to make such changes in the future. In general, changes to an operational policy or practice are made following a period of frank, open, and honest discussion regarding the current operational practice, an assessment of whether that practice is working, and whether changes may be warranted to address any additional vulnerabilities or unmet needs. It is critical that individuals within OFO are able to communicate freely about operational and policy concerns. Public disclosure of the outcome of this decision-making process could have a chilling effect on individuals' willingness to engage in such conversations in the future, which could in turn limit the agency's ability to assess and make changes to ongoing operations.

6. Additionally, the operational details I testified to, especially when combined with other information that is publicly available, could be used to harm operations at POEs. The danger of disclosing these operational details still exists even though the operational details in my testimony relate to past time periods. Specifically, my testimony reveals the relevance of certain operational factors, such as port infrastructure and operating hours, in deciding whether, and how, to implement queue management. Thus, the information in my testimony could be combined with other information, including publicly available information, to paint a more fulsome picture of operations at a particular POE, as well as

3

the factors that management considers relevant to certain operational decisions at specific ports. Hostile actors could thus take this operational snapshot and focus their resources appropriately to exploit perceived vulnerabilities at certain times of day and target certain physical areas at POEs they deem to be weak enough to manipulate.

7. Additionally, I provided testimony about discussions between and among individuals at CBP and DHS related to the motivations for conducting queue management, the implementation of policy decisions related to queue management, and reactions to inquiries from outside entities, such as Congress and the DHS Office of Inspector General. In this testimony, I interpreted various internal CBP emails discussing these topics, discussed my personal interactions with other individuals within CBP, and discussed the reactions of various CBP officials to inquiries from outside entities.

8. All of this testimony should remain confidential, as it provides insight into the types of factors CBP and DHS consider when assessing ongoing policies and operations, and reveals the contents of relevant discussions regarding these policies. It is critical that individuals within CBP and DHS can have open, frank, and honest conversations regarding policy initiatives, requests from outside entities, and ongoing operational issues. Such frank conversation ensures that all relevant individuals have the necessary and appropriate feedback, including the opinions of individuals involved in the actual implementation of operations and policy, to make informed decisions, and are able to course correct, if needed. Public disclosure of the substance of these conversations, however, would permit outside entities to second-guess or provide commentary on the process. Such after-the-fact second-guessing could have a chilling effect on individuals' willingness to share information, which could in turn limit the agency's ability to assess

4

and make changes to operations and policy, and could limit the effectiveness of the Agency's and Department's response to outside entities.

9. Similarly, I also provided testimony regarding actions taken by certain officials within CBP in response to, and in anticipation of, certain lines of inquiry from the DHS OIG. In this testimony, I discussed the process by which CBP responds to inquiries from the OIG, as well as the motivations behind certain actions taken by CBP during interactions with the DHS OIG. I also provided testimony regarding the actions CBP officials took in response to a recently-released OIG report regarding the Tecate port of entry. In this testimony, I explained the specific steps undertaken by OFO management, the reasons underlying such actions, and the conclusions management reached following these actions. This testimony, if made public, could similarly have a chilling effect on these interactions, and thus limit CBP's ability to effectively engage with the OIG and other components within DHS, and to effectively respond to reports and other issues raised by the OIG.

10. I also provided testimony about CBP's communications with the government of Mexico, both at the headquarters and local levels, related to the implementation of queue management, including the method by which various ports communicate with the Mexican government and the frequency of such communication. My testimony discussed the nature and scope of daily communications with the Mexican government and the operational factors driving such communications. This testimony discussed sensitive law enforcement considerations, including, but not limited to, the joint efforts of the U.S. and Mexican authorities to secure the border, and distinct topics given particular attention in U.S.-Mexican communications.

5

11. This information is, and should remain, confidential, in order to protect the ability to continue to communicate in this manner in the future. The POEs on the southwest border regularly share information with their counterparts in Mexico on issues that may have an impact on operations on both sides of the border. It is of critical importance that both OFO and their Mexican counterparts are able to share all relevant information in a frank, open, and honest manner, as it is critical that both OFO and Mexican officials have a complete understanding of the operational picture on both sides of the border. Disclosure of the details of these conversations to the public could have a chilling effect on the willingness of officials in both countries to have open, honest, and frank discussions in the future, and on their willingness to share complete and accurate information. If officials were to stop or limit the sharing information in this manner, it could significantly limit both the United States' and Mexico's ability to conduct law enforcement operations at our shared border, including impeding our ability to work together to address threats to safety and security.

12. Additionally, I specifically testified to specific methods by which the ports communicate and share information with their Mexican counterparts, the types of information which may be shared, and the specific individuals who are generally responsible for that communication at the San Ysidro POE. Some of this testimony was provided in the context of explaining internal CBP emails containing this information.

13. This testimony should remain confidential, as it reveals specific operational details that could, if disclosed publicly, be exploited to seriously harm operations on both sides of the U.S.-Mexico border. Specifically, if a hostile actor learned that certain individuals at the San Ysidro POE use a specific technological method to communicate with their Mexican

6

counterparts, that hostile actor could easily take steps to intercept and interfere with that method of communication, harass CBP or Mexican officials using that technology, and also to potentially take over that technology and prevent CBP and Mexican officials from actually using the technology (for instance, through spam messages or spam phone calls).

14. Lastly, I provided testimony about actions of potential misconduct at three POEs. This testimony should remain confidential, as it provides insight into the types of actions that CBP considers to be misconduct, as well as the process for addressing this misconduct, and thus reveals details of how the agency exercises its discretion in certain situations. This information should remain confidential in order to protect the integrity of the disciplinary process. In addition, public release could also allow for the exploitation of the information for an improper purpose. For instance, disclosure of the types of factors that consist misconduct would provide hostile actors with information that could be used to bribe officers into potentially committing misconduct, or to further take advantage of acts of misconduct that have already been committed.

15. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this __11__ day of March, 2020.

_[signature]_
Randy Howe
Director, Field Operations (Laredo)
Office of Field Operations
U.S. Customs and Border Protection

7