# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> Chad Wolf, *et al.*, <br> *Defendants*. | No. 3:17-cv-02366-BAS-KSC |

## DECLARATION OF TODD C. OWEN

I, Todd C. Owen, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am currently the Executive Assistant Commissioner, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I have been employed in this role since February 2015. I began my career in 1990 with the legacy U.S. Customs Service. During my 30 years of federal service, I have held various leadership positions, including Executive Director, Cargo and Conveyance Security; Area Port Director, New Orleans; and Director, Field Operations(DFO), Los Angles. In my current position, I oversee more than 29,000 employees, with operations at 20 major field offices, 328 ports of entry (POEs), and 16 Preclearance locations.

2. I make this Declaration to support the confidentiality markings that should be applied to the transcript of my deposition, which was taken on December 13, 2019, in this case, as well as to support the filing of Exhibit 34 to that deposition under seal.

1

3. My personal address should be marked highly confidential because disclosure would allow bad actors to know the location where I live with my wife and two children. It is not uncommon for individuals who disagree with U.S. government policy to protest outside the home of government employees, including when spouses and children are home. For example, individuals protested outside the home of Kevin McAleenan, former Acting Secretary, DHS, when his children were home alone in December 2018.

4. During the deposition, we discussed regularly scheduled meetings that occur in a sensitive compartmented information facility (SCIF). A SCIF is a room designed and constructed to prevent outside access to the information being discussed. SCIFs are used by law enforcement, military, and the intelligence and national security communities to hold meetings when sensitive compartmented information (SCI) is discussed. SCI is a type of classified information derived from sensitive intelligence sources, methods, and/or analytical processes.

5. I provided detailed information regarding the timing and attendance of regularly scheduled intelligence briefings at the SCIF. With this knowledge, bad actors could target senior CBP leadership at a specific location, date, and time.

6. I responded to multiple questions regarding CBP communications with officials from the Government of Mexico. Such communications represent highly confidential diplomatic discussions between foreign governments. Disclosure could have a chilling effect on the willingness of officials in both countries to have open, honest, and frank discussions, as described further below.

7. Exhibit 34 is an internal CBP email from November 2016, in which I requested that the leadership of OFO's Operations Directorate provide me with information regarding how

2

metering operations were being implemented at the ports of entry along the southwest border, specifically, whether any ports were providing appointments to individuals subject to metering. In response, I received a summary of how ports in each of the four southwest border field offices – San Diego, Tucson, El Paso, and Laredo, were conducting metering operations. This summary contained, as requested, information about which ports of entry were or had been providing appointments. The response also contained details about the specific operational methods by which ports of entry were conducting metering, information about the ports' interactions with the Mexican government and efforts the Mexican government was undertaking to manage the flow of travel across its own border, and the operational readiness of ports in each field office to implement metering or take other actions, if needed, in response to changing operational circumstances. This response thus provides a snapshot of the operations at the four field offices on the southwest border, including insight into how the ports managed their day-to-day operational needs, how they worked with their Mexican counterparts, and actions that had been undertaken by the Mexican government.

8. This information should remain confidential. With respect to information about port operations along the southwest border, this information shows the specific discretionary decisions made by DFOs with respect to the process of metering, including changes made to previously-taken actions and steps the DFOs were prepared to take in the future. The email also shows the author's reactions to some of these discretionary decisions. All of this information, when read as a whole, could be used to undermine and harm OFO operations if disclosed to the public.

9. Specifically, when making decisions about how to implement metering or otherwise conduct operations, DFOs must examine all relevant information and make a decision, based on their own experience and the facts available to them, as to the most appropriate course of action. The DFOs must make these decisions in a fluid operational environment, often with incomplete information or information that is constantly in flux. Public disclosure of this decision-making process, and the results of this process, would therefore permit outside entities to second-guess this discretionary decision. Such after-the-fact second-guessing could have a chilling effect on a DFO's future decision-making process, as he or she may be more sensitive to how such a decision may be seen by external entities in the future. This could prevent a DFO from making the best operational decision in the future, in favor of one that may be seen as more favorable by outside entities.

10. Similarly, individuals within OFO must be able to communicate freely about operational vulnerabilities, operational decisions, and plans for future operational decisions. Such open and honest communication is critical to ensuring that OFO consistently makes decisions that are sound from an operational, legal, and policy perspective. In order to ensure that the agency exercises its discretion in a reasonable manner, I, as the EAC, must have sufficient knowledge of all aspects of operations on the ground, so that I can maintain awareness and direct changes, when needed. Public disclosure of such frank communications could have a chilling effect on DFOs' willingness to share information both with others in OFO and with me, which could in turn limit the agency's ability to assess and make changes to ongoing operations.

4

11. With respect to the information about efforts taken by the Mexican government to manage the flow of travel across its borders, this information is the type of operational information that is regularly shared between OFO officials at ports of entry and their Mexican counterparts. The POEs on the southwest border regularly share information with their counterparts in Mexico, on issues that may have an impact on operations on both sides of the border. For instance, the United States and Mexico regularly share information about ongoing law enforcement efforts and activities in Mexico and the United States, issues of particular note to both countries, cross-border safety or security threats, and migration trends. The ports also regularly share logistical information related to the safe and orderly operation of cross-border traffic, such as vehicle wait times, computer outages or other issues impacting processing times, as well as infrastructure and other facilities issues.

12. It is of critical importance that both OFO and their Mexican counterparts are able to share all relevant information in a frank, open, and honest manner, as it is critical that both OFO and Mexican officials have a complete understanding of the operational picture on both sides of the border. Thus, officials from both countries must be able to share complete and accurate information, at a sufficiently granular level, to ensure that both governments have sufficient information to make decisions in a fast-moving, often fluid environment. It is also of critical importance that officials from both countries are able to share their own personal opinions and reactions to the facts on the ground, in order to facilitate quick and effective decision-making. Disclosure of this information to the public, especially without any context for how the information was obtained or developed, could have a chilling effect on the willingness of officials in both countries to

have open, honest, and frank discussions in the future, and on their willingness to share complete and accurate information. If officials were to stop or limit the sharing information in this manner, it could significantly limit both the United States' and Mexico's ability to conduct law enforcement operations at our shared border, including limiting our ability to work together to address threats to safety and security.

13. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this __29__ day of January, 2020.

*(signature)*

Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs and Border Protection