JOSEPH H. HUNT
Assistant Attorney General, Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ARI NAZAROV (CT 414491)
DHRUMAN SAMPAT (NJ 270892018)
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' RESPONSE IN SUPPORT OF PLAINTIFFS' MOTION TO SEAL LIMITED PORTIONS OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO STRIKE (ECF No. 432)** |
| Chad F. WOLF, Acting Secretary of Homeland Security, in his official capacity, *et al.*,* | |
| *Defendants* | |

---

\* Acting Secretary Wolf and Acting Commissioner Morgan are automatically substituted as Defendants pursuant to Federal Rule of Civil Procedure 25(d).

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ....................................................................................1

BACKGROUND ......................................................................................1

ARGUMENT ..........................................................................................3

   I.  The Good-Cause Standard, Not the Compelling-Reasons Standard, Applies to the Parties' Sealing Request Because the Motion at Issue is Unrelated to the Merits. ....................................3

   II.  There is Good Cause to Keep the Privileged and Law-Enforcement Sensitive Documents Sealed. ...............................6

      A.  Exhibit 1 (AOL-DEF-00070361–62) ...............................6

      B.  Exhibit 2 (AOL-DEF-00283080–86) & Exhibit 3 (AOL-DEF-00283226–32) ......................................................7

      C.  Exhibit 4 (AOL-DEF-00516605–23) ...............................10

      D.  Exhibit 5 (AOL-DEF-00528691–707) .............................13

      E.  Exhibit 6 (AOL-DEF-00556914–18) & Exhibit 7 (AOL-DEF-00556928) ...............................................................15

   III.  The Parties' Request Also Meets the Compelling-Reasons Standard. ............................................................................16

   IV.  If the Court Denies the Sealing Request, Defendants Request the Opportunity to Redact U.S. Government Personnel's Telephone Numbers from the Documents Before Release. ...........................20

CONCLUSION .....................................................................................20

# TABLE OF AUTHORITIES

## Federal Cases

*ASUS Computer Int'l v. Round Rock Research, LLC,*
    No. 12-cv-2099, 2014 WL 2810193 (N.D. Cal. June 20, 2014) ...................6

*Ctr. for Auto Safety v. Chrysler Group, LLC,*
    809 F.3d 1092 (9th Cir. 2016) ......................................................... 3, 4, 5, 16

*DSS Tech. Mgmt., Inc. v. Apple, Inc.,*
    No. 14-cv-5330, 2020 WL 496085 (N.D. Cal. Jan. 30, 2020) .......................4

*Foltz v. State Farm Mut. Auto. Ins. Co.,*
    331 F.3d 1122 (9th Cir. 2003) .....................................................................3

*Hamdan v. U.S. Dept. of Justice,*
    797 F.3d 759 (9th Cir. 2015) .....................................................................17

*Jones v. Travelers Casualty Ins. Co. of America,*
    No. 13-cv-2390, 2015 WL 865877 (N.D. Cal. Feb. 5, 2015) .......................6

*Kamakana v. City and County of Honolulu,*
    447 F.3d 1172 (9th Cir. 2006) ............................................................. 4, 16

*Munoz v. PHH Corp.,*
    No. 08-cv-759, 2016 WL 10646326 (E.D. Cal. Sept. 16, 2016)...................6

*Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.,*
    307 F.3d 1206 (9th Cir. 2002) ..................................................................4, 9

*Pickard v. Dept. of Justice,*
    217 F. Supp. 3d 1081 (N.D. Cal. 2016)......................................................18

*Seattle Times Co. v. Rhinehart,*
    467 U.S. 20 (1984)........................................................................................4

*Tuite v. Henry,*
    181 F.R.D. 175 (D.D.C. 1998) ..................................................................16

*United States v. Amodeo,*
    71 F.3d 1044 (2d Cir. 1995) ........................................................................5

1

## **Other Authorities**

2

CBP, Secure Electronic Network for Travelers Rapid Inspection, https://
www.cbp.gov/travel/trusted-traveler-programs/sentri ....................................2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# **INTRODUCTION**

Defendants urge this Court to grant Plaintiffs' Motion to Seal Limited Portions of Their Opposition to Defendants' Motions to Strike (ECF No. 432). The seven Exhibits attached to Plaintiffs' Opposition to the Motions to Strike (ECF No. 434)—which does not relate to the underlying merits of this case—contain sensitive and, in some cases, law-enforcement privileged material. Regardless of the outcome of the parties' pending privilege dispute, the information should be kept sealed because of the specific harms articulated below: Public disclosure of the Exhibits would undermine the ability of U.S. Customs and Border Protection (CBP) to continue effectively utilizing that same information, its sources, and the methods by which it was obtained to the detriment of the United States' border security. Further, some information contained in the Exhibits was provided by foreign government partners. The revelation of that information would chill foreign governments' willingness to continue providing information to the United States, further compromising the United States' ability to secure its border. Therefore, it is critical that these documents and the portions of Plaintiffs' Opposition that rely on them remain sealed.

# **BACKGROUND**

Plaintiffs filed their Motion for Class Certification (ECF No. 390) on January 14, 2020, and attached to the Motion declarations from 23 putative class members whose names are either redacted or replaced with the declarants' initials (ECF Nos. 390-67–390-74, 390-76–390-90). Plaintiffs attached to their February 26, 2020 Reply in Support of Class Certification (ECF No. 413) declarations from 44 putative class members whose names are also redacted or replaced with initials (ECF Nos. 413-8–413-51).

Defendants moved to strike these 67 declarations on February 26 and March 17, 2020, because Plaintiffs did not request or receive this Court's permission to file the declarations anonymously or pseudonymously and because Plaintiffs did not

DEFS.' RESPONSE IN SUPPORT
OF PLS.' MOT. TO SEAL
Case No. 3:17-cv-02366-BAS-KSC

share the declarants' names and alien registration numbers (A numbers) with Defendants when asked. *See* First Mot. to Strike (ECF No. 411-1); Second Mot. to Strike (ECF No. 425-1). Defendants explained that Plaintiffs' decision to file the declarations in this manner violates 28 U.S.C. § 1746 and the common law right of access to judicial records and prejudiced Defendants' ability to oppose Plaintiffs' Class Certification Motion because it prevented Defendants from examining their own files for information about the declarants' statements. *See* First Mot. to Strike 1–8; Second Mot. to Strike 2–7. Defendants also explained that Plaintiffs' decision to file 44 of the declarations with their Reply caused separate and additional prejudice to Defendants because it gave them no opportunity to respond. *See* Second Mot. to Strike 7–8.

This Court consolidated the briefing on both of Defendants' Motions to Strike. *See* Order (ECF No. 416). In their consolidated Opposition to Defendants' two Motions to Strike (ECF No. 434), Plaintiffs argued that their decision to file the declarations anonymously was justified primarily by the declarants' "fear of being persecuted if located" and their alleged "fear that revealing such information will cause them to be retaliated against by the Government in immigration enforcement proceedings." Pls.' Opp. 6; *see also id.* at 6–11. None of the declarants state in their declarations that they fear retaliation from the U.S. government, and Plaintiffs submit no evidence of any such retaliation against putative class members or similarly situated individuals. *See* Pls.' Class Cert. Exs. 65–72 & 74–88; Pls.' Class Cert. Reply Exs. 7–50.

Instead, Plaintiffs point in their Opposition to CBP's January 2019 decision to revoke Al Otro Lado employee Nicole Ramos's SENTRI enrollment—which "allows expedited clearance" for certain "pre-approved, low-risk travelers," *see* CBP, Secure Electronic Network for Travelers Rapid Inspection, https://www.cbp.gov/travel/trusted-traveler-programs/sentri—and argue that the revocation was retalia-

DEFS.' RESPONSE IN SUPPORT
OF PLS.' MOT. TO SEAL
Case No. 3:17-cv-02366-BAS-KSC

tion for Al Otro Lado's participation in this lawsuit. *See* Pls.' Opp. 8–12. They attached to the Opposition seven documents that Defendants produced to Plaintiffs in discovery that relate to Ramos's SENTRI revocation. *See* Pls.' Exs. 1–7 (ECF No. 434-2–434-8). All of the documents are marked "Confidential" or "Highly Confidential – Attorneys' Eyes Only" under the Protective Order (ECF No. 276). After Plaintiffs notified Defendants that they intended to attach the documents and sought Defendants' position on this Motion to Seal, Defendants realized that four of the documents contain law-enforcement privileged material that should not have been produced. *See* Decl. of Alexander J. Halaska ¶¶ 2–3 (filed concurrently). Defendants served Plaintiffs with a clawback letter asserting privilege over four of the seven Exhibits (and other documents) before Plaintiffs filed their Opposition and the Exhibits. *Id.* ¶ 3. Defendants then joined Plaintiffs' Motion to Seal with the intent to address the privilege dispute at a later date. Defendants hereby respond in support of Plaintiffs' Motion to Seal with the intent to seek additional relief from this Court if Judge Crawford resolves the privilege dispute in Defendants' favor.

## ARGUMENT

This Court should seal all seven of Plaintiffs' Exhibits to Their Opposition to Defendants' Motions to Strike, including the four Exhibits that are subject to the parties' pending clawback dispute.

## I. The Good-Cause Standard, Not the Compelling-Reasons Standard, Applies to the Parties' Sealing Request Because the Motion at Issue is Unrelated to the Merits.

At the outset, the good-cause standard applies to this sealing request, not the compelling-reasons standard. Typically, there is a "strong presumption in favor of access to court records," *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003), and "a court may seal records only when it finds 'a compelling reason and articulate[s] the factual basis for its ruling, without relying on hypothesis or conjecture,'" *Ctr. for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092, 1096–97 (9th Cir. 2016) (quoting *Kamakana v. City and County of Honolulu*, 447 F.3d

1172, 1179 (9th Cir. 2006)). However, when the documents sought to be sealed are attached to a motion that is not "more than tangentially related to the underlying cause of action," *Ctr. for Auto Safety*, 809 F.3d at 1099, a party need only show good cause to keep the documents sealed. The good-cause standard requires only "a 'particularized showing' that 'specific prejudice or harm will result' if the information is disclosed." *DSS Tech. Mgmt., Inc. v. Apple, Inc.*, No. 14-cv-5330, 2020 WL 496085, at *1 (N.D. Cal. Jan. 30, 2020) (quoting *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002)).

The application of the good-cause standard to motions that are not more than tangentially related to the underlying cause of action reflects the purpose for which discovery documents are submitted to a court and technically become "court records" in the first place. "Discovery rarely takes place in public," and the Federal Rules' liberal discovery standards "ha[ve] a significant potential for abuse." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 n.19, 34 (1984). Litigants have "an opportunity ... to obtain—incidentally or purposefully—information that not only is irrelevant but if publicly released could be damaging to" the opposing party's legitimate interests. *Id.* at 35. Protective orders issued under Rule 26(c) mitigate this risk between the parties, *see id.* at 34 & n.20, but the efficacy of protective orders would be "undermine[d], and possibly eviscerate[d]," if documents made confidential pursuant to those orders are presumptively made public simply because a party files them on the docket, *Phillips*, 307 F.3d at 1213. It makes "little sense" to "[a]pply[] a strong presumption of access in those circumstances. *Id.*

To determine which standard applies, the Ninth Circuit previously looked to whether the motion to which the relevant documents were attached was a dispositive motion or a non-dispositive motion. *See id.* The Ninth Circuit has since refined its case law and clarified that the relevant inquiry is not whether the motion is dispositive or non-dispositive, but rather whether the documents are attached to a motion that is "more than tangentially related to the underlying cause of action." *Ctr. for*

*Auto Safety*, 809 F.3d at 1099. This test acknowledges that "the weight given to the presumption of access is 'governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.' Documents submitted to the court exist on a 'continuum,' spanning those that play a role in 'determining litigants' substantive rights,' which are afforded 'strong weight,' to those that play only a 'negligible role in performance of Article III duties ... such as those passed between the parties in discovery,' which lie 'beyond the presumption's reach.'" *Id.* at 1099–1100 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049–50 (2d Cir. 1995)).

Here, the documents at issue are attached to Plaintiffs' Opposition to Defendants' Motions to Strike. The Motions to Strike and the Opposition do not relate to the underlying causes of action in this case, so the good-cause standard, not the compelling-reasons standard, should apply.

Plaintiffs' causes of actions are whether metering or an alleged "Turnback Policy" violate the Immigration and Nationality Act (INA), the Administrative Procedure Act (APA), the Fifth Amendment, or the "international law norm" of non-refoulement. *See* Second Am. Compl. ¶¶ 244–303 (ECF No. 189). The documents that the parties seek to seal, however, are attached to Plaintiffs' Opposition to Defendants' Motions to Strike 67 declarations from Plaintiffs' Motion for Class Certification. The Motions to Strike and the Opposition concern a procedural issue, not the underlying merits of the parties' claims and defenses. These filings address whether Plaintiffs improperly filed 67 anonymous declarations and thereby prejudiced Defendants' ability to oppose Plaintiffs' Class Certification Motion. Plaintiffs' Opposition also injects the issue of whether the U.S. government "retaliated" against Nicole Ramos because of Al Otro Lado's participation in this litigation—although Defendants maintain that there is no evidence of retaliation. But neither the Motions nor the Opposition discuss, for example, metering, queue management, an alleged "Turnback Policy," port capacity, detention space, limit line positions, or any of the

other issues that affect the parties' claims and defenses here.[1] When, as here, a motion to strike does not relate to the underlying merits of a case, the good-cause standard applies. *See, e.g.*, *Munoz v. PHH Corp.*, No. 08-cv-759, 2016 WL 10646326, at *3 (E.D. Cal. Sept. 16, 2016); *Jones v. Travelers Casualty Ins. Co. of America*, No. 13-cv-2390, 2015 WL 865877, at *1 (N.D. Cal. Feb. 5, 2015); *ASUS Computer Int'l v. Round Rock Research, LLC*, No. 12-cv-2099, 2014 WL 2810193, at *2 (N.D. Cal. June 20, 2014).

## II. There is Good Cause to Keep the Privileged and Law-Enforcement Sensitive Documents Sealed.

Good cause exists to keep each of the documents sealed, regardless of the outcome of the pending privilege dispute over some of the documents.

### A. Exhibit 1 (AOL-DEF-00070361–62)

Exhibit 1 (AOL-DEF-00070361–62) is an internal February 2017 email chain between the Port Director, the then-Assistant Port Director of Tactical Operations, the then-Watch Commander of the Admissibility Enforcement Unit and the Criminal Enforcement Unit, and three members of the International Liaison Unit at the San

---

[1] Moreover, while the Ninth Circuit's test looks to the relationship between the *motion* and the causes of action (as opposed to the *documents* and the causes of action), it is also worth noting that the documents at issue here have no relationship to the underlying causes of action, either. As discussed below, Exhibit 1 is an email chain from February 2017 that summarizes an interview at the San Ysidro port of entry and includes the interview's objective. Exhibits 2 & 3 are compiled intelligence updates mostly about events occurring outside the United States. Exhibit 4 is a PowerPoint presentation that also discusses events outside the United States. Exhibit 5 is a detailed U.S. Border Patrol (BP) intelligence report about potentially unlawful activity in Mexico. And Exhibits 6 & 7 relate to the revocation of Nicole Ramos's SENTRI privileges. The Exhibits do not relate to the merits of this case. Indeed, Plaintiffs previously acknowledged that this type of information was "outside the scope of the [operative] Complaint" when Al Otro Lado sought expedited discovery of the information. Order Denying Plaintiff Al Otro Lado's Ex Parte Motion for Expedited Discovery 4–5 (ECF No. 237).

6

Ysidro port of entry. *See* Gov't Ex. 1, Decl. of Mariza Marin ¶ 7. The email thread includes a summary of an interview with inadmissible aliens conducted by a specific enforcement unit at the San Ysidro port of entry and includes information regarding the objective of the interview. *See* Pls.' Ex. 1 at 361.[2] The document is designated "Confidential" under the Protective Order. The document is not the subject of the parties' pending privilege dispute.

There is good cause to seal Exhibit 1 because public disclosure of the information in Exhibit 1 would alert individuals entering the United States at the San Ysidro port of entry and the public at large that CBP has demonstrated an interest in a certain topic and that CBP has used a law-enforcement technique involving CBP officials from a specific unit to acquire information about this topic. Marin Decl. ¶ 8. Certain individuals would then have an incentive to prepare themselves to answer questions on that topic in the future, which would undermine CBP's ability to acquire additional information about this topic. *Id.* CBP would thus lose the advantage it gains from that law-enforcement technique, which in turn could adversely impact mission readiness at the port. *Id.* Accordingly, there is good cause to seal Exhibit 1.

**B.    Exhibit 2 (AOL-DEF-00283080–86) & Exhibit 3 (AOL-DEF-00283226–32)**

Exhibit 2 (AOL-DEF-00283080–86) and Exhibit 3 (AOL-DEF-00283226–32) are compiled intelligence updates sent on December 18, 2018 and December 19, 2018 to DHS, CBP, and ICE personnel. These compiled intelligence updates provide detailed and law-enforcement sensitive factual updates about an approaching migrant caravan and related subjects warranting the Department's and the agencies' operational awareness. *See* Gov't Ex. 2, Decl. of Erik Moncayo ¶¶ 3–4. Both documents are designated "Highly Confidential – Attorneys' Eyes Only" under the Pro-

---

[2] Because the documents do not contain native page numbers, Defendants identify the page numbers using the last three digits of the "AOL-DEF-" Bates numbers.

1    tective Order. Neither document is the subject of the parties' pending privilege dis-
2    pute.

3        There is good cause to keep Exhibits 2 & 3 sealed because they contain a
4    series of detailed compiled intelligence reports, including factual matter that, in
5    CBP's assessment, was important enough to share with other DHS, CBP, and ICE
6    personnel, the sources from which that intelligence information was gathered, and
7    the methods by which that information was gathered. For example, in terms of fac-
8    tual intelligence information, Exhibit 2 notes when CBP intends to take additional
9    steps in response to the factual information circulated in the reports and specifically
10   states what those actions are. *See* Pls.' Ex. 2 at 083. Exhibit 2 states how the Mexican
11   government anticipates responding to intelligence gathered on migrant caravan ac-
12   tions. *See* Pls.' Ex. 2 at 084, 085. Exhibit 3 states the next steps that one law-en-
13   forcement source is taking in response to certain intelligence information. *See* Pls.'
14   Ex. 3 at 226. And Exhibit 3 states whether law enforcement has or has not confirmed
15   a specific individual's allegations on the specified topic. Pls.' Ex. 3 at 233.

16       In terms of sources, Exhibits 2 & 3 each specifically identify the sources that
17   contributed the relevant factual material in bold headings above the bulleted intelli-
18   gence narratives. *See* Pls.' Ex. 2 at 080 (identifying three sources); *id.* at 081 (iden-
19   tifying three sources); *id.* at 082 (identifying four sources); *id.* at 083 (identifying
20   four sources); *id.* at 084 (identifying three sources); *id.* at 085 (identifying two
21   sources); *id.* at 086 (identifying two sources and one open source); Pls.' Ex. 3 at 226
22   (identifying two sources and one open source); *id.* at 227 (identifying four sources);
23   *id.* at 228 (identifying one source); *id.* at 229 (identifying four sources); *id.* at 230
24   (identifying two sources); *id.* at 231 (identifying three sources and one open source);
25   *id.* at 232 (identifying three sources); *id.* at 233 (identifying two sources).

26       In terms of methods, Exhibits 2 & 3 each identify the manner in which the
27   source obtained their information and in many cases reveal the specific individual
28   who is the subject of law-enforcement agencies' interest. *E.g.*, Pls.' Ex. 2 at 080; *id.*

at 081; *id.* at 085; Pls.' Ex. 3 at 231; *id.* at 232; *id.* at 233.

In sum, as CBP's Acting Assistant Commissioner for International Affairs Erik Moncayo explains, there is good cause to seal the intelligence updates because they "contain a discussion of specific actions taken by both domestic and foreign law enforcement related to the activities of interest, such as arrests and particular allocation of personnel and other resources." Moncayo Decl. ¶ 5. Public disclosure of this information would cause the government "specific ... harm," *Phillips*, 307 F.3d at 1210, by "reveal[ing] the extent of law enforcement interest into the activities, and would similarly permit such actors to reallocate resources and change their operational posture to avoid law enforcement scrutiny." Moncayo Decl. ¶ 5. The very revelation of this information thus erodes or eviscerates the efficacy of those sources and methods of information-gathering because it would allow the subject individuals "to adjust their operational posture or cease activities to avoid law enforcement scrutiny. For instance, if individuals involved in criminal or other unlawful activities learn of law enforcement investigations into or enforcement efforts against these activities, they are likely to change their behavior and work to undermine such investigations or enforcement activities." *Id.*

Moreover, public disclosure of these documents will harm the U.S. government's relationship with its partner nations' law-enforcement agencies. The updates "contain granular, detailed, real-time assessments of vulnerabilities (or perceived vulnerabilities) in partner nations' law-enforcement efforts. It is critical that individuals within CBP and DHS are able to share such frank and honest assessments of their foreign partners, as it is critical that decisionmakers are able to understand all relevant facts at hand in order to make the most effective decisions." Moncayo Decl. ¶ 7. If discussions of these perceived or actual vulnerabilities were revealed, it "would have a significant chilling effect on foreign partners' willingness to cooperate and share information with U.S law enforcement agencies, thereby severely limiting joint efforts to reduce unlawful activity across the region." *Id.* ¶ 8.

DEFS.' RESPONSE IN SUPPORT
OF PLS.' MOT. TO SEAL
Case No. 3:17-cv-02366-BAS-KSC

Accordingly, this Court should seal Exhibits 2 & 3.

**C.      Exhibit 4 (AOL-DEF-00516605–23)**

Exhibit 4 (AOL-DEF-00516605–23) is a PowerPoint presentation created by CBP's Region IX Emergency Operations Center entitled "Region IX Update: 29 December 2018 (1800 – 0800)." *See* Pls.' Ex. 4 at 605; Gov't Ex. 3, Decl. of Deputy Executive Assistant Commissioner John P. Wagner ¶ 10. CBP has asserted the law-enforcement privilege over part of page 11 (at -615) and pages 12–14 of Exhibit 4 (at -616–18). *See* Wagner Decl. ¶ 11 (asserting privilege over the information on pages 11, 12, and 14); Gov't Ex. 4, Decl. of Aaron Heitke ¶ 13 (asserting privilege over the information on page 13). The document was designated "Confidential" during initial production but was re-designated as "Highly Confidential – Attorneys' Eyes Only" on March 31. *See* Halaska Decl. ¶ 3. Exhibit 4 is subject to the parties' pending privilege dispute. *See id.* ¶¶ 3–4.

Regardless of the outcome of the privilege dispute, there is good cause to seal the entirety of Exhibit 4 (including the pages that CBP has not asserted privilege over). The Region IX Emergency Operations Center was temporarily activated in late 2018 as part of Operation Secure Line, a "multi-phased and flexible operational response designed to ensure that CBP was prepared for any attempted incursion of large groups of intending migrants, whether at or between ports of operation." Heitke Decl. ¶ 11; Wagner Decl. ¶ 10. The Region IX Emergency Operations Center covered the U.S.-Mexico border spanning California and Arizona. *Id.* It was staffed principally by multiple CBP components, including the Office of Field Operations (OFO), Border Patrol, Air and Marine Operations, and the Office of Intelligence, and included partners from other federal agencies. *Id.* Exhibit 4 was created "to brief CBP's Region IX EOC's leadership team on ongoing operational issues[] to ensure that the CBP's Region IX Lead Field Commander and his team had sufficient awareness of the facts on the ground to make effective operational decisions." Heitke Decl. ¶ 12; *see also* Wagner Decl. ¶ 11.

Pages 1–11 (AOL-DEF-00516605–15) and 15–19 (AOL-DEF-00516619–23) of Exhibit 4 contain sensitive law-enforcement information for which there is good cause to keep sealed. As Chief Patrol Agent Heitke explains, these pages:

> contain detailed statistical information about [Border Patrol's (BP)] apprehensions and [OFO]'s encounters of individuals associated with migrant caravans, broken down both by the numbers on a particular date and for the fiscal year up to that date. This data is set forth in various ways, including by [OFO]'s Field Offices and BP Sectors. Additionally, Pages 1–11 and Pages 15–19 of AOL-DEF-00556921 contain statistical information about all apprehensions made by BP's San Diego and El Centro Sectors on a particular date, broken down by BP station, zone, and hour of the day. Further, Pages 1–11 and 15–19 in AOL-DEF-00516605 contain detailed maps for the BP's San Diego and El Centro Sectors, showing geographic locations of all BP activity in those sectors on a particular date, and detailing the number of apprehensions, as well as individuals who may have avoided apprehension.

Heitke Decl. ¶ 16. If this information were publicly disclosed, the United States would be harmed because "hostile actors seeking to enter the United States between ports of entry, seeking to lead others to do so, or seeking to stage or participate in a mass incursion at or between ports of entry, would know where BP has been the most active, when BP has been the most occupied, which BP stations and zones have been the busiest, and how many individuals may have avoided apprehension." *Id.* ¶ 17. Although the information is historical, the United States would still experience a current harm because the information on pages 1–11 and 15–19 "can be combined with other information, including publicly-available information, to provide a roadmap of how BP deploys its staffing resources across Sectors, perceived vulnerabilities in BP's enforcement actions, and particular geographical areas where resources are and are not focused." *Id.* The information can thus be exploited by hostile actors who would concentrate their own resources towards areas of the border with perceived resource vulnerabilities to undermine BP's ability to carry out its mission sets. *Id.* That specific harm warrants keeping this information sealed.

Additionally, pages 1–11 and 15–19 should be sealed because those pages

contain information provided by a foreign government partner, among other sources. Heitke Decl. ¶ 18. CBP continues to rely on information provided by foreign governments, and public disclosure of the information in pages 1–11 and 15–19 would harm the United States by "chill[ing] the willingness of sources and foreign governments alike to share information with CBP in the future, which would seriously undermine CBP's mission readiness." *Id.*

Pages 11–14 should also be kept sealed for good cause. As Deputy Executive Assistant Commissioner Wagner explains, page 11, *see* Pls.' Ex. 4 at 615, in addition to the information discussed above, also identifies the entities with which CBP shared the information discussed in the document, as well as the purpose. Wagner Decl. ¶ 12. Revelation of this information would harm CBP's law-enforcement mission by permitting hostile actors to anticipate CBP's methods and work to subvert them. *Id.* Pages 12 and 14, *see* Pls.' Ex. 4 at 616, 618, identify several persons of interest to law enforcement, explain why those individuals are of interest, and reveal the techniques and methods utilized to obtain this information. Wagner Decl. ¶ 13. Page 12 also contains a discussion of the relative weaknesses of that information, which, if revealed, would inform the subject of both the source of CBP's information and how to exploit gaps in CBP's knowledge. *Id.* Revelation of that information would inform those individuals that they are, in fact, persons of interest, thereby incentivizing them to alter their behavior to avoid detection. *Id.* That would undermine CBP's ability to continue gathering information or intelligence related to those individuals. *Id.* Page 13, *see* Pls.' Ex. 4 at 617, similarly identifies persons of interest to law enforcement and explains why they are of interest. Heitke Decl. ¶ 13(a)(i). Disclosure of that information "would alert the individuals of interest, as well as any other individuals involved in the same potential unlawful activity, to take actions to evade law enforcement, thereby undermining CBP and other agencies' abilities to continue to obtain and develop information and intelligence about these individuals and the potential unlawful activity." *Id.* ¶ 13(b). It would also "provide hostile actors

with insights into the law enforcement priorities of CBP and other agencies, as well as the techniques and methods utilized to obtain certain information, permitting them to exploit this information to more effectively evade law enforcement." *Id.* ¶ 13(c).

In sum, good cause exists to seal the entirety of Exhibit 4.

### D.    Exhibit 5 (AOL-DEF-00528691–707)

Exhibit 5 (AOL-DEF-00528691–707) is an intelligence report created in January 2019 by a Border Patrol (BP) agent in the San Diego Sector Intelligence Unit. *See* Heitke Decl. ¶ 4. The document is marked "Highly Confidential – Attorneys' Eyes Only." CBP has asserted law-enforcement privilege over this document in its entirety. Heitke Decl. ¶ 4.

Regardless of the outcome of the privilege dispute, there is good cause to seal Exhibit 5 because it contains sensitive "identification codes and information about how the intelligence contained within the document is categorized, which reveal information about how the document is stored within CBP systems and the types of individuals who are able to access the document, and more broadly, about the structure, logic, and technical capabilities of that CBP system." Heitke Decl. ¶ 8; *see* Pls.' Ex. 5 at 693; *see also id.* at 692–707 (recurring on each page). CBP creates and maintains intelligence products in a system called Intelligence Reporting System – Next Generation, which sits on CBP's Automated Targeting System (ATS) platform. Heitke Decl. ¶ 7. ATS is critical to CBP's border-security mission because it allows the agency to identify actual and potential threats by "compar[ing] information about travelers and conveyances arriving in, transiting through, or exiting the country against law enforcement and intelligence databases, compar[ing] existing information about individuals and cargo entering and exiting the country with patterns identified as requiring additional scrutiny, and allow[ing] users to search data across many different databases and systems to provide a consolidated view of data about a person or entity." *Id.* Access to the system is restricted to individuals with an official need, and even those with access permission are restricted to accessing specific

13

1    information and workspaces consistent with their roles and responsibilities within

2    the agency. *See id.*

3         The identification codes and other categorization information reveal how the

4    intelligence information contained within Exhibit 5 is categorized, which in turn re-

5    veals how the document is stored within CBP systems and, more broadly, the struc-

6    ture, logic, and technical capabilities of those systems. *Id.* ¶ 8. Were this information

7    publicly disclosed, it would allow hostile actors to access CBP's systems and ac-

8    quire, modify, or potentially remove U.S. government intelligence records. *Id.* Such

9    manipulation of intelligence records would be catastrophic, as it would undermine

10   the integrity of the underlying data and compromise ongoing investigations and law-

11   enforcement operations, thereby risking the security of the United States. *Id.* Such

12   tangible harm constitutes good cause for sealing Exhibit 5.

13        Separately, there is good cause to seal Exhibit 5 because it contains detailed

14   information about potentially unlawful activity of interest to the United States, which

15   is subject to a pending claim of law-enforcement privilege. Heitke Decl. ¶ 9. The

16   report identifies the specific sources, techniques, and methods utilized to obtain in-

17   formation about this potentially unlawful activity; identifies individuals of interest

18   and connections between those individuals; assesses the reliability of the information

19   already known to law enforcement and any gaps in the available information; and

20   discusses ongoing and anticipated needs additional for obtaining additional infor-

21   mation." *Id.* As Chief Patrol Agent Heitke explains, "disclosure of this information

22   would alert individuals involved in this potentially unlawful activity to change their

23   behavior or take steps to evade law enforcement, which would undermine CBP and

24   other agencies' abilities to continue to obtain and develop information and intelli-

25   gence about this potential unlawful activity and any related unlawful activities."

26   Heitke Decl. ¶ 9. Disclosure would "provide hostile actors with insights in the law

27   enforcement priorities of CBP and other agencies, as well as the techniques and

28   methods utilized to obtain certain information." *Id.*

14

DEFS.' RESPONSE IN SUPPORT
OF PLS.' MOT. TO SEAL
Case No. 3:17-cv-02366-BAS-KSC

Accordingly, this Court should seal Exhibit 5.

**E.      Exhibit 6 (AOL-DEF-00556914–18) & Exhibit 7 (AOL-DEF-00556928)**

Exhibit 6 (AOL-DEF-00556914) is an email chain from January 2019 with the subject line "FWD: Recommendation for the revocation of SENTRI privileges for Nicole Ramos." *See* Pls.' Ex. 6 at 914; Wagner Decl. ¶ 3(a). Exhibit 7 (AOL-DEF-00556928) is an image that was extracted from Exhibit 6. Exhibit 6 is marked "Highly Confidential – Attorneys' Eyes Only," and Exhibit 7 is marked "Confidential." CBP has asserted the law-enforcement privilege over Exhibits 6 & 7. Wagner Decl. ¶¶ 3(a), (k). Exhibits 6 & 7 are subject to the parties' pending privilege dispute. *See* Halaska Decl. ¶¶ 3–4.

As Deputy Executive Assistant Commissioner Wagner explains, "SENTRI is one of four CBP Trusted Traveler Programs, which allow pre-enrolled, low-risk participants to receive expedited border processing, enabling CBP to direct additional scrutiny to unknown, potentially higher-risk travelers arriving at ports of entry." Wagner Decl. ¶ 5. "All of [the] ports of entry that participate in the SENTRI program have designated vehicle and/or pedestrian lanes with access restricted to SENTRI members." *Id.*

Exhibit 6 contains detailed information supporting CBP's determination that Nicole Ramos was not a low-risk traveler eligible for the SENTRI program and the sources from which CBP obtained that information. Wagner Decl. ¶ 6; *see* Pls.' Ex. 6 at 914–18. This includes Exhibit 7, which is one of the specific pieces of information supporting CBP's determination. "Disclosure of this information would reveal the types and sources of information that CBP considers relevant for determining eligibility in its Trusted Traveler Programs, thereby undermining CBP's ability to use the same law enforcement techniques and sources to assess future applicants for and participants in those Trusted Traveler Programs. Individuals seeking to ob-

tain or retain Trusted Traveler privileges for illicit purposes could use that information to identify any possible gaps in CBP's decision making, manipulate information provided to CBP, and change their behavior in order to inappropriately obtain Trusted Traveler privileges. Such manipulation could result in CBP being unable to assess applicants for and participants in the Trusted Traveler Programs with the requisite confidence level, and could result in CBP incorrectly identifying individuals as low risk and thus eligible for Trusted Traveler Programs, when, for instance, they pose a threat to national security." Wagner Decl. ¶ 6. Additionally, Exhibit 6 includes "information regarding areas and individuals of interest to CBP law enforcement efforts," which reflects CBP's law-enforcement priorities. *Id.* ¶ 7. If revealed, "individuals seeking to evade law enforcement activities could better assess the areas to which CBP has devoted significant resources, and conversely, the areas to which it may not devote significant resources, and thus implement more effective countermeasures to evade law enforcement. Those countermeasures could undermine CBP and other agencies' abilities to obtain and develop information and intelligence needed to carry out their law enforcement missions." *Id.* These specific harms warrant sealing Exhibits 6 & 7, regardless of the outcome of the parties' pending privilege dispute.

## III. The Parties' Request Also Meets the Compelling-Reasons Standard.

Even though the good cause standard should apply to the Parties' sealing request, the Parties' request also satisfies the compelling-reasons standard. Under that standard, "a court may seal records only when it finds 'a compelling reason and articulate[s] the factual basis for its ruling, without relying on hypothesis or conjecture.' The court must then 'conscientiously balance[] the competing interests of the public and the party who seeks to keep certain judicial records secret.'" *Ctr. for Auto Safety*, 809 F.3d at 1096–97 (quoting *Kamakana*, 447 F.3d at 1179). This includes the "public interest in the effective functioning of law enforcement." *Tuite v. Henry*, 181 F.R.D. 175, 176 (D.D.C. 1998), *aff'd per curiam*, 203 F.3d 53 (D.C. Cir. 1999).

Exhibit 1 satisfies this standard because there is a compelling reason to prevent the public from learning of CBP's law-enforcement priorities and investigatory techniques at the San Ysidro port of entry. The United States has a strong interest in limiting the disclosure of its law-enforcement methods. *Cf. Hamdan v. U.S. Dept. of Justice*, 797 F.3d 759, 777–78 (9th Cir. 2015) (holding in the Freedom of Information Act (FOIA) context that FBI records which would reveal "techniques and procedures related to surveillance and credit searches" were exempt from disclosure even though "credit searches and surveillance are publicly known law enforcement techniques"). The public, by contrast, has no interest in learning those methods to avoid being subject to them.

Exhibits 2 & 3 satisfy the compelling reasons standard because they contain compiled intelligence updates providing detailed and law-enforcement sensitive facts about an approaching migrant caravan and related subjects warranting the Department's and the agencies' operational awareness. *See* Moncayo Decl. ¶¶ 3–4. The United States plainly has a strong interest in maintaining the secrecy of its intelligence sources and methods in foreign countries and in keeping the confidences of its foreign government law-enforcement partners. The public, in contrast, does not have any identifiable countervailing interest.

Exhibit 4 is a PowerPoint presentation that was created "to brief CBP's Region IX EOC's leadership team on ongoing operational issues[]" during Operation Secure Line "to ensure that the CBP's Region IX Lead Field Commander and his team had sufficient awareness of the facts on the ground to make effective operational decisions." Heitke Decl. ¶ 12; *see also* Wagner Decl. ¶ 11. The document (at p. 12) also contains a discussion of the weaknesses of that information, which, if revealed, informs the subject of both the source of CBP's information and how to exploit gaps in CBP's knowledge. Wagner Decl. ¶ 12. The United States has a strong interest in maintaining the secrecy of the border locations "where BP has been the most active, when BP has been the most occupied, which BP stations and zones have

DEFS.' RESPONSE IN SUPPORT
OF PLS.' MOT. TO SEAL
Case No. 3:17-cv-02366-BAS-KSC

been the busiest, and how many individuals may have avoided apprehension." Heitke Decl. ¶ 17. Although the information is historical, the United States' interest remains equally as strong: Disclosure of the information would create a current harm because it "can be combined with other information, including publicly-available information, to provide a roadmap of how BP deploys its staffing resources across Sectors, perceived vulnerabilities in BP's enforcement actions, and particular geo-graphical areas where resources are and are not focused." *Id.* The United States also has a strong interest in ensuring that the public does not know where the gaps in CBP's intelligence lie. The public, in contrast, has weak or nonexistent interests in learning Border Patrol's operational posture during times of heightened law-enforce-ment activity or learning where there are gaps in the government's intelligence.

Exhibit 5 is an intelligence report created in January 2019 by a Border Patrol (BP) agent in the San Diego Sector Intelligence Unit. *See* Heitke Decl. ¶ 4. The doc-ument contains sensitive "identification codes and information about how the intel-ligence contained within the document is categorized, which reveal information about how the document is stored within CBP systems and the types of individuals who are able to access the document, and more broadly, about the structure, logic, and technical capabilities of that CBP system." *Id.* ¶ 8; *see* Pls.' Ex. 5 at 693; *see also id.* at 692–707 (recurring on each page). The identification codes and other cat-egorization information reveal how the intelligence information contained within Exhibit 5 is categorized, which in turn reveals how the document is stored within CBP systems and, more broadly, the structure, logic, and technical capabilities of those systems. Heitke Decl. ¶ 8. The United States has an exceedingly strong interest in preventing disclosure of this information, since it would allow hostile actors to access CBP's systems and acquire, modify, or potentially remove U.S. government intelligence records. *Cf. Pickard v. Dept. of Justice*, 217 F. Supp. 3d 1081, 1096–97 (N.D. Cal. 2016) (in the FOIA context, declining to order the disclosure of a single NADDIS number used internally by the Drug Enforcement Administration because

"the DEA uses a particular method to assign NADDIS numbers, and that the more NADDIS numbers get out, the more people will be able to discern that methodology"). Disclosure of this information and the potential resultant manipulation of intelligence records would be catastrophic. The public, in contrast, has no interest in obtaining this information at the expense of the integrity of law-enforcement records. Further, Exhibit 5 contains detailed information about potentially unlawful activity of interest to the United States. Heitke Decl. ¶ 9; *see, e.g.*, Pls.' Ex. 5 at 694–96, 698, 702–03. The report also includes the source material upon which aspects of the report are based and identifies the gaps in the agency's intelligence. *Id.* at 697, 699–702, 703. The United States has a strong interest in maintaining the secrecy of this law-enforcement-privileged document because "disclosure of this information would alert individuals involved in this potentially unlawful activity to change their behavior or take steps to evade law enforcement, which would undermine CBP and other agencies' abilities to continue to obtain and develop information and intelligence about this potential unlawful activity and any related unlawful activities." Heitke Decl. ¶ 9. The public, in contrast, has no countervailing interest in the information at issue.

Exhibits 6 & 7 are law-enforcement-privileged documents explaining why CBP revoked Nicole Ramos's SENTRI privileges and one of the supporting documents. *See* Wagner Decl. ¶ 3(a), (k). CBP has a strong interest in keeping these documents secret because they reveal the types of information that CBP assesses when evaluating whether an individual is a low-risk traveler potentially eligible for enrollment in CBP's Trusted Traveler programs. Were this information disclosed, the public would know how to circumvent CBP's investigatory methods and assessments for eligibility in CBP's Trusted Traveler programs, which in turn would erode CBP's ability to accurately identify low-risk travelers. In short, revelation of the information would blunt the value of CBP's Trusted Traveler programs because it would reduce confidence that only low-risk travelers are enrolled. In contrast, the public

has no interest in learning this information. If anything, the public's interests are aligned with CBP's, since Trusted Traveler enrollees and the public at large also benefit from CBP's ability to accurately identify low-risk individuals for potential enrollment in CBP's Trusted Traveler programs.

Accordingly, this Court should grant the sealing request even under the compelling-reasons standard.

## IV. If the Court Denies the Sealing Request, Defendants Request the Opportunity to Redact U.S. Government Personnel's Telephone Numbers from the Documents Before Release.

Finally, although Defendants urge this Court to seal the Exhibits in their entirety, Defendants respectfully request the opportunity to redact U.S. government personnel's telephone numbers from the Exhibits if this Court denies the sealing request. As this Court previously explained, "the public has no comparable interest in or need for the office phone numbers and cell numbers of the agency officials. The redaction of th[at] information will not compromise the public's understanding of this case or the judicial process." Order Denying Without Prejudice the Parties Motions to Seal 7 (ECF No. 332).

## CONCLUSION

This Court should grant the parties' Motion to Seal Plaintiffs' Exhibits 1–7 and the portions of Plaintiffs' Oppositions to Defendants' Motions to Strike that rely on those Exhibits.

DEFS.' RESPONSE IN SUPPORT
OF PLS.' MOT. TO SEAL
Case No. 3:17-cv-02366-BAS-KSC

DATED: May 4, 2020                    Respectfully submitted,

                                      JOSEPH H. HUNT
                                      Assistant Attorney General
                                      Civil Division

                                      WILLIAM C. PEACHEY
                                      Director

                                      KATHERINE J. SHINNERS
                                      Senior Litigation Counsel

                                      */s/ Alexander J. Halaska*
                                      ALEXANDER J. HALASKA
                                      Trial Attorney
                                      United States Department of Justice
                                      Civil Division
                                      Office of Immigration Litigation
                                      District Court Section
                                      P.O. Box 868, Ben Franklin Station
                                      Washington, D.C. 20044
                                      Tel: (202) 307-8704 | Fax: (202) 305-7000
                                      alexander.j.halaska@usdoj.gov

                                      *Counsel for Defendants*

# **CERTIFICATE OF SERVICE**

*Al Otro Lado v. Wolf*, No. 17-cv-02366-BAS-KSC (S.D. Cal.)

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: May 4, 2020                     Respectfully submitted,

                                       */s/ Alexander J. Halaska*
                                       ALEXANDER J. HALASKA
                                       Trial Attorney
                                       United States Department of Justice

DEFS.' RESPONSE IN SUPPORT
OF PLS.' MOT. TO SEAL
Case No. 3:17-cv-02366-BAS-KSC