MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.: 17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | **PLAINTIFFS' NOTICE OF FED. R. CIV. P. 30(b)(6) DEPOSITION OF U.S. DEPARTMENT OF HOMELAND SECURITY** |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857


AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

PLEASE TAKE NOTICE that, in accordance with the Federal Rules of Civil Procedure and any other applicable rules or Court orders, Plaintiffs will take the deposition by oral examination of U.S. Department of Homeland Security ("DHS") pursuant to Fed. R. Civ. P. 30(b)(6) on February 18, 2020 commencing at 9:30am ET at Mayer Brown LLP, 1999 K Street, N.W., Washington, D.C. 20006-1101. The deposition shall be taken before a notary public or some other person authorized by law to administer oaths. The testimony will be recorded stenographically by a court reporter and may be videotaped. This deposition is being taken for the purpose of discovery, for use at trial, and/or for any other purpose permitted under the applicable Federal and Local Rules of Civil Procedure.

Dated: January 31, 2020

MAYER BROWN LLP
    Matthew H. Marmolejo
    Ori Lev
    Stephen S. Medlock

SOUTHERN POVERTY LAW CENTER
    Melissa Crow
    Sarah Rich
    Rebecca Cassler

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy
    Ghita Schwarz
    Angelo Guisado

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters

By: */s/ Stephen M. Medlock*_____
    Stephen M. Medlock

*Attorneys for Plaintiffs*

**DEPOSITION TOPICS**

**I.   DEFINITIONS**

A.   "You," "your" and "DHS" shall mean and refer to the U.S. Department of Homeland Security and, where appropriate in the context, its headquarters and offices, including any divisions, subdivisions, components or sections therein; DHS offices at ports of entry, including any divisions, subdivisions or sections therein; or any other DHS organizational structures, including but not limited to U.S. Customs and Border Protection, Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services or private contractors hired by DHS.

B.   "CBP" shall mean and refer to U.S. Customs and Border Protection, and, where appropriate in the context, its headquarters and offices, including any divisions, subdivisions, components or sections therein, or any other CBP organizational structures, including, by way of example, the Office of Field Operations ("OFO").

C.   "ICE" shall mean and refer to U.S. Immigration and Customs Enforcement, and, where appropriate in the context, its headquarters and offices, including any divisions, subdivisions, components or sections therein, or any other ICE organizational structures.

D.   "Border Patrol" shall mean and refer to U.S. Border Patrol, and, where appropriate in the context, its headquarters and offices, including any divisions, subdivisions, components or sections therein, or any other Border Patrol organizational structures.

E.   "USCIS" shall mean and refer to U.S. Citizenship and Immigration Services, and, where appropriate in the context, its headquarters and offices, including any divisions, subdivisions, components or sections therein, or any other USCIS organizational structures.

F.   "Person(s)" shall mean and refer to any individual, including, without

limitation, any government official (elected or appointed) or entity, including, without limitation, any government agency, division, subdivision or section therein, sole proprietorship, association, company, partnership, joint venture, corporation, trust, estate or any other entity that have in their possession, custody, or control documents or electronically stored information that is relevant to the claims and defenses in this litigation.

G. "Noncitizen" shall mean any individual who is not a citizen of the United States and shall include, without limitation, "aliens" as that term is defined in the Immigration and Nationality Act.

H. "Arriving noncitizen" shall mean a noncitizen described in 8 U.S.C. § 1225(b)(1).

I. "Communication(s)" shall mean and refer to the exchange of information by or through any mode or medium including, but not limited to, spoken word, written correspondence, any form of technology, face-to-face meetings or conveying of information through third person(s) to some other intended recipient.

J. "Document(s)" is used in its customary broad sense, and includes, but is not limited to, any written, printed, typed, recorded, videotaped, filmed, punched, transcribed, taped, electronically created or other graphic matter of any kind or nature held or produced or reproduced, whether sent or received, including the original, and includes, but is not limited to, all correspondence, emails, records, drawings, calculations, memoranda, reports, financial statements, telegrams, cables, contracts, tabulations, studies, analyses, evaluations, work appointment books, diaries, comparisons, questionnaires, surveys, charts, graphs, books, pamphlets, booklets, articles, magazines, newspapers, microfilm, microfiche, photographs, tapes or other recordings, punched cards, magnetic tapes, discs, printouts, computer-generated reports and printouts, other data compilations from which information can be obtained, and includes all such document(s) that are in your possession, custody or control, or to which you otherwise have access. The term document(s)

encompasses all communications available in the foregoing formats. The term document(s) does not include intangible information that cannot be physically collected.

K. "Relating to" as used herein, shall mean constituting, comprising, pertaining to, in connection with, reflecting, respecting, regarding, referring to, based upon, stating, showing, evidencing, establishing, supporting, negating, contradicting, describing, recording, noting, embodying, memorializing, containing, mentioning, studying, analyzing, discussing, specifying, setting forth, identifying or in any manner logically, factually, indirectly or directly, or in any other way connecting to the matter addressed in the request, in whole or in part.

L. "Metering" or "queue management" shall mean the procedures described in your Answer as metering or queue management and/or the procedures described in the April 27, 2018 memorandum from Todd C. Owen entitled "Metering Guidance." *See, e.g.*, Dkt. 283 at ¶¶ 3, 7, 10, 48, 54, 67, 68, 69.

M. "Port of Entry" or "POE" shall mean one or more of the following ports of entry on the U.S.-Mexico border that have a pedestrian entrance, including, but not limited to, San Ysidro (including PedWest), Otay Mesa, Tecate, Calexico West, Calexico East, Andrade, San Luis, San Luis II, Lukeville, Sasabe, Nogales-Mariposa, Nogales-Grand Avenue, Nogales-Morley Gate, Naco, Douglas, Antelope Wells, Columbus, Santa Teresa, El Paso-PDN, El Paso-Stanton, El Paso-BOTA, El Paso-Ysleta, Tornillo, Fort Hancock, Presidio, Boquillas, Amistad Dam, Del Rio, Eagle Pass, Eagle Pass II, Laredo-Colombia Solidarity, Laredo-World Trade, Laredo Bridge 1, Laredo-Juarez/Lincoln, Falcon Dam, Roma, Rio Grande City, Los Ebanos, Anzalduas, Hidalgo, Pharr, Donna, Progreso, Los Indios, Brownsville-B&M, Brownsville-Gateway, and Brownsville-Veterans.

N. "Turnback" or "turned back" shall mean denying, delaying, or withholding inspection and processing of asylum seekers at a port of entry on the U.S.-Mexico border, on the bridge leading to a port of entry on the U.S.-Mexico

border, and/or at or near the international boundary between the U.S. and Mexico by engaging in any of the following conduct: (a) lying; (b) using threats, intimidation, and coercion; (c) employing verbal abuse and/or physical force; (d) physically obstructing access to the POE or inspection station; (e) imposing unreasonable delays before granting access to the asylum process; and/or (f) metering or queue management.

## II.   INSTRUCTIONS

A.   The terms defined above are to be construed broadly and to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Civil Procedure.

B.   As used in these subjects, the singular is to be treated as plural and vice-versa.

C.   The words "and/or," "or," and "and" are used inclusively, not exclusively.

D.   The term "any" means any and all.

E.   Unless otherwise stated, these subjects for examination cover the period from January 1, 2016 to the date of this notice (the "Relevant Time Period").

## III.   TOPICS FOR EXAMINATION

1.   The organization and structure of DHS, including the reporting relationships between DHS' leadership, CBP leadership, the Office of Field Operations, POEs, and CBP officers working at POEs.

2.   Your practice of metering, queue management, and/or turnbacks at POEs, including, but not limited to, the development of the practice, the reasons for its adoption, and its implementation.

3.   The April 2018 memorandum drafted by Todd Owen entitled "Metering Guidance," including, but not limited to, the development of the memorandum, communications regarding the memorandum, and any additional guidance provided to POEs or CBP officers working at POEs with respect to the

memorandum.

4. The Ports of Entry at which CBP inspects and processes noncitizens without proper travel documents to enter the United States.

5. Your definition of the term "capacity" when used in reference to a Port of Entry's ability to inspect and process noncitizens without proper travel documents to enter the United States.

6. The capacity of each Port of Entry to inspect and process noncitizens without proper travel documents to enter the United States.

7. Changes in the capacity of each Port of Entry to inspect and process noncitizens without proper travel documents to enter the United States, including, but not limited to, changes caused by construction projects or closures.

8. Proposed or actual plans to increase the capacity of Ports of Entry on the U.S.-Mexico border with respect to inspecting and processing arriving noncitizens.

9. Your purported justifications, if any, for your policy of metering, queue management, and/or turnbacks.

10. The September 26, 2019 report by the U.S. Department of Homeland Security's Office of Inspector General ("DHS OIG") entitled "Investigation of Alleged Violations of Immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel," including, but not limited to, the factual findings contained in the report and the basis for those findings, the identities of the individuals interviewed by DHS OIG during its investigation, the identities of the persons found to have violated U.S. immigration laws at the Tecate Port of Entry, and the identities of any CBP managers, port directors, assistant port directors, directors of field operations, or personnel employed at the CBP Office of Field Operations that directed, condoned, or were aware of conduct at the Tecate, California Port of Entry that violated U.S. immigration law.

11. Any investigation, other than the investigation disclosed in the

September 26, 2019 DHS OIG report, of metering, queue management, or turnbacks at a Port of Entry conducted by DHS OIG, DHS Office of Civil Rights and Civil Liberties, DHS, CBP, the U.S. Department of Justice or the United States Office of Special Counsel, including, but not limited to:

    a. Case Number 201708904 (CRCL 17-06-CBP-0219);
    b. Case Number 201704357 (CRCL 16-10-CBP-0508);
    c. Case Number 201703830 (CRCL 17-04-CBP-0186);
    d. Case Number 201702722 (CRCL 17-03-CBP-0091; OIG 117-07679);
    e. Case Number 201706316 (CRCL 17-07-CBP-0258);
    f. Case Number 201709492 (OIG 117-07833);
    g. Case Number 201709491 (OIG 117-10860);
    h. Case Number 201709490;
    i. Case Number 201708903 (16-12-CBP-0573);
    j. Case Number 201709489 (OIG 117-07833);
    k. Case Number 201709241 (OIG 117-18993);
    l. Case Number 201709242 (OIG 117-18993);
    m. Case Number 201709243 (OIG 117-18993);
    n. Case Number 201709244 (OIG 117-18993);
    o. Case Number 201709245 (OIG 117-18993);
    p. Case Number 201709246 (OIG 117-18993);
    q. Case Number 201709247 (OIG 117-19166);
    r. Case Number 201709170 (OIG 117-18987);
    s. Case Number 201709675;
    t. Case Number 201702711;
    u. Case Number 201701464;
    v. Case Number 201705368 (17-02-CBP-0047);
    w. Case Number 20180737;

|   |   |   |
|---|---|---|
| x. | Case Number 201802466; |
| y. | Case Number 201704082 (17-05-CBP-0218); |
| z. | Case Number 201800364; |
| aa. | Case Number 201803085; |
| bb. | Case Number 201806440; |
| cc. | Case Number 201807398; |
| dd. | Case Number 201807420; |
| ee. | Case Number 201809989; |
| ff. | Case Number 201811832; |
| gg. | Case Number 201809561; |
| hh. | Case Number 201811335; |
| ii. | Case Number 20180213; |
| jj. | Case Number 201900622; |
| kk. | Case Number 201900623; |
| ll. | Case Number 201900624; |
| mm. | Case Number 201900625; |
| nn. | Case Number 201900626; and |
| oo. | Case Number 201900627. |

12. Any disciplinary action taken, or policy changes implemented, as a result of any investigation of metering, queue management, or turnbacks at a Port of Entry conducted by DHS OIG, DHS Office of Civil Rights and Civil Liberties, DHS, CBP, the U.S. Department of Justice or the U.S. Office of Special Counsel, including, but not limited to the investigations specified in Topic 11.

13. Your efforts to obtain copies of lists of noncitizens waiting in towns on the Mexican side of the U.S.-Mexico border due to your queue management and/or metering policy, including, but not limited to copies of waitlists provided by migrant shelters in Mexicali, Mexico.

14. Your communications with Mexican officials, including but not limited

to INM, Grupo Beta, and Mexican local or state government authorities, regarding metering, queue management, or turnbacks at a POE on the U.S.-Mexico border, including but not limited to communications regarding the development and implementation of the metering policy and communications regarding the number of asylum seekers that will be accepted for processing at a POE on a given day.

15. Your communications with management of migrant shelters on the Mexican side of the border or other third parties in Mexico regarding implementation of the metering policy, including but not limited to communications regarding the number, identity, and characteristics of asylum seekers that will be accepted for processing at a POE on a given day.

16. Your decision to inspect and process asylum seekers that arrived on U.S. soil through the vehicle lanes at POEs on the U.S.-Mexico border without subjecting them to metering/queue management.

17. Your decision about whether to inspect and process vulnerable asylum seekers, including, but not limited to, unaccompanied children, pregnant women, and individuals with urgent medical needs, at POEs on the U.S.-Mexico border without subjecting them to metering/queue management.

18. The decision to switch from using detention capacity to operational capacity as a metric for analyzing metering and/or queue management.

19. The definition of the term "operational capacity" when used with respect to metering and/or queue management.

20. The definition of the term "detention capacity" when used with respect to metering and/or queue management.

21. The detention capacity of each Class A POE on the U.S.-Mexico border.

22. The steady state or normal processing capability of each Class A POE on the U.S.-Mexico border

23. The factors considered by each POE when determining the operational capacity of that POE.

24. Any efforts to track the operational capacity of each POE on the U.S.-Mexico border.

25. The use of the Humanitarian Asylum Review Process program at POEs on the U.S.-Mexico border.

26. The use of the Prompt Asylum Claims Review program at POEs on the U.S.-Mexico border.

27. DHS OIG's investigation known as "CBP's Processing of Asylum-Seekers at Ports of Entry (18-122)."

28. The capacity of ICE Enforcement and Removal Operations ("ICE ERO") to detain asylum seekers that present themselves at POEs on the U.S.-Mexico border, including, but not limited to, available detention space at ICE facilities and how frequently ICE ERO transports asylum seekers from POEs on the U.S.-Mexico border to their ICE ERO detention facilities.

29. Requests for information or investigatory requests from members of the U.S. Congress and/or Congressional committees or subcommittees concerning metering and/or queue management.

30. Requests, efforts, or plans to add workstations to the primary or secondary inspection areas of any POE on the U.S.-Mexico border.

31. Increasing or decreasing the seating area or number of chairs in the secondary inspection area of any POE on the U.S.-Mexico border.

32. Whether Mexican asylum seekers were, or are, subject to queue management and/or metering at POEs on the U.S.-Mexico border.

33. Your practice of providing tickets or appointment times to asylum seekers that were metered at POEs on the U.S.-Mexico border, including, but not limited to, the reason why you stopped providing tickets or appointment times to asylum seekers who were metered.

34. Communications between CBP Officer ▮▮▮▮▮▮▮▮ and DHS OIG related to metering, queue management, or turnbacks at the Tecate POE, including,

1 but not limited to, CBP Officer ▮▮▮▮'s account regarding metering, queue
2 management, or turnbacks at the Tecate POE.

   35. The June 5, 2018 prioritization-based queue management policy, including, but not limited to, any supporting paper and Commissioner cover memorandum concerning the policy.

   36. Your definition of the term "arriving alien," as that term is used in the Immigration and Nationality Act and its implementing regulations.

   37. Your decision not to collect or document information concerning asylum seekers that were metered at POEs on the U.S.-Mexico border.

   38. Your plans, strategies, tactics, policies, or procedures for addressing increases in the number of noncitizens without proper travel documents presenting themselves for inspection and processing at Ports of Entry, including, but not limited to, the use of CBP and ICE detention facilities, extending the working hours of personnel at a Port of Entry, utilizing detention space at other Ports of Entry, constructing additional temporary detention space, paroling an increasing number of noncitizens, and increasing the number of CBP officers inspecting and processing noncitizens.

   39. Any orders, directions, instructions, authorizations, or mandates that DHS received from the National Security Council, Domestic Policy Council, any White House staffer, a Cabinet Secretary or Acting Secretary, a special advisor to the President, or the President of the United States regarding metering, queue management, or turnbacks.

   40. Any reason why you believe that you would incur a hardship as a result of being ordered to inspect and process all noncitizens in the order that they arrive at Ports of Entry at the U.S.-Mexico border.

   41. Any reason why you believe that it would be against the public interest if you were ordered to inspect and process all noncitizens in the order that they arrive at Ports of Entry at the U.S.-Mexico border.

42. The authenticity of the documents and ESI that you produced in response to Defendants' requests for production in this litigation.

43. The factual basis for whether the documents and ESI that you produced in response to Defendants' requests for production in this litigation constitute records of regularly conducted business activity under Fed. R. Evid. 803(6), including (a) whether the document or ESI in question was made at or near the time by someone with knowledge of the matters discussed in the document or ESI; (b) whether You kept the document or ESI in the course of Your regularly conducted business activities; and (c) whether creating the document or ESI was a regular practice of Your business.

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 31, 2020 a copy of the above Plaintiffs' Rule 30(b)(6) Deposition Notice to the U.S. Department of Homeland Security has been served by electronic mail to all counsel for Defendants.

*s/Stephen M. Medlock*
Stephen M. Medlock