

# U.S. Department of Homeland Security
## Office for Civil Rights and Civil Liberties
Fiscal Year 2018 Annual Report to Congress

*November 18, 2019*



Homeland
Security

# Foreword

Pursuant to Congressional requirements 6 U.S.C. § 345 and 42 U.S.C. § 2000ee-1, the U.S. Department of Homeland Security (DHS), Office for Civil Rights and Civil Liberties (CRCL) presents this Fiscal Year 2018 Annual Report to the following Members of Congress:

The Honorable Michael R. Pence
President of the Senate

The Honorable Richard Shelby
Chairman, U.S. Senate Committee on Appropriations

The Honorable Patrick Leahy
Vice Chairman, U.S. Senate Committee on Appropriations

The Honorable Ron Johnson
Chairman, U.S. Senate Committee on Homeland Security and Governmental Affairs

The Honorable Gary C. Peters
Ranking Member, U.S. Senate Committee on Homeland Security and Governmental Affairs

The Honorable Richard Burr
Chairman, U.S. Senate Select Committee on Intelligence

The Honorable Mark Warner
Vice Chairman, U.S. Senate Select Committee on Intelligence

The Honorable Lindsey Graham
Chairman, U.S. Senate Committee on the Judiciary

The Honorable Dianne Feinstein
Ranking Member, U.S. Senate Committee on the Judiciary

The Honorable Nancy Pelosi
Speaker of the House, U.S. House of Representatives

The Honorable Nita Lowey
Chairwoman, U.S. House of Representatives Committee on Appropriations

The Honorable Kay Granger
Ranking Member, U.S. House of Representatives Committee on Appropriations

The Honorable Bennie G. Thompson
Chairman, U.S. House of Representatives Committee on Homeland Security

The Honorable Mike Rogers
Ranking Member, U.S. House of Representatives Committee on Homeland Security

The Honorable Adam Schiff
Chairman, U.S. House of Representatives Permanent Select Committee on Intelligence

The Honorable Devin Nunes
Ranking Member, U.S. House of Representatives Permanent Select Committee on Intelligence

The Honorable Jerrold Nadler
Chairman, U.S. House of Representatives Committee on the Judiciary

The Honorable Doug Collins
Ranking Member, U.S. House of Representatives Committee on the Judiciary

The Honorable Carolyn B. Maloney
Acting Chairwoman, U.S. House of Representatives Committee on Oversight and Government Reform

The Honorable Jim Jordan
Ranking Member, U.S. House of Representatives Committee on Oversight and Government Reform

Inquiries relating to this Report may be directed to CRCL at 866-644-8360 (TTY 866-644-8361) or crcl@hq.dhs.gov.  This Report and other information about CRCL are available at www.dhs.gov/crcl.

# Message from the Officer, Cameron Quinn



It is my honor to serve as Officer for Civil Rights and Civil Liberties at the Department of Homeland Security.  Since the Department's inception in 2002, CRCL has worked throughout the Department to ensure DHS makes the Nation more secure while integrating the core values of our constitutional rights and liberties—freedom, fairness, and equality under the law—into DHS programs and activities.

I am pleased to present this Annual Report detailing CRCL's priorities and activities in Fiscal Year (FY) 2018, which focused on alignment with the Department's missions: Preventing Terrorism and Enhancing Security; Securing and Managing Our Borders; Enforcing and Administering Our Immigration Laws; Safeguarding and Securing Cyberspace; and Ensuring Resilience to Disasters.

The employees of CRCL are proud of the work accomplished throughout FY 2018.  As you will see from the highlights and key accomplishments outlined in this report, CRCL has worked diligently to ensure civil rights and civil liberties protections through community engagement, complaints investigations, training, and a host of other civil rights programs and activities.

Respectfully submitted,

Cameron P. Quinn
Officer for Civil Rights and Civil Liberties
U.S. Department of Homeland Security

# Executive Summary

The Office for Civil Rights and Civil Liberties, created by the Homeland Security Act of 2002, has a statutory mission "to ensure that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland." CRCL is housed within the Office of the Secretary and provides proactive policy advice to the Secretary of Homeland Security and other leaders across the Department to integrate civil rights and civil liberties protections into all DHS activities.

An office of nearly 100 people in a Department with over 240,000 employees, CRCL supports DHS as it secures the Nation while preserving individual liberty, fairness, and equality under the law. Every day, CRCL staff administer the Department's diversity and equal employment opportunity systems, receive and investigate complaints from the public, and participate in policy creation, oversight, and outreach to those who may be negatively affected by Departmental policy.

In response to Congressional requirements, this Annual Report details CRCL's priorities and activities in FY 2018 covering the period from October 1, 2017, through September 30, 2018 (FY 2018). Significant updates to this report's content that postdate the period covered in this report will be provided in subsequent annual reports.

Some of CRCL's key accomplishments are listed below and are described in further detail throughout this report:

***Emergency Response Related to Needs of Individuals with Disabilities:*** Coordinated with the Federal Emergency Management Agency (FEMA), Office of Disability Integration and Coordination (ODIC) and Office of Equal Rights (OER) on a listening tour regarding "Best Practices and Challenges for Persons with Access and Functional Needs" related to disasters in 2017. This led to a new joint U.S. Department of Justice (DOJ), Civil Rights Division (CRT)/DHS Emergency Response Initiative to improve sharing of best practices and technical assistance to state and local emergency management offices to improve stakeholder engagement with disability communities.

***Maturing the Department's Equal Employment Opportunity and Diversity Programs:*** Led a comprehensive study of the Department's anti-harassment programs, benchmarking them against programs at other federal agencies and in the private sector; this study identified enhancements to DHS programs, with implementation expected in FY 2019.

***Investigating Complaints from the Public:*** CRCL investigated complaints from the public alleging violations of civil rights or civil liberties by DHS personnel, programs, or activities. In FY 2018, CRCL received 4,244 allegations that were considered for investigation as complaints, an increase of 20 percent over FY 2017 (3,513). This increase resulted in CRCL opening and conducting more investigations. CRCL opened 743 complaint investigations (an increase of 31 percent) and closed 693 complaint investigations (an increase of 14 percent).

***Community Engagement and Outreach:***  Coordinated and participated in over 150 engagement events, including over 75 standing roundtables meetings in 18 cities across the country. Roundtables are merely the tip of the iceberg, as CRCL's Community Engagement Section responds to hundreds of community concerns annually and provides information regarding DHS programs and activities. Through these and other community outreach endeavors, CRCL builds trust and establishes a routine process for communication and coordination with diverse community leaders and organizations across the country.

***Diversity Award Received:***  CRCL's Special Emphasis Program Manager received the first Federal Public Partnership Award for efforts to strengthen the capacity of Historically Black Colleges and Universities (HBCU) to successfully compete for local, state, and federal government funding through programs, grants, cooperative agreements, and initiatives.

***Law Enforcement Awareness Brief (LAB) Training:***  After a two-year development process, CRCL launched a joint nation-wide project with the Federal Law Enforcement Training Centers (FLETC), and the Office for Targeted Violence and Terrorism Prevention (TVTP), that resulted in a highly anticipated, customizable training program designed for local law enforcement.  After extensive development involving over 80 federal, state, local, and tribal law enforcement partners, dozens of jurisdictions have requested the training which is organized for train-the-trainer deployment to minimize impacts on DHS resources while maximizing local education requirements of the Department's law enforcement partners.

***Responding to Family Separation at the Southern Border:***  Received allegations of civil rights and civil liberties abuses related to separating families at the Southern border.  CRCL has open investigations underway on several family separation issues.

***Language Access Improvements:***  Launched an initiative to improve DHS Components' compliance with mandatory language access requirements, in addition to ensuring translation of key DHS public messaging, such as during natural disasters.

***EEO and Diversity Training Conference:***  Hosted a training conference for over 300 Equal Employment Opportunity (EEO) and diversity professionals from across the Department.  The event ensured cost-effective EEO refresher training, and provided over 20 breakout workshops, spanning an array topics, including sessions on legal and case law updates, managing unconscious bias in the workforce, and "Ask the Administrative Judge" questions and answers.

***Improved CRCL Cyber Impact:***  Established a new collaborative engagement process with then-National Protection and Programs Directorate (NPPD) (now under the purview of the Cybersecurity and Infrastructure Security Agency (CISA)) to facilitate improved insight into cybersecurity programs promoting faster assessment and collaborative mitigation of potential civil rights and civil liberties issues.

***Final Agency Actions:***  In FY 2018, CRCL issued 940 final agency decisions (FAD).  FADs are prepared for formal EEO complaints filed by DHS employees, former employees, and applicants for employment who alleged discrimination in violation of Title VII of the Civil Rights Act of

1964, the Age Discrimination in Employment Act of 1967, the Rehabilitation Act of 1973, the Equal Pay Act of 1963, the Genetic Information Nondiscrimination Act of 2008, and Executive Orders prohibiting discrimination on the bases of parental status and sexual orientation.

***Civil Rights Evaluation Tool:***  Obtained Office of Personnel Management (OPM) approval of a civil rights evaluation tool to improve grantees' compliance with Title VI of the Civil Rights Act of 1964, after an extended approval process that involved two rounds of public comment.  Since receiving approval, CRCL socialized the tool with recipients via presentations, webinars, and conferences.

***Anti-Harassment Training:***  Developed, deployed, and updated, interim anti-harassment training for all DHS employees with a near 100% participation rate.

***National Vetting Center (NVC):***  CRCL Officer Quinn co-chaired the Privacy, Civil Rights, and Civil Liberties (PCRCL) Working Group of the NVC, along with the DHS Privacy Officer and the Office of the Director of National Intelligence (ODNI) Civil Liberties and Privacy Officer. The PCRCL Working Group ensures redress, compliance with applicable law, and protects individuals' privacy, civil rights, and civil liberties within NVC vetting programs.

These efforts continue to reflect DHS's dedication to securing the country while protecting our freedoms, including core civil rights and civil liberties values of liberty, fairness, and equality under the law.

# DHS Office for Civil Rights and Civil Liberties Annual Report FY 2018

## Table of Contents

**Message from the Officer, Cameron Quinn** ............................................................................ iv

**Executive Summary** ................................................................................................................... v

**I. Legislative Language** .............................................................................................................. 1

**II. Background** ............................................................................................................................ 5

    A. Mission ................................................................................................................................ 5

    B. Authorities .......................................................................................................................... 5

    C. Leadership .......................................................................................................................... 5

    D. Organization ....................................................................................................................... 6

**III. FY 2018 Highlights** ............................................................................................................... 7

    A. CRCL Integrates Civil Rights in Disaster Preparedness, Response, and Recovery .............. 7

    B. CRCL Responds to Family Separation .................................................................................. 7

    C. CRCL Hosts 2018 EEO and Diversity Training Conference .................................................. 8

    D. CRCL Activates the Incident Community Coordination Team ............................................. 9

    E. CRCL Leads DHS Women's History Month Program ......................................................... 9

**IV. Programs Branch: Policy Advice, Training, and Outreach** ................................................. 10

    A. Civil Rights and Civil Liberties Institute ........................................................................... 11

    B. Community Engagement Section ....................................................................................... 14

    C. Immigration Section ......................................................................................................... 19

    D. Security, Intelligence, and Information Policy Section ...................................................... 24

    E. Antidiscrimination Group .................................................................................................. 28

**V. Compliance Branch: Public Complaints** ............................................................................. 32

    A. FY 2018 Investigations ..................................................................................................... 35

    B. Investigative Processes ..................................................................................................... 36

C. Complaint Recommendations Issued in FY 2018....................................................41

D. Expert Recommendations from Onsite Investigations..........................................43

E. Section 504 Determinations and Informal Resolutions.........................................45

F. Component Responses to CRCL Expert and Recommendations Memoranda.....................47

**VII. Equal Employment Opportunity and Diversity Division**.................................**57**

A. Complaints Management and Adjudication Section...........................................57

B. Diversity Management Section .............................................................59

C. Alternative Dispute Resolution Program ..................................................61

D. Anti-Harassment Unit .....................................................................62

E. Headquarters Equal Employment Opportunity Office ........................................62

**VIII. Office of Accessible Systems and Technology**.......................................**64**

**IX. Conclusion**...........................................................................**66**

**Appendix A: DHS Civil Rights and Civil Liberties Authorities**..............................**i**

**Appendix B: Public Complaints Tables**...................................................**vi**

**Appendix C: Abbreviations**..............................................................**xvi**

# I. Legislative Language

**6 U.S.C. § 345. Establishment of Officer for Civil Rights and Civil Liberties.**

*Homeland Security Act of 2002* (HSA), Pub. L. No. 107-296, § 705, 116 Stat. 2135, 2219-20, *amended by* Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, §sec. 8303, § 705(a), 118 Stat. 3638, 3867 (amending section 705(a) of the HSA).

**(a)** In general.  The Officer for Civil Rights and Civil Liberties, who shall report directly to the Secretary, shall—

> **(1)** review and assess information concerning abuses of civil rights, civil liberties, and profiling on the basis of race, ethnicity, or religion, by employees and officials of the Department;

> **(2)** make public through the Internet, radio, television, or newspaper advertisements information on the responsibilities and functions of, and how to contact, the Officer;

> **(3)** assist the Secretary, directorates, and offices of the Department to develop, implement, and periodically review Department policies and procedures to ensure that the protection of civil rights and civil liberties is appropriately incorporated into Department programs and activities;

> **(4)** oversee compliance with constitutional, statutory, regulatory, policy, and other requirements relating to the civil rights and civil liberties of individuals affected by the programs and activities of the Department;

> **(5)** coordinate with the Privacy Officer to ensure that—

>> **(A)** programs, policies, and procedures involving civil rights, civil liberties, and privacy considerations are addressed in an integrated and comprehensive manner; and

>> **(B)** Congress receives appropriate reports regarding such programs, policies, and procedures; and

> **(6)** investigate complaints and information indicating possible abuses of civil rights or civil liberties, unless the Inspector General of the Department determines that any such complaint or information should be investigated by the Inspector General.

 **(b)** Report

The Secretary shall submit to the President of the Senate, the Speaker of the House of Representatives, and the appropriate committees and subcommittees of Congress on an annual basis a report on the implementation of this section, including the use of funds appropriated to carry out this section, and detailing any allegations of abuses described under subsection (a)(1) of this section and any actions taken by the Department in response to such allegations.

**42 U.S.C. § 2000ee-1. Privacy and Civil Liberties Officers.**
*Implementing Recommendations of the 9/11 Commission Act of 2007*, Pub. L. No. 110-53, sec. 803, § 1062, 121 Stat. 266, 360-362 (amending section 1062 of the National Security Intelligence Reform Act of 2004, Pub. L. No. 108-458, 118 Stat. 3688), as amended by the

*Intelligence Authorization Act for Fiscal Year 2014*, Pub. L. No. 113-126, title III, § 329(b)(4), 128 Stat. 1390, 1406.

**(a)** Designation and functions

... [T]he Secretary of Homeland Security ... shall designate not less than one senior officer to serve as the principal advisor to—

> **(1)** assist the head of such department, agency, or element and other officials of such department, agency, or element in appropriately considering privacy and civil liberties concerns when such officials are proposing, developing, or implementing laws, regulations, policies, procedures, or guidelines related to efforts to protect the Nation against terrorism;
>
> **(2)** periodically investigate and review department, agency, or element actions, policies, procedures, guidelines, and related laws and their implementation to ensure that such department, agency, or element is adequately considering privacy and civil liberties in its actions;
>
> **(3)** ensure that such department, agency, or element has adequate procedures to receive, investigate, respond to, and redress complaints from individuals who allege such department, agency, or element has violated their privacy or civil liberties; and
>
> **(4)** in providing advice on proposals to retain or enhance a particular governmental power the officer shall consider whether such department, agency, or element has established—
>
> > **(A)** that the need for the power is balanced with the need to protect privacy and civil liberties;
> >
> > **(B)** that there is adequate supervision of the use by such department, agency, or element of the power to ensure protection of privacy and civil liberties; and
> >
> > **(C)** that there are adequate guidelines and oversight to properly confine its use.

**(b)** Exception to designation authority...

> **(2)** Civil liberties officers
>
> In any department, agency, or element referred to in subsection (a) of this section... which has a statutorily created civil liberties officer, such officer shall perform the functions specified in subsection (a) of this section with respect to civil liberties.

**(c)** Supervision and coordination

Each privacy officer and civil liberties officer described in subsection (a) or (b) of this section shall—

> **(1)** report to the head of the department...; and
>
> **(2)** coordinate their activities with the Inspector General of such department... to avoid duplication of effort.

**(d)** Agency cooperation

The head of each department, agency, or element shall ensure that each privacy officer and civil liberties officer—

> **(1)** has the information, material, and resources necessary to fulfill the functions of such officer;

**(2)** is advised of proposed policy changes;

**(3)** is consulted by decision makers; and

**(4)** is given access to material and personnel the officer determines to be necessary to carry out the functions of such officer.

...

**(f)** Periodic reports

**(1)** In general

The privacy officers and civil liberties officers of each department, agency, or element referred to or described in subsection (a) or (b) of this section shall periodically, but not less than semiannually, submit a report on the activities of such officers—

**(A)**    **(i)** to the appropriate committees of Congress, including the Committee on the Judiciary of the Senate, the Committee on the Judiciary of the House of Representatives, the Committee on Homeland Security and Governmental Affairs of the Senate, the Committee on Oversight and Government Reform of the House of Representatives, the Select Committee on Intelligence of the Senate, and the Permanent Select Committee on Intelligence of the House of Representatives;

**(ii)** to the head of such department, agency, or element; and

**(iii)** to the Privacy and Civil Liberties Oversight Board; and

**(B)** which shall be in unclassified form to the greatest extent possible, with a classified annex where necessary.

**(2)** Contents

Each report submitted under paragraph (1) shall include information on the discharge of each of the functions of the officer concerned, including—

**(A)** information on the number and types of reviews undertaken;

**(B)** the type of advice provided and the response given to such advice;

**(C)** the number and nature of the complaints received by the department, agency, or element concerned for alleged violations; and

**(D)** a summary of the disposition of such complaints, the reviews and inquiries conducted, and the impact of the activities of such officer.

**(g)** Informing the public

Each privacy officer and civil liberties officer shall—

**(1)** make the reports of such officer, including reports to Congress, available to the public to the greatest extent that is consistent with the protection of classified information and applicable law; and

**(2)** otherwise inform the public of the activities of such officer, as appropriate and in a manner consistent with the protection of classified information and applicable law.

**(h)** Savings clause

Nothing in this section shall be construed to limit or otherwise supplant any other authorities or responsibilities provided by law to privacy officers or civil liberties officers.

# II. Background

## A. Mission

The Office for Civil Rights and Civil Liberties supports the Department of Homeland Security as it secures the Nation while preserving individual liberty, fairness, and equality under the law.

CRCL integrates civil rights and civil liberties into all of the Department's activities by:

- Promoting respect for civil rights and civil liberties in policy creation and implementation by advising Department leadership and personnel, and state and local partners;
- Communicating with individuals and communities whose civil rights and civil liberties may be affected by Department activities, informing them about policies and avenues of redress, and promoting appropriate attention within the Department to their experiences and concerns;
- Investigating civil rights and civil liberties complaints filed by the public regarding Department policies or activities, or actions taken by Department personnel; and
- Leading the Department's equal employment opportunity (EEO) programs and promoting workforce diversity and merit system principles.

## B. Authorities

The authorities under which CRCL supports the Department are embodied in a variety of legal sources, including statutes passed by Congress, regulations issued by the Department, Executive Orders signed by the President, and delegations and directives issued by the Secretary of Homeland Security. Some of those authorities are listed in Appendix A of this Report, and others are posted at www.dhs.gov/crcl.

## C. Leadership

During the FY 2018 reporting period, **Cameron Quinn** was the CRCL Officer. Prior to her appointment in September 2017, Ms. Quinn served in the Office of the Assistant Secretary for Civil Rights at the U.S. Department of Agriculture. She also served as a senior policy advisor in the Civil Rights Division of the U.S. Department of Justice; as counsel to the Chairman of the Merit Systems Protection Board; and as an Assistant Attorney General for the Commonwealth of Virginia. Among other civil and community activities, Ms. Quinn also served on the Virginia State advisory committee for the U.S. Commission on Civil Rights and spent much of the past 25 years on boards affiliated with Community Residences, Inc., which focuses on providing community-based alternatives to the institutionalization of people with mental health or intellectual disabilities. Ms. Quinn spent several years specializing in election law and administration, including serving as chief State election official for Virginia, and chief local election official for Fairfax County, Virginia; she also served as the U.S. elections advisor for IFES, the International Foundation for Electoral Systems; and was with the Federal Voting Assistance Program at the U.S. Department of Defense (DOD). Ms. Quinn taught election law

for more than a decade at George Mason University's Scalia Law School. In addition to Ms. Quinn's civil rights, employment, and elections experience, she spent several years in private practice at Winston & Strawn in Washington, D.C. Ms. Quinn is a graduate of the University of Florida, and earned both her Juris Doctor and Master's Degree in accounting from the University of Virginia.

During the FY 2018 reporting period, **Veronica Venture** served in dual positions as the Deputy Officer for EEO and Diversity and the DHS EEO Director, as well as the Acting Deputy Officer for Programs and Compliance. Prior to joining DHS, Ms. Venture first served as a Trial Attorney for the Equal Employment Opportunity Commission (EEOC), then spent seven years as an EEOC Administrative Judge, adjudicating complaints of discrimination brought by federal employees. She has spent her career promoting equal employment in the Federal Government, most recently as the EEO Director for the Federal Bureau of Investigation (FBI) from 2002 to 2011.

## D. Organization

Under 6 U.S.C. § 345 and 42 U.S.C. § 2000ee-1, the Officer for Civil Rights and Civil Liberties reports directly to the Secretary. The Officer is supported by two Deputy CRCL Officers: a Deputy Officer for Programs and Compliance and a Deputy Officer for EEO and Diversity. CRCL's staff is organized into the Programs and Compliance Division (further subdivided into two Branches, one for Programs and one for Compliance); the EEO and Diversity Division; and the Office of Accessible Systems and Technology, a joint endeavor with the DHS Office of the Chief Information Officer.

At the close of FY 2018, CRCL had 88 staff and 12 contractors on board. Table 1 details the Office's operating budget and staff for the past five fiscal years.

### Table 1: CRCL Operating Budget and Staffing, FY 2014–FY 2018

| Fiscal Year | Operating Budget[1] | Federal Staff | Contract Staff |
|---|---|---|---|
| 2014 | $21,360,000 | 97 | 8 |
| 2015 | $21,800,000 | 86 | 6 |
| 2016 | $21,680,000 | 86 | 10 |
| 2017 | $22,571,000 | 88 | 12 |
| 2018 | $23,571,000 | 89 | 12 |

The following pages provide an overview of major accomplishments in FY 2018, followed by detailed information about each CRCL functional unit's activities during the year.

---

[1] Operating budget totals are based on the enacted, or revised enacted (where applicable), appropriated funding levels and payroll reimbursement funding from other government entities.

# III. FY 2018 Highlights

## A. CRCL Integrates Civil Rights in Disaster Preparedness, Response, and Recovery



*CRCL Officer Cameron Quinn and FEMA, ODIC Director Linda Mastandrea meet with stakeholders at California listening session focused on improving disaster planning for individuals with disabilities*

As the country experienced an unprecedented hurricane season and California wildfires in FY 2018, CRCL provided policy guidance and advice to federal, state, local, tribal, and territorial governments on compliance with civil rights during disasters. Compliance with civil rights laws in disasters can mean the difference between life and death for communities affected by disasters. Throughout FY 2018, CRCL engaged directly with individuals and communities, including persons with disabilities and those with access and functional needs, to learn of barriers and gaps in civil rights compliance following the disasters and provide real-time information and solutions, while also developing strategies for making needed systemic changes to support compliance with civil rights. Notably, during FY 2018, leadership from CRCL and FEMA's ODIC and OER led 11 listening sessions with disability stakeholders across the country focused on improving disaster planning and preparedness for persons with disabilities. The listening sessions occurred between February and June 2018, in California, Florida, Puerto Rico, Texas, and the U.S. Virgin Islands. Several cross-cutting issues were discussed during the listening sessions including: improving communication access for people with disabilities; integrating individuals with disabilities into planning and preparedness efforts at all levels of government; ensuring emergency shelters are accessible and are resourced and prepared for the whole community; and strengthening access to FEMA resources and programs before, during, and after disasters. CRCL continues to work with its partners in government and nongovernmental organizations (NGO) to improve emergency preparedness, response, and recovery for persons with disabilities and others with access and functional needs.

## B. CRCL Responds to Family Separation

The policies and procedures relating to the separation of families while immigration proceedings are pending have concerned CRCL since 2016. CRCL's Compliance Branch reviews and investigates civil rights and civil liberties complaints filed by the public regarding DHS policies and activities, including issues related to family separation. In April 2018, CRCL received over 1,000 allegations of civil rights and civil liberties abuses relating at least in part to family separation. CRCL has open investigations underway on related family separation issues, including the separation of families that have children under the age of six and minor children with disabilities, and the standards for separating families based on parental criminal history.

7

CRCL also is investigating allegations of coercion regarding the reunification of families after separations. CRCL continues to provide assistance to complainants where appropriate. More information about CRCL's Compliance Branch and our public complaints process is in Section V of this report

In June 2018, CRCL sent U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) a draft memo with recommendations relating to the development of clear and cohesive family separation policies and procedures regarding the documentation of family separations, communication between separated family members, reunification of separated family members, and information sharing between CBP, ICE, and the U.S. Department of Health and Human Service (HHS), Office of Refugee Resettlement. Between May and August 2018, CBP and ICE responded to the draft recommendations. CRCL is working with both Components to address the issues and outstanding concerns and will send a final recommendation memorandum in FY 2019.

## C. CRCL Hosts 2018 EEO and Diversity Training Conference

CRCL hosted an EEO and Diversity Training Conference on June 18-20, 2018.  The training conference convened over 300 EEO and diversity professionals from across the Department.  In keeping with DHS Leadership Year, the Department's year-long campaign to build and enhance a culture of leadership at DHS, the conference theme, "Partners in Leadership & Excellence," reinforced the critical role of EEO and Diversity practitioners in fostering effective leadership and promoting excellence at all levels throughout the Department.  Dynamic plenary sessions set the tone each morning, featuring broad themes of diversity and inclusion; participants then chose from over 20 breakout workshops, spanning a wide array of EEO and Diversity topics, including a session on legal and case law updates, a session on managing unconscious bias in the workforce, and an "Ask the Administrative Judge" question-and-answer session.  Additionally, the conference offered a day-long required refresher training for EEO counselors and investigators from across DHS.  The conference concluded with an awards ceremony recognizing employees for their contributions to the Department's EEO and Diversity programs.



*Plenary session of the 2018 DHS EEO and Diversity Training Conference*

8

## D. CRCL Activates the Incident Community Coordination Team

In FY 2018, CRCL activated the Incident Community Coordination Team (ICCT) on October 3, 2017, following the mass shooting at the Route 91 Harvest Country Music Festival in Las Vegas, Nevada.  The ICCT is a mechanism for rapid communication with national community leaders. These calls are used to inform leaders of the Department's position and actions and to receive immediate feedback regarding civil rights and civil liberties concerns of community members. The ICCT nationwide call is the only tool of its kind available for rapid-incident communications between the Federal Government and diverse communities in the immediate aftermath of an incident of national significance.

On October 1, 2017, gunman Stephen Paddock opened fire on concert attendees from his position at a Las Vegas hotel, killing 58 and wounding approximately 500 people.  CRCL held the ICCT two days after the shooting in order to respond to community partners who expressed concerns and requested information related to the incident and its aftermath, as well as tools and resources to protect community members.  Over 150 stakeholders participated in the call, including a cross section of faith-based organizations, community-based organizations, local law enforcement agencies, and local and state governments.

Several senior government officials from the Department shared information with participants, including the CRCL Officer and leadership from the then-Office for Terrorism Prevention and Partnerships (now TVTP), the Office of Public Affairs, FEMA, the Office of Intelligence and Analysis (I&A), and the then-National Protection and Programs Directorate (now CISA).  All speakers offered their deepest condolences during the difficult time for our nation, condemned the attack as a horrific act of violence, and emphasized the use of all available resources in the ongoing investigation.  Issues discussed during the call included: ensuring the safety and security at future events, how communities can best work with local law enforcement to prevent active shooter incidents, DHS's Protective Security Advisor program, and community grants available at DHS to protect houses of worship and other soft targets.

## E. CRCL Leads DHS Women's History Month Program

In FY 2018, CRCL hosted the DHS-wide Women's History Month event: *Honoring Women Who Protect the Homeland*, which included keynote remarks from then Deputy Secretary Elaine Duke, and a panel discussion featuring women leaders from U.S. Citizenship and Immigration Services (USCIS), ICE, the Transportation Security Administration (TSA), and U.S. Secret Service (USSS).

During her remarks, Ms. Duke spoke about the value of female leadership at every level in the DHS workforce.  "We are proud to be a federal agency that is led by strong women," she said. "The women of DHS play a vital role in shaping public policies, securing and managing our borders, preventing and obstructing terrorist and public safety threats, and protecting our nation's cyber networks and critical infrastructure.  Every day, the women of DHS are inspiring future leaders in the homeland security enterprise."

9

CRCL Deputy Officer Venture introduced the distinguished panelists representing several DHS Components, who shared stories about their career paths, challenges, and successes as leaders advancing in various homeland security-related fields. Panelists offered their personal perspectives on achieving balance between work and family and overcoming adversity in the workplace. This was the first DHS Women's History Month event made available to all DHS employees via video teleconference and Adobe Connect.



*CRCL Deputy Officer Veronica Venture moderates panel of DHS leaders from several DHS Components at the DHS Women's History Month Program*

# IV. Programs Branch: Policy Advice, Training, and Outreach

The Programs Branch provides policy advice to the Department on civil rights and civil liberties issues, conducts training of DHS personnel and state and local law enforcement partners, and coordinates engagement with communities whose civil rights and civil liberties are affected by DHS programs.

In FY 2018, the Programs Branch consisted of five sections:

1. Civil Rights and Civil Liberties Institute;
2. Community Engagement;
3. Immigration;
4. Security, Intelligence, and Information Policy; and
5. Antidiscrimination Group

The following pages discuss the structure of these sections and accomplishments in addition to those already described in the Highlights section.

## A. Civil Rights and Civil Liberties Institute

The CRCL Institute leads efforts to develop and deliver targeted training for DHS employees and federal, state, and local partners on civil rights and civil liberties.  Effective training on civil rights and civil liberties issues helps to operationalize policy, promote partner cooperation that is essential to the success of the Department's mission, and build public trust.

CRCL defines "training" broadly to encompass a range of activities, approaches, and delivery methods designed to improve mission performance and raise awareness about civil rights and civil liberties at DHS.  The Institute reaches virtually every DHS employee and numerous state and local partners through one or more of its programs or products.

### Accomplishments in FY 2018

***National Launch of Major New Training Program for State, Local, Tribal, and Territorial Law Enforcement:***  With funding and support from DHS OTPP, in FY 2018, CRCL partnered with the FLETC Counter-Terrorism Division to launch a major new terrorism prevention training program designed for a national state and local audience: "The Law Enforcement Awareness Briefing (LAB) on Terrorism Prevention Partnerships."  This critical new program was designed to complement and leverage the existing "Community Awareness Briefing" (CAB) on Terrorism Prevention.

The LAB is a locally customizable training designed to be delivered *by* state and local law enforcement *to* state and local law enforcement with DHS providing support through training of instructors, updated materials, and quality control mechanisms.  This "for official use only" (FOUO) brief for line officers is supported by a Training-of-Trainers course for local law enforcement instructors.  The training is supplemented by videos, FOUO Intelligence products, reference aids, and research materials. Importantly, the LAB focuses on the threat as it is  encountered by state, local, and tribal law enforcement partners with a significant portion of the brief addressing the threats posed by domestic violent extremism.

In partnership with the FLETC Counterterrorism Division and OTPP, CRCL completed the final program vetting and began the implementation and institutionalization phase, which included the following accomplishments during FY 2018:

11

- *First Local Partner Program Rollout* - After providing the venue for a successful pilot of the LAB in 2017, the Institute selected the Denver Police Department (DPD) as the first DHS grantee to receive the LAB instructor training. The trained local instructors have been providing their customized version of the LAB to Denver Metro area patrol officers since the pilot rollout (*February 6-8, 2018 – Denver, Colorado*)
- *Development and Pilot of a New Fusion Center LAB Version* - Based on the DPD's implementation and the presence of an OTTP staff member in Colorado, CRCL also selected Colorado as the site for the September 2018 Training-of-Trainers for the Colorado Information and Analysis Center (CIAC) fusion center. This session piloted a fusion center-specific version of the LAB with the goal of developing a state-wide plan for rollout of the LAB to the CIAC Terrorism Liaison Officer (TLO) network. The state-wide plan leverages the LAB through three strategic approaches: (1) leverages the DPD training to support a statewide partner, thereby providing a more cohesive statewide program; (2) creates a sustainable plan for the entire state; and (3) develops a model for fusion center delivery.
- *Strong Interest from State and Local Law Enforcement Agencies* - CRCL's preliminary announcement in the first quarter of FY 18 of the impending LAB launch garnered a strong expression of interest from over 50 jurisdictions at national conferences and meetings such as the International Association of Chiefs of Police Conference, the National Fusion Center Association Training, and the Global Justice Information Sharing Initiative's Criminal Intelligence Coordinating Council (CICC) meeting.
- *Progress on Institutionalizing the LAB Program Foundational Support Systems* - To ensure a successful national training program that is scalable and sustainable, CRCL developed technical infrastructure and key partnerships in FY 2018, including:
  o Further developing content for the anticipated launch of the Homeland Security Information Network web portal to support the program. Also, beginning the process of updating course content focusing first on the sections of the course requiring routine statistical and research updates with a planned overarching "trends" in countering violent extremism review in the fourth quarter of FY 2019 for both the CAB and LAB.
  o Continuing to work with various internal and external partners on a multi-tier framework for updating both the CAB and LAB that is consistent with existing interagency Task Force protocols.
  o Reaching an agreement to partner with the DHS Office for State and Local Law Enforcement to begin promoting the LAB starting in the first quarter of FY 2019.

**Fusion Center Training Program:** State and major urban area fusion centers serve as focal points for the receipt, analysis, gathering, and sharing of threat-related information among federal, state, local, tribal, and territorial government, and private sector partners. CRCL leads coordination among DHS I&A and the DHS Privacy Office (PRIV) to develop and deliver civil rights, civil liberties, and privacy training for



personnel at fusion centers, in fulfillment of the Department's obligation under the Implementing Recommendations of the 9/11 Commission Act of 2007.

In FY 2018, CRCL undertook a five-pronged approach to meet its mandate under the 9/11 Act to provide training and technical assistance to all personnel at the state and major urban area fusion centers.

- *Planning Completed for Relaunch of the Joint National Training Program* - During FY 2018, CRCL led the creation of a new approach to this joint statutory obligation as described below. Throughout FY 2018, CRCL gathered the input of fusion center directors and Privacy/Civil Rights and Civil Liberties (P/CRCL) officers from nearly 40 jurisdictions on this new approach and finalized the framework based on this feedback. CRCL currently plans a launch of the new approach to its national fusion center training program in calendar year 2019.
- *Training New Fusion Center Leadership* - During FY 2018, in support of the FEMA Fusion Center Technical Assistance Program, CRCL also partnered with DHS PRIV to provide P/CRCL orientation training to newly appointed fusion centers leaders (directors and assistant directors) from over 25 jurisdictions during two sessions: June 6-8, 2018, in Lemont, Illinois and August 30-31, 2018, in Washington, D.C.
- *National P/CRCL Seminar for Fusion Centers* - During FY 2018, CRCL took a leadership role in designing and supporting the first national session devoted primarily to P/CRCL issues for fusion center officers since 2012. The session was convened by I&A and held at the state capital building in Lincoln, Nebraska September 26-27, 2018, for P/CRCL officers and senior fusion center personnel. Following the Nebraska Lt. Governor's welcome, the CRCL Officer delivered the keynote remarks and the session launched a new approach for CRCL/PRIV to meet their 9/11 Act mandate to support the network via training and networking. CRCL and PRIV developed and presented workshops on "Roles and Responsibilities for P/CRCL Officers;" "Policies, Audits, and Guidance;" "Emerging Issues/Technologies: A federal perspective (*License Plate Readers, Facial Recognition, Body Worn Camera, and Unmanned Aircraft Systems*);" "Operationalizing P/CRCL: Analytic Production;" and "P/CRCL Impact Assessments." In addition, CRCL facilitated a discussion on the CRCL/PRIV-proposed design and scope of its training and technical assistance program relaunch. Over 80 fusion center personnel attended, representing centers from Guam, Florida, Vermont, Washington, and many other locations.
- *New Fusion Center LAB Module Created* - CRCL created a specialized version of the LAB for the fusion center liaison officer networks. More detail on this new module is described above.
- *Establishing a National P/CRCL Award* - Finally, as a means of enhancing its work in the field, CRCL created an annual P/CRCL national award for fusion center personnel. The new award will recognize fusion center P/CRCL officers, directors, or centers demonstrating operational excellence or innovation in protecting individual rights, liberties, and privacy. The award process will give special consideration to "best practices" that might be adopted by other centers. The CRCL Officer will announce the first national awardee at the National Fusion Center Association's annual conference in the first quarter of FY 2020.

13

***Supporting the Criminal Intelligence Coordinating Council:*** Upon invitation, CRCL provided expert leadership and support to the various working groups convened by I&A on behalf of the CICC. CRCL worked in collaboration with other DHS offices; the Bureau of Justice Assistance; and numerous federal, state, and local partners to complete another key product for state and local law enforcement partners, including fusion centers: *Privacy/Civil Liberties Policy for Fusion Centers (Fusion Center Policy),* which updates the template for the policies required of all 79 fusion centers to qualify for DHS funding. CRCL played a significant role in the first policy template update since 2010, which is due to be published in FY 2019. The purpose of a P/CRCL policy is to provide internal guidance for the fusion centers and their information-sharing partners and to publicly articulate adherence to legal requirements, policies, and procedures that enable the gathering and sharing of information that protects constitutional rights, including personal privacy and other civil liberties and civil rights.

***Key Issue Policy Template for State and Local Homeland Security Partners:*** CRCL was invited to participate as a civil liberties subject matter expert in the CICC-sponsored development of policy guidance. In early FY 2018, CRCL led and coordinated input to the update of the *P/CRCL Policy Guidance Template for State and Local Fusion Centers and Justice Entities* due to be published in FY 2019. This template is a primary tool to ensure that fusion centers meet the minimum standards of the Information Sharing Environment (ISE) Privacy Guidelines.

***"I Speak" Materials:*** CRCL continued to deploy its "I Speak" materials (first developed in FY 2011). The "I Speak" products include multi-lingual posters, pocket guides, and job aids that individuals with limited English proficiency can use to identify the languages they speak. The materials have been used by multiple DHS Components and programs. Upon request, CRCL will provide external partners with customized, digital versions of the "I Speak" materials. This year, CRCL renewed efforts to disseminate a multi-country job aid for language identification for illiterate persons. CRCL also supported an FBI request to provide "I Speak" materials at their annual conference in September 2018 for mass casualty responders.

***The Information Sharing Environment Core Awareness Training:*** CRCL coordinated with ODNI's Partnership Engagement for the Information Sharing Environment (PE-ISE) to revitalize the ISE-wide Core Awareness Training using PE-ISE contractor funds. CRCL updated the course content enhancing the inclusion of privacy and civil liberties issues in the ISE.

## B. Community Engagement Section

Public engagement with diverse American communities remains a top priority for CRCL as it supports the Department's mission to secure our nation while protecting the civil rights and civil liberties of those who may be affected by DHS programs and activities. CRCL's Community Engagement Section responds to community concerns and provides information regarding DHS programs and activities by building trust and establishing a routine process for communication and coordination with diverse community leaders and organizations. Since 2005, CRCL has convened regular roundtable meetings with American Arab, Muslim, Sikh, South Asian, and Middle Eastern community leaders in multiple cities across the country. In recent years, the Community Engagement Section has expanded its demographic profile to include Latino,

Somali, Jewish, Asian/Asian Pacific Islander, and other communities, depending on the relevance to the localities, and leads a wide variety of outreach endeavors, with core programs in 18 cities working with all segments of society.

The Community Engagement Section aims to:

- Serve as a credible source for sharing with stakeholders timely, relevant information about federal programs and policies including redress and compliance processes;
- Receive feedback about community concerns and the perceived impacts of DHS activities on communities to facilitate discussions, mutual understanding, and resolution;
- Incorporate community input relating to civil rights and civil liberties into the policymaking process;
- Assist Department leadership and the Officer for Civil Rights and Civil Liberties in making informed policy decisions that ensure the protection of civil rights and liberties and advance American values; and
- Contribute to the homeland security mission of building resilient communities by deepening trusted channels of communication and an understanding of federal policies, programs, and resources, between communities, regional DHS and federal leadership, and state and local governments and public officials.

## Accomplishments in FY 2018

***Community Roundtables and Other Related Engagement:*** Community engagement roundtables provide community leaders an opportunity to interface routinely and directly with DHS and other federal, state, and local partners on issues important to them. Roundtables occur quarterly in cities throughout the country and are hosted by federal agencies and community organizations on an alternating basis. Attendees may submit questions beforehand, so officials are prepared to respond, and topics of discussion are focused on concerns specific to each city's participants.

Information gathered at roundtables plays a vital role in helping to inform policy decisions and improve the effectiveness of DHS policies and programs. For example, discussion and feedback from roundtable meetings have resulted in improvements to CRCL's complaints process and DHS Components' training programs and have also assisted a DHS task force in learning about the public's travel experiences.

In FY 2018, CRCL conducted community engagement events and led or played a significant role in regular roundtable meetings with community leaders and federal, state, and local government officials in 18 cities across the country, including: Phoenix and Tucson, Arizona; Washington, D.C.; Los Angeles and San Diego, California; Denver, Colorado; Orlando and Tampa, Florida; Atlanta, Georgia; Chicago, Illinois; Boston, Massachusetts; Detroit, Michigan; Minneapolis, Minnesota; New York, New York; Columbus, Ohio; Portland, Oregon; Houston, Texas; and Seattle, Washington. Overall, CRCL coordinated and participated in well over 150 engagement events in FY 2018, encompassing over 75 standing roundtables and several dozen secondary meetings and events associated with standing roundtables and individual engagement events.

***Facilitating High-level Engagement for the Department's Senior Leadership:*** In FY 2018, DHS senior leaders participated in several community engagement meetings, emphasized the importance of community partnerships, and encouraged other senior leader participation at these events. In the last several years, DHS Secretaries and Deputy Secretaries have participated in dozens of engagement events across the country, including the following locations: Los Angeles, California; Chicago, Illinois; Boston, Massachusetts; Minneapolis, Minnesota; New York, New York; Columbus, Ohio; Philadelphia, Pennsylvania; Houston, Texas; and Northern Virginia. The impact of these leadership engagement events continues to appreciate in FY 2018 with numerous stakeholders seeking DHS senior leadership engagement.

***Implementing CRCL's Southern Border Strategy***: The "southern border" refers to the 3,201 mile-long international land border separating Mexico and the United States and extending from the Pacific Ocean in the west to the Gulf of Mexico to the east and includes a 100-mile zone extending generally inland north of the border. CRCL expanded engagement with communities in close proximity to the southern border in FY 2017.

In FY 2018, CRCL hosted quarterly meetings in San Diego, California; El Paso, Texas; and Tucson, Arizona. As necessary, CRCL also convened engagement meetings in Southern Arizona, the Imperial Valley of California, and the Rio Grande Valley of Texas. Throughout FY 2018, southern border communities raised a number of important topics, similar to concerns CRCL heard from other stakeholders. These include: detention of undocumented individuals arriving at the border; family separation and reunification challenges; the treatment of



*CRCL Officer and staff meet with CBP personnel in Nogales, Arizona*

unaccompanied minors; concerns regarding expansion of detention facilities and the conditions of these detention facilities and hold rooms; access to medical professionals in detention facilities; expansion of 287(g) by ICE in the border region; border wall construction; issues related to language access and limited English proficiency; unauthorized use of force; unauthorized practice of immigration law; and credible fear processing and adjudication of asylum claims.

***Expanded Syria-related Engagement:*** Given the events in Syria, CRCL created the Strategic Syria Outreach Plan at the request of DHS leadership and the DHS Counterterrorism Advisory Board in late FY 2013. The plan outlines several concrete initiatives aimed at expanding Syria-specific engagement with communities demonstrating, or likely to have, strong equities in a variety of topics surrounding the conflict in Syria, or the region writ large. In FY 2018, CRCL continued to successfully implement these initiatives, including holding community engagement meetings on topics with a focus on Syrian refugees, providing community awareness briefings throughout the United States in cities with large Syrian-American populations, such as Chicago,

which focused on the foreign fighter threat and the threat of recruitment by Islamic State of Iraq and Levant (ISIL), youth engagement initiatives, collaboration with partner countries to identify best practices, and senior DHS leadership participation in community engagement events.

***Implementing the Somali American Community Strategic Engagement Plan:*** In FY 2018, CRCL continued to implement the Somali American Community Strategic Engagement Plan with marked success.  The plan, implemented in 2011 and updated in 2018, was developed to address a well-documented and unique assortment of civil rights and civil liberties issues and complaints from this segment of the community which, at the time, resulted in a deepening schism between government agencies and the Somali American community.  In FY 2018, DHS and U.S. Government senior leadership visited with Somali American communities across the country and participated in roundtables, town halls, issue-specific meetings, women's and youth summits, and terrorism prevention programming.

***Campus/Youth Engagement Program***:  CRCL continued its Campus/Youth Engagement program, initiated in FY 2016.  The program involves engaging young adults across the country, often held in CRCL's roundtable cities.  This program is a way for CRCL to obtain feedback from young adults regarding on-the-ground impact of DHS activities.  While a variety of topics are covered at these engagement events, young adults tend to focus on issues of immigration enforcement, immigration policy, travel screening, watchlisting, and the No-Fly list.  In FY 2018, CRCL hosted several youth engagement events, and as a part of its Somali American engagement plan, CRCL spearheaded similar efforts with Somali American youth, and held several successful events across the country.  Through this ongoing work, CRCL encourages young adults towards civic participation and leadership, and encourages the use of social media and other forms of cost-effective communication and engagement to connect with the Department, as well as other government agencies.

***Community Engagement Benefiting Efforts to Counter Violent Extremism/Prevent Terrorism:*** Much of CRCL's community engagement work benefits efforts to counter violent extremism/prevent terrorism in the U.S. and abroad.  CRCL conducts Community Awareness Briefings and Community Resilience Exercises (CREX).  CRCL, along with the National Counterterrorism Center, also developed and implemented the CAB, designed to share unclassified information with communities regarding the threat of terrorism.  The CAB assists communities and law enforcement to recognize and understand al-Qa'ida and ISIL recruitment tactics, as well as tactics used by domestic terrorists and explore ways to collectively and holistically address these threats before they become a challenge at the local level.

The CREX is a half-day table-top exercise designed to improve communication between law enforcement and communities and to share ideas on how to best prevent terrorism.  The CREX uses an unfolding scenario of possible terrorist activity with two threads: one discloses what the police have learned while the other discloses what the community experiences.  The scenario is revealed in several stages, with participants breaking into small groups after each stage to discuss potential responses and how they should work together.  The scenario is hypothetical but based on the behaviors exhibited by past terrorists prior to their arrest.  At the end of the exercise, the facilitators help the participants create a local action plan focused on prevention and intervention.

*International Engagement:*  CRCL plays a key role in training international partners in the DHS methods of community engagement and the benefit those efforts bring to preventing terrorism. CRCL's community engagement efforts include participation in international meetings, conferences, and trainings throughout Europe, Canada, and Central Asia in coordination with the U.S. Department of State.  In addition to sharing best practices on community engagement and terrorism prevention, these efforts promote immigrant integration, youth empowerment, resolution of grievances, and protection of civil rights and liberties.

A highlight of CRCL's international engagement is its annual community engagement exchange, the City-Pair Program, coordinated with and funded by the U.S. Department of State.  The City-Pair program connects cities in the U.S. with cities in European countries, and each sends a delegation representing civil society and local government to exchange best practices on community engagement and its benefits to preventing terrorism.  The City-Pair Program started in 2011, and has been conducted with Germany, Belgium, Sweden, France, and the Netherlands. The program has been successful due to the participation of key stakeholders who incorporate community engagement best practices in their day-to-day responsibilities in their various fields of work.

In FY 2018, CRCL participated in the City-Pair Program among the cities of Chattanooga and Nashville, Tennessee with Liege and Brussels, Belgium; Las Vegas, Nevada and San Bernardino, California with Calgary and Edmonton in Alberta, Canada; and Tampa and Orlando, Florida with Marseille, France.  The first leg of this program was hosted in the Netherlands where law enforcement officials, civil society members, and local government offices visited The Hague, Arnhem, and Amsterdam to engage in a series of meetings and events pertaining to civil rights and community engagement.  Participants spent one week meeting with government officials, civil society groups, and law enforcement agencies.  The second leg of the program took place in Washington, D.C. and Phoenix, Arizona where the same delegation participated in a series of meetings organized by CRCL to learn best practices in civil rights and community engagement at the national and local levels.

*United Nations Resolution 16/18 Country-to-Country Implementation Program:*  In 2012, CRCL partnered with DOJ, Civil Rights Division in conducting a training program on religious tolerance.  The program was designed to promote the country-to-country implementation of United Nations Resolution 16/18 adopted in March 2011.  Resolution 16/18 is focused on "combating intolerance, negative stereotyping and stigmatization of, and discrimination, incitement to violence, and violence against persons based on religion and belief."  The Resolution emphasizes concrete, positive measures that nation states can take to combat religious bias and intolerance rather than legal measures to restrict speech.  In FY 2018, CRCL co-led the country-to-country implementation of Resolution 16/18.  CRCL was in South Africa as part of the interagency group to implement the program where many of the good practices on community engagement shared by CRCL practitioner trainers were adopted as part of a work plan established by members of the South African participants in coordination with the U.S. Consulate in Durban, South Africa.

## C. Immigration Section

Civil rights and civil liberties issues often arise as the Department carries out its dual mission to foster lawful international travel, commerce, and immigration while preventing unlawful immigration and enforcing immigration laws.  CRCL's Immigration Section works with DHS Components to ensure that civil rights and civil liberties are considered in, and incorporated into, immigration and border policies and programs, as well as other programs, such as E-Verify and the Systematic Alien Verification for Entitlements (SAVE) Program, that use immigration-related data.  The Immigration Section also communicates with the public and with the nongovernmental and civil society community about civil rights and civil liberties issues in the Department's immigration activities; provides training on civil rights and civil liberties to DHS Components; drafts, edits, and provides comments on regulations, guidance, testimony, speeches, issue papers, and legislative proposals; and supports the Officer, under Executive Order 13107, *Implementation of Human Rights Treaties*, as the Department's single point of contact for international human rights treaty responsibilities.  The Immigration Section works closely with the CRCL Compliance Branch, providing subject-matter expertise on complaints raising immigration issues and advancing policy development in DHS Components.

### Accomplishments in FY 2018

***Interior Immigration Enforcement Oversight:***  In FY 2018, CRCL continued to work with ICE on interior enforcement and the 287(g) program, allowing state or local law enforcement to enter into a partnership with ICE in order to receive delegated authority for immigration enforcement within their jurisdictions.

CRCL is the only DHS office outside of ICE that has a vote in the 287(g) Program Advisory Board, which reviews applications by state and local law enforcement agencies to enter into memoranda of agreement with ICE to obtain a limited delegation of federal immigration authority for specially trained local officers.  Throughout FY 2018, CRCL performed research and, as appropriate, stakeholder outreach to identify whether particular applicants were appropriate for recommendation as 287(g) partners.  Based on CRCL's research and elevation of concerns about particular jurisdictions, the Board considered additional information about particular jurisdictions beyond the information provided in the applications.  As a result, the Board was better able to determine whether a particular jurisdiction should be admitted to the program or admitted to the program with certain limitations or in a delayed fashion.

***Conditions of Detention:***  CRCL works with ICE and CBP to design and implement policies, procedures, and guidance to protect the civil and human rights of detainees in DHS custody.  In FY 2018, CRCL continued to work with ICE on appropriate use of segregation, the ongoing revision of detention standards, and suicide prevention training.  In addition, both the Immigration Section and CRCL's Compliance Branch have worked with ICE and CBP to implement sexual abuse prevention and response policies and procedures in the Department's holding and detention facilities under the DHS Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities (DHS PREA Standards).  Please see Section V, page 33 for more details on CRCL's work related to sexual abuse prevention and response.

19

With regard to the use of segregation, CRCL continued to review ICE's use of segregated (or special) housing units in immigration detention and implementation of its September 2013 directive "Review of the Use of Segregation for ICE Detainees" and other applicable policies. Through these reviews, CRCL sought to ensure that segregation placements were made in accordance with ICE standards and policies; that ICE housed detainees in the least restrictive setting necessary; and that detainees—particularly those with special vulnerabilities as defined in the Directive—were appropriately cared for and monitored while placed in segregation to prevent mental decompensation and long-lasting harm.

In FY 2018, CRCL facilitated the convening of ICE's new Detention Monitoring Council, Segregation Subcommittee to discuss concerns related to prolonged segregation placements for detainees with mental illnesses as well as prolonged segregation placements at facilities under the National Detention Standards. These meetings included representatives from CRCL and from several offices within ICE, including the Office of Detention Policy and Planning, Enforcement and Removal Operations, ICE Health Service Corps, and the Office of the Principal Legal Advisor, and often resulted in ICE re-examining the segregation placements of those cases of prolonged segregation that were identified by CRCL.

Additionally, CRCL participated in ICE's working group to develop training for ICE officers on suicide prevention for detainees in ICE custody. The working group developed a draft training slide deck and pilot tested the training at two field locations with ICE officers. The draft training provides ICE offices with the tools to identify and respond to detainees exhibiting or expressing suicidal thoughts or behavior.

CRCL continued to participate in ICE's working group to review and develop a new set of draft detention standards for its over-seven-day, non-dedicated immigration detention facilities. The draft standards, which remain under review by ICE, are a revision of ICE's 2000 National Detention Standards (NDS). The working group focused on updating and streamlining the standards, as well as including critical elements that are not currently part of the NDS. CRCL, with the assistance of its contractual detention subject matter experts, provided feedback on important civil rights and civil liberties issues during the working group's review, such as suicide prevention, mental health care, disability accommodation, and sexual assault.

***Protecting Other Vulnerable Populations, Including Women and Children:*** CRCL works closely with Components to help ensure the Department's humanitarian policies and operations take a victim-centered approach that upholds the civil rights and dignity of alien victims of human trafficking, domestic violence, and other serious crimes. This work is conducted through leading the Department's Council on Combatting Violence Against Women (CCVAW), actively participating in the Blue Campaign, and working closely with Components such as USCIS and ICE to strengthen policies around implementing 8 U.S.C. § 1367 victim confidentiality protections.

***Council on Combatting Violence Against Women:*** The CCVAW focuses on advancing overall compliance with, and knowledge about, the Violence Against Women Act (VAWA), the Victims of Trafficking and Violence Protection Act, and other immigration laws and issues aimed at protecting immigrants from violence. The CCVAW is also charged with provision of training

and resources to stakeholders and the public as appropriate.  In leading the CCVAW, CRCL was involved in several initiatives, including serving as co-chair with USCIS for a working group composed of representatives from multiple DHS Components dedicated to implementing the Department's January 2017 outreach and education strategy to protect women in the U.S from female genital mutilation/cutting (FGM/C).

To further the Department's anti-FGM outreach efforts, in FY 2018, CRCL continued to work closely with ICE Homeland Security Investigations to help ensure the successful implementation of an important FGM/C outreach effort, Operation Limelight.  Operation Limelight is a proactive operation in which ICE Homeland Security Investigations agents interview passengers on inbound and outbound flights to countries of prevalence for FGM/C and is currently established at several international airports around the U.S.

***Combatting Human Trafficking:***  In FY 2018, CRCL also continued to serve on the Blue Campaign Steering Committee where it worked with other DHS Components, including the DHS Office of Public Engagement, to raise awareness about human trafficking; to leverage partnerships; to educate the public to recognize human trafficking and report suspected instances; and to develop training for law enforcement, non-governmental, and private organizations to increase detection and investigation of human trafficking.



In FY 2018, the Immigration Section and CRCL's Anti-Discrimination Group started an intra-agency working group to look into mitigating human trafficking in the wake of a natural disaster, when affected civilians may become most vulnerable to human trafficking schemes.  CRCL's aim is to help ensure first responders to natural disasters are trained about human trafficking indicators and risks and are equipped with important outreach materials to deploy to those affected communities.  This important work will continue throughout FY 2019.

***Strengthening and Protecting Confidentiality of Victims:***  In FY 2018, CRCL continued to lead an ongoing Department-wide effort to implement the confidentiality provisions of 8 U.S.C. § 1367, as amended by the Violence Against Women Reauthorization Act of 2013.  These provisions are designed to ensure that abusers, including human traffickers, are not able to gain access to DHS information that may help perpetuate the victimization or abuse and to ensure that information provided by an abuser is not the sole source of evidence used to support taking an adverse immigration action against an individual protected by these confidentiality provisions.  Subject to certain limited exceptions, the provisions prohibit disclosure to a third-party of any information relating to an alien who is an applicant/petitioner for a T visa, U visa, or relief for domestic abuse under VAWA.

Since September 2013, the CRCL Officer has been delegated the authority to implement the mandates of 8 U.S.C. § 1367 throughout the Department.  In FY 2018, CRCL continued to lead several implementation efforts including coordinating and drafting the FY 2018 annual report on the Department's implementation of the confidentiality provisions of 8 U.S.C. § 1367.  CRCL

also co-chaired a working group with FLETC to revise and strengthen the mandatory department-wide training on immigration options for victims of human trafficking, domestic violence and other serious crimes, and 8 U.S.C. § 1367 confidentiality protections.  The training is expected to be finalized and rolled out in FY 2019.

***Stakeholder Liaison Activities:***  Since the creation of CRCL, the CRCL Officer and staff have met on a quarterly basis with NGOs that focus on immigration issues.  During these meetings, CRCL presents information on CRCL's activities and responds to NGO concerns regarding civil rights and civil liberties issues related to DHS policies, programs, and activities.

In addition to continuing these quarterly meetings, in FY 2018, CRCL was engaged in numerous other communications and stakeholder events, including the CRCL Officer presenting at the annual conference for the American Immigration Lawyers Association and the CRCL Immigration Section joining the CRCL Community Engagement Section for events across the country to present information and answer questions about CRCL's work.

***International Human Rights Treaties:***  The CRCL Officer is the Department's designated "single contact officer" under Executive Order 13107, *Implementation of Human Rights Treaties*, December 10, 1998.  In support of this role, CRCL coordinates the Department's activities and outreach involving processing complaints under, and reporting information to, international human rights mechanisms relevant to the Department's function and mission.  Such entities include the U.N. General Assembly; the Special Procedures (e.g., Special Rapporteurs and Working Groups) and the Universal Periodic Review of the U.N. Human Rights Council; the Office of the High Commissioner of Human Rights; and the U.N. human rights treaty bodies, as well as the Inter-American Commission on Human Rights, regional human rights body applicable to the United States.

In FY 2018, CRCL coordinated the Department's review of approximately 30 inquiries from the international human rights mechanisms and contributed to two U.S. Government presentations before the Inter-American Human Rights Commission.  CRCL also coordinated the Department's input for two periodic treaty reports under the International Convention on the Elimination of All Forms of Racial Discrimination and the International Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

***Review of Computer Matching Agreements under the Data Integrity Board:***  The CRCL Officer is a member of the DHS Data Integrity Board, which oversees agency matching programs pursuant to the requirements of the Computer Matching and Privacy Protection Act, an amendment to the Privacy Act of 1974.  CRCL supports the Officer in her responsibility to review and approve the creation or renewal of agency computer matching agreements (CMA).

CMAs generally involve a federal or state agency that seeks immigration data from USCIS to determine an applicant's eligibility for certain public benefits, such as driver's licenses or disaster assistance.  Specifically, USCIS may enter into a CMA with a government agency to provide it with electronic access to immigrant, nonimmigrant, and naturalized or derived citizenship status information contained within or accessed by the USCIS Verification Information System.

The Officer's review includes consideration of whether the CMA appropriately protects an individual's privacy, due process, and equal protection rights, and whether the sharing of information is authorized by law.  For example, failure to provide individuals with an appropriate process to contest and resolve mismatches may result in an individual's loss of government benefits based on inaccurate information in computer systems.  An essential part of the review process includes discussions and negotiation on CMA language to best protect the rights of persons subject to verification.

In FY 2018, the CRCL Officer reviewed and voted to approve or extend a number of CMAs, including agreements between:

- FEMA and the Small Business Administration (SBA), which is designed to ensure applicants for SBA Disaster Loans and applicants for FEMA programs, that provide Other Needs Assistance and Housing Assistance, do not receive duplicate benefits for the same disaster.
- FEMA and the U.S. Department of Housing and Urban Development, which addresses the verification of immigration and naturalized or derived U.S. citizen status of applicants for, and recipients of, disaster assistance to ensure eligibility for benefits and non-duplication of benefits.
- USCIS and the California Department of Social Services, which addresses the verification of immigration and naturalized or derived U.S. citizen status of applicants for, and recipients of, Medicaid;
- USCIS and HHS, Centers for Medicare and Medicaid Services, which addresses the verification of immigration and naturalized or derived U.S. citizen status under the Patient Protection and Affordable Care Act of 2010, as amended, by the Health Care and Education Reconciliation Act of 2010;
- USCIS and the California Department of Health Services, which addresses the verification of immigration and naturalized or derived U.S. citizen status of applicants for, and recipients of, Medicaid;
- USCIS and the Texas Workforce Commission; USCIS and the Massachusetts Division of Unemployment Assistance; USCIS and the New York Department of Labor; USCIS and the New Jersey Department of Labor and Workforce Development, all of which address the verification of immigration and naturalized or derived U.S. citizen status of applicants for, and recipients of, unemployment compensation benefits; and
- USCIS and the U.S. Department of Education, which addresses the verification of immigration and naturalized or derived U.S. citizen status of applicants or recipients of student financial assistance programs under Title IV of the Higher Education Act of 1965, including the Federal Pell Grant Program, the Direct Loan  Program, and the Federal Work-Study Program.

***Enhancing Civil Rights Protections in the SAVE Program, E-Verify, and Form I-9
Compliance:*** In FY 2018, CRCL continued to
collaborate with the USCIS Verification Division, ICE
Homeland Security Investigations, and the DOJ, Civil
Rights Division's Immigrant and Employee Rights
Section to ensure that civil rights and civil liberties
protections are incorporated into the employment
eligibility verification process. For example, CRCL
participated in the development of a revised Form I-9,
*Employment Eligibility Verification,* which would
include enhanced privacy protections for individuals.
CRCL also worked with USCIS to ensure the
protection of civil rights when government agencies



use the SAVE Program to verify immigration status or derived/naturalized U.S. citizenship when
making eligibility determinations for essential government benefits, voter registration, and
licenses. CRCL continued to monitor the USCIS SAVE program to ensure that user agencies
follow all SAVE verification procedures before relying upon a SAVE response to deny an
application for an essential benefit, service, or license.

***Implementing the REAL ID Act:*** In FY 2018, CRCL worked closely with the DHS Office of
Policy on the implementation of the REAL ID Act of 2005. CRCL assisted in the development
of roll-out plans and public guidance, seeking to ensure the fair treatment of all persons who may
be affected by implementation, particularly low-income persons, individuals with limited English
proficiency, and other vulnerable groups.

## D. Security, Intelligence, and Information Policy Section

The Security, Intelligence, and Information Policy Section (SIIP) provides guidance and
oversight designed to preserve civil rights and civil liberties in the execution of homeland
security programs and activities. SIIP works with DHS Components and offices to ensure that
appropriate protections and safeguards are incorporated into the Department's screening and
vetting programs, information sharing and safeguarding activities, cybersecurity efforts, security
technologies, and intelligence programs and products.

### Accomplishments in FY 2018

***National Vetting Center:*** The NVC is a collaborative interagency effort, based on White House
Executive Orders and National Security Presidential Memorandum 9, to provide a clearer picture
of threats to national security, border security, homeland security, or public safety that may be
posed by individuals seeking to transit our borders or exploit our immigration system. Creating a
consistent, comprehensive process out of a decentralized vetting system is a significant
undertaking in which CRCL has been involved in throughout FY 2018, and will continue to be
an active participant. CRCL's efforts seek to mitigate potential risks to the program and ensures
DHS remains a trusted steward of individual rights and liberties. CRCL leverages its specialized
security and intelligence expertise to help the NVC integrate civil rights and civil liberties
protections into new architecture, technologies, information sharing agreements, and vetting

procedures.  In particular, the CRCL Officer co-chairs the Privacy, Civil Rights, and Civil Liberties Working Group of the National Vetting Governance Board.  CRCL has assisted in the drafting of the NVC Privacy Impact Assessment and other operational documentation, including data access rules and redress processes.  CRCL has also held regular engagements on civil rights and civil liberties issues with the NVC's Privacy and Civil Liberties official, other DHS Components and offices, Intelligence Community elements, other Department and federal partners, interagency governance bodies, and interested community and civil society stakeholders.

*Information Sharing:*  In FY 2018, CRCL actively worked with the DHS Information Sharing and Safeguarding Governance Board and its subordinate bodies, including the Information Sharing Coordinating Council, the Information Safeguarding and Risk Management Council, and the Data Access Review Council (DARC) to ensure that civil rights and civil liberties protections are incorporated into the Department's information sharing and safeguarding policies, agreements, and programs.  In particular, CRCL prioritizes participation in the Department's DARC process for the collaborative review and approval of bulk data information sharing and access agreements.  In FY 2018, CRCL reviewed and approved 17 agreements.

*DHS Data Framework:*  CRCL continued its collaboration with the DHS Office of the General Counsel (OGC), PRIV, I&A, and the Office of the Chief Information Officer (OCIO) in the development of the DHS Data Framework—a scalable information technology program with built-in capabilities to support advanced data architecture and governance processes.  CRCL provided guidance regarding appropriate civil rights and civil liberties safeguards during this process, including for the ingestion and uses of new data sets.

*Nationwide Suspicious Activity Reporting Initiative (NSI):*  The protection of civil rights and civil liberties is critical to the success of this joint collaborative effort by DHS, the FBI, and State, local, tribal, and territorial law enforcement partners to gather suspicious activity reports from the public in a framework for the analysis and sharing of terrorism-related information. CRCL continued oversight activities and began collaboration with NSI program leadership to explore the legal and policy implications of potentially new suspicious activity reporting behavioral indicators for Functional Standard 1.5.5.

*Intelligence and Analysis Product Review:*  Since FY 2009, CRCL has worked with I&A to review classified and unclassified intelligence products.  CRCL's product review function is an ongoing real-time operational service for the Department, requiring 365 day per year response to requests for review of intelligence products drafted to respond to immediate threats and planned intelligence requirements.  CRCL reviewed more than 1,000 products in FY 2018, ensuring that the intelligence delivered to state and local partners was appropriately sensitive to and protective of civil rights and civil liberties.

*CRCL Principles for DHS Intelligence Analysis Training:*  CRCL continued its participation in training the Department's intelligence enterprise personnel, including senior analysts and officers who have intelligence product release authority and the responsibility to review intelligence products for compliance with civil rights and civil liberties principles.  Basic

familiarization training on these same principles was also provided in several other courses, including the Reports Officer Course and Intelligence Analysis Basics Course.

***Insider Threat Program Oversight:*** CRCL participates in the Department's Insider Threat Oversight Group, ensuring that activities designed to detect and prevent insider threats comply with Department policy and do not constitute retaliation against whistleblowers or others who have filed employee grievances or EEO complaints. In FY 2018, CRCL continued oversight activities under Department directives, reviewing and approving the use of new tools and techniques by the Insider Threat Program and assisting with its planned operational expansion to cover the entire DHS workforce and additional mission areas, such as workplace violence.

***Cybersecurity:*** CRCL also continued its efforts to support the Department's implementation of Executive Order 13636, *Improving Critical Infrastructure Cybersecurity* and Executive Order 13691, *Promoting Private Sector Cybersecurity Information Sharing*. CRCL collaborated with DHS Privacy to produce a privacy and civil liberties assessment of activities conducted under those orders. CRCL also developed a plan to improve oversight and advisory support to the Office of Cybersecurity and Communications, which will be implemented in FY 2019. CRCL also provided advice and oversight to other DHS cybersecurity programs and activities, which included advising the Department on civil liberties protections in cybersecurity activities to ensure appropriate protections of individual rights were built into pre-existing and new programs and activities. This included providing guidance and oversight to those DHS-led programs that secure the .gov domain and protect critical infrastructure, including assistance in operations of the EINSTEIN program, Enhanced Cyber Security program, Continuous Diagnostics and Mitigation, and the Automated Indicator Sharing program.

***Countering Foreign Interference:*** Foreign adversaries are taking advantage of the freedoms and protections guaranteed by the U.S. Constitution to interfere with democracy and markets while sowing discord within society. DHS has unique authorities and capabilities to contribute to the whole of government effort addressing malign foreign interference, but we cannot safeguard American sovereignty, values, and national interests unless we maintain the public trust and ensure the civil rights and civil liberties of persons are not diminished by our very efforts aimed at securing the homeland. CRCL has been integral in the DHS efforts to date, contributing to strategy development, advising on cybersecurity engagement with state and local election officials, engaging with social media companies, reviewing intelligence products and collection requirements, developing safeguards for information sharing agreements with Intelligence Community partners, and setting out guiding principles to ensure the Department's actions in this mission space are consistent with the Constitution and in compliance with U.S. laws, regulations, and policies.

***Automated Targeting System Rules:*** CRCL conducts quarterly reviews of CBP's and TSA's risk-based targeting rules run by the Automated Targeting System (ATS), to ensure that civil rights, civil liberties, and privacy protections are in place. ATS is an intranet-based decision support tool used by CBP to improve the collection, use, analysis, and dissemination of information that is used to facilitate legitimate trade and travel while managing the shared threat to the homeland posed by individuals and cargo that may require additional scrutiny prior to entering or exiting the U.S.

***Watchlist Guidance:***  CRCL is an active participant in terrorist watchlisting governance and provides civil rights and civil liberties-focused comments and expertise in interagency discussion.  The Watchlist Guidance, which provides an overall framework for the interagency watchlisting and screening process, is reviewed every three years to incorporate process changes and updates.  CRCL participated in the 2018 review process as one of the DHS representatives on the interagency Watchlist Guidance Working Group.

***TOC Watchlisting Pilot:***  CRCL also supports the Federal Government's ongoing development of policies and procedures for transnational organized crime (TOC) watchlisting.  In 2014, the National Security Council recommended that a pilot be developed to determine if the terrorism watchlisting structure could be adapted to counter national security threats other than terrorism, specifically the watchlisting of TOC group associates.  CRCL continues be very engaged in the development and implementation of the TOC watchlisting process through the auspices of the pilot.

***Unmanned Aircraft Systems:***  CRCL co-chairs the DHS Unmanned Aircraft Systems (UAS) Working Group, comprising most DHS Components and offices, which serves to provide awareness of UAS activities throughout the Department while ensuring privacy, civil rights, and civil liberties are protected.  In addition, CRCL is a member of the Counter-UAS Executive Steering Committee, which oversees the Department's implementation of its new counter-UAS authorities.  The Department remains engaged with interagency partners to ensure UAS and counter-UAS activities and operations are conducted in a manner consistent with Constitutional protections and Department and Agency policies regarding the use of individual characteristics.

***DHS Joint Requirements Council (JRC) Support***:  CRCL participates in various processes flowing from the JRC, which provides oversight of the DHS operational requirements process, harmonizes efforts across the Department, and makes prioritized funding recommendations to DHS leadership.  The JRC also governs the Joint Requirements Integration and Management System (JRIMS) execution process.  JRIMS is a process by which the Department reviews and validates capability requirements, associated gaps, and proposed solutions to mitigate those gaps.  CRCL is a member of the Screening and the Immigration Management Portfolio Teams, the Vetting, Remote Vetting, and Biometrics Sub-Integrated Project Team, as well as the Information Sharing sub-IPT within the Prevent Terrorism Portfolio Team, which are all under the JRC.  Through this engagement, CRCL ensures civil rights and civil liberties issues are appropriately mitigated in DHS programs and activities, to include requirements and acquisitions.  Within the JRIMS process, CRCL serves as a JRIMS Gatekeeper ensuring that civil rights and civil liberties protections are appropriately placed between the Department's strategic objectives and capability investments.

***DOD Operational Protocols:***  In FY 2018, CRCL, along with its DHS partners, finalized and implemented nine separate DOD-DHS Operational Protocols to ensure compliance with the "Memorandum of Agreement between the Department of Homeland Security and the Department of Defense on Information Sharing and Technology Partnering Relating to Identity Verification and Screening Activities."  These protocols allowed DHS and DOD to appropriately share millions of records, thereby enhancing each department's respective missions.  CRCL

provided civil rights and civil liberties-focused comments and advice regarding the implementation of these protocols and the information exchanged as part of these agreements.

***Soft Targets-Crowded Places:*** In FY 2018, CRCL participated in the Department's Soft Targets – Crowded Places Executive Steering Committee and School Security Working Group, advising on civil rights and civil liberties considerations in securing soft targets and preparing other public and private sector partners responsible for soft targets such as schools and other environments accessible to large numbers of people. In this capacity, CRCL provided advice and guidance related to how to best integrate appropriate civil rights and civil liberties protections into the K-12 School Security Guide and Action Plans for state, local, tribal, and territorial partners and communities.

## E. Antidiscrimination Group

The Antidiscrimination Group (ADG) engages in policy work to ensure fair and equitable treatment of individuals and guards against discrimination based on race, color, national origin, disability, sex, age, and religion in DHS programs and activities. ADG's work includes:

- Providing technical assistance to DHS Components and recipients of DHS financial assistance on meeting their obligations under federal civil rights laws;
- Coordinating with federal partners, including reporting to and collaborating with DOJ's Civil Rights Division pursuant to Executive Order 12250, *Leadership and Coordination of Nondiscrimination Laws* (November 2, 1980), to ensure consistent and robust implementation of these laws; and
- Engaging with community stakeholders, especially in connection with disasters, to ensure protection of individuals with disabilities, diverse racial and ethnic communities, and individuals with limited English proficiency (LEP).

### Accomplishments in FY 2018

***Listening Sessions in Disaster Impacted Areas:*** In 2018, in conjunction with FEMA, CRCL held 11 listening sessions in states and territories that were heavily impacted by the unprecedented hurricanes and wildfires that occurred in 2017 and 2018. The listening sessions, which were held in Texas, Florida, California, Puerto Rico, and the U.S. Virgin Islands, revealed significant gaps in serving persons with disabilities, as well as gaps in language services for LEP persons. At the same time, the listening sessions highlighted effective practices that local communities were able to put in place to serve these populations. The listening sessions resulted in a set of CRCL recommendations directed to state and local partners to strengthen equal access to all members of the community in advance of future disasters.

***Letter to State and Local Emergency Managers with U.S. Department of Justice, Civil Rights Division***: In the aftermath of the 2017 and 2018 natural disasters, CRCL maintained communication with FEMA and other federal agencies to discuss emerging civil rights issues and to exchange information about agency resources that support civil rights compliance. As result of this interagency relationship focused on civil rights, CRCL, along with DOJ CRD, and FEMA OER, issued a joint letter to state and local emergency management agencies reiterating

the importance of incorporating the needs of diverse populations, people with disabilities, and those with limited English proficiency into all phases of disaster planning.  The letter offers support to emergency managers by providing technical assistance, outreach, and training to help meet their responsibilities under federal civil rights laws.  At the same time, CRCL, CRD, and OER launched a joint initiative to better educate and support emergency managers with complying with civil rights during disasters.

***New Web Page on Civil Rights and Disasters:***  As part of the joint initiative mentioned above, CRCL created a web page, Civil Rights in Emergencies and Disasters, which features information and resources to assist state, local, territorial, and tribal officials in meeting their civil rights obligations to plan for and respond to disasters.  The page includes a variety of training materials and related content, such as information on civil rights laws; resources featuring practical steps to achieve civil rights compliance such as "Tips for Communicating with the Whole Community in Disasters," which CRCL developed with FEMA; and information on requirements related to service animals in shelters.  The website also provides information on how entities may request technical assistance from CRCL on ensuring equal access to individuals with disabilities, diverse racial and ethnic communities, and those with limited English proficiency during disasters, as well as how to file complaints with CRCL, FEMA, and DOJ.

***Engaging with Persons with Disabilities and Organizations Serving Persons with Disabilities:***  ADG built strong relationships with disability stakeholders across the country by conducting significant and ongoing engagements with national and local disability stakeholders following the major natural disasters of 2017.  These engagements provided the public an opportunity to hear about federal resources and activities that support equal access for persons with disabilities in disasters and provided DHS a means to identify and proactively resolve civil rights concerns arising in these disasters.  CRCL leadership and staff delivered presentations at stakeholder conferences such as "Getting it Right 2018 National Inclusive Disaster Strategies Conference," hosted by The Partnership for Inclusive Disaster Strategies, and the Pacific Americans with Disabilities Act Center conferences.

***Technical Assistance for Recipients of DHS Financial Assistance:***  DHS and federal regulations require recipients of federal financial assistance (e.g., grantees) to collect civil rights data, keep compliance records and reports, establish compliance procedures for subrecipients, and inform program beneficiaries of their civil rights protections, among other requirements.  In FY 2018, CRCL began implementing a process to review data using the new DHS Civil Rights Evaluation Tool.  The tool provides a more efficient way for recipients to submit data to DHS for review, and in turn, for DHS to review this data.  At the same time, the tool clarifies the

> *Kentucky Emergency Management Leadership on a civil rights and civil liberties compliance review:*
> *"The Commonwealth intends to use this review as an opportunity to become a hallmark of inclusiveness in emergency management and to serve as an example to the rest of the Nation.  We will follow up with our plan to implement the recommendations listed in a report no later than January 26, 2019."*

recipients' civil rights obligations to ensure nondiscrimination on the basis of race, color, national origin, age, disability, sex, or religion in accordance with civil rights authorities and directs recipients to available resources.  CRCL created a webpage that includes sample documents, such as a "Sample Notice of Nondiscrimination for Recipients," should recipients lack policies or procedures to ensure compliance.

***DHS Component Self Evaluations to Identify Barriers and Gaps to Serving Persons with Disabilities in DHS Programs:***  CRCL continued to oversee and support Components in implementing Directive 065-01, *Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities (Non-Employment)*.  The Directive established a DHS-wide policy on providing access to DHS programs and activities for persons with disabilities, as required by Section 504 of the Rehabilitation Act of 1973 (Section 504).  In accordance with the Directive, CRCL provided support and guidance to Components on conducting self-evaluations of their programs and activities to identify any barriers to access posed by existing policies, communication mechanisms, physical spaces, and any gaps in existing policies or procedures for providing reasonable accommodations and modifications to qualified individuals with disabilities.  CRCL reviewed the results of completed self-evaluations for 15 Components, including its own, and continued to share guidance with Components on meeting the requirements of the Directive and Section 504.

***Updating DHS Language Access Plans:***  In FY 2018, CRCL continued to implement Executive Order 13166, *Improving Access to Services for Persons with Limited English Proficiency* (EO 13166) and requested that Components having contact with the public update their Language Access Plans consistent with EO 13166 and the DHS Language Access Plan.  CRCL requested that in updating these plans, each Component report on: the status of its Component language access working groups; the steps taken to assess the effectiveness of its language access plan, policies, and procedures; efforts to evaluate the top LEP populations it serves and whether its language access activities are adequately meeting the needs of LEP communities; and any initiatives related to the use of new technologies intended to strengthen language access.

***Guidance on Service Animals:***  Increasingly, service animals perform an array of tasks in support of individuals with disabilities in daily life.  As individuals with disabilities interact with DHS programs and activities, it is important for DHS personnel to understand what constitutes a service animal and how to uphold the rights of service animal handlers.  CRCL has assumed a leadership role in providing guidance to DHS Components regarding service animals.  For example, in FY 2018, CRCL drafted guidance for the public regarding the inclusion of service animals in emergency shelters, commented on service animal job aids for Component personnel, reviewed screening protocols for appropriate treatment of service animals within Component security operations, and delivered briefings to Component Disability Access Coordinators on service animal issues.  Among other principles, CRCL's work underscores the core concept that persons with disabilities should not be separated from their service animals, as they are defined by DOJ regulation.  CRCL also played an active role in interagency efforts led by DOJ to ensure that federal agency policy and guidance on service animals are consistent with civil rights obligations under the Rehabilitation Act of 1973.

***Compliance Reviews of Chemical Stockpile Preparedness Program:*** CRCL and FEMA's OER concluded compliance reviews in connection with the Chemical Stockpile Emergency Preparedness Program (CSEPP). CSEPP is a partnership between FEMA and the U.S. Department of the Army that provides emergency preparedness assistance and resources surrounding the Army's chemical warfare agent stockpiles. The compliance reviews focused on how the primary recipients and subrecipients of CSEPP funds ensure nondiscrimination in their programs and activities with an emphasis on how they provide meaningful access for LEP individuals and effective communication, program access, and physical access for persons with disabilities and others with access and functional needs. As part of CRCL's compliance reviews, CRCL highlighted the recipients' effective practices regarding accessibility, identified areas of concern or in need of improvement, and made recommendations. CRCL provided resources on civil rights requirements associated with federal financial assistance and offered to provide ongoing technical assistance to the recipients to assist them in fulfilling their civil rights obligations.

# V. Compliance Branch: Public Complaints

The Compliance Branch investigates complaints from the public alleging violations of civil rights or civil liberties by DHS personnel, programs, or activities.  Such complaints may include allegations about:

- Racial, ethnic, or religious profiling;
- Disability discrimination prohibited by the Rehabilitation Act of 1973;
- Discrimination based on race, ethnicity, national origin, religion, gender, sexual orientation, or gender identity;
- Inappropriate use of force by DHS officers or agents;
- Inadequate conditions of detention;
- Violation of the right to due process, such as the right to timely notice of charges or access to a lawyer;
- Violation of the confidentiality requirements of 8 U.S.C. § 1367, relating to VAWA, T visas, and U visas; or
- Any other civil rights or civil liberties violation related to a Department program or activity, including human rights complaints.

In FY 2018, CRCL received 4,244 allegations that CRCL considered for investigation as a complaint, an increase of 20 percent over FY 2017 (3,513). This increase resulted in additional complaints opened and investigations conducted. Over the course of the year, CRCL opened 743 complaint investigations (an increase of 31 percent) and closed 693 of the open complaint investigations (an increase of 14 percent). Tables 2 and 3 summarize complaints CRCL opened and closed in FY 2018.

Of the 743 complaints CRCL opened, the DHS Office of Inspector General (OIG) retained 19 for investigation.  Appendix B includes data tables detailing complaints retained by the OIG and complaints investigated by the OIG and returned to CRCL for their action following completion of the OIG's work.

Additionally, CRCL adds all incoming allegations that it does not open as complaints, but fall within its jurisdiction, to the information layer.[2]  Summaries of the 3,458 matters CRCL added to its information layer in FY 2018 are in Table 4.

---

[2] The information layer, a subset of the Compliance Branch system of record, is used to track issues and identify potential patterns of civil rights or civil liberties allegations that may result in CRCL review.  CRCL may ultimately investigate matters entered into its information layer and open them as part of a complaint investigation if they are subsequently identified as relevant to a pattern or emerging civil rights or civil liberties issue.

## Accomplishments in FY 2018

### Response to Executive Order 13780, Protecting the Nation from Foreign Terrorist Entry into the United States

CRCL opened over 20 complaints stemming from the issuance of Executive Order 13769, including an overarching complaint from 38 Members of Congress about DHS' implementation of the executive order (later replaced by Executive Order 13780).  CRCL has closed all but one of the complaints; of these, two of the complaints resulted in informal resolutions to CBP suggesting improvements related to language access and the documentation of minors in custody (detailed in Section G).

### Prison Rape Elimination Act Audits

As part of its formal role under the DHS Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities (DHS PREA Standards), CRCL continued to assist CBP in developing its Prison Rape Elimination Act (PREA) audit instrument and methodology to audit sexual abuse prevention, detection, and response in CBP holding facilities, as required by the DHS PREA Standards.  Part of this work involved observing CBP PREA pilot audits and providing feedback on the process.  CRCL personnel also observed an ICE PREA audit to assist with evaluating the auditors and planning for future audits.  CRCL's work on the CBP and ICE audit processes will continue into FY 2019.  In addition, CRCL personnel developed and delivered training as part of ICE's training of the independent DHS PREA auditors who were contracted to conduct the audits and provided training on PREA to ICE agents and staff.

### Disability-Related Complaints

The Compliance Branch reviews and adjudicates allegations of disability-based discrimination under Section 504 of the Rehabilitation Act of 1973, as amended, for almost all DHS Components.  During the fiscal year, CRCL opened 26 complaints under Section 504, an all-time high, including allegations involving CBP, ICE, USCIS, FEMA, and the Federal Protective Service (FPS).  CRCL did not issue any determination letters finding a violation of Section 504 during the fiscal year; however, through its complaint review, CRCL helped arrange reasonable accommodations for numerous complainants, including providing a sign language interpreter for a naturalization interview and ensuring a video phone was available for a detainee in ICE custody. CRCL also facilitated numerous informal resolutions between complainants and Components.  In particular, CRCL's work prompted CBP to develop several new musters and job aids to assist its workforce in its interactions with individuals with disabilities.[3]

> *Comment from an individual who filed a Section 504 civil rights and civil liberties complaint:*
> *"This email is to confirm acceptance of informal resolution to my concerns.  Enjoy your weekend and thanks for all your time, effort and patience.  BLESSINGS♥"*

---

[3] Section E contains a detailed description of the complaints investigations handled pursuant to Section 504 of the Rehabilitation Act.

33

*FEMA External Complaint Process*

Stemming from the recent disasters in 2017 and 2018, the Compliance Branch has seen an increase in complaints related to FEMA's work with disaster victims. This includes disability-related complaints, racial profiling, disparate treatment, and limited English proficiency issues. As a result, CRCL has worked closely with FEMA's Office of Equal Rights on its non-EEO complaint process and provided guidance on the development of a complaint process that would allow for increased CRCL visibility into civil rights and civil liberties allegations.

*Unaccompanied Alien Children*

CRCL has longstanding involvement on issues arising from unaccompanied alien children (UAC) held in CBP custody, which includes conducting onsite investigations and providing recommendations regarding treatment of UAC in the Tucson, Yuma, Laredo, Del Rio, and Rio Grande Valley Border Patrol sectors. CRCL most recently conducted a follow-up onsite investigation in the Rio Grande Valley sector in July 2018 investigating issues including conditions for children and families in a number of Border Patrol station hold rooms. CRCL used a contract subject matter expert with expertise in the detention of children to identify concerns related to health and safety. Over the course of the onsite investigation, CRCL looked at allegations including whether UAC or family units were: held for excessive periods of time in cold, over-crowded, and unsanitary cells with unrelated adults; separated from their family members and placed in different holding cells; not provided blankets or bedding; not fed adequately or in a timely manner; not provided potable drinking water; physically or verbally abused and threatened by agents; denied medical attention; transferred to other locations without their property; not provided necessary hygiene or childcare items; and denied phone calls to family members. During the investigation, CRCL reviewed CBP's implementation of CRCL's previous recommendations and the sector's adherence to current policies and procedures regarding the care and treatment of UACs. In general, CRCL found that detention conditions had vastly improved since our onsite investigation in 2014. During the onsite investigation in 2018, CRCL observed clean holding cells and well-stocked supplies and perceived that the implementation of the National Standards on Transport, Escort, Detention, and Search (TEDS) and the increased use of an electronic recordkeeping system had made a positive impact in the Rio Grande Valley Sector. CRCL also noted that USBP has made a significant effort to provide humanitarian services, but its resources—including facilities and staffing—as well as its training and policies are not sufficient to support this mission.

*Family Detention*

The Compliance Branch received and carefully tracked allegations regarding family detention and has opened a representative sample as complaints for full investigation and will continue to grow this sample in FY 2019 including the medical and mental health care of families in detention. Currently, CRCL utilizes medical experts to review medical files on specific allegations raised as well as correction and environmental health and safety experts. CRCL expects to build from the results of these individual investigations and plans to conduct onsite investigations with a full cadre of experts for a comprehensive follow-up review of family detention facilities in FY 2020.

***Increased Efficiency Due to Collaboration Between DHS Investigative Partners***
The Compliance Branch held the first ever deconfliction meeting with DHS OIG, CRCL, ICE, and CBP in July 2018. That meeting established a recurring quarterly forum to discuss common issues, investigative overlap, and ways to force multiply and decrease duplication on important issues. The result aimed at more smartly addressing emerging issues of shared concern. CRCL is currently drafting a charter and will spearhead the meetings with Component input.

***Finalized MOA with NPPD and Revised TSA Section 504 MOA***
CRCL continues to institutionalize the complaint process with DHS Components to ensure timely information exchange, thorough provision of documentation and access to materials, and visibility into Component civil rights and Section 504 matters.

*NPPD (now CISA):* In June 2018, CRCL entered into a memorandum of agreement (MOA) with then-NPPD regarding coordination of CRCL complaint investigations. CRCL and NPPD drafted the MOA through a collaborative working group that was formed in response to CRCL's recommendations to NPPD to improve its public-facing complaint process, particularly with respect to civil rights issues, with a focus on the work of the FPS. The working group had already enhanced CRCL's work with NPPD on civil rights complaints, but the MOA formalized procedures to ensure clear and consistent coordination and communication about new complaints, synchronization of investigations, requests for documents and materials, interviews, responding to recommendations following investigations, and reports about complaints and allegations.

*TSA:* Since 2011, CRCL has had a memorandum of agreement with TSA's Office of Civil Rights and Liberties, Ombudsman, and Traveler Engagement (CRLOTE) that delegates CRCL's authority to CRLOTE to investigate and resolve complaints alleging violations of the Section 504 involving the traveler security screening process. Beginning in May 2018, CRCL and CRLOTE worked collaboratively to update the MOA to reflect additional coordination opportunities between CRCL and CRLOTE. The revised MOA was signed on October 26, 2018.

# A. FY 2018 Investigations

CRCL receives complaints and information regarding issues and incidents that may merit investigation from a variety of sources, including the general public, Members of Congress, NGOs, other DHS Offices and Components, the OIG, and other governmental agencies. For example, HHS's Office of Refugee Resettlement sends CRCL reports regarding treatment of unaccompanied children by DHS personnel. DOJ also forwards public complaints which raise concerns that may fall within CRCL's jurisdiction. Since October 2009, ICE has notified CRCL whenever a person has died in ICE custody, and CBP sends CRCL reports of non-employee deaths.

Pursuant to 6 U.S.C. § 345(a)(6) and internal DHS policies, CRCL begins the complaint process by referring all complaints opened by CRCL to the DHS OIG, which then determines whether it will investigate the complaint. If the OIG declines to investigate the complaint, it is returned to CRCL, which determines whether the complaints should be retained for CRCL's own investigation or referred to the relevant DHS Component(s) for investigation. If CRCL keeps the

complaint for investigation, CRCL requests information from the Component and conducts its own factual investigation.  If a complaint is referred, the Component issues a Report of Investigation (ROI) to CRCL at the completion of its factual investigation.[4]  CRCL reviews the ROI and determines whether additional investigation is warranted and/or whether recommendations should be issued to the Component.  Although the recommendations made as a result of individual investigations generally are made confidentially to the affected Component, CRCL notifies complainants of the results whenever possible and provides summaries of its recommendations in its annual report.

## B. Investigative Processes

***Complaints Closed Without Recommendations:***  Of the complaints CRCL investigated and closed in FY 2018, CRCL closed 77 percent without issuing recommendations.  This typically occurs when allegations are unsubstantiated; when an allegation does not warrant a recommendation because existing policy, procedures, and training are found to be sufficient; or when the Component has already addressed the concerns that CRCL identified.

***Complaints Closed with Recommendations:***  For complaints in which CRCL determines that policy-driven or operational recommendations should be issued to Components, CRCL issues formal recommendations to the Component.

***Expert Recommendations from Onsite Investigations in Immigration Custody and Detention:***
Each year, CRCL's Compliance Branch conducts onsite investigations at CBP, ICE, and ICE-contracted detention facilities to examine alleged violations of civil rights and civil liberties related to the care and custody of individuals in custody.  In FY 2018, CRCL conducted two onsite investigations related to CBP custody and ten onsite investigations at facilities where ICE held immigration detainees.[5]  For these reviews, CRCL utilized the assistance of competitively-awarded contract subject matter experts in the areas of medical care, mental health care, correctional security and operations, suicide prevention, use of force, and environmental health and safety.  Following each investigation, CRCL reviews the experts' recommendations and provides, in consultation with the experts, an initial report.  ICE and CBP are asked to review the recommendations, provide a written response regarding concurrence or non-concurrence, and provide evidence of implementation of the concurred-with recommendations within a defined timeframe.  If ICE or CBP non-concurs, they must provide an explanation, which CRCL reviews to determine whether to continue discussions on the substance of the disagreement with the Component or consider raising to DHS leadership.  Summaries of complaints for which CRCL

---

[4] Retained cases may be subject to a full investigation or short-form resolution.  CRCL's "short-form" complaint processing procedures facilitate swift action on urgent complaints and expeditious resolution of allegations that are narrowly focused and require limited investigation.  The short-form process makes it easier to open and close complaints, allowing speedier resolution.  Cases that subsequently require additional work are converted to standard investigations.

[5] These onsite investigations involved ICE facilities in Alabama, California, Colorado, Florida, Georgia, New Jersey, and Texas.  The facilities included one Service Processing Center, one Contract Detention Center, four Intergovernmental Service Agreement facilities, and four Intergovernmental Agreement facilities through the U.S. Marshals Service.

submitted an expert recommendations memorandum to ICE and CBP in FY 2018 are provided in Section D.

**Recommendation Memoranda:**  CRCL issues formal recommendation memos to address civil rights and liberties issues throughout the Department.  These memoranda often recommend broad and systemic changes, such as policy modifications, alterations to practice and procedures, and training.

*Draft Recommendation Memoranda:*  Prior to issuance, CRCL sends a draft to the Component to ensure the accuracy and operational feasibility of its analysis and recommendations prior to issuing the memorandum in final.  CRCL provides the draft recommendations memoranda to Components for a review and comment within a timeframe designated by CRCL, generally 60 days.  After receiving comments, CRCL works to resolve any areas of disagreement prior to finalizing the memoranda and issuing final recommendations. Providing the opportunity for Components to review and provide feedback also allows Components to inform CRCL of steps they may have taken or intend to take to address the concerns noted or implement the recommendations. During FY 2018, CRCL issued seven final recommendation memoranda to the Components.

*Final Recommendation Memoranda:*  Following review of Component comments to draft memoranda, CRCL adjudicates the comments and issues a final recommendations memorandum signed by CRCL and OGC leadership, which is then sent to Component leadership.  The Component typically has 60 days to respond, either concurring with the recommendations and offering an implementation plan(s), or non-concurring on the recommendations and providing a reason.

**Component Responses to CRCL Expert and Recommendations Memoranda:**  CRCL requests that Components respond to experts and final recommendations memoranda, typically within 60 days of issuance.  In FY 2018, CRCL received eight ICE responses to recommendations memoranda, five CBP responses and two USCIS responses.  Summaries of complaints for which CRCL submitted an expert memorandum or recommendations memorandum and received Component responses in FY 2018 are provided in Section F.

**Informal Resolutions:**  Beyond the recommendation process CRCL may, when appropriate, conclude its investigation of a complaint through an informal resolution rather than a formal recommendation.  An informal resolution is appropriate for a narrow concern or request that is best addressed by communication directly from CRCL to the involved Component.  These communications remain outside the formal recommendation process, yet explain the issue or concern found and may offer proposed resolutions.  After sending the informal resolution email, CRCL closes the relevant complaint(s).  During FY 2018, CRCL transmitted proposed informal resolution emails to ICE and CBP addressing issues arising in 28 complaints.  Summaries of complaints that CRCL closed with informal resolutions in the reporting period are provided in Section G.

TABLE 2: COMPLAINTS OPENED FY 2018: PRIMARY ALLEGATION BY COMPONENT

| Primary Allegation | CBP 110 | | | FEMA 8 | | | ICE 563 | | | TSA 5 | | | USCG 1 | | | USCIS 28 | | | USSS 1 | | | Multi-Component 27 | | | Sub-Totals 743 | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | All |
| Abuse of authority/ misuse of official position | | 1 | 8 | | | | 1 | 1 | 7 | | | | | | | | | | | | 1 | 2 | | 3 | 3 | 2 | 19 | 24 |
| Conditions of detention | 1 | | 8 | | | | 1 | 16 | 15 | | | | | | | | | | | | | | | 1 | 2 | 16 | 24 | 42 |
| Disability accommodation (Section 504) | | 1 | 10 | | | 2 | | | 7 | | | | | | | | | 17 | | | | | | 1 | | 1 | 37 | 38 |
| Discrimination/profiling | 1 | | 8 | | | 4 | 2 | | 7 | | | 2 | | | | | | | | | | 2 | | 2 | 5 | | 27 | 32 |
| Due process | | | 18 | | | 1 | 1 | 3 | 15 | | | | | | | | | 4 | | | | | | 3 | 1 | 3 | 38 | 42 |
| Excessive force or inappropriate use of force | 6 | | 10 | | | | 2 | 3 | 10 | | | | | | | | | | | | 1 | | | | 8 | 3 | 20 | 31 |
| Fourth Amendment (search and seizure) | 1 | | 4 | | | | 1 | | 2 | | | | | | | | | | | | | | | | 2 | | 6 | 8 |
| First Amendment (free speech/association) | | | | | | | | | 1 | | | | | | | | | | | | | | | | | | 1 | 1 |
| Human rights | | | | | | | | | 3 | | | | | 1 | | | | | | | | | | 2 | | 1 | 5 | 6 |
| Inappropriate questioning/ inspection conditions | 2 | | 7 | | | | | | | | | | | | | | | | | | | | | | 2 | | 7 | 9 |
| Inappropriate touch/ search of person (non-TSA) | 2 | | 6 | | | | | | | | | | | | | | | | | | | | | 2 | 2 | | 8 | 10 |
| Intimidation/threat/ improper coercion | 1 | | 2 | | | | | | | | | | | | | | | 1 | | | | 1 | | 2 | 2 | | 4 | 6 |
| Language access | | | 1 | | | 1 | | | 2 | | | | | | | | | 1 | | | | | | 1 | | | 6 | 6 |
| Legal access | | | | | | | | 1 | 1 | | | | | | | | | | | | | | | | | 1 | 1 | 2 |
| Medical/mental health care | | | 7 | | | | 2 | 12 | 426 | | | | | | | | | | | | | 1 | | 4 | 3 | 12 | 437 | 452 |
| Privacy | | | | | | | | | 4 | | | | | | | | | 3 | | | | | | | | | 7 | 7 |
| Religious accommodation | | | | | | | | | 2 | | | | | | | | | 1 | | | | 1 | | 1 | 1 | 2 | 1 | 4 |
| Retaliation | | | | | | | | 1 | 2 | | | | | | | | | | | | | | | | 1 | | 2 | 3 |
| Sexual assault/abuse | 2 | | 3 | | | | 5 | 1 | 6 | | | | | | | | | | | | | | | | 7 | 1 | 9 | 17 |
| TSA Advanced Imaging Technology and TSA pat-downs | | | | | | | | | | | | 3 | | | | | | | | | | | | | | | 3 | 3 |
| Total | 16 | 2 | 92 | 0 | 0 | 8 | 16 | 39 | 508 | 0 | 0 | 5 | 0 | 1 | 0 | 0 | 0 | 28 | 0 | 0 | 1 | 7 | 0 | 20 | 39 | 42 | 662 | 743 |

### TABLE 3: COMPLAINTS CLOSED FY 2018: PRIMARY ALLEGATION BY COMPONENT

| Primary Allegation | CBP 121 | | | ICE 529 | | | FEMA 1 | | | TSA 6 | | | USCIS 17 | | | USSS 1 | | | Multi-Component 18 | | | Sub-Totals 693 | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | All |
| Abuse of authority/ misuse of official position | 3 | | 2 | 1 | | 5 | | | | | | | | | | | | | 1 | | 1 | 5 | | 8 | **13** |
| Conditions of detention | 1 | 1 | 10 | 3 | 19 | 26 | | | | | | | | | | | | | | | 1 | 4 | 20 | 37 | **61** |
| Disability accommodation (Section 504) | | 2 | 2 | | 1 | 2 | | | | | | | | | 8 | | | | | | 4 | | 3 | 16 | **19** |
| Discrimination/profiling | 4 | 1 | 19 | | 8 | 4 | | | | 2 | 1 | | | | | | | | | | 1 | 5 | 9 | 26 | **40** |
| Due process | | 2 | 10 | 2 | 6 | 15 | | | | | | | | | 2 | | | | | | 2 | 2 | 8 | 29 | **39** |
| Excessive force or inappropriate use of force | 3 | | 13 | 1 | 2 | 10 | | | | | | | | | | | | 1 | | | | 4 | 2 | 24 | **30** |
| First Amendment (free speech/ association) | | | | 1 | | 1 | | | | | | | | | | | | | | | | 1 | | 1 | **2** |
| Fourth Amendment (search and seizure) | 2 | | 2 | | | 2 | | | | | | | | | | | | | | | | 2 | | 4 | **6** |
| Hate speech | | | | | | | | | | | | | | | | | | | | | | | | | **0** |
| Human rights | | | | | | 1 | | | | | | | | | | | | | 2 | | 3 | 2 | | 4 | **6** |
| Inappropriate questioning/ inspection conditions | 2 | | 3 | | | | | | | | | | | | | | | | | | | 2 | | 3 | **5** |
| Inappropriate touch/ search of person (non-TSA) | | | 4 | 1 | | | | | | | | | | | | | | | 1 | | | 1 | 1 | 4 | **6** |
| Intimidation/threat/ improper coercion | | | 2 | | | | | | | | | | | | 1 | | | | | | | | | 3 | **3** |
| Language access | | | 2 | 3 | | | | | 1 | | | | | | | | | | | | | 3 | | 3 | **6** |
| Legal access | | | | 4 | 4 | | | | | | | | | | | | | | | | | 4 | 4 | | **8** |
| Medical/mental health care | | 6 | 16 | 1 | 38 | 348 | | | | | | | | | | | | | | | 2 | 1 | 44 | 366 | **411** |
| Privacy | | | 1 | | | 5 | | | | | | | | | 4 | | | | | | | | | 10 | **10** |
| Religious accommodation | | | | 1 | | 1 | | | | | | | | | 1 | | | | | | | 1 | | 2 | **3** |
| Retaliation | | | 1 | | | 2 | | | | | | | | | | | | | | | | | | 3 | **3** |
| Sexual assault/abuse | 3 | | 4 | 1 | 3 | 7 | | | | | | | | | | | | | | | | 4 | 3 | 11 | **18** |
| TSA AIT and TSA pat-downs | | | | | | | | | | | | 4 | | | | | | | | | | | | 4 | **4** |
| **Total** | **18** | **12** | **91** | **10** | **86** | **433** | **0** | **0** | **1** | **0** | **0** | **6** | **1** | **0** | **16** | **0** | **0** | **1** | **4** | **0** | **14** | **33** | **98** | **562** | **693** |

**TABLE 4: FY 2018: INFORMATION LAYER - PRIMARY ALLEGATION**

| Primary Allegation | Total |
|---|---|
| Abuse of authority/misuse of official position | 152 |
| Conditions of detention | 604 |
| Disability accommodation (Section 504) | 21 |
| Discrimination/profiling | 228 |
| Due process | 1866 |
| Excessive or inappropriate use of force | 99 |
| First Amendment (free speech/association) | 5 |
| Fourth Amendment (search and seizure) | 32 |
| Hate speech | 4 |
| Human rights | 3 |
| Inappropriate questioning/inspection conditions | 53 |
| Inappropriate touch/search of person (non-TSA) | 19 |
| Intimidation/threat/improper coercion | 34 |
| Language access | 11 |
| Legal access | 49 |
| Medical/mental health care | 80 |
| Privacy | 6 |
| Religious accommodation | 28 |
| Retaliation | 16 |
| Sexual assault/abuse | 108 |
| TSA AIT and TSA pat-downs and TSA pat-downs | 40 |
| **Total** | **3,458** |

40

## C. Complaint Recommendations Issued in FY 2018

The following summaries describe the complaints closed in FY 2018 pursuant to 6 USC § 345 with recommendations for the relevant DHS Component(s).

***ICE Enforcement in and Around New Orleans:***  CRCL received a variety of complaints in 2014 alleging racial profiling, LEP violations, and inappropriate collusion between local law enforcement and ICE, among other concerns.  CRCL conducted an onsite investigation into the complaints in August 2015 and issued a final recommendations memorandum to ICE in June 2018.  In the memorandum, CRCL made recommendations to ICE regarding its coordination with local law enforcement, including law enforcement agencies where there are known civil rights or civil liberties concerns.  Additional recommendations dealt with ICE's provision of interpretation and other assistance to local law enforcement, the use of mobile biometrics, and collateral arrests.  As of September 30, 2018, ICE had not responded to these recommendations.

***Adjudication of Stay Requests:***  In February 2016, CRCL received a complaint on behalf of an individual who claimed that ICE violated the 2011 memorandum *Prosecutorial Discretion: Certain Victims, Witnesses and Plaintiffs* by removing his client even though she had a pending VAWA self-petition with USCIS.  In April 2018, CRCL issued a memorandum to ICE with recommendations regarding access to safeguards and remedies relating to removal currently available to U-visa petitioners for victim-based applicants and petitioners.  As of September 30, 2018, ICE had not responded to these recommendations.

***Mental Health Admissibility at Toronto Preclearance:***  Over the past five years, CRCL has opened and investigated several complaints related to the denial of admission to travelers with mental illness at CBP's preclearance location at the Toronto Pearson International Airport.  These complaints raised similar concerns about the ability of CBP to access a traveler's medical information and the traveler's subsequent referral to a panel physician based upon a mental health condition.  As part of its review, CRCL performed an onsite investigation in September 2016.  While CRCL determined that CBP's actions conformed to national policy and local procedures, in June 2018 CRCL provided three recommendations stemming from its review to improve the current process at Toronto preclearance.  In August 2018, CBP concurred with each recommendation.

***USBP Checkpoints:***  Having initially delayed its investigation due to pending litigation, CRCL proceeded to investigate complaints received regarding Border Patrol immigration checkpoints in southern Arizona.  The complaints alleged unconstitutional searches and seizures, excessive use of force, racial profiling, and other mistreatment by U.S. Border Patrol agents.  In March 2018, CRCL recommended improvements in the areas of immigration checkpoint effectiveness, information sharing with travelers at immigration checkpoints, increased public outreach to affected local communities, enhanced training for agents assigned to immigration checkpoint operations, and increasing stakeholder understanding of canine enforcement operations at immigration checkpoints, as requested.  In September 2018, CBP concurred with all seven of CRCL's recommendations.

***Sign Language Interpretation:***  In May 2016, CRCL received a complaint alleging that CBP did not provide a sign language interpreter for travelers during their inspections at the Laurier Port of Entry in May 2015.  CBP acknowledged that the individuals requested a sign language interpreter and that CBP staff stated they seemed to communicate with the travelers effectively via handwritten notes given the Port's location and staffing, travel records, and documentation provided by the traveler.  The response from CBP also indicated that certain equipment is not available and that the Laurier Port normally communicates with travelers who are deaf or hard of hearing in writing.  CRCL was concerned that without video access or in-person interpretation services, the Laurier Port of Entry may not have the capacity to provide travelers with sign language interpreters as required by law and policy.  CBP concurred with CRCL's informal resolution and stated that it would ensure that there was access to sign language interpreters.

***Feeding Minors at Yuma Border Patrol Station:***  CRCL investigated numerous allegations that U.S. Border Patrol did not provide adequate food and drinks to minors in CBP custody at the Yuma Border Patrol Station, including: missing meals, failing to comply with the six-hour meal requirement in TEDS, and serving uncooked food.  In September 2018, CRCL issued a memorandum recommending that CBP reiterate to Border Patrol Agents the requirements that: 1) meals be served at least every six hours; 2) meal service be documented in a system of record; 3) food is properly heated; and 4) snacks or meals be provided to minors prior to their departure from the station when operationally feasible.  Although disagreeing with the conclusions reached, in November 2018, CBP concurred with CRCL's recommendations and stated that it would implement the recommendations by March 30, 2019.

***CBP Searches of Transgender Travelers:***  CRCL received a complaint based on allegations by a transgender female traveler about her pat-down search by CBP officers during her inspection at the Detroit-Windsor Tunnel port of entry. The complainant alleged that the search was not conducted by officers consistent with her gender identity, and instead involved both male and female officers who searched different parts of her body. While this was in accordance with existing policy and the facts of the incident were not in dispute, CRCL recommended that CBP update its relevant policies or guidance to be consistent with TEDS and release a muster instructing CBP officers on the appropriate way to search transgender individuals consistent with TEDS. In October 2018, CBP concurred with both recommendations.

***VAWA Confidentiality:***  In May 2015, CRCL received a complaint alleging that that USCIS violated the confidentiality provisions of VAWA at 8 U.S.C. § 1367 (a)(1) when it denied the complainant's application for an adjustment of status based solely on her U.S. citizen husband's withdrawal of his affidavit of support for her adjustment of status application.  In addition, the complaint alleged that USCIS failed to meet its legal obligation to inform the complainant about her ability to file for VAWA benefits, given that USCIS had knowledge of the complainant's history of domestic violence.  In April 2018, CRCL issued recommendations relating to the development and implementation of guidance on 8 U.S.C. §1367(a)(1) and the training of appropriate USCIS personnel on the steps to take once evidence of domestic violence or other abuse covered under VAWA is presented.  In June 2018, USCIS responded that it partially concurred with the recommendations, noting that it had already instituted procedures to ensure compliance with the confidentiality and prohibited source provisions in 8 U.S.C. §1367,

42

including the development of internal guidance and training. CRCL will work with USCIS in 2019 to address unresolved issues related to the complaint and recommendations.

## D. Expert Recommendations from Onsite Investigations

CRCL issued 11 expert reports resulting from onsite investigations in FY 2018. The following summaries describe complaints in which CRCL completed an onsite investigation and subsequently provided to ICE or CBP the expert reports, along with a cover memorandum outlining CRCL's final recommendations.[6] These recommendations aim to improve conditions of detention for individuals in ICE and CBP custody to enhance compliance with the applicable detention standards at the facilities involved in the complaints.

***Conditions of Detention at the Orange County Jail (Goshen, New York):*** CRCL received numerous allegations raising concerns about medical care, general conditions of detention, and environmental health and safety at the Orange County Jail. In addition, CRCL received notice from ICE about the July 2016 death of an individual in ICE custody at the facility. In October 2017, CRCL conducted an onsite investigation, and in April 2018 issued 21 expert recommendations to ICE in the areas of medical care, environmental health and safety, and overall conditions of confinement. As of September 30, 2018, ICE had not yet responded to CRCL regarding these issues.

***Conditions of Detention at the Glades County Detention Center (Moore Haven, Florida):*** CRCL investigated complaints alleging that ICE violated the civil rights and civil liberties of individuals in custody at the Glades County Detention Center. The allegations involved inadequate medical care and conditions of confinement. CRCL conducted an onsite inspection of the facility in April 2018, and in September 2018 CRCL sent a memorandum to ICE that outlined 18 expert recommendations addressing medical care, specifically dental care, chronic care, specialty care, access to health care, and communicable diseases. Other recommendations addressed correctional issues, including the provision of religious meals. As of September 30, 2018, ICE had not yet responded to CRCL regarding these issues.

***Conditions of Detention at the Adelanto Correctional Facility (Adelanto, California):*** In November 2017, CRCL investigated three deaths at the facility in addition to a number of other complaints involving medical and mental health care, segregation, housing, conditions of detention, and due process. In addition, while onsite, CRCL evaluated ICE's implementation of CRCL's prior recommendations stemming from a 2015 investigation at the same facility. CRCL

> **ICE Leadership on CRCL partnership:**
> *"We appreciate our partnership with CRCL and value your important advice on civil rights and civil liberties issues as we work to improve our enforcement programs and detention facilities."*

---

[6] There were a number of situations in FY 2018 where CRCL conducted an onsite investigation and received a response from ICE. In those situations, we have included them in Section F.

issued 36 new recommendations to ICE in April 2018, which included an assessment of their implementation of the 2015 recommendations.  As of September 30, 2018, ICE had not yet responded to CRCL regarding these issues.

***Conditions of Detention at the LaSalle Detention Facility (Jena, Louisiana):***  CRCL investigated complaints alleging that ICE violated the civil rights or civil liberties of individuals held in custody at the LaSalle Detention Facility.  In general, the complaints included allegations about the deaths of four detainees, inadequate medical care, suicide prevention, and conditions of confinement. CRCL conducted an onsite investigation in March 2017 and sent nine recommendations to ICE regarding its findings in August 2017.  In September 2018, ICE responded that it concurred with four of the nine recommendations and partially concurred with the remaining five.  CRCL will work with ICE to address the unresolved issues.  Also, in September 2018, CRCL sent a second expert recommendation memorandum to ICE that outlined three additional medical care recommendations.  As of September 30, 2018, ICE had not yet responded to CRCL regarding these issues.

***Conditions of Detention at the St. Clair County Jail (Port Huron, Michigan):***  CRCL investigated complaints alleging that ICE violated the civil rights or civil liberties of individuals held in custody at the St. Clair County Jail.  The allegations involved medical care and treatment and conditions of confinement.  CRCL conducted an onsite inspection of the facility in June 2017.  In January 2018, CRCL sent a memorandum to ICE that outlined 18 expert recommendations addressing medical care, mental health care, language access, use of force reporting, and legal mail.  As of September 30, 2018, ICE had not yet responded to CRCL regarding these issues.

***Conditions of Detention at the El Paso Service Processing Center (El Paso, Texas):***  CRCL investigated complaints alleging that ICE violated the civil rights or civil liberties of individuals held in custody at the El Paso Service Processing Center.  The allegations involved medical and mental health care and conditions of confinement.  CRCL conducted an onsite inspection of the facility in November 2017.  In March 2018, CRCL sent a memorandum to ICE that outlined 12 expert recommendations addressing medical care, mental health care, environmental health and safety concerns, legal access, and visitation.  As of September 30, 2018, ICE had not yet responded to CRCL regarding these issues.

***Conditions of Detention at the Karnes County Family Residential Center (Karnes City, Texas) and the South Texas Family Residential Center (Dilley, Texas):***  In February 2018, CRCL issued final recommendations to ICE resulting from an initial and three follow-up onsite investigations at the two family residential centers in Texas.  During each of the four investigations, CRCL utilized the same expert consultants to investigate allegations involving medical care, mental health care, corrections, and environmental health and safety at both facilities, as well as to assess whether their recommendations from the previous investigation(s) were adequately implemented.  The final set of recommendations issued to ICE in 2018 contained several new recommendations and a final assessment of their implementation of the previous recommendations.  As of September 30, 2018, ICE had not yet responded to CRCL regarding these issues.

***Conditions of Detention at the Etowah County Jail (Gadsden, Alabama):*** In April 2018, CRCL conducted an onsite investigation into conditions of detention for ICE detainees at the Etowah County Jail. This was CRCL's fourth onsite investigation at the facility since 2006 and involved reviewing allegations regarding many of the same areas of the facility's operations. CRCL examined general conditions of detention, environmental health and safety, and medical and mental health care. Following the investigation, CRCL issued 45 recommendations to ICE to address concerns identified during the investigation. As of September 30, 2018, ICE had not yet responded to CRCL regarding these issues.

***Conditions of Detention at the West County Detention Facility (Richmond, California):*** In June 2018, CRCL conducted an onsite investigation into conditions of detention for ICE detainees at the West County Detention Facility. CRCL's investigation was in response to allegations related to inadequate conditions of detention and inadequate medical care of detainees at the facility. Based on its findings, CRCL made 19 recommendations to ICE to address issues identified during the investigation. In July 2018, Contra Costa County informed ICE that it was terminating its contract to hold immigration detainees; however, CRCL sent the recommendations to ICE in the event that detainees are held by the county in the future. As of September 30, 2018, ICE had not yet responded to CRCL regarding these issues.

***CBP Suicide Prevention and Response:*** From January 2014 through September 2017, CRCL opened 12 complaints into reports of attempted or completed suicides and conducted onsite investigations at three different CBP environments where the issues occurred: a port of entry, a checkpoint, and a processing center. In February 2018, CRCL issued eight recommendations to CBP on issues including training, identification/screening, communication, housing, levels of supervision/management, intervention, reporting, and follow-up/morbidity-mortality reviews. In April 2018, CBP responded that it partially concurred with four and non-concurred with four of CRCL's recommendations. CRCL is reviewing CBP's response.

## E. Section 504 Determinations and Informal Resolutions

CRCL processes, investigates, and resolves disability-related complaints alleging violations of Section 504 of the Rehabilitation Act of 1973 in accordance with the compliance procedures described in 6 CFR Part 15.70. The regulations allow CRCL to conclude an investigation either through: (1) a letter to the complainant containing findings of fact, conclusions of law, a description of a remedy for each violation found, and a notice of the right to appeal; or (2) a written informal agreement provided to the complainant describing the subject matter of the complaint and any agreed upon corrective action.

***Determination Letters***
In FY 2018, CRCL issued four determination letters to complainants under the regulations implementing Section 504. The following summary describes those four complaints, each of which involved similar allegations.

**USCIS**
***Section 504 Accommodations for Victims of Trauma in Credible Fear Interviews:*** In FY 2018, CRCL completed its investigation of four complaints alleging that USCIS failed to provide

accommodations for individuals with trauma-related mental health disabilities during their credible fear interviews. The complaints claimed that, without accommodations, individuals were not able to detail their stories to asylum officers resulting in negative credible fear findings. CRCL found that the credible fear interview process did provide accommodations for individuals with trauma-related disabilities and that USCIS did not violate Section 504.

### Informal Resolutions

During FY 2018, CRCL also completed six informal resolutions under the regulations implementing Section 504. The following summaries describe those complaints and the resolutions agreed upon by the complainant and component.

### CBP

**Accommodations for Individuals Who are Deaf or Hard of Hearing:** In May 2017, CRCL received an allegation that CBP officers at the Honolulu International Airport denied a request for a sign language interpreter from a traveler who was deaf and did not offer access to other services or aids to allow for effective communication during her inspection. As a result of the complaint, CBP agreed to develop and implement a nationwide policy that requires CBP officers to provide appropriate auxiliary aids and services to travelers who are deaf or hard of hearing. CBP also agreed to train CBP officers regarding compliance with Section 504, and to conduct periodic reviews to assess the efficacy of CBP policies and procedures for receiving and processing accommodation requests.

**Accommodation for Non-Obvious Disability:** In March 2018, CRCL received a complaint in which a traveler alleged that he requested to sit during a secondary inspection at the Brownsville Port of Entry. He claimed that a CBP officer did not grant his request, insinuating that he was not truly disabled because he was not in a wheelchair. The complainant further alleged that the officer told him to purchase a cane and to stop living in Mexico. He also said that an officer told his six-year-old daughter to move more quickly or her father would have to stand longer. In response, CBP informally resolved the complaint by issuing a muster to the Port of Brownsville titled, "Reasonable Accommodation for Persons with Non-Obvious Disabilities in CBP Public-Facing Programs and Activities."

### USCIS

**Accommodation for Lip Reader:** In September 2017, CRCL received a complaint regarding an individual who was applying for naturalization. The complainant, who is deaf and communicates by reading lips of individuals who speak Amharic, requested to have a friend who spoke Amharic interpret for her during an interview. USCIS denied her request, asked her to provide additional information about her disability, and delayed rescheduling her interview until receiving the documentation. CRCL opened an investigation under Section 504 and contacted USCIS to determine whether it could provide her requested accommodation. In October 2017, USCIS informed CRCL that it granted her reasonable accommodation request and rescheduled her interview.

**Accommodations for Victims of Trauma in Credible Fear Interviews:** In addition to looking at the Section 504 implications of victims of trauma and credible fear interviews, in FY 2018 CRCL resolved three similar complaints regarding individuals with trauma-related disabilities

who alleged that USCIS failed to provide accommodations for their disabilities during their credible fear interviews, resulting in negative findings.  After opening complaints under Section 504, CRCL was informed that USCIS had changed its credible fear findings from negative to positive findings for the three individuals.  ICE subsequently released the individuals from detention, providing the complainants with the accommodation they were seeking.

## F. Component Responses to CRCL Expert and Recommendations Memoranda

Below are summaries of the responses CRCL received from Components following the issuance of final expert and recommendations memoranda FY 2018.[7]

**ICE**
***Asylum Seekers in ICE Detention:***  CRCL investigated allegations that ICE violated the civil rights of 52 asylum seekers, mostly from Bangladesh, who were participating in a hunger strike while detained at the El Paso Service Processing Center.  Specifically, the detainees alleged that ICE violated the asylum confidentiality of these individuals during a consular visit.  Additionally, the complaint claimed that coercive tactics were used to end the hunger strike.  CRCL did not find that ICE violated asylum confidentiality or engaged in the use of intentionally coercive tactics.  However, after investigating the allegations, in June 2017 CRCL issued final recommendations that ICE improve the current policy regarding consular visits to asylum seekers; provide refresher training on language access responsibilities; and provide guidance to the field on the use of consent forms and photography of detainees.  In August 2018, ICE responded to the recommendations, concurring with three and partially concurring with two.  Based on ICE's response, CRCL closed the complaints.

***Conditions of Detention at the Theo Lacy Facility (Orange, California):***  CRCL conducted an onsite investigation at the Theo Lacy Facility in December 2015 after receiving notice from ICE regarding the death of an individual detained at that facility, as well as separate complaints raising concerns about use of force and conditions of detention at the facility.  In August 2016, CRCL issued 11 recommendations to ICE in the areas of medical care and conditions of confinement.  ICE responded to the recommendations in January 2018; concurring with six, partially concurring with four, and non-concurring with one.  While CRCL is closing the complaints, CRCL plans to conduct a follow-up investigation that will include a focused review of the facility's use of force policies, procedures, and reports.

***Conditions of Detention at the Alexandria Staging Facility (Alexandria, Louisiana):***  CRCL conducted a complaint investigation into a number of allegations that ICE violated the civil rights or civil liberties of individuals held in custody at the Alexandria Staging Facility.  In general, the complaints included allegations about inadequate medical care and treatment, suicide prevention, and conditions of confinement.  CRCL conducted an onsite investigation in

---

[7] Please note that these final memoranda were issued prior to FY 2018 (the date of issuance of the CRCL memorandum is noted in the summary).  This grouping uses the date of receipt of a Component response to define the category.  This is important to highlight in the Annual Report as the formal Component responses represent the acceptance and implementation of changes resulting from CRCL investigations.

March 2017 to examine conditions at the facility.  In August 2017, CRCL sent six recommendations to ICE regarding its findings.  In September 2018, ICE responded that it concurred with one of the six recommendations, and partially concurred with the remaining five recommendations.  CRCL will work with ICE to address the unresolved issues.

***Conditions of Detention at the Stewart Detention Center (Lumpkin, Georgia):***  In February 2017, CRCL conducted an onsite investigation of the Stewart Detention Center, engaging the assistance of four subject matter experts: a medical doctor, a mental health expert, an environmental health and safety expert, and a corrections expert.  Following the review in May 2017, CRCL sent ICE an expert report memorandum that contained 13 recommendations.  In February 2018, ICE responded to the recommendations and provided comments to explain its responses.  Of the 13 recommendations ICE concurred with eight, partially concurred with two, and non-concurred with three.  Based on ICE's response, CRCL closed the complaints in May 2018.

***Conditions of Detention at the Atlanta City Detention Center (Atlanta, Georgia):***  In May 2017, CRCL investigated the Atlanta City Detention Center to address allegations involving mental health care, conditions of confinement, and environmental health and safety.  In October 2017, CRCL issued 27 recommendations to ICE regarding its findings from this investigation.  In August 2018, ICE responded to the recommendations, concurring with 14, partially concurring with five, and non-concurring with eight.  Following the response, ICE informed CRCL that effective September 6, 2018, ICE was no longer housing detainees at the facility.  Consequently, CRCL closed all complaints related to that investigation.[8]

***Conditions of Detention in Johnson County Detention Center (Cleburne, Texas):***  In March 2017, CRCL conducted an onsite investigation into a number of complaints alleging that ICE violated the civil rights or civil liberties of individuals held in custody at the Johnson County Detention Center.  In July 2017, CRCL issued 31 recommendations to ICE in the areas of medical care, mental health care, conditions of confinement, and environmental health and safety.  In September 2018, ICE responded to the recommendations, concurring with 11, partially concurring with one, and non-concurring with 19.  CRCL is reviewing ICE's response and will address any additional concerns.

***Conditions of Detention at the Henderson Detention Facility (Henderson, Nevada):***  In March 2017, CRCL conducted an onsite investigation at the Henderson Detention Facility.  In June 2017, CRCL issued 48 recommendations to ICE regarding inadequate medical and mental health care, conditions of confinement, and environmental health and safety.  In June 2018, ICE responded to the recommendations, concurring with 16, partially concurring with one, and non-concurring with 31.  CRCL has contacted ICE to discuss further action.

---

[8] When CRCL closes complaints based upon ICE's report to CRCL that it is no longer using the facility, CRCL requires that ICE inform them prior to any change to that decision and, in certain instances where conditions were particularly problematic, may request that CRCL do a follow-up onsite investigation prior to the use of the facility by ICE for immigration detention.

***Conditions of Detention at the Houston Contract Detention Facility (Houston, Texas):***
In response to numerous complaints, a death in custody, and earlier recommendations, CRCL conducted an onsite investigation in February 2017 at the Houston Contract Detention Facility. In June 2017, CRCL issued 21 recommendations to ICE in the areas of medical care, mental health care, and conditions of detention. In January 2018, ICE responded to the recommendations, concurring with nine, partially concurring with two, and non-concurring with ten. CRCL communicated to ICE that it remains concerned about the issues that were not addressed at the facility. CRCL will close this investigation and continue to review new allegations received about the facility.

**USCIS**
***USCIS Credible Fear Interview Process at Family Residential Centers:*** CRCL investigated numerous allegations claiming that USCIS asylum officers violated the civil rights of asylum seekers being held at family residential centers during the credible fear interview process. The primary allegation was that USCIS denied meaningful access to individuals whose trauma-related mental illness prevented them from fully articulating their fear claims during their interviews. CRCL investigated these complaints under Section 504 of the Rehabilitation Act and found no evidence that USCIS engaged in disability-based discrimination. Our review also concluded that USCIS provides robust training that prepares asylum officers to engage with asylum seekers who have trauma-related mental health issues. While CRCL did not find any violation of Section 504, the complaints raised other issues about the credible fear interview process at family residential centers. The issues include the adequacy of the re-orientation video, access to childcare for mothers during their interviews, limited time for officers to develop rapport, and interpreters who are not prepared for interviews that discuss traumatic events. In September 2017, CRCL issued final recommendations to USCIS, which included that USCIS should update its training for asylum officers and suggested modifications to the procedures prior to and during credible fear interviews, among other things. In January 2018 USCIS responded to the recommendations, concurring with six and non-concurring with one. CRCL continues to monitor USCIS's handling of credible fear interviews in family residential centers.

## G. Informal Resolutions

The following summaries describe complaints in which CRCL concluded an investigation pursuant to 6 USC Section 345 through an informal resolution. An informal resolution is a notification involving a non-systemic issue, or a concern of narrow scope which results in a communication directly from CRCL leadership to the involved Component. These communications remain outside the formal recommendation process, yet explain the issue or concern found and may offer proposed resolutions. During FY 2018, CRCL transmitted informal resolutions to ICE, CBP, USCIS, and FEMA for 28 complaints. Complaints are typically closed following the issuance of an informal resolution; exceptions are noted below.

**ICE**
***Provision of Medical Records:*** In October 2016, CRCL received a complaint regarding a resident at the South Texas Family Residential Center. The complaint alleged that ICE delayed its response to counsel's requests for medical records, resulting in difficulties presenting the detainee's legal claims. CRCL's investigation determined that ICE took 23 days to provide the

requested information, which exceeds the length of the typical stay at the facility.  In January 2018, CRCL requested that ICE establish procedures at the facility to ensure timely delivery of requested medical records and make efforts to respond more quickly to requests, ideally within 48-72 hours.  On January 16, 2018, ICE Health Services Corps (IHSC) responded and indicated that its national health information consultant would review all processes related to the release of medical records and provide additional training to staff as appropriate.

**Access to Medical and Mental Health Care:**  In July 2017, CRCL received a complaint alleging that the Sherburne County Jail in Elk River, Minnesota provided inadequate medical care for a previous gunshot wound to a detainee's arm, as well as inadequate mental health care for PTSD.  Based on information received, in May 2018 ICE Health Services Corp implemented a corrective action plan to address several issues with the provision of medical and mental health care.  After reviewing the plan, CRCL's medical expert suggested additional improvements to ensure that: 1) detainees are seen within 48-72 hours of having received a request; 2) detainees sign a refusal form when refusing an appointment; and 3) sick call responses are handled as face-to-face assessments instead of written notifications.  The matter was sent to IHSC leadership with a request to consider a more responsive corrective action plan.

**Access to Medical Care:**  In November 2017, CRCL received a complaint that the Carver County Jail in Chaska, Minnesota provided inadequate medical care following a use of force incident.  Based on information received, ICE IHSC implemented a corrective action plan to address compliance with the use of force standards, which requires a medical provider to examine the detainee after an incident occurs.  After reviewing the plan, CRCL's medical expert suggested that IHSC review facility policy to ensure that it was consistent with the applicable detention standards.  In addition, the medical expert suggested that an after-action review should explicitly consider whether medical staff were contacted in a timely manner and in accordance with policy.  The matter was sent to IHSC leadership to assist them with oversight of the facility's medical care.

**Continuity of Medical Care:**  In January 2018, CRCL received a complaint regarding an ICE detainee housed at both Prairieland Detention Center in Alvarado, Texas and Okmulgee County Jail in Okmulgee, Oklahoma, who allegedly received inadequate care for issues with his feet.  Based on information received, ICE IHSC implemented a corrective action plan to address issues at both facilities including quality of care concerns related to delayed specialty care appointments, and a lack of documented refusals for care.  After reviewing the plan, CRCL's medical expert noted that the detainee's medical care was interrupted with each transfer, and a workup of his condition was started anew at each facility.  CRCL reiterated previous formal recommendations made to ICE regarding the importance of continuity of medical care when detainees are transferred which noted that facility transfers, while at times necessary, can hamper efforts to meet these standards and should therefore be accompanied by appropriate procedural safeguards.

**Language Access:**  In March 2016, CRCL opened a complaint alleging that an individual could not fully avail herself of the immigration process because she is limited English proficient, and immigration officials, attorneys, and an immigration judge failed to speak to her in her primary language of Q'anjob'al, an indigenous Mayan language spoken in Guatemala and parts of Mexico.  Although ICE did ultimately correct the issue once they identified it, CRCL was

concerned with how long it took to identify that the complainant was not proficient in English or Spanish. CRCL issued an informal resolution to ICE reminding them of the importance to ensure that language access needs are assessed early and throughout the immigration process.

***Medical Care at the Hall County Sheriff's Office (Grand Island, Nebraska):*** In September 2016, CRCL was notified by ICE of the death of an ICE detainee in custody at the Hall County Sheriff's Office. A CRCL medical expert reviewed the relevant information and agreed with ICE that language access issues, poor medical staffing, inadequate intake screening, inadequate documentation, and gaps in follow-up appointments contributed to the overall problematic medical care. CRCL's medical expert noted one additional item not covered in the ICE detainee death review. CRCL's expert suggested adding this additional item to any corrective action plan currently in place at the detention facility.

***Prosecution of Sexual Abuse Complainants:*** CRCL received a complaint from a woman on behalf of her fiancé, an ICE detainee at the Johnson County Jail in Cleburne, Texas alleging that he was sexually assaulted by a correctional officer. CRCL opened a complaint and requested and reviewed information and records from ICE and the Johnson County Sheriff's Office. Based on the information reviewed, CRCL could not substantiate the sexual assault allegations. However, CRCL did have concerns about the facility's investigation and prosecution of the complainant for making a false police report, a charge for which he was acquitted at trial. As a result, CRCL called ICE's attention to the fact that decisions to prosecute sexual abuse complainants can have a chilling effect on reporting of sexual abuse allegations.

***Interviews of Witnesses in ICE Investigations:*** CRCL received a complaint from an ICE detainee alleging he had been humiliated and discriminated against by facility staff at the Bergen County Jail in Hackensack, New Jersey. He alleged that an officer spread inaccurate information about his medical status to other detainees in the facility, and as a result, other detainees started to treat him differently with a negative impact. CRCL referred the complaint to ICE for investigation. ICE reported that the officer who was the subject of the allegations declined to be interviewed as part of ICE's inquiry. While it appears ICE made every effort to conduct a thorough investigation, cooperation from all parties involved in such an inquiry is necessary to ensure a complete investigation. Based on the information contained in ICE's investigative report CRCL did not substantiate the allegations, but issued an informal resolution to ICE to take steps to improve the investigative process and ensure full cooperation by all relevant witnesses as part of its investigations.

***Sensitive Locations:*** In June 2014, CRCL received a complaint alleging that a man was arrested and physically injured by ICE officers while he was walking towards a supervised child custody exchange and visitation center in San Diego, California for a meeting with his son. Video surveillance and witness accounts confirmed many of the allegations. The complainant sued DHS for his injuries, and the case was settled out of court. CRCL did not make formal recommendations regarding the physical altercation as those issues were settled in litigation. However, CRCL did issue an informal resolution to remind ICE that supervisory approval is required for enforcement actions when a location could reasonably be viewed as being at or near a sensitive location. While child custody exchange and visitation centers are not specifically mentioned in the sensitive locations policy, they would fall within the definition of when

51

"particular care" should be taken, given the spirit of the policy to protect children, and supervisory approval should be obtained before undertaking an enforcement action at such locations.

## CBP

*Language Access:*  In February 2017, CRCL reviewed news articles describing a family's time spent in CBP custody at an airport due to the passage of Executive Order 13769, *Protecting the Nation from Foreign Terrorist Entry into the United States*.  According to the articles, CBP did not provide the family with an interpreter and pressured the family to sign papers.  The CRCL investigation raised concerns regarding provision of meaningful access to persons with limited English proficiency (LEP), and precipitated an informal resolution to CBP suggesting they reference the CBP Language Access plan, and use the telephonic interpretation service or rely on qualified bilingual personnel to ensure consistency with Department policy and language access requirements.  In response, CBP concurred with this suggestion and issued a muster in August 2018 titled, "*Providing Foreign Language Assistance to Persons with Limited English Proficiency*" for nationwide delivery at musters and roll calls to frontline officers.

*Treatment of a Minor when a Parent or Accompanying Adult is in Secondary Inspection:* In November 2017, CRCL encouraged the Port of Washington-Dulles to create standard operating procedures (similar to those issued by another Port of Entry) to ensure that CBP documents all juvenile detentions in the correct system of record.  CRCL encouraged CBP to implement a requirement that officers record the length of time, location, and conditions in which, a traveling minor is held in custody when the accompanying adult is referred to secondary inspection, as well as whether the minor was separated from the adult, and, if so, the duration and reason for separation.  CBP responded that records would have indicated if CBP detained the minor and reflected details of the detention.

*Hours of Repatriation:*  In September 2017, CRCL received a complaint from an individual who alleged that CBP was in violation of repatriation agreements that specify the hours of deportation, as he claimed to have been removed from a Port of Entry at 1:30 a.m.  CRCL understands that the return of this individual did not violate any existing CBP policy or procedure, and that existing repatriation agreements are not specifically applicable.  However, CRCL encouraged CBP to follow the existing repatriation agreements, which demonstrate that CBP is cognizant of potential dangers associated with the return of individuals from land border Ports of Entry into certain areas of Mexico late at night and in the early morning hours.  In response, CBP concurred with this suggestion and confirmed that CBP carefully considers whether to remove individuals at land border Ports of Entry governed by repatriation agreements at hours that are outside of those in the agreements.

*Operational Use of Social Media:*  In January 2017, CRCL opened an investigation into allegations that CBP denied or delayed travelers, including U.S. citizens, at the Canadian border

---

**CBP Leadership on CRCL's complaints processing:**
*"We thank CRCL for its thoughtful review and for working collaboratively with CBP to meet the needs of the traveling public and CBP's missions. We appreciate the important role CRCL continues to play in addressing civil rights and civil liberties matters."*

after they informed CBP that they intended to attend the Women's March, held in Washington, DC on January 21, 2017.  CRCL reviewed CBP policy, training, and musters on CBP's operational uses of social media data collection and review and the sufficiency of First Amendment protections.  CRCL, via an informal resolution sent in September 2018, suggested revisions to CBP training in the areas of the collection and review of First Amendment-protected content.  CRCL also asked to audit an in-person training CBP is currently providing.  CRCL is working with CBP on these recommendations in FY 2019.

**USCIS**

***Religious Accommodations:***  In November 2017, CRCL received a complaint from an individual who alleged that a USCIS employee was engaging in discriminatory behavior by requiring female applicants who wear religious headscarves to remove their headscarf or adjust their headscarf to show their ears when photographed for biometric purposes.  CRCL encouraged USCIS to redistribute the "USCIS Policy for Accommodating Religious Beliefs during Photograph and Fingerprint Capture" to employees charged with capturing biometrics of applicants.  In response, USCIS re-issued the policy to all employees within the USCIS Refugee Affairs Division.

***Guidance Regarding Change of Gender Markers on USCIS Documents:***  In April 2016, CRCL received a complaint alleging that during a naturalization interview at the USCIS Field Office in San Bernardino, California a USCIS officer provided the applicant with incorrect information relative to her transgender status by informing her that evidence of completion of gender reassignment was required before her application could be adjudicated.  USCIS provided CRCL with guidance stating that medical certification of gender transition received from a licensed physician is sufficient documentation, on its own, of gender change, and that proof of sex reassignment surgery is not required.  In addition, USCIS provided a copy of a presentation issued to adjudicators in the San Bernardino Field Office as an informational resource on policies addressing topics specific to the adjudication of immigration benefits for transgender applicants.  Based on the information from USCIS, it appeared to CRCL that the complainant had met requirements for documentation of her transgender status at her initial naturalization interview.  She was naturalized in 2016 after her case was reassigned to another adjudicator.  In September 2018, CRCL suggested to USCIS that it modify the existing informational resource provided to officers within the San Bernardino Field Office to incorporate scenario-based training.

**FEMA**

***Language Access:***  In October 2015, CRCL received a complaint concerning FEMA's provision of language access in connection with flood insurance claim reviews for LEP individuals impacted by Hurricane Sandy.  CRCL determined that FEMA made positive language access outreach efforts regarding the Hurricane Sandy claims review process in coordination with media outlets and advocacy organizations.  While recognizing that FEMA took actions to publicize the reopening of the National Flood Insurance Program review process, CRCL concluded that FEMA's efforts were not sufficient to provide meaningful language access to many impacted LEP individuals.  In January 2018, CRCL suggested to FEMA that moving forward, it should translate FEMA information about the availability of multilingual phone operators into the ten top languages of the impacted populations, including a conspicuous translated "tagline" when

issuing vital notices.  CRCL also encouraged FEMA to modify its language access plan to incorporate this practice.

## H. Complaints Investigated by CRCL without Operational Recommendations

The majority of CRCL complaint investigations are closed without recommendations or informal resolutions.  In FY 2018, CRCL closed 77 percent of complaints with no further action needed.  Below are examples of complaints where CRCL completed investigations that did not warrant corrections by the Components.

**ICE**
***Medical Care:***  In November 2017, CRCL received a complaint alleging that an ICE detainee at the Otay Mesa Detention Facility in San Diego, California received inadequate medical care for an insect bite he experienced in Panama prior to detention.  The detainee reported that he feared losing his leg because it was so infected.  CRCL opened a complaint and referred the information to ICE under CRCL's medical referral process.  ICE provided its report to CRCL, which indicated that the detainee had approximately 13 appointments with medical providers, was provided four different medications, and ICE ultimately transferred the detainee to another facility that had the necessary equipment for his treatment.  In addition, ICE consulted with the U.S. Centers for Disease Control and Prevention which subsequently confirmed the diagnosis.  After reviewing ICE's report, CRCL's medical expert determined that the detainee had been provided with timely access to an appropriate level of care to address his medical condition.  Accordingly, CRCL closed the complaint.

***Due Process:***  In May 2018, CRCL received a complaint from an attorney alleging that ICE violated his client's due process rights by removing him when an emergency motion to reopen and rescind the order of removal entered in absentia was filed, which should have resulted in an automatic stay of deportation.  CRCL investigated the complaint.  The attorney only provided proof of serving ICE counsel with the motion, not the court, and ICE contended that it had completed all necessary checks before the removal.  There was no evidence of any violation of applicable law or policy, so CRCL closed this complaint.

***Retaliation:***  In March 2018, CRCL opened a complaint to investigate allegations that ICE detained a woman in retaliation for her participating in a peaceful protest.  The investigation revealed that the woman, who previously had legal permanent resident status, was free on an order of supervised release following criminal convictions.  ICE stated that the change in her detention status was based solely on an earlier court decision related to her immigration proceedings and denied that her participation in the protest played a role in the decision.  The allegation was not substantiated, and CRCL closed the matter without recommendations.

***Family Separation and Reunification:***  In July 2018, CRCL received a complaint from a legal service provider alleging that an 11-year old minor remained in HHS ORR custody in a New York shelter as an unaccompanied minor because she was separated from her father at the border, and he was returned to Guatemala without his daughter.  The complaint also alleged that the child's mother, who entered the U.S. separately and was detained at the Laredo Detention

54

Center in Texas, requested to be reunified with her daughter.  ICE denied reunification, however, because they did not enter the U.S. together and because the mother had previously lived and worked in the U.S. illegally, was deported, and entered illegally again.  Upon CRCL's request, the ICE Juvenile and Family Residential Management Unit worked with HHS and the Guatemalan Consulate to verify the mother and daughter relationship and, when verification was completed, ICE placed the mother and daughter together at the South Texas Family Residential Center in Dilley, Texas.

## CBP

***Inappropriate Treatment of a Transgender Woman:***  In May 2016, CRCL received a complaint from a legal service provider on behalf of a transgender woman traveler who alleged that, after learning that she was transgender, CBP officers subjected her to inappropriate questioning and comments during a body search.  According to CBP, she was sent to secondary for law enforcement purposes.  CRCL referred the matter to CBP for internal investigation and received their final response in April 2017, concluding that no evidence was found to demonstrate that officers violated CBP policies and procedures.  CBP also reported that they issued a letter to the transgender traveler apologizing for any discomfort she felt as a result of her secondary inspection and sent CRCL a copy of that correspondence.  Accordingly, CRCL was satisfied with CBP's response and closed the matter without recommendations in FY 2018.

***Inappropriate Treatment on the Basis of Gender and Sexual Orientation:***  In April 2016, CRCL received a complaint alleging that a CBP officer at the Los Angeles International Airport was "infatuated" by the complainant's high heels, lingerie, and adult toys, asked detailed questions about female condoms and how they are used in same sex relationships, implied the complainant was a prostitute, and informed her that he had relationships with two women he had met while screening them at work.  The complainant also alleged that a transgendered woman stated the same officer asked her about her surgery, how long she had to wait before she could have sexual activity, and whether she could feel sexual intercourse.  CRCL referred these allegations to CBP, which responded in September 2017.  CBP substantiated the allegations made by both the complainant and transgender traveler and recommended discipline.  Accordingly, CRCL closed the complaint in FY 2018 with no further action.

***Inappropriate Search:***  In March 2017, CRCL received a complaint from an attorney on behalf of his client, who alleged that CBP inappropriately searched his client.  Specifically, the complainant's attorney alleged that during a strip search, CBP asked his client to remove her clothing, to include her bra and underwear, and then proceeded to take her bust measurements.  The investigation conducted by the CBP Office of Professional Responsibility did not substantiate the allegations, and CRCL closed the complaint without recommendations in FY 2018.

***Electronic System for Travel Authorization Online Application:***  In 2017, CRCL received two similar complaints regarding the denial of Electronic System for Travel Authorization applications completed online.  In each instance, the applicant answered affirmatively to the same eligibility question regarding a history of having a physical or mental disorder.  Both applicants did not think that their minor medical conditions should have resulted in a denial.  CRCL was concerned that information on the application website regarding this question was

neither obvious nor easily accessible to applicants. Therefore, CRCL believed that it may have been causing applicants to answer the eligibility question incorrectly. CRCL determined that CBP's admissibility and passenger programs updated the online application in August 2018, adding a pop-up message when an applicant selects "yes" to this eligibility question. This alert recommends that the applicant view the relevant portion of the help section before proceeding with and submitting the application and provides a direct link to the information. The pop-up message alleviated CRCL's concerns that applicants do not have readily accessible information about the eligibility question. CRCL closed this complaint without recommendations.

***Treatment of an Unaccompanied Minor:*** In April 2016, CRCL received a complaint on behalf of a seven-year-old male unaccompanied minor who reported that he hit his head and injured his shoulder in the G4S transport van on his way to the HHS ORR shelter facility because he was sleeping with no seatbelt and fell off the seat. CRCL requested information from CBP regarding the UAC's transport, the vehicle, and policies regarding children and the use of seatbelts. CBP reported that ICE contracted transport services in early summer 2016 to transport all UAC from Border Patrol facilities to HHS ORR shelters in south Texas, and that all transport vehicles are equipped with seatbelts as required by the contract. Further, headquarters reported that all passengers transported by the transportation contractor are instructed to use the seatbelts, in both English and Spanish. Satisfied with Border Patrol's response, CRCL closed the matter with no findings or recommendations in FY 2018.

## USCIS
***VAWA Confidentiality:*** In April 2018, CRCL received a complaint from an attorney on behalf of his client, who alleged that USCIS violated the VAWA confidentiality provisions at 8 U.S.C. § 1367(a)(1) when it relied on information provided by the abuser to attempt to make an adverse determination on his client's case. The investigation revealed that USCIS did contact the abuser identified in the self-petition to verify information that could have been and was discovered through standard USCIS background checks. Based on CRCL's intervention, USCIS reviewed the steps taken in this case and issued updated guidance to officers on how to verify possibly derogatory information without contacting an alleged abuser. The complainant's case with USCIS was favorably adjudicated, and CRCL closed this complaint without recommendations.

# VII. Equal Employment Opportunity and Diversity Division

The Equal Employment Opportunity and Diversity Division (EEOD) leads the Department's efforts to ensure that all employees and applicants are provided equal opportunity by maintaining effective EEO programs and diversity management under various federal laws, regulations, Executive Orders and Directives, including:

- Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;*
- Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.;*
- The Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.;*
- The Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1);
- Title II of the Genetic Information Nondiscrimination Act of 2008, 42 U.S.C. § 2000ff *et seq.;*
- Executive Order 11478, (as amended by Executive Orders 13087 and 13152) prohibiting discrimination based on sexual orientation or status as a parent;
- 29 C.F.R. § 1614;
- EEOC Management Directive 110; and
- EEOC Management Directive 715.

The Division is responsible for adjudicating EEO complaints for all DHS Components; developing and monitoring EEO and diversity program policies, plans, and guidance; managing the Department's Alternative Dispute Resolution program; and delivering training, conducting oversight, and administering EEO and diversity programs for DHS Headquarters and its nearly 8,000 employees. In addition, the Division generates a variety of annual progress reports relating to the Department's diversity and EEO activities.

The Deputy Officer for EEO and Diversity also chairs the DHS EEO Directors Council, composed of Component EEO Directors and a human capital representative. In 2018, the Council convened a cross-Component working group, charged with proposing recommendations to enhance the Department's anti-harassment programs. The working group studied best practices across the federal government and in the private sector, benchmarking those practices against standards promulgated by the Equal Employment Opportunity Commission, the Merit Systems Protection Board, the Office of Personnel Management, and other subject-matter experts, while ensuring compliance with applicable laws and regulations. With over 20 recommendations, the working group's report has set the table for the implementation of program enhancements in FY 2019.

## A. Complaints Management and Adjudication Section

The Complaints Management and Adjudication Section (CMAS) leads the administrative processing and adjudication of EEO complaints throughout the Department. CMAS prepares final actions on all formal EEO complaints filed by DHS employees, former employees, and applicants for employment who allege discrimination in violation of Title VII of the Civil Rights

Act of 1964, the Age Discrimination in Employment Act of 1967, the Rehabilitation Act of 1973, the Equal Pay Act of 1963, the Genetic Information Nondiscrimination Act of 2008, and/or Executive Orders prohibiting discrimination on the bases of parental status and sexual orientation.  CMAS also prepares the following Departmental reports:

- Annual Notification and Federal Employee Antidiscrimination and Retaliation (No FEAR) Act Report;
- Quarterly No FEAR Act data postings; and
- Annual Federal Equal Employment Opportunity Statistical Report of Discrimination Complaints ("462 Report").

## Accomplishments in FY 2018

***Report of Investigation Feedback Tool:***  During FY 2018, CMAS continued to provide quarterly feedback to DHS Components on the quality of their ROIs through use of an ROI Feedback Tool.  The Tool was developed and launched by CMAS in FY 2016, and allows CMAS adjudications analysts to rate the quality of ROIs they review during the preparation of FADs.  Analysts use a numerical scale to rate each ROI in a number of categories; narrative information is provided, if needed, to further explain numerical ratings.  At the end of FY 2017, CMAS polled Complaints Managers at each Component regarding their use of the Tool. Responses generally favored the Tool and users found the detailed comments to be helpful.  Two Components noted that they found the information provided by the Tool helpful in evaluating the quality of investigations performed by contract firms.

***Collaboration with DHS Components and other Stakeholders:***  In FY 2018, CMAS continued to lead quarterly meetings of the DHS EEO Complaint Managers, where topics of discussion included the review of EEO complaint management processes, standardized and ad hoc reports, updates and refresher training on the DHS enterprise EEO database, and briefings from the EEOC on their data management system.

The CMAS compliance program monitors Components' implementation of remedial relief ordered in findings of discrimination and reports compliance progress to the EEOC for EEOC-issued decisions in which discrimination was found.  During FY 2018, CMAS collaborated with the EEOC's Compliance Officer to establish and implement new reporting requirements for all DHS Components, based on newly revised EEOC guidelines.  The CMAS Compliance Officer then conducted training for all DHS Components' Compliance Managers on the new procedures.

CMAS conducted briefings for EEO managers and staff at two Components to ensure that these stakeholders understood CRCL's and Components' roles within the EEO complaint program, and how those roles intersect and impact each other.  CMAS also conducted several workshops open to all DHS Components regarding preparation of the annual statistical report of complaint activity (referred to as the "462 Report"), which is produced for the EEOC by each Component and aggregated by CMAS for the Department's annual report.

CMAS staff participated in working groups formed to implement annual goals of the EEO Directors' Council's Strategic Plan.  These working groups consisted of DHS EEO professionals

from all Components and demonstrated a commitment to unity of effort by the DHS EEO Program. Additionally, CMAS staff members delivered EEO training to Headquarters supervisors, members of the Senior Executive Service, and new employees.

***Issuance of Final Agency Actions:*** CMAS issued 940 final agency actions during FY 2018, including 417 merit FADs. Although CRCL had a performance measure goal to issue 40 percent of merit FADs by the regulatory due date – usually 60 calendar days from the date of request for a FAD by the complainant – CRCL issued 37 percent (155) of FADs within regulatory timelines. The shortfall is attributed to a temporary decrease in available adjudications program personnel who perform this specialized work and an approximate three-month lapse in funding on the contract CMAS has in place to provide additional FAD writing support. These factors were further complicated by an inventory of pending FAD requests that carried over from FY 2017, and an increase in FAD requests in FY 2018. In response to the number of pending FADs and temporarily diminished resources, CMAS developed a strategic approach to case management, striking a balance between issuing regulatory timely FADs, while also not disadvantaging complainants whose cases had been pending longer with the agency.



***Vetting Requests:*** CMAS is required to conduct vetting of DHS employees' names prior to those employees being approved to receive certain high-level awards from DHS leadership. During FY 2018, 91 vetting requests were received and processed, consisting of over 3,600 names, each of which was individually researched. CMAS dedicated additional internal resources to this area and completed 96 percent of vetting requests by the assigned due date.

## B. Diversity Management Section

The Diversity Management Section (DMS) provides leadership, guidance, and technical assistance to DHS Components on the Department's EEO and Diversity initiatives, consistent

with federal laws, regulations, executive orders, and management directives.  Specifically, DMS prepares EEO and diversity policy guidance for Department personnel, supports special emphasis programs that increase awareness of diversity issues throughout the Department, and conducts workforce trend analysis, including utilizing Department-wide workforce data to identify anomalies that may be tied to EEO or diversity issues.

On behalf of the Department, DMS also prepares and submits annual reports related to historically black colleges and universities, mandated by Executive Order 13779, to the White House Initiative on Historically Black Colleges and Universities.  DMS staff members actively participate on various committees and working groups including, OPMs Applicant Flow Data Working Group, the White House Initiative on Historically Black Colleges and Universities Federal Interagency Working Group, the White House Council on Native American Affairs, the Office of the Director of National Intelligences EEO Council, the Interagency Disability Policy Group, and the Interagency Women and Girls in STEM Working Group.

## Accomplishments in FY 2018

***Support of Women in Law Enforcement:***  DMS presented the findings and recommendations of the Women in Law Enforcement Study approved by the Deputy Secretary in January 2018, during the 2018 EEO and Diversity Training Conference, hosted by CRCL.  DMS facilitated a panel of senior-level women from FLETC, ICE, TSA, USSS, and Women in Federal Law Enforcement, Inc., who discussed career advancement, workplace challenges, and successes followed by a moderated question-and-answer segment.  Workshop participants received copies of the DHS Women in Law Enforcement Study Executive Summary.

DMS collaborated with the Office of the Chief Human Capital Officer to provide support and guidance for the DHS Women in Law Enforcement Recruitment and Hiring Event.  DMS led the Accessibility and Reasonable Accommodation team that ensured full accessibility of facilities and technology, including coordination of materials in accessible formats, interpreting services for the two-day event, and real-time closed captioning for all workshops.  DMS provided technical advice and guidance to other teams and to event participants.  DMS also assisted in the development of the marketing materials for the event.

***Leadership of DHS Disability Employment Program:***  DMS led the planning and coordination of the DHS-wide National Disability Employment Awareness Month (NDEAM) Observance program.  The day-long event included workshops, panel discussions, exhibitors and a main event.  This was the first DHS NDEAM event made available to all DHS employees both locally and nationally via Video Teleconference and Adobe Connect.

In FY 2018, DMS launched the DHS 2018 Campaign to Resurvey the Workforce on DHS Connect to encourage DHS employees to review and update their disability status in an effort to ensure DHS is accurately documenting and tracking progress in achieving our employment goals for individuals with disabilities.  The CRCL Officer led interdepartmental coordination and engagement directly with all Component Heads, the Office of the Chief Human Capital Officer, the Human Capital Leadership Council, and the EEO Directors' Council.

***Outreach to Minority Serving Institutions:***  In FY 2018, DMS and the Office of the Chief Human Capital Officer sponsored an outreach event, "Spring Break:  Make Your Impact While DHS Secures the Homeland."  The all-day event, designed to ensure outreach to our diverse communities in academia, included moderated morning and afternoon panels composed of DHS employees in STEM, law enforcement, security, management, administrative, and professional occupations.  Students received information from OPM about the Pathways Program and had their resumes critiqued by DHS recruiters.  Attendees included representatives from minority serving institutions, two-year colleges, and Gallaudet University.  The CRCL Officer and Deputy Officer attended and provided remarks to student attendees.

DMS also participated in events and activities sponsored by the White House Initiative on HBCU.  In FY 2018, WHI HBCU commended and recognized the Department and the CRCL Special Emphasis Program Manager via the first annual Excellence in Innovation and Competitiveness Public Partnership Award for excellence in furthering HBCU priorities throughout DHS and beyond.  CRCL also represented DHS at the HBCU Week Conference Career Fair for HBCU students and alumni.  DHS and DOJ also led an HBCU cluster that works to improve and increase HBCU campus preparedness and resilience through the provision of grants; resources; emergency management curriculum development; and training to faculty, staff, and students.

***Reporting Requirements:***  DMS prepared and submitted to the EEOC the DHS Management Directive 715 (MD-715) Report.  MD-715 is the policy guidance that the EEOC provides to federal agencies for their use in establishing and maintaining effective EEO programs under Section 717 of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq., and Section 501 of the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 et seq.  MD-715 provides a roadmap for creating effective EEO programs for all federal employees as required by Title VII and the Rehabilitation Act.

## C. Alternative Dispute Resolution Program

DHS is committed to effectively and efficiently resolving EEO complaints by providing civilian employees access to Alternative Dispute Resolution (ADR) methods.  As a model employer, DHS recognizes that early resolution of EEO complaints through ADR provides faster, less expensive, and longer-lasting results than through litigation.  CRCL's ADR Program helps individuals resolve workplace disputes and provides an alternative to the traditional EEO complaint process through mediation.

The Department's ADR Program provides a cadre of ADR shared neutrals (mediators) for use by all DHS Components to achieve early resolution of employee disputes.  In FY 2018, Components increased their use of mediators from the shared neutrals roster by 45 percent, saving Components over $60,000 in their ADR programs.

# D. Anti-Harassment Unit

The DHS Headquarters (HQ) Anti-Harassment Unit (AHU) is responsible for conducting fact-findings into allegations of harassment brought by DHS-HQ employees.  The AHU process is separate from the EEO complaint process.

In FY 2018, CRCL drafted revisions to the DHS Anti-Harassment Directive, with an eye toward improving the effectiveness and coordination of anti-harassment programs across the Department.  Implementation of these enhancements is expected in FY 2019.  CRCL also drafted statements issued by the Secretary reinforcing DHS's commitment to a harassment-free workplace and requiring all Department employees to take mandatory anti-harassment training.

# E. Headquarters Equal Employment Opportunity Office

The Headquarters EEO Office (HQ EEO) supports nearly 8,000 DHS Headquarters employees by enforcing compliance with EEO laws, regulations, and mandates; providing; guidance to Headquarters management officials and employees on EEO and diversity; preventing and addressing unlawful employment discrimination; and ensuring that all Headquarters employees have a working environment free from unlawful discrimination, harassment, or reprisal that will support them in the fulfillment of their mission to protect the homeland.

## Accomplishments in FY 2018

*Infrastructure Enhancements:*  In FY 2018, HQ EEO actively worked to fill key vacancies.  In in late-FY 2018, a selection was made for the hiring of a new HQ EEO Director, who entered on duty in early FY 2019.  Earlier in FY 2018, HQ EEO also hired a Formal Complaints Program Manager to oversee the acceptance or dismissal of complaints, investigations, and coordination with the EEOC for cases that go to hearing before an EEOC Administrative Judge.  Moreover, HQ EEO hired an EEO Specialist to work on reports and diversity initiatives.  Lastly, to further strengthen staffing, HQ EEO advertised vacancy announcements for an EEO Specialist position and an EEO Investigator position, with the goal of filling those positions in FY 2019.

*Complaints Processing:*  In FY 2018, HQ EEO provided EEO counseling on 70 complaints and conducted 40 EEO investigations—near record levels of complaints activity at Headquarters when compared to the prior five fiscal years.  Moreover, the timely completion rates of counseling increased by 25 percent, compared to the prior fiscal year, and the timely completion rate of investigations increased by 103 percent compared to the prior year.  During FY 2018, the most commonly alleged bases for Headquarters complaints were reprisal, race, disability, and sex.  The most commonly alleged issues were non-sexual harassment, performance/evaluation, disciplinary actions, and promotion/non-selection.

*Maturity of Reasonable Accommodation Program:*  HQ EEO continued to make strides in growing its Reasonable Accommodation (RA) program.  In FY 2018, in addition to handling daily contacts from employees and managers seeking advice and guidance on the RA process and disability rights and responsibilities, HQ EEO processed 369 RA requests made by 186 employees, applicants for employment, and contractors.  HQ EEO also produced a draft RA

procedures document that will provide Headquarters employees and applicants with additional clarity into how an RA is requested, reviewed, and approved. Moreover, HQ EEO coordinated with the Department's Office of the Chief Human Capital Officer and OGC to work on a new standard operating procedure for the HQ Medical Review Officer. In FY 2018, HQ EEO staff also conducted outreach and provided RA and Schedule A (an excepted service appointment for people with disabilities) trainings to several HQ program offices. Staff will work towards finalizing the RA procedures document and coordinating with the Office of the Chief Human Capital to improve the tracking of Schedule A eligible conversions.

***Educational and Outreach Events:*** To keep Headquarters employees engaged and informed about EEO and diversity, HQ EEO engaged in a regular training cadence. HQ EEO conducted EEO training for all new Headquarters employees, including new incoming Headquarters senior executives. HQ EEO staff also incorporated an EEO segment into the Human Resources Essentials training course for new HQ supervisors. Additionally, HQ EEO conducted monthly internal EEO Counselor meetings to discuss the status of cases and provide a forum for regular, technical refresher training. HQ EEO also continued to produce and disseminate a semiannual newsletter to keep Headquarters employees informed of relevant and recent EEO developments.

In addition, HQ EEO conducted outreach efforts by sponsoring or co-sponsoring a wide variety of EEO and diversity events that commemorate special emphasis programs, such as Black History Month; Women's History Month; Asian American/Pacific Islander Heritage Month; Lesbian, Gay, Bisexual and Transgender Awareness Month; Hispanic Heritage Month; National Disability Employment Awareness Month; and National American Indian Heritage Month.

# VIII. Office of Accessible Systems and Technology

Section 508 of the Rehabilitation Act of 1973, as amended, requires federal agencies to ensure that the electronic and information technology (EIT) procured, maintained, developed, and used is accessible for employees and customers with disabilities.  This legislation affects the full range of EIT including hardware, software, telecommunications systems, operating systems, kiosks, ATMs, copiers, facsimile machines, websites (both internet and intranet), and multimedia productions.

In 2005, the Officer for Civil Rights and Civil Liberties and the DHS Chief Information Officer joined efforts and resources to establish the Office of Accessible Systems & Technology (OAST).  The mission of OAST is to provide the strategic direction, governance, technical assistance, and training to ensure DHS employees and customers with disabilities have equal access to DHS information and data.

***OAST Structure:***  The Executive Director of OAST reports directly to the DHS Principal Deputy Chief Information Officer and indirectly to the CRCL Officer and is a part of senior management for both offices.  OAST is physically located within the front office of the OCIO.

OAST is divided into two divisions: Program Compliance and Program Services.

Program Compliance is responsible for Section 508 compliance and governance activities including: Change and Configuration Management; Acquisition Review and Audit Operations; Web Accessibility and Remediation Program; Enterprise Architecture & Life Cycle Compliance; and Accessibility Compliance Center of Excellence (ACCOE).  The ACCOE is responsible for assessing Section 508 compliance of DHS IT Programs, conducting audits for Section 508 compliance during program reviews, and serving the end-user DHS Program personnel with advice and consultation on how to achieve Section 508 compliance in accordance with OAST guidance and authority.

Program Services is responsible for the DHS Accessibility Help Desk services and operations, IT Application Accessibility Testing & Remediation Services, Electronic Document Accessibility & Remediation Services, e-Learning & Multimedia Accessibility Services, Reasonable Accommodations services, Classroom and Online Training development and delivery, Technical Support, and Outreach and Awareness.

## Accomplishments in FY 2018

***Continued Participation in the Federal Chief Information Officers Council Accessibility Community of Practice:***  In FY 2018, OAST continued collaborating with members of the Federal Chief Information Officers Council, Accessibility Community of Practice (ACOP) leading the effort to update the "Harmonized Testing Processes for Section 508 Compliance: Baseline Tests for Web Accessibility" and the Trusted Tester process for Web to reflect the revised Section 508 Accessibility Standards and to support a wider set of test environments. This update decreases the level of effort required to establish Section 508 conformance test environments government-wide and increases the flexibility of the test process overall.  The

DHS Trusted Tester Program, which includes training and certification, is based on these two foundational best practices documents. The newest Trusted Tester V5 training and certification update, Trusted Tester V5, is scheduled for release in FY 2019. In addition, OAST led the ACOP Accessible Electronic Document authoring and evaluation best practices group to update these best practices to support the Revised Section 508 Standards and the Microsoft Office 365 environment.

***DHS Accessibility Help Desk:*** The DHS Accessibility Help Desk was stood up in September 2007, and serves as a single point of contact for disability related issues, especially as they pertain to EIT accessibility and reasonable accommodation needs. In FY 2018, the Accessibility Help Desk processed approximately 6,600 help desk requests.

***Training Development/Delivery:*** The OAST Training Program provides awareness and training on Section 508-related topics including the Trusted Tester training and certification series. OAST offered seven different training courses and logged approximately 2,500 course completions during FY 2018 through online, classroom, one-on-one, and hands-on trainings. In FY 2018, OAST ended the Trusted Tester V3 training and certification in preparation for release of completely revised courses to support the Revised Section 508 Standards. This reduced overall volume of training delivered. Since 2013, OAST has certified over 1,300 Trusted Testers worldwide.

***Application/Document Testing:*** Within Headquarters, OAST is responsible for testing IT applications for compliance based on Section 508 accessibility standards and best practices. In FY 2018, OAST tested 53 IT and Web-based applications for Section 508 compliance. To support equal access to information and data for persons with disabilities, the DHS Continuous Diagnostics and Mitigation Office collaborated with the OAST to improve the accessibility of key tools. Over the past year, the team closed approximately half of the accessibility gaps, dramatically increasing accessibility for people with disabilities. OAST also tested 371 electronic documents and assisted in ensuring those documents were made accessible as needed.

***Governance:*** During FY 2018, OAST completely updated how Section 508 compliance was integrated within acquisition. OAST also updated change control policies and procedures to support the Revised Section 508 Standards, and to streamlined IT governance overall. The DHS Accessibility Requirements Tool was fully updated to significantly strengthen contractual requirements for Section 508 compliance DHS-wide. The DHS Interagency Change Control Board, changed control governance review procedures and DHS enterprise architecture review procedures were aligned to improve efficiencies in governance activities and increase value of such review activities. Overall, OAST reviewed a total of 453 IT acquisitions valuing $1,594,264,048.00 as well as 3,292 change control and enterprise architecture requests.

# IX. Conclusion

The staff of the Office for Civil Rights and Civil Liberties works with dedication and vigor each day to secure the country while protecting our freedoms, including core civil rights values of liberty, fairness, and equality under the law.  For much more information, including prior congressional reports, testimony, training materials, and many other items, see the Office's website at www.dhs.gov/crcl.

# Appendix A: DHS Civil Rights and Civil Liberties Authorities

**Statutes:**

- **6 U.S.C. § 111; Section 101, Homeland Security Act of 2002 (as amended)—DHS Mission.** Requires that the Department ensure that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland.

- **6 U.S.C. § 113; Section 103, Homeland Security Act of 2002 (as amended)—Other Officers.** The Officer for Civil Rights and Civil Liberties is appointed by the President.

- **6 U.S.C. § 345; Section 705, Homeland Security Act of 2002 (as amended)— Establishment of Officer for Civil Rights and Civil Liberties.** Authorizes the CRCL Officer to investigate complaints, provide policy advice to Department leadership and Components on civil rights and civil liberties issues, and communicate with the public about CRCL and its activities. The statute also requires coordination with the DHS Chief Privacy Officer and Inspector General and directs submission of this annual Report to Congress.

- **42 U.S.C. § 2000ee-1; Section 803, Implementing Recommendations of the 9/11 Commission Act of 2007—Privacy and Civil Liberties Officers.** Provides additional authority to investigate complaints, review Department activities and programs for their civil liberties impact, and communicate with the public about CRCL and its activities. This statute also ensures CRCL's access to information and individuals needed to carry out its functions, forbids reprisal against complainants, requires general coordination with the Inspector General, and directs the Officer for Civil Rights and Civil Liberties to report, semi-annually, to Congress.

- **20 U.S.C. § 1681 et seq. ("Title IX"); Education Amendments Act of 1972— Nondiscrimination Based on Sex.** Under Delegation 19003 (see below), CRCL is responsible for ensuring all federally-assisted and federally-conducted programs or activities of the Department comply with Title IX.

- **29 U.S.C. § 794; ("Section 504") Rehabilitation Act of 1973 (as amended)— Nondiscrimination Under Federal Grants and Programs.** Prohibits discrimination on the basis of disability under any program or activity receiving Federal financial assistance or under any program or activity conducted by DHS. Under Delegation 19003 (see below), CRCL is responsible for ensuring all federally-assisted and federally-conducted programs or activities of the Department comply with the Rehabilitation Act of 1973, as amended.

- **42 U.S.C. §§ 2000d to 2000d-7 ("Title VI"); Civil Rights Act of 1964**—Prohibition Against Exclusion From, Participation In, Denial of Benefits of, and Discrimination Under Federally Assisted Programs on the Grounds of Race, Color, or National Origin. Under

i

Delegation 19003 (see below), CRCL is responsible for ensuring all federally-assisted and federally-conducted programs or activities of the Department comply with Title VI.

- **U.S.C. §§ S 6101-6107; ("Age Act") Age Discrimination Act of 1975 (as amended)**— Prohibits discrimination in federally supported activities on the basis of age.

**Regulations:**

- **6 C.F.R. pt. 15.**  Forbids discrimination on the basis of disability in programs or activities conducted by the Department of Homeland Security.  This regulation effectuates Section 504 of the Rehabilitation Act of 1973 (as amended), 29 U.S.C.  § 794.

- **6 C.F.R. pt. 17.**  Forbids discrimination on the basis of sex in education programs or activities receiving federal financial assistance.  This regulation effectuates Title IX of the Education Amendments of 1972 (as amended), 20 U.S.C.  § 1681 et seq.

- **6 C.F.R. pt. 19.** Affirms that faith-based organizations are able to seek and receive DHS financial assistance to administer social service programs on the same basis as other organizations and assures nondiscrimination against beneficiaries of those programs; complaints of violations may be considered by CRCL.  This regulation effectuates Executive Orders 13279 and 13559.

- **6 C.F.R. pt. 21.**  Forbids discrimination on the basis of race, color, or national origin (including Limited English Proficiency) in programs or activities receiving federal financial assistance from the Department of Homeland Security.  This regulation effectuates the provisions of Title VI of the Civil Rights Act of 1964, 42 U.S.C.  § 2000d et seq.

- **6 C.F.R. pt. 115.**  Sets forth standards to prevent, detect, and respond to sexual abuse in DHS immigration detention facilities and holding facilities.  This regulation effectuates the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601 et. seq.

**Executive Orders:**

- **Executive Order 11478 (as amended by Executive Orders 11590, 12106, 13087, and 13152),** *Equal Employment Opportunity in the Federal Government* **(August 8, 1969)**. Prohibits federal employment discrimination on the basis of race, color, religion, sex, national origin, handicap, age, sexual orientation, or status as a parent.

- **Executive Order 12898,** *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* **(February 11, 1994).**  Requires each federal agency to make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the U.S.

- **Executive Order 13107,** *Implementation of Human Rights Treaties* **(December 10, 1998).** Requires the Secretary to designate a single official as the interagency point of contact for human rights treaties; the Secretary has so designated the Officer for Civil Rights and Civil Liberties.

- **Executive Order 13145,** *To Prohibit Discrimination in Federal Employment Based on Genetic Information* **(February 10, 2000).** Prohibits federal employment discrimination on the basis of protected genetic information.

- **Executive Order 13160,** *Nondiscrimination on the Basis of Race, Sex, Color, National Origin, Disability, Religion, Age, Sexual Orientation, and Status as a Parent in Federally Conducted Education and Training Programs* **(June 23, 2000).** Holds the Federal Government to the same nondiscrimination principles relating to educational opportunities as those that apply to the education programs and activities of state and local governments, and to private institutions receiving federal financial assistance.

- **Executive Order 13163,** *Increasing the Opportunity for Individuals with Disabilities to be Employed in the Federal Government* **(July 28, 2000).** Promotes increasing opportunities for individuals with disabilities to be employed at all levels and occupations of the Federal Government, and supports the goals articulated in section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791.

- **Executive Order 13164,** *Requiring Federal Agencies to Establish Procedures to Facilitate the Provision of Reasonable Accommodation* **(July 26, 2000).** Requires federal agencies to establish procedures to facilitate the provision of reasonable accommodation, and to submit a plan to do so to EEOC within one year.

- **Executive Order 13166,** *Improving Access to Services for Persons with Limited English Proficiency* **(August 11, 2000).** Requires federal agencies to take reasonable steps to promote meaningful access to federally-conducted and federally-funded programs and activities for people with Limited English Proficiency.

- **Executive Order 13256,** *President's Board of Advisors on Historically Black Colleges and Universities* **(February 12, 2002).** Establishes Board of Advisors on Historically Black Colleges and Universities.

- **Executive Order 13270,** *Tribal Colleges and Universities* **(July 3, 2002).** Establishes Board of Advisors on Tribal Colleges and Universities and the White House Initiative on Tribal Colleges and Universities.

- **Executive Order 13279,** *Equal Protection of the Laws for Faith-based and Community Organizations* **(December 12, 2002).** Establishes baseline principles for participation of faith-based organizations in funded social service programs.

- **Executive Order 13347,** *Individuals with Disabilities in Emergency Preparedness* **(July 26, 2004).** Promotes the safety and security of individuals with disabilities in emergency and

disaster situations.  The Executive order also created an Interagency Coordinating Council on Emergency Preparedness and Individuals with Disabilities, which is chaired by the Secretary of the Department of Homeland Security.  The Officer for Civil Rights and Civil Liberties was designated by the Secretary to carry out these duties from 2004–2012.  In January 2012, the Secretary transferred the leadership from CRCL to FEMA's Administrator and designee, the Office of Disability and Integration Coordination.

- **Executive Order 13515, *Increasing Participation of Asian Americans and Pacific Islander in Federal Programs* (October 19, 2009).**  Establishes an Advisory Commission as well as a White House Initiative on Asian Americans and Pacific Islanders, and requires participating agencies, including DHS, to prepare plans to increase those populations' participation in federal programs where they may be underserved.

- **Executive Order 13559, *Fundamental Principles and Policymaking Criteria for Partnerships with Faith-based and Other Neighborhood Organizations* (November 17, 2010).** Amends Executive Order 13279, providing new religious liberty protections for beneficiaries of federally funded social service programs, while adding new protections for the ability of religious providers to compete for government funds on the same basis as any other private organization.

- **Executive Order 13636, *Improving Critical Infrastructure Cybersecurity* (February 12, 2013).**  Directs Executive Branch efforts to enhance the security and resilience of the Nation's critical infrastructure and to maintain a cyber environment that, among other things, incorporates strong civil liberties and privacy protections into every initiative to secure our critical infrastructure.

- **Executive Order 13831, *Establishment of a White House Faith and Opportunity Initiative* (May 3, 2018).**  Amends Executive Orders 13279 and 13559 by, among other things, removing the beneficiary referral requirements and the written notice requirement.

## Delegations and Directives:

- **Management Directive 3500,** Operationalizes Roles of the Officer for Civil Rights and Civil Liberties and the Office of the Chief Counsel.

- **Management Directive 4010.2,** Establishes the DHS Section 508 Program Management Office within the DHS Office of the Chief Information Officer and establishes policy regarding Electronic and Information Technology accessibility.

- **Delegation 19000,** Delegation to the Deputy Officer for Equal Opportunity Programs.

- **Delegation 19001,** Delegation to the Deputy Officer for Civil Rights and Civil Liberties Programs and Compliance.

- **Delegation 19003**, Delegation to the Officer for CRCL for Matters Involving CRCL, Including EEO and Workplace Diversity.

iv

- **Delegation 19004,** Delegates authority to provide DHS-wide guidance and oversight on the implementation of 8 United States Code (U.S.C.) Section 1367 confidentiality and prohibited source provisions (relating to applicants for and beneficiaries of Violence Against Women Act, T visa, or U visa protections) in accordance with 8 U.S.C. 1367(d) and Section 810 of the Violence Against Women Reauthorization Act of 2013.

- **Delegation 19005,** Delegation of Authority to Disclose Section 1367 Information to National Security Officials for National Security Purposes.

- **Directive 002-02,** Implementation of Section 1367 Information Provisions.

- **Directive 046-01,** Directive, Office for Civil Rights and Civil Liberties.

- **Directive 065-01,** Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities (Non-Employment).

- **Directive 065-02,** Establishes the Department's Special Emphasis Program policy and requirements.

- **Directive 065-04,** Establishes the Department's Equal Employment Opportunity Alternative Dispute Resolution Program.

- **Directive 256-01,** Anti–Harassment Policy.

- **Directive 259-01,** Providing Reasonable Accommodations for Employees and Applicants with Disabilities.

- **Directive 262-01,** Effectuates a Data Integrity Board for the Department of Homeland Security, and provides policies for engaging in and approving Computer Matching Agreements that fall under the Privacy Act of 1974, as amended (5 U.S.C. § 552a).

# Appendix B: Public Complaints Tables

In FY 2018, CRCL opened 743 new complaints from members of the general public (compared to 568 opened in FY 2017, an increase of 31 percent) and closed 693 complaints (compared to 606 closed in FY 2017, an increase of 14 percent). Data tables B-1A and B-1B describe matters retained by the OIG during FY 2018, and complaints closed and returned to CRCL from the OIG during FY 2018, by quarter. Data tables B-2A through B-5B summarize complaints retained by CRCL and referred to DHS Components by quarter in FY 2018.

As of September 30, 2018, the Compliance Branch had 570 open complaints. Of those, 170 complaints were opened and retained by CRCL for investigation. Of those, 195 were addressed using "short form" investigations to facilitate swift action on urgent complaints and to expedite resolution of allegations that are narrowly focused and therefore require a more limited investigation. Another 29 of the open complaints were referred to a DHS Component for investigation, and 47 are currently retained by OIG for investigations.

For a tally of all CRCL's complaints by Component and primary allegation from FY 2003 to 2017, please visit: www.dhs.gov/complaints.

## Office of the Inspector General

CRCL initially refers all complaints it opens to DHS OIG, which retains a relatively small number of those complaints for its own investigations (See 6 U.S.C. § 345(a)(6)). Of the 743 complaints opened in FY 2018, 19 complaints were retained by the OIG.

In FY 2018, CRCL closed 28 complaints retained by the OIG, which completed OIG investigations and were returned to CRCL for follow-up on remaining civil rights issues. These matters included one matter retained by OIG in FY 2014, six matters retained in FY 2015, thirteen matters retained in FY 2016, and eight matters retained in FY 2017. CRCL closed these complaints based upon either the conclusions reached in the OIG's investigation or based on additional investigation by CRCL.

**TABLE B-1A: CRCL COMPLAINTS OPENED AND RETAINED BY THE OIG, FY 2018**

| Primary Allegation | CBP 9 | | | | ICE 10 | | | | Sub-Totals 19 | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | All |
| Conditions of detention | | | | | | | | 1 | | | | 1 | 1 |
| Due process | 1 | | | 1 | | | | | 1 | | | 1 | 2 |
| Excessive force or inappropriate use of force | 1 | | 1 | 1 | | 1 | | 1 | 1 | 1 | 1 | 2 | 5 |
| Fourth Amendment (search and seizure) | | | | | 1 | | 1 | | 1 | | 1 | | 2 |
| Inappropriate questioning/ inspection conditions (non-TSA) | | | 1 | | | | | | | | 1 | | 1 |
| Inappropriate touch/ search of person (non-TSA) | | 1 | | | | | | | | 1 | | | 1 |
| Language access | | | | | | | | 1 | | | | 1 | 1 |
| Medical/mental health care | | | 1 | | | | 3 | 1 | | | 4 | 1 | 5 |
| Sexual assault/abuse | | 1 | | | | | | | | 1 | | | 1 |
| **Total** | **2** | **2** | **3** | **2** | **1** | **1** | **4** | **4** | **3** | **3** | **7** | **6** | **19** |

**TABLE B-1B: CRCL COMPLAINTS CLOSED BY THE OIG, FY 2018**

| Primary Allegation | CBP 8 | | | | ICE 18 | | | | TSA 1 | | | | USSS 1 | | | | Sub-Totals 28 | | | | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | All |
| Discrimination/profiling | | 1 | 1 | 1 | | | | | | | 1 | | | | | | | 1 | 2 | 1 | 4 |
| Excessive force or inappropriate use of force | | | 1 | 1 | | 1 | | | | | | | | | 1 | | | 1 | 2 | 1 | 4 |
| Inappropriate touch/ search of person (non-TSA) | | | 1 | 1 | | 1 | | | | | | | | | | | | 1 | 1 | 1 | 3 |
| Legal access | | | | | | 1 | 1 | | | | | | | | | | | 1 | 1 | | 2 |
| Medical/mental health care | 1 | | | | | 3 | 3 | 8 | | | | | | | | | 1 | 3 | 3 | 8 | 15 |
| **Total** | **1** | **1** | **3** | **3** | **0** | **6** | **4** | **8** | **0** | **0** | **1** | **0** | **0** | **0** | **1** | **0** | **1** | **7** | **9** | **11** | **28** |

## First Quarter FY 2018

**TABLE B-2A: COMPLAINTS OPENED Q1 FY 2018: PRIMARY ALLEGATION BY COMPONENT**

| Primary Allegation | CBP 26 | | | FEMA 1 | | | ICE 87 | | | TSA 2 | | | USCG 1 | | | USCIS 7 | | | Multi-Component 2 | | | Sub-Totals 126 | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | All |
| Abuse of authority/ misuse of official position | | | 3 | | | | | | 1 | | | | | | | | | | | | | | | 4 | **4** |
| Conditions of detention | 1 | | | | | | 1 | 1 | 3 | | | | | | | | | | | | | 2 | 1 | 3 | **6** |
| Disability accommodation (Section 504) | | | | | | | | | | | | | | | | | | 4 | | | 1 | | | 4 | **4** |
| Discrimination/profiling | | | 3 | | | 1 | | | 2 | | | | | | | | | | | | | | | 7 | **7** |
| Due process | | | 6 | | | | | | 4 | | | | | | | | | 1 | | | | | | 11 | **11** |
| Excessive force or inappropriate use of force | 2 | | 3 | | | | | 1 | 1 | | | | | | | | | | | | | | | 4 | **7** |
| Fourth Amendment (search and seizure) | | | | | | | | | 1 | | | | | | | | | | | | | 2 | 1 | 1 | **1** |
| Human rights | | | | | | | | | | | | | | 1 | | | | | | | 1 | | | 1 | **2** |
| Inappropriate questioning/ inspection conditions (non-TSA) | | | 1 | | | | | | | | | | | | | | | | | | | | 1 | 1 | **1** |
| Inappropriate touch/ search of person (non-TSA) | | | 2 | | | | | | | | | | | | | | | | | | | | | 2 | **2** |
| Intimidation/threat/ improper coercion | | | 1 | | | | | | | | | | | | | | | | | | | | | 1 | **1** |
| Language access | | | 1 | | | | | | | | | | | | | | | | | | | | | 1 | **1** |
| Medical/mental health care | | | 1 | | | | | 2 | 68 | | | | | | | | | | | | | | 2 | 69 | **71** |
| Privacy | | | | | | | | | 1 | | | | | | | | 1 | | | | | | | 2 | **2** |
| Religious | | | | | | | | | | | | | | | | | 1 | | | | | | | 1 | **1** |
| Sexual assault/abuse | 1 | | 1 | | | | | | 1 | | | | | | | | | | | | | 1 | | 2 | **3** |
| TSA AIT and TSA pat-downs | | | | | | | | | | | | 2 | | | | | | | | | | | | 2 | **2** |
| **Total** | **4** | **0** | **22** | **0** | **0** | **1** | **1** | **4** | **82** | **0** | **0** | **2** | **0** | **1** | **0** | **0** | **0** | **7** | **0** | **0** | **2** | **5** | **5** | **116** | **126** |

**TABLE B-2B: COMPLAINTS CLOSED Q1 FY 2018: PRIMARY ALLEGATION BY COMPONENT**

| Primary Allegation | CBP 28 | | | ICE 8 | | | TSA 2 | | | USCIS 1 | | | Multi-Component 4 | | | Sub-Totals 43 | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | All |
| Abuse of authority/ misuse of official position | | | | | | | | | 1 | | | | | | | | | 1 | **1** |
| Conditions of detention | | | 2 | 1 | | 1 | | | | | | | | | | | 1 | 3 | **4** |
| Disability accommodation (Section 504) | | 1 | | | 1 | | | | | | | | | | 1 | | 2 | 1 | **3** |
| Discrimination/profiling | | | 5 | | | | | | | | | | | | | | | 5 | **5** |
| Due process | | | 2 | | | | | | | | | 1 | | | | | | 3 | **3** |
| Excessive force or inappropriate use of force | | | 4 | | | | | | | | | | | | | | | 4 | **4** |
| Human rights | | | | | | | | | | | | | 2 | | 1 | 2 | | 1 | **3** |
| Medical/mental health care | | | 13 | | | 4 | | | | | | | | | | | | 17 | **17** |
| Retaliation | | | 1 | | | | | | | | | | | | | | | 1 | **1** |
| TSA AIT and TSA pat-downs | | | | | | | | | 2 | | | | | | | | | 2 | **2** |
| **Total** | **0** | **1** | **27** | **1** | **1** | **6** | **0** | **0** | **2** | **0** | **0** | **1** | **2** | **0** | **2** | **3** | **2** | **38** | **43** |

## Second Quarter FY 2018

### TABLE B-3A: COMPLAINTS OPENED Q2 FY 2018: PRIMARY ALLEGATION BY COMPONENT

| Primary Allegation | CBP 22 | | | FEMA 3 | | | ICE 86 | | | TSA 1 | | | USCIS 8 | | | USSS 1 | | | Multi-Component 6 | | | Sub-Totals 127 | | | Total 127 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | All |
| Abuse of authority/ misuse of official position | | | 2 | | | | | 1 | 2 | | | | | | | | | 1 | | | 1 | | 1 | 6 | **7** |
| Conditions of detention | | | 1 | | | | | 7 | 3 | | | | | | | | | | | | | | 7 | 4 | **11** |
| Disability accommodation (Section 504) | | | 1 | | | 2 | | | | | | | | | 6 | | | | | | | | | 9 | **9** |
| Discrimination/profiling | | | 2 | | | 1 | | 1 | | | | | | | 1 | | | | 1 | | | 1 | 1 | 4 | **6** |
| Due process | | | 1 | | | | 1 | 1 | 5 | | | | | | | | | | | | | 1 | 1 | 6 | **8** |
| Excessive force or inappropriate use of force | 1 | | 2 | | | | | 1 | 3 | | | | | | | | | | | | | 1 | 1 | 5 | **7** |
| Fourth Amendment (search and seizure) | 1 | | 2 | | | | 1 | | | | | | | | | | | | | | | 2 | | 2 | **4** |
| Human rights | | | | | | | | | 1 | | | | | | | | | | | | 1 | | | 2 | **2** |
| Inappropriate questioning/inspection conditions (non-TSA) | 1 | | 2 | | | | | | | | | | | | | | | | | | | 1 | | 2 | **3** |
| Inappropriate touch/ search of person (non-TSA) | 2 | | 2 | | | | | | | | | | | | | | | | | | 1 | 2 | | 3 | **5** |
| Language access | | | | | | | | | 1 | | | | | | 1 | | | | | | | | | 2 | **2** |
| Legal access | | | | | | | | 1 | | | | | | | | | | | | | | | 1 | | **1** |
| Medical/mental health care | | | | | | | 1 | 1 | 47 | | | | | | | | | | 1 | | | 2 | 1 | 47 | **50** |
| Privacy | | | | | | | | | 1 | | | | | | | | | | | | | | | 1 | **1** |
| Religious accommodation | | | | | | | | | 1 | | | | | | | | | | 1 | | | 1 | | 1 | **2** |
| Retaliation | | | | | | | 1 | | 1 | | | | | | | | | | | | | 1 | | 1 | **2** |
| Sexual assault/abuse | 1 | | 1 | | | | 1 | 1 | 2 | | | | | | | | | | | | | 2 | 1 | 3 | **6** |
| TSA AIT and TSA pat-downs | | | | | | | | | | | | 1 | | | | | | | | | | | | 1 | **1** |
| **Total** | **6** | **0** | **16** | **0** | **0** | **3** | **5** | **14** | **67** | **0** | **0** | **1** | **0** | **0** | **8** | **0** | **0** | **1** | **3** | **0** | **3** | **14** | **14** | **99** | **127** |

x

**TABLE B-3B: COMPLAINTS CLOSED Q2 FY 2018: PRIMARY ALLEGATION BY COMPONENT**

| Primary Allegation | CBP 24 | | | ICE 114 | | | TSA 1 | | | USCIS 7 | | | Multi-Component 4 | | | Sub-Totals 150 | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | All |
| Abuse of authority/ misuse of official position | | | | | | 1 | | | | | | | | | 1 | | | 2 | 2 |
| Conditions of detention | | 1 | 1 | | 2 | 5 | | | | | | | | | | | 3 | 6 | 10 |
| Disability accommodation (Section 504) | | 1 | | | | 1 | | | | | | 6 | | | 2 | | 1 | 9 | 10 |
| Discrimination/profiling | 1 | | 2 | | | 1 | | | | | | | | | | 1 | | 3 | 4 |
| Due process | | | 1 | 1 | | 1 | | | | | | | | | | 1 | | 3 | 4 |
| Excessive force or inappropriate use of force | 1 | | 2 | | | 2 | | | | | | | | | | 1 | | 5 | 6 |
| First Amendment (free speech/association) | | | | 1 | | 3 | | | | | | | | | | 1 | | | 1 |
| Fourth Amendment (search and seizure) | 1 | | | | | | | | | | | | | | | 1 | | 1 | 2 |
| Inappropriate questioning/ inspection conditions | 1 | | | | | 1 | | | | | | | | | | 1 | | | 1 |
| Inappropriate touch/ search of person (non-TSA) | | | 1 | | 1 | | | | | | | | 1 | | | 1 | 1 | 1 | 3 |
| Language access | | | 1 | | | | | | | | | | | | | | | 1 | 1 |
| Legal access | | | | | | 1 | | | | | | | | | | | | 1 | 1 |
| Medical/mental health care | | 6 | 1 | | 6 | 84 | | | | | | | | | | | 12 | 85 | 97 |
| Privacy | | | 1 | | | | | | | | | 1 | | | | | | 2 | 2 |
| Religious accommodation | | | | | | 1 | | | | | | | | | | | | 1 | 1 |
| Sexual assault/abuse | | | 2 | | | 3 | | | | | | | | | | | | 5 | 5 |
| TSA AIT and TSA pat-downs | | | | | | | | | 1 | | | | | | | | | 1 | 1 |
| **Total** | **4** | **8** | **12** | **2** | **9** | **103** | **0** | **0** | **1** | **0** | **0** | **7** | **1** | **0** | **3** | **7** | **17** | **126** | **150** |

### Third Quarter FY 2018

**TABLE B-4A: COMPLAINTS OPENED Q3 FY 2018: PRIMARY ALLEGATION BY COMPONENT**

| Primary Allegation | CBP 23 | | | FEMA 2 | | | ICE 224 | | | TSA 1 | | | USCIS 7 | | | Multi-Component 8 | | | Sub-Totals 265 | | | Total 265 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | All |
| Abuse of authority/ misuse of official position | | | 1 | | | | | | 2 | | | | | | | | | 1 | | | 4 | 4 |
| Conditions of detention | | | 2 | | | | | 8 | 4 | | | | | | | | | | | 8 | 6 | 14 |
| Disability accommodation (Section 504) | | | 5 | | | | | | 2 | | | | | | 2 | | | 1 | | | 10 | 10 |
| Discrimination/profiling | | | 2 | | 2 | | 1 | | 2 | | | 1 | | | 2 | | | 1 | 1 | | 10 | 11 |
| Due process | | | 1 | | | | | 2 | 1 | | | | | | | | | 1 | | 2 | 3 | 5 |
| Excessive force or inappropriate use of force | 1 | | 1 | | | | 2 | 1 | 4 | | | | | | | | | | 3 | 1 | 5 | 9 |
| First Amendment (free speech/association) | | | | | | | | | 1 | | | | | | | | | | | | 1 | 1 |
| Fourth Amendment (search and seizure) | | | 2 | | | | | | 1 | | | | | | | | | | | | 3 | 3 |
| Human rights | | | | | | | | | 1 | | | | | | | | | | | | 1 | 1 |
| Inappropriate questioning/inspection conditions (non-TSA) | 1 | | 2 | | | | | | | | | | | | | | | 1 | | | 2 | 3 |
| Inappropriate touch/ search of person (non-TSA) | | | 1 | | | | | | | | | | | | | | | | | | 1 | 1 |
| Intimidation/threat/ improper coercion | | | | | | | | | | | | | 1 | 1 | | | | 1 | 1 | | 2 | 3 |
| Legal access | | | | | | | | | 1 | | | | | | | | | | | | 1 | 1 |
| Medical/mental health care | | | 4 | | | | 1 | 4 | 182 | | | | | | | | 2 | | 1 | 4 | 188 | 192 |
| Privacy | | | | | | | | | 2 | | | | | | 2 | | | | | | 4 | 4 |
| Sexual assault/abuse | | | | | | | 1 | | 1 | | | | | | | | | | 1 | | 1 | 2 |
| **Total** | **2** | **0** | **21** | **0** | **0** | **2** | **5** | **15** | **204** | **0** | **0** | **1** | **0** | **0** | **7** | **1** | **0** | **7** | **8** | **15** | **242** | **265** |

**TABLE B-4B: COMPLAINTS CLOSED Q3 FY 2018: PRIMARY ALLEGATION BY COMPONENT**

| | CBP 27 | | | FEMA 1 | | | ICE 236 | | | TSA 1 | | | USCIS 4 | | | USSS 1 | | | Multi-Component 3 | | | Sub-Totals 273 | | | Total 273 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | All |
| Abuse of authority/ misuse of official position | 2 | | 1 | | | | | | 3 | | | | | | | | | | | | | 2 | | 4 | 6 |
| Conditions of detention | | | 1 | | | | 2 | 9 | 11 | | | | | | | | | | | | 1 | 2 | 9 | 13 | 24 |
| Disability accommodation (Section 504) | | | | | | | | | | | | | | | 2 | | | | | | | | | 2 | 2 |
| Discrimination/profiling | 1 | | 3 | | | | | 8 | 3 | | | 1 | | | 1 | | | | | | | 1 | 8 | 8 | 17 |
| Due process | | 1 | 4 | | | | | 3 | 7 | | | | | | 1 | | | | | | 1 | | 4 | 13 | 17 |
| Excessive force or inappropriate use of force | 1 | | 3 | | | | 1 | 2 | 3 | | | | | | | | | 1 | | | | 2 | 2 | 7 | 11 |
| Fourth Amendment (search and seizure) | | | 2 | | | | | | | | | | | | | | | | | | | | | 2 | 2 |
| Human rights | | | | | | | | | 1 | | | | | | | | | | | | | | | 1 | 1 |
| Inappropriate questioning/inspection conditions (non-TSA) | | | 1 | | | | | | | | | | | | | | | | | | | | | 1 | 1 |
| Inappropriate touch/ search of person (non-TSA) | | | 2 | | | | | | | | | | | | | | | | | | | | | 2 | 2 |
| Intimidation/threat/ improper coercion | | | 2 | | | | | | | | | | | | | | | | | | | | | 2 | 2 |
| Language access | | | | | | 1 | | 3 | | | | | | | | | | | | | | | 3 | 1 | 4 |
| Legal access | | | | | | | | 3 | 2 | | | | | | | | | | | | | | 3 | 2 | 5 |
| Medical/mental health care | | | | | | | 1 | 16 | 155 | | | | | | | | | | | | | 1 | 16 | 155 | 172 |
| Privacy | | | | | | | | | 1 | | | | | | | | | | | | 1 | | | 2 | 2 |
| Religious accommodation | | | | | | | | 1 | | | | | | | | | | | | | | | 1 | | 1 |
| Sexual assault/abuse | 2 | | 1 | | | | | | 1 | | | | | | | | | | | | | 2 | | 2 | 4 |
| **Total** | **6** | **1** | **20** | **0** | **0** | **1** | **4** | **45** | **187** | **0** | **0** | **1** | **0** | **0** | **4** | **0** | **0** | **1** | **0** | **0** | **3** | **10** | **46** | **217** | **273** |

xiii

**Fourth Quarter FY 2018**

TABLE B-5A: COMPLAINTS OPENED Q4 FY 2018: PRIMARY ALLEGATION BY COMPONENT

| Primary Allegation | CBP 39 | | | FEMA 2 | | | ICE 166 | | | TSA 1 | | | USCIS 7 | | | Multi-Component 11 | | | Sub-Totals 225 | | | Total 225 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | All |
| Abuse of authority/ misuse of official position | | 1 | 2 | | | | 1 | | 2 | | | | | | | 2 | | 1 | 3 | 1 | 5 | **9** |
| Conditions of detention | | | 5 | | | | | | 5 | | | | | | | | | 1 | | | 11 | **11** |
| Disability accommodation (Section 504) | | 1 | 4 | | | | | | 5 | | | | | | 5 | | | | 0 | 1 | 14 | **15** |
| Discrimination/profiling | 1 | | 1 | | | | 1 | | 2 | | | 1 | | | 1 | 1 | | | 3 | | 5 | **8** |
| Due process | | | 10 | | | 1 | | | 5 | | | | | | | | | 2 | 0 | | 18 | **18** |
| Excessive force or inappropriate use of force | 2 | | 4 | | | | | | 2 | | | | | | | | | | 2 | | 6 | **8** |
| Human rights | | | | | | | | | 1 | | | | | | | | | | | | 1 | **1** |
| Inappropriate questioning/ inspection conditions | | | 2 | | | | | | | | | | | | | | | | | | 2 | **2** |
| Inappropriate touch/ search of person (non-TSA) | | | 1 | | | | | | | | | | | | | | | 1 | | | 2 | **2** |
| Intimidation/threat/ improper coercion | 1 | | | | | | | | | | | | | | 1 | | | | 1 | | 1 | **2** |
| Language access (limited English proficiency) | | | | | | 1 | | | 1 | | | | | | | | | 1 | | | 3 | **3** |
| Medical/mental health care | | | 2 | | | | | 5 | 129 | | | | | | | | | 2 | | 5 | 133 | **138** |
| Religious accommodation | | | | | | | | 1 | | | | | | | | | | | | 1 | | **1** |
| Retaliation | | | | | | | | | 1 | | | | | | | | | | | | 1 | **1** |
| Sexual assault/abuse | | | 1 | | | | 3 | | 2 | | | | | | | | | | 3 | | 3 | **6** |
| **Total** | **4** | **2** | **33** | **0** | **0** | **2** | **5** | **6** | **155** | **0** | **0** | **1** | **0** | **0** | **7** | **3** | **0** | **8** | **12** | **8** | **205** | **225** |

**TABLE B-5B: COMPLAINTS CLOSED Q4 FY 2018: PRIMARY ALLEGATION BY COMPONENT**

| Primary Allegation | CBP 42 | | | ICE 171 | | | TSA 2 | | | USCIS 5 | | | Multi-Component 7 | | | Sub-Totals 227 | | | Total 227 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | Referred | Retained | Short Form | All |
| Abuse of authority/ misuse of official position | 1 | | 1 | 1 | | | | | | | | | 1 | | | 3 | | 1 | 4 |
| Conditions of detention | 1 | | 6 | | 8 | 9 | | | | | | | | | | 1 | 8 | 15 | 24 |
| Disability accommodation (Section 504) | | | 2 | | | 1 | | | | | | | | | 1 | | | 4 | 4 |
| Discrimination/profiling | 2 | 1 | 9 | | | | | | 1 | 1 | | | | | | 3 | 1 | 10 | 14 |
| Due process | | 1 | 3 | 1 | 3 | 6 | | | | | | | | | 1 | 1 | 4 | 10 | 15 |
| Excessive force or inappropriate use of force | 1 | | 4 | | | 4 | | | | | | | | | | 1 | | 8 | 9 |
| First Amendment (free speech/association) | | | | | | 1 | | | | | | | | | | | | 1 | 1 |
| Fourth Amendment (search and seizure) | 1 | | | | | 1 | | | | | | | | | | 1 | | 1 | 2 |
| Human rights | | | | | | | | | | | | | | | 2 | | | 2 | 2 |
| Inappropriate questioning/inspection conditions (non-TSA) | 1 | | 2 | | | | | | | | | | | | | 1 | | 2 | 3 |
| Inappropriate touch/ search of person (non-TSA) | | | 1 | | | | | | | | | | | | | | | 1 | 1 |
| Intimidation/threat/ improper coercion | | | | | | | | | | | | 1 | | | | | | 1 | 1 |
| Language access | | | 1 | | | | | | | | | | | | | | | 1 | 1 |
| Legal access | | | | | 1 | 1 | | | | | | | | | | | 1 | 1 | 2 |
| Medical/mental health care | | | 2 | | 16 | 105 | | | | | | | | | 2 | | 16 | 109 | 125 |
| Privacy | | | | | | 4 | | | | | | 2 | | | | | | 6 | 6 |
| Religious accommodation | | | | | | | | | | | | 1 | | | | | | 1 | 1 |
| Retaliation | | | | | | 2 | | | | | | | | | | | | 2 | 2 |
| Sexual assault/abuse | 1 | | 1 | 1 | 3 | 3 | | | | | | | | | | 2 | 3 | 4 | 9 |
| TSA AIT and TSA pat-downs | | | | | | | | | 1 | | | | | | | | | 1 | 1 |
| **Total** | 8 | 2 | 32 | 3 | 31 | 137 | 0 | 0 | 2 | 1 | 0 | 4 | 1 | 0 | 6 | 13 | 33 | 181 | 227 |

# Appendix C: Abbreviations

| | |
|---|---|
| ACCOE | DHS Accessibility Compliance Center of Excellence |
| ACOP | Accessibility Community of Practice |
| ADG | CRCL Antidiscrimination Group |
| ADR | Alternative Dispute Resolution |
| AHU | CRCL Anti-Harassment Unit |
| AIT | Advanced Imaging Technology |
| ALPR | Automated License Plate Readers |
| ATS | Automated Targeting System |
| CAB | CRCL Community Awareness Briefing |
| CBP | U.S. Customs and Border Protection |
| CCVAW | DHS Council on Combatting Violence Against Women |
| CIAC | Colorado Information and Analysis Center |
| CICC | Criminal Intelligence Coordinating Council |
| CISA | Cybersecurity and Infrastructure Security Agency |
| CMA | Computer Matching Agreements |
| CMAS | CRCL Complaints Management and Adjudication Section |
| CRCL | DHS Office for Civil Rights and Civil Liberties |
| CRD | DOJ Civil Rights Division |
| CREX | CRCL Community Resilience Exercise |
| CRLOTE | TSA Office of Civil Rights and Liberties, Ombudsman, and Traveler Engagement |
| CSEPP | Chemical Stockpile Emergency Preparedness Grant Program |
| CTAB | Counterterrorism Advisory Board |
| CVE | Countering Violent Extremism |
| DARC | Data Access Review Council |
| DHS | U.S. Department of Homeland Security |
| DMS | CRCL Diversity Management Section |
| DOD | U.S. Department of Defense |
| DOJ | U.S. Department of Justice |
| DOL | U.S. Department of Labor |
| DPD | Denver Police Department |
| ECW | Electronic Control Weapons |
| EEO | Equal Employment Opportunity |
| EEOD | CRCL Equal Employment Opportunity and Diversity Division |
| EEOC | Equal Employment Opportunity Commission |
| EIT | Electronic and Information Technology |
| ETD | Explosives Trace Detection |
| FAD | Final Agency Decision |
| FBI | Federal Bureau of Investigation |
| FEMA | Federal Emergency Management Agency |
| FGM/C | Female Genital Mutilation/Cutting |
| FLETC | DHS Federal Law Enforcement Training Centers |
| FOUO | For Official Use Only |
| FPS | DHS Federal Protective Service |

| | |
|---|---|
| FY | Fiscal Year |
| HBCU | Historically Black Colleges and Universities |
| HQ | Headquarters |
| HQ EEO | DHS Headquarters Equal Employment Opportunity Office |
| HSA | Homeland Security Act of 2002 |
| HSI | Homeland Security Investigations |
| HHS | U.S. Department of Health and Human Services |
| I&A | DHS Office of Intelligence and Analysis |
| ICCT | CRCL Incident Community Coordination Team |
| ICE | U.S. Immigration and Customs Enforcement |
| IHSC | Immigration Health Service Corps |
| ISE | Information Sharing Environment |
| ISIL | Islamic State of Iraq and the Levant |
| JRC | DHS Joint Requirements Council |
| JRIMS | DHS Joint Requirements Integration and Management System |
| LAB | Law Enforcement Awareness Briefing |
| LEP | Limited English Proficiency |
| LGBT | Lesbian, Gay, Bisexual, and Transgender |
| LPR | Legal Permanent Resident |
| MD-715 | Equal Employment Opportunity Commission Management Directive 715 Report |
| MOA | Memorandum of Agreement |
| NDS | National Detention Standards |
| NDEAM | National Disability Employment Awareness Month |
| NGO | Non–governmental Organization |
| NHSC | National Homeland Security |
| No FEAR | Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002 |
| NPPD | DHS National Protection and Programs Directorate |
| NSI | Nationwide Suspicious Activity Reporting Initiative |
| NVC | National Vetting Center |
| OAST | DHS Office of Accessible Systems & Technology |
| OCIO | DHS Office of the Chief Information Officer |
| ODIC | FEMA Office of Disability Integration and Coordination |
| ODNI | Office of the Director of National Intelligence |
| OER | FEMA Office of Equal Rights |
| OGC | DHS Office of the General Counsel |
| OIG | DHS Office of the Inspector General |
| OPM | U.S. Office of Personnel Management |
| OTPP | DHS Office of Terrorism Prevention Partnerships |
| P/CRCL | Privacy/Civil Rights and Civil Liberties |
| PE-ISE | Partnership Engagement for the Information Sharing Environment |
| POST | Peace Officer Standards and Training |
| PREA | Prison Rape Elimination Act |
| PRIV | DHS Privacy Office |
| RA | Reasonable Accommodation |

| ROI | Report of Investigation |
| ROSA | Real-Time and Open Source Analysis |
| SAR | Suspicious Activity Reports |
| SAVE | Systematic Alien Verification for Entitlements |
| SBA | U.S. Small Business Administration |
| SEP | DHS Special Emphasis Program |
| SIIP | CRCL Security, Intelligence, and Information Policy Section |
| TEDS | National Standards on Transport, Escort, Detention, and Search |
| TOC | Transnational Organized Crime |
| TLO | Terrorism Liaison Officer |
| TSA | Transportation Security Administration |
| TTY | Teletypewriter |
| TVTP | DHS Office for Targeted Violence and Terrorism Prevention |
| UAC | Unaccompanied Alien Children |
| UAS | Unmanned Aircraft Systems |
| U.N. | United Nations |
| U.S. | United States |
| USSS | U.S. Secret Service |
| UNHRC | UN Human Rights Council |
| USCG | U.S. Coast Guard |
| USCIS | U.S. Citizenship and Immigration Services |
| VAWA | Violence Against Women Act |