# EXHIBIT C

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| Al Otro Lado, Inc., *et al.*, | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-02366-BAS-KSC |
| | ) | |
| Chad F. Wolf, *et al.*, | ) | |
| *Defendants.* | ) | |
| | ) | |

## DECLARATION OF ASHLEY B. CAUDILL-MIRILLO

I, Ashley B. Caudill-Mirillo, pursuant to 28 U.S.C. § 1746, and based upon personal knowledge and information made known to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am currently the Deputy Chief of the Asylum Division with U.S. Citizenship and Immigration Services (USCIS), U.S. Department of Homeland Security (DHS). I have held this position since February 2019. Prior to becoming the Deputy Chief of the Asylum Division, I served as the Management Branch Chief at Asylum Division Headquarters since 2015, where I was responsible for overseeing the Division's resource management and strategic planning, as well as its contracts, performance management initiatives, and labor-management obligations among other duties. I joined USCIS as an Asylum Officer in the New York Asylum Office in 2008, and, in 2011, I became a Supervisory Asylum Officer. In 2012, I was selected to be the Deputy Director of the New York Asylum Office. In my current position as Deputy Chief of the Asylum Division, I oversee all Asylum Offices

App208

nationwide as well as the Division's headquarters component, which is involved in policy development, quality assurance, and overall management of the asylum program.

### Identifying Provisional Class Members and Applying the Preliminary Injunction Prospectively

2. The October 4, 2019 Declaration of Randy Howe, Executive Director for Operations, Office of Field Operations, U.S. Customs and Border Protection (CBP) (filed on the district court docket at ECF No. 307-8), explains at paragraphs 4 to 6 that CBP does not keep a systematic record of encounters with individuals at the international boundary line between the United States and Mexico who are informed that access to a port of entry is not immediately available, and that CBP records would not include any indicia of whether an individual, at some point, sought entry to the United States at the international boundary at a time when the port did not have capacity to immediately process the individual.

3. Because DHS maintains no such lists, it will need to identify class members prospectively. To accomplish that task reliably, USCIS will have to spend an additional estimated 15 to 30 minutes per person asking as many as 30 additional questions during each credible fear screening interview regarding metering and any attempted entry before July 16, 2019, to determine whether the individual can establish that he or she is a member of the provisionally certified class. Even if USCIS had access to any lists, purportedly maintained by shelters or otherwise, of individuals who were subjected to metering prior to July 16, 2019 but were unable to cross the border because the port of entry did not have immediate capacity to process the individual, USCIS has no definitive way to verify the accuracy or authenticity of any such lists. Thus, even if USCIS could access the lists, asylum officers would still need to question the interviewees to assess the veracity of any documentation provided and determine whether or not they are class members. Further, obtaining documentary evidence from each individual to establish class membership in the form of a declaration, shelter list,

2

or other documentation is likely to result in significant delays in credible fear processing. For example, individuals are likely to seek to reschedule their credible fear interviews to obtain documentary evidence or to consult with an attorney to draft a declaration to submit in support of their assertion that they were impacted by CBP's metering policy and therefore are a member of the provisional class.

4.  Given the extremely high volume of credible fear cases that USCIS processes daily (an average of approximately 390 completions per business day over the past four months), lengthening the duration of each interview – even by 15 to 30 minutes per person – and any increase in the number of rescheduled interviews, would have a significant negative impact on credible fear processing times overall. Based on information provided to me, I estimate that credible fear interviews generally take anywhere between 1 and 3 hours per case, with asylum officers generally completing between 3 and 4 cases during an 8-hour day, depending on the location, the number of people interviewed (single adult v. family unit), and the specific needs of the case.[1]  Increasing the length of each interview by 15 to 30 minutes would reduce the total number of interviews an asylum officer could complete per day.  If asylum officers complete fewer credible fear cases per day overall, each individual referred to USCIS for a credible fear determination will wait longer to receive that determination. Additionally, if a high number of individuals arrive at their interviews only to ask to reschedule in order to draft a declaration or obtain other documentary evidence to prove class membership, USCIS may not be able to substitute a different individual for an immediate interview to make use of that interview slot because USCIS must work with CBP personnel, Immigration and Customs Enforcement (ICE) personnel, or non-USCIS contracted personnel

---

[1] Because of the volume of credible fear cases, officers complete additional interviews and cases beyond the 3-4 range referenced above on overtime.  On those days, officers may interview and complete 5-6 cases per day.

to facilitate bringing persons to the interviewing rooms, which would cause even fewer case completions per day. The individual seeking to reschedule will then take up a second interview slot, which will in turn increase the overall credible fear processing time for that individual and increase the length of time other individuals are waiting to be interviewed. Most individuals are detained throughout the credible fear process, so increased credible fear processing times due to longer interviews and/or unused interview slots due to rescheduling would generally also increase the length of time an individual remains detained in ICE custody, including at the family residential centers, and in certain limited locations, CBP custody.

5. To address these increased burdens in the credible fear workload, USCIS would need to shift even more officers than it already has from other Asylum Division workloads. If USCIS were to shift officers from other Asylum Division workloads to add resources to the credible fear workload, it would negatively affect cases in those other workloads, by generally increasing the overall processing times for reasonable fear cases, Migrant Protection Protocol (MPP) cases, assessments under the U.S.-Guatemala Asylum Cooperation Agreement (ACA), and affirmative asylum adjudications, thereby lengthening the amount of time an individual would wait to receive the screening or adjudication. MPP assessments and ACA threshold screenings are generally conducted while individuals are in CBP custody. Accordingly, any increase in processing time for the MPP and ACA workloads and any credible fear cases conducted while individuals are in CBP custody would prolong time in CBP custody for such individuals. It is my understanding that increased detention times in CBP custody would result in CBP facilities having less space to hold additional individuals arriving at the port of entry, and that any decrease in CBP's capacity to process additional

App211

individuals may require CBP to take additional steps to manage the flow of aliens at the port of entry.

### Identifying Provisional Class Members and Applying the Preliminary Injunction Retrospectively

6. For cases where the credible fear screening interview already took place and the decision has already been served, USCIS would have no sound way to identify class members retrospectively without reviewing the credible fear documentation and conducting case-by-case follow-up interviews for each individual to whom the Third Country Transit Asylum Bar was applied and who received a negative screening determination, but who has not yet been removed. It is my understanding that ICE estimates that there are approximately 700 detained individuals who received a negative screening determination from an asylum officer between July 16, 2019 and mid-November, which was upheld by an immigration judge. USCIS would need to schedule a second interview (either follow-up interviews or new credible fear interviews) to individually question each person regarding metering and attempted entry before July 16, 2019. As with prospective cases, USCIS would be unable to readily corroborate the individual's responses because USCIS does not have access to any shelter lists or other lists, and CBP does not maintain their own list of such individuals.

7. In order to conduct these individual follow-up interviews, it is necessary for USCIS to coordinate with ICE to identify which individuals were subject to the Third Country Transit Asylum Bar and received a negative screening determination, but who have not already been removed. Once such individuals are identified, USCIS would also need to develop a process with ICE for referring these individuals back to USCIS to conduct a follow up interview, and, if found to be class members, issue a new credible fear determination. The interview process alone, depending on the case composition and the issues involved, could take up to

5

several hours per case on average and USCIS will need to fit these interviews into its existing heavy workload. Other factors that may impede the process are whether the detention facilities have sufficient phone line capacity to handle the number of interviews that will need to occur, and whether the telephonic interpreters can handle the additional number of interviews.  If any such individuals are not detained, coordinating follow-up interviews would present additional logistical challenges, as USCIS would likely need to obtain addresses for such individuals from ICE, mail out follow-up interview notices, and rely on the individuals to appear for their interviews. If any individuals failed to appear for their follow-up interviews, DHS would be unable to assess class membership unless they are later apprehended.  This process would require close coordination with ICE to ensure such individuals are not removed before USCIS conducts the follow-up/new credible fear interview.  The entire process outlined above would be estimated to take months.

8. For individuals who appear to be class members based on additional questioning about metering and attempted entry prior to July 16, 2019, USCIS would have to review the interview and credible fear determination record from the original credible fear screening to determine if there is sufficient information to make a new credible fear determination applying the "significant possibility" standard. If there is insufficient information from the original interview, and depending on how much time has passed since the original interview, USCIS may need to conduct additional questioning on the substance of the individual's claim in order to make a new credible fear determination.  Additionally, for cases where USCIS must review the original interview and credible fear determination record and the asylum office does not still have a local copy of the credible fear paperwork, it may be necessary for USCIS to request the hard-copy A-file, which may be in use by another DHS component.  In

App213

those cases, the A-file must be shipped back to USCIS.  Requesting the A-file will be an additional operational burden that will further delay processing of the case.

9.  For individuals found to meet the provisional class definition and for whom USCIS issues a new negative credible fear determination applying the significant possibility standard, USCIS would have to issue new negative credible fear determination documentation and, if the individual requests immigration judge review, refer the case for such review by an immigration judge.  This would further prolong the completion of the credible fear process for each such individual. For those individuals that are detained throughout the credible fear process, increased credible fear processing times would generally also increase the length of time an individual remains detained in ICE custody, including at the family residential centers, and, in certain limited locations, CBP custody.

10. The logistics involved with identifying, processing, and accommodating follow-up and/or new credible fear interviews for the individuals described in Paragraphs 6 through 9 above into the Asylum Division's existing workload would significantly increase the Asylum Division's overall workload and would require a significant diversion of resources from the high volume of existing Asylum Division work.  In FY 2019, USCIS received approximately 105,301 credible fear referrals. In FY 2019, USCIS received approximately 13,177 reasonable fear referrals, 10,481 Migrant Protection Protocol referrals, and 95,959 new affirmative asylum applications.  Over the past four months, the average number of cases completed on a daily basis for the Asylum Division's primary workloads are: 390 credible fear cases, 50 reasonable fear cases, 90 MPP cases, and 280 affirmative asylum cases.   The addition of an estimated 700 interviews, including the logistics and administrative processing involved, would significantly slow processing in these other workloads as resources would need to be shifted to accommodate this additional work, resulting in increased processing

App214

times for other Asylum Division workloads. The same consequences described in paragraph 4 above regarding the impact of increased processing times for other Asylum Division workloads, including potential downstream consequences for time in ICE and CBP custody and CBP processing, would likewise apply if hundreds of additional interviews were required. Additionally, pursuant to a settlement agreement in Alfaro-Garcia v. Johnson, 4:14-cv-01775, N.D. Ca. (Oct. 27, 2015), USCIS is required to maintain a national average reasonable fear determination period of 10 court days for detained reasonable fear cases and must report each individual detained reasonable fear case that exceeds 20 court days to class counsel. Accordingly, USCIS would be limited in its ability to shift resources from the detained reasonable fear workload.

11. Given the incredible volume of credible fear cases that USCIS already handles, as well as the time-sensitive challenges of processing these cases, individually questioning each alien on this issue going forward and calling individuals who were already screened back in for follow up interviews would place an unmanageable operational burden on USCIS.

Executed this 12th day of December, 2019.

Ashley B. Caudill-Mirillo
Deputy Chief, Asylum Division
U.S. Citizenship and Immigration Services
Department of Homeland Security

8

App215