**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

Al Otro Lado, Inc., *et al.*,

Plaintiffs,

v.

Kevin K. McAleenan, *et al.*,

Defendants.

Case No. 17-cv-02366-BAS-KSC

**ORDER GRANTING PLAINTIFFS' *EX PARTE* APPLICATION FOR ORAL ARGUMENT ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**[ECF No. 419]**

The Court hereby provides notice of its tentative ruling granting Plaintiffs' Motion for Class Certification (ECF No. 390), attached to this order. The Court further **GRANTS** Plaintiffs' *Ex Parte* Application for Oral Argument (ECF No. 419) and **ORDERS** the parties to appear for oral argument in **Courtroom 4B on Thursday, July 30, 2020 at 2:00 p.m.** The parties should be prepared to discuss the motion and the Court's tentative ruling.

**IT IS SO ORDERED.**

**DATED: July 16, 2020**

**Hon. Cynthia Bashant**
**United States District Judge**

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

Al Otro Lado, Inc., *et al.*,

Plaintiffs,

v.

Kevin K. McAleenan, *et al.*,

Defendants.

Case No.: 17-cv-02366-BAS-KSC

**TENTATIVE ORDER:**

**(1) GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [ECF No. 390];**

**(2) DENYING AS MOOT DEFENDANTS' MOTIONS TO STRIKE [ECF No. 411, 425];**

**AND**

**(3) TERMINATING AS MOOT THE PARTIES' MOTION TO SEAL [ECF No. 432]**

Before the Court is Plaintiffs' Motion for Class Certification ("Motion"). (ECF No. 390.) Plaintiffs request that the Court certify a class of all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A port of entry ("POE") on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of U.S. Customs and Border Protection ("CBP") officials on or after January 1, 2016. Plaintiffs further request that the Court certify a subclass of all noncitizens who were or will be denied access to the asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016. For the reasons explained below, the Court **TENTATIVELY GRANTS** Plaintiffs' Motion, **DENIES AS MOOT** Defendants' Motions to Strike, and **TERMINATES AS MOOT** the related Motion to seal.

## I. RELEVANT BACKGROUND

On November 13, 2018, Plaintiffs filed the operative Second Amended Complaint ("SAC") in this action seeking class-wide injunctive and declaratory relief regarding Customs and Border Protection's ("CBP") purported pattern and practice of systematically denying asylum seekers access to the asylum process along the U.S.-Mexico border. (*See* ECF No. 189.) Specifically, Plaintiffs claim that "CBP refused to inspect and process" asylum-seekers in accordance with statute, which requires that CBP officers refer for an interview by an asylum officer any noncitizens who arrive at POEs and "indicate an intention to apply for asylum." (Mem. of P. & A. in supp. of Mot. ("Mem. of P. & A.") at 6–7, ECF No. 390-1 (citing 8 U.S.C. § 1225(b)).) Instead, Plaintiffs allege, CBP prevents asylum-seekers from accessing the asylum process on the pretext that the POEs were at capacity, when their true intent was to deter individuals from seeking asylum in the United States at all. (*Id.* at 13.)

First, Plaintiffs claim that in 2016, CBP officers engaged in "various means to turn back asylum seekers arriving at Class A POEs on the U.S.-Mexico border"—including lies, threats, intimidation and coercion, verbal abuse, physical force or obstruction, delays and denials, and racial discrimination. (Mem. of P. & A. at 7; *see also* SAC ¶ 2.) Second, Plaintiffs contend that as early as May 2016, Defendants began implementing a policy to restrict the flow of asylum seekers at the San Ysidro POE. (SAC ¶ 51.) Pursuant to this policy, CBP coordinates with the Government of Mexico to "control the flow" of asylum applicants by limiting the number of intakes performed daily at POEs. (*Id.* ¶ 52.) Noncitizens who attempt to seek asylum at POEs outside certain "intake periods" were given "numbers with intake dates" and told to "remain in-line in Mexico" until their number was called—a practice referred to as "metering." (*Id.* ¶¶ 52–53.) Plaintiffs allege that CBP has been metering asylum-seekers border-wide since November 2016. (*Id.* ¶¶ 55–57.)

Ultimately, according to Plaintiffs, Defendants announced the existence of a "Turnback Policy" in spring 2018 "mandating that lower-level officials directly or

constructively turn back asylum seekers at the border," including through pretextual assertions that POEs lack capacity to process asylum seekers. (SAC ¶¶ 3, 61–62, 65; *see also* Metering Guidance, Ex. 1 to Defs.' Opp'n to Mot., ECF No. 406-2.) Per this Metering Guidance, CBP officers instruct asylum-seekers "to wait on the bridge, in the preinspection area, or at a shelter until there is adequate space at the POE" or inform them that they cannot be processed because the POE is "full" or "at capacity." (*Id.* ¶ 3; Metering Guidance at 1.)

Plaintiffs claim that CBP "continued to buttress the Turnback Policy" with the other unlawful tactics, some of which were implemented independently of the Turnback Policy, while others were "part of or incident to the Turnback Policy." (SAC ¶¶ 62, 84.) In sum, Plaintiffs' allege that CBP officials commit the following acts to further their goal of restricting access to the asylum process:

1) Misrepresent the state of the law, asylum seekers' eligibility, prerequisites to make asylum claims, or POE capacity (*id.* ¶ 85)[1];
2) Threaten to detain, deport, arrest, ban, bring criminal charges against, or physically harm asylum-seekers, or threaten to separate them from their children, if they continue to pursue their asylum claims (*id.* ¶ 87)[2];
3) Verbally and physically abuse asylum seekers (*id.* ¶ 89)[3];
4) Coerce asylum seekers into recanting their alleged credible fear on video or

---

[1] (*See* Decl. of Abigail Doe ¶¶ 13, 15, Ex. 9 to Decl. of Stephen Medlock ("Medlock Decl."), ECF No. 390-11; Decl. of Beatrice Doe ¶¶ 10–12, 24, Ex. 10 to Medlock Decl., ECF No. 390-12; Decl. of Carolina Doe ¶¶ 18, 20, Ex. 11 to Medlock Decl., ECF No. 390-13; Decl. of Dinora Doe ¶¶ 9, 12, Ex. 12 to Medlock Decl., ECF No. 390-14; Decl. of Ingrid Doe ¶¶ 15, 17, Ex. 13 to Medlock Decl., ECF No. 390-15; Decl. of Jose Doe ¶¶ 9, 18–19, Ex. 14 to Medlock Decl., ECF No 390-16; Decl. of Maria Doe ¶¶ 4, 9, Ex. 97 to Medlock Decl., ECF No. 390-99; *see also* Expert Report of Stephanie Leutert ("Leutert Rep.") ¶ 45, Ex. 7 to Medlock Decl., ECF No. 389-9 (attesting that turnbacks from POEs are often accompanied by messages that the U.S. was "not accepting any more people" and CBP was not "receiving people from Honduras").)

[2] (*See* Decl. of Abigail Doe ¶¶ 14–16; Decl. of Beatrice Doe ¶¶ 16, 21, 24; Decl. of Carolina Doe ¶¶ 19–21; Decl. of Dinora Doe ¶¶ 16–17; Decl. of Jose Doe ¶ 11.)

[3] (*See* CBP Report of Investigation, Ex. 5 to Medlock Decl., ECF No. 389-7; Decl. of Dinora Doe ¶¶ 16–17; Decl. of Jose Doe ¶ 11.)

withdrawing their applications for admission (*id.* ¶ 91)[4];

5) Deny access to POEs without any explanation (*id.* ¶ 93)[5];

6) Obstruct access to POEs by setting up "pre-checkpoints" that prevent asylum-seekers from entering the POE building (*id.* ¶ 95)[6];

7) "Meter" asylum seekers by limiting the number of individuals they process per day, "routinely tell[ing] asylum seekers approaching POEs that in order to apply for asylum, they must get on a list or get a number," and preventing asylum-seekers from coming to the POE "until their number is called which can take days, weeks or longer" (*id.* ¶ 100)[7];

8) Discriminate against certain asylum-seekers by denying access to those with darker complexion or those from certain countries (*id.* ¶¶ 103–04).[8,9]

Plaintiffs argue that Defendants, through the above conduct, "single out asylum seekers for treatment that applies to no other group of individuals seeking admission to the U.S." and that no statutory authorization or other lawful justification exists for the underlying policy to turn away asylum-seekers from POEs. (Mem. of P. & A. at 1, 4, 7 (noting that it is undisputed that CBP officers must refer individuals seeking asylum for an interview with an asylum officer or place them into removal proceedings where they can raise an asylum claim before an immigration judge).)

---

[4] (*See* Decl. of Abigail Doe ¶¶ 16–18; Decl. of Beatrice Doe ¶ 21; Decl. of Carolina Doe ¶¶ 23–27.)

[5] (*See* Decl. of César Doe ¶ 11, Ex. 99 to Medlock Decl., ECF No. 390-11; Decl. of Victoria Doe ¶ 11, Ex. 100 to Medlock Decl., ECF No. 390-102.)

[6] (*See* Decl. of Roberto Doe ¶¶ 4–5, Ex. 73 to Medlock Decl., ECF No. 390-75; Decl. of Maria Doe ¶¶ 4, 9; Decl. of Juan Doe ¶¶ 6, 9, Ex. 101 to Medlock Decl., ECF No. 390-103; Decl. of Úrsula Doe ¶¶ 6, 9, Ex. 102 to Medlock Decl., ECF No. 390-104; *see also* Dep. of Todd Owens 155:10–156:17, 274:7–8, Ex. 2 to Medlock Decl., ECF No. 389-4 (testifying that CBP officers were posted at the limit line or in the middle of POE bridges); March 19, 2019 email, Ex. 15 to Medlock Decl., ECF No. 390-17 (concerning dangers to CBP officers standing at bridge midpoint); Leutert Rep. ¶¶ 51, 60.)

[7] (*See* Decl. of Roberto Doe ¶¶ 4–5; Decl. of Maria Doe ¶ 4; Decl. of Bianca Doe ¶¶ 8–9, Ex. 98 to Medlock Decl., ECF No. 390-100; Decl. of Victoria Doe ¶ 11; Decl. of Juan Doe ¶¶ 6, 9; Decl. of Úrsula Doe ¶¶ 6, 9; Decl. of Emiliana Doe ¶¶ 9–12, Ex 103 to Medlock Decl., ECF No. 390-105.)

[8] (*See* Leutert Rep. ¶ 45; Decl. of Dinora Doe ¶ 12.)

[9] The Court refers to these practices collectively as "turnbacks."

Based on these assertions, Plaintiffs now bring this Motion to certify: (1) a class of asylum-seekers who were or will be denied inspection and access to the U.S. asylum process at certain POEs due to these practices; and (2) a subclass of asylum-seekers specifically denied access due to CBP's metering practices. (*Id.* at 4.) Five of the Named Plaintiffs—Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, and Ingrid Doe—claim they were subjected to coercion or lies when CBP officials denied them access to the asylum process at various POEs. The other eight Named Plaintiffs—Roberto Doe, Maria Doe, Juan Doe, Úrsula Doe, Victoria Doe, Bianca Doe, Emiliana Doe, and César Doe—allege that they were subjected to CBP's metering policy.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs the certification and maintenance of class actions. Plaintiffs bear the burden of demonstrating that their proposed class and subclass comport with both Rule 23(a) and (b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). A plaintiff whose lawsuit meets the requirements of Rule 23 has a "categorical" right "to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 559 U.S. 393, 398 (2010).

Federal courts possess broad discretion over class certification under this Rule. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) ("The decision to grant or deny class certification is within the trial court's discretion."). A district court must take the substantive allegations of the complaint as true but is also "required to consider the nature and range of proof necessary to establish [the] allegations" of the complaint. *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982) (citing *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975)). A court may therefore consider evidentiary submissions as part of its Rule 23 analysis. *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. &*

*Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 810 (9th Cir. 2010).

However, a court has "no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.* at 466 (internal quotation marks omitted). Ultimately, "[t]he district court's class certification order, while important, is also preliminary" because "'[a]n order that grants or denies class certification may be altered or amended before final judgment.'" *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) (quoting Fed. R. Civ. P. 23(c)(1)(C)).

**III. ANALYSIS**

Plaintiffs request that the Court certify a class consisting of:

> all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A [POE] on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [CBP] officials on or after January 1, 2016.

(Mem. of P. & A. at 1.) Plaintiffs also request that the Court certify a subclass of "all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016." (*Id.*) The Court briefly addresses evidentiary issues before turning to the class certification analysis.

**A. Evidentiary Objections**

Preliminarily, the Court addresses Defendants' two Motions to Strike the anonymous and pseudonymous declarations submitted in support of Plaintiffs' Motion and Reply briefs. (*See* ECF Nos. 411, 425.) Defendants filed these motions after the parties failed to reach an agreement about how to limit the disclosure of the declarants' identifying

information.[10] Defendants now move to strike 23 declarations submitted in support of Plaintiffs' Motion for Class Certification and 44 declarations submitted in support of the Reply on the basis that Plaintiffs never requested or received permission for these unidentified declarants to proceed anonymously or pseudonymously.[11] Because the Court did not rely on the declarations to resolve the issues raised on class certification, the Court **DENIES AS MOOT** Defendants' Motions to Strike.[12]

**B. Fed. R. Civ. P. 23(a)**

Rule 23(a) provides that a class may be certified only if:

> (1) the class is so numerous that joinder of members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Shady Grove*, 559 U.S. at 398. Courts refer to the Rule 23(a) factors as "numerosity, commonality, typicality, and adequacy of representation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). Plaintiffs generally bear the burden to show that their proposed subclass "independently meet[s] the requirements for the maintenance of a class action." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 630 (9th Cir. 1982). The Court addresses each factor below and finds that Plaintiffs have satisfied the Rule 23(a) requirements.

1. <u>Numerosity</u>

Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). When a class action seeks only equitable relief,

---

[10] Plaintiffs' counsel twice offered to share the information with Defendants on the condition that Defendants agree to limit disclosure to only certain members of the defense team, but Defendants did not agree to Plaintiffs' terms. (*See* Decl. of Alexander Halaska in supp. of Mot. to Strike Mot. Decls. ¶¶ 4, 5, ECF No. 411-2; Decl. of Stephen Medlock ("Medlock Decl.") in supp. of Opp'n ¶ 6, ECF No. 434-1.)

[11] The Court previously allowed the Named Plaintiffs to proceed pseudonymously or anonymously in this case without prejudice to future challenges by Defendants at later stages of the proceedings. (*See* ECF No. 138.) Defendants do not seek to strike Named Plaintiffs' declarations in their instant Motions to Strike.

[12] Because the Court did not consider any supporting documentation in conjunction with the Motions to Strike, the parties' Motion to Seal certain exhibits to and portions of Plaintiffs' Opposition to Defendants' Motions to Strike (ECF No. 432) is **TERMINATED AS MOOT**.

as here, "the numerosity requirement is relaxed and plaintiffs may rely on the reasonable inference arising from plaintiffs' other evidence that the number of unknown and future members" of a proposed class is sufficient to make joinder impracticable. *Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004).

The numerosity requirement is generally satisfied when the class contains 40 or more members. *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007). Plaintiffs claim that this threshold is far exceeded in this case, noting that in Ciudad Juarez and Tijuana alone, a total of 57,460 people placed their names on waitlist in 2018 and 2019. (Mem. of P. & A. at 23.) Defendants concede that this satisfies the numerosity requirements for the subclass, *i.e.*, people who have been subjected or will be subjected to CBP's metering policy since April 2018. (Defs.' Opp'n to Mot. ("Opp'n") at 17–18, ECF No. 406.)

However, Defendants argue that Plaintiffs' class/subclass distinction is flawed because "[m]etering is so distinct from the allegations of other 'turnbacks' that the metering sub-class cannot properly be considered" derivative of the larger class.[13] (*Id.* at 18.) Instead, Defendants contend, the two groups should be considered separate classes. (*Id.*) Defendants claim that under this formulation, the proposed class covering turnbacks other than metering does not meet the numerosity requirement. (*Id.*)

The Court finds no issue with the class/subclass structure. Metering, like the other conduct alleged, is one way in which CBP officers turned asylum-seekers away from POEs instead of referring them to asylum officers for credible fear interviews, as required by 8 U.S.C. § 1225(b). The proposed class and subclass capture all individuals allegedly subject to some form of CBP conduct—metering or otherwise—that denied them access to this statutory process. The subclass of metered asylum-seekers, therefore, does not encompass anyone who is not also in the class; every individual who was or will be denied

[13] Defendants' challenge to numerosity overlaps considerably with their argument regarding commonality and typicality. The Court addresses these issues in Sections III.B.2 and III.B.3, *infra*.

access to a POE necessarily includes any individual subject to metering at a POE. *C.f. Ashker v. Gov. of State of Calif.*, No. C 09-5796 CW, 2014 WL 2465191, at *3 n.1 (N.D. Cal. June 2, 2014) (treating a proposed subclass as a separate class where plaintiff's definition of the subclass "conceivably could encompass inmates who are not members of the proposed . . . class"). Where a subclass is subsumed within larger class, as here, plaintiffs are required to show only that the subclass was sufficiently numerous to satisfy numerosity requirement. *See McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 168 (S.D. Cal. 2019); *see also Langley v. Coughlin*, 715 F. Supp. 522, 553 (S.D.N.Y. 1989) (finding allegations that subclasses each encompassed anywhere between 30 and 250 class members were sufficient to meet numerosity requirement for class and subclass certification). Plaintiffs have done so. Thus, the Court finds numerosity is satisfied.

2. Commonality

The commonality requirement requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "What matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quotations omitted). "All questions of fact and law need not be common to satisfy the [commonality requirement]. The existence of shared legal issues with divergent factual predicates is sufficient." *Meyer v. Portfolio Recovery Assocs.*, 707 F.3d 1036, 1041 (9th Cir. 2012) (quotations omitted). "The common contention 'must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* at 1041–42 (quoting *Dukes*, 564 U.S. at 350).

In this case, Plaintiffs argue that the commonality requirement is met because Plaintiffs have shown that "that the existence and effects of turnbacks, including metering, are systemic and capable of common proof." (Mem. of P. & A. at 27.) With respect to metering specifically, Plaintiffs state that it is undisputed that this practice applied to all

POEs on the U.S.-Mexico border, regardless of capacity. (*Id.* at 26–27.) Plaintiff thus identify the following common questions of law and fact in this action:

> (1) whether Defendants are misinterpreting 8 U.S.C. §§ 1158(a)(1) and 1225(a)(1), (a)(3), and (b)(1)(A)(ii) to apply only to individuals who are physically present in the U.S.; (2) whether Defendants denied noncitizens arriving at Class A POEs on the U.S.-Mexico border access to the U.S. asylum process; (3) whether class members have been "adversely affected or aggrieved" by agency action taken by Defendants, 5 U.S.C. § 701; (4) whether Defendants "unlawfully withheld or unreasonably delayed" mandatory agency action; (5) whether Defendants denied class members due process in violation of the Fifth Amendment; (6) whether Defendants' conduct violated the universal and obligatory international norm of nonrefoulement; (7) whether Defendants' turnbacks are ultra vires; and (8)
>
> whether the Turnback Policy was adopted and implemented based on pretext and an unlawful desire to deter asylum seekers.

(*Id.* at 28.)

Defendants argue that Plaintiffs' commonality argument fails for a number of reasons. First, Defendants contend that Plaintiffs fail to "identify any common policy beyond metering" regarding the broader class because the eight individuals allegedly subjected to "turnbacks" other than metering allege conduct too disparate for purposes of commonality. (Opp'n at 20–21.) Second, Defendants state that there are no questions common to the metering subclass because Plaintiffs' claims "turn on the highly-variable factual circumstances unique to each port of entry," some of which provide legitimate reasons for turnbacks and thus require "an individual assessment of the officer's use of discretion." (*Id.* at 22–23, 28–29.)

The Court is not persuaded. While Plaintiffs include eight discrete practices as the factual bases for their claims,[14] this does not defeat commonality where the claims

[14] There is evidence that the reason for these varied practices was due to the fact that despite turning asylum-seekers away since 2016, CBP had no standard practice governing the way in which officers were to carry out that objective before the issuance of the Metering Guidance in 2018. (*See* CBP Report of Investigation at 8–9 (noting that at the beginning of 2017, CBP's instructions at the San Ysidro POE about stopping undocumented individuals were "conflicting and constantly changing" and while written policy was to allow those claiming asylum into the U.S., "management instructed the [CBP officers] to direct [undocumented aliens] to the Beta group in Tijuana"); *see also* Leutert Rep. ¶¶ 45–47 (noting that "CBP officials were not using a uniform explanation for why [turnbacks] were taking place" and that metering was not standardized in 2017–2018).)

themselves are still capable of class-wide resolution. In this regard, Plaintiffs identify sufficient commonalities between all eight practices to generate common answers in this case, including the following: (1) each practice is carried out border-side by a single agency, CBP; (2) each furthers the administration's objective of restricting asylum access; (3) all members of the class are subject to at least one of these practices; and (4) each practice is unlawful as to every asylum-seeker, regardless of the unique circumstances at each POE. (*See* Mem. of Ps. & As. at 27 ("[T]urnbacks, including metering, are illegal regardless of Defendants' proffered justification for them.").) Thus, Defendants' argument that "potentially legitimate factors" exist to justify individual instances of metering is inapposite.[15] *See Parsons*, 754 F.3d at 678 (holding that commonality existed where the inquiry into class claims did not require a determination as to "the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination").

What remains for the Court to resolve on the merits is whether these practices constitute "agency actions unlawfully withheld"—namely, a refusal to inspect or process asylum-seekers by referring them for credible fear interviews under 8 U.S.C. § 1225(b). (Pls.' Reply in. supp. of Mot. ("Reply") at 5, ECF No. 413.) This is sufficient for commonality. The different factual circumstances between each class member's particular experience does not destroy commonality because there is still a common underlying legal question regarding whether each and every class member was illegally denied access to the asylum system because of Defendants' overarching policy. *See Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) (finding commonality where putative class sought to

---

[15] In any event, Plaintiffs have provided evidence to support that Defendants' capacity-related justifications for turnbacks are pretextual. (*See, e.g.*, "Prioritization Queue Management Strategy," Ex. 35 to Medlock Decl., ECF No. 389-37 (shifting from "detention capacity" to "operational capacity" and prioritizing other tasks over asylum processing); Exs. 43–47 to Medlock Decl., ECF Nos. 389-45, 389-46, 389-47, 389-48, 390-49 (noting processing capacities at POEs and CBP's "funneling" of asylum-seekers from smaller POEs to larger POEs with long wait times); Exs. 52–56 to Medlock Decl., ECF No. 389-54 through 389-58 (citing to statements by CBP and DHS officials implying intended deterrent effect of turnbacks); *see also* Dep. of Whistleblower 99:15–100:2, 111:18–25, 112:23–113:6, Ex. 3 to Medlock Decl., ECF No. 389-5 (testifying that capacity claims were false).)

challenge 17 statewide policies governing "the overall conditions of health care services and confinement" because "either each of the policies and practices [was] unlawful as to every inmate or it [was] not"); *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) ("[Commonality] does not . . . mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact.") (quotations and citation omitted); *see also Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (finding commonality satisfied "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members"), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005). The fact that "precise practices" among ports of entry or CBP officials differ does not mean that a constitutional or statutory floor does not apply equally to all asylum claims raised at a POE. *See Lyon v. U.S. Immigration & Customs Enf't*, 300 F.R.D. 628, 642 (N.D. Cal. 2014) (finding commonality existed where plaintiffs alleged that they were denied effective access to telephones at detention facilities, despite the variation in phone policies and practices at each facility).

Thus, the Court finds commonality satisfied for purposes of certification.

3. Typicality

In general, the claims of the representative parties "need not be substantially identical" to those of all absent class members and need only be "reasonably co-extensive" in order to qualify as typical. *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 464 U.S. 338. "The test of typicality is 'whether other members [of the class] have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Parsons*, 754 F.3d at 685 (citation omitted).

The claims of the 14 Named Plaintiffs illustrate the myriad ways in which denials of access to the asylum process are carried out at the southern border. While some Named Plaintiffs were able to reach the entrance to the POE building or even the building itself

before being turned away by CBP,[16] others were prevented from approaching the POE building by CBP or Mexican officials,[17] often at the midpoint of the bridge that divides the United States and Mexico.[18] Some were told by CBP officials that the POE was full or closed,[19] while others were told to wait in Mexico, referred to Mexican officials, or simply told that they could not apply for asylum.[20] Further, five Named Plaintiffs allege that they experienced coercion, threats, misrepresentations, and abuse as part of CBP's denial of access to the asylum process.[21]

The Court finds that the Named Plaintiffs' claims are all "reasonably co-extensive" of the claims of the broader class of asylum-seekers who were or will be denied access to a Class A POE "by or at the instruction of" CBP officials, and of the claims of the metered subclass. Although the mechanics and locations of the Named Plaintiffs' claims vary, they all involve the same injury—denial of access to the asylum process. The Named Plaintiffs also raise the same legal arguments as those of the class and subclass; namely, that CBP's refusal to inspect and process them violates the Immigration and Nationality Act ("INA"), the Administrative Procedures Act ("APA"), the Due Process Clause of the Fifth Amendment, and the Alien Tort Statute. (Mem. of P. & A. at 29–30.) Identical factual circumstances are not necessary where, as here, the claims of the Named Plaintiffs, class, and subclass are based on the same legal theories arising from the same alleged unlawful practice. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (finding typicality

---

[16] (*See* Decl. of Abigail Doe ¶¶ 9–10; Decl. of Beatrice Doe ¶ 9; Decl. of Carolina Doe ¶¶ 14; Decl. of Dinora Doe ¶¶ 8, 11, 16; Decl. of Ingrid Doe ¶¶ 13, 16; Decl. of Bianca Doe ¶¶ 8, 11–14; Decl. of Victoria Doe ¶ 11; Decl. of Emiliana Doe ¶ 12.)

[17] (*See* Decl. of César Doe ¶ 4; Decl. of Maria Doe ¶¶ 4, 9–12.)

[18] (*See* Decl. of Roberto Doe ¶¶ 2–4; Decl. of Maria Doe ¶ 7; Decl. of Juan Doe ¶¶ 6, 9; Decl. of Úrsula Doe ¶¶ 6, 9.)

[19] (*See* Decl. of Beatrice Doe ¶ 10, 12; Decl. of Jose Doe ¶ 18; Decl. of Roberto Doe ¶ 5; Decl. of Bianca Doe ¶ 8; Decl. of Juan Doe ¶ 6; Decl. of Úrsula Doe ¶ 6; Decl. of Emiliana Doe ¶ 12.)

[20] (*See* Decl. of Abigail Doe ¶ 15; Decl. of Ingrid Doe ¶¶ 15, 16; Decl. of Jose Doe ¶¶ 9, 18–19; Decl. of Maria Doe ¶ 4; Decl. of Bianca Doe ¶¶ 11–14; Decl. of Victoria Doe ¶ 11.)

[21] (*See* Decl. of Abigail Doe ¶¶ 13–18; Decl. of Beatrice Doe ¶¶ 9, 12, 20–21, 24; Decl. of Carolina Doe ¶¶ 16, 18–21, 23–24, 26; Decl. of Dinora Doe ¶¶ 9, 12, 16–17; Decl. of Jose Doe ¶ 12.)

where the petitioner and proposed class "raise[d] similar constitutionally-based arguments and [were] alleged victims of the same practice of prolonged detention while in immigration proceedings"). Further, there is no indication that these denials were unique to Named Plaintiffs; indeed, given the undisputed number of people on waitlists, it is clear that others have been injured by this same course of conduct.

Defendants raise several challenges to typicality. First, Defendants contend that the claims of Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe, Dinora Doe, and Ingrid Doe are not typical of the putative subclass members' claims because they allege they were turned back by CBP officers before the Metering Guidance was issued in 2018. (Opp'n at 31–32.) However, the Court is not persuaded by any suggestion that these claims are atypical simply because of their timing. Plaintiffs have alleged, with citation to supporting evidence, that Defendants began metering asylum seekers at the San Ysidro POE in 2016 and that the metering policy adopted in 2018 was merely a formalization of this process.[22] As such, the Court does not find that the chronology of these Plaintiffs' claims means they are not reasonably co-extensive of the subclass's metering claims.

Second, echoing their challenge to the commonality requirement, Defendants state they "can raise unique factual defenses" as to each Named Plaintiff's individual turnback at a POE that defeats typicality for both the class and subclass. (Opp'n at 32–33.) By way of example, they state that the unlawfulness of Roberto Doe's turnback, given the timing, "depends on whether the government's delay in processing him was unreasonable in light of other congressionally-mandated activities occurring at the port that day[.]" (*Id.* at 32.) This appears to be another iteration of Defendants' argument that other "potentially legitimate factors" could provide legal justification for the decision to turn back asylum-seekers at POEs. Again, this argument misunderstands Plaintiffs' core legal claim that all turnbacks are illegal regardless of the proffered justification. *See* Section III.B.2., *supra*.

---

[22] (*See* Rule 30(b)(6) Dep. of U.S. CBP 241:9–242:6, Ex. 1 to Medlock Decl., ECF No. 389-3 (noting that metering began in 2016 with influx of Haitian migrants); Dep. of Todd Owens 38:9–16, 100:2–6 (testifying that metering has been in place from 2016 to present).)

Lastly, Defendants contend that in some Plaintiffs' cases, they were "intercepted by Mexican officials" or otherwise did not encounter CBP officials and were therefore not subject to the enumerated turnback practices. (Opp'n at 32–33.) However, Plaintiffs have sufficiently supported their arguments at this stage that Mexican officials acted at the direction of CBP officials as part of the metering policy.[23] Moreover, to the extent some asylum-seekers placed themselves on waitlists without approaching a POE at all pursuant to the understanding that metering was in effect at the U.S.-Mexico border, these claims are also reasonably-coextensive of the Named Plaintiffs' claims. The Court sees no meaningful difference between asylum-seekers who metered directly by CBP at or near a POE and those who placed their names on waitlists after receiving information about the practice from third parties, such as Mexican officials or other asylum-seekers.[24]

Thus, the Court therefore finds typicality has been met.

4. Adequacy of Representation

For the class representatives to adequately and fairly protect the interests of the class, two criteria must be satisfied. "First, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). Defendants do not contest the adequacy of the representation in this case.

The Court finds no evidence that the proposed class representatives have any

[23] (*See, e.g.*, Sept. 4, 2016 Email, Ex. 40 to Medlock Decl., ECF No. 389-42 ("Yesterday was the first day we have coordinated with [G]rupo [B]eta to slowdown the intake process."); Queue Management Brief, Ex. 41 to Medlock Decl., ECF No. 389-43 ("CBP has established a collaborative bi-national effort with The Government of Mexico (GoM) . . . to assist in slowing the flow of individuals to the border."); *see also* Decl. of Roberto Doe ¶ 6 (stating that a CBP official called Mexican immigration officials to "come and pick up" asylum-seekers from POE); Decl. of César Doe ¶¶ 4–6 (attesting that Grupo Beta told him that he "would need to go through them to apply for asylum"); Decl. of Juan Doe ¶ 9 (stating that Mexican officials were "standing on the sidewalk checking people's documents before they could reach the American officials standing in the middle of the bridge).)

[24] Two Named Plaintiffs did not initially approach POEs on the advice of third parties that they would first need to put their names on waitlists. (*See* Decl. of Cesar Doe ¶ 4 (told by Grupo Beta that "they would put [him] on a list and give [him] a number"); Decl. of Emiliana Doe ¶¶ 9–11 (learned about waitlist from another asylum-seeker and placed herself on the list in the parking lot next to the Chaparral POE.)

antagonistic or conflicting interests with the unnamed members of the class, and counsel has shown that they are qualified and willing to prosecute this action vigorously. (*See* Medlock Decl. ¶¶ 4–5, ECF No. 390-2.) Thus, the requirements of Rule 23(a)(4) have been met.

**C. Fed. R. Civ. P. 23(b)(2)**

If a proposed class satisfies Rule 23(a)'s requirements, then the proposed class must also qualify as one of the types of class actions Rule 23(b) identifies. Fed. R. Civ. P. 23(b); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). Plaintiffs seek certification of the class and subclass pursuant to Rule 23(b)(2). (Mem. of P. & A. at 6.) Rule 23(b)(2) permits class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Ninth Circuit has held that "'it is sufficient' to meet the requirements of Rule 23(b)(2) [when] 'class members complain of a pattern or practice that is generally applicable to the class as a whole.'" *Rodriguez*, 591 F.3d at 1125 (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)). "The rule does not require [the Court] to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Id.* at 1125; *see also Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (internal quotation marks omitted).

The Court finds that Rule 23(b)(2)'s requirements are plainly met. Plaintiffs Prayer for Relief requests that this Court: (1) declare that Defendants' Turnback Policy violates the INA, APA, the Due Process Clause of the Fifth Amendment, or principles of non-refoulement; and (2) issue injunctive relief prohibiting Defendants from continuing to implement the Policy and requiring Defendants to implement oversight and accountability procedures related to inspecting and processing asylum-seekers at POEs along the southern

border. (SAC ¶ 304.) This relief would benefit the Named Plaintiffs as well as all members of the proposed class and subclass in the same manner in a single stroke. *See Parsons*, 754 F.3d at 689 ("[E]very [member] in the proposed class is allegedly suffering the same (or at least a similar) injury and that injury can be alleviated for every class member by uniform changes in . . . policy and practice."); *see also Inland Empire-Immigrant Youth Collective v. Nielsen*, No. EDCV 17-2048 PSG (SHKx), 2018 WL 1061408, at *12 (C.D. Cal. Feb. 26, 2018).

Defendants claim that because the evidence does not support that CBP officers acted generally to implement each of the eight distinct practices alleged by Plaintiffs, there is no evidence a "Turnback Policy" is applicable to the broader class and therefore no basis for finding that CBP officials "acted or refused to act on grounds that apply generally to the class" as required under Rule 23(b)(2). (Opp'n at 34 ("[T]here is no evidence that Defendants have acted generally to . . . take[] any of the other myriad actions that Plaintiffs claim is part of the same general course of conduct.").)[25]

This argument is without merit. Factual differences among class member claims is not a focus of the Rule 23(b)(2) inquiry. *See Walters*, 145 F.3d at 1047 (noting that "the government's dogged focus on the factual differences among the class members appears to demonstrate a fundamental misunderstanding" of Rule 23(b)(2)). Plaintiffs allege that CBP officers refused to process asylum-seekers, an act which they claim is unlawful regardless of the grounds for the refusal. (*See* Mem. of P. & A. at 9 (arguing alternatively that all turnbacks "are categorically unlawful because they exceed CBP's authority" or that turnbacks in this case are unlawful because "they are based on pretext and an unlawful deterrence motive").) The officers' refusal to process asylum-seekers, therefore, is the generally applicable ground for class-wide relief under Rule 23(b)(2). *See Walters*, 145 F.3d at 1047 ("It is sufficient [for Rule 23(b)(2)] if class members complain of a pattern

[25] Defendants also note that if Rule 23(b)(2) requirements are met, "there are important limits on the relief available to a 23(b)(2) class." (Opp'n at 35.) Because these contentions concern the scope of the requested injunctive relief, which falls outside the class certification inquiry, the Court does not address these arguments.

or practice that is generally applicable to the class as a whole."); *Rodriguez*, 591 F.3d at 1126 (certifying class of immigrant detainees under Rule 23(b)(2) where "relief from a single practice is requested by all class members").

Hence, Plaintiffs have shown that the requirements of Rule 23(b)(2) have been met.

## IV. CONCLUSION

Accordingly, the Court **TENTATIVELY ORDERS** as follows:

(1) Plaintiffs' Motion for Class Certification (ECF No. 390) is **GRANTED**.

The Court certifies a class consisting of

> all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A [POE] on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [CBP] officials on or after January 1, 2016.

The Court also certifies a subclass of

> all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016.

(2) Defendants' Motions to Strike (ECF No. 411, 425) are **DENIED AS MOOT**;

(3) The related Motion to Seal (ECF No. 432) is **TERMINATED AS MOOT**.

**IT IS SO ORDERED.**

**Dated: July 16, 2020**

**Hon. Cynthia Bashant**
**United States District Judge**