1   MAYER BROWN LLP
      Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857
14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
               **SOUTHERN DISTRICT OF CALIFORNIA**
17
18  | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
    | | |
19  |              Plaintiffs, | |
    | | **EXHIBIT 5 TO PLAINTIFFS'** |
20  |            v. | **MOTION FOR CLARIFICATION** |
    | | **OF THE PRELIMINARY** |
21  | Chad F. Wolf,[1] *et al.*, | **INJUNCTION** |
    | | |
22  |              Defendants. | ***FILED UNDER SEAL*** |
23  | | |
24
25
26
27  _____
28  [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
    McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.

No. 19-56417

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

AL OTRO LADO, INC., *et al.*,

Plaintiffs-Appellees,

v.

CHAD WOLF, Acting Secretary of Homeland Security, *et al.*,

Defendants-Appellants.

---

On Appeal from a Preliminary Injunction Issued by the
U.S. District Court for the Southern District of California,
Civil Action No. 17-cv-02366-BAS-KSC

---

**DEFENDANTS-APPELLANTS' OPENING BRIEF**

---

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

SCOTT G. STEWART
Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director, District Court Section

EREZ REUVENI
Assistant Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

ALEXANDER J. HALASKA
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants-Appellants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ....................................................................................... 1

STATEMENT OF JURISDICTION.............................................................. 6

ISSUE PRESENTED................................................................................... 7

PERTINENT STATUTES AND REGULATIONS....................................... 7

STATEMENT OF THE CASE..................................................................... 7

    A.  This Lawsuit: Plaintiffs' Challenge to CBP's Metering Practices ............... 7

    B.  The Third-Country-Transit Rule and the Litigation Challenging It ........... 11

    C.  Plaintiffs' Preliminary-Injunction Motion in This Case and the
       District Court's Injunction of the Third-Country-Transit Rule.................. 14

    D.  The Government's Requests for a Stay of the District Court's
       Injunction and Proceedings in this Court .................................... 15

SUMMARY OF THE ARGUMENT ....................................................... 16

STANDARD OF REVIEW ..................................................................... 20

ARGUMENT .........................................................................................20

   I.  The District Court's Preliminary Injunction Rests on Serious and
     Clear Errors of Law. ...................................................................... 21

      A.  The Rule Clearly Applies to the Provisional Class, and the
        District Court Erred by Ruling Otherwise. ........................... 21

      B.  The District Court Lacked Jurisdiction to Enter Class-Wide
        Injunctive Relief Against the Rule. ...................................... 31

      C.  Plaintiffs' Arguments on Metering Cannot Support the
        District Court's Injunction. ................................................. 38

  II.  Considerations of Irreparable Injury and the Balance of Equities
     Foreclose a Preliminary Injunction. ........................................... 46

CONCLUSION ......................................................................52

CERTIFICATE OF SERVICE .............................................53

CERTIFICATE OF COMPLIANCE......................................54

# TABLE OF AUTHORITIES

**Federal Cases**

*Al Otro Lado, Inc. v. McAleenan*,
    394 F. Supp. 3d 1168 (S.D. Cal. July 29, 2019) .................................... *passim*

*Almeida-Sanchez v. United States*,
    413 U.S. 266 (1973) ......................................................................... 39

*Alvarez-Garcia v. Ashcroft*,
    378 F.3d 1094 (9th Cir. 2004) ....................................................... 30

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ......................................................................... 44

*Barr v. East Bay Sanctuary Covenant*,
    140 S. Ct. 3 (2019) (mem.) ........................................... 2, 14, 20, 47

*Barrera-Echavarria v. Rison*,
    44 F.3d 1441 (9th Cir. 1995) ....................................................... 30

*Capital Area Immigrants' Rights Coalition v. Trump*,
    No. 19-cv-2117, 2019 WL 3436501 (D.D.C. July 24, 2019) ...................... 13

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
    68 F.3d 828 (3d Cir. 1995) ........................................................... 50

*Carroll v. United States*,
    267 U.S. 132 (1925) ......................................................................... 38

*City & Cty. of San Francisco v. USCIS.*,
    944 F.3d 773 (9th Cir. 2019) ....................................................... 49

*Colvin v. Caruso*,
    605 F.3d 282 (6th Cir. 2010) ....................................................... 22

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ......................................................................... 43

*De Beers Consol. Mines v. United States*,
    325 U.S. 212 (1945) ......................................................................... 21

*E. & J. Gallo Winery v. Andina Licores S.A.*,
446 F.3d 984 (9th Cir. 2006) .........................................................................20

*East Bay Sanctuary Covenant v. Barr*,
385 F. Supp. 3d 922 (N.D. Cal. July 24, 2019) .............................................12

*East Bay Sanctuary Covenant v. Barr*,
391 F. Supp. 3d 974 (N.D. Cal. Sept. 9, 2019) .............................................13

*East Bay Sanctuary Covenant v. Barr*,
934 F.3d 1026 (9th Cir. 2019) ......................................................................13

*EEOC v. Arabian American Oil Co.*,
499 U.S. 244 (1991)......................................................................................26

*Hamama v. Adducci*,
912 F.3d 869 (6th Cir. 2018) ............................................................... 35, 37

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987)......................................................................................49

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
502 U.S. 183 (1991)......................................................................................42

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018)....................................................................................32

*Kiyemba v. Obama*,
555 F.3d 1022 (D.C. Cir. 2009)....................................................................45

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)......................................................................................39

*Little v. Jones*,
607 F.3d 1245 (10th Cir. 2010) ....................................................................22

*Meredith v. Oregon*,
321 F.3d 807 (9th Cir. 2003) ........................................................................42

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010)......................................................................................26

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ................................................................ 21, 22

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ........................................................43

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999)........................................................................32

*RJR Nabisco, Inc. v. European Cmty.*,
    136 S. Ct. 2090 (2016)............................................................ 26, 27

*Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*,
    506 U.S. 194 (1993)........................................................................28

*Sale v. Haitian Centers Council, Inc.*,
    509 U.S. 155 (1993)................................................ 26, 29, 30, 45

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953)............................................................ 5, 30, 39

*Singleton v. Wulff*,
    428 U.S. 106 (1976)........................................................................45

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950)........................................................................39

*United States v. Villanueva*,
    408 F.3d 193 (5th Cir. 2005) ........................................................27

*Vartelas v. Holder*,
    566 U.S. 257 (2012)........................................................................30

*Vazquez Perez v. Decker*,
    No. 18-cv-10683, 2019 WL 4784950 (S.D.N.Y. Sept. 30, 2019)................37

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).............................................................. 42, 44

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..........................................................................21

v

## Federal Statutes

1 U.S.C. § 1 ............................................................................................ 10, 28

6 U.S.C. § 202 ................................................................................................39

6 U.S.C. § 211(c) ...........................................................................................40

8 U.S.C. § 1103(a)(1) .....................................................................................40

8 U.S.C. § 1103(a)(3) .....................................................................................40

8 U.S.C. § 1158(a)(1) ............................................................................ *passim*

8 U.S.C. § 1158(b)(1)(A) ...............................................................................12

8 U.S.C. § 1158(b)(2)(C) ...............................................................................12

8 U.S.C. § 1225(a)(1) .......................................................................... 25, 27, 28

8 U.S.C. § 1225(a)(2) .....................................................................................29

8 U.S.C. § 1225(a)(3) ............................................................................. 10, 25

8 U.S.C. § 1225(b)(1)(A)(ii) ................................................................ *passim*

8 U.S.C. § 1225(b)(1)(B)(ii) ................................................................ *passim*

8 U.S.C. § 1225(b)(1)(B)(v) ................................................................ *passim*

8 U.S.C. § 1229a(c)(4) ......................................................................... *passim*

8 U.S.C. § 1252(f)(1) ........................................................................... *passim*

8 U.S.C. § 1324(a)(2) .....................................................................................27

28 U.S.C. § 1292(a)(1) ....................................................................................6

28 U.S.C. § 1331 ..............................................................................................6

## Federal Regulations

8 C.F.R. § 1208.13(c)(4) .................................................................................22

8 C.F.R. § 208.13(c)(4) ...................................................................................22

8 C.F.R. § 208.30(e)(5)(iii) ...........................................................................33

**Administrative Rules and Decisions**

Asylum Eligibility and Procedural Modifications,
    84 Fed. Reg. 33,829 (July 16, 2019) .................................................... *passim*

**Other Authorities**

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc.
    Civ. § 2948.1 (3d ed.) .....................................................................50

Richard A. Nagareda, Class Certification in the Age of Aggregate Proof,
    84 N.Y.U. L. Rev. 97 (2009) ..........................................................42

The American Heritage Dictionary of the English Language (3d ed. 1992).... 27, 28

## **INTRODUCTION**

This Court should vacate the district court's flawed injunction of a critical interim final rule designed to prioritize urgent and meritorious asylum claims, deter non-urgent or baseless ones, and aid ongoing international negotiations to address the flow of migrants to our southern border. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019) (Rule). The district court's order rests on serious errors of law, enjoins a Rule that is not even challenged in this case, and does so after the Supreme Court stayed an injunction of that very Rule. Letting the injunction stand will irreparably harm the United States and the public.

Faced with an unprecedented and unsustainable surge in migration, on July 16, 2019, the Attorney General and Acting Secretary of Homeland Security issued the Rule, which generally denies asylum in the United States to aliens who failed to seek protection in a third country through which they traveled and where such protection was available. In screening out asylum claims made by those who declined to request protection at the first opportunity, the Rule alleviates a crushing burden on the U.S. asylum system. It does so by prioritizing asylum claims by those who most need it in the United States, screening out claims that are less urgent or less likely to be meritorious, and aiding ongoing negotiations aimed at reaching a lasting solution to the shared international challenge of mass migration. 84 Fed. Reg. at 33,839. The Rule preserves the ability to seek withholding of removal and protection

1

under the Convention Against Torture, so aliens will not be returned to countries where they face persecution or torture. When a district court in this Circuit enjoined the Rule nationwide, the Supreme Court stayed that injunction pending appeal and through the disposition of any petition for certiorari filed by the government. *Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019) (mem.).

After the Supreme Court issued that stay, Al Otro Lado—one of the plaintiffs that secured the nationwide injunction of the Rule and then unsuccessfully opposed a stay of that injunction in the Supreme Court—turned to the district court in this case. This case, which has been pending since 2017, challenges Customs and Border Protection's (CBP) metering practices—the process by which CBP manages the flow of aliens who approach U.S ports of entry, to ensure that the ports have suffi-cient operational resources to safely process and detain them as required by law. Plaintiffs here claim that metering "unlawfully den[ies]" them "access to the asylum process" in the United States. ER340 (operative complaint). This case has never challenged—or even concerned—the Rule. Yet after the Supreme Court issued its stay in *East Bay* in September 2019, Al Otro Lado and its co-plaintiffs in this case moved the district court here to enjoin the government from applying the Rule to aliens who purportedly would have entered the United States before the Rule's July 16 effective date but did not enter because they were metered. The district court granted that injunction, reasoning that the Rule—which by its terms applies to "any

alien who enters, attempts to enter, or arrives in the United States across the southern land border *on or after July 16, 2019*," 84 Fed. Reg. at 33,834 (emphasis added)— does not apply to a class of an estimated 26,000+ aliens who purportedly would have entered before July 16 if not for metering, and will now enter after July 16. *See* Order 1–36 (ER1–36).

The district court's injunction rests on manifest errors of law and damages the interests of the United States and the public. It should be vacated.

The district court was wrong that the Rule by its terms does not apply to the provisional class members. Order 31. The opposite is true: The Rule by its terms *clearly* applies to class members. The Rule applies to an alien who "enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019." 84 Fed. Reg. at 33,843. By definition, class members will enter, attempt to enter, or arrive in the United States after July 16, 2019. Indeed, that obvious truth is why the Plaintiffs in this case *sought an injunction of the Rule*. The district court thought that the Rule does not apply to class members because those aliens "attempted to enter or arrived at the southern border *before* July 16, 2019 to seek asylum" but could not apply for asylum because of the metering policy. Order 31. But the Rule makes no exception for aliens who attempted to enter before July

16 but were metered and will not enter until after July 16. Indeed, it makes no exception based on prior entry (or attempted entry) for *any alien* who enters or attempts to enter after July 16. The district court was clearly wrong.

Separately, the district court also lacked jurisdiction to grant class-wide injunctive relief. The Immigration and Nationality Act (INA) makes clear that "[r]egardless of the nature of the action or claim ... no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain" on a class-wide basis "the operation of" (among other statutes) the statute governing the expedited removal of aliens from the United States. 8 U.S.C. § 1252(f)(1). The Rule here applies to aliens who are subject to the expedited removal statute, and provides that an alien who is subject to the Rule cannot establish the "significant possibility" of receiving asylum that is generally necessary to avoid expedited removal. *See id.* § 1225(b)(1)(B)(v); 84 Fed. Reg. at 33,843–44. Likewise, the Rule applies to aliens in full removal proceedings under 8 U.S.C. § 1229a, *see* 84 Fed. Reg. at 33,844–45, and therefore precludes aliens from "satisf[ying] the applicable eligibility requirements" for asylum. 8 U.S.C. § 1229a(c)(4). In conflict with the INA, however, the district court "enjoin[ed]" on a class-wide basis "the operation of" that statutory provision for aliens who would otherwise be subject to the Rule. This Court should therefore vacate the injunction in full for the independent and alternative reason that

it unlawfully enjoins asylum officers from making negative credible-fear determinations under the Rule when there is not a "significant possibility" that the alien "could establish eligibility for asylum under section 1158," 8 U.S.C. §§ 1225(b)(1)(B)(ii), (v), and immigration judges from concluding that aliens subject to the Rule have failed to carry their burden of demonstrating their eligibility for "relief ... from removal" in the form of asylum when placed in full removal proceedings under section 1229a, *id.* § 1229a(c)(4)(A).

Nor can the injunction be supported by any claims on the lawfulness of CBP's metering practices—a matter that the district court did not reach. The Executive has the constitutional and statutory authority to control the manner and pace of travel and trade across the border, and class members—all of whom are aliens without prior authorization to enter the country—have no constitutional or statutory right to enter the United States. *E.g.*, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953). Even if class members did have any such right, metering still could not be categorically held unlawful, as even Plaintiffs and the district court have recognized. *See Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1212 (S.D. Cal. July 29, 2019). So there would have been no basis for granting class-wide relief on the basis of any purported legal flaw in metering.

Considerations of irreparable harm and the equities also foreclose the injunctive relief that the district court ordered. The injunction bars the government from

applying a critical Rule to tens of thousands of aliens, it imposes major systematic burdens on the government that undermine the Rule's functioning, and it thus undercuts the multiple aims of the Rule to address an ongoing crisis. The injunction therefore causes the very harms that the Rule sought to address—and it does so where the Supreme Court issued a stay allowing the Rule to go into effect nationwide. The harms to class members, in contrast, are self-inflicted, because class members are subject to the Rule only because they have declined to seek protection in a third country. Those harms are also minimal, because the Rule preserves class members' ability to seek mandatory protection from removal in the United States and renders them ineligible only for the discretionary benefit of asylum.

This Court should reverse the decision below and vacate the district court's preliminary injunction.

## STATEMENT OF JURISDICTION

The district court has jurisdiction over this case under 28 U.S.C. § 1331. (As explained below, under 8 U.S.C. § 1252(f)(1) the district court lacked jurisdiction to enter class-wide injunctive relief of the Rule.) The government filed a timely notice of appeal on December 4, 2019. *See* ER96–99. This Court has jurisdiction over this appeal from the district court's preliminary-injunction order under 28 U.S.C. § 1292(a)(1).

## ISSUE PRESENTED

Did the district court err in issuing a class-wide preliminary injunction against the Rule when: the Rule by its terms applies to aliens—like all class members—who will enter the United States after the Rule's effective date, regardless of whether those aliens entered or attempted to enter before that date; federal courts may not, under 8 U.S.C. § 1252(f)(1), grant class-wide injunctive relief enjoining the operation of the expedited or full removal statutes; the district court did not rule on the legality of metering, and the government's metering policy is lawful or, at the least, not categorically unlawful; and the injunction inflicts system-wide harms on the Rule's operation and exacts minimal or self-inflicted harms on class members?

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and the Rule are included in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     This Lawsuit: Plaintiffs' Challenge to CBP's Metering Practices

In 2016, in response to an overwhelming surge of aliens seeking to enter the San Ysidro port of entry in San Diego, California, CBP instituted an informal "metering" or "queue management" system at some ports of entry. *See* ER246 (congressional testimony describing capacity limits leading to metering); *see also* ER149–52 (internal memorandum describing operations at the San Ysidro port of entry). When a port is metering, a CBP officer is posted at the boundary line between the United States and Mexico and preliminarily screens pedestrians' travel documents. *See*

ER154 (CBP metering guidance memorandum). Travelers who present what appear to be facially legitimate documents are permitted to cross the border and proceed to inspection inside the port. ER154. Aliens without sufficient documents may be instructed to wait to cross the border until the port has enough resources—including personnel and holding space, and taking into account CBP's other mission responsibilities—to process their resource-intensive applications for admission and detain them for further processing. ER154. In April 2018, as this surge of undocumented migrants spread across the U.S.-Mexico border, CBP issued a guidance memorandum to CBP's four border field offices. *See* ER154. Under that guidance, CBP officers may use metering procedures "[w]hen necessary or appropriate to facilitate orderly processing and maintain the security and safety of the port and safe and sanitary conditions for the traveling public." ER154.

In July 2017, plaintiffs Al Otro Lado and several individual aliens filed this lawsuit challenging CBP's metering-related actions at land ports of entry on the U.S.-Mexico border. In their operative (second amended) complaint, filed in November 2018, Plaintiffs claim that CBP's metering policy and other alleged port-related conduct unlawfully "deny" them and a putative class of similarly situated aliens "access to the asylum process" in violation of the INA, the Administrative Procedure Act (APA), the Due Process Clause, and the international-law norm of non-refoulement. ER340, ER413–28. Plaintiffs rely on the asylum statute, which generally allows an

alien "who is physically present in the United States or who arrives in the United States" to apply for asylum, 8 U.S.C. § 1158(a)(1), and the expedited removal statute, which requires immigration officers to refer an alien "who is arriving in the United States" for credible-fear screening (effectively, asylum pre-screening) if he asserts an intent to apply for asylum or a fear of persecution, *id.* § 1225(b)(1)(A)(ii). ER414, ER415. Plaintiffs contend that when a CBP officer, under the metering policy, prevents an alien who intends to seek asylum in the United States from immediately crossing the U.S.-Mexico border into a port of entry, the officer deprives the alien of a statutory right to apply for asylum in the United States (thereby also violating due process) and fails to discharge his duty to refer that alien for credible-fear screening. ER426–35.

In November 2018, the government moved to dismiss the operative complaint. The government explained that metering is lawful because the asylum and expedited removal statutes by their terms apply only to aliens "in the United States," so the government does not violate those statutes by preventing an alien who is outside the United States from immediately crossing the border. Mot. to Dismiss 6–11 (D. Ct. Dkt. 192-1) (citing 8 U.S.C. §§ 1158(a)(1), 1225(b)(1)(A)(ii)). The government also explained that metering is a lawful exercise of the Executive's constitutional and statutory authority to control the flow of travel across the border. *Id.* at 11–15.

In July 2019, the district court substantially denied that motion to dismiss. The court held that Plaintiffs stated claims regarding the government's alleged failure to process them for asylum under the metering policy. *See Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1199–1205. The court reasoned that the asylum and expedited removal statutes apply extraterritorially to aliens who are outside the United States and wish to arrive through a port of entry to apply for asylum, conferring on such aliens a right to apply for asylum and a duty on the government to process their asylum applications. *See id.* The court reasoned that section 1158(a)(1) provides a right to apply for asylum both to any alien "who is physically present in the United States" and to any alien "who arrives in the United States" (*id.* at 1199); that, under the rule against surplusage, the latter category presumptively must encompass a different group of aliens than the former category (*see id.*); and that, given the rule against surplusage and the Dictionary Act's general rule that "the present tense include[s] the future as well as the present" (1 U.S.C. § 1), section 1158(a)(1) provides a right to an alien who has not yet arrived in the United States but who has approached a port of entry to seek admission—that is, someone who is "in the process of arriving in the United States" through a port of entry, 394 F. Supp. 3d at 1200; *see also id.* at 1199–1203. The court applied similar reasoning to section 1225, which imposes on immigration officers a duty to inspect aliens who are "seeking admission" (8 U.S.C. § 1225(a)(3)) and a duty to refer to a credible-fear interview an alien "who is arriving in the United

States" who intends to seek asylum (*id.* § 1225(b)(1)(A)(ii)). The court concluded that the quoted language shows that the expedited removal statute applies to aliens who were "in the process of seeking admission into the United States or otherwise attempting to do so"—and thus covers aliens who reached the southern border to seek asylum. 394 F. Supp. 3d at 1205; *see id.* at 1203–05.

Although the district court held that the asylum and expedited removal statutes apply to aliens "who may not yet be in the United States," the court did not declare that metering is categorically unlawful. *Id.* at 1212. Rather, the court acknowledged that "there may exist potentially legitimate factors that prevent CBP officers from immediately" processing undocumented aliens seeking to enter the ports. *Id.* It explained that, on the motion to dismiss, it had to accept as true Plaintiffs' allegations that the government's resource-management rationale for metering was a pretext and that metering is driven instead by unlawful motives, and that the government's explanations of why metering is necessary is "fundamentally [a] merits argument[]" that the court "cannot resolve" at the motion-to-dismiss stage. *Id.* at 1213.

## B.    The Third-Country-Transit Rule and the Litigation Challenging It

Generally, an alien "who is physically present in the United States or who arrives in the United States ... may apply for asylum in accordance with [section 1158] or, where applicable, section 1225(b)." 8 U.S.C. § 1158(a)(1). But a grant of asylum is discretionary. Asylum "*may* [be] grant[ed] to an alien who has applied,"

11

*id.* § 1158(b)(1)(A) (emphasis added), if the alien satisfies certain standards and is not subject to an application or eligibility bar, *id.* §§ 1158(a)(2), (b)(1)(B), (b)(2). And the "Attorney General [and the Secretary of Homeland Security] may by regulation establish additional limitations and conditions, consistent with [section 1158], under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C).

On July 16, 2019, the Attorney General and the Acting Secretary issued the Rule, which provides that "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum." 84 Fed. Reg. at 33,843. The Rule does not apply to an alien who shows that he or she applied for and was denied protection in a third country through which the alien traveled en route to the United States. *Id.* at 33,843. Nor does it apply to an alien who is a victim of a severe form of trafficking or who traveled exclusively through countries that, at the time of transit, were not parties to certain international agreements governing non-refoulement. *Id.*

Multiple organizations, including Al Otro Lado, challenged the Rule in the Northern District of California. On July 24, 2019, the district judge there preliminarily enjoined the Rule nationwide, *East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922 (N.D. Cal. 2019), only hours after a district judge in the District of Columbia

denied a similar request for nationwide injunctive relief, *Capital Area Immigrants'
Rights Coalition v. Trump*, No. 19-cv-2117, 2019 WL 3436501 (D.D.C. July 24,
2019) (transcript of oral ruling). This Court stayed the injunction as to all jurisdic-
tions but its own, ruling that the record did not support the injunction's nationwide
scope. *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026 (9th Cir. 2019). The
district court nonetheless restored the nationwide scope of the injunction weeks later.
*East Bay Sanctuary Covenant v. Barr*, 391 F. Supp. 3d 974 (N.D. Cal. Sept. 9, 2019).

On September 11, 2019, the Supreme Court stayed the district court's injunc-
tive orders "in full" over Al Otro Lado's and others' opposition. *East Bay*, 140 S.
Ct. 3. In opposing the government's stay application, Al Otro Lado and its co-plain-
tiffs in *East Bay* argued that a stay would cause "thousands" of aliens to "be deported
to danger," and resisted the government's view that "the availability of other forms
of relief—withholding of removal and relief under [the Convention Against Tor-
ture]—mitigates the harm to asylum seekers" because those forms of protection are
subject to "a much higher standard" and do not come with the same benefits as a
grant of asylum. Opp. to Stay App. 34, 35, *East Bay*, No. 19A230 (U.S. Sept. 4,
2019). Al Otro Lado similarly claimed that the Rule "ignores the grave dangers that
asylum seekers ... face while forced to wait in transit countries like Mexico ... ." *Id.*
The Supreme Court nonetheless granted a stay that permitted the Rule to go into

effect nationwide. *East Bay*, 140 S. Ct. 3. That stay remains in effect "pending dis-

position of the Government's appeal ... and disposition of the Government's petition

for a writ of certiorari, if such writ is sought." *Id.*

### C. Plaintiffs' Preliminary-Injunction Motion in This Case and the District Court's Injunction of the Third-Country-Transit Rule

After the Supreme Court allowed the Rule to go into effect, Al Otro Lado and

the individual Plaintiffs in this case filed preliminary-injunction and class-certifica-

tion motions, alleging that metering is unlawful and asking the district court to enjoin

the government from applying the Rule to a class of aliens who were metered before

the Rule took effect and still seek to access the U.S. asylum process. *See* Pls.' Mot.

for Provisional Class Certification 1–4 (D. Ct. Dkt. 293-1); Pls.' Mot. for Prelim.

Inj. 1–2 (D. Ct. Dkt. 294-1).

On November 19, the district court granted a preliminary injunction, ordering

that the Rule could not be applied to a class of "all non-Mexican asylum-seekers

who were unable to make a direct asylum claim at a U.S. POE [i.e., port of entry]

before July 16, 2019 because of the U.S. Government's metering policy, and who

continue to seek access to the U.S. asylum process." Order 36; *see* Order 1–36. The

court did not address the legality of the Rule or of metering. Order 15, 23. Instead,

"[a]dopting and applying" the reasoning of its July 2019 order denying the govern-

ment's motion to dismiss the second amended complaint, the court concluded that

14

the Rule, "by its express terms, does not apply to those non-Mexican foreign nationals who attempted to enter or arrived at the southern border *before* July 16, 2019 to seek asylum but were prevented from making a direct claim at a [port of entry] pursuant to the metering policy." Order 31 (emphasis in original); *see* Order 30–32. In the court's view, an alien who approached the border to seek asylum before July 16 but was metered was "in the processing of arriving in the United States" (and thus, under the statute, was "arriving in the United States") before the Rule's effective date, Order 31, and so that alien is not covered by the Rule because the Rule "clearly states that it applies only to aliens who entered, attempted to enter, or arrived on or after July 16, 2019," Order 32. The court added that applying the Rule to Plaintiffs would irreparably harm them by stripping them of "an opportunity to have their asylum claims heard," and that the equities favored an injunction because class members purportedly "relied on the Government's representations" that "they would eventually have an opportunity to make a claim for asylum in the United States." Order 34; *see* Order 32–35.

### D. The Government's Requests for a Stay of the District Court's Injunction and Proceedings in this Court

On December 4, the government appealed from the district court's preliminary-injunction order and filed an emergency motion in the district court for an expedited order staying the injunction pending appeal. ER96–99; Stay Mot. iii–iv (9th Cir. Dkt. 12-1). On December 9, the district court denied the request for an expedited

decision and indicated that it would not rule on the stay motion until December 20 at the earliest, nine days later than the date the government requested. *See* Order on Stay 1–2 (D. Ct. Dkt. 347); *see also* Stay Mot. iii–iv. On December 12, the government filed a motion in this Court asking for an immediate administrative stay of the injunction and a stay pending resolution of its appeal. *See* Stay Mot. 1.

On December 20, a motions panel of this Court granted the government's request for an emergency temporary stay pending a decision on the motion for a stay pending appeal. Stay Order 1–3 (Dkt. 24). The panel explained that "[a] temporary stay in this context ... is only intended to preserve the status quo until the substantive motion for a stay pending appeal can be considered on the merits ... ." *Id.* at 1. The panel recognized that the status quo here is where the Rule is in full effect nationwide, not one where it is enjoined. *Id.* at 1–2. Judge Bress concurred in the grant of a stay, but wrote separately to emphasize that, "[b]ased on the standards that apply here, which includes consideration of the likelihood of success on the merits, the government has demonstrated that a temporary stay is warranted." *Id.* at 4 (Bress, J., concurring) (internal citation omitted).

## SUMMARY OF THE ARGUMENT

This Court should vacate the preliminary injunction.

I.A. The preliminary injunction rests on serious and clear errors of law. The Rule applies to "any alien who enters, attempts to enter, or arrives in the United

States across the southern land border on or after July 16, 2019." 84 Fed. Reg. at 33,843. By definition, aliens in the provisional class fall within that plain text. The class comprises aliens who "were unable to make a direct asylum claim" before July 16 (because they were metered before then and so did not enter the United States and apply for asylum) and "who continue," on or after July 16, "to seek access to the U.S. asylum process." Order 36. The class thus comprises aliens who were outside the United States on or after July 16 and who will therefore enter the United States only after that date—which is to say, they are plainly covered by the Rule. The Rule makes no exception for aliens who also may have attempted to enter the United States on or before July 16. Indeed, nothing in the Rule makes prior attempts at entry relevant. Nor does the district court's reasoning in its July 2019 order denying the government's motion to dismiss support the preliminary injunction. Nothing in the law supports the proposition that an alien who is outside of the United States has nonetheless "arrived in" the United States.

B. There is an independent and alternative ground for vacating the district court's injunction: The district court did not have jurisdiction to enter class-wide injunctive relief. The INA prohibits any court but the Supreme Court from issuing an order that "enjoin[s] or restrain[s] the operation of" the expedited removal statute (8 U.S.C. § 1225) or the full removal statute (*id.* § 1229a) on a class-wide basis. *Id.* § 1252(f)(1). The Rule applies to aliens who are subject to the expedited removal

statute, and provides that an alien who is subject to the Rule cannot establish the "significant possibility" of receiving asylum that is generally necessary to avoid expedited removal. *See id.* § 1225(b)(1)(B)(v); 84 Fed. Reg. at 33,843–44. The Rule also applies to aliens in full removal proceedings, *see* 8 C.F.R. § 208.13(c); 84 Fed. Reg. at 33,843, and therefore precludes aliens from "satisfy[ing] the applicable eligibility requirements" for asylum in such proceedings. 8 U.S.C. § 1229a(c)(4). But the district court here "enjoin[ed]" on a class-wide basis "the operation of" both statutory provisions for aliens who would otherwise be subject to the Rule. The Court should vacate the injunction because, in conflict with the INA's jurisdictional limitations, the injunction unlawfully enjoins asylum officers from making negative credible-fear determinations when there is not a "significant possibility" that the alien "could establish eligibility for asylum under section 1158," 8 U.S.C. §§ 1225(b)(1)(B)(ii), (v), and immigration judges from concluding that aliens subject to the Rule have failed to carry their burden of demonstrating their eligibility for "relief ... from removal" in the form of asylum when placed in full removal proceedings under section 1229a.

C. The injunction also cannot be justified based on the legality of CBP's metering practices—for several reasons. First, metering is lawful. It falls squarely within CBP's authority and duty to manage and secure the ports of entry. And metering does not deny provisional class members any right because they have no right

to apply for asylum while they stand in Mexico. Second, at the very least, metering is not categorically unlawful, and so it cannot support class-wide injunctive relief. Third, the district court failed to address Plaintiffs' fiercely contested factual claims about metering, and it would be inappropriate for this Court to uphold the injunction based on a ruling on those factual arguments in the first instance.

II. Considerations of irreparable harm and the equities also foreclose a preliminary injunction. The injunction hobbles a Rule designed to respond to an unsustainable strain on the asylum system. That strain is undeniable: from May 2017 to May 2019, for example, the number of apprehended non-Mexican border-crossers increased over 1600 percent. *See* 84 Fed. Reg. at 33,838. The Rule aims to channel our asylum system's resources to aid those who truly have nowhere else to turn, to discourage the gaming of our system by those who seek asylum simply to gain indefinite entry to our country, and to press our foreign partners to share the burdens presented by mass migration. *Id.* at 33,839. The injunction undercuts those aims and reintroduces the burdens that the Rule sought to alleviate. Those harms greatly outweigh any claimed harms to provisional class members. The Rule potentially denies them a purely discretionary benefit, while still allowing them to seek other forms of protection in the United States, including withholding of removal and CAT protection. And any injury to Plaintiffs is largely of their own making, since the provisional class members have all had the opportunity to seek relief in Mexico to comply with

the Rule. Indeed, the Supreme Court faced many of the equitable arguments that Plaintiffs lodged in this case—when it allowed the Rule to go into effect without limitation. *See East Bay*, 140 S. Ct. 3.

## STANDARD OF REVIEW

The grant of a preliminary injunction is reviewed for abuse of discretion, but "the district court's interpretation of the underlying legal principles is subject to de novo review and a district court abuses its discretion when it makes an error of law." *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) (quotation marks, brackets, and ellipsis omitted).

## ARGUMENT

This Court should reverse the decision below and vacate the district court's preliminary injunction. The district court's order rests on serious and clear errors of law, and enjoins a Rule that is not even challenged in this case. The district court clearly erred in holding that the Rule by its terms does not apply to aliens who necessarily will enter or arrive in the United States after its effective date, it did not have jurisdiction to enter class-wide injunctive relief for aliens subject to the Rule and to the expedited removal and full removal statutes, and the injunction cannot be supported based on Plaintiffs' claims against metering, even if the district court had reached those claims. And considerations of irreparable harm and the balance of the equities strongly favor the United States and the public.

## I. The District Court's Preliminary Injunction Rests on Serious and Clear Errors of Law.

### A. The Rule Clearly Applies to the Provisional Class, and the District Court Erred by Ruling Otherwise.

The Rule by its terms plainly applies to class members, and the district clearly erred in holding otherwise. *See* Order 30–32.

At the outset, the district court clearly erred in enjoining the Rule without addressing the Plaintiffs' likelihood of success on any of the claims actually advanced in the operative complaint. Among other things, Plaintiffs must demonstrate that they are "likely to succeed on the *merits*." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (emphasis added). Only once such a showing is made (and the other injunctive factors are demonstrated), does the court consider the question of the proper preliminary *remedy* for the merits issues raised in the complaint. *See De Beers Consol. Mines v. United States*, 325 U.S. 212, 219 (1945). That rule makes good sense: as this Court has explained, for injunctive relief to be proper, "there must be a relationship between the injury claimed in the motion for injunctive relief and the *conduct asserted in the underlying complaint*." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (emphasis added). But if a court never finds that the "conduct asserted in the underlying complaint" is likely to be unlawful, then there is no basis to issue an injunction concerning conduct not actually challenged in the complaint. *See De Beers Consol. Mines*, 325 U.S. at 219

(the issuance of preliminary relief "presupposes or assumes ... that a decree may be entered after a trial on the *merits* enjoining and restraining the defendants from certain future conduct") (emphasis added). Indeed, such a ruling would be an abuse of discretion. *See Pac. Radiation Oncology*, 810 F.3d at 637 (explaining that movant "could not prove the likelihood of success requirement of the preliminary injunction analysis because the [] violations alleged in the motion were not contained within the actual complaint"); *accord Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) (explaining that plaintiff "had no grounds to seek an injunction pertaining to allegedly impermissible conduct not mentioned in his original complaint"); *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (similar). Thus, the district court's failure to address the likelihood of success on the merits of any of the actual claims pending in this case precluded it from issuing the injunctive relief it did.

Even on its own terms, the district court was wrong. The Rule applies to "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019." 84 Fed. Reg. at 33,843; 8 C.F.R. §§ 208.13(c)(4), 1208.13(c)(4). By definition, aliens in the provisional class fall within that plain text. The class comprises aliens who "were unable to make a direct asylum claim" before July 16 (because they were metered before then and so did not enter the United States and apply for asylum) and "who continue," on or after July 16, "to seek access to the U.S. asylum process." Order 36. The class thus comprises

aliens who were outside the United States on or after July 16 and who will therefore enter the United States only after that date—which is to say, they are plainly covered by the Rule.

The district court thought that the Rule does not apply to provisional class members because those aliens "attempted to enter or arrived at the southern border *before* July 16, 2019 to seek asylum," Order 31, and the Rule applies only to those who entered, attempted to enter, or arrived "*after*" July 16, Order 32 (emphasis added). That reasoning is incorrect. The provisional class members may have attempted to enter the United States before July 16, 2019, but they will *also* attempt to enter the United States after that date. Nothing in the Rule suggests that only an alien's first attempt at entry counts, and nothing makes prior attempts at entry relevant. The Rule applies (for example) to an alien who entered at the southern border in May 2019, left the United States in June 2019, and then again entered at the southern border in August 2019. It likewise applies to (for example) an alien who attempted to enter in May 2019 and again attempted to enter in August 2019. It does not matter that an alien entered, attempted to enter, or arrived *before* July 16: the Rule makes no exception for such an alien when the alien enters or attempts to enter after July 16. The Rule covers provisional class members.

The district court believed that its conclusion followed from the logic of its prior motion-to-dismiss order, where it held that an alien who approached a port of

entry to seek asylum before July 16 but was metered was "in the process of arriving in the United States" before the Rule's effective date, and so that alien is not covered by the Rule because the Rule "clearly states that it applies only to aliens who entered, attempted to enter, or arrived on or after July 16, 2019." Order 31, 32. Even if the district court's motion-to-dismiss reasoning were sound, it would not show that the Rule does not apply to class members: as explained above, regardless of whether a class member was "in the process of arriving in the United States" before the effective date, the class member would still be entering, attempting to enter, or arriving in the United States after that date—and so would be covered by the Rule.

In any event, the district court's motion-to-dismiss reasoning is highly flawed and cannot support the injunction. Aliens who approach a port of entry to seek asylum but never enter the United States are not covered by the relevant statutes. The statutes simply do not provide a right to apply for asylum to—or a duty on U.S. officials to process for asylum—aliens who are standing outside of the United States who wish to seek asylum and so are purportedly "in the process of arriving in the United States." Section 1158(a)(1) entitles only an alien "who is physically present *in* the United States or who arrives *in* the United States" to apply for asylum. 8 U.S.C. § 1158(a)(1) (emphases added). The statute confers a right to apply for asylum only on those who are within the United States. The district court believed that the present-tense statutory phrase "arrives in" shows that arrival is not a discrete

event of physically being within the United States, but is instead a process that be-gins before arrival: someone who approaches the border with an intent to apply for asylum is someone who "arrives in" the United States, because they are "in the pro-cess of arriving in" the United States. 394 F. Supp. 3d at 1199–1203. But section 1158(a)(1) does not speak to a *process* of arrival; it speaks to "physical presen[ce] *in*" and "arriv[al] *in*" the United States. The statute's use of the simple present tense creates a nexus between an alien's right to apply for asylum and his current physical presence or arrival "*in* the United States." A present-tense phrase like "arrives in" speaks to the *present* moment of arrival, not some potential arrival in the future.

Section 1225 confirms that the right to apply for asylum attaches only when an alien is within the United States, and that aliens who are outside of the United States have not arrived in the United States. The government's obligation to inspect aliens, which triggers its obligation to permit aliens "to apply for asylum under sec-tion 1158," 8 U.S.C. § 1225(b)(1)(A)(ii), applies only when an alien is "present *in* the United States" or "arrives *in* the United States," *id.* § 1225(a)(1) (emphases added). Indeed, aliens cannot apply for asylum in expedited removal proceedings until they are actually "inspected by immigration officers," *id.* § 1225(a)(3); *see id.* § 1225(b)(1)(A)(ii) (aliens must be "inspect[ed]" before they can be "refer[red] ... for an interview by an asylum officer"). And an alien cannot be "inspected" until he is "present in the United States ... or [] arrives in the United States." *Id.* § 1225(a)(1).

The presumption against extraterritoriality confirms this understanding. It is settled that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991). "The question is not whether [a court] think[s] 'Congress would have wanted' a statute to apply to foreign conduct 'if it had thought of the situation before the court,' but whether Congress has *affirmatively and unmistakably instructed* that the statute will do so. 'When a statute gives no clear indication of extraterritorial application, it has none.'" *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255, 261 (2010); emphasis added). Applying this principle in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), the Supreme Court concluded that INA procedures concerning exclusion and asylum did not apply beyond our borders because they did not contemplate any extraterritorial application. *See id.* at 174[1]; *id.* at 173 & n.29 (citing 8 U.S.C. § 1158(a) for the proposition that "other provisions of the INA obviously contemplate that such proceedings would be held

---

[1] Under the procedures considered in *Sale*, "[a]liens residing illegally in the United States [were] subject to deportation after a formal hearing. Aliens arriving at the border, or those who are temporarily paroled into the country, [were] subject to an exclusion hearing, the less formal process by which they, too, may eventually be removed from the United States." *Sale*, 509 U.S. at 159 & nn.4, 5 (citing 8 U.S.C. § 1252 (1988 ed. and Supp. IV) and 8 U.S.C. § 1226 (enacted June 27, 1952, and amended Nov. 29, 1990, and Dec. 12, 1991)).

within the country"). Like the provisions governing former exclusion and deportation proceedings at issue in *Sale*, sections 1158 and 1225 similarly contain no "affirmative[] and unmistakabl[e] instruct[ion]" that Congress intended them to apply abroad. *RJR Nabisco, Inc.*, 136 S. Ct. at 2100. As explained above, those provisions by their terms apply to an alien who "arrives" or "is arriving *in* the United States." 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), 1225(b)(1)(A)(ii) (emphasis added).

The district court believed that the presumption was rebutted based on section 1158(a)(1)'s "context," which (according to the district court) "shows that Congress intended the statute to apply to asylum seekers in the process of arriving." 394 F. Supp. 3d at 1202. The court relied on *United States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005), for the proposition that "'[i]mmigration statutes, by their very nature, pertain to activity at or near international borders. It is natural to expect that Congress intends for laws that regulate conduct that occurs near international borders to apply to some activity that takes place on the foreign side of those borders.'" 394 F. Supp. 3d at 1202. But *Villanueva* addressed the extraterritorial scope of a statute that imposes criminal penalties on a smuggler who "attempts to *bring to* the United States" an alien who does not have prior authorization to enter. 8 U.S.C. § 1324(a)(2) (emphasis added). "Bring" is a transitive verb that means "to take with oneself to a place," The American Heritage Dictionary of the English Language 239 (3d ed. 1992), so a statute penalizing a smuggler who "attempts to bring" aliens "to the

United States" necessarily touches conduct that occurs outside the country. *See also id.* ("Usage Note: In most dialects of American English *bring* is used to denote motion toward the place of speaking or the place *from which the action is being regarded*." (emphasis added)). *Villanueva*, therefore, changes nothing in the points set forth above on the asylum and expedited removal statutes, which refer to an alien who "arrives in the United States," 8 U.S.C. §§ 1158(a)(1), 1225(a)(1) (emphasis added), because "arrive" is an intransitive verb that means "to reach a destination," The American Heritage Dictionary of the English Language 102 (3d ed. 1992).

The presumption against extraterritoriality also defeats the Dictionary Act's general rule that "the present tense include[s] the future as well as the present," 1 U.S.C. § 1 (*see* 394 F. Supp. 3d at 1200): that general rule would give the asylum statutes extraterritorial effect by conferring sweeping rights on those who are outside our borders when there is no clear statement to that effect (in either the Dictionary Act or the INA) and when the INA indeed says otherwise. *See, e.g.*, *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 200 (1993) ("[O]rdinary rules of statutory construction would prefer the specific definition over the Dictionary Act's general one."). And the presumption against extraterritoriality likewise defeats the district court's view, *see* 394 F. Supp. 3d at 1203–05, that other phrases in section 1225—such as references to an alien who "is arriving in" the United States or is "otherwise seeking" admission—encompass aliens who are not within the

28

United States. Immigration officers must refer certain aliens who are "arriving in the United States" for credible-fear screening, 8 U.S.C. § 1225(b)(1)(A)(ii), but that duty attaches while the immigration officer inspects the alien for admission "in the United States," *id.*, which is the only place immigration officers are authorized to inspect aliens for admissibility. *See Sale*, 509 U.S. at 173 & n.29 (reasoning that "[t]he reference to the Attorney General in the statutory text is significant ... because it suggests that [the statute] applies only to the Attorney General's normal responsibilities under the INA" and stating that "other provisions of the INA," including section 1158(a), "obviously contemplate that such proceedings would be held in the country"); *id.* at 161–62 & n.11. Similarly, the reference to aliens who are "otherwise seeking admission" does not include aliens who are abroad, but rather refers to aliens who are subject to inspection but are also deemed by statute not to be applicants for admission—such as lawful permanent residents, who generally "shall not be regarded as seeking admission into the United States" unless an exception applies. 8 U.S.C. § 1101(a)(13)(C).

The district court also thought that the reference in section 1158(a)(1) to an alien "who is physically present in the United States" already covers aliens in the United States, so (in order to avoid treating statutory language as surplusage) the phrase embracing any alien "who arrives in the United States" must apply to another group of aliens—including "an alien who may not yet be in the United States, but

who is in the process of arriving in the United States" through a port of entry. 394 F. Supp. 3d at 1199–1200. But Congress included both phrases in section 1158(a)(1) to ensure that aliens subject to full removal proceedings (the alien who "is physically present") and aliens subject to expedited removal (the alien "who arrives in") both may apply for asylum, which was an important clarifying measure after Congress enacted major immigration legislation in 1996 that modified deportation and exclusion hearings into removal and expedited removal proceedings. *See, e.g.*, *Vartelas v. Holder*, 566 U.S. 257 (2012) (discussing proceedings before and after that legislation); *Sale*, 509 U.S. at 174–76 (both deportable and excludable aliens would presumptively "continue to be found only within United States territory"). Without such clarifying language, Congress would have risked an interpretation of the statute that precluded arriving aliens from applying for asylum at all, since, under the entry doctrine, an arriving alien is "classified as 'one who has never entered' the country." *Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094, 1097 (9th Cir. 2004) (quoting *Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1450 (9th Cir. 1995)). "'[A]lthough aliens seeking admission into the United States may be physically allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected an entry into this country.'" *Id.* (quoting *Barrera-Echavarria*, 44 F.3d at 1450); *see also Mezei*, 345 U.S. at 212 ("It is true that aliens who have once passed through our gates, even illegally,

may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law. But an alien on the threshold of initial entry stands on a different footing[.]" (internal citations omitted)). The inclusion of the phrase "who is arriving in the United States" in section 1158(a)(1) thus makes clear that aliens who are subject to the entry doctrine, although "legally considered to be detained at the border," *Alvarez-Garcia*, 378 F.3d at 1097, may still apply for asylum.

The district court gave no other merits reasons for enjoining the government from applying the Rule to provisional class members. *See* Order 1–36. Given the points above, the court was plainly incorrect that the Rule does not apply to provisional class members. The Court should vacate the injunction on this ground alone.

## B.  The District Court Lacked Jurisdiction to Enter Class-Wide Injunctive Relief Against the Rule.

The district court's injunction must also be vacated for an independent and alternative reason: the court lacked jurisdiction to issue it.

The district court's injunction violates 8 U.S.C. § 1252(f)(1), which prohibits any court but the Supreme Court from issuing an order that "enjoin[s] or restrain[s] the operation of" 8 U.S.C. §§ 1221–1232 "other than with respect to the application of such provisions to an individual alien against whom proceedings under" those statutes "have been initiated." As the Supreme Court has emphasized, "[b]y its plain

terms, and even by its title," section 1252(f)(l) "prohibits federal courts from grant-ing classwide injunctive relief against the operation of §§ 1221–123[2], but specifies that this ban does not extend to individual cases." *Reno v. Am.-Arab Anti-Discrimi-nation Comm.*, 525 U.S. 471, 481–82 (1999); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018) (same). The district court's order enjoins and restrains the operation of two provisions found in sections 1221–1232: 8 U.S.C. § 1225(b)(1)(B) (which codifies provisions requiring an asylum officer to find that an alien does not have a credible fear of persecution or torture if there is not a "significant possibility" that the alien "could establish eligibility for asylum under section 1158," *id.* §§ 1225(b)(1)(B)(ii), (v)) and 8 U.S.C. § 1229a(c)(4) (which provides that "[a]n al-ien applying for relief or protection from removal has the burden of proof to establish that [he] satisfies the applicable eligibility requirements," or "merits a favorable ex-ercise of discretion").

First, the district court's order enjoins the operation of the expedited removal statute—specifically, 8 U.S.C. § 1225(b)(1)(B)—on a class-wide basis by reading into it a prohibition on applying a specific mandatory asylum bar in expedited re-moval proceedings found nowhere in the statute, and therefore violates § 1252(f)(1). Section 1225(b)(1)(B)(ii) provides that aliens otherwise subject to expedited re-moval may not be removed if, after expressing a fear of return to their home country, an "officer determines ... that [the] alien has a credible fear of persecution (within

the meaning of clause (v)).” Section 1225(b)(1)(B)(v) then defines a credible fear to mean “that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien’s claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title.” The Rule provides that any alien subject to it is categorically ineligible for asylum, such that “[a]n alien who is subject to the” Rule “and nonetheless has entered the United States along the southern land border after the effective date of this rule creating the bar would be ineligible for asylum and would not be able to establish a ‘significant possibility ... [of] eligibility for asylum under section 1158’” in expedited removal. 84 Fed. Reg. at 33,837 (quoting 8 U.S.C. § 1225(b)(1)(B)(v)). Thus, under the Rule, asylum officers enter negative credible-fear determinations for class members who cannot show during their credible-fear interviews that they sought and were denied protection in a third country that they transited through en route to the United States (unless another of the Rule’s exceptions applies). *Id.*; *see* 8 C.F.R. § 208.30(e)(5)(iii) (“If the alien is found to be an alien described as ineligible for asylum in § 208.13(c)(4), then the asylum officer shall enter a negative credible fear determination with respect to the alien’s application for asylum.”).

But the district court’s blanket injunction of the Rule prohibits asylum officers from finding that provisional class members “would be ineligible for asylum and

would thus not be able to establish a 'significant possibility ... [of] eligibility for asylum under section 1158.'" 84 Fed. Reg. at 33,837 (quoting 8 U.S.C. § 1225(b)(1)(B)(v)); *see* Order 36 (wholesale injunction of the Rule). In other words, the injunction grafts onto section 1225(b)(1)(B)(v) a requirement found nowhere in the statute that asylum officers may not apply a specific asylum ineligibility bar—the Rule—to any class member, even though those class members are categorically ineligible for asylum under the Rule, and therefore cannot in any sense demonstrate a significant possibility of eligibility for asylum. The injunction thus enjoins and restrains the operation of section 1225(b)(1)(B) as written by barring asylum officers from making negative credible-fear determinations when there is not a "significant possibility" that the alien "could establish eligibility for asylum under section 1158," 8 U.S.C. §§ 1225(b)(1)(B)(ii), (v), because of an existing mandatory bar to asylum.

The district court believed that section 1252(f)(1) did not pose any obstacle to its injunction of the Rule because Plaintiffs were "not asking the Court" to "enjoin the operation of" any provision of the expedited removal statute. Order 15. Rather, the district court believed, Plaintiffs were asking it to enjoin the government only from applying the Rule to provisional class members, which the district court believed was "not authorized by the [Rule]." *Id.* As discussed above, *supra* Part I-A, the Rule *clearly* applies to class members. But even if the district court were correct, it still did not have authority to enter class-wide injunctive relief. The prohibition

applies "[r]egardless of the nature of the action or claim." 8 U.S.C. § 1252(f)(1). And notwithstanding how the district court chose to view what it was doing, the district court created new requirements, precluding asylum officers from applying the Rule in expedited removal proceedings, that are found nowhere in the statute. Using an injunction to re-write the statute to include limitations on the government's authority "that [do] not exist in the statute" is what section 1252(f) forecloses. *Hamama v. Adducci*, 912 F.3d 869, 879–80 (6th Cir. 2018). Nothing in section 1225(b)(1)(B) limits the Executive's authority to apply mandatory asylum bars to aliens in expedited removal proceedings, including the Rule, and the district court's injunction imposes such a requirement "out of thin air." *Id.* at 879. Thus, regardless of how the district court understood Plaintiffs' preliminary-injunction arguments, the court was barred from granting the relief that it did.

Second, the district court's order enjoins the operation of a provision governing full removal proceedings under section 1229a—specifically, 8 U.S.C. § 1229a(c)(4)—on a class-wide basis by reading into it a prohibition on applying certain eligibility criteria in assessing any application "for relief or protection from removal." Section 1229a—titled "Removal proceedings"—articulates the procedures applicable in full removal proceedings, including assertions of asylum claims. And section 1229a(c)(4), titled "Applications for Relief From Removal," provides that "[a]n alien applying for relief or protection from removal has the burden of proof

to establish that the alien ... satisfies the applicable eligibility requirements," and "with respect to any form of relief that is granted in the exercise of discretion, that the alien merits a favorable exercise of discretion." 8 U.S.C. § 1229a(c)(4)(A). One such eligibility requirement is the one established by the Rule: "that, with limited exceptions, an alien who enters or arrives in the United States across the southern land border is ineligible for the discretionary benefit of asylum unless he or she applied for and received a final judgment denying protection in at least one third country through which he or she transited en route to the United States." 84 Fed. Reg. at 33,831.

The district court's injunction precludes application of that eligibility rule to members of the class in removal proceedings under section 1229, and thus establishes new requirements precluding immigration judges or the Board of Immigration Appeals from applying the Rule in full removal proceedings found nowhere in the statute. Put differently, the injunction relieves all class members placed in full removal proceedings of their statutory burden of demonstrating that they "satisf[y] the applicable eligibility requirements," thereby rewriting section 1229a(c)(4)(A)(i) to provide that aliens must satisfy all such "eligibility requirements" *except for the Rule*. Likewise, the injunction precludes application of a rule that bars the "favorable exercise of discretion," 8 U.S.C. § 1229a(c)(4)(A)(ii), on a categorical basis, thereby rewriting section 1229a(c)(4) to *not* require a determination "that the alien merits a

favorable exercise of discretion," *id.*, when the eligibility rule at issue is the Rule. The injunction thus re-writes section 1229a, establishing "limitations on what the government can and cannot do under the removal ... provisions." *Hamama*, 912 F.3d at 880. But, again, using an injunction to re-write the statute to include limitations on the government's authority "that [do] not exist in the statute" is what section 1252(f) forecloses. *Id.* at 879–80; *see Vazquez Perez v. Decker*, No. 18-cv-10683, 2019 WL 4784950, at *6 (S.D.N.Y. Sept. 30, 2019) (rejecting similar reasoning as that employed by the district court here as to full removal proceedings: "Because Congress, in its judgment, chose not to mandate a statutory ceiling, an injunction imposing one where the statute is silent would displace that judgment in a way that would enjoin or restrain the method or manner of Section 1229(b)'s functioning. Accordingly, Section 1252(f)(1) strips this Court of jurisdiction to issue the injunction [plaintiff] seeks here.").

Given these points, the injunction must be vacated in full for the independent and alternative reason that it enjoins asylum officers from making negative credible-fear determinations when there is not a "significant possibility" that the alien "could establish eligibility for asylum under section 1158," 8 U.S.C. §§ 1225(b)(1)(B)(ii), (v), and enjoins immigration judges or the Board of Immigration Appeals from con-

cluding that aliens subject to the Rule have failed to carry their burden of demon-strating their eligibility for "relief ... from removal" in the form of asylum when placed in full removal proceedings under section 1229a, *id.* § 1229a(c)(4)(A).

### C.   Plaintiffs' Arguments on Metering Cannot Support the District Court's Injunction.

The district court's class-wide injunction also cannot be justified based on an asserted illegality of CBP's metering practices. The district court did not reach the legality of metering, *see* Order 1–36, and this Court cannot soundly rely on the as-serted illegality of metering as an alternative ground to uphold the class-wide injunc-tive relief that the district court ordered—for several reasons.

First, and most fundamentally, metering is lawful. To start, metering does not infringe any right of provisional class members. As explained, sections 1158(a) and 1225 apply only to aliens "in the United States," and so any claimed right to apply for asylum simply does not exist while provisional class members stand in Mexico. *See supra* Part I-A. And metering falls squarely within CBP's authority and duty to manage and secure the ports of entry and carry out its multiple missions at the border. The Constitution and the INA grant the Executive the authority and duty to manage the flow of travel and trade through ports of entry. "Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in ... ." *Carroll v. United States*, 267 U.S. 132, 154 (1925). "It is undoubtedly within the

power of the Federal Government to exclude aliens from the country. It is also with-
out doubt that this power can be effectuated by routine inspections and searches of
individuals or conveyances seeking to cross our borders." *Almeida-Sanchez v.
United States*, 413 U.S. 266, 272 (1973) (internal citation omitted). Controlling the
manner and pace of travel into the ports of entry is thus "a fundamental act of sov-
ereignty. The right to do so stems not alone from legislative power but is inherent in
the executive power to control the foreign affairs of the nation." *United States ex rel.
Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *see also Mezei*, 345 U.S. at 210;
*Kleindienst v. Mandel*, 408 U.S. 753, 765–67 (1972).

Against this constitutional backdrop, Congress ordered the Secretary of
Homeland Security to regulate travel and trade into the ports of entry and gave him
the authority to balance the Department of Homeland Security's resources to dis-
charge its multiple mission responsibilities at the border. The Secretary is "respon-
sible for ... [s]ecuring the borders [and] ports," "managing and coordinating" all port
"functions," and, in carrying out these and other responsibilities, "ensuring the
speedy, orderly, and efficient flow of lawful traffic and commerce." 6 U.S.C.
§ 202(2), (8). Congress ordered the Commissioner of Customs and Border Protec-
tion to (among other things): "ensure the interdiction of persons and goods illegally
entering or exiting the United States"; "facilitate and expedite the flow of legitimate
travelers and trade"; "detect, respond to, and interdict terrorists, drug smugglers and

traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States, in cases in which such persons are entering, or have recently entered, the United States"; "safeguard the borders of the United States to protect against the entry of dangerous goods"; and "enforce and administer all immigration laws ... including the inspection, processing, and admission of persons who seek to enter or depart the United States; and the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States." *Id.* § 211(c). And the Secretary is "charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," and he "shall ... perform such other acts as he deems necessary for carrying out his authority" under the law. 8 U.S.C. §§ 1103(a)(1), (a)(3).

Given the Executive's constitutional authority and the broad statutory authorities set forth above—including the authority to "perform such other acts as he deems necessary" for carrying out all of his duties under the law—the Secretary of Homeland Security plainly has the authority to regulate the pace at which pedestrians enter the ports, particularly as it pertains to the provisional class members here, who do not have prior statutory authorization to enter the United States with a visa or otherwise. Metering is thus clearly lawful, so there would be no basis for the district court to have imposed—or this Court to uphold—a class-wide injunction of the Rule based

40

on the premise that metering is unlawful.

Second, at the very least, metering is clearly not *categorically unlawful*, so a ruling on the legality of metering could not support the indiscriminate, class-wide injunctive relief—extending to all aliens metered before July 16 who still seek to apply for asylum—without regard to the grounds on which they were metered. As the district court has recognized, "it is entirely possible that there may exist potentially legitimate factors that prevent CBP officers from immediately discharging the mandatory duties set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225. Even Plaintiffs acknowledge as much." *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1212. The court added: "[F]ederal agencies and the individuals who lead them can face co-existing obligations that Congress has chosen to place on the agency, obligations that may at times be viewed as competing with each other and competing for the resources an agency has." *Id.* Thus, any injunction aimed at remedying an asserted unlawful deprivation of a right to apply for asylum based on the premise that metering may be unlawful would have to account for the reasons why the port was metering in the first place. Class-wide relief assumes that metering—no matter the specific circumstances at issue at individual ports of entry on specific days—is always unlawful, but that assumption is plainly unsound, and the district court's own reasoning precludes relief so broad. *See, e.g.*, *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502

U.S. 183, 188 (1991) ("That the regulation may be invalid as applied in s[ome] cases ... does not mean that the regulation is facially invalid ... .").

It was therefore particularly inappropriate for the district court to certify the provisional class for the purpose of granting injunctive relief—and would be likewise inappropriate to uphold class-wide relief in the face of such an erroneous class-certification order. *See Meredith v. Oregon*, 321 F.3d 807, 814 (9th Cir. 2003) ("[B]ecause certification of a class provides the basis for granting relief on a class-wide basis, an injunction granting class-wide relief cannot be affirmed without also upholding the class certification order."). A class action must be capable of "generat[ing] common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009); emphasis omitted). The district court conceived of the common question presented by Plaintiffs' motion as "whether Defendants are improperly construing the [Rule] to apply to those class members who attempted to enter or arrived at a U.S. [port of entry] before July 16, 2019." Order 23. But that question does nothing to answer the common question at the core of the preliminary-injunction motion and Plaintiffs' operative complaint—namely, whether the provisional class members were metered *unlawfully*, such that an order enjoining the government from applying the Rule to them would be an appropriate remedy for the deprivation of their claimed right to

apply for asylum—because it does not account for the specific reasons why a partic-
ular port of entry may have been metering on a particularly day.

The district court's order proceeds as though metering could be ruled categor-
ically unlawful, but the district court made no square ruling to that effect—which
itself makes its certification order an abuse of discretion. *See Comcast Corp. v. Beh-
rend*, 569 U.S. 27, 35 (2013) (district court "must conduct a 'rigorous analysis'" of
whether the Rule 23 criteria are satisfied.). Indeed, as discussed, it has made the
*opposite* finding, concluding that metering "may" be lawful depending on the case-
specific "obligations that may at times be viewed as competing with each other
and ... the resources an agency has." *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1212.
The lawfulness of metering and of any resulting delay in the processing of putative
asylum-seekers may differ for individual class members or for groups of class mem-
bers, depending on the port they seek to enter and the timing of that attempted entry.
*See* ER154; ER157–61 (declaration of a San Diego Assistant Director of Field Op-
erations explaining that "CBP's actual capacity to hold individuals in its short-term
hold rooms at the San Ysidro and Otay Mesa [ports of entry] is generally lower than
the designated capacity at any given time," and providing examples of factors influ-
encing the ports' capacities). This is thus not a case where "either [the policy and
practice] is unlawful as to every [class member] or it is not." *Parsons v. Ryan*, 754
F.3d 657, 678 (9th Cir. 2014). The "common question" the district court apparently

43

assumed thus does nothing to "generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (quoting Nagareda; emphasis omitted). Quite the opposite: it requires an individualized, case-specific analysis of each class member's specific circumstances and each port of entry's—in the district court's own telling—"co-existing obligations that Congress has chosen to place on the agency," and the limited "resources an agency has" on any given day, *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1212, which by definition precludes a "determination of" the "truth or falsity" of metering's legality "in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350; *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609–10 (1997) (affirming determination that when "factual differences" "translate[] into "significant legal differences," class certification is inappropriate).

Given these problems, this Court cannot uphold the class-wide injunction based on the asserted illegality of metering. Metering is clearly not categorically unlawful, and the nature of metering is not one that lends itself to the class-wide relief that the district court granted.

Third, because even on Plaintiffs' own theory the legality of metering is a fact-driven issue, it would be inappropriate for this Court to uphold the injunction based on fiercely contested factual matters that the district court did not address. Plaintiffs contend that the metering policy is unlawful and exceeds the scope of the government's statutory authority because it was allegedly issued to deter aliens from

44

crossing the border and applying for asylum in the United States, and CBP's explanation of a lack of capacity in the ports is allegedly false. The district court did not address those arguments, *see* Order 1–36, and this Court should decline to address those fiercely contested arguments for the first time on appeal. *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). And in any event, Plaintiffs' arguments still could not support class-wide injunctive relief. For one thing, even if metering were done for deterrence purposes, a policy that seeks to deter irregular migration would be lawful. *See Sale*, 509 U.S. at 163–64, 165 (approving determination to return Haitians apprehended on the high seas to address an "exodus [that had] expanded dramatically," overburdening screening facilities and "pos[ing] a ... danger to thousands of persons embarking on long voyages in dangerous craft," and explaining that the "wisdom of the policy choices ... is not a matter for our consideration"). Neither the asylum nor the expedited removal statutes compel a different conclusion because neither applies outside the United States' borders. *See id.* at 173 & n.29; *Kiyemba v. Obama*, 555 F.3d 1022, 1030–31 (D.C. Cir. 2009) (noting that "refugees apply from abroad; asylum applicants apply when already here"), *vacated on other grounds*, 559 U.S. 131 (2010), *reinstated with some modifications*, 605 F.3d 1046 (D.C. Cir. 2010). For another thing, Plaintiffs' arguments would still fail to show that metering is *categorically* unlawful: as explained above,

45

even Plaintiffs recognize that metering may be justified in "certain types of exigent circumstances," which precludes the imposition of class-wide relief for the benefit of all aliens who were metered before July 16, 2019. MTD Opp. 21 (D. Ct. Dkt. 210); *see also* 394 F. Supp. 3d at 1212 ("[I]t is entirely possible that there may exist potentially legitimate factors that prevent CBP officers from immediately discharging the mandatory duties set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225. Even Plaintiffs acknowledge as much.").

For all of these reasons, this Court cannot uphold the injunction based on the asserted illegality of metering: metering is lawful; at the very least it is not categorically unlawful and so cannot support the class-wide injunctive relief that the district court ordered; and the district court failed to address Plaintiffs' fiercely contested factual claims about metering, and it would be inappropriate for this Court to uphold the injunction based on a ruling on those factual arguments in the first instance.

## II. Considerations of Irreparable Injury and the Balance of Equities Foreclose a Preliminary Injunction.

The district court's injunction undermines the Executive Branch's constitutional and statutory authority to secure the country's borders, and invites the harms to the public that the Rule sought to address. The injunction bars the government from applying the Rule to tens of thousands of aliens who fall within the heart of the Rule: aliens who claim to need asylum but who spent meaningful time in a third country without seeking protection there, raising questions about the validity and

urgency of their asylum claims. 84 Fed. Reg. at 33,839. In granting the government's emergency stay request in *East Bay*, the Supreme Court necessarily already concluded that the government will suffer irreparable harm from an injunction of the Rule. *See* 140 S. Ct. 3.

The injunction also imposes system-wide harm on the Rule's operation. Because the government reasonably does not maintain records of who was metered, ER260–62 (declaration of CBP's Executive Director for Operations), asylum officers will need to add a substantial amount of time to *every* credible-fear interview to question an alien whether he was subjected to metering before July 15, 2019, ER265–66 (declaration of the Deputy Chief of U.S Citizenship and Immigration Services' (USCIS) Asylum Division). This would have to occur until the government is reasonably confident it identified the 26,000+ provisional class members. Given the extremely high volume of credible-fear cases that USCIS processes—105,301 referrals in FY 2019 alone—adding even a seemingly small amount of time to each interview would dramatically undermine the overall rate of credible-fear processing, which is problematic given the time-sensitive nature of the interviews. ER265–66. USCIS would similarly need to re-interview aliens with Rule-based removal orders who are still in the government's custody to determine whether they were subjected to metering, which would further drain the agency's resources.

ER265–66. Similar issues can be expected in full removal proceedings before immigration judges.

In carving out tens of thousands of aliens from the Rule's scope and systemically frustrating its operation, the injunction would dramatically undermine the Rule's aims. The Rule represents the government's response to a massive backlog in the asylum system. From May 2017 to May 2019, the number of apprehended non-Mexican border-crossers increased over 1600 percent. *See* 84 Fed. Reg. at 33,838. This corresponds with a trend over the past decade, where the number of aliens in expedited removal who are referred for credible-fear interviews jumped from about 5 percent to above 40 percent. *Id.* Many such aliens secure release into our country and then never apply for asylum, never show up for their hearings, or ultimately have their asylum claims rejected as meritless. *Id.* at 33,839–41. The proliferation of such claims depletes our asylum resources and has overwhelmed our immigration-enforcement agencies. By rendering ineligible for asylum aliens who cross our southern border after failing to apply for protection in a third country through which they transited en route to the United States, the Rule aims to channel our asylum system's resources to aid those who truly have nowhere else to turn, to discourage the gaming of our system by those who seek asylum simply to gain indefinite entry to our country, and to press our foreign partners to share the burdens presented by mass migration. *Id.* at 33,839. The injunction undercuts those aims and

48

reintroduces the burdens that the Rule sought to alleviate. These harms are irreparable; some aliens will surely be granted asylum in the absence of the Rule even though those aliens are ones who the Attorney General and the Acting Secretary have otherwise deemed ineligible. *See City & Cty. of San Francisco v. USCIS*, 944 F.3d 773, 806 (9th Cir. 2019) (preliminary injunction that "force[s] DHS to grant status to those not legally entitled to it" constitutes irreparable harm).

Against these harms to the government and the public, the provisional class members would not be substantially or irreparably harmed by a stay. The Rule potentially denies them a purely discretionary benefit, while still allowing them to seek other forms of protection in the United States, including withholding of removal and CAT protection. Denial of only a discretionary benefit is not typically understood to be an irreparable injury. And, contrary to the district court's reasoning, Plaintiffs have no entitlement to any particular asylum-eligibility rules. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 444–45 (1987).

Any injury to Plaintiffs is also largely of their own making. The provisional class members have all had the opportunity to seek relief in Mexico to comply with the Rule. Plaintiffs noted to the district court that Mexico places a 30-day time limit on such claims, but Plaintiffs themselves acknowledge that this requirement can be waived. PI Mot. 12. Plaintiffs cannot refuse to even attempt to comply with the Rule—by declining to seek relief as it lays out—and then assert that the Rule, rather

than their own inaction, causes irreparable injury. *See Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) (self-inflicted harm "does not qualify as irreparable"); *accord* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted"). In any event, the Supreme Court already considered similar claims regarding Mexican law but nonetheless stayed the nationwide injunction in the litigation directly challenging the Rule. *See* Opp. to Stay Appl. 28–29, *East Bay*, No. 19A230 (U.S. Sept. 4, 2019).

The district court held that equitable considerations favored the provisional class because class members "relied on the Government's representations" that "they would eventually have an opportunity to make a claim for asylum in the United States," and such claims would be "adjudicated under the law in place at the time of their metering, which did not include the requirement that they first exhaust asylum procedures in Mexico." Order 34. But the declarations cited by the district court say only that CBP officers told them they had to "wait" or "get a number" from Mexican authorities before crossing into a port of entry. *See* Order 6 (citing D. Ct. Dkts. 294-7 ¶¶ 5–6, 294-8 ¶¶ 15–16, 294-9 ¶¶ 14–16, 294-15 ¶¶ 6–9,[2] 294-17 ¶ 9, 294-24 ¶ 8,

---

[2] The cited paragraphs in this declaration relate to the declarant's participation in the Migrant Protection Protocols, not metering. In the only paragraph that relates to metering (¶ 1), the declarant says that "[my] friends told me not to go directly to the

294-51 ¶ 8). There is no indication that CBP officers told class members that they would be able to apply under any given set of asylum rules once they cross into the United States, and class members never had that right to begin with. The district court also held that the equities favored the provisional class because "if the [Rule] was meant to apply to those individuals waiting for their asylum hearing in Mexico due to the metering policy, the regulation could simply have said so." Order 35. But as explained above, the Rule does say so, because it applies to "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019." 84 Fed. Reg. at 33,843; *see supra* Part I-A. Equitable considerations thus foreclose the issuance of a preliminary injunction.

---

international bridge, that it was required to go first to Senda de Vida, a shelter, and get on the list."

## **CONCLUSION**

This Court should reverse the decision below and vacate the district court's preliminary injunction.

DATED: January 7, 2020        Respectfully submitted,

                             JOSEPH H. HUNT
Assistant Attorney General
Civil Division

SCOTT G. STEWART
Deputy Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section

EREZ REUVENI
Assistant Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants-Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2020, I served a copy of this document on

the Court and all parties by filing it with the Clerk of the Court through the CM/ECF

system, which will provide electronic notice and a link to this document to all coun-

sel of record.


DATED: January 7, 2020                Respectfully submitted,

*/s/Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
U.S. Department of Justice

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with Federal Rules of Appellate Procedure 32(a)(4) and 32(a)(5) because it is double-spaced, has margins of at least one inch on all four sides, and uses proportionally-spaced, 14-point Times New Roman font.

I certify that this brief complies with the type-volume limitation of Circuit Rule 32-1(a) because it contains 13,020 words, including headings and footnotes, as measured by the word processing application used to prepare this brief.

DATED: January 7, 2020              Respectfully submitted,

                                    */s/Alexander J. Halaska*
                                    ALEXANDER J. HALASKA
                                    Trial Attorney
                                    U.S. Department of Justice

                                    *Counsel for Defendants-Appellants*