# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>    Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br><br>**PLAINTIFFS' EXHIBIT 1 IN SUPPORT OF JOINT MOTION FOR DETERMINATION OF DISCOVERY DISPUTE CONCERNING SCOPE OF 30(b)(6) DEPOSITION [UNDER SEAL]** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

----------------------------x

AL OTRO LADO, INC., et al., :

    Plaintiff,           :

     -vs-              : Case No.

KEVIN K. McALEENAN, et al., : 17-cv-02366-BAS-KSC

    Defendants.        :

----------------------------x


CONFIDENTIAL

Remote Videotape Deposition of

TODD HOFFMAN

Wednesday, June 10, 2020

9:34 a.m.



Job No.:  578769

Pages 1 - 343

Reported by:  Tammy S. Newton

Magna Legal Services

866-624-6221

www.MagnaLS.com



Page 58

1      Q     Okay.  How long did this meeting last

2    for?

3      A     At least an hour and a half to two

4    hours, maybe an hour and 45.

5      Q     Were any written materials distributed

6    either in advance of the meeting or at the

7    meeting?

8            MS. SHINNERS:  I'm just going to

9    instruct the witness not to answer to the extent

10   it's asking for the substance of any written

11   materials.

12           MR. MEDLOCK:  Sure.  I was asking what

13   was distributed.  So I'm not asking for the

14   substance.

15           THE WITNESS:  I don't recall.  We may

16   have distributed materials, but I don't -- I

17   don't recall.

18   BY MR. MEDLOCK:

19     Q     Do you recall, without going into the

20   substance of it, whether a presentation in the

21   form of a PowerPoint or other presentation was

22   put up on a screen during that December 2019



Page 59

1   meeting?

2        A    No.  No presentations, no PowerPoint.

3        Q    Were any attorneys present for those

4   meetings?

5        A    I'm not sure how to answer that.  I

6   don't know exactly who was in the room.  And I'm

7   not sure Scott Glabe's position is, if he's an

8   attorney, an advisor, or what his role is.

9        Q    Okay.  That's fair.

10           Do you know whether anyone took notes

11  at this meeting?

12       A    No, not specifically aware.

13       Q    Did you take notes during the meeting?

14       A    I don't recall if I did or not.

15       Q    Do you recall whether there was any

16  instruction that notes should not be taken at the

17  meeting?

18           MS. SHINNERS:  Objection.  I'm going

19  to instruct the witness not to answer.

20  BY MR. MEDLOCK:

21       Q    Are you going to follow your

22  attorney's advice?



Page 60

1      A      Yes.

2             MR. MEDLOCK:  And Katie, just so I

3   understand the privilege objection, is it

4   deliberative process or is it another privilege

5   that you're relying on for that instruction?

6             MS. SHINNERS:  For that instruction, I

7   am instructing the witness not to answer.  I --

8   based on executive privilege.  I only -- only the

9   President can assert the presidential

10  communications privilege, but we are instructing

11  the witness not to answer so the privilege can be

12  preserved.

13            MR. MEDLOCK:  Okay.  We'll probably

14  follow up with you on that in written

15  correspondence, but thank you for explaining.

16  BY MR. MEDLOCK:

17      Q      Sir, do you recall the substance of

18  what was discussed at the meeting?

19            MS. SHINNERS:  I just want to object

20  to the extent it's asking for the substance of

21  the meeting.

22            MR. MEDLOCK:  Sure.  You can answer



Page 61

1    yes or no, whether you recall what was -- what

2    was discussed at the meeting.

3              THE WITNESS:  Katie?

4              MS. SHINNERS:  Again, I just -- he's

5    not asking for the substance.  He clarified.  So

6    I'm not instructing you not to answer this

7    question whether or not you recall the substance.

8              THE WITNESS:  Yes, I do.

9    BY MR. MEDLOCK:

10   Q    Do you recall whether any final policy

11   decisions were arrived at during the meeting with

12   Stephen Miller and Gene Hamilton in December

13   2019?

14             MS. SHINNERS:  Objection; instruct not

15   to answer to the extent it's asking for anything

16   other than his recollection of whether or not a

17   policy decision was reached at the meeting.

18             MR. MEDLOCK:  Sure.  My question --

19   my -- just to clarify my question is yes or no.

20   BY MR. MEDLOCK:

21   Q    Were any final policy decisions

22   reached at that meeting with Stephen Miller and



Page 62

1   Gene Hamilton in December 2019?

2               MS. SHINNERS:  Okay, yeah.  Objection.

3   I'm going to instruct not to answer.

4   BY MR. MEDLOCK:

5       Q    Are you going to follow your

6   attorney's advice, sir?

7       A    Yes.

8               MR. MEDLOCK:  And Katie, is that based

9   on the executive privilege and the presidential

10  privilege as you stated before?

11              MS. SHINNERS:  Again, only the

12  president can assert the presidential

13  communications privilege.  But we are instructing

14  the witness not to answer so that privilege can

15  be preserved.

16  BY MR. MEDLOCK:

17      Q    Sir, can you tell me the substance of

18  what was discussed during this December 2019

19  meeting in the Situation Room with Stephen

20  Miller, Gene Hamilton, and others?

21              MS. SHINNERS:  Objection.  I'm going

22  to instruct Mr. Hoffman not to answer.



Page 63

1    BY MR. MEDLOCK:

2        Q    Are you going to follow your

3    attorney's advice, sir?

4        A    Yes.

5            MR. MEDLOCK:  And so I have a clean

6    record on this, Katie, are you instructing Mr.

7    Hoffman not to answer the prior question based on

8    the executive privilege and the potential that

9    the presidential communications privilege could

10   be invoked?

11           MS. SHINNERS:  Yes.  And I'm sorry if

12   I may not have heard you.  But we are instructing

13   the witness not to answer to preserve the

14   presidential communications privilege and only

15   the President can invoke the privilege.

16           MR. MEDLOCK:  Okay.  Thank you for

17   clarifying.

18   BY MR. MEDLOCK:

19       Q    Sir, what, if anything, did you do as

20   a result of attending this December 2019 meeting

21   with Stephen Miller and Gene Hamilton?

22           MS. SHINNERS:  Objection.  I just want



Page 64

1  to instruct the witness not to answer to the

2  extent if answering would reveal any of the

3  contents of the substance of the meeting in

4  question.  But if you can answer without --

5  without revealing the substance, then please do

6  so.

7            THE WITNESS:  I don't believe I can.

8  BY MR. MEDLOCK:

9      Q    Okay.  So you're going to follow your

10 attorney's advice and not answer the question; is

11 that correct?

12     A    Yes.

13     Q    Did anyone, to your knowledge, call in

14 to this meeting in the Situation Room?

15     A    No.  I don't believe anyone called in.

16     Q    Did anyone attend the meeting remotely

17 via video conference?

18     A    No, not -- I don't recall that.  I

19 don't believe so.

20     Q    Was there anybody who attended the

21 role -- who attended the meeting in the role as a

22 secretary or assistant or adjutant who took



Page 65

1    minutes of the meeting?

2         A       Not to my knowledge.

3         Q       After the meeting, did you receive an

4    e-mail or any written materials containing a

5    readout of what was discussed at the meeting?

6         A       No, I did not.

7         Q       Prior to the meeting taking place, did

8    you receive a meeting invitation or any other

9    communication that laid out an agenda for what

10   would be discussed at the meeting?

11        A       I'm not -- I don't believe so.   I

12   think it was just a typical calendar invite with

13   no agenda.

14        Q       Did you need to do anything to prepare

15   to attend this meeting?

16             MS. SHINNERS:   Objection.   I just want

17   to caution the witness not to answer about the

18   substance, if anything, that you did to prepare,

19   but to the extent the question does not call for

20   that, you can answer.

21             THE WITNESS:   No.   I mean in terms of

22   preparation was just gathering the latest data.



Page 66

1          MS. SHINNERS:  Objection.  It's a yes

2    or no question, Mr. Hoffman.

3          THE WITNESS:  I'm sorry.  Can you

4    repeat?

5    BY MR. MEDLOCK:

6      Q    Sure.  My question was, do you recall

7    doing anything to prepare for the December 2019

8    meeting in the Situation Room with Stephen Miller

9    and Gene Hamilton?

10     A    Yes.

11     Q    Okay.  And you mentioned you were

12   gathering the latest data.  What was the latest

13   data that you were gathering?

14         MS. SHINNERS:  Objection and instruct

15   the witness not to answer on deliberative process

16   privilege grounds and --

17         MR. MEDLOCK:  I think he's -- I think

18   he's waived to the extent he said he gathered

19   data.

20         MS. SHINNERS:  He didn't talk about

21   the substance of the data.

22         MR. MEDLOCK:  I think that's a waiver.



Page 67

1   Are you instructing him not to answer the

2   question?

3              MS. SHINNERS:  I'm instructing him not

4   to answer the question on deliberative process

5   privilege grounds.

6              MR. MEDLOCK:  Okay.  We will follow up

7   with you on correspondence about that.

8   BY MR. MEDLOCK:

9       Q     Are you going to follow your

10  attorney's advice, Mr. Hoffman, not to answer my

11  question about what data you were gathering?

12      A     Yes.

13      Q     During the meeting with Stephen Miller

14  and Gene Hamilton in the Situation Room at the

15  White House on December 2019, was metering or

16  queue management discussed?

17             MS. SHINNERS:  Objection.  I'm going

18  to instruct the witness not to answer on

19  deliberative process grounds and -- yeah, go

20  ahead.

21             MR. MEDLOCK:  Are you also preserving

22  the presidential communications privilege, Katie?



Page 68

1            MS. SHINNERS:  Yes, correct.  We are

2   preserving the privilege -- the instruction is to

3   preserve that privilege as well.

4   BY MR. MEDLOCK:

5       Q    Okay.  Sir, are you going to follow

6   your attorney's advice about answering that

7   question?

8       A    Yes.

9       Q    Did the topic of the capacity of ports

10  of entry on the U.S.-Mexico border come up as a

11  topic of discussion during the December 2019

12  meeting with Stephen Miller and Gene Hamilton in

13  the Situation Room at the White House?

14           MS. SHINNERS:  Objection.  Instruct

15  the witness not to answer on deliberative process

16  grounds.

17  BY MR. MEDLOCK:

18      Q    Are you going to follow your

19  attorney's advice, sir, and not answer the

20  question?

21      A    Yes.

22      Q    Do you know whether anyone from the



Page 75

1           COURT REPORTER:  "During the meeting,

2    did Ms. Koller provide any legal advice or did

3    anyone provide information to Ms. Koller for the

4    purpose of her providing legal advice?  It's just

5    a yes or no question."

6           MS. SHINNERS:  And I'm going to insert

7    the same objection.  It calls for legal

8    conclusion, and also, I'm going to instruct the

9    witness not to answer any questions regarding the

10   substance of this conversation on deliberative

11   process and attorney-client privilege grounds.

12   BY MR. MEDLOCK:

13     Q     Mr. Hoffman, are you going to follow

14   your attorneys's advice of not answering my

15   question?

16     A     Yes.

17     Q     Okay.  I don't know if I asked this

18   earlier, but how long did this telephone call

19   last for?

20     A     I'd say probably an hour.

21     Q     Okay.  And did you receive a written

22   agenda of the topics to be discussed prior to the



Page 76

1    June 2019 phone call with Mr. Miller and others?

2              MS. SHINNERS:  And I object to the --

3    instruct the witness not to answer to the extent

4    it would reveal the contents of any agenda, if

5    any.  But you can answer to the extent you can

6    without revealing the contents of any agenda.

7              THE WITNESS:  No, I don't recall

8    receiving an agenda.

9    BY MR. MEDLOCK:

10        Q    Do you recall receiving a summary or

11   readout of the conference call with Stephen

12   Miller and others on June 2019 after it occurred?

13             MS. SHINNERS:  Same instruction.

14             THE WITNESS:  No, I don't believe -- I

15   don't recall, and I don't believe I received a

16   readout.

17   BY MR. MEDLOCK:

18        Q    So, as you sit here today, the only

19   evidence that you can recall what was discussed

20   during this meeting is your own recollection of

21   the events of that meeting; is that correct?

22             MS. SHINNERS:  I'm not -- I'm not



Page 84

1           Did I read that correctly, sir?

2      A     Yes, it appears so.

3      Q     Okay.  The meeting that you attended

4  with Stephen Miller and Gene Hamilton in the

5  Situation Room of the White House, did that

6  meeting touch on whether El Salvador had a

7  functioning asylum system?

8           MS. SHINNERS:  Objection.  Instruct

9  the witness not to answer.  Same objections as

10  before regarding the content of the meeting in

11  December 2019.

12  BY MR. MEDLOCK:

13      Q     Are you going to follow your

14  attorney's instruction and not answer my

15  question, sir?

16      A     Yes.

17      Q     Okay.  Do you -- during -- I'm sorry.

18  Let me back up and ask the question correctly.

19           During the meeting that you attended

20  with Stephen Miller and Gene Hamilton and others

21  in the White House Situation Room, did Stephen

22  Miller say, "It's just that this is all I care



Page 85

1    about.  I don't have a family.  I don't have

2    anything else.  This is my life"?

3              MS. SHINNERS:  Objection.  Same

4    instruction not to answer on the same grounds

5    regarding the content of the December 2019

6    meeting.

7    BY MR. MEDLOCK:

8        Q    Mr. Hoffman, are you going to follow

9    your attorney's advice and not answer my

10   question?

11       A    Yes.

12       Q    Okay.  I'd like to move on to Gene

13   Hamilton, if I could.  I think you previously

14   said you had several interactions with Mr.

15   Hamilton.  Approximately how many actions --

16   interactions have you had with Gene Hamilton?

17       A    Three or four.

18       Q    And we talked about the December 2019

19   meeting in the Situation Room at the White House.

20   Is that amongst the three or four interactions

21   you had with Gene Hamilton?

22       A    Yes.



Page 88

1    are present.  So I am going to have to take

2    another break.

3              MR. MEDLOCK:  Okay.  How long do you

4    want?

5              MS. SHINNERS:  At least 10 minutes.

6              MR. MEDLOCK:  Okay.  That's fine.

7              MS. SHINNERS:  Thank you.

8              VIDEOTAPE OPERATOR:  The time is 11:36

9    a.m.  We're going off the record.

10             (A brief recess was taken.)

11             VIDEOTAPE OPERATOR:  The time is 11:52

12   a.m.  We're back on the record.

13             MR. MEDLOCK:  All right, Mr. Hoffman.

14   Welcome back.  I'll ask the court reporter to

15   read back my last question.

16             COURT REPORTER:  "In the course of

17   your interactions with Gene Hamilton, has the

18   topic of metering or queue management ever come

19   up?"

20             MS. SHINNERS:  And I'm --

21   BY MR. MEDLOCK:

22       Q    Can you answer that, sir?  Sorry.



Page 89

1              MS. SHINNERS:  I'm going to instruct

2      the witness not to answer to the extent --

3      because the question encompasses the December

4      2019 meeting for the same reasons asserted

5      previously.

6      BY MR. MEDLOCK:

7          Q      All right, sir.  Are you going to

8      follow your attorney's instruction to not answer

9      my question?

10         A      Yes.

11         Q      Okay.  All right.  Have you ever heard

12     of something called the Homeland Security

13     Advisory Council?

14         A      Yes.

15         Q      What is it?

16         A      It is an advisory council, as you say.

17     It's usually made up of senior representatives

18     that will typically, you know -- best way I can

19     probably say, typically may research specific

20     issues that provide advice to leadership within

21     the Department of Homeland Security.

22         Q      And the members of the Homeland



Page 153

1    **Confidential**

2        Q      Who in the commissioner's office would

3    typically be responsible for interagency

4    communication in April 2018?

5        A      I don't know.  There's been so much

6    turnover there.  I don't know if Patrick

7    Flanagan, if he was still on his role at that

8    time.  But he was a key counselor down there,

9    chief of staff.  It was Mr. McAleenan's chief of

10   staff.  **Confidential**        **[redacted]**

11   **Confidential**

12   **Confidential**

13   **Confidential**

14       Q      So as you sit here today, your belief

15   that the person who could best answer that

16   question -- my questions about interagency

17   consultation would be someone from the

18   commissioner's office at CBP; is that right?

19       A      **Confidential**

20   **Confidential**

21       Q      **Confidential**

22   **Confidential**



Page 154

1    Confidential

2            MS. SHINNERS:  Objection.  I'm going

3    to instruct the witness not to answer on

4    grounds -- attorney-client privilege grounds.

5    BY MR. MEDLOCK:

6        Q    Sir, can you answer my question

7    without going into conversations that you had

8    with attorneys?

9        A    I'm looking at Katie.

10           THE WITNESS:  And do you want me to

11   answer?

12           MS. SHINNERS:  One second.  You know,

13   I -- I don't actually know.  I think I may need

14   -- require a consultation to answer that

15   question, Mr. Hoffman.

16           MR. MEDLOCK:  Do you want to take a

17   break to do that?

18           MS. SHINNERS:  Yeah.  Yes.  We can go

19   off the record.

20           MR. MEDLOCK:  Let's go off the record.

21           VIDEOTAPE OPERATOR:  The time is 1:22

22   p.m.  We are going off the record.



Page 186

1        A        [Confidential]

2    [Confidential].

3    [Confidential]

4    [Confidential]

5    [Confidential]

6        Q        [Confidential]

7    [Confidential]

8    [Confidential]

9            MS. SHINNERS:  Objection.  I'm going

10   to caution -- I'm going to caution the witness

11   not to answer to reveal pre-decisional

12   deliberations about how or when to issue written

13   guidance.  So if -- if you can answer without

14   revealing pre-decisional deliberations, you can

15   do so.  But again, I'm instructing you not to

16   reveal deliberations, expressions of what

17   advantages or disadvantages of particular courses

18   of action might be.

19            THE WITNESS:  Okay.  I'd have to hear

20   the question again.

21   BY MR. MEDLOCK:

22       Q        Sure.        [Confidential]



[redacted]

A [redacted]

Q [redacted]

MS. SHINNERS: Objection. I'm going to instruct the witness not to answer to the extent it would reveal attorney-client -- if it would reveal attorney-client communication, the work product, or mental impressions of attorneys or pre-decisional deliberation.

BY MR. MEDLOCK:

Q Can you answer my question?

A Can you state it one more time?

Q Sure. Isn't it true that [redacted]

Page 200

1      ██████████████████ Confidential ██████████████████

2      Confidential

3              Did I read that correctly?

4      A      Yes.

5      Q      Confid ██████████████████████
       ti l

6      ██████████████ Confidential ██████████████

7      █████████████ Confidential █████████████

8      █████████████ Confidential █████████████

9      Confidential

10             MS. SHINNERS:  Objection.  Instruct

11     the witness not to answer, attorney-client

12     communication, and work product of a party.

13             MR. MEDLOCK:  I'm sorry.  I didn't ask

14     about attorneys.  I just asked if people were

15     saying that.  Is there a reason why he can't

16     answer if it didn't come from an attorney?

17             MS. SHINNERS:  Well, it sort of

18     depends.  I mean you asked it in connection with

19     an attorney asking about Al Otro, so hence my

20     objection.  I will instruct the witness not to

21     answer to the extent it would reveal

22     attorney-client communication or the mental



Page 201

1   impressions of counsel.

2   BY MR. MEDLOCK:

3       Q    All right, sir.   Confidential

4   Confidential

5   Confidential

6   Confidential

7   Confidential

8            MS. SHINNERS:  I want to, again,

9   instruct the witness not to answer to the extent

10  it would be reveal someone relaying to him

11  communications of counsel or legal advice or the

12  mental impressions of counsel.

13  BY MR. MEDLOCK:

14      Q    Can you answer my question, sir?

15      A    I -- I don't recall.

16      Q    Okay.   Confidential

17  Confidential

18  Confidential

19  Confidential

20      A    Confidential

21  Confidential

22      Q    Okay.  Let me ask it --



Page 240

1          A      No, I have not.

2          Q      To your knowledge, have OIG reviewed

3     any of your e-mails or documents in connection

4     with an investigation into metering or queue

5     management?

6          A      No.  In fact, I am recalling that -- I

7     know there is a draft.  I think it's an OIG.  I

8     want to say it's queue management.  I think

9     there's a draft OIG document now.  Probably ready

10    to be --

11              MS. SHINNERS:  So -- okay.  That's

12    fine.  I'm sorry to interrupt.

13              THE WITNESS:  I just wanted to clarify

14    I recall that there is a specific OIG.

15    BY MR. MEDLOCK:

16         Q      What's the draft document you're

17    thinking of?

18              MS. SHINNERS:  Yeah.  I just want to

19    instruct the witness not to answer to the extent

20    it would reveal the substance of the draft

21    document, which is not final and pre-decisional.

22    If I may, you can -- you can say the topic in



Page 241

1   very general terms.

2   BY MR. MEDLOCK:

3       Q       Can you, please, state the topic of

4   the draft OIG memorandum in very general terms,

5   sir?

6       A       I don't know the topic.  I believe it

7   is regarding metering or queue management.

8       Q       Do you know whether there is any

9   timetable for the release of a final OIG report

10  on metering or queue management?

11      A       No, I don't know the timetable.

12      Q       Do you know whether the release of any

13  draft OIG report on metering or queue management

14  have been held up due to this ongoing litigation?

15      A       No, not aware.

16      Q       Are you aware of any statements being

17  inserted into a draft OIG report regarding

18  metering or queue management that would be

19  consistent to the Department of Justice in

20  dissenting the Al Otro Lado litigation?

21      A       No.

22      Q       Have you seen a draft, the actual



Page 244

1      Q      Have you yourself weighed in with Mr.

2   Mejia or Mr. Draganac regarding comments or

3   feedback that should be provided to OIG regarding

4   any draft report on metering or queue management?

5      A      No.

6      Q      Have you seen a draft of the comments

7   that either Mr. Mejia or Mr. Draganac intends to

8   send to OIG regarding the OIG report on metering

9   or queue management?

10     A      No.

11     Q      How many pages long is the draft OIG

12   report on metering or queue management?

13     A      I don't know.  Maybe 50, 60.

14     Q      Does the draft OIG report regarding

15   metering or queue management contain a discussion

16   of the Al Otro Lado litigation?

17            MS. SHINNERS:  Objection.  I'm going

18   to instruct him not to answer about the substance

19   of the draft report.  If you can answer without

20   revealing the substance of the draft report, go

21   ahead, Mr. Hoffman.  Thank you.

22            THE WITNESS:  I don't recall.



Page 245

1    BY MR. MEDLOCK:

2        Q    Do you recall whether the draft OIG

3    report regarding metering or queue management

4    comes to any conclusion regarding the legality of

5    metering or queue management?

6            MS. SHINNERS:  Same objection.  I'm

7    going to instruct him not to answer the question

8    to the extent it would reveal anything about the

9    substance of the DHS OIG report, the draft.

10   BY MR. MEDLOCK:

11       Q    Are you able to answer my question, or

12   are you going to follow your attorney's

13   instruction and not answer my question?

14       A    I'll follow my attorney's instruction.

15       Q    Okay.  How -- to your knowledge, how

16   many drafts of the OIG report regarding metering

17   or queue management have been distributed to APP

18   or ops?

19       A    I have no idea.

20       Q    Do you recall anything else that you

21   can disclose to me today regarding the substance

22   of the draft OIG report regarding metering or



Page 246

1   queue management?

2           MS. SHINNERS:  Object.  I'm going to

3   instruct the witness not to answer because it

4   asks for information about the substance of the

5   draft OIG report.

6           MR. MEDLOCK:  Okay.  Before I move on

7   to another -- to another topic, I just want to

8   make a quick statement for the record, and then

9   we can take a break after that because I think

10  that's what you were going to ask for Katie.

11          MS. SHINNERS:  Yes.

12          MR. MEDLOCK:  It's our position that

13  regardless of whether the draft -- the draft OIG

14  report and comments to it are pre-decisional or

15  deliberative, they go directly to the heart of

16  this litigation.  If, for example, OIG made an

17  initial determination that metering or queue

18  management was illegal and was pushed away from

19  making that determination, that's highly relevant

20  both to the legality of metering and to the

21  intent and motivation of CBP.

22          So our position is it fits squarely



Page 335

1      A      Correct.  About mid-February, I

2   believe it was 12.

3      Q      And that's your most recent figure

4   that you have?

5      A      That's the most recent recollection.

6   We may have applied it to a few more.  But being

7   that with COVID-19, probably not too many more

8   from February to March.

9      Q      Okay.  Do you know how many people

10  total have been subject to the ACA rule on both

11  those who presented at ports and those who have

12  entered between ports?

13     A      No.  I'm just aware of the OFO

14  numbers.

15     Q      Is OFO currently applying the ACA rule

16  to noncitizens entering the U.S. at any ports of

17  entry?

18     A      No, not currently.

19     Q      When did you stop?

20     A      Everything essentially stopped March

21  20th with COVID-19.

22     Q      And does OFO plan on resuming applying



Page 336

1    the ACA rule to noncitizens entering the U.S. at

2    ports of entry?

3              MS. SHINNERS:  Objection.

4              THE WITNESS:  I would imagine -- GO

5    ahead.

6              MS. SHINNERS:  I was going to say

7    calls for speculation, as well as projections

8    about plans that are pre-decision -- would

9    reflect pre-decisional deliberations.

10             So Mr. Hoffman, I'm going to instruct

11   you not to answer to the extent it would call for

12   the revelation of communications or documents

13   that have pre-decisional deliberations in them.

14   BY MS. CROW:

15       Q    Are you going to follow your

16   attorney's instructions?

17       A    Yes.

18       Q    Is there any reason that CBP could not

19   in the future apply the ACA rule to a noncitizen

20   entering the U.S. at any port of entry?

21             MS. SHINNERS:  Objection; calls for

22   speculation.

