1                    United States District Court

2               for the Southern District of California

3                                      )
    AL OTRO LADO, Inc., et al.,        )
4                                      )   No. 17cv2366-BAS
           Plaintiffs,                 )
5                                      )   July 2, 2020
               v.                      )
6                                      )   San Diego, California
    CHAD F. WOLF, etc., et al.,        )
7                                      )
           Defendants.                 )
8                                      )

9              TRANSCRIPT OF TELEPHONIC MOTION HEARING
              BEFORE THE HONORABLE KAREN S. CRAWFORD
10                  United States Magistrate Judge

11   APPEARANCES:

12   For the Plaintiffs:      MAYER BROWN LLP
                                  STEPHEN M. MEDLOCK
13                                Attorney at Law

14   For the Defendants:      U.S. DEPARTMENT OF JUSTICE
                                  KATHERINE J. SHINNERS
15                                Attorney at Law

16

17

18

19
     Court Reporter:          Dana Peabody, RDR, CRR
20                            District Court Clerk's Office
                              333 West Broadway, Suite 420
21                            San Diego, California 92101
                              DanaPeabodyCSR@gmail.com
22

23

24

25

```
 1              San Diego, California, July 2, 2020

 2                          *   *   *

 3       (This is how the recording begins.  It is unknown if there

 4   was a portion of the hearing held without being recorded.)

 5              THE COURT:  Go ahead, I'm sorry.

 6              MS. SHINNERS:  No, and I think -- well -- while

 7   predecisional deliberations remain protected regardless of

 8   whether a final decision has been issued, we do think this is a

 9   particular concern and particularly difficult for the witness

10   and counsel to navigate when there has been no final decision

11   because it is harder to -- everything at that point is still

12   predecisional in terms of analysis, and any conclusion would

13   still be interim at that time.

14       So, for example --

15              THE COURT:  Are you addressing the final reports

16   versus the open or ongoing reports or investigations?  Is that

17   what you're addressing?

18              MS. SHINNERS:  Yes.  So I think --

19              THE COURT:  Predecisional?

20              MS. SHINNERS:  Yes, but I think the concern about

21   revealing predecisional deliberations is at issue regardless of

22   whether the final report has issued or whether the

23   investigation or inquiry is closed in a final report.  Excuse

24   me.  Regardless of whether it's open or closed.  And the reason

25   is that is the fact of the final decision doesn't render any
```

1    predecisional deliberation that were interim conclusion final.

2    And so those interim conclusions or interim recommendations or

3    interim thoughts of perhaps the inspector would still be like

4    the discussions about those would still be privileged.

5        So, for example, if a question was asked in a particular

6    way, and it could be seeking both facts and potentially

7    predecisional deliberation such as an interim conclusion; for

8    example, what facts did, you know, the inspecting entity gather

9    about the capacity of ports of entry?  Well, that seems like a

10    very factual question or about gathering discovery about a

11    factual issue, anything that might ask someone to categorize

12    might prematurely reveal or reveal conclusions that were at

13    that time or might -- the witness might be inclined to reveal

14    that and because at times the selection or categorization of

15    documents are part of the deliberative process.  So -- or

16    questions about why did you interview this person?  Again,

17    these are particularly concerning if there is no final report,

18    but even if there is a final report, those technical questions

19    still involve predecisional consideration.

20        And then the other harms and issues that were noted when

21    conducting the proportionality inquiry as well as the inquiry

22    into the burdens and harms in this case are the exposure of

23    processes and inquiries that, you know, are really, you know,

24    tangential at most to the case.

25        Again, as we noted before, it's not the inspecting or

1   investigating entities processes that are at issue in this case

2   or challenged in this case.  And then there's concern with

3   questions that might press for the witness' personal opinions

4   or opinions that elaborate on conclusions that might be in a

5   final report because the final report should speak for itself,

6   and the documents produced should speak for themselves in terms

7   of the facts that were collected or discovered.

8       And the testimony has a potential to cause confusion as to

9   the position of OIG as well as expose the agencies to -- expose

10  the agencies to a potential, I think, just -- I apologize,

11  Your Honor.  I think that -- I was melding two different

12  points, but the confusion as to -- it would cause confusion as

13  to the position of OIG potentially even if the witness made

14  clear that they were speaking personally, I think that it's

15  where the final report issues conclusions, draws conclusions,

16  then those are the position of OIG.  OIG might also give

17  Congressional testimony on that matter, but the -- those are

18  the statements of OIG, and where -- especially where the

19  benefit of a deposition in this case is not clear, and we think

20  there is not one, that this -- the harms from a live deposition

21  outweigh -- outweigh plaintiffs' choice of discovery method in

22  this case.

23          THE COURT:  Okay.  So -- let me just finish.  You make

24  no distinction, then, between, for instance, Topic 11, which

25  seeks testimony regarding open reports versus -- or

1    investigations versus ones that are closed?

2              MS. SHINNERS:  So --

3              THE COURT:  For Topic 11 and 27 talk about ones that

4    are ongoing or open.

5              MS. SHINNERS:  Just to be clear, Your Honor, there are

6    topics that -- a number of the investigations listed in

7    Topic 11 are closed.  So I just want to make sure that -- I

8    don't want to give a misimpression.  We do make a distinction

9    between those two categories of -- well, there's several

10   categories.  We would make a distinction between investigation,

11   which are conducted by law enforcement investigators and are

12   subject to the law enforcement privilege and that inspections

13   or special reviews.  So those are two distinctions that there

14   are in this case.

15       And then we would also make a -- we do make a distinction

16   between matters that are open and closed regardless of whether

17   there are investigations or what's called an inspection or a

18   review; however, with respect to predecisional deliberation,

19   deliberations that are predecisional remain protected even when

20   there is a final report.

21       So regardless of whether an inspection investigation is

22   open or closed, there are going to be predecisional

23   deliberations that issue interim conclusions or recommendations

24   potentially that were drawn along the way or just that interim

25   decision-making processes really, not even so much interim

1   conclusions that would be protected from disclosure and that

2   are at issue with the deliberative process privilege.

3        Now, with respect to the law enforcement privilege there,

4   you know, to protect sources and witnesses and ongoing

5   investigations, there's an added protection for open

6   investigation.  And so to the extent that there are open

7   investigations, there would be the added issue of law

8   enforcement privilege.

9        Does that answer your question, Your Honor?

10            THE COURT:  I think so.

11       Could you address further why you feel it's more burdensome

12  for the government to prepare these witnesses?  Because there's

13  a lot of "may" and "possibly" and other qualifiers in your

14  papers, and it's not as clear-cut to me why you feel it will be

15  burdensome for the government to produce 30(b)(6) witnesses on

16  these four topics.  Could you address that, please?

17            MS. SHINNERS:  Sure.

18       I think that the main issue really began to be -- goes back

19  to the proportionality analysis in that the plaintiffs have not

20  shown a need to do live questioning on the particular topics

21  related to investigations inspections because those aren't

22  challenged in the case, and the burden in preparing a witness

23  to testify about a variety of different topics, a variety of

24  different investigations, a variety of different inspections,

25  including all the facts that were produced, is in light of that

1   lack of relevance per se or in light of that relevance is due
2   or disproportional to the needs of the case.  The specific
3   added burden that we point to in this case are the potential
4   onerous nature of the deposition because of the privilege
5   issues involved, and to the potential intrusion, it's
6   privileged just because of the difficulty in ascertaining
7   the -- sometimes ascertaining -- in certain instances
8   ascertaining the line between the factual material and the
9   deliberative material.  And thus, our proposed solution and
10  limits relate to -- we think these types of topics could be
11  more easily ascertained through written discovery.  And that's
12  the -- and the burden in preparing that witness and in
13  conducting the deposition in this case, and we face that
14  supported in the case of Jones versus Hernandez and
15  Capsiar (phonetic), that under these circumstances, that the
16  burden of preparing a witness to testify about the multiple
17  investigation and inspection does not outweigh -- does
18  outweigh -- excuse me -- the benefit of a live deposition.
19      We do think it's -- you know, plaintiffs say that they are
20  speaking -- at certain points they have said they are seeking
21  discrete information.  They want to, you know, test what all
22  discovery -- all documents that have been produced, but their
23  topics aren't so limited, and again, we've expressed the
24  concerns about particular types of questions that may probe
25  further beyond the issues of final report and go beyond these

1  discrete factual inquiries, and so that also presents specific
2  harms and a burden to defendants.

3      I think to the extent that we say "may," I think we
4  do -- we do understand that that is speculative; however,
5  plaintiffs have simply not narrowed their topics in any way to
6  say here's the discrete factual inquiries we're seeking, and,
7  you know, today I've pointed to specific examples of the type
8  of questions that lead to sort of the potential intrusions on
9  the privilege aspect of these components work.

10             THE COURT:  Okay.  Thank you.

11      So here's a question which has been posed by plaintiff:
12  Why can't the depositions proceed and the questions asked which
13  potentially elicit privileged information?  You can simply just
14  instruct the witness not to answer.

15             MS. SHINNERS:  Yes, Your Honor.  And that, we would
16  do; however, as I've noted, we think in this particular case,
17  as in the cases of Gen-Probe or Fidelity Management, that
18  instructions not to answer are going to result in a
19  particularly onerous deposition and particularly when compared
20  with the fact that if there's -- if there are questions that
21  are straightforward factual inquiries, those can be easily
22  resolved in writing.

23      The second point in response to plaintiffs' question is
24  that, again, particularly where factual questions might be
25  intertwined with certain predecisional deliberations and,

1    again, particularly where an inspection or investigation

2    is -- we'll focus on inspection -- is not -- is still ongoing

3    or is not yet final, it can be particularly difficult for both

4    counsel and the witness to protect the privilege, and thus we

5    request the limits on these topics and to do written discovery,

6    to do written discovery in lieu of live deposition testimony.

7             THE COURT:  Okay.  Thank you.

8        Is there anything else you want to add with respect to the

9    30(b)(6) inquiry at this time?

10            MS. SHINNERS:  At this time, yeah, I would just like

11   to say -- I mean, we think that defendants have met the burden

12   to show that this method of discovery, and given the breadth of

13   the topic, is not proportional to the needs of the case and

14   that the Court does have the authority to limit it and that

15   proportionality doesn't require a specific calculation of

16   burden where the relative lacking benefit and the burden

17   imposed is clear and where we pointed to specific harms that

18   would result from certain aspects of a deposition.

19            THE COURT:  Okay.  Thank you very much.

20       Who's going to speak for the plaintiff?

21            MR. MEDLOCK:  Your Honor, I will.  This is

22   Stephen Medlock from Mayer Brown, LLP.

23            THE COURT:  All right.  You may proceed.

24            MR. MEDLOCK:  Your Honor, I think you heard and

25   alluded to defendants' argument is extraordinarily premature.

No questions have been asked, no witnesses has taken an oath,
and what we really have here is a motion for protective order
that's based on straw man logic.  If a question is posed that
is -- that is eliciting privileged information, the federal
rules give the defendants an easy remedy.  They can object,
instruct the witness to limit his or her answer, or to not
answer the question.  If there are issues regarding
line-drawing with respect to a particular question, then the
parties can recess, and the witness and their counsel can
confer about privilege.  We've allowed defendants to do that
multiple times and in many depositions in this case to deal
with deliberative process issues, but also to deal with
other -- the applications of other privileges, and where we
disagree, we reserve the right to come back and seek this
Court's guidance, but so far we've been able to deal with those
issues during the depositions.

        What -- what the government is seeking here is to upend
what has been a process that has worked for everyone with
respect to every other deposition in this case based on their
presumptions about what may be asked or what probably would be
asked at the deposition, and the simple fact is that that is
premature.

        I'd like to address a few other topics that Ms. Shinners
raised in her argument.

        The government raises the idea that it would be unduly

1    burdensome or -- burdensome under proportionality analysis to

2    have -- to prepare a witness to testify regarding

3    investigations conducted by DHS either through the Office of

4    Inspector General or the Office of Civil Rights and Civil

5    Liberties, but they ignore the fact that the other defendant in

6    this case, U.S. Customs and Border Protection, produced a

7    30(b)(6) witness to discuss internal CBP investigations on

8    December 20th, 2019, and that deposition went forward without

9    being noticed to the Court for a -- for a protective order, but

10   the government has not explained and explains nowhere and says

11   nothing about -- in its papers of why was it okay for

12   plaintiffs to ask 30(b)(6) questions to CBP about

13   investigations that it was conducting internally, but it is

14   somehow not permissible to ask DHS, another defendant in this

15   case, about similar investigations.

16         In addition, Ms. Shinners also alluded to the fact that

17   defendants apparently believe that these investigations are

18   tangential at best to the case, but I think plaintiffs strongly

19   disagree with that.  And I'll draw your attention to the

20   September 26, 2019, report from DHS's Office of Inspector

21   General regarding violations of the Immigration Nationality Act

22   at Tecate, California, port of entry, in which the Office of

23   Inspector General concluded that CBP officers stationed near

24   the U.S./Mexico border were turning back asylum-seekers from

25   U.S. soil to Mexican soil in violation of the Immigration and

1    Nationality Act.  That aligns almost on all four with the

2    violation alleged in the second amended complaint by plaintiffs

3    in this case.  It is -- although -- it is an investigation and

4    not a document, a contemporaneous document showing that those

5    turn-backs occurred, it's hard to think of evidence that would

6    be -- that would go more to the heart of this case.

7        So I believe that with respect to the relevance prong of

8    proportionality and the importance to the case, the defendants

9    simply have it wrong.  And by ignoring that, the findings of

10    the -- of this OIG report, they're simply trying to -- they're

11    simply trying to rig the proportionality analysis here.

12        Moreover, we have -- just to give you a discrete idea of

13    the -- of the types of questions we may have about that report,

14    that report was signed, and the investigation was overseen by

15    at the time Acting Inspector General Jennifer Costello;

16    however, on June 11th, 2020, the Department of Homeland

17    Security sent a letter to the shares of ranking members of

18    their oversight committees in the U.S. Senate and U.S. House

19    stating that Ms. Costello had been removed from her position,

20    presumably fired, and the letter also appears to repudiate

21    certain actions that Ms. Costello took when she was acting

22    Inspector General of DHS, which would include signing the

23    report concerning Tecate, California, port of entry.

24        Of course, plaintiffs are very concerned that DHS is

25    attempting to distance itself from this report, which we think

1    is -- it is quite damning for defendants in this case.  We

2    definitely want to know at a minimum in our questioning what

3    DHS's position is with respect to that report.

4        I'll also note that we have learned through discovery in

5    this case that the Office of Inspector General, at least in

6    early June 2020, had sent a draft report regarding metering at

7    ports of entry on the U.S./Mexico border, the exact issue in

8    this case, to DHS and CBP for comment, and that that comment

9    period is ongoing.  Certainly if that report is issued, we will

10   want to question a DHS witness regarding the findings of that

11   report.

12       And again, it's hard to think of something that would be

13   more relevant to this case and would go more to the heart of

14   this case, so we simply disagree that these reports are

15   tangential.

16       And I'd also like to note that in response to your question

17   regarding the burden, Ms. Shinners based her answer about what

18   the plaintiffs have not shown, but the burden in that -- the

19   burden analysis within proportionality, as the Court is aware,

20   and all aspects of the proportionality analysis is a shared

21   burden between the plaintiffs and the defendants.  And by

22   attempts to put the entirety of that burden on to plaintiffs,

23   defendants are simply misstating the law.

24       We believe that we have complied with our -- to tailor our

25   discovery requests to the needs of the case.  We are asking

1   about discrete investigations.  We have named them.  We have

2   explained which reports we want to ask about.  And that is not

3   for DHS to prepare -- reasonably prepare a witness to testify

4   on those topics.  We don't believe that we need to outline the

5   exact questions that we will ask at the deposition in order to

6   seek a 30(b)(6) deposition, but we have given you some of the

7   topics that we feel are not privileged, that we would like to

8   discuss at the deposition.

9       And again, to the extent that there's any concern about

10  privilege, the Federal Rules of Civil Procedure have a ready

11  made -- have a ready-made answer, and that is objecting.

12          THE COURT:  My apologies.  I forgot to unmute it.

13      If you could just articulate why you believe this

14  information is relevant beyond what you've already explained to

15  the extent you have anything to add to your comments.

16          MR. MEDLOCK:  Well, Your Honor, I think that if you

17  take this case and just treat it as a normal case, if a

18  defendant investigates in a nonprivileged manner, the

19  allegations that are at issue in the case, and the plaintiff

20  wants to -- wants to seek testimony regarding that

21  investigation, there would be little debate that that

22  information and its findings are relevant, and that's all we're

23  seeking here.  We want to question a witness regarding the

24  conclusion that these investigations came to and the reasons

25  for them.

15

1          And as I've stated previous, the investigations that we are

2     seeking testimony on go directly to the issues in this case;

3     that is, turn-backs of asylum-seekers at ports of entry along

4     the U.S./Mexico border.

5          THE COURT:  Okay.  And why do you feel that responding

6     to this by way of interrogatory responses is insufficient, if

7     you could address that, please?

8          MR. MEDLOCK:  Certainly.  I'm happy to.

9          The interrogatories and live questioning in the deposition

10    are just not the same animal.  First off, interrogatories allow

11    a party 30 days to respond.  The answers are frequently, and

12    not to denigrate interrogatory answers -- generally are

13    frequently drafted by attorneys, have heavily caveated

14    language, extensive objections that precede them, and they can

15    often be difficult to understand what exactly the answer is

16    once you have peeled back all the objections and caveats.

17         In contrast, the iterative question-and-answer format of a

18    deposition allows straightforward answers to straightforward

19    questions.  And as I said, previously, this is the exact mode

20    of questioning that all parties agreed to December 20, 2019,

21    with respect to CBP's internal investigation, and there seems

22    to be no reason why DHS and CBP should have differing rules

23    regarding how plaintiffs elicit evidence regarding their

24    investigations.

25         THE COURT:  Okay.  Thank you.

1        And do you make any distinction or will you concede that

2   there's more of an interest in protecting information on behalf

3   of the government where an investigation is ongoing or open

4   versus closed?

5              MR. MEDLOCK:  Yes, Your Honor, I will concede that,

6   although I will not concede that every question regarding an

7   ongoing investigation is necessarily privileged or necessarily

8   requires discovery through a different mode other than a

9   deposition.  If an investigation is ongoing and there is -- and

10  the question elicits deliberative process privileged

11  information, then the witness can be instructed not to answer

12  the question.  The question may simply be as simple as is this

13  investigation still ongoing, and when will this investigation

14  end.  I don't think that any party would claim that those are

15  eliciting -- those questions are eliciting privileged

16  information.

17             THE COURT:  Okay.  Thank you.

18       Any response, Ms. Shinners, to the arguments raised by

19  Mr. Medlock?

20             MS. SHINNERS:  Yes.  In particular, Mr. Medlock's

21  point that they are seeking a deposition because they would

22  like to ask questions regarding conclusions that are already

23  set forth in a final report to prove defendant's point about

24  the harms or potential harm relating to a deposition.

25  Defendants have produced the final report.  They've produced

1   the factual materials that underlie that final report.  With

2   respect to the ongoing report, that is undergoing the typical

3   prefatory of that type of report under OIG's general procedures

4   in terms of comments from the agencies.  That report we have

5   produced factual information that was gathered in the context

6   of that report.  We have logged information that -- we have

7   logged information that is privileged related to that report.

8   That is not something that plaintiffs don't have, and so, you

9   know, to the extent they want to ask questions about the

10  reasons for the conclusions in a final report, those are there.

11  They have the information.  It just proves that the goal of the

12  deposition is to try to poke holes in that, which is -- which

13  is really not appropriate in this context and is not a discrete

14  factual inquiry and does tend to undermine the independent

15  function of these inspection agencies and cause confusion

16  potentially as to their position.

17      I mean, I just think that that really just underscores the

18  harms from the deposition, and the plaintiffs just haven't

19  showed a need for the information of that nature when they have

20  the report that sets forth the conclusions and the reasons

21  therefor.

22      So none of this is hidden.  This is information that we've

23  produced in discovery.  Much of it is public information.  The

24  Catatki (phonetic) report references public information that

25  plaintiffs have.  They've talked to witnesses underlying that

1   investigation.  They disclosed the witness underlying that

2   investigation.  They have the factual -- they have interview

3   memorandum.  They have all of that information.  They're free

4   to use those facts how they see fit in arguing their case.

5           THE COURT:  Can I just ask you a question?  You're

6   saying that clearly what plaintiffs are trying to do is poke

7   holes in the report.  Isn't that kind of a province of

8   discovery to drill down on the bases for certain positions that

9   are held and analyze that?  I mean, you suggest that that

10  creates confusion and causes harm, but I'm not -- there's a

11  disconnect there.  I'm not understanding why that isn't

12  appropriate for the plaintiff to pursue.

13          MS. SHINNERS:  But what I mean, because OIG's

14  investigatory process in the conduct of their investigation is

15  not what's at issue.  You know, this is not a case about, well,

16  you didn't consider X factor, X factor, in drawing this

17  conclusion.  The conclusions that they drew in particular, say,

18  to the Catatki (phonetic) report, they're public, they note the

19  fact, we've provided those facts to plaintiffs, plaintiffs are

20  free to make arguments about those facts, but to try to go

21  behind the report is -- not only risks confusion, but it's just

22  unnecessary and not relevant to this case.

23      I mean, I understand plaintiffs' point that the facts may

24  be relevant and maybe the existence of the report's relevant.

25  They have that.  I'm not sure -- I'm not sure how -- I

1   don't -- I understand what you're saying about discovery and

2   asking questions about -- to prove certain conclusions, but

3   these conclusions are set forth in the final report.  There's

4   no -- there's no justification for asking a witness to go

5   behind those.  That's the position of the agency.

6             THE COURT:  Okay.  Thank you.

7       Anything further to add?

8             MS. SHINNERS:  Sure, and I think that the -- we did go

9   forward at the deposition from CBP, and I think

10  what -- regarding its Office of Professional Responsibility in

11  the work -- in any work that it had done.  I think there's a

12  difference there.  One, we learned some lessons from that

13  deposition, but two, the difference there is in that case, that

14  is CBP, that is CBP is the defendant in this case, not an

15  independent oversight body, and so as a result, in the

16  deposition of CBP, we could produce, and CBP did designate, a

17  witness to discuss about its investigations, and I think the

18  difference here is that we're talking in particular about OIG,

19  which is a defendant oversight functions, and we agree to

20  provide the discovery pertaining to issues that are relevant to

21  this case, and defendants have done so.  Our position is that a

22  deposition in this case is not necessary and not proportional

23  to the case.

24      In terms of interrogatories, again, they're straightforward

25  factual inquiries or even if there are inquiries that required

1  application of fact conclusions, there's no evidence to show

2  that they would be highly caveated in this case.  We haven't

3  had any disputes or any disputes of any significance about

4  interrogatory responses in this case, and I understand the

5  plaintiffs prefer to take a deposition, but as we said in this

6  case, we think that written discovery should be able to satisfy

7  what actual inquiries plaintiffs may wish to make.

8         THE COURT:  Okay.  Thank you.

9     Any response, Mr. Medlock?

10        MR. MEDLOCK:  Just briefly, Your Honor.

11    I think there's just a point of clarification.

12  Ms. Shinners indicated that -- that a witness was made

13  available from CBP to testify about CBP's internal

14  investigations because CBP is a, quote, defendant in this case.

15  The U.S. Department of Homeland Security is equally a defendant

16  in this case.  And as Ms. Shinners notes, there has been

17  considerable evidence presented -- sorry -- produced from the

18  office of the Inspector General than the Office of Civil Rights

19  and Civil Liberty from DHS in this case.

20     And finally, simply because a document is presented does

21  not mean in discovery -- does not mean that the opposing party

22  simply take the other side of the word for it and isn't allowed

23  to ask further questions about that document in a deposition.

24  If that were the rule, there would be no need for depositions

25  at all.

1          THE COURT:  Okay, thank you.

2      All right.  Susanna, is there anything that you'd like to

3  oppose at this time, any clarifications that you see?

4          LAW CLERK:  No, not at this time, Judge.

5          THE COURT:  Okay.  Thank you.

6      All right.  Let's move on to the document request.  And

7  again, since the defense is essentially seeking -- well,

8  actually, plaintiff is seeking to compel production, so,

9  Mr. Medlock, I'll let you proceed first on this matter.

10         MR. MEDLOCK:  Sure.

11     Your Honor, would you like me to begin with request 220 or

12  222?

13         THE COURT:  Let's start with 220.  And I think it

14  would be simpler if you address 220 and any general comments

15  you want to make with respect to 220 and 222.  And then let me

16  have Ms. Shinners respond to that because then we'll have more

17  continuity on the particular request, and we can proceed that

18  way.

19         MR. MEDLOCK:  Certainly, Your Honor.  I'm happy to do

20  that, and I really believe that these are two very discrete

21  issues that are seeking very discrete requests for production

22  that are seeking discrete sets of documents.

23     For request 222 --

24         THE COURT:  We're starting with 220.

25         MR. MEDLOCK:  220.  I apologize.  For request 220,

1    plaintiffs are seeking documents sufficient to show the

2    guidance that was given to a single custodian, Randy Howe,

3    regarding his preservation of the document and electronically

4    stored information, and we do not gainsay the fact that

5    typically litigation hold notices are privileged and do not get

6    produced; however, in this case, there have been a significant

7    preliminary showing of spoliation on Mr. Howe's part, and

8    significantly the parties do not dispute the key facts that are

9    at issue here.

10        First, in October 2017, Mr. Howe was promoted to become the

11   executive director of operations in U.S. Customs and Border

12   Protection Office of Field Operation.  In that position he was

13   the official that was directly responsible for the management

14   of operations at ports of entry along the U.S./Mexico border.

15   And that would include the processing and inspection of

16   asylum-seekers at those ports of entry, which is the exact

17   issue that is at the heart of this case.

18        Although he was promoted into that position in

19   October 2017, which was after this litigation was filed in

20   July 2017, everyone agreed that Mr. Howe did not receive a

21   litigation hold notice for over 14 months, from October 2017

22   until December 2018.

23        Furthermore, Mr. Howe testified at his deposition that he

24   routinely attended an 8:15 a.m. meeting with the highest

25   official in the Office of Field Operations where he took

1   limited written notes into the meeting and jotted down short

2   notes to himself to jog his memory about what was discussed

3   during that meeting.  And afterwards, he sometimes took those

4   notes to a meeting with his direct reports so that he could

5   tell them what had been discussed in the 8:15 meeting, and

6   following that meeting with his direct reports, he routinely

7   threw those notes into a shred bin in his office.  He did this

8   both before he received the litigation hold notice and after he

9   received the litigation hold notice.  There is no dispute about

10  those facts.

11      And plaintiffs believe that that shows -- is a significant

12  showing of -- of a preliminary showing of spoliation.

13      Now, in their briefing, defendants spent a great deal of

14  time explaining why this might not be -- ultimately be

15  spoliation.  But that is a different argument under a different

16  legal standard for a different day.  The case that is directly

17  on point, City of Colton, which is cited in our brief, says

18  that an extraordinary delay in sending out a litigation hold

19  notice can be enough for a preliminary showing of spoliation.

20      And here we think it is self-evident that we need 14 months

21  to send a litigation hold notice to a key custodian at a high

22  level within the Office of Field Operations is a -- is an

23  extraordinary delay, and it's not as though Mr. Howe was some

24  sort of tangential custodian.  When time came for CBP to name a

25  30(b)(6) witness on most of the substantive issues in this

 1    case, Mr. Howe was that 30(b)(6) witness.

 2        So what we were ultimately deprived of here from the

 3    plaintiffs' side is we did not have these notes that Mr. Howe

 4    testified at his deposition were the only evidence that he is

 5    aware of of what was discussed at this regular 8:15 a.m.

 6    meeting and that he testified he uses to jog his memory.  We

 7    didn't have those notes to refresh his recollection about what

 8    was discussed during these meetings regarding the inspection

 9    and processing of asylum-seekers at ports of entry on the

10    U.S./Mexico border.  We think that that is certainly enough to

11    overcome the usual presumption that litigation hold notices

12    should not be produced because we have shown and made a

13    significant preliminary showing of spoliation.

14            THE COURT:  If I could interject for a moment, if what

15    you say is true, that it's already been established that it was

16    a 14-month delay in providing them with notice, you know, that

17    the notes were a point that he would have discussed with folks

18    at both of those meetings, that those notes were thrown into

19    the shredder, don't you have enough to establish spoliation?

20    Why do you need the retention letter?  The litigation --

21            MR. MEDLOCK:  Well, we certainly think that we do

22    already, but we think we need -- we believe we need the

23    litigation hold notice for two reasons:  One, those

24    notice -- we want to know one of those notices would have

25    instructed Mr. Howe to obtain these notes that he sent -- that

1    he then put into the shred bin because one of the things we

2    need to establish for a showing of spoliation is a level of

3    culpability on behalf of the spoliator.  So did he act

4    willfully?  Did he act recklessly?  Did he act simply

5    negligently?  If he was explicitly instructed to save written

6    notes and failed to do so, that would buttress our argument

7    that this may be willful.  If the litigation hold notice is

8    deficient and didn't say "save your written notes," then

9    perhaps it is reckless or grossly negligent or negligent, but

10   we need the litigation hold notice to tell us that.

11       And quite frankly, when the key witness has testified that

12   despite receiving the litigation hold notice, he destroyed

13   relevant documents, we want to know whether there were

14   loopholes built into the litigation hold notice that

15   allowed -- that would have sent a signal that this sort of

16   behavior was condoned, and that's why we need to know what's in

17   the hold notice.

18           THE COURT:  Okay.  You said there were two -- I said

19   why do you need the letter.  You said there were two issues.

20   One was what you just advised.  What was the second?

21           MR. MEDLOCK:  Oh, the second is whether the -- and it

22   may be they blend together somewhat, so I apologize if I didn't

23   make them distinct.  The second is whether the litigation hold

24   notice was --

25           THE COURT:  Was deficient.

1        MR. MEDLOCK:  -- on its face deficient because it

2   allowed custodians to destroy certain categories of documents

3   that would have been relevant for one of the things that

4   sometimes comes up in cases such as this, and I don't know if

5   this is the case, is a litigation hold notice.  The parties of

6   the litigation hold notice without disclosing it to anyone in

7   the case to tell custodians you should run search terms, and if

8   your email comes back with the following search terms, then

9   preserve it, but if it doesn't, don't -- you don't need to

10  preserve anything.  If that were the case, then we'd argue that

11  that was -- that that was a similar issue, so we need to know

12  how systemic the problems are that are indicated by Mr. Howe's

13  behavior.

14        THE COURT:  Okay.  So just to follow up on that, I

15  understand the logic in not having the notes available

16  precluded you from asking him questions about what a particular

17  trigger point or other comment might have had in those notes.

18  It limited your ability to be able to drill down on the -- on

19  what some of those points might have been and whether they were

20  germane to this case, but ultimately whether he was willful or

21  negligent, what level of culpability he might have, whether

22  there was a deficiency in the notice, how does that help you in

23  this litigation?  Why do you need that in this litigation?  Is

24  it for issue preclusion or seeking some other form of sanction?

25  Why do you need it when you already know there's spoliation?

1          MR. MEDLOCK:  Yes, so it will direct the parties

2     to -- and the Court to what particular remedy is necessary.  So

3     the level of culpability directly in the Ninth Circuit

4     spoliation cases directly ties into whether you're simply in

5     the realm of an instruction or a presumption or in the most

6     extreme cases a default judgment.

7          THE COURT:  Okay.  Thank you.

8        Anything further on 220?

9          MR. MEDLOCK:  There's nothing further from plaintiffs

10    on 220 at this time, Your Honor.

11         THE COURT:  All right.  Just one other inquiry.  The

12    defendant states that the information that Mr. Howe noted in

13    his bullet points was typically captured or memorialized in

14    other forms.  Why isn't this sufficient?

15         MR. MEDLOCK:  I think that the selective reading of

16    the transcript, to be frank, Your Honor, Mr. -- after he said

17    that Mr. Howe clarified that that occurred sometimes, but it

18    did not occur all of the time, and he also went on to testify

19    that the only evidence that he's aware of that directly shows

20    what was discussed at the meetings are his notes.  And without

21    that, we were forced to rely on sort of hazy and general

22    recollections from Mr. Howe and others who attended that

23    meeting.

24         THE COURT:  Okay.  Thank you.

25        All right.  So with respect to 220, Ms. Shinners.

1          MS. SHINNERS:  Yes, Your Honor.

2      So defendants and plaintiffs agree that the litigation hold

3  notice is privileged, so I don't -- I guess we do not need to

4  touch on that.

5      And first of all, we -- defendants do not believe that it's

6  plaintiffs' -- or that it's defendants' burden to defeat their

7  allegations of spoliation and that it's plaintiffs' burden to

8  show spoliation as well as to show a need for the litigation

9  hold, and I think you touched on, Your Honor, a number of the

10  relevant points here.

11     Regardless of when Mr. Howe himself received a litigation

12  hold, defendants contend that the showing plaintiffs have made

13  is not enough to either waive the privilege or show that

14  there's any need for the litigation hold notice in this case,

15  which is, I think, related.

16     We've provided plaintiffs with a number of information

17  regarding this issue with respect to Mr. Howe of including the

18  date he received the litigation hold, he was instructed to

19  preserve ESI and hard copy.

20     Plaintiffs had the opportunity to depose Mr. Howe, and he

21  explained the reasons that he did not retain these notes, and

22  that was because he -- they were not substantive, and they

23  contained only a few words to trigger his memory.

24     Plaintiffs had the opportunity to question him about his

25  practices, and they did so, and they had the opportunity to

1    question him about whether particular facts were discussed at
2    particular meetings.

3        Now, I understand they have made an argument that they're
4    prejudiced by the inability to try to refresh his recollection
5    with those notes.  These were daily operational meetings.  As
6    Mr. Howe stated, typically what he would have been talking
7    about at the meetings that he might have jotted down before
8    going into the meetings were reportable incidents and things
9    that were otherwise reflected in email and that he may have
10   jotted down things that he needed to follow-up on from his boss
11   at these daily meetings, and those would have been reflected in
12   some sort of email because he would have actually followed up.

13       So I think given all this information, we've -- defendants
14   do not see the necessity for waiving the attorney-client
15   privilege and the work product protection over the litigation
16   hold notice in this case, and we don't think that there's any
17   reason to probe further into what the level of intent may be.
18   They've already asked Mr. Howe about the reasons that
19   he -- that he did not retain these particular notes.

20       Another point I wanted to make is that in addition to
21   Mr. Howe saying that, well, his particular notes, they have
22   been the best evidence of what he wrote down, that there were
23   these other electronic trails for what he would have written
24   down, we also produced notes from another individual who was
25   present at these daily meetings, and there is other evidence

1    from these daily meetings, and they said that nothing

2    responsive would have produced from these meetings is

3    additional evidence that nothing material would have been lost.

4        In some --

5            THE COURT:  What was the other individual you're

6    referring to?

7            MS. SHINNERS:  Executive Director Todd Hoffman.

8            THE COURT:  Okay.  Thank you.

9            MS. SHINNERS:  Thank you.

10           THE COURT:  You can proceed.

11           MS. SHINNERS:  Some defendants, you know, are

12   not -- defendants have to maintain that, of course, the

13   litigation hold notice is privileged and that the evidence

14   doesn't provide -- isn't sufficient to waive that privilege in

15   this instance.

16           THE COURT:  Okay.  Thank you.

17       So one of the things that you articulate in the papers is

18   that you seek -- hold on one second.  You indicate that the

19   hold -- the litigation hold contains legal guidance with

20   respect to preservation obligations as well as the mental

21   impressions of counsel.  Are you able to elaborate on what

22   aspects of the litigation hold pertain to mental impressions of

23   counsel?

24           MS. SHINNERS:  Sure.  I can -- I think there's a

25   significant overlap, but in terms of identifying categories of

1  information that are deemed relevant that may be broader than

2  what are called for by the responsive -- the request for

3  production in this case, for example.

4        THE COURT:  Yes.

5        MS. SHINNERS:  That's really the primary category of

6  information that I think -- the entire document I think

7  reflects the legal advice of counsel.  It was drafted by

8  counsel, and put out by counsel, and reflects the legal advice,

9  but that's the additional layer in terms of the mental

10  impressions of counsel with respect to litigation strategy.

11        THE COURT:  So you impose litigation strategy in a

12  litigation hold document?

13        MS. SHINNERS:  No, the point I was trying to make,

14  perhaps inartfully, was more that those categories of

15  information about relevant -- tends to reveal the impressions

16  of counsel about things, again, that may be broader than what

17  plaintiffs have requested in this case and would thus reveal

18  some aspects of litigation strategy.

19        THE COURT:  Couldn't that be addressed by having an in

20  camera review of the documents and redaction of any mental

21  impressions?

22        MS. SHINNERS:  I think that there would be overlap.  I

23  think just the categorization of relevant topics could be

24  considered covered by the work product doctrine here, and so I

25  think there's overlap, in effect, between what plaintiffs are

1    seeking and those mental impressions of counsel, if that makes

2    sense.

3              THE COURT:  Okay.  You state in your papers that the

4    notes were not substantive and they were just little notes and

5    that the duty to extend only pertains to relevant documents.

6    Are you suggesting that these notes were not relevant?

7              MS. SHINNERS:  I think that's -- I think that what I

8    was making that argument for was twofold.  One, that as it

9    relates to Mr. Howe's mental state in terms of why he didn't

10   retain those documents; and then the second one is I think it's

11   clear that not -- that likely those notes were not responsive

12   and intentionally not relevant.  The daily meetings discussed a

13   variety of operational issues, and there's a number of

14   operational issues that CBP's Office of Field Operations deal

15   with that, of course, go beyond the issues in this case.

16        Some of the examples Mr. Howe gave, he would typically talk

17   about reportable incidents or incidents that happened in the

18   past 24 hours, many of which -- some of which would be

19   relevant, but would otherwise represented in emails because

20   it's a reportable incident or would not be relevant.

21        So I think it's very likely, too, that if these notes were

22   very nonsubstantive, then they were likely not to be

23   responsive.

24        We did want to make sure that we disclosed this issue to

25   plaintiffs in the interest of full disclosure despite the fact

1    that the notes were typically just nonsubstantive, one or two
2    words to trigger his memory.
3             THE COURT:  Right, but without having the benefit of
4    actually seeing those notes, how can you make a determination
5    on whether or not they were relevant or at least partially
6    relevant?
7             MS. SHINNERS:  The -- yes, Your Honor.  Again, I mean
8    I -- I think that's a difficult question.  We can't concede
9    that they were relevant.  Again, it's very likely that
10   they -- given the nature of these notes, one or two words,
11   they're not something that would have been responsive given the
12   nature of the meeting; however, yeah, I mean, we acknowledge
13   that we don't have the particular notes in front of us.
14        Plaintiffs have also had the opportunity to depose Mr. Howe
15   and depose other individuals who were at these daily
16   operational meetings, received numerous documents about the
17   case, and so they -- you know, they could have asked specific
18   questions of these witnesses about what was discussed or if
19   there are things that they think they wanted to know, they've
20   had the opportunity to ask those witnesses.
21            THE COURT:  Yeah, I guess I'm -- I'm trying to drill
22   down a little bit more.  If you were to ask me where I had
23   lunch last Tuesday, I wouldn't have any idea how to respond,
24   but if I had my calendar open, and it said, you know, "lunch
25   with Cindy" or "Milton's," I would remember exactly where I was

1   and who I met and everything else, and it would just be maybe

2   one word that would trigger that.  The defense -- excuse me,

3   the plaintiff was precluded from being able to trigger the

4   witness' memory because they didn't have those notes.  That's

5   the problem.  So when you respond by saying they could have

6   asked questions in the deposition, true, but he still might not

7   know where he had lunch last Tuesday because he doesn't have

8   the notes to jog his memory, so that's the problem with it.

9   What I'm --

10          MS. SHINNERS:  Yeah.

11          THE COURT:  What I'm concerned about is that there's a

12   statement from the defense that these notes aren't relevant,

13   they're just little notes, and they're not substantive, but you

14   haven't actually seen the notes, so how can you determine

15   whether they're relevant or not or partially relevant?  I don't

16   understand that.

17          MS. SHINNERS:  Sure.  I mean, again, I think it's a

18   difficult question.  Your point is -- is understood,

19   Your Honor, but I think the point we're making is that they are

20   likely not to have been relevant or that the information is

21   likely not to have been responsive and beyond what has already

22   been produced.  I mean, I think the fact that we did produce

23   notes from Todd Hoffman, who took notes at those meetings, and

24   also the fact that, you know, other things could have been used

25   to jog his memory about things that he might have talked about

1    such as reportable incidents, emails that Mr. Howe would have

2    sent after those meetings.  I don't know -- I don't -- while I

3    see your point, and I don't know that that relates to the need

4    for the litigation hold.  The point that we were making with

5    the nonsubstantive nature of the notes was -- went to

6    Mr. Howe's mental state, and so regardless of -- regardless of

7    this issue, I don't think that it goes to a necessity for

8    production of the litigation hold with respect to this request

9    for production.

10              THE COURT:  Okay.  Thank you.

11         Let's move on to request Number 222.

12         Mr. Medlock.

13              MR. MEDLOCK:  Yes, Your Honor.  Happy to move on to

14    222.

15              THE COURT:  Hold on.  Before doing so, did you have

16    any response to Ms. Shinners' arguments with respect to 220?

17              MR. MEDLOCK:  Very, very briefly.

18         First, Your Honor raised the idea of an in camera review of

19    the litigation holds.  Plaintiffs are fine with that.  We think

20    that's a -- if Your Honor's willing to take on that task, we

21    would agree to it.

22         Second, Ms. Shinners made a reference to notes

23    produced -- a witness -- a custodian named Todd Hoffman and

24    that those somehow could have been used to refresh Mr. Howe's

25    recollection.  The only way I could have done that at

1    those -- at Mr. Howe's deposition is if I was a time traveler.

2    Mr. Howe's notes -- sorry.  Mr. Hoffman's notes were produced

3    to us in June 2020.  Mr. Howe's deposition took place in

4    January of 2020.  So I think this just highlights the prejudice

5    here short of reopening his deposition.  There's -- you know,

6    the testimony is that what the testimony was six months before

7    then, and we did not have the benefit of anyone's notes at that

8    point.

9        And also I'd point out that Mr. Hoffman's notes appear

10   to -- are very brief, just like Mr. Howe testified that his

11   notes were, and defendant still undertook the work to find them

12   and produce them to us.  This only points out the fact that

13   Mr. Howe's notes likely did contain relevant material that

14   would have been produceable because -- because defendants have

15   produced notes from another custodian, a similarly high level

16   within the Office of Field Operations, so we think it only

17   highlights the fact that we've made a preliminary showing of

18   spoliation.

19       And I want to close by just focusing on that preliminary

20   showing.

21           THE COURT:  Can I just interrupt?  When was Mr. Howe's

22   deposition taken again?

23           MR. MEDLOCK:  Mr. Howe's deposition, I believe, was

24   taken January 8th, 2020.

25           THE COURT:  Thank you.

37

1          MR. MEDLOCK:  And Mr. Hoffman's notes were

2    presented -- were produced to us, I believe, June 9, 2020.

3          THE COURT:  Okay.  Thank you.  You may proceed.

4          MR. MEDLOCK:  And I just wanted to point out the real

5    legal standard here is a preliminary showing of spoliation.  A

6    lot of defendants' arguments are sort of like two ships passing

7    in the night.  They're arguing that no spoliation occurred for

8    various reasons.  That's a legal standard.  That's a standard

9    for a different motion that will be most likely filed on a

10   different day.  Right now all we're talking about was whether

11   there was a preliminary showing of spoliation, and City of

12   Colton says that as little as the -- an extraordinary delay in

13   sending out a litigation hold notice is sufficient for a

14   preliminary showing of spoliation, and I heard nothing in

15   Ms. Shinners' argument to say that the 14-month delay was not

16   an extraordinary delay.

17         THE COURT:  Thank you.

18      And, Ms. Shinners, I did mean to ask you why was there a

19   delay in providing Officer Howe with the litigation hold

20   notice?  He was elevated in October of 2017, but as stated in

21   the papers, he didn't receive the notice until December 20th of

22   2018.  Can you address that?

23         MS. SHINNERS:  I don't believe I have enough facts to

24   address that fully today, Your Honor.  We don't dispute

25   that -- I mean, we've given plaintiffs the date that he

38

1   received the litigation hold, which was -- and I will note

2   that, you know, the complaint was amended and filed 2018.  The

3   litigation hold that went out in December of 2018 was after the

4   amendment of the complaint.  And Mr. Howe did receive that

5   litigation hold.  And, you know -- yeah, I -- we don't dispute

6   that he, he, this particular individual, did not receive a

7   litigation hold until that -- until December of 2018.  Again, I

8   don't think I can answer more fully without talking to

9   individuals in a bit more detail about that.

10          THE COURT:  Okay.  And can I ask further, I mean, the

11  papers suggest that he received the notice on December 20 of

12  2018, but then he didn't retain notes until January of 2020.

13  Is that correct?

14          MS. SHINNERS:  Right.  Again --

15          THE COURT:  Why didn't you retain notes after getting

16  the litigation hold on December 20th, 2018?

17          MS. SHINNERS:  Right.  Again, that's -- his -- he did

18  not view the notes as substantive.  They were one or two words,

19  and that is his explanation provided in his deposition as to

20  why he did not retain notes.  Again, regardless of whether or

21  not they may have had to do with relevant, responsive

22  documents, that is his reason that he has given in his

23  deposition.

24          THE COURT:  And have any of his cryptic notes been

25  produced since January of 2020?

1          MS. SHINNERS:  He is in a different position now.

2          THE COURT:  Okay.

3          MS. SHINNERS:  So --

4          THE COURT:  No.

5          MS. SHINNERS:  So no.

6          THE COURT:  When was he moved from his position?

7          MS. SHINNERS:  It was actually -- he was already

8   transferring his position at the time his deposition took

9   place, so the decision -- his transfer -- I'm not entirely sure

10  when he decided to transfer, but he decided to transfer

11  sometime before his deposition, and if plaintiffs' counsel will

12  recall, we were scheduling a deposition, we were needing to

13  schedule it before a particular date because we had movers

14  coming and things happening.

15         THE COURT:  Okay.

16         MS. SHINNERS:  So it was very shortly after his

17  deposition.

18         THE COURT:  Okay.  Thank you.

19     Anything further with respect to 220?

20         MS. SHINNERS:  No, just that, Your Honor, defendants

21  are also happy to submit the litigation hold for in camera

22  review as well.

23         THE COURT:  Okay.  Thanks very much.

24     Let's move to 222.

25     Mr. Medlock.

1           MR. MEDLOCK:  Thank you, Your Honor.

2      Request 222 is a similarly narrow request.  We are seeking

3 documents regarding guidance given to DHS and CBP officials

4 concerning the implementation of Judge Bashant's preliminary

5 injunction ruling with respect to what we have called -- we

6 call asylum ban, but it's sometimes called The Transit Rule.

7      The -- we believe that this is directly relevant to this

8 case, and for that relevance, you need look no further than

9 Judge Bashant's ruling in the preliminary injunction motion.

10 Judge Bashant explicitly found that there was, quote, a

11 sufficient nexus between plaintiffs' request for an injunction

12 and the claims in their second amended complaint, and that's at

13 423 F. Supp. 3d. 848, page 868.

14      And similarly, a motions panel for the Ninth Circuit found

15 that Judge Bashant's preliminary injunction ruling was tied to

16 her statutory interpretation that -- in the motion-to-dismiss

17 ruling in this case.

18      So the defendants' suggestion that this is simply a fishing

19 exercise that has no relevance to the case is absolutely wrong,

20 but even if that were true, courts have the inherent authority

21 to monitor and enforce their prior orders and to allow

22 discovery into those issues.

23      And here we're simply asking for a very brief document

24 production, possibly in the tens of documents, showing the

25 guidance that was issued.

1    Defendants also suggest that this might -- this information

2  might be privileged, but if that were the case, the cat is out

3  of the bag.  Defendants have allowed plaintiffs to take

4  significant formal and informal discovery.

5    We point to some of this on page 6 of the joint motion, but

6  I wanted to highlight what has occurred since the joint motion

7  was filed.

8    As we've previously alluded to during this oral argument,

9  the deposition of Todd Hoffman from the Office of Field

10 Operations was taken on June 10, 2020, and during that

11 deposition at page 315 of the transcript, my colleague,

12 Ms. Crow, asked Mr. Hoffman questions.  "Were you involved in

13 determining how to implement The Transit Rule injunction; in

14 other words, Judge Bashant's preliminary injunction ruling?"

15 In response to that question, Ms. Shinners stated, "Objection.

16 Never mind.  Objection withdrawn."  And then over the next six

17 pages of the transcript, defense counsel permitted Mr. Hoffman

18 to testify about a range of topics related to the

19 implementation of the preliminary injunction in this case,

20 including questions regarding what data was pulled to implement

21 the preliminary injunction, who received the guidance

22 implementing the preliminary injunction, the substance of the

23 guidance, the names of the people who were involved in drafting

24 the guidance, and meetings that Mr. Hoffman had about the

25 implementation of the injunction.

1        So the idea that any guidance that was issued was somehow

2   privileged has long since given way because defense counsel has

3   permitted testimony -- deposition testimony on this very topic

4   and have themselves made volitional and intentional statements

5   regarding when the guidance was issued and a summary of what

6   was contained in the guidance.

7        So we believe we've easily met the showings of relevance,

8   and if there was any sort of privilege attached to this

9   guidance, that that privilege has long since been waived.

10       So given that those are the principal objections that

11  defendants put forward to -- to the effective motion to compel,

12  we see no reason why this limited discovery should not go

13  forward.

14            THE COURT:  Okay.  Thank you.

15       Why do you need these documents?

16            MR. MEDLOCK:  We need these documents, Your Honor,

17  because as soon as the motions panel from the Ninth Circuit

18  dissolved the temporary administrative stay that was put on

19  Judge Bashant's ruling, we started receiving feedback from

20  members of our -- of the class that Judge Bashant certified

21  indicating that immigration judges were not -- were not

22  enforcing the Ninth Circuit's ruling, they were somehow stating

23  that the motions panel's ruling had no effect and that they

24  could nevertheless deny asylum based on the application of The

25  Transit Rule.

1          That's a direct violation of the preliminary injunction,

2     and most disturbingly, after our motion -- after this motion

3     was filed in mid-June 2020, we learned of yet another instance

4     of noncompliance that occurred.

5          In this most recent instance, it's not simply the

6     immigration judge who did not effectuate the preliminary

7     injunction, the -- an attorney from the U.S. Department of

8     Homeland Security actually opposed, filed a brief opposing the

9     class members' motion to reopen their proceedings and for a

10    judgment of asylum because of their -- because their

11    interpretation -- because of DHS's apparent interpretation that

12    the preliminary injunction had no effect.

13         So we are seeing specific instances of noncompliance, and

14    we want to determine whether those instances of noncompliance

15    are simply rouge actors or individuals that made, you know,

16    good faith but ultimately incorrect interpretations of guidance

17    or if the guidance that was given to those individuals was

18    incomplete or inaccurate.

19              THE COURT:  So let's assume for a moment that there

20    has been noncompliance.  How does that impact your clients or

21    potential class of clients?

22              MR. MEDLOCK:  It impacts them greatly, Your Honor,

23    because these are individuals who would otherwise receive

24    asylum, but are being denied asylum in immigration proceedings,

25    so they've -- so it's hard to think of a more drastic way that

1    a member of our class could be harmed because ultimately this

2    case is about access to the U.S. asylum process, and these

3    individuals are being effectively denied access to that process

4    because of the -- because of the incorrect application of The

5    Transit Rule in violation of Judge Bashant's preliminary

6    injunction ruling.

7                THE COURT:  Okay.  Thank you.

8          Ms. Shinners.

9                MS. SHINNERS:  Yes, Your Honor.

10         So I'd like to address initially the privilege argument

11   made, which is a bit of a straw man.  The -- there are several

12   components of DHS as well as component of U.S. DOJ, the

13   Executive Office for Immigration Review, that are involved in

14   some way in taking action related to the preliminary

15   injunction.  We have provided -- defendants have provided

16   plaintiffs more informally in terms of discussions in trying

17   to -- in the interest of compromise and address issues relating

18   to the preliminary injunction.  We've provided a list of

19   guidance or instructions or procedures that have been provided

20   to the field in terms of the preliminary injunction.

21         And so what Mr. Medlock was discussing earlier in terms of

22   a waiver of privilege was really related only to a particular

23   aspect of that guidance and instructions given by CBP's Office

24   of Field Operations regarding the preliminary injunction.

25         Of course, as we've noted in our brief, CBP is not the

1    primary entity implementing the preliminary injunction for DHS.

2    That is USCIF, but the point remains that, no, we do not argue

3    that all of the guidance issued is privileged.  We have

4    provided nonprivileged information to plaintiffs about

5    instructions.  We've also notified them of guidance that is

6    privileged, attorney-client privileged guidance, and provided

7    them with the date that that has been provided, so any argument

8    about waiver of privilege we don't think is applicable here.

9        We don't assert privilege over the information that we have

10   provided, and to the extent that we do assert privilege over

11   some of the guidance, we continue to assert privilege over it

12   as legal guidance under the attorney -- an attorney-client

13   communication.

14       So that said, we don't dispute that whatever was testified

15   to by Mr. Hoffman or information about the procedures taken by

16   CBP, that that is not privileged.  So we do reserve any

17   assertions of privilege over any other guidance over which we

18   have asserted the privilege.

19       In terms of the substance of the request, the instances of

20   noncompliance that plaintiffs allege, although we do dispute

21   some of their characterizations before cited in the brief, as

22   we noted, relates solely to the Executive Office for

23   Immigration Review and have nothing to do with any guidance

24   that is sought in this particular request for production.

25       Now, since the plaintiffs have pointed some of those out to

1   us, three of them -- three of those instances has been

2   addressed by the immigration judges themselves.  Three of those

3   aliens who are class members now have been granted asylum.  The

4   remainder, the fourth, is -- that case is going through the

5   immigration procedures.  It is on appeal, so those

6   administrative procedures can serve to address any -- if there

7   had been any error in adjudication or those administration

8   procedures can address that.

9        Now, the instance mentioned by Mr. Medlock that is more

10  recent and states it involves a DHS attorney, that would be a

11  DHS attorney from U.S. Immigration and Customs Enforcement, and

12  the brief that was initially incorrect was corrected, even

13  before -- about the effect of the preliminary injunction, I

14  think within one or two days.  And I think -- in that case I'm

15  not -- we are -- we just -- don't think those -- these

16  instances give rise to any reason to require the production of

17  the guidance in terms of the need to enforce instances of the

18  preliminary injunction because they're so few identified, five

19  instances of the tens of thousands or thousands of class

20  members, and we have been working with plaintiff to address

21  those as they arise or -- in working with the agencies to

22  address those as necessary as they arise, and plaintiffs are

23  aware, and we just don't see any need for the documents

24  requested in this request.

25            THE COURT:  My apologies.

 1          Any response, Mr. Medlock?

 2               MR. MEDLOCK:  Yes, Your Honor, I do, briefly.

 3          I'd like to address first the statement that really what's

 4     been provided to plaintiffs so far on a formal or informal

 5     basis has really been metadata essentially about when

 6     directives were issued, who they were directed to, and who they

 7     came from.

 8          That's simply not the case, so I'll direct you to pages 317

 9     to 318 of Todd Hoffman's deposition transcript.  The question

10     put to him that was not objected to in any shape or form by

11     defense counsel was, "Well, what was the substance of that

12     directive?"  Referring to a directive regarding the

13     implementation of the preliminary injunction.  And then

14     Mr. Hoffman gave a four- or five-line summary of what the

15     substance of the directive implementing the -- the --

16     implementing the preliminary injunction was.

17          So it's simply not true that there has been no discussion

18     about the substance of those directives in discovery.  In fact,

19     testimony was directly elicited on this point on June 10, 2020,

20     and we believe that that's a waiver.

21          Further, Ms. Shinners points to five total incidents, three

22     of which are -- have been addressed, and others are in the

23     process of being addressed.  The -- we are not -- our concern

24     is not with the number of incidents, but the fact that the

25     incidents are occurring.  We are concerned by the fact that any

1    noncompliance with the injunction because Judge Bashant's

2    preliminary injunction, as it should be, in full force and

3    effect, and we want to understand why those instances of

4    noncompliance, even if they have been righted, occurred in the

5    first place.  That's really the issue here.

6        And really, I also point out that the mere fact has been

7    three to five -- five instances of noncompliance is most likely

8    a dramatic undercounting because those instances we only know

9    about because sophisticated immigration counsel reached out to

10   us with those issues.  Most individuals in immigration

11   proceedings are representing themselves and do not have a

12   sophisticated understanding of the immigration legal system,

13   much less what to them would be collateral litigation that they

14   may not even be able to access because it's behind a paywall on

15   PACER, and because they may have language issues, so the mere

16   fact that there's only been five instances that have been

17   brought to the government's attention does not mean that those

18   are the only five instances that exist out there.

19       Counsel also has tried to draw some distinctions between

20   differing agencies of DHS, and I'd just like to go back to the

21   actual request that's at issue here.  What plaintiffs are

22   asking is for the documents that provided guidance to DHS

23   officers or employees regarding the injunction.

24       As I stated before, it's not just CBP that is a defendant

25   in this case.  It's also the U.S. Department of Homeland

49

1   Security.  And they are equally bound by the injunction as a

2   party to this case, so I fail to see the distinctions and

3   line-drawing that's -- the significance of the line-drawing

4   between component agencies of DHS that has -- was drawn by

5   Ms. Shinners.

6       And I think Ms. Shinners also raised issues with respect to

7   the Executive Office of Immigration Review and DOJ.

8       We acknowledge that the Department of Justice and the

9   Executive Office of Immigration Review are not parties to this

10  case, and we -- and that's why we didn't seek their documents

11  in Request 222, so I believe that argument belies on a bit of

12  sleight of hand.

13          THE COURT:  If this document did demonstrate -- if

14  produced, if I ordered them to be produced, if they did show

15  insufficient guidance in your determination, what would be

16  plaintiffs' remedy?  What remedy would you seek?

17          MR. MEDLOCK:  We have been meeting and conferring for

18  sometime now with defendants regarding a potential motion for a

19  clarification of Judge Bashant's ruling to make it clear that

20  these instances of noncompliance are, in fact, noncompliant

21  with her preliminary injunction ruling.

22      What we really want to see is does this guidance

23  say -- does this guidance say, look, you only need to do the

24  bare minimum to comply with this, and here's what we think it

25  is.  You don't all need to do anything to give -- to make sure

1    that noncitizens in asylum proceedings are not subject to the

2    improper application of The Transit Rule.

3        And if that's the case, I think we need to have -- we may

4    need to ask Judge Bashant to further clarify her ruling to make

5    it clear that these -- these instances of what we believe are

6    noncompliant are, in fact, noncompliance with the preliminary

7    injunction ruling.

8            THE COURT:  Okay.  Thank you.

9        Any response, Ms. Shinners?

10            MS. SHINNERS:  Yeah, there's a couple things I want to

11   mention.

12       First, I should have mentioned this before, but I do want

13   the Court to note that The Transit Rule that has been enjoined

14   with respect to the class by the district court's preliminary

15   injunction was, in fact, vacated this week, the interim final

16   rule that encompasses The Transit Rule, so it's not in effect

17   at all.

18            THE COURT:  Who --

19            MS. SHINNERS:  It was -- the district court for the

20   District of Colombia, and it's -- I am getting the case number

21   now, but it's Cair, C-A-I-R, and I might have to wait on the

22   case number, but yeah, it's -- so that's been vacated at this

23   time.

24       But I really -- I will provide the case number as soon as I

25   can, but I really wanted to note I'm a little concerned about

 1  the characterization of the privilege issues here.

 2      I want to make very clear that any information that may

 3  have been provided by CBP regarding procedures taken with

 4  respect to the preliminary injunction is CBP's procedures.

 5  There was no assertion of privilege there to begin with, but

 6  had there been, Mr. Hoffman certainly could not waive it with

 7  respect to other guidance issued by other components that does

 8  constitute legal guidance and attorney-client communication.

 9      So -- and also procedures that are -- that's the main

10  point.  That is the purpose of me drawing lines in terms of

11  components and stating that a number of different components

12  are involved, a number of different -- different types of

13  guidance went out to different components of which plaintiffs

14  are aware because we enumerated it for them, and so there is

15  absolutely -- cannot be any waiver of any privilege, and it

16  would need to be examined on an individual basis in any event

17  by a revelation of procedures that CBP is taking or

18  nonprivileged guidance that CBP had sent out.

19      So I just want to make clear that that's our position.  We

20  would still, you know -- we -- were the Court to order

21  production of guidance to DHS, we would still reserve the right

22  to assert privilege over those privilege guidance and to log

23  them, and that would be the proper procedure for challenging

24  privilege in this case.  There is no blanket waiver of any

25  privilege at issue here right now.

1    And I think, you know, Mr. Medlock acknowledged that EOAR

2    is not a party, and that is why they are seeking DHS guidance,

3    and our point here is that the issues that they have raised are

4    few and relate to EOAR, and so the DHS guidance really -- I

5    mean, we've made this point in the briefing, and I made it

6    before.  The DHS guidance really doesn't relate to EOAR

7    activities, actions in the few instances that they mention and

8    that we've been working with plaintiffs and the agencies on.

9    And I do have the case number for the District of Colombia

10   opinion.

11            THE COURT:  Okay.

12            MS. SHINNERS:  It's -- the case number is

13   1:19-CV-02117.

14            THE COURT:  And the date?

15            MS. SHINNERS:  I think it was yesterday.

16            THE COURT:  Okay.

17            MS. SHINNERS:  June 30, actually.  Sorry.

18            THE COURT:  June 30.  The district court in D.C.?

19            MS. SHINNERS:  Uh-huh, correct.

20            THE COURT:  Okay.  All right.

21        Any response, Mr. Medlock?

22            MR. MEDLOCK:  Just very briefly on the Cair decision,

23   Your Honor.

24        I think there's two issues that I just wanted to raise.

25   One, the -- as has been shown by the procedural posture of this

1  case, just because a party wins a preliminary injunction does

2  not mean that DOJ will not elect to appeal that decision and

3  seek a stay of it.  So we believe that compliance with

4  Judge Bashant's preliminary injunction, which is also still in

5  effect, is still relevant, and there's nothing about the

6  opinion in Cair that makes -- that somehow moots

7  Judge Bashant's preliminary injunction ruling.  Simply her

8  injunction is still in effect, and we still -- and it should

9  still be complied with, and if there are instances of

10 noncompliance, then we want to understand the genesis of those

11 instances of noncompliance by seeking the guidance that was

12 provided to the field regarding the preliminary injunction

13 ruling.

14          THE COURT:  Okay.  Thank you.

15      Suzanne, is there anything else you'd like to ask?

16          LAW CLERK:  Nothing else from me, Your Honor.

17          THE COURT:  Okay.  Thank you.

18      Any other final comments from counsel on any of these

19 requests?

20      Let me hear from defense first.

21          MS. SHINNERS:  No, Your Honor.  Thank you for your

22 time today.

23          THE COURT:  Okay.  Thank you.

24      From plaintiff?

25          MR. MEDLOCK:  No, Your Honor.  Thank you for your time

1    and your attention to discovery matters.

2              THE COURT:  Okay.  You're more than welcome.

3        I'm going to take this under submission and issue a ruling

4    shortly.

5        Okay.  Thank you very much, counsel.  Stay safe, and enjoy

6    your holiday weekend.

7              MR. MEDLOCK:  You as well.

8              THE COURT:  Thank you.  Bye now.

9                           ---OOO---

10

11                    C-E-R-T-I-F-I-C-A-T-I-O-N

12

13       I hereby certify that the foregoing is a correct transcript

14   from the electronic sound recording of the proceedings in the

15   above-entitled matter.

16       Dated July 19, 2020, at San Diego, California.

17

18
                         /Dana Peabody/
19                       Dana Peabody, Transcriber

20

21

22

23

24

25