1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CHAD F. WOLF, *et al.*, <br><br> Defendants. | Case No.:  17-cv-02366-BAS-KSC <br><br> **ORDER:** <br><br> **(1) GRANTING IN PART AND DENYING IN PART MOTIONS TO SEAL CLASS CERTIFICATION MOTION AND OPPOSITION BRIEF [ECF Nos. 388, 404];** <br><br> **AND** <br><br> **(2) DENYING WITHOUT PREJUDICE MOTION TO SEAL REPLY BRIEF [ECF No. 410]** |

Before the Court are Plaintiffs' Motion to Seal Limited Portions of their Class Certification Papers (ECF No. 388), Defendants' Motion to Seal Portions of their Opposition to the Motion for Class Certification (ECF No. 404), and Plaintiffs' Motion to Seal Portions of their Class Certification Reply (ECF No. 410).[1]  For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the Motions to Seal the Class Certification Papers and Opposition (ECF Nos. 388, 404) and **DENIES WITHOUT PREJUDICE** Plaintiffs' Motion to Seal the Reply (ECF No. 410).

---

[1] Defendants filed a Consolidated Response in Support of Plaintiffs' Motions to Seal ("Response") (ECF No. 424.)

1
2
3
4
5
6
7
8
9
10

# I.    BACKGROUND

The parties request that the Court seal a total of 59 exhibits attached to Plaintiffs' Motion for Class Certification ("Motion"), Defendants' Opposition to the Motion ("Opposition"), and Plaintiffs' Reply in support of the Motion ("Reply"), as well as any portions of the parties' briefings that refer to these exhibits.[2]  Defendants argue that sealing is necessary because the documents contain "diplomatic and sensitive law enforcement information and communications" about ports of entry that "expose[] vulnerabilities of those ports" which could be used to threaten port security.  (Resp. at 1–2.)  Further, Defendants claim disclosure will chill communications within agencies and between the U.S. Government and foreign governments.  (*Id.*)[3]

11

# II.    LEGAL STANDARD

12
13
14
15
16
17
18
19
20
21
22
23
24

"[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  "Unless a particular court record is one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting point."  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (citing *Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).  "The presumption of access is 'based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice."  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)).  A party seeking to seal a judicial record bears the burden of overcoming the strong presumption of access.  *Foltz*, 331 F.3d at 1135.  The showing required to meet this burden depends upon whether the documents to be sealed relate to a

25
26
27

[2] These includes Exhibit Nos. 1–5, 7, 16, 17, 19–24, 26, 29–34, 36-37, 39–44, 46–62 to the Class Certification Motion, Exhibit Nos. 2, 6–10, 12, 26, 28, and 30 to the Opposition, and Exhibit Nos. 2–6 to Plaintiffs' Reply.  A list of the exhibits, the corresponding rulings, and any applicable redactions is included in **Appendix A** to this Order.

28

[3] To the extent the Court relied on limited parts of the information contained in these exhibits in its Order Granting Class Certification, the Court considers requests to seal that information moot.

1  motion that is "more than tangentially related to the merits of the case." *Ctr. for Auto*
2  *Safety*, 809 F.3d at 1102. When the underlying motion is more than tangentially related to
3  the merits, the "compelling reasons" standard applies. *Id*. at 1096–98. When the
4  underlying motion does not surpass the tangential relevance threshold, the "good cause"
5  standard applies. *Id.*

6      A party seeking to seal a judicial record bears the burden of overcoming the strong
7  presumption of access. *Foltz*, 331 F.3d at 1135. The showing required to meet this burden
8  depends upon whether the documents to be sealed relate to a motion that is "more than
9  tangentially related to the merits of the case." *Ctr. for Auto Safety*, 809 F.3d at 1102. When
10 the underlying motion is more than tangentially related to the merits, the "compelling
11 reasons" standard applies. *Id.* at 1096–98. When the underlying motion does not surpass
12 the tangential relevance threshold, the "good cause" standard applies. *Id.*

13     "In general, 'compelling reasons' sufficient to outweigh the public's interest in
14 disclosure and justify sealing court records exist when such 'court files might have become
15 a vehicle for improper purposes,' such as the use of records to gratify private spite, promote
16 public scandal, circulate libelous statements, or release trade secrets." *Kamakana*, 447
17 F.3d at 1179. If a court chooses to seal documents, it must "base its decision on a
18 compelling reason and articulate the factual basis for its ruling, without relying on
19 hypothesis or conjecture." *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995).
20 This requires the party seeking to seal documents to "make a particularized showing . . .
21 supported by specific factual findings that outweigh the important public policies favoring
22 disclosure of that document." *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-
23 DCB, 2016 WL 8199309, at *4 (D. Ariz. June 27, 2016) (citing *Kamakana*, 447 F.3d at
24 1178, 1180–81). Therefore, blanket claims of privacy or law enforcement are insufficient;
25 instead, the party "must demonstrate specific prejudice or harm flowing from the
26 disclosure of a specific document." *Id.*

27     Further, consistent with the presumptive right of public access to court records, this
28 Court's Standing Order for Civil Cases provides:

1

2

> The Court may seal documents to protect sensitive information, however, the documents to be filed under seal will be limited by the Court to only those documents, or portions thereof, necessary to protect such sensitive information.

3

4

5

> Parties seeking a sealing order must provide the Court with: (1) a specific description of particular documents or categories of documents they need to protect; and (2) declarations showing a compelling reason or good cause to protect those documents from disclosure. The standard for filing documents under seal will be strictly applied.

6

7

(Standing Order ¶ 5.)

8

## III.   DISCUSSION

9

10

11

12

13

14

Plaintiffs' Class Certification Motion is more than tangentially related to the merits of the underlying dispute. *See Baker v. SeaWorld Entm't, Inc.*, No. 14CV2129-MMA (AGS), 2017 WL 5029612, at *3 (S.D. Cal. Nov. 3, 2017) (finding motion for class certification to be more than tangentially related to merits of the case and citing cases). Hence, the instant Motions to Seal are subject to the "compelling reasons" standard. The Court discusses the exhibits by category below.

15

### A.   Deposition Testimony (Exs. 1–3 to Mot.)

16

17

18

19

20

Defendants seek to seal the 30(b)(6) deposition testimony of Randy Howe, the Executive Director for the Office of Field Operations ("Howe Deposition"); Executive Assistant Commissioner Todd Owen's deposition testimony ("Owen Deposition") and the deposition testimony of a Customs and Border Protection ("CBP") Whistleblower ("Whistleblower Deposition").

21

### 1.   Howe Deposition (Ex. 1 to Mot.)

22

23

24

25

26

27

According to Defendants, the Howe Deposition should be sealed in its entirety primarily because disclosure could reveal port vulnerabilities and allow for second-guessing or commentary by "outside entities" that would have a "chilling effect" on the decisionmaking ability of CBP officials. (Decl. of Randy Howe ("Howe Decl.") ¶¶ 4, 5, 7–9, 11, Ex. C to Decl. of Ari Nazarov in supp. of Resp. ("Nazarov Decl."), ECF No. 424-5.)

28

The Court does not find potential public scrutiny of government discretion is an "improper purpose" necessitating sealing. Further, any "chilling effect" on an official because of such scrutiny is purely conjectural; it is far from certain that such scrutiny will occur at all, let alone to such a degree that individual officials would feel unable to execute their job duties. However, the Court finds that testimony regarding port hours and port infrastructure could compromise border security and therefore warrant sealing. (Howe Decl. ¶¶ 6, 14.) Further, the Court finds that the testimony about the types of communication between POEs and officials from the Government of Mexico presents concrete threats to security that justify sealing. (*Id.* ¶¶ 12–13.)

Thus, while the Court does not find compelling reasons to seal the Howe Deposition in its entirety, Defendants may propose targeted redactions based on the Court's above analysis by the deadline listed in Section IV, *infra*. Defendants should consider the Court's rulings on related exhibits when proposing redactions to the transcript.

2.     Owen Deposition Transcript (Ex. 2 to Mot.; Ex. 2 to Opp'n)

Regarding Todd Owen's deposition, Defendants seek to seal only portions of the transcript and have proposed redactions accordingly. (*See* Dep. of Todd Owen – Confidentiality Designations, Ex. H to Nazarov Decl., ECF No. 424-10.)

Defendants allege that the disclosure of the timing and attendance of regularly scheduled intelligence briefings in the SCIF could endanger senior CBP leadership. (Decl. of Todd Owen ("Owen Decl.") ¶ 4, Ex. F to Nazarov Decl., ECF No. 424-8.) Further, several requested redactions concern testimony related to exhibits which Defendants have identified as confidential. Defendants argue that the discussion of these exhibits reveals information about "methodology for gathering information, internal decisionmaking processes," and communications with the Government of Mexico about logistics and infrastructure, all of which, if disclosed, would chill communications between the two countries and compromise security. (*See* Resp. at 14; Owens Decl. ¶¶ 6, 11–12.)

After reviewing the deposition transcript and the corresponding confidentiality designations, the Court grants in part Defendants' request to seal parts of Owen's

testimony.  Regarding the SCIF-related testimony, the Court finds that the times and frequencies of the meetings can be redacted to address Defendants' safety concerns. Further, the Court largely grants Defendants' request to seal Owen's testimony concerning internal memos and communications with the Government of Mexico.  The rulings on each requested redaction can be found in **Appendix B** attached to this Order.

### 3.   Whistleblower Deposition Transcript (Ex. 3. To Mot.)

Defendants similarly seek to seal only portions of the Whistleblower's deposition testimony.  They argue that disclosure of certain portions "would compromise port operations and have an adverse effect on operational decisionmaking in addition to revealing law enforcement techniques and methods."  (Resp. at 16.)   The Court has reviewed the testimony in question and finds these reasons largely conclusory and therefore insufficient to support sealing of parts of this deposition transcript.

Defendants also seek to redact several pieces of testimony related to other investigations prompted by the Whistleblower's complaint on the basis that this testimony would reveal the Whistleblower's identity.  (*See* Dep. of Whistleblower – Confidentiality Designations, Ex. G to Nazarov Decl., ECF No. 424-9.)  However, redacted versions of these reports and other documents related to these investigations are publicly available (*see* Section III.E.3) but do not disclose the Whistleblower's name.  Because the Court will allow the Whistleblower's name and other identifying information in his testimony to remain redacted as well, it is not clear to the Court how disclosure of testimony about these investigations will reveal the Whistleblower's identity.

Further, Defendants seek to seal testimony regarding several musters and queue management reports that are critical to understanding the underlying metering claims in the case.  The Court finds that most of this testimony covers information publicly disclosed elsewhere or that Defendants have not identified compelling reasons for sealing.  This includes references to queue management reports, for which the Court denies sealing as explained in Section III.E.1, *infra*.

17cv2366

Nonetheless, the Court finds that some parts of the Whistleblower's testimony warrant redactions.  The rulings on each requested redaction can be found in **<u>Appendix C</u>** attached to this Order.

4.   <u>Leutert Expert Report and Deposition Transcript</u><br><u>(Ex. 26 to Opp'n; Ex. 2 to Reply)</u>

Defendants note that the Leutert Report, Exhibit 7 to the Motion, was unsealed by the Ninth Circuit.  As such, this subsequent request to seal is now moot.  *See Kamakana*, 447 F.3d at 1184 (affirming an unsealing order because the information at issue was "already publicly available"); *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) ("[H]owever confidential it may have been beforehand, subsequent to publication it [i]s confidential no longer. . . . [A court] simply do[es] not have the power . . . to make what has thus become public private again.").  Thus, the Court denies Defendants' request to seal this document.

Defendants also request to seal the Deposition of Stephanie Leutert.  Defendants provide specific reasons to seal Exhibit 26 (*see* Defs.' Mot. to Seal, ECF No. 404), which contains excerpts of her deposition testimony totaling 10 pages; Defendants do not provide reasons to seal the entirety of her deposition testimony, attached as Exhibit 2 to the Reply. The partial testimony primarily covers the factors that Leutert did and did not consider in the methodology underlying the conclusions in her report.  The Court finds that this line of inquiry does not disclose information that would compromise port security, as claimed by Defendants.  (*See* Feb. 2020 Decl. of Randy Howe ("Feb. 2020 Howe Decl.") ¶¶ 6–11, Ex. D to Nazarov Decl., ECF No. 424-6.)  Further, to the extent Defendants seek to seal Leutert's entire deposition transcript, they have presented no compelling reason to do so.

Defendants may submit specific redactions to Leutert's transcript by the deadlines stated in Section IV, *infra*.  When proposing redactions, Defendants should consider this Court's rulings on related exhibits, including Leutert's expert report mentioned above.

**B.   Exhibits with CBP/DHS Operational Details**
**(Exs. 20, 21–24, 29, 56, 59– 61 to Mot.; Exs. 6–10 to Opp'n)**

Defendants seek to seal certain email attachments to the class certification briefings on the basis that they contain one or more of the following:

> information obtained from foreign partners, information routinely shared within and among CBP and its interagency partners, . . . information obtained through sensitive law enforcement techniques and methods[,] . . . frank and unvarnished assessments of the strengths and weaknesses of particular operational and policy decisions, and assessments of operational and resources needs.

(Decl. of Vernon Foret ("Foret Decl.") ¶ 3, Ex. A to Nazarov Decl., ECF No. 424-3.) Defendants allege that disclosure of this information will compromise the ability of the Office of Field Operations ("OFO") to "execute its mission of securing the borders and protecting the American public." (*Id.*)  Below, the Court reviews each exhibit to determine if the content presents the compelling reasons for sealing alleged by Defendants.

### 1.   Exhibits Regarding the "Haitian Migration Surge" (Ex. 17, 20–22, 24 to Mot.; Exs. 6–10 to Opp'n)

Exhibits 17, 20, and 21 to the Motion and Exhibits 6–10 to the Reply are memoranda, emails and PowerPoint presentations prepared by the OFO concerning the 2016 Haitian Migration Surge.  Exhibits 17 to the Motion and Exhibit 6 to the Reply outline the reasons for the surge and the status of CBP and OFO's responses as of that date, specific requests made by the Government of Mexico, and steps that overburdened POEs took, at the time, to streamline the processing of the high volume of migrants.  Exhibit 21 to the Motion and Exhibits 7 and 9 to the Opposition are other OFO briefs regarding the surge dated in May, September, and October 2016, respectively, and contain very similar types of information.  Exhibit 20 to the Motion is an email chain including raw data regarding the credible fear influx at the San Ysidro POE in May 2016 and its impact on port operations.  Exhibits 8 and 10 are PowerPoint presentations for a Panel Discussion and a proposal for the El Centro Processing cite, dated in November and October 2016, respectively, that consolidate much of the information contained in the other exhibits.

Defendants argue that disclosure of these exhibits' contents would discourage information-sharing between the Government of Mexico and the United States and reveal

operational vulnerabilities and capacity limitations during a crisis, thereby providing criminal organizations "with a roadmap as to how CBP and DHS attempt to manage emergency situations," which they can use in turn to evade CBP during a migrant crisis. (Decl. of Vernon Foret ¶¶ 6–9, Ex. B to Decl. of Ari Nazarov in supp. of Defs.' Mot. to Seal, ECF No. 404-4.)

Defendants have not shown compelling reasons to seal the exhibits in their entirety. The Haitian Migration Surge—occurred four years ago due to the availability of a specific immigration status and in a particular set of circumstances—demonstrates CBP's prior response to a "migration crisis" that employed methods other than metering to manage. It is therefore relevant to determining whether the port capacity justification for metering, put forth by Defendants, is legitimate or pretextual. In addition, Defendants' allegation that criminal organizations could extrapolate data from this period to overwhelm POEs in the future is too speculative to satisfy the compelling reason standard. Nevertheless, the Court will allow for targeted redactions of information relating to port capacity to address Defendants' concerns about security. The Court will also allow redactions related to communications from the Government of Mexico. (*See* Appendix A.)

Exhibit 22 consists of findings and recommendations from the United Nations High Commissioner for Refugees (UNHCR) regarding CBP's response to the migration surge in 2016. The report notes CBP-imposed "ceilings" on asylum processing, describes the effect of the metering process on wait times, and proposes alternatives to metering. The UNHCR's assessment, as it pertains to metering, is directly relevant to the parties' dispute about this issue. Further, the report broadly characterizes the strain on the San Ysidro POE without mentioning details about port capacity that would compromise security if disclosed. The Court therefore finds no compelling reasons to seal this exhibit.

Exhibit 23 is an email chain regarding the Haitian migration surge in 2016 and the Haitian Ambassador's upcoming visit to the San Ysidro port of entry. Defendants argue that disclosing this document, which contains the personal opinions and reactions of high-level officials about policy decisions, "would have a significant chilling effect on such

individuals' willingness to share such personal opinions in the future" because of the possible public scrutiny and would therefore impede "the ability of the U.S. Government and its foreign partners to make reasoned, sound, and rational decisions" going forward. (Foret Decl. ¶ 6.) The Court is unconvinced. Again, the Court finds the potential "chilling effect" from public scrutiny of these exhibits, which concern a migration event that occurred four years ago, to be attenuated and not the type of "improper purpose" that justifies sealing. *See Kamakana*, 447 F.3d at 1179. In any event, the individual in question is the former DHS Secretary and hardly immune from significant public scrutiny regardless of disclosure. The request to seal Exhibit 23 is therefore denied.

Exhibit 24 is another email chain between then-CBP Deputy Commissioner Kevin McAleenan and other officials discussing the strategy for processing Haitian migrants during the surge in 2016. The chain includes details about the state of operations at ports of entry, including details about capacity limitations and release into the interior. Because these emails reveal specific, concrete vulnerabilities in CBP's operations caused by a surge in migration (*see* Foret Decl. ¶ 12), the Court finds compelling reasons to seal this document.

### 2. Exhibit Related to the 2018 "Migrant Caravan" (Ex. 29 to Mot.)

Exhibit 29 is a lengthy email chain from CBP officials on the ground in Mexico City updating officials in the United States about the progress and size of the caravan. It includes summaries from CBP's attaché and other personnel in Mexico City about the size of the caravan and the demographic and health statistics of its members.

Defendants allege sealing is necessary to preserve the ability of the United States and Mexican governments "to jointly address security risks in the future" and to prevent hostile actors from learning how the governments gather information about migrant caravans, which could then be manipulated "to provide CBP with false or misleading information in an effort to pull CBP resources away from certain areas of the border." (Foret Decl. ¶¶ 8–10.)

17cv2366

Given the minimal relevance of the majority of this exhibit's contents to the claims in this case, and recognizing both the importance of confidentiality to both the U.S. Government and the Government of Mexico concerning migration efforts, the Court finds that compelling reasons to keep the details of this information sealed.

### C.  Port Operational Data and Information
### (Exs. 16, 19, 40, 41, 48 to Mot., Ex. 30 to Opp'n)

1.  <u>Documents with San Diego Field Office Operational Information</u>
<u>(Exs. 16, 19, 40, 41, 48, 56, 59–61 to Mot.; Ex. 30 to Opp'n)</u>

Exhibit 16 to Plaintiffs' Class Certification Motion is a short chain of emails between CBP officials dated August 2, 2017.  It includes timeframes for metering and two tables, one with monthly "Credible Fear Totals" for 2016 and half of 2017—including a breakdown of the number subject to expedited removal, the number detained, and the number released—and "AEU [Admissibility Enforcement Unit] Detention Totals for six days in July 2016 and one day in July 2017 at three locations.  Defendants claim that releasing this information will allow second-guessing of discretionary decisions by outside entities and provides data about resource allocation that could be used to compromise border security.  (*See* Howe Decl. ¶ 11; Feb. 2020 Howe Decl. ¶ 11; Owen Decl. ¶¶ 8–10.) As stated before, scrutiny of governmental officials' use of discretion is not an "improper purpose" necessitating sealing.  Second, the Court does not find that the data contained in Exhibit 16 informs outside entities about "when certain entities are operating below, at, or above capacity" (Feb. 2020 Howe Decl. ¶ 11); rather, it reflects totals, without reference to whether they exceed a port's capacity, either over an 18-month period three to four years ago or for seven days between 2016 and 2017.  The Court therefore finds Defendants' allegations of risk unpersuasive and denies the Motion to Seal this exhibit.

Exhibits 19 and 40 to the Motion contain data compiled by the AEU on two days in 2016.  The data provides a snapshot of the capacity at the San Ysidro, Otay Mesa, and Tecate POEs for each 24-hour period.  Each email breaks down the number of detainees in custody, the total processed and transported, and the number of intakes for expedited

17cv2366

removal with credible fear by nationality.   Defendants allege that this statistical information would give hostile actors "a baseline to assess what number of inadmissible aliens would strain or overwhelm resources" at each POE.   (March 10, 2020 Decl. of Johnny L. Armijo ("Mar. 2020 Armijo Decl.") ¶¶ 8b, 15, Ex. B to Nazarov Decl., ECF No. 424-4.)   The Court is not convinced that disclosing data from these documents would expose the POEs to any risk of harm.   The information is limited to two days in 2016 and does not indicate that the volume on these days overwhelmed or otherwise complicated operations at the POEs.   Moreover, the emails primarily consist of acronyms and numbers that reveal little to someone unfamiliar with the intricacies of CBP operations.

Exhibit 41 to the Motion is a Queue Management Brief from the AEU.   It specifies the metering process, including CBP's coordination with the Government of Mexico, and includes instructions for compliance with humanitarian policies.   It also includes three tables with statistical information about the number of "inadmissibles" at the San Ysidro, Otay Mesa, and Tecate POEs for each quarter of 2018.   Defendants allege that disclosure of these statistics will enable migrants to evaluate the chances of being caught with fraudulent documents or provide capacity information to hostile actors who may then attempt to overwhelm POE operations.   (Mar. 2020 Armijo Decl. ¶¶ 8a, 8b.)   The Court rejects sealing the entirety of this exhibit.   It includes details about the Government of Mexico's involvement to "slow the flow" of migration to the southern border, which is a key component of the case.   However, the Court will allow redaction of the statistical information contained in the tables.

Exhibit 30 to the Opposition contains "adverse action traffic" and custody data for October 2, 2018.   The data reflects how many individuals were released, voluntarily returned, or subject to expedited removal on this specific date, as well as demographic data (*e.g.*, the number of unaccompanied minors, single adults, those with credible fear claims), the total number in custody at four ports, and the duration that individual, unidentified detainees remained in custody.   Defendants argue that this provides information about a port's total capacity because resources are diverted to address the needs of certain types of

migrants, such as unaccompanied children, and therefore "make[] the port more vulnerable to outside threats."  Again, this information concerns a single day in 2018.  The argument that this information, if disclosed, would allow bad actors to predict and then exploit port activity in the future is a tenuous theory that does not establish compelling reasons for sealing.  The Court therefore denies the Motion to Seal as to this exhibit.

Exhibit 48 to the Motion is document titled "Migrant Processing at Limit Line – San Diego Field Office" and contains information about the layout of the pedestrian limit line at certain POEs and instructions for referring migrants to other POEs if capacity is reached. Defendants claim that disclosure of this document could be used to plot terrorist attacks and drug smuggling operations.  (Mar. 2020 Armijo Decl. ¶ 11.)  Exhibit 48 notes, in simple language, which areas at POEs are unstaffed, where CBP officers' line of sight is obstructed, and where traffic can present security challenges.  The Court agrees that this presents a compelling reason to seal this document.

### 2.   Exhibits re: CBP/ICE Operations at San Ysidro in 2017 and 2018 (Ex. 56, 59–61 to Mot.)

Exhibit 56 is an email chain outlining the processing procedure for family units at San Ysidro in December 2017.  The emails discuss family unit arrivals at the border, including the availability of bed space and when family units are processed into the interior, and mentions deterrence objectives regarding family arrivals at the San Ysidro POE.  No specific data regarding bed space capacity is mentioned.  Exhibits 59–61 are email communications between CBP officials regarding the intake of asylum seekers at San Ysidro during a surge in November 2018.  The emails relay information about unresolved capacity issues, the number of "crossers" and their proposed "redirection" in response to the caravan, and the DHS Secretary's processing priorities.

Defendants allege, as they have for other exhibits, that POE capacity and "operational capabilities to move individuals out of CBP custody" could be used by hostile actors to overwhelm POEs and strain resources.  (Foret Decl. ¶¶ 16, 20.)  The Court once again finds this purported threat too speculative to meet the heightened sealing standard.

As with other exhibits, these documents capture issues with processing and transport at a specific time and under specific circumstances present in 2017 and 2018. Given the relevance of the information in these exhibits to questions of port capacity and deterrence—which are critical to understanding the claims at the core of the parties' dispute—targeted redactions are more appropriate than sealing these documents in their entirety. As noted in Appendix A, the Court will permit redactions of numbers and information that reveal capacity information for specific ports in the interests of security.

**D.    Other Exhibits Presenting Security Risks or a Potential Chilling Effect on Agency Operations and International Relations (Exs. 26, 36, 42, 52–55, 57, 62 to Mot.)**

Defendants seek to seal Exhibits 26, 36, 42, 57, and 62 because they contain "frank communications" within CBP that, if disclosed, could have a chilling effect on information-sharing and because they "reveal operational details that could be exploited by bad actors." (Resp. at 15; Howe Decl. ¶¶ 5, 6, 8; Owen Decl. ¶¶ 8–10.)

Exhibit 26 does not contain information that would increase risk or chill speech if available to the public. It includes a brief reminder about professionalism and compliance with the law and agency procedures in advance of the "migrant caravan" in 2018. The email chain includes instructions about processing migrants according to port capacity, which is a key claim in the underlying suit and discussed in great detail in unsealed materials already before this Court. Defendants do not identify any details about port security measures or internal agency deliberations or opinions that have not previously been disclosed. The Court therefore finds no compelling reason to seal this Exhibit.

Exhibit 36 is an email to Port Directors soliciting responses to a list of questions about the effect of a shift in "Queue Management Strategy" in 2018. The email contains only questions for conducting an internal assessment and not the corresponding answers. Consequently, the exhibit does not contain operational details or the comments, opinions, or internal assessments of agency officials. As such, the Court sees no justification for sealing this document.

17cv2366

Exhibit 42 is email correspondence between various CBP officials about asylum processing capacity at each POE, specifically about "ceilings" on asylum cases at each POE and border enforcement priorities, in response to inquiries from a U.S. Senator. Defendants seek to seal this document because of its potential chilling effects on agency communications. However, as aforementioned, POE capacity and corresponding impacts on operations underlie the claims in this case. Plaintiffs allege that Defendants' use of capacity to justify their various border enforcement methods is a pretext and that Defendants instead intended to unlawfully deter asylum-seekers from arriving at POEs at the southern border. Moreover, the Court again finds that any "after-the-fact second-guessing"—and their potential to have a chilling effect on internal agency communications—is too speculative to constitute a compelling reason to prevent public disclosure of information critical to the resolution of issues in this case. Accordingly, the Court finds the sealing of Exhibit 42 unwarranted.

Exhibits 52 and 53 contain information shared by the AEU regarding noncitizen's views of immigration laws and CBP queue management. Defendants argue that public disclosure of the information and the methods of information-gathering would discourage intelligence groups from sharing sensitive information, thereby impeding CBP officials from assessing risks and planning for contingencies. (*Id.* at 16; *see also* Feb. 2020 Decl. of Johnny Armijo ("Feb. 2020 Armijo Decl.") ¶¶ 8a, 8b, Ex. E to Nazarov Decl., ECF No. 424-7.) Defendants claim that there are heightened risks associated with these documents because they concern the San Ysidro POE specifically, which is a large port that has purportedly been the target of "recent attempts by large groups of undocumented aliens to forcefully breach the port of entry." (*Id.*)

Based on the content of these exhibits, the Court does not find that Defendants have alleged compelling reasons to seal. Both exhibits appear to contain the same information—an official's evaluation, based on a review of relevant documents, of whether detained migrants felt deterred by the Zero Tolerance Policy or metering at the San Ysidro POE. Defendants do not explain how detainee sentiment constitutes "sensitive law enforcement

17cv2366

1    information" or how disclosure of this official's "method of information-gathering" (which

2    appears to be document review) would compromise CBP's ability to assess or plan for

3    future risk.[4]  Accordingly, the Court finds no compelling reason to seal these emails.

4         Exhibit 54 includes a discussion about the different methods employed to meter

5    migrants in 2016 and Exhibit 55 includes a very cursory mention of the deterrent effect.

6    Defendants again rely on a purported chilling effect to justify their request for sealing these

7    exhibits.  (Resp. at 14–15; Owen Decl. ¶¶ 7–10.)  For the same reasons stated above

8    regarding Exhibit 42, the Court denies the request to seal these exhibits.

9         **E.    Exhibits Purportedly Revealing "CBP Vulnerabilities and Weaknesses"**

10            **(Exs. 5, 30–34, 37, 39, 43–44, 49, 50, 51, 57 to Mot.; Exs. 3–6 to Reply)**

11            1.    Field Queue Management Reports

12                 (Exs. 37, 43, 49, 50, 51, 57, 62 to Mot.; Exs. 3–5 to Reply)

13        Exhibits 37, 43, 49, 50, 51, 57, and 62 to the Motion and Exhibits 3–5 to the Reply

14   all contain tables with data for various POEs regarding queue management, often referred

15   to as Field Queue Management Reports ("FQMR").  Exhibit 37 to the Motion and Exhibits

16   3–5 to the Reply list information about the total number of individuals in custody and the

17   percent capacity of each port for four different days in 2018.  These charts also include

18   information about staffing and infrastructure.  Exhibits 43, 50, and 57 contain tables from

19   two different dates in 2018, listing the total number of detainees at each POE, the percent

20   of capacity those numbers reflect, the number of individuals remaining in the queue, and

21   the impact to port operations.  Exhibits 49 and 51 contain similar data about custody and

22   capacity from March 21, 2019, but also include annual statistics about pedestrian traffic

23   and asylum processing at different POEs.[5]  Exhibit 62 is an email chain wherein an official

---

[4] Armijo further states that disclosure would effectively have a chilling effect on his subordinates' willingness "to relay sensitive and/or confidential information and findings to [him] in a full and forthright manner[.]"  (Feb. 2020 Decl. ¶ 8a.)  Because Defendants have disclosed the officer's name in the publicly available February 2020 Armijo Declaration, the Court finds it futile, at this point, to permit redaction of the subordinate's name to preserve his privacy and thereby circumvent any potential chilling effect.

[5] These five exhibits do not include details about port infrastructure.

discloses, in response to an inquiry, the number of cases San Ysidro could process a day under certain conditions.

Defendants contend that this queue management data can "paint a more fulsome picture of operations at a particular POE" and could thereby enable hostile actors "focus their resources appropriately to exploit perceived vulnerabilities[.]" (Feb. 2020 Howe Decl. ¶ 6.) For reasons stated above, port capacity is a central part of the underlying arguments in this case. Defendants repeatedly rely on the existence of "potentially legitimate factors," many related to port capacity, to justify metering. This information is central to the public's understanding of the claims in this case. Therefore, the Court denies the wholesale sealing of these exhibits containing FQMRs. However, in light of Defendants' concern that such information could be exploited by bad actors (*see* Feb. 2020 Howe Decl. ¶¶ 11–12), the Court will permit Defendants to redact information regarding certain locations, staffing, and infrastructure from Exhibit 37 and the total number of detainees in custody from the remaining exhibits.[6] (*See* Appendix A.)

2. Migrant Crisis Action Team Documents

(Exs. 30–34 to Mot.; Ex. 12 to Opp'n; Ex. 6 to Reply)

Another set of documents that are the subject of Defendants' sealing motion are related to the Migrant Crisis Action Team ("MCAT"). The MCAT "provides daily reports to CBP leadership on the number of individuals apprehended or found inadmissible along the southwest border, the demographics of those individuals (e.g., family units or unaccompanied minors), as well as information relating to the capacity of various CBP facilities and the immigration system overall." (Feb. 2020 Howe Decl. ¶ 13.) Defendants allege that because the MCAT reports "provide detailed information" about apprehensions and agency capacity to detain, transfer, or release individuals in their custody, the information could be used to "cripple operations" by overwhelming the capacities of these ports. (*Id.* at ¶¶ 13–15.) According to Howe, information about resource constraints could

---

[6] Defendants also seek to seal the queue management data in Exhibit 5 regarding the number of individuals in custody on particular days. The Court denies this request for the reasons stated above.

threaten port security because agents are diverted from "their primary mission of patrolling the border" during migrant influxes "to ensure that individuals in custody received appropriate treatment." (*Id.* ¶ 16.) Howe attests that bad actors often target ports with high volumes of individuals in custody or those that are thinly staffed to exploit these ports vulnerabilities, and could use MCAT report information to further these efforts. (*Id.*)

Upon review of the content of the specific exhibits in question, the Court finds that targeted redactions, as opposed to sealing them in their entirety, will address the concerns stated in Howe's declaration. Data regarding the number of arrivals, apprehensions, transfers, and releases during certain periods in past years do not by themselves disclose information regarding the maximum capacity of POEs such that it can be exploited by bad actors. This information reflects CBP's handling of high-volume migration events, which is relevant to the capacity allegations made by Defendants in this action to justify its metering procedures. The Court will, however, permit certain redactions, specified in Appendix A, for the reasons explained below.

a.   *MCAT Emails (Exs. 30, 34 to Mot.; Ex. 12 to Opp'n)*

Exhibit 30 is an email from the MCAT team that includes minimal demographic information about arrivals from the so-called "migrant caravan" in 2018. Specifically, the email notes details about members of the caravan apprehended on one day in April 2018. The email does not contain data regarding arrests and holding capacity. The remainder of the email includes links to media articles. The Court finds that this email, while affiliated with the MCAT, does not contain the type of information noted by Howe that would compromise border security. The Motion to Seal this exhibit is thus denied.

The majority of Exhibit 34's email thread contains detailed information about San Ysidro POE infrastructure, including specifics about its detention capacity and staffing. Given that the other potentially relevant statistical information in this document is minimal, the Court grants Defendants' request to seal Exhibit 34.

17cv2366

Exhibit 12 to the Opposition is also an email thread that discusses solely capacity and related comments by CBP officials.  Again, the Court finds that sealing this document in its entirety is appropriate.

b.  *MCAT Daily Reports (Exs. 31, 32 to Mot.)*

Exhibits 31 and 32 are emails containing MCAT daily reports.  Exhibit 31 contains two charts.  The first chart reflecting details about capacity and custody warrants sealing, while the second chart containing demographics and raw numbers across the southwest border, without specifying port capacity, does not.  The Court will therefore permit redaction of the first chart, but not of the second.  The Court will also allow redaction of comments regarding "holding capacities" in the body of the email.  Similarly, Exhibit 32 primarily contains raw data, but the Court will permit redactions, noted in Appendix A, of the charts with custody and capacity information for each POE.

c.  *MCAT Presentations (Ex. 33 to Mot.; Ex. 6 to Reply)*

Exhibit 33 to the Motion and Exhibit 6 to the Reply are MCAT PowerPoint presentations from 2017 and 2018 containing much of the same data as Exhibits 31 and 32. The Court therefore similarly denies sealing this document in the entirety and instead will allow redaction of the charts regarding capacity and custody as specified in Appendix A.

3.  <u>Investigation Reports and Contingency Plans</u>
<u>(Exs. 4, 5, 39, 44, 45, 47 to Mot.; Ex. 28 to Opp'n)</u>[7]

Exhibit 5 is a Report of Investigation from the Office of Professional Responsibility in San Diego.  Defendants state that it includes references to "an internal OFO muster" that instructs CBP officers about vetting and detecting potential terrorist and public safety threats at the border.  (Resp. at 21.)  Upon review of the document, it does not appear that the report itself refers to this guidance regarding public safety threats.  Rather, the report refers to other musters prohibiting CBP officers from denying asylum applicants entry into

---

[7] The Court could not find any compelling reason stated in Defendants' Consolidated Response or Motion for sealing Exhibit 45 to Plaintiffs' Motion and denies sealing on this basis.

17cv2366

the United States, which is again critical to the parties' dispute.  The Court will allow Defendants to redact the muster in question, which is attached to the report.

Regarding Exhibits 39 and 44, Defendants state that they "contain specific details about the Laredo Field Office's Mass Migration Contingency Plan, and specifically the maximum number of individuals that a particular port can process and hold in a crisis." (Resp. at 20; Howe Decl. ¶ 18.)  Defendants allege that the plan, while "no longer in effect," includes details about capacity, resource allocation, staffing, and other operational details that "are incorporated into existing contingency planning" and therefore pose risks to security if publicly disclosed.  (Howe Decl. ¶ 18; *see also id.* ¶¶ 19–23.)

The Court finds compelling reasons to seal both exhibits.  Exhibit 44 is the Laredo Contingency Plan itself, comprised of over 100 pages of detailed information about port operations and contingency planning during mass migration events, the vast majority of which is not relevant to the instant action and pertinent only to CBP agents and officials responsible for operations.[8]  Exhibit 39 is an executive summary of the Contingency Plan. It includes details about metering, queue management, "funneling," and a media statement about processing capabilities, all of which relate to the underlying claims.   Other information contained within the summary concerns the assignment of resources specifically for the 2018 migration event and the availability and assignment of resources during that time.  Based on Defendants' representation that these details are incorporated into existing contingency planning, the Court finds a compelling reason to seal both exhibits.

Exhibit 47 is a two-page letter from the United States Office of Special Counsel referring for investigation the disclosures made by the Whistleblower.  It summarizes the disclosures from the Whistleblower's disclosures regarding turnbacks of asylum-seekers, restates the law regarding asylum processing, and includes a preliminary legal conclusion that prompted the investigation.  Defendants argue that the disclosure of this document

---

[8] Based on this ruling, the Court also grants Defendants' request to seal paragraph 12 of the Declaration of Rodney H. Harris submitted in support their Opposition to the Motion for Class Certification.  (*See* Ex. 28 to Defs.' Opp'n to Mot., ECF No. 405-9.)

"may jeopardize an ongoing investigation." (Resp. at 25.) However, this letter, with redactions, is already available to the public, along with the OIG report attached as Exhibit 4 to the Motion. (*See* Dep't of Homeland Sec., Office of Inspector General, "Investigation of Alleged Violations of Immigration Laws at the Tecate, California, Port of Entry, by U.S. Customs and Border Protection Personnel (OSC File No. DI-18-5034); OSC Final Letter to President; OSC Referral to DHS, https://www.oig.dhs.gov/reports/2020/investigation-alleged-violations-immigration-laws-tecate-california-port-entry-us-customs-and-border-protection-personnel-osc-file-no-di (last accessed August 5, 2020).)[9] Thus, the Court denies any request to seal this exhibit in its entirety, but will allow Defendants to submit the redacted version in its place.

### F.   Contact Information and Other Identifying Information

Defendants also request to seal the personal and work email addresses and other contact information of CBP employees to the extent they appear in any of the exhibits. The Court grants this request and permits redactions of CBP employees' phone numbers and email addresses. (*See* ECF No. 332 at 7.) The Court further grants Defendants request to seal any identifying information—including names—regarding the Whistleblower, as well as the subject of and witnesses to the investigations reflected in Exhibits 3, 4, and 5 to the Class Certification Motion.

## IV.   CONCLUSION AND ORDER

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** the Plaintiffs' Motion to Seal the Class Certification Papers (ECF No. 388), **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Seal the Opposition (ECF No. 404), and **DENIES WITHOUT PREJUDICE** Plaintiffs' Motion to Seal the Reply (ECF No. 410).

Specifically, the Court **GRANTS** sealing of the following exhibits:

- Ex. 24 to Motion (ECF No. 389-26)
- Ex. 29 to Motion (ECF No. 389-31)

---

[9] The document itself can be accessed at https://www.oig.dhs.gov/sites/default/files/assets/2020-04/OSC-File-No-DI-18-5034-Agency-Report-Redacted.pdf.

- Exhibit 34 to Motion (ECF No. 389-36)
- Exhibit 39 to Motion (ECF No. 389-41)
- Exhibit 44 to Motion (ECF No. 389-46)
- Exhibit 48 to Motion (ECF No. 389-50)
- Exhibit 12 to Opposition (ECF No. 405-7)
- Paragraph 12 to Exhibit 28 to Opposition (ECF No. 405-9)

The Court **GRANTS IN PART** and **DENIES IN PART** the redaction requests for the following exhibits (permitted redactions in Appendix B and Appendix C):

- Ex. 2 to Motion (ECF No. 389-4) (Owen Deposition)
- Ex. 3 to Motion (ECF No. 389-5) (Whistleblower Deposition)
- Ex. 2 to Opposition (ECF No. 405-1) (Owen Deposition)

The Court **DENIES WITH PREJUDICE** sealing of the following documents:

- Ex. 4 to Motion (ECF No. 389-6)
- Ex. 7 to Mot. (ECF No. 389-9)
- Ex. 47 to Mot. (ECF No. 389-49)

The Court **DENIES WITHOUT PREJUDICE** sealing of the following documents (permitted redactions are specified in Appendix A):

- Ex. 1 to Motion (ECF No. 389-1)
- Ex. 4 to Motion (ECF No. 389-6)
- Ex. 5 to Motion (ECF No. 389-7)
- Ex. 16 to Motion (ECF No. 389-18)
- Ex. 17 to Motion (ECF No. 389-19)
- Ex. 19 to Motion (ECF No. 389-21)
- Exs. 20–23 to Motion (ECF No. 389-22 through ECF No. 389-25)
- Ex. 26 to Motion (ECF No. 389-28)
- Exs. 30–33 to Motion (ECF No. 389-32 through ECF No. 389-35)
- Exs. 36–37 to Motion (ECF No. 389-38 through ECF No. 389-39)
- Exs. 40–43 to Motion (ECF No. 389-42 through ECF No. 389-45)

17cv2366

- Ex. 45 to Motion (ECF No. 389-47)
- Exs. 49–57 to Motion (ECF No. 389-51 through ECF No. 389-59)
- Exs. 59–63 to Motion (ECF No. 389-61 through ECF No. 389-65)
- Ex. 96 to Motion (ECF No. 389-98)
- Exs. 6–10 to Opposition (ECF No. 405-2 through ECF No. 405-6)
- Ex. 26 to Opposition (ECF No. 405-8)
- Ex. 30 to Opposition (ECF No. 405-10)
- Exs. 2–6 to Reply (ECF No. 412-3 through ECF No. 412-7)

If Defendants wish to provide supplemental briefing regarding any exhibits for which sealing is denied without prejudice, they must do so by **August 21, 2020**. Defendants may either provide additional facts to support their request to seal exhibits in their entirety or propose additional targeted redactions. If Defendants do not file supplemental briefing by this date, the Court shall instruct the Clerk to docket the exhibits in accordance with this Order.[10] The exhibits will remain lodged under seal in the interim.

**IT IS SO ORDERED.**

**Dated: August 6, 2020**

Hon. Cynthia Bashant
United States District Judge

---

[10] To the extent Defendants have failed in their Motion to Seal or Response to specifically address exhibits that are currently lodged under seal—and to the extent they do not address these exhibits in any supplemental briefing filed by the deadline—the Court will direct the Clerk to reject the exhibit lodged under seal and publicly file the exhibit on the docket.

17cv2366

**APPENDIX A**
**Exhibit List and Corresponding Rulings**

| ECF No. | Exhibit No. | Brief | Bates No. | Short Description | Ruling |
|---|---|---|---|---|---|
| 389-3 | 1 | Mot. | | Deposition of Randy Howe (Jan. 9, 2020) | **DENIED WITHOUT PREJUDICE** Defendants permitted to submit proposed redactions regarding categories specified in Order. |
| 389-4 | 2 | Mot. | | Deposition of Todd Owen (Dec. 13, 2019) | **GRANTED IN PART, DENIED IN PART** See Appendix B. |
| 389-5 | 3 | Mot. | | Deposition of Whistleblower (Nov. 21, 2019) | **GRANTED IN PART, DENIED IN PART** See Appendix C. |
| 389-6 | 4 | Mot. | AOL-DEF-00615546-63 | DHS OIG Tecate Report | **DENIED WITH PREJUDICE** Defendants permitted to submit the redacted version, which is publcly avaiable. |
| 389-7 | 5 | Mot. | AOL-DEF-00014041-77 | CBP OPR Report of Investigation | **DENIED WITHOUT PREJUDICE** Redactions of names of subject of and witnesses to investigations permitted.  Redactions of the public safety muster (AOL-DEF-00014073) also permitted. |
| 389-9 | 7 | Mot. | | Expert Report of Leutert | **DENIED WITH PREJUDICE** Unsealed on 9th Circuit docket. See Al Otro Lado v. Chad F. Wolf, Case No. 19-56417 (9th Cir. Dec. 5, 2019), Dkt. No. 82. |
| 389-18 | 16 | Mot. | AOL-DEF-00328857-58 | Hood email (Aug. 2, 2017) | **DENIED WITHOUT PREJUDICE** |
| 389-19 | 17 | Mot. | AOL-DEF-00020023-24 | OFO memo regarding Haitian Migration Surge (Oct. 6, 2016) | **DENIED WITHOUT PREJUDICE** Redactions of the last two sentences under "Executive Summary," describing communications with the Government of Mexico, permitted. |
| 389-21 | 19 | Mot. | AOL-DEF-00029916-18 | Aki email re: San Ysidro End of Day AEU Reporting for7/29/16 (July 30, 2016) | **DENIED WITHOUT PREJUDICE** |
| 389-22 | 20 | Mot. | AOL-DEF-00243099 | Owen email (May 25, 2016) | **DENIED WITHOUT PREJUDICE** Redactions to numbers of individuals asserting credible fear on AOL-DEF-00761339 permitted. |
| 389-23 | 21 | Mot. | AOL-DEF-00243099-100 | Hood email regarding Haitian Processing (May 25, 2016) | **DENIED WITHOUT PREJUDICE** Redactions to numbers of detainees on site and any capacity-related numbers regarding housing or transportation permitted. |
| 389-24 | 22 | Mot. | AOL-DEF-00046740-43 | Letter from UNHCR Re: San Ysidro | **DENIED WITHOUT PREJUDICE** |
| 389-25 | 23 | Mot. | AOL-DEF-00372629-34 | Email re: Haitian Ambassador Request (Aug. 2016) | **DENIED WITHOUT PREJUDICE** |
| 389-26 | 24 | Mot. | AOL-DEF-00525116-18 | Morgan email re: Haitian Migrants  (Oct. 2016) | **GRANTED** |
| 389-28 | 26 | Mot. | AOL-DEF-00041757-58 | Howe email re: Caravan arrival (April 25, 2018) | **DENIED WITHOUT PREJUDICE** |
| 389-31 | 29 | Mot. | AOL-DEF-00041825-36 | Gonzales email re: update on Carvan and interaction w Mexico (April 23, 2018) | **GRANTED** |
| 389-32 | 30 | Mot. | AOL-DEF-00027054-55 | Email re: MCAT (April 28, 2018) | **DENIED WITHOUT PREJUDICE** |
| 389-33 | 31 | Mot. | AOL-DEF-00060695-96 | MCAT Report (April 27, 2018) | **DENIED WITHOUT PREJUDICE** Redaction of chart on AOL-DEF-00060695 and "holding capacities" sentence on AOL-DEF-00060696 permitted. |
| 389-34 | 32 | Mot. | AOL-DEF-00028127-30 | MCAT Report (April 28, 2018) | **DENIED WITHOUT PREJUDICE** Redaction of charts on AOL-DEF-00028128 permitted. |
| 389-35 | 33 | Mot. | AOL-DEF-00274287-91 | MCAT Presentation (April 29, 2018) | **DENIED WITHOUT PREJUDICE** Redaction of charts on AOL-DEF-00274289 permitted. |
| 389-36 | 34 | Mot. | AOL-DEF-00063246-47 | Hood email re: mass migration plan (April 18, 2018) | **GRANTED.** |
| 389-38 | 36 | Mot. | AOL-DEF-00060768-69 | Longoria email re: Queue managment (July 9, 2018) | **DENIED WITHOUT PREJUDICE** |
| 389-39 | 37 | Mot. | AOL-DEF-00027740-43 | Field Queue Management Report, Laredo Field Office (Oct 25, 2018) | **DENIED WITHOUT PREJUDICE** Redactions allowed of the columns regarding the location and staffing of the "Queue Management point" (columns 2 and 3) and the column regarding infrastructure (column 8). |
| 389-41 | 39 | Mot. | AOL-DEF-00190370-74 | LFO Queue Mgmt Contingency Plan (June 8, 2018) | **GRANTED** |
| 389-42 | 40 | Mot. | AOL-DEF-0009513-15 | Aki email re: San Ysidro End of Day AEU Reporting for 9/3/16 (Sept 4, 2016) | **DENIED WITHOUT PREJUDICE** |
| 389-43 | 41 | Mot. | AOL-DEF-00517231-33 | SYS Queue Mang. Brief (undated) | **DENIED WITHOUT PREJUDICE** Redactions to tables on AOL-DEF-00517232 and AOL-DEF-00517233 permitted. |

| 389-44 | 42 | Mot. | AOL-DEF-00041453-54 | Howe email re: hearing prep questions asylum cases (Mar 4, 2019) | **DENIED WITHOUT PREJUDICE** |
|---|---|---|---|---|---|
| 389-45 | 43 | Mot. | AOL-DEF-00039597 | Campbell email re: LFO Queue Mang. Report for 8/29/18 (August 29, 2018) | **DENIED WITHOUT PREJUDICE** |
| 389-46 | 44 | Mot. | AOL-DEF-00058200-310 | Laredo Field Office Contingency Plan (August 31, 2017) | **GRANTED** |
| 389-47 | 45 | Mot. | AOL-DEF-00205966-74 | OIG memo re San Ysidro East Separation of asylum-seeking parents from children (Sept. 12, 2018) | **DENIED WITHOUT PREJUDICE** |
| 389-49 | 47 | Mot. | AOL-DEF-00205420-22 | Office of Special Counsel letter  (August 23, 2018). | **DENIED WITH PREJUDICE**<br>Defendants permitted to submit the redacted version, which is publcly avaiable. |
| 389-50 | 48 | Mot. | AOL-DEF-00036343-44 | SFO memo titled on top "Migrant Processing at Limit Line-San Diego Field Office) | **GRANTED** |
| 389-51 | 49 | Mot. | AOL-DEF-00087160-61 | Exhibit 5 from Whistleblower deposition, Field Queue Management Report  (Mar 21, 2019). | **DENIED WITHOUT PREJUDICE** |
| 389-52 | 50 | Mot. | AOL-DEF-00170598 | Exhibit 6 from Whistleblower deposition, Field Queue Management Report (June 16, 2018) | **DENIED WITHOUT PREJUDICE** |
| 389-53 | 51 | Mot. | AOL-DEF-00086900-01 | Exhibit 7 from Gibbons depo (FQMR may 2, 2019) | **DENIED WITHOUT PREJUDICE** |
| 389-54 | 52 | Mot. | AOL-DEF-00205672-74 | Arias email re: AEU Detainee-Sentiment on Metering, current legislation and SOP at SYS (July 3, 2018) | **DENIED WITHOUT PREJUDICE** |
| 389-55 | 53 | Mot. | AOL-DEF-00205672-74 | Arias email metadata | **DENIED WITHOUT PREJUDICE** |
| 389-56 | 54 | Mot. | AOL-DEF-00022783-84 | Owen email re: appointments (Nov 22, 2016) | **DENIED WITHOUT PREJUDICE** |
| 389-57 | 55 | Mot. | AOL-DEF-00566881 | Saenz email re: PCS update 1800hrs (April 28, 2018) | **DENIED WITHOUT PREJUDICE** |
| 389-58 | 56 | Mot. | AOL-DEF-00036004-05 | Archambeault email re: family units (Dec 6, 2017) | **DENIED WITHOUT PREJUDICE**<br>Redactions of FAMU processing and daily processing numbers permitted. |
| 389-59 | 57 | Mot. | AOL-DEF-00038633-34 | Howe email re: field office queue management (June 18, 2018) | **DENIED WITHOUT PREJUDICE** |
| 389-61 | 59 | Mot. | AOL-DEF-00028473-75 | Owen email re: C1 Migrant Processing Direction (Nov. 12, 2018) | **DENIED WITHOUT PREJUDICE**<br>Redactions of daily processing and daily crossing numbers permitted. |
| 389-62 | 60 | Mot. | AOL-DEF-00028469-70 | Flores email re:C1 migrant processing direction (Nov. 11, 2018) | **DENIED WITHOUT PREJUDICE**<br>Redactions of daily processing numbers permitted. |
| 389-63 | 61 | Mot. | AOL-DEF-00050247-50 | Flores email re:C1 migrant processing direction (Nov. 14, 2018) | **DENIED WITHOUT PREJUDICE**<br>Redactions of daily processing and daily crossing numbers permitted. |
| 389-64 | 62 | Mot. | AOL-DEF-000602802-03 | Marin email re: Queue management (August 6, 2018) | **DENIED WITHOUT PREJUDICE**<br>Redaction of number regarding capacity on AOL-DEF-00602802 permitted. |
| 389-65 | 63 | Mot. | AOL-DEF-00012000-01 | MCAT Report (Feb. 25, 2018) | **DENIED WITHOUT PREJUDICE** |
| 389-98 | 96 | Mot. | AOL-DEF-00027614-15 | FQMR re: Field Queue Management Report (Oct 2, 2018) | **DENIED WITHOUT PREJUDICE** |
| 405-1 | 2 | Opp'n | | Deposition of Todd Owen (Dec. 13, 2019) | **GRANTED IN PART, DENIED IN PART**<br>See ruling on Ex. 2 to Mot. |
| 405-2 | 6 | Opp'n | AOL-DEF-00020023-24 | OFO memo regarding Haitian Migration Surge (Oct. 6, 2016) | **DENIED WITHOUT PREJUDICE**<br>See ruling on Ex. 17 to Mot. |
| 405-3 | 7 | Opp'n | AOL-DEF-00285232-33 | OFO Incident Management Division memo on the Haitian Migration Surge (Sept. 14, 2016) | **DENIED WITHOUT PREJUDICE**<br>Redaction of third sentence under "Mission" ("Haitian nationals are arriving at an approximate rate…") and the number indicating capacity of temporary holding space under "Execution" |
| 405-4 | 8 | Opp'n | AOL-DEF-0018728 | SWB DFO/XD Panel Discussion PowerPoint presentation re: mass migration (Nov. 16, 2016) | **DENIED WITHOUT PREJUDICE**<br>Redactions to "Capacity Stress Points" on slide 3 and daily processing states on slide 8 permitted. |
| 405-5 | 9 | Opp'n | AOL-DEF-00219717-23 | OFO Incident Management Division memo (Oct. 13, 2016) | **DENIED WITHOUT PREJUDICE**<br>Second to last sentence under "Executive Summary" revealing communication from the Government of Mexico may be redacted.<br>Any numbers throughout memo indicating daily average processing; daily rates of metered, transferred, transported, or released migrants; number of beds at certain ports may be redacted.<br>All "Strengths and Risks" listed on AOL-DEF-00219721 may be redacted. |

| | | | | | |
|---|---|---|---|---|---|
| 405-6 | 10 | Opp'n | AOL-DEF-00221166 | PowerPoint presentation (Oct. 2016) | **DENIED WITHOUT PREJUDICE**<br>Redactions permitted for: numbers reflecting daily processing amount on slide 4, monthly processing increase on slide 7, all risks listed on slide 8. |
| 405-7 | 12 | Opp'n | AOL-DEF-00379492-93 | Email chain re: CBP MCAT C-1 notes (Feb. 8, 2019) | **GRANTED** |
| 405-8 | 26 | Opp'n | | January 28, 2020 Deposition of Stephanie Leutert | **DENIED WITHOUT PREJUDICE**<br>Defendants permitted to submit proposed redactions.  See Order § III.A.4. |
| 405-9 | 28 | Opp'n | | Paragraph 12 of Declaration of Rodney Harris | **GRANTED** |
| 405-10 | 30 | Opp'n | AOL-DEF-00235700-03 | Email re: "LFO Adverse Traffic" (Oct. 2, 2018) | **DENIED WITHOUT PREJUDICE** |
| 412-3 | 2 | Reply | | January 28, 2020 Deposition of Stephanie Leutert | **DENIED WITHOUT PREJUDICE**<br>See ruling on Ex. 26 to Opp'n |
| 412-4 | 3 | Reply | AOL-DEF-00026892-96 | July 18, 2018 Field Queue Management Report | **DENIED WITHOUT PREJUDICE**<br>Redactions allowed of the columns regarding the location and staffing of the "Queue Management point" (columns 2 and 3) and the column regarding infrastructure (column 8) |
| 412-5 | 4 | Reply | AOL-DEF-00026897-901 | July 19, 2018 Field Queue Management Report | **DENIED WITHOUT PREJUDICE**<br>Redactions allowed of the columns regarding the location and staffing of the "Queue Management point" (columns 2 and 3) and the column regarding infrastructure (column 8) |
| 412-6 | 5 | Reply | AOL-DEF-00026902-06 | July 20, 2018 Field Queue Management Report | **DENIED WITHOUT PREJUDICE**<br>Redactions allowed of the columns regarding the location and staffing of the "Queue Management point" (columns 2 and 3) and the column regarding infrastructure (column 8) |
| 412-7 | 6 | Reply | AOL-DEF-00018087 | December 1, 2017 MCAT PPT Presentation | **DENIED WITHOUT PREJUDICE**<br>Redactions of charts regarding capacity and custody on slides 5 and 7 permitted |

**APPENDIX B**

**Deposition ot Todd Owen**

(Ex. 2 to Mot., ECF No. 389-4; Ex. 2 to Opp'n, ECF No. 405-1)

| Page | Line | Rationale | Ruling |
|------|------|-----------|--------|
| 11 | 3–10 | Personal address of deponent; sensitive, private information of law enforcement personnel. | Granted. |
| 28 | 21–22 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Denied.  Meeting not held in the SCIF per testimony. |
| 29 | 1–5 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Denied.  Meeting not held in the SCIF per testimony. |
| 40 | 5–22 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Granted as to lines 8–18. |
| 42 | 2–4 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Granted as to part of lines 2–4 ("so . . . driven"). |
| 43 | 7–9 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Granted as to part of lines 8–9 ("the [time] . . . SCIF"). |
| 45 | 20–22 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Granted as to part of line 21 ("at the . . . SCIF"). |
| 46 | 9–14 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Granted. |
| 47 | 5–8 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Granted as to lines 5–6 and part of line 8 ("at the . . . meeting"). |
| 47 | 19–22 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Granted. |
| 48 | 1–4 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Granted. |
| 48 | 17–21 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Granted. |
| 49 | 1–4 | Detailed information of sensitive meetings in the SCIF could give bad actors the ability to target senior CBP leadership at a specific location and time. | Granted. |
| 63 | 17–22 | Reference to confidential metering memo. | Denied. The Metering Guidance is publicly available on the docket (ECF Nos. 390-29, 406-2). |
| 84 | 1–22 | Discusses details of confidential queue management report from June 19, 2018. | Denied.  Does not disclose any data. |
| 85 | 1–7 | Discusses details of confidential queue management report from June 19, 2018. | Denied.  Does not disclose any data. |
| 88 | 1–22 | Discusses details of confidential queue management report from June 19, 2018. | Granted. |
| 89 | 6–22 | Discusses details of confidential queue management report from June 19, 2018. | Granted as to lines 13–22. |
| 90 | 1–22 | Discusses details of confidential queue management report from June 19, 2018. | Granted as to lines 1–6, 10–22 |
| 91 | 1–5 | Discusses details of confidential queue management report from June 19, 2018. | Granted. |
| 126 | 1–22 | Reference to email discussing Mexican government officials' communications with CBP Attache. | Granted. |
| 127 | 1–8 | Reference to email discussing Mexican government officials' communications with CBP Attache. | Granted. |
| 127 | 13–15 | Reference to email discussing Mexican government officials' communications with CBP Attache. | Granted. |
| 128 | 16–22 | Reference to email discussing Mexican government officials' communications with CBP Attache. | Granted. |
| 129 | 1–22 | Reference to email discussing Mexican government officials' communications with CBP Attache | Granted. |
| 130 | 1–19 | Reference to email discussing Mexican government officials' communications with CBP Attache. | Granted. |
| 131 | 15–22 | Reference to email discussing Mexican government officials' communications with CBP Attache. | Granted. |
| 132 | 1–8 | Reference to email discussing Mexican government officials' communications with CBP Attache. | Granted. |
| 132 | 13–15 | Reference to email discussing Mexican government officials' communications with CBP Attache. | Denied. |
| 191 | 17–22 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. Does not discuss content of memo. |
| 195 | 9–22 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. Does not discuss content of memo. |
| 197 | 12–21 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. Does not discuss content of memo. |
| 198 | 13–17 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. |
| 199 | 17–22 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. Does not discuss content of memo. |
| 200 | 6–22 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. Does not discuss content of memo. |
| 201 | 1–22 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. |
| 202 | 1–22 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. |
| 203 | 1–22 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. |
| 212 | 10–15 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. |
| 215 | 12–22 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. Does not discuss content of memo. |
| 216 | 1–22 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. Does not discuss content of memo. |
| 217 | 1–22 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. |
| 218 | 1–22 | Reference to confidential queue management memo. | Denied.  No compelling reasons stated. Does not discuss content of memo. |
| 219 | 1–12 | References to communications with a foreign government and confidential queue management memo. | Granted as to lines 2–12. |
| 250 | 4–12 | Internal agency deliberations | Granted. |
| 250 | 17–20 | Internal agency deliberations | Granted. |

APPENDIX C
**Deposition of Whistleblower**
(Ex. 3 to Mot., ECF No. 389-5)

| Page | Line | Rationale | Ruling |
|---|---|---|---|
| 6 | 15–17 | Customs and Border Protection (CBP) employee personal address | Granted. |
| 18 | 1–5 | Reveals whistleblower's identity | Granted. |
| 18 | 11–25 | Identifies a CBP employee and potential witness to the whistleblower's complaint | Granted in part. Name may be redacted in lines 13–17. Lines 18-25 can be redacted in their entirety. |
| 19 | 2 | Identifies a CBP employee and potential witness to the whistleblower's complaint | Granted in part. Name may be redacted. |
| 20 | 19–23 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 22 | 20–25 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 23 | 1–25 | Reveals whistleblower's identity | Granted only as to email address. Denied as to remaining testimony. See Order at § III.A.3. |
| 24 | 1–25 | Reveals whistleblower's identity | Granted only as to email address. Denied as to remaining testimony. See Order at § III.A.3. |
| 25 | 1–25 | Reveals whistleblower's identity (email address) | Granted only as to email address. Denied as to remaining testimony. See Order at § III.A.3. |
| 27 | 5, 17 | Reveals whistleblower's identity (personal and work email address) | Granted. |
| 35 | 15–24 | Describes training for how cases are processed (could disclose law enforcement investigative techniques) | Granted. |
| 36 | 5–25 | Describes training for how cases are processed (could disclose law enforcement investigative techniques) | Granted. |
| 37 | 1–15 | Describes training for how cases are processed (could disclose law enforcement investigative techniques) | Granted. |
| 38 | 1–25 | Describes training for how cases are processed (could disclose law enforcement investigative techniques) | Granted. |
| 42 | 23–24 | Identifies a CBP employee and potential witness to the whistleblower's complaint | Granted in part. Name may be redacted. |
| 43 | 4 | Identifies a CBP employee and potential witness to the whistleblower's complaint | Granted in part. Name may be redacted. |
| 78 | 9, 12, 15 | Identifies a CBP employee and potential witness to the whistleblower's complaint | Granted in part. Name may be redacted. |
| 90 | 23–24 | Reveals whistleblower's identity | Granted. |
| 91 | 6–9 | Reveals whistleblower's identity | Granted. |
| 93 | 23–24 | Reveals whistleblower's identity | Granted. |
| 108 | 5–14; 18–20 | Discusses details of confidential queue management report from March 21, 2019 which both parties are seeking to seal. (AOL-DEF-00087161). *See* Mot. for TRO Ex. 5 (ECF No. 344-7). | Denied. Discusses only metadata (from, date, time, subject), not content. |
| 109 | 8–25 | Discusses details of confidential queue management report from March 21, 2019 which both parties are seeking to seal. (AOL-DEF-00087161). *See* Mot. for TRO Ex. 5 (ECF No. 344-7). | Denied. See Order at § III.E.1. |
| 110 | 1–7; 20–25 | Discusses details of confidential queue management report from March 21, 2019 which both parties are seeking to seal. (AOL-DEF-00087161). *See* Mot. for TRO Ex. 5 (ECF No. 344-7). | Granted only as to number in line 21. Denied as to the remaining lines. See Order at § III.E.1. |
| 111 | 1–25 | Discusses details of confidential queue management report from March 21, 2019 which both parties are seeking to seal. (AOL-DEF-00087161). *See* Mot. for TRO Ex. 5 (ECF No. 344-7). | Denied. See Order at § III.E.1. |
| 112 | 8–25 | Discusses details of confidential queue management report from March 21, 2019 which both parties are seeking to seal. (AOL-DEF-00087161). *See* Mot. for TRO Ex. 5 (ECF No. 344-7). | Denied. See Order at § III.E.1. |
| 113 | 1–2 | Discusses details of confidential queue management report from March 21, 2019 which both parties are seeking to seal. (AOL-DEF-00087161). *See* Mot. for TRO Ex. 5 (ECF No. 344-7). | Denied. See Order at § III.E.1. |
| 115 | 7–8 | Discusses details of confidential queue management report from June 16, 2018 which both parties are seeking to seal (AOL-DEF-00170598). *See* Mot. for TRO Ex. 6 (ECF No. 344-8). | Denied. See Order at § III.E.1. |
| 116 | 2–11; 20–21; 23–25 | Discusses details of confidential queue management report from June 16, 2018 which both parties are seeking to seal (AOL-DEF-00170598). *See* Mot. for TRO Ex. 6 (ECF No. 344-8). | Granted as to lines 20–21. Denied as to the remaining lines. See Order at § III.E.1. |
| 117 | 10–11; 14–15; 20–25 | Discusses details of confidential queue management report from June 16, 2018 which both parties are seeking to seal (AOL-DEF-00170598). *See* Mot. for TRO Ex. 6 (ECF No. 344-8). | Granted as to lines 10–11. Denied as to the remaining lines. See Order at § III.E.1. |
| 118 | 1–23 | Discusses details of confidential queue management report from June 16, 2018 which both parties are seeking to seal (AOL-DEF-00170598). *See* Mot. for TRO Ex. 6 (ECF No. 344-8). | Denied. See Order at § III.E.1. |
| 122 | 1–25 | Reference to confidential metering memo and staffing discussions. | Denied. The Metering Guidance is publicly available on the docket (ECF Nos. 390-29, 406-2). |
| 123 | 1–25 | Discussion of port capacity | Granted. |
| 124 | 1–25 | Discussion of port security problems | Denied. This information is disclosed elsewhere in the transcript, which Defendants do not seek to seal. |
| 125 | 17–25 | Reference to port security | Denied. This information is disclosed elsewhere in the transcript, which Defendants do not seek to seal. |
| 129 | 1–25 | Discussion of port capacity issues | Denied. Defendants offer no compelling reasons why the issues discussed should be sealed. |

| | | | |
|---|---|---|---|
| 130 | 1–16 | Reference to port capacity issue | Denied. Defendants offer no compelling reasons why the issues discussed should be sealed. |
| 134 | 20–25 | Discusses details of confidential queue management report from May 2, 2019 which both parties are seeking to seal (AOL-DEF-00086900 – AOL- DEF-00086901). *See* Mot. for TRO Ex. 7 (ECF No. 344-9). | Denied. Only discusses metadata (from, date, time, subject), not content. |
| 135 | 6–25 | Discusses details of confidential queue management report from May 2, 2019 which both parties are seeking to seal (AOL-DEF- 00086900 – AOL- DEF-00086901). *See* Mot. for TRO Ex. 7 (ECF No. 344-9). | Granted only as to number in line 12. Denied as to the remaining lines. See Order at § III.E.1. |
| 136 | 1–18 | Discusses details of confidential queue management report from May 2, 2019 which both parties are seeking to seal (AOL-DEF- 00086900 – AOL- DEF-00086901). *See* Mot. for TRO Ex. 7 (ECF No. 344-9). | Denied. See Order at § III.E.1. |
| 137 | 6–9 | Discusses details of confidential queue management report from February 5, 2019 which both parties are seeking to seal (AOL-DEF-00088202 – AOL- DEF-00088203). *See* Mot. for TRO Ex. 8 (ECF No. 344-10). | Denied. Discusses only metadata (from, date, time, subject), not content. |
| 137 | 20–25 | Discusses details of confidential queue management report from February 5, 2019 which both parties are seeking to seal (AOL-DEF-00088202 – AOL- DEF-00088203). *See* Mot. for TRO Ex. 8 (ECF No. 344-10). | Granted only as to number in line 21. Denied as to the remaining lines. See Order at § III.E.1. |
| 138 | 1–7; 11–25 | Discusses details of confidential queue management report from February 5, 2019 which both parties are seeking to seal (AOL-DEF-00088202 – AOL- DEF-00088203). *See* Mot. for TRO Ex. 8 (ECF No. 344-10). | Denied. See Order at § III.E.1. |
| 139 | 1–11 | Discusses details of confidential queue management report from February 5, 2019 which both parties are seeking to seal (AOL-DEF-00088202 – AOL- DEF-00088203). *See* Mot. for TRO Ex. 8 (ECF No. 344-10). | Denied. See Order at § III.E.1. |
| 140 | 3–5 | Discusses details of confidential queue management report from January 10, 2019 which both parties are seeking to seal (AOL-DEF- 00050964 – AOL- DEF-00050965). *See* Mot. for TRO Ex. 9 (ECF No. 344-11). | Denied. Discusses only metadata (from, date, time, subject), not content. |
| 140 | 11–25 | Discusses details of confidential queue management report from January 10, 2019 which both parties are seeking to seal (AOL-DEF- 00050964 – AOL- DEF-00050965). *See* Mot. for TRO Ex. 9 (ECF No. 344-11). | Granted only as to number in line 18. Denied as to the remaining lines. See Order at § III.E.1. |
| 141 | 1–13 | Discusses details of confidential queue management report from January 10, 2019 which both parties are seeking to seal (AOL-DEF- 00050964 – AOL- DEF-00050965). *See* Mot. for TRO Ex. 9 (ECF No. 344-11). | Denied. See Order at § III.E.1. |
| 142 | 9–25 | Discusses details of confidential queue management report from December 26, 2018 which both parties are seeking to seal (AOL-DEF- 00195859 – AOL- DEF-00195860). *See* Mot. for TRO Ex. 10 (ECF No. 344-11). | Granted only as to number in line 18. Denied as to the remaining lines. See Order at § III.E.1. |
| 143 | 1–16 | Discusses details of confidential queue management report from December 26, 2018 which both parties are seeking to seal (AOL-DEF- 00195859 – AOL- DEF-00195860). *See* Mot. for TRO Ex. 10 (ECF No. 344-11). | Denied. See Order at § III.E.1. |
| 145 | 9–25 | Discusses port capacity issues | Denied. Defendants offer no compelling reasons why the issues discussed should be sealed. |
| 146 | 3–22 | Discusses port capacity issues | Granted. |
| 147 | 13–25 | Discussion of a muster that could reveal sensitive law enforcement information. | Denied. Only discusses metadata (to, date, time, subject), not content. |
| 148 | 1–25 | Discussion of a muster that could reveal sensitive law enforcement information. | Denied. See Order at § III.A.3. |
| 149 | 1–25 | Discussion of a muster that could reveal sensitive law enforcement information. | Denied. See Order at § III.A.3. |
| 150 | 1–25 | Discussion of a muster that could reveal sensitive law enforcement information | Denied. See Order at § III.A.3. |
| 152 | 1–25 | Discussion of a muster that could reveal sensitive law enforcement information | Denied. See Order at § III.A.3. |
| 153 | 1–23 | Discussion of a muster and standard operating procedure that could reveal sensitive law enforcement information. | Denied. See Order at § III.A.3. |
| 154 | 2–25 | Discussion of a muster that could reveal sensitive law enforcement information. | Denied. See Order at § III.A.3. |
| 155 | 1–25 | Port processing issues | Denied. See Order at § III.A.3. |
| 156 | 3–17 | Port operational concerns | Denied. Discusses motivation behind the policy, not the content or any sensitive law enforcement information. |
| 157 | 9–25 | Discussion of a standard operating procedure that could reveal sensitive law enforcement information. | Denied. Only discusses metadata (subject, date), not content. |
| 158 | 1–25 | Quoting from and discussing a standard operating procedure that could reveal sensitive law enforcement information. | Denied. Contains same language as Metering Guidance, which is publicly available. |
| 160 | 1–25 | Quoting from and discussing a standard operating procedure that could reveal sensitive law enforcement information. | Denied. Contains same language as Metering Guidance, which is publicly available. No discussion of sensitive law enforcement information. |
| 162 | 18–25 | Reveals whistleblower's identity | Granted. |
| 163 | 1–25 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 164 | 1–8 | Reveals whistleblower's identity | Granted. |
| 166 | 5–25 | Reveals whistleblower's identity | Granted. |
| 167 | 1–25 | Reveals whistleblower's identity | Granted. |
| 168 | 7–10 | Reveals whistleblower's identity | Granted. |
| 169 | 7–9; 17–25 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 170 | 1–25 | Reveals whistleblower's identity | Granted. |
| 171 | 1–4 | Reveals whistleblower's identity | Granted. |

| 179 | 17–19 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
|---|---|---|---|
| 180 | 13–19 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 181 | 3–25 | Reveals whistleblower's identity | Granted. |
| 182 | 12–25 | Reveals whistleblower's identity | Granted. |
| 183 | 1–25 | Reveals whistleblower's identity | Granted. |
| 184 | 1–25 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 185 | 1–14 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 186 | 24–25 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 187 | 3–8; 16–23 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 188 | 1–25 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 189 | 1–25 | Reveals whistleblower's identity | Granted. |
| 190 | 14–16 | Reveals whistleblower's identity | Granted. |
| 191–205 | 1–25 | Reveals whistleblower's identity | Granted. |
| 206 | 1–5; 9–14; 24–25 | Reveals whistleblower's identity | Granted in part. Name to be redacted. |
| 207 | 1–2; 21–25 | Reveals whistleblower's identity | Denied as to lines 1–2. Granted in part as to lines 21–25. Name may be redacted. |
| 209–214 | 1–25 | Reveals whistleblower's identity | Granted. |
| 215 | 1–16 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 216 | 4 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 217 | 21–25 | Reveals whistleblower's identity | Granted. |
| 218 | 2–25 | Reveals whistleblower's identity | Granted. |
| 219 | 8–25 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 221 | 2–25 | Pertains to confidential muster and references sensitive information contained therein regarding law enforcement processes and procedures | Denied. See Order at § III.A.3. |
| 222 | 1–8 | Pertains to confidential muster and references sensitive information contained therein regarding law enforcement processes and procedures | Denied. See Order at § III.A.3. |
| 225 | 6–25 | Reveals whistleblower's identity | Granted |
| 226 | 1–3 | Reveals whistleblower's identity | Granted. |
| 227 | 3–25 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 228 | 1–12 | Reveals whistleblower's identity | Denied. See Order at § III.C.1. |
| 231 | 20–25 | Reveals whistleblower's identity | Granted in part. Name can be redacted. |
| 232 | 1–8 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 232 | 9–13 | Discussions of contents of confidential queue management reports | Denied. See Order at § III.A.3. |
| 233 | 3–25 | Reveals whistleblower's identity | Granted in part. Name may be redacted. |
| 234 | 2–4 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 234 | 16–25 | Discussions of contents of confidential queue management reports | Denied. See Order at § III.A.3. |
| 238 | 8–13; 23–25 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 239 | 1–3 | Reveals whistleblower's identity | Denied. See Order at § III.A.3. |
| 240 | 14–16 | Reveals whistleblower's identity | Granted. |
| 242 | 10–14; 21–24 | Reveals whistleblower's identity | Granted. |
| 247 | 7–9 | Reveals whistleblower's identity | Granted. |
| 254 | 1–7, 16–23 | Pertains to muster and references sensitive information contained therein regarding law enforcement processes and procedures | Denied. The Metering Guidance is publicly available on the docket (ECF Nos. 390-29, 406-2). |
| 255 | 11–25 | Discusses details of confidential queue management report from March 21, 2019 which both parties are seeking to seal. (AOL-DEF- 0008760 – AOL- DEF-00087161). See Mot. for TRO Ex. 5 (ECF No. 344-7). | Denied. See Order at § III.E.1. |
| 256 | 1–3 | Discusses details of confidential queue management report from June 16, 2018 which both parties are seeking to seal (AOL-DEF- 00170598). *See* Mot. for TRO Ex. 6 (ECF No. 344-8). | Denied. See Order at § III.E.1. |
| 256 | 4–25 | Discusses details of confidential queue management report from June 16, 2018 which both parties are seeking to seal (AOL-DEF- 00170598). *See* Mot. for TRO Ex. 6 (ECF No. 344-8). | Granted only as to number in line 9. Denied as to the remaining lines. See Order at § III.3.1. |

| | | | |
|---|---|---|---|
| 257 | 1–25 | Discusses details of confidential queue management report from June 16, 2018 which both parties are seeking to seal (AOL-DEF- 00170598). *See* Mot. for TRO Ex. 6 (ECF No. 344-8). | Denied. See Order at § III.E.1. |
| 258 | 1–18 | Discusses details of confidential queue management report from June 16, 2018 which both parties are seeking to seal (AOL-DEF- 00086900 – AOL-DEF-00086901). | Denied. See Order at § III.E.1. |
| 258 | 19–25 | Discusses details of confidential queue management report from May 2, 2019 which both parties are seeking to seal (AOL-DEF- 00086900 – AOL-DEF-00086901). | Denied. See Order at § III.E.1. |
| 259 | 1–23 | Discusses details of confidential queue management report from May 2, 2019 which both parties are seeking to seal (AOL-DEF- 00086900 – AOL- DEF-00086901). See Mot. for TRO Ex. 7 (ECF No. 344-9). | Granted only as to number in line 16. Denied as to the remaining lines. See Order at § III.E.1. |
| 259 | 24–25 | Discusses details of confidential queue management report from January 10, 2019 which both parties are seeking to seal (AOL-DEF- 00050964 – AOL- DEF-00050965). See Mot. for TRO Ex. 9 (ECF No. 344-11). | Denied. See Order at § III.E.1. |
| 260 | 1–12 | Discusses details of confidential queue management report from January 10, 2019 which both parties are seeking to seal (AOL-DEF- 00050964 – AOL- DEF-00050965). See Mot. for TRO Ex. 9 (ECF No. 344-11). | Granted only as to number in line 4. Denied as to the remaining lines. See Order at § III.E.1. |
| 260 | 13–25 | Discusses details of confidential queue management report from December 26, 2018 which both parties are seeking to seal (AOL-DEF-00195859 – AOL- DEF-00195860). See Mot. for TRO Ex. 10 (ECF No. 344-11). | Denied. See Order at § III.E.1. |
| 261 | 1–2 | Discusses details of confidential queue management report from December 26, 2018 which both parties are seeking to seal (AOL-DEF- 00195859 – AOL- DEF-00195860). See Mot. for TRO Ex. 10 (ECF No. 344-11). | Denied. See Order at § III.E.1. |