MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>　　　　Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 1 TO DECLARATION OF STEPHEN M. MEDLOCK IN SUPPORT OF JOINT MOTION FOR DETERMINATION OF MAY 2020 CLAWBACK DISPUTE** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--------------------------------x

AL OTRO LADO, INC., et al.,          :

               Plaintiffs,          : Case No.:

        vs.                          : 17-cv-02366-BAS-KSC

KEVIN K. MCALEENAN, et al.,          :

              Defendants.          :

--------------------------------x


DEPOSITION MARKED CONFIDENTIAL

DEPOSITION OF TODD OWEN

Washington, D.C.

Friday, December 13, 2019

9:40 a.m.


Job No.:  529549

Pages:  1 - 332

Reported by:  Elizabeth Mingione, RPR

Page 2

1

2            Deposition of TODD OWEN, held at the offices

3    of Mayer Brown, LLP, 1999 K Sreet, Northwest,

4    Washington, D.C., commencing at 9:40 a.m., Friday,

5    December 13, 2019, and taken down stenographically by

6    Elizabeth Mingione, Registered Professional Reporter

7    and Notary Public for the Commonwealth of Virginia.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1   A P P E A R A N C E S   O F   C O U N S E L:

 2   ON BEHALF OF PLAINTIFFS:

 3            MAYER BROWN, LLP

 4            Stephen M. Medlock, Esquire

 5            Ori Lev, Esquire

 6            1999 K Street, Northwest

 7            Washington, DC 20006

 8            (202) 263-3000

 9            Smedlock@mayerbrown.com

10

11   ON BEHALF OF DEFENDANTS:

12            U.S. DEPARTMENT OF JUSTICE

13            Katherine J. Shinners, Esquire

14            David White, Esquire

15            Ben Franklin Station

16            PO Box 868

17            Washington, DC 20044

18            (202) 598-8259

19            Katherine.J.Shinner@usdoj.gov

20

21   (Appearances, Continued)

22
```

Page 4

1                A L S O   P R E S E N T

2              Louisa Slocum,  Esquire

3                 Rameez Burney

4    Karolina Walters, American Immigration Council

5                 Kristine King

6         Matthew Fenn (via phone, as indicated)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 5

1                     C O N T E N T S

2              WITNESS:  TODD OWEN

3    EXAMINATION BY:                            PAGE

4    Mr. Medlock ...................................   9

5    Ms. Shinners ................................  312

6    Mr. Lev .....................................  322

7

8                     *    *    *

9

10                 DEPOSITION EXHIBITS

11                     TODD OWEN

12   NUMBER          DESCRIPTION              PAGE

13   Exhibit 20   Notice of Deposition ............   19

14   Exhibit 21   Website Printout of Todd Owen

15        Description ............................   49

16   Exhibit 22   U.S. Customs and Border Protection

17        Standard of Conduct, AOL-DEF-00669013 ....   51

18   Exhibit 23   Metering Guidance Memorandum, Date

19        Stamped April 27, 2018 .................   63

20   Exhibit 24   E-mail from Randy Howe, June 19,

21        2018, AOL-DEF-00088501 .................   81

22   (Exhibits Continued)

Page 6

1   NUMBER          DESCRIPTION                    PAGE

2   Exhibit 25   E-mail from Robert Hood, August

3        2, 2017, AOL-DEF-00328857 ...............  100

4   Exhibit 26   E-mail from Todd Owen, May 25,

5        2016 AOL-DEF-00761338 ...................  104

6   Exhibit 27   E-mail Chain, Sept. 13, 2016,

7        AOL-DEF-00762746 ........................  123

8   Exhibit 28   E-mail Chain from Todd Hoffman,

9        Sept. 16, 2016, AOL-DEF-00762523 ........  132

10  Exhibit 29   E-mail from Katherine Stark, Sept. 7,

11       2016 AOL-DEF-00761290 ................... 135

12  Exhibit 30   E-mail Chain from Todd Owen, August

13       17, 2016, AOL-DEF-00761340 .............. 142

14  Exhibit 31   E-mail chain, Novemer 11, 2016,

15       AOL-DEF-00272936 ........................ 146

16  Exhibit 32   ***   Exhibit is removed ***

17  Exhibit 33   E-mail from Hector Mancha,

18       AOL-DEF-00081089 ........................ 162

19  Exhibit 34   E-mail from Beverly Good, Nov. 22,

20       2016, AOL-DEF-00032389 .................. 167

21  Exhibit 35   E-mail from Alberto Flores, November

22       14, 2016, AOL-DEF-00576607 .............. 174

Page 7

```
 1   NUMBER           DESCRIPTION                    PAGE

 2   Exhibit 36    ***  Exhibit is Removed ***

 3   Exhibit 37    ***  Exhibit is Removed ***

 4   Exhibit 38  E-mail from Valerie Boyd, June 5,

 5        2018, AOL-DEF-00273293 ................. 196

 6   Exhibit 39  Homeland Security Memo of June 5,

 7        2018, AOL-DEF-00273294 ................. 199

 8   Exhibit 40  Memo from Kevin McAleenan, August 1,

 9        2018, AOL-DEF-00039620 ................. 213

10   Exhibit 41  Evaluation of Prioritization Queue

11        Management Pilot, AOL-DEF-00039621 ...... 213

12   Exhibit 42 Mark Morgan Memo, CBPALTR0000303 .. 213

13   Exhibit 43  Complaint fof Declaratory and

14        Injunctive Relief ...................... 220

15   Exhibit 44  E-mail Chain Aug. 14, 2017,

16        AOL-DEF-00723886 ...................... 223

17   Exhibit 45  Confidential Al Otro Lado Lawsuit

18        Document, AOL-DEF-00723887 ............. 225

19   Exhibit 46   E-mail from William Haralson,

20        March 15, 2017, NTEU 000132 ............ 229

21   Exhibit 47   Search Results Report and E-mail

22        from Eddie Arias, July 3, 2018 ......... 243
```

Page 8

1  NUMBER          DESCRIPTION                PAGE

2  Exhibit 48   Five-Page Document, Annotations ..  248

3  Exhibit 49   E-mail from David Atkinson,

4       March 19, 2019, NTEU-000110 ..............  255

5  Exhibit 50   Photograph of Mother and Child ...  291

6  Exhibit 51   Photograph of Bodies in Water ....  292

7  Exhibit 52   E-mail Chain, March 19, 2019,

8       AOL-DEF-00269970 ........................  293

9  Exhibit 53   E-mail Chain, March 19, 2019,

10      AOL-DEF-00270451 ........................  296

11

12

13

14          (Exhibits Attached to Transcript,

15           Except for Nos. 32, 36, 37 TBD)

16

17

18

19

20

21

22

1                    P R O C E E D I N G S

2    Whereupon,

3                          TODD OWEN,

4               having been first duly sworn was

5               examined and testified as follows:

6                          -   -   -

7                    EXAMINATION CONDUCTED

8        BY MR. MEDLOCK:

9        Q.    Good morning, sir.

10       A.    Good morning.

11       Q.    Can you please state and spell your name

12   for the record.

13       A.    My name is Todd Owen, T-O-D-D, O-W-E-N.

14       Q.    Have you ever gone by any other names, sir?

15       A.    No.

16       Q.    Are you presently employed?

17       A.    Yes.

18       Q.    Where are you employed?

19       A.    With U.S. Customs and Border Protection,

20   Washington, D.C.

21       Q.    What is your -- if I refer to U.S. Customs

22   and Border Protection as CBP, you'll understand that?

Page 51

1        A.    6.5 billion.

2        Q.    Okay.  And how many employees do you

3    oversee at CBP today?

4        A.    Just on -- just under 30,000.

5        Q.    How many of those 30,000 are sworn law

6    enforcement officers?

7        A.    24,600 approximately.

8        Q.    And one of the things that you do in your

9    role as EAC is you set an example for the other CBP

10   employees; is that right?

11       A.    Try to.

12       Q.    And would you agree with me that it's

13   important for a CBP officer to be honest when they are

14   on and off duty; is that right?

15       A.    Yes.

16       Q.    And as a member of CBP senior leadership,

17   you try to hold yourself to that standard, and in fact

18   to a higher standard; is that right?

19       A.    Yes.

20       Q.    Okay.

21                     -   -   -

22                (A document was marked as Deposition

Page 52

1    Exhibit Number 22.)

2                        -   -   -

3        BY MR. MEDLOCK:

4        Q.    Let me show you a copy of Exhibit 22.  It's

5    a long document.  I'm sure you have probably seen it

6    in your career.  Take a moment to flip through it.

7    I'll direct you to the parts I want to talk about.

8        A.    Okay.

9        Q.    All right, sir.  Exhibit 22 is a multi-page

10   document entitled U.S. Customs and Border Protection

11   Standards Of Conduct.  Do you see that, sir?

12       A.    Yes.

13       Q.    And, for the record, it begins with

14   AOL-DEF-00669013 in the bottom right corner.

15             Do you see that?

16       A.    Yes.

17       Q.    Lawyers call those Bates numbers.  I have

18   no idea why.  But I may refer to them as Bates numbers

19   throughout today's deposition.

20             Can you flip through to the Section 3.2.

21   I'm sorry.  It's on the first page.  I apologize.  You

22   don't need to flip anywhere.  Section 3.2 on the first

Page 53

1    page that ends in 69013.  Do you see that?

2        A.    Yes.

3        Q.    Okay.  And this section here notes that a

4    CBP employee that does not comply with the standards

5    of conduct can face disciplinary action; is that

6    right?

7        A.    Yes.

8        Q.    And if you move up, and Section 3.1 on the

9    same page, that section begins, "In fulfilling its

10   mission, CBP and its employees must sustain the trust

11   and confidence of the public they serve."

12             Did I read that correctly?

13       A.    Yes.

14       Q.    In your opinion, why is it important for

15   CBP to sustain the trust of the public?

16       A.    In my opinion as a law enforcement agency,

17   if you lose the public trust, you won't be able to

18   perform the mission that you are entitled -- you're

19   expected to perform.

20       Q.    Is it important for a law enforcement

21   agency to be candid with the public about what it's

22   doing and why?

Page 54

1      A.      Yes, it is.

2      Q.      Do you believe that CBP has been candid

3   with the public regarding the metering policy?

4      A.      I know that I have been candid with the

5   metering with the public.  I can't speak for the

6   entire Agency.

7      Q.      Are you aware of any instances where any of

8   the law enforcement officers that you oversee have not

9   been candid with the public about the metering policy?

10     A.      Have not been candid, not that I can

11  recall.

12     Q.      Are you aware of any instances in which CBP

13  employees have been told that they have not been

14  candid about the metering policy?

15     A.      Can you repeat the question.

16     Q.      Yeah.  Are you aware of any instances in

17  which CBP employees have been told that they weren't

18  candid about the metering policy?

19     A.      Not that I can recall.

20     Q.      Are you aware of any instance in which CBP

21  officers were told that the metering policy broke the

22  law?

Page 55

1    A.    No.

2    Q.    Are you aware of any instances in which CBP

3    officers admitted to third parties that the metering

4    policy broke the law?

5    A.    I don't believe the metering policy has

6    broken the law.

7    Q.    I understand that, but are you aware of any

8    instances in which CBP officers admitted that?

9    A.    Not that I'm aware of.

10    Q.    Let's turn to Section 6.1, which is on the

11    page that ends in 669015.

12    A.    I'm sorry, 66?

13    Q.    9015.  Should be the third page of the

14    document.

15    A.    Third page.

16    Q.    And in the bottom right, it should end in

17    901.

18    A.    Oh, I'm sorry.  I'm looking in the 6.1,

19    6.2.  Okay.

20    Q.    No, I get it.  There's page numbers, then

21    there's Bates number --

22    A.    Got it.

Page 56

1          Q.      -- then there's the sections, so I get it.

2          A.      Okay.

3          Q.      So I'm under Standards of Conduct, 6.1,

4     conduct prejudicial to the government.  Do you see

5     that?

6          A.      Yes.

7          Q.      All right.  That section, the body of that

8     section reads, quote, Employees will not engage on or

9     off duty in criminal, infamous, dishonest or

10    notoriously disgraceful conduct, or any other conduct

11    prejudicial to the government.

12              Did I read that correctly?

13         A.      Yes.

14         Q.      So there can be disciplinary actions if CBP

15    officers are dishonest when they are on duty; is that

16    right?

17         A.      Yes.

18         Q.      And are you aware of any instance in which

19    CBP officers have been dishonest about the metering

20    policy?

21         A.      No.

22         Q.      You yourself have always been honest about

1    the metering policy; is that right?

2        A.    Yes.

3        Q.    You have always been honest about the

4    purpose of the metering policy?

5        A.    Yes.

6        Q.    You've always been honest about the reasons

7    why CBP was implementing the metering policy?

8        A.    Yes.

9        Q.    In your written communications regarding

10   the metering policy, you have been honest and complete

11   about the reasons why CBP was implementing the

12   metering policy; is that correct?

13       A.    I believe so.

14       Q.    Can you think of any instance in which you

15   in your written communications about the metering

16   policy withheld material information about the purpose

17   of the policy?

18       A.    No.  I would like to go back.  You asked

19   the question about officers that have been dishonest

20   with the metering policy.

21       Q.    Yes.

22       A.    There have been several allegations that

Page 58

1    officers have not followed the policy.

2        Q.    Correct.

3        A.    And have said things like asylum is closed

4    and things of that nature.  I'm aware of those

5    incidences.  And when we become aware of those, those

6    have been referred to the check again.

7        Q.    You refer to those as allegations. Are

8    those allegations or have OPR determined that those

9    instances occurred?

10       A.    To my knowledge, they were allegations.  I

11   don't have the outcome of the OPR or the OIG

12   investigations.

13       Q.    So they may have occurred, they may not

14   have occurred.  You just don't know as you sit here

15   today; is that right?

16       A.    Correct.

17       Q.    Now, I'd like to move to the next -- to

18   page Section 6.4.1, Which is on the Bates numbered

19   page that ends in 669017.  Do You see Section 6.4.1,

20   sir?

21       A.    Yes.

22       Q.    And that's under the Section 6.4 which is

Page 69

1    border.

2        Q.    At the time this memorandum was issued,

3    what were the capacity -- what ports of entry were

4    capacity constrained that you felt justified the

5    issuance of this metering guidance?

6        A.    I don't recall specifically what ports, but

7    our primary gateway ports in the southwest border

8    began to experience capacity issues again throughout

9    2016.  Those would be the major ports, the San

10   Ysidros, the Calexico, Nogales, El Paso, Laredo,

11   Hidalgo off and on, Brownsville off and on.

12       Q.    And it's your assumption that those were

13   the ports that were capacity constrained at that time;

14   is that right?

15       A.    At that time, but again we have 26 ports

16   along the southwest border, 46 actual crossings.  A

17   port of entry may have multiple crossings.  El Paso

18   has four crossings.  At some point because of the

19   migrant situation which ebbs and flows, one of those

20   bridges might have capacity while the other three do

21   not.  It really is a very fluid situation at the ports

22   from port to port, day to day.

Page 70

1      Q.    Is it your position that the metering

2  policy was not motivated by a desire to deter asylum

3  seekers from entering the U.S.?

4      A.    The policy was not desired to deter

5  migrants from entering the U.S.  No, it was not.

6      Q.    And there was no communication that went to

7  any field office or port director that -- from you,

8  that would have led those field offices or port

9  directors to believe that the metering policy should

10  be used to deter asylum seekers; is that right?

11      A.    The metering policy, which again began in

12  2016, was used to address the capacity when we were

13  having large numbers of volumes.

14      Q.    And that's it?

15      A.    That's the reason we do the metering in the

16  ports of entry.

17      Q.    There's no other reason?

18      A.    No other reason.

19      Q.    So I shouldn't see any e-mails or

20  correspondence that would indicate there was another

21  reason; is that right?

22      A.    I can't speak for the whole agency.

Page 71

1    Q.    Okay.  But you would be surprised to see

2    that, wouldn't you?

3    A.    This is the official guidance that I issued

4    to the directors to cascade down through their

5    leadership.  This is why we do metering, because of

6    the operational necessity based on the capacity at the

7    ports.

8    Q.    Okay.  So there shouldn't be any port

9    director or CBP officer who would believe that there

10    was a policy to deter asylum seekers; is that right?

11    A.    If they are following the April 2018 memo,

12    they should not believe there's any other reason.

13    Q.    Okay.  You mentioned that in 2017 the

14    migrant numbers went down; is that right?

15    A.    Correct.

16    Q.    Isn't it the case that some ports of entry

17    continued to meter, even though the number of migrants

18    went down?

19    A.    The number of migrants went down compared

20    th 2016.  We had 154,000 inadmissibles in 2016.  We

21    had 111,000 inadmissibles in 2017.

22             So while the numbers did go down somewhat,