MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:  +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Chad F. Wolf,[1] *et al.*, <br><br> Defendants. | Case No.:  17-cv-02366-BAS-KSC <br><br> **JOINT MOTION FOR DETERMINATION OF JUNE 2020 CLAWBACK** <br><br><br> ***DECLARATIONS OF STEPHEN M. MEDLOCK AND ALEXANDER J. HALASKA FILED CONCURRENTLY*** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

The parties submit this joint motion for purposes of deciding the propriety of certain of Defendants' claims of the deliberative-process and attorney-client privileges. Defendants asserted privilege over these documents in a letter dated June 15, 2020 ("June 15 Clawback"). Plaintiffs challenged all of these privilege claims. The parties have conferred and narrowed their dispute to 17 documents, or portions thereof, which are listed below and will be lodged with this Court for *in camera* review, highlighted to identify the material over which Defendants are asserting privilege.

| Document | Bates Range | Defendants' Deliberative Process Privilege ("DPP") and/or Attorney-Client Privilege ("ACP") Assertions |
|---|---|---|
| A | AOL-DEF-0094030 | ACP/DPP (entire document): email discussing counsel's involvement and communications regarding review of attached, non-final draft response to inquiry from outside entity; email also discusses preparation for responding to question from OFO leadership on related topics. |
| B | AOL-DEF-00094032 | DPP (entire document): briefing memo circulated for purposes of assisting in draft response to inquiries from outside entity and OFO leadership. |
| C | AOL-DEF-00094034 | DPP/ACP (entire document): draft, non-final, predecisional document drafted by CBP counsel for purposes of providing legal advice. |
| D | AOL-DEF-00094036 | DPP/ACP (entire document): draft, non-final letter response to outside entity; document still under review by counsel for purposes of providing legal advice. |
| E | AOL-DEF-00094022 | ACP/DPP (entire document): email discussing counsel's involvement and communications regarding review of attached, non-final, draft response to inquiry from outside entity. |
| F | AOL-DEF- | DPP (entire document): briefing memo |

| | | | |
|---|---|---|---|
| | | 00094024 | circulated for purposes of assisting in draft response to inquiries from outside entity and OFO leadership. |
| | **G** | AOL-DEF-00094026 | DPP/ACP (entire document): non-final, predecisional, draft document, drafted by CBP counsel for purposes of providing legal advice. |
| | **H** | AOL-DEF-00094028 | DPP/ACP (entire document): draft, non-final letter response to outside entity; document still under review by counsel for purposes of providing legal advice. |
| | **I** | AOL-DEF-00069025 | DPP/ACP (entire document): email discussing counsel's involvement and communications regarding review of attached documents; response to inquiry from outside entity; email also discusses preparation for responding to question from OFO leadership on related topics. |
| | **J** | AOL-DEF-00069027 | DPP (entire document): briefing memo circulated for purposes of assisting in draft response to inquiries from outside entity and OFO leadership. |
| | **K** | AOL-DEF-00069029 | DPP/ACP (entire document): non-final, predecisional document drafted by CBP counsel for purposes of providing legal advice. |
| | **L** | AOL-DEF-00069031 | DPP/ACP (entire document): draft, non-final letter response to outside entity; document still under review by counsel for purposes of providing legal advice. |
| | **M** | AOL-DEF-00069033 | ACP/DPP (entire document): email discussing counsel's involvement and communications regarding review of attached, non-final, draft response to inquiry from outside entity. |
| | **N** | AOL-DEF-00069035 | DPP (entire document): briefing memo circulated for purposes of assisting in draft response to inquiries from outside entity and OFO leadership. |
| | **O** | AOL-DEF- | DPP/ACP (entire document): draft, non- |

| | | | |
|---|---|---|---|
| | | 0069037 | final, predecisional document drafted by CBP counsel for purposes of providing legal advice. |
| | **P** | AOL-DEF-00069039 | DPP/ACP (entire document): draft, non-final letter response to outside entity; document still under review by counsel for purposes of providing legal advice. |
| | **Q**[2] | AOL-DEF-00665934 | AC: pg. 665936 (substance of email from Julie Koller (OCC), to James R. Hutton and Louisa Slocum (OCC), copying Marc Bennett Courey (OCC), Todd A. Hoffman, and Randy J. Howe): email from counsel to client made for purposes of providing legal advice concerning metering guidance; <br><br> AC, DP: pg. 665936 (substance of email from James R. Hutton to Julie Koller (OCC), and Louisa Slocum (OCC), copying Marc Bennett Courey (OCC), Todd A. Hoffman, and Randy J. Howe): email from client to counsel made for purposes of seeking and obtaining legal advice concerning metering guidance; reflects predecisional questions regarding metering guidance. <br><br> AC, DP: pg. 665937 (substance of email from James R. Hutton to Julie Koller (OCC), and copying Marc Bennett Courey (OCC) Louisa Slocum (OCC)): email from client to counsel made for purposes of seeking and obtaining legal advice concerning draft metering guidance. <br><br> AC, DP: pg. 665937 (substance of email from Julie Koller (OCC) to James R. Hutton, copying Louisa Slocum (OCC) |

---

[2] These documents are referred to below as "Doc." They will be lodged with the Court for *in camera* review by Defendants.

| | | |
|---|---|---|
| | | and Marc Bennett Courey (OCC)): email from counsel to client made for purposes of seeking and obtaining legal advice concerning draft metering guidance; reflects predecisional questions regarding metering guidance.<br><br>Note: Other portions of this document have already been properly redacted as AC and DP |

## DEFENDANTS' ARGUMENT

Plaintiffs' brief on this dispute focuses on a draft November 2016 metering guidance document that was not issued to the field ("Draft"),[3] which is protected by the attorney-client and deliberative process privileges. The government has not waived the privileges, and Plaintiffs have not shown that the deliberative-process privilege should yield. Defendants have not placed the attorney-client communications at issue because they have not relied on the communications as a defense to Plaintiffs' claims. The deliberative process privilege should not yield because the interest in not disclosing the Draft outweighs Plaintiffs' need for it.

### I.  DEFENDANTS HAVE NOT WAIVED ATTORNEY-CLIENT PRIVILEGE OVER THE DRAFT

The Draft is protected by the attorney-client privilege because it contains "confidential communications between attorneys and clients, which are made for the purpose of giving legal advice," *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citation omitted), and was also an attachment to an email that also contains privileged communications. The privilege exists when:

> (1) [] legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Id.* (brackets in original) (citation and quotation marks omitted).

Although the original author of the Draft is a non-attorney CBP official, counsel participated in its drafting, providing substantive edits and advice. Davies Decl., Aug. 17, 2020 ¶ 9. Additionally, the Draft was attached to an email chain containing a proposed response to an outside agency and related discussions, including the substance of a draft under review by counsel. *Id.* ¶¶ 6, 9, 11-12, 19. The emails in that chain further reveal the legal advice that agency counsel provided

---

[3] Defendants still assert that all documents are subject to the deliberative process privilege and that Docs. A, C-E, G-I, K-M, O and portions of Q are subject to the attorney-client privilege.

their client. *Id.* ¶¶ 6, 12, 19. The four versions of the CBP internal email chain, Docs. A, E, I, M, reflect "agency counsel's involvement in reviewing the draft response" and counsel's "participation in related discussions with OFO and CBP leadership on topics related to the draft response contained in the email." Davies Decl. ¶ 6. Attorneys from the Office of Chief Counsel ("OCC") are also copied on every email within the chain. *Id.* ¶ 6.

Two of each email's attachments – the draft letter response to the NGO, Docs. D, H, L, P; and the Draft, Docs. C, G, K, O – were appended to the email chain for legal advice purposes. Davies Decl. ¶¶ 9-10, 12. When emails were sent, counsel was reviewing the draft letter response to provide legal advice to OFO. *Id.* ¶ 10. Additionally, as noted above, counsel helped write the Draft. *Id.* ¶ 9. The emails contain communications between OFO leadership and CBP's OCC for the purpose of obtaining legal advice. *Id.* ¶¶ 5-6, 12. They therefore fall within the attorney-client privilege. Revelation of the preliminary draft of the guidance would reveal attorney-client communications and legal advice constituting revisions to that guidance.

Plaintiffs do not argue that the attorney-client privilege does not cover the Draft; rather, they argue that Defendants have implicitly waived the privilege, alleging that Defendants have affirmatively raised the Draft and prioritization-based queue management documents as a key part of their defense. *See infra* (citing Dkt. Nos. 283 (Answer) at ¶ 7, 406 (Defs.' Opp'n Mot. Class Cert.) at 10). Plaintiffs construe Defendants' statements with inappropriate breadth. Defendants state in the Answer and Class Certification Opposition that CBP issued guidance permitting ports of entry to implement metering procedures based on their operational capacities when necessary and appropriate to facilitate orderly processing and maintain port security and sanitation for the public. *See* Dkt. No. 283 ¶ 7; 406 at 10. Noting that CBP issued guidance which, like much government policy, was formulated with the input of counsel does not waive the attorney-client privilege

over that input. *See Home Indemnity Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995) (explaining under what circumstances a party may impliedly wave attorney-client privilege). Defendants have not waived the privilege because they have not affirmatively placed the contested attorney-client communication at issue in the litigation or defended themselves in this lawsuit by stating that they acted in reliance on the legal advice contained therein. *See Rock River Comm'ns., Inc. v. Universal Music Group, Inc.*, 745 F.3d 343, 353 (9th Cir. 2014); *see also United States v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1999). Moreover, Defendants have produced the internal guidance cited in their Answer and Opposition to Class Certification. *See* Docket No. 308-6. That the language of the metering guidance changed during the course of drafting, even with the input of counsel, does not waive the privilege.[4] *See Amlani*, 169 F.3d at 1195 ("[P]rivileged communications do not become discoverable simply because they are related to issues raised in the litigation.") (citation and quotation marks omitted).

## II. THE DELIBERATIVE PROCESS PRIVILEGE SHOULD NOT YIELD.

The deliberative process privilege protects "advisory opinions, recommendations, and deliberations comprising part of the process by which government decisions and policies are formulated." *Oceana Inc. v. Ross*, 2018 WL 5276297, at *2 (C.D. Cal. Aug. 20, 2018)). To qualify for the privilege, a document must be predecisional and deliberative. *Sierra Club, Inc. v. U.S. Fish & Wildlife Serv.*, 925 F.3d 1000, 1011 (9th Cir. 2019). A document is predecisional when it predates the decision to which it relates, *id.* at 1012, 1014, and deliberative if it "would expose an agency's decisionmaking process in such a way to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its function," *Carter v. U.S. Dep't of Commerce*, 307 F.3d 1084, 1089 (9th

---

[4] The breadth of Plaintiffs' waiver assertion also would render the deliberative process privilege largely moot.

Cir. 2002); *see Sierra Club, Inc.*, 925 F.3d at 1015 (listing "draft documents" as example of deliberative material).

The Draft is covered by the deliberative process privilege. It is a non-final, predecisional policy document. This version of the metering guidance was never issued to the field. *See* Davies Decl. ¶ 9. Instead, it was updated before being finalized and issued in April 2018. The disclosure of this document would reveal the content of the predecisional deliberations and recommendations regarding the implementation of metering that were not part of the final version of the metering guidance. "So long as such recommendations do not represent final agency policy, it is clear that they fall within the deliberative process privilege." *Nat'l Wildlife Fed. v. U.S. Forest Serv.*, 861 F.2d 1114, 1121 (9th Cir. 1988).

Although the deliberative process privilege is a qualified one, it should not give way here. For the privilege to yield, Plaintiffs' "need for the materials and need for accurate fact-finding [must] override the government's interest in nondisclosure," considering: (1) the relevance of the evidence; (2) the availability of other evidence; (3) the government's role in the litigation; and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions. *FTC v. Warner Commc'ns, Inc.*, 742 F.3d 1156, 1161 (9th Cir. 1984). These factors weigh against the disclosure of a privileged draft because, even crediting Plaintiffs' theory of the case, the Draft's relevance to Plaintiffs' arguments is tenuous, and Plaintiffs themselves cite other available evidence to support those arguments. By contrast, Defendants' interest in protecting interim drafts from disclosure is strong because disclosure "would reveal agency deliberations and negatively impact the decision-making process, as it would impede open and frank discussions in the deliberative process." Davies Decl. ¶¶ 16-18, 20.

Defendants disagree with Plaintiffs that the government's "intent" is at issue here. This case concerns the objective validity of the government's metering or "queue management" practices. Although Judge Bashant has stated that the validity

of the government's justification for metering—operational capacity constraints in light of CBP's multiple statutory mission sets—is at issue, the validity of this justification must be examined on its merits by evaluating the facts underlying those capacity constraints, which Defendants have produced in discovery. *See Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

If Plaintiffs' theory of the case were correct, the Draft is not evidence of an "illegal intent." It is merely an earlier, draft version of the metering guidance. Plaintiffs suggest that the "documents link the Government's policies to an illegal intent to turnback asylum seekers who are in the process of arriving at a port of entry," but it is unclear why an earlier reliance on one operational factor evidences "illegal intent." And, reliance on that factor does not preclude reliance on other important operational factors when determining when a port should engage in metering to ensure safety, security, and the orderly processing of travelers. Thus, this document does not demonstrate pretext or undermine the government's defense that CBP's ability to process insufficiently documented aliens is limited by finite resources and its need to focus on other statutory mission sets.

Plaintiffs themselves cite to other evidence that they claim demonstrates a switch from holding capacity to operational capacity as the reason to engage in metering to manage the flow of travelers lacking sufficient entry documents. *See infra*. The government's need to protect interim, non-final views thus outweighs Plaintiffs' need for the document. And the protective order—even the Attorneys' Eyes Only designation—cannot fully protect against the harms of disclosure of internal government deliberations. Although these deliberations are irrelevant to the merits and unnecessary due to other available evidence, their use in this litigation may result in their public release if not protected by the privilege. Such disclosure will chill officials' frank and open communication, compromising future decisionmaking.

**PLAINTIFFS' ARGUMENT**

This is a narrow privilege dispute that relates only to Document K.[5] Two principles mandate the disclosure of the documents subject to this privilege dispute: (1) there is no "bad document" privilege, and (2) a party cannot play games with privilege by selectively disclosing documents.

This case is focused on the Defendants' policy of turning back asylum seekers that are in the process of arriving at ports of entry on the U.S.-Mexico border. In their Answer, Defendants "deny that CBP has implemented a 'Turnback Policy' and aver instead that CBP has issued guidance permitting ports of entry . . . to implement metering procedures based on their operational capacities." Dkt. 283 at ¶ 7. As Defendants put it in their class certification opposition, turnbacks occurred at ports of entry on the U.S.-Mexico border for "operational purposes," such as a lack of holding capacity, "not to deter [non-citizens] from seeking asylum in the United States." Dkt. 406 at 10. One of the key documents Defendants have cited in support of this argument is an April 27, 2018 "metering guidance" memorandum. Dkt. 406-2. But Defendants' argument ignores the fact that a ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. And by affirmatively putting the metering guidance and prioritization-based queue management memoranda at issue, Defendants have waived their attorney-client privilege claim over the prior drafts of the metering guidance memorandum.

### I. The Document At Issue

Although multiple version of the same email chain and attachments are listed above, this privilege dispute really deals with one document. Document K is a November 11, 2016 memorandum entitled "Metering at the Southwest Border POEs." *Id.* at 029. According to the metadata that was produced with the document,

---

[5] For strategic reasons, Plaintiffs do not challenge Defendants' privilege claims with respect to the other documents listed above.

1  it was drafted by a non-attorney, Robert Vaquero. It provides operational guidance
2  on how metering should occur, not legal advice. *Id.*

3        Importantly, Document K is a prior draft of the metering guidance
4  memorandum that Defendants issued on April 27, 2018. ███████████
5  ████████████████████████████████████████████████████████
6  ████████████████████████████████████████████████████████
7  ████████████████████████████████████████████████████████
8  ████████████████████████████████████████████████████████
9  ███████████████████████████████████ *Id.* at 029.

10       The difference between "holding capacity" and "operational capacity" is
11 critical to this case. Holding capacity refers to the physical space in a port of entry's
12 detention facilities—i.e., the actual number of asylum seekers that can be placed into
13 the port's temporary holding cells. Ex. 1 at 74:11-14. Operational capacity
14 supposedly refers to the capacity of a port of entry when resource allocation and
15 operational priorities are taken into account. *Id.* at 74:14-22.

16       However, operational capacity is largely a fiction. CBP did not begin using
17 the term "operational capacity" until 2018—when it realized that the holding
18 capacity numbers CBP tracked on a daily basis showed that there was no need to
19 turnback asylum seekers. Ex 3 at 161:8-10. The distinction between detention
20 capacity and operational capacity is not memorialized in any statute, regulation,
21 guidance, memorandum, or any sort of official document. Ex. 2 at 68:8-71:24; Ex.
22 3 at 161:20-162:12; Ex. 4 at 50:4-51:7. Key documents that define the standard
23 operating procedures for detention spaces at POEs do not mention operational
24 capacity at all. Ex. 2 at 102:13-111:11. In fact, the term "operational capacity" has
25 no concrete definition. *Id.* at 73:6-11, 110:24-111:11. CBP never even wrote down
26 the factors that a port director should consider when determining a POE's
27 operational capacity. *Id.* at 111:13-112:13. CBP did not track operational capacity
28 at any of its ports. Ex. 4 at 66:10-25. CBP has no way of reconstructing what the

1  operational capacity of a port of entry would have been at any given time. Ex. 2 at
2  129:7-14. In the end, operational capacity is what the port director says it is, without
3  any reference to the actual holding space at the port. Ex. 3 at 181:22-182:4; *see also*
4  Ex. 5 at 140:19-21 ("there's not a definition of operational capacity that we were
5  giv[en], so it would be up to interpretation."). Document K is important direct
6  evidence of the change from holing capacity to operational capacity. ▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and
8  when those figures no longer justified turning back asylum seekers, it moved to the
9  fictitious "operational capacity" concept.

10 **II.    The Deliberative Process Privilege Does Not Apply**

11         As this Court has recognized, the deliberative process privilege is not
12 absolute. Dkt. 446 at 5. It is a qualified privilege that is to be applied as narrowly
13 as possible. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.3d 854, 868
14 (D.C. Cir. 1980). Even if the privilege applies, the documents at issue may be
15 discoverable if the plaintiffs' "need for the materials and the need for accurate fact-
16 finding override the government's interest in non-disclosure." *L.H. v.*
17 *Schwarzenegger*, 2007 WL 2009807, at *2–3 (E.D. Cal. 2007) (citing *FTC v.*
18 *Warner Commc'ns., Inc.*, 742 F.2d 1156, 1161 (9th Cir.1984)). In *Warner*, the Ninth
19 Circuit laid out four factors to be considered when balancing the plaintiffs' need for
20 discovery against the government's privilege claim: (1) the relevance of the evidence
21 sought to the litigation; (2) the availability of comparable evidence from other
22 sources; (3) the government's role in the litigation; and (4) the extent to which
23 disclosure would hinder frank and independent discussion regarding contemplated
24 policies and decisions. 742 F.2d at 1161.

25         All four factors favor disclosure the documents here. (1) All of the documents
26 link the Government's policies to an illegal intent to turnback asylum seekers who
27 are in the process of arriving at a port of entry. *See* Dkt. 280 at 60 (a key issue in
28 this case is whether the Government's stated justification for turn backs—

1  "operational capacity constraints" is a pretext); Dkt. 446 at 6.  In particular,
2  Document K shows that turnbacks were supposed to be based on a port of entry's
3  ███████████████████ not the "operational capacity."  (2) There is no other
4  evidence that directly shows that the policy documents that Defendants cite are based
5  on a pretext.  (3) The Government is a party to this case and the deliberative process
6  privilege is "inapplicable where the agency's decision-making is itself at issue."
7  Dkt. 446 at 5.  (4) The disclosure of the documents at issue here would not hinder
8  Government decision-making—the Government has no interest in the privacy of
9  communications that violate the law and, at any rate, the Protective Order in this
10 case restricts the disclosure of these documents.  *See* Dkt. 446 at 6.  Thus, even if
11 the deliberative process privilege applied to these documents, all of the *Warner*
12 factors, and this Court's prior analysis of those factors, favor the disclosure of the
13 documents.

14 **III.   Even If the Attorney-Client Privilege Applied, Defendants' Waived the
15         Privilege By Putting Document K At Issue**

16 As an initial matter, "[t]he attorney-client privilege only protects
17 communications between attorney and client made for the purpose of seeking or
18 delivering the attorney's legal advice or representation." *Tattersalls Ltd. v. Wiener*,
19 2020 U.S. Dist. LEXIS 22656, at *9 (S.D. Cal. 2020) (citing California law).  Here,
20 there is no indication that Document K is even a communication with an attorney.
21 It is a memorandum that was drafted by a non-attorney that does not have any
22 redlines or comments reflecting attorney advice.  It does not offer legal advice;
23 instead, it offers operational instructions on how metering should occur.  It is not
24 privileged.  And the mere fact that it was attached to a privileged email does not
25 make the document itself privileged.

26 Furthermore, "[w]here a party raises a claim which in fairness requires
27 disclosure of the protected [document], the privilege may be implicitly waived."
28 *Chevron Corp. v. Penzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992).  The principle

purpose of the waiver doctrine is to avoid the unfairness that would result from the privilege holder selectively disclosing favorable documents to an adversary, "while claiming the shelter of the privilege to avoid disclosing those that are less favorable." *Apple, Inc. v. Samsung Elecs. Co.*, 306 F.R.D. 234, 241 (N.D. Cal. 2015).

In the Ninth Circuit, a party waives a privilege claim when "(1) the party asserts the privilege as a result of some affirmative act, such as filing suit; (2) through this affirmative act, the asserting part puts the privileged information at issue; and (3) allowing the privilege would deny the opposing party access to information vital to its [claims]." *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995). In assessing whether a waiver has occurred, "an overarching consideration is whether allowing the privilege to protect against disclosure would be 'manifestly unjust' to the opposing party." *Id.* Each of these factors strongly support disclosure of the documents that Defendants now seek to claw back. (1) Defendants affirmatively raised the metering guidance and prioritization-based queue management documents as a key part of their purported defense. *See* Dkt. 283 at ¶ 7 (citing metering guidance in Defendants' Answer); Dkt. 406 at 10 (citing both documents in opposition to class certification); *Confed. Tribes of the Chehalis Reserv. v. Thurston*, 2009 WL 3835304, at *5 (W.D. Wash. 2009) (asserting a defense in an answer is an "affirmative act"). (2) Defendants put Document K at issue by claiming that the metering policy is evidence that turnbacks occurred based on "operational capacity" concerns. Document K undermines this defense by showing that Defendants were considering a different capacity metric. (3) This information is vital to Plaintiffs' claims—indeed, this is the very issue that Judge Bashant identified as critical to this litigation in her motion to dismiss opinion. Dkt. 280 at 60. Accordingly, Defendants have waived any privilege claim that they may have regarding Document K.

Dated: August 18, 2020

ETHAN P. DAVIS

JOINT MOTION FOR DETERMINATION OF DISCOVERY DISPUTE

14

Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

MAYER BROWN LLP
   Matthew H. Marmolejo
   Ori Lev
   Stephen M. Medlock

SOUTHERN POVERTY LAW CENTER
   Melissa Crow
   Sarah Rich
   Rebecca Cassler

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy
   Ghita Schwarz
   Angelo Guisado

AMERICAN IMMIGRATION COUNCIL

1 | Karolina Walters
2 |
3 | By: */s/ Stephen M. Medlock*
    | Stephen M. Medlock
4 | *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the foregoing document to be served on all counsel via the Court's CM/ECF system.

Dated:  August 18, 2020                             MAYER BROWN LLP


                                                    By */s/ Stephen M. Medlock*