IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

(SAN DIEGO)

AL OTRO LADO, INC.,        )
ET AL.,                    )
                           )
                           )
      Plaintiffs,          )
                           )
                           )
                           )
                           )
                           )
vs.                        )    NO. 3:17-CV-02366-BAS-KSC
                           )
                           )
                           )
                           )
                           )
CHAD F. WOLF, ACTING       )
SECRETARY, U.S. DEPARTMENT )
OF HOMELAND SECURITY, IN   )
HIS OFFICIAL CAPACITY,     )
ET AL.,                    )
                           )
                           )
      Defendants.          )


********************************************************

*** CONFIDENTIAL ***

ORAL DEPOSITION OF

STEPHANIE LEUTERT

VOLUME 1

JANUARY 28, 2020

********************************************************

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

1      ORAL DEPOSITION OF STEPHANIE LEUTERT, produced

2  as a witness at the instance of the DEFENDANTS, and

3  duly sworn, was taken in the above-styled and

4  numbered cause on January 28, 2020, from 9:13 a.m.

5  to 3:05 p.m.,  before Jodi Cardenas, CSR, RPR, in

6  and for the State of Texas, reported by machine

7  shorthand, at the U.S. Attorney's Office for the

8  Western District of Texas, 903 San Jacinto

9  Boulevard, Suite 334, Austin, Texas, pursuant to the

10  Federal Rules of Civil Procedure and the provisions

11  stated on the record or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stephanie Leutert - 1/28/2020    Confidential

```
 1                    APPEARANCES

 2

 3  FOR THE PLAINTIFFS:

 4      Mr. Matthew E. Fenn
        MAYER BROWN, LLP
 5      1221 Avenue of the Americas
        New York, New York 10020
 6      (212) 506-2316
        mfenn@mayerbrown.com
 7
        -and-
 8
        Ms. Rebecca Cassler
 9      SOUTHERN POVERTY LAW CENTER
        P.O. Box 1287
10      Decatur, Georgia 30031
        (414) 521-6700
11      rebecca.cassler@splcenter.org

12      -and-

13      Mr. Baher Azmy
        CENTER FOR CONSTITUTIONAL RIGHTS
14      666 Broadway, 7th Floor
        New York, New York 10012
15      (212) 614-6427
        bazmy@ccrjustice.org
16

17
    FOR THE DEFENDANTS:
18
        Mr. Dhruman Y. Sampat
19      Mr. Ari Nazarov
        U.S. DEPARTMENT OF JUSTICE - CIVIL DIVISION
20      Ben Franklin Station
        P.O. Box 868
21      Washington, DC 20044
        (202) 532-4281
22      dhruman.y.sampat@usdoj.gov
        ari.nazarov@usdoj.gov
23

24

25
```

Stephanie Leutert - 1/28/2020    Confidential

```
                         INDEX
                                                  PAGE

Appearances.................................    3

STEPHANIE LEUTERT

     Examination by Mr. Sampat...............    5

Changes & Signature.........................  167

Reporter's Certificate......................  169




                        EXHIBITS

NO.  DESCRIPTION                                 PAGE

1..........................................    11
     Curriculum Vitae

2..........................................    87
     Expert Report of Stephanie Leutert

3..........................................   158
     June 5, 2018, Memorandum
```

Stephanie Leutert - 1/28/2020    Confidential

1                (Federal Rules 30(b)(5)(A) and (C)

2                were waived by all counsel present)

3                THE REPORTER:  Would counsel for the

4 plaintiffs and defendants please state your

5 appearances?

6                MR. SAMPAT:  Dhruman Sampat on behalf

7 of the defendants.

8                MR. NAZAROV:  Ari Nazarov on behalf of

9 the United States.

10                MR. FENN:  Matthew Fenn for Mayor

11 Brown on behalf of plaintiffs and Ms. Leutert.

12                MR. AZMY:  Baher Azmy from the Center

13 for Constitutional Rights on behalf of Ms. Leutert.

14                MS. CASSLER:  Rebecca Cassler from the

15 Southern Poverty Law Center on behalf of

16 Ms. Leutert.

17                THE REPORTER:  Thank you.

18                Would you raise your right hand,

19 please?

20                STEPHANIE LEUTERT,

21 having been first duly sworn, testified as follows:

22                EXAMINATION

23 BY MR. SAMPAT:

24    Q.  Good morning.  My name is Dhruman Sampat,

25 and next to me is Ari Nazarov.  We're both attorneys

Stephanie Leutert - 1/28/2020     Confidential

1  with the United States Department of Justice, and we

2  represent the federal defendants in this matter.

3           Could you please state your full name

4  for the record, please?

5       A.    It is Stephanie Helen Leutert.

6       Q.    Is that Leutert (pronouncing)?

7       A.    Leutert.

8       Q.    Okay.  Ms. Leutert, have you had your

9  deposition taken before?

10      A.    No.

11      Q.    Have you ever testified at a trial or

12  hearing before?

13      A.    No.

14      Q.    Well, in that case, I'm just going to go

15  over a few ground rules.  And we'll go over them.

16  I'm sure you've already gone over them with your

17  counsel, but just to make sure we're both on the

18  same page.  If you don't understand the question I'm

19  trying to ask you, I'm going to ask you that you ask

20  me to clarify; otherwise, I'm going to assume that

21  you understood what I meant.  Is that okay?

22      A.    That's fine.

23      Q.    As you can see, to my right is a court

24  reporter who records everything that is being said

25  here.  And she can only record words that are being

Stephanie Leutert - 1/28/2020    Confidential

1  told and that are verbal responses.  So I'm going to

2  ask you to refrain from shaking your head, nodding

3  your head, saying "uh-huh" or "huh-uh."  It's

4  common -- it's a common thing, so if you do do that,

5  I might just ask you to clarify for the record.  Is

6  that okay?

7      A.    Yes.

8      Q.    Did you understand -- did you take an oath

9  before we started this morning?

10     A.    Yes.

11     Q.    And you understand the nature of that oath?

12     A.    Yes.

13     Q.    And you understand that your testimony here

14 today is the same -- is similar to if you have -- if

15 you would be giving testimony in open court?

16     A.    Yes.

17     Q.    The questions I ask you today and the oath

18 requires you to provide a full and complete answer

19 to the extent that you can.  Do you agree to do so?

20     A.    Yes.

21     Q.    If for any reason you don't have a complete

22 answer, but it requires you to estimate, you can

23 still do that and I would ask you to do so.  Do you

24 agree to do that?

25     A.    Yes.

Stephanie Leutert - 1/28/2020    Confidential

1     Q.    Is there any reason why your testimony here

2  today would be affected or any reason that you

3  cannot testify truthfully today?

4     A.    No.

5     Q.    Two most important things.  From time to

6  time, your lawyer may object to some of my

7  questions.  After he objects, you must still answer

8  unless he instructs you not to do so.  Do you agree

9  to do that?

10     A.    Yes.

11     Q.    And most importantly, we can take a break

12  any time you would like, so if you feel like you

13  need to use the restroom or just need to, you know,

14  get a drink of water or something like, please let

15  us -- let me know, and we can go off the record.

16     A.    Okay.

17     Q.    Do you agree to do that?

18     A.    Yes.

19     Q.    Okay.  Are you ready to begin?

20     A.    Yes.

21     Q.    Okay.  Did you do anything to prepare for

22  this deposition?

23     A.    Yes.

24     Q.    What did you do?

25     A.    I met with plaintiffs' counsel.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    And how many times did you meet with
2    counsel?
3    A.    I am going to clarify that.  I had one
4    phone call with plaintiffs' counsel and then a
5    meeting with plaintiffs' counsel.
6    Q.    So one phone call, one meeting?
7    A.    Yes.
8    Q.    And when did you have the phone call with
9    counsel?
10    A.    It was about two-and-a-half weeks ago, two
11    weeks ago.
12    Q.    For how long about?
13    A.    About 30 minutes.
14    Q.    And when did you have the meeting with
15    counsel?
16    A.    Yesterday.
17    Q.    And how long was that meeting?
18    A.    A full day.
19    Q.    Okay.  And about how many hours in total
20    would you say you talked to your attorneys to
21    prepare for this deposition?
22    A.    About -- combining the phone call and the
23    meeting yesterday, about eight -- eight-and-a-half
24    hours.
25    Q.    Okay.  Was anyone else present in those

Stephanie Leutert - 1/28/2020     Confidential

1   meetings?

2       A.    No -- no.

3       Q.    Did you discuss this deposition with anyone

4   else?

5       A.    No.   Can you define "discuss the

6   deposition"?

7       Q.    Have you -- have you mentioned that you're

8   here being deposed today?

9       A.    Yes.

10      Q.    To whom?

11      A.    My boss at work, my husband, and my

12  immediate family.

13      Q.    And what did you discuss?

14      A.    Just that I would be here today.

15      Q.    Did you discuss the substance of your

16  testimony?

17      A.    No.

18      Q.    Okay.  Did you review any documents to

19  prepare for the deposition?

20      A.    Yes.

21      Q.    And what documents did you review?

22            MR. FENN:  I'm just going to instruct

23  the witness not to reveal any privileged discussions

24  between counsel and the witness.

25            THE WITNESS:  I reviewed documents

Stephanie Leutert - 1/28/2020    Confidential

1  that plaintiffs' counsel provided.

2      Q.    (BY MR. SAMPAT)    Okay.   Did you bring any

3  documents with you today?

4      A.    No.

5      Q.    Okay.

6              MR. SAMPAT:    I'm going to ask that

7  this be marked Exhibit 1.

8              (Exhibit No. 1 marked)

9              MR. SAMPAT:    Thank you very much.

10     Q.    (BY MR. SAMPAT)    There you go, Ms. Leutert.

11  I'm sorry.   And let me just clarify this.   Do you

12  have teaching responsibilities currently?

13     A.    Yes.

14     Q.    So could I call you Professor Leutert?

15     A.    Technically, my position is as a lecturer.

16     Q.    Okay.

17     A.    As -- not as a professor.

18     Q.    Okay.   So Ms. Leutert is fine?

19     A.    But I do teach a class -- a master's-level

20  class.   Yes, Ms. Leutert is fine.

21     Q.    Okay.   Ms. Leutert, do you recognize this

22  document?

23     A.    Yes.

24     Q.    What is it?

25     A.    It is my CV.

1    Q.    Is this the most recent CV that you have?

2    A.    Yes.

3    Q.    And does the CV represent all of your

4    educational experiences starting from college?

5              MR. FENN:  Object -- excuse me --

6    object to form.

7    Q.    (BY MR. SAMPAT)  You can answer.

8    A.    Yes.

9    Q.    Okay.  So I would like to just kind of go

10    through some of the points you've -- and some of the

11    points in your CV.  Where did you go to college?

12    A.    Skidmore College.

13    Q.    And when did you graduate?

14    A.    In 2011.

15    Q.    What did you major in?

16    A.    International affairs and Spanish

17    literature.

18    Q.    Is that what your degree is in?

19    A.    Is a BA in international affairs and

20    Spanish literature.  It's a double major.

21    Q.    Is there anything you originally majored in

22    that you did not earn your degree in?

23              MR. FENN:  Object to the form.

24              THE WITNESS:  Not that I can remember.

25    Q.    (BY MR. SAMPAT)  Okay.  And what classes

Stephanie Leutert - 1/28/2020    Confidential

1  did you take to earn your degree?

2      A.    Classes in international affairs and

3  Spanish literature.

4      Q.    Do any of those classes require the use of

5  analytics?

6      A.    I took a microeconomics class in undergrad.

7      Q.    Was that intro to microeconomics?

8      A.    Yes.

9      Q.    Any other classes?

10     A.    In that Skidmore College, no.

11     Q.    And in your intro to microeconomics

12  classes, were you required to interpret data?

13              MR. FENN:  Object to form.

14              THE WITNESS:  Yes.

15     Q.    (BY MR. SAMPAT)  What kind of data were you

16  asked to interpret?

17     A.    It would have been basic microeconomics, so

18  probably looking at company-level data.

19     Q.    Okay.  Did -- did any of the classes you

20  take delve into how an organization determined

21  staffing?

22              MR. FENN:  Object to form.

23              THE WITNESS:  At Skidmore College, no.

24     Q.    (BY MR. SAMPAT)  How about any classes that

25  discussed staffing decisions?

1        A.    At Skidmore -- no.

2        Q.    Did any of those classes discuss

3  governmental operations?

4        A.    No.

5        Q.    How about CBP operations, specifically?

6        A.    No.

7        Q.    And you understand when I say "CBP," I mean

8  customs and border protection.  Correct?

9        A.    Yes.

10       Q.    Did you discuss budgeting considerations?

11       A.    At Skidmore College, no.

12       Q.    How about resource limitations?

13       A.    I imagine that in the microeconomics class

14 we talked about the allocation of scarce resources,

15 considering that's the basis of economics, but

16 that --

17       Q.    Do you recall specifically in what context

18 it was?

19       A.    No.

20       Q.    Okay.  Did any of those classes discuss

21 logistical analytics?

22             MR. FENN:  Object to form.

23             THE WITNESS:  No.

24       Q.    (BY MR. SAMPAT)  After Skidmore, did you

25 seek further education?

Stephanie Leutert - 1/28/2020    Confidential

1    A.    I took two online classes prior to Yale

2    University.

3    Q.    And what online classes did you take?

4    A.    One statistics course -- intro to

5    statistics and one intro to microeconomics.

6                   THE REPORTER:  Micro?

7                   THE WITNESS:  Micro.  To refresh.

8    Q.    (BY MR. SAMPAT)  Okay.  And do you recall

9    what platform you used to take the online classes?

10   A.    It was the Harvard -- it was the -- the

11   online classes offered through Harvard University.

12   I forget the exact name of the program.

13   Q.    Did you receive any kind of certification

14   when -- in taking that course?

15   A.    I'm sure I received certifications for --

16   for them, yes.

17   Q.    And in those -- in your intro to statistics

18   class that you took, I'm guessing you were required

19   to use analytics?

20                   MR. FENN:  Object to form.

21                   THE WITNESS:  How are you defining

22   analytics?

23   Q.    (BY MR. SAMPAT)  So were you required to

24   take data and interpret that data?

25   A.    Yes.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    What kind of data were you looking at?

2    A.    I don't remember, but that would be the

3  basis.  You said of my statistics class.

4    Q.    Correct.

5    A.    That would have been the basis of any intro

6  to statistics.  I don't remember which specific

7  data.

8    Q.    Okay.  Did any of it have to go --

9  scratch -- strike that.

10           Did any of statistics relate to

11  governmental operations?

12    A.    I don't remember.

13    Q.    How about organizational staffing?

14           MR. FENN:  Object to form.

15           THE WITNESS:  Likely not, but I don't

16  remember.

17    Q.    (BY MR. SAMPAT)  Okay.  So after you took

18  your intro to stats class online, is that when you

19  started at Yale University?

20    A.    Yes, after those two classes.  I -- I took

21  them the year prior to beginning at Yale.

22    Q.    Okay.  And there was nothing -- no classes

23  in between the intro to statistics and the intro to

24  microeconomics and then Yale.  Correct?

25    A.    Yes.  Those were the only two I took

Stephanie Leutert - 1/28/2020    Confidential

1  online.

2      Q.    Okay.  And what degree did you earn from

3  Yale University?

4      A.    Global Affairs.

5      Q.    What classes did you take?

6      A.    Many classes.

7      Q.    Can you give me an overall view of what you

8  learned in those classes?

9              MR. FENN:  Object to form.

10             THE WITNESS:  I entered grad school to

11  gain greater quantitative skills.  That was my

12  original aim.  That's what I wrote about in my

13  personal statement.  When I arrived, I took

14  intermediate macroeconomics, which was why I took

15  the intro to microeconomics, again, online.  And I

16  took intermediate statistics, which is also why I

17  took the intermediate statistics class online in

18  preparation.  I took classes specific to foreign

19  policy.  I took classes specific to -- well, excuse

20  me -- various classes within the business school.  I

21  took two follow-on classes with STATA.

22      Q.    (BY MR. SAMPAT)  I'm sorry.  With --

23      A.    With STATA, a statistical program.

24      Q.    Okay.

25      A.    That was a follow-on to my intermediate

Stephanie Leutert - 1/28/2020    Confidential

1  statistics.  And then I -- one of those was a class
2  on STATA and the -- I also did an independent study
3  also using STATA.  I also took several classes
4  related to Central American -- well, one related to
5  Central American migration and the other related to
6  migration globally, so a range of classes.
7      Q.   And which classes required you to look at
8  data, interpret data, or analyze data?
9      A.   A few -- a lot.  I looked at data in my
10  intro to statistics class.  My follow-on to that
11  that focused on STATA was based around a data
12  project where we used data to develop out -- to look
13  at a big sheet of data.  My follow-up project was
14  also related to interpreting large amounts of data.
15  Actually, it was -- I was looking at publically
16  available CBP data and survey data.
17      Q.   This is while you were --
18      A.   Yes.  It was a graduate program.
19      Q.   Yeah.
20      A.   I also used data in a -- did the required
21  history course because my final paper was a
22  data-driven look at U.S. immigration policy, so in
23  various classes.
24      Q.   Okay.  You mentioned a data project that
25  you did.

Stephanie Leutert - 1/28/2020    Confidential

1    A.    Yes.

2    Q.    And was that through STATA?

3    A.    Yes.

4    Q.    And what was that data project?

5    A.    I was looking at -- it was more to explore

6  the data and to get a sense of how to use -- how to

7  use the data, but it was looking at how -- well, if

8  you could say anything about staffing changes on the

9  border and had the number of individuals crossing

10  through and smuggling costs.

11    Q.    And where were you obtaining this data

12  from?

13              MR. FENN:  Objection; form.

14              THE WITNESS:  Publically available

15  data and the Princeton Migrant Project.  I can't

16  remember the exact name -- which is a survey of

17  migration along the border.

18    Q.    (BY MR. SAMPAT)  Did any of those classes

19  also discuss how an organization determined

20  staffing?

21              MR. FENN:  Object to form.

22              THE WITNESS:  It may have been covered

23  in one of my business classes, but I can't -- I

24  don't remember specifically.

25    Q.    (BY MR. SAMPAT)  Okay.  How about staffing

Stephanie Leutert - 1/28/2020    Confidential

1  decisions that are made; any classes discuss those?

2              MR. FENN:  Object to form.

3              THE WITNESS:  I don't remember.

4     Q.   (BY MR. SAMPAT)  Any of those classes talk

5  about government operations?

6              MR. FENN:  Object to form.

7              THE WITNESS:  I'm fairly certain that

8  they did, considering that many of my classes were

9  policy classes.  I'm fairly certain.  I'm sure I

10  discussed that in some classes.

11     Q.   (BY MR. SAMPAT)  And did you also discuss

12  the U.S. Government's operations and --

13              MR. FENN:  Object to form.

14              THE WITNESS:  It may have come up in

15  some lectures in some of my classes.

16     Q.   (BY MR. SAMPAT)  Okay.  How about CBP

17  operations; any classes discuss those?

18     A.   More unlikely.  Probably not.

19     Q.   Did any of your classes go into budgeting

20  considerations?

21              MR. FENN:  Object to form.

22              THE WITNESS:  What types of

23  budgetary --

24     Q.   (BY MR. SAMPAT)  How an organization makes

25  certain decisions when they have budgetary

Stephanie Leutert - 1/28/2020    Confidential

1    constraints.

2        A.    I'm fairly sure that some of my classes

3    would have covered that.

4        Q.    Do you recall to what extent?

5        A.    It would have probably been mentioned in

6    some of the classes I took that focused on policy

7    and U.S. foreign policy -- U.S. policy.

8        Q.    Do you recall what kind of -- what kind of

9    lessons they might have taught regarding budgetary

10   constraints?

11              MR. FENN:  Object to form; vague.

12              THE WITNESS:  I don't know.

13       Q.    (BY MR. SAMPAT)  Did any of the classes

14   talk about resource limitations and -- strike that.

15              Did any of the classes discuss

16   governmental resource limitations?

17              MR. FENN:  Object to form.

18              THE WITNESS:  It's possible.  If I --

19   it seems that if government came up in my economics

20   classes, it probably was something along that, given

21   that economics is the study of binary resources.  So

22   I can imagine that it may have.

23       Q.    (BY MR. SAMPAT)  Do you recall to what

24   extent or what --

25              MR. FENN:  Object to form.

1      THE WITNESS:  Probably not a large

2   extent, but it could have come up.

3      Q.   (BY MR. SAMPAT)  Okay.  Did you ever attend

4   any other educational institutions?

5      A.   I studied abroad first semester, but other

6   than that, no.

7      Q.   Is that your first semester while you were

8   at Skidmore -- or -- sorry.

9      A.   The first semester I was at Skidmore, I was

10  abroad, but that was a Skidmore program.

11     Q.   Okay.

12     A.   My first semester of junior year, I was in

13  SIT, the School of International Training.

14     Q.   And that is through Yale or through

15  Skidmore?

16     A.   I'm sorry.  That's all Skidmore College.

17     Q.   Oh, all Skidmore?

18     A.   Yes.

19     Q.   Okay.  And did you earn a degree from SIT?

20     A.   No.

21     Q.   Did you take classes while you were there?

22     A.   Yes.

23     Q.   And what types of classes did you take

24  while you were at SIT?

25     A.   I -- I was in Uganda, so I took Luganda,

Stephanie Leutert - 1/28/2020    Confidential

1  the language, and I did an independent research

2  project.  And I imagine I also took something on

3  Uganda governance or politics, current events.

4      Q.   What was the independent research project

5  you did?

6      A.   I looked at the effects of torture on war

7  torture victims.

8      Q.   And in conducting that research, did you

9  collect data?

10         MR. FENN:  Object to form.

11         THE WITNESS:  I actually did collect

12  data through surveys.

13      Q.   (BY MR. SAMPAT)  In the local town or --

14      A.   I was partnered with the African Centre for

15  Research and Rehabilitation of Torture Victims.  I

16  believe it's -- it's at the bottom.

17      Q.   And just for the record, we are looking at

18  the second page of the CV, which is numbered

19  Page 69.

20      A.   Yes.

21         MR. FENN:  Can I just clarify for the

22  record, this is the CV that's an excerpt from

23  Ms. Leutert's expert report.  Is that correct?

24         MR. SAMPAT:  That is correct.

25         MR. FENN:  Okay.

Stephanie Leutert - 1/28/2020    Confidential

1      MR. SAMPAT:  We simply just extracted
2  it to keep it as a --
3      MR. FENN:  That's fine.
4    Q.   (BY MR. SAMPAT)  And I'm sorry.  And you
5  were saying?
6    A.   Oh, that I worked with the African Center
7  for Treatment at -- it's Treatment and
8  Rehabilitation for Torture Victims is the full name.
9  And I did interviews with them with war torture
10  victims, and those interviews were used to form the
11  basis of data.
12    Q.   What sort of data were you collecting?
13    A.   Descriptive statistics of the numbers of
14  people affected and certain characteristics.  I
15  honestly can't remember all of the questions we
16  asked, but that was the basis.
17    Q.   Of course.
18      Did you -- after collecting the data,
19  did you, yourself, compile it and analyze it?
20      MR. FENN:  Object to form.
21      THE WITNESS:  I helped compile it, but
22  I wasn't there long enough to be able to do some of
23  the overall analysis because I only was with them
24  for a period of months.  Actually, it was under two
25  months.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    (BY MR. SAMPAT)  Okay.  And while you were

2    at SIT and you were doing your independent study and

3    taking some classes, did you take any classes

4    regarding governmental operations?

5    A.    At SIT?

6    Q.    Yes.

7    A.    I don't think so.

8    Q.    Did you -- any classes that you took, did

9    they discuss budgetary constraints?

10                MR. FENN:  Object to form.

11                THE WITNESS:  I don't think so.

12    Q.    (BY MR. SAMPAT)  How about resource

13    limitations?

14                MR. FENN:  Object to form.

15                THE WITNESS:  That's possible if we

16    were talking about the Ugandan government, but I

17    don't honestly remember.

18    Q.    (BY MR. SAMPAT)  Okay.  And through SIT,

19    did you earn any kind of certification?

20    A.    I don't believe I did.  It was just class

21    credit that went towards graduation at Skidmore.

22    Q.    Okay.  Are there any educational

23    experiences that are not listed on your CV?

24                MR. FENN:  Object to form.

25                THE WITNESS:  No.  Like the two online

Stephanie Leutert - 1/28/2020    Confidential

1  classes, but nothing formal beyond these two.

2      Q.    (BY MR. SAMPAT)   Okay.

3      A.    No degrees.

4      Q.    And no certifications.   Correct?

5      A.    These -- I can't -- I think I would have

6  had a completion certification of the intro to micro

7  and intro to statistics courses that I took online.

8      Q.    Okay.   Beyond that, anything?

9      A.    No.

10      Q.    If we could, I'd like to move on to your

11  professional experience.   So where do you currently

12  live?

13      A.    I work at the Strauss Center for

14  International Security and Law at The University of

15  Texas at Austin.

16      Q.    And what is your role there?

17      A.    I am the director of the Central America

18  and Mexico Policy Initiative.

19      Q.    And when did you begin working at Strauss?

20      A.    It was in 2016.

21      Q.    Can you explain the responsibilities you

22  hold as the director?

23      A.    Yes.   So I have three primary roles.   The

24  first is that I teach a master's-level class on

25  Central American migration and Mexico's migratory

Stephanie Leutert - 1/28/2020    Confidential

1  policy.  The second is that I conduct original

2  research on issues related to public policy issues

3  within Central America and Mexico and along the

4  U.S.-Mexico border.  And the third is that I lead

5  outreach engagement with the UT Austin community and

6  the broader -- and the broader Austin events

7  engaging the Austin community as well.

8       Q.   Can you talk about what you have learned as

9  your role as director?

10              MR. FENN:  Object to form.

11              THE WITNESS:  What I've learned about

12  what specifically?

13       Q.   (BY MR. SAMPAT)  Let's talk about your --

14  the research that you've done on Central America and

15  Mexico's policies -- immigration policies or --

16       A.   I've done research on various topics,

17  including other policies.

18       Q.   So just a -- what you've learned about that

19  as your role as director --

20              MR. FENN:  Object to form.

21              THE WITNESS:  I -- each project I

22  learned something different.  I've learned a lot

23  about -- about a lot of these topics.

24       Q.   (BY MR. SAMPAT)  Have you -- did you learn

25  anything regarding Mexico's immigration proceedings?

Stephanie Leutert - 1/28/2020    Confidential

1          MR. FENN:  Object to form.

2          THE WITNESS:  Yes.  A lot of my work

3  has to do with Mexico's migratory policy.

4     Q.   (BY MR. SAMPAT)  Do they have the

5  equivalent of removal proceedings that we have here

6  in the United States?

7          MR. FENN:  Object to form; calls for a

8  legal conclusion.

9          You can answer.

10          THE WITNESS:  It's not equivalent.

11     Q.   (BY MR. SAMPAT)  Okay.  On your CV, you

12  mentioned that you are the head author of the first

13  ever border-wide report on CBP's key management

14  policy, is that correct, if you look at the second

15  bullet point?

16     A.   Yes.  It says on metering policy or key

17  management policy, as you said, and a silent

18  waitlist.

19          THE REPORTER:  I'm sorry.  And a...

20          THE WITNESS:  And a silent waitlist.

21          THE REPORTER:  Thank you.  I'm going

22  to have you speak up just a little.

23          THE WITNESS:  Oh, sorry.  Okay.

24          THE REPORTER:  That's okay.

25     Q.   (BY MR. SAMPAT)  How did you know -- how do

Stephanie Leutert - 1/28/2020    Confidential

1  you know that was the first report?

2                 MR. FENN:  Object to form.

3                 THE WITNESS:  Other people had written

4  about the metering policy, but this was the first

5  border-wide report on metering policy and a silent

6  waitlist.

7       Q.    (BY MR. SAMPAT)  Who else has written on

8  the metering policy?

9       A.    Human Rights First, I believe, published a

10  report on the metering policy prior.  There might

11  have been another report as well.  But this was on

12  the metering policy and a silent waitlist.

13      Q.    Do you conduct original research?

14      A.    I do.

15                 MR. FENN:  Object to form.

16      Q.    (BY MR. SAMPAT)  With whom?

17      A.    Various partners.

18      Q.    Can you list some of those partners for us?

19      A.    Colleagues in my university and other

20  universities.  I work -- I'm working on a project

21  with the Brooks County Sheriff's Office.  I've also

22  worked with Mexico's federal police and with

23  Mexico's National Security Commission.

24      Q.    And what kind of research have you done?

25                 MR. FENN:  Object to form.

Stephanie Leutert - 1/28/2020    Confidential

1    THE WITNESS:  With which partner?

2    Q.  (BY MR. SAMPAT)  Let's talk about the

3    sheriff's office.

4    A.    Sure.  I'm working on documenting their

5    data on -- or I actually -- okay.  I'll back up.

6    I took 650 of their case files and

7    turned it into a database for the sheriff.  These

8    were case files related to suspected migrants that

9    were crossing through the brush to circumvent the

10   CBP checkpoint and who passed away.

11   Q.  (BY MR. SAMPAT)  As conducting this

12   research, what were you -- what kind of data were

13   you gathering?

14   A.    I --

15   MR. FENN:  Object to form.  You can

16   answer.

17   THE WITNESS:  I created a database of

18   over 50 variables to understand where the body was

19   discovered, in what state the body was discovered,

20   the types of belongings that the individual had on

21   them, the type of clothing that they had, and their

22   demographic information.  I provided a copy to the

23   sheriff for their own use.  And I also have used

24   that database as the basis for two articles that

25   I've written so far and a research project that I'm

Stephanie Leutert - 1/28/2020    Confidential

1    working on right now.

2         Q.    (BY MR. SAMPAT)  As part of -- as a

3    director -- at -- can I -- if I use CAMPI, is that

4    okay?

5         A.    That's fine.

6         Q.    Okay.  So as --

7         A.    It's a total acronym, but that's fine.

8         Q.    So as director of CAMPI, have you ever

9    partnered with CBP?

10                   MR. FENN:  Object to form.

11                   THE WITNESS:  Partnered in what way?

12        Q.    (BY MR. SAMPAT)  Have you -- in the same

13   way that you have with the sheriff's office?

14        A.    No.

15        Q.    Have you had interactions with CBP

16   officers?

17        A.    Yes.

18        Q.    Have you had interactions with CBP

19   officials?

20        A.    Yes.

21        Q.    Have you had interactions with DHS

22   officials?

23        A.    Yes.

24        Q.    So what have you discussed with CBP

25   officers in your current role as director of CAMPI?

Stephanie Leutert - 1/28/2020    Confidential

1      MR. FENN:  Object to the form.

2      THE WITNESS:  Many issues.

3    Q.  (BY MR. SAMPAT)  Such as?

4    A.   Central American migration, current border

5  policies, conditions in Central America, those are

6  just three big ones that come to mind.  I've had

7  various conversations with CBP officers.

8    Q.   When -- do you recall their names?

9    A.   One.

10   Q.   Okay.

11   A.   The -- the last one that I interacted with,

12 Brian Martinez, yes.  Yes.  The others -- oh, I can

13 actually -- yes, I can think of others' names as

14 well.

15   Q.   Do you -- so Brian Martinez is one.

16 Correct?

17   A.   Yes.  He was in charge of doing a

18 presentation for a group of students.

19   Q.   Students where?

20   A.   In the RGV.

21   Q.   What's the RGV?

22   A.   The Rio Grande Valley.

23   Q.   Do you recall the substance of the -- of

24 the class?

25      MR. FENN:  Object to form.

Stephanie Leutert - 1/28/2020    Confidential

1          THE WITNESS:  He provided a

2    presentation for my students when they were down

3    there at the border.

4          Q.  (BY MR. SAMPAT)  Can you estimate about how

5    many -- how many CBP officers you have spoken with

6    in your current role?

7          A.    How do you define "spoken with"?  Just

8    words?

9          Q.    Interacted with face to face.

10         A.    Interacted face to face.  Oh, wow.  More

11    than -- interacted with face to face?  Oh, I -- more

12    than 20.

13         Q.    Less than 40?

14         A.    Maybe.  I don't know.  I've spent a lot of

15    time at the border.

16         Q.    Uh-huh.

17         A.    I -- I mean, even if we're -- if this

18    includes crossing back and forth, I mean, then my

19    number would be expedientially higher.

20         Q.    I'm not including -- I'm not --

21         A.    If you are just talking about

22    conversations --

23         Q.    Yes.  Yes.

24         A.    -- perhaps more than 20, less than 40, in

25    that range.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    Did you interview them?

2              MR. FENN:  Object to form.

3              THE WITNESS:  Maybe more.  I'm sorry.

4    I'm trying to go through all the different times

5    I've had interactions.  I'm not certain about a

6    number.  The -- have I interviewed them?  In at

7    least one occasion, yes.

8    Q.    (BY MR. SAMPAT)  And how many CBP officers

9    were interviewed -- strike that.

10             Actually, so was this a formal

11   interview process with -- with officers?

12             MR. FENN:  Object to form.

13             THE WITNESS:  I requested an interview

14   with CBP, and they provided one for myself and a

15   colleague.

16   Q.    (BY MR. SAMPAT)  Who did you speak with?

17   A.    I cannot remember the name of my -- of the

18   individual, but it was in the Rio Grande Valley.  It

19   was about a year and a half ago.

20   Q.    Would you describe this as a formal

21   interview?

22             MR. FENN:  Object to form.

23             THE WITNESS:  Yes.

24   Q.    (BY MR. SAMPAT)  And did you interview

25   them -- did you interview this individual as what

Stephanie Leutert - 1/28/2020    Confidential

1  the requirements are for the job?

2              MR. FENN:  Object to form.

3              THE WITNESS:  I don't believe we

4  covered that.

5      Q.  (BY MR. SAMPAT)  What did you cover?

6      A.  A range of issues, but -- a range of issues

7  related to migration in the RGV and CBP operations.

8      Q.  What about CBP operations did you discuss?

9      A.  Likely -- I can't remember exactly.  Yeah.

10 Actually, I can't remember exactly.

11     Q.  Have you ever interviewed anyone at CBP

12 management?

13             MR. FENN:  Object to form.

14             THE WITNESS:  Interviewed?

15     Q.  (BY MR. SAMPAT)  Yes.

16     A.  Formally interviewed?

17     Q.  Yes.

18     A.  No.

19     Q.  Informally interviewed?

20             MR. FENN:  Object to form.

21             THE WITNESS:  No.

22     Q.  (BY MR. SAMPAT)  Who in CBP management have

23 you spoken with?

24     A.  I -- I -- actually, I'm apparently terrible

25 with names.  I cannot remember this man's name.

Stephanie Leutert - 1/28/2020    Confidential

1  He -- he called me, but I can't remember his name,
2  and I forgot to look it up.
3     Q.    What did you discuss?
4     A.    He wanted to discuss my foreign affairs
5  article and another piece that I had published with
6  Sarah Spalding regarding how many Central Americans
7  are traveling north.
8     Q.    Is it -- it's listed in your CV?
9     A.    It is.  It's the one, two, three, four,
10 five -- sixth bullet point down.  It is a -- a model
11 that we built and then we shared through the Lawfare
12 blog that estimates the number of individuals
13 leaving Central America every year, and he wanted to
14 speak to me about that.
15    Q.    What did he want to discuss?
16           MR. FENN:  Object to the form.
17           THE WITNESS:  His thoughts on my -- my
18 articles.  And he wanted to know more about my views
19 on Central American migration.
20    Q.    (BY MR. SAMPAT)  Going back to your role as
21 director, have you conducted research into how
22 organizations determine staffing?
23           MR. FENN:  Object to form.
24           THE WITNESS:  Not specifically.
25    Q.    (BY MR. SAMPAT)  So is it fair to say,

Stephanie Leutert - 1/28/2020    Confidential

1  then, that you have -- you haven't done any research

2  into government staffing?

3          MR. FENN:  Object to form.

4          THE WITNESS:  That hasn't been a focus

5  of any of my research progress.

6      Q.    (BY MR. SAMPAT)  How about staffing at

7  CBP's Office of Field Operations?

8      A.    That has come up in some of my metering

9  work.

10     Q.    And how has it come up?

11     A.    Well, following the issue of metering.

12 It's clearly pretty aligned with the topic, given

13 what the government -- what CBP officials have been

14 stating.  So it is something that comes up that we

15 were also aware of and following public statements

16 on.

17     Q.    Is there data that you have collected

18 regarding to that topic?

19     A.    In --

20          MR. FENN:  Object to form.

21          THE WITNESS:  In my metering reports?

22     Q.    (BY MR. SAMPAT)  In -- in -- yes.  In this

23 role as director, has there been data that -- that

24 goes into -- has there been data you have collected

25 that goes into staffing at -- for CBP's Office of

Stephanie Leutert - 1/28/2020    Confidential

1  Field Operations?

2          MR. FENN:  Object to form.  Are we

3  talking about generally in her role at CAMPI or in

4  her metering reports?

5          MR. SAMPAT:  So we are talking about

6  her role at CAMPI, which my understanding is --

7  also includes the metering reports.  Is that

8  correct?

9          THE WITNESS:  It is something that

10  I've done as part of my role at CAMPI.

11      Q.   (BY MR. SAMPAT)  Okay.

12      A.   I have taught classes about CBP's total

13  staffing numbers.

14      Q.   Where did you get the information that you

15  used to talk about staffing numbers?

16          MR. FENN:  Object to form.

17          THE WITNESS:  CBP's website.

18      Q.   (BY MR. SAMPAT)  Do you know what these

19  reports reflect?

20      A.   Overall staffing numbers at different

21  sectors over time.

22      Q.   At various ports of entry?

23      A.   They're not broken down by port of entry.

24  They're often broken down by field office or sector

25  and what is publically available.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    So have you looked at -- have you looked
2  at -- have you looked at data that talks about
3  various staffing at a specific port of entry?

4    A.    For the report that I produced or in CAMPI?

5    Q.    In CAMPI.

6    A.    I did not have access to that information.

7    Q.    When you were conducting your research for
8  the metering reports and as director of CAMPI, what
9  government officials did you speak with?

10    A.    Are you asking about the U.S. government?

11    Q.    Yes.

12    A.    In the first report we reached out to
13 someone from CBP in the Laredo field office.  In
14 following reports, I've had discussions with
15 individuals stationed at the limit line.

16    Q.    Whom at the Laredo field office did you
17 speak with?

18    A.    I believe his name is Richard Pauza,
19 P-A-U-Z-A.  I believe he's a -- a communications
20 officer who provides -- he's a liaison of some sort.

21    Q.    How often do you end up speaking with CBP
22 officials?

23    A.    In -- in what regard?  In what time -- for
24 the metering reports?

25    Q.    To -- as director normally.

Stephanie Leutert - 1/28/2020    Confidential

1    A.    Usually when I'm doing a project that

2    relates to them, I end up interacting with them.

3    Q.    When you're working on a project, how often

4    do you end up speaking with them?

5    A.    Well, I do the metering reports every three

6    months, the updates, which takes me to the border

7    and at -- while I'm there, I -- I almost always end

8    up having at least informal conversations with CBP

9    officers stationed at the limit line.

10                THE REPORTER:  I'm sorry.  Stationed

11    at the limit line?

12                THE WITNESS:  Yes.  At the

13    international border.

14    Q.    (BY MR. SAMPAT)  So I want to focus on your

15    conversations with Richard -- I'm sorry -- what was

16    his last name?

17    A.    I believe it's Pauza.

18    Q.    No, no, no.  That's okay.

19    A.    I'm terrible at names.  P-A-U-Z-A, I

20    believe.

21    Q.    Okay.

22    A.    He's in the Laredo field office.

23    Q.    Okay.  And you said that he was a liaison

24    of some kind in communications or something like

25    that?

1    A.    Yes.

2    Q.    All right.  Okay.  Did you ever discuss

3 staffing with Richard?

4    A.    I believe we sent him questions, and he

5 responded with a press release.

6    Q.    Did you ever discuss government operations

7 with him?

8              MR. FENN:  Object to form.

9              THE WITNESS:  We sent him questions,

10 and he responded with a press release.

11    Q.    (BY MR. SAMPAT)  And what was in the press

12 release?

13    A.    The -- CBP's explanation for why metering

14 was occurring.

15    Q.    When you have talked to individuals at the

16 limit line, CBP officers have gone on the line

17 specifically, have you ever discussed staffing with

18 them?

19    A.    I don't think directly.

20    Q.    Indirectly, though?

21    A.    It might have been inferred -- it might

22 have been implied in certain conversations.

23    Q.    How so?

24    A.    Talking about a lack of capacity.

25    Q.    And what did they tell you?

Stephanie Leutert - 1/28/2020     Confidential

1      A.     More just discussing if they -- actually

2  probably more just discussing that that was the

3  reason why they were turning people away.

4      Q.     Because they lack capacity.  Correct?

5      A.     Yes.

6      Q.     At any point did you have discussions

7  regarding the various other operations that occur at

8  a port of entry?

9      A.     With the CBP officers at the limit line?

10     Q.     Yes.

11     A.     Specifically with those individuals, likely

12 not since I would have been asking specifically

13 about metering.

14     Q.     So you didn't discuss constraints regarding

15 budgetary issues?

16     A.     With those individuals, no.

17     Q.     How about staffing numbers?

18                MR. FENN:  Object to form.

19                THE WITNESS:  With those individuals,

20 likely not, no.

21     Q.     (BY MR. SAMPAT)  Have you been to a land

22 port of entry at the U.S.-Mexico border?

23     A.     Many.

24     Q.     How many?

25     A.     Multiple crossings in various cities.  But

Stephanie Leutert - 1/28/2020     Confidential

1  I have been to Matamoros, Progreso, Hildago, Roma,

2  Laredo, Eagle Pass, Del Rio, El Paso, Nogales,

3  Tecate.  I can't remember on the other side what's

4  there.  Sasabe, Sonoyta, which is Douglas on the

5  other side, Calexico.  And I've been on the U.S.

6  side but not at the port of entry but at the actual

7  border in three additional cities.

8      Q.    And what cities would those be?

9      A.    Tijuana, I was on the beach along the wall

10  on the U.S. side.  Auga Prieta, so the other side

11  would have been -- wow.  I'm blanking for a second.

12  That's the other side of Auga Prieta.

13              THE REPORTER:  I'm sorry.  The other

14  side of?

15              THE WITNESS:  Auga Prieta.  Sorry.

16  It's Spanish.

17              THE REPORTER:  Okay.

18              THE WITNESS:  And then the other side

19  of Naco, Arizona.  A did a road trip where I went

20  through many of those ports, and then I returned to

21  certain ports after.

22      Q.    (BY MR. SAMPAT)  In what capacity were you

23  at these various ports?

24      A.    I was already a researcher so I was

25  interested in understanding that section of the

Stephanie Leutert - 1/28/2020    Confidential

1  border.  For -- I'm sorry -- that's from El Paso to

2  San Diego --

3      Q.    Okay.

4      A.    -- in that specific trip.  I have returned

5  to multiple -- to some of those ports later and

6  prior.  And I visit the ports in Texas on a regular

7  basis as part of my research.

8      Q.    And what did you do while you were at these

9  other ports?

10            MR. FENN:  Object to form.

11            THE WITNESS:  I -- it depends,

12  actually, by port.

13      Q.    (BY MR. SAMPAT)  Can you give an

14  overarching answer -- overarching view of what you

15  do while you're there?

16            MR. FENN:  Object to form.

17      Q.    (BY MR. SAMPAT)  Are you --

18      A.    In -- when I visit the ports of entry in --

19  in Texas, I do a range of activities.  For the

20  metering reports, I will go visit individuals often

21  on the Mexican side, organizations, government

22  officials.

23      Q.    Do you speak to CBP at that point?

24            MR. FENN:  Object to form.

25            THE WITNESS:  Sometimes when I'm

Stephanie Leutert - 1/28/2020    Confidential

1  returning I speak to the individual stationed at the

2  limit line.

3      Q.    (BY MR. SAMPAT)   And what do you discuss

4  with them?

5      A.    Often the situation, there you were also to

6  bridges where asylum seekers were waiting on the

7  bridges and the CBP officers were stationed right

8  there.   And so I sometimes discussed with the CBP

9  officer stationed there about the situation.

10  Sometimes they were curious about how many people

11  were waiting in Mexico, so kind of a range of topics

12  related to metering or what is going on.

13      Q.    Did you have any role at Strauss before

14  becoming the director?

15      A.    Yes.   I was a fellow.

16      Q.    And how long were you in that role?

17      A.    One year.

18      Q.    What did you do as a fellow?

19      A.    Similar activities in terms of research.   I

20  focused slightly more on Mexican public security

21  issues because that was the initial idea for the

22  initiative, but not exclusively.   And I did less on

23  administrative logistics.

24           MR. SAMPAT:   You know what?   I think

25  we're just at about an hour.   Are we okay for a

Stephanie Leutert - 1/28/2020     Confidential

1   break?

2                   MR. FENN:  Sure.  Five minutes.

3                   MR. SAMPAT:  Yeah, that's fine.

4                   (Off the record)

5      Q.   (BY MR. SAMPAT)  Ms. Leutert, do you still

6   understand you're under oath?

7      A.   Yes.

8      Q.   I would like to actually go back to some of

9   the stuff we were discussing while you were still --

10  while we -- as -- sorry -- to discuss some of the

11  responsibilities and projects you've been handling

12  as director of CAMPI.  You were talking about

13  authoring metering reports.  Correct?

14     A.   Yes.

15     Q.   And you said in order to prepare these

16  metering reports you would take trips about every

17  three months to the border.  Is that correct?

18     A.   For the report itself, yes, every three

19  months I would make a trip.

20     Q.   So about how many trips would you say

21  you've -- you've made in order to prepare for

22  these -- to prepare these reports?

23     A.   I prepare the reports at -- in multiple

24  ways.  I make phone calls.  Often I look at news

25  articles, and then I also will conduct visits to

Stephanie Leutert - 1/28/2020    Confidential

1  border cities.  I divide it -- the border cities

2  with colleagues -- colleagues, actually.  In all

3  cases plural, colleagues.

4      Q.   So about how many trips have you made to

5  the border or to the border cities in order to

6  prepare your reports?

7      A.   I make trips to the border somewhat

8  frequently, but for the report creation I would

9  generally do one trip per report to get those exact

10  numbers at the time, and that's what goes into the

11  report.

12     Q.   How many trips do you make outside of

13  providing for the report?

14     A.   I do travel somewhat frequently to the

15  border and to south Texas.  I don't have an exact

16  number for you, but it is something that I do since

17  U.S. -- the U.S.-Mexico border is within my research

18  purview.

19     Q.   Over how many years have you been taking

20  these trips?

21     A.   Regularly?

22     Q.   Yes.

23     A.   For the past three-and-a-half years

24  regularly.  Yeah.

25     Q.   And you were saying in order to prepare

Stephanie Leutert - 1/28/2020    Confidential

1  these reports you make phone calls, collect news

2  articles, and visit border cities.  Correct?

3      A.   Yes.

4      Q.   Is there anything else that you do?

5            MR. FENN:  Object to form.

6            THE WITNESS:  The phone calls are --

7  are usually interviews ahead of time to kind of get

8  a sense of often the situation.  And while I'm

9  there, the trips are -- I conduct meetings with as

10 many people as I can usually as long as time allows.

11     Q.   (BY MR. SAMPAT)  Just to be clear, when you

12 say to get an understanding of the situation, what

13 situation?

14     A.   Sometimes a security situation.

15     Q.   Such as?

16     A.   In Nuevo Laredo.

17           THE REPORTER:  I'm sorry?

18           THE WITNESS:  In Nuevo Laredo.  We

19 used phone calls to get a sense of whether it was

20 safe to cross over.

21     Q.   (BY MR. SAMPAT)  You also said some of

22 these phone calls are interviews that you do.

23 Correct?

24     A.   Yes.

25     Q.   Who do you speak with when you conduct

Stephanie Leutert - 1/28/2020    Confidential

1  these interviews?

2      A.   Civil society organizations.  It looks

3  different port by port.  Sometimes Mexican

4  government officials.  Those are the two big groups

5  of individuals who we call.

6      Q.   Do you speak with CBP officers?

7      A.   No.  In the -- on the phone calls?

8      Q.   Yes.

9      A.   No.

10     Q.   Do you speak with CBP management?

11     A.   No.

12     Q.   DHS officials?

13     A.   No.

14     Q.   Anyone within the United States government?

15          MR. FENN:  Object to form.

16          THE WITNESS:  No.  In the first report

17  we attempted to reach out to CBP and then were just

18  provided the press release.  And so we have focused

19  our -- our efforts elsewhere.

20     Q.   (BY MR. SAMPAT)  Where do you normally stay

21  when you're preparing these reports?

22          MR. FENN:  Object to form.

23          THE WITNESS:  Where do I stay?

24     Q.   (BY MR. SAMPAT)  Yes.  Is there a specific

25  hotel or anything like that where you stay?

Stephanie Leutert - 1/28/2020    Confidential

1          MR. FENN:  Object to form.
2          THE WITNESS:  There are hotels where
3   we stay in -- in multiple cities on the U.S. side of
4   the border.
5      Q.   (BY MR. SAMPAT)  Do you run into CBP
6   officers there?
7      A.   Normally, no, but there have been occasions
8   where we have actually been in hotels during some of
9   the CBP operations where most of the hotel is filled
10  with CBP officials sometimes.  That has occurred.
11     Q.   Have you -- have you taken the time to
12  interview them then?
13     A.   No.
14     Q.   We can move on and talk about your time as
15  a fellow.
16     A.   Uh-huh.
17     Q.   That was at CAMPI.  Correct?
18     A.   Yes.
19     Q.   And --
20     A.   And we changed the name from Mexico
21  Security Initiative to CAMPI in the past year.
22     Q.   Okay.  That -- okay.  And you testified
23  earlier you were in that role about a year.
24     A.   Yes.
25     Q.   Did you conduct any research in that role?

Stephanie Leutert - 1/28/2020     Confidential

1     A.    I did.

2     Q.    What kind of research did you conduct?

3     A.    Going to -- I conducted research on Central

4  American migration as well as Mexico's public

5  security policy.

6     Q.    Did you obtain data points?

7               MR. FENN:  Object to form.

8               THE WITNESS:  Data points -- what do

9  you mean by data points?

10    Q.    (BY MR. SAMPAT)  So we can scratch the last

11 question.

12              What kind of data were you collecting

13 when you were conducting this research?

14    A.    I'm sorry.  I'm trying to remember when I

15 wrote which reports and which ones I started as a

16 fellow and which ones I completed as a fellow.

17    Q.    Okay.

18    A.    I believe I was using -- I was using

19 Mexican crime data in mapping that out.

20    Q.    And which report was this for?

21    A.    These were for LAWFARE articles I have

22 published -- I published at least two that we're

23 using homicide data from Mexico's federal

24 government.  I also would have been using -- based

25 on my publications in the time period, I would have

Stephanie Leutert - 1/28/2020     Confidential

1  been using some likely CBP data for some of my
2  LAWFARE blogs publically available to map out
3  migrations dynamics.
4      Q.   What kind of CBP data were you looking at?
5           MR. FENN:  Objection; form.
6           THE WITNESS:  I would have been --
7           MR. FENN:  Sorry.
8           THE WITNESS:  No, I'm sorry.  I would
9  have been looking at the publically available data
10  on the website.
11      Q.   (BY MR. SAMPAT)  That reflected?
12      A.   Apprehensions.
13      Q.   Anything regarding staffing?
14           MR. FENN:  Object to form.
15           THE WITNESS:  In this period, likely,
16  no.
17      Q.   (BY MR. SAMPAT)  Anything regarding other
18  operations that took place at a port of entry?
19           MR. FENN:  Object to form.
20           THE WITNESS:  It's possible that I
21  also looked at apprehensions of -- not
22  apprehensions.  Sorry.  What's the word?  Looked at
23  narcotic seizures as well as -- along the border,
24  but I don't know if I -- I -- I periodically look at
25  that data.  I don't know if I used it in any of my

Stephanie Leutert - 1/28/2020    Confidential

1   published reports.

2       Q.   (BY MR. SAMPAT)  How -- when you say

3   "periodically," how often?

4       A.   At that time, more often since I was

5   focusing on public security issues in Mexico.

6   Probably every three to four months just to see if

7   there were any interesting changes.  It's less now,

8   given that that's not my focus at the moment.

9       Q.   How frequently do you look at those reports

10  now?

11      A.   Narcotic seizures?

12      Q.   Yes.

13      A.   Probably now only when I am -- when they

14  are relevant to a report that I am working on.

15      Q.   Were there reports regarding how many

16  vehicles were being processed at a port of entry?

17              MR. FENN:  Object to form.

18              THE WITNESS:  I have looked at that

19  data prior.  It is -- I have looked at that data

20  before.

21      Q.   (BY MR. SAMPAT)  When was this?

22      A.   In my first job at the Council on Foreign

23  Relations.

24              THE REPORTER:  I'm sorry.  First job

25  at the?

Stephanie Leutert - 1/28/2020    Confidential

1          THE WITNESS:   Council on Foreign
2  Relations.
3      Q.   (BY MR. SAMPAT)   And we'll discuss that, but
4  just for now, where did you get access to that data?
5      A.    It would have been the Department of
6  Transportation's data, I believe.
7      Q.   Is that publically available?
8      A.   Yes.  It was all publically available.
9      Q.   Do you look at that data now?
10          MR. FENN:  Object to form.
11          THE WITNESS:  I have looked at it
12  during my time at CAMPI.
13      Q.   (BY MR. SAMPAT)   For what purpose?
14      A.   Probably to look at -- to compare how busy
15  a port was versus another port.
16      Q.   Have you looked at those reports recently?
17          MR. FENN:  Object to form.
18          THE WITNESS:  Probably not within the
19  last six months.
20      Q.   (BY MR. SAMPAT)   As a fellow, were you --
21  did any of your research projects involve research
22  into how organizations determined staffing?
23          MR. FENN:  Object to form.
24          THE WITNESS:  Not directly.
25      Q.   (BY MR. SAMPAT)   Indirectly, though?

Stephanie Leutert - 1/28/2020    Confidential

1    A.    It had come up based on my research on

2 metering, but it was a -- it was not the focus of

3 their reports.

4    Q.    So did you gather data for -- that

5 reflected staffing decisions?

6              MR. FENN:  Object to the form.

7              THE WITNESS:  I did not gather data.

8 I would have -- I'm sure I looked at the publically

9 available data online.

10    Q.    (BY MR. SAMPAT)  That showed what exactly?

11    A.    Staffing -- I can't remember which exactly.

12 I imagine -- I know I've looked at overall numbers

13 over time, and the breakdown among positions at CBP

14 both within border patrol -- I can't remember --

15 also within OFO, if there exists that breakdown

16 publically available.

17    Q.    I'm sorry to interrupt.  When you say

18 "OFO" --

19    A.    Office of Field Operations.

20    Q.    Yes.

21    A.    So I -- I have looked at some of this -- I

22 probably didn't find it very useful because it

23 didn't make it into reports, so probably didn't find

24 what was publically available useful to answering

25 our research questions.

Stephanie Leutert - 1/28/2020     Confidential

1    Q.    Okay.  Did any of the research projects
2  involve operations at land ports of entry?
3              MR. FENN:  Objection.  Can you just
4  clarify what research projects you're asking about?
5              MR. SAMPAT:  Any research that she did
6  as a fellow at the Mexican Security Initiative.
7              THE REPORTER:  I'm sorry.  The Mexican
8  Security Initiative?
9              MR. SAMPAT:  Initiative, yes.
10             THE WITNESS:  Oh, are we only focusing
11 on fellow?  I'm sorry.  I was talking about my
12 entire time.
13    Q.    (BY MR. SAMPAT)  Oh, that's fine.
14    A.    Okay.
15    Q.    Okay.
16    A.    Because we can also just focus on the
17 fellow.
18    Q.    No.  And if that's the case, then we can
19 just talk about your entire time at CAMPI and then
20 at the Mexican Security Initiative.  So in that
21 case, have you done any research regarding CBP's
22 operations at lands of ports of entry?
23    A.    How do you define operations?
24    Q.    So other mission sets that they have, have
25 you looked at how they go about seizing illegal

Stephanie Leutert - 1/28/2020    Confidential

1  narcotics?

2                MR. FENN:  Object to form.

3                THE WITNESS:  It has both come up in

4  my work on deceased migrants who circumvent the CBP

5  checkpoint and also at -- in -- in metering reports,

6  given that I know that it's the CBP's position --

7  one of CBP's position is that they have other

8  missions.  So also in my -- my discussions with CBP

9  officers, and then in just my general interviews and

10 discussions with the range of individuals it's come

11 up, so, yes, it has come up in my research.

12      Q.   (BY MR. SAMPAT)  And to clarify, these

13 conversations you had with CBP officers are not

14 formal interviews.  Correct?

15      A.   I did conduct one formal interview with

16 five individuals at the table.  I believe it was

17 five -- four or five.

18      Q.   Do you remember who they were?  I know I'm

19 asking you to recall names.

20      A.   I don't remember who -- I don't remember

21 their names.

22      Q.   When did you conduct this interview?

23      A.   It would have been August 2018.

24      Q.   And what did you discuss?

25      A.   Migration dynamics in south Texas.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    Can you elaborate a little bit more on

2  that?

3                MR. FENN:  Object to form.

4                THE WITNESS:  They talked about their

5  different roles, and we asked a range of questions.

6  There were many topics that were covered.

7    Q.    (BY MR. SAMPAT)  What were the roles that

8  these individuals held?

9    A.    They -- I remember specifically discussing

10 apprehensions of individuals --

11   Q.    Okay.

12   A.    -- and also narcotics.

13   Q.    Anything regarding vehicle processing?

14   A.    I think only in the context of the

15 Falfurrias checkpoint, but that was mostly -- that

16 was border patrol.

17   Q.    Did you discuss anything regarding trade?

18                MR. FENN:  Object to form.

19                THE WITNESS:  I don't remember.  It's

20 possible.  They showed us a PowerPoint with many

21 slides.

22   Q.    (BY MR. SAMPAT)  How about national

23 security?

24                MR. FENN:  Object to form.

25                THE WITNESS:  I would imagine that

Stephanie Leutert - 1/28/2020     Confidential

1   that would have come up.

2       Q.    (BY MR. SAMPAT)   Do you recall what was

3   discussed?

4       A.    I don't remember what was on every slide.

5       Q.    How about economic security?

6               MR. FENN:  Object to form.

7               THE WITNESS:  They had -- their

8   PowerPoint covered their activities.  I -- I don't

9   remember what was on every slide.  I remember it was

10  an overview of what they believed were the important

11  activities in their sector.

12      Q.    (BY MR. SAMPAT)   Do you recall what

13  activities they were discussing?

14      A.    The two that I distinctly remember, because

15  they had videos, were narcotic seizures and

16  apprehensions, but there were many slides.

17      Q.    And was it your testimony that you don't

18  recall what positions they held?

19      A.    I genuinely do not remember.  No, I don't

20  remember.

21      Q.    Okay.  Did you discuss other constraints on

22  the federal government at that meeting?

23              MR. FENN:  Object to form.

24              THE WITNESS:  What do you mean

25  "constraints on the federal government"?

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    (BY MR. SAMPAT)  Budgetary constraints.

2    A.    I'm sure that they talked to us about

3  budgetary constraints or their budgetary issues.

4    Q.    Do you recall what was said?

5    A.    No, but in almost all of the official

6  PowerPoints I've seen from CBP, they have talked

7  about their budgets.

8    Q.    How about staffing numbers?

9    A.    I don't specifically remember.  That tends

10  to also frequently appear in the PowerPoints but not

11  always.  So it's possible, but I don't remember.

12    Q.    Did you hold any other position also either

13  at the Strauss Center for International Security and

14  Law or the Mexican Security Initiative?

15    A.    No.  I have only been a fellow and a

16  director.

17    Q.    What position did you hold prior to working

18  at Strauss?

19          MR. FENN:  Object to form.

20          THE WITNESS:  My last full-time job

21  was at the Council on Foreign Relations.

22          THE REPORTER:  I'm sorry.  The counsel

23  of?

24          THE WITNESS:  On Foreign Relations.

25    Q.    (BY MR. SAMPAT)  If I could just direct

Stephanie Leutert - 1/28/2020    Confidential

1  your attention to the -- the entry for Hillary for
2  America?
3      A.    Uh-huh.
4      Q.    Was that not a full-time position as an
5  administrative?
6      A.    I was not being paid, so, no, it was not a
7  full-time job.
8      Q.    Okay.  When did you begin working for
9  Hillary for America?
10     A.    It was the fall of 2015.
11     Q.    Can you explain what responsibilities you
12 held as the administrator?
13     A.    Yes.  I supported the coordinator of a
14 policy working group.  I was in charge of organizing
15 the numbers that were divided by subregional groups
16 on different talking points that were memos or
17 briefings about current events and developments that
18 were occurring in their specific regions.
19     Q.    Were you asked to collect additional
20 information while you were an administrator?
21             MR. FENN:  Object to form.
22             THE WITNESS:  What type of additional
23 information?
24     Q.    (BY MR. SAMPAT)  Let's talk about were you
25 asked to conduct any research projects as an

Stephanie Leutert - 1/28/2020    Confidential

1  administrator?

2      A.    I -- I may have been.  Usually we would

3  task it to the particular subgroup, and if I felt

4  like there was editing that needed to be done or I

5  felt like I needed to add on a part or I felt for

6  whatever reason that I could do it quickly or

7  something like that, I would take it on.  I -- yeah.

8  That was generally the structure of how it worked.

9      Q.    What did you conduct research in?  Do you

10  recall?

11             MR. FENN:  Object to the form.

12             THE WITNESS:  It would have been

13  everything that -- that would have been related to

14  U.S. foreign policy or in-country conditions

15  within -- within the specific -- well, country

16  conditions within Latin America.

17      Q.    (BY MR. SAMPAT)  So at that point, you were

18  not conducting any research into metering.  Correct?

19             THE REPORTER:  Any research into?

20             MR. SAMPAT:  Metering.

21             MR. FENN:  Object to form.

22             THE WITNESS:  For the campaign, I was

23  focused on the -- the form policy of the United

24  States for Latin America.

25      Q.    (BY MR. SAMPAT)  Which did not entail

Stephanie Leutert - 1/28/2020    Confidential

1  metering.   Correct?
2              MR. FENN:  Object to form.
3              THE WITNESS:  It was -- we -- sorry.
4  I'm trying to actually think if it ever came up.  It
5  would have focused less on the border and likely not
6  in such specific, so probably not directly, no.
7      Q.   (BY MR. SAMPAT)  So nothing on key
8  management?
9      A.   As part of the campaign?
10     Q.   Yes.
11     A.   That was not within our purview of my -- of
12  the group.
13     Q.   Did you do any research into OFO
14  operations?
15     A.   As part of the campaign?
16     Q.   Yes.
17     A.   No.
18     Q.   The research projects you did conduct as
19  part of the campaign, did you do any statistical
20  analysis?
21     A.   For the campaign, no.  It was generally
22  talking points on -- or -- I'm sorry.  Maybe
23  briefing paragraphs on overall developments that
24  were occurring in a country like the Columbia Peace
25  Agreement or some big -- someone -- a new -- someone

Stephanie Leutert - 1/28/2020     Confidential

1  was elected or an election.

2      Q.   Did you conduct any research into

3  government staffing as part of the campaign?

4                MR. FENN:  Objection.

5                THE WITNESS:  That was not within the

6  mandate that I was working under, no.

7      Q.   (BY MR. SAMPAT)  So safe to say there was

8  nothing regarding CBP's operation -- CBP's

9  operations at the border?

10               MR. FENN:  Objection.

11               THE WITNESS:  I was focused on foreign

12  policy.

13     Q.   (BY MR. SAMPAT)  Okay.  Before Hillary for

14  America, what position did you hold then?

15     A.   My prior full-time job?

16     Q.   Well, your prior job listed on your CV.

17     A.   I was a teaching fellow at Yale University.

18     Q.   And can you explain the responsibilities

19  you held there?

20     A.   Yes.  I was a teaching assistant for three

21  of my four semesters while at Yale University.  I

22  taught sections for various classes in the political

23  science and economics departments.  Actually, two

24  different classes.

25     Q.   Did you conduct -- did you conduct any

Stephanie Leutert - 1/28/2020     Confidential

1  research in your role as a teaching fellow?

2           MR. FENN:  Sorry.  Couldn't hear the

3  question.

4       Q.   (BY MR. SAMPAT)  Did you conduct any

5  research as a teaching fellow?

6       A.   No.  My job was at -- to lead sections on

7  the lectures of the professors -- the political

8  science and economics professors.

9       Q.   And before Yale, where were you?

10      A.   Coca-Cola World Fund Fellowship.

11      Q.   And when did you begin working there?

12      A.   The summer of 2015.

13      Q.   Can you explain some of the

14  responsibilities you held in that one?

15      A.   I received a grant to conduct independent

16  field research --

17           THE REPORTER:  I'm sorry.

18           THE WITNESS:  I received a grant to

19  conduct independent field research across various

20  states and Mexico related to the automotive

21  industry.

22      Q.   (BY MR. SAMPAT)  And did you gather data as

23  part of that role?

24      A.   I would have reviewed data on Mexico's

25  automotive industry.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    Okay.  Did you analyze the data yourself?

2    A.    Yes.

3    Q.    Did you do any kind of research into

4  staffing?

5              MR. FENN:  Object to form.

6              THE WITNESS:  What type of staffing?

7    Q.    (BY MR. SAMPAT)  How organizations

8  determine their staffing.

9              MR. FENN:  Object to form.

10             THE WITNESS:  It likely would have

11 come up in my interviews as I was working with

12 private sector companies that were -- yeah, it would

13 have come up.

14   Q.    (BY MR. SAMPAT)  So nothing regarding the

15 government?

16             MR. FENN:  Object to form.

17             THE WITNESS:  Government staffing?

18   Q.    (BY MR. SAMPAT)  Right.

19   A.    Regarding government staffing, that was not

20 what I was conducting research on.

21   Q.    Okay.  And is it safe to say that you

22 didn't conduct any research into CBP operations as a

23 fellow?

24             MR. FENN:  Object to form.

25             THE WITNESS:  It did come up, CBP

Stephanie Leutert - 1/28/2020    Confidential

1    operations for preclearance of automotive parts that

2    were being exported from Mexico into the United

3    States.

4        Q.    (BY MR. SAMPAT)  So can you elaborate a

5    little bit more on what that means?

6        A.    I toured a factory in Ciudad Juarez that

7    had a CBP preclearance, which means that the

8    automotive parts are precleared before they are

9    exported to the United States to speed up processing

10   at the border.

11       Q.    And that helps facilitate trade.  Correct?

12                MR. FENN:  Object to form.

13                THE WITNESS:  Yes.  Yes.

14       Q.    (BY MR. SAMPAT)  So you did have -- you

15   have in the past done some research that involves

16   CBP's other operations regarding trade?

17       A.    It was not the focus of my project.

18       Q.    Uh-huh.

19       A.    But I -- it was a factor -- it is a factor

20   within -- trade is -- North American trade is an

21   important factor in Mexico's automotive industry, so

22   it played a role in my research.

23       Q.    So you've been exposed?

24       A.    Yes.

25       Q.    Okay.  And before the Coca-Cola fund, where

Stephanie Leutert - 1/28/2020    Confidential

1    were you?

2        A.    The Ukrainian Parliament.

3        Q.    And what was your position there?

4        A.    I apologize.  Those actually should be

5    reversed.  I did the Coca-Cola fund for the month

6    prior to the Ukrainian Parliament.

7        Q.    Okay.

8        A.    So they should be flipped in terms of

9    order.

10        Q.    Okay.  So -- and what was your position at

11    the Ukrainian Parliament?

12        A.    I was a legislative assistant.

13        Q.    And when did you begin working there as a

14    legislative assistant?

15        A.    In the summer of 2015.

16        Q.    As a -- as a legislative assistant, were

17    you are asked to do any research to that?

18                    MR. FENN:  Object to form.

19                    THE WITNESS:  Any research on...

20        Q.    (BY MR. SAMPAT)  Any research, just

21    generally.

22        A.    Yes.

23        Q.    Into what?

24        A.    Production sharing agreements.

25        Q.    What does that mean?

Stephanie Leutert - 1/28/2020    Confidential

1    A.    The agreements between the Ukrainian
2  government and private companies that were drilling
3  for shale gas in the country.
4    Q.    Was there anything regarding government --
5  governmental operations?
6            MR. FENN:  Object to form.
7            THE WITNESS:  I was working within the
8  parliament, so...
9    Q.    (BY MR. SAMPAT)  And it could have went --
10  while you were conducting research, was there data
11  that you were receiving that reflected governmental
12  operations?
13            MR. FENN:  Are you talking about the
14  United States government operations?
15    Q.    (BY MR. SAMPAT)  Just generally for now.
16    A.    How are you defining operations?
17    Q.    I'll be more specific.  Did you ever -- did
18  your research projects involve research into
19  governmental staffing?  How about that?
20            MR. FENN:  Object to form.
21            THE WITNESS:  Into the United States
22  governmental staffing?
23    Q.    (BY MR. SAMPAT)  No.  Just governmental
24  staffing generally.
25            MR. FENN:  Object to form.

Stephanie Leutert - 1/28/2020     Confidential

1          THE WITNESS:  Not directly.  It was

2     not a -- in my final memo on production sharing

3     agreements.

4          Q.   (BY MR. SAMPAT)  How --

5          A.   Staffing is a big issue in the Ukrainian

6     government, so it was kind of a constant.

7          Q.   Did you ever do any research into CBP

8     staffing as part of -- in that role?

9          A.   I did not.

10         Q.   Any research into the CBP's operations?

11         A.   I did not.

12         Q.   And did you hold any positions -- hold any

13    other positions at the -- at parliament?

14         A.   I was only a legislative assistant.

15         Q.   Okay.

16         A.   I was a legislative assistant.  I also

17    served as a representative of the Ukrainian

18    Parliament's energy committee in the U.S. winter

19    action plan meetings, which was a role that I

20    undertook as my internship as a legislative

21    assistant.

22         Q.   Your CV indicates that you did some

23    freelance work before you went to work in the

24    Ukraine.  Is that correct?

25         A.   I did.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    And how long were you a freelancer?

2    A.    And -- after I worked in the Ukraine --

3    Q.    Okay.

4    A.    -- for three years.

5    Q.    And what kind of work did you do?

6    A.    A range of work.  I helped write up bids.

7  I wrote briefings.  I -- I once did a -- a project

8  for -- on Mexico's energy reform.  And then also I

9  did -- between CFR, Council on Foreign Relations and

10 Yale, I did independent research on Mexico's

11 aerospace industry.

12   Q.    What kind of research were you doing

13 regarding the aerospace industry?

14   A.    I was looking at Bombardier's arrival in

15 Queretaro, a Mexican central state and how that had

16 spurred a high-tech manufacturing boom that had

17 helped the local economy.

18             THE REPORTER:  I'm sorry.  That had?

19             THE WITNESS:  Helped the local

20 economy.

21             Oh, and I was interested -- Guanajuato

22 was trying to copy work Queretaro had done, so I was

23 looking at that as well.

24   Q.    (BY MR. SAMPAT)  Okay.  How did you go

25 about recording the data you were receiving?

Stephanie Leutert - 1/28/2020    Confidential

1          MR. FENN:  Object to form.

2          THE WITNESS:  How did I go about

3    recording?

4      Q.   (BY MR. SAMPAT)  Yes.

5      A.   Do you mean writing down?

6      Q.   Yeah.

7      A.   I'm sure I took notes or was reviewing

8    electronic files.

9      Q.   Did you do the statistical analysis

10   yourself?

11         MR. FENN:  Objection to form;

12   Mischaracterizes the witness's testimony.

13         THE WITNESS:  I -- on that particular

14   project, I was not doing statistical analysis.

15     Q.   (BY MR. SAMPAT)  Did you do the data

16   analysis yourself?

17     A.   Yes.

18     Q.   Was anyone else involved in -- in that

19   process?

20     A.   No.

21     Q.   Did you do -- strike that.

22         As a freelancer, were you doing -- did

23   you conduct any research into how the United States

24   government determined staffing?

25         MR. FENN:  Object to form.

Stephanie Leutert - 1/28/2020    Confidential

1    THE WITNESS:  No.

2    Q.   (BY MR. SAMPAT)  Did you do any research

3    into how CBP runs its operations?

4    MR. FENN:  Object to form.

5    THE WITNESS:  As a freelance

6    researcher, no.

7    Q.   (BY MR. SAMPAT)  Can you -- what was the

8    position you held before you were a freelancer?

9    A.   I was a research assistant at the Council

10    on Foreign Relations.

11    Q.   And you testified earlier that was the last

12    full-time job you had had before you became a fellow

13    at the Mexico Security Initiative.  Is that correct?

14    A.   A full-time -- with a full salary, yes.

15    Q.   Okay.  And when did you begin working at

16    the Council on Foreign Relations?

17    A.   In 2012.

18    Q.   You're okay calling it the CFR?

19    A.   I'm fine, yeah.

20    Q.   Okay.  What were your -- and what position

21    did you hold?

22    A.   I was a research associate in the Latin

23    America Studies program.

24    Q.   In what areas were you conducting research?

25    A.   Oh a wide range of issues.  The purview was

Stephanie Leutert - 1/28/2020    Confidential

1  all of Latin America.  I was working with a fellow

2  who focused on Mexico, so that was generally the

3  focus of what my work -- of my work at that time.

4      Q.    Were there specific projects you were doing

5  research into?

6      A.    Many.  I believe what's written on here was

7  my role -- my work as the lead researcher for the

8  2014 CFR Task Force on North America.

9      Q.    And what did that entail?

10      A.    That was a year-long project that had a

11  group of experts that met four times to reimagine

12  security, energy, economic -- there might have been

13  a -- the fourth one.  Let's see.  Oh, it doesn't

14  have it there.  Security, energy, economic, and I

15  don't know if it was political.  There was

16  another -- bucket issues within North America.

17  There was a catchall bucket.

18      Q.    Okay.  Did you have to collect data as part

19  of the work you were doing as a research associate?

20      A.    Yes.

21      Q.    What kind of data did you have to collect?

22      A.    A lot of data.  The big project I'm

23  remembering, which is my emphatic yes was I had to

24  map out the -- the entire budget and production, oil

25  and gas production, to model it.  I did not do the

Stephanie Leutert - 1/28/2020    Confidential

1  modeling, but I created the base to model it for how

2  changes in oil and gas prices would affect the

3  company.

4      Q.   Did you have any involvement with CBP in

5  that role?

6              MR. FENN:  Object to form.

7              THE WITNESS:  How do you define

8  involvement?

9      Q.   (BY MR. SAMPAT)  Did you interact with

10  anyone at CBP as a research associate?

11      A.   I believe we had speakers from CBP who

12  came.  I can't remember if at that point they were

13  at CBP or DHS, but we certainly had speakers who

14  came to talk about the border.

15      Q.   As a research associate at the CFR, did you

16  have to interview CBP officials?

17      A.   As part of my role, no.

18      Q.   Did you ever interview CBP officials?

19              MR. FENN:  Object to form.

20              THE WITNESS:  No.

21      Q.   (BY MR. SAMPAT)  How about DHS officials?

22              MR. FENN:  Object to form.

23              THE WITNESS:  We conducted interviews

24  for the task force of which I was apart, and I -- I

25  can't remember if we ever -- if I ever conducted

Stephanie Leutert - 1/28/2020    Confidential

1    them with DHS officials.  I honestly can't remember.

2    Q.   (BY MR. SAMPAT)  That's --

3    A.   Possible.

4    Q.   No, that's perfectly fine.

5         Did you do research into staffing

6    decisions for the government?

7         MR. FENN:  Object to form.

8         THE WITNESS:  How do you define

9    "staffing"?

10   Q.   (BY MR. SAMPAT)  How different government

11   agencies go about determining how to staff certain

12   offices?

13   A.   We talk about different staffing or

14   structurally -- or structure -- organization

15   structures within different government agencies

16   within the CFR task force.

17   Q.   So nothing regarding CBP's staffing at

18   ports of entry.  Correct?

19        MR. FENN:  Object to form;

20   mischaracterizes the witness's testimony.

21        THE WITNESS:  It would have come up in

22   the task force in terms of -- staffing at ports of

23   entry would have come up within the task force

24   report.

25   Q.   (BY MR. SAMPAT)  How would it have come up?

Stephanie Leutert - 1/28/2020    Confidential

1    A.    The task force focused on facilitating

2 movement of goods at the border and people and

3 security at -- and so certain staffing decisions

4 would likely -- I'm almost certain would have been

5 mentioned in the report, and there would have been

6 some baseline, at least, research conducted in that

7 regard.

8    Q.    So just to -- just to make sure I

9 understand your testimony --

10    A.    Uh-huh.

11    Q.    -- while you were a research associate at

12 the CFR --

13    A.    Yeah.

14    Q.    -- you were exposed to other missions that

15 CBP has?

16          MR. FENN:  Object to form.

17    Q.    (BY MR. SAMPAT)  Is that correct?

18          MR. FENN:  Misstates the witness's

19 testimony.  I'm sorry.  I didn't mean to cut you

20 off.

21          THE WITNESS:  In that task -- in that

22 task force report, we focused on the borders and at

23 the ports of entry and discussed CBP in that

24 capacity and the activities that they currently were

25 engaging in and that they could engage in.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    (BY MR. SAMPAT)    So it was in that role

2    that you learned of CBP's operations when it comes

3    to national security issues?

4            MR. FENN:    Object to the form;

5    mischaracterizes the witness's testimony.

6            THE WITNESS:    My role at CBP -- at CFR

7    was the first time that I was able to conduct

8    research on CBP in a meaningful way beyond kind of

9    cursory, perhaps, viewing of documents.

10    Q.    (BY MR. SAMPAT)    Is there anything else you

11    did research into regarding CBP while you were a

12    research associate?

13    A.    I'm almost certain that I would have done

14    additional research projects for my fellow related

15    to the border and CBP because that was an area of

16    interest for her.

17    Q.    Uh-huh.

18    A.    I don't remember specific projects.

19    Q.    Okay.    Have you ever worked at a port of

20    entry?

21    A.    I have not.

22    Q.    At any point in your career, did you work

23    for CBP?

24    A.    I have not.

25    Q.    At any point in your career, have you

Stephanie Leutert - 1/28/2020    Confidential

1  worked for the Department of Homeland Security?

2      A.    I have not.

3      Q.    Have you worked for INS?

4      A.    I have not.

5            MR. FENN:  Object to form.

6      Q.  (BY MR. SAMPAT)  Custom Services?

7      A.    I have not.

8      Q.    Did you work for the United States

9  government at all?

10     A.    No.

11     Q.    Have you ever witnessed the seizure of

12 narcotics at the border?

13     A.    I have not.

14     Q.    Have you talked to anyone that has

15 experience witnessing seizures of illegal narcotics

16 at the border?

17            MR. FENN:  Object to form.

18            THE WITNESS:  I have.

19     Q.  (BY MR. SAMPAT)  Who?

20     A.    Sheriffs, individuals who worked at Texas

21 DPS.  I have also talked to CBP officers who spoke

22 as if they had, but I cannot confirm whether they

23 had.

24     Q.    Do you recall the nature of the

25 conversation?

Stephanie Leutert - 1/28/2020    Confidential

1    A.    They were discussing seizing narcotics with
2   great detail which leads me to believe or suggest
3   that they might have been involved, but I can't
4   confirm that because I did not ask -- I don't
5   remember asking specifically.

6    Q.    What were they discussing regarding the
7   operations of seizing illegal narcotics?

8    A.    In the conversation I'm remembering, they
9   were discussing the area along the border where
10  criminal groups move narcotics.  That was one.  And
11  another example, discussing the lines that are left
12  on your back through the movement of -- of backpacks
13  of marijuana.  So specific details that led me to
14  believe they had a specific knowledge, but I can't
15  confirm that they actually had witnessed it
16  themselves or were involved.

17   Q.    Did you talk to any other supervisors at
18  CBP regarding the seizure of illegal narcotics?

19   A.    I don't believe so -- or I don't know if
20  the people that I interviewed -- they were not line
21  officers.  And I would have spoken with them in the
22  interview as well about the seizure of narcotics.

23   Q.    CBP management?

24          MR. FENN:  Object to form.

25          THE WITNESS:  I don't know what roles

Stephanie Leutert - 1/28/2020    Confidential

1   they have.

2       Q.    (BY MR. SAMPAT)   How about DHS officials?

3       A.    Regarding narcotics seizures?

4       Q.    Yes.

5       A.    I don't believe -- well, in what capacity?

6   Well, current DHS officials?

7       Q.    Current and former.

8       A.    If I have discussed narcotic seizures?

9       Q.    Yes.

10      A.    I'm sure it's -- it might have come up in a

11  conversation.

12      Q.    So have any of these conversations

13  discussed the staffing considerations that need to

14  be made when seizing illegal narcotics?

15              MR. FENN:  Object to form.

16              THE WITNESS:  I honestly don't

17  remember.

18      Q.    (BY MR. SAMPAT)   Have you ever inspected

19  cargo at a port of entry?

20      A.    I have not.

21      Q.    Have you talked to anybody about this

22  experience?

23              MR. FENN:  Object to form.

24              THE WITNESS:  Not directly.

25      Q.    (BY MR. SAMPAT)   Indirectly?

Stephanie Leutert - 1/28/2020    Confidential

1    A.    Yes.

2    Q.    How so?

3    A.    Individuals who have -- well, I've talked

4 to individuals who have a member -- a family member

5 who is a CBP officer and talked about their family

6 member's experience.  So it's a -- it's not direct.

7 It was a conversation about someone else, so, no, in

8 various occasions.

9    Q.    And have you talked to CBP officials or

10 officers about inspecting cargo at ports of entry?

11    A.    It may have come up in a conversation, but

12 likely not the focus of any of my conversations.

13    Q.    Do you recall to what extent it came up?

14        MR. FENN:  Object to form.

15        THE WITNESS:  I imagine it probably

16 came up in reviewing -- in some of the more formal

17 presentations when CBP was reviewing their overall

18 mandate.

19    Q.    (BY MR. SAMPAT)  And in those presentations

20 or any conversations you have had, was there ever

21 any discussion regarding staffing decisions that

22 have to be made when processing cargo at a port of

23 entry?

24    A.    It's possible that they mention that.

25    Q.    But you don't recall the nature of those

Stephanie Leutert - 1/28/2020     Confidential

1  conversations or what was said?

2      A.     It's -- it's often a general theme -- the

3  finite resources or the need for additional

4  resources are things that I've heard before, so it's

5  possible in those contexts it came up, but I can't

6  recall a specific example.

7      Q.     Okay.  So is it fair to say, then, that you

8  don't have any firsthand knowledge about how the

9  United States government goes about making staffing

10  decisions?

11          MR. FENN:  Object to form;

12  Mischaracterizes the witness's testimony.

13          THE WITNESS:  How do you define

14  "firsthand"?

15      Q.  (BY MR. SAMPAT)  You have not yourself been

16  directly involved with those decisions.

17      A.     I have not myself been directly involved in

18  staffing decisions, that is connect, at the ports of

19  entry.

20      Q.     Do you have any firsthand knowledge about

21  how OFO goes about making decisions how to allocate

22  resources?

23          MR. FENN:  Object to form.

24          THE WITNESS:  Is this the same

25  firsthand I was directly involved or --

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    (BY MR. SAMPAT)   Yes.

2    A.    -- is that how you're --

3    Q.    Okay.

4    A.    Then I have not been directly involved in

5    decisions related to -- as far as OFO staffing.

6    Q.    Uh-huh.

7    A.    I have not been directly involved in those

8    decisions.

9    Q.    Have you ever discussed the management of

10    operations at a port of entry with any CBP officer?

11    A.    By "management," do you mean what

12    specifically?

13    Q.    Day-to-day operations on how they go about

14    running the port.

15    A.    I believe actually I have had discussions

16    with CBP individuals about day-to-day.

17    Q.    With whom?

18    A.    CBP officials at the Eagle Pass port of

19    entry.

20    Q.    And what have you discussed?

21    A.    They were discussing their activities and

22    specifically asylum processing.

23         THE REPORTER:  And typically --

24         THE WITNESS:  And specifically asylum

25    processing.

Stephanie Leutert - 1/28/2020     Confidential

1        MR. FENN:  Do you want to go off the

2   record for a minute?

3        MR. SAMPAT:  Yeah.  Can we go off the

4   record for a minute?

5             (Off the record)

6        MR. SAMPAT:  We can go back on the

7   record.

8   Q.   (BY MR. SAMPAT)  Ms. Leutert, do you have

9   any knowledge regarding the budgeting at various

10  ports of entries?

11       MR. FENN:  Object to form.

12       THE WITNESS:  Knowledge?  As in

13  firsthand knowledge?

14  Q.   (BY MR. SAMPAT)  No.  Do you have -- have

15  you reviewed data or reviewed reports that discuss

16  budgeting at various ports of entry?

17       MR. FENN:  Same objection.

18       THE WITNESS:  I don't think I have.

19  Of a port of entry, no.

20  Q.   (BY MR. SAMPAT)  Land ports of entry.

21  A.   Yes.  Because -- yeah.  No, I have not --

22  specific port, no.

23  Q.   Do you have knowledge of staffing levels at

24  various ports of entry?

25       MR. FENN:  Object to form.

Stephanie Leutert - 1/28/2020     Confidential

1          THE WITNESS:  I may have seen some

2   information regarding that in some of the documents

3   that I reviewed.  Beyond that, no, since publically

4   available data does not distinguish by port.

5       Q.   (BY MR. SAMPAT)  So is it fair to say you

6   have not experienced the day-to-day operational

7   decisions that CBP has to make on a daily basis?

8          MR. FENN:  Object to form;

9   Mischaracterizes the witness's testimony.

10          THE WITNESS:  That I have not

11   experienced it?

12      Q.   (BY MR. SAMPAT)  Yes.

13      A.   And by "experience," you mean my lived

14   experience as --

15      Q.   That you have -- yes.

16          MR. FENN:  Same objection.

17          THE WITNESS:  I have not worked at

18   CBP; therefore, I have not been involved in the

19   decisions or personally in those experiences.

20      Q.   (BY MR. SAMPAT)  Okay.

21          MR. SAMPAT:  We're just at about

22   another hour.  Are you okay taking another five- to

23   ten-minute break?

24          MR. FENN:  Sure.

25          (Off the record)

Stephanie Leutert - 1/28/2020     Confidential

1      MR. SAMPAT:  Back on the record.

2      Q.   (BY MR. SAMPAT)  Ms. Leutert, you

3  understand we're back on the record?

4      A.   Yes.

5      Q.   And you understand you're still under oath?

6      A.   Yes.

7      Q.   I understand there's a clarification you

8  would like to make?

9      A.   Yes.

10     Q.   Please go ahead.

11     A.   I misspoke and said that Douglas was on the

12 other side of Sonoyta.  Douglas is on the other side

13 of Agua Prieta, and Lukeville is on the other side

14 of --

15          THE REPORTER:  I'm sorry.  I might

16 have you spell those.

17          (Laughter)

18          (Off the record)

19          MR. SAMPAT:  In the meantime.  I'll

20 pass out the exhibits.

21          (Exhibit No. 2 marked)

22     Q.   (BY MR. SAMPAT)  Is there any other

23 clarification you would like to make?

24     A.   No.  That was all.

25     Q.   All right.  Well, thank you for that.

Stephanie Leutert - 1/28/2020    Confidential

1        Ms. Leutert, I'm going to give you
2  this document that's been marked Exhibit 2.
3        A.    Thank you.
4        Q.    Do you recognize this document?
5        A.    Yes, I do.
6        Q.    And what is the document?
7        A.    This is the expert report that I prepared.
8        Q.    And it's the report that you prepared for
9  your proposed testimony in Al Otro Lado versus Wolf.
10  Correct?
11        A.    Correct.
12        Q.    Did you prepare this report?
13        A.    I did.
14        Q.    Did anyone else play a role in drafting
15  this report?
16        A.    No.
17        Q.    Does the report accurately reflect the full
18  opinions you intend to give in this case?
19        A.    Full opinions I have not -- I'm aware that
20  there may be -- they're the full opinions for the
21  documents that were available when I wrote the
22  report.  I'm aware that there might be additional
23  documents that were produced after I wrote the
24  report that might influence my decisions, but for
25  what was available, what I could review, yes, it is

Stephanie Leutert - 1/28/2020    Confidential

1  my full opinion.

2      Q.    And does this report reflect all the

3  documents you reviewed, considered, or relied on in

4  forming these opinions for this report?

5      A.    That were available when I wrote the report

6  and that are listed in the back at -- or, I guess,

7  not in this version, but --

8      Q.    I believe they --

9      A.    Are they?

10     Q.    They should be.  Oh, are they not?

11     A.    No.

12     Q.    Okay.

13              MR. SAMPAT:  Just one second.

14              MR. FENN:  Sure.

15              (Pause in proceedings)

16     Q.    (BY MR. SAMPAT)  So I'd like to focus on the

17  content and substance of this report that you have

18  admitted.  And you said this report reflects all the

19  opinions you intend to give as per the documents

20  that you have been provided and relied on at this

21  juncture.  Correct?

22     A.    Correct.

23              MR. FENN:  Object to form.

24              THE WITNESS:  Oh.

25              MR. FENN:  Go ahead.

Stephanie Leutert - 1/28/2020    Confidential

```
1        THE WITNESS:  I -- I'm sorry.
2   Actually, can you repeat the question?
3        Q.   (BY MR. SAMPAT)  Sure.
4        A.   I'm sorry.
5        Q.   Sure.
6             The report that -- that's before you
7   right now --
8        A.   Uh-huh.
9        Q.   -- that -- that reflects all the opinions
10  you intend to give at this time based on the
11  documents that you were provided and the documents
12  you relied on based on Exhibit -- the attached
13  exhibit in the report?
14       A.   They -- so this report and the attached
15  exhibit reflect my response to the question -- my
16  full response to the question that was provided --
17  my response to the question that was provided by
18  plaintiffs' counsel for me to answer in the report.
19       Q.   And what questions were those?
20       A.   On Page 8 it lists out -- in Paragraph 22
21  that plaintiffs' counsel have asked me to address
22  whether between 2016 and the present the United
23  States government engaged in a systemic practice of
24  denying noncitizens access to the asylum process at
25  ports of entry on the U.S.-Mexico border.
```