Stephanie Leutert - 1/28/2020    Confidential

1    Q.    Were there any other questions that you

2  were asked to consider?

3    A.    That was the primary question.

4    Q.    Were there other questions you took into

5  consideration?

6              MR. FENN:  I advise the witness not to

7  reveal any privileged communications between her and

8  her attorneys that aren't discussed in the report.

9              THE WITNESS:  That was the primary

10  question that I was asked to answer.

11    Q.    (BY MR. SAMPAT)  Okay.  So would your

12  conclusions change upon reviewing more documents

13  later?

14              MR. FENN:  Object to the form;

15  Incomplete hypothetical.

16              THE WITNESS:  I'd have to see the

17  documents.

18    Q.    (BY MR. SAMPAT)  So it -- are there

19  documents that could potentially be relevant that

20  you would consider that may change your opinions?

21              MR. FENN:  Same objection.

22              THE WITNESS:  If that hypothetical --

23  it could be any document that says anything.  If

24  there were documents that said the opposite of

25  documents that I received, I would -- it would

Stephanie Leutert - 1/28/2020    Confidential

1  affect my -- it could affect my -- my conclusions.

2  However, I base this on the documents that I

3  reviewed at the time.

4       Q.   (BY MR. SAMPAT)  Do you know of any

5  documents that may contradict some of the other

6  documents that you reviewed in this case?

7                 MR. FENN:  Object to form.

8                 THE WITNESS:  Contradict?

9       Q.   (BY MR. SAMPAT)  Well, you -- you said that

10  there could be some report or documents that come

11  out that contradict stuff you've already reviewed.

12  Correct?

13       A.   In the hypothetical?

14       Q.   Right.

15       A.   My results and conclusions reflect what I

16  reviewed.  If what I was reviewing was different, my

17  results would look different.

18       Q.   Correct.  So this -- so we understand that.

19  What I'm asking is, do you know of any documents

20  that contradict some of the documents you already

21  reviewed?

22                 MR. FENN:  Object to form.

23                 THE WITNESS:  I'm just not sure what

24  you mean by "contradict."  And, perhaps, it's too

25  vague.  Maybe if it was more specific.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    (BY MR. SAMPAT)   So if you viewed a report

2   hypothetically and then there was another report

3   that directly contradicted it in terms -- it showed

4   the opposite conclusion.

5    A.    I did not base any -- any of my conclusions

6   on one specific document.

7    Q.    Uh-huh.

8    A.    It was in the totality of the documents.

9    Q.    Okay.

10   A.    Yeah.

11   Q.    Okay.   In your report, is it true that you

12   say that there's a policy and practice of

13   turn-backs?

14   A.    Where do I say that?   On what page?

15   Q.    It is on Page -- Page 9, Subparagraph A.

16   A.    That is what it states.   It says, "A policy

17   and practice of turning back asylum seekers arriving

18   on ports of entry on the U.S.-Mexico border" --

19              THE REPORTER:   I'm sorry.   When you

20   read you need to slow down just a little bit.

21              THE WITNESS:   I'm sorry.   I said, yes,

22   it says beginning in 2016, U.S. Customs and Border

23   Protection adopted a policy and practice of turning

24   back asylum seekers that were arriving at ports of

25   entry on the U.S.-Mexico border.

Stephanie Leutert - 1/28/2020    Confidential

1              MR. FENN:  Can we go off the record?

2              MR. SAMPAT:  I don't need an extra

3    copy of the report.  I'm happy to give it to you if

4    there is reading from it.  That way, you can refer

5    to it if that's okay with the counsel.  Is that

6    fine?  So that way if people read fast --

7              MR. FENN:  That's fine.

8              THE REPORTER:  Thank you so much.

9              MR. FENN:  I'm sorry to interrupt.

10              THE REPORTER:  Very helpful.  Thank

11    you.

12              MR. FENN:  Are we still off the

13    record?

14              THE REPORTER:  No.  We're -- we've

15    been going.

16              MR. FENN:  Oh, okay.

17              MR. SAMPAT:  Oh, we have.  I thought

18    that was off the record.  Would you like to go off

19    the record?

20              MR. FENN:  Yeah, can we go off the

21    record for second?

22              MR. SAMPAT:  Yeah.

23              (Off the record)

24    Q.   (BY MR. SAMPAT)  All right.  We're back on

25    the record.  Ms. Leutert, you understand you're

Stephanie Leutert - 1/28/2020    Confidential

1  still under oath?

2      A.    Yes.

3      Q.    We have just made copies of Exhibit C that

4  was attached to your expert report, and that lists

5  all the materials that you considered in preparing

6  this report.  Is that correct?

7      A.    Yes.

8      Q.    Okay.  And before we went off the record

9  and took our break, we were talking about

10  Subparagraph A on Page 9 of your report, is that

11  correct, about the policy and practices of turning

12  back asylum seekers?

13      A.    Yes.

14      Q.    Can you define what you mean by policy?

15          MR. FENN:  Go ahead.

16          THE WITNESS:  By policy, I was

17  defining it as a written guidance throughout U.S.

18  customs and border protection.

19      Q.    (BY MR. SAMPAT)  And what written guidance

20  would that be?

21      A.    Oh, I'm sorry.  I'm sorry.  That's what I

22  was thinking of -- well, yeah.  No, actually, no, I

23  stand by that.  Sorry.  I got confused for a second.

24  A written guidance, and I was referring to the

25  April 2018 metering guidance that was issued by Todd

Stephanie Leutert - 1/28/2020    Confidential

1  Owen.

2      Q.   Is there anything else that you mean when

3  you use the word "policy"?

4      A.   I think just the general guidance and

5  musters that were being used -- that this was coming

6  from CBP leadership.

7      Q.   So in order to make sure I am understanding

8  your testimony, when you talk about policy, you're

9  talking about the written guidance throughout CBP

10 that includes the metering guidance and the musters.

11 Is that correct?

12     A.   There could be other documents.  It's --

13     Q.   Such as?

14     A.   The musters -- there could be additional

15 guidance on metering that was issued or that was

16 related to.

17     Q.   Do you recall what guidance?

18          MR. FENN:  Object to the form.

19          THE WITNESS:  That's more in the --

20 well -- not particular guidance on metering.  It

21 would be the -- the main one would be the April 2018

22 guidance.  I've seen from depositions that there are

23 other documents that were issued later that would

24 also be relevant.

25     Q.   (BY MR. SAMPAT)  And what depositions would

Stephanie Leutert - 1/28/2020     Confidential

1  that be?

2      A.    Those would be the depositions of Todd Owen

3  and Randy Howe.

4      Q.    So then is it -- it's fair to say, then,

5  that you haven't relied on all available

6  information.  Correct?

7            MR. FENN:  Objection; form.

8            THE WITNESS:  I --

9      Q.    (BY MR. SAMPAT)  You can answer.

10     A.    I'm not sure that that -- those documents

11 were released at the time of my report.  I did not

12 know about them until the deposition.

13     Q.    Until your deposition?

14     A.    No.  I'm sorry.  Until I read those

15 depositions.

16     Q.    And when did you read those depositions?

17     A.    I read them in the last week.

18     Q.    Okay.  Is there anything else you would

19 like to add to your definition of a policy?  My

20 understanding is you're -- when you talk about

21 policy, you're talking about written guidance, and

22 when you talk about written guidance, you're talking

23 about the metering guidance from April 2018 musters

24 and addition -- any additional guidance that may

25 have come out regarding metering?

Stephanie Leutert - 1/28/2020    Confidential

1      A.    It could also be verbal as well in the form
2    of guidance or musters.  It could be verbal or
3    written guidance in standardizing a practice
4    throughout CBP.  That's what I would say is a
5    policy.
6      Q.    Have you recorded the verbal guidances
7    anywhere?
8                MR. FENN:  Object to form.
9                THE WITNESS:  No, I have not recorded
10   them myself.
11     Q.    (BY MR. SAMPAT)  Have you gotten records of
12   them?
13                MR. FENN:  Object to form.
14                THE WITNESS:  I have read about them
15   in various depositions.
16     Q.    (BY MR. SAMPAT)  And what depositions are
17   we talking about?
18     A.    I believe they were in the ███████████
19   deposition, and I can't remember if they were in
20   both or in one of the Todd Owens {sic} and Randy
21   Howe depositions.
22     Q.    Okay.  Can you define what you mean by
23   "practice"?
24     A.    Practice would be the act of turning
25   someone away.  Generally, frequently any somewhat

Stephanie Leutert - 1/28/2020    Confidential

1  standardized form, perhaps, in the absence of that

2  written or verbal guidance that's clarified perhaps

3  from CBP leadership.  So to explain in this context,

4  it appears that CBP began a practice of turning

5  people away, and then there was a policy issued

6  regarding metering in April of 2018.

7            It's possible they were also -- there

8  are -- I noted them in here.  There were other

9  documents that outlined specifics, particularly in

10 various sectors leading up to that April 2018

11 guidance, but the April 2018 guidance was issued

12 from leadership to all ports -- to all field offices

13 across the border, so that's the distinction I was

14 making between those two words.

15    Q.   So to -- to make sure I understand --

16    A.   Uh-huh.

17    Q.   -- your testimony, so practices is when CBP

18 began to regularly turn back --

19            MR. FENN:  Objection; form.

20    Q.   (BY MR. SAMPAT)  -- asylum seekers?

21            MR. FENN:  Mischaracterizes the

22 witness's testimony.

23            THE WITNESS:  When they began turning

24 people back across the border, in what became

25 regular, in a -- in a way where noncitizens

Stephanie Leutert - 1/28/2020    Confidential

1  continued to report similar characteristics of the

2  turn-back, that's how I -- I see it as becoming a

3  practice.

4      Q.    (BY MR. SAMPAT)  I'm not sure I understand

5  the final part of your -- of your testimony there.

6      A.    Okay.  I can restate it.

7              The practice of turn-backs the way

8  that I see it in my perspective based on the

9  documents that I reviewed and the testimonies is

10  that particularly in 2016 and 2017, I have not

11  reviewed any overarching guidance from the direct

12  data at all ports of entry that was outlining the

13  metering practice.

14              But individuals were being turned pack

15  at ports of entry along the border and were

16  having -- reporting experiences in their testimonies

17  of these turn-backs that had many of the same

18  characteristics.  Given the frequency of these

19  similar testimonies, it began to appear that there

20  was a practice, that it was -- that CBP was turning

21  people back in a similar manner.  That's the way

22  that I'm defining practice.  The policy is when it

23  has a written and often verbal component of guidance

24  from leadership that is establishing that practice

25  as policy.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    How frequent must something happen for it
2    to become a practice?
3                MR. FENN:  Object to form.
4                THE WITNESS:  More than once.
5    Q.   (BY MR. SAMPAT)  Twice?
6                MR. FENN:  Objection.
7                THE WITNESS:  It just has to happen
8    more than once.  I don't have a specific number.
9    Q.   (BY MR. SAMPAT)  If something happens five
10   times, is that a practice?
11               MR. FENN:  Object to form.
12               THE WITNESS:  I don't think I could
13   put a number, but it's if something is reoccurring,
14   so more than once.
15   Q.   (BY MR. SAMPAT)  So you -- you testified
16   just a little while ago saying that the turn-back
17   practice was defined because CBP began to do it with
18   some frequency.  Is that correct?
19   A.    More than once.
20   Q.    So do you know how frequently they were
21   doing it?
22               MR. FENN:  Object.
23   Q.   (BY MR. SAMPAT)  That led to your opinion
24   that it was a practice?
25               MR. FENN:  Same objection.

Stephanie Leutert - 1/28/2020    Confidential

1    THE WITNESS:  I -- I have access to

2    some of the published testimonies, and I reviewed

3    documents that were reporting some of these

4    turn-backs even within -- within CBP structure.  I

5    reviewed those.  These are the ones that were

6    recorded.  I'm sure there were others as well, but

7    there were multiple turn-backs beginning in 2016

8    that had similar characteristics.

9    Q.   (BY MR. SAMPAT)  So, then, is it your

10   testimony that a practice of turn-backs occurred

11   after the first turn-back?

12   MR. FENN:  Objection; calls for a

13   legal conclusion.

14   You can answer.

15   THE WITNESS:  That is practice -- I'm

16   sorry -- practice -- after the first -- I think when

17   you have more than one turn-back and individuals

18   with similar characteristics are reporting that

19   similar things were told to them or happen to them,

20   you begin to have a practice.

21   Q.   (BY MR. SAMPAT)  You begin -- what do you

22   mean by you begin to have a practice?

23   A.   That's when the practice begins.

24   Q.   So --

25   A.   That's when you can start saying that there

Stephanie Leutert - 1/28/2020    Confidential

1  is a practice.

2      Q.    So on the second individual, that would be

3  a practice?

4            MR. FENN:    Objection; calls for a

5  legal conclusion.

6            You can answer.

7            THE WITNESS:    I'm stating that it's

8  multiple.    I -- I -- after one when you have

9  multiple turn-backs, you can start to say there is a

10  practice.

11      Q.    (BY MR. SAMPAT)    How many -- how many

12  practices -- how many individual turn-backs did you

13  look at in order to form the opinion that there was

14  a practice?

15            MR. FENN:    Object to form.

16            THE WITNESS:    What do you mean

17  turn-backs I looked at?

18      Q.    (BY MR. SAMPAT)    So in preparing this

19  report, you opined that there was a practice of

20  turning back asylum seekers.    Correct?

21      A.    (Witness nods head).

22      Q.    How many -- how many individual cases did

23  you review before you came to the conclusion that

24  there was a practice?

25            MR. FENN:    Same objection.

Stephanie Leutert - 1/28/2020    Confidential

1    THE WITNESS:  I genuinely couldn't put

2  a number on it.  I cited some of the sources.  I

3  reviewed the cases that were mentioned in the

4  documents that are -- that were produced during

5  discovery.  I also reviewed cases that were in

6  public reports, and I also reviewed cases that were

7  in articles.  And I had -- well, that's what I

8  reviewed for the report.

9    Q.  (BY MR. SAMPAT)  Did you review ten cases?

10    MR. FENN:  Object to form; asked and

11  answered.

12    THE WITNESS:  I believe more.

13    Q.  (BY MR. SAMPAT)  20?

14    A.  In what time frame?

15    Q.  While you were preparing this report as you

16  were opining on that there is a practice --

17    A.  The turn-backs under what time frame?  As

18  when I believed it was -- when it -- I believed it

19  was a --

20    Q.  A practice?

21    A.  A practice.

22    Q.  Yes.

23    A.  Oh.

24    MR. FENN:  Same objection.

25    THE WITNESS:  I don't know, but it was

**WRIGHT WATSON & ASSOCIATES**

Stephanie Leutert - 1/28/2020    Confidential

1  quite a few because some of those reports have

2  many -- many cases of individuals who were turned

3  back from early 2016 through April 2018.

4       Q.   (BY MR. SAMPAT)  30?

5            MR. FENN:  Objection; asked and

6  answered.

7            THE WITNESS:  I really couldn't give

8  you a number.

9       Q.   (BY MR. SAMPAT)  Okay.  How do you define

10 turn-backs?

11           MR. FENN:  Objection; calls for a

12 legal conclusion.

13           You can answer.

14           THE WITNESS:  Turn-backs are

15 individuals who are seeking to access the U.S.

16 asylum system and are told at various geographic

17 points at times -- well, while it was a practice and

18 not a policy, so in the beginning, in 2016 to

19 April 2018, turn-backs would be CBP officers not

20 allowing that individual to seek asylum at the port

21 of entry when they sought to seek the asylum

22 system -- access to the asylum system and were not

23 allowed to seek that access and were such -- as such

24 returned to Mexico.

25      Q.   (BY MR. SAMPAT)  When you say "not allowed

Stephanie Leutert - 1/28/2020    Confidential

1  to seek access," what do you mean?

2      A.    Were told various explanations.

3      Q.    What various explanations were they told?

4      A.    I believe I have that in my report.

5      Q.    Is it potentially on Page 24?

6      A.    Yes.   Thank you.

7      Q.    Uh-huh.

8      A.    These -- these explanations include a

9  description such as we're not accepting any more

10  people, and we -- CBP wasn't receiving people from

11  Honduras.

12      Q.    But these explanations weren't

13  standardized, correct, according to your report?

14           MR. FENN:   Object to form.

15           THE WITNESS:   According to the

16  testimonies in 2016 and 2017, the explanations

17  varied.   There were multiple explanations for why

18  these individuals could not seek asylum.

19      Q.    (BY MR. SAMPAT)   Do you know why those

20  reasons varied?

21           MR. FENN:   Object to form.

22           THE WITNESS:   I could speculate.

23      Q.    (BY MR. SAMPAT)   I'm not going to ask you

24  to do that.   For -- for the individuals that you

25  identify as being turned back, were any of them on

Stephanie Leutert - 1/28/2020    Confidential

1  U.S. soil?

2      A.    According to the publically recorded

3  testimonies of individuals who were turned back, it

4  appears that, yes, some of the individuals were

5  turned back once they were on U.S. soil.

6      Q.    So what documents did you rely on to inform

7  your opinion that there was a policy of turn-backs?

8  We have -- just to make sure I understand, we have

9  the metering guidance.  Correct?

10     A.    Uh-huh.

11     Q.    Various musters.  Correct?

12     A.    For implementing the guidance.

13     Q.    Any verbal guidance you may have come

14  across through other documents that are listed in

15  Exhibit C of your report.  Correct?

16     A.    Correct.

17     Q.    And all of those documents that you

18  reviewed informed your opinion that there was a

19  policy of turn-backs?

20     A.    Those documents combined with my field

21  research that the -- the metering was being

22  implemented in a uniform fashion by late 2018 across

23  all of the ports of entry that I visited and that my

24  colleagues visited for our December -- December 2018

25  metering report.

Stephanie Leutert - 1/28/2020    Confidential

1      Q.   Are there any other documents that support

2  your -- your opinion of that there's a policy?

3                MR. FENN:  Object to form.

4                THE WITNESS:  There -- those are the

5  primary documents combined with the implementation

6  that I witnessed across the border through my

7  fieldwork.

8      Q.   (BY MR. SAMPAT)  Okay.  What informs your

9  opinion that there's a practice of turn-backs?

10                MR. FENN:  Object to form.

11                THE WITNESS:  The testimonies that are

12  publically available, including the testimonies that

13  were within the documents that I reviewed and the

14  depositions as well when they were talking about the

15  origins of metering in the San Ysidro port of entry.

16                THE REPORTER:  I'm sorry.  In the...

17                THE WITNESS:  San Ysidro port of entry

18  and across some of the nearby ports of entry.

19      Q.   (BY MR. SAMPAT)  And that was only in

20  ███████████████████████  deposition?

21                MR. FENN:  Objection; mischaracterizes

22  the witness's testimony.

23                THE WITNESS:  No.  I believe that

24  was -- I believe in all of the depositions they

25  talked about metering beginning in early 2016 in

Stephanie Leutert - 1/28/2020    Confidential

1  San Ysidro.

2      Q.    (BY MR. SAMPAT)   Just to be clear, but the

3  only deposition testimony you considered when

4  preparing this report --

5      A.    Oh, I'm sorry.

6      Q.    -- was the ████████████████

7      A.    Yes, yes.

8      Q.    -- deposition.  Correct?

9      A.    Yes.

10      Q.    Okay.  And what documents did you use to

11  support your theory that there is a practice of

12  turn-backs?

13      A.    I used -- I used the -- some of the

14  articles and documents that are included in my

15  footnotes and that are included in Exhibit C.

16      Q.    Okay.  Were there any other documents that

17  you did not list that were considered?

18      A.    No.

19      Q.    Any field notes?

20      A.    No.

21      Q.    Did you consider any field notes to support

22  your theory that there was a policy of turn-backs?

23            MR. FENN:  Objection; asked and

24  answered.

25            THE WITNESS:  No.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    (BY MR. SAMPAT)    How do you define

2  metering?

3    A.    I define metering as the CBP's process of

4  turning individuals back at certain point -- at

5  certain -- turning people back at ports of entry.

6  In its current form, it includes individuals at the

7  limit line turning people back, and also includes a

8  decision on a certain number of individuals who will

9  be accepted into that port of entry on a daily

10  basis.    The metering itself, the way it looks has

11  changed over time during that -- during the four

12  years in slight ways, particularly after the

13  April 2018 guidance.

14    Q.    So before we move on to that, is it --

15  would I be -- would I be correct to say that the

16  turn-backs and the metering are basically one and

17  the same except we're talking about different time

18  periods?

19        MR. FENN:    Object to form;

20  mischaracterizes the witnesses testimony and calls

21  for a legal conclusion.

22        THE WITNESS:    I tend to see them as

23  parts of one another.    It's combined into the same

24  policy.

25    Q.    (BY MR. SAMPAT)    Okay.

Stephanie Leutert - 1/28/2020    Confidential

1    A.    I tend to see turn-backs as the physical
2   turning back of an individual back to Mexico and not
3   accepting them in the moment they seek to access the
4   asylum system.    Metering is -- in my perspective is
5   that turn-backs -- well, it's the deciding on the
6   number of individuals that will be processed every
7   day in conjunction with turn-backs.
8    Q.    Okay.    What informs your opinion that there
9   was a policy of metering?
10    A.    My fieldwork that shows that there's a
11   standard uniform practice across ports of entry
12   along with reading the April 2018 guidance where the
13   guidance matched what I had seen at ports of entry
14   along the U.S.-Mexico border.
15    Q.    Did you say a standard uniform practice
16   across the various ports of entry?
17    A.    Yes.
18    Q.    How do you know they were standard?
19    A.    They were at least two -- often two CBP
20   officers stationed at the limit line providing
21   standard explanations to arriving noncitizens as to
22   why they could not access the U.S. asylum system at
23   that time.
24    Q.    And what were those explanations?
25    A.    That they were at capacity.

Stephanie Leutert - 1/28/2020     Confidential

1    Q.    And how is that different from Page 24,

2    Paragraph No. -- Paragraph No. 45 in your report

3    where you talk about the explanations not being

4    standardized?

5              MR. FENN:   Object to form.

6              THE WITNESS:   At the time, I --

7    looking at the public testimonies from 2016 through

8    2017, they were -- they were turning people back and

9    not allowing them to -- CBP was turning people back

10   and not allowing noncitizens to access the asylum

11   system, but their explanations while having the same

12   practical consequence for noncitizens were

13   different -- involved different wording.   My

14   experience since late 2018 onward -- since 2018

15   onward, the second half of 2018 onward, has been

16   that there are not different explanations, there's

17   one standard sentence which is that the port is at

18   capacity.   There's very little variation in that

19   wording.

20   Q.    (BY MR. SAMPAT)   What documents support

21   your theory that there's a policy in metering?

22   A.    The April 2018 metering guidance.

23   Q.    Anything else?

24   A.    There are -- there are documents that were

25   mentioned in the depositions that may support them,

Stephanie Leutert - 1/28/2020    Confidential

1  but I did not review them for this expert testimony.

2      Q.    Anything else besides the metering guidance

3  and these other documents that you did not rely on?

4      A.    Yes.  I -- the deposition with ███████ as

5  well.  Also, I -- I'm sorry.  I did forget to

6  mention earlier.  The OIG reports -- the Office of

7  Inspector General, within CBP also makes reference

8  to metering and how it was standardized, I believe

9  both in the report that looks -- actually, I can

10 pull it up.  Right here.  It's both the -- the OIG

11 report that looks at Tecate --

12     Q.    Okay.

13     A.    -- and then the OIG report that looks at

14 initial observations regarding family separation

15 issues under zero tolerance policy.

16     Q.    Do you have a cite in the report?

17     A.    Yes.

18     Q.    Did you find it?

19     A.    Yes.

20     Q.    Could you direct us to it, please?

21     A.    Sure.  I'm sorry.  I just --

22     Q.    No, no.  That's perfectly all right.

23     A.    61, I believe it was.  No, I lied.  It's

24 60 -- I was lucky -- 55.

25     Q.    55.  Okay.  Okay.  And you're looking at

Stephanie Leutert - 1/28/2020    Confidential

1  Footnote 131.  Is that correct?

2      A.    I am.

3      Q.    Okay.  So the metering guidance, OIG

4  report, ██████ depositions -- ██████ deposition.

5  Sorry.

6      A.    Yes.  And the -- I mean, I think the key

7  management reports as well, which are specifically

8  looking at data regarding metering.

9      Q.    Okay.  What -- what informs your opinion

10 that there was a practice of metering?

11     A.    The -- there would -- first the testimonies

12 of individuals who returned back.  The documents

13 that I reviewed, even in many of the e-mails, they

14 reference turn-backs.  ██████ testimony.  I

15 believe in the Tecate OIG report they also reference

16 turn-backs in 2016, 2017.

17     Q.    Okay.

18     A.    It was pretty ubiquitous that people were

19 talking about the kind of earliest forms of metering

20 in San Ysidro, Nogales, and Mexicali, perhaps among

21 other ports, perhaps Tecate.  In the -- in 2016 in

22 that -- this was a pretty common theme in a lot of

23 the documents that I reviewed.

24     Q.    So you -- you mentioned testimonies of

25 individuals who were subject to metering.  Correct?

Stephanie Leutert - 1/28/2020     Confidential

1     A.    Yes.

2     Q.    Were those individuals listed in Exhibit C

3  of your report?

4              MR. FENN:  Object to form.

5              THE WITNESS:  If it's located in the

6  footnotes on Pages 23 and 24.

7     Q.    (BY MR. SAMPAT)  And can you just state for

8  the record what footnotes you're looking at?

9     A.    Absolutely.  There are also in Exhibit C

10  within some of these -- some of the documents that

11  were produced in discovery also do mention that some

12  of these testimonies, the ones that were reviewed, I

13  believe, for further review by the Office of the

14  Inspector General, I believe that was the office --

15  so there were accounts within the documents I

16  reviewed where they were speaking about some of the

17  cases that had been identified in Footnote 46 --

18     Q.    Okay.

19     A.    -- 47 and 48 -- 47 and 48 are IBID.

20              THE REPORTER:  47 and 48 are?

21              THE WITNESS:  IBID.  They are

22  repetitions.  But, again, these are -- these

23  testimonies are also in some of the documents that I

24  reviewed because some of the documents were internal

25  CBP discussions about some of these cases.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.   (BY MR. SAMPAT)   How many individual
2    metering -- strike that.
3            How many individual instances of
4    metering did you review before you came to the
5    conclusion that there was a practice of metering?
6            MR. FENN:   Objection; form, asked and
7    answered.
8            THE WITNESS:   Are you speaking to a
9    specific time frame of metering cases within a
10   specific time frame?
11   Q.   (BY MR. SAMPAT)   So your opinion is
12   about -- or you opine on that CBP has a metering
13   policy and practice.   Right?
14   A.   Yes.
15   Q.   When -- what is your opinion regarding when
16   that practice of metering went into place?
17           MR. FENN:   Object to form; calls for a
18   legal conclusion.
19           THE WITNESS:   When it goes into place,
20   the -- I write on Page 17, Paragraph 38 on May 26,
21   2016, CBP implemented the first iteration of its
22   metering system in the San Ysidro port of entry in
23   San Diego.
24   Q.   (BY MR. SAMPAT)   So starting on May 26 in
25   2016 to present day, how many individual situations

Stephanie Leutert - 1/28/2020     Confidential

1  or circumstances of metering did you see -- did you

2  review in order to reach your opinion that you opine

3  on saying that there is a practice of metering?

4          MR. FENN:  Object to form.

5          THE WITNESS:  I -- I -- this is a

6  slightly complicated question.  I'm not sure I fully

7  understand exactly what is being asked that I

8  reviewed.  I've worked on metering research and

9  produced five reports of which -- which were used in

10  the creation of this report.  And in creating those

11  five reports I met with hundreds of people who have

12  claimed to have been metered.

13          I also reviewed the cases that were

14  published online.  I follow this issue quite

15  closely.  And I have reviewed the -- reviewed the

16  published testimonies of individuals who were

17  metered or claimed to be turned back were metered in

18  2016, 2017, and have also reviewed CBP's documents

19  talking about these cases.

20  Q.    (BY MR. SAMPAT)  And just to make sure I

21  heard you clearly earlier, the only explanation you

22  considered in reaching your opinion that there was

23  turn-backs -- or sorry -- that there was metering at

24  the POEs is that they were at capacity?

25          MR. FENN:  Object to form;

Stephanie Leutert - 1/28/2020     Confidential

1    mischaracterizes the witness's testimony.

2              THE WITNESS:  Can you repeat that

3    question, please.

4        Q.   (BY MR. SAMPAT)  Sure.

5              The only explanation that you

6    considered in forming your opinion that there was a

7    practice of metering was that the POEs were at

8    capacity?

9              MR. FENN:  Same objection.

10             THE WITNESS:  The only explanation

11   that I considered for metering was that the ports

12   were at capacity?

13       Q.   (BY MR. SAMPAT)  Yes.

14       A.   I don't think I -- I don't think I said

15   that.

16       Q.   Okay.  So -- and please correct me if I'm

17   wrong.  You testified earlier saying that there was

18   a standard explanation as to why individuals were

19   being metered.  Correct?

20             MR. FENN:  Objection; form.

21             THE WITNESS:  I understand what you're

22   referring to now.

23       Q.   (BY MR. SAMPAT)  Yeah.  Yeah.

24       A.   This -- which is along the lines of the

25   press release that was provided to us by CBP in late

Stephanie Leutert - 1/28/2020    Confidential

1  2018.  You don't happen to actually have a copy of

2  my December report, do you?

3       Q.    I do not.

4       A.    I believe I -- I write the -- I think we

5  put in, perhaps, in full the -- what was provided to

6  us.  The explanation that we had heard repeatedly

7  was -- included capacity but was not exclusive to

8  that.  They talked about many things.  But I did not

9  go in with one set idea for why this was occurring.

10      Q.    My question is a little bit different.

11      A.    Okay.

12      Q.    Were there any other explanations that you

13  considered or didn't CBP provide any other

14  explanations as to why they were metering

15  individuals?

16                 MR. FENN:  Object to form.

17                 THE WITNESS:  While I was -- at what

18  point?

19      Q.    (BY MR. SAMPAT)  At any point that -- that

20  eventually made it into the expert report that you

21  have submitted in this case.

22                 MR. FENN:  Objection; asked and

23  answered.

24                 THE WITNESS:  I believe the primary

25  reason -- I'm sorry -- the primary explanation that

Stephanie Leutert - 1/28/2020    Confidential

1  had been provided was regarding at capacity.  I'm

2  not -- it may not be the only there might be, but

3  that was the primary.

4      Q.    (BY MR. SAMPAT)  So was there any

5  consideration regarding the diversion and staffing

6  of resources for other -- for CBP purposes?

7                MR. FENN:  Objection; form.

8                THE REPORTER:  For other?

9                MR. SAMPAT:  CBP purposes.

10                MR. FENN:  Object to form.

11                THE WITNESS:  Can you repeat the

12  question?

13      Q.    (BY MR. SAMPAT)  Sure.

14      A.    If that was something I considered?

15      Q.    Yes.  So if -- did you consider CBP not

16  being able to process somebody for asylum because

17  there was a staffing issue for illegal narcotics

18  that had just come across the border?

19      A.    So I believe that was -- so I -- I believe

20  that is outside the scope of what I was specifically

21  asked to analyze in the report.

22      Q.    Okay.  Okay.  Just to be clear about your

23  report, you have not concluded that there is a

24  policy of using coercion to withdraw applications

25  for admission.  Is that correct?

Stephanie Leutert - 1/28/2020    Confidential

1          MR. FENN:  Object to form;

2  Mischaracterizes the witness's testimony.

3          THE WITNESS:  How do you define

4  "coercion"?

5      Q.   (BY MR. SAMPAT)  That CBP officers have --

6  have used questionable tactics or certain tactics to

7  have individuals withdraw their applications?

8      A.   I have seen -- I have seen testimonies of

9  individuals who make those allegations.  I have not

10 seen a written document that outlines that that

11 should be official CBP practice.

12     Q.   So --

13     A.   Or policy.

14     Q.   Right.  And so have you concluded there's

15 any practice of using coercion?

16          MR. FENN:  Same objection.

17          THE WITNESS:  There are allegations.

18 I have seen allegations of that.  It is not

19 something that I discuss in my report.

20     Q.   (BY MR. SAMPAT)  So you don't conclude that

21 in your report.  Correct?

22     A.   I don't discuss it in my report.  It seemed

23 outside the scope of exactly what I was supposed to

24 be discussing.

25     Q.   Okay.  You have not concluded that there

Stephanie Leutert - 1/28/2020    Confidential

1  was a policy of using threats or intimidation to

2  prevent people from entering.  Is that correct?

3          MR. FENN:  Object to form.

4  Mischaracterizes the witness's testimony.

5          THE WITNESS:  I'm sorry.  Can you

6  repeat that again?

7     Q.  (BY MR. SAMPAT)  Sure.

8          In your report, you don't conclude

9  that there's a policy or practice of using threats

10  or -- and intimidation to prevent people from

11  entering.  Is that correct?

12          MR. FENN:  Same objection.

13          THE WITNESS:  I am not stating one way

14  or the other.  It is not something that I cover in

15  my report.

16     Q.  (BY MR. SAMPAT)  So it's not written in

17  your report as an opinion you are proffering for

18  this case right now?

19     A.   It was outside the scope -- I believe it to

20  be outside the scope of the question I was asked to

21  answer.

22     Q.   Okay.  You have not concluded that there's

23  a policy of returning asylum seekers to Mexico after

24  they're on U.S. soil.  Correct?

25          MR. FENN:  Same objection.

Stephanie Leutert - 1/28/2020    Confidential

1    THE WITNESS:  I believe there was a

2  practice in 2016 and 2017, given the areas where

3  individuals were reporting that they made contact

4  with CBP officials and given that CBP officials were

5  not stationed yet at the limit line.

6    Can you repeat -- I'm sorry -- the

7  question?

8    Q.   (BY MR. SAMPAT)  Sure.

9    The -- my question only pertains to a

10 policy of it, right, so that you have not concluded

11 there was a policy of returning asylum seekers to

12 Mexico after they were on U.S. soil?

13    MR. FENN:  Object to the form.

14    THE WITNESS:  I have not seen written

15 guidance that would be requiring individuals who

16 were on U.S. soil to be returned.  I have not seen

17 that.  There were cases before that policy -- that

18 policy was issued in April 2018 between early 2016

19 and April of 2018 when that guidance had not yet

20 been issued.

21    Q.   (BY MR. SAMPAT)  Are you talking about the

22 metering guidance?

23    A.   Yes.

24    Q.   From April of 2018, Todd Owen's metering

25 guidance?

Stephanie Leutert - 1/28/2020    Confidential

1    A.    Yes.

2    Q.    Okay.

3    A.    The -- before that, there does appear to be

4  a practice that asylum seekers would routinely,

5  perhaps in all cases, enter U.S. territory

6  between -- before being turned back.

7    Q.    What evidence did you consider in reaching

8  that -- actually, strike that.

9             Is that an opinion you actually offer

10 in your report?

11            MR. FENN:  Object to form.

12            THE WITNESS:  Yes.  Page 22,

13 Paragraph 44, during these initial turn-backs.  And

14 I'm referring to that of between May 2016 and April

15 2018.

16   Q.    (BY MR. SAMPAT)  Okay.

17   A.    Asylum seekers arriving at U.S. ports of

18 entry would generally cross into U.S. territory

19 before CBP officials told them that they had to

20 return to Mexico.

21   Q.    So that states -- and -- individual

22 instances of individuals being turned back.

23 Correct?

24            MR. FENN:  Objection; calls for a

25 legal conclusion.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    (BY MR. SAMPAT)    Strike that.

2             That sentence refers to individual

3    cases of asylum seekers being told to return to

4    Mexico after they had crossed on U.S. soil.

5    Correct?

6             MR. FENN:    Objection; calls for a

7    legal conclusion.

8             THE WITNESS:    Given that CBP officials

9    were not yet given guidance to stand at the limit

10   line, it appears that -- and to stop people from

11   entering into U.S. territory, it would appear that

12   individuals who were seeking asylum -- all

13   individuals who were seeking asylum during that time

14   period would have entered into U.S. port of entry if

15   they were turned back -- I'm sorry -- U.S. territory

16   if they were turned back.

17   Q.    (BY MR. SAMPAT)    So I'd like to focus on

18   Pages 9 through 13 of your report.    Is there

19   anywhere in that section where you talked about --

20   where you talk about you have reached the following

21   conclusions.    Is there anywhere in that section that

22   you talk about a practice of returning asylum

23   seekers to Mexico after they had already returned

24   on -- after they were already on U.S. soil?

25             MR. FENN:    Object to form.

Stephanie Leutert - 1/28/2020    Confidential

1      THE WITNESS:  Do you mind if I review?

2    Q.   (BY MR. SAMPAT)  No.  Please.

3    A.   So CBP's turning back of individuals --

4  actually, can you repeat your question so I can try

5  to answer better?

6    Q.   Sure.

7      Is there any part under Paragraph 23

8  in which you offer the opinion that there was a

9  practice of returning asylum seekers to Mexico after

10  they had already come on to U.S. soil?

11      MR. FENN:  Object to form.

12      THE WITNESS:  I do not write those

13  words in Paragraph 23 from Pages 9 through 13 -- or,

14  I'm sorry -- 12 -- the end of Page 12.

15    Q.   (BY MR. SAMPAT)  Okay.  And what was the

16  page number again that -- where you discussed

17  those --

18    A.   22.

19    Q.   Page 22.  Okay.

20      What evidence did you cite to in your

21  report to support the statement that there was a --

22  that individuals were being turned back after they

23  entered on U.S. soil?

24    A.   Well, on Table 1 on Page 23, I looked at a

25  few examples in different cities of first publicly

Stephanie Leutert - 1/28/2020     Confidential

1  recorded turn-backs and then I noted down the
2  location of each turn-back, whether it was in a port
3  of entry entry hall or the U.S. side of the national
4  bridge, and this was gleaned from their testimonies.
5  I didn't just take these testimonies, though, on
6  face value.  I also, again, was using my
7  understanding that CBP officers were not uniformly
8  stationed at the limit line during this period, that
9  that had occurred after April 2018, which means
10 that -- that noncitizens that were seeking to access
11 the U.S. asylum system during this period would
12 likely have had to enter into U.S. territory to have
13 contact with a CBP officer.
14          I also quote on Page 23 that in
15 December 2016, large groups of Cubans arrived at the
16 Brownsville and Hildago points of entry.  And then I
17 noted that photos and video footage show the Cubans
18 entering and lining up in U.S. territory on the
19 Hidalgo international bridge.  So there was some
20 photos and videos of Cubans who were in U.S.
21 territory at that time.
22     Q.    Okay.  You have not concluded that there is
23 a policy or was a policy about the availability of
24 asylum in the United States.  Correct?
25          MR. FENN:  Objection to form;

Stephanie Leutert - 1/28/2020    Confidential

1   misstates the witness's testimony.

2       Q.    (BY MR. SAMPAT)    Sorry.    Strike that.    Let

3   me rephrase the question.

4              You have not concluded that there was

5   a policy of lying about the availability of asylum

6   in the United States.    Correct?

7       A.    I did not attempt to answer that question.

8       Q.    So is it fair to say you didn't attempt to

9   answer the question of whether there was a practice

10  of it?

11             MR. FENN:    Object to form.

12             THE WITNESS:    That -- my -- I was

13  focusing on the question that plaintiffs' counsel

14  asked me to answer.

15      Q.    (BY MR. SAMPAT)    Which did not include as

16  to whether or not there was a practice of

17  individuals lying about the availability of asylum

18  in the United States?

19      A.    That was outside the scope of the question

20  I was asked to address.

21      Q.    Okay.    You have not concluded that there is

22  or was a policy of using physical force to block

23  access to ports of entry.    Correct?

24             MR. FENN:    Objection; form.

25             THE WITNESS:    That was outside the

Stephanie Leutert - 1/28/2020    Confidential

1  scope of the question I was asked to address.

2     Q.   (BY MR. SAMPAT)   How about a practice of

3  using physical force to block access to ports of

4  entry?

5     A.   That was outside the question that I was

6  asked to address.

7     Q.   One second.

8     A.   Okay.

9     Q.   So then the answer is no.  Correct?

10    A.   I'm not stating that.  I'm just stating

11 that I offer no opinion on that.

12    Q.   Okay.  And -- but in that -- there is no

13 opinion in this report reflecting that.  Correct?

14    A.   It was not the question that I set out to

15 answer.

16    Q.   And there was -- there's no opinion in your

17 report regarding individuals lying about the

18 availability of asylum in the United States.

19 Correct?

20            MR. FENN:  Objection; asked and

21 answered.

22            THE WITNESS:  I mention cases where --

23    Q.   (BY MR. SAMPAT)   Sorry.  Let me rephrase.

24            There's nothing in your report

25 regarding a policy or practice of individuals lying

Stephanie Leutert - 1/28/2020    Confidential

1   about availability of asylum in the United States?

2       A.    I did not seek to answer that question.

3       Q.    Okay.  Okay.

4               MR. SAMPAT:  It's 12:30.  Are you guys

5   thinking lunch?

6               MR. FENN:  Is this off the record?

7               MR. SAMPAT:  Can we go off the record?

8   Sorry.

9               (Off the record)

10      Q.    (BY MR. SAMPAT)  Ms. Leutert, do you

11  understand you're still under oath?

12      A.    Yes.

13      Q.    I'd like to move on to talk about the

14  methodology you used in preparing your expert report

15  that you submitted in Al Otro Lada versus Wolf.  You

16  mentioned that Exhibit C of your report reflects the

17  documents that you relied on to prepare this report

18  at this time.  Is that correct?

19      A.    Yes.

20      Q.    And there's a bunch of documents that

21  you've referred to in Bates stamp as provided by

22  defendants during the course of discovery.  Is that

23  correct?

24      A.    Yes.

25      Q.    And is it fair to say many of them were the

Stephanie Leutert - 1/28/2020    Confidential

1   MCAT reports and queue management reports that we've

2   been discussing throughout the course of the

3   deposition?

4           MR. FENN:  Object to form.

5           THE WITNESS:  Which reports?  Can you

6   just restate --

7   Q.   (BY MR. SAMPAT)  The MCAT and the queue

8   management reports.

9   A.   Yes.

10  Q.   So what did the MCAT reports show?

11          MR. FENN:  Object to form.

12          THE WITNESS:  What did they include in

13  each one?

14  Q.   (BY MR. SAMPAT)  What were the -- what were

15  the different data points that they provided?

16          MR. FENN:  Object to form.

17          THE WITNESS:  They would have

18  provided -- they would have provided the number of

19  individuals who were detained at each port of entry.

20  They would have provided a detention capacity for

21  each port of entry and the percent capacity filled

22  at each port of entry among other data points.

23  Those were not the only data points that were

24  included in those reports.

25  Q.   (BY MR. SAMPAT)  Do you recall what other

Stephanie Leutert - 1/28/2020   Confidential

1  data points were included?

2      A.   There was a lot of points on the ports of

3  entry for border patrol.  They had ERO numbers.

4  They were ready for removal on some of them.  I

5  believe in later ones they had time in custody.

6  There was a different range of data points that they

7  included.

8      Q.   Okay.  When you mentioned that the three --

9  the first three points you discussed --

10     A.   Uh-huh.

11     Q.   -- which is detention, detention capacity,

12 and percent capacity.

13     A.   Yes.

14     Q.   Those were numbers that provided -- that

15 were provided by CBP.  Correct?

16     A.   They are numbers that were in the MCAT

17 reports that are created and -- created by CBP and

18 were provided by CBP.

19     Q.   So it would be the detention capacity that

20 CBP has at a given port of entry at that time.

21     A.   It would be the number of individuals they

22 have detained, the detention capacity, and the

23 percent detention capacity was filled at any given

24 point, yes.

25     Q.   Okay.  And what did the queue management

Stephanie Leutert - 1/28/2020     Confidential

1   report show?

2                    MR. FENN:  Object to form.

3                    THE WITNESS:  The queue management

4   reports -- again, this is from my memory.

5        Q.   (BY MR. SAMPAT)  Uh-huh.

6        A.   Would have had the numbers of individuals

7   detained.  They would have had -- so similar to the

8   MCAT.  They did not include the -- no.  They did not

9   include the capacity -- the detention capacity for

10  each port.  But they did include the percent

11  capacity full or filled.  So it was -- it was

12  possible to, at times, deduce the detention

13  capacity, given that you had the number of

14  individuals detained and the number of -- and the

15  percent capacity that was filled at each port of

16  entry.

17                   There also was the number of

18  individuals who were waiting at the limit line, and

19  there was a box that asked about effects on port

20  operations.  There may have been other variables

21  that were mentioned that I didn't name, and it's

22  just from my memory.

23       Q.   Okay.  Okay.  So when you talked -- when

24  you're discussing the fact that it was easy to

25  deduce what the capacity may have been at a specific

Stephanie Leutert - 1/28/2020     Confidential

1  port --

2               MR. FENN:  I'm sorry.  Go ahead.

3        Q.   (BY MR. SAMPAT)  You -- is it fair to say

4   that if a port of entry had 80 individuals in

5   detention and documented it as 80 percent full, then

6   you could deduce that there was a hundred -- the

7   capacity to hold a hundred detainees?

8               MR. FENN:  Object to form;

9   mischaracterizes the witness's testimony.

10               THE WITNESS:  Queue management data

11   did not include detention capacity for ports of

12   entry.  MCAT data did.

13        Q.   (BY MR. SAMPAT)  Okay.

14        A.   I generally used MCAT data since it was

15   dated.  I would -- I did, however, compare it to

16   queue management data to see if they were roughly

17   the same, and they were.  That's when I tried to

18   make that deduction.  So I was still able to figure

19   out -- and, yes, using the method that you

20   described, but that's generally not what I used.  I

21   used MCAT as stated capacity because it was

22   explicitly stated in the MCAT reports.

23        Q.   So when you say you generally relied on the

24   MCAT reports, can you give a percentage as to how

25   much you relied on them in preparing your report?

Stephanie Leutert - 1/28/2020    Confidential

1          MR. FENN:  Object to form.  I

2    didn't -- I did not generally rely on the MCAT

3    reports.  I generally relied on them for that

4    specific variable of percent capacity filled at each

5    port of entry.

6          Q.   (BY MR. SAMPAT)  Okay.  So in that case,

7    how -- can you give a percentage as to how much you

8    relied on the MCAT reports to prepare your expert

9    report in this case?

10          MR. FENN:  Object to form.

11          THE WITNESS:  Quite heavily, because

12    they had -- I reviewed 547 MCAT reports -- unique

13    MCAT reports.  This is Page 63 in the exhibits,

14    Table 7.

15          Q.   (BY MR. SAMPAT)  Page 63, you said?

16          A.   Yes.

17          Q.   Okay.

18          A.   I reviewed 547 MCAT daily reports and 314

19    queue management reports.  The MCAT reports had a

20    longer date range, so that's the times where I used

21    it.  It began in -- on November 30th, 2016 --

22          Q.   Uh-huh.

23          A.   -- and went through June -- I'm sorry --

24    July 13th, 2019.  So for certain questions, I looked

25    at the MCAT daily reports, given the date range, and

Stephanie Leutert - 1/28/2020    Confidential

1  for others, I used the field queue -- or the queue

2  management reports because they had more -- it was

3  318 reports, but they were in a shorter time period,

4  and it had unique information that was not included

5  in MCAT such as the number of individuals waiting at

6  the limit line.  So I used both.  I don't know which

7  percent, but throughout the report I used both.

8      Q.   So fair to say you relied on the MCAT

9  reports more than the queue management reports?

10     A.   No.  I relied on both of them in different

11 ways throughout the report.  I -- I couldn't tell

12 you a percent that I -- I used.  I would say it's

13 about equal.  I used both reports --

14     Q.   Equal?

15     A.   -- in different ways throughout, but I

16 don't know what percent I would have assigned to

17 each, but I used them both throughout quite a bit.

18     Q.   And your testimony is that you relied on --

19 relied on both reports -- sorry.  Strike that.

20          You relied on the MCAT reports quite

21 heavily.  Correct?

22     A.   On the MCAT and the queue management quite

23 heavily, both.

24     Q.   Okay.  I just want to talk about something

25 you mentioned regarding the queue management

Stephanie Leutert - 1/28/2020    Confidential

1  reports.  You said they also reflected the variables

2  affecting port operations.  Is that correct?

3      A.    There was a variable.  I don't know if you

4  have a copy I could point to, but there was a

5  variable.  It's the last one on the right, and it

6  would say something about effect on port operations,

7  and there would be written in an answer for the

8  different ports of entry.

9      Q.    Do you recall any answers that were

10 written?

11     A.    Yes.  Most of the time it would say no

12 effect to port operations except in Eagle Pass where

13 there was almost constantly something written about

14 an effect to operations.

15     Q.    When talking about the MCAT daily reports,

16 do you know if the reports reflected physical

17 capacity or operational capacity?

18             MR. FENN:  Object to form.

19             THE WITNESS:  They were referring to

20 physical capacity.

21     Q.    (BY MR. SAMPAT)  Do you know what

22 operational capacity is?

23     A.    I do.

24     Q.    What is your understanding of what

25 operational capacity is?

Stephanie Leutert - 1/28/2020    Confidential

1    A.    Physical -- well, I'm going to state it

2    in -- to differentiate it from physical capacity.

3    Q.    Sure.

4    A.    Physical capacity being the number of

5    individuals who could be inside of a physical space,

6    perhaps the physical limit of that space, and

7    operational capacity being the other factors that

8    might influence the number of individuals within

9    that port of entry or who could be processed within

10   that port of entry since its operational.

11   Q.    And do you know what other factors that may

12   be?

13   A.    Other factors for what?

14   Q.    When determining operational capacity.

15         MR. FENN:  Object to the form.

16         THE WITNESS:  Can you restate the

17   question?

18   Q.    (BY MR. SAMPAT)  So you said the

19   difference -- physical capacity is how much a

20   port -- how many individuals a port of entry can

21   hold physically.  Is that correct?

22   A.    Correct.

23   Q.    And operational capacity is a port of

24   entry's ability to process and detain asylum

25   seekers, depending on various other factors.  Is

Stephanie Leutert - 1/28/2020    Confidential

1  that correct?

2      A.    Correct.

3      Q.    So do you know what other factors go into

4  determining what a port of entry's operational

5  capacity is?

6      A.    I can list some.  Is that what you're

7  asking?

8      Q.    Yeah, that would be great.

9      A.    Well, there are factors that can

10 increase -- I'm sorry -- decrease or increase

11 operational capacity.  For decrease, some of the

12 factors that I know have been listed have been the

13 demographics at times of the individuals -- well, I

14 can just read what I wrote.  Why reinvent?

15     Q.    Sure.  And if you could direct us to the

16 page number you're referring, that could be great,

17 too.

18     A.    Let's see.  Okay.  I wrote, "Certain groups

19 of asylum seekers or individuals may need to be held

20 in distinct areas," which would limit capacity.  I

21 also pointed to changes in port infrastructure,

22 which could decrease capacity.  I also mentioned,

23 however, that there are possibilities to increase

24 capacity, that there could be different allocations

25 of personnel, of resources, and also changes to port

Stephanie Leutert - 1/28/2020    Confidential

1  infrastructure could increase capacity.

2      Q.    And you're looking at Page 30?

3      A.    Oh, I'm so sorry.  Yeah.  39, yeah.

4      Q.    Okay.  And this is Paragraph 61?

5      A.    It is Paragraph 61.

6      Q.    Are you aware of any other factors that

7  can -- that affect operational capacity?

8              MR. FENN:  Object to the form.

9              THE WITNESS:  There's a wide range of

10 factors that could happen at a port of entry that

11 could affect capacity.  You can come up with lots of

12 hypothetical situations that could decrease

13 capacity.  They are also listed in some of the

14 port -- I'm sorry -- not the port -- the contingency

15 planning documents, different ways to increase

16 capacity.  So there's -- there's a lot of different

17 scenarios out there for affecting operational

18 capacity.

19     Q.    (BY MR. SAMPAT)  But the MCAT reports don't

20 reflect operational capacity.  Is that correct?

21     A.    They do not.

22     Q.    How about the queue management reports; do

23 they -- do they show physical capacity or

24 operational capacity?

25             MR. FENN:  Object to form.

Stephanie Leutert - 1/28/2020    Confidential

1    THE WITNESS:  They do not show -- they
2  do not have a variable that is stated capacity
3  percentages -- I'm sorry -- stated capacity numbers.
4  They do have the variable of capacity filled, which
5  I have interpreted, and I believe, given its
6  similarity to MCAT numbers as being at physical
7  capacity.
8    Q.    (BY MR. SAMPAT)  And in regards to the
9  contingency plan at various ports --
10    A.    Uh-huh.
11    Q.    -- when they talk about increasing or
12  decreasing capacity, do they discuss actual or
13  operational capacity?
14    MR. FENN:  Object to form.
15    THE WITNESS:  On Page 47 in my report,
16  I discuss some of this or one example of the reports
17  that I'm referring to.
18    Q.    (BY MR. SAMPAT)  Okay.
19    A.    Paragraph 71.
20    Q.    Okay.
21    A.    The integrated concept of operations
22  report, which I write was created for the southern
23  California region to lay out a plan for addressing
24  an arriving refugee caravan.
25    Q.    Uh-huh.

Stephanie Leutert - 1/28/2020   Confidential

1    A.   I note some of the steps that it outlines

2   for increasing capacity, which are to transfer

3   individuals from CBP custody --

4              THE REPORTER:  I'm sorry?  Which

5   custody?

6              THE WITNESS:  CBP.

7              THE REPORTER:  Thank you.

8              THE WITNESS:  And I interpret that as

9   being created to allow processing capacities to

10  accelerate and match higher than normal migration

11  numbers.  Oh, I'm sorry.  And then later on in 72, I

12  talk a little bit more about the stages of what that

13  looks like.  I interpreted this as being --

14  increasing operational capacity, not physical

15  capacity.

16    Q.   (BY MR. SAMPAT)  So in these -- in these

17  reports, were there -- were there indicators as to

18  when operational capacity would need to be increased

19  or decreased?

20             MR. FENN:  Object to form.

21             THE WITNESS:  Within which reports?

22    Q.   (BY MR. SAMPAT)  The contingency plan

23  reports or the DHS integrated concept of operations

24  report you refer to in your expert report.

25    A.   And the question is if it contained what

Stephanie Leutert - 1/28/2020    Confidential

1  exactly?  Sorry.

2      Q.  Did it contain any indication as to when a

3  port of entry should increase or decrease

4  operational capacity?

5                MR. FENN:  Object to form.

6                THE WITNESS:  I believe if it wasn't

7  this one and others, there were triggers, but I

8  would have to confirm by looking at the document

9  again.

10     Q.  (BY MR. SAMPAT)  Okay.  Do you believe it's

11  important to know the difference between physical

12  capacity and operational capacity?

13                MR. FENN:  Object to the form.

14                THE WITNESS:  Me personally knowing or

15  for what exactly?

16     Q.  (BY MR. SAMPAT)  In providing your opinion

17  in this case, do you think it's important to know

18  the difference between the two?

19                MR. FENN:  Object to form.

20                THE WITNESS:  The dictionary

21  difference?

22     Q.  (BY MR. SAMPAT)  Or how we've defined -- how

23  you've defined it in your testimony here today.

24     A.  Well, they are referring -- by nature

25  physical capacity and operational capacity are

Stephanie Leutert - 1/28/2020    Confidential

1  different concepts, so it's important to make that

2  distinction.

3      Q.    I'm sorry.  I missed the last part.

4      A.    Oh, sorry.  So I think it's important to

5  make that distinction.

6      Q.    Uh-huh.  Why is it important?

7              MR. FENN:  Object to the form.

8              THE WITNESS:  Because there are two

9  different concepts.  I think particularly in this

10 case, I know from reading the depositions, the

11 focus -- there's a lot of focus on operational

12 capacity.  In the MCAT, the only data that's

13 provided is detention capacity.  I think

14 understanding how people are talking about this is

15 important.  And I feel like I try to note throughout

16 some of the differences and to make that

17 distinction.

18     Q.    (BY MR. SAMPAT)  Were there reports that

19 you reviewed in preparing your expert report in this

20 case that reflected the operational capacity of a

21 port of entry at a given point in time?

22     A.    By reports do you mean the documents that

23 were provided in discovery?

24     Q.    Yes.

25     A.    I'm sorry.  But by operational capacity,

Stephanie Leutert - 1/28/2020    Confidential

1   you're referring to what specifically in those

2   documents?

3       Q.   Was -- were there any reports that you

4   reviewed in preparing your report that reflected

5   operational capacity?  So that said, this is how

6   many individuals we can process or take into custody

7   today, given other constraints.

8              MR. FENN:  Object to form.

9              THE WITNESS:  The majority of the

10  documents that I did review were the MCAT and queue

11  management, which I was under the -- I am under the

12  impression that those are the documents that CBP

13  uses in its own determinations, and those do not

14  reflect operational capacity.

15      Q.   (BY MR. SAMPAT)  Okay.  Is there

16  information that you came across during the course

17  of reviewing documents in preparing your report that

18  you disregarded?

19             MR. FENN:  Object to form.

20             THE WITNESS:  I did not disregard

21  anything.  I've read everything and put it into a

22  complete picture, given all of the documents that I

23  had available to me.

24      Q.   (BY MR. SAMPAT)  Are there data points or

25  are there reports that you reviewed that you

Stephanie Leutert - 1/28/2020    Confidential

1  considered to be less important?

2           MR. FENN:  Object to form.

3           THE WITNESS:  No.  I think everything

4  helped me understand what was happening at the

5  U.S.-Mexico border within ports of entry.

6      Q.   (BY MR. SAMPAT)  And that was by relying

7  quite heavily on the MCAT and the queue management

8  reports.  Correct?

9      A.   And -- sorry.  Because you said you -- can

10 you just repeat that?  I think also repeating what I

11 said.

12     Q.   Sure.

13     A.   Uh-huh.

14     Q.   In regards to my question --

15     A.   Uh-huh.

16     Q.   -- being that is there questions that

17 you -- are there data points or reports that you

18 consider to be unimportant.  You said no.  Is that

19 correct?

20     A.   There are data points that I used more than

21 others.  For example, within the MCAT, I did not use

22 the border patrol data.

23     Q.   Okay.

24     A.   Because it did not seem as relevant for

25 answering the specific question at hand.  However, I

Stephanie Leutert - 1/28/2020     Confidential

1  did review all of the documents to try to get a full

2  understanding.  I did not dismiss any documents out

3  of hand.

4      Q.   In terms of the weight of importance you

5  gave certain documents versus others?

6              MR. FENN:  Object to form.

7              THE WITNESS:  No.  I think I took them

8  all into consideration.  I tried to answer the

9  question that I was asked to answer.

10     Q.   (BY MR. SAMPAT)  And you answered that

11 question by relying quite heavily, as per your

12 testimony, on the MCAT and queue management reports.

13 Correct?

14     A.   There is no database on operational

15 capacity that I could have used.

16     Q.   Okay.  And to reach your -- the opinions

17 you provide in this case, you mentioned you used a

18 common method.  Is that correct?

19     A.   Is that a direct quote from my report?

20     Q.   I believe it is.

21     A.   What page is that?

22     Q.   So you discuss common method on Page 12

23 starting at -- starting in Paragraph H, this common

24 methodology.

25     A.   Yes.

Stephanie Leutert - 1/28/2020     Confidential

1    Q.   Can you -- can you describe what you mean

2    by this -- by common methodology?

3              MR. FENN:  Object to form.

4              THE WITNESS:  Yes, I can.  What I mean

5    by common methodology --

6    Q.   (BY MR. SAMPAT)  Yes.

7    A.   -- is that I could use a dataset that

8    through time and space -- so across multiple years

9    and across multiple ports of entry along the

10   U.S.-Mexico border, I could look at the same

11   information and to -- discern patterns or -- well,

12   pretty much patterns.  That's what I mean by common

13   methodology.

14   Q.   So in order -- to make sure I understand

15   your -- the methodology, you took MCAT and queue

16   management reports --

17   A.   Uh-huh.

18   Q.   -- that were provided to you for various

19   ports of entry.  Is that correct?

20   A.   Yes.

21   Q.   And you compiled that data together?

22   A.   Yes.

23   Q.   And then created a dataset that allows you

24   to make an opinion about CBP's patterns and

25   practices across the entire border?

Stephanie Leutert - 1/28/2020    Confidential

1           MR. FENN:  Object to form;
2  mischaracterizes the witness's testimony.
3           THE WITNESS:  I went through the MCAT
4  data.  I identified within the reports what I
5  thought would be relevant to addressing the question
6  that I was asked to address.  I had put it into an
7  Excel spreadsheet and then analyzed the outcome.
8  And what you see in the report is the presentation
9  of some of that outcome.
10     Q.   (BY MR. SAMPAT)  And in using this common
11  method, you primarily relied on the queue
12  management -- queue management reports, the MCAT
13  reports, and the contingency plans.  Correct?
14           MR. FENN:  Object to form,
15  mischaracterizes the witness's testimony.
16           THE WITNESS:  I -- in this common
17  methodology, I used the queue management data and
18  the MCAT reports.
19     Q.   (BY MR. SAMPAT)  You did not consider the
20  contingency plans?
21     A.   I considered the contingency plans in the
22  report itself.
23     Q.   Yes.
24     A.   But in the Excel spreadsheet, I did not.
25     Q.   Okay.  So -- so, then, the data that you

Stephanie Leutert - 1/28/2020     Confidential

1   were looking at reflected actual capacity?

2                   MR. FENN:  Object to form.

3       Q.   (BY MR. SAMPAT)  Correct?

4       A.   I was using the MCAT reports and queue

5   management reports.

6       Q.   Okay.  Who else uses the common methodology

7   report?

8       A.   CBP.

9       Q.   And what is that based on?

10      A.   Oh, what -- the common methodology report,

11  you mean --

12      Q.   Sorry.  Let me rephrase the question.

13                  Who else uses the common methodology

14  approach that you employed in providing your expert

15  opinion in this case?

16      A.   Well, in one of the documents that I

17  reviewed, CBP also used something similar in looking

18  at queue management across ports of entry.

19      Q.   Do you recall which document that was?

20      A.   Let me find it for you.

21      Q.   Sure.

22      A.   I cite it on Page 44.

23      Q.   Give me one moment.

24      A.   That's fine.

25      Q.   You said 44?

Stephanie Leutert - 1/28/2020    Confidential

1     A.    Yes.

2     Q.    Okay.

3     A.    The Bates number on the document I'm

4   referring to is at the bottom of Footnote 103.

5     Q.    So you're talking about a document Bates

6   stamped AOL-DEF-00210504?

7     A.    Yes.

8     Q.    Okay.  Were you asked to use this approach

9   by anyone?

10    A.    No.

11               MR. FENN:  Object to form.

12               THE WITNESS:  No.

13    Q.    (BY MR. SAMPAT)  Has this method been used

14  before other than by you or what you claim that CBP

15  did in -- in the referred-to document?

16               MR. FENN:  Object to form.

17               THE WITNESS:  I'm sure.

18    Q.    (BY MR. SAMPAT)  Are you aware of

19  circumstances in which it's been used?

20    A.    By method, do you mean collecting this

21  information and analyzing it?

22    Q.    Yes.  In the manner in which you did to

23  prepare this report.

24    A.    Specifically MCAT and queue management or

25  any document of this type?

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    MCAT and queue management.

2    A.    Oh, CBP may have done it internally like

3    they did in this document, but this isn't public

4    information, and so it could not have been analyzed

5    by anyone outside of CBP.

6    Q.    So, then, is it fair to say that the method

7    that you employed for this -- in order to prepare

8    this report has not been subject to peer review?

9              MR. FENN:  Object to form.

10             THE WITNESS:  I -- I'm not allowed to

11   use -- I wouldn't be allowed to use this data nor

12   would anyone else because it's classified, and so it

13   would be impossible to have it peer reviewed.

14   Q.    (BY MR. SAMPAT)  How about the method

15   itself of just compiling data in other forms?

16   A.    I'm sure that could pass a peer-review

17   standard.  It's pretty common practice.

18   Q.    Has anything regarding CBP's numbers at

19   ports of entry been published before?

20             MR. FENN:  Object to form.

21   Q.    (BY MR. SAMPAT)  I'm sorry.  Let me

22   rephrase the question.

23             Has CBP's detention numbers in this

24   form using MCAT and queue management reports been

25   published before --

Stephanie Leutert - 1/28/2020    Confidential

1          MR. FENN:  Object.

2     Q.   (BY MR. SAMPAT)  -- publically?

3     A.   To the best of my knowledge, no.

4     Q.   Are you aware of -- sorry.

5     A.   No.

6     Q.   Is there something you wanted to say?

7     A.   No.  I'm sorry.  I was going to make a

8  clarification, but I --

9     Q.   Please.  Go right ahead.

10     A.   But I think that my clarification was

11  wrong, so it's --

12     Q.   Okay.

13     A.   Thank you.

14     Q.   Is -- are you aware of what potential error

15  rate the methodology you used may pose for other

16  experts --

17          MR. FENN:  Object to form.

18     Q.   (BY MR. SAMPAT)  -- that use the same

19  method?

20     A.   I do note that -- so in Footnote 103 --

21     Q.   Okay.

22     A.   -- in the second sentence, I write,

23  "Similar to CBP, I also discovered multiple errors

24  in CBP's capacity percentages, which often stated a

25  hundred percent capacity despite reporting low

Stephanie Leutert - 1/28/2020    Confidential

1  numbers of individuals in custody."

2           So that is something that is written

3  in that document that the person in CBP who did

4  similar analysis found errors.  I found those same

5  errors.  There are potentially several errors within

6  that dataset.  I did not attempt to fix those

7  errors.  I kept the CBP data as it was written.

8      Q.   Do you know how many errors you found?  Do

9  you recall?

10     A.   I don't have an exact number.  In the

11  dataset that I provided along with my expert report

12  in the key management data, these sales that are

13  highlighted yellow are the errors.

14     Q.   Okay.  Have you -- have you ever been an

15  expert witness before?

16     A.   I have not.

17     Q.   Okay.  When it comes to the MCAT reports,

18  right, would you agree that it provides a snapshot

19  of what's going on at a port of entry?

20           MR. FENN:  Object to form.

21           THE WITNESS:  I actually believe in

22  one of the depositions -- one of -- either Todd Owen

23  or Randy Howe might have used that exact word or

24  agreed to it, but -- and so I would -- I would trust

25  their judgment since they would be the ones who

Stephanie Leutert - 1/28/2020    Confidential

1  would be using it in an operational capacity.

2       Q.   (BY MR. SAMPAT)   Okay.  Do you know whether

3  ports of entry had the flexibility to implement key

4  management as needed?

5            MR. FENN:  Object to form.

6            THE WITNESS:  What do you mean?  Sorry

7  to get -- what do you mean by "had the flexibility"?

8       Q.   (BY MR. SAMPAT)   So are you aware that

9  ports of entry were provided -- were allowed to

10  implement queue management as needed depending on

11  their operational constraints at a given time?

12       A.   What time frame are we talking about?

13       Q.   Let's talk about from -- starting at the

14  beginning in 2016 -- or sorry -- the metering

15  guidance came out in April 2018.  Correct?  So let's

16  talk from April 2018 to today.

17       A.   I believe -- do you have a copy of that

18  guidance?  And I could quote it back.

19       Q.   I actually do not.

20       A.   No?

21       Q.   No.

22       A.   Okay.  I think I quoted it.  I might not

23  have quoted that exact line.  I don't remember the

24  exact language.  I know that document is the one

25  that would have stated language to that -- on that

Stephanie Leutert - 1/28/2020    Confidential

1  issue, but I don't have it in front of me, and I
2  don't remember the exact language that was used.
3      Q.    That's okay.  Did that -- did that language
4  play a role in reaching your conclusion?
5              MR. FENN:  Object to the form.
6              THE WITNESS:  Which language exactly?
7      Q.   (BY MR. SAMPAT)  About the -- the -- about
8  ports of entry having flexibility to implement queue
9  management.
10     A.    I took everything in that memo into
11  consideration.  I used -- I based my information --
12  or I -- what I also took into consideration along
13  with that memo was my own fieldwork that showed that
14  it was being implemented uniformly in that time
15  period across all the ports of entry that I visited
16  and also CBP's own internal document that noted that
17  key management was in place by -- I think it was
18  June of 2018 in every port of entry except Calexico
19  West, which was noted that it was redirecting.
20     Q.    And are you aware of time periods when
21  queue management was not being implemented at a port
22  of entry?
23     A.    From April 2018 onward?
24     Q.    From -- let's start before that.  Let's go
25  from 2016 onward.

Stephanie Leutert - 1/28/2020    Confidential

1    A.    Queue management was not implemented

2  uniformly across the entire border until April 2018.

3    Q.    So then after April 2018, are you aware

4  of -- of a time when queue management was not being

5  implemented at an individual port of entry?

6    A.    By queue management, do we also mean the --

7  by queue management, can you explain actually all

8  the different activities that you're including in

9  that?

10    Q.    We were talking about metering.  We're

11  talking about individuals being told that we're at

12  capacity.

13    A.    And individuals stationed at the limit

14  line?

15    Q.    Yes.

16    A.    Then I don't -- I don't know of any cases

17  where individuals were removed from the limit line

18  during that period.

19    Q.    Are you aware where ports of entry were

20  processing the asylum seekers as they were coming to

21  the limit line?

22          MR. FENN:  Object to form.

23    Q.    (BY MR. SAMPAT)  Rather than redirecting

24  them?

25    A.    Do I personally know those cases?  No.

1    Q.    Okay.

2          MR. SAMPAT:  Can we take five minutes?

3          MR. FENN:  Sure.

4          (Off the record)

5          (Exhibit No. 3 marked)

6    Q.    (BY MR. SAMPAT)  Ms. Leutert, you've just

7    been handed a document that's been marked Exhibit 3,

8    and that is Bates stamped AOL-DEF-00273294.  Have

9    you seen this document before?

10   A.    I believe this is one of the documents.

11   Actually, let me just -- yeah -- yeah, I believe

12   this is one of the documents -- no -- that -- that I

13   read about in the -- in the depositions after I

14   submitted my expert report.

15   Q.    So is it fair to say that you did not rely

16   on this document when preparing your report because

17   it's not listed in Exhibit C?

18   A.    It was not available to me at the time, so,

19   no, I did not rely on it.

20   Q.    Can you turn to the third and last page in

21   the document?

22   A.    (Witness complies).

23   Q.    And -- and you'll see that the document

24   lists the order in which CBP prioritizes their

25   staffing and operations.  It's just a numerical list

Stephanie Leutert - 1/28/2020    Confidential

1  right there.  Can you please read them over and let

2  me know when you're done?

3      A.    Sure.  Okay.  I'm done.

4      Q.    So in the methodology you employed to

5  prepare your expert report in this case, did your

6  methodology consider how OFO makes staffing

7  decisions to protect against national security

8  threats?

9              MR. FENN:  Object to form.

10              THE WITNESS:  That was beyond the

11  scope of what I was asked to write about.

12      Q.    (BY MR. SAMPAT)  Did your methodology

13  consider what other resources and staffing may need

14  to be allocated to address national security

15  threats?

16              MR. FENN:  Object to form.

17              THE WITNESS:  That was also beyond the

18  scope of what I was asked to talk about.

19      Q.    (BY MR. SAMPAT)  Do you agree that the U.S.

20  government should expend resources to identify

21  national security threats?

22              MR. FENN:  Object to form.  Are you

23  asking about in her capacity as an expert or

24  personally?

25              MR. SAMPAT:  Yes.  As an expert.

Stephanie Leutert - 1/28/2020    Confidential

1          THE WITNESS:  Can you repeat the
2     question?
3          Q.    (BY MR. SAMPAT)  Do you agree that the U.S.
4     government should expend resources to identify
5     national security threats?
6          MR. FENN:  Same objection.
7          THE WITNESS:  Speaking as the expert
8     in -- speaking as in my personal capacity?
9          Q.    (BY MR. SAMPAT)  No.
10         A.    As an expert?
11         Q.    In the capacity in which you are providing
12     a report, an expert report in this case?
13         A.    Yes, they should expend resources to
14     identify national security threats.
15         Q.    Did your methodology consider how OFO makes
16     staffing decisions to run counter narcotics
17     operations?
18         MR. FENN:  Object to form.
19         THE WITNESS:  That was beyond the
20     scope of what I was asked to address.
21         Q.    (BY MR. SAMPAT)  Did your methodology
22     consider how resources and staffing may need to be
23     allocated to run counter narcotics operations?
24         MR. FENN:  Objection; form.
25         THE WITNESS:  That was beyond the

Stephanie Leutert - 1/28/2020    Confidential

1  scope of what I was asked to address.

2      Q.    (BY MR. SAMPAT)  Do you agree that the U.S.

3  government should expend resources to run narcotics

4  operations?

5              MR. FENN:  Object to the form.

6              THE WITNESS:  I -- yes.  I do believe

7  that expending some resources to those operations is

8  useful.

9      Q.    (BY MR. SAMPAT)  Did your methodology

10 consider how OFO makes staffing decisions to protect

11 economic security?

12             MR. FENN:  Object to form.

13             THE WITNESS:  That was beyond the

14 scope of what I was asked to address.

15     Q.    (BY MR. SAMPAT)  Did your methodology

16 consider what resources and staffing may need to be

17 allocated to protect economic security?

18     A.    That was beyond the scope of what I was

19 asked to address.

20     Q.    Did your methodology consider how OFO makes

21 staffing decisions to prioritize trade and travel

22 facilitation?

23             MR. FENN:  Objection; form.

24             THE WITNESS:  That was beyond the

25 scope of what I was asked to address.

Stephanie Leutert - 1/28/2020    Confidential

1    Q.    (BY MR. SAMPAT)  Did your methodology

2  consider what resources may be allocated -- sorry.

3  Strike that.

4          Did your methodology consider what

5  resources and staffing may need to be allocated to

6  facilitate travel and trade across the border?

7          MR. FENN:  Object to form.

8          THE WITNESS:  That was beyond the

9  scope of what I was asked to address.

10   Q.    (BY MR. SAMPAT)  Did your methodology

11 consider any staff fluctuation on a particular day

12 at a port of entry -- at a particular port of entry,

13 I should say?

14         MR. FENN:  Object to form.

15         THE WITNESS:  At a particular -- can

16 you repeat the question?

17   Q.    (BY MR. SAMPAT)  Sure.

18         Did your methodology consider any

19 staff fluctuation on a particular day at a

20 particular port of entry?

21         MR. FENN:  Same objection.

22         THE WITNESS:  My report looks at --

23 looks at some of the contingency plans that discuss

24 increasing personnel to process additional asylum

25 seekers, so it is mentioned -- looking at different

Stephanie Leutert - 1/28/2020    Confidential

1  staffing levels of ports of entry is mentioned in

2  the report.

3      Q.   (BY MR. SAMPAT)  Did any of the reports

4  reflect what the staffing was at a particular port

5  on a given day?

6              MR. FENN:  Object to form.

7              THE WITNESS:  That information is not

8  included in any of the databases I received.

9      Q.   (BY MR. SAMPAT)  Did your methodology

10  consider how demographics of asylum seekers might

11  affect operational capacity at a particular port of

12  entry?

13              MR. FENN:  Object to the form; asked

14  and answered.

15              THE WITNESS:  On Page 39, I do mention

16  that certain groups of asylum seekers or individuals

17  may need to be held in distinct areas limiting

18  capacity.  That's Page 6 -- or Page 39, Paragraph

19  61.

20      Q.   (BY MR. FENN)  I'm sorry.  Which -- which

21  line is that?

22      A.   It is Line -- it's begins on Line 6, and

23  certain groups of -- it's in the sentence (as read),

24  "Changes to support infrastructure" --

25      Q.   Okay.

Stephanie Leutert - 1/28/2020    Confidential

1    A.    It's the second half of that sentence.

2    Q.    Okay.  And the MCAT reports wouldn't

3 reflect that.  Correct?

4              MR. FENN:  Object to form.

5              THE WITNESS:  Wouldn't reflect what

6 specifically?

7    Q.  (BY MR. SAMPAT)  When asylum seekers and

8 other individuals may need to be held in distinct

9 areas.

10    A.    That is not a variable included in the MCAT

11 reports.

12    Q.    How about the queue management reports?

13    A.    It is not included in the queue management

14 reports.

15    Q.    Are you being paid for your services in

16 this case?

17    A.    I am not.

18    Q.    Did you waive your fee in this case?

19    A.    I did.

20    Q.    Why?

21    A.    Because I was under -- well, plaintiffs'

22 counsel let me know that this was a pro bono case.

23    Q.    If plaintiffs prevail in this action, will

24 you request compensation then?

25    A.    I honestly hadn't thought that far in

Stephanie Leutert - 1/28/2020    Confidential

1   advance.  I don't expect to.

2                  MR. SAMPAT:  Can you give us two

3   minutes?

4                  (Off the record)

5       Q.   (BY MR. SAMPAT)  Ms. Leutert, we're back on

6   the record.  You understood you're still under oath?

7       A.   Yes.

8       Q.   Thank you.  At this time, we actually have

9   no further questions, and we're going to pass --

10  we're going to pass you over to counsel.

11                 MR. SAMPAT:  If you have any?

12                 MR. FENN:  I'm sorry.  Can you give us

13  five more minutes?

14                 MR. SAMPAT:  Yeah, yeah.  Take your

15  time.

16                 (Off the record)

17                 MR. FENN:  We have no questions for

18  Ms. Leutert.

19                 MR. SAMPAT:  Okay.  We are actually

20  going to hold the deposition open at this time.

21  There is the matter of the notes and stuff that we

22  had subpoenaed from Ms. Leutert regarding her field

23  notes and things like that, and we were told we'd

24  be -- so we'll be in touch and clarify all that, and

25  then we'll go from there.

Stephanie Leutert - 1/28/2020    Confidential

1                 MR. FENN:  Okay.  Thank you.

2                 MR. SAMPAT:  All right.  Thank you

3    very much.

4                 (Deposition concluded at 3:05 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CHANGES AND CORRECTIONS

2    STEPHANIE LEUTERT - JANUARY 28, 2020 - VOLUME 1

3    [DISREGARD IF WAIVED]

4
     Reason Codes:  (1) to clarify the record; (2) to
5
     conform to the facts; (3) to correct a transcription
6
     error; (4) (please explain).
7
     PAGE/LINE            CHANGE              REASON CODE
8
     _____
9    ____
     _____
10
     _____
11
     _____
12
     _____
13
     _____
14
     _____
15
     _____
16
     _____
17
     _____
18
     _____
19
     _____
20
     _____
21
     _____
22
     _____
23
     _____
24
     _____
25

Stephanie Leutert - 1/28/2020    Confidential

1                        SIGNATURE

2

3       I, STEPHANIE LEUTERT, have read the foregoing

4  deposition and hereby affix my signature that same

5  is true and correct, except as noted above.

6

7    __            _____

8                              STEPHANIE LEUTERT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stephanie Leutert - 1/28/2020    Confidential

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3                   (SAN DIEGO)

4   AL OTRO LADO, INC.,        )
    ET AL.,                    )
5                              )
                               )
6        Plaintiffs,           )
                               )
7                              )
                               )
8                              )
    vs.                        )   NO. 3:17-CV-02366-BAS-KSC
9                              )
                               )
10                             )
                               )
11  CHAD F. WOLF, ACTING       )
    SECRETARY, U.S. DEPARTMENT )
12  OF HOMELAND SECURITY, IN   )
    HIS OFFICIAL CAPACITY,     )
13  ET AL.,                    )
                               )
14                             )
        Defendants.            )
15

16      * * * * * * * * * * * * * * * * * * * * * * *
17

18            REPORTER'S CERTIFICATION

19              *** CONFIDENTIAL ***
20
              ORAL DEPOSITION OF
21
              STEPHANIE LEUTERT
22
                 VOLUME 1
23
              JANUARY 28, 2020
24

25      * * * * * * * * * * * * * * * * * * * * * * *

Stephanie Leutert - 1/28/2020    Confidential

1    I, Jodi Cardenas, Certified Shorthand Reporter

2  in and for the State of Texas, hereby certify to the

3  following:

4    That the witness, STEPHANIE LEUTERT, was duly

5  sworn by the officer and that the transcript of the

6  oral deposition is a true record of the testimony

7  given by the witness;

8    I further certify that pursuant to the Federal

9  Rules of Civil Procedure, Rule 30(e)(1) (A) and (B)

10  as well as Rule 30(e)(2) that the signature of the

11  deponent:

12

13    _____ was requested by the deponent and/or a

14  party before the completion of the deposition and is

15  to be returned within 30 days from date of receipt

16  of the transcript.  If returned, the attached

17  Changes and Corrections and Signature Pages contains

18  any changes and the reasons therefor;

19

20    __X__ was not requested by the deponent or

   a party before the completion of the deposition.

21

22    That $_____ is the deposition officer's

23  charges for preparing the original deposition

24  transcript and any copies of exhibits charged to

25  DEFENDANTS;

Stephanie Leutert - 1/28/2020    Confidential

1       That pursuant to information given to the

2   deposition officer at the time said testimony was

3   taken, the following includes all parties of record:

4

5   FOR THE PLAINTIFFS:

6       Mr. Matthew E. Fenn
        MAYER BROWN, LLP
7       1221 Avenue of the Americas
        New York, New York 10020
8       (212) 506-2316
        mfenn@mayerbrown.com
9
        -and-
10
        Ms. Rebecca Cassler
11      SOUTHERN POVERTY LAW CENTER
        P.O. Box 1287
12      Decatur, Georgia 30031
        (414) 521-6700
13      rebecca.cassler@splcenter.org

14      -and-

15      Mr. Baher Azmy
        CENTER FOR CONSTITUTIONAL RIGHTS
16      666 Broadway, 7th Floor
        New York, New York 10012
17      (212) 614-6427
        bazmy@ccrjustice.org
18

19
    FOR THE DEFENDANTS:
20
        Mr. Dhruman Y. Sampat
21      Mr. Ari Nazarov
        U.S. DEPARTMENT OF JUSTICE - CIVIL DIVISION
22      Ben Franklin Station
        P.O. Box 868
23      Washington, DC 20044
        (202) 532-4281
24      dhruman.y.sampat@usdoj.gov
        ari.nazarov@usdoj.gov
25

Stephanie Leutert - 1/28/2020    Confidential

1    I further certify that I am neither counsel

2  for, related to, nor employed by any of the parties

3  or attorneys in the action in which this proceeding

4  was taken;

5    Further, I am not a relative nor an employee of

6  any attorney of record in this cause, nor am I

7  financially or otherwise interested in the outcome

8  of the action.

9    Certified to by me this 3RD day of FEBRUARY,

10 2020.

11

12

13  _____

14  JODI CARDENAS, RPR, Texas CSR 7594
    CSR Expiration: 12/31/21

15  WRIGHT WATSON & ASSOCIATES
    Firm Registration No. 225

16  Firm Expiration: 12-31-22
    1250 South Capital of Texas Highway

17  Building 3, Suite 400
    Austin, Texas 78746

18  512-474-4363/512-474-8802 (fax)
    www.wrightwatson.com

19

20

21

22

23

24

25