MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | ***REDACTED PUBLIC VERSION*** |
| Defendants. | Special Briefing Schedule Ordered (*See* Dkt. 518) |
| | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

---

[1]  Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.   THE UNDISPUTED FACTS ................................................ 4

    A.   Overview of Defendants' Unlawful Conduct ................. 4

    B.   Defendants Adopt the Turnback Policy ......................... 7

    C.   Defendants Implement the Turnback Policy Border-Wide ......................... 9

    D.   Defendants Knew that the Turnback Policy Violated the Law ................. 11

    E.   Defendants Memorialize Aspects of the Turnback Policy ..................... 12

    F.   Defendants Begin Using "Operational Capacity" As a Metric ................. 14

    G.   Defendants Harmed the Class and Al Otro Lado ..................................... 16

III.  LEGAL STANDARD ......................................................... 18

IV.   ARGUMENT ..................................................................... 18

    A.   The Turnback Policy Violates the APA and INA ................... 18

    B.   The Turnback Policy Violates the Due Process Clause ............................. 31

    C.   The Turnback Policy Violates the ATS ......................... 33

    D.   The Court Should Enter A Permanent Injunction ..................................... 36

    E.   The Court Should Enter A Declaratory Judgment ..................................... 38

V.    CONCLUSION ................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) .......................................................................... 22, 24

*Allstate Ins. Co. v. Farmers Ins. Exch.*,
  2008 WL 11508663 (S.D. Cal. 2008) ................................................................. 19

*Aracely, R. v. Nielsen*,
  319 F. Supp. 3d 110 (D.D.C. 2018) .................................................................... 30

*Bennett v. Spear*,
  520 U.S. 154 (1997) .................................................................................... 20, 21

*Bostock v. Clayton Cnty., Ga.*,
  140 S. Ct. 1731 (2020) ..................................................................................... 25

*California v. Trump*,
  963 F.3d 926 (9th Cir. 2020) ............................................................................ 39

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ......................................................................................... 19

*County of Sacramento v. Lewis*,
  523 U.S. 833 (1998) .................................................................................... 32, 33

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ..................................................................................... 26

*DHS v. Regents of the Univ. of Calif.*,
  140 S. Ct. 1891 (2020) ................................................................................. 27, 29

*E. Bay Sanctuary Covenant v. Trump*,
  349 F. Supp. 3d 838 (N.D. Cal. 2018) ................................................................ 37

*eBay Inc. v. MercExchange LLC*,
  547 U.S. 388 (2006) ......................................................................................... 37

*EBSC v. Barr*,
  964 F.3d 832 (9th Cir. 2020) ........................................................................ 26, 37

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

*EBSC v. Trump*,
    932 F.3d 742 (9th Cir. 2018) .................................................................... 24

*EBSC v. Trump*,
    950 F.3d 1242 (9th Cir. 2020) ............................................................ 31, 32

*GEICO v. Dizol*,
    133 F.3d 1220 (9th Cir. 1998) .................................................................. 39

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) ................................................................................. 33

*Graham v. FEMA*,
    149 F.3d 997 (9th Cir. 1998) .................................................................... 32

*Hansen v. United States*,
    7 F.3d 137 (9th Cir. 1993) ....................................................................... 19

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) .................................................................... 37

*I.N.S. v. Stevic*,
    467 U.S. 407 (1984) ................................................................................. 34

*Innovation Law Lab v. Wolf*,
    951 F.3d 1073 (9th Cir. 2020) .................................................................. 35

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ........................................................................... 25, 32

*LaDuke v. Nelson*,
    762 F.2d 1318 (9th Cir. 1985) ............................................................ 37, 38

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ..................................................................... 38

*Lujan v. Nat'l Wildlife Federation*,
    497 U.S. 871 (1990) ................................................................................. 21

*Lyng v. Payne*,
    476 U.S. 926 (1986) ................................................................................. 24

*Marincas v. Lewis*,
    92 F.3d 195 (3d Cir. 1996) ....................................................................... 33

*McGraw-Edison Co. v. Preformed Line Products Co.*,
    362 F.2d 339 (9th Cir. 1966) ................................................................... 4, 39

*Meachum v. Fano*,
    427 U.S. 215 (1976) ................................................................................. 32

*Munyua v. United States*,
    2005 WL 43960 (N.D. Cal. 2005) .............................................................. 4

*Navajo Nation v. Dep't of the Interior*,
    876 F.3d 1144 (9th Cir. 2017) .................................................................. 19

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................. 38

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ................................................................................... 22

*ONRC Action v. Bureau of Land Mgmt.*,
    150 F.3d 1132 (9th Cir. 1998) .................................................................. 20

*Orantes-Hernandez v. Thornburgh*,
    919 F.2d 549 (9th Cir. 1990) .................................................................... 36

*Perales v. Reno*,
    48 F.3d 1305 (2d Cir. 1995) ..................................................................... 32

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of
    Health & Human Servs.*,
    946 F.3d 1100 (9th Cir. 2020) ....................................................... 22, 23, 25

*Principal Life Ins. Co. v. Robinson*,
    394 F.3d 665 (9th Cir. 2005) .................................................................... 39

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ...................................................... 20, 31

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ................................................................................. 26

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ............................................................... 26, 30

*Siderman de Blake v. Rep. of Arg.*,
    965 F.2d 699 (9th Cir. 1992) ................................................................. 34

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ........................................................... 37, 38

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ............................................................................. 34

*Superintendent v. Hill*,
    472 U.S. 445 (1985) ............................................................................. 33

*Tripoli Rocketry Ass'n, Inc. v. ATF*,
    437 F.3d 75 (D.C. Cir. 2006) ...................................... 26, 27, 28, 29

*Util. Air Regulatory Grp. v. E.P.A.*,
    573 U.S. 302 (2014) ............................................................................. 24

*Wagafe v. Trump*,
    2017 WL 2671254 (W.D. Wash. 2017) ....................................... 20, 21

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ............................................................. 37

**OTHER CASES**

*Abdolkhani & Karimnia v. Turkey*,
    App. No. 30471/08 (Eur. Ct. H.R., Sep. 22, 2009) ............................ 34

*Hirsi Jamaa and Others v. Italy*,
    App. No. 27765/09 (Eur. Ct. H.R., Feb. 23, 2012) ................. 34, 35, 36

*Ilias v. Hungary*,
    App. No. 47287/15 (Eur. Ct. H.R. Mar. 14, 2017).............................. 34

*M.S.S. v. Belgium and Greece*,
    App. No. 30696/09 (Eur. Ct. H.R., Jan. 21, 2011).............................. 34

*T.I. v. United Kingdom*,
    App. No. 43844/98 (Eur. Ct. H.R., Mar. 7, 2000).............................. 36

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

# FEDERAL STATUTES

5 U.S.C.
    § 704 ........................................................................................... 19
    § 706(1) ...................................................................... 2, 22, 24, 25
    § 706(1), (2)(A), (C) ................................................................... 19
    § 706(2) ...................................................................... 2, 22, 24, 25
    § 706(2)(A), (C) ...................................................... 22, 24, 26

8 U.S.C.
    §§ 1158(a)(1) .............................................................................. 22
    § 1225 .................................................................... 22, 24, 31, 32
    § 1225(a)(3) ............................................................................ 4, 22
    § 1225(b)(1) ................................................................................. 4
    § 1225(b)(1)(a)(ii) ..................................................................... 22
    §§ 1225(b)(2) ............................................................................... 4
    § 1229(a)(1) ............................................................................... 28

28 U.S.C.
    § 1350 ........................................................................................ 34
    § 2201(a) .................................................................................... 39

# OTHER AUTHORITIES

8 C.F.R. § 235.3(b)(4) ................................................................ 22

Elyssa Pachico and Maureen Meyer, *One Year After U.S.-Mexico
    Migration Deal, a Widespread Humanitarian Disaster*, WOLA
    (Jun. 6, 2020) ......................................................................... 36

Fed. R. Civ. P. 23(b)(2) ............................................................. 37

Fed. R. Civ. P. 30(b)(6) ............................................................. 23

Fed. R. Civ. P. 56(c) .................................................................. 19

H.R. Conf. Rep. No. 104-828, at 209 (1996) ........................... 31

U.N. High Comm'r for Refugees, *Note on International Protection* ............. 34, 35

# I.    INTRODUCTION

Every day at ports of entry ("POEs") on the U.S.-Mexico border, U.S. Customs and Border Protection ("CBP") officers inspect thousands of people in vehicles in the order that those vehicles arrive at POEs. Until 2016, CBP officers also inspected thousands of pedestrians who traveled to POEs in the order that those pedestrians arrived at POEs. In May 2016, everything changed. Starting at the San Ysidro POE, CBP officers began turning asylum seekers—and only asylum seekers—back to Mexico, telling them that if they wanted to be inspected and processed—actions required by statute—they needed to return to the POE "later." Later that year, Defendants decided to expand this turnback policy to other POEs along the southern border, instead of doing what they have always done—finding solutions that enable them to inspect and process asylum seekers as they arrive at POEs.

Initially, Defendants did not put the turnback policy in writing, keeping it in a self-admitted gray area that CBP used to justify turning back asylum seekers by various means. Then, in the spring of 2018, CBP and the U.S. Department of Homeland Security ("DHS") issued memos memorializing aspects of the turnback policy—referred to as "metering" or "queue management." As Defendants drafted these memos, they explicitly contemplated turning back hundreds of asylum seekers at POEs each day pursuant to the memos, and disregarded obvious signs that a humanitarian disaster in Mexico would result. Then, they denied POEs permission to inspect and process asylum seekers more quickly.

The turnback policy is based on a lie. CBP told asylum seekers that POEs were "at capacity" when the POEs were actually well below capacity. Even in the rare cases where the capacity of a POE was close to 100% utilized, inspecting and processing asylum seekers had minimal or no impact on other POE operations. As a result, the "capacity excuse was a lie" that "was obvious to everybody" that

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

implemented it at POEs. Ex. 1 at 100:25-101:6.[2] Moreover, Defendants "lack[ed] candor to the public [by not] stating the true facts that [CBP is] . . . blocking asylum to persons and families in order to block the flow of asylum applicants." Ex. 2 at 132. Meanwhile, behind the scenes, CBP officials admitted that the turnback policy broke the law. Ex. 2 ("[CBP] [r]epresentatives acknowledged that [CBP's] unilateral work policies broke . . . Federal immigration rules and Laws"); Ex. 3 at 125:2-15.

The turnback policy violates the Immigration and Nationality Act ("INA"), the Administrative Procedure Act ("APA"), the Due Process Clause of the Fifth Amendment, and the Alien Tort Statute ("ATS") for several reasons. *First,* as this Court has already recognized, turnbacks amount to unlawful withholding of a discrete mandatory duty to inspect and process asylum seekers in violation of APA § 706(1). *Second*, turnbacks are at odds with the statutory scheme governing POEs in violation of APA § 706(2). *Third*, overwhelming and undisputed evidence shows that Defendants' stated justification for the turnback policy is a pretext, their real motivations are unlawful, and the policy is otherwise arbitrary and capricious in violation of the APA. *Fourth*, since the turnback policy violates the statutory procedure for inspecting and processing asylum seekers and otherwise represents an arbitrary deprivation of a statutory entitlement, the policy violates the Due Process Clause. *Fifth*, the turnback policy violates the ATS because it violates the specific, universal, and obligatory norm of *non-refoulement*.

Defendants claim that they turned back asylum seekers to maintain the "operational capacities" of POEs. *See* Dkt. 283 at ¶ 7. This argument fails for two reasons. *First*, turnbacks are unlawful regardless of Defendants' justification for them. *Second*, even if Defendants' justification were theoretically relevant, it is undisputed that Defendants never defined the term "operational capacity," do not track "operational capacity," cannot calculate the "operational capacity" of any POE,

---

[2] "Ex." refers to the exhibits to the concurrently filed Declaration of Stephen M. Medlock.

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

and cannot link the decision to turn back asylum seekers to particular changes in "operational capacity." Since Defendants cannot define, track or calculate "operational capacity"—or link it to the decision to turn back asylum seekers—it is not, in fact, a justification for their conduct.

Because Plaintiffs succeed on the merits, a permanent injunction is warranted. **First**, Plaintiffs have suffered irreparable injuries. Class members have been killed, raped, and seriously injured after Defendants turned them back to Mexico. In addition, class members' loss of the right to seek asylum constitutes a loss of statutory and constitutional rights that courts recognize as irreparable harm. Similarly, Al Otro Lado suffered irreparable harm when it was forced to radically change its operations in order to account for the turnback policy. **Second**, there is no adequate remedy at law. Neither a declaratory judgment nor monetary damages could adequately ensure access to the asylum process or prevent the harm that results from class members being turned back at the U.S. border and left stranded in dangerous border towns in Mexico. **Third**, the balance of hardships tips decisively in Plaintiffs' favor. Plaintiffs only ask that asylum seekers be treated the same as others who approach POEs, consistent with Defendants' longstanding practices. Any asserted administrative burden on Defendants cannot outweigh the risk of persecution, serious injury, and death that class members face when turned back. **Fourth**, there is a strong public interest in Executive Branch agencies following the plain language of the INA and complying with international law. There is no public interest in violating the law. Because there is no genuine factual dispute concerning the permanent injunction factors, Plaintiffs request that the Court enter a permanent injunction prohibiting all forms of turnbacks and requiring Defendants to inspect asylum seekers as they arrive at Class A POEs on the U.S.-Mexico border.

Furthermore, since the undisputed facts show that Defendants broke the law, this Court should enter a declaratory judgment that the turnback policy violates the INA, the APA, class members' procedural due process rights under the Fifth

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

Amendment, and the ATS. *See McGraw-Edison Co. v. Preformed Line Products Co.*, 362 F.2d 339, 342 (9th Cir. 1966) (declaratory relief is appropriate regardless of "whether . . . further relief is . . . sought").

## II.    THE UNDISPUTED FACTS

### A. Overview of Defendants' Unlawful Conduct

There is no cap on the number of asylum seekers who may arrive in the U.S. in a particular time period. Dkt. 260 at 4:24-5:2 ("there aren't limits on the number of people who can seek asylum."). When a person without entry documents is arriving at a POE and asserts a fear of return to her home country or an intention to seek asylum, CBP must inspect her, *see* 8 U.S.C. § 1225(a)(3), and process her—either refer the asylum seeker for an interview with an asylum officer, *see* 8 U.S.C. § 1225(b)(1), or place the asylum seeker into removal proceedings, which allows her to pursue asylum in immigration court, *see* 8 U.S.C. §§ 1225(b)(2), 1229a. CBP's statutory duty to inspect and process arriving asylum seekers is "not discretionary." *Munyua v. United States*, 2005 WL 43960, at *6 (N.D. Cal. 2005).

In 2016, Defendants departed from this congressionally-mandated process and implemented a policy to turn back asylum seekers who were in the process of arriving at POEs on the U.S.-Mexico border. *See* Ex. 1 at 46:12-21; Ex. 3 at 55:8-15. The policy was first implemented at the San Ysidro POE, the largest POE on the U.S.-Mexico border. By the end of 2016, it had spread to other major POEs. Shortly thereafter, it was implemented at every Class A POE on the U.S.-Mexico border.[3]

Initially, CBP management decided ███████████████████—a practice that CBP uses when ██████████████████████████ Ex. 5 at 366 (CBP kept turnbacks "████████████████████████████████ ████████"); Ex. 6 (head of CBP's Office of Field Operations ("OFO") stating that he was "████████████████" but "██████████████████████████

---

[3] A Class A POE is open to all travelers, including asylum seekers. Ex. 4 at 75:18-76:8.

1   ████████████"). This ████████████ meant that,

2   initially, CBP turned back asylum seekers from POEs using a variety of tactics. CBP

3   officers lied to some, Ex. 1 at 99:25-101:6; Ex. 3 at 145:3-7; coerced some to

4   withdraw their applications for admission, Ex. 7 at 611 (permitting the use of

5   "████████████████████████████

6   ████████████"); and used physical force to turn back others, Ex. 8 at

7   045-046. Although the methods varied, the common result was clear: turning back

8   asylum seekers to Mexico without processing them for asylum.[4]

9       Over time, Defendants formalized these practices into what is known as

10  "metering" or "queue management."[5] When a POE is metering, "a non-citizen

11  without proper travel documents [who] arrives at the border, . . . will be told that the

12  port is at capacity and they should return to be processed later." Ex. 4 at 171:7-13.

13  Despite the formal documentation, CBP has no plan in place for asylum seekers to

14  "return to be processed later." *Id.*  While metering, CBP often stations officers near

15  the physical border line between the U.S. and Mexico and attempts to physically

16  block those being metered from setting foot on U.S. soil. *Id.*[6] Initially, class members

17

---

18  [4] CBP's treatment of certain class representatives is illustrative of the disparate means CBP employed initially to turn back asylum seekers. *See, e.g.*, Dkt. 390-11 at

19  ¶¶ 15-19 (Plaintiff Abigail Doe was forced to sign a document withdrawing her asylum claim and returned from the U.S. to Mexico); Dkt. 390-12 at ¶¶ 9-21

20  (Beatrice Doe was told she "had no right" to be in the U.S., was forced to withdraw her application for admission, and was returned from the U.S. to Mexico); Dkt. 390-

21  13 at ¶¶ 18-26 (Carolina Doe was told she "would not receive asylum" and that she would be separated from her daughter and was then forced to withdraw her asylum

22  claim before she was returned from the U.S. to Mexico); Dkt. 390-14 at ¶¶ 8-19 (Dinora Doe was told "Central Americans did not understand that there was no

23  asylum for us" and was told that she would be separated from her daughter if she attempted to seek asylum in the U.S.); Dkt. 390-15 at ¶¶ 13, 17-18 (Ingrid Doe was

24  told that "asylum had ended" and that "there was a new law in the United States that meant no asylum" before she was turned back from the U.S. to Mexico).

25  [5] "Metering" and "queue management" are synonyms. Ex. 4 at 176:18-22; Ex. 9 at

26  102:21-103:2; Ex. 10 at 43:2-4.

27  [6] *See, e.g.*, Dkt. 390-103 at ¶¶ 5-8 (Plaintiff Juan Doe was turned back after requesting protection at the middle of a bridge leading to a POE by two American

28  officials who said that he "could not pass," "the port was closed," and that he had to "wait [his] turn"); Dkt. 390-104 at ¶¶ 5-6 (same for Ursula Doe).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1  remained in a line at the border, for days or even weeks, waiting to be processed.

2  *See, e.g.*, Ex. 10 at 152:16-153:8 (initially ███████████████); Ex. 11 at 298

3  ("███████████████████████████"). This resulted in a growing

4  humanitarian crisis in Mexico. *See, e.g.*, Ex. 12 at 742 (UNHCR reporting ███████

5  ████████████████████████████████). CBP

6  officers met with their Mexican counterparts to make arrangements to limit the flow

7  of asylum seekers to the U.S. border. *See* Ex. 13 at 607 ("████████████

8  ████████████████████████████████████

9  ██████████████████"); Ex. 14 at 123:21-124:20. Subsequently, a

10  new system arose in which asylum seekers placed their names on waitlists in Mexico

11  in order to be inspected at a POE, and when a particular POE decided to inspect

12  more asylum seekers, CBP would direct its Mexican counterparts to bring a certain

13  number of asylum seekers to the POE for processing.[7] *See, e.g.*, Ex. 15 at 966 ("█

14  ████████████████████████████████████

15  █████████████"); Ex. 16 at 140:1-16 ("If [Mexican immigration] brings

16  them over, we're going to take them in, if we've called [Mexican immigration] to

17  bring over some.").

18  Importantly, CBP concedes that asylum seekers approaching the U.S.-Mexico

19  border are "attempting to enter the United States at a [POE]" when they are turned

20  back. Ex. 17 at 201:22-202:3. CBP also admits that it has turned back asylum seekers

21  who were standing on U.S. soil. *See* Ex. 4 at 171:14-172:10; Ex. 3 at 101:21-102:10;

22  Ex. 1 at 96:11-97:18; Ex. 10 at 93:1-94:18; Ex. 18 (recording of turnback where an

23  asylum seeker was told to "go back to Mexico."); Ex. 19 at 2.

24  Defendants' justification for the turnback policy—a purported lack of

---

[7] *See, e.g.*, Dkt. 390-100 at ¶¶ 8-9, 14 (Plaintiff Bianca Doe put herself on a waitlist maintained by Mexican authorities who were restricting people from approaching the POE and was turned back by CBP officers who told her that the POE was "full"); Dkt 390-105 at ¶¶ 8-12 (a CBP officer told Plaintiff Emiliana Doe that "everywhere was full and they could not accept any more people" and she put her name on a waitlist).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

"operational capacity"—is a pretext. CBP kept daily records of POE capacities, which show that POEs generally operated well below 100% capacity. Moreover, POEs almost never reported that the number of asylum seekers at the POEs had █ ██████████████. *See* Ex. 20 at ¶¶ 22, 101-23; Ex. 21; Ex. 22; Ex. 23; Ex. 24; Ex. 25. In the few instances of high numbers of asylum seekers arriving at POEs, Defendants could have operated in line with their historical practice and inspect and process asylum seekers as they arrived, utilizing established contingency plans created specifically for that purpose. Instead, Defendants turned asylum seekers back to Mexico.

## B. Defendants Adopt the Turnback Policy

In early 2016, CBP undertook a construction project that cut the San Ysidro POE's detention capacity for asylum seekers from approximately ███ to ███ Ex. 26 at 002; Ex. 27 at 574-75 (noting that ██████████████████████████████ ███████████████████████████████████████████████████████ ████████████████).

That spring, the San Ysidro POE saw an increase in the number of asylum seekers seeking entry. Like all POEs, San Ysidro had well-worn plans for dealing with it. *See, e.g.*, Ex 28 (Southwest Border contingency plan); Ex. 29 (San Ysidro POE activated its overflow contingency plan on March 25, 2016); Ex. 30 (Laredo Field Office contingency plan); Ex. 31 (Eagle Pass contingency plan); Ex. 32 (Brownsville contingency plan). Indeed, despite the decrease in capacity due to the construction project, until May 2016, ██████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████. Ex. 33 at 444 ("███████████████ ███████████████████████████████████"). On May 26, 2016, San Ysidro POE leadership wrote to CBP headquarters █████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

1    ██████████. Ex. 34 at 338-39; Ex. 35; Ex. 36 at 640 (May 27, 2016 report

2    listing "█████ taken "███████████████████" at San Ysidro).

3    Notably, at that time the leadership of the San Ysidro POE did not ████████

4    ████████████████████████████████████. Ex. 37

5    at 023; Ex. 38 at 099.

6         It was not until the San Ysidro POE received media inquiries about asylum

7    seekers at the port that CBP decided to abandon its existing contingency plans and

8    began turning back asylum seekers instead. By May 26, 2016, CBP's San Diego

9    Field Office[8] "████████████████████████████

10   ████████████." Ex. 39 at 741. On the same day, the offices of Senator

11   Barbara Boxer and Representative Susan Davis asked questions about the asylum

12   seekers at the San Ysidro POE. Ex. 40 at 870. In response to those inquiries, Sidney

13   Aki, the Port Director of the San Ysidro POE, wrote, "███████████████

14   ████████████████████████." Ex. 41 at 552.

15        The next day, the San Ysidro POE began turning back asylum seekers that

16   were in the process of arriving at the POE and preventing them from crossing the

17   international boundary. *See* Ex. 42 ("██████████████████████

18   ████████"); Ex. 43 ("██████████████████."); Ex. 44 ("█████

19   ██████████████████."); Ex. 45 (instructing CBP officers "███████

20   ████████████████"). However, San Ysidro POE leadership agreed that "█

21   ████████████████" to inspect a few asylum seekers "████████████."

22   Ex. 46. By the end of May 2016, CBP was ████████████████████

23   ████████████████████████████████████████

24   ████████████████████████. Ex. 11 at 298.

25        But senior leadership at CBP was becoming increasingly impatient with

26   asylum seekers being released into the U.S. rather than being turned back to Mexico.

27   _____

28   [8] CBP's Office of Field Operations has four field offices on the U.S.-Mexico border:
     San Diego, Tucson, El Paso, and Laredo.

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

Then-Deputy Commissioner of CBP, Kevin McAleenan, reacted to news that

asylum seekers ████████████████████████████████, "██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████." Ex. 47. Mr. McAleenan also expressed his

frustration that "████████████████████████████████████████████████████

██████████████████████." *Id.* Defendants would later expand the turnback policy

border-wide in the fall of 2016, with McAleenan playing a key role.

### C. Defendants Implement the Turnback Policy Border-Wide

In the fall of 2016, Defendants again diverged from their historical practice

and Congressional mandates. They began turning back asylum seekers at the

Calexico West POE, in addition to the San Ysidro POE. *See* Ex. 48 at 086; Ex. 49 at

715, 718. They did so despite knowing that the turnback policy had created a

████████████████████ in Tijuana, Mexico, and that there were already ██████

████████████████████████████████. *See, e.g.*, Ex. 50 at 746; Ex. 51 at

438 (UNHCR urging CBP to "████████████████████████████████████████");

Ex. 52 (DHS's Office of Civil Rights and Civil Liberties "████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████" starting

in July 2016); Ex. 53 at 294 (House Judiciary Committee ████████████████████).

But by October 2016, Defendants had made plans to find a way to inspect and

process asylum seekers arriving at POEs, instead of ignoring their statutory duty and

turning back asylum seekers at POEs. On October 16, 2016, then-DHS Secretary Jeh

Johnson and then-CBP Commissioner Gil Kerlikowske "████████████████████

████████████████████████████████████████████." Ex. 54 at 340. On

October 30, 2016, Commissioner Kerlikowske directed CBP "████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████." Ex. 55 at 175.  In addition to the

processing facilities in ██████████████████████, Defendants began examining ways

1   to build other temporary processing facilities and expand detention capacity. On

2   October 31, 2016, the Commissioner of CBP and the DHS Secretary " ███████████

3   ████████████████████████████████████████████████████████████████████████████

4   ████████████████████████████."[9] *Id.* at 173. In particular, FEMA had identified

5   ████████████████████████████████████████████████████████████████████████████

6   ████████████████████████████. Ex. 56 at 316; Ex. 57 at 577-78 (" ██████████████

7   ██████████" were " ███████████████████████████████████████████."); Ex.

8   58 (" ██████████████████████████████████████████████████████████████████████

9   ██████████████").

10      On November 2, DHS explained that it ███████████████████████████████████

11   ████████████████████████████████████████████████████████████████████████████

12   ████████████████. Ex. 59. DHS also directed CBP " ███████████████████████████

13   ████████████████████████████████████████████████████████████████████████████

14   ██████████████." Ex. 60.

15      Within days of that meeting, DHS outlined ██████████████████████████████

16   ██████████████████████████████. Ex. 61. Then, CBP held

17   an " ███████████████████████" with the management of OFO's San Diego Field

18   Office concerning ██████████████████████████████████████████. Ex. 62.

19      On November 9, 2016, Donald Trump won the 2016 presidential election. Ex.

20   63 at 1; Ex. 64 at 114:20-115:2. Within hours, CBP ██████████████████████████

21   ██████████████████████████████████████. Ex. 65 at 879; Ex. 66.  At a

22   meeting the next day, then-Deputy Commissioner McAleenan proposed " ████████

23   ████████████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████." Ex. 67 at 936. Shortly

25   after the meeting, then-DHS Secretary Johnson approved ██████████████████████

26   ██████████████████████████████. *Id.*; *see also* Ex. 68 at 880.

27

28   ────────────────────
     [9] "FMUA" refers to family units. "UAC" refers to unaccompanied minors.

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   Todd Owen told McAleenan that he was "█████████████████." Ex. 6.

2   However, Mr. Owen explained that he "████████████████████

3   █████████████████████████████████." *Id.*; *see also* Ex. 69 at 935 ("█

4   ████████████████████████████████████████████████████

5   ███████." ). Although CBP decided ████████████████████████

6   ████████████████████████████, each field office on the U.S.-Mexico

7   border gave similar directions concerning turnbacks at POEs. William Brooks,

8   Director of Field Operations for Tucson, instructed the port directors to, "████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ██████████████████." Ex. 70; *see also* Ex. 13 at 607 (similar, Laredo Field

12  Office); Ex. 71 at 496 (similar, El Paso Field Office). Finally, on November 15,

13  2016, CBP leadership ██████████████████████████████. Ex. 72

14  at 939. Thus, within a week of the 2016 presidential election, Defendants largely

15  abandoned their Congressionally-mandated duty of inspecting and processing

16  asylum seekers who were in the process of arriving at POEs, electing instead to

17  expand turnbacks.

18  **D. Defendants Knew that the Turnback Policy Violated the Law**

19  Defendants implemented the turnback policy, despite acknowledging that it

20  broke the law. In some cases, asylum seekers standing on U.S. soil were returned to

21  Mexico. *See* Ex. 73 at Resp. 7; Ex. 74 at 450 (El Paso Field Office officials reported

22  to CBP headquarters that "████████████████████████████████

23  ████████"). A CBP officer at the San Ysidro POE ████████████

24  ████████████. Ex. 8 at 045-046. At another POE, a CBP officer

25  "█████████████████████████████████████████████." Ex.

26  75 at 272. At the Hidalgo POE, "█████████████████████████" from the

27  secondary inspection area to reduce the number of asylum seekers processed at the

28  port. Ex. 3 at 157:15-18; *see also* Ex. 76 at 113; Ex. 14 at 96:17-99:6 (Nogales POE

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    ███████████████████████████████████████████).

2    In the Laredo Field Office, multiple CBP officers observed asylum seekers

3    being returned from U.S. territory to Mexico without being processed. Ex. 77 at 136.

4    The CBP officers who witnessed these turnbacks summarized them in emails sent to

5    Chapter 149 of the National Treasury Employees Union ("NTEU").[10] *See, e.g.*, Ex.

6    78 at 139-40. NTEU Chapter 149 sent a letter to the director of the Pharr POE, to

7    invoke a Step 1 grievance concerning "the Agency . . . unilaterally implement[ing]

8    a policy that prevents and/or blocks CBP Officers . . . from processing political

9    asylum seekers." Ex. 79 at 142-43. During a grievance meeting with representatives

10   of the NTEU, CBP "***acknowledged that***" the turnback policy "***broke . . . Federal***

11   ***immigration rules and Laws***." Ex. 2 at 0132 (emphasis added). Although CBP

12   officials would freely state that the turnback policy violated the law in conversations,

13   they refused to say so in writing. Ex. 3 at 125:17-21. Eventually, NTEU Chapter 149

14   asked then-CBP Commissioner McAleenan to provide the legal authority to support

15   CBP's "instructions to return individuals who enter the U.S. and request asylum back

16   to Mexico without" being processed. Ex. 76 at 110.

17   **E. Defendants Memorialize Aspects of the Turnback Policy**

18   In 2018,[11] Defendants memorialized aspects of the turnback policy in writing.

19   On April 23, 2018, "█████████████████████████████████████████████

20   ████████████████████████████████████████." Ex. 80 at 784. On

21   April 24, 2018, CBP Commissioner McAleenan directed his deputies to "████████

22   ████████████████████████████." Ex. 81 at 778. Then, on April 27, 2018,

23   CBP issued its metering guidance memorandum, which was distributed to the four

24   Directors of Field Operations who oversee the operations of all POEs on the U.S.-

---

25

26   [10] The NTEU represents CBP officers in the Laredo Field Office.

27   [11] In 2017, as the number of asylum seekers arriving at POEs on the U.S.-Mexico border declined precipitously, *see* Dkt. 390-91 at ¶¶ 5, 8, CBP continued to turn back asylum seekers arriving at those POEs, *see* Ex. 18 (April 2017 recording of turnback

28   where an asylum seeker was told to "go back to Mexico."), Ex. 17 at 307:8-308:8.

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   Mexico border. Ex. 82. Under the metering policy, Directors of Field Operations are

2   permitted to "meter the flow of travelers at the land border" between the U.S. and

3   Mexico. *Id.* When "metering" is in place, CBP officers tell "waiting travelers that

4   processing at the port of entry is currently at capacity and CBP is permitting travelers

5   to enter the port once there is sufficient space and resources to process them." *Id.*

6       Although the policy was supposed to address "█████████," Ex. 83 at 332,

7   there was no appreciable surge in asylum seekers in April 2018. For example, at the

8   San Ysidro POE, on April 24, 2018, ███████████████████████████████

9   ███████████████████████████████████████. Ex. 84. On April 27-28, 2018, the port

10  still had ████████████████. Ex. 85 at 719-720; Ex. 86 at 722-23; Ex. 87 at

11  759. On April 29, 2018, San Diego Director of Field Operations, Pete Flores, wrote

12  to Kevin McAleenan that "██████████████████████████████████████████"

13  POE. Ex. 88 at 694. Ultimately, the April 2018 migrant caravan largely fizzled.

14  Mexican migration authorities "███████████████" as soon as it "███████████

15  ████████████" to "███████████████." Ex. 89.[12]

16      Because the low numbers of caravan members at the border could not justify

17  border-wide turnbacks, DHS began writing guidance on turning back asylum seekers

18  to permit turnbacks to occur outside of "surge events." In late May 2018, DHS

19  Secretary Nielsen began considering a "prioritization-based queue management"

20  approach that would allow port directors to turn back asylum seekers, purportedly

21  as a matter of "discretion," on the basis of amorphous considerations related to port

22  capacity and resources. During a May 24, 2018 meeting, DHS Secretary Nielsen

23

24  ─────────────────────

    [12] Even though the turnback policy would later create a queue of asylum seekers in
25  Tijuana, Mexico much larger than the number of asylum seekers who might
    approach the port on a typical day, CBP privately acknowledged that █████████████
26  █████████████████████████████████████. For example, in its normal
    posture, the San Ysidro POE can process approximately █ asylum cases per day.
27  Ex. 90 at 246; Ex. 91 at 676 (CBP could have cleared the queue existing on
    November 9, 2018 in "[a]pproximately 11 days"). Even with no additional resources,
28  the San Ysidro POE estimated that ████████████████████████████████████
    ████████████████████████████████████████████████ Ex. 92 at 964.

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.



?" Ex. 93 at 317. In response, OFO's San Diego Field Office indicated that

s. *Id.* at 316. OFO's

El Paso Field Office reported that

Ex. 94 at 575. The Tucson Field Office said that it

could                              . Ex. 95. Synthesizing this information,

Todd Owen reported to CBP Commissioner McAleenan that

Ex. 96. However, he warned that this policy would result in "[

." *Id.*

. Ex. 97. On June 5,

2018, Defendants adopted the prioritization-based queue management policy. Ex. 98

at 294. The policy directs POEs to focus on other missions, such as inspecting

incoming food and other cargo, instead of processing asylum seekers. *Id.* at 296.

## F. Defendants Begin Using "Operational Capacity" As a Metric

At the same time, CBP began using a new metric to justify its turnbacks of

asylum seekers. While the "           " for implementing the April 2018

metering policy was "detention capacity" (*i.e.*, the number of persons who can be

held at a POE, Ex. 17 at 158:4-7), in June 2018, CBP began using "operational

capacity" as its stated metric to justify turning back asylum seekers. Ex. 99 at 864.

This change was significant. Detention capacity is a known, quantifiable number

that CBP regularly tracks. *See* Ex. 4 at 105:11-106:14; Ex. 10 at 185:9-20. On the

other hand, operational capacity has no definition and is not tracked by CBP. Ex. 10

at 74:11-76:15, 189:8-191:6. Defendants thus shifted from the measurable metric of

detention capacity to an unmeasurable and pretextual metric of operational capacity,

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   in order to " ███████████████████." Ex. 100 at 207:7-14.

2        "Operational capacity," as Defendants use the term, is essentially a fiction.

3   ████████████████████████████████████████████████—after the

4   turnback policy was already in effect and this litigation was filed. Ex. 100 at 161:8-

5   10. The distinction between detention capacity and operational capacity is not

6   memorialized in any statute, regulation, guidance, memorandum, or official

7   document. Ex. 17 at 68:8-71:24; Ex. 100 at 161:20-162:12. ███████████████

8   ████████████████████████████████████████████████████████████

9   ██████████. Ex. 17 at 102:13-111:11; *see also* Ex. 101. In fact, the term

10  "operational capacity" has no concrete definition. Ex. 17 at 73:6-11, 110:24-111:11.

11  CBP never even wrote down the factors that a port director should consider when

12  determining a POE's operational capacity. *Id.* at 111:13-112:13; Ex. 14 at 292:13-

13  15. CBP did not track operational capacity at any of its ports. Ex. 102 at 66:10-25.

14  CBP has no way of reconstructing what the operational capacity of a POE would

15  have been at any given time. Ex. 17 at 129:7-14; Ex. 14 at 106:20-107:7. In the end,

16  operational capacity is what the port director says it is, without any reference to a

17  port's actual holding space. Ex. 100 at 181:22-182:4; *see also* Ex. 14 at 140:19-21

18  ("██████████████████████████████████████████████████

19  ██████████████████."); Ex. 103 at 57:2-20.

20       The reason that Defendants changed the metric they used to justify metering

21  is no secret. According to CBP's daily capacity figures, POEs routinely operated

22  below capacity. *See* Ex. 20 at ¶¶ 22, 101-23. Contemporaneous reports also show

23  that the number of asylum seekers detained at POEs ████████████████

24  ██████████. *See* Exs. 14-15, 17-19. Once CBP enabled port directors to ignore

25  the actual capacity of their POEs, ████████████████████████████

26  ██████████. *See, e.g.*, Ex. 12 at 742 (San Ysidro POE had a " ████████

27  ████████████████████████"); Ex. 104 (████████████████████

28  ████████████████████"); Ex. 105 (CBP sent guidance about " ██████

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮”).

2    As the turnback policy was rolled out border-wide, POEs tracked ▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See,*

4    *e.g.*, Ex. 106 at 089 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 107 at 2 (internal CBP study

6    analyzing whether ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 108

7    ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

8    Defendants refused to implement plans that could have considerably increased

9    the capacity of POEs to process asylum seekers. For instance, in November 2018,

10   Pete Flores, the Director of Field Operations for OFO's San Diego Field Office,

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex.

14   109; Ex. 110. DHS Secretary Nielsen ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 111.

16   CBP also considered whether ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮. Ex. 112. However, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

20   **G. Defendants Harmed the Class and Al Otro Lado**

21   The turnback policy seriously harmed asylum seekers, returning them to

22   Mexican border cities that Defendants knew were dangerous. *See* Ex. 96 ("▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 100 at 202:24-203:5; Ex. 50 at 746 (report

25   indicating that turnbacks were "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" in Tijuana). In

26   response to "the needs of particularly vulnerable migrants who ha[d] been metered[,

27   s]pecifically those who are in imminent danger of harm or death in Tijuana,"

28   Plaintiff Al Otro Lado, as the only organization that offered comprehensive,

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

emergency services to migrants in Tijuana, found itself "constantly having to pull resources from [its] other offices" to address those needs. Ex. 113 at 92:12-96:4. The need to provide services in Tijuana to asylum seekers who had been turned back strained Al Otro Lado's resources and frustrated its other missions, including its deportee program and medical-legal program. *Id.* at 153:3-154:23.

Moreover, turnbacks were responsible for the deaths of asylum seekers. Ex. 113 at 161:25-162:9 (discussing murders of and assaults on unaccompanied minors who were turned back). For example, on June 23, 2019, CBP officers turned back Oscar Alberto Martinez Ramirez, his wife, and their 23-month-old daughter, Valeria, when they attempted to enter the U.S. at the Brownsville POE. Ex. 114 at 139; *see also* Ex. 115 at 64. There was no reason to turn the family back; the Brownsville POE was operating at only ██% capacity that day. Ex. 115 at 64. After aid workers in Matamoros told Oscar there were hundreds of people in front of him waiting to be processed at the Brownsville POE, *id.*, Oscar waded into the Rio Grande River near the Brownsville POE with his daughter on his back. *Id.* The rapid current swept Oscar off his feet and pulled him and Valeria under. Ex. 115 at 139. They drowned. *Id.* When their bodies washed up along the U.S. side of the riverbank, Valeria's hand was wrapped around her father's shoulders. *Id.*



MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1  Ex. 116.

2        Defendants take no responsibility for the harm they have caused. When Todd

3  Owen was asked, "Do you take responsibility for instances where the metering

4  policy was implemented in ways that broke the law?", he answered, "I do not take

5  responsibility for the 30,000 officers that work under me." Ex. 10 at 239:22-240:6.

6  When asked whether he takes responsibility for asylum seekers staying in squalid

7  conditions at migrant shelters in Mexico as a result of his turnback policy, Mr. Owen

8  answered, "No." *Id.* at 289:14-17. When asked whether he took any responsibility

9  for parents who were sleeping on the street in Mexico with toddlers in temperatures

10 over 100 degrees as a result of the turnback policy, Mr. Owen answered, "No." *Id.*

11 at 291:15-20. And finally, when he was asked whether he took any responsibility for

12 the death of Oscar Alberto Martinez Ramirez and his two-year-old daughter, Mr.

13 Owen answered, "No." *Id.* at 292:13-21.

14 **III.    LEGAL STANDARD**

15       Summary judgment should be granted where the moving party demonstrates

16 there "is no genuine issue as to any material fact and [it] is entitled to judgment as a

17 matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R.

18 Civ. P. 56(c)). Upon such a showing, the burden shifts to the nonmoving party to

19 "come forth with specific facts to show that a genuine issue of material fact exists."

20 *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993). On cross-motions for

21 summary judgment, a court "must consider each motion separately 'on its own

22 merits' to determine whether any genuine issue of material fact exists." *Allstate Ins.*

23 *Co. v. Farmers Ins. Exch.*, 2008 WL 11508663, *3 (S.D. Cal. 2008).

24 **IV.    ARGUMENT**

25       **A. The Turnback Policy Violates the APA and INA**

26       Section 706 of the APA directs courts to "compel agency action unlawfully

27 withheld" and to "hold unlawful and set aside agency action" that is "not in

28 accordance with law," "in excess of statutory jurisdiction, authority, or limitations,"

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    or otherwise "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(1),

2    (2)(A), (C). The turnback policy is a final agency action that is unlawful and must

3    be set aside under those standards. *First*, as this Court recognized, the policy violates

4    the specific mandates in the INA governing how Defendants must treat arriving

5    noncitizens at POEs. Similarly, each instance when a class member is turned back

6    amounts to the unlawful withholding of agency action. *Second*, as this Court

7    likewise recognized, the policy violates the statutory scheme Congress created to

8    ensure access to the asylum process for noncitizens at POEs. *Third*, the policy is

9    arbitrary, capricious, and an abuse of discretion because Defendants' stated

10   justification is a pretext, the real reasons for the policy are unlawful, and the policy

11   is at odds with congressional intent.

12              a.       **The turnback policy is a final agency action**

13          The APA permits judicial review over agency actions that are "final." 5 U.S.C.

14   § 704; *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017).

15   Agency action is "final" when (1) it "mark[s] the 'consummation' of the agency's

16   decisionmaking process" and (2) as a result of the action, "'rights or obligations have

17   been determined,' or … 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S.

18   154, 177-78 (1997). The turnback policy, under which CBP officers at POEs along

19   the U.S.-Mexico border restrict the flow of asylum seekers by turning them back to

20   Mexico, fulfills both requirements. *See* Dkt. 280 at 49-54 (concluding Plaintiffs'

21   allegations, which the evidence now substantiates, satisfy the *Bennett* test).

22          The turnback policy satisfies the finality test's first prong because it reflects a

23   "conscious" and "deliberate decision" by Defendants, *ONRC Action v. Bureau of

24   Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998), and is "an active program

25   implemented by the agency." *Wagafe v. Trump*, 2017 WL 2671254, at *10 (W.D.

26   Wash. 2017); *see R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (an

27   implemented policy directing an ongoing practice affecting individual cases is final

28   agency action).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

Defendants first began turning back asylum seekers at the San Ysidro POE in May 2016. In the fall of 2016, Defendants expanded the turnback policy to other POEs along the U.S.-Mexico border. Both decisions amounted to "conscious" and "deliberate" choices by Defendants to reject their standard contingency plans and pursue a different option. *See supra* at 9-12, 13-15; Ex. 110; Ex. 111; Ex. 112; Ex. 65 at 879; Ex. 66; Ex. 67 at 936; *ONRC Action*, 150 F.3d at 1137. Defendants previously had plans to utilize temporary facilities near POEs to fulfill their congressionally-mandated duty to inspect and process asylum seekers, yet they abdicated this duty following the 2016 election by expanding the turnback policy. *See supra* at 9-12; Ex. 54 at 340; Ex. 55 at 173; Ex. 67 at 936. On the instruction of the DHS Secretary and the CBP Commissioner, OFO leadership instructed the Directors of Field Operations overseeing POEs along the southern border to coordinate with Mexican government officials to begin metering. *See supra* at 11; Ex. 67 at 936.

Then, in April and June 2018, Defendants memorialized aspects of the turnback policy in formal guidance documents. *See supra* at 12-14; Ex. 85; Ex. 98 at 294. CBP also disseminated instructions to POEs requiring them to meter asylum seekers, assign staff to "limit line" positions to prevent asylum seekers from entering U.S. territory, and avoid surpassing an arbitrary cap on POEs' detention capacity. *See, e.g.*, Ex. 14 at 74:2-8; Ex. 117 ("holding at the line will soon become the norm so all along the SW border need to act the same so the NGOs don't try to play one port against the other."). The implementation of the policy has been confirmed by high-level government officials, as well as CBP officers with firsthand experience implementing it. *See supra* at 9-16; Ex. 1 at 100:25-101:6; Ex. 2 at 132. Defendants' top-down, calculated efforts to restrict the flow of asylum seekers leaves no doubt that it "mark[s] the 'consummation' of the agency's decisionmaking process." *Bennett*, 520 U.S. at 177-78.

With respect to the second prong, legal consequences flow from the turnback

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    policy because it instructs CBP officers to reject asylum seekers at POEs and deny
2    them access to the asylum process, in contravention of their mandatory statutory
3    duties. Asylum seekers are forced to wait in dangerous Mexican border towns, where
4    they risk grave harm or even death. *See infra* at 16-18. Many are ultimately deprived
5    of any ability to access the asylum process at a POE as a result of the policy. *See,*
6    *e.g.*, Dkt. 390-75 at ¶ 6 (Roberto Doe was turned back from Hidalgo POE); Dkt.
7    390-97 at ¶¶ 6-7 (Roberto Doe was subsequently deported from Mexico). These
8    "actual or immediately threatened effect[s]" satisfy the finality test's second prong.
9    *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 894 (1990); *Wagafe*, 2017 WL
10   2671254, at *10 (action was final when policy resulted in "thousands of . . . qualified
11   applications [being] allegedly indefinitely delayed or denied").

12          **b.      The policy directs CBP officers to unlawfully withhold a**
13                  **discrete, mandatory ministerial action**

14          Congress has spoken clearly about what Defendants are required to do when
15   noncitizens come to POEs—inspect them when they arrive and allow those seeking
16   asylum to access the asylum process. *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), (3),
17   and (b)(1)(A)(ii). Because Defendants have a discrete mandatory duty to inspect and
18   refer asylum seekers arriving at POEs, *see* Dkt. 280 at 31-46; 8 U.S.C. § 1225, each
19   turnback amounts to the unlawful withholding of mandatory agency action. 5 U.S.C.
20   § 706(1). Moreover, the turnback policy—which is an overarching agency policy
21   directing this unlawful withholding of mandatory action—is "not in accordance with
22   law" and is "in excess of statutory jurisdiction, authority, or limitations." *Id.* §
23   706(2)(A), (C).

24          Section 706(1) of the APA requires a court to "compel agency action
25   unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Agency actions
26   that are "legally *required*," *i.e.*, that are "ministerial or non-discretionary," are
27   subject to § 706(1), and courts may compel them as in a mandamus action. *Norton*
28   *v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004). Section 706(2) of the APA

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    directs the court to "hold unlawful and set aside agency action," 5 U.S.C. §

2    706(2)(A), (C), that is "contrary to clear congressional intent" or "inconsistent with

3    the statutory mandate," or that "frustrate[s] the policy that Congress sought to

4    implement." *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of*

5    *Health & Human Servs.*, 946 F.3d 1100, 1112 (9th Cir. 2020) (quotations omitted).

6    This Court previously concluded that "the mandatory duties to inspect all

7    aliens and refer certain aliens seeking asylum are discrete actions for which this

8    Court can compel Section 706(1) relief under 8 U.S.C. § 1225(a)(3), 8 U.S.C.

9    § 1225(b)(1)(a)(ii), and 8 C.F.R. § 235.3(b)(4)." Dkt. 280 at 31. Defendants' duty to

10   inspect and refer applies to those "who are in the process of arriving in the United

11   States," including those who may not yet have set foot across the physical border.

12   Dkt. 280 at 46. The Ninth Circuit found this analysis "sound and persuasive." *Al*

13   *Otro Lado v. Wolf*, 952 F.3d 999, 1011-12 (9th Cir. 2020). The Court's prior

14   conclusion stems directly from a straightforward interpretation of sections 1158 and

15   1225 of the INA, aided by traditional canons of statutory construction and

16   Defendants' own regulations. *See* Dkt. 280 at 31-46. Similarly, the turnback

17   policy—a  policy to evade those mandatory duties—is "contrary to clear

18   congressional intent" and "inconsistent with the statutory mandate," and would

19   "frustrate the policy that Congress sought to implement." *Planned Parenthood*, 946

20   F.3d at 1112.

21   Summary judgment is warranted on Plaintiffs' 706(1) and 706(2) claims

22   because it is undisputed that Defendants have a policy of turning back asylum

23   seekers and refusing to inspect and process them when they are arriving at POEs

24   along the U.S.-Mexico border, and that they do so to individual asylum seekers. As

25   CBP's Rule 30(b)(6) witness, Randy Howe, conceded:

26       Q.    Is it the case currently that when a port is engaged in metering,
27             when a noncitizen without proper travel documents arrives at the
             border, they will be told that the port is at capacity and they
28

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1  should return to be processed later?
2      A.    Yes.

3  Ex. 4 at 171:7-13; Ex. 17 at 201:22-202:3. A second Rule 30(b)(6) witness, Mariza
4  Marin, admitted that asylum seekers approaching POEs are attempting to enter the
5  United States:

6      Q.    Okay.  In your experience[], are asylum seekers who are at the
7            border between the United States and Mexico attempting to enter
            the United States at a port of entry?
8      A.    Yes.

9
10  Ex. 17 at 201:22-202:3 (objection omitted).[13] Thus, Defendants have admitted that
11  it is their policy to turn back asylum seekers who are in the process of arriving in the
12  United States. Dkt. 280 at 31-46; *see also Al Otro Lado*, 952 F.3d at 1012.[14]

13      Defendants also turned back to Mexico asylum seekers who were standing *on
14  U.S. soil*.  *See, e.g.*, Ex. 1 at 97:14-18; Ex. 3 at 61:13-16; Ex. 73 at Resp. 7; Ex. 74
15  at 450; Ex. 8 at 045-046; Ex. 14 at 141:6-142:23; Ex. 102 at 205:16-206:11. No
16  statutory analysis of the term "arriving in" is required to determine that CBP broke
17  the law by turning back asylum seekers *who were already on U.S. soil*.

18      Plaintiffs are thus entitled to an order compelling Defendants to comply with
19  their mandatory, ministerial inspection and processing duties set out in § 1225. *See*
20  5 U.S.C. § 706(1). Furthermore, it is undisputed that it is agency policy to withhold
21  these mandatory actions, and therefore the Court should set aside the policy because
22  it is incompatible with applicable law. *See id.* § 706(2)(A), (C).

23

24  ---
25  [13] A third CBP witness testified that when CBP tells an asylum seeker to wait in
    Mexico because the POE is "at current capacity," "there's no guarantee" "ever
26  implied" that "at some point in the future, [the asylum seeker] might be processed."
    Ex. 14 at 234:25-235:20.

27  [14] To the extent the turnback policy purports to grant POEs discretion to turn back
    asylum seekers, *see e.g.* Ex. 98, the policy is unlawful because, as the Court has
28  stated, the duty to inspect and process asylum seekers is mandatory.  *See* Dkt. 280
    at 29.

1

2

      **c.**    **The policy contravenes Congress' unambiguous statutory scheme and exceeds Defendants' authority**

3          Even if CBP's ministerial duties to inspect and process were not triggered

4 until an asylum seeker steps onto U.S. soil, summary judgment is still warranted on

5 Plaintiffs' § 706(2) claim because the turnback policy contravenes Congress'

6 statutory scheme governing inspection at POEs and exceeds Defendants' statutory

7 authority. "[A]n agency's power is no greater than that delegated to it by Congress."

8 *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *Util. Air Regulatory Grp. v. E.P.A.*, 573

9 U.S. 302, 328 (2014) ("[A] core administrative-law principle [is] that an agency may

10 not rewrite clear statutory terms to suit its own sense of how the statute should

11 operate."). In particular, agencies lack authority to "abandon" a "detailed scheme"

12 established by Congress if they think it is not working well. *EBSC v. Trump*, 932

13 F.3d 742, 774 (9th Cir. 2018). Because Congress designed a "statutory scheme" by

14 which all noncitizens are to be inspected at POEs and asylum seekers must be

15 referred for credible fear interviews, Dkt. 280 at 62, Defendants have no authority

16 to turn back any noncitizens at POEs, much less single out asylum seekers for such

17 treatment. *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1747 (2020) (when

18 Congress makes a "broad rule" and includes no exceptions, the rule applies and no

19 "tacit exception" may be inferred).[15]

20      Since 2016, it has been Defendants' policy to turn back asylum seekers at

21 POEs. *See, e.g.*, *supra* at 7-14; Ex. 4 at 171:7-13; Ex. 10 at 102:21-103:22; Ex. 93

22 at 317; Ex. 94 at 575; Ex. 95; Ex. 96. Asylum seekers are turned back when they are

23

---

24

[15] Even if the Court were to reject its prior conclusion that Defendants' duties to inspect and refer attach to individual asylum seekers in the process of arriving in the United States at a POE who may not have stepped across the international border, the Court could still "hold unlawful and set aside" Defendants' *policy* to turn back such asylum seekers. 5 U.S.C. § 706(2). Any such policy runs counter to the statutory scheme, and thus is "contrary to clear congressional intent" and "inconsistent with the statutory mandate" of inspecting all noncitizens at POEs and referring all asylum seekers for credible fear interviews, even if asylum seekers whom the government prevents from accessing U.S. territory cannot enforce those duties via a § 706(1) claim. *Planned Parenthood*, 946 F.3d at 1112.

25

26

27

28

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

"attempting to enter the United States at a [POE]." Ex. 17 at 201:22-202:3. CBP officers at POEs physically block those perceived to be asylum seekers—and only asylum seekers—from crossing the border, and tell them "that the port is at capacity and they should return to be processed later." Ex. 4 at 171:7-13; Ex. 14 at 232:8-15 (acknowledging that "officers staffing the limit line are directed to prevent migrants from crossing [the] international boundary," "because once they do cross the boundary, then they have to be processed").

The formulation of policies "prescrib[ing] the terms and conditions upon which [noncitizens] may come to this country" "is entrusted exclusively to Congress," not the executive. *Kleindienst v. Mandel*, 408 U.S. 753, 766-67 (1972); *see also* Dkt. 280 at 23 ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of [noncitizens]."). Here, Defendants claim that they have the power to selectively screen out asylum seekers and deny them processing. The logical result of Defendants' argument is that they would have sole authority to end asylum for noncitizens arriving at POEs, without any involvement by Congress—an interpretation of the INA that plainly conflicts with Congress' statutory scheme. *See* 5 U.S.C. § 706(2)(A), (C).[16]

Defendants may not usurp Congress' role in this way. Because Congress never authorized Defendants to turn back any noncitizens at POEs, and in fact created a statutory scheme that "specifically addresse[s]" how Defendants must treat individuals who are coming to POEs to seek asylum, *EBSC v. Barr*, 964 F.3d 832, 848 (9th Cir. 2020), the turnback policy is "not in accordance with law" and is "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(A), (C).

---

[16] CBP's general power to operate POEs does not include authority to contravene more specific provisions of the INA. "[I]t is a commonplace of statutory construction that the specific governs the general," particularly where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citations omitted).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

#### d.    The Turnback Policy is arbitrary and capricious

In addition to the turnback policy's categorical incompatibility with the INA, the policy is also illegal under APA § 706(2)(A) because it is "arbitrary, capricious, [and] an abuse of discretion" for a number of reasons, each of which provides an independent basis to grant Plaintiffs' motion.

#### i.    The Turnback Policy Is Based On Pretext

It is arbitrary and capricious for an agency to "offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (citation omitted). "[A]gencies [must] offer genuine justifications for important decisions." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019). An agency is due no deference when the explanation provided for its action "lacks any coherence." *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006). Courts must not "simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment." *Id*. "[R]easoned decisionmaking" is required. *Id*. Similarly, an agency action cannot survive APA review if it is supported only by post hoc rationalizations. *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1907-09 (2020).

The undisputed evidence shows that Defendants' stated justification for the turnback policy—a "lack of capacity" at POEs, Dkt. 283 ¶ 7—is pretextual. CBP's own daily internal statistics capturing "capacity" show that POEs generally operated well below 100% during the policy's implementation and that the number of asylum seekers at POEs ███████████████████████. *See* Ex. 20 at ¶¶ 22, 101-23; Ex. 21; Ex. 22; Ex. 23 Ex. 24; Ex. 25. Indeed, a CBP officer at the Tecate POE testified that this "capacity excuse" is a lie:

> Q.    And when [your supervisors] said the port was at capacity, you
>       knew that was a lie, right?

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

A.    Yes.

Q.    And it would have been obvious to those supervisors that it was a lie as well, correct?

A.    Correct.

Q.    In fact, it was obvious to everybody that was implementing the policy at [the] Tecate [POE] that the capacity excuse was a lie, right?

A.    Correct.

Ex. 1 at 100:22-101:6. Meanwhile, CBP "███████████████████████████████████████████████████████████████████████." Ex. 118 at 93:4-12. At the Hidalgo POE, CBP "███████████████████████████" from the port's secondary inspection area, "███████████████████████████████████." Ex. 3 at 157:15-18. A CBP officer from the Laredo Field Office testified that there was no justification for metering because CBP could process asylum seekers in the order that they came to a POE without resorting to turnbacks. *Id.* at 71:9-16. Finally, prior to issuing the prioritization-based queue management guidance, then-DHS Secretary Nielsen ██████████████████████████████████████████████████████████████████████████████████████████████. *Supra* at 13-14.

If there really were capacity issues, Defendants have long had contingency plans ready to obviate any genuine need to turn back asylum seekers. Yet Defendants have repeatedly ████████████████████████████████████████. *See, e.g.*, Ex. 65 at 879; Ex. 66; Ex. 14 at 156:12-157:22; *supra* at 10-11. Moreover, Defendants have always had the power to release asylum seekers from POEs rather than waiting for ICE to pick up and transfer them to a detention facility. *See, e.g.*, Ex. 119 at 545 (DHS Secretary Johnson ██████████████████████████████ in fall 2016 ██████████████

1 ███████████████████████).[17] ████████████████████████

2 ███████████████████████████████████████████████████████

3 ███████████████████████████████████████████████████. *See, e.g.*,

4 Ex. 3 at 157:15-18; Ex. 14 at 96:17-99:6.

5     In June 2018—well after this litigation began—CBP began using "operational

6 capacity," as opposed to "detention capacity," as its justification for turnbacks. *See*

7 *supra* at 14-16. The new metric, "operational capacity," has no definition and is

8 not—and has never been—tracked, and it is impossible to reconstruct a port's

9 operational capacity. *See supra* at 14-15. "Operational capacity" means w████████

10 ███████████████████████████████████████████████████████

11 ████████████████████████████. Ex. 100 at 181:22-182:4; *see also* Ex.

12 14 at 140:19-21. "Operational capacity" as a reason for turning back asylum seekers

13 "lacks any coherence," and is anything but a "concrete standard." *Tripoli Rocketry*,

14 437 F.3d at 77. Defendants have offered no contemporaneous data or documents to

15 support an "operational capacity" defense. *Id*. Reliance on the "operational capacity"

16 concept demonstrates a lack of "reasoned decisionmaking" and is therefore arbitrary

17 and capricious. *Id*.

18     The shift to "operational capacity" simply resulted in ██████████ "██████

19 ████████." Ex. 100 at 207:7-14. Around the same time, Defendants issued the

20 prioritization-based queue management memo. *See* Ex. 98 at 294. The memo

21 purports to give port directors "discretion" not to inspect and process asylum seekers

22 at all.[18] *Id*. at 296 ("Field leaders have the discretion to allocate resources and staffing

23 dedicated to any areas of enforcement and trade facilitation not covered by the

---

[17] "NTA" refers to a "notice to appear," which institutes removal proceedings in immigration court. *See* 8 U.S.C. § 1229(a)(1).

[18] While the June 2018 memo on its face grants POEs discretion to meter asylum seekers or not, CBP subsequently directed POEs to undertake metering. *See, e.g.,* Ex. 14 at 93:2-24 (███████████████████████████████████████████████ ████████████████████████████████████).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   [specified] priorities and queue management process based on the availability of

2   resources and holding capacity at the local port level."). The combination of

3   "operational capacity" and "prioritization-based queue management" meant that

4   POEs could rely on CBP's explicit policies to justify not inspecting and processing

5   any asylum seekers at all, independent of the actual availability of processing or

6   detention capacity at a given POE. Indeed, after June 2018, POEs set ████████

7   ████████████████████████████████████████████████████████████.

8   *See supra* at 15-16.

9       Defendants' sole stated rationale for the turnback policy—that they lacked

10  "capacity" to inspect and process asylum seekers—has always been pretextual.

11  When CBP officers told asylum seekers at POEs that they could not be processed

12  due to lack of "capacity" under the turnback policy, these were "obvious" "lies" in

13  violation of APA § 706(2)(A). Ex. 1 at 99:19-101:2. As a whistleblower testified,

14  metering is "a solution in search of a problem." *Id.* at 153:24-154:1. This is textbook

15  arbitrary and capricious action. *See DHS*, 140 S. Ct. at 1907-09 (post hoc

16  rationalization violates § 706(2)(A)).

17          **ii.    The True Motivations for Metering Are Unlawful**

18      Defendants needed to fabricate a seemingly legitimate excuse to turn back

19  asylum seekers from POEs because their true motivations—limiting access to the

20  asylum process, deterring asylum seekers from seeking protection in the U.S., and

21  evading a statutory command—are arbitrary and capricious and an abuse of

22  discretion. It is a violation of § 706(2)(A) for an agency to "rel[y] on factors which

23  Congress has not intended it to consider." *Locke*, 776 F.3d at 994 (citation omitted).

24      A desire to limit access to the asylum process at POEs for its own sake is not

25  a legitimate basis for the turnback policy. *See* Dkt. 280 at 63 (explaining that unlike

26  the statutory numerical limit on refugee admissions, the INA does not cap the

27  number of people who may access the asylum process at ports, and a "*de facto*

28  numerical limit" would be "unlawful"). The undisputed facts are that Defendants

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1  nonetheless proceeded with the turnback policy in pursuit of this purpose. *See, e.g.*,

2  Ex. 47 (McAleenan, who ultimately proposed the turnback policy, ███████

3  ████████████████████████████████████████████████████████

4  ████████████); Ex. 96 (prior to implementing prioritization-based queue

5  management, CBP leadership ████████████████████████████████

6  ████████████████████████).

7      In addition, deterring lawful migration is not a proper basis for the turnback

8  policy, yet deterrence has always been at the core of the policy. In fall 2016, CBP

9  put out a call for proposals "████████████████████████████████

10  ███████." Ex. 57 at 577-578. In November of that year, McAleenan proposed

11  ██████████████████████████████████. Ex. 67 at 936; Ex. 68 at 880.

12  After the turnback policy's adoption, Defendants sought to determine whether ███

13  ████████████████████████████████████████. *See, e.g.*,

14  Ex. 109 at 2. As this Court has correctly observed, "there is no room for deterrence

15  under the scheme Congress has enacted." Dkt. 280 at 65; *see also Locke*, 776 F.3d

16  at 994; *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 154 (D.D.C. 2018) (finding

17  challenge to a policy that took deterrence into account showed a likelihood of

18  success on the merits by "demonstrat[ing] the incompatibility of the deterrence

19  policy and [applicable law]"); *R.I.L-R*, 80 F. Supp. 3d at 174–76 (similar).

20      **iii.    The Policy Amounts to an Arbitrary and Capricious**

21      **Interpretation of the INA**

22      Even if the Court were to conclude that the INA's text is ambiguous as to

23  whether turnbacks could be permissible in some form and even if, contrary to the

24  evidence, Defendants adopted the turnback policy for a legitimate reason, the fact

25  that the policy turns asylum seekers back to danger *en masse* nevertheless amounts

26  to an arbitrary and capricious interpretation of § 1225 because it is "inconsistent with

27  clearly expressed congressional intent," *EBSC v. Trump*, 950 F.3d 1242, 1273 (9th

28  Cir. 2020).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    The turnback policy has resulted in a humanitarian crisis across the border in

2  contravention of the INA and the humanitarian principles Congress sought to

3  enshrine in it. *See* Ex. 51 at 746. Under the policy, Defendants have forced thousands

4  of asylum seekers to wait in dangerous border towns where they risk physical harm

5  or death. *See, e.g.*, Ex. 96 at 009; Ex. 100 at 202:24-203:5; Ex. 51 at 746. And

6  Defendants are well aware of the dangers asylum seekers face in Mexico. *See, e.g.*,

7  Ex. 14 at 97:4-99:5 (CBP is aware of S█████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████

9  ███████████). But in enacting § 1225, Congress adopted inspection and processing

10  requirements that ensure that despite CBP's general ability to perform summary

11  expedited removal, those with claims for humanitarian protection have the ability to

12  seek asylum *before* they are summarily sent back to Mexico. *See* H.R. Conf. Rep.

13  No. 104-828, at 209 (1996) (noting the purposes of § 1225 are to "expedite the

14  removal from the [U.S.] of aliens who indisputably have no authorization to be

15  admitted" while concurrently providing individuals in that category who claim

16  asylum to have that claim "promptly assessed"). Thus, Congress intended processing

17  of asylum seekers—and only asylum seekers—instead of expedited removal, to

18  avert the harm such individuals might face if summarily removed. The human toll

19  of the turnback policy evinces an abject failure to consider Congress's guiding

20  concern in crafting the relevant portions of § 1225—preventing just such harm.

21  Thus, in the context of the current dangers asylum seekers face in Mexico, the

22  turnback policy is "inconsistent with clearly expressed congressional intent," *EBSC*

23  *v. Trump*, 950 F.3d at 1273.

24    **B. The Turnback Policy Violates the Due Process Clause**

25    As this Court has already held and as Defendants concede, Plaintiffs have

26  Fifth Amendment due process rights that are coextensive with their statutory rights

27  under the INA. Dkt. 280 at 70, 76; *see also Meachum v. Fano*, 427 U.S. 215, 226

28  (1976) (minimum due process rights attach to statutory rights); *Graham v. FEMA*,

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

149 F.3d 997, 1001 & n.2 (9th Cir. 1998). "In the enforcement of [congressional immigration] policies, the Executive Branch of the Government must respect the procedural safeguards of due process." *Kleindienst v. Mandel*, 408 U.S. 753, 767 (1972) (quotation omitted). Congress "has plainly established procedural protections for" class members, requiring that they "shall" be inspected and processed for asylum at POEs pursuant to § 1225 of the INA. Dkt. 280 at 76-77; *cf. Perales v. Reno*, 48 F.3d 1305, 1314 (2d Cir. 1995) (Congress's use of word "shall" in IRCA gives rise to statutory entitlements which are subject to due process protections). This is so even if the Court concludes that Plaintiffs have not met all the technical requirements necessary to succeed on their APA claims. Dkt. 280 at 67 n.13, 68. Accordingly, Plaintiffs have proven a due process violation on this basis alone.

In addition, the government's policy to categorically deny class members their statutorily mandated entitlement to the asylum scheme also constitutes a violation of fundamental due process principles. At its core, due process is a "protection of the individual against arbitrary action of government," *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998), and its procedural component protects against "denial of fundamental procedural fairness." *Id.* at 845-46. In applying procedural due process, courts are to prevent an "arbitrary deprivation" of rights "without threatening institutional interests or imposing undue administrative burdens." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). Due process is "flexible and depend[s] on a balancing of the interests affected by the relevant government action." *Id.* at 454.

The undisputed facts show that the turnback policy violates this due process requirement. The weight of the procedural right at stake here is enormous: Plaintiffs' statutorily-enshrined right to seek protection from persecution for themselves and their families. *See Goldberg v. Kelly,* 397 U.S. 254, 264-65 (1970) (potential for grave consequences necessitates maximum procedural due process protections); Ex. 20 at ¶ 86 ("[T]here are . . . cases of turn-backs and metering that have led to an effective end to asylum seekers' claims, and even their lives."); *cf. Marincas v.*

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1  *Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) ("The basic procedural rights Congress

2  intended to provide asylum applicants . . . are particularly important because an

3  applicant erroneously denied asylum could be subject to death or persecution if

4  forced to return to his or her home country."). Further, it is self-evident that in a

5  system of separation of powers, the executive branch is not free to ignore statutorily

6  mandated procedures by claiming that they impose a "burden." Defendants need

7  only return to inspecting and processing asylum seekers in accordance with the

8  statutorily required procedure, as Defendants were doing before the turnback

9  policy.  Where individual interest in the mandatory, life-saving protections of a

10 statute is so grave, and the government's actual—as opposed to manufactured and

11 pretextual (*see supra* at 26-29)—burden to abide by the statute is negligible,

12 Defendants' willful and arbitrary decision to deny individuals access to those

13 statutory protections violates fundamental due process principles.

14      **C.      The Turnback Policy Violates the ATS**

15      As this Court recognized, the ATS allows noncitizens to seek redress for a

16 "violation of the law of nations," 28 U.S.C. § 1350, that is "specific, universal, and

17 obligatory." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) (quotation omitted);

18 Dkt. 280 at 80.  The duty of *non-refoulement* has achieved the status of a *jus cogens*

19 norm—*i.e.* "an elite subset of . . . customary international law" from which no

20 derogation is ever permitted. *Siderman de Blake v. Rep. of Arg.*, 965 F.2d 699, 714-

21 15 (9th Cir. 1992). Plaintiffs have previously summarized the international law

22 authorities recognizing *non-refoulement* as a *jus cogens* norm, *see* Dkt. 210 at 27-

23 30, a point which Defendants "concede[d]." Dkt. 280, at 82. That should be

24 sufficient to meet the *Sosa* standard and authorize jurisdiction under the ATS. *Id.*

25      The duty of *non-refoulement* forbids a government from returning or

26 expelling an individual to a country where he or she has a well-founded fear of

27 persecution, torture, or other harm, whether it is the individual's home country or

28 another country, *see  I.N.S. v. Stevic*, 467 U.S. 407, 417 & n.20 (1984) (referencing

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1    obligations under 1951 Refugee Convention), and it "encompass[es] any measure .

2    . . which could have the effect of returning an asylum-seeker or refugee to the

3    frontiers of territories where his or her life or freedom would be threatened[.]" U.N.

4    High Comm'r for Refugees, *Note on International Protection*, ¶ 16 (citing Refugee

5    Convention, art. 33(1)).  As interpreted by the European Court of Human Rights, the

6    principle of *non-refoulement* "essentially means that States must refrain from

7    returning a person (directly or indirectly) to a place where he or she could face a real

8    risk of being subjected to torture or to inhuman[e] or degrading treatment."[19]

9         The Turnback Policy violates the duty of *non-refoulement*—and thus the

10   ATS—on multiple grounds. First, Defendants have *refouled* class members to

11   Mexico where they fear persecution or other harm, and Defendants "knew or should

12   have known" of those likely risks. *Hirsi Jamaa and Others v. Italy*, App. No.

13   27765/09 ¶¶ 131, 156 (Eur. Ct. H.R., Feb. 23, 2012). Three of the Plaintiffs—

14   Abigail, Beatrice, and Carolina—are Mexican nationals who claimed fear of

15   persecution in Mexico—the country to which they were *refouled*.  *See* Dkt. 390-11

16   at ¶¶ 18-20; 390-12 at ¶¶ 26-27; 390-13 at ¶¶ 28-31. Many other class members

17   stated a substantial fear of harm in Mexico. *See, e.g.*, Dkts. 390-11, 390-12, 390-13,

18   390-14, 390-15, 390-16, 390-73, 390-74, 390-75, 390-76, 390-77, 390-78, 390-79,

19   390-80, 390-81, 390-82, 390-83, 390-85.

20        Further, Defendants knew that class members were at risk of such harms in

21   Mexico. Other Executive agencies had stated the risks publicly. Many border towns

22   are so dangerous the Department of State prohibits U.S. government employees from

23   traveling there, of which this Court may take judicial notice. Dkt. 216 at 10, n.32;

24   *see also* Ex. 14 at 97:4-99:5 (CBP is aware of State Department's travel advisories

---

25   [19] *Hirsi Jamaa and Others v. Italy*, App. No. 27765/09 ¶ 34 (Eur. Ct. H.R., Feb. 23,
26   2012), available at shorturl.at/nEHNQ.  Numerous courts are in accord. *See, e.g.*,
     *Ilias v. Hungary*, App. No. 47287/15 ¶ 98, 244 (Eur. Ct. H.R. Mar. 14, 2017)
27   available at shorturl.at/aizK2; *M.S.S. v. Belgium and Greece*, App. No. 30696/09 ¶
     (Eur. Ct. H.R., Jan. 21, 2011) available at shorturl.at/yKWY7; *Abdolkhani &*
28   *Karimnia v. Turkey*, App. No. 30471/08, ¶ 88 (Eur. Ct. H.R., Sep. 22, 2009),
     available at shorturl.at/dyTU8.

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1   for Mexican border states). Plaintiffs also have presented undisputed evidence that

2   non-Mexican asylum seekers are at particular risk of harm in Mexico after CBP

3   *refoulement*. Although these class members do not claim persecution from Mexico,

4   this showing is not required under *non-refoulement* doctrine if Plaintiffs otherwise

5   show that their "life or freedom would be threatened," UNHCR, *Note on*

6   *International Protection*, ¶ 16, or that they have a substantial fear of "inhuman[e]

7   treatment." *See supra* note 18. Migrants marooned on the Mexican side of the border

8   await a full panoply of dangers, including "disappearances, kidnappings, rape[,]

9   sexual and labor exploitation," and worse. Dkt. 104-C at 16; *see Innovation Law Lab*

10  *v. Wolf*, 951 F.3d 1073, 1078 (9th Cir. 2020) (discussing danger). It has been

11  described as a "human rights catastrophe," Dkt. 293-34 at 1, and overwhelming

12  evidence corroborates the existence of these threats. *See, e.g.*, Ex. 20 at ¶¶ 83-86.

13  Defendants are or should be fully aware of the peril the turnback policy places on its

14  targets, and have thus violated their duty of *non-refoulement* by implementing it.

15  *See, e.g.*, Ex. 100 at 201:1-203:5.

16          Finally, the Turnback Policy subjects asylum-seekers to impermissible chain

17  *refoulement*—that is, the risk that CBP's expulsion of migrants to Mexico will lead

18  to Mexican-initiated deportation.[20] Mexico—whose asylum system has been

19  described as on "the brink of collapse"[21]—has continually violated migrants' rights.

20  To wit, when CBP turned back Plaintiff Roberto Doe in October 2018, it specifically

21  instructed Mexican immigration officials to remove him from the bridge, and

22  Roberto was later deported from Mexico. Dkt. 390-75 at ¶ 4, 9, 390-97 at ¶¶ 6-7.

23  Plaintiff Cesar Doe would have suffered the same fate were it not for the timely

24  intervention of an attorney who thwarted his deportation twelve days into his

25  _____

26  [20] *See, e.g.*, *Hirsi Jamaa and Others v. Italy*, App. No. 27765/09 (Eur. Ct. H.R., Feb.
    23, 2012) (Italy violated *non-refoulement* when it refused to consider whether Libya

27  would onwardly deport asylum seekers); *T.I. v. United Kingdom*, App. No.
    43844/98, ¶ 2 (Eur. Ct. H.R., Mar. 7, 2000) available at shorturl.at/iHK68 (same).

28  [21] Elyssa Pachico and Maureen Meyer, *One Year After U.S.-Mexico Migration Deal,
    a Widespread Humanitarian Disaster*, WOLA (Jun. 6, 2020).

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

Mexican-ordered detention. Dkt. 390-101 at ¶¶ 8-9. CBP's cooperation with Mexican immigration authorities jeopardizes hundreds—if not thousands—of individuals' legitimate claims to asylum through the *chain refoulement* process. *See, e.g.*, Dkt. 293-47 at ¶¶ 11-16; 293-46 at ¶¶ 39-46.

### C. The Court Should Enter A Permanent Injunction

The relief Plaintiffs seek is simple: for Defendants to cease treating asylum seekers differently from all other people arriving at POEs on foot or by vehicle. Prior to instituting the Turnback Policy, the government inspected those seeking access to the asylum process just like everybody else; that is, in the order in which they approached the POE. Defendants' self-generated "operational capacity" constraints have created an unlawful and untenable situation at the U.S.-Mexico border and absent injunctive relief, Defendants' "past and present misconduct indicates a strong likelihood of future violations." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990). "The Supreme Court has repeatedly upheld the appropriateness of federal injunctive relief to combat [such] a 'pattern' of illicit law enforcement behavior." *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985).

Because they have succeeded on the merits of their claims, *see supra* 20-37, Plaintiffs' ability to satisfy the remaining factors warranting permanent injunctive relief is uncontroversial. "A permanent injunction is appropriate when: (1) a plaintiff will suffer an irreparable injury absent injunction, (2) remedies available at law are inadequate, (3) the balance of hardships between the parties supports an equitable remedy, and (4) the public interest would not be disserved." *Sierra Club v. Trump*, 963 F.3d 874, 895 (9th Cir. 2020) (citing *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006)).

*First*, as discussed *supra* 16-18, the statutory, constitutional, and international law violations Defendants commit through implementation of the turnback policy put asylum seekers in grave danger in Mexico and deny them access to the U.S.

1  asylum process. These violations constitute irreparable harm. *See E. Bay Sanctuary*

2  *Covenant v. Trump*, 349 F. Supp. 3d 838, 864 (N.D. Cal. 2018) (loss of the right to

3  seek asylum constitutes irreparable harm); *Hernandez v. Sessions*, 872 F.3d 976, 994

4  (9th Cir. 2017) ("the deprivation of constitutional rights 'unquestionably constitutes

5  irreparable injury'") (citation omitted). Moreover, the "ongoing harms to [Plaintiff

6  Al Otro Lado's] organizational missions" also constitute irreparable harm. *E. Bay*

7  *Sanctuary Covenant v. Barr*, 964 F.3d at 854 (citation omitted).

8       **Second**, injunctive relief is appropriate because the turnback policy strands

9  class members in border towns where they face grave harm while waiting

10 indefinitely to seek asylum in the U.S., *see supra* 16-18, and there "are no legal

11 remedies available that would adequately compensate the class members" for this

12 type of harm. *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998) (there is "no

13 way to calculate the value of such a constitutional deprivation or the damages that

14 result from erroneous deportation") (citation omitted). Moreover, where, as here, a

15 court has certified a class action under Rule 23(b)(2), Dkt. 513 at 18, the Rule

16 "literally permits only class applications for injunctive or declaratory relief."

17 *LaDuke*, 762 F.2d at 1330.

18      **Third** and **Fourth**, the balance of the hardships and the public interest weigh

19 in Plaintiffs' favor. "When the government is a party to the case, the court should

20 consider the balance of hardships and public interest factors together." *Sierra Club*,

21 963 F.3d at 895 (citation omitted). Even if Defendants suffer some hardship by

22 processing more asylum seekers, that harm is far outweighed by denying class

23 members access to the U.S. asylum process. On the one hand, processing and

24 inspecting asylum seekers is *CBP's job*. Asking an agency to do its job is not a

25 hardship. Defendants inspected asylum seekers as they approached a POE without

26 resorting to turnbacks before 2016, *see* Ex. 3 at 71:9-16, and continue to do so for

27 individuals who approach a POE with travel documents and for vehicular traffic, Ex.

28 118 at 24:17-25:13. There is no reason why CBP cannot return to inspecting and

processing even high numbers of asylum seekers. Ex. 3 at 71:9-16. On the other hand, any hardships the government faces pale in comparison to the denial of statutory rights and the grave risk of persecution, torture, and death that class members will face absent an injunction. *See supra* at 16-18.

Complying with an injunction should not be difficult. Defendants have ███████ ███████████████████████████████████████████████████ Ex. 120 at 270 ("█████████████████████████████████████████████████████████ ███████████████████████"). Moreover, the Supreme Court has recognized that "preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm," is "of course" in the public interest. *Nken v. Holder*, 556 U.S. 418, 436 (2009); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). Turning back Mexican class members to their country of origin and stranding non-Mexican class members in Mexico constitutes an unlawful denial of access to the U.S. asylum process. Defendants have sought to do through policy what they cannot do by law: deny those in need of protection access to the U.S. asylum process. Therefore, the Court should enter an injunction that permanently enjoins all forms of turnbacks and requires Defendants to inspect and process asylum seekers as they arrive at Class A POEs on the U.S.-Mexico border.

## E. The Court Should Enter A Declaratory Judgment

In addition to a injunctive relief, the Court should also enter a declaratory judgment that Defendants have violated the APA, Fifth Amendment, and ATS. "[A]ny court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see also McGraw-Edison Co.*, 362 F.2d at 342 (declaratory relief is appropriate in addition to other forms of relief). Here, Plaintiffs seek a declaratory judgment that "will serve a useful purpose in clarifying

the legal relations at issue," *GEICO v. Dizol*, 133 F.3d 1220, 1225 n.5 (9th Cir. 1998), namely adjudicating whether the turnback policy broke the law. Because Plaintiffs have shown via undisputed facts that Defendants' conduct was unlawful, this Court should enter a declaratory judgment that Defendants violated the APA, Fifth Amendment, and ATS. *See California v. Trump*, 963 F.3d 926, 949 (9th Cir. 2020) (affirming summary judgment entering a declaratory judgment where the undisputed facts showed that the Government broke the law).

**V.    CONCLUSION**

For the foregoing reasons, Plaintiffs are entitled to summary judgment, declaratory relief, and a permanent injunction.

Dated: September 4, 2020

MAYER BROWN LLP
 Matthew H. Marmolejo
 Ori Lev
 Stephen M. Medlock

SOUTHERN POVERTY LAW CENTER
 Melissa Crow
 Sarah Rich
 Rebecca Cassler

CENTER FOR CONSTITUTIONAL RIGHTS
 Baher Azmy
 Ghita Schwarz
 Angelo Guisado

AMERICAN IMMIGRATION COUNCIL
 Karolina Walters

By: */s/ Stephen M. Medlock*
 Stephen M. Medlock

*Attorneys for Plaintiffs*

MEMO OF P. & A. IN SUPP. OF
PLTFS' MOT. S.J.

1

**CERTIFICATE OF SERVICE**

2    I certify that I caused a copy of the foregoing document to be served on all

3 counsel via the Court's CM/ECF system.

4 Dated: September 4, 2020                    MAYER BROWN LLP

5

6                                            By _/s/ Stephen M. Medlock_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28