1  MAYER BROWN LLP
   Matthew H. Marmolejo (CA Bar No. 242964)
2    *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4    Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5      *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:   +1.202.263.3000
   Facsimile:    +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11     *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                    **UNITED STATES DISTRICT COURT**
16
                 **SOUTHERN DISTRICT OF CALIFORNIA**
17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19               Plaintiffs,              **EXHIBIT 1 IN SUPPORT OF
                                          PLAINTIFFS' MEMORANDUM OF
20        v.                              POINTS AND AUTHORITIES IN
                                          SUPPORT OF THEIR MOTION
21  Chad F. Wolf,[1] *et al.*,            FOR SUMMARY JUDGMENT

22               Defendants.
                                          **REDACTED VERSION**
23

24

25

26

27  _____
   [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 1 IN SUPPORT OF PLAINTIFFS' MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

------------------------------

AL OTRO LADO, INC., et al.,

      Plaintiffs,

v.                         Case No.

                           17-cv-02366-BAS-KSC

KEVIN K. McALEENAN, et al.,

      Defendants.

------------------------------

      Deposition Taken of ███████████, on
Thursday, November 21, 2019, at 9:30 a.m., held at
the offices of Mayer Brown, 1999 K Street, N.W.,
Washington, D.C. 20006, before Goldy Gold, a
Registered Professional Reporter and a Notary Public
within and for District of Columbia.



Page 2

```
 1    A P P E A R A N C E S:
 2
 3    On Behalf of the Plaintiffs:
 4         STEPHEN M. MEDLOCK, ESQUIRE
           Mayer Brown
 5         1999 K Street, N.W.
           Washington, D.C. 20006
 6         Telephone:  202.263.3221
           E-mail:  smedlock@mayerbrown.com
 7
 8
      On Behalf of the Defendants:
 9
           ALEXANDER J. HALASKA, ESQUIRE
10         U.S. Department of Justice
           Office of Immigration Litigation
11         Ben Franklin Station, P.O. Box 868
           Washington, D.C. 20044
12         Telephone:  202.307.8704
           E-mail:  alexander.j.halaska@usdoj.gov
13
14
           MELISSA CROW, ESQUIRE
15         Southern Poverty Law Center
           1101 17th Street, N.W., Suite 705
16         Washington, D.C. 20036
           Telephone:  202.355.4471
17         E-mail:  melissa.crow@splcenter.org
18
19         REBECCA CASSLER, ESQUIRE
           Southern Poverty Law Center
20         P.O. Box 1287
           Decatur, Georgia 30031
21         Telephone:  404.521.6700
           E-mail:  rebecca.cassler@splcenter.org
22
23
      Also Present:
24         Kristine E. King, Esquire
           Jillian M. Clouse, Esquire
25         U.S. Department of Homeland Security
```



Page 3

1                       I N D E X

2              Deposition of ███████████

3                  November 21, 2019

4

5    Examination By:                           Page

6  Mr. Medlock                                    5

7  Mr. Halaska                                  247

8  Mr. Medlock                                  253

9  Mr. Halaska                                  263

10 Mr. Medlock                                  264

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 4

E X H I B I T S

| Exhibits | Description | Page |
|---|---|---|
| Exhibit 1 | Plaintiff's first notice of deposition | 6 |
| Exhibit 2 | Protective order | 21 |
| Exhibit 3 | Metering guidance memorandum | 79 |
| Exhibit 4 | Declaration of Mariza Marin | 101 |
| Exhibit 5 | E-mail, 3/21/2019 | 107 |
| Exhibit 6 | E-mail, 6/16/2018 | 114 |
| Exhibit 7 | E-mail, 5/2/2019 | 134 |
| Exhibit 8 | E-mail, 2/5/2019 | 136 |
| Exhibit 9 | E-mail, 1/10/2019 | 139 |
| Exhibit 10 | E-mail, 12/26/2018 | 141 |
| Exhibit 11 | Copy of 9/4/2018 muster | 147 |
| Exhibit 12 | Tecate Limit Line Officer Standard Operating Procedure | 156 |
| Exhibit 13 | E-mail chain, 11/2/2018 through 11/7/2018 | 167 |
| Exhibit 14 | Letter, 8/23/2018 | 183 |
| Exhibit 15 | E-mail chain, 11/2/2018 through 2/12/2019 | 199 |
| Exhibit 16 | Memorandum, 11/19/2019 | 203 |
| Exhibit 17 | Memorandum, 2/13/2019 | 211 |
| Exhibit 18 | Note, CBP Ofc. ████████ | 222 |
| Exhibit 19 | Report of Investigation of Alleged Violations of Immigration Laws at the Tecate Port of Entry by U.S. CBP | |



```
 1                   P R O C E E D I N G S
 2    WHEREUPON --
 3                    ███████████████
 4    a witness called for examination, having been duly
 5    sworn by a Notary Public, was examined and testified
 6    as follows:
 7                        EXAMINATION
 8    BY MR. MEDLOCK:
 9         Q.     Good morning, sir.
10         A.     Good morning.
11         Q.     Would you please state and spell your
12    full name?
13         A.     ████████████████████
14         Q.     Have you ever gone by any other name,
15    sir?
16         A.     No, sir.
17         Q.     Are you presently employed?
18         A.     Yes.
19         Q.     Where are you employed?
20         A.     Tecate Port of Entry.
21         Q.     Have you ever heard the term "port of
22    entry" abbreviated as "POE" before?
23         A.     Correct.
24         Q.     If I use the term "POE," you won't be
25    confused by that today?
```



```
 1        A.      No.

 2        Q.      What's your present job title at the

 3   Tecate POE?

 4        A.      Customs and Border Protection officer.

 5        Q.      How long have you worked at U.S. Customs

 6   and Border Protection?

 7        A.      Since July 9th of 2012.

 8        Q.      That's the date you were sworn in?

 9        A.      Yes.

10        Q.      What is your present work address?

11        A.      405 Tecate Road, Tecate, California.  I

12   don't know the ZIP Code.

13        Q.      That's all right.  It's not a memory

14   test.  Don't worry about it.

15        ██████████████████████████████

16        A.      ████████████████████████████

17   █████████████████████

18              MR. MEDLOCK:  We'll go ahead and mark

19        the first exhibit as Exhibit 1 and give a copy

20        of it to your counsel.

21              [Exhibit 1, a notice of deposition, was

22        marked for identification.]

23   BY MR. MEDLOCK:

24        Q.      Sir, you have in front of you what we've

25   marked as Exhibit 1 to your deposition.  It's a copy
```



MAGNA ▶
LEGAL SERVICES

Page 7

1    of a multipage document that is entitled "Plaintiff's

2    First Deposition Notice."

3              Have you seen this document before, sir?

4    A.    No.

5    Q.    On the page that you're -- that you have

6    in front of you, that's page 3 of the notice.  Do you

7    see that, sir?

8    A.    Yes.

9    Q.    And do you see your name on that page of

10   the notice?

11   A.    Correct.

12   Q.    And that page indicates that you are to

13   be deposed today, at this time and at this location,

14   correct?

15   A.    Yes.

16   Q.    Have you ever been deposed before, sir?

17   A.    Yes.

18   Q.    And that case was Doyma, D-o-y-m-a,

19   Michel, M-i-c-h-e-l, versus United States; is that

20   right?

21   A.    I -- I don't know the exact name.

22   Q.    Besides that one deposition, have you

23   ever testified in court before, sir?

24   A.    Testified in court?

25   Q.    Yes.



Page 8

```
 1          A.      Yes.

 2          Q.      How many times?

 3          A.      Three to four.

 4          Q.      When you testified at a deposition

 5     before, did you have an opportunity to review a copy

 6     of your transcript afterwards?

 7          A.      I don't recall.

 8          Q.      Do you still have a copy of your

 9     deposition transcript from that case?

10          A.      I don't believe so.

11          Q.      Have you ever been involved in any sort

12     of arbitration proceeding before?

13          A.      Not that I know, no.

14          Q.      Have you ever testified before any

15     governmental body, other than the deposition and the

16     trial testimony that we talked about?

17          A.      No.

18          Q.      Have you ever provided written testimony

19     in the form of an affidavit or a declaration before,

20     sir?

21          A.      No.

22          Q.      So it sounds like you may have done this

23     before, so I'm going to over the ground rules pretty

24     quickly.  But if at any point you don't understand

25     any of these ground rules, please let me know.  I can
```



MAGNA
LEGAL SERVICES

Page 9

1    stop and explain them in more detail to you.

2         A.    Okay.

3         Q.    So a deposition is essentially a

4    conversation between me and you in which I ask

5    questions and you answer them.  It's important in any

6    sort of answer that you give that it be audible.  The

7    court reporter is extremely good, but she can't take

8    down shakes of the head, and the words uh-huh and

9    uh-uh can sounds very similar.  So please state your

10   answer audibly and clearly.  Do you understand that?

11        A.    Yes.

12        Q.    It's important that you understand my

13   questions.  So if at any point you don't understand a

14   word I'm using or the question I'm asking, please let

15   me know.  It happens; sometimes I ask a C-plus

16   question.  Just let me know, and I'll try and do my

17   usual B-plus and A-minus work.  Okay?

18        A.    Okay.

19        Q.    Objections:  From time to time your

20   lawyers here can object.  That's their right.

21   Objections are something that the court will rule on

22   later.  So unless your attorney asks you not to

23   answer a question based on his or her objection, I'm

24   going to ask you to answer the question for today.

25   You understand that?



1      A.     Yes.

2      Q.     Most importantly for you, we're going to

3   take some breaks.  I'll do my best to try to take a

4   break every hour, but I know that the need can arise

5   for a break when we're taking a deposition.  So if

6   you need a break, just let me know.  My only request

7   is that you answer any pending question before taking

8   the break.  Do you understand that?

9      A.     Yes.

10      Q.     Unless I state otherwise today, my

11   questions are going to relate to the period from

12   January 1, 2016, through the present.  Do you

13   understand that?

14      A.     Yes.

15      Q.     During this deposition, we will refer to

16   the U.S. Department of Homeland Security as DHS.  Do

17   you understand that?

18      A.     Yes.

19      Q.     We talked a little bit about

20   U.S. Customs and Border Protection.  That's sometimes

21   abbreviated as "CBP," correct?

22      A.     Yes.

23      Q.     From time to time I'll use the term

24   "CBP" today.  Do you understand that?

25      A.     Yes.



1      Q.      You understand that you took an oath to
2   tell the truth today?
3      A.      Yes.
4      Q.      And you understand that's the same oath
5   that you would take as if you were in a courtroom
6   testifying, correct?
7      A.      Yes.
8      Q.      And you understand there could be
9   criminal consequences for lying under oath, correct?
10      A.      Yes.
11      Q.      Is there any reason that you can't
12   testify fully and truthfully today?
13      A.      No.
14      Q.      Other than traffic offenses, have you
15   ever been convicted of a crime, sir?
16      A.      No.
17      Q.      And other than traffic offenses, have
18   you ever been charged with a crime?
19      A.      No.
20      Q.      Again, other than traffic offenses, have
21   you ever been arrested?
22      A.      No.
23      Q.      Have you ever been sued before in a
24   personal capacity?
25      A.      No.



Page 12

1          Q.     Have you ever been a party to a lawsuit
2     as a plaintiff or a defendant?
3          A.     I don't believe so.
4          Q.     I think you'd probably know.
5                 Have you ever been disciplined for your
6     conduct at CBP?
7          A.     Yes.
8          Q.     And when did that occur?
9          A.     2018.  I don't know the exact date.
10         Q.     What were the circumstances that led to
11    that disciplinary action?
12         A.     It was just for being on my cell phone.
13         Q.     So you were -- I think I remember this.
14    You were at the limit line and you were on your cell
15    phone briefly?
16         A.     Correct.
17         Q.     Okay.  We'll talk about that later.
18                Are you being represented by any
19    attorneys in connection with your deposition today?
20                THE WITNESS:  Is that you guys?
21                MR. HALASKA:  You can answer the
22         question to the best of your ability.
23         A.     Yes.
24         Q.     To the best of your knowledge, which
25    attorney is sitting to your right or representing you



Page 13

```
 1   today?

 2               MR. HALASKA:  My name is Alex Halaska.

 3         The witness is gesturing towards me.

 4               MR. MEDLOCK:  Thank you, Alex.

 5               THE WITNESS:  Yes.

 6   BY MR. MEDLOCK:

 7         Q.    Without going into the substance of your

 8   conversations with any of the attorneys that you

 9   have, have you met with anyone to prepare for your

10   deposition today?

11         A.    Other than my attorneys?

12         Q.    Including your attorneys.  Just a "yes"

13   or "no."

14         A.    Yes.

15         Q.    Who did you meet with?

16         A.    Alex.

17         Q.    Mr. Halaska?

18         A.    Correct.

19         Q.    Did you meet with anyone else, other

20   than Mr. Halaska?

21         A.    Yes.

22         Q.    Were those individuals attorneys as

23   well?

24         A.    Yes.

25         Q.    Where did that meeting take place?
```



Page 14

```
 1        A.      At their office.  I don't know the
 2   exact --
 3        Q.      In Washington, D.C.?
 4        A.      Correct.
 5        Q.      At the offices of the U.S. Department of
 6   Justice; is that right?
 7        A.      Yes.
 8        Q.      When did that meeting begin?
 9        A.      9:30.
10        Q.      And that meeting occurred yesterday; is
11   that right?
12        A.      Correct.
13        Q.      When did that meeting end?
14        A.      1:30?
15        Q.      So you were at the offices of the
16   U.S. Department of Justice from 9:30 to 1:30
17   yesterday; is that right?
18        A.      Correct.
19        Q.      And during that four hours, was that
20   time exclusively devoted to meeting with attorneys?
21        A.      Yes.
22        Q.      When you met with the attorneys from the
23   U.S. Department of Justice to prepare for your
24   deposition, were there any non-attorneys who were
25   present in the room?
```



Page 15

```
 1        A.      No.

 2        Q.      Other than yourself, of course.

 3        A.      No.

 4        Q.      Did anyone participate in that meeting

 5   via telephone?

 6        A.      No.

 7        Q.      Did anyone participate in that meeting

 8   via video conference?

 9        A.      No.

10        Q.      Prior to the meeting, did you receive

11   any documents from any of the attorneys that are

12   representing you in this case via e-mail or via

13   regular mail?

14        A.      Yes.

15        Q.      How many documents did you receive?

16        A.      It was -- pages, you mean?

17        Q.      Different documents, not just pages.

18   How many documents?

19        A.      One.

20        Q.      And how many pages long was that

21   document?

22        A.      I believe it was 131 pages.

23        Q.      I have a good idea of what that document

24   is, but I won't ask what it was.

25                Did you read that document prior to the
```



Page 16

1    meeting?

2        A.      Four pages of it.

3        Q.      Outside of your conversations with your

4    lawyers, have you discussed this deposition with

5    anyone else?

6        A.      Just people at work.

7        Q.      And when you say "people at work," who?

8        A.      I mean, just coworkers, saying that I'm

9    coming here.  But I don't know for really what.

10       Q.      When you talked to those coworkers, did

11   you tell them that you were having your deposition

12   taken, or did you tell them you were simply traveling

13   outside of the office?

14       A.      Just doing a deposition.

15       Q.      Did you tell them what case you were

16   being deposed in?

17       A.      No.

18       Q.      Did you have any conversations with your

19   coworkers about the substance of your testimony

20   today?

21       A.      No.

22       Q.      The document that you were shown that

23   was 131 pages that you said you read four pages of,

24   did reading those four pages refresh your memory

25   about anything that may have happened in the past?



Page 17

1    A.    No.

2    Q.    During your meeting at the

3    U.S. Department of Justice yesterday, were you shown

4    any documents during that meeting?

5          And this is simply a "yes" or "no"

6    question.

7    A.    Yes.

8    Q.    How many documents were you shown?

9    A.    Five.

10   Q.    Did reviewing those documents refresh

11   your memory about anything that happened in the past?

12   A.    Yes.

13   Q.    How did it refresh your memory about

14   things that happened in the past?

15   A.    Just different situations that arose

16   during the process.

17   Q.    When you say the process, what are you

18   referring to?

19   A.    Of whistle-blowing.

20   Q.    And which documents in particular

21   refreshed your memory about the process of

22   whistle-blowing?

23   A.    E-mails that were sent to either OIG or

24   Office of Special Counsel.

25   Q.    And these e-mails that were sent to OIG,



Page 18



```
 1   ███████████████████████████████████████

 2        A.    ███████████

 3        Q.    ████████████████████████████████

 4   ███████████████████████████████████████████

 5   ███████████████████████████████████████████

 6        A.    There were just dates, and one was about

 7   another officer that came to mind.  Other than that,

 8   that was pretty much it.

 9        Q.    How was your memory refreshed about --

10   well, let me ask a better question, actually.

11             Who was the officer that you were

12   referring to in your last answer?

13        A.    ████████████

14        Q.    Is that Officer ████████████

15        A.    Correct.

16        Q.    What was your memory refreshed about

17   with respect to ███████████████?

18        A.    ███████████████████████████████████

19   ███████████████████████████████████████████████

20   █████████████████████████████████████████████

21        Q.    █████████████████████████████████████

22   ███████████████████████████

23        A.    ████████████████████████████████████

24        Q.    ████████████████████████████████████

25   █████████████████
```


MAGNA
LEGAL SERVICES

1      A.      I -- I don't know the exact date.

2      Q.      Do you know -- ███████ is a coworker

3  of yours at the Tecate Port of Entry; is that right?

4      A.      Yes.

5      Q.      And how did you come to know that she

6  was disciplined for letting an asylum seeker pass the

7  limit line at the Tecate Port of Entry?

8      A.      She told me.

9      Q.      And what, specifically, did she tell you

10  about being disciplined for letting an asylum seeker

11  pass the limit line at the Tecate Port of Entry?

12      A.      Nothing much.  She pretty much just told

13  me that these asylum seekers were in a group of

14  people with documents, and she checked as many as she

15  could, and they were -- they got past her.  And she

16  got disciplined for it.

17      Q.      How was she disciplined?

18      A.      She got what I believe was a letter of

19  reprimand.

20      Q.      Can a letter of reprimand have a

21  negative consequence for someone's promotion, ability

22  to be promoted within CBP?

23      A.      Yes.

24      Q.      How so?

25      A.      They won't even accept you if you have a



Page 20

1    letter on file.

2        Q.      Was it an official policy of CBP, to

3    your knowledge, to discipline officers for letting

4    asylum seekers past the limit line?

5        A.      Not that I knew at that time.

6        Q.      Did you have an understanding at the

7    time that asylum seekers should not be let past the

8    limit line at the Tecate Port of Entry?

9        A.      Yes.

10       Q.      And, in fact, at that time, asylum

11   seekers that came to the limit line were instructed

12   to be turned back and redirected to the San Ysidro

13   Port of Entry; is that right?

14       A.      Yes, or Calexico.

15       Q.      But in either circumstance, an asylum

16   seeker that came to the limit line at the Tecate Port

17   of Entry would be turned back; is that right?

18       A.      Correct.

19       Q.      Are there any other facts that you

20   recall as a result of reviewing those e-mails with

21   the Office of Inspector General of DHS and the Office

22   of Special Counsel?

23       A.      No.

24       Q.      In addition to the documents that you

25   were shown by your counsel, did your counsel read to



Page 21

1    you the contents of any documents during your

2    preparation yesterday?  And this is just a "yes" or

3    "no" question.

4          A.     Just a confidential.

5          Q.     I'm sorry?

6          A.     A confidential document that I had to

7    sign.

8          Q.     Oh, okay.  Understood.

9                 Have you ever heard any news stories

10   regarding this lawsuit?

11         A.     No.

12         Q.     Have you read any of the documents that

13   have been filed with the court in this lawsuit?

14         A.     I think it was just that 131 pages.

15         Q.     Was that the complaint?

16         A.     Yeah, that one.

17         Q.     Second amended complaint, probably?

18         A.     I don't remember.

19                MR. MEDLOCK:  Exhibit 2.

20                [Exhibit 2, a protective order, was

21         marked for identification.]

22   BY MR. MEDLOCK:

23         Q.     Sir, I put in front of you what was

24   marked Exhibit 2 to your deposition.  It's a

25   multi-page document that comprises the protective



Page 22

1    order in this case, in Exhibit A to the protective

2    order, which it appears that you have signed.

3              Please take a moment to flip through it,

4    and then let me know audibly on the record when

5    you're done doing so.

6         A.    Yes.

7         Q.    Is that a copy of the protective order

8    that you were referring to earlier in your testimony?

9         A.    Yes.

10        Q.    And you reviewed a copy of this

11   yesterday with your counsel and then signed it,

12   correct?

13        A.    Correct.

14        Q.    Do you have a cell phone, sir?

15        A.    Yes.

16        Q.    Who's the provider of your cell phone?

17        A.    Verizon.

18        Q.    And do you use your cell phone for work

19   purposes?

20        A.    For the whistle-blowing, I did.

21        Q.    When you say you used it for the

22   whistle-blowing, can you explain what you mean by

23   that?

24        A.    For all the e-mails I used to OSC.

25        Q.    And also to the Office of Inspector



Page 23

1      General?

2           A.      Yes.

3           Q.      Did you exclusively communicate with the

4      Office of Inspector General and the Office of Special

5      Counsel via e-mail on your phone?

6           A.      I think I used both, I believe.

7           Q.      When you say "both," what are you

8      referring to?

9           A.      My personal phone and work e-mails.

10          Q.      When you sent an e-mail to the Office of

11     Special Counsel from your personal phone, would you

12     have sent it from your personal e-mail address?

13          A.      Correct.

14          Q.      What's your personal e-mail address?

15          A.      ███████████████████

16          Q.      How many e-mails would you estimate you

17     sent from ████████████████ to the Office of

18     Special Counsel?

19          A.      Maybe, ten.

20          Q.      And with respect to the Office of

21     Inspector General, how many e-mails did you send from

22     ████████████████████ to the Office of Inspector

23     General?

24          A.      Maybe, five or a little less.

25          Q.      Why did you choose to use your personal



Page 24

1    e-mail to send those communications to the Office of

2    Special Counsel and the Office of Inspector General?

3           A.    It's just easier.

4           Q.    Can you recall the approximate time

5    period in which you would have been using your

6    personal e-mail to send e-mails to the Office of

7    Special Counsel and the Office of Inspector General?

8           A.    The approximate time?

9           Q.    The time period in which you would have

10   done it.

11          A.    From the time I made the complaint,

12   which I don't remember the exact date.

13          Q.    So if I said it was around the summer of

14   2018 through the summer of 2019, does that sound

15   correct?

16          A.    Yes.

17          Q.    So that would have been the approximate

18   time period in which you would have been sending

19   e-mails from your personal e-mail account,

20   ███████████████████, to the Office of Special

21   Counsel and the Office of Inspector General; is that

22   right?

23          A.    Yes.

24          Q.    And to your knowledge, have you deleted

25   any of those e-mails?



Page 25

1          A.    No.

2          Q.    Have you been told by anyone to preserve

3    those e-mails?

4          A.    No.

5          Q.    If we ask you to go and find those

6    e-mails in your personal Yahoo account, could you do

7    that for us?

8          A.    Yes.  I don't know about today, but yes,

9    I could.

10          Q.    Would it be difficult to do so?

11          A.    I don't believe so.

12          Q.    Could you simply search for them and

13    then bring them up?

14          A.    I would think I could.

15          Q.    Can you think of any other instance in

16    which you used your cell phone for work purposes?

17          A.    I mean, to call in the work stuff,

18    but --

19          Q.    Other than that?

20          A.    No.

21          Q.    Can you think of any instance in which

22    you've used your personal e-mail,

23    ███████████████████  for work purposes?

24          A.    No.

25          Q.    Have you ever used any messaging apps,



Page 26

1    like WhatsApp or FaceTime or text messaging, for work
2    purposes?
3            A.    No.
4            Q.    Are you aware of any of your coworkers
5    at Tecate Port of Entry who do so?
6            A.    I don't know.
7            Q.    You don't know in the sense that they
8    may, but you just don't know one way or the other?
9            A.    Yeah.  Yes.
10           Q.    During the time that you worked at CBP,
11   have you communicated with any Mexican government
12   official?
13           A.    No.
14           Q.    Do you know whether any of your
15   coworkers at the Tecate Port of Entry have ever
16   communicated with a Mexican government official?
17           A.    No, I do not.
18           Q.    How about the San Ysidro Port of Entry,
19   any of your former coworkers at the San Ysidro Port
20   of Entry ever communicated with a Mexican government
21   official?
22           A.    I do not know.
23           Q.    And would the answer be the same with
24   respect to your former coworkers at the Otay Mesa
25   Port of Entry?



Page 27

```
 1        A.      Yes.

 2        Q.      Do you have a work e-mail address?

 3        A.      Yes.

 4        Q.      What is your work e-mail address?

 5        A.      ████████████████████████████

 6        Q.      Has that been your work e-mail address

 7    from January 1, 2016, to the present?

 8        A.      Yes.

 9        Q.      And I assume you use that work e-mail

10    address for work purposes; is that right?

11        A.      Yes.

12        Q.      Do you have a work computer issued to

13    you?

14        A.      No.

15        Q.      Do you have a personal computer at home?

16        A.      Not now.

17        Q.      So when you access ████████████████

18    you're using your cell phone exclusively to do that?

19        A.      Yes.

20        Q.      I'd like to move on to some of your

21    educational experience.

22                What's the highest level of education

23    you obtained, sir?

24        A.      Some college.

25        Q.      "Some college" where?
```



Page 28

1          A.      In Southwestern College.

2          Q.      And where's Southwestern College

3    located?

4          A.      In Chula Vista.

5          Q.      California?

6          A.      California.

7          Q.      I'm usually pretty good with college

8    mascots, but I've got to admit, I don't know

9    Southwestern.

10         A.      It's a community college.

11         Q.      How many years were you at Southwestern?

12         A.      Two to three.

13         Q.      And what was the course of study you

14   were in before you left?

15         A.      I kept changing.  I think it was fire

16   science.

17         Q.      When did you leave Southwestern?

18         A.      I can't tell you that.  I don't know.

19         Q.      What was your first job after you left

20   Southwestern?

21         A.      I've had a lots of jobs.

22         Q.      Immediately prior to joining -- deciding

23   to join CBP, what was your job?

24         A.      Pepsi.

25         Q.      What was your job at Pepsi?



Page 29

1        A.      Delivery driver.

2        Q.      So you were the person who actually took

3   the cans of Pepsi into the store and then put them

4   into the back, into the racks, the chill racks in the

5   back?

6        A.      Correct.

7        Q.      How long were you working as a delivery

8   driver for Pepsi?

9        A.      About two and a half years.

10       Q.      When did you decide to join CBP?

11       A.      In the middle of that.

12       Q.      Approximately when was the year when you

13   decided to join CBP?

14       A.      2010, 2011.

15       Q.      Why did you decide to join CBP?

16       A.      Pay, pretty much.

17       Q.      Any other reason?

18       A.      It seemed like a good career to get

19   into, something I can stay with for a very long time.

20       Q.      And I think you said earlier you began

21   to work for CBP in July 2012; is that correct?

22       A.      Correct.

23       Q.      Prior to being sworn in, did you receive

24   training at the Federal Law Enforcement Training

25   Center in Glynco, Georgia?



Page 30

```
 1        A.     I think we swear in first.

 2        Q.     Oh, you swore in first, and then you

 3   went to training?

 4        A.     Yes.

 5        Q.     But you did go to the Federal Law

 6   Enforcement Training Center in Glynco, Georgia?

 7        A.     Correct.

 8        Q.     And you received training at the Federal

 9   Law Enforcement Training Center for about six months;

10   is that right?

11        A.     Yes.

12        Q.     At the Federal Law Enforcement Training

13   Center, you took courses on Spanish; is that right?

14        A.     Yeah, after.

15        Q.     After.  And that's sort of an intensive

16   course to get your Spanish up to where it needs to

17   be; is that right?

18        A.     Not really.  It's just for the

19   declaration, to learn the declaration.

20        Q.     And "to learn the declaration" in --

21   what do you mean by that?

22        A.     The Customs declaration.

23        Q.     I see.

24               When you were at the Federal Law

25   Enforcement Training Center, did you take any courses
```



Page 31

```
 1    related to the U.S. asylum law?
 2         A.     No.
 3         Q.     How about U.S. immigration law,
 4    generally?
 5         A.     Yes.
 6         Q.     What courses did you take regarding
 7    U.S. immigration law?
 8         A.     I -- I don't recall.
 9         Q.     So you recall there was a course, but
10    you don't recall what it was called?
11         A.     Yeah, because we go over -- there's like
12    six books or seven books we go over, and it's just
13    all different immigration and all the different
14    classes.
15         Q.     Were there books specifically related to
16    the law and regulations for U.S. immigration?
17         A.     I believe so.
18         Q.     Do you remember what the title of that
19    book was?
20         A.     No.
21         Q.     Were you provided any training materials
22    outside of that book regarding U.S. immigration law?
23         A.     Just what we had over there at FLETC.
24         Q.     Do you still have a copy of that book?
25         A.     No.
```



Page 32

```
 1        Q.      Do you have a copy of any of the

 2   training materials that you received from the Federal

 3   Law Enforcement Training Center?

 4        A.      No.

 5        Q.      Were you assigned any homework related

 6   to U.S. immigration law during your -- the time you

 7   were at training?

 8        A.      I don't know if it was homework or just

 9   studying for tests.

10        Q.      Did you have any tests regarding

11   U.S. immigration law?

12        A.      Right now?

13        Q.      No, no, no.  When you were in training.

14        A.      Yes, I had tests.

15        Q.      Do you recall any of the types of

16   questions that would be on the tests related to

17   immigration law?

18        A.      Yeah.

19        Q.      You know there were questions on the

20   test, you just don't recall what the questions were;

21   is that right?

22        A.      Yes.

23        Q.      Did you receive any other training

24   related to U.S. immigration law when you were at the

25   Federal Law Enforcement Training Center?
```



MAGNA
LEGAL SERVICES

Page 33

1      A.      No.

2      Q.      Since going to work at ports of entry on

3  the U.S.-Mexico border, have you received any

4  continuing training regarding U.S. immigration law?

5      A.      No.

6      Q.      Have you, from time to time, received

7  any written materials updating you on changes to

8  U.S. immigration law?

9      A.      We have these PALMS courses, which are

10  on-line courses that we've got to do every year.  But

11  I don't know exactly what -- I can't tell what's on

12  there.

13      Q.      When you say PALMS, that's an acronym,

14  right?  Can you spell it out?

15      A.      I believe it's P-A-L-M-S.

16      Q.      Do you understand what it stands for?

17      A.      No.

18      Q.      Do the PALMS courses that you take

19  on-line include information about U.S. immigration

20  law?

21      A.      I'm sure there is.  I just -- there's so

22  many we had to take, so I just -- I can't tell you

23  exactly if there is or not.

24      Q.      And do you have to take those PALMS

25  courses annually?



Page 34

    1          A.      Yes.

    2          Q.      Is it required to take them, or is it

    3   merely suggested?

    4          A.      Required.

    5          Q.      So you're taking it is tracked

    6   internally at CBP in some way; is that your

    7   understanding?

    8          A.      Yes.

    9          Q.      Do you get any sort of test at the end

   10   of the PALMS course to make sure you were paying

   11   attention?

   12          A.      Yes.

   13          Q.      And are you graded on the results of

   14   that test?

   15          A.      Yes.

   16          Q.      Do you know if the grade you get in the

   17   PALMS course is reported to your management?

   18          A.      I don't know if it's just a pass or

   19   fail.

   20          Q.      Is it pass/fail or do you get --

   21          A.      No, you do get a grade.  I just don't

   22   know if they know if it's a -- if it's you passed it

   23   or if it's the actual percentage.

   24          Q.      When you were at the Federal Law

   25   Enforcement Training Center, did you get any training



Page 35

1   whatsoever with respect to the procedure for

2   inspecting and processing noncitizens who don't have

3   proper travel documents?

4          A.     I don't recall.

5          Q.     It may have happened, but you just don't

6   know it, right now, sitting here?

7          A.     Yeah.  Yeah.

8          Q.     Since going to work in the field, have

9   you received any training, whether formal or

10  informal, regarding the proper procedure for

11  inspecting and processing noncitizens without proper

12  travel documents?

13         A.     Yes.

14         Q.     Can you describe that training?

15         A.

16

17

18

19

20

21

22

23

24

25         Q.     Are there any other processes that you



Page 36

1    received training on besides the four you just

2    mentioned?

3         A.     I'm sure there are.  I just don't recall

4    at this moment.

5         Q.     Okay. 

6

7

8

9         A.

10

11

12

13        Q.

14

15        A.

16        Q.

17

18

19        A.

20

21        Q.

22        A.

23        Q.

24        A.

25        Q.





Page 37

| | | |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | A. | |
| 5 | Q. | |
| 6 | A. | |
| 7 | Q. | |
| 8 | A. | |
| 9 | Q. | |
| 10 | | |
| 11 | A. | |
| 12 | Q. | |
| 13 | | |
| 14 | | |
| 15 | | |

16      A.      Not to my knowledge.

17      Q.      How many people attended the training?

18      A.      It was voluntarily based, so whoever

19   wanted to learn could ask for some overtime and go

20   there.

21      Q.      Where in the Otay Mesa Port of Entry

22   facility did the training take place?

23      A.      In the AEU.

24      Q.      Did you receive any written materials as

25   part of that training?







Page 39

```
 1          A.      Yes.

 2          Q.      And did you receive written materials

 3    that would have been taken off the Share drive as

 4    part of that training?

 5          A.      Yes.

 6          Q.      And it was voluntary as well?

 7          A.      Yes.

 8          Q.      For the U.S. asylum law process, what

 9    training did you receive on that, when you were in

10    the field?

11          A.      I really didn't receive any kind of

12    training.  I never processed an asylum case.

13          Q.      As you sit here today, have you still

14    not processed an asylum case?

15          A.      No.

16          Q.      When you were at San Ysidro, were you

17    ever posted to the limit line at San Ysidro?

18          A.      Yes.

19          Q.      Were you ever posted to primary

20    inspection at San Ysidro?

21          A.      Yes.

22          Q.      Can you explain what primary inspection

23    is, as it differs from the limit line?

24          A.      Primary inspection of pedestrian or

25    vehicle?
```



Page 40

1        Q.      Pedestrian.

2        A.      You're in a booth and you get people

3    crossing, and you're inspecting for immigration and

4    customs law as they cross.

5        Q.      And during that time, you've never had

6    somebody come up and express a credible fear?

7        A.      Yes, I have.

8        Q.      Okay.  But you didn't actually process

9    that case?

10       A.      No.

11       Q.      You send them to secondary?

12       A.      Correct.

13       Q.      During your time at San Ysidro, were you

14   ever posted to secondary inspection of pedestrians?

15       A.      Yes.

16       Q.      And during the time you were at

17   secondary inspection for pedestrians, you never

18   processed an asylum case; is that right?

19       A.      No.

20       Q.      In your time at Otay Mesa, were you

21   posted to the limit line?

22       A.      We didn't have one at the time.

23       Q.      Were you posted to the primary

24   inspection?

25       A.      Yes.



Page 41

1       Q.      Were you ever posted to secondary

2   inspection?

3       A.      Yes.

4       Q.      Can you explain the difference between

5   primary inspection and secondary inspection?

6       A.      So in secondary you have more checks in

7   the system to check out different -- you know, law

8   enforcement checks.  On the individual, you can go a

9   little more in detail on why they're there and what

10  they need and stuff like that.  Criminal history and

11  everything like that.

12      Q.      And when you were at Otay Mesa, were you

13  ever posted to secondary inspection?

14      A.      Yes.

15      Q.      For pedestrians?

16      A.      Yes.

17      Q.      And during the time you were doing

18  secondary inspections of pedestrians at Otay Mesa,

19  you never processed an asylum case; is that right?

20      A.      No.

21      Q.      And at the Tecate Port of Entry -- and

22  I'm sorry, I know I'm mispronouncing that -- at the

23  Tecate Port of Entry, you were posted to the limit

24  line; is that right?

25      A.      Yes.


MAGNA
LEGAL SERVICES

Page 42

1      Q.     And you were also posted to primary

2    inspection on occasion?

3      A.     Yes.

4      Q.     Were you ever posted to secondary

5    inspection?

6      A.     Yes.

7      Q.     In your entire time at Tecate, you never

8    processed an asylum case; is that right?

9      A.     No.

10     Q.     Would it be fair to say that your

11   training processing asylum cases is limited?

12     A.     Yes.

13     Q.     From your conversations with other CBP

14   officers who were assigned to OFO facilities, is your

15   level of training regarding asylum law pretty

16   typical?

17     A.     I don't believe so.  I think they're a

18   little more extensive.

19     Q.     That other officers have more extensive

20   experience with processing asylum cases?

21     A.     Well, it's a little more extensive of a

22   processing than an ER.

23     Q.     So you mentioned ██████████ earlier

24   today?

25     A.     Yes.



Page 43

1      Q.     And she's a coworker of yours at the

2    Tecate POE, correct?

3      A.     Yes.

4      Q.     And have you ever seen ████████

5    process an asylum seeker?

6      A.     No.  We also worked different shifts.

7      Q.     Are you're on the second shift at

8    Tecate, correct?

9      A.     Correct.

10      Q.     Has anyone on the second shift at

11    Tecate, that you've observed, ever processed an

12    asylum seeker?

13      A.     Yes.

14      Q.     How often does that occur?

15      A.     Not as much now as it did before.

16      Q.     When you say "it did before," what time

17    period are you referring to?

18      A.     Early 2019.

19      Q.     And do you have an understanding as to

20    why it's not happening as much now?

21      A.     I'm guessing the limit line, maybe?

22      Q.     And what makes you guess the limit line?

23      A.     Just because we're not -- they're not

24    coming up to primary, so we're not accepting them.

25      Q.     So one of the reasons that the Tecate



Page 44

1    Port of Entry has not been processing asylum seekers

2    is because they're being turned back at the limit

3    line; is that right?

4           A.    Well, we are still taking them.  They've

5    been running up the vehicle lanes.

6           Q.    Sure.  So outside of instances where

7    people are rushing the vehicle lanes, just normal

8    pedestrians flowing towards the limit line, those

9    individuals who are seeking asylum are being turned

10   back to Mexico; is that right?

11          A.    Yes.

12          Q.    And the officers at the limit line who

13   are turning those asylum seekers back to Mexico,

14   they're doing that because they have orders or

15   instructions to do that, right?

16          A.    Correct.

17          Q.    Where did those orders or instructions

18   to turn back asylum seekers come from?

19          A.    The port director.

20          Q.    Who is the port director that has

21   instructed officers at the limit line to turn back

22   asylum seekers?

23          A.    Ortega.

24          Q.    What's Mr. Ortega -- do you know

25   Mr. Ortega's full name?



Page 45

1        A.      I think it's Rene Ortega.

2        Q.      So Port Director Rene Ortega has

3    instructed officers at Tecate Port of Entry to turn

4    back asylum seekers at the limit line; is that right?

5        A.      Correct.

6        Q.      During the entire time that you have

7    been posted to the Tecate Port of Entry, have asylum

8    seekers that approach the limit line been turned

9    back?

10       A.      Yes.

11       Q.      And Rene Ortega has not been the port

12   director the entire time that you've been at the

13   Tecate Port of Entry, correct?

14       A.      No.

15       Q.      Who was the port director before Rene

16   Ortega?

17       A.      It was Avila.

18       Q.      Can you spell the last name or just

19   guess at it?

20       A.      I-v-i-l-i-a?

21       Q.      And did Port Director Avila also order

22   or instruct that asylum seekers be turned back at the

23   limit line?

24       A.      Yes.

25       Q.      Do you know whether the port directors



Page 46

1    received orders or instructions from either the San

2    Diego field office or senior management at OFO to

3    turn back asylum seekers at the limit line?

4         A.     That's what they were telling us.

5         Q.     When you say "they were telling us,"

6    what do you mean by that?

7         A.     The supervisors would tell us that they

8    had instructions from higher management.

9         Q.     Do you know what "higher management"

10   means?

11        A.     I don't.

12        Q.     So is it your impression, based on your

13   work at the Tecate Port of Entry, that there is some

14   sort of broader policy of turning back asylum

15   seekers?

16        A.     What do you mean, "broader policy"?

17        Q.     That either someone at OFO or the

18   San Diego field office, someone higher up, has

19   ordered or instructed that asylum seekers be turned

20   back?

21        A.     Yes.

22        Q.     So I think you said you were sworn in

23   on -- oh, I'm sorry.

24               You were talking earlier about

25   supervisors who have instructed you to turn back



Page 47

```
 1   asylum seekers.  What do you mean by "supervisors"?
 2        A.    There was a muster in the morning
 3   about -- or in the afternoon about what we needed to
 4   do when an asylum seeker comes up.
 5        Q.    Can you explain what a muster is, in the
 6   CBP parlance?
 7        A.    It's kind of like an order of what to
 8   do.
 9        Q.    And can a muster be written or oral?
10        A.    Yes.
11        Q.    And the muster that you received
12   regarding turning back asylum seekers, was it in
13   writing or was it oral?
14        A.    At first it was oral, and then it became
15   writing months later.
16        Q.    When do you first recall receiving a
17   muster telling you to turn back asylum seekers?
18        A.    Orally or written?
19        Q.    Oral.
20        A.    I -- I don't recall.  It was months
21   before I did my whistle-blowing.
22        Q.    And this occurred during your time at
23   Tecate or was it another port of entry?
24        A.    At Tecate.
25        Q.    Do you have friends who work at other
```


MAGNA
LEGAL SERVICES

Page 48

```
 1    ports of entry?
 2          A.     Yes.
 3          Q.     Where do your friends at other ports of
 4    entry -- where do they work?
 5          A.     Otay Mesa and San Ysidro.
 6          Q.     Do you know whether your friends who
 7    work at other ports of entry have received similar
 8    musters?
 9          A.     I don't.
10          Q.     Have you ever talked to them about it?
11          A.     No.
12          Q.     So it's possible they have, but you just
13    have discussed it with them?
14          A.     Exactly.
15          Q.     Let's go back for a second.
16                 When you were talking about various
17    training you had on certain processes, and I think
18    the last one we talked about was the asylum process,
19    and the fourth process that you talked about was
20    people running into lanes, people rushing vehicle
21    lanes?
22          A.     Yes.
23          Q.     And when did you receive training on
24    people rushing the lanes?
25          A.     It's almost the same thing as -- it's an
```



Page 49

1    expedited removal as well.  So -- yeah.  It's the

2    same process.  They're called EWIs, entry without

3    inspections.

4         Q.    And individuals who rush the lanes, or

5    EWI, they're put into expedited removal?  Is that the

6    case?

7         A.    Yes.

8         Q.    Where did you receive training on

9    individuals who rush the lanes?

10        A.    Same SharePoint.

11        Q.    You received it at the Otay Mesa AEU?

12        A.    Yes.

13        Q.    And then if you wanted materials on

14   that, you'd access the SharePoint site?

15        A.    Yeah, or ask other officers.

16        Q.    Okay.  Have you ever asked other

17   officers for further training on the process for

18   inspecting and processing asylum seekers?

19        A.    I have.  I have told people I will do

20   them.

21        Q.    Okay.

22        A.    I don't mind.  I mean, I just know it's

23   a very time-consuming process.

24        Q.    Do you know how time-consuming?

25        A.    A couple of hours.



Page 50

1          Q.      And a couple of hours, is that a guess

2     or your best estimate?

3          A.      It's a guess.

4          Q.      When we talked about the four areas that

5     you received training in at the Otay Mesa AEU,

6     fraudulent documents, oral -- instances where someone

7     orally makes a false claim of U.S. citizenship,

8     asylum processing, and people running into the lanes,

9     have you received any training on any other process

10    or procedure for inspecting individuals as they

11    arrive at the port of entry?

12         A.      That committed a crime, you mean?

13         Q.      In any instance.

14         A.      Not that I recall right now.

15         Q.      How about unaccompanied children, have

16    you received any training for that?

17         A.      Yes.

18         Q.      Where did that training occur?

19         A.      I don't recall.  It's been a while.

20         Q.      Was that training that occurred in

21    person or via the PALMS course or via reading on the

22    SharePoint?

23         A.      I want to say there is a PALMS course on

24    it, but I'm not 100 percent sure.

25         Q.      How about training regarding Mexican



Page 51

1    citizens who have a credible fear, have you received

2    any training on that, Mexican citizens who have a

3    credible fear of persecution?

4         A.     There is a training, but I don't recall

5    where or how to get that.

6         Q.     Okay.  Did you ever attend it, or do you

7    just know it exists?

8         A.     I know it exists.

9         Q.     Okay.  But you don't recall attending

10   it?

11        A.     No.  I would have to ask.

12        Q.     Are there any other training courses

13   that are available to you that you're aware of,

14   regarding inspecting individuals as they arrive at a

15   port of entry?

16        A.     Not that I know right now.

17        Q.     Can you recall any other training that

18   you have attended regarding inspecting individuals as

19   they arrive at a port of entry?

20        A.     Not at this moment, no.

21        Q.     You mentioned earlier receiving orders

22   via a muster to turn individuals back at the limit

23   line.

24               Were you ever told why that order was

25   being given?



Page 52

```
 1        A.      I believe it was just we don't have the
 2   facility, and San Ysidro is the main, I guess, hub or
 3   POE that has the facility to process them.
 4        Q.      Have you ever heard the term "processing
 5   hub" before?
 6        A.      Yes.
 7        Q.      In the San Diego field office area, or
 8   OFO, there are two processing hubs, correct?
 9        A.      I -- I don't know.
10        Q.      Well, is San Ysidro a processing hub?
11        A.      Yes.
12        Q.      Is Calexico a processing hub?
13        A.      Yes.
14        Q.      Can you think of any other processing
15   hubs in the San Diego field office?
16        A.      No.
17        Q.      So is it the case that because Tecate
18   was a smaller port of entry, officers were being
19   asked to turn back asylum seekers and redirect them
20   to processing hubs in the San Diego field office?
21        A.      Yes.
22        Q.      When you first joined CBP after you were
23   sworn in and got your training and were sent to the
24   field, what was your first assignment or port of
25   entry you were assigned to?
```



Page 53

1          A.       San Ysidro.

2          Q.       And how long were you at San Ysidro?

3          A.       Roughly, around a year.  I don't know

4     the exact dates.

5          Q.       You don't know the exact dates.  Okay.

6                   After San Ysidro, what was your next

7     posting?

8          A.       Otay Mesa.

9          Q.       Why did you get moved from San Ysidro to

10    Otay Mesa, if you know?

11         A.       I applied for it.

12         Q.       Was the Otay Mesa port somehow more

13    desirable to you?

14         A.       Yes.

15         Q.       Why?

16         A.       It was a lot slower pace.  It was just

17    an easier port to work at.

18         Q.       Was the pay any different?

19         A.       No.

20         Q.       Was your rank or title any different?

21         A.       No.

22         Q.       How long were you at the Otay Mesa Port

23    of Entry?

24         A.       About a year.

25         Q.       And again, you don't know the exact



Page 54

1   dates?

2       A.      I don't know the exact dates.

3       Q.      Okay.  From Otay Mesa, what was the next

4   port of entry that you were posted to?

5       A.      Tecate.

6       Q.      Do you recall when you started working

7   at Tecate?

8       A.      October, maybe, of 2016.

9       Q.      Okay.  So you've been working at Tecate

10  for a little over three years now?

11      A.      Yes.

12      Q.      And why, if you know, were you

13  transferred or moved from Otay Mesa to Tecate?

14      A.      I put in for it.

15      Q.      Why did you put in for it?

16      A.      It's -- there's numerous reasons.  It

17  closes, so I knew I was going home every night, and

18  it's a lot slower pace, and they have three days off.

19  So I wanted a better home life.

20      Q.      When you say "three days off," does that

21  mean you're on four, off three?

22      A.      No, it's two -- two, one week, and then

23  three the following week.  So two, three, two, three.

24      Q.      I see.

25              And that's not the case at Otay Mesa and



Page 55

```
 1    San Ysidro?

 2         A.    No.

 3         Q.    Was the pay the same?

 4         A.    Yes.

 5         Q.    So the same pay, less work?

 6         A.    Yes.

 7         Q.    It's a good deal.

 8               MR. MEDLOCK:  Why don't we take a quick

 9         break?  We'll probably take a about a

10         five-minute break.

11               (Brief recess.)

12               MR. MEDLOCK:  Back on the record.

13    BY MR. MEDLOCK:

14         Q.    Welcome back, sir.

15         A.    Thank you.

16         Q.    You mentioned earlier, and I think I

17    have this right, that supervisors indicated to you

18    that this order to turn people back at the limit line

19    came from higher management?

20         A.    Yes.

21         Q.    Who were the supervisors you were

22    referring to there?

23         A.    I know I heard it from Spencer.

24         Q.    What is Mr. Spencer's full name?

25         A.    I don't remember his -- I don't know his
```



Page 56

```
 1   full name.
 2          Q.     What was his rank or title?
 3          A.     Supervisor.
 4          Q.     Okay.  Batch supervisor or --
 5          A.     I think it's just first-line supervisor.
 6          Q.     Anyone else?
 7          A.     McCarthy.  Noelle McCarthy.
 8          Q.     Noelle McCarthy, and what was
 9   Mr. McCarthy's rank or title?
10          A.     It's a female.
11          Q.     Sorry.
12          A.     A first-line supervisor as well.
13          Q.     Okay.  Anyone else?
14          A.     At that time, I think that's the only
15   time I worked when they were giving it out.  So there
16   could be others who -- I just don't know.
17          Q.     And both of those individuals worked at
18   the Tecate Port of Entry?
19          A.     Correct.
20          Q.     And both of those first-line supervisors
21   gave you that order or instruction at the Tecate Port
22   of Entry, correct?
23          A.     Correct.
24          Q.     And musters are given to the second
25   shift.
```



Page 57

```
 1              Do those musters happen in a centralized
 2    location, or do you go to your duty location and then
 3    they give you the muster there?
 4         A.     Second part, we go to our duty location
 5    and they give us our muster there.
 6         Q.     We talked earlier about, you know,
 7    personal computer, cell phone.  Do you have any sort
 8    of like tablet, iPad, Surface, anything like that?
 9         A.     No.
10         Q.     We talked about access to a Share drive.
11    I assume you're not accessing that on your personal
12    cell phone?
13         A.     No.  I can't.
14         Q.     How are you accessing the Share drive at
15    work?
16         A.     On the government computer.
17         Q.     So there's a computer that --
18         A.     A computer.
19         Q.     -- anyone can sort of log into?
20         A.     Correct.
21         Q.     Okay.  And we talked a little bit
22    about -- there had been instances where you had been
23    stationed at primary inspection, where individuals
24    came to primary inspection and either expressed a
25    credible fear or an intent to apply for asylum,
```



Page 58

1    correct?

2         A.    Correct.

3         Q.    What ports of entry were you at when

4    that occurred?

5         A.    All ports of entry.  All three.

6         Q.    So Tecate, Otay Mesa, and San Ysidro?

7         A.    Correct.

8         Q.    When someone comes to the primary

9    inspection point and either mentions a credible fear

10   or asks to seek asylum, what's the process you go

11   through?

12        A.    At San Ysidro, they would come up to me.

13   I would -- they would ask for credible fear.  I would

14   write a referral slip out, refer them to secondary

15   for credible fear, and then we would walk them to the

16   AEU.

17        Q.    And was the AEU where secondary

18   inspection would happen, or is that where they would

19   be detained?

20        A.    That's where they would be detained.

21        Q.    So they would be detained at the AEU

22   pending secondary?

23        A.    They wouldn't go to secondary.

24        Q.    I see.

25        A.    They would be referred to secondary so



Page 59

```
 1    AEU can have it, but they would go straight to AEU.
 2         Q.    I got it.
 3               So you mentioned a referral slip that is
 4    filled out.  Is that filled out by hand or on a
 5    computer at the primary inspection point?
 6         A.    By hand and on computer.
 7         Q.    And the referral slip, that's actually a
 8    form; is that right?
 9         A.    Yes.
10         Q.    How long is the referral slip form?
11         A.    It's about four inches by four inches.
12         Q.    Okay.  So it's a single piece of paper?
13         A.    Correct.
14         Q.    Are there boxes that you check or are
15    you filling in text?
16         A.    Either/or.  There's boxes that you can
17    check, or you can actually leave a comment and you
18    can just write it in.
19         Q.    What are the boxes that are available to
20    you to check on that referral slip, if you know?
21         A.    There's agriculture, there's customs,
22    there's immigration.  There's about 20 different
23    boxes.  I can't read them all off to you.  I don't
24    know them all.
25         Q.    And one of them is for credible fear or
```



Page 60

1    asylum?

2         A.    I believe so.

3         Q.    Did you have -- at times were those

4    referral slips prefilled for a credible fear or

5    asylum, to expedite the process of dealing with

6    individuals claiming a credible fear?

7         A.    Not at the time I was there.

8         Q.    When you say you were there, are you

9    referring to each of the -- at San Ysidro or each of

10   the three?

11        A.    Each, each of the three.

12        Q.    What questions, if any, do you ask an

13   individual claiming a credible fear when they are at

14   the primary inspection point?

15        A.    Usually, I ask if they have anything

16   that they're bringing that could be dangerous, just

17   for us and them; where they're coming from, usually;

18   and usually where they're trying to go in the U.S.;

19   and I put that on the referral slip.

20        Q.    Anything else that you ask?

21        A.    Not at that point, no.

22        Q.    Do you ask whether they have any

23   documents, like a G-28 or a prefilled-out I-586?

24        A.    No.  Sometimes I do ask if they do have

25   any documents, just so I can see their -- their name



Page 61

1    and date of birth and all that, so I can put them in

2    the system.  Usually, every single time I do that;

3    some people have it, some people don't.

4          Q.    I should say I-583, counsel is reminding

5    me.

6                Do you affirmatively ask for those

7    documents, or do you just -- sometimes they just give

8    them to you?

9          A.    Sometimes they do both.  I'll ask, and

10   if they -- sometimes they will give it to me.  If

11   they don't, I always ask because I need to put

12   something in the system, as in name and date of

13   birth.  So I'll usually ask, do you have anything,

14   any kind of documentation that shows your name and

15   date of birth so I can put it in?

16         Q.    Okay.

17         A.    Sometimes they understand me, sometimes

18   they don't.

19         Q.    Okay.  If someone comes up and they

20   don't appear to have travel documents but they don't

21   express a credible fear, do you affirmatively ask

22   whether they have a credible fear?

23         A.    No.

24         Q.    Is it part of your training to not ask

25   whether people have a credible fear, or is that



Page 62

1    discretion left to you?

2         A.    That discretion is left to us.

3         Q.    Why have you decided not to ask?

4         A.    I just -- I -- that's not the first

5    thing I ask people, if they have a credible fear,

6    when they come up with a document.

7         Q.    Do you know some CBP officers who will

8    affirmatively ask whether individuals have a credible

9    fear?

10        A.    Not that I know of.

11        Q.    If an unaccompanied minor approaches the

12   primary inspection point, how does the inspection

13   procedure go for that individual?

14        A.    Usually, I ask where they're going, are

15   they -- is there -- are they here with anybody, is

16   someone waiting for them?  I figure out if they do

17   have any documents, are they U.S. citizens or are

18   they not, why is a minor crossing by themselves, and

19   then we go from there.  Usually, I send them to

20   secondary, and then they'll either call somebody and

21   then see what their status is as of that, and then

22   it'll -- it'll go from there.

23        Q.    And for a Mexican citizen who claims a

24   credible fear, is there a different procedure for

25   inspecting them at primary?



Page 63

1       A.      I don't believe so.

2       Q.      I'd like to go through a little bit of

3   the chain of command at CBP and help define some

4   terms.

5               Have you ever heard the term "OFO"

6   before?

7       A.      Yes.

8       Q.      What does "OFO" mean?

9       A.      Operation field --

10      Q.      Office of Field Operations?

11      A.      There you go.

12      Q.      Is that right?

13      A.      Office of Field Operations.

14      Q.      Have you ever heard the term "director

15  of field operations" or "DOFO"?

16      A.      No.  I think that's new with -- the new

17  thing that they're doing right now, their new --

18      Q.      Structure?

19      A.      Yeah.  Okay, yeah.

20      Q.      I think we talked about port directors

21  before.  Within CBP, what does the term "port

22  director" mean?

23      A.      That's usually the director at the port,

24  the one that's in charge of the port.

25      Q.      And they're ultimately responsible for



Page 64

1    all things that occur at the port; is that correct?

2         A.    Correct.

3         Q.    There's also a title, assistant port

4    director, correct?

5         A.    Yes.

6         Q.    How many assistant port directors

7    typically work at a port of entry?

8         A.    It's always different, depending on the

9    size of the port of entry.

10        Q.    How about at Tecate?

11        A.    We have two.

12        Q.    And at San Ysidro?

13        A.    I have no clue.

14        Q.    A lot more than two?

15        A.    Yes.

16        Q.    What are the responsibilities of an

17   assistant port director, if you know?

18        A.    I believe they're in charge of the lower

19   management, which are first-line and second-line

20   supervisors, I believe.  Just a chain of custody, so

21   I believe anything that happens with them, they're in

22   charge of that.  I don't really know offhand, though,

23   exactly.

24        Q.    So beneath the assistant port director

25   there's a term of a second-line supervisor?



Page 65

1        A.      Second-line supervisor.

2        Q.      What does a second-line supervisor do?

3        A.      I believe they're in charge of the

4    first-line supervisors.

5        Q.      How many second-line supervisors are

6    there at Tecate?

7        A.      We don't have any second-line

8    supervisors.

9        Q.      I see.

10               So there's only first-line supervisors

11   at Tecate?

12       A.      Yes.

13       Q.      And the first-line supervisors, they're

14   directly responsible for the officers; is that

15   correct?

16       A.      Correct.

17       Q.      How many first-line supervisors are

18   there at Tecate, currently?

19       A.      Between six and seven.

20       Q.      Is there anybody I've left out in the

21   chain from OFO higher management down to the officer

22   level?

23       A.      I don't believe so.

24       Q.      Have you ever heard of the term "Class A

25   port of entry" before?



Page 66

1          A.     No.

2          Q.     Have you heard Tecate referred to as a

3    Class A port of entry?

4          A.     No.

5          Q.     We talked about musters before.  Who at

6    CBP has the authority to issue a muster?

7          A.     I don't know that question.

8          Q.     And who are musters intended for, if you

9    know?

10         A.     I believe officers.  I'm sure there's

11   some for supervisors, too, but I believe officers.  I

12   don't know.

13         Q.     Are you familiar with the term "standard

14   operating procedure" as it is used in CBP?

15         A.     Yes.

16         Q.     What does the term "standard operating

17   procedure" mean at CBP?

18         A.     That's usually for the port.  It's like

19   a port policy.  It's usually how the port is going to

20   be ran, and that's the procedure we're going to run

21   it at.

22         Q.     Who issues a standard operating

23   procedure for a port?

24         A.     I want to say the port director.

25         Q.     What's the -- let me ask a better



Page 67

1    question.

2              What's the difference between a muster

3    and a standard operating procedure?

4         A.    I believe a muster is just like intel on

5    how we're going to -- intel of what's going to

6    possibly occur.  I believe we have muster like on --

7    you know, on different groups that come through,

8    like -- like motorcycle groups.  So if there's like a

9    danger or something like that, how we're going to --

10   you know, there's a muster.  Or different trends,

11   there's muster for those.  And standard operating

12   procedures are actual procedures that are going to be

13   taken for different situations.

14        Q.    You mentioned the term AEU, and that

15   means Admissibility Enforcement Unit; is that right?

16        A.    Yes.

17        Q.    What physically is an AEU?

18        A.    It's I guess a detention facility of

19   some sort for short term.  So we have a -- we have a

20   secure area where we secure everything down and make

21   sure there's no weapons going in.  And now from

22   there, there's like a waiting area.  And then

23   there's -- there's bathrooms, and depending if the

24   people need showers or not or medication, we have an

25   on-site nurse that can prescribe medication, and then



Page 68

1    all the holding cells.

2         Q.    And when you said short-term detention,

3    what does -- how do you define "short term"?

4         A.    I believe -- I think the longest I've

5    seen someone there is maybe like four days, maybe, I

6    think.  I don't know the exact days, but it's not for

7    months on end.

8         Q.    So when someone leaves an AEU, what are

9    the ways they can leave an AEU?

10        A.    So they either get paroled in or they

11   get transferred to a longer facility, holding

12   facility, or they get ER'd back to Mexico.

13        Q.    Are there any other ways that an

14   individual can leave an AEU?

15        A.    There would possibly be; I just don't

16   know right now.

17        Q.    Have you ever had heard the term

18   "Criminal Enforcement Unit" or "CEU"?

19        A.    Yes.

20        Q.    What is a CEU, if you know?

21        A.    I believe those are the people we

22   contact for when we have warrants.  We contact them,

23   and they can process them and take them.  We don't --

24   so we always have to contact them if they want to

25   take them or not.



Page 69

1           Also if there is an EWI that was in

2     credible -- in fear -- entry without inspection, ESI,

3     if there was someone like in a vehicle that had a

4     compartment case where they couldn't get out and they

5     were in danger, CEU would process the driver of that

6     vehicle.

7          Q.     If somebody uses false or fraudulent

8     documents to attempt to enter the United States, are

9     they sent to a CEU or to the AEU?

10         A.     I guess it depends.  There's always --

11    if the guy is like a felon, aggravated felon, they

12    could be -- AEU could be contacted, you know, because

13    he's been doing it multiple times.  And they can

14    prosecute him, which he can do some jail time.  But

15    if he's just a first-time crosser, it's usually just

16    AEU.

17         Q.     We talked about the term "limit line"

18    before today.  What is the limit line?

19         A.     It is a position right outside the gate

20    of the -- of Mexico into the U.S., where we check

21    documents of everyone coming into the United States.

22         Q.     Is it the case that the limit line is

23    actual physical line between the United States and

24    Mexico, right?

25         A.     Yes.



Page 70

1      Q.      Is the limit line demarcated differently
2   in different ports of entry you've been to?
3      A.      I -- no.  There's always a gate in front
4   of it.  I just don't know if that's the actual limit
5   line or not.
6      Q.      Okay.
7      A.      But there's always a gate that separates
8   Mexico from the U.S.
9      Q.      In some cases, is there a turnstile at
10  the limit line?
11     A.      Yes.
12     Q.      What ports have you been to where there
13  is a turnstile at the limit line?
14     A.      San Ysidro and Otay Mesa.
15     Q.      To your knowledge, why is there a
16  turnstile at the limit line at San Ysidro and Otay
17  Mesa?
18     A.      I don't -- I don't know the reason why
19  they did that.
20     Q.      In each of the three ports you've been
21  to -- Otay Mesa, San Ysidro, and Tecate -- there have
22  been officers posted to the limit line at least a
23  part of the time you've been there?
24     A.      Not at Otay.
25     Q.      Not at -- that was the first port you



Page 71

1    were at?

2        A.    No.  San Ysidro was the first port I was

3    at.  But we didn't have the -- that position was made

4    for security purposes.

5        Q.    I see.

6              The limit line position?

7        A.    Yeah.  It wasn't -- we weren't there

8    checking or facilitating traffic.  We weren't there

9    at that time doing any -- anything like that.  It was

10   just to back up the GSA guards.

11       Q.    I see.

12             When was the first time you're aware of

13   that officers were posted to the limit line to check

14   documents?

15       A.    It was right when I was leaving

16   San Ysidro.

17       Q.    So that would have been around 2016,

18   2017?

19       A.    No.  I was at Tecate at that time.

20       Q.    Okay.

21       A.    I want to say the end of 2013.

22       Q.    Okay.  Got it.

23       A.    And that was for safety reasons, though.

24   I remember that.

25       Q.    And have you heard the term "metering"



Page 72

```
 1   before?
 2       A.    Not till all -- after this.
 3       Q.    So the first time you heard about
 4   metering was when you heard about this litigation; is
 5   that right?
 6       A.    Yeah.
 7       Q.    But you had certainly heard about
 8   turning back individuals at the limit line before?
 9       A.    Yeah, we call it "redirecting."
10       Q.    Have you heard the term "queue
11   management" before?
12       A.    No.
13       Q.    So I just want to be real clear:  Your
14   higher management has never told you -- used the term
15   "metering" with you before?
16       A.    No.
17       Q.    And they've never used the term "queue
18   management" before?
19       A.    No.
20       Q.    And your supervisors, they've never used
21   the term "metering" with you before?
22       A.    No.
23       Q.    And your supervisors have never used the
24   term "queue management" with you before?
25       A.    No.
```



Page 73

```
 1          Q.     But they have told you to turn

 2    individuals back at the limit line or redirect them?

 3          A.     Yes.

 4          Q.     Have you ever heard the term "UDA"

 5    before?

 6          A.     No.

 7          Q.     Have you ever heard the term

 8    "undocumented alien" before?

 9          A.     Yes.

10          Q.     Is "UDA" sometimes used as an

11    abbreviation for it, "undocumented alien"?

12          A.     I've never heard.

13          Q.     Okay.

14          A.     I think it's more Border Patrol.

15          Q.     Got it.

16                 Have you ever heard the term "FAMU" or

17    "family unit" before?

18          A.     No.  That's more -- I think that's more

19    of an AEU, too.

20          Q.     How about "OTM" or "other than Mexican"?

21          A.     Yes.

22          Q.     What does "OTM" mean?

23          A.     "Other than Mexican."

24          Q.     Fair point.

25                 So these are individuals who present at
```



Page 74

```
 1    a port of entry that aren't Mexican nationals,

 2    correct?

 3         A.     Yes.

 4         Q.     Have you ever heard the term "funneling"

 5    before?

 6         A.     I feel like I have, but I don't recall

 7    when and where.

 8         Q.     Have you heard the term "funneling" used

 9    synonymously with redirecting asylum seekers?

10         A.     No.

11         Q.     So when you're posted to a primary

12    inspection point, you're governed by musters,

13    standards procedures, as well as your training; is

14    that right?

15         A.     Yes.

16         Q.     And the officers at the limit line,

17    they're governed by the musters, standard operating

18    procedures, and training that they receive; is that

19    right?

20         A.     Yes.

21         Q.     And in your experience, do CBP officers

22    deliberately disobey the training or musters or

23    instructions they receive from senior management?

24         A.     Not that I know of.

25         Q.     Why not?
```



Page 75

1      A.      Because no one wants to get written up.

2      Q.      In your experience, have you ever
3   deliberately disobeyed an order or instruction from
4   your senior management?

5      A.      No.

6      Q.      Have you ever observed any of your
7   fellow coworkers deliberately disobey an order from
8   senior management?

9      A.      Not that I know of.

10      Q.      Do CBP officers freelance and come up
11   with their own practices for inspecting and
12   processing individuals, without reference to the
13   guidance and orders from senior management?

14      A.      I guess everyone has their different
15   practices.  It's just something you learn in the
16   field, and what kind of style inspections you want to
17   do.

18      Q.      But do they ignore their training?

19      A.      No.

20      Q.      Do they -- do officers ignore the orders
21   that they receive?

22      A.      Not that I know.

23      Q.      So when officers receive an order to
24   turn back individuals at the limit line, they
25   wouldn't ignore that order, right?



Page 76

```
 1        A.    No.

 2        Q.    And, in fact, you never ignored an order

 3   to turn back asylum seekers at the limit line?

 4        A.    I have not, but I also haven't ever

 5   returned asylum seekers.  I've always called for a

 6   supervisor.

 7        Q.    And you call for a supervisor because

 8   you were uncomfortable with the order; is that right?

 9        A.    Correct.

10        Q.    Why were you uncomfortable with that

11   order?

12        A.    At that time there was no documentation,

13   nor would they give me documentation on what to do.

14        Q.    Did you have a concern that following

15   the order could expose you to a lawsuit?

16        A.    Yes.

17        Q.    Did you have a concern that following

18   the order might be illegal?

19        A.    Yes.

20        Q.    How so?

21        A.    To my understanding, asylum seekers

22   could apply for entry at any port of entry, not

23   certain ports of entry.

24        Q.    And how did it make you feel to be

25   forced to follow an order that you believe was
```



Page 77

1    illegal?

2         A.    I would -- I would never do it.  That's

3    why I always called for a supervisor.

4         Q.    Did any of your fellow coworkers at the

5    Tecate Port of Entry ever express to you that they

6    were uncomfortable with following the order to turn

7    back asylum seekers at the port of entry?

8         A.    No.

9         Q.    Did anyone else at the Tecate Port of

10   Entry ever express to you that they believed the

11   order was illegal?

12        A.    No.  They might have expressed that they

13   were a little concerned, but not -- it wasn't -- it

14   was less work for them, pretty much.

15        Q.    It was less work because they didn't

16   have to process the asylum seekers?

17        A.    Yes.

18        Q.    And who expressed to you that they were

19   a little concerned?

20        A.    I don't -- I don't recall names.

21        Q.    Do you recall how many people expressed

22   to you that they were a little concerned?

23        A.    Maybe about four.

24        Q.    And these four, were they officers or

25   supervisors?



Page 78

```
 1          A.      Officers.

 2          Q.      Were these officers posted to limit line

 3     or --

 4          A.      Everyone was posted to limit line.

 5          Q.      Were they officers who were on your

 6     shift?

 7          A.      Some on my shift and some on other

 8     shifts.

 9          Q.      Was ███████████ one of the officers

10     that expressed a concern?

11          A.      I believe so.

12          Q.      And do you recall when Officer ████████

13     expressed that concern to you?

14          A.      I don't.

15          Q.      Do you recall what Officer ████████ said

16     to you to indicate she had a concern with the order?

17          A.      I -- I don't, to be honest.  It's been a

18     while.

19          Q.      Do you have any social media accounts?

20          A.      Yes.

21          Q.      A Facebook account?

22          A.      Yes.

23          Q.      How about LinkedIn?

24          A.      I do, but I never use it.

25          Q.      Same; don't worry about it.
```



Page 79

```
 1                Twitter?

 2      A.        No.

 3      Q.        Instagram account?

 4      A.        Yes.

 5      Q.        Do you ever post on your Facebook

 6   account about things you do at work?

 7      A.        Never.

 8      Q.        Do you ever post on your Facebook

 9   account about U.S. immigration policy?

10      A.        Never.

11      Q.        Are you a part of any Facebook groups

12   related to the activities of CBP officers?

13      A.        No.

14      Q.        Have you ever been a part of a Facebook

15   group called "I'm 10-15"?

16      A.        No.

17      Q.        Have you ever heard about that group?

18      A.        No.

19                MR. MEDLOCK:  We'll mark the next

20           document.

21                [Exhibit 3, a memorandum, was marked for

22           identification.]

23                MR. MEDLOCK:  Let's go off the record.

24                (Brief recess.)

25                MR. MEDLOCK:  Back on the record.
```



Page 80

 1    BY MR. MEDLOCK:

 2        Q.    All right, sir.  I've put in front of

 3    you what's marked as Exhibit 3 to your deposition.

 4    It's a one-page document that I'll represent to you

 5    is a somewhat redacted copy that was filed on the

 6    public docket in this case; that's why there's those

 7    black boxes there some weird type on the top of it.

 8            Please take a moment to review it, and

 9    let me know verbally when you've done so.

10        A.    Okay.

11        Q.    So Exhibit 3 is an April 27, 2018,

12    memorandum with the subject line, "Metering

13    guidance."  Do you see that?

14        A.    Yes.

15        Q.    And it's from Todd C. Owen, Executive

16    Assistant Commissioner, Office of Field Operations.

17    Do you see that?

18        A.    Yes.

19        Q.    Have you ever met Mr. Owen?

20        A.    No.

21        Q.    Have you ever communicated with Mr. Owen

22    in any way?

23        A.    No.

24        Q.    At the bottom, there's a distribution

25    list.  Do you see that?



Page 81

1          A.      Yes.

2          Q.      And the distributions are to director of

3    field operations El Paso, director of field

4    operations Laredo, director of field operations

5    San Diego, and director of field operations Tucson,

6    correct?

7          A.      Correct.

8          Q.      And those are the four field offices

9    that the office of -- that OFO has on the U.S.-Mexico

10   border; is that right?

11         A.      Yes.

12         Q.      So this memo did not go to anyone on the

13   OFO staff on the northern border with Canada; is that

14   right?

15         A.      Yes.

16         Q.      Have you seen a copy of Exhibit 3

17   before?

18         A.      Yes.

19         Q.      When did you first see a copy of this

20   memorandum?

21         A.      Yesterday.

22         Q.      So prior to you being involved in this

23   litigation, you never saw a copy of this memorandum;

24   is that right?

25         A.      No.



Page 82

```
 1       Q.      Okay.  So understanding that you haven't

 2   seen it, I would still like to ask you a few

 3   questions about it.

 4               I'm focused on the first full paragraph

 5   of the memorandum, that begins with, "When

 6   necessary."  Do you see that?

 7       A.      Yes.

 8       Q.      Okay.  That reads, "When necessary or

 9   appropriate to facilitate orderly processing and

10   maintain the security of the port in safe and

11   sanitary conditions for the traveling public, DFOs

12   may elect to meter the flow of travelers at the land

13   border to take into account the port's processing

14   capacity."

15               Did I read that correctly?

16       A.      Yes.

17       Q.      The term "DFO," though, that means

18   "director of field operations"; is that right?

19       A.      Correct.

20       Q.      Do you have any understanding of what

21   the phrase "meter the flow of travelers" means?

22       A.      No.

23       Q.      From reviewing this memorandum, is the

24   phrase "meter the flow of travelers" defined anywhere

25   in this memorandum?
```



Page 83

```
 1        A.     Not that I see.

 2        Q.     When you get guidance from your senior

 3   management, do you want to understand what the terms

 4   in that guidance mean?

 5        A.     Yes.

 6        Q.     If you got this memorandum, would you

 7   have a question about what the phrase "meter the flow

 8   of travelers" means?

 9        A.     Yes.

10        Q.     On its face, this memorandum applies to

11   all members of the traveling public.  Do you see

12   that?

13        A.     Where?

14        Q.     It's says, "Meter the flow of

15   travelers," so this memorandum applies to travelers,

16   right?

17        A.     Yes.

18        Q.     Are you aware of any instance in which

19   the port directors at San Ysidro or Otay Mesa or

20   Tecate elected to meter the flow of U.S. citizens

21   entering the United States through the land border

22   with Mexico?

23        A.     I never heard of metering before this.

24   I always heard of redirecting; that's what we used.

25        Q.     Have you ever been instructed to
```



Page 84

1    redirect or turn back U.S. citizens entering the

2    United States through the land border with Mexico?

3         A.    No.

4              MR. HALASKA:  Objection.  Compound.

5    BY MR. MEDLOCK:

6         Q.    Let me ask it to you a different way:

7    Have you ever been asked to redirect U.S. citizens

8    entering the United States?

9         A.    No.

10        Q.    Have you ever been asked to redirect

11   legal permanent residents entering the United States?

12        A.    No.

13        Q.    Have you ever been asked to turn back

14   U.S. citizens entering the United States?

15        A.    No.

16        Q.    Have you ever been asked to turn back

17   legal permanent residents entering the United States?

18        A.    No.

19        Q.    Are you aware of the SENTRI program?

20        A.    Somewhat.

21        Q.    Have you ever been asked to meter the

22   flow of a SENTRI pass holders entering the United

23   States?

24        A.    No.

25        Q.    Have you ever been asked to turn back



Page 85

1    SENTRI pass holders?

2         A.    No.

3         Q.    Have you ever been asked to redirect

4    SENTRI pass holders?

5         A.    No.

6         Q.    Have you ever received any order telling

7    you to redirect any class of traveler at a port of

8    entry, other than asylum seekers?

9         A.    Can you repeat the question?

10        Q.    So put asylum seekers aside for a

11   second.

12        A.    Okay.

13        Q.    Have you ever been asked to redirect

14   anyone else at a port of entry?

15        A.    Redirect them to other ports of entry?

16        Q.    Yes.

17        A.    No.

18        Q.    Have you ever been asked to turn back

19   anyone other than an asylum seeker at a port of

20   entry?

21        A.    Yes.

22        Q.    Who?

23        A.    We have some people that just get lost

24   and they ask random questions on, like, I wanted to

25   go to the grocery store, and they don't know they're



Page 86

1    at a port of entry, and so yes, we do return those

2    people.  But --

3        Q.    Okay.  So put aside the people who are

4    simply lost and the asylum seekers, have you ever

5    been asked to turn back anyone else?

6        A.    No.

7        Q.    Okay.  So focusing again on the first

8    sentence of this memorandum, it says, "Facilitate

9    orderly processing."  Do you see that phrase?

10       A.    Yes.

11       Q.    Do you have an understanding of what the

12   phrase, "Facilitate orderly processing," means?

13       A.    In an orderly fashion?  I don't know.

14       Q.    Is the phrase "facilitate orderly

15   processing" defined anywhere in this memorandum?

16       A.    No.

17       Q.    If you read this memorandum, and this

18   memorandum was given to you by your senior

19   management, would you have a question about what the

20   phrase "facilitate orderly processing" means?

21       A.    Yes.

22       Q.    The next phrase I want to focus on is,

23   "Maintain the security of the port."  Do you see

24   that?

25       A.    Yes.



Page 87

 1       Q.     In your experience, do asylum seekers
 2   threaten the security of ports of entry?
 3       A.     We don't know what's coming in.
 4   Everybody --
 5       Q.     Anybody could, right?
 6       A.     Anybody could.
 7              MR. HALASKA:  I'll ask that you let him
 8       just finish his answer to your questions.
 9              MR. MEDLOCK:  That's fine.
10              MR. HALASKA:  Thank you.
11   BY MR. MEDLOCK:
12       Q.     Anyone approaching a port of entry,
13   regardless of whether they're an asylum seeker or any
14   other type of traveler, could threaten the safety of
15   a port of entry, right?
16       A.     Correct.
17       Q.     So it could be a U.S. citizen that could
18   threaten the safety of a port of entry, right?
19       A.     Correct.
20       Q.     But you've never been asked to redirect
21   a U.S. citizen, right?
22       A.     No.
23       Q.     And you've never been asked to meter a
24   U.S. citizen, correct?
25       A.     No.



Page 88

1      Q.      It could be that they -- a legal

2  permanent resident could threaten the security of a

3  port of entry, correct?

4      A.      Correct.

5      Q.      And you've ever been asked to redirect

6  them either?

7      A.      No.

8      Q.      Okay.  So the next phrase in this first

9  sentence is "sanitary conditions"?

10      A.      Correct.

11      Q.      Do you see that?

12      A.      Yes.

13      Q.      Do you have any understanding of what

14  "sanitary conditions" means?

15      A.      Cleanliness.

16      Q.      But besides sanitary meaning clean, do

17  you have any understanding of what the standard for

18  sanitary conditions is, as set out by this memo?

19      A.      No.

20      Q.      If you received an instruction from your

21  senior management asking you to redirect people in

22  order to maintain sanitary conditions at the port,

23  would you have a question about what the phrase

24  "sanitary conditions" means?

25      A.      Yeah and no.



Page 89

1      Q.      Okay.  Let's start with the "yeah."
2    What's the "yeah" for?
3      A.      Would I have -- well, because I -- I
4    would like to know what exactly sanitary does, what
5    it falls -- it falls into.  But also we do have a lot
6    of people that do have lice and scabies and all these
7    other things that can be passed on to other people.
8    So I can understand that aspect of sanitary.  We
9    can't have people with other people that have lice
10   and scabies.  We have to take care of that situation
11   before we put them in the general population.
12     Q.      Are asylum seekers the only people in
13   your experience who have lice?
14     A.      No.
15     Q.      Are asylum seekers the only people who
16   approach a port of entry who have scabies?
17     A.      No.
18     Q.      Are asylum seekers the only individuals
19   who approach a port of entry who have health
20   conditions?
21     A.      No.
22     Q.      In fact, it could be that U.S. citizens
23   approaching a port of entry have lice?
24     A.      Yes.
25     Q.      And it could be that U.S. citizens



Page 90

1    approaching a port of entry have scabies, correct?

2         A.      Yes.

3         Q.      And it could be that U.S. citizens

4    approaching a port of entry have communicable

5    diseases, correct?

6         A.      Correct.

7         Q.      And you've never been asked to redirect

8    them?

9         A.      No.

10        Q.      I want to focus back on that sentence.

11   It says, "DFOs may elect to meter the flow of

12   travelers."  Do you see that?

13        A.      Correct.

14        Q.      During the entire time you worked at the

15   Tecate Port of Entry, there were officers posted to

16   the limit line, correct?

17        A.      No.

18        Q.      No?

19        A.      No.

20        Q.      What was the periods where there were

21   not officers at the limit line?  What was the period

22   in which there weren't officers at the limit line?

23        A.      ████████████████████████████████████████

24   ████████████████████████████████████   I don't know

25   the exact date of that, but it was about two or three



Page 91

1    months before that we had -- we didn't have a limit

2    line position.

3         Q.    Is there still a limit line position

4    today?

5         A.    Yes.

6         Q.    ███████████████████████████████████

7    ██████████████████████████████████████████████████

8    ██████████████████████████████████████████████████

9         A.    ████████████

10        Q.    And during that time that officers were

11   posted to the limit line at Tecate, they were always

12   instructed to check documents that the travelers had,

13   correct?

14        A.    Yes.

15        Q.    And those officers at the limit line

16   were all instructed to turn back asylum seekers,

17   correct?

18        A.    We had instructions at one point to just

19   call a supervisor, and they would --

20        Q.    They would do the turn-back?

21        A.    Yes.

22        Q.    So one way or the other, the

23   instructions were that the asylum seekers would be

24   turned back.  It was just in some cases the

25   supervisor was doing it, and in some cases the



Page 92

1    officer was doing it; is that right?

2         A.    Correct.

3         Q.    And there's a reference to the port's

4    processing capacity.  Do you see that?

5         A.    Yes.

6         Q.    Do you have an understanding of what

7    "processing capacity" means here?

8         A.    Yes.  We all have a capacity of how many

9    we can fit in a port.

10        Q.    When you say "how many," what do you

11   mean?  How many of what?

12        A.    How many people can be in a port.  Just

13   like any building, there's always a capacity of

14   occupancy.

15        Q.    Are you aware of the General Services

16   Administration of the United States' government?

17        A.    GSA?

18        Q.    Yes.

19        A.    Yes.

20        Q.    And GSA tells you the maximum number of

21   people who can be in a government building, correct?

22        A.    Correct.

23        Q.    And that is the capacity that you

24   believe is being referred to here?

25        A.    That's what I would take it as.



Page 93

1      Q.     In that capacity, that number that you

2   got from GSA, that's an actual number, right?

3      A.     Yes.

4      Q.     It's not something that's, you know,

5   amorphous and unknowable, right?  It's an actual

6   number?

7      A.     Yes.

8      Q.     So I want to focus on the next sentence.

9   It says, "Depending on port configuration operating

10  conditions, the DFO may establish and operate

11  physical access controls at the borderline, including

12  as close to the U.S.-Mexico border as operationally

13  feasible."

14            Did I read that correctly?

15     A.     Yes.

16     Q.     Okay.  I want to pick out some parts of

17  that sentence.

18            Do you have a sense of what the phrase

19  "physical access controls" means?

20     A.     I'm guessing officers?

21     Q.     Could it also be turnstiles as well?

22     A.     Yes.

23     Q.     ████████████████████████████████████

24  ████████████████████████████   there's always been

25  some form of physical access control at the



Page 94

1    borderline of Tecate; is that right?

2         A.     Wait.  Three months before and now?

3         Q.     Yes.

4         A.     Yes, sir.

5         Q.     I want to look at the next sentence, and

6    I'll read it to you:  "DFOs may not create a line

7    specifically for asylum seekers only, but could, for

8    instance, create lines based on legitimate

9    operational needs, such as lines for those with

10   appropriate travel documents and those without such

11   documents."

12                Do you see that?

13        A.     Yes.

14        Q.     At Tecate, are there two different lines

15   of people approaching the port of entry?

16        A.     No.

17        Q.     At San Ysidro, were there?

18        A.     Yes.

19        Q.     And how many lines were there

20   approaching the port of entry?

21        A.     I believe there was four.

22        Q.     Who was in each of those lines?  How

23   were they broken down?

24        A.     There was a SENTRI, there was a ready

25   line, there was a general public lane -- that just



Page 95

1    didn't have any -- just regular passport, wasn't a

2    ready-lane document -- and then there was the

3    handicapped lane.

4          Q.    And these are the lanes of people

5    approaching primary, right?

6          A.    Correct.

7          Q.    Were there lines of people approaching

8    the limit line?

9          A.    Yes.

10         Q.    And how were those lines broken down?

11         A.    They were the same.

12         Q.    The same?

13         A.    Yes.

14         Q.    And how about at Otay Mesa, were there

15    different lines at Otay Mesa?

16         A.    I don't -- well, yes, there was a SENTRI

17    line, for sure.  I don't remember there because there

18    was no limit line when I was there at Otay Mesa.

19         Q.    I see.  Okay.

20               There's a reference here to the border

21    line.  Do you see that in the memorandum?

22         A.    Yes.

23         Q.    Is the border line what you understand

24    to be the limit line?

25         A.    That's -- I -- what I understand is



Page 96

 1    that's the actual physical line that separates Mexico

 2    to the U.S.

 3          Q.    And the officers who were posted to the

 4    limit line at Tecate, do they stand at the actual

 5    border, or do they stand some ways back of it?

 6          A.    Some ways back of it.

 7          Q.    How far back?

 8          A.    Every port is different.

 9          Q.    Okay.  At Tecate, how far back?

10          A.    Three feet.

11          Q.    Okay.  So if an asylum seeker approaches

12    the officer at the limit line and is turned back,

13    they've actually stepped three feet into U.S. soil

14    before being turned back; is that right?

15          A.    There's a possibility.

16          Q.    Where is -- when you say there's a

17    possibility --

18          A.    Because they could stop before and talk

19    to the officer.

20          Q.    Okay --

21          A.    So --

22          Q.    So unless they stand a yard away and

23    just yell at the officer, they're going to be on

24    U.S. soil, right?

25          A.    Yes.



Page 97

1      Q.      Okay.  And in your experience, how often
2  do asylum seekers just stand three feet back to have
3  that conversation from you?
4      A.      Very rare.
5      Q.      In fact, they usually come up a normal
6  speaking distance away, right?
7      A.      Yes.
8      Q.      So we're talking about a foot or so away
9  from you?
10      A.      Correct.
11      Q.      So they're on U.S. soil, most cases,
12  when they come to the limit line at Tecate, right?
13      A.      Yes.
14      Q.      And so they would be -- in most cases,
15  asylum seekers would have their feet on U.S. soil and
16  then be turned back to Mexican soil and told to go to
17  another port of entry; is that right?
18      A.      Correct.
19      Q.      During the time that you were at
20  San Ysidro, where were the officers stationed at the
21  limit line with respect to the actual borderline
22  between the U.S. and Mexico?
23      A.      San Ysidro?  I don't remember where the
24  actual limit line is at San Ysidro.
25      Q.      And at Otay Mesa, no one was posted to



Page 98

1    the limit line, so you don't recall?

2         A.    No.

3         Q.    I want to move down to the second

4    paragraph of this memo, that begins with, "Ports

5    should."

6               Do you see that?

7         A.    Yes.

8         Q.    That sentence reads, "Ports should

9    inform the waiting travelers that processing at the

10   port of entry is currently at capacity.  And CBP is

11   permitting travelers to enter the port once there is

12   sufficient space and resources to process them."

13              Did I read that correctly?

14        A.    Yes.

15        Q.    Have you -- at the time you were at

16   Tecate, did officers ever tell individuals that the

17   port was at capacity and turn them back to Mexico?

18        A.    Yes.

19        Q.    And the Tecate port doesn't have an AEU,

20   right?

21        A.    No.

22        Q.    But asylum seekers can be processed at

23   Tecate, right?

24        A.    Yes.

25        Q.    There are individuals, officers at



Page 99

1    Tecate, who have training that enables them to

2    process asylum seekers, correct?

3         A.     Correct.

4         Q.     And do you know -- do you know of

5    instances where asylum seekers have actually been

6    processed at Tecate?

7         A.     Yes.

8         Q.     And do you know what the actual capacity

9    of Tecate is on a daily basis to process asylum

10   seekers?

11        A.     No.

12        Q.     Is it safe to say that it is higher than

13   zero?

14        A.     Yes.

15        Q.     And in most days that you were posted to

16   the limit line, the Tecate port was processing zero

17   asylum seekers per day, correct?

18        A.     Yes.

19        Q.     So it's just simply not true that when

20   officers told asylum seekers that the port was

21   currently at capacity and turning them back, that the

22   port was actually -- that Tecate was actually at

23   capacity, right?

24        A.     Correct.

25        Q.     So you were instructed to lie to people



Page 100

1    when turning them back; is that right?

2         A.     We were instructed, yes.

3         Q.     How did it make you feel that your

4    management was telling you to lie to people in order

5    to turn them back from U.S. soil to Mexican soil?

6         A.     I didn't do it.  I would have the

7    manager come down and they would have to do it.

8         Q.     So the management would lie?

9         A.     Yes.

10        Q.     They would lie for you, essentially; is

11   that right?

12        A.     Well, I wouldn't talk to them.  First

13   off, I don't -- a lot of time I don't speak the

14   language --

15        Q.     I see.

16        A.     -- enough to tell them all that.

17        Q.     But when the supervisor came down, they

18   would give this capacity excuse, correct?

19        A.     Not all the time.

20        Q.     So sometimes they would, though?

21        A.     Yes.

22        Q.     And when they said the port was at

23   capacity, you knew that was a lie, right?

24        A.     Yes.

25        Q.     And it would have been obvious to those



Page 101

1    supervisors that it was a lie as well, correct?

2          A.    Correct.

3          Q.    In fact, it was obvious to everybody who

4    was implementing this policy at Tecate that the

5    capacity excuse was a lie, right?

6          A.    Correct.

7                MR. MEDLOCK:  We'll mark the next

8          exhibit as Exhibit 4.

9                [Exhibit 4, a declaration, was marked

10         for identification.]

11   BY MR. MEDLOCK:

12         Q.    Okay, sir.  I put in front of you what

13   we've marked as Exhibit 4 to your deposition.  It's a

14   multipage declaration from Mariza Marin, whose name

15   I'm hoping I pronounced correctly, that was filed

16   earlier in this litigation.

17               Please take a moment to review it, and

18   then let me know verbally on the record when you've

19   finished doing that.

20         A.    This is going to take a while.  It looks

21   like a lot of it is not my port of entry.

22         Q.    Yes, that's correct.

23               You want me to direct you to the place I

24   would like to talk to you about?

25         A.    Sure.



Page 102

1        Q.      Well, first off, I take it you've never

2   seen this document before?

3        A.      No.

4        Q.      And if you look at the very last page,

5   page 6, there's a page that has what appears to be a

6   signature above the name Mariza Marin.  Do you see

7   that?

8        A.      Yes.

9        Q.      And it lists -- it says Mariza Marin,

10  Assistant Director of Border Security, San Diego

11  Field Office, Office of Field Operations, correct?

12       A.      Yes.

13       Q.      Have you ever met Mariza Marin before?

14       A.      No.

15       Q.      Have you ever communicated with Mariza

16  Marin for any purpose?

17       A.      No.

18       Q.      Okay.  And I take it you didn't know

19  Mariza Marin had offered a declaration in this case;

20  is that right?

21       A.      No.

22       Q.      Let's turn to paragraph 5 on page 2 of

23  the declaration.  Do you see paragraph 5, sir?

24       A.      Yes.

25       Q.      That reads, quote, "As an initial



Page 103

1    matter, it is impossible to state the capacity of the

2    San Ysidro and Otay Mesa port of entries" -- POEs, I

3    should say -- "to process aliens without documents

4    sufficient for lawful entry to the United States."

5            Did I read that correctly?

6        A.    Yes.

7        Q.    And you stated earlier that the capacity

8    of a port of entry to house individuals comes from

9    the GSA, right?

10        A.    I would assume so.

11        Q.    So to you, you did know the capacity

12    of -- you knew there was a capacity to the Tecate

13    Port of Entry, correct?

14        A.    I believe every building has a capacity.

15        Q.    So when Mariza Marin says it's

16    impossible to state the capacity of the San Ysidro

17    and Otay Mesa ports of entry, that's not correct.

18    There's a known capacity for those ports of entry,

19    right?

20        A.    I don't know that.

21        Q.    Okay.

22        A.    I mean, I'm sure there has to be, from

23    GSA and fire codes and --

24        Q.    Did it strike you as odd to hear there's

25    no gas and fire code capacity for those ports of



Page 104

1    entry, correct?

2        A.      Correct.

3        Q.      And in your experience, when you were at

4    San Ysidro, did you know, roughly, how many asylum

5    seekers could be housed in the AEU?

6        A.      No.

7        Q.      Did your management know that?

8        A.      No.

9        Q.      Nobody knew that?

10       A.      Not that I know of.

11       Q.      And did you ever see any document that

12   actually listed the capacity of the San Ysidro Port

13   of Entry --

14       A.      No.

15       Q.      -- for housing asylum seekers?

16       A.      No.

17       Q.      Did you ever see a document that said

18   the San Ysidro Port of Entry is at 50 percent

19   capacity for housing asylum seekers?

20       A.      No.

21       Q.      Did you ever see a document that says

22   here's the percentage capacity for San Ysidro?

23       A.      No.

24       Q.      Do you think that those documents exist?

25       A.      I would hope so.



Page 105

1       Q.      Why would you hope so?

2       A.      Well, because it's -- like I said, it's

3    a safety hazard for everybody.

4       Q.      It's operationally important to know the

5    percentage capacity that a port of entry has; is that

6    correct?

7       A.      Yes.

8       Q.      And it's something that you would expect

9    senior management of the port of entry to be

10   tracking, correct?

11      A.      Yes.

12      Q.      You would be expect them to be tracking

13   it on a daily basis, right?

14      A.      Yes.

15      Q.      Because it is important to know what the

16   capacity of the port of entry is, right?

17      A.      Correct.

18      Q.      So when Mariza Marin says it's

19   impossible to state what with the capacity of the

20   port of entry is, it would surprise you to know that

21   that -- it would surprise you that -- that somehow

22   management of CBP doesn't know the percentage

23   capacity of a port of entry on any day, right?

24      A.      Yes.

25      Q.      And it would surprise you that



Page 106

1    management of CBP doesn't know the actual capacity of

2    the port of entry on any given day, correct?

3         A.    Yes.

4         Q.    Let's turn back to Exhibit 3, the

5    metering guidance.  I want to focus for a second on

6    the third paragraph, the beginning of it.

7               Are you with me on the third paragraph,

8    sir?

9         A.    Yes.

10        Q.    If begins, "INAMI has, at times, elected

11   to conduct exit controls at some locations in Mexico,

12   to limit the throughput of travelers to the United

13   States."

14              Did you read that, sir?

15        A.    Yes.

16        Q.    And INAMI, I-N-A-M-I, do you know what

17   that is?

18        A.    No.

19        Q.    Do you know what the exit controls

20   referred to in this document are?

21        A.    No.

22        Q.    And have you ever heard of the Mexican

23   government implementing exit controls to limit the

24   throughput of travelers to the U.S.?

25        A.    No.



Page 107

1      Q.      In your experience, do your counterparts

2   in Mexico do anything to stop people from coming up

3   to the Tecate Port of Entry?

4      A.      No.

5      Q.      I know I said I'd offer you a break

6   every hour, but do you want to take a break now or

7   keep going?

8      A.      I can keep going.

9              MR. MEDLOCK:  Okay.  Exhibit 5.

10             [Exhibit 5, an e-mail, was marked for

11         identification.]

12  BY MR. MEDLOCK:

13     Q.      All right, sir.  I have put in front of

14  you what we've marked as, I believe, Exhibit 5 to

15  your deposition.  It's a two-page document that bears

16  the Bates numbers AOL-DEF-00087160 through 87161.

17  And for your edification, because I'm sure you'll

18  want to know this going forward, Bates numbers are

19  those tiny things in the bottom right-hand corner of

20  the document.  I don't know why they call them Bates

21  numbers; it's a lawyer word.

22             Please review the document and then let

23  me know audibly on the record when you're done doing

24  so.

25     A.      Okay.  I'm done.



Page 108

1      Q.     So this is an e-mail from -- it says

2    Eric J. Everson, sent on March 21, 2019, at 3:56 p.m.

3    Do you see that?

4      A.     Yes.

5      Q.     And it says, "On behalf of CBP MCAT

6    team."  Do you see that, sir?

7      A.     Yes.

8      Q.     Have you ever heard the term "MCAT" or

9    M-C-A-T?

10     A.     No.

11     Q.     Do you have any understanding of whether

12   there's an organization with CBP referred to as a

13   migration crisis action team?

14     A.     No.

15     Q.     You never said heard of that, that group

16   before?

17     A.     No.

18     Q.     So the subject line of this e-mail is,

19   "Field office queue management report, March 21,

20   2019."  Do you see that?

21     A.     Yes.

22     Q.     And then beneath that, there in the body

23   of the e-mail, there are several charts, correct?

24     A.     Correct.

25     Q.     And they're labeled "Laredo Field



Page 109

```
 1    Office," "El Paso Field Office," "Tucson Field
 2    Office," and "San Diego Field Office," correct?
 3         A.    Correct.
 4         Q.    And I think we already discussed this,
 5    but those are the four field offices on the
 6    U.S.-Mexico border within LFO, correct?
 7         A.    Correct.
 8         Q.    And let's focus for a moment on the
 9    San Diego field office chart.  Do you see that on
10    page 2, sir?
11         A.    Yes.
12         Q.    That chart has various vertical columns
13    that goes across the page, correct?
14         A.    Yes.
15         Q.    The first reads "Port of Entry"; is that
16    right?
17         A.    Yes.
18         Q.    And then moving to the right, it says,
19    "Total in Custody"?
20         A.    Correct.
21         Q.    And then to the right of that is,
22    "Percentage of Capacity," correct?
23         A.    Correct.
24         Q.    And then to the right of that is, "Do
25    you have any UDAs in line waiting on the Mexico side?
```



Page 110

1    If yes, how many?"  Do you see that?

2        A.     Yes.

3        Q.     And then the next column to the right of

4    that reads, "Are you directing UDAs to other ports of

5    entry?  If yes, which ports of entry?"  Did I read

6    that correctly?

7        A.     Yes.

8        Q.     And there are various other columns to

9    the right of that, correct?

10       A.     Correct.

11       Q.     So I want to focus on those four

12   columns.

13              So under the Port of Entry column, it

14   lists San Ysidro, Otay Mesa, Tecate, Calexico West,

15   Calexico East, and Andrade.  Do you see that, sir?

16       A.     Yes.

17       Q.     And those are the six ports of entry in

18   the San Diego field office, correct?

19       A.     Correct.

20       Q.     And for the San Ysidro port of entry, it

21   lists ███ in custody, correct?

22       A.     Correct.

23       Q.     And it says that's 96 percent of

24   capacity, correct?

25       A.     Correct.



1          Q.     And it lists 2,800 undocumented aliens

2    in line, waiting on the Mexico side, correct?

3          A.     Correct.

4          Q.     And for the Otay Mesa Port of Entry, it

5    says that there are zero in custody, correct?

6          A.     Correct.

7          Q.     And when it says, "Are you directing

8    UDAs to other ports of entry?  If yes, which port of

9    entry?"  For Otay Mesa, it says, "Referred to

10   San Ysidro," correct?

11         A.     That's correct.

12         Q.     And for Tecate, it says there are zero

13   in custody, correct?

14         A.     Correct.

15         Q.     And that people are being referred to

16   San Ysidro, correct?

17         A.     Correct.

18         Q.     So according to this chart, on March 21,

19   2019, there were zero undocumented aliens in custody

20   at the Tecate Port of Entry, correct?

21         A.     Correct.

22         Q.     And all the undocumented noncitizens

23   that approached the port of entry we're being

24   referred to San Ysidro, correct?

25         A.     Correct.



Page 112

1          Q.      And that's consistent with your

2     experience when you were posted at Tecate, correct?

3          A.      Correct.

4          Q.      It's also consistent with the processing

5     hub theory that we talked about earlier, correct?

6          A.      Correct, unless they came running up the

7     lanes.

8          Q.      So on March 21st, CBP officers at Tecate

9     were referring noncitizens without proper travel

10    documents who approached the Otay Mesa Port of Entry

11    to San Ysidro, where there were 2,800 people already

12    in line; is that right?

13         A.      Non-U.S. citizens?

14         Q.      Right.

15         A.      Without documents?

16         Q.      Right.

17         A.      To?

18         Q.      Were being referred to San Ysidro?

19         A.      Yes.

20         Q.      And there were already 2,800 people in

21    line at San Ysidro on that day?

22         A.      Yes.

23         Q.      So those noncitizens at Tecate went from

24    a port where there were zero people in custody but

25    there was capacity to process them, and they were



Page 113

1    redirected to a port where there were already 2,800

2    people in line; is that correct?

3         A.     Yes.

4         Q.     And that was the policy of CBP as you

5    understood it on that day?

6         A.     Yes.

7         Q.     Before we move on, if you just look at

8    this chart, the charts on Exhibit 5, there is a

9    percentage of capacity for every port listed,

10   correct?

11        A.     Correct.

12        Q.     So according to this e-mail, people at

13   CBP do know the capacity of the ports of entry,

14   correct?

15        A.     Yes.

16        Q.     And they do track it, correct?

17        A.     Correct.

18        Q.     So it's simply not true to say that

19   there is no way to know the capacity of a port of

20   entry, correct?

21             MR. HALASKA:  Objection.  Leading.

22             You can answer.

23   BY MR. MEDLOCK:

24        Q.     Sir, just so I'm clear, you work at CBP,

25   correct?



Page 114

1          A.      Correct.

2          Q.      And your attorney is from the U.S.

3     Department of Justice, correct?

4          A.      Correct.

5          Q.      So I am going to ask you a leading

6     question, if that's all right.  My question to you

7     is:  Isn't it true -- if somebody says that you can't

8     know the capacity of a port of entry, this document

9     shows that that's just simply incorrect, right?

10         A.      Correct.

11                 MR. MEDLOCK:  Let's move on to the next

12         exhibit.  Exhibit 6.

13                 [Exhibit 6, an e-mail, was marked for

14         identification.]

15    BY MR. MEDLOCK:

16         Q.      Sir, I'm showing you a one page e-mail

17    that we marked as Exhibit 6 to your deposition.  It

18    bears the Bates number AOL-DEF-00170598.

19                 Please take a moment to review the

20    document and then let me know when you're done doing

21    so, sir.

22         A.      Okay.

23         Q.      This is a one-page e-mail from Ryan

24    Koseor that was sent on Saturday, June 16, 2018, at

25    7:17 p.m., correct?



Page 115

1          A.     Correct.

2          Q.     And it was sent to Randy Howe.  Do you

3     see that?

4          A.     Yes.

5          Q.     Do you know who Randy Howe is?

6          A.     No.

7          Q.     And the subject line of the e-mail is,

8     "SWB queue management update"; is that right?

9          A.     Yes.

10         Q.     And do you know what "SWB" means?

11         A.     No.

12         Q.     Have you heard of the phrase "Southwest

13    border" used at CBP?

14         A.     Yes.

15         Q.     And does that refer to the U.S.-Mexico

16    border?

17         A.     Yes.

18         Q.     There's no other border on the

19    Southwest, right?

20         A.     Yes.

21         Q.     In the report date -- in the body of the

22    e-mail, there's a spreadsheet or chart, correct?

23         A.     Correct.

24         Q.     And the top of it says, "Report date,

25    June 16, 2018," correct?



Page 116

1        A.      Correct.

2        Q.      And then beneath that, there are six

3   columns, correct?

4        A.      Yes.

5        Q.      And those columns are -- those vertical

6   columns read from left to right, "Field office,"

7   "Port," "Total number of detainees," "Percentage of

8   capacity," "Number in queue at boundary line," and

9   "Impact to port operations."  Did I read that

10  correctly?

11       A.      Correct.

12       Q.      And the fields offices listed are the

13  four field offices for the U.S.-Mexico border,

14  correct?

15       A.      Yes.

16       Q.      And the ports listed in this chart are

17  all the ports on the U.S.-Mexico border, correct?

18       A.      Yes.

19       Q.      Let's start with San Ysidro.

20  ███████████████████████████████████████████

21  ███████ correct?

22       A.      Yes.

23       Q.      And that percentage of capacity is

24  63 percent, correct?

25       A.      Yes.



Page 117

1      Q.      So, again, on this day, CBP knows

2  exactly how many individuals are being detained at

3  the San Ysidro Port of Entry and what that percentage

4  of capacity is, correct?

5      A.      Yes.

6      Q.      That's because it is operationally

7  important, and it doesn't surprise you as being

8  tracked on a daily basis, correct?

9      A.      Yes.

10     Q.      And it lists ███████████████████

11  ████████████████████████████████████████████

12  correct?

13     A.      Yes.

14     Q.      And under "Impact to Port Operations" it

15  says "negative," correct?

16     A.      Yes.

17     Q.      So let's move down.

18             Do you see Tecate listed here?

19     A.      Yes.

20     Q.      And the number of detainees at Tecate is

21  zero, correct?

22     A.      Yes.

23     Q.      And the percentage capacity is listed as

24  zero, right?

25     A.      Yes.



Page 118

1        Q.    And under "Impact to Port Operations,"

2    it says, "Redirecting to San Ysidro," correct?

3        A.    Yes.

4        Q.    So on June 16, 2018, individuals who

5    were noncitizens that didn't have proper travel

6    documents were being -- who came to the Tecate Port

7    of Entry were being redirected to San Ysidro,

8    correct?

9        A.    Yes.

10        Q.    Even though there was nobody being --

11    there were no asylum seekers being detained at the

12    Tecate Port of Entry?

13        A.    Correct.

14        Q.    And even though zero percent of Tecate's

15    capacity was being used, correct?

16        A.    Correct.

17        Q.    And they were being redirected to

18    San Ysidro, where there were already 850 people in

19    Tijuana shelters in line, correct?

20        A.    Correct.

21        Q.    And that was being done consistent with

22    CBP policy, right?

23        A.    Yes.  May I use the restroom again?

24            MR. MEDLOCK:  You may.  Let's take a

25        five-minute break.



Page 119

1                    (Brief recess.)

2                    MR. MEDLOCK:  Back on the record.

3    BY MR. MEDLOCK:

4         Q.    Thank you, sir.

5         A.    Thank you.

6         Q.    Before I mark the next document, I have

7    a couple of follow-up questions I want to ask you.

8                    Did you have any conversations with

9    anyone during the break?

10        A.    No.

11        Q.    You haven't discussed the substance of

12   your testimony with anyone during the breaks during

13   this deposition?

14        A.    No.

15        Q.    When an asylum seeker is turned away at

16   the Tecate Port of Entry, how do they react?

17        A.    Sometimes -- it's always different.

18   Sometimes they're hysterical.  Sometimes they don't

19   understand why.  Some people just say "okay" and walk

20   away.

21        Q.    And when you say "hysterical," I imagine

22   you're saying that's an emotional reaction?

23        A.    Yes.

24        Q.    Some people cry?

25        A.    Yes.



Page 120

1      Q.      How does it make you actually to see

2      people who are turned away being -- crying?

3      A.      Not good.

4      Q.      Is that one of the hardest things you

5      have to do in your job?

6      A.      Not one of the harder.  We definitely

7      deal with harder things at my job.

8      Q.      Harder emotionally?

9      A.      Yes.

10     Q.      And why is that?

11     A.      We see -- we see everything.  We see

12     kids in trunks that come across.  We've seen dead

13     bodies come across.  We've seen women that are

14     internal body carriers.  We see a lot more than just

15     somebody crying.

16     Q.      Got it.

17             And the individuals that are turned back

18     from U.S. soil to Mexican soil at the Tecate Port of

19     Entry, CBP doesn't provide transport for them from

20     Tecate to San Ysidro, do they?

21     A.      No.

22     Q.      You've traveled to both the San Ysidro

23     Port of Entry and the Tecate Port of Entry, correct?

24     A.      Correct.

25     Q.      Roughly, how far away are they from each



Page 121

1    other?

2         A.     I think Mexico is a little -- a straight

3    shot than ours.

4         Q.     Okay.

5         A.     Ours is about a 55-minute drive.

6         Q.     As the crow flies, how far is it in

7    miles from one to the other?

8         A.     A rough estimate?  45 miles.

9         Q.     So if individuals that were turned away

10   at the Tecate Port of Entry can't get a bus or a car,

11   they have to walk 45 miles to the San Ysidro Port of

12   Entry; is that right?

13        A.     Correct.

14        Q.     Where, as we saw in some of these

15   documents, there are already hundreds of people who

16   are already waiting, correct?

17        A.     Correct.

18        Q.     When the limit line position was created

19   at the Tecate Port of Entry, were additional officers

20   added to the shifts to account for those limit line

21   positions?

22        A.     No.

23        Q.     So the officers for those limit line

24   positions came from elsewhere, correct?

25        A.     No.



Page 122

1      Q.      They would have had to have been working

2    at -- those officers would have had to have been --

3    somebody would've -- they would've been working at

4    primary or secondary, and then they were moved to the

5    limit line; is that right?

6      A.      Correct.

7      Q.      So as a result of creating the limit

8    line position, there were less officers either at

9    primary or secondary; is that right?

10     A.      Correct.

11     Q.      Let's turn back to the metering policy

12   for a second.  That's Exhibit 3, the one-page

13   metering one.  Do you still have that in front of

14   you, sir?

15     A.      Yes.

16     Q.      I want to focus again on the phrase,

17   "Orderly processing."

18     A.      What paragraph?

19     Q.      First paragraph, first sentence.  Do you

20   see the phrase, "Orderly processing"?

21     A.      Yes.

22     Q.      During your time at the Tecate Port of

23   Entry, can you think of any instance in which

24   processing became disorderly?

25     A.      No.



Page 123



```
 1      Q.
 2
 3
 4
 5
 6      A.
 7      Q.
 8      A.
 9
10      Q.
11      A.
12
13
14
15      Q.
16      A.
17
18
19
20
21
22
23      Q.
24
25      A.
```



Page 124

```
 1        Q.     And that security issue is created by
 2   I-94 holders, not asylum seekers, correct?
 3        A.     Correct.
 4        Q.     Can you think of any instance in which
 5   the security of the port of entry at Tecate was
 6   threatened by asylum seekers?
 7        A.     Just when they're running up the lanes.
 8        Q.     Besides that?
 9        A.     No.
10        Q.     When asylum seekers rush the lanes, in
11   the vehicle traffic lanes, are they actually
12   threatening the security of the port?
13        A.     We don't know what they're doing.  We
14   just get people running, a group of them, so we have
15   no clue what they want.
16        Q.     In the instances where individuals have
17   rushed the vehicular lanes at the Tecate Port of
18   Entry, can you think of any instance in which an
19   asylum seeker was carrying a weapon?
20        A.     No.
21        Q.     Can you think of any instance in which
22   an asylum seeker was carrying drugs?
23        A.     No.
24        Q.     Can you think of any instance in which
25   an asylum seeker that rushed the vehicular lanes was
```



Page 125

1    carrying bomb-making materials?

2         A.    No.

3         Q.    Can you think of any instances in which

4    an asylum seeker who rushed the vehicular lanes had

5    expressed a desire to hurt Americans?

6         A.    No.

7         Q.    Can you think of any instance in which

8    an asylum seeker who rushed the vehicular lanes at

9    the Tecate Port of Entry assaulted an officer?

10        A.    No.  The thing is that we don't know

11   also who is an asylum seeker or not till after the

12   fact.

13        Q.    But now knowing after the fact, can you

14   say that non-asylum seekers who actually rushed the

15   lanes were violent in any way?

16        A.    No.

17        Q.    Prior to the implementation of the duty

18   station at the limit line and the policy to turn back

19   asylum seekers, were asylum seekers rushing the

20   vehicular lanes?

21        A.    No.

22        Q.    Let's focus again on the memo.

23              We talked about the reference to

24   sanitary conditions, correct?

25        A.    Yes.



Page 126

1       Q.      During the time you've been at the
2  Tecate Port of Entry, has it ever become unsanitary?
3       A.      No.
4       Q.      How about the San Ysidro Port of Entry,
5  has it ever become unsanitary during the time you
6  were working there?
7       A.      Yes.
8       Q.      And that unsanitary condition, what was
9  it?
10       A.      We've had feces, we've had diseases,
11  we've had dirt and just other stuff, not necessarily
12  always from asylums.  But GSA is usually pretty good
13  about cleaning up the facility pretty fast.
14       Q.      When you say "pretty fast," how quickly
15  does that happen?
16       A.      Within an hour or so.
17       Q.      So --
18       A.      I don't know if it's GSA, but I think
19  that's -- I don't know the cleaning crew exactly.
20       Q.      But whoever provides the cleaning crew,
21  they can clean it up in about an hour?
22       A.      Yes.
23       Q.      So any of the unsanitary conditions that
24  you just mentioned could be remedied in an hour or
25  less?



Page 127

1          A.     Unless they need to be showered, which

2     that -- sometimes depending on how many officers,

3     depending on the cases, how many people need to be --

4     take showers.  But they do do that, I believe, once a

5     day, they'll have, you know, new people or whatever

6     come in, shower, and then give them all their lice

7     medication or scabies medication that they need.  I

8     believe it's once a day; I don't know exactly.

9          Q.     So to the best of your recollection, any

10    unsanitary condition at the San Ysidro Port of Entry

11    that you saw could have been remedied in about a day;

12    is that right?

13         A.     Yes.

14         Q.     And is that the same for the Otay Mesa

15    Port of Entry with respect to unsanitary conditions?

16         A.     They never really have any unsanitary,

17    and the -- and theirs is -- they didn't have any

18    overnights -- well, they did have overnights, but

19    they didn't have anything over, I believe, three

20    days.  I think the longest for San Ysidro -- I mean

21    for Otay Mesa was two days, just because they didn't

22    have holding cells.

23         Q.     I see.

24                And for the San Ysidro Port of Entry,

25    was there ever a time period in which an asylum



Page 128

1    seeker caused the port of entry to no longer be

2    secure, that you can think of?

3         A.    No.

4         Q.    For the Otay Mesa Port of Entry, was

5    there ever an instance where an asylum seeker caused

6    the Otay Mesa Port of Entry to no longer be secure?

7         A.    No.

8         Q.    For the San Ysidro Port of Entry, can

9    you think of an instance where an asylum seeker or

10   asylum seekers caused the port of entry to be

11   processing people in a disorderly manner?

12        A.    No.

13        Q.    And is the same true of Otay Mesa?

14        A.    Well, not disorderly.  Sometimes

15   San Ysidro would have an influx of them come at a

16   certain time, and we couldn't take them all.  So I

17   remember we had them line up along the side of the

18   wall for a while, because we -- we just couldn't --

19   you can't pat down 20 people at a time.

20        Q.    Sure.

21        A.    So it would take some time to get them

22   all in.

23        Q.    So in those instances where you had

24   influxes of asylum seekers at San Ysidro, and there

25   were more people than you could actually take in at



Page 129

1    any given time, how long did it take you to work

2    through the backlog?

3         A.     It's hard to say.  Maybe an hour or so,

4    maybe longer.

5         Q.     Any time where it took more than a day

6    that you can think of?

7         A.     When I was there, no.

8         Q.     Would it be odd for you to have a

9    backlog when you were there for more -- was there

10   ever a backlog when you were at San Ysidro of longer

11   than a week?

12        A.     No.

13        Q.     How about longer than a month?

14        A.     You mean staying in the cells or just

15   outside.

16        Q.     Just waiting.

17        A.     No.

18        Q.     Would it be odd to you if someone had to

19   wait outside the San Ysidro Port of Entry for longer

20   than a month to be processed as an asylum seeker?

21        A.     When I was at San Ysidro?

22        Q.     Yes.

23        A.     Yes, I never encountered that.

24        Q.     It never happened, right?

25        A.     Not when I was there.



Page 130

1       Q.      Did it ever occur at Otay Mesa, that

2   asylum seekers were waiting longer than a day to be

3   processed?

4       A.      No.   Well, inside there were, maybe, two

5   maximum.   There would be some transport over, but not

6   outside.

7       Q.      So asylum seekers never had to wait

8   longer than a day at Otay Mesa to be processed during

9   your time there?

10      A.      No.

11      Q.      And was there ever an instance when you

12  were working at Otay Mesa as an officer where Otay

13  Mesa actually had an influx of asylum seekers, where

14  there were more asylum seekers than could be

15  processed at that time?

16      A.      No.

17      Q.      What's the process that CBP officers go

18  through when a Mexican without proper travel

19  documents presents themselves at the limit line?

20      A.      What is --

21      Q.      When a Mexican national presents

22  themselves at the limit line and claims asylum, what

23  happens?

24      A.      Claims asylum?

25      Q.      Yes.


MAGNA
LEGAL SERVICES

Page 131

```
 1          A.      For me, I call a supervisor, always.

 2          Q.      And when the supervisor comes down, what

 3     happens?

 4          A.      They either -- depending -- well, if

 5     they want asylum, they will redirect them to San

 6     Ysidro or Calexico.

 7          Q.      Okay.  So I want to make sure I get this

 8     correct:  So at Tecate, a Mexican citizen claiming

 9     asylum approaches the limit line and steps onto U.S.

10     soil, you will call a supervisor down, and the

11     supervisor will redirect them back to Mexican soil;

12     is that right?

13          A.      Yes, but, I think, recently we did take

14     one.

15          Q.      So you can take them, right?

16          A.      Yes.

17          Q.      But it's often the case that the

18     supervisor redirects them back to Mexico?

19          A.      Yes.

20          Q.      What happens when somebody comes to the

21     limit line with a serious medical issue?  What's the

22     process?

23          A.      We call for an MFRT, which is our

24     first -- I don't know what it stands for.

25          Q.      A medical first response team?
```



Page 132

1        A.      Yes, something like that, that's trained

2    for -- as an EMT.  So he comes down, assesses the

3    situation, calls 911 and all that stuff.  But they

4    have to have proper documents to come into the U.S.

5        Q.      So if an asylum seeker has a medical

6    issue, either at the limit line or at primary, what

7    happens to them?

8        A.      I believe they would call the Mexican

9    police for them to come down and call for an

10   ambulance.

11       Q.      So that person would be taken --

12       A.      I don't know because I haven't --

13       Q.      That's never happened to you?

14       A.      That's never happened to me.

15       Q.      Have you ever heard of any of your

16   coworkers encountering that situation?

17       A.      No.

18       Q.      Were you ever asked to track the

19   processing time for individuals without proper travel

20   documents who come to the limit line?

21       A.      Never.

22       Q.      Were you ever asked to track the

23   processing time for individuals without proper travel

24   documents to come to primary?

25       A.      No.



Page 133

```
 1        Q.     Are you aware of any -- anyone at CBP
 2   who was tracking the processing time for individuals
 3   without proper travel documents presenting themselves
 4   at the limit line?
 5        A.     No.
 6        Q.     Are you aware of anyone at CBP who was
 7   tracking the processing time for individuals without
 8   proper travel documents presenting themselves at
 9   primary?
10        A.     No.
11        Q.     And I want to make sure I got this
12   correct earlier:  At the Tecate Port of Entry, how
13   many lines are there for individuals who are coming
14   up to the limit line?
15        A.     Coming up to the limit line, there's
16   only one.
17        Q.     There's only one?
18        A.     Pedestrian, when they walk up to the
19   actually booth, there's two.
20        Q.     When you say "the actual booth," that's
21   primary?
22        A.     There's two primary positions, but limit
23   line, there's only one.
24        Q.     And how are folks sorted into those two
25   lines after they hit the limit line?
```



Page 134

1       A.      Right when they walk into the door,

2  there's two different lines they can go into.

3       Q.      What are the two different lines for?

4       A.      They're both the exact same.

5               MR. MEDLOCK:  Okay.  Understood.

6               Let's mark this as Exhibit 7.

7               [Exhibit 7, an e-mail, was marked for

8       identification.]

9  BY MR. MEDLOCK:

10      Q.      All right.  Sir, I put in front of you

11  what we marked as Exhibit 7 to your deposition.  It

12  is a two-page e-mail that bears the Bates number

13  AOL-DEF-00086900 through 01.

14              Please review it and let me know when

15  you're done reviewing it, and then we'll talk about

16  it.

17      A.      Okay.

18      Q.      You've done reviewing it, sir?

19      A.      Yes.

20      Q.      This is an e-mail from Michael Estrada,

21  sent on May 2, 2019, at 3:25 p.m., correct?

22      A.      Correct.

23      Q.      And the subject line of the e-mail is,

24  "Field office queue management report, May 2, 2019."

25  Did I read that correctly?



Page 135

1        A.      Correct.

2        Q.      I want to focus on the chart that says

3    "San Diego Field Office" on the second page.  Do you

4    see that?

5        A.      Yes.

6        Q.      And this has the same columns as the

7    other charts that we've been discussing, with "Port

8    of Entry," "Total in Custody," "Percentage of

9    Capacity," and other columns, correct?

10       A.      Correct.

11       Q.      So for the San Ysidro Port of Entry, it

12    lists ████ individuals in custody, correct?

13       A.      Correct.

14       Q.      And that's 93 percent of its capacity,

15    correct?

16       A.      Correct.

17       Q.      And under the column where it says, "Do

18    you have any UDAs in line waiting on the Mexico side?

19    If yes, how many?"  It lists 4,000, correct?

20       A.      Correct.

21       Q.      And for the Tecate Port of Entry, the

22    total in custody is zero, correct?

23       A.      Correct.

24       Q.      And that means there's zero asylum

25    seekers and no one else in custody at Tecate,



Page 136

1    correct?

2          A.     Correct.

3          Q.     That's zero percent of Tecate's

4    available capacity, correct?

5          A.     Correct.

6          Q.     And the UDAs are being referred to

7    San Ysidro, correct?

8          A.     Correct.

9          Q.     That's consistent with the policy of

10   turning people back to Mexico and redirecting them to

11   San Ysidro that we've been talking about, correct?

12         A.     Correct.

13         Q.     And so in this instance on May 2, 2019,

14   asylum seekers who approached the Tecate Port of

15   Entry's limit line position were being turned back to

16   Mexico and sent to San Ysidro, where there were 4,000

17   people already in line, correct?

18         A.     Correct.

19                MR. MEDLOCK:  Exhibit 8.

20                [Exhibit 8, an e-mail, was marked for

21         identification.]

22   BY MR. MEDLOCK:

23         Q.     Sir, I put in front of you what we

24   marked as Exhibit 8 to your deposition.  It is a

25   two-page e-mail that bears the Bates numbers



Page 137

1    AOL-DEF-00088202 through 03.

2            Please take a moment to review it, and

3    then let me know audibly on the record when you're

4    done doing so.

5        A.    Okay.

6        Q.    This is an e-mail dated February 5,

7    2019, at 4:06 p.m., with the subject line, "Field

8    office queue management report, February 5, 2019."

9    Did I read that correctly?

10       A.    Yes.

11       Q.    And it has the same charts for Laredo,

12   El Paso, Tucson, and San Diego, correct?

13       A.    Correct.

14       Q.    Let's focus on the San Diego field

15   office chart again.

16            The San Diego field office section of

17   the chart has the same columns that we've been

18   talking about on other documents, correct?

19       A.    Correct.

20       Q.    And for San Ysidro, it says there are

21   ████     individuals in custody, correct?

22       A.    Correct.

23       Q.    And that's 97 percent of San Ysidro's

24   capacity, correct?

25       A.    Yes.



Page 138

1       Q.      And it also states that there's 1,930

2   people in line at San Ysidro, correct?

3       A.      Correct.

4       Q.      During your time at the San Ysidro Port

5   of Entry, can you think of any time where there were

6   1,930 people in line waiting to be processed?

7       A.      Never.

8       Q.      It's just something that never happened,

9   right?

10      A.      Not while I was there.

11      Q.      For the Tecate Port of Entry, there are

12  zero people in custody listed here?

13      A.      Yes.

14      Q.      And that's zero percent of Tecate's

15  capacity, correct?

16      A.      Correct.

17      Q.      And it says that individual --

18  undocumented aliens are being referred to the

19  San Ysidro Port of Entry, correct?

20      A.      Correct.

21      Q.      And that's consistent with the turn-back

22  policy we've been discussing today, correct?

23      A.      Correct.

24      Q.      Just so I'm clear, what this chart shows

25  is if somebody came -- if an asylum seeker came to a



Page 139

```
 1    Tecate Port of Entry on February 5, 2019, they would
 2    be redirected from U.S. soil to Mexican soil, and
 3    referred to the San Ysidro Port of Entry, where there
 4    are already 1,930 people in line, correct?
 5         A.    Or they can be standing in Mexico.
 6         Q.    Either way?
 7         A.    Yes, correct.
 8         Q.    So their options were either get in line
 9    with 1,930 people, or go back to Mexico and give up
10    on asylum in the U.S.?
11         A.    Correct.
12               MR. MEDLOCK:  Exhibit 9.
13               [Exhibit 9, an e-mail, was marked for
14         identification.]
15    BY MR. MEDLOCK:
16         Q.    Sir, I've put front of you what's marked
17    Exhibit 9 to your deposition.  It's two-page e-mail
18    that bears the Bates numbers AOL-DEF-00050964
19    through 65.  Do you see that, sir?
20         A.    Yes.
21         Q.    Please take a moment to review the
22    document and then let me know when you're done
23    reviewing it.
24         A.    I'm done.
25         Q.    All right.  So this is an e-mail dated
```



Page 140

1    January 10, 2019, at 3:20 p.m., correct?

2         A.    Correct.

3         Q.    And the subject line is, "Field office

4    queue management report, 1.10.2018," correct?

5         A.    Yes.

6         Q.    And the actual date of it as reflected

7    in the chart is from January 10, 2019, correct?

8         A.    Correct.

9         Q.    So that appears to be a typo, right?

10        A.    Yes.

11        Q.    So let's focus on the San Diego field

12   office portion of the chart again.  And this has --

13   this portion of the chart has the same vertical

14   columns that we were looking at in the prior

15   documents, correct?

16        A.    Correct.

17        Q.    And for the San Ysidro Port of Entry, it

18   says there are ▮▮▮▮ people in custody, correct?

19        A.    Correct.

20        Q.    And that's 97 percent of San Ysidro's

21   capacity, correct?

22        A.    Yes.

23        Q.    And it lists 4,540 UDAs who are in line

24   waiting in Mexico, correct?

25        A.    Yes.



Page 141

```
 1        Q.     And for the Tecate Port of Entry, there
 2   are zero people in custody, correct?
 3        A.     Yes.
 4        Q.     And that's zero asylum seekers, zero of
 5   anyone in custody at Tecate, correct?
 6        A.     Yes.
 7        Q.     And that's zero percent of Tecate's
 8   operating capacity, correct?
 9        A.     Yes.
10        Q.     And it says that UDAs who come into the
11   Tecate Port of Entry are being referred to
12   San Ysidro, correct?
13        A.     Yes.
14        Q.     And that's consistent with the turn-back
15   policy we've been discussing today, correct?
16        A.     Correct.
17               MR. MEDLOCK:  Exhibit 10.
18               [Exhibit 10, an e-mail, was marked for
19          identification.]
20   BY MR. MEDLOCK:
21        Q.     Sir, I put in front of you what we've
22   marked as Exhibit 10 to your deposition.  It is a
23   two-page e-mail that bears the Bates numbers
24   AOL-DEF-00195859 through 60.
25               Please take a moment to review it, and
```



Page 142

1    let me know audibly on the record when you're done

2    doing so.

3          A.     I'm done.

4          Q.     All right.  This is an e-mail sent on

5    December 26, 2018, at 3:05 p.m., correct?

6          A.     Correct.

7          Q.     The day after Christmas, right?

8          A.     Yes.

9          Q.     And it's in the same format with the

10   charts for the Laredo field office, El Paso field

11   office, Tucson field office, and San Diego field

12   office that we've been discussing, correct?

13         A.     Correct.

14         Q.     And I'm focusing now on the San Diego

15   field office portion of the document.  Are you there?

16         A.     Yes.

17         Q.     And there's -- for the San Ysidro Port

18   of Entry, it lists ████ individuals in custody,

19   correct?

20         A.     Correct.

21         Q.     And that is 87 percent of their

22   capacity; is that correct?

23         A.     Correct.

24         Q.     And it states that there are 4,950

25   individuals waiting in line on the Mexico side at the



Page 143

1      San Ysidro Port of Entry, correct?

2          A.      Correct.

3          Q.      And for the Tecate Port of Entry there

4      are zero individuals in custody, correct?

5          A.      Correct.

6          Q.      That's zero percent of Tecate's

7      operating capacity, correct?

8          A.      Correct.

9          Q.      And individuals that come to the limit

10     line are being referred to the San Ysidro, correct?

11         A.      Correct.

12         Q.      So an individual who comes to the Tecate

13     Port of Entry seeking asylum would be referred to

14     San Ysidro, where there are already 4,950 people in

15     line, according to this document, correct?

16         A.      Correct.

17         Q.      And that's consistent with the turn-back

18     policy that we've been discussing today, correct?

19         A.      Correct.

20              MR. MEDLOCK:  So I've hit a stopping

21         point in my outline.  Do you guys want to break

22         for lunch?

23              MR. HALASKA:  I think that makes sense.

24              MR. MEDLOCK:  So let's go off the record

25         then.



Page 144

```
 1                    (Lunch recess taken.)

 2                    MR. MEDLOCK:  Back on the record.

 3      BY MR. MEDLOCK:

 4           Q.     Sir, welcome back from lunch.

 5           A.     Thank you.

 6           Q.     I just wanted to clarify a few things

 7      before I jump back to where we were in the

 8      questioning.

 9                    What's the longest period of time that

10      individuals expressing a desire to seek asylum had to

11      wait at the limit line of the San Ysidro Port of

12      Entry when you were stationed there?

13           A.     20, 30 minutes, maybe.  Oh, wait at the

14      limit line?

15           Q.     Yes.

16           A.     When I was stationed there, there was no

17      wait.

18           Q.     And what's the longest --

19           A.     I'm sorry.  I take that back.  There are

20      lines that we do accumulate, so I think they would

21      just stay in the regular line.  So I -- it was

22      frequent -- during the time of week it is.

23           Q.     Okay.

24           A.     Because they would wait in general

25      traffic when we held them back, and then they would
```



Page 145

1    just come in with general traffic.  So it would

2    always be different.  But I don't think they would be

3    held specifically for -- because they're asylums.

4        Q.    So during the time you were at the

5    San Ysidro Port of Entry, the asylum seekers that

6    arrived at the port were part of the general traffic;

7    is that right?

8        A.    Correct.

9        Q.    And to your knowledge, what's the

10   longest period of time that an asylum seeker had to

11   wait to approach the primary inspection point during

12   the time you were there?

13       A.    With general traffic, maybe two, three

14   hours sometimes, depending on the time of the week,

15   depending on if there's a holiday or not.  It was

16   always -- it varied every day.

17       Q.    And would that be the same -- would the

18   same answer be true for Otay Mesa during the time you

19   were there?

20       A.    Yeah.  Otay Mesa, we didn't have as long

21   of a line.  It's a smaller port so it wasn't as long

22   of a line.  But yeah, it would be the same.  It would

23   vary.

24       Q.    During the time you were at Otay Mesa,

25   were asylum seekers part of the general line that you



Page 146

1    were describing?

2         A.    Yes.

3         Q.    

4

5

6

7

8         A.

9         Q.

10

11

12

13        A.

14

15

16

17

18

19        Q.

20

21        A.

22

23        Q.    So what you're testifying to is more

24   your guess and opinion?

25        A.    Yes.



Page 147

```
 1                 MR. MEDLOCK:  I'd like to mark the next
 2        exhibit.  Exhibit 11.
 3                 [Exhibit 11, copy of a CBP muster, was
 4        marked for identification.]
 5   BY MR. MEDLOCK:
 6        Q.     Sir, I've put in front of you a one-page
 7   document that bears the Bates number
 8   AOL-DEF-00216856.
 9                 Please take a moment to review the
10   document, and let me know audibly on the record when
11   you've done so.
12        A.     I have.
13        Q.     This is a true and accurate copy of a
14   muster that is dated September 4, 2018; is that
15   correct?
16        A.     Correct.
17        Q.     And it's addressed to, "All uniformed
18   personnel at Tecate Port of Entry"; is that right?
19        A.     Correct.
20        Q.     So this would have been included you at
21   the time you worked at the Tecate Port of Entry,
22   correct?
23        A.     Correct.
24        Q.     This is an example of the written
25   musters that we were talking about earlier?
```



Page 148

1          A.      Yes.  It is also an SOP.

2          Q.      Do you have any doubt that you would

3    have received this muster in the course of your

4    duties as a CBP officer at the Tecate Port of Entry?

5          A.      One more time?

6          Q.      You would have received a muster like

7    this during the course of your duties, correct?

8          A.      Yes, I have received this.

9          Q.      And at the time you received this

10   muster, you would have been knowledgeable about its

11   contents, right?

12         A.      When I got it, yes.

13         Q.      So this muster was sent from a J. Rene

14   Ortega, correct?

15         A.      Correct.

16         Q.      And this is the Rene Ortega you were

17   testifying earlier was the port director for part of

18   the time you've been at Tecate, correct?

19         A.      He's currently the port director right

20   now.

21         Q.      I want to focus on the body of the

22   muster.  And looking at the first paragraph, that

23   paragraph begins, "When necessary or appropriate to

24   facilitate orderly processing and maintain the

25   security of the port and safe and sanitary conditions



Page 149

1     for the traveling public, management may elect to

2     meter the flow of travelers at the land border, to

3     take into account the port's processing capability."

4     Did I read that correctly?

5          A.     Yes.

6          Q.     Do you still have Exhibit 3, the

7     metering policy, in front of you?

8          A.     Yes.

9          Q.     That sentence in Port Director Ortega's

10    muster is very similar to the language in the

11    metering guidance, correct?

12         A.     Yes.

13         Q.     Do you have any doubt that this

14    September 4, 2018, muster implements the metering

15    guidance?

16         A.     Excuse me?

17         Q.     Do you have any doubt that this muster

18    is implementing the metering guidance in Exhibit 3?

19         A.     No, no doubt.

20         Q.     We talked a little bit about the phrase

21    "facilitate orderly processing" earlier, correct?

22         A.     Yes.

23         Q.     Does Port Director Ortega define the

24    phrase "orderly processing" in this muster?

25         A.     No.



Page 150

1          Q.     Do you think it's important to
2     understand what the term "orderly processing" means
3     in order to understand this muster?
4          A.     Yes.
5          Q.     Did you ever ask Port Director Ortega or
6     any of your line supervisors what the phrase "orderly
7     processing" means?
8          A.     No.
9          Q.     Did Port Director Ortega or any of your
10    line supervisors ever further define the term
11    "orderly processing" for you?
12         A.     They might have and I don't recall.
13         Q.     So it might have occurred, it might not
14    have occurred?  Is that right?
15         A.     Yeah, yeah.  I don't remember.  I know
16    we talked about this SOP numerous times, on different
17    phrases in it, but I don't remember exactly.  It's
18    been a while.
19         Q.     When was the first time you discussed
20    this muster or SOP with your management at the Tecate
21    Port of Entry?
22         A.     I think it was the day it came out.
23         Q.     Who did you discuss it with?
24         A.     I -- I don't recall.  It's been a while.
25         Q.     Do you recall the substance of the



Page 151

1    conversation?

2         A.     Sort of.  It was -- it was different

3    parts in this that I was -- I didn't really

4    understand fully, and I think there is a couple of

5    officers that didn't fully understand.  And I believe

6    they did another one of these after that.

7         Q.     When you say "another one of these,"

8    another muster?

9         A.     Another SOP, yeah.

10        Q.     Who were the other officers, if you

11   recall, that had questions about this SOP?

12        A.     I don't recall right now.

13        Q.     Do you recall how many officers had

14   questions besides yourself?

15        A.     It's probably about three or four.

16        Q.     And what were the specific questions you

17   had about the muster in front of you?

18        A.     So I think it was like the case-by-case

19   basis was one of them.  You know, that's why we would

20   call for a supervisor, and the discretion should be

21   exercised.  So we didn't know what -- that exactly --

22   how much discretion we had.

23        Q.     Okay.  Any other questions you had?

24        A.     There were probably other questions.  I

25   just don't remember at this time.



Page 152

1       Q.      Let's go to what you were talking about

2    earlier.  So there is a sentence that reads, "In

3    addition, on a case-by-case basis, discretion should

4    be exercised when encountering a humanitarian

5    situation."  Did I read that correctly?

6       A.      Yes.

7       Q.      And that's the sentence that you had

8    questions about when this muster was first issued?

9       A.      Yes.

10      Q.      And what direction or guidance did you

11   receive about the meaning of that sentence?

12      A.      They just -- pretty much they just said

13   call for a supervisor at that point, and if you don't

14   feel comfortable with anything, then just call for a

15   supervisor and they'll take care of the situation.

16      Q.      Was the phrase "humanitarian situation"

17   ever defined for you?

18      A.      No.

19      Q.      Do you know if the leadership of the

20   Tecate Port of Entry ever further defined the phrase

21   "humanitarian situation"?

22      A.      I don't know.

23      Q.      Got it.

24              So going back to "orderly processing,"

25   prior to September 4, 2018, had processing ever



Page 153

1    become disorderly at the Tecate Port of Entry, to

2    your knowledge?

3         A.    No.

4         Q.    And focusing on the phrase "maintain the

5    security of the port," prior to September 4, 2018, do

6    you recall any instance in which the security of the

7    Tecate Port of Entry was not maintained due to the

8    presence of an asylum seeker?

9         A.    No.

10        Q.    And there's a reference here to "safe,

11   sanitary conditions."  Prior to September 4, 2018, do

12   you recall an instance in which there were not safe,

13   sanitary conditions at the Tecate Port of Entry due

14   to the presence of an asylum seeker?

15        A.    No.

16        Q.    So this policy says, "When necessary or

17   appropriate for orderly processing, maintain the

18   security of the port, or safe, sanitary conditions

19   for the traveling public," but those weren't problems

20   at the Tecate Port of Entry prior to the issuance of

21   this standard operating procedure or muster; isn't

22   that right?

23        A.    Correct.

24        Q.    So this is a solution in search of a

25   problem; isn't that right?



Page 154

```
 1          A.      Yes.
 2          Q.      I want to focus on the next sentence or
 3    second sentence in the first paragraph of the muster.
 4    It says, quote, "Due to the facility and operating
 5    hour limitations, this necessitates that we redirect
 6    asylum seekers to our processing hubs in Calexico
 7    West or San Ysidro PedWest."
 8                  Did I read that correctly?
 9          A.      Correct.
10          Q.      In practice, isn't it the case that
11    asylum seekers were redirected to San Ysidro?
12          A.      Correct.  But I --
13          Q.      Sorry?  Go ahead.
14          A.      I do believe they were telling them they
15    can go to Calexico as well.
16          Q.      Okay.  Isn't it true that the Tecate
17    Port of Entry typically receives a relatively low
18    number of noncitizens who are seeking asylum in the
19    U.S.?
20          A.      Correct.
21          Q.      Isn't it true that the Tecate Port of
22    Entry does have individuals -- officers, I should
23    say -- who are capable of conducting an asylum
24    interview?
25          A.      Correct.
```


MAGNA
LEGAL SERVICES

Page 155

1          Q.     Isn't it true that the Tecate Port of

2    Entry has officers who are capable of filling out the

3    referral slip to send an asylum seeker to secondary?

4          A.     Correct.

5          Q.     And it's true, isn't it, that the Tecate

6    Port of Entry has, on occasion, processed some asylum

7    seekers?

8          A.     Yes.

9          Q.     So was it always necessary for the

10   Tecate Port of Entry to redirect asylum seekers to

11   San Ysidro or to Calexico West?

12         A.     No.  I believe they were in fear that if

13   we let a couple through, then we would have a --

14         Q.     Sure.  The more you process, the more

15   will come, right?

16         A.     Yes.

17         Q.     That's a fear that CBP had, correct?

18         A.     Correct.

19         Q.     And that's one of the fears that

20   motivated this policy, correct?

21         A.     I -- I believe so.  I can't speak on who

22   wrote it.

23         Q.     Did you ever ask Port Director Ortega

24   why he wrote this policy?

25         A.     No.



Page 156

1      Q.      Did you ever ask what the motivation for

2  this policy was?

3      A.      No.

4      Q.      Did anyone ever tell you or suggest what

5  the motivation for this policy was?

6      A.      No, because they -- they -- I mean, it

7  says it's not specifically for asylum seekers.  It's

8  for operational needs.  So that's what they were --

9  that's what they kept saying.

10     Q.      "That's what they kept saying."  Who is

11 the "they" in that sentence?

12     A.      Just management.

13     Q.      And management said it was for

14 operational reasons, but those operational reasons

15 weren't actually a problem prior to this policy being

16 issued, right?

17     A.      No.

18             MR. MEDLOCK:  Exhibit 12.

19             [Exhibit 12, a CBP SOP document, was

20        marked for identification.]

21 BY MR. MEDLOCK:

22     Q.      All right, sir, we've marked the next

23 exhibit, which I believe is Exhibit 12 to your

24 deposition.  It's a one-page document that bears the

25 Bates number AOL-DEF-00216853.



Page 157

1              Please take a moment to review it, sir,

2      and let me know when you're done doing so.

3          A.     I've reviewed this one.

4          Q.     You reviewed it prior to today?

5          A.     Yeah, I got this at work.

6          Q.     When you say you "got this at work," let

7      me just back up and make sure we're all talking about

8      the same "this."

9              This document is a true and accurate

10     copy of a standard operating procedure entitled

11     "Tecate Limit Line Officer Standard Operating

12     Procedure," correct?

13         A.     Correct.

14         Q.     And it's dated February 15, 2019,

15     correct?

16         A.     Correct.

17         Q.     And this is a document that you would

18     have received in the regular course of your duties,

19     correct?

20         A.     Correct.

21         Q.     And at the time you received this

22     document, you would have been knowledgeable about its

23     contents, right?

24         A.     Correct.

25         Q.     The first sentence of this standard



Page 158

1    operating procedure states, quote, "In order to

2    facilitate orderly processing, maintain security of

3    the port, and safe, sanitary conditions for the

4    traveling public, management may elect to meter the

5    flow of travelers at the land border, while taking

6    into account the Tecate Port of Entry's processing

7    capability."

8              Did I read that correctly?

9        A.    Correct.

10       Q.    That sentence is similar to the first

11   sentence of the muster that we were just looking at

12   in Exhibit 11 and the metering guidance from

13   Exhibit 3, correct?

14       A.    Correct.

15       Q.    So this standard operating procedure is

16   also implementing the metering memo that we saw in

17   Exhibit 3, correct?

18       A.    Correct.

19       Q.    Do you have any understanding of why

20   further guidance was necessary for limit line

21   officers?

22       A.    I think because numerous officers had

23   made -- they didn't understand this one completely,

24   so they made a little more detail in this one.  I'm

25   guessing.



Page 159

1          Q.      When you say "this one," the first one
2     you were pointing at?
3          A.      Exhibit 11.
4          Q.      And is this one, the second time, is
5     Exhibit 12, correct?
6          A.      Correct.
7          Q.      So as you understood it, the goal of the
8     February 15, 2019, standard operating procedure was
9     to answer some of the officers' questions, correct?
10         A.      Correct.
11         Q.      I wanted to draw your attention to a
12    sentence in the first paragraph that begins with, "In
13    addition."  Do you see that?
14         A.      Yes.
15         Q.      It reads, "In addition, based on the
16    case-by-case basis, officer discretion should be
17    exercised when encountering a humanitarian
18    situation."
19                 Did I read that correctly?
20         A.      Correct.
21         Q.      That's the exact same sentence that was
22    in the prior muster, correct, in Exhibit 11?
23         A.      Correct.
24         Q.      So you wanted further guidance on what
25    that sentence means, and your management simply



Page 160

1    repeated it, correct?

2         A.    Correct.

3         Q.    Did you ever actually get anyone to

4    define for you what the phrase "humanitarian

5    situation" means?

6         A.    No.

7         Q.    Do you know if there is any definition

8    of the phrase "humanitarian situation" that's used

9    with respect to this SOP?

10        A.    Not that I know of.

11        Q.    This SOP still uses the same phrases,

12   "orderly processing," "maintain security," and "safe,

13   sanitary conditions," correct?

14        A.    Correct.

15        Q.    And has anybody at the Tecate Port of

16   Entry ever defined those terms for you?

17        A.    No.

18        Q.    Are you aware of any written guidance,

19   whether it's been in the form of muster or some

20   training materials or on the Share drive, that

21   defines those terms?

22        A.    No.  Maybe security in the port, maybe.

23        Q.    Maybe.

24        A.    "Safe and sanitary conditions," that

25   would be really less.



Page 161

1      Q.      So to your knowledge, to your knowledge,

2  is this SOP still in effect at the Tecate Port of

3  Entry today?

4      A.      Yes.

5      Q.      And is this SOP still followed today?

6      A.      Yes.

7      Q.      So if somebody wishing to seek asylum in

8  the U.S. comes to the Tecate Port of Entry today,

9  they will encounter an officer at the limit line who

10  will turn them back to Mexico, to seek asylum at

11  another port of entry?

12      A.      Correct.  I think the only thing that

13  might have changed is if they're a Mexican citizen --

14  which I don't -- we haven't got any guidance on it,

15  but I've heard they have taken someone that was

16  Mexican in.

17      Q.      When did that happen?

18      A.      I -- I don't -- I don't have an exact

19  date for you.

20      Q.      It happened recently?

21      A.      Yes.  I would say within a month.

22      Q.      So in the last month, a Mexican national

23  came to the port, said they were seeking asylum, and

24  they were actually processed at Tecate, correct?

25      A.      Correct, but we haven't received any



Page 162

1    guidance on that.

2        Q.    There's no guidance on it.  That's just

3    what happened in that one instance, correct?

4        A.    Yeah.  I think it's the management

5    guidance that they have.

6        Q.    When you say "management guidance that

7    they have," who is the management in that sentence?

8        A.    I think the -- the first-line

9    supervisors, I think they may have gotten it higher

10   up, saying we need to take Mexican nationals.

11       Q.    Are there separate operating procedures

12   or musters that go to the line 1 or line 2

13   supervisors that don't make their way down to the

14   officers?

15       A.    I have no clue.

16       Q.    You just wouldn't be aware of that?

17       A.    I wouldn't be aware of that.

18       Q.    ████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████████

21       A.    ████████████████████████████

22       Q.    ████████████████████████████

23       A.    ████████████████████████████

24       Q.    ████████████████████████████

25   ██████



Page 163

1        A.      Correct.   There is no paperwork stating

2   what to do, and they wouldn't give me any

3   documentation stating that, and I didn't feel

4   comfortable doing it without any paperwork.

5        Q.      So let me just make sure I understand.

6   You were uncomfortable that there had been an oral

7   muster given to turn back asylum seekers, and you

8   were uncomfortable with turning them back and that

9   there was no written guidance, correct?

10       A.      Correct.

11       Q.      Why in particular did you reach out to

12  the Office of Special Counsel as opposed to the

13  Office of the Inspector General or DHS?

14       A.      I -- that was just -- we had it on the

15  wall, whistle-blowing, and that was just something

16  that I went through the proper steps.  I asked my

17  management; they wouldn't give me any paperwork on

18  it.  So I tried to go through them first and they

19  denied me anything, so then I just -- that was -- I

20  didn't have any phone numbers for OIG.

21       Q.      When you say you tried to go through

22  your management first, who is the manager that you

23  went through to try to make this complaint?

24       A.      I believe it was almost all of them.  I

25  was asking for, can I have some documentation on



Page 164



1

2

3    Q.

4

5    A.

6    Q.

7

8    A.

9    Q.      When the first-line supervisors told you

10   that there was no guidance, did they in any way

11   discourage you from complaining about it?

12   A.      No.

13   Q.      What did the first-line supervisors tell

14   you about why there was no written guidance?

15   A.      I don't know if they really had an

16   answer on that or not.  I don't know if they've ever

17   gotten written guidance.  Or they -- I can't explain

18   why they didn't have an answer for that question.

19   Q.      Did it strike you as odd that they would

20   not give you written guidance on --

21   A.      A little, a little.

22   Q.      Had there been other instances in which

23   you asked for written guidance and it was given to

24   you?

25   A.      No, just because I haven't really felt



Page 165

```
 1    uncomfortable doing anything else.  It's always been
 2    within my scope.  I've always been trained for all
 3    the other positions.
 4        Q.    So was this the first time that, in the
 5    course of your duty as a CBP officer, that you were
 6    asked to do something that made you feel
 7    uncomfortable?
 8        A.    Yes.
 9        Q.    Was this the first time in the course of
10    your duties as a CBP officer that you were asked to
11    do something that made you think that you might get
12    sued?
13        A.    Yes.
14        Q.    Was this the first time that you were
15    asked to do something in the course of your duties as
16    a CBP officer that made you think you were being
17    asked to do something illegal?
18        A.    Yes.
19        Q.    Did you share your belief that this oral
20    muster was illegal with your first-line supervisors?
21        A.    No.
22        Q.    Why did you decide not to share that
23    belief with them?
24        A.    That it was illegal?
25        Q.    Yes.
```





Page 166

1        A.      I just didn't know.  I mean, it's come

2   from our port director.  I didn't know if it was

3   legal or not.  There's just nothing that really came

4   to my attention, whether it was legal or not.

5        Q.

6

7        A.

8        Q.

9

10

11

12

13        A.

14        Q.

15

16

17        A.

18

19        Q.

2

2

22        A.

23

24

25



Page 167



```
 1
 2
 3
 4
 5
 6    Q.
 7
 8    A.
 9    Q.
10
11    A.
12
13
14    Q.
15    A.
16    Q.
17
18
19    A.
20
21
22
23    BY MR. MEDLOCK:
24    Q.
25
```



Page 168

```
 1    is an e-mail chain and the attachments to it.  It

 2    bears the Bates number AOL-DEF-00216870 through 72.

 3              Please take a moment to review it, sir,

 4    and let me know audibly on the record when you've

 5    done so.

 6         A.    Okay.

 7         Q.    ████████████████████████████████████████

 8    ███████████████████████████████████████████████████

 9    ███████████████████████████████████████████████████

10    ███████████████████████████████████████████████████

11         A.    Correct.

12         Q.    And that e-mail chain runs from

13    November 2, 2018, through November 7, 2018, correct?

14         A.    Correct.

15         Q.    And do you have any doubt that this is

16    an accurate and correct copy of the e-mail chain and

17    the attachments to it?

18         A.    Yes.

19         Q.    You have a doubt about that?

20         A.    Oh.  No.

21         Q.    If you do, I'd like to know.

22         A.    No.

23         Q.    And these would be e-mails that you

24    would have sent and received in the course of your

25    duties as a CBP officer, correct?
```



Page 169

1          A.     Correct.

2          Q.     And you would have been knowledgeable

3     about the contents of these e-mails and the

4     attachments to these e-mails at the time you sent

5     them and received them, correct?

6          A.     Correct.

7          Q.     The top e-mail in the chain is a

8     November 7, 2018, e-mail from you to John Goodrich,

9     correct?

10         A.     Correct.

11         Q.     And there's two attachments to that

12    e-mail, correct?

13         A.     Correct.

14         Q.     The first is "Muster regarding limit

15    line, Tecate POE, September 2018," PDF, correct?

16         A.     Correct.

17         Q.     And the second is a Word document

18    entitled, "Report date to OSC," correct?

19         A.     Correct.

20         Q.     And "OSC" there means Office of Special

21    Counsel, correct?

22         A.     Correct.

23         Q.     Flip to the page that ends in 872, sir.

24         A.     Okay.

25         Q.     The top of this document says, "Report







Page 171

1  ████████████████████

2      A.   ███████████

3      Q.   ████████████████████████████

4  ██████████

5          When did you first become concerned

6  about turning back asylum seekers at the Tecate Port

7  of Entry?

8      A.   It was probably about a month or two

9  before that.

10     Q.   So May or June of 2018?

11     A.   Yes.

12     Q.   And when you first became concerned, you

13 know whether other officers at the Tecate Port of

14 Entry shared your concern?

15     A.   I believe there's a couple.

16     Q.   Would one of those be ███████████?

17     A.   I don't -- I don't know.

18     Q.   Do you remember the names of the others?

19     A.   No, I do not.

20     Q.   And how do you know that others were

21 concerned?

22     A.   We've talked about it.  Just -- it

23 wasn't always about just that.  There's been safety

24 issues, too, we talked about.

25     Q.   Was one of the safety issues that you



Page 172

1    talked with respect to the limit line position, that

2    it wasn't on camera?

3          A.      That was one of them.

4          Q.      What were the others?

5          A.      There was nothing to hide behind in case

6    something happened.  There were no barricade between

7    you and, pretty much, Mexico.  You had no backup

8    there; backup is behind a secured gate that they

9    would to punch through to get through, have to punch

10   a code in to get through to you.  All backup was

11   about 200 feet, 100 yards from you.  So that was

12   always an issue, just because you're dealing with

13   people within two feet of Mexico.

14         Q.      In your opinion, do you think it's true

15   that whoever came up with this policy wasn't thinking

16   about officers' safety?

17         A.      Yes.

18         Q.      Do you think that this policy put

19   officers at risk?

20         A.      Yes.

21         Q.      From that perspective, did you think

22   that this policy was not well thought through?

23         A.      Yes.

24         Q.      When an officer turned an asylum seeker

25   back to Mexico, were there ever instances in which



Page 173

1    the officer had to use physical force to accomplish

2    that goal?

3         A.    No.

4         Q.    It would sort of just be a verbal

5    conversation and the person would return to Mexico?

6         A.    Correct.

7         Q.    Have you ever seen an officer use

8    physical force to escort someone back to Mexico?

9         A.    No.  Well, escort him -- asylum or in

10   general?

11        Q.    An asylum seeker.

12        A.    No.

13        Q.    I take it, though, that you observed

14   other officers turning asylum seekers back to Mexico,

15   correct?

16        A.    Yes.

17        Q.    How many officers did you observe doing

18   that during your time at Tecate?

19        A.    Five or six.

20        Q.    And how many supervisors did you observe

21   doing that?

22        A.    Three or four.

23        Q.    Do you remember the names of the

24   supervisors who turned asylum seekers back to Mexico

25   at the Tecate Port of Entry?



Page 174

1          A.      Not offhand.  I don't know whether --

2     which ones exactly, but I know there had been

3     supervisors.

4          Q.      Did Mexican officials ever assist with

5     escorting asylum seekers back from the limit line to

6     Mexican soil?

7          A.      Not that I know of.

8          Q.      Do you know of any instance in which

9     Mexican officials were called to assist with a

10    turn-back to Mexico?

11         A.      From asylum seekers?

12         Q.      For asylum seekers.

13         A.      No.

14         Q.      To your knowledge, was the assistant

15    port director aware of the turn-backs that were

16    happening at Tecate?

17         A.      Yes.

18         Q.      Did the assistant port directors at

19    Tecate ever express any discomfort or unease with the

20    turn-backs at Tecate?

21         A.      No.

22         Q.      Did the assistant port directors at

23    Tecate ever do anything to dissuade you or any other

24    officer from turning back asylum seekers?

25         A.      No.  I do remember, though, that I



Page 175

1    believe after this memo came out, somebody returned

2    them from primary, and they wrote them up for that.

3         Q.      So if you turn back someone from

4    primary, that might be a write-up, but if you turn

5    them back from the limit line, that's okay?

6         A.      Yes.

7         Q.      And in fact, turning back asylum seekers

8    from the limit line, as you understood it, was the

9    policy of CBP?

10        A.      Yes.

11        Q.      To your knowledge, was the port director

12   aware that asylum seekers were being turned back?

13        A.      Yes.

14        Q.      Did the port director ever tell you that

15   turning back asylum seekers was inappropriate?

16        A.      Me, personally?

17        Q.      Yes.

18        A.      No.

19        Q.      Do you know of any instance in which the

20   port director ever told anyone else that turning back

21   asylum seekers was inappropriate?

22        A.      It was inappropriate?

23        Q.      Inappropriate.

24        A.      No.

25        Q.      Did the port director ever do anything



Page 176

```
 1   to dissuade you or any other officer from turning
 2   back asylum seekers?
 3       A.      No.
 4       Q.      To your knowledge, was the San Diego
 5   field office aware that asylum seekers were being
 6   turned back?
 7       A.      I believe so.
 8       Q.      And did anybody from the San Diego field
 9   office ever do anything to dissuade you or any other
10   officer from turning back asylum seekers?
11       A.      Not that I know of.
12       Q.      Do you know whether the Office of Field
13   Operations, or OFO, was aware that asylum seekers
14   were being turned back?
15       A.      I believe so.
16       Q.      Did anyone from OFO ever tell you that
17   it was inappropriate to turn back asylum seekers?
18       A.      No.
19       Q.      Did anyone from OFO ever do anything to
20   dissuade you or any other officer from turning back
21   asylum seekers?
22       A.      No.
23       Q.      Throughout the senior management of CBP,
24   did anyone ever do anything to dissuade you or any
25   other officer from turning back asylum seekers?
```



Page 177

```
 1        A.      As in like getting in trouble for
 2    turning them back?
 3        Q.      Yes.
 4        A.      Just that one instance I told you about,
 5    about the primary.
 6        Q.      Besides that one instance?
 7        A.      Not that I know of.
 8        Q.      Was there ever an official communication
 9    from anyone in CBP management stating that asylum
10    seekers should not be turned back?
11        A.      Just Exhibit -- that should not be
12    turned back?
13        Q.      That should not be turned back?
14        A.      Oh.  No.
15        Q.      Did that give the impression that it was
16    the policy of CBP's senior management to turn back
17    asylum seekers?
18        A.      Yes.
19        Q.      Did anyone -- has anyone ever told you
20    anything that would make you feel that it is not the
21    policy of CBP to turn back asylum seekers?
22        A.      No.
23        Q.      When you were standing at the limit line
24    and you turned back an asylum seeker, was any record
25    created regarding that turn-back?
```



Page 178

```
 1        A.      I've never personally turned back an

 2   asylum seeker.

 3        Q.      I'm sorry.  When a supervisor came --

 4   when a supervisor turned back an asylum seeker, was

 5   any record made of that turn-back?

 6        A.      No.

 7        Q.      When another officer turned back an

 8   asylum seeker, was any record made of that turn-back?

 9        A.      No, not to my knowledge.

10        Q.      Not to your knowledge, or you've never

11   seen a record that would indicate that?

12        A.      No.

13        Q.      Were you uncomfortable with the fact

14   that no records were kept about who was turned back

15   or the number of turn-backs that occurred?

16        A.      No.

17        Q.      You were uncomfortable about that?

18        A.      That never crossed my mind.

19        Q.      When did you learn that records weren't

20   being maintained of individuals that were turned back

21   at the ports of entry?

22        A.      When they weren't?

23        Q.      Yes.

24        A.      When that report from OIG came out.

25        Q.      When you learned that from the report
```



Page 179

1    from OIG, did that concern you at all?

2        A.    No.

3        Q.    Have you ever heard of the National

4    Treasury Employees Union, or NTEU?

5        A.    Yes.

6        Q.    The NTEU is a union that represents some

7    CBP officers, correct?

8        A.    Correct.

9        Q.    Are you personally a member of the NTEU?

10       A.    No.

11       Q.    Despite not being a member of the NTEU,

12   did you ever raise any concerns about the turn-back

13   policy with the union?

14       A.    Yes.

15       Q.    What were the concerns that you raised

16   with the union?

17       A.    It was pretty much what my concerns

18   were, what I brought up on OSC and the safety aspect

19   of it.

20       Q.    When did you make your complaint to the

21   union?

22       A.    I think -- I don't think it was an

23   actual -- I don't remember if it was -- if I actually

24   wrote a verbal complaint or if it was just talking to

25   the union president.


MAGNA
LEGAL SERVICES

Page 180

```
 1        Q.     So there's a union rep at Tecate?

 2        A.     Yes.

 3        Q.     So you sought out that union rep and

 4   discussed this issue with him or her, correct?

 5        A.     Yes.

 6        Q.     Who was the union rep at Tecate?

 7        A.     It was Brian Ballatore.

 8        Q.     When did you speak to Brian Ballatore?

 9        A.     I -- I don't know.  It was probably

10   right around the time I did --

11        Q.     Your best guess is July 2018?

12        A.     Something like that, yeah.

13        Q.     Prior to blowing the whistle, did you

14   seek any legal advice before you contacted the Office

15   of Special Counsel?

16        A.     No.

17        Q.     When you blew the whistle, were you at

18   all concerned about retaliation or reprisals?

19        A.     No.

20        Q.     Are you concerned about retaliation or

21   reprisals now for having blown the whistle?

22        A.     No.

23        Q.     Are you at all concerned about

24   retaliation or reprisals for testifying at this

25   deposition today?
```



Page 181



```
 1        A.      I hope not.

 2        Q.      Okay.  Fair enough.

 3

 4

 5

 6        A.

 7        Q.

 8

 9        A.

10

11        Q.

12

13        A.

14        Q.

15

16        A.

17        Q.

18

19

20        A.

21

22        Q.

23

24        A.

25        Q.
```



Page 182

1    conferences with ████████ last?

2         A.    Depended on what the questions were he

3    was asking.  Anywhere between 5 to 20 minutes, maybe.

4         Q.    Did you take any notes regarding these

5    phone calls?

6         A.    No.

7         Q.    Did you take any notes regarding your

8    concerns about the limit line or the turn-back

9    policy?

10        A.    No.

11        Q.    Did you take any notes regarding your

12   ████████████████████

13        A.    ████████████████████████

14        Q.    ████████████████████████

15        A.    ████████████████████████

16   ████████████████████████████

17   ████████████

18        Q.    ████████████████████

19   ████████████████████████████

20   ████████████████████████████

21   ████████████████████████████

22   ████████████████████████████

23   ████████████████████████████

24        A.    ████████████████████

25        Q.    ████████████████████



Page 183



```
 1
 2
 3       A.
 4       Q.
 5
 6       A.
 7
 8       Q.
 9
10       A.
11       Q.
12
13
14       A.
15
16
17
18
19    BY MR. MEDLOCK:
20       Q.
21
22
23
24
25
```



Page 184

1    on the record.

2         A.    Okay.

3         Q.    So Exhibit 14 is a true and accurate

4    copy of an August 23, 2018, letter from Henry J.

5    Kerner, special counsel to the Honorable Kirstjen

6    Nielsen, secretary of DHS, correct?

7         A.    Yes.

8         Q.    And did you receive a copy of this

9    letter, sir?

10         A.    I -- I don't know.

11         Q.    You may have but you just can't recall

12    as you sit here right now?

13         A.    Yes.

14         Q.    I'd like to focus on the second

15    paragraph of the letter.  Do you see that, sir?

16         A.    Yes.

17         Q.    And that paragraph begins, "CBP Officer

18    ███████████████, who consented to the release of his

19    names, disclosed that CBP managers directed CBP

20    officer to deny aliens seeking asylum entry to the

21    United States at the Tecate Port of Entry."

22              Did I read that correctly, sir?

23         A.    Correct.

24         Q.    Does that sentence fairly summarize the

25    complaint that you made to OSC?



Page 185

```
 1          A.      Yes.

 2          Q.      Beneath that sentence there are several

 3   bullet points, correct?

 4          A.      Correct.

 5          Q.      And you've had a chance to read through

 6   those bullet points here today?

 7          A.      Not today.

 8          Q.      Could you read through them and then let

 9   me know whether they also accurately summarize the

10   complaint you made to OSC?

11          A.      Okay.

12          Q.      Do those bullet points summarize your

13   complaint to OSC accurately?

14          A.      Yes.

15          Q.      Let's move to the second page, first

16   paragraph.  That paragraph begins, "According to DHS

17   regulations, all arriving aliens who approach a port

18   of entry are subject to either expedited removal or

19   detention pending an asylum review.  If at any point

20   the arriving alien expresses an intention to apply

21   for asylum, a fear of persecution or a fear of

22   returning to their native country, then the officer

23   must halt removal proceedings immediately."

24                  Did I read that correctly, sir?

25          A.      Yes.
```



Page 186

```
1          Q.     And that's consistent with the training
2     that you received regarding asylum law, correct, sir?
3          A.     Yes.
4          Q.     That's also consistent with the training
5     you received regarding how asylum seekers are to be
6     processed at ports of entry, correct?
7          A.     Can you explain that a little?
8          Q.     Well, you received some training,
9     although it was limited, about how to process asylum
10    seekers, correct?
11         A.     Yes.
12         Q.     And you can, if called upon today,
13    process an asylum seeker, correct?
14         A.     I can process one?
15         Q.     Yeah.  You're able to do it, right?
16         A.     It would take me a while.
17         Q.     But --
18         A.     I probably can.
19         Q.     -- you probably could do it?
20                Do these two sentences accurately
21    summarize how an asylum seeker is supposed to be
22    processed?
23         A.     Yes.
24         Q.     Later in the same paragraph, there's a
25    sentence that begins, "According to ███████."  Do
```



Page 187

1    you see that?

2         A.      Yes.

3         Q.      And that sentence reads, "According to

4    ██████████ CBP officers are escorting asylum

5    seekers who have entered the U.S. out of the country

6    and preventing asylum seekers at the Tecate Port of

7    Entry from entering, in violation of the alien's

8    right to seek asylum."

9              Did I read that correctly?

10        A.      Correct.

11        Q.      And do you believe that statement is

12   true?

13        A.      At the time, yes.

14        Q.      And is it still true today?

15        A.      Yes.

16        Q.      The next paragraph begins with,

17   "Pursuant to my authority."  Do you see that?

18        A.      Yes.

19        Q.      That paragraph begins, "Pursuant to my

20   authority under 5 U.S.C., Section 1213 (c), I have

21   concluded that there is a substantial likelihood that

22   the information provided to OSC discloses violation

23   of law, rule, or regulation."

24              Did I read that correctly?

25        A.      Yes.



Page 188

```
 1          Q.      Did anyone from OSC ever share with you
 2     that there was a substantial likelihood that CBP was
 3     breaking the law when it implemented its turn-back
 4     policy?
 5          A.      I don't recall them ever telling me
 6     that.
 7          Q.      Did anybody from OIG ever share that
 8     with you?
 9          A.      No, I don't -- no, they just made the
10     report.
11          Q.      On the next page of the document,
12     there's a page that's labeled "Appendix."  Do you see
13     that?
14          A.      Yes.
15          Q.      And there's a section that says,
16     "Retaliation against whistle-blowers."  Do you see
17     that?
18          A.      Yes.
19          Q.      And the last sentence of that section
20     reads, "Special counsel strongly recommends the
21     agency take all appropriate measures to protect
22     individuals from retaliation and other prohibited
23     personnel practices."
24                  Did I read that correctly?
25          A.      Yes.
```



Page 189





Page 190

1      Q.    Good for you.  Who was this officer?

2      A.    It was Supervisor Garcia.

3      Q.    What's Supervisor Garcia's full name?

4      A.    Antonio Garcia, I believe.

5      Q.    And Antonio Garcia was a first-line

6  supervisor, I take it?

7      A.    He was at the time, I believe.

8      Q.    Where does he work now?

9      A.    At Tecate.

10     Q.    Has he been promoted?

11     A.    Yes.

12     Q.    To what?

13     A.    Assistant port director.

14     Q.    ███████████████████████

15  ███████████████████████████████████████

16  ███████████████████████████████████████

17     A.    Yes.

18     Q.    Have you been promoted?

19     A.    No.

20     Q.    Can you be promoted at this point?

21     A.    If I put in for it.

22     Q.    If you put in for it, would you have any

23  demerits on your record that would prevent you from

24  being promoted?

25     A.    Not right now.







Page 192





Page 193







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 195













Page 198







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 200











1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25







Page 204





Page 205





1      Q.     Okay.  That sentence reads, ▮▮▮▮▮ was

2   given verbal instruction on what to do when assigned

3   to the limit line."

4             Did I read that correctly, sir?

5      A.     Yes.

6      Q.     And this is the verbal muster that

7   you've been referring to today, correct?

8      A.     Yes.

9      Q.     And it goes on to state, ▮▮▮▮▮ was

10  told to stop asylum seekers at the limit line before

11  they cross on to U.S. soil and to redirect them to

12  the San Ysidro POE."

13            Did I read that correctly?

14     A.     Correct.

15     Q.     As we talked about earlier today, it was

16  often the case that some of these asylum seekers were

17  on U.S. soil and were turned back to Mexican soil; is

18  that right?

19     A.     Correct.

20     Q.     So that's not quite an accurate

21  statement about how the turn-back policy worked at

22  Tecate, correct?

23     A.     Correct.

24     Q.     It goes on to state, ▮▮▮▮▮ id not

25  feel comfortable with this instruction, because his



Page 207

1    understanding of the law was that an individual can

2    claim asylum at any POE."

3                Did I read that correctly, sir?

4        A.    Correct.

5        Q.    Is that still your understanding of the

6    law?

7        A.    Yes.

8        Q.    Has anyone told you that your

9    understanding of the law is incorrect?

10       A.    No.

11       Q.    Has anyone ever told you that it is

12   legal to turn back an asylum seeker who is on U.S.

13   soil?

14       A.    It is legal?

15       Q.    Yes.

16       A.    No.

17       Q.    Has anyone ever told you that it is

18   legal to turn back an asylum seeker who was arriving

19   at a port of entry?

20       A.    No.

21       Q.    Okay.  This paragraph then goes on to

22   state, "When ████████ asked for written instruction,

23   none was provided.  ████████ raised concerns with his

24   supervisors and was told that the protocol came from

25   'higher up.'"



Page 208

1           Did I read that correctly?

2    A.     Correct.

3    Q.     And the phrase "higher up" here is in

4    quotes, correct?

5    A.     Yes.

6    Q.     Does that lead you to believe that

7    that's a phrase that you used during the call?

8    A.     Yes.

9    Q.     Is "higher up" a type of phrase you

10   would use?

11   A.     Yeah, they would use that.

12   Q.     Did you ever figure out who the

13   higher-ups were that came up with this protocol?

14   A.     No.

15   Q.     Did you try to find out?

16   A.     No.

17   Q.     Other than the bit about asylum seekers

18   not being on U.S. soil, does this paragraph

19   accurately summarize your complaint?

20   A.     Yes.

21   Q.     And let's return for a second to

22   Exhibit 15, the e-mail chain between you and John

23   Goodrich.

24           Do you see the e-mail on November 7,

25   2018, at 3:50 p.m. from you to Mr. Goodrich?



Page 209





Page 210





Page 211





Page 212





Page 213



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25







Page 215

1      Special Counsel and the Office of Inspector General?

2           A.     Can you repeat the sentence?

3           Q.     Sure.  Besides talking to OSC and OIG,

4      did you express the fear that a lawsuit might be

5      filed with anyone else at CBP?

6           A.     No.

7           Q.     Did you know at this time that a lawsuit

8      actually had been filed regarding turn-backs at ports

9      of entry?

10          A.     Not at all.

11          Q.     And this is a just a "yes" or "no"

12     question:  Were you ever contacted by anyone at the

13     Department of Justice regarding turn-backs around the

14     time that you spoke to the Office of Inspector

15     General?

16          A.     No.

17                 MR. MEDLOCK:  Let's take a break.

18                 (Brief recess.)

19                 MR. MEDLOCK:  Back on the record.

20     BY MR. MEDLOCK:

21          Q.     Sir, welcome back.

22          A.     Thank you.

23          Q.     We talked a little bit earlier about the

24     grievance that you filed related to turn-backs at the

25     Tecate Port of Entry.  Was that grievance in writing



Page 216

1    or made orally?

2         A.     I believe it was in writing.

3         Q.     And who did you make that grievance to?

4         A.     I believe it was OSC, I believe.

5         Q.     Let me direct you to Exhibit 13.  Do you

6    have Exhibit 13 in front of you, sir?  It should be

7    the e-mail that contains your timeline as an

8    attachment to it.

9              And then four -- three lines up from the

10   bottom, there's a reference to a grievance letter to

11   management and a letter of reprimand.  Do you see

12   that, sir?

13        A.     Yes.

14        Q.     And you sent that on September 10, 2018;

15   is that correct?

16        A.     Yes.

17        Q.     And beneath that, there is a Step 1

18   meeting for -- actually, sorry, I skipped a line.

19              Beneath that, there is an entry that

20   reads, "Grievance letter about Supervisor McCarthy,"

21   and that's also on September 10, 2018, correct?

22        A.     Correct.

23        Q.     And then beneath that, it states that

24   you had a Step 1 meeting for both grievances on

25   September 11, 2018, correct?



Page 217

1        A.      Correct.

2        Q.      Does that refresh your recollection

3    about the timing and circumstances of those

4    grievances?

5        A.      Yes.

6        Q.      What were your two grievances that you

7    filed on September 10, 2018, about?

8        A.      One was about my cell phone at the limit

9    line, and my other one was about how McCarthy

10   demanded me to stay for a seizure when, per union

11   contract, that goes to lowest earner, and she wasn't

12   following the contract.

13       Q.      And what happened with regard to those

14   grievances at the Step 1 meeting on September 11th?

15       A.      My letter of reprimand got dropped down

16   to six months, and nothing happened with the

17   following grievance.

18       Q.      Was the other grievance just discussed

19   and nothing happened?

20       A.      Yes.

21       Q.      ████████████████████████████████████

22   █████████████████████████████████████████████████

23   █████████████████████████████████████████████

24       A.      ███████████████████████████████████

25       Q.      ██████████████████████████████



Page 218



1       A.      I believe that is a retaliation form.

2       Q.

3

4       A.

5

6       Q.

7

8       A.

9

10

11      Q.

12

13      A.

14

15      Q.

16

17

18      A.

19      Q.

20

21      A.

22      Q.

23

24

25      A.



Page 219

```
 1          Q.      We talked a little bit earlier about

 2     recordkeeping related to turn-backs.

 3               Do you have an understanding of why CBP

 4     did not keep records regarding turn-backs?

 5          A.      No, I didn't.

 6          Q.      Did you ever ask?

 7          A.      No.

 8          Q.      When you were speaking to OSC, did they

 9     ever ask you to provide them with any documents or

10     e-mails substantiating your allegations?

11          A.      I don't believe so.

12          Q.      Regardless of whether they asked for it,

13     did you provide any documents to OSC?

14          A.      I think just the musters.

15          Q.      Okay.

16          A.      Or the SOPs.

17          Q.      Did you tell OSC or the Office of

18     Inspector General any other CBP employees who they

19     could speak with who would substantiate your

20     allegations?

21          A.      Yes.

22          Q.      Do you recall who you directed CBP --

23     I'm sorry, OIG -- to?

24          A.      Yes.  I think it's on here.  I believe

25     it was Scott Scavo and Brian Ballatore.
```



Page 220

1          Q.      And Mr. Ballatore is the union rep that
2    we talked about earlier?
3          A.      Correct.
4          Q.      And Scott Scavo?  How do you spell his
5    last name?
6          A.      S-c-a-v-o.
7          Q.      And what's Mr. Scavo's role at the
8    Tecate Port of Entry, if you know?
9          A.      He's a CBPO as well.
10         Q.      And when you say "CBPO," that's a CBP
11   officer, correct?
12         A.      Correct.
13         Q.      Is Mr. Scavo on your shift at Tecate?
14         A.      Yes.
15         Q.      Have you seen Mr. Scavo turn back asylum
16   seekers to Mexico?
17         A.      No.
18         Q.      Did Mr. Scavo express to you any
19   concerns regarding the turn-back policy?
20         A.      Yes.
21         Q.      What were the concerns Mr. Scavo
22   expressed to you regarding the turn-back policy?
23         A.      I don't recall at this moment.
24         Q.      So you recall that he had concerns, but
25   you don't recall what they were?



Page 221

```
 1          A.     Yes.

 2          Q.     Do you have on Exhibit 13 the attachment

 3    to it that's the September 4, 2018, muster?  This

 4    should be in the e-mail chain that we were just

 5    talking about.

 6          A.     Okay.

 7          Q.     And the second page of that document,

 8    sir, is the September 4, 2018, muster.  Do you see

 9    that?

10          A.     Yes.

11          Q.     Do you see a section entitled "Limit

12    Line Personnel"?

13          A.     Yes.

14          Q.     And the first section of "Limit Line

15    Personnel" reads, "The limit line is not specifically

16    for asylum seekers.  It is based on legitimate

17    operational needs, and it's designated for those with

18    appropriate travel documents and those without such

19    documents."

20                 Did I read that correctly?

21          A.     Yes.

22          Q.     Then the very next sentence reads, "Due

23    to the facility and operating-hour limitations, this

24    necessitates that we redirect asylum seekers to our

25    processing hubs in Calexico West or San Ysidro
```



Page 222

```
 1    PedWest."

 2              Did I read that correctly?

 3         A.    Yes.

 4         Q.    Is it the case even though the limit

 5    line is not supposed to be for asylum seekers in

 6    practice, what occurs at the limit line is that

 7    asylum seekers are turned back to Mexico?

 8         A.    Yes.

 9              MR. MEDLOCK:  Mark this as Exhibit 18.

10              [Exhibit 18, a one-page note, was marked

11         for identification.]

12    BY MR. MEDLOCK:

13         Q.    All right, sir.  We put in front of you

14    what we marked as Exhibit 18 to your deposition.

15    It's a one-page document, one paragraph long, that is

16    Bates numbered AOL-DEF-00216886.

17              Please take a moment to review it, sir,

18    and let me know when you're done doing so.

19         A.    Okay.

20         Q.    Have you ever seen a copy of Exhibit 18

21    before, sir?

22         A.    No.

23         Q.    Exhibit 18 at the bottom says "CBPO

24    ███████████."  Do you see that?

25         A.    Yes.
```



Page 223

1       Q.      And that's a reference to CBP Officer

2       ███████████, who worked at the Tecate Port of

3   Entry, correct?

4       A.      Correct.

5       Q.      And we talked a little bit about ████████

6   ████ in your deposition earlier today, correct?

7       A.      Correct.

8       Q.      And this appears to be a note from

9   ████████████████, correct?

10      A.      Correct.

11      Q.      I want to focus on the second sentence

12  of the note.  It reads, "All officers have been

13  instructed to turn away or redirect those seeking

14  asylum to other ports."

15              Did I read that correctly, sir?

16      A.      Yes.

17      Q.      Does that accurately describe the

18  instructions that were given to officers at the

19  Tecate Port of Entry?

20      A.      Yes.

21      Q.      Does that corroborate your complaint

22  about the turn-back policy at the Tecate Port of

23  Entry?

24      A.      Yes.

25      Q.      In practice, are asylum seekers the only



Page 224

1    group of people that are turned back from the port of

2    entry?

3        A.    Unless it's people that come that just

4    want to go to the gas station, yes.

5        Q.    Okay.  So two classes of people:  People

6    who are simply lost?

7        A.    Yes.

8        Q.    And people who are seeking asylum,

9    correct?

10       A.    Yes.

11       Q.    And the only people who seem to know

12   where they're going who are turned back are asylum

13   seekers, correct?

14       A.    I guess we have some too that bring

15   quantities or certain things that cannot come in.

16       Q.    So contraband?

17       A.    Not -- no, not necessarily contraband.

18   Maybe like a commercial quantity, and they're like --

19       Q.    I see.

20       A.    You know, B1/B2, you know, cardholder,

21   B1/B2 holders, visitors, and they have like too much

22   product, so we'll just return them due to the product

23   they have, or something like that.

24       Q.    I see.

25            But those people can come right back?



Page 225

1          A.    Could come right back, correct.

2          Q.    But asylum seekers can't come back to

3     the port of entry, they need to go somewhere else; is

4     that right?

5          A.    Yes.

6          Q.    

7

8

9          A.

10         Q.

11

12

13         A.

14         Q.

15

16

17         A.

18         Q.

19

20         A.

21         Q.

22

23

24         A.

25



Page 226

```
 1      Q.      ████████████████████████████
 2  ███████████████████████████████████████████
 3  ███████████████████████████████████████████

 4      A.      Yes.

 5              MR. MEDLOCK:  All right.  Exhibit 19.

 6              [Exhibit 19, a report from the Office of

 7      the Inspector General, was marked for

 8      identification.]

 9  BY MR. MEDLOCK:

10      Q.      So we marked Exhibit 19 to your

11  deposition.  It is a multi-page document from the

12  Office of the Inspector General of the Department of

13  Homeland Security, dated September 26, 2019, and

14  entitled "Investigation of Alleged Violations of

15  Immigration Laws at the Tecate Port of Entry by U.S.

16  Customs and Border Protection Personnel."

17              Take a moment to review the document,

18  sir.

19              I think you've probably read it before?

20      A.      Yes.

21      Q.      Let me know when you're done reviewing

22  it audibly on the record.

23      A.      Okay.

24      Q.      All right.  You've reviewed it?

25      A.      Yes.
```



Page 227

1       Q.      Do you recognize this document, sir?

2       A.      Yes.

3       Q.      Were you given a copy of this OIG report

4    in a draft form to review?

5       A.      No.

6       Q.      Did you ever ask to do so?

7       A.      No.

8       Q.      Did anyone ever tell you that you had a

9    right to review a draft copy of this report?

10      A.      No.

11      Q.      The -- sorry.  Go ahead.

12      A.      They didn't, but after the fact, it was.

13      Q.      The only time you learned that you could

14   have looked at a draft of this report was after it

15   was actually issued; is that right?

16      A.      Yes.

17      Q.      And who told you that?

18      A.      Office of Special Counsel.

19      Q.      Do you feel that you should have been

20   told that before the final report was issued?

21      A.      Yes.

22      Q.      Why is that?

23      A.      In case I needed to make any corrections

24   to it.

25      Q.      Do you feel that corrections need to be



Page 228

1    made to this report?

2         A.    No.

3         Q.    So the title of this report is

4    Investigation of Alleged Violations of Immigration

5    Laws at the Tecate, California, Port of Entry by U.S.

6    Customs and Border Protection Personnel."

7               Did I read that correctly?

8         A.    Yes.

9         Q.    And this is the report that was

10   generated from your initial complaint in the summer

11   of 2018, correct?

12        A.    Correct.

13        Q.    I am on the second page of the document,

14   that at the top says "DHS OIG Highlights."  Do you

15   see that page, sir?

16        A.    "DHS OIG Highlights"?

17        Q.    Yes.  It should have been on this page?

18        A.    This page.  Okay.

19        Q.    Do you see that page, sir?

20        A.    Yes.

21        Q.    And there's a heading that's entitled

22   "What We Found."  Do you see that?

23        A.    Yes.

24        Q.    All right.  There's three findings that

25   are listed on that page, sir; is that right?



Page 229

1        A.        Yes.

2        Q.        And I want to focus on the first one.

3                  The beginning of that section reads,

4    "First, we found that contrary to federal law and

5    U.S. Customs and Border Protection policy, CBP

6    officials at the Tecate, California, Port of Entry

7    returned some asylum applicants from inside the

8    United States back to Mexico, and instructed those

9    individuals to go to other ports of entry to make

10   their asylum claims."

11                 Did I read that correctly?

12       A.        Yes.

13       Q.        So OIG found that this turn-back policy

14   that we've been discussing today violated federal

15   law, correct?

16       A.        Correct.

17       Q.        And that it violated CBP policy,

18   correct?

19       A.        Correct.

20       Q.        And to your knowledge, these turn-backs

21   are still occurring today at Tecate, correct?

22       A.        Correct.

23       Q.        So despite the OIG's findings that this

24   violated the law, it's still going on; is that right?

25       A.        Correct.



Page 230

1    Q.    Do you see the section that says "What

2    We Recommend" there?

3    A.    Yes.

4    Q.    Can you read what is written below "What

5    We Recommend"?

6    A.    "This report contains no

7    recommendations."

8    Q.    So OIG found that CBP officers were

9    violating the law, and they have no recommendations

10   on how to fix that, and it's still happening, right?

11   A.    Correct.

12   Q.    Do you have any understanding of why OIG

13   would spend months investigating an issue and then

14   not recommend any way to fix it?

15   A.    No.

16   Q.    Let's focus on the next sentence of that

17   first paragraph.  It reads, "However, we did not

18   substantiate the allegation that managers instructed

19   officers to do this, or that it was the port's

20   standard practice."

21          Did I read that correctly?

22   A.    Yes.

23   Q.    Now, we've just read Officer ███████

24   ███████ note that states, "All officers have been

25   instructed to turn away or redirect those seeking



Page 231

1    asylum to other ports," right?

2        A.    Yes.

3        Q.    So it's simply not true that there

4    wasn't anything to substantiate that allegation; is

5    that right?

6              MR. HALASKA:  Objection.  Leading.

7    BY MR. MEDLOCK:

8        Q.    Sir, remind me again:  What agency do

9    you work for?

10       A.    CBP.

11       Q.    So I will ask that leading question

12   again:  It's simply not true that there was nothing

13   to substantiate the allegation that managers

14   instructed officers to turn back asylum seekers,

15   right?

16       A.    Sorry.  Can you say it again?

17       Q.    All right.  So OIG says that there was

18   nothing to substantiate your allegation, correct?

19       A.    Yes.

20       Q.    But you told OIG that this was

21   occurring, correct?

22       A.    Yes.

23       Q.    And Officer ▇▇▇▇▇ told OIG that this

24   was occurring, correct?

25       A.    Yes.



Page 232

```
1        Q.      So there was something to substantiate
2   your account, wasn't there?
3        A.      Yes.
4        Q.      There was the testimony -- there was a
5   note, I should say, from another CBP officer who was
6   at the Tecate Port of Entry at the same time you
7   were, correct?
8        A.      Yes.
9        Q.      And we just earlier this morning, we
10  reviewed multiple queue management reports that said
11  that UDAs were being redirected to San Ysidro,
12  correct?
13       A.      Yes.
14       Q.      So there were e-mails that also
15  substantiated your allegation too, correct?
16       A.      Yes.
17       Q.      So this sentence is simply untrue, when
18  it says, "We did not substantiate the allegation that
19  managers instructed officers to do this or that it
20  was the port's standard practice," correct?
21       A.      Correct.
22       Q.      Do you have any understanding as to why
23  OIG would come to the conclusion that there was
24  nothing to substantiate the allegation when there
25  was?
```



Page 233

```
 1         A.      Maybe during that time they didn't say
 2    that.
 3         Q.      Did anyone ever -- did anyone ever
 4    express to you from OIG that they thought you were
 5    lying?
 6         A.      No.
 7         Q.      Did they ever tell you your story was
 8    incredible?
 9         A.      No.
10         Q.      Did they ever tell you they weren't
11    going to place any weight on your account?
12         A.      No.
13         Q.      Did they ever tell you that ████████
14    ████████ was lying?
15         A.      No.
16         Q.      Did they ever tell you that they weren't
17    going to believe ████████████?
18         A.      No.
19         Q.      Did they ever tell you that they weren't
20    going to place any weight on what ████████████ had
21    to say?
22         A.      No.
23         Q.      Did anyone at OIG ever tell you that
24    they weren't going to believe what was written in the
25    queue management reports?
```



Page 234

 1       A.      No.

 2       Q.      Did anyone from OIG ever tell you that

 3  what was written in the queue management report was

 4  incorrect?

 5       A.      No.

 6       Q.      So to believe this sentence in the OIG

 7  report, you'd have to ignore the queue management

 8  reports and ignore ███████████ testimony in her

 9  note, correct?

10       A.      Yes.

11       Q.      The next paragraph begins, "Second, we

12  found that Tecate and other ports of entry use a

13  practice known as metering or queue management to

14  prevent overcrowding at the ports," correct?

15       A.      Yes.

16       Q.      And we reviewed several queue management

17  reports this morning, sir, correct?

18       A.      Yes.

19       Q.      And all those queue management reports

20  we reviewed showed there was no one in custody at the

21  port, correct?

22       A.      Correct.

23       Q.      And that the utilized capacity of the

24  port was zero percent, correct?

25       A.      Yes.



Page 235

1          Q.      Do you have any understanding of how the

2     OIG can come to the conclusion that metering or queue

3     management was done to prevent overcrowding at the

4     ports, when there was no one in custody at the Tecate

5     Port of Entry?

6          A.      No.

7          Q.      Was it the fact -- at any time that you

8     were at the Tecate Port of Entry, was it ever

9     overcrowded?

10         A.      No.

11         Q.      So -- go ahead, sir.

12         A.      Well, I told you that one case we had

13    with the I-94s.

14         Q.      How long did that one case with the

15    I-94s last?

16         A.      It happened on Fridays, mostly.  But

17    it's usually a couple of hours.

18         Q.      It's done by Saturday; is that right?

19         A.      It's done in a couple of hours, yeah.

20         Q.      So it's done by Friday night?

21         A.      Yeah.

22         Q.      So on average, the Tecate port is not

23    overcrowded, right?

24         A.      No.

25         Q.      In fact, it's a lesser-utilized port of



Page 236

1    entry, correct?

2         A.    Correct.

3         Q.    And one of the reasons you wanted to

4    work at the Tecate Port of Entry was it was less

5    utilized than Otay Mesa and San Ysidro, correct?

6         A.    Correct.

7         Q.    So the idea that metering or queue

8    management happened at Tecate to prevent overcrowding

9    is just simply wrong; isn't that right?

10             MR. HALASKA:   Objection.   Leading.

11   BY MR. MEDLOCK:

12        Q.    Go ahead and answer my question, sir.

13        A.    Yes.

14        Q.    The paragraph goes on to state, "We

15   identified three concerns with how CBP implemented

16   this practice at Tecate, including that the port

17   generally refers most asylum seekers to go to other

18   ports, despite representing Tecate as open to all

19   travelers," correct?

20        A.    Yes.

21        Q.    And this was one of the things that

22   concerned you about the practice of turning back

23   asylum seekers, sir; isn't that right?

24        A.    Yes.

25        Q.    On the one hand, CBP was saying the port



Page 237

1    was open to everyone, and in reality it wasn't open

2    to asylum seekers; isn't that right?

3         A.     Yes.

4         Q.     And that's because of the turn-back

5    policy, right?

6         A.     Correct.

7         Q.     CBP says the ports are open to everyone,

8    but they aren't; is that right?

9         A.     Correct.

10        Q.     And then finally -- I'm sorry, I should

11   say the last paragraph reads, "Finally we found that

12   Tecate officials do not create records when they

13   instruct individuals to go to other ports to make

14   their asylum claims."

15               Did I read that correctly?

16        A.     Yes.

17        Q.     And that's true, isn't it?

18        A.     Yes.

19        Q.     Let's move to the next page of the OIG

20   report.

21               This part of the OIG report appears to

22   be a memorandum from Jennifer Costello, Acting

23   Inspector General, dated July 9, 2019, correct?

24        A.     Yes.

25        Q.     And it appears that either in actual pen



Page 238

1   or some sort of an image form, Jennifer Costello has

2   signed the memorandum, correct?

3          A.     Correct.

4          Q.     Okay.  So do you see there's a list of

5   one, two, three, on the first page of this

6   memorandum?

7          A.     Yes.

8          Q.     And those three points purport to

9   summarize the allegations that you made, correct?

10         A.     Yes.

11         Q.     Can you take a moment and review them,

12  and let me know if those three points accurately

13  summarize your allegations?

14         A.     Yes.

15         Q.     Okay.  So I want to focus on the first

16  allegation.  That reads, "Since 2016, CBP managers

17  have instructed CBP officers to physically escort

18  asylum seekers arriving at the Tecate Port of Entry

19  back to Mexico and to direct those asylum seekers to

20  the San Ysidro Port of Entry."

21                Did I read that correctly?

22         A.     Correct.

23         Q.     And that accurately describes your

24  complaint, that it says from 2016 through the

25  present, these turn-backs have been occurring,



Page 239

1   correct?

2       A.      I don't remember it being 2016, but I

3   could be wrong.

4       Q.      Okay.  You don't know whether that's --

5   whether that is or isn't the case, that it started in

6   2016?

7       A.      Yes.

8       Q.      Based on it appearing in this memorandum

9   that the turn-backs started in 2016, do you have any

10  reason to quarrel or to doubt that this turn-back

11  started in 2016?

12      A.      I don't remember.

13      Q.      Okay.  It might have happened, it might

14  not?

15      A.      I feel like it hasn't, though, because

16  it wasn't there when I started, and I've been there

17  since 2016.

18      Q.      All right.  But you don't know the exact

19  date on which they started?

20      A.      No.

21      Q.      And you can't give me the month and year

22  when it started?

23      A.      I want to say 2017, but I don't know.

24      Q.      Would you say early 2017?

25      A.      I would say late 2017.



Page 240

```
 1         Q.      Do you know what season of the year it
 2    was?
 3         A.      I have no clue.
 4         Q.      I understand Southern California doesn't
 5    have seasons, but you can pretend with me here.
 6         A.      I don't know.
 7         Q.      Okay.  I want to go to page 5 of the
 8    memorandum.  At the top of that page, there's a bold
 9    header that reads, "A, the OIG substantiated that CBP
10    officers have returned some asylum seekers present in
11    the U.S. to Mexico and redirected those individuals
12    to other ports."  Do you see that, sir?
13         A.      Yes.
14         Q.      ███████████████████████████████████████
15    ████████████████████████████████████████████████████
16    ████████████████████████████████████████████████████
17         A.      Yes.
18         Q.      And at the end of that paragraph, there
19    is a footnote to Footnote 9, correct?
20         A.      Footnote 8, you mean?
21         Q.      Oh, sorry, footnote -- I believe it's 9
22    on my --
23         A.      On the muster?
24         Q.      No.  Right after "Mexico."  Do you see
25    that at the end of the paragraph?
```



Page 241

1          A.      Oh.   Yeah.

2          Q.      So that directs down to Footnote 9 at

3     the bottom of page 5, correct?

4          A.      Yes.

5          Q.      And Footnote 9 begins with, "We're aware

6     that some witnesses have chosen to be less then

7     forthcoming regarding a practice most witnesses

8     acknowledged as improper."

9                  Did I read that correctly, sir?

10         A.      Yes.

11         Q.      Do you have any understanding of why a

12    CBP officer would be less than forthcoming when asked

13    questions about -- by the Office of Inspector

14    General?

15         A.      They were just concerned about their

16    job.

17         Q.      Can you elaborate on that?

18         A.      A concern on being reprimanded on their

19    job.

20         Q.      So do you know whether any CBP officers

21    that spoke to the Office of Inspector General were

22    less than forthcoming?

23         A.      No.

24         Q.      Would it surprise you to learn that they

25    were?



Page 242

1      A.      "That they were"?

2      Q.      Less than forthcoming.

3      A.      No.

4      Q.      Why wouldn't it surprise you?

5      A.      Because I know some of them just want to

6  be quiet and left alone.

7      Q.      They don't want to draw attention to

8  themselves; is that right?

9      A.      Yes.

10     Q.      ███████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████

14     A.      ████████

15     Q.      In general, in your experience, is it a

16  bad thing if a CBP officer draws attention to himself

17  or herself?

18     A.      Yes.

19     Q.      Why is that?

20     A.      Just it's harder to move up.

21     Q.      ████████████████████████████████

22  ████████████████████████████████████████████

23  ████████████████████████████████████████████

24     A.      ████████

25     Q.      Let's move to page 6 of the report, sir.



Page 243

1          Towards the bottom of the page, there's

2     a paragraph that begins, "Consistent with witness

3     testimony."  Do you see that paragraph, sir?

4          A.    Yes.

5          Q.    And that section begins, "Consistent

6     with witness testimony, the OIG identified e-mails

7     confirming some instances of Tecate returning and

8     redirecting asylum seekers in 2017."

9          Did I read that correctly?

10         A.    Yes.

11         Q.    Is that consistent with your

12    recollection that by 2017, asylum seekers were being

13    turned back?

14         A.    Yes.

15         Q.    This was before the muster that you

16    described, correct?

17         A.    Correct.

18         Q.    So these turn-backs that happened in

19    2017 would have happened pursuant to oral

20    instructions from management; is that correct?

21         A.    Yes.

22         Q.    Actually, I want to just make one thing

23    clear, actually.

24         Can you go to the last page of the

25    report, page 15?



Page 244

```
 1        A.    Yes.

 2        Q.    And on page 15 at the top says,

 3   "Appendix B, Report Distribution."  Do you see that?

 4        A.    Yes.

 5        Q.    And amongst others, this report went to

 6   the secretary of Homeland Security, the deputy

 7   secretary of Homeland Security, the chief of staff to

 8   the secretary of Homeland Security, the general

 9   counsel of DHS, and the commissioner of U.S. Customs

10   and Border Protection, correct?

11        A.    Yes.

12        Q.    So at least by July 9, 2019, all these

13   individuals would have been aware that turn-backs

14   were happening at Tecate, correct?

15        A.    Yes.

16        Q.    And they would have been aware from this

17   report that individuals were being turned back from

18   U.S. soil to Mexican soil after they tried to seek

19   asylum in the United States, correct?

20        A.    Yes.

21        Q.    And still the turn-backs are still

22   occurring, correct?

23        A.    Yes.

24              MR. MEDLOCK:  All right.  Why don't we

25         take five minutes so I can collect my thoughts.
```



Page 245

1          I may have a few more questions.

2                (Brief recess.)

3                MR. MEDLOCK:  Back on the record.

4    BY MR. MEDLOCK:

5          Q.    Thank you, sir.  I appreciate your

6    forbearance.

7                On the last exhibit, the OIG report, can

8    you please turn to page 11?  Are you there with me on

9    page 11, sir?

10         A.    Yes.

11         Q.    And at the bottom of page 11, there's a

12   Footnote 25.  Do you see that, sir?

13         A.    Yes.

14         Q.    And Footnote 25 reads, "Tecate's port

15   director did not unilaterally decide to close the

16   port to most asylum seekers.  San Diego field office

17   leadership was involved with and may have directed

18   this approach."

19                Did I read that correctly?

20         A.    Yes.

21         Q.    Do you have any understanding of what

22   role San Diego field office played in the turn-back

23   policy?

24         A.    No, I do not.

25         Q.    Do you know one way or another whether



Page 246

```
 1    the port director at Tecate was acting unilaterally
 2    when the turn-back policy was implemented?
 3         A.     No, I do not.
 4         Q.     Do you have any reason to doubt the
 5    accuracy of what's written in Footnote 25, sir?
 6         A.     No.
 7         Q.     Do port directors typically, in your
 8    experience, act unilaterally and in defiance of
 9    orders from upper management?
10         A.     I don't know.  I'm not a port director.
11         Q.     Okay.  But the CBP officers that you've
12    worked with follow the orders that they're given; is
13    that right?
14         A.     Correct.
15              MR. MEDLOCK:  That's all the questions I
16         have.  I believe your attorney has some
17         questions for you, sir.
18              MR. HALASKA:  Can we have the room for a
19         little bit?
20              MR. MEDLOCK:  Sure.
21              (Brief recess.)
22                        EXAMINATION
23    BY MR. HALASKA:
24         Q.     ████████████, thank you for being
25    here today.  I just have a few questions about the
```



Page 247

1    testimony you gave in response to Mr. Medlock's

2    questions throughout the day.

3              Do you have any knowledge of how many

4    people the Office of Inspector General spoke with in

5    the course of its investigation?

6         A.    No.

7         Q.    ███████████████████████████████████

8    ███████████████████████████

9         A.    ███████

10        Q.    Do you know if they spoke with anyone

11   else?

12        A.    No.

13        Q.    So you wouldn't be aware if they had

14   spoken with management?

15        A.    No.

16              MR. MEDLOCK:   Objection to form.

17        Leading.

18   BY MR. HALASKA:

19        Q.    You wouldn't be aware if they had spoken

20   with other witnesses?

21              MR. MEDLOCK:   Objection.   Form, leading.

22        A.    No.

23        Q.    Do you know why the OIG report would

24   have contained that statement when it says, "This

25   report contains no recommendations"?


MAGNA
LEGAL SERVICES

Page 248

```
 1          A.      No.  I've never seen an OIG report ever.

 2     It's my first time ever reading it.

 3          Q.      ███████████, what is your opinion of

 4     your work environment today?

 5          A.      Great.

 6          Q.      Do you still feel like you're being

 7     subject to a hostile work environment?

 8          A.      No.

 9          Q.      Do you have any issues -- let me start

10     that again.

11                  Do you have any employment-related

12     issues with any of the managers at the port?

13          A.      Not at all.

14          Q.      How about with any of the supervisors?

15          A.      Not at all.

16          Q.      Do you still feel like there's any hint

17     of retaliation going on?

18          A.      No.

19          Q.      Earlier Mr. Medlock was asking you about

20     concerns related to a U.S. citizen who might have

21     lice who enters the Tecate Port of Entry.  Do you

22     recall that?

23          A.      A U.S. citizen with lice?

24          Q.      Yes.

25          A.      Sort of.
```



Page 249

1       Q.      Do you have the same concerns if a U.S.

2   citizen with lice enters the port of entry that you

3   would if an asylum seeker with lice entered the port

4   of entry?

5               MR. MEDLOCK:  Objection to form.

6   Leading.

7   BY MR. HALASKA:

8       Q.      You can answer the question.

9       A.      No.

10      Q.      Why not?

11      A.      Because a U.S. citizen will be up the

12  road after we check immigration and customs, and an

13  asylum seeker will be there a lot longer.

14      Q.      I want to turn your attention to

15  Exhibit 4, the Marin declaration.

16              MR. HALASKA:  Am I right?

17              MR. MEDLOCK:  That is correct.

18  BY MR. HALASKA:

19      Q.      Earlier, you and Mr. Medlock were

20  discussing paragraph 5; is that right?

21      A.      Correct.

22      Q.      And just to refresh everyone's

23  recollection, paragraph 5 reads, "As an initial

24  matter, it is impossible to state 'the' capacity of

25  the San Ysidro and Otay Mesa POEs to process aliens



Page 250

1    without documents sufficient for lawful entry to the

2    United States."

3              Did I read that correctly?

4    A.    Yes.

5    Q.    I want to turn your attention to

6    paragraph 7 of the same declaration, and I'll read.

7    It says, "While the designated capacity of these

8    short-term hold rooms generally sets an upper ceiling

9    for CBP's holding-capacity purposes, CBP's actual

10   capacity to hold individuals in its short-term hold

11   rooms at the San Ysidro and Otay Mesa POEs is

12   generally lower than the designated capacity at any

13   given time."

14             Did I read that correctly?

15   A.    Yes.

16   Q.    Do you understand that to be consistent

17   with your experience as a CBP officer?

18             MR. MEDLOCK:  Objection.  Form, leading.

19   BY MR. HALASKA:

20   Q.    You can answer.

21   A.    What was the question?

22             MR. HALASKA:  Would you mind reading it

23        back to the witness?

24             (Whereupon, the referred-to question was

25        read back by the Reporter.)



Page 251

```
 1                   THE WITNESS:  Yes.
 2                   MR. MEDLOCK:  Same objection.
 3      BY MR. HALASKA:
 4          Q.     Why do you understand that to be so?
 5          A.     We have -- at San Ysidro, when I was
 6      there, we had rooms that were designated for certain
 7      people.  We had a room that was only for women and
 8      children, no males can go in there.  We had a padded
 9      cell for people that were -- had some kind of
10      criminal history or something that they could hurt
11      themselves or other people.  We had other rooms that
12      were just meant for transgenders, and no one else can
13      be in there.  We had other rooms that had some kind
14      of either virus or disease, and they couldn't be
15      around the other people as well in the other cells.
16      And then we had rooms for males, and we had rooms for
17      minors.
18          Q.     And what does all that mean for the port
19      of entry's capacity to hold asylum seekers?
20                   MR. MEDLOCK:  Objection to form,
21          leading.
22      BY MR. HALASKA:
23          Q.     You can answer.
24          A.     We couldn't really fully fill up the
25      rooms due to we don't have -- if the rooms has 25
```



Page 252

1    people and we have one transgender, we can't put 25

2    in there with the one transgender.  So that

3    transgender would have its own room.  If we had a

4    person with a disease that couldn't be around anyone,

5    they would be solitary confined, that person wouldn't

6    have -- we couldn't put another 25 people in there to

7    fill up that, that room.

8              So yes, the maximum occupancy can never

9    be filled due to these certain circumstances.

10             MR. HALASKA:  No more questions.

11             MR. MEDLOCK:  All right.  I have some

12        brief redirect, sir.

13                      EXAMINATION

14   BY MR. MEDLOCK:

15        Q.    You said that an asylum seeker with lice

16   is a bigger issue because they have to stay longer at

17   the port of entry; is that correct?

18        A.    Correct.

19        Q.    How many asylum seekers with lice did

20   you -- came to the Tecate Port of Entry when you

21   worked there?

22        A.    None that I know of.

23        Q.    And at all times, in the documents that

24   we saw, there was no one in custody at the Tecate

25   Port of Entry?



Page 253

```
 1          A.      For those days, correct.

 2          Q.      And was that because there was a real

 3   concern about lice, or is that just because everyone

 4   was being turned away?

 5          A.      I don't -- I don't know about those

 6   days.

 7          Q.      Sir, was the metering policy, you think,

 8   motivated by concerns about disease outbreaks at the

 9   port of entry?  Do you have any information about

10   that?

11          A.      I do not.

12          Q.      So you don't know whether it was; is

13   that right?

14          A.      No.

15          Q.      Okay.  So let me go back to the metering

16   policy.  That's Exhibit 3 in front of you.

17                  And where in this policy does it refer

18   to travelers with diseases?

19          A.      I don't think I see it in here.

20          Q.      Where in this policy does it refer to

21   travelers who have a criminal record?

22          A.      I don't see that in -- well, I don't

23   know if that would be considered maintaining of

24   security of the port, and safe and sanitary

25   conditions.
```



Page 254

1      Q.     Sure, but it doesn't actually refer to

2  anybody with a communicable disease, does it?

3      A.     No.

4      Q.     It doesn't actually refer to what to do

5  with an asylum seeker that has a criminal record,

6  does it?

7      A.     No.

8      Q.     When you were at the Tecate Port of

9  Entry and you received the oral muster to turn back

10  asylum seekers at the port of entry, were you told

11  anything about diseases at that time?

12      A.     No.

13      Q.     Were you told anything about lice at

14  that time?

15      A.     No.

16      Q.     When you received the written muster

17  regarding the turn-back policy, did that turn-back --

18  did that muster or any oral guidance you got at that

19  time refer to diseases?

20      A.     No.

21      Q.     Did it refer to individuals with

22  criminal records?

23      A.     No.

24      Q.     You stated in your testimony that there

25  were occasions when CBP officers couldn't fully fill



Page 255

1       the rooms in the AEU at San Ysidro; is that right?

2           A.      Yes.

3           Q.      Do you have Exhibit 5 in front of you?

4           A.      Yes.

5                   MR. HALASKA:  I'm sorry.  One moment.  I

6           have to pull it out.

7                   MR. MEDLOCK:  That's the March 21, 2019,

8           queue management report.

9                   MR. HALASKA:  Okay.  Go ahead.

10      BY MR. MEDLOCK:

11          Q.      All right.  In Exhibit 3, for the

12      San Diego field office, it says that San Ysidro was

13      at 96 percent capacity, right?

14          A.      Correct.

15          Q.      And is there any notation anywhere on

16      this chart that there are any sort of circumstances

17      that would prevent San Ysidro from getting to

18      100 percent capacity?

19          A.      Is there any --

20          Q.      Yes.  Does this chart say that there's

21      something that's going on that's restraining the

22      capacity at San Ysidro?

23          A.      No.

24          Q.      Is there anything on this chart that

25      would indicate that the particular uses that the



Page 256

1    holding cells are put towards would constrain the

2    capacity of San Ysidro?

3         A.    No.

4         Q.    Okay.  Let's turn to Exhibit 6.  This is

5    the June 16, 2018, queue management update e-mail.

6    Do you see that?

7         A.    Yes.

8         Q.    For the San Ysidro Port of Entry, it

9    says that there are ███ detainees in detention,

10   correct?

11        A.    Correct.

12        Q.    And then it says 63 percent capacity,

13   correct?

14        A.    Yes.

15        Q.    And for impact to port operations,

16   what's written there?

17        A.    Excuse me?

18        Q.    What is the entry for impact to port

19   operations for San Ysidro?

20        A.    Negative.

21        Q.    Let's go down to Tucson, the Douglas

22   Port.  What's written for impact to port operations

23   there?

24        A.    "The port processed a family unit

25   earlier with" --



Page 257

1          Q.      No, no.  For Douglas.

2          A.      Negative.

3          Q.      And for Lukeville, what's written for

4     impact to port operations?

5          A.      Negative.

6          Q.      And for Naco, what's written for impact

7     to port operations?

8          A.      Negative.

9          Q.      For San Luis, what's written for impact

10    to port operations?

11         A.      Negative.

12         Q.      How about El Paso?

13         A.      Negative.

14         Q.      And for the Laredo field office, the

15    Brownsville Port, what's written there for impact to

16    port operations?

17         A.      Negative.

18         Q.      For Progreso, what's written?

19         A.      Negative.

20         Q.      For Rio Grande City, what's written down

21    there?

22         A.      Negative.

23         Q.      For Roma, what's written down?

24         A.      Negative.

25         Q.      For Laredo, what's written down there?



Page 258

1          A.     Negative.

2          Q.     And for Eagle Pass, what's written

3     there?

4          A.     Negative.

5          Q.     And for Del Rio, what's written down

6     there?

7          A.     Negative.

8          Q.     Okay.  So where on this chart does it

9     state that the capacity of the San Ysidro Port of

10    Entry has been constrained by operational

11    limitations?

12         A.     It doesn't.

13         Q.     It doesn't, and it says, in fact, there

14    is no impact to port operations, correct?

15         A.     Yes.

16         Q.     And it says that for many ports on this

17    chart; isn't that right?

18         A.     Yes.

19         Q.     Okay.  Let's go to Exhibit 7, the queue

20    management report for May 2, 2019.  Do you have that

21    in front of you, sir?

22         A.     Yes.

23         Q.     So I'm focused on the San Diego field

24    office section, the San Ysidro Port of Entry.

25                This chart indicates there are █████



Page 259

1    individuals in custody, and that represents

2    93 percent of capacity, correct, sir?

3         A.    Yes.

4         Q.    And is there anything on this chart

5    anywhere where it states that the San Ysidro Port of

6    Entry has constrained capacity for any reason?

7         A.    No.

8         Q.    Let's move to Exhibit 8, sir.  This is

9    the field office queue management report for

10   February 5, 2019.

11              Do you have that in front of you, sir?

12        A.    Yes.

13        Q.    All right.  Turn to the section on the

14   San Diego field office.

15              Do you see the San Ysidro Port of Entry,

16   it has █████ individuals in custody, representing

17   97 percent of its capacity?

18        A.    Yes.

19        Q.    And on this chart, is there any

20   indication that the San Ysidro Port of Entry is

21   operating at less than 100 percent capacity due to

22   operational constraints?

23        A.    No.

24        Q.    Let's move to the next exhibit,

25   Exhibit 9.  This is the field office queue management



Page 260

1    report for January 10, 2019.

2              Again, directing you to the San Diego

3    field office section of the chart, it shows that the

4    San Ysidro Port of Entry is operating -- has ███

5    individuals in custody, representing 97 percent of

6    its capacity, correct?

7        A.    Yes.

8        Q.    And is there anything on this chart that

9    indicates that the San Ysidro Port of Entry is

10   operating at less than 100 percent capacity because

11   its capacity is constrained for operational reasons?

12       A.    No.

13       Q.    Let's move to Exhibit 10.  This is the

14   same -- this is the field office queue management

15   report for December 26, 2018.

16              You're with me, sir?

17       A.    Yes.

18       Q.    Okay.  And moving again to the San Diego

19   field office section, this shows that San Ysidro has

20   275 individuals in custody, representing 87 percent

21   of its total capacity, correct?

22       A.    Correct.

23       Q.    And is there anything on this chart that

24   indicates that the San Ysidro Port of Entry is

25   operating at less than 100 percent capacity due to



Page 261

```
1    operational constraints?
2         A.    No.
3         Q.    When did you last work at the San Ysidro
4    Port of Entry?
5         A.    Maybe 2014, 2015.
6         Q.    You didn't work there in 2016; is that
7    right?
8         A.    I don't believe so, no.
9         Q.    You didn't work there in 2017?
10        A.    No.
11        Q.    You didn't work there in 2018?
12        A.    No.
13        Q.    You don't know what was happening with
14   the -- firsthand with the San Ysidro Port of Entry's
15   capacity between 2016 and the present, correct?
16        A.    No.
17        Q.    When was the last time you worked at
18   Otay Mesa?
19        A.    2015.
20        Q.    So you didn't work at Otay Mesa in 2016;
21   is that right?
22        A.    No.
23        Q.    Or 2017?
24        A.    No.
25        Q.    Or 2018?
```



Page 262

```
 1      A.      No.

 2      Q.      Or this year?

 3      A.      No.

 4      Q.      So you don't know what was happening

 5   with the capacity of Otay Mesa, from firsthand

 6   knowledge, for the period 2016 through 2019; is that

 7   right, sir?

 8      A.      No.

 9      Q.      Did any of Mr. Halaska's questions

10   change your mind as to whether a turn-back policy

11   existed at the Tecate Port of Entry?

12      A.      No.

13      Q.      In fact, it happened; there were

14   turn-backs at the Tecate Port of Entry, correct?

15      A.      Yes.

16      Q.      And despite the fact that OIG found that

17   those turn-backs violated the law, they have not

18   stopped; is that right?

19      A.      Correct.

20              MR. MEDLOCK:  Thank you.

21              MR. HALASKA:  Just a few more questions.

22                     EXAMINATION

23   BY MR. HALASKA:

24      Q.      ████████████, Exhibits 5, 6, 7, 8, 9,

25   and 10 are all field queue management reports; is
```



Page 263

1    that right?

2         A.    Correct.

3         Q.    Do you play any role in creating these

4    reports?

5         A.    No.

6         Q.    Are you part of the MCAT team?

7         A.    No.

8               MR. HALASKA:  No more questions.

9               MR. MEDLOCK:  One question.

10                     EXAMINATION

11   BY MR. MEDLOCK:

12        Q.    Do you think those reports are

13   inaccurate?

14        A.    I -- I can't say for sure or not.

15        Q.    So you don't have a basis to believe

16   that they're inaccurate, as you sit here today?

17        A.    No, I don't.

18              MR. MEDLOCK:  Okay.  That's all my

19        questions.

20              MR. HALASKA:  I'm all set.

21              (Deposition concluded at 4:50 p.m.)

22              (Reading and signing requested.)

23

24

25



Page 264

1                CERTIFICATE OF REPORTER/NOTARY PUBLIC

2

3                I, Goldy Gold, a Notary Public within and

4     for the District of Columbia, do hereby certify that

5     the within-named witness personally appeared before

6     me at the time and place herein set out, and after

7     having been duly sworn by me, according to the law,

8     was examined by counsel.

9                I further certify that the examination was

10    recorded stenographically by me and this transcript

11    is a true record of the proceedings.

12                I further certify that I am not of counsel

13    to any of the parties, nor in any way interested in

14    the outcome of this action.

15                As witness my hand and notarial seal this

16    26th day of November, 2019.

17

18

                    _____

19                      GOLDY GOLD, RPR

                        Notary Public

20

21

22

      My Commission Expires:  April 21, 2024

23

24

25



Page 265

CERTIFICATE OF DEPONENT

1

2

3        I, ████████████, do hereby certify that

4    I have read the foregoing pages, 1 through 264,

5    inclusive, which contain a correct transcripts of the

6    answers given by me to the questions propounded to me

7    herein, except for changes, if any, duly noted on the

8    enclosed errata sheet.

9

10

11        _____|

            ████████████████

12

13

14

        Sworn and subscribed to before me this

15

    ___day of _____2019.

16

17

18    My Commission Expires:        Notary Public:

19    _____        _____

20

21

22

23

24

25



Page 266

```
1    CASE:  Al Otro Lado v. Kevin McAleenan

2    DEPOSITION OF:  ██████████████

3    DATE TAKEN:  November 21, 2019

4

5    PAGE  LINE  ERROR      CORRECTION         REASON

6

7    ----------------------------------------------------

8    ----------------------------------------------------

9    ----------------------------------------------------

10   ----------------------------------------------------

11   ----------------------------------------------------

12   ----------------------------------------------------

13   ----------------------------------------------------

14   ----------------------------------------------------

15   ----------------------------------------------------

16   ----------------------------------------------------

17   ----------------------------------------------------

18   ----------------------------------------------------

19   ----------------------------------------------------

20   ----------------------------------------------------

21   ----------------------------------------------------

22   ----------------------------------------------------

23   ----------------------------------------------------

24   ----------------------------------------------------

25   ----------------------------------------------------
```



| A | | | | |
|---|---|---|---|---|
| **abbreviated** 5:22 10:21 | 237:25 250:9 **added** 121:20 **addition** 20:24 152:13 159:13,15 | 185:20 **aliens** 103:3 111:1 111:19 138:18 184:20 185:17 | **AOL-DEF-00195...** 141:24 **AOL-DEF-00205...** 183:23 | 221:18 **approximate** 24:4 24:8,17 **Approximately** |

**abbreviated** 5:22
10:21
**abbreviation** 73:11
**ability** 12:22 19:21
**able** 186:15 192:17
**accept** 19:25
**accepting** 43:24
**access** 27:17 49:14
57:10 93:11,19,25
**accessing** 57:11,14
**accomplish** 173:1
**account** 24:19 25:6
78:21 79:3,6,9
82:13 121:20
149:3 158:6 201:3
225:11,22 232:2
233:11
**accounts** 78:19
**accumulate** 144:20
**accuracy** 246:5
**accurate** 147:13
157:9 168:16
184:3 199:23
206:20
**accurately** 185:9
185:13 186:20
208:19 223:17
238:12,23
**acknowledged**
241:8
**acronym** 33:13
**act** 246:8
**acting** 237:22 246:1
**action** 12:11 108:13
264:14
**activities** 79:12
189:17 218:24
**activity** 191:10
192:22 193:1
**actual** 34:23 67:12
69:23 70:4 93:2,5
96:1,4 97:21,24
99:8 106:1 133:20
140:6 179:23

237:25 250:9
**added** 121:20
**addition** 20:24
152:13 159:13,15
**additional** 121:19
209:16
**address** 6:10,15
23:12,14 27:2,4,6
27:10 166:15,16
166:18 200:25
**addressed** 147:17
**addressing** 123:22
123:23
**Administration**
92:16
**Admissibility** 36:21
67:15
**admit** 28:8
**advice** 180:14
**AEU** 36:19,25 37:1
37:5,23 38:25
49:11 50:5 58:16
58:17,21 59:1,1
67:14,17 68:8,9
68:14 69:9,12,16
73:19 98:19 104:5
255:1
**affidavit** 8:19
**affirmatively** 61:6
61:21 62:8
**afraid** 214:21
**afternoon** 47:3
**agency** 188:21
197:12,15 231:8
**aggravated** 69:11
**agree** 218:11,13
**agriculture** 59:21
**ahead** 6:18 154:13
227:11 235:11
236:12 255:9
**al** 1:3,3,6 266:1
**Alex** 13:2,4,16
**ALEXANDER** 2:9
**alexander.j.halas...**
2:12
**alien** 73:8,11

185:20
**aliens** 103:3 111:1
111:19 138:18
184:20 185:17
249:25
**alien's** 187:7
**allegation** 230:18
231:4,13,18
232:15,18,24
238:16
**allegations** 204:21
219:10,20 238:9
238:13
**Alleged** 4:24
226:14 228:4
**allowed** 146:9
**ambulance** 132:10
**amended** 21:17
**Americans** 125:5
**amorphous** 93:5
**Analyst** 204:17
**Andrade** 110:15
**annually** 33:25
**answer** 9:5,6,10,23
9:24 10:7 12:21
18:12 26:23 87:8
113:22 145:18
159:9 164:16,18
236:12 249:8
250:20 251:23
**answers** 265:6
**Antonio** 190:4,5
**anybody** 62:15
65:20 87:5,6
160:15 176:8
188:7 254:2
**AOL-DEF-00050...**
139:18
**AOL-DEF-00086...**
134:13
**AOL-DEF-00087...**
107:16
**AOL-DEF-00088...**
137:1
**AOL-DEF-00170...**
114:18

**AOL-DEF-00195...**
141:24
**AOL-DEF-00205...**
183:23
**AOL-DEF-00210...**
203:12
**AOL-DEF-00210...**
211:21
**AOL-DEF-00216...**
156:25
**AOL-DEF-00216...**
147:8
**AOL-DEF-00216...**
199:18
**AOL-DEF-00216...**
168:2
**AOL-DEF-00216...**
222:16
**APD** 192:6,8
**appear** 61:20
**appeared** 264:5
**appearing** 239:8
**appears** 22:2 102:5
140:9 223:8
237:21,25
**Appendix** 188:12
244:3
**applicants** 229:7
**applied** 53:11
**applies** 83:10,15
**apply** 57:25 76:22
185:20
**appreciate** 245:5
**approach** 45:8
89:16,19 145:11
185:17 245:18
**approached** 111:23
112:10 136:14
**approaches** 62:11
96:11 131:9
**approaching** 87:12
89:23 90:1,4
94:15,20 95:5,7
**appropriate** 82:9
94:10 148:23
153:17 188:21

221:18
**approximate** 24:4
24:8,17
**Approximately**
29:12
**apps** 25:25
**April** 80:11 264:22
**arbitration** 8:12
**area** 52:7 67:20,22
**areas** 50:4
**arose** 17:15
**arrested** 11:21
**arrive** 50:11 51:14
51:19
**arrived** 145:6
**arriving** 185:17,20
207:18 238:18
**aside** 85:10 86:3
**asked** 49:16 52:19
84:7,10,13,16,21
84:25 85:3,13,18
86:5 87:20,23
88:5 90:7 132:18
132:22 163:16
164:23 165:6,10
165:15,17 170:15
170:17,19,25
198:9 207:22
209:12 213:23
219:12 241:12
**asking** 9:14 88:21
163:25 182:3
248:19
**asks** 9:22 58:10
**aspect** 89:8 179:18
**assaulted** 125:9
**assesses** 132:2
**assigned** 32:5 42:14
52:25 206:2
**assignment** 52:24
**assist** 174:4,9
**assistant** 64:3,6,17
64:24 80:16
102:10 164:7
174:14,18,22
190:13 191:25



**assume** 27:9 57:11
103:10 209:6
**asylum** 18:19 19:6
19:10,13 20:4,7
20:10,15 31:1
35:21 39:8,12,14
40:18 41:19 42:8
42:11,15,20 43:5
43:12 44:1,9,13
44:18,22 45:4,7
45:22 46:3,14,19
47:1,4,12,17
48:18 49:18 50:8
52:19 57:25 58:10
60:1,5 74:9 76:3,5
76:21 77:7,16
85:8,10,19 86:4
87:1,13 89:12,15
89:18 91:16,23
94:7 96:11 97:2
97:15 98:22 99:2
99:5,9,17,20
104:4,15,19
118:11 119:15
124:2,6,10,19,22
124:25 125:4,8,11
125:19,19 127:25
128:5,9,10,24
129:20 130:2,7,13
130:14,22,24
131:5,9 132:5
135:24 136:14
138:25 139:10
141:4 143:13
144:10 145:5,10
145:25 146:3,9
153:8,14 154:6,11
154:18,23 155:3,6
155:10 156:7
161:7,10,23 163:7
171:6 172:24
173:9,11,14,24
174:5,11,12,24
175:7,12,15,21
176:2,5,10,13,17
176:21,25 177:9

177:17,21,24
178:2,4,8 184:20
185:19,21 186:2,5
186:9,13,21 187:4
187:6,8 206:10,16
207:2,12,18
208:17 213:8
214:5,22 220:15
221:16,24 222:5,7
223:14,25 224:8
224:12 225:2
229:7,10 231:1,14
236:17,23 237:2
237:14 238:18,19
240:10 243:8,12
244:19 245:16
249:3,13 251:19
252:15,19 254:5
254:10
**asylums** 126:12
145:3
**attachment** 170:4
194:22 216:8
221:2
**attachments** 168:1
168:17 169:4,11
**attempt** 69:8
**attend** 51:6
**attended** 37:17
51:18
**attending** 51:9
**attention** 34:11
159:11 166:4
193:25 194:1
242:7,13,16
249:14 250:5
**attorney** 9:22 12:25
114:2 246:16
**attorneys** 12:19
13:8,11,12,22
14:20,22 15:11
**audible** 9:6
**audibly** 9:10 22:4
107:23 137:3
142:1 147:10
168:4 183:25

211:24 226:22
**August** 184:4 195:9
195:16,21
**authority** 66:6
187:17,20
**available** 51:13
59:19 136:4 202:8
**average** 235:22
**Avila** 45:17,21
**aware** 26:4 51:13
71:12 83:18 84:19
92:15 133:1,6
146:12 160:18
162:16,17 174:15
175:12 176:5,13
225:6 241:5
244:13,16 247:13
247:19
**awkward** 196:8
**A-minus** 9:17
**a.m** 1:12 200:12
202:18 209:20

---

**B**

**B** 4:1 244:3
**back** 20:12,17 29:4
29:5 44:2,10,13
44:18,21 45:4,9
45:22 46:3,14,20
46:25 47:12,17
48:15 51:22 52:19
55:12,14,18 68:12
71:10 72:8 73:2
75:24 76:3 77:7
79:25 84:1,13,16
84:25 85:18 86:5
90:10 91:16,24
96:5,6,7,9,12,14
97:2,16 98:17
99:21 100:1,5
106:4 119:2
120:17 122:11
125:18 131:11,18
136:10,15 139:9
144:2,4,7,19,25
146:3,17,20

152:24 157:7
161:10 163:7,8
171:6 172:25
173:8,14,24 174:5
174:24 175:3,5,7
175:12,15,20
176:2,6,10,14,17
176:20,25 177:2
177:10,12,13,16
177:21,24 178:1,4
178:7,14,20 181:3
195:11 202:24
206:17 207:12,18
214:6,22 215:19
215:21 220:15
222:7 224:1,12,25
225:1,2 229:8
231:14 236:22
238:19 243:13
244:17 245:3
250:23,25 253:15
254:9
**backlog** 129:2,9,10
**backup** 172:7,8,10
**bad** 194:2 242:12
242:16
**Ballatore** 180:7,8
193:8 219:25
220:1
**barricade** 172:6
**based** 9:23 37:18
46:12 94:8 159:15
221:16 239:8
**basis** 99:9 105:13
117:8 151:19
152:3 159:16
263:15
**Batch** 56:4
**Bates** 107:16,18,20
114:18 134:12
136:25 139:18
141:23 147:7
156:25 168:2
183:22 211:20,21
222:16
**bathrooms** 67:23

**bears** 107:15
114:18 134:12
136:25 139:18
141:23 147:7
156:24 168:2
**began** 29:20 196:18
202:3
**beginning** 106:6
229:3
**begins** 82:5 98:4
106:10 148:23
159:12 183:22
184:17 185:16
186:25 187:16,19
199:18 203:12
204:14 205:23
211:20 214:10
234:11 240:15
241:5 243:2,5
**behalf** 2:3,8 108:5
**belief** 165:19,23
**believe** 8:10 12:3
15:22 19:18 23:6
25:11 31:17 33:15
38:1 42:17 52:1
60:2 63:1 64:18
64:20,21 65:3,23
66:10,11 67:4,6
68:4,21 76:25
78:11 90:23 92:24
94:21 103:14
107:14 127:4,8,19
132:8 151:5
154:14 155:12,21
156:23 163:24
166:13 167:8,17
171:15 175:1
176:7,15 181:6
187:11 189:2,16
189:21 190:4,7
191:18 192:6
197:11,17 198:25
203:21 204:9
208:6 209:18
216:2,4,4 218:1,4
218:16 219:11,24



233:17,24 234:6
240:21 246:16
261:8 263:15
**believed** 77:10
225:23
**Ben** 2:11
**beneath** 64:24
108:22 116:2
185:2 213:23
216:17,19,23
217:21 240:14
**best** 10:3 12:22,24
50:2 127:9 180:11
198:11
**better** 18:10 54:19
66:25 182:22
████████████
23:15,17,22 24:20
25:23 27:17
166:15
**bigger** 252:16
**birth** 61:1,13,15
**bit** 10:19 57:21
63:2 149:20
190:15 205:19
208:17 215:23
219:1 223:5
246:19
**black** 80:7
**blew** 180:17 194:9
**blow** 194:12,15
**blowing** 180:13
182:18 193:17,20
193:23 194:5
242:22
**blown** 180:21
**bodies** 120:13
**body** 8:15 108:22
115:21 120:14
148:21
**bold** 240:8
**bomb-making**
125:1
**book** 31:19,22,24
**books** 31:12,12,15
**booth** 40:2 133:19

133:20
**border** 6:4,6 10:20
33:3 73:14 81:10
81:13 82:13 83:21
84:2 93:12 95:20
95:23 96:5 102:10
109:6 115:13,16
115:18 116:13,17
149:2 158:5
204:20 226:16
228:6 229:5
244:10
**borderline** 93:11
94:1 97:21
**bottom** 80:24
107:19 216:10
222:23 241:3
243:1 245:11
**boundary** 116:8
117:11
**Box** 2:11,20
**boxes** 59:14,16,19
59:23 80:7
████████ 1:11 3:2
5:3,13 184:18
201:14 204:18
209:20 210:14
212:8 265:3,11
266:2
████████████.
27:5
**break** 10:4,5,6,8
55:9,10 107:5,6
118:25 119:9
143:21 215:17
**breaking** 167:18
188:3
**breaks** 10:3 119:12
**Brian** 180:7,8
193:8 219:25
**brief** 55:11 79:24
119:1 215:18
245:2 246:21
252:12
**briefly** 12:15
**bring** 25:13 224:14

**bringing** 60:16
**broader** 46:14,16
**broken** 94:23 95:10
**brought** 123:21
179:18
**Brown** 1:13 2:4
**Brownsville** 257:15
**building** 92:13,21
103:14
**bullet** 185:3,6,12
**bus** 121:10
**busy** 123:17
**B-plus** 9:17
**B1/B2** 224:20,21

---

### C

**c** 2:1 5:1 80:15
187:20
**Calexico** 20:14
52:12 110:14,15
131:6 154:6,15
155:11 221:25
**California** 1:1 6:11
6:17 28:5,6 212:9
228:5 229:6 240:4
**call** 25:17 62:20
72:9 76:7 91:19
107:20 131:1,10
131:23 132:8,9
151:20 152:13,14
181:18,20 201:22
202:18,22 203:2
204:11 205:1,11
205:14 208:7
210:8,22 211:1,6
211:10 212:13,18
212:25
**called** 5:4 31:10
49:2 76:5 77:3
79:15 174:9
186:12
**calls** 132:3 182:5
196:22 197:1,5,10
197:19 198:12,16
198:16,20,24
199:1,5,9 204:2

205:6 211:5
**camera** 172:2
**Canada** 81:13
**cans** 29:3
**capability** 149:3
158:7
**capable** 154:23
155:2
**capacity** 11:24
82:14 92:4,7,8,13
92:23 93:1 98:10
98:17 99:8,21,23
100:18,23 101:5
103:1,7,11,12,14
103:16,18,25
104:12,19,22
105:5,16,19,23
106:1 109:22
110:24 112:25
113:9,13,19 114:8
116:8,23 117:4,23
118:15 135:9,14
136:4 137:24
138:15 140:21
141:8 142:22
143:7 234:23
249:24 250:7,10
250:12 251:19
255:13,18,22
256:2,12 258:9
259:2,6,17,21
260:6,10,11,21,25
261:15 262:5
**car** 121:10
**cardholder** 224:20
**care** 89:10 152:15
**career** 29:18 194:5
194:11,16
**careful** 189:9
**carriers** 120:14
**carrying** 124:19,22
125:1
**case** 1:5 7:18 8:9
15:12 16:15 22:1
35:17 38:5,12
39:12,14 40:9,18

41:19 42:8 49:6
52:17 54:25 69:4
69:22 80:6 102:19
131:17 154:10
167:12,14 172:5
182:21 206:16
209:17 222:4
227:23 235:12,14
239:5 266:1
**cases** 35:15 42:11
42:20 70:9 91:24
91:25 97:11,14
127:3
**case-by-case**
151:18 152:3
159:16
**CASSLER** 2:19
**cause** 146:6,11
**caused** 128:1,5,10
**CBP** 4:22,25 10:21
10:24 12:6 19:22
20:2 26:10 28:23
29:10,13,15,21
34:6 42:13 47:6
52:22 62:7 63:3
63:21 66:6,14,17
74:21 75:10 79:12
98:10 105:22
106:1 108:5,12
112:8 113:4,13,24
115:13 117:1
118:22 120:19
123:23 130:17
133:1,6 147:3
148:4 155:17
156:19 165:5,10
165:16 167:17
168:25 175:9
176:23 177:9,21
179:7 184:17,19
184:19 187:4
188:2 200:4
204:21 212:8
215:5 219:3,18,22
220:10 223:1
229:5,17 230:8



231:10 232:5
236:15,25 237:7
238:16,17 240:9
241:12,20 242:16
246:11 250:17
254:25
**CBPO** 220:9,10
222:23
**CBP's** 177:16
250:9,9
**ceiling** 250:8
**cell** 12:12,14 22:14
22:16,18 25:16
27:18 57:7,12
181:19 191:3
199:2 202:9 217:8
251:9
**cells** 68:1 127:22
129:14 251:15
256:1
**Center** 2:15,19
29:25 30:6,9,13
30:25 32:3,25
34:25
**centralized** 57:1
**certain** 48:17 76:23
128:16 146:14
197:23 224:15
251:6 252:9
**certainly** 72:7
**CERTIFICATE**
264:1 265:1
**certify** 264:4,9,12
265:3
**CEU** 68:18,20 69:5
69:9
**chain** 4:16,19 63:3
64:20 65:21
167:21 168:1,7,12
168:16 169:7
199:14,23 200:11
202:6 208:22
210:10 221:4
**chance** 185:5
**change** 262:10
**changed** 161:13

**changes** 33:7
213:24 265:7
**changing** 28:15
**channel** 192:5
**charge** 63:24 64:18
64:22 65:3
**charged** 11:18
**chart** 109:9,12
111:18 113:8
115:22 116:16
135:2 137:15,17
138:24 140:7,12
140:13 255:16,20
255:24 258:8,17
258:25 259:4,19
260:3,8,23
**charts** 108:23
113:8 135:7
137:11 142:10
**check** 41:7 59:14
59:17,20 69:20
71:13 91:12
249:12
**checked** 19:14
**checking** 71:8
191:5
**checks** 41:6,8
**chief** 244:7
**children** 50:15
251:8
**chill** 29:4
**choose** 23:25
**chosen** 241:6
**Christmas** 142:7
**Chula** 28:4
**circumstance** 20:15
**circumstances**
12:10 217:3 252:9
255:16
**citizen** 62:23 87:17
87:21,24 131:8
161:13 248:20,23
249:2,11
**citizens** 35:20 51:1
51:2 62:17 83:20
84:1,7,14 89:22

89:25 90:3 112:13
**citizenship** 35:19
38:17,19 50:7
**City** 257:20
**claim** 35:19 38:17
38:21 50:7 207:2
**claiming** 60:6,13
131:8
**claims** 38:19 62:23
130:22,24 229:10
237:14
**clarify** 144:6
**class** 65:24 66:3
85:7
**classes** 31:14 224:5
**clean** 88:16 126:21
**cleaning** 126:13,19
126:20
**Cleanliness** 88:15
**clear** 72:13 113:24
138:24 243:23
**clearly** 9:10
**close** 93:12 245:15
**closes** 54:17
**Clouse** 2:24
**clue** 64:13 124:15
162:15 204:3
240:3
**code** 6:12 103:25
172:10
**codes** 103:23
**coincidence** 196:2
196:6
**colleagues** 242:11
**collect** 244:25
**college** 27:24,25
28:1,2,7,10
**Columbia** 1:16
264:4
**column** 110:3,13
135:17
**columns** 109:12
110:8,12 116:3,5
116:6 135:6,9
137:17 140:14
**come** 19:5 35:16,19

37:1 40:6 44:18
58:12 62:6 67:7
75:10 97:5,12
100:7 120:12,13
127:6 128:15
132:4,9,20,24
141:10 143:9
145:1 146:15
155:15 166:1
189:1 209:3 224:3
224:15,25 225:1,2
232:23 235:2
**comes** 47:4 58:8
61:19 103:8 131:2
131:20 132:2
143:12 161:8
**comfortable** 152:14
163:4 166:24
206:25
**coming** 16:9 43:24
60:17 69:21 87:3
107:2 133:13,15
189:8,21
**command** 63:3
**comment** 59:17
**commercial** 224:18
**Commission**
264:22 265:18
**commissioner**
80:16 244:9
**committed** 50:12
**communicable**
90:4 254:2
**communicate** 23:3
201:2
**communicated**
26:11,16,20 80:21
102:15 196:21
201:7
**communication**
177:8
**communications**
24:1
**community** 28:10
**compartment** 69:4
**complaining**

164:11
**complaint** 21:15,17
24:11 162:19
163:23 179:20,24
183:1 184:25
185:10,13 189:3
189:14 202:4
208:19 223:21
228:10 238:24
**complaints** 196:16
218:22
**completely** 158:23
**Compound** 84:4
**comprises** 21:25
**computer** 27:12,15
57:7,16,17,18
59:5,6
**concern** 76:14,17
78:10,13,16
171:14 179:1
241:18 253:3
**concerned** 77:13,19
77:22 171:5,12,21
180:18,20,23
193:16,17,18,20
193:22 236:22
241:15
**concerns** 179:12,15
179:17 182:8
201:16 207:23
220:19,21,24
225:25 226:1
236:15 248:20
249:1 253:8
**concluded** 187:21
263:21
**concluding** 195:17
**conclusion** 232:23
235:2
**condition** 126:8
127:10
**conditions** 82:11
88:9,14,18,22,24
89:20 93:10
125:24 126:23
127:15 148:25



153:11,13,18
158:3 160:13,24
253:25
**conduct** 12:6
106:11
**conducted** 204:18
**conducting** 154:23
**conference** 15:8
204:18
**conferences** 182:1
**confidential** 21:4,6
**configuration** 93:9
**confined** 252:5
**confirm** 198:16
**confirmatory** 211:6
**confirmed** 214:10
**confirming** 243:7
**confused** 5:25
**connection** 12:19
**consented** 184:18
**consequence** 19:21
**consequences** 11:9
**considered** 253:23
**considering** 242:11
**consistent** 112:1,4
118:21 136:9
138:21 141:14
143:17 186:1,4
243:2,5,11 250:16
**constrain** 256:1
**constrained** 258:10
259:6 260:11
**constraints** 259:22
261:1
**contact** 68:22,22,24
**contacted** 69:12
180:14 201:9
215:12
**contain** 265:5
**contained** 247:24
**contains** 216:7
230:6 247:25
**contents** 21:1
148:11 157:23
169:3 200:7
**continuing** 33:4

**contraband** 224:16
224:17
**contract** 217:11,12
**contrary** 229:4
**control** 93:25
**controls** 93:11,19
106:11,19,23
**conversation** 9:4
97:3 151:1 173:5
205:1
**conversations** 13:8
16:3,18 42:13
119:8 182:12
183:11 210:4
**convey** 197:18
**convicted** 11:15
**copy** 4:14 6:19,25
8:5,8 22:7,10
31:24 32:1 80:5
81:16,19,23 147:3
147:13 157:10
168:16 184:4,8
199:23 203:19
222:20 227:3,9
**corner** 107:19
**correct** 5:23 7:11
7:14 10:21 11:6,9
12:16 13:18 14:4
14:12,18 18:2,15
18:22,23,25 20:18
22:12,13 23:13
24:15 29:6,21,22
30:7 36:24 40:12
43:2,8,9 44:16
45:5,13 52:8
56:19,22,23 57:20
58:1,2,7 59:13
64:1,2,4 65:15,16
74:2 76:9 81:6,7
82:19 87:16,19,24
88:3,4,10 90:1,5,6
90:13,16 91:9,13
91:17 92:2,21,22
95:6 97:10,18
99:2,3,17,24
100:18 101:1,2,6

101:22 102:11
103:13,17 104:1,2
105:6,10,17 106:2
108:23,24 109:2,3
109:6,7,13,20,22
109:23 110:9,10
110:18,19,21,22
110:24,25 111:2,3
111:5,6,10,11,13
111:14,16,17,20
111:21,24,25
112:2,3,5,6 113:2
113:10,11,14,16
113:17,20,25
114:1,3,4,10,25
115:1,22,23,25
116:1,3,11,14,17
116:21,24 117:4,8
117:12,15,21
118:2,8,13,15,16
118:19,20 120:23
120:24 121:13,16
121:17,24 122:6
122:10 123:24
124:2,3 125:24
131:8 133:12
134:21,22 135:1,9
135:10,12,13,15
135:16,19,20,22
135:23 136:1,2,4
136:5,7,8,11,12
136:17,18 137:12
137:13,18,19,21
137:22,24 138:2,3
138:15,16,19,20
138:22,23 139:4,7
139:11 140:1,2,4
140:7,8,15,16,18
140:19,21,24
141:2,5,8,12,15
141:16 142:5,6,12
142:13,19,20,22
142:23 143:1,2,4
143:5,7,8,10,11
143:15,16,18,19
145:8 147:15,16

147:19,22,23
148:7,14,15,18
149:11,21 153:23
154:9,12,20,25
155:4,17,18,20
157:12,13,15,16
157:19,20,24
158:9,13,14,17,18
159:5,6,9,10,20
159:22,23 160:1,2
160:13,14 161:12
161:24,25 162:3
163:1,9,10 168:10
168:11,13,14,16
168:25 169:1,5,6
169:9,10,12,13,15
169:16,18,19,21
169:22 170:1,2,8
170:9,22,23 171:1
171:2 173:6,15
179:7,8 180:4
184:6,23 185:3,4
186:2,6,10,13
187:10 195:19,22
195:25 196:1,23
198:7,8 199:3,25
200:1,4,5,9,10,22
200:23,25 201:1
201:23 202:11,14
202:19 206:7,14
206:19,22,23
207:4 208:2,4
209:7,13,14 210:1
210:23 212:15,16
214:3,6,7,19,23
216:15,21,22,25
217:1,23 220:3,11
220:12 223:3,4,6
223:7,9,10 224:9
224:13 225:1
226:3 228:11,12
229:15,16,18,19
229:21,22,25
230:11 231:18,21
231:24 232:7,12
232:15,20,21

234:9,14,17,21,22
234:24 236:1,2,5
236:6,19 237:6,9
237:23 238:2,3,9
238:22 239:1
240:19 241:3
243:16,17,20
244:10,14,19,22
246:14 249:17,21
252:17,18 253:1
255:14 256:10,11
256:13 258:14
259:2 260:6,21,22
261:15 262:14,19
263:2 265:5
**CORRECTION**
266:5
**corrections** 227:23
227:25
**correctly** 82:15
93:14 98:13
101:15 103:5
110:6 116:10
134:25 137:9
149:4 152:5 154:8
158:8 159:19
184:22 185:24
187:9,24 188:24
201:19 204:23
206:4,13 207:3
208:1 209:4,23
210:19 212:10
214:2,18 221:20
222:2 223:15
228:7 229:11
230:21 237:15
238:21 241:9
243:9 245:19
250:3,14
**corroborate** 223:21
225:15,22
**corroborating**
225:11
**Costello** 237:22
238:1
**counsel** 6:20 17:24



20:22,25,25 22:11
23:5,11,18 24:2,7
24:21 61:4 162:19
163:12 166:6,11
166:20 167:6
168:9 169:21
170:11 180:15
182:21 183:2,13
184:5 188:20
195:13,15 199:24
201:16 204:15,22
215:1 227:18
244:9 264:8,12
**counterparts** 107:1
**country** 36:11
185:22 187:5
**couple** 49:25 50:1
119:7 146:14
151:4 155:13
171:15 183:7,8
193:2 198:18,19
202:7 205:17
235:17,19
**course** 15:2 28:13
30:16 31:9 34:10
34:17 50:21,23
148:3,7 157:18
165:5,9,15 168:24
200:3 247:5
**courses** 30:13,25
31:6 33:9,10,18
33:25 51:12
**court** 1:1 7:23,24
9:7,21 21:13
**courtroom** 11:5
**cover** 167:1
**coworker** 19:2 43:1
**coworkers** 16:8,10
16:19 26:4,15,19
26:24 75:7 77:4
132:16
**create** 94:6,8
237:12
**created** 121:18
124:1 177:25
**creating** 122:7

263:3
**credible** 40:6 51:1
51:3 57:25 58:9
58:13,15 59:25
60:4,6,13 61:21
61:22,25 62:5,8
62:24 69:2
**crew** 126:19,20
**crime** 11:15,18
50:12
**criminal** 11:9 41:10
68:18 251:10
253:21 254:5,22
**crisis** 108:13
**cross** 40:4 123:12
123:13 146:16
206:11
**crossed** 178:18
199:11
**crosser** 69:15
**crossing** 40:3 62:18
**crow** 2:14 121:6
**cry** 119:24
**crying** 120:2,15
**currently** 65:18
98:10 99:21
148:19
**custody** 64:20
109:19 110:21
111:5,13,19
112:24 135:8,12
135:22,25 137:21
138:12 140:18
141:2,5 142:18
143:4 234:20
235:4 252:24
259:1,16 260:5,20
**customs** 6:4,5
10:20 30:22 40:4
59:21 204:20
226:16 228:6
229:5 244:9
249:12
**C-plus** 9:15

—————————————
**D**
—————————————

**D** 3:1 5:1
**daily** 99:9 105:13
117:8
**danger** 67:9 69:5
**dangerous** 60:16
**date** 6:8 12:9 19:1
24:12 61:1,12,15
90:25 115:21,24
140:6 161:19
166:7 169:18
170:1,4,8 239:19
266:3
**dated** 137:6 139:25
147:14 157:14
203:11,22 212:5
226:13 237:23
**dates** 18:6 53:4,5
54:1,2 170:19
209:2
**day** 99:17 105:23
106:2 112:21
113:5 117:1 127:5
127:8,11 129:5
130:2,8 142:7
145:16 150:22
195:5,24 247:2
264:16 265:15
**days** 54:18,20 68:5
68:6 99:15 127:20
127:21 195:21
253:1,6
**dead** 120:12
**deal** 37:13 55:7
120:7
**dealing** 60:5 172:12
**Decatur** 2:20
**December** 142:5
260:15
**decide** 29:10,15
165:22 194:15
245:15
**decided** 29:13 62:3
194:12
**deciding** 28:22
**declaration** 4:7
8:19 30:19,19,20

30:22 101:9,14
102:19,23 249:15
250:6
**defendant** 12:2
**Defendants** 1:7 2:8
**defiance** 246:8
**define** 36:13 63:3
68:3 149:23
150:10 160:4
**defined** 82:24
86:15 152:17,20
160:16
**defines** 160:21
**definitely** 120:6
**definition** 160:7
**Del** 258:5
**deleted** 24:24
**deliberately** 74:22
75:3,7
**delivery** 29:1,7
**demanded** 217:10
**demarcated** 70:1
**demerits** 190:23
**denied** 163:19
**deny** 184:20
**Department** 2:10
2:25 10:16 14:5
14:16,23 17:3
114:3 215:13
226:12
**Depended** 182:2
**depending** 64:8
67:23 93:9 127:2
127:3 131:4
145:14,15 199:6
**depends** 69:10
**DEPONENT** 265:1
**deposed** 7:13,16
16:16
**deposition** 1:11 3:2
4:4 6:21,25 7:2,22
8:4,9,15 9:3 10:5
10:15 12:19 13:10
14:24 16:4,11,14
21:24 80:3 101:13
107:15 114:17

119:13 134:11
136:24 139:17
141:22 156:24
167:25 180:25
183:21 222:14
223:6 226:11
263:21 266:2
**deputy** 244:6
**describe** 35:14
189:5 223:17
**described** 210:4
243:16
**describes** 238:23
**describing** 146:1
**Description** 4:2
**designated** 221:17
250:7,12 251:6
**desirable** 53:13
**desire** 125:5 144:10
**despite** 179:11
194:11 229:23
236:18 262:16
**detail** 9:1 41:9
158:24 205:19
**detained** 58:19,20
58:21 117:2
118:11
**detainees** 116:7,20
117:20 256:9
**detention** 67:18
68:2 185:19 256:9
**devoted** 14:20
**DFO** 82:17 93:10
**DFOs** 82:11 90:11
94:6
**DHS** 10:16 20:21
163:13 168:10
184:6 185:16
195:14 199:25
201:14 228:14,16
244:9
**DHS's** 182:22
183:2
**Diego** 6:16 46:2,18
52:7,15,20 81:5
102:10 109:2,9



110:18 135:3
137:12,14,16
140:11 142:11,14
176:4,8 245:16,22
255:12 258:23
259:14 260:2,18
**difference** 41:4
67:2 201:24
**different** 15:17
17:15 31:13,13
35:15,16 41:7
43:6 53:18,20
59:22 62:24 64:8
67:7,10,13 70:2
75:14 84:6 94:14
95:15 96:8 119:17
134:2,3 145:2
150:16 151:2
213:4
**differently** 70:1
**differs** 39:23
**difficult** 25:10
**direct** 101:23
203:16 205:17
216:5 218:9,13,15
238:19
**directed** 184:19
219:22 245:17
**directing** 110:4
111:7 260:2
**direction** 152:10
**directly** 65:14
192:7 218:9
**director** 44:19,20
45:2,12,15,21
63:14,22,23 64:4
64:17,24 66:24
81:2,3,4,5 82:18
102:10 148:17,19
149:9,23 150:5,9
155:23 164:7
166:2 174:15
175:11,14,20,25
190:13 191:25
245:15 246:1,10
**directors** 45:25

63:20 64:6 83:19
174:18,22 246:7
**directs** 241:2
**dirt** 126:11
**disagree** 218:11
**disappointed** 189:7
189:10,18 192:19
192:21
**disciplinary** 12:11
**discipline** 20:3
**disciplined** 12:5
19:6,10,16,17
**disclosed** 184:19
195:18 218:2
**discloses** 187:22
**discomfort** 174:19
**discourage** 164:11
**discretion** 62:1,2
151:20,22 152:3
159:16
**discuss** 150:23
205:18 210:17
**discussed** 16:4
48:13 109:4
119:11 150:19
180:4 196:25
211:9 212:24
217:18
**discussing** 135:7
138:22 141:15
142:12 143:18
229:14 249:20
**discussion** 209:22
**disease** 251:14
252:4 253:8 254:2
**diseases** 90:5
126:10 253:18
254:11,19
**disobey** 74:22 75:7
**disobeyed** 75:3
**disorderly** 122:24
128:11,14 153:1
**dissuade** 174:23
176:1,9,20,24
**distance** 97:6
**distribution** 80:24

244:3
**distributions** 81:2
**District** 1:1,1,16
264:4
**docket** 80:6
**document** 7:1,3
15:21,23,25 16:22
21:6,25 38:5,21
62:6 79:20 80:4
95:2 102:2 104:11
104:17,21 106:20
107:15,20,22
114:8,20 119:6
139:22 142:15
143:15 147:7,10
156:19,24 157:9
157:17,22 169:17
169:25 170:7,14
188:11 203:11,15
203:20 221:7
222:15 226:11,17
227:1 228:13
**documentation**
61:14 76:12,13
163:3,25
**documents** 15:11
15:15,17,18 17:4
17:8,10,20 19:14
20:24 21:1,12
35:3,12,16,18
36:6,8 37:3,14
38:12 50:6 60:23
60:25 61:7,20
62:17 69:8,21
71:14 91:12 94:10
94:11 103:3
104:24 112:10,15
118:6 121:15
130:19 132:4,20
132:24 133:3,8
137:18 140:15
209:10,12,17
219:9,13 221:18
221:19 250:1
252:23
**DOFO** 63:15

**doing** 16:14 22:5
37:2 38:11 41:17
44:14 63:17 69:13
71:9 91:25 92:1
101:19 107:23
114:20 124:13
137:4 142:2 157:2
163:4 165:1 167:1
173:17,21 193:5
195:4 211:25
222:18
**door** 134:1
**doubt** 148:2 149:13
149:17,19 168:15
168:19 170:3
239:10 246:4
**Douglas** 256:21
257:1
**Doyma** 7:18
**draft** 170:14,25
227:4,9,14
**drafting** 226:2
**draw** 159:11
193:24 242:7,13
**drawing** 194:1
**draws** 242:16
**drive** 38:7 39:3
57:10,14 121:5
160:20
**driver** 29:1,8 69:5
**driving** 123:12
**drop** 192:17
**dropped** 217:15
**drugs** 124:22
**due** 153:7,13 154:4
218:10 221:22
224:22 251:25
252:9 259:21
260:25
**duly** 5:4 264:7
265:7
**duties** 148:4,7
157:18 165:10,15
168:25
**duty** 57:2,4 125:17
165:5 200:3

**D-o-y-m-a** 7:18
**D.C** 1:14 2:5,11,16
14:3

**E**
**E** 2:1,1,24 3:1 4:1
5:1,1
**Eagle** 258:2
**earlier** 22:8 29:20
42:23 46:24 51:21
55:16 57:6 101:16
103:7 112:5
133:12 147:25
148:17 149:21
152:2 206:15
214:21 215:23
219:1 220:2 223:6
232:9 242:10
248:19 249:19
256:25
**early** 43:18 210:16
239:24
**earner** 217:11
**easier** 24:3 53:17
**East** 110:15
**Eastern** 201:25
**easy** 146:16
**edification** 107:17
**education** 27:22
**educational** 27:21
**effect** 161:2
**either** 17:23 20:15
46:1,17 57:24
58:9 62:20 68:10
88:6 122:8 131:4
132:6 139:6,8
185:18 218:23
237:25 251:14
**Either/or** 59:16
**El** 81:3 109:1
137:12 142:10
257:12
**elaborate** 241:17
**elect** 82:12 90:11
149:1 158:4
**elected** 83:20



106:10
emotional 119:22
emotionally 120:8
employed 5:17,19
employees 179:4
219:18
employment-rela...
248:11
EMT 132:2
enables 99:1
enclosed 265:8
encounter 161:9
encountered
129:23
encountering
132:16 152:4
159:17
ends 169:23 200:16
enforcement 29:24
30:6,9,12,25 32:3
32:25 34:25 36:21
41:8 67:15 68:18
engaged 191:9
192:25
entailed 170:4
enter 69:8 98:11
entered 187:5
249:3
entering 83:21 84:1
84:8,11,14,17,22
187:7
enters 248:21 249:2
entire 42:7 45:6,12
90:14
entitled 7:1 157:10
169:18 221:11
226:14 228:21
entries 103:2
entry 4:25 5:20,22
18:22 19:3,7,11
20:8,13,17 26:5
26:15,18,20,25
33:2 37:9,21
38:13 41:21,23
44:1 45:3,7,13
46:13 47:23 48:1

48:4,7 49:2 50:11
51:15,19 52:18,25
53:23 54:4 56:18
56:22 58:3,5 64:7
64:9 65:25 66:3
69:2 70:2 74:1
76:22,22,23 77:5
77:7,10 85:8,14
85:15,20 86:1
87:2,12,15,18
88:3 89:16,19,23
90:1,4,15 94:15
94:20 97:17 98:10
101:21 103:4,8,13
103:17,18 104:1
104:13,18 105:5,9
105:16,20,23
106:2 107:3
109:15 110:5,5,13
110:17,20 111:4,8
111:9,20,23
112:10 113:13,20
114:8 117:3 118:7
118:12 119:16
120:19,23,23
121:10,12,19
122:23 123:3
124:5,18 125:9
126:2,4 127:10,15
127:24 128:1,4,6
128:8,10 129:19
133:12 135:8,11
135:21 138:5,11
138:19 139:1,3
140:17 141:1,11
142:18 143:1,3,13
144:12 145:5
146:7 147:18,21
148:4 150:21
152:20 153:1,7,13
153:20 154:17,22
155:2,6,10 160:16
161:3,8,11 162:20
170:7 171:7,14
173:25 178:21
184:20,21 185:18

186:6 187:7
192:25 195:1
201:18 207:19
215:9,25 216:19
220:8 223:3,19,23
224:2 225:3
226:15 228:5
229:6,9 232:6
234:12 235:5,8
236:1,4 238:18,20
248:21 249:2,4
250:1 252:17,20
252:25 253:9
254:9,10 256:8,18
258:10,24 259:6
259:15,20 260:4,9
260:24 261:4
262:11,14
entry's 136:15
158:6 251:19
261:14
environment 248:4
248:7
ER 36:9,13 37:3
42:22
Eric 108:2
errata 265:8
ERROR 266:5
ERs 38:2
ER'd 68:12
escalate 164:6
escort 173:8,9
238:17
escorting 174:5
187:4
ESI 69:2
Esquire 2:4,9,14,19
2:24,24
essentially 9:3
100:10
establish 93:10
166:8
estimate 23:16 50:2
121:8 146:19
Estrada 134:20
et 1:3,6

events 196:3
Everson 108:2
everybody 87:4
101:3 105:3
everyone's 249:22
evidence 218:9,14
218:16
EWI 49:5 69:1
EWIs 49:2
exact 7:21 12:9
14:2 19:1 24:12
53:4,5,25 54:2
68:6 90:25 134:4
159:21 161:18
166:7 181:10
239:18
exactly 33:11,23
48:14 64:23 89:4
117:2 126:19
127:8 150:17
151:21 174:2
213:3
examination 3:5
5:4,7 246:22
252:13 262:22
263:10 264:9
examined 5:5 264:8
example 147:24
exclusively 14:20
23:3 27:18
excuse 100:18
101:5 149:16
256:17
Executive 80:15
exercised 151:21
152:4 159:17
exhibit 4:3,5,6,7,8
4:9,10,11,12,13
4:14,15,16,18,19
4:20,21,22,23
6:19,19,21,25
21:19,20,24 22:1
79:21 80:3,11
81:16 101:8,8,9
101:13 106:4
107:9,10,14 113:8

114:12,12,13,17
122:12 134:6,7,11
136:19,20,24
139:12,13,17
141:17,18,22
147:2,2,3 149:6
149:18 156:18,19
156:23,23 158:12
158:13,17 159:3,5
159:22 167:20,21
167:25 168:7
177:11 183:16,17
183:21 184:3
194:19,20 195:12
199:13,14,22
200:3,8 203:5,6,7
208:22 211:14,15
211:16,19 212:3,5
216:5,6 221:2
222:9,10,14,20,23
226:5,6,10 245:7
249:15 253:16
255:3,11 256:4
258:19 259:8,24
259:25 260:13
Exhibits 4:2 162:24
262:24
exist 104:24
existed 262:11
exists 51:7,8
exit 106:11,19,23
expect 105:8,12
expedite 60:5
expedited 36:15
38:4,11 49:1,5
185:18
experience 27:21
42:20 74:21 75:2
87:1 89:13 97:1
104:3 107:1 112:2
242:15 246:8
250:17
Expires 264:22
265:18
explain 9:1 22:22
39:22 41:4 47:5



146:8 164:17
186:7
**explained** 192:15
**expose** 76:15 199:9
**express** 40:6 61:21
77:5,10 174:19
214:24 215:4
220:18 233:4
**expressed** 57:24
77:12,18,21 78:10
78:13 125:5
220:22 226:1
**expresses** 185:20
**expressing** 144:10
**extended** 36:10
37:2
**extensive** 42:18,19
42:21
**extremely** 9:7
**e-mail** 2:6,12,17,21
4:8,9,10,11,12,13
4:16,19 15:12
23:5,10,12,14
24:1,6,19 25:22
27:2,4,6,9 107:10
108:1,18,23
113:12 114:13,16
114:23 115:7,22
134:7,12,20,23
136:20,25 137:6
139:13,17,25
141:18,23 142:4
166:11,14,16
167:21 168:1,7,12
168:16 169:7,8,12
170:4 181:11
191:6 196:22
197:24 199:14,18
199:23 200:11,20
200:25 201:12
202:6,12,13
208:22,24 209:2
210:11,21 216:7
221:4 256:5
**e-mails** 17:23,25
18:3 20:20 22:24

23:9,16,21 24:6
24:19,25 25:3,6
166:13 168:23
169:3,4 197:19
200:3,7 219:10
232:14 243:6

---

**F**

**face** 83:10
**Facebook** 78:21
79:5,8,11,14
**FaceTime** 26:1
**facilitate** 82:9 86:8
86:12,14,20
148:24 149:21
158:2
**facilitating** 71:8
**facilities** 42:14
**facility** 37:22 38:25
52:2,3 67:18
68:11,12 126:13
154:4 221:23
**fact** 20:10 76:2
89:22 97:5 101:3
125:12,13 175:7
178:13 227:12
235:7,25 258:13
262:13,16
**facts** 20:19
**fail** 34:19
**fair** 42:10 73:24
181:2
**fairly** 184:24
**falls** 89:5,5
**false** 35:18,18,18
38:17,19,20 50:7
69:7
**familiar** 66:13
123:9
**family** 73:17
256:24
**FAMU** 73:16
**far** 96:7,9 120:25
121:6
**fashion** 86:13
**fast** 126:13,14

146:18
**fear** 40:6 51:1,3
57:25 58:9,13,15
59:25 60:4,6,13
61:21,22,25 62:5
62:9,24 69:2
155:12,17 185:21
185:21 214:24
215:4
**fears** 155:19
**feasible** 93:13
**February** 137:6,8
139:1 157:14
159:8 200:16
210:12 211:2,9
212:6,13,21
259:10
**feces** 126:10
**federal** 29:24 30:5
30:8,12,24 32:2
32:25 34:24 229:4
229:14
**feel** 74:6 76:24
100:3 152:14
163:3 165:6
166:24 177:20
199:8 206:25
225:24 227:19,25
239:15 248:6,16
**feet** 96:10,13 97:2
97:15 172:11,13
**fellow** 75:7 77:4
**felon** 69:11,11
**felt** 164:25 166:24
194:17
**female** 56:10
**field** 35:8 39:10
46:2,18 52:7,15
52:20,24 63:9,10
63:13,15 75:16
80:16 81:3,3,4,5,8
82:18 102:11,11
108:19,25 109:1,1
109:2,5,9 110:18
116:6,13 134:24
135:3 137:7,14,16

140:3,11 142:10
142:10,11,11,15
176:5,8,12 204:19
245:16,22 255:12
257:14 258:23
259:9,14,25 260:3
260:14,19 262:25
**fields** 116:12
**figure** 62:16 208:12
**file** 20:1 191:21
192:7 218:22
**filed** 21:13 80:5
101:15 192:3
214:17,25 215:5,8
215:24 217:7,23
218:7
**fill** 251:24 252:7
254:25
**filled** 59:4,4 252:9
**filling** 59:15 155:2
**final** 227:20
**finally** 237:10,11
**find** 25:5 35:20
208:15
**findings** 218:12
228:24 229:23
**fine** 87:9
**finish** 87:8
**finished** 101:19
**fire** 28:15 103:23
103:25
**first** 4:3 6:19 7:2
28:19 30:1,2
47:14,16 52:22,24
62:4 70:25 71:2
71:12 72:3 81:19
82:4 86:7 88:8
100:12 102:1
109:15 122:19,19
131:24,25 148:22
150:19 152:8
154:3 157:25
158:10 159:1,12
163:18,22 165:4,9
165:14 169:14
171:5,12 182:15

182:18 185:15
192:2,10,16
212:12 213:11,14
213:16 221:14
229:2,4 230:17
238:5,15 248:2
**firsthand** 261:14
262:5
**first-line** 56:5,12,20
64:19 65:4,10,13
65:17 162:8 164:5
164:9,13 165:20
190:5
**first-lines** 164:4
**first-time** 69:15
**fit** 92:9
**five** 17:9 23:24
173:19 195:21
198:14 210:1
244:25
**five-minute** 55:10
118:25
**fix** 230:10,14
**FLETC** 31:23
**flies** 121:6
**flip** 22:3 169:23
**flow** 82:12,21,24
83:7,14,20 84:22
90:11 149:2 158:5
**flowing** 44:8
**focus** 86:22 90:10
93:8 106:5 109:8
110:11 122:16
125:22 135:2
137:14 140:11
148:21 154:2
184:14 194:22
205:20 213:11
223:11 229:2
230:16 238:15
**focused** 82:4
214:13 258:23
**focusing** 86:7 123:1
142:14 153:4
**folks** 133:24
**follow** 76:25 246:12



**followed** 161:5
**following** 54:23
  76:14,17 77:6
  213:15,20 217:12
  217:17
**follows** 5:6 213:14
**follow-up** 119:7
  209:21 210:3,17
  212:8
**foot** 97:8
**footnote** 240:19,19
  240:20,21 241:2,5
  245:12,14 246:5
**forbearance** 245:6
**force** 173:1,8
**forced** 76:25
**foregoing** 265:4
**form** 8:19 59:8,10
  93:25 160:19
  217:22,25 218:1,3
  218:7 227:4 238:1
  247:16,21 249:5
  250:18 251:20
**formal** 35:9
**format** 142:9
**former** 26:19,24
**forthcoming** 241:7
  241:12,22 242:2
**forward** 107:18
  209:10,16
**found** 228:22 229:4
  229:13 230:8
  234:12 237:11
  262:16
**four** 8:3 14:19 16:2
  16:23,24 36:1
  50:4 54:21 59:11
  59:11 68:5 77:23
  77:24 81:8 94:21
  109:5 110:11
  116:13 151:15
  173:22 181:9
  194:25 198:14
  216:9
**fourth** 48:19
**Franklin** 2:11

**fraud** 35:16
**fraudulent** 36:6,8
  37:3,13 38:4,12
  50:6 69:7
**freelance** 75:10
**freely** 146:9
**frequent** 144:22
**Friday** 210:16
  235:20
**Fridays** 235:16
**friends** 47:25 48:3
  48:6
**front** 6:24 7:6
  21:23 70:3 80:2
  101:12 107:13
  122:13 134:10
  136:23 139:16
  141:21 147:6
  149:7 151:17
  194:19 199:17
  216:6 222:13
  253:16 255:3
  258:21 259:11
**full** 5:12 44:25
  55:24 56:1 82:4
  190:3
**fully** 11:12 151:4,5
  251:24 254:25
**Fulmar** 6:16
**funneling** 74:4,8
**further** 49:17
  150:10 152:20
  158:20 159:24
  210:10 264:9,12

---
## G

**G** 5:1 168:8
**Garcia** 190:2,4,5
  192:18
**Garcia's** 190:3
**gas** 103:25 224:4
**gate** 69:19 70:3,7
  172:8
**general** 20:21 23:1
  23:4,21,23 24:2,7
  24:21 89:11 92:15

  94:25 144:24
  145:1,6,13,25
  146:4 163:13
  168:10 173:10
  182:23 183:2
  195:8 196:17
  201:15 204:16
  215:1,15 219:18
  225:8 226:3,7,12
  237:23 241:14,21
  242:15 244:8
  247:4
**generally** 31:4
  236:17 250:8,12
**generated** 228:10
**Georgia** 2:20 29:25
  30:6
**gesturing** 13:3
**getting** 177:1
  255:17
▮▮▮▮▮▮ 1:11 3:2
  5:3,13 184:18
  186:25 187:4
  204:19 205:23
  206:1,9,24 207:22
  207:23 212:8
  213:15,18,20
  214:1,10,14
  240:15 246:24
  248:3 262:24
  265:3,11 266:2
**give** 6:19 9:6 37:1
  57:3,5 61:7,10
  76:13 100:18
  127:6 139:9 163:2
  163:17 164:20
  177:15 239:21
**given** 51:25 56:24
  86:18 106:2 129:1
  163:7 164:23
  205:24 206:2
  223:18 227:3
  246:12 250:13
  265:6
**giving** 56:15 167:10
**Glynco** 29:25 30:6

**go** 6:18 25:5 30:5
  31:11,12 37:19
  38:8 41:8 48:15
  57:2,4 58:10,23
  59:1 60:18 62:13
  62:19,22 63:2,11
  79:23 81:12 85:25
  97:16 123:11
  130:17 134:2
  139:9 143:24
  146:10 152:1
  154:13,15 162:12
  163:18,21 167:5
  192:1 224:4 225:3
  227:11 229:9
  235:11 236:12,17
  237:13 240:7
  243:24 251:8
  253:15 255:9
  256:21 258:19
**goal** 159:7 173:2
**God** 192:9
**goes** 109:13 170:21
  201:13,21 203:13
  206:9,24 207:21
  209:25 210:21
  217:11 236:14
**going** 8:23 9:24
  10:2,11 13:7 33:2
  35:8 54:17 62:14
  66:19,20 67:5,5,9
  67:12,21 96:23
  101:20 107:7,8,18
  114:5 152:24
  167:5,12,13 181:3
  182:16 189:22
  191:17 193:19
  197:22 205:15
  213:24 224:12
  229:24 233:11,17
  233:20,24 248:17
  255:21
**Gold** 1:14 264:3,19
**Goldy** 1:14 264:3
  264:19
**good** 5:9,10 9:7

  15:23 28:7 29:18
  55:7 120:3 126:12
  167:12,14 190:1
**Goodrich** 18:1,4
  168:8 169:8
  196:19,24 197:4
  197:19 198:4,13
  199:24 200:20
  201:3,13,21 202:3
  202:7,16,22 203:2
  203:23 204:4,7,10
  204:15 205:3
  208:23,25 209:9
  209:15,19 210:5
  210:11,14 211:1,9
  212:6,14,20
**gotten** 162:9
  164:17
**governed** 74:12,17
**government** 26:11
  26:16,20 57:16
  92:16,21 106:23
  200:24
**governmental** 8:15
**grade** 34:16,21
**graded** 34:13
**Grande** 257:20
**Great** 248:5
**grievance** 191:21
  192:3,4 215:24,25
  216:3,10,20
  217:17,18 218:4
**grievances** 216:24
  217:4,6,14 218:5
**grocery** 85:25
**ground** 8:23,25
**group** 19:13 79:15
  79:17 108:15
  124:14 168:9
  199:25 204:16
  224:1
**groups** 67:7,8
  79:11
**GSA** 71:10 92:17
  92:20 93:2 103:9
  103:23 126:12,18



**guards** 71:10
**guess** 43:22 45:19
  50:1,3 52:2 67:18
  69:10 75:14
  146:24 180:11
  224:14
**guessing** 43:21
  93:20 158:25
**guidance** 4:6 75:13
  80:13 83:2,4
  106:5 149:11,15
  149:18 152:10
  158:12,20 159:24
  160:18 161:14
  162:1,2,5,6 163:9
  164:10,14,17,20
  164:23 254:18
**guy** 69:11
**guys** 12:20 143:21
**G-28** 60:23

**H**

**H** 4:1
**Halaska** 2:9 3:7,9
  12:21 13:2,2,17
  13:20 84:4 87:7
  87:10 113:21
  143:23 202:24
  231:6 236:10
  246:18,23 247:18
  249:7,16,18
  250:19,22 251:3
  251:22 252:10
  255:5,9 262:21,23
  263:8,20
**Halaska's** 262:9
**half** 29:9
**halt** 185:23
**hand** 59:4,6 236:25
  264:15
**handed** 195:4,25
**handicapped** 95:3
**happen** 57:1 58:18
  126:15 161:17
  189:13 194:9
**happened** 16:25

17:11,14 35:5
  129:24 132:13,14
  138:8 146:22
  161:20 162:3
  172:6 196:3,9
  197:21,24 198:1
  205:2 217:13,16
  217:19 235:16
  236:8 239:13
  243:18,19 262:13
**happening** 43:20
  174:16 230:10
  244:14 261:13
  262:4
**happens** 9:15 64:21
  130:23 131:3,20
  132:7
**hard** 129:3
**harder** 120:6,7,8
  242:20
**hardest** 120:4
**harmed** 194:16
**hazard** 105:3
**head** 9:8
**header** 240:9
**heading** 228:21
**health** 89:19
**hear** 103:24
**heard** 5:21 21:9
  52:4 55:23 63:5
  63:14 65:24 66:2
  68:17 71:25 72:3
  72:4,7,10 73:4,7
  73:12,16 74:4,8
  79:17 83:23,24
  106:22 108:8,15
  115:12 132:15
  161:15 179:3
  214:1
**held** 1:12 144:25
  145:3
**help** 63:3
**Henry** 184:4
**Hi** 201:14 210:14
**hide** 172:5
**higher** 46:8,9,18

55:19 65:21 72:14
  99:12 162:9
  207:25 208:3,9
**higher-ups** 208:13
**highest** 27:22
**Highlights** 228:14
  228:16
**hint** 248:16
**history** 41:10
  251:10
**hit** 133:25 143:20
**hold** 250:8,10,10
  251:19
**holders** 84:22 85:1
  85:4 124:2 224:21
**holding** 68:1,11
  127:22 256:1
**holding-capacity**
  250:9
**holiday** 145:15
**home** 6:15 27:15
  54:17,19 198:24
  198:25
**Homeland** 2:25
  10:16 226:13
  244:6,7,8
**homework** 32:5,8
**honest** 78:17
  183:15
**Honorable** 184:5
**hope** 104:25 105:1
  181:1 210:15
**hoping** 101:15
  210:15
**hostile** 248:7
**hour** 10:4 107:6
  126:16,21,24
  129:3 154:5
**hours** 14:19 49:25
  50:1 145:14 202:7
  235:17,19
**house** 103:8
**housed** 104:5
**housing** 104:15,19
**Howe** 115:2,5
**hub** 52:2,5,10,12

112:5
**hubs** 52:8,15,20
  154:6 221:25
**humanitarian**
  152:4,16,21
  159:17 160:4,8
**hundreds** 121:15
**hurt** 125:5 194:5,12
  251:10
**hysterical** 119:18
  119:21

**I**

**idea** 15:23 236:7
**identification** 6:22
  21:21 79:22
  101:10 107:11
  114:14 134:8
  136:21 139:14
  141:19 147:4
  156:20 167:22
  183:18 199:15
  203:8 211:17
  222:11 226:8
**identified** 236:15
  243:6
**ignore** 75:18,20,25
  234:7,8
**ignored** 76:2
**illegal** 76:18 77:1
  77:11 165:17,20
  165:24 166:23
**image** 238:1
**imagine** 119:21
**immediately** 28:22
  185:23
**immigration** 2:10
  4:24 31:3,7,13,16
  31:22 32:6,11,17
  32:24 33:4,8,19
  40:3 59:22 79:9
  226:15 228:4
  249:12
**impact** 116:9
  117:14 118:1
  256:15,18,22

257:4,6,9,15
  258:14
**implementation**
  125:17
**implemented** 188:3
  236:15 246:2
**implementing**
  101:4 106:23
  149:18 158:16
**implements** 149:14
**important** 9:5,12
  105:4,15 117:7
  150:1 170:25
  198:5
**importantly** 10:2
**impossible** 103:1
  103:16 105:19
  249:24
**impression** 46:12
  177:15
**improper** 241:8
**inaccurate** 263:13
  263:16
**INAMI** 106:10,16
**inappropriate**
  175:15,21,22,23
  176:17
**inches** 59:11,11
**include** 33:19
**included** 147:20
**including** 13:12
  93:11 236:16
**inclusive** 265:5
**incorrect** 114:9
  207:9 234:4
**incredible** 233:8
**indicate** 78:16
  178:11 255:25
**indicated** 55:17
**indicates** 7:12
  258:25 260:9,24
**indicating** 189:21
**indication** 259:20
**individual** 37:3
  41:8 60:13 62:13
  68:14 138:17



143:12 204:1
207:1 214:16
**individuals** 13:22
44:9 49:4,9 50:10
51:14,18,22 56:17
57:23 60:6 62:8
72:8 73:2,25
75:12,24 89:18
98:16,25 103:8
117:2 118:4
120:17 121:9
124:16 132:19,23
133:2,7,13 135:12
137:21 142:18,25
143:4,9 144:10
154:22 178:20
188:22 229:9
237:13 240:11
244:13,17 250:10
254:21 259:1,16
260:5,20
**influx** 128:15
130:13
**influxes** 128:24
**inform** 98:9
**informal** 35:10
**information** 33:19
167:10 187:22
195:18 197:18
209:10,16 213:15
213:20 253:9
**informed** 182:20
**initial** 102:25
228:10 249:23
**initially** 166:19
242:11
**inside** 130:4 229:7
**inspecting** 35:2,11
40:3 49:18 50:10
51:14,18 62:25
75:11
**inspection** 39:20,22
39:24 40:14,17,24
41:2,5,5,13 42:2,5
57:23,24 58:9,18
59:5 60:14 62:12

62:12 69:2 74:12
145:11 146:11
195:4,8,22
**inspections** 41:18
49:3 75:16
**Inspector** 20:21
22:25 23:4,21,22
24:2,7,21 163:13
168:10 182:23
183:2 195:8
196:17 201:15
204:16 215:1,14
219:18 225:7
226:3,7,12 237:23
241:13,21 247:4
**Instagram** 79:3
**instance** 25:15,21
50:13 83:18 94:8
122:23 123:4
124:4,18,21,24
125:7 128:5,9
130:11 136:13
153:6,12 162:3
174:8 175:19
177:4,6
**instances** 44:6 50:6
57:22 99:5 124:16
125:3 128:23
164:22 172:25
243:7
**instruct** 45:22
237:13
**instructed** 20:11
44:21 45:3 46:19
46:25 83:25 91:12
91:16 99:25 100:2
223:13 229:8
230:18,25 231:14
232:19 238:17
**instruction** 56:21
75:3 88:20 205:24
206:2,25 207:22
**instructions** 44:15
44:17 46:1,8
74:23 91:18,23
223:18 243:20

**intel** 67:4,5
**intended** 66:8
**intensive** 30:15
**intent** 57:25
**intention** 185:20
**interacting** 196:18
**interactions** 181:3
**interest** 203:17
**interested** 264:13
**internal** 120:14
**internally** 34:6
**interview** 154:24
198:15,18,20,23
205:6 211:5 212:8
**investigate** 201:16
202:4
**investigating**
230:13
**investigation** 4:23
167:3 226:14
228:4 247:5
**investigative** 168:8
199:24 204:15
**involved** 8:11 37:14
81:22 245:17
**iPad** 57:8
**issuance** 153:20
**issue** 66:6 123:21
123:23 124:1
131:21 132:6
166:25 172:12
180:4 230:13
252:16
**issued** 27:12 152:8
156:16 198:7
227:15,20
**issues** 66:22 171:24
171:25 248:9,12
**items** 210:17
**it'll** 62:22,22
**I-N-A-M-I** 106:16
**I-v-i-l-i-a** 45:20
**I-583** 61:4
**I-586** 60:23
**I-94** 123:9 124:2
**I-94s** 123:18 235:13

235:15

---
**J**
**J** 2:9 108:2 148:13
184:4
**jail** 69:14
**Jake** 167:8
**January** 10:12 27:7
140:1,7 260:1
**Jennifer** 237:22
238:1
**Jillian** 2:24
**job** 6:2 28:19,23,25
120:5,7 241:16,19
**jobs** 28:21
**John** 18:1,4 169:8
199:23 200:20
203:23 204:15
205:2 208:22
212:6,14,20
**join** 28:23 29:10,13
29:15
**joined** 52:22
**joining** 28:22
**Jonathan** 168:8
196:18
**July** 6:7 29:21
170:12,22 171:3
180:11 181:4,8
183:7,9 237:23
244:12
**jump** 144:7
**June** 114:24 115:25
118:4 171:10
256:5
**Justice** 2:10 14:6
14:16,23 17:3
114:3 215:13

---
**K**
**K** 1:6,13 2:5
**keep** 107:7,8 198:9
219:4
**kept** 28:15 156:9,10
178:14
**Kerner** 184:5

**Kevin** 1:6 266:1
**kids** 120:12
**kind** 39:11 47:7
61:14 75:16 251:9
251:13
**King** 2:24
**Kirstjen** 184:5
**knew** 20:5 54:17
100:23 103:12
104:9
**knocked** 192:13
**know** 6:12 7:21
8:13,25 9:15,16
10:4,6 12:4,9 14:1
16:9 19:1,2,5 22:4
25:8 26:6,7,8,14
26:22 28:8,18
32:8,19 33:11
34:16,18,22,22
35:6 36:19 41:7
41:22 44:24 45:25
46:9 48:6 49:22
49:24 51:7,8,16
52:9 53:3,5,10,25
54:2,12 55:23,25
56:16 57:6 59:20
59:24 62:7,10
64:17,22 66:7,9
66:12 67:7,10
68:6,16,20 69:12
70:4,18 74:24
75:9,22 80:9
85:25 86:13 87:3
89:4 90:24 93:4
99:4,4,8 101:18
102:18 103:11,20
104:4,7,10 105:4
105:15,20,22
106:1,16,19 107:5
107:18,20,23
113:13,19 114:8
114:20 115:5,10
123:8 124:13
125:10 126:18,19
127:5,8 131:24
132:12 134:14



137:3 139:22
142:1 147:10
150:15 151:19,21
152:19,22 157:2
160:7,10 164:15
164:16 166:1,2,7
166:23 167:4
168:4,21 170:18
171:13,17,20
174:1,2,7,8
175:19 176:11,12
177:7 180:9 181:9
182:16 183:6,15
183:25 184:10
185:9 192:25
196:4,15 197:2,9
197:12,22 199:20
203:15 210:7
211:24 215:7
218:18,20 220:8
222:18 224:11,20
224:20 226:21
238:12 239:4,18
239:23 240:1,6
241:20 242:5
245:25 246:10
247:7,10,23
252:22 253:5,12
253:23 261:13
262:4
**knowing** 125:13
146:16 194:16
**knowledge** 12:24
20:3 24:24 37:16
70:15 145:9 153:2
161:1,1 174:14
175:11 176:4
178:9,10 229:20
247:3 262:6
**knowledgeable**
148:10 157:22
169:2 200:6
**known** 103:18
234:13
**knows** 117:1
**Koseor** 114:24

**Kristine** 2:24

---

**L**

**L** 4:22
**labeled** 108:25
188:12
**lack** 182:22
**Lado** 1:3 266:1
**land** 82:12 83:21
84:2 149:2 158:5
167:8,9 181:5,7
181:14,17,22
182:1 201:8
**lane** 94:25 95:3
**lanes** 35:23 44:5,7
48:20,21,24 49:4
49:9 50:8 95:4
112:7 124:7,10,11
124:17,25 125:4,8
125:15,20
**language** 100:14
149:10
**Laredo** 81:4 108:25
137:11 142:10
257:14,25
**late** 171:3 239:25
**law** 2:15,19 29:24
30:5,9,12,24 31:1
31:3,7,16,22 32:3
32:6,11,17,24,25
33:4,8,20 34:24
39:8 40:4 41:7
42:15 167:18
186:2 187:23
188:3 195:19
201:17 207:1,6,9
229:4,15,24 230:9
262:17 264:7
**lawful** 103:4 250:1
**Laws** 4:24 226:15
228:5
**lawsuit** 12:1 21:10
21:13 76:15
214:17,24 215:4,7
**lawyer** 107:21
**lawyers** 9:20 16:4

**lead** 208:6
**leadership** 152:19
245:17
**leading** 113:21
114:5 231:6,11
236:10 247:17,21
249:6 250:18
251:21
**learn** 30:19,20
37:19 75:15
178:19 182:25
198:5 241:24
**learned** 178:25
227:13
**leave** 28:17 59:17
68:9,14 199:7
**leaves** 68:8
**leaving** 71:15
**led** 12:10
**left** 28:14,19 62:1,2
65:20 116:6 242:6
**legal** 84:11,17 88:1
166:3,4 180:14
207:12,14,18
**legitimate** 94:8
221:16
██████ 18:14,17
42:23 78:9 222:24
223:2 230:23
233:13,17,20
234:8
**lesser-utilized**
235:25
**letter** 4:18 19:18,20
20:1 183:17,22
184:4,9,15 195:1
195:3,12,16,25
196:11 213:7
216:10,11,20
217:15
**letting** 18:18,19
19:6,10 20:3
**let's** 36:5 48:15
79:23 89:1 102:22
106:4 109:8
114:11 116:19

117:17 118:24
122:11 125:22
134:6 137:14
140:11 143:24
152:1 185:15
208:21 215:17
230:16 237:19
242:25 256:4,21
258:19 259:8,24
260:13
**level** 27:22 42:15
65:22 164:7
**LFO** 109:6
**lice** 89:6,9,13,23
127:6 248:21,23
249:2,3 252:15,19
253:3 254:13
**lie** 99:25 100:4,8,10
100:23 101:1,5
**life** 54:19
**likelihood** 167:17
187:21 188:2
195:17
**limit** 4:15 12:14
18:19 19:7,11
20:4,8,11,16
39:17,23 40:21
41:23 43:21,22
44:2,8,12,21 45:4
45:8,23 46:3
51:22 55:18 69:17
69:18,22 70:1,4
70:10,13,16,22
71:6,13 72:8 73:2
74:16 75:24 76:3
78:2,4 90:16,21
90:22 91:1,3,8,11
91:15 95:8,18,24
96:4,12 97:12,21
97:24 98:1 99:16
106:12,23 121:18
121:20,23 122:5,7
125:18 130:19,22
131:9,21 132:6,20
133:4,14,15,22,25
136:15 143:9

144:11,14 146:4
146:10 157:11
158:20 161:9
166:22 169:14
172:1 174:5 175:5
175:8 177:23
182:8 206:3,10
213:25 214:6
217:8 221:11,14
221:15 222:4,6
**limitations** 154:5
221:23 258:11
**limited** 42:11 186:9
**line** 4:15 12:14
18:20 19:7,11
20:4,8,11,16
39:17,23 40:21
41:24 43:21,22
44:3,8,12,21 45:4
45:8,23 46:3
51:23 55:18 69:17
69:18,22,23 70:1
70:5,10,13,16,22
71:6,13 72:8 73:2
74:16 75:24 76:3
78:2,4 80:12
90:16,21,22 91:2
91:3,8,11,15 94:6
94:25 95:8,17,18
95:21,23,24 96:1
96:4,12 97:12,21
97:24 98:1 99:16
108:18 109:25
111:2 112:12,21
113:2 115:7 116:8
117:11 118:19
121:18,20,23
122:5,8 123:19,19
125:18 128:17
130:19,22 131:9
131:21 132:6,20
133:4,14,15,23,25
134:23 135:18
136:15,17 137:7
138:2,6 139:4,8
140:3,23 142:25



143:10,15 144:11
144:14,21 145:21
145:22,25 146:4,4
146:10 150:6,10
157:11 158:20
161:9 162:12,12
166:22 169:15
172:1 174:5 175:5
175:8 177:23
182:8 206:3,10
212:7 213:25
214:6 216:18
217:9 221:12,14
221:15 222:5,6
266:5
**lines** 94:8,9,14,19
94:22 95:7,10,15
133:13,25 134:2,3
144:20 194:25
205:22 216:9
**LinkedIn** 78:23
**list** 80:25 238:4
**listed** 104:12 113:9
116:12,16,20
117:18,23 138:12
228:25
**lists** 102:9 110:14
110:21 111:1
117:10 135:12,19
140:23 142:18
**literally** 191:9
**litigation** 2:10 72:4
81:23 101:16
**little** 10:19 23:24
41:9 42:18,21
54:10 57:21 63:2
77:13,19,22 121:2
149:20 158:24
164:21,21 186:7
189:4 190:15
205:19 215:23
219:1 223:5
246:19
**located** 28:3
**location** 7:13 57:2,2
57:4

**locations** 106:11
**log** 57:19
**long** 6:5 15:20 29:7
29:19 53:2,22
59:10 123:19
129:1 145:20,21
146:19 181:25
191:16 198:18,21
222:15 235:14
**longer** 68:11 128:1
128:6 129:4,10,13
129:19 130:2,8
198:15,20,23
203:15 205:6
211:5 249:13
252:16
**longest** 68:4 127:20
144:9,18 145:10
**look** 94:5 102:4
113:7
**looked** 227:14
**looking** 140:14
148:22 158:11
**looks** 101:20
**lost** 85:23 86:4
224:6
**lot** 53:16 54:18
64:14 89:5 100:13
101:21 120:14
123:11 249:13
**lots** 28:21
**low** 154:17
**lower** 64:18 250:12
**lowest** 217:11
**Luis** 257:9
**Lukeville** 257:3
**lunch** 143:22 144:1
144:4
**lying** 11:9 233:5,14

---
**M**

**M** 2:4,24
**mail** 15:13
**main** 52:2
**maintain** 82:10
86:23 88:22 123:2

148:24 153:4,17
158:2 160:12
**maintained** 123:5
153:7 178:20
**maintaining** 253:23
**making** 189:2
191:23
**males** 251:8,16
**man** 196:18
**management** 34:17
46:2,8,9 55:19
64:19 65:21 72:11
72:14,18,24 74:23
75:4,8,13 83:3
86:19 88:21 100:4
100:8 104:7 105:9
105:22 106:1
108:19 115:8
134:24 137:8
140:4 149:1
150:20 156:12,13
158:4 159:25
162:4,6,7 163:17
163:22 176:23
177:9,16 216:11
232:10 233:25
234:3,7,13,16,19
235:3 236:8
243:20 246:9
247:14 255:8
256:5 258:20
259:9,25 260:14
262:25
**manager** 100:7
163:22
**managers** 184:19
230:18 231:13
232:19 238:16
248:12
**manner** 128:11
**March** 108:2,19
111:18 112:8
255:7
**Marin** 4:7 101:14
102:6,9,13,16,19
103:15 105:18

249:15
**Mariza** 4:7 101:14
102:6,9,13,15,19
103:15 105:18
**mark** 6:18 79:19
101:7 119:6 134:6
147:1 167:20
211:14 222:9
**marked** 6:22,25
21:21,24 79:21
80:3 101:9,13
107:10,14 114:13
114:17 134:7,11
136:20,24 139:13
139:16 141:18,22
147:4 156:20,22
167:21,25 183:17
199:14 203:7
211:16,19 222:10
222:14 226:7,10
**mascots** 28:8
**materials** 31:21
32:2 33:7 37:24
38:2,3 39:2 49:13
125:1 160:20
**matter** 103:1
210:18 249:24
**maximum** 92:20
130:5 252:8
**Mayer** 1:13 2:4
**McALEENAN** 1:6
266:1
**MCAT** 108:5,8
263:6
**McCarthy** 56:7,7,8
216:20 217:9
**McCarthy's** 56:9
**McFeeley** 193:10
193:11
**mean** 15:16 16:8
22:22 25:17 30:21
38:7 46:6,16 47:1
49:22 50:12 54:21
63:8,22 66:17
73:22 83:4 92:11
103:22 127:20

129:14 146:13
156:6 166:1
240:20 251:18
**meaning** 88:16
152:11
**means** 46:10 67:15
82:17,21 83:8
86:12,20 88:14,24
92:7 93:19 115:10
135:24 150:2,7
159:25 160:5
166:12 169:20
209:6
**meant** 251:12
**measures** 188:21
**media** 78:19
**medical** 131:21,25
132:5
**medication** 67:24
67:25 127:7,7
**Medlock** 2:4 3:6,8
3:10 5:8 6:18,23
13:4,6 21:19,22
55:8,12,13 79:19
79:23,25 80:1
84:5 87:9,11
101:7,11 107:9,12
113:23 114:11,15
118:24 119:2,3
134:5,9 136:19,22
139:12,15 141:17
141:20 143:20,24
144:2,3 147:1,5
156:18,21 167:20
167:23 183:16,19
199:13,16 203:5,9
211:14,18 215:17
215:19,20 222:9
222:12 226:5,9
231:7 236:11
244:24 245:3,4
246:15,20 247:16
247:21 248:19
249:5,17,19
250:18 251:2,20
252:11,14 255:7



255:10 262:20 263:9,11,18
**Medlock's** 247:1
**meet** 13:15,19
**meeting** 13:25 14:8 14:10,13,20 15:4 15:7,10 16:1 17:2 17:4 216:18,24 217:14
**MELISSA** 2:14
**melissa.crow@sp...** 2:17
**member** 179:9,11
**members** 83:11
**memo** 81:12 88:18 98:4 125:22 158:16 175:1
**memorandum** 4:6 4:20,21 79:21 80:12 81:20,23 82:5,23,25 83:6 83:10,15 86:8,15 86:17,18 95:21 203:7,11,22 204:14 205:9,18 205:21 211:16,20 212:5,7,12,23 213:12 237:22 238:2,6 239:8 240:8
**memory** 6:13 16:24 17:11,13,21 18:5 18:9,16 166:8
**mentioned** 36:2 42:23 51:21 55:16 59:3 67:14 126:24 189:20
**mentions** 58:9
**merely** 34:3 35:15 35:19,22
**Mesa** 26:24 37:11 37:21 38:13,23 40:20 41:12,18 48:5 49:11 50:5 53:8,10,12,22 54:3,13,25 58:6

70:14,17,21 83:19 95:14,15,18 97:25 103:2,17 110:14 111:4,9 112:10 127:14,21 128:4,6 128:13 130:1,8,12 130:13 145:18,20 145:24 146:6 236:5 249:25 250:11 261:18,20 262:5
**messaging** 25:25 26:1
**met** 13:9 14:22 80:19 102:13 209:9
**meter** 82:12,21,24 83:7,14,20 84:21 87:23 90:11 149:2 158:4
**metering** 4:6 71:25 72:4,15,21 80:12 83:23 106:5 122:11,13 149:7 149:11,14,18 158:12,16 234:13 235:2 236:7 253:7 253:15
**Mexican** 26:11,16 26:20 50:25 51:2 62:23 73:20,23 74:1 97:16 100:5 106:22 120:18 130:18,21 131:8 131:11 132:8 139:2 161:13,16 161:22 162:10 174:4,6,9 206:17 244:18
**Mexico** 33:3 36:11 44:10,13 68:12 69:20,24 70:8 81:9 83:22 84:2 93:12 96:1 97:22 98:17 106:11 107:2 109:6,25

111:2 115:15 116:13,17 121:2 131:18 135:18 136:10,16 139:5,9 140:24 142:25 161:10 172:7,13 172:25 173:5,8,14 173:24 174:10 220:16 222:7 229:8 238:19 240:11,24
**MFRT** 131:23
**Michael** 5:13 134:20
**Michel** 7:19
**middle** 29:11
**migration** 108:13
**miles** 121:7,8,11
**mind** 18:7 49:22 178:18 199:11 250:22 262:10
**minor** 62:11,18
**minors** 251:17
**minute** 199:19
**minutes** 144:13 182:3 198:22 210:1 244:25
**mispronouncing** 41:22
**moment** 22:3 36:4 51:20 80:8 101:17 109:8 114:19 137:2 139:21 141:25 147:9 157:1 168:3 183:24 203:14 211:23 220:23 222:17 226:17 238:11 255:5
**month** 129:13,20 161:21,22 171:8 239:21
**months** 30:9 47:15 47:20 68:7 90:24 91:1,7 93:23 94:2 183:7,8 191:18,19

191:20 192:1,13 192:17 217:16 230:13
**morning** 5:9,10 47:2 232:9 234:17
**motivated** 155:20 162:22 253:8
**motivation** 156:1,5
**motorcycle** 67:8
**move** 27:20 98:3 113:7 114:11 117:17 185:15 237:19 242:20,25 259:8,24 260:13
**moved** 53:9 54:13 122:4
**moving** 109:18 202:6 210:10 260:18
**multipage** 7:1 101:14
**multiple** 69:13 232:10
**multi-page** 21:25 183:21 199:17 203:11 211:20 226:11
**mustard** 209:3,6
**muster** 4:14 47:2,5 47:9,11,17 51:22 57:3,5 66:6 67:2,4 67:6,10,11 147:3 147:14 148:3,6,10 148:13,22 149:10 149:14,17,24 150:3,20 151:8,17 152:8 153:21 154:3 158:11 159:22 160:19 163:7 165:20 169:14 206:6 209:6,13 221:3,8 240:23 243:15 254:9,16,18
**musters** 48:8 56:24 57:1 66:5,8 74:12

74:17,22 147:25 162:12 213:10 219:14
**M-C-A-T** 108:9
**M-i-c-h-e-l** 7:19

---

**N**

**N** 2:1 3:1 5:1
**Naco** 257:6
**name** 5:12,14 7:9 7:21 13:2 44:25 45:18 55:24 56:1 60:25 61:12,14 101:14 102:6 190:3 192:9,10 193:10 196:18 220:5
**names** 77:20 171:18 173:23 184:19
**national** 130:21 161:22 179:3
**nationals** 74:1 162:10
**native** 185:22
**necessarily** 126:11 224:17
**necessary** 82:6,8 148:23 153:16 155:9 158:20
**necessitates** 154:5 221:24
**need** 10:4,6 41:10 61:11 67:24 127:1 127:3,7 162:10 225:3 227:25
**needed** 47:3 170:18 182:16 227:23
**needs** 30:16 94:9 156:8 221:17
**negative** 19:21 117:15 189:22 194:8 256:20 257:2,5,8,11,13 257:17,19,22,24 258:1,4,7



nervous 193:4
never 39:12 40:5,17
  41:19 42:7 72:14
  72:17,20,23 73:12
  76:2 77:2 78:24
  79:7,10 81:23
  83:23 87:20,23
  90:7 102:1 108:15
  127:16 129:23,24
  130:7 132:13,14
  132:21 138:7,8
  146:21 178:1,10
  178:18 199:11
  204:11 248:1
  252:8
new 63:16,16,17
  127:5 164:2 198:6
news 21:9
Nielsen 184:6
night 54:17 235:20
Noelle 56:7,8
noncitizens 35:2,11
  111:22 112:9,23
  118:5 154:18
non-asylum 125:14
non-attorneys
  14:24
Non-U.S 112:13
normal 44:7 97:5
northern 81:13
notarial 264:15
Notary 1:15 5:5
  264:3,19 265:18
notation 255:15
note 4:22 182:14
  222:10 223:8,12
  225:7 226:2
  230:24 232:5
  234:9
noted 265:7
notes 182:4,7,11,17
  196:25 201:24
notice 4:3 6:21 7:2
  7:6,10
November 1:12 3:3
  168:13,13 169:8

200:12,19 201:12
202:3,13,17,23
203:3,12,22
204:14 205:2
208:24 209:1,20
264:16 266:3
NTEU 179:4,6,9,11
number 92:20 93:1
  93:2,6 114:18
  116:7,8,20 117:20
  134:12 147:7
  154:18 156:25
  168:2 178:15
  183:22 211:21,21
numbered 222:16
numbers 107:16,18
  107:21 136:25
  139:18 141:23
  163:20 181:10
numerous 54:16
  150:16 158:22
nurse 67:25
N.W 1:13 2:5,15

───────

O

O 5:1
oath 11:1,4,9
object 9:20
objection 9:23 84:4
  113:21 231:6
  236:10 247:16,21
  249:5 250:18
  251:2,20
Objections 9:19,21
observe 173:17,20
observed 43:11
  75:6 173:13
obtained 27:23
obvious 100:25
  101:3
occasion 42:2 155:6
occasions 254:25
occupancy 92:14
  252:8
occur 12:8 37:7
  38:22,25 43:14

50:18 64:1 67:6
  123:7 130:1
occurred 14:10
  18:21,24 37:10
  47:22 50:20 58:4
  150:13,14 178:15
  183:5,8 198:6
occurring 201:18
  229:21 231:21,24
  238:25 244:22
occurs 222:6
October 54:8
odd 103:24 129:8
  129:18 164:19
Ofc 4:22
offense 192:2,16
offenses 11:14,17
  11:20
offer 107:5
offered 102:19
offhand 64:22
  174:1
office 2:10 14:1
  16:13 17:24 20:21
  20:21 22:25 23:4
  23:4,10,17,20,22
  24:1,2,6,7,20,21
  46:2,18 52:7,15
  52:20 63:10,13
  80:16 81:9 102:11
  102:11 108:19
  109:1,1,2,2,9
  110:18 116:6
  134:24 135:3
  137:8,15,16 140:3
  140:12 142:10,11
  142:11,12,15
  162:19 163:12,13
  166:5,10,20 167:6
  168:9 169:20
  170:11 176:5,9,12
  180:14 182:21,22
  183:1,2,12 195:8
  195:12,15 196:17
  201:14,16 204:16
  204:19,22 214:25

215:1,14 219:17
  225:7 226:2,6,12
  227:18 241:13,21
  245:16,22 247:4
  255:12 257:14
  258:24 259:9,14
  259:25 260:3,14
  260:19
officer 4:15 6:4
  18:7,11,14 38:8
  65:21 78:12,15
  92:1 96:12,19,23
  125:9 130:12
  148:4 157:11
  159:16 161:9
  165:5,10,16
  168:25 171:16
  172:24 173:1,7
  174:24 176:1,10
  176:20,25 178:7
  184:17,20 185:22
  190:1 193:12,13
  200:4 204:19
  212:9 220:11
  223:1,5,9 225:6
  225:10,14,21
  230:23 231:23
  232:5 241:12
  242:16 246:24
  247:8 248:3
  250:17 262:24
officers 20:3 42:14
  42:19 44:12,21
  45:3 49:15,17
  52:18 62:7 65:14
  66:10,11 70:22
  71:13 74:16,21
  75:10,20,23 77:24
  78:1,2,5,9 79:12
  90:15,21,22 91:10
  91:15 93:20 96:3
  97:20 98:16,25
  99:20 112:8
  121:19,23 122:2,8
  127:2 130:17
  151:5,10,13

154:22 155:2
  158:21,22 159:9
  162:14 171:13
  172:16,19 173:14
  173:17 179:7
  187:4 223:12,18
  230:8,19,24
  231:14 232:19
  238:17 240:10
  241:20 246:11
  254:25
offices 1:13 14:5,15
  81:8 109:5 116:12
  116:13
official 20:2 26:12
  26:16,21 177:8
  192:5
officials 174:4,9
  229:6 237:12
OFO 42:14 46:2,17
  52:8 63:5,8 65:21
  81:9,13 176:13,16
  176:19 204:20
oh 21:8 30:2 46:23
  144:13 146:21
  168:20 177:14
  192:9 213:18
  240:21 241:1
OIG 17:23,25 18:1
  18:4 163:20
  170:17,25 178:24
  179:1 182:12
  183:12,14 188:7
  191:7 195:4,22
  196:19 197:16
  199:25 203:2
  204:8,17,18 210:8
  214:1,4 215:3
  219:23 227:3
  228:14,16 229:13
  230:8,12 231:17
  231:20,23 232:23
  233:4,23 234:2,6
  235:2 237:19,21
  240:9 243:6 245:7
  247:23 248:1



262:16
**OIG's** 229:23
**okay** 9:2,17,18
  12:17 21:8 36:5
  40:8 49:16,21
  51:6,9 53:5 54:3,9
  56:4,13 57:21
  59:12 61:16,19
  63:19 70:6 71:20
  71:22 73:13 80:10
  82:1,8 85:12 86:3
  86:7 88:8 89:1
  93:16 95:19 96:9
  96:11,20 97:1
  101:12 102:18
  103:21 107:9,25
  114:22 119:19
  121:4 123:15
  131:7 134:5,17
  137:5 144:23
  151:23 154:16
  166:19 168:6,7
  169:24 175:5
  181:2 183:16
  184:2 185:11
  199:21 200:13
  203:5,17,18 206:1
  207:21 212:1
  213:5,13 219:15
  221:6 222:19
  224:5 226:23
  228:18 238:4,15
  239:4,13 240:7
  246:11 253:15
  255:9 256:4 258:8
  258:19 260:18
  263:18
**once** 98:11 127:4,8
  196:16
**ones** 167:3 174:2
  198:19,19
**one-page** 80:4
  114:23 122:12
  147:6 156:24
  222:10,15
**on-line** 33:10,19

**on-site** 67:25
**open** 38:8 236:18
  237:1,1,7
**operate** 93:10
**operating** 4:15
  66:14,16,22 67:3
  67:11 74:17 93:9
  141:8 143:7
  153:21 154:4
  157:10,11 158:1
  158:15 159:8
  162:11 259:21
  260:4,10,25
**operating-hour**
  221:23
**Operation** 63:9
**operational** 94:9
  146:6,11 156:8,14
  156:14 221:17
  258:10 259:22
  260:11 261:1
**operationally** 93:12
  105:4 117:6
**operations** 63:10
  63:13,15 80:16
  81:3,4,4,5 82:18
  102:11 116:9
  117:14 118:1
  146:17,20 162:20
  176:13 204:20
  256:15,19,22
  257:4,7,10,16
  258:14
**opinion** 146:24
  172:14 248:3
**opportunity** 8:5
**opposed** 163:12
**opposites** 183:14
**options** 139:8
**oral** 35:18 38:17,19
  47:9,13,14,19
  50:6 163:6 165:19
  243:19 254:9,18
**orally** 47:18 50:7
  216:1
**order** 4:5 21:20

22:1,2,7 45:21
  47:7 51:24 55:18
  56:21 75:3,7,23
  75:25 76:2,8,11
  76:15,18,25 77:6
  77:11 78:16 85:6
  88:22 100:4 150:3
  158:1
**ordered** 46:19
**orderly** 82:9 86:9
  86:12,13,14,20
  122:17,20 148:24
  149:21,24 150:2,6
  150:11 152:24
  153:17 158:2
  160:12
**orders** 44:14,17
  46:1 51:21 75:13
  75:20 246:9,12
**organization**
  108:12
**origin** 36:11
**Ortega** 44:23,24
  45:1,2,11,16
  148:14,16 149:23
  150:5,9 155:23
**Ortega's** 44:25
  149:9
**OSC** 22:24 169:18
  169:20 170:1,5,8
  171:3 179:18
  181:4,4 184:25
  185:10,13 187:22
  188:1 189:14
  191:7,8 196:17
  201:5,6 204:22
  210:17 215:3
  216:4 217:22,25
  218:3,6 219:8,13
  219:17
**OSC's** 218:12
**Otay** 26:24 37:11
  37:21 38:13,22
  40:20 41:12,18
  48:5 49:11 50:5
  53:8,10,12,22

54:3,13,25 58:6
  70:14,16,21,24
  83:19 95:14,15,18
  97:25 103:2,17
  110:14 111:4,9
  112:10 123:13
  127:14,21 128:4,6
  128:13 130:1,8,12
  130:12 145:18,20
  145:24 146:6
  236:5 249:25
  250:11 261:18,20
  262:5
**OTM** 73:20,22
**Otro** 1:3 266:1
**outbreaks** 253:8
**outcome** 264:14
**outline** 143:21
**outside** 16:3,13
  31:22 44:6 69:19
  129:15,19 130:6
**overcrowded** 235:9
  235:23
**overcrowding**
  234:14 235:3
  236:8
**overnights** 127:18
  127:18
**overtime** 37:19
**Owen** 80:15,19,21

_____

**P**

**P** 2:1,1 5:1
**pace** 53:16 54:18
**Pacific** 201:25
  202:18
**padded** 251:8
**page** 3:5 4:2 7:5,6,9
  7:12 102:4,5,5,22
  109:10,13 114:16
  135:3 169:23
  185:15 188:11,12
  201:13 205:21
  213:11 214:8,9
  221:7 228:13,15
  228:17,18,19,25

237:19 238:5
  240:7,8 241:3
  242:25 243:1,24
  243:25 244:2
  245:8,9,11 266:5
**pages** 15:16,17,20
  15:22 16:2,23,23
  16:24 21:14 265:4
**PALMS** 33:9,13,18
  33:24 34:10,17
  50:21,23
**paper** 59:12
**paperwork** 163:1,4
  163:17
**paragraph** 82:4
  98:4 102:22,23
  106:6,7 122:18,19
  148:22,23 154:3
  159:12 184:15,17
  185:16,16 186:24
  187:16,19 205:20
  205:21 207:21
  208:18 213:14,16
  214:9,14 222:15
  230:17 234:11
  236:14 237:11
  240:14,18,25
  243:2,3 249:20,23
  250:6
**parlance** 47:6
**paroled** 68:10
**part** 37:25 39:4
  57:4 61:24 70:23
  79:11,14 145:6,25
  146:4 148:17
  214:10 237:21
  263:6
**participate** 15:4,7
**particular** 17:20
  163:11 255:25
**parties** 264:13
**parts** 93:16 151:3
  205:18
**party** 12:1
**Paso** 81:3 109:1
  137:12 142:10



257:12
pass 19:6,11 34:18
  84:22 85:1,4
  146:10 258:2
passed 34:22 89:7
passport 95:1
pass/fail 34:20
pat 35:17 128:19
Patrick 193:11
Patrol 73:14
pay 29:16 53:18
  55:3,5
paying 34:10
PDF 169:15
pedestrian 39:24
  40:1 133:18
pedestrians 40:14
  40:17 41:15,18
  44:8
PedWest 154:7
  222:1
pen 237:25
pending 10:7 58:22
  185:19
people 16:6,7 19:14
  37:17 40:2 44:7
  48:20,20,24 49:19
  50:8 55:18 61:3,3
  61:25 62:5 67:24
  68:21 77:21 85:23
  86:2,3 88:21 89:6
  89:7,9,9,12,15
  92:12,21 94:15
  95:4,7 99:25
  100:4 107:2
  111:15 112:11,20
  112:24 113:2,12
  117:10 118:18
  119:19,24 120:2
  121:15 124:14
  127:3,5 128:11,19
  128:25 136:10,17
  138:2,6,12 139:4
  139:9 140:18
  141:2 143:14
  172:13 192:24

197:10 213:8
  224:1,3,5,5,8,11
  224:25 247:4
  251:7,9,11,15
  252:1,6
Pepsi 28:24,25 29:3
  29:8
percent 50:24
  104:18 110:23
  116:24 118:14
  135:14 136:3
  137:23 138:14
  140:20 141:7
  142:21 143:6
  234:24 255:13,18
  256:12 259:2,17
  259:21 260:5,10
  260:20,25
percentage 34:23
  104:22 105:5,22
  109:22 113:9
  116:7,23 117:3,23
  135:8
perform 37:2
period 10:11 24:5,9
  24:18 36:10 43:17
  90:21 91:6 127:25
  144:9 145:10
  191:14 262:6
periods 90:20
permanent 84:11
  84:17 88:2
permits 123:9
permitting 98:11
persecution 51:3
  185:21
person 29:2 50:21
  132:11 173:5
  190:14 197:12
  204:7 252:4,5
personal 11:24
  23:9,11,12,14,25
  24:6,19 25:6,22
  27:15 57:7,11
  181:20 199:2
  202:9

personally 175:16
  178:1 179:9 264:5
personnel 147:18
  188:23 221:12,15
  226:16 228:6
perspective 172:21
  192:19
phone 12:12,15
  22:14,16,18 23:5
  23:9,11 25:16
  27:18 57:7,12
  163:20 166:11
  181:12,15,18,18
  181:19,21 182:5
  191:3 196:22
  197:1,19 198:15
  198:20 199:1,2,8
  202:9 204:2,5,8
  205:1,6,11,14
  210:8,16,22 211:5
  212:13,18,24
  217:8
phrase 82:21,24
  83:7 86:9,12,14
  86:20,22 88:8,23
  93:18 115:12
  122:16,20 123:1
  149:20,24 150:6
  152:16,20 153:4
  160:4,8 208:3,7,9
phrases 150:17
  160:11
physical 69:23
  93:11,19,25 96:1
  173:1,8
physically 67:17
  238:17
pick 93:16
piece 59:12
place 13:25 37:22
  101:23 233:11,20
  264:6
plaintiff 12:2
Plaintiffs 1:4 2:3
Plaintiff's 4:3 7:1
play 263:3

played 245:22
please 5:11 8:25 9:9
  9:14 22:3 80:8
  101:17 107:22
  114:19 134:14
  137:2 139:21
  141:25 147:9
  157:1 168:3
  183:24 199:19
  203:14 211:23
  222:17 245:8
POE 5:22,24 6:3
  43:2 52:3 169:15
  206:12 207:2
POEs 103:2 249:25
  250:11
point 8:24 9:13
  58:9 59:5 60:14
  60:21 62:12 73:24
  74:12 91:18
  143:21 145:11
  146:11 152:13
  162:18 182:20,25
  185:19 190:20
pointing 159:2
points 185:3,6,12
  203:16 238:8,12
police 132:9
policies 198:6
policy 20:2 46:14
  46:16 66:19 79:9
  101:4 113:4
  118:22 122:11
  125:18 136:9
  138:22 141:15
  143:18 149:7
  153:16 155:20,24
  156:2,5,15 167:18
  172:15,18,22
  175:9 177:16,21
  179:13 182:9
  188:4 206:21
  218:24 220:19,22
  223:22 225:12,15
  229:5,13,17 237:5
  245:23 246:2

253:7,16,17,20
  254:17 262:10
population 89:11
port 4:25 5:20,21
  18:21 19:3,7,11
  20:8,13,16 26:5
  26:15,18,19,25
  37:9,21 38:13
  41:21,23 44:1,19
  44:20 45:2,3,7,11
  45:13,15,21,25
  46:13 47:23 50:11
  51:15,19 52:18,24
  53:12,17,22 54:4
  56:18,21 63:20,21
  63:23,24 64:1,3,6
  64:7,9,17,24
  65:25 66:3,18,19
  66:19,23,24 70:25
  71:2 74:1 76:22
  77:5,7,9 82:10
  83:19 85:7,14,19
  86:1,23 87:12,15
  87:18 88:3,22
  89:16,19,23 90:1
  90:4,15 92:9,12
  93:9 94:15,20
  96:8 97:17 98:10
  98:11,17,19 99:16
  99:20,22 100:22
  101:21 103:2,8,13
  104:12,18 105:5,9
  105:16,20,23
  106:2 107:3
  109:15 110:13,20
  111:4,8,20,23
  112:10,24 113:1,9
  113:19 114:8
  116:7,9 117:3,14
  118:1,6,12 119:16
  120:18,23,23
  121:10,11,19
  122:22 123:2,3,4
  124:5,12,17 125:9
  126:2,4 127:10,15
  127:24 128:1,4,6



128:8,10 129:19
133:12 135:7,11
135:21 136:14
138:4,11,19 139:1
139:3 140:17
141:1,11 142:17
143:1,3,13 144:11
145:5,6,21 146:7
147:18,21 148:4
148:17,19,25
149:9,23 150:5,9
150:21 152:20
153:1,5,7,13,18
153:20 154:17,21
155:1,6,10,23
158:3,6 160:15,22
161:2,8,11,23
162:20 164:7
166:2 171:6,13
173:25 174:15,18
174:22 175:11,14
175:20,25 184:21
185:17 187:6
190:13 191:4,25
192:25 195:4,8,22
197:22 201:18
204:19 207:19
212:9 215:25
220:8 223:2,19,22
224:1 225:3
226:15 228:5
229:6 232:6
234:21,24 235:5,8
235:22,25 236:4
236:16,25 238:18
238:20 245:14,16
246:1,7,10 248:12
248:21 249:2,3
251:18 252:17,20
252:25 253:9,24
254:8,10 256:8,15
256:18,22,22,24
257:4,7,10,15,16
258:9,14,24 259:5
259:15,20 260:4,9
260:24 261:4,14

262:11,14
**portion** 140:12,13
142:15
**ports** 33:2 48:1,3,7
58:3,5 70:2,12,20
76:23 85:15 87:2
98:4,8 103:17,18
103:25 110:4,5,17
111:8 113:13
116:16,17 178:21
186:6 215:8
223:14 229:9
231:1 234:12,14
235:4 236:18
237:7,13 240:12
258:16
**port's** 82:13 92:3
149:3 230:19
232:20
**position** 69:19 71:3
71:6 91:2,3
121:18 122:8
136:15 164:2
166:22 172:1
199:7
**positions** 121:21,24
133:22 165:3
**possibility** 96:15,17
189:19
**possible** 48:12
201:17
**possibly** 36:23 67:6
68:15
**post** 79:5,8
**posted** 39:17,19
40:14,21,23 41:1
41:13,23 42:1,4
45:7 54:4 70:22
71:13 74:11 78:2
78:4 90:15 91:11
96:3 97:25 99:15
112:2
**posting** 53:7
**Poverty** 2:15,19
**practice** 154:10
222:6 223:25

230:20 232:20
234:13 236:16,22
241:7
**practices** 75:11,15
188:23
**prefilled** 60:4
**prefilled-out** 60:23
**preparation** 21:2
**prepare** 13:9 14:23
**prescribe** 67:25
**presence** 153:8,14
**present** 2:23 6:2,10
6:15 10:12 14:25
27:7 73:25 238:25
240:10 261:15
**presenting** 133:3,8
**presently** 5:17
**presents** 130:19,21
**preserve** 25:2
**president** 179:25
**pretend** 240:5
**pretty** 8:23 18:8
19:12 28:7 29:16
36:11 42:15 77:14
126:12,13,14
152:12 167:2
172:7 179:17
192:14 197:20
213:9
**prevent** 190:23
234:14 235:3
236:8 255:17
**prevented** 191:13
**preventing** 187:6
**primary** 39:19,22
39:24 40:23 41:5
42:1 43:24 57:23
57:24 58:8 59:5
60:14 62:12,25
74:11 95:5 122:4
122:9 132:6,24
133:9,21,22
145:11 146:10
175:2,4 177:5
**prior** 15:10,25
28:22 29:23 81:22

125:17 140:14
152:25 153:5,11
153:20 156:15
157:4 159:22
180:13 194:20
226:2
**probably** 12:4
21:17 55:9 151:15
151:24 171:8
180:9 186:18,19
201:4,5 226:19
**problem** 153:25
156:15
**problems** 146:6,12
153:19
**procedure** 4:15
35:1,10 50:10
62:13,24 66:14,17
66:20,23 67:3
153:21 157:10,12
158:1,15 159:8
**procedures** 67:12
67:12 74:13,18
162:11
**proceeding** 8:12
**proceedings** 185:23
264:11
**process** 17:16,17,21
35:17,21,22,22,24
36:6,8,12,16,18
37:2,13 38:16
39:8 40:8 43:5
48:18,19 49:2,17
49:23 50:9 52:3
58:10 60:5 68:23
69:5 77:16 98:12
99:2,9 103:3
112:25 130:17
131:22 155:14
186:9,13,14
192:12 249:25
**processed** 39:12,14
40:18 41:19 42:8
43:11 98:22 99:6
129:20 130:3,8,15
138:6 155:6

161:24 186:6,22
256:24
**processes** 35:25
48:17
**processing** 35:2,11
42:11,20,22 44:1
49:18 50:8 52:4,8
52:10,12,14,20
75:12 82:9,13
86:9,12,15,20
92:4,7 98:9 99:16
112:4 122:17,20
122:24 128:11
132:19,23 133:2,7
148:24 149:3,21
149:24 150:2,7,11
152:24,25 153:17
154:6 158:2,6
160:12 221:25
**product** 224:22,22
**Professional** 1:15
**program** 84:19
204:17
**Progreso** 257:18
**prohibited** 188:22
**promoted** 19:22
190:10,15,18,20
190:24 191:14
**promotion** 19:21
**pronounced** 101:15
**proper** 35:3,10,11
112:9 118:5
130:18 132:4,19
132:23 133:3,8
163:16
**propounded** 265:6
**prosecute** 69:14
**prospects** 194:5,12
194:16
**protect** 188:21
**Protection** 6:4,6
10:20 204:20
226:16 228:6
229:5 244:10
**protective** 4:5
21:20,25 22:1,7



protocol 207:24
208:13
provide 120:19
219:9,13
provided 8:18
31:21 187:22
195:18 207:23
213:15,18,20
225:7,11
provider 22:16
provides 126:20
public 1:15 5:5
80:6 82:11 83:11
94:25 149:1
153:19 158:4
264:1,3,19 265:18
pull 255:6
punch 172:9,9
purport 238:8
purpose 102:16
purposes 22:19
25:16,23 26:2
27:10 71:4 250:9
pursuant 187:17,19
243:19
put 21:23 29:3 49:5
54:14,15 60:19
61:1,11,15 80:2
85:10 86:3 89:11
101:12 107:13
134:10 136:23
139:16 141:21
147:6 172:18
190:21,22 199:17
222:13 252:1,6
256:1
P-A-L-M-S 33:15
p.m 108:2 114:25
134:21 137:7
140:1 142:5
202:14 208:25
210:12 263:21
P.O 2:11,20

---

Q

quantities 224:15

quantity 224:18
quarrel 239:10
question 9:14,16,23
9:24 10:7 12:22
17:6 18:10 21:3
66:7 67:1 83:7
85:9 86:19 88:23
114:6,6 164:18
182:24 196:5,10
215:12 231:11
236:12 249:8
250:21,24 263:9
questioning 144:8
questions 9:5,13
10:11 32:16,19,20
60:12 82:3 85:24
87:8 119:7 151:11
151:14,16,23,24
152:8 159:9 182:2
204:5 209:21
241:13 245:1
246:15,17,25
247:2 252:10
262:9,21 263:8,19
265:6
queue 72:10,17,24
108:19 115:8
116:8 134:24
137:8 140:4
232:10 233:25
234:3,7,13,16,19
235:2 236:7 255:8
256:5 258:19
259:9,25 260:14
262:25
quick 55:8
quickly 8:24
126:14 183:9
quiet 242:6
quite 206:20
quote 102:25 154:4
158:1
quotes 208:4

---

R

R 2:1 5:1

racks 29:4,4
raise 179:12
raised 179:15
201:17 207:23
ran 66:20
random 85:24
Randy 115:2,5
rank 53:20 56:2,9
rare 97:4
reach 163:11 166:5
reached 166:10,19
181:4
reaching 202:3
react 119:16
reaction 119:22
167:9
read 15:25 16:23
20:25 21:12 59:23
82:15 86:17 93:14
94:6 98:13 103:5
106:14 110:5
116:6,9 134:25
137:9 149:4 152:5
154:8 158:8
159:19 184:22
185:5,8,24 187:9
187:24 188:24
201:19 202:24
204:23 206:4,13
207:3 208:1 209:4
209:23 210:19
212:10 214:2,18
221:20 222:2
223:15 226:19
228:7 229:11
230:4,21,23
237:15 238:21
241:9 243:9
245:19 250:3,6,14
250:25 265:4
reading 16:24
50:21 248:2
250:22 263:22
reads 82:8 98:8
102:25 109:15
110:4 152:2

159:15 170:8
187:3 188:20
195:3 206:1 209:2
214:14 216:20
221:15,22 223:12
229:3 230:17
237:11 238:16
240:9 245:14
249:23
ready 94:24
ready-lane 95:2
real 72:13 253:2
reality 237:1
really 16:9 30:18
39:11 64:22
127:16 151:3
160:25 164:15,25
166:3 167:4
194:10 196:8
204:11 213:3
251:24
realtime 198:10
reason 11:11 29:17
70:18 192:20
199:4 239:10
246:4 259:6 266:5
reasons 43:25
54:16 71:23
156:14,14 236:3
260:11
REBECCA 2:19
rebecca.cassler@...
2:21
recall 8:7 20:20
24:4 31:8,9,10
32:15,20 35:4
36:3 37:6,8 38:10
38:14 47:16,20
50:14,19 51:4,9
51:17 54:6 74:6
77:20,21 78:12,15
98:1 150:12,24,25
151:11,12,13
153:6,12 166:17
183:4 184:11
188:5 192:10

197:7 211:7,8
217:25 218:2
219:22 220:23,24
220:25 225:17
248:22
receive 15:10,15
29:23 32:23 36:17
37:24 38:3,18
39:2,9,11 48:23
49:8 74:18,23
75:21,23 152:11
184:8 189:22
received 30:8 32:2
33:3,6 35:9 36:1,7
38:6,11 46:1
47:11 48:7 49:11
50:5,9,16 51:1
85:6 88:20 148:3
148:6,8,9 157:18
157:21 161:25
168:24 169:5
186:2,5,8 196:11
200:2,7,8 254:9
254:16
receives 154:17
receiving 47:16
51:21
recess 55:11 79:24
119:1 144:1
215:18 245:2
246:21
recognize 227:1
recollection 127:9
170:10 195:7
202:2,21 203:1
204:25 205:5,10
205:13 210:25
211:13 212:17,24
213:2 217:2
214:12 249:23
recommend 230:2
230:5,14
recommendations
230:7,9 247:25
recommends
188:20



**record** 22:4 55:12
79:23,25 101:18
107:23 119:2
137:3 142:1
143:24 144:2
147:10 168:4
177:24 178:5,8,11
184:1 190:23
191:18 211:24
215:19 226:22
245:3 253:21
254:5 264:11
**recorded** 264:10
**recordkeeping**
219:2
**records** 178:14,19
219:4 237:12
254:22
**redacted** 80:5
**redirect** 52:19 73:2
84:1,7,10 85:3,7
85:13,15 87:20
88:5,21 90:7
131:5,11 154:5
155:10 206:11
221:24 223:13
230:25 252:12
**redirected** 20:12
113:1 118:7,17
139:2 154:11
232:11 240:11
**redirecting** 72:9
74:9 83:24 118:2
136:10 243:8
**redirects** 131:18
214:15
**refer** 10:15 58:14
115:15 253:17,20
254:1,4,19,21
**reference** 75:12
92:3 95:20 125:23
153:10 212:13
216:10 217:22
223:1
**referencing** 189:16
**referral** 58:14 59:3

59:7,10,20 60:4
60:19 155:3
201:15
**referred** 58:25 66:2
92:24 106:20
108:12 111:9,15
111:24 112:18
136:6 138:18
139:3 141:11
143:10,13 183:1
196:16 201:15
**referred-to** 250:24
**referring** 17:18
18:12 22:8 23:8
43:17 55:22 60:9
112:9 182:21
198:1 201:12
205:7 206:7
**refers** 236:17
**reflected** 140:6
**refresh** 16:24 17:10
17:13 18:4 170:10
195:7 202:2,21
203:1 204:25
205:9,13 210:25
211:12 212:17,23
213:2 217:2
249:22
**refreshed** 17:21
18:9,16
**regard** 201:17
217:13
**regarding** 21:10
31:6,22 32:10
33:4 35:10 36:8
36:17 38:4,18
42:15 47:12 50:25
51:14,18 162:20
169:14 177:25
182:4,7,11 186:2
186:5 196:25
204:21 205:14
210:17 215:8,13
219:4 220:19,22
225:11,15 241:7
254:17

**regardless** 87:13
219:12
**Registered** 1:15
**regular** 15:13 95:1
144:21 157:18
**regulation** 187:23
195:19
**regulations** 31:16
185:17
**relate** 10:11
**related** 31:1,15
32:5,16,24 79:12
198:6 209:21
215:24 218:23
219:2 248:20
**relatively** 154:17
183:9
**relaying** 214:4
**release** 184:18
**relevant** 209:17
**remedied** 126:24
127:11
**remember** 12:13
21:18 24:12 31:18
38:6 55:25 71:24
95:17 97:23
128:17 150:15,17
151:25 170:20
171:18 173:23
174:25 179:23
210:9 211:4 213:3
239:2,12
**remembered** 166:9
**remind** 231:8
**reminding** 61:4
**removal** 36:15 38:4
38:12 49:1,5
185:18,23
**Rene** 45:1,2,11,15
148:13,16
**rep** 180:1,3,6 220:1
**repeat** 85:9 182:24
215:2
**repeated** 160:1
**replies** 202:16
**report** 4:23 108:19

115:21,24 134:24
137:8 140:4
169:18,25 170:4,8
170:11 178:24,25
188:10 226:6
227:3,9,14,20
228:1,3,9 230:6
234:3,7 237:20,21
242:25 243:25
244:3,5,17 245:7
247:23,25 248:1
255:8 258:20
259:9 260:1,15
**reported** 34:17
171:3
**reporter** 1:15 9:7
250:25
**REPORTER/NO...**
264:1
**reports** 232:10
233:25 234:8,17
234:19 262:25
263:4,12
**represent** 80:4
191:23
**represented** 12:18
**representing** 12:25
15:12 236:18
259:16 260:5,20
**represents** 179:6
259:1
**reprimand** 19:19
19:20 195:1,3,25
196:11 213:7
216:11 217:15
**reprimanded**
241:18
**reprisals** 180:18,21
180:24
**request** 10:6
**requested** 263:22
**required** 34:2,4
**resident** 88:2
**residents** 84:11,17
**resources** 98:12
**respect** 18:17 23:20

26:24 35:1 97:21
127:15 160:9
172:1
**responded** 202:7
**response** 131:25
247:1
**responsibilities**
64:16
**responsible** 63:25
65:14
**restraining** 255:21
**restroom** 118:23
**result** 20:20 122:7
**results** 34:13
**retaliated** 189:2
190:14
**retaliation** 180:18
180:20,24 188:16
188:22 196:11
199:9 218:1,16,23
248:17
**retaliatory** 196:14
**return** 86:1 173:5
208:21 213:8
224:22
**returned** 36:10
76:5 175:1 229:7
240:10
**returning** 185:22
243:7
**review** 8:5 80:8
101:17 107:22
114:19 134:14
137:2 139:21
141:25 147:9
157:1 168:3
183:24 185:19
189:8,20,22
199:19 211:23
222:17 226:17
227:4,9 238:11
**reviewed** 18:4
22:10 157:3,4
226:24 232:10
234:16,20
**reviewing** 17:10



20:20 82:23
134:15,18 139:23
183:25 199:20
226:21
**Reviews** 168:9
199:24 204:16
**right** 6:13 7:20 9:20
12:25 14:6,11,17
19:3 20:13,17
24:22 27:10 30:10
30:13,17 32:12,21
33:14 35:6 36:23
40:18 41:19,24
42:8 44:3,10,15
45:4 50:14 51:16
55:17 59:8 63:12
63:17 67:15 68:16
69:19,24 71:15
72:5 74:14,19
75:25 76:8 80:2
81:10,14,24 82:18
83:16 87:5,15,18
87:21 92:1 93:2,5
94:1 95:5 96:14
96:24 97:6,12,17
98:20,23 99:23
100:1,11,23 101:5
102:20 103:9,19
105:13,16,23
107:13 109:16,18
109:21,24 110:3,9
112:12,14,16
114:6,9 115:8,19
116:6 117:24
118:22 121:12
122:5,9 127:12
129:24 131:12,15
134:1,10 138:9
139:25 140:9
142:4,7 145:7
146:15 147:18
148:11,19 150:14
151:12 153:22,25
155:15 156:16,22
157:23 162:18
167:13,24 180:10

181:5 183:20
184:12 186:15
187:8 190:25
191:11,14 194:13
194:17 196:19
198:10 199:22
200:17 202:10
203:10 206:18
211:19 212:2
214:22 222:13
224:25 225:1,4,19
226:5,24 227:9,15
228:24,25 229:24
230:10 231:1,5,15
231:17 235:18,23
236:9,23 237:2,5
237:8 239:18
240:24 242:8,13
242:23 244:24
246:13 247:8
249:16,20 252:11
253:13 255:1,11
255:13 258:17
259:13 261:7,21
262:7,18 263:1
**right-hand** 107:19
**Rio** 257:20 258:5
**risk** 172:19 242:21
**road** 6:11 249:12
**role** 220:7 245:22
263:3
**Roma** 257:23
**Romero** 192:9
**room** 14:25 246:18
251:7 252:3,7
**rooms** 250:8,11
251:6,11,13,16,16
251:25,25 255:1
**rough** 121:8
**roughly** 53:3 104:4
120:25 183:4
**RPR** 264:19
**rule** 9:21 187:23
195:19
**rules** 8:23,25
**run** 66:20

**running** 35:22,23
37:12 44:5 48:20
50:8 112:6 124:7
124:14
**runs** 168:12
**rush** 49:4,9 124:10
**rushed** 124:17,25
125:4,8,14
**rushing** 44:7 48:20
48:24 125:19
**Ryan** 114:23

**S**

**S** 2:1 4:1 5:1
**safe** 82:10 99:12
148:25 153:10,12
153:18 158:3
160:12,24 253:24
**safety** 71:23 87:14
87:18 105:3
171:23,25 172:16
179:18
**San** 6:16 20:12
26:18,19 39:16,17
39:20 40:13 46:1
46:18 48:5 52:2,7
52:10,15,20 53:1
53:2,6,9 55:1 58:6
58:12 60:9 64:12
70:14,16,21 71:2
71:16 81:5 83:19
94:17 97:20,23,24
102:10 103:2,16
104:4,12,18,22
109:2,9 110:14,18
110:20 111:10,16
111:24 112:11,18
112:21 116:19
117:3,11 118:2,7
118:18 120:20,22
121:11 123:13
126:4 127:10,20
127:24 128:8,15
128:24 129:10,19
129:21 131:5
135:3,11 136:7,11

136:16 137:12,14
137:16,20,23
138:2,4,19 139:3
140:11,17,20
141:12 142:11,14
142:17 143:1,10
143:14 144:11
145:5 146:5 154:7
154:11 155:11
176:4,8 206:12
214:15 221:25
232:11 236:5
238:20 245:16,22
249:25 250:11
251:5 255:1,12,12
255:17,22 256:2,8
256:19 257:9
258:9,23,24 259:5
259:14,15,20
260:2,4,9,18,19
260:24 261:3,14
**sanitary** 82:11 88:9
88:14,16,18,22,24
89:4,8 125:24
148:25 153:11,13
153:18 158:3
160:13,24 253:24
**Saturday** 114:24
235:18
**saw** 81:23 121:14
127:11 158:16
252:24
**saying** 16:8 119:22
156:9,10 162:10
192:7 197:25
202:8,17 236:25
**says** 83:14 86:8
90:11 93:9 102:9
103:15 104:21
105:18 108:1,5
109:18 110:23
111:5,7,9,12
114:7 115:24
117:15 118:2
135:2,17 137:20
138:17 140:18

141:10 153:16
154:4 156:7
169:25 188:15
213:20 222:23
228:14 230:1
231:17 232:18
237:7 238:24
244:2 247:24
250:7 255:12
256:9,12 258:13
258:16
**scabies** 89:6,10,16
90:1 127:7
**scan** 203:14
**Scavo** 219:25 220:4
220:13,15,18,21
**Scavo's** 220:7
**science** 28:16
**scope** 165:2
**Scott** 219:25 220:4
**seal** 264:15
**search** 25:12
153:24
**season** 240:1
**seasons** 240:5
**second** 21:17 43:7
43:10 48:15 56:24
57:4 85:11 98:3
106:5 122:12
135:3 154:3 159:4
169:17 184:14
185:15 195:11
208:21 214:13
221:7 223:11
228:13 234:11
**secondary** 40:11,14
40:17 41:1,5,6,13
41:18 42:4 58:14
58:17,22,23,25
62:20 122:4,9
155:3
**second-line** 64:19
64:25 65:1,2,5,7
**secretary** 184:6
195:16 244:6,7,8
**section** 137:16



187:20 188:15,19
221:11,14 229:3
230:1 243:5
258:24 259:13
260:3,19
**secure** 67:20,20
128:2,6
**secured** 172:8
**security** 2:25 10:16
71:4 82:10 86:23
87:2 88:2 102:10
123:2,4,21 124:1
124:5,12 148:25
153:5,6,18 158:2
160:12,22 226:13
244:6,7,8 253:24
**see** 7:7,9 30:23 38:9
54:24 58:24 60:25
62:21 65:9 71:5
71:11 80:13,17,25
81:19 82:6 83:1
83:11 86:9,23
88:11 90:12 92:4
94:12 95:19,21
98:6 100:15 102:6
102:23 104:11,17
104:21 108:3,6,20
109:9 110:1,15
115:3 117:18
120:1,11,11,11,14
122:20 127:23
135:4 139:19
159:13 166:9
184:15 187:1,17
188:12,16 194:23
195:1,5 200:14
203:24 205:22
208:24 210:12
211:12 213:16,19
214:11 216:11
221:8,11 222:24
224:19,24 228:15
228:19,22 230:1
238:4 240:12,15
240:24 243:3
244:3 245:12

253:19,22 256:6
259:15
**seek** 58:10 144:10
161:7,10 180:14
187:8 244:18
**seeker** 18:19 19:6
19:10 20:16 43:5
43:12 47:4 85:19
87:13 96:11
119:15 124:19,22
124:25 125:4,8,11
128:1,5,9 129:20
132:5 138:25
145:10 153:8,14
155:3 172:24
173:11 177:24
178:2,4,8 186:13
186:21 207:12,18
249:3,13 252:15
254:5
**seekers** 19:13 20:4
20:7,11 44:1,13
44:18,22 45:4,8
45:22 46:3,15,19
47:1,12,17 49:18
52:19 74:9 76:3,5
76:21 77:7,16
85:8,10 86:4 87:1
89:12,15,18 91:16
91:23 94:7 97:2
97:15 98:22 99:2
99:5,10,17,20
104:5,15,19
118:11 124:2,6,10
125:14,19,19
128:10,24 130:2,7
130:13,14 135:25
136:14 141:4
145:5,25 146:3,9
154:6,11 155:7,10
156:7 163:7 171:6
173:14,24 174:5
174:11,12,24
175:7,12,15,21
176:2,5,10,13,17
176:21,25 177:10

177:17,21 186:5
186:10 187:5,6
206:10,16 208:17
213:9 214:5,22
220:16 221:16,24
222:5,7 223:25
224:13 225:2
231:14 236:17,23
237:2 238:18,19
240:10 243:8,12
245:16 251:19
252:19 254:10
**seeking** 44:9
143:13 154:18
161:23 184:20
223:13 224:8
230:25
**seen** 7:3 43:4 68:5
81:16 82:2 102:2
120:12,13 173:7
178:11 203:19
212:2 220:15
222:20 248:1
**seizure** 217:10
**send** 23:21 24:1,6
40:11 62:19 155:3
**sending** 24:18
**senior** 46:2 74:23
75:4,8,13 83:2
86:18 88:21 105:9
176:23 177:16
204:17
**sense** 26:7 93:18
143:23
**sent** 17:23,25 18:1
23:10,12,17 52:23
69:9 108:2 114:24
115:2 134:21
136:16 142:4
148:13 166:14
168:24 169:4
195:15 200:2,22
200:24 202:12,13
216:14
**sentence** 86:8 88:9
90:10 93:8,17

94:5 98:8 122:19
123:1 149:9 152:2
152:7,11 154:2,3
156:11 157:25
158:10,11 159:12
159:21,25 162:7
184:24 185:2
186:25 187:3
188:19 205:23
206:1 212:12
213:17,19 214:13
215:2 221:22
223:11 230:16
232:17 234:6
**sentences** 186:20
**SENTRI** 84:19,22
85:1,4 94:24
95:16
**separate** 162:11
**separates** 70:7 96:1
**September** 147:14
149:14 152:25
153:5,11 169:15
170:22 216:14,21
216:25 217:7,14
217:23 221:3,8
226:13
**serious** 131:21
**Services** 92:15
**set** 88:18 201:22
263:20 264:6
**sets** 250:8
**seven** 31:12 65:19
**shakes** 9:8
**share** 38:7 39:3
57:10,14 160:20
165:19,22 188:1,7
**shared** 171:14
**SharePoint** 49:10
49:14 50:22
**sheet** 265:8
**shelters** 117:11
118:19
**shift** 43:7,10 56:25
78:6,7 181:23,23
220:13

**shifts** 43:6 78:8
121:20
**short** 67:19 68:3
210:3
**shorter** 198:16
211:5
**short-term** 68:2
250:8,10
**shot** 121:3
**show** 183:20
**showed** 234:20
**shower** 127:6
**showered** 127:1
**showers** 67:24
127:4
**showing** 114:16
167:24 203:10
**shown** 16:22 17:3,8
20:25
**shows** 61:14 114:9
138:24 260:3,19
**side** 109:25 111:2
128:17 135:18
142:25
**sign** 21:7
**signature** 102:6
**signed** 22:2,11
238:2
**signing** 263:22
██████ 4:22 18:13
18:14,17 19:2
42:23 43:4 78:9
78:12,15 171:16
222:24 223:2,6,9
225:6,10,14,21
231:23 233:14,17
233:20 247:8
██████ 230:24
234:8
**similar** 9:9 48:7
149:10 158:10
**simply** 16:12 17:5
25:12 86:4 99:19
113:18 114:9
159:25 224:6
231:3,12 232:17



236:9
**single** 59:12 61:2
**sir** 5:9,15,16 6:24
  7:3,7,16,23 8:20
  11:15 21:23 22:14
  27:23 55:14 80:2
  94:4 101:12
  102:23 106:8,14
  107:13 108:6
  109:10 110:15
  113:24 114:16,21
  119:4 122:14
  134:10,18 136:23
  139:16,19 141:21
  144:4 147:6
  156:22 157:1
  162:18,25 167:24
  168:3 169:23
  183:20 184:9,15
  184:22 185:24
  186:2 194:20,23
  199:17,19 200:14
  203:10,14,19
  204:23 206:4
  207:3 211:19,23
  212:2 215:21
  216:6,12 221:8
  222:13,17,21
  223:15 226:18
  227:1 228:15,19
  228:25 231:8
  234:17 235:11
  236:12,23 240:12
  241:9 242:23,25
  243:3 245:5,9,12
  246:5,17 252:12
  253:7 258:21
  259:2,8,11 260:16
  262:7
**sit** 39:13 184:12
  218:20 263:16
**site** 49:14
**sitting** 12:25 35:6
**situation** 89:10
  132:3,16 152:5,15
  152:16,21 159:18

160:5,8 192:15
**situations** 17:15
  67:13
**six** 30:9 31:12
  65:19 110:17
  116:2 173:19
  191:20 192:1,13
  192:17 217:16
**size** 64:9
**skipped** 216:18
**slip** 58:14 59:3,7,10
  59:20 60:19 155:3
**slips** 60:4
**slower** 53:16 54:18
**small** 198:19
**smaller** 52:18
  145:21
**smedlock@maye...**
  2:6
**social** 78:19
**soil** 96:13,24 97:11
  97:15,16 100:5,5
  120:18,18 131:10
  131:11 139:2,2
  174:6 206:11,17
  206:17 207:13
  208:18 244:18,18
**solitary** 252:5
**solution** 153:24
**somebody** 40:6
  62:20 69:7 91:8
  114:7 120:15
  122:3 131:20
  138:25 161:7
  175:1
**someone's** 19:21
  37:13
**somewhat** 80:5
  84:20
**soon** 196:9
**SOP** 148:1 150:16
  150:20 151:9,11
  156:19 160:9,11
  161:2,5 198:2
**SOPs** 219:16
**sorry** 21:5 41:22

46:23 56:11
  144:19 154:13
  178:3 202:13
  216:18 219:23
  227:11 231:16
  237:10 240:21
  255:5
**sort** 8:11 9:6 30:15
  34:9 46:14 57:7
  57:19 67:19 151:2
  170:21 173:4
  194:25 226:2
  238:1 248:25
  255:16
**sorted** 133:24
**sought** 180:3
**sound** 24:14
**sounds** 8:22 9:9
  167:11
**Southern** 1:1 2:15
  2:19 240:4
**Southwest** 115:12
  115:19
**Southwestern** 28:1
  28:2,9,11,17,20
**space** 98:12
**Spanish** 30:13,16
  213:9
**speak** 100:13
  155:21 180:8
  181:7,14 210:15
  213:9 219:19
**speaking** 97:6
  167:7 219:8
**special** 17:24 20:22
  23:4,11,18 24:2,7
  24:20 162:19
  163:12 166:6,11
  166:20 167:6
  168:9 169:20
  170:11 180:15
  182:21 183:2,13
  184:5 188:20
  195:13,15 199:24
  201:16 204:15,22
  215:1 227:18

**specific** 151:16
**specifically** 19:9
  31:15 94:7 145:3
  156:7 221:15
**specify** 167:14
**spell** 5:11 33:14
  45:18 220:4
**Spencer** 55:23
**Spencer's** 55:24
**spend** 230:13
**spoke** 181:5 193:4
  193:5 204:11
  213:25 215:14
  241:21 247:4,7,10
**spoken** 247:14,19
**spreadsheet** 115:22
**SRG** 204:16,17
**Staats** 203:23 204:1
  204:17 205:3
  210:7 212:7,14,20
**staff** 81:13 183:12
  183:12 244:7
**stand** 96:4,5,22
  97:2
**standard** 4:15
  66:13,16,22 67:3
  67:11 74:17 88:17
  153:21 157:10,11
  157:25 158:15
  159:8 201:25
  202:18 230:20
  232:20
**standards** 74:13
**standing** 139:5
  177:23
**stands** 33:16
  131:24
**start** 36:5 89:1
  116:19 200:19
  248:9
**started** 54:6 90:23
  123:8 200:11
  239:5,9,11,16,19
  239:22
**state** 5:11 9:9 10:10
  103:1,16 105:19

206:9,24 207:22
  236:14 249:24
  258:9
**stated** 103:7 254:24
**statement** 187:11
  206:21 247:24
**states** 1:1 7:19 69:8
  69:21,23 83:21
  84:2,8,11,14,17
  84:23 92:16 103:4
  106:13 138:1
  142:24 158:1
  184:21 213:23
  216:23 229:8
  230:24 244:19
  250:2 259:5
**stating** 163:1,3
  177:9
**station** 2:11 125:18
  224:4
**stationed** 57:23
  97:20 144:12,16
**status** 62:21
**stay** 29:19 144:21
  217:10 252:16
**staying** 129:14
**stenographically**
  264:10
**Step** 191:22 192:4,7
  192:12 216:17,24
  217:14
**STEPHEN** 2:4
**stepped** 96:13
**steps** 131:9 163:16
**Steve** 203:23
  204:17 205:3
  212:6,14,20
**stop** 9:1 96:18
  107:2 206:10
**stopped** 262:18
**stopping** 143:20
**store** 29:3 85:25
**stories** 21:9
**story** 225:15 233:7
**straight** 59:1 121:2
**Street** 1:13 2:5,15



6:16
**strike** 103:24
164:19
**strongly** 188:20
**Structure** 63:18
**study** 28:13
**studying** 32:9
**stuff** 25:17 41:10
126:11 132:3
197:3 213:8
**style** 75:16
**subject** 80:12
108:18 115:7
134:23 137:7
140:3 185:18
212:7 248:7
**subscribed** 265:14
**substance** 13:7
16:19 119:11
150:25 166:20
211:8 213:16,21
**substantial** 187:21
188:2 195:17
**substantiate** 219:19
230:18 231:4,13
231:18 232:1,18
232:24
**substantiated**
232:15 240:9
**substantiating**
219:10
**sued** 11:23 165:12
214:21
**sufficient** 98:12
103:4 250:1
**suggest** 156:4
210:21
**suggested** 34:3
**Suite** 2:15
**summarize** 184:24
185:9,12 186:21
208:19 238:9,13
**summer** 24:13,14
228:10
**Sunday** 202:12,17
**supervisor** 56:3,4,5

56:12 64:25 65:1
65:2 76:6,7 77:3
91:19,25 100:17
131:1,2,10,11,18
151:20 152:13,15
167:12 178:3,4
190:2,3,6 192:18
216:20
**supervisors** 46:7,25
47:1 55:17,21
56:20 64:20 65:4
65:5,8,10,13,17
66:11 72:20,23
77:25 101:1 150:6
150:10 162:9,13
164:9,13 165:20
173:20,24 174:3
189:6 207:24
248:14
**supposed** 186:21
222:5
**sure** 33:21 34:10
36:3 44:6 50:24
66:10 67:21 95:17
101:25 103:22
107:17 128:20
131:7 133:11
146:17 155:14
157:7 163:5
191:23 215:3
246:20 254:1
263:14
**Surface** 57:8
**surprise** 105:20,21
105:25 117:7
241:24 242:4
**SWB** 115:8,10
**swear** 30:1
**swore** 30:2
**sworn** 5:5 6:8 29:23
46:22 52:23 264:7
265:14
**synonymously** 74:9
**system** 41:7 61:2,12
**S-c-a-v-o** 220:6

**T**

**T** 4:1
**tablet** 57:8
**take** 9:7 10:3,3 11:5
13:25 22:3 30:25
31:6 33:18,22,24
34:2 35:17 37:22
55:8,9 68:23,25
80:8 82:13 89:10
92:25 101:17,20
102:1,18 107:6
114:19 118:24
127:4 128:16,21
128:25 129:1
131:13,15 137:2
139:21 141:25
144:19 147:9
149:3 152:15
157:1 162:10
168:3 173:13
182:4,7,11,14
183:24 186:16
188:21 190:6
199:1,5,19 203:14
209:25 211:23
215:17 222:17
226:17 238:11
244:25
**taken** 1:11 16:12
39:3 67:13 132:11
144:1 161:15
242:21 266:3
**taker** 182:14
**talk** 12:17 96:18
100:12 101:24
134:15 167:12
181:22
**talked** 8:16 10:19
16:10 38:16 48:10
48:18,19 50:4
57:6,10,21 63:20
66:5 69:17 112:5
125:23 149:20
150:16 171:22,24
172:1 181:17

191:24 206:15
214:20 215:23
219:1 220:2 223:5
**talking** 46:24 48:16
97:8 136:11
137:18 147:25
152:1 157:7 164:4
179:24 191:3
204:8 205:1 215:3
221:5 242:22
**team** 108:6,13
131:25 263:6
**Tecate** 4:15,24 5:20
6:3,11,11 18:21
19:3,7,11 20:8,16
26:5,15 41:21,23
42:7 43:2,8,11,25
45:3,7,13 46:13
47:23,24 52:17
54:5,7,9,13 56:18
56:21 58:6 64:10
65:6,11,18 66:2
70:21 71:19 77:5
77:9 83:20 90:15
91:11 94:1,14
96:4,9 97:12
98:16,19,23 99:1
99:6,9,16,22
101:4 103:12
107:3 110:14
111:12,20 112:2,8
112:23 117:18,20
118:6,12 119:16
120:18,20,23
121:10,19 122:22
123:3 124:5,17
125:9 126:2 131:8
133:12 135:21,25
136:14 138:11
139:1 141:1,5,11
143:3,12 146:7,10
146:12,16 147:18
147:21 148:4,18
150:20 152:20
153:1,7,13,20
154:16,21 155:1,5

155:10 157:11
158:6 160:15
161:2,8,24 162:20
169:15 171:6,13
173:18,25 174:16
174:19,20,23
180:1,6 184:21
187:6 190:9
192:25 201:18
204:19 206:22
212:9 215:25
220:8,13 223:2,19
223:22 225:12,16
226:15 228:5
229:6,21 232:6
234:12 235:4,8,22
236:4,8,16,18
237:12 238:18
243:7 244:14
246:1 248:21
252:20,24 254:8
262:11,14
**Tecate's** 118:14
136:3 138:14
141:7 143:6
245:14
**telephone** 2:6,12,16
2:21 15:5 181:25
198:12 202:22
204:18 211:1,10
**tell** 11:2 16:11,12
16:15 19:9 28:18
33:11,22 46:7
98:16 100:16
156:4 164:13
175:14 176:16
193:7,14 194:4,8
196:24 209:15
219:17 225:10
227:8 233:7,10,13
233:16,19,23
234:2
**telling** 46:4,5 47:17
85:6 100:4 154:14
188:5
**tells** 92:20



ten 23:19
term 5:21,24 10:23
  52:4 63:5,14,21
  64:25 65:24 66:13
  66:16 67:14,19
  68:3,17 69:17
  71:25 72:10,14,17
  72:21,24 73:4,7
  73:16 74:4,8
  82:17 108:8 150:2
  150:10
terms 63:4 83:3
  160:16,21
test 6:14 32:20 34:9
  34:14 166:8
testified 5:5 7:23,24
  8:4,14 242:10
testify 11:12
testifying 11:6
  146:23 148:17
  180:24
testimony 8:16,18
  16:19 22:8 119:12
  232:4 234:8 243:3
  243:6 247:1
  254:24
tests 32:9,10,14,16
text 26:1 59:15
thank 13:4 55:15
  87:10 119:4,5
  144:5 215:22
  245:5 246:24
  262:20
thanks 202:17
theirs 127:17
theory 112:5
thing 38:20 48:25
  62:5 63:17 125:10
  161:12 194:2,17
  242:12,16 243:22
things 17:14 64:1
  79:6 89:7 107:19
  120:4,7 144:6
  198:17 224:15
  236:21
think 12:4,13 21:14

23:6 25:14,15,21
28:15 29:20 30:1
38:7 42:17 45:1
46:22 48:17 52:14
55:16 56:5,14
63:16,20 68:4,6
73:14,18 104:24
109:4 121:2
122:23 123:3
124:4,18,21,24
125:3,7 126:18
127:20 128:2,9
129:6 131:13
138:5 143:23
144:20 145:2
150:1,22 151:4,18
158:22 161:12
162:4,8,9 165:11
165:16 167:8
172:14,18,21
179:22,22 196:2
196:13 197:2,3,21
201:4 219:14,24
226:19 253:7,19
263:12
thinking 172:15
third 106:6,7
  214:10
thought 172:22
  190:14 233:4
  242:12
thoughts 244:25
threaten 87:2,14,18
  88:2
threatened 124:6
threatening 124:12
three 8:3 28:12
  54:10,18,20,21,23
  54:23,23 58:5
  60:10,11 70:20
  90:23,25 91:7
  93:23 94:2 96:10
  96:13 97:2 127:19
  145:13 151:15
  173:22 181:9,16
  216:9 228:24

236:15 238:5,8,12
throughput 106:12
  106:24
Thursday 1:12
Tijuana 117:10
  118:19
till 72:2 125:11
time 7:13 9:19,19
  10:23,23 14:20
  20:5,7,10 24:4,8,9
  24:11,18 26:10
  29:19 32:6 33:6,6
  36:10 40:5,13,16
  40:20,22 41:17
  42:7 43:16 45:6
  45:12 47:22 56:14
  56:15 60:7 61:2
  69:14 70:23 71:9
  71:12,19 72:3
  76:12 90:14 91:10
  97:19 98:15
  100:13,19 122:22
  123:2 126:1,5
  127:25 128:16,19
  128:21 129:1,5
  130:9,15 132:19
  132:23 133:2,7
  138:4,5 144:9,22
  145:4,10,12,14,18
  145:24 147:21
  148:5,9,18 150:19
  151:25 157:21
  159:4 165:4,9,14
  169:4 173:18
  180:10 182:15,18
  187:13 189:1
  190:7 191:1,14
  192:24 196:12
  197:23,25 200:8
  201:10,22,25,25
  202:18 205:16
  215:7,14 227:13
  232:6 233:1 235:7
  248:2 250:13
  254:11,14,19
  261:17 264:6

timeline 170:21
  194:23 216:7
  217:22
times 8:2 60:3
  69:13 106:10
  150:16 181:7,9,14
  197:23 210:22
  252:23
time-consuming
  49:23,24
timing 217:3
tiny 107:19
title 6:2 31:18
  53:20 56:2,9 64:3
  228:3
today 5:25 7:13
  9:24 10:10,24
  11:2,12 12:19
  13:1,10 16:20
  25:8 39:13 42:24
  69:18 91:4,7
  93:24 138:22
  141:15 143:18
  157:4 161:3,5,8
  180:25 185:6,7
  186:12 187:14
  206:7,15 218:20
  223:6 229:14,21
  242:22 246:25
  248:4 263:16
Todd 80:15
told 19:8,12 25:2
  49:19 51:24 72:14
  73:1 97:16 99:20
  164:9 166:21
  175:20 177:4,19
  189:7 192:16,19
  194:11 204:10
  206:10 207:8,11
  207:17,24 227:17
  227:20 231:20,23
  235:12 254:10,13
top 80:7 115:24
  169:7,25 170:7
  205:22 228:14
  240:8 244:2

total 109:19 116:7
  116:20 135:8,22
  260:21
totally 182:19
track 113:16
  132:18,22
tracked 34:5 117:8
tracking 105:10,12
  133:2,7
traffic 11:14,17,20
  71:8 124:11
  144:25 145:1,6,13
trained 132:1 165:2
training 29:24,24
  30:3,6,8,9,12,25
  31:21 32:2,3,7,13
  32:23,25 33:4
  34:25,25 35:9,14
  36:1,7,17,19,25
  37:1,5,7,10,15,17
  37:22,25 38:5,11
  38:14,18 39:4,9
  39:12 42:11,15
  48:17,23 49:8,17
  50:5,9,16,18,20
  50:25 51:2,4,12
  51:17 52:23 61:24
  74:13,18,22 75:18
  99:1 160:20 186:1
  186:4,8
transcript 8:6,9
  264:10
transcripts 265:5
transferred 54:13
  68:11
transgender 252:1
  252:2,3
transgenders
  251:12
transport 120:19
  130:5
travel 35:3,12
  61:20 94:10 112:9
  118:5 130:18
  132:19,23 133:3,8
  221:18



traveled 120:22
traveler 85:7 87:14
travelers 82:12,21
    82:24 83:8,15,15
    90:12 91:12 98:9
    98:11 106:12,24
    149:2 158:5
    236:19 253:18,21
traveling 16:12
    82:11 83:11 149:1
    153:19 158:4
Treasury 179:4
trends 67:10
trial 8:16
tried 163:18,21
    244:18
trouble 18:18 177:1
true 99:19 113:18
    114:7 128:13
    145:18 147:13
    154:16,21 155:1,5
    157:9 172:14
    184:3 187:12,14
    199:22 231:3,12
    237:17 264:11
trunks 120:12
truth 11:2
truthfully 11:12
try 9:16 10:3
    163:23 164:6
    208:15
trying 60:18
Tucson 81:5 109:1
    137:12 142:11
    256:21
Tuesday 202:8,19
    202:23 203:2
    209:22
turn 44:18,21 45:3
    46:3,25 47:17
    51:22 52:19 55:18
    73:1 75:24 76:3
    77:6 84:1,13,16
    84:25 85:18 86:5
    91:16 98:17 100:5
    102:22 106:4

122:11 125:18
161:10 163:7
175:3,4 176:17
177:16,21 195:11
207:12,18 214:8
220:15 223:13
230:25 231:14
245:8 249:14
250:5 254:9 256:4
259:13
turned 20:12,17
    44:2,9 45:8,22
    46:19 91:24 96:12
    96:14 97:16
    119:15 120:2,17
    121:9 136:15
    146:3 172:24
    173:24 175:12
    176:6,14 177:10
    177:12,13,24
    178:1,4,7,14,20
    206:17 214:6
    222:7 224:1,12
    243:13 244:17
    253:4
turning 44:13
    46:14 47:12 72:8
    99:21 100:1
    136:10 163:8
    171:6 173:14
    174:24 175:7,15
    175:20 176:1,10
    176:20,25 177:2
    214:22 236:22
turnstile 70:9,13,16
turnstiles 93:21
turn-back 91:20
    138:21 141:14
    143:17 174:10
    177:25 178:5,8
    179:12 182:8
    188:3 206:21
    218:24 220:19,22
    223:22 225:12,15
    229:13 237:4
    239:10 245:22

246:2 254:17,17
262:10
turn-backs 174:15
    174:20 178:15
    198:1,2,6,7 215:8
    215:13,24 219:2,4
    229:20 238:25
    239:9 243:18
    244:13,21 262:14
    262:17
Twitter 79:1
two 28:12 29:9 52:8
    54:22,22,23,23
    64:11,14 90:23,25
    91:6 94:14 127:21
    130:4 133:19,22
    133:24 134:2,3
    145:13 169:11
    171:8 172:13
    181:16 186:20
    205:22 217:6
    224:5 238:5
two-page 107:15
    134:12 136:25
    139:17 141:23
type 80:7 87:14
    208:9
types 32:15
typical 42:16
typically 64:7
    154:17 246:7
typo 140:9 209:7

—————— U ——————

UDA 73:4,10
UDAs 109:25 110:4
    111:8 135:18
    136:6 140:23
    141:10 232:11
uh-huh 9:8 123:10
uh-uh 9:9
ultimately 63:25
unaccompanied
    50:15 62:11
uncomfortable
    76:8,10 77:6

163:6,8 165:1,7
178:13,17
understand 8:24
    9:10,12,13,25
    10:8,13,17,24
    11:1,4,8 33:16
    36:16 61:17 83:3
    89:8 95:23,25
    119:19 150:2,3
    151:4,5 158:23
    163:5 240:4
    250:16 251:4
understanding
    20:6 34:7 43:19
    76:21 82:1,20
    86:11 88:13,17
    92:6 108:11
    158:19 170:24
    198:5 207:1,5,9
    219:3 230:12
    232:22 235:1
    241:11 245:21
understood 21:8
    113:5 134:5 159:7
    175:8
undocumented
    73:8,11 111:1,19
    111:22 138:18
unease 174:19
uniformed 147:17
unilaterally 245:15
    246:1,8
union 179:4,6,13
    179:16,21,25
    180:1,3,6 191:22
    192:4 217:10
    220:1
unit 36:21 67:15
    68:18 73:17
    256:24
United 1:1 7:19
    69:8,21,23 83:21
    84:2,8,11,14,17
    84:22 92:16 103:4
    106:12 184:21
    229:8 244:19

250:2
unknowable 93:5
unsanitary 126:2,5
    126:8,23 127:10
    127:15,16
untrue 232:17
update 115:8 256:5
updating 33:7
upper 246:9 250:8
up-to-date 198:9
use 5:24 10:23
    22:18 23:25 27:9
    78:24 118:23
    173:1,7 208:10,11
    234:12
uses 69:7 160:11
    255:25
usual 9:17
usually 28:7 60:15
    60:17,18 61:2,13
    62:14,19 63:23
    66:18,19 69:15
    97:5 126:12 194:3
    235:17
utilized 234:23
    236:5
U.S 2:10,25 4:25
    6:5 10:16,20 14:5
    14:16,23 17:3
    31:1,3,7,16,22
    32:6,11,24 33:3,4
    33:8,19 35:19,20
    35:23 38:17,19
    39:8 50:7 60:18
    62:17 69:20 70:8
    79:9 81:9 83:20
    84:1,7,14 87:17
    87:21,24 89:22,25
    90:3 93:12 96:2
    96:13,24 97:11,15
    97:22 100:5
    106:24 109:6
    114:2 115:15
    116:13,17 120:18
    131:9 132:4 139:2
    139:10 154:19



161:8 187:5
204:20,21 206:11
206:17 207:12
208:18 226:15
228:5 229:5
240:11 244:9,18
248:20,23 249:1
249:11
**U.S.C** 187:20

**V**

**v** 1:5 266:1
**varied** 145:16
**various** 48:16
109:12 110:8
**vary** 145:23
**vehicle** 39:25 44:5
44:7 48:20 69:3,6
124:11
**vehicular** 124:17
124:25 125:4,8,20
**verbal** 173:4
179:24 205:24
206:2,6
**verbally** 80:9
101:18
**Verizon** 22:17
**versus** 7:19
**vertical** 109:12
116:5 140:13
**video** 15:8
**violated** 229:14,17
229:24 262:17
**violating** 230:9
**violation** 187:7,22
195:19
**violations** 4:24
201:17 226:14
228:4
**violent** 125:15
**virus** 251:14
**visitors** 224:21
**Vista** 28:4
**voluntarily** 37:18
**voluntary** 39:6
**VS** 123:11

**W**

**wait** 94:2 129:19
130:7 144:11,13
144:17,24 145:11
**waiting** 62:16
67:22 98:9 109:25
111:2 121:16
129:16 130:2
135:18 138:6
140:24 142:25
**walk** 58:15 119:19
121:11 133:18
134:1
**walking** 123:14,17
123:18
**wall** 128:18 163:15
**want** 50:23 66:24
68:24 71:21 72:13
75:16 83:3 86:22
90:10 93:8,16
94:5 98:3 101:23
106:5 107:6,18
110:11 119:7
122:16 124:15
131:5,7 133:11
135:2 143:21
148:21 154:2
170:17 183:14
192:7 193:24
194:22 197:14,14
199:4 200:19
214:16 223:11
224:4 229:2
238:15 239:23
240:7 242:5,7
243:22 249:14
250:5
**wanted** 37:19 49:13
54:19 85:24 144:6
159:11,24 166:9
197:21,22 236:3
**wants** 75:1
**warrants** 68:22
**Washington** 1:14
2:5,11,16 14:3

**wasn't** 71:7 77:13
95:1 145:21
166:24 171:23
172:2,15 217:11
218:8,9 231:4
232:2 237:1
239:16
**wave** 146:15
**way** 26:8 34:6
80:2 84:6 91:22
113:19 125:15
139:6 162:13
164:10 230:14
245:25 264:13
**ways** 68:9,13 96:5,6
**weapon** 124:19
**weapons** 67:21
**week** 54:22,23
129:11 144:22
145:14 196:3
202:8 210:16
**weekends** 123:17
**weight** 233:11,20
**weird** 80:7 196:8
**welcome** 55:14
144:4 215:21
**went** 30:3 112:23
163:16,23 192:4
192:12,14 244:5
**weren't** 71:7,8
90:22 153:19
156:15 178:19,22
225:23 233:10,16
233:19,24
**West** 110:14 154:7
155:11 221:25
**we'll** 6:18 12:17
55:9 79:19 101:7
134:15 166:8
167:20 224:22
**we're** 10:2,5 43:23
43:24 66:20 67:5
67:9 97:8 111:23
123:12 157:7
241:5
**we've** 6:24 33:10

101:13 107:14
120:12,13 126:10
126:10,11 135:7
136:11 137:17
138:22 141:15,21
142:12 143:18
156:22 171:22
205:1 229:14
230:23
**WhatsApp** 26:1
**whatsoever** 35:1
**whistle** 180:13,17
180:21 182:19
193:15,18,21,23
194:6,9,13,15
242:22
**whistle-blowers**
188:16
**whistle-blowing**
17:19,22 22:20,22
47:21 90:24 91:7
93:24 163:15
189:17 191:6,10
192:21 193:1
218:10,17,24
242:12
**wishing** 161:7
**within-named**
264:5
**witness** 5:4 12:20
13:3,5 243:2,6
250:23 251:1
264:5,15
**witnesses** 241:6,7
247:20
**women** 120:13
251:7
**word** 9:14 107:21
169:17 182:22
**words** 9:8
**work** 6:10 9:17
16:6,7 22:18 23:9
25:16,17,23 26:1
27:2,4,6,9,10,12
29:21 33:2 35:8
38:8 46:13 47:25

48:4,7 53:17 55:5
57:15 64:7 77:14
77:15 79:6 113:24
129:1 157:5,6
166:16,18 167:13
181:18 190:8
198:24 199:5,9
231:9 236:4 248:4
248:7 261:3,6,9
261:11,20
**worked** 6:5 26:10
43:6 56:15,17
90:14 147:21
197:13 206:21
223:2 246:12
252:21 261:17
**working** 29:7 54:6
54:9 122:1,3
126:6 130:12
192:24
**worried** 214:15
225:23
**worry** 6:14 78:25
**wouldn't** 58:23
75:25 100:12
162:16,17 163:2
163:17 242:4
247:13,19 252:5
**would've** 122:3,3
**write** 58:14 59:18
182:16 197:24
**writes** 201:14
209:19 210:14
**write-up** 175:4
191:13
**writing** 47:13,15
197:3 215:25
216:2
**written** 8:18 18:20
33:7 37:24 38:1,3
39:2 47:9,18 75:1
147:24 160:18
163:9 164:14,17
164:20,23 191:10
207:22 230:4
233:24 234:3



246:5 254:16
256:16,22 257:3,6
257:9,15,18,20,23
257:25 258:2,5
**wrong** 236:9 239:3
**wrote** 155:22,24
175:2 179:24
192:6,8

**X**

**X** 3:1 4:1

**Y**

**Yahoo** 25:6 201:3
**yard** 96:22
**yards** 172:11
**yeah** 21:16 26:9
30:14 31:11 32:18
35:7,7 49:1,15
63:19,19 71:7
72:6,9 88:25 89:1
89:2 145:20,22
150:15,15 151:9
157:5 162:4 164:5
180:12 186:15
189:19,23 191:5
196:7 198:2 201:9
201:9 205:12
208:11 225:20
235:19,21 241:1
**year** 29:12 33:10
53:3,24 239:21
240:1 262:2
**yearly** 189:8
**years** 28:11 29:9
54:10
**yell** 96:23
**yesterday** 14:10,17
17:3 21:2 22:11
81:21
**Ysidro** 20:12 26:18
26:19 39:16,17,20
40:13 48:5 52:2
52:10 53:1,2,6,9
55:1 58:6,12 60:9
64:12 70:14,16,21

71:2,16 83:19
94:17 97:20,23,24
103:2,16 104:4,12
104:18,22 110:14
110:20 111:10,16
111:24 112:11,18
112:21 116:19
117:3,11 118:2,7
118:18 120:20,22
121:11 123:13
126:4 127:10,20
127:24 128:8,15
128:24 129:10,19
129:21 131:6
135:11 136:7,11
136:16 137:20
138:2,4,19 139:3
140:17 141:12
142:17 143:1,10
143:14 144:11
145:5 146:5 154:7
154:11 155:11
206:12 214:15
221:25 232:11
236:5 238:20
249:25 250:11
251:5 255:1,12,17
255:22 256:2,8,19
258:9,24 259:5,15
259:20 260:4,9,19
260:24 261:3,14
**Ysidro's** 137:23
140:20

**Z**

**zero** 99:13,16 111:5
111:12,19 112:24
117:21,24 118:14
135:22,24 136:3
138:12,14 141:2,4
141:4,7 143:4,6
234:24
**ZIP** 6:12

**0**

**01** 134:13

**03** 137:1
**07/23/2018** 170:8
**08/29/2018** 195:5

**1**

**1** 4:3 6:19,21,25
10:12 27:7 162:12
191:22 192:4,7,12
205:21 216:17,24
217:14 265:4
**1,930** 138:1,6 139:4
139:9
**1.10.2018** 140:4
**1/10/2019** 4:12
**1:17** 210:12
**1:30** 14:14,16
**10** 4:13 140:1,7
141:17,18,22
216:14,21 217:7
260:1,13 262:25
**10-15** 79:15
**100** 50:24 172:11
255:18 259:21
260:10,25
**101** 4:7
**107** 4:8
**11** 4:14 147:2,3
158:12 159:3,22
162:24 212:13,21
216:25 217:22,25
218:3,7 245:8,9
245:11
**11th** 217:14
**11/19/2019** 4:20
**11/2/2018** 4:17,19
**11/7/2018** 4:17
**11:00** 202:18
**1101** 2:15
**114** 4:9
**12** 4:15 156:18,19
156:23 159:5
162:24 200:16
**12/26/2018** 4:13
**1213** 187:20
**1287** 2:20
**13** 4:16 167:20,21

167:25 168:7
194:19 212:6
216:5,6 221:2
21:14
**131** 15:22 16:23
21:14
**134** 4:10
**136** 4:11
**139** 4:12
**14** 4:18 183:16,17
184:3 195:12
**141** 4:13
**147** 4:14
**15** 4:19 157:14
159:8 199:13,14
199:22 200:3,8
208:22 243:25
244:2
**156** 4:15
**16** 4:20 114:24
115:25 118:4
191:18 203:6,7
256:5
**167** 4:17
**17** 4:21 211:15,16
211:19 212:3,5
**17th** 2:15
**17-cv-02366-BAS...**
1:5
**18** 4:22 222:9,10,14
222:20,23
**183** 4:18
**19** 4:23 226:5,6,10
**199** 4:19
**1999** 1:13 2:5

**2**

**2** 4:5 21:19,20,24
102:22 109:10
134:21,24 136:13
162:12 168:13
200:12,19 202:13
258:20
**2nd** 201:12
**2,800** 111:1 112:11
112:20 113:1
**2/12/2019** 4:19

**2/13/2019** 4:21
**2/5/2019** 4:11
**20** 59:22 128:19
144:13 182:3
**200** 116:21 172:11
256:9
**20006** 1:14 2:5
**20036** 2:16
**20044** 2:11
**2010** 29:14
**2011** 29:14
**2012** 6:7 29:21
**2013** 71:21
**2014** 261:5
**2015** 261:5,19
**2016** 10:12 27:7
54:8 71:17 238:16
238:24 239:2,6,9
239:11,17 261:6
261:15,20 262:6
**2017** 71:18 239:23
239:24,25 243:8
243:12,19 261:9
261:23
**2018** 12:9 24:14
80:11 114:24
115:25 118:4
142:5 147:14
149:14 152:25
153:5,11 168:13
168:13 169:8,15
170:12,22,22
171:4,10 180:11
181:4,8 184:4
195:9,16,22
200:12,20 202:4
202:13,17,23
203:3,12,23
204:15 205:2
208:25 209:20
216:14,21,25
217:7,23 221:3,8
228:11 256:5
260:15 261:11,25
**2019** 1:12 3:3 18:24
24:14 43:18 108:2



108:20 111:19
134:21,24 136:13
137:7,8 139:1
140:1,7 157:14
159:8 200:16
210:12 211:2,10
212:6,13,21
226:13 237:23
244:12 255:7
258:20 259:10
260:1 262:6
264:16 265:15
266:3
**202.263.3221** 2:6
**202.307.8704** 2:12
**202.355.4471** 2:16
**2024** 264:22
**203** 4:20
**21** 1:12 3:3 4:5
108:2,19 111:18
255:7 264:22
266:3
**21st** 112:8
**211** 4:21
**222** 4:22
**23** 170:12 184:4
195:16
**23rd** 183:7
**247** 3:7
**25** 245:12,14 246:5
251:25 252:1,6
**253** 3:8
**26** 142:5 226:13
260:15
**26th** 264:16
**263** 3:9
**264** 3:10 265:4
**27** 80:11
**275** 142:18 260:20
**278** 135:12 258:25
**28** 195:9,21
**288** 110:21
**292** 137:21 140:18
259:16 260:4

**3**

**3** 4:6 7:6 79:21 80:3
80:11 81:16 106:4
122:12 149:6,18
158:13,17 253:16
255:11
**3/21/2019** 4:8
**3:05** 142:5
**3:20** 140:1
**3:25** 134:21
**3:50** 208:25
**3:56** 108:2
**30** 144:13
**30031** 2:20
**359** 203:13
**385** 214:9
**386** 211:22

**4**

**4** 4:7 101:8,9,13
147:14 149:14
152:25 153:5,11
202:17 217:23
221:3,8 249:15
**4,000** 135:19
136:16
**4,540** 140:23
**4,950** 142:24
143:14
**4:06** 137:7
**4:50** 263:21
**40** 198:22
**404.521.6700** 2:21
**405** 6:11
**45** 121:8,11

**5**

**5** 3:6 4:8 102:22,23
107:9,10,14 113:8
137:6,8 139:1
182:3 187:20
210:12 240:7
241:3 249:20,23
255:3 259:10
262:24
**5/2/2019** 4:10
**50** 104:18

**5422** 183:23
**55-minute** 121:5

**6**

**6** 4:3,9 102:5
114:12,13,17
191:19 202:23
203:3 204:14
205:2 242:25
256:4 262:24
**6/16/2018** 4:9
**60** 141:24
**6079** 6:16
**63** 116:24 256:12
**65** 139:19
**69** 199:18

**7**

**7** 4:10 134:6,7,11
168:13 169:8
208:24 209:1
250:6 258:19
262:24
**7:17** 114:25
**7:29** 200:12
**705** 2:15
**72** 168:2
**79** 4:6

**8**

**8** 4:11 136:19,20,24
209:20 240:20
259:8 262:24
**8/23/2018** 4:18
**850** 117:10 118:18
**868** 2:11
**87** 142:21 260:20
**87161** 107:16
**872** 169:23

**9**

**9** 4:12 139:12,13,17
203:12,22 237:23
240:19,21 241:2,5
244:12 259:25
262:24

**9th** 6:7
**9/4/2018** 4:14
**9:13** 202:14
**9:24** 209:20
**9:30** 1:12 14:9,16
**911** 132:3
**92114** 6:17
**93** 135:14 259:2
**96** 110:23 255:13
**97** 137:23 140:20
259:17 260:5

