MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **EXHIBIT 10 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | **REDACTED VERSION** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

1

2    CENTER FOR CONSTITUTIONAL RIGHTS
         Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
3        *bazmy@ccrjustice.org*
         Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
4        *gschwarz@ccrjustice.org*
         Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
5        *aguisado@ccrjustice.org*
6    666 Broadway, 7th Floor
     New York, NY 10012
7    Telephone: +1.212.614.6464
     Facsimile: +1.212.614.6499
8
9    SOUTHERN POVERTY LAW CENTER
         Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
         *sarah.rich@splcenter.org*
10       Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
         *rebecca.cassler@splcenter.org*
11   150 E. Ponce de Leon Ave., Suite 340
     Decatur, GA 30030
12   Telephone: +1.404.521.6700
13   Facsimile: +1.404.221.5857

14   AMERICAN IMMIGRATION COUNCIL
         Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
15       *kwalters@immcouncil.org*
16   1331 G St. NW, Suite 200
     Washington, D.C. 20005
17   Telephone: +1.202.507.7523
     Facsimile: +1.202.742.5619
18

19

20

21

22

23

24

25

26

27

28

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--------------------------------x

AL OTRO LADO, INC., et al.,          :

          Plaintiffs,          : Case No.:

      vs.                      : 17-cv-02366-BAS-KSC

KEVIN K. MCALEENAN, et al.,          :

          Defendants.          :

--------------------------------x


DEPOSITION MARKED CONFIDENTIAL

DEPOSITION OF TODD OWEN

Washington, D.C.

Friday, December 13, 2019

9:40 a.m.


Job No.:  529549

Pages:  1 - 332

Reported by:  Elizabeth Mingione, RPR



Page 2

1

2          Deposition of TODD OWEN, held at the offices

3    of Mayer Brown, LLP, 1999 K Sreet, Northwest,

4    Washington, D.C., commencing at 9:40 a.m., Friday,

5    December 13, 2019, and taken down stenographically by

6    Elizabeth Mingione, Registered Professional Reporter

7    and Notary Public for the Commonwealth of Virginia.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Page 3

1    A P P E A R A N C E S   O F   C O U N S E L:

2    ON BEHALF OF PLAINTIFFS:

3            MAYER BROWN, LLP

4            Stephen M. Medlock, Esquire

5            Ori Lev, Esquire

6            1999 K Street, Northwest

7            Washington, DC 20006

8            (202) 263-3000

9            Smedlock@mayerbrown.com

10

11   ON BEHALF OF DEFENDANTS:

12           U.S. DEPARTMENT OF JUSTICE

13           Katherine J. Shinners, Esquire

14           David White, Esquire

15           Ben Franklin Station

16           PO Box 868

17           Washington, DC 20044

18           (202) 598-8259

19           Katherine.J.Shinner@usdoj.gov

20

21   (Appearances, Continued)

22



Page 4

1                    A L S O   P R E S E N T

2                  Louisa Slocum,  Esquire

3                    Rameez Burney

4        Karolina Walters, American Immigration Council

5                    Kristine King

6           Matthew Fenn (via phone, as indicated)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



                                                      Page 5

1                    C O N T E N T S

2                  WITNESS:  TODD OWEN

3      EXAMINATION BY:                          PAGE

4      Mr. Medlock .................................   9

5      Ms. Shinners ................................  312

6      Mr. Lev .....................................  322

7

8                      *     *     *

9

10                  DEPOSITION EXHIBITS

11                      TODD OWEN

12     NUMBER          DESCRIPTION             PAGE

13     Exhibit 20    Notice of Deposition ............   19

14     Exhibit 21    Website Printout of Todd Owen

15          Description .............................   49

16     Exhibit 22    U.S. Customs and Border Protection

17          Standard of Conduct, AOL-DEF-00669013 ....   51

18     Exhibit 23    Metering Guidance Memorandum, Date

19          Stamped April 27, 2018 ..................   63

20     Exhibit 24    E-mail from Randy Howe, June 19,

21          2018, AOL-DEF-00088501 ..................   81

22     (Exhibits Continued)



Page 6

1    NUMBER            DESCRIPTION                    PAGE

2    Exhibit 25   E-mail from Robert Hood, August

3        2, 2017, AOL-DEF-00328857 ............... 100

4    Exhibit 26   E-mail from Todd Owen, May 25,

5        2016 AOL-DEF-00761338 ................... 104

6    Exhibit 27   E-mail Chain, Sept. 13, 2016,

7        AOL-DEF-00762746 ....................... 123

8    Exhibit 28   E-mail Chain from Todd Hoffman,

9        Sept. 16, 2016, AOL-DEF-00762523 ........ 132

10   Exhibit 29   E-mail from Katherine Stark, Sept. 7,

11       2016 AOL-DEF-00761290 ................... 135

12   Exhibit 30   E-mail Chain from Todd Owen, August

13       17, 2016, AOL-DEF-00761340 ............... 142

14   Exhibit 31   E-mail chain, Novemer 11, 2016,

15       AOL-DEF-00272936 ....................... 146

16   Exhibit 32   ***   Exhibit is removed ***

17   Exhibit 33   E-mail from Hector Mancha,

18       AOL-DEF-00081089 ....................... 162

19   Exhibit 34   E-mail from Beverly Good, Nov. 22,

20       2016, AOL-DEF-00032389 .................. 167

21   Exhibit 35   E-mail from Alberto Flores, November

22       14, 2016, AOL-DEF-00576607 ............... 174



Page 7

```
 1   NUMBER            DESCRIPTION                    PAGE

 2   Exhibit 36    ***  Exhibit is Removed ***

 3   Exhibit 37    ***  Exhibit is Removed ***

 4   Exhibit 38  E-mail from Valerie Boyd, June 5,

 5        2018, AOL-DEF-00273293 .................. 196

 6   Exhibit 39  Homeland Security Memo of June 5,

 7        2018, AOL-DEF-00273294 .................. 199

 8   Exhibit 40  Memo from Kevin McAleenan, August 1,

 9        2018, AOL-DEF-00039620 .................. 213

10   Exhibit 41  Evaluation of Prioritization Queue

11        Management Pilot, AOL-DEF-00039621 ...... 213

12   Exhibit 42 Mark Morgan Memo, CBPALTR0000303 .. 213

13   Exhibit 43  Complaint fof Declaratory and

14        Injunctive Relief ....................... 220

15   Exhibit 44  E-mail Chain Aug. 14, 2017,

16        AOL-DEF-00723886 ........................ 223

17   Exhibit 45  Confidential Al Otro Lado Lawsuit

18        Document, AOL-DEF-00723887 .............. 225

19   Exhibit 46   E-mail from William Haralson,

20        March 15, 2017, NTEU 000132 ............. 229

21   Exhibit 47   Search Results Report and E-mail

22        from Eddie Arias, July 3, 2018 .......... 243
```



Page 8

1    NUMBER              DESCRIPTION                    PAGE

2    Exhibit 48    Five-Page Document, Annotations ..  248

3    Exhibit 49    E-mail from David Atkinson,

4         March 19, 2019, NTEU-000110 .............  255

5    Exhibit 50    Photograph of Mother and Child ...  291

6    Exhibit 51    Photograph of Bodies in Water ....  292

7    Exhibit 52    E-mail Chain, March 19, 2019,

8         AOL-DEF-00269970 ........................  293

9    Exhibit 53    E-mail Chain, March 19, 2019,

10        AOL-DEF-00270451 ........................  296

11

12

13

14              (Exhibits Attached to Transcript,

15               Except for Nos. 32, 36, 37 TBD)

16

17

18

19

20

21

22



Page 9

```
 1                    P R O C E E D I N G S
 2    Whereupon,
 3                         TODD OWEN,
 4              having been first duly sworn was
 5              examined and testified as follows:
 6                       -   -   -
 7                    EXAMINATION CONDUCTED
 8         BY MR. MEDLOCK:
 9         Q.    Good morning, sir.
10         A.    Good morning.
11         Q.    Can you please state and spell your name
12    for the record.
13         A.    My name is Todd Owen, T-O-D-D, O-W-E-N.
14         Q.    Have you ever gone by any other names, sir?
15         A.    No.
16         Q.    Are you presently employed?
17         A.    Yes.
18         Q.    Where are you employed?
19         A.    With U.S. Customs and Border Protection,
20    Washington, D.C.
21         Q.    What is your -- if I refer to U.S. Customs
22    and Border Protection as CBP, you'll understand that?
```



Page 10

1         A.    Yes, I will.

2         Q.    What is your present job title at CBP?

3         A.    I'm the executive assistant commissioner

4    for the Office of Field Operations.

5         Q.    How long have you held that title?

6         A.    Since February of 2015.

7         Q.    What's your present work address?

8         A.    1300 Pennsylvania Avenue, Washington, D.C.

9         Q.    So Ronald Reagan Building?

10        A.    Yes.  Ronald Reagan Building.

11        Q.    And what's your home address, sir?

12              MS. SHINNERS:  Objection.  Is that

13   necessary?

14              MR. MEDLOCK:  If I have to serve a subpoena

15   to get him to testify at trial, it is.

16              MS. SHINNERS:  I don't think I --

17              MR. MEDLOCK:  Are you going to instruct him

18   not to answer.

19              MS. SHINNERS:  I am not.  I --

20              MR. MEDLOCK:  Either object and instruct

21   him not to answer, or he'll answer the question.

22              MS. SHINNERS:  Object.  Intimidating.  It's



Page 11

1    not relevant.

2              BY MR. MEDLOCK:

3    Q.   ████  ████████████████████████████

4    ██████

5    A.   █████

6    Q.   █████████████████████

7    A.   ████████

8    Q.   ████  ████████████████████████

9    █████████████

10   A.   ████████

11   Q.   Okay.  That wasn't hard, was it.

12             So, sir, have you ever testified in court

13   before?

14   A.   In court, no.

15   Q.   Have you ever testified in a deposition

16   before?

17   A.   Yes.

18   Q.   How many times?

19   A.   Twice.

20   Q.   What were the nature of those cases?

21   A.   They were both EEO nonselection cases in my

22   previous position in Los Angeles.



Page 12

1     Q.    What was your previous position in Los

2   Angeles?

3     A.    I was the Director of Field Operations for

4   the Los Angeles field office.

5     Q.    And what's an EEO -- this EEO action that

6   you were talking about?

7     A.    Equal Employment Opportunity.

8     Q.    So those were essentially employment cases?

9     A.    Employment cases.  Yes, sir.

10    Q.    And you have testified before for

11  committees and subcommittees of the U.S. Congress; is

12  that right?

13    A.    Yes.

14    Q.    You testified before the Senate Judiciary

15  Committee on May 8, 2019; is that right?

16    A.    I don't recall the date, but if that's what

17  the record says.  Yes.

18    Q.    Okay.  And you testified before the House

19  Ways and Means Committee Subcommittee on Trade, on

20  April 25, 2018; is that right?

21    A.    Again, if that's the date, I've testified

22  several times before Congress in many committees.



Page 13

1      Q.    And you have testified to the Senate

2   Homeland Security and Governmental Affairs Committee

3   before, correct?

4      A.    Yes.

5      Q.    And that would have happened in 2018,

6   correct?

7      A.    Again, I've testified several times in this

8   position since 2015, so every year between different

9   committees.

10     Q.    And you've testified before the House

11  Committee on Transportation Infrastructure; is that

12  right?

13     A.    I believe so.

14     Q.    And you've testified before the House

15  Oversight and Government Reform Committee too as well?

16     A.    Yes.

17     Q.    Have you ever provided any other testimony

18  before a House or Senate committee or subcommittee

19  other than the ones I've just listed?

20     A.    Again, I've testified several times in the

21  last four and a half years, and then in my previous

22  position at headquarters.  So you have listed some.



Page 14

1    I'm not sure if that's inclusive of all.

2        Q.    Have you ever provided written testimony in

3    the form of an affidavit or declaration?

4            MS. SHINNERS:  Objection.  Vague.

5        Q.    Do you understand my question, sir?

6        A.    Yes.

7        Q.    Okay.  Go ahead and answer.

8        A.    I have provided --

9            MS. SHINNERS:  Uh --

10            THE WITNESS:  Go ahead.

11            MR. MEDLOCK:  If you are going to instruct

12   him not to answer, you can --

13            MS. SHINNERS:  I'm not instructing him not

14   to answer.  I apologize.

15            THE WITNESS:  Okay.

16            MS. SHINNERS:  You can answer.

17       A.    I provided affidavits.

18       BY MR. MEDLOCK:

19       Q.    Do you remember what cases you provided

20   affidavits in?

21       A.    No.  Most of those were employment related

22   again.



Page 15

1     Q.    Do you remember how many affidavits you

2     were provided in court cases?

3     A.    No.

4     Q.    Do you have an approximation?

5     A.    Through out my career.

6     Q.    Yes.

7     A.    Several dozen.

8     Q.    All right.  Sounds like you have got some

9     experience testifying before, but I'm going to go over

10    just a few ground rules so that we are all on the same

11    page here today.  This is a conversation between you

12    and me in which I ask questions and you answer them.

13            There's a court reporter sitting to my

14    left, your right.  She's taking down everything I say

15    and that you say.  That means there's a couple of

16    things we need to keep in mind, or else the court

17    reporter will kill both of us.  That is that you must

18    give audible answers to my questions.  The court

19    reporter is extremely good.  She can't take down

20    shakes of the head or nods of the head.  And the

21    phrase uh-huh and huh-uh can sound very similar.

22            Do you understand that, sir?



Page 16

1          A.     Yes.

2          Q.     It's also important that we not talk over

3     each other.  I'll try to do my best to not start a

4     question while you are still answering, if you can do

5     the same while I'm trying to finish a question.  Okay,

6     sir?

7          A.     Yes.

8          Q.     It's important that if you don't understand

9     any of my questions today, that you say so.  And I'll

10    do my best to ask the question better.  Sometimes I

11    ask a C-plus question.  I'll try to get back to my

12    usual B-plus, A-minus work, if you let me know.  Okay?

13         A.     Yes.

14         Q.     From time to time your attorney will

15    object.  You have already heard that.  The objections

16    from your attorney are for the record.  A judge rules

17    on them later.  Unless your attorney instructs you not

18    to answer, I'm going to ask that you answer my

19    questions today.  Okay, sir?

20         A.     Yes.

21         Q.     We will take breaks approximately every

22    hour.  We can take them more often if you would like.



Page 17

1    My only request to you is that if there's a question

2    pending and you are in the middle of an answer, that

3    you finish your answer before we take the break.  Do

4    you understand that?

5         A.    Yes.

6         Q.    All right.  So unless I tell you otherwise,

7    my questions will relate to the time period from

8    January 1, 2016, through the present day.  Do you

9    understand that, sir?

10        A.    Yes.

11        Q.    And during this deposition, I'm going to

12   refer the U.S. Department of Homeland Security as DHS.

13   Do you understand what that acronym means sir?

14        A.    Yes.

15        Q.    And I'm going to refer the Office of Field

16   Operations as OFO.  Do you understand that?

17        A.    Yes.

18        Q.    I'm going to refer to ports of entries as

19   POEs.  Do you understand that?

20        A.    Yes.

21        Q.    From time to time, I'm going to ask you

22   about certain practices that have been implemented at



Page 18

 1   CBP.  When I do that, I'm asking for your personal

 2   knowledge, not the knowledge of CBP.  Do you

 3   understand that?

 4        A.   Yes.

 5        Q.   And do you understand that you have taken

 6   an oath to tell the truth today, sir?

 7        A.   Yes.

 8        Q.   That's the same oath that you would take

 9   when testifying in court.  Do you understand that?

10        A.   Yes.

11        Q.   Is there any reason why you can't tell me

12   the complete and honest truth in response to my

13   questions today?

14        A.   No.

15        Q.   And you understand there could be criminal

16   consequences for lying under oath?

17        A.   Yes.

18        Q.   And you understand that lying under oath

19   could violate CBP's ethics policies as well?

20        A.   Yes.

21        Q.   All right.  I'm going to mark the first

22   exhibit as Exhibit 20.



Page 19

```
 1                       -   -   -

 2              (A document was marked as Deposition

 3    Exhibit Number 20.)

 4                       -   -   -

 5       BY MR. MEDLOCK:

 6       Q.    So I'm showing you what we have marked as

 7    Exhibit 20 to your deposition, sir.  It's a multi-page

 8    document that on the first page has a caption that

 9    says, Plaintiff's First Deposition Notices.

10              Please take a moment to review it, and let

11    me know audibly when you are done reviewing it, sir.

12       A.    I've finished.

13       Q.    Okay.  This is a deposition notice that

14    contains your name on page 3; is that right?

15       A.    Yes.

16       Q.    And you understand that you are here to

17    testify today pursuant to this deposition notice; is

18    that right?

19       A.    Yes.

20       Q.    Okay.  And are you being represented by any

21    attorneys in connection with your deposition today?

22       A.    These attorneys.  Yes.  Yes.
```



Page 20

1        Q.      Without going into the substance of any

2    conversations that you have had with attorneys

3    regarding this case, can you tell me whether you met

4    with anyone in preparation for your deposition today?

5        A.      I did meet with the attorneys.

6        Q.      When you say the attorneys can you define

7    what that means?

8        A.      The attorneys from chief counsel with CBP

9    as well as Department of Justice.

10       Q.      When did you meet with them to prepare for

11   your deposition?

12       A.      Yesterday and the day before.

13       Q.      Over those two days, approximately how long

14   did you meet with those attorneys to prepare for your

15   deposition?

16       A.      Yesterday about four or five hours, the day

17   before about 45 minutes.

18       Q.      So in total we are talking about somewhere

19   besetment five and almost six hours; is that right?

20       A.      That would be right.

21       Q.      During the time that you met with those

22   attorneys, were there any non attorneys present in the



Page 21

1    room with you?

2         A.    No.

3         Q.    Did anyone participate in the meetings that

4    you had to prepare for today's deposition by

5    telephone?

6         A.    No.

7         Q.    Did anybody participate in the those

8    meetings by video conference?

9         A.    No.

10        Q.    Prior to the meeting did you receive any

11   documents that you were supposed to review prior to

12   your deposition preparation session?

13        A.    Prior to the meeting documents that --

14        Q.    Yes.

15        A.    -- I pulled to review?

16        Q.    That were sent to you by counsel?

17        A.    Yes.

18        Q.    Approximately how many did you receive?

19        A.    Four.

20        Q.    And when you say they were sent to you by

21   counsel, were they sent to you by counsel for CBP or

22   DOJ?



Page 22

1          A.     CBP counsel.

2          Q.     Did reviewing those documents refresh your

3     memory about any events that had happened in the past

4     with respect to the metering policies?

5          A.     Yes.

6          Q.     What were the documents that refreshed your

7     recollection about the metering policy?

8                 MS. SHINNERS:  Objection.  I think it makes

9     -- work product -- but I think it makes more sense to

10    if in the context of the specific questions because

11    the -- in order to fall within the refresh

12    recollection exception, it would need to actually --

13    he would need to rely on it for his testimony.  So if

14    you would like to ask him if he reviewed any documents

15    to refresh his memory about specific facts,

16         Q.     So, as you know, under Rule 30(D)(1),

17    objections are supposed to be stated concisely in a

18    nonargumentative and nonsuggestive manner.  I have let

19    you make several speaking objections today.  It's

20    going to stop.  Okay.  You've got an objection --

21                MS. SHINNERS:  That was not a speaking

22    objection.  It was a privilege objection.



Page 23

```
 1                MR. MEDLOCK:  -- you can object to the

 2   form.  So you are objecting to him talking about

 3   documents that refreshed his recollection that he

 4   already testified as privileged; is that right?

 5                MS. SHINNERS:  I'm objecting to --

 6                MR. MEDLOCK:  Are you going to talk --

 7                MS. SHINNERS:  -- the question as

 8   potentially revealing work product.

 9                MR. MEDLOCK:  Are you going to stop him

10   from testifying about documents that he said refreshed

11   his recollection?

12                MS. SHINNERS:  I am not.

13                MR. MEDLOCK:  Okay.  So my --

14                MS. SHINNERS:  However, in this --

15        BY MR. MEDLOCK:

16        Q.    My question to you, sir, is what were those

17   documents, to the best of your recollection?

18                MS. SHINNERS:  Objection.  Work product.

19                MR. MEDLOCK:  Okay.  Are you going to stop

20   him from testifying?

21                MS. SHINNERS:  I instruct you not to answer

22   this question.  And I am state --
```



Page 24

1           MR. MEDLOCK:  Okay.  We will move on that

2    issue.  We will bring him back to testify again.  As

3    you know, when he testified that it refreshed his

4    recollection, that is an exception to the work product

5    doctrine, and I am entitled to know that.  Okay.

6           BY MR. MEDLOCK:

7      Q.    So, sir, are you going to follow your

8    counsel's instruction and not testify about the

9    documents that you said refreshed your recollection?

10     A.    I will follow my counsel's instructions.

11     Q.    Okay.  You said there were approximately

12   four documents that were sent to you.

13           How long did you spend reviewing those

14   documents?

15     A.    Two or three minutes.

16     Q.    And then when were those documents sent to

17   you prior to your meetings with counsel?

18     A.    They wee provided to me at the first

19   meeting with counsel.

20     Q.    Okay.  That's the 45-minute --

21     A.    Yes.

22     Q.    -- meeting that happened two days ago?



Page 25

1     A.    Yes.

2     Q.    During the longer meeting that you

3 discussed that happened yesterday, were you shown any

4 documents during that meeting?

5     A.    Yes.

6     Q.    Approximately how many documents were you

7 shown?

8     A.    Three.

9     Q.    And during those three documents that you

10 were shown, I take it they were different than the

11 four that you were shown the day before?

12     A.    Correct.

13     Q.    Okay.  Did those three documents refresh

14 your memory about events that happened in the past

15 with respect to the metering policy?

16     A.    No.

17     Q.    During the 45-minute session two days ago,

18 who were the attorneys that were in the room with you?

19     A.    My attorneys from chief counsel with the

20 CBP, Louisa and Christine.

21     Q.    And during the meeting that happened

22 yesterday for about four hours, how -- who were the



Page 26

1    attorneys that were in the room with you that day?

2         A.    The two attorneys from the Department of

3    Justice and the two attorneys from CBP counsel.

4         Q.    Did you review any deposition transcripts

5    prior to today's deposition?

6         A.    I reviewed my deposition that I had

7    provided some time ago.

8         Q.    In what case?

9         A.    In this case.  Oh, I'm sorry.  I'm

10   referring to the interrogatories.

11        Q.    I see.

12        A.    That's right.  I'm sorry.  I was confused.

13        Q.    That's all right.  So I take it you didn't

14   review any depositions?

15        A.    Not a deposition, no.

16        Q.    Okay.  Did you speak to anybody else at CBP

17   or DHS to -- about today's deposition?

18        A.    No.

19        Q.    Does anybody else other than counsel know

20   that you are here today?

21        A.    Yes.

22        Q.    Who?



1     A.   My leadership team knows that I'm out of

2   pocket today because I'm giving a deposition.

3     Q.   But they don't know what case?

4     A.   They know what's on the metering case.

5   Yes.

6     Q.   What did you specifically tell your

7   leadership team about it?

8     A.   That I would be unavailable throughout the

9   day because I'm here giving a deposition on the

10  metering case.

11     Q.   Did your leadership team have any questions

12  for you --

13     A.   No.

14     Q.   -- about today's deposition?  When you say

15  your leadership team, who is on your leadership team?

16     A.   My deputy commissioner, my direct boss, as

17  well as my executive director for operations, as well

18  as my executive director for admissibility, and my

19  executive director for the National Targeting Center.

20  Those are the four that I routinely engage with

21  throughout the day on operational matters.

22          I felt it was important for them to know I



Page 28

1    wouldn't be available throughout the day.

2        Q.    And those four that you just named, those

3    four roles are direct reports to you?

4        A.    The three are direct reports.  The one I am

5    the direct report to, my deputy commissioner.

6        Q.    Fair point.  Can you give me the names of

7    those individuals along with their titles?

8        A.    Yes.  The deputy commissioner is Robert

9    Perez.  The executive director for operations is Randy

10   Howell.  The executive director for admissibility

11   programs is Todd Hoffman.  And the executive director

12   for the National Targeting Center is Vernon Foray.

13       Q.    And how often on an average day do you meet

14   with those four individuals?

15       A.    Multiple times.

16       Q.    Are you all in the same office in the

17   Ronald Reagan building?

18       A.    Yes, we were.

19       Q.    Do you have any standing meetings with your

20   leadership committee on a weekly or daily basis?

21       A.    ███████████████████████████████████████████

22   ███████████████████    ███████████████████████████████



Page 29

1  ████████████████████████████████████

2  ██████████████████████████████████████

3  ████

4      Q.    ████████████████████████████████████

5  ██████████

6      A.    No, it's not.

7      Q.    During that 8:15 meeting who exactly is

8  present at that meeting?

9      A.    There are six executive directors.  My

10 deputy executive assistant commissioner, my chief of

11 staff, his chief of staff.

12     Q.    Okay.  Does anybody attend that meeting via

13 telephone?

14     A.    No.

15     Q.    Are any minutes of that meeting kept?

16     A.    No.

17     Q.    Are any notes sent around after that

18 meeting?

19     A.    No.

20     Q.    Are there any standing topics at that

21 meeting?

22     A.    Standing topics, no.



Page 30

1      Q.    Are there any topics that are typically

2   discussed at that meeting?

3      A.    It is a 24-hour recap of the activities

4   that took place in the ports of entry.

5      Q.    And when you say in the ports of entry, are

6   you talking about ports of entry on the southwest

7   board ports of entry generally?

8      A.    Ports of entry throughout the country.

9      Q.    And do event that occur at ports of entry

10  on the southwest border come up during that meeting?

11     A.    Yes.

12     Q.    Has the metering policy ever come up during

13  that meeting?

14     A.    Yes.

15     Q.    Has the -- has the migration crisis action

16  team ever come up during that meeting?

17     A.    Yes.

18     Q.    Have members of the migration crisis action

19  team ever been invited to that meeting?

20     A.    No.

21     Q.    Has anybody other than the individuals that

22  you already listed ever been invited to that meeting



Page 31

1   on an ad hoc basis?

2        A.    There will be.  On -- again this is an

3   operational meeting.  So depending if an event occurs

4   in a subject matter has information to add, they will

5   be included.

6        Q.    Have you ever discussed investigations by

7   the Office of Civil Rights and Civil Liberties during

8   those meetings?

9        A.    No.

10       Q.    During the 8:15 meeting have you ever

11  discussed investigations by the DHS Office of

12  Inspector General?

13       A.    We have discussed incidents that have been

14  relayed -- or have been referred to OIG for

15  investigation.

16       Q.    Have you ever discussed incidents related

17  to the metering policy that have been referred to OIG

18  for investigation during that meeting, the 8:15

19  meeting?

20       A.    Yes.

21       Q.    Can you describe those discussions that

22  have happened at the 8:15 meeting about the DHS-OIG



Page 32

1    investigation into metering?

2              MS. SHINNERS:  Object to the extent it

3    would cause you to -- answering would cause you to

4    reveal deliberations that are predecisional.  If you

5    can answer without revealing such predeliberations,

6    you may do so.

7         A.    So, I'm sorry, specific to the metering

8    policy.

9         Q.    Correct.

10        A.    I can recall two events where policy was

11   not followed in terms of the metering policy.  We had

12   discussions of those events, and to ensure that they

13   were referred to our Office of Professional

14   Responsibility.

15        Q.     What was the first event?

16        A.    As best as I can recall, one event was --

17   occurred in Laredo.

18        Q.    What was that event in Laredo?

19        A.    To the best of my recollection, individuals

20   who had crossed into the U.S. were returned by the

21   officers back into Mexico.

22        Q.    So the individuals actually stepped foot on



Page 33

1    U.S. soil and then were moved back --

2         A.    Yes.

3         Q.    -- to Mexican soil; is that right?

4         A.    Yes.

5         Q.    Who reported to you about the incident in

6    Laredo?

7         A.    That was reported up from the Laredo field

8    office, the Laredo leadership.

9         Q.    Who in Laredo leadership?

10        A.    I don't recall.

11        Q.    When did this event occur?

12        A.    Best of my recollection, two years ago.

13        Q.    So 2017?

14        A.    Sometime in 2018.

15        Q.    Okay.  And do you recall what month of

16   2018?

17        A.    No, I do not.

18        Q.    And this event was referred to the Office

19   of Professional Responsibilities; is that right?

20        A.    It was.

21        Q.    Do you know what the outcome of the Office

22   of Professional Responsibilities investigation was



Page 34

1    into this incident?

2         A.    I do not.

3         Q.    Who at the Office of Professional

4    Responsibility would this have been referred to?

5         A.    We have an intake center that receives

6    these allegations.  And then they are assigned within

7    the Office of Professional Responsibility.  So we sent

8    them into the joint intake center, as it's called; and

9    it starts the process from there.

10        Q.    And you said this instant happened in

11   Laredo.  Are you referring to the Laredo field office;

12   is that right?

13        A.    I believe this was the port of Laredo.

14        Q.    Okay.  So who at the port of Laredo was

15   directly responsible for directing individuals that

16   were on U.S. soil back to Mexico?

17        A.    Who were the subjects of this action?

18        Q.    Correct.

19        A.    I do not know.

20        Q.    Do you know any CBP officers' names who

21   were involved with the action?

22        A.    I do not.




Page 35

1      Q.    Do you recall who would have been port

2    director at Laredo at the time?

3      A.    At the time, it was likely Greg Alvarez.

4      Q.    You say likely.  Are you --

5      A.    Because Greg Alvarez stepped into a new

6    position around the same time, so --

7      Q.    I see.  Is there anything else you can

8    recall right now sitting here today about this Laredo

9    incident that happened sometime in 2018 that was

10   discussed at the 8:15 meeting?

11     A.    Just again that it was referred to the JIC,

12   the Joint Intake Center.

13     Q.    Okay.  Now you said there was a second

14   incident with respect to the metering policy that was

15   at the 8:15 meeting.  What was that second incident?

16     A.    I believe it occurred in Brownsville.  And

17   it was similar circumstances.  Individuals that had

18   set foot on U.S. soil were taken back.

19     Q.    When did that incident occur?

20     A.    Around the same time.

21     Q.    In 2018?

22     A.    As far as I can recall, 2018.



Page 36

1       Q.      Who reported to you initially about this

2   incident in Brownsville?

3       A.      It would have come up again through the

4   Laredo field office leadership.

5       Q.      And who specifically in Laredo field office

6   leadership would have reported up?

7       A.      It would likely have been whoever the watch

8   commander was that day.

9       Q.      But you don't know the name?

10      A.      No, I do not.

11      Q.      What was discussed at the 8:15 meeting

12  regarding this incident in Brownsville?

13      A.      As far as I can --

14              MS. SHINNERS:  Objection to the extent it

15  would cause you to reveal predecisional deliberations.

16  To the extent you can answer without doing so.

17      A.      Okay.  Just again that we ensured that it

18  was referred to the Joint Intake Center for

19  investigation review by Office of Professional

20  Responsibility.

21      Q.      Do you know what the results of that

22  referral to the Office of Professional Responsibility



Page 37

1    was?

2         A.    I do not.

3         Q.    Did you ever follow up regarding either of

4    these incidents after they were raised at the 8:15

5    meeting?

6         A.    I did not.

7         Q.    Did you ever instruct anyone to do so?

8         A.    No.  I instructed to make sure it was in

9    fact referred, that both were referred.

10        Q.    Did an incident where individuals were on

11   U.S. soil and were returned to Mexican can soil at the

12   Tecate point of entry ever come up during your 8:15

13   meeting?

14        A.    Not through the 8:15.

15        Q.    Okay.  But it may have come up in a

16   different meeting; is that right?

17        A.    It did not come up through a meeting.  It

18   came up with the production of the OIG report.

19        Q.    I see.  Okay.  Can you -- besides this

20   incident in the Laredo Port of Entry and this incident

21   at the Brownsville Port of Entry, can you recall any

22   other discussions regarding the metering policy that



Page 38

1    occurred at the 8:15 meeting?

2         A.    The metering policy?

3         Q.    Correct.

4         A.    Is part of general discussions on our

5    operational flow at the ports of entry.

6         Q.    So it sort of gets wrapped up into that

7    general discussion?

8         A.    Some days it gets wrapped up in that

9    general conversation.  We have been dealing with

10   metering since 2016.

11        Q.    And you are still dealing with it today?

12        A.    We still implement as we need to

13   operationally.  Yes.

14        Q.    Okay.  And it still -- the metering policy

15   is being implemented at ports of entry today?

16        A.    As needed, yes.

17        Q.    Do you know whether it's being implemented

18   at San Ysidro today?

19        A.    It is likely at San Ysidro today.

20        Q.    Otay Mesa?

21        A.    I don't know for sure.

22        Q.    Hidalgo?



Page 39

1     A.     When you say today, are you speaking

2   physically today or --

3     Q.     This week.

4     A.     This week, Hidalgo, not likely.

5     Q.     Not likely.  Why do you say not likely?

6     A.     Because the migrant flows have diminished

7   through the Hidalgo and far ports of entry.

8     Q.     How about Laredo?

9     A.     Likely in Laredo.

10    Q.     Brownsville?

11    A.     Not certain on Brownsville.

12    Q.     Nogales?

13    A.     Definitely being implemented in Nogales.

14    Q.     El Paso?

15    A.     Yes, it's being implemented in El Paso.

16    Q.     And --

17    A.     And these are the ports of entry that I'm

18  referencing.

19    Q.     Correct.  And that's what I mean to say as

20  well.

21    A.     Right.

22    Q.     Are there any ports, other ports of entry



Page 40

1   other than the ones that we have mentioned right now

2   that you are aware of where metering is occurring this

3   week?

4        A.    No.

5        Q.    ████   ████████████████████████████

6   ████████████████████

7        A.    ████

8        Q.    █████████████   █████████████

9   ███████████

10       A.    ████████

11       Q.    ████████████████████

12       A.    ████████████████████

13  ██████████████████████████

14  ████████████████████████████

15  ████████████████████

16  ███████████████████████

17  ██████████████████████████

18  █████████████████████

19       Q.    ███████████████████████

20  █████

21       A.    ███████████████████████

22  ████████████████████



Page 41

1    Operational Support, the Office of Trade.  Who am I

2    forgetting -- oh, and the deputy commissioner.  Oh,

3    and Air and Marine is the sixth one.  I'm sorry.

4         Q.    So you referred to the commissioner of CBP.

5    That individual is sometimes referred to as C1 in

6    e-mail traffic, right?

7         A.    Yes.  Or AC1 as Acting C1.  We have had

8    actings for some time.

9         Q.    Understand.  And have you ever seen an

10   individual referred to as C2 in the e-mails?

11        A.    That is the deputy commissioner.

12        Q.    And if there's --

13        A.    Or DC2.

14        Q.    -- an acting --

15        A.    Yes, sir.  Yes, sir.

16        Q.    And you were referred sometimes referred to

17   as EAC in e-mails; is that right?

18        A.    That is my title, executive assistant

19   commissioner.

20        Q.    Okay.  And that's just an abbreviation of

21   your title; is that right?

22        A.    Yes.  And there's also others that share



Page 42

1    that title.

2         Q.    ████████████████████████████████████

3    ████████████████████████████████████████████████

4    ████████████████████████████████████████████████

5         A.    No.

6         Q.    Are any summaries of that meeting

7    distributed after it occurs?

8         A.    No.

9         Q.    And the individuals that you listed

10   attending that meeting, are there other individuals

11   who sometimes attend that meeting an ad hoc basis?

12        A.    There are.

13        Q.    Of those -- the individuals that attend on

14   ad hoc basis, can you recall who they would be?

15        A.    They are generally representatives from the

16   Office of Intelligence that are briefing on specific

17   intelligence products.

18        Q.    Has the metering policy ever been discussed

19   in the 9:00 a.m. meeting?

20        A.    No.

21        Q.    Has queue management ever been discussed in

22   the 9:00 a.m. meeting?



Page 43

1      A.    No.

2      Q.    Do you understand there to be a difference

3  between metering and queue management, sir?

4      A.    No.  I view it as the same.

5      Q.    They are synonymous terms?

6      A.    Yes.

7      Q.    ████████████████████████████████

8  ████████████████████████████████████████

9  ███████

10     A.    Yes.

11     Q.    Which ones?

12     A.    Which?

13     Q.    Members of MCAT?

14     A.    They have different folks who come and

15  report the stats on a weekly basis.

16     Q.    And when you say report the stats, can you

17  tell me what you mean by that?

18           MS. SHINNERS:  Objection.  I'm going to

19  object to the extent it calls for classified

20  information or law enforcement privileged information.

21  To the extent that you can answer without revealing

22  it, you can.  If you need to consult with your counsel



Page 44

1    from CBP as to what constitutes law enforcement

2    privileged information, we can do so.  I know that

3    counsel instructed you, you can't take a break, but we

4    can take a break to discuss --

5              MR. MEDLOCK:  You can take it to discuss

6    privilege -- let me ask a different question.

7         BY MR. MEDLOCK:

8         Q.    Have you seen e-mails from the Migration

9    Crisis Action Team that list data about processing and

10   throughput at ports of entry?

11        A.    Yes.

12        Q.    And those e-mails go out on a daily basis;

13   is that right?

14        A.    Yes.

15        Q.    And you consume that those e-mails as a

16   part of your official duties; is that right?

17        A.    Yes.

18        Q.    And those e-mails for the Migration Crisis

19   Action Team are sometimes referred to as MCAT reports,

20   sometimes they are referred to as queue management

21   reports; is that right?

22        A.    Mostly referred to as MCAT reports.



Page 45

```
1        Q.    But you've seen reports called queue

2   management reports before?

3        A.    Yes.

4        Q.    And those are also drafted by the MCAT team

5   as well?

6        A.    Yes.

7        Q.    And those MCAT and queue management reports

8   operationally important for you, right?

9        A.    They provide an operational snapshot.

10       Q.    And are those operational snapshots useful

11  to you in your day-to-day business?

12       A.    To some degree.

13       Q.    And why are they useful to some degree?

14       A.    Because they again are just a snapshot in

15  time and are not very detailed.  So they often don't

16  give you the reasons behind the numbers.

17       Q.    But you do use them; is that right?

18       A.    I use them to, again, to give me some

19  visibility as to what's going on in the ports.

20       Q.    ████████████████████████████████████████

21  ██████████████████████████████████████████████████

22  ██████████████████████████████████████████████████
```



Page 46

1    presented in those daily e-mails?

2         A.   No.

3         Q.   So it's just simply a recitation of what

4    you could get by reading those e-mails; is that right?

5         A.   Correct.

6         Q.   Got it.  And just presented verbally; is

7    that right?

8         A.   Yes.

9         Q.   ███████   ████████████████████████████████

10   ████████████████████████████████████████████████

11   ████████████████████████

12        A.   ████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████

15        Q.   What day --

16        A.   So --

17        Q.   -- of the week does the MCAT presentation

18   usually happen?

19        A.   Generally at the start of the week, but it

20   will also align with when the commissioner and the

21   deputy are attending.  They may not attend every day,

22        Q.   So C1 and C2, or AC1 and AC2, are not at



Page 47

1    the Monday meeting that might get bumped to Tuesday or

2    Wednesday?

3         A.    Correct.

4         Q.    All right.  So we have talked about the

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7              ████████████████████████████████████████

8    ████████████████████████████████████

9              MS. SHINNERS:  Objection.  I believe that

10   veers in towards --

11             MR. MEDLOCK:  It's just a yes or no.  I was

12   just asking yes or no.

13             MS. SHINNERS:  Fair enough.  I will allow

14   the witness.

15        A.    Standing topics.  Yes.

16        Q.    Okay.  And the members of that meeting,

17   they know what those standing topics are; is that

18   right?

19        A.    ████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████



Page 48



```
 1    ████████████████████████████████████████████████

 2    ███████████████████████████████████

 3        Q.    ███████████████████████████████████████

 4    ████████████████████████████████████████████████

 5    meetings either with your direct reports or people you

 6    directly report to?

 7        A.    No.

 8        Q.    Do you have any weekly meetings with your

 9    direct reports or people you directly report to?

10        A.    Outside of the 8:15, no.

11        Q.    Okay.  And so the 8:15 is a weekly meeting?

12        A.    Every day.

13        Q.    It's a daily meeting.

14        A.    Daily.

15        Q.    So every weekday; is that right?

16        A.    Every weekday.

17        Q.    ████████████████████████████████████████

18    ██████

19        A.    █████████████████████████████████████

20    ████████████████████████████████████████████████

21    ████████████████████████████

22        Q.    Oh, so --
```



Page 49

```
 1      A.      ████████████████████████████

 2      Q.      ████████████████████████████

 3      ████████████████████████████████████████

 4      A.      ████████████████████

 5      Q.     Okay.  Let me move to the next exhibit.

 6                         -   -   -

 7             (A document was marked as Deposition

 8      Exhibit Number 21.)

 9                         -   -   -

10      BY MR. MEDLOCK:

11      Q.     I think you might be familiar with this

12      exhibit.

13      A.     Yes.

14      Q.     But humor me, and let me know when you have

15      read through it.

16      A.     Yes.  Yes.

17      Q.     All right.  So Exhibit 21 is a copy of a

18      printout from a website that at the stop is entitled

19      Executive Assistant Commissioner Todd Owen.

20             Do you see that?

21      A.     Yes.

22      Q.     And that's you, obviously?
```



Page 50

1       A.    Yes.

2       Q.    Okay.

3       A.    Yes.

4       Q.    Okay.  This website lists some of your

5   educational and career highlights; is that right?

6       A.    Yes.

7       Q.    And you were consulted when this website

8   was drafted; is that right?

9       A.    I'm sure I reviewed a draft.  Yes.

10      Q.    And you approved what went on this; is that

11   right?

12      A.    Yes.

13      Q.    Is there anything that's missing from this

14   page or that you think is inaccurate on it?

15      A.    The budget figure is inaccurate.

16      Q.    It's increased since then?

17      A.    Yes, it has.

18      Q.    Other than that, is there anything else

19   that you would change about this website?

20      A.    Doesn't appear so.

21      Q.    Okay.  So what's the budget that you manage

22   today?



Page 51

1      A.    6.5 billion.

2      Q.    Okay.  And how many employees do you

3   oversee at CBP today?

4      A.    Just on -- just under 30,000.

5      Q.    How many of those 30,000 are sworn law

6   enforcement officers?

7      A.    24,600 approximately.

8      Q.    And one of the things that you do in your

9   role as EAC is you set an example for the other CBP

10  employees; is that right?

11     A.    Try to.

12     Q.    And would you agree with me that it's

13  important for a CBP officer to be honest when they are

14  on and off duty; is that right?

15     A.    Yes.

16     Q.    And as a member of CBP senior leadership,

17  you try to hold yourself to that standard, and in fact

18  to a higher standard; is that right?

19     A.    Yes.

20     Q.    Okay.

21                    -   -   -

22              (A document was marked as Deposition



Page 52

1    Exhibit Number 22.)

2                          -   -   -

3         BY MR. MEDLOCK:

4         Q.    Let me show you a copy of Exhibit 22.  It's

5    a long document.  I'm sure you have probably seen it

6    in your career.  Take a moment to flip through it.

7    I'll direct you to the parts I want to talk about.

8         A.    Okay.

9         Q.    All right, sir.  Exhibit 22 is a multi-page

10   document entitled U.S. Customs and Border Protection

11   Standards Of Conduct.  Do you see that, sir?

12        A.    Yes.

13        Q.    And, for the record, it begins with

14   AOL-DEF-00669013 in the bottom right corner.

15              Do you see that?

16        A.    Yes.

17        Q.    Lawyers call those Bates numbers.  I have

18   no idea why.  But I may refer to them as Bates numbers

19   throughout today's deposition.

20              Can you flip through to the Section 3.2.

21   I'm sorry.  It's on the first page.  I apologize.  You

22   don't need to flip anywhere.  Section 3.2 on the first



Page 53

1    page that ends in 69013.  Do you see that?

2         A.    Yes.

3         Q.    Okay.  And this section here notes that a

4    CBP employee that does not comply with the standards

5    of conduct can face disciplinary action; is that

6    right?

7         A.    Yes.

8         Q.    And if you move up, and Section 3.1 on the

9    same page, that section begins, "In fulfilling its

10   mission, CBP and its employees must sustain the trust

11   and confidence of the public they serve."

12             Did I read that correctly?

13        A.    Yes.

14        Q.    In your opinion, why is it important for

15   CBP to sustain the trust of the public?

16        A.    In my opinion as a law enforcement agency,

17   if you lose the public trust, you won't be able to

18   perform the mission that you are entitled -- you're

19   expected to perform.

20        Q.    Is it important for a law enforcement

21   agency to be candid with the public about what it's

22   doing and why?



Page 54

1      A.     Yes, it is.

2      Q.     Do you believe that CBP has been candid

3   with the public regarding the metering policy?

4      A.     I know that I have been candid with the

5   metering with the public.  I can't speak for the

6   entire Agency.

7      Q.     Are you aware of any instances where any of

8   the law enforcement officers that you oversee have not

9   been candid with the public about the metering policy?

10     A.     Have not been candid, not that I can

11  recall.

12     Q.     Are you aware of any instances in which CBP

13  employees have been told that they have not been

14  candid about the metering policy?

15     A.     Can you repeat the question.

16     Q.     Yeah.  Are you aware of any instances in

17  which CBP employees have been told that they weren't

18  candid about the metering policy?

19     A.     Not that I can recall.

20     Q.     Are you aware of any instance in which CBP

21  officers were told that the metering policy broke the

22  law?



Page 55

1        A.    No.

2        Q.    Are you aware of any instances in which CBP

3    officers admitted to third parties that the metering

4    policy broke the law?

5        A.    I don't believe the metering policy has

6    broken the law.

7        Q.    I understand that, but are you aware of any

8    instances in which CBP officers admitted that?

9        A.    Not that I'm aware of.

10        Q.    Let's turn to Section 6.1, which is on the

11    page that ends in 669015.

12        A.    I'm sorry, 66?

13        Q.    9015.  Should be the third page of the

14    document.

15        A.    Third page.

16        Q.    And in the bottom right, it should end in

17    901.

18        A.    Oh, I'm sorry.  I'm looking in the 6.1,

19    6.2.  Okay.

20        Q.    No, I get it.  There's page numbers, then

21    there's Bates number --

22        A.    Got it.



Page 56

1      Q.     -- then there's the sections, so I get it.

2      A.     Okay.

3      Q.     So I'm under Standards of Conduct, 6.1,

4   conduct prejudicial to the government.  Do you see

5   that?

6      A.     Yes.

7      Q.     All right.  That section, the body of that

8   section reads, quote, Employees will not engage on or

9   off duty in criminal, infamous, dishonest or

10  notoriously disgraceful conduct, or any other conduct

11  prejudicial to the government.

12          Did I read that correctly?

13     A.     Yes.

14     Q.     So there can be disciplinary actions if CBP

15  officers are dishonest when they are on duty; is that

16  right?

17     A.     Yes.

18     Q.     And are you aware of any instance in which

19  CBP officers have been dishonest about the metering

20  policy?

21     A.     No.

22     Q.     You yourself have always been honest about



Page 57

1    the metering policy; is that right?

2          A.    Yes.

3          Q.    You have always been honest about the

4    purpose of the metering policy?

5          A.    Yes.

6          Q.    You've always been honest about the reasons

7    why CBP was implementing the metering policy?

8          A.    Yes.

9          Q.    In your written communications regarding

10   the metering policy, you have been honest and complete

11   about the reasons why CBP was implementing the

12   metering policy; is that correct?

13         A.    I believe so.

14         Q.    Can you think of any instance in which you

15   in your written communications about the metering

16   policy withheld material information about the purpose

17   of the policy?

18         A.    No.  I would like to go back.  You asked

19   the question about officers that have been dishonest

20   with the metering policy.

21         Q.    Yes.

22         A.    There have been several allegations that



Page 58

1    officers have not followed the policy.

2         Q.    Correct.

3         A.    And have said things like asylum is closed

4    and things of that nature.  I'm aware of those

5    incidences.  And when we become aware of those, those

6    have been referred to the check again.

7         Q.    You refer to those as allegations. Are

8    those allegations or have OPR determined that those

9    instances occurred?

10        A.    To my knowledge, they were allegations.  I

11   don't have the outcome of the OPR or the OIG

12   investigations.

13        Q.    So they may have occurred, they may not

14   have occurred.  You just don't know as you sit here

15   today; is that right?

16        A.    Correct.

17        Q.    Now, I'd like to move to the next -- to

18   page Section 6.4.1, Which is on the Bates numbered

19   page that ends in 669017.  Do You see Section 6.4.1,

20   sir?

21        A.    Yes.

22        Q.    And that's under the Section 6.4 which is



Page 59

1    entitled False Statements?

2         A.    Correct.

3         Q.    And 6.4.1 reads, "Employees will not

4    knowingly make false, misleading, incomplete or

5    ambiguous statements, whether oral or written, in

6    connection with any matter of official interest."

7               Did I read that correctly?

8         A.    Yes.

9         Q.    You would agree with me that the metering

10   policy is a matter of official interest, correct?

11        A.    Yes.

12        Q.    Are you aware of any employee who has made

13   a false statement regarding the metering policy?

14        A.    I'm not aware of that.  But, again, I have

15   30,000 employees under me.  I don't know.

16        Q.    Are you aware of any instance in which an

17   employee has made a misleading statement about the

18   metering policy?

19        A.    Again, I am aware of allegations.  And

20   those have been referred to the JIC.

21        Q.    Besides those allegations, are you aware of

22   any other misleading statements?



Page 60

1      A.    Not that I'm aware of.

2      Q.    Are you aware of any incomplete statements

3  that have been made regarding the metering policy?

4      A.    Not that I'm aware of.

5      Q.    How about ambiguous statements?  Are you

6  aware of any ambiguous statements that have been made

7  regarding the metering policy?

8      A.    I would say ambiguous how?  I mean, some

9  people may feel it's ambiguous or incomplete, others

10  may not.  I think that's an awful general statement.

11      Q.    Okay.  Are you aware of anybody who has --

12  any CBP employee who has ever told you that the

13  metering policy is ambiguous?

14      A.    I know that our union representatives have

15  asked for more clarification on the union policy.

16      Q.    The union represents you are referring to

17  is the National Treasury Employees Union or NTEU?

18      A.    Correct.

19      Q.    Do you recall whether it was the national

20  chapter or local chapter that asked for more clarity?

21      A.    I primarily deal with the national.

22      Q.    And the national chapter, who's the head of



Page 61

1    the national chapter?

2        A.    Tony Reardon.

3        Q.    How often do you interact with Mr. Reardon?

4        A.    Few times a year.

5        Q.    Does Mr. Reardon ever forward you e-mails

6    regarding union activities that you should be aware

7    of?

8        A.    Yes.

9        Q.    Does Mr. Reardon ever forward you union

10   grievances that you should be aware of?

11       A.    Not Mr. Reardon.  His vice president Jim

12   Bailey will sometimes call my attention to a specific

13   grievance or not.

14       Q.    How often do you interact with Mr. Bailey?

15       A.    About once a month.

16       Q.    Are those standing meetings or they just

17   happen to happen once a month.

18       A.    No.  They are mostly telephone calls as

19   issues come up.

20       Q.    Besides Mr. Bailey and Mr. Reardon is there

21   anybody else from the NTEU national chapter or any of

22   the local chapters that you deal with?



Page 62

1          A.     From the national chapter, Jonathan Levine,

2     who is -- I'm not quite sure what his title is, but he

3     handles a lot of the CBP OFO matters.  So I will

4     receive messages from him periodically, but Jim Bailey

5     is my primary contact.

6          Q.     And do you ever receive any information

7     from field offices or port directors regarding ongoing

8     grievances filed by NTEU members?

9          A.     I mean, sometimes, yes.  But not every

10    grievance or matter that is filed in the field is

11    raised to my attention.

12         Q.     Sure.  So it's the things that are at least

13    your deputies perceive as more important that

14    percolate up to you?

15         A.     Yes.

16         Q.     With respect to grievances?

17         A.     I would say yes.

18         Q.     It's probably the most important grievances

19    that hit your desk; is that right?

20         A.     Yes.

21         Q.     All right.  Mark the next exhibit.

22                          -   -   -



Page 63

1                    (A document was marked as Deposition

2       Exhibit Number 23.)

3                             -   -   -

4          BY MR. MEDLOCK:

5          Q.    All right, sir.  I've marked as Exhibit 23

6       a one-page document.  Again this is probably one you

7       are familiar with.  That was previously marked in

8       another deposition in this matter as Exhibit 3.

9                    Can you please take a moment to review

10      Exhibit 23, and let know when you are done doing so.

11                    MS. SHINNERS:  Exhibit 3?

12                    MR. MEDLOCK:  Well, I marked it as 23 as

13      well.

14                    MS. SHINNERS:  Okay.

15                    THE WITNESS:  Okay.

16         BY MR. MEDLOCK:

17         Q.    ███████████████████████████████

18      ████████████████████████████████████████████

19      ███████████████████████

20         A.    ██████████

21         Q.    ██████████████████████████████████████

22      ████████



Page 64

1          A.    Yes.

2          Q.    You wrote the memorandum shown in Exhibit

3    23 as part of your job at CBP, correct?

4          A.    Well, my executive director for

5    Admissibility Programs would have written the initial

6    draft.  I would have commented on the draft, and then

7    I would have signed the official guidance that went

8    out, so --

9          Q.    Who's the individual that would have

10   drafted this?

11         A.    Todd Hoffman.

12         Q.    And would Mr. Hoffman have received any

13   input from any of his reports, do you know?

14         A.    I don't know.

15         Q.    Do you know if Ryan Koseor had any input

16   into this guidance?

17         A.    Ryan Koseor does not work for Mr. Hoffman,

18   so I would doubt it.

19         Q.    Do you know if anybody else at CBP had any

20   input into this metering guidance?

21         A.    Mr. Hoffman's director deals with all

22   immigration matters.  So subject matters on his staff



Page 65

1    may very well help contribute to this.

2         Q.    But you don't know one way or the other as

3    you sit here today?

4         A.    I don't know within his staff who helped

5    draft this memo.  No.

6         Q.    So this memorandum was prepared for your

7    signature; is that right?

8         A.    Yes, it was.

9         Q.    And you had the opportunity to give

10   feedback on a draft of this memorandum?

11        A.    I believe so.  Yes.

12        Q.    Do you recall when in relation to April 27,

13   2018, you would have received the draft?

14        A.    No.

15        Q.    Do you recall whether you actually had any

16   edits to this memorandum?

17        A.    I don't recall.

18        Q.    You may have, you may not have.  You just

19   don't recall?

20        A.    I sign a lot of memos.  I don't recall on

21   this specific one I had comments on the draft or not.

22        Q.    Do you recall how long you spent reviewing



Page 66

1    this memo?

2         A.    No, I do not.

3         Q.    How long would you typically spend

4    reviewing a one-page memo?

5         A.    I mean, not very long.  I mean, I would

6    look to make sure that the guidance I felt was clear

7    from this.

8         Q.    Okay.

9         A.    So not very long.

10        Q.    When you say not very long, can you give me

11   an estimate?

12        A.    You know maybe five or ten minutes.

13        Q.    So --

14        A.    Some documents I will review and let them

15   sit and then come back to them and review them again

16   with fresh eyes at a later time.  I mean, I don't

17   recall this one specifically.

18        Q.    Do you recall whether you reviewed this

19   memorandum more than one time?

20        A.    Yes.

21        Q.    How many times did you review it?

22        A.    Prior to its issuance or since then or --



Page 67

1      Q.     Prior to its issuance?

2      A.     Prior to it issuance, I don't recall.

3      Q.     You cite in this memorandum as part of your

4  official duties as the EAC at CBP's Office of Field

5  Operations; is that correct?

6      A.     Yes.

7      Q.     And you would have been knowledgeable about

8  the contents of this memorandum at the time you signed

9  it; is that right?

10     A.     Yes.

11     Q.     And you signed it on or about the date list

12  on the memorandum, April 27, 2018; is that right?

13     A.     Correct. On or about the date.

14     Q.     Correct.

15     A.     Because when the memos come to me, they

16  don't have a date on them yet.  And then when the

17  executive secretaries issue it, within the next day or

18  two that's when they date stamp it.

19     Q.     Okay.  And from reviewing this memorandum,

20  other than the fact there's been a few redactions on

21  it, to your knowledge is this memorandum accurate and

22  correct?



Page 68

 1      A.     Yes.

 2      Q.     And if I refer to this memorandum as the

 3 metering policy, you'll understand that?

 4      A.     Metering guidance.  Yes, sir.

 5      Q.     Okay.  It's your position, isn't it, sir,

 6 that the metering policy was motivated by capacity

 7 constraints at ports of entry on the Mexico border?

 8      A.     In 2016 in San Ysidro.  Yes.

 9      Q.     Any other ports of entry where there were

10 capacity constraints that you believe justified this

11 memorandum?

12      A.     The metering practice started in 2016.  It

13 started in San Ysidro.  As other ports were

14 overwhelmed with the volume of migrants, then we

15 adopted the same practice across the southwest border

16 as needed.  That was throughout 2016.

17             In 2017, the migrant numbers subsided

18 significantly.  It was less necessary to implement

19 metering throughout 2017.  In 2018, the migrants

20 numbers again started to increase, starting to reach a

21 high point in the spring of 2018.  That was what drove

22 this message, this guidance across our southwest



Page 69

1    border.

2        Q.    At the time this memorandum was issued,

3    what were the capacity -- what ports of entry were

4    capacity constrained that you felt justified the

5    issuance of this metering guidance?

6        A.    I don't recall specifically what ports, but

7    our primary gateway ports in the southwest border

8    began to experience capacity issues again throughout

9    2016.  Those would be the major ports, the San

10   Ysidros, the Calexico, Nogales, El Paso, Laredo,

11   Hidalgo off and on, Brownsville off and on.

12       Q.    And it's your assumption that those were

13   the ports that were capacity constrained at that time;

14   is that right?

15       A.    At that time, but again we have 26 ports

16   along the southwest border, 46 actual crossings.  A

17   port of entry may have multiple crossings.  El Paso

18   has four crossings.  At some point because of the

19   migrant situation which ebbs and flows, one of those

20   bridges might have capacity while the other three do

21   not.  It really is a very fluid situation at the ports

22   from port to port, day to day.



Page 70

1      Q.    Is it your position that the metering

2  policy was not motivated by a desire to deter asylum

3  seekers from entering the U.S.?

4      A.    The policy was not desired to deter

5  migrants from entering the U.S.  No, it was not.

6      Q.    And there was no communication that went to

7  any field office or port director that -- from you,

8  that would have led those field offices or port

9  directors to believe that the metering policy should

10 be used to deter asylum seekers; is that right?

11     A.    The metering policy, which again began in

12 2016, was used to address the capacity when we were

13 having large numbers of volumes.

14     Q.    And that's it?

15     A.    That's the reason we do the metering in the

16 ports of entry.

17     Q.    There's no other reason?

18     A.    No other reason.

19     Q.    So I shouldn't see any e-mails or

20 correspondence that would indicate there was another

21 reason; is that right?

22     A.    I can't speak for the whole agency.



Page 71

1      Q.    Okay.  But you would be surprised to see

2   that, wouldn't you?

3      A.    This is the official guidance that I issued

4   to the directors to cascade down through their

5   leadership.  This is why we do metering, because of

6   the operational necessity based on the capacity at the

7   ports.

8      Q.    Okay.  So there shouldn't be any port

9   director or CBP officer who would believe that there

10   was a policy to deter asylum seekers; is that right?

11      A.    If they are following the April 2018 memo,

12   they should not believe there's any other reason.

13      Q.    Okay.  You mentioned that in 2017 the

14   migrant numbers went down; is that right?

15      A.    Correct.

16      Q.    Isn't it the case that some ports of entry

17   continued to meter, even though the number of migrants

18   went down?

19      A.    The number of migrants went down compared

20   th 2016.  We had 154,000 inadmissibles in 2016.  We

21   had 111,000 inadmissibles in 2017.

22          So while the numbers did go down somewhat,



Page 72

1    there were still large numbers of migrants seeking

2    entry into the country, primarily through the gateway

3    land borders, which there would then be a need to

4    meter, as the operational needs dictated.

5        Q.    So the answer to my question is yes, there

6    was metering that occurred in 20 --

7        A.    In 2017.  Yes.

8        Q.    Okay.  And metering occurred in 2018 as

9    well; is that right?

10       A.    Yes.

11       Q.    And 2019 it still occurs.

12       A.    Still occurs.

13       Q.    The metering policy did have a deterrent

14   effect though, didn't it?

15            MS. SHINNERS:  Objection argumentative.

16   You can answer.

17       A.    I don't believe it had a deterrent effect.

18   When you look at the number of migrants that have come

19   in and sought refuge at the ports of entry, the flows

20   -- there have been ebbs and flows as we typically see.

21   But again, last year 126,000 migrants came in and

22   sough refuge; 124,000 the year before.  So I don't



Page 73

1    believe the metering had a chilling effect.

2         Q.    You were told that the metering policy had

3    a deterrent effect, weren't you?

4         A.    I was told?

5         Q.    Yes.

6         A.    I do not recall being told.  I believe some

7    feel that it has a deterrent effect.

8         Q.    But you don't recall ever been told that

9    the metering policy had a deterrent effect?

10        A.    I may have.  I don't recall.

11        Q.    Were you told at any point that the

12   metering policy was working because it was cutting

13   down on the number of asylum seekers that came to the

14   port of entry?

15        A.    I don't recall that.

16        Q.    Were you told that the metering policy

17   created a humanitarian disaster?

18        A.    Humanitarian disaster?

19        Q.    Yeah.

20        A.    No.

21        Q.    Do you believe that the metering policy

22   created a humanitarian disaster?



Page 74

1      A.    No.  Disaster, no.

2      Q.    If somebody told you that the metering

3  policy created a humanitarian disaster, you would have

4  told them that's not correct; is that right?

5      A.    Well, I would tell them if that's their

6  opinion and I don't share that opinion.

7      Q.    Isn't it true that metering occurred at

8  ports of entry even when those ports have excess

9  capacity?

10      A.    You have to define capacity.

11      Q.    How do you define capacity?

12      A.    I define capacity as two parts.  There is

13  the physical capacity which is the space within the

14  detention cells.  Then there's the operational

15  capacity which takes into consideration such things as

16  the demographics of those in custody, the conditions

17  of those in custody T, the issues and sickness issues,

18  the other operational priorities as to how the

19  resources in the ports are being directed that day,

20  all of these other day-to-day operational

21  considerations which may keep a port from reaching the

22  full physical space that they have.



Page 75

1      Q.    So if a port decides to prioritize other

2   matters over processing migrants without proper travel

3   documents, they may have a lower operational capacity;

4   is that right?

5      A.    Could you repeat that question.

6      Q.    Sure.

7      A.    Trying to follow.

8      Q.    If as a policy matter a port decides that

9   they are going to prioritize other missions besides

10  inspecting and processing individuals that don't have

11  proper travel documents, that port will effectively

12  have a lower operational capacity; is that right?

13     A.    Correct.  The finite resources that we have

14  are directed amongst multiple priorities in the ports

15  of entry.  The more you direct towards narcotics

16  intradiction or the counter-terrorism threat means

17  there's less to do other things in, whether that's the

18  migrant processing, the trade enforcement, the

19  agriculture mission.  The full scope of what we do at

20  the ports of entry, if you push resources in one area,

21  there will be less resources in other areas including

22  migrant process.



Page 76

1      Q.    And if you wanted to intentionally lower

2    the operational capacity to process migrants, you

3    could assign more front-line officers to those other

4    missions; is that right?

5           MS. SHINNERS:  Objection.  Argumentative.

6    You can answer.

7      A.    The capacity drives the decisions.  And,

8    again, the capacity is not just the physical space but

9    the operational aspects of what's taking place.  There

10   are certain priority missions within CBP that we do

11   not pull officers off of to process the migrants.  We

12   will not sacrifice the counter-terrorism mission.  we

13   will not sacrifice the narcotics mission.

14          We would not reassign officers from those

15   key missions to process more migrants.

16     Q.    But you have a legal duty to process asylum

17   seekers, right?

18     A.    And we do.

19     Q.    And so but you won't sacrifice the

20   counter-terrorism mission and the narcotics mission to

21   process asylum seekers; is that right?

22     A.    I will not redirect resources from those



Page 77

1    priority missions to process migrants quicker.

2         Q.    Do you believe that counter-terrorism and

3    anti-narcotics are higher priority missions that

4    processing asylum seekers?

5         A.    Yes, I do.

6         Q.    Do you believe that having a orderly flow

7    of trade is a higher priority mission than processing

8    asylum seekers?

9         A.    Yes, I do.

10        Q.    Do you ever interact with individuals in

11   the Mexican government?

12        A.    Yes.

13        Q.    Have you ever -- do you know of an agency

14   in the Mexican government called INM or --

15        A.    INAMI.

16        Q.    -- or INAMI?

17        A.    Yes.  It's Mexican immigration.

18        Q.    Have you ever interacted with the

19   commissioner of INAMI?

20        A.    No.

21        Q.    Do you know of a commissioner of INAMI

22   called Commissioner Vargas?



Page 78

1      A.    I believe I recall the name.

2      Q.    Okay.  Did you ever receive any e-mail

3  traffic regarding Commissioner Vargas?

4      A.    Generally, I -- can you be more specific?

5      Q.    Well, let me ask it this way, CBP has

6  liaison units for foreign governments, correct?

7      A.    Correct.

8      Q.    And one of those liaison -- some of those

9  liaison units are stationed in Mexico City; is that

10 right?

11     A.    Yes.

12     Q.    And they interact with -- those liaison

13 units interact with agencies in the Mexican

14 government, correct?

15     A.    Correct.

16     Q.    Including INAMI, right?

17     A.    Correct.

18     Q.    And that would also include interactions

19 with the commissioner of INAMI, correct?

20     A.    Correct.

21     Q.    And as the EAC, occasionally you would get

22 communications from the liaison unit regarding the



Page 79

1   interactions with the Commissioner of INAMI; is that

2   right?

3          A.    I would receive meetings -- messages on

4   discussions that may have taken place on operational

5   issues.  Those are usually sent through the leadership

6   then cascaded down.  So I would see e-mails like that,

7   but I don't communicate directly with Commissioner

8   Vargas.

9          Q.    Okay.  Do you have any opinion about

10  whether Commissioner Vargas is an honest man?

11         A.    I don't know the man.

12         Q.    Do you believe that INAMI as an agency --

13  it to be dishonest in its interactions with CBP?

14         A.    Dishonest with its interactions with CBP?

15  I don't engage with them directly enough to have an

16  opinion.

17         Q.    Has anybody ever told you that INAMI has

18  been dishonest with respect to CBP?

19         A.    Dishonest with respect to CBP, no.

20         Q.    We talked a little bit about the MCAT and

21  queue management reports that you said gave an

22  operational snapshot.  Do you recall that?



Page 80

1          A.     Yes.

2          Q.     The MCAT and queue management reports, do

3    they list operational capacities in those reports?

4          A.     They list the physical capacity in those

5    reports.

6          Q.     And do they give commentary occasionally on

7    operational capacity issues?

8          A.     Occasionally.

9          Q.     And occasionally those MCAT reports will

10   say whether there are issues that are affecting the

11   port at the time; is that right?

12         A.     They may.

13         Q.     Okay.  Isn't it true that metering has

14   occurred at ports of entry even when those ports

15   reported that the number of asylum seekers that were

16   being processed had no impact on port operations?

17                MS. SHINNERS:  Objection as to

18   characterization of form.  You can answer.

19         A.     I'm not sure I understand the question.

20         Q.     Sure.  The MCAT reports will occasionally

21   have a column that lists whether there is an impact to

22   port operations based on the number of migrants that



Page 81

1    are being processed; correct?

2         A.    That column is more inclusive than simply

3    the number of migrants that may be impacting the port

4    operations.

5         Q.    Sure.  So there are times at which people

6    -- the reports will say that people are being held at

7    the boundary line, even though there's no impact to

8    port operations; is that right?

9              MS. SHINNERS:  Objection.  Assumes facts

10   not in evidence.  Are you referring to the MCAT

11   report?

12             BY MR. MEDLOCK:you know what, I'll make

13   those facts in evidence.  Hold on one second.

14             MS. SHINNERS:  That's fine, I just --

15             MR. MEDLOCK:  No.  No.  That's fine.  I get

16   it.  Let's go ahead and mark this next exhibit.

17                      -   -   -

18             (A document was marked as Deposition

19   Exhibit Number 24.)

20                      -   -   -

21        BY MR. MEDLOCK:

22        Q.    Sir, I put in front of you what we marked



Page 82

1    as Exhibit 24 to your deposition.  It's a two-page

2    e-mail that begins with the Bates number

3    AOL-DEF-00088501 through '502.  Please take a moment

4    to review it, and let me know when you are done doing

5    so.

6         A.    Okay.

7         Q.    All right.  So this is a June 19, 2018

8    e-mail chain between Randy Howe, Ryan Koseor, yourself

9    and others; is that right?

10        A.    Yes.

11        Q.    And you received the top e-mail in this

12   chain; correct, sir?

13        A.    Yes.

14        Q.    You received that e-mail on or about June

15   19, 2018, at 4:22 p.m.; is that right?

16        A.    According to this document, yes.

17        Q.    And if you look on the second page, it

18   looks like you may have printed this e-mail out and

19   circled the number; is that right?

20        A.    May have.

21        Q.    You would have received this e-mail,

22   Exhibit 24, in the course of your duties at CBP,



Page 83

1   correct?

2       A.    Yes.

3       Q.    You would have been knowledgeable about the

4   contents of this e-mail at the time you received it,

5   correct?

6       A.    In terms of knowledgeable of the contents?

7       Q     Yes.  When you received it?

8       A.    I'm not sure I understand, because there's

9   a whole lot that goes in behind these reports that I'm

10  not knowledgeable of.

11      Q.    But you would have been knowledgeable about

12  what's said in e-mail at the time you received it; is

13  that right?

14      A.    I'm still not following.

15      Q.    You would have read and understood this

16  e-mail at the time you received it?

17      A.    I would have read and understood this

18  report.  Yes.

19      Q.    Okay.  And you would have received this

20  e-mail on or about the time listed on the top e-mail,

21  June 19, 2018 at 4:22 p.m.?

22      A.    Yes.





Page 84

1   Q.
2
3
4   A.
5   Q.
6   A.
7   Q.
8
9   A.
10  Q.
11
12  A.
13  Q.
14
15
16  A.
17  Q.
18
19
20
21
22  A.



Page 85

1      Q.    ████████████████████████████████████

2   ████████████████████████████████████████████████

3   ████████████████████████████████████████████████

4   ████████████

5      A.    ██████

6      Q.    ██████████████████████████████████████

7   ███████████████████████████████████████

8      A.    Yes.

9      Q.    And the San Ysidro Port of Entry is one of

10  the gateway ports that you listed?

11     A.    Correct.

12     Q.    How many gateway ports are there on the

13  southwestern border?

14     A.    I would say the major ports would be San

15  Ysidro, Calexico, Nogales, El Paso, Laredo;

16  Brownsville, Hidalgo, somewhat gateways.

17     Q.    They might be a gateway?

18     A.    They might, you know, they are kind of the

19  next band.

20     Q.    Okay.  Have you ever heard the term Class A

21  Port of Entry?

22     A.    Yes.



Page 86

1        Q.    What's a Class A Port of Entry?

2        A.    Class A Port is generally a port that can

3   handle all CBP functions.

4        Q.    And there are also Class B and Class C

5   ports?

6        A.    There are Class Bs and Cs.

7        Q.    What's the difference between a Class A

8   Port of Entry and a Class B Port of Entry?

9        A.    Deals with what they can handle, whether

10  they handle the full scope of CBP operations.  They

11  may only handle cargo.  They may only handle certain

12  types of cargo.  It differentiates those.

13       Q.    As a general matter, does a Class B Port

14  of Entry not have an AEU?

15       A.    As a general matter, a Class B port does

16  not have an AEU, AEU meaning the Admissibility

17  Enforcement Unit?

18       Q.    Correct.

19       A.    Your larger ports have admissibility units.

20  They are called different things.  But most of your

21  larger ports that are either Class As or Class Bs

22  would have individuals trained to deal with migrant



Page 87

1    processing.  Yes.

2         Q.    And do Class A and Class B ports both --

3    are they both able to process pedestrian traffic?

4         A.    I don't recall.  I would assume so.

5         Q.    Okay.

6         A.    I don't recall.  I mean, those are the

7    larger ports.  Now whether they even have pedestrian

8    traffic, I don't know.

9         Q.    Right.  Okay.  Have you ever heard of an

10   effort to create a Class D Port of Entry?

11        A.    Yes.

12        Q.    What was the effort to create a Class D

13   part of entry about?

14              MS. SHINNERS:  Objection to the extent it

15   causes you to reveal pre-decisional deliberations,

16   especially if there's a non-final policy?

17        A.    There's a non-final policy on that

18   discussion.

19        Q.    Okay.  So you are not going to testify

20   about that today?

21        A.    No.

22        Q.    Okay.  Let's look at the San Ysidro entry







Page 89

1          A.     Those are approximates, based on what we

2     receive from the Mexican authorities.

3          Q.     Okay.  From INAMI and Grupo Beta?

4          A.     Or the NGOs, whoever is controlling the

5     process on the Mexican side.

6          Q.     ████████████████████████████████████████

7     ██████████████████████████████████████████████████

8     ████████

9          A.     ████████

10         Q.     ██████████████████████████████████████

11    ██████████

12         A.     ████████████

13         Q.     ████████████████████████████████████████

14    ████████████████████████████████████████████████████

15    ██████████████████████████████

16         A.     ████████████

17         Q.     ████████████████████████████████████████

18    ████████████████████████████████████

19         A.     ████████

20         Q.     ████████████████████████████████████████

21    ██████████████

22         A.     ████████



Page 90

1    Q.    ████████████████████████████

2    ████████████████████████

3    A.    ████

4    Q.    ██████████████████████████████

5    ████████████████████

6    A.    █████

7    Q.    ███████████████████████████████

8    ███████████████

9    A.    ████

10   Q.    ████████████████████████████████

11   ██████████

12   A.    ████

13   Q.    ██████████████████

14   A.    ████

15   Q.    ███████████████████████████

16   ████████████████████████████████

17   ██████████████████████████████

18   ██████████████████████████████

19   ██████

20   A.    ████

21   Q.    █████████████████████████████

22   ███████



Page 91

```
1        A.    ███████
2        Q.    ████████████████████████████
3  ███████████████████████
4        A.    ████████████
5        Q.    ████████████████████
```

6              MS. SHINNERS:  Objection.  Just to clarify,

7    you are stating what's listed in the report?

8        Q.    That's correct.  And then impact to port

9    operations it lists none; is that right?

10       A.    Yes.

11       Q.    Okay.  So there are in fact instances where

12   these snapshots that are taken by the MCAT, it lists

13   no impact to port operations.  And less than 100

14   percent physical capacity where there are individuals

15   being held at the boundary lines; is that right?

16       A.    Yes.

17       Q.    Okay.  Isn't it true that the metering

18   policy was being used to return individuals who

19   entered the U.S. back to Mexico?

20       A.    There were issues of misconduct where

21   individuals that had stepped foot on U.S. soil were

22   returned back.



Page 92

```
 1        Q.    Those would be in instances of misconduct

 2    where people weren't following the policy; is that

 3    right?

 4        A.    Yes.

 5        Q.    As part of the metering policy, ports of

 6    entry, directors of ports of entry on the U.S.-Mexico

 7    border were able to create limit line positions; is

 8    that right?

 9        A.    In 2018, yes.

10        Q.    Okay.  So beginning of 2018 those limit

11    line positions were created by some ports of entry; is

12    that right?

13        A.    In 2018, we started to station officers at

14    the limit line.

15        Q.    Okay.  In some ports of entry were officers

16    a few feet back of the limit line?

17        A.    Yes.

18        Q.    Which ports of entry would those be?

19        A.    Tecate and Otay Mesa for a short period of

20    time.

21        Q.    Any others?

22        A.    Not that I'm aware of.
```



Page 93

```
 1      Q.    And so at Tecate and Otay Mesa, a

 2  individual without proper documents -- proper travel

 3  documents would actually cross the boundary line and

 4  then come up to -- potentially come up to the limit

 5  line position before they interacted with the CBP

 6  officer; is that correct?

 7      A.    In Tecate, the canopy that was erected to

 8  protect the officers from the elements was about ten

 9  feet over the limit line.  So, theoretically,

10  individuals could have stepped within those 10 feet.

11            In Otay Mesa, the jersey barrier that was

12  placed to secure the officers from a car that may try

13  to veer towards them was placed just a few feet across

14  the limit line.

15      Q.    Right.

16      A     Those individuals probably did not cross.

17  They probably could have handed the documents right at

18  the limit line.

19      Q.    When you say a few feet, how far?

20      A.    A few feet, literally a few feet.

21      Q.    Like two feet, three feet?

22      A.    Probably about three or four feet.
```



Page 94

1          Q.     Do you know any individual with three-feet

2     arm, three-foot arms?

3          A.     No.

4          Q.     Okay.  So let's just be straight here.

5          A.     Well, let me also be clear, though, that

6     our officers may not have been standing behind the

7     jersey barriers at three or four, five feet, and they

8     could have walked up to the limit line.

9          Q.     Do you know -- it's possible, right, that

10    asylum seekers walked onto U.S. soil at Otay Mesa and

11    interacted with a CBP officer before they -- when they

12    got to the limit line position, isn't it?

13         A.     It's possible over the past four years,

14    depending on where those officers with stationed

15    throughout the day.

16         Q.     You can't rule it out as you sit here

17    today?

18         A.     I can't rule it out.

19         Q.     Have you ever asked?

20         A.     Yes.

21         Q.     And have you ever been told that asylum

22    seekers stepped onto U.S. soil at Otay Mesa before



Page 95

1   they were turned back to Mexico?

2       A.    We had an issue at Otay Mesa with a

3   congressional representative who brought migrants

4   back.  And that is when it became aware that the

5   officers needed to reposition closer to the limit

6   line.

7       Q.    Who was that Congressional representative?

8       A.    I don't recall.

9       Q.    When did that occur?

10      A.    Sometime within the last twelve months,

11  five, six months ago, perhaps.  No.  Wait.  It was

12  earlier than that.  I believe it would have been last

13  summer, summer of 2018, perhaps the fall.

14      Q.    Okay.  So there was a period between April

15  2018 and the summer of 2018 when this issue at Otay

16  Mesa had not been brought to your attention; is that

17  right?

18      A.    Correct.

19      Q.    And during that time period before the

20  officers were restationed, asylum seekers that came to

21  the limit line position at Otay Mesa may have stepped

22  onto U.S. soil to interact with a CBP officer before



Page 96

1    they were directed back to Mexican soil; is that

2    right?

3        A.    Again, I don't know that, because the

4    officers could have physically been stationed at the

5    limit line, even though the jersey barrier was several

6    feet in.

7        Q.    But as you sit here today, you can't

8    actually rule that out?

9        A.    I can't rule that out.

10       Q.    Okay.  And -- sorry?

11             MS. SHINNERS:  I have to visit the

12    restroom.  Is it okay if we take a break?

13             MR. MEDLOCK:  We can take a break.

14                       -  -  -

15             (Recessed at 10:56 a.m.)

16             (Reconvened at 11:08 a.m.)

17                       -  -  -

18    BY MR. MEDLOCK:

19       Q.    Sir, welcome back.  I understand that you

20    had a few points you wanted to clarify about your

21    deposition?

22       A.    Yes.  I just want to correct on my prep



Page 97

1    session, it was actually with the DOJ and the OCC

2    lawyers on Wednesday, not Thursday.

3         Q.    Okay.

4         A.    And it was with the CBP counsel on Tuesday,

5    not Wednesday.

6         Q.    Okay.

7         A.    And at the Tuesday session, it was only

8    with Christine.  Louisa was at the Wednesday session,

9    but she left early, which is what I got confused with.

10   So I was off by a day with those prep sessions.

11        Q.    Let me see if I get all that.  There was no

12   prep on Thursday.

13        A.    There was no prep on Thursday.

14        Q.    There was on Wednesday and Tuesday,

15   correct?

16        A.    Yes, sir.

17        Q.    Okay.  Thank you for clarifying.  I

18   appreciate it.

19              Could you turn back for a second to Exhibit

20   23, the copy --

21        A.    Yes.

22        Q.    -- of the metering policy.  There's no



Page 98

1   reference in the metering policy to deterrents

2   anywhere in there right?  It doesn't even use the

3   words; is that right?

4       A.    No.

5       Q.    So the metering policy doesn't say one way

6   or another whether the purpose of it is to deter

7   people; is that right?

8       A.    Deterrence is not mentioned in the

9   deposition.

10      Q.    Sure.  So someone reading the document

11  would not know whether the metering guidance is aimed

12  at deterrence; is that right?

13          MS. SHINNERS:  Objection.  Calls for

14  speculation.  You can answer.

15      A.    I would think that the officers, the

16  leadership that read this are clear that this is being

17  done for operational reasons.  And it also very

18  clearly outlines that we are not to discourage a

19  travel waiting to be processed from claiming fear or

20  seeking other protections.

21          It's also very clear that once a traveler

22  is in the U.S., he or she must be fully processed.



Page 99

1    That is the guidance from this.

2         Q.     Okay.  So my question was -- and maybe I

3    can ask it little bit better, the metering guidance

4    memo here in front of you does not take a position one

5    way or another in the written words that are used

6    about whether the policy is being driven by a

7    deterrence rationale?

8         A.     The memo states the policy's been written

9    to ensure the orderly processing and security and

10   safety of the ports.

11        Q.     Does it say that that's the only reason?

12               MS. SHINNERS:  Objection.  Document speaks

13   for itself.  You can answer.

14        A.     That is what's in the document.  There's no

15   reference to deterrents throughout the document.

16        Q.     So it's your view that the metering

17   guidance that is in this April 27, 2018 memorandum at

18   Exhibit 23, the exclusive reason for metering are the

19   operational reasons stated in the memorandum; is that

20   right?

21        A.     Yes.  The memo that I signed, the direction

22   for guidance or the direction for metering is done for



Page 100

1  operational purposes, not for deterrence.

2      Q.    We talked about this a little bit earlier,

3  some ports of entry began metering before April 2018;

4  is that right?

5      A.    We began metering in the early part of

6  2016.

7      Q.    In fact that metering started at the San

8  Ysidro Port of Entry?

9      A.    It started at San Ysidro to deal with the

10  influx of Haitians.

11      Q.    And that began in May 2016; is that right?

12      A.    It was the early part of '16, April, May.

13      Q.    Was it on Memorial Day?

14      A.    I believe it was before Memorial Day, but I

15  don't recall specifically.

16      Q.    All right.  Let me see if I can refresh

17  your recollection.

18                  -   -   -

19          (A document was marked as Deposition

20  Exhibit Number 25.)

21                  -   -   -

22          BY MR. MEDLOCK:



Page 101

1     Q.    All right, sir.  I've put in front of you a

2  multi-page e-mail, two-page e-mail marked as Exhibit

3  25 to your deposition.  The leading Bates number on

4  the document is AOL-DEF-00328857.

5          Please take a moment to flip through it.

6  And when you are done doing so, please let me know.

7          And while you are doing that, we had

8  somebody join us on the phone.  Could you please enter

9  your appearance.

10         MR. FENN:  Hi.  This is Matt Fenn from

11  Mayer Brown.

12         MR. MEDLOCK:  Thank you.

13         THE WITNESS:  Okay.

14  BY MR. MEDLOCK:

15     Q.    All right.  And Exhibit 25 is an August 2,

16  2017 e-mail chain between Robert Hood, Sidney Aki,

17  Johnny Armijo and others; is that correct?

18     A.    Yes.

19     Q.    Who is Robert W. Hood?

20     A.    Robert Hood is one of the assistant port

21  directors at the part of San Ysidro.

22     Q.    And Sidney Aki is the port director?



Page 102

1      A.    He's the port director.

2      Q.    At San Ysidro?

3      A.    At San Ysidro.

4      Q.    And what is Johnny Armijo's position, if

5  you know?

6      A.    Johnny Armijo was assigned to the field

7  office.  He's held various positions.  This one he's

8  the assistant director.  He had been the border

9  security.  He's in leadership at the field office.

10     Q.    When you say the field office, you mean the

11 San Diego field office?

12     A.    The San Diego field office.

13     Q.    Okay.the  subject line in this e-mail

14 reads, RE:  Interview with OIG Special Agents.

15           Do you see that?

16     A.    Yes.

17     Q.    And if you look down in Mr. Armijo's August

18 2, 2017 e-mail from 5:50 p.m., the bottom e-mail in

19 the chain; do you see that e-mail?

20     A.    Yes.

21     Q.    The number 3 on the list of topics in the

22 e-mail is metering start and stop frames.  And then



Page 103

1  below that in a bullet he writes, quote, I indicated

2  the first week of June 2016 at the start, and the

3  first week of February 2017 at the stop.

4           Did I read that correctly?

5      A.    Yes.

6      Q.    And then Sidney Aki, who was the port

7  director, responds to Mr. Armijo's e-mail; is that

8  right?

9      A.    Yes.

10      Q.    And he writes, Johnny, I believe the

11  metering started in May 2016.  THX.  Or thanks.

12           Did I read that correctly?

13      A.    Yes.

14      Q.    And then Mr. Hood responds to Mr. Aki's

15  e-mail writing, quote, Correct.  I think right before

16  Memorial Day in May 2016, 5/24.  Question mark.  Did I

17  read that correctly?

18      A.    Yes.

19      Q.    Does this refresh your recollection that

20  the metering began sometime around Memorial Day

21  weekend in 2016?

22      A.    Yes.



Page 104

1          MS. SHINNERS:  Objection.  Improper

2    refreshing of recollection.  Continue.

3          Q.    Go ahead.

4          A.    I still seem to think it started around

5    April or May.

6          Q.    Okay.

7          A.    To my recollection, in San Ysidro at the

8    time, we were having the influx of Haitians.  The port

9    was under construction.  We had lost holding capacity.

10   I remember having discussions with the DFO about them

11   needing to control the flow into the port.

12          I thought it was around April, May.  This

13   document seems to indicate the end of May.

14         Q.    Okay.  So the answer to my question is you

15   think it began sometime around April or May?

16         A.    I think it began in April or May.

17         Q.    Of 2016.  Is that right?

18         A.    Yes, sir.

19         Q.    Okay.  Let's mark the next exhibit.

20                         -   -   -

21          (A document was marked as Deposition

22   Exhibit Number 26.)



Page 105

```
 1                          -   -   -

 2        BY MR. MEDLOCK:

 3        Q.    All right, sir.  I've put in front of you

 4   Exhibit 26 to your deposition.  It is a two-page

 5   e-mail bearing the Bates number AOL-DEF-00761338

 6   through 39.

 7              Please take a moment to review the e-mail,

 8   and let me know audibly when you are done doing so.

 9        A.    Okay.

10        Q.    All right.  So Exhibit 26 is a May 25

11   through 26, 2016 e-mail chain between yourself, Carlos

12   Martel, John Wagner, Todd Hoffman and others; is that

13   correct?

14        A.    Correct.

15        Q.    And you would have received this e-mail as

16   part of your job at CBP; is that right?

17        A.    Correct.

18        Q.    And you would have read and understood the

19   contents of this e-mail at or about the time that you

20   received it; is that right?

21        A.    Yes.

22        Q.    And in reviewing this e-mail chain, you
```



MAGNA
LEGAL SERVICES

Page 106

1    believe it to be accurate and complete; is that right?

2         A.    Yes.

3         Q.    And you would have received the e-mails in

4    this chain on or about the dates listed in the

5    e-mails; is that right?

6         A.    Yes.

7         Q.    Okay.  The e-mail chain starts with an

8    e-mail from Johnny Armijo, who we were just talking

9    about, on May 26, 2016, at 1:59 a.m.  Do you see that?

10        A.    Yes.

11        Q.    Okay.  And Mr. Armijo at the beginning of

12   the e-mail notes that the San Diego field office has

13   received media requests regarding an increased number

14   of credible fear, slash, asylum applicants at the San

15   Ysidro point of entry; is that right?

16        A.    Correct.

17        Q.    And if you look at the second page of the

18   document, the Bates Number 761339, Mr. Armijo states

19   that the San Ysidro, slash, Otay Mesa AEU, or

20   Admissibility Enforcement Unit, has exceeded its

21   temporary detention capabilities, correct?

22        A.    Correct.



Page 107

1      Q.     And then he goes on to list remedies that

2    have been undertaken to create additional space; is

3    that right?

4      A.     Correct.

5      Q.     Okay.  The first remedy he lists is, quote,

6    utilized several border patrol stations to temporarily

7    house -- hold detainees awaiting transfer to ICE-ERO.

8           Did I read that correctly?

9      A.     Yes.

10     Q.     So in the -- near San Ysidro, that would be

11   the Imperial Beach Border Patrol Station?

12     A.     Yes.

13     Q.     And would there be other border patrol

14   stations would have been utilized?

15     A.     I'm not that familiar with the border

16   patrol structure throughout San Diego, but Imperial

17   Beach Station One, as they call it, is the primary.

18     Q.     And then there are substations near --

19     A.     There are substations.  There's check

20   points, there's other facilities.

21     Q.     And ICE-ERO, can you define what that

22   means?



Page 108

1          A.     Immigration and Customs Enforcement.

2     Enforcement Removal Office is what I believe they are

3     still called by ERO.

4          Q.     And transfer to ICE-ERO means transfer to

5     an ICE detention facility; is that --

6          A.     Right.  Once we complete the processing in

7     our temporary facilities, we transfer them to ICE-ERO

8     comes and picks them up and takes them to a

9     longer-term detention facility.

10         Q.     When you say "them" you mean asylum

11    seekers?

12         A.     The migrants.  Yes, sir.  The asylum

13    seekers.

14         Q.     And when an individual comes to a port of

15    entry and expresses a credible fear, a CBP officer in

16    secondary has -- can take several steps to process

17    that individual, correct?

18              MS. SHINNERS:  Object to the use of the

19    term credible fear.  You can answer.

20         A.     When the asylum seekers come in, the CBP

21    officer begins the process.  We are the initial intake

22    face.



Page 109

1       Q.      Correct.  An asylum seeker could get a

2    notice to appear, correct?

3       A.      They could.  Correct.

4       Q.      They could be paroled into the United

5    States, correct?

6       A.      They could be.

7       Q.      And they could also be put into expedited

8    removal proceedings and then detained?

9       A.      And held in detention by ERO.  Yes.

10      Q.      So those are three options that are

11   available when an individual without proper travel

12   documentation comes to a port of entry and expresses a

13   credible fear of persecution?

14      A.      Can you list the three you mentioned again?

15      Q.      Notice to appear.

16      A.      Yes.

17      Q.      Parole.

18      A.      Parole.

19      Q.      And expedited removal and detention.

20      A.      If the individual is claiming fear.  Yes.

21      Q.      But all those are options that are

22   available?



Page 110

1          A.     All those are options.

2          Q.     Okay.  The second -- the second remedy that

3    is listed in Mr. Armijo's e-mail is, "Transferred all

4    accompanied and unaccompanied unit processing to the

5    Old Port overflow processing area."

6                 Did I read that correctly?

7          A.     Yes.

8          Q.     The Old Port refers to the older part of

9    part of the port of San Ysidro, correct?

10         A.     Correct.

11         Q.     The next remedy that is listed here is,

12    quote, Transferred all permit, open parens, I-94,

13    closed parens, processing to the Otay Mesa Port of

14    Entry in order to secure additional workstations to

15    conduct in-person or virtual interviews.

16                 Did I read that correctly?

17         A.     Correct.

18         Q.     Can you explain what I-94 permit processing

19    is?

20         A.     I-94 is a permit, a authorization to travel

21    beyond the border zone by Mexican citizens primarily

22    through San Ysidro, Otay Mesa.



Page 111

1     Q.     Okay.  And when the reference to secure

2  additional workstations.  That refers to workstations

3  in the secondary inspection processing area, correct?

4          MS. SHINNERS:  Objection.  Foundation.

5  Continue.

6     A.     As I recall, at the time in 2016 the

7  permits, the I-94s were being issues out of the Old

8  Port building.  So in relation to the second bullet

9  and the third bullet, it would make sense to me that

10 they would have moved the processing of the I-94s out

11 of the Old Port building to Otay Mesa.

12    Q.     To make space.

13    A.     Which would have created more space in the

14 Old Port building.  Thus the reference to workstations

15 and such, as I recall.  In 2016, San Ysidro was

16 undergoing the construction.  Different parts of it

17 were being torn down.  We used temporary trailers for

18 a while.

19          We had a reduction in the overall

20 detention space.  And the port management was trying

21 to make work arounds throughout all of this

22 construction.



Page 112

1      Q.     There's a reference here to virtual

2   interviews.  What does that mean?

3      A.     Virtual interviews is something that Border

4   patrol primarily does where you can set up the migrant

5   seeker.  That initial Q and A, that a question and

6   answer, the sworn statement can be done through a

7   video conference with an officer or agent that is

8   stationed somewhere else.

9      Q.     CBP has utilized virtual interviews in the

10  past, hasn't it?

11     A.      Border Patrol primarily uses --

12     Q.     I understand they primarily use it, but

13  hasn't CBP done it?

14     A.     Well, CBP is border patrol.  We are one and

15  the same.

16     Q.     I'm sorry.  OFO has done it, has used it?

17     A.     We have done it in a much less extent.

18  Yes.

19     Q.     OFO has used virtual interviews at ports of

20  entry, correct?

21     A.     Correct.

22     Q.     OFO has used virtual interviews for



Page 113

1    individuals expressing incredible fear and

2    persecution, correct?

3        A.    To my recollection.

4        Q.    OFO has used virtual interviews for

5    secondary processing of asylum seekers at ports of

6    entry, correct?

7        A.    I believe so.

8        Q.    OFO has used virtual interviews to increase

9    the throughput of ports of entry with respect to

10   asylum seekers, correct?

11       A.    Correct.  Terms of the processing.

12       Q.    Virtual interviews are one way that OFO can

13   increase the throughput of a port of entry with

14   respect to asylum seekers, correct?

15       A.    Incorrect.  Virtual interviews are one way

16   to increase the processing, but not the throughput.

17       Q.    Okay.  So, but if I wanted to increase the

18   processing capacity of a port of entry, virtual

19   interviews are one tool that is available to me,

20   correct?

21       A.    The processing capability only.

22       Q.    Correct.  So if I wanted to process more



Page 114

1    asylum seekers, if that was my goal, virtual

2    interviews are a tool that is available to me?

3        A.    Without the accompanying detention space to

4    hold them, or the ability to turn them over to ERO, we

5    would not increase the processing with any tool.  You

6    can't just process somebody.  You have to have

7    someplace to put them when the processing is done.

8        Q.    My question more simple.  Virtual

9    interviews are a way of increasing the processing

10   capacity of a port of entry; is that right?

11       A.    You said increased throughput.

12       Q.    I was talking about processing though, just

13   processing?

14       A.    Virtual interviews can assist with the

15   processing.

16       Q.    They can increase the processing

17   capabilities of a port of entry; is that right?

18       A.    By diverting resources from other

19   activities.

20       Q.    Certainly.  But you could have somebody in

21   Detroit or Miami conduct a virtual interview at San

22   Ysidro using the virtual interview technology that's



Page 115

1    available to OFO?

2         A.    If you are willing to accept the impact to

3    Detroit and Miami, you could use those officers to

4    help process the migrants through virtual processing.

5         Q.    Okay.  The next remedy that is listed in

6    Mr. Armijo's e-mail is, quote, converted GSA's

7    recently vacated maintenance working area at the Old

8    Port into a temporary holding room.

9               Did I read that correctly?

10        A.    Yes.

11        Q.    And this is simply taking available space

12   and using it as a temporary holding area; is that

13   right?

14        A.    I can't speak to that.  I'm not familiar

15   with what that space was or how they intended to use

16   it.

17        Q.    All right.  But you did receive this

18   e-mail; is that right?

19        A.    Yes.

20        Q.    Okay.  And then the next, below those four

21   listed items Mr. Armijo's e-mail he writes, quote,

22   Port management is currently working with San Diego



Page 116

```
 1    Sector Border Patrol to utilize the Imperial Beach

 2    station to hold and process single adult males

 3    awaiting credible fear.

 4               Did I read that correctly?

 5        A.    Yes.

 6        Q.    Please take a moment to read Mr. Armijo's

 7    e-mail.  Does Mr. Armijo anywhere in his e-mail

 8    request that the San Ysidro Port of Entry begin

 9    metering?

10        A.    As I read this, I would reach the

11    conclusion that they need to meter.

12        Q.    Okay.

13        A.    He does not come out and ask for

14    permission.  He does not need to ask for permission.

15    The port leadership has the flexibility to implement

16    metering as they need to.  And looking at this, he's

17    referencing infra structure complaints.  He's

18    referencing a large influx of Haitians.  He's

19    referencing the inability for ERO and such to pick up

20    folks.

21               So as I read this, again leadership at the

22    ports does not need to ask for permission to begin
```



Page 117

1    metering.

2         Q.    So that's not my question.  My questions

3    was does Mr. Armijo, anywhere in his e-mail, reference

4    metering?

5         A.    He does not.

6         Q.    And regardless of whether one could imply

7    that metering should occur, he doesn't say it, right?

8         A.    He does not use the term metering in his

9    e-mail.

10        Q.    He doesn't use the term queue management

11   either?

12        A.    He does not.

13        Q.    He doesn't talk about putting officers at

14   the limit line, does he?

15        A.    No.

16        Q.    So and Mr. Armijo lists several remedies

17   that are being taken, right?

18        A.    Yes.  Temporary.

19        Q.    And he said temporary remedy that might be

20   available to a port director at this time would be

21   metering, correct?

22        A.    Yes.



Page 118

1          Q.     And he doesn't list metering as one of

2     those remedies that's being undertaken, correct?

3          A.     He may already be doing metering.

4          Q.     Me doesn't list it here, does he?

5          A.     He hasn't.

6          Q.     So you are just assuming that he might have

7     been metering?

8          A.     I'm assuming based on the conditions that

9     he clearly outlines here, that they have already been

10    metering to control the influx because they have

11    infrastructure constraints.  They have no one being

12    picked up from ERO.

13         Q.     But you are reading that into his e-mail,

14    correct?

15         A.     Yes.

16         Q.     You are assuming that's correct, right?

17         A.     I believe it to be correct.

18         Q.     That's a guess, right?  That's a guess as

19    you sit here today?

20         A.     As I read this, that would bring me to that

21    conclusion.

22         Q.     I'm not asking whether it led you to that



Page 119

1  conclusion.  There's nothing in this e-mail that says

2  that the port is metering, correct?

3      A.    They are receiving inquiries from the media

4  about the queuing area, the asylum line.  To me that

5  indicates they are metering, that they are holding.

6      Q.    Where does he say they are holding?

7      A.    It says the inquiries are most likely

8  attributed to our usage of designated queuing area,s

9  asylum line.

10     Q.    Where does he say holding?

11     A.    He doesn't say holding.

12     Q.    Where does he say that individuals are

13  being told that the port is at capacity and to come

14  back at a later date?

15          MS. SHINNERS:  Objection.

16     A.    That's not listed in this e-mail.

17     Q.    Okay.  And Mr. Armijo is sending this

18  bottom e-mail to Carlos Martel?

19     A.    Yes.

20     Q.    And Margaret Braunstein, correct?

21     A.    Correct.

22     Q.    And Carlos Martel is the acting executive



Page 120

1    director for operations of OFO?

2          A.    At that time he was.  Yes.

3          Q.    So he would have been Mr. Armijo's boss,

4    correct?

5          A.    No.  Mr. Armijo would report the director

6    of field operations.

7          Q.    Okay.

8          A.    And the director would report to

9    Mr. Martel.

10         Q.    And who's Margaret Braunstein?

11         A.    That was the deputy executive director for

12    operations at the time.

13         Q.    Okay.  And would he have been a direct

14    report to Margaret Braunstein?

15         A.    No.

16         Q.    There are -- is there's also -- is there

17    anybody on this e-mail who would have been Mr.

18    Armijo's direct supervisor?

19         A.    Pete Flores.

20         Q.    Anyone else?

21         A.    No.  Mr. Armijo reports to Pete Flores.

22         Q.    So Mr. Armijo did cc Pete Flores on this



Page 121

1    e-mail, correct?

2         A.    Yes.

3         Q.    And then Carlos Martel forwards this e-mail

4    correspondence from Mr. Armijo to you --

5         A.    Yes.

6         Q.    -- John Wagner, and Todd Hoffman, correct?

7         A     Correct.

8         Q.    With a copy to Margaret Braunstein?

9         A.    Yes.

10        Q.    What was John Wagner's position at this

11   time in May 2016?

12        A.    He's the deputy executive assistant

13   commissioner for field operations.

14        Q.    And was Mr. Hoffman's position the same as

15   what we talked about earlier?

16        A.    Yes, it was.

17        Q.    Okay.  And Carlos Martel writes, quote,

18   Gentlemen, FYSA, significant increase in CF cases at

19   SYS/Otay, POEs resulting in saturation of detention

20   space.  Mitigation actions are enumerated below to

21   include virtual processing assistance from Detroit and

22   MIA.  Media coverage is expected.



Page 122

1              Did I read that correctly?

2        A.    Yes.

3        Q.    And FYSA means For Your Situational

4    Awareness?

5        A.    Yes.

6        Q.    CF refers to Credible Fear?

7        A.    Yes.

8        Q.    And MIA is Miami?

9        A.    Right.

10       Q.    Okay.  I'm sorry.  Decoding stuff here.

11   SYS is San Ysidro?

12       A.    San Ysidro.

13       Q.    Okay.  And nowhere in Mr. Martel's e-mail

14   does he say that one of the mitigation actions is

15   being undertaken is metering, correct?

16       A.    He does not mention metering.

17       Q.    Okay.  You then respond and say, "Kirby,

18   PLS advise the status of the cap waiver request for

19   San Diego.  Need to know by 11:00 a.m. Thursday.  In

20   speaking with Pete Flores, we need to get this

21   approved immediately.  PLS advise."

22              Did I read that correctly?



Page 123

1        A.    Yes.

2        Q.    You are referring to the -- gain a waiver

3   on the cap overtime?

4        A.    The overtime cap waiver.  Yes.

5        Q.    And in your e-mail that was sent on May 25,

6   2016 at 10:19 p.m., do you suggest that the port begin

7   metering?

8        A.    No.

9        Q.    Did Carlos Martel in his e-mail suggest the

10  port begin metering?

11       A.    No.

12       Q.    Okay.

13                    -   -   -

14       (A document was marked as Deposition

15  Exhibit Number 27.)

16                    -   -   -

17       BY MR. MEDLOCK:

18       Q.    All right, sir.  I've put in front of you

19  what we've marked as Exhibit 27 to your deposition.

20  It's a multi-page e-mail chain that begins with

21  AOL-DEF-00762746 and ends with the Bates Number 48.

22            Did I read that correct?  Do you see that,



Page 124

1    sir?

2          A.    Ends with what again?

3          Q.    The page number 48.

4          A.    Yes.  46.

5          Q.    To 48.  There is a September 13, 2016

6    e-mail chain, September 12 through September 13, 2016

7    e-mail chain with the subject line:  Haitians arriving

8    Tijuana.  Do you see that, sir?

9          A.    Yes.

10         Q.    All right.  You received some of the

11   e-mails in this chain, but you did not receive the top

12   e-mail in this chain; is that correct?

13         A.    The top e-mail.

14         Q.    The top e-mail from John Wagner to Maureen

15   Dugan?

16         A.    Maureen Dugan.  There's doesn't seem to be

17   anything in there.

18         Q.    Correct.  But you didn't receive that?

19         A.    No, I did not receive that.

20         Q.    Okay.  You received every other e-mail in

21   the chain; is that right?

22         A.    Yes.



Page 125

1        Q.    Okay.  And for those e-mails, you received

2    them as part of your job at CBP, correct?

3        A.    Yes.

4        Q.    You would have received them on or about

5    the dates and times listed in those e-mails, correct?

6        A.    Correct.

7        Q.    You would have read and understood those

8    e-mails at the time you received them, correct?

9        A.    Yes.

10        Q.    And you have no reason to believe as you

11    are sitting here today that this -- these e-mails,

12    other than the redactions that appear on them, are

13    inaccurate or incomplete in any way, correct?

14        A.    No.

15        Q.    Okay.  I want to focus on the e-mail from

16    Carlos L. Gonzalez on Tuesday, September 13, 2016 at

17    8:54 a.m.?

18        A.    Yes.

19        Q.    And at the time Mr. Gonzalez sent this

20    e-mail, he was the attache for CBP at the U.S. Embassy

21    in Mexico City; is that right?

22        A.    He was.



Page 126





Page 127

1      Q.  ████████████████████████████████████

2  ████████████████████████████████████████████

3  ██████████████████████████████████████████████

4  ██████████████████████████████████████████████

5  ████████████

6      A.  ████████████████████████████████████

7  ██████████████████████████████████████████████████

8  ████████████████████████████████████████

9      Q.   And this would have been during the time

10 period during which the San Ysidro Port of Entry was

11 engaged in metering, correct?

12     A.   Correct.

13     Q.  ████████████████████████████████████████

14 ██████████████████████████████████████

15     A.   ████████████

16     Q.   And for a time when the metering policy was

17 first issued, individuals without proper travel

18 documents who approached a port of entry were given

19 physical appointments, correct?

20          MS. SHINNERS:  Objection.  Vague as to

21 geographic scope.

22     Q.   Do you understand my questions?



Page 128

1      A.    I believe at the time we started to use

2    metering, Grupo Beta handed out appointment tickets.

3    I don't recall CBP doing that.

4      Q.    Okay.

5      A.    But again, this was in 2016 when we started

6    this process.  Best of my recollection, it was Grupo

7    Beta that was trying to control the flow through

8    appointment tickets.  I don't believe we gave out any

9    tickets.

10      Q.    Okay.  Thank you for clarifying.

11      A.    To the best of my recollection.

12      Q.    So the phrase wait for appointments here is

13    in reference to the metering policy, correct?

14      A.    Waiting for available space to process.

15    Yes.

16      Q.    ██████████████████████████████████████

17    ████████████████████████████████████████████████

18    ████████████████████████████████████████████████

19    ██████████████████████████

20      A.    ██████████████████████████████████

21    █████████████████

22      Q.    ████████████████████████████████



Page 129





Page 130



```
 1  ████████████████████████████████████████████
 2  ████████████████████████████████████████████
 3  ██████████████████████████████████████████
 4  ███████████████████████████████████████████████
 5  ████████
 6      Q.   ██████████████████████████████████
 7  ███████████████████████████████████████████████
 8  ████████████████████████████████████████████
 9  ██████████████████████████████
10      A.   ████████████████████████████████████
11  ████████████████████████████
12      Q.   ████████████████████████████████████
13  █████████████████████████████████████████████████
14  ████████████████████████████████████████
15  █████████████████
16      A.   ███████████████████████████████████
17  ██████████████████████████████████████
18  ███████████████████████████████████████████
19  ███████████████████████████████████████████
20      Q.   So, sir, when you were -- no one told you
21  to avoid answering my questions today, did they?
22      A.   No.
```

Page 131

1        Q.    No one told you to come here and

2    filibuster, did they?

3        A.    No.

4        Q.    So you are capable of giving a yes or no

5    answer to a question, right?

6        A.    Not to something that I have to speculate

7    on.

8        Q.    So I don't think this requires speculation,

9    sir.

10       A.    The mayor from Tijuana --

11       Q.    Can I -- can I just --

12       A.    Yes, sir.

13       Q.    -- ask you the question though, before you

14   go into the answer.

15

16

17

18

19

20       A.

21

22



Page 132

1    Q.    ████████████████████████

2    ████████████████

3    A.    ██████████████████████

4    ████████████████████████

5    Q.    ██████████████████████████

6    ████████████

7    A.    ████████████████████████████

8    ████████████

9         Q.    Okay.  Thank you, sir.  All right.  Let's

10   move on to our next exhibit.

11                        -    -    -

12              (A document was marked as Deposition

13   ████████████████

14                   ██    ██    ██

15        ████████████

16        Q.    All right, sir.  I've marked as Exhibit 28

17   a three-page e-mail that begins with the Bates number

18   AOL-DEF-00762523, ends with the Bates number trailing

19   in 525.  Sir, Exhibit 28 is an e-mail chain from

20   September 16, 2016, that was exchanged between Todd

21   Hoffman, Pete Flores, Sidney Aki, Johnny Armijo and

22   others, correct?



Page 133

1     A.    Yes.

2     Q.    And you were aware in 2016 that senior

3  government officials were interested in what was

4  occurring at the San Ysidro Port of Entry with respect

5  to the Haitians; is that correct?

6     A.    Yes.  I remember Secretary Johnson was

7  interested in what was taking place in San Diego.

8     Q.    When you say Secretary Johnson, you mean J.

9  Johnson, who was at the time --

10    A.    DHS?

11    Q.    -- DHS secretary?

12    A.    Yes, sir.

13    Q.    And in fact the National Security Council

14  was getting updates on what was going on at San Ysidro

15  at that time?

16    A.    Apparently, yes.

17    Q.    And the deputy's committee actually held a

18  meeting about what was going on in San Ysidro,

19  correct?

20    A.    According to this e-mail.

21          MS. SHINNERS:  Can we take a quick break

22  just to look at this document and discuss among



Page 134

1    counsel?  We just want to make sure there's no

2    redactions that need to be made.  I'm not saying there

3    will be, just potentially if there's potential claw

4    back, we want to just take a look.

5              MR. MEDLOCK:  Okay.  Sure.  We can do that.

6                   -  -  -

7              (Recessed at 11:45 a.m.)

8              (Reconvened at 11:47 a.m.)

9                   -  -  -

10    BY MR. MEDLOCK:

11        Q.    Sir, did you ever attend any of these

12    deputy's committee meetings or National Security

13    Council meetings regarding what was going on in San

14    Ysidro in 2016?

15        A.    No.  Not that I recall.  No.

16        Q.    Did you ever get a readout of those

17    meetings?

18        A.    I'm sure the deputy, when he came back,

19    probably would have discussed what occurred at those

20    meetings.  That's generally the way these things go.

21        Q.    Do you have any recollection of your

22    interactions with the deputy regarding those meetings?



Page 135

1        A.    No.

2        Q.    Who would the Deputy or C2 have been at

3   that time?

4        A.    At that time it would have been Kevin

5   McAleenan.

6        Q.    Do you know whether the deputy's Committee

7   of the National Security Council or the National

8   Security Council was aware that metering was going on

9   at the San Ysidro Port of Entry in September 2016?

10       A.    I don't know if they were aware.

11                          -   -   -

12            (A document was marked as Deposition

13   Exhibit Number 29.)

14                          -   -   -

15       BY MR. MEDLOCK:

16       Q.    Sir, I've put in front of you a multi-page

17   e-mail chain that begins with the Bates number

18   AOL-DEF-00761290 through 294.  It's an e-mail chain

19   that begins in August 17, 2016, and ends on September

20   7, 2016.

21            Do you see that, sir?

22       A.    Yes.



Page 136

```
 1         Q.    And this is an e-mail -- a chain of e-mails

 2    between Katherine Stark, Johnny Armijo, Pete Flores

 3    and others, correct?

 4         A.    Correct.

 5         Q.    And the subject line of the e-mail is

 6    Asylum Claims at San Ysidro/Ped West, correct?

 7         A.    Correct.

 8         Q.    Ped West is a portion of the San Ysidro

 9    Port of Entry, correct?

10         A.    Pedestrian West.  Yes.

11         Q.    And there's also a pedestrian east as well,

12    correct?

13         A.    Yes.

14         Q.    We talked a little bit earlier about a

15    Grupo Beta.  What is Grupo Beta to your knowledge?

16         A.    Grupo Beta, to my knowledge, is a arm or

17    branch within Mexican immigration, Mexican INAMI.

18         Q.    What does Grupo Beta do, if you know?

19         A.    To the best of my recollection, they deal

20    with the asylum, the migrant processing, those types

21    of things.  I'm not real clear on the distinction

22    between what Grupo Beta does as a part of INAMI and
```



Page 137

1  the broader units within IMANI.  I don't know.

2      Q.    Nor am I.  I was hoping you would.  Is it

3  correct that Grupo Beta coordinates with OFO regarding

4  the implementation of the metering policy?

5      A.    During the beginning of the implementation,

6  we did coordinate with Grupo Beta.  I do not know if

7  San Ysidro still does that.

8      Q.    Do ports of entry, when implementing the

9  metering policy, coordinate with individuals in Mexico

10  to meter the asylum seekers that come to the port of

11  entry?

12      A.    Could you just restate that again?

13      Q.    Sure.  I guess -- I can break it down a

14  little bit for you.

15      A.    Okay.  Because I think I want to make sure

16  I'm clear on the process, explain the process, because

17  there is interaction at some point.

18      Q.    Right.

19      A.    In order to say we have capacity, bring

20  up --

21      Q.    And that's what I was going to get to.

22      A.    That that occurs.  Yes.



Page 138

1      Q.    Okay.  So when a port is metering, there

2    has to be someone that they interact with on the

3    Mexican side of the border to say we have capacity for

4    5 more or 10 more or 20 more correct?

5      A.    Correct, if the migrants have returned to

6    the shelters.

7      Q.    Correct.

8      A.    In some locations they may be waiting on

9    the bridge.  And at that location, there's no reason

10   to coordinate.  You would just bring in the next 10

11   that are waiting in line on the bridge, if you will.

12     Q.    So there -- but there are some ports for --

13     A.    There are some -- right.  But I'm saying

14   it's a different process at each port.

15     Q.    Understood.

16     A.    But yes, in some locations like San Ysidro,

17   generally the migrants have returned to the shelters.

18   And San Diego would coordinate with somebody to say we

19   now have capacity, bring up 10 or 20; or we have space

20   specifically for family units.  Bring up family units.

21   That coordination would take place.

22     Q.    Okay.



Page 139

1        A.     If that answers where you were.

2        Q.     I think it does.  So, for example, the San

3    Ysidro Port of Entry is located next to the Mexican

4    city of Tijuana, correct?

5        A.     Correct.

6        Q.     And there are individuals without proper

7    travel documents who are in shelters in Tijuana due to

8    the metering policy, correct?

9        A.     They are in shelters not just because of

10   the metering.  There are individuals awaiting to come

11   to the U.S. in shelters.

12       Q.     Okay.  And under the metering policy,

13   someone at the San Ysidro Port of Entry would need to

14   contact someone in Mexico to coordinate bringing up a

15   certain number of individuals to be processed at the

16   port, correct?

17       A.     Correct.

18       Q.     And that also happens with Brownsville and

19   Matamoros at times, correct?

20       A.     Again, depending, you know, Brownsville and

21   Matamoros, I mean, some of those are bridges with

22   folks waiting.  And because there is capacity, the



Page 140

1    line may not be that long.  So they may not have

2    actually returned to a shelter.  They may wait a few

3    hours and then come across.

4              So in those situations we wouldn't

5    coordinate with someone because the asylum seekers

6    would be there physically across the line, if you

7    understand that.

8         Q.    Understood.

9         A.    Yeah.

10        Q.    And are you aware that there are in some

11   cases lists of individuals that like to be processed

12   for asylum in ports of entry that are kept on the

13   Mexican side of the border?

14        A.    Yes.

15        Q.    And in instances where OFO is interacting

16   with someone on the Mexican side of the border to

17   bring people up to the port for processing, the wait

18   lists are used to determine who will become next,

19   correct?

20        A.    Correct.

21        Q.    I want to go back to the e-mail I've marked

22   in front of you.  And I'm looking at the September 7,



Page 141

1    2016 e-mail from Johnny Armijo at 1:02 p.m.

2         A.    Okay.

3         Q.    And he says, "Good morning, Ms. Stark.

4    Affixed below in red are responses to the questions

5    submitted."  Do you see that, sir?

6         A.    Yes.

7         Q.    I'll represent to you  there's no red on

8    this document, but it looks like there are questions

9    and then answers set out below them, correct?

10        A.    Correct.

11        Q.    Okay.  Do you know who Katherine Stark is?

12        A.    No.

13        Q.    Okay.  The first question is, "I believe in

14   the call, the port director said on behalf of CBP,

15   there is currently no coordination with Grupo Beta.

16   Is that accurate."

17             Do you see that, sir?

18        A.    Yes.

19        Q.    And then below that there is an answer that

20   begins with, "At the outset, CBP SYS did not

21   coordinate with Grupo Beta on the development of the

22   numbering system in which Grupo Beta currently



Page 142

1    utilizes to meter the flow of potential asylum claims

2    into our custody.  However, subsequent to the

3    development of this system, CBP SYS does routinely

4    coordinate with Grupo Beta to ensure that there is a

5    consistent, slash, metered flow."

6              Did I read that correctly?

7         A.    Correct.

8         Q.    And does that accurately describe the

9    interactions between the San Ysidro Port of Entry and

10   Grupo Beta as it existed in September 2016?

11        A.    To my recollection in September 2016 that

12   would be accurate.

13        Q.    Okay.  Sir, I've marked as Exhibit 30 a

14   two-page e-mail, begins with the Bates number

15   AOL-DEF-00761340 and continues over to 341.

16                   -   -   -

17             (A document was marked as Deposition

18   Exhibit Number 30.)

19                   -   -   -

20        BY MR. MEDLOCK:

21        Q.    This is a August 17, 2016 e-mail chain

22   between yourself, James R. Hutton and John P. Wagner



Page 143

1    and Todd Hoffman, correct?

2         A.    Correct.

3         Q.    And just so we get this correct, the e-mail

4    chain starts on august 17, 2016, with a e-mail sent at

5    12:46 p.m. by Katherine Stark, correct?

6         A.    Correct.

7         Q.    And it appears she goes by the name Kylie

8    Stark in her e-mail signature, correct?

9         A.    Okay.  Yes.  Now, seeing that she's in the

10   Office of Congressional Affairs, I do know a Kylie in

11   Congressional Affairs.

12        Q.    Okay.  So that refreshes your recollection

13   of who Katherine Stark --

14        A.    I do know who Katherine Stark was.  Okay.

15        Q.    And do you know who James R. Hutton or J.

16   Ryan Hutton is?

17        A.    Yes.  Goes by Ryan Hutton.  Yes.

18        Q.    And what was -- his position was deputy

19   executive director, admissibility?

20        A.    Yes.

21        Q.    And Passenger Programs at the time?

22        A.    He was the deputy of Todd Hoffman at this



Page 144

 1   time.

 2       Q.    Okay.  And we already discussed John

 3   Wagner's position.

 4       A.    Yes.

 5       Q.    So I won't belabor that.  Ryan Hutton

 6   writes, on August 17, 2016 at 1:08 p.m., quote, Gary

 7   Merson, in parentheses, Democratic Chief Council

 8   Subcommittee on Immigration and Border Security,

 9   Committee of the Judiciary, end parentheses, would

10   like to have a conference call with the PD at San

11   Ysidro, and the appropriate HQ SME to discuss the

12   processing of asylum claims at San Ysidro, slash, Ped

13   West.

14            Did I read that correctly?

15       A.    Yes.

16       Q.    HQ SME refers to a headquarters subject

17   matter expert, correct?

18       A.    Right.  Correct.

19       Q.    And Mr. Hutton goes on to state, quote,

20   This relates to a call you, XD Hoffman and PD Aki

21   recently had with DHS on this very issue in which NGOs

22   were claiming that POE was turning away people



Page 145

1    claiming the CF, when in fact Government of Mexico is

2    assisting with metering pedestrians due to current

3    construction.  Did I read that correctly?

4        A.    Yes.

5        Q.    So in August 2016 counsel for the

6    Subcommittee on Immigration and Border Security

7    reached out with questions regarding allegations that

8    individuals were being turned away at the San Ysidro

9    Port of Entry, correct?

10        A.    With the allegations.  Yes.

11        Q.    And those allegations related to

12    implementation of the metering policy, correct?

13        A.    I don't know.  It just says alleging that

14    CBP officers are turning Mexicans away from the port.

15        Q.    Correct.  And then later in the e-mail it

16    refers to assisting with metering pedestrians,

17    correct?

18        A.    Yes.

19        Q.    Okay.  So is it your understanding that

20    this inquiry related to the implementation of the

21    metering policy at San Ysidro?

22        A.    I have no reason not to think so.



Page 146

1       Q.    Okay.  Do you recall at all what the

2   outcome of this inquiry from the subcommittee on

3   immigration and border security on he -- of the

4   committee on the judiciary was?

5       A.    No, I do not.

6       Q.    But you did know in August 2016 that

7   counsel for a congressional subcommittee had questions

8   about how the metering was being implemented at the

9   San Ysidro Port of Entry, correct?

10      A.    Yes.

11                        -   -   -

12            (A document was marked as Deposition

13  Exhibit Number 31.)

14                        -   -   -

15      BY MR. MEDLOCK:

16      Q.    All right.  Exhibit 31 is a one-page e-mail

17  from November 10 to 11, 2016, With a Bates number

18  AOL-DEF-00272936.  Do you see that, sir?

19      A.    Yes.

20      Q.    And this is an e-mail exchange between

21  yourself, Kevin McAleenan, John Wagner, Gloria Chavez

22  and others, correct?



Page 147

1          A.     Correct.

2          Q.     Do you see an individual in this e-mail

3    referred to as Patrick Flanagan?

4          A.     Yes.

5          Q.     What's Patrick Flanagan's position?

6          A.     Where -- is that in the body of the e-mail?

7          Q.     It's not.  That's why I'm asking.

8          A.     Oh, I see the cc there.  He was the chief

9    of staff to the deputy commissioner in 2016.

10         Q.     Okay.  And Enrique Tamayo, what was his or

11   her position at the time?

12         A.     I believe at this time he was also assigned

13   to the Crisis Action Team, which was the precursor to

14   the MCAT.

15         Q.     Okay.  So it started out as Crisis Action

16   team and became MCAT?

17         A.     Border patrol had a stats unit, field op

18   had a stats unit.  They brought the two together to

19   try to have some greater visibility and reconcile the

20   numbers because we were reporting things differently.

21   the CAT then became the MCAT at some point.

22         Q.     But you don't recall when?



Page 148

1        A.      I don't recall when.

2        Q.      Okay, and there's also a reference in here

3    to Beverly Good?

4        A.      Beverly Good.

5        Q.      Who's Beverly Good at this time?

6        A.      At this time, I believe this was in the

7    latter part of '16.  I believe at this time Beverly

8    Good would have been the acting executive director for

9    operations.

10       Q.      Okay.  All right.  So I'm starting down at

11   the e-mail from Gloria Chavez to Beverly Good at the

12   bottom of the e-mail chain.  Do you see that?

13       A.      Yes.

14       Q.      Okay.  That e-mail was sent November 10,

15   2016 at 2:48 p.m., correct?

16       A.      Yes.

17       Q.      All right.  And it begins, quote, One other

18   top that C2 discussed at the NAC meeting today was the

19   ability to meter the flow of FMUAs at the POE bridges,

20   in open parentheses, at the middle the bridge, closed

21   parentheses, at some of our Texas POEs to prevent the

22   overflow at the actual POEs.



Page 149

1          Did I read that correctly?

2     A.    Yes.

3     Q.    What does FMUAs mean?

4     A.    Family units.

5     Q.    What is the NAC meeting?

6     A.    The NAC was the location of DHS

7  headquarters.

8     Q.    And do you recall whether this is referring

9  to an ad hoc meeting or a standing meeting?

10    A.    I don't know.

11    Q.    Okay.  Did you attend this meeting, do you

12 recall?

13    A.    No.  I don't recall.

14    Q.    Okay.  Then Ms. Chavez goes on to state in

15 the e-mail, further down in the same paragraph, I'm

16 sorry, actually the next paragraph, quote, I just

17 received word from Commissioner staff that this

18 proposal that C2 introduced to S1 for consideration

19 earlier today was approved by S1 and to make

20 notification to OFO.

21          Did I read that correctly?

22    A.    Yes.



Page 150

1      Q.    So if I could decode some jargon here, the

2   deputy commissioner made a proposal to the secretary

3   to begin metering flow of family units at ports of

4   entry in Texas, and that was approved by the

5   secretary; is that correct?

6      A.    I'm not sure if this was to begin the

7   metering or the placement of the officers at the limit

8   line.

9      Q.    Okay.  But a proposal was made by the

10  deputy secretary that was approved -- by the deputy

11  commissioner that was approved by the deputy

12  secretary?

13     A.    Correct.  Correct.

14     Q.    And at this time, November 2016, the

15  secretary would have been J. Johnson?

16     A.    I believe so.  Yes.  Yes.  Because I --

17  yes, because Mr. Johnson stayed until the change of

18  the administration in January of '17.  He didn't leave

19  early, as far as I recall, so...

20     Q.    Okay.  And Ms. Chavez goes on to say that

21  OFO field leadership should be told that some of the

22  Texas POEs can start engaging in this new operational



Page 151

1   alignment, correct?

2        A.    Correct?

3        Q.    So sometime around November 10, 2016, some

4   of the ports of entry in Texas began metering the flow

5   of family units on POE bridges, correct?

6        A.    Again, according to this, I'm not sure if

7   it was to begin the metering or the placement of the

8   officers at the limit line, because we had been

9   metering throughout 2016 at different places at

10  different times.

11       Q.    But when that metering occurred at some --

12  it sounds like there were instances where officers

13  weren't at the limit line, correct?

14       A.    When we started the metering in 2016, we

15  did not hold at the limit line.  We simply allowed

16  people to line up outside the doors to the port and

17  wait to be processed.

18       Q.    I see.

19       A.    Our processing capability was not

20  sufficient to handle the flows we had.  You ended up

21  with individuals camping out outside, outside the port

22  limits without shelter, without food, without





Page 152

1    bathrooms.

2        Q.    I see?

3        A.    As the situations deteriorated and we had

4    unsafe conditions, then we started to hold at the

5    limit line so that the migrants could return to the

6    shelters where there was food, there was bathrooms.

7    And then we would process them from the limit line.

8              That was how the metering process

9    transitioned from where we started in 2016 holding at

10   the doors, to beginning to place officers at the limit

11   line so that they would remain in the shelters, as

12   opposed to outside the port exposed to the elements

13   without restrooms and such.

14       Q.    Can I -- thank you for that explanation.  I

15   just want to unpack a couple things.

16             So you said originally when metering was

17   first implemented, people were held at the doors to

18   the actual port building, correct?

19       A.    Correct.

20       Q.    And the port building is on U.S. soil?

21       A.    Correct.

22       Q.    It's actually set back from the boundary



Page 153

1    line, correct?

2         A.    Correct, in most ports.

3         Q.    In most ports it's actually set back

4    several feet from the boundary line?

5         A.    Correct.

6         Q.    Can it be several yards from the boundary

7    line?

8         A.    It could be.

9         Q.    What's the furthest distance between the

10   boundary line and a port that you are aware of on the

11   southwestern border?

12        A.    Oh, I think Anzalduas from the limit line

13   to the port is about a mile, 1.2 miles.

14        Q.    How about San Ysidro, how far back is the

15   port building from the boundary line?

16        A.    I couldn't speculate.  It's a huge port.

17   From where the limit line is and where pedestrians

18   come, it's a short walk to the old port building.

19   It's a long walk to primary.  The POV lanes is

20   different.

21        Q.    Yeah.  But from the boundary line to the

22   port building, whether it's the --



Page 154

1        A.    Correct.

2        Q.    -- old port or the new port, it's several

3   feet, correct?

4        A.    Correct.

5        Q.    That's true in Otay Mesa, true, as well?

6        A.    I believe so.  Yes.

7        Q.    That's also true in Hidalgo, correct?

8        A.    Hidalgo, correct.

9        Q.    And Laredo it's also true?

10       A.    Correct.

11       Q.    Is it true in Brownsville as well, that

12   there's several feet between the boundary line and the

13   port building?

14       A.    Yes.

15       Q.    How about El Paso, several feet between --

16       A.    Yes.

17       Q.    Okay.  So when metering was first

18   implemented at those ports, individuals actually --

19   individuals who were seeking asylum actually crossed

20   the boundary line onto U.S. soil and were waiting on

21   U.S. soil, before they were metered, correct?

22       A.    Right.  They remained on U.S. soil until we



Page 155

1    had the capacity to bring them into the office to

2    process them.

3         Q.    All right.  So they were on U.S. soil when

4    they were told to wait until they had capacity,

5    correct?

6         A.     They were told to wait.  We -- they stayed

7    where they were on U.S. soil.  They were not returned

8    to Mexico.

9         Q.    Correct.  I guess I want to make sure I

10   understand exactly the -- how this worked.  And then

11   at some point there was a decision made to move

12   officers to the limit line, correct?

13        A.    Correct.

14        Q.    And the limit line refers to the boundary

15   line between the actual physical boundary between the

16   U.S. and Mexico, correct?

17        A.    Yes.

18        Q.    Who made the decision, to your knowledge,

19   to move the officers to the limit line?

20        A.    I don't think it was a single decision.  I

21   think it was in discussions based on the operational

22   situations at each locations.  But we did have



Page 156

1    discussions throughout 2016, and then into 2017 when

2    the migrants slowed down, that allowing people to wait

3    within the U.S. space, exposed to the elements,

4    without the bathrooms, without food, was not the way

5    we were going to do this if we had to again.

6         Q.   And when to the best of your knowledge was

7    that decision actually made about moving officers to

8    the limit line?

9         A.   I don't recall when it was made.  It may

10   have been made sometime in late 2016.  Again, the

11   numbers came down significantly in 2017.  And clearly

12   in 2018, we held folks at the limit lines.

13        Q.   And this is just a question -- a yes or no

14   question.  Was legal counsel looped in on the

15   discussion regarding moving officers to the limit

16   lines?

17        A.   Not to my recollection.

18        Q.   Was this limit line ever discussed during

19   your 8:15 standing meeting?

20        A.   I can't recall.  I have no reason to think

21   we -- that we would not have discussed it at some

22   point.



Page 157

1       Q.     How about the standing meeting in the SCIF

2    with the commissioner and deputy commissioner?

3       A.     No.

4       Q.     It wouldn't have been discussed?

5       A.     Those meetings are intelligence driven, not

6    operationally.

7       Q.     So do you recall when ports of entry in

8    Texas began implementing metering in 2016?

9       A.     No.  I don't recall.

10      Q.     It would have been sometime after San

11   Ysidro did it though?

12      A.     Yes.  San Ysidro started and then --

13      Q.     What was the second port that was --

14      A.     I don't recall as the -- I believe it would

15   have likely have been Calexico, because the Haitians

16   moved then from Tijuana to Mexicali.  They then moved

17   to San Luis and then into Nogales.

18             So if I had to, to the best of my

19   recollection those were probably the next three that

20   would have started to metering, because the metering,

21   again, was a direct response to the Haitian arrivals.

22      Q.     In November 2016 when this decision in this



Page 158

1    e-mail was made to move officers either to the limit

2    line or start metering at Texas ports of entry --

3        A.    Yes.

4        Q.    -- you would have been aware that Mexican

5    government officials had said that there was a local

6    humanitarian crisis going on in Tijuana, correct?

7        A.    Based on your other mail, yes.

8        Q.    And you also would have been aware at this

9    point in November of 2016 that the Subcommittee on

10   Immigration and Border Security and the commissioner

11   of the committee of the judiciary had questions about

12   the metering policy, correct?

13       A.    Yes.

14       Q.    And do you recall raising any concerns at

15   that time that Mexican authorities believed that there

16   was a local humanitarian crisis going on when this

17   discussion regarding the Texas ports of entry was

18   going on?

19       A.    I don't recall those discussions.  No.

20       Q.    Do you recall anyone saying, hey, we are

21   getting congressional inquiries; should we rethink how

22   we are rolling out metering in the Texas Port of



Page 159

1    Entry?

2         A.    No.  I mean, we took the steps we needed to

3    operationally.

4                         -   -   -

5              (A document was marked as Deposition

6    Exhibit Number 32.)

7                         -   -   -

8         BY MR. MEDLOCK:

9         Q.    Sir, we've put in front of you what we've

10   marked as Exhibit 32 to your deposition.  It's a

11   two-page e-mail beginning with AOL-DEF-00259454 and

12   ending with 455.  This is an e-mail exchange from

13   November 16, 2016, that involves you, John Wagner,

14   Mark Koumans and others, correct?

15        A.    Correct.

16        Q.    And you would have sent and received the

17   e-mails in this chain as part of your job at CBP,

18   correct?

19        A.    Correct.

20        Q.    And you would have read and understood the

21   e-mails in this chain at the time you received them,

22   correct?



Page 160

1        A.    Yes.

2        Q.    And you would have received these e-mails

3   on or about the time listed in the time and date

4   listed in the e-mails, correct?

5        A.    Correct.

6        Q.    And you have no reason as you sit here

7   today to believe that these e-mails, other than the

8   redactions that appear in some parts of them are

9   incomplete or inaccurate, correct?

10       A.    Correct.

11       Q.    Okay.  Do you remember --

12             MS. SHINNERS:  I'm so sorry.  This seems as

13   if the redactions on this document are insufficient to

14   protect the deliberations regarding decisions that are

15   being made about policy.  So I am --

16             MR. MEDLOCK:  Are you going to claw this

17   back?

18             MS. SHINNERS:  I am going to claw it back.

19             MR. MEDLOCK:  Okay.

20             MS. SHINNERS:  If you want to go off the

21   record for a moment, perhaps we can discuss.

22             MR. MEDLOCK:  Well, maybe I can just ask it



Page 161

1    without the document.

2              MS. SHINNERS:  Okay.

3         BY MR. MEDLOCK:

4         Q.   Do you ever recall telling anyone -- you

5    can put the document aside, sir.  I don't want you to

6    look at it when answering the question.

7              Do you ever recall telling anyone that

8    maybe Mexico should start metering?

9         A.   Yes.

10        Q.   And you believe that Mexico should start

11   metering in order reduce the flow of migrants to the

12   U.S., correct?

13        A.   Not to reduce the flow but to control the

14   flow so that we can handle it operationally.

15        Q.   And you are talking about metering

16   happening on the southern border?

17        A.   On the southern border.

18        Q.   And you believe that Mexico should be

19   metering to control the flow of migrants, correct?

20        A.   As opposed to letting them line up outside

21   the door, which is what we started with.

22        Q.   You want Mexico to do its fair share to



Page 162

1    control the flow of migrants, correct?

2         A.    I want Mexico to control the flow into the

3    United States so we can handle it operationally.

4         Q.    And you believe that Mexico wasn't being --

5    wasn't doing enough to make that happen, correct?

6         A.    At times Mexico was not doing enough to

7    assist us in controlling the flow.

8         Q.    Was there ever a time period in which ports

9    of entry were actually handing out appointments to

10   individuals who were metered?

11        A.    Again I referenced the San Ysidro at the

12   start, I believe appointment tickets were handed out.

13   I don't again remember if it was Grupo Beta or us in

14   the very beginning.  I don't recall other ports doing

15   that.

16        Q.    Do you recall El Paso doing that?

17        A.    I don't recall El Paso doing it.

18        Q.    All right.

19                       -    -    -

20             (A document was marked as Deposition

21   Exhibit Number 33.)

22                       -    -    -



Page 163

1          BY MR. MEDLOCK:

2          Q.    All right.  Exhibit 33 is a one-page e-mail

3    that bears the Bates number AOL-DEF-00081089.  It's a

4    November 22, 2016 e-mail chain between yourself and

5    Hector Mancha.  Do you see that?

6          A.    Yes.

7          Q.    And at this time Hector Mancha was the

8    director of field operations for the El Paso field

9    office, correct?

10         A.    Correct.

11         Q.    The title -- the subject of the e-mail is

12   call today, correct?

13         A.    Okay.  Yes, correct.

14         Q.    And you write in the bottom e-mail, on

15   November 22, 2016 at 7:58 a.m., quote, Hector, I need

16   to give you a call later today re: the metering and

17   how it is going, and if we are giving appointments

18   out.  Thanks.

19               Do you see that?

20         A.    Yes.

21         Q.    You get into the office pretty early.  And

22   then Hector responds to your e-mail, correct?



Page 164

1      A.     Correct.

2      Q.     At 10:16 a.m., correct?

3      A.     Correct.

4      Q.     And he writes, quote, Will be on standby

5   ready for your call.  El Paso started out by giving

6   appointments and has since course corrected and

7   stopped with the appointments and is now just advising

8   immigrants to come back at a later time if the POE is

9   at detention capacity.

10          Did I read that correctly?

11     A.     Correct.

12     Q.     Does that refresh your recollection that

13  some ports may have been giving out appointments?

14     A.      Yes.  At some point in 2016 it must have

15  come to my attention that El Paso was using tickets,

16  which generated my message to the DFO.

17     Q.     Was there a concern about giving out

18  tickets?

19     A.     We don't want to be giving out tickets.

20     Q.     Why?

21     A.     Because we want to -- we are simply

22  controlling the flow based on our operation.  We are



Page 165

1    not getting into a scheduling system.  We didn't want

2    to be getting in to giving out tickets anywhere.

3         Q.    Did anyone tell you that there was a legal

4    risk to giving out tickets?

5              MS. SHINNERS:  Objection.  That calls for

6    attorney-client communications.

7              MR. MEDLOCK:  That's just a yes or no.

8              MS. SHINNERS:  But it asks a question about

9    legal risk, so it's not actually yes or no.

10        Q.    Okay.  To the extent you can answer that

11   without giving communications to attorneys, go ahead.

12             Can you tell me whether you believe there's

13   a legal risk to giving out tickets?

14        A.    Do I personally believe there's a legal

15   risk?

16        Q.    Yeah.

17        A.    I don't.  I'm not a lawyer.  I don't --

18        Q.    Did you believe that giving out tickets to

19   immigrants could cause them to rely on a promise that

20   they would be called back to the port to be processed?

21        A.    No.  I recall that in the early discussions

22   we were very concerned that giving out tickets would



```
1   just lead to a lot of fake tickets and a lot of misuse

2   of a system that we weren't prepared to handle with

3   the influx of migrants.  So I think my operational

4   concern on giving out tickets was more of a, you know,

5   how are we going to control this.  How do we know the

6   ticket we give them is legitimate.

7             You know, we just continue with the process

8   that we were adopting with the folks holding the

9   folks.  So my concerns were more operational, not

10  legal.

11       Q.   And course corrected is in this e-mail from

12  Hector Mancha, is it, the statement that the -- is

13  essentially him saying that they fixed the problem,

14  correct?

15       A.   That they stopped.  Yes.

16       Q.   And Mr. Mancha goes on to write, quote,

17  Metering is definitely working.  Overall numbers for

18  POEs are significantly down since initiating metering,

19  while in comparison the BP numbers for between the

20  ports are showing an upward trend.

21            Did I read that correctly?

22       A.   Yes.
```



Page 167

1    Q.    BP refers to border patrol, correct?

2    A.    Correct.

3    Q.    Okay.  Put that aside.

4                    -   -   -

5         (A document was marked as Deposition

6    Exhibit Number 34.)

7                    -   -   -

8    BY MR. MEDLOCK:

9    Q.    All right, sir.  I show you what we've

10   marked as Exhibit --

11        MS. SHINNERS:  Yeah.  I'm sorry.  This has

12   -- definitely contains attorney reference to legal

13   advice, attorney-client communications.  We are going

14   to have to claw it back again.  We can discuss a

15   solution.  We may be able to redact it on the fly

16   here.

17        MR. MEDLOCK:  Okay.  I'm going to ask

18   about this document.  So we need to redact it on the

19   fly.  Here's what I would suggest.  It is about 12:30.

20   Let's break for lunch, you guys can redact and let me

21   know what you are going to take out, and then I can

22   ask about the other parts.



Page 168

1              MS. SHINNERS:  That sounds fine, as long as

2    -- yes, as long as everyone is not using the document

3    in the meantime.

4              MR. MEDLOCK:  No.  I'll put it right here.

5              MS. SHINNERS:  Great.  Thank you.

6              MR. MEDLOCK:  All right.

7                        -   -   -

8              (Recessed for lunch at 12:22 p.m.)

9              (Reconvened at 1:06 p.m.)

10                       -   -   -

11       BY MR. MEDLOCK:

12       Q.    So we are back on the record.  Thank you

13   for -- welcome back, sir.  I think your counsel had a

14   few notes regarding documents that have been either

15   clawed back and redacted on the fly, or will be clawed

16   back in their entirety at this time.

17             MS. SHINNERS:  Thank you, Counsel.  So,

18   yes, defendants are clawing back what had been marked

19   as Exhibit 32.  It's Bates stamped AOL-DEF-00259454

20   through 259455.  We are clawing back the basis being

21   that there are additional redactions needed to protect

22   information protected by the deliberative process



Page 169

1    privilege.

2              Second, with respect to the document that

3    has been marked as Exhibit 34, we have -- it is Bates

4    labeled AOL-DEF-00032389.  Defendants have clawed back

5    the unredacted version to assert attorney-client and

6    deliberative process privileges over a portion of that

7    document.  For purposes of today's deposition, we have

8    redacted the version that is being used as the exhibit

9    to this deposition.

10              MR. MEDLOCK:  Okay.  And just so I'm clear,

11   I think you handed Exhibit 32 back to the witness, and

12   you probably want to still have a copy of that.

13              MS. SHINNERS:  It was actually exhibit --

14   yes.  I'm so sorry.  That's what I did.  Thank you.

15              MR. MEDLOCK:  Okay.  No problem.  Just want

16   to make sure we are all on the same page here.

17              MS. SHINNERS:  Excellent.  Thanks for that

18   catch.

19        BY MR. MEDLOCK:

20        Q.   All right, sir.  You have Exhibit 34 in

21   front of you.  It's a one-page e-mail with the Bates

22   number AOL-DEF-00032389; correct, sir?



Page 170

1      A.    Yes.

2      Q.    And that's a November 22, 2016 e-mail

3  exchange between yourself, Beverly Good, Enrique

4  Tamayo, Todd Hoffman, John Wagner; is that correct?

5      A.    Correct.

6      Q.    And I'm going to focus just for a second on

7  the bottom e-mail that you sent.  And I just want to

8  get the gist of it.  I'm not going to get into

9  anything that's been redacted.  But the gist of your

10  e-mail is that you have some questions about whether

11  CBP is giving out appointments at ports of entry,

12  correct?

13      A.    Correct.

14      Q.    And that's in relation to the

15  implementation of the metering policy, correct?

16      A.    Correct.

17      Q.    Okay.  Let's move up to the top e-mail from

18  Beverly Good.  She responds to your e-mail, November

19  22, 2016, at 11:41 a.m., correct?

20      A.    Correct.

21      Q.    And she gives you answers with respect to

22  the El Paso, Laredo, Tucson and San Diego field



Page 171

1    offices, correct?

2          A.    Correct.

3          Q.    Okay.  So this is an e-mail exchange that

4    you received in the course of your duties at CBP,

5    correct?

6          A.    Correct.

7          Q.    And you would have received these e-mails

8    on or about the times and dates listed on the e-mails,

9    correct?

10         A.    Correct.

11         Q.    And you would have read and understood

12   these e-mails at the time you received them, right?

13         A.    Correct.

14         Q.    And apart from the redactions that were

15   just made, these -- this e-mail exchange appears to be

16   true and correct, correct?

17         A.    Correct.

18         Q.    All right.  Let's start with the El Paso

19   field office.  For that field office, Miss Good

20   writes, quote, El Paso started giving out appointments

21   and has since course corrected, open parens, this

22   occurred sometime mid to end of last week, closed



Page 172

1    parens, and stopped with the appointments and is now

2    just advising immigrants to come back at a later time

3    if the POE is at detention capacity.

4              Did I read that correctly?

5        A.    Correct.

6        Q.    And that's very similar to the e-mail

7    exchange that you had with Hector Mancha that we

8    looked at earlier?

9        A.    Correct.

10       Q.    Okay.  And then the next field office

11   that's listed is Laredo, correct?

12       A.    Correct.

13       Q.    All right.  And for Laredo, Miss Good

14   writes, quote, Laredo gives them an appointment open

15   parens, verbally, closed parens, and tells them when

16   to come back.  Officers are on the bridge now as well

17   as -- as well but the metering seems to have had a

18   deterrent effect and they are not seeing too many

19   cases daily, so they don't really have to meter at the

20   moment.  However, they are prepared to do so at any

21   moment their capacity reaches its maximum.

22             Did I read that correctly?



Page 173

1          A.     Correct?

2          Q.     So Miss Good told you that at least at the

3   Laredo field office the metering policy was having a

4   deterrent effect, correct?

5          A.     It seemed to have a deterrent effect.

6          Q.     So when we talked earlier about -- and you

7   said that you couldn't recall anyone ever telling you

8   that the metering policy had a deterrent effect, in

9   fact Ms. Good did tell you that?

10          A.     I did not recall this e-mail from November

11   of 2016.

12          Q.     But you do recall now that in November 2016

13   you were told that metering was having a deterrent

14   effect, correct?

15          A.     Reading this e-mail, it appears to have a

16   deterrent effect.  Metering is having deterrent

17   effect.  Yes.

18          Q.     Okay.  Do you recall following up with

19   Ms. Good to understand what the phrase deterrent

20   effect meant?

21          A.     No, I don't.

22          Q.     Do you recall telling Miss Good that the



Page 174

1    purpose of metering was not to -- was not having a

2    deterrent effect?

3         A.    Can you --

4         Q.    Yeah.   That was a bad question, so I'll ask

5    it a different way.

6              Do you recall telling Miss Good that the

7    purpose, that deterrence was not a purpose of

8    metering?

9         A.    No.   I don't believe I corrected Ms. Good

10   and told her that deterrent was not the purpose.

11        Q.    Okay.

12                   -   -   -

13             (A document was marked as Deposition

14   Exhibit Number 35.)

15                   -   -   -

16        BY MR. MEDLOCK:

17        Q.    All right, sir.   I've put in font of you

18   what's been marked as Exhibit 35 to your deposition.

19        A.    Okay.

20        Q.    It is a one-page e-mail with the Bates

21   number AOL-DEF-00576607.  And it is a November 12

22   through 14, 2016 e-mail exchange amongst Frank



Page 175

1    Longoria, Alberto Flores and others.  Do you see that?

2         A.    Yes.

3         Q.    Do you recall what Albert Flores's position

4    was in the Laredo Port of Entry at this time?

5         A.    Looking at the e-mail, he was a deputy port

6    director for Laredo.

7         Q.    Thank you.  And looking at the e-mail Frank

8    Longoria --

9         A.    Longoria.

10        Q.    Thank you.  Was the assistant director of

11   field operations for border security in the Laredo

12   field office?

13        A.    In the field office.  Correct.

14        Q.    Okay.

15        A.    The ports report to the field office.

16        Q.    Yeah.  Let's actually go through that.

17        A.    Yeah.

18        Q.    So starting at the line officers.

19        A.    Yes.

20        Q.    You have CBP officers, got the very bottom

21   of the law enforcement pyramid, correct?

22        A.    Correct.



Page 176

```
 1        Q.    And then they can report up to supervisory

 2   officers?

 3        A.    First line, second line --

 4        Q.    Second line.

 5        A.    -- watch commander, deputy, dependent on

 6   the structure, how big of the port, who then reports

 7   to generally an assistant port director, to a port

 8   director.  Then the port director reports to the

 9   director of field operations who has several port

10   directors under him within that geographical area.

11             Now each director of field operations may

12   have two or three deputies depending on the size.

13   There are operational deputies, but technically the

14   port director reports to the DFO.

15        Q.    I see.

16        A.    But the deputies help do what deputies do.

17   So you'll see messages like this from the deputy down

18   to --

19        Q.    Yeah.  And it says in a situation like this

20   the deputy is essentially managing up, for lack of a

21   better word for his --

22        A.    The deputy port director --
```



Page 177

1          Q.     -- DFO?

2          A.     -- was managing up for his port director to

3    the deputy DFO, who was managing for his DF.  Yes.

4          Q.     Yes.  This is how it works in the

5    government.  The deputies help their principals out,

6    right?

7          A.     Correct.  Yes, sir.

8          Q.     And then from those DFOs, they report up as

9    well?

10         A.     The DFOs report to the executive director

11   for operations, who reports to the deputy executive

12   assistant commissioner, who reports to me.

13         Q.     Okay.  And then who do --

14         A.     And then I report to the deputy

15   commissioner the highest career person, who reports to

16   the commissioner that is a political.

17         Q.     Okay.  Thank you.  I appreciate that.  And

18   I take it the commissioner reports to the secretary?

19         A.     Correct.

20         Q.     Okay.

21         A.     Yes, sir.

22         Q.     Okay.  So you testified earlier that you



Page 178

1      couldn't recall exactly whether in November 2016

2      whether the -- whether ports of entry in Texas were

3      being -- were actually being authorized to put

4      officers at limit line positions or if they were being

5      authorized to start metering.  Do you recall that?

6           A.    Yes.

7           Q.    Okay.  I'm focused down on the November 12,

8      2016 e-mail, 2:42 p.m., sent by Frank Longoria --

9      wait.

10                          -  -  -

11          (Sirens interrupted, recessed at 1:16 p.m.)

12                  (Reconvened at 1:19 p.m.)

13                          -  -  -

14          BY MR. MEDLOCK:

15          Q.    All right, sir.  Focused on the November

16     12, 2016 e-mail from Frank Longoria at 2:42 p.m. at

17     the bottom of the e-mail chain.  Do you see that?

18          A.    Yes.

19          Q.    All right.  That e-mail has the subject

20     line Meeting with INM.  Do you see that?

21          A.    Yes.

22          Q.    INM is a reference to INAMI, correct?



Page 179

1      A.     Correct.

2      Q.     And that e-mail reads, Port directors, at

3    the request of C-1 and C22, you are to meet your INM

4    counterpart and request they control the flow of

5    aliens to the port of entry.  For example, if you

6    determine you can only process 50 aliens at a time,

7    you will request that INM release only 50.

8             Did I read that correctly?

9      A.     Yes.

10     Q.     And then it goes on to give more details

11   about controlling the flow and the relationship with

12   INAMI, correct?

13     A.     Correct.

14     Q.     Does this refresh your recollection that in

15   November 2016 port directors in the Laredo field

16   office were given authorization to begin metering?

17     A.     Again I still believe the metering was

18   occurring before November.

19     Q.     Okay.

20     A.     I mean, 2016 was the year we had to do the

21   metering because the volumes were so great.  And by

22   November, we were putting up soft-sided facilities to



Page 180

1    handle the overflow.

2          So in my recollection, we started metering

3    in the Laredo field office before November.

4    Q.    Okay.  But this e-mail certainly is

5    giving --

6    A.    It was taking place in November.

7    Q.    This -- sorry.  And this e-mail from Frank

8    Longoria is definitely giving the port directors

9    authority to meter if they aren't already doing so,

10   correct?

11   A.    To engage with the Mexicans to control the

12   flow.  Yes.

13   Q.    Okay.

14                    -   -   -

15          (A document was marked as Deposition

16   Exhibit Number 36.)

17                    -   -   -

18   BY MR. MEDLOCK:

19   Q.    Sir, I have marked for you Exhibit 36.

20   It's a multi-page document that begins with the Bates

21   number AOL-DEF-00703133 through 139.  Do you see that?

22   A.    Yes.



Page 181

1            MS. SHINNERS:  Again, I'm sorry, this

2    document is labeled as protected by attorney-client

3    and deliberative process privileges.  I'm afraid I'm

4    going to have to claw this back.  It looks like it's

5    insufficient -- I mean, it looks like it needs to be

6    clawed back in full.

7            So, again, defendant's have produced a

8    large volume of documents in this litigation, and we

9    continue to produce documents.  It looks like this one

10   was just missed.  I know that other versions of this

11   document were withheld in full.

12           MR. MEDLOCK:  Okay.  And you anticipate

13   clawing back and withholding it in full; is that

14   right?

15           MS. SHINNERS:  Yes.  I do need to review --

16   yes.  I can review a little more carefully on the

17   break, but yes.

18       BY MR. MEDLOCK:

19       Q.   Okay.  I would ask you, if you can take the

20   document away from him I'll ask you just some general

21   questions.

22           Sir, are you aware of an office within CBP



Page 182

1    called the Office of Civil Rights and Civil Liberties?

2        A.    That office is within DHS not CBP.

3        Q.    Thank you for the correction.  And it's

4    sometimes called CRCL?

5        A.    Yes.

6        Q.    Are you aware whether CRCL undertook any

7    investigation related to metering at ports of entry?

8        A.    I'm aware that CRCL received allegations

9    that individuals who had crossed were returned, and

10   that they were looking at those allegations, so yes.

11       Q.    And were you spoken with or interviewed by

12   anybody from CRCL in connection with that?

13       A.    I was not interviewed with CRCL.

14       Q.    Did you receive any findings or conclusions

15   from that CRCL investigation?

16       A.    I can't recall.  I received quite a few

17   documents from CRCL in this capacity.  I can't recall

18   if there's one specific to metering.  There may have

19   well been.  I just don't recall.

20       Q.    To the best of your recollection, when did

21   this CRCL investigation with respect to allegations

22   about metering begin?



Page 183

1       A.      To my recollection, in the first year or so

2   of metering, so throughout 2016, early '17.

3       Q.      Okay.  So certainly before you signed the

4   metering memorandum that we looked at earlier.

5       A.      In 2018.

6       Q.      You were aware that CRCL had investigated

7   allegations related to metering, correct?

8       A.      Correct.

9       Q.      You were aware that the judiciary committee

10  had questions about it?

11      A.      Correct.

12      Q.      You were aware that -- you had gotten

13  e-mails before then saying that the policy had a

14  deterrent effect, correct?

15      A.      You have refreshed my recollection on one

16  e-mail that used the word deterrent.

17      Q.      Right.  But you did receive an e-mail

18  saying it was --

19      A.      I received that one e-mail.  Yes.

20      Q.      And you also received an e-mail saying that

21  Mexican officials said that the metering policy was

22  causing the humanitarian crisis as well?



Page 184

1          A.     In their view.  Yes.

2          Q.     Okay.  And you also received MCAT reports

3     that said that individuals were being either held at

4     the line or held in shelters when there was no impact

5     to port capacity, correct?

6               MS. SHINNERS:  Objection.  Mischaracterizes

7     the document.

8          A.     The no-impact deport capacity on that

9     report is a general snapshot of significant issues to

10    be brought to our attention.  So I have, you know, I

11    disagree with the fact that it says no impact,

12    negative, non-- that that indicates that there was no

13    impact to port operations.  That column is used to

14    call senior leadership's attention to something

15    significant that had happened, such as a large number

16    of port runners, an outbreak of tuberculosis, things

17    of that nature.

18               I don't take the presence of no, negative,

19    none as meaning the metering is not having an impact

20    to the ports.

21         Q.     Okay.  Let's go back -- and I apologize.

22    I'm about to do a little bit of flipping through to



Page 185

1     find the prior e-mail we looked at.

2          A.    Yes.

3          Q.    From I believe it was June 19, 2018.  Do

4     you have that in front of you, sir?

5          A.    Sure.

6          Q.    Which exhibit is that, if you could help me

7     do my job.

8          A.    Exhibit 24.

9          Q.    So Exhibit 24 lists percentage capacities

10    for various ports, correct?

11         A.    Correct.

12         Q.    And you said that that is physical

13    capacity, not the actual detention capacity, correct?

14         A.    Not operational capacity.

15         Q.    Oh, I'm sorry.  I got the wrong word.

16    Operational capacity.  Okay.

17               Did you ever tell anyone from MCAT they

18    should start listing operational capacities, not

19    physical?

20         A.    No.

21         Q.    Did you ever criticize MCAT for not using

22    the operational capacities?



Page 186

1        A.    No.   Because as this report as I use it,

2   since it gives me a snapshot as to the number of folks

3   that are in our custody, how many folks are waiting in

4   Mexico, and any significant issues to be aware of,

5   that's how I used it.   I didn't correct them on each

6   heading of the category of the report.

7        Q.    Sure.   Did anybody to your knowledge in

8   senior leadership at CVP or OFO correct the -- request

9   that MCAT put together a version of this report that

10  actually used operational capacities?

11       A.    No.   Because the operational capacity

12  differs from port to port and from day-to-day.   And

13  that would just be too cumbersome to record every

14  event that's taking place in the port through out the

15  day, which has had an impact on how many migrants we

16  could come across.   If a port was working multiple

17  simultaneous seizures, and then we had to pull

18  officers to do that, we wouldn't record all of those

19  activities.   It's just too cumbersome of a report to

20  come together for the 46 crossings along the southwest

21  border as to what's taking place.

22                And again, the operational capacity is



Page 187

1   fluid.  It fluctuates from day to day.  There may be

2   no capacity at 9:00 a.m, but ERO comes and picks folks

3   up at 11:00.  And at 12 o'clock we have capacity.

4           So this is a static view that gives us a

5   high level understanding of what's taking place in the

6   ports in terms of our capacity.  The migrants that

7   have come in, the migrants that are waiting, and any

8   operation issues.  That's how I see this report.

9   That's how I use the report.

10      Q.   And --

11      A.   And similar reports like this.

12      Q.   Yeah, sure.  The queue management report as

13  well?

14      A.   Yeah.  It's modeled differently, but

15  generally the same information.

16      Q.   Okay.  Is it the case that there is no

17  regularly generated report at CBP or OFO that lists

18  the operational capacities for ports of entry on a

19  daily basis?

20      A.   No.  There are multiple reports that deal

21  with our different mission sense.  So there is

22  reporting that comes into what we call our situation



Page 188

1    room.  And there is a threshold limit as to what needs

2    to be reported.

3              So seizures of certain amounts have to be

4    reported.  There's a report that captures all of that

5    every day.  Our counter-terrorism connections or

6    encounters gets reported up a different way, and we

7    receive a report on that.  If we have outbound

8    operations underway, we would be made aware of those

9    that rise to a certain level of outbound operations.

10             So the migrant processing is just one

11   aspect of what we do within the port every single day.

12   And there are different reports for those other

13   activities.  And again, based on the operational area

14   we are talking about, the reports for the southern

15   border are different that the reports for the

16   airports, the sea ports, the northern border, and our

17   foreign operations.

18             So to understand the operational aspect of

19   what's taking place at any one port at any one given

20   time, you need to look at all of those mission sets

21   and what's being done with all of that.  And you also

22   have to then consider the staffing that we have on



Page 189

1   hand, things like that.  When you look at Calexico

2   here, 74 percent of capacity -- but we have 20 percent

3   of our officers vacant in El Paso -- I'm sorry,  in

4   Calexico.

5            So we have a huge staffing issue in

6   Calexico, which impacts our ability to bring more

7   folks in to process them for their asylum claims.

8        Q.    So I think my question -- and I appreciate

9   your answer, but I think my question was just a little

10  bit more focused, which was there's no single report

11  that's generated that lists the operational capacities

12  for migrant processing at each port of entry on a

13  daily basis, is there?

14       A.    No, because the operational capacity is

15  influenced by all of our other mission sets.  And

16  there's separate reports for those other missions

17  sets.

18       Q.    So is there any way that I could go back to

19  2016, 2017, or 2018 and reconstruct what the

20  operational capacity would have been at that port of

21  entry on a given day?

22       A.    I think it would be very, very difficult to



Page 190

1    do that because of all the barriers that you would

2    need to consider, including how many officers called

3    in sick that day, how many may have been out at the

4    range, how many may have been processing seizures.

5    All of those variables impact our operational

6    capacity.

7              You will not find that in one port or in

8    one report because the nuance is of everything that we

9    do in the port of entry.  We haven't talked about the

10   trade mission.  We haven't talked about passenger --

11   or traveler processing and wait times, cargo.  We

12   haven't talked about the agriculture mission.

13             We compete for limited resources in the

14   ports of entry.  Migrant processing is one aspect of

15   what we do.

16        Q.    Okay.

17        A.    You are looking for a totality across the

18   board.  There is not a single report that captures

19   that totality.

20        Q.    Okay.  So as we sit here today, although

21   it's imperfect, the best snapshot we have of what was

22   going on with capacity in the port would be these MCAT



Page 191

1  reports.

2      Q.    From the headquarters visibility aspect,

3  yes.  But this is why we allow the queue management,

4  the metering to be controlled by the local port

5  directors and their management teams because they have

6  the day-to-day visibility as to what's going on.

7      Q.    I see.

8      A.    This report again gives me a snapshot at a

9  very high level from my position as the executive

10 assistant commissioner what's taking place in this one

11 mission space.

12     Q.    I see.  Okay.  We talked a little bit about

13 the metering guidance.  Was there ever any subsequent

14 guidance that was given to field offices or port

15 directors regarding the implementation of the April

16 2018 metering guidance?

17     A.    ████████████████████████████████████████

18 ████████████████████████████████████████████

19     Q.    ████████████████████████████████

20     A.    ████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████



Page 192

1      Q.    Okay.  And I think you testified to this

2   earlier.  In 2018 -- so in general, just looking at

3   numbers of inadmissibles?

4      A.    Yes.

5      Q.    There's a fairly large number in 2016?

6      A.    Yes.

7      Q.    There was a large number but reduced in

8   2017?

9      A.    Correct.

10     Q.    2018 was a very high year for

11  inadmissibles, correct?

12     A.    Correct.  And '19 even higher.

13     Q.    So if I'm looking at this in sort of a

14  stair step fashion, was 2018 --

15     A.    Can I give you the --

16     Q.    Yeah.  If you have got the numbers, I'll

17  take them.

18     A.    FY '15, about 111 -- I'm sorry, 113,000

19  inadmissibles.

20     Q.    Okay.

21     A.    FY '16 about 154,000 inadmissibles; '17

22  dropped to 111,000; '18 was 124,000, And '19 was



Page 193

1    126,000.

2         Q.    Okay.

3         A.    So those are in our inadmissible numbers

4    across the southwest border.  I'm not giving you

5    airport inadmissibles and all of that.

6         Q.    And inadmissibles is a broader category of

7    an asylum seeker?  That's how --

8         A.    Correct.

9         Q.    -- are part of it.

10        A     In a -- yes, sir.

11        Q.    Okay.  So in 2018 is a year where you are

12   seeing increased numbers of inadmissibles coming to

13   the ports?

14        A.    Compared to '17, yes.

15        Q.    Okay.

16        A.    But not as large as '16.

17        Q.    Right.  And not as large as '19?

18        A.    Correct.

19        Q.    Okay.

20                         -   -   -

21             (A document was marked as Deposition

22   Exhibit Number 37.)



Page 194

1                          -   -   -

2          BY MR. MEDLOCK:

3          Q.     All right.  37 is a one-page e-mail, Bates

4     number AOL-DEF-00371176?

5          A.     Correct.

6          Q.     And it's a e-mail from Valerie Boyd that

7     you are copied on, dated May 29, 2018, correct?

8          A.     Correct.

9               MS. SHINNERS:  I'm so sorry.

10              MR. MEDLOCK:  There you go again.

11              MS. SHINNERS:  Here I go again.  This

12    contains insufficient redactions to protect the

13    deliberative process privilege and potentially

14    attorney-client, but I think the main issue is

15    deliberative process.  This is an mail from the deputy

16    chief of staff to office of chief counsel.

17              MR. MEDLOCK:  I see that.

18              MS. SHINNERS:  At CBP.

19              MR. MEDLOCK:  Yes.

20              MS. SHINNERS:  So I -- yeah I think we have

21    to claw this one back in full.

22              MR. MEDLOCK:  Okay.



Page 195

1          MS. SHINNERS:  I'm not seeing anything

2     that's possible to redact here.

3          MR. MEDLOCK:  Okay.  So you are redacting

4     -- sorry.  You are clawing back 37 in full; is that

5     correct?

6          MS. SHINNERS:  Correct.

7     BY MR. MEDLOCK:

8     Q.   Okay.  So let me ask you a more simple

9     ███████████████████████████████████████████████

10    ███████████████████████████████████████████████

11    ████████████████████████████████████████

12    █████████████████████████████████████████

13    A.   ███████████████████████████████████████████

14    ██████████████████████████

15    Q.   ████████████████████████████████████████████

16    █████████████

17    A.   ██████████

18    Q.   ████████████████████████████

19    ███████████████████████████████████████████

20    ████████████

21    A.   ██████

22    Q.   █████████████



Page 196

1       A.    Folks -- as I recall from the commissioner

2   staff, as well as executive director Todd Hoffman,

3   again my admissibility lead.

4             MR. MEDLOCK:  Can we go off the record for

5   just a second.

6                    -   -   -

7             (Discussion off the Record)

8                    -   -   -

9       (A document was marked as Deposition Exhibit

10  Number 38.)

11                   -   -   -

12      BY MR. MEDLOCK:

13      Q.    All right, sir.  We've put in front of you

14  what we've marked as Exhibit 38 to your deposition.  I

15  is a one-page e-mail that has the Bates number

16  AOL-DEF-0027393.  It is an e-mail exchange between

17  Valerie Boyd, yourself, John Wagner, Randy Howe and

18  others, correct?

19      A.    Correct.

20      Q.    And this is an e-mail you would have

21  received in the course of your duties at CBP, correct?

22      A.    Correct.



Page 197

1     Q.     And you would have received this e-mail at

2     or about the times listed in the e-mail chain,

3     correct?

4     A.     Correct.

5     Q.     And you would have read and understood the

6     e-mail at the time you received it?

7     A.     Correct.

8     Q.     And you have no reason, sitting here, to

9     believe that this e-mail is incomplete or inaccurate,

10    right?

11    A.     No.

12    Q.     ████████████████████████████████████████████

13    ████████████████████████████████████████████████

14    ███████████

15    A.     ██████

16    Q.     ████████████████████████████████████████████

17    ███████████████████████████████████████████████

18    ████████████████████████████████████████

19    ██████████████████████████████████████████

20    ██████████

21    A.     ██████

22    Q.     In the top e-mail, Valerie Boyd wrote on



Page 198

1    June 5, 2018, at 5:45 p.m.:  OFO leadership, should we

2    gather with OPA, OCA and IPL to discuss the public

3    message around this 30-day pilot.  Did I read that

4    correctly?

5         A.    Yes.

6         Q.    What is OPA?

7         A.    Office of Public Affairs.

8         Q.    What is OCA?

9         A.    Office of Congressional Affairs.

10        Q.    What is IPL?

11        A.    It's the office that deals with state and

12   local governments.  I don't know what IPL stands for.

13        Q.    ████████████████████████████████████████

14   ██████████████████████████████████████████

15        A.    ████████████████████████████████████████

16   ███████████████████████████████████████████████

17   ███████████████████████████████

18        Q.    Okay.  And do you know whether that 30-day

19   pilot was extended at any point?

20        A.    It was extended.

21        Q.    Was it made permanent?

22        A.    The activities continue today.  Yes.



Page 199

1        Q.    So from at least until today it's been

2    going on?

3        A.    It continues.  Yes.

4        Q.    Okay.  All right.  Let's put 38 aside.

5                        -   -   -

6              (A document was marked as Deposition

7    Exhibit Number 39.)

8                        -   -   -

9        BY MR. MEDLOCK:

10       Q.    Sir, I'm showing you what I've marked as

11   Exhibit 39 to your deposition.  I hope and pray this

12   is the final one and there will be no need to claw it

13   back.  It is a multi-page memorandum that begins with

14   Bates number AOL-DEF-00273294 and continues to 296.

15             Do you see that, sir?

16       A.    Yes.

17       Q.    ████████████████████████████████████████████

18   ███████████████████████████████████████████████████████

19   ██████████████████████████████████████████████████

20       A.    ██████████

21       Q.    ████████████████████████████████████████████

22   ███████████████████████████████████████████████████████



Page 200

1       A.   Yes.

2       Q.   And at the time you received the

3    memorandum, you would have read and understood it.

4    Correct?

5       A.   Yes.

6       Q.   ████████████████████████████████████████

7    ████████████████████████

8       A.   █████

9       Q.   ███████████████████████████████████████

10   ███████████████████████████

11      A.   ████████████████████

12      Q.   ████████████████████████████████████████

13   ███████████████████████████████████████████

14   ███

15      A.   █████

16      Q.   ██████████████████████████

17   ████████████████████████████████████████████████

18   ██████████████████████████

19      A.   █████

20      Q.   █████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ███████████████████████████████



Page 201



```
 1    A.  ████
 2    Q.  ████████████████████████
 3        ████████████████████████
 4        ████████████
 5        █████████████████
 6    A.  ███
 7    Q.  ████████████████████
 8    A.  ███
 9    Q.  ████████████████████████
10    A.  ████████████████████
11        ████████████████████████
12    Q.  ████████████████████████
13        █████████████████████████
14        ████████████████████████
15        ████████████
16    A.  ███
17    Q.  █████████████████████████
18        ████████████████████
19    A.  ███
20    Q.  ████████████████████████
21        █████████████████████████
22        ████████████████████████
```



Page 202







Page 203

1     Q.     ████████████████████████████████
2     ████████████
3     A.     ████████
4     Q.     ███████████████████████████████
5     █████████████████████████████████████████
6     ████████████████████████████████
7     ██████████████████████████████████
8     █████████████████████████████████████████
9     ██████████████████████████████
10            ████████████████████████
11     A.     ████
12     Q.     ████████████████████████████████
13     ████████████████████
14     A.     ████████████████████████████████
15     ████████
16     Q.     ██████████████████████████
17     ██████████████████████████████
18     A.     ████████████████████████████████
19     ████████████████████████████████
20     █████████████████████████████
21     Q.     ████████████████████████████████
22     ████████████████████████████████████████



Page 204

1    processing asylum seekers; is that right?

2         A.    And other activities as well.

3         Q.    Sure.  Are there other activities that you

4    would put above processing asylum seekers in the

5    prioritization list for CBP?

6         A.    That's really hard to say because depending

7    on, you know, the four categories you have, certain

8    aspects of our mission set that may not be directly

9    listed would fall under, you know, our agriculture

10   inspection mission, the pest and the disease on plants

11   and things of that nature.  You could put that as

12   economic security.  You could also put it as trade and

13   facilitation.

14              There are other things that are probably

15   outside of that area.  I'm just trying to think.  I

16   mean, I think the top four, which have always been our

17   primary focus, capture that on processing the

18   undocumented as, you know, not been within the top

19   four.

20        Q.    It never has been during the time you have

21   been at CBP, correct?

22        A.    Not -- no, not in the time we have been



Page 205

1    CBP.

2         Q.    So would you say that the agriculture

3    mission that you've described has a higher priority

4    than processing asylum seekers?

5         A.    Yes.

6         Q.    Can you think of any activities that CBP is

7    required to do by statute that are of a lower priority

8    than processing asylum seekers?

9         A.    That we are required to do by statute.

10        Q.    Yes.

11        A.    I mean, all cargo and passengers, travelers

12   entering the country have to be presented for

13   inspection.  I can't think of anything by statute that

14   would be lower priority.

15        Q.    So the lowest priority for CBP of the

16   things it's required to do by statute is processing

17   asylum seekers; is that right?

18        A.    Yes.  Processing the undocumented.

19        Q.    Right.  They --

20        A.    The may or may not be --

21        Q.    Of the things you are required to do, they

22   come last?



Page 206

1       A.      Right.  But as they present without

2    documentation, they may or may not be requesting

3    asylum.

4       Q.      Right.

5       A.      Right.

6       Q.      So processing the undocumented is the

7    lowest of the statutorily required priorities; is that

8    right?

9       A.      Yes.

10      Q.      And that's true even when the number of

11   undocumented migrants presenting at ports of entry are

12   -- is increasing, correct?

13      A.      Can you rephrase?  Ask the question.

14      Q.      Sure.  I guess my question is we talked

15   about in 2018 the number of inadmissibles coming to

16   ports of entry had increased over 2017?

17      A.      Correct.

18      Q.      And in response to that, CBP did not

19   reorder its prioritization, did it?

20      A.      Correct.  We did not reassign officers from

21   counter-terrorism, narcotics, economic security, trade

22   facilitation so that we could process more



Page 207

1    undocumented migrants or process them quicker.  We

2    left those resources aligned with the priority

3    mission.

4         Q.    Theoretically, you could -- CBP could do

5    that, but it chooses not to do that, correct?

6         A.    Theoretically, it would be a trade-off.

7    And would you make the choice to have less folks

8    working the counter-terrorism mission set, or less

9    folks working the narcotics mission set, et cetera.

10   Those are trade-offs that I'm not willing to make.

11        Q.    Okay.  And you are not willing to trade off

12   between the agriculture mission set and the processing

13   undocumented migrants?

14        A.    I am not, because the agriculture mission

15   set prevents plant and animal diseases from entering

16   the country.  If we allowed the fruit fly to get in,

17   it would devastate economies in Florida and

18   California.  If we allow the Asian swine flu and

19   things of that nature to get in, it would decimate our

20   pork industry.

21             So the agriculture priority of preventing

22   pests and disease from entering is a top priority for



Page 208

1    the Agency.

2         Q.    So fruit flies higher priority than the

3    asylum seekers, right?

4         A.    Wiping out --

5              MS. SHINNERS:  Objection.  Argumentative.

6              THE WITNESS:  I'm sorry.

7    BY MR. MEDLOCK:

8         Q.   Go ahead.

9              MS. SHINNERS:  You can answer.

10        A.    I would say wiping out the economies in

11   Florida and California because of an infestation of

12   fruit flies remains a high priority to prevent that,

13   as opposed to processing an undocumented migrant

14   quicker.

15        Q.    Inspecting pigs is a higher priority than

16   inspecting asylum seekers, right?

17        A.    Preventing Asian swine flu from entering

18   the country and decimating the pork industry of the

19   United States and likely Canada is a high priority.

20        Q.    But the way you do that is you look at pigs

21   coming into --

22        A.    We inspect agriculture and agricultural



Page 209

1    products entering the country.

2          Q.    And in the case of swine flu, you are

3    looking at pigs, right?

4          A.    Pigs and meat.

5          Q.    They are the carriers of swine flu?

6          A.    Right.  Pork products.  Yes.

7          Q.    And --

8          A.    Not necessarily pigs.  It may be --

9          Q.    Chicken too, right?

10         A.    -- pig products.  It may be, you know,

11   different types of consumables involving pork.

12         Q.    Sure.  It could be live pigs or dead pigs

13   or parts of dead pigs?

14         A.    There's different pathways for these

15   diseases to come into the country.

16         Q.    And CBP has chosen to prioritize inspecting

17   those products over inspecting asylum seekers, right?

18         A.    We have chose to prioritize preventing

19   dangerous animal and plant disease from entering the

20   country at the exchange of processing migrants slower.

21         Q.    Right.  Got it.  So what that looks like at

22   a port level is if a shipment of pork products comes



Page 210

1    in, and there are migrants that are -- there's a line

2    of migrants waiting to be processed, you are going to

3    prioritize inspecting the pork products over

4    inspecting the asylum -- the migrants, correct?

5         A.    We will prioritize the inspection of

6    harmful products over time quickly processing an

7    undocumented migrant seeking entry.  If the

8    undocumented migrant has to wait in line longer

9    because we have to conduct those inspections, then

10   that's what we will do.

11        Q.    So be it, right?

12        A.    So be it.

13        Q.    Got it.  So you have a -- CBP has a

14   statutory duty to inspect products that are coming

15   into the U.S. for harmful diseases, correct?

16        A.    As well as health and safety issues, the

17   whole gamut of what we do at the port of entry,

18   counterfeit goods, you know.

19        Q.    Those are statutory duties though, right?

20        A.    We have statutory to inspect, right.

21        Q.    And you have a statutory duty to inspect

22   asylum seekers?



Page 211

1        A.     We have responsibility to inspect --

2    everyone who's presented themselves for entry into the

3    United States.

4        Q.     Right.  So you have to do it all.  It's not

5    a question of prioritizing.  The statute says you have

6    to do both, right?

7             MS. SHINNERS:  Objection to the extent it

8    calls for a legal conclusion from a lay witness.

9        Q.     Okay.

10       A.     We have a wide scope of responsibilities in

11   the ports every day.  We have to prioritize those

12   activities, direct the limited resources that we have

13   to those that are of greater concern.

14       Q.     Yeah.  And my question is you have to

15   inspect plants, animals, people to include

16   undocumented migrants; those are all duties you have?

17       A.     And we do inspect undocumented migrants.

18       Q.     Sure.  But you have chosen to prioritize

19   inspecting plants and animals over inspecting

20   undocumented migrants, correct?

21       A.     We will inspect undocumented migrants.

22       Q.     Not my question.  You have chosen --



```
                                                      Page 212
  1                    (Phone interruption)

  2        BY MR. MEDLOCK:

  3        Q.    My question was you have chosen as an

  4   agency to prioritize inspecting plants and animals

  5   over inspecting undocumented migrants, correct?

  6        A.    Since CBP was created in 2003, yes.

  7        Q.    Okay.  All right, sir.  Do you still have

  8   Exhibit 39 in front of you?

  9        A.    Yes.

 10        Q.    ████████████████████████████████

 11   ██████████

 12        A.    ██████████████████

 13        Q.    █████████████████████████████████

 14   █████████████████████████████████

 15        A.    ████████

 16                         -   -   -

 17              (The documents were marked as Deposition

 18   Exhibit Numbers 40 and 41.)

 19                         -   -   -

 20        BY MR. MEDLOCK:

 21        Q.    And I've put in front of you what we've

 22   marked Exhibits 40 and 41.  40 is a one-page document
```



Page 213

1    with the Bates number AOL-DEF-00039620.  And 41 is a

2    two-page document with the Bates numbers ending in 621

3    through 622.  And I want to focus on 40 for a minute.

4             It is a document with the subject line

5    Evaluation of Queue Management Pilot.  Do you see

6    that?

7        A.   Yes.

8        Q.   And it's listed as from Kevin McAleenan,

9    correct?

10       A.   Correct.

11       Q.   And it's dated August 1, 2018, correct?

12       A.   Correct.

13       Q.   And then the bottom there are boxes for

14   approve/date, disapproved/date, needs discussions/date

15   and modify/date.  Do you see that?

16       A.   Yes.

17       Q.   And there was -- this was a form for

18   evaluating and approving whether the pilot project

19   discussed in Exhibit 39 would be continued, correct?

20       A.   It appears so.

21       Q.   Okay.  And then if you look at Exhibit 41,

22   on the first page it says, Evaluation of


MAGNA
LEGAL SERVICES

Page 214

1    Prioritization Queue Management Pilot.  Do you see

2    that?

3         A.    Yes.

4         Q.    And it says, Action Required, quote,

5    Approval from the Secretary of Homeland Security to

6    implement queue management protocols along the

7    southwest border.  Do you see that?

8         A.    I see where it says that.

9         Q.    Okay.  And this is consistent with your

10   recollection that after the 30-day pilot described in

11   Exhibit 39 concluded, it was extended by the Secretary

12   of Homeland Security, correct?

13        A.    I do not recall a document that said

14   continue the pilot.  I just know we remain under these

15   priorities today, as we did since 2003 priority to the

16   issuance of this letter.

17        Q.    I see so.  It's regardless of whether 40

18   and 41 were actually executed, that's still what's

19   going on today?

20        A.    This has now been updated.

21        Q.    And I'll show you that in a second.

22        A.    Right.  So this was going on until the



Page 215

1    updated memo from Commissioner Morgan.

2        Q.    Okay.  I will not keep you in suspense on

3    that.

4                        -   -   -

5            (A document was marked as Deposition

6    Exhibit Number 42.)

7                        -   -   -

8        BY MR. MEDLOCK:

9        Q.    Put in front of you what we've marked as

10   Exhibit 42 to your deposition.  It is a multi-page

11   memorandum that bears the leading Bates number CBP AL

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14       A.    ██████████████

15       Q.    █████████████████████████████████████████████

16   ██████████████████████████████████████

17       A.    ████████████████████████████

18       Q.    ███████████████████████████████████████████

19       A.    ██████████████

20       Q.    ███████████████████████████████████████████

21   ███████

22       A.    ████████



Page 216



```
 1      Q. ████████████████████████████████
 2   ██████████████████████████████████████
 3   ████████
 4      A. ██████
 5      Q. ████████████████████████████████████
 6   █████████████████
 7      A. ██████
 8      Q. ██████████████████████████████████
 9   ███████████████████████████████████
10   █████████████
11      A. █████
12      Q. ██████████████████████████████████
13   ███████████████████████████████████████
14      A. ██████
15      Q. ██████████████████████████████████
16   ██████████████████████████████████
17   ██████████████████████████████████
18   ████
19      A. ██████
20      Q. ██████████████████████████████████
21   ████████████████████████████████
22   ██████████████████
```



Page 217



1    A.    ▬▬
2    Q.    ▬▬▬▬▬▬▬▬▬▬
3    ▬▬▬▬▬
4    A.    ▬▬▬
5    Q.    ▬▬▬▬▬▬▬▬▬▬▬
6    ▬▬▬▬▬▬▬▬▬▬
7    ▬▬▬▬▬▬▬
8    A.    ▬
9    Q.    ▬▬▬▬▬▬▬▬▬▬
10    ▬▬▬▬▬▬▬▬▬▬▬▬
11    ▬▬▬▬▬▬▬▬▬
12    A.    ▬▬
13    Q.    ▬▬▬▬▬▬▬▬▬▬
14    ▬▬▬▬▬▬▬▬▬▬▬
15    ▬▬▬▬▬▬▬▬▬
16    ▬▬▬▬
17    A.    ▬▬
18    Q.    ▬▬▬▬▬▬▬▬
19    ▬▬▬▬▬▬▬▬
20    ▬▬
21    A.    ▬▬▬▬▬▬▬▬▬▬
22    ▬▬▬▬▬▬▬▬





Page 218

1

2      Q.

3

4      A.

5

6

7      Q.

8      A.

9      Q.

10

11

12

13     A.

14     Q.

15

16

17

18     A.

19     Q.

20

21

22



Page 219

1      A.    ███████████

2      Q.    █████████████████████████

3  ███████████████████████████████████

4  ████████████

5      A.    ██████████████████████

6      Q.    █████

7      A.    ██████████████████████

8  ██████████████████████████

9  ████████████████████████████████████

10 ███████████████████████████████████

11 ██████████████████████████████

12 ████████████

13      Q.    Okay.  Thank you for clarifying.  That was

14 a bit of a mystery to me, to be honest.

15      A.    Yes.

16      Q.    Okay.  Do you recall receiving a copy of

17 the complaint in this litigation shortly after it was

18 filed in 2017?

19      A.    I remember receiving it.  I don't remember

20 if it came from counsel or if it was received direct,

21 but I remember seeing it.  Yes.

22      Q.    Okay.  Mark the next exhibit.



Page 220

```
 1                    -   -   -

 2           (A document was marked as Deposition

 3    Exhibit Number 43.)

 4                    -   -   -

 5        BY MR. MEDLOCK:

 6        Q.    All right gith.  Marked a copy of a

 7    multi-page document that I'll represent to you is the

 8    complaint in this litigation.  It begins with the

 9    Bates number AOL-DEF-00088503.  Do you see that, sir?

10        A.    Yes, sir.

11        Q.    And there's handwriting on this document?

12        A.    Yes.

13        Q.    Do you see that?  At the top, I believe it

14    says something like received?

15        A.    Reviewed.

16        Q.    Or reviewed 7/14/17, correct?

17        A.    Yes.

18        Q.    Is that your handwriting?

19        A.    Yes, it is.

20        Q.    So if you look at the very top of the

21    document in the middle, it says filed 7/12/17,

22    correct?  Very, very top?
```



Page 221

1      A.     Where?

2      Q.     Of the first page?

3      A.     Filed 7/12.

4      Q.     7/12/17.

5      A.     Okay.

6      Q.     So it appears this document was filed on

7   July 12, 2017.  And you reviewed it two days later on

8   the 14th, correct?

9      A.     Correct.

10     Q.     And if you flip through the document, for

11  example, looking at the page in 8505, the introduction

12  page, it looks like you've underlined a few phrases in

13  here; is that correct?

14     A.     Appears so.  Yes.

15     Q.     And then if you look at page 4, at

16  paragraph 11, you circled a few things as well,

17  correct.

18     A.     Circled things.  Okay.  Correct.

19     Q.     Is that usually your process when you are

20  reviewing documents?

21     A.     Legal documents when I'm not a lawyer.

22     Q.     Right.  That is very fair.  Starting in



Page 222

1    paragraph 19, on page 6, which ends in the Bates

2    Number 8510; do you see that paragraph, sir?

3        A.    Yes.

4        Q.    There's a reference to a plaintiff named

5    Abigail Doe who is referred to by the pseudonym AD.

6    Do you see that?

7        A.    Yes, sir.

8        Q.    Did you ever participate in any effort to

9    unmask the pseudonyms of the plaintiffs in this

10   litigation?

11       A.    No.  No.

12       Q.    Did anybody ever tell you, ever unmask for

13   you the pseudonyms of the plaintiffs in this

14   litigation?

15       A.    No.

16       Q.    Okay.  Without going into any conversations

17   you had with attorneys in this case for the

18   government, can you tell me why you reviewed,

19   underlined and circled things on this document in

20   2017?

21       A.    Because I was named in the lawsuit.

22       Q.    That was your primary concern?



Page 223

1          A.    That was my concern.  That's why on page 3

2     it also said circled -- I'm being sued in my official

3     capacity, you know, so I circled that.

4          Q.    That would have been important to you, I

5     suppose?

6          A.    Yes, sir.

7          Q.    Yes.  All right.  I think I understand the

8     reason for that.

9          A.    Yes.

10                         -   -   -

11               (A document was marked as Deposition

12     Exhibit Number 44.)

13                         -   -   -

14          BY MR. MEDLOCK:

15          Q.    All right, sir.  I've put in front of you

16     what we have marked as Exhibit 44 to your deposition.

17     It's a one page e-mail exchange that bears the Bates

18     number AOL-DEF-00723886.

19               Do you see that, sir?

20          A.    Yes.

21          Q.    All right.  This is an e-mail exchange

22     dated from August 1 through August 14, 2017, with



Page 224

1    Rodriguez -- Charmaine Rodriguez, Pete Flores, Rosa

2    Hernandez, Robert Hood and others.  Do you see that?

3         A.    Yes.

4         Q.    Okay.  And the title of the e-mail is

5    Lawsuit Documents, correct?

6         A.    Yes.

7         Q.    And in the bottom e-mail from Charmaine

8    Rodriguez there is -- Charmaine says, quote, Attached

9    are the two documents we looked at today from the

10   lawsuit.  I will update them as soon as we know more

11   information from Berg Electric on the issue with AEU

12   video.

13             Did I read that correctly?

14        A.    Yes.

15        Q.    Were you aware of any meetings that were

16   going on regarding the lawsuit, this lawsuit between

17   Charmaine Rodriguez, Pete Flores and others in August

18   2017?

19        A.    No, not that I recall.

20        Q.    So you weren't read into the loop on this

21   effort?

22        A.    I'm not on the e-mail distribution here.  I



Page 225

1    don't know who Burg Electric is.

2        Q.    Okay.  Mark the next exhibit.

3                    -   -   -

4            (A document was marked as Deposition

5    Exhibit Number 45.)

6                    -   -   -

7        BY MR. MEDLOCK:

8        Q.    So I'll try to marry these two documents up

9    together, but if you look at Exhibit 44 --

10            MS. SHINNERS:  If I may interrupt.  Is this

11   attached to an e-mail to counsel?

12            MR. MEDLOCK:  No.  It's actually attached

13   to Exhibit 44.

14            MS. SHINNERS:  Oh, it was attached.

15            BY MR. MEDLOCK:  Yeah.  I'll make that

16   clear in just a second.

17       BY MR. MEDLOCK:

18       Q.    So do you see at the top of Exhibit 44

19   there's an e-mail from Moises Castillo to Variza

20   Marin?

21       A.    Yes.

22       Q.    And at least one other person.  And there's



Page 226

1    an attachment to that e-mail called AL Otro Lado

2    complaint dot -- doc X.  Do you see that?

3         A.    Yes.

4         Q.    Okay.  And I'll represent to you that this

5    document, Exhibit 45, is that attachment.

6         A.    Okay.

7         Q.    And it bears the Bates numbers

8    AOL-DEF-00723887 through 892.  Do you see that?

9         A.    Yes.

10             MS. SHINNERS:  I mean, this is quite

11   clearly work product.  I mean, I apologize for the

12   interruption, and again if it was produced without

13   appropriate markings, but this appears to be an

14   analysis of -- or a summary of the lawsuit.

15             MR. MEDLOCK:  So --

16             MS. SHINNERS:  And we wouldn't even have to

17   -- well, continue.

18             MR. MEDLOCK:  Okay.  Just so we are clear,

19   I don't know if you are clawing it back, if that's

20   what your game is but --

21             MS. SHINNERS:  Go ahead.

22             MR. MEDLOCK:  Okay.  But this does not



Page 227

1    appear to be an e-mail exchange that counsel is on.

2    This seems to be an effort done by people other than

3    counsel to do this.  I haven't seen any -- to be

4    frank, I haven't seen any e-mail that indicates this

5    was directed by counsel.

6              MS. SHINNERS:  Which wouldn't actually

7    matter, because such materials could be prepared by a

8    party.  However, even --

9              MR. MEDLOCK:  That's not how work product

10   works.  But continue.

11             MS. SHINNERS:  We are clawing back the

12   document.  If further investigation reveals that it is

13   not work product -- but at this time I have no reason

14   to believe it is not work product, whether done by

15   counsel or at the direction of counsel.  If you want

16   to ask questions about the facts that you are trying

17   to get at, Mr. Owen is not even on these e-mails so --

18             MR. MEDLOCK:  Okay.  So here's -- if you

19   want to claw it back, that's fine.  We can handle that

20   through separate correspondence.  I do want to just

21   make a record that there's now been five or six

22   documents that have been clawed back either in full or



Page 228

1    in part during this deposition.  Obviously we need to

2    work through these issues and, you know, we are going

3    to have to hold the deposition open because of those

4    claw backs.  If we determine that there's not a valid

5    basis for the privilege, I was prepared to ask the

6    witness questions about them, and I want to ask him

7    questions about them.

8                 MS. SHINNERS:  Are you speaking just of the

9    document that's in front of you now?

10                MR. MEDLOCK:  I do agree there are some

11   documents in here that I think you probably have a

12   pretty strong privilege claim for, but this document

13   in particular I would like to ask questions about.

14   And if we have to come back and do that, we'll do it.

15                MS. SHINNERS:  Perhaps on the next break --

16   if we can do some investigation on the next break,

17   perhaps we can.  But, for the record, there are

18   270,000 documents, over 270,000 documents produced in

19   this litigation, so just responding to your point

20   regarding the claw-backs.  And at least if we can come

21   to the agreement right now, if you would like to allow

22   us to do some further investigation, at this time I



Page 229

1  believe we'll be clawing it back.  I think it's quite

2  clearly work product, but --

3          MR. MEDLOCK:  Okay.  Why don't we do this.

4  I'll move on to a different topic, and then we can

5  take a break, and you guys can take look at that, at

6  those documents.

7          MS. SHINNERS:  We don't want to waive any

8  protections that --

9          MR. MEDLOCK:  I understood.

10                  -   -   -

11          (A document was marked as Deposition

12  Exhibit Number 46.)

13                  -   -   -

14      BY MR. MEDLOCK:

15      Q.    I've put in front of you a document,

16  Exhibit 46 is a document bearing the Bates number

17  NTEU-000132.  It's an e-mail from William T. Haralson

18  to David Higgerson with cc's to David Atkinson, Eric

19  Claw and Eduardo Ponce.

20          Do you see that, sir?

21      A.    I see that.

22      Q.    And this e-mail is dated March 15, 2017?



Page 230

1      A.    Correct.

2      Q.    Okay.  And we talked -- this is an e-mail

3  with -- from an NTEU representative, correct?

4      A.    Correct.

5      Q.    And we talked about NTEU earlier.  They are

6  -- it's the National Treasury Employees Union.  They

7  represent CBP officers at some of the ports of entry

8  on the southwest border, correct?

9      A.    They represent all CBP officers.

10     Q.    Okay,

11     A.    Yeah.

12     Q.    And this e-mail is to David Higgerson.  Do

13  you remember what his position would have been at this

14  time?

15     A.    He was the -- at this time the director of

16  field operations for the Laredo field office.

17     Q.    Okay.  This e-mail from William Haralson

18  begins, "During the grievance meetings, Agency

19  representatives acknowledge that the Agency's

20  unilateral work policies broke CBP mandates, federal

21  immigration rules and laws in formally processing

22  persons who seek political asylum, and screening for



Page 231

1    possible terrorist or fugitive status, which places

2    CBP officers' safety, integrity and position to be

3    questioned, as the Agency lacks candor to the public

4    in stating the true facts that the Agency

5    intentionally placed the changes of denying and

6    blocking asylum to persons and families in order to

7    block the flow of asylum applicants in a chilling

8    affects to all others attempting entry into the United

9    States.

10         Did I read that first paragraph correctly?

11   A.    Yes.

12   Q.    Okay.  Did Mr. Higgerson ever make you

13   aware of that e-mail?

14   A.    No.  Not that I recall.  Chapter 149 of the

15   local, Local NTEU Chapter 149 is one of our most

16   problematic local chapters.  And they file grievances

17   on everything.  So I'm not -- I don't recall this

18   grievance, but this type of language where they

19   believe we are breaking federal laws is consistent

20   with every grievance that they file.

21   Q.    Okay.  So they are just problematic in your

22   view, correct, this chapter 149?



Page 232

1          A.     What I'm saying is they make so many

2     allegations about every issue in the Hidalgo area that

3     this is in line with what I typically see coming out

4     of that chapter.

5          Q.     So in March 15, 2017, the metering policy

6     would have been in effect at the Hidalgo Port of

7     Entry, correct?

8          A.     Correct.

9          Q.     Okay.  And there is a grievance from the

10    NTEU Chapter 149 that claims that the CBP is denying

11    blocking asylum to persons and families in order to

12    block the flow of asylum applicants, correct?

13         A.     That's what the e-mail says.

14         Q.     And the e-mail also says it's having

15    chilling effects, correct?

16         A.     According to the chapter.

17         Q.     Okay.  Is it your position that the chapter

18    is just making that up?

19         A.     It is my position that related to the

20    metering the chapter wanted more officers on the limit

21    line on overtime.

22         Q.     Let me make the question even clearer.  Is



Page 233

1    William Haralson lying about what's going on in this

2    e-mail?

3         A.    That is William Haralson's view.

4         Q.    Do you think that it's a lie?

5         A.    I think it's inaccurate.

6         Q.    Do you think it's a lie?

7         A.    I think it's inaccurate.

8         Q.    Do you think intentionally inaccurate?

9         A.    I think it's intentionally inaccurate.

10        Q.    So that would be a lie, right?

11        A.    He believes it to be true.

12        Q.    So the question -- so the question that --

13   so it's an open question whether William Haralson is

14   telling the truth or CBP management is telling the

15   truth about what's going on in the Hidalgo Port of

16   Entry, correct?

17        A.    He has a different view than the policies

18   we have implemented.

19        Q.    Okay.  So looking at this e-mail, what you

20   are saying is you are correct that CBP wasn't breaking

21   the law, and Mr. Haralson is being intentionally

22   incorrect?



Page 234

1      A.    I don't believe Mr. Haralson has enough

2    knowledge to know if we are breaking the law.  We are

3    not breaking the law.

4      Q.    Do you know if William Haralson is actually

5    a CBP employee who worked at the Hidalgo Port of

6    Entry?

7      A.    I don't know if he is, but our chapter

8    representatives are CBP employees.

9      Q.    And do you know -- so do you not trust his

10   word on this issue?

11     A.     I do not trust his word, especially this

12   chapter, which has been problematic throughout my time

13   in my current position.

14     Q.    So -- and I want to make this crystal clear

15   for Judge Bishan, (ph) the judge looking at this case.

16   Your position that you want to tell Judge Bishan is

17   that William Haralson is lying in this e-mail; is that

18   right?

19          MS. SHINNERS:  Objection.

20     Q.    Go ahead.

21     A.    I do not agree with Mr. Haralson's

22   assessment as to the situation on the ground.



Page 235

1      Q.    Were you on the ground on March 15, 2017?

2      A.    No, I was not.

3      Q.    When in 2017 did you visit the Hidalgo Port

4  of Entry?

5      A.    Oh, I don't recall, but I have visited all

6  of our southwest border ports many times.

7      Q.    Okay.  Do you recall whether in March 2017

8  you actually visited the Hidalgo Port of Entry?

9      A.    I don't recall.

10     Q.    What specifically about the NTEU Chapter

11  149 is problematic in your view?

12     A.    In my view, just the history of raising

13  complaints on every issue that is there.  The same

14  issues would exist in every other port and no

15  complaints are raised there.  They are in my view a

16  very problematic chapter that likes to file grievances

17  on everything.

18     Q.    So the same issues that are discussed in

19  this e-mail would be present at every other port; is

20  that right?

21     A.    No.  I said the same issues that occur in

22  different ports that no other chapters file grievance



Page 236

1    on, this chapter will file grievances on.

2        Q.    Okay.  So one of your problems with this

3    chapter is that they speak up and file grievances,

4    right?

5        A.    No.  I think they lack credibility in the

6    complaints that they raise.

7        Q.    So you just put no stock in this e-mail

8    whatsoever, right?

9        A.    In this e-mail which I've never seen until

10   today?

11       Q.    Yeah.  Yeah.  That's what I'm asking.  Can

12   you answer my question, sir?

13       A.    Let me read the e-mail, sir.

14       Q.    Sure.  Go ahead.

15       A.    From this e-mail, the third paragraph where

16   he talks about the officers' working conditions out on

17   the middle -- and this would be in the middle of the

18   bridges, I don't disagree with that.  Those are issues

19   that we worked on with the national union to bring

20   more safety at the middle of the bridges.  But again,

21   the next sentence they are looking for back pay

22   compensation.



Page 237

1      Q.     And why does that make this e-mail less

2  credible?

3      A.     Because this chapter is always looking for

4  additional compensation for doing their duties.

5  Throughout the migrant issues, they have always wanted

6  more officers on overtime for what they believe are

7  unsafe working conditions.  So I disagree with his

8  first two paragraphs, and his assessment as to the

9  metering and what it's doing to the asylum seekers,

10  but I agree that we have to work with the union on

11  enhancing the working conditions.

12           I do not agree with the remedy always being

13  bring more officers on and pay them over time.

14      Q.     Would it surprise you -- so you disagree

15  that -- sorry.  Let me ask a better question.

16           You disagree that CBP was breaking federal

17  immigration law, correct?

18      A.     I disagree.

19      Q.     And you specifically disagree that CBP was

20  breaking federal immigration law when it implemented

21  the metering policy, correct?

22      A.     The metering policy was implemented for



Page 238

1  operational concerns.  I do not believe it was

2  breaking federal law.

3      Q.    Okay.  And would it surprise you to know

4  that other CBP officer, front-line officers, also had

5  concerns?

6      A.    No.

7      Q.    About breaking -- about the metering policy

8  breaking the law?

9      A.    No.  It would not surprise me.

10      Q.    In fact you know that other CBP front-line

11  officers had concerns that the metering policy broke

12  the law?

13      A.    Yes.

14      Q.    You know that there was a whistleblower in

15  the Tecate Port of Entry who raised concerns about the

16  metering policy breaking the law?

17      A.    Yes.

18      Q.    And you know that there was a DHS OIG

19  investigation of that, correct?

20      A.    Correct.

21      Q.    And you were contacted as part of that

22  investigation, correct?



Page 239

1          A.    I don't believe I was contacted as part of

2    that investigation.  I have seen the report.

3          Q.    And you know that DHS OIG did conclude that

4    part -- that as part of the way the metering policy

5    was implemented at the Tecate Port of Entry, that that

6    implementation broke the law?

7          A.    That implementation was not directed by

8    management.  And the OIG report found it was not the

9    standard protocols for the agency.

10         Q.    Let me ask you a question.  Do you take

11   responsibility for -- ultimate responsibility for what

12   happens at the ports of entry?

13         A.    Do I take ultimate --

14         Q.    Yeah.  For the actions of your officers?

15         A.    I am not -- I am the leader of field

16   operations.  And when our officers engage in

17   misconduct, they are held accountable for it.  As

18   those officers that have improperly returned people

19   back into Mexico after having been on U.S. soil, those

20   cases go to the OIG to OPR for investigation.  And if

21   found valid, they are held accountable.

22         Q.    Do you take responsibility for -- do you



Page 240

1    take responsibility for instances where the metering

2    policy was implemented in ways that broke the law?

3         A.    Do I take -- my direction was very clear.

4    And I do not take responsibility for the 30,000

5    officers that work under me if they do not follow the

6    guidance of the policies.

7         Q.    Let me ask you, the concerns that are

8    raised in the first paragraph of this e-mail from

9    William Haralson to David Higgerson, have those

10   concerns been investigated by anyone at CBP, to your

11   knowledge?

12        A.    I'm not quite sure I even understand what

13   his concerns are.  I mean, that we --

14        Q.    Well, Mr. Haralson is concerned that the

15   metering policy as it was implemented at the Hidalgo

16   Port of Entry broke the law and had a chilling effect

17   on others trying to attempt to enter the U.S.

18             Do you know whether the Office of

19   Professional Responsibility, the Office of the

20   Inspector General, or anyone else at DHS or CBP ever

21   investigated the allegation made in the first

22   paragraph of this e-mail?



Page 241

1      A.    This specific allegation on Hidalgo, I do

2  not know.

3      Q.    Do you know whether anybody who -- at CBP

4  has ever disproven the allegations in the first

5  paragraph of this e-mail?

6      A.    To disprove whether or not our process had

7  a chilling effect on migrants, I don't know that.

8      Q.    You don't know as you sit here today

9  whether the metering policy had a chilling effect,

10 right?

11     A.    I do not.

12     Q.    You don't know as you sit here today

13 whether the metering policy had a deterrent effect, do

14 you?

15     A.    I know what our statistics show, and that

16 the migrants, 126,000 last year, were not deterred,

17 were not chilled.  They came in.  They were not

18 discouraged from crossing.

19     Q.    Isn't it the case that CBP actually

20 investigated whether the metering policy had a

21 chilling -- had a deterring effect?

22     A.    It's not aware of that.



Page 242

1      Q.    Were you ever read into any sort of effort

2  to do that?

3      A.    Not that I recall.  No.

4      Q.    Would it surprise you if CBP officers were

5  investigating that issue?

6      A.    CBP officers.

7      Q.    Yes.

8      A.    You mean the Office of Professional

9  Responsibility.

10     Q.    No, just line -- people --

11     A.    Line officers?

12     Q.    -- people in the field in the San Diego

13  field office.

14     A.    That they were investigating that?

15     Q.    Yeah.

16     A.    I'm not aware of that.

17     Q.    Would it surprise you if they were?

18     A.    It would, because it's not our role.  Our

19  role when we suspect misconduct is to refer that to

20  the OPR and to OIG.

21     Q.    So that would have been beyond their role

22  to do that sort of investigation in your view?



Page 243

1        A.    Unless it was one of our integrity officers

2    in the port.

3                    -   -   -

4              (A document was marked as Deposition

5    Exhibit Number 47.)

6                    -   -   -

7        BY MR. MEDLOCK:

8        Q.    Sir, I'm showing you a multi-page document.

9    And I apologize I didn't print the Bates numbers on

10   this, but I'll represent to you begins with the

11   AOL-DEF-00205672 and is designated highly

12   confidential.

13             Sir, can you take a moment to review this

14   document and let me know when you are done with it.

15             Sir, have you finished reviewing it?

16       A.    Not yet.

17       Q.    Okay.  Sorry.

18       A.    Okay.

19       Q.    All right, sir.  I'm focused on the second

20   and third pages of the document.  That's a copy of a

21   July 3, 2018 e-mail from Eddy Arias to Johnny Armijo,

22   correct?



Page 244

1     A.     Yes.

2     Q.     And we already talked about Johnny Armijo.

3  He works in the San Diego field office, correct?

4     A.     Yes.

5     Q.     And Eddie Arias at the time was with CBP

6  Border Security program manager, TAU, in the San Diego

7  field office, correct?

8     A.     According to the e-mail.

9     Q.     And what does TAU stand for?

10    A.     Tactical Analysis Unit.

11    Q.     Okay.  And what's the Tactical Analysis

12 Unit do?

13    A.     They are a -- help target and do intel-type

14 research in things.

15    Q.     And when he's talking about intel, this is

16 developing some of the intel information that would

17 feed into the meeting the SCIF?

18    A.     No.  No.  This is more tactical information

19 rather than intel, so identifying, you know,

20 shipments, loads, individuals, those types of things.

21    Q.     Okay.

22    A.     It's not classified information like we



Page 245

 1    have at the SCIF.

 2         Q.    Okay.  So the e-mail begins:  Sir, as

 3    requested over the past week, I have worked towards

 4    gauging the overall sentiment of subjects detained at

 5    the San Ysidro SYS Port of Entry.  My goal was to

 6    determine what effect, if any, are measures such as,

 7    quote, unquote, zero tolerance, end quote, metering,

 8    end quote, implemented by U.S./CBP making on subjects

 9    attempting entry either illegally or through the

10    credible fear/asylum process.

11              Did I read that correctly?

12         A.    Yes.

13         Q.    And then in the next paragraph Mr. Arias

14    states that he reviewed 75 detainee I-213 interview

15    narratives, correct?

16         A.    Correct.

17         Q.    What's an I-213 interview narrative?

18         A.    It's one of the immigration forms.  It's

19    the Q&A, the question and answer.

20         Q.    And then he also states that he spoke with

21    deferred inspections officers from the San Ysidro AEU,

22    correct?



Page 246

1        A.     Yes.

2        Q.     That's the Admissibility Enforcement Unit

3   in San Ysidro?

4        A.     Part of it.  Yes.

5        Q.     And then he goes on to say, quote, I assess

6   that the Mexican, Honduran, El Salvadorian, and

7   Guatemalan citizen sentiment detained at the POE is

8   unshaken.  Detainees did not claim fear of inspection,

9   possible separation of family units, and long wait

10  times in Mexico as deterrent factors.

11            Did I read that correctly?

12       A.     Yes.

13       Q.      Are you surprised to see that in July 2018

14  officials in the San Diego field office were

15  investigating whether there -- whether the metering

16  policy had a deterrent factor?

17       A.     Well, they are also talking about zero

18  tolerance, which in July 2018 was in the high point of

19  family separation activities that were taking place.

20       Q.     I get that, but they are also talking about

21  metering.

22       A.     They are.



1       Q.      And they are also talking about whether

2  long wait times in Mexico are a deterrent factor,

3  right?

4       A.      Correct.

5       Q.      Does that surprise you?

6       A.      It does surprise me.

7       Q.      And you weren't read into that effort, were

8  your?

9       A.      No, not that I recall.  No.

10      Q.      Did anybody ever report up to you about

11 anything relating to this apparent study done by the

12 TAU?

13      A.      No.  This is the first time that I recall

14 seeing this.

15      Q.      Okay.  Do you know Elizabeth Kingma is?

16      A.      No.

17      Q.      I'll represent to you that Elizabeth Kingma

18 is a investigator with the Office of Inspector General

19 at the Department of Homeland Security.  Okay?

20      A.      Okay.

21      Q.      All right.  Mark the next exhibit.

22                              -   -   -



Page 248

1            (A document was marked as Deposition

2     Exhibit Number 48.)

3                      -    -    -

4       BY MR. MEDLOCK:

5       Q.    And while you look at 48, sir, I just want

6     to explain a couple things to you.  Have you ever

7     marked up a PDF before, sir?

8       A.    If I've marked up a PDF?

9       Q.    Right.  Ever made comments on a PDF?

10      A.    Ever?

11      Q.    Yeah.

12      A.    Like in the computer, like adding a

13    footnote --

14      Q.    Yeah, in the course of your work?

15      A.    I guess I have.

16      Q.    You see how there's in the -- in Exhibit 47

17    there's some highlighting and there's some comment

18    bubbles underneath some of the paragraphs?

19      A.    Yes.

20      Q.    All right.  And there's actually sort of a

21    comment bubble right off of the phrase, the phrase

22    deterrent factor is underlined, and there's a comment



Page 249

1    bubble next to it?

2         A.    Yes.  Okay.

3         Q.    Okay.  So I'm back on 48, and I'll

4    represent to you this is the metadata taken from this

5    document, AOL-DEF-00205672.  Okay.  And I am on page 3

6    of the metadata sheet in front of you.  Do you see

7    that?

8         A.    Yes.

9         Q.    Page 3?

10        A.    Page 3.

11        Q.    And confusingly, halfway -- more than

12   halfway down the bottom of the page it says, Page 2 of

13   3.  Do you see that?

14        A.    Yes.

15        Q.    Okay.  And there's something that says

16   "annotations," correct?

17        A.    Yes.

18        Q.    And it says "Author, Kingma, E," do you see

19   that?

20        A.    Yes.

21        Q.    And it says created on, 3/31/2019, 3:56

22   p.m.?



Page 250

1    A.    Okay.

2    Q.    Then it says "contents."  Do you see that?

3    A.    Yes.

4    Q.    ████████████████████████████████████

5    ████████████████████████████████████████

6    ████████████████████████████████████████

7    ████████████████████████████████████

8    A.    ████████

9    Q.    ████████████████████████████████████

10   ████████████████████████████████████████

11   ████████████████████████████████████████

12   ████████████████████

13   A.    Correct.

14   Q.    And that occurred on March 31, 2019,

15   correct?

16   A.    Correct.

17   Q.    ████████████████████████████████████████

18   ████████████████████████████████████████

19   ████████████████████████████████

20   ████████████████████████████████████

21         MS. SHINNERS:  Objection.  This is quite

22   clearly an OIG document.  I just want to make --



Page 251

1            MR. MEDLOCK:  I'm asking whether he's aware

2      of that.

3      A.    I don't recall being aware of anything like

4      that with OIG.

5      BY MR. MEDLOCK:

6      Q.    Did anyone in your reporting or command

7      structure ever tell you whether -- ever tell you that

8      there were questions being asked about whether one of

9      the purposes of the queue management or metering

10     policy was deterrents?

11     A.    Well, you showed me an e-mail earlier from

12     one of my staff that said deterrents was named.

13     Q.    Right.

14     A.    So I can't -- I can't say for certain that

15     I haven't received some documents for folks that have

16     expressed concern.  But I know why the policy was set

17     up, and deterrents was not why the policy was set up.

18     Q.    Right.  So you -- but can you just help me

19     out here and explain if deterrents isn't one of the

20     reasons why the policy is set up, why is Eddie Arias

21     going through the AEU at San Ysidro and asking people

22     whether they were deterred by long waits in Mexico?



Page 252

1            MS. SHINNERS:  Objection.  Foundation,

2    knowledge.

3        Q.    I'm asking whether he know.

4        A.    I don't know.  I don't know who Eddy Arias

5    is.  I don't know the reason to start that inquiry.  I

6    don't know.

7        Q.    And he was reporting to Johnny Armijo,

8    correct?

9        A.    Correct.

10        Q.    You do know Johnny Armijo?

11        A.    I do know Johnny Armijo.

12        Q.    Do you trust Johnny Armijo's work?

13        A.    Yes.

14        Q.    Do you think he's a good CBP officer?

15        A.    I do.

16        Q.    And do you -- and Johnny Armijo just never

17    brought this up with you, correct?

18        A.    He is several steps down below my chain of

19    command.  He's never brought this up to me.

20        Q.    Do you know for what purpose Mr. Arias and

21    Mr. Armijo exchanged this e-mail about whether long

22    wait times in Mexico were a deterrent factor?



Page 253

1          MS. SHINNERS:  Objection to the

2     characterization of the document.

3          A.    I do not know.  I don't know.

4          Q.    So as you sit here today, this is the first

5     time you have ever scene this e-mail, correct?

6          A.    Correct.

7          Q.    And you don't have an explanation for why

8     the TAU and the San Diego field office was looking at

9     whether the metering policy had a deterrent factor do

10    you?  You don't have an explanation for that?

11         A.    No.

12         Q.    And you don't have an explanation for why

13    someone named Elizabeth Kingma in March 31, 2019 was

14    asking whether the queue management policy, one of the

15    purposes of the queue management policy was

16    deterrents, do you?

17         A.    No.  I mean, lower-level employees

18    throughout the agency, throughout OIG have their

19    views.  My policy memo from April of 2018 is very

20    clear.

21         Q.    Okay.  So let me get this straight.  You

22    believe your policy memo is clear, correct?



Page 254

1          A.    I do.

2          Q.    But you received e-mails saying -- that

3    indicated to you that some people that purported to

4    you thought that the policy had a deterrent effect,

5    correct?  We looked at that e-mail earlier.

6          A.    Right.  From that e-mail, I recall that.

7          Q.    And you were getting questions from CRCL

8    about whether one of the purposes for the metering

9    policy was deterrents, correct?

10         A.    CRCL was investigating that.  I was not

11   getting questions from that.

12         Q.    There was an investigation.  You knew that?

13         A.    From CR.  Right.

14         Q.    And you also knew that there was a DHS OIG

15   investigation about the metering policy in 2018, 2019,

16   correct?

17         A.    I'm aware there was a review about how the

18   policy was implemented and the misconduct of some

19   officers, not if it had a deterrent effect.

20         Q.    And you now know there was also an e-mail

21   sent in 2017 by someone with the NTEU chapter claiming

22   that the metering policy broke the law, correct?



Page 255

1       A.    In their view, yes.

2       Q.    And you also know that somebody named

3    Elizabeth Kingma was raising questions about the

4    purpose of the --

5       A.    Based on the documents you just provided

6    me, yes.

7       Q.    And your -- but despite all of that, you

8    believe your policy was crystal clear?

9       A.    I do.

10      Q.    Okay.  Got it.  All right.  Let's go to the

11   next document.

12            Are you good?  Do you need a break?

13      A.    No, I'm good.

14                        -   -   -

15            (A document was marked as Deposition

16   Exhibit Number 49.)

17                        -   -   -

18      BY MR. MEDLOCK:

19      Q.    Sir, I've marked as Exhibit 49 a multi-page

20   e-mail attachment that begins with NTEU-000110 and

21   goes all the way to NTEU-000126.

22            Take a moment to review the document.  Let



Page 256

1     me know when you have finished doing so.

2          A.     Okay.

3          Q.     All right, sir.  You've seen a copy of this

4     e-mail before?

5          A.     I believe I have.

6          Q.     And when I say "this e-mail" I'm referring

7     to the March 19, 2019 e-mail from David Atkinson to

8     Kevin McAleenan with William Haralson and Romualdo

9     Iglesias, Jr. copied.  Do you see that e-mail, sir?

10         A.     Yes, sir.

11         Q.     And the subject line of that e-mail is

12    safety alert, slash, rule clarification?

13         A.     Correct.

14         Q.     And you would have -- you received that

15    e-mail in the course of your duties at CBP, correct?

16         A.     I believe either I received this from

17    Mr. McAleenan or I may have received it from the

18    national NTEU.

19         Q.     Okay.  But either way, you received it in

20    the course of your duties?

21         A.     I do recall seeing this.  Yes.

22         Q.     Okay.  And you would have received it on or



Page 257

1    around March 19, 2019?

2          A.    Generally speaking.

3          Q.    Give or take?

4          A.    Give or take.  Yeah.

5          Q.    And at the time you received the e-mail,

6    you would have read it and understood it, correct?

7          A.    Yes.

8          Q.    And from looking at the e-mail and

9    attachment, the e-mail attachment appears to be true

10   and correct; is that right?

11         A.    Best as I can recall.  Yes.

12         Q.    Okay.  Do you think David Atkinson is a

13   problem employee?

14         A.    He is the same chapter as the last e-mail

15   you showed me.  Yes.

16         Q.    Do you think he's a liar?

17         A.    I question his assessments.  Yes.  I think

18   he misleads.

19         Q.    Question his veracity?

20         A.    Define veracity.

21         Q.    It's another fancy -- it's a 25 cent way of

22   asking do you think he's a liar?



Page 258

1          A.     I think he misleads.  Yes.

2          Q.     So, I mean, we looked at the CBP ethics

3     policy earlier.  How many times has -- it's a

4     violation of the ethics policy to lie, correct?

5          A.     Correct.

6          Q.     And mislead, correct?

7          A.     Correct.

8          Q.     Do you think he's an unethical officer?

9          A.     Do I think he's an unethical officer.

10         Q.     Yes.

11         A.     Yes.

12         Q.     How many times to your knowledge has David

13    Atkinson been reprimanded for violating the CBP ethics

14    policy?

15         A.     I don't have that data.

16         Q.     Would it -- do you have any information as

17    you sit here today that he's ever been reprimanded?

18         A.     I don't.  I know he's received cease and

19    desist orders on things.

20         Q.     Did he receive a cease and desist order for

21    this e-mail?

22         A.     Not that I'm aware of.



Page 259

1      Q.    When you say he's received cease and desist

2  orders from a court or from officials at CBP?

3      A.    From his leadership at CBP.

4      Q.    When you say cease and desist order, is it

5  the leadership asked him to stop doing certain things?

6      A.    Certain things, yes, in terms of his

7  conduct towards other employees

8      Q.    Okay.  Did the leadership at CBP ever ask

9  Mr. Atkinson to stop making complaints?

10     A.    No.  No.  The cease and desist was in his

11  relationship to how he was engaging with other

12  employee.

13     Q.    All right.  Let's look at the e-mail that

14  Mr. Atkinson sent to Mr. McAleenan.  It reads, the

15  first paragraph, quote, First, the port of Hidalgo,

16  Texas employees would like a written order provided to

17  them that mirrors their instructions to return

18  individuals who enter the U.S.  And request asylum

19  back to Mexico without appointment for a future

20  appointment.  The Agency is allowing the Mexican

21  officials to create a list and detention area mid

22  bridge to facilitate who would be next to enter the



Page 260

1    United States from that detention site on the Mexican

2    side which is under the control and direction of CBP

3    officers on the U.S. side.

4              Did I read that correctly?

5         A.    Yes.

6         Q.    Do you agree with anything in that

7    paragraph?

8         A.    Do I agree with anything in this paragraph.

9         Q     Yeah.

10        A.    I believe the Mexican officials did create

11   a list on the other side of Hidalgo.

12        Q.    So that at least is accurate as far as

13   you --

14        A.    Right.  I mean, they did request a written

15   order on our policy.  That's accurate.

16        Q.    Anything else?

17        A.    Well, just again when he says, Return

18   individuals who enter the U.S., if again they have

19   crossed over into the U.S. they are not to be

20   returned; I don't know if he means actually entered or

21   just at the limit line.  I don't know where he's going

22   with that.



Page 261

1    Q.    Okay.  so you may disagree with that, you

2    may not.  You just don't understand his phrasing; is

3    that right?

4    A.    I know that, again, it's against policy to

5    return folks who have already crossed into the U.S.  I

6    don't know if that's what he is meaning.

7    Q.    And Mr. Atkinson states that there were

8    instructions to return individuals who enter the U.S.

9    And request asylum back to Mexico, correct?

10    A.    That's what his e-mail says.

11    Q.    If that occurred, that was a violation of

12    your metering policy, correct?

13    A.    If they had already stepped foot in the

14    United States.  If they were still at the limit line

15    and we were beyond capacity, to tell them at that

16    point to return to Mexico would not violate the

17    metering policy.

18    Q.    Right.  In fact that's what the policy sort

19    of describes, right?

20    A.    That's what it describes.

21    Q.    So you don't -- we can go back to this

22    e-mail for a second.  I just want to make sure I



Page 262

1    understand it.  We don't dispute a couple facts here.

2              We don't -- you don't dispute that officers

3    are placed -- have been placed at the limit line of

4    ports of entry on the southwestern border, right?

5         A.    No.

6         Q.    You don't dispute that those officers have

7    been instructed, per your memorandum, to state that

8    the port is at capacity and that people should come

9    back at a later time, correct?

10        A.    Correct.

11        Q.    And you don't dispute that individuals who

12   come to the actual boundary between the U.S.  And

13   Mexico are told that by CBP officers, and as a result

14   return to Mexico, correct?

15        A.    At the limit line, if we are beyond

16   capacity, they are told to return to Mexico, and we

17   will process them when we have capacity, if that's

18   what you are asking.

19        Q.    Right.  There's no dispute about those

20   facts, right?

21        A.    No, but again, at the limit line.

22        Q.    Right.



Page 263

1          A.     If they have stepped into the U.S., that's

2     different.

3          Q.     Right.  Right.  So if somebody is at the

4     limit line but on Mexican soil --

5          A.     Correct.

6          Q.     -- CBP officers are instructed to engage in

7     metering per your policy which would include telling

8     people that the port is at capacity and that they

9     should return at a later date, correct?

10         A.     That's right.

11         Q.     Okay.  I just want to make sure that we

12    have that correct.  Okay.  Let's go back to the memo,

13    to the e-mail for a second.

14               If people actually stepped foot on -- if

15    asylum seekers actually stepped foot on U.S. soil and

16    were returned back to Mexico, you would agree with me

17    that that violates your policy, right?

18         A.     The policy says that.

19         Q.     And to your understanding it would also

20    violate the law, right?

21         A.     To my understanding, yes.

22         Q.     Okay.  And so you may or may not dispute



Page 264

1    the phrasing of what Mr. Atkinson is actually saying

2    in this first paragraph.  It just depends on what he

3    means by entering, correct?

4        A.    Correct.

5        Q.    But if he is saying that people actually

6    step foot on U.S. soil, you would dispute that?  You

7    would dispute that that was actually occurring at the

8    Hidalgo Port of Entry?

9        A.    I can't speak to what happened on March 19

10   at the Hidalgo Port of Entry.

11       Q.    Okay.

12       A.    I'm saying is if they step foot at any port

13   into the United States, they are to be brought in and

14   be processed.

15       Q.    Okay.  And one of the reasons that Mr.

16   Atkinson was asking for a written order was he

17   apparently believed that your April 2018 memorandum

18   was unclear?

19          MS. SHINNERS:  Objection.  Calls for

20   speculation.  You can answer.

21       A.    I don't know why he wanted more than what

22   we have already put out.



Page 265

1      Q.    Okay.  Let's move to the page that ends in

2    115.  That is a letter that appears to begin with a

3    "To Whom It May Concern," correct?

4      A.    Correct.

5      Q.    It's dated March 6, 2019?

6      A.    Yes.

7      Q.    And there's heading at the top that says,

8    CBP Officers, U.S. Customs and Border Protection, U.S.

9    Port of Hidalgo, Texas.  Do you see that?

10     A.    Yes.

11     Q.    You reviewed this attachment at the time

12   that you also reviewed the e-mail that was sent to Mr.

13   McAleenan, correct?

14     A.    I believe so.

15     Q.    Okay.  And the "To Whom It May Concern"

16   letter reads, "We CBP officers assigned the port of

17   Hidalgo, Texas, have been ordered by CBP supervisors

18   to inspect persons seeking, slash, requesting asylum

19   status near the middle of the United States-Mexico

20   bridge in Hidalgo, Texas, on the U.S. side."

21           Did I read that correctly?

22     A.    I'm sorry.  On the U.S. side.  Yes.



Page 266

```
 1        Q.    And that's a correct statement of the

 2   metering policy, correct?  Of how it's supposed to

 3   operate?

 4        A.    Operate at the limit line which is

 5   generally in the middle of the bridges.

 6        Q.    Okay.  And the next sentence "reads, We are

 7   posted mere feet into the U.S. from the U.S.-Mexico

 8   border line, and are intercepting and immediately

 9   preventing asylees who request asylum entering the

10   United States.

11              Did I read that correctly?

12        A.    Yes.

13        Q.    Is that how the metering policy is supposed

14   to work?

15        A.    Immediately preventing asylees.

16        Q.    Yes.

17        A.    If we were at capacity, we are to direct

18   the asylees to go back to Mexico, remain in the

19   shelters until we have capacity.

20        Q.    So it may not be phrased the way that you

21   want but --

22        A.    Well, I would not use the word preventing.
```



Page 267

1      Q.    Okay.  But that's just a word choice issue,

2   correct?

3      A.    But I think preventing gives the wrong

4   connotation.

5      Q.    Right.  It does, doesn't it?

6      A.    It does.

7      Q.    Because you wouldn't view immediately

8   preventing asylees as the purpose of your metering

9   policy, correct?

10      A.    I would not.

11      Q.    But the officers who signed this letter

12   appeared to believe that that was a purpose of the

13   metering policy?

14      A.    The officers who signed this letter were

15   more concerned with the safety of being now posted mid

16   bridge.

17      Q.    Not my question.

18      A.    Well --

19      Q.    My question is these officers used the

20   phrase "immediately preventing asylees," correct?

21      A.    That's the term they used.

22      Q.    And they have -- it appears that these



Page 268

1    officers believed that immediately preventing asylees

2    from entering the U.S. was a purpose of the metering

3    policy, correct?

4         A.    I don't know if that's -- they believe that

5    was the purpose.

6         Q.    But anyone who read your metering policy

7    should not have come away with the impression of it

8    was immediately preventing asylees from entering the

9    U.S., right?

10             MS. SHINNERS:  Objection.

11        Q.    You never wanted to convey that sentiment;

12   is that right?

13        A.    Metering has never been designed to be a

14   deterrent.

15        Q.    Can you explain to me why these officers

16   who are implementing the metering policy at the

17   Hidalgo point of entry believe that it is being used

18   to intercept and immediately prevent asylees who

19   request asylum from entering the U.S.?

20        A.    I don't believe this is an accurate

21   reflection of the policy or what's taking place.

22        Q.    Do you think these officers are being



Page 269

1    inaccurate in their statements?

2         A.    I think these officers signed a petition

3    provided to them by their union chapter president.

4         Q.    Do you think that these officers were

5    forced to sign this?

6         A.    No.

7         Q.    Do you think that these officers have free

8    will?

9         A.    Yes.

10         Q.    Do you think these officers have the

11    ability to decide that they didn't agree with this and

12    didn't want to sign it?

13         A.    Yes.

14         Q.    Do you think that the officers who signed

15    this letter agreed with the statements in it?

16          A.    I believe so.

17         Q.    Can you explain to me why the 187 officers

18    who signed this letter had the impression that the

19    metering policy was designed to immediately prevent

20    asylees from entering the U.S.?

21              MS. SHINNERS:  Objection, foundation.

22         Q.    So how many -- will you take my word for it



Page 270

1    that 187 officers signed this?

2          A.    Okay.

3          Q.    I counted it, but do you have any reason to

4    dispute that?

5          A.    No.

6          Q.    And have you spoken to any of these

7    officers?

8          A.    No.

9          Q.    Have you attempted to ask them what -- why

10   they would come away with the impression that

11   immediately -- that the metering policy was designed

12   to immediately prevent asylees from requesting asylum

13   in the U.S.?

14         A.    I have not spoken with these officers.

15         Q.    So you don't know where they got this

16   phrase "immediately preventing asylees who request

17   asylum from entering the U.S."?

18         A.    I know the policy doesn't say that.

19         Q.    And you can't explain why 187 officers

20   would sign a letter indicating that that's how the

21   policy was being implemented?

22               MS. SHINNERS:  Same objection.  Foundation.



Page 271

1          A.    I don't know why they would sign this memo.

2          Q.    So --

3          A.    But I know from the e-mail that is attached

4     to this, there are other issues at play here besides

5     simply the metering.

6          Q.    Do you think these officers are just out

7     to get some back pay,these 187 officers?

8          A.    I think these officers don't like being

9     stationed mid bridge.  I think they feel that more

10    needs to be done mid bridge.  And I also do believe

11    they want more officers on overtime at mid bridge.

12         Q.    So you think these 187 officers are just

13    out for some more overtime?

14         A.    I think there's a lot of reasons behind why

15    they are unhappy with being stationed mid bridge.

16         Q.    Do you think these 187 officers have

17    legitimate concerns about their safety?

18         A.    Legitimate concerns about their safety mid

19    bridge, yes.  And we have worked with national union

20    and we've worked to address the safety issues mid

21    bridge.

22         Q.    Is officer safety a priority for you --



Page 272

1      A.    Yes, it is.

2      Q.    -- at the --

3      A.    Yes, it is.

4      Q.    And it's something you want to try to

5  guarantee as best you can --

6      A.    Yes.

7      Q.    -- correct?  So isn't it true that when the

8  metering policy was rolled out, there were concerns

9  about office safety at multiple ports of entry?

10     A.    There were.

11     Q.    There were concerns at the Tecate Port of

12 Entry, correct?

13     A.    I don't recall Tecate, but there were

14 concerns at multiple ports expressed.

15     Q.    And there certainly were concerns at

16 Hidalgo, correct?

17     A.    At the -- particularly in the Laredo area

18 where the bridges are long.  Yes.

19     Q.    Was the metering policy rolled out before

20 the officer safety aspect of putting people at mid

21 bridge could be fully considered?

22     A.    No.  Metering policy, again, began in 2016.



Page 273

1    It was when we started stationing officers at the

2    limit line.  That is what caused some greater concern

3    for officer safety.

4        Q.    So you didn't know about the officer safety

5    concerns until officers were put at the limit line,

6    right?

7        A.    Until officers started raising their

8    concerns, yes.

9        Q.    If a -- if you learned the metering policy

10   was causing concerns about officer safety, and officer

11   safety was a paramount concern for yourself, why not

12   pull back the policy and say we are going to work it

13   out so that we can do this safely, and then we'll roll

14   it out again?

15       A.    Because we addressed the physical safety

16   aspects of what their concerns were.  And working with

17   the national chapter at all of the crossings, we

18   addressed, location by location, safety aspects to

19   address their concerns.  We built protection booths,

20   if you will.  We had vehicles out there.

21           We have the heaters, the lighting.  All of

22   the efforts that are needed to enhance officer safety



Page 274

1    at the limit line was the direction we went.  We did

2    not pull back the policy.  We enhanced the officer

3    safety.

4         Q.    That happened after the metering policy was

5    rolled out, correct?

6         A.    The metering policy again started in 2016.

7    These concerns came up when we started posting

8    officers mid bridge.  And we have worked to address

9    those issues since that time.

10        Q.    If you are going to roll out a new policy,

11   why not look at officer safety first and then

12   implement the policy?  Why do it backwards?

13        A.    We were facing a crisis with the level of

14   migrants that were coming in.  We were overwhelmed.

15   What we did in 2016 also created officer safety issues

16   when we brought in as many migrants as we physically

17   could, when we converted conference rooms to provide

18   them space, when we allowed them to stay outside of

19   the doors of the offices and defecate all over the

20   property.  That was creating officer safety issues

21   too.  So we had to take actions then.

22               And we were not going to repeat the



Page 275

1    conditions that existed in 2016 when the migrants

2    started surging again in 2018.  So there are no easy

3    answers when you implement these policies in the

4    ports.

5         Q.    There are no easy answers but you still

6    have to follow the law, right?

7         A.    And we do follow the law.

8              MS. SHINNERS:  I think it's time for a

9    break.

10             MR. MEDLOCK:  Do you need a break, sir?

11             THE WITNESS:  I do need a break.

12             MR. MEDLOCK:  Okay.

13                   -  -  -

14             (Recessed at 3:11 p.m.)

15             (Reconvened at 3:25 p.m.)

16                   -  -  -

17        BY MR. MEDLOCK:

18        Q.    All right, sir.  You still have --

19        A.    Yes.

20        Q.    -- the current exhibit in front of you,

21   sir.  I want to direct your attention to the e-mail

22   from David Atkinson, and specifically the picture that



Page 276

1    appears on the fourth page of the e-mail with the what

2    appears to be sort of grainy picture of a secondary

3    inspection area.  Do you see that, sir?

4         A.    Okay.

5         Q.    Does that -- is that a secondary inspection

6    area at Hidalgo, do you know?

7         A.    I mean it -- it could be.  It could be the

8    permit area.

9         Q.    Okay.

10        A.    I mean, it could be.

11        Q.    You are not clear as you look -- I gather

12   it's a bad photo, but you can't tell where it's taken?

13        A.     I can't tell.  No, sir.

14        Q.    Okay.  And below that it says, Chairs

15   reduced to minimize the amount of persons held in the

16   seating area, leaving a huge blank space.

17             Did I read that correctly?

18        A.    Okay.

19        Q.    Are you aware of any effort to reduce the

20   number of chairs at the Hidalgo Port of Entry to

21   reduce the throughput the port?

22        A.    No.  I'm aware we changed some of the



Page  277

 1   secondary areas because we had absconders.  And we

 2   took measures such as moving chairs, reducing chairs,

 3   adding specialized locks to the doors to reduce the

 4   absconders.

 5       Q.    Okay.  So there was a time period in which

 6   the number of chairs in the port facility were

 7   reduced; is that right?

 8       A.    I remember there was issues with absconders

 9   at Hidalgo.  And port management took measures to

10   address that.  I don't know if that included removing

11   chairs or what.

12       Q.    My question was -- I think you just said

13   there was an absconder issue and there were --

14       A.    Right.  And they reconfigured areas.

15       Q.    They reconfigured the space.  And as part

16   of the reconfigures of space is that chairs were

17   removed from them; is that right?

18       A.    Well, they reconfigured space; they added

19   additional security measures to prevent the

20   absconders.  I can't attest whether or not they

21   removed chairs as part of that reconfiguration.

22       Q.    So you can't tell me one way or the other



Page 278

```
 1   whether this sentence about removing chairs is

 2   accurate?

 3        A.   No.

 4        Q.   Okay.  Do you ever investigate whether that

 5   was accurate?

 6        A.   No.  I did not investigate whether chairs

 7   were removed.

 8        Q.   Did you ever ask anyone to do so?

 9        A.   No.

10        Q.   Did you think it was part of your duty as

11   the EAC and oversees more than 20,000 law enforcement

12   officers to determine whether this statement was true?

13        A.   No.  This would be a relatively local

14   matter if somebody removed chairs from a holding area.

15        Q.   And so it just didn't have any significance

16   in your mind?

17        A.   No.

18        Q.   It was a local issue?

19        A.   It did not rise up to my level to

20   investigate whether some chairs were removed.

21        Q.   So you just didn't review determining

22   whether this was accurate or not as your
```



Page 279

1   responsibility?

2       A.   I did not.  No.

3       Q.   And then the next page, page 5, there's a

4   picture that appears to be of some workstations.  Do

5   you see that?

6       A.   Yes.

7       Q.   And then there's -- it look likes there's

8   no one sitting at any of those workstations, correct?

9       A.   That's correct.

10      Q.   And beneath that it says, No officer

11  stationed to process work at 10:00 to 11:00 p.m.  And

12  only for employees to process family unit credible

13  fear cases.  Did I read that correctly?

14      A.   Yes.

15      Q.   Did you do anything to investigate whether

16  this picture of and the sentence below it are

17  accurate?

18      A.   No.  I don't investigate staffing levels on

19  a particular shift.

20      Q.   Did you ask anyone to look into whether

21  this photo was accurate?

22      A.   No.



Page 280

1          Q.     Do you know whether Commissioner McAleenan

2    did?

3          A.     I don't know if he did.

4          Q.     Do you know whether Commissioner McAleenan

5    ever asked whether the number of chairs had been

6    reduced?

7          A.     I find it highly unlikely that at the

8    commissioner's level he would be asking about the

9    number of chairs in a waiting area.

10         Q.     Did he ever staff anyone to do that

11   investigation?

12         A.     Not to my knowledge.

13         Q.     Did you?

14         A.     No.  I mean, again, when we have

15   allegations of alleged misconduct, I would refer that

16   to the JIC.  With this specific instance where the

17   chairs were removed, or why there was no officers from

18   10:00 to 11:00 in this particular work unit, I would

19   not investigate that.

20         Q.     Would you refer this issue to the JIC?

21         A.     No.

22         Q.     Did you do that?



Page 281

1          A.     No, I did not.

2          Q.     Do you know whether Commissioner McAleenan

3     did?

4          A.     I do not.

5          Q.     Do you know if anyone referred this issue

6     to the Joint Intake Center, or JIC?

7          A.     I don't know if anything was referred.  I

8     don't know if any local efforts were taken.

9          Q.     Did you ever talk just informally to David

10    Higgerson to determine whether these photos and the

11    statements below them were true?

12         A.     I did not speak to David Higgerson about

13    the staffing from 10:00 to 11:00, or the number of

14    chairs.  I did speak to David Higgerson about the

15    overall safety issues at the limit line.

16         Q.     So the allegations about no officers being

17    stationed at the workstation, and the number of chairs

18    being reduced are, in your view, local issues that

19    don't raise to your level?

20         A.     Yes.

21         Q.     And you don't take responsibility for

22    determining whether these statements are true or



Page 282

1    accurate, correct?

2          A.    In this form, correct.

3          Q.    All right.  Now back on page 1 of

4    Mr. Atkinsons' e-mail, and I'm looking at the second

5    paragraph.  It reads, "The employees would like you to

6    provide them the proper authority and sections of law

7    that allows them to detain these asylum seekers on the

8    Mexican side and prevent them from entering the U.S.

9    after presenting themselves for inspection and

10   requesting asylum.  The employees would like something

11   in writing to protect their ordered activities as the

12   Agency is claiming publicly that they are not

13   conducting these activities when they really are."

14               Did I read that correctly?

15         A.    You read it correctly.

16         Q.    Do you have any understanding of what the

17   phrase, "the Agency is claiming publicly they are not

18   conducting these activities when they really are"

19   means?

20         A.    No.

21         Q.    Do you believe that statement is true?

22         A.    I don't know what he means by that



Page 283

1    statement.

2         Q.    Do you believe -- do you have any

3    information that regardless of what was written in the

4    official policy that you promulgated for metering,

5    that the Hidalgo Port of Entry was engaged in some

6    form of informal turn-back action with respect to

7    asylum seekers?

8         A.    I'm not sure I understand your question.

9         Q.    Sure.  So you have your written policy?

10        A.    Right.

11        Q.    The metering policy?

12        A.    Right.

13        Q.    And you expected that policy to be

14   followed?

15        A.    Correct.

16        Q.    And a good CBP officer should follow that

17   order, correct?

18        A.    Correct.

19        Q.    Now, isn't it the case that there's

20   basically two ways in which a policy can be

21   disseminated to your front-line officers?  There's

22   written orders and musters, and then there's, you



Page 284

1    know, verbal orders and verbal musters that can come

2    down?

3         A.    Yes.

4         Q.    Do you know whether there was ever a verbal

5    order or verbal muster to turn back asylum seekers at

6    the Hidalgo Port of Entry?

7         A.    No.  But if there was, it would be against

8    policy.

9         Q.    Did you ever ask anyone to investigate

10   whether there was such a verbal order?

11        A.    No.

12        Q.    So as you sit here today, you don't know

13   one way or the other whether that verbal order was

14   ever given?

15        A.    I can't say what was said.  I know what the

16   official policies that's been distributed.

17        Q.    Okay.

18        A.    There's other statements in here, ask about

19   detaining asylum seekers on the Mexican side.  I know

20   that to be false.  Our officers do not cross into

21   Mexico to detain Mexicans on the Mexican side.  We do

22   not cross that limit line.



Page 285

1      Q.    All right.  And do your officers prevent --

2   your officers at limit line prevent foreign nationals

3   from entering the U.S. after -- for the purpose of

4   preventing -- let me ask this question better because

5   I just got tied up.

6              Is one of the purposes of putting CBP

7   officers at the limit line to stop asylum seekers from

8   setting foot on U.S. soil?

9      A.    It is to control the access based on our

10  capacity.  In 2016 we did not set up at the limit

11  line, and we ended up with unacceptable conditions at

12  our ports of entry.  So when we re-established the

13  metering across the southwest border in response to

14  this surge of migrants, we set up at the limit line so

15  that the Mexicans -- those that are seeking entry when

16  we were beyond capacity would return and wait in the

17  shelters, as opposed to waiting outside the doors of

18  the ports unprotected, without bathrooms, without

19  food.

20             We believed it was the more responsible

21  thing to do, to ask them to return and wait in the

22  shelters.



Page 286

1          Q.    Right.

2          A.    Than wait in our courtyards where 2016 it

3    was creating unsafe conditions.  It was -- there was

4    no shelter.  The migrants are defecating all over the

5    port.

6          Q.    Is it your belief that conditions in

7    Mexican border towns are safer than outside U.S. ports

8    of entry?

9          A.    I'm sorry?

10         Q.    Yeah.  You said you wanted the migrants to

11   return to the shelters.

12         A.    Right.

13         Q.    Are those shelters safer than being outside

14   of the port of entry?

15         A.    I believe those shelters provide shelter.

16   They provide security.  They provide food.  They

17   provide bathrooms.

18              When migrants are camped out in the

19   courtyards of the ports, they don't have shelter.

20   They don't have bathrooms.  They don't have food.  I

21   think it is better to have them wait in a shelter than

22   in a open courtyard exposed to the elements without



Page 287

1    food, without bathrooms.

2        Q.    Would it surprise you to learn that

3    migrants in shelters on the Mexican side of the border

4    have been assaulted?

5        A.    No.

6        Q.    Would it surprise you to learn that

7    migrants in shelters on the Mexican border have been

8    murdered?

9        A.    Migrants on the Mexican -- migrants being

10   murdered in Mexico.

11       Q.    Correct.

12       A.    I would not -- that's common.  That's

13   understood.

14       Q.    It's common, right?

15       A.    It's common knowledge that -- yeah.

16       Q.    And would it surprise you to learn that

17   migrants in the shelters on the Mexican side of the

18   border do not have easy access to food or employment?

19       A.    I don't know that to be true.

20       Q.    You don't know one way or the other?

21       A.    I know the Mexican government has been

22   offering the migrants that are waiting with work



Page 288

1    permits.

2         Q.    And it's still your position -- so that I'm

3    clear on this, that it's safer to wait in a shelter on

4    the Mexican side of the border than it is to wait on

5    U.S. soil outside of the port of entry building?

6         A.    Yes.

7         Q.    Okay.

8         A.    I believe it's better to be in a shelter

9    with food and security and bathrooms, than it is to be

10   exposed outdoors in the elements for days on end with

11   no shelter, no food, no bathrooms.

12        Q.    Do you know if migrants on the Mexican side

13   of the border are exposed to the elements outside with

14   no access to food or shelter or -- and are in the

15   heat?

16        A.    There are government-run shelters.   There

17   are shelters run by private entities.   And then there

18   are migrants that choose not to go to shelters for

19   whatever reason.

20        Q.    There are migrants who sleep on the -- who

21   sleep outside the ports of entry, correct?

22        A.    I would assume so.



Page 289

```
1        Q.    And there are migrants who sleep outside in

2   100-degree weather, correct?

3        A.    I would assume so.

4        Q.    And do you think that's safer than being

5   outside the port?

6        A.    I have a responsibility to create safe

7   working conditions for the traveling public and for

8   our officers in the ports of entry.

9        Q.    And you are responsible --

10       A.    Having migrant camps --

11       Q.    -- stops at the border, right?

12       A.    My responsibility starts at the border, the

13   board U.S. Border.

14       Q.    Correct.  So you don't view yourself as

15   having any responsibility to migrants who are in

16   shelters on the Mexican side?

17       A.    No.  Mexico is a sovereign country.  They

18   have a responsibility to protect the people in their

19   borders, as I have the responsibility to police what

20   comes across our borders.

21       Q.    Do you take any responsibility for what's

22   happened to Mexican -- to migrants who are living on
```



Page 290

1    the Mexican side of the border due to the metering

2    policy?

3         A.    Do I take --

4         Q.    Yeah.  Do you take any responsibility for

5    that?

6         A.    No.

7         Q.    Okay.  Do you sympathize with their

8    situation?

9         A.    Yes.

10        Q.    Do you -- do you wish those would be --

11   those asylum seekers were in better conditions on the

12   Mexican side of the border?

13        A.    I wish our immigration policy would be

14   fixed so that we wouldn't have to deal with these

15   issues.

16        Q.    My question is, is it your desire that

17   those Mexicans can -- sorry, that those individuals in

18   Mexico due to the metering policy would be living in

19   better conditions?

20        A.    That's Mexico's responsibility to provide

21   the conditions for the people in their borders.

22        Q.    Okay.  Mark the next exhibit.



Page 291

1                          -   -   -

2              (A document was marked as Deposition

3    Exhibit Number 50.)

4                          -   -   -

5        BY MR. MEDLOCK:

6        Q.    Sir, this is a picture taken on August 2019

7    by an Associated Press reporter in Matamoros, Mexico,

8    of a migrant mother sleeping with her child outside of

9    a shelter because the shelter had lacked space.  And

10   as you can see, the child is not even wearing any

11   pants.

12              Do you take any responsibility for this

13   happening?

14       A.    No.

15       Q.    Okay.  Do you take any responsibility for

16   what occurs to asylum seekers who, when forced with

17   waiting in -- waiting for months in Mexico due to

18   metering decide to cross illegally between ports and

19   are harmed?  Do you take any responsibility for that?

20       A.    No.

21       Q.    Okay.

22       A.    There's a lawful way to enter.  And I'll --



Page 292

1    go ahead.  Show me the pictures from the river.

2        Q.    Sure.  Here you go.

3                      -   -   -

4            (A document was marked as Deposition

5    Exhibit Number 51.)

6                      -   -   -

7        BY MR. MEDLOCK:

8        Q.    This is a picture taken of a father with

9    his less-than-two-year-old child in the river in the

10   Rio Grande.

11           MS. SHINNERS:  Counsel, you are really just

12   berating the witness at this time.

13           MR. MEDLOCK:  I'm not.  I'm not.  His name

14   was Oscar Alberto Martinez Ramirez.  And his

15   daughter's name -- his daughter was less than two

16   years old.

17           These individuals were forced to wait in

18   matamoros and then try to cross the Rio Grande and

19   then drowned.  Do you take any responsibility for

20   that?

21       A.    No.

22       Q.    Okay.  You said there's a lawful way to



Page 293

1     enter, correct?

2          A.     Correct.

3          Q.     Do you agree that migrants who are metered

4     to the port of entry are seeking to enter the U.S.

5     lawfully?

6          A.     Through the port of entry, yes.

7          Q.     Okay.  Do you recall there being any follow

8     up to this e-mail from David Atkinson that we have

9     been looking at?

10         A.     Follow up with Mr. Atkinson or --

11         Q.     No.  With other people in leadership at

12    CBP?

13         A.     I've discussed with Mr. Higgerson, the DFO,

14    about enhancing the security at the limit lines.

15         Q.     Do you recall discussing anything else with

16    Mr. Higgerson?

17         A.     I would need some more specifics.

18         Q.     Sure.  I'll mark the next exhibit.

19                         -  -  -

20                (A document was marked as Deposition

21    Exhibit Number 52.)

22                         -  -  -



Page 294

1        BY MR. MEDLOCK:

2        Q.    All right.  So I've marked as Exhibit 52 a

3    multi-page e-mail that begins with AOL-DEF-00269970

4    and goes to 71.  This appears to be a continuation of

5    the e-mail chain that began David Atkinson's e-mail;

6    is that correct?

7        A.    Yes.

8        Q.    And it goes -- it all occurs on March 19,

9    2019, correct?

10        A.    Yes.

11        Q.    And this -- these are e-mails that were

12    sent between you and Kevin McAleenan and David

13    Higgerson, correct?

14        A.    Yes.

15        Q.    And you would have received these e-mails

16    in the course of your duties as CBP officer?

17        A.    Yes.

18        Q.    And you would have read and understood

19    these e-mails at the time you received them?

20        A.    Yes.

21        Q.    And you would have received these e-mails

22    on or about March 19, 2019?



Page 295

1      A.    Yes.

2      Q.    And these e-mails, other than some

3  redactions to them, appear, to be full and correct

4  copies of the e-mail chain?

5      A.    They appear to.

6      Q.    Okay.  So Mr. McAleenan forwards on

7  Mr. Atkinson's mail to you and writes, EAC, neither

8  response coordinated with the front office and

9  counsel, thank you, KM, correct?

10      A.    Correct.

11      Q.    And the EAC refers to you correct?

12      A.    Yes.

13      Q.    And you write back, Sir, will do?

14      A.    Yes.

15      Q.    And then it appears that Mr. Higgerson next

16  wrote, "never stops," correct?

17      A.    Correct.

18      Q.    And then you wrote, "this guy, I tell you,

19  I am tired.  You must be exhausted," correct?

20      A.    Yes.

21      Q.    And you were writing that regarding David

22  Atkinson, correct?



Page 296

1      A.    Yes.

2      Q.    All right.  Do you recall if there was any

3  more to that e-mail chain?

4      A.    I don't recall, but again Mr. Atkinson

5  files and writes on everything dealing with the ports.

6      Q.    Um-hmm.  All right.

7                      -   -   -

8            (A document was marked as Deposition

9  Exhibit Number 53.)

10                     -   -   -

11     BY MR. MEDLOCK:

12     Q.    All right.  I've marked a document Exhibit

13  53.  It's again a multi-page e-mail chain with the

14  Bates numbers AOL-DEF-00270451 through 452.  This

15  appears to be a continuation of the same e-mail chain,

16  correct?

17     A.    Yes.

18     Q.    And again you would have sent and received

19  these e-mails in the course of your duties at CBP on

20  or about March 19, 2019?

21     A.    Correct.

22     Q.    And you would have read and understood them



Page 297

1   at that time?

2         A.    Yes.

3         Q.    Okay.  And so it appears that after you

4   wrote, "this guy, I tell you, I'm tired.  You must be

5   exhausted," Mr. Higgerson responded?

6         A.    Yes, he did.

7         Q.    And he wrote back, "Sadly, we have real

8   work to do.  This guy is not helping his folks."

9               Did I read that correctly?

10        A.    Yes.

11        Q.    Do you understand what Mr. Higgerson meant

12  by real work?

13        A.    We have a multitude of priorities within

14  the port of entry.  And now the senior leadership

15  there, senior leadership within OFO is again having to

16  take time out to address Mr. Atkinson's latest

17  complaint.

18        Q.    Do you think that raising complaints about

19  possible illegal conduct at a port of entry is not --

20  does not constitute real work?

21        A.    Again, I disagree with his assessment that

22  there's illegal activity going on in the port of



Page 298

1    entry.

2         Q.    If someone believes that there is illegal

3    conduct going on, don't they have a duty to report

4    that up?

5         A.    As did Mr. Atkinson.  And he chose to

6    report it to the commissioner.

7         Q.    But not real work though that he reported

8    it up?  Having -- what do you take that to mean, that

9    sadly we have real work to do?

10        A.    We have real work to do.  We have real

11   activities to be focused on, and here we are spending

12   time discussing Mr. Atkinson's latest complaint.

13        Q.    Which you never investigated, correct?

14        A.    Which we -- no, that is not true.  I did

15   investigate, and we took actions against the officer

16   safety issues that he outlines in the middle of his

17   e-mail.

18        Q.    So you know for a fact that the first

19   paragraph in his e-mail is not true?

20        A.    That he's requesting instructions?

21        Q.    Yeah.

22              MS. SHINNERS:  Objection.  Asked and



Page 299

1    answered.

2         Q.    I just want to make sure I understand that.

3    You don't think that's true?

4         A.    That what, that he asked for instructions?

5         Q.    Yeah.

6         A.    He did ask for instruction.

7         Q.    Were they ever given to him?

8         A.    He received a copy of the April 2018

9    metering memo.

10        Q.    And were further instructions or

11   clarifications given to him?

12        A.    No.  That memo was what was given to him.

13        Q.    So he would have already had -- known about

14   that memorandum because it had been mustered to all of

15   the CBP officers, first and second-level CBP officers

16   at ports of entry, correct?

17        A.    I assume so, that he was present when it

18   was mustered.

19        Q.    And the 187 individuals who signed his

20   letter, that letter, would have also been present for

21   that muster?

22        A.    Assuming.



Page 300

1      Q.    Do you think 187 people at a port of entry

2   missed a muster about -- like that?

3      A.    I think the direction was clear.  I think

4   the officers didn't like that direction.  And I think

5   spun up by the union, 187 officers all signed their

6   name to that document.  That's what I think.

7      Q.    You think that they didn't like that

8   direction?

9      A.    They didn't like being posted mid bridge.

10      Q.    They didn't like having to be posted mid

11   bridge to meter a site?

12      A.    They didn't like being posted mid bridge

13   exposed to the elements.  And their primary complaints

14   were about assigning more officers on overtime to do

15   that.

16      Q.    Where in his e-mail did it say his primary

17   complaint was about overtime?

18      A.    That has been his primary complaint dealing

19   with the metering.  This is not the only communication

20   from Mr. Atkinson or from the union.

21      Q.    Right.  But where did he say that his

22   primary complaint in March 2019 was overtime?



Page 301

1        A.     It is not in this e-mail.

2        Q.     That's an assumption you are making, right?

3        A.     The other e-mail you provided from the same

4   chapter talked about back pay compensation.

5        Q.     That's correct, but it also raised issues

6   about the -- about the purported illegality of

7   metering, correct?

8        A.     I don't believe the metering policy is

9   illegal.

10       Q.     I understand that, but that's a concern

11  that's raised in both of these e-mails.

12       A.     He raised that concern, yes, amongst

13  others.

14       Q.     So he's been -- the union's been

15  consistent, right?  In 2017 they raised concerns about

16  the legality of metering.  And then 2019 they raised

17  concerns about the legality of metering, correct?

18       A.     The Hidalgo chapter has been consistent.

19       Q.     Yes.  That's correct.

20       A.     Yes.  The other 12 chapters along the

21  southern border have not raised those concerns,

22       Q.     Okay.  So, but my question is there's been



Page 302

1   a three-year period where they have been raising this

2   concern, but you say it's really just about back pay?

3       A.   I'm saying that is driving a lot of their

4   concerns along with the security mid bridge.

5       Q.   And you don't think that the legality is a

6   real concern of theirs at all?

7       A.   No.  I believe we are acting legally.

8       Q.   You believe that their purported concerns

9   about the legality of metering is just a cover to get

10  some better conditions at the mid bridge and some back

11  pay, right?

12      A.   I believe that is what is primarily driving

13  their concerns, yes.

14      Q.   They don't actually state that in the

15  e-mails, correct?

16      A.   Not in this e-mail that you showed me.  No.

17      Q.   And you never -- in either of them, right?

18      A.   The other e-mail does talk about back pay

19  compensation.

20      Q.   It does say that, but it doesn't say that's

21  their primary concern, does it?

22      A.   No.



Page 303

1      Q.    That's an assumption you are making,

2  correct?

3      A.    Correct.

4      Q.    Okay.  So, and you've never actually talked

5  to William T. Haralson, have you?

6      A.    No.

7      Q.    You've never talked to David Atkinson, have

8  you?

9      A.    Not on this matter.

10      Q.    Not regarding metering?

11      A.    Not regarding metering.

12      Q.    You have talked to him about other matters?

13      A.    Yes, at union president meetings.

14      Q.    At those meetings did you ever tell him to

15  stop filing grievances?

16      A.    No, I don't -- I don't ever told him to

17  stop filing grievances.

18      Q.    Did you ever tell him you thought his

19  grievances had no factual basis?

20      A.    No.  I don't view their grievances.

21      Q.    Well, you did get these?

22      A.    These weren't grievances.  These were



Page 304

1    e-mails.

2        Q.    So let's take -- do you still have William

3    Haralson's e-mail in front of you?

4              MS. SHINNERS:  What's the exhibit number,

5    do you have it?

6        A.    I have it, 46.

7        Q.    46.  What are the first four words of the

8    body of that e-mail?

9        A.    During the grievance meeting.

10       Q.    Okay.  So it was a grievance, wasn't it?

11       A.    This message wasn't addressed to me.

12       Q.    Right, but you had -- but you now know that

13   during grievance meetings, metering was discussed,

14   right?

15       A.    Apparently during a grievance meeting at

16   the local level, the issue was discussed.

17       Q.    And these concerns that were raised about

18   metering and grievance meetings weren't raised to your

19   level, were they?

20       A.    What was raised in a grievance at these

21   local grievance meetings?

22       Q.    Yeah.



Page 305

1      A.    No.

2      Q.    So, sir, were you -- and this is just a yes

3  or no.  You were -- you understood that you were to

4  preserve documents related to this litigation?

5      A.    Yes.

6      Q.    And you have done so, right?

7      A.    Yes, I have.

8      Q.    And can you explain to me why we can't find

9  this e-mail, Exhibit 46, anywhere in David Higgerson's

10 files?

11          MS. SHINNERS:  Objection.  Foundation.

12     Q.    Can you explain that to me?

13          MS. SHINNERS:  Objection.  Calls for

14 speculation.

15     Q.    Okay.  Would it surprise you that David

16 Higgerson appears to have deleted this e-mail?

17     A.    I have no knowledge of how the records were

18 pulled or what Mr. Higgerson has done.  I don't know.

19          MS. SHINNERS:  For the record, defendants

20 have not completed their production from Custodian

21 Higgerson.

22     Q.    Okay.  That's fine.  We have a lot of



Page 306

1    documents from Mr. Higgerson from this time period,

2    but strangely but we don't have this e-mail.

3            Can you explain that for me?

4    A.    I cannot.

5    Q.    Okay.

6            MS. SHINNERS:  I'm happy to discuss with

7    you the mechanics of how e-mails are retained at CBP

8    on a break.

9            MR. MEDLOCK:  You can discuss whatever you

10   want with me during a break.

11   BY MR. MEDLOCK:

12   Q.    Let's go back to the March 2019 e-mail from

13   Mr. Atkinson with the attachment of the To Whom It May

14   Concern letter.  Do you see the sentence that begins

15   after their immediate request?

16   A.    Which paragraph?

17   Q.    I'm in the To Whom It May Concern Letter.

18   A.    Oh.

19   Q.    Sorry.  It says, quote, After their

20   immediate request, we are instantly sending them back

21   to Mexico without date, time or appointment to be

22   allowed in the United States for processing.  We are



Page 307

1    not aware of any process used to inform these asylum

2    seekers to return to the port for processing into the

3    U.S. and feel there is need for clarification for the

4    authority or law allowing us to immediately deny entry

5    to these asylum seekers into the United States and

6    returning them back to Mexico.

7            Did I read that correctly?

8       A.   Yes.

9       Q.   Did it cause you any concern that 187

10   officers believed that they needed further guidance

11   about what the -- about the metering policy?

12      A.   No.

13      Q.   Okay.  Sir, are you aware that there was a

14   preliminary injunction granted in this case?

15      A.   I'm not sure.

16      Q.   Okay.  Were you aware that there was a

17   preliminary injunction issued by the court that

18   prevented some individuals without proper travel

19   documents from being denied entry to the United States

20   based on the -- their having transited another

21   country?

22      A.   Yes.  Recently?



Page 308

1     Q.    Yes.

2     A.    Yes.  That I'm aware of.

3     Q.    Okay.  Are you aware of any -- yes or no --

4    aware of any guidance that was issued --

5     A.    Yes.

6     Q.    -- to implement that?

7     A.    Yes.

8     Q.    In implementing that guidance, what are CBP

9    officers supposed to do?

10    A.    If the individual who approaches the

11   officers indicates that they are part of the Al Otro

12   Lado, I think it was the Al Otro Lado part of that

13   case, they are to tell us that so we can notate it in

14   the file.  So that when their case goes to CIS, CIS

15   can then consider that as they adjudicate the claim.

16    Q.    And when you say there are these questions

17   that are asked, is that asked at primary or secondary,

18   to your knowledge?

19    A.    To my knowledge, it would be after we had

20   the capacity to receive them and began their

21   processing as part of the sworn statement process.

22    Q.    Okay.  So this would be part of the



Page 309

1    credible fear interview?

2         A.    Well, we don't do the credible fear

3    interview.

4         Q.    Right.  That's what I'm trying to

5    understand.

6         A.    No.  When they come across and we start the

7    processing, so again if we were beyond capacity, they

8    wouldn't come into the port.  If we had capacity and

9    we started their credible fear claim, where we take

10   the sworn statement, my understanding is it would be

11   asked as part of that.  And the file would be notated

12   as it then moved through the immigration process.

13        Q.    Do you, to your knowledge, do CBP officers

14   do anything to investigate whether individuals that

15   claim to be part of the Al Otro Lado preliminary

16   injunction -- do you anything to investigate whether

17   they are on any sort of wait list on the Mexican side?

18        A.    No.

19        Q.    As a part of implementing that preliminary

20   injunction, are you aware of any efforts by CBP to get

21   a copy of those wait lists on the Mexican side?

22        A.    I'm not aware of those activities, but I



Page 310

1    know there's discussions on moving forward with what

2    was ordered by the courts.

3         Q.    Okay.

4         A.    Again, this was just within the last week

5    or so, so --

6         Q.    Right.  I'm just trying to understand

7    what's going on.  So what's happening in those sworn

8    statements essentially is that the officer is asking a

9    few extra questions to determine whether the person

10   fits into the Al Otro Lado injunction; is that right?

11        A.    I don't know.

12        Q.    Okay.  Do you know who would know the

13   answer to that question at CBP?

14        A.    That would have come out from again our

15   executive director for passenger -- for admissibility,

16   Todd Hoffman.

17        Q.    Yeah?

18        A.    Yeah.

19        Q.    Okay.  When did you learn of the

20   injunction?

21        A.    I don't recall.  Within the last week or

22   so.



Page 311

1      Q.    Was it before or after Thanksgiving?

2      A.    I don't recall.

3      Q.    Okay.  Let me pause here.

4                   -  -  -

5            (Recessed at 3:59 p.m.)

6            (Reconvened at 4:09 p.m.)

7                   -  -  -

8       BY MR. MEDLOCK:

9      Q.    Sir, thank you for indulging me.  You

10   mentioned that there was guidance that would have been

11   sent by Todd Hoffman regarding the preliminary

12   injunction in this case?

13     A.    Yes.

14     Q.    Do you know when that guidance was sent

15   out?

16     A.    Within a few days ago.

17     Q.    Few days being how many?

18     A.    What is today, the 13th.

19     Q.    Yeah.

20     A.    Maybe the start of this week, the end of

21   last week.

22     Q.    So possible --


MAGNA
LEGAL SERVICES

Page 312

1        A.    As far as I can recall.  I don't have the

2    exact date.

3        Q.    So best recollection would be Friday the

4    6th or Monday the 9th?

5        A.    Best recollection maybe a little before the

6    6th.  I'm trying to think with the Thanksgiving, it

7    was -- it was within the last, you know, 10 days

8    maybe.

9             MR. MEDLOCK:  Okay.  All right.  I have no

10   further questions at this time, sir.

11            THE WITNESS:  Okay.  Thank you.

12            MS. SHINNERS:  Defendant's counsel would

13   like to do redirect.  We'll take a quick break.

14                      -  -  -

15             (Recessed at 4:10 p.m.)

16             (Reconvened at 4:20 p.m.)

17                      -  -  -

18             EXAMINATION CONDUCTED

19        BY MS. SHINNERS:

20        Q.    Mr. Owen, I'd like to ask you if -- to the

21   extent of your recollection, if you could explain to

22   me the sequence of events in 2016 in San Ysidro in



Page 313

1    terms of accommodations that were made at the San

2    Ysidro port with respect to the Haitian migrant surge?

3            MR. LEV:  Objection.  Vague.  I don't know

4    what accommodations means.

5        Q.    Do you understand my question?

6        A.    I can talk about what processes we

7    implemented to address the Haitians.

8        Q.    That's fine.

9        A.    Okay.  So, to put this in context, the

10   migrants have undergone waves as they have come into

11   the United States.  In 2014, it was unaccompanied

12   alien children.  They were primarily entering between

13   the ports, which is a border responsibility.  It was

14   not an OFO issue.

15            So we really did not start to engage with

16   the high numbers of migrants until 2016.  So that

17   started in the early part of 2016 with the Haitians

18   that were leaving Brazil.  Historically, the

19   earthquake Haiti, destruction in Haiti.  Brazil opened

20   their doors to the Haitians.  They needed cheap labor

21   to build the venues for the Olympics.

22            By 2015, those venues were built.  They



Page 314

1    canceled all of the Haitian work permits and directed

2    the Haitians to leave.  The Haitians did not go back

3    to Haiti because Haiti was still in bad shape.  They

4    came up through the southern border and arrived in San

5    Ysidro.

6         So at the start of 2006 is when we started

7    to sea all of these Haitians, which quickly began to

8    overwhelm our detention and processing capabilities.

9    The entire system was overwhelmed with the Haitians.

10   ERO, who would remove the Haitians from our temporary

11   detention, put them into permanent detention where it

12   was also overwhelmed.  So this is what started the

13   metering.

14        So we needed to control the flow, because

15   we simply had no more processing or holding capacity.

16   What we did throughout 2016, and this started to

17   spread with the Haitians as they went east into

18   Calexico, into San Luis, Arizona, into Nogales,

19   because this was our first dealing with such large

20   numbers, we would start to convert conference space,

21   training facilities room like this into temporary

22   holding facilities.



Page 315

1          So they were not designed for holing

2     individuals in detention, but because the numbers were

3     so overwhelming us, we would convert space like this.

4     And we had way too many people beyond our official

5     detention capacity.  Throughout 2006, the numbers

6     started to increase across the entire southwest

7     border, not just San Diego.

8          And then they started becoming not just

9     Haitians, but more family units as they were coming in

10    through out 2016, which is why we then rolled out the

11    metering across the southern border where it was

12    needed operationally.  We employed the same tactics at

13    those ports that we would convert conference space and

14    wherever we could make space to hold people.

15         Again ERO who is supposed to take them from

16    our temporary storage, temporary detention space to

17    the permanent detention facilities to was overwhelmed

18    as well.

19         2017 came along, and the numbers came down

20    to more manageable levels.  We had less metering at

21    that time.  And we assessed what we did in '16 in

22    terms of converting conference space and such into



Page 316

1    holding people.  And I really believed that in 2016,

2    we got lucky when we had so many people in our

3    facilities, that there was not a fire, that there was

4    not acts of violence, that there was not disease  that

5    would spread through the community.

6            So when '17 came along and we assessed

7    that, we said we would not do that again.  We would

8    only hold to what we had the physical capacity and the

9    operational capacity to do.  When 2018 came along and

10   the migrant numbers again started to increase, that's

11   when we decided operationally to hold at the limit

12   line to have folks remain in Mexico as opposed to in

13   our non-official detention space, you know, creating

14   unsafe conditions, not allowing people to remain at

15   the corridors in the open areas of the ports waiting

16   to be processed.

17           So that is why we switched from holding at

18   the doors of the port to holding at the limit line '16

19   versus '18.

20      Q.    Okay.  A couple times in your response you

21   mentioned in 2006.  Were you referring to 2016?

22      A.    Oh,2016.  Yes.  Sorry.



Page 317

1      Q.    You also mentioned that -- I believe you

2   mentioned that ports of entry were receiving family

3   units.

4            Can you explain the impact, if any, of

5   receiving more family units through ports of entry, of

6   the receipt of more family units in ports of entry on

7   the capacity of the port of entry?

8      A.    Yes.  ports of entry are not designed for

9   long-term holdings.  Our detention cells are like jail

10  cells in a police station.  They are intended for

11  short-term detention, primarily of single adults,

12  while we are waiting to turn them over to another

13  agency or to, you know, immigration and customs

14  enforcement, whatnot.

15           So as the composition of the migrants

16  started to change throughout 2016 and we started to

17  receive more and more family units, our space is not

18  designed for family units.  You look at a lot of our

19  ports, the cells are very small.  Some are what we

20  call wet cells, meaning they have toilets.  Some are

21  not.

22           So the increase in family units further





Page 318

1    taxed our abilities to bring in large numbers of folks

2    and hold them, because our cells were simply not

3    designed to do that.  We talked about the physical

4    capacity and the operational capacity.  If you take a

5    place like Hidalgo that has four cells designed to

6    hold 42 people, but only 3 of those cells has

7    bathrooms.  Okay.  So that is our total physical

8    capacity of 42.

9            When you start to factor in the operational

10   considerations, the demographics of who has come

11   across and filed a claim today.  Right?  So if you

12   have a family unit, you have to put them in one cell.

13   Another family unit comes in and they have scabies or

14   lice.  You can't put them in with the first family.

15   You Would put them into a second cell.

16           If you had an adult male, he would not go

17   in with the families and the children.  He would go

18   into a different cell.  If you -- we have to separate

19   individuals from different countries with different

20   gang affiliations as notated through their tattoos,

21   because they will not -- there will be trouble in the

22   cells.  So you have to separate those.



Page 319

1            Anybody that we arrest, and we make 40,000

2    arrests a year, they go into a cell separate from the

3    migrants.  The migrants are here for an administrative

4    matter, if you will.  Anyone that we arrest for a

5    criminal matter goes into a separate cell by

6    themselves.  So you may have a physical capacity of

7    42, but in this example you actually only have 7

8    people in your cells, and you are a full capacity.

9        Q.    Thank you.  Can you explain what impacts

10    there might be on trade and travel, in general, at any

11    port of entry, if resources are diverted from

12    facilitating trade and travel?

13        A.    Okay.

14            MR. LEV:  Objection.  Calls for

15    speculation.

16        A.    I do understand.

17        Q.    Just to clarify, I'm asking can you explain

18    to your knowledge --

19        A.    This is confusing with you objecting.  Do I

20    look at you or do I look at her.  Can I answer?

21        Q.    You may answer, but I'm going to go ahead

22    and rephrase.



Page 320

1      A.    Okay.

2      Q.    So can you explain, based on your knowledge

3  and your experience, in general any impacts on trade

4  and travel from -- if you divert resources, or if a

5  port of entry diverts resources from the facilitation

6  of trade or travel?

7            MR. LEV:  Same objection.

8      A.    Okay.  From my knowledge, we prioritize our

9  mission sets within the ports of entry along the

10  guidance that we receive from the secretary.  So if we

11  had to divert officers from the counter-terrorism

12  mission, or if we had to divert officers to put more

13  officers towards the processing of undocumented

14  migrants, we would not pull them from the

15  counter-terrorism mission.  We would not pull them

16  from the narcotics intradiction mission.

17            So the two missions that they would be

18  pulled from, one would be the facilitation of lawful

19  trade and travel.  So those are folks who have lawful

20  documents to enter the country.  Most of the

21  cross-border traffic on the southern border comes and

22  goes with border crossing cards.



Page 321

1            We would reduce travel lanes so you would

2    have fewer booths open.  This would impact the

3    business community as they crossed.  This would impact

4    the school kids that cross every day.  This would

5    impact the people coming for medical treatments, to do

6    their business, to do their shopping.  It Would result

7    in longer wait times to cross the border if we pulled

8    individuals from that mission set.

9            If we pulled officers from the processing

10   cargo mission set, your summer produce would be

11   delayed.  All of your cargo processing would be

12   delayed.  In the summer -- the spring and summer of

13   2019, when we reassigned 731 officers from field

14   operations from the ports of entry to assist the

15   border patrol because of the migrant crisis that they

16   were facing at that time, we saw cargo wait times in

17   places like El Paso and San Ysidro go up from 45

18   minutes to over five hours.

19           Those are the types of real impacts that

20   we would experience if we diverted more resources away

21   from the trade and travel mission, from the economic

22   security mission to put towards the migrant



Page 322

1    processing.

2              MS. SHINNERS:  All right.  Mr. Owen, thank

3    you.  I don't have any questions.  I don't have

4    further questions for Mr. Owen.

5              MR. LEV:  Can we take two minutes.

6                        -  -  -

7              (Recessed at 4:30 p.m.)

8              (Reconvened at 4:35 p.m.)

9                        -  -  -

10             EXAMINATION CONDUCTED

11   BY MR. LEV:

12        Q.    I just have a few more questions for you.

13        A.    Yes, sir.

14        Q.    You just testified that in 2017 you

15   assessed what you did in 2016 in terms of converting

16   conference spaces and other rooms into holding

17   facilities and determined that you wouldn't do that

18   again.

19        A.    Yes.

20        Q.    Who conducted that assessment?

21        A.    We did internally, just with our leadership

22   at the ports.  It was not a formal report or anything



Page 323

1    like that.  When we did just an after action amongst

2    ourselves talking of what we did right and what was

3    concerning to us, converting and holding people in

4    space that's not designed for that, we decided that

5    was not the safest thing that we should have done.

6         Q.    Was that assessment memorialized in any

7    writing?

8         A.    No.  It was just discussions between the

9    leadership within field operations.

10        Q.    Who was part of those discussions?

11        A.    Myself and the four southwest border DFOs,

12   directors.

13        Q.    And who were those four southwest --

14        A.    It would be Pete Flores.  Will Brooks,

15   Hector Mancha, and David Higgerson.

16        Q.    So the five of you had an after-action

17   report discussion about -- let me finish my question.

18   You had an after-action report discussion about how

19   you handled this major migrant surge in 2016, and

20   based on that informal discussion with the five of

21   you, you decided that it wasn't handled appropriately;

22   is that correct?



Page 324

1          A.    We decided the informal discussions -- and

2     it's not that it occurred, you know, at one meeting.

3     It was kind of ongoing discussions throughout 2017 as

4     we were no longer faced with the migrant numbers that

5     we were faced with in '16.

6               It was through those discussions that we

7     felt very fortunate that nothing terrible happened

8     based on creating space that was not designed to hold

9     people.

10         Q.    And did you rely on any documentation, data

11    in reaching these conclusions?

12         A.    We relied on our knowledge of what was a

13    safe condition to hold people in and not.

14         Q.    You talked a little bit earlier with

15    Mr. Medlock about the MCAT reports?

16         A.    Yes.

17         Q.    Did you undertake any activity to ascertain

18    whether the metering guidance you issued was being

19    implemented in a manner that was solely tied to

20    operational capacity at specific ports of entry?

21         A.    I'm not sure I understand the question.

22         Q.    The metering guidance, I believe you



Page 325

1  testified provided discretion to the port directors to

2  implement it as they deemed appropriate based on

3  capacity concerns, correct?

4       A.    Correct.

5       Q.    An individual port director might exercise

6  that discretion appropriately by limiting -- what you

7  would view I believe as appropriately by metering

8  migrants because the port was truly at its operational

9  capacity limit?

10       A.    Correct.

11       Q.    A port director might exercise that

12  discretion inappropriately by limiting migrants more

13  than is necessary due to capacity constraints at a

14  port, correct?

15       A.    Understood.

16       Q.    Did you ever undertake any sort of

17  oversight or analysis to ascertain whether port

18  directors were implementing the guidance in the first

19  form and not in the second form that I just discussed?

20       A.    Not at my level.  The four directors of

21  field operations have that responsibility to directly

22  oversee the day-to-day operations at their ports.  It



Page 326

1    was my clear expectation to them that folks were

2    knowledgeable with the direction and were carrying it

3    out appropriately.

4            If we became aware of instances when that

5    was not done, that was to be referred to the JIC

6    again, the Joint Intake Center, to Office of

7    Professional Responsibilities.

8        Q.    Are you aware of instances such as that

9    being referred to the JIC?

10       A.    Of?

11       Q.    Of ports implementing metering beyond the

12   extent due to their capacity constraints?

13       A.    I am not.  I am aware of individual actions

14   where individuals who are already in the U.S. were

15   sent back, and those were reported.

16       Q.    And I take it from your testimony that

17   beyond the ordinary expectations that supervisors

18   oversee their subordinates, there was no organized

19   effort undertaken to ensure that the metering guidance

20   was being implemented in the way that you intended,

21   and would only limit asylum applicants based on actual

22   capacity constraints?



Page 327

1          A.     There was no activity to such directed from

2     headquarters.  I don't know if individual field

3     directors took any such assessment.

4          Q.     Are you aware of any such assessment?

5          A.     I am not.

6          Q.     Would you expect your individual field

7     directors to let you know if they had done so?

8          A.     Not necessarily.

9               MR. LEV:  I don't think we have anything

10    else.  We are going to keep the deposition open as we

11    previously indicated, based on various documents that

12    have been clawed back and that we need to ascertain

13    whether they were appropriately clawed back or whether

14    we want to ask further questions about them.

15               MS. SHINNERS:  Okay.  Any other basis for

16    keeping the deposition open?

17               MR. LEV:  I don't think so.

18               MS. SHINNERS:  Okay.  And, for the record,

19    the witness -- I would like to request that the

20    witness be able to read and sign the deposition.  We

21    would like to designate the transcript confidential

22    for the 30-day period while we determine which



Page 328

1    portions would be designated confidential.

2               And defendants are making note of their

3    intent to claw back the exhibit that was briefly

4    marked as 44.  I'm not sure if -- it's not in the

5    pile, but it's AOL-DEF-00723887.  And we will follow

6    up for this and other claw backs with the formal

7    claw-back assertion.  We just wanted to make sure that

8    we put those on the record today.

9

10                        -   -   -

11         (The deposition was concluded at 4:41 p.m.)

12          (Reading and signature not being waived.)

13                        -   -

14

15

16

17

18

19

20

21

22



Page 329

1    UNITED STATES OF AMERICA   )

2                                ss:

3    DISTRICT OF COLUMBIA       )

4

5              I, TODD OWEN, the witness herein, having

6    read the foregoing testimony of the pages of this

7    deposition do hereby certify it to be a true and

8    correct transcript, subject to the corrections, if

9    any, shown on the attached page.

10                      -   -   -

11

12

13                                 _____

14                                 TODD OWEN

15

16   Subscribed and sworn to before me

17   this _____ day of _____, 20_____.

18

19   _____.

20       SIGNATURE

21

22



Page 330

1               C E R T I F I C A T E

2    UNITED STATES OF AMERICA  )

3                              ss:

4    DISTRICT OF COLUMBIA      )

5            I, ELIZABETH MINGIONE, Registered

6    Professional Reporter and Notary Public within and for

7    the District of Columbia, do hereby certify:

8            That the witness whose testimony appears in

9    the foregoing deposition was duly sworn, and that the

10   within transcript is a true record of the testimony

11   given by such witness.

12           I further certify that I am not related to

13   any of the parties to this action by blood or

14   marriage,  and that I am in no way interested in the

15   outcome of this matter.

16           IN WITNESS WHEREOF, I have hereunto set my

17   hand this _____ day of _____, 20_____.

18

19                        _____

20   My Commission Expires:

21   June 14, 2020

22



Page 331

1                    ERRATA SHEET INSTRUCTIONS

2    WITNESS:  It is your right to read your deposition and

3    make any changes in form or substance.  Note the

4    reason for any changes directly on the errata sheet.

5         Please sign and date the errata sheet and your

6    deposition in the spaces provided.  You are signing

7    this transcript subject to the changes you have made

8    on the errata sheet.  Unless otherwise agreed to by

9    counsel to this deposition, you must sign before a

10   notary public.

11        Return the original errata sheet and signature

12   page to the deposing attorney (attorney asking

13   questions) promptly!  Court rules require completion

14   of this process within 30 days after receipt of the

15   transcript or signature is deemed waived.

16   DEPOSING ATTORNEY:  Upon receipt of the signed errata

17   sheet and signature page, please distribute copies to

18   all parties in attendance and place the original

19   signed pages in the original transcript.

20        If you do not receive the signed errata sheet and

21   signature page within 30 days after receipt of the

22   transcript, you may assume signature is waived.



```
                                                      Page 332

 1                    E R R A T A    S H E E T

 2    PAGE        LINE #        CORRECTION AND REASON

 3    ----------------------------------------------------------

 4    ----------------------------------------------------------

 5    ----------------------------------------------------------

 6    ----------------------------------------------------------

 7    ----------------------------------------------------------

 8    ----------------------------------------------------------

 9    ----------------------------------------------------------

10    ----------------------------------------------------------

11    ----------------------------------------------------------

12    ----------------------------------------------------------

13    ----------------------------------------------------------

14    ----------------------------------------------------------

15    ----------------------------------------------------------

16    ----------------------------------------------------------

17    ----------------------------------------------------------

18    ----------------------------------------------------------

19

20    _____        _____

21       WITNESS SIGNATURE                         DATE

22
```



**A**

**abbreviation** 41:20
**Abigail** 222:5
**abilities** 318:1
**ability** 114:4
　148:19 189:6
　269:11
**able** 53:17 87:3
　92:7 167:15
　327:20
**absconder** 277:13
**absconders** 277:1,4
　277:8,20
**accept** 115:2
**access** 285:9 287:18
　288:14
**accommodations**
　313:1,4
**accompanied** 110:4
**accompanying**
　114:3
**accountable** 239:17
　239:21
**accurate** 67:21
　106:1 141:16
　142:12 260:12,15
　268:20 278:2,5,22
　279:17,21 282:1
**accurately** 142:8
**acknowledge**
　230:19
**acronym** 17:13
**acting** 41:7,14
　119:22 148:8
　215:16 302:7
**actings** 41:8
**action** 12:5 30:15
　30:18 34:17,21
　43:8 44:9,19 53:5
　84:8 147:13,15
　214:4 283:6 323:1
　330:13
**actions** 56:14
　121:20 122:14
　218:5 239:14

274:21 298:15
326:13
**activities** 30:3 61:6
　114:19 186:19
　188:13 198:17,22
　204:2,3 205:6
　211:12 246:19
　282:11,13,18
　298:11 309:22
**activity** 297:22
　324:17 327:1
**acts** 316:4
**actual** 69:16 148:22
　152:18 155:15
　185:13 262:12
　326:21
**AC1** 41:7 46:22
**AC2** 46:22
**ad** 29:1 31:1 42:11
　42:14 149:9 222:5
**add** 31:4
**added** 277:18
**adding** 248:12
　277:3
**additional** 107:2
　110:14 111:2
　168:21 237:4
　277:19
**address** 10:7,11
　70:12 271:20
　273:19 274:8
　277:10 297:16
　313:7
**addressed** 273:15
　273:18 304:11
**adjudicate** 308:15
**administration**
　150:18 219:8,9
**administrative**
　319:3
**admissibility** 27:18
　28:10 64:5 86:16
　86:19 106:20
　143:19 196:3
　246:2 310:15
**admission** 203:6

**admitted** 55:3,8
**adopted** 68:15
**adopting** 166:8
**adult** 116:2 318:16
**adults** 317:11
**advice** 167:13
**advise** 122:18,21
**advising** 126:2
　164:7 172:2
**AEU** 86:14,16,16
　106:19 224:11
　245:21 251:21
**Affairs** 13:2 143:10
　143:11 198:7,9
**affidavit** 14:3
**affidavits** 14:17,20
　15:1
**affiliations** 318:20
**Affixed** 141:4
**afraid** 181:3
**after-action** 323:16
　323:18
**agencies** 78:13
**agency** 53:16,21
　54:6 70:22 77:13
　79:12 208:1 212:4
　230:18 231:3,4
　239:9 253:18
　259:20 282:12,17
　317:13
**Agency's** 230:19
**agent** 112:7
**Agents** 102:14
**ago** 24:22 25:17
　26:7 33:12 95:11
　311:16
**agree** 51:12 59:9
　201:7 228:10
　234:21 237:10,12
　260:6,8 263:16
　269:11 293:3
**agreed** 269:15
　331:8
**agreement** 228:21
**agricultural** 208:22
**agriculture** 75:19

190:12 204:9
205:2 207:12,14
207:21 208:22
**ahead** 14:7,10
　81:16 104:3
　165:11 208:8
　226:21 234:20
　236:14 292:1
　319:21
**aimed** 98:11
**Air** 41:3
**airport** 193:5
**airports** 188:16
**Aki** 101:16,22
　103:6 132:21
　144:20
**Aki's** 103:14
**al** 1:4,4,7 7:17
　215:11 226:1
　308:11,12 309:15
　310:10
**Albert** 175:3
**Alberto** 6:21 175:1
　292:14
**alert** 256:12
**alien** 313:12
**aliens** 179:5,6
**align** 46:20
**aligned** 207:2
**alignment** 151:1
**allegation** 240:21
　241:1
**allegations** 34:6
　57:22 58:7,8,10
　59:19,21 145:7,10
　145:11 182:8,10
　182:21 183:7
　232:2 241:4
　280:15 281:16
**alleged** 280:15
**alleging** 145:13
**allow** 47:13 191:3
　207:18 228:21
**allowed** 151:15
　207:16 274:18
　306:22

**allowing** 156:2
　259:20 307:4
　316:14
**allows** 282:7
**Alvarez** 35:3,5
**ambiguous** 59:5
　60:5,6,8,9,13
**AMERICA** 329:1
　330:2
**American** 4:4
　201:3
**amount** 276:15
**amounts** 188:3
**analysis** 226:14
　244:10,11 325:17
**Angeles** 11:22 12:2
　12:4
**animal** 207:15
　209:19
**animals** 211:15,19
　212:4
**annotations** 8:2
　249:16
**answer** 10:18,21,21
　14:7,12,14,16
　15:12 16:18,18
　17:2,3 23:21 32:5
　36:16 43:21 72:5
　72:16 76:6 80:18
　98:14 99:13
　104:14 108:19
　112:6 130:12
　131:5,14 141:19
　208:9 236:12
　245:19 264:20
　310:13 319:20,21
**answered** 299:1
**answering** 16:4
　32:3 130:21 161:6
**answers** 15:18
　139:1 141:9
　170:21 218:19
　275:3,5
**anticipate** 181:12
**anti-narcotics** 77:3



**anybody** 21:7
26:16,19 29:12
30:21 60:11 61:21
64:19 79:17
120:17 182:12
186:7 222:12
241:3 247:10
319:1
**Anzalduas** 153:12
**AOL-DEF-00032...**
6:20 169:4,22
**AOL-DEF-00039...**
7:9 213:1
**AOL-DEF-00039...**
7:11
**AOL-DEF-00081...**
6:18 163:3
**AOL-DEF-00088...**
5:21 82:3
**AOL-DEF-00088...**
220:9
**AOL-DEF-00205...**
243:11 249:5
**AOL-DEF-00259...**
159:11 168:19
**AOL-DEF-00269...**
8:8 294:3
**AOL-DEF-00270...**
8:10 296:14
**AOL-DEF-00272...**
6:15 146:18
**AOL-DEF-00273...**
7:5
**AOL-DEF-00273...**
7:7 199:14
**AOL-DEF-00273...**
201:13
**AOL-DEF-00273...**
196:16
**AOL-DEF-00328...**
6:3 101:4
**AOL-DEF-00371...**
194:4
**AOL-DEF-00576...**
6:22 174:21
**AOL-DEF-00669...**

5:17 52:14
**AOL-DEF-00703...**
180:21
**AOL-DEF-00723...**
7:16 223:18
**AOL-DEF-00723...**
7:18 226:8 328:5
**AOL-DEF-00761...**
6:11 135:18
**AOL-DEF-00761...**
6:5 105:5
**AOL-DEF-00761...**
6:13 142:15
**AOL-DEF-00762...**
6:9 132:18
**AOL-DEF-00762...**
6:7 123:21
**apart** 171:14
**apologize** 14:14
52:21 184:21
226:11 243:9
**apparent** 247:11
**apparently** 129:2
133:16 264:17
304:15
**appear** 50:20 109:2
109:15 125:12
160:8 200:13
216:9 227:1 295:3
295:5
**appearance** 101:9
**Appearances** 3:21
**appeared** 267:12
**appears** 126:14
143:7 171:15
173:15 213:20
221:6,14 226:13
250:9 257:9 265:2
267:22 276:1,2
279:4 294:4
295:15 296:15
297:3 305:16
330:8
**applicants** 106:14
231:7 232:12
326:21

**appointment** 128:2
128:8 162:12
172:14 259:19,20
306:21
**appointments**
126:6 127:14,19
128:12 162:9
163:17 164:6,7,13
170:11 171:20
172:1
**appreciate** 97:18
177:17 189:8
**approached** 127:18
**approaches** 308:10
**appropriate** 144:11
226:13 325:2
**appropriately**
323:21 325:6,7
326:3 327:13
**Approval** 214:5
**approved** 50:10
122:21 149:19
150:4,10,11
**approve/date**
213:14
**approving** 213:18
**approximately**
16:21 20:13 21:18
24:11 25:6 51:7
**approximates** 89:1
**approximation**
15:4
**April** 5:19 12:20
63:18 65:12 67:12
71:11 95:14 99:17
100:3,12 104:5,12
104:15,16 191:15
253:19 264:17
299:8
**area** 75:20 110:5
111:3 115:7,12
119:4 176:10
188:13 204:15
232:2 259:21
272:17 276:3,6,8
276:16 278:14

280:9
**areas** 75:21 277:1
277:14 316:15
**area,s** 119:8
**argumentative**
72:15 76:5 208:5
**Arias** 7:22 243:21
244:5 245:13
251:20 252:4,20
**Arizona** 314:18
**arm** 94:2 136:16
**Armijo** 101:17
102:6 106:8,11,18
116:7 117:3,16
119:17 120:5,21
120:22 121:4
132:21 136:2
141:1 243:21
244:2 252:7,10,11
252:16,21
**Armijo's** 102:4,17
103:7 110:3 115:6
115:21 116:6
120:3,18 252:12
**arms** 94:2
**arounds** 111:21
**arrest** 319:1,4
**arrests** 319:2
**arrivals** 157:21
**arrived** 314:4
**arriving** 124:7
203:6
**ascertain** 324:17
325:17 327:12
**Asian** 207:18
208:17
**aside** 161:5 167:3
199:4
**asked** 57:18 60:15
60:20 94:19
250:10 251:8
259:5 280:5
298:22 299:4
308:17,17 309:11
**asking** 18:1 47:12
118:22 147:7

236:11 251:1,21
252:3 253:14
257:22 262:18
264:16 280:8
310:8 319:17
331:12
**asks** 165:8
**aspect** 188:11,18
190:14 191:2
272:20
**aspects** 76:9 204:8
273:16,18
**assaulted** 287:4
**assert** 169:5
**assertion** 328:7
**assess** 246:5
**assessed** 315:21
316:6 322:15
**assessing** 198:17
**assessment** 234:22
237:8 297:21
322:20 323:6
327:3,4
**assessments** 257:17
**assign** 76:3
**assigned** 34:6 102:6
147:12 265:16
**assigning** 300:14
**assist** 114:14 162:7
321:14
**assistance** 121:21
**assistant** 10:3
29:10 41:18 49:19
101:20 102:8
121:12 175:10
176:7 177:12
191:10
**assisting** 126:4
145:2,16
**Associated** 291:7
**assume** 87:4 288:22
289:3 299:17
331:22
**Assumes** 81:9
**assuming** 118:6,8
118:16 299:22



**assumption** 69:12
301:2 303:1
**asylees** 266:9,15,18
267:8,20 268:1,8
268:18 269:20
270:12,16
**asylum** 58:3 70:2
70:10 71:10 73:13
76:16,21 77:4,8
80:15 94:10,21
95:20 106:14
108:10,12,20
109:1 113:5,10,14
114:1 119:4,9
136:6,20 137:10
140:5,12 142:1
144:12 154:19
189:7 193:7
202:15,19 204:1,4
205:4,8,17 206:3
208:3,16 209:17
210:4,22 230:22
231:6,7 232:11,12
237:9 259:18
261:9 263:15
265:18 266:9
268:19 270:12,17
282:7,10 283:7
284:5,19 285:7
290:11 291:16
307:1,5 326:21
**Atkinson** 8:3
229:18 256:7
257:12 258:13
259:9,14 261:7
264:1,16 275:22
293:8,10 295:22
296:4 298:5
300:20 303:7
306:13
**Atkinsons** 282:4
**Atkinson's** 294:5
295:7 297:16
298:12
**attache** 125:20
**attached** 8:14

217:3,7 224:8
225:11,12,14
271:3 329:9
**attachment** 226:1,5
255:20 257:9,9
265:11 306:13
**attempt** 240:17
**attempted** 270:9
**attempting** 231:8
245:9
**attend** 29:12 42:11
42:13 46:10,13,21
134:11 149:11
**attendance** 331:18
**attended** 43:8
**attending** 42:10
46:21
**attends** 40:11
**attention** 61:12
62:11 95:16
164:15 184:10,14
275:21
**attest** 277:20
**attorney** 16:14,16
16:17 167:12
331:12,12,16
**attorneys** 19:21,22
20:2,5,6,8,14,22
20:22 25:18,19
26:1,2,3 165:11
222:17
**attorney-client**
165:6 167:13
169:5 181:2
194:14
**attributed** 119:8
130:19
**audible** 15:18
**audibly** 19:11
105:8
**Aug** 7:15
**august** 6:2,12 7:8
101:15 102:17
135:19 142:21
143:4 144:6 145:5
146:6 213:11

223:22,22 224:17
291:6
**Author** 249:18
**authorities** 89:2
158:15
**authority** 180:9
282:6 307:4
**authorization**
110:20 179:16
**authorized** 178:3,5
**available** 28:1
109:11,22 113:19
114:2 115:1,11
117:20 128:14
**Avenue** 10:8
**average** 28:13
**avoid** 130:21
**awaiting** 107:7
116:3 129:22
139:10
**aware** 40:2 54:7,12
54:16,20 55:2,7,9
56:18 58:4,5
59:12,14,16,19,21
60:1,2,4,6,11 61:6
61:10 92:22 95:4
133:2 135:8,10
140:10 153:10
158:4,8 181:22
182:6,8 183:6,9
183:12 186:4
188:8 224:15
231:13 241:22
242:16 250:17
251:1,3 254:17
258:22 276:19,22
307:1,13,16 308:2
308:3,4 309:20,22
326:4,8,13 327:4
**Awareness** 122:4
**awful** 60:10
**A-minus** 16:12
**a.m** 1:15 2:4 42:3
42:19,22 43:8
45:21 46:10 47:5
47:6,8 48:4,19

96:15,16 106:9
122:19 125:17
134:7,8 163:15
164:2 170:19
187:2

--------------------

**B**

**B** 86:4,8,13,15 87:2
**back** 16:11 24:2
32:21 33:1 34:16
35:18 47:6 57:18
66:15 91:19,22
92:16 95:1,4 96:1
96:19 97:19
119:14 134:4,18
140:21 152:22
153:3,14 160:17
160:18 164:8
165:20 167:14
168:12,13,15,16
168:18,20 169:4
169:11 172:2,16
181:4,6,13 184:21
189:18 194:21
195:4 199:13
226:19 227:11,19
227:22 228:14
229:1 236:21
239:19 249:3
259:19 261:9,21
262:9 263:12,16
266:18 271:7
273:12 274:2
282:3 284:5
295:13 297:7
301:4 302:2,10,18
306:12,20 307:6
314:2 326:15
327:12,13 328:3
**Background**
216:17
**backs** 228:4 328:6
**backwards** 274:12
**bad** 174:4 276:12
314:3
**Bailey** 61:12,14,20

62:4
**Baja** 126:3 128:22
131:17
**band** 85:19
**barrier** 93:11 96:5
**barriers** 94:7 190:1
**based** 71:6 80:22
89:1 118:8 127:6
130:10 131:20
155:21 158:7
164:22 188:13
255:5 285:9
307:20 320:2
323:20 324:8
325:2 326:21
327:11
**basically** 283:20
**basis** 28:20 31:1
40:8 42:11,14
43:15 44:12 130:4
168:20 187:19
189:13 219:11
228:5 303:19
327:15
**Bates** 52:17,18
55:21 58:18 82:2
101:3 105:5
106:18 123:21
132:17,18 135:17
142:14 146:17
163:3 168:19
169:3,21 174:20
180:20 194:3
196:15 199:14
201:13 213:1,2
215:11 220:9
222:1 223:17
226:7 229:16
243:9 296:14
**bathrooms** 152:1,6
156:4 285:18
286:17,20 287:1
288:9,11 318:7
**Beach** 107:11,17
116:1
**bearing** 105:5



229:16
**bears** 163:3 215:11
223:17 226:7
**becoming** 315:8
**began** 69:8 70:11
100:3,5,11 103:20
104:15,16 151:4
157:8 272:22
294:5 308:20
314:7
**beginning** 92:10
106:11 137:5
152:10 159:11
162:14
**begins** 52:13 53:9
82:2 108:21
123:20 132:17
135:17,19 141:20
142:14 148:17
180:20 199:13
200:22 201:2
220:8 230:18
243:10 245:2
255:20 294:3
306:14
**behalf** 3:2,11
141:14
**belabor** 144:5
**belief** 286:6
**believe** 13:13 34:13
35:16 47:9 54:2
55:5 57:13 65:11
68:10 70:9 71:9
71:12 72:17 73:1
73:6,21 77:2,6
78:1 79:12 95:12
100:14 103:10
106:1 108:2 113:7
118:17 125:10
128:1,8,17 129:3
129:8 130:16
141:13 147:12
148:6,7 150:16
154:6 157:14
160:7 161:10,18
162:4,12 165:12

165:14,18 174:9
179:17 185:3
197:9 219:9
220:13 227:14
229:1 231:19
234:1 237:6 238:1
239:1 253:22
255:8 256:5,16
260:10 265:14
267:12 268:4,17
268:20 269:16
271:10 282:21
283:2 286:15
288:8 301:8 302:7
302:8,12 317:1
324:22 325:7
**believed** 89:14
126:12,15,19
127:4 130:13
158:15 264:17
268:1 285:20
307:10 316:1
**believes** 128:21
233:11 298:2
**Ben** 3:15
**beneath** 279:10
**berating** 292:12
**Berg** 224:11
**besetment** 20:19
**best** 16:3,10 23:17
32:16,19 33:12
128:6,11 136:19
156:6 157:18
182:20 190:21
257:11 272:5
312:3,5
**Beta** 89:3 128:2,7
136:15,15,16,18
136:22 137:3,6
141:15,21,22
142:4,10 162:13
**better** 16:10 88:14
99:3 129:20
176:21 237:15
285:4 286:21
288:8 290:11,19

302:10
**Beverly** 6:19 148:3
148:4,5,7,11
170:3,18
**beyond** 110:21
242:21 261:15
262:15 285:16
309:7 315:4
326:11,17
**big** 176:6
**billion** 51:1
**Bishan** 234:15,16
**bit** 79:20 90:16
99:3 100:2 136:14
137:14 184:22
189:10 191:12
219:14 324:14
**blame** 126:6
**blank** 276:16
**block** 231:7 232:12
**blocking** 231:6
232:11
**blood** 330:13
**board** 30:7 190:18
289:13
**Bodies** 8:6
**body** 56:7 147:6
304:8
**booths** 273:19
321:2
**border** 5:16 9:19
9:22 30:10 40:21
52:10 68:7,15
69:1,7,16 85:13
92:7 102:8 107:6
107:11,13,15
110:21 112:3,11
112:14 116:1
138:3 140:13,16
144:8 145:6 146:3
147:17 153:11
158:10 161:16,17
167:1 175:11
186:21 188:15,16
193:4 202:1 203:7
214:7 218:5 230:8

235:6 244:6 262:4
265:8 266:8
285:13 286:7
287:3,7,18 288:4
288:13 289:11,12
289:13 290:1,12
301:21 313:13
314:4 315:7,11
320:21,22 321:7
321:15 323:11
**borders** 72:3
289:19,20 290:21
**boss** 27:16 120:3
**bottom** 52:14 55:16
102:18 119:18
148:12 163:14
170:7 175:20
178:17 213:13
224:7 249:12
**boundary** 81:7
84:20 88:16 90:5
91:3,15 93:3
152:22 153:4,6,10
153:15,21 154:12
154:20 155:14,15
262:12
**Box** 3:16
**boxes** 213:13
**Boyd** 7:4 194:6
196:17 197:22
**BP** 166:19 167:1
**branch** 136:17
**Braunstein** 119:20
120:10,14 121:8
**Brazil** 313:18,19
**break** 17:3 44:3,4
96:12,13 133:21
137:13 167:20
181:17 228:15,16
229:5 255:12
275:9,10,11 306:8
306:10 312:13
**breaking** 231:19
233:20 234:2,3
237:16,20 238:2,7
238:8,16

**breaks** 16:21
**bridge** 138:9,11
148:20 172:16
259:22 265:20
267:16 271:9,10
271:11,15,19,21
272:21 274:8
300:9,11,12 302:4
302:10
**bridges** 69:20
139:21 148:19
151:5 236:18,20
266:5 272:18
**briefing** 42:16
**briefly** 328:3
**bring** 24:2 118:20
137:19 138:10,19
138:20 140:17
155:1 189:6
236:19 237:13
318:1
**bringing** 139:14
**broader** 137:1
193:6
**broke** 54:21 55:4
230:20 238:11
239:6 240:2,16
254:22
**broken** 55:6
**Brooks** 323:14
**brought** 95:3,16
147:18 184:10
252:17,19 264:13
274:16
**Brown** 2:3 3:3
101:11
**Brownsville** 35:16
36:2,12 37:21
39:10,11 69:11
85:16 90:10
139:18,20 154:11
**Bs** 86:6,21
**bubble** 248:21
249:1
**bubbles** 248:18
**budget** 50:15,21



**build** 313:21
**building** 10:9,10
28:17 111:8,11,14
152:18,20 153:15
153:18,22 154:13
288:5
**built** 273:19 313:22
**bullet** 103:1 111:8
111:9
**bumped** 47:1
**Burg** 225:1
**Burney** 4:3
**business** 45:11
321:3,6
**B-plus** 16:12

**C**

**C** 3:1,1 5:1 9:1 86:4
330:1,1
**Calexico** 69:10
85:15 89:17
157:15 189:1,4,6
314:18
**California** 1:2
126:4 128:22
131:17 207:18
208:11
**call** 52:17 61:12
107:17 141:14
144:10,20 163:12
163:16 164:5
184:14 187:22
317:20
**called** 34:8 40:22
45:1 77:14,22
86:20 108:3 129:4
165:20 182:1,4
190:2 198:15
216:17,21 226:1
**calls** 43:19 61:18
98:13 165:5 211:8
264:19 305:13
319:14
**camped** 286:18
**camping** 151:21
**camps** 289:10

**Canada** 208:19
**canceled** 48:20
314:1
**candid** 53:21 54:2,4
54:9,10,14,18
**candor** 231:3
**canopy** 93:7
**cap** 122:18 123:3,4
**capabilities** 106:21
114:17 314:8
**capability** 113:21
151:19
**capable** 131:4
**capacities** 80:3
185:9,18,22
186:10 187:18
189:11
**capacity** 68:6,10
69:3,4,8,13,20
70:12 71:6 74:9
74:10,11,12,13,15
75:3,12 76:2,7,8
80:4,7 84:19 88:4
90:2,21 91:14
104:9 113:18
114:10 119:13
137:19 138:3,19
139:22 155:1,4
164:9 172:3,21
182:17 184:5,8
185:13,13,14,16
186:11,22 187:2,3
187:6 189:2,14,20
190:6,22 223:3
261:15 262:8,16
262:17 263:8
266:17,19 285:10
285:16 308:20
309:7,8 314:15
315:5 316:8,9
317:7 318:4,4,8
319:6,8 324:20
325:3,9,13 326:12
326:22
**caption** 19:8
**capture** 204:17

**captures** 188:4
190:18
**car** 93:12
**cards** 320:22
**career** 15:5 50:5
52:6 177:15
**carefully** 181:16
**cargo** 86:11,12
190:11 205:11
321:10,11,16
**Carlos** 105:11
119:18,22 121:3
121:17 123:9
125:16 126:11
**carriers** 209:5
**carrying** 326:2
**cascade** 71:4
**cascaded** 79:6
**case** 1:5 20:3 26:8,9
27:3,4,10 71:16
187:16 203:21
209:2 222:17
234:15 241:19
283:19 307:14
308:13,14 311:12
**cases** 11:20,21 12:8
12:9 14:19 15:2
121:18 140:11
172:19 239:20
279:13
**Castillo** 225:19
**CAT** 147:21
**catch** 169:18
**categories** 204:7
**category** 186:6
193:6
**cause** 32:3,3 36:15
165:19 307:9
**caused** 130:8,14
131:19 273:2
**causes** 87:15
**causing** 126:8
183:22 273:10
**CBP** 9:22 10:2 18:1
18:2 20:8 21:21
22:1 25:20 26:3

26:16 34:20 40:12
41:4 44:1 51:3,9
51:13,16 53:4,10
53:15 54:2,12,17
54:20 55:2,8
56:14,19 57:7,11
60:12 62:3 64:3
64:19 71:9 76:10
78:5 79:13,14,18
79:19 82:22 86:3
86:10 93:5 94:11
95:22 97:4 105:16
108:15,20 112:9
112:13,14 125:2
125:20 128:3
141:14,20 142:3
145:14 159:17
170:11 171:4
175:20 181:22
182:2 187:17
194:18 196:21
199:18,22 200:22
201:2 204:5,21
205:1,6,15 206:18
207:4 209:16
210:13 212:6
215:11,16 216:6
217:16 218:16,17
230:7,9,20 231:2
232:10 233:14,20
234:5,8 237:16,19
238:4,10 240:10
240:20 241:3,19
242:4,6 244:5
245:8 250:5
252:14 256:15
258:2,13 259:2,3
259:8 260:2
262:13 263:6
265:8,16,17
283:16 285:6
293:12 294:16
296:19 299:15,15
306:7 308:8
309:13,20 310:13
**CBPALTR00003...**

7:12
**CBPs** 203:12
**CBP's** 18:19 67:4
201:9 203:7,14
**cc** 120:22 147:8
**cc's** 229:18
**cease** 258:18,20
259:1,4,10
**cell** 318:12,15,18
319:2,5
**cells** 74:14 88:10
317:9,10,19,20
318:2,5,6,22
319:8
**cent** 257:21
**center** 27:19 28:12
34:5,8 35:12
36:18 281:6 326:6
**certain** 17:22 39:11
47:20 76:10 86:11
139:15 188:3,9
198:16 204:7
251:14 259:5,6
**certainly** 114:20
130:6 180:4 183:3
272:15
**certify** 329:7 330:7
330:12
**cetera** 207:9
**CF** 121:18 122:6
145:1
**chain** 6:6,8,12,14
7:15 8:7,9 82:8,12
101:16 102:19
105:11,22 106:4,7
123:20 124:6,7,11
124:12,21 132:19
135:17,18 136:1
142:21 143:4
148:12 159:17,21
163:4 178:17
197:2 252:18
294:5 295:4 296:3
296:13,15
**chairs** 276:14,20
277:2,2,6,11,16



277:21 278:1,6,14
278:20 280:5,9,17
281:14,17
**change** 50:19
150:17 218:10
317:16
**changed** 276:22
**changes** 231:5
331:3,4,7
**chapter** 60:20,20
60:22 61:1,21
62:1 231:14,15,22
232:4,10,16,17,20
234:7,12 235:10
235:16 236:1,3
237:3 254:21
257:14 269:3
273:17 301:4,18
**chapters** 61:22
231:16 235:22
301:20
**characterization**
80:18 129:12
253:2
**Charmaine** 224:1,7
224:8,17
**Chavez** 146:21
148:11 149:14
150:20
**cheap** 313:20
**check** 58:6 107:19
**Chicken** 209:9
**chief** 20:8 25:19
29:10,11 40:21,21
40:22 144:7 147:8
194:16,16
**child** 8:5 291:8,10
292:9
**children** 313:12
318:17
**chilled** 241:17
**chilling** 73:1 231:7
232:15 240:16
241:7,9,21
**choice** 207:7 267:1
**choose** 288:18

**chooses** 207:5
**chose** 209:18 298:5
**chosen** 209:16
211:18,22 212:3
**Christine** 25:20
97:8
**circled** 82:19
221:16,18 222:19
223:2,3
**circumstances**
35:17
**CIS** 308:14,14
**cite** 67:3
**citizen** 246:7
**citizens** 110:21
**city** 78:9 125:21
126:7 127:5,7
139:4
**Civil** 31:7,7 182:1,1
**claim** 132:2 228:12
246:8 308:15
309:9,15 318:11
**claiming** 98:19
109:20 131:17
144:22 145:1
254:21 282:12,17
**claims** 136:6 142:1
144:12 189:7
232:10
**clarification** 60:15
256:12 307:3
**clarifications**
299:11
**clarify** 91:6 96:20
319:17
**clarifying** 97:17
128:10 219:13
**clarity** 60:20
215:15
**Class** 85:20 86:1,2
86:4,4,6,7,8,13,15
86:21,21 87:2,2
87:10,12
**classified** 43:19
244:22
**claw** 134:3 160:16

160:18 167:14
181:4 194:21
199:12 227:19
228:4 229:19
328:3,6
**clawed** 168:15,15
169:4 181:6
227:22 327:12,13
**clawing** 168:18,20
181:13 195:4
226:19 227:11
229:1
**claw-back** 328:7
**claw-backs** 228:20
**clear** 66:6 94:5
98:16,21 129:21
136:21 137:16
169:10 225:16
226:18 234:14
240:3 253:20,22
255:8 276:11
288:3 300:3 326:1
**clearer** 232:22
**clearly** 98:18 118:9
156:11 226:11
229:2 250:22
**closed** 58:3 110:13
148:20 171:22
172:15
**closer** 95:5
**Columbia** 329:3
330:4,7
**column** 80:21 81:2
85:2 89:7 90:17
184:13
**columns** 84:13,17
85:1
**come** 30:10,12,16
36:3 37:12,15,17
43:14 61:19 66:15
67:15 72:18 93:4
93:4 108:20
116:13 119:13
131:1 137:10
139:10 140:3
153:18 164:8,15

172:2,16 186:16
186:20 187:7
205:22 209:15
218:7 228:14,20
262:8,12 268:7
270:10 284:1
309:6,8 310:14
313:10 318:10
**comes** 108:8,14
109:12 187:2,22
209:22 289:20
318:13 320:21
**coming** 193:12
206:15 208:21
210:14 232:3
274:14 315:9
321:5
**command** 251:6
252:19
**commander** 36:8
84:7 176:5
**commencing** 2:4
**comment** 248:17
248:21,22
**commentary** 80:6
**commented** 64:6
**comments** 65:21
248:9
**Commission**
330:20
**commissioner** 10:3
27:16 28:5,8 29:1
29:2,10 40:17,17
41:2,4,11,19
46:20 49:3,3,19
77:19,21,22 78:3
78:19 79:1,7,10
121:13 126:2
147:9 149:17
150:2,11 157:2,2
158:10 177:12,15
177:16,18 191:10
196:1 199:18
215:1,16 280:1,4
281:2 298:6
**commissioner's**

280:8
**committee** 12:15
12:19 13:2,11,15
13:18 28:20
133:17 134:12
135:6 144:9 146:4
158:11 183:9
**committees** 12:11
12:22 13:9
**common** 287:12,14
287:15
**Commonwealth**
2:7
**communicate** 79:7
**communication**
70:6 300:19
**communications**
57:9,15 78:22
165:6,11 167:13
**community** 316:5
321:3
**compared** 71:19
193:14
**comparison** 166:19
**compensation**
236:22 237:4
301:4 302:19
**compete** 190:13
**complaint** 7:13
219:17 220:8
226:2 297:17
298:12 300:17,18
300:22
**complaints** 116:17
235:13,15 236:6
259:9 297:18
300:13
**complete** 18:12
57:10 106:1 108:6
**completed** 305:20
**completion** 331:13
**comply** 53:4
**component** 203:7
**composition** 317:15
**computer** 248:12
**concern** 164:17



166:4 211:13
222:22 223:1
251:16 265:3,15
273:2,11 301:10
301:12 302:2,6,21
306:14,17 307:9
**concerned** 127:7
165:22 240:14
267:15
**concerning** 323:3
**concerns** 158:14
166:9 238:1,5,11
238:15 240:7,10
240:13 271:17,18
272:8,11,14,15
273:5,8,10,16,19
274:7 301:15,17
301:21 302:4,8,13
304:17 325:3
**concisely** 22:17
**conclude** 239:3
**concluded** 214:11
328:11
**conclusion** 116:11
118:21 119:1
211:8
**conclusions** 182:14
324:11
**condition** 324:13
**conditions** 74:16
118:8 129:14
152:4 236:16
237:7,11 275:1
285:11 286:3,6
289:7 290:11,19
290:21 302:10
316:14
**conduct** 5:17 52:11
53:5 56:3,4,10,10
110:15 114:21
210:9 259:7
297:19 298:3
**conducted** 9:7
312:18 322:10,20
**conducting** 282:13
282:18

**conference** 21:8
112:7 144:10
274:17 314:20
315:13,22 322:16
**confidence** 53:11
**confidential** 1:11
7:17 243:12
327:21 328:1
**confused** 26:12
97:9
**confusing** 319:19
**confusingly** 249:11
**Congress** 12:11,22
**congressional** 95:3
95:7 143:10,11
146:7 158:21
198:9
**connection** 19:21
59:6 182:12
**connections** 188:5
**connotation** 267:4
**consequences**
18:16
**consider** 188:22
190:2 308:15
**consideration**
74:15 149:18
**considerations**
74:21 318:10
**considered** 272:21
**consistent** 142:5
197:16 203:12
214:9 231:19
301:15,18
**constitute** 297:20
**constitutes** 44:1
**constrained** 69:4
69:13
**constraints** 68:7,10
118:11 325:13
326:12,22
**construction** 104:9
111:16,22 145:3
**consult** 43:22
**consulted** 50:7
**consumables**

209:11
**consume** 44:15
**contact** 62:5 139:14
**contacted** 238:21
239:1
**contains** 19:14
167:12 194:12
**contents** 67:8 83:4
83:6 105:19
216:13 250:2
**context** 22:10 313:9
**continuation** 294:4
296:15
**continue** 104:2
111:5 166:7 181:9
198:22 214:14
226:17 227:10
**continued** 3:21
5:22 71:17 213:19
**continues** 142:15
199:3,14
**contribute** 65:1
**control** 104:11
118:10 128:7
161:13,19 162:1,2
166:5 179:4
180:11 260:2
285:9 314:14
**controlled** 191:4
**controlling** 89:4
162:7 164:22
179:11
**conversation** 15:11
38:9
**conversations** 20:2
222:16
**convert** 314:20
315:3,13
**converted** 115:6
274:17
**converting** 315:22
322:15 323:3
**convey** 268:11
**coordinate** 137:6,9
138:10,18 139:14
140:5 141:21

142:4
**coordinated** 295:8
**coordinates** 137:3
**coordination**
138:21 141:15
**copied** 194:7 256:9
**copies** 295:4 331:17
**copy** 49:17 52:4
97:20 121:8
169:12 199:21
217:6 219:16
220:6 243:20
256:3 299:8
309:21
**corner** 52:14
**correct** 11:7,10
13:3,6 25:12 32:9
34:18 38:3 39:19
46:5 47:3 57:12
58:2,16 59:2,10
60:18 64:3 67:5
67:13,14,22 71:15
74:4 75:13 78:6,7
78:14,15,17,19,20
81:1 82:12 83:1,5
84:3 85:11 86:18
89:11,12,16 90:6
91:3,4,8 93:6
95:18 96:22 97:15
101:17 103:15
105:13,14,17
106:16,21,22
107:4 108:17
109:1,2,3,5 110:9
110:10,17 111:3
112:20,21 113:2,6
113:10,11,14,20
113:22 117:21
118:2,14,16,17
119:2,20,21 120:4
121:1,6,7 122:15
123:22 124:12,18
125:2,5,6,8,13
126:13,16,20
127:11,12,14,15
127:19 128:13,19

129:1 132:22
133:5,19 136:3,4
136:6,7,9,12
137:3 138:4,5,7
139:4,5,8,16,17
139:19 140:19,20
141:9,10 142:7
143:1,2,3,5,6,8
144:17,18 145:9
145:12,15,17
146:9,22 147:1
148:15 150:5,13
150:13 151:1,2,5
151:13 152:18,19
152:21 153:1,2,5
154:1,3,4,7,8,10
154:21 155:5,9,12
155:13,16 158:6
158:12 159:14,15
159:18,19,22
160:4,5,9,10
161:12,19 162:1,5
163:9,10,12,13,22
164:1,2,3,11
166:14 167:1,2
169:22 170:4,5,12
170:13,15,16,19
170:20 171:1,2,5
171:6,9,10,13,16
171:16,17 172:5,9
172:11,12 173:1,4
173:14 175:13,21
175:22 177:7,19
178:22 179:1,12
179:13 180:10
183:7,8,11,14
184:5 185:10,11
185:13 186:5,8
192:9,11,12 193:8
193:18 194:5,7,8
195:5,6,16 196:18
196:19,21,22
197:3,4,7,20
199:19,22 200:4,7
200:10,18 202:16
202:21,22 203:3



203:13,18 204:21
206:12,17,20
207:5 210:4,15
211:20 212:5,11
212:14,15 213:9
213:10,11,12,19
214:12 215:13,14
215:16,17,18,19
216:3,6,13,22
217:3,4,7,11,12
217:16,17 218:12
218:18 220:16,22
221:8,9,13,17,18
224:5 230:1,3,4,8
231:22 232:7,8,12
232:15 233:16,20
237:17,21 238:19
238:20,22 243:22
244:3,7 245:15,16
245:22 247:4
249:16 250:12,13
250:15,16 252:8,9
252:17 253:5,6,22
254:5,9,16,22
256:13,15 257:6
257:10 258:4,5,6
258:7 261:9,12
262:9,10,14 263:5
263:9,12 264:3,4
265:3,4,13 266:1
266:2 267:2,9,20
268:3 272:7,12,16
274:5 279:8,9
282:1,2 283:15,17
283:18 287:11
288:21 289:2,14
293:1,2 294:6,9
294:13 295:3,9,10
295:11,16,17,19
295:22 296:16,21
298:13 299:16
301:5,7,17,19
302:15 303:2,3
323:22 325:3,4,10
325:14 329:8
**corrected** 164:6

166:11 171:21
174:9
**correction** 182:3
332:2
**corrections** 329:8
**correctly** 53:12
56:12 59:7 103:4
103:12,17 107:8
110:6,16 115:9
116:4 122:1,22
126:9 142:6
144:14 145:3
149:1,21 164:10
166:21 172:4,22
179:8 198:4 201:5
202:2 203:10
224:13 231:10
245:11 246:11
250:7 260:4
265:21 266:11
276:17 279:13
282:14,15 297:9
307:7
**correspondence**
70:20 121:4
227:20
**corridors** 316:15
**Council** 4:4 133:13
134:13 135:7,8
144:7
**counsel** 20:8 21:16
21:21,21 22:1
24:17,19 25:19
26:3,19 43:22
44:3 97:4 134:1
145:5 146:7
156:14 168:13,17
194:16 219:20
225:11 227:1,3,5
227:15,15 292:11
295:9 312:12
331:9
**counsel's** 24:8,10
**counted** 270:3
**counter** 217:21
**counterfeit** 210:18

**counterpart** 179:4
**counter-narcotics**
202:7
**counter-terrorism**
75:16 76:12,20
77:2 188:5 201:10
201:11 203:18
206:21 207:8
320:11,15
**countries** 318:19
**country** 30:8 72:2
202:18 205:12
207:16 208:18
209:1,15,20
289:17 307:21
320:20
**couple** 15:15
152:15 248:6
262:1 316:20
**course** 82:22 164:6
166:11 171:4,21
196:21 199:22
248:14 256:15,20
294:16 296:19
**court** 1:1 11:12,14
15:2,13,16,18
18:9 259:2 307:17
331:13
**courts** 310:2
**courtyard** 286:22
**courtyards** 286:2
286:19
**cover** 302:9
**coverage** 121:22
**CR** 254:13
**CRCL** 182:4,6,8,12
182:13,15,17,21
183:6 254:7,10
**create** 87:10,12
92:7 107:2 259:21
260:10 289:6
**created** 73:17,22
74:3 92:11 111:13
203:14 212:6
249:21 274:15
**creating** 130:17

274:20 286:3
316:13 324:8
**credibility** 236:5
**credible** 106:14
108:15,19 109:13
116:3 122:6 237:2
245:10 279:12
309:1,2,9
**criminal** 18:15 56:9
319:5
**crisis** 30:15,18 43:7
44:9,18 84:8
126:8,13,15,20
127:2,4,8 128:18
129:5,7,13,17,21
130:2,5,9,11,14
130:18 131:18,22
147:13,15 158:6
158:16 183:22
274:13 321:15
**criticize** 185:21
**cross** 93:3,16
284:20,22 291:18
292:18 321:4,7
**crossed** 32:20
154:19 182:9
260:19 261:5
321:3
**crossing** 241:18
320:22
**crossings** 69:16,17
69:18 186:20
273:17
**cross-border**
320:21
**crystal** 234:14
255:8
**Cs** 86:6
**cumbersome**
186:13,19
**current** 145:2
218:13 234:13
275:20
**currently** 115:22
141:15,22
**Custodian** 305:20

**custody** 74:16,17
142:2 186:3
**customs** 5:16 9:19
9:21 52:10 108:1
265:8 317:13
**cutting** 73:12
**CVP** 186:8
**C-plus** 16:11
**C-1** 179:3
**C1** 41:5,7 46:22
**C2** 41:10 46:22
135:2 148:18
149:18
**C22** 179:3

─────────
**D**
─────────
**D** 9:1 87:10,12
**daily** 28:20,21,22
40:8 44:12 46:1
48:4,13,14 172:19
187:19 189:13
**dangerous** 201:4
201:11 209:19
**data** 44:9 258:15
324:10
**date** 5:18 12:16,21
67:11,13,16,18
85:3 119:14 160:3
263:9 306:21
312:2 331:5
332:21
**dated** 63:18 194:7
200:6 212:10
213:11 215:20
223:22 229:22
265:5
**dates** 106:4 125:5
171:8
**daughter** 292:15
**daughter's** 292:15
**David** 3:14 8:3
229:18,18 230:12
240:9 256:7
257:12 258:12
275:22 281:9,12
281:14 293:8



294:5,12 295:21
303:7 305:9,15
323:15
**day** 17:8 20:12,16
25:11 26:1 27:9
27:21 28:1,13
36:8 46:14,15,21
48:12 67:17 69:22
69:22 74:19 94:15
97:10 100:13,14
103:16,20 186:15
187:1,1 188:5,11
189:21 190:3
203:13 211:11
321:4 329:17
330:17
**days** 20:13 24:22
25:17 29:1 38:8
47:22 48:20 49:1
221:7 288:10
311:16,17 312:7
331:14,21
**day-to-day** 45:11
74:20 186:12
191:6 325:22
**DC** 3:7,17
**DC2** 41:13
**dead** 209:12,13
**deal** 60:21 61:22
86:22 100:9
136:19 187:20
290:14
**dealing** 38:9,11
296:5 300:18
314:19
**deals** 64:21 86:9
198:11
**December** 1:14 2:5
**decide** 269:11
291:18
**decided** 316:11
323:4,21 324:1
**decides** 75:1,8
**decimate** 207:19
**decimating** 208:18
**decision** 155:11,18

155:20 156:7
157:22
**decisions** 76:7
160:14
**declaration** 14:3
**Declaratory** 7:13
**decode** 150:1
**Decoding** 122:10
**deemed** 325:2
331:15
**defecate** 274:19
**defecating** 286:4
**defendants** 1:8
3:11 168:18 169:4
305:19 328:2
**defendant's** 181:7
312:12
**deferred** 245:21
**define** 20:6 74:10
74:11,12 107:21
218:2 257:20
**definitely** 39:13
166:17 167:12
180:8
**degree** 45:12,13
**delayed** 321:11,12
**deleted** 305:16
**deliberations** 32:4
36:15 87:15
160:14
**deliberative** 168:22
169:6 181:3
194:13,15
**Democratic** 144:7
**demographics**
74:16 318:10
**denied** 307:19
**deny** 307:4
**denying** 231:5
232:10
**Department** 3:12
17:12 20:9 26:2
247:19
**dependent** 176:5
**depending** 31:3
94:14 139:20

176:12 204:6
**depends** 264:2
**depicted** 217:10
**deport** 184:8
**deposing** 331:12,16
**deposition** 1:11,12
2:2 5:10,13 11:15
17:11 19:2,7,9,13
19:17,21 20:4,11
20:15 21:4,12
26:4,5,6,15,17
27:2,9,14 49:7
51:22 52:19 63:1
63:8 81:18 82:1
96:21 98:9 100:19
101:3 104:21
105:4 123:14,19
132:12 135:12
142:17 146:12
159:5,10 162:20
167:5 169:7,9
174:13,18 180:15
193:21 196:9,14
199:6,11 212:17
215:5,10 220:2
223:11,16 225:4
228:1,3 229:11
243:4 248:1
255:15 291:2
292:4 293:20
296:8 327:10,16
327:20 328:11
329:7 330:9 331:2
331:6,9
**depositions** 26:14
**deputies** 62:13
176:12,13,16,16
177:5
**deputy** 27:16 28:5
28:8 29:2,10
40:17 41:2,11
46:21 49:3 84:7
120:11 121:12
134:18,22 135:2
143:18,22 147:9
150:2,10,10,11

157:2 175:5 176:5
176:17,20,22
177:3,11,14
194:15
**deputy's** 133:17
134:12 135:6
**describe** 31:21
142:8
**described** 203:9
205:3 214:10
**describes** 261:19
261:20
**Description** 5:12
5:15 6:1 7:1 8:1
**designate** 327:21
**designated** 119:8
243:11 328:1
**designed** 268:13
269:19 270:11
315:1 317:8,18
318:3,5 323:4
324:8
**desire** 70:2 290:16
**desired** 70:4
**desist** 258:19,20
259:1,4,10
**desk** 62:19
**despite** 255:7
**destruction** 313:19
**detailed** 45:15
**details** 179:10
**detain** 282:7
284:21
**detained** 109:8
245:4 246:7
**detainee** 245:14
**detainees** 84:19
88:1 89:20 90:18
107:7 246:8
**detaining** 284:19
**detention** 74:14
106:21 108:5,9
109:9,19 111:20
114:3 121:19
164:9 172:3
185:13 259:21

260:1 314:8,11,11
315:2,5,16,17
316:13 317:9,11
**deter** 70:2,4,10
71:10 98:6
**deteriorated** 152:3
**determine** 140:18
179:6 228:4 245:6
278:12 281:10
310:9 327:22
**determined** 58:8
322:17
**determining**
278:21 281:22
**deterred** 241:16
251:22
**deterrence** 98:8,12
99:7 100:1 174:7
**deterrent** 72:13,17
73:3,7,9 172:18
173:4,5,8,13,16
173:16,19 174:2
174:10 183:14,16
241:13 246:10,16
247:2 248:22
252:22 253:9
254:4,19 268:14
**deterrents** 98:1
99:15 250:4,7,12
250:20 251:10,12
251:17,19 253:16
254:9
**deterring** 241:21
**Detroit** 114:21
115:3 121:21
**devastate** 207:17
**developing** 244:16
**development**
141:21 142:3
**DF** 177:3
**DFO** 104:10 164:16
176:14 177:1,3
293:13
**DFOs** 177:8,10
323:11
**DHS** 17:12 26:17



31:11 133:10,11
144:21 149:6
182:2 238:18
239:3 240:20
250:18 254:14
**DHS-OIG** 31:22
dictated 72:4
**Diego** 102:11,12
106:12 107:16
115:22 122:19
133:7 138:18
170:22 242:12
244:3,6 246:14
253:8 315:7
**difference** 43:2
86:7
**different** 13:8
25:10 37:16 43:14
44:6 45:22 86:20
111:16 138:14
151:9,10 153:20
174:5 187:21
188:6,12,15
209:11,14 229:4
233:17 235:22
263:2 318:18,19
318:19
differentiates 86:12
differently 147:20
187:14
differs 186:12
difficult 189:22
diminished 39:6
direct 27:16 28:3,4
28:5 48:5,9 52:7
75:15 120:13,18
157:21 201:18,20
201:20 211:12
219:20 266:17
275:21
directed 74:19
75:14 96:1 227:5
239:7 314:1 327:1
directing 34:15
198:16
direction 99:21,22

227:15 240:3
260:2 274:1 300:3
300:4,8 326:2
directly 34:15 48:6
48:9 79:7,15
204:8 325:21
331:4
director 12:3 27:17
27:18,19 28:9,10
28:11 35:2 64:4
64:21 70:7 71:9
101:22 102:1,8
103:7 117:20
120:1,5,8,11
141:14 143:19
148:8 163:8 175:6
175:10 176:7,8,8
176:9,11,14,22
177:2,10 196:2
230:15 310:15
325:5,11
directors 29:9 62:7
70:9 71:4 92:6
101:21 176:10
179:2,15 180:8
191:5,15 323:12
325:1,18,20 327:3
327:7
disagree 184:11
236:18 237:7,14
237:16,18,19
261:1 297:21
disapproved/date
213:14
disaster 73:17,18
73:22 74:1,3
disciplinary 53:5
56:14
discourage 98:18
discouraged 241:18
discretion 325:1,6
325:12
discuss 44:4,5
133:22 144:11
160:21 167:14
198:2 306:6,9

discussed 25:3 30:2
31:6,11,13,16
35:10 36:11 42:18
42:21 47:8 134:19
144:2 148:18
156:18,21 157:4
213:19 235:18
293:13 304:13,16
325:19
discussing 293:15
298:12
discussion 38:7
40:14,16 87:18
156:15 158:17
196:7 219:7
323:17,18,20
discussions 31:21
32:12 37:22 38:4
48:1 79:4 104:10
155:21 156:1
158:19 165:21
310:1 323:8,10
324:1,3,6
discussions/date
213:14
disease 204:10
207:22 209:19
316:4
diseases 207:15
209:15 210:15
disgraceful 56:10
dishonest 56:9,15
56:19 57:19 79:13
79:14,18,19
disprove 241:6
disproven 241:4
dispute 129:11
262:1,2,6,11,19
263:22 264:6,7
270:4
disseminated
283:21
distance 153:9
distinction 136:21
distribute 331:17
distributed 42:7

284:16
distribution 132:4
224:22
District 1:1,2 329:3
330:4,7
divert 320:4,11,12
diverted 319:11
321:20
diverting 114:18
diverts 320:5
doc 226:2
doctrine 24:5
document 7:18 8:2
19:2,8 49:7 51:22
52:5,10 55:14
63:1,6 81:18
82:16 98:10 99:12
99:14,15 100:19
101:4 104:13,21
106:18 123:14
132:12 133:22
135:12 141:8
142:17 146:12
159:5 160:13
161:1,5 162:20
167:5,18 168:2
169:2,7 174:13
180:15,20 181:2
181:11,20 184:7
193:21 195:9
196:9 199:6
212:22 213:2,4
214:13 215:5
220:2,7,11,21
221:6,10 222:19
223:11 225:4
226:5 227:12
228:9,12 229:11
229:15,16 243:4,8
243:14,20 248:1
249:5 250:22
253:2 255:11,15
255:22 291:2
292:4 293:20
296:8,12 300:6
documentation

109:12 206:2
324:10
documents 21:11
21:13 22:2,6,14
23:3,10,17 24:9
24:12,14,16 25:4
25:6,9,13 66:14
75:3,11 93:2,3,17
127:18 139:7
168:14 181:8,9
182:17 202:18
203:6 212:17
221:20,21 224:5,9
225:8 227:22
228:11,18,18
229:6 251:15
255:5 305:4 306:1
307:19 320:20
327:11
Doe 222:5
doing 36:16 53:22
63:10 82:4 101:6
101:7 105:8 118:3
128:3 162:5,6,14
162:16,17 180:9
219:9 237:4,9
256:1 259:5
DOJ 21:22 97:1
door 161:21
doors 151:16
152:10,17 274:19
277:3 285:17
313:20 316:18
dot 226:2
doubt 64:18
dozen 15:7
draft 50:9 64:6,6
65:5,10,13,21
219:2
drafted 45:4 50:8
64:10
Drive 11:6,8
driven 42:4 99:6
157:5
drives 76:7
driving 302:3,12



**dropped** 192:22
**drove** 68:21
**drowned** 292:19
**Drugs** 218:7
**due** 128:17 129:18
139:7 145:2 290:1
290:18 291:17
325:13 326:12
**Dugan** 124:15,16
**duly** 9:4 330:9
**duties** 44:16 67:4
82:22 171:4
196:21 210:19
211:16 237:4
256:15,20 294:16
296:19
**duty** 51:14 56:9,15
76:16 210:14,21
278:10 298:3
**D.C** 1:13 2:4 9:20
10:8

_____

**E**

**E** 3:1,1,1 4:1,1 5:1
9:1,1 249:18
330:1,1 332:1,1,1
**EAC** 41:17 51:9
67:4 78:21 278:11
295:7,11
**earlier** 95:12 100:2
121:15 127:1
136:14 149:19
172:8 173:6
177:22 183:4
192:2 197:17
200:18 218:14
230:5 251:11
254:5 258:3
324:14
**early** 97:9 100:5,12
150:19 163:21
165:21 183:2
313:17
**earthquake** 313:19
**east** 136:11 314:17
**easy** 275:2,5 287:18

**ebbs** 69:19 72:20
**economic** 202:9
203:19 204:12
206:21 321:21
**economies** 207:17
208:10
**Eddie** 7:22 244:5
251:20
**Eddy** 243:21 252:4
**edits** 65:16
**Eduardo** 229:19
**educational** 50:5
**EEO** 11:21 12:5,5
**effect** 72:14,17 73:1
73:3,7,9 172:18
173:4,5,8,14,16
173:17,20 174:2
183:14 232:6
240:16 241:7,9,13
241:21 245:6
254:4,19
**effectively** 75:11
**effects** 232:15
**effort** 87:10,12
195:10,19 222:8
224:21 227:2
242:1 247:7
276:19 326:19
**efforts** 202:5 203:8
273:22 281:8
309:20
**either** 10:20 37:3
48:5 86:21 117:11
158:1 168:14
184:3 227:22
245:9 256:16,19
302:17
**EI** 39:14,15 69:10
69:17 85:15
154:15 162:16,17
163:8 164:5,15
170:22 171:18,20
189:3 246:6
321:17
**Electric** 224:11
225:1

**elements** 93:8
152:12 156:3
286:22 288:10,13
300:13
**Elizabeth** 1:22 2:6
247:15,17 250:10
253:13 255:3
330:5
**Embassy** 125:20
**employed** 9:16,18
315:12
**employee** 53:4
59:12,17 60:12
234:5 257:13
259:12
**employees** 51:2,10
53:10 54:13,17
56:8 59:3,15
60:17 230:6 234:8
253:17 259:7,16
279:12 282:5,10
**employment** 12:7,8
12:9 14:21 287:18
**encounters** 188:6
**ended** 151:20
285:11
**ends** 53:1 55:11
58:19 123:21
124:2 132:18
135:19 201:18
215:12 222:1
265:1
**enforcement** 43:20
44:1 51:6 53:16
53:20 54:8 75:18
86:17 106:20
108:1,2 175:21
218:5 246:2
278:11 317:14
**engage** 27:20 56:8
79:15 180:11
239:16 263:6
313:15
**engaged** 127:11
283:5
**engaging** 150:22

259:11
**enhance** 273:22
**enhanced** 274:2
**enhancing** 237:11
293:14
**Enrique** 147:10
170:3
**ensure** 32:12 99:9
142:4 326:19
**ensured** 36:17
**enter** 101:8 202:18
240:17 259:18,22
260:18 261:8
291:22 293:1,4
320:20
**entered** 91:19
260:20
**entering** 70:3,5
205:12 207:15,22
208:17 209:1,19
219:10 264:3
266:9 268:2,8,19
269:20 270:17
282:8 285:3
313:12
**Enterprise** 40:22
**entire** 54:6 314:9
315:6
**entirety** 168:16
**entities** 288:17
**entitled** 24:5 49:18
52:10 53:18 59:1
63:18
**entries** 17:18
**entry** 30:4,5,6,7,8,9
37:12,20,21 38:5
38:15 39:7,17,22
44:10 68:7,9 69:3
69:17 70:16 71:16
72:2,19 73:14
74:8 75:15,20
80:14 85:7,7,9,21
86:1,8,8,14 87:10
87:13,22 88:22
90:11 92:6,6,11
92:15,18 100:3,8

106:15 108:15
109:12 110:14
112:20 113:6,9,13
113:18 114:10,17
116:8 127:10,18
130:1 133:4 135:9
136:9 137:8,11
139:3,13 140:12
142:9 145:9 146:9
150:4 151:4 157:7
158:2,17 159:1
162:9 170:11
175:4 178:2 179:5
182:7 187:18
189:12,21 190:9
190:14 202:1
206:11,16 210:7
210:17 211:2
230:7 231:8 232:7
233:16 234:6
235:4,8 238:15
239:5,12 240:16
245:5,9 262:4
264:8,10 268:17
272:9,12 276:20
283:5 284:6
285:12,15 286:8
286:14 288:5,21
289:8 293:4,6
297:14,19 298:1
299:16 300:1
307:4,19 317:2,5
317:6,7,8 319:11
320:5,9 321:14
324:20
**enumerated** 121:20
**Equal** 12:7
**erected** 93:7
**Eric** 229:18
**ERO** 108:3 109:9
114:4 116:19
118:12 187:2
314:10 315:15
**errata** 331:1,4,5,8
331:11,16,20
**especially** 87:16



234:11
**Esquire** 3:4,5,13,14
  4:2
**essentially** 12:8
  166:13 176:20
  218:10 310:8
**estimate** 66:11
**et** 1:4,7 207:9
**ethics** 18:19 258:2
  258:4,13
**evaluating** 213:18
**Evaluation** 7:10
  213:5,22
**event** 30:9 31:3
  32:15,16,18 33:11
  33:18 48:2 186:14
**events** 22:3 25:14
  32:10,12 312:22
**evidence** 81:10,13
  129:17
**exact** 312:2
**exactly** 29:7 155:10
  178:1
**EXAMINATION**
  5:3 9:7 312:18
  322:10
**examined** 9:5
**example** 51:9 139:2
  179:5 221:11
  319:7
**exceeded** 106:20
**Excellent** 169:17
**exception** 22:12
  24:4
**excess** 74:8
**exchange** 146:20
  159:12 170:3
  171:3,15 172:7
  174:22 196:16
  209:20 223:17,21
  227:1
**exchanged** 132:20
  252:21
**exclusive** 99:18
**executed** 214:18
**executive** 10:3

27:17,18,19 28:9
28:10,11 29:9,10
41:18 49:19 64:4
67:17 119:22
120:11 121:12
143:19 148:8
177:10,11 191:9
196:2 310:15
**exercise** 325:5,11
**exhausted** 295:19
  297:5
**exhibit** 5:13,14,16
  5:18,20 6:2,4,6,8
  6:10,12,14,16,16
  6:17,19,21 7:2,2,3
  7:3,4,6,8,10,12,13
  7:15,17,19,21 8:2
  8:3,5,6,7,9 18:22
  18:22 19:3,7 49:5
  49:8,12,17 52:1,4
  52:9 62:21 63:2,5
  63:8,10,11,17
  64:2 81:16,19
  82:1,22 97:19
  99:18 100:20
  101:2,15 104:19
  104:22 105:4,10
  123:15,19 132:10
  132:13,16,19
  135:13 142:13,18
  146:13,16 159:6
  159:10 162:21
  163:2 167:6,10
  168:19 169:3,8,11
  169:13,20 174:14
  174:18 180:16,19
  185:6,8,9 193:22
  196:9,14 199:7,11
  212:8,18 213:19
  213:21 214:11
  215:6,10 217:7,7
  218:11,12,21,22
  219:22 220:3
  223:12,16 225:2,5
  225:9,13,18 226:5
  229:12,16 243:5

247:21 248:2,16
255:16,19 275:20
290:22 291:3
292:5 293:18,21
294:2 296:9,12
304:4 305:9 328:3
**Exhibits** 5:10,22
  8:14 212:22
**exist** 235:14
**existed** 142:10
  275:1
**expanded** 217:22
**expect** 327:6
**expectation** 326:1
**expectations**
  326:17
**expected** 53:19
  121:22 283:13
**expedited** 109:7,19
**experience** 15:9
  69:8 320:3 321:20
**expert** 144:17
**Expires** 330:20
**explain** 110:18
  137:16 248:6
  251:19 268:15
  269:17 270:19
  305:8,12 306:3
  312:21 317:4
  319:9,17 320:2
**explanation** 152:14
  253:7,10,12
**exposed** 152:12
  156:3 286:22
  288:10,13 300:13
**expressed** 251:16
  272:14
**expresses** 108:15
  109:12
**expressing** 113:1
**extended** 198:19,20
  214:11
**extent** 32:2 36:14
  36:16 43:19,21
  87:14 112:17
  165:10 211:7

312:21 326:12
**extra** 310:9
**extremely** 15:19
**eyes** 66:16
**e-mail** 5:20 6:2,4,6
  6:8,10,12,14,17
  6:19,21 7:4,15,19
  7:21 8:3,7,9 41:6
  78:2 82:2,8,11,14
  82:18,21 83:4,12
  83:16,20,20 84:1
  84:2,11,14 101:2
  101:2,16 102:13
  102:18,18,19,22
  103:7,15 105:5,7
  105:11,15,19,22
  106:7,8,12 110:3
  115:6,18,21 116:7
  116:7 117:3,9
  118:13 119:1,16
  119:18 120:17
  121:1,3 122:13
  123:5,9,20 124:6
  124:7,12,13,14,20
  125:15,20 126:1
  126:16,21 127:6
  127:14 128:17
  130:7,10 131:20
  132:4,7,17,19
  133:20 135:17,18
  136:1,5 140:21
  141:1 142:14,21
  143:3,4,8 145:15
  146:16,20 147:2,6
  148:11,12,14
  149:15 158:1
  159:11,12 163:2,4
  163:11,14,22
  166:11 169:21
  170:2,7,10,17,18
  171:3,15 172:6
  173:10,15 174:20
  174:22 175:5,7
  178:8,16,17,19
  179:2 180:4,7
  183:16,17,19,20

185:1 194:3,6
196:15,16,20
197:1,2,6,9,12,22
198:14 223:17,21
224:4,7,22 225:11
225:19 226:1
227:1,4 229:17,22
230:2,12,17
231:13 232:13,14
233:2,19 234:17
235:19 236:7,9,13
236:15 237:1
240:8,22 241:5
243:21 244:8
245:2 250:10
251:11 252:21
253:5 254:5,6,20
255:20 256:4,6,7
256:9,11,15 257:5
257:8,9,14 258:21
259:13 261:10,22
263:13 265:12
271:3 275:21
276:1 282:4 293:8
294:3,5,5 295:4
296:3,13,15
298:17,19 300:16
301:1,3 302:16,18
304:3,8 305:9,16
306:2,12
**e-mails** 41:10,17
  44:8,12,15,18
  46:1,4 61:5 70:19
  79:6 106:3,5
  124:11 125:1,5,8
  125:11 136:1
  159:17,21 160:2,4
  160:7 171:7,8,12
  183:13 227:17
  254:2 294:11,15
  294:19,21 295:2
  296:19 301:11
  302:15 304:1
  306:7
**e-mail's** 132:4



**F**

**F** 3:1 330:1
**face** 53:5 108:22
**faced** 324:4,5
**facilitate** 259:22
**facilitating** 319:12
**facilitation** 202:12
  202:14,17 204:13
  206:22 320:5,18
**facilities** 107:20
  108:7 179:22
  314:21,22 315:17
  316:3 322:17
**facility** 108:5,9
  277:6
**facing** 274:13
  321:16
**fact** 11:8 37:9 51:17
  67:20 89:13 91:11
  100:7 133:13
  145:1 173:9
  184:11 238:10
  261:18 298:18
**factor** 246:16 247:2
  248:22 252:22
  253:9 318:9
**factors** 246:10
**facts** 22:15 81:9,13
  227:16 231:4
  262:1,20
**factual** 303:19
**fair** 28:6 47:13
  161:22 198:13
  221:22
**fairly** 192:5
**fake** 166:1
**fall** 22:11 95:13
  202:15,20 204:9
**false** 59:1,4,13
  284:20
**familiar** 49:11 63:7
  107:15 115:14
**families** 231:6
  232:11 318:17
**family** 138:20,20

**149:4** 150:3 151:5
  246:9,19 279:12
  315:9 317:2,5,6
  317:17,18,22
  318:12,13,14
**fancy** 257:21
**far** 35:22 36:13
  39:7 93:19 150:19
  153:14 260:12
  312:1
**fashion** 192:14
**father** 292:8
**fear** 98:19 106:14
  108:15,19 109:13
  109:20 113:1
  116:3 122:6 246:8
  279:13 309:1,2,9
**fear/asylum** 245:10
**February** 10:6
  103:3
**federal** 230:20
  231:19 237:16,20
  238:2
**feed** 244:17
**feedback** 65:10
**feel** 60:9 73:7
  130:11 271:9
  307:3
**feet** 92:16 93:9,10
  93:13,19,20,20,21
  93:21,22 94:7
  96:6 153:4 154:3
  154:12,15 266:7
**felt** 27:22 66:6 69:4
  127:8 324:7
**Fenn** 4:6 101:10,10
**fewer** 321:2
**field** 10:4 12:3,4
  17:15 28:22 33:7
  34:11 36:4,5
  40:13 62:7,10
  67:4 70:7,8 84:2
  84:18 102:6,9,10
  102:11,12 106:12
  120:6 121:13
  147:17 150:21

**163:8,8** 170:22
  171:19,19 172:10
  173:3 175:11,12
  175:13,15 176:9
  176:11 179:15
  180:3 191:14
  230:16,16 239:15
  242:12,13 244:3,7
  246:14 253:8
  321:13 323:9
  325:21 327:2,6
**figure** 50:15
**file** 231:16,20
  235:16,22 236:1,3
  308:14 309:11
**filed** 62:8,10 219:18
  220:21 221:3,6
  318:11
**files** 296:5 305:10
**filibuster** 131:2
**filing** 303:15,17
**final** 199:12
**find** 185:1 190:7
  280:7 305:8
**findings** 182:14
**fine** 81:14,15 168:1
  227:19 305:22
  313:8
**finish** 16:5 17:3
  323:17
**finished** 19:12
  243:15 256:1
**finite** 75:13
**fire** 316:3
**first** 9:4 18:21 19:8
  19:9 24:18 32:15
  52:21,22 103:2,3
  107:5 127:17
  141:13 152:17
  154:17 176:3
  183:1 200:21
  202:4 213:22
  216:15 217:14
  221:2 231:10
  237:8 240:8,21
  241:4 247:13

**253:4** 259:15,15
  264:2 274:11
  298:18 299:15
  304:7 314:19
  318:14 325:18
**fits** 310:10
**five** 20:16,19 49:1
  66:12 94:7 95:11
  227:21 321:18
  323:16,20
**Five-Page** 8:2
**fixed** 166:13 290:14
**Flanagan** 147:3
**Flanagan's** 147:5
**flexibility** 116:15
**flies** 208:2,12
**flip** 52:6,20,22
  101:5 217:5
  221:10
**flipping** 90:16
  184:22
**Flores** 6:21 120:19
  120:21,22 122:20
  132:21 136:2
  175:1 224:1,17
  323:14
**Flores's** 175:3
**Florida** 207:17
  208:11
**flow** 38:5 77:6
  104:11 128:7
  142:1,5 148:19
  150:3 151:4
  161:11,13,14,19
  162:1,2,7 164:22
  179:4,11 180:12
  231:7 232:12
  314:14
**flowing** 218:6
**flows** 39:6 69:19
  72:19,20 151:20
**flu** 207:18 208:17
  209:2,5
**fluctuates** 187:1
**fluid** 69:21 187:1
**fly** 167:15,19

**168:15** 207:16
**FMUAs** 148:19
  149:3
**focus** 85:6 125:15
  170:6 201:2
  204:17 213:3
  217:22
**focused** 178:7,15
  189:10 243:19
  298:11
**fof** 7:13
**folks** 43:14 116:20
  139:22 156:12
  166:8,9 186:2,3
  187:2 189:7 196:1
  207:7,9 251:15
  261:5 297:8
  316:12 318:1
  320:19 326:1
**follow** 24:7,10 37:3
  75:7 191:14 240:5
  275:6,7 283:16
  293:7,10 328:5
**followed** 32:11 58:1
  203:18 283:14
**following** 71:11
  83:14 92:2 173:18
  201:22
**follows** 9:5
**font** 174:17
**food** 151:22 152:6
  156:4 285:19
  286:16,20 287:1
  287:18 288:9,11
  288:14
**foot** 32:22 35:18
  91:21 261:13
  263:14,15 264:6
  264:12 285:8
**footnote** 248:13
**Foray** 28:12
**forced** 269:5
  291:16 292:17
**foregoing** 329:6
  330:9
**foreign** 78:6 188:17



285:2
**forgetting** 41:2
**form** 14:3 23:2
  80:18 213:17
  282:2 283:6
  325:19,19 331:3
**formal** 216:1
  322:22 328:6
**formally** 230:21
**forms** 245:18
**fortunate** 324:7
**forward** 61:5,9
  310:1
**forwards** 121:3
  295:6
**found** 239:8,21
**foundation** 111:4
  252:1 269:21
  270:22 305:11
**four** 13:21 20:16
  21:19 24:12 25:11
  25:22 27:20 28:2
  28:3,14 69:18
  93:22 94:7,13
  115:20 202:20
  203:1,5,20,22
  204:7,16,19
  217:18 304:7
  318:5 323:11,13
  325:20
**fourth** 202:11
  276:1
**four-pronged**
  217:15
**frames** 102:22
**frank** 174:22 175:7
  178:8,16 180:7
  227:4
**Franklin** 3:15
**free** 269:7
**fresh** 66:16
**Friday** 1:14 2:4
  312:3
**front** 81:22 99:4
  101:1 105:3
  123:18 135:16

140:22 159:9
169:21 185:4
196:13 212:8,21
215:9 223:15
228:9 229:15
249:6 275:20
295:8 304:3
**front-line** 76:3
  238:4,10 283:21
**fruit** 207:16 208:2
  208:12
**fugitive** 231:1
**fulfilling** 53:9
**full** 74:22 75:19
  86:10 181:6,11,13
  194:21 195:4
  200:22 227:22
  295:3 319:8
**fully** 98:22 272:21
**functions** 86:3
**further** 149:15
  227:12 228:22
  299:10 307:10
  312:10 317:22
  322:4 327:14
  330:12
**furthest** 153:9
**future** 259:19
**FY** 192:18,21
**FYSA** 121:18 122:3

**G**

**G** 9:1
**gain** 123:2
**game** 226:20
**gamut** 210:17
**gang** 318:20
**Gary** 144:6
**gateway** 69:7 72:2
  85:10,12,17 89:18
**gateways** 85:16
**gather** 198:2
  276:11
**gauging** 245:4
**general** 31:12 38:4
  38:7,9 60:10

86:13,15 181:20
184:9 192:2
219:11 240:20
247:18 250:18
319:10 320:3
**generally** 30:7
  42:15 46:12,19
  47:19 49:2 78:4
  86:2 134:20
  138:17 176:7
  187:15 257:2
  266:5
**generated** 164:16
  187:17 189:11
**Gentlemen** 121:18
**geographic** 127:21
**geographical**
  176:10
**getting** 133:14
  158:21 165:1,2
  191:19 254:7,11
**gist** 170:8,9
**gith** 220:6
**give** 15:18 28:6
  45:16,18 65:9
  66:10 80:6 163:16
  166:6 179:10
  192:15 257:3,4
**given** 127:18
  179:16 188:19
  189:21 191:14
  203:8 284:14
  299:7,11,12
  330:11
**gives** 170:21 172:14
  186:2 187:4 191:8
  267:3
**giving** 27:2,9 131:4
  163:17 164:5,13
  164:17,19 165:2,4
  165:11,13,18,22
  166:4 170:11
  171:20 180:5,8
  193:4
**Gloria** 146:21
  148:11

**go** 14:7,10 15:9
  44:12 47:6,21,22
  57:18 71:22 81:16
  84:14 104:3
  131:14 134:20
  140:21 160:20
  165:11 175:16
  184:21 189:18
  194:10,11 196:4
  208:8 226:21
  234:20 236:14
  239:20 255:10
  261:21 263:12
  266:18 288:18
  292:1,2 306:12
  314:2 318:16,17
  319:2,21 321:17
**goal** 114:1 245:5
**goals** 250:5,11
**goes** 83:9 107:1
  143:7,17 144:19
  149:14 150:20
  166:16 179:10
  218:8,9 246:5
  255:21 294:4,8
  308:14 319:5
  320:22
**going** 10:17 14:11
  15:9 16:18 17:11
  17:15,18,21 18:21
  20:1 22:20 23:6,9
  23:19 24:7 43:18
  45:19 75:9 87:19
  90:15 126:20
  127:2,4 128:19
  129:12,18 133:14
  133:18 134:13
  135:8 137:21
  156:5 158:6,16,18
  160:16,18 163:17
  166:5 167:13,17
  167:21 170:6,8
  181:4 190:22
  191:6 199:2 210:2
  214:19,22 217:14
  222:16 224:16

228:2 233:1,15
251:21 260:21
273:12 274:10,22
297:22 298:3
310:7 319:21
327:10
**Gonzalez** 125:16,19
  126:1,11 128:16
**good** 6:19 9:9,10
  15:19 141:3 148:3
  148:4,5,8,11
  170:3,18 171:19
  172:13 173:2,9,19
  173:22 174:6,9
  252:14 255:12,13
  283:16
**goods** 210:18
**gotten** 183:12
**government** 13:15
  56:4,11 77:11,14
  78:14 133:3 145:1
  158:5 177:5
  222:18 287:21
**Governmental** 13:2
**governments** 78:6
  198:12
**government-run**
  288:16
**governor** 126:3
  128:22 131:17,22
**grainy** 276:2
**Grande** 292:10,18
**granted** 307:14
**great** 168:5 179:21
**greater** 147:19
  211:13 273:2
**Greg** 35:3,5
**grievance** 61:13
  62:10 230:18
  231:18,20 232:9
  235:22 304:9,10
  304:13,15,18,20
  304:21
**grievances** 61:10
  62:8,16,18 231:16
  235:16 236:1,3



303:15,17,19,20
303:22
**ground** 15:10
234:22 235:1
**Grupo** 89:3 128:2,6
136:15,15,16,18
136:22 137:3,6
141:15,21,22
142:4,10 162:13
**GSA's** 115:6
**guarantee** 272:5
**Guatemalan** 246:7
**guess** 118:18,18
137:13 155:9
206:14 248:15
**guidance** 5:18
63:18 64:7,16,20
66:6 68:4,22 69:5
71:3 98:11 99:1,3
99:17,22 191:13
191:14,16,17
240:6 307:10
308:4,8 311:10,14
320:10 324:18,22
325:18 326:19
**guns** 218:6
**guy** 295:18 297:4,8
**guys** 167:20 229:5

---

**H**

**H** 332:1
**Haiti** 313:19,19
314:3,3
**Haitian** 157:21
313:2 314:1
**Haitians** 100:10
104:8 116:18
124:7 129:22
133:5 157:15
313:7,17,20 314:2
314:2,7,9,10,17
315:9
**half** 13:21
**halfway** 249:11,12
**hand** 189:1 330:17
**handed** 93:17

128:2 162:12
169:11
**handing** 162:9
**handle** 86:3,9,10,11
86:11 151:20
161:14 162:3
166:2 180:1
227:19
**handled** 323:19,21
**handles** 62:3
**handwriting**
220:11,18
**hanging** 126:6
**happen** 40:9 46:18
49:1 61:17,17
162:5
**happened** 13:5
22:3 24:22 25:3
25:14,21 31:22
34:10 35:9 184:15
264:9 274:4
289:22 324:7
**happening** 161:16
291:13 310:7
**happens** 139:18
239:12
**happy** 306:6
**Haralson** 7:19
229:17 230:17
233:1,13,21 234:1
234:4,17 240:9,14
256:8 303:5
**Haralson's** 233:3
234:21 304:3
**hard** 11:11 204:6
**harmed** 291:19
**harmful** 210:6,15
**head** 15:20,20
60:22
**heading** 186:6
265:7
**headquarters**
13:22 144:16
149:7 191:2 327:2
**health** 210:16
**heard** 16:15 85:20

87:9
**heat** 288:15
**heaters** 273:21
**Hector** 6:17 163:5
163:7,15,22
166:12 172:7
323:15
**held** 2:2 10:5 81:6
91:15 102:7 109:9
133:17 152:17
156:12 184:3,4
239:17,21 276:15
**help** 65:1 115:4
176:16 177:5
185:6 244:13
251:18
**helped** 65:4
**helping** 297:8
**hereunto** 330:16
**Hernandez** 224:2
**hey** 158:20
**he'll** 10:21
**Hi** 101:10
**Hidalgo** 38:22 39:4
39:7 69:11 85:16
154:7,8 232:2,6
233:15 234:5
235:3,8 240:15
241:1 259:15
260:11 264:8,10
265:9,17,20
268:17 272:16
276:6,20 277:9
283:5 284:6
301:18 318:5
**Higgerson** 229:18
230:12 231:12
240:9 281:10,12
281:14 293:13,16
294:13 295:15
297:5,11 305:16
305:18,21 306:1
323:15
**Higgerson's** 305:9
**high** 68:21 187:5
191:9 192:10

208:12,19 246:18
313:16
**higher** 51:18 77:3,7
192:12 203:22
205:3 208:2,15
**highest** 177:15
**highlighting** 248:17
**highlights** 50:5
**highly** 243:11
280:7
**Historically** 313:18
**history** 235:12
**hit** 62:19
**hmm** 250:4
**hoc** 31:1 42:11,14
149:9
**Hoffman** 6:8 28:11
64:11,12,17
105:12 121:6
132:21 143:1,22
144:20 170:4
196:2 310:16
311:11
**Hoffman's** 64:21
121:14
**hold** 51:17 81:13
107:7 114:4 116:2
151:15 152:4
228:3 315:14
316:8,11 318:2,6
324:8,13
**holding** 88:10
104:9 115:8,12
119:5,6,10,11
152:9 166:8
278:14 314:15,22
316:1,17,18
322:16 323:3
**holdings** 317:9
**holing** 315:1
**home** 10:11
**Homeland** 7:6 13:2
17:12 195:11
197:18 199:19
214:5,12 247:19
**Honduran** 246:6

**honest** 18:12 51:13
56:22 57:3,6,10
79:10 219:14
**Hood** 6:2 101:16,19
101:20 103:14
224:2
**hope** 199:11
**hoping** 137:2
**hour** 16:22
**hours** 20:16,19
25:22 140:3
321:18
**house** 12:18 13:10
13:14,18 107:7
**Howe** 5:20 82:8
196:17
**Howell** 28:10
**HQ** 144:11,16
**huge** 153:16 189:5
276:16
**huh-uh** 15:21
**humanitarian**
73:17,18,22 74:3
126:8,12,15,20
127:2,4,8 128:18
129:4,6,13,17,21
130:2,4,9,11,14
130:18 131:18,22
158:6,16 183:22
**humor** 49:14
**Hutton** 142:22
143:15,16,17
144:5,19
**H-M-M** 250:5

---

**I**

**ICE** 108:5
**ICE-ERO** 107:7,21
108:4,7
**idea** 52:18
**identifying** 244:19
**Iglesias** 256:9
**illegal** 297:19,22
298:2 301:9
**illegality** 301:6
**illegally** 245:9



291:18
**IMANI** 137:1
**immediate** 306:15
306:20
**immediately**
122:21 266:8,15
267:7,20 268:1,8
268:18 269:19
270:11,12,16
307:4
**immense** 126:3
**immigrants** 164:8
165:19 172:2
**immigration** 4:4
64:22 77:17 108:1
136:17 144:8
145:6 146:3
158:10 230:21
237:17,20 245:18
290:13 309:12
317:13
**impact** 80:16,21
81:7 84:20 89:7
89:10,14 90:7
91:5,8,13 115:2
184:4,11,13,19
186:15 190:5
317:4 321:2,3,5
**impacting** 81:3
**impacts** 189:6
319:9 320:3
321:19
**imperfect** 190:21
**Imperial** 107:11,16
116:1
**implement** 38:12
68:18 116:15
214:6 274:12
275:3 308:6 325:2
**implementation**
137:4,5 145:12,20
170:15 191:15
239:6,7
**implemented** 17:22
38:15,17 39:13,15
146:8 152:17

154:18 233:18
237:20,22 239:5
240:2,15 245:8
254:18 270:21
313:7 324:19
326:20
**implementing** 57:7
57:11 137:8 157:8
268:16 308:8
309:19 325:18
326:11
**imply** 117:6
**important** 16:2,8
27:22 45:8 51:13
53:14,20 62:13,18
223:4
**impression** 268:7
269:18 270:10
**Improper** 104:1
**improperly** 239:18
**inability** 116:19
**inaccurate** 50:14
50:15 125:13
129:8 160:9 197:9
200:13 233:5,7,8
233:9 269:1
**inadmissible** 193:3
**inadmissibles**
71:20,21 192:3,11
192:19,21 193:5,6
193:12 206:15
**INAMI** 77:15,16,19
77:21 78:16,19
79:1,12,17 89:3
136:17,22 178:22
179:12
**inappropriately**
325:12
**incidences** 58:5
**incident** 33:5 34:1
35:9,14,15,19
36:2,12 37:10,20
37:20
**incidents** 31:13,16
37:4
**include** 78:18

121:21 211:15
263:7
**included** 31:5
277:10
**includes** 219:5,12
**including** 75:21
78:16 190:2
**inclusive** 14:1 81:2
**incomplete** 59:4
60:2,9 125:13
160:9 197:9
200:13 216:10
**incorrect** 113:15
233:22
**increase** 68:20
113:8,13,16,17
114:5,16 121:18
315:6 316:10
317:22
**increased** 50:16
106:13 114:11
193:12 206:16
**increasing** 114:9
206:12
**incredible** 113:1
**indicate** 70:20
104:13 131:21
**indicated** 4:6 103:1
254:3 327:11
**indicates** 119:5
184:12 217:2
227:4 308:11
**indicating** 270:20
**individual** 41:5,10
64:9 93:2 94:1
108:14,17 109:11
109:20 147:2
308:10 325:5
326:13 327:2,6
**individuals** 28:7,14
30:21 32:19,22
34:15 35:17 37:10
42:9,10,13 75:10
77:10 86:22 88:21
91:2,14,18,21
93:10,16 113:1

119:12 127:17
137:9 139:6,10,15
140:11 145:8
151:21 154:18,19
162:10 182:9
184:3 244:20
259:18 260:18
261:8 262:11
290:17 292:17
299:19 307:18
309:14 315:2
318:19 321:8
326:14
**indulging** 311:9
**industry** 207:20
208:18
**infamous** 56:9
**infestation** 208:11
**influenced** 189:15
**influx** 100:10 104:8
116:18 118:10
166:3
**inform** 307:1
**informal** 283:6
323:20 324:1
**informally** 281:9
**information** 31:4
43:20,20 44:2
45:22 57:16 62:6
168:22 187:15
224:11 244:16,18
244:22 258:16
283:3
**infra** 116:17
**infrastructure**
13:11 118:11
**initial** 64:5 108:21
112:5
**initially** 36:1
**initiate** 201:21
**initiating** 166:18
**injunction** 307:14
307:17 309:16,20
310:10,20 311:12
**Injunctive** 7:14
**INM** 77:14 178:20

178:22 179:3,7
**input** 64:13,15,20
**inquiries** 119:3,7
158:21
**inquiry** 145:20
146:2 252:5
**inspect** 208:22
210:14,20,21
211:1,15,17,21
265:18
**inspecting** 75:10
208:15,16 209:16
209:17 210:3,4
211:19,19 212:4,5
**inspection** 111:3
204:10 205:13
210:5 246:8 276:3
276:5 282:9
**inspections** 210:9
245:21
**Inspector** 31:12
240:20 247:18
250:18
**instance** 54:20
56:18 57:14 59:16
280:16
**instances** 54:7,12
54:16 55:2,8 58:9
91:11 92:1 140:15
151:12 240:1
326:4,8
**instant** 34:10
**instantly** 306:20
**instruct** 10:17,20
14:11 23:21 37:7
**instructed** 37:8
44:3 262:7 263:6
**instructing** 14:13
**instruction** 24:8
299:6
**instructions** 24:10
259:17 261:8
298:20 299:4,10
331:1
**instructs** 16:17
**insufficient** 160:13



181:5 194:12
**intake** 34:5,8 35:12
36:18 108:21
250:6 281:6 326:6
**integrity** 231:2
243:1
**intel** 244:15,16,19
**intelligence** 29:2
42:4,16,17 47:20
48:1 157:5
**intelligence-driven**
40:16
**intel-type** 244:13
**intended** 48:19
115:15 317:10
326:20
**intent** 328:3
**intentionally** 76:1
231:5 233:8,9,21
**interact** 61:3,14
77:10 78:12,13
95:22 138:2
**interacted** 77:18
93:5 94:11
**interacting** 140:15
**interaction** 137:17
**interactions** 78:18
79:1,13,14 134:22
142:9
**intercept** 268:18
**intercepting** 266:8
**interest** 59:6,10
**interested** 133:3,7
330:14
**internally** 322:21
**interrogatories**
26:10
**interrupt** 225:10
**interrupted** 178:11
**interruption** 212:1
226:12
**interview** 102:14
114:21,22 245:14
245:17 309:1,3
**interviewed** 182:11
182:13

**interviews** 110:15
112:2,3,9,19,22
113:4,8,12,15,19
114:2,9,14
**Intimidating** 10:22
**intradiction** 75:16
320:16
**introduced** 149:18
**introduction**
221:11
**investigate** 278:4,6
278:20 279:15,18
280:19 284:9
298:15 309:14,16
**investigated** 183:6
240:10,21 241:20
298:13
**investigating** 242:5
242:14 246:15
254:10
**investigation** 31:15
31:18 32:1 33:22
36:19 182:7,15,21
227:12 228:16,22
238:19,22 239:2
239:20 242:22
254:12,15 280:11
**investigations** 31:6
31:11 58:12
**investigator** 247:18
**invited** 30:19,22
**involved** 34:21
195:19
**involves** 159:13
**involving** 209:11
**in-person** 110:15
**IPL** 198:2,10,12
**issuance** 66:22 67:1
67:2 69:5 214:16
**issue** 24:2 67:17
95:2,15 144:21
189:5 194:14
219:7 224:11
232:2 234:10
235:13 242:5
267:1 277:13

278:18 280:20
281:5 304:16
313:14
**issued** 69:2 71:3
127:17 197:17
307:17 308:4
324:18
**issues** 61:19 69:8
74:17,17 79:5
80:7,10 91:20
111:7 184:9 186:4
187:8 210:16
228:2 235:14,18
235:21 236:18
237:5 271:4,20
274:9,15,20 277:8
281:15,18 290:15
298:16 301:5
**items** 115:21
**I-213** 245:14,17
**I-94** 110:12,18,20
**I-94s** 111:7,10

─────────
**J**
─────────
**J** 3:13 133:8 143:15
150:15
**jail** 317:9
**James** 142:22
143:15
**January** 17:8
150:18
**jargon** 150:1
**jersey** 93:11 94:7
96:5
**JIC** 35:11 59:20
280:16,20 281:6
326:5,9
**Jim** 61:11 62:4
**job** 1:20 10:2 64:3
105:16 125:2
159:17 185:7
216:6
**John** 105:12 121:6
121:10 124:14
142:22 144:2
146:21 159:13

170:4 196:17
**Johnny** 101:17
102:4,6 103:10
106:8 132:21
136:2 141:1
243:21 244:2
252:7,10,11,12,16
**Johnson** 133:6,8,9
150:15,17
**join** 101:8
**joint** 34:8 35:12
36:18 281:6 326:6
**Jonathan** 62:1
**Jr** 256:9
**judge** 16:16 234:15
234:15,16
**judiciary** 12:14
144:9 146:4
158:11 183:9
**July** 7:22 221:7
243:21 246:13,18
**June** 5:20 7:4,6
82:7,14 83:21
84:4 85:3 103:2
185:3 191:22
195:15 197:18
198:1 199:17
200:7,10,16
212:10 216:20
217:19 330:21
**Justice** 3:12 20:9
26:3
**justified** 68:10 69:4

─────────
**K**
─────────
**K** 1:7 2:3 3:6 88:16
**Karolina** 4:4
**Katherine** 3:13
6:10 136:2 141:11
143:5,13,14
**Katherine.J.Shin...**
3:19
**keep** 15:16 74:21
215:2 218:5
327:10
**keeping** 327:16

**kept** 29:15 140:12
**Kevin** 1:7 7:8 135:4
146:21 199:18
213:8 256:8
294:12
**key** 76:15
**kids** 321:4
**kill** 15:17
**kind** 85:18 324:3
**King** 4:5
**Kingma** 247:15,17
249:18 250:10
253:13 255:3
**Kirby** 122:17
**Kirstjen** 199:18
**KM** 295:9
**knew** 126:18 130:6
130:13 131:15
132:1 254:12,14
**know** 16:12 19:11
22:16 24:3,5
26:19 27:3,4,22
33:21 34:19,20
36:9,21 38:17,21
44:2 47:17 49:14
54:4 58:14 59:15
60:14 63:10 64:13
64:14,15,19 65:2
65:4 66:12 77:13
77:21 79:11 81:12
82:4 85:18 87:8
94:1,9 96:3 98:11
101:6 102:5 105:8
122:19 130:19
135:6,10 136:18
137:1,6 139:20
141:11 143:10,14
143:15 145:13
146:6 149:10
166:4,5,7 167:21
181:10 184:10
198:12,18 204:7,9
204:18 209:10
210:18 214:14
219:2 223:3
224:10 225:1



226:19 228:2
234:2,4,7,9 238:3
238:10,14,18
239:3 240:18
241:2,3,7,8,12,15
243:14 244:19
247:15 251:16
252:3,4,4,5,6,10
252:11,20 253:3,3
254:20 255:2
256:1 258:18
260:20,21 261:4,6
264:21 268:4
270:15,18 271:1,3
273:4 276:6
277:10 280:1,3,4
281:2,5,7,8
282:22 284:1,4,12
284:15,19 287:19
287:20,21 288:12
298:18 304:12
305:18 310:1,11
310:12,12 311:14
312:7 313:3
316:13 317:13
324:2 327:2,7
**knowingly** 59:4
**knowledge** 18:2,2
58:10 67:21
136:15,16 155:18
156:6 186:7 234:2
240:11 252:2
258:12 280:12
287:15 305:17
308:18,19 309:13
319:18 320:2,8
324:12
**knowledgeable**
67:7 83:3,6,10,11
326:2
**known** 132:5,7
299:13
**knows** 27:1
**Koseor** 64:15,17
82:8 84:5
**Koseor's** 84:11

**Koumans** 159:14
**Kristine** 4:5
**Kylie** 143:7,10

_____

**L**

**L** 3:1 4:1 125:16
**labeled** 84:18 169:4
181:2
**labor** 313:20
**lack** 176:20 236:5
**lacked** 291:9
**lacks** 231:3
**Lado** 1:4 7:17
226:1 308:12,12
309:15 310:10
**land** 72:3
**lanes** 153:19 321:1
**language** 212:13
231:18
**Laredo** 32:17,18
33:6,7,8,9 34:11
34:11,13,14 35:2
35:8 36:4,5 37:20
39:8,9 69:10
85:15 154:9
170:22 172:11,13
172:14 173:3
175:4,6,11 179:15
180:3 230:16
272:17
**large** 70:13 72:1
116:18 129:22
130:16 181:8
184:15 192:5,7
193:16,17 314:19
318:1
**larger** 86:19,21
87:7
**late** 156:10
**latest** 297:16
298:12
**law** 43:20 44:1 51:5
53:16,20 54:8,22
55:4,6 175:21
203:6 233:21
234:2,3 237:17,20

238:2,8,12,16
239:6 240:2,16
254:22 263:20
275:6,7 278:11
282:6 307:4
**lawful** 202:18
291:22 292:22
320:18,19
**lawfully** 293:5
**laws** 230:21 231:19
**lawsuit** 7:17 222:21
224:5,10,16,16
226:14
**lawyer** 88:15
165:17 221:21
**lawyers** 52:17 97:2
**lay** 211:8
**lead** 166:1 196:3
**leader** 239:15
**leadership** 27:1,7
27:11,15,15 28:20
28:21 33:8,9 36:4
36:6 40:12,13
51:16 71:5 79:5
98:16 102:9
116:15,21 150:21
186:8 198:1 259:3
259:5,8 293:11
297:14,15 322:21
323:9
**leadership's** 184:14
**leading** 101:3
215:11
**leads** 40:18,19
**learn** 287:2,6,16
310:19
**learned** 273:9
**leave** 150:18 314:2
**leaving** 276:16
313:18
**led** 70:8 118:22
**left** 15:14 84:14,17
97:9 207:2
**legal** 76:16 156:14
165:3,9,13,14
166:10 167:12

211:8 221:21
**legality** 301:16,17
302:5,9
**legally** 302:7
**legitimate** 166:6
271:17,18
**less-than-two-ye...**
292:9
**letter** 214:16 265:2
265:16 267:11,14
269:15,18 270:20
299:20,20 306:14
306:17
**letting** 161:20
**let's** 55:10 81:16
87:22 94:4 104:19
132:9 167:20
170:17 171:18
175:16 184:21
199:4 255:10
259:13 263:12
265:1 304:2
306:12
**Lev** 3:5 5:6 313:3
319:14 320:7
322:5,11 327:9,17
**level** 127:7 187:5
188:9 191:9
209:22 274:13
278:19 280:8
281:19 304:16,19
325:20
**levels** 250:6 279:18
315:20
**Levine** 62:1
**liaison** 78:6,8,9,12
78:22
**liar** 257:16,22
**Liberties** 31:7
182:1
**lice** 318:14
**lie** 233:4,6,10 258:4
**lighting** 273:21
**likes** 235:16 279:7
**limit** 92:7,10,14,16
93:4,9,14,18 94:8

94:12 95:5,21
96:5 117:14 150:7
151:8,13,15 152:5
152:7,10 153:12
153:17 155:12,14
155:19 156:8,12
156:15,18 158:1
178:4 188:1
232:20 260:21
261:14 262:3,15
262:21 263:4
266:4 273:2,5
274:1 281:15
284:22 285:2,7,10
285:14 293:14
316:11,18 325:9
326:21
**limited** 190:13
211:12
**limiting** 325:6,12
**limits** 151:22
**line** 81:7 84:2,20
88:16 90:5 91:3
92:7,11,14,16
93:3,5,9,14,18
94:8,12 95:6,21
96:5 102:13
117:14 119:4,9
124:7 136:5
138:11 140:1,6
150:8 151:8,13,15
151:16 152:5,7,11
153:1,4,7,10,12
153:15,17,21
154:12,20 155:12
155:14,15,19
156:8,18 158:2
161:20 175:18
176:3,3,4 178:4
178:20 184:4
201:18 210:1,8
213:4 217:9 232:3
232:21 242:10,11
256:11 260:21
261:14 262:3,15
262:21 263:4



266:4,8 273:2,5
274:1 281:15
284:22 285:2,7,11
285:14 316:12,18
332:2
**lines** 91:15 156:12
156:16 293:14
**list** 44:9 67:11 80:3
80:4 102:21 107:1
109:14 118:1,4
201:14 204:5
259:21 260:11
309:17
**listed** 13:19,22
30:22 42:9 83:20
85:10 88:16 89:21
90:18 91:7 106:4
110:3,11 115:5,21
119:16 125:5
160:3,4 171:8
172:11 197:2
204:9 213:8
217:19
**listing** 185:18
**lists** 50:4 80:21
88:1 89:10 90:7
91:9,12 107:5
117:16 140:11,18
185:9 187:17
189:11 309:21
**literally** 93:20
**litigation** 181:8
219:17 220:8
222:10,14 228:19
305:4
**little** 79:20 90:16
99:3 100:2 136:14
137:14 181:16
184:22 189:9
191:12 312:5
324:14
**live** 11:3 209:12
**living** 289:22
290:18
**LLP** 2:3 3:3
**loads** 244:20

**local** 60:20 61:22
126:8,12,19 130:3
130:10 131:18,22
158:5,16 191:4
198:12 231:15,15
231:16 278:13,18
281:8,18 304:16
304:21
**located** 139:3
**location** 138:9
149:6 273:18,18
**locations** 138:8,16
155:22
**locks** 277:3
**long** 10:5 20:13
24:13 52:5 65:22
66:3,5,9,10 140:1
153:19 168:1,2
246:9 247:2
251:22 252:21
272:18
**longer** 25:2 126:7
210:8 321:7 324:4
**longer-term** 108:9
**Longoria** 175:1,8,9
178:8,16 180:8
**long-term** 317:9
**look** 66:6 72:18
82:17 87:22
102:17 106:17
133:22 134:4
161:6 188:20
189:1 208:20
213:21 216:8
220:20 221:15
225:9 229:5 248:5
259:13 274:11
276:11 279:7,20
317:18 319:20,20
**looked** 172:8 183:4
185:1 217:6 224:9
254:5 258:2
**looking** 55:18
116:16 140:22
175:5,7 182:10
190:17 192:2,13

200:12 209:3
221:11 233:19
234:15 236:21
237:3 253:8 257:8
282:4 293:9
**looks** 82:18 141:8
181:4,5,9 209:21
221:12
**loop** 224:20
**looped** 156:14
**Los** 11:22 12:1,4
**lose** 53:17
**lost** 104:9
**lot** 62:3 65:20 83:9
166:1,1 271:14
302:3 305:22
317:18
**Louisa** 4:2 25:20
97:8
**lower** 75:3,12 76:1
205:7,14
**lower-level** 253:17
**lowest** 205:15
206:7
**lucky** 316:2
**Luis** 157:17 314:18
**lunch** 167:20 168:8
**lying** 18:16,18
129:4 233:1
234:17

---

**M**

**M** 3:4
**mail** 158:7 194:15
295:7
**main** 194:14
**maintenance** 115:7
**major** 69:9 85:14
323:19
**making** 132:1
232:18 245:8
259:9 301:2 303:1
328:2
**male** 318:16
**males** 116:2
**man** 79:10,11

**manage** 50:21
**manageable** 315:20
**management** 7:11
42:21 43:3 44:20
45:2,7 79:21 80:2
84:3 111:20
115:22 117:10
187:12 191:3,5
195:12,14 197:13
197:19 200:17
213:5 214:1,6
216:22 217:11
233:14 239:8
250:6,11,20 251:9
253:14,15 277:9
**manager** 244:6
**managing** 176:20
177:2,3
**Mancha** 6:17 163:5
163:7 166:12,16
172:7 323:15
**mandates** 230:20
**manner** 22:18
324:19
**March** 7:20 8:4,7,9
229:22 232:5
235:1,7 250:14
253:13 256:7
257:1 264:9 265:5
294:8,22 296:20
300:22 306:12
**Margaret** 119:20
120:10,14 121:8
**Marin** 225:20
**Marine** 41:3
**mark** 7:12 18:21
62:21 81:16
103:16 104:19
159:14 215:13,15
219:22 225:2
247:21 290:22
293:18
**marked** 1:11 19:2,6
49:7 51:22 63:1,5
63:7,12 81:18,22
100:19 101:2

104:21 123:14,19
132:12,16 135:12
140:21 142:13,17
146:12 159:5,10
162:20 167:5,10
168:18 169:3
174:13,18 180:15
180:19 193:21
196:9,14 199:6,10
212:17,22 215:5,9
220:2,6 223:11,16
225:4 229:11
243:4 248:1,7,8
250:10 255:15,19
291:2 292:4
293:20 294:2
296:8,12 328:4
**markings** 226:13
**marriage** 330:14
**marry** 225:8
**Martel** 105:12
119:18,22 120:9
121:3,17 123:9
**Martel's** 122:13
**Martinez** 292:14
**matamoros** 139:19
139:21 291:7
292:18
**material** 57:16
**materials** 227:7
**math** 88:14
**Matt** 101:10
**matter** 31:4 59:6,10
62:10 63:8 75:8
86:13,15 144:17
227:7 278:14
303:9 319:4,5
330:15
**matters** 27:21 29:2
47:20 62:3 64:22
64:22 75:2 303:12
**Matthew** 4:6
**Maureen** 124:14,16
**maximum** 172:21
**Mayer** 2:3 3:3
101:11



**mayor** 126:4,14
  127:6 128:20,20
  129:3 131:10,16
  131:21
**McAleenan** 1:7 7:8
  135:5 146:21
  199:18 213:8
  256:8,17 259:14
  265:13 280:1,4
  281:2 294:12
  295:6
**MCAT** 43:13 44:19
  44:22 45:4,7,20
  46:9,10,13,17
  79:20 80:2,9,20
  81:10 91:12
  147:14,16,21
  184:2 185:17,21
  186:9 190:22
  324:15
**McLean** 11:3
**mean** 39:19 43:17
  60:8 62:9 66:5,5
  66:16 87:6 88:20
  102:10 108:10
  112:2 129:21
  133:8 139:21
  149:3 159:2
  179:20 181:5
  204:16 205:11
  226:10,11 240:13
  242:8 253:17
  258:2 260:14
  276:7,10 280:14
  298:8
**meaning** 86:16
  184:19 261:6
  317:20
**means** 12:19 15:15
  17:13 20:7 75:16
  107:22 108:4
  122:3 198:14
  218:3 260:20
  264:3 282:19,22
  313:4
**meant** 173:20

297:11
**measures** 245:6
  277:2,9,19
**meat** 209:4
**mechanics** 306:7
**media** 106:13 119:3
  121:22
**medical** 321:5
**Medlock** 3:4 5:4
  9:8 10:14,17,20
  11:2 14:11,18
  19:5 23:1,6,9,13
  23:15,19 24:1,6
  44:5,7 47:11
  49:10 52:3 63:4
  63:12,16 81:15,21
  96:13,18 100:22
  101:12,14 105:2
  123:17 132:15
  134:5,10 135:15
  142:20 146:15
  159:8 160:16,19
  160:22 161:3
  163:1 165:7 167:8
  167:17 168:4,6,11
  169:10,15,19
  174:16 178:14
  180:18 181:12,18
  194:2,10,17,19,22
  195:3,7 196:4,12
  199:9 208:7 212:2
  212:20 215:8
  220:5 223:14
  225:7,12,15,17
  226:15,18,22
  227:9,18 228:10
  229:3,9,14 243:7
  248:4 251:1,5
  255:18 275:10,12
  275:17 291:5
  292:7,13 294:1
  296:11 306:9,11
  311:8 312:9
  324:15
**MEDLOCK:you**
  81:12

**meet** 20:5,10,14
  28:13 179:3
**meeting** 21:10,13
  24:19,22 25:2,4
  25:21 29:7,8,12
  29:15,18,21 30:2
  30:10,13,16,19,22
  31:3,10,18,19,22
  35:10,15 36:11
  37:5,13,16,17
  38:1 40:6,9,11,15
  42:3,4,6,10,11,19
  42:22 43:8 45:21
  46:11 47:1,5,5,6,8
  47:16 48:3,4,11
  48:13,17 133:18
  148:18 149:5,9,9
  149:11 156:19
  157:1 178:20
  244:17 304:9,15
  324:2
**meetings** 21:3,8
  24:17 28:19 31:8
  48:5,8 61:16 79:3
  134:12,13,17,20
  134:22 157:5
  224:15 230:18
  303:13,14 304:13
  304:18,21
**member** 46:10
  51:16
**members** 30:18
  43:7,13 46:9
  47:16 62:8
**memo** 7:6,8,12 65:5
  66:1,4 71:11 99:4
  99:8,21 197:13,17
  198:15 200:6,9
  201:13 215:1
  218:16 219:11
  253:19,22 263:12
  271:1 299:9,12
**memorandum** 5:18
  63:17,21 64:2
  65:6,10,16 66:19
  67:3,8,12,19,21

68:2,11 69:2
  99:17,19 183:4
  195:10,15,20
  199:13,17,22
  200:3,12,17,21
  215:11,12,18
  216:1,8,9,12,16
  216:21 217:2,10
  217:13,20 218:10
  219:3,4,5 262:7
  264:17 299:14
**Memorial** 100:13
  100:14 103:16,20
**memorialized**
  218:12,15 323:6
**memorializes**
  203:17
**memorializing**
  218:11
**memory** 22:3,15
  25:14
**memos** 65:20 67:15
**mention** 122:16
**mentioned** 40:1,5
  71:13 89:18 98:8
  109:14 311:10
  316:21 317:1,2
**mere** 266:7
**merely** 203:16
**Merson** 144:7
**Mesa** 38:20 92:19
  93:1,11 94:10,22
  95:2,16,21 106:19
  110:13,22 111:11
  154:5
**message** 68:22
  164:16 198:3
  304:11
**messages** 62:4 79:3
  176:17
**met** 20:3,21
**metadata** 249:4,6
**meter** 71:17 72:4
  116:11 137:10
  142:1 148:19
  172:19 180:9

300:11
**metered** 142:5
  154:21 162:10
  293:3
**metering** 5:18 22:4
  22:7 25:15 27:4
  27:10 30:12 31:17
  32:1,7,11 35:14
  37:22 38:2,10,14
  40:2 42:18 43:3
  54:3,5,9,14,18,21
  55:3,5 56:19 57:1
  57:4,7,10,12,15
  57:20 59:9,13,18
  60:3,7,13 63:18
  64:20 68:3,4,6,12
  68:19 69:5 70:1,9
  70:11,15 71:5
  72:6,8,13 73:1,2,9
  73:12,16,21 74:2
  74:7 80:13 91:17
  92:5 97:22 98:1,5
  98:11 99:3,16,18
  99:22 100:3,5,7
  102:22 103:11,20
  116:9,16 117:1,4
  117:7,8,21 118:1
  118:3,7,10 119:2
  119:5 122:15,16
  123:7,10 127:11
  127:16 128:2,13
  128:18 129:19
  130:8,14,19
  131:19 135:8
  137:4,9 138:1
  139:8,10,12 145:2
  145:12,16,21
  146:8 150:3,7
  151:4,7,9,11,14
  152:8,16 154:17
  157:8,20,20 158:2
  158:12,22 161:8
  161:11,15,19
  163:16 166:17,18
  170:15 172:17
  173:3,8,13,16



174:1,8 178:5
179:16,17,21
180:2 182:7,18,22
183:2,4,7,21
184:19 191:4,13
191:16 232:5,20
237:9,21,22 238:7
238:11,16 239:4
240:1,15 241:9,13
241:20 245:7
246:15,21 250:20
251:9 253:9 254:8
254:15,22 261:12
261:17 263:7
266:2,13 267:8,13
268:2,6,13,16
269:19 270:11
271:5 272:8,19,22
273:9 274:4,6
283:4,11 285:13
290:1,18 291:18
299:9 300:19
301:7,8,16,17
302:9 303:10,11
304:13,18 307:11
314:13 315:11,20
324:18,22 325:7
326:11,19
**Mexicali** 157:16
**Mexican** 33:3
37:11 77:11,14,17
78:13 89:2,5 96:1
110:21 126:11,19
127:3 128:17,20
130:7,13 136:17
136:17 138:3
139:3 140:13,16
158:4,15 183:21
219:8 246:6
259:20 260:1,10
263:4 282:8
284:19,21 286:7
287:3,7,9,17,21
288:4,12 289:16
289:22 290:1,12
309:17,21

**Mexicans** 145:14
180:11 284:21
285:15 290:17
**Mexico** 32:21 34:16
68:7 78:9 88:17
88:21 91:19 92:6
95:1 125:21 137:9
139:14 145:1
155:8,16 161:8,10
161:18,22 162:2,4
162:6 186:4 218:6
219:10 239:19
246:10 247:2
251:22 252:22
259:19 261:9,16
262:13,14,16
263:16 266:7,18
284:21 287:10
289:17 290:18
291:7,17 306:21
307:6 316:12
**Mexico's** 290:20
**MIA** 121:22 122:8
**Miami** 114:21
115:3 122:8
**mid** 171:22 259:21
267:15 271:9,10
271:11,15,18,20
272:20 274:8
300:9,10,12 302:4
302:10
**middle** 17:2 148:20
201:15 220:21
236:17,17,20
265:19 266:5
298:16
**migrant** 39:6 68:17
69:19 71:14 75:18
75:22 86:22 112:4
136:20 188:10
189:12 190:14
208:13 210:7,8
237:5 289:10
291:8 313:2
316:10 321:15,22
323:19 324:4

**migrants** 68:14,19
70:5 71:17,19
72:1,18,21 75:2
76:2,11,15 77:1
80:22 81:3 91:2
95:3 108:12 115:4
126:5,6 127:7
130:17 138:5,17
152:5 156:2
161:11,19 162:1
166:3 186:15
187:6,7 206:11
207:1,13 209:20
210:1,2,4 211:16
211:17,20,21
212:5 241:7,16
274:14,16 275:1
285:14 286:4,10
286:18 287:3,7,9
287:9,17,22
288:12,18,20
289:1,15,22 293:3
313:10,16 317:15
319:3,3 320:14
325:8,12
**migration** 30:15,18
43:7 44:8,18 84:8
**mile** 153:13
**miles** 153:13
**mind** 15:16 278:16
**mine** 88:14
**Mingione** 1:22 2:6
330:5
**minimize** 276:15
**minute** 213:3
**minutes** 20:17
24:15 29:15 66:12
321:18 322:5
**mirrors** 259:17
**Mischaracterizes**
184:6
**misconduct** 91:20
92:1 239:17
242:19 254:18
280:15
**mislead** 258:6

**misleading** 59:4,17
59:22
**misleads** 257:18
258:1
**missed** 181:10
300:2
**missing** 50:13
216:9
**mission** 53:10,18
75:19 76:12,13,20
76:20 77:7 187:21
188:20 189:15
190:10,12 191:11
201:3,9,10,11
203:8 204:8,10
205:3 207:3,8,9
207:12,14 320:9
320:12,15,16
321:8,10,21,22
**missions** 75:9 76:4
76:10,15 77:1,3
189:16 191:20
203:20,22 217:16
217:19 320:17
**misuse** 166:1
**mitigation** 121:20
122:14
**modeled** 187:14
**modify/date** 213:15
**Moises** 225:19
**moment** 19:10 52:6
63:9 82:3 101:5
105:7 116:6
160:21 172:20,21
243:13 255:22
**Monday** 47:1 312:4
**money** 218:6,8,9
**month** 33:15 61:15
61:17 191:18
**months** 47:22
95:10,11 291:17
**Morgan** 7:12 215:1
215:13,15
**morning** 9:9,10
141:3
**mother** 8:5 291:8

**motivated** 68:6
70:2
**motivations** 250:19
**move** 24:1 49:5
53:8 58:17 132:10
155:11,19 158:1
170:17 229:4
265:1
**moved** 33:1 111:10
157:16,16 309:12
**moving** 156:7,15
277:2 310:1
**multiple** 28:15
69:17 75:14
186:16 187:20
272:9,14
**multitude** 297:13
**multi-page** 19:7
52:9 101:2 123:20
135:16 180:20
199:13 215:10
220:7 243:8
255:19 294:3
296:13
**murdered** 287:8,10
**muster** 284:5
299:21 300:2
**mustered** 299:14
299:18
**musters** 283:22
284:1
**mystery** 219:14

## N

**N** 3:1,1 4:1 5:1,1
9:1
**NAC** 148:18 149:5
149:6
**name** 9:11,13 19:14
36:9 78:1 143:7
292:13,15 300:6
**named** 28:2 222:4
222:21 250:9
251:12 253:13
255:2
**names** 9:14 28:6



34:20
**narcotics** 75:15
76:13,20 203:19
206:21 207:9
217:21 320:16
**narrative** 245:17
**narratives** 245:15
**national** 27:19
28:12 60:17,19,21
60:22 61:1,21
62:1 133:13
134:12 135:7,7
202:4 230:6
236:19 256:18
271:19 273:17
**nationals** 285:2
**nature** 11:20 58:4
184:17 204:11
207:19
**near** 107:10,18
265:19
**necessarily** 46:14
209:8 327:8
**necessary** 10:13
68:18 219:2
325:13
**necessity** 71:6
**need** 15:16 22:12
22:13 38:12 43:22
52:22 72:3 116:11
116:14,16,22
122:19,20 134:2
139:13 163:15
167:18 181:15
188:20 190:2
199:12 228:1
255:12 275:10,11
293:17 307:3
327:12
**needed** 38:16 68:16
95:5 159:2 168:21
273:22 307:10
313:20 314:14
315:12
**needing** 104:11
**needs** 72:4 181:5

188:1 213:14
271:10
**negative** 184:12,18
**Neilson** 191:18
**neither** 295:7
**never** 204:20 236:9
252:16,19 268:11
268:13 295:16
298:13 302:17
303:4,7
**new** 35:5 150:22
154:2 219:5,11
274:10
**NGOs** 89:4 144:21
**Nielson** 199:19
**nine** 28:22 40:10,11
40:15
**nods** 15:20
**Nogales** 39:12,13
69:10 85:15
157:17 314:18
**non** 20:22 184:12
**nonargumentative**
22:18
**nonselection** 11:21
**nonsuggestive**
22:18
**non-final** 87:16,17
**non-official** 316:13
**northern** 188:16
**Northwest** 2:3 3:6
**Nos** 8:15
**notary** 2:7 330:6
331:10
**notate** 308:13
**notated** 309:11
318:20
**note** 328:2 331:3
**notes** 29:17 42:4
53:3 106:12
168:14
**notice** 5:13 19:13
19:17 109:2,15
**Notices** 19:9
**notification** 149:20
**notoriously** 56:10

Nov 6:19
**November** 6:21
146:17 148:14
150:14 151:3
157:22 158:9
159:13 163:4,15
170:2,18 173:10
173:12 174:21
178:1,7,15 179:15
179:18,22 180:3,6
215:20 216:2
217:9
**Novemer** 6:14
**no-impact** 184:8
**NTEU** 7:20 60:17
61:21 62:8 230:3
230:5 231:15
232:10 235:10
254:21 256:18
**NTEU-000110** 8:4
255:20
**NTEU-000126**
255:21
**NTEU-000132**
229:17
**nuance** 190:8
**number** 5:12 6:1
7:1 8:1 19:3 49:8
52:1 55:21 63:2
71:17,19 72:18
73:13 80:15,22
81:3,19 82:2,19
84:18,19 88:1,16
89:20 90:18
100:20 101:3
102:21 104:22
105:5 106:13,18
123:15,21 124:3
130:17 132:13,17
132:18 135:13,17
139:15 142:14,18
146:13,17 159:6
162:21 163:3
167:6 169:22
174:14,21 180:16
180:21 184:15

186:2 192:5,7
193:22 194:4
196:10,15 199:7
199:14 201:13
206:10,15 213:1
215:6,11 217:21
220:3,9 222:2
223:12,18 225:5
229:12,16 243:5
248:2 255:16
276:20 277:6
280:5,9 281:13,17
291:3 292:5
293:21 296:9
304:4
**numbered** 58:18
201:14
**numbering** 141:22
**numbers** 45:16
52:17,18 55:20
68:17,20 70:13
71:14,22 72:1
129:22 147:20
156:11 166:17,19
192:3,16 193:3,12
212:18 213:2
226:7 243:9
296:14 313:16
314:20 315:2,5,19
316:10 318:1
324:4

---

**O**

**O** 3:1,1 4:1 5:1 9:1
**oath** 18:6,8,16,18
**object** 10:20,22
16:15 23:1 32:2
43:19 108:18
**objecting** 23:2,5
319:19
**objection** 10:12
14:4 22:8,20,22
22:22 23:18 36:14
43:18 47:9 72:15
76:5 80:17 81:9
87:14 91:6 98:13

99:12 104:1 111:4
119:15 127:20
165:5 184:6 208:5
211:7 234:19
250:21 252:1
253:1 264:19
268:10 269:21
270:22 298:22
305:11,13 313:3
319:14 320:7
**objections** 16:15
22:17,19
**obviously** 49:22
228:1
**OCA** 198:2,8
**OCC** 97:1
**occasionally** 78:21
80:6,8,9,20
**occur** 30:9 33:11
35:19 95:9 117:7
235:21
**occurred** 32:17
35:16 38:1 58:9
58:13,14 72:6,8
74:7 80:14 134:19
151:11 171:22
250:14 261:11
324:2
**occurring** 40:2
133:4 179:18
264:7
**occurs** 31:3 40:6
42:3,7 72:11,12
137:22 291:16
294:8
**offering** 287:22
**office** 10:4 12:4
17:15 28:16 31:7
31:11 32:13 33:8
33:18,21 34:3,7
34:11 36:4,5,19
36:22 41:1 42:16
67:4 70:7 84:2,18
102:7,9,10,11,12
106:12 108:2
143:10 155:1



163:9,21 171:19
171:19 172:10
173:3 175:12,13
175:15 179:16
180:3 181:22
182:1,2 194:16
198:7,9,11 230:16
240:18,19 242:8
242:13 244:3,7
246:14 247:18
250:18 253:8
272:9 295:8 326:6
**officer** 51:13 71:9
93:6 94:11 95:22
108:15,21 112:7
238:4 252:14
258:8,9 271:22
272:20 273:3,4,10
273:10,22 274:2
274:11,15,20
279:10 283:16
294:16 298:15
310:8
**officers** 32:21
34:20 51:6 54:8
54:21 55:3,8
56:15,19 57:19
58:1 76:3,11,14
92:13,15 93:8,12
94:6,14 95:5,20
96:4 98:15 115:3
117:13 145:14
150:7 151:8,12
152:10 155:12,19
156:7,15 158:1
172:16 175:18,20
176:2 178:4
186:18 189:3
190:2 206:20
230:7,9 231:2
232:20 236:16
237:6,13 238:4,11
239:14,16,18
240:5 242:4,6,11
243:1 245:21
254:19 260:3

262:2,6,13 263:6
265:8,16 267:11
267:14,19 268:1
268:15,22 269:2,4
269:7,10,14,17
270:1,7,14,19
271:6,7,8,11,12
271:16 273:1,5,7
274:8 278:12
280:17 281:16
283:21 284:20
285:1,2,7 289:8
299:15,15 300:4,5
300:14 307:10
308:9,11 309:13
320:11,12,13
321:9,13
**offices** 2:2 62:7
70:8 171:1 191:14
274:19
**official** 44:16 59:6
59:10 64:7 67:4
71:3 223:2 283:4
284:16 315:4
**officials** 126:12,19
127:3 128:17
130:8,10,13 133:3
158:5 183:21
246:14 259:2,21
260:10
**OFO** 17:16 62:3
112:16,19,22
113:4,8,12 115:1
120:1 137:3
140:15 149:20
150:21 186:8
187:17 198:1
297:15 313:14
**oh** 26:9 41:2,2
48:22 55:18 147:8
153:12 185:15
225:14 235:5
306:18
**Oh,2016** 316:22
**OIG** 31:14,17
37:18 58:11

102:14 238:18
239:3,8,20 242:20
250:22 251:4
253:18 254:14
**okay** 11:3,6,8,11
12:18 14:7,15
16:5,12,19 19:13
19:20 22:20 23:13
23:19 24:1,5,11
24:20 25:13 26:16
29:12 33:15 34:14
35:13 36:17 37:15
37:19 38:14 40:5
41:20 42:2 43:7
46:9 47:16 48:3
48:11 49:5 50:2,4
50:21 51:2,20
52:8 53:3 55:19
56:2 60:11 63:14
63:15 66:8 67:19
68:5 71:1,8,13
72:8 78:2 79:9
80:13 82:6 83:19
84:1,5,10 85:6,20
87:5,9,19,22
88:11 89:3 90:15
91:11,17 92:10,15
94:4 95:14 96:10
96:12 97:3,6,17
99:2 101:13 104:6
104:14,19 105:9
106:7,11 107:5
110:2 111:1
113:17 115:5,20
116:12 119:17
120:7,13 121:17
122:10,13,17
123:12 124:20
125:1,15 128:4,10
132:5,9 134:5
137:15 138:1,22
139:12 141:2,11
141:13 142:13
143:9,12,14 144:2
145:19 146:1
147:10,15 148:2

148:10,14 149:11
149:14 150:9,20
154:17 160:11,19
161:2 163:13
165:10 167:3,17
169:10,15 170:17
171:3 172:10
173:18 174:11,19
175:14 177:13,17
177:20,22 178:7
179:19 180:4,13
181:12,19 183:3
184:2,21 185:16
187:16 190:16,20
191:12 192:1,20
193:2,11,15,19
194:22 195:3,8
198:13,18 199:4
200:16 201:1,12
201:17 207:11
211:9 212:7,10
213:21 214:9
215:2 216:15
218:7,9,19 219:6
219:13,16,22
221:5,18 222:16
224:4 225:2 226:4
226:6,18,22
227:18 229:3
230:2,10,17
231:12,21 232:9
232:17 233:19
235:7 236:2 238:3
243:17,18 244:11
244:21 245:2
247:15,19,20
249:2,3,5,15
250:1 253:21
255:10 256:2,19
256:22 257:12
259:8 261:1
263:11,12,22
264:11,15 265:1
265:15 266:6
267:1 270:2
275:12 276:4,9,14

276:18 277:5
278:4 284:17
288:7 290:7,22
291:15,21 292:22
293:7 295:6 297:3
301:22 303:4
304:10 305:15,22
306:5 307:13,16
308:3,22 310:3,12
310:19 311:3
312:9,11 313:9
316:20 318:7
319:13 320:1,8
327:15,18
**Okay,the** 102:13
**old** 110:5,8 111:7
111:11,14 115:7
153:18 154:2
292:16
**older** 110:8
**Olympics** 313:21
**once** 46:12 61:15
61:17 98:21 108:6
**ones** 13:19 40:1
43:11
**one-page** 63:6,17
66:4 146:16 163:2
169:21 174:20
194:3 196:15
212:22
**ongoing** 62:7 324:3
**op** 147:17
**OPA** 198:2,6
**open** 110:12 148:20
171:21 172:14
228:3 233:13
286:22 316:15
321:2 327:10,16
**opened** 313:19
**operate** 266:3,4
**operated** 218:17
**operation** 89:7
164:22 187:8
**operational** 27:21
31:3 38:5 40:14
40:18,19 41:1



45:9,10 71:6 72:4
74:14,18,20 75:3
75:12 76:2,9 79:4
79:22 80:3,7 88:8
98:17 99:19 100:1
150:22 155:21
166:3,9 176:13
185:14,16,18,22
186:10,11,22
187:18 188:13,18
189:11,14,20
190:5 238:1 316:9
318:4,9 324:20
325:8
**operationally** 38:13
45:8 157:6 159:3
161:14 162:3
315:12 316:11
**operations** 10:4
12:3 17:16 27:17
28:9,22 40:14
67:5 80:16,22
81:4,8 84:20
86:10 89:15 90:7
91:9,13 120:1,6
120:12 121:13
148:9 163:8
175:11 176:9,11
177:11 184:13
188:8,9,17 201:22
202:7 218:1,3,4
230:16 239:16
321:14 323:9
325:21,22
**opinion** 53:14,16
74:6,6 79:9,16
**opportunity** 12:7
65:9
**opposed** 152:12
161:20 208:13
285:17 316:12
**OPR** 58:8,11
239:20 242:20
**options** 109:10,21
110:1
**oral** 59:5

**order** 22:11 110:14
137:19 161:11
201:22 203:9
231:6 232:11
258:20 259:4,16
260:15 264:16
283:17 284:5,10
284:13
**ordered** 265:17
282:11 310:2
**orderly** 77:6 99:9
**orders** 258:19
259:2 283:22
284:1
**ordinary** 326:17
**organized** 326:18
**Ori** 3:5
**original** 331:11,18
331:19
**originally** 152:16
**Oscar** 292:14
**Otay** 38:20 92:19
93:1,11 94:10,22
95:2,15,21 106:19
110:13,22 111:11
154:5
**Otro** 1:4 7:17
215:12 226:1
308:11,12 309:15
310:10
**outbound** 188:7,9
217:22 218:3,4
219:5,12
**outbreak** 184:16
**outcome** 33:21
58:11 146:2
330:15
**outdoors** 288:10
**outlines** 98:18
118:9 298:16
**outset** 141:20
**outside** 48:10
151:16,21,21
152:12 161:20
204:15 274:18
285:17 286:7,13

288:5,13,21 289:1
289:5 291:8
**overall** 111:19
166:17 245:4
281:15
**overflow** 110:5
148:22 180:1
**oversee** 51:3 54:8
325:22 326:18
**oversees** 278:11
**oversight** 13:15
325:17
**overtime** 123:3,4
232:21 237:6
271:11,13 300:14
300:17,22
**overwhelm** 314:8
**overwhelmed**
68:14 274:14
314:9,12 315:17
**overwhelming**
315:3
**Owen** 1:12 2:2 5:2
5:11,14 6:4,12 9:3
9:13 49:19 227:17
312:20 322:2,4
329:5,14
**o'clock** 28:22 40:10
40:11,15 187:3
**O-W-E-N** 9:13

_____

**P**

**P** 3:1,1 4:1 9:1
142:22
**page** 5:3,12 6:1 7:1
8:1 15:11 19:8,14
50:14 52:21 53:1
53:9 55:11,13,15
55:20 58:18,19
82:17 90:13
106:17 124:3
169:16 200:21
201:12,13,15
213:22 216:15,16
217:10,14,14
221:2,11,12,15

222:1 223:1,17
249:5,9,10,12,12
265:1 276:1 279:3
279:3 282:3 329:9
331:12,17,21
332:2
**pages** 1:21 243:20
329:6 331:19
**pants** 291:11
**paragraph** 149:15
149:16 200:22
221:16 222:1,2
231:10 236:15
240:8,22 241:5
245:13 259:15
260:7,8 264:2
282:5 298:19
306:16
**paragraphs** 237:8
248:18
**paramount** 273:11
**parens** 110:12,13
171:21 172:1,15
172:15
**parentheses** 88:17
144:7,9 148:20,21
**Parole** 109:17,18
**paroled** 109:4
**part** 38:4 44:16
64:3 67:3 87:13
92:5 100:5,12
101:21 105:16
110:8,9 125:2
136:22 148:7
159:17 193:9
216:5 228:1
238:21 239:1,4,4
246:4 277:15,21
278:10 308:11,12
308:21,22 309:11
309:15,19 313:17
323:10
**participate** 21:3,7
222:8
**particular** 228:13
279:19 280:18

**particularly** 272:17
**parties** 55:3 330:13
331:18
**parts** 52:7 74:12
111:16 160:8
167:22 209:13
**party** 227:8
**Paso** 39:14,15
69:10,17 85:15
154:15 162:16,17
163:8 164:5,15
170:22 171:18,20
189:3 321:17
**passenger** 143:21
190:10 310:15
**passengers** 205:11
**pathways** 209:14
**Patrick** 147:3,5
**patrol** 40:21 107:6
107:11,13,16
112:4,11,14 116:1
147:17 167:1
321:15
**pause** 311:3
**pay** 236:21 237:13
301:4 302:2,11,18
**pay,these** 271:7
**PD** 144:10,20
**PDF** 248:7,8,9
**Ped** 136:8 144:12
**pedestrian** 87:3,7
136:10,11
**pedestrians** 145:2
145:16 153:17
**pending** 17:2
**Pennsylvania** 10:8
**people** 48:5,9 60:9
81:5,6 89:13 92:2
98:7 140:17
144:22 151:16
152:17 156:2
201:3,4,11 211:15
227:2 239:18
242:10,12 251:21
254:3 262:8 263:8
263:14 264:5



272:20 289:18 290:21 293:11 300:1 315:4,14 316:1,2,14 318:6 319:8 321:5 323:3 324:9,13
**perceive** 62:13
**percent** 88:5,13 90:1,21 91:14 189:2,2
**percentage** 84:19 88:4 185:9
**percolate** 62:14
**Perez** 28:9
**perform** 53:18,19
**period** 17:7 92:19 95:14,19 127:10 162:8 277:5 302:1 306:1 327:22
**periodically** 62:4
**permanent** 198:21 314:11 315:17
**permission** 116:14 116:14,22
**permit** 110:12,18 110:20 276:8
**permits** 111:7 288:1 314:1
**Perry** 11:6,8
**persecution** 109:13 113:2
**person** 177:15 225:22 310:9
**personal** 18:1
**personally** 165:14
**persons** 203:5 230:22 231:6 232:11 265:18 276:15
**pest** 204:10
**pests** 207:22
**Pete** 120:19,21,22 122:20 132:21 136:2 224:1,17 323:14
**petition** 269:2

**ph** 234:15
**phone** 4:6 101:8 212:1
**photo** 276:12 279:21
**Photograph** 8:5,6
**photos** 281:10
**phrase** 15:21 128:12 173:19 201:18 248:21,21 267:20 270:16 282:17
**phrased** 266:20
**phrases** 221:12
**phrasing** 261:2 264:1
**physical** 74:13,22 76:8 80:4 88:8,9 90:2 91:14 127:19 155:15 185:12,19 273:15 316:8 318:3,7 319:6
**physically** 39:2 96:4 140:6 274:16
**pick** 116:19
**picked** 118:12
**picks** 108:8 187:2
**picture** 275:22 276:2 279:4,16 291:6 292:8
**pictures** 292:1
**pig** 209:10
**pigs** 208:15,20 209:3,4,8,12,12 209:13
**pile** 328:5
**pilot** 7:11 198:3,14 198:16,19 201:21 212:14 213:5,18 214:1,10,14
**place** 30:4 76:9 79:4 133:7 138:21 152:10 180:6 186:14,21 187:5 188:19 191:10 246:19 268:21

318:5 331:18
**placed** 93:12,13 231:5 262:3,3
**placement** 150:7 151:7
**places** 151:9 231:1 321:17
**plaintiff** 222:4
**plaintiffs** 1:5 3:2 222:9,13
**Plaintiff's** 19:9
**plant** 207:15 209:19
**plants** 204:10 211:15,19 212:4
**play** 271:4
**please** 9:11 19:10 63:9 82:3 101:5,6 101:8 105:7 116:6 331:5,17
**PLS** 122:18,21
**PO** 3:16
**pocket** 27:2
**POE** 144:22 148:19 151:5 164:8 172:3 246:7
**POEs** 17:19 121:19 148:21,22 150:22 166:18
**point** 28:6 37:12 68:21 69:18 73:11 106:15 137:17 147:21 155:11 156:22 158:9 164:14 195:9 198:19 228:19 246:18 261:16 268:17
**points** 96:20 107:20
**police** 289:19 317:10
**policies** 18:19 22:4 230:20 233:17 240:6 275:3 284:16
**policy** 22:7 25:15

30:12 31:17 32:8 32:10,11 35:14 37:22 38:2,14 42:18 54:3,9,14 54:18,21 55:4,5 56:20 57:1,4,7,10 57:12,16,17,20 58:1 59:10,13,18 60:3,7,13,15 68:3 68:6 70:2,4,9,11 71:10 72:13 73:2 73:9,12,16,21 74:3 75:8 87:16 87:17 91:18 92:2 92:5 97:22 98:1,5 99:6 127:16 128:13,18 129:19 130:8 131:19 137:4,9 139:8,12 145:12,21 158:12 160:15 170:15 173:3,8 183:13,21 203:12,14 218:16 232:5 237:21,22 238:7,11,16 239:4 240:2,15 241:9,13 241:20 246:16 250:20 251:10,16 251:17,20 253:9 253:14,15,19,22 254:4,9,15,18,22 255:8 258:3,4,14 260:15 261:4,12 261:17,18 263:7 263:17,18 266:2 266:13 267:9,13 268:3,6,16,21 269:19 270:11,18 270:21 272:8,19 272:22 273:9,12 274:2,4,6,10,12 283:4,9,11,13,20 284:8 290:2,13,18 301:8 307:11
**policy's** 99:8
**political** 177:16

230:22
**politician** 130:3
**Ponce** 229:19
**pork** 207:20 208:18 209:6,11,22 210:3
**port** 34:13,14 35:1 37:20,21 62:7 69:17,22,22 70:7 70:8 71:8 73:14 74:21 75:1,8,11 80:11,16,22 81:3 81:8 84:18,20 85:7,9,21 86:1,2,2 86:8,8,13,15 87:10 88:22 89:7 89:15 90:7,10 91:8,13 100:8 101:20,22 102:1 103:6 104:8,11 108:14 109:12 110:5,8,9,13 111:8,11,14,20 113:13,18 114:10 114:17 115:8,22 116:8,15 117:20 119:2,13 123:6,10 127:10,18 133:4 135:9 136:9 137:10 138:1,14 139:3,13,16 140:17 141:14 142:9 145:9,14 146:9 151:16,21 152:12,18,20 153:10,13,15,16 153:18,22 154:2,2 154:13 157:13 158:22 165:20 175:4,5 176:6,7,7 176:8,9,14,22 177:2 179:2,5,15 180:8 184:5,13,16 186:12,12,14,16 188:11,19 189:12 189:20 190:7,9,22 191:4,14,21



209:22 210:17
232:6 233:15
234:5 235:3,8,14
235:19 238:15
239:5 240:16
243:2 245:5
259:15 262:8
263:8 264:8,10,12
265:9,16 272:11
276:20,21 277:6,9
283:5 284:6 286:5
286:14 288:5
289:5 293:4,6
297:14,19,22
300:1 307:2 309:8
313:2 316:18
317:7 319:11
320:5 325:1,5,8
325:11,14,17
**portion** 136:8
169:6
**portions** 328:1
**ports** 17:18 30:4,5
30:6,7,8,9 38:5,15
39:7,17,22,22
44:10 45:19 68:7
68:9,13 69:3,6,7,9
69:13,15,21 70:16
71:7,16 72:19
74:8,8,19 75:14
75:20 80:14,14
85:10,12,14 86:5
86:19,21 87:2,7
89:18 92:5,6,11
92:15,18 99:10
100:3 112:19
113:5,9 116:22
137:8 138:12
140:12 150:3
151:4 153:2,3
154:18 157:7
158:2,17 162:8,14
164:13 166:20
170:11 175:15
178:2 182:7
184:20 185:10

187:6,18 188:16
190:14 193:13
202:1 206:11,16
211:11 230:7
235:6,22 239:12
262:4 272:9,14
275:4 285:12,18
286:7,19 288:21
289:8 291:18
296:5 299:16
313:13 315:13
316:15 317:2,5,6
317:8,19 320:9
321:14 322:22
324:20 325:22
326:11
**position** 11:22 12:1
13:8,22 35:6 68:5
70:1 93:5 94:12
95:21 99:4 102:4
121:10,14 143:18
144:3 147:5,11
175:3 191:9
230:13 231:2
232:17,19 234:13
234:16 288:2
**positions** 88:10
92:7,11 102:7
178:4
**possible** 94:9,13
195:2 231:1 246:9
297:19 311:22
**posted** 266:7
267:15 300:9,10
300:12
**posting** 274:7
**potential** 134:3
142:1
**potentially** 23:8
93:4 134:3 194:13
**POV** 153:19
**practice** 68:12,15
**practices** 17:22
218:11
**pray** 199:11
**precursor** 147:13

**predecisional** 32:4
36:15
**predeliberations**
32:5
**preexisting** 203:17
**prejudicial** 56:4,11
**preliminary** 307:14
307:17 309:15,19
311:11
**prep** 96:22 97:10
97:12,13
**preparation** 20:4
21:12
**prepare** 20:10,14
21:4
**prepared** 65:6
166:2 172:20
227:7 228:5
**prescribed** 203:9
**presence** 130:16
184:18
**present** 10:2,7 17:8
20:22 29:8 46:12
203:13 206:1
235:19 299:17,20
**presentation** 46:17
**presentations**
45:20
**presented** 45:22
46:1,6 205:12
211:2
**presenting** 206:11
282:9
**presently** 9:16
**preserve** 305:4
**president** 61:11
269:3 303:13
**Press** 291:7
**pressure** 126:3
**pretty** 163:21
228:12
**prevent** 148:21
208:12 219:10
268:18 269:19
270:12 277:19
282:8 285:1,2

**prevented** 307:18
**preventing** 207:21
208:17 209:18
266:9,15,22 267:3
267:8,20 268:1,8
270:16 285:4
**prevents** 207:15
**previous** 11:22
12:1 13:21
**previously** 63:7
217:6 327:11
**pre-decisional**
87:15
**primarily** 60:21
72:2 110:21 112:4
112:11,12 302:12
313:12 317:11
**primary** 62:5 69:7
107:17 153:19
201:3,9,10 204:17
222:22 300:13,16
300:18,22 302:21
308:17
**principals** 177:5
**print** 243:9
**printed** 82:18
**printout** 5:14 49:18
**prior** 21:10,11,13
24:17 26:5 66:22
67:1,2 185:1
217:6
**priorities** 74:18
75:14 203:2,8
206:7 214:15
297:13
**prioritization** 7:10
195:13 202:20
203:5,17 204:5
206:19 214:1
217:15 218:20
**prioritization-ba...**
195:12 197:13,19
200:17 216:21
217:11
**prioritize** 75:1,9
201:21 209:16,18

210:3,5 211:11,18
212:4 320:8
**prioritizing** 191:20
211:5
**priority** 76:10 77:1
77:3,7 198:16
202:1,4 203:20,22
203:22 205:3,7,14
205:15 207:2,21
207:22 208:2,12
208:15,19 214:15
217:18 271:22
**private** 288:17
**privilege** 22:22
44:6 169:1 194:13
228:5,12
**privileged** 23:4
43:20 44:2
**privileges** 169:6
181:3
**probably** 52:5
62:18 63:6 88:12
90:16 93:16,17,22
134:19 157:19
169:12 204:14
228:11
**problem** 166:13
169:15 257:13
**problematic** 231:16
231:21 234:12
235:11,16
**problems** 236:2
**proceedings** 109:8
**process** 34:9 75:22
76:2,11,15,16,21
77:1 87:3 89:5
108:16,21 113:22
114:6 115:4 116:2
128:6,14 130:19
137:16,16 138:14
152:7,8 155:2
166:7 168:22
169:6 179:6 181:3
189:7 194:13,15
206:22 207:1
221:19 241:6



245:10 262:17
279:11,12 307:1
308:21 309:12
331:14
**processed** 80:16
81:1 88:22 98:19
98:22 139:15
140:11 151:17
165:20 210:2
264:14 316:16
**processes** 313:6
**processing** 44:9
75:2,10,18 77:4,7
87:1 99:9 108:6
110:4,5,13,18
111:3,10 113:5,11
113:16,18,21
114:5,7,9,12,13
114:15,16 115:4
121:21 126:5
136:20 140:17
144:12 151:19
188:10 189:12
190:4,11,14
202:15,19 203:5
204:1,4,17 205:4
205:8,16,18 206:6
207:12 208:13
209:20 210:6
230:21 306:22
307:2 308:21
309:7 314:8,15
320:13 321:9,11
322:1
**produce** 181:9
321:10
**produced** 181:7
226:12 228:18
**product** 22:9 23:8
23:18 24:4 226:11
227:9,13,14 229:2
**production** 37:18
305:20
**products** 42:17
209:1,6,10,17,22
210:3,6,14

**Professional** 2:6
32:13 33:19,22
34:3,7 36:19,22
240:19 242:8
326:7 330:6
**program** 201:21
244:6
**programs** 28:11
64:5 143:21
**project** 213:18
**promise** 165:19
**promptly** 331:13
**promulgated** 283:4
**proper** 75:2,11
93:2,2 109:11
127:17 139:6
282:6 307:18
**property** 274:20
**proposal** 149:18
150:2,9
**protect** 93:8 160:14
168:21 194:12
201:3 282:11
289:18
**protected** 168:22
181:2
**protection** 5:16
9:19,22 52:10
265:8 273:19
**protections** 98:20
229:8
**protocols** 214:6
239:9
**provide** 45:9
274:17 282:6
286:15,16,16,17
290:20
**provided** 13:17
14:2,8,17,19 15:2
24:18 26:7 255:5
259:16 269:3
301:3 325:1 331:6
**pseudonym** 222:5
**pseudonyms** 222:9
222:13
**public** 2:7 53:11,15

53:17,21 54:3,5,9
198:2,7 231:3
289:7 330:6
331:10
**publicly** 282:12,17
**pull** 76:11 186:17
273:12 274:2
320:14,15
**pulled** 21:15
305:18 320:18
321:7,9
**purported** 254:3
301:6 302:8
**purpose** 57:4,16
98:6 174:1,7,7,10
216:17 252:20
255:4 267:8,12
268:2,5 285:3
**purposes** 100:1
169:7 251:9
253:15 254:8
285:6
**pursuant** 19:17
**push** 75:20
**put** 81:22 101:1
105:3 109:7 114:7
123:18 135:16
159:9 161:5 167:3
168:4 174:17
178:3 186:9
195:10,19 196:13
199:4 204:4,11,12
212:21 215:9
223:15 229:15
236:7 264:22
273:5 313:9
314:11 318:12,14
318:15 320:12
321:22 328:8
**putting** 117:13
179:22 272:20
285:6
**pyramid** 175:21
**p.m** 82:15 83:21
102:18 123:6
141:1 143:5 144:6

148:15 168:8,9
178:8,11,12,16
198:1 249:22
275:14,15 279:11
311:5,6 312:15,16
322:7,8 328:11

_____
**Q**
**question** 10:21 14:5
16:4,5,10,11 17:1
23:7,16,22 44:6
54:15 57:19 72:5
75:5 80:19 99:2
103:16 104:14
112:5 114:8 117:2
130:12 131:5,13
131:15 141:13
156:13,14 161:6
165:8 174:4 189:8
189:9 195:9
206:13,14 211:5
211:14,22 212:3
232:22 233:12,12
233:13 236:12
237:15 239:10
245:19 257:17,19
267:17,19 277:12
283:8 285:4
290:16 301:22
310:13 313:5
323:17 324:21
**questioned** 231:3
**questions** 15:12,18
16:9,19 17:7
18:13 22:10 27:11
117:2 127:22
130:21 141:4,8
145:7 146:7
158:11 170:10
181:21 183:10
227:16 228:6,7,13
250:18 251:8
254:7,11 255:3
308:16 310:9
312:10 322:3,4,12
327:14 331:13

**queue** 7:10 42:21
43:3 44:20 45:1,7
79:21 80:2 84:2
84:19 89:14 90:4
117:10 187:12
191:3 195:12,14
197:13,19 200:17
213:5 214:1,6
216:21 217:11
250:5,11,19 251:9
253:14,15
**queuing** 119:4,8
**quick** 133:21
312:13
**quicker** 77:1 207:1
208:14
**quickly** 210:6
218:2 314:7
**quite** 62:2 182:16
226:10 229:1
240:12 250:21
**quote** 56:8 103:1,15
107:5 110:12
115:6,21 121:17
126:2 144:6,19
148:17 149:16
163:15 164:4
166:16 171:20
172:14 214:4
224:8 245:7,7,8
246:5 259:15
306:19
**Q&A** 245:19

_____
**R**
**R** 3:1 4:1 9:1
142:22 143:15
330:1 332:1,1
**raise** 236:6 281:19
**raised** 37:4 62:11
235:15 238:15
240:8 301:5,11,12
301:15,16,21
304:17,18,20
**raising** 158:14
235:12 255:3



273:7 297:18
302:1
**Rameez** 4:3
**Ramirez** 292:14
**Randy** 5:20 28:9
82:8 196:17
**range** 190:4
**rationale** 99:7
**reach** 68:20 116:10
**reached** 145:7
**reaches** 172:21
**reaching** 74:21
324:11
**read** 49:15 53:12
56:12 59:7 83:15
83:17 98:16 103:4
103:12,17 105:18
107:8 110:6,16
115:9 116:4,6,10
116:21 118:20
122:1,22 123:22
125:7 126:9,22
142:6 144:14
145:3 149:1,21
159:20 164:10
166:21 171:11
172:4,22 179:8
197:5 198:3 200:3
201:5 202:2
203:10 212:13
216:13 224:13,20
231:10 236:13
242:1 245:11
246:11 247:7
250:7 257:6 260:4
265:21 266:11
268:6 276:17
279:13 282:14,15
294:18 296:22
297:9 307:7
327:20 329:6
331:2
**reading** 46:4 98:10
118:13 173:15
328:12
**readout** 134:16

**reads** 56:8 59:3
102:14 179:2
201:20 203:5
250:4 259:14
265:16 266:6
282:5
**ready** 164:5
**Reagan** 10:9,10
28:17
**real** 136:21 297:7
297:12,20 298:7,9
298:10,10 302:6
321:19
**really** 69:21 172:19
204:6 218:2
282:13,18 292:11
302:2 313:15
316:1
**Reardon** 61:2,3,5,9
61:11,20
**reason** 18:11 48:21
70:15,17,18,21
71:12 99:11,18
125:10 129:11
138:9 145:22
156:20 160:6
197:8 223:8
227:13 252:5
270:3 288:19
331:4 332:2
**reasonable** 250:6
**reasons** 45:16 57:6
57:11 98:17 99:19
251:20 264:15
271:14
**reassign** 76:14
206:20
**reassigned** 321:13
**recall** 12:16 32:10
32:16 33:10,15
35:1,8,22 37:21
42:14 54:11,19
60:19 65:12,15,17
65:19,20,22 66:17
66:18 67:2 69:6
73:6,8,10,15 78:1

79:22 87:4,6 95:8
100:15 111:6,15
128:3 134:15
146:1 147:22
148:1 149:8,12,13
150:19 156:9,20
157:7,9,14 158:14
158:19,20 161:4,7
162:14,16,17
165:21 173:7,10
173:12,18,22
174:6 175:3 178:1
178:5 182:16,17
182:19 196:1
214:13 219:16
224:19 231:14,17
235:5,7,9 242:3
247:9,13 251:3
254:6 256:21
257:11 272:13
293:7,15 296:2,4
310:21 311:2
312:1
**recap** 30:3
**receipt** 317:6
331:14,16,21
**receive** 21:10,18
62:4,6 78:2 79:3
89:2 115:17
124:11,18,19
182:14 183:17
188:7 258:20
308:20 317:17
320:10 331:20
**received** 64:12
65:13 82:11,14,21
83:4,7,12,16,19
105:15,20 106:3
106:13 124:10,20
125:1,4,8 126:21
130:7 131:20
132:7 149:17
159:16,21 160:2
171:4,7,12 182:8
182:16 183:19,20
184:2 196:21

197:1,6 199:21
200:2,9 216:2,5
216:12 219:20
220:14 251:15
254:2 256:14,16
256:17,19,22
257:5 258:18
259:1 294:15,19
294:21 296:18
299:8
**receives** 34:5
**receiving** 119:3
219:16,19 317:2,5
**recessed** 96:15
134:7 168:8
178:11 275:14
311:5 312:15
322:7
**recitation** 46:3
**recollection** 22:7
22:12 23:3,11,17
24:4,9 32:19
33:12 90:17
100:17 103:19
104:2,7 113:3
127:3 128:6,11
132:3 134:21
136:19 142:11
143:12 156:17
157:19 164:12
179:14 180:2
182:20 183:1,15
214:10 312:3,5,21
**reconcile** 147:19
**reconfiguration**
277:21
**reconfigured**
277:14,15,18
**reconfigures**
277:16
**reconstruct** 189:19
**Reconvened** 96:16
134:8 168:9
178:12 275:15
311:6 312:16
322:8

**record** 9:12 12:17
16:16 52:13
160:21 168:12
186:13,18 196:4,7
227:21 228:17
305:19 327:18
328:8 330:10
**records** 305:17
**recurring** 47:19,21
**red** 141:4,7
**redact** 167:15,18
167:20 195:2
**redacted** 168:15
169:8 170:9
**redacting** 195:3
**redactions** 67:20
125:12 134:2
160:8,13 168:21
171:14 194:12
295:3
**redirect** 76:22
312:13
**reduce** 161:11,13
276:19,21 277:3
321:1
**reduced** 192:7
276:15 277:7
280:6 281:18
**reducing** 277:2
**reduction** 111:19
**refer** 9:21 17:12,15
17:18 52:18 58:7
68:2 242:19
280:15,20
**reference** 98:1
99:15 111:1,14
112:1 117:3
127:13 128:13
148:2 167:12
178:22 198:14
216:20 222:4
**referenced** 162:11
**referencing** 39:18
116:17,18,19
**referral** 36:22
**referred** 31:14,17



32:13 33:18 34:4
35:11 36:18 37:9
37:9 41:4,5,10,16
41:16 44:19,20,22
58:6 59:20 147:3
212:14 222:5
281:5,7 326:5,9
**referring** 26:10
34:11 60:16 81:10
123:2 149:8
215:13 256:6
316:21
**refers** 110:8 111:2
122:6 144:16
145:16 155:14
167:1 295:11
**reflection** 268:21
**Reform** 13:15
**refresh** 22:2,11,15
25:13 90:17
100:16 103:19
127:3 164:12
179:14
**refreshed** 22:6 23:3
23:10 24:3,9
183:15
**refreshes** 143:12
**refreshing** 104:2
132:3
**refuge** 72:19,22
**regarding** 20:3
36:12 37:3,22
54:3 57:9 59:13
60:3,7 61:6 62:7
78:3,22 106:13
134:13,22 137:3
145:7 156:15
158:17 160:14
168:14 191:15
195:11 197:19
218:20 224:16
228:20 295:21
303:10,11 311:11
**regardless** 117:6
214:17 283:3
**Registered** 2:6

330:5
**regularly** 46:10
187:17
**relate** 17:7
**related** 14:21 31:16
145:11,20 182:7
183:7 232:19
305:4 330:12
**relates** 144:20
**relating** 247:11
**relation** 65:12
111:8 170:14
195:13
**relationship** 179:11
259:11
**relatively** 278:13
**relayed** 31:14
**release** 179:7
**released** 195:15
**relevant** 11:1
**relied** 324:12
**Relief** 7:14
**rely** 22:13 165:19
324:10
**remain** 152:11
214:14 266:18
316:12,14
**remained** 154:22
**remains** 203:7
208:12
**remedies** 107:1
117:16 118:2
**remedy** 107:5
110:2,11 115:5
117:19 237:12
**remember** 14:19
15:1 104:10 133:6
160:11 162:13
219:19,19,21
230:13 277:8
**removal** 108:2
109:8,19
**remove** 314:10
**removed** 6:16 7:2,3
277:17,21 278:7
278:14,20 280:17

**removing** 277:10
278:1
**renewed** 217:22
**reorder** 206:19
**repeat** 54:15 75:5
274:22
**rephrase** 206:13
319:22
**report** 7:21 28:5
37:18 43:15,16
48:6,9 81:11
83:18 85:3 91:7
120:5,8,14 175:15
176:1 177:8,10,14
184:9 186:1,6,9
186:19 187:8,9,12
187:17 188:4,7
189:10 190:8,18
191:8 239:2,8
247:10 298:3,6
322:22 323:17,18
**reported** 1:22 33:5
33:7 36:1,6 80:15
126:11 188:2,4,6
298:7 326:15
**reporter** 2:6 15:13
15:17,19 291:7
330:6
**reporting** 47:19,21
128:16 147:20
187:22 251:6
252:7
**reports** 28:3,4
44:19,21,22 45:1
45:2,7 48:5,9
64:13 79:21 80:2
80:3,5,9,20 81:6
83:9 120:21 176:6
176:8,14 177:11
177:12,15,18
184:2 187:11,20
188:12,14,15
189:16 191:1
324:15
**reposition** 95:5
**represent** 141:7

220:7 226:4 230:7
230:9 243:10
247:17 249:4
**representative** 95:3
95:7 230:3
**representatives**
42:15 60:14
230:19 234:8
**represented** 19:20
**represents** 60:16
**reprimanded**
258:13,17
**request** 17:1 116:8
122:18 179:3,4,7
186:8 259:18
260:14 261:9
266:9 268:19
270:16 306:15,20
327:19
**requested** 245:3
**requesting** 206:2
265:18 270:12
282:10 298:20
**requests** 106:13
**require** 90:15
331:13
**required** 203:6
205:7,9,16,21
206:7 214:4
**requires** 131:8
**research** 244:14
**resources** 74:19
75:13,20,21 76:22
114:18 190:13
195:13 198:16
207:2 211:12
319:11 320:4,5
321:20
**respect** 22:4 25:15
35:14 62:16 79:18
79:19 113:9,14
133:4 169:2
170:21 182:21
218:20,21 283:6
313:2
**respond** 122:17

**responded** 297:5
**responding** 228:19
**responds** 103:7,14
163:22 170:18
**response** 18:12
157:21 206:18
285:13 295:8
316:20
**responses** 141:4
**responsibilities**
33:19,22 211:10
326:7
**responsibility**
32:14 34:4,7
36:20,22 211:1
239:11,11,22
240:1,4,19 242:9
279:1 281:21
289:6,12,15,18,19
289:21 290:4,20
291:12,15,19
292:19 313:13
325:21
**responsible** 34:15
285:20 289:9
**restate** 137:12
**restationed** 95:20
**restroom** 96:12
**restrooms** 152:13
**result** 262:13 321:6
**resulting** 121:19
**results** 7:21 36:21
198:17
**retained** 306:7
**rethink** 158:21
**return** 91:18 152:5
259:17 260:17
261:5,8,16 262:14
262:16 263:9
285:16,21 286:11
307:2 331:11
**returned** 32:20
37:11 91:22 138:5
138:17 140:2
155:7 182:9
239:18 260:20



263:16
returning 307:6
reveal 32:4 36:15
  87:15
revealing 23:8 32:5
  43:21
reveals 227:12
review 19:10 21:11
  21:15 26:4,14
  36:19 63:9 66:14
  66:15,21 82:4
  105:7 181:15,16
  243:13 254:17
  255:22 278:21
reviewed 22:14
  26:6 50:9 66:18
  220:15,16 221:7
  222:18 245:14
  265:11,12
reviewing 19:11
  22:2 24:13 65:22
  66:4 67:19 105:22
  221:20 243:15
re-established
  285:12
right 11:4,9 12:12
  12:15,20 13:12
  15:8,14 17:6
  18:21 19:14,18
  20:19,20 23:4
  26:12,13 29:5
  33:3,19 34:12
  35:8 37:16 39:21
  40:1 41:6,17,21
  44:13,16,21 45:8
  45:17 46:4,7 47:4
  47:18 48:15 49:17
  50:5,8,11 51:10
  51:14,18 52:9,14
  53:6 55:16 56:7
  56:16 57:1 58:15
  62:19,21 63:5,19
  63:22 65:7 67:9
  67:12 69:14 70:10
  70:21 71:10,14
  72:9 74:4 75:4,12

76:4,17,21 78:10
  78:16 79:2 80:11
  81:8 82:7,9,15,19
  83:13 84:8,11,14
  84:15,17,21 87:9
  88:2,5,22 89:6,15
  89:18 90:2,8,10
  90:19,22 91:9,15
  92:3,8,12 93:15
  93:17 94:9 95:17
  96:2 98:2,3,7,12
  99:20 100:4,11,16
  101:1,15 103:8,15
  104:17 105:3,10
  105:16,20 106:1,5
  106:15 107:3
  108:6 114:10,17
  115:13,17,18
  117:7,17 118:16
  118:18 122:9
  123:18 124:10,21
  125:21 129:19
  130:9,15 131:5
  132:6,9,16 137:18
  138:13 144:18
  146:16 148:10,17
  154:22 155:3
  162:18 163:2
  167:9 168:4,6
  169:20 171:12,18
  172:13 174:17
  177:6 178:15,19
  181:14 183:17
  193:17 194:3
  195:12 196:13
  197:10,12 199:4
  200:20 201:17
  204:1 205:17,19
  206:1,4,5,8 208:3
  208:16 209:3,6,9
  209:17,21 210:11
  210:19,20 211:4,6
  212:7 214:22
  215:20 218:14
  220:6 221:22
  223:7,15,21

228:21 233:10
  234:18 235:20
  236:4,8 241:10
  243:19 247:3,21
  248:9,20,21
  251:13,18 254:6
  254:13 255:10
  256:3 257:10
  259:13 260:14
  261:3,18,19 262:4
  262:19,20,22
  263:3,3,10,17,20
  267:5 268:9,12
  273:6 275:6,18
  277:7,14,17 282:3
  283:10,12 285:1
  286:1,12 287:14
  289:11 294:2
  296:2,6,12 300:21
  301:2,15 302:11
  302:17 304:12,14
  305:6 309:4 310:6
  310:10 312:9
  318:11 322:2
  323:2 331:2
Rights 31:7 182:1
Rio 292:10,18
rise 188:9 278:19
risk 165:4,9,13,15
river 292:1,9
Robert 6:2 28:8
  101:16,19,20
  224:2
Rodriguez 224:1,1
  224:8,17
role 51:9 242:18,19
  242:21
roles 28:3
roll 273:13 274:10
rolled 272:8,19
  274:5 315:10
rolling 158:22
Romualdo 256:8
Ronald 10:9,10
  28:17
room 21:1 25:18

26:1 115:8 188:1
  314:21
rooms 274:17
  322:16
Rosa 224:1
routinely 27:20
  142:3
RPR 1:22
rule 22:16 94:16,18
  96:8,9 256:12
rules 15:10 16:16
  230:21 331:13
run 288:17
runners 184:16
runs 85:2
Ryan 64:15,17 82:8
  84:5 143:16,17
  144:5

————————
        S
————————
S 3:1,1 4:1,1 5:1 9:1
  332:1
sacrifice 76:12,13
  76:19
sadly 297:7 298:9
safe 289:6 324:13
safely 273:13
safer 286:7,13
  288:3 289:4
safest 323:5
safety 99:10 210:16
  231:2 236:20
  256:12 267:15
  271:17,18,20,22
  272:9,20 273:3,4
  273:10,11,15,18
  273:22 274:3,11
  274:15,20 281:15
  298:16
Salvadorian 246:6
San 38:18,19 68:8
  68:13 69:9 85:6,9
  85:14 87:22 88:9
  89:10 100:7,9
  101:21 102:2,3,11
  102:12 104:7

106:12,14,19
  107:10,16 110:9
  110:22 111:15
  114:21 115:22
  116:8 122:11,12
  122:19 127:10
  133:4,7,14,18
  134:13 135:9
  136:6,8 137:7
  138:16,18 139:2
  139:13 142:9
  144:10,12 145:8
  145:21 146:9
  153:14 157:10,12
  157:17 162:11
  170:22 242:12
  244:3,6 245:5,21
  246:3,14 251:21
  253:8 312:22
  313:1 314:4,18
  315:7 321:17
saturation 121:19
saw 321:16
saying 88:7 90:1
  134:2 138:13
  158:20 166:13
  183:13,18,20
  197:17 232:1
  233:20 254:2
  264:1,5,12 302:3
says 12:17 19:9
  85:3 89:7 119:1,7
  141:3 145:13
  176:19 184:11
  211:5 213:22
  214:4,8 220:14,21
  224:8 232:13,14
  249:12,15,18,21
  250:2 260:17
  261:10 263:18
  265:7 276:14
  279:10 306:19
scabies 318:13
scene 253:5
scheduling 165:1
school 321:4



**SCIF** 29:3,4 40:6
40:15 42:3 43:9
45:21 46:11 47:5
48:1 157:1 244:17
245:1
**scope** 75:19 86:10
127:21 211:10
**screening** 230:22
**sea** 188:16 314:7
**Search** 7:21
**seating** 276:16
**second** 35:13,15
40:5 81:13 82:17
90:13 97:19
106:17 110:2,2
111:8 157:13
169:2 170:6 176:3
176:4 196:5 202:7
214:21 225:16
243:19 261:22
263:13 282:4
318:15 325:19
**secondary** 108:16
111:3 113:5 276:2
276:5 277:1
308:17
**second-level** 299:15
**secretaries** 67:17
**secretary** 133:6,8
133:11 150:2,5,10
150:12,15 177:18
191:18 195:11
197:18 199:19
214:5,11 219:3
320:10
**secretary's** 198:15
**section** 52:20,22
53:3,8,9 55:10
56:7,8 58:18,19
58:22 216:17
250:4
**sections** 56:1 282:6
**Sector** 116:1
**secure** 93:12
110:14 111:1
**security** 7:6 13:2

17:12 99:9 102:9
133:13 134:12
135:7,8 144:8
145:6 146:3
158:10 175:11
195:11 197:18
199:19 202:4,9
203:19 204:12
206:21 214:5,12
244:6 247:19
277:19 286:16
288:9 293:14
302:4 321:22
**see** 26:11 35:7
37:19 49:2,20
52:11,15 53:1
56:4 58:19 70:19
71:1 72:20 79:6
85:4,7 88:17 89:7
90:10 97:11
100:16 102:15,19
106:9 123:22
124:8 135:21
141:5,17 146:18
147:2,8 148:12
151:18 152:2
163:5,19 175:1
176:15,17 178:17
178:20 180:21
187:8 191:7,12
194:17 197:14
199:15 201:14,17
202:19 213:5,15
214:1,7,8,17
216:17 220:9,13
222:2,6 223:19
224:2 225:18
226:2,8 229:20,21
232:3 246:13
248:16 249:6,13
249:18 250:2
256:9 265:9 276:3
279:5 291:10
306:14
**seeing** 143:9 172:18
193:12 195:1

219:21 247:14
256:21
**seek** 230:22
**seeker** 109:1 112:5
193:7
**seekers** 70:3,10
71:10 73:13 76:17
76:21 77:4,8
80:15 94:10,22
95:20 108:11,13
108:20 113:5,10
113:14 114:1
137:10 140:5
202:15,19 204:1,4
205:4,8,17 208:3
208:16 209:17
210:22 237:9
263:15 282:7
283:7 284:5,19
285:7 290:11
291:16 307:2,5
**seeking** 72:1 98:20
154:19 210:7
265:18 285:15
293:4
**seen** 41:9 44:8 45:1
52:5 227:3,4
236:9 239:2 256:3
**seizures** 186:17
188:3 190:4
**Senate** 12:14 13:1
13:18
**sending** 119:17
306:20
**senior** 40:12,13
51:16 133:2
184:14 186:8
297:14,15
**sense** 22:9 111:9
187:21
**sent** 21:16,20,21
24:12,16 29:17
34:7 79:5 84:5
123:5 125:19
126:16 143:4
148:14 159:16

170:7 178:8
254:21 259:14
265:12 294:12
296:18 311:11,14
326:15
**sentence** 201:2
203:4 236:21
266:6 278:1
279:16 306:14
**sentiment** 245:4
246:7 268:11
**separate** 189:16
227:20 318:18,22
319:2,5
**separation** 246:9
246:19
**Sept** 6:6,9,10
**September** 124:5,6
124:6 125:16
126:13,18 129:13
129:18 130:6,13
131:16 132:2,6,8
132:20 135:9,19
140:22 142:10,11
**sequence** 312:22
**serve** 10:14 53:11
**Services** 40:22
**session** 21:12 25:17
97:1,7,8
**sessions** 97:10
**set** 35:18 51:9
112:4 141:9
152:22 153:3
204:8 207:8,9,12
207:15 251:16,17
251:20 285:10,14
321:8,10 330:16
**sets** 188:20 189:15
189:17 320:9
**setting** 285:8
**shakes** 15:20
**shape** 314:3
**share** 41:22 74:6
161:22
**sheet** 249:6 331:1,4
331:5,8,11,17,20

**shelter** 140:2
151:22 286:4,15
286:19,21 288:3,8
288:11,14 291:9,9
**shelters** 88:21
138:6,17 139:7,9
139:11 152:6,11
184:4 266:19
285:17,22 286:11
286:13,15 287:3,7
287:17 288:16,17
288:18 289:16
**shift** 279:19
**Shinners** 3:13 5:5
10:12,16,19,22
14:4,9,13,16 22:8
22:21 23:5,7,12
23:14,18,21 32:2
36:14 43:18 47:9
47:13 63:11,14
72:15 76:5 80:17
81:9,14 87:14
91:6 96:11 98:13
99:12 104:1
108:18 111:4
119:15 127:20
133:21 160:12,18
160:20 161:2
165:5,8 167:11
168:1,5,17 169:13
169:17 181:1,15
184:6 194:9,11,18
194:20 195:1,6
208:5,9 211:7
225:10,14 226:10
226:16,21 227:6
227:11 228:8,15
229:7 234:19
250:21 252:1
253:1 264:19
268:10 269:21
270:22 275:8
292:11 298:22
304:4 305:11,13
305:19 306:6
312:12,19 322:2



327:15,18
shipment 209:22
shipments 244:20
shopping 321:6
short 92:19 153:18
shortly 219:17
short-term 317:11
show 52:4 167:9
214:21 241:15
292:1
showed 251:11
257:15 302:16
showing 19:6
166:20 199:10
243:8
shown 25:3,7,10,11
64:2 329:9
sick 190:3
sickness 74:17
side 89:5 138:3
140:13,16 260:2,3
260:11 265:20,22
282:8 284:19,21
287:3,17 288:4,12
289:16 290:1,12
309:17,21
Sidney 101:16,22
103:6 132:21
sign 65:20 269:5,12
270:20 271:1
327:20 331:5,9
signature 65:7
143:8 328:12
329:20 331:11,15
331:17,21,22
332:21
signed 64:7 67:8,11
99:21 183:3
267:11,14 269:2
269:14,18 270:1
299:19 300:5
331:16,19,20
significance 278:15
significant 121:18
184:9,15 186:4
significantly 68:18

156:11 166:18
signing 331:6
similar 15:21 35:17
172:6 187:11
simple 114:8 195:8
simply 46:3 81:2
115:11 151:15
164:21 271:5
314:15 318:2
simultaneous
186:17
single 116:2 155:20
188:11 189:10
190:18 317:11
sir 9:9,14 10:11
11:3,12 12:9 14:5
15:22 16:6,19
17:9,13 18:6 19:7
19:11 23:16 24:7
41:15,15 43:3
52:9,11 58:20
63:5 68:4,5 81:22
82:12 96:19 97:16
101:1 104:18
105:3 108:12
123:18 124:1,8
130:20 131:9,12
132:9,16,19
133:12 134:11
135:16,21 141:5
141:17 142:13
146:18 159:9
161:5 167:9
168:13 169:20,22
174:17 177:7,21
178:15 180:19
181:22 185:4
193:10 195:17
196:13 199:10,15
212:7 219:1 220:9
220:10 222:2,7
223:6,15,19
229:20 236:12,13
243:8,13,15,19
245:2 248:5,7
255:19 256:3,9,10

275:10,18,21
276:3,13 291:6
295:13 305:2
307:13 311:9
312:10 322:13
Sirens 178:11
sit 58:14 65:3 66:15
94:16 96:7 118:19
129:11,16 160:6
190:20 241:8,12
253:4 258:17
284:12
site 260:1 300:11
sitting 15:13 35:8
125:11 197:8
279:8
situation 69:19,21
176:19 187:22
234:22 290:8
Situational 122:3
situations 140:4
152:3 155:22
six 20:19 29:9
40:17,19 90:18
95:11 227:21
sixth 41:3
size 176:12
slash 106:14,19
142:5 144:12
256:12 265:18
sleep 288:20,21
289:1
sleeping 291:8
Slocum 4:2
slowed 156:2
slower 209:20
Slowing 250:6
small 317:19
SME 144:11,16
Smedlock@maye...
3:9
snapshot 45:9,14
79:22 184:9 186:2
190:21 191:8
snapshots 45:10
91:12

soft-sided 179:22
soil 33:1,3 34:16
35:18 37:11,11
91:21 94:10,22
95:22 96:1 152:20
154:20,21,22
155:3,7 239:19
263:4,15 264:6
285:8 288:5
solely 324:19
solution 167:15
somebody 74:2
101:8 114:6,20
138:18 255:2
263:3 278:14
someplace 114:7
somewhat 71:22
85:16
soon 224:10
sorry 26:9,12 32:7
41:3 52:21 55:12
55:18 96:10
112:16 122:10
149:16 160:12
167:11 169:14
180:7 181:1
185:15 189:3
192:18 194:9
195:4 208:6
212:12 237:15
243:17 265:22
286:9 290:17
306:19 316:22
sort 38:6 85:2
192:13 242:1,22
248:20 261:18
276:2 309:17
325:16
sough 72:22
sought 72:19
sound 15:21
sounds 15:8 151:12
168:1
south 218:6
southern 1:2
161:16,17 188:14

soft-sided 179:22
301:21 314:4
315:11 320:21
southwest 30:6,10
68:15,22 69:7,16
186:20 193:4
202:1 203:7 214:7
218:4 230:8 235:6
285:13 315:6
323:11,13
southwestern 85:13
153:11 262:4
sovereign 289:17
space 74:13,22 76:8
107:2 111:12,13
111:20 114:3
115:11,15 121:20
128:14 138:19
156:3 191:11
274:18 276:16
277:15,16,18
291:9 314:20
315:3,13,14,16,22
316:13 317:17
323:4 324:8
spaces 322:16
331:6
speak 26:16 54:5
70:22 115:14
129:9 236:3 264:9
281:12,14
speaking 22:19,21
39:1 122:20 228:8
257:2
speaks 99:12
Special 102:14
specialized 277:3
specific 22:10,15
32:7 42:16 61:12
65:21 78:4 182:18
241:1 280:16
324:20
specifically 27:6
36:5 66:17 69:6
100:15 138:20
235:10 237:19
275:22



**specifics** 293:17
**speculate** 129:14
  131:6 153:16
**speculation** 98:14
  131:8 264:20
  305:14 319:15
**spell** 9:11
**spend** 24:13 66:3
**spending** 298:11
**spent** 65:22
**spoke** 245:20
**spoken** 182:11
  270:6,14
**spread** 314:17
  316:5
**spring** 68:21
  321:12
**spun** 300:5
**Sreet** 2:3
**ss** 329:2 330:3
**staff** 29:11,11 64:22
  65:4 147:9 149:17
  194:16 196:2
  251:12 280:10
**staffing** 188:22
  189:5 201:21
  279:18 281:13
**stair** 192:14
**stamp** 67:18
**stamped** 5:19
  168:19
**stand** 244:9
**standard** 5:17
  51:17,18 239:9
**standards** 52:11
  53:4 56:3
**standby** 164:4
**standing** 28:19
  29:20,22 47:7,15
  47:17 61:16 94:6
  149:9 156:19
  157:1
**stands** 198:12
**Stark** 6:10 136:2
  141:3,11 143:5,8
  143:13,14

**start** 16:3 46:19
  102:22 103:2
  150:22 158:2
  161:8,10 162:12
  171:18 178:5
  185:18 217:13
  252:5 309:6
  311:20 313:15
  314:6,20 318:9
**started** 68:12,13,20
  92:13 100:7,9
  103:11 104:4
  128:1,5 147:15
  151:14 152:4,9
  157:12,20 161:21
  164:5 171:20
  180:2 273:1,7
  274:6,7 275:2
  309:9 313:17
  314:6,12,16 315:6
  315:8 316:10
  317:16,16
**starting** 68:20
  148:10 175:18
  221:22
**starts** 34:9 106:7
  143:4 289:12
**state** 9:11 23:22
  144:19 149:14
  198:11 262:7
  302:14
**stated** 22:17 99:19
**statement** 59:13,17
  60:10 112:6
  166:12 201:7
  266:1 278:12
  282:21 283:1
  308:21 309:10
**statements** 59:1,5
  59:22 60:2,5,6
  200:21 269:1,15
  281:11,22 284:18
  310:4
**states** 1:1 99:8
  106:18 109:5
  130:1 162:3

  208:19 211:3
  231:9 245:14,20
  260:1 261:7,14
  264:13 266:10
  306:22 307:5,19
  313:11 329:1
  330:2
**States-Mexico**
  265:19
**static** 187:4
**stating** 91:7 231:4
**station** 3:15 92:13
  107:11,17 116:2
  317:10
**stationed** 78:9
  94:14 96:4 112:8
  271:9,15 279:11
  281:17
**stationing** 273:1
**stations** 107:6,14
**statistics** 218:13
  241:15
**stats** 43:15,16
  147:17,18
**status** 122:18 231:1
  265:19
**statute** 205:7,9,13
  205:16 211:5
**statutorily** 206:7
**statutory** 210:14,19
  210:20,21
**stay** 274:18
**stayed** 150:17
  155:6
**stenographically**
  2:5
**step** 192:14 264:6
  264:12
**Stephen** 3:4
**stepped** 32:22 35:5
  91:21 93:10 94:22
  95:21 261:13
  263:1,14,15
**steps** 108:16 159:2
  252:18
**stock** 236:7

**stop** 22:20 23:9,19
  49:18 102:22
  103:3 259:5,9
  285:7 303:15,17
**stopped** 164:7
  166:15 172:1
**stops** 289:11
  295:16
**storage** 315:16
**straight** 94:4
  253:21
**strangely** 306:2
**Street** 3:6
**strong** 228:12
**structure** 107:16
  116:17 176:6
  251:7
**study** 247:11
**stuff** 122:10
**subcommittee**
  12:19 13:18 144:8
  145:6 146:2,7
  158:9
**subcommittees**
  12:11
**subject** 31:4 64:22
  84:2 102:13 124:7
  136:5 144:16
  163:11 178:19
  213:4 217:9
  256:11 329:8
  331:7
**subjects** 34:17
  245:4,8
**submitted** 141:5
**subordinates**
  326:18
**subpoena** 10:14
**Subscribed** 329:16
**subsequent** 142:2
  191:13
**subsided** 68:17
**substance** 20:1
  331:3
**substations** 107:18
  107:19

**sued** 223:2
**sufficient** 151:20
**suggest** 123:6,9
  167:19
**summaries** 42:6
**summary** 226:14
**summer** 95:13,13
  95:15 321:10,12
  321:12
**supervisor** 120:18
**supervisors** 265:17
  326:17
**supervisory** 176:1
**Support** 41:1
**suppose** 223:5
**supposed** 21:11
  22:17 266:2,13
  308:9 315:15
**sure** 14:1 37:8
  38:21 50:9 52:5
  62:2,12 66:6 75:6
  80:19,20 81:5
  83:8 98:10 134:1
  134:5,18 137:13
  137:15 150:6
  151:6 155:9
  169:16 185:5
  186:7 187:12
  191:17 204:3
  206:14 209:12
  211:18 236:14
  240:12 261:22
  263:11 283:8,9
  292:2 293:18
  299:2 307:15
  324:21 328:4,7
**surge** 285:14 313:2
  323:19
**surging** 275:2
**surprise** 237:14
  238:3,9 242:4,17
  247:5,6 287:2,6
  287:16 305:15
**surprised** 71:1
  246:13
**suspect** 242:19



**suspense** 215:2
**sustain** 53:10,15
**swine** 207:18
    208:17 209:2,5
**switched** 316:17
**sworn** 9:4 51:5
    112:6 308:21
    309:10 310:7
    329:16 330:9
**sympathize** 290:7
**synonymous** 43:5
**SYS** 122:11 141:20
    142:3 245:5
**system** 141:22
    142:3 165:1 166:2
    314:9
**SYS/Otay** 121:19
**S1** 149:18,19
    197:12

─────── **T** ───────
**T** 4:1 5:1,1 74:17
    229:17 303:5
    330:1,1 332:1,1
**table** 84:10,14
**tactical** 244:10,11
    244:18
**tactics** 315:12
**take** 15:19 16:21,22
    17:3 18:8 19:10
    25:10 26:13 44:3
    44:4,5 52:6 63:9
    82:3 96:12,13
    99:4 101:5 105:7
    108:16 116:6
    133:21 134:4
    138:21 167:21
    177:18 181:19
    184:18 192:17
    218:19 229:5,5
    239:10,13,22
    240:1,3,4 243:13
    255:22 257:3,4
    269:22 274:21
    281:21 289:21
    290:3,4 291:12,15

291:19 292:19
297:16 298:8
304:2 309:9
312:13 315:15
318:4 322:5
326:16
**taken** 2:5 18:5
    35:18 42:4 79:4
    91:12 117:17
    249:4 276:12
    281:8 291:6 292:8
**takes** 74:15 108:8
**talk** 16:2 23:6 52:7
    117:13 281:9
    302:18 313:6
**talked** 47:4 79:20
    100:2 121:15
    127:1 136:14
    173:6 190:9,10,12
    191:12 206:14
    230:2,5 244:2
    301:4 303:4,7,12
    318:3 324:14
**talking** 12:6 20:18
    23:2 30:6 106:8
    114:12 161:15
    188:14 200:18
    244:15 246:17,20
    247:1 323:2
**talks** 236:16
**Tamayo** 147:10
    170:4
**target** 244:13
**targeted** 218:5
**Targeting** 27:19
    28:12
**tattoos** 318:20
**TAU** 244:6,9
    247:12 253:8
**taxed** 318:1
**TBD** 8:15
**team** 27:1,7,11,15
    27:15 30:16,19
    43:8 44:9,19 45:4
    45:21 46:9,10
    84:8 147:13,16

**teams** 191:5
**Tecate** 37:12 92:19
    93:1,7 238:15
    239:5 272:11,13
**technically** 176:13
**technology** 114:22
**telephone** 21:5
    29:13 61:18
**tell** 17:6 18:6,11
    20:3 27:6 43:17
    74:5 165:3,12
    173:9 185:17
    222:12,18 234:16
    251:7,7 261:15
    276:12,13 277:22
    295:18 297:4
    303:14,18 308:13
**telling** 161:4,7
    173:7,22 174:6
    233:14,14 263:7
**tells** 172:15
**temporarily** 107:6
**temporary** 106:21
    108:7 111:17
    115:8,12 117:18
    117:19 314:10,21
    315:16,16
**ten** 66:12 93:8
**term** 85:20 108:19
    117:8,10 267:21
**terms** 32:11 43:5
    83:6 113:11 187:6
    259:6 313:1
    315:22 322:15
**terrible** 324:7
**terrorist** 231:1
**testified** 9:5 11:12
    11:15 12:10,14,18
    12:21 13:1,7,10
    13:14,20 23:4
    24:3 177:22 192:1
    218:14 322:14
    325:1
**testify** 10:15 19:17
    24:2,8 87:19
**testifying** 15:9 18:9

23:10,20
**testimony** 13:17
    14:2 22:13 326:16
    329:6 330:8,10
**Texas** 148:21 150:4
    150:22 151:4
    157:8 158:2,17,22
    178:2 259:16
    265:9,17,20
**th** 71:20
**thank** 97:17 101:12
    128:10 132:9
    152:14 168:5,12
    168:17 169:14
    175:7,10 177:17
    182:3 219:13
    295:9 311:9
    312:11 319:9
    322:2
**thanks** 103:11
    163:18 169:17
**Thanksgiving**
    311:1 312:6
**theirs** 302:6
**theoretically** 93:9
    207:4,6
**thing** 285:21 323:5
**things** 15:16 51:8
    58:3,4 62:12
    74:15 75:17 86:20
    134:20 136:21
    147:20 152:15
    184:16 189:1
    204:11,14 205:16
    205:21 207:19
    221:16,18 222:19
    244:14,20 248:6
    258:19 259:5,6
**think** 10:16 22:8,9
    46:13 49:11 50:14
    57:14 60:10 88:12
    98:15 103:15
    104:4,15,16 131:8
    137:15 139:2
    145:22 153:12
    155:20,21 156:20

166:3 168:13
169:11 189:8,9,22
192:1 194:14,20
201:9 204:15,16
205:6,13 223:7
228:11 229:1
233:4,5,6,7,8,9
236:5 252:14
257:12,16,17,22
258:1,8,9 267:3
268:22 269:2,4,7
269:10,14 271:6,8
271:9,12,14,16
275:8 277:12
278:10 286:21
289:4 297:18
299:3 300:1,3,3,4
300:6,7 302:5
308:12 312:6
327:9,17
**third** 55:3,13,15
    111:9 200:22
    201:12,18 202:9
    236:15 243:20
**thought** 104:12
    131:21 254:4
    303:18
**threat** 48:2 75:16
**three** 24:15 25:8,9
    25:13 28:4 29:1
    69:20 93:21,22
    94:7 109:10,14
    157:19 176:12
**three-feet** 94:1
**three-foot** 94:2
**three-page** 132:17
**three-year** 302:1
**threshold** 188:1
**throughput** 44:10
    113:9,13,16
    114:11 276:21
**Thursday** 97:2,12
    97:13 122:19
**THX** 103:11
**ticket** 166:6
**tickets** 128:2,8,9



162:12 164:15,18
164:19 165:2,4,13
165:18,22 166:1,4
**tied** 285:5 324:19
**Tijuana** 124:8
126:4,5,13,20
127:2,6 128:19,20
129:4,9,12,15,18
129:22 130:15,17
131:10,16,18
139:4,7 157:16
158:6
**time** 16:14,14 17:7
17:21,21 20:21
26:7 35:2,3,6,20
40:8 41:8 45:15
66:16,19 67:8
69:2,13,15 80:11
83:4,12,16,20
92:20 95:19 104:8
105:19 111:6
117:20 120:2,12
121:11 125:8,19
127:9,16 128:1
129:15 133:9,15
135:3,4 143:21
144:1 147:11,12
148:5,6,7 150:14
158:15 159:21
160:3,3 162:8
163:7 164:8
168:16 171:12
172:2 175:4 179:6
188:20 197:6
200:2 204:20,22
210:6 227:13
228:22 230:14,15
234:12 237:13
244:5 247:13
253:5 257:5 262:9
265:11 274:9
275:8 277:5
292:12 294:19
297:1,16 298:12
306:1,21 312:10
315:21 321:16

**times** 11:18 12:22
13:7,20 28:15
61:4 66:21 81:5
125:5 139:19
151:10 162:6
171:8 190:11
197:2 235:6
246:10 247:2
252:22 258:3,12
316:20 321:7,16
**tired** 295:19 297:4
**title** 10:2,5 41:18
41:21 42:1 62:2
163:11 197:12
224:4
**titles** 28:7
**today** 15:11 16:9,19
18:6,13 19:17,21
20:4 22:19 26:20
27:2 35:8 38:11
38:15,18,19 39:1
39:2 50:22 51:3
58:15 65:3 87:20
94:17 96:7 118:19
125:11 129:11,16
130:21 148:18
149:19 160:7
163:12,16 190:20
198:22 199:1
214:15,19 215:17
224:9 236:10
241:8,12 253:4
258:17 284:12
311:18 318:11
328:8
**today's** 21:4 26:5
26:17 27:14 52:19
169:7
**Todd** 1:12 2:2 5:2
5:11,14 6:4,8,12
9:3,13 28:11
49:19 64:11
105:12 121:6
132:20 143:1,22
170:4 196:2
310:16 311:11

329:5,14
**toilets** 317:20
**told** 54:13,17,21
60:12 73:2,4,6,8
73:11,16 74:2,4
79:17 94:21
119:13 130:20
131:1 150:21
155:4,6 173:2,13
174:10 262:13,16
303:16
**tolerance** 245:7
246:18
**Tony** 61:2
**tool** 113:19 114:2,5
**top** 82:11 83:20
84:1 85:1,3 90:16
124:11,13,14
148:18 170:17
197:22 203:1,20
203:22 204:16,18
207:22 220:13,20
220:22 225:18
265:7
**topic** 229:4
**topics** 29:20,22
30:1 47:7,15,17
102:21
**torn** 111:17
**total** 20:18 84:18
88:1 89:20 90:18
318:7
**totality** 190:17,19
**towns** 286:7
**tracked** 47:20
**trade** 12:19 41:1
75:18 77:7 190:10
202:11,14,17
203:19 204:12
206:21 207:11
319:10,12 320:3,6
320:19 321:21
**trade-off** 207:6
**trade-offs** 207:10
218:20
**traffic** 41:6 78:3

87:3,8 320:21
**trailers** 111:17
**trailing** 132:18
**trained** 86:22
**training** 314:21
**transcript** 8:14
327:21 329:8
330:10 331:7,15
331:19,22
**transcripts** 26:4
**transfer** 107:7
108:4,4,7
**Transferred** 110:3
110:12
**transited** 307:20
**transitioned** 152:9
**Transportation**
13:11
**travel** 49:4 75:2,11
93:2 98:19 109:11
110:20 127:17
139:7 202:11,14
202:17 203:19
307:18 319:10,12
320:4,6,19 321:1
321:21
**traveler** 98:21
190:11
**travelers** 205:11
**traveling** 289:7
**Treasury** 60:17
230:6
**treatments** 321:5
**trend** 166:20
**trial** 10:15
**trouble** 318:21
**true** 74:7 80:13
91:17 154:5,5,7,9
154:11 171:16
206:10 231:4
233:11 257:9
272:7 278:12
281:11,22 282:21
287:19 298:14,19
299:3 329:7
330:10

**truly** 325:8
**trust** 53:10,15,17
234:9,11 252:12
**truth** 18:6,12
233:14,15
**try** 16:3,11 51:11
51:17 93:12
147:19 225:8
272:4 292:18
**trying** 16:5 75:7
111:20 128:7
204:15 227:16
240:17 309:4
310:6 312:6
**tuberculosis** 184:16
**Tucson** 170:22
**Tuesday** 47:1 97:4
97:7,14 125:16
**turn** 55:10 97:19
114:4 284:5
317:12
**turned** 95:1 145:8
**turning** 144:22
145:14
**turn-back** 283:6
**twelve** 95:10
**Twice** 11:19
**two** 20:13 24:15,22
25:17 26:2,3
32:10 33:12 67:18
74:12 93:21
147:18 176:12
191:18 221:7
224:9 225:8 237:8
283:20 292:15
320:17 322:5
**two-page** 82:1
101:2 105:4
142:14 159:11
213:2
**type** 231:18
**types** 86:12 136:20
209:11 244:20
321:19
**typically** 30:1 66:3
72:20 232:3



**T-O-D-D** 9:13

**U**

**U** 3:1
**Uh** 14:9
**uh-huh** 15:21
**ultimate** 239:11,13
**Um-hmm** 296:6
**unacceptable**
 285:11
**unaccompanied**
 110:4 313:11
**unavailable** 27:8
**unclear** 264:18
**undergoing** 111:16
**undergone** 313:10
**underlined** 221:12
 222:19 248:22
**underneath** 248:18
**understand** 9:22
 14:5 15:22 16:8
 17:4,9,13,16,19
 18:3,5,9,15,18
 19:16 41:9 43:2
 55:7 68:3 80:19
 83:8 88:20 96:19
 112:12 127:22
 129:20 130:3
 140:7 155:10
 173:19 188:18
 198:13 223:7
 240:12 261:2
 262:1 283:8
 297:11 299:2
 301:10 309:5
 310:6 313:5
 319:16 324:21
**understanding**
 145:19 187:5
 263:19,21 282:16
 309:10
**understood** 83:15
 83:17 105:18
 125:7 138:15
 140:8 159:20
 171:11 197:5

200:3 216:13
229:9 257:6
287:13 294:18
296:22 305:3
325:15
**undertake** 324:17
 325:16
**undertaken** 107:2
 118:2 122:15
 326:19
**undertook** 182:6
**underway** 188:8
**undocumented**
 204:18 205:18
 206:6,11 207:1,13
 208:13 210:7,8
 211:16,17,20,21
 212:5 320:13
**unethical** 258:8,9
**unhappy** 271:15
**unilateral** 230:20
**union** 60:14,15,16
 60:17 61:6,9
 230:6 236:19
 237:10 269:3
 271:19 300:5,20
 303:13
**union's** 301:14
**unit** 78:22 86:17
 106:20 110:4
 147:17,18 244:10
 244:12 246:2
 279:12 280:18
 318:12,13
**United** 1:1 109:4
 130:1 162:3
 208:19 211:3
 231:8 260:1
 261:14 264:13
 265:19 266:10
 306:22 307:5,19
 313:11 329:1
 330:2
**units** 78:6,9,13
 86:19 137:1
 138:20,20 149:4

150:3 151:5 246:9
315:9 317:3,5,6
317:17,18,22
**unmask** 222:9,12
**unpack** 152:15
**unprotected** 285:18
**unquote** 245:7
**unredacted** 169:5
**unsafe** 152:4 237:7
 286:3 316:14
**unshaken** 246:8
**update** 224:10
**updated** 214:20
 215:1 218:13
**updates** 133:14
**upward** 166:20
**usage** 119:8
**use** 45:17,18 98:2
 108:18 112:12
 115:3,15 117:8,10
 128:1 186:1 187:9
 266:22
**useful** 45:10,13
**uses** 112:11
**usual** 16:12
**usually** 46:18 79:5
 221:19
**utilize** 116:1
**utilized** 107:6,14
 112:9
**utilizes** 142:1
**U.S** 3:12 5:16 9:19
 9:21 12:11 17:12
 32:20 33:1 34:16
 35:18 37:11 52:10
 70:3,5 91:19,21
 92:6 94:10,22
 95:22 98:22
 125:20 139:11
 152:20 154:20,21
 154:22 155:3,7,16
 156:3 161:12
 210:15 239:19
 240:17 245:8
 259:18 260:3,18
 260:19 261:5,8

262:12 263:1,15
264:6 265:8,8,20
265:22 266:7,7
268:2,9,19 269:20
270:13,17 282:8
285:3,8 286:7
288:5 289:13
293:4 307:3
326:14

**V**

**vacant** 189:3
**vacated** 115:7
**Vague** 14:4 127:20
 313:3
**Valerie** 7:4 194:6
 196:17 197:22
**valid** 228:4 239:21
**Vargas** 77:22 78:3
 79:8,10 126:2
**variables** 190:5
**various** 84:13
 102:7 185:10
 327:11
**Variza** 225:19
**veer** 93:13
**veers** 47:10
**vehicles** 273:20
**venues** 313:21,22
**veracity** 257:19,20
**verbal** 284:1,1,4,5
 284:10,13
**verbally** 46:6
 172:15
**Vernon** 28:12
**version** 169:5,8
 186:9
**versions** 181:10
**versus** 316:19
**vice** 61:11
**video** 21:8 112:7
 224:12
**view** 43:4 99:16
 129:6,8 130:1,2,4
 184:1 187:4
 231:22 233:3,17

235:11,12,15
242:22 255:1
267:7 281:18
289:14 303:20
325:7
**viewed** 130:8
**views** 253:19
**violate** 18:19
 261:16 263:20
**violates** 263:17
**violating** 258:13
**violation** 258:4
 261:11
**violence** 316:4
**Virginia** 2:7
**virtual** 110:15
 112:1,3,9,19,22
 113:4,8,12,15,18
 114:1,8,14,21,22
 115:4 121:21
**visibility** 45:19
 147:19 191:2,6
**visit** 96:11 235:3
**visited** 235:5,8
**volume** 68:14 181:8
**volumes** 70:13
 179:21
**vs** 1:6

**W**

**W** 101:19
**Wagner** 105:12
 121:6 124:14
 142:22 146:21
 159:13 170:4
 196:17
**Wagner's** 121:10
 144:3
**wait** 95:11 126:5
 128:12 140:2,17
 151:17 155:4,6
 156:2 178:9
 190:11 210:8
 246:9 247:2
 252:22 285:16,21
 286:2,21 288:3,4



292:17 309:17,21
321:7,16
**waiting** 88:21
98:19 127:13
128:14 138:8,11
139:22 154:20
186:3 187:7 210:2
280:9 285:17
287:22 291:17,17
316:15 317:12
**waits** 251:22
**waive** 229:7
**waived** 328:12
331:15,22
**waiver** 122:18
123:2,4
**walk** 153:18,19
**walked** 94:8,10
**Walters** 4:4
**want** 52:7 85:6
96:22 125:15
134:1,4 137:15
140:21 152:15
155:9 160:20
161:5,22 162:2
164:19,21 165:1
169:12,15 170:7
200:20 213:3
227:15,19,20
228:6 229:7
234:14,16 248:5
250:22 261:22
263:11 266:21
269:12 271:11
272:4 275:21
299:2 306:10
327:14
**wanted** 76:1 96:20
113:17,22 232:20
237:5 264:21
268:11 286:10
328:7
**Washington** 1:13
2:4 3:7,17 9:20
10:8
**wasn't** 11:11 162:4

162:5 233:20
304:10,11 323:21
**watch** 36:7 176:5
**Water** 8:6
**waves** 313:10
**way** 65:2 78:5 98:5
99:5 113:12,15
114:9 125:13
129:10 134:20
156:4 174:5 188:6
189:18 208:20
239:4 255:21
256:19 257:21
266:20 277:22
284:13 287:20
291:22 292:22
315:4 326:20
330:14
**ways** 12:19 240:2
283:20
**weapons** 219:10
**wearing** 291:10
**weather** 289:2
**website** 5:14 49:18
50:4,7,19
**Wednesday** 47:2
97:2,5,8,14
**wee** 24:18
**week** 29:1 39:3,4
40:3 46:12,13,17
46:19 48:20 49:1
103:2,3 171:22
245:3 310:4,21
311:20,21
**weekday** 48:15,16
48:17,20
**weekend** 103:21
**weekly** 28:20 29:4
43:15 48:8,11
**welcome** 96:19
168:13
**went** 50:10 64:7
70:6 71:14,18,19
274:1 314:17
**weren't** 54:17 73:3
92:2 151:13 166:2

224:20 247:7
303:22 304:18
**West** 136:6,8,10
144:13
**wet** 317:20
**we'll** 228:14 229:1
273:13 312:13
**we've** 123:19 159:9
159:9 167:9
196:13,14 212:21
215:9 271:20
**whatnot** 49:4
317:14
**whatsoever** 236:8
**WHEREOF**
330:16
**whistleblower**
238:14
**White** 3:14
**wide** 211:10
**William** 7:19 11:6
11:8 229:17
230:17 233:1,3,13
234:4,17 240:9
256:8 303:5 304:2
**willing** 115:2
207:10,11
**wiping** 208:4,10
**wish** 290:10,13
**withheld** 57:16
181:11
**withholding** 181:13
**witness** 5:2 14:10
14:15 47:14 63:15
101:13 169:11
208:6 211:8 228:6
275:11 292:12
312:11 327:19,20
329:5 330:8,11,16
331:2 332:21
**word** 149:17
176:21 183:16
185:15 234:10,11
266:22 267:1
269:22
**words** 98:3 99:5

304:7
**work** 10:7 16:12
22:9 23:8,18 24:4
64:17 111:21
199:22 226:11
227:9,13,14 228:2
229:2 230:20
237:10 240:5
248:14 252:12
266:14 273:12
279:11 280:18
287:22 297:8,12
297:20 298:7,9,10
314:1
**worked** 155:10
234:5 236:19
245:3 271:19,20
274:8
**working** 73:12
115:7,22 166:17
186:16 207:8,9
236:16 237:7,11
273:16 289:7
**works** 177:4 227:10
244:3
**workstation** 281:17
**workstations**
110:14 111:2,2,14
279:4,8
**wouldn't** 28:1 71:2
140:4 157:4
186:18 226:16
227:6 267:7
290:14 309:8
322:17
**wrapped** 38:6,8
**write** 163:14
166:16 295:13
**writes** 103:1,10
115:21 121:17
126:1 144:6 164:4
171:20 172:14
295:7 296:5
**writing** 103:15
282:11 295:21
323:7

**written** 14:2 57:9
57:15 59:5 64:5
99:5,8 259:16
260:14 264:16
283:3,9,22
**wrong** 185:15
267:3
**wrote** 64:2 197:22
295:16,18 297:4,7

---
**X**
---
**x** 1:3,9 226:2
**XD** 144:20

---
**Y**
---
**yards** 153:6
**yeah** 54:16 73:19
140:9 153:21
165:16 167:11
174:4 175:16,17
176:19 187:12,14
191:20 192:16
194:20 195:13
211:14 225:15
230:11 236:11,11
239:14 242:15
248:11,14 257:4
260:9 286:10
287:15 290:4
298:21 299:5
304:22 310:17,18
311:19
**year** 13:8 61:4
72:21,22 179:20
183:1 192:10
193:11 241:16
319:2
**years** 13:21 33:12
94:13 292:16
**yesterday** 20:12,16
25:3,22
**Ysidro** 38:18,19
68:8,13 85:6,9,15
87:22 88:9 89:10
100:8,9 101:21
102:2,3 104:7



106:15,19 107:10
110:9,22 111:15
114:22 116:8
122:11,12 127:10
133:4,14,18
134:14 135:9
136:8 137:7
138:16 139:3,13
142:9 144:11,12
145:8,21 146:9
153:14 157:11,12
162:11 245:5,21
246:3 251:21
312:22 313:2
314:5 321:17
**Ysidros** 69:10
**Ysidro/Ped** 136:6

———————
**Z**
———————
**zero** 245:7 246:17
**zone** 110:21

———————
**0**
———————
**000132** 7:20
**000303** 215:12

———————
**1**
———————
**1** 1:21 7:8 17:8
201:14 213:11
223:22 282:3
**1.2** 153:13
**1:02** 141:1
**1:06** 168:9
**1:08** 144:6
**1:16** 178:11
**1:19** 178:12
**1:59** 106:9
**10** 93:10 138:4,10
138:19 146:17
148:14 151:3
312:7
**10:00** 279:11
280:18 281:13
**10:16** 164:2
**10:19** 123:6
**10:56** 96:15

**100** 6:3 91:13
**100-degree** 289:2
**104** 6:5
**11** 6:14 146:17
221:16
**11:00** 122:19 187:3
279:11 280:18
281:13
**11:08** 96:16
**11:41** 170:19
**11:45** 134:7
**11:47** 134:8
**111** 192:18
**111,000** 71:21
192:22
**113,000** 192:18
**115** 265:2
**12** 124:6 174:21
178:7,16 187:3
221:7 301:20
**12:22** 168:8
**12:30** 167:19
**12:46** 143:5
**1222** 11:8
**123** 6:7
**124,000** 72:22
192:22
**126,000** 72:21
193:1 241:16
**13** 1:14 2:5 6:6
124:5,6 125:16
**13th** 311:18
**1300** 10:8
**132** 6:9
**135** 6:11
**139** 180:21
**14** 6:22 7:15 174:22
223:22 330:21
**14th** 221:8
**142** 6:13
**146** 6:15
**149** 231:14,15,22
232:10 235:11
**15** 7:20 192:18
229:22 232:5
235:1

**154,000** 71:20
192:21
**16** 6:9 100:12
132:20 148:7
159:13 192:21
193:16 315:21
316:18 324:5
**162** 6:18
**167** 6:20
**17** 6:13 90:21
135:19 142:21
143:4 144:6
150:18 183:2
192:21 193:14
316:6
**17-cv-02366-BAS...**
1:6
**174** 6:22
**18** 192:22 316:19
**187** 269:17 270:1
270:19 271:7,12
271:16 299:19
300:1,5 307:9
**19** 5:13,20 8:4,7,9
82:7,15 83:21
84:4 85:3 91:2
185:3 192:12,22
193:17 222:1
256:7 257:1 264:9
294:8,22 296:20
**196** 7:5
**199** 7:7
**1999** 2:3 3:6

———————
**2**
———————
**2** 6:3 101:15 102:18
217:21 249:12
**2:42** 178:8,16
**2:48** 148:15
**20** 5:13 18:22 19:3
19:7 72:6 138:4
138:19 189:2
329:17 330:17
**20,000** 278:11
**20006** 3:7
**2003** 203:15 212:6

214:15
**20044** 3:17
**2006** 314:6 315:5
316:21
**2014** 313:11
**2015** 10:6 13:8
313:22
**2016** 6:5,6,9,11,13
6:14,20,22 17:8
38:10 68:8,12,16
69:9 70:12 71:20
71:20 100:6,11
103:2,11,16,21
104:17 105:11
106:9 116:6,15
121:11 123:6
124:5,6 125:16
126:13,18,21
128:5 129:13,18
130:7,13 131:16
131:21 132:2,6,8
132:20 133:2
134:14 135:9,19
135:20 141:1
142:10,11,21
143:4 144:6 145:5
146:6,17 147:9
148:15 150:14
151:3,9,14 152:9
156:1,10 157:8,22
158:9 159:13
163:4,15 164:14
170:2,19 173:11
173:12 174:22
178:1,8,16 179:15
179:20 183:2
189:19 192:5
272:22 274:6,15
275:1 285:10
286:2 312:22
313:16,17 314:16
315:10 316:1,21
317:16 322:15
323:19
**2017** 6:3 7:15,20
33:13 68:17,19

71:13,21 72:7
101:16 102:18
103:3 156:1,11
189:19 192:8
206:16 219:18
221:7 222:20
223:22 224:18
229:22 232:5
235:1,3,7 254:21
301:15 315:19
322:14 324:3
**2018** 5:19,21 7:5,7
7:9,22 12:20 13:5
33:14,16 35:9,21
35:22 63:19 65:13
67:12 68:19,21
71:11 72:8 82:7
82:15 83:21 84:4
84:9 85:3 92:9,10
92:13 95:13,15,15
99:17 100:3
156:12 183:5
185:3 189:19
191:16,22 192:2
192:10,14 193:11
194:7 195:16
197:18 198:1
199:17 200:7,10
200:16 206:15
212:10 213:11
216:20 217:19
243:21 246:13,18
253:19 254:15
264:17 275:2
299:8 316:9
**2019** 1:14 2:5 8:4,7
8:9 12:15 72:11
215:21 216:2
217:10 250:14
253:13 254:15
256:7 257:1 265:5
291:6 294:9,22
296:20 300:22
301:16 306:12
321:13
**202** 3:8,18



**2020** 330:21
**21** 5:14 49:8,17
**213** 7:9,11,12
**22** 5:16 6:19 52:1,4
  52:9 163:4,15
  170:2,19
**220** 7:14
**223** 7:16
**225** 7:18
**229** 7:20
**23** 5:18 63:2,5,10
  63:12,17 64:3
  97:20 99:18
**236** 88:1,12
**24** 5:20 81:19 82:1
  82:22 185:8,9
**24,600** 51:7
**24-hour** 30:3
**243** 7:22
**248** 8:2
**25** 6:2,4 12:20
  100:20 101:3,15
  105:10 123:5
  257:21
**255** 8:4
**259455** 168:20
**26** 6:4 69:15 104:22
  105:4,10,11 106:9
**263-3000** 3:8
**27** 5:19 6:6 63:18
  65:12 67:12 99:17
  123:15,19 215:20
  216:2 217:9
**270,000** 228:18,18
**28** 6:8 132:13,16,19
**29** 6:10 135:13
  194:7
**291** 8:5
**292** 8:6
**293** 8:8
**294** 135:18
**296** 8:10 199:14

**3**

**3** 7:22 19:14 63:8
  63:11 102:21

223:1 243:21
  249:5,9,10,13
  318:6
**3.1** 53:8
**3.2** 52:20,22
**3/31/2019** 249:21
**3:11** 275:14
**3:25** 275:15
**3:56** 249:21
**3:59** 311:5
**30** 6:12 142:13,18
  331:14,21
**30(D)(1)** 22:16
**30,000** 51:4,5 59:15
  240:4
**30-day** 198:3,14,15
  198:18 201:21
  212:14 214:10
  327:22
**303** 216:16 217:10
  217:14
**304** 217:15
**308** 215:12
**31** 6:14 88:10
  146:13,16 250:14
  253:13
**312** 5:5
**315** 88:9,12
**32** 6:16 8:15 90:4
  159:6,10 168:19
  169:11
**322** 5:6
**33** 6:17 162:21
  163:2
**332** 1:21
**34** 6:19 167:6 169:3
  169:20
**341** 142:15
**35** 6:21 174:14,18
**36** 7:2 8:15 180:16
  180:19
**37** 7:3 8:15 193:22
  194:3 195:4
**38** 7:4 196:10,14
  199:4
**39** 7:6 105:6 199:7

199:11 212:8,10
  212:12 213:19
  214:11 217:7
  218:12,21

**4**

**4** 201:14 221:15
**4:09** 311:6
**4:10** 312:15
**4:20** 312:16
**4:22** 82:15 83:21
**4:30** 322:7
**4:35** 322:8
**4:41** 328:11
**40** 7:8 212:18,22,22
  213:3 214:17
**40,000** 319:1
**41** 7:10 212:18,22
  213:1,21 214:18
**42** 7:12 215:6,10
  217:7 218:11,22
  318:6,8 319:7
**43** 7:13 220:3
**44** 7:15 223:12,16
  225:9,13,18 328:4
**45** 7:17 20:17 225:5
  226:5 321:17
**45-minute** 24:20
  25:17
**452** 296:14
**455** 159:12
**46** 7:19 69:16 124:4
  186:20 229:12,16
  304:6,7 305:9
**47** 7:21 243:5
  248:16
**48** 8:2 123:21 124:3
  124:5 248:2,5
  249:3
**49** 5:15 8:3 255:16
  255:19

**5**

**5** 7:4,6 138:4 198:1
  199:17 200:7,10
  212:10 216:20

217:19 279:3
**5/24** 103:16
**5:45** 198:1
**5:50** 102:18
**50** 8:5 89:20 179:6
  179:7 291:3
**502** 82:3
**51** 5:17 8:6 292:5
**52** 8:7 293:21 294:2
**525** 132:19
**529549** 1:20
**53** 8:9 296:9,13
**598-8259** 3:18

**6**

**6** 222:1 265:5
**6th** 312:4,6
**6.1** 55:10,18 56:3
**6.2** 55:19
**6.4** 58:22
**6.4.1** 58:18,19 59:3
**6.5** 51:1
**6/19/2018** 84:3
**621** 213:2
**622** 213:3
**63** 5:19
**66** 55:12
**669015** 55:11
**669017** 58:19
**69013** 53:1

**7**

**7** 6:10 135:20
  140:22 319:7
**7/12** 221:3
**7/12/17** 220:21
  221:4
**7/14/17** 220:16
**7:58** 163:15
**71** 294:4
**731** 321:13
**74** 90:1 189:2
**75** 88:4,13 245:14
**761339** 106:18

**8**

**8** 12:15
**8:15** 28:21 29:4,7
  31:10,18,22 35:10
  35:15 36:11 37:4
  37:12,14 38:1
  40:13 47:5 48:3
  48:10,11 156:19
**8:54** 125:17
**81** 5:21
**8505** 221:11
**8510** 222:2
**868** 3:16
**892** 226:8

**9**

**9** 5:4
**9th** 312:4
**9:00** 42:2,19,22
  43:8 45:21 46:10
  47:5,6,8 48:4,17
  48:19 187:2
**9:40** 1:15 2:4
**901** 55:17
**9015** 55:13
**950** 88:17,21 89:13

