MAYER BROWN LLP
   Matthew H. Marmolejo (CA Bar No. 242964)
   *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
   Ori Lev (DC Bar No. 452565)
   (*pro hac vice*)
   *olev@mayerbrown.com*
   Stephen M. Medlock (VA Bar No. 78819)
   (*pro hac vice*)
   *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
   Melissa Crow (DC Bar No. 453487)
   (*pro hac vice*)
   *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **EXHIBIT 103 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | **REDACTED VERSION** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

AL OTRO LADO, INC, ET AL.  )
                           )
                           ) CIVIL ACTION NO.
VS.                        ) 17-CV-02366-BAS-KSC
                           )
KEVIN K. MCALEENAN, ET AL. )


------------------------------------

VIDEOTAPED DEPOSITION OF
STEPHANIE LEUTERT
AUGUST 11, 2020
DEPOSITION VIA WEBEX

------------------------------------




ANSWERS AND DEPOSITION OF STEPHANIE
LEUTERT, produced as a witness at the instance of
the Defendant, taken in the above-styled and
-numbered cause on AUGUST 11, 2020, at 10:37 a.m.,
before CHARIS M. HENDRICK, a Certified Shorthand
Reporter in and for the State of Texas, witness
located in the city of Austin, County of Travis and
State of Texas, in accordance with the Federal
Rules of Civil Procedure and the provisions stated
on the record or attached hereto.



Page 2

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3       MR. STEPHEN M. MEDLOCK
         MAYER BROWN
 4       1999 K Street, N.W.
         Washington, District of Columbia  20006
 5       (202) 263-3221
         smedlock@mayerbrown.com
 6
         MS. REBECCA CASSLER
 7       SOUTHERN POVERTY LAW CENTER
         400 Washington Avenue
 8       Montgomery, Alabama  36104
         (678) 954-4996
 9       rebecca.cassler@splcenter.org

10       MR. ANGELO GUISADO
         CENTER FOR CONSTITUTIONAL RIGHTS
11       666 Broadway, 7th Floor
         New York, New York  10012
12       (212) 614-6464
         aguisado@ccrjustice.org

13

14   FOR THE DEFENDANTS:

15       MR. ARI NAZAROV
         MR. ALEXANDER HALASKA
16       MR. DHRUMAN SAMPAT
         U.S. DEPARTMENT OF JUSTICE
17       OFFICE OF IMMIGRATION LITIGATION
         Ben Franklin Square, P.O. Box 868
18       Washington, District of Columbia  20044
         (202) 598-8259
19       ari.nazarov@usdoj.gov
         alexander.j.halaska@usdoj.gov
20

21
     ALSO PRESENT:  MR. JOSH PINKUS - VIDEOGRAPHER
22

23

24

25
```



```
                                                              Page 3

  1                          INDEX

  2    Appearances .................................2

  3    STEPHANIE LEUTERT

  4         Examination by Mr. Nazarov...............5

  5

  6    Signature and Changes.......................67

  7    Reporter's Certificate......................69

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```



Page 4

```
 1                      PROCEEDINGS
 2              THE VIDEOGRAPHER:  We are now on the
 3    record.  This begins Videotape Number 1 of -- in
 4    the deposition of Stephanie Leutert in the matter
 5    of Al Otro Lado vs. McAleenan.  Today is
 6    August 11th, 2020 and the time is 10:38 a.m.
 7              This deposition is being taken
 8    remotely via Magna Legal Vision at the request of
 9    the US Department of Justice.  The videographer is
10    Joshua Pinkus of Magna Legal Services, and the
11    court reporter is Charis Hendrick of Magna Legal
12    Services.
13              Will counsel and all parties present
14    state their appearances and whom they represent.
15              MR. MEDLOCK:  Good morning, everyone.
16    This is Stephen Medlock from Mayer Brown, LLP on
17    behalf of Al Otro Lado, the class and the witness.
18    With me are Michelle Webster from Mayer, Brown,
19    LLP, Angelo Guisado from the Center for
20    Constitutional Rights, and Rebecca Cassler from the
21    Southern Poverty Law Center, who all also represent
22    Al Otro Lado, the class and the witness.
23              MR. NAZAROV:  My name is Ari Nazarov.
24    I'm with the US Department of Justice, Civil
25    Division.  I represent the defendants.  With me via
```



Page 5

1    telephone are Alex Halaska and Dhru Sampat, also of

2    the Civil Division.

3              THE VIDEOGRAPHER:  Will the court

4    reporter please swear in the witness?

5              THE REPORTER:  This deposition is

6    being conducted remotely in accordance with the

7    current emergency order regarding the COVID-19

8    State of Disaster.  The witness is located in

9    Austin, Texas.

10             And, Ms. Leutert, if you would please

11   raise your right hand, I'm going to swear you in.

12             STEPHANIE LEUTERT,

13   having been duly sworn, testified as follows:

14                  EXAMINATION

15   BY MR. NAZAROV:

16     Q.  Good morning, Ms. Leutert.  My name is Ari

17   Nazarov.  We previously met during your

18   January 28th deposition in Austin.  It's nice to

19   see you again.

20     A.  Thank you.

21     Q.  Since your -- since you're a deposition

22   veteran, familiar with the process, I will move

23   quickly through the instructions and please let me

24   know if you have any questions.

25             Do you understand that you're under



Page 6

1    the same oath today as you were -- as if you were

2    in a courtroom?

3        A.   Yes.

4        Q.   Is there anything that would prevent you

5    from thinking clearly and testifying truthfully

6    today?

7        A.   No.

8        Q.   If at any time you need to take a break

9    during the deposition, please let me know.  I will

10   try to take one every hour or so.

11              Finally -- and this is most

12   important -- from time to time your counsel may

13   object.  After his or her objection, I'm going to

14   ask you to go ahead and answer the question unless

15   he instructs you not to do so.  Do you understand?

16       A.   Yes.

17       Q.   Okay.  During the January 28th deposition

18   we had talked about your CV, your resume.  Have

19   there been any changes or updates to your resume in

20   your education or employment history since January

21   of this year?

22       A.   Yes.

23       Q.   And what are those?

24       A.   I was accepted to a Ph.D. in Public Policy

25   program at the University of Texas at Austin.



Electronically signed by Charis Hendrick (301-212-281·                    d7251d10-a060-4449-87fa-0f18982e93a9

Page 7

1       Q.   Congratulations.

2       A.   Thank you.

3       Q.   What would this Ph.D. program be in?

4       A.   In public policy.

5       Q.   And what would be your focus?

6       A.   The US-Mexico border.

7       Q.   Tell me more about that.

8       A.   My proposed research is --

9            THE REPORTER:  I'm sorry.  I'm sorry.

10  You cut out.  Say it again, please.

11      A.   My proposed research topic is on migration

12  dynamics in south Texas along the US-Mexico border.

13      Q.   (By Mr. Nazarov)  Okay.  Now, I remember

14  that you previously testified about your

15  educational background.  Let's take it up to -- to

16  this Ph.D. program.

17           Has the Ph.D. program started yet, or

18  you're about to start in the fall?

19      A.   I'm about to start in the fall.

20      Q.   Okay.  I remember you previously testified

21  that you graduated from Skidmore College in 2011

22  with a bachelor's degree in international affairs

23  and Spanish literature; is that correct?

24      A.   Correct.

25      Q.   And then you did some classes at Harvard,



Page 8

1    I believe, that were online; is that correct?

2        A.  Yes, through the Harvard Extension School.

3        Q.  Did that lead to a certificate or a

4    degree?

5        A.  I think I got a certificate of completion

6    for the courses, but no broader certificate or

7    degree.

8        Q.  Okay.  And what did those courses involve?

9        A.  It was a course in microeconomics and a

10   course in statistics.

11       Q.  Then you went to -- I believe you -- you

12   testified that then you went to Yale University and

13   graduated with a master's degree in global affairs;

14   did I get that right?

15       A.  Correct.  Yes.

16       Q.  Okay.  Now, while obtaining your education

17   through your master's, did you ever take any

18   courses related to data analysis?

19           MR. MEDLOCK:  Objection.  Vague.

20       A.  How do you define data analysis?

21       Q.  (By Mr. Nazarov)  Collecting and

22   processing data.

23           MR. MEDLOCK:  Objection.  Vague.

24       A.  What do you mean by processing data?

25       Q.  (By Mr. Nazarov)  Analyzing data that you



Page 9

1    have collected or coming to conclusions based on

2    that data.  Have you ever taken a course that

3    taught that?

4         A.  Yes.

5              MR. MEDLOCK:  Object to form.

6         Q.  (By Mr. Nazarov)  Tell me about that.

7         A   I took a course, I believe it was actually

8    called data analysis or it might be Stata:  Data

9    Analysis.  It was a follow-up to the statistics for

10   policymakers class that I took.  In that class we

11   had to collect data -- find data online and then

12   use statistical software and analysis to analyze it

13   throughout the course of the semester as one large

14   independent project.

15              I also took a follow-up class to that

16   the following year where I did something similar;

17   it was with the same professor, but I chose a

18   different set of data and carried out a different

19   project.

20         Q.  Was this while you were in undergrad or in

21   graduate school?

22         A.  In graduate school.

23         Q.  Okay.  So that would have been at Harvard

24   or at Yale?

25         A.  At Yale.



Electronically signed by Charis Hendrick (301-212-281·                                    d7251d10-a060-4449-87fa-0f18982e93a9

Page 10

1       Q.  At Yale.  Okay.  Did you ever take classes

2    that deal with police or law enforcement

3    administration and operations?

4            MR. MEDLOCK:  Objection.  Vague.

5       A.  Not specifically, no.

6       Q.  (By Mr. Nazarov)  Okay.  Did you take any

7    classes in public administration of governmental

8    operations?

9            MR. MEDLOCK:  Objection.  Vague.

10      A.  Yes.

11      Q.  (By Mr. Nazarov)  Tell me about that,

12   please.

13      A.  Well, my degree was in global affairs

14   and -- with a focus on public policy and

15   international relations, so governmental affairs

16   was a pretty integral part of the entire program.

17   As for specific classes, I would say actually that

18   framework was built into almost every class, even

19   statistics and microeconomics.  They were

20   statistics for policymakers, economics for

21   policymakers.

22           Our -- this is our core class.  This

23   is -- our core history class was focused on a lot

24   of different topics, but covered -- among it --

25   political philosophy.  It was a program that was



Page 11

1    designed for people who were coming from government

2    or going into government, and so that framework and

3    focus was really present in almost every class that

4    I took through the program.

5         Q.   Okay.  So you were -- were you learning

6    how -- how to manage a government organization, the

7    staffing involved, the budgets involved?

8              MR. MEDLOCK:  Objection.  Vague and

9    compound.

10        A.   That -- I don't think I had a class -- I

11   did not have a class specifically focused solely on

12   those topics.  I'm sure that those issues came up

13   in some of the classes.

14        Q.   (By Mr. Nazarov)  Did you ever study any

15   labor management relations?

16             MR. MEDLOCK:  Objection.  Vague.

17        A.   How do you define labor management

18   relations?

19        Q.   (By Mr. Nazarov)  Negotiations, contracts

20   between you and some government organizations, how

21   they managed those contracts.

22             Just to throw out an example, you

23   know, CBP officers having -- those relations and

24   those -- those going-ons.

25             MR. MEDLOCK:  Object to the form.



Page 12

1       A.  I did not take a class specific -- that

2   focused specifically on that topic alone.

3       Q.  (By Mr. Nazarov)  My -- I believe you

4   previously testified that you've never been

5   employed by the US Federal Government; is that

6   still correct?

7       A.  Correct.

8       Q.  And have you ever done an internship or

9   externship at a Federal Government agency?

10          MR. MEDLOCK:  Object to the form.

11      A.  No.

12      Q.  (By Mr. Nazarov)  Have you ever done an

13  externship or internship at a State Government

14  agency?

15          MR. MEDLOCK:  Object to the form.

16      A.  No.

17      Q.  (By Mr. Nazarov)  Have you ever been

18  employed by a State Government agency?

19      A.  I don't think so, but I do work at the

20  University of Texas at Austin, which is a public

21  university, so I don't know how -- how that works,

22  but directly with the State Government or municipal

23  government, no.

24      Q.  Okay.  Have you ever been advised -- I'm

25  sorry.  I withdraw that.  Let me rephrase that.



Page 13

1                   Have you ever been hired or retained

2    to advise a Federal Government agency?

3                   MR. MEDLOCK:  Objection.  Vague.

4         A.  No.

5         Q.  (By Mr. Nazarov)  Okay.  Have you ever

6    been hired or retained to advise a State agency?

7         A.  No.

8                   MR. MEDLOCK:  Same objection.

9         Q.  (By Mr. Nazarov)  Okay.  Have you ever

10   been inside the San Ysidro Port of Entry?

11        A.  No.

12        Q.  Have you ever conducted any fieldwork in

13   Tijuana?

14        A.  No.  I have been on the other side of the

15   border fence on the beach, but that is one of the

16   only border cities I have not visited.

17        Q.  What about Baja California?

18        A.  Mexicali is in Baja California, correct?

19   Then, I have been.

20        Q.  Okay.  Have you ever visited and been

21   inside the Otay Mesa Port of Entry?

22        A.  No.

23                   MR. NAZAROV:  Can we go off the record

24   for a minute?  This is for the court reporter.

25                   (Off-the-record discussion had.)



Page 14

1      Q.  (By Mr. Nazarov)  Have you ever visited or
2  been inside the Calexico Port of Entry?
3      A.  Yes.
4      Q.  Which parts?
5      A.  The pedestrian walkway.
6      Q.  Have you been actually inside the port of
7  entry?
8      A.  In so as much as I crossed from Mexicali
9  back to Calexico.
10     Q.  But inside the building?
11          MR. MEDLOCK:  Objection.  Vague.
12     A.  Trying to remember the Mexicali Port of
13  Entry.  You would have had to go inside to the --
14  be processed by CBP officers, so, yes.  But if you
15  mean to secondary, no.
16     Q.  (By Mr. Nazarov)  Okay.  But you've been
17  beyond the limit line at Calexico Port of Entry?
18     A.  Yes.  I went to Mexicali and then crossed
19  back to Calexico.
20     Q.  Okay.  Did you talk to any of the CBP
21  personnel in the port of entry?
22     A.  Beyond processing my mission back into the
23  United States, no.
24     Q.  Okay.  Have you been in the Tecate Port of
25  Entry?



Page 15

1     A.  Yes.

2     Q.  Which part?

3     A.  I crossed through Tecate and then came

4  back.

5     Q.  Were you ever inside for processing?

6          MR. MEDLOCK:  Objection.  Form.

7     A.  For secondary, I was processed -- my

8  admission back into the United States was processed

9  in -- within that port of entry.

10     Q.  (By Mr. Nazarov)  Okay.  Did you talk to

11  any OFO officers while you were there?

12     A.  I would have, yes.  My husband would have

13  needed to be paroled back in at that time.  And so

14  there were certain ports of entry that we spoke at

15  length to CBP officers.

16     Q.  Okay.  Did you discuss with the OFO

17  officers you spoke with the running of the port at

18  any point?

19     A.  No.

20          MR. MEDLOCK:  I just object to that

21  last question as vague.

22     Q.  (By Mr. Nazarov)  Have you ever visited or

23  been inside the Hidalgo Port of Entry?

24     A.  Yes.

25          MR. MEDLOCK:  Object to the form.



Page 16

1       Q.  (By Mr. Nazarov)  Which parts?

2       A.  The pedestrian processing.

3       Q.  Okay.  Beyond the pedestrian processing,

4  were you inside the port of entry?

5       A.  In Hidalgo, no.

6       Q.  Have you ever visited or been inside the

7  Laredo Port of Entry?

8       A.  Yes.

9            MR. MEDLOCK:  Object to the form.

10      Q.  (By Mr. Nazarov)  And which parts?

11      A.  Pedestrian processing.

12      Q.  And that's the only part?

13      A.  Yes.

14           MR. MEDLOCK:  Object to the form to

15  the last question.

16      Q.  (By Mr. Nazarov)  Did you discuss with any

17  CBP personnel while you were there the operations

18  or the running of the port?

19           MR. MEDLOCK:  Object to the form.

20      A.  In Laredo?

21      Q.  (By Mr. Nazarov)  Laredo, yes, ma'am.

22      A.  No.

23      Q.  Okay.  Have you ever visited or been

24  inside the El Paso Port of Entry?

25      A.  Yes.



```
                                                     Page 17

 1      Q.  Which parts?

 2      A.  Multiple ports of entry.  There are

 3   multiple bridges in El Paso.  I have been actually

 4   both in primary inspection and secondary

 5   inspection.

 6      Q.  And that's in connection with your

 7   husband?

 8      A.  Yes, where he went to secondary

 9   inspection.

10      Q.  Okay.

11      A.  Because he was being --

12              THE REPORTER:  I'm sorry --

13      Q.  (By Mr. Nazarov)  I'm sorry.  I didn't

14   hear that last part.

15      A.  Because he was being paroled in.

16      Q.  Okay.  I see.  Did you speak to any port

17   personnel, C- -- or CBP officers about the

18   operations of the port?

19              MR. MEDLOCK:  Objection to form and

20   vague.

21      A.  Yes.

22      Q.  (By Mr. Nazarov)  I'm sorry?

23      A.  Yes.

24      Q.  Yes?  Tell me about that.

25      A.  I was speaking to them in relation to my
```



Page 18

1    husband's parole situation.  There had been some

2    confusion, and so they were explaining to us what

3    was going on at the port of entry at the time.

4        Q.  And what did they -- what did they explain

5    to you?

6        A.  To quote them, they said the port of the

7    entry was not Newark, and so we were going to have

8    to wait a very long time for him to be paroled into

9    the United States.

10       Q.  What happened after that?

11       A.  Well, that was before I arrived.  I was

12   waiting outside, and then they went and got me and

13   brought me in.  And about 20 minutes later, they

14   said there had been a misunderstanding, and they

15   provided him with the parole document and actually

16   with an additional document they said we'd need in

17   the interior checkpoints.  And they let him go into

18   the United States.

19       Q.  How long did all of this take, this

20   inspection?

21       A.  About an hour.

22       Q.  About an hour.  Have you had similar

23   exchanges at other ports of entry regarding him?

24            MR. MEDLOCK:  Objection.  Vague.  I

25   assume by him, you mean her husband?



Page 19

1                    MR. NAZAROV:  Let me rephrase that.

2     That was -- that was vague.

3         Q.  (By Mr. Nazarov)  Has anything like this

4     happened with your husband at other ports of entry?

5         A.  So during this period in his paperwork, it

6     was only -- it was a short time period of about six

7     months, and we had similar conversations -- nothing

8     like the occurrence at the El Paso Port of Entry,

9     but we had similar discussions at Sasabe, Tecate.

10    I believe those were the only other two ports of

11    entry.

12        Q.  Okay.  While you were in El -- El Paso,

13    did you ever discuss with any of the CBP personnel

14    the overall running of the port, their missions or

15    budgets or contracts or anything like that?

16        A.  No.

17        Q.  So it mostly dealt with your husband's

18    situation?

19        A.  Inside the port of entry, yes.  It might

20    be unrelated, but I also met with El Paso Border

21    Patrol.  And actually in that discussion they did

22    discuss overall CBP budget and staffing, but that

23    was through the border patrol.

24        Q.  When did you meet with them?

25        A.  That would have been spring -- winter --



Page 20

1    winter or January of 2018, I believe.

2        Q.  Okay.  And do you remember who you met

3    with?

4        A.  No.  It was a meeting for a group of

5    students that I brought to El Paso.

6        Q.  Why did you bring them to El Paso?

7        A.  I wanted them to understand migratory

8    dynamics in that part of the border.

9        Q.  And did you meet with OFO or --

10       A.  No.  I met with border --

11            MR. MEDLOCK:  Asked and answered.

12       Q.  (By Mr. Nazarov)  And how many students

13   did you bring?

14       A.  I believe it was eight or nine.  It was

15   about half the class, and I had a 16-person class

16   at that time.

17       Q.  Okay.  Was that a day-long meeting?

18       A.  It was a presentation and a ride-along.

19       Q.  I'm sorry.  I didn't catch the first thing

20   you said.

21       A.  A presentation and a ride-along.

22       Q.  Oh, interesting.  Who gave the

23   presentation?

24       A.  I -- I don't remember.  I've now done this

25   three times, and they're all blending together in



Electronically signed by Charis Hendrick (301-212-281·          d7251d10-a060-4449-87fa-0f18982e93a9

Page 21

1    my head, three different -- entry -- or port of

2    patrol sectors.  I don't remember the person.

3    Usually there's multiple border patrols that

4    provide the presentation, but I don't remember who

5    they were.

6        Q.  What do they talk about in their

7    presentation?

8        A.  They always hit on the same themes, which

9    are generally their work in apprehensions, their

10   work in -- in their other missions, drug

11   trafficking, seizures, national security.  They

12   probably talked about staffing; they probably

13   talked about budget.  They would have answered

14   questions for my students.

15       Q.  Did you ask any questions?

16       A.  I'm sure I did.  I always ask questions in

17   those presentations.

18       Q.  Okay.  Do you remember what those

19   questions were, what areas you covered?

20           MR. MEDLOCK:  Object to the form.

21       A.  I don't.  That was three years ago.  I

22   don't remember what specific questions I asked.

23       Q.  Okay.

24       A.  I usually would ask questions if I thought

25   there would be something interesting that they



Page 22

1    hadn't covered yet and that I thought the students

2    would benefit from hearing, kind of spur them to

3    explain something more.

4         Q.  Tell me about the ride-along.

5         A.  In El Paso?

6         Q.  Yeah.

7         A.  We -- actually, we drove out in a small

8    van, and they took us to various points.  And then,

9    the highlight at the end, the highlight for the

10   students is this higher ledge where you can kind of

11   see into a valley, you can see the border wall.

12   And then they explained the entire dynamics in that

13   region.

14        Q.  Did your students like it?

15        A.  They did.

16        Q.  So did you do this visit with your

17   students at any other ports of entry or just El

18   Paso?

19             MR. MEDLOCK:  Objection.  Misstates

20   prior testimony.  I believe she didn't say it was a

21   port of entry.

22        A.  Yeah.  To the border patrol sector.  I

23   have taken them to the Nogales Border Patrol Sector

24   and as well to the RGV Border Patrol Sector for

25   ride-alongs -- for presentations and ride-alongs.



Page 23

1      Q.  (By Mr. Nazarov)  Are they done outside,

2   these presentations?

3      A.  I'm sorry?

4      Q.  Are they done in the building or outside?

5      A.  If I remember correctly, the El Paso and

6   the Nogales presentations were done inside the

7   border patrol station in that sector.  And the RGV

8   presentation was outside in a park.

9      Q.  Okay.  Have you ever visited or been

10  inside the Brownsville Port of Entry?

11     A.  Yes.

12     Q.  Which parts?

13     A.  Well, two of the group bridges and the

14  pedestrian processing.

15     Q.  Okay.  But were you ever in secondary?

16     A.  No.  I've -- I've also been in the MPP

17  court that is part of the -- it's right next to the

18  Gateway Bridge Port of Entry.  I think it's

19  actually on their territory, within the

20  jurisdiction of the port.

21     Q.  Tell me about that.

22     A.  I went to witness an MPP court hearing.

23     Q.  Is that with an immigration judge?

24     A.  Yes.  Remotely.

25     Q.  Okay.



Page 24

1       A.   She was videoed in.

2       Q.   Okay.  At the Brownsville Port of Entry,

3   did you ever discuss the operations of the port or

4   the mission with any personnel, CBP personnel?

5            MR. MEDLOCK:  Object to the form.

6   Compound.

7       A.   Not -- no, not specifically at the ports

8   of entry, no.

9       Q.   (By Mr. Nazarov)  You previously testified

10   that you've been to the Nogales Port of Entry; is

11   that correct?

12       A.   Correct.

13       Q.   Can you tell me which parts again?

14       A.   The pedestrian processing.

15       Q.   Okay.  Anyplace outside of the pedestrian

16   processing?

17       A.   No.

18       Q.   Have you been to any ports of entry that I

19   have not asked about?

20       A.   Yes.

21       Q.   Tell me about it.

22       A.   Progreso.

23            MR. MEDLOCK:  Object to the form.  Go

24   ahead.

25       A.   Roma, Eagle Pass, Del Rio, Sasabe, which I



Page 25

1    believe I previously covered, Lukeville.  I think

2    that's it.

3        Q.  (By Mr. Nazarov)  Have you been inside any

4    of those ports of entry?

5        A.  I have gone through pedestrian processing

6    in all of them.  I have also sat in secondary in

7    Eagle Pass.

8        Q.  But you have not been outside of secondary

9    in any of those ports?

10           MR. MEDLOCK:  Misstates prior

11    testimony.  Go ahead.

12        A.  No.

13        Q.  (By Mr. Nazarov)  Have you heard the

14    acronym AEU?

15        A.  Yes.

16        Q.  What does that mean?

17        A.  It's, like, admissibility enforcement

18    unit.

19        Q.  What do you think it mean -- what does it

20    mean to you?

21           MR. MEDLOCK:  Objection.  Asked and

22    answered.

23        A.  It is a group of -- it's a unit within

24    OFO.

25        Q.  (By Mr. Nazarov)  Do you know what it



Page 26

1  does?

2      A.  It would be operating in secondary.

3      Q.  Are you aware of whether every port of

4  entry uses that acronym?

5      A.  I would imagine Class A ports of entry

6  would.

7      Q.  Will you define metering for me?

8      A.  Sure.  Sure.  Actually, I'm opening my

9  merits expert report just to point you to a

10  footnote, if that's okay.

11      Q.  That -- that is okay.  Let me --

12      A.  I can do it without.

13      Q.  Yeah.  Let's do it without now.  And then

14  we'll introduce the exhibit and -- I, frankly,

15  don't mind if you refer to the exhibit, so why

16  don't you give --

17      A.  Okay.

18      Q.  Let me -- let me control the exhibits for

19  now.

20      A.  That sounds perfect.  Thank you.  It's

21  just that I have a footnote that explains the way

22  that I am discussing metering in the report, which

23  I think is relevant, which is that -- when in the

24  report I use metering, queue management and

25  turn-backs interchangeably.  So in the definition



Page 27

1    I'm about to give, I'm kind of encompassing all of

2    that.

3        Q.  Okay.  Give me the definition.

4        A.  The way that I view metering is -- what

5    metering is, is multipronged.  It is essentially

6    when individuals arrive at a port of entry,

7    asylum-seekers arrive at a point of entry.  They

8    are turned back to Mexico and told they cannot be

9    processed at that time.

10              Now, the way this looks right now is

11   that there are CBP officers that are stationed at

12   the limit line, at the international line and

13   provide an explanation that the port is at

14   capacity.

15              Now, simultaneously, the port director

16   or an individual in the port is determining how

17   many asylum-seekers that port of entry can process

18   every day.  So that in a combination of saying

19   we're going to process a certain number a day and

20   we're not going to process people immediately when

21   they arrive at the port of entry.  That entire

22   combination is metering.

23       Q.  Okay.  And what would be your definition

24   of queue management, then?

25       A.  As I said in the footnote, I'm -- I am



Page 28

1    using that term interchangeably:  metering, queue

2    management and turn-backs.

3         Q.  Can you define physical capacity?

4         A.  It is the number of people that can fit in

5    a physical space.

6         Q.  So what would it mean for a port of entry

7    to be operating at 100 percent physical capacity?

8         A.  Well, it's slightly complicated because

9    physical capacity is also -- maybe I should have

10   said this in the definition.  It's also subjective

11   to certain things, given that CBP determines its

12   own physical numbers at times, but what it is, is

13   taking the number -- it is the number of people

14   within a port of entry matches the total number

15   that CBP believes can fit safely in that port of

16   entry, or it's been determined by a fire marshal in

17   these certain areas where they have people

18   watching, supervising at a certain time.

19        Q.  How would you define turn-back?

20        A.  I'm sorry?

21        Q.  How would you define the term "turn-back"?

22             MR. MEDLOCK:  Objection.  Asked and

23   answered.

24        A.  I'm defining turn-back, metering and queue

25   management as synonymous in my report.



Page 29

1        Q.  (By Mr. Nazarov)  Okay.  So they're all
2    the same in your definition?
3        A.  I'm using them as -- as being all the
4    same, yeah.
5        Q.  Do you know if your definition is
6    different from CBP's definition?
7        A.  It's possible.
8              MR. MEDLOCK:  Objection.  Vague.
9        Q.  (By Mr. Nazarov)  Are you familiar with
10    CBP's TEDS standards?
11        A.  Could you repeat that?
12        Q.  Yeah.  So are you familiar with CBP's TEDS
13    standards?
14              And I'm going to give you the
15    definition of TEDS, which is National Standards in
16    Transport, Escort, Detention and Search; that's
17    TEDS.
18        A.  I may have reviewed it, but I -- I'm not
19    that familiar with it.
20        Q.  Okay.  Are you familiar at all with the
21    requirements of the Flores Agreement?
22        A.  Yes.
23        Q.  Tell me about it.
24        A.  A settlement that determined the detention
25    conditions or the conditions in which minors should



Page 30

1     be held.

2         Q.   Okay.   Are you familiar with the general

3     length of time that CBP facilities are designed to

4     hold individuals?

5         A.   Yes.

6              MR. MEDLOCK:   Objection.   Vague as to

7     facilities.

8         Q.   (By Mr. Nazarov)   And what is that length

9     of time?

10        A.   72 hours.

11             MR. MEDLOCK:   Same objection.

12        Q.   (By Mr. Nazarov)   Have -- are you --

13    scratch that.

14             Are you familiar with the Prison Rape

15    Elimination Act?

16        A.   No.

17        Q.   Okay.   Are you familiar with the

18    requirement of the Trafficking Victims Protection

19    Reauthorization Act?

20        A.   In what -- in what way?

21        Q.   Well, have you heard of it?

22        A.   Yes.

23        Q.   Okay.   Tell me what you've heard.

24        A.   It would be determining the processing for

25    minor -- accompanying minors from non-contiguous



Page 31

1    countries.

2        Q.  Have you ever written about it or

3    lectured?

4        A.  I might have --

5        Q.  Okay.

6        A.  Sorry?

7        Q.  I'm sorry.  Have you ever written about

8    it, published anything about it or lectured about

9    it?

10       A.  I might have when mentioning the

11   difference between unaccompanied minors from Mexico

12   versus from non-contiguous countries, like Central

13   America.

14       Q.  Okay.  Can you give me your definition of

15   operational capacity?

16           MR. MEDLOCK:  Objection.  Vague.

17       A.  I actually went back to my deposition and

18   read what I had written as the definition of

19   operational capacity, which were all the factors

20   that CBP discusses for -- discusses that affect its

21   filing processing beyond physical capacity, but I

22   have also learned through this discovery period in

23   deposition that ████████████████████████████████

24   ███████████████████████████████.  So it is a

25   little difficult to define.  I -- I hesitate now to



Page 32

1    define as I did before.

2        Q.  (By Mr. Nazarov)  Okay.  So you would say

3    your testimony on operational capacity is different

4    now than it was during the deposition in January?

5            MR. MEDLOCK:  Object to the form.

6        A.  I was -- I was under the understanding

7    that ███████████████████████.  And one of the

8    things that I have learned through this discovery

9    is that ████████████████████████████████████

10   ████████████████████████.

11       Q.  (By Mr. Nazarov)  I see.  Will you take a

12   stab at it for me and just define it the best you

13   can?

14       A.  I can define it the way --

15           MR. MEDLOCK:  Objection.  Asked and

16   answered.

17       A.  I can define it the way that I defined it

18   in the previous deposition, which were all the

19   other factors that CBP has noted that influenced

20   its ability to process asylum-seekers beyond --

21   perhaps including physical capacity, but beyond

22   physical capacity as well as -- my explanation.

23       Q.  (By Mr. Nazarov)  Okay.  All right.  Well,

24   now I want to briefly turn to your merits report

25   dated July 20, 2020.



Page 33

1              MR. NAZAROV:  Josh, would you be

2    able -- do you have it in front of you?  Josh can

3    put it up, maybe.

4              THE VIDEOGRAPHER:  Yes, I can.  Did

5    you want the -- I'm sorry.  You're going to have to

6    clarify.  Did you want the --

7              MR. NAZAROV:  Let's go off the --

8              THE VIDEOGRAPHER:  -- expert report or

9    the merits report?

10              MR. NAZAROV:  The merits report.

11              THE VIDEOGRAPHER:  Got it.  Sorry

12    about that.

13              MR. NAZAROV:  No problem.

14              MR. MEDLOCK:  Just to clarify, I think

15    you got the date of it wrong.  I believe it's

16    July 10th, 2020.

17              MR. NAZAROV:  It's July 10th?  Well,

18    July 2020.

19      Q.  (By Mr. Nazarov)  Okay.  Just a minute.

20    Will you please tell me about the methodology you

21    used to prepare this report?

22      A.  Sure.  I based my understanding of this

23    report first in fieldwork that I conducted along

24    the US-Mexico border primarily over the past three

25    and a half years, but in-depth since October 2018



Page 34

1    on this specific issue.

2              And in that time period, I used

3    methodologies that I would use that are pretty

4    well-known in the political science and public

5    policy fields.  They are observation at port of

6    entry of metering practices; semi-structured

7    interviews with different individuals, primarily in

8    Mexico, but also at times in the United States; and

9    a review of primary documents such in this case

10   were the asylum waitlists.  And I used that as my

11   foundation for going into this report; and then

12   received questions from plaintiff's counsel and I

13   reviewed quite a few documents that were produced

14   in discovery; and I attempted to answer plaintiff's

15   counsel in this report.

16       Q.  Is this the same methodology you used in

17   your December 2019 report?

18       A.  Yes, more or less.

19       Q.  Are there any differences between the key

20   terminology used in this July 2020 report and the

21   December 2019 report?

22              MR. MEDLOCK:  Objection.  Vague as to

23   key terminology.

24       A.  There are differences between the two

25   reports because I was able to review additional



Page 35

1    information that I had not reviewed in writing the

2    first expert report.

3        Q.   (By Mr. Nazarov)  What additional

4    information did you review?

5        A.   When -- quite -- quite a few additional

6    documents that were produced during discovery.  I

7    had also reviewed more than 100 new queue

8    management reports that I included in the data, and

9    in certain places I came to -- to different

10   conclusions and perhaps used different terminology

11   than I did in the first report.

12            MR. NAZAROV:  I'm sorry.  Can we go

13   off the record for a second?

14            (Off-the-record discussion.)

15            (Record read by Reporter.)

16       Q.   (By Mr. Nazarov)  So, Ms. Leutert, you

17   mentioned that you had different conclusions.

18            What are these different conclusions

19   from your December 2019 report?

20            MR. MEDLOCK:  Objection.  Misstates

21   prior testimony.

22       Q.   (By Mr. Nazarov)  You can still go ahead

23   and answer.

24       A.   One second.  I'm so sorry, but my computer

25   just minimized the -- the Webex screen for a



Page 36

1    second, and I cannot find it.

2        Q.  Let's go off the record.

3        A.  Sorry.  Some technical difficulties on my

4    end.

5        Q.  Are you okay now, or should we take a

6    little break?

7        A.  No.  I'm perfect now.  Sorry.  I don't

8    know what just happened.

9        Q.  That happens sometimes on Webex.

10       A.  That was very strange.

11            I think the findings that -- that

12   differed from the first report, the -- one of the

13   main things -- and this came up in our previous

14   deposition -- was that I had believed that metering

15   in 2016 and 2017 was more of a practice versus a

16   policy.

17            And one of the findings that came up

18   for me, in reading through more of the documents

19   produced in discovery, is that ████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████

23   ████████████████████████  And I did not know that

24   in writing the first expert report.

25            That was something new that I included



Page 37

1    in this report and changes my view of it ████████

2    ████████████████████████████████.  I would now

3    be more confident in saying ██████████████ from

4    2016 onward.

5        Q.  Any other conclusions that you would have

6    changed from the original report?

7        A.  Another conclusion was my understanding of

8    operational capacity and its origins.  Again, as I

9    mentioned earlier in this deposition, I had been

10   under the impression that operational capacity was

11   a widely used term throughout the entire time

12   period in question.

13            Now, when I read through the other

14   depositions, when I reviewed additional documents,

15   it became clear to me that ██████████████████████

16   ████████████████████████████████████████████████

17   ██████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ██████████████████████  -- it is an evolution of my

20   understanding of the term "operational capacity".

21       Q.  Well, let's stay on operation (sic)

22   capacity.  In evolving to this new understanding of

23   operational capacity, did you at any point discuss

24   it with any CBP or OFO personnel?

25            MR. MEDLOCK:  Object to the form.



Page 38

1       A.  No.  I read their depositions, though.

2       Q.  (By Mr. Nazarov)  Okay.  So your -- your

3  definition now is based on reading their

4  depositions?

5       A.  As well as their emails that were produced

6  during discovery.

7       Q.  Okay.  Let's go back.  You said that

8  there's different terminology in the merits report

9  of July 2020 and the December 2019 report.  What's

10  different in the terminology?

11       A.  I said -- I believe I said it -- there

12  could be differences.

13       Q.  Okay.

14       A.  I can't think of any right now, but I

15  wouldn't be surprised because my thinking on some

16  of these issues did evolve.

17       Q.  Okay.  When you -- let me stay on this

18  methodology a little bit.

19           Did you develop this methodology, or

20  was this developed by somebody else?

21           MR. MEDLOCK:  Objection.  Asked and

22  answered, also vague.

23       A.  Which methodology are you referring to?

24       Q.  (By Mr. Nazarov)  The methodology that you

25  listed on Page 10 of your report.  And let me --



Page 39

1    let me put it into evidence.  Did we put it into

2    evidence?  I think we did already put it into

3    evidence.  Exhibit A is your report.  It's right

4    there in front of me.

5              That methodology, is this something

6    that you developed or somebody else developed that

7    you copied?

8              MR. MEDLOCK:  Objection.  Vague.  Are

9    you referring to a particular paragraph, Ari?  And

10   if -- put it on the screen.

11             MR. NAZAROV:  I'm referring to

12   Paragraph 18 and -- let's put that on the screen.

13   Josh, could we see Page 10, Paragraph 18 and 19?

14        Q.  (By Mr. Nazarov)  Are you able to read

15   that?

16        A.  Yes.

17        Q.  Okay.

18        A.  And what was the question?

19        Q.  The question was, these two paragraphs,

20   did you develop this methodology?

21             MR. MEDLOCK:  Objection.  Vague.

22        A.  Can I see the second paragraph, because I

23   only see one paragraph.  It's just 18.

24        Q.  (By Mr. Nazarov)  Of course.

25        A.  Well, I am -- my team and I are the only



Page 40

1   ones who have collected consistent metering data at

2   ports of entry over the past almost -- almost three

3   years, more than two and a half years.  However,

4   the methodologies we use are very standard within

5   the field of public policy or political science.

6       Q.  Can you give me an example of where else

7   this type of methodology has been used?

8       A.  The methodologies of reviewing primary

9   sources of observation, of semi-structured

10  interviews are pretty core tenets of qualitative

11  research in actually not just political science and

12  public policy, which are more my fields, but also

13  sociology and probably even anthropology, although

14  I'm not as familiar with their methods.

15      Q.  Do you know if anyone else has used this

16  methodology that you've listed there for any kind

17  of publication or for their own studies?

18          MR. MEDLOCK:  Objection.  Asked and

19  answered.  Also, vague and compound.

20      A.  Are you referring to -- which -- I'm

21  sorry.  I don't fully understand.  Which part of

22  the methodology are you referring to?

23      Q.  (By Mr. Nazarov)  Both.

24      A.  The original data selection or --

25      Q.  Yeah.  Just, you know, both 18 and 19, but



Electronically signed by Charis Hendrick (301-212-281·

Page 41

1    I guess I would focus on, you know, looking at

2    MCAT, queue management reports.  I believe --

3    that's -- that's outlined here -- semi-structured

4    interviews.

5            Has anybody else used that for their

6    methodology related to immigration?

7            MR. MEDLOCK:  Objection.  Form, vague.

8        A.  Most people would not have access to MCAT

9    and queue management reports considering that

10   they're classified and not released to the public,

11   so that's -- that would be difficult for other

12   restrictors to evaluate.

13           With that said, CBP assigned an

14   analyst to look at metering at ports of entry and

15   used a very similar methodology in terms of

16   documenting the numbers into an Excel spreadsheet

17   and analyzing and doing -- coming up with basic

18   descriptive statistics.

19       Q.  (By Mr. Nazarov)  Do you know who this

20   individual was?

21       A.  I don't know the person's name, but I do

22   cite that Excel in one of my footnotes.

23       Q.  Okay.  Do you know when that Excel sheet

24   was dated?

25       A.  It was the end of 2018 --



Electronically signed by Charis Hendrick (301-212-281·

Page 42

1        Q.  Okay.

2        A.  -- because it only contained about six

3    months of data.  It was from the beginning of

4    metering or around -- or at the beginning of the

5    pilot program, so June all the way through perhaps

6    November or December of 2018, about six months of

7    data.

8        Q.  But let me go back to the methodology.

9    When you were preparing this report, did you make

10   any factual assumptions?

11       A.  What do you mean by factual assumptions?

12       Q.  Did you assume any facts?  For example,

13   that there are 24 hours in a day; that's what I

14   would consider a factual assumption.

15            MR. MEDLOCK:  Objection.  Vague.  It's

16   also using assumptions with facts.

17       A.  I'm slightly confused by the question

18   because, yes, I did use basic parameters of time in

19   my report, but I don't know if those are

20   assumptions.

21       Q.  (By Mr. Nazarov)  Okay.  What parameters

22   did you use, just so that I know?

23       A.  I did assume --

24            MR. MEDLOCK:  Objection.  Vague.

25       A.  I assumed there were 24 hours in a day.



Page 43

1    I -- I also -- I mean, I -- I'm sorry.  I really

2    don't understand exactly what I'm being asked.

3        Q.  (By Mr. Nazarov)  Let me move on, and we

4    can maybe come back to that.

5            Are there any weaknesses in your

6    methodology?

7            MR. MEDLOCK:  Objection.  Vague.

8    Weakness is vague.

9        Q.  (By Mr. Nazarov)  You can answer the

10   question.

11       A.  I would say the biggest weakness is that

12   I'm relying on CBP's data, and even CBP themselves

13   have noted that some of their data isn't correct

14   for certain days.

15       Q.  In an ideal world, if you could have other

16   data for this report, what data would you want?

17       A.  To be able to answer the questions that I

18   was asked --

19           MR. MEDLOCK:  Objection.  Incomplete

20   hypothetical.  Continue.

21       A.  To be able to answer the questions that I

22   was asked, it would have been helpful to have a

23   definition of operational capacity and to have had

24   metrics that CBP has outlined over time and

25   collected data for, because I -- I was asked to



Page 44

1    look at operational capacity, but CBP itself has

2    said that ████████████████████████████

3    ████████████████████████████████████.

4    And so it makes it difficult to measure what CBP is

5    saying if I don't have ████████████████████

6    t████████████████████████.

7        Q.  (By Mr. Nazarov)  Do you believe the data

8    you did have and your methodology is reliable in

9    providing an overview of CBP overall operations?

10            MR. MEDLOCK:  Objection.  Vague.

11       A.  What do you mean by CBP overall

12   operations?

13       Q.  (By Mr. Nazarov)  Well, CBP overall

14   missions and operations involved narcotics and

15   trade; do you believe that the data you collected

16   and the methodology you used provides an overview

17   of -- of those operations?

18       A.  Well, I'd consider them, but I was

19   specifically focusing on the processing of

20   asylum-seekers at ports of entry.

21       Q.  Okay.

22       A.  So I looked at the data that -- that CBP

23   also looks at to help me understand what was going

24   on.

25       Q.  Would you agree that this data does not



Page 45

1    represent all of the missions of CBP at the ports

2    of entry?

3        A.   There are certainly other missions and

4    other data that reflects that, but what I was asked

5    to look at is metering, and in looking at those

6    other data sources, which I did, I did not believe

7    that it would be methodologically sound to include

8    them because I could not link them to metering in

9    the type of way I would have needed to, to have

10   appropriate analysis.

11       Q.   Okay.  We've been going at this about an

12   hour.  Are you okay with taking a 10-minute break?

13       A.   Yes.

14       Q.   Okay.

15            MR. NAZAROV:  Steve, you okay with

16   that?

17            MR. MEDLOCK:  Yeah.  I'm fine with

18   that.  Thank you.

19            MR. NAZAROV:  So it's 11:35 your time.

20   Why don't we meet back here at 11:45; how about

21   that?

22            MR. MEDLOCK:  Great.  Thank you.

23            THE VIDEOGRAPHER:  The time is 11:35.

24   We are off the record.

25            (Recess taken.)



Page 46

1           THE VIDEOGRAPHER:  The time is 11:47.

2  We are back on the record.

3      Q.  (By Mr. Nazarov)  Ms. Leutert, you realize

4  that you are still under oath to tell the truth?

5      A.  Yes.

6      Q.  Okay.  Do you know how CBP uses the MCAT

7  reports and the queue management reports?

8           MR. MEDLOCK:  Objection.  Vague and

9  compound.

10     A.  What do you mean by uses?

11     Q.  (By Mr. Nazarov)  In the daily practice of

12  running the ports, how do they utilize the data for

13  their day-to-day operations?

14     A.  ███████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17     Q.  Okay.  Let me go back to your methodology.

18           Is it fair to say that this

19  methodology has not been subject to peer review?

20     A.  The methodology --

21           MR. MEDLOCK:  Objection.  Vague.

22     A.  The methodologies themselves or my report?

23     Q.  (By Mr. Nazarov)  Yeah, your report.  I'm

24  sorry.  Let me rephrase that.  I withdraw the

25  previous question.



Page 47

1              Is it fair to say that this report has

2    not been subject to peer review?

3        A.  I couldn't get it subject to peer review

4    because it's based upon nonpublic information.

5        Q.  Okay.  So would you agree that port of

6    entry contingency plans are designed for

7    emergencies and not for a sustained level of

8    migration?

9              MR. MEDLOCK:  Objection.  Vague.

10       A.  My understanding is that contingency plans

11   are ████████████████████████████████████████████

12   █████████████.

13       Q.  (By Mr. Nazarov)  But they're not

14   sustainable over the long-term; would you agree

15   with that?

16             MR. MEDLOCK:  Same objection.

17       A.  There are possibly elements in them that

18   could be sustainable in the long-term, but they are

19   not -- they're certainly not a overall policy shift

20   that would be more long-term.

21             It's -- it is a response to -- to

22   something versus a new policy.

23       Q.  (By Mr. Nazarov)  Do I hear you saying

24   that they're not sustainable over the long-term?

25             MR. MEDLOCK:  Objection.  Asked and



Page 48

1    answered.  Also, vague.

2        A.  I believe that they're -- they're not

3    designed to be long-term policy shifts.  They are

4    designed to be responses to higher levels of

5    migration.

6            With that said, the reason why I'm not

7    stating yes or no is there are elements of those --

8    of those contingency reports that might be

9    sustainable over a long period of time; there are

10   others that might not be.

11       Q.  (By Mr. Nazarov)  What elements do you

12   think can be sustainable over a long period of

13   time?

14       A.  Potentially, something like virtual

15   processing; that might be a way to relieve --

16   relieve pressure in the port of entry.

17       Q.  Tell me about virtual processing.

18       A.  Well --

19           MR. MEDLOCK:  Objection to the form.

20       A.  It was in some of the contingency reports

21   as a way to relieve pressure at ports of entry.

22       Q.  (By Mr. Nazarov)  Have you ever -- have

23   you ever witnessed virtual processing?

24       A.  No.

25       Q.  Do you know if there's any publication on



```
                                                    Page 49

 1    virtual processing?

 2         A.  I'm not sure if CBP --

 3              MR. MEDLOCK:  Objection.  Vague.

 4         A.  -- has placed recently.

 5         Q.  (By Mr. Nazarov)  I'm sorry.  I didn't

 6    hear your answer.

 7         A.  I'm not sure that CBP has put it in place

 8    recently, so it wouldn't -- it wouldn't likely be

 9    in a publication or --

10         Q.  Okay.

11         A.  -- an evaluation of it somewhere.

12         Q.  Do you know if CBP has used virtual

13    processing?

14         A.  I believe at certain points they may have,

15    but that would have been years ago.  I think I saw

16    some emails ████████████████████████████████████

17    ██████████████████████████.  But, again, that

18    would have been multiple years ago.  I have had

19    something recently.

20         Q   Okay.  To the best of your knowledge, do

21    you know why they stopped using virtual processing?

22         A.  ██████████████████████████████████████████

23    ██████████████████████████████.  So, no, I

24    don't know why an individual port of entry would

25    have put it in place and then come back.
```



Page 50

1      Q.  Okay.  Let me just go back to your

2   methodology again and just quickly ask you, what is

3   the potential error rate for this methodology if --

4   if it's used by other experts?

5      A.  Well, can I refer to the -- to my expert

6   report?

7      Q.  Sure.  Where is it in your expert report?

8      A.  Page 63, Footnote 190.

9      Q.  I'm sorry.  You said Page 63?

10     A.  63.

11     Q.  And where is it on Page 63?

12     A.  Footnote 190.

13     Q.  Okay.

14     A.  Which is the -- using -- similar to CBP, I

15   also discovered multiple errors in the capacity

16   percentages, so there are errors in the data.  So

17   there is an error.

18     Q.  How did you discover these errors?

19     A.  Two ways.  The first is that CBP actually

20   highlighted some of the cells in the Excel, noting

21   that they seem to be wrong.  The other way that I

22   also did was the MCAT reports provide the detention

23   capacity for every port of entry.  They also

24   provide the number of people that are detained and

25   they provide the person capacity filled.



Page 51

1          So it's a pretty basic calculation of

2    total capacity, total number of people; one divided

3    by the other should give you the percent capacity

4    filled.  And when that number did not equal that

5    simple calculation, I also flagged it.  It

6    pretty -- it's what CBP was also doing.

7          I actually have it in the -- in the

8    Excel that I submitted with my expert report; there

9    is a tab, I think, called double-checking or

10   something like that.  And that's what I was doing

11   is just that very simple calculation to make sure

12   these numbers matched; and, if not, flagging them

13   with -- highlighting the cell.  And I did not

14   attempt to fix the calculations, however.  I just

15   flagged them.

16      Q.  So does this have a percentage error rate,

17   that this -- these errors?

18      A.  You could calculate it based on the

19   numbers that appear to be wrong.

20      Q.  And did you calculate it?

21      A.  No, I didn't.

22      Q.  Okay.  So I want to get back to the

23   methodology again.  The methodology you employed,

24   is it able to demonstrate how OFO makes staffing

25   decisions to protect against national security



Page 52

1    threats?

2                MR. MEDLOCK:  Objection.  Vague.

3        A.   If OFO makes staffing decisions -- how OFO

4    makes staffing decisions to protect against

5    national security threats?

6                I -- I'm thinking, because I don't

7    even know -- there are multiple sets of data you

8    could have even to measure that.  I don't even know

9    if CBP collects data that could say that.  And so,

10   no, I did not include that.  I don't even think CBP

11   has the data to be able to say that they have each

12   component, but taken together, that would be

13   something different.

14       Q.   (By Mr. Nazarov)  Is the methodology you

15   employed able to demonstrate how OFO makes staffing

16   decisions to address national security threats?

17               MR. MEDLOCK:  Objection.  Vague and

18   asked and answered.

19       A.   Again, OFO has staffing data and they have

20   data perhaps on national security; the combination

21   of the two would require additional analysis of

22   those two data sets, if it's even possible.

23               With that said, I did consider these

24   elements.  I could not include them in the report

25   because I didn't find that it would be



Page 53

1    methodologically sound to -- to try to link them to

2    metering in a way that -- let me pause; let me go

3    back.  It would be difficult to link them to

4    metering because the data wasn't collected with

5    that purpose, and it doesn't -- it's collected with

6    different methodology over different time periods

7    in the reports.

8           So I considered it, but I was not able

9    to -- or I chose not to put it in the report

10   because it did not allow me to conduct the analysis

11   I was trying to do.

12   Q.   Is the methodology you employed able to

13   demonstrate how OFO makes staffing decisions to run

14   counter-narcotics programs?

15           MR. MEDLOCK:  Objection.  Vague.

16   Objection.  Asked and answered.

17   A.   I considered -- again, I considered CBP

18   staffing data, and I considered some of the other

19   information I was provided on drug seizures or

20   other operations.  I, ultimately, decided to use

21   the data that CBP uses because my questions that I

22   was asked were based on metering.  So I used the

23   only data that I had that would allow me to get an

24   operational picture of what was happening, was

25   metered, which was physical capacity data.



Page 54

1      Q.  (By Mr. Nazarov)  Okay.  So the data you

2   had on counter-narcotics programs and staffing

3   decisions related to counter-narcotics programs,

4   you did not use that data; is that correct?

5            MR. MEDLOCK:  Objection.  Asked and

6   answered, misstates prior testimony, vague.

7      A.  I considered that data, the data that I

8   had that included elements of what you are saying.

9   I just -- I chose not to use it because it wasn't

10  useful in answering the questions I was asked to

11  answer.

12     Q.  (By Mr. Nazarov)  Is the methodology you

13  employed able to demonstrate and consider resources

14  of staffing that may be needed to be allocated to

15  run counter-narcotics operations?

16           MR. MEDLOCK:  Objection.  Asked and

17  answered, vague, compound.

18     A.  Again, I considered data related to some

19  of the elements of what you're saying, but I was

20  unable to use it because it did not allow me to

21  answer the questions I was asked to answer.

22     Q.  (By Mr. Nazarov)  And that's a fair

23  answer.

24           Is the methodology you employed in

25  your merits report able to demonstrate how staffing



Page 55

1    and resources are made by OFO to protect economic

2    security?

3            And let me define economic security

4    for you.  You probably know it, but I will just

5    throw it out there.  It's trade and cargo

6    processing, enforcing trade laws, protecting

7    agriculture and addressing anti-competitive

8    elements in the supply chain.

9            MR. MEDLOCK:  Object to the form.

10   Asked and answered.

11       A.  I, again, looked at data relating to the

12   elements of what you just said.  I was unable to

13   include it in the report because it did not allow

14   me to answer the questions I was asked to answer.

15       Q.  (By Mr. Nazarov)  Is the methodology you

16   employed in your report able to evaluate how

17   staffing and resources are allocated to facilitate

18   trade and travel facilitation?

19            MR. MEDLOCK:  Object to the form,

20   vague, asked and answered.

21       A.  Again, I considered this data -- these

22   data sources.  I even tried to build a model that

23   could include it all.  I was unable to do so.  And

24   I did not find that it allowed me to answer the

25   questions that I wanted to answer because CBP does



Page 56

1    not collect these type of data in a way that allows

2    you to answer questions relating to metering at

3    ports of entry in asylum processing.

4        Q.  (By Mr. Nazarov)  You have to agree that

5    neutralizing national security threats and running

6    counter-narcotics operations are an important

7    part -- a critical part of the CBP mission?

8            MR. MEDLOCK:  Objection.  Form, vague.

9     A.  Correct.

10            MR. MEDLOCK:  Also compound.

11    A.  Correct.

12        Q.  (By Mr. Nazarov)  I'm sorry.  I didn't

13    hear the answer.

14    A.  Correct.

15        Q.  You would have to agree that economic

16    security and trade and travel facilitation are also

17    critical to the larger border missions?

18            MR. MEDLOCK:  Objection.  Form,

19    compound, vague.

20    A.  Correct.

21        Q.  (By Mr. Nazarov)  So, really, in answering

22    the question that you were set out to answer, this

23    methodology only focuses on the small sliver of

24    what goes on at a port of entry; is that correct?

25            MR. MEDLOCK:  Objection.  Asked and



Page 57

1    answered, misstates prior testimony, vague.

2        A.   My focus is understanding metering at

3    ports of entry along the US-Mexico border.   In

4    doing so, I used the only data source that allows

5    me to get that picture.   It is also the only data

6    source that CBP collects to provide an

7    understanding of metering and the one that CBP

8    leadership uses to get a sense of metering in ports

9    of entry.

10            That is ultimately why I used it.   I

11    did consider these other data sources.   I was

12    interested to see if there was a way that I could

13    reconstruct what was going on.   I wasn't able to do

14    that, and I later learned that CBP in this sixth

15    interrogatory also noted that they could not

16    reconstruct what was going on at a port of entry at

17    any given time.

18            And with that, I went back to using

19    the data that CBP uses to look at metering, and

20    that's how I constructed and wrote my report.

21        Q.   (By Mr. Nazarov)  In your data, in your

22    conclusions are focused only on the processing of

23    asylum-seekers; is that correct?

24        A.   Yes, it focuses on the processing of

25    asylum-seekers.



Page 58

1    Q.  I want to take a look -- I want to go to

2    your report, and I have a few questions about that.

3    A.  Okay.

4    Q.  I want to --

5              MR. MEDLOCK:  Which report are you

6    referring to, Ari?  I just want to make sure.

7              MR. NAZAROV:  Yes.  That makes a lot

8    of sense.  I'm referring to Exhibit A, which is

9    your merits report.

10   Q.  (By Mr. Nazarov)  I want to go back and

11   look at Page 73.  That is Section F, titled

12   Operational Capacity Does Not Justify the Turn-Back

13   Policy.  Do you see that?

14   A.  Yes.

15   Q.  Do you want to take a minute to read over

16   that, or can I go ahead and -- why don't I ask the

17   question, and if you think you need to read over

18   it, then you may take the time to do so.

19              If the judge in this case disagrees

20   with your conclusion and finds that operational

21   capacity is a legitimate explanation, how does that

22   affect your conclusion for the report?

23              MR. MEDLOCK:  Objection.  Incomplete

24   hypothetical, calls for a legal conclusion and

25   vague.



Page 59

1      A.  Can I read the section?

2      Q.  (By Mr. Nazarov)  Please.  In fact, if you

3   could, Josh will run it up for you on the screen so

4   you can see it.  Just when you're done with the

5   section, ask him to turn the next page and we'll do

6   that for you.

7      A.  Okay.

8      Q.  Sorry.  Just throw that in there.  We've

9   done that with other witnesses.

10     A.  Next page, please.  Next page, please.

11  Next page, please.  Next page.  Next page, please.

12  Next page, please.  Next page, please.  Next page,

13  please.  Next page, please.  Next page, please.

14  Next page, please.  Next page, please.  Next page,

15  please.  Next page, please, or just maybe perhaps

16  scroll down to the end of the -- that.  Okay.

17     Q.  Would you like the court reporter to read

18  the question to you again?

19     A.  Yes, please.

20             (Record read by Reporter.)

21             MR. MEDLOCK:  I assert my same

22  objection to that question.

23     A.  It wouldn't change it at all.

24     Q.  (By Mr. Nazarov)  Okay.  Let's focus on

25  your Conclusion G, which is right there.  We got to



Page 60

1    it.  I was -- let me go back.

2              I want to ask one last question.  Why

3    wouldn't it change it?

4       A.  What I outline is the history of CBP's use

5    of operational capacity.  ████████████████████

6    ████████████████████████████████  That

7    would not change regardless of whether it's deemed

8    to be a legitimate or not-legitimate explanation

9    for metering.

10             The second part discusses the lack of

11   data to be able to assess whether operational

12   capacity is a legitimate reason for metering.

13   If -- it would stay the same even if it's deemed a

14   justif- -- a justifiable explanation.  There still

15   wouldn't be the data to be able to assess that

16   because CBP, in assessing the metering policy,

17   collects detention capacity, to make that a

18   different conclusion would require that CBP defines

19   operational capacity and collects different data.

20             If they did that, it might be possible

21   to run a different analysis.  Unfortunately, I

22   don't have that data or that definition and, thus,

23   was unable to do that.

24       Q.  Okay.  Let me turn to your conclusion at

25   G, which is on Page 79.  I believe we're right



```
                                            Page 61
 1    there, a lack of ICE/ERO capacity does not justify

 2    turn-backs.

 3              If the judge in this case finds that

 4    ICE/ERO's slow responses or failure of other

 5    agencies to coordinate with OFO affects OFO's

 6    ability to move asylum-seekers, how would that

 7    change your conclusion?

 8              MR. MEDLOCK:  Objection.  Incomplete

 9    hypothetical, vague, calls for a legal conclusion.

10       Q.  (By Mr. Nazarov)  Would you like to

11    read -- would you like to read your section before

12    you answer?

13       A.  Yes.

14       Q.  Okay.

15       A.  Next page, please.  Next page, please.

16    Next page, please.  Next page, please.  Next page,

17    please.  Next page, please.  Next page, please.

18              Is it possible to have the court

19    reporter repeat the question like last time?

20       Q.  Of course.

21              MR. NAZAROV:  Ms. Hendrick?

22              (Record read by Reporter.)

23              MR. MEDLOCK:  I will assert the same

24    objections.

25       A.  It would not.
```



Page 62

1        Q.   (By Mr. Nazarov)   And why not?

2        A.   Can we scroll up to Paragraph 138?  So as

3    I write in Paragraph 138, while ICE/ERO's slow

4    responses or limited pick-ups may affect OFO's

5    ability to move asylum-seekers quickly out of ports

6    of entry, these situations constitute self-imposed

7    bottlenecks.

8             And then I go on.  And that's -- that

9    would be the same regardless of the judge's

10   conclusion.  I do note that slow responses or

11   limited pick-up times affect OFO's ability to move

12   asylum-seekers out of ports of entry; however, I

13   also conclude that this is a self-imposed

14   bottleneck on processing asylum-seekers.

15             THE REPORTER:  I'm sorry.  Say that

16   last part again.

17       A.   I said that conclusion would remain the

18   same.

19       Q.   (By Mr. Nazarov)   What do you mean by

20   self-imposed bottlenecks?

21       A.   I mean that there are other ways to move

22   asylum-seekers through ports of entry that do not

23   need to be immediate mandatory detention.  In fact,

24   in other points of time CBP has pursued these

25   alternatives, including creating alternative



Page 63

1    processing centers or moving forward in that

2    creation, which I also mentioned earlier in that

3    report, or paroling individuals.

4              However, there has been a focus on

5    mandatory detention, as I write in the next line.

6    The mandatory detention for asylum-seekers and the

7    reluctance and refusal to use NTAs or paroles,

8    these are policy and leadership decisions, not

9    immutable rules.

10    Q.   Okay.   I have one more question before I

11    pass the witness.

12              If someone else were to analyze your

13    work and try to replicate it, how would they go

14    about doing it?

15    A.   Well --

16              MR. MEDLOCK:   Objection.   Vague.

17    A.   -- there are multiple ways.   Primarily, if

18    they wanted to just write the report, they could

19    review the documents that I reviewed.   And --

20    apologies; things moved around on my screen -- they

21    could review the documents that I reviewed; they

22    could review the queue management reports and the

23    MCAT reports; they could build the database that I

24    built.   You can easily build that again.

25              In fact, for every column in that



Page 64

1    Excel, I note the Bates number of the report that I

2    used, so you could very clearly rebuild it.  You

3    could review the documents.  I used primarily all

4    the documents that were provided in discovery.  And

5    I also used other reports, outside reports, when

6    relevant.

7              You could essentially build this by

8    reviewing everything that I reviewed.  However --

9    and that's why I paused in the beginning -- I think

10   you would also want to have the foundational

11   knowledge, having visited ports of entry, having

12   spoken to asylum-seekers, having spoken to CBP

13   officers at the limit line, having watched metering

14   take place.

15             Because, in taking all this data and

16   taking all these emails and the reports, having

17   that foundational knowledge and having conducted

18   that fieldwork previously helps to put it into a

19   context and helps to be able to pick out what's

20   actually important and what is irrelevant to

21   answering these specific questions.

22             MR. NAZAROV:  Okay.  Well, thank you,

23   Ms. Leutert.  I'm going to pass you to your

24   attorney, Steve.  And he can decide whether he has

25   any questions for you, and then I might come and



Page 65

1    redirect depending on whatever questions he has.

2            MR. MEDLOCK:  Sure.  Ari, can we go

3    off the record for maybe 10 minutes so I can

4    discuss with my co-counsel whether I do have

5    questions?

6            MR. NAZAROV:  Sure.  Can we take more

7    than 10 minutes?  Can we take 15 minutes?

8            MR. MEDLOCK:  Absolutely.  So come

9    back at -- let's say we come back at 1:40 Eastern,

10   12:40 Central.

11           MR. NAZAROV:  1:40.  Okay.  That

12   sounds good.  Thank you both.

13           THE VIDEOGRAPHER:  The time is 12:22.

14   We are off the record.

15           (Recess taken.)

16           THE VIDEOGRAPHER:  The time is 12:41.

17   We are back on the record.

18           MR. MEDLOCK:  Ms. Leutert, thank you

19   very much for your time today.  Al Otro Lado and

20   the class has no questions for you at this time.

21           MR. NAZAROV:  I would like to also

22   thank you for your time today.  Thank you, and I

23   guess this concludes our deposition.

24           Josh, what do we do next?

25           MR. MEDLOCK:  I say we are off the



```
                                              Page 66
 1   record.   The time is 12:41, and that concludes

 2   today's deposition.

 3             MR. MEDLOCK:  We'll, obviously, read

 4   and sign this.

 5             MR. NAZAROV:  That's fine with us.

 6             (End of Proceedings, 12:42 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Electronically signed by Charis Hendrick (301-212-281·                    d7251d10-a060-4449-87fa-0f18982e93a9

Page 67

1              CHANGES AND SIGNATURE

2    WITNESS NAME:  STEPHANIE LEUTERT

3    DATE OF DEPOSITION:  AUGUST 11, 2020

4    PAGE          LINE     CHANGEREASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____



Electronically signed by Charis Hendrick (301-212-281·                    d7251d10-a060-4449-87fa-0f18982e93a9

Page 68

1       I, STEPHANIE LEUTERT, have read the foregoing
     deposition and hereby affix my signature that same
2    is true and correct, except as noted above.

3

4

5                    _____
                     STEPHANIE LEUTERT
6

7    THE STATE OF _____
     COUNTY OF _____
8

9

10   Before me, _____, on this day
     personally appeared STEPHANIE LEUTERT, known to me
11   (or proved to me under oath or through
     _____) to be the person whose name is
12   subscribed to the foregoing instrument and
     acknowledged to me that they executed the same for
13   the purposes and consideration therein expressed.

14

15   Given under my hand and seal of office this _____
     day of _____, 2020.
16

17

18   _____
     NOTARY PUBLIC IN AND FOR THE
19   STATE OF _____

20

21   MY COMMISSION EXPIRES:_____

22

23

24

25



```
                                                         Page 69

 1                    REPORTER'S CERTIFICATION

 2            IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF CALIFORNIA
 3
     AL OTRO LADO, INC, ET AL.  )
 4                              )
                                ) CIVIL ACTION NO.
 5   VS.                        ) 17-CV-02366-BAS-KSC
                                )
 6   KEVIN K. MCALEENAN, ET AL. )

 7            ------------------------------------

 8              DEPOSITION OF STEPHANIE LEUTERT
                        AUGUST 11, 2020
 9                      REPORTED REMOTELY

10            ------------------------------------

11

12            I, CHARIS M. HENDRICK, Certified Shorthand

13   Reporter in and for the State of Texas, do hereby

14   certify to the following:

15            That the witness, STEPHANIE LEUTERT, was

16   by me duly sworn and that the transcript of the

17   oral deposition is a true record of the testimony

18   given by the witness.

19            I further certify that pursuant to Federal

20   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)

21   as well as Rule 30(e)(2), that review of the

22   transcript and signature of the deponent:

23      __xx__ was requested by the deponent and/or a

24   party before completion of the deposition.

25        _____ was not requested by the deponent and/or
```



Page 70

1    a party before the completion of the deposition.

2         I further certify that I am neither

3    attorney  nor counsel for, nor related to or

4    employed by any of the parties to the action in

5    which this deposition is taken and further that I

6    am not a relative or employee of any attorney of

7    record in this cause, nor am I financially or

8    otherwise interested in the outcome of the action.

9         The amount of time used by each party at

10   the deposition is as follows:

11        Mr. Nazarov - 1:44 hours/minutes

12

13        Subscribed and sworn to on this 21st day

14   of August, 2020.

15

16

17   _Charis M. Hendrick_
     CHARIS M. HENDRICK, CSR # 34

18   Certification Expires: 10-31-21
     MAGNA LEGAL SERVICES

19   (866) 624-6221
     Firm Registration No. 633

20

21

22

23

24

25



Electronically signed by Charis Hendrick (301-212-281·          d7251d10-a060-4449-87fa-0f18982e93a9