MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Chad F. Wolf,[112] *et al.*,<br><br>Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 113 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

[112] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 113 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

(San Diego)

AL OTRO LADO, INC., ET AL.,    )
                               )
              Plaintiffs,      )
                               )
     vs.                       )CASE NO.
                               )3:17-cv-02366-BAS-KSC
CHAD F. WOLF, Acting           )
Secretary of Homeland          )
Security, in his official      )
capacity, et al.,              )
                               )
              Defendants.      )
_____ )

VIDEO-RECORDED VIRTUAL DEPOSITION OF

ERIKA DACRUZ PINHEIRO

TIJUANA, MEXICO

THURSDAY, JUNE 18, 2020

STENOGRAPHICALLY REPORTED BY:

Valerie C. Rodriguez
CSR No. 12871 (orig 6980)



Page 2

1                    UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3                          (San Diego)

4    AL OTRO LADO, INC., ET AL.,   )
                                   )
5                     Plaintiff,   )
                                   )
6        vs.                       )CASE NO.
                                   )3:17-cv-02366-BAS-KSC
7    CHAD F. WOLF, Acting          )
     Secretary of Homeland         )
8    Security, in his official     )
     capacity, et al.,             )
9                                  )
                      Defendants.  )
10   _____  )

11

12

13

14

15    VIDEO-RECORDED VIRTUAL DEPOSITION OF ERIKA DACRUZ

16       PINHEIRO, TAKEN ON BEHALF OF THE DEFENDANTS,

17   TIJUANA, MEXICO, COMMENCING AT 9:03 a.m. AND ENDING

18    AT 3:37 p.m. ON THURSDAY, JUNE 18, 2020, BEFORE

19   VALERIE C. RODRIGUEZ, CERTIFIED SHORTHAND REPORTER

20           NO. 12871 (ORIGINALLY 6980).

21

22

23

24

25



```
                                                            Page 3
 1   APPEARANCES:
 2
             FOR PLAINTIFF AL OTRO LADO, INC., ET AL.:
 3
                 MAYER BROWN
 4               BY:  MICHELLE WEBSTER, ESQ.
                 1999 K STREET N.W.
 5               WASHINGTON, DC  20006
                 202.263.3221
 6               MWEBSTER@MAYERBROWN.COM
                 VIA WEBEX
 7
 8           FOR DEFENDANT CHAD F. WOLF,
             ACTING SECRETARY OF HOMELAND SECURITY,
 9           IN HIS OFFICIAL CAPACITY, ET AL.:
10               UNITED STATES DEPARTMENT OF JUSTICE
                 CIVIL DIVISION
11               OFFICE OF IMMIGRATION LITIGATION
                 BY:  ALEXANDER J. HALASKA, ESQ.
12               P.O. BOX 868
                 BEN FRANKLIN STATION
13               WASHINGTON, DC 20044
                 202.307.8704
14               ALEXANDER.J.HALASKA@USDOJ.GOV
                 VIA WEBEX
15
16           FOR DEFENDANT
17               SOUTHERN POVERTY LAW CENTER
                 BY:  MELISSA CROW, ESQ.
18               1101 17TH STREET, N.W.
                 SUITE 705
19               WASHINGTON, D.C. 20036
                 202.355.4471
20               MELISSA.CROW@SPLCENTER.ORG
                 VIA WEBEX
21
22           ALSO PRESENT:
23               SOL TRAN, VIDEO TECHNICIAN
                 KEVIN CRANFORD, MAGNA TECH
24
25
```



Page 4

1            INDEX TO DEPOSITION OF ERIKA DACRUZ PINHEIRO

2                         JUNE 18, 2020

3

4    EXAMINATION BY MR. HALASKA                                6

5

6                          EXHIBITS

7     MARKED              DESCRIPTION                        PAGE

8    Exhibit 1      AOL 30(b)(6), Notice of
                    Deposition                                14
9

     Exhibit 2      Email dated 11/28/17                      61
10

     Exhibit 3      Return of organization exempt
11                  from income tax for 2017                  71

12   Exhibit 4      Series of emails                          96

13   Exhibit 5      Email thread                             138

14   Exhibit 6      Second Amended Complaint                 157

15   Exhibit 7      2016 Tax Return, one page only           160

16

17

               INFORMATION REQUESTED:   (None)
18

19             DIRECTIONS NOT TO ANSWER:   (None)

20

21

22

23

24

25



Page 5

```
1              TIJUANA, MEXICO, THURSDAY, JUNE 18, 2020

2                        ~~~9:03 a.m.~~~

3                            -o0o-

4

5

6

7              THE VIDEOGRAPHER:  We are now on the

8    record.  This begins media number one in the

9    deposition of Erika Pinheiro in the matter of Al

10   Otro Lado, Inc., et al. versus Kevin McAleenan, et

11   al., in the United States District Court, Southern

12   District of California.

13              Today is Thursday, June 18th, 2020.  The

14   time is 12:04 p.m.

15              This deposition is being held remotely at

16   the request of the U.S. Department of Justice,

17   Office of Immigration Litigation.

18              The videographer is Sol Tran, the trial

19   tech is Kevin Cranford, and the court reporter is

20   Valerie Rodriguez, all of Magna Legal Services.

21              All counsel and parties present will be

22   noted on the stenographic record.

23              Will the court reporter please swear in

24   the witness.

25   ///
```



Page 6

1               ERIKA DACRUZ PINHEIRO,

2          having been first duly sworn,

3        was examined and testified as follows:

4                    -o0o-

5                  EXAMINATION

6                    -o0o-

7   BY MR. HALASKA:

8       Q    Good morning.  Could you please state

9   your full name for the record?

10      A    Erika DaCruz Pinheiro.

11      Q    Can you spell that for the court

12  reporter?

13      A    E-R-I-K-A.  Capital D, A, capital C,

14  R-U-Z.  P as in Peter, I, N as in Nancy, H-E-I-R-O.

15      Q    Thank you.  Have you ever gone by any

16  other names?

17      A    No.

18      Q    Ms. Pinheiro, are you presently employed?

19      A    Yes.

20      Q    Where are you employed?

21      A    Al Otro Lado.

22      Q    What's your current job title there?

23      A    Litigation and policy director.

24      Q    How long have you held that position?

25      A    When I initially became staff at Al Otro



Page 7

1   Lado, that was April of 2017, I had a different

2   title.  I was policy and technology director.  And I

3   transitioned to my new title, I'm honestly not sure.

4   It was probably sometime in 2017 as well.  But I'm

5   not sure of the exact date that I transitioned

6   title, but I've been at Al Otro Lado as staff since

7   April of 2017 and I've been a board member of Al

8   Otro Lado since probably around December of 2015.

9        Q     What do you do in your current role as

10  the litigation and policy director?

11       A     Can you repeat the question?  You're just

12  cutting out a little bit.

13       Q     Sure.  What do you do in your current

14  role as the litigation and policy director?

15       A     Oh, a lot.  Do you want me to go through

16  all my responsibilities?  So, I'm the -- I manage

17  our litigation programs, but I also have more of an

18  administrative role for the organization overall.

19            So I just overall oversee our operations,

20  development, HR and media.  I supervise -- I oversee

21  the supervisors for the following programs,

22  litigation programs.  Our Otay Mesa Release Project,

23  which is housed at the San Diego office.  I oversee

24  the Family Reunification Program.  I provide

25  administrative support to our Border Rights Project.




Page 8

1          And let's see, what else?  I also report

2     back to the board and I'm a member of the board of

3     directors as well.

4          Q     Okay, great.  Have you ever testified in

5     court before?

6          A     No.

7          Q     Have you ever testified in a deposition

8     before?

9          A     No.

10         Q     Have you ever testified in any kind of

11    arbitration hearing?

12         A     The one for this case, we have the early

13    neutral evaluation.  I was present there and I

14    offered some information.  But beyond that, no.

15              THE STENOGRAPHIC REPORTER:  I'm sorry to

16    interrupt, Erika --

17    BY MR. HALASKA:

18         Q     Have you ever testified --

19              THE STENOGRAPHIC REPORTER:  Alex, I'm

20    sorry to interrupt.  You had said, Erika, beyond the

21    something program.

22              THE WITNESS:  It was -- we were required

23    to -- I'm sorry if I'm not getting the terminology

24    correct.  It was early neutral evaluation where we

25    had -- would that constitute a mediation, Alex?



Page 9

1    That meeting?  I think you were there.

2                    MR. HALASKA:  Yeah, that's not what I'm

3    looking for, but it's good information to have on

4    the record.

5                    THE WITNESS:  Okay, yeah.

6    BY MR. HALASKA:

7        Q     Have you ever testified in immigration

8    proceedings?

9        A     No.

10       Q     Have you ever testified in any other

11   administrative proceeding?

12       A     No.  I've testified before government

13   bodies, like the Board of Supervisors for L.A.

14   County.  I did offer formal testimony there, but

15   that would be the only place.

16       Q     That was the Los Angeles Board of

17   Supervisors?

18       A     Yes.

19       Q     When was that?

20       A     I've done -- I've testified before them

21   several times between, I would say, 2014 and 2015.

22       Q     Do you remember how many times?

23       A     No, it was actually after that.  Sorry.

24   Let me correct that.

25                    2015 and 2016.  It was two to three



1    times.

2         Q    What was the nature of your testimony

3    before the Board of Supervisors?

4         A    One was regarding the 287 -- renewal of

5    the 287-G program in L.A. County.  And honestly, I

6    don't recall the others.  But it generally had to do

7    with immigration matters before the Board of

8    Supervisors.

9              Oh, I'm sorry.  I do remember one other

10   one.  It was regarding a motion, the Board of

11   Supervisors were considering to regulate immigration

12   consultants in the County of Los Angeles.

13        Q    Did your testimony to the Board of

14   Supervisors ever touch on ports of entry along the

15   U.S.-Mexico border?

16        A    No.

17        Q    Well, thank you for that.

18             Just to go into a little bit of the

19   ground rules.  This is a deposition and a deposition

20   takes place in question and answer format.  I'm

21   going to ask you questions and you're going to

22   answer them to the best of your ability.

23             Do you understand?

24        A    Yes.

25        Q    We've been kind of, you know, doing this



Page 11

1    already, but it's important that you provide audible

2    answers to my questions, because even though the

3    court reporter is very good, it's very difficult to

4    take down nods or shakes of the head.

5        A    Okay.

6        Q    I'm going to try to ask questions in a

7    way that you need to understand, but if you don't

8    understand any of my questioning, please let me know

9    and I'll offer a better question; okay?

10       A    Okay, thank you.

11       Q    Your attorney might object to my

12   questioning today and that's fine.  However, the

13   objections will be ruled on by a judge later.  So

14   unless your attorney instructs you not to answer a

15   question, I'm going to ask that you answer to the

16   best of your ability.

17            Do you understand?

18       A    Yes.

19       Q    I'll try to take breaks every hour or so

20   during the deposition.  You should feel free to ask

21   for a break if you need one, ask if you need one.

22   My only request is that if I have a question

23   pending, that you just answer the question before we

24   break; okay?

25       A    Okay.



Page 12

1      Q    Unless I indicate otherwise, my questions

2  today are going to relate to the time period from

3  January 1, 2016, to the present, okay?

4      A    Yes.

5      Q    Do you understand that you've taken an

6  oath today to tell the truth?

7      A    Yes.

8      Q    Do you understand that it's the same oath

9  that you would say in front of a judge in a

10  courtroom?

11     A    Yes.

12     Q    Is there any reason why you can't provide

13  complete and truthful testimony this morning?

14     A    No.

15     Q    Other than traffic offenses, have you

16  ever been convicted of a crime?

17     A    No.

18     Q    Other than traffic offenses, have you

19  ever been charged with a crime?

20     A    No.

21     Q    Other than traffic offenses, have you

22  ever been arrested?

23     A    No.

24     Q    Have you ever been the subject of any

25  state bar association's disciplinary proceedings?



Page 13

1       A     No.

2       Q     Have you ever been sued in your personal

3    capacity before?

4       A     No.  I'm just trying to think back of any

5    traffic accident I had, whether there was, like, an

6    insurance dispute.  But, no.  No.

7       Q     Have you ever personally been a party to

8    a lawsuit before?

9       A     Yes.

10      Q     What was that lawsuit?

11      A     It's a pending lawsuit in the Central

12   District of California.  It's Phillips versus CBP.

13   I'm one of the three plaintiffs in that lawsuit.

14      Q     What is the nature of that lawsuit?

15      A     It's challenging customs and border

16   protections, unlawful surveillance of myself and

17   co-plaintiffs, and their placement of a travel alert

18   on my passport.

19      Q     What's the status of that case?

20      A     We are in discovery right now and trial

21   is set for sometime in August.

22            MR. HALASKA:  Kevin, can you please pull

23   up the document that's designated AOL 30(b)(6)

24   deposition notice.

25   ///



Page 14

1                (Pinheiro Exhibit 1 was marked for

2                identification.)

3    BY MR. HALASKA:

4        Q     Ms. Pinheiro, this is the Notice of

5    Deposition under Rule 30(b)(6) that the defendant in

6    this case served on plaintiff, Al Otro Lado,

7    Incorporated.

8                Have you seen this document before?

9        A     Yes.

10       Q     When did you see it?

11       A     It was sent to me by counsel upon

12   receipt, and I've reviewed it several times on my

13   own, as well as with my attorneys.

14       Q     Do you understand that you are here to

15   testify as the 30(b)(6) representative for Al Otro

16   Lado, Incorporated?

17       A     Yes.

18       Q     In your own words, what does it mean to

19   be a 30(b)(6) representative?

20               MS. WEBSTER:  Objection.  Calls for a

21   legal conclusion.

22               THE WITNESS:  Okay.  Should I --

23               MR. HALASKA:  Go ahead.

24               MS. WEBSTER:  Go ahead and answer.

25               THE WITNESS:  So I am here today on



Page 15

1    behalf of Al Otro Lado.  I am prepared to give

2    answers to all of your questions on behalf of the

3    organization.  And my answers today will include

4    information that is known by the organization and

5    not necessarily, you know, like I had to prepare for

6    this obviously, so...not necessarily my personal --

7    things that I personally had known before preparing.

8              MR. HALASKA:  Okay.

9              Kevin, if you wouldn't mind turning to

10   page four of the PDF.

11   BY MR. HALASKA:

12       Q    Ms. Pinheiro, do you see about halfway

13   down, where it says topics for examination?

14       A    Yes.

15       Q    Are you here to testify on all those

16   topics today?

17       A    Yes.

18              MS. WEBSTER:  One note.  We had a dispute

19   regarding topic, I believe it's 32.  No, it's 36.

20   Sorry about that.

21              So there is a debate that we've engaged

22   in with defense counsel with regard to this topic,

23   and we have objected and -- based on the confusing

24   nature of the topic and Ms. Pinheiro is not been

25   instructed to testify on that topic.



Page 16

1            THE WITNESS:  Could you scroll down to

2    that topic just so I can see what we're talking

3    about?

4            MS. WEBSTER:  Yes, it's on page 16.

5            THE WITNESS:  36, factual basis for your

6    statements...oh, okay.

7            MR. HALASKA:  Thank you.

8    BY MR. HALASKA:

9        Q    When did you find out that you would be

10   testifying as a 30(b)(6) witness?

11       A    We had a discussion about it two weeks

12   ago, I believe, and then decided who would be the

13   witness and -- yeah.  And I -- we decided it would

14   be me.  I think it was --

15       Q    Do you recall -- I'm sorry, I cut you

16   off.

17       A    No, I'm just trying to remember the exact

18   date, because I think we usually talk on Thursdays.

19   And it was not last Thursday, but the Thursday

20   before if I'm remembering correctly, but I'm not

21   like 100 percent sure on that.  But it was over a

22   week ago.

23       Q    You said you spoke on Thursdays.  Is that

24   conversation usually over phone, is it by email, is

25   it in person?



Page 17

```
 1          A       Webex.

 2          Q       By video platform?

 3          A       Uh-huh, yes.

 4          Q       Have you prepared yourself to testify

 5    today as a 30(b)(6) witness?

 6          A       Yes, I have.

 7          Q       What have you done to prepare yourself?

 8          A       So I've had about ten hours of video

 9    conference or phone conversations with counsel.

10    I've spoken with Nicole Ramos and Nora Phillips

11    about some information that was more clearly known

12    to them that I thought I would have to be prepared

13    for today.

14                  I reviewed some foundational

15    organizational documents that are addressed in the

16    30(b)(6) notice.

17                  I reviewed the complaints, the second

18    amended complaint and some of the other documents

19    that have been filed in this case.

20                  I reviewed some of the documents that Al

21    Otro Lado offered to the government as part of your

22    discovery.

23                  MS. WEBSTER:  Pardon me, Erika.  I would

24    advise you not to get into much detail about what

25    we've discussed, but the fact that we've discussed
```



Page 18

1    these items is fine.

2              THE WITNESS:  Sure.  No, I think --

3              MS. WEBSTER:  I would instruct you on the

4    basis of privilege to --

5              THE WITNESS:  Yeah, yeah, of course.  I

6    was about to end there.  I think that was

7    everything.

8    BY MR. HALASKA:

9        Q     Okay.  So you said you had about ten

10   hours of phone or video conversation; is that right?

11       A     Uh-huh, yes.

12       Q     Were those with counsel?

13       A     Yes.

14       Q     Was anyone besides counsel present on

15   those calls?

16       A     No -- oh, the first hour, I think Nicole

17   Ramos might have been on the call.

18       Q     Anyone else?

19       A     No.

20       Q     You said you reviewed some documents; is

21   that right?

22       A     Yes.

23       Q     Were those documents that -- let me start

24   that again.

25              The documents that you reviewed, were



Page 19

1    these documents that were provided by the government

2    to plaintiffs in this litigation?

3        A    No, I don't -- give me one second to

4    think about that.

5             MS. WEBSTER:  Again, Erika, I would

6    advise you not to discuss the contents of the

7    materials that we have reviewed, but the fact that

8    we have reviewed documents produced in this matter

9    is not subject to privilege.

10            THE WITNESS:  I reviewed filings --

11            MR. HALASKA:  This is a simple yes-or-no

12   question, I'm sorry.

13            THE WITNESS:  I reviewed filings by the

14   government in our case; yes.  Motions, things like

15   that.

16   BY MR. HALASKA:

17       Q    Do you recall which filings?

18       A    Let's see.  Give me one second to think

19   through so I can give an accurate answer.

20            I believe it was the response to the

21   Second Amended Complaint, the government's motions

22   to dismiss.  I believe there were two if I'm

23   remembering correctly.

24            There were a few other documents, but

25   those were all filed with the court.  They were all



Page 20

1    things that are part of the cases' record.

2           So I don't remember the names of the

3    other documents but they were things like motions,

4    responses that were filed with the court.

5       Q    Based on your review of those documents,

6    did you engage in any follow-up activities on your

7    own?

8       A    Can you clarify?  Based my review of the

9    government's filed documents?  Or based --

10      Q    Based on your review of anything.

11      A    Oh, of any documents.  I had several

12   conversations on the advice of counsel with Nora

13   Phillips and Nicole Ramos just to clarify certain

14   facts or statistics or just organizational

15   information that was addressed specifically in the

16   notice.

17      Q    You said it was on the advice of counsel.

18   Was counsel present for those conversations?

19      A    Only the first hour that I mentioned

20   where Nicole Ramos was present.  The other counsel

21   directed me to clarify certain information with my

22   co-directors in preparation for this deposition.

23      Q    This is just a yes-or-no question.  The

24   topics that you sought clarification on with your

25   co-directors, did counsel specifically identify



Page 21

1    those topics for you?

2        A    Yes.

3        Q    Did you do anything else to prepare for

4    this deposition besides the ten hours of video and

5    phone conversations, the conversations with

6    Ms. Phillips and Ms. Ramos, and your review of the

7    documents?

8        A    No.

9        Q    I'd like to go into some background

10   information generally about Al Otro Lado.  And just

11   for the record, if I refer to Al Otro Lado as AOL

12   today, will you understand what that means?

13       A    Yes.

14       Q    What is Al Otro Lado?

15       A    Al Otro Lado is --

16            MS. WEBSTER:  Objection, vague.

17            You can respond.

18            THE WITNESS:  Al Otro Lado is a

19   binational nonprofit organization dedicated to

20   providing advocacy, screening, and legal

21   representation for migrants on both sides of the

22   U.S.-Mexico border.

23            We also seek to redress civil rights

24   violations that are committed against our clients,

25   and connect our clients -- provide services or



Page 22

1    connect our clients with legal and other social

2    services that they might need.

3    BY MR. HALASKA:

4        Q    What do binational legal services entail?

5             MS. WEBSTER:  Objection, vague.

6             THE WITNESS:  Let me just ask to clarify

7    that.  Would you like me to describe the services

8    that we provide on both sides of the border in all

9    of our offices?

10            MR. HALASKA:  Sure, we can start there.

11            THE WITNESS:  Okay, great.

12            So we have three offices currently.  One

13   is located in Tijuana, Mexico.  One is located in

14   San Diego, California.  And in Los Angeles we have a

15   main office in Maywood, California, which is in

16   Los Angeles County.  And we have like a small

17   satellite office on the campus of the L.A.

18   County-USC hospital.  But I would count that as one

19   office, the LA programs.

20            So I'll go from south to north and talk

21   about the programs.

22            So our Border Rights Project and our

23   deportee programs are the two programs located in

24   the Tijuana office.  The Border Rights Project

25   offers legal orientation to Asylum seekers, both



Page 23

1    those who have been metered and those who are part

2    of the MPP program.

3              Those services include giving group legal

4    orientations, conducting individual legal

5    orientations or screenings.

6              We offer accompaniment to the port of

7    entry in some cases.  And of the MPP clients, we --

8    we'll represent some clients, either before the

9    immigration court or before -- in front of the

10   federal court, like on habeas matters or mandamus

11   matters.

12             We also, as part of that program, engage

13   in just different kinds of advocacy, both with

14   U.S. Government officials and in Mexico.  So we're

15   part of several coalitions in Mexico that include

16   all three levels of government, other civil society

17   organizations and shelters.  So we generally

18   advocate for the rights of Asylum seekers and other

19   migrants through those coalitions.

20             And we receive visits, like visits from

21   Members of Congress, Attorneys General, other

22   lawmakers who want to come to the border or even

23   just, you know, other public figures who want to

24   come to the border and get a better sense of what's

25   happening.  So we will host those types of visits in



Page 24

1    Tijuana.

2              So -- and then in Tijuana as well, we

3    have the deportee program, so that sounds like what

4    it is.  We provide services to people who have been

5    deported from the United States to Mexico, with a

6    particular emphasis on deportees who have a claim

7    for derived citizenship, those who were legal

8    permanent residents in the United States, and those

9    who were the primary -- almost all of our clients

10   were the primary bread winners for U.S. citizen

11   children who are in the United States.  So the cross

12   border nature of that program entails providing

13   legal services to the deportees if they do have a

14   legal avenue of return to the United States.

15             We also help those who do not have a

16   legal avenue of return in integrating in Mexico, and

17   for family members in the United States, we help

18   connect with -- we help them connect with legal and

19   social service or sometimes represent them in

20   immigration matters, just depending on the case.

21             We also -- so that's basically Tijuana.

22   Do you want me to clarify anything about Tijuana

23   before I move to San Diego?

24   BY MR. HALASKA:

25        Q    Yes, let's talk about the Tijuana program



Page 25

1    before we move onto the other locations.  That was

2    very comprehensive, I appreciate that.

3              How many Al Otro Lado staff members, paid

4    employees, are there in the Tijuana office?

5         A    13, I believe.

6         Q    13?

7         A    Well, actually, let me clarify that.

8    Because we are also a nonprofit in Mexico, so it's a

9    separate legal entity.  In Mexico, it's called an

10   associação civil.  It's essentially like a

11   501(c)(3).

12             I believe -- hold on, let me count how

13   many people are employees of that organization.

14   It's five.  I believe it's five if I'm remembering

15   correctly.  Five of the 13 are actually employees of

16   the Mexican entity.  And then the other eight are

17   employees of the U.S. organization.  Some -- yeah, I

18   think that's right.

19        Q    Are any employees of both the U.S. and

20   the Mexico entities?

21        A    I am one of the -- I'm trying to

22   translate it from Spanish.  Just give me one second

23   to give you an accurate representation here.  I

24   guess it would be like a founding executive of the

25   Mexican organization, as is Nora Phillips.



Page 26

1          One thing I wanted to mention, just to go

2     back to the number of full-time staff, all of our

3     employees in the U.S. have to come to Tijuana at

4     some point to do -- you know, to do legal work or

5     help with the clinics or whatever is coming up at

6     the time, especially in periods of really high

7     demands for service.

8          So while there are people who are like

9     assigned to the Tijuana office more or less on a

10    full-time basis, there are other employees of both

11    San Diego and Los Angeles offices who come to

12    Tijuana to help on a very regular basis, including

13    Nora Phillips, who largely manages the deportee

14    program and there's a staff attorney in Los Angeles

15    who works, I think almost exclusively on the

16    deportee program, but she's assigned to the LA

17    office.

18         So it's a little more complicated than

19    saying this person is in this office, this person is

20    in that office, because a lot of the programs -- and

21    you'll see when I talk about the San Diego and L.A.

22    programs, but they're connected in many ways.

23         Q    Okay.  What are some of the roles that

24    those 13 employees in the Tijuana office occupy?

25         A    All right.  Let me think, let me make



Page 27

1    sure I remember all of this.  Give me one second

2    here.

3              So we have the director of the Border

4    Rights Project.  We have a staff attorney who --

5    just, you know, just helps -- mostly with the pro se

6    work, so helping people who don't have an attorney,

7    so mostly meter people or MPP folks.

8              There's a clinic coordinator.  There's a

9    volunteer coordinator.  There's a psychologist.

10   There's someone who helps with data management.

11             There's -- who else?  Operations,

12   logistics.  There's someone who works in the

13   deportee program.  Oh, God, who else is there.  I'm

14   forgetting people.

15             Let me think what else.  I'm thinking

16   through the people, what they do.

17        Q    Take your time.

18        A    Yeah, I feel like I'm forgetting

19   somebody.  I feel bad.  Okay.

20             Director, staff attorney -- sorry, I'm

21   just going to go through in my head, and then if I

22   think of somebody I forgot to tell you, I'm going to

23   tell you.  Just give me one second.

24             There's another attorney who is a dual --

25   he lives in Mexico, but he's like kind of half



Page 28

1    between San Diego, like he works on litigation

2    stuff.

3              I don't recall whether his official

4    designation is for the San Diego office.

5              Oh, okay.  I remember who the other

6    people are now.  We have a fellow -- we actually

7    have two fellows.  Those are the people I was

8    forgetting.

9              And they do like whatever we ask them to

10   do basically.

11       Q    Anyone else?

12       A    I don't know -- those are the basic

13   roles.  I feel like I'm forgetting somebody, but

14   generally it's everything I described.

15             Legal, like helping with the legal stuff

16   if they're not a lawyer, helping with volunteer

17   coordination, helping with clinic coordination,

18   helping with the deportee program.  So yeah, these

19   are the roles, generally.

20       Q    Okay, great.  The Border Rights Project

21   director, who currently occupies that role?

22       A    Nicole Ramos.

23       Q    Has Ms. Ramos occupied that really since

24   the Border Rights Project began?

25       A    She was a volunteer for Al Otro Lado and



Page 29

1    then came on as staff in -- since she came on as

2    staff, she has; yes.  She has occupied that role.

3         Q    Was there anyone occupying that role

4    before Ms. Ramos joined the Al Otro Lado staff?

5         A    No, but we didn't always call it the

6    Border Rights Project.  I think when we first

7    incorporated, we had different names for the

8    programs.  I think it was called the refugee program

9    initially.  We had it split up like refugee and then

10   I think it was the cross border program and then

11   there was our U.S. work.  But we kind of like

12   renamed the programs at some point.

13             I honestly don't remember when, but in

14   terms of her responsibility and her position having

15   changed, it would just be like the name of the

16   program at some point I think was refugee program.

17        Q    Is there a substantial difference in

18   Ms. Ramos' job duty within the context of the border

19   rights program between when she was a volunteer to

20   when she joined the staff?

21        A    Yes, because -- well, I'll just say yes.

22        Q    Please go on.  What were these

23   differences?

24        A    Well, as turnbacks in metering became

25   more of an issue in Tijuana, we -- as you know from



Page 30

1    multiple filings in this case, we had to transition

2    our programs from more of a group orientation model

3    toward more of an individual representation model.

4              So back before metering basically, or

5    turnbacks, I guess that's how it started, the

6    volunteers generally were present during the group

7    orientations or maybe conducted group orientations,

8    although I don't know she did, like specify.  But

9    they were in the group orientations and then helped

10   with screening, individual screenings.

11             Then once she came on to direct the

12   program, it was more of individual representation

13   model because, you know, whereas with the group

14   orientations, we could just tell someone, go to the

15   port of entry and you will be processed.

16             When CBP stopped processing people, we

17   had to follow the cases for much longer.  So the

18   job, instead of just helping with the clinic, it

19   entailed training pro bono attorneys to come to the

20   border and working with clients on a more long-term

21   basis, and coordinating volunteers to come down to

22   the border, creating a system to follow the cases

23   longer term.

24             Because when, you know, we were just

25   doing these large scale clinics, it was -- we barely



Page 31

1    saw -- we didn't ever see the Asylum seekers after

2    they went.  It was just like here's law in the

3    United States and then they would go to the United

4    States.  But when you're having to follow a case and

5    the person might not have stable housing in Tijuana,

6    whatever the case might be, it requires building

7    like a system just to keep track of these cases.

8            So I would say that her job evolved over

9    time to meet the needs of metered clients and then

10    later, other types of Asylum seekers who were in

11    Tijuana, like those who are in the MPP program.

12    Q    You referred to both metering and

13    turnbacks which I'm going to explore a little bit

14    later, but...

15            When the Border Rights Project first

16    began under whatever name it might have started as

17    at that point in time, what was its goal?

18    A    So the goal was in line with our

19    organizational mission, again to provide screening

20    and advocacy and, at times, representation to

21    migrants on both sides of the border, seek redress

22    for civil rights violations and connect people with

23    other legal and other types of services.

24    Q    At the beginning, was the work more

25    focused on providing legal services in Mexico or



Page  32

1    providing legal service for individuals who intended

2    to go into the United States?

3         A    So the bulk of the work in Mexico is more

4    legal orientation.  I just want to make that

5    distinction.  Because it's a lot of just giving

6    information to people who state an intent to seek

7    Asylum in the United States, telling them what that

8    means, what the process will be, the basics of

9    eligibility for Asylum, things like that.

10              I just want to make that distinction,

11   because the representation by definition, until MPP

12   of course, happens in the United States, MPP is a

13   little bit of a different situation.  But even now

14   with MPP cases, generally what's happening in Mexico

15   is orientation.

16              So is that clear?

17        Q    Yeah, I guess my question -- I think you

18   mentioned at the outset part of the Border Rights

19   Project was seeking redress for civil rights

20   violations.

21        A    Yeah, yeah.

22        Q    Was that kind of geared toward civil

23   rights violations that would be redressed by Mexican

24   authorities or something else?

25        A    Well, the kind of a core violation is the



Page 33

1    refusal to process at the port of entry.  Over time,

2    the Mexican -- there's a number of ways in which

3    Mexican authorities participate in that refusal.

4           We have mostly directed our requests for

5    redress toward -- I'm sorry, toward United States

6    government agencies, right, or courts, or whatever.

7    However, we have filed complaints with -- let me

8    remember the exact name of the agency in Mexico.

9    It's...the Human Rights Mission or -- I'm sorry --

10   I'm like blanking on the name.  Basically like the

11   human rights body.

12          They have different ones in every state,

13   so we have filed local complaints with the civil

14   rights body here in Mexico for violation that take

15   place.  But I would say the vast majority of

16   complaints or our attempts to seek redress have been

17   before the U.S. Government.

18   Q     Would it be fair to say then that the

19   Border Rights Project was -- I'll ask a different

20   question.

21          So when was this period of time?  You

22   said -- when was the time period?

23   A     What time period do you mean?

24   Q     The period before metering, do you have

25   an approximate date range?



Page 34

1      A     I can talk about like the evolution of

2   what I would refer to as turnbacks and metering and

3   how that's changed.  Is that okay?

4      Q     Sure.

5      A     So 2016, and I don't remember the exact

6   month, but that was -- there was a large influx of

7   Haitian migrants to Tijuana.  I think that's the

8   first time we saw something akin to metering.  It

9   looked different than what it looks like now.

10          I think there were like appointments --

11   I'm not sure exactly how it's organized, but

12   basically that was the first population that was

13   subject to something like metering in the sense that

14   they were not processed upon arrival to the port of

15   entry.

16          Then I would say late 2016, we started to

17   see turnaways, what I would call turnaways.  So I

18   would define that as a person approaches the port of

19   entry, expresses and attempt to seek Asylum, and a

20   CBP officer uses force, fraud, coercion, to try

21   to -- to turn the person back to Mexico and deny

22   them access to the U.S. Asylum system.

23          So that includes statements like, there

24   is no Asylum in Mexico -- or I'm sorry, there is no

25   more Asylum in the United States.  You have to go to



Page 35

1    the Embassy to seek Asylum, or even like threatening

2    people.

3              We've seen documented cases of

4    physical -- people being removed physically from the

5    port of entry after they've expressed an intent to

6    seek asylum.

7              And that was happening both to people who

8    had approached the port of entry from the Mexican

9    side and never actually reached, like, into the

10   United States, and people who actually had gone into

11   the United States.

12             So like our first set of plaintiffs,

13   there were a few who actually were taken into CBP

14   custody and through force, fraud, or coercion, made

15   to recant their claim of fear -- returned to, I

16   think in these cases it was Mexico, and then sent

17   back to Mexico.  So that was basically like most

18   people were just turned away for a while.  There

19   wasn't like a line.

20             And then -- let's see.  So that was late

21   2016.  That probably went through -- just give me a

22   second to remember the timeline here.  Turnaways.

23             And then, it was around the first time I

24   saw like the beginnings of the current system of

25   metering was late 2017, around Christmas holiday.  I



Page 36

1    remember migrants going to the port of entry and
2    saying, expressing an intent to seek Asylum, and
3    being told to go back to the shelters.
4         And they were -- I'm not exactly sure how
5    the list was working, but basically, CBP I think
6    would tell Rebecca that they were going to process X
7    number of people.  I think they were taken directly
8    from the shelters at that point, but it wasn't like
9    a first come, first serve.  It was really haphazard,
10   like not all the shelters were participating, so if
11   you were at a certain shelter, I don't think you
12   were even called for processing.  So it was like a
13   mess.
14        And then the list, like in its current
15   iteration, I think was -- started around the spring
16   of 2018 if I believe -- if I'm remembering
17   correctly.  And that's, really where -- initially it
18   was, again, really haphazard.  There were like
19   different lists for different people.  It wasn't
20   like -- it wasn't really that organized, I guess.
21        And then like over time, it became -- it
22   looked to me to be more formalized, I guess you
23   could say.  There was one list that everybody is
24   supposed to get on.  It's like the same time every
25   morning.  Of course now, that's not happening at all


MAGNA
LEGAL SERVICES

Page 37

1    because of COVID and the border closures, according

2    to the U.S. Government.  It's enough to say it's not

3    happening right now.

4              But up until the CDC order or a little

5    bit before that, it was like more formalized, kind

6    of like the same place outside, at least the

7    San Ysidro port of entry.  And over time, too, we

8    learned how metering was working at other ports of

9    entry as well.

10             So, yeah, that's...

11       Q    Back in 2016, when you mentioned -- when

12   you recall a surgery of Haitian migrants approaching

13   the port of entry, that was at San Ysidro; right?

14       A    Yes.

15       Q    Do you recall the volume, like how many

16   you saw at that port?

17       A    No.

18       Q    Do you recall seeing a line of people

19   outside the port?

20       A    Me personally or someone else from Al

21   Otro Lado?

22       Q    Either.

23       A    I didn't personally see that.  I -- I

24   know Nicole Ramos had personally seen that, and

25   worked with some of the Haitian migrants at that



Page 38

1   time, but that was when she was serving in a

2   volunteer capacity only.

3            And I wouldn't necessarily say that,

4   like, her work with Haitians was on behalf of the

5   organization.  But I know that she was present and

6   knew about it and worked with the population.

7       Q    What kind of work was Ms. Ramos doing on

8   behalf of the organization?

9            MS. WEBSTER:  Objection.  Can you clarify

10  a time period, please?

11           MR. HALASKA:  I'm sorry?

12           MS. WEBSTER:  Could you clarify a time

13  period, please?

14           MR. HALASKA:  Sure.  I'm talking about in

15  2016, during the surge of Haitian migrants, I

16  believe Ms. Pinheiro testified that she didn't

17  recall the exact date.

18           THE WITNESS:  Yeah.  Well, I can speak

19  generally to what volunteers did for Al Otro Lado,

20  which would include Nicole's participation.

21           So pre metering and even during this

22  initial iteration in metering with the Haitians, we

23  had clinics in Tijuana two, three times a year,

24  maybe four sometimes.  And we would recruit

25  volunteer attorneys or law students or other --



Page 39

1    others, paralegals, things like that, to come to

2    Tijuana.

3              We would do a group orientation for

4    Asylum seekers and deportees.  So sometimes we'd

5    have a separate orientation and there are language

6    issues.  Obviously, you have to accommodate that.

7              So people would hear just general

8    information in the group, and then the volunteers

9    would provide individual screenings.  So we, you

10   know, just ask individual questions, try to get a

11   sense of the case, and then talk with the individual

12   about -- yep, just about what they were -- just

13   information about their case.

14             So that was essentially what Nicole would

15   have done.

16   BY MR. HALASKA:

17   Q    When about the Border Rights Project

18   start focusing on individuals who had been metered

19   or had been subject to a turnback?

20   A    We had -- I remember this specifically.

21   So we had a clinic in Tijuana in fall of 2016.  And

22   that was really the last -- let me go back a second.

23             We probably had -- I don't remember if we

24   had a clinic earlier when the Haitian metering was

25   going on, but if we did, I wasn't there.  If we did,



Page 40

1    it probably would have included Haitian people in

2    that same format I'm telling you, right, like a

3    group, and then the individual stuff.

4             And then the last clinic of that format

5    was October of 2016.  Nicole was there as a

6    volunteer.  We did the same thing I've described to

7    you several times, giving group orientation and then

8    individual.

9             Nicole was residing in Tijuana at the

10   time.  So as I mentioned earlier, generally, when we

11   gave those types of clinics, we didn't see the

12   Asylum seekers again because they would have gone to

13   the United States already.  But she informed us that

14   they -- Asylum seekers who had attended our clinic

15   and come into contact with her to say that they had

16   been turned away from the port of entry.

17            So at that point, she started

18   accompanying -- because we -- we didn't believe it

19   at first because it was -- the law said that people

20   should be processed.  So she went herself to see

21   what was happening, and sure enough, people were

22   being turned back from the port of entry in the ways

23   that I described earlier, being told there's no more

24   Asylum, et cetera, et cetera.

25            So that was really when we started to



Page 41

1    focus -- shift the focus to more individual

2    representation.  So that time period would be like

3    fall of 2016 into the early stages of 2017.  And it

4    took a lot of work to make that transition.

5            So it wasn't like -- like we had to shift

6    our programming and, you know, put a lot of extra

7    work into transitioning that model.  So it was like

8    over a period of time.  It wasn't like from one day

9    to another; right?

10    Q    What sorts of things did you -- did Al

11    Otro Lado do to shift its program at that point?

12    A    So, it was a few things.  We had to make

13    more of an effort to recruit attorneys who had some

14    Asylum experience.  We had to redo all of our

15    screening materials to reflect the new reality of

16    turnbacks.

17            We got ourselves -- I'm not sure of the

18    exact terminology, but we were approved as a CLE

19    provider by the California State Bar and hosted a

20    CLE in Los Angeles to talk through -- to train

21    people on border-specific Asylum issues, including

22    the turnbacks.  And then talk through, like, what --

23    trying to figure out like what the attorneys' role

24    would be in that.

25            And then we had to create a system to --



Page 42

1    as I mentioned earlier, it's very different to just

2    like have -- have a group orientation and never see

3    the person again versus like following a person

4    who's stuck in Tijuana.  So we had to create filing

5    systems.  We had to figure out like electronic case

6    management for those cases.  We went through a

7    couple different iterations of that and it was

8    really difficult.

9            We had to screen our volunteers

10   differently because we didn't want people who were

11   just going to like go for a weekend and not follow

12   up.  And that was a really big struggle because it's

13   hard to get somebody to commit to helping someone

14   who is stuck in Mexico.

15           So like we went through a couple

16   different iterations of that, I would say.  Like

17   first we wanted -- only wanted attorneys who were

18   going to take a whole case.  But then we didn't get

19   any volunteers.  So it's like, it was hard to get

20   people to, like, sign up for that kind of

21   commitment.

22           So we went through like a couple

23   different iterations of that.  Do we split up the

24   cases?  Do we get one person to do one thing and

25   another person to do another thing and how do we



Page 43

1    manage that?  It was really difficult.  There was a

2    lot that went into it.

3            It honestly took longer than the time

4    period I mentioned.  Like the CLE that I mentioned

5    was in February of 2017 was the first one.  But even

6    when I look back at that, it's, you know, we had to

7    change that several times over.  And yeah, just keep

8    tinkering with the model until we figured out

9    something that works.

10           MS. WEBSTER:  Hey Alex, do you mind if we

11   take a quick break.  We've been going for about an

12   hour.

13           MR. HALASKA:  Yeah, that's perfectly

14   fine.

15           MS. WEBSTER:  Ten minutes?

16           MR. HALASKA:  Ten minutes.  See you back

17   on at 1:10.

18           MS. WEBSTER:  Okay, great.  Thank you

19   very much.

20           THE VIDEOGRAPHER:  The time is 1:02 p.m.

21   We're going off the record.

22       (Break in the deposition taken at 10:02 a.m.)

23                     0o0

24       (The deposition resumed at 10:16 a.m.)

25                     0o0



Page 44

1            THE VIDEOGRAPHER:  The time is 10:17 a.m.

2    We're back on the record.

3    BY MR. HALASKA:

4        Q    Ms. Pinheiro, welcome back.

5        A    Thank you.

6        Q    Before the break, we were discussing some

7    of the ways that Al Otro Lado adjusted its

8    operations in Tijuana to account for metering or

9    turnbacks.

10           You mentioned there were some changes to

11   how the organization recruited attorneys.  There

12   were some changes to the screening materials.  The

13   organization in terms of the California CLE and

14   generally the organization had to create a system, a

15   support system for people in Tijuana; is that right?

16       A    That is correct, but not exhaustive.

17       Q    That was going to be my next question.

18   Were there other things that the organization did?

19       A    Yes.

20           MS. WEBSTER:  Objection.  Vague.

21   BY MR. HALASKA:

22       Q    Can you go into what these steps were?

23       A    Sure.  Let me just preface the rest of

24   this by saying, I am going to try my best to

25   remember every single thing.  But it was several



Page 45

1    years ago, so I am doing my best to just try to give

2    a complete answer.

3              But I did think about your question

4    during the break a little bit more and thought of a

5    few more things that we had to do when working on a

6    more long-term basis with clients in Tijuana.

7              So one was filing complaints on behalf of

8    migrants who had been turned away.  I believe Nicole

9    submitted complaints before the Office of Civil

10   Rights and Civil Liberties, if I remember correctly.

11             We also -- so one really important thing

12   to understand about turnbacks that it includes, it

13   included and it continues to include Mexican Asylum

14   seekers who might have been facing imminent harm in

15   Tijuana.  So when someone was turned back, in many

16   cases, the person or people who were seeking to harm

17   or kill the person who was turned back were actually

18   present in Tijuana.

19             So when I refer to connecting someone

20   with other social services, that could include

21   emergency housing, mental health services, just

22   other types of services like that when you think

23   about someone who's being pursued actively here in

24   Tijuana.

25             We also -- so it was, you know, the



Page 46

1    complaints, having to do -- provide a more broader

2    array of services.  For sure, staff time, having to

3    come more frequently to meet with clients, arrange

4    for volunteers to accompany them to the port of

5    entry, working out cases, preparing complaints,

6    translating documents because sometimes we would try

7    to show CBP proof that the person was facing

8    imminent harm in Mexico.  So present -- translating

9    things like police reports, things like that, to

10   show to CBP to attempt to get them to accept the

11   person at the port of entry.

12            Just give me a minute, because I want to

13   make sure I'm giving as complete of an answer as

14   possible.

15            Another thing was like we -- like I

16   mentioned earlier, when we were doing the large

17   clinics, we generally didn't see the person anymore.

18   But once -- the Asylum seeker, right, we would just

19   give them information and that was it.  We wouldn't

20   have any further contact.

21            But once we started working individually

22   with clients, we also needed to set up a system to

23   where, if they were eventually admitted to the port

24   of entry, we would figure out where they were

25   detained and provide follow-up in that way.



Page 47

    1            So more going back to the data management

    2    and case management systems that I had referenced

    3    previously.  Just building that out.  It was more

    4    than just keeping documented -- like keeping track

    5    of who we speak to in a clinic.  It was really like

    6    when you're working on a long-term case, you need to

    7    have case notes and have a place to upload documents

    8    and all these things.  So building out these systems

    9    for more long-term work.

    10           Yeah, like I mentioned, the time, just

    11   having to spend more time in Tijuana working with

    12   these people.

    13           Complaints...what else?  Yeah, there may

    14   have been more, but it's not coming to mind just

    15   right at this moment.

    16      Q    Earlier you said the Office of Civil

    17   Rights and Civil Liberties.  Just for clarification,

    18   is that a U.S. Government agency?

    19      A    Yes.

    20      Q    Did Al Otro Lado's services in Tijuana

    21   continue to evolve in response to metering after

    22   this October 2016 time period?

    23           MS. WEBSTER:  Objection, vague.

    24           THE WITNESS:  Yes.

    25   ///



MAGNA
LEGAL SERVICES

Page 48

1    BY MR. HALASKA:

2        Q    How so?

3            MS. WEBSTER:  Objection, vague.

4            THE WITNESS:  I think I answered this

5    already, but I'll just give a brief recount of that.

6    So thinking back to my answer on how turnbacks and

7    metering evolved, like the practices and policies of

8    customs and border protection, and processing or not

9    processing Asylum seekers at the port of entry.

10           If you think back to that, basically our

11   evolution needed to mirror that in some ways.  So

12   every time -- you know, it wasn't like there was a

13   policy that was communicated to anyone.  We had to

14   figure out what was going on.

15           That's something, actually, to the last

16   question is, increase monitoring of what was -- of

17   turnbacks and metering, right, because -- because

18   there was no official stance from the U.S.

19   Government, that they weren't going to process

20   people, we had no choice but to engage in more

21   monitoring of the situation at the port of entry to

22   really figure out what was happening so that we

23   could properly communicate that information to

24   individuals who had expressed intent to seek Asylum

25   in the United States.



Page 49

1          Every time CBP's practices and policies

2     evolved, we also had to change our materials and

3     change our advisals, keep monitoring, try to find

4     examples.  You know, it's -- you can kind of think

5     of it like mirroring in some ways, but also as I

6     mentioned earlier, it wasn't an easy transition.

7          It was a very resource intensive

8     transition from group orientations to individual --

9     more individual representation, and you know, I

10    think it's always a work in process.  It's very

11    difficult given the volume that we're talking about

12    in Tijuana.

13         So, yeah, it encompasses a lot of

14    different -- constantly going back and trying to

15    improve our services toward the population of

16    metered migrants in Tijuana.

17    BY MR. HALASKA:

18    Q     When the Border Rights Project initially

19    began, about how many individuals -- how many paid

20    employees were working as part of the Border Rights

21    Project?

22    A     Paid?  We weren't getting paid in the

23    beginning.

24    Q     Oh, okay.  When did...okay, then, let me

25    ask a different question.



Page 50

1           The people who were working as part of

2    the Border Rights Project in the beginning, were

3    they considered employees of Al Otro Lado or were

4    they volunteers?

5           A     So I just want to clarify, when we're

6    talking about Border Rights Project, and I know this

7    is something you mentioned earlier, I want to

8    clarify again.

9           We're talking about the current project

10   under all the names it had; right?  Because I

11   mentioned earlier, it was the refugee program for a

12   little while and we went back to Border Rights

13   Project.  So I just want to clarify that before I

14   answer.

15          Q     Okay.

16          A     Yes?

17          Q     Yes, any of the Al Otro Lado's programs

18   designed to facilitate the cross-border work.

19          A     Okay.  Any of Al Otro Lado's programs

20   designed to facility cross-border work.  Not

21   including the deportee program?

22          Q     I'm not trying -- maybe that's a

23   confusing way to phrase it.

24          A     Yeah, if you can rephrase it, that would

25   be helpful.  Yeah, thank you.



Page 51

 1      Q      Sure.  So at this time, back when --

 2   people in the Tijuana office, were they considered

 3   employees or volunteers by Al Otro Lado?

 4            MS. WEBSTER:  Objection, clarification

 5   based on -- vague based on time period.

 6            THE WITNESS:  Yeah, that's what I was

 7   just about to ask, actually.

 8   BY MR. HALASKA:

 9      Q      I am talking about the time period when

10   the Border Rights Project or the Tijuana office was

11   beginning.

12      A      Okay.

13      Q      I'm trying to understand the timeline.

14      A      Okay.  I think if it's okay, I can

15   explain the transition from all-volunteer to having

16   staff.  Is that kind of what you're trying to get

17   at?

18      Q      Yes.

19      A      Okay, just want to make sure.

20            So Al Otro Lado was incorporated in 2014

21   and we were an all-volunteer organization until

22   April of 2017, when Nora, Nicole and myself, decided

23   to cease other employment and come into Al Otro Lado

24   as staff.  I'm going to put that in quotes, because

25   we didn't have a funding stream to pay for our



Page 52

1  salaries.  So we were, I would say, considered

2  employees, but like not getting -- we didn't have

3  any money.

4          So that's why I'm kind of going back and

5  forth with this, because I think -- I just want to

6  make sure -- I don't know if you would consider an

7  employee someone who doesn't get paid.  But like I

8  didn't have another job, so...yeah.  We didn't --

9  yeah.

10     Q     When did the deportee program begin?

11     A     So the deportee program began, I want to

12  say, when the organization began.  It's like a

13  foundational program of the organization.

14     Q     Was that 2014?

15     A     2014 was when we were incorporated as a

16  nonprofit.  I know Nora has been coming to Tijuana

17  to work with deportees since 2011, but if we want to

18  talk like formally as Al Otro Lado, then you can put

19  our date of incorporation in 2014.

20     Q     Would you consider the work that

21  Ms. Phillips was doing prior to Al Otro Lado's

22  incorporation to be on behalf of Al Otro Lado?

23     A     Yes.  Incorporation doesn't happen

24  overnight, you know.

25     Q     In 2014 and '15, we'll go from the date



Page 53

1    of incorporation, what types of work was being done

2    under the umbrella of the deportee program?

3        A    So kind of the same model I had mentioned

4    previously with the group orientations and

5    individual orientations.  But in 2014 and 2015, we

6    did some -- I say we as an organization because I

7    was not personally part of the organization then.

8    But the organization did some individual work on

9    behalf of deportees.

10           But it was like -- kind of like I had

11   mentioned earlier, you know.  If a person was

12   screened, had a legal avenue for return to the

13   United States, it was mostly like family-based

14   petitions or U Visas.  Nora would do some of these

15   with other volunteer attorneys.

16           And there were some cases where a person

17   who had been deported had an approved Visa, like a

18   U Visa or some other type of Visa in the United

19   States.  And Nora and her colleagues at the time

20   would help liaise with the consulate here in Tijuana

21   to ensure that the person could return to the United

22   States with the Visa.

23           And there was some work done in the

24   United States for people who had been deported and

25   their children had ended up in the foster care



Page 54

1    system in the United States.  So family law,

2    dependency court kind of stuff.

3              And if like a U.S. citizen child had to

4    move to Mexico with their deported parents, helping

5    with like getting them Mexican status, identity

6    documents, stuff like that, helping them so they

7    could attend school, stuff like that.

8        Q    Anything else?

9        A    That's what I know of.  I didn't join the

10   organization until the end of 2015.  But that's what

11   I know of in broad terms.

12       Q    In the 2014, 2015 initial phase of the

13   deportee program, how many employees were working as

14   part of that program?

15             MS. WEBSTER:  Objection.  Beyond the

16   scope -- the time period for this deposition.  The

17   litigation is January 1st, 2016, to the present.

18             THE WITNESS:  Should I still answer?

19             MS. WEBSTER:  Object -- I mean, answer to

20   the point you're able to.

21             THE WITNESS:  We were an all-volunteer

22   organization until April of 2017.

23             Can I just -- because we keep going back

24   to this employee issue.  Can I just ask you to

25   define exactly what you mean as employee just so I



Page 55

1    make sure I'm answering these questions accurately?

2              MR. HALASKA:  Yes, I actually don't have

3    a standard definition.  Part of what I'm trying to

4    get at here is when Al Otro Lado considered itself

5    to start bringing on more employees when it was

6    working just with volunteers.  So it's kind of what

7    my questions are actually getting at.  If you have a

8    definition of employee, I'm happy to work with that.

9              THE WITNESS:  Okay.  I would consider Al

10   Otro Lado to have been an all-volunteer organization

11   with no employees until April of 2017.

12   BY MR. HALASKA:

13        Q    Why was that?

14             MS. WEBSTER:  Objection.  Vague.

15             MR. HALASKA:  I'll rephrase.

16   BY MR. HALASKA:

17        Q    Why did Al Otro Lado have no employees

18   until April 2017?

19        A    So as an all-volunteer organization,

20   anyone participating in our programs, including Nora

21   or the other founders of the organization, any pro

22   bono attorney working on a case, like they had

23   other -- I assume most people had other employment.

24   Maybe some of them didn't, but it wasn't like -- it

25   was very limited involvement.  Like if they were



Page 56

1    coming for a clinic, it was a weekend commitment.

2    And if there was other work being done on behalf of

3    a client, it was in a pro bono capacity.

4            So...

5        Q    Before April 2017, was Al Otro Lado

6    actively trying to hire employees, paid staff?

7        A    No.

8        Q    Why not?

9        A    Why weren't we trying to hire paid staff?

10   Is that the question?

11       Q    Correct.

12       A    Okay.  Because Al Otro Lado could

13   function as an all-volunteer organization, given the

14   model that we had and the work that was being done.

15       Q    Would it be fair to say that Al Otro Lado

16   just didn't need paid employees prior to April

17   of 2017?

18           MS. WEBSTER:  Objection.  Foundation.

19   BY MR. HALASKA:

20       Q    I'm just asking if you would agree with

21   that statement or not.

22       A    No, because I -- I think that there's

23   always a need for someone to effectuate the mission

24   of our organization in Mexico.  I think that it

25   would have been nice, but just clarify -- I want to



Page 57

1    just try to clarify what you're getting at here.

2    Because we're talking about cases, about turnbacks

3    and metering; right?  Is that --

4         Q    At the moment, I'm trying to understand

5    Al Otro Lado's organizational structure and

6    development of its operation.

7         A    Oh, okay.  So before 2016 or like, you

8    know, metering and turnbacks started, our model of

9    weekend clinics -- I'm talking specifically about

10   Asylum seekers right now, not the deportees, because

11   as I just mentioned, that looks different before

12   metering and all of that started.  So with Asylum,

13   specifically to Asylum seekers.

14             Before metering and turnbacks started,

15   our model of group orientation and individual

16   orientation where we communicated the law and

17   procedure of Asylum to Asylum seekers was sufficient

18   because the U.S. Government was following those laws

19   and procedures.

20             When the U.S. Government failed to follow

21   those laws and procedures, it required greater

22   investment of resources on the border to do all of

23   the things I mentioned earlier, monitoring, changing

24   materials, et cetera, et cetera, et cetera.

25             So I wouldn't say -- like April 2017 was



Page 58

1    like when we started needing to do those things

2    because it obviously happened before.  That's when I

3    quit my other job, because the time and resources

4    needed to address turnbacks became overwhelming for

5    an all-volunteer organization.

6              Is that sort of -- does that answer the

7    question?

8        Q    Yes, that's helpful.

9              When did Al Otro Lado first start paying

10   its staff?

11       A    I think it was November of 2017 maybe,

12   around there.  I'm not 100 percent sure on that, but

13   I'm fairly certain it was toward the end of 2017.

14       Q    At that point, how many employees was Al

15   Otro Lado able to pay?

16       A    We had -- yeah.  We had one -- let's see,

17   I'm trying to remember when we hired the legal

18   assistant in Los Angeles.  So it was Nora, Nicole,

19   myself, and then we had a legal assistant in

20   Los Angeles.  I think he started around the end --

21   either the end of 2017 or maybe early 2018.

22             Yeah, so -- and I think Nicole -- yeah, I

23   think that was it.  We might have --

24       Q    Where did the funding --

25       A    Go ahead.



Page 59

```
 1        Q      Sorry.

 2        A      No, I'm okay.

 3        Q      Where did the funding for those salaries

 4   come from?

 5        A      So the funding was based -- was for work

 6   done in Los Angeles.  It was from the Robert Wood

 7   Johnson Foundation.

 8        Q      Was it a grant from that organization?

 9        A      Yes.

10        Q      Do you recall when that grant was made?

11        A      I know we started getting payments at the

12   end of 2017 -- we got our first disbursement at the

13   end of 2017.  I think it was -- I don't know, fall.

14   I don't remember the exact date.  But...

15        Q      Do you recall the total amount of the

16   grant?

17        A      I don't recall the total amount.  I

18   remember what my W-2 said from 2017.

19        Q      What was that?

20        A      $3,700.

21        Q      Did you ever get a raise?

22        A      Yes.

23        Q      When was that?

24        A      Umm --

25               MS. WEBSTER:  Objection, scope.
```



Page 60

1              THE WITNESS:  I'm not sure exactly when.

2    BY MR. HALASKA:

3        Q      Was Al Otro Lado -- let me start that

4    again.

5              What other grants has Al Otro Lado

6    received?

7              MS. WEBSTER:  Objection, foundation.

8              THE WITNESS:  When?  Can you specify a

9    time period?

10   BY MR. HALASKA:

11       Q      So at the moment, I'm just asking what

12   other ones has Al Otro Lado received.  The scope of

13   the question is from January 1, 2016, to the

14   present.

15       A      Okay.  We've received grants from

16   probably at least a dozen different foundations.

17       Q      What foundations are those?

18       A      I don't know if I can name them all from

19   memory.

20       Q      Can you name any of them from memory?

21       A      Sure.  Coriolis Foundation.  Impact Fund.

22   Open Society Foundation.  Four Freedoms Fund.

23   Benevity Foundation.  A few small family foundations

24   that I don't recall the names of right now.  Global

25   Fund For Children.



Page 61

1          What else?  I'm trying to remember the

2    reports I have to do to think through this.

3          Let me see if I can remember any others

4    that would be considered like foundations.

5          Avaaz, I think is a foundation.  I'm not

6    sure of like the legal, like, underpinnings of some

7    of these funders, but I think of Avaaz as a

8    foundation.  Together Rising.

9          I know that there's others, but I can't

10   remember off the top of my head right now.  I might,

11   you know, think of some later.  But that's all I can

12   remember off the top of my head right now.  I know

13   that there's some more.

14       Q    Okay.

15          MR. HALASKA:  Kevin, can you please pull

16   up 7491?

17          THE REPORTER:  Counsel, I'm sorry.

18   Before you move on, I know you had looked at one

19   document before and I don't recall, and I may be

20   incorrect, if you are marking these as exhibits.

21          MR. HALASKA:  Can we mark that first one

22   as Exhibit 1 and we'll call this Exhibit 2.

23          (Pinheiro Exhibit 2 was marked for

24          identification.)

25          MR. HALASKA:  Bates stamped Al Otro Lado



Page 62

1    7491.  I can represent to you that it was a document

2    that was produced from plaintiffs to defendants in

3    discovery in this case.

4              Feel free to take a moment.  Ask the

5    technician to scroll through and familiarize

6    yourself with it and let me know when you've had a

7    chance to take a look.

8              THE WITNESS:  Okay.

9              (Document review.)

10   BY MR. HALASKA:

11        Q    Ms. Pinheiro, do you recognize this

12   document?

13        A    Yes.

14        Q    What do you recognize it to be?

15        A    This was an email I sent to some of my

16   contacts in November of 2017, trying to raise money

17   for Al Otro Lado in support of our cause.

18        Q    Is this an email that you would have

19   maintained in the normal course of your employment

20   at Al Otro Lado?

21        A    Can you repeat that?

22        Q    Is this an email that you would have sent

23   and maintained in the normal course of your

24   employment at Al Otro Lado?

25             THE WITNESS:  Michelle, I think you're



Page 63

1    typing or not on mute.  Sorry, I was getting like

2    background noise there.

3              MS. WEBSTER:  Sorry.

4              THE WITNESS:  Is this an email I would

5    have sent or maintained as an employee of Al Otro

6    Lado, was that the question?  Yes.

7              MR. HALASKA:  In the normal course of

8    your employment at Al Otro Lado.

9              THE WITNESS:  Yes, uh-huh.

10   BY MR. HALASKA:

11       Q    Do you have any reason to think that the

12   document is inaccurate or inauthentic?

13       A    I was looking at the attachments and I

14   didn't remember -- I remembered some of the things

15   there, but I didn't remember -- yeah.  I didn't

16   remember every single detail that was written in the

17   attachments.

18             But it looks like -- it looks like it was

19   attached to this email, so I don't think it is --

20   yeah.

21       Q    Sure.  Okay.

22             MR. HALASKA:  Kevin, if you wouldn't mind

23   scrolling down to the second page, 91.

24   BY MR. HALASKA:

25       Q    The email says, and I'll quote, friends,



Page 64

1    in 2017, Al Otro Lado went from being an entirely

2    volunteer-run organization to achieving some

3    incredible accomplishments, including bringing a

4    federal lawsuit against Customs and Border Patrol

5    for unlawfully turning away Asylum seekers, opening

6    two new offices in Tijuana, and at the LAC+USC

7    Hospital Wellness Center in Los Angeles, holding

8    almost a dozen legal clinics in Tijuana, and helping

9    hundreds of refugees, deportees and undocumented

10   Californians and their families.

11            Did I read that correctly?

12   A     Yes.

13   Q     This first tab or bullet, bringing up

14   federal lawsuits against Customs and Border Patrol,

15   which of Al Otro Lado's programs does that fall

16   under?

17   A     Now, it would fall under the litigation

18   program.

19   Q     What about in November 2017 when the

20   email was sent?

21   A     Well, we didn't have a formal litigation

22   program at that time.  So I would say it was most

23   closely associated with Border Rights Project

24   because that's what the population that we served

25   through that project would be, people who were



Page 65

1  metered or turned away at that time, sorry.

2           But it wasn't -- we didn't have a

3  litigation program.  It was just the three of us,

4  so, yeah.

5      Q    When did Al Otro Lado begin its

6  litigation program?

7      A    I don't remember exactly when we put the

8  formal name to it.

9      Q    Presumably, would it be sometime --

10 excuse me.  Let me start that again.

11          Would it be after November 28th, 2017,

12 when the email was sent?

13     A    Yes.

14          MR. HALASKA:  Kevin, can you go to

15 page 7498.  I'm not sure what page it is, of the

16 PDF.  7498.

17 BY MR. HALASKA:

18     Q    At the top, it says Border Rights

19 Project, Helping Refugees -- sorry, I just got some

20 feedback.

21          It says, quote, Border Rights Project,

22 Helping Refugees Seek Safety in the United States

23 and Mexico.

24          Did I read that right?

25     A    Yes.



Page 66

```
 1        Q      Is this a flyer about the Border Rights

 2   Project?

 3        A      No, I wouldn't say --

 4        Q      What would you call it?

 5        A      This was -- I'm trying to think how to

 6   explain it correctly.  At the time, we consulted

 7   with friends and other colleagues about the best way

 8   to try to raise money for the organization and for

 9   our programs.

10             And several funders and people associated

11   with foundations suggested that we create short

12   overviews of our work and try to set a dollar amount

13   for, like, what we thought -- you know, what would

14   help us further the work.

15             As you know, we didn't really have

16   salaries at that time, so it was more aspirational

17   than anything else.  But these individuals who had

18   more experience with fund raising suggested to us

19   that if we put a dollar amount on these documents

20   that provided an overview of each program, that that

21   would help funders decide how they wanted to support

22   within those parameters.

23             Does that make sense?

24        Q      Sure.  Down towards the bottom of the

25   document, it says, quote, what your contributions
```



Page  67

1     will accomplish.  Do you see that?

2          A     Yes.

3          Q     The first line, it says $500, Al Otro

4     Lado will provide individual legal orientation for

5     five detained Asylum seekers.

6                Did I read that right?

7          A     Yes.

8          Q     Where did that $500 figure come from?

9          A     There is a program funded by the State of

10    California that sets flat rates for certain like

11    work with detained immigrants.  And I based that

12    number on the rates that were provided by the State

13    of California.

14         Q     Okay.  The next line says $5,000 pays for

15    one refugee clinic providing legal orientation for

16    up to 50 refugee families.

17                Did I read that right?

18         A     Yes.

19         Q     What is that $5,000 figure based on?

20         A     That -- this might not be exhaustive, but

21    I'm trying to remember the best I can, because our

22    clinic model has changed so much since then.  So I'm

23    thinking back to the date this was sent, so that was

24    November of 2017.

25                So it would include the time that staff



Page 68

1  spend on setting up the clinic.  If we had

2  volunteers who did not speak Spanish or another

3  language that was represented among the Asylum

4  seekers we were serving, we would sometimes pay

5  interpreters if we couldn't find enough volunteers

6  or volunteers for the specific language.

7           There's like material costs, like paper

8  and printing and all that stuff.  The clinics were

9  all day, so we would usually host the clinic at a

10 migrant shelter in Tijuana, and sometimes we would

11 make agreements with the shelter to provide food and

12 like coffee, beverages, everything to the

13 participants.  And we would provide that to the

14 volunteers sometimes as well.

15          I'm trying to think what else.  I'm sure

16 I'm forgetting something.  Food, beverages.  Oh,

17 like if we needed a particular language or some

18 special volunteer that we like really needed to

19 come, we could sometimes pay for her, help provide

20 support for like housing or travel, that kind of

21 thing.

22          There's also like outreach and

23 registration that took place before the clinic.  And

24 so sometimes we would pay someone in Mexico if one

25 of us couldn't be there the whole time to do all



Page 69

1    this stuff.

2              I'm trying to think back to those

3    clinics.

4              Yeah, I think that's more or less it.  I

5    might be forgetting some costs, but that's basically

6    what it would cover.

7         Q    Okay.  The next line says $30,000 pays

8    for one full-time legal assistant, drastically

9    increasing program capacity.

10             Did I read that right?

11        A    Yes.

12        Q    What's that $30,000 figure based on?

13        A    I don't think we've ever paid a legal

14   assistant that little to be honest.  We didn't have

15   any.  I don't even know what I based that number on

16   to be honest with you.  I will have to do math in my

17   head for this, and I'm sorry, it's not going to be

18   great.

19             So at that time, we only had -- we had

20   one paid legal assistant in LA.  I don't recall how

21   much he made.  But I'm thinking, I used that figure

22   to come to this number.

23             We would also -- yeah, I think that's

24   probably what it was, something like that.

25        Q    Okay.



Page 70

```
 1        A       But it didn't look quite --

 2        Q       Go ahead.

 3        A       No, it just, like, seems low.  Now when

 4   I --

 5        Q       The next line says --

 6        A       Yeah.

 7        Q       I'm sorry.

 8        A       Now, when I know you have to --

 9        Q       The --

10        A       -- legal assistant, it seems low to me.

11        Q       Understood.  Then the next line says

12   $80,000, salary plus benefits for one full-time

13   attorney representing dozens of refugees in court.

14                Did I read that right?

15        A       Yes.

16        Q       Then what's that $80,000 figure based on?

17        A       Daydream at the time, very aspirational.

18   It's like a normal salary --

19        Q       Like a goal?

20        A       Yeah, it was a goal, definitely a goal.

21        Q       Okay.  Do you recall whether the email

22   received any donations at any of those levels?

23        A       I -- I know we didn't get anything close

24   to 80 or $30,000, that's for sure.  But I don't

25   recall the exact amounts of the other donations.
```



Page 71

1   But I would have remembered, like, a donation that

2   was in the tens of thousands of dollars and I don't

3   recall that.

4        Q     I want to turn back to -- we were

5   discussing the deportee program a little earlier.

6   Do you recall that?

7        A     Yes.

8              MR. HALASKA:  Kevin, can you please pull

9   up -- hold on one second.  It's 104.

10             We'll call this Exhibit 3.

11             (Pinheiro Exhibit 3 was marked for

12             identification.)

13             MR. HALASKA:  Ms. Pinheiro, feel free to

14   ask the technician to scroll through the document

15   and take your time to familiarize yourself with it.

16             (Document review.)

17             THE WITNESS:  It's kind of hard for me to

18   read the small print here, but -- I'm hurting my

19   eyes a little bit, but I don't -- if we need to ask

20   something specific, maybe we can go back and

21   enlarge, but we can move to the next page for now.

22             MR. HALASKA:  Sure, I should say, don't

23   feel free -- or excuse me, you shouldn't feel the

24   need to review to review exhaustively on my account.

25   You should feel free to do so if you want, but --



Page 72

1              THE WITNESS:  Okay, I might just ask to

2     go back to that page if needed to look more closely.

3     But you can go ahead.

4              MR. HALASKA:  Sure.

5     BY MR. HALASKA:

6         Q     This is -- Ms. Pinheiro, do you recognize

7     this document?

8         A     I know what it is from looking at it.

9         Q     What is it?

10        A     It's return of organization exempt from

11    income tax for 2017.

12             MR. HALASKA:  Kevin, if you could go to

13    the second page of the PDF, page 105.  Then zoom in

14    on the box that starts, about halfway down, part

15    four, down to the end of the page.

16    BY MR. HALASKA:

17        Q     It looks to be a -- part four says list

18    of officers, directors, trustees and key employees.

19    It includes the names under, A, name and title.

20    Then the next column, B, average hours per week

21    devoted to position.

22             Then if you look all the way down under

23    column A, the second to last line says, Jose Mares,

24    and the next line says, coordinator, deportee

25    program.  Then if you go over to column B, it says


MAGNA
LEGAL SERVICES

Page 73

1    an average of zero hours per week devoted to that

2    position.

3              Is that correct?

4         A    No.

5         Q    I'm sorry, let me rephrase.  Did I

6    represent the form correctly?

7         A    Oh, yes.

8         Q    Were other people spending more time on

9    the deportee program than what's listed here?

10        A    Yes.

11        Q    Do you know why Mr. Mares was listed here

12   on the tax return?

13        A    I'm not sure.

14        Q    Do you know why he might have been listed

15   as 40 hours -- excuse me, zero hours a week on

16   average?

17        A    I'm not sure why this form was filled out

18   the way it was.

19        Q    Okay.  So far we've been talking about Al

20   Otro Lado's Tijuana office, but you also said there

21   is a San Diego -- you were going to take me from

22   south to north; is that right?

23        A    Yeah.  Feels like a long time ago.

24        Q    That was a little bit ago.

25        A    Yeah.


MAGNA
LEGAL SERVICES

Page 74

1        Q      Let's move onto the next office.  What is

2    the next office north for Al Otro Lado?

3        A      Our San Diego office.

4        Q      What programs happened out of the

5    San Diego office?

6        A      The Otay Mesa Release Project.  We

7    have -- we do cases under the California Department

8    of Social Services contract that I mentioned

9    earlier.

10              We have a few national qualified

11   representative cases.

12              We run the Family Reunification Program

13   formally out of that office, and the litigation

14   program.

15       Q      You said Family Unification Program

16   formally or formerly?

17       A      Formally, family reunification program,

18   but we have like employees all over working on that.

19       Q      So the program is ongoing?

20       A      Yes, it's ongoing.  It's just not -- not

21   everyone who works on it is physically in that

22   office.  But that's like the home of the program.

23       Q      Sure.  What is the Otay Mesa Release

24   Project?

25       A      The Otay Mesa Release Project focuses on



Page 75

1    detainees at Otay Mesa.  We provide -- we do bond,

2    parole, and habeas to try to get people released.

3    We also represent some people in their individual

4    hearings for the immigration court at the Otay Mesa

5    Detention Facility, and provide post-release

6    maintenance, including medicine assistance when you

7    get released from the detention facility, coordinate

8    travel to sponsor, and then assist with either pro

9    bono placement a referral, like a lot of people go

10   to Los Angeles, so we'll refer released respondents

11   to our Los Angeles office for representation.

12        Q    When did the Otay Mesa Release Project

13   begin?

14        A    I want to say like spring of 2019.

15        Q    Approximately how much of Al Otro Lado's

16   budget is dedicated to the Otay Mesa Release

17   Project?

18        A    Less than one-tenth of the budget.

19        Q    Less than one-tenth of the budget?

20        A    Yeah.  Maybe even closer to like

21   five percent.

22        Q    What does the operational structure of

23   the Otay Mesa Release Project look like?  I'm

24   speaking generally here, right?  Is there a

25   director, dedicated employees, is it more like --



Page 76

1    just describe it for me, please.

2         A    Sure.  So I am the director with

3    responsibility for overseeing the San Diego office

4    generally.  There is a supervising attorney for the

5    Otay Mesa Release Project.  There is -- but she

6    works on other -- it's not like 100 percent of her

7    time is dedicated to that, but she generally

8    oversees that program.

9              There's a staff attorney.  Again, not

10   100 percent -- or, actually, yeah.  There's one

11   staff attorney that's actually like funded for that

12   program.

13             There's a legal assistant whose time is

14   split between that program and other programs.

15             And then there's the post-release

16   coordinator who also works on other things as well.

17        Q    Just to clarify, there's one staff

18   attorney you said who's funded for that program?

19        A    Yes.

20        Q    By that, do you mean that there's a

21   specific source of funding that goes to that staff

22   attorney for the purpose of working as part of the

23   Otay Mesa Release Project?

24        A    Correct.

25        Q    What prompted Al Otro Lado to begin the



Page 77

 1    Otay Mesa Release Project?

 2             MS. WEBSTER:  I'm going to object.  This

 3    isn't within the topics.  I thought we could just go

 4    over what the office did for a little bit.  We're

 5    going pretty deep dive into this program and this

 6    program is not specified in the scope of the

 7    30(b)(6) topics, unless you want to point me to

 8    where it is.

 9             MR. HALASKA:  Sure.  Let me ask this

10    question.

11    BY MR. HALASKA:

12        Q    Is the Otay Mesa Release Project within

13    the scope of Al Otro Lado's mission?

14        A    Yes.

15        Q    So that's really what we're getting at

16    here is the implementation of Al Otro Lado's mission

17    statement.

18             So I think the question was -- I'm sorry,

19    could you read the question back before Ms. Webster

20    and my discussion?

21             (The following question was re-read:

22             "What prompted Al Otro Lado to begin the

23             Otay Mesa Release Project?")

24             THE WITNESS:  We wanted to get people out

25    of Otay Mesa.



Page 78

 1   BY MR. HALASKA:

 2        Q     Is the staff attorney who has funding

 3   specifically for the program, was that an individual

 4   who was employed by Al Otro Lado before that grant

 5   was awarded?

 6        A     No.

 7              MR. HALASKA:  Do you feel like you need a

 8   break?  It's been about an hour.

 9              THE WITNESS:  We can go a little bit

10   more.  I'll let you know when I'm ready.

11              MR. HALASKA:  Okay, sure.

12   BY MR. HALASKA:

13        Q     I think the next thing that you mentioned

14   out of the San Diego office, you mentioned the

15   California Department of Services organization.

16        A     It's not a specific program.  It's a

17   funding source from the State of California.  We do

18   some of the cases there.

19        Q     What cases?  What do you mean by -- let

20   me say that again.

21              What do you mean when you say you do some

22   of the cases there?

23        A     So the California Department of Social

24   Services funds removal defense, and we are

25   specifically funded to provide representation in



Page 79

1    bond and individual -- like individual hearings for

2    persons detained in California.

3              So we apply that funding toward the Otay

4    Mesa Release Project when it's a bond case, right,

5    because it's geared to getting them out.

6              And we do just a few representations

7    through that grant as well.  It's mostly bond as

8    applied to the Otay Mesa Release Project.

9        Q    So the -- then you also mentioned the

10   Family Reunification Program; is that right?

11       A    Yes.

12       Q    Can you describe that --

13            MS. WEBSTER:  Again, I want to object as

14   to scope.  This is not one of the programs listed in

15   the 30(b)(6) notice.

16   BY MR. HALASKA:

17       Q    Before we go on, Ms. Pinheiro, I'll ask

18   you:  Is the Family Reunification Program within the

19   scope of Al Otro Lado's mission statement?

20       A    Yes.

21       Q    Okay.  Can you describe the program for

22   me?

23       A    Sure.  The Family Reunification Program

24   is primarily dedicated to serving clients who were

25   separated as part of zero tolerance, where the



Page 80

1   parent was removed to home country and the child

2   remained in the United States.

3            Those cases are -- all are Ms. L's class

4   members and referred by the Ms. L's steering

5   committee to Al Otro Lado.  So then, we work on

6   those cases on behalf of the Ms. L's steering

7   committee.

8            Just generally monitoring continued

9   family separation at the border and offering

10  assistance, especially when there's separated

11  parents detained at Otay Mesa.

12  BY MR. HALASKA:

13       Q    Does Al Otro Lado receive its funding

14  from a specific source for the Family Reunification

15  Program?

16       A    Yes.

17       Q    When did that funding begin?

18       A    2018.

19       Q    Do you recall what month?

20       A    Sometime between July and December.

21       Q    Did Al Otro Lado use that funding to hire

22  a new staff member to do the -- excuse me, to

23  implement the Family Reunification Program?

24       A    Yes.

25       Q    How many staff members?



Page 81

```
 1      A    So we hire -- it's been -- the program
 2   has now been going for almost two years; right?  So
 3   it's evolved over time.
 4           I think initially -- I know there was at
 5   one point like eight people working on it.  But it
 6   was people who are also working on other programs.
 7   That's -- generally when I answer these questions,
 8   like when you're like how many staff members are
 9   working on each program, like it's rare for one
10   person to be 100 percent dedicated to one program.
11           We did hire -- I've honestly -- I know we
12   hired at least two, and then eventually we hired
13   more people.  But I know like at the peak, there
14   were probably around eight people working on it.
15   But it fluctuates, just depending on, you know,
16   whatever deadlines we're coming up against or how
17   many cases are referred to us, et cetera.
18      Q    Okay.  Are there any other programs that
19   operate out of the San Diego office?
20      A    The National Qualified Representative
21   Program.  We have I think one case now.  They're in
22   San Diego.
23      Q    What is that program?
24      A    National Qualified Representative Program
25   is a program of the Department of Justice that
```



Page 82

1    appoints counsel to represent detained indigent

2    immigrants who have been found to be mentally

3    incompetent to represent themselves at immigration

4    proceedings.

5        Q    You said Al Otro Lado has just one of

6    those cases at the moment?

7        A    We have one in San Diego.  I believe we

8    have a few more in Los Angeles.

9            MR. HALASKA:  I think I'm inclined to a

10   break now.  Do you want to take a longer break for

11   lunch or do you want to take a short break and then

12   come back and do a little bit longer break for lunch

13   for you later.  I know it's coming up on noon over

14   there.

15           THE WITNESS:  Let's just do a short break

16   now and break a little bit later for lunch if that's

17   okay.

18           MR. HALASKA:  Sounds good.  About ten

19   minutes?

20           THE WITNESS:  Okay.

21           THE VIDEOGRAPHER:  The time is 11:26 a.m.

22   We're going off the record.

23       (Break in the deposition taken at 11:26 a.m.)

24                    0o0

25       (The deposition resumed at 11:45 a.m.)



Page 83

```
 1                        0o0
 2              THE VIDEOGRAPHER:  The time is 11:45 a.m.
 3     We're back on the record.
 4     BY MR. HALASKA:
 5         Q    Good morning, Ms. Pinheiro.  Welcome
 6     back.
 7         A    Thank you.
 8         Q    Before the break, we were -- we had gone
 9     over Al Otro Lado's operations in its Tijuana office
10     and its San Diego office, and you also mentioned
11     that Al Otro Lado has a Los Angeles office; correct?
12         A    Correct.
13         Q    Can you walk me through the operations
14     that take place out of that office?
15         A    Sure.
16              So I want to preface this, again, by
17     saying the programs based out of the office are not
18     the only programs that Los Angeles would work on,
19     because we often need to pull employees from all
20     offices to support the work in Tijuana especially.
21     But the programs I'm about to describe are those
22     that are officially designated out of the LA office.
23              So one is our medical/legal program.
24     That includes our work at the LAC+USC hospital.
25     That work has evolved over time.  Initially, it was
```



Page 84

1    focused on undocumented and uninsured immigrants

2    experiencing medical crisis.  Now it's more specific

3    to undocumented and uninsured survivors of sexual

4    violence and domestic violence, including survivors

5    of childhood sexual and physical abuse.

6            We also have a homeless immigrant

7    services program that is -- includes street-based

8    outreach to homeless immigrants, and wraparound

9    legal services.  When I say wraparound, it means

10   that we work through an interdisciplinary team.

11   That includes social workers, mental health

12   professionals, housing, organizations and multiple

13   LA County agencies that serve the homeless

14   population.

15           We also have the California Department of

16   Social Services cases that are worked on out of the

17   LA office.  So that includes bond retained

18   representation and release representation for the

19   Los Angeles immigration court.

20           We have several National Qualified

21   Representative Program cases that are being

22   completed out of the LA office.  And the main

23   administrators for people are mostly working on the

24   deportee program in Tijuana are actually in LA a lot

25   of the time but come to the border for the deportee



Page 85

1    program.

2            Let me make sure I'm not missing

3    anything.  Medical, legal, homeless services, QRP,

4    CDSS.  Oh, we have another California Department of

5    Social Services program that covers affirmative

6    immigration applications.  So stuff like U Visas and

7    family petitions, stuff like that.

8            And I know that Nora is working on the

9    trauma-informed service model.  I'm not sure

10   exactly.  I would have to ask her for more details,

11   but it's working to develop a more trauma-informed

12   wraparound service model in collaboration with local

13   mental health professionals.  But I would put that

14   under medical/legal.

15        Q     When did the medical/legal program start?

16        A     In 2017.

17        Q     What's the organizational structure of

18   the medical/legal program look like?

19        A     So Nora is the director -- I'm sorry, let

20   me just ask a clarifying question.  Are you talking

21   about today?

22        Q     Yes.

23        A     What it looks like now?  Okay.

24            So Nora is the director generally

25   responsible for the medical/legal program.  And then



Page 86

1    there's a supervising attorney.  There are two

2    accredited representatives.  There's a mental health

3    professional/case manager.  And I think that's it.

4              Oh, I just want to quickly go back to

5    your last question.  We also have operations

6    capacity running out of LA.  So operations,

7    development, communications, like the kind of core

8    support positions are also housed in LA.  I forgot

9    to mention that.

10       Q    So Ms. Phillips is the director of

11   programs.  There's one supervising attorney.  And

12   I'm sorry, what was the next thing you said, two

13   attorneys?

14       A    No, it's accredited representatives.  So

15   they are accredited --

16       Q    Yeah.

17       A    -- by the Office of Legal Access Programs

18   at UIR and they are able to essentially do what an

19   attorney does in immigration court and before USCIS.

20       Q    About how much -- again, this is

21   currently.  About how much of Al Otro Lado's budget

22   is dedicated to the medical/legal program?

23       A    Like -- sorry, give me a minute to think

24   through.

25       Q    Sure.



Page 87

1      A      I would say -- funding specifically for

2    that program is probably less than five percent of

3    the budget.  We use NCRP -- we count NCRP under

4    medical/legal because it's working with people with

5    mental illness or other disabilities that affect

6    their competency.

7                The homeless services program is

8    separately funded.  That's counted.

9                Then some of the CDSS funding -- sorry,

10   when I say CDSS, I mean California Department of

11   Social Services funding for affirmative cases we

12   count as part of the medical/legal program because

13   we only apply that funding for survivors of sexual

14   violence, domestic violence or child.

15     Q      When the medical/legal program began in

16   2017, approximately how much of Al Otro Lado's

17   budget was dedicated to the program at that point.

18                MS. WEBSTER:  Objection as to scope.  The

19   topic is limited to implementation.

20                MR. HALASKA:  Sure, let me rephrase it

21   then.

22   BY MR. HALASKA:

23     Q      In 2017, approximately how much of Al

24   Otro Lado's budget was dedicated to its

25   implementation of the medical/legal program?



Page 88

 1      A    So that's a hard question to answer,
 2  because there was -- as you saw from tax returns, a
 3  lot of unfunded work for the company.  So I mean, in
 4  terms of funding, it was almost all of our funding
 5  was for medical/legal.  We have the Robert Wood
 6  Johnson granted that I mentioned earlier.
 7           In terms of the working happening, like
 8  we weren't able to actually -- there was more work
 9  going on in Tijuana than -- for which we were
10  receiving funding, if that makes sense.  It's hard
11  to give a number because we just had so little
12  funding and the vast -- almost all of our funding
13  was for medical/legal.  But that didn't necessarily
14  reflect the work going on.  We had to divert a lot
15  of resources.
16      Q    Yes, maybe that's a better way to ask the
17  question then.  In 2017, approximately, just an
18  approximation, about how much -- bad question.
19           In 2017, approximately how much of Al
20  Otro Lado's staff or volunteer hours was dedicated
21  to the medical/legal program?
22           THE WITNESS:  I'm sorry, somebody is not
23  muted.  Can everyone make sure they're muted because
24  I'm hearing some background noise.
25           (Unintelligible conversation.)



Page 89

1            THE MAGNA TECH:  It's the call-in line

2    number.  Folks on the call-in lines, you have to

3    mute your conference phone.

4            We can still hear it.

5            Sol, I believe you're able to as host --

6            MS. WALTERS:  I think I know who it is.

7    I'll send a text.

8            THE MAGNA TECH:  Sol, you might be able

9    to mute them also because you're host.

10           THE VIDEOGRAPHER:  I just muted both

11   call-in users.

12           THE WITNESS:  I can't hear.  Sorry, Alex,

13   if you can just repeat that one more time.

14           MR. HALASKA:  Yeah, let me ask it again

15   just to account for the conference.

16   BY MR. HALASKA:

17       Q    In 2017, when the medical/legal program

18   began, approximately how much of Al Otro Lado's

19   attorney or staff hours were dedicated to

20   implementing a program?

21       A    God, so many hours, but not enough to do

22   it.  Not enough -- we didn't have enough time to

23   properly implement it because metering, basically,

24   because we -- like, I just want to go back to

25   another answer I had given when I talked about the



Page 90

 1   difficulties of transitioning our programs in

 2   Tijuana to address turnbacks and later metering.

 3           And it was unfortunate that we were

 4   unable to effectively implement the medical/legal

 5   program, given staffing and resource constraints

 6   because of the demands that were caused by turnbacks

 7   on the border.

 8           But I mean, it was -- I spent a lot of

 9   time trying to set that program up.  Hours.  I don't

10   even know.  Let me think.  I mean, it was a lot.

11   Like meetings and trying to set up the office and

12   talking to funders and applying for funding.  Oh,

13   God, a million stakeholder meetings with the other

14   people on the Robert Wood Johnson Grant.  Just a

15   lot.

16           One of us tried to be there every day to

17   try to set it up, but it just wasn't possible.  And

18   it's difficult now thinking back because it was

19   several years ago to really give like a number of

20   hours.

21           But more broadly, when we established it,

22   it was me and Nora in LA, right, working on it.  But

23   we were both going down to TJ, especially I was

24   going down more often.

25           Then we eventually hired -- when we got



Page 91

1    the Robert Wood Johnson Grant, eventually hired

2    another person that was working on it full-time.

3    That was Ricardo.  But...

4              Yeah, it's hard to -- I can't -- it's

5    really hard for me to give an estimate of like

6    number of hours.  I can just describe sort of what I

7    just described.

8        Q    Okay.  Today, do you feel like Al Otro

9    Lado has a greater capacity to implement its

10   medical/legal program than it did back in 2017 when

11   it began?

12             MS. WEBSTER:  Objection, foundation.

13             MR. HALASKA:  You can go ahead and

14   answer.

15             THE WITNESS:  Can you repeat the

16   question?

17             MR. HALASKA:  Yeah, sure.  Well,

18   actually, can you just read it back.

19             (The following question was re-read:

20             "Today, do you feel like Al Otro Lado has

21             a greater capacity to implement its

22             medical/legal program than it did back in

23             2017 when it began?")

24             THE WITNESS:  It's hard to compare the

25   program in 2017 to what it is now, because we


MAGNA
LEGAL SERVICES

Page 92

1  actually lost the first funding source because we

2  weren't able, we didn't have capacity to properly

3  implement it, so the Robert Wood Johnson Grant that

4  I referenced earlier.  And then had to obtain

5  separate funding to try to continue -- to fulfill

6  our mission in Los Angeles as related to the

7  medical/legal program.

8          So the program has changed over time, and

9  the funding sources are different.  So I think it's

10  difficult to compare the two.

11  BY MR. HALASKA:

12  Q    You said that in 2017, it seemed that Al

13  Otro Lado's work in response to address metering

14  kind of took away from its ability to implement its

15  medical/legal program.

16          Is that a fair characterization?

17  A    Yes.

18  Q    Is that still happening today -- sorry,

19  let me ask it a different way.

20          Do you still feel the same way today with

21  regard to metering --

22  A    Yes.

23  Q    -- and the implementation of the

24  medical/legal program?

25  A    Yes, continues to be a struggle.



Page 93

 1      Q      Why is that?

 2      A      The volume of migrants who have been

 3   metered specifically in Tijuana is, I believe,

 4   hovering somewhere around 10,000.  And it's been

 5   that way for a while.

 6             We are constantly having to pull

 7   resources from our other offices to address the

 8   needs of particularly vulnerable migrants who have

 9   been metered.  Specifically those who are in

10   imminent danger of harm or death in Tijuana.

11             Those by definition are emergency

12   situations that constantly -- it's difficult to plan

13   for them.  So we're constantly having to shift

14   resources around to address those emergency

15   situations.

16             I think also just, in terms of the

17   organizational capacity to even ask for grants to

18   support certain programs, you know, we have a

19   limited capacity to do that.  And because of the

20   volume of work on the border, we necessarily need to

21   shift resources toward trying to get funding to

22   support it.

23             And the other, just a more foundational

24   issue is like, there are other non-profits in

25   Los Angeles who we collaborate -- with whom we



Page 94

1   collaborate to assist our clients in Los Angeles.

2   And we don't -- that doesn't really exist in

3   Tijuana.  We're -- now there are more organizations

4   here, but we're essentially the only organization

5   offering the types of services we do and dealing

6   with these emergencies that come up with respect to

7   Asylum seekers who have been metered.

8           So it's sort of like easier, I guess, in

9   a way, to find somebody else to help the people that

10  we would serve under the medical/legal program in

11  Los Angeles.  And so that -- we don't have that

12  luxury in Tijuana.  So we have no choice but to

13  divert different resources to address emergency

14  situations.

15      Q    What sorts -- let me go back.  You said

16  that the organization is diverting resources from

17  other programs to dedicate to its Tijuana

18  operations; right?

19      A    Yes.

20      Q    Where are those resources being pulled

21  from?

22      A    So our -- it's staff resources more than

23  anything.  So we -- like I mentioned earlier, we

24  have employees based in San Diego or Los Angeles

25  working on these other programs.  And we will often



Page 95

1    have to pull in staff to address emergency or other

2    situations, even if we're just having a large-scale

3    clinic, to help with cases of individuals who have

4    been metered.  It becomes more urgent when they're

5    in imminent risk of harm or even like serious

6    medical cases.

7              So for example, like we in the

8    Los Angeles office built a particular expertise in

9    working with clients through the medical/legal

10   program who are experiencing medical emergencies or

11   mental health crises or some other disability that

12   affects their ability to communicate their rights.

13             We are also encountering individuals who

14   fall into those categories who have been metered.

15   So we would ask individuals who have that expertise

16   from working in the LA programs to assist with

17   following who have been metered who are facing

18   similar medical challenges, if that makes sense.

19             Again, organizational orientation

20   overall, just the volume -- I mean, again, I think

21   it's around 10,000 people who are waiting in Tijuana

22   alone here on the list.  It might be a little bit

23   lower.  I haven't seen the exact numbers, but on

24   average, it's been around 10,000 for a while.

25             The sheer volume of cases we're seeing,



Page 96

1    it's really like we're identifying hundreds of

2    people who are particularly vulnerable.  So it's

3    just a constant battle to try to meet those needs

4    with limited, limited resources in the organization.

5              MR. HALASKA:  Kevin, can you please pull

6    up the document, 22830.

7              MR. HALASKA:  Ms. Pinheiro, this document

8    is about 25 pages.  You're, of course, free to

9    review the entire thing, but I'll represent to you

10   that the scope of my questions are really just going

11   to be about kind of the last three pages.

12             THE WITNESS:  Okay.

13             MR. HALASKA:  We'll mark this as

14   Exhibit 4.

15             (Pinheiro Exhibit 4 was marked for

16             identification.)

17             (Document review.)

18             MS. WEBSTER:  Alex, we did not receive

19   this document.

20             MR. HALASKA:  I will email it to you.

21             MS. WEBSTER:  In the box folder.

22   Thank you.

23             (Continued document review.)

24             MS. WEBSTER:  We have not received it

25   yet.



Page 97

1            MR. HALASKA:  Okay, thanks.  Sure.  Sorry

2     about that.  Probably just slipped through.

3            MS. WALTERS:  I actually just got it.

4     Michelle, I'll try to forward it in case that's

5     faster.

6            MS. WEBSTER:  Thanks, Karoline.  I've

7     received it as well.

8            MR. HALASKA:  Okay.  Let me know when

9     you're all set for me to start asking questions.

10           MS. WEBSTER:  Yeah, if you could just

11    give us a couple of seconds to please look it over a

12    little bit.

13           MR. HALASKA:  Sure.

14           MS. WEBSTER:  Thank you.

15           (Document review.)

16           THE WITNESS:  I'm ready when Michelle and

17    others are ready.

18           MS. WEBSTER:  Sorry, just a second.  It's

19    a long document and we didn't have a chance to

20    review it.

21           THE WITNESS:  No worries.

22           MR. HALASKA:  Of course.

23           (Continued document review.)

24           MS. WEBSTER:  We're ready to proceed.

25    Thank you.



Page 98

1                MR. HALASKA:  Okay, great.

2       BY MR. HALASKA:

3            Q       So Ms. Pinheiro, do you recognize the

4       email?

5            A       I recognize the email, yes.

6            Q       Okay.  After having reviewed it, do you

7       recognize the attachment to it?

8            A       The attachment looks a little strange to

9       me actually.  I recognize pieces of it.

10           Q       In what way does it seem strange?

11           A       If you go to the end, yeah, the last

12      page, those revenues are probably like from -- the

13      email -- the email exchange is in 2019.  And some of

14      that, some of the revenue was from like 2017 and

15      like early 2018.

16                So it wouldn't, like, have overlapped

17      with the period that's, like, described in the email

18      on top.  It seems -- I'm not even sure, like, was it

19      attached to it?  It just seems strange for that

20      reason.

21                And then there's -- if you go up --

22      there's a couple things.  There's some -- just years

23      and things that are missing and out of date.  So it

24      just seems like it's maybe cobbled together from a

25      few different documents.  Doesn't seem to me like



Page 99

1    it's one thing.

2        Q      The document was produced natively by

3    plaintiffs.  These are PDF printouts of the Excel

4    spreadsheet.

5        A      Yeah, might be --

6        Q      If you go to -- go ahead.

7        A      There's things that we'd need to believe

8    it's a draft or sort of like in progress or not a

9    final version.

10       Q      Okay.

11              MR. HALASKA:  Kevin, can you go to page

12   22.  It's the one that starts with Al Otro Lado

13   budget.

14              THE MAGNA TECH:  This is the 22nd page of

15   the PDF.

16              MR. HALASKA:  Okay.  Up one more page,

17   sorry.

18              Yes, this is the page that I would like

19   to ask you a couple questions about.

20   BY MR. HALASKA:

21       Q      Ms. Pinheiro, does this page look

22   inaccurate to you?

23       A      Yes.

24              MS. WEBSTER:  Objection -- I'm sorry.

25   Objection, vague.



Page 100

1           THE WITNESS:  Sorry, I just heard, does

2    it look inaccurate.  Yes.  Was there another

3    question after that?

4    BY MR. HALASKA:

5        Q     Yeah.  I said in what way.  Ms. Webster

6    objected as vague.

7        A     Oh, okay.

8              Well, there's -- the total is certainly

9    not accurate.  It says zero.

10       Q     The -- sure.  What about the specific

11   line items?

12       A     The fringe isn't there.  And it's

13   difficult for me to know whether -- I don't -- I

14   don't know the date that this was produced or

15   what -- like I said, it looks like a draft.  So it's

16   hard -- like salaries change and -- yeah.

17             This looked like -- kind of like

18   estimates to me, because it's like totally round

19   numbers for people who aren't salary, things like

20   that.  Just -- it's not -- it's not accurate in a

21   couple different ways.

22       Q     Okay.  Let's look at the left column that

23   says staff number.  The first three -- Nora

24   Phillips, Erika Pinheiro, Nicole Ramos.  You three

25   are staff members; correct?



Page 101

```
 1        A      Correct.

 2        Q      I apologize in advance, I'll probably get

 3   all of these names wrong, but the next line, Karlyn

 4   Kuchery, is she a contact or he?

 5        A      Yes.

 6        Q      Does this person currently occupy the

 7   role of supervising attorney?

 8        A      Yes.

 9        Q      What are -- is this individual's primary

10   job duties?

11        A      They are the supervising attorney for the

12   Los Angeles office.  So overseeing the work on the

13   programs that I described earlier, including

14   medical/legal, CDSS, QRP.  But also assists when

15   needed on other programs like our Border Rights

16   Project.

17        Q      The next line says Anne Rios.  Is Anne

18   Rios still on staff?

19        A      She is.

20        Q      Does she still hold the role of staff

21   attorney?

22        A      No.

23        Q      What role does she hold now?

24        A      Supervising attorney.

25        Q      What are Anne Rios' primary job duties?
```



Page 102

1      A      Anne Rios is the supervising attorney for

2    the San Diego office.  She primarily oversees the

3    Otay Mesa Release Project, the NCRP cases that are

4    assigned to the San Diego office, as well as any

5    CDSS work that is assigned to the San Diego office.

6            She also assists with the Border Rights

7    Project on an as-needed basis.

8      Q      The next line is Hugo Salazar.  Is Hugo

9    Salazar still on staff?

10     A      No.  I believe so -- yeah, I believe so.

11     Q      Does he still occupy the role of staff

12   attorney?

13     A      He's a fellow, so the reason I hesitated

14   a bit, because I know his fellowship is ending in

15   the next few weeks.  I'm not sure of his exact end

16   date.

17     Q      Was his fellowship or is his fellowship

18   funded by a specific grant or source of income?

19     A      Yes.

20     Q      Do you know as you sit here which one

21   that is?

22     A      ChangeLawyers Foundation.

23     Q      What were or are Mr. Salazar's primary

24   job duties?

25     A      Assisting with the Border Rights Project



Page 103

1    with limited work on the Otay Mesa Release Project.

2        Q      On the next line is Katharine Gordon.  Is

3    Katharine Gordon still on staff?

4        A      No.

5        Q      When did she leave?

6        A      Sometime last year.  I'm not 100 percent

7    sure the month, but I think it was maybe around the

8    summer of 2019.  I'm not 100 percent sure.

9        Q      Is there another individual that

10   currently occupies the role of pro bono coordinator?

11       A      Yes.

12       Q      Who is that individual?

13       A      Karen Anderson.

14       Q      Next line is Carolanne Donohoe.  Is

15   Carolanne Donohoe still on staff?

16       A      Yes.

17       Q      What are Carolanne Donohoe's primary job

18   duties?

19       A      She is managing attorney for the Family

20   Reunification Program, and assists with Border

21   Rights Project on an as-needed basis.

22       Q      Is her job title staff attorney or

23   managing attorney?

24       A      Managing attorney.

25       Q      The next line says Helen Boyer.  Is Helen



Page 104

1    Boyer still on staff?

2        A    No.

3        Q    When did she leave?

4        A    I'm not sure.  Sometime in 2019.

5        Q    While Helen Boyer was employed, what were

6    her primary job duties?

7        A    Helen Boyer worked out of the Los Angeles

8    office.  They worked primarily on the programs in

9    Los Angeles, medical/legal, CDSS-funded cases, and

10   NCRP.  Then traveled to Tijuana to assist with the

11   Border Rights Project on an as-needed basis.

12       Q    Does another individual currently occupy

13   the role that Helen Boyer occupied while she was

14   employed at Al Otro Lado?

15       A    Yes.

16       Q    Who is that person?

17       A    Regina Ramirez.

18       Q    I'm sorry, I didn't catch the first name.

19       A    R-E-G-I-N-A, Regina.

20       Q    Great, the next line is Meghan Maurus.

21   Does -- is Megan --

22       A    Let me just clarify for that last one.

23   Regina took over responsibilities, but is an

24   accredited representative, not a staff attorney.  So

25   the title is different, but the responsibilities are



Page 105

1    the same.

2        Q    Gotcha.  Thank you for that

3    clarification.

4            The next individual is Meghan Maurus.  Is

5    that individual still on staff?

6        A    No.

7        Q    When did that individual leave?

8        A    Probably -- I'm not sure if it was 2019

9    or maybe the start of 2020.  I'm not sure.  I think

10   it was 2019, though.

11       Q    What were that individual's primary job

12   duties while she was employed?

13       A    Assisting with the Border Rights Project.

14       Q    Anything else?

15       A    No.

16       Q    Does another individual currently occupy

17   the role that Meghan Maurus did while she was

18   employed?

19       A    Yes.

20       Q    Who is that individual?

21       A    Ia Ibars, I-B-A-R-S.

22       Q    The next individual is Shane Mulligan.

23   Is Shane Mulligan still on staff?

24       A    No.

25       Q    When did he or she leave?



Page 106

```
 1        A      Around September of 2019.

 2        Q      While Shane Mulligan was on staff, what

 3   were his or her primary job responsibilities?

 4        A      Coordinating volunteers for the Border

 5   Rights Project.

 6        Q      Does OTG volunteer coordinator mean on

 7   the ground volunteer coordinator?

 8        A      Yes.

 9        Q      Does another individual currently occupy

10   that role?

11        A      Yes.

12        Q      Who is that person?

13        A      Lily Hertz.

14        Q      The next person is Jessica Fuller.  Is

15   she still on staff?

16        A      No.

17        Q      When did she leave?

18        A      I think it was either end of 2019 or

19   early 2020.

20        Q      While Jessica Fuller was employed, what

21   were her primary job duties?

22        A      Assisting with the Border Rights Project.

23        Q      She was a paralegal assigned to the

24   Border Rights Project?

25        A      Correct.
```



Page 107

```
 1        Q     Does another individual currently occupy
 2   that role?
 3        A     The role has changed since then.  There
 4   is another individual assisting.  It's just a little
 5   different.  Name is Karen Golvon.
 6        Q     How is the role different?
 7        A     The new -- the new position is more
 8   focused on data management for the cases that we
 9   have rather than substantive -- well, they're still
10   substantive legal support, but it's also more of a
11   data -- like the data management has become more of
12   a focus.
13        Q     Is that individual still primarily
14   assigned to the Border Rights Project?
15        A     Yes.
16        Q     The next individual is Alejandra
17   Martinez.  Is Alejandra Martinez still on staff?
18        A     Yes.
19        Q     Does she still occupy the role of
20   coordinator?
21        A     Yes.
22        Q     What does a coordinator do?
23        A     She coordinates the services for Asylum
24   seekers that are receiving services from the Border
25   Rights Project.
```



Page 108

1       Q       The next person is Jose Mares.  Is Jose

2   Mares still on staff?

3       A       Yes.

4       Q       Then under title, says operations.  What

5   does that entail?

6       A       Like making sure, you know, utility bills

7   are paid, helping with transportation.  Helping with

8   vendors, assisting with some administrative duties

9   related to the Mexico legal entity, things like

10  that.  Just general administrative for the

11  organization.

12      Q       Is Jose Mares assigned to a specific

13  program of Al Otro Lado's?

14      A       The operations of work includes work for

15  Border Rights Project and the deportee program, both

16  of which operate out of our Mexican office.  So just

17  overall for those...

18      Q       Okay.  The next individual is Pricila

19  Rivas.  Is that individual still on staff?

20      A       Yes.

21      Q       Does that individual still occupy the

22  role of project assistance?

23      A       I'm not sure what her title is now, but I

24  think it's the same.

25      Q       What are her primary job duties?



Page 109

```
 1        A      She assists with the Border Rights

 2   Project and the deportee program.

 3        Q      The next line says Matias with no title

 4   or salary.  Is this individual still on staff?

 5        A      Yes.

 6        Q      Does this individual have a title?

 7        A      Psychologist.

 8        Q      Psychologist.  Is this individual a

 9   volunteer?

10        A      No.

11        Q      What are this individual's primary job

12   duties?

13        A      Providing mental health assistance to

14   Asylum seekers served by the Border Rights Project,

15   as well as assisting in some coordination and

16   administrative duties for the project.

17        Q      Was he primarily assigned to the Border

18   Rights Project?

19        A      Yes.

20        Q      The next person is Stephanie Bloomberg.

21   Is she still on staff?

22        A      No.

23        Q      When did she leave?

24        A      I think it was 2019, probably late 2019.

25        Q      Does another individual currently occupy
```



Page 110

1    the role that Stephanie Bloomberg did while she was

2    on staff?

3         A     Yes, but the title and the role has

4    shifted.

5         Q     Well, first, who is that person?

6         A     Katia Cardoza.

7         Q     What is the new title?

8         A     Family Reunification Project coordinator,

9    C-A-R-D-O-Z-A.

10        Q     I should have asked, while Stephanie

11   Bloomberg was on staff, in her role as the case

12   manager, what were her primary job duties?

13        A     She worked exclusively with families

14   being served by the Family Reunification Project.

15        Q     When Katia Cardoza came on, even though

16   the title shifted, that role is still associated

17   with the Family Reunification Project?

18        A     Yes, but she also assists the Border

19   Rights Project on an as-needed basis.

20        Q     The next person is Aldo Martinez.  Is

21   Aldo Martinez still on staff?

22        A     Yes.

23        Q     Does he still occupy the role of

24   paralegal?

25        A     Yes.



Page 111

1      Q      What are his primary job duties?

2      A      He's split between San Diego and Border

3  Rights Project.  Sometimes -- just depending on what

4  the immediate needs are at the time.  Just kind of

5  depends on what's happening.  But he works in those

6  two offices.

7      Q      Erin Anderson, is this the Erin Anderson

8  who now occupies the role of pro bono coordinator?

9      A      Yes.

10      Q      Does another individual currently occupy

11  the paralegal role that Erin Anderson used to

12  occupy?

13      A      Yes.

14      Q      Who is that person?

15      A      Abigail Jimenez.

16      Q      What are Abigail Jimenez' primary job

17  duties?

18      A      Abigail primarily works in the San Diego

19  office on the programs that are housed in our

20  San Diego office.  And she also assists with the

21  Border Rights Project on a regular basis.

22      Q      Were those the same job duties that Erin

23  Anderson had when she was a paralegal?

24      A      Erin did more work on family

25  reunification than Abigail does now.  Abigail still



Page 112

1    does some work on that, but Alby has been pulled

2    more to Tijuana specifically with respect to

3    unaccompanied children who have been metered.

4         Q     Just a few more, I promise, then I'll

5    propose that we break for lunch.

6              The next person is Aaron Cobian.  Is this

7    individual still on staff?

8         A     No.

9         Q     When did he or she leave?

10        A     Last week.

11        Q     Does another person already occupy the

12   role that Aaron Cobian used to?

13        A     No.

14        Q     Does Al Otro Lado intend to fill the role

15   that Aaron Cobian used to?

16        A     Yes.

17        Q     What were the primary job duties that

18   Aaron Cobian had as coordinator while he was

19   employed?

20        A     He was our operations coordinator, so

21   helped with general bookkeeping.  He helps with

22   paying vendors, making sure utilities were paid,

23   things like that.

24              He helped with some transfers for direct

25   support, like for, you know, client needed -- we



Page 113

1   raised money for a client.  They needed assistance

2   with something, he would help with that.  Helped

3   with payroll.  Helped with tax and regulatory

4   compliance stuff.  He helped with, like, insurance,

5   like operational.

6          Q     Then you still anticipate that whoever is

7   hired into that position will have the same job

8   duties?

9          A     Not the human resources related.  We

10  actually hired a separate position for that.  So the

11  new person wouldn't have those responsibilities.

12               Erin also traveled to Tijuana on a pretty

13  regular basis to assist with the Border Rights

14  Project and he provided assistance substantive

15  paperwork.  So the new person, it would depend on

16  their particular skill set if they were also to

17  engage in that.

18         Q     The next line is Regina Ramirez.  Is this

19  the individual who is now the accredited

20  representative?

21         A     Yes.

22         Q     Has anyone been hired or promoted to her

23  former role as paralegal?

24         A     Yes.

25         Q     Who is that person?



Page 114

1      A     I know her first name is Corrina.  I'm
2  blanking on her last name.
3      Q     That's okay.
4            Does she -- what are her primary job
5  duties?
6      A     She works primarily on medical/legal
7  program, but does travel to Tijuana to assist with
8  the Border Rights Project on an as-needed basis.
9      Q     The next person is Ricardo Diaz.  Is he
10 still on staff?
11     A     Yes.
12     Q     Does he still occupy the role of
13 paralegal?
14     A     No.
15     Q     What role does he occupy now?
16     A     Accredited representative.
17     Q     Did he fill a position that someone had
18 left or was that a new position?
19     A     He just became accredited, so his
20 responsibilities changed.  But we didn't hire
21 another paralegal.
22     Q     Gotcha.
23           Do you intend to hire another paralegal?
24     A     If we can secure funding for it, of
25 course I would love to.  But it's a question of



Page 115

```
 1   resources.

 2        Q     The next person is Rosa Diaz.  Is she

 3   still on staff?

 4        A     Yes.

 5        Q     Does she still occupy the role of case

 6   manager?

 7        A     Yes.

 8        Q     What are her primary job duties?

 9        A     She primarily works on the Homeless

10   Immigrant Services Program, and she travels to --

11   she also provides some mental health support to

12   other clients of the Los Angeles office.  And she

13   travels to Tijuana to assist with the Border Rights

14   Project on an as-needed basis.

15        Q     The next person is Maria Lozoya.  Is she

16   still on staff?

17        A     Yes.

18        Q     Is she still the receptionist?

19        A     Yes.

20        Q     Is there a specific office that she

21   primarily attends to?

22        A     Los Angeles.

23        Q     Any others?

24        A     So LA is our main office.  So we'll get

25   mail there for all of the offices or calls or things
```



Page 116

```
 1    like that.  So she frequently will assist forwarding

 2    correspondence or phone calls or other

 3    communications to the other offices as well as

 4    processing documents and checks and whatever.  Like

 5    we'll send things to the LA office for her to

 6    process or take care of.

 7             And she also helps with the voicemail

 8    from different offices.  So...

 9        Q    Next is Melissa Flores.  Is she still on

10    staff?

11        A    Yes.

12        Q    Does she still occupy the communications

13    role?

14        A    Yes.

15        Q    What are her primary job duties?

16        A    Melissa helps with -- she runs our social

17    media.  She helps when like other organizations form

18    a coalition to address -- to do advocacy around a

19    certain issue.  She will often represent Al Otro

20    Lado in like communications meetings.

21             She helps us develop communication

22    strategies for or -- just different -- our different

23    projects, just depending on like, if we file

24    something or if we have a particular case that we

25    want to get out to the public, she'll help craft the
```



Page 117

1   media strategy around that.

2         She also travels to Tijuana frequently to

3   keep apprised of what's happening with border rights

4   and deportee program to offer assistance on those

5   programs.  And she brings like delegations of people

6   to visit Tijuana to see the programming there.  Or

7   she will accompany delegations for communications

8   purposes.

9         Q     Last is Danielle Padilla.  Is she still

10  on staff?

11        A     No.

12        Q     When did she leave?

13        A     Last week.

14        Q     While she was employed and occupied the

15  role of coordinator, what were her primary job

16  duties?

17        A     She was the development coordinator.  So

18  write grants, keep track of reporting deadlines,

19  communicate with funders, communicate with

20  individual donors, work with operations coordinator

21  on bookkeeping issues related to development.  Event

22  planning, like for fundraisers.  Wellness, she did

23  like wellness events for staff and clients.

24        Q     Okay.  Do you anticipate hiring another

25  person to fill that role?



Page 118

```
 1        A      Yes.
 2        Q      Was Daniel Padilla the first person to
 3   occupy the development coordinator role at Al Otro
 4   Lado?
 5        A      No.
 6        Q      Who was before her?
 7        A      Liz Ramirez.
 8        Q      I'm sorry, I didn't catch the first name?
 9        A      Liz, Elizabeth Ramirez.
10        Q      Was she the first?
11        A      She was the first.
12        Q      Do you recall when she started in that
13   role?
14        A      Maybe November of 2018, around then.
15   Could be October.
16        Q      Okay.  You also mentioned that -- please
17   correct me if I'm wrong, that you were hiring or
18   looking to fill a human resources position?
19        A      We've already hired for that position.
20        Q      Okay.  Who is that individual?
21        A      Yesua, Y-E-S-U-A.  Last name, Castañeda.
22        Q      What are her primary responsibilities?
23        A      Yesua is our HR coordinator.  So he --
24        Q      I'm sorry, he.
25        A      -- helps with employee onboarding, like
```



Page 119

1  all the forms people have to fill out when they're

2  hired.  Helps with terminations.  Helps with

3  payroll.  He helps with the employee manual.  Helps

4  with like benefits stuff.

5           Just any issues that come up related to

6  human resources.

7      Q    Okay.  Are there any individuals

8  currently on the Al Otro Lado staff that aren't

9  listed here?

10     A    I'm trying to think if there's someone I

11 didn't mention already when we talked about the

12 switching.  There's one more staff attorney in

13 San Diego, the one I mentioned earlier specific to

14 the Otay Mesa Release Project, but who also helps

15 for border rights.

16          Then we have a post-release coordinator

17 who's split between San Diego and Border Rights

18 Project.

19          There's another attorney who works on

20 litigation who is also split between border rights

21 and San Diego.

22          Who else?  I think that's it.

23          MR. HALASKA:  Okay.  That is all the

24 questions I have at the moment.  I will propose that

25 we break for lunch.



Page 120

1           MS. WEBSTER:  How much time would you

2    like, Erika?

3           THE WITNESS:  How much time have we done

4    so far.  It's been like --

5           THE STENOGRAPHIC REPORTER:  We've been on

6    the record for three hours and 17 minutes.

7           THE WITNESS:  Let's just take 30, then,

8    if that's okay.

9           MR. HALASKA:  That sounds good.  Back on

10   at 1:30 local time?

11          THE VIDEOGRAPHER:  The time is 12:57 p.m.

12   We're going off the record.

13          (Lunch break taken at 12:57 p.m.)

14                  0o0

15       (The deposition resumed at 1:45 p.m.)

16                  0o0

17          THE VIDEOGRAPHER:  The time is 1:45 p.m.

18   we're back on the record.

19          MR. HALASKA:  Ms. Pinheiro, welcome back.

20   I hope you had an enjoyable lunch.

21          Just before we get into questioning, the

22   parties have worked out a stipulation regarding the

23   fact that Ms. Pinheiro was providing testimony from

24   Tijuana, Mexico, and they want to offer a

25   stipulation on the record.  I'll just read that in.



Page 121

```
 1              The parties stipulate that they expected
 2    the witness to testify in California, that they
 3    agree that the court reporter may place the witness
 4    under oath while she's in Mexico and the fact that
 5    the witness is providing testimony from Mexico shall
 6    not be a basis for this testimony to be held
 7    inadmissible.
 8              Ms. Webster, do you agree?
 9              MS. WEBSTER:  So agreed.
10              MR. HALASKA:  Great.  Okay.
11    BY MR. HALASKA:
12         Q    I want to go -- pivot back to the
13    operations in Tijuana for a little bit if you don't
14    mind.
15              In this case, plaintiffs allege the
16    existence of a capital T, Turnback, and capital P,
17    Policy.  What is the term of that policy?
18              MS. WEBSTER:  Objection.  Vague.
19              THE WITNESS:  My understanding of
20    Turnback Policy is that it is a set of policies and
21    practices implemented by the defendants to reduce or
22    eliminate the flow of Asylum seekers through the
23    ports of entry to the United States by limiting or
24    eliminating access to the U.S. Asylum system through
25    force, fraud, coercion, or metering.
```



Page 122

```
 1   BY MR. HALASKA:

 2        Q     When did you first hear the phrase,

 3   Turnback Policy?

 4        A     I'm not sure.

 5        Q     Who did you hear it from?

 6              MS. WEBSTER:  Objection, foundation.

 7              MR. HALASKA:  Let me rephrase the

 8   question.

 9   BY MR. HALASKA:

10        Q     Did you hear it from another person?

11        A     Well, I don't recall whether that's what

12   we call it when CBP was turning away Asylum seekers,

13   like when we first started documenting that.  We

14   would use the phrases turnbacks or turnaways

15   interchangeably.

16              This was before -- you know, when we

17   first started documenting it.  So I don't think

18   necessarily it was from another person, although the

19   phrase Turnback Policy is obviously used in

20   documents in the litigation.

21        Q     Have you ever heard a government

22   official, a U.S. Government official, refer to the,

23   quote, Turnback Policy, end quote?

24              MS. WEBSTER:  Objection.  Scope.

25              THE WITNESS:  Me personally or somebody
```



Page 123

1   else from the organization?

2           MR. HALASKA:  I'm asking for Al Otro

3   Lado's knowledge here.  I do think it's

4   encompassed -- let me look at the exact topic

5   number.

6           THE STENOGRAPHIC REPORTER:  Michelle, I'm

7   sorry --

8           MR. HALASKA: ... the scope of topics 19,

9   20, and 21.  I understand Ms. Webster has a scope

10  objection, but either way, you can go ahead and

11  answer.

12          THE WITNESS:  Sure.

13          Michelle, do you mind muting yourself.

14  Your pages are very loud.

15          I saw the phrase Turnback Policy in some

16  of the documents filed by the government in this

17  case, and I've heard attorneys representing the

18  government use that phrase in oral argument.  I

19  believe probably also when we did the early neutral

20  evaluation.

21          And as an organization, I can't say with

22  certainty exactly what phrases were used by

23  officials at a port of entry if I wasn't present.

24  So I'm not sure if any staff or volunteers heard an

25  official use that exact terminology.



Page 124

1          And I know that there have been panels

2   and other public events at which CBP officials have

3   spoken discussing what we would call the Turnback

4   Policy, but I was not present personally at those

5   events and I'm not sure if those were the exact

6   words used by the government officials participating

7   on those panels.

8   BY MR. HALASKA:

9       Q     Just taking those one by one.  You said

10  you have seen the government use the phrase,

11  Turnback Policy, in court documents in this

12  litigation; correct?

13      A     I believe so, yes.

14      Q     Which documents were those?

15      A     I reviewed a number of documents in

16  preparation for this deposition, some of which were

17  responses to our complaint or motion to dismiss,

18  things like that.

19          I couldn't say with certainly which of

20  those documents referenced the Turnback Policy.

21      Q     Was there anything that would refresh

22  your recollection?

23      A     I mean, if we would like to take the time

24  to show me all of the government's filings in this

25  case, I might be able to find it.  But...


MAGNA
LEGAL SERVICES

Page 125

1      Q      So as you sit here today -- go ahead.

2      A      No, the filings were quite extensive,

3   so...

4      Q      But as you sit here today, you can't say

5   definitively which documents -- in which documents

6   the government affirmatively referred to a capital

7   T, Turnback, capital P, Policy?

8      A      No.

9      Q      You also said that you heard or have

10  heard government officials use the phrase Turnback

11  Policy at oral arguments and at early neutral

12  evaluation conferences; is that right?

13             MS. WEBSTER:  Objection.

14  Mischaracterizes prior testimony.

15             MR. HALASKA:  Please correct me if I'm

16  wrong.

17             THE WITNESS:  I believe I might have

18  heard a government attorney or government official

19  use that phrase at oral argument or early neutral

20  evaluation, but I'm not 100 percent certain.

21  BY MR. HALASKA:

22     Q      Do you recall the name of the person who

23  you think may have used the phrase at either oral

24  argument or the early neutral evaluation?

25     A      I apologize, I don't remember the names



Page 126

1    of all of the attorneys who represented the

2    government.  I know we've met before.  I know you

3    were there at some of them.

4              I don't recall the other attorneys' names

5    who were representing the government, nor -- and I

6    know that there's always been a CBP official

7    present, but I don't recall the name of that

8    individual.

9         Q    Do you recall whether it was a CBP

10   official who used the phrase Turnback Policy?

11        A    I don't recall.

12        Q    Is there a difference between a, quote,

13   turnback and metering?

14              MS. WEBSTER:  Objection.  Vague.

15              (Technical difficulties.)

16              (Melissa Crow joined.)

17              MS. WEBSTER:  Go ahead, Erika.  Do you

18   want the question repeated?

19              THE WITNESS:  Please.

20              (The following question was re-read: "Is

21              there a difference between a, quote,

22              turnback and metering?")

23              THE WITNESS:  So my understanding is that

24   metering is part of the Turnback Policy, but that

25   there are policies and practices beyond metering



Page 127

1    that are also included in the Turnback Policy.

2    BY MR. HALASKA:

3         Q    Why do you say that metering is part of

4    the Turnback Policy?

5         A    Because when an Asylum seeker is metered,

6    they are literally turned back from the port of

7    entry.

8         Q    At what port of entry has Al Otro Lado

9    witnessed individuals being subjected to metering?

10        A    When you refer to Al Otro Lado, are you

11   referring to staff employees?

12        Q    Yes.

13        A    Employees?  San Ysidro port of entry,

14   Otay Mesa port of entry, Mexicali-Calexico port of

15   entry.

16             I also know that we've had staff travel

17   to Laredo port of entry, but I'm not -- I can't say

18   with certainty that they witnessed metering because

19   I'm not exactly sure what their activities.  I'm not

20   sure.

21             (Reporter clarification.)

22   BY MR. HALASKA:

23        Q    Has Al Otro Lado witnessed turnbacks

24   separate from the instances of metering that you

25   were just referring to?



Page 128

 1            MS. WEBSTER:  Objection, vague.

 2            THE WITNESS:  I wasn't just referring to

 3    metering in my last answer.  I was referring to

 4    turnbacks more broadly.

 5    BY MR. HALASKA:

 6        Q    Okay.  Let's go back to that question.

 7    The next -- I'll take it one by one, but in that

 8    question, I am specifically asking which ports of

 9    entry that Al Otro Lado has witnessed individuals

10    being subjected to metering?

11        A    To metering; okay.  San Ysidro, Mexicali,

12    and Otay Mesa.

13        Q    What about Laredo?

14        A    I can't answer that with certainty.  We

15    had staff go to a conference in Laredo, the subject

16    of the -- I know that they traveled to the Mexican

17    side of the border, but I don't know exactly what

18    they saw.  I didn't ask staff specifically about

19    that.

20        Q    Then at what ports of entry has Al Otro

21    Lado witnessed individuals -- let me start that

22    again.

23            At which ports of entry has Al Otro Lado

24    witnessed turnbacks separate from the incident of

25    metering that we were just talking about?



Page 129

```
 1        A       Definitely San Ysidro.  Definitely Otay
 2   Mesa.  From Mexicali, it was -- I guess, you know,
 3   initially what we witnessed was people being told
 4   that they had to get on a list.  And then -- so I
 5   guess that would be more on the metering side of
 6   things.
 7        Q       Okay.
 8        A       Yeah.  Sorry, just to get back to
 9   Mexicali.  They were told they had to get on the
10   list, but then when the Asylum applicants continued
11   to ask to be admitted, we were told there was not
12   capacity.
13                I'm trying to think if there was
14   something else besides that.  We were there for
15   quite a long time, so there might have been other
16   statements made by CBP officials that I'm not
17   remembering at this time.
18        Q       Are you referring to a specific time
19   period or date?
20        A       Yes, yes.
21        Q       When was that?
22        A       March 2nd, 2018 -- no, 2019, I'm sorry.
23        Q       Is there a reason you remember the
24   specific date?
25        A       Yes.
```



Page 130

1      Q     What is that reason?

2      A     I was there.

3      Q     Okay.  Earlier when we were talking about

4  the way that Al Otro Lado responded -- rather

5  adapted or changed the implementation of its Border

6  Rights Project in response to metering, you

7  mentioned that it had to -- let me just make sure

8  I'm...

9            I remember you saying, please correct me

10  if I'm wrong, that Al Otro Lado had to change all of

11  like its handouts, advisory handouts.  Is that -- am

12  I misremembering now?

13            MS. WEBSTER:  Objection.

14  Mischaracterizes prior testimony.

15            You can answer.

16            THE WITNESS:  Part of our transitioning

17  and the evolution in programming included changing

18  and adapting our educational materials for Asylum

19  seekers, intake, other things like that.

20  BY MR. HALASKA:

21      Q     Yeah, that's -- okay, perfect.  Can you

22  give me some examples of the way that you changed --

23  we'll start with the educational materials?

24            MS. WEBSTER:  Objection.  Vague.

25            THE WITNESS:  So we give a group



Page 131

1    presentation to Asylum seekers explaining the

2    procedure of seeking Asylum in the United States.

3            I'm just going to close this window

4    because somebody has decided to drill outside our

5    window.  So give me one second.

6            Okay, sorry about that.  So changing

7    materials; right?  That's what we're talking about?

8    BY MR. HALASKA:

9        Q    Yes.

10       A    Yeah, so, we had to change the

11   presentation numerous times.  Every time the

12   practice and policies were changing at the ports of

13   entry, we needed to change the presentation that we

14   were giving to Asylum seekers.

15           We needed to change our screening

16   materials to document if a person and how a person

17   had been turned away so that we could get a better

18   sense of how the policies and practices were playing

19   out.

20           We had to change our attorney training

21   materials extensively to teach volunteer attorneys

22   and other volunteers what was actually happening at

23   the border, how Asylum seekers were not being

24   processed, and how we hoped that their volunteers

25   could help address those issues.



Page 132

1          We also -- in terms of materials that we

2    used to engage volunteers on a longer-term basis, we

3    also had to evolve those materials to address the

4    needs of working with migrants who had been turned

5    away and were remaining for a long time on the

6    Mexican side of the border.

7          What else?

8          So client-facing materials,

9    volunteer-facing materials, our internal protocol.

10   And then also just anything that had to do with the

11   monitoring the ports of entry or gathering

12   information from Asylum seekers that sought services

13   from us.  We had to adapt so that we were able to

14   document what was happening when Asylum seekers were

15   being turned away and metered at ports of entry,

16   and/or metered.

17     Q    How do you document instances of metering

18   or turnbacks or the Turnback Policy?

19     A    So we have incident reports that are

20   filled out by volunteers who are physically at the

21   port of entry and there's been several versions of

22   that throughout, like since the policies started.

23          Nicole Ramos also keeps a log.  Just

24   like -- I don't remember if it's Excel or Word, but

25   just basically a running list of, you know, anyone



Page 133

1    who is accompanied, what happened, just details like

2    that.  Anything the officer said.

3              We also, as I mentioned, have adapted our

4    screening materials to ask any Asylum seeker who is

5    receiving services from us whether they've been

6    turned away or metered.  So it's on individual

7    intakes.

8              We also have a spreadsheet -- it's pretty

9    basic.  It's just the list numbers, like which

10   numbers called -- like what's the last number given

11   out on a particular day and what's the last number

12   called on a particular day so that we can have a

13   sense of like where people are in the line.  But

14   that's obviously after the line was more formalized

15   that we set up that spreadsheet.

16             What else?  There's been declarations

17   that have been used in immigration court that

18   describe turnbacks and metering.

19             And there might be some other things I'm

20   not remembering off the top of my head, but that's

21   the core of it.

22        Q    Do you ever document it with any kind of

23   audio or visual recording?

24        A    Did anyone from Al Otro Lado document it

25   with audio or visual?



Page 134

```
 1        Q     Correct.

 2        A     I know that there are -- I know that

 3   there's audio and video, some of which was actually

 4   given to us by outside parties.  But generally, our

 5   employees and volunteers are instructed not to

 6   record Asylum seekers, and including their

 7   interactions with CBP agents.

 8              But I know that there's like a couple of

 9   early recordings.  I'm not sure who did them

10   exactly.  I don't recall if it was -- like right at

11   the beginning of the Turnback Policy, I don't recall

12   if it was someone from Al Otro Lado or -- I know

13   that there were some given to us from other people,

14   but I don't remember if someone from Al Otro Lado

15   also did it.

16        Q     The third parties that you're referring

17   to there, are those counsel?

18        A     No.  There was an Asylum seeker who on

19   his own recorded his interaction with CBP officials,

20   and then later when he became aware of our services,

21   provided us with that recording.  And I believe he

22   also provided that recording to other individuals

23   and organizations.

24              And then beyond -- sorry.

25        Q     No, keep going.
```



Page 135

1        A     Media, there has been media recordings of

2    turnback incidents.  I know that Representative

3    Barragán witnessed a turning back incident and

4    recorded it.  Not in any, like, connection with us,

5    but we did obtain that recording.  She posted it

6    publicly.

7               Let me think what other ones there were.

8               That's what I'm remembering right now.

9        Q     Why do you generally instruct people not

10   to record individuals' actions -- excuse me,

11   interactions with CBP?

12       A     To protect the Asylum seekers' privacy.

13       Q     Any other reason?

14       A     It's more of a general -- it's not a

15   specific instruction not to record CBP.  It's a

16   specific instruction not to record the clients.

17       Q     Understood.

18             Do you have facts to -- this is going to

19   be the medical/legal issue.  But Al Otro Lado

20   alleges in the operative complaint that there was a

21   delay in opening its medical/legal partnership with

22   the Los Angeles County Hospital; is that right?

23       A     Correct.

24       Q     Al Otro Lado alleges that that was

25   because of the need to respond to CBP's conduct at



Page 136

1    ports of entry; right?

2        A    Correct.

3        Q    Can you just elaborate on that a little

4    bit for me?  I'm curious about the connection

5    between the two.

6            MS. WEBSTER:  Objection.  Vague.

7            THE WITNESS:  Also --

8            MR. HALASKA:  Connection --

9            THE WITNESS:  I answered that question

10   earlier when you asked specifically about the time

11   that was spent in LA on the medical/legal program.

12   I don't know if you want anything beyond the

13   information I've already provided.

14   BY MR. HALASKA:

15       Q    I think earlier we talked about the

16   consequences of -- I believe earlier you testified

17   that you lost the Robert Wood Johnson Grant because

18   of metering.  I believe we talked about the

19   consequences, but I'm curious about -- let me ask it

20   this way.

21           Before metering was ever implemented,

22   what were Al Otro Lado's goals in trying to open

23   a -- excuse me, in trying to partner with the

24   Los Angeles County Hospital?

25           MS. WEBSTER:  Objection.  Did we specify



Page 137

1    a time period?

2              MR. HALASKA:  Sure.  2017, before

3    metering began -- strike that.

4    BY MR. HALASKA:

5         Q    In 2017, what were Al Otro Lado's goals

6    in attempting to partner with the Los Angeles County

7    Hospital?

8         A    Our goals were to offer wraparound legal

9    services, so when I say wraparound services, it's

10   like partnering with mental health providers, social

11   service providers, benefit enrollment providers, and

12   medical staff to provide services to undocumented

13   and uninsured migrants who were experiencing medical

14   crisis.

15             So it was like -- specifically with the

16   Robert Wood Johnson Grant, we were partnering with

17   the emergency room and urgent care at the hospital,

18   and so when someone showed up there without

19   insurance and, you know, they had other -- there's

20   other issues that people would have, like they were

21   there for domestic violence or they're homeless or

22   whatever the case might be.

23             The goal was really to work with that

24   interdisciplinary team to ensure that we could help

25   the person obtain legal status if they were eligible



Page 138

1    for it, and enroll in programs through which they

2    could receive other services that would help them

3    improve their medical condition and just their

4    condition overall.

5        Q    Was the plan to have an Al Otro Lado

6    staff member or multiple Al Otro Lado staff members

7    that are on site at the hospital?

8        A    Yes.

9            MS. WEBSTER:  Objection.  Scope.

10           MR. HALASKA:  Kevin, can you pull up the

11   Document 8754.

12           Same thing, Ms. Pinheiro, take your time

13   reviewing the document.

14           We'll mark this as Exhibit 5.

15           (Pinheiro Exhibit 5 was marked for

16           identification.)

17           (Document review.)

18           THE WITNESS:  Michelle, do you need more

19   time?

20           MS. WEBSTER:  No.

21   BY MR. HALASKA:

22       Q    So if we look at the first page here,

23   email thread, subject line is re, colon, what the

24   hell is our project name?  This particular at the

25   top email was sent from Katharine Gordon and it was



Page 139

1    sent to Anna Castro.  Copied on the email are

2    several individuals, one of which is the email

3    address, Erika@alotrolado.org.

4             Is that you, Ms. Pinheiro?

5    A    Yes.

6    Q    Do you recognize this email thread?

7    A    Yes.

8             MR. HALASKA:  Kevin, can you go to the

9    bottom of the second page for me and into the top of

10   the third page?  So right there, starting at -- on

11   Thursday, December 6th.

12   BY MR. HALASKA:

13   Q    I'm going to read from the email, quote,

14   on Thursday, December 6th, 2018, at 1:02 p.m., Luis

15   Guerra wrote:  Team, we need to figure out what the

16   hell to call our legal services on the ground.  So

17   that we can start to brand it and its [sic] easier

18   to recruit support both monetarily and

19   non-monetarily towards our work.  I expect Al Otro

20   Lado to lead many of the efforts while allowing for

21   other allies to integrate their strength into our

22   project.

23             Nicole - do you see this as a new Al Otro

24   Lado Border Rights Project?  Or as a

25   subprogram/activity of that already existing



Page 140

1    project, end quote.

2              Did I read that correctly?

3    A    Yes.

4    Q    Who is Luis Guerra?

5    A    Luis Guerra is an employee of Clinic

6    Legal.

7    Q    The email suggests to me that Luis Guerra

8    and other individuals were maybe seeking to

9    collaborate or partner with Al Otro Lado; is that

10   correct?  Am I wrong on that?

11   A    That's correct.

12   Q    What was Mr. Guerra trying to collaborate

13   with Al Otro Lado about?

14             MS. WEBSTER:  Objection, vague.

15             THE WITNESS:  So if you look at the date

16   of this exchange, it's shortly after the large

17   caravan arrived to Tijuana.  There were a large

18   number of legal organizations on the ground,

19   including clinics, and a large number of volunteers

20   assisting Asylum seekers who traveled this part of

21   the caravan and were turned away from the port of

22   entry and they sought to seek Asylum.

23             So the collaboration between Clinic, Al

24   Otro Lado, and other organizations was specifically

25   to assist those migrants.



Page 141

1   BY MR. HALASKA:

2        Q    Was there a conversation about other

3   organizations merging with Al Otro Lado's Border

4   Rights Project?

5                MS. WEBSTER:  Objection, foundation.

6                THE WITNESS:  It wasn't -- I'm a little

7   confused by the merging.  I don't think that's

8   necessarily accurate.  It's more about building a

9   formal coalition to -- because there was no way Al

10  Otro Lado could do all of the work necessary on its

11  own.  So it was about building a coalition of

12  organizations working towards the same goal.

13               So I don't know if that's really what you

14  mean by merge, but --

15               MR. HALASKA:  Yeah, that's helpful.

16               THE WITNESS:  Coalition building, not

17  like a formal merger.

18  BY MR. HALASKA:

19       Q    Did anything formal ever come of this?

20       A    Yes.

21       Q    Can you tell me what that was?

22       A    Sure.

23               MS. WEBSTER:  Objection, vague.

24               THE WITNESS:  Clinic provided funding to

25  allow Luis Guerra to work with Al Otro Lado for



Page 142

```
 1   about a year total.  He worked full-time for a
 2   while, and then kind of transitioned off, kind of
 3   tapered off.
 4            And then we had a formal agreement
 5   with -- I can't remember, it was the Center For
 6   Gender and Refugee Studies to help with technical
 7   assistance for volunteers.
 8            And we had several other organizations
 9   from -- throughout the United States send employees
10   to Tijuana to volunteer with the Border Rights
11   Project.  But beyond just volunteering, also
12   offering their expertise and at times -- mostly just
13   expertise like in helping to shape our response to
14   having thousands of people turned away from the port
15   of entry.
16   BY MR. HALASKA:
17       Q    Is that coalition still in place?
18       A    It's evolved.  We work with a lot of the
19   same partners, including Clinic.  But there's some
20   additional organizations now that are involved and,
21   yeah -- it's evolved.  It's definitely evolved.  But
22   it exists, I guess.  Just it looks different now.
23            MR. HALASKA:  Kevin, can you scroll up a
24   little bit just to -- so the full second page is in
25   view.
```



Page 143

1   BY MR. HALASKA:

2       Q      Right there in the middle of the page,

3   Nicole Ramos writes, December 6, 2018.

4              She says, quote, I think that reinventing

5   the wheel is not necessary.  Because Al Otro Lado

6   Border Rights Project has brand recognition, I think

7   we keep it as is.  Because it encompasses our on the

8   ground teams and remote teams working in the field.

9   Just checked in with Andrew on this too.

10             Did I read that right?

11      A      Yes.

12      Q      So was -- let me start again.  Does the

13  phrase Border Rights Project -- let me start that

14  again.

15             Does the phrase Border Rights Project

16  today refer to a broader coalition of organizations

17  than just Al Otro Lado's Border Rights Project?

18      A      That's hard to answer as a yes or no,

19  because we utilize like volunteers and partnerships

20  so much, but I believe -- I mean, that's the name of

21  our Border Rights Project.  There isn't really like

22  a separate project with all those organizations that

23  has that exact name.  But other organizations

24  participate in the Border Rights Project.

25             I don't know if I'm making that



Page 144

1   distinction clear.  It's not like a separate entity.

2   But we do have coalition partners who participate in

3   our work, so...

4        Q     In what way will those coalition partners

5   participate in Al Otro Lado's work?

6              MS. WEBSTER:  Objection.  Vague.

7              THE WITNESS:  We have -- and this is also

8   evolving -- it's always evolving over time; right?

9   We're always trying to improve how we offer services

10  and be responsive to the situation on the ground.

11             So the examples that I'm giving you are

12  from the time period that we're discussing today,

13  but not necessarily happening right at this moment,

14  especially because the CDC border restrictions have

15  really affected our work, so I will just answer more

16  generally.

17             So we have -- there's like a program, I

18  believe, that Clinic funds that encompasses other

19  like Catholic Charities organization.  So there's

20  like a lot of immigration legal service

21  organizations are housed at Catholic Charities

22  throughout the country and they used to have a

23  program where they would send someone from a

24  Catholic Charities office for like a week or two to

25  work at Al Otro Lado to like help with metering



Page 145

 1    cases.

 2              We also seek assistance in creating

 3    training, so that was when I mentioned earlier,

 4    Center For Gender and Refugee Studies, they have a

 5    lot more experience than we do for creating remote

 6    trainings.  So we will often seek their advice and

 7    preparation and often have their attorneys help to

 8    train our volunteers.

 9              We also, for a period of time, had a

10    couple different non-profits around the country send

11    their employees for a week or two to volunteer with

12    us.

13              I'm trying to think what else.  There's

14    like law schools.  We have relationships with over a

15    dozen law schools and they will send students to

16    volunteer.  It can be for credit or as part of their

17    clinical work.  And that's actually a very

18    substantial part of our Border Rights Project.  It's

19    grown to be a substantial part of our Border Rights

20    Project.

21              What else?  When we are doing advocacy

22    work on metering and Turnback Policy more generally,

23    we collaborate with other organizations at other

24    ports of entry so that we have like a really clear

25    understanding about how metering and the Turnback



Page 146

1    Policy is implemented at different ports of entry,

2    that we have some idea of how people are -- how

3    other organizations are documenting that and what

4    the effects of that are at different ports of entry,

5    noting the consistencies obviously and how the

6    programs are implemented across or how the Turnback

7    Policy is implemented at other ports of entry.

8                I'm trying to think what else.  It's a

9    lot of that like participation kind of

10   collaboration, the training collaboration, just

11   sharing data with each other.  There might be some

12   other things I'm forgetting, but that's the general

13   contours what those partnerships look like.

14               MR. HALASKA:  Kevin, can you scroll to

15   the first page.  At the bottom -- I'm sorry, I'm

16   getting feedback.  At the bottom of number six -- is

17   anyone else getting it or is it just me?

18               FEMALE SPEAKER:  I don't hear anything

19   else.

20               THE VIDEOGRAPHER:  I'm getting feedback

21   too.

22               THE STENOGRAPHIC REPORTER:  I getting

23   lots of feedback.

24               THE VIDEOGRAPHER:  Should we go off the

25   record while we figure this out?



Page 147

1           MR. HALASKA:  That's fine.

2           The time is 2:37 p.m.  We're going off

3    the record.

4        (Break in the deposition taken at 2:37 p.m.)

5                    0o0

6        (The deposition resumed at 2:43 p.m.)

7                    0o0

8           THE VIDEOGRAPHER:  The time is 2:43 p.m.

9    We're back on the record.

10          MR. HALASKA:  Kevin, would you mind

11   pulling Exhibit 5, which is 8754, back up.

12   BY MR. HALASKA:

13       Q    Ms. Pinheiro, we were just speaking about

14   this exhibit before we went on the break.  I wanted

15   to -- looking at the bottom where it says, on

16   Thursday, December 6, 2018, Luis Guerra wrote, "Not

17   intending to reinvent, but rather make sure we are

18   all using the same thing.  The name that we all use,

19   however, would be something that we would call the

20   larger coalition of groups working on this issue

21   with AOL's direction, end quote.

22          Did I read that right?

23       A    Yes.

24       Q    Is Al Otro Lado directing other

25   organizations as they work as part of the Border



Page 148

1    Rights Project?

2              MS. WEBSTER:  Objection, vague.

3              THE WITNESS:  We directly supervise the

4    work of other organizations done on the ground as

5    volunteers for Al Otro Lado.  Other than that, it's

6    more of a coalition.

7              MR. HALASKA:  Okay.

8    BY MR. HALASKA:

9        Q    Last question.  After having reviewed the

10   document, is there any reason to think that it's

11   inaccurate or inauthentic?

12       A    No.

13             MR. HALASKA:  Kevin, can you pull up the

14   document, AOL Second Amended Complaint.

15   BY MR. HALASKA:

16       Q    Ms. Pinheiro, I'm sure you recognize the

17   document; am I correct?

18       A    Yes.

19       Q    Do you need time to review it or are you

20   okay with me just asking you questions?

21       A    I'm okay with asking you questions [sic],

22   but I know it's a lengthy document.  I did review

23   portions of it in preparation for this deposition,

24   but if you ask me about portions that I didn't

25   review, that I only skimmed in preparation, I might



Page 149

1    need some time to review it again.

2        Q    Sure.

3            MR. HALASKA:  Kevin, can you scroll down

4    to paragraph ten.  I'll just read this quote out

5    loud from paragraph ten of the second amended

6    complaint in this case.

7            It says, quote, on information and

8    belief, CBP's conduct pursuant to the Turnback

9    Policy and other unlawful practices were and

10   continue to be performed at the instigation, under

11   the control or authority of, or with the direction,

12   knowledge, consent, or acquiescence of defendants.

13   By refusing to follow the law, defendants have

14   caused, and will continue to cause, class plaintiffs

15   and Al Otro Lado concrete and demonstrable injuries

16   and irreparable harm.

17           Did I read that right?

18           THE WITNESS:  Yes.

19   BY MR. HALASKA:

20       Q    What are the concrete and demonstrable

21   injuries that defendants are causing to Al Otro

22   Lado?

23           MS. WEBSTER:  Objection, vague.

24           THE WITNESS:  Concrete and demonstrable

25   injuries being caused to Al Otro Lado include


MAGNA
LEGAL SERVICES

Page 150

1  several of the responses I had previously given

2  regarding the need for us to divert resources away

3  from other programming, toward our work at the

4  borders, so they could address the issues caused by

5  the Turnback Policy and other unlawful practices.

6  BY MR. HALASKA:

7       Q     Anything else?

8       A     I mean, it's -- I think that's a summary.

9       Q     Is there anything else you would want to

10  include in the summary?

11      A     Well, I can reiterate or touch upon some

12  of the answers I had given previously.  Would you

13  like me to do that?

14      Q     Please.

15      A     All right.  Well, at the beginning of the

16  Turnback Policy, we had to transition our programs

17  from largely group orientation format toward more

18  individualized representation, which required

19  significant investment of staff time and other

20  resources in transitioning our materials, creating

21  an entirely new volunteer recruitment and training

22  system, investing in case management so we could

23  track individual cases, changing client-facing

24  materials, et cetera, et cetera.

25           And then just, when someone is turned



Page 151

1   back and they are at imminent risk of being harmed

2   or killed in Tijuana, it really requires us to

3   respond in an emergency fashion by, in accordance

4   with our organizational mission, providing and

5   coordinating other types of services like emergency

6   housing or social services for folks that are stuck

7   in Tijuana.

8          It's continued to be a strain on our

9   organizational resources due to those issues,

10  especially the emergency issues that come up with

11  folks who have been metered.  It's also posed an

12  enormous challenge recruiting volunteers, willing

13  and able to work longer term on cases of individuals

14  who have been metered or turned back and are stuck

15  in Tijuana.

16         Yeah, there's a host of issues just like

17  that.  And then the resources that have to go into

18  documentation, because as you know, there was never

19  really, especially at the beginning, a formal policy

20  or practice change announced.  This is something

21  that we learned through monitoring, through

22  interviewing, and so we had to change all of our

23  screening tools to make sure that we were

24  documenting what was happening at the port of entry

25  accurately so that we could accurately communicate



Page 152

1    that to Asylum seekers who received our services.

2              We had to divert resources to file

3    complaints.

4              We had to -- oh, there's a lot of issues.

5    I'm thinking back, too, to like the medically

6    vulnerable people, for example, who were metered and

7    all the resources that we had to expend to ensure

8    that we could coordinate services for them,

9    especially when people have more serious or urgent

10   medical needs.

11             When someone was suffering from post

12   traumatic stress disorder, for example, and still

13   facing immediate risk of harm in Tijuana, the

14   resources that had to be expended to ensure that

15   those people are put with mental health services.

16             There's a host of issues that come up

17   when trying to address the human impact of metering

18   and the Turnback Policy on the Asylum seekers that

19   we serve.

20        Q    For the things that Al Otro Lado would be

21   doing that isn't right now because it's dedicating

22   these resources in responding to metering?

23        A    Yes.

24             MS. WEBSTER:  Objection, vague.

25   ///



Page 153

1    BY MR. HALASKA:

2         Q     What are those things?

3         A     Well, anytime divert resources from one

4    program or one part of the organization to another,

5    there are necessarily things that you cannot do

6    because you don't have the resources to do them.

7               I can give a specific example, which is

8    one of the many, of our deportee program.  So I had

9    previously explained in some of my responses that we

10   had a fairly robust service model that helped

11   families that were separated by deportation on both

12   sides of the border, helping, for example, people

13   who were deported but had a legal right to return to

14   the United States, et cetera.

15              Really since metering, the deportee

16   program specifically, I would say only in recent

17   months have we even come close to what we used to

18   do.  We had a very long period of time where we

19   simply just didn't have the resources to address the

20   issues that our deportee clients were facing.

21              We had to divert staffing to deal with

22   those who were turned back.  Again, all the things I

23   just mentioned, documenting, changing materials,

24   et cetera, et cetera, like that, takes a lot of

25   staff resources, which were systematically taken



Page 154

1    away from the deportee program in particular, as

2    well as other programs like our medical/legal

3    program.

4            So with respect to the medical/legal

5    program, there was the initial delay in setting it

6    up, there was the loss of funding due to lack of

7    personnel in Los Angeles.  There was later and

8    continuing to this day a lack of internal resources

9    to adequately fund raise to cover that work.

10           We receive many, many more referrals than

11   we're able to handle.  Sometimes for people who are

12   really in terrible situations, like I mentioned,

13   we're working with victims of extreme child abuse,

14   including sexual violence and, you know,

15   unfortunately, because of the massive resource

16   diversion toward the border, have not always been

17   able to raise funds necessary to provide services to

18   those extremely vulnerable clients.

19           There's more examples, but the kind of

20   general contours are the same.  It's just diversion

21   of resources affects most of our other programs at

22   the organization and, in turn, affects the people

23   that we otherwise would be serving.

24        Q    In what way did it affect the people that

25   you'd otherwise be serving?



Page 155

1      A      Well, like a baby in a coma from being

2    abused isn't going to get an attorney or a social

3    worker or, you know, other wraparound services as

4    quickly as she otherwise would because we don't have

5    the resources to fully staff or fund the program

6    that would serve that child.

7             Similarly, for deportees.  If someone is

8    deported, they're the primary bread winner in their

9    family, their family in the United States is

10   suffering due to that deportation, we don't have the

11   staff or otherwise have the resources to provide the

12   level or, frankly, any services to some people.  We

13   have to turn away referrals.  We have to refer

14   clients out to other organizations who may or may

15   not take the case.

16             So it really does have profound

17   consequences for the clients that we serve, as well

18   as our ability to implement -- to implement our

19   organizational mission with respect to those

20   clients.

21      Q      You mentioned specifically the example of

22   a baby in a coma who might not get legal

23   representation as quickly as she otherwise might; is

24   that correct?

25      A      Yes.



Page 156

1     Q    Is that a specific example you're

2  thinking of or is that a hypothetical?

3     A    That's a specific example I'm thinking

4  of.

5     Q    Okay.  Has Al Otro Lado applied for

6  grants -- let me start that again.

7            Has Al Otro Lado applied for and received

8  grants that it otherwise would not have received but

9  for its work to address the metering or Turnback

10  Policy?

11            MS. WEBSTER:  Objection, form.  Could you

12  repeat the question?

13            MR. HALASKA:  Can you read it back?

14            (The following question was re-read: "Has

15            Al Otro Lado applied for grants -- let me

16            start that again.

17            "Has Al Otro Lado applied for and

18            received grants that it otherwise would

19            not have received but for its work to

20            address the metering or Turnback

21            Policy?")

22            THE WITNESS:  It's hard for me to answer

23  that, because I don't know the intention or the

24  thoughts of the foundation's individuals or others

25  providing funding to Al Otro Lado, like what their



Page 157

1    reasons for them to provide funding to us were.

2              So I don't know that I can answer that.

3    BY MR. HALASKA:

4       Q    Have there been any beneficial

5    consequences of the adaptations or changes that Al

6    Otro Lado has made to respond to metering or the

7    Turnback Policy?

8              MS. WEBSTER:  Objection, vague.

9              THE WITNESS:  Beneficial to whom?

10             MR. HALASKA:  To Al Otro Lado.

11             THE WITNESS:  I think adaptations benefit

12   the clients, maybe, but I don't know that I can say

13   that the organization has benefitted from being

14   forced to divert resources in the way that we have.

15             MR. HALASKA:  Kevin, can you please pull

16   up -- it's Exhibit 4, 22830.

17             (Reporter clarification.)

18             (Pinheiro Exhibit 6 was marked for

19             identification.)

20             MR. HALASKA:  Can you go -- Kevin, can

21   you go to the -- where we were before, which I

22   believe was page 21.  Yeah, then scroll down a

23   little bit more to the last page.

24   BY MR. HALASKA:

25      Q    Ms. Pinheiro, I know you testified



Page 158

1    earlier that this wasn't a total revenue,

2    $357,000 -- $357,500, that you think that that's not

3    correct.

4              Do you know what Al Otro Lado's revenue

5    is?

6              MS. WEBSTER:  Objection, mischaracterizes

7    prior testimony.

8              MR. HALASKA:  I haven't even finished the

9    question.

10             MS. WEBSTER:  Sorry.  I apologize.

11   BY MR. HALASKA:

12   Q    Did you testify earlier that you believe

13   that this total revenue, $357,500 figure, is not

14   accurate?

15   A    I do not believe that that is accurate,

16   especially because this is -- this -- you pulled up

17   in connection to an email sent in 2019; right?  Am I

18   remembering this correctly?

19   Q    Yes, the date on the email is Monday,

20   June 3rd, 2019.

21   A    Yeah.  So, there's like the New America,

22   Robert Wood Johnson, the European stuff is

23   definitely -- Robert Wood Johnson and New America

24   didn't -- we didn't get any money from them in 2019.

25             I don't think we ever really made that



Page 159

1    much in CLEs, because we gave it free to people who

2    volunteered, so...

3            Then I don't think we have got that much

4    from NCRP either.  There's a lot of things that are

5    inaccurate here.

6    Q    Okay.  Do you know what Al Otro Lado's

7    total revenue was for fiscal year 2019?

8    A    I believe it was around probably between

9    two and $3 million.

10   Q    The total revenue was between two and

11   $3 million?

12   A    I believe so.  I don't have anything in

13   front of me to confirm that, but I believe that's

14   the ballpark.

15           MR. HALASKA:  Kevin, can you pull up --

16   this is number one.

17           THE WITNESS:  You're going to have --

18           MR. HALASKA:  Feel free to explore,

19   review the document, take a look.

20           THE WITNESS:  Okay.

21           (Document review.)

22           MR. HALASKA:  If it helps, I'm only going

23   to ask about information on the first phage.

24           THE WITNESS:  Okay, I've never seen this

25   before, so I just want to make sure.



Page 160

1            MR. HALASKA:  Sure, take your time.

2            (Continued document review.)

3            THE WITNESS:  Is that the entire

4    document?  Oh, there's more.  All right, back to

5    page one.

6            MR. HALASKA:  I'll mark this as

7    Exhibit 7.

8            (Pinheiro Exhibit 7 was marked for

9            identification.)

10   BY MR. HALASKA:

11        Q    Ms. Pinheiro, this appears to be Al Otro

12   Lado's return of organization exempt for income tax

13   for year 2016, correct?

14        A    Correct.

15        Q    If you look down on part one, page --

16   excuse me, line nine, it says total revenue, $9,599;

17   is that correct?

18        A    That's what it says on the form.

19        Q    So Al Otro Lado went from a revenue of

20   $9,599 in 2016, to a revenue of between two to

21   $3 million for the best of your recollection fiscal

22   year 2019; is that right?

23        A    That's correct.

24        Q    Is it still your testimony that Al Otro

25   Lado had experienced harm in light of this



Page 161

1  significant growth in revenue?

2           MS. WEBSTER:  Objection, form.

3           THE WITNESS:  Yes.

4           MR. HALASKA:  Kevin, can you go back to

5  Exhibit 6, the second amended complaint, same

6  paragraph, paragraph ten.

7  BY MR. HALASKA:

8       Q    Just to quote again, four lines down, "By

9  refusing to follow the law, Defendants have caused,

10 and will continue to cause, Class Plaintiffs and Al

11 Otro Lado concrete and demonstrable injuries and

12 irreparable harm," end quote.

13          How has Al Otro Lado been irreparably

14 harmed by defendants' conduct?

15          MS. WEBSTER:  Objection.  Calls for a

16 legal conclusion.

17          THE WITNESS:  All right.  Well, where do

18 I start?  I've explained numerous times about

19 diversion of resources and all of what that entails,

20 the specifics of what that entails, how we needed to

21 divert resources toward the border, and how that had

22 concrete effects on both our ability to manage the

23 organization and on our ability to serve extremely

24 vulnerable clients.

25          We've had actually several meter



Page 162

1    clients -- I'm sorry, this is a little bit difficult

2    for me to talk about, but two children who,

3    unaccompanied children who were turned away and

4    subsequently murdered in Tijuana.  And that

5    was...that was really, really difficult, really

6    difficult thing to deal with.

7                And we've had other clients who were

8    turned away and assaulted, sexually assaulted, some

9    who disappeared.

10               So you know, there's nothing -- there's

11   no donation or anything like that that's going to

12   bring those children back.  I don't think that can

13   be repaired.

14               And I can think to a lot of examples like

15   that, but that's really the one that -- those two

16   kids that really stick out in my mind.

17               I can also think of examples of clients

18   in Los Angeles that really faced some really

19   terrible outcomes because we weren't able to do what

20   I think -- you know, what our mission is to do, to

21   help them.

22               I mentioned the baby in a coma.  That's a

23   real case.  There's others like that that are

24   horrible.  I mean, just really the worst -- you

25   can't even believe another person would do that to



Page  163

1    another human being.  The feeling of powerlessness

2    of not being able to actually help someone, because

3    we're -- it's like an emergency room at the border

4    all the time.

5              It's just like every time, you know, with

6    metering policy and Turnback Policy changes, we have

7    to be so on top of it and dealing with all the stuff

8    that comes up.  And it's just like -- diverting of

9    resources, it has those concrete affects and they

10   really stay with you as a practitioner and as an

11   organization when you come into contact with these

12   clients and you feel a responsibility to help them,

13   and you can't.

14             Then there's a terrible outcome.  I think

15   that's really, to me, what would be the most

16   egregious injury as a result metering policy.

17             And just, you know, from an -- this

18   isn't -- feels trivial to mention this after talking

19   about the murder and rape and assault of our

20   clients, but from an administrative perspective,

21   it's incredibly challenging to manage programming

22   when constantly having to pull staff to respond to

23   changes in policy and practice that are never

24   announced by the government.

25             It's like practicing law in the dark;



Page 164

 1  right?  So it's just like the other programs just --

 2  they suffer because of it.  We can't build them in

 3  the same way that we otherwise would.

 4          You know, we've definitely, just from a

 5  lack of capacity, probably like damaged some funder

 6  relationships or damaged some other coalition

 7  relationships, just from like not being able to

 8  respond sometimes because we're dealing with some

 9  insane, you know, like murder, rape, or something

10  like that at the border, someone has been metered or

11  turned back.

12          So, yeah, I'd rather not have to do any

13  of those things or see no children who have been

14  murdered brutally, I mean, tortured and murdered,

15  not even talking like shot in the street.  I'm

16  talking tortured and murdered and not know those

17  things, or have to have, you know, met and formed a

18  relationship with these clients.

19          There's no going back from that.  There's

20  no -- like, there's no way to right these wrongs.

21          MR. HALASKA:  I think I'm near or at the

22  end of my questions.  Michelle, do you guys think

23  that you're going to do cross?

24          MS. WEBSTER:  I don't suspect so.  You

25  know, we can take a little break if you need a



Page 165

```
 1   second to look over yours.  I can confer with

 2   co-counsel, but I don't imagine we'll have any

 3   redirect.

 4              MR. HALASKA:  That's what I was going to

 5   suggest.  Can we do ten minutes back on at half hour

 6   past, 30 minutes past, and then --

 7              MS. WEBSTER:  Sure.

 8              MR. HALASKA:  -- maybe a few more

 9   questions or maybe wrap up?

10              MS. WEBSTER:  Okay.

11              THE VIDEOGRAPHER:  The time is 3:19 p.m.

12   We're going off the record.

13       (Break in the deposition taken at 3:19 p.m.)

14                      0o0

15         (The deposition resumed at 3:35 p.m.)

16                      0o0

17              THE VIDEOGRAPHER:  The time is 3:35 p.m.

18   We're back on the record.

19              MR. HALASKA:  Welcome back, Ms. Pinheiro.

20   Just one or two more questions.

21   BY MR. HALASKA:

22       Q    You testified earlier that Nicole Ramos

23   maintains or keeps a log of what plaintiffs refer to

24   as turnbacks; is that right?

25       A    Correct.
```



Page 166

1      Q     Is that log easily accessible?

2      A     I believe it was already provided as part

3   of discovery requests.

4      Q     Okay.

5            MR. HALASKA:  Defendants have no more

6   questions.

7            MS. WEBSTER:  None from plaintiffs.

8            MR. HALASKA:  Ms. Pinheiro, thank you

9   very much for appearing today.  We very much

10  appreciate your testimony and making yourself

11  available.

12           THE VIDEOGRAPHER:  The time is 3:36 p.m.

13  This concludes the deposition of Erika Pinheiro.

14  We're off the record.

15           THE STENOGRAPHIC REPORTER:  Ms. Webster

16  and Ms. Crow, would you like to order copies of the

17  transcript?  I'm just asking on the record.

18           MS. WEBSTER:  Electronic copies are

19  sufficient for our purposes.  We have a standing

20  order and they have directed where those should go.

21           THE STENOGRAPHIC REPORTER:  And Ms. Crow?

22           MS. CROW:  I'll get it from Mayer Brown,

23  but thank you.  I assume that we want Erika to read

24  and sign?

25           MS. WEBSTER:  Yes, please.



Page 167

1          THE STENOGRAPHIC REPORTER:  Yes.  We're

2     off the record.

3          (The deposition was concluded at 3:37 p.m.)

4                         0o0

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 168

1          I, ERIKA DACRUZ PINHEIRO, do hereby

2    declare under penalty of perjury that I have read

3    the foregoing transcript; that I have made any

4    corrections as noted in ink, initialed by me; that

5    my testimony as contained herein, as corrected, is

6    true and correct.

7

8          EXECUTED this _____ day of _____,

9    20____, at _____, _____.
                     (City)                (State)

10

11

12                   _____

                     ERIKA DACRUZ PINHEIRO

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 169

```
 1                    REPORTER'S CERTIFICATE
 2              I, Valerie C. Rodriguez, a Certified
 3   Shorthand Reporter for the State of California, do
 4   hereby certify:
 5              That said proceedings were taken before
 6   me at the time and place set forth herein and was
 7   stenographically reported remotely by me in
 8   shorthand, and I hereby certify that said
 9   proceedings are a full, true, and correct transcript
10   of my shorthand notes so taken; that the
11   dismantling, unsealing, or unbinding of the original
12   transcript will render the reporter's certificate
13   null and void.
14              Further, that if the foregoing pertains
15   to the original transcript of a deposition in a
16   federal case, pursuant to F.R.C.P. 30(e)(2) before
17   completion of the proceedings, review of the
18   transcript was requested.
19              I further certify that I am neither
20   counsel for, nor related to any party to said
21   action, nor in any way interested in the outcome
22   thereof.  IN WITNESS WHEREOF, I have subscribed my
23   name this 5th day of July, 2020.
24                    _____.
                             VALERIE C. RODRIGUEZ
25                             CSR No. 12871
```



Page 170

```
 1   DEPOSITION ERRATA SHEET
 2   Case Name: AL OTRO LADO, INC. vs. CHAD WOLF
 3   Name of Witness:  ERIKA DACRUZ PINHEIRO
 4   Date of Deposition: JUNE 18, 2020
 5   Job No.: 591267
 6   Reason Codes:  1. To clarify the record.
 7                  2. To conform to the facts.
 8                  3. To correct transcription errors.
 9
     Page _____ Line _____ Reason _____
10
     From _____ to
11   _____
12   Page _____ Line _____ Reason _____
13   From _____ to
     _____
14
     Page _____ Line _____ Reason _____
15
     From _____ to
16   _____
17   Page _____ Line _____ Reason _____
18   From _____ to
     _____
19
     Page _____ Line _____ Reason _____
20
21   _____  Subject to the above changes, I certify
     that the transcript is true and correct.
22
     _____  No changes have been made. I certify that
23   the transcript is true and correct.
24                  _____
25                      ERIKA DACRUZ PINHEIRO
```



**A**

**Aaron** 112:6,12
112:15,18
**Abigail** 111:15
111:16,18,25
111:25
**ability** 10:22
11:16 92:14
95:12 155:18
161:22,23
**able** 54:20 58:15
86:18 88:8 89:5
89:8 92:2
124:25 132:13
151:13 154:11
154:17 162:19
163:2 164:7
**abuse** 84:5
154:13
**abused** 155:2
**accept** 46:10
**access** 34:22
86:17 121:24
**accessible** 166:1
**accident** 13:5
**accommodate**
39:6
**accompanied**
133:1
**accompaniment**
23:6
**accompany** 46:4
117:7
**accompanying**
40:18
**accomplish** 67:1
**accomplishme...**
64:3
**account** 44:8
71:24 89:15
**accredited** 86:2
86:14,15
104:24 113:19
114:16,19
**accurate** 19:19

25:23 100:9,20
141:8 158:14
158:15
**accurately** 55:1
151:25,25
**achieving** 64:2
**acquiescence**
149:12
**Acting** 1:7 2:7
3:8
**action** 169:21
**actions** 135:10
**actively** 45:23
56:6
**activities** 20:6
127:19
**adapt** 132:13
**adaptations**
157:5,11
**adapted** 130:5
133:3
**adapting** 130:18
**additional**
142:20
**address** 58:4
90:2 92:13 93:7
93:14 94:13
95:1 116:18
131:25 132:3
139:3 150:4
152:17 153:19
156:9,20
**addressed** 17:15
20:15
**adequately** 154:9
**adjusted** 44:7
**administrative**
7:18,25 9:11
108:8,10
109:16 163:20
**administrators**
84:23
**admitted** 46:23
129:11
**advance** 101:2
**advice** 20:12,17

145:6
**advisals** 49:3
**advise** 17:24 19:6
**advisory** 130:11
**advocacy** 21:20
23:13 31:20
116:18 145:21
**advocate** 23:18
**affect** 87:5
154:24
**affirmative** 85:5
87:11
**affirmatively**
125:6
**agencies** 33:6
84:13
**agency** 33:8
47:18
**agents** 134:7
**ago** 16:12,22 45:1
73:23,24 90:19
**agree** 56:20
121:3,8
**agreed** 121:9
**agreement** 142:4
**agreements**
68:11
**ahead** 14:23,24
58:25 70:2 72:3
91:13 99:6
123:10 125:1
126:17
**akin** 34:8
**al** 1:4,4,9 2:4,4,8
3:2,2,9 5:9,10
5:11 6:21,25
7:6,7 14:6,15
15:1 17:20
21:10,11,14,15
21:18 25:3
28:25 29:4
37:20 38:19
41:10 44:7
47:20 50:3,17
50:19 51:3,20
51:23 52:18,21

52:22 55:4,9,17
56:5,12,15 57:5
58:9,14 60:3,5
60:12 61:25
62:17,20,24
63:5,8 64:1,15
65:5 67:3 73:19
74:2 75:15
76:25 77:13,16
77:22 78:4
79:19 80:5,13
80:21 82:5 83:9
83:11 86:21
87:16,23 88:19
89:18 91:8,20
92:12 99:12
104:14 108:13
112:14 116:19
118:3 119:8
123:2 127:8,10
127:23 128:9
128:20,23
130:4,10
133:24 134:12
134:14 135:19
135:24 136:22
137:5 138:5,6
139:19,23
140:9,13,23
141:3,9,25
143:5,17 144:5
144:25 147:24
148:5 149:15
149:21,25
152:20 156:5,7
156:15,17,25
157:5,10 158:4
159:6 160:11
160:19,24
161:10,13
170:2
**Alby** 112:1
**Aldo** 110:20,21
**Alejandra**
107:16,17
**alert** 13:17

**Alex** 8:19,25
43:10 89:12
96:18
**ALEXANDER**
3:11
**ALEXANDER...**
3:14
**allege** 121:15
**alleges** 135:20,24
**allies** 139:21
**allow** 141:25
**allowing** 139:20
**all-volunteer**
51:15,21 54:21
55:10,19 56:13
58:5
**amended** 4:14
17:18 19:21
148:14 149:5
161:5
**America** 158:21
158:23
**amount** 59:15,17
66:12,19
**amounts** 70:25
**Anderson** 103:13
111:7,7,11,23
**Andrew** 143:9
**and/or** 132:16
**Angeles** 9:16
10:12 22:14,16
26:11,14 41:20
58:18,20 59:6
64:7 75:10,11
82:8 83:11,18
84:19 92:6
93:25 94:1,11
94:24 95:8
101:12 104:7,9
115:12,22
135:22 136:24
137:6 154:7
162:18
**Anna** 139:1
**Anne** 101:17,17
101:25 102:1



announced
    151:20 163:24
answer 4:19
    10:20,22 11:14
    11:15,23 14:24
    19:19 45:2
    46:13 48:6
    50:14 54:18,19
    58:6 81:7 88:1
    89:25 91:14
    123:11 128:3
    128:14 130:15
    143:18 144:15
    156:22 157:2
answered 48:4
    136:9
answering 55:1
answers 11:2
    15:2,3 150:12
anticipate 113:6
    117:24
anymore 46:17
anytime 153:3
AOL 4:8 13:23
    21:11 148:14
AOL's 147:21
apologize 101:2
    125:25 158:10
APPEARANC...
    3:1
appearing 166:9
appears 160:11
applicants
    129:10
applications 85:6
applied 79:8
    156:5,7,15,17
apply 79:3 87:13
applying 90:12
appointments
    34:10
appoints 82:1
appreciate 25:2
    166:10
apprised 117:3
approached 35:8

approaches
    34:18
approaching
    37:12
approved 41:18
    53:17
approximate
    33:25
approximately
    75:15 87:16,23
    88:17,19 89:18
approximation
    88:18
April 7:1,7 51:22
    54:22 55:11,18
    56:5,16 57:25
arbitration 8:11
argument 123:18
    125:19,24
arguments
    125:11
arrange 46:3
array 46:2
arrested 12:22
arrival 34:14
arrived 140:17
asked 110:10
    136:10
asking 56:20
    60:11 97:9
    123:2 128:8
    148:20,21
    166:17
aspirational
    66:16 70:17
assault 163:19
assaulted 162:8,8
assigned 26:9,16
    102:4,5 106:23
    107:14 108:12
    109:17
assist 75:8 94:1
    95:16 104:10
    113:13 114:7
    115:13 116:1
    140:25

assistance 75:6
    80:10 108:22
    109:13 113:1
    113:14 117:4
    142:7 145:2
assistant 58:18
    58:19 69:8,14
    69:20 70:10
    76:13
assisting 102:25
    105:13 106:22
    107:4 108:8
    109:15 140:20
assists 101:14
    102:6 103:20
    109:1 110:18
    111:20
associated 64:23
    66:10 110:16
association's
    12:25
associação 25:10
assume 55:23
    166:23
asylum 22:25
    23:18 31:1,10
    32:7,9 34:19,22
    34:24,25 35:1,6
    36:2 39:4 40:12
    40:14,24 41:14
    41:21 45:13
    46:18 48:9,24
    57:10,12,13,17
    57:17 64:5 67:5
    68:3 94:7
    107:23 109:14
    121:22,24
    122:12 127:5
    129:10 130:18
    131:1,2,14,23
    132:12,14
    133:4 134:6,18
    135:12 140:20
    140:22 152:1
    152:18
as-needed 102:7

103:21 104:11
    110:19 114:8
    115:14
attached 63:19
    98:19
attachment 98:7
    98:8
attachments
    63:13,17
attempt 34:19
    46:10
attempting 137:6
attempts 33:16
attend 54:7
attended 40:14
attends 115:21
attorney 11:11
    11:14 26:14
    27:4,6,20,24
    55:22 70:13
    76:4,9,11,18,22
    78:2 86:1,11,19
    89:19 101:7,11
    101:21,24
    102:1,12
    103:19,22,23
    103:24 104:24
    119:12,19
    125:18 131:20
    155:2
attorneys 14:13
    23:21 30:19
    38:25 41:13,23
    42:17 44:11
    53:15 86:13
    123:17 126:1,4
    131:21 145:7
audible 11:1
audio 133:23,25
    134:3
August 13:21
authorities 32:24
    33:3
authority 149:11
Avaaz 61:5,7
available 166:11

avenue 24:14,16
    53:12
average 72:20
    73:1,16 95:24
awarded 78:5
aware 134:20
a.m 2:17 5:2
    43:22,24 44:1
    82:21,23,25
    83:2

---

**B**

B 72:20,25
baby 155:1,22
    162:22
back 8:2 13:4
    26:2 30:4 34:21
    35:17 36:3
    37:11 39:22
    40:22 43:6,16
    44:2,4 45:15,17
    47:1 48:6,10
    49:14 50:12
    51:1 52:4 54:23
    67:23 69:2 71:4
    71:20 72:2
    77:19 82:12
    83:3,6 86:4
    89:24 90:18
    91:10,18,22
    94:15 120:9,18
    120:19 121:12
    127:6 128:6
    129:8 135:3
    147:9,11 151:1
    151:14 152:5
    153:22 156:13
    160:4 161:4
    162:12 164:11
    164:19 165:5
    165:18,19
background 21:9
    63:2 88:24
bad 27:19 88:18
ballpark 159:14
bar 12:25 41:19



**barely** 30:25
**Barragán** 135:3
**based** 15:23 20:5
  20:8,9,10 51:5
  51:5 59:5 67:11
  67:19 69:12,15
  70:16 83:17
  94:24
**basic** 28:12 133:9
**basically** 24:21
  28:10 30:4
  33:10 34:12
  35:17 36:5
  48:10 69:5
  89:23 132:25
**basics** 32:8
**basis** 16:5 18:4
  26:10,12 30:21
  45:6 102:7
  103:21 104:11
  110:19 111:21
  113:13 114:8
  115:14 121:6
  132:2
**Bates** 61:25
**battle** 96:3
**began** 28:24
  31:16 49:19
  52:11,12 87:15
  89:18 91:11,23
  137:3
**beginning** 31:24
  49:23 50:2
  51:11 134:11
  150:15 151:19
**beginnings** 35:24
**begins** 5:8
**behalf** 2:16 15:1
  15:2 38:4,8
  45:7 52:22 53:9
  56:2 80:6
**belief** 149:8
**believe** 15:19
  16:12 19:20,22
  25:5,12,14
  36:16 38:16

40:18 45:8 82:7
  89:5 93:3 99:7
  102:10,10
  123:19 124:13
  125:17 134:21
  136:16,18
  143:20 144:18
  157:22 158:12
  158:15 159:8
  159:12,13
  162:25 166:2
**BEN** 3:12
**beneficial** 157:4
  157:9
**benefit** 137:11
  157:11
**benefits** 70:12
  119:4
**benefitted** 157:13
**Benevity** 60:23
**best** 10:22 11:16
  44:24 45:1 66:7
  67:21 160:21
**better** 11:9 23:24
  88:16 131:17
**beverages** 68:12
  68:16
**beyond** 8:14,20
  54:15 126:25
  134:24 136:12
  142:11
**big** 42:12
**bills** 108:6
**binational** 21:19
  22:4
**bit** 7:12 10:18
  31:13 32:13
  37:5 45:4 71:19
  73:24 77:4 78:9
  82:12,16 95:22
  97:12 102:14
  121:13 136:4
  142:24 157:23
  162:1
**blanking** 33:10
  114:2

**Bloomberg**
  109:20 110:1
  110:11
**board** 7:7 8:2,2
  9:13,16 10:3,7
  10:10,13
**bodies** 9:13
**body** 33:11,14
**bond** 75:1 79:1,4
  79:7 84:17
**bono** 30:19 55:22
  56:3 75:9
  103:10 111:8
**bookkeeping**
  112:21 117:21
**border** 7:25
  10:15 13:15
  21:22 22:8,22
  22:24 23:22,24
  24:12 27:3
  28:20,24 29:6
  29:10,18 30:20
  30:22 31:15,21
  32:18 33:19
  37:1 39:17 48:8
  49:18,20 50:2,6
  50:12 51:10
  57:22 64:4,14
  64:23 65:18,21
  66:1 80:9 84:25
  90:7 93:20
  101:15 102:6
  102:25 103:20
  104:11 105:13
  106:4,22,24
  107:14,24
  108:15 109:1
  109:14,17
  110:18 111:2
  111:21 113:13
  114:8 115:13
  117:3 119:15
  119:17,20
  128:17 130:5
  131:23 132:6
  139:24 141:3

142:10 143:6
  143:13,15,17
  143:21,24
  144:14 145:18
  145:19 147:25
  153:12 154:16
  161:21 163:3
  164:10
**borders** 150:4
**border-specific**
  41:21
**bottom** 66:24
  139:9 146:15
  146:16 147:15
**box** 3:12 72:14
  96:21
**Boyer** 103:25
  104:1,5,7,13
**brand** 139:17
  143:6
**bread** 24:10
  155:8
**break** 11:21,24
  43:11,22 44:6
  45:4 78:8 82:10
  82:10,11,12,15
  82:16,23 83:8
  112:5 119:25
  120:13 147:4
  147:14 164:25
  165:13
**breaks** 11:19
**brief** 48:5
**bring** 162:12
**bringing** 55:5
  64:3,13
**brings** 117:5
**broad** 54:11
**broader** 46:1
  143:16
**broadly** 90:21
  128:4
**Brown** 3:3
  166:22
**brutally** 164:14
**budget** 75:16,18

75:19 86:21
  87:3,17,24
  99:13
**build** 164:2
**building** 31:6
  47:3,8 141:8,11
  141:16
**built** 95:8
**bulk** 32:3
**bullet** 64:13

──────────
**C**
──────────
**C** 1:24 2:19 6:13
  169:2,24
**California** 1:2
  2:2 5:12 13:12
  22:14,15 41:19
  44:13 67:10,13
  74:7 78:15,17
  78:23 79:2
  84:15 85:4
  87:10 121:2
  169:3
**Californians**
  64:10
**call** 18:17 29:5
  34:17 61:22
  66:4 71:10
  122:12 124:3
  139:16 147:19
**called** 25:9 29:8
  36:12 133:10
  133:12
**calls** 14:20 18:15
  115:25 116:2
  161:15
**call-in** 89:1,2,11
**campus** 22:17
**capacity** 1:9 2:8
  3:9 13:3 38:2
  56:3 69:9 86:6
  91:9,21 92:2
  93:17,19
  129:12 164:5
**capital** 6:13,13
  121:16,16



125:6,7
**caravan** 140:17
140:21
**Cardoza** 110:6
110:15
**care** 53:25 116:6
137:17
**Carolanne**
103:14,15,17
**case** 1:6 2:6 8:12
13:19 14:6
17:19 19:14
24:20 30:1 31:4
31:6 39:11,13
42:5,18 47:2,6
47:7 55:22 62:3
79:4 81:21 97:4
110:11 115:5
116:24 121:15
123:17 124:25
137:22 149:6
150:22 155:15
162:23 169:16
170:2
**cases** 20:1 23:7
30:17,22 31:7
32:14 35:3,16
42:6,24 45:16
46:5 53:16 57:2
74:7,11 78:18
78:19,22 80:3,6
81:17 82:6
84:16,21 87:11
95:3,6,25 102:3
104:9 107:8
145:1 150:23
151:13
**Castañeda**
118:21
**Castro** 139:1
**catch** 104:18
118:8
**categories** 95:14
**Catholic** 144:19
144:21,24
**cause** 62:17

149:14 161:10
**caused** 90:6
149:14,25
150:4 161:9
**causing** 149:21
**CBP** 13:12 30:16
34:20 35:13
36:5 46:7,10
122:12 124:2
126:6,9 129:16
134:7,19
135:11,15
**CBP's** 49:1
135:25 149:8
**CDC** 37:4 144:14
**CDSS** 85:4 87:9
87:10 101:14
102:5
**CDSS-funded**
104:9
**cease** 51:23
**Center** 3:17 64:7
142:5 145:4
**Central** 13:11
**certain** 20:13,21
36:11 58:13
67:10 93:18
116:19 125:20
**certainly** 100:8
124:19
**certainty** 123:22
127:18 128:14
**certificate** 169:1
169:12
**Certified** 2:19
169:2
**certify** 169:4,8,19
170:21,22
**cetera** 40:24,24
57:24,24,24
81:17 150:24
150:24 153:14
153:24,24
**CHAD** 1:7 2:7
3:8 170:2
**challenge** 151:12

**challenges** 95:18
**challenging**
13:15 163:21
**chance** 62:7
97:19
**change** 43:7 49:2
49:3 100:16
130:10 131:10
131:13,15,20
151:20,22
**changed** 29:15
34:3 67:22 92:8
107:3 114:20
130:5,22
**ChangeLawyers**
102:22
**changes** 44:10,12
157:5 163:6,23
170:21,22
**changing** 57:23
130:17 131:6
131:12 150:23
153:23
**characterization**
92:16
**charged** 12:19
**Charities** 144:19
144:21,24
**checked** 143:9
**checks** 116:4
**child** 54:3 80:1
87:14 154:13
155:6
**childhood** 84:5
**children** 24:11
53:25 60:25
112:3 162:2,3
162:12 164:13
**choice** 48:20
94:12
**Christmas** 35:25
**citizen** 24:10
54:3
**citizenship** 24:7
**City** 168:9
**civil** 3:10 21:23

23:16 25:10
31:22 32:19,22
33:13 45:9,10
47:16,17
**claim** 24:6 35:15
**clarification**
20:24 47:17
51:4 105:3
127:21 157:17
**clarify** 20:8,13,21
22:6 24:22 25:7
38:9,12 50:5,8
50:13 56:25
57:1 76:17
104:22 170:6
**clarifying** 85:20
**class** 80:3 149:14
161:10
**CLE** 41:18,20
43:4 44:13
**clear** 32:16 144:1
145:24
**clearly** 17:11
**CLEs** 159:1
**client** 56:3
112:25 113:1
**clients** 21:24,25
22:1 23:7,8
24:9 30:20 31:9
45:6 46:3,22
79:24 94:1 95:9
115:12 117:23
135:16 153:20
154:18 155:14
155:17,20
157:12 161:24
162:1,7,17
163:12,20
164:18
**client-facing**
132:8 150:23
**clinic** 27:8 28:17
30:18 39:21,24
40:4,14 47:5
56:1 67:15,22
68:1,9,23 95:3

140:5,23
141:24 142:19
144:18
**clinical** 145:17
**clinics** 26:5 30:25
38:23 40:11
46:17 57:9 64:8
68:8 69:3
140:19
**close** 70:23 131:3
153:17
**closely** 64:23
72:2
**closer** 75:20
**closures** 37:1
**coalition** 116:18
141:9,11,16
142:17 143:16
144:2,4 147:20
148:6 164:6
**coalitions** 23:15
23:19
**cobbled** 98:24
**Cobian** 112:6,12
112:15,18
**Codes** 170:6
**coercion** 34:20
35:14 121:25
**coffee** 68:12
**collaborate** 93:25
94:1 140:9,12
145:23
**collaboration**
85:12 140:23
146:10,10
**colleagues** 53:19
66:7
**colon** 138:23
**column** 72:20,23
72:25 100:22
**coma** 155:1,22
162:22
**come** 23:22,24
26:3,11 30:19
30:21 36:9 39:1
40:15 46:3



51:23 59:4 67:8
68:19 69:22
82:12 84:25
94:6 119:5
141:19 151:10
152:16 153:17
163:11
**comes** 163:8
**coming** 26:5
47:14 52:16
56:1 81:16
82:13
**COMMENCI...**
2:17
**commit** 42:13
**commitment**
42:21 56:1
**committed** 21:24
**committee** 80:5,7
**communicate**
48:23 95:12
117:19,19
151:25
**communicated**
48:13 57:16
**communication**
116:21
**communications**
86:7 116:3,12
116:20 117:7
**company** 88:3
**compare** 91:24
92:10
**competency** 87:6
**complaint** 4:14
17:18 19:21
124:17 135:20
148:14 149:6
161:5
**complaints** 17:17
33:7,13,16 45:7
45:9 46:1,5
47:13 152:3
**complete** 12:13
45:2 46:13
**completed** 84:22

**completion**
169:17
**compliance**
113:4
**complicated**
26:18
**comprehensive**
25:2
**concluded** 167:3
**concludes** 166:13
**conclusion** 14:21
161:16
**concrete** 149:15
149:20,24
161:11,22
163:9
**condition** 138:3,4
**conduct** 135:25
149:8 161:14
**conducted** 30:7
**conducting** 23:4
**confer** 165:1
**conference** 17:9
89:3,15 128:15
**conferences**
125:12
**confirm** 159:13
**conform** 170:7
**confused** 141:7
**confusing** 15:23
50:23
**Congress** 23:21
**connect** 21:25
22:1 24:18,18
31:22
**connected** 26:22
**connecting** 45:19
**connection** 135:4
136:4,8 158:17
**consent** 149:12
**consequences**
136:16,19
155:17 157:5
**consider** 52:6,20
55:9
**considered** 50:3

51:2 52:1 55:4
61:4
**considering**
10:11
**consistencies**
146:5
**constant** 96:3
**constantly** 49:14
93:6,12,13
163:22
**constitute** 8:25
**constraints** 90:5
**consulate** 53:20
**consultants**
10:12
**consulted** 66:6
**contact** 40:15
46:20 101:4
163:11
**contacts** 62:16
**contained** 168:5
**contents** 19:6
**context** 29:18
**continue** 47:21
92:5 149:10,14
161:10
**continued** 80:8
96:23 97:23
129:10 151:8
160:2
**continues** 45:13
92:25
**continuing** 154:8
**contours** 146:13
154:20
**contract** 74:8
**contributions**
66:25
**control** 149:11
**conversation**
16:24 18:10
88:25 141:2
**conversations**
17:9 20:12,18
21:5,5
**convicted** 12:16

**coordinate** 75:7
152:8
**coordinates**
107:23
**coordinating**
30:21 106:4
151:5
**coordination**
28:17,17
109:15
**coordinator** 27:8
27:9 72:24
76:16 103:10
106:6,7 107:20
107:22 110:8
111:8 112:18
112:20 117:15
117:17,20
118:3,23
119:16
**Copied** 139:1
**copies** 166:16,18
**core** 32:25 86:7
133:21
**Coriolis** 60:21
**correct** 8:24 9:24
44:16 56:11
73:3 76:24
83:11,12
100:25 101:1
106:25 118:17
124:12 125:15
130:9 134:1
135:23 136:2
140:10,11
148:17 155:24
158:3 160:13
160:14,17,23
165:25 168:6
169:9 170:8,21
170:23
**corrected** 168:5
**corrections** 168:4
**correctly** 16:20
19:23 25:15
36:17 45:10

64:11 66:6 73:6
140:2 158:18
**correspondence**
116:2
**Corrina** 114:1
**costs** 68:7 69:5
**counsel** 5:21
14:11 15:22
17:9 18:12,14
20:12,17,18,20
20:25 61:17
82:1 134:17
169:20
**count** 22:18
25:12 87:3,12
**counted** 87:8
**country** 80:1
144:22 145:10
**County** 9:14 10:5
10:12 22:16
84:13 135:22
136:24 137:6
**County-USC**
22:18
**couple** 42:7,15,22
97:11 98:22
99:19 100:21
134:8 145:10
**course** 18:5
32:12 36:25
62:19,23 63:7
96:8 97:22
114:25
**court** 1:1 2:1
5:11,19,23 6:11
8:5 11:3 19:25
20:4 23:9,10
54:2 70:13 75:4
84:19 86:19
121:3 124:11
133:17
**courtroom** 12:10
**courts** 33:6
**cover** 69:6 154:9
**covers** 85:5
**COVID** 37:1



co-counsel 165:2
co-directors
  20:22,25
co-plaintiffs
  13:17
craft 116:25
Cranford 3:23
  5:19
create 41:25 42:4
  44:14 66:11
creating 30:22
  145:2,5 150:20
credit 145:16
crime 12:16,19
crises 95:11
crisis 84:2 137:14
cross 24:11 29:10
  164:23
cross-border
  50:18,20
Crow 3:17
  126:16 166:16
  166:21,22
CSR 1:25 169:25
curious 136:4,19
current 6:22 7:9
  7:13 35:24
  36:14 50:9
currently 22:12
  28:21 86:21
  101:6 103:10
  104:12 105:16
  106:9 107:1
  109:25 111:10
  119:8
custody 35:14
customs 13:15
  48:8 64:4,14
cut 16:15
cutting 7:12
C-A-R-D-O-Z-A
  110:9

———————
          D
———————
D 6:13
DaCruz 1:16

2:15 4:1 6:1,10
  168:1,12 170:3
  170:25
damaged 164:5,6
danger 93:10
Daniel 118:2
Danielle 117:9
dark 163:25
data 27:10 47:1
  107:8,11,11
  146:11
date 7:5 16:18
  33:25 38:17
  52:19,25 59:14
  67:23 98:23
  100:14 102:16
  129:19,24
  140:15 158:19
  170:4
dated 4:9
day 41:8 68:9
  90:16 133:11
  133:12 154:8
  168:8 169:23
Daydream 70:17
DC 3:5,13
deadlines 81:16
  117:18
deal 153:21
  162:6
dealing 94:5
  163:7 164:8
death 93:10
debate 15:21
December 7:8
  80:20 139:11
  139:14 143:3
  147:16
decide 66:21
decided 16:12,13
  51:22 131:4
declarations
  133:16
declare 168:2
dedicate 94:17
dedicated 21:19

75:16,25 76:7
  79:24 81:10
  86:22 87:17,24
  88:20 89:19
dedicating
  152:21
deep 77:5
defendant 3:8,16
  14:5
defendants 1:10
  2:9,16 62:2
  121:21 149:12
  149:13,21
  161:9,14 166:5
defense 15:22
  78:24
define 34:18
  54:25
definitely 70:20
  129:1,1 142:21
  158:23 164:4
definition 32:11
  55:3,8 93:11
definitively
  125:5
delay 135:21
  154:5
delegations 117:5
  117:7
demands 26:7
  90:6
demonstrable
  149:15,20,24
  161:11
deny 34:21
Department 3:10
  5:16 74:7 78:15
  78:23 81:25
  84:15 85:4
  87:10
depend 113:15
dependency 54:2
depending 24:20
  81:15 111:3
  116:23
depends 111:5

deportation
  153:11 155:10
deported 24:5
  53:17,24 54:4
  153:13 155:8
deportee 22:23
  24:3 26:13,16
  27:13 28:18
  50:21 52:10,11
  53:2 54:13 71:5
  72:24 73:9
  84:24,25
  108:15 109:2
  117:4 153:8,15
  153:20 154:1
deportees 24:6
  24:13 39:4
  52:17 53:9
  57:10 64:9
  155:7
deposition 1:15
  2:15 4:1,8 5:9
  5:15 8:7 10:19
  10:19 11:20
  13:24 14:5
  20:22 21:4
  43:22,24 54:16
  82:23,25
  120:15 124:16
  147:4,6 148:23
  165:13,15
  166:13 167:3
  169:15 170:1,4
derived 24:7
describe 22:7
  76:1 79:12,21
  83:21 91:6
  133:18
described 28:14
  40:6,23 91:7
  98:17 101:13
DESCRIPTION
  4:7
designated 13:23
  83:22
designation 28:4

designed 50:18
  50:20
detail 17:24
  63:16
details 85:10
  133:1
detained 46:25
  67:5,11 79:2
  80:11 82:1
detainees 75:1
detention 75:5,7
develop 85:11
  116:21
development
  7:20 57:6 86:7
  117:17,21
  118:3
devoted 72:21
  73:1
Diaz 114:9 115:2
Diego 1:3 2:3
  7:23 22:14
  24:23 26:11,21
  28:1,4 73:21
  74:3,5 76:3
  78:14 81:19,22
  82:7 83:10
  94:24 102:2,4,5
  111:2,18,20
  119:13,17,21
difference 29:17
  126:12,21
differences 29:23
different 7:1
  23:13 29:7
  32:13 33:12,19
  34:9 36:19,19
  42:1,7,16,23
  49:14,25 57:11
  60:16 92:9,19
  94:13 98:25
  100:21 104:25
  107:5,6 116:8
  116:22,22
  142:22 145:10
  146:1,4



differently 42:10
difficult 11:3
  42:8 43:1 49:11
  90:18 92:10
  93:12 100:13
  162:1,5,6
difficulties 90:1
  126:15
direct 30:11
  112:24
directed 20:21
  33:4 166:20
directing 147:24
direction 147:21
  149:11
DIRECTIONS
  4:19
directly 36:7
  148:3
director 6:23 7:2
  7:10,14 27:3,20
  28:21 75:25
  76:2 85:19,24
  86:10
directors 8:3
  72:18
disabilities 87:5
disability 95:11
disappeared
  162:9
disbursement
  59:12
disciplinary
  12:25
discovery 13:20
  17:22 62:3
  166:3
discuss 19:6
discussed 17:25
  17:25
discussing 44:6
  71:5 124:3
  144:12
discussion 16:11
  77:20
dismantling

169:11
dismiss 19:22
  124:17
disorder 152:12
dispute 13:6
  15:18
distinction 32:5
  32:10 144:1
District 1:1,2 2:1
  2:2 5:11,12
  13:12
dive 77:5
diversion 154:16
  154:20 161:19
divert 88:14
  94:13 150:2
  152:2 153:3,21
  157:14 161:21
diverting 94:16
  163:8
DIVISION 3:10
document 13:23
  14:8 61:19 62:1
  62:9,12 63:12
  66:25 71:14,16
  72:7 96:6,7,17
  96:19,23 97:15
  97:19,23 99:2
  131:16 132:14
  132:17 133:22
  133:24 138:11
  138:13,17
  148:10,14,17
  148:22 159:19
  159:21 160:2,4
documentation
  151:18
documented 35:3
  47:4
documenting
  122:13,17
  146:3 151:24
  153:23
documents 17:15
  17:18,20 18:20
  18:23,25 19:1,8

19:24 20:3,5,9
  20:11 21:7 46:6
  47:7 54:6 66:19
  98:25 116:4
  122:20 123:16
  124:11,14,15
  124:20 125:5,5
doing 10:25
  30:25 38:7 45:1
  46:16 52:21
  145:21 152:21
dollar 66:12,19
dollars 71:2
domestic 84:4
  87:14 137:21
donation 71:1
  162:11
donations 70:22
  70:25
Donohoe 103:14
  103:15
Donohoe's
  103:17
donors 117:20
dozen 60:16 64:8
  145:15
dozens 70:13
draft 99:8 100:15
drastically 69:8
drill 131:4
dual 27:24
due 151:9 154:6
  155:10
duly 6:2
duties 101:10,25
  102:24 103:18
  104:6 105:12
  106:21 108:8
  108:25 109:12
  109:16 110:12
  111:1,17,22
  112:17 113:8
  114:5 115:8
  116:15 117:16
duty 29:18
D.C 3:19

| E |
| --- |
earlier 39:24
  40:10,23 42:1
  46:16 47:16
  49:6 50:7,11
  53:11 57:23
  71:5 74:9 88:6
  92:4 94:23
  101:13 119:13
  130:3 136:10
  136:15,16
  145:3 158:1,12
  165:22
early 8:12,24
  41:3 58:21
  98:15 106:19
  123:19 125:11
  125:19,24
  134:9
easier 94:8
  139:17
easily 166:1
easy 49:6
educational
  130:18,23
effectively 90:4
effects 146:4
  161:22
effectuate 56:23
effort 41:13
efforts 139:20
egregious 163:16
eight 25:16 81:5
  81:14
either 23:8 37:22
  58:21 75:8
  106:18 123:10
  125:23 159:4
elaborate 136:3
electronic 42:5
  166:18
eligibility 32:9
eligible 137:25
eliminate 121:22
eliminating

121:24
Elizabeth 118:9
email 4:9,13
  16:24 62:15,18
  62:22 63:4,19
  63:25 64:20
  65:12 70:21
  96:20 98:4,5,13
  98:13,17
  138:23,25
  139:1,2,6,13
  140:7 158:17
  158:19
emails 4:12
Embassy 35:1
emergencies 94:6
  95:10
emergency 45:21
  93:11,14 94:13
  95:1 137:17
  151:3,5,10
  163:3
emphasis 24:6
employed 6:18
  6:20 78:4 104:5
  104:14 105:12
  105:18 106:20
  112:19 117:14
employee 52:7
  54:24,25 55:8
  63:5 118:25
  119:3 140:5
employees 25:4
  25:13,15,17,19
  26:3,10,24
  49:20 50:3 51:3
  52:2 54:13 55:5
  55:11,17 56:6
  56:16 58:14
  72:18 74:18
  75:25 83:19
  94:24 127:11
  127:13 134:5
  142:9 145:11
employment
  51:23 55:23



62:19,24 63:8
**encompassed**
123:4
**encompasses**
49:13 143:7
144:18
**encountering**
95:13
**ended** 53:25
**engage** 20:6
23:12 48:20
113:17 132:2
**engaged** 15:21
**enjoyable** 120:20
**enlarge** 71:21
**enormous** 151:12
**enroll** 138:1
**enrollment**
137:11
**ensure** 53:21
137:24 152:7
152:14
**entail** 22:4 108:5
**entailed** 30:19
**entails** 24:12
161:19,20
**entire** 96:9 160:3
**entirely** 64:1
150:21
**entities** 25:20
**entity** 25:9,16
108:9 144:1
**entry** 10:14 23:7
30:15 33:1
34:15,19 35:5,8
36:1 37:7,9,13
40:16,22 46:5
46:11,24 48:9
48:21 121:23
123:23 127:7,8
127:13,14,15
127:17 128:9
128:20,23
131:13 132:11
132:15,21
136:1 140:22

142:15 145:24
146:1,4,7
151:24
**Erika** 1:16 2:15
4:1 5:9 6:1,10
8:16,20 17:23
19:5 100:24
120:2 126:17
166:13,23
168:1,12 170:3
170:25
**Erika@alotrol...**
139:3
**Erin** 111:7,7,11
111:22,24
113:12
**ERRATA** 170:1
**errors** 170:8
**especially** 26:6
80:10 83:20
90:23 144:14
151:10,19
152:9 158:16
**ESQ** 3:4,11,17
**essentially** 25:10
39:14 86:18
94:4
**established** 90:21
**estimate** 91:5
**estimates** 100:18
**et** 1:4,9 2:4,8 3:2
3:9 5:10,10
40:24,24 57:24
57:24,24 81:17
150:24,24
153:14,24,24
**European** 158:22
**evaluation** 8:13
8:24 123:20
125:12,20,24
**Event** 117:21
**events** 117:23
124:2,5
**eventually** 46:23
81:12 90:25
91:1

**everybody** 36:23
**evolution** 34:1
48:11 130:17
**evolve** 47:21
132:3
**evolved** 31:8 48:7
49:2 81:3 83:25
142:18,21,21
**evolving** 144:8,8
**exact** 7:5 16:17
33:8 34:5 38:17
41:18 59:14
70:25 95:23
102:15 123:4
123:25 124:5
143:23
**exactly** 34:11
36:4 54:25 60:1
65:7 85:10
123:22 127:19
128:17 134:10
**examination** 4:4
6:5 15:13
**examined** 6:3
**example** 95:7
152:6,12 153:7
153:12 155:21
156:1,3
**examples** 49:4
130:22 144:11
154:19 162:14
162:17
**Excel** 99:3
132:24
**exchange** 98:13
140:16
**exclusively** 26:15
110:13
**excuse** 65:10
71:23 73:15
80:22 135:10
136:23 160:16
**EXECUTED**
168:8
**executive** 25:24
**exempt** 4:10

72:10 160:12
**exhaustive** 44:16
67:20
**exhaustively**
71:24
**exhibit** 4:8,9,10
4:12,13,14,15
14:1 61:22,22
61:23 71:10,11
96:14,15
138:14,15
147:11,14
157:16,18
160:7,8 161:5
**exhibits** 4:6
61:20
**exist** 94:2
**existence** 121:16
**existing** 139:25
**exists** 142:22
**expect** 139:19
**expected** 121:1
**expend** 152:7
**expended** 152:14
**experience** 41:14
66:18 145:5
**experienced**
160:25
**experiencing**
84:2 95:10
137:13
**expertise** 95:8,15
142:12,13
**explain** 51:15
66:6
**explained** 153:9
161:18
**explaining** 131:1
**explore** 31:13
159:18
**expressed** 35:5
48:24
**expresses** 34:19
**expressing** 36:2
**extensive** 125:2
**extensively**

131:21
**extra** 41:6
**extreme** 154:13
**extremely** 154:18
161:23
**eyes** 71:19
**E-R-I-K-A** 6:13

_____

**F**

**F** 1:7 2:7 3:8
**faced** 162:18
**facilitate** 50:18
**facility** 50:20
75:5,7
**facing** 45:14 46:7
95:17 152:13
153:20
**fact** 17:25 19:7
120:23 121:4
**facts** 20:14
135:18 170:7
**factual** 16:5
**failed** 57:20
**fair** 33:18 56:15
92:16
**fairly** 58:13
153:10
**fall** 39:21 41:3
59:13 64:15,17
95:14
**familiarize** 62:5
71:15
**families** 64:10
67:16 110:13
153:11
**family** 7:24 24:17
54:1 60:23
74:12,15,17
79:10,18,23
80:9,14,23 85:7
103:19 110:8
110:14,17
111:24 155:9,9
**family-based**
53:13
**far** 73:19 120:4



**fashion** 151:3
**faster** 97:5
**fear** 35:15
**February** 43:5
**federal** 23:10
  64:4,14 169:16
**feedback** 65:20
  146:16,20,23
**feel** 11:20 27:18
  27:19 28:13
  62:4 71:13,23
  71:23,25 78:7
  91:8,20 92:20
  159:18 163:12
**feeling** 163:1
**feels** 73:23
  163:18
**fellow** 28:6
  102:13
**fellows** 28:7
**fellowship**
  102:14,17,17
**FEMALE** 146:18
**field** 143:8
**figure** 41:23 42:5
  46:24 48:14,22
  67:8,19 69:12
  69:21 70:16
  139:15 146:25
  158:13
**figured** 43:8
**figures** 23:23
**file** 116:23 152:2
**filed** 17:19 19:25
  20:4,9 33:7,13
  123:16
**filing** 42:4 45:7
**filings** 19:10,13
  19:17 30:1
  124:24 125:2
**fill** 112:14 114:17
  117:25 118:18
  119:1
**filled** 73:17
  132:20
**final** 99:9

**find** 16:9 49:3
  68:5 94:9
  124:25
**fine** 11:12 18:1
  43:14 147:1
**finished** 158:8
**first** 6:2 18:16
  20:19 29:6
  31:15 34:8,12
  35:12,23 36:9,9
  40:19 42:17
  43:5 58:9 59:12
  61:21 64:13
  67:3 92:1
  100:23 104:18
  110:5 114:1
  118:2,8,10,11
  122:2,13,17
  138:22 146:15
  159:23
**fiscal** 159:7
  160:21
**five** 25:14,14,15
  67:5 75:21 87:2
**flat** 67:10
**Flores** 116:9
**flow** 121:22
**fluctuates** 81:15
**flyer** 66:1
**focus** 41:1,1
  107:12
**focused** 31:25
  84:1 107:8
**focuses** 74:25
**focusing** 39:18
**folder** 96:21
**folks** 27:7 89:2
  151:6,11
**follow** 30:17,22
  31:4 42:11
  57:20 149:13
  161:9
**following** 7:21
  42:3 57:18
  77:21 91:19
  95:17 126:20

156:14
**follows** 6:3
**follow-up** 20:6
  46:25
**food** 68:11,16
**force** 34:20 35:14
  121:25
**forced** 157:14
**foregoing** 168:3
  169:14
**forgetting** 27:14
  27:18 28:8,13
  68:16 69:5
  146:12
**forgot** 27:22 86:8
**form** 73:6,17
  116:17 156:11
  160:18 161:2
**formal** 9:14
  64:21 65:8
  141:9,17,19
  142:4 151:19
**formalized** 36:22
  37:5 133:14
**formally** 52:18
  74:13,16,17
**format** 10:20
  40:2,4 150:17
**formed** 164:17
**former** 113:23
**formerly** 74:16
**forms** 119:1
**forth** 52:5 169:6
**forward** 97:4
**forwarding**
  116:1
**foster** 53:25
**found** 82:2
**foundation** 56:18
  59:7 60:7,21,22
  60:23 61:5,8
  91:12 102:22
  122:6 141:5
**foundational**
  17:14 52:13
  93:23

**foundations**
  60:16,17,23
  61:4 66:11
**foundation's**
  156:24
**founders** 55:21
**founding** 25:24
**four** 15:10 38:24
  60:22 72:15,17
  161:8
**FRANKLIN**
  3:12
**frankly** 155:12
**fraud** 34:20
  35:14 121:25
**free** 11:20 62:4
  71:13,23,25
  96:8 159:1,18
**Freedoms** 60:22
**frequently** 46:3
  116:1 117:2
**friends** 63:25
  66:7
**fringe** 100:12
**front** 12:9 23:9
  159:13
**fulfill** 92:5
**full** 6:9 142:24
  169:9
**Fuller** 106:14,20
**fully** 155:5
**full-time** 26:2,10
  69:8 70:12 91:2
  142:1
**function** 56:13
**fund** 60:21,22,25
  66:18 154:9
  155:5
**funded** 67:9
  76:11,18 78:25
  87:8 102:18
**funder** 164:5
**funders** 61:7
  66:10,21 90:12
  117:19
**funding** 51:25

58:24 59:3,5
  76:21 78:2,17
  79:3 80:13,17
  80:21 87:1,9,11
  87:13 88:4,4,10
  88:12,12 90:12
  92:1,5,9 93:21
  114:24 141:24
  154:6 156:25
  157:1
**fundraisers**
  117:22
**funds** 78:24
  144:18 154:17
**further** 46:20
  66:14 169:14
  169:19
**F.R.C.P** 169:16

─────── G ───────
**gathering** 132:11
**geared** 32:22
  79:5
**Gender** 142:6
  145:4
**general** 23:21
  39:7 108:10
  112:21 135:14
  146:12 154:20
**generally** 10:6
  21:10 23:17
  28:14,19 30:6
  32:14 38:19
  40:10 44:14
  46:17 75:24
  76:4,7 80:8
  81:7 85:24
  134:4 135:9
  144:16 145:22
**getting** 8:23
  49:22 52:2 54:5
  55:7 57:1 59:11
  63:1 77:15 79:5
  146:16,17,20
  146:22
**give** 15:1 19:3,18



19:19 25:22,23
27:1,23 35:21
45:1 46:12,19
48:5 86:23
88:11 90:19
91:5 97:11
130:22,25
131:5 153:7
**given** 49:11
56:13 89:25
90:5 133:10
134:4,13 150:1
150:12
**giving** 23:3 32:5
40:7 46:13
131:14 144:11
**Global** 60:24
**go** 7:15 10:18
14:23,24 21:9
22:20 26:1
27:21 29:22
30:14 31:3 32:2
34:25 36:3
39:22 42:11
44:22 52:25
58:25 65:14
70:2 71:20 72:2
72:3,12,25 75:9
77:3 78:9 79:17
86:4 89:24
91:13 94:15
98:11,21 99:6,6
99:11 121:12
123:10 125:1
126:17 128:6
128:15 139:8
146:24 151:17
157:20,21
161:4 166:20
**goal** 31:17,18
70:19,20,20
137:23 141:12
**goals** 136:22
137:5,8
**God** 27:13 89:21
90:13

**goes** 76:21
**going** 10:21,21
11:6,15 12:2
27:21,22 31:13
36:1,6 39:25
42:11,18 43:11
43:21 44:17,24
47:1 48:14,19
49:14 51:24
52:4 54:23
69:17 73:21
77:2,5 81:2
82:22 88:9,14
90:23,24 96:10
120:12 131:3
134:25 135:18
139:13 147:2
155:2 159:17
159:22 162:11
164:19,23
165:4,12
**Golvon** 107:5
**good** 6:8 9:3 11:3
82:18 83:5
120:9
**Gordon** 103:2,3
138:25
**Gotcha** 105:2
114:22
**government** 9:12
17:21 19:1,14
23:14,16 33:6
33:17 37:2
47:18 48:19
57:18,20
122:21,22
123:16,18
124:6,10 125:6
125:10,18,18
126:2,5 163:24
**government's**
19:21 20:9
124:24
**grant** 59:8,10,16
78:4 79:7 90:14
91:1 92:3

102:18 136:17
137:16
**granted** 88:6
**grants** 60:5,15
93:17 117:18
156:6,8,15,18
**great** 8:4 22:11
28:20 43:18
69:18 98:1
104:20 121:10
**greater** 57:21
91:9,21
**ground** 10:19
106:7 139:16
140:18 143:8
144:10 148:4
**group** 23:3 30:2
30:6,7,9,13
39:3,8 40:3,7
42:2 49:8 53:4
57:15 130:25
150:17
**groups** 147:20
**grown** 145:19
**growth** 161:1
**Guerra** 139:15
140:4,5,7,12
141:25 147:16
**guess** 25:24 30:5
32:17 36:20,22
94:8 129:2,5
142:22
**guys** 164:22

————————
**H**
**habeas** 23:10
75:2
**Haitian** 34:7
37:12,25 38:15
39:24 40:1
**Haitians** 38:4,22
**HALASKA** 3:11
4:4 6:7 8:17 9:2
9:6 13:22 14:3
14:23 15:8,11
16:7,8 18:8

19:11,16 22:3
22:10 24:24
38:11,14 39:16
43:13,16 44:3
44:21 48:1
49:17 51:8 55:2
55:12,15,16
56:19 60:2,10
61:15,21,25
62:10 63:7,10
63:22,24 65:14
65:17 71:8,13
71:22 72:4,5,12
72:16 77:9,11
78:1,7,11,12
79:16 80:12
82:9,18 83:4
87:20,22 89:14
89:16 91:13,17
92:11 96:5,7,13
96:20 97:1,8,13
97:22 98:1,2
99:11,16,20
100:4 119:23
120:9,19
121:10,11
122:1,7,9 123:2
123:8 124:8
125:15,21
127:2,22 128:5
130:20 131:8
136:8,14 137:2
137:4 138:10
138:21 139:8
139:12 141:1
141:15,18
142:16,23
143:1 146:14
147:1,10,12
148:7,8,13,15
149:3,19 150:6
153:1 156:13
157:3,10,15,20
157:24 158:8
158:11 159:15
159:18,22

160:1,6,10
161:4,7 164:21
165:4,8,19,21
166:5,8
**half** 27:25 165:5
**halfway** 15:12
72:14
**handle** 154:11
**handouts** 130:11
130:11
**haphazard** 36:9
36:18
**happen** 52:23
**happened** 58:2
74:4 133:1
**happening** 23:25
32:14 35:7
36:25 37:3
40:21 48:22
88:7 92:18
111:5 117:3
131:22 132:14
144:13 151:24
**happens** 32:12
**happy** 55:8
**hard** 42:13,19
71:17 88:1,10
91:4,5,24
100:16 143:18
156:22
**harm** 45:14,16
46:8 93:10 95:5
149:16 152:13
160:25 161:12
**harmed** 151:1
161:14
**head** 11:4 27:21
61:10,12 69:17
133:20
**health** 45:21
84:11 85:13
86:2 95:11
109:13 115:11
137:10 152:15
**hear** 39:7 89:4,12
122:2,5,10



146:18
**heard** 100:1
122:21 123:17
123:24 125:9
125:10,18
**hearing** 8:11
88:24
**hearings** 75:4
79:1
**held** 5:15 6:24
121:6
**Helen** 103:25,25
104:5,7,13
**hell** 138:24
139:16
**help** 24:15,17,18
26:5,12 53:20
66:14,21 68:19
94:9 95:3 113:2
116:25 131:25
137:24 138:2
142:6 144:25
145:7 162:21
163:2,12
**helped** 30:9
112:21,24
113:2,3,4
153:10
**helpful** 50:25
58:8 141:15
**helping** 27:6
28:15,16,17,18
30:18 42:13
54:4,6 64:8
65:19,22 108:7
108:7 142:13
153:12
**helps** 27:5,10
112:21 116:7
116:16,17,21
118:25 119:2,2
119:3,3,14
159:22
**Hertz** 106:13
**hesitated** 102:13
**Hey** 43:10

**high** 26:6
**hire** 56:6,9 80:21
81:1,11 114:20
114:23
**hired** 58:17
81:12,12 90:25
91:1 113:7,10
113:22 118:19
119:2
**hiring** 117:24
118:17
**hold** 25:12 71:9
101:20,23
**holding** 64:7
**holiday** 35:25
**home** 74:22 80:1
**Homeland** 1:8
2:7 3:8
**homeless** 84:6,8
84:13 85:3 87:7
115:9 137:21
**honest** 69:14,16
**honestly** 7:3 10:5
29:13 43:3
81:11
**hope** 120:20
**hoped** 131:24
**horrible** 162:24
**hospital** 22:18
64:7 83:24
135:22 136:24
137:7,17 138:7
**host** 23:25 68:9
89:5,9 151:16
152:16
**hosted** 41:19
**hour** 11:19 18:16
20:19 43:12
78:8 165:5
**hours** 17:8 18:10
21:4 72:20 73:1
73:15,15 88:20
89:19,21 90:9
90:20 91:6
120:6
**housed** 7:23 86:8

111:19 144:21
**housing** 31:5
45:21 68:20
84:12 151:6
**hovering** 93:4
**HR** 7:20 118:23
**Hugo** 102:8,8
**human** 33:9,11
113:9 118:18
119:6 152:17
163:1
**hundreds** 64:9
96:1
**hurting** 71:18
**hypothetical**
156:2
**H-E-I-R-O** 6:14

_____

**I**

**Ia** 105:21
**Ibars** 105:21
**idea** 146:2
**identification**
14:2 61:24
71:12 96:16
138:16 157:19
160:9
**identify** 20:25
**identifying** 96:1
**identity** 54:5
**illness** 87:5
**imagine** 165:2
**immediate** 111:4
152:13
**immigrant** 84:6
115:10
**immigrants**
67:11 82:2 84:1
84:8
**immigration**
3:11 5:17 9:7
10:7,11 23:9
24:20 75:4 82:3
84:19 85:6
86:19 133:17
144:20

**imminent** 45:14
46:8 93:10 95:5
151:1
**impact** 60:21
152:17
**implement** 80:23
89:23 90:4 91:9
91:21 92:3,14
155:18,18
**implementation**
77:16 87:19,25
92:23 130:5
**implemented**
121:21 136:21
146:1,6,7
**implementing**
89:20
**important** 11:1
45:11
**improve** 49:15
138:3 144:9
**inaccurate** 63:12
99:22 100:2
148:11 159:5
**inadmissible**
121:7
**inauthentic**
63:12 148:11
**incident** 128:24
132:19 135:3
**incidents** 135:2
**inclined** 82:9
**include** 15:3 23:3
23:15 38:20
45:13,20 67:25
149:25 150:10
**included** 40:1
45:13 127:1
130:17
**includes** 34:23
45:12 72:19
83:24 84:7,11
84:17 108:14
**including** 26:12
41:21 50:21
55:20 64:3 75:6

84:4 101:13
134:6 140:19
142:19 154:14
**income** 4:11
72:11 102:18
160:12
**incompetent** 82:3
**incorporated**
14:7,16 29:7
51:20 52:15
**incorporation**
52:19,22,23
53:1
**incorrect** 61:20
**increase** 48:16
**increasing** 69:9
**incredible** 64:3
**incredibly**
163:21
**INDEX** 4:1
**indicate** 12:1
**indigent** 82:1
**individual** 23:4
30:3,10,12 39:9
39:10,11 40:3,8
41:1 49:8,9
53:5,8 57:15
67:4 75:3 78:3
79:1,1 103:9,12
104:12 105:4,5
105:7,16,20,22
106:9 107:1,4
107:13,16
108:18,19,21
109:4,6,8,25
111:10 112:7
113:19 117:20
118:20 126:8
133:6 150:23
**individualized**
150:18
**individually**
46:21
**individuals** 32:1
39:18 48:24
49:19 66:17



95:3,13,15
119:7 127:9
128:9,21
134:22 135:10
139:2 140:8
151:13 156:24
**individual's**
101:9 105:11
109:11
**influx** 34:6
**information** 4:17
8:14 9:3 15:4
17:11 20:15,21
21:10 32:6 39:8
39:13 46:19
48:23 132:12
136:13 149:7
159:23
**informed** 40:13
**initial** 38:22
54:12 154:5
**initialed** 168:4
**initially** 6:25
29:9 36:17
49:18 81:4
83:25 129:3
**injuries** 149:15
149:21,25
161:11
**injury** 163:16
**ink** 168:4
**insane** 164:9
**instances** 127:24
132:17
**instigation**
149:10
**instruct** 18:3
135:9
**instructed** 15:25
134:5
**instruction**
135:15,16
**instructs** 11:14
**insurance** 13:6
113:4 137:19
**intake** 130:19

**intakes** 133:7
**integrate** 139:21
**integrating** 24:16
**intend** 112:14
114:23
**intended** 32:1
**intending** 147:17
**intensive** 49:7
**intent** 32:6 35:5
36:2 48:24
**intention** 156:23
**interaction**
134:19
**interactions**
134:7 135:11
**interchangeably**
122:15
**interdisciplinary**
84:10 137:24
**interested** 169:21
**internal** 132:9
154:8
**interpreters** 68:5
**interrupt** 8:16,20
**interviewing**
151:22
**investing** 150:22
**investment** 57:22
150:19
**involved** 142:20
**involvement**
55:25
**irreparable**
149:16 161:12
**irreparably**
161:13
**issue** 29:25 54:24
93:24 116:19
135:19 147:20
**issues** 39:6 41:21
117:21 119:5
131:25 137:20
150:4 151:9,10
151:16 152:4
152:16 153:20
**items** 18:1

100:11
**iteration** 36:15
38:22
**iterations** 42:7
42:16,23
**I-B-A-R-S**
105:21

---

## J

**J** 3:11
**January** 12:3
54:17 60:13
**Jessica** 106:14,20
**Jimenez** 111:15
111:16
**job** 6:22 29:18
30:18 31:8 52:8
58:3 101:10,25
102:24 103:17
103:22 104:6
105:11 106:3
106:21 108:25
109:11 110:12
111:1,16,22
112:17 113:7
114:4 115:8
116:15 117:15
170:5
**Johnson** 59:7
88:6 90:14 91:1
92:3 136:17
137:16 158:22
158:23
**join** 54:9
**joined** 29:4,20
126:16
**Jose** 72:23 108:1
108:1,12
**judge** 11:13 12:9
**July** 80:20
169:23
**June** 1:18 2:18
4:2 5:1,13
158:20 170:4
**Justice** 3:10 5:16
81:25

---

## K

**K** 3:4
**Karen** 103:13
107:5
**Karlyn** 101:3
**Karoline** 97:6
**Katharine** 103:2
103:3 138:25
**Katia** 110:6,15
**keep** 31:7 43:7
49:3 54:23
117:3,18
134:25 143:7
**keeping** 47:4,4
**keeps** 132:23
165:23
**Kevin** 3:23 5:10
5:19 13:22 15:9
61:15 63:22
65:14 71:8
72:12 96:5
99:11 138:10
139:8 142:23
146:14 147:10
148:13 149:3
157:15,20
159:15 161:4
**key** 72:18
**kids** 162:16
**kill** 45:17
**killed** 151:2
**kind** 8:10 10:25
27:25 29:11
32:22,25 37:5
38:7 42:20 49:4
51:16 52:4 53:3
53:10 54:2 55:6
68:20 71:17
86:7 92:14
96:11 100:17
111:4 133:22
142:2,2 146:9
154:19
**kinds** 23:13
**knew** 38:6

**know** 10:25 11:8
15:5 23:23 26:4
27:5 28:12
29:25 30:8,13
30:24 37:24
38:5 39:10 41:6
43:6 45:25
48:12 49:4,9
50:6 52:6,16,24
53:11 54:9,11
57:8 59:11,13
60:18 61:9,11
61:12,18 62:6
66:13,15 69:15
70:8,23 72:8
73:11,14 78:10
81:4,11,13,15
82:13 85:8 89:6
90:10 93:18
97:8 100:13,14
102:14,20
108:6 112:25
114:1 122:16
124:1 126:2,2,6
127:16 128:16
128:17 129:2
132:25 134:2,2
134:8,12 135:2
136:12 137:19
141:13 143:25
148:22 151:18
154:14 155:3
156:23 157:2
157:12,25
158:4 159:6
162:10,20
163:5,17 164:4
164:9,16,17,25
**knowledge** 123:3
149:12
**known** 15:4,7
17:11
**Kuchery** 101:4

---

## L

**LA** 22:19 26:16



69:20 83:22
84:13,17,22,24
86:6,8 90:22
95:16 115:24
116:5 136:11
**lack** 154:6,8
164:5
**LAC+USC** 64:6
83:24
**Lado** 1:4 2:4 3:2
5:10 6:21 7:1,6
7:8 14:6,16
15:1 17:21
21:10,11,14,15
21:18 25:3
28:25 29:4
37:21 38:19
41:11 44:7 50:3
51:3,20,23
52:18,22 55:4
55:10,17 56:5
56:12,15 58:9
58:15 60:3,5,12
61:25 62:17,20
62:24 63:6,8
64:1 65:5 67:4
74:2 76:25
77:22 78:4 80:5
80:13,21 82:5
83:11 91:9,20
99:12 104:14
112:14 116:20
118:4 119:8
127:8,10,23
128:9,21,23
130:4,10
133:24 134:12
134:14 135:19
135:24 138:5,6
139:20,24
140:9,13,24
141:10,25
143:5 144:25
147:24 148:5
149:15,22,25
152:20 156:5,7

156:15,17,25
157:6,10
160:19,25
161:11,13
170:2
**Lado's** 47:20
50:17,19 52:21
57:5 64:15
73:20 75:15
77:13,16 79:19
83:9 86:21
87:16,24 88:20
89:18 92:13
108:13 123:3
136:22 137:5
141:3 143:17
144:5 158:4
159:6 160:12
**language** 39:5
68:3,6,17
**Laredo** 127:17
128:13,15
**large** 30:25 34:6
46:16 140:16
140:17,19
**largely** 26:13
150:17
**larger** 147:20
**large-scale** 95:2
**late** 34:16 35:20
35:25 109:24
**law** 3:17 31:2
38:25 40:19
54:1 57:16
145:14,15
149:13 161:9
163:25
**lawmakers** 23:22
**laws** 57:18,21
**lawsuit** 13:8,10
13:11,13,14
64:4
**lawsuits** 64:14
**lawyer** 28:16
**lead** 139:20
**learned** 37:8

151:21
**leave** 103:5 104:3
105:7,25
106:17 109:23
112:9 117:12
**left** 100:22
114:18
**legal** 5:20 14:21
21:20 22:1,4,25
23:3,4 24:7,13
24:14,16,18
25:9 26:4 28:15
28:15 31:23,25
32:1,4 53:12
58:17,19 61:6
64:8 67:4,15
69:8,13,20
70:10 76:13
84:9 85:3 86:17
107:10 108:9
137:8,25
139:16 140:6
140:18 144:20
153:13 155:22
161:16
**lengthy** 148:22
**let's** 8:1 19:18
24:25 35:20
58:16 74:1
82:15 100:22
120:7 128:6
**level** 155:12
**levels** 23:16
70:22
**liaise** 53:20
**Liberties** 45:10
47:17
**light** 160:25
**Lily** 106:13
**limited** 55:25
87:19 93:19
96:4,4 103:1
**limiting** 121:23
**line** 31:18 35:19
37:18 67:3,14
69:7 70:5,11

72:23,24 89:1
100:11 101:3
101:17 102:8
103:2,14,25
104:20 109:3
113:18 133:13
133:14 138:23
160:16 170:9
170:12,14,17
170:19
**lines** 89:2 161:8
**list** 36:5,14,23
72:17 95:22
129:4,10
132:25 133:9
**listed** 73:9,11,14
79:14 119:9
**lists** 36:19
**literally** 127:6
**litigation** 3:11
5:17 6:23 7:10
7:14,17,22 19:2
28:1 54:17
64:17,21 65:3,6
74:13 119:20
122:20 124:12
**little** 7:12 10:18
26:18 31:13
32:13 37:4 45:4
50:12 69:14
71:5,19 73:24
77:4 78:9 82:12
82:16 88:11
95:22 97:12
98:8 107:4
121:13 136:3
141:6 142:24
157:23 162:1
164:25
**lives** 27:25
**Liz** 118:7,9
**local** 33:13 85:12
120:10
**located** 22:13,13
22:23
**locations** 25:1

**log** 132:23
165:23 166:1
**logistics** 27:12
**long** 6:24 73:23
97:19 129:15
132:5 153:18
**longer** 30:17,23
43:3 82:10,12
151:13
**longer-term**
132:2
**long-term** 30:20
45:6 47:6,9
**look** 43:6 62:7
70:1 72:2,22
75:23 85:18
97:11 99:21
100:2,22 123:4
138:22 140:15
146:13 159:19
160:15 165:1
**looked** 34:9
36:22 61:18
100:17
**looking** 9:3 63:13
72:8 118:18
147:15
**looks** 34:9 57:11
63:18,18 72:17
85:23 98:8
100:15 142:22
**Los** 9:16 10:12
22:14,16 26:11
26:14 41:20
58:18,20 59:6
64:7 75:10,11
82:8 83:11,18
84:19 92:6
93:25 94:1,11
94:24 95:8
101:12 104:7,9
115:12,22
135:22 136:24
137:6 154:7
162:18
**loss** 154:6



**lost** 92:1 136:17
**lot** 7:15 26:20
  32:5 41:4,6
  43:2 49:13 75:9
  84:24 88:3,14
  90:8,10,15
  142:18 144:20
  145:5 146:9
  152:4 153:24
  159:4 162:14
**lots** 146:23
**loud** 123:14
  149:5
**love** 114:25
**low** 70:3,10
**lower** 95:23
**Lozoya** 115:15
**Luis** 139:14
  140:4,5,7
  141:25 147:16
**lunch** 82:11,12
  82:16 112:5
  119:25 120:13
  120:20
**luxury** 94:12
**L's** 80:3,4,6
**L.A** 9:13 10:5
  22:17 26:21

**M**

**Magna** 3:23 5:20
  89:1,8 99:14
**mail** 115:25
**main** 22:15 84:22
  115:24
**maintained**
  62:19,23 63:5
**maintains** 165:23
**maintenance**
  75:6
**majority** 33:15
**making** 108:6
  112:22 143:25
  166:10
**manage** 7:16
  43:1 161:22

163:21
**management**
  27:10 42:6 47:1
  47:2 107:8,11
  150:22
**manager** 86:3
  110:12 115:6
**manages** 26:13
**managing** 103:19
  103:23,24
**mandamus** 23:10
**manual** 119:3
**March** 129:22
**Mares** 72:23
  73:11 108:1,2
  108:12
**Maria** 115:15
**mark** 61:21
  96:13 138:14
  160:6
**marked** 4:7 14:1
  61:23 71:11
  96:15 138:15
  157:18 160:8
**marking** 61:20
**Martinez** 107:17
  107:17 110:20
  110:21
**massive** 154:15
**material** 68:7
**materials** 19:7
  41:15 44:12
  49:2 57:24
  130:18,23
  131:7,16,21
  132:1,3,8,9
  133:4 150:20
  150:24 153:23
**math** 69:16
**Matias** 109:3
**matter** 5:9 19:8
**matters** 10:7
  23:10,11 24:20
**Maurus** 104:20
  105:4,17
**Mayer** 3:3

166:22
**Maywood** 22:15
**McAleenan** 5:10
**mean** 14:18
  33:23 54:19,25
  76:20 78:19,21
  87:10 88:3 90:8
  90:10 95:20
  106:6 124:23
  141:14 143:20
  150:8 162:24
  164:14
**means** 21:12 32:8
  84:9
**media** 5:8 7:20
  116:17 117:1
  135:1,1
**mediation** 8:25
**medical** 84:2
  85:3 95:6,10,18
  137:12,13
  138:3 152:10
**medically** 152:5
**medical/legal**
  83:23 85:14,15
  85:18,25 86:22
  87:4,12,15,25
  88:5,13,21
  89:17 90:4
  91:10,22 92:7
  92:15,24 94:10
  95:9 101:14
  104:9 114:6
  135:19,21
  136:11 154:2,4
**medicine** 75:6
**meet** 31:9 46:3
  96:3
**meeting** 9:1
**meetings** 90:11
  90:13 116:20
**Megan** 104:21
**Meghan** 104:20
  105:4,17
**Melissa** 3:17
  116:9,16

126:16
**MELISSA.CR...**
  3:20
**member** 7:7 8:2
  80:22 138:6
**members** 23:21
  24:17 25:3 80:4
  80:25 81:8
  100:25 138:6
**memory** 60:19
  60:20
**mental** 45:21
  84:11 85:13
  86:2 87:5 95:11
  109:13 115:11
  137:10 152:15
**mentally** 82:2
**mention** 26:1
  86:9 119:11
  163:18
**mentioned** 20:19
  32:18 37:11
  40:10 42:1 43:4
  43:4 44:10
  46:16 47:10
  49:6 50:7,11
  53:3,11 57:11
  57:23 74:8
  78:13,14 79:9
  83:10 88:6
  94:23 118:16
  119:13 130:7
  133:3 145:3
  153:23 154:12
  155:21 162:22
**merge** 141:14
**merger** 141:17
**merging** 141:3,7
**Mesa** 7:22 74:6
  74:23,25 75:1,4
  75:12,16,23
  76:5,23 77:1,12
  77:23,25 79:4,8
  80:11 102:3
  103:1 119:14
  127:14 128:12

129:2
**mess** 36:13
**met** 126:2 164:17
**meter** 27:7
  161:25
**metered** 23:1
  31:9 39:18
  49:16 65:1 93:3
  93:9 94:7 95:4
  95:14,17 112:3
  127:5 132:15
  132:16 133:6
  151:11,14
  152:6 164:10
**metering** 29:24
  30:4 31:12
  33:24 34:2,8,13
  35:25 37:8
  38:21,22 39:24
  44:8 47:21 48:7
  48:17 57:3,8,12
  57:14 89:23
  90:2 92:13,21
  121:25 126:13
  126:22,24,25
  127:3,9,18,24
  128:3,10,11,25
  129:5 130:6
  132:17 133:18
  136:18,21
  137:3 144:25
  145:22,25
  152:17,22
  153:15 156:9
  156:20 157:6
  163:6,16
**Mexicali** 128:11
  129:2,9
**Mexicali-Calex...**
  127:14
**Mexican** 25:16
  25:25 32:23
  33:2,3 35:8
  45:13 54:5
  108:16 128:16
  132:6



**Mexico** 1:17 2:17
5:1 10:15 21:22
22:13 23:14,15
24:5,16 25:8,9
25:20 27:25
31:25 32:3,14
33:8,14 34:21
34:24 35:16,17
42:14 46:8 54:4
56:24 65:23
68:24 108:9
120:24 121:4,5
**Michelle** 3:4
62:25 97:4,16
123:6,13
138:18 164:22
**middle** 143:2
**migrant** 68:10
**migrants** 21:21
23:19 31:21
34:7 36:1 37:12
37:25 38:15
45:8 49:16 93:2
93:8 132:4
137:13 140:25
**million** 90:13
159:9,11
160:21
**mind** 15:9 43:10
47:14 63:22
121:14 123:13
147:10 162:16
**minute** 46:12
86:23
**minutes** 43:15,16
82:19 120:6
165:5,6
**mirror** 48:11
**mirroring** 49:5
**mischaracterizes**
125:14 130:14
158:6
**misrememberi...**
130:12
**missing** 85:2
98:23

**mission** 31:19
33:9 56:23
77:13,16 79:19
92:6 151:4
155:19 162:20
**model** 30:2,3,13
41:7 43:8 53:3
56:14 57:8,15
67:22 85:9,12
153:10
**moment** 47:15
57:4 60:11 62:4
82:6 119:24
144:13
**Monday** 158:19
**monetarily**
139:18
**money** 52:3
62:16 66:8
113:1 158:24
**monitoring** 48:16
48:21 49:3
57:23 80:8
132:11 151:21
**month** 34:6
80:19 103:7
**months** 153:17
**morning** 6:8
12:13 36:25
83:5
**motion** 10:10
124:17
**motions** 19:14,21
20:3
**move** 24:23 25:1
54:4 61:18
71:21 74:1
**MPP** 23:2,7 27:7
31:11 32:11,12
32:14
**Mulligan** 105:22
105:23 106:2
**multiple** 30:1
84:12 138:6
**murder** 163:19
164:9

**murdered** 162:4
164:14,14,16
**mute** 63:1 89:3,9
**muted** 88:23,23
89:10
**muting** 123:13
**MWEBSTER...**
3:6

---
**N**
---

**N** 6:14
**name** 6:9 29:15
31:16 33:8,10
60:18,20 65:8
72:19 104:18
107:5 114:1,2
118:8,21
125:22 126:7
138:24 143:20
143:23 147:18
169:23 170:2,3
**names** 6:16 20:2
29:7 50:10
60:24 72:19
101:3 125:25
126:4
**Nancy** 6:14
**national** 74:10
81:20,24 84:20
**natively** 99:2
**nature** 10:2
13:14 15:24
24:12
**NCRP** 87:3,3
102:3 104:10
159:4
**near** 164:21
**necessarily** 15:5
15:6 38:3 88:13
93:20 122:18
141:8 144:13
153:5
**necessary** 141:10
143:5 154:17
**need** 11:7,21,21
22:2 47:6 56:16

56:23 71:19,24
78:7 83:19
93:20 99:7
135:25 138:18
139:15 148:19
149:1 150:2
164:25
**needed** 46:22
48:11 58:4
68:17,18 72:2
101:15 112:25
113:1 131:13
131:15 161:20
**needing** 58:1
**needs** 31:9 93:8
96:3 111:4
132:4 152:10
**neither** 169:19
**neutral** 8:13,24
123:19 125:11
125:19,24
**never** 35:9 42:2
151:18 159:24
163:23
**new** 7:3 41:15
64:6 80:22
107:7,7 110:7
113:11,15
114:18 139:23
150:21 158:21
158:23
**nice** 56:25
**Nicole** 17:10
18:16 20:13,20
28:22 37:24
39:14 40:5,9
45:8 51:22
58:18,22
100:24 132:23
139:23 143:3
165:22
**Nicole's** 38:20
**nine** 160:16
**nods** 11:4
**noise** 63:2 88:24
**nonprofit** 21:19

25:8 52:16
**non-monetarily**
139:19
**non-profits** 93:24
145:10
**noon** 82:13
**Nora** 17:10 20:12
25:25 26:13
51:22 52:16
53:14,19 55:20
58:18 85:8,19
85:24 90:22
100:23
**normal** 62:19,23
63:7 70:18
**north** 22:20
73:22 74:2
**note** 15:18
**noted** 5:22 168:4
**notes** 47:7 169:10
**notice** 4:8 13:24
14:4 17:16
20:16 79:15
**noting** 146:5
**November** 58:11
62:16 64:19
65:11 67:24
118:14
**null** 169:13
**number** 5:8 26:2
33:2 36:7 67:12
69:15,22 88:11
89:2 90:19 91:6
100:23 123:5
124:15 133:10
133:11 140:18
140:19 146:16
159:16
**numbers** 95:23
100:19 133:9
133:10
**numerous** 131:11
161:18
**N.W** 3:4,18

---
**O**
---



oath 12:6,8 121:4
object 11:11
  54:19 77:2
  79:13
objected 15:23
  100:6
objection 14:20
  21:16 22:5 38:9
  44:20 47:23
  48:3 51:4 54:15
  55:14 56:18
  59:25 60:7
  87:18 91:12
  99:24,25
  121:18 122:6
  122:24 123:10
  125:13 126:14
  128:1 130:13
  130:24 136:6
  136:25 138:9
  140:14 141:5
  141:23 144:6
  148:2 149:23
  152:24 156:11
  157:8 158:6
  161:2,15
objections 11:13
obtain 92:4 135:5
  137:25
obviously 15:6
  39:6 58:2
  122:19 133:14
  146:5
occupied 28:23
  29:2 104:13
  117:14
occupies 28:21
  103:10 111:8
occupy 26:24
  101:6 102:11
  104:12 105:16
  106:9 107:1,19
  108:21 109:25
  110:23 111:10
  111:12 112:11
  114:12,15

115:5 116:12
  118:3
occupying 29:3
October 40:5
  47:22 118:15
offenses 12:15,18
  12:21
offer 9:14 11:9
  23:6 117:4
  120:24 137:8
  144:9
offered 8:14
  17:21
offering 80:9
  94:5 142:12
offers 22:25
office 3:11 5:17
  7:23 22:15,17
  22:19,24 25:4
  26:9,17,19,20
  26:24 28:4 45:9
  47:16 51:2,10
  73:20 74:1,2,3
  74:5,13,22
  75:11 76:3 77:4
  78:14 81:19
  83:9,10,11,14
  83:17,22 84:17
  84:22 86:17
  90:11 95:8
  101:12 102:2,4
  102:5 104:8
  108:16 111:19
  111:20 115:12
  115:20,24
  116:5 144:24
officer 34:20
  133:2
officers 72:18
offices 22:9,12
  26:11 64:6
  83:20 93:7
  111:6 115:25
  116:3,8
official 1:8 2:8
  3:9 28:3 48:18

122:22,22
  123:25 125:18
  126:6,10
officially 83:22
officials 23:14
  123:23 124:2,6
  125:10 129:16
  134:19
oh 7:15 10:9 16:6
  18:16 20:11
  27:13 28:5
  49:24 57:7
  68:16 73:7 85:4
  86:4 90:12
  100:7 152:4
  160:4
okay 8:4 9:5 11:5
  11:9,10,24,25
  12:3 14:22 15:8
  16:6 18:9 22:11
  26:23 27:19
  28:5,20 34:3
  43:18 49:24,24
  50:15,19 51:12
  51:14,14,19
  55:9 56:12 57:7
  59:2 60:15
  61:14 62:8
  63:21 67:14
  69:7,25 70:21
  72:1 73:19
  78:11 79:21
  81:18 82:17,20
  85:23 91:8
  96:12 97:1,8
  98:1,6 99:10,16
  100:7,22
  108:18 114:3
  117:24 118:16
  118:20 119:7
  119:23 120:8
  121:10 128:6
  128:11 129:7
  130:3,21 131:6
  148:7,20,21
  156:5 159:6,20

159:24 165:10
  166:4
onboarding
  118:25
once 30:11 46:18
  46:21
ones 33:12 60:12
  135:7
one-tenth 75:18
  75:19
ongoing 74:19,20
open 60:22
  136:22
opening 64:5
  135:21
operate 81:19
  108:16
operation 57:6
operational
  75:22 113:5
operations 7:19
  27:11 44:8 83:9
  83:13 86:5,6
  94:18 108:4,14
  112:20 117:20
  121:13
operative 135:20
oral 123:18
  125:11,19,23
order 37:4
  166:16,20
organization
  4:10 7:18 15:3
  15:4 21:19
  25:13,17,25
  38:5,8 44:11,13
  44:14,18 51:21
  52:12,13 53:6,7
  53:8 54:10,22
  55:10,19,21
  56:13,24 58:5
  59:8 64:2 66:8
  72:10 78:15
  94:4,16 96:4
  108:11 123:1
  123:21 144:19

153:4 154:22
  157:13 160:12
  161:23 163:11
organizational
  17:15 20:14
  31:19 57:5
  85:17 93:17
  95:19 151:4,9
  155:19
organizations
  23:17 84:12
  94:3 116:17
  134:23 140:18
  140:24 141:3
  141:12 142:8
  142:20 143:16
  143:22,23
  144:21 145:23
  146:3 147:25
  148:4 155:14
organized 34:11
  36:20
orientation 22:25
  30:2 32:4,15
  39:3,5 40:7
  42:2 57:15,16
  67:4,15 95:19
  150:17
orientations 23:4
  23:5 30:7,7,9
  30:14 49:8 53:4
  53:5
orig 1:25
original 169:11
  169:15
ORIGINALLY
  2:20
Otay 7:22 74:6
  74:23,25 75:1,4
  75:12,16,23
  76:5,23 77:1,12
  77:23,25 79:3,8
  80:11 102:3
  103:1 119:14
  127:14 128:12
  129:1



**OTG** 106:6
**Otro** 1:4 2:4 3:2
  5:10 6:21,25
  7:6,8 14:6,15
  15:1 17:21
  21:10,11,14,15
  21:18 25:3
  28:25 29:4
  37:21 38:19
  41:11 44:7
  47:20 50:3,17
  50:19 51:3,20
  51:23 52:18,21
  52:22 55:4,10
  55:17 56:5,12
  56:15 57:5 58:9
  58:15 60:3,5,12
  61:25 62:17,20
  62:24 63:5,8
  64:1,15 65:5
  67:3 73:20 74:2
  75:15 76:25
  77:13,16,22
  78:4 79:19 80:5
  80:13,21 82:5
  83:9,11 86:21
  87:16,24 88:20
  89:18 91:8,20
  92:13 99:12
  104:14 108:13
  112:14 116:19
  118:3 119:8
  123:2 127:8,10
  127:23 128:9
  128:20,23
  130:4,10
  133:24 134:12
  134:14 135:19
  135:24 136:22
  137:5 138:5,6
  139:19,23
  140:9,13,24
  141:3,10,25
  143:5,17 144:5
  144:25 147:24
  148:5 149:15

  149:21,25
  152:20 156:5,7
  156:15,17,25
  157:6,10 158:4
  159:6 160:11
  160:19,24
  161:11,13
  170:2
**outcome** 163:14
  169:21
**outcomes** 162:19
**outreach** 68:22
  84:8
**outset** 32:18
**outside** 37:6,19
  131:4 134:4
**overall** 7:18,19
  95:20 108:17
  138:4
**overlapped** 98:16
**overnight** 52:24
**oversee** 7:19,20
  7:23
**overseeing** 76:3
  101:12
**oversees** 76:8
  102:2
**overview** 66:20
**overviews** 66:12
**overwhelming**
  58:4
**o0o** 5:3 6:4,6

---

**P**
**P** 6:14 121:16
  125:7
**Padilla** 117:9
  118:2
**page** 4:7,15 15:10
  16:4 63:23
  65:15,15 71:21
  72:2,13,13,15
  98:12 99:11,14
  99:16,18,21
  138:22 139:9
  139:10 142:24

  143:2 146:15
  157:22,23
  160:5,15 170:9
  170:12,14,17
  170:19
**pages** 96:8,11
  123:14
**paid** 25:3 49:19
  49:22,22 52:7
  56:6,9,16 69:13
  69:20 108:7
  112:22
**panels** 124:1,7
**paper** 68:7
**paperwork**
  113:15
**paragraph** 149:4
  149:5 161:6,6
**paralegal** 106:23
  110:24 111:11
  111:23 113:23
  114:13,21,23
**paralegals** 39:1
**parameters**
  66:22
**Pardon** 17:23
**parent** 80:1
**parents** 54:4
  80:11
**parole** 75:2
**part** 17:21 20:1
  23:1,12,15
  32:18 49:20
  50:1 53:7 54:14
  55:3 72:14,17
  76:22 79:25
  87:12 126:24
  127:3 130:16
  140:20 145:16
  145:18,19
  147:25 153:4
  160:15 166:2
**participants**
  68:13
**participate** 33:3
  143:24 144:2,5

**participating**
  36:10 55:20
  124:6
**participation**
  38:20 146:9
**particular** 24:6
  68:17 95:8
  113:16 116:24
  133:11,12
  138:24 154:1
**particularly** 93:8
  96:2
**parties** 5:21
  120:22 121:1
  134:4,16
**partner** 136:23
  137:6 140:9
**partnering**
  137:10,16
**partners** 142:19
  144:2,4
**partnership**
  135:21
**partnerships**
  143:19 146:13
**party** 13:7
  169:20
**passport** 13:18
**Patrol** 64:4,14
**pay** 51:25 58:15
  68:4,19,24
**paying** 58:9
  112:22
**payments** 59:11
**payroll** 113:3
  119:3
**pays** 67:14 69:7
**PDF** 15:10 65:16
  72:13 99:3,15
**peak** 81:13
**penalty** 168:2
**pending** 11:23
  13:11
**people** 24:4
  25:13 26:8 27:6
  27:7,14,16 28:6

  28:7 30:16
  31:22 32:6 35:2
  35:4,7,10,18
  36:7,19 37:18
  39:7 40:1,19,21
  41:21 42:10,20
  44:15 45:16
  47:12 48:20
  50:1 51:2 53:24
  55:23 64:25
  66:10 73:8 75:2
  75:3,9 77:24
  81:5,6,13,14
  84:23 87:4
  90:14 94:9
  95:21 96:2
  100:19 117:5
  119:1 129:3
  133:13 134:13
  135:9 137:20
  142:14 146:2
  152:6,9,15
  153:12 154:11
  154:22,24
  155:12 159:1
**percent** 16:21
  58:12 75:21
  76:6,10 81:10
  87:2 103:6,8
  125:20
**perfect** 130:21
**perfectly** 43:13
**performed**
  149:10
**period** 12:2
  33:21,22,23,24
  38:10,13 41:2,8
  43:4 47:22 51:5
  51:9 54:16 60:9
  98:17 129:19
  137:1 144:12
  145:9 153:18
**periods** 26:6
**perjury** 168:2
**permanent** 24:8
**person** 16:25



26:19,19 31:5
34:18,21 42:3,3
42:24,25 45:16
45:17 46:7,11
46:17 53:11,16
53:21 81:10
91:2 101:6
104:16 106:12
106:14 108:1
109:20 110:5
110:20 111:14
112:6,11
113:11,15,25
114:9 115:2,15
117:25 118:2
122:10,18
125:22 131:16
131:16 137:25
162:25
**personal** 13:2
15:6
**personally** 13:7
15:7 37:20,23
37:24 53:7
122:25 124:4
**personnel** 154:7
**persons** 79:2
**perspective**
163:20
**pertains** 169:14
**Peter** 6:14
**petitions** 53:14
85:7
**phage** 159:23
**phase** 54:12
**Phillips** 13:12
17:10 20:13
21:6 25:25
26:13 52:21
86:10 100:24
**phone** 16:24 17:9
18:10 21:5 89:3
116:2
**phrase** 50:23
122:2,19
123:15,18

124:10 125:10
125:19,23
126:10 143:13
143:15
**phrases** 122:14
123:22
**physical** 35:4
84:5
**physically** 35:4
74:21 132:20
**pieces** 98:9
**Pinheiro** 1:16
2:16 4:1 5:9 6:1
6:10,18 14:1,4
15:12,24 38:16
44:4 61:23
62:11 71:11,13
72:6 79:17 83:5
96:7,15 98:3
99:21 100:24
120:19,23
138:12,15
139:4 147:13
148:16 157:18
157:25 160:8
160:11 165:19
166:8,13 168:1
168:12 170:3
170:25
**pivot** 121:12
**place** 9:15 10:20
33:15 37:6 47:7
68:23 83:14
121:3 142:17
169:6
**placement** 13:17
75:9
**plaintiff** 2:5 3:2
14:6
**plaintiffs** 1:5
13:13 19:2
35:12 62:2 99:3
121:15 149:14
161:10 165:23
166:7
**plan** 93:12 138:5

**planning** 117:22
**platform** 17:2
**playing** 131:18
**please** 5:23 6:8
11:8 13:22
29:22 38:10,13
61:15 71:8 76:1
96:5 97:11
118:16 125:15
126:19 130:9
150:14 157:15
166:25
**plus** 70:12
**point** 26:4 29:12
29:16 31:17
36:8 40:17
41:11 54:20
58:14 77:7 81:5
87:17
**police** 46:9
**policies** 48:7 49:1
121:20 126:25
131:12,18
132:22
**policy** 6:23 7:2
7:10,14 48:13
121:17,17,20
122:3,19,23
123:15 124:4
124:11,20
125:7,11
126:10,24
127:1,4 132:18
134:11 145:22
146:1,7 149:9
150:5,16
151:19 152:18
156:10,21
157:7 163:6,6
163:16,23
**population** 34:12
38:6 49:15
64:24 84:14
**port** 23:6 30:15
33:1 34:14,18
35:5,8 36:1

37:7,13,16,19
40:16,22 46:4
46:11,23 48:9
48:21 123:23
127:6,8,13,14
127:14,17
132:21 140:21
142:14 151:24
**portions** 148:23
148:24
**ports** 10:14 37:8
121:23 128:8
128:20,23
131:12 132:11
132:15 136:1
145:24 146:1,4
146:7
**posed** 151:11
**position** 6:24
29:14 72:21
73:2 107:7
113:7,10
114:17,18
118:18,19
**positions** 86:8
**possible** 46:14
90:17
**post** 152:11
**posted** 135:5
**post-release** 75:5
76:15 119:16
**POVERTY** 3:17
**powerlessness**
163:1
**practice** 131:12
151:20 163:23
**practices** 48:7
49:1 121:21
126:25 131:18
149:9 150:5
**practicing**
163:25
**practitioner**
163:10
**pre** 38:21
**preface** 44:23

83:16
**preparation**
20:22 124:16
145:7 148:23
148:25
**prepare** 15:5
17:7 21:3
**prepared** 15:1
17:4,12
**preparing** 15:7
46:5
**present** 3:22 5:21
8:13 12:3 18:14
20:18,20 30:6
38:5 45:18 46:8
54:17 60:14
123:23 124:4
126:7
**presentation**
131:1,11,13
**presently** 6:18
**Presumably** 65:9
**pretty** 77:5
113:12 133:8
**previously** 47:3
53:4 150:1,12
153:9
**Pricila** 108:18
**primarily** 79:24
102:2 104:8
107:13 109:17
111:18 114:6
115:9,21
**primary** 24:9,10
101:9,25
102:23 103:17
104:6 105:11
106:3,21
108:25 109:11
110:12 111:1
111:16 112:17
114:4 115:8
116:15 117:15
118:22 155:8
**print** 71:18
**printing** 68:8



printouts 99:3
prior 52:21 56:16
    125:14 130:14
    158:7
privacy 135:12
privilege 18:4
    19:9
pro 27:5 30:19
    55:21 56:3 75:8
    103:10 111:8
probably 7:4,8
    35:21 39:23
    40:1 60:16
    69:24 81:14
    87:2 97:2 98:12
    101:2 105:8
    109:24 123:19
    159:8 164:5
procedure 57:17
    131:2
procedures 57:19
    57:21
proceed 97:24
proceeding 9:11
proceedings 9:8
    12:25 82:4
    169:5,9,17
process 32:8 33:1
    36:6 48:19
    49:10 116:6
processed 30:15
    34:14 40:20
    131:24
processing 30:16
    36:12 48:8,9
    116:4
produced 19:8
    62:2 99:2
    100:14
professionals
    84:12 85:13
professional/case
    86:3
profound 155:16
program 7:24
    8:21 10:5 23:2

23:12 24:3,12
24:25 26:14,16
27:13 28:18
29:8,10,16,16
29:19 30:12
31:11 41:11
50:11,21 52:10
52:11,13 53:2
54:13,14 64:18
64:22 65:3,6
66:20 67:9 69:9
71:5 72:25 73:9
74:12,14,15,17
74:19,22 76:8
76:12,14,18
77:5,6 78:3,16
79:10,18,21,23
80:15,23 81:1,9
81:10,21,23,24
81:25 83:23
84:7,21,24 85:1
85:5,15,18,25
86:22 87:2,7,12
87:15,17,25
88:21 89:17,20
90:5,9 91:10,22
91:25 92:7,8,15
92:24 94:10
95:10 103:20
108:13,15
109:2 114:7
115:10 117:4
136:11 144:17
144:23 153:4,8
153:16 154:1,3
154:5 155:5
programming
    41:6 117:6
    130:17 150:3
    163:21
programs 7:17
    7:21,22 22:19
    22:21,23,23
    26:20,22 29:8
    29:12 30:2
    50:17,19 55:20

64:15 66:9 74:4
76:14 79:14
81:6,18 83:17
83:18,21 86:11
86:17 90:1
93:18 94:17,25
95:16 101:13
101:15 104:8
111:19 117:5
138:1 146:6
150:16 154:2
154:21 164:1
progress 99:8
project 7:22,25
    22:22,24 27:4
    28:20,24 29:6
    31:15 32:19
    33:19 39:17
    49:18,21 50:2,6
    50:9,13 51:10
    64:23,25 65:19
    65:21 66:2 74:6
    74:24,25 75:12
    75:17,23 76:5
    76:23 77:1,12
    77:23 79:4,8
    101:16 102:3,7
    102:25 103:1
    103:21 104:11
    105:13 106:5
    106:22,24
    107:14,25
    108:15,22
    109:2,14,16,18
    110:8,14,17,19
    111:3,21
    113:14 114:8
    115:14 119:14
    119:18 130:6
    138:24 139:22
    139:24 140:1
    141:4 142:11
    143:6,13,15,17
    143:21,22,24
    145:18,20
    148:1

projects 116:23
promise 112:4
promoted 113:22
prompted 76:25
    77:22
proof 46:7
properly 48:23
    89:23 92:2
propose 112:5
    119:24
protect 135:12
protection 48:8
protections 13:16
protocol 132:9
provide 7:24
    11:1 12:12
    21:25 22:8 24:4
    31:19 39:9 46:1
    46:25 67:4
    68:11,13,19
    75:1,5 78:25
    137:12 154:17
    155:11 157:1
provided 19:1
    66:20 67:12
    113:14 134:21
    134:22 136:13
    141:24 166:2
provider 41:19
providers 137:10
    137:11,11
provides 115:11
providing 21:20
    24:12 31:25
    32:1 67:15
    109:13 120:23
    121:5 151:4
    156:25
psychologist 27:9
    109:7,8
public 23:23
    116:25 124:2
publicly 135:6
pull 13:22 61:15
    71:8 83:19 93:6
    95:1 96:5

138:10 148:13
157:15 159:15
163:22
pulled 94:20
    112:1 158:16
pulling 147:11
purpose 76:22
purposes 117:8
    166:19
pursuant 149:8
    169:16
pursued 45:23
put 41:6 51:24
    52:18 65:7
    66:19 85:13
    152:15
p.m 2:18 5:14
    43:20 120:11
    120:13,15,17
    139:14 147:2,4
    147:6,8 165:11
    165:13,15,17
    166:12 167:3
P.O 3:12

## Q

QRP 85:3 101:14
qualified 74:10
    81:20,24 84:20
question 7:11
    10:20 11:9,15
    11:22,23 19:12
    20:23 32:17
    33:20 44:17
    45:3 48:16
    49:25 56:10
    58:7 60:13 63:6
    77:10,18,19,21
    85:20 86:5 88:1
    88:17,18 91:16
    91:19 100:3
    114:25 122:8
    126:18,20
    128:6,8 136:9
    148:9 156:12
    156:14 158:9



questioning 11:8
  11:12 120:21
questions 10:21
  11:2,6 12:1
  15:2 39:10 55:1
  55:7 81:7 96:10
  97:9 99:19
  119:24 148:20
  148:21 164:22
  165:9,20 166:6
quick 43:11
quickly 86:4
  155:4,23
quit 58:3
quite 70:1 125:2
  129:15
quote 63:25
  65:21 66:25
  122:23,23
  126:12,21
  139:13 140:1
  143:4 147:21
  149:4,7 161:8
  161:12
quotes 51:24

**R**

raise 59:21 62:16
  66:8 154:9,17
raised 113:1
raising 66:18
Ramirez 104:17
  113:18 118:7,9
Ramos 17:10
  18:17 20:13,20
  21:6 28:22,23
  29:4,18 37:24
  38:7 100:24
  132:23 143:3
  165:22
range 33:25
rape 163:19
  164:9
rare 81:9
rates 67:10,12
reached 35:9

read 64:11 65:24
  67:6,17 69:10
  70:14 71:18
  77:19 91:18
  120:25 139:13
  140:2 143:10
  147:22 149:4
  149:17 156:13
  166:23 168:2
ready 78:10
  97:16,17,24
real 162:23
reality 41:15
really 26:6 28:23
  36:9,17,18,20
  39:22 40:25
  42:8,12 43:1
  45:11 47:5
  48:22 66:15
  68:18 77:15
  90:19 91:5 94:2
  96:1,10 137:23
  141:13 143:21
  144:15 145:24
  151:2,19
  153:15 154:12
  155:16 158:25
  162:5,5,5,15,16
  162:18,18,24
  163:10,15
reason 12:12
  63:11 98:20
  102:13 129:23
  130:1 135:13
  148:10 170:6,9
  170:12,14,17
  170:19
reasons 157:1
Rebecca 36:6
recall 10:6 16:15
  19:17 28:3
  37:12,15,18
  38:17 59:10,15
  59:17 60:24
  61:19 69:20
  70:21,25 71:3,6

80:19 118:12
  122:11 125:22
  126:4,7,9,11
  134:10,11
recant 35:15
receipt 14:12
receive 23:20
  80:13 96:18
  138:2 154:10
received 60:6,12
  60:15 70:22
  96:24 97:7
  152:1 156:7,8
  156:18,19
receiving 88:10
  107:24 133:5
receptionist
  115:18
recognition
  143:6
recognize 62:11
  62:14 72:6 98:3
  98:5,7,9 139:6
  148:16
recollection
  124:22 160:21
record 5:8,22 6:9
  9:4 20:1 21:11
  43:21 44:2
  82:22 83:3
  120:6,12,18,25
  134:6 135:10
  135:15,16
  146:25 147:3,9
  165:12,18
  166:14,17
  167:2 170:6
recorded 134:19
  135:4
recording 133:23
  134:21,22
  135:5
recordings 134:9
  135:1
recount 48:5
recruit 38:24

41:13 139:18
recruited 44:11
recruiting 151:12
recruitment
  150:21
redirect 165:3
redo 41:14
redress 21:23
  31:21 32:19
  33:5,16
redressed 32:23
reduce 121:21
refer 21:11 34:2
  45:19 75:10
  122:22 127:10
  143:16 155:13
  165:23
referenced 47:2
  92:4 124:20
referral 75:9
referrals 154:10
  155:13
referred 31:12
  80:4 81:17
  125:6
referring 127:11
  127:25 128:2,3
  129:18 134:16
reflect 41:15
  88:14
refresh 124:21
refugee 29:8,9,16
  50:11 67:15,16
  142:6 145:4
refugees 64:9
  65:19,22 70:13
refusal 33:1,3
refusing 149:13
  161:9
regard 15:22
  92:21
regarding 10:4
  10:10 15:19
  120:22 150:2
Regina 104:17,19
  104:23 113:18

registration
  68:23
regular 26:12
  111:21 113:13
regulate 10:11
regulatory 113:3
reinvent 147:17
reinventing
  143:4
reiterate 150:11
relate 12:2
related 92:6
  108:9 113:9
  117:21 119:5
  169:20
relationship
  164:18
relationships
  145:14 164:6,7
release 7:22 74:6
  74:23,25 75:12
  75:16,23 76:5
  76:23 77:1,12
  77:23 79:4,8
  84:18 102:3
  103:1 119:14
released 75:2,7
  75:10
remained 80:2
remaining 132:5
remember 9:22
  10:9 16:17 20:2
  27:1 28:5 29:13
  33:8 34:5 35:22
  36:1 39:20,23
  44:25 45:10
  58:17 59:14,18
  61:1,3,10,12
  63:14,15,16
  65:7 67:21
  125:25 129:23
  130:9 132:24
  134:14 142:5
remembered
  63:14 71:1
remembering



16:20 19:23
25:14 36:16
129:17 133:20
135:8 158:18
**remote** 143:8
145:5
**remotely** 5:15
169:7
**removal** 78:24
**removed** 35:4
80:1
**renamed** 29:12
**render** 169:12
**renewal** 10:4
**repaired** 162:13
**repeat** 7:11 62:21
89:13 91:15
156:12
**repeated** 126:18
**rephrase** 50:24
55:15 73:5
87:20 122:7
**report** 8:1
**reported** 1:23
169:7
**reporter** 2:19
5:19,23 6:12
8:15,19 11:3
61:17 120:5
121:3 123:6
127:21 146:22
157:17 166:15
166:21 167:1
169:3
**reporter's** 169:1
169:12
**reporting** 117:18
**reports** 46:9 61:2
132:19
**represent** 23:8
24:19 62:1 73:6
75:3 82:1,3
96:9 116:19
**representation**
21:21 25:23
30:3,12 31:20

32:11 41:2 49:9
75:11 78:25
84:18,18
150:18 155:23
**representations**
79:6
**representative**
14:15,19 74:11
81:20,24 84:21
104:24 113:20
114:16 135:2
**representatives**
86:2,14
**represented** 68:3
126:1
**representing**
70:13 123:17
126:5
**request** 5:16
11:22
**requested** 4:17
169:18
**requests** 33:4
166:3
**required** 8:22
57:21 150:18
**requires** 31:6
151:2
**residents** 24:8
**residing** 40:9
**resource** 49:7
90:5 154:15
**resources** 57:22
58:3 88:15 93:7
93:14,21 94:13
94:16,20,22
96:4 113:9
115:1 118:18
119:6 150:2,20
151:9,17 152:2
152:7,14,22
153:3,6,19,25
154:8,21 155:5
155:11 157:14
161:19,21
163:9

**respect** 94:6
112:2 154:4
155:19
**respond** 21:17
135:25 151:3
157:6 163:22
164:8
**responded** 130:4
**respondents**
75:10
**responding**
152:22
**response** 19:20
47:21 92:13
130:6 142:13
**responses** 20:4
124:17 150:1
153:9
**responsibilities**
7:16 104:23,25
106:3 113:11
114:20 118:22
**responsibility**
29:14 76:3
163:12
**responsible**
85:25
**responsive**
144:10
**rest** 44:23
**restrictions**
144:14
**result** 163:16
**resumed** 43:24
82:25 120:15
147:6 165:15
**retained** 84:17
**return** 4:10,15
24:14,16 53:12
53:21 72:10
73:12 153:13
160:12
**returned** 35:15
**returns** 88:2
**reunification**
7:24 74:12,17

79:10,18,23
80:14,23
103:20 110:8
110:14,17
111:25
**revenue** 98:14
158:1,4,13
159:7,10
160:16,19,20
161:1
**revenues** 98:12
**review** 20:5,8,10
21:6 62:9 71:16
71:24,24 96:9
96:17,23 97:15
97:20,23
138:17 148:19
148:22,25
149:1 159:19
159:21 160:2
169:17
**reviewed** 14:12
17:14,17,20
18:20,25 19:7,8
19:10,13 98:6
124:15 148:9
**reviewing** 138:13
**re-read** 77:21
91:19 126:20
156:14
**Ricardo** 91:3
114:9
**right** 13:20 18:10
18:21 25:18
26:25 33:6 37:3
37:13 40:2 41:9
44:15 46:18
47:15 48:17
50:10 57:3,10
60:24 61:10,12
65:24 67:6,17
69:10 70:14
73:22 75:24
79:4,10 81:2
90:22 94:18
125:12 131:7

134:10 135:8
135:22 136:1
139:10 143:2
143:10 144:8
144:13 147:22
149:17 150:15
152:21 153:13
158:17 160:4
160:22 161:17
164:1,20
165:24
**rights** 7:25 21:23
22:22,24 23:18
27:4 28:20,24
29:6,19 31:15
31:22 32:18,19
32:23 33:9,11
33:14,19 39:17
45:10 47:17
49:18,20 50:2,6
50:12 51:10
64:23 65:18,21
66:1 95:12
101:15 102:6
102:25 103:21
104:11 105:13
106:5,22,24
107:14,25
108:15 109:1
109:14,18
110:19 111:3
111:21 113:13
114:8 115:13
117:3 119:15
119:17,20
130:6 139:24
141:4 142:10
143:6,13,15,17
143:21,24
145:18,19
148:1
**Rios** 101:17,18
101:25 102:1
**Rising** 61:8
**risk** 95:5 151:1
152:13



MAGNA
LEGAL SERVICES

**Robert** 59:6 88:5
90:14 91:1 92:3
136:17 137:16
158:22,23
**robust** 153:10
**Rodriguez** 1:24
2:19 5:20 169:2
169:24
**role** 7:9,14,18
28:21 29:2,3
41:23 101:7,20
101:23 102:11
103:10 104:13
105:17 106:10
107:2,3,6,19
108:22 110:1,3
110:11,16,23
111:8,11
112:12,14
113:23 114:12
114:15 115:5
116:13 117:15
117:25 118:3
118:13
**roles** 26:23 28:13
28:19
**room** 137:17
163:3
**Rosa** 115:2
**round** 100:18
**Rule** 14:5
**ruled** 11:13
**rules** 10:19
**run** 74:12
**running** 86:6
132:25
**runs** 116:16
**R-E-G-I-N-A**
104:19
**R-U-Z** 6:14

———————
**S**
———————
**Safety** 65:22
**salaries** 52:1 59:3
66:16 100:16
**salary** 70:12,18

100:19 109:4
**Salazar** 102:8,9
**Salazar's** 102:23
**San** 1:3 2:3 7:23
22:14 24:23
26:11,21 28:1,4
37:7,13 73:21
74:3,5 76:3
78:14 81:19,22
82:7 83:10
94:24 102:2,4,5
111:2,18,20
119:13,17,21
127:13 128:11
129:1
**satellite** 22:17
**saw** 31:1 34:8
35:24 37:16
88:2 123:15
128:18
**saying** 26:19 36:2
44:24 83:17
130:9
**says** 15:13 63:25
65:18,21 66:25
67:3,14 69:7
70:5,11 72:17
72:23,24,25
100:9,23
101:17 103:25
108:4 109:3
143:4 147:15
149:7 160:16
160:18
**scale** 30:25
**school** 54:7
**schools** 145:14
145:15
**scope** 54:16
59:25 60:12
77:6,13 79:14
79:19 87:18
96:10 122:24
123:8,9 138:9
**screen** 42:9
**screened** 53:12

**screening** 21:20
30:10 31:19
41:15 44:12
131:15 133:4
151:23
**screenings** 23:5
30:10 39:9
**scroll** 16:1 62:5
71:14 142:23
146:14 149:3
157:22
**scrolling** 63:23
**se** 27:5
**second** 4:14
17:17 19:3,18
19:21 25:22
27:1,23 35:22
39:22 63:23
71:9 72:13,23
97:18 131:5
139:9 142:24
148:14 149:5
161:5 165:1
**seconds** 97:11
**Secretary** 1:8 2:7
3:8
**secure** 114:24
**Security** 1:8 2:8
3:8
**see** 8:1 14:10
15:12 16:2
19:18 26:21
31:1 34:17
35:20 37:23
40:11,20 42:2
43:16 46:17
58:16 61:3 67:1
117:6 139:23
164:13
**seeing** 37:18
95:25
**seek** 21:23 31:21
32:6 33:16
34:19 35:1,6
36:2 48:24
65:22 140:22

145:2,6
**seeker** 46:18
127:5 133:4
134:18
**seekers** 22:25
23:18 31:1,10
39:4 40:12,14
45:14 48:9
57:10,13,17
64:5 67:5 68:4
94:7 107:24
109:14 121:22
122:12 130:19
131:1,14,23
132:12,14
134:6 135:12
140:20 152:1
152:18
**seeking** 32:19
45:16 131:2
140:8
**seen** 14:8 35:3
37:24 95:23
124:10 159:24
**send** 89:7 116:5
142:9 144:23
145:10,15
**sense** 23:24 34:13
39:11 66:23
88:10 95:18
131:18 133:13
**sent** 14:11 35:16
62:15,22 63:5
64:20 65:12
67:23 138:25
139:1 158:17
**separate** 25:9
39:5 92:5
113:10 127:24
128:24 143:22
144:1
**separated** 79:25
80:10 153:11
**separately** 87:8
**separation** 80:9
**September** 106:1

**Series** 4:12
**serious** 95:5
152:9
**serve** 36:9 84:13
94:10 152:19
155:6,17
161:23
**served** 14:6
64:24 109:14
110:14
**service** 24:19
26:7 32:1 85:9
85:12 137:11
144:20 153:10
**services** 5:20
21:25 22:2,4,7
23:3 24:4,13
31:23,25 45:20
45:21,22 46:2
47:20 49:15
74:8 78:15,24
84:7,9,16 85:3
85:5 87:7,11
94:5 107:23,24
115:10 132:12
133:5 134:20
137:9,9,12
138:2 139:16
144:9 151:5,6
152:1,8,15
154:17 155:3
155:12
**serving** 38:1 68:4
79:24 154:23
154:25
**set** 13:21 35:12
46:22 66:12
90:9,11,17 97:9
113:16 121:20
133:15 169:6
**sets** 67:10
**setting** 68:1
154:5
**sexual** 84:3,5
87:13 154:14
**sexually** 162:8



shakes 11:4
Shane 105:22,23
  106:2
shape 142:13
sharing 146:11
sheer 95:25
SHEET 170:1
shelter 36:11
  68:10,11
shelters 23:17
  36:3,8,10
she'll 116:25
shift 41:1,5,11
  93:13,21
shifted 110:4,16
short 66:11 82:11
  82:15
shorthand 2:19
  169:3,8,10
shortly 140:16
shot 164:15
show 46:7,10
  124:24
showed 137:18
sic 139:17 148:21
side 35:9 128:17
  129:5 132:6
sides 21:21 22:8
  31:21 153:12
sign 42:20 166:24
significant
  150:19 161:1
similar 95:18
Similarly 155:7
simple 19:11
simply 153:19
single 44:25
  63:16
sit 102:20 125:1,4
site 138:7
situation 32:13
  48:21 144:10
situations 93:12
  93:15 94:14
  95:2 154:12
six 146:16

skill 113:16
skimmed 148:25
slipped 97:2
small 22:16
  60:23 71:18
social 22:1 24:19
  45:20 74:8
  78:23 84:11,16
  85:5 87:11
  116:16 137:10
  151:6 155:2
society 23:16
  60:22
Sol 3:23 5:18
  89:5,8
somebody 27:19
  27:22 28:13
  42:13 88:22
  94:9 122:25
  131:4
sorry 8:15,20,23
  9:23 10:9 15:20
  16:15 19:12
  27:20 33:5,9
  34:24 38:11
  59:1 61:17 63:1
  63:3 65:1,19
  69:17 70:7 73:5
  77:18 85:19
  86:12,23 87:9
  88:22 89:12
  92:18 97:1,18
  99:17,24 100:1
  104:18 118:8
  118:24 123:7
  129:8,22 131:6
  134:24 146:15
  158:10 162:1
sort 58:6 91:6
  94:8 99:8
sorts 41:10 94:15
sought 20:24
  132:12 140:22
sounds 24:3
  82:18 120:9
source 76:21

78:17 80:14
  92:1 102:18
sources 92:9
south 22:20
  73:22
Southern 1:2 2:2
  3:17 5:11
Spanish 25:22
  68:2
speak 38:18 47:5
  68:2
SPEAKER
  146:18
speaking 75:24
  147:13
special 68:18
specific 68:6
  71:20 76:21
  78:16 80:14
  84:2 100:10
  102:18 108:12
  115:20 119:13
  129:18,24
  135:15,16
  153:7 156:1,3
specifically 20:15
  20:25 39:20
  57:9,13 78:3,25
  87:1 93:3,9
  112:2 128:8,18
  136:10 137:15
  140:24 153:16
  155:21
specifics 161:20
specified 77:6
specify 30:8 60:8
  136:25
spell 6:11
spend 47:11 68:1
spending 73:8
spent 90:8
  136:11
split 29:9 42:23
  76:14 111:2
  119:17,20
spoke 16:23

spoken 17:10
  124:3
sponsor 75:8
spreadsheet 99:4
  133:8,15
spring 36:15
  75:14
stable 31:5
staff 6:25 7:6
  25:3 26:2,14
  27:4,20 29:1,2
  29:4,20 46:2
  51:16,24 56:6,9
  58:10 67:25
  76:9,11,17,21
  78:2 80:22,25
  81:8 88:20
  89:19 94:22
  95:1 100:23,25
  101:18,20
  102:9,11 103:3
  103:15,22
  104:1,24 105:5
  105:23 106:2
  106:15 107:17
  108:2,19 109:4
  109:21 110:2
  110:11,21
  112:7 114:10
  115:3,16
  116:10 117:10
  117:23 119:8
  119:12 123:24
  127:11,16
  128:15,18
  137:12 138:6,6
  150:19 153:25
  155:5,11
  163:22
staffing 90:5
  153:21
stages 41:3
stakeholder
  90:13
stamped 61:25
stance 48:18

standard 55:3
standing 166:19
start 18:23 22:10
  39:18 55:5 58:9
  60:3 65:10
  85:15 97:9
  105:9 128:21
  130:23 139:17
  143:12,13
  156:6,16
  161:18
started 30:5
  31:16 34:16
  36:15 40:17,25
  46:21 57:8,12
  57:14 58:1,20
  59:11 118:12
  122:13,17
  132:22
starting 139:10
starts 72:14
  99:12
state 6:8 12:25
  32:6 33:12
  41:19 67:9,12
  78:17 168:9
  169:3
statement 56:21
  77:17 79:19
statements 16:6
  34:23 129:16
States 1:1 2:1
  3:10 5:11 24:5
  24:8,11,14,17
  31:3,4 32:2,7
  32:12 33:5
  34:25 35:10,11
  40:13 48:25
  53:13,19,22,24
  54:1 65:22 80:2
  121:23 131:2
  142:9 153:14
  155:9
STATION 3:12
statistics 20:14
status 13:19 54:5



137:25
**stay** 163:10
**steering** 80:4,6
**stenographic**
5:22 8:15,19
120:5 123:6
146:22 166:15
166:21 167:1
**stenographically**
1:23 169:7
**Stephanie** 109:20
110:1,10
**steps** 44:22
**stick** 162:16
**stipulate** 121:1
**stipulation**
120:22,25
**stopped** 30:16
**strain** 151:8
**strange** 98:8,10
98:19
**strategies** 116:22
**strategy** 117:1
**stream** 51:25
**street** 3:4,18
164:15
**street-based** 84:7
**strength** 139:21
**stress** 152:12
**strike** 137:3
**structure** 57:5
75:22 85:17
**struggle** 42:12
92:25
**stuck** 42:4,14
151:6,14
**students** 38:25
145:15
**Studies** 142:6
145:4
**stuff** 28:2,15 40:3
54:2,6,7 68:8
69:1 85:6,7
113:4 119:4
158:22 163:7
**subject** 12:24

19:9 34:13
39:19 128:15
138:23 170:21
**subjected** 127:9
128:10
**submitted** 45:9
**subprogram/a...**
139:25
**subscribed**
169:22
**subsequently**
162:4
**substantial** 29:17
145:18,19
**substantive**
107:9,10
113:14
**sued** 13:2
**suffer** 164:2
**suffering** 152:11
155:10
**sufficient** 57:17
166:19
**suggest** 165:5
**suggested** 66:11
66:18
**suggests** 140:7
**SUITE** 3:18
**summary** 150:8
150:10
**summer** 103:8
**supervise** 7:20
148:3
**supervising** 76:4
86:1,11 101:7
101:11,24
102:1
**supervisors** 7:21
9:3,13,17 10:3,8
10:11,14
**support** 7:25
44:15 62:17
66:21 68:20
83:20 86:8
93:18,22
107:10 112:25

115:11 139:18
**supposed** 36:24
**sure** 7:3,5,13
16:21 18:2
22:10 27:1 34:4
34:11 36:4
38:14 40:21
41:17 44:23
46:2,13 51:1,19
52:6 55:1 58:12
60:1,21 61:6
63:21 65:15
66:24 68:15
70:24 71:22
72:4 73:13,17
74:23 76:2 77:9
78:11 79:23
83:15 85:2,9
86:25 87:20
88:23 91:17
97:1,13 98:18
100:10 102:15
103:7,8 104:4
105:8,9 108:6
108:23 112:22
122:4 123:12
123:24 124:5
127:19,20
130:7 134:9
137:2 141:22
147:17 148:16
149:2 151:23
159:25 160:1
165:7
**surge** 38:15
**surgery** 37:12
**surveillance**
13:16
**survivors** 84:3,4
87:13
**suspect** 164:24
**swear** 5:23
**switching** 119:12
**sworn** 6:2
**system** 30:22
31:7 34:22

35:24 41:25
44:14,15 46:22
54:1 121:24
150:22
**systematically**
153:25
**systems** 42:5
47:2,8

─────── **T** ───────

**T** 121:16 125:7
**tab** 64:13
**take** 11:4,19
27:17 33:14
42:18 43:11
62:4,7 71:15
73:21 82:10,11
83:14 116:6
120:7 124:23
128:7 138:12
155:15 159:19
160:1 164:25
**taken** 2:16 12:5
35:13 36:7
43:22 82:23
120:13 147:4
153:25 165:13
169:5,10
**takes** 10:20
153:24
**talk** 16:18 22:20
24:25 26:21
34:1 39:11
41:20,22 52:18
162:2
**talked** 89:25
119:11 136:15
136:18
**talking** 16:2
38:14 49:11
50:6,9 51:9
57:2,9 73:19
85:20 90:12
128:25 130:3
131:7 163:18
164:15,16

**tapered** 142:3
**tax** 4:11,15 72:11
73:12 88:2
113:3 160:12
**teach** 131:21
**team** 84:10
137:24 139:15
**teams** 143:8,8
**tech** 3:23 5:19
89:1,8 99:14
**technical** 126:15
142:6
**technician** 3:23
62:5 71:14
**technology** 7:2
**tell** 12:6 27:22,23
30:14 36:6
141:21
**telling** 32:7 40:2
**ten** 17:8 18:9
21:4 43:15,16
82:18 149:4,5
161:6 165:5
**tens** 71:2
**term** 30:23
121:17 151:13
**terminations**
119:2
**terminology** 8:23
41:18 123:25
**terms** 29:14
44:13 54:11
88:4,7 93:16
132:1
**terrible** 154:12
162:19 163:14
**testified** 6:3 8:4,7
8:10,18 9:7,10
9:12,20 38:16
136:16 157:25
165:22
**testify** 14:15
15:15,25 17:4
121:2 158:12
**testifying** 16:10
**testimony** 9:14



10:2,13 12:13
120:23 121:5,6
125:14 130:14
158:7 160:24
166:10 168:5
**text** 89:7
**thank** 6:15 10:17
11:10 16:7
43:18 44:5
50:25 83:7
96:22 97:14,25
105:2 166:8,23
**thanks** 97:1,6
**thereof** 169:22
**thing** 26:1 40:6
42:24,25 44:25
45:11 46:15
68:21 78:13
86:12 96:9 99:1
138:12 147:18
162:6
**things** 15:7 19:14
20:1,3 32:9
39:1 41:10,12
44:18 45:5 46:9
46:9 47:8 57:23
58:1 63:14
76:16 98:22,23
99:7 100:19
108:9 112:23
115:25 116:5
124:18 129:6
130:19 133:19
146:12 152:20
153:2,5,22
159:4 164:13
164:17
**think** 9:1 13:4
16:14,18 18:2,6
18:16 19:4,18
25:18 26:15,25
27:15,22 29:6,8
29:10,16 32:17
34:7,10 35:16
36:5,7,11,15
45:3,22 48:4,10

49:4,10 51:14
52:5 56:22,24
58:11,20,22,23
59:13 61:2,5,7
61:11 62:25
63:11,19 66:5
68:15 69:2,4,13
69:23 77:18
78:13 81:4,21
82:9 86:3,23
89:6 90:10 92:9
93:16 95:20
103:7 105:9
106:18 108:24
109:24 119:10
119:22 122:17
123:3 125:23
129:13 135:7
136:15 141:7
143:4,6 145:13
146:8 148:10
150:8 157:11
158:2,25 159:3
162:12,14,17
162:20 163:14
164:21,22
**thinking** 27:15
48:6 67:23
69:21 90:18
152:5 156:2,3
**third** 134:16
139:10
**thought** 17:12
45:4 66:13 77:3
**thoughts** 156:24
**thousands** 71:2
142:14
**thread** 4:13
138:23 139:6
**threatening** 35:1
**three** 9:25 13:13
22:12 23:16
38:23 65:3
96:11 100:23
100:24 120:6
**Thursday** 1:18

2:18 5:1,13
16:19,19
139:11,14
147:16
**Thursdays** 16:18
16:23
**Tijuana** 1:17
2:17 5:1 22:13
22:24 24:1,2,21
24:22,25 25:4
26:3,9,12,24
29:25 31:5,11
34:7 38:23 39:2
39:21 40:9 42:4
44:8,15 45:6,15
45:18,24 47:11
47:20 49:12,16
51:2,10 52:16
53:20 64:6,8
68:10 73:20
83:9,20 84:24
88:9 90:2 93:3
93:10 94:3,12
94:17 95:21
104:10 112:2
113:12 114:7
115:13 117:2,6
120:24 121:13
140:17 142:10
151:2,7,15
152:13 162:4
**time** 5:14 12:2
26:6 27:17 31:9
31:17 33:1,21
33:22,23 34:8
35:23 36:21,24
37:7 38:1,10,12
40:10 41:2,8
43:3,20 44:1
46:2 47:10,11
47:22 48:12
49:1 51:1,5,9
53:19 54:16
58:3 60:9 64:22
65:1 66:6,16
67:25 68:25

69:19 70:17
71:15 73:8,23
76:7,13 81:3
82:21 83:2,25
84:25 89:13,22
90:9 92:8 111:4
120:1,3,10,11
120:17 124:23
129:15,17,18
131:11 132:5
136:10 137:1
138:12,19
144:8,12 145:9
147:2,8 148:19
149:1 150:19
153:18 160:1
163:4,5 165:11
165:17 166:12
169:6
**timeline** 35:22
51:13
**times** 9:21,22
10:1 14:12
31:20 38:23
40:7 43:7
131:11 142:12
161:18
**tinkering** 43:8
**title** 6:22 7:2,3,6
72:19 103:22
104:25 108:4
108:23 109:3,6
110:3,7,16
**TJ** 90:23
**today** 5:13 11:12
12:2,6 14:25
15:3,16 17:5,13
21:12 85:21
91:8,20 92:18
92:20 125:1,4
143:16 144:12
166:9
**told** 36:3 40:23
129:3,9,11
**tolerance** 79:25
**tools** 151:23

**top** 61:10,12
65:18 98:18
133:20 138:25
139:9 163:7
**topic** 15:19,22,24
15:25 16:2
87:19 123:4
**topics** 15:13,16
20:24 21:1 77:3
77:7 123:8
**tortured** 164:14
164:16
**total** 59:15,17
100:8 142:1
158:1,13 159:7
159:10 160:16
**totally** 100:18
**touch** 10:14
150:11
**track** 31:7 47:4
117:18 150:23
**traffic** 12:15,18
12:21 13:5
**train** 41:20 145:8
**training** 30:19
131:20 145:3
146:10 150:21
**trainings** 145:6
**Tran** 3:23 5:18
**transcript** 166:17
168:3 169:9,12
169:15,18
170:21,23
**transcription**
170:8
**transfers** 112:24
**transition** 30:1
41:4 49:6,8
51:15 150:16
**transitioned** 7:3
7:5 142:2
**transitioning**
41:7 90:1
130:16 150:20
**translate** 25:22
**translating** 46:6



MAGNA
LEGAL SERVICES

46:8
**transportation** 108:7
**traumatic** 152:12
**trauma-inform...** 85:9,11
**travel** 13:17 68:20 75:8 114:7 127:16
**traveled** 104:10 113:12 128:16 140:20
**travels** 115:10,13 117:2
**trial** 5:18 13:20
**tried** 90:16
**trivial** 163:18
**true** 168:6 169:9 170:21,23
**trustees** 72:18
**truth** 12:6
**truthful** 12:13
**try** 11:6,19 34:20 39:10 44:24 45:1 46:6 49:3 57:1 66:8,12 75:2 90:17 92:5 96:3 97:4
**trying** 13:4 16:17 25:21 41:23 49:14 50:22 51:13,16 55:3 56:6,9 57:4 58:17 61:1 62:16 66:5 67:21 68:15 69:2 90:9,11 93:21 119:10 129:13 136:22 136:23 140:12 144:9 145:13 146:8 152:17
**turn** 34:21 71:4 154:22 155:13
**turnaways** 34:17 34:17 35:22

122:14
**turnback** 39:19 121:16,20 122:3,19,23 123:15 124:3 124:11,20 125:7,10 126:10,13,22 126:24 127:1,4 132:18 134:11 135:2 145:22 145:25 146:6 149:8 150:5,16 152:18 156:9 156:20 157:7 163:6
**turnbacks** 29:24 30:5 31:13 34:2 41:16,22 44:9 45:12 48:6,17 57:2,8,14 58:4 90:2,6 122:14 127:23 128:4 128:24 132:18 133:18 165:24
**turned** 35:18 40:16,22 45:8 45:15,17 65:1 127:6 131:17 132:4,15 133:6 140:21 142:14 150:25 151:14 153:22 162:3,8 164:11
**turning** 15:9 64:5 122:12 135:3
**two** 9:25 16:11 19:22 22:23 28:7 38:23 64:6 81:2,12 86:1,12 92:10 111:6 136:5 144:24 145:11 159:9 159:10 160:20 162:2,15 165:20

**type** 53:18
**types** 23:25 31:10 31:23 40:11 45:22 53:1 94:5 151:5
**typing** 63:1

---

**U**

U 53:14,18 85:6
**uh-huh** 17:3 18:11 63:9
**UIR** 86:18
**umbrella** 53:2
**Umm** 59:24
**unable** 90:4
**unaccompanied** 112:3 162:3
**unbinding** 169:11
**underpinnings** 61:6
**understand** 10:23 11:7,8,17 12:5,8 14:14 21:12 45:12 51:13 57:4 123:9
**understanding** 121:19 126:23 145:25
**Understood** 70:11 135:17
**undocumented** 64:9 84:1,3 137:12
**unfortunate** 90:3
**unfortunately** 154:15
**unfunded** 88:3
**Unification** 74:15
**uninsured** 84:1,3 137:13
**Unintelligible** 88:25
**United** 1:1 2:1 3:10 5:11 24:5

24:8,11,14,17 31:3,3 32:2,7 32:12 33:5 34:25 35:10,11 40:13 48:25 53:13,18,21,24 54:1 65:22 80:2 121:23 131:2 142:9 153:14 155:9
**unlawful** 13:16 149:9 150:5
**unlawfully** 64:5
**unsealing** 169:11
**upload** 47:7
**urgent** 95:4 137:17 152:9
**USCIS** 86:19
**use** 80:21 87:3 122:14 123:18 123:25 124:10 125:10,19 147:18
**users** 89:11
**uses** 34:20
**usually** 16:18,24 68:9
**utilities** 112:22
**utility** 108:6
**utilize** 143:19
**U.S** 5:16 10:15 21:22 23:14 24:10 25:17,19 26:3 29:11 33:17 34:22 37:2 47:18 48:18 54:3 57:18,20 121:24 122:22

---

**V**

**vague** 21:16 22:5 44:20 47:23 48:3 51:5 55:14 99:25 100:6 121:18 126:14

128:1 130:24
136:6 140:14
141:23 144:6
148:2 149:23
152:24 157:8
**Valerie** 1:24 2:19 5:20 169:2,24
**vast** 33:15 88:12
**vendors** 108:8 112:22
**version** 99:9
**versions** 132:21
**versus** 5:10 13:12 42:3
**victims** 154:13
**video** 3:23 17:2,8 18:10 21:4 134:3
**videographer** 5:7 5:18 43:20 44:1 82:21 83:2 89:10 120:11 120:17 146:20 146:24 147:8 165:11,17 166:12
**VIDEO-RECO...** 1:15 2:15
**view** 142:25
**violation** 32:25 33:14
**violations** 21:24 31:22 32:20,23
**violence** 84:4,4 87:14,14 137:21 154:14
**VIRTUAL** 1:15 2:15
**Visa** 53:17,18,18 53:22
**Visas** 53:14 85:6
**visit** 117:6
**visits** 23:20,20,25
**visual** 133:23,25
**voicemail** 116:7
**void** 169:13



**volume** 37:15
49:11 93:2,20
95:20,25
**volunteer** 27:9
28:16,25 29:19
38:2,25 40:6
53:15 68:18
88:20 106:6,7
109:9 131:21
142:10 145:11
145:16 150:21
**volunteered**
159:2
**volunteering**
142:11
**volunteers** 30:6
30:21 38:19
39:8 42:9,19
46:4 50:4 51:3
55:6 68:2,5,6
68:14 106:4
123:24 131:22
131:24 132:2
132:20 134:5
140:19 142:7
143:19 145:8
148:5 151:12
**volunteer-facing**
132:9
**volunteer-run**
64:2
**vs** 1:6 2:6 170:2
**vulnerable** 93:8
96:2 152:6
154:18 161:24

_____
**W**
**waiting** 95:21
**walk** 83:13
**WALTERS** 89:6
97:3
**want** 7:15 23:22
23:23 24:22
32:4,10 42:10
46:12 50:5,7,13
51:19 52:5,11

52:17 56:25
71:4,25 75:14
77:7 79:13
82:10,11 83:16
86:4 89:24
116:25 120:24
121:12 126:18
136:12 150:9
159:25 166:23
**wanted** 26:1
42:17,17 66:21
77:24 147:14
**WASHINGTON**
3:5,13,19
**wasn't** 35:19
36:8,19,20
39:25 41:5,8
48:12 49:6
55:24 65:2
90:17 123:23
128:2 141:6
158:1
**way** 11:7 46:25
50:23 66:7
72:22 73:18
88:16 92:19,20
93:5 94:9 98:10
100:5 123:10
130:4,22
136:20 141:9
144:4 154:24
157:14 164:3
164:20 169:21
**ways** 26:22 33:2
40:22 44:7
48:11 49:5
100:21
**Webex** 3:6,14,20
17:1
**Webster** 3:4
14:20,24 15:18
16:4 17:23 18:3
19:5 21:16 22:5
38:9,12 43:10
43:15,18 44:20
47:23 48:3 51:4

54:15,19 55:14
56:18 59:25
60:7 63:3 77:2
77:19 79:13
87:18 91:12
96:18,21,24
97:6,10,14,18
97:24 99:24
100:5 120:1
121:8,9,18
122:6,24 123:9
125:13 126:14
126:17 128:1
130:13,24
136:6,25 138:9
138:20 140:14
141:5,23 144:6
148:2 149:23
152:24 156:11
157:8 158:6,10
161:2,15
164:24 165:7
165:10 166:7
166:15,18,25
**week** 16:22 72:20
73:1,15 112:10
117:13 144:24
145:11
**weekend** 42:11
56:1 57:9
**weeks** 16:11
102:15
**welcome** 44:4
83:5 120:19
165:19
**wellness** 64:7
117:22,23
**went** 31:2 35:21
40:20 42:6,15
42:22 43:2
50:12 64:1
147:14 160:19
**weren't** 48:19
49:22 56:9 88:8
92:2 162:19
**we'll** 23:8 52:25

61:22 71:10
75:10 96:13
115:24 116:5
130:23 138:14
165:2
**we're** 16:2 23:14
43:21 44:2
49:11 50:5,9
57:2 77:4,15
81:16 82:22
83:3 93:13 94:3
94:4 95:2,25
96:1 97:24
120:12,18
131:7 144:9,12
147:2,9 154:11
154:13 163:3
164:8 165:12
165:18 166:14
167:1
**we've** 10:25
15:21 17:25,25
35:3 43:11
60:15 69:13
73:19 118:19
120:5 126:2
127:16 161:25
162:7 164:4
**wheel** 143:5
**WHEREOF**
169:22
**willing** 151:12
**window** 131:3,5
**winner** 155:8
**winners** 24:10
**witness** 5:24 8:22
9:5 14:22,25
16:1,5,10,13
17:5 18:2,5
19:10,13 21:18
22:6,11 38:18
47:24 48:4 51:6
54:18,21 55:9
60:1,8 62:8,25
63:4,9 71:17
72:1 77:24 78:9

82:15,20 88:22
89:12 91:15,24
96:12 97:16,21
100:1 120:3,7
121:2,3,5,19
122:25 123:12
125:17 126:19
126:23 128:2
130:16,25
136:7,9 138:18
140:15 141:6
141:16,24
144:7 148:3
149:18,24
156:22 157:9
157:11 159:17
159:20,24
160:3 161:3,17
169:22 170:3
**witnessed** 127:9
127:18,23
128:9,21,24
129:3 135:3
**WOLF** 1:7 2:7
3:8 170:2
**Wood** 59:6 88:5
90:14 91:1 92:3
136:17 137:16
158:22,23
**Word** 132:24
**words** 14:18
124:6
**work** 26:4 27:6
29:11 31:24
32:3 38:4,7
41:4,7 47:9
49:10 50:18,20
52:17,20 53:1,8
53:23 55:8 56:2
56:14 59:5
66:12,14 67:11
80:5 83:18,20
83:24,25 84:10
88:3,8,14 92:13
93:20 101:12
102:5 103:1



108:14,14
111:24 112:1
117:20 137:23
139:19 141:10
141:25 142:18
144:3,5,15,25
145:17,22
147:25 148:4
150:3 151:13
154:9 156:9,19
**worked** 37:25
38:6 84:16
104:7,8 110:13
120:22 142:1
**worker** 155:3
**workers** 84:11
**working** 30:20
36:5 37:8 45:5
46:5,21 47:6,11
49:20 50:1
54:13 55:6,22
74:18 76:22
81:5,6,9,14
84:23 85:8,11
87:4 88:7 90:22
91:2 94:25 95:9
95:16 132:4
141:12 143:8
147:20 154:13
**works** 26:15
27:12 28:1 43:9
74:21 76:6,16
111:5,18 114:6
115:9 119:19
**worries** 97:21
**worst** 162:24
**wouldn't** 15:9
38:3 46:19
57:25 63:22
66:3 98:16
113:11
**wrap** 165:9
**wraparound**
84:8,9 85:12
137:8,9 155:3
**write** 117:18

**writes** 143:3
**written** 63:16
**wrong** 101:3
118:17 125:16
130:10 140:10
**wrongs** 164:20
**wrote** 139:15
147:16
**W-2** 59:18

**X**

**X** 36:6

**Y**

**yeah** 9:2,5 16:13
18:5,5 25:17
27:18 28:18
32:17,21,21
37:10 38:18
43:7,13 47:10
47:13 49:13
50:24,25 51:6
52:8,9 58:16,22
58:22 63:15,20
65:4 69:4,23
70:6,20 73:23
73:25 75:20
76:10 86:16
89:14 91:4,17
97:10 98:11
99:5 100:5,16
102:10 129:8
130:21 131:10
141:15 142:21
151:16 157:22
158:21 164:12
**year** 38:23 103:6
142:1 159:7
160:13,22
**years** 45:1 81:2
90:19 98:22
**yep** 39:12
**Yesua** 118:21,23
**yes-or-no** 19:11
20:23
**Ysidro** 37:7,13

127:13 128:11
129:1
**Y-E-S-U-A**
118:21

**Z**

**zero** 73:1,15
79:25 100:9
**zoom** 72:13

**$**

**$3** 159:9,11
160:21
**$3,700** 59:20
**$30,000** 69:7,12
70:24
**$357,000** 158:2
**$357,500** 158:2
158:13
**$5,000** 67:14,19
**$500** 67:3,8
**$80,000** 70:12,16
**$9,599** 160:16,20

**0**

**0o0** 43:23,25
82:24 83:1
120:14,16
147:5,7 165:14
165:16 167:4

**1**

**1** 4:8 12:3 14:1
60:13 61:22
170:6
**1st** 54:17
**1:02** 43:20
139:14
**1:10** 43:17
**1:30** 120:10
**1:45** 120:15,17
**10,000** 93:4 95:21
95:24
**10:02** 43:22
**10:16** 43:24
**10:17** 44:1

**100** 16:21 58:12
76:6,10 81:10
103:6,8 125:20
**104** 71:9
**105** 72:13
**11/28/17** 4:9
**11:26** 82:21,23
**11:45** 82:25 83:2
**1101** 3:18
**12:04** 5:14
**12:57** 120:11,13
**12871** 1:25 2:20
169:25
**13** 25:5,6,15
26:24
**138** 4:13
**14** 4:8
**15** 52:25
**157** 4:14
**16** 16:4
**160** 4:15
**17** 120:6
**17TH** 3:18
**18** 1:18 2:18 4:2
5:1 170:4
**18th** 5:13
**19** 123:8
**1999** 3:4

**2**

**2** 4:9 61:22,23
170:7
**2nd** 129:22
**2:37** 147:2,4
**2:43** 147:6,8
**20** 123:9 168:9
**20006** 3:5
**20036** 3:19
**20044** 3:13
**2011** 52:17
**2014** 9:21 51:20
52:14,15,19,25
53:5 54:12
**2015** 7:8 9:21,25
53:5 54:10,12
**2016** 4:15 9:25

12:3 34:5,16
35:21 37:11
38:15 39:21
40:5 41:3 47:22
54:17 57:7
60:13 160:13
160:20
**2017** 4:11 7:1,4,7
35:25 41:3 43:5
51:22 54:22
55:11,18 56:5
56:17 57:25
58:11,13,21
59:12,13,18
62:16 64:1,19
65:11 67:24
72:11 85:16
87:16,23 88:17
88:19 89:17
91:10,23,25
92:12 98:14
137:2,5
**2018** 36:16 58:21
80:18 98:15
118:14 129:22
139:14 143:3
147:16
**2019** 75:14 98:13
103:8 104:4
105:8,10 106:1
106:18 109:24
109:24 129:22
158:17,20,24
159:7 160:22
**202.263.3221** 3:5
**202.307.8704**
3:13
**202.355.4471**
3:19
**2020** 1:18 2:18
4:2 5:1,13
105:9 106:19
169:23 170:4
**21** 123:9 157:22
**22** 99:12
**22nd** 99:14



**22830** 96:6
 157:16
**25** 96:8
**28th** 65:11
**287** 10:4
**287-G** 10:5

---
**3**
---
**3** 4:10 71:10,11
 170:8
**3rd** 158:20
**3:17-cv-02366-...**
 1:7 2:6
**3:19** 165:11,13
**3:35** 165:15,17
**3:36** 166:12
**3:37** 2:18 167:3
**30** 120:7 165:6
**30(b)(6)** 4:8
 13:23 14:5,15
 14:19 16:10
 17:5,16 77:7
 79:15
**30(e)(2)** 169:16
**32** 15:19
**36** 15:19 16:5

---
**4**
---
**4** 4:12 96:14,15
 157:16
**40** 73:15

---
**5**
---
**5** 4:13 138:14,15
 147:11
**5th** 169:23
**50** 67:16
**501(c)(3)** 25:11
**591267** 170:5

---
**6**
---
**6** 4:4,14 143:3
 147:16 157:18
 161:5
**6th** 139:11,14
**61** 4:9

**6980** 1:25 2:20

---
**7**
---
**7** 4:15 160:7,8
**705** 3:18
**71** 4:11
**7491** 61:16 62:1
**7498** 65:15,16

---
**8**
---
**80** 70:24
**868** 3:12
**8754** 138:11
 147:11

---
**9**
---
**9:03** 2:17 5:2
**91** 63:23
**96** 4:12

