1  ETHAN P. DAVIS
2  Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
   ALEXANDER J. HALASKA (IL 6327002)
7  ARI NAZAROV (CT 414491)
8  HAYDEN WINDROW (NY 4384749)
   DHRUMAN Y. SAMPAT(NJ 270892018)
9  Trial Attorneys
10 United States Department of Justice
   Civil Division
11 Office of Immigration Litigation – District
12 Court Section
   P.O. Box 868, Ben Franklin Station
13 Washington, D.C. 20044
14 Tel: (202) 514-4120 | Fax: (202) 305-7000

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
(San Diego)**

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO SEAL EXHIBITS FILED WITH DEFENDANTS' MOTION TO EXCLUDE** |
| CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | |

## INTRODUCTION

Defendants hereby respectfully request that the Court seal portions of exhibits filed with Defendants' motion to exclude Plaintiffs' proffered expert witness, Stephanie Leutert. There are compelling reasons to seal this confidential material. Specifically, Defendants ask the Court to seal: (1) portions of Leutert's merits report ("Leutert Report") (Exhibit 1 to Defendants' Motion to Exclude); (2) the transcript of Leutert's August 2020 deposition (Exhibit 2 to Defendants' Motion to Exclude); and (3) portions of the transcript of Leutert's January 2020 deposition (Exhibit 3 to Defendants' Motion to Exclude). The Court should allow portions of these documents to remain under seal to prevent public disclosure of information that could be used to circumvent or otherwise compromise law enforcement operations, threaten the integrity and security of ports of entry into the United States, and chill frank discussions that are crucial to agency operations and foreign relations. The Court should also seal portions of documents that reveal the identity of a whistleblower. Finally, the Court should seal the entirety of Leutert's August 2020 deposition transcript because it is presumptively confidential.

## ARGUMENT

Although there is "a strong presumption in favor of access to court records," a party seeking to seal judicial records can "overcom[e] this strong presumption by meeting the 'compelling reasons' standard." *Ctr. for Auto Safety v. Chrysler Group*, LLC, 809 F.3d 1092, 1096 (9th Cir. 2016). The presumption of access is "based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). Thus, when the documents to be protected are "more than tangentially related to the merits," parties must show compelling reasons to keep those documents sealed. *Heldt*, 2018 WL 5920029 at *1 (quoting *Ctr. for*

1  *Auto Safety*, 809 F.3d 1092, 1096–98). Courts have applied the compelling reasons
2  standard when determining to seal documents filed in support or in opposition of
3  motions to exclude expert testimony. *Whitewater West Indus., Ltd. v. Pac. Surf De-*
4  *signs, Inc.*, 2019 WL 1590470, at *2 (S.D. Cal. Apr. 12, 2019); *Moussouris v. Mi-*
5  *crosoft Corp.*, 2018 WL 2016851, at *1 (W.D. Was. Apr. 16, 2018).

6      Compelling reasons include "when [] 'court files might [] become a vehicle
7  for improper purposes,' such as the use of records to gratify private spite, promote
8  public scandal, circulate libelous statements, or release trade secrets." *Kamakana v.*
9  *City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). "In certain circum-
10 stances, courts have allowed the *government* to file under seal material that contains
11 confidential and sensitive government information that might endanger or under-
12 mine law enforcement's activities . . . where the government identifies the particular
13 harm that may result from the specific disclosure." *Music Grp. Macao Commercial*
14 *Offshore Ltd. v. Foote*, No. 14-CV-03078-JSC, 2015 WL 3993147, at *3 (N.D. Cal.
15 June 30, 2015); *see Hesterberg v. United States*, No. C-13-01265 JSC, 2013 WL
16 6057068, at *2 (N.D. Cal. Nov. 15, 2013) (finding compelling reasons to seal por-
17 tions of documents that could "empower criminal suspects who come in contact with
18 . . . officers because they will be able to predict the officer's actions.").

19     As shown below, Defendants' request to file law-enforcement-sensitive ma-
20 terials under seal satisfies the "compelling reasons" standard. This includes portions
21 of plaintiffs' expert report showing internal discussions that reflect operational de-
22 tails, information gathered from foreign partners, and candid internal assessments of
23 operations and policies. Defendants have submitted specific support to demonstrate
24 the harm that could occur if the information is disclosed, including threats to sound
25 operational decisionmaking, information-sharing, law enforcement operations, and
26 the security of the border. *See Am. Auto. Ass'n of N. California, Nevada & Utah v.*
27 *Gen. Motors LLC*, 2019 WL 1206748, at *1 (N.D. Cal. Mar. 14, 2019). The interest
28

in confidentiality thus far outweighs any interest in public disclosure of the information at issue. *See Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010). Moreover, because some similar information has already been filed publicly, the government has a *heightened* interest in keeping these documents confidential. The more law enforcement sensitive information that is disclosed to the public, the more that such information can be analyzed, pieced together, and utilized by hostile actors seeking to harm the government's operations. In other words, the risk of serious harm increases with each piece of sensitive information released. Thus, the government's needs have become even more compelling in light of the fact that other documents have been unsealed.

**I. Portions of Ms. Leutert's Report Warrant Sealing**

Communications with Mexico

Defendants respectfully request that the Court seal portions of the Leutert Report that "quote from CBP emails and other documents" that "reflect communications between the U.S. Government and the officials and NGOs in Mexico related to manage migration flows across the border." Foret Decl. ¶ 3. Specifically, Defendants seek to seal portions of paragraphs: 37, 40, 41, 43, 51, 53, 73, 76, 93, and 94, as well as footnotes 160 and 162.

Recently, the Court allowed redactions "related to communications from the Government of Mexico." ECF No. 510 at 9. Similarly here, the proposed redactions "reveal the recommendations, opinions, and reactions of various officials in both Mexico and the United States to the 2016 Haitian migration surge; requests for information and assistance from officials in both governments; and efforts to work together on efforts to manage the flow of migration." *Id*. ¶ 3. Public disclosure of this law-enforcement sensitive information would "stifle the willingness of officials in both governments, as well as non-governmental organizations in Mexico, to freely

share critical information . . . ." *Id.* ¶ 5. That would be harmful because "it is important that information be shared freely, quickly, and often" in order to "maintain[] a safe and secure border." *Id.* ¶ 4.

Accordingly, the Court should seal the relevant portions of the Leutert Report that would reveal the nature and content of communications between CBP and foreign governments and NGOs.

Capacity Information

The Court should seal the portions of the Leutert Report that "discuss and analyze several factors that reveal operational vulnerabilities about OFO operations," such as: "(1) the specific detention capacities of certain ports of entry along the southwest border, as well as an analysis of any changes in the detention capacity; (2) trends related to the percentages of holding capacities utilized by the ports of entry along the southwest border; (3) the specific numbers of individuals in custody at the ports of entry along the southwest border; and (4) San Ysidro's rate of processing." *Id.* ¶ 7.

The proposed redactions to Tables 2, 3, 12; graphs 3 and 4; paragraphs 80, 103, 105, 106, 109, 119, 125, 130 and 134; and footnotes 194, 220, 231, and 251-254 reflect the both actual and "percentage of capacity" various ports operated at over various periods of time, which can be used to exploit "operational vulnerabilities." *Id.* ¶ 11. Specifically, ports that are operating at a high capacity are "more vulnerable to outside threats, such as drugs, weapons, contraband, and individuals attempting to enter the port without inspection." *Id.* ¶ 12. Thus, revealing this capacity information provide a mechanism for hostile actors to take advantage of operational vulnerabilities. *Id.* ¶ 13. The proposed redactions here mirror information which the Court has already ordered sealed. *See* ECF No. 510 at 19 (permitting redactions to raw data contained in the daily MCAT reports that reflected details about capacity). Therefore, the Court should seal this information from public disclosure.

Tables 7, 8, 13, and 14 contain a compilation of the raw data that the Court has ordered to be sealed already. ECF No. 510 at 19. These tables, which show trends in utilized capacity over time, present serious risks to port operations if disclosed. Information that discloses these trends can be combined with other publicly available information and could be exploited by hostile actors. Foret Decl. ¶ 13. For example, a smuggling organization can use this information with publicly available seasonal migration trends to create a vulnerability. *Id*. ¶ 14.

Even though the information discusses trends and changes in capacity over time, public disclosure would still reveal "operational vulnerabilities that can be exploited" by bad actors. *Id*. ¶ 10. This data could be "cross-referenced with CBP's publicly available data on migration trends," which would then be used to determine whether the agency "may take steps to increase or decrease detention capacity at the POE in response to similar changes in the future." *Id*. ¶ 13.

Therefore, the capacity information referenced in the Leutert Report should be sealed.

Operational Plans for Addressing Migration Surges

The Court should also seal the following paragraphs and footnotes of the Leutert Report that discuss "contingency plans and efforts by CBP and DHS to plan for and address surges in migration, in particular the surge in Haitian migration in 2016 and the arrival of a caravan in April 2018:" 41, 42, 44, 47, 49, 51, 71, 112, 113, 115, and 116; footnotes 194 and 200. *Id*. ¶ 14.

Paragraphs 41, 42, 44, 47, 49 and 51 of the Report sets out specific steps that DHS and CBP took in responding to the Haitian migration surge, including developing and constructing a temporary processing facility. The report discusses "the reasons underlying that decision," as well as "operational details about the facility (such as the number of beds at the facility and the personnel and other resources required to operate the facility)." *Id*. ¶ 16. These operational details delve into the

5

specific reasoning contemplated by the agency in making certain decisions, as well as "the challenges DHS faced in developing and constructing the facility." *Id*. ¶ 17. This decisionmaking process would reveal how the agency may react to a similar surge in the future, which would thereby "provide hostile actors with a roadmap for how to potentially interfere in such a response." *Id*. ¶ 17.

Paragraphs 71, 112, 113, 115, and 116 relate to the April 2018 caravan, and the Leutert Report quotes from a DHS Integrated Concept of Operations (CONOP), "which is a contingency plan prepared by DHS officials in southern California." *Id*. ¶ 16. The information quoted and cited in the Leutert Report "provides specific operational plan that could be implanted in response to the arrival of a large number of individuals arriving at the border at the same time." *Id*. ¶ 16. As was the case with the 2016 migration surge, the Leutert Report goes into "specific detail about how DHS operators in Southern California anticipated responding to the arrival of a large caravan in their area, including specific trigger points that would lead to certain actions." If disclosed, individuals would have a blueprint of how CBP operations can be circumvented. *Id*. ¶ 18.

Paragraphs 138, and 139, as well as footnotes 194 and 200, of the Leutert Report discuss "specific contingency trigger points for the ports of San Ysidro and Laredo, as well as efforts by CBP and ICE to adjust the typical methods by which aliens are process, in response to a surge in migration in the summer of 2019." *Id*. ¶ 17. These sections explain "the specific factors that triggered the implementation of the port of San Ysidro's Mass Migration plan," as well as a "specific timeframe under which the port of Laredo would implement additional processing alternatives." *Id*. ¶ 20. The details also outline the concrete steps that CBP and ICE took in response to the surge, which would provide hostile actors with the government's playbook on how it may respond to similar operational situations. *Id*. ¶ 20

Because the redacted material "reveal[s] specific, concrete vulnerabilities in

DEFS.' MEM. IN SUPPORT OF
MOT. TO SEAL

1  CBP's operations caused by a surge in migration," ECF No. 510 at 10, the Court
2  should seal the information from public disclosure.

3  Operational Details Regarding Limit Line Positions

4      The Court should seal table 4; paragraphs 90 and 100; and footnotes 131 and
5  186 of the Leutert Report, which "discuss[] the location and staffing of OFO's 'limit
6  line' position at several ports of entry along the southwest border." Foret Decl. ¶ 21.
7  The report describes "the location at which officers staffing the limit line during
8  queue management at the San Ysidro, Otay Mesa, Calexico, Nogales, El Paso, La-
9  redo, Hidalgo, and Brownsville POEs stand, and how far away those officers are
10 from the physical border between the United States and Mexico." *Id*. ¶ 21. These
11 paragraphs also provide information about the number of officers assigned to staff
12 the limit line position at the Eagle Pass and Laredo POEs. *Id*. ¶ 21.

13     The Court already determined that there was "compelling reason" to seal in-
14 formation about "the layout of the pedestrian limit line at certain POEs and instruc-
15 tions for referring to migrants to other POEs if capacity is reached." ECF No. 510 at
16 13. Similarly here, the details would "jeopardize officer safety and the safety of trav-
17 elers approaching the limit line," Foret Decl. ¶ 22, as well as the safety of the entire
18 POE. *Id*. ¶ 23. Bad actors would be able to use this information to plan and then
19 execute operations to "evade detection." *Id*. ¶¶ 22, 23.

20     Accordingly, the Court should order this information to be sealed.

21 **II. The Court Should Seal Information that is Subject to the Parties' Discov-
22 ery Dispute**

23     The Court should seal portions of paragraph 115 and footnote 200 because
24 they discuss the contents of documents that are currently subject of Defendants' Rule
25 72(a) objections that are currently pending before the Court. In her May 1, 2020
26 order, Judge Crawford already determined that references or quotes to AOL-DEF-

27
28      7

00024873, AOL-DEF-00028469, and AOL-DEF-00050247 should be sealed because they are subject to the deliberative process privilege. ECF No. 446 at 8. Defendants also filed a response in support of Plaintiffs' motion to seal portions of their opposition to the Rule 72(a) objections that reference these documents. *See* ECF No. 472.

Accordingly, the Court should seal paragraph 115 and footnote 200 of the Leutert Report.

### III. The Court Should Seal References to the Identity of a Whistleblower

The Court should seal portions of the Leutert Report and the January 28, 2020 deposition transcript that refer to the identity of a whistleblower. The Court has already ruled that there is good cause to protect the whistleblower's name from disclosure. ECF No. 510 at 21. Accordingly, the Court should seal this minimal part of the deposition transcript.

### IV. The August 2020 Deposition Transcript Remains Confidential at the Time of this Filing

The Court should seal the August 2020 deposition transcript because it is Protected Material pursuant to the Protective Order entered by the Court. The entire deposition transcript "shall be treated as protected material" "until 30 days after the receipt of the transcript by both parties." ECF No. 277 at 6. Leutert's deposition took place on August 11, 2020. The 30-day time period has not yet run. Defendants do not intend to designate any material confidential, but Plaintiffs may yet do so.

Accordingly, the Court should order the entire transcript sealed until such a time that confidentiality designations can be provided.

### CONCLUSION

For the aforementioned reasons, the Court should seal the referenced material found in the exhibits filed with Defendants' motion to exclude Plaintiffs' proffered expert.

Dated: September 4, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

SAMUEL P. GO
Assistant Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4281| Fax: (202) 305-7000
dhruman.y.sampat@usdoj.gov

*Counsel for Defendants*

9

DEFS.' MEM. IN SUPPORT OF
MOT. TO SEAL

# CERTIFICATE OF SERVICE

No. 17-cv-02366-BAS-KSC

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: September 4, 2020

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4281| Fax: (202) 305-7000
dhruman.y.sampat@usdoj.gov

*Counsel for Defendants*