ETHAN P. DAVIS
Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation – District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV (CT 414491)
HAYDEN WINDROW (NY 4384749)
DHRUMAN Y. SAMPAT (NJ 270892018)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
**(San Diego)**

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE TESTIMONY OF STEPHANIE LEUTERT** |
| CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | Hearing Date: October 19, 2020 |
| | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................1

    I.   Legal Standard under *Daubert* .................................................................2

    II.  Leutert is Unqualified to Serve as an Expert on CBP's Capacity to Process Individuals Without Documents Sufficient for Lawful Entry to the United States ........................................................................................4

    III. Leutert's Flawed Methodology Warrants Striking Her Testimony ..............9

CONCLUSION ...................................................................................................12

# TABLE OF AUTHORITIES

**Cases**

*A.B. v. Cty. of San Diego*,
   2020 WL 4430971 (S.D. Cal. July 31, 2020) ................................................ 2, 3, 4

*Allen v. Am. Capital Ltd.*,
   287 F. Supp. 3d 763 (D. Ariz. 2017) ........................................................... 11, 12

*Amador v. Sikorski Aircraft Corp.*,
   2017 WL 4922814 (S.D. Cal. Oct. 30, 2017) ....................................................... 5

*Crowley v. EpiCept Corp.*,
   2015 WL 13827908 (S.D. Cal. Mar. 11, 2015) .................................................... 8

*Daubert v. Merrell Dow Pharm.*,
   43 F.3d 1311 (9th Cir. 1995) ..................................................................... 3, 4, 11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 .................................................................................................. 2, 3

*Estate of Barabin v. AstenJohnson, Inc.*,
   740 F.3d 457 (9th Cir. 2014) ........................................................................... 3, 9

*Henricksen v. ConocoPhillips Co.*,
   605 F. Supp. 2d 1142 (E.D. Wash. 2009) ....................................................... 9, 12

*In re Hanford Nuclear Reservation Litig.*,
   894 F. Supp. 1436 (E.D. Wash. 1995) ................................................................ 11

*In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices and
   Products Liability Litigation*,
   978 F. Supp. 2d 1053 (C.D. Cal. 2013) ............................................................ 5, 8

*Smith v. Pac. Bell. Tel. Co. Inc.*,
   649 F. Supp. 2d 1073 (E.D. Cal. 2009) .............................................................. 11

*Jinro America Inc. v. Secure Investments, Inc.*,
   266 F.3d 993 (9th Cir. 2001) ............................................................................... 9

*Gen. Elect. Co. v. Joiner,*
   522 U.S. 136 (1997) .................................................................................... passim

*LeClercq v. The Lockformer Co.,*
   2005 WL 1162979 (N.D. Ill. Apr. 28, 2005) ....................................................... 11

*Maricopa Country,*
   2010 WL 1381338 (D. Ariz. Apr. 6, 2010) ........................................................... 5

*Metabolife Int'l, Inc. v. Wornick,*
   264 F.3d 832 (9th Cir. 2001) ................................................................................. 4

*Moussouris v. Microsoft, Corp.,*
   311 F. Supp. 3d 1223 (W.D. Wash. 2018) ........................................................... 11

*Obesity Research Inst., LLC v. Fiber Research Int'l, LLC,*
   2017 WL 1174756 (S.D. Cal. Mar. 29, 2017) ............................................... 5, 6, 7

*Thomas v. Newton Int'l Enters.,*
   42 F.3d 1266 (9th Cir. 1994) ................................................................................. 5

*United States v. Adams,*
   444 F. Supp. 3d 1248 (D. Or. 2020) ................................................................... 11

*United States v. Rincon,*
   28 F.3d (9th Cir. 1994) .......................................................................................... 4

**Statutes**

8 U.S.C. § 1232(b)(3) ................................................................................................. 7

**Rules**

Fed. R. Evid. 702 ........................................................................................... 3, 4, 12

**Regulations**

6 C.F.R. Part 115 ........................................................................................................ 7

# INTRODUCTION

Plaintiffs' proffered expert witness, Stephanie Leutert ("Leutert"), is a lecturer on Central American and Mexican migration policy at the University of Texas at Austin and has been accepted into the Ph.D. program in Public Policy. She lacks the necessary expertise to opine on the multi-faceted governmental operations and missions of various ports of entry along the southwest border, and how those multi-faceted mission sets impact U.S. Customs and Border Protection's capacity to process individuals without documents sufficient for lawful entry at ports of entry on the southern border. She does not have any educational background in public administration, organizational staffing, or law enforcement administration. Her professional background is devoid of any governmental experience, law enforcement experience, or experience with detention or other administrative capacity issues in any context. Her personal fieldwork and experience does not even include visiting the San Ysidro or the Otay Mesa Ports of Entry, which are critical to this litigation. Her lack of expertise alone is grounds for disqualification.

Additionally, Leutert's testimony should be struck because of its flawed methodology. She conceded that her data and conclusions only required her to look at information related to the physical capacity of ports of entry and the processing of individuals without documents sufficient for lawful entry, while disregarding various relevant data points reflecting how other operations at the ports of entry and multiple missions impacted its ability to process such individuals. This selective use and application of data seriously undermines the reliability of her methodology, and therefore, her proffered opinion.

Accordingly, Defendants respectfully request that the Court exclude Leutert's testimony.

# ARGUMENT

Leutert purports to be "an expert on the practices of U.S. Customs and Border

Protection ("CBP") officers and supervisors, in particular, those assigned to the Office of Field Operations ("OFO"), with respect to asylum seekers who are in the process of arriving at ports of entry ("POEs") on the U.S.-Mexico border from January 1, 2016 to the present." Ex. 1 at 2. But Leutert lacks the requisite knowledge or experience to opine on operations of CBP at POEs across the Southern Border. She has never worked for any U.S. government agency, let alone CBP, in any capacity, nor does she have any academic or professional experience that would give her insight into how CBP manages its detention space or its various mission priorities. While she has been inside several POEs at both primary and secondary pedestrian processing, her knowledge of OFO operations is limited to such primary and secondary inspection of pedestrians. She admits, for instance, that she has never spoken with anyone in OFO at any of the POEs she has traveled through about the operations at those POEs. This lack of knowledge presents a fatal flaw to her qualifications to provide the proffered expert opinions concerning CBP's capacity to process individuals without documents sufficient for lawful entry.

Further, Leutert's opinions are based on flawed or unexplained methodology, nor has her methodology been subject to peer review. She disregarded critical data that reflected CBP's operations, which impacts CBP's ability to process individuals without documents sufficient for lawful entry. She also admitted that the methodology employed in her report has not been subject to peer review. Finally, she did not calculate the margin of error in her calculations despite knowing one existed. Individually, these issues are problematic, but collectively, they fully undermine the reliability of Leutert's opinions. Accordingly, the Court should exclude her testimony.

I. **Legal Standard under *Daubert***

Plaintiffs bear the burden to establish by a preponderance of the evidence that: (1) Leutert is properly qualified to opine on the proffered matters; (2) her opinion is based on reliable methodology; and (3) her opinion would be helpful. *A.B. v. Cty. of San Diego*, 2020 WL 4430971, at *1–2 (S.D. Cal. July 31, 2020) (*Daubert v. Merrell*

1  *Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 & n. 10 (1993)). To establish suffi-
2  cient qualifications, Plaintiffs must show that Leutert has "scientific, technical, or
3  other specialized knowledge" that "will help the trier of fact understand the evidence
4  or to determine a fact in issue. *A.B.*, 2020 WL 4430971, at *1–2 (citing Fed. R. Evid.
5  702). To establish reliability, Leutert's opinion must be: (1) based on *sufficient* facts
6  or data; (2) a product of *reliable* principles and methods; and (3) the product of reli-
7  able application of the principles and methods to the facts at hand. *A.B.*, 2020 WL
8  4430971, at *1–2 (citing Fed. R. Evid. 702) (emphasis added). Helpfulness is deter-
9  mined by if Leutert's knowledge will "assist the trier of fact to understand the evi-
10 dence or to determine a fact in issue." Fed. R. Evid. 702.

11      To aid courts in exercising their "gatekeeper" role to the admission of expert
12 testimony, the Supreme Court has set out non-exhaustive factors to determine
13 whether an expert's testimony is reliable, which include: (1) whether the theory or
14 technique could be tested; (2) whether it has been peer reviewed or published; (3)
15 the known or potential error rate of the theory or technique; and (4) whether the
16 theory or technique has been generally accepted within the relevant scientific com-
17 munity. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014).
18 While *Daubert* focuses on the principles and methodology underlying an expert's
19 testimony, not on the experts' conclusions, 509 U.S. at 595, "conclusions and meth-
20 odology are not entirely distinct from one another." *Gen. Elect. No. v. Joiner*, 522
21 U.S. 136, 146 (1997).

22      A "very significant fact to be considered is whether the expert [is] proposing
23 to testify about matters growing naturally and directly out of research they have con-
24 ducted independent of the litigation, or whether they have developed their opinions
25 expressly for purposes of testifying." *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311,
26 1317 (9th Cir. 1995) ("*Daubert II*"). Expert testimony "based directly on legitimate,
27 preexisting research unrelated to the litigation provides the most persuasive basis for
28 concluding that the opinions [] expresse[d] were 'derived by the scientific method.'"

*Id*. Peer review is the chief way of satisfying this requirement, though it may also be met by precisely explaining how the experts went about reaching their conclusions and pointing to some objective source —a learned treatise, the policy statement of a professional association, a published article in a reputable journal or the like —to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field. *Id*. at 1318-19 (citing *United States v. Rincon*, 28 F.3d 91, 924 (9th Cir. 1994)); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001) (citing *Daubert II*).

### II.   Leutert is Unqualified to Serve as an Expert on CBP's Capacity to Process Individuals Without Documents Sufficient for Lawful Entry to the United States

Leutert does not have "scientific, technical, or other specialized knowledge" that "will help the trier of fact understand the evidence or to determine a fact in issue. *A.B.*, 2020 WL 4430971, at *1–2 (citing Fed. R. Evid. 702). Leutert claims to be "an expert on the practices of [CBP] officers and supervisors . . . with respect to asylum seekers who are in the process of arriving at ports of entry . . . on the U.S.-Mexico border." Ex. 1 at 2. She then offers opinions as to whether CBP's metering and queue management practices are "justified,"[1] opining that "there is no contemporaneous data" showing such justification, either because of a "lack of capacity," "a need to focus on other operational exigencies," or "a lack of capacity to detain asylum seekers in ICE custody." But Leutert clearly lacks the requisite qualifications to evaluate the existing data and opine on the operational justifications for CBP's practices. She does not have any educational or professional experience that would qualify her to

---

[1] For the purposes of her opinion, Leutert uses the terms "metering," "queue management" and "turn-backs" interchangeably. Ex. 1 at 3, n.2. Leutert assumes that "metering" and "queue management" are part of an alleged "turn-back policy," which Plaintiffs continue to claim exists, but Leutert offers no evidence or opinion to support this assumption. *Id*.

1  opine on OFO's short term detention operations and how managing such opera-
2  tions—which requires OFO to balance its limited resources to implement its multiple
3  priority missions, to deal with labor and employment issues, and to handle budgetary
4  constraints—relates to processing individuals without documents sufficient for law-
5  ful entry to the United States along the entire southwest border.

6  An expert's testimony is admissible "so long as [it] remains within the rea-
7  sonable confines of [her] subject area.'" *D.F. by and through Amador v. Sikorski*
8  *Aircraft Corp.*, 2017 WL 4922814, at *14 (S.D. Cal. Oct. 30, 2017) (quoting *Thomas*
9  *v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994)). The Court must still
10 find that the proffered expert has experience in the general area of the subject matter
11 upon which she is testifying. *Id*.

12 Leutert fails to "explain how [her] experience leads to the conclusion reached,
13 why that experience is sufficient basis for the opinion, and how that experience is
14 reliably applied to the facts." *In re Toyota Motor Corp. Unintended Acceleration*
15 *Marketing, Sales Practices and Products Liability Litigation*, 978 F. Supp. 2d 1053,
16 1067 (C.D. Cal. 2013) (quoting Fed. R. Evid. 702 advisory committee's note
17 (2000)); *see also Transwestern Pipeline Co., LLC v. 3.42 Acres, More of Less, of*
18 *Permanent Easement Located in Maricopa Country*, 2010 WL 1381338, at *2 (D.
19 Ariz. Apr. 6, 2010). Despite providing Leutert's credentials, Plaintiffs' expert dis-
20 closures "fail[] to explain how these qualifications will help the 'trier of the fact [in]
21 understand[ing] the evidence or to determine a fact in issue.'" *Obesity Research*
22 *Inst., LLC v. Fiber Research Int'l, LLC*, 2017 WL 1174756, at *3 (S.D. Cal. Mar.
23 29, 2017) (quoting Fed. R. Evid. 702). As this Court has previously held, this failure
24 to connect Leutert's qualifications to her opinions and expected testimony warrants
25 exclusion. *Obesity Research*, 2017 WL 1174756, at *3-4.

26 Rather, Leutert's credentials affirmatively show that she lacks any back-
27 ground that is relevant to assessing how many individuals CBP can process and hold
28

at a particular time at a specific port, including detention capacity, detention standards, competing mission priorities, and organizational staffing and resource allocation. Leutert has never interned with, advised, or worked for a state or federal government agency. Ex. 2, 12:3-13:7. She does not have an academic or professional background that would inform her opinions that relate to how law enforcement carries out various operations. *Id.*, 10:1-5. Leutert has not taken classes that would provide insight of the organization of a large government agency, the staffing concerns involved, or the budgetary considerations that it must undertake. *Id.*, 11:5-13; *see also* Ex. 3, 13:19-14:1 (discussing undergraduate coursework); 19:18-24 (discussing graduate coursework).

Leutert also has no background in governmental operations, let alone CBP operations. *See* Ex. 3, 14:2-6; 20:16-18. Leutert's professional and academic credentials reveal zero expertise in evaluating and assessing either short-term or long-term detention capacity *in any context*. Ex. 1 at 90. Nor does she have any expertise in evaluating or assessing how CBP or any governmental or law enforcement entity manages its resources, staffing, or other mission sets. Ex. 2, 11:14-12:2; *see also* Ex. 1 at 2-5 (listing her qualifications, which does not include any reference to background or knowledge in management or allocation of resources and staffing, to address administrative missions or obligations).

Furthermore, during her August 2020 deposition, Leutert acknowledged that she was not familiar with and/or never reviewed key CBP policies, as well as laws and other legal requirements of that impact operations at POEs. For example, she testified that is not familiar with the critically important CBP's National Standards on Transport, Escort, Detention and Search (TEDS), which govern CBP's interactions with detained individuals. Ex. 2, 29:12-19. TEDS sets out detention standards and policies, such as "[m]ale and female adult detainees will be segregated at all times when in hold rooms." U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention and Search*, at 15 (2015)

Case 3:17-cv-02366-BAS-KSC   Document 539-1   Filed 09/04/20   PageID.51201
Page 11 of 18

1 https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf. Nor is she familiar with the Prison Rape Elimination Act, Ex. 2, 30:14-16, which requires CBP to take certain steps to protect individuals in custody from sexual abuse in its facilities (including, for instance, that unaccompanied minors be held separately from unrelated adults). *See* 6 C.F.R. Part 115 Subpart B. She also does not appear to have knowledge of the significance of the William Wilberforce Trafficking Victims Protect Reauthorization Act (TVPRA), Ex. 2, 30:17-31:13, which requires CBP to transfer an unaccompanied alien child (UAC) to the custody of the Department of Health and Human Services within 72 hours of determining that the child is a UAC. 8 U.S.C. § 1232(b)(3). All of these requirements impact the number of individuals that CBP can safely process and hold in its facilities, and yet Leutert's report does not acknowledge these realities.

Leutert also acknowledged that she lacks knowledge about OFO's high-stakes mission sets and priorities. For example, she does not have any knowledge about CBP's counter-narcotics operations. Ex. 3, 79: 11-17. She lacks experience and knowledge about OFO's trade operations. *Id*., 81:12-82:12. She has never even spoken with any OFO officers, much less OFO managers, about the running of a POE. Ex. 2, 13:9-24:8.

Furthermore, although Leutert has observed certain aspects of metering from the point of view of migrants, Leutert's fieldwork at the border is limited in ways that are material to her ability to opine on CBP operations. For example, Leutert testified she has never been inside the San Ysidro and Otay Mesa POEs, *Id*., 13:9-11, *Id.*. 13:20-22, and she has only visited other ports in her personal capacity as a traveler. *See* Ex. 2, 14:1-5; 15:22-16:13; 24:9-17; (testifying that she has been to four POEs, but never beyond "pedestrian processing").

Leutert's lack of experience in port operations, or in *any* subject-matter area that is relevant to the aspects of port operations that may impact a particular port's capacity considerations, makes her unqualified to opine on CBP's operations at these

7
DEFENDANTS' MOT. TO EXCLUDE
PLS.' EXPERT TESTIMONY
Case No. 3:17-cv-02366-BAS-KSC

various ports. *See In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1067; *see also Crowley v. EpiCept Corp.*, 2015 WL 13827908, at *2 (S.D. Cal. Mar. 11, 2015) (questioning the expertise of an individual opining on the value of a drug patent because he had no experience or expertise as to FDA drug approval when the value of the drug hinged on FDA approval). She is unqualified to interpret and assess the import of data—whether it relates to physical capacity or other aspects of operations—and whether that data justifies it metering at any particular port of entry.

In *Toyota Motor Corp.*, the district court excluded the proffered testimony of Allan Kam, an attorney and consultant by trade, who opined that: (1) the National Highway Traffic Safety Administration's (NHTSA), Office of Defect Investigations had an institutional bias towards finding mechanical and driver error causes sudden unintended acceleration; and (2) the federal agency had not developed any "real expertise in automotive electronics which, together with its lack of staffing, regulation, and enforcement, undermine[d] its ability to examine the causes of [sudden unintended acceleration]." *In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1067. Although Kam's proffered expert opinion did not directly relate to the specific science of unintended acceleration, the district court excluded Kam's opinions regarding NHTSA's bias because Kam lacked the underlying expertise in automotive electronics to opine on NHTSA's record of decision-making. *In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1067.

Similar to *Kam*, Leutert fails to explain "how [her] experience … provides [her] with a sufficient basis under Rule 702 and *Daubert* to *reliably* opine" on CBP's operations. *Id.* at 1068 (emphasis added). She provides no basis that her experience working with migrants *south* of certain ports of entry, without conducting any fieldwork actually *in* a port of entry, makes her an expert on complicated and multifaceted government operations involving competing priorities such as detention, processing of cargo, preventing the entry of illicit drugs, and processing individuals for entry into the country. She provides no indication as to how her experience translates

into expertise on how CBP runs POEs.

Ultimately, the Court is tasked with ensuring that that a proffered witness is truly qualified before she is "cloaked with the mantle of an expert." *Jinro America Inc. v. Secure Investments, Inc.* 266 F.3d 993, 1004 (9th Cir. 2001). Leutert lacks the expertise to provide the proffered opinions, and therefore, the Court should exclude her testimony.

### III. Leutert's Flawed Methodology Warrants Striking Her Testimony

The Court should exclude Leutert's unreliable testimony because her methodology is flawed for numerous reasons, including: (1) she disregarded relevant data; (2) her methodology employed to reach her opinions has not been subject to peer scrutiny; and (3) she did not calculate the margin of error in her calculations.

It is the district court's duty to ensure that "junk science that does not meet [Rule 702]'s reliability standards" is excluded. *AstenJohnson, Inc.*, 740 F.3d at 463 (internal citation and quotation omitted). Therefore, a court must examine the "soundness of [the] methodology" employed by the proffered witness in reaching the opinions. *Id*. A court may exclude proffered expert testimony if it determines "'there is simply too great an analytical gap between the data and opinion proffered.'" *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1153–54 (E.D. Wash. 2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

In preparing this report, Leutert reviewed her field work over the last three years, which is based on "observations at [POE] metering practices;"[2]; "semi-structured interviews; and "review of primary documents such in this case were the asy-

---

[2] The Court should note that these observations are incomplete. She never visited or been inside the Otay Mesa POE. Ex. 2, 13:20-22. She has never been inside the Hidalgo POE. Ex. 2, 16:3-5. Therefore, Leutert never observed how these POEs operate differently from the ones that she has been to and how different operational constraints affect different ports.

lum waitlists." Ex. 2, 34:22-25; 34:5-10. She was then given questions from Plaintiffs' counsel and reviewed documents produced in discovery to answer those questions. *Id.*, 34:11-15. Her methodology presents three fundamental concerns.

<u>First</u>, Leutert ignored relevant data without scientifically-based explanation. During her August 2020 deposition, Leutert testified that she reviewed documents reflecting CBP's priority mission and how they are implemented. *Id.*, 44:13-45:10. She made the affirmative decision to disregard that data, because she "did not believe that it would be methodologically sound to include them because I could not link them to metering in the type of way I would have needed to, to have appropriate analysis." *Id.*, 44:13-20, 45:3-10. She testified, saying, "[s]o I used the only data that I had that would allow me to get an operational picture of what was happening, was metered, which was physical capacity data." *Id.*, 53: 23-25. Yet she does not explain in her report why those considerations—which CBP and DHS have stated are relevant to queue management, Ex. 4, 75:1-76:15—should not or cannot be linked to metering and why they are irrelevant. Although Leutert complains that "operational justifications" have not been quantified or tracked in a specific numerical form, Ex. 1 at 13, she does not provide any reason why they should not nevertheless be considered. And she lacks any relevant expertise or experience in such operational considerations to soundly make that determination.

By ignoring this relevant data and failing to adequately explain the reason for its exclusion, Leutert's methodology is devoid of any consideration of how various ports make staffing decisions regarding how to protect against national security threats. Ex. 2, 51:22-53:11. Her methodology also ignores staffing decisions regarding counter-narcotics operations. *Id.*, 53:12-54:11. Nor did she consider how the need to ensure economic security may affect staffing at a specific port. *Id.*, 54:24-55:14. She also set aside data that illustrated staffing and resource decisions made to facilitate trade and travel because the manner in which CBP collected that data was

not suitable to her model. *Id.*, 55:15-56-3. "This disregard of relevant data undermines the reliability of [Leutert]'s entire opinion in this matter." *LeClercq v. The Lockformer Co.*, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005). Exclusion on this ground alone would be appropriate. *Moussouris v. Microsoft, Corp.*, 311 F. Supp. 3d 1223, 1244 (W.D. Wash. 2018) (citing *Smith v. Pac. Bell. Tel. Co., Inc.*, 649 F. Supp. 2d 1073, 1096 (E.D. Cal. 2009)).

Second, Plaintiffs have not demonstrated that Leutert's methodology has been peer reviewed. Because the research Leutert conducted for purposes of the proffered expert opinions—which primarily involves Leutert's review of materials produced by Defendants in this case—is not independent of the litigation, Plaintiffs have to come forward with "objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *In re Hanford Nuclear Reservation Litig.*, 894 F. Supp. 1436, 1447 (E.D. Wash. 1995) (quoting *Daubert II*, 43 F.3d at 1317)). In other words, Plaintiffs must show that the methodology has been reviewed by the relevant community "for the purpose of detecting substantive flaws." *United States v. Adams*, 444 F. Supp. 3d 1248, 1265 (D. Or. 2020).

Leutert freely admits that the methodology she employed in her report has not been subjected to peer review. Ex. 2, 47:1-4. Leutert and Plaintiffs further fail to point to any authority to show the basis for her employed methodology or that it has ever been scrutinized when applied to this subject matter —the management of a complex operational environment. That alone seriously undermines the reliability of Leutert's opinions. *See Daubert II*, 43 F.3d at 1318-19 (stating that peer review is a strong indication that the expressed opinions were derived by the scientific method). The lack of evidence that her methodology has been reviewed "for the purpose of detecting substantive flaws" renders her testimony inadmissible. *Adams*, 444 F. Supp. 3d at 1265-66.

Third, the Court should also be troubled by Leutert's failure to calculate the margin of error in her analysis despite "the availability of statistical analysis." *Allen*

*v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 782 (D. Ariz. 2017). Leutert testified and admitted that there was a margin of error in her calculations based on the data she was provided. Ex. 2, 50:1-51:15. She specifically identified that there were instances in which the listed percentage of physical capacity utilized on a particular report did not match the calculation of that percentage. *Id.*, 50:21-25. Despite the "pretty basic calculation" to match reports to her calculated numbers, she did not calculate the margin of error in her analysis, which aggregated the data that she reviewed. *Id.*, 51:20-21. The lack of a calculated error rate, along with the other deficiencies, undermines the reliability of Leutert's findings and conclusions. *See Allen*, 287 F. Supp. 3d at 782 (concluding that the proffered expert testimony should be excluded because the analysis had "never been subject to formal testing and there [was] no known rate of error despite the availability of statistical analysis.").

In light of these shortcomings in how Leutert went about reaching her opinions, her testimony would not be helpful in the least sense. *See* Fed. R. Evid. 702 (requiring that the proffered opinion assist a trier of fact to understand evidence). Her opinions only muddy the water further because of these methodological flaws. These flaws, combined with her lack of expertise to opine on these matters, demonstrate that her conclusions are "connected to the underlying data 'only by the *ipse dixit* of the expert,'" and are, therefore, inadmissible. *Henricksen*, 605 F. Supp. 2d at 1153-54 (quoting *Joiner*, 522 U.S. at 146).

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court exclude Leutert's proffered testimony.

Dated: September 4, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

ALEXANDER J. HALASKA
ARI NAZAROV
HAYDEN WINDROW
Trial Attorneys

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4281| Fax: (202) 305-7000
dhruman.y.sampat@usdoj.gov

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: September 4, 2020         Respectfully submitted,

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section

*Counsel for Defendants*