ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
SAMUEL P. GO
Assistant Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV (CT 414491)
HAYDEN WINDROW (NY 4384749)
DHRUMAN Y. SAMPAT (NJ 270892018)
United States Department of Justice
Civil Division
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4281 | Fax: (202) 305-7000
Trial Attorneys
*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' EXHIBIT 3 IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT** |
| CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' EX. 3 IN SUPPORT
OF MOTION TO EXCLUDE TESTI-
MONY OF PLAINTIFFS' EXPERT

Stephanie Leutert - 1/28/2020        Confidential

**Page 1**

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3               (SAN DIEGO)

4  AL OTRO LADO, INC.,        )
   ET AL.,                    )
5                             )
6      Plaintiffs,            )
7                             )
8                             )
9  vs.                        )  NO. 3:17-CV-02366-BAS-KSC
10                            )
11                            )
12 CHAD F. WOLF, ACTING       )
   SECRETARY, U.S. DEPARTMENT )
13 OF HOMELAND SECURITY, IN   )
   HIS OFFICIAL CAPACITY,     )
14 ET AL.,                    )
15                            )
       Defendants.            )
16

17 *******************************************

18

19        *** CONFIDENTIAL ***

20      ORAL DEPOSITION OF

21      STEPHANIE LEUTERT

22         VOLUME 1

23       JANUARY 28, 2020

24

25 *******************************************

**Page 2**

1     ORAL DEPOSITION OF STEPHANIE LEUTERT, produced

2  as a witness at the instance of the DEFENDANTS, and

3  duly sworn, was taken in the above-styled and

4  numbered cause on January 28, 2020, from 9:13 a.m.

5  to 3:05 p.m., before Jodi Cardenas, CSR, RPR, in

6  and for the State of Texas, reported by machine

7  shorthand, at the U.S. Attorney's Office for the

8  Western District of Texas, 903 San Jacinto

9  Boulevard, Suite 334, Austin, Texas, pursuant to the

10 Federal Rules of Civil Procedure and the provisions

11 stated on the record or attached hereto.

**Page 3**

1               APPEARANCES
2
3  FOR THE PLAINTIFFS:
4     Mr. Matthew E. Fenn
      MAYER BROWN, LLP
5     1221 Avenue of the Americas
      New York, New York 10020
6     (212) 506-2316
      mfenn@mayerbrown.com
7
      -and-
8
      Ms. Rebecca Cassler
9     SOUTHERN POVERTY LAW CENTER
      P.O. Box 1287
10    Decatur, Georgia 30031
      (414) 521-6700
11    rebecca.cassler@splcenter.org
12    -and-
13    Mr. Baher Azmy
      CENTER FOR CONSTITUTIONAL RIGHTS
14    666 Broadway, 7th Floor
      New York, New York 10012
15    (212) 614-6427
      bazmy@ccrjustice.org
16
17
      FOR THE DEFENDANTS:
18
      Mr. Dhruman Y. Sampat
19    Mr. Ari Nazarov
      U.S. DEPARTMENT OF JUSTICE - CIVIL DIVISION
20    Ben Franklin Station
      P.O. Box 868
21    Washington, DC 20044
      (202) 532-4281
22    dhruman.y.sampat@usdoj.gov
      ari.nazarov@usdoj.gov
23
24
25

**Page 4**

1                 INDEX
                                    PAGE
2
   Appearances.....................    3
3
   STEPHANIE LEUTERT
4
      Examination by Mr. Sampat...............    5
5
   Changes & Signature...........................  167
6
   Reporter's Certificate.......................  169
7
8
9
                    EXHIBITS
10
   NO.  DESCRIPTION                     PAGE
11
   1...........................................   11
12     Curriculum Vitae
13 2...........................................   87
       Expert Report of Stephanie Leutert
14
   3...........................................  158
15     June 5, 2018, Memorandum
16
17
18
19
20
21
22
23
24
25

Stephanie Leutert - 1/28/2020    Confidential

5

1          (Federal Rules 30(b)(5)(A) and (C)
2       were waived by all counsel present)
3          THE REPORTER:  Would counsel for the
4  plaintiffs and defendants please state your
5  appearances?
6          MR. SAMPAT:  Dhruman Sampat on behalf
7  of the defendants.
8          MR. NAZAROV:  Ari Nazarov on behalf of
9  the United States.
10          MR. FENN:  Matthew Fenn for Mayor
11  Brown on behalf of plaintiffs and Ms. Leutert.
12          MR. AZMY:  Baher Azmy from the Center
13  for Constitutional Rights on behalf of Ms. Leutert.
14          MS. CASSLER:  Rebecca Cassler from the
15  Southern Poverty Law Center on behalf of
16  Ms. Leutert.
17          THE REPORTER:  Thank you.
18          Would you raise your right hand,
19  please?
20          STEPHANIE LEUTERT,
21  having been first duly sworn, testified as follows:
22          EXAMINATION
23  BY MR. SAMPAT:
24       Q.  Good morning.  My name is Dhruman Sampat,
25  and next to me is Ari Nazarov.  We're both attorneys

6

1  with the United States Department of Justice, and we
2  represent the federal defendants in this matter.
3          Could you please state your full name
4  for the record, please?
5       A.  It is Stephanie Helen Leutert.
6       Q.  Is that Leutert (pronouncing)?
7       A.  Leutert.
8       Q.  Okay.  Ms. Leutert, have you had your
9  deposition taken before?
10       A.  No.
11       Q.  Have you ever testified at a trial or
12  hearing before?
13       A.  No.
14       Q.  Well, in that case, I'm just going to go
15  over a few ground rules.  And we'll go over them.
16  I'm sure you've already gone over them with your
17  counsel, but just to make sure we're both on the
18  same page.  If you don't understand the question I'm
19  trying to ask you, I'm going to ask you that you ask
20  me to clarify; otherwise, I'm going to assume that
21  you understood what I meant.  Is that okay?
22       A.  That's fine.
23       Q.  As you can see, to my right is a court
24  reporter who records everything that is being said
25  here.  And she can only record words that are being

7

1  told and that are verbal responses.  So I'm going to
2  ask you to refrain from shaking your head, nodding
3  your head, saying "uh-huh" or "huh-uh."  It's
4  common -- it's a common thing, so if you do do that,
5  I might just ask you to clarify for the record.  Is
6  that okay?
7       A.  Yes.
8       Q.  Did you understand -- did you take an oath
9  before we started this morning?
10       A.  Yes.
11       Q.  And you understand the nature of that oath?
12       A.  Yes.
13       Q.  And you understand that your testimony here
14  today is the same -- is similar to if you have -- if
15  you would be giving testimony in open court?
16       A.  Yes.
17       Q.  The questions I ask you today and the oath
18  requires you to provide a full and complete answer
19  to the extent that you can.  Do you agree to do so?
20       A.  Yes.
21       Q.  If for any reason you don't have a complete
22  answer, but it requires you to estimate, you can
23  still do that and I would ask you to do so.  Do you
24  agree to do that?
25       A.  Yes.

8

1       Q.  Is there any reason why your testimony here
2  today would be affected or any reason that you
3  cannot testify truthfully today?
4       A.  No.
5       Q.  Two most important things.  From time to
6  time, your lawyer may object to some of my
7  questions.  After he objects, you must still answer
8  unless he instructs you not to do so.  Do you agree
9  to do that?
10       A.  Yes.
11       Q.  And most importantly, we can take a break
12  any time you would like, so if you feel like you
13  need to use the restroom or just need to, you know,
14  get a drink of water or something like, please let
15  us -- let me know, and we can go off the record.
16       A.  Okay.
17       Q.  Do you agree to do that?
18       A.  Yes.
19       Q.  Okay.  Are you ready to begin?
20       A.  Yes.
21       Q.  Okay.  Did you do anything to prepare for
22  this deposition?
23       A.  Yes.
24       Q.  What did you do?
25       A.  I met with plaintiffs' counsel.

Stephanie Leutert - 1/28/2020    Confidential

9

1    Q.  And how many times did you meet with
2    counsel?
3    A.  I am going to clarify that.  I had one
4    phone call with plaintiffs' counsel and then a
5    meeting with plaintiffs' counsel.
6    Q.  So one phone call, one meeting?
7    A.  Yes.
8    Q.  And when did you have the phone call with
9    counsel?
10   A.  It was about two-and-a-half weeks ago, two
11   weeks ago.
12   Q.  For how long about?
13   A.  About 30 minutes.
14   Q.  And when did you have the meeting with
15   counsel?
16   A.  Yesterday.
17   Q.  And how long was that meeting?
18   A.  A full day.
19   Q.  And about how many hours in total
20   would you say you talked to your attorneys to
21   prepare for this deposition?
22   A.  About -- combining the phone call and the
23   meeting yesterday, about eight -- eight-and-a-half
24   hours.
25   Q.  Okay.  Was anyone else present in those

10

1    meetings?
2    A.  No -- no.
3    Q.  Did you discuss this deposition with anyone
4    else?
5    A.  No.  Can you define "discuss the
6    deposition"?
7    Q.  Have you -- have you mentioned that you're
8    here being deposed today?
9    A.  Yes.
10   Q.  To whom?
11   A.  My boss at work, my husband, and my
12   immediate family.
13   Q.  And what did you discuss?
14   A.  Just that I would be here today.
15   Q.  Did you discuss the substance of your
16   testimony?
17   A.  No.
18   Q.  Okay.  Did you review any documents to
19   prepare for the deposition?
20   A.  Yes.
21   Q.  And what documents did you review?
22   MR. FENN:  I'm just going to instruct
23   the witness not to reveal any privileged discussions
24   between counsel and the witness.
25   THE WITNESS:  I reviewed documents

11

1    that plaintiffs' counsel provided.
2    Q.  (BY MR. SAMPAT)  Okay.  Did you bring any
3    documents with you today?
4    A.  No.
5    Q.  Okay.
6    MR. SAMPAT:  I'm going to ask that
7    this be marked Exhibit 1.
8    (Exhibit No. 1 marked)
9    MR. SAMPAT:  Thank you very much.
10   Q.  (BY MR. SAMPAT)  There you go, Ms. Leutert.
11   I'm sorry.  And let me just clarify this.  Do you
12   have teaching responsibilities currently?
13   A.  Yes.
14   Q.  So could I call you Professor Leutert?
15   A.  Technically, my position is as a lecturer.
16   Q.  Okay.
17   A.  As -- not as a professor.
18   Q.  Okay.  So Ms. Leutert is fine?
19   A.  But I do teach a class -- a master's-level
20   class.  Yes, Ms. Leutert is fine.
21   Q.  Okay.  Ms. Leutert, do you recognize this
22   document?
23   A.  Yes.
24   Q.  What is it?
25   A.  It is my CV.

12

1    Q.  Is this the most recent CV that you have?
2    A.  Yes.
3    Q.  And does the CV represent all of your
4    educational experiences starting from college?
5    MR. FENN:  Object -- excuse me --
6    object to form.
7    Q.  (BY MR. SAMPAT)  You can answer.
8    A.  Yes.
9    Q.  Okay.  So I would like to just kind of go
10   through some of the points you've -- and some of the
11   points in your CV.  Where did you go to college?
12   A.  Skidmore College.
13   Q.  And when did you graduate?
14   A.  In 2011.
15   Q.  What did you major in?
16   A.  International affairs and Spanish
17   literature.
18   Q.  Is that what your degree is in?
19   A.  Is a BA in international affairs and
20   Spanish literature.  It's a double major.
21   Q.  Is there anything you originally majored in
22   that you did not earn your degree in?
23   MR. FENN:  Object to the form.
24   THE WITNESS:  Not that I can remember.
25   Q.  (BY MR. SAMPAT)  Okay.  And what classes

Stephanie Leutert - 1/28/2020    Confidential

---

13

1  did you take to earn your degree?
2      **A.  Classes in international affairs and**
3  **Spanish literature.**
4      Q.  Do any of those classes require the use of
5  analytics?
6      **A.  I took a microeconomics class in undergrad.**
7      Q.  Was that intro to microeconomics?
8      **A.  Yes.**
9      Q.  Any other classes?
10      **A.  In that Skidmore College, no.**
11      Q.  And in your intro to microeconomics
12  classes, were you required to interpret data?
13          MR. FENN:  Object to form.
14          THE WITNESS:  Yes.
15      Q.  (BY MR. SAMPAT)  What kind of data were you
16  asked to interpret?
17      **A.  It would have been basic microeconomics, so**
18  **probably looking at company-level data.**
19      Q.  Okay.  Did -- did any of the classes you
20  take delve into how an organization determined
21  staffing?
22          MR. FENN:  Object to form.
23          THE WITNESS:  At Skidmore College, no.
24      Q.  (BY MR. SAMPAT)  How about any classes that
25  discussed staffing decisions?

---

14

1      **A.  At Skidmore -- no.**
2      Q.  Did any of those classes discuss
3  governmental operations?
4      **A.  No.**
5      Q.  How about CBP operations, specifically?
6      **A.  No.**
7      Q.  And you understand when I say "CBP," I mean
8  customs and border protection.  Correct?
9      **A.  Yes.**
10      Q.  Did you discuss budgeting considerations?
11      **A.  At Skidmore College, no.**
12      Q.  How about resource limitations?
13      **A.  I imagine that in the microeconomics class**
14  **we talked about the allocation of scarce resources,**
15  **considering that's the basis of economics, but**
16  **that --**
17      Q.  Do you recall specifically in what context
18  it was?
19      **A.  No.**
20      Q.  Okay.  Did any of those classes discuss
21  logistical analytics?
22          MR. FENN:  Object to form.
23          THE WITNESS:  No.
24      Q.  (BY MR. SAMPAT)  After Skidmore, did you
25  seek further education?

---

15

1      **A.  I took two online classes prior to Yale**
2  **University.**
3      Q.  And what online classes did you take?
4      **A.  One statistics course -- intro to**
5  **statistics and one intro to microeconomics.**
6          THE REPORTER:  Micro?
7          THE WITNESS:  Micro.  To refresh.
8      Q.  (BY MR. SAMPAT)  Okay.  And do you recall
9  what platform you used to take the online classes?
10      **A.  It was the Harvard -- it was the -- the**
11  **online classes offered through Harvard University.**
12  **I forget the exact name of the program.**
13      Q.  Did you receive any kind of certification
14  when -- in taking that course?
15      **A.  I'm sure I received certifications for --**
16  **for them, yes.**
17      Q.  And in those -- in your intro to statistics
18  class that you took, I'm guessing you were required
19  to use analytics?
20          MR. FENN:  Object to form.
21          THE WITNESS:  How are you defining
22  analytics?
23      Q.  (BY MR. SAMPAT)  So were you required to
24  take data and interpret that data?
25      **A.  Yes.**

---

16

1      Q.  What kind of data were you looking at?
2      **A.  I don't remember, but that would be the**
3  **basis.  You said of my statistics class.**
4      Q.  Correct.
5      **A.  That would have been the basis of any intro**
6  **to statistics.  I don't remember which specific**
7  **data.**
8      Q.  Okay.  Did any of it have to go --
9  scratch -- strike that.
10          Did any of statistics relate to
11  governmental operations?
12      **A.  I don't remember.**
13      Q.  How about organizational staffing?
14          MR. FENN:  Object to form.
15          THE WITNESS:  Likely not, but I don't
16  remember.
17      Q.  (BY MR. SAMPAT)  Okay.  So after you took
18  your intro to stats class online, is that when you
19  started at Yale University?
20      **A.  Yes, after those two classes.  I -- I took**
21  **them the year prior to beginning at Yale.**
22      Q.  Okay.  And there was nothing -- no classes
23  in between the intro to statistics and the intro to
24  microeconomics and then Yale.  Correct?
25      **A.  Yes.  Those were the only two I took**

---

Stephanie Leutert - 1/28/2020     Confidential

17

1 online.
2    Q.  Okay.  And what degree did you earn from
3 Yale University?
4    **A.  Global Affairs.**
5    Q.  What classes did you take?
6    **A.  Many classes.**
7    Q.  Can you give me an overall view of what you
8 learned in those classes?
9         MR. FENN:  Object to form.
10        THE WITNESS:  I entered grad school to
11 gain greater quantitative skills.  That was my
12 original aim.  That's what I wrote about in my
13 personal statement.  When I arrived, I took
14 intermediate macroeconomics, which was why I took
15 the intro to microeconomics, again, online.  And I
16 took intermediate statistics, which is also why I
17 took the intermediate statistics class online in
18 preparation.  I took classes specific to foreign
19 policy.  I took classes specific to -- well, excuse
20 me -- various classes within the business school.  I
21 took two follow-on classes with STATA.
22    Q.  (BY MR. SAMPAT)  I'm sorry.  With --
23    **A.  With STATA, a statistical program.**
24    Q.  Okay.
25    **A.  That was a follow-on to my intermediate**

18

1 **statistics.  And then I -- one of those was a class**
2 **on STATA and the -- I also did an independent study**
3 **also using STATA.  I also took several classes**
4 **related to Central American -- well, one related to**
5 **Central American migration and the other related to**
6 **migration globally, so a range of classes.**
7    Q.  And which classes required you to look at
8 data, interpret data, or analyze data?
9    **A.  A few -- a lot.  I looked at data in my**
10 **intro to statistics class.  My follow-on to that**
11 **that focused on STATA was based around a data**
12 **project where we used data to develop out -- to look**
13 **at a big sheet of data.  My follow-up project was**
14 **also related to interpreting large amounts of data.**
15 **Actually, it was -- I was looking at publically**
16 **available CBP data and survey data.**
17    Q.  This is while you were --
18    **A.  Yes.  It was a graduate program.**
19    Q.  Yeah.
20    **A.  I also used data in a -- did the required**
21 **history course because my final paper was a**
22 **data-driven look at U.S. immigration policy, so in**
23 **various classes.**
24    Q.  Okay.  You mentioned a data project that
25 you did.

19

1    **A.  Yes.**
2    Q.  And was that through STATA?
3    **A.  Yes.**
4    Q.  And what was that data project?
5    **A.  I was looking at -- it was more to explore**
6 **the data and to get a sense of how to use -- how to**
7 **use the data, but it was looking at how -- well, if**
8 **you could say anything about staffing changes on the**
9 **border and had the number of individuals crossing**
10 **through and smuggling costs.**
11    Q.  And where were you obtaining this data
12 from?
13        MR. FENN:  Objection; form.
14        THE WITNESS:  Publically available
15 data and the Princeton Migrant Project.  I can't
16 remember the exact name -- which is a survey of
17 migration along the border.
18    Q.  (BY MR. SAMPAT)  Did any of those classes
19 also discuss how an organization determined
20 staffing?
21        MR. FENN:  Object to form.
22        THE WITNESS:  It may have been covered
23 in one of my business classes, but I can't -- I
24 don't remember specifically.
25    Q.  (BY MR. SAMPAT)  Okay.  How about staffing

20

1 decisions that are made; any classes discuss those?
2        MR. FENN:  Object to form.
3        THE WITNESS:  I don't remember.
4    Q.  (BY MR. SAMPAT)  Any of those classes talk
5 about government operations?
6        MR. FENN:  Object to form.
7        THE WITNESS:  I'm fairly certain that
8 they did, considering that many of my classes were
9 policy classes.  I'm fairly certain.  I'm sure I
10 discussed that in some classes.
11    Q.  (BY MR. SAMPAT)  And did you also discuss
12 the U.S. Government's operations and --
13        MR. FENN:  Object to form.
14        THE WITNESS:  It may have come up in
15 some lectures in some of my classes.
16    Q.  (BY MR. SAMPAT)  Okay.  How about CBP
17 operations; any classes discuss those?
18    **A.  More unlikely.  Probably not.**
19    Q.  Did any of your classes go into budgeting
20 considerations?
21        MR. FENN:  Object to form.
22        THE WITNESS:  What types of
23 budgetary --
24    Q.  (BY MR. SAMPAT)  How an organization makes
25 certain decisions when they have budgetary

Stephanie Leutert - 1/28/2020    Confidential

---

21

1 constraints.
2     A.  I'm fairly sure that some of my classes
3 would have covered that.
4     Q.  Do you recall to what extent?
5     A.  It would have probably been mentioned in
6 some of the classes I took that focused on policy
7 and U.S. foreign policy -- U.S. policy.
8     Q.  Do you recall what kind of -- what kind of
9 lessons they might have taught regarding budgetary
10 constraints?
11         MR. FENN:  Object to form; vague.
12         THE WITNESS:  I don't know.
13     Q.  (BY MR. SAMPAT)  Did any of the classes
14 talk about resource limitations and -- strike that.
15         Did any of the classes discuss
16 governmental resource limitations?
17         MR. FENN:  Object to form.
18         THE WITNESS:  It's possible.  If I --
19 it seems that if government came up in my economics
20 classes, it probably was something along that, given
21 that economics is the study of binary resources.  So
22 I can imagine that it may have.
23     Q.  (BY MR. SAMPAT)  Do you recall to what
24 extent or what --
25         MR. FENN:  Object to form.

---

22

1         THE WITNESS:  Probably not a large
2 extent, but it could have come up.
3     Q.  (BY MR. SAMPAT)  Okay.  Did you ever attend
4 any other educational institutions?
5     A.  I studied abroad first semester, but other
6 than that, no.
7     Q.  Is that your first semester while you were
8 at Skidmore -- or -- sorry.
9     A.  The first semester I was at Skidmore, I was
10 abroad, but that was a Skidmore program.
11     Q.  Okay.
12     A.  My first semester of junior year, I was in
13 SIT, the School of International Training.
14     Q.  And that is through Yale or through
15 Skidmore?
16     A.  I'm sorry.  That's all Skidmore College.
17     Q.  Oh, all Skidmore?
18     A.  Yes.
19     Q.  Okay.  And did you earn a degree from SIT?
20     A.  No.
21     Q.  Did you take classes while you were there?
22     A.  Yes.
23     Q.  And what types of classes did you take
24 while you were at SIT?
25     A.  I -- I was in Uganda, so I took Luganda,

---

23

1 the language, and I did an independent research
2 project.  And I imagine I also took something on
3 Uganda governance or politics, current events.
4     Q.  What was the independent research project
5 you did?
6     A.  I looked at the effects of torture on war
7 torture victims.
8     Q.  And in conducting that research, did you
9 collect data?
10         MR. FENN:  Object to form.
11         THE WITNESS:  I actually did collect
12 data through surveys.
13     Q.  (BY MR. SAMPAT)  In the local town or --
14     A.  I was partnered with the African Centre for
15 Research and Rehabilitation of Torture Victims.  I
16 believe it's -- it's at the bottom.
17     Q.  And just for the record, we are looking at
18 the second page of the CV, which is numbered
19 Page 69.
20     A.  Yes.
21         MR. FENN:  Can I just clarify for the
22 record, this is the CV that's an excerpt from
23 Ms. Leutert's expert report.  Is that correct?
24         MR. SAMPAT:  That is correct.
25         MR. FENN:  Okay.

---

24

1         MR. SAMPAT:  We simply just extracted
2 it to keep it as a --
3         MR. FENN:  That's fine.
4     Q.  (BY MR. SAMPAT)  And I'm sorry.  And you
5 were saying?
6     A.  Oh, that I worked with the African Center
7 for Treatment at -- it's Treatment and
8 Rehabilitation for Torture Victims is the full name.
9 And I did interviews with them with war torture
10 victims, and those interviews were used to form the
11 basis of data.
12     Q.  What sort of data were you collecting?
13     A.  Descriptive statistics of the numbers of
14 people affected and certain characteristics.  I
15 honestly can't remember all of the questions we
16 asked, but that was the basis.
17     Q.  Of course.
18         Did you -- after collecting the data,
19 did you, yourself, compile it and analyze it?
20         MR. FENN:  Object to form.
21         THE WITNESS:  I helped compile it, but
22 I wasn't there long enough to be able to do some of
23 the overall analysis because I only was with them
24 for a period of months.  Actually, it was under two
25 months.

---

Stephanie Leutert - 1/28/2020     Confidential

---

25

1  Q. (BY MR. SAMPAT) Okay. And while you were
2  at SIT and you were doing your independent study and
3  taking some classes, did you take any classes
4  regarding governmental operations?
5  A. At SIT?
6  Q. Yes.
7  A. I don't think so.
8  Q. Did you -- any classes that you took, did
9  they discuss budgetary constraints?
10     MR. FENN: Object to form.
11     THE WITNESS: I don't think so.
12  Q. (BY MR. SAMPAT) How about resource
13  limitations?
14     MR. FENN: Object to form.
15     THE WITNESS: That's possible if we
16  were talking about the Ugandan government, but I
17  don't honestly remember.
18  Q. (BY MR. SAMPAT) Okay. And through SIT,
19  did you earn any kind of certification?
20  A. I don't believe I did. It was just class
21  credit that went towards graduation at Skidmore.
22  Q. Okay. Are there any educational
23  experiences that are not listed on your CV?
24     MR. FENN: Object to form.
25     THE WITNESS: No. Like the two online

---

26

1  classes, but nothing formal beyond these two.
2  Q. (BY MR. SAMPAT) Okay.
3  A. No degrees.
4  Q. And no certifications. Correct?
5  A. These -- I can't -- I think I would have
6  had a completion certification of the intro to micro
7  and intro to statistics courses that I took online.
8  Q. Okay. Beyond that, anything?
9  A. No.
10  Q. If we could, I'd like to move on to your
11  professional experience. So where do you currently
12  live?
13  A. I work at the Strauss Center for
14  International Security and Law at The University of
15  Texas at Austin.
16  Q. And what is your role there?
17  A. I am the director of the Central America
18  and Mexico Policy Initiative.
19  Q. And when did you begin working at Strauss?
20  A. It was in 2016.
21  Q. Can you explain the responsibilities you
22  hold as the director?
23  A. Yes. So I have three primary roles. The
24  first is that I teach a master's-level class on
25  Central American migration and Mexico's migratory

---

27

1  policy. The second is that I conduct original
2  research on issues related to public policy issues
3  within Central America and Mexico and along the
4  U.S.-Mexico border. And the third is that I lead
5  outreach engagement with the UT Austin community and
6  the broader -- and the broader Austin events
7  engaging the Austin community as well.
8  Q. Can you talk about what you have learned as
9  your role as director?
10     MR. FENN: Object to form.
11     THE WITNESS: What I've learned about
12  what specifically?
13  Q. (BY MR. SAMPAT) Let's talk about your --
14  the research that you've done on Central America and
15  Mexico's policies -- immigration policies or --
16  A. I've done research on various topics,
17  including other policies.
18  Q. So just a -- what you've learned about that
19  as your role as director --
20     MR. FENN: Object to form.
21     THE WITNESS: I -- each project I
22  learned something different. I've learned a lot
23  about -- about a lot of these topics.
24  Q. (BY MR. SAMPAT) Have you -- did you learn
25  anything regarding Mexico's immigration proceedings?

---

28

1     MR. FENN: Object to form.
2     THE WITNESS: Yes. A lot of my work
3  has to do with Mexico's migratory policy.
4  Q. (BY MR. SAMPAT) Do they have the
5  equivalent of removal proceedings that we have here
6  in the United States?
7     MR. FENN: Object to form; calls for a
8  legal conclusion.
9     You can answer.
10     THE WITNESS: It's not equivalent.
11  Q. (BY MR. SAMPAT) Okay. On your CV, you
12  mentioned that you are the head author of the first
13  ever border-wide report on CBP's key management
14  policy, is that correct, if you look at the second
15  bullet point?
16  A. Yes. It says on metering policy or key
17  management policy, as you said, and a silent
18  waitlist.
19     THE REPORTER: I'm sorry. And a...
20     THE WITNESS: And a silent waitlist.
21     THE REPORTER: Thank you. I'm going
22  to have you speak up just a little.
23     THE WITNESS: Oh, sorry. Okay.
24     THE REPORTER: That's okay.
25  Q. (BY MR. SAMPAT) How did you know -- how do

---

Stephanie Leutert - 1/28/2020     Confidential

29

1  you know that was the first report?
2          MR. FENN:  Object to form.
3          THE WITNESS:  Other people had written
4  about the metering policy, but this was the first
5  border-wide report on metering policy and a silent
6  waitlist.
7      Q.  (BY MR. SAMPAT)  Who else has written on
8  the metering policy?
9      **A.  Human Rights First, I believe, published a**
10 **report on the metering policy prior.  There might**
11 **have been another report as well.  But this was on**
12 **the metering policy and a silent waitlist.**
13     Q.  Do you conduct original research?
14     **A.  I do.**
15          MR. FENN:  Object to form.
16     Q.  (BY MR. SAMPAT)  With whom?
17     **A.  Various partners.**
18     Q.  Can you list some of those partners for us?
19     **A.  Colleagues in my university and other**
20 **universities.  I work -- I'm working on a project**
21 **with the Brooks County Sheriff's Office.  I've also**
22 **worked with Mexico's federal police and with**
23 **Mexico's National Security Commission.**
24     Q.  And what kind of research have you done?
25          MR. FENN:  Object to form.

30

1          THE WITNESS:  With which partner?
2      Q.  (BY MR. SAMPAT)  Let's talk about the
3  sheriff's office.
4      **A.  Sure.  I'm working on documenting their**
5  **data on -- or I actually -- okay.  I'll back up.**
6          **I took 650 of their case files and**
7  **turned it into a database for the sheriff.  These**
8  **were case files related to suspected migrants that**
9  **were crossing through the brush to circumvent the**
10 **CBP checkpoint and who passed away.**
11     Q.  (BY MR. SAMPAT)  As conducting this
12 research, what were you -- what kind of data were
13 you gathering?
14     **A.  I --**
15          MR. FENN:  Object to form.  You can
16 answer.
17          THE WITNESS:  I created a database of
18 over 50 variables to understand where the body was
19 discovered, in what state the body was discovered,
20 the types of belongings that the individual had on
21 them, the type of clothing that they had, and their
22 demographic information.  I provided a copy to the
23 sheriff for their own use.  And I also have used
24 that database as the basis for two articles that
25 I've written so far and a research project that I'm

31

1  working on right now.
2      Q.  (BY MR. SAMPAT)  As part of -- as a
3  director -- at -- can I -- if I use CAMPI, is that
4  okay?
5      **A.  That's fine.**
6      Q.  Okay.  So as --
7      **A.  It's a total acronym, but that's fine.**
8      Q.  So as director of CAMPI, have you ever
9  partnered with CBP?
10          MR. FENN:  Object to form.
11          THE WITNESS:  Partnered in what way?
12     Q.  (BY MR. SAMPAT)  Have you -- in the same
13 way that you have with the sheriff's office?
14     **A.  No.**
15     Q.  Have you had interactions with CBP
16 officers?
17     **A.  Yes.**
18     Q.  Have you had interactions with CBP
19 officials?
20     **A.  Yes.**
21     Q.  Have you had interactions with DHS
22 officials?
23     **A.  Yes.**
24     Q.  So what have you discussed with CBP
25 officers in your current role as director of CAMPI?

32

1          MR. FENN:  Object to the form.
2          THE WITNESS:  Many issues.
3      Q.  (BY MR. SAMPAT)  Such as?
4      **A.  Central American migration, current border**
5  **policies, conditions in Central America, those are**
6  **just three big ones that come to mind.  I've had**
7  **various conversations with CBP officers.**
8      Q.  When -- do you recall their names?
9      **A.  One.**
10     Q.  Okay.
11     **A.  The -- the last one that I interacted with,**
12 **Brian Martinez, yes.  Yes.  The others -- oh, I can**
13 **actually -- yes, I can think of others' names as**
14 **well.**
15     Q.  Do you -- so Brian Martinez is one.
16 Correct?
17     **A.  Yes.  He was in charge of doing a**
18 **presentation for a group of students.**
19     Q.  Students where?
20     **A.  In the RGV.**
21     Q.  What's the RGV?
22     **A.  The Rio Grande Valley.**
23     Q.  Do you recall the substance of the -- of
24 the class?
25          MR. FENN:  Object to form.

Stephanie Leutert - 1/28/2020    Confidential

33

1    THE WITNESS: He provided a
2  presentation for my students when they were down
3  there at the border.
4    Q. (BY MR. SAMPAT) Can you estimate about how
5  many -- how many CBP officers you have spoken with
6  in your current role?
7    A. How do you define "spoken with"? Just
8  words?
9    Q. Interacted with face to face.
10    A. Interacted face to face. Oh, wow. More
11  than -- interacted with face to face? Oh, I -- more
12  than 20.
13    Q. Less than 40?
14    A. Maybe. I don't know. I've spent a lot of
15  time at the border.
16    Q. Uh-huh.
17    A. I -- I mean, even if we're -- if this
18  includes crossing back and forth, I mean, then my
19  number would be expeditentially higher.
20    Q. I'm not including -- I'm not --
21    A. If you are just talking about
22  conversations --
23    Q. Yes. Yes.
24    A. -- perhaps more than 20, less than 40, in
25  that range.

34

1    Q. Did you interview them?
2    MR. FENN: Object to form.
3    THE WITNESS: Maybe more. I'm sorry.
4  I'm trying to go through all the different times
5  I've had interactions. I'm not certain about a
6  number. The -- have I interviewed them? In at
7  least one occasion, yes.
8    Q. (BY MR. SAMPAT) And how many CBP officers
9  were interviewed -- strike that.
10    Actually, so was this a formal
11  interview process with -- with officers?
12    MR. FENN: Object to form.
13    THE WITNESS: I requested an interview
14  with CBP, and they provided one for myself and a
15  colleague.
16    Q. (BY MR. SAMPAT) Who did you speak with?
17    A. I cannot remember the name of my -- of the
18  individual, but it was in the Rio Grande Valley. It
19  was about a year and a half ago.
20    Q. Would you describe this as a formal
21  interview?
22    MR. FENN: Object to form.
23    THE WITNESS: Yes.
24    Q. (BY MR. SAMPAT) And did you interview
25  them -- did you interview this individual as what

35

1  the requirements are for the job?
2    MR. FENN: Object to form.
3    THE WITNESS: I don't believe we
4  covered that.
5    Q. (BY MR. SAMPAT) What did you cover?
6    A. A range of issues, but -- a range of issues
7  related to migration in the RGV and CBP operations.
8    Q. What about CBP operations did you discuss?
9    A. Likely -- I can't remember exactly. Yeah.
10  Actually, I can't remember exactly.
11    Q. Have you ever interviewed anyone at CBP
12  management?
13    MR. FENN: Object to form.
14    THE WITNESS: Interviewed?
15    Q. (BY MR. SAMPAT) Yes.
16    A. Formally interviewed?
17    A. Yes.
18    A. No.
19    Q. Informally interviewed?
20    MR. FENN: Object to form.
21    THE WITNESS: No.
22    Q. (BY MR. SAMPAT) Who in CBP management have
23  you spoken with?
24    A. I -- I -- actually, I'm apparently terrible
25  with names. I cannot remember this man's name.

36

1  He -- he called me, but I can't remember his name,
2  and I forgot to look it up.
3    Q. What did you discuss?
4    A. He wanted to discuss my foreign affairs
5  article and another piece that I had published with
6  Sarah Spalding regarding how many Central Americans
7  are traveling north.
8    Q. Is it -- it's listed in your CV?
9    A. It is. It's the one, two, three, four,
10  five -- sixth bullet point down. It is a -- a model
11  that we built and then we shared through the Lawfare
12  blog that estimates the number of individuals
13  leaving Central America every year, and he wanted to
14  speak to me about that.
15    Q. What did he want to discuss?
16    MR. FENN: Object to the form.
17    THE WITNESS: His thoughts on my -- my
18  articles. And he wanted to know more about my views
19  on Central American migration.
20    Q. (BY MR. SAMPAT) Going back to your role as
21  director, have you conducted research into how
22  organizations determine staffing?
23    MR. FENN: Object to form.
24    THE WITNESS: Not specifically.
25    Q. (BY MR. SAMPAT) So is it fair to say,

Stephanie Leutert - 1/28/2020     Confidential

---

37

1 then, that you have -- you haven't done any research
2 into government staffing?
3        MR. FENN: Object to form.
4        THE WITNESS: That hasn't been a focus
5 of any of my research progress.
6    Q. (BY MR. SAMPAT) How about staffing at
7 CBP's Office of Field Operations?
8    **A. That has come up in some of my metering**
9 **work.**
10   Q. And how has it come up?
11   **A. Well, following the issue of metering.**
12 **It's clearly pretty aligned with the topic, given**
13 **what the government -- what CBP officials have been**
14 **stating. So it is something that comes up that we**
15 **were also aware of and following public statements**
16 **on.**
17   Q. Is there data that you have collected
18 regarding that topic?
19   **A. In --**
20        MR. FENN: Object to form.
21        THE WITNESS: In my metering reports?
22   Q. (BY MR. SAMPAT) In -- in -- yes. In this
23 role as director, has there been data that -- that
24 goes into -- has there been data you have collected
25 that goes into staffing at -- for CBP's Office of

---

38

1 Field Operations?
2        MR. FENN: Object to form. Are we
3 talking about generally in her role at CAMPI or in
4 her metering reports?
5        MR. SAMPAT: So we are talking about
6 her role at CAMPI, which my understanding is --
7 also includes the metering reports. Is that
8 correct?
9        THE WITNESS: It is something that
10 I've done as part of my role at CAMPI.
11   Q. (BY MR. SAMPAT) Okay.
12   **A. I have taught classes about CBP's total**
13 **staffing numbers.**
14   Q. Where did you get the information that you
15 used to talk about staffing numbers?
16        MR. FENN: Object to form.
17        THE WITNESS: CBP's website.
18   Q. (BY MR. SAMPAT) Do you know what these
19 reports reflect?
20   **A. Overall staffing numbers at different**
21 **sectors over time.**
22   Q. At various ports of entry?
23   **A. They're not broken down by port of entry.**
24 **They're often broken down by field office or sector**
25 **and what is publically available.**

---

39

1    Q. So have you looked at -- have you looked
2 at -- have you looked at data that talks about
3 various staffing at a specific port of entry?
4    **A. For the report that I produced or in CAMPI?**
5    Q. In CAMPI.
6    **A. I did not have access to that information.**
7    Q. When you were conducting your research for
8 the metering reports and as director of CAMPI, what
9 government officials did you speak with?
10   **A. Are you asking about the U.S. government?**
11   Q. Yes.
12   **A. In the first report we reached out to**
13 **someone from CBP in the Laredo field office. In**
14 **following reports, I've had discussions with**
15 **individuals stationed at the limit line.**
16   Q. Whom at the Laredo field office did you
17 speak with?
18   **A. I believe his name is Richard Pauza,**
19 **P-A-U-Z-A. I believe he's a -- a communications**
20 **officer who provides -- he's a liaison of some sort.**
21   Q. How often do you end up speaking with CBP
22 officials?
23   **A. In -- in what regard? In what time -- for**
24 **the metering reports?**
25   Q. To -- as director normally.

---

40

1    **A. Usually when I'm doing a project that**
2 **relates to them, I end up interacting with them.**
3    Q. When you're working on a project, how often
4 do you end up speaking with them?
5    **A. Well, I do the metering reports every three**
6 **months, the updates, which takes me to the border**
7 **and at -- while I'm there, I -- I almost always end**
8 **up having at least informal conversations with CBP**
9 **officers stationed at the limit line.**
10        THE REPORTER: I'm sorry. Stationed
11 at the limit line?
12        THE WITNESS: Yes. At the
13 international border.
14   Q. (BY MR. SAMPAT) So I want to focus on your
15 conversations with Richard -- I'm sorry -- what was
16 his last name?
17   **A. I believe it's Pauza.**
18   Q. No, no, no. That's okay.
19   **A. I'm terrible at names. P-A-U-Z-A, I**
20 **believe.**
21   Q. Okay.
22   **A. He's in the Laredo field office.**
23   Q. Okay. And you said that he was a liaison
24 of some kind in communications or something like
25 that?

---

Stephanie Leutert - 1/28/2020    Confidential

---

41

1      A.  Yes.
2      Q.  All right.  Okay.  Did you ever discuss
3  staffing with Richard?
4      **A.  I believe we sent him questions, and he**
5  **responded with a press release.**
6      Q.  Did you ever discuss government operations
7  with him?
8          MR. FENN:  Object to form.
9          THE WITNESS:  We sent him questions,
10  and he responded with a press release.
11     Q.  (BY MR. SAMPAT)  And what was in the press
12  release?
13     **A.  The -- CBP's explanation for why metering**
14  **was occurring.**
15     Q.  When you have talked to individuals at the
16  limit line, CBP officers have gone on the line
17  specifically, have you ever discussed staffing with
18  them?
19     **A.  I don't think directly.**
20     Q.  Indirectly, though?
21     **A.  It might have been inferred -- it might**
22  **have been implied in certain conversations.**
23     Q.  How so?
24     **A.  Talking about a lack of capacity.**
25     Q.  And what did they tell you?

---

42

1      **A.  More just discussing if they -- actually**
2  **probably more just discussing that that was the**
3  **reason why they were turning people away.**
4      Q.  Because they lack capacity.  Correct?
5      **A.  Yes.**
6      Q.  At any point did you have discussions
7  regarding the various other operations that occur at
8  a port of entry?
9      **A.  With the CBP officers at the limit line?**
10     Q.  Yes.
11     **A.  Specifically with those individuals, likely**
12  **not since I would have been asking specifically**
13  **about metering.**
14     Q.  So you didn't discuss constraints regarding
15  budgetary issues?
16     **A.  With those individuals, no.**
17     Q.  How about staffing numbers?
18         MR. FENN:  Object to form.
19         THE WITNESS:  With those individuals,
20  likely not, no.
21     Q.  (BY MR. SAMPAT)  Have you been to a land
22  port of entry at the U.S.-Mexico border?
23     **A.  Many.**
24     Q.  How many?
25     **A.  Multiple crossings in various cities.  But**

---

43

1  **I have been to Matamoros, Progreso, Hildago, Roma,**
2  **Laredo, Eagle Pass, Del Rio, El Paso, Nogales,**
3  **Tecate.  I can't remember on the other side what's**
4  **there.  Sasabe, Sonoyta, which is Douglas on the**
5  **other side, Calexico.  And I've been on the U.S.**
6  **side but not at the port of entry but at the actual**
7  **border in three additional cities.**
8      Q.  And what cities would those be?
9      **A.  Tijuana, I was on the beach along the wall**
10  **on the U.S. side.  Auga Prieta, so the other side**
11  **would have been -- wow.  I'm blanking for a second.**
12  **That's the other side of Auga Prieta.**
13         THE REPORTER:  I'm sorry.  The other
14  side of?
15         THE WITNESS:  Auga Prieta.  Sorry.
16  It's Spanish.
17         THE REPORTER:  Okay.
18         THE WITNESS:  And then the other side
19  of Naco, Arizona.  A did a road trip where I went
20  through many of those ports, and then I returned to
21  certain ports after.
22     Q.  (BY MR. SAMPAT)  In what capacity were you
23  at these various ports?
24     **A.  I was already a researcher so I was**
25  **interested in understanding that section of the**

---

44

1  **border.  For -- I'm sorry -- that's from El Paso to**
2  **San Diego --**
3      Q.  Okay.
4      **A.  -- in that specific trip.  I have returned**
5  **to multiple -- to some of those ports later and**
6  **prior.  And I visit the ports in Texas on a regular**
7  **basis as part of my research.**
8      Q.  And what did you do while you were at these
9  other ports?
10         MR. FENN:  Object to form.
11         THE WITNESS:  I -- it depends,
12  actually, by port.
13     Q.  (BY MR. SAMPAT)  Can you give an
14  overarching answer -- overarching view of what you
15  do while you're there?
16         MR. FENN:  Object to form.
17     Q.  (BY MR. SAMPAT)  Are you --
18     **A.  In -- when I visit the ports of entry in --**
19  **in Texas, I do a range of activities.  For the**
20  **metering reports, I will go visit individuals often**
21  **on the Mexican side, organizations, government**
22  **officials.**
23     Q.  Do you speak to CBP at that point?
24         MR. FENN:  Object to form.
25         THE WITNESS:  Sometimes when I'm

---

**WRIGHT WATSON & ASSOCIATES**

Stephanie Leutert - 1/28/2020      Confidential

45

1  returning I speak to the individual stationed at the
2  limit line.
3      Q.  (BY MR. SAMPAT)  And what do you discuss
4  with them?
5      A.  Often the situation, there you were also to
6  bridges where asylum seekers were waiting on the
7  bridges and the CBP officers were stationed right
8  there.  And so I sometimes discussed with the CBP
9  officer stationed there about the situation.
10  Sometimes they were curious about how many people
11  were waiting in Mexico, so kind of a range of topics
12  related to metering or what is going on.
13      Q.  Did you have any role at Strauss before
14  becoming the director?
15      A.  Yes.  I was a fellow.
16      Q.  And how long were you in that role?
17      A.  One year.
18      Q.  What did you do as a fellow?
19      A.  Similar activities in terms of research.  I
20  focused slightly more on Mexican public security
21  issues because that was the initial idea for the
22  initiative, but not exclusively.  And I did less on
23  administrative logistics.
24          MR. SAMPAT:  You know what?  I think
25  we're just at about an hour.  Are we okay for a

46

1  break?
2          MR. FENN:  Sure.  Five minutes.
3          MR. SAMPAT:  Yeah, that's fine.
4          (Off the record)
5      Q.  (BY MR. SAMPAT)  Ms. Leutert, do you still
6  understand you're under oath?
7      A.  Yes.
8      Q.  I would like to actually go back to some of
9  the stuff we were discussing while you were still --
10  while we -- as -- sorry -- to discuss some of the
11  responsibilities and projects you've been handling
12  as director of CAMPI.  You were talking about
13  authoring metering reports.  Correct?
14      A.  Yes.
15      Q.  And you said in order to prepare these
16  metering reports you would take trips about every
17  three months to the border.  Is that correct?
18      A.  For the report itself, yes, every three
19  months I would make a trip.
20      Q.  So about how many trips would you say
21  you've -- you've made in order to prepare for
22  these -- to prepare these reports?
23      A.  I prepare the reports at -- in multiple
24  ways.  I make phone calls.  Often I look at news
25  articles, and then I also will conduct visits to

47

1  border cities.  I divide it -- the border cities
2  with colleagues -- colleagues, actually.  In all
3  cases plural, colleagues.
4      Q.  So about how many trips have you made to
5  the border or to the border cities in order to
6  prepare your reports?
7      A.  I make trips to the border somewhat
8  frequently, but for the report creation I would
9  generally do one trip per report to get those exact
10  numbers at the time, and that's what goes into the
11  report.
12      Q.  How many trips do you make outside of
13  providing for the report?
14      A.  I do travel somewhat frequently to the
15  border and to south Texas.  I don't have an exact
16  number for you, but it is something that I do since
17  U.S. -- the U.S.-Mexico border is within my research
18  purview.
19      Q.  Over how many years have you been taking
20  these trips?
21      A.  Regularly?
22      Q.  Yes.
23      A.  For the past three-and-a-half years
24  regularly.  Yeah.
25      Q.  And you were saying in order to prepare

48

1  these reports you make phone calls, collect news
2  articles, and visit border cities.  Correct?
3      A.  Yes.
4      Q.  Is there anything else that you do?
5          MR. FENN:  Object to form.
6          THE WITNESS:  The phone calls are --
7  are usually interviews ahead of time to kind of get
8  a sense of often the situation.  And while I'm
9  there, the trips are -- I conduct meetings with as
10  many people as I can usually as long as time allows.
11      Q.  (BY MR. SAMPAT)  Just to be clear, when you
12  say to get an understanding of the situation, what
13  situation?
14      A.  Sometimes a security situation.
15      Q.  Such as?
16      A.  In Nuevo Laredo.
17          THE REPORTER:  I'm sorry?
18          THE WITNESS:  In Nuevo Laredo.  We
19  used phone calls to get a sense of whether it was
20  safe to cross over.
21      Q.  (BY MR. SAMPAT)  You also said some of
22  these phone calls are interviews that you do.
23  Correct?
24      A.  Yes.
25      Q.  Who do you speak with when you conduct

Stephanie Leutert - 1/28/2020    Confidential

---

49

1  these interviews?
2     A.  Civil society organizations.  It looks
3  different port by port.  Sometimes Mexican
4  government officials.  Those are the two big groups
5  of individuals who we call.
6     Q.  Do you speak with CBP officers?
7     A.  No.  In the -- on the phone calls?
8     Q.  Yes.
9     A.  No.
10    Q.  Do you speak with CBP management?
11    A.  No.
12    Q.  DHS officials?
13    A.  No.
14    Q.  Anyone within the United States government?
15       MR. FENN:  Object to form.
16       THE WITNESS:  No.  In the first report
17 we attempted to reach out to CBP and then were just
18 provided the press release.  And so we have focused
19 our -- our efforts elsewhere.
20    Q.  (BY MR. SAMPAT)  Where do you normally stay
21 when you're preparing these reports?
22       MR. FENN:  Object to form.
23       THE WITNESS:  Where do I stay?
24    Q.  (BY MR. SAMPAT)  Yes.  Is there a specific
25 hotel or anything like that where you stay?

---

50

1       MR. FENN:  Object to form.
2       THE WITNESS:  There are hotels where
3  we stay in -- in multiple cities on the U.S. side of
4  the border.
5     Q.  (BY MR. SAMPAT)  Do you run into CBP
6  officers there?
7     A.  Normally, no, but there have been occasions
8  where we have actually been in hotels during some of
9  the CBP operations where most of the hotel is filled
10 with CBP officials sometimes.  That has occurred.
11    Q.  Have you -- have you taken the time to
12 interview them then?
13    A.  No.
14    Q.  We can move on and talk about your time as
15 a fellow.
16    A.  Uh-huh.
17    Q.  That was at CAMPI.  Correct?
18    A.  Yes.
19    Q.  And --
20    A.  And we changed the name from Mexico
21 Security Initiative to CAMPI in the past year.
22    Q.  Okay.  That -- okay.  And you testified
23 earlier you were in that role about a year.
24    A.  Yes.
25    Q.  Did you conduct any research in that role?

---

51

1     A.  I did.
2     Q.  What kind of research did you conduct?
3     A.  Going to -- I conducted research on Central
4  American migration as well as Mexico's public
5  security policy.
6     Q.  Did you obtain data points?
7       MR. FENN:  Object to form.
8       THE WITNESS:  Data points -- what do
9  you mean by data points?
10    Q.  (BY MR. SAMPAT)  So we can scratch the last
11 question.
12       What kind of data were you collecting
13 when you were conducting this research?
14    A.  I'm sorry.  I'm trying to remember when I
15 wrote which reports and which ones I started as a
16 fellow and which ones I completed as a fellow.
17    Q.  Okay.
18    A.  I believe I was using -- I was using
19 Mexican crime data in mapping that out.
20    Q.  And which report was this for?
21    A.  These were for LAWFARE articles I have
22 published -- I published at least two that we're
23 using homicide data from Mexico's federal
24 government.  I also would have been using -- based
25 on my publications in the time period, I would have

---

52

1  been using some likely CBP data for some of my
2  LAWFARE blogs publically available to map out
3  migrations dynamics.
4     Q.  What kind of CBP data were you looking at?
5       MR. FENN:  Objection; form.
6       THE WITNESS:  I would have been --
7       MR. FENN:  Sorry.
8       THE WITNESS:  No, I'm sorry.  I would
9  have been looking at the publically available data
10 on the website.
11    Q.  (BY MR. SAMPAT)  That reflected?
12    A.  Apprehensions.
13    Q.  Anything regarding staffing?
14       MR. FENN:  Object to form.
15       THE WITNESS:  In this period, likely,
16 no.
17    Q.  (BY MR. SAMPAT)  Anything regarding other
18 operations that took place at a port of entry?
19       MR. FENN:  Object to form.
20       THE WITNESS:  It's possible that I
21 also looked at apprehensions of -- not
22 apprehensions.  Sorry.  What's the word?  Looked at
23 narcotic seizures as well as -- along the border,
24 but I don't know if I -- I -- I periodically look at
25 that data.  I don't know if I used it in any of my

---

Stephanie Leutert - 1/28/2020    Confidential

---

53

1 published reports.
2    Q.  (BY MR. SAMPAT)  How -- when you say
3 "periodically," how often?
4    **A.  At that time, more often since I was**
5 **focusing on public security issues in Mexico.**
6 **Probably every three to four months just to see if**
7 **there were any interesting changes.  It's less now,**
8 **given that that's not my focus at the moment.**
9    Q.  How frequently do you look at those reports
10 now?
11    **A.  Narcotic seizures?**
12    Q.  Yes.
13    **A.  Probably now only when I am -- when they**
14 **are relevant to a report that I am working on.**
15    Q.  Were there reports regarding how many
16 vehicles were being processed at a port of entry?
17       MR. FENN:  Object to form.
18       THE WITNESS:  I have looked at that
19 data prior.  It is -- I have looked at that data
20 before.
21    Q.  (BY MR. SAMPAT)  When was this?
22    **A.  In my first job at the Council on Foreign**
23 **Relations.**
24       THE REPORTER:  I'm sorry.  First job
25 at the?

---

54

1       THE WITNESS:  Council on Foreign
2 Relations.
3    Q.  (BY MR. SAMPAT)  And we'll discuss that, but
4 just for now, where did you get access to that data?
5    **A.  It would have been the Department of**
6 **Transportation's data, I believe.**
7    Q.  Is that publically available?
8    **A.  Yes.  It was all publically available.**
9    Q.  Do you look at that data now?
10       MR. FENN:  Object to form.
11       THE WITNESS:  I have looked at it
12 during my time at CAMPI.
13    Q.  (BY MR. SAMPAT)  For what purpose?
14    **A.  Probably to look at -- to compare how busy**
15 **a port was versus another port.**
16    Q.  Have you looked at those reports recently?
17       MR. FENN:  Object to form.
18       THE WITNESS:  Probably not within the
19 last six months.
20    Q.  (BY MR. SAMPAT)  As a fellow, were you --
21 did any of your research projects involve research
22 into how organizations determined staffing?
23       MR. FENN:  Object to form.
24       THE WITNESS:  Not directly.
25    Q.  (BY MR. SAMPAT)  Indirectly, though?

---

55

1    **A.  It had come up based on my research on**
2 **metering, but it was a -- it was not the focus of**
3 **their reports.**
4    Q.  So did you gather data for -- that
5 reflected staffing decisions?
6       MR. FENN:  Object to the form.
7       THE WITNESS:  I did not gather data.
8 I would have -- I'm sure I looked at the publically
9 available data online.
10    Q.  (BY MR. SAMPAT)  That showed what exactly?
11    **A.  Staffing -- I can't remember which exactly.**
12 **I imagine -- I know I've looked at overall numbers**
13 **over time, and the breakdown among positions at CBP**
14 **both within border patrol -- I can't remember --**
15 **also within OFO, if there exists that breakdown**
16 **publically available.**
17    Q.  I'm sorry to interrupt.  When you say
18 "OFO" --
19    **A.  Office of Field Operations.**
20    Q.  Yes.
21    **A.  So I -- I have looked at some of this -- I**
22 **probably didn't find it very useful because it**
23 **didn't make it into reports, so probably didn't find**
24 **what was publically available useful to answering**
25 **our research questions.**

---

56

1    Q.  Okay.  Did any of the research projects
2 involve operations at land ports of entry?
3       MR. FENN:  Objection.  Can you just
4 clarify what research projects you're asking about?
5       MR. SAMPAT:  Any research that she did
6 as a fellow at the Mexican Security Initiative.
7       THE REPORTER:  I'm sorry.  The Mexican
8 Security Initiative?
9       MR. SAMPAT:  Initiative, yes.
10       THE WITNESS:  Oh, are we only focusing
11 on fellow?  I'm sorry.  I was talking about my
12 entire time.
13    Q.  (BY MR. SAMPAT)  Oh, that's fine.
14    **A.  Okay.**
15    Q.  Okay.
16    **A.  Because we can also just focus on the**
17 **fellow.**
18    Q.  No.  And if that's the case, then we can
19 just talk about your entire time at CAMPI and then
20 at the Mexican Security Initiative.  So in that
21 case, have you done any research regarding CBP's
22 operations at lands of ports of entry?
23    **A.  How do you define operations?**
24    Q.  So other mission sets that they have, have
25 you looked at how they go about seizing illegal

---

Stephanie Leutert - 1/28/2020    Confidential

57

1  narcotics?
2        MR. FENN:  Object to form.
3        THE WITNESS:  It has both come up in
4  my work on deceased migrants who circumvent the CBP
5  checkpoint and also at -- in -- in metering reports,
6  given that I know that it's the CBP's position --
7  one of CBP's position is that they have other
8  missions.  So also in my -- my discussions with CBP
9  officers, and then in just my general interviews and
10  discussions with the range of individuals it's come
11  up, so, yes, it has come up in my research.
12        Q.  (BY MR. SAMPAT)  And to clarify, these
13  conversations you had with CBP officers are not
14  formal interviews.  Correct?
15        **A.  I did conduct one formal interview with**
16  **five individuals at the table.  I believe it was**
17  **five -- four or five.**
18        Q.  Do you remember who they were?  I know I'm
19  asking you to recall names.
20        **A.  I don't remember who -- I don't remember**
21  **their names.**
22        Q.  When did you conduct this interview?
23        **A.  It would have been August 2018.**
24        Q.  And what did you discuss?
25        **A.  Migration dynamics in south Texas.**

58

1        Q.  Can you elaborate a little bit more on
2  that?
3        MR. FENN:  Object to form.
4        THE WITNESS:  They talked about their
5  different roles, and we asked a range of questions.
6  There were many topics that were covered.
7        Q.  (BY MR. SAMPAT)  What were the roles that
8  these individuals held?
9        **A.  They -- I remember specifically discussing**
10  **apprehensions of individuals --**
11        Q.  Okay.
12        **A.  -- and also narcotics.**
13        Q.  Anything regarding vehicle processing?
14        **A.  I think only in the context of the**
15  **Falfurrias checkpoint, but that was mostly -- that**
16  **was border patrol.**
17        Q.  Did you discuss anything regarding trade?
18        MR. FENN:  Object to form.
19        THE WITNESS:  I don't remember.  It's
20  possible.  They showed us a PowerPoint with many
21  slides.
22        Q.  (BY MR. SAMPAT)  How about national
23  security?
24        MR. FENN:  Object to form.
25        THE WITNESS:  I would imagine that

59

1  that would have come up.
2        Q.  (BY MR. SAMPAT)  Do you recall what was
3  discussed?
4        **A.  I don't remember what was on every slide.**
5        Q.  How about economic security?
6        MR. FENN:  Object to form.
7        THE WITNESS:  They had -- their
8  PowerPoint covered their activities.  I -- I don't
9  remember what was on every slide.  I remember it was
10  an overview of what they believed were the important
11  activities in their sector.
12        Q.  (BY MR. SAMPAT)  Do you recall what
13  activities they were discussing?
14        **A.  The two that I distinctly remember, because**
15  **they had videos, were narcotic seizures and**
16  **apprehensions, but there were many slides.**
17        Q.  And was it your testimony that you don't
18  recall what positions they held?
19        **A.  I genuinely do not remember.  No, I don't**
20  **remember.**
21        Q.  Okay.  Did you discuss other constraints on
22  the federal government at that meeting?
23        MR. FENN:  Object to form.
24        THE WITNESS:  What do you mean
25  "constraints on the federal government"?

60

1        Q.  (BY MR. SAMPAT)  Budgetary constraints.
2        **A.  I'm sure that they talked to us about**
3  **budgetary constraints or their budgetary issues.**
4        Q.  Do you recall what was said?
5        **A.  No, but in almost all of the official**
6  **PowerPoints I've seen from CBP, they have talked**
7  **about their budgets.**
8        Q.  How about staffing numbers?
9        **A.  I don't specifically remember.  That tends**
10  **to also frequently appear in the PowerPoints but not**
11  **always.  So it's possible, but I don't remember.**
12        Q.  Did you hold any other position also either
13  at the Strauss Center for International Security and
14  Law or the Mexican Security Initiative?
15        **A.  No.  I have only been a fellow and a**
16  **director.**
17        Q.  What position did you hold prior to working
18  at Strauss?
19        MR. FENN:  Object to form.
20        THE WITNESS:  My last full-time job
21  was at the Council on Foreign Relations.
22        THE REPORTER:  I'm sorry.  The counsel
23  of?
24        THE WITNESS:  On Foreign Relations.
25        Q.  (BY MR. SAMPAT)  If I could just direct

Stephanie Leutert - 1/28/2020    Confidential

61

1 your attention to the -- the entry for Hillary for
2 America?
3   A. Uh-huh.
4   Q. Was that not a full-time position as an
5 administrative?
6   A. I was not being paid, so, no, it was not a
7 full-time job.
8   Q. Okay. When did you begin working for
9 Hillary for America?
10   A. It was the fall of 2015.
11   Q. Can you explain what responsibilities you
12 held as the administrator?
13   A. Yes. I supported the coordinator of a
14 policy working group. I was in charge of organizing
15 the numbers that were divided by subregional groups
16 on different talking points that were memos or
17 briefings about current events and developments that
18 were occurring in their specific regions.
19   Q. Were you asked to collect additional
20 information while you were an administrator?
21     MR. FENN: Object to form.
22     THE WITNESS: What type of additional
23 information?
24   Q. (BY MR. SAMPAT) Let's talk about were you
25 asked to conduct any research projects as an

62

1 administrator?
2   A. I -- I may have been. Usually we would
3 task it to the particular subgroup, and if I felt
4 like there was editing that needed to be done or I
5 felt like I needed to add on a part or I felt for
6 whatever reason that I could do it quickly or
7 something like that, I would take it on. I -- yeah.
8 That was generally the structure of how it worked.
9   Q. What did you conduct research in? Do you
10 recall?
11     MR. FENN: Object to the form.
12     THE WITNESS: It would have been
13 everything that -- that would have been related to
14 U.S. foreign policy or in-country conditions
15 within -- within the specific -- well, country
16 conditions within Latin America.
17   Q. (BY MR. SAMPAT) So at that point, you were
18 not conducting any research into metering. Correct?
19     THE REPORTER: Any research into?
20     MR. SAMPAT: Metering.
21     MR. FENN: Object to form.
22     THE WITNESS: For the campaign, I was
23 focused on the -- the form policy of the United
24 States for Latin America.
25   Q. (BY MR. SAMPAT) Which did not entail

63

1 metering. Correct?
2     MR. FENN: Object to form.
3     THE WITNESS: It was -- we -- sorry.
4 I'm trying to actually think if it ever came up. It
5 would have focused less on the border and likely not
6 in such specific, so probably not directly, no.
7   Q. (BY MR. SAMPAT) So nothing on key
8 management?
9   A. As part of the campaign?
10   Q. Yes.
11   A. That was not within our purview of my -- of
12 the group.
13   Q. Did you do any research into OFO
14 operations?
15   A. As part of the campaign?
16   Q. Yes.
17   A. No.
18   Q. The research projects you did conduct as
19 part of the campaign, did you do any statistical
20 analysis?
21   A. For the campaign, no. It was generally
22 talking points on -- or -- I'm sorry. Maybe
23 briefing paragraphs on overall developments that
24 were occurring in a country like the Columbia Peace
25 Agreement or some big -- someone -- a new -- someone

64

1 was elected or an election.
2   Q. Did you conduct any research into
3 government staffing as part of the campaign?
4     MR. FENN: Objection.
5     THE WITNESS: That was not within the
6 mandate that I was working under, no.
7   Q. (BY MR. SAMPAT) So safe to say there was
8 nothing regarding CBP's operation -- CBP's
9 operations at the border?
10     MR. FENN: Objection.
11     THE WITNESS: I was focused on foreign
12 policy.
13   Q. (BY MR. SAMPAT) Okay. Before Hillary for
14 America, what position did you hold then?
15   A. My prior full-time job?
16   Q. Well, your prior job listed on your CV.
17   A. I was a teaching fellow at Yale University.
18   Q. And can you explain the responsibilities
19 you held there?
20   A. Yes. I was a teaching assistant for three
21 of my four semesters while at Yale University. I
22 taught sections for various classes in the political
23 science and economics departments. Actually, two
24 different classes.
25   Q. Did you conduct -- did you conduct any

Stephanie Leutert - 1/28/2020    Confidential

65

1 research in your role as a teaching fellow?
2         MR. FENN: Sorry. Couldn't hear the
3 question.
4    Q. (BY MR. SAMPAT) Did you conduct any
5 research as a teaching fellow?
6    A. No. My job was at -- to lead sections on
7 the lectures of the professors -- the political
8 science and economics professors.
9    Q. And before Yale, where were you?
10   A. Coca-Cola World Fund Fellowship.
11   Q. And when did you begin working there?
12   A. The summer of 2015.
13   Q. Can you explain some of the
14 responsibilities you held in that one?
15   A. I received a grant to conduct independent
16 field research --
17         THE REPORTER: I'm sorry.
18         THE WITNESS: I received a grant to
19 conduct independent field research across various
20 states and Mexico related to the automotive
21 industry.
22   Q. (BY MR. SAMPAT) And did you gather data as
23 part of that role?
24   A. I would have reviewed data on Mexico's
25 automotive industry.

66

1    Q. Okay. Did you analyze the data yourself?
2    A. Yes.
3    Q. Did you do any kind of research into
4 staffing?
5         MR. FENN: Object to form.
6         THE WITNESS: What type of staffing?
7    Q. (BY MR. SAMPAT) How organizations
8 determine their staffing.
9         MR. FENN: Object to form.
10         THE WITNESS: It likely would have
11 come up in my interviews as I was working with
12 private sector companies that were -- yeah, it would
13 have come up.
14   Q. (BY MR. SAMPAT) So nothing regarding the
15 government?
16         MR. FENN: Object to form.
17         THE WITNESS: Government staffing?
18   Q. (BY MR. SAMPAT) Right.
19   A. Regarding government staffing, that was not
20 what I was conducting research on.
21   Q. Okay. And is it safe to say that you
22 didn't conduct any research into CBP operations as a
23 fellow?
24         MR. FENN: Object to form.
25         THE WITNESS: It did come up, CBP

67

1 operations for preclearance of automotive parts that
2 were being exported from Mexico into the United
3 States.
4    Q. (BY MR. SAMPAT) So can you elaborate a
5 little bit more on what that means?
6    A. I toured a factory in Ciudad Juarez that
7 had a CBP preclearance, which means that the
8 automotive parts are precleared before they are
9 exported to the United States to speed up processing
10 at the border.
11   Q. And that helps facilitate trade. Correct?
12         MR. FENN: Object to form.
13         THE WITNESS: Yes. Yes.
14   Q. (BY MR. SAMPAT) So you did have -- you
15 have in the past done some research that involves
16 CBP's other operations regarding trade?
17   A. It was not the focus of my project.
18   Q. Uh-huh.
19   A. But I -- it was a factor -- it is a factor
20 within -- trade is -- North American trade is an
21 important factor in Mexico's automotive industry, so
22 it played a role in my research.
23   Q. So you've been exposed?
24   A. Yes.
25   Q. Okay. And before the Coca-Cola fund, where

68

1 were you?
2    A. The Ukrainian Parliament.
3    Q. And what was your position there?
4    A. I apologize. Those actually should be
5 reversed. I did the Coca-Cola fund for the month
6 prior to the Ukrainian Parliament.
7    Q. Okay.
8    A. So they should be flipped in terms of
9 order.
10   Q. Okay. So -- and what was your position at
11 the Ukrainian Parliament?
12   A. I was a legislative assistant.
13   Q. And when did you begin working there as a
14 legislative assistant?
15   A. In the summer of 2015.
16   Q. As a -- as a legislative assistant, were
17 you are asked to do any research to that?
18         MR. FENN: Object to form.
19         THE WITNESS: Any research on...
20   Q. (BY MR. SAMPAT) Any research, just
21 generally.
22   A. Yes.
23   Q. Into what?
24   A. Production sharing agreements.
25   Q. What does that mean?

Stephanie Leutert - 1/28/2020    Confidential

---

69

1    A.  The agreements between the Ukrainian
2  government and private companies that were drilling
3  for shale gas in the country.
4    Q.  Was there anything regarding government --
5  governmental operations?
6        MR. FENN:  Object to form.
7        THE WITNESS:  I was working within the
8  parliament, so...
9    Q.  (BY MR. SAMPAT)  And it could have went --
10  while you were conducting research, was there data
11  that you were receiving that reflected governmental
12  operations?
13        MR. FENN:  Are you talking about the
14  United States government operations?
15    Q.  (BY MR. SAMPAT)  Just generally for now.
16    A.  How are you defining operations?
17    Q.  I'll be more specific.  Did you ever -- did
18  your research projects involve research into
19  governmental staffing?  How about that?
20        MR. FENN:  Object to form.
21        THE WITNESS:  Into the United States
22  governmental staffing?
23    Q.  (BY MR. SAMPAT)  No.  Just governmental
24  staffing generally.
25        MR. FENN:  Object to form.

---

70

1        THE WITNESS:  Not directly.  It was
2  not a -- in my final memo on production sharing
3  agreements.
4    Q.  (BY MR. SAMPAT)  How --
5    A.  Staffing is a big issue in the Ukrainian
6  government, so it was kind of a constant.
7    Q.  Did you ever do any research into CBP
8  staffing as part of -- in that role?
9    A.  I did not.
10    Q.  Any research into the CBP's operations?
11    A.  I did not.
12    Q.  And did you hold any positions -- hold any
13  other positions at the -- at parliament?
14    A.  I was only a legislative assistant.
15    Q.  Okay.
16    A.  I was a legislative assistant.  I also
17  served as a representative of the Ukrainian
18  Parliament's energy committee in the U.S. winter
19  action plan meetings, which was a role that I
20  undertook as my internship as a legislative
21  assistant.
22    Q.  Your CV indicates that you did some
23  freelance work before you went to work in the
24  Ukraine.  Is that correct?
25    A.  I did.

---

71

1    Q.  And how long were you a freelancer?
2    A.  And -- after I worked in the Ukraine --
3    Q.  Okay.
4    A.  -- for three years.
5    Q.  And what kind of work did you do?
6    A.  A range of work.  I helped write up bids.
7  I wrote briefings.  I -- I once did a -- a project
8  for -- on Mexico's energy reform.  And then also I
9  did -- between CFR, Council on Foreign Relations and
10  Yale, I did independent research on Mexico's
11  aerospace industry.
12    Q.  What kind of research were you doing
13  regarding the aerospace industry?
14    A.  I was looking at Bombardier's arrival in
15  Queretaro, a Mexican central state and how that had
16  spurred a high-tech manufacturing boom that had
17  helped the local economy.
18        THE REPORTER:  I'm sorry.  That had?
19        THE WITNESS:  Helped the local
20  economy.
21        Oh, and I was interested -- Guanajuato
22  was trying to copy work Queretaro had done, so I was
23  looking at that as well.
24    Q.  (BY MR. SAMPAT)  Okay.  How did you go
25  about recording the data you were receiving?

---

72

1        MR. FENN:  Object to form.
2        THE WITNESS:  How did I go about
3  recording?
4    Q.  (BY MR. SAMPAT)  Yes.
5    A.  Do you mean writing down?
6    Q.  Yeah.
7    A.  I'm sure I took notes or was reviewing
8  electronic files.
9    Q.  Did you do the statistical analysis
10  yourself?
11        MR. FENN:  Objection to form;
12  Mischaracterizes the witness's testimony.
13        THE WITNESS:  I -- on that particular
14  project, I was not doing statistical analysis.
15    Q.  (BY MR. SAMPAT)  Did you do the data
16  analysis yourself?
17    A.  Yes.
18    Q.  Was anyone else involved in -- in that
19  process?
20    A.  No.
21    Q.  Did you do -- strike that.
22        As a freelancer, were you doing -- did
23  you conduct any research into how the United States
24  government determined staffing?
25        MR. FENN:  Object to form.

---

Stephanie Leutert - 1/28/2020    Confidential

---

73

1        THE WITNESS: No.
2    Q. (BY MR. SAMPAT) Did you do any research
3 into how CBP runs its operations?
4        MR. FENN: Object to form.
5        THE WITNESS: As a freelance
6 researcher, no.
7    Q. (BY MR. SAMPAT) Can you -- what was the
8 position you held before you were a freelancer?
9    **A. I was a research assistant at the Council**
10 **on Foreign Relations.**
11    Q. And you testified earlier that was the last
12 full-time job you had had before you became a fellow
13 at the Mexico Security Initiative. Is that correct?
14    **A. A full-time -- with a full salary, yes.**
15    Q. Okay. And when did you begin working at
16 the Council on Foreign Relations?
17    **A. In 2012.**
18    Q. You're okay calling it the CFR?
19    **A. I'm fine, yeah.**
20    Q. Okay. What were your -- and what position
21 did you hold?
22    **A. I was a research associate in the Latin**
23 **America Studies program.**
24    Q. In what areas were you conducting research?
25    **A. Oh a wide range of issues. The purview was**

---

74

1 **all of Latin America. I was working with a fellow**
2 **who focused on Mexico, so that was generally the**
3 **focus of what my work -- of my work at that time.**
4    Q. Were there specific projects you were doing
5 research into?
6    **A. Many. I believe what's written on here was**
7 **my role -- my work as the lead researcher for the**
8 **2014 CFR Task Force on North America.**
9    Q. And what did that entail?
10    **A. That was a year-long project that had a**
11 **group of experts that met four times to reimagine**
12 **security, energy, economic -- there might have been**
13 **a -- the fourth one. Let's see. Oh, it doesn't**
14 **have it there. Security, energy, economic, and I**
15 **don't know if it was political. There was**
16 **another -- bucket issues within North America.**
17 **There was a catchall bucket.**
18    Q. Okay. Did you have to collect data as part
19 of the work you were doing as a research associate?
20    **A. Yes.**
21    Q. What kind of data did you have to collect?
22    **A. A lot of data. The big project I'm**
23 **remembering, which is my emphatic yes was I had to**
24 **map out the -- the entire budget and production, oil**
25 **and gas production, to model it. I did not do the**

---

75

1 **modeling, but I created the base to model it for how**
2 **changes in oil and gas prices would affect the**
3 **company.**
4    Q. Did you have any involvement with CBP in
5 that role?
6        MR. FENN: Object to form.
7        THE WITNESS: How do you define
8 involvement?
9    Q. (BY MR. SAMPAT) Did you interact with
10 anyone at CBP as a research associate?
11    **A. I believe we had speakers from CBP who**
12 **came. I can't remember if at that point they were**
13 **at CBP or DHS, but we certainly had speakers who**
14 **came to talk about the border.**
15    Q. As a research associate at the CFR, did you
16 have to interview CBP officials?
17    **A. As part of my role, no.**
18    Q. Did you ever interview CBP officials?
19        MR. FENN: Object to form.
20        THE WITNESS: No.
21    Q. (BY MR. SAMPAT) How about DHS officials?
22        MR. FENN: Object to form.
23        THE WITNESS: We conducted interviews
24 for the task force of which I was apart, and I -- I
25 can't remember if we ever -- if I ever conducted

---

76

1 them with DHS officials. I honestly can't remember.
2    Q. (BY MR. SAMPAT) That's --
3    **A. Possible.**
4    Q. No, that's perfectly fine.
5        Did you do research into staffing
6 decisions for the government?
7        MR. FENN: Object to form.
8        THE WITNESS: How do you define
9 "staffing"?
10    Q. (BY MR. SAMPAT) How different government
11 agencies go about determining how to staff certain
12 offices?
13    **A. We talk about different staffing or**
14 **structurally -- or structure -- organization**
15 **structures within different government agencies**
16 **within the CFR task force.**
17    Q. So nothing regarding CBP's staffing at
18 ports of entry. Correct?
19        MR. FENN: Object to form;
20 mischaracterizes the witness's testimony.
21        THE WITNESS: It would have come up in
22 the task force in terms of -- staffing at ports of
23 entry would have come up within the task force
24 report.
25    Q. (BY MR. SAMPAT) How would it have come up?

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400   Austin, Texas 78746   (512) 474-4363

Stephanie Leutert - 1/28/2020     Confidential

---

77

1    A.  The task force focused on facilitating
2 movement of goods at the border and people and
3 security at -- and so certain staffing decisions
4 would likely -- I'm almost certain would have been
5 mentioned in the report, and there would have been
6 some baseline, at least, research conducted in that
7 regard.
8    Q.  So just to -- just to make sure I
9 understand your testimony --
10    A.  Uh-huh.
11    Q.  -- while you were a research associate at
12 the CFR --
13    A.  Yeah.
14    Q.  -- you were exposed to other missions that
15 CBP has?
16       MR. FENN:  Object to form.
17    Q.  (BY MR. SAMPAT)  Is that correct?
18       MR. FENN:  Misstates the witness's
19 testimony.  I'm sorry.  I didn't mean to cut you
20 off.
21       THE WITNESS:  In that task -- in that
22 task force report, we focused on the borders and at
23 the ports of entry and discussed CBP in that
24 capacity and the activities that they currently were
25 engaging in and that they could engage in.

---

78

1    Q.  (BY MR. SAMPAT)  So it was in that role
2 that you learned of CBP's operations when it comes
3 to national security issues?
4       MR. FENN:  Object to the form;
5 mischaracterizes the witness's testimony.
6       THE WITNESS:  My role at CBP -- at CFR
7 was the first time that I was able to conduct
8 research on CBP in a meaningful way beyond kind of
9 cursory, perhaps, viewing of documents.
10    Q.  (BY MR. SAMPAT)  Is there anything else you
11 did research into regarding CBP while you were a
12 research associate?
13    A.  I'm almost certain that I would have done
14 additional research projects for my fellow related
15 to the border and CBP because that was an area of
16 interest for her.
17    Q.  Uh-huh.
18    A.  I don't remember specific projects.
19    Q.  Okay.  Have you ever worked at a port of
20 entry?
21    A.  I have not.
22    Q.  At any point in your career, did you work
23 for CBP?
24    A.  I have not.
25    Q.  At any point in your career, have you

---

79

1 worked for the Department of Homeland Security?
2    A.  I have not.
3    Q.  Have you worked for INS?
4    A.  I have not.
5       MR. FENN:  Object to form.
6    Q.  (BY MR. SAMPAT)  Custom Services?
7    A.  I have not.
8    Q.  Did you work for the United States
9 government at all?
10    A.  No.
11    Q.  Have you ever witnessed the seizure of
12 narcotics at the border?
13    A.  I have not.
14    Q.  Have you talked to anyone that has
15 experience witnessing seizures of illegal narcotics
16 at the border?
17       MR. FENN:  Object to form.
18       THE WITNESS:  I have.
19    Q.  (BY MR. SAMPAT)  Who?
20    A.  Sheriffs, individuals who worked at Texas
21 DPS.  I have also talked to CBP officers who spoke
22 as if they had, but I cannot confirm whether they
23 had.
24    Q.  Do you recall the nature of the
25 conversation?

---

80

1    A.  They were discussing seizing narcotics with
2 great detail which leads me to believe or suggest
3 that they might have been involved, but I can't
4 confirm that because I did not ask -- I don't
5 remember asking specifically.
6    Q.  What were they discussing regarding the
7 operations of seizing illegal narcotics?
8    A.  In the conversation I'm remembering, they
9 were discussing the area along the border where
10 criminal groups move narcotics.  That was one.  And
11 another example, discussing the lines that are left
12 on your back through the movement of -- of backpacks
13 of marijuana.  So specific details that led me to
14 believe they had a specific knowledge, but I can't
15 confirm that they actually had witnessed it
16 themselves or were involved.
17    Q.  Did you talk to any other supervisors at
18 CBP regarding the seizure of illegal narcotics?
19    A.  I don't believe so -- or I don't know if
20 the people that I interviewed -- they were not line
21 officers.  And I would have spoken with them in the
22 interview as well about the seizure of narcotics.
23    Q.  CBP management?
24       MR. FENN:  Object to form.
25       THE WITNESS:  I don't know what roles

---

Stephanie Leutert - 1/28/2020     Confidential

---

81

1  they have.
2      Q.  (BY MR. SAMPAT)  How about DHS officials?
3      A.  Regarding narcotics seizures?
4      Q.  Yes.
5      A.  I don't believe -- well, in what capacity?
6  Well, current DHS officials?
7      Q.  Current and former.
8      A.  If I have discussed narcotic seizures?
9      Q.  Yes.
10     A.  I'm sure it's -- it might have come up in a
11  conversation.
12     Q.  So have any of these conversations
13  discussed the staffing considerations that need to
14  be made when seizing illegal narcotics?
15         MR. FENN:  Object to form.
16         THE WITNESS:  I honestly don't
17  remember.
18     Q.  (BY MR. SAMPAT)  Have you ever inspected
19  cargo at a port of entry?
20     A.  I have not.
21     Q.  Have you talked to anybody about this
22  experience?
23         MR. FENN:  Object to form.
24         THE WITNESS:  Not directly.
25     Q.  (BY MR. SAMPAT)  Indirectly?

---

82

1      A.  Yes.
2      Q.  How so?
3      A.  Individuals who have -- well, I've talked
4  to individuals who have a member -- a family member
5  who is a CBP officer and talked about their family
6  member's experience.  So it's a -- it's not direct.
7  It was a conversation about someone else, so, no, in
8  various occasions.
9      Q.  And have you talked to CBP officials or
10  officers about inspecting cargo at ports of entry?
11     A.  It may have come up in a conversation, but
12  likely not the focus of any of my conversations.
13     Q.  Do you recall to what extent it came up?
14         MR. FENN:  Object to form.
15         THE WITNESS:  I imagine it probably
16  came up in reviewing -- in some of the more formal
17  presentations when CBP was reviewing their overall
18  mandate.
19     Q.  (BY MR. SAMPAT)  And in those presentations
20  or any conversations you have had, was there ever
21  any discussion regarding staffing decisions that
22  have to be made when processing cargo at a port of
23  entry?
24     A.  It's possible that they mention that.
25     Q.  But you don't recall the nature of those

---

83

1  conversations or what was said?
2      A.  It's -- it's often a general theme -- the
3  finite resources or the need for additional
4  resources are things that I've heard before, so it's
5  possible in those contexts it came up, but I can't
6  recall a specific example.
7      Q.  Okay.  So is it fair to say, then, that you
8  don't have any firsthand knowledge about how the
9  United States government goes about making staffing
10  decisions?
11         MR. FENN:  Object to form;
12  Mischaracterizes the witness's testimony.
13         THE WITNESS:  How do you define
14  "firsthand"?
15     Q.  (BY MR. SAMPAT)  You have not yourself been
16  directly involved with those decisions.
17     A.  I have not myself been directly involved in
18  staffing decisions, that is connect, at the ports of
19  entry.
20     Q.  Do you have any firsthand knowledge about
21  how OFO goes about making decisions how to allocate
22  resources?
23         MR. FENN:  Object to form.
24         THE WITNESS:  Is this the same
25  firsthand I was directly involved or --

---

84

1      Q.  (BY MR. SAMPAT)  Yes.
2      A.  -- is that how you're --
3      Q.  Okay.
4      A.  Then I have not been directly involved in
5  decisions related to -- as far as OFO staffing.
6      Q.  Uh-huh.
7      A.  I have not been directly involved in those
8  decisions.
9      Q.  Have you ever discussed the management of
10  operations at a port of entry with any CBP officer?
11     A.  By "management," do you mean what
12  specifically?
13     Q.  Day-to-day operations on how they go about
14  running the port.
15     A.  I believe actually I have had discussions
16  with CBP individuals about day-to-day.
17     Q.  With whom?
18     A.  CBP officials at the Eagle Pass port of
19  entry.
20     Q.  And what have you discussed?
21     A.  They were discussing their activities and
22  specifically asylum processing.
23         THE REPORTER:  And typically --
24         THE WITNESS:  And specifically asylum
25  processing.

---

Stephanie Leutert - 1/28/2020    Confidential

85

1            MR. FENN:  Do you want to go off the
2  record for a minute?
3            MR. SAMPAT:  Yeah.  Can we go off the
4  record for a minute?
5            (Off the record)
6            MR. SAMPAT:  We can go back on the
7  record.
8       Q.  (BY MR. SAMPAT)  Ms. Leutert, do you have
9  any knowledge regarding the budgeting at various
10 ports of entries?
11           MR. FENN:  Object to form.
12           THE WITNESS:  Knowledge?  As in
13 firsthand knowledge?
14      Q.  (BY MR. SAMPAT)  No.  Do you have -- have
15 you reviewed data or reviewed reports that discuss
16 budgeting at various ports of entry?
17           MR. FENN:  Same objection.
18           THE WITNESS:  I don't think I have.
19 Of a port of entry, no.
20      Q.  (BY MR. SAMPAT)  Land ports of entry.
21      A.  Yes.  Because -- yeah.  No, I have not --
22 specific port, no.
23      Q.  Do you have knowledge of staffing levels at
24 various ports of entry?
25           MR. FENN:  Object to form.

86

1            THE WITNESS:  I may have seen some
2  information regarding that in some of the documents
3  that I reviewed.  Beyond that, no, since publically
4  available data does not distinguish by port.
5       Q.  (BY MR. SAMPAT)  So is it fair to say you
6  have not experienced the day-to-day operational
7  decisions that CBP has to make on a daily basis?
8            MR. FENN:  Object to form;
9  Mischaracterizes the witness's testimony.
10           THE WITNESS:  That I have not
11 experienced it?
12      Q.  (BY MR. SAMPAT)  Yes.
13      A.  And by "experience," you mean my lived
14 experience as --
15      Q.  That you have -- yes.
16           MR. FENN:  Same objection.
17           THE WITNESS:  I have not worked at
18 CBP; therefore, I have not been involved in the
19 decisions or personally in those experiences.
20      Q.  (BY MR. SAMPAT)  Okay.
21           MR. SAMPAT:  We're just at about
22 another hour.  Are you okay taking another five- to
23 ten-minute break?
24           MR. FENN:  Sure.
25           (Off the record)

87

1            MR. SAMPAT:  Back on the record.
2       Q.  (BY MR. SAMPAT)  Ms. Leutert, you
3  understand we're back on the record?
4       A.  Yes.
5       Q.  And you understand you're still under oath?
6       A.  Yes.
7       Q.  I understand there's a clarification you
8  would like to make?
9       A.  Yes.
10      Q.  Please go ahead.
11      A.  I misspoke and said that Douglas was on the
12 other side of Sonoyta.  Douglas is on the other side
13 of Agua Prieta, and Lukeville is on the other side
14 of --
15           THE REPORTER:  I'm sorry.  I might
16 have you spell those.
17           (Laughter)
18           (Off the record)
19           MR. SAMPAT:  In the meantime.  I'll
20 pass out the exhibits.
21           (Exhibit No. 2 marked)
22      Q.  (BY MR. SAMPAT)  Is there any other
23 clarification you would like to make?
24      A.  No.  That was all.
25      Q.  All right.  Well, thank you for that.

88

1            Ms. Leutert, I'm going to give you
2  this document that's been marked Exhibit 2.
3       A.  Thank you.
4       Q.  Do you recognize this document?
5       A.  Yes, I do.
6       Q.  And what is the document?
7       A.  This is the expert report that I prepared.
8       Q.  And it's the report that you prepared for
9  your proposed testimony in Al Otro Lado versus Wolf.
10 Correct?
11      A.  Correct.
12      Q.  Did you prepare this report?
13      A.  I did.
14      Q.  Did anyone else play a role in drafting
15 this report?
16      A.  No.
17      Q.  Does the report accurately reflect the full
18 opinions you intend to give in this case?
19      A.  Full opinions I have not -- I'm aware that
20 there may be -- they're the full opinions for the
21 documents that were available when I wrote the
22 report.  I'm aware that there might be additional
23 documents that were produced after I wrote the
24 report that might influence my decisions, but for
25 what was available, what I could review, yes, it is

Stephanie Leutert - 1/28/2020    Confidential

89

1  my full opinion.
2    Q.   And does this report reflect all the
3  documents you reviewed, considered, or relied on in
4  forming these opinions for this report?
5    A.   That were available when I wrote the report
6  and that are listed in the back at -- or, I guess,
7  not in this version, but --
8    Q.   I believe they --
9    A.   Are they?
10   Q.   They should be.  Oh, are they not?
11   A.   No.
12   Q.   Okay.
13       MR. SAMPAT:  Just one second.
14       MR. FENN:  Sure.
15       (Pause in proceedings)
16   Q.   (BY MR. SAMPAT)  So I'd like to focus on the
17  content and substance of this report that you have
18  admitted.  And you said this report reflects all the
19  opinions you intend to give as per the documents
20  that you have been provided and relied on at this
21  juncture.  Correct?
22   A.   Correct.
23       MR. FENN:  Object to form.
24       THE WITNESS:  Oh.
25       MR. FENN:  Go ahead.

90

1       THE WITNESS:  I -- I'm sorry.
2  Actually, can you repeat the question?
3    Q.   (BY MR. SAMPAT)  Sure.
4    A.   I'm sorry.
5    Q.   Sure.
6       The report that -- that's before you
7  right now --
8    A.   Uh-huh.
9    Q.   -- that -- that reflects all the opinions
10  you intend to give at this time based on the
11  documents that you were provided and the documents
12  you relied on based on Exhibit -- the attached
13  exhibit in the report?
14   A.   They -- so this report and the attached
15  exhibit reflect my response to the question -- my
16  full response to the question that was provided --
17  my response to the question that was provided by
18  plaintiffs' counsel for me to answer in the report.
19   Q.   And what questions were those?
20   A.   On Page 8 it lists out -- in Paragraph 22
21  that plaintiffs' counsel have asked me to address
22  whether between 2016 and the present the United
23  States government engaged in a systemic practice of
24  denying noncitizens access to the asylum process at
25  ports of entry on the U.S.-Mexico border.

91

1    Q.   Were there any other questions that you
2  were asked to consider?
3    A.   That was the primary question.
4    Q.   Were there other questions you took into
5  consideration?
6       MR. FENN:  I advise the witness not to
7  reveal any privileged communications between her and
8  her attorneys that aren't discussed in the report.
9       THE WITNESS:  That was the primary
10  question that I was asked to answer.
11   Q.   (BY MR. SAMPAT)  Okay.  So would your
12  conclusions change upon reviewing more documents
13  later?
14       MR. FENN:  Object to the form;
15  Incomplete hypothetical.
16       THE WITNESS:  I'd have to see the
17  documents.
18   Q.   (BY MR. SAMPAT)  So it -- are there
19  documents that could potentially be relevant that
20  you would consider that may change your opinions?
21       MR. FENN:  Same objection.
22       THE WITNESS:  If that hypothetical --
23  it could be any document that says anything.  If
24  there were documents that said the opposite of
25  documents that I received, I would -- it would

92

1  affect my -- it could affect my -- my conclusions.
2  However, I base this on the documents that I
3  reviewed at the time.
4    Q.   (BY MR. SAMPAT)  Do you know of any
5  documents that may contradict some of the other
6  documents that you reviewed in this case?
7       MR. FENN:  Object to form.
8       THE WITNESS:  Contradict?
9    Q.   (BY MR. SAMPAT)  Well, you -- you said that
10  there could be some report or documents that come
11  out that contradict stuff you've already reviewed.
12  Correct?
13   A.   In the hypothetical?
14   Q.   Right.
15   A.   My results and conclusions reflect what I
16  reviewed.  If what I was reviewing was different, my
17  results would look different.
18   Q.   Correct.  So this -- so we understand that.
19  What I'm asking is, do you know of any documents
20  that contradict some of the documents you already
21  reviewed?
22       MR. FENN:  Object to form.
23       THE WITNESS:  I'm just not sure what
24  you mean by "contradict."  And, perhaps, it's too
25  vague.  Maybe if it was more specific.

Stephanie Leutert - 1/28/2020    Confidential

---

93

1    Q. (BY MR. SAMPAT) So if you viewed a report
2  hypothetically and then there was another report
3  that directly contradicted it in terms -- it showed
4  the opposite conclusion.
5    **A. I did not base any -- any of my conclusions**
6  **on one specific document.**
7    Q. Uh-huh.
8    **A. It was in the totality of the documents.**
9    Q. Okay.
10    **A. Yeah.**
11    Q. Okay. In your report, is it true that you
12  say that there's a policy and practice of
13  turn-backs?
14    **A. Where do I say that? On what page?**
15    Q. It is on Page -- Page 9, Subparagraph A.
16    **A. That is what it states. It says, "A policy**
17  **and practice of turning back asylum seekers arriving**
18  **on ports of entry on the U.S.-Mexico border" --**
19    THE REPORTER: I'm sorry. When you
20  read you need to slow down just a little bit.
21    THE WITNESS: I'm sorry. I said, yes,
22  it says beginning in 2016, U.S. Customs and Border
23  Protection adopted a policy and practice of turning
24  back asylum seekers that were arriving at ports of
25  entry on the U.S.-Mexico border.

---

94

1    MR. FENN: Can we go off the record?
2    MR. SAMPAT: I don't need an extra
3  copy of the report. I'm happy to give it to you if
4  there is reading from it. That way, you can refer
5  to it if that's okay with the counsel. Is that
6  fine? So that way if people read fast --
7    MR. FENN: That's fine.
8    THE REPORTER: Thank you so much.
9    MR. FENN: I'm sorry to interrupt.
10    THE REPORTER: Very helpful. Thank
11  you.
12    MR. FENN: Are we still off the
13  record?
14    THE REPORTER: No. We're -- we've
15  been going.
16    MR. FENN: Oh, okay.
17    MR. SAMPAT: Oh, we have. I thought
18  that was off the record. Would you like to go off
19  the record?
20    MR. FENN: Yeah, can we go off the
21  record for second?
22    MR. SAMPAT: Yeah.
23    (Off the record)
24    Q. (BY MR. SAMPAT) All right. We're back on
25  the record. Ms. Leutert, you understand you're

---

95

1  still under oath?
2    **A. Yes.**
3    Q. We have just made copies of Exhibit C that
4  was attached to your expert report, and that lists
5  all the materials that you considered in preparing
6  this report. Is that correct?
7    **A. Yes.**
8    Q. Okay. And before we went off the record
9  and took our break, we were talking about
10  Subparagraph A on Page 9 of your report, is that
11  correct, about the policy and practices of turning
12  back asylum seekers?
13    **A. Yes.**
14    Q. Can you define what you mean by policy?
15    MR. FENN: Go ahead.
16    THE WITNESS: By policy, I was
17  defining it as a written guidance throughout U.S.
18  customs and border protection.
19    Q. (BY MR. SAMPAT) And what written guidance
20  would that be?
21    **A. Oh, I'm sorry. I'm sorry. That's what I**
22  **was thinking of -- well, yeah. No, actually, no, I**
23  **stand by that. Sorry. I got confused for a second.**
24  **A written guidance, and I was referring to the**
25  **April 2018 metering guidance that was issued by Todd**

---

96

1  **Owen.**
2    Q. Is there anything else that you mean when
3  you use the word "policy"?
4    **A. I think just the general guidance and**
5  **musters that were being used -- that this was coming**
6  **from CBP leadership.**
7    Q. So in order to make sure I am understanding
8  your testimony, when you talk about policy, you're
9  talking about the written guidance throughout CBP
10  that includes the metering guidance and the musters.
11  Is that correct?
12    **A. There could be other documents. It's --**
13    Q. Such as?
14    **A. The musters -- there could be additional**
15  **guidance on metering that was issued or that was**
16  **related to.**
17    Q. Do you recall what guidance?
18    MR. FENN: Object to the form.
19    THE WITNESS: That's more in the --
20  well -- not particular guidance on metering. It
21  would be the -- the main one would be the April 2018
22  guidance. I've seen from depositions that there are
23  other documents that were issued later that would
24  also be relevant.
25    Q. (BY MR. SAMPAT) And what depositions would

---

Stephanie Leutert - 1/28/2020    Confidential

---

97

1  that be?
2  **A. Those would be the depositions of Todd Owen**
3  **and Randy Howe.**
4  Q. So then is it -- it's fair to say, then,
5  that you haven't relied on all available
6  information. Correct?
7          MR. FENN: Objection; form.
8          THE WITNESS: I --
9  Q. (BY MR. SAMPAT) You can answer.
10  **A. I'm not sure that that -- those documents**
11  **were released at the time of my report. I did not**
12  **know about them until the deposition.**
13  Q. Until your deposition?
14  **A. No. I'm sorry. Until I read those**
15  **depositions.**
16  Q. And when did you read those depositions?
17  **A. I read them in the last week.**
18  Q. Okay. Is there anything else you would
19  like to add to your definition of a policy? My
20  understanding is you're -- when you talk about
21  policy, you're talking about written guidance, and
22  when you talk about written guidance, you're talking
23  about the metering guidance from April 2018 musters
24  and addition -- any additional guidance that may
25  have come out regarding metering?

---

98

1  **A. It could also be verbal as well in the form**
2  **of guidance or musters. It could be verbal or**
3  **written guidance in standardizing a practice**
4  **throughout CBP. That's what I would say is a**
5  **policy.**
6  Q. Have you recorded the verbal guidances
7  anywhere?
8          MR. FENN: Object to form.
9          THE WITNESS: No, I have not recorded
10  them myself.
11  Q. (BY MR. SAMPAT) Have you gotten records of
12  them?
13          MR. FENN: Object to form.
14          THE WITNESS: I have read about them
15  in various depositions.
16  Q. (BY MR. SAMPAT) And what depositions are
17  we talking about?
18  **A. I believe they were in the ███████████**
19  **deposition, and I can't remember if they were in**
20  **both or in one of the Todd Owens {sic} and Randy**
21  **Howe depositions.**
22  Q. Okay. Can you define what you mean by
23  "practice"?
24  **A. Practice would be the act of turning**
25  **someone away. Generally, frequently any somewhat**

---

99

1  **standardized form, perhaps, in the absence of that**
2  **written or verbal guidance that's clarified perhaps**
3  **from CBP leadership. So to explain in this context,**
4  **it appears that CBP began a practice of turning**
5  **people away, and then there was a policy issued**
6  **regarding metering in April of 2018.**
7          **It's possible they were also -- there**
8  **are -- I noted them in here. There were other**
9  **documents that outlined specifics, particularly in**
10  **various sectors leading up to that April 2018**
11  **guidance, but the April 2018 guidance was issued**
12  **from leadership to all ports -- to all field offices**
13  **across the border, so that's the distinction I was**
14  **making between those two words.**
15  Q. So to -- to make sure I understand --
16  **A. Uh-huh.**
17  Q. -- your testimony, so practices is when CBP
18  began to regularly turn back --
19          MR. FENN: Objection; form.
20  Q. (BY MR. SAMPAT) -- asylum seekers?
21          MR. FENN: Mischaracterizes the
22  witness's testimony.
23          THE WITNESS: When they began turning
24  people back across the border, in what became
25  regular, in a -- in a way where noncitizens

---

100

1  continued to report similar characteristics of the
2  turn-back, that's how I -- I see it as becoming a
3  practice.
4  Q. (BY MR. SAMPAT) I'm not sure I understand
5  the final part of your -- of your testimony there.
6  **A. Okay. I can restate it.**
7          **The practice of turn-backs the way**
8  **that I see it in my perspective based on the**
9  **documents that I reviewed and the testimonies is**
10  **that particularly in 2016 and 2017, I have not**
11  **reviewed any overarching guidance from the direct**
12  **data at all ports of entry that was outlining the**
13  **metering practice.**
14          **But individuals were being turned pack**
15  **at ports of entry along the border and were**
16  **having -- reporting experiences in their testimonies**
17  **of these turn-backs that had many of the same**
18  **characteristics. Given the frequency of these**
19  **similar testimonies, it began to appear that there**
20  **was a practice, that it was -- that CBP was turning**
21  **people back in a similar manner. That's the way**
22  **that I'm defining practice. The policy is when it**
23  **has a written and often verbal component of guidance**
24  **from leadership that is establishing that practice**
25  **as policy.**

---

Stephanie Leutert - 1/28/2020    Confidential

101

1    Q.  How frequent must something happen for it
2  to become a practice?
3          MR. FENN:  Object to form.
4          THE WITNESS:  More than once.
5    Q.  (BY MR. SAMPAT)  Twice?
6          MR. FENN:  Objection.
7          THE WITNESS:  It just has to happen
8  more than once.  I don't have a specific number.
9    Q.  (BY MR. SAMPAT)  If something happens five
10 times, is that a practice?
11         MR. FENN:  Object to form.
12         THE WITNESS:  I don't think I could
13 put a number, but it's if something is reoccurring,
14 so more than once.
15   Q.  (BY MR. SAMPAT)  So you -- you testified
16 just a little while ago saying that the turn-back
17 practice was defined because CBP began to do it with
18 some frequency.  Is that correct?
19   **A.  More than once.**
20   Q.  So do you know how frequently they were
21 doing it?
22         MR. FENN:  Object.
23   Q.  (BY MR. SAMPAT)  That led to your opinion
24 that it was a practice?
25         MR. FENN:  Same objection.

102

1          THE WITNESS:  I -- I have access to
2  some of the published testimonies, and I reviewed
3  documents that were reporting some of these
4  turn-backs even within -- within CBP structure.  I
5  reviewed those.  These are the ones that were
6  recorded.  I'm sure there were others as well, but
7  there were multiple turn-backs beginning in 2016
8  that had similar characteristics.
9    Q.  (BY MR. SAMPAT)  So, then, is it your
10 testimony that a practice of turn-backs occurred
11 after the first turn-back?
12         MR. FENN:  Objection; calls for a
13 legal conclusion.
14         You can answer.
15         THE WITNESS:  That is practice -- I'm
16 sorry -- practice -- after the first -- I think when
17 you have more than one turn-back and individuals
18 with similar characteristics are reporting that
19 similar things were told to them or happen to them,
20 you begin to have a practice.
21   Q.  (BY MR. SAMPAT)  You begin -- what do you
22 mean by you begin to have a practice?
23   **A.  That's when the practice begins.**
24   Q.  So --
25   **A.  That's when you can start saying that there**

103

1  **is a practice.**
2    Q.  So on the second individual, that would be
3  a practice?
4          MR. FENN:  Objection; calls for a
5  legal conclusion.
6          You can answer.
7          THE WITNESS:  I'm stating that it's
8  multiple.  I -- I -- after one when you have
9  multiple turn-backs, you can start to say there is a
10 practice.
11   Q.  (BY MR. SAMPAT)  How many -- how many
12 practices -- how many individual turn-backs did you
13 look at in order to form the opinion that there was
14 a practice?
15         MR. FENN:  Object to form.
16         THE WITNESS:  What do you mean
17 turn-backs I looked at?
18   Q.  (BY MR. SAMPAT)  So in preparing this
19 report, you opined that there was a practice of
20 turning back asylum seekers.  Correct?
21   **A.  (Witness nods head).**
22   Q.  How many -- how many individual cases did
23 you review before you came to the conclusion that
24 there was a practice?
25         MR. FENN:  Same objection.

104

1          THE WITNESS:  I genuinely couldn't put
2  a number on it.  I cited some of the sources.  I
3  reviewed the cases that were mentioned in the
4  documents that are -- that were produced during
5  discovery.  I also reviewed cases that were in
6  public reports, and I also reviewed cases that were
7  in articles.  And I had -- well, that's what I
8  reviewed for the report.
9    Q.  (BY MR. SAMPAT)  Did you review ten cases?
10         MR. FENN:  Object to form; asked and
11 answered.
12         THE WITNESS:  I believe more.
13   Q.  (BY MR. SAMPAT)  20?
14   **A.  In what time frame?**
15   Q.  While you were preparing this report as you
16 were opining on that there is a practice --
17   **A.  The turn-backs under what time frame?  As**
18 **when I believed it was -- when it -- I believed it**
19 **was a --**
20   Q.  A practice?
21   **A.  A practice.**
22   Q.  Yes.
23   **A.  Oh.**
24         MR. FENN:  Same objection.
25         THE WITNESS:  I don't know, but it was

Stephanie Leutert - 1/28/2020    Confidential

---

105

1  quite a few because some of those reports have
2  many -- many cases of individuals who were turned
3  back from early 2016 through April 2018.
4      Q.  (BY MR. SAMPAT)  30?
5          MR. FENN:  Objection; asked and
6  answered.
7          THE WITNESS:  I really couldn't give
8  you a number.
9      Q.  (BY MR. SAMPAT)  Okay.  How do you define
10 turn-backs?
11         MR. FENN:  Objection; calls for a
12 legal conclusion.
13         You can answer.
14         THE WITNESS:  Turn-backs are
15 individuals who are seeking to access the U.S.
16 asylum system and are told at various geographic
17 points at times -- well, while it was a practice and
18 not a policy, so in the beginning, in 2016 to
19 April 2018, turn-backs would be CBP officers not
20 allowing that individual to seek asylum at the port
21 of entry when they sought to seek the asylum
22 system -- access to the asylum system and were not
23 allowed to seek that access and were such -- as such
24 returned to Mexico.
25     Q.  (BY MR. SAMPAT)  When you say "not allowed

---

106

1  to seek access," what do you mean?
2      A.  Were told various explanations.
3      Q.  What various explanations were they told?
4      A.  I believe I have that in my report.
5      Q.  Is it potentially on Page 24?
6      A.  Yes.  Thank you.
7      Q.  Uh-huh.
8      A.  These -- these explanations include a
9  description such as we're not accepting any more
10 people, and we -- CBP wasn't receiving people from
11 Honduras.
12     Q.  But these explanations weren't
13 standardized, correct, according to your report?
14         MR. FENN:  Object to form.
15         THE WITNESS:  According to the
16 testimonies in 2016 and 2017, the explanations
17 varied.  There were multiple explanations for why
18 these individuals could not seek asylum.
19     Q.  (BY MR. SAMPAT)  Do you know why those
20 reasons varied?
21         MR. FENN:  Object to form.
22         THE WITNESS:  I could speculate.
23     Q.  (BY MR. SAMPAT)  I'm not going to ask you
24 to do that.  For -- for the individuals that you
25 identify as being turned back, were any of them on

---

107

1  U.S. soil?
2      A.  According to the publically recorded
3  testimonies of individuals who were turned back, it
4  appears that, yes, some of the individuals were
5  turned back once they were on U.S. soil.
6      Q.  So what documents did you rely on to inform
7  your opinion that there was a policy of turn-backs?
8  We have -- just to make sure I understand, we have
9  the metering guidance.  Correct?
10     A.  Uh-huh.
11     Q.  Various musters.  Correct?
12     A.  For implementing the guidance.
13     Q.  Any verbal guidance you may have come
14 across through other documents that are listed in
15 Exhibit C of your report.  Correct?
16     A.  Correct.
17     Q.  And all of those documents that you
18 reviewed informed your opinion that there was a
19 policy of turn-backs?
20     A.  Those documents combined with my field
21 research that the -- the metering was being
22 implemented in a uniform fashion by late 2018 across
23 all of the ports of entry that I visited and that my
24 colleagues visited for our December -- December 2018
25 metering report.

---

108

1      Q.  Are there any other documents that support
2  your -- your opinion of that there's a policy?
3          MR. FENN:  Object to form.
4          THE WITNESS:  There -- those are the
5  primary documents combined with the implementation
6  that I witnessed across the border through my
7  fieldwork.
8      Q.  (BY MR. SAMPAT)  Okay.  What informs your
9  opinion that there's a practice of turn-backs?
10         MR. FENN:  Object to form.
11         THE WITNESS:  The testimonies that are
12 publically available, including the testimonies that
13 were within the documents that I reviewed and the
14 depositions as well when they were talking about the
15 origins of metering in the San Ysidro port of entry.
16         THE REPORTER:  I'm sorry.  In the...
17         THE WITNESS:  San Ysidro port of entry
18 and across some of the nearby ports of entry.
19     Q.  (BY MR. SAMPAT)  And that was only in
20 ██████████████' deposition?
21         MR. FENN:  Objection; mischaracterizes
22 the witness's testimony.
23         THE WITNESS:  No.  I believe that
24 was -- I believe in all of the depositions they
25 talked about metering beginning in early 2016 in

---

Stephanie Leutert - 1/28/2020    Confidential

109

1  San Ysidro.
2      Q.  (BY MR. SAMPAT)  Just to be clear, but the
3  only deposition testimony you considered when
4  preparing this report --
5      A.  Oh, I'm sorry.
6      Q.  -- was the ███████████ --
7      A.  Yes, yes.
8      Q.  -- deposition.  Correct?
9      A.  Yes.
10     Q.  Okay.  And what documents did you use to
11 support your theory that there is a practice of
12 turn-backs?
13     A.  I used -- I used the -- some of the
14 articles and documents that are included in my
15 footnotes and that are included in Exhibit C.
16     Q.  Okay.  Were there any other documents that
17 you did not list that were considered?
18     A.  No.
19     Q.  Any field notes?
20     A.  No.
21     Q.  Did you consider any field notes to support
22 your theory that there was a policy of turn-backs?
23         MR. FENN:  Objection; asked and
24 answered.
25         THE WITNESS:  No.

110

1      Q.  (BY MR. SAMPAT)  How do you define
2  metering?
3      A.  I define metering as the CBP's process of
4  turning individuals back at certain point -- at
5  certain -- turning people back at ports of entry.
6  In its current form, it includes individuals at the
7  limit line turning people back, and also includes a
8  decision on a certain number of individuals who will
9  be accepted into that port of entry on a daily
10 basis.  The metering itself, the way it looks has
11 changed over time during that -- during the four
12 years in slight ways, particularly after the
13 April 2018 guidance.
14     Q.  So before we move on to that, is it --
15 would I be -- would I be correct to say that the
16 turn-backs and the metering are basically one and
17 the same except we're talking about different time
18 periods?
19         MR. FENN:  Object to form;
20 mischaracterizes the witnesses testimony and calls
21 for a legal conclusion.
22         THE WITNESS:  I tend to see them as
23 parts of one another.  It's combined into the same
24 policy.
25     Q.  (BY MR. SAMPAT)  Okay.

111

1      A.  I tend to see turn-backs as the physical
2  turning back of an individual back to Mexico and not
3  accepting them in the moment they seek to access the
4  asylum system.  Metering is -- in my perspective is
5  that turn-backs -- well, it's the deciding on the
6  number of individuals that will be processed every
7  day in conjunction with turn-backs.
8      Q.  Okay.  What informs your opinion that there
9  was a policy of metering?
10     A.  My fieldwork that shows that there's a
11 standard uniform practice across ports of entry
12 along with reading the April 2018 guidance where the
13 guidance matched what I had seen at ports of entry
14 along the U.S.-Mexico border.
15     Q.  Did you say a standard uniform practice
16 across the various ports of entry?
17     A.  Yes.
18     Q.  How do you know they were standard?
19     A.  They were at least two -- often two CBP
20 officers stationed at the limit line providing
21 standard explanations to arriving noncitizens as to
22 why they could not access the U.S. asylum system at
23 that time.
24     Q.  And what were those explanations?
25     A.  That they were at capacity.

112

1      Q.  And how is that different from Page 24,
2  Paragraph No. -- Paragraph No. 45 in your report
3  where you talk about the explanations not being
4  standardized?
5          MR. FENN:  Object to form.
6          THE WITNESS:  At the time, I --
7  looking at the public testimonies from 2016 through
8  2017, they were -- they were turning people back and
9  not allowing them to -- CBP was turning people back
10 and not allowing noncitizens to access the asylum
11 system, but their explanations while having the same
12 practical consequence for noncitizens were
13 different -- involved different wording.  My
14 experience since late 2018 onward -- since 2018
15 onward, the second half of 2018 onward, has been
16 that there are not different explanations, there's
17 one standard sentence which is that the port is at
18 capacity.  There's very little variation in that
19 wording.
20     Q.  (BY MR. SAMPAT)  What documents support
21 your theory that there's a policy in metering?
22     A.  The April 2018 metering guidance.
23     Q.  Anything else?
24     A.  There are -- there are documents that were
25 mentioned in the depositions that may support them,

Stephanie Leutert - 1/28/2020    Confidential

---

113

1  but I did not review them for this expert testimony.
2      Q.   Anything else besides the metering guidance
3  and these other documents that you did not rely on?
4      A.   Yes.  I -- the deposition with ███████ as
5  well.  Also, I -- I'm sorry.  I did forget to
6  mention earlier.  The OIG reports -- the Office of
7  Inspector General, within CBP also makes reference
8  to metering and how it was standardized, I believe
9  both in the report that looks -- actually, I can
10  pull it up.  Right here.  It's both the -- the OIG
11  report that looks at Tecate --
12     Q.   Okay.
13     A.   -- and then the OIG report that looks at
14  initial observations regarding family separation
15  issues under zero tolerance policy.
16     Q.   Do you have a cite in the report?
17     A.   Yes.
18     Q.   Did you find it?
19     A.   Yes.
20     Q.   Could you direct us to it, please?
21     A.   Sure.  I'm sorry.  I just --
22     Q.   No, no.  That's perfectly all right.
23     A.   61, I believe it was.  No, I lied.  It's
24  60 -- I was lucky -- 55.
25     Q.   55.  Okay.  Okay.  And you're looking at

---

114

1  Footnote 131.  Is that correct?
2      A.   I am.
3      Q.   Okay.  So the metering guidance, OIG
4  report, ███████ depositions -- ███████ deposition.
5  Sorry.
6      A.   Yes.  And the -- I mean, I think the key
7  management reports as well, which are specifically
8  looking at data regarding metering.
9      Q.   Okay.  What -- what informs your opinion
10  that there was a practice of metering?
11     A.   The -- there would -- first the testimonies
12  of individuals who returned back.  The documents
13  that I reviewed, even in many of the e-mails, they
14  reference turn-backs.  ███████' testimony.  I
15  believe in the Tecate OIG report they also reference
16  turn-backs in 2016, 2017.
17     Q.   Okay.
18     A.   It was pretty ubiquitous that people were
19  talking about the kind of earliest forms of metering
20  in San Ysidro, Nogales, and Mexicali, perhaps among
21  other ports, perhaps Tecate.  In the -- in 2016 in
22  that -- this was a pretty common theme in a lot of
23  the documents that I reviewed.
24     Q.   So you -- you mentioned testimonies of
25  individuals who were subject to metering.  Correct?

---

115

1      A.   Yes.
2      Q.   Were those individuals listed in Exhibit C
3  of your report?
4          MR. FENN:  Object to form.
5          THE WITNESS:  If it's located in the
6  footnotes on Pages 23 and 24.
7      Q.   (BY MR. SAMPAT)  And can you just state for
8  the record what footnotes you're looking at?
9      A.   Absolutely.  There are also in Exhibit C
10  within some of these -- some of the documents that
11  were produced in discovery also do mention that some
12  of these testimonies, the ones that were reviewed, I
13  believe, for further review by the Office of the
14  Inspector General, I believe that was the office --
15  so there were accounts within the documents I
16  reviewed where they were speaking about some of the
17  cases that had been identified in Footnote 46 --
18     Q.   Okay.
19     A.   -- 47 and 48 -- 47 and 48 are IBID.
20         THE REPORTER:  47 and 48 are?
21         THE WITNESS:  IBID.  They are
22  repetitions.  But, again, these are -- these
23  testimonies are also in some of the documents that I
24  reviewed because some of the documents were internal
25  CBP discussions about some of these cases.

---

116

1      Q.   (BY MR. SAMPAT)  How many individual
2  metering -- strike that.
3          How many individual instances of
4  metering did you review before you came to the
5  conclusion that there was a practice of metering?
6          MR. FENN:  Objection; form, asked and
7  answered.
8          THE WITNESS:  Are you speaking to a
9  specific time frame of metering cases within a
10  specific time frame?
11     Q.   (BY MR. SAMPAT)  So your opinion is
12  about -- or you opine on that CBP has a metering
13  policy and practice.  Right?
14     A.   Yes.
15     Q.   When -- what is your opinion regarding when
16  that practice of metering went into place?
17         MR. FENN:  Object to form; calls for a
18  legal conclusion.
19         THE WITNESS:  When it goes into place,
20  the -- I write on Page 17, Paragraph 38 on May 26,
21  2016, CBP implemented the first iteration of its
22  metering system in the San Ysidro port of entry in
23  San Diego.
24     Q.   (BY MR. SAMPAT)  So starting on May 26 in
25  2016 to present day, how many individual situations

---

Stephanie Leutert - 1/28/2020    Confidential

---

117

1  or circumstances of metering did you see -- did you
2  review in order to reach your opinion that you opine
3  on saying that there is a practice of metering?
4      MR. FENN:  Object to form.
5      THE WITNESS:  I -- I -- this is a
6  slightly complicated question.  I'm not sure I fully
7  understand exactly what is being asked that I
8  reviewed.  I've worked on metering research and
9  produced five reports of which -- which were used in
10  the creation of this report.  And in creating these
11  five reports I met with hundreds of people who have
12  claimed to have been metered.
13      I also reviewed the cases that were
14  published online.  I follow this issue quite
15  closely.  And I have reviewed the -- reviewed the
16  published testimonies of individuals who were
17  metered or claimed to be turned back were metered in
18  2016, 2017, and have also reviewed CBP's documents
19  talking about these cases.
20      Q.  (BY MR. SAMPAT)  And just to make sure I
21  heard you clearly earlier, the only explanation you
22  considered in reaching your opinion that there was
23  turn-backs -- or sorry -- that there was metering at
24  the POEs is that they were at capacity?
25      MR. FENN:  Object to form;

---

118

1  mischaracterizes the witness's testimony.
2      THE WITNESS:  Can you repeat that
3  question, please.
4      Q.  (BY MR. SAMPAT)  Sure.
5      The only explanation that you
6  considered in forming your opinion that there was a
7  practice of metering was that the POEs were at
8  capacity?
9      MR. FENN:  Same objection.
10      THE WITNESS:  The only explanation
11  that I considered for metering was that the ports
12  were at capacity?
13      Q.  (BY MR. SAMPAT)  Yes.
14      A.  I don't think I -- I don't think I said
15  that.
16      Q.  Okay.  So -- and please correct me if I'm
17  wrong.  You testified earlier saying that there was
18  a standard explanation as to why individuals were
19  being metered.  Correct?
20      MR. FENN:  Objection; form.
21      THE WITNESS:  I understand what you're
22  referring to now.
23      Q.  (BY MR. SAMPAT)  Yeah.  Yeah.
24      A.  This -- which is along the lines of the
25  press release that was provided to us by CBP in late

---

119

1  2018.  You don't happen to actually have a copy of
2  my December report, do you?
3      Q.  I do not.
4      A.  I believe I -- I write the -- I think we
5  put in, perhaps, in full the -- what was provided to
6  us.  The explanation that we had heard repeatedly
7  was -- included capacity but was not exclusive to
8  that.  They talked about many things.  But I did not
9  go in with one set idea for why this was occurring.
10      Q.  My question is a little bit different.
11      A.  Okay.
12      Q.  Were there any other explanations that you
13  considered or didn't CBP provide any other
14  explanations as to why they were metering
15  individuals?
16      MR. FENN:  Object to form.
17      THE WITNESS:  While I was -- at what
18  point?
19      Q.  (BY MR. SAMPAT)  At any point that -- that
20  eventually made it into the expert report that you
21  have submitted in this case.
22      MR. FENN:  Objection; asked and
23  answered.
24      THE WITNESS:  I believe the primary
25  reason -- I'm sorry -- the primary explanation that

---

120

1  had been provided was regarding at capacity.  I'm
2  not -- it may not be the only there might be, but
3  that was the primary.
4      Q.  (BY MR. SAMPAT)  So was there any
5  consideration regarding the diversion and staffing
6  of resources for other -- for CBP purposes?
7      MR. FENN:  Objection; form.
8      THE REPORTER:  For other?
9      MR. SAMPAT:  CBP purposes.
10      MR. FENN:  Object to form.
11      THE WITNESS:  Can you repeat the
12  question?
13      Q.  (BY MR. SAMPAT)  Sure.
14      A.  If that was something I considered?
15      Q.  Yes.  So if -- did you consider CBP not
16  being able to process somebody for asylum because
17  there was a staffing issue for illegal narcotics
18  that had just come across the border?
19      A.  So I believe that was -- so I -- I believe
20  that is outside the scope of what I was specifically
21  asked to analyze in the report.
22      Q.  Okay.  Okay.  Just to be clear about your
23  report, you have not concluded that there is a
24  policy of using coercion to withdraw applications
25  for admission.  Is that correct?

---

Stephanie Leutert - 1/28/2020     Confidential

---

121

1          MR. FENN: Object to form;
2 Mischaracterizes the witness's testimony.
3          THE WITNESS: How do you define
4 "coercion"?
5      Q.  (BY MR. SAMPAT) That CBP officers have --
6 have used questionable tactics or certain tactics to
7 have individuals withdraw their applications?
8      **A.  I have seen -- I have seen testimonies of**
9 **individuals who make those allegations. I have not**
10 **seen a written document that outlines that that**
11 **should be official CBP practice.**
12     Q.  So --
13     **A.  Or policy.**
14     Q.  Right.  And so have you concluded there's
15 any practice of using coercion?
16         MR. FENN: Same objection.
17         THE WITNESS: There are allegations.
18 I have seen allegations of that.  It is not
19 something that I discuss in my report.
20     Q.  (BY MR. SAMPAT) So you don't conclude that
21 in your report.  Correct?
22     **A.  I don't discuss it in my report.  It seemed**
23 **outside the scope of exactly what I was supposed to**
24 **be discussing.**
25     Q.  Okay.  You have not concluded that there

---

122

1 was a policy of using threats or intimidation to
2 prevent people from entering.  Is that correct?
3          MR. FENN: Object to form.
4 Mischaracterizes the witness's testimony.
5          THE WITNESS: I'm sorry.  Can you
6 repeat that again?
7      Q.  (BY MR. SAMPAT) Sure.
8          In your report, you don't conclude
9 that there's a policy or practice of using threats
10 or -- and intimidation to prevent people from
11 entering.  Is that correct?
12         MR. FENN: Same objection.
13         THE WITNESS: I am not stating one way
14 or the other.  It is not something that I cover in
15 my report.
16     Q.  (BY MR. SAMPAT) So it's not written in
17 your report as an opinion you are proffering for
18 this case right now?
19     **A.  It was outside the scope -- I believe it to**
20 **be outside the scope of the question I was asked to**
21 **answer.**
22     Q.  Okay.  You have not concluded that there's
23 a policy of returning asylum seekers to Mexico after
24 they're on U.S. soil.  Correct?
25         MR. FENN: Same objection.

---

123

1          THE WITNESS: I believe there was a
2 practice in 2016 and 2017, given the areas where
3 individuals were reporting that they made contact
4 with CBP officials and given that CBP officials were
5 not stationed yet at the limit line.
6          Can you repeat -- I'm sorry -- the
7 question?
8      Q.  (BY MR. SAMPAT) Sure.
9          The -- my question only pertains to a
10 policy of it, right, so that you have not concluded
11 there was a policy of returning asylum seekers to
12 Mexico after they were on U.S. soil?
13         MR. FENN: Object to the form.
14         THE WITNESS: I have not seen written
15 guidance that would be requiring individuals who
16 were on U.S. soil to be returned.  I have not seen
17 that.  There were cases before that policy -- that
18 policy was issued in April 2018 between early 2016
19 and April of 2018 when that guidance had not yet
20 been issued.
21     Q.  (BY MR. SAMPAT) Are you talking about the
22 metering guidance?
23     **A.  Yes.**
24     Q.  From April of 2018, Todd Owen's metering
25 guidance?

---

124

1      **A.  Yes.**
2      Q.  Okay.
3      **A.  The -- before that, there does appear to be**
4 **a practice that asylum seekers would routinely,**
5 **perhaps in all cases, enter U.S. territory**
6 **between -- before being turned back.**
7      Q.  What evidence did you consider in reaching
8 that -- actually, strike that.
9          Is that an opinion you actually offer
10 in your report?
11         MR. FENN: Object to form.
12         THE WITNESS: Yes.  Page 22,
13 Paragraph 44, during these initial turn-backs.  And
14 I'm referring to that of between May 2016 and April
15 2018.
16     Q.  (BY MR. SAMPAT) Okay.
17     **A.  Asylum seekers arriving at U.S. ports of**
18 **entry would generally cross into U.S. territory**
19 **before CBP officials told them that they had to**
20 **return to Mexico.**
21     Q.  So that states -- and -- individual
22 instances of individuals being turned back.
23 Correct?
24         MR. FENN: Objection; calls for a
25 legal conclusion.

---

Stephanie Leutert - 1/28/2020    Confidential

125

1    Q.  (BY MR. SAMPAT)  Strike that.
2         That sentence refers to individual
3    cases of asylum seekers being told to return to
4    Mexico after they had crossed on U.S. soil.
5    Correct?
6         MR. FENN:  Objection; calls for a
7    legal conclusion.
8         THE WITNESS:  Given that CBP officials
9    were not yet given guidance to stand at the limit
10   line, it appears that -- and to stop people from
11   entering into U.S. territory, it would appear that
12   individuals who were seeking asylum -- all
13   individuals who were seeking asylum during that time
14   period would have entered into U.S. port of entry if
15   they were turned back -- I'm sorry -- U.S. territory
16   if they were turned back.
17   Q.  (BY MR. SAMPAT)  So I'd like to focus on
18   Pages 9 through 13 of your report.  Is there
19   anywhere in that section where you talked about --
20   where you talk about you have reached the following
21   conclusions.  Is there anywhere in that section that
22   you talk about a practice of returning asylum
23   seekers to Mexico after they had already returned
24   on -- after they were already on U.S. soil?
25        MR. FENN:  Object to form.

126

1         THE WITNESS:  Do you mind if I review?
2    Q.  (BY MR. SAMPAT)  No.  Please.
3    A.  So CBP's turning back of individuals --
4    actually, can you repeat your question so I can try
5    to answer better?
6    Q.  Sure.
7         Is there any part under Paragraph 23
8    in which you offer the opinion that there was a
9    practice of returning asylum seekers to Mexico after
10   they had already come on to U.S. soil?
11        MR. FENN:  Object to form.
12        THE WITNESS:  I do not write those
13   words in Paragraph 23 from Pages 9 through 13 -- or,
14   I'm sorry -- 12 -- the end of Page 12.
15   Q.  (BY MR. SAMPAT)  Okay.  And what was the
16   page number again that -- where you discussed
17   those --
18   A.  22.
19   Q.  Page 22.  Okay.
20        What evidence did you cite to in your
21   report to support the statement that there was a --
22   that individuals were being turned back after they
23   entered on U.S. soil?
24   A.  Well, on Table 1 on Page 23, I looked at a
25   few examples in different cities of first publicly

127

1    recorded turn-backs and then I noted down the
2    location of each turn-back, whether it was in a port
3    of entry entry hall or the U.S. side of the national
4    bridge, and this was gleaned from their testimonies.
5    I didn't just take these testimonies, though, on
6    face value.  I also, again, was using my
7    understanding that CBP officers were not uniformly
8    stationed at the limit line during this period, that
9    that had occurred after April 2018, which means
10   that -- that noncitizens that were seeking to access
11   the U.S. asylum system during this period would
12   likely have had to enter into U.S. territory to have
13   contact with a CBP officer.
14        I also quote on Page 23 that in
15   December 2016, large groups of Cubans arrived at the
16   Brownsville and Hidalgo points of entry.  And then I
17   noted that photos and video footage show the Cubans
18   entering and lining up in U.S. territory on the
19   Hidalgo international bridge.  So there was some
20   photos and videos of Cubans who were in U.S.
21   territory at that time.
22   Q.  Okay.  You have not concluded that there is
23   a policy or was a policy about the availability of
24   asylum in the United States.  Correct?
25        MR. FENN:  Objection to form;

128

1    misstates the witness's testimony.
2    Q.  (BY MR. SAMPAT)  Sorry.  Strike that.  Let
3    me rephrase the question.
4         You have not concluded that there was
5    a policy of lying about the availability of asylum
6    in the United States.  Correct?
7    A.  I did not attempt to answer that question.
8    Q.  So is it fair to say you didn't attempt to
9    answer the question of whether there was a practice
10   of it?
11        MR. FENN:  Object to form.
12        THE WITNESS:  That -- my -- I was
13   focusing on the question that plaintiffs' counsel
14   asked me to answer.
15   Q.  (BY MR. SAMPAT)  Which did not include as
16   to whether or not there was a practice of
17   individuals lying about the availability of asylum
18   in the United States?
19   A.  That was outside the scope of the question
20   I was asked to address.
21   Q.  Okay.  You have not concluded that there is
22   or was a policy of using physical force to block
23   access to ports of entry.  Correct?
24        MR. FENN:  Objection; form.
25        THE WITNESS:  That was outside the

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
ea092fcc-d3ab-4695-8338-c4d0b0f0b6f3

Stephanie Leutert - 1/28/2020    Confidential

---

129

1  scope of the question I was asked to address.
2      Q.  (BY MR. SAMPAT)  How about a practice of
3  using physical force to block access to ports of
4  entry?
5      **A.  That was outside the question that I was**
6  **asked to address.**
7      Q.  One second.
8      **A.  Okay.**
9      Q.  So then the answer is no.  Correct?
10     **A.  I'm not stating that.  I'm just stating**
11 **that I offer no opinion on that.**
12     Q.  Okay.  And -- but in that -- there is no
13 opinion in this report reflecting that.  Correct?
14     **A.  It was not the question that I set out to**
15 **answer.**
16     Q.  And there was -- there's no opinion in your
17 report regarding individuals lying about the
18 availability of asylum in the United States.
19 Correct?
20         MR. FENN:  Objection; asked and
21 answered.
22         THE WITNESS:  I mention cases where --
23     Q.  (BY MR. SAMPAT)  Sorry.  Let me rephrase.
24         There's nothing in your report
25 regarding a policy or practice of individuals lying

---

130

1  about availability of asylum in the United States?
2      **A.  I did not seek to answer that question.**
3      Q.  Okay.  Okay.
4          MR. SAMPAT:  It's 12:30.  Are you guys
5  thinking lunch?
6          MR. FENN:  Is this off the record?
7          MR. SAMPAT:  Can we go off the record?
8  Sorry.
9          (Off the record)
10     Q.  (BY MR. SAMPAT)  Ms. Leutert, do you
11 understand you're still under oath?
12     **A.  Yes.**
13     Q.  I'd like to move on to talk about the
14 methodology you used in preparing your expert report
15 that you submitted in Al Otro Lada versus Wolf.  You
16 mentioned that Exhibit C of your report reflects the
17 documents that you relied on to prepare this report
18 at this time.  Is that correct?
19     **A.  Yes.**
20     Q.  And there's a bunch of documents that
21 you've referred to in Bates stamp as provided by
22 defendants during the course of discovery.  Is that
23 correct?
24     **A.  Yes.**
25     Q.  And is it fair to say many of them were the

---

131

1  MCAT reports and queue management reports that we've
2  been discussing throughout the course of the
3  deposition?
4          MR. FENN:  Object to form.
5          THE WITNESS:  Which reports?  Can you
6  just restate --
7      Q.  (BY MR. SAMPAT)  The MCAT and the queue
8  management reports.
9      **A.  Yes.**
10     Q.  So what did the MCAT reports show?
11         MR. FENN:  Object to form.
12         THE WITNESS:  What did they include in
13 each one?
14     Q.  (BY MR. SAMPAT)  What were the -- what were
15 the different data points that they provided?
16         MR. FENN:  Object to form.
17         THE WITNESS:  They would have
18 provided -- they would have provided the number of
19 individuals who were detained at each port of entry.
20 They would have provided a detention capacity for
21 each port of entry and the percent capacity filled
22 at each port of entry among other data points.
23 Those were not the only data points that were
24 included in those reports.
25     Q.  (BY MR. SAMPAT)  Do you recall what other

---

132

1  data points were included?
2      **A.  There was a lot of points on the ports of**
3  **entry for border patrol.  They had ERO numbers.**
4  **They were ready for removal on some of them.  I**
5  **believe in later ones they had time in custody.**
6  **There was a different range of data points that they**
7  **included.**
8      Q.  Okay.  When you mentioned that the three --
9  the first three points you discussed --
10     **A.  Uh-huh.**
11     Q.  -- which is detention, detention capacity,
12 and percent capacity.
13     **A.  Yes.**
14     Q.  Those were numbers that provided -- that
15 were provided by CBP.  Correct?
16     **A.  They are numbers that were in the MCAT**
17 **reports that are created and -- created by CBP and**
18 **were provided by CBP.**
19     Q.  So it would be the detention capacity that
20 CBP has at a given port of entry at that time.
21     **A.  It would be the number of individuals they**
22 **have detained, the detention capacity, and the**
23 **percent detention capacity was filled at any given**
24 **point, yes.**
25     Q.  Okay.  And what did the queue management

---

Stephanie Leutert - 1/28/2020    Confidential

133

1  report show?
2          MR. FENN:  Object to form.
3          THE WITNESS:  The queue management
4  reports -- again, this is from my memory.
5      Q.  (BY MR. SAMPAT)  Uh-huh.
6      A.  Would have had the numbers of individuals
7  detained.  They would have had -- so similar to the
8  MCAT.  They did not include the -- no.  They did not
9  include the capacity -- the detention capacity for
10  each port.  But they did include the percent
11  capacity full or filled.  So it was -- it was
12  possible to, at times, deduce the detention
13  capacity, given that you had the number of
14  individuals detained and the number of -- and the
15  percent capacity that was filled at each port of
16  entry.
17          There also was the number of
18  individuals who were waiting at the limit line, and
19  there was a box that asked about effects on port
20  operations.  There may have been other variables
21  that were mentioned that I didn't name, and it's
22  just from my memory.
23      Q.  Okay.  Okay.  So when you talked -- when
24  you're discussing the fact that it was easy to
25  deduce what the capacity may have been at a specific

134

1  port --
2          MR. FENN:  I'm sorry.  Go ahead.
3      Q.  (BY MR. SAMPAT)  You -- is it fair to say
4  that if a port of entry had 80 individuals in
5  detention and documented it as 80 percent full, then
6  you could deduce that there was a hundred -- the
7  capacity to hold a hundred detainees?
8          MR. FENN:  Object to form;
9  mischaracterizes the witness's testimony.
10          THE WITNESS:  Queue management data
11  did not include detention capacity for ports of
12  entry.  MCAT data did.
13      Q.  (BY MR. SAMPAT)  Okay.
14      A.  I generally used MCAT data since it was
15  dated.  I would -- I did, however, compare it to
16  queue management data to see if they were roughly
17  the same, and they were.  That's when I tried to
18  make that deduction.  So I was still able to figure
19  out -- and, yes, using the method that you
20  described, but that's generally not what I used.  I
21  used MCAT as stated capacity because it was
22  explicitly stated in the MCAT reports.
23      Q.  So when you say you generally relied on the
24  MCAT reports, can you give a percentage as to how
25  much you relied on them in preparing your report?

135

1          MR. FENN:  Object to form.  I
2  didn't -- I did not generally rely on the MCAT
3  reports.  I generally relied on them for that
4  specific variable of percent capacity filled at each
5  port of entry.
6      Q.  (BY MR. SAMPAT)  Okay.  So in that case,
7  how -- can you give a percentage as to how much you
8  relied on the MCAT reports to prepare your expert
9  report in this case?
10          MR. FENN:  Object to form.
11          THE WITNESS:  Quite heavily, because
12  they had -- I reviewed 547 MCAT reports -- unique
13  MCAT reports.  This is Page 63 in the exhibits,
14  Table 7.
15      Q.  (BY MR. SAMPAT)  Page 63, you said?
16      A.  Yes.
17      Q.  Okay.
18      A.  I reviewed 547 MCAT daily reports and 314
19  queue management reports.  The MCAT reports had a
20  longer date range, so that's the times where I used
21  it.  It began in -- on November 30th, 2016 --
22      Q.  Uh-huh.
23      A.  -- and went through June -- I'm sorry --
24  July 13th, 2019.  So for certain questions, I looked
25  at the MCAT daily reports, given the date range, and

136

1  for others, I used the field queue -- or the queue
2  management reports because they had more -- it was
3  318 reports, but they were in a shorter time period,
4  and it had unique information that was not included
5  in MCAT such as the number of individuals waiting at
6  the limit line.  So I used both.  I don't know which
7  percent, but throughout the report I used both.
8      Q.  So fair to say you relied on the MCAT
9  reports more than the queue management reports?
10      A.  No.  I relied on both of them in different
11  ways throughout the report.  I -- I couldn't tell
12  you a percent that I -- I used.  I would say it's
13  about equal.  I used both reports --
14      Q.  Equal?
15      A.  -- in different ways throughout, but I
16  don't know what percent I would have assigned to
17  each, but I used them both throughout quite a bit.
18      Q.  And your testimony is that you relied on --
19  relied on both reports -- sorry.  Strike that.
20          You relied on the MCAT reports quite
21  heavily.  Correct?
22      A.  On the MCAT and the queue management quite
23  heavily, both.
24      Q.  Okay.  I just want to talk about something
25  you mentioned regarding the queue management

Stephanie Leutert - 1/28/2020    Confidential

---

137

1  reports. You said they also reflected the variables
2  affecting port operations. Is that correct?
3      A. There was a variable. I don't know if you
4  have a copy I could point to, but there was a
5  variable. It's the last one on the right, and it
6  would say something about effect on port operations,
7  and there would be written in an answer for the
8  different ports of entry.
9      Q. Do you recall any answers that were
10  written?
11      A. Yes. Most of the time it would say no
12  effect to port operations except in Eagle Pass where
13  there was almost constantly something written about
14  an effect to operations.
15      Q. When talking about the MCAT daily reports,
16  do you know if the reports reflected physical
17  capacity or operational capacity?
18          MR. FENN: Object to form.
19          THE WITNESS: They were referring to
20  physical capacity.
21      Q. (BY MR. SAMPAT) Do you know what
22  operational capacity is?
23      A. I do.
24      Q. What is your understanding of what
25  operational capacity is?

---

138

1      A. Physical -- well, I'm going to state it
2  in -- to differentiate it from physical capacity.
3      Q. Sure.
4      A. Physical capacity being the number of
5  individuals who could be inside of a physical space,
6  perhaps the physical limit of that space, and
7  operational capacity being the other factors that
8  might influence the number of individuals within
9  that port of entry or who could be processed within
10  that port of entry since its operational.
11      Q. And do you know what other factors that may
12  be?
13      A. Other factors for what?
14      Q. When determining operational capacity.
15          MR. FENN: Object to the form.
16          THE WITNESS: Can you restate the
17  question?
18      Q. (BY MR. SAMPAT) So you said the
19  difference -- physical capacity is how much a
20  port -- how many individuals a port of entry can
21  hold physically. Is that correct?
22      A. Correct.
23      Q. And operational capacity is a port of
24  entry's ability to process and detain asylum
25  seekers, depending on various other factors. Is

---

139

1  that correct?
2      A. Correct.
3      Q. So do you know what other factors go into
4  determining what a port of entry's operational
5  capacity is?
6      A. I can list some. Is that what you're
7  asking?
8      Q. Yeah, that would be great.
9      A. Well, there are factors that can
10  increase -- I'm sorry -- decrease or increase
11  operational capacity. For decrease, some of the
12  factors that I know have been listed have been the
13  demographics at times of the individuals -- well, I
14  can just read what I wrote. Why reinvent?
15      Q. Sure. And if you could direct us to the
16  page number you're referring, that could be great,
17  too.
18      A. Let's see. Okay. I wrote, "Certain groups
19  of asylum seekers or individuals may need to be held
20  in distinct areas," which would limit capacity. I
21  also pointed to changes in port infrastructure,
22  which could decrease capacity. I also mentioned,
23  however, that there are possibilities to increase
24  capacity, that there could be different allocations
25  of personnel, of resources, and also changes to port

---

140

1  infrastructure could increase capacity.
2      Q. And you're looking at Page 30?
3      A. Oh, I'm so sorry. Yeah. 39, yeah.
4      Q. Okay. And this is Paragraph 61?
5      A. It is Paragraph 61.
6      Q. Are you aware of any other factors that
7  can -- that affect operational capacity?
8          MR. FENN: Object to the form.
9          THE WITNESS: There's a wide range of
10  factors that could happen at a port of entry that
11  could affect capacity. You can come up with lots of
12  hypothetical situations that could decrease
13  capacity. They are also listed in some of the
14  port -- I'm sorry -- not the port -- the contingency
15  planning documents, different ways to increase
16  capacity. So there's -- there's a lot of different
17  scenarios out there for affecting operational
18  capacity.
19      Q. (BY MR. SAMPAT) But the MCAT reports don't
20  reflect operational capacity. Is that correct?
21      A. They do not.
22      Q. How about the queue management reports; do
23  they -- do they show physical capacity or
24  operational capacity?
25          MR. FENN: Object to form.

---

Stephanie Leutert - 1/28/2020    Confidential

141

1        THE WITNESS:  They do not show -- they
2   do not have a variable that is stated capacity
3   percentages -- I'm sorry -- stated capacity numbers.
4   They do have the variable of capacity filled, which
5   I have interpreted, and I believe, given its
6   similarity to MCAT numbers as being at physical
7   capacity.
8        Q.  (BY MR. SAMPAT)  And in regards to the
9   contingency plan at various ports --
10       **A.  Uh-huh.**
11       Q.  -- when they talk about increasing or
12  decreasing capacity, do they discuss actual or
13  operational capacity?
14       MR. FENN:  Object to form.
15       THE WITNESS:  On Page 47 in my report,
16  I discuss some of this or one example of the reports
17  that I'm referring to.
18       Q.  (BY MR. SAMPAT)  Okay.
19       **A.  Paragraph 71.**
20       Q.  Okay.
21       **A.  The integrated concept of operations**
22  **report, which I write was created for the southern**
23  **California region to lay out a plan for addressing**
24  **an arriving refugee caravan.**
25       Q.  Uh-huh.

142

1        **A.  I note some of the steps that it outlines**
2   **for increasing capacity, which are to transfer**
3   **individuals from CBP custody --**
4        THE REPORTER:  I'm sorry?  Which
5   custody?
6        THE WITNESS:  CBP.
7        THE REPORTER:  Thank you.
8        THE WITNESS:  And I interpret that as
9   being created to allow processing capacities to
10  accelerate and match higher than normal migration
11  numbers.  Oh, I'm sorry.  And then later on in 72, I
12  talk a little bit more about the stages of what that
13  looks like.  I interpreted this as being --
14  increasing operational capacity, not physical
15  capacity.
16       Q.  (BY MR. SAMPAT)  So in these -- in these
17  reports, were there -- were there indicators as to
18  when operational capacity would need to be increased
19  or decreased?
20       MR. FENN:  Object to form.
21       THE WITNESS:  Within which reports?
22       Q.  (BY MR. SAMPAT)  The contingency plan
23  reports or the DHS integrated concept of operations
24  report you refer to in your expert report.
25       **A.  And the question is if it contained what**

143

1   **exactly?  Sorry.**
2        Q.  Did it contain any indication as to when a
3   port of entry should increase or decrease
4   operational capacity?
5        MR. FENN:  Object to form.
6        THE WITNESS:  I believe if it wasn't
7   this one and others, there were triggers, but I
8   would have to confirm by looking at the document
9   again.
10       Q.  (BY MR. SAMPAT)  Okay.  Do you believe it's
11  important to know the difference between physical
12  capacity and operational capacity?
13       MR. FENN:  Object to form.
14       THE WITNESS:  Me personally knowing or
15  for what exactly?
16       Q.  (BY MR. SAMPAT)  In providing your opinion
17  in this case, do you think it's important to know
18  the difference between the two?
19       MR. FENN:  Object to form.
20       THE WITNESS:  The dictionary
21  difference?
22       Q.  (BY MR. SAMPAT)  Or how we've defined -- how
23  you've defined it in your testimony here today.
24       **A.  Well, they are referring -- by nature**
25  **physical capacity and operational capacity are**

144

1   **different concepts, so it's important to make that**
2   **distinction.**
3        Q.  I'm sorry.  I missed the last part.
4        **A.  Oh, sorry.  So I think it's important to**
5   **make that distinction.**
6        Q.  Uh-huh.  Why is it important?
7        MR. FENN:  Object to the form.
8        THE WITNESS:  Because there are two
9   different concepts.  I think particularly in this
10  case, I know from reading the depositions, the
11  focus -- there's a lot of focus on operational
12  capacity.  In the MCAT, the only data that's
13  provided is detention capacity.  I think
14  understanding how people are talking about this is
15  important.  And I feel like I try to note throughout
16  some of the differences and to make that
17  distinction.
18       Q.  (BY MR. SAMPAT)  Were there reports that
19  you reviewed in preparing your expert report in this
20  case that reflected the operational capacity of a
21  port of entry at a given point in time?
22       **A.  By reports do you mean the documents that**
23  **were provided in discovery?**
24       Q.  Yes.
25       **A.  I'm sorry.  But by operational capacity,**

Stephanie Leutert - 1/28/2020    Confidential

145

1  you're referring to what specifically in those
2  documents?
3      Q.  Was -- were there any reports that you
4  reviewed in preparing your report that reflected
5  operational capacity?  So that said, this is how
6  many individuals we can process or take into custody
7  today, given other constraints.
8          MR. FENN:  Object to form.
9          THE WITNESS:  The majority of the
10  documents that I did review were the MCAT and queue
11  management, which I was under the -- I am under the
12  impression that those are the documents that CBP
13  uses in its own determinations, and those do not
14  reflect operational capacity.
15      Q.  (BY MR. SAMPAT)  Okay.  Is there
16  information that you came across during the course
17  of reviewing documents in preparing your report that
18  you disregarded?
19          MR. FENN:  Object to form.
20          THE WITNESS:  I did not disregard
21  anything.  I've read everything and put it into a
22  complete picture, given all of the documents that I
23  had available to me.
24      Q.  (BY MR. SAMPAT)  Are there data points or
25  are there reports that you reviewed that you

146

1  considered to be less important?
2          MR. FENN:  Object to form.
3          THE WITNESS:  No.  I think everything
4  helped me understand what was happening at the
5  U.S.-Mexico border within ports of entry.
6      Q.  (BY MR. SAMPAT)  And that was by relying
7  quite heavily on the MCAT and the queue management
8  reports.  Correct?
9      A.  And -- sorry.  Because you said you --  can
10  you just repeat that?  I think also repeating what I
11  said.
12      Q.  Sure.
13      A.  Uh-huh.
14      Q.  In regards to my question --
15      A.  Uh-huh.
16      Q.  -- being that is there questions that
17  you -- are there data points or reports that you
18  consider to be unimportant.  You said no.  Is that
19  correct?
20      A.  There are data points that I used more than
21  others.  For example, within the MCAT, I did not use
22  the border patrol data.
23      Q.  Okay.
24      A.  Because it did not seem as relevant for
25  answering the specific question at hand.  However, I

147

1  did review all of the documents to try to get a full
2  understanding.  I did not dismiss any documents out
3  of hand.
4      Q.  In terms of the weight of importance you
5  gave certain documents versus others?
6          MR. FENN:  Object to form.
7          THE WITNESS:  No.  I think I took them
8  all into consideration.  I tried to answer the
9  question that I was asked to answer.
10      Q.  (BY MR. SAMPAT)  And you answered that
11  question by relying quite heavily, as per your
12  testimony, on the MCAT and queue management reports.
13  Correct?
14      A.  There is no database on operational
15  capacity that I could have used.
16      Q.  Okay.  And to reach your -- the opinions
17  you provide in this case, you mentioned you used a
18  common method.  Is that correct?
19      A.  Is that a direct quote from my report?
20      Q.  I believe it is.
21      A.  What page is that?
22      Q.  So you discuss common method on Page 12
23  starting at -- starting in Paragraph H, this common
24  methodology.
25      A.  Yes.

148

1      Q.  Can you -- can you describe what you mean
2  by this -- by common methodology?
3          MR. FENN:  Object to form.
4          THE WITNESS:  Yes, I can.  What I mean
5  by common methodology --
6      Q.  (BY MR. SAMPAT)  Yes.
7      A.  -- is that I could use a dataset that
8  through time and space -- so across multiple years
9  and across multiple ports of entry along the
10  U.S.-Mexico border, I could look at the same
11  information and to -- discern patterns or -- well,
12  pretty much patterns.  That's what I mean by common
13  methodology.
14      Q.  So in order -- to make sure I understand
15  your -- the methodology, you took MCAT and queue
16  management reports --
17      A.  Uh-huh.
18      Q.  -- that were provided to you for various
19  ports of entry.  Is that correct?
20      A.  Yes.
21      Q.  And you compiled that data together?
22      A.  Yes.
23      Q.  And then created a dataset that allows you
24  to make an opinion about CBP's patterns and
25  practices across the entire border?

Stephanie Leutert - 1/28/2020     Confidential

149

1          MR. FENN:  Object to form;
2  mischaracterizes the witness's testimony.
3          THE WITNESS:  I went through the MCAT
4  data.  I identified within the reports what I
5  thought would be relevant to addressing the question
6  that I was asked to address.  I had put it into an
7  Excel spreadsheet and then analyzed the outcome.
8  And what you see in the report is the presentation
9  of some of that outcome.
10     Q.  (BY MR. SAMPAT)  And in using this common
11  method, you primarily relied on the queue
12  management -- queue management reports, the MCAT
13  reports, and the contingency plans.  Correct?
14          MR. FENN:  Object to form,
15  mischaracterizes the witness's testimony.
16          THE WITNESS:  I -- in this common
17  methodology, I used the queue management data and
18  the MCAT reports.
19     Q.  (BY MR. SAMPAT)  You did not consider the
20  contingency plans?
21     **A.  I considered the contingency plans in the**
22  **report itself.**
23     Q.  Yes.
24     **A.  But in the Excel spreadsheet, I did not.**
25     Q.  Okay.  So -- so, then, the data that you

150

1  were looking at reflected actual capacity?
2          MR. FENN:  Object to form.
3     Q.  (BY MR. SAMPAT)  Correct?
4     **A.  I was using the MCAT reports and queue**
5  **management reports.**
6     Q.  Okay.  Who else uses the common methodology
7  report?
8     **A.  CBP.**
9     Q.  And what is that based on?
10     **A.  Oh, what -- the common methodology report,**
11  **you mean --**
12     Q.  Sorry.  Let me rephrase the question.
13          Who else uses the common methodology
14  approach that you employed in providing your expert
15  opinion in this case?
16     **A.  Well, in one of the documents that I**
17  **reviewed, CBP also used something similar in looking**
18  **at queue management across ports of entry.**
19     Q.  Do you recall which document that was?
20     **A.  Let me find it for you.**
21     Q.  Sure.
22     **A.  I cite it on Page 44.**
23     Q.  Give me one moment.
24     **A.  That's fine.**
25     Q.  You said 44?

151

1     **A.  Yes.**
2     Q.  Okay.
3     **A.  The Bates number on the document I'm**
4  **referring to is at the bottom of Footnote 103.**
5     Q.  So you're talking about a document Bates
6  stamped AOL-DEF-00210504?
7     **A.  Yes.**
8     Q.  Okay.  Were you asked to use this approach
9  by anyone?
10     **A.  No.**
11          MR. FENN:  Object to form.
12          THE WITNESS:  No.
13     Q.  (BY MR. SAMPAT)  Has this method been used
14  before other than by you or what you claim that CBP
15  did in -- in the referred-to document?
16          MR. FENN:  Object to form.
17          THE WITNESS:  I'm sure.
18     Q.  (BY MR. SAMPAT)  Are you aware of
19  circumstances in which it's been used?
20     **A.  By method, do you mean collecting this**
21  **information and analyzing it?**
22     Q.  Yes.  In the manner in which you did to
23  prepare this report.
24     **A.  Specifically MCAT and queue management or**
25  **any document of this type?**

152

1     Q.  MCAT and queue management.
2     **A.  Oh, CBP may have done it internally like**
3  **they did in this document, but this isn't public**
4  **information, and so it could not have been analyzed**
5  **by anyone outside of CBP.**
6     Q.  So, then, is it fair to say that the method
7  that you employed for this -- in order to prepare
8  this report has not been subject to peer review?
9          MR. FENN:  Object to form.
10          THE WITNESS:  I -- I'm not allowed to
11  use -- I wouldn't be allowed to use this data nor
12  would anyone else because it's classified, and so it
13  would be impossible to have it peer reviewed.
14     Q.  (BY MR. SAMPAT)  How about the method
15  itself of just compiling data in other forms?
16     **A.  I'm sure that could pass a peer-review**
17  **standard.  It's pretty common practice.**
18     Q.  Has anything regarding CBP's numbers at
19  ports of entry been published before?
20          MR. FENN:  Object to form.
21     Q.  (BY MR. SAMPAT)  I'm sorry.  Let me
22  rephrase the question.
23          Has CBP's detention numbers in this
24  form using MCAT and queue management reports been
25  published before --

Stephanie Leutert - 1/28/2020     Confidential

153

1     MR. FENN: Object.
2     Q. (BY MR. SAMPAT) -- publically?
3     A. To the best of my knowledge, no.
4     Q. Are you aware of -- sorry.
5     A. No.
6     Q. Is there something you wanted to say?
7     A. No. I'm sorry. I was going to make a
8 clarification, but I --
9     Q. Please. Go right ahead.
10     A. But I think that my clarification was
11 wrong, so it's --
12     Q. Okay.
13     A. Thank you.
14     Q. Is -- are you aware of what potential error
15 rate the methodology you used may pose for other
16 experts --
17     MR. FENN: Object to form.
18     Q. (BY MR. SAMPAT) -- that use the same
19 method?
20     A. I do note that -- so in Footnote 103 --
21     Q. Okay.
22     A. -- in the second sentence, I write,
23 "Similar to CBP, I also discovered multiple errors
24 in CBP's capacity percentages, which often stated a
25 hundred percent capacity despite reporting low

154

1 numbers of individuals in custody."
2     So that is something that is written
3 in that document that the person in CBP who did
4 similar analysis found errors. I found those same
5 errors. There are potentially several errors within
6 that dataset. I did not attempt to fix those
7 errors. I kept the CBP data as it was written.
8     Q. Do you know how many errors you found? Do
9 you recall?
10     A. I don't have an exact number. In the
11 dataset that I provided along with my expert report
12 in the key management data, these sales that are
13 highlighted yellow are the errors.
14     Q. Okay. Have you -- have you ever been an
15 expert witness before?
16     A. I have not.
17     Q. Okay. When it comes to the MCAT reports,
18 right, would you agree that it provides a snapshot
19 of what's going on at a port of entry?
20     MR. FENN: Object to form.
21     THE WITNESS: I actually believe in
22 one of the depositions -- one of -- either Todd Owen
23 or Randy Howe might have used that exact word or
24 agreed to it, but -- and so I would -- I would trust
25 their judgment since they would be the ones who

155

1 would be using it in an operational capacity.
2     Q. (BY MR. SAMPAT) Okay. Do you know whether
3 ports of entry had the flexibility to implement key
4 management as needed?
5     MR. FENN: Object to form.
6     THE WITNESS: What do you mean? Sorry
7 to get -- what do you mean by "had the flexibility"?
8     Q. (BY MR. SAMPAT) So are you aware that
9 ports of entry were provided -- were allowed to
10 implement queue management as needed depending on
11 their operational constraints at a given time?
12     A. What time frame are we talking about?
13     Q. Let's talk about from -- starting at the
14 beginning in 2016 -- or sorry -- the metering
15 guidance came out in April 2018. Correct? So let's
16 talk from April 2018 to today.
17     A. I believe -- do you have a copy of that
18 guidance? And I could quote it back.
19     Q. I actually do not.
20     A. No?
21     Q. No.
22     A. Okay. I think I quoted it. I might not
23 have quoted that exact line. I don't remember the
24 exact language. I know that document is the one
25 that would have stated language to that -- on that

156

1 issue, but I don't have it in front of me, and I
2 don't remember the exact language that was used.
3     Q. That's okay. Did that -- did that language
4 play a role in reaching your conclusion?
5     MR. FENN: Object to the form.
6     THE WITNESS: Which language exactly?
7     Q. (BY MR. SAMPAT) About the -- the -- about
8 ports of entry having flexibility to implement queue
9 management.
10     A. I took everything in that memo into
11 consideration. I used -- I based my information --
12 or I -- what I also took into consideration along
13 with that memo was my own fieldwork that showed that
14 it was being implemented uniformly in that time
15 period across all the ports of entry that I visited
16 and also CBP's own internal document that noted that
17 key management was in place by -- I think it was
18 June of 2018 in every port of entry except Calexico
19 West, which was noted that was redirecting.
20     Q. And are you aware of time periods when
21 queue management was not being implemented at a port
22 of entry?
23     A. From April 2018 onward?
24     Q. From -- let's start before that. Let's go
25 from 2016 onward.

Stephanie Leutert - 1/28/2020    Confidential

---

157

1    **A. Queue management was not implemented**
2  **uniformly across the entire border until April 2018.**
3    Q.  So then after April 2018, are you aware
4  of -- of a time when queue management was not being
5  implemented at an individual port of entry?
6    **A.  By queue management, do we also mean the --**
7  **by queue management, can you explain actually all**
8  **the different activities that you're including in**
9  **that?**
10    Q.  We were talking about metering.  We're
11  talking about individuals being told that we're at
12  capacity.
13    **A.  And individuals stationed at the limit**
14  **line?**
15    Q.  Yes.
16    **A.  Then I don't -- I don't know of any cases**
17  **where individuals were removed from the limit line**
18  **during that period.**
19    Q.  Are you aware where ports of entry were
20  processing the asylum seekers as they were coming to
21  the limit line?
22        MR. FENN:  Object to form.
23    Q.  (BY MR. SAMPAT)  Rather than redirecting
24  them?
25    **A.  Do I personally know those cases?  No.**

---

158

1    Q.  Okay.
2        MR. SAMPAT:  Can we take five minutes?
3        MR. FENN:  Sure.
4        (Off the record)
5        (Exhibit No. 3 marked)
6    Q.  (BY MR. SAMPAT)  Ms. Leutert, you've just
7  been handed a document that's been marked Exhibit 3,
8  and that is Bates stamped AOL-DEF-00273294.  Have
9  you seen this document before?
10    **A.  I believe this is one of the documents.**
11  **Actually, let me just -- yeah -- yeah, I believe**
12  **this is one of the documents -- no -- that -- that I**
13  **read about in the -- in the depositions after I**
14  **submitted my expert report.**
15    Q.  So is it fair to say that you did not rely
16  on this document when preparing your report because
17  it's not listed in Exhibit C?
18    **A.  It was not available to me at the time, so,**
19  **no, I did not rely on it.**
20    Q.  Can you turn to the third and last page in
21  the document?
22    **A.  (Witness complies).**
23    Q.  And -- and you'll see that the document
24  lists the order in which CBP prioritizes their
25  staffing and operations.  It's just a numerical list

---

159

1  right there.  Can you please read them over and let
2  me know when you're done?
3    **A.  Sure.  Okay.  I'm done.**
4    Q.  So in the methodology you employed to
5  prepare your expert report in this case, did your
6  methodology consider how OFO makes staffing
7  decisions to protect against national security
8  threats?
9        MR. FENN:  Object to form.
10        THE WITNESS:  That was beyond the
11  scope of what I was asked to write about.
12    Q.  (BY MR. SAMPAT)  Did your methodology
13  consider what other resources and staffing may need
14  to be allocated to address national security
15  threats?
16        MR. FENN:  Object to form.
17        THE WITNESS:  That was also beyond the
18  scope of what I was asked to talk about.
19    Q.  (BY MR. SAMPAT)  Do you agree that the U.S.
20  government should expend resources to identify
21  national security threats?
22        MR. FENN:  Object to form.  Are you
23  asking about in her capacity as an expert or
24  personally?
25        MR. SAMPAT:  Yes.  As an expert.

---

160

1        THE WITNESS:  Can you repeat the
2  question?
3    Q.  (BY MR. SAMPAT)  Do you agree that the U.S.
4  government should expend resources to identify
5  national security threats?
6        MR. FENN:  Same objection.
7        THE WITNESS:  Speaking as the expert
8  in -- speaking as in my personal capacity?
9    Q.  (BY MR. SAMPAT)  No.
10    **A.  As an expert?**
11    Q.  In the capacity in which you are providing
12  a report, an expert report in this case?
13    **A.  Yes, they should expend resources to**
14  **identify national security threats.**
15    Q.  Did your methodology consider how OFO makes
16  staffing decisions to run counter narcotics
17  operations?
18        MR. FENN:  Object to form.
19        THE WITNESS:  That was beyond the
20  scope of what I was asked to address.
21    Q.  (BY MR. SAMPAT)  Did your methodology
22  consider how resources and staffing may need to be
23  allocated to run counter narcotics operations?
24        MR. FENN:  Objection; form.
25        THE WITNESS:  That was beyond the

---

Stephanie Leutert - 1/28/2020     Confidential

---

161

1  scope of what I was asked to address.
2      Q.  (BY MR. SAMPAT)  Do you agree that the U.S.
3  government should expend resources to run narcotics
4  operations?
5          MR. FENN:  Object to the form.
6          THE WITNESS:  I -- yes.  I do believe
7  that expending some resources to those operations is
8  useful.
9      Q.  (BY MR. SAMPAT)  Did your methodology
10  consider how OFO makes staffing decisions to protect
11  economic security?
12          MR. FENN:  Object to form.
13          THE WITNESS:  That was beyond the
14  scope of what I was asked to address.
15      Q.  (BY MR. SAMPAT)  Did your methodology
16  consider what resources and staffing may need to be
17  allocated to protect economic security?
18      A.  That was beyond the scope of what I was
19  asked to address.
20      Q.  Did your methodology consider how OFO makes
21  staffing decisions to prioritize trade and travel
22  facilitation?
23          MR. FENN:  Objection; form.
24          THE WITNESS:  That was beyond the
25  scope of what I was asked to address.

---

162

1      Q.  (BY MR. SAMPAT)  Did your methodology
2  consider what resources may be allocated -- sorry.
3  Strike that.
4          Did your methodology consider what
5  resources and staffing may need to be allocated to
6  facilitate travel and trade across the border?
7          MR. FENN:  Object to form.
8          THE WITNESS:  That was beyond the
9  scope of what I was asked to address.
10      Q.  (BY MR. SAMPAT)  Did your methodology
11  consider any staff fluctuation on a particular day
12  at a port of entry -- at a particular port of entry,
13  I should say?
14          MR. FENN:  Object to form.
15          THE WITNESS:  At a particular -- can
16  you repeat the question?
17      Q.  (BY MR. SAMPAT)  Sure.
18          Did your methodology consider any
19  staff fluctuation on a particular day at a
20  particular port of entry?
21          MR. FENN:  Same objection.
22          THE WITNESS:  My report looks at --
23  looks at some of the contingency plans that discuss
24  increasing personnel to process additional asylum
25  seekers, so it is mentioned -- looking at different

---

163

1  staffing levels of ports of entry is mentioned in
2  the report.
3      Q.  (BY MR. SAMPAT)  Did any of the reports
4  reflect what the staffing was at a particular port
5  on a given day?
6          MR. FENN:  Object to form.
7          THE WITNESS:  That information is not
8  included in any of the databases I received.
9      Q.  (BY MR. SAMPAT)  Did your methodology
10  consider how demographics of asylum seekers might
11  affect operational capacity at a particular port of
12  entry?
13          MR. FENN:  Object to the form; asked
14  and answered.
15          THE WITNESS:  On Page 39, I do mention
16  that certain groups of asylum seekers or individuals
17  may need to be held in distinct areas limiting
18  capacity.  That's Page 6 -- or Page 39, Paragraph
19  61.
20      Q.  (BY MR. FENN)  I'm sorry.  Which -- which
21  line is that?
22      A.  It is Line -- it's begins on Line 6, and
23  certain groups of -- it's in the sentence (as read),
24  "Changes to support infrastructure" --
25      Q.  Okay.

---

164

1      A.  It's the second half of that sentence.
2      Q.  Okay.  And the MCAT reports wouldn't
3  reflect that.  Correct?
4          MR. FENN:  Object to form.
5          THE WITNESS:  Wouldn't reflect what
6  specifically?
7      Q.  (BY MR. SAMPAT)  When asylum seekers and
8  other individuals may need to be held in distinct
9  areas.
10      A.  That is not a variable included in the MCAT
11  reports.
12      Q.  How about the queue management reports?
13      A.  It is not included in the queue management
14  reports.
15      Q.  Are you being paid for your services in
16  this case?
17      A.  I am not.
18      Q.  Did you waive your fee in this case?
19      A.  I did.
20      Q.  Why?
21      A.  Because I was under -- well, plaintiffs'
22  counsel let me know that this was a pro bono case.
23      Q.  If plaintiffs prevail in this action, will
24  you request compensation then?
25      A.  I honestly hadn't thought that far in

---

Stephanie Leutert - 1/28/2020    Confidential

165

1  advance.  I don't expect to.
2           MR. SAMPAT:  Can you give us two
3  minutes?
4           (Off the record)
5       Q.  (BY MR. SAMPAT)  Ms. Leutert, we're back on
6  the record.  You understood you're still under oath?
7       A.  Yes.
8       Q.  Thank you.  At this time, we actually have
9  no further questions, and we're going to pass --
10  we're going to pass you over to counsel.
11          MR. SAMPAT:  If you have any?
12          MR. FENN:  I'm sorry.  Can you give us
13  five more minutes?
14          MR. SAMPAT:  Yeah, yeah.  Take your
15  time.
16          (Off the record)
17          MR. FENN:  We have no questions for
18  Ms. Leutert.
19          MR. SAMPAT:  Okay.  We are actually
20  going to hold the deposition open at this time.
21  There is the matter of the notes and stuff that we
22  had subpoenaed from Ms. Leutert regarding her field
23  notes and things like that, and we were told we'd
24  be -- so we'll be in touch and clarify all that, and
25  then we'll go from there.

166

1           MR. FENN:  Okay.  Thank you.
2           MR. SAMPAT:  All right.  Thank you
3  very much.
4           (Deposition concluded at 3:05 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

167

1
2  CHANGES AND CORRECTIONS
   STEPHANIE LEUTERT - JANUARY 28, 2020 - VOLUME 1
3  [DISREGARD IF WAIVED]
4
   Reason Codes:  (1) to clarify the record; (2) to
5
   conform to the facts; (3) to correct a transcription
6
   error; (4) (please explain).
7
   PAGE/LINE       CHANGE       REASON CODE
8
9  ___
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

168

1           SIGNATURE
2
3       I, STEPHANIE LEUTERT, have read the foregoing
4  deposition and hereby affix my signature that same
5  is true and correct, except as noted above.
6
7  _____
            STEPHANIE LEUTERT
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Stephanie Leutert - 1/28/2020     Confidential

---

169

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA
3                    (SAN DIEGO)
4  AL OTRO LADO, INC.,    )
   ET AL.,                )
5                         )
                          )
6     Plaintiffs,         )
                          )
7                         )
                          )
8                         )
   vs.                    )  NO. 3:17-CV-02366-BAS-KSC
9                         )
                          )
10                        )
                          )
11 CHAD F. WOLF, ACTING   )
   SECRETARY, U.S. DEPARTMENT )
12 OF HOMELAND SECURITY, IN )
   HIS OFFICIAL CAPACITY,  )
13 ET AL.,                )
                          )
14                        )
   Defendants.            )
15
16 .........................

17
18       REPORTER'S CERTIFICATION
19
         *** CONFIDENTIAL ***
20
         ORAL DEPOSITION OF
21
         STEPHANIE LEUTERT
22
             VOLUME 1
23
         JANUARY 28, 2020
24
25 .........................
```

---

170

```
1      I, Jodi Cardenas, Certified Shorthand Reporter
2  in and for the State of Texas, hereby certify to the
3  following:
4      That the witness, STEPHANIE LEUTERT, was duly
5  sworn by the officer and that the transcript of the
6  oral deposition is a true record of the testimony
7  given by the witness;
8      I further certify that pursuant to the Federal
9  Rules of Civil Procedure, Rule 30(e)(1) (A) and (B)
10 as well as Rule 30(e)(2) that the signature of the
11 deponent:
12
13      _____ was requested by the deponent and/or a
14 party before the completion of the deposition and is
15 to be returned within 30 days from date of receipt
16 of the transcript.  If returned, the attached
17 Changes and Corrections and Signature Pages contains
18 any changes and the reasons therefor;
19
20      __X__ was not requested by the deponent or
   a party before the completion of the deposition.
21
22      That $_____ is the deposition officer's
23 charges for preparing the original deposition
24 transcript and any copies of exhibits charged to
25 DEFENDANTS;
```

---

171

```
1      That pursuant to information given to the
2  deposition officer at the time said testimony was
3  taken, the following includes all parties of record:
4
5  FOR THE PLAINTIFFS:
6    Mr. Matthew E. Fenn
     MAYER BROWN, LLP
7    1221 Avenue of the Americas
     New York, New York 10020
8    (212) 506-2316
     mfenn@mayerbrown.com
9
   -and-
10
     Ms. Rebecca Cassler
11   SOUTHERN POVERTY LAW CENTER
     P.O. Box 1287
12   Decatur, Georgia 30031
     (414) 521-6700
13   rebecca.cassler@splcenter.org
14 -and-
15   Mr. Baher Azmy
     CENTER FOR CONSTITUTIONAL RIGHTS
16   666 Broadway, 7th Floor
     New York, New York 10012
17   (212) 614-6427
     bazmy@ccrjustice.org
18
19
   FOR THE DEFENDANTS:
20
     Mr. Dhruman Y. Sampat
21   Mr. Ari Nazarov
     U.S. DEPARTMENT OF JUSTICE - CIVIL DIVISION
22   Ben Franklin Station
     P.O. Box 868
23   Washington, DC 20044
     (202) 532-4281
24   dhruman.y.sampat@usdoj.gov
     ari.nazarov@usdoj.gov
25
```

---

172

```
1      I further certify that I am neither counsel
2  for, related to, nor employed by any of the parties
3  or attorneys in the action in which this proceeding
4  was taken;
5      Further, I am not a relative nor an employee of
6  any attorney of record in this cause, nor am I
7  financially or otherwise interested in the outcome
8  of the action.
9      Certified to by me this 3RD day of FEBRUARY,
10 2020.
11
12
13
14 JODI CARDENAS, RPR, Texas CSR 7594
   CSR Expiration: 12/31/21
15 WRIGHT WATSON & ASSOCIATES
   Firm Registration No. 225
16 Firm Expiration: 12-31-22
   1250 South Capital of Texas Highway
17 Building 3, Suite 400
   Austin, Texas 78746
18 512-474-4363/512-474-8802 (fax)
   www.wrightwatson.com
19
20
21
22
23
24
25
```

---