ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
SAMUEL P. GO
Assistant Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV (CT 414491)
HAYDEN WINDROW (NY 4384749)
DHRUMAN Y. SAMPAT (NJ 270892018)
United States Department of Justice
Civil Division
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4281 | Fax: (202) 305-7000
Trial Attorneys
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' EXHIBIT 4 IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT** |
| CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

DEFENDANTS' EX. 4 IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

----------------------------------x

AL OTRO LADO, INC., et al.,        :

            Plaintiffs,          : Case No.:

    vs.                              : 17-cv-02366-BAS-KSC

KEVIN K. MCALEENAN, et al.,        :

            Defendants.          :

----------------------------------x


DEPOSITION MARKED CONFIDENTIAL

DEPOSITION OF TODD OWEN

Washington, D.C.

Friday, December 13, 2019

9:40 a.m.


Job No.: 529549

Pages: 1 - 332

Reported by: Elizabeth Mingione, RPR



Page 74

1    A.    No.  Disaster, no.

2    Q.    If somebody told you that the metering

3    policy created a humanitarian disaster, you would have

4    told them that's not correct; is that right?

5    A.    Well, I would tell them if that's their

6    opinion and I don't share that opinion.

7    Q.    Isn't it true that metering occurred at

8    ports of entry even when those ports have excess

9    capacity?

10   A.    You have to define capacity.

11   Q.    How do you define capacity?

12   A.    I define capacity as two parts.  There is

13   the physical capacity which is the space within the

14   detention cells.  Then there's the operational

15   capacity which takes into consideration such things as

16   the demographics of those in custody, the conditions

17   of those in custody T, the issues and sickness issues,

18   the other operational priorities as to how the

19   resources in the ports are being directed that day,

20   all of these other day-to-day operational

21   considerations which may keep a port from reaching the

22   full physical space that they have.



Page 75

1    Q.    So if a port decides to prioritize other
2  matters over processing migrants without proper travel
3  documents, they may have a lower operational capacity;
4  is that right?
5    A.    Could you repeat that question.
6    Q.    Sure.
7    A.    Trying to follow.
8    Q.    If as a policy matter a port decides that
9  they are going to prioritize other missions besides
10 inspecting and processing individuals that don't have
11 proper travel documents, that port will effectively
12 have a lower operational capacity; is that right?
13   A.    Correct.  The finite resources that we have
14 are directed amongst multiple priorities in the ports
15 of entry.  The more you direct towards narcotics
16 intradiction or the counter-terrorism threat means
17 there's less to do other things in, whether that's the
18 migrant processing, the trade enforcement, the
19 agriculture mission.  The full scope of what we do at
20 the ports of entry, if you push resources in one area,
21 there will be less resources in other areas including
22 migrant process.



Page 76

1    Q.    And if you wanted to intentionally lower
2    the operational capacity to process migrants, you
3    could assign more front-line officers to those other
4    missions; is that right?
5          MS. SHINNERS:  Objection.  Argumentative.
6    You can answer.
7    A.    The capacity drives the decisions.  And,
8    again, the capacity is not just the physical space but
9    the operational aspects of what's taking place.  There
10   are certain priority missions within CBP that we do
11   not pull officers off of to process the migrants.  We
12   will not sacrifice the counter-terrorism mission.  we
13   will not sacrifice the narcotics mission.
14         We would not reassign officers from those
15   key missions to process more migrants.
16   Q.    But you have a legal duty to process asylum
17   seekers, right?
18   A.    And we do.
19   Q.    And so but you won't sacrifice the
20   counter-terrorism mission and the narcotics mission to
21   process asylum seekers; is that right?
22   A.    I will not redirect resources from those



Page 77

1   priority missions to process migrants quicker.

2       Q.   Do you believe that counter-terrorism and
3   anti-narcotics are higher priority missions that
4   processing asylum seekers?

5       A.   Yes, I do.

6       Q.   Do you believe that having a orderly flow
7   of trade is a higher priority mission than processing
8   asylum seekers?

9       A.   Yes, I do.

10      Q.   Do you ever interact with individuals in
11  the Mexican government?

12      A.   Yes.

13      Q.   Have you ever -- do you know of an agency
14  in the Mexican government called INM or --

15      A.   INAMI.

16      Q.   -- or INAMI?

17      A.   Yes.  It's Mexican immigration.

18      Q.   Have you ever interacted with the
19  commissioner of INAMI?

20      A.   No.

21      Q.   Do you know of a commissioner of INAMI
22  called Commissioner Vargas?

