MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>              Plaintiffs,<br><br>      v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>              Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 2 IN SUPPORT OF JOINT MOTION CONCERNING SPOLIATION SANCTIONS** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

1  CENTER FOR CONSTITUTIONAL RIGHTS
2      Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
       *bazmy@ccrjustice.org*
3      Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
       *gschwarz@ccrjustice.org*
4      Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
       *aguisado@ccrjustice.org*
5  666 Broadway, 7th Floor
   New York, NY 10012
6  Telephone: +1.212.614.6464
7  Facsimile: +1.212.614.6499

8  SOUTHERN POVERTY LAW CENTER
       Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
9      *sarah.rich@splcenter.org*
       Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
10     *rebecca.cassler@splcenter.org*
   150 E. Ponce de Leon Ave., Suite 340
11 Decatur, GA 30030
   Telephone: +1.404.521.6700
12 Facsimile: +1.404.221.5857

13
   AMERICAN IMMIGRATION COUNCIL
14     Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
       *kwalters@immcouncil.org*
15 1331 G St. NW, Suite 200
   Washington, D.C. 20005
16 Telephone: +1.202.507.7523
17 Facsimile: +1.202.742.5619

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---------------------------x

AL OTRO LADO, INC., et al., :

    Plaintiff,        :

  -vs-             : Case No.

KEVIN K. McALEENAN, et al., : 17-cv-02366-BAS-KSC

    Defendants.     :

---------------------------x

CONFIDENTIAL

30(b)(6) Deposition of

U.S. CUSTOMS & BORDER PROTECTION

By and Through

RANDY J. HOWE

Washington, D.C.

Thursday, January 9, 2019

9:34 a.m.

Job No.:  541878

Pages 1 - 305

Reported by:  Tammy S. Newton

Magna Legal Services
866-624-6221
www.MagnaLS.com

Page 2

1

2    30(b)(6) Deposition of Randy J. Howe held at the

3    offices of:

4        Mayer Brown

5        1999 K Street, N.W.

6        Washington, D.C. 20006

7

8

9

10   Pursuant to agreement, before Tammy S. Newton, a

11   Notary Public in and for the District of

12   Columbia.

13

14

15

16

17

18

19

20

21

22

1                   A P P E A R A N C E S

2        ON BEHALF OF PLAINTIFFS:

3              STEPHEN M. MEDLOCK, ESQUIRE

4              Mayer Brown

5              1999 K Street, N.W.

6              Washington, D.C. 20006

7              (202) 263-3221

8              smedlock@mayerbrown.com

9                    and

10             ANGELO GUISADO, ESQUIRE

11             Center for Constitutional Rights

12             666 Broadway, 7th Floor

13             New York, New York 10012

14             (212) 614-6454

15             aguisado@ccrjustice.org

16

17

18

19

20

21

22

Page 4

1        ON BEHALF OF DEFENDANTS:

2               KATHERINE J. SHINNERS, ESQUIRE

3               SUSAN IMERMAN, ESQUIRE

4               U.S. Department of Justice

5               Office of Immigration Litigation

6               Ben Franklin Square, P.O. Box 868

7               Washington, D.C. 20044

8               (202) 598-8259

9               katherine.j.shinners@usdoj.gov

10                  and

11              SARAH RICH, ESQUIRE

12              REBECCA CASSLER, ESQUIRE

13              Southern Poverty Law Center

14              1101 17th Street, N.W.

15              Suite 705

16              Washington, D.C. 20036

17              (202) 355-4471

18              sarah.rich@splcenter.org

19              (Appeared via Telephone)

20

21

22

1        Also Present:

2              Louisa Slocum, Esquire, CBP

3              Kristine King, Esquire, CBP

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 6

1                    C O N T E N T S

2    EXAMINATION OF RANDY J. HOWE              PAGE:

3         By Mr. Medlock                          9

4         By Mr. Guisado                        257

5         By Ms. Shinners                       297

6

7    DEPOSITION EXHIBITS                       PAGE:

8    Number 78 - January 8, 2020 Letter        18

9    Number 79 - Notice of Deposition          33

10   Number 80 - Expert Designation            59

11   Number 81 - LinkedIn Profile              63

12   Number 82 - February 20, 2017 Memo        96

13   Number 83 - E-mail Chain                  98

14   Number 84 - E-mail Chain                 108

15   Number 85 - E-mail Chain                 111

16   Number 86 - June 5, 2018 Memo            120

17   Number 87 - E-mail Chain                 137

18   Number 88 - E-mail Chain                 140

19   Number 89 - E-mail Chain                 144

20   Number 90 - E-mail Chain                 150

21   Number 91 - Contingency Plan             158

22   Number 92 - E-mail Chain                 177

Page 7

```
 1    DEPOSITION EXHIBITS                              PAGE:

 2    Number 93 - E-mail Chain                         180

 3    Number 94 - April 27, 2018 Memo                  182

 4    Number 95 - E-mail Chain                         184

 5    Number 96 - E-mail                               186

 6    Number 97 - E-mail Chain                         189

 7    Number 98 - E-mail Chain                         195

 8    Number 99 - MCAT Report                          198

 9    Number 100 - MCAT Report                         200

10    Number 101 - E-mail Chain                        202

11    Number 102 - Document Clawed Back                204

12    Number 103 - Contingency Plan                    211

13    Number 104 - BuzzFeed News Article               218

14    Number 105 - E-mail Chain                        221

15    Number 106 - E-mail Chain                        224

16    Number 107 - E-mail                              228

17    Number 108 - E-mail Chain                        232

18    Number 109 - E-mail Chain                        236

19    Number 110 - OIG Special Report                  239

20    Number 111 - October 29, 2018 Memo               243

21    Number 112 - Information Request                 245

22    Number 113 - OIG Report                          247
```

Page 8

```
 1   DEPOSITION EXHIBITS                          PAGE:

 2   Number 114 - E-mail Chain                     252

 3   Number 115 - Region IV Executive Summary

 4              Update                             266

 5   Number 116 - E-mail Chain                     269

 6   Number 117 - Mass Migration Surges Document   282

 7   Number 118 - Significant Visit Summary        286

 8   Number 119 - E-mail Chain                     290

 9

10        (All exhibits attached to transcript.)

11

12

13

14

15

16

17

18

19

20

21

22
```

Page 18

```
 1        A      No, sir.

 2        Q      Have you ever been sued in your

 3   personal capacity before?

 4        A      No.

 5        Q      Have you ever been a party to a

 6   lawsuit?

 7        A      No.

 8        Q      Have you ever been disciplined in any

 9   way for your conduct while employed by CBP or its

10   predecessor organizations?

11        A      No.

12        Q      Are you a member of any social

13   networking platforms such as LinkedIn or

14   Facebook?

15        A      I'm in LinkedIn.

16        Q      Do you have a Facebook account?

17        A      No.

18               MR. MEDLOCK:  Mark the first exhibit

19   as 78.

20               (Deposition Exhibit Number 78 was

21   marked for identification and attached to the

22   transcript.)
```

Page 19

1    BY MR. MEDLOCK:

2         Q    Sir, I put in front of you marked

3    Exhibit 78 to your deposition.  It is a two-page

4    letter from Katherine J. Shinners to myself dated

5    January 8th, 2020.  Do you see that, sir?

6         A    Yes, sir.

7         Q    Have you seen a copy of this letter

8    before?

9         A    No.

10        Q    Okay.  I'll -- beneath the salutation,

11   "Dear Counsel," it reads, "I write to advise you

12   that defendants' counsel recently learned that

13   Custodian Randy Howe has not retained personal,

14   hard-copy notes that he has taken at daily

15   internal operations meetings."

16              Did I read that correctly?

17        A    You did.

18              MS. SHINNERS:  I just -- go ahead.

19   BY MR. MEDLOCK:

20        Q    Okay.  So I want to understand what

21   that sentence means to the best of your

22   understanding.  What are the daily internal

Page 20

1    operations meetings that are referred to here?

2              MS. SHINNERS:  Objection to the scope.

3    Just to make clear, this is not within the scope

4    of the 30(b)(6) topics and two, to the extent

5    that you know, you can answer.

6              THE WITNESS:  Each day EAC Owen has a

7    morning 8:15 operational meeting.

8    BY MR. MEDLOCK:

9        Q    And so when you say "each day", that's

10   each weekday?

11       A    Each weekday.

12       Q    So that morning operational meeting at

13   8:15, how long does it last for?

14       A    Typically 20 to 30 minutes.

15       Q    And your practice has been to take

16   notes during that meeting?

17       A    Not substantive notes but the intent

18   of that meeting is to brief Mr. Owen on the daily

19   happenings of the last 24-hour period, maybe some

20   things that he needs to be aware of.  So I would

21   go in there with -- just things in my mind to

22   trigger that I need to advise him of.

Page 21

1      Q      So these are sort of your bullet

2   points to organize your briefing of EAC Owen?

3      A      Pretty much.   Just very basic words to

4   trigger my mind on events that happened in the

5   last 24 hours.

6      Q      And where do you write these bullet

7   points down?

8      A      Piece of paper.

9      Q      Do you have a notebook, or is it just

10  looseleaf paper you're using?

11     A      Looseleaf paper.

12     Q      And after you brief EAC Owen at that

13  8:15 meeting, what do you do with that looseleaf

14  paper with the bullet points on it?

15     A      I have a nine o'clock meeting with my

16  direct reports that are in headquarters.   So if

17  there's anything from the 8:15 meeting that I

18  need to pass on to them, a request from EAC Owen,

19  an update on a particular issue, I would keep it

20  for that meeting, and then after that, I'd

21  commonly just place it in my shred bin.

22     Q      So that I get this process down, you

Page 22

1    bring the bullet points that you jot down before

2    the 8:15 to your meeting with EAC Owen; is that

3    right?

4        A    Correct.

5        Q    Then during the meeting, do you take

6    notes on what EAC Owen tells you as sort of

7    follow-up items you may need to take to the 9

8    a.m. meeting?

9        A    Yes.  If there is a request from him,

10   update on a particular program, I might -- or

11   follow-up with a particular director of field

12   operations, I might make a little note just to

13   trigger my memory so I follow my boss' request.

14       Q    Sure.  And the briefing bullet points

15   that you take to the 8:15 meeting, have those

16   bullet points ever included information about the

17   operation of ports of entry on the U.S.-Mexico

18   border?

19       A    Have they?

20       Q    Yes.

21       A    Yes.

22       Q    Have those bullet points ever included

Page 23

1    information on processing an inspection of

2    individuals without proper travel documents at

3    ports of entry on the U.S.-Mexico border?

4         A    I don't recall a specific instance

5    but --

6         Q    Is it possible?

7         A    It's possible.  There's a vast -- vast

8    variety of things that occur within our daily

9    operations.  So it could be anywhere from a large

10   seizure, an NCIC arrest at a port of entry, an

11   employee matter where maybe somebody was

12   arrested.  So it's really a wide scope of things.

13        Q    How about migrant caravans, could that

14   also be in those notes?

15        A    There may have been.

16        Q    And you were instructed by counsel to

17   retain information related to this case, correct?

18             MS. SHINNERS:  Objection to the scope.

19   You can answer.

20             THE WITNESS:  I was.

21   BY MR. MEDLOCK:

22        Q    When did you receive that direction?

1              MS. SHINNERS:  Same objection to this

2      line of questioning.  Go ahead.

3              THE WITNESS:  I don't recall.

4              MR. MEDLOCK:  You can have a standing

5      objection.

6              MS. SHINNERS:  I was going to say.

7      I'll just object to this line of questioning as

8      beyond the scope.

9              THE WITNESS:  I don't recall.

10     BY MR. MEDLOCK:

11         Q    Do you recall whether it was in 2017?

12         A    I don't recall.

13         Q    When you were writing down these notes

14     and then -- and then putting them in your shred

15     bin, at some point you knew that this litigation

16     was going on and you needed to preserve relevant

17     information, correct?

18         A    I would like to point out that --

19     although I -- I'm assuming I got notified.  I've

20     only been in this position since October of '17.

21     So I don't know exactly when I may have received

22     it.  So I'm assuming I have been.  I don't

Page 25

1    remember when.  I certainly -- I wasn't in this

2    current role.  So I probably wouldn't have

3    received it before October of '17, if that makes

4    sense.

5         Q    Okay.  So sometime after October 2017,

6    to the best of your knowledge, you were told by

7    legal counsel that you needed to preserve

8    documents that were relevant to this case; is

9    that right?

10        A    Yes.

11        Q    And you understood that this case

12   related to the processing and inspection of

13   individuals without proper travel documents at

14   ports of entry on the U.S.-Mexico border,

15   correct?

16        A    Correct.

17        Q    And to the best of your knowledge,

18   there may have been some notes regarding the

19   processing of individuals without proper travel

20   documents at ports of entry on the U.S.-Mexico

21   border that you did place into your shred bin; is

22   that right?

1      A      I wouldn't say there's substantive

2   notes.

3      Q      I'm just asking.  There are notes

4   though that were placed in the shred bin that

5   dealt with that topic; is that right?

6      A      They weren't substantive notes.

7   Everything that I would have brought up to Mr.

8   Owen would have been captured in electronic form.

9   So significant events, anything that I would

10  typically bring up would have been captured in

11  electronically.  Any follow-up to Mr. Owen's

12  requests for additional information always would

13  have been kept electronically.

14             And then again, my notes weren't

15  substantive.  They were only things to trigger

16  me.  So in my mind I was not throwing out

17  anything that was in violation to this.  It was

18  just little notes to me.  Nothing in great detail

19  other than notes to me to follow-up with Mr.

20  Owen.

21     Q      So when you say "captured

22  electronically," how is it that the substance of

Page 27

1    your briefing to EAC Owen at the 8:15 operational

2    meeting was captured electronically?

3        A    So if I'm briefing him on a

4    significant seizure or significant event, it's

5    all reportable.  It's all -- he would have

6    received it.  So he would have had that

7    electronically.  It would have been -- that was

8    just a trigger point for me to say, "As you know,

9    sir, yesterday there was a seizure at one of the

10    crossings."  A follow-up to that discussion.

11        Q    Is there a hard copy or electronic

12    agenda that goes to the participants at the 8:15

13    meeting --

14        A    No, sir.

15        Q    -- beforehand?  Is there any sort of

16    preread materials that go to the participants at

17    that meeting?

18        A    No, sir.

19        Q    Do you provide any sort of minutes or

20    summary of the 8:15 meeting after it occurs?

21        A    No, sir.

22        Q    So while I understand there would be

Page 28

1    some paper trail related to items that were

2    discussed during the meeting, the best way to

3    understand whether those were actually discussed

4    at the meeting is looking at your bullet points,

5    right?

6            MS. SHINNERS:  Objection.

7            THE WITNESS:  I don't understand your

8    question.

9    BY MR. MEDLOCK:

10      Q    I get that if there's a NCIC event or

11   there's a large seizure, EAC Owen would find out

12   about that, correct?

13      A    Correct.

14      Q    And the question is, the best way to

15   understand whether that was actually raised

16   during this 8:15 meeting and what request, if

17   any, Mr. Owen had as a result of that briefing is

18   to look at your notes; is that right?

19            MS. SHINNERS:  Objection;

20   argumentative.

21            THE WITNESS:  I don't get what you're

22   saying.  All the information that was discussed

1   was captured electronically in reports.  Any

2   follow-up to him would have been an e-mail to him

3   as a follow-up.

4   BY MR. MEDLOCK:

5       Q    Is there any paper or electronic

6   summary of what is actually discussed during the

7   8:15 meeting?

8       A    No.

9       Q    Does anyone, to your knowledge, take

10  regular notes at the 8:15 meeting besides

11  yourself?

12      A    I don't know.

13      Q    Have you ever seen anybody else doing

14  it?

15      A    I don't recall.

16      Q    So as you sit here today, you can't

17  actually recall ever seeing anyone else take

18  notes during that meeting?

19      A    No -- no.

20      Q    So as you sit here today, you're the

21  only person that you know of that would take

22  notes on requests from EAC Owen during the 8:15

Page 30

1    meeting?

2         A     You're asking me if they have

3    knowledge of people taking notes?

4         Q     Right.

5         A     I don't know what people are doing

6    when they have a piece of paper and a pen in

7    their hand.  I have no idea.

8         Q     Has anybody ever shown you notes that

9    they took --

10        A     No.

11        Q     -- from the 8:15 meeting?  Has anyone

12   ever indicated to you that they were taking notes

13   during the 8:15 meeting?

14        A     It's never come up.

15        Q     Have you ever seen anyone come to the

16   8:15 meeting with bullet points that they were

17   prepared to read off?

18        A     People have paper in front of them.

19   What they have in front of them, I don't know.

20        Q     Okay.  And does anyone else at CBP or

21   OFO have a copy of the bullet points that you

22   used to jog your memory?

Page 31

1       A    No.

2       Q    Have there been occasions when you

3  couldn't attend these 8:15 meetings?

4       A    Yes.

5       Q    During -- when you missed the 8:15

6  meeting, do you ever ask for anybody to fill you

7  in on what happened during the meeting?

8       A    Sure.

9       Q    And have you ever asked for somebody's

10  notes or summary of the meeting?

11       A    No.

12       Q    When that occurs that you have missed

13  the meeting, you just ask them verbally to tell

14  you what was discussed?

15       A    Yes.

16       Q    And vice -- does that occur -- when

17  somebody misses the meeting, have they ever asked

18  you to fill them in on what happened at the 8:15

19  meeting?

20       A    I don't recall.

21       Q    Isn't it the case that they -- the

22  best evidence of what you actually said during

1   this 8:15 meeting is the bullet points on your

2   notes?

3           MS. SHINNERS:  Objection; legal

4   argument.

5           THE WITNESS:  I don't understand your

6   question.

7   BY MR. MEDLOCK:

8       Q    Sure.  Is there any other evidence out

9   there of what was -- of what you actually talked

10  about at these 8:15 meetings other than the

11  bullet points that you wrote down?

12      A    No.

13      Q    And is there any other evidence about

14  what you -- what items you took from the 8:15

15  meeting to the 9 o'clock meeting with your team

16  other than what you wrote down on those pieces of

17  paper?

18      A    There may be e-mail traffic.

19      Q    In some cases there might be?

20      A    In some cases.

21      Q    But not in all; is that right?

22      A    Correct.

1          MR. MEDLOCK:  Mark the next exhibit.

2          (Deposition Exhibit Number 79 was

3    marked for identification and attached to the

4    transcript.)

5    BY MR. MEDLOCK:

6      Q    Sir, I put in front of you what we

7    marked as Exhibit 79 to your deposition.  It's a

8    multipage document that on the front page says,

9    "Plaintiff's Notice of Federal Rules of Civil

10   Procedure 30(b)(6) Deposition of U.S. Customs &

11   Border Protection."

12         Do you see that?

13     A    I do.

14     Q    Have you seen a copy of this document

15   before, sir?

16     A    I believe so, yes.

17     Q    When did you see it?

18     A    I don't recall.

19     Q    Who showed it to you?  Counsel?

20     A    CBP counsel, yes.

21     Q    Do you understand that you're here to

22   testify as a 30(b)(6) representative?