JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
SAMUEL P. GO
Assistant Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV (CT 414491)
HAYDEN WINDROW (NY 4384749)
DHRUMAN Y. SAMPAT (NJ 270892018)
United States Department of Justice
Civil Division
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4281 | Fax: (202) 305-7000
Trial Attorneys
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Karen S. Crawford |
| v. | **DEFENDANTS' EXHIBIT A IN SUPPORT OF JOINT MOTION REGARDING SPOLIATION DISPUTE** |
| CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

DEFENDANTS' EX. A IN SUPPORT OF JOINT MOTION FOR SPOLIATION DISPUTE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Al Otro Lado, Inc., *et al.*, <br> *Plaintiffs,* | ) <br> ) <br> ) <br> ) | |
| v. | ) <br> ) | No. 3:17-cv-02366-BAS-KSC |
| Chad Wolf, *et al.*, <br> *Defendants.* | ) <br> ) <br> ) <br> ) | |

### DECLARATION OF TODD C. OWEN

I, Todd C. Owen, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am currently the Executive Assistant Commissioner, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I am retiring effective August 29, 2020. I have been employed in this role since February 2015. I began my career in 1990 with the legacy U.S. Customs Service. During my 30 years of federal service, I have held various leadership positions, including Executive Director, Cargo and Conveyance Security; Area Port Director, New Orleans; and Director, Field Operations (DFO), Los Angles. In my current position, I oversee more than 31,250 employees, with operations at 20 major field offices, 328 ports of entry (POEs), and 16 Preclearance locations.

2. In my role as the EAC, I hold daily operational meetings with my leadership team at OFO headquarters. These meetings occur every weekday at 8:15 am, and are attended by

      myself, the Deputy Executive Assistant Commissioner, our respective Chiefs of Staff, and the six Executive Directors at OFO headquarters – including the Executive Director for Operations and the Executive Director for Admissibility and Passenger Programs. Attendance by the Executive Directors, or by the Deputy Executive Director in the Executive Director's absence, is required. Other individuals may also attend, on an ad hoc basis, to provide information on a particular event or topic. I have held these meetings during my entire time as the EAC. Previous EACs, dating back to at least 2005, have also held such meetings.

3. As I explained in my deposition taken in this case, these daily meetings are an operational recap of OFO's activities of the previous twenty-four hours, as well as a discussion of particular events, topics, or issues that I need to know about (for example, an upcoming congressional visit to a particular port, concerns raised by the trade community on a particular issue). There are no standing topics or standing agenda items. Rather, the meetings provide a broad, high-level overview of issues that either have been identified in electronic reports, and/or that I or my Executive Directors have identified as being of particular interest.

4. OFO's operations are broad and complicated. For instance, OFO operates 328 land, sea, and airports in twenty field offices across the United States, as well as 70 locations in forty foreign countries. These 328 ports of entry range from airports such as O'Hare, LAX, and JFK, to seaports such as Newark and Long Beach, to land ports such as San Ysidro, Buffalo, and Laredo. On a typical day, OFO processes over 1 million passengers and pedestrians, including more than 370,000 incoming international air passengers and crew, and more than 620,681,750 incoming land travelers; as well as approximately 273,000 privately owned vehicles, more than 78,000 rail, truck, and sea containers, and

$7.3 billion worth of imported goods. In FY 2019, OFO arrested more than 8,500 wanted individuals, and seized over 455,000 pounds of illicit narcotics.

5. The list above does not even include the other aspects that make up the day-to-day operations at the ports of entry, such as budget and facility constraints, personnel issues, media events such as press conferences, visits or inquiries from members of Congress or local politicians, weather or other localized events, and staffing requirements.

6. Therefore, given the breadth of OFO operations nationwide, the topics discussed at the 8:15 meetings range from a use of force incident to a large drug seizure to the arrest of a wanted individual to a personnel matter. Some of these events are captured in reports emailed from the field, while others are raised directly through phone calls or other conversations. We also may discuss particular topics or issues of interest to CBP and DHS as a whole. For instance, we may discuss particular Executive Orders and other policies, court orders, lawsuits, or significant media events. However, the 8:15 meetings are intended to provide a broad, high-level snapshot of issues of which I should be aware. Therefore, we do not, in these meetings, discuss all aspects of such high-profile or large-scale events, nor do we discuss the response of CBP, as an agency, to a particular event. For example, while we may discuss the fact that a hurricane is scheduled to hit Miami on a particular day, and the anticipated impacts to OFO employees, facilities, and operations, we will not discuss every aspect of CBP's preparation for the storm's arrival, as that would be covered through other, more detailed operational meetings with other stakeholders within CBP and DHS.

7. Additionally, while I do direct certain my Executive Directors to take certain actions at these meetings, the purpose of these meetings is not to make substantive decisions or to have substantive discussions about the implementation of particular policies. Such

3

substantive discussion and decision-making would occur during other meetings on that particular topic, with other agency stakeholders such as the Office of Chief Counsel, Office of Congressional Affairs, the Commissioner's Office, and others. For example, the Executive Director for Trade may alert me to a particular Executive Order or policy decision related to trade at the 8:15 am meeting, and alert me that there may be follow up decision points for OFO. In such a case, I would likely direct him to schedule a follow-up meeting to have substantive discussions and make any appropriate decisions. Additionally, if I am alerted to a particular issue at a particular port of entry, I may direct follow up action on that particular issue. For instance, if one of OFO's canines bites a traveler, I may direct one of the Executive Directors to follow up and ensure that the canine is taken off duty. I may also request a follow up meeting to discuss the training of our canines. I would not, however, make any substantive decisions about that training at the 8:15 meeting.

8. Therefore, as I explained in my deposition testimony, we have, on several occasions since 2016, discussed my April 2018 Metering Guidance (and the practice of queue management more generally), in the context of discussions about the operational flow of travel at the southern land border ports of entry. For instance, we may discuss that a particular port of entry experienced an outbreak of scabies in its hold rooms, requiring the implementation of queue management to limit the flow of additional individuals into the port. While it is important for me to be aware of this situation, I would not direct any particular course of action in response to learning of such an event. As outlined in my April 2018 Metering Guidance, field leadership has the discretion to determine when it is operationally appropriate to implement metering, and is responsible for providing instructions and guidance to officers in the field regarding the implementation of

metering. Beyond the requirements outlined in my guidance (as well as in subsequent written guidance issued by the Executive Director of Operations), any specific instructions to officers in the field regarding the implementation of queue management in a particular field office is conveyed by field leadership.

9. At the 8:15 meetings, I often ask my leadership team to follow up on a particular issue or topic that I would like to know more about. For instance, if I received a report that a large quantity of drugs had just been seized at O'Hare airport, but the report did not provide information about whether the individual carrying the drugs was being charged with a crime, I may direct my team to follow up with O'Hare to obtain that information. Depending on the topic, I may also request that we schedule a follow up meeting to discuss a particular topic in more detail and with a broader range of stakeholders.

10. Given the nature of these meetings, I do not take substantive notes regarding the topics discussed. However, I do write down particular words or phrases to remind myself to take future action. These notes are phrases that will jog my memory of particular follow up actions. For instance, if we are discussing a personnel action that requires follow up with the particular port of entry at issue, I may write down the name of that POE, or the name of the port director, as a reminder to ask one of my Executive Directors to follow up. Similarly, I may write down the name of a particular Congressman who has scheduled a meeting on a particular topic. However, given the nature of these meetings, I do not take substantive notes on particular topics. As outlined above, any substantive discussion about particular topics or events would occur at follow up meetings. Often, the follow up meetings will involve substantive briefing materials or decision memos for action. Thus, any substantive notes that I have on a particular topic will come from those follow up meetings. Additionally, any meeting agendas, briefing papers, or decision

5

memos arising out of or related to substantive policy discussions will be captured in email traffic.

11. Following these meetings and any appropriate follow up, my standard practice is to discard my notes. In other words, if I write myself a note to remind myself of a meeting on a particular day, I will discard that piece of paper once that meeting has occurred. Because my notes are intended only for purposes of appropriate follow up action and do not convey the substance of any discussions or the substance of any particular incident, I do not view them as substantive records. I have received four litigation holds in this case, and I have preserved documents that I determined to be responsive to the litigation holds (such as policy memoranda, the complaint in this action, and briefing materials from various meetings). I do not interpret my notes from the 8:15 meetings to be in this same category.

12. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 27 day of August, 2020.

Todd C. Owen
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs and Border Protection