JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
SAMUEL P. GO
Assistant Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV (CT 414491)
HAYDEN WINDROW (NY 4384749)
DHRUMAN Y. SAMPAT (NJ 270892018)
United States Department of Justice
Civil Division
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4281 | Fax: (202) 305-7000
Trial Attorneys
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Karen S. Crawford |
| v. | **DEFENDANTS' EXHIBIT B IN SUPPORT OF JOINT MOTION REGARDING SPOLIATION DISPUTE** |
| CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1 | DEFENDANTS' EX. B IN SUPPORT OF JOINT MOTION FOR SPOLIA-TION DISPUTE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br>     *Plaintiffs*, <br> <br> v. <br> <br> Chad Wolf, *et al.*, <br>     *Defendants*. | No. 3:17-cv-02366-BAS-KSC |

**DECLARATION OF RANDY HOWE**

I, Randy Howe, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am currently the Director, Field Operations (Laredo), Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). Until January 18, 2020, I was the Executive Director for Operations, OFO in Washington, DC. I was employed as the Executive Director for Operations from October 2017 until my transfer to Laredo in January 2020. I began my career in 1988 with the legacy U.S. Immigration and Naturalization Service. During my 31 years of federal service, I have held various leadership positions, including Area Port Director, Buffalo; Assistant Director for Border Security; and Border Security Coordinator. Prior to becoming the Executive Director for Operations, I served as Director of Field Operations (DFO) for the Preclearance Office. As the Executive Director for Operations, I oversaw operations at 20 major field offices, 328 Ports of Entry (POE), and 16 Preclearance locations.

1

2. As I testified in my deposition in this matter, in my position as the Executive Director for Operations at OFO Headquarters in Washington, D.C., I attended a daily 8:15 a.m. operational meeting from October 2017 to January 2020. This meeting was internal to OFO senior leadership and was attended by the OFO Executive Assistant Commissioner (EAC) Todd Owen, the EAC's chief of staff, the deputy EAC, the deputy EAC's chief of staff, and the six OFO executive directors. Other individuals may have also attended this meeting to provide information on a particular event or topic, depending on the events that transpired in the previous twenty-four hours leading up to the meeting. These meetings typically lasted between 20 to 30 minutes.

3. The intent of these daily meetings was to brief EAC Owen on significant events that occurred at all ports of entry in the United States, to include all air, land, and sea ports within the preceding twenty-four hours and discuss particular events or issues that warranted EAC Owen's attention. The order of the meetings was relatively informal. Following a brief introduction by EAC Owen, meeting participants could brief EAC Owen on topics they believed warranted his awareness, or simply state that they had nothing to report. There was no agenda or list of standing topics for these meetings. Rather, because the purpose of each meeting was to keep the EAC abreast of important issues and operational events, each meeting consisted of a high-level overview of significant events and issues. Some of the events would have been captured in electronic reporting, while others were ones that any of the Executive Directors thought necessary to bring to the EAC's attention. Given my role as the Executive Director for Operations, I was largely focused on bringing significant operational events to EAC Owen's attention. I largely used electronic reporting of significant incidents as a guide of what types of

issues may be of particular importance to the EAC on a particular day. In other words, I largely focused on events mentioned in electronic reporting for the previous twenty-four hours, as the EAC generally read these reports and often had follow up questions about them.

4. The universe of materials covered during these meetings was vast, including topics such as employee disciplinary matters, use of force events, large narcotics seizures, National Crime Information Center (NCIC) arrests, and port runner events at a particular port. We also may have discussed particular topics or issues of interest to CBP and DHS as a whole, such as particular Executive Orders and other policies, court orders, lawsuits, or significant media events. However, the 8:15 meetings are intended to provide a broad, high-level snapshot of issues for the EAC's awareness. Therefore, we did not, in these meetings, discuss all aspects of such high-profile or large-scale events, nor did we discuss the response of CBP, as an agency, to a particular event. Additionally, we did not make substantive decisions or have substantive discussions about the implementation of particular policies. Such substantive discussion and decision-making would occur during other, follow up meetings on a particular topic, often with other agency stakeholders.

5. Additionally, while we may have discussed metering and queue management at these meetings, these discussions occurred in the context of other operational issues. In other words, we did not discuss queue management as a standalone topic. Because queue management is so integral to OFO's operations at ports of entry on the southern border, in the same manner as, for instance, primary and secondary inspections, we would discuss queue management in the context of a significant event (just as we would discuss a specific operational event that may have occurred in primary inspection). For instance, if

3

a port of entry was facing particular capacity constraints, such that the port was required to implement queue management, we may discuss this event.

6. Following these meetings, I would attend a daily 9 a.m. meeting with my direct reports within OFO headquarters. The intent of these meetings was to discuss significant events and follow-up on any points discussed in the 8:15 a.m. meeting with senior leadership.

7. I previously testified that, prior to attending the 8:15 a.m. meetings, I took non-substantive notes on loose-leaf paper that were typically in bullet-point format. Each bullet consisted of "trigger words" that I would use to assist me in recalling the events that I wanted to advise EAC Owen of during the daily meeting. I would take these notes into the 8:15 a.m. meetings and, if necessary, take down additional non-substantive notes, such as "due outs" that I would pass along to my subordinates at the 9 a.m. meeting or use to remind myself later to follow up on a particular topic. For instance, if EAC Owen had a question for a particular director of field operations (DFO), I might write down that DFO's name to remind myself to follow up with that individual. Additionally, if the EAC directed me to set up a follow up meeting on a potential change to OFO's uniform policy, I may write down the word "uniform brief." I generally followed up on the EAC's questions or requests in an email. While some of the bullet notes may have pertained to metering, queue management, or the processing of individuals without proper travel documents, these notes, like the others, were not substantive and consisted of one or two words that I would use to assist me in recalling a certain discussion point or reminding myself to follow up.

8. As I testified in my deposition, following the 9 a.m. meeting, it was my practice to discard my notes in my shred bin. I believed at the time of discarding these notes that

4

they were not substantive, responsive, or relevant to the litigation holds that I received in this case, because they were used only for the purpose of assisting me in recalling certain topics during the meetings or following up on certain points. Thus, after I used these notes to brief EAC Owen in the 8:15 a.m. meeting and my subordinates in the 9 a.m. meeting and completed any necessary follow up, I generally discarded my notes. Additionally, as outlined above, I generally followed up on EAC Owen's request in email.

9. I also testified in my deposition that I was notified of my responsibility to preserve documents responsive to the subject litigation. For this case, I received two litigation hold notices via email. I received the first notice on or about December 10, 2018 and the second on or about March 31, 2020. I did not interpret my notes from either the 8:15 or 9 a.m. meetings to fall in the same category as the documents requiring preservation pursuant to the litigation holds.

10. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 31 day of August, 2020.

_____
Randy Howe
Director, Field Operations (Laredo)
Office of Field Operations
U.S. Customs and Border Protection

5