JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
SAMUEL P. GO
Assistant Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV (CT 414491)
HAYDEN WINDROW (NY 4384749)
DHRUMAN Y. SAMPAT (NJ 270892018)
United States Department of Justice
Civil Division
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4281 | Fax: (202) 305-7000
Trial Attorneys
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' EXHIBIT E IN SUPPORT OF JOINT MOTION REGARDING SPOLIATION DISPUTE** |
| CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

------------------------------x

AL OTRO LADO, INC., et al.,    :

    Plaintiff,                :

    -vs-                      : Case No.

KEVIN K. McALEENAN, et al.,    : 17-cv-02366-BAS-KSC

    Defendants.               :

------------------------------x


CONFIDENTIAL

Remote Videotape Deposition of

TODD HOFFMAN

Wednesday, June 10, 2020

9:34 a.m.


Job No.: 578769

Pages 1 - 343

Reported by: Tammy S. Newton

Magna Legal Services

866-624-6221

www.MagnaLS.com



Page 2

```
 1              A P P E A R A N C E S
 2       ON BEHALF OF PLAINTIFFS:
 3            STEPHEN M. MEDLOCK, ESQUIRE
 4            Mayer Brown
 5            1999 K Street, N.W.
 6            Washington, D.C. 20006
 7            (202) 263-3221
 8            smedlock@mayerbrown.com
 9               and
10            MELISSA CROW, ESQUIRE
11            Southern Poverty Law Center
12            1101 17th Street, N.W.
13            Suite 705
14            Washington, D.C. 20036
15            (202) 355-4471
16            melissa.crow@splcenter.org
17
18
19
20
21
22
```



Page 34

1    Q    We've gone over several things you did
2    to prepare for today's deposition, including
3    meeting with attorneys from OCC, meeting with
4    attorneys from U.S. DOJ, having conversations
5    with Mr. Howe and Mr. Owen and reviewing the
6    deposition transcripts of Mr. Howe and Mr. Owen.
7         Can you think of anything else you did
8    to prepare for today's deposition?
9    A    No.  Just in the nature of flipping
10   through my notebooks, just any type of material
11   that may be -- may have been responsive that's
12   been provided.
13   Q    You say you flipped through your
14   notebooks.  What do you mean by "notebooks"?
15   A    The books that I keep -- that I keep
16   notes in when I attend various meetings.
17   Q    How many notebooks do you have in your
18   office that contain notes from meetings that you
19   attend?
20   A    Six notebooks.
21   Q    Okay.  And are they -- do you begin
22   using a new -- a new notebook every year, or do



Page 35

1  you just wait until it fills up with notes and
2  then you move on to the next notebook?
3       A    The latter.  I wait until it fills up
4  and go to the next one.
5       Q    Okay.  Since July 2017, have you
6  thrown out any notebooks that you used to have in
7  your office?
8       A    No.
9       Q    When you take notes regarding a
10 meeting that you attend, do you have a particular
11 process that you use for taking notes?  And by
12 that I mean, do you write down verbatim what is
13 being said, or do you just try to capture the
14 gist of what's being said?
15      A    Probably the gist.  I'm not a very
16 good notetaker.  I don't keep great records as
17 far as when the meeting dates were and things of
18 that nature.  It would just be a greater guide
19 for me.
20      Q    Okay.  Is there some sort of standard
21 that you'll use to decide "I need to take notes
22 at this meeting", or do you just generally take



Page 36

1   notes at every meeting you attend?
2       A    No.  There's no standard.  I may or
3   may not take notes, depending on the nature of
4   the meetings.  I attend a lot of meetings.  So it
5   depends on the nature and if I feel I need to
6   take notes.  Or if I'm going to be briefing out
7   material, kind of what I'm going to say, may be
8   outlined in that same notebook, you know, as far
9   as notes.
10      Q    So sometimes before attending a
11  meeting where you'll need to be speaking, you
12  will jot down a few bullet points to remind you
13  about what you should be saying?
14      A    Correct.
15      Q    When you said you went through your
16  notebooks prior to today's deposition, how long
17  did you spend doing that?
18      A    I believe I did it twice.  In total,
19  probably maybe an hour.
20      Q    And did you do that on your own
21  volition, or did your attorneys instruct you to
22  go through your notebooks?



Page 37

1  A    I did it on my own.
2  Q    Did there come a time at which you
3  gave your notebooks to the attorneys that
4  represent you in this case?
5  A    Yes.  I mean, they reviewed.  They
6  came into the office and reviewed.
7       MS. SHINNERS:  I just want to counsel
8  you, Mr. Hoffman.  I know you're not asking for
9  the substance of the communications.  I just want
10 to make sure he's aware that you're not asking
11 for the substance of communications.
12 BY MR. MEDLOCK:
13 Q    When those attorneys came into your
14 office to essentially take your notebooks, did
15 you have tabs on them of relevant pages, or did
16 you point them to relevant pages of your notes?
17 A    Yes.  I flagged what I believed --
18 what I flagged to be responsive.
19 Q    When you say "responsive", what do you
20 mean by that?
21 A    Anything relating to queue management
22 and, of course, meetings I may have attended.



Page 38

1    Q    Is it possible that you attended
2 meetings related to metering or queue management
3 and did not take notes at those meetings?
4    A    Sure.  It's possible.
5    Q    So it is possible that your notes in
6 your notebook may not reflect every meeting that
7 you -- that you attended related to queue
8 management or metering; is that right?
9    A    It's possible.
10   Q    Do you have any reason to doubt that
11 your notes may not capture the -- every meeting
12 you had related to queue management or metering?
13   A    I would think my notes are pretty
14 comprehensive in that regard.  Queue management
15 was not within my portfolio, but it would come up
16 on occasions where I maybe cared to brief it out
17 in the context of broader immigration issues.
18   Q    What do you mean by it was not in your
19 portfolio?
20   A    It was -- it wasn't my area of
21 responsibility of -- queue management was under
22 Executive Director Randy Howe at the time.



Page 39

1  Q    Who made the decision that queue
2  management would be under Executive Director
3  Randy Howe?
4  A    I'm not sure who exactly made it.  It
5  just was kind of just a natural progression.
6  Probably EAC Todd Owen.  It had to do with the --
7  with the application of resources at ports of
8  entry within the purview --
9       COURT REPORTER:  I'm sorry.  It had to
10 do with application of resources and then what
11 did you say?
12      THE WITNESS:  Within the purview of
13 executive director of operations.
14 BY MR. MEDLOCK:
15 Q    So as I understand it, at the time
16 that Mr. Howe was the executive director of
17 operations, he was responsible for the operations
18 of ports of entry on the U.S.-Mexico border,
19 amongst other responsibilities in his portfolio;
20 is that right?
21 A    That's correct.
22 Q    And as the executive director of



Page 40

1  Admissibility and Passenger Programs, what was
2  under your portfolio?
3     A   Essentially just the policies
4  regarding admissibility and passenger entry.
5  Anything from how to process passengers in
6  primary, how to process processors in secondary,
7  how to conduct adverse action cases, how to
8  properly --
9           COURT REPORTER:  Excuse me.  This is
10 the court reporter.  I'm sorry.  I'm having a
11 hard time, Mr. Hoffman, hearing you.  Is there a
12 way for you to get closer to the mic or get the
13 mic closer to you?  I'm hearing Mr. Medlock fine.
14          THE WITNESS:  I don't know where the
15 mic is on this.  I'll try to speak -- I'll try to
16 get close.
17          COURT REPORTER:  It seems to be a
18 little delay sometimes when you're speaking.  I
19 don't know why, but anyway, sorry.  Go ahead.
20          THE WITNESS:  Again, so I would be
21 responsible for policies regarding admissibility
22 along the border whether --



Page 41

```
 1                COURT REPORTER:  I'm sorry.  I'm still
 2   -- is anybody -- can we go off the record,
 3   please?
 4                MR. MEDLOCK:  Sure.  Let's go off the
 5   record.
 6                MS. Shinners:  Let's go off the
 7   record.
 8                VIDEOTAPE OPERATOR:  The time is 9:41
 9   a.m.  We are going off the record.
10                (Discussion off the record.)
11                VIDEOTAPE OPERATOR:  The time is 9:43
12   a.m.  We're back on the record.
13   BY MR. MEDLOCK:
14       Q     All right.  Thank you for bearing with
15   us, Mr. Hoffman, with the audio issues.  I think
16   before we had the audio problems, the question I
17   asked you was what -- essentially what
18   responsibilities fall under your portfolio as the
19   executive director of Admissibility and Passenger
20   Programs?  Would you mind indulging us in
21   answering that question again?
22       A     Yeah, I mean, many programs.  I have
```



Page 42

1  eight different directors.  It could be anything
2  on the admissibility side as to how to process
3  the policies, how to process passengers on both
4  primary and in secondary, how to collect the
5  proper adverse action cases into our systems of
6  record.
7           In the passenger program side, it's
8  programs like migration, MPP, migration --
9  migration protection protocol; ACA, asylum
10 cooperative agreement; HARP, Humanitarian
11 Assistance Review Program.  Things of that
12 nature.  As they need us for passengers who want
13 to go overseas, global entry, immigration
14 advisory program, and there's many different
15 programs within my portfolio.
16      Q    Thank you for that explanation.  This
17 may be a gross oversimplification.  But is it
18 essentially the case that you work on the
19 admissibility policies, and at the time Executive
20 Director Howe was the executive director of
21 operation, he put those policies into action at
22 the ports of entry at the Southwest border?



Page 43

```
 1      A      Yeah.  I mean, again, we have the
 2   responsibility within my portfolio policies.  Mr.
 3   Howe is more the day-to-day operations, having
 4   oversight of all the field directors.
 5      Q      Okay.  Thank you.  You mentioned that
 6   you have eight directors who are under you.  Are
 7   those your direct reports?
 8      A      Yes, they are.
 9      Q      Today, who are your direct reports?
10      A      Today, my deputy is Matt Davies, and
11   Luis Mejia, John Maulella.  He's currently on
12   TDY.
13      Q      Can you spell the last names of these
14   individuals for the benefit of the court reporter
15   as you go through.
16      A      Mejia is M-E-J-I-A.
17      Q      And Mr. Maulella's last name?
18      A      I think it's M-A-U-L-E-L-L-A.
19      Q      Okay.  And who were the other five
20   direct reports you have?
21      A      Sikina Hasham, Kurry Pastilong, Peter
22   Acosta.
```



```
                                                    Page 44
 1              COURT REPORTER:  Can you spell these?
 2              THE WITNESS:  Where do I start?  Which
 3    ones do you need?
 4    BY MR. MEDLOCK:
 5        Q     With Mr. Hasham.
 6        A     Hasham, H-A-S-H-A-M.
 7        Q     And then you had another direct report
 8    whose first name was Kurry, I believe.  Can you
 9    give us --
10        A     Kurry Pastilong, P-A-S-T-I-L-O-N-G.
11        Q     Is Mr. Acosta's last name A-C-O-S-T-A?
12        A     Correct.
13        Q     That brings us up to six direct
14    reports.  Who are the remaining two?
15        A     Belinda Garcia.  And then another
16    currently acting as of Monday is Frank Willson.
17        Q     During the period 2016 to the present,
18    was J. Ryan Hutton ever your deputy?
19        A     Yes, he was.
20        Q     And I believe his first name is James,
21    but he goes by Ryan; is that correct?
22        A     That's correct.
```



MAGNA
LEGAL SERVICES

Page 45

1    Q    What was Mr. Mejia's role or title at
2    CBP, if you know?
3    A    Right now, he's my director of --
4         COURT REPORTER:  Director of what?
5         THE WITNESS:  Enforcement programs
6    division.
7    BY MR. MEDLOCK:
8    Q    What is the enforcement programs
9    division responsible for?
10   A    Many of the admissibility issues that
11   I already alluded to.  Essentially how to process
12   adverse action cases, expedited removal.  He's
13   got MPP within his portfolio, ACA, HARP, parole
14   policy, refugee processing, things of that
15   nature.
16   Q    Is there anything -- is there anything
17   else beyond those -- beyond what you mentioned
18   within his portfolio?
19   A    Those are the major and any type of
20   policy changes related to processing different --
21        COURT REPORTER:  I can't hear you
22   again.



Page 46

1            THE WITNESS:  I'm up on my computer
2  and speaking pretty loud, so I'm not sure what
3  more I can do.
4            COURT REPORTER:  Well, I could hear
5  you there.
6  BY MR. MEDLOCK:
7       Q    That last answer one more time please.
8       A    I can try to -- the camera
9  is [unintelligible] --
10           MR. MEDLOCK:  Why don't we go off the
11 record for a second while he fixes this.
12           VIDEOTAPE OPERATOR:  The time is 9:49
13 a.m.  We are going off the record.
14           (Discussion off the record.)
15           VIDEOTAPE OPERATOR:  The time is 9:56
16 a.m.  We're back on the record.
17 BY MR. MEDLOCK:
18      Q    Thank you for your patience, Mr.
19 Hoffman.  I appreciate it.
20           Before we went off the record, you had
21 told me a little bit about the portfolio of
22 responsibilities that Luis Mejia has, and I asked



Page 47

1  you whether there was anything else that was
2  within his purview.
3             Do you mind repeating your answer for
4  me?
5      A     Yeah.  I'm not sure where I left off,
6  but I mean, it's not -- you know, that's just not
7  all encompassing what I mentioned.  You know, he
8  has the adverse actions, expedited removal,
9  credible fear, removal process, how to put the
10 policy, how to put the proper adverse actions
11 into our system of record, the migrant protection
12 protocol, MPP, ACA, HARP, refugee processing, and
13 also visa processing, any changes that, you know,
14 as it comes up.  Changes in policy regarding
15 various visa holders, he'll send out the field
16 and things of that nature.
17            So that's the general gist of it.  He
18 probably has other things in his portfolio as
19 well, but those are the main items.
20      Q     Would the metering guidance have
21 fallen into Mr. Mejia's portfolio?
22      A     No.



Page 48

1     Q    Okay.  You mentioned Kurry Pastilong
2  is one of your direct reports.  What -- is it Mr.
3  Pastilong or Ms. Pastilong?
4     A    Mr.
5     Q    What falls into the portfolio of Mr.
6  Pastilong?
7     A    He's in charge of our overseas
8  deployment, the immigration advisory program.
9     Q    Okay.  What is the immigration
10 advisory program?
11    A    It's a program whereby we have our
12 officers stationed at foreign locations, foreign
13 airports.  There's about 20 different locations
14 throughout the world where they work with their
15 foreign counterparts and they're prepositioned.
16 They work closely with our National Targeting
17 Center, and they will adjudicate any security
18 concerns overseas to decide if people are
19 cleared, you know, an acceptable risk to continue
20 to fly on to the United States.
21    Q    Okay.  Thank you for that.  I'd like
22 to go a little bit through your professional

