JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| CHAD F. WOLF, Acting Secretary of Homeland Security, *et al.*, in their official capacities, | |
| *Defendants*. | |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ........................................................................................ 1

LEGAL STANDARD .................................................................................. 7

UNDISPUTED FACTS ............................................................................... 7

    A.    Congress Charged DHS, CBP, and OFO With Numerous Duties to Safeguard America's Borders................................. 7

    B.    The 2016 Migration Surge Stretches the San Ysidro Port of Entry's Capabilities and Diverts Resources From Other Statutory Missions. ................................................................ 10

    C.    The Surge's Adverse Impacts Expand to Other Ports of Entry. ......... 12

    D.    DHS and CBP Take Additional Steps to Address the Surge. ............. 15

    E.    As the 2018 Migrant Caravan Approaches, CBP Issues Written Metering Guidance. ................................................................ 22

    F.    DHS Directs CBP to Prioritize Statutory Mission Sets. ................. 25

    G.    CBP Issues the Prioritization-Based Queue Management Memorandum. ................................................................... 30

ARGUMENT ............................................................................................ 31

    I.    Plaintiffs Lack a Private Right of Action to Enforce the INA. ........... 31

    II.    Defendants Have Not Taken Discrete and Final Agency Action of the Sort Plaintiffs Contend. ................................................ 32

        A.    There is No Discrete "Turnback Policy." ................................. 32

        B.    The Border-Wide Metering Decisions are Not Final Agency Action. ................................................................... 35

    III.    Defendants Have Not "Direct[ed] CBP Officers to Unlawfully Withhold a Discrete, Mandatory Ministerial Action." ....................... 37

    IV.    Metering is Statutorily Permissible. ......................................... 40

    V.    Defendants' Actions are Not Arbitrary and Capricious. ................... 44

        A.    Defendants' Border-Wide Actions are Not Based on "Pretext." ................................................................... 45

        B.    The "True Motivations" for Metering are Lawful. ................... 51

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

C.     Metering is Consistent with Congressional Intent.....................53

VI.    Metering Does Not Deprive Class Members of Procedural Due
       Process.......................................................................................54

VII.   Plaintiffs' International-Law Claim is Not Actionable........................55

VIII.  Plaintiffs are Not Entitled to the Relief They Seek.............................58

CONCLUSION ..........................................................................................60

# TABLE OF AUTHORITIES

**Federal Cases**

*AID v. All. for Open Soc. Int'l,*
    140 S. Ct. 2082 (2019)....................................................................54

*Al Otro Lado, Inc. v. McAleenan,*
    394 F. Supp. 3d 1168 (S.D. Cal. 2019) ..................................... 5, 32, 36, 38

*Al Otro Lado, Inc. v. Nielsen,*
    327 F. Supp. 3d 1284 (S.D. Cal. 2018) .......................................... 31, 32, 40

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).........................................................................7

*Arlington Heights v. Metro. Housing Dev. Corp.,*
    429 U.S. 252 (1977).......................................................................51

*Bark v. U.S. Forest Service,*
    37 F. Supp. 3d 41 (D.D.C. 2014)....................................................34

*Bennett v. Spear,*
    520 U.S. 154 (1997).......................................................................35

*Cal. Communities Against Toxics v. EPA,*
    934 F.3d 627 (D.C. Cir. 2019).......................................................36

*Cal. Wilderness Coalition v. DOE,*
    631 F.3d 1072 (9th Cir. 2011) ......................................................59

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).........................................................................7

*City of Indianapolis v. Edmond,*
    531 U.S. 32 (2000).........................................................................56

*Compassion Over Killing v. FDA,*
    849 F.3d 849 (9th Cir. 2017) ........................................................44

*Dept. of Commerce v. New York,*
    139 S. Ct. 2551 (2019)............................................... 6, 46, 51, 52

*DHS v. Thuraissigiam,*
    140 S. Ct. 1959 (2020) ............................................................ *passim*

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ................................................ 43, 60

*E. Bay Sanctuary Covenant v. Trump,*
    950 F.3d 1242 (9th Cir. 2020)) ............................................ 53, 59

*E. Bay,* 950 F.3d at 1273 ........................................................................53

*Edmo v. Corizon, Inc.,*
    935 F.3d 757 (9th Cir. 2019) ...............................................59

*Gardner v. Toilet Goods Ass'n, Inc. v. Gardner,*
    387 U.S. 158 (1967) ............................................................36

*Hamama v. Adducci,*
    912 F.3d 869 (6th Cir. 2018) ...............................................58

*Hells Canyon Preservation Council v. U.S. Forest Service,*
    593 F.3d 923 (9th Cir. 2010) ...............................................37

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020) ...................................................... 1, 43, 56

*INS v. Stevic,*
    467 U.S. 407 (1984) ........................................................ 55, 57

*Jean v. Nelson,*
    472 U.S. 846 (1985) ..........................................................53

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018) .........................................................49

*Lightfoot v. District of Columbia,*
    273 F.R.D. 314 (D.D.C. 2011) ......................................... 33, 35

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) .................................................. 32, 34, 36

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ........................................................ 6, 43

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)........................................................................60

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)........................................................................38

*Motor Vehicle Mfts. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..........................................................................44

*Ms. L. v. ICE*,
    302 F. Supp. 3d 1149 (S.D. Cal. 2018) ..........................................31

*Munaf v. Geren*,
    553 U.S. 674 (2008)........................................................................58

*Navajo Nation v. Dept. of the Interior*,
    876 F.3d 1144 (9th Cir. 2017) ........................................................35

*New Mexico v. McAleenan*,
    450 F. Supp. 3d 1130 (D. N.M. 2020).............................................31

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004)................................................... 5, 32, 34, 37

*Padilla v. ICE*,
    953 F.3d 1134 (9th Cir. 2020) ........................................................58

*Quidel Corp. v. Siemens Med. Solutions USA, Inc.*,
    --- F. Supp. 3d ---, 2020 WL 1820247 (S.D. Cal. 2020) ................7

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)........................................................................43

*Rafeedie v. INS*,
    880 F.2d 506 (D.C. Cir. 1989)........................................................55

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993)........................................................................38

*San Luis & Delta-Mendota Water Authority v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ............................................... 44, 51

*Sanchez-Espinoza v. Reagan*,
     770 F.2d 202 (D.C. Cir. 1985)...................................................................59

*Shaughnessy v. United States ex rel. Mezei*,
     345 U.S. 206 (1953)............................................................... 39, 54

*Sierra Club v. Costle*,
     657 F.2d 298 (D.C. Cir. 1981)................................................................46

*Sierra Club v. Trump*,
     963 F.3d 874 (9th Cir. 2020) ...............................................................59

*Sosa v. Alvarez-Machain*,
     542 U.S. 692 (2004)............................................................... 55, 56

*Sturgeon v. Frost*,
     136 S. Ct. 1061 (2016)........................................................................38

*Tripoli Rocketry Ass'n v. ATF*,
     437 F.3d 75 (D.C. Cir. 2006)................................................................50

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*,
     136 S. Ct. 1807 (2016)........................................................... 5, 35

*Ukiah Valley Med. Ctr. v. FTC*,
     911 F.2d 261 (9th Cir. 1990) ...............................................................35

*Underhill v. Hernandez*,
     168 U.S. 250, 252 (1897) ....................................................................58

*United States ex rel. Knauff v. Shaughnessy*,
     338 U.S. 537 (1950)............................................................................54

*United States v. Balint*,
     201 F.3d 928 (7th Cir. 2000) ...............................................................38

*United States v. City of Fulton*,
     475 U.S. 657 (1986)............................................................................53

*Wild Fish Conservancy v. Jewell*,
     730 F.3d 791 (9th Cir. 2013) .................................................. 32, 34

*Winter v. NRDC,*
    555 U.S. 7 (2008) ................................................................ 58, 60

*Zadvydas v. Davis,*
    533 U.S. 678 (2001) ........................................................... 38, 54

**<u>Federal Statutes</u>**

5 U.S.C. § 551(13) ...................................................................32

5 U.S.C. § 704 ..........................................................................35

5 U.S.C. § 706(1) ........................................................................5

5 U.S.C. § 706(2) ................................................... 6, 40, 44, 59

6 U.S.C. § 111(b)(1) ..................................................... *passim*

6 U.S.C. § 202 ................................................................ 1, 9, 41

6 U.S.C. § 211(a) ......................................................................9

6 U.S.C. § 211(c) .......................................................... *passim*

6 U.S.C. § 211(g) .......................................................... *passim*

8 U.S.C. § 1225(b)(1)(A)(i) .....................................................38

8 U.S.C. § 1225(b)(1)(A)(ii) ....................................................54

8 U.S.C. § 1225(b)(2)(A) .........................................................39

8 U.S.C. § 1225(b)(2)(C) .........................................................53

8 U.S.C. § 1231(b)(3)(A) .................................................. 55, 57

8 U.S.C. § 1231(h) ...................................................................55

8 U.S.C. § 1252(a)(5) ...............................................................56

8 U.S.C. § 1252(b)(9) ...............................................................56

8 U.S.C. § 1252(f)(1) ...............................................................58

28 U.S.C. § 1350 ......................................................................55

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

**Federal Regulations**

8 C.F.R. § 235.1(a)................................................................37

**Federal Rules**

Fed. R. Civ. P. 23(b)(2)..........................................................57

Fed. R. Civ. P. 56(a)................................................................7

**Acts of Congress**

Homeland Security Act of 2002,
    Pub. L. No. 107-296, 116 Stat. 2135 (2002) ....................40

Trade Facilitation and Trade Enforcement Act of 2015,
    Pub. L. No. 114-125, 130 Stat. 122 (2016) ......................41

**Administrative Rules and Decisions**

*Matter of Lewiston-Queenston Bridge*,
    17 I. & N. Dec. 410 (BIA 1980)......................................38

**Legislative Materials**

H.R. Rep. No. 104-469, pt. 1 (1996) ....................... 38, 49, 53

H.R. Rep. No. 104-828 (1996)...............................................39

**Other Authorities**

The American Heritage Dictionary of the English Language (3d ed. 1992)..........38

# INTRODUCTION

"The United States' border with Mexico extends for 1,900 miles, and every day thousands of persons and a large volume of goods enter this country at ports of entry on the southern border." *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020). "One of the ways in which the Executive protects this country is by attempting to control the movement of people and goods across the border, and that is a daunting task." *Id.* This case is about whether U.S. Customs and Border Protection (CBP) can control the flow of undocumented aliens into the ports of entry to help accomplish that daunting task.

"[T]he inspection, processing, and admission" of aliens is one of CBP's functions, 6 U.S.C. § 211(c), but it is not the government's primary function at the ports of entry. Congress tasked CBP's Office of Field Operations (OFO), the component that operates the ports, with deterring and preventing terrorists, weapons, illegal entrants, illicit drugs, agricultural pests, and contraband from entering the United States through the ports and "facilitat[ing] and expedit[ing] the flow of legitimate travelers and trade." *Id.* § 211(g)(3). Congress directed the Secretary of Homeland Security to secure the borders and the ports and to "ensur[e] the speedy, orderly, and efficient flow of lawful traffic and commerce." *Id.* § 202. The Department of Homeland Security's (DHS) "primary mission" is preventing terrorism in the United States and "ensur[ing]" that its component agencies' functions "that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." *Id.* § 111(b)(1).

In recent years, however, inspecting, processing, and detaining inadmissible arriving aliens has consumed an outsize proportion of OFO's strained resources to the detriment of CBP's national-security, counter-narcotics, economic-security, and trade-and-travel-facilitation missions. Beginning in 2016, a sustained and overwhelming surge of undocumented Haitian nationals, the majority of whom were not seeking asylum, sought admission to the United States through the San Ysidro Port

of Entry in San Diego. CBP made every effort to expand the Port's processing and detention capacity, including implementing its contingency plan for surge events, converting office and other spaces into temporary holding areas, diverting port officers from anti-narcotics functions, and using virtual processing to allow CBP officers and Border Patrol agents at other locations to process migrants remotely. But the queue of migrants awaiting processing continued to grow, until eventually the line stretched from the primary inspection booth inside the Port building "clear south into Mexico." Pl. Ex. 17 at 160:12. In late May 2016, around the time the Port surpassed 1,000 individuals in custody and individuals were sleeping in the elements for lack of holding space, San Ysidro stopped intake at the international boundary and directed officers to focus their efforts on processing migrants in custody.

The surge continued into the fall of 2016, changed in composition, and spread east to other ports of entry in OFO's San Diego Field Office and then to ports in the Tucson, El Paso, and Laredo Field Offices. The severe overcrowding, case-processing delays, and adverse impacts to frontline operations followed with it. By the close of Fiscal Year (FY) 2016, ports in the four southwest border Field Offices had encountered and processed more than 150,800 inadmissible aliens, a 70% increase from the recent major surge in 2014. In FY 2016, the southwest border ports seized 8% less narcotics by weight than in FY 2015, a decrease that was not consistent with rising trends in the years preceding and the years since. Def. Ex. 1 ¶ 21. From October 2016 to mid-April 2017, CBP spent more than $45.25 million in overtime, temporary details, and facilities in maintenance costs to address the surge.

In the fall of 2016, DHS and CBP took overarching steps to address the overcrowding and lessen the strain from the unprecedented migrant surge on DHS's operations. CBP created a Crisis Action Team (CAT). DHS and CBP approved the construction of a temporary processing center in El Centro, California. The facility ultimately did not open due to contracting issues, but DHS opened two other facilities in Tornillo and Donna, Texas, later that year. And in November 2016, the CBP

Deputy Commissioner authorized the use of "metering" or "queue management" procedures border-wide. Generally, when a port is metering, an officer stands at the international boundary and screens pedestrians' travel documents. Travelers with facially legitimate documents are permitted to proceed across the border into the port for inspection, and travelers without such documents may be instructed to wait until the port has sufficient capacity to process their resource-intensive applications for admission. There have been isolated missteps, particularly in the initial phases, but the government's policy is and has always been that aliens on U.S. soil must be processed for admission. The Deputy Commissioner explained: "I just want our folks to have an additional tool to keep conditions safe and working at our POEs." Pl. Ex. 69 at 935.

In January 2017, the surge abruptly ended. By that time, the southwest border ports for the most part had stopped metering. But in spring 2018, the ports saw another sustained increase in inadmissible aliens and again reported impacts to their frontline operations. CBP also had evidence that a "caravan" of 550 undocumented migrants was heading north to the border from Central America. Faced with increasing numbers and evidence of a potential mass influx event, and seeking to avoid the crisis that consumed the southwest border in 2016, the OFO Executive Assistant Commissioner issued guidance to the four border Field Offices memorializing their discretion to use queue management "[w]hen necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public." Def. Ex. 2. The guidance is clear that "[o]nce a traveler is in the United States, he or she must be fully processed." *Id.*

Although not all 550 caravan members reached the border at once, the number of inadmissible arriving aliens continued trending upwards. DHS and CBP knew the adverse impacts that a sustained migrant surge can bring, so in June 2018, the Secretary of Homeland Security decided that "CBP must focus on its primary mission:

to protect the American public from dangerous people and materials while enhancing our economic competitiveness through facilitating legitimate trade and travel." Def. Ex. 3 at 294. The Secretary instructed CBP to structure its staffing and resources at the southwest border ports of entry in order of CBP's national-security, counter-narcotics, economic-security, and trade-and-travel-facilitation mission sets, and to use queue management to ensure that the ports have sufficient operational capacity to implement those missions. *Id.* at 296. The Secretary explained that processing undocumented aliens "remains a component of CBP's mission," *id.*, and indeed, it did: The border Field Offices processed 13,604 more inadmissible aliens in FY 2018 than they did in FY 2017, and they referred twice as many of those inadmissible arriving aliens for credible-fear interviews. Def. Ex. 4 at 2. "[B]ut priority should be given to the" four identified mission sets. Def. Ex. 3 at 296.

The prioritization regime was successful. From FY 2018 to FY 2019, the border Field Offices' narcotics seizure weights for fentanyl and methamphetamine increased by 58% and 19%, respectively, and the value of interdicted outbound currency increased by more than $2.4 million. Def. Ex. 5 at 304. During the same period, the Field Offices saw a moderate increase in the total number of inadmissible arriving aliens (from 124,876 to 126,001), and again referred twice as many aliens for credible-fear interviews in FY 2019 (80,055) as they did in FY 2018 (38,399). Def. Ex. 4 at 2. In November 2019, OFO directed the Field Offices to renew their focus on the priority missions, and the Acting CBP Commissioner ordered the OFO Executive Assistant Commissioner to continue prioritizing staffing and resources at the ports in accordance with the Secretary's June 2018 memorandum.

Plaintiffs contend that these and a host of other DHS and CBP actions since 2016 together constitute "the turnback policy," which is a purported "overarching agency policy directing th[e] unlawful withholding of mandatory action" under the INA, and which was adopted with the "desire to limit access to the asylum process at POEs for its own sake." Pls.' Mem. in Support of Mot. for Summ. J. 21, 29 (Pl.

MSJ; ECF No. 535-1). Plaintiffs contend that "the turnback policy" is unlawful under the Immigration and Nationality Act (INA), the Administrative Procedure Act (APA), the Due Process Clause, and the international law norm of non-refoulement.

Plaintiffs are wrong, and this Court should enter summary judgment for the government on all counts.

*First*, Defendants are entitled to summary judgment on Plaintiffs' APA claims because they fail to challenge a "circumscribed, discrete agency action[]." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004). There is no such thing as "the turnback policy," nor is there any evidence that the myriad government actions that Plaintiffs identify were taken pursuant to the same agency policy. Plaintiffs have "simply attach[ed] a policy label to disparate agency practices or conduct" and called it agency action, which under the APA they simply "may not" do. *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1207 (S.D. Cal. 2019). Further, the government's border-wide metering decisions do not "give[] rise to direct and appreciable legal consequences," *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1814 (2016) (quotation marks omitted), and thus are not "final."

*Second*, Defendants are entitled to summary judgment on Plaintiffs' first APA claim (under 5 U.S.C. § 706(1)) because the government has not "directed [CBP] officers to unlawfully withhold" the government's obligations under 8 U.S.C. §§ 1158 and 1225. *See* Pl. MSJ 21–23. Defendants respectfully maintain their position that §§ 1158 and 1225 do not impose obligations on the government toward aliens who stand outside the United States. But even if the statutes applied, the government has not "direct[ed] th[e] unlawful withholding of" its legal obligations. The southwest border Field Offices continue to inspect and process inadmissible arriving aliens and in fact referred almost five times as many of those aliens for credible-fear interviews in FY 2019 than they did in FY 2017. Def. Ex. 4 at 2. At *most*, such agency action is delayed, and Plaintiffs do not attempt to argue that delays attendant to metering were unreasonable. *See* Pl. MSJ 19–31. Thus, their § 706(1) claim fails.

*Third*, Defendants are entitled to summary judgment on Plaintiffs' second APA claim (under 5 U.S.C. § 706(2)) because the government's border-wide metering decisions are statutorily permissible. *See* Pl. MSJ 24–25. Congress ordered CBP to perform a number of critical national-security, counter-narcotics, economic-security, and trade-and-travel functions at the ports and elevated DHS's national-security and counter-narcotics functions above all others, 6 U.S.C. §§ 111(b)(1), 211(c), (g)(3), and the agency has reasonably exercised its "broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities," *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) (citation omitted).

*Fourth*, each of the government's border-wide metering decisions is well-supported by the facts, is the product of reasoned decisionmaking, and is not based on an arbitrary and capricious interpretation of the INA. *See* Pl. MSJ 26–31. The stated purpose of metering is to address capacity constraints. There is no "pretext" because CBP *in fact was facing capacity constraints*. Even if the evidence showed that there were other reasons for metering, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).

*Fifth*, the government has not violated class members' procedural-due-process rights, *see* Pl. MSJ 31–33, because they do not have a protected statutory interest while they stand in Mexico. Even if class members had a protected interest, they cannot obtain more than what the statute already provides.

*Sixth*, Plaintiffs' Alien Tort Statute (ATS) claim (at 33–36) is not actionable. There is no cause of action for purported violations of the non-refoulement doctrine, and it would be an extraordinary exercise of lawmaking power for this Court to create such a cause of action here.

*Finally*, even if Plaintiffs were to succeed on their claims, they are not entitled to the permanent injunctive and declaratory relief they seek. Vacatur of the border-wide metering decisions is an appropriate legal remedy that provides complete relief.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

Moreover, the balance of the harms weighs starkly against an injunction of metering, as it would harm CBP's national-security and economic security functions and lead to overcrowded facilities where class members would suffer.

This Court should enter summary judgment for the government on all Claims.

## LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). The moving party can carry its burden: "(1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial." *Quidel Corp. v. Siemens Med. Solutions USA, Inc.*, --- F. Supp. 3d ---, 2020 WL 1820247, at *2 (S.D. Cal. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" at the summary-judgment stage. *Id.* at *3 (quoting *Anderson*, 477 U.S. at 255). The non-movant's evidence "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255; *Quidel Corp.*, 2020 WL 1820247, at *3.

## UNDISPUTED FACTS

### A.    Congress Charged DHS, CBP, and OFO With Numerous Duties to Safeguard America's Borders.

CBP's Office of Field Operations is the largest component of the largest federal law-enforcement agency in the United States, with operations spanning over 328 ports of entry within 20 field offices and 70 international locations. *See* Def. Ex. 6 at 1. Almost 30,000 OFO employees implement CBP's mission "[t]o safeguard

1   America's borders thereby protecting the public from dangerous people and materi-
2   als while enhancing the Nation's global economic competitiveness by enabling le-
3   gitimate trade and travel." Pl. Ex. 10, at 51:2–4; Def. Ex. 7 at 1.

4       Congress mandated that OFO "shall coordinate the enforcement activities of
5   [CBP] at United States air, land, and sea ports of entry to deter and prevent terrorists
6   and terrorist weapons from entering the United States at such ports of entry; conduct
7   inspections at such ports of entry to safeguard the United States from terrorism and
8   illegal entry of persons; prevent illicit drugs, agricultural pests, and contraband from
9   entering the United States; in coordination with the Commissioner, facilitate and
10  expedite the flow of legitimate travelers and trade; ... coordinate with the Executive
11  Assistant Commissioner for the Office of Trade with respect to the trade facilitation
12  and trade enforcement activities of [CBP]; and carry out other duties and powers
13  prescribed by the Commissioner." 6 U.S.C. § 211(g)(3) (numbering omitted).

14      OFO is only one of several offices within CBP. Congress has tasked CBP with
15  many additional functions, including to coordinate CBP's "security, trade facilita-
16  tion, and trade enforcement functions"; to direct and administer CBP's commercial
17  operations; to "detect, respond to, and interdict terrorists, drug smugglers and traf-
18  fickers, human smugglers and traffickers" and other national security threats from
19  abroad; to "ensure the overall economic security of the United States is not dimin-
20  ished by efforts, activities, and programs aimed at securing the homeland"; to "de-
21  velop and implement screening and targeting capabilities," including for passengers
22  and cargo; to "enforce and administer the laws relating to agricultural import and
23  entry inspection"; and, "in coordination with [ICE] and United States Citizenship
24  and Immigration Services [USCIS], [to] enforce and administer all immigration
25  laws ... including the inspection, processing, and admission of persons who seek to
26  enter or depart the United States, and the detection, interdiction, removal, departure
27  from the United States, short-term detention, and transfer of persons unlawfully en-
28  tering, or who have recently unlawfully entered, the United States." *Id.* § 211(c).

And CBP in turn is only one component agency of the Department of Homeland Security (DHS). *Id.* § 211(a). DHS's "primary mission[s]" are focused on securing the nation and the prevention of terrorism and terrorist attacks. *See id.* § 111(b)(1). Further, DHS is charged with not only preventing the entry of terrorists and securing the borders, but also administering customs laws, conducting agricultural inspections, carrying out all immigration enforcement functions, administering the laws governing permissions for aliens to enter the United States, and "establishing national immigration policies and priorities." *Id.* §§ 202(1)–(7). "In carrying out the foregoing responsibilities," the Secretary shall "[e]nsur[e] the speedy, orderly, and efficient flow of lawful traffic and commerce." *Id.* § 202(8).

The southwest border Field Offices perform an immense job. In 2019, the ports in those Field Offices processed approximately 49.2 million pedestrians; 73 million personal vehicles and 136.9 million personal passenger vehicles; 2.2 million bus passengers; and 6.4 million trucks and 6.5 million truck containers. *See* Def. Ex. 8 at 1, 2, 4–5. OFO also "plays a vital role in interdicting illicit narcotics." Def. Ex. 9 at 1. The "vast majority of all opioids interdicted by CBP are seized at ports of entry." *Id.* at 1; *see id.* at 4–5. From 2013 to 2017, 88% of CBP's opioid seizures occurred at ports of entry, and 75% of those seizures occurred at ports on the southwest border. *Id.* at 1. CBP currently "does not have technology that screens all packages, cargo, or vehicles," so the agency's "ability to detect narcotics hidden on individuals, in vehicles, or comingled with shipments of goods currently relies heavily on targeting intelligence and officer training and experience." *Id.* at 16.

The ports of entry often operate with "significant shortages" of CBP officers. *Id.* at 1. As of May 2018, there were "4,000 [CBP officers] less than the number needed to staff all ports of entry. Ports of entry in the San Diego and Tucson areas ... have required CBP to assign temporary staff details to fulfill staffing needs at those locations. The practice of temporary details has become so systemic ... that CBP has named it 'Operation Overflow.'" *Id.* at 2; *see also* Def. Ex. 10 at 836.

**B.      The 2016 Migration Surge Stretches the San Ysidro Port of Entry's Capabilities and Diverts Resources From Other Statutory Missions.**

Beginning in February 2016, inadmissible Haitian nationals traveling from Brazil began presenting themselves in significant numbers at the San Ysidro Port of Entry in San Diego, the busiest land border crossing in the Western Hemisphere. *See* Pl. Ex. 33 at 443; Def. Ex. 11 at 1. By May 2016, CBP officials in Southern California "exhausted every effort" to "expand any additional processing and [short-term] detention capacity" to accommodate this influx. Pl. Ex. 17 at 160:9–18. Measures included activating the San Ysidro Admissibility Enforcement Unit's (AEU) "Max Capacity Contingency Plan" San Ysidro's Admissibility Enforcement Unit, Pl. Ex. 35 at 271, which involved "convert[ing] office and administrative spaces to temporary holding areas to increase capacity to over 900 persons," Pl. Ex. 33 at 444; Pl. Ex. 29 at 660; Def. Ex. 12; converting a maintenance area recently vacated by the General Services Administration (GSA) into a holding area, Pl. Ex. 34 at 339; almost doubling the number of CBP officers assigned to the AEU per shift, Pl. Ex. 35 at 271; diverting officers from anti-narcotics functions to assist the AEU with processing, Pl. Ex. 35 at 271; using "virtual processing" to allow CBP officers in the San Diego, Los Angeles, Detroit, and Miami Field Offices and Border Patrol agents in the El Centro Sector to assist in processing migrants at San Ysidro, *id.*; Pl. Ex. 34 at 338; Def. Ex. 10 at 835; housing detainees at nearby Border Patrol facilities, if the facilities "were not already at capacity," Pl. Ex. 33 at 445; and transferring processing of all I-94 arrival records for documented non-resident aliens to the Otay Mesa Port of Entry to free up workstations at San Ysidro, Pl. Ex. 34 at 339. Even with all of these measures, undocumented aliens still had to wait to be processed and detained. Aliens "without documents for admission would queue in an area between the [international boundary] at the port of entry and the primary [pedestrian] lanes to wait until there was sufficient space" to be processed. Pl. Ex. 17 at 159:12–19. By late May 2016, this queue stretched from the primary inspection booths at the POE

"clear south into Mexico." *Id.* at 160:12.

The numbers of undocumented aliens seeking entry at San Ysidro continued to grow, to the point that the Port reached surpassed 1,000 individuals in custody and CBP officers at San Ysidro were compelled to "stop intake at the international boundary" because there "was no space" left, and they needed to bring in everyone from the queue "to make sure they were not left in the elements." Pl. Ex. 17 at 160:6–161:9; Def. Ex. 10 at 836; *see also* Def. Ex. 1 ¶ 22. On May 26, 2016, when asked by a media outlet about the "several hundred people [] sleeping on the floor of the [San Ysidro] pedestrian entrance," the San Ysidro Port Director directed his staff "to do all we can to get this under control." Pl. Ex. 41, at 552–53. He instructed them "to continue to process in a timely manner" and locate temporary holding space "as efficiently as possible." *Id.* at 552. On May 27, 2016, upon receiving word that "[o]ne of the shelters" in Mexico was bringing "a van full" of individuals to the limit line, the San Ysidro Assistant Port Director instructed the Watch Commander to "hold them at the turnstile and not allow them to come into the line. We have no space and it is ugly." Pl. Ex. 42 at 127; *see also* Def. Ex. 1 ¶ 21. Shortly thereafter, the Port Director instructed his deputies "to hold the line the best we can" to enable staff to "process cases and only focus on processing case[s] at this time." Pl. Ex. 43 at 657. The next evening, the Assistant Port Director remarked that "[t]his could go on for a while. When they bring the 74+ from the shelter, the 50 I saw this morning plus whatever else is arriving, we will be overcrowded." Pl. Ex. 44 at 316. In response, the Port Director ordered his deputies to "coordinate and bring small groups at a time and hold the line to prevent any from entering." *Id.*

On May 29, 2016, San Ysidro leadership notified supervisors that the government of Mexico had "set[] up shelters in Tijuana to house those waiting to claim credible fear/asylum," rather than continue to allow them to wait unsheltered in "a line staged on the Mexican side" of the border. Pl. Ex. 11 at 298. The Mexican government would ███████████████████████

1  ████████ *Id.* CBP officers were to "staff[] the ... Limit Line to ensure that trav-

2  elers have documents" and ensure that "those coming to seek credible fear/asylum

3  are identified and directed appropriately at the onset if feasible." *Id.*

4     To add to the operational challenges posed by surge, San Ysidro was in the

5  middle of a multi-phase, multi-year "complete reconfiguration and expansion of the

6  port" that "included the demolition and construction of the LPOE [land port of en-

7  try], including primary and secondary inspection areas, administration and pedes-

8  trian buildings, and all other support structures." Def. Ex. 11 at 1. In late June 2016,

9  as phase 2 of the GSA construction project began, the "PedEast" facilities that San

10  Ysidro had utilized in May to create makeshift detention space for the overflow of

11  undocumented migrants were demolished. Pl. Ex. 33 at 444; Def. Ex 12. This effec-

12  tively cut the Port's short-term detention capacity from ██ (which it achieved by

13  converting office and other space, *see* Pl. Ex. 33 at 444) to ██. Def. Ex. 10 at 837.

14  During the surge at San Ysidro, officers were regularly reminded that "[u]nder no

15  circumstances will an asylum applicant be denied entry into the U.S. Please direct

16  all applicants to the Pedestrian West (PedWest) facility for proper intake and pro-

17  cessing." Pl. Ex. 8 at 069, 070, 071 (instructions issued in July, Sept., and Nov. 2016

18  to the San Ysidro and Otay Mesa POEs).

19  **C.  The Surge's Adverse Impacts Expand to Other Ports of Entry.**

20     The migrant surge continued into the fall of 2016, began spreading east, and

21  started to change in composition to include more family units (FAMU or FMUA)

22  and unaccompanied alien children (UAC). *See* Pl. Ex. 10 at 313:9–319:8. Other ports

23  began to experience severe overcrowding, case-processing delays, and related ad-

24  verse impacts to their operations. For example, on September 3, 2016, the El Paso

25  Port of Entry in Texas, which around that time reported a detention capacity of ██

26  persons, Def. Ex. 13 at 100, "received 92 cases in one shift. Since th[at] date, the

27  Port [] experienc[ed] a significant spike in FAMU cases. In the ten day span between

28  September 4 and September 13 the Port [was] averaging ██ subjects in custody per

12

day." Def. Ex. 14 at 893–94; *see* Def. Ex. 15 at 737 (reporting on Sept. 9, 2016 "an all-time high of 265 detainees in custody"). "During this spike, an average of 23% FAMU cases [were] held at a POE in excess of 72 hours pending placement." Def. Ex. 14 at 894. The Port was "providing up to 1,000 meals per day using microwaves. The facility [was] not equipped for this amount of volume." *Id.* "Active caseload management [was] being performed by transporting cases for processing to less affected Ports." *Id.* But the El Paso Field Office "has no ground transportation contract. All transports are performed by OFO officers." *Id.* at 893. "[T]he increased transports between Ports, to ERO facilities, and to the Airport is straining OFO vehicle and personnel resources." *Id.* at 894. Moreover, the Field Office was "scheduled to detail eight (8) Officers to San Diego" on October 3, 2016. *Id.; see also* Def. Ex. 16 at 099 (on Sept. 21, 2016, noting need for overflow holding area and more staffing).

On September 12, 2016, "at least 950 Haitians" arrived in Tijuana to be processed at San Ysidro. Pl. Ex. 12 at 741; Pl. Ex. 50 at 747–48. "Haitians [were] also [] arriving in increasing numbers at other ports of entry in [preceding] weeks, such as Calexico, which is far less resourced than San Ysidro." Pl. Ex. 12 at 741. Representatives from the U.N. High Commissioner for Refugees (UNHCR) "confirmed" that "most" of the Haitian nationals were "not seeking asylum. ... Instead, they [were] expressing interest in working and/or reuniting with family in the" United States. *Id.* "At least half of CBP's staffing and space previously dedicated to processing asylum-seekers [was] being used to process Haitian parole cases." *Id.* at 742. UNHCR acknowledged that "[b]oth CBP and ICE in Southern California [were] ... doing what they c[ould] with existing resources to process the Haitians expeditiously and humanely and maintain regular processing of asylum-seekers." *Id.* at 741–42.

On September 27, 2016, the El Paso POE reported that it "ha[d] 361 detainees in custody" (surpassing its September 9 "all-time high of 265 detainees in custody," Def. Ex. 15 at 737) "as more FAMU and UAC continue to arrive." Def. Ex. 17 at 817. On September 28, 2016, the El Paso POE reported that it had diverted resources

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

from various other operational areas "to address the current Credible Fear processing and detention overflow at the" Port. Def. Ex. 18 at 684. It redirected officers who work on terrorism-related enforcement to assist with inadmissible alien case processing and related duties (*see id.*, "ATCET [Anti-Terrorism Contraband Enforcement Team] Supervisors and Officers have been re-directed to assist with PCS [Passport Control Secondary], PVP [Passenger-Vehicle-Pedestrian] and transportation duties until further notice"); suspended new-officer training; redirected training officers and firearm staff to assist with inadmissible alien case processing and transportation; redirected "CBP Techs assigned to the Administration Office ... to each bridge location to assist with feeding and other duties as necessary to keep the Officers focused on processing." Def. Ex. 18 at 684; *see* Def. Ex. 19 at 859–68 (images of overcrowding at the El Paso Field Office's ports of entry). Even so, on September 30, 2016, ports of entry in the El Paso Field Office ports "surpassed 400" in custody. Def. Ex. 20 at 830. The situation was "critical." *Id.* Nevertheless, OFO was in the process of transporting Haitian migrants into the El Paso Field Office from the San Diego Field Office to relieve the pressure at the California ports. *Id.*

On October 3, 2016, the El Paso Field Office reported that the surge of UACs and family units "continues to create adverse impacts to port operations, as UAC and FAMU's [*sic*] are being placed throughout administrative spaces of the port. Additionally, CBP personnel are being reassigned to support this influx, impacting other critical areas." Def. Ex. 21 at 755. The same day, the El Paso Border Patrol Sector reported that it was "barely staying afloat," and requested that the El Paso Field Office move its detainees out of Border Patrol's Paso Del Norte facility and into others because Border Patrol was "currently out of policy ... by holding subjects in non-holding cells." Def. Ex. 22 at 270.

Other southwest border ports experienced similar overcrowding and adverse impacts on port operations. *See, e.g.*, Def. Ex. 23 (Oct. 3, 2016 report that Brownsville POE had to re-allocate staff to address "high volume of detainees"); Def. Ex.

24 (Oct. 14, 2016 report that the Laredo Field Office had to divert staff, detail offic-
ers, and was "expanding use of port administrative space for temporary holding,"
which required additional personnel); Def. Ex. 25 (Oct. 16, 2016 report from the
Port of Hidalgo); Def. Ex. 26 (Oct. 25, 2016 report from the Port of Hidalgo); Def.
Ex. 27 (Oct. 10, 2016 report from the Port of San Luis in the Tucson Field Office);
Pl. Ex. 16 at 46:5–13 (numbers in custody at San Luis were "unsafe" and "un-
healthy"); Def. Ex. 28 (Oct. 19, 2016 report from Port of Nogales); Def. Ex. 29 (Oct.
25, 2016, Ports of Nogales and San Luis had "far exceeded capacity").

On October 5, 2016, ███████████████████████████
████████████████████████████████████████████████
████████████████████████ the Deputy CBP Commissioner asked ICE
about the possibility of increasing the rate of pickups from the San Ysidro and Calex-
ico Ports of Entry. Def. Ex. 30 at 527. The Acting ICE Director responded that ICE
was "currently at 39,650 aliens in custody," "the highest level in [its] history." *Id.*

On October 17, 2016, the San Diego Field Office was utilizing 155% of its
detention capacity, the Tucson Field Office was utilizing 231% of its detention ca-
pacity, the El Paso Field Office was using 99% of its detention capacity, and the
Laredo Field Office was utilizing 106% of its detention capacity. Def. Ex. 31 at 585.
In FY 2016, the southwest border ports of entry encountered more than 150,800
inadmissible aliens, a 70% increase over FY 2014. Def. Ex. 32 at 562.

**D.     DHS and CBP Take Additional Steps to Address the Surge.**

Against this backdrop, in the fall of 2016, DHS and CBP evaluated and took
additional, overarching steps to address overcrowding and to lessen the strain of the
unprecedented migrant surge on DHS operations and mitigate humanitarian con-
cerns. These steps involved plans to increase processing and holding capacity, as
well as to meter the intake of aliens without documents sufficient for lawful entry.

In October 2016, the CBP Commissioner "established a single CBP Crisis
Action Team," Def. Ex. 33 at 4, the purpose of which was "to mitigate impacts to

mission essential functions," Def. Ex. 34 at 710, and "to learn lessons from and avoid repeating mistakes made during a prior surge of UAC in 2014," Def. Ex. 33 at 4. The Crisis Action Team (CAT) was "[c]omposed of representatives from various CBP components" and "compiled data and developed strategies to address the surge and overcrowding." *Id.* at 4.

On October 18, the day ICE reported surpassing 41,000 detention beds, CBP Deputy Commissioner McAleenan communicated to CBP leadership that the Secretary and Commissioner had approved the establishment of a temporary processing center for Haitian nationals in El Centro, California. Pl. Ex. 47 at 116–17. Considerations supporting the facility's establishment included the "current numbers in Baja California and throughout the transit route from Panama," the "lack of near-term removals to Haiti" because of Hurricane Matthew, the lack of "near-term agreement with Brazil for returns of Haitians with residency status there," the "pressure on Mexico and Central American partners" caused by "over 12,000 Haitian nationals in various stages of transit and high-level requests from Mexico and others for US assistance," and "no immediately available path for providing foreign assistance for Central American partners to conduct detention and removal operations." *Id.* at 116. In this broader discussion of regional migration patterns and international coordination, Mr. McAleenan also noted that ███████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██ *Id.*

On October 30, 2016, the CBP Commissioner directed his staff "to continue El Centro work" and "look[] at bringing the Nogales facility from 2014 back on line." Pl. Ex. 55 at 175. On or about October 31, 2016, the Secretary and the Commissioner "approved moving forward with the plan to establish the infrastructure that would support ███████ soft-sided FMUA or UAC beds." *Id.* at 173. On or about

November 1, 2016, the El Centro facility was expected to have a "soft opening on November 14th and a full opening on November 28th." Pl. Ex. 56 at 316.

On November 2, 2016, the OFO Executive Assistant Commissioner wrote to his deputies that he was "seeing engagement by senior leaders at the department and in the administration on our migration and detention issues." Pl. Ex. 60 at 228. In addition to steps identified above, DHS was working to ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ *Id.* at 228; *see also* Pl. Ex. 59 at 845 ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████.

At this time, the CAT began reporting on the ongoing DHS-coordinated plans "for addressing the surge of migration along the Southwest border." Pl. Ex. 61 at 530. ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ *Id.*

On November 7, 2016, both the San Ysidro and Calexico Ports of Entry were "at capacity and [were] prioritizing intake to manage the flow." Pl. Ex. 62 at 790. That same day, the CAT held an "operational conference call" with the San Diego Field Office to "discuss the 'soft opening' of the El Centro Processing center" on November 14. *Id.* ████████████████████████████████████ ████████████████████████████████████████████████

1   ████████████ *Id.* ███████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4   ██████████████████████████████████ *Id.* at 790,

5 791. ██████████████████████████████████

6 ████████████████████████████████████████

7 ████████████ *See id.* at 790.

On November 9, 2016, the CAT informed CBP leadership that the "El Centro Facility will NOT have a soft opening of 11/14 and will NOT go live on 11/28. Planning and contracting will continue but NO TDY personnel from OFO and ICE will be deployed. CBP will continue to work and have [the] facility ready for when trigger is pulled to staff it." Pl. Ex. 65 at 879. "[T]he issue [was] bed space." *Id.* at 878. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████ Pl. Ex. 66 at 216. The CAT continued to discuss and work on other options for soft-sided facilities. Pls.' Ex. 65, at 879.

On November 10, 2016, CBP Deputy Commissioner McAleenan discussed "meter[ing] the flow ... at the POE bridges (at the middle of the bridge) at some of our Texas POEs to prevent the overflow at the actual POE." Pl. Ex. 67 at 936; *see also* Pl. Ex. 68 (Commissioner Kerlikowske and Mr. McAleenan "briefed" Secretary Jeh Johnson "that [they] wanted to increase efforts to meter arrivals of non-UAC, non-Mexican CF cases mid-bridge"). That afternoon, Secretary Johnson approved the proposal. Pl. Ex. 67 at 936. OFO was directed to "proceed with informing [the] OFO field leadership at some of our Texas POEs of this approval so they can start this new operational alignment to bring relief at the POEs." *Id.*

On November 11, 2016, the OFO Executive Assistant Commissioner informed the CBP Deputy Commissioner that he was "on board with the metering," and that he "advised [the Directors of Field Operations] via telephone last night to

start." Pl. Ex. 69 at 935. The Deputy Commissioner responded: "[t]he implementa-
tion [of metering] is subject to your discretion and theirs (and PDs') on what will
work best operationally and whether it is required on any given day or any specific
location." *Id*. The Deputy Commissioner explained that " ███████████████
███████████████████████████████████████ I just want our folks to
have an additional tool to keep conditions safe and working at our POEs." *Id.*

On November 11, the El Paso POE reported "406 detainees in custody." Def.
Ex. 13 at 100; *see also* Def. Ex. 35. The Port "beg[a]n metering at the middle of the
bridge at all 3 crossing locations." Def. Ex. 13 at 100. On November 11 and 12,
2016, the Tucson, Laredo, and El Paso Field Offices transmitted instructions to their
ports authorizing metering-like practices. *See* Pl. Ex. 70 at 662 (Nov. 11, 2016 email
from Tucson Field Office to Port Directors); Pl. Ex. 71 at 496; Pl. Ex. 13 at 607
(Nov. 12, 2016 email from Laredo Field Office authorizing ports to use "appoint-
ment[s]" ████████████████████████); Def. Ex. 36
(Nov. 11, 2016 email from Laredo Field Office to Port Directors).

Metering practices at this time were "not standardized." Pl. Ex. 20 ¶ 47. For
example, on November 17, 2016, the Port of El Paso reported that it was using an
appointment system and that it was metering aliens "while on the U.S. side of the
bridge [walkway into the port]." Pl. Ex. 74 at 450. Upon learning that aliens may be
being turned away while on U.S. soil, OFO headquarters immediately began "work-
ing with the port to address" the issue. Def. Ex. 37 (Nov. 18, 2016 email noting that
the Ports of El Paso and Hidalgo were turning people away on U.S. soil, and that it
was being addressed); Def. Ex. 36 (Nov. 15, 2016 email from OFO headquarters
clarifying to Laredo Field Office that "[i]f any individual arrives at POE, we cannot
just send them back to MX ... but must process them upon arrival"); *see also* Def.
Ex. 38; Pl. Ex. 102 at 137:10–20 (the officers at El Paso were not stationed correctly
during the first week of metering in November 2016, "so we had some corrections
to make"); Def. Ex. 39 (El Paso "course corrected" and ceased using appointment

system). At this and all times, the use of physical force to return an asylum seeker to Mexico was "CBP['s] policy and procedures pertaining to the processing of asylum seekers." Pl. Ex. 8, at 043 (report from CBP's Office of Professional Responsibility (OPR)).[1]

On November 15, 2016, the CAT informed CBP leadership that the planned Nogales Processing Center was on hold. *See* Pl. Ex. 72 at 938, 939. The CAT explained that ███████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████ *Id.* at 939. The same day, the CAT informed CBP leadership that a "Notice to Proceed issued last night to erect a temporary CBP processing center" at Tornillo "with 500 bed capacity with option to expand." *Id.*

CBP then stood up two soft-sided facilities, one on November 25, 2016, in Tornillo, Texas, and the other on December 10, 2016, in Donna, Texas. Def. Ex. 33 at 5; *see also* Pl. Ex. 33 at 445; Def. Ex. 42 (Dec. 8, 2016 CAT report). From November 25 until February 14, 2017, when the facility went to stand-by status, the

---

[1] Plaintiffs' "undisputed facts" recite a handful of unrelated incidents involving alleged coercion or use of physical force, claiming that these incidents are related to metering in 2016 and 2017. *See, e.g.*, Pl. MSJ 5 & n.4, 11. The one cited use-of-force incident in January 2017 resulted in an internal OPR investigation and discipline. Pl. Ex. 8; Def. Ex. 40 (disciplinary letter for unbecoming conduct and "failure to follow procedures"). Plaintiffs cite only three incidents of claimed coercion from only one POE (San Ysidro), in which Plaintiffs were allegedly coerced in May 2017 into withdrawing their asylum applications. Pl. MSJ 5 n.4. Yet Plaintiffs do not, and cannot, connect these claimed incidents to any overarching or border-wide DHS or CBP policy, let alone to the decisions to implement metering. The most Plaintiffs cite is a San Diego Field Office policy regarding a "streamlined withdrawal" process for aliens who chose to withdraw their applications for admission. *See* Pl. Ex. 7 at 611. Under that local policy, "[i]f the applicant indicates a request for asylum or articulates a fear of returning," he or she "must" be referred for a credible-fear interview. Def. Ex. 41 at 619; *see also* Pl. Ex. 7 at 611.

Tornillo facility held a total of 5,721 aliens. Def. Ex. 33 at 6. From December 10 until February 10, 2017, when the facility went to stand-by status, the Donna facility held 2,172 aliens. *Id.*

In December 2016, as the numbers of migrants abated, most ports stopped using metering-like practices to control intake of aliens without documents sufficient for lawful entry. Def. Ex. 43 (Dec. 17, 2016 custody report showing decreased numbers); Pl. Ex. 102 at 86:15–19 (El Paso engaged in metering for three weeks beginning in November 2016); *accord* Pl. Ex. 20 ¶ 41 (noting that metering had ceased in Nogales, Arizona in December 2016).[2]

In January 2017, the surge "abruptly, drastically, and unexpectedly ended." Def. Ex. 33 at 2; *see also id.* at 5 ("[W]itnesses ... were stunned at how low the numbers were."). "In March 2017, several CBP executives recommended permanently closing the [Donna and Tornillo] facilities (which at that time were in stand-by status) because they believed the migration levels would remain low due to policy changes and other factors." *Id.* at 8. But Deputy Commissioner "McAleenan decided to keep the facilities in stand-by status for one additional month" because "he worried [about] another backup," "he was mindful that a recent Executive Order and DHS guidance ... instructed CBP to ensure sufficient short-term detention capacity," he was concerned that the migrants' initial reluctance to come to the U.S. after the inauguration might wear off," and "he feared the annual Spring migration increase." Def. Ex. 33 at 8 (footnote omitted).

Between October 1, 2016, and April 12, 2017, CBP spent more than $45.25

---

[2] Although San Ysidro did not cease metering in December 2016, it was usually not metering between February and December 2017 due to the low numbers. *See* Pl. Ex. 17 at 258:15–21. In April 2017, upon learning of a complaint that a CBP supervisor turned back an individual at the border, *see* Def. Ex 44, port leadership promptly messaged San Ysidro and Otay Mesa managers: "Any asylum applicant we encounter should be taken into custody, escorted to the security office, and then transported to AEU for proper intake and processing. We should not be sending any asylum seekers back to Mexico. Please remind our officers." Def. Ex 45.

million to address the migrant surge. Pl. Ex. 33 at 446. This included OFO's expenditure of $15.76 million in overtime, temporary duty assignments, and operations support; Border Patrol's expenditure of $9.13 million in overtime, TDY, and operations support; and more than $20.24 million in facilities and maintenance costs. *Id.*

## E. As the 2018 Migrant Caravan Approaches, CBP Issues Written Metering Guidance.

In early 2018, the number of undocumented aliens approaching the border began to rise and "start[ed] to reach a high point in the spring of 2018." Pl. Ex. 10 at 68:19–20. In January 2018, the southwest border Field Offices processed 9,930 inadmissible arriving aliens. Def. Ex. 46 at 4. In February 2018, the Field Offices processed 10,085 inadmissible arriving aliens. Def. Ex. 47 at 4. In March 2018, the Field Offices processed 12,957 inadmissible arriving aliens. Def. Ex. 48 at 4. In April 2018, the Field Offices processed 12,295 inadmissible arriving aliens. Def. Ex. 49 at 4. Ports began to report "impacts to frontline functions" from the "increase in detainees." Def. Ex. 50 at 853 (Apr. 4, 2018 email from the El Paso Assistant Director of Field Operations); *see also* Def. Ex. 51 (Apr. 3, 2018 Laredo Field Office report of increased numbers and impact on processing and holding capacity, although "currently manageable"); Def. Ex. 52 (Apr. 18, 2018 San Ysidro report of passenger officers being diverted to provide emergency case-processing assistance).

Between March 31, 2018, and April 23, 2018, CBP received information that a migrant caravan originating in Central America was making its way north from southern Mexico to the U.S.-Mexico border. *E.g.*, Pl. Ex. 80. On April 21, 2018, 550 members of the caravan arrived in Hermosillo, Sonora (a city about 175 miles south of Nogales, Arizona), intending to "continu[e] their voyage northward." *Id.* at 784. On April 24, CBP Commissioner McAleenan wrote to his deputies: "While we are working diligently with Mexico to address as many caravan members as possible, pressing ICE and others to prepare effective coordination of detention and immigration proceedings, and recommending strong posture changes for [the Secretary's]

decision, it is increasingly likely that we will face the arrival of a large portion of these 500–600 individuals ... in the coming days without a change in enforcement posture ... ." Pl. Ex. 81 at 778. Commissioner McAleenan continued: "I know that you have been planning and preparing, and that our field leadership and our officers will act with utmost professionalism and competence, in accordance with law, regulation, and CBP policy, as well as the guidance from the Secretary to effectively enforce the immigration laws of the United States, while appropriately considering and processing claims of fear for those seeking protection. Please confirm that you have sent out guidance regarding safe processing and port security and capacity issues relating to queue management. Please confirm that, absent special circumstances, we will utilize ER [expedited removal], vice NTA [notice to appear], and that release decisions will be made by ICE unless there is a medical emergency or humanitarian emergency." *Id.*

On April 25, 2018, at about 9:00 AM, the San Ysidro Port of Entry had ███ individuals in custody, representing 92% of its detention capacity. Def. Ex. 53 at 712. Around 1:00 PM, the Mexican government notified CBP that ███████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ Def. Ex. 54 at 632. That day, San Ysidro had brought in "50 Mexican Family Units claiming asylum." Def. Ex. 55 at 632. On April 26, 2018, at about 9:00 AM, the San Ysidro Port of Entry had ███ individuals in custody, representing 104% of its detention capacity. Def. Ex. 56 at 645.

On April 27, 2018, the OFO Executive Assistant Commissioner issued a memorandum with the subject line "Metering Guidance" to the Directors of Field Operations (DFOs) for the El Paso, Laredo, San Diego, and Tucson Field Offices. *See* Def. Ex 2. The memorandum states: "When necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public, DFOs may elect to meter the flow of travelers at the

1    land border to take into account the port's processing capacity." *Id.* When metering,

2    "[p]orts should inform the waiting travelers that processing at the port is currently at

3    capacity and CBP is permitting travelers to enter the port once there is sufficient

4    space and resources to process them." *Id.* DFOs "may establish and operate physical

5    access controls at the borderline." *Id.* Ports "may not create a line specifically for

6    asylum-seekers only, but could, for instance, create lines based on legitimate opera-

7    tional needs, such as lines for those with appropriate travel documents and those

8    without such documents." *Id.* "At no point may an officer discourage a traveler from

9    waiting to be processed, claiming fear of return, or seeking any other protection."

10   *Id.* "Once a traveler is in the United States, he or she must be fully processed." *Id.*

11           Thus, the memorandum clarifies that port leaders may exercise their discretion

12   to engage in metering "to facilitate orderly processing and maintain the security of

13   the port and safe and sanitary conditions for the traveling public." Def. Ex. 2. Me-

14   tered travelers are asked to wait on the other side of U.S.-Mexico border until there

15   is "sufficient space and resources to process them." *Id.* One factor in assessing "suf-

16   ficient space and resources" is the port's detention capacity. Def. Ex. 57 ¶ 6; Def.

17   Ex. 58 ¶¶ 13–16. A port's capacity to hold individuals is not a fixed number, but is

18   instead "fluid." Pls.' Ex. 14, at 291:1–3. Although GSA has established the ports'

19   numerical "cell capacit[ies]" (which is typically what is reported as the port's phys-

20   ical detention capacity), "in reality, [CBP] can hold far less" than that maximum-

21   occupancy number. Pl. Ex. 15 at 967. "GSA does not take into account space for

22   sleeping." *Id.*; *see also* Pls. Ex. 102 at 58:15-21. The reported detention capacity

23   number also does not account for the demographics of those in custody, which CBP

24   must account for when allocating detention space; for example, "a family unit with

25   a male head of household who has children who are older and another family unit

26   with a female head of household who has relatively young children" are not "able to

27   [be] detain[ed] ... in the same detention areas or holding" areas. Pl. Ex. 14 at 289:19–

28   288:2; *see also, e.g.*, Def. Ex. 59 at 055 (CBP's Nat'l Transportation, Escort, and

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    Detention Standards (TEDS) requiring gender and juvenile/adult segregation in

2    CBP's hold rooms); Def. Ex. 57 ¶ 10; Def. Ex. 60 ¶ 7; Def. Ex. 58 ¶¶ 13–15.

3         The memorandum was issued to give the ports the ability "to address the ca-

4    pacity" for "large numbers of volumes" of inadmissible aliens attempting to cross

5    into the United States. Pl. Ex. 10 at 70:6–13. There is "[n]o other reason" the mem-

6    orandum was issued. *Id.* at 70:18. The guidance "was not desired to deter migrants

7    from entering the [United States]." Pl. Ex. 10 at 70:1–5; *see also* Pl. Ex. 69 at 935

8    (Nov. 11, 2016 email from Mr. McAleenan: "I just want our folks to have an addi-

9    tional tool to keep conditions safe and working at our POEs.").

10   **F.    DHS Directs CBP to Prioritize Statutory Mission Sets.**

11        From FY 2017 to FY 2018, the number of inadmissible arriving aliens pro-

12   cessed by the southwest border Field Offices crept upwards, and the proportion of

13   those aliens who were placed into expedited removal and referred for a credible-fear

14   interview doubled. In FY 2017, those Field Offices processed 111,275 inadmissible

15   aliens, 17,284 of whom were placed into expedited removal and referred for a cred-

16   ible-fear interview. Def. Ex. 4 at 2. In FY 2018, those Field Offices processed

17   124,879 inadmissible arriving aliens, 38,399 of whom were placed into expedited

18   removal and were referred for a credible-fear interview. *Id.*

19        On June 5, 2018, the Secretary of Homeland Security issued a memorandum

20   to the CBP Commissioner entitled "Prioritization-Based Queue Management." *See*

21   Def. Ex. 3. The Secretary explained that "apprehensions of those crossing our border

22   illegally between the ports of entry and the number of arriving aliens determined to

23   be inadmissible at ports of entry continue to rise," all while CBP's "resources remain

24   strained along the Southwest Border. Inadmissible arriving aliens presenting at ports

25   of entry, many of whom arrive without possessing appropriate travel and identity

26   documents required by law, such as a visa and passport, require additional pro-

27   cessing time that delays the flow of legitimate trade and travel." Def. Ex. 3 at 294.

28

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

The Secretary instructed that "CBP must focus on its primary mission: to protect the American public from dangerous people and materials while enhancing our economic competitiveness through facilitating legitimate trade and travel." *Id.* "The processing of travelers without documentation draws resources away from CBP's fundamental responsibilities." *Id.* at 295–96. "Moreover," the Secretary continued, "staffing at Southwest Border ports of entry is below our target level for almost all major ports, and our officers are increasingly working extensive overtime hours each pay period, leading to increased fatigue and stress on the workforce. At several of the largest ports of entry, upwards of 10 percent of the CBP officer workforce are engaged in immigration secondary screening and processing functions, primarily addressing persons presenting without documents sufficient for admission or other lawful entry." *Id.* at 296.

Thus, "[i]n recognition of (1) the continued prevalence of security threats, (2) the dire consequences of illicit narcotics on our communities (especially the devastating opioid epidemic), (3) the staffing and resource challenges summarized above, and (4) the increase of irregular migration flows," the Secretary "direct[ed the Commissioner] to initiate a 30-day pilot program to prioritize staffing and operations at all Southwest Border ports of entry in accordance with the following order of priority": (1) national-security efforts; (2) counter-narcotics operations; (3) economic security: trade and cargo processing efforts to facilitate lawful commerce into the United States, while enforcing trade laws, protecting agriculture, and addressing anticompetitive elements in the supply chain; and (4) trade and travel facilitation. *Id.* at 296. The memorandum "memorializes a preexisting prioritization" scheme that has been "CBP's policy since [it] w[as] created in 2003." Pl. Ex. 10 at 203:12–20.

The Secretary explained that "[p]rocessing persons without documents required by law for admission arriving at the Southwest Border remains a component of CBP's mission." Def. Ex. 3 at 296; *see also* Pl. Ex. 4 at 133:12–18 (CBP "continue[s] to process migrants in the midst of prioritizing all these different things.").

1   "[B]ut priority should be given to the efforts described above in the prescribed order.

2   Field leaders have the discretion to allocate resources and staffing dedicated to any

3   areas of enforcement and trade facilitation not covered by the above priorities and

4   queue management process based on the availability of resources and holding ca-

5   pacity at the local port level. Depending on port configuration and operating condi-

6   tions, [DFOs] may establish and operate physical access controls at the borderline,

7   including as close to the U.S.-Mexico border as operationally feasible. DFOs may

8   create lines based on legitimate operational needs, such as lines for those with ap-

9   propriate travel documents and those without such documents. As in all operations

10   the safety of employees and the public is paramount in operational decisions." Def.

11   Ex. 3 at 296.

12       Before issuing the June 5, 2018 memo, DHS considered the impact of priori-

13   tization-based queue management on both staffing and daily intake. ████████████

14   ███████████████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████████████████████

19   ███████████████████████████████████████████████████████████████████████

20   ███████████████████████████████████████████████████████████████████████

21   ████████████████████████   Pl. Ex. 96 at 009.

22       Thus, under the June 5, 2018 memo, when determining whether and when to

23   conduct metering, ports were to consider not only the detention and processing ca-

24   pacity factors noted above, but also other operational factors, and were to avoid al-

25   locating resources away from priority mission sets. Accordingly, CBP officials be-

26   gan to more frequently refer to the ports' capacity to process inadmissible aliens in

27   terms of "operational capacity." *E.g.*, Pl. Ex. 99 at 864 (OFO "shifted from 'deten-

28

1  tion' capacity to 'operational' capacity" after June 5, 2018). "The operational capac-

2  ity at a POE varies depending on overall port volume, facility capacity, resource

3  constraints, and daily tactical and enforcement activities. Operational impact at

4  POEs cannot always be planned; for example, [OFO] do[es] not know in advance

5  when [it] will discover human, narcotics, or weapons smuggling attempts, or which

6  individuals may present a threat to our officers. It takes significant resources to man-

7  age this highly variable environment." Def. Ex. 61 at 279. There are "a lot of factors

8  that go into operational capacity." Pl. Ex. 14 at 286:9–10. Operational capacity turns

9  "primarily [on] what else is going on at the port," including "other mission sets that

10 [the port] ha[s] to fulfill," like "immigration secondary processing, drug seizures,

11 money seizures, weapons seizures," or "trade processing," *id.* at 286:25–287:1,

12 288:13–21; "how much physical space is available," which turns on a calculation of

13 the port's "holding capacity" or "detention capacity" and "how many people [the

14 port] already ha[s] in custody," *id.* at 287:2–7; "the type and the makeup of the

15 cases," such as "whether or not they are migrant cases or other types of admissibility

16 cases" and "the complexity of the cases," *id.* at 287:25–288:2, 287:3–4, 289:1; and

17 the number of "people that [the port] ha[s] to dedicate to the other mission sets,' *id.*

18 at 288:22–25; *see also* Pl. Ex. 102 at 222:16-24.

19     OFO does not regularly quantify, record, or report the ports' operational ca-

20 pacity, let alone its specific operational capacity to process aliens without entry doc-

21 uments. It "would just be too cumbersome to record every event that's taking place

22 in the port through out [*sic*] the day, which has had an impact on how many migrants

23 we could come across. If a port was working multiple simultaneous seizures, and

24 then we had to pull officers to do that, we wouldn't record all of those activities. It's

25 just too cumbersome of a report to come together for the 46 crossings along the

26 southwest border as to what's taking place." Pl. Ex. 10 at 186:11–21; *see also* Pl.

27 Ex. 102 at 66:13–14. "And," operational capacity "is fluid" and "differs from port

28 to port and from day-to-day." Pl. Ex. 10 at 186:11–12, 186:22–187:3. "There may

be no capacity at 9:00 a.m, but [ICE] ERO comes and picks folks up at 11:00. And at 12 o'clock we have capacity." *Id.* at 186:22–187:3.

OFO has used "operational capacity" as a metric for port operations in the past. *E.g.*, Def. Ex. 62 at 712 (Sept. 14, 2016 report from CBP's Incident Management Division: "The current influx of inadmissible aliens coupled with added administrative functions and decreased operational capacity due to construction has created an untenable situation for which ERO assistance is critical."); Pl. Ex. 17 at 70:4–13 ("[F]or as long as I have worked in detention as a manager, going back to '15–'16, we have always used operational capacity.").

On June 16, 2018, the Migration Crisis Action Team (MCAT) Deputy Commander reported to ICE that "all the ports along the SWB [southwest border] will increase their daily intake. The ports will not go beyond their capacity limits but will get as close as possible without negatively impacting their other responsibilities. This will result in a significant increase of referrals of FMUAs and single adults [to ICE]." Def. Ex. 63 at 555. Another member of the MCAT "convey[ed]" this information to the ICE field offices on the southwest border to "ensure ERO is ready to support all facets of [the] mission." *Id.*

Between June 26 and July 3, 2018, a CBP officer in the San Diego Field Office "worked toward gauging the overall sentiment of subjects detained at" the San Ysidro Port of Entry. Pl. Ex. 107 at 2. His "goal was to determine what effect, if any," measures "such as ... metering" were having "on subjects attempting entry either illegally or through the credible fear/asylum process." *Id.* (quotation marks omitted). The officer "assess[ed] that the Mexican, Honduran, El Salvadorian and Guatemalan citizen sentiment detained at the POE is unshaken. Detainees did not claim ... long wait times in Mexico as deterrent factors." *Id.*

On August 6, 2018, the MCAT Deputy Commander asked "[h]ow many cases SYS [could] process a day if ERO moved them out the next day." Pl. Ex. 112 at 802. The Watch Commander overseeing San Ysidro's AEU responded ███████████ but

1   only if "half of the officers" were not already at their overtime cap. *Id.*[3] The Deputy

2   Commander indicated that he would not recommend that solution because

3   "throw[ing] money at" the problem "would defeat the purpose of queue manage-

4   ment." *Id.*

5   **G.    CBP Issues the Prioritization-Based Queue Management Memorandum.**

6       From FY 2018 to FY 2019, the number of inadmissible arriving aliens pro-

7   cessed by the southwest border Field Offices continued to creep upwards, and the

8   proportion of those inadmissible arriving aliens who were placed into expedited re-

9   moval and referred for a credible-fear interview doubled again. In FY 2018, those

10  Field Offices processed 124,879 inadmissible arriving aliens, 38,399 of whom were

11  referred for a credible-fear interview. Def. Ex. 4 at 2. In FY 2019, those Field Offices

12  processed 126,001 inadmissible arriving aliens, 80,055 of whom were referred for a

13  credible-fear interview. *Id.*

14      In late November 2019, CBP determined that OFO should renew its focus on

15  directing its resources toward the priority mission sets. *See* Def. Ex. 67 at 15–16. On

16  November 27, 2019, Mark Morgan, the Acting CBP Commissioner issued a memo-

17  randum to the OFO Executive Assistant Commissioner with the subject "Prioritiza-

18  tion-Based Queue Management." Def. Ex. 5. The Acting Commissioner cited the

19  sustained increase in the number of inadmissible aliens presenting at ports of entry

20  and the substantial resources their processing requires, and stated that "CBP must

21  carefully balance its space and resources to ensure that each POE has sufficient ca-

22  pacity to address its mission sets, in order of priority, including the safety and expe-

23  ditious processing of all travelers accessing the port." *Id.* at 303. The Acting Com-

24  missioner explained that Secretary Nielsen previously instructed the southwest bor-

25  der Field Offices to structure their staffing and resources to accomplish four priority

26

27  ---

    [3] On August 7, 2018, San Ysidro reported that over the preceding 60 days, it aver-
28  aged █ intakes per day, processed █ cases per day, and █ individuals were moved
    from the Port per day. Pl. Ex. 92 at 964.

mission sets. *See id.* at 303–04. In Fiscal Year 2019, while the Nielsen memorandum was in effect, CBP officers at the southwest border ports of entry arrested 1,800 convicted criminals, encountered 1,601 Special Interest Aliens,[4] and found three individuals on the terrorist watchlist. *Id.* at 304. CBP officers at the ports seized 19% more methamphetamine and 58% more fentanyl by weight and interdicted $2.4 million more in outbound currency than the previous fiscal year. *Id.* Accordingly, the Acting Commissioner reiterated that "field leaders must continue to balance resources according to the order of priority listed above," *i.e.*, national security efforts, counter-narcotics and outbound operations, economic security, and trade and travel facilitation. *Id.* at 305.

## ARGUMENT

### I.    Plaintiffs Lack a Private Right of Action to Enforce the INA.

Defendants are entitled to summary judgment on Claim I for purported independent violations of the INA (*see* SAC ¶¶ 244–55) because Plaintiffs lack a private right of action under the INA. *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1166 (D. N.M. 2020) (the INA "does not provide a private right of action" to litigants seeking to enforce its terms); *Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1168 (S.D. Cal. 2018) (dismissing claim under § 1158 because "it is unclear to the Court whether Plaintiffs have a private right of action under the Asylum Statute"). As this Court recognized, "[w]hile a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless specifically excluded." *Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1316 (S.D. Cal. 2018) (brackets in original;

---

[4] A Special Interest Alien is "a non-U.S. person who, based on an analysis of travel patterns, potentially poses a national security risk to the United States or its interests." https://www.dhs.gov/news/2019/01/07/mythfact-known-and-suspected-terroristsspecial-interest-aliens (last visited Sept. 25, 2020).

citation and quotation marks omitted). "Insofar as [Plaintiffs] have such an entitle-ment under the INA and its implementing regulations, Plaintiffs may obtain all the relief they request under the provisions of the APA." *Id.* (quotation marks omitted). This Court should thus grant summary judgment for Defendants on Claim I.

## II.    Defendants Have Not Taken Discrete and Final Agency Action of the Sort Plaintiffs Contend.

### A.    There is No Discrete "Turnback Policy."

Plaintiffs in their APA claims challenge "the turnback policy," a purported "overarching agency policy directing th[e] unlawful withholding of mandatory ac-tion" under 8 U.S.C. §§ 1158 and 1225. Pl. MSJ 19, 21; *see also id.* at 7–16, 19–21. Defendants are entitled to summary judgment on these claims because "the turnback policy," as Plaintiffs describe it, is not sufficiently discrete for APA review.

"The APA authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the mean-ing of a relevant statute.'" *Norton*, 542 U.S. at 61 (brackets in original; quoting 5 U.S.C. § 702). "'[A]gency action' is defined in § 551(13) to include 'the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'" *Id.* at 62 (brackets in original; emphasis omitted). These are "circumscribed, discrete agency actions, as their definitions make clear." *Id.* APA challenges can succeed only where the plaintiff "identif[ies] a discrete 'agency action' that fits within the APA's definition of that term" *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013) (citations omitted). It is "entirely certain" that an "entire 'program'—consisting principally of the many individual actions ref-erenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA." *Lujan v. Nat'l Wild-life Fed'n*, 497 U.S. 871, 892–93 (1990). "A plaintiff may not simply attach a policy label to disparate agency practices or conduct" to satisfy the APA's discrete agency action requirement. *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1207. They must identify

an actual government policy. *See Lightfoot v. District of Columbia*, 273 F.R.D. 314, 326 (D.D.C. 2011).

The "turnback policy," as Plaintiffs describe it, is not a "circumscribed, discrete" agency action. *Norton*, 542 U.S. at 62. It comprises many claimed actions or decisions spanning several years that have different factual bases. These purported various disparate actions include: the San Ysidro Port of Entry purportedly "abandon[ing]" its surge contingency plans in May 2016 and "turning back asylum seekers instead," Pl. MSJ 8; OFO "turning back asylum seekers" at the Calexico Port of Entry in September 2016, supposedly with knowledge that there were "multiple investigations" into the policy's legality, *id.* at 9; DHS and CBP deciding "[w]ithin hours" of the 2016 presidential election "not to open" a temporary processing facility in El Centro, California and expanding metering to Texas ports of entry, *id.* at 10; DHS and CBP "plac[ing] the planned Nogales[, Arizona] processing center on hold" "within a week of the 2016 presidential election" and electing instead "to expand turnbacks" border-wide, *id.* at 11; the government "return[ing]" "asylum seekers standing on U.S. soil" to Mexico in November and December 2017, *id.* at 11, 12; a CBP officer at a Texas port of entry allegedly "'cross[ing] into Mexican territory to keep a migrant from coming onto U.S. soil'"[5] in June 2018, *id.* (quoting Pl. Ex. 75 at 272); the Hidalgo Port of Entry purportedly "intentionally remov[ing] seats from the secondary inspection area to reduce the number of asylum seekers processed at the port," *id.* at 11 (quotation marks omitted); the OFO Executive Assistant Commissioner issuing metering guidance in April 2018, *id.* at 12–14; and DHS and CBP "adopt[ing] the prioritization-based queue management policy" in June 2018 and "using 'operational capacity' as [their] stated metric to justify turning back asylum

---

[5] This statement is inadmissible hearsay. *See* Fed. R. Civ. P. 56(c)(2). It was made by an individual who has not testified or submitted a declaration, Pl. Ex. 75 at 272, and Plaintiffs offer it for the truth of the matter asserted, *i.e.*, that an officer crossed the border to prevent a migrant from coming onto U.S. soil.

1  seekers," *id.* at 14.

2      Plaintiffs do not provide a sound representation of the facts. *See supra* at Facts

3  §§ B–G. But in any event, this constellation of actions grouped together under the

4  banner of "the turnback policy" is not a "'discrete' action[] by an agency" amenable

5  to APA review. *Bark v. U.S. Forest Service*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014)

6  (quoting *Norton*, 542 U.S. at 63). In fact, there is no "turnback policy." The reference

7  appears only in litigation documents, and Plaintiff Al Otro Lado inexplicably has no

8  memory of where the term came from. *See* Pl. Ex. 113 at 121:11–126:11. The "turn-

9  back policy" is "simply the name by which" Plaintiffs "refer[] to the continuing (and

10  thus constantly changing) operations of" CBP at the southwest border ports of entry.

11  *Lujan*, 497 U.S. at 890. "It is no more an identifiable 'agency action'—much less a

12  'final agency action'—than a 'weapons procurement program' of the Department of

13  Defense or a 'drug interdiction program' of the Drug Enforcement Administration."

14  *Id.*; *see, e.g.*, *Wild Fish Conservancy*, 730 F.3d at 801 (government's operation of

15  dams "in a manner that obstructs fish passage" is "not ... a discrete 'agency action'").

16      Nor is there any evidence connecting these disparate actions to a single agency

17  policy. To the contrary, the evidence shows that many of these actions were *against*

18  government policy and that the agency took steps to correct them. *E.g.*, Def. Ex. 2

19  ("Once a traveler is in the United States, he or she must be fully processed."); Def.

20  Ex. 64 at 294–95 (finding the "misconduct" described in Pl. Ex. 8 to be "very seri-

21  ous" and "not in compliance" with CBP policy and suspending the officer for 30

22  days); Def. Ex. 37 at 927 (on Nov. 18, 2016, OFO immediately began "working with

23  the" El Paso and Hidalgo POEs "to address" use of appointments and metering on

24  U.S. soil). Plaintiffs say that CBP officers "lied to" asylum seekers, Pl. MSJ 5, "co-

25  erced some to withdraw their applications for admission" through the use of "stream-

26  lined withdrawal" procedures, *id.*, and "used physical force to turn back others," *id.*,

27  as part of a "widespread pattern and practice" sanctioned by DHS and CBP leader-

28  ship "of denying asylum seekers access to the asylum process at POEs on the U.S.-

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

Mexico border," SAC ¶ 2. But even if those allegations were true, the evidence does not show they were part of or pursuant to any border-wide policy or practice that "is common to the class." *Lightfoot*, 273 F.R.D. at 326. At *most*, Plaintiffs' Exhibits show that "lies" occurred at the Tecate and Hidalgo POEs, *see* Pl. Ex. 1 at 99:25– 101:6 (testimony of Tecate CBP officer), *and* Pl. Ex. 3 at 145:3–7 (testimony of Hidalgo CBP officer); and that "coercion" or "physical force" was used at the San Ysidro POE, *see* Pl. Ex. 7 at 611 (email to San Ysidro CBP officers regarding streamlined withdrawal procedures), *and* Pl. Ex. 8 at 042 (CBP OPR report relating to a single incident at San Ysidro). The evidence does not show any border-wide "turnback policy," nor is there any evidence of a border-wide policy, instruction, or guidance that links these disparate actions together. The challenged "turnback policy" is not sufficiently discrete to permit review under the APA.

## B.    The Border-Wide Metering Decisions are Not Final Agency Action.

Besides being sufficiently discrete, a challenged agency action must be "final." 5 U.S.C. § 704; *Navajo Nation v. Dept. of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017). Agency action is final when it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations and quotation marks omitted). "The general rule" under the second *Bennett* prong is that agency action must "impose an obligation, deny a right, or fix some legal relationship" to be final. *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th Cir. 1990) (quotation marks omitted).

While Defendants' border-wide metering decisions may be discrete and mark the consummation of the decisionmaking process, none are "final" under *Bennett* because they do not "give[] rise to direct and appreciable legal consequences" as to the Plaintiff class. *Hawkes*, 136 S. Ct. at 1814 (quotation marks omitted). The metering decisions do not compel or obligate class members to take a particular action, do not deny class members any rights, and do not fix the legal relations between the

1    parties. An alien who is subject to metering is in the same legal position that he

2    would be in if he were never subject to metering. He still may cross the border into

3    a port of entry (albeit at a later date), and when he "is physically present in the United

4    States or [] arrives in the United States," he "may apply for asylum in accordance

5    with" the INA and its implementing regulations. 8 U.S.C. § 1158(a)(1).

6         Plaintiffs' arguments to the contrary (at Pl. MSJ 20–21) lack merit. *First*, me-

7    tering does not alter or change existing statutory entitlements or duties. Defendants

8    acknowledge that this Court previously held that certain aliens who are outside the

9    United States but are "in the process of arriv[ing] in" the country fall within the

10   scope of the asylum statute, *Al Otro Lado*, 394 F. Supp. 3d at 1200, but respectfully

11   maintain their position that §§ 1158 and 1225 by their terms do not apply to class

12   members outside the United States, *see infra* Argument § III. Even if class members

13   were within the scope of the statutes, Defendants' policies have not "den[ied] them

14   access to the asylum process." Pl. MSJ 20–21. Plaintiffs identify no direct order to

15   "deny access," and class members continue to be referred for asylum processing.

16   Def. Ex. 4 at 2. If Plaintiffs are correct that "[m]any" class members are "ultimately

17   deprived" of the opportunity to apply for asylum in the United States, Pl. MSJ 21,

18   this is not a direct legal consequence of the metering decisions, *see* Roberto Doe

19   Decl. ¶ 6 (ECF No. 390-75) (detention by Mexico); Roberto Doe Decl. ¶ 7 (ECF No.

20   390-97) (deportation by Mexico). *Second*, Plaintiffs assert that queue management

21   is final because it has an "'actual or immediately threatened effect,'" namely, class

22   members being "forced to wait" in Mexico. Pl. MSJ 21 (quoting *Lujan*, 497 U.S. at

23   894). But whether agency action has an "actual or immediately threatened effect"

24   goes to whether a claim is ripe, not whether it is final. *Lujan*, 497 U.S. at 894 (citing

25   *Gardner v. Toilet Goods Ass'n, Inc.*, 387 U.S. 158, 164–66 (1967)). Waiting in Mex-

26   ico may be an immediate and practical effect of queue management, but it is not a

27   *legal* consequence. *See Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 637

28   (D.C. Cir. 2019) ("pragmatic" inquiry looks to consequences of agency action "as a

result of the specific statutes and regulations that govern it"). Plaintiffs fail to challenge any discrete and final agency action. Therefore, Defendants are entitled to summary judgment on Plaintiffs' APA claims.

## III. Defendants Have Not "Direct[ed] CBP Officers to Unlawfully Withhold a Discrete, Mandatory Ministerial Action."

For two reasons, Defendants are entitled to summary judgment on Plaintiffs' claim that Defendants "direct[ed] CBP officers to unlawfully withhold a discrete, mandatory ministerial action" under §§ 1158 and 1225 in violation of the APA, § 706(1). Pl. MSJ 21–23. *First*, § 706(1) requires Plaintiffs to show "that an agency failed to take a *discrete* agency action that it is *required* to take." *Norton*, 542 U.S. at 64; *Hells Canyon Preservation Council v. U.S. Forest Service*, 593 F.3d 923, 932 (9th Cir. 2010). Defendants respectfully maintain that §§ 1158 and 1225 do not mandate any actions toward aliens who are outside the United States. Section 1158(a)(1) allows an alien to apply for asylum if he "is physically present in the United States" or "arrives in the United States." Section 1225(a)(3) requires the government to inspect for admission "[a]ll aliens ... who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States." Section 1225(a)(1) defines an applicant for admission as "[a]n alien present in the United States who has not been admitted or who arrives in the United States," and regulations require anyone who is seeking admission to do so "at a U.S. port-of-entry," all of which are in the United States, *United States v. Aldana*, 878 F.3d 877, 880–82 (9th Cir. 2017), *cert. denied* 139 S. Ct. 157 (2018), "when the port is open for inspection," 8 C.F.R. § 235.1(a). Section 1225(b)(1)(A)(ii) requires the government to refer for a credible-fear interview an alien "who is arriving in the United States," "[i]f" it "determines" that the alien is inadmissible on certain grounds "and the alien indicates either an intention to apply for asylum" or fear.

Sections 1158 and 1225 apply exclusively to aliens "in the United States." This reading is supported by: (1) the statutes' present-tense language, *see DHS v.*

*Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("[w]hen an alien arrives at a port of entry ... the alien is on U.S. soil"); *United States v. Balint*, 201 F.3d 928, 933 (7th Cir. 2000); (2) the definition of the word "arrive," which means "to reach a destination," The American Heritage Dictionary of the English Language 102 (3d ed. 1992); (3) the presumption against extraterritoriality, *see Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255, 261 (2010) ("When a statute gives no clear indication of extraterritorial application, it has none."); (4) the structure of the INA, *see Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993) (there is "no provision in the statute for the conduct of such proceedings outside the United States"); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."); *Matter of Lewiston-Queenston Bridge*, 17 I. & N. Dec. 410, 413 (BIA 1980) ("when an individual comes to this country by way of an international bridge, he has 'landed' when he touches United States soil"); (5) the rule that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (citation and quotation marks omitted), which here is a scheme for expedited "remov[al] *from* the United States," 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added); and (6) the legislative history of § 1225, *see* H.R. Rep. No. 104-469, pt. 1, at 175–76 (1996) (an asylum claim should "be commenced as soon as possible *after* the alien's arrival in the U.S." (emphasis added)).[6]

---

[6] The use of the present-progressive tense ("arriving in") in § 1225(a)(1)(A)(ii) does not change this conclusion. Even if "arriving in" may refer to a "process of arriving," *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1200, for the reasons discussed, that process does not begin before an alien crosses the border. Further, the obligation to refer an alien for a credible-fear interview does not attach until the government "determines" the alien is inadmissible on certain grounds, 8 U.S.C. § 1225(b)(1)(A)(ii), and that determination can occur only once an alien is physically present *in* the United States. Nor does the rule against surplusage support a contrary interpretation. Congress

This entitles the government to summary judgment on all subclass members' claims, since by the class definition they did not cross onto U.S. soil "as a result of Defendants' metering policy." ECF No. 513, at 18. Pursuant to that policy, any class member who is on U.S. soil must be inspected and processed and may not be returned to Mexico. Def. Ex. 2; *supra* Facts §§ B–G; Argument § II.A (failure to process aliens on U.S. soil is against CBP policy).

*Second*, even if the statutes applied to aliens outside the United States, Defendants have not in fact implemented "an overarching agency policy directing th[e] unlawful withholding of [these] mandatory agency action[s]." Pl. MSJ 21. The undisputed evidence shows just the opposite: "Processing persons without documents required by law for admission arriving at the Southwest Border remains a component of CBP's mission." Def. Ex. 3 at 296; *accord* Def. Ex. 2. Moreover, class members *are in fact* being processed for asylum. Concurrently with the implementation of metering, the number of inadmissible arriving aliens referred by the southwest border Field Offices for credible-fear interviews increased four-and-a-half times over, from 17,284 in FY 2017 to 80,055 in FY 2019. Def. Ex. 4 at 2. This figure represents only a subset of class members whom CBP referred for asylum processing, since some class members would have been placed into full removal proceedings to raise their claim before an immigration judge. *See* 8 U.S.C. § 1225(b)(2)(A). Even if some

---

wrote § 1225 to ensure that both aliens encountered within the United States (the alien who "is physically present") and aliens subject to expedited removal (the alien "who arrives in") may apply for asylum, which was an important clarifying measure included as part of Congress's enactment of major immigration legislation in 1996. *See* H.R. Rep. No. 104-828, at 209 (1996) ("[t]he purpose of these provisions is to expedite [] removal *from* the United States" (emphasis added)). Without such clarifying language, Congress would have risked an interpretation of the statute that precluded arriving aliens from applying for asylum at all, since, under the entry doctrine, "an alien detained after arriving at a port of entry ... is 'on the threshold'" and is treated "'as if stopped at the border.'" *Thuraissigiam*, 140 S. Ct. at 1983, 1982 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 215 (1953)).

class members ultimately did not enter the United States to seek asylum after being subject to metering, as Plaintiffs' contend, *see* Pl. MSJ 21, the fact that "many more asylum seekers were not denied access" to the asylum process "defeats the inference that a categorical policy of the nature Plaintiffs intimate exists." *Al Otro Lado, Inc.*, 327 F. Supp. 3d at 1320–21.[7] There is no "overarching agency policy directing th[e] unlawful withholding of mandatory action" under §§ 1158 and 1225. Pl. MSJ 21. At most, agency action is delayed, and Plaintiffs make no attempt to argue that these delays are unreasonable. *See id.* at 21–23. Defendants are thus entitled to summary judgment on Plaintiffs' § 706(1) claim.

## IV.     Metering is Statutorily Permissible.

Plaintiffs argue that "[e]ven if" the statutes do not apply to aliens in Mexico, Defendants' "policy" nevertheless "contravenes" the "statutory scheme governing inspection at POEs and exceeds Defendants' statutory authority" in violation of the APA, § 706(2). Pl. MSJ 24; *see also id.* at 24–25. This is wrong. Metering is statutorily permissible. Defendants are thus entitled to summary judgment on this claim.

The government's border-wide metering decisions—which as discussed are the only decisions that apply class-wide—are statutorily permissible. In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), Congress ordered DHS as its "primary mission" to prevent terrorism in the United States and, in so doing, "ensure that the functions of the agencies and subdivisions within [DHS] that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1). Congress made

---

[7] Plaintiffs cite a Rule 30(b)(6) witness's statement that, "[i]n her experience[]," "asylum seekers who are at the border between the United States and Mexico [are] attempting to enter the United States at a port of entry." Pl. MSJ 23 (second brackets in original; quoting Pl. Ex. 17 at 201:22–202:3). But the witness's testimony (which was provided subject to a timely scope objection, Pl. Ex. 17 at 202:1–2) shows at most that CBP officers understood that those individuals intended to present themselves at the port, not that CBP has a policy to withhold legal obligations. Those obligations are being discharged concurrently with metering. *See* Def. Ex. 4 at 2.

the Secretary "responsible for" "preventing the entry of terrorists," "securing the borders [and] ports," "carrying out the immigration enforcement functions," "establishing and administering rules" governing "forms of permission ... to enter the United States," "establishing national immigration enforcement policies and priorities," and, "in carrying out the foregoing responsibilities, ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce." *Id.* § 202 (capitalization altered).

In the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, 130 Stat. 122 (2016), Congress mandated that the CBP Commissioner "shall" "coordinate and integrate [CBP's] security, trade facilitation, and trade enforcement functions," ensure the interdiction of illegal entrants and goods, "facilitate and expedite the flow of legitimate travelers and trade," "direct and administer [CBP's] commercial operations" and "enforce[] the customs and trade laws," "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers" and other dangerous persons, "safeguard the borders" against "the entry of dangerous goods," coordinate with ICE and USCIS to "enforce and administer all immigration laws," including "the inspection, processing, and admission of persons who seek to enter or depart the United States" and "the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States," and various other functions. 6 U.S.C. § 211(c). In the same Act, Congress ordered the OFO Executive Assistant Commissioner to "coordinate [CBP's] enforcement activities" at the ports of entry to "deter and prevent terrorists and terrorist weapons from entering," "conduct inspections at [the] ports of entry to safeguard [against] ... terrorism and illegal entry of persons," "prevent illicit drugs, agricultural pests, and contraband from entering the United States," "in coordination with the Commissioner, facilitate and expedite the flow of legitimate travelers and

1  trade," administer the National Targeting Center, coordinate the agency's "trade fa-

2  cilitation and trade enforcement activities" with CBP's Office of Trade, and "carry

3  out other duties and powers prescribed by the Commissioner." *Id.* § 211(g)(3).

4       Metering, whether to facilitate safe and orderly processing at the ports of en-

5  try, *see* Def. Ex. 2, or to facilitate the prioritization of resources in order of CBP's

6  national-security, counter-narcotics and outbound-operations, economic-security,

7  and trade-and-travel mission sets, *see* Def. Ex. 3 at 296; Def. Ex. 5 at 303–04, is

8  permissible under this statutory scheme. During the 2016 surge, the physical port

9  facilities at San Ysidro were overrun by the sheer volume of individuals waiting to

10  be processed. *See, e.g.*, Pl. Ex. 41 at 553 (referring to "several hundred people []

11  sleeping on the floor of the [San Ysidro] pedestrian entrance"). At the same time,

12  CBP was regularly diverting resources from the entire agency to process inadmissi-

13  ble arriving aliens at the southwest border. *See supra* at Argument § B–E; Def. Ex.

14  9 at 2 ("The practice of temporary details has become so systemic ... that CBP has

15  named it 'Operation Overflow.'"); Pl. Ex. 33 at 446 (showing more than $45 million

16  of expenditures in six and a half months). This was at the direct expense of CBP's

17  obligations (for example) to coordinate and integrate security, trade facilitation, and

18  trade enforcement functions at the ports and to facilitate and expedite the flow of

19  legitimate travelers and trade. 6 U.S.C. § 211(c). Border-wide metering was neces-

20  sary to CBP's functioning and performance of its statutory mission and duties.

21       In 2018, at the beginning of another sustained increase in undocumented mi-

22  gration on the southwest border and when faced with evidence of a forthcoming

23  potential mass influx event, CBP elected to issue border-wide guidance that permits

24  the ports to meter "[w]hen necessary or appropriate to facilitate orderly processing

25  and maintain the security of the port and safe and sanitary conditions for the traveling

26  public." Def. Ex 2. Then, rather that continuing to expend millions of dollars to ad-

27  dress another sustained surge, DHS instructed CBP to prioritize its national-security

28

1    and other critical missions at the southwest border ports and the use queue manage-
2    ment procedures to facilitate this prioritization, Def. Ex. 3 at 294–96, and later to
3    continue operating under this scheme, Def. Ex. 5 at 303–05. This is consistent with
4    Congress's elevation of DHS's national-security function over all others and is a
5    reasonable exercise of CBP's "broad discretion" to allocate its limited resources to
6    accomplish it many statutory functions. *Massachusetts*, 549 U.S. at 527; *Hernandez*,
7    140 S. Ct. at 746 ("attempting to control the movement of people and goods across
8    the border" "implicates an element of national security").

9        Plaintiffs contend that DHS and CBP have "'abandon[ed]'" § 1225 because
10   "they think it is not working well," Pl. MSJ 24 (quoting *E. Bay Sanctuary Covenant*
11   *v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018)). Not so. CBP prioritizes certain mission
12   sets over processing undocumented aliens at the southwest border POEs, but the
13   processing of such individuals continues, Def. Ex. 4 at 2, and it "remains a compo-
14   nent of CBP's mission," Def. Ex. 3 at 296; *see also* Pl. Ex. 4 at 133:12–18.

15       Plaintiffs also contend that "CBP's general power to operate POEs does not
16   include authority to contravene more specific provisions of the INA" because the
17   "specific" provisions of § 1225 "govern[] the general.'" Pl. MSJ 25 n.16 (quoting
18   *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).
19   Plaintiffs never specify which "general" statutory provisions they are referring to.
20   Regardless, this argument ignores that Congress also enacted a detailed statutory
21   scheme setting forth CBP's and OFO's functions at the ports of entry. *See* 6 U.S.C.
22   §§ 211(c), (g)(3). As part of that scheme, it elevated DHS's national security func-
23   tions over all others, including processing undocumented migrants. *Id.*
24   § 111(b)(1)(A), (E). In all events, the Supreme Court "ha[s] repeated time and again"
25   that when faced with competing obligations, "an agency has broad discretion to
26   choose how best to marshal its limited resources and personnel to carry out its dele-
27   gated responsibilities." *Massachusetts*, 549 U.S. at 527. CBP continues to discharge
28   its obligations under § 1225 as intakes individuals from Mexico, *see* Def. Ex. 4 at 2,

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    so the "agency's decision to prioritize other projects is entitled to great deference,"

2    *Compassion Over Killing v. FDA*, 849 F.3d 849, 857 (9th Cir. 2017).

3        Plaintiffs further contend that "the logical result" of the government's position

4    is that DHS and CBP "would have sole authority to end asylum for noncitizens ar-

5    riving at POEs, without any involvement by Congress." Pl. MSJ 25. But none of the

6    government's border-wide metering decisions permit CBP to do this. The metering

7    decisions are well within the government's statutory authority.

8    **V.    Defendants' Actions are Not Arbitrary and Capricious.**

9        The undisputed facts also demonstrate that each of Defendants' relevant de-

10   cisions regarding metering is well-supported by the factual record before the agency,

11   is logical and coherent, and is the product of reasoned decisionmaking. Each deci-

12   sion more than satisfies the narrow and deferential standard for arbitrary-and-capri-

13   cious review. *See Motor Vehicle Mfts. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*

14   *Co.*, 463 U.S. 29, 43 (1983). Defendants are thus entitled to summary judgment.

15       The APA "requires a reviewing court to uphold agency action unless it is 'ar-

16   bitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"

17   *San Luis & Delta-Mendota Water Authority v. Locke*, 774 F.3d 971, 994 (9th Cir.

18   2014) (quoting 5 U.S.C. § 706(2)(A)). "Under this standard, [courts] will sustain an

19   agency action if the agency has articulated a rational connection between the facts

20   found and the conclusions made." *Id.* (quotation marks omitted). The 2016 metering

21   decisions were necessitated by overwhelming numbers of migrants seeking to pre-

22   sent themselves for processing, the resultant overcrowding and unsanitary condi-

23   tions at the ports, and the prolonged diversion of staffing resources from other stat-

24   utory mission sets. *See supra* at Facts §§ B–C. Each later decision by CBP or DHS

25   was made against this factual backdrop, and with consideration of substantiated in-

26   creases in the number of undocumented aliens seeking entry to the United States.

27   Plaintiffs claim that the capacity constraints are exaggerated or nonexistent, and thus

28   "pretextual," but this is not so. Moreover, Plaintiffs ignore that the stated reasons for

44

metering include to proactively *avoid* overcrowding and diversion of resources. Def. Ex. 2 (metering to be used when "necessary or appropriate to facilitate orderly processing"); Def. Ex. 5 at 303–05. It is eminently reasonable to act to prevent an operational crisis before one occurs. Further, the evidence shows that queue management in fact facilitated orderly processing: The border Field Offices referred more inadmissible arriving aliens for credible-fear interviews after the metering memoranda were issued. *See* Def. Ex. 4 at 2. Field personnel attribute this to metering "allow[ing them] to prevent emergencies." Pl. Ex. 102 at 188:18–25.

Plaintiffs nonetheless contend that the "turnback policy" is arbitrary and capricious because it is "based on pretext," its "true motivations are unlawful," and it "amounts to an arbitrary and capricious interpretation of the INA." Pl. MSJ 26, 29, 30 (capitalization altered); *see also id.* at 26–31. Plaintiffs' arguments are flawed.

## A.     Defendants' Border-Wide Actions are Not Based on "Pretext."

Plaintiffs say that "Defendants' stated justification for the turnback policy— a 'lack of capacity' at POEs—is pretextual." *Id.* at 26 (quoting Answer ¶ 7). That is not true. The undisputed facts demonstrate that the capacity concerns giving rise to metering—and the resulting overcrowding and diversion of resources—are genuine.

When the San Ysidro Port of Entry began metering in late May 2016, the Port was overwhelmed by individuals seeking admission despite having taken a number of steps to increase its processing and detention capacity, *supra* at Facts § B, which required the Port Director to eventually instruct his deputies to "hold the line the best we can" to enable staff to "process cases and only focus on processing case[s] at this time." Pl. Ex. 43 at 657. The subsequent instructions to other ports of entry to control the flow of travelers through metering were animated by the same concerns. *See supra* at Facts § C; Pl. Ex. 69 at 935 ("I just want our folks to have an additional tool to keep conditions safe and working at our POEs.").

Likewise, in April and May 2018, directly preceding the April and June 2018

memoranda, the southwest border ports were processing an increased number of inadmissible arriving aliens and had begun to report "impacts to frontline functions," Def. Ex. 50 at 853, and CBP was facing another potential mass migration event, *see* Pl. Ex. 10 at 68:19–20; Def. Ex. 46 at 4; Def. Ex. 47 at 4; Def. Ex. 48 at 4; Def. Ex. 49 at 4; Def. Ex. 3 at 295–96; Pl. Ex. 80. By the time the CBP Acting Commissioner issued the prioritization-based queue management memorandum in November 2019, the number of inadmissible arriving aliens referred by the southwest border Field Offices for credible-fear screening had doubled again, from 38,399 in FY 2018 to 80,055 in FY 2019. Def. Ex. 4 at 2.

Defendants' capacity justifications are not a "pretext" because *CBP in fact was facing capacity constraints when the government made the border-wide metering decisions*. Even if there were additional reasons for the government's actions, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dept. of Commerce*, 139 S. Ct. at 2573.[8] The facts show that the government truthfully "disclose[d] the basis of its action." *Id.* (quotation marks omitted).

Plaintiffs' arguments to the contrary (at Pl. MSJ 26–29) lack merit. *First*, Plaintiffs contend that that the government's justifications are pretextual because "POEs generally operated well below 100%" while metering and the numbers "almost never impacted port operations." Pl. MSJ 26. But that is not evidence of pretext; it is evidence that the government's policies work as intended. When metering,

---

[8] "Relatedly, a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities. Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.' Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *Dept. of Commerce*, 139 S. Ct. at 2573 (quoting *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981)).

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

ports will generally detain fewer people at a time, which in turn allows them to dedicate their resources to their priority missions. *See* Def. Ex. 5 at 303–05 (showing an increase in inbound drug interdictions and currency seizure under the priority scheme). When not metering, there are "impacts to frontline functions," Def. Ex. 50 at 853, including, for example, lower border-wide drug seizure weights, Def. Ex. 1 ¶ 21, and lines of people waiting to be processed that stretch "clear south into Mexico," Pl. Ex. 17 at 160:12. Further, as explained, physical detention capacity is only one aspect of a port's ability to detain individuals, and whether the port can safely detain and orderly process them depends on myriad other factors, including the demographics of the detained population, available staffing and overtime, and the other enforcement actions occurring at the port. That CBP does not continuously max out its detention capacity is not evidence of pretext, nor is it unlawful in any way.

*Second*, Plaintiffs raise several port-specific examples that purportedly show that Defendants' capacity concerns are pretextual, but none support Plaintiffs' argument nor undermine Defendants' stated reasons for metering. Plaintiffs say that "a CBP officer at the Tecate POE testified that this 'capacity excuse' is a lie." Pl. MSJ 26–27. But testimony from a single first-line officer at Tecate is probative only of what the officer believes occurred at Tecate, not of whether an entire government agency implemented a policy for a pretextual reason. In any event, the officer's testimony supports the government's stated reasons for metering, because the officer also testified that if the Port of Tecate were not permitted to meter, it would "back up our operations very fast." Pl. Ex. 1 at 146:9–18.

Quoting their attorney's leading questions, Plaintiffs also say that CBP officers at Otay Mesa "were telling travelers that the facility was at capacity but weren't actually checking on the capacity of the facility.'" Pl. MSJ 27 (quoting Pl. Ex. 118, at 93:4–12; *see id.* at 93:9 (objection)). That is inaccurate. The evidence shows that the officers "'*tell travelers they can go to San Ysidro or wait at the limit line*,'" Pl. Ex. 118 at 92:18–93:1 (emphasis added), not that limit line officers tell travelers that

1    the "facility was at capacity" without checking. Regardless of what line officers do,

2    this does not mean that supervisors at the port have not assessed a port's capacity

3    based on a number of operational considerations.

4        Again quoting their own attorney's leading questions, Plaintiffs say that the

5    Hidalgo POE "'intentionally removed seats' from the port's secondary inspection

6    area, 'so that they could say that [the port] couldn't process as many people.'" Pl.

7    MSJ 27 (quoting Pl. Ex. 3 at 157:15–18; *see id.* at 156:9, 21 (objections)). But this

8    testimony is inadmissible for lack of foundation and cannot be considered on sum-

9    mary judgment. *See* Fed. R. Civ. P. 56(c)(2). This witness (another first-line CBP

10   officer) was being asked his "opinion," Pl. Ex. 3 at 156:19–20, and he did not testify

11   that he personally knows port leadership to have removed seats with the intention of

12   processing fewer asylum seekers, *see id.* at 155:19–157:18.[9] Plaintiffs also incor-

13   rectly state that the same officer "testified that there was no justification for metering

14   because CBP could process asylum seekers in the order that they came to a POE

15   without resorting to turnbacks." Pl. MSJ 27 (quoting Pl. Ex. 3 at 71:9–16). What the

16   officer actually testified was that he "couldn't see a reason why [CBP] couldn't"

17   "process asylum seekers in the order that they came to the port of entry." Pl. Ex. 3

18   at 71:9–16. This merely shows that this one local officer does not have insight into

19   the government's border-wide operations and capacity constraints, not that those

20   constraints are false. As explained, those constraints are real.

21       *Third*, Plaintiffs say that prior to issuing the June 2018 memorandum, Secre-

22   tary Nielsen "explicitly asked for and considered the fact that the policy would result

23   in [] turnbacks ... without linking those expected turnback numbers to any actual

24   capacity shortage at POEs." Pl. MSJ 27 (emphasis removed). That is not accurate.

25   The Secretary's office asked, "if we fully implement the priority based Que [*sic*]

26

27   _____

     [9] The witness also has a self-described "traumatic brain injury," Pl. Ex. 3 at 179:13–

28   14, and expressed concern with "[his] memory a little bit" when asked about the
     chairs, *id.* at 157:7–13.

Management option—what's a rough magnitude of the CBP folks that will be needed to man the boundary line? What's a rough estimate of the number of folks that would likely be turned away per day?" Pl. Ex. 93 at 317. Requesting information about the potential costs and impacts of implementing a policy is a regular aspect of the policymaking process. It does not show that there were no capacity constraints.

*Fourth*, Plaintiffs say that "[i]f there really were capacity issues, Defendants have long had contingency plans" for mass migration events but "repeatedly declined to implement such plans and in some instances scrapped their rollout." Pl. MSJ 27. Plaintiffs ignore that ports *did* implement contingency plans and that Defendants engaged in extensive contingency planning in 2016 before authorizing metering border-wide. *See supra* at Facts §§ B–D.[10] But those efforts were insufficient to prevent overcrowding in the event of a sustained migrant surge and came at the expense of the government's other statutory obligations.

*Fifth*, Plaintiffs say that the government can simply parole class members from the ports. Pl. MSJ 27. But mass parole would be manifestly contrary to the plain language of § 1225, which "mandate[s]" the detention of an alien until his asylum application is adjudicated or he is removed from the United States. *Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018). Parole "should not be used to circumvent Congressionally-established immigration policy." H.R. Rep. No. 104-469, pt. 1, at 141. In any event, Plaintiffs acknowledge that Defendants attempted this approach "in fall 2016," Pl. MSJ 27, but like the other steps taken, it did not solve the problem.

*Sixth*, Plaintiffs say that in June 2018, "CBP began using 'operational capacity,' as opposed to 'detention capacity,'" to justify metering, and that this metric

---

[10] The planned El Centro facility was delayed because of "bed space." Pl. Ex. 65 at 879. ██████████████████████████████████████████████████████████████████████ ███ Pl. Ex. 66 at 216. The government would later open two soft-sided facilities in Tornillo and Donna, Texas. Def. Ex. 33 at 5.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1    "'lacks any coherence,' and is anything but a 'concrete standard.'" Pl. MSJ 28 (quot-

2    ing *Tripoli Rocketry Ass'n v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006)). This is wrong.

3    CBP used "operational capacity" long before June 2018. *E.g.*, Def. Ex. 62 at 712

4    (Sept. 2016); Pl. Ex. 17 at 70:4–13 (2015–16). While operational capacity may not

5    be quantifiable, that does not make it arbitrary and capricious. Operational capacity

6    is an established metric in detention contexts. *See Coleman v. Schwarzenegger*, 922

7    F. Supp. 2d 882, 921 (N.D. Cal. 2009) ("A prison system's capacity is not defined

8    by square footage alone; it is also determined by the system's resources and its abil-

9    ity to provide inmates with essential services such as food, air, and temperature and

10   noise control."); DOJ, Bureau of Justice Statistics, https://www.bjs.gov/index.cfm?

11   ty=tdtp&tid=1 (defining "operational capacity" as "[t]he number of inmates that can

12   be accommodated based on a facility's staff, existing programs, and services").

13       *Seventh*, it is not true that the purported "shift to 'operational capacity' simply

14   resulted in POEs processing 'fewer immigrants.'" Pl. MSJ 28 (quoting Pl. Ex. 100

15   at 207:7–14; *see also id.* at 207:12–13 (objection)). From FY 2018 (when Plaintiffs

16   say that CBP was not using operational capacity) to FY 2019 (when Plaintiffs say

17   that CBP was using operational capacity), the border Field Offices maintained their

18   overall levels of inadmissible-alien processing, and their credible-fear referrals more

19   than doubled. Def. Ex. 4 at 2. Further, the border Field Offices' inbound drug sei-

20   zures and currency interdictions increased following the Secretary's memorandum,

21   Def. Ex. 5 at 304, which shows that the Secretary's memorandum had its intended

22   effects on CBP's priority mission sets.

23       *Finally*, Plaintiffs say that "after June 2018, POEs set arbitrary numerical caps

24   on asylum seeker processing" below "actual capacity." Pl. MSJ 29. But again, more

25   class members were referred for asylum processing overall. Def. Ex. 4 at 2. As one

26   Assistant Port Director explained, his port was "able to process more with metering"

27   in 2019 "because metering allowed [CBP] to prevent emergencies," like those "that

28   occurred in 2016." Pl. Ex. 102 at 188:18–25. Metering is not pretextual.

### B.    The "True Motivations" for Metering are Lawful.

Plaintiffs say that metering has an unlawful "[t]rue [m]otivation," Pl. MSJ 29; *id.* at 29–30, but this argument is flawed for several reasons. *First*, arbitrary-and-capricious review "is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dept. of Commerce*, 139 S. Ct. at 2573; *see San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 992 (collecting cases). This rule "reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Dept. of Commerce*, 139 S. Ct. at 2573 (quoting *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)). As explained above, the government's border-wide metering decisions easily satisfy this test when evaluated against the evidence before the agency when the decisions were made. *Supra* at Facts §§ B–G; Argument § V.A. The decisions are "within the bounds of reasoned decisionmaking," and this Court should not "improperly substitute[] its judgment for that of the agency." *Dept. of Commerce*, 139 S. Ct. at 2569, 2570 (quotation marks omitted).

*Second*, even if this Court were to look behind the government's explanations, Plaintiffs offer no direct evidence that the "true motivation" for metering is to "limit access to the asylum process at POEs for its own sake." Pl. MSJ 29. The metering memoranda address the constraints on Defendants' capacity to process undocumented aliens, not just asylum-seekers. *See* Def. Ex. 2; *supra* at Argument § V.A. Further, border-wide metering has not resulted in reduced numbers of asylum seekers, as the southwest border Field Offices' credible-fear referrals doubled following the 2018 memoranda's implementation. Def. Ex. 4 at 2.

*Third*, Plaintiffs' circumstantial evidence falls well short of showing that Defendants "proceeded with the turnback policy in pursuit of" limiting asylum "for its own sake." Pl. MSJ 30. Plaintiffs say that CBP Deputy Commissioner McAleenan, "who ultimately proposed the turnback policy, lament[ed] in mid-2016 that there

1   was 'no appetite to try and refuse [asylum seekers] and push them back to Mexico.'"
2   *Id.* at 30 (quoting Pl. Ex. 47 at 116; alteration in Pl. MSJ). But the Deputy Commis-
3   sioner was not referring to "asylum seekers," he was referring to the Haitian nation-
4   als, whom UNHCR "confirmed" were mostly "not seeking asylum." Pl. Ex. 12 at
5   741. Moreover, Mr. McAleenan was not "lamenting"; he was discussing potential
6   policy proposals within a broader discussion about regional migration patterns and
7   international coordination. Pl. Ex. 47 at 116. He would later authorize metering be-
8   cause he "just want[ed] our folks to have an additional tool to keep conditions safe
9   and working at our POEs." Pl. Ex. 69 at 935. This does not show an intent to deter
10  asylum processing for its own sake. But even if it did, that would not show an APA
11  violation, particularly because "a court may not set aside an agency's policymaking
12  decision solely because it might have been influenced by political considerations or
13  prompted by an Administration's priorities." *Dept. of Commerce*, 139 S. Ct. at 2573.

14        *Fourth*, Plaintiffs say that a deterrence motive exists because ████████████
15  ████████████████████████████████████████████████████████████████████████
16  ████████████████ Pl. MSJ 30. ████████████████████████████████████████
17  ████████████████████████████████████ Pl. Ex. 96 at 009. This shows that the
18  purpose of the request was to gather information about the policy's anticipated costs
19  and effects, which is a normal aspect of policymaking.

20        *Fifth*, Plaintiffs say that in November 2016, "CBP put out a call for proposals
21  'that would have a deterrent effect on the sending populations.'" Pl. MSJ 30. But a
22  call for proposals that deter people from making the dangerous journey to the United
23  States is not a call for proposals to deter people from seeking asylum. Indeed, most
24  of the Haitian population seeking admission at San Ysidro at the time were not asy-
25  lum seekers, but rather were seeking to work or reunite with family. Pl. Ex. 12 at
26  741. There is nothing unlawful about seeking policy solutions to irregular migration.

27        *Finally*, even if the evidence showed that Defendants implemented metering
28  to deter individuals from accessing the asylum process for its own sake, Defendants

respectfully maintain their position that this would not be contrary to the statute or unlawful. *See, e.g.*, *Thuraissigiam*, 140 S. Ct. at 1964–67; H.R. Rep. No. 104-469, pt. 1, at 1; *cf. Jean v. Nelson*, 472 U.S. 846, 880 (1985) (Marshall, J., dissenting) (noting "the valid immigration goal of reducing the number of undocumented aliens arriving at our borders"). Further, IIRIRA was motivated by "legitimate concerns" that the government's "capacity for admitting, assimilating, and naturalizing immigrants ha[s] been strained by current levels of legal immigration," including increases attributable to the 1980 Refugee Act. H.R. Rep. No. 104-469, pt. 1, at 133. If Defendants had a "deterrence" motive, that would not be inconsistent with § 1225.

## C. Metering is Consistent with Congressional Intent.

Plaintiffs argue that metering "is 'inconsistent with clearly expressed congressional intent'" because it "turns asylum seekers back to danger en masse." Pl. MSJ 30 (quoting *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1273 (9th Cir. 2020)); *see also id.* at 30–31. This is wrong. *First*, Plaintiffs do not identify any "clear[]" statutory language evidencing that Congress did not intend for asylum seekers to wait in Mexico. *See E. Bay*, 950 F.3d at 1273 (citing *United States v. City of Fulton*, 475 U.S. 657, 666–67 (1986)). Nor could they. Section § 1225 applies by its terms to aliens "in the United States." Further, Congress included in § 1225 a provision expressly permitting the government to "return [an] alien" "who is arriving on land ... from a foreign territory contiguous to the United States" back "to that territory pending" full removal proceedings. 8 U.S.C. § 1225(b)(2)(C). Congress did not object to asylum seekers waiting in Mexico.

*Second*, policies that authorize metering to facilitate safe and orderly processing, Def. Ex. 2, or the prioritization of specific statutory functions, Def. Ex. 5 at 303–04; *see also* Def. Ex. 3 at 294–96, are consistent with the relevant Acts of Congress. As explained, the Homeland Security Act, IIRIRA, and the Trade and Travel Facilitation Act prioritize DHS's national-security mission over all others and require CBP to facilitate the flow of legitimate travel and trade. Metering is consistent

1    with the Acts because it facilitates these functions. The government is entitled to

2    summary judgment on Plaintiffs' APA claims because the challenged metering de-

3    cisions are well-supported, are the product of reasoned decisionmaking, and are con-

4    sistent with congressional intent.

5    **VI.    Metering Does Not Deprive Class Members of Procedural Due Process.**

6            On their due-process claims (at Pl. MSJ 31–33), Plaintiffs first contend that

7    Defendants have deprived class members of their statutory "procedural protections"

8    to "be inspected and processed for asylum at POEs pursuant to § 1225." Pl. MSJ 32.

9    But § 1225 does not establish any such protections for aliens outside the United

10   States. *Supra* at Argument § III. Nor does the obligation to refer an alien for a cred-

11   ible-fear interview attach until the government "determines" that an alien is inad-

12   missible on certain grounds, which does not occur until an alien is physically present

13   *in* the United States. 8 U.S.C. § 1225(b)(1)(A)(ii). By seeking to compel inspection

14   and processing, class members seek to compel entry to the United States, which is

15   not provided by the statute or the Constitution. "[I]t is long settled as a matter of

16   American constitutional law that foreign citizens outside U.S. territory do not pos-

17   sess rights under the U.S. Constitution." *AID v. All. for Open Soc. Int'l*, 140 S. Ct.

18   2082, 2086 (2019) (collecting cases); *Zadvydas*, 533 U.S. at 693. Thus, Defendants

19   do not violate any claimed due-process interest by subjecting class members to me-

20   tering.

21           Plaintiffs argue "[i]n addition" that metering violates the due-process require-

22   ment of "fundamental procedural fairness" toward class members. Pl. MSJ 32–33.

23   It is unclear what Plaintiffs seek by raising this "addition[al]" argument, but in all

24   events class members cannot obtain more than what the statute already provides: to

25   be inspected and processed for admission. *Thuraissigiam*, 140 S. Ct. at 1983 (arriv-

26   ing alien "has only those rights regarding admission that Congress has provided by

27   statute," and "the Due Process Clause provides nothing more"); *Mezei*, 345 U.S. at

28   215; *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950); *Rafeedie*

1  *v. INS*, 880 F.2d 506, 520 (D.C. Cir. 1989).[11]

2  **VII.    Plaintiffs' International-Law Claim is Not Actionable.**

3        Plaintiffs' claim under the ATS, 28 U.S.C. § 1350, is not actionable. *See* Pl.

4  MSJ 33–36. *First*, Plaintiffs fail to show why this Court should use its restricted

5  power to create federal common law to fashion a cause of action for injunctive and

6  declaratory relief against the United States for purported violations of the non-re-

7  foulement obligation. The "three primary offenses" cognizable under the ATS in-

8  clude "violation of safe conducts, infringements of the rights of ambassadors, and

9  piracy." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004). While courts in certain

10  circumstances may create a cause of action for an additional offense that would in-

11  corporate a "specific, universal, and obligatory" international-law standard, *id.* at

12  732, courts must exercise "great caution in adapting the law of nations to private

13  rights," *id.* at 728, and engage in "vigilant doorkeeping," *id.* at 729.

14        The non-refoulement obligation is binding on the Executive only by statute

15  and regulation. *See* 8 U.S.C. § 1231(b)(3)(A) (prohibiting the government from "re-

16  mov[ing] an alien to a country if the Attorney General decides that the alien's life or

17  freedom would be threatened in that country" on a protected ground); *INS v. Stevic*,

18  467 U.S. 407, 421 (1984) (Congress amended the INA to "basically conform[] it to

19  the language of Article 33 of the United Nations Protocol"). When it acceded to the

20  obligation, Congress made clear that "[n]othing in this section shall be construed to

21  create any substantive or procedural right or benefit that is legally enforceable by

22  any party against the United States or its agencies or officers or any other person."

23  8 U.S.C. § 1231(h). And when it allowed for judicial review of claims arising out of

24  the withholding statute, Congress divested district courts of authority to hear such

25

26  ───────────────

[11] To the extent that Plaintiffs raise a *Mathews* balancing argument, *see* Pl. MSJ 33,
27  that argument fails. As discussed, class members lack a protected interest. Even if
they had a protected interest, the burdens to those interests are far outweighed by the
28  burdens to the government's and the public's interests. *See infra* at Argument § VIII.

claims and channeled them instead into the courts of appeals to be reviewed along-side a final order of removal. *Id.* §§ 1252(a)(5), (b)(9). In light of these statutory restrictions, it would be an extraordinary exercise of lawmaking power by the Judiciary that is nowhere suggested in the text or origins of the ATS, and that would be manifestly contrary to the Supreme Court's instruction to exercise "great caution" in recognizing new causes of action under the ATS, *Sosa*, 542 U.S. at 727–28, for this Court to recognize Plaintiffs' novel cause of action. Plaintiffs seek to enforce the same obligation that Congress adopted by statute, but to avoid the attendant limitations on judicial review. Plaintiffs should not be permitted to circumvent those statutory restrictions by couching their claims under the ATS.

*Second*, that Plaintiffs' claims implicate national security and foreign relations further demonstrates that the Court should not fashion a cause of action here. The Supreme Court recently held that courts may not fashion a cause of action for damages under *Bivens* against U.S. officials based on claimed violations arising out of cross-border shootings, reasoning that "the conduct of agents positioned at the border has a has a clear and strong connection to national security" and "regulating the conduct of agents at the border unquestionably has national security implications." *Hernandez*, 140 S. Ct. at 746, 747; *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000). "[T]he risk of undermining border security provides reason to hesitate before extending *Bivens* into this field." *Hernandez*, 140 S. Ct. at 747. Further, the claimed violations arose from a cross-border shooting (which "is by definition an international incident," *id.* at 744) and "implicated" foreign relations, which provided "even greater reason for hesitation" before creating a cause of action. *Id.* at 747. The same national-security and foreign-relations implications are present here. OFO's function "to control the movement of people and goods across the border" indisputably "implicates an element of national security," *id.* at 746, and its cooperation with the Mexican government to regulate crossings of the shared border is "by definition" an international affair, *id.* at 744. Thus, this Court should decline

1    to fashion a private cause of action for much the same reasons the Supreme Court

2    declined to fashion one in *Hernandez*.

3         Plaintiffs do not explain why this Court should recognize an ATS cause of

4    action, and instead merely argue that they *succeed* on an ATS claim. *See* Pl. MSJ

5    33–36. Those arguments are also flawed. *First*, the non-refoulement obligation that

6    Congress acceded to has never been "available to aliens at the border." *Stevic*, 467

7    U.S. at 415. Even if this Court creates an ATS cause of action under the ATS, Plain-

8    tiffs offer no explanation why it should extend further than the INA. *Second*, a non-

9    refoulement obligation attaches under U.S. law when an individual's life or freedom

10   would be threatened *on a protected ground*. 8 U.S.C. § 1231(b)(3)(A). Plaintiffs'

11   contention (at 34) that Defendants "'knew or should have known'" that Mexican

12   "border towns are ... dangerous" is facially insufficient to establish this nexus. *Third*,

13   Plaintiffs cite only eighteen declarations[12] filed in support of their class-certification

14   motion (but not attached to their summary-judgment motion) showing the declarants

15   fear waiting in Mexico. Pl. MSJ 34. Even if credited, the declarations do not show

16   that all class or sub-class members "fear persecution or other harm" in Mexico, it

17   shows only that the eighteen declarants do. Accordingly, Plaintiffs fail to show that

18   relief would be "appropriate respecting the class as a whole." Fed. R. Civ. P.

19   23(b)(2). *Finally*, Plaintiffs contend that Defendants have subjected class members

20   to "impermissible chain refoulement—that is, the risk that CBP's expulsion of mi-

21   grants to Mexico will lead to Mexican-initiated deportation." Pl. MSJ 35. But class

22   members have not been "exp[elled]" to Mexico, they are waiting in Mexico, a coun-

23   try through which many have voluntarily traveled. In any event, this theory would

24   require the Court to sit in judgment of Mexico's enforcement of its own immigration

25   _____

26   [12] Defendants previously moved to strike some of these and other anonymous dec-
larations because Plaintiffs refused to share the declarants' identities under the terms

27   of the protective order, which precluded Defendants from even evaluating whether
to seek discovery from the declarants. *See* ECF Nos. 411, 425. This Court should

28   decline to consider the declarations for the reasons discussed in the motions to strike.

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1  laws within its own borders, which is precluded under the act-of-state doctrine. *See*

2  *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) ("the courts of one country will

3  not sit in judgment on the acts of the government of another, done within its own

4  territory"); *see also Munaf v. Geren*, 553 U.S. 674, 700–01 (2008) (under the rule of

5  non-inquiry, "it is for the political branches, not the judiciary, to assess practices in

6  foreign countries and to determine national policy in light of those assessments").

7  Plaintiffs' ATS claim is not actionable, but even if it were it fails.

## VIII.  Plaintiffs are Not Entitled to the Relief They Seek.

9       Plaintiffs seek a permanent injunction requiring "Defendants to cease treating

10 asylum seekers differently from all other people arriving at POEs on foot or by ve-

11 hicle" and a declaratory judgment. Pl. MSJ 36–39. They are entitled to neither, and

12 this Court should deny the request or allow briefing on the appropriate remedy, if

13 necessary, after it rules on the merits.

14      *First*, Plaintiffs' requested injunction is prohibited by 8 U.S.C. § 1252(f)(1)

15 because it would "enjoin or restrain the operation of" § 1225(b)(1)(A)(ii) by rewrit-

16 ing it to apply to aliens outside the United States. *See Hamama v. Adducci*, 912 F.3d

17 869, 879–80 (6th Cir. 2018), *cert. denied* 2020 WL 3578681 (July 2, 2020)

18 (§ 1252(f)(1) prohibits injunctions that "create[] out of thin air a requirement ... that

19 does not exist in the statute"). Moreover, § 1252(f)(1) "restrict[s] courts' power to

20 impede" admission and removal statutes "on the basis of suits brought by organiza-

21 tional plaintiffs and noncitizens not yet facing [removal] proceedings." *Padilla v.*

22 *ICE*, 953 F.3d 1134, 1151 (9th Cir. 2020). Class members are by definition not yet

23 facing removal proceedings, so they cannot obtain the requested injunction that re-

24 writes § 1225's clear terms.

25      *Second*, Plaintiffs are not entitled to an injunction under the traditional test.

26 Injunctive relief is an "extraordinary remedy never awarded as of right." *Winter v.*

27 *NRDC*, 555 U.S. 7, 24 (2008). A party must demonstrate "(1) actual success on the

28 merits; (2) that it has suffered an irreparable injury; (3) that remedies available at

1    law are inadequate; (4) that the balance of hardships justify a remedy in equity; and

2    (5) that the public interest would not be disserved by a permanent injunction." *Edmo*

3    *v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir. 2019). Because "it must be presumed

4    that federal officers will adhere to the law as declared by the court," the requirements

5    for discretionary declaratory relief in this context should be the same. *Sanchez-Es-*

6    *pinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985) (Scalia, J.). An injunction

7    "should be no more burdensome to the defendant than necessary to provide complete

8    relief." *E. Bay*, 950 F.3d at 1282 (quotation marks omitted).

9        Plaintiffs' claims fail on the merits, so they are not entitled to an injunction.

10   But even if Plaintiffs showed actual success on the merits, the remaining prongs do

11   not support the injunctive relief they request. The third prong weighs against a per-

12   manent injunction because vacatur, which is the customary and "appropriate rem-

13   edy" for an APA violation, is an adequate legal remedy. *Cal. Wilderness Coalition*

14   *v. DOE*, 631 F.3d 1072, 1095 (9th Cir. 2011); 5 U.S.C. § 706(2). If Plaintiffs were

15   to succeed on their APA and duplicative due-process claims, the Court can vacate

16   Defendants' border-wide metering decisions rather than enter a permanent injunc-

17   tion and provide Plaintiff with complete relief on all claims, including their ATS

18   claim, which is based on the same operative facts. And because the APA is the only

19   statute that waives the United States' sovereign immunity for an injunctive ATS

20   claim, any ATS relief should be no broader than the relief granted under the APA.

21       The balance of hardships and the public interest, which should be considered

22   together, *Sierra Club v. Trump*, 963 F.3d 874, 895 (9th Cir. 2020), also weigh against

23   a permanent injunction. An order categorically enjoining metering at minimum

24   "would require OFO to divert staffing and resources, both at the southern land border

25   POEs and across the country, away from their priority missions and towards the

26   processing of" undocumented aliens. Def. Ex. 1 ¶ 16. Although some class members

27   may be adversely affected by metering, the order would impose direct economic

28   harms on border communities, *id.* ¶¶ 16–17, result in significantly fewer inbound

drug interdictions from Mexico, *id.* ¶ 18, and would create humanitarian challenges by crowding class members into facilities that "do not have showers, beds, laundry facilities, or space for recreation" and "are not equipped to meet the needs of families with small children" or "those with unique medical needs," *id.* ¶ 19. It would also significantly degrade the government's national-security and law-enforcement missions. *Winter*, 555 U.S. at 31 n.5;  Def. Ex. 9 at 1; Pl. Ex. 102 at 136:7–18 (overcrowding "flat out degraded [CBP's] ability to do other mission sets"), 184:7–21 (same); Def. Ex. 65; Def. Ex. 66 (showing diversions of resources); *supra* Facts §§ B–D. There would also be a significant financial cost to the government. Def. Ex. 1 ¶ 23; Pl. Ex. 33 at 446. Mass parole, besides being contrary to the mandatory detention scheme and the public's "weighty interest in efficient administration of the immigration laws at the border," *E. Bay*, 932 F.3d at 779 (quotation marks omitted); *supra* at Argument § V.A, would not alleviate these burdens. It would merely reallocate them to "local NGOs, shelters, and other community organizations that often provide assistance to aliens released from DHS custody." Def. Ex. 1 ¶ 25. These costs to the public, class members, and the government vastly outweigh the harms to class members' interests from metering.

Finally, Plaintiffs' requested injunction is more burdensome than necessary to provide complete relief. The "less drastic remedy" of vacatur would be "sufficient to redress [Plaintiffs'] injury," so "no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). Even if the Court were to issue an injunction, it should order the narrowest relief permissible and preserve metering as an option in certain circumstances to give CBP the flexibility to adapt to changing circumstances and mitigate harms to the United States.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Summary Judgment and enter summary judgment for Defendants.

DATED: September 25, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section

KATHERINE J. SHINNERS
Senior Litigation Counsel

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

No. 17-cv-02366-BAS-KSC

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: September 25, 2020          Respectfully submitted,

                                   */s/ Alexander J. Halaska*
                                   ALEXANDER J. HALASKA
                                   Trial Attorney
                                   United States Department of Justice

MEM. IN SUPPORT OF DEFS.' CROSS-
MSJ & IN OPP'N TO PLS.' MSJ
Case No. 3:17-cv-02366-BAS-KSC