1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
   Director, Office of Immigration Litigation –
4  District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
   Senior Litigation Counsel
6  ALEXANDER J. HALASKA (IL 6327002)
7  Trial Attorney
   United States Department of Justice
8  Civil Division
9  Office of Immigration Litigation
   P.O. Box 868, Ben Franklin Station
10 Washington, D.C. 20044
11 Tel: (202) 307-8704 | Fax: (202) 305-7000
12 alexander.j.halaska@usdoj.gov
13 *Counsel for Defendants*
14
15             **UNITED STATES DISTRICT COURT**
16    **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
                      **(San Diego)**
17

18 AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC

19                    *Plaintiffs*,        **DEFENDANTS' EXHIBIT 33**

20
                          v.
21
22 Chad F. WOLF, Acting Secretary of
   Homeland Security, in his official
23 capacity, *et al.*,
24
25                   *Defendants*.
26
27
28



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

October 10, 2017

MEMORANDUM FOR:    The Honorable Claire M. Grady
Under Secretary for Management
Department of Homeland Security

FROM:    John Roth
Inspector General

SUBJECT:    Investigation of Allegations Related to Temporary
Holding Facilities and Non-Intrusive Inspection
Equipment at U.S. Customs and Border
Protection (OSC File No. DI-17-0368)

The U.S. Office of Special Counsel (OSC) received a whistleblower
disclosure alleging that Kevin McAleenan, Acting Commissioner, U.S.
Customs and Border Protection (CBP), engaged in conduct that
constitutes an abuse of authority and a gross waste of funds.
Specifically, the whistleblower alleged that against the advice of senior
CBP executives:

- McAleenan improperly allocated $32,200,000 of CBP's Operations
  and Maintenance (O&M) funds to construct and operate temporary
  holding facilities in Tornillo, Texas and Donna, Texas from
  November 2016 to March 2017; and

- McAleenan halted Border Patrol agents' use of Non-Intrusive
  Inspection (NII) equipment from June 9, 2017 to June 19, 2017 in
  order to avoid scrutiny from the National Border Patrol Council
  prior to his confirmation hearing.

On July 14, 2017, OSC referred this complaint to then-DHS Secretary
General John F. Kelly. The Department referred the matter for our
consideration, and we agreed to investigate the allegations. Pursuant to 5
U.S.C. § 1213(c)(1)(B) and OSC procedures, a response from the
Secretary (or her delegate) is due by November 13, 2017.

We have not substantiated these allegations. The decision to establish
and operate the Tornillo and Donna facilities was based on sound



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

evidence, after significant research, and with the consensus of CBP senior officials. Separately, while McAleenan did unilaterally decide to temporarily suspend the use of NII equipment by Border Patrol agents in the El Paso, Texas Sector for 10 days in June 2017, he did not receive objections from any senior officials, and we identified no evidence that his decision was based on anything other than a concern for the safety of CBP employees and their potential lack of confidence in the safety of the NII equipment. Consequently, we found no violations of law, rule, or regulation, or any gross mismanagement, gross waste of funds, abuse of authority, or substantial and specific danger to public health or safety. *See* 5 U.S.C. § 1213(a)(2).

In the course of this investigation, we interviewed approximately 15 witnesses and reviewed emails and other key documents. The whistleblower declined our request for an interview, but provided answers to our written questions.

## Tornillo and Donna Temporary Holding Facilities

According to the whistleblower, McAleenan decided to build temporary facilities to hold undocumented immigrants at Tornillo, Texas and Donna, Texas. The whistleblower alleged that McAleenan made this decision unilaterally, without a proper basis, and against the advice and objections of CBP senior executives. The whistleblower stated the facilities were each built to hold approximately 450 individuals, but they never held more than a fraction of that capacity. The whistleblower claimed that CBP spent approximately $32.2 million of O&M funds to build and operate these facilities, which left insufficient funds to purchase ammunition and other necessary equipment. Finally, the whistleblower claimed it was improper for CBP to use appropriated funds on holding facilities because U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), and not CBP, is responsible for detaining aliens.

We found that the Tornillo and Donna facilities were built to address a documented surge of migrants arriving on the Southwest border in 2016. While the facilities were never filled to capacity, that was because the surge abruptly, drastically, and unexpectedly ended. The decision to build the facilities was collaborative, and we found no disagreement about that decision among CBP leadership. We also found that CBP kept DHS, Congress, and the White House informed about the need for and



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

cost of the holding facilities, and we identified no appropriations, accounting, or procurement abnormalities related to the temporary facilities.

### The decision to build the Tornillo and Donna facilities had a sound basis

In the summer and fall of 2016, CBP observed a large increase of foreign nationals arriving at the Southwest border. For example, in October and November 2016, the number of Border Patrol apprehensions and inadmissible aliens who arrived at Ports of Entry (POE) was 75% higher than the prior five-year averages for those months. Many witnesses told us this surge was related to the upcoming U.S. presidential election. Regardless of the election's outcome, there was a strong desire among migrants to arrive in the United States before the new president took office. According to the witnesses, the migrants believed they might receive amnesty if Hillary Clinton took office or that the border would close under Donald Trump's administration. Additionally, there were also substantial increases of Cubans and Haitians arriving at the U.S. border.

CBP lacked sufficient space to hold all the apprehended and inadmissible aliens. Generally, CBP only holds aliens for short periods of time while they are being processed and awaiting transfer to either the U.S. Department of Health and Human Services (HHS) (for unaccompanied alien children (UAC)) or to ICE ERO (for everyone else).[1] However, HHS and ICE ERO both struggled to keep up with the surge of individuals, which resulted in a backup at CBP facilities. In particular, the POEs became especially crowded. Several witnesses told us that aliens, including children, were forced to sleep in hallways, conference rooms, and breakrooms because there was nowhere else to put them. Witnesses told us that holding people in these conditions presented health and safety concerns for both the people being held and the CBP employees at these facilities. Moreover, CBP employees were taken away from their regular enforcement duties in order to help feed and care for the detainees. According to one witness, CBP facilities were "drowning in bodies."

---

[1] CBP's policy is to make every effort to hold individuals for the least amount of time possible and "generally not . . . longer than 72 hours." U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search (Oct. 2015), § 4.1. Additionally, except in exceptional circumstances, UACs must be transferred to HHS within 72 hours of determining that the child is a UAC. 8 U.S.C. § 1232(b)(3).



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Seeking to learn lessons from and avoid repeating mistakes made during a prior surge of UAC in 2014,[2] CBP established a Crisis Action Team (CAT team) in October 2016 to manage its response to this migration surge. Composed of representatives from various CBP components, the CAT team compiled data and developed strategies to address the surge and overcrowding. The CAT team combined data and intelligence gathered by different CBP offices into a daily report, which it provided to CBP leadership. The CAT team also briefed the leadership daily on the data and what it was doing to address the surge.

The CAT team considered several approaches to address the overcrowding. For example, it tried working with Mexico to "meter" the number of individuals allowed to enter the U.S. at a given time, to ensure that CBP had space for everyone. It also tried getting ICE to increase the number of deportation flights. Additionally, ICE offered to transfer a building it was no longer using to CBP so that CBP could convert it into a holding facility. However, the building was far from where CBP had the most need and CBP did not want to assume permanent control of it.

The CAT team, in conjunction with CBP's Office of Facilities & Asset Management (OFAM), also explored building temporary facilities to hold aliens until ICE ERO and HHS could accept them. In CBP's view, temporary facilities offered several advantages. First, they could be built much more quickly and less expensively than permanent facilities. Within just a few weeks, CBP could solicit bids, sign a contract, and have a facility built and operational. Temporary facilities were also scalable, meaning capacity could be increased or decreased relatively easily to meet demand. Additionally, the facilities could be primarily staffed by contractors, which was attractive to CBP because it would allow CBP personnel to return to their regular enforcement duties rather than caretaking and custodial work.

In evaluating potential sites for temporary facilities, OFAM, the CAT team, and CBP leadership evaluated several factors, such as the

---

[2] *See, e.g.*, Memoranda from John Roth, DHS Inspector General to the Honorable Jeh C. Johnson re: Oversight of Unaccompanied Alien Children (July 30, Aug. 28 & Oct. 2, 2014),
https://www.oig.dhs.gov/sites/default/files/assets/Mga/2016/Over_Un_Ali_Chil.pdf;
https://www.oig.dhs.gov/sites/default/files/assets/Mga/2016/Sig_Mem_Over_Unac_Alien_Child090214.pdf;
https://www.oig.dhs.gov/sites/default/files/assets/Mga/2016/Over_Un_Ali_Child_100214.pdf.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

locations of migration flows, accessibility, and logistical needs. After considering several sites in Texas, Arizona, and California they ultimately selected Tornillo as the first location. They chose Tornillo because it was adjacent to a POE, it was on land already owned by the government, and it was only 45 miles from El Paso, which was one of the most overcrowded POEs. They later selected Donna as the second location because it was also near the migration flow, it had a lot of available land, and it met other logistical needs. Tornillo opened on November 25, 2016 and Donna opened on December 10, 2016. Both facilities became operational approximately two weeks after CBP selected the site. Both facilities were initially built to hold up to 500 people, and both could be expanded if necessary.

In December 2016 and January 2017, the number of aliens arriving at the border began to decline from the prior months but was still significantly higher than in prior years. Many witnesses told us this was a normal pattern. Every year, the numbers decline in these months because people stay in their native countries to celebrate the holidays. Then, the numbers begin to increase in the new year and into the spring. Therefore, even though fewer people arrived in December and January, the witnesses uniformly told us that they expected the numbers to rise again. However, this did not happen. After the presidential inauguration, the numbers dropped suddenly and drastically, to historic lows. The witnesses told us they were stunned at how low the numbers were.

Table 1, taken from the CAT team's May 2, 2017 briefing, shows the total number of Border Patrol apprehensions and inadmissible aliens who arrived at POEs on the Southwest border. As shown, from August 2016 through January 2017, this number was significantly higher than any of the prior five years, and it drastically declined beginning in February 2017. In prior years, the table shows the typical December – January decrease and February – May increase that many of the witnesses described to us.

5



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Table 1



**CBP Southwest Border Total Apprehensions / Inadmissibles**

|      | OCT    | NOV    | DEC    | JAN    | FEB    | MAR    | APR    | MAY    | JUN    | JUL    | AUG    | SEP    |
|------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| FY17 | 66,710 | 63,363 | 58,431 | 42,477 | 23,570 | 16,712 | 15,850 |        |        |        |        |        |
| FY16 | 45,546 | 45,774 | 48,761 | 33,676 | 38,316 | 46,150 | 48,541 | 55,442 | 45,722 | 46,966 | 51,961 | 56,535 |
| FY15 | 35,895 | 33,023 | 34,238 | 30,178 | 32,550 | 39,159 | 38,296 | 40,681 | 38,616 | 38,610 | 42,414 | 41,165 |
| FY14 | 41,828 | 38,685 | 36,695 | 35,181 | 42,399 | 57,405 | 59,119 | 68,804 | 66,541 | 48,819 | 39,758 | 34,003 |
| FY13 | 34,836 | 33,153 | 29,075 | 32,481 | 40,632 | 54,009 | 54,761 | 50,481 | 40,785 | 39,993 | 41,110 | 38,182 |
| FY12 | 31,323 | 28,601 | 24,360 | 30,758 | 36,990 | 48,520 | 46,660 | 42,995 | 36,794 | 32,801 | 33,686 | 32,375 |

As the numbers of apprehensions and inadmissible arrivals dropped, so too did the number of people being held at the Tornillo and Donna facilities. By February, there were only a few days in which the two facilities held more than 100 people combined (out of 1,000 total capacity). Therefore, in mid-February 2017, CBP decided to place the facilities in "stand-by" mode. This meant that the facilities remained intact with basic maintenance, but they did not hold any detainees. It cost approximately $1.8 million to keep the two facilities in stand-by mode each month, which was approximately $2.8 million less than keeping them fully operational. The facilities could be reactivated from stand-by status within 72 hours, at a minimal cost. In contrast, if the facilities were permanently closed, it would cost approximate $6.6 million to reopen them if necessary. Therefore, in CBP's view, keeping the facilities in stand-by mode was a form of insurance, in case the migration flow increased again. By mid-April 2017, the numbers had not increased and so McAleenan gave the order to permanently close the facilities.

The Tornillo facility held a total of 5,721 aliens over 82 days (November 25, 2016 – February 14, 2017). It held an average of 174.34 aliens per day. The Donna facility held 2,172 aliens over 63 days (December 10, 2016 – February 10, 2017). It held an average of 43.52 aliens per day.[3] The total cost for the two facilities was approximately $20 million.

---

[3] The daily average is higher than the number of aliens divided by the number of days the facility was open because aliens often remained at a facility for more than one day.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

<u>The decision to build and maintain the facilities was a collaborative
agency decision</u>

We found that McAleenan did not unilaterally make the decision to build
the Tornillo and Donna facilities, as the whistleblower alleged. Many CBP
senior executives, as well as the CAT team, were closely involved in the
process of addressing the surge and the specific decisions to open and
locate temporary holding facilities. The CAT team met with CBP senior
executives daily during this time, and one senior member of the CAT
team told us that McAleenan did not dictate any particular course of
action. Instead, according to the witnesses we interviewed, there was
always a discussion based on the information provided by the CAT team.
Indeed, McAleenan was not even CBP's Commissioner when the facilities
were built in 2016. Then-Commissioner Gil Kerlikowske ultimately made
the decision to open the facilities.

Moreover, CBP was in constant communication about the migration
surge with the White House, then-DHS Secretary Jeh C. Johnson, then-
acting DHS Deputy Secretary Russ Deyo, and others throughout DHS
and its components. One senior member of the CAT team recounted
attending regular meetings at DHS headquarters where then-Secretary
Johnson was briefed on the crisis and approved a number of proposed
solutions, including the temporary facilities. We also identified emails
confirming the Secretary's awareness and involvement.

Every current and former CBP senior executive whom we interviewed
(which includes every person the whistleblower identified as objecting to
the facilities) told us they agreed with the decision to establish the
temporary facilities. Most witnesses also told us that all CBP senior
executives agreed with the decision to open the Tornillo and Donna
facilities, though one witness recalled another senior official who agreed
with the need for the temporary facilities, but argued that it was ICE's
responsibility to establish them. While we reviewed documents that
identified potential benefits and risks of various measures for addressing
the migration surge, including the temporary facilities, we found no
emails or documents showing major objections to the proposed plan. Nor

---

The daily averages above reflect the total number of aliens that were at each facility
each day, regardless of how long each alien spent at the facility. We identified other CBP
reports that showed different figures because the data was collected using different
methodologies (e.g. measuring the number of aliens at the facilities at one particular
time each morning).



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

did we identify any documents that contradicted the witnesses'
assertions that CBP leadership was generally all in agreement with the
decision to open the Tornillo and Donna facilities.

However, there was some disagreement as to when to close the facilities.
In March 2017, several CBP executives recommended permanently
closing the facilities (which at that time were in stand-by status) because
they believed the migration levels would remain low due to policy
changes and other factors. However, McAleenan decided to keep the
facilities in stand-by status for one additional month. He told us there
were several reasons for his decision. First, he worried that policy
changes at ICE might lead to another backup. Second, he was mindful
that a recent Executive Order and DHS guidance for implementing that
order instructed CBP to ensure sufficient short-term detention capacity.[4]
Third, he was concerned that the migrants' initial reluctance to come to
the U.S. after the inauguration might wear off. Finally, he feared the
annual Spring migration increase. We identified a contemporaneous
email demonstrating McAleenan's concern related to ICE, but no
documentation of the other concerns he shared with us. Nonetheless, his
explanation was credible and we found no evidence to the contrary.

In any event, no senior official we spoke to, including the ones who
recommended closing the facilities in March, criticized McAleenan's
decision to keep the facilities in stand-by status for another month. To
the contrary, the officials said they understood McAleenan's decision,
that it was a judgment call, and that it was not an objectively incorrect
decision. The following month, McAleenan accepted the recommendation
and decommissioned the facilities.

---

[4] On January 25, 2017, President Trump signed Executive Order 13,767, which
directed the DHS Secretary to "take all appropriate action and allocate all legally
available resources to immediately construct, operate, control, or establish contracts to
construct, operate, or control facilities to detain aliens at or near the land border with
Mexico" and "immediately take all appropriate actions to ensure the detention of aliens
apprehended for violations of immigration law . . . ." Exec. Order No. 13,767, §§ 5(a), 6.
On February 20, 2017, then-DHS Secretary General Kelly issued a memorandum
implementing the Executive Order that instructed the ICE Director and CBP
Commissioner to "take all necessary action and allocate all available resources to
expand their detention capabilities and capacities at or near the border with Mexico to
the greatest extent practicable" and for CBP to focus on expanding "short-term
detention" capability. Memorandum from John Kelly, DHS Secretary to Kevin
McAleenan, Acting Commissioner, CBP, *et al.*, Implementing the President's Border
Security and Immigration Enforcement Improvements Policies,
https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-
Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

---

<u>We identified no appropriations, accounting, or procurement
abnormalities associated with the Tornillo and Donna facilities</u>

The whistleblower claimed it was unlawful for CBP to use appropriated
funds on "detention" facilities because only ICE may detain aliens.
Similarly, some witnesses told us that others within CBP believed ICE
should be responsible for building temporary facilities because ICE was
the cause of the backlog. As an initial matter, there was nothing
fundamentally improper about CBP establishing temporary facilities to
hold aliens. The Tornillo and Donna facilities merely did what CBP is
statutorily required to do (and has continued to do since the facilities
closed) – holding aliens in short-term detention until they can be
processed and transferred to HHS or ICE ERO. During the surge, CBP
simply ran out of space to hold the aliens in its existing facilities, and the
temporary facilities were built to expand its capacity.

Moreover, CBP was transparent about the Tornillo and Donna facilities
with DHS, Congress, and the White House. Indeed, CBP argued to then-
DHS Secretary Johnson that ICE should build the facilities, but he
decided that CBP would be responsible for standing up the facilities.
During the migration surge, CBP regularly briefed and communicated
with Congress about the surge and its costs, and provided specific
information about the Tornillo and Donna facilities. For example, in
November 2016, CBP representatives, along with representatives from
DHS, ICE, and U.S. Citizenship and Immigration Services, provided a
briefing on the surge to staff from the Homeland Security Subcommittees
of Congress' Appropriations Committees. During that briefing, CBP
summarized the surge's impact on its budget and identified its surge-
related expenses, including the actual and projected costs of the Tornillo
and Donna facilities. In January 2017, CBP again briefed staff from those
subcommittees on its surge response and provided updated cost
information on the Tornillo and Donna facilities. Finally, McAleenan told
us, and we found emails confirming, that White House officials were
closely involved in managing the surge and were well aware of the
Tornillo and Donna facilities.

Nor did we find any other appropriations issues related to the Tornillo
and Donna facilities. CBP was operating under two continuing
resolutions (CR) during much of the time it was addressing the surge.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

During the first CR,[5] CBP was able to address its surge-related expenses, including the Tornillo and Donna facilities, with the funds it had been apportioned by the Office of Management and Budget (OMB). However, CBP projected that its surge-related expenses would continue to increase after the CR expired, and therefore asked Congress for the authority in the next CR "to obligate funding under the CR formula at a rate for operations necessary to respond to ongoing unpredictable surges in migration."[6] Congress granted CBP this flexibility through an anomaly in the second CR for Fiscal Year 2017.[7] A CBP official familiar with the anomaly process told us that CBP followed typical procedures for seeking and receiving this anomaly. After Congress included this anomaly in the second CR, DHS requested an exception apportionment from OMB on CBP's behalf.[8] The materials accompanying this request specifically referenced the Tornillo and Donna facilities. OMB approved the exception apportionment request in February 2017.

We also found that CBP used the correct source of funds for the temporary facilities and the other surge expenses. CBP used funds from the Operations and Support (O&S) appropriations category, which is the category used to support the costs associated with DHS operations and maintenance activities.[9] This funding category was new for Fiscal Year 2017 so there was no precedent for using it. However, Congress validated this approach by twice later using the O&S category for surge expenses: in the anomaly in the second CR and in its enacted Fiscal Year 2017 appropriation for CBP.

---

[5] The first CR was in place October 1, 2016 – December 9, 2016. Continuing Appropriations Act, 2017, Pub. L. No. 114-223, div. C, § 106, 130 Stat. 908, 909–10 (2016).

[6] *See* OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, FY 2017 CONTINUING RESOLUTION (CR) APPROPRIATIONS ISSUES (ANOMALIES REQUIRED FOR A CR THROUGH MARCH) 8.

[7] Further Continuing and Security Assistance Appropriations Act, 2017, Pub. L. No. 114-254, div. A, § 101, 130 Stat. 1005, 1008 (2016) (amending first CR to add section 163). The second CR for Fiscal Year 2017 was in place December 10, 2016 – April 28, 2017.

[8] An exception apportionment "is a colloquial term that describes the written apportionment that is issued for operations under a [CR], in lieu of the OMB-issued automatic apportionment." OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, OMB CIRCULAR NO. A-11, PREPARATION, SUBMISSION, AND EXECUTION OF THE BUDGET § 120 5 (2016).

[9] DHS, Financial Management Policy Manual ch. 2, § 2.0 15 (Oct. 1, 2016).



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

While we did not formally audit the procurement of the Tornillo and Donna facilities, we found nothing in either our review of documents or interviews of relevant personnel which would indicate any abnormality in the procurement process. Witnesses told us that CBP relied mainly on its procurement staff to handle the procurement process for the facilities, and that McAleenan and other senior executives did not interfere with or influence the process. Nor is there evidence that McAleenan benefitted in any way from the facilities contracts. He was not involved in the procurement process, his financial disclosure forms reveal no financial ties to the contractor that was selected, and no witnesses were aware of McAleenan receiving any benefit from the contracts. Indeed, McAleenan seemed to genuinely not recognize the name of the contractor during our interview of him.

Lastly, we did not substantiate the whistleblower's claim that the Tornillo and Donna facilities left CBP unable to purchase ammunition and other necessary equipment. We asked the whistleblower for more information about this allegation, but he/she could not identify any specific needs that were not met because CBP funded the facilities. In fact, in the Fiscal Year 2017 omnibus appropriation, Congress included sufficient "surge operations" funding to CBP to cover all of its surge-related costs. Therefore, CBP was eventually made whole for all of the costs associated with the Tornillo and Donna facilities. Before the omnibus appropriation, DHS acknowledged to Congress that CBP had temporarily diverted funds from other needs to pay for the facilities, but witnesses told us that no mission critical requirements or equipment were unfunded.

In our view, CBP's decision to stand up the two detention facilities in the manner it did was reasonable and did not constitute an abuse of authority or a gross waste of funds.

## **Shutdown of Non-Intrusive Inspection (NII) Equipment**

The whistleblower separately alleged that in response to a National Border Patrol Council (NBPC) advisory, McAleenan ordered Border Patrol agents on the Southwest Border to stop using NII equipment from June 9, 2017 to June 19, 2017. According to the whistleblower, McAleenan ordered this shutdown even though senior Border Patrol officials informed him that CBP had previously shut down the NII equipment, examined it, and determined it to be safe. Further, the whistleblower

11



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

suggested that McAleenan did not conduct a substantive review of the NII equipment during the June shutdown, and allowed Office of Field Operations (OFO) officers at POEs, who are not NBPC members, to continue using NII equipment. The whistleblower claimed McAleenan ordered the shutdown in order to avoid NBPC scrutiny before his confirmation hearing.

We found no evidence that McAleenan ordered the shutdown for any reasons other than his concerns for the health and safety of CBP employees and their confidence in the NII equipment. At the time he ordered the shutdown, McAleenan was unaware that the NII equipment in question was previously examined in March 2017. While he learned that shortly after ordering the shutdown, he did not cancel the shutdown because he believed the complaint was specific and credible and he did not know the details of the prior examination. Moreover, the NBPC advisory was specific to Border Patrol agents in the El Paso region and so, in McAleenan's view, there was no reason to stop using NII equipment in other regions or at POEs. During the June shutdown, CBP leadership reviewed the results of the prior examination, consulted with subject matter experts, and determined that no further testing was necessary to confirm the safety of the equipment.

> McAleenan was not aware of the prior examination when he ordered the shutdown

On June 9, 2017, the Deputy Chief of the Border Patrol briefed CBP leadership about a NBPC advisory she had just received. The advisory stated that there were "at least 8 confirmed cases of cancer (7 Papillary Thyroid Carcinoma, 1 Medullary Thyroid Carcinoma) among" Border Patrol agents who used NII equipment in the El Paso Sector. McAleenan was not at the briefing because he was on official travel in Mexico City. Following the briefing, the Acting CBP Chief of Staff forwarded the NBPC advisory to McAleenan, and 17 minutes later, McAleenan responded with an instruction to stand down the equipment.

We confirmed McAleenan's assertion that when he received the NBPC advisory on June 9, 2017, he was not aware that the NII equipment in El Paso previously had been shut down and examined in March 2017. The March shutdown was ordered by the El Paso Sector Chief, not by officials at CBP headquarters in Washington. Most of the headquarters officials we spoke to said they were not aware of the March shutdown when they received the NBPC advisory in June, and they did not think McAleenan



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

was aware of it either. We reviewed McAleenan's emails between March and June 2017, and found no mention of the March shutdown or any other NII equipment safety concerns until he received the NBPC advisory on June 9, 2017.

Later on June 9, 2017, after McAleenan had already ordered the shutdown, he received a brief timeline about the March shutdown. However, because he was in Mexico City and attending meetings all day, he was not able to speak to anybody extensively about the March shutdown or fully evaluate the thoroughness of that inspection. Therefore, he did not reverse his decision.

<u>McAleenan offered credible reasons for ordering the June
shutdown and received no objections about that decision</u>

McAleenan told us he was most concerned that eight people within the El Paso Sector had been diagnosed with cancer. He believed that eight agents with similar cancers within one region were too many to be a coincidence. Further, he thought the specificity of the diagnoses in the advisory gave it credibility. McAleenan said he decided to shut down the equipment only in the El Paso Sector, and only within the Border Patrol, because the eight diagnoses there suggested that the problem was localized. Moreover, shutting down OFO's use of NII equipment at the POEs would be much more debilitating than shutting down the Border Patrol's use of it. NII equipment is one of many tools that the Border Patrol uses, and a temporary shutdown would not substantially harm the Border Patrol's operations. In contrast, NII is an integral tool for OFO, and a shutdown at the POEs would have a major impact.

McAleenan's explanation is internally consistent and was corroborated by other witnesses. The existence of eight cancer cases within a relatively small population suggests specific faulty equipment rather than a widespread problem with NII equipment. Therefore, it was not unreasonable, in our view, to stop using and examine the particular equipment in El Paso rather than shutting down all equipment throughout the country. Additionally, many witnesses confirmed that NII equipment is much more important to OFO than the Border Patrol. For example, a senior OFO official told us that NII equipment "is a cornerstone" of their operations at POEs, while a senior Border Patrol official told us that NII equipment is not a primary tool. In fact, the Border Patrol generally does not employ replacement equipment when a NII machine breaks or is taken offline for repairs. Instead, while NII

13



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

equipment is out of service, the Border Patrol increases its use of other inspection tools.

The whistleblower claimed that several senior CBP officials communicated objections about the shutdown to McAleenan. While some witnesses told us they disagreed with McAleenan's decision and might have made a different decision, they understood his decision and did not express their objections to McAleenan. Nor did we find any emails suggesting that any objections were communicated to McAleenan about this decision. Before it was clear that McAleenan was only shutting down the Border Patrol's use of NII equipment, the head of OFO objected to shutting down the use of NII equipment at the POEs. But he did not express objections once he learned that the shutdown only affected the Border Patrol.

### The Border Patrol developed and presented sound evidence for restarting the use of NII equipment to McAleenan

During the June shutdown, the Border Patrol re-evaluated the testing done in March, spoke with experts from CBP's Occupational Safety and Health Division who oversaw the March testing, reviewed recent radiation measurements, met with other stakeholders, and prepared detailed timelines and issue papers on the NII equipment. Based on this work, the Border Patrol determined that the NII equipment in the El Paso Sector was safe, and that no new testing was necessary. Consequently, after they presented their findings to McAleenan on June 19, 2017, he ordered the end of the shutdown.

Importantly, during the shutdown CBP attempted to confirm the eight cancer diagnoses alleged by the NBPC, but only identified two people who claimed their cancer diagnoses were related to their use of NII equipment. Given the importance McAleenan had placed on the number of alleged diagnoses, discovering that number was incorrect gave McAleenan comfort that the NII equipment was safe.

### We found no evidence that McAleenan shut down the use of NII equipment to appease the union

McAleenan told us that he ordered the shutdown for two primary reasons – the safety of CBP employees and their confidence in using the NII equipment. First, he said safety of CBP employees "is paramount" and "an unacceptable risk." Secondarily, he said the morale and engagement

14



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

of CBP employees was important and he wanted to be sure that they were comfortable using the equipment. We found nothing that contradicted this. Other witnesses told us that McAleenan was concerned only with the safety and welfare of CBP employees. Not one witness thought his confirmation process or his relationship with the union factored into McAleenan's decision at all. Nor did we find anything in McAleenan's emails that suggested anything untoward in regard to the union. There were limited references to the union before and during the shutdown, and those references reflected a balance of tension and cooperation that would be expected between an agency and a union.

Based on our review of the evidence, we do not believe McAleenan's decision to temporarily shut down the use of NII equipment in El Paso constituted an abuse of authority. We believe it was a reasonable decision based on the information he had at the time, and that he ordered the shutdown out of concern for CBP employees rather than his own self-interest.