JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation – District Court
Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
ARI NAZAROV (CT 414491)
HAYDEN WINDROW (NY 4384749)
DHRUMAN Y. SAMPAT (NJ 270892018)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERTS' TESTIMONY** |
| CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants* | |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................1

RELEVANT BACKGROUND ON WITNESSES ...............................................2

    I.   Samuel Cleaves – Port of El Paso ....................................................2

    II.  Rodney Harris – Laredo Field Office & Laredo Port of Entry ...................4

    III. Mariza Marin – San Ysidro Port of Entry ...................................6

ARGUMENT .........................................................................................................8

    I.   Defendants' Expert Witnesses Are Not Required to Produce Expert Reports. .........................................................................................9

        A.  Defendants' Experts Are Subject to the Requirements Under Rule 26(a)(2)(C). ..................................................................9

        B.  Defendants' Disclosure Under Rule 26(a)(2)(C) Is Both Substantially Justified and Harmless.........................................13

    II.  The Opinions Proffered by Defendants' Expert Witnesses Are Admissible. ..................................................................................15

        A.  Defendants' Expert Witnesses Are Not Subject to the *Daubert* Factors Because They Proffer Testimony Based on Specialized Knowledge, Not Scientific Expert Testimony. ....................................16

        B.  The Testimony Proffered by Defendants' Experts is Supported by the Record and Consistent with Prior Testimony. ...........................19

CONCLUSION ....................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Adams v. AllianceOne, Inc.*,
   2011 WL 2066617 (S.D. Cal. May 25, 2011).......................................................14

*Bauer Bros., LLC v. Nike, Inc.*,
   2011 WL 12828588 (S.D. Cal. Oct. 19, 2011) ....................................................13

*Cantu v. United States*,
   2015 WL 12743881 (C.D. Cal. Apr. 6, 2015) .....................................................13

*Cervantes v. Zimmerman*,
   2019 WL 1598219 (S.D. Cal. Apr. 15, 2019).......................................................14

*Cooper v. Brown*,
   510 F.3d 870 (9th Cir. 2007) ...............................................................................16

*Copart Inc. v. Sparta Consulting, Inc.*,
   2017 WL 85824 (E.D. Cal. Jan. 9, 2017) ..................................................... 10, 14

*Daubert v. Merrell Dow Pharms, Inc.*,
   509 U.S. 579 (1993)..............................................................................................16

*David E. Watson, P.C. v. United States*,
   668 F.3d 1008 (8th Cir. 2012) .............................................................................17

*Devaney v. Continental Am. Ins. Co.*,
   989 F.2d 1154 (11th Cir. 1993) ...........................................................................14

*Epitech, Inc. v. Krause*,
   2016 WL 7637660 (C.D. Cal. Sept. 21, 2016) ............................................. 19, 20

*Estate of Barabin v. AstenJohnson, Inc.*,
   740 F.3d 457 (9th Cir. 2014) ...............................................................................16

*GE Co. v. Joiner*,
   522 U.S. 136 (1997)..............................................................................................17

*Goodman v. Staples The Office Superstore, LLC*,

644 F.3d 817 (9th Cir. 2011) ................................................................ 11, 12, 14

*GroundMetrics, Inc. v. Wells Fargo & Co.*,

2017 WL 4512141 (S.D. Cal. Aug. 14, 2017) ...................................... 10

*Hangarter v. Provident Life Ins. Co.*,

373 F.3d 998 (9th Cir. 2004) ............................................................ 9, 17

*Hernandez v. Mesa*,

140 S. Ct. 735 (2020) .......................................................................... 12

*Hill v. U.S. Dep't of Homeland Sec.*,

570 F. App'x 667 (9th Cir. 2014) ......................................................... 9

*Kumho Tire Co. v. Carmichael*,

526 U.S. 137 (1999) ...................................................................... 16, 17

*Macias v. Perez*,

2011 WL 2669475 (S.D. Cal. July 7, 2011) ......................................... 13

*Open Text S.A. v. Box, Inc.*,

2015 WL 349197 (N.D. Cal. Jan. 23, 2015) .................................... 18, 19

*Primiano v. Cook*,

598 F.3d 558 (9th Cir. 2010) ............................................................... 17

*Radobenko v. Automated Equip. Corp.*,

520 F.2d 540 (9th Cir. 1975) ............................................................... 21

*Republic of Ecuador v. Mackay*,

742 F.3d 860 (9th Cir. 2014) ......................................................... 10, 14

*Sabadin v. Hartford Casualty Ins. Co.*,

2015 WL 12698445 (C.D. Cal. Jan. 13, 2015) .................................... 17

*Sherwin-Williams Co. v. JB Collision Serv., Inc.*,

2015 WL 11237466 (S.D. Cal. Nov. 6, 2015) ...................................... 19

*United States v. Hankey*,

203 F.3d 1160 (9th Cir. 2000) ...................................................... 16, 17

*Van Asdale v. Int'l Game*,

iii

*Tech.*, 577 F.3d 989 (9th Cir. 2009).............................................................. 21, 22

*Victorino v. FCA US LLC*,

    2018 WL 2551192 (S.D. Cal. June 4, 2018)................................. 18, 19

**<u>Rules</u>**

Fed. R. Civ. P. 26 ......................................................................................14

Fed. R. Civ. P. 26(a)(2)(B) ........................................................................9

Fed. R. of Civ. P. 26(a)(2)(C) ............................................................ passim

Fed. R. of Civ. P. 37(c)(1) ......................................................................13

Fed. R. Evid. 702 ............................................................................... 16, 17

# INTRODUCTION

Defendants proffer the opinion testimony of three employees of the Office of Field Operations (OFO) of U.S. Customs and Border Protection (CBP), all of whom have firsthand knowledge of the complicated operations that take place at specific ports of entry. These three witnesses are expected to testify on the operational factors that impact the Laredo, El Paso, and San Ysidro ports of entry's capacities to process individuals without documents sufficient for lawful entry and to provide a qualitative analysis of each port's operations and operational capacity on a particular Sunday in June 2018. Unlike Plaintiffs' proffered expert, Stephanie Leutert, these three individuals have the necessary experience and expertise to opine on the multi-faceted governmental operations and missions of various ports of entry along the southwest border, and how those factors impact OFO's capacity to process individuals without documents sufficient for lawful entry at those ports of entry on the southern border. Plaintiffs do not dispute that.

These three individuals have worked in supervisory or leadership positions at their respective ports of entry or the relevant Field Office and have first-hand or other on-the-ground knowledge of those ports' operations. As party employees and as witnesses whose testimony is based on their daily work and who have never previously testified as expert witnesses, Defendants' witnesses' opinions are at most subject to the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2)(C), which does not require them to author an expert report.

Furthermore, the testimony proffered by Defendants' expert witnesses is not subject to the *Daubert* factors because they rely on their professional knowledge and experience in support of the opinions that they proffer. As a police officer would opine on the definition of code words to decipher gang-speak or the way a mechanic would opine on automotive design flaws, the three individuals apply their years of experience to opine on the factors that are considered when determining if their respective ports are operating at capacity. And contrary to Plaintiffs' assertions, the

1

three expert witnesses' proposed testimony is entirely consistent with their prior deposition testimony that operational capacity is a complex and fluid concept that encompasses many factors and cannot be easily tracked or calculated.

There is no basis to exclude the testimony of Defendants' expert witnesses. Because these witnesses proffer relevant and reliable testimony, the Court should deny Plaintiffs' motion to exclude.

## RELEVANT BACKGROUND ON WITNESSES

### I.    Samuel Cleaves – Port of El Paso

Samuel Cleaves is the Assistant Port Director at the Port of El Paso, a position he has held since 2017. Ex. 2, Declaration of Samuel Cleaves (Sept. 25, 2020) ("Cleaves Decl.") ¶ 1. In this role, he oversees "all aspects of passenger operations within the Port of El Paso to include the facilitation of trade and travel and the process of those subsequently determined to be in violation of law." *Id*. ¶ 2. The Port of El Paso has been one of the largest ports of entry along the U.S.-Mexico border, and it processes a vast number of vehicles, pedestrians, commercial trucks, and imported merchandise every day. *Id*. ¶¶ 5, 7. In his capacity as Assistant Port Director, Mr. Cleaves oversees all aspects of passenger operations and provides managerial oversight. Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures at 6.

Before becoming the Assistant Port Director for the Port of El Paso, Mr. Cleaves served as the Acting Assistant Director, Field Operations for Border Security, with oversight of all passenger and tactical operations for the El Paso Field Office. Ex. 2, Cleaves Decl. ¶ 3; Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures at 6. Before that, he was a Watch Commander and a Chief Supervisory CBP Officer for the Port of El Paso. Ex. 2, Cleaves Decl. ¶ 3. He also served as a Supervisory CBP officer at the Ports of Champlain, New York, and Columbus, New Mexico. *Id*.

Plaintiffs deposed Mr. Cleaves on May 20, 2020. Pls.' Ex. 7, Cleaves Dep. Tr., at 1. Mr. Cleaves testified that, when determining a port's operational capacity, port management considers what the port can process and what is going on at the

2

port at the time, which is different from the physical capacity of the port. *Id.* 53:5-9; 65:21-66:5. At the Port of El Paso, operational capacity takes into account the port's unique layout and ongoing operations. *Id.* 56:8-14. Operational capacity at the El Paso port changes from day to day and hour to hour, so it cannot be tracked as a data point because "it would be different after get done writing it down." *Id.* 66:15-16.[1] Mr. Cleaves also testified about various factors that affect the port's operational capacity. He explained that factors such as budget constraints, whether the port is "intercepting other types of violators other than migrants," whether staff must be pulled away to conduct transportation, and "other emergent events" will also impact the port's operational capacity. *Id.* 65:21- 66:5. He also mentioned that certain cells are not designed for long-term/overnight detention, which is also a consideration for operational capacity. *Id.* 72:13-18, 73:3-19. Also, the Port of El Paso does not have food contracts, dining halls, or medical or transport capabilities. *Id.* 56:19-24. Therefore, when there are large groups of individuals, the Port has to move its officers from other areas to provide these services. *Id.* 56:22-24. He also testified that operational capacity takes into account the "back end of the process," or how quickly U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) can accept custody of individuals from OFO. *Id.* 57:1-7.

On August 7, Defendants disclosed that Defendants may offer the testimony of Mr. Cleaves on how the "Port of El Paso considers operational capacity when determining its capacity to process individuals without documents sufficient for lawful entry." Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures at 4. Mr. Cleaves would testify as to the factors that the port deems relevant when determining operational

---

[1] Mr. Cleaves noted that this was an over-exaggeration and was attempting to elaborate on why operational capacity could not be tracked in real time. Pls.' Ex. 7, Cleaves Dep. Tr. 66:16. Before he could provide such testimony, the questioner cut him off. *Id.* at 66:17.

3

capacity, including but not limited to "the characteristics and demographics of indi-viduals in custody," the physical characteristics of the port and its infrastructure and their impact on the port's operational capacity, and the "fluidity of the operational needs in responding to the various missions on a given day." *Id.* at 4-5. Then, to illustrate these factors, Mr. Cleaves would use information and documents relating to the Port of El Paso's operations on June 17, 2018, to "provide a snapshot into port operations for that specific day," and to opine that the Port of El Paso was operating beyond its capacity during its midnight shift and at or near its operational capacity for all other shifts on that date. *Id.* at 5. Mr. Cleaves and the other two experts had been asked "to review documents and facts from a specific day, as an example that is illustrative of overall practices, procedures, and considerations that go into deter-mining the port's operational capacity, which is subject to the witness's firsthand, percipient knowledge." Sampat Decl. ¶ 6 (recounting email response to questions raised by Plaintiffs concerning the expert disclosures).

Defendants provided a declaration from Mr. Cleaves attesting to these matters in support of their Opposition to Plaintiffs' Motion for Summary Judgment. Ex. 2, Cleaves Decl.

## II.    Rodney Harris – Laredo Field Office & Laredo Port of Entry

Rodney Harris is the Deputy Assistant Director for the Border Security Divi-sion for the Laredo Field Office and has been in that role since mid-2018. Pls.' Ex. 8, Harris Dep. Tr., 40:17-24. He began his career with the federal government when he joined CBP's predecessor agency, the Customs Service, in the fall of 1999. *Id.* 42:2-4. In 2003, after the creation of the Department of Homeland Security, Mr. Harris became a CBP officer at the Laredo Port of Entry. *Id.* 42:13-23, 44:9-12. In addition to his experience in passenger processing operations, Mr. Harris was also responsible for numerous narcotics and commercial seizures. Ex. 3 at 6.

In 2006, Mr. Harris was promoted to a supervisory CBP officer and primarily worked at the passenger bridges at the Port of Laredo. *Id.* at 4; Pls.' Ex. 8, Harris

Dep. Tr., 43:24-25. There, he oversaw CBP officers' day-to-day duties in the passenger environment, namely the processing of travelers' vehicles. *Id*. 44:1-3. Four years later, he was promoted again to be a program manager at the Laredo Field Office, where he was involved with, among other duties, port-hardening infrastructure to address absconders and port runners. *Id*. 44:15-45:7. As program manager, Mr. Harris also oversaw the completion of Continuity of Operations Plans and Occupant Emergency Plans. Ex. 3 at 5. He was promoted again in 2015 to a supervisory program manager in the Laredo Field Office and remained in that role under he was appointed as the Deputy Assistant Director. Pls.' Ex. 8, Harris Dep. Tr., 47:9-21. As the supervisory program manager, Mr. Harris had numerous direct reports, including the Laredo Operations Center and its admissibility unit. Ex, 3 at 4-5.

During his deposition, Mr. Harris testified that the Laredo Field Office has never had a "calculation" for operational capacity. Pls.' Ex. 8, Harris Dep. Tr., 107:1-7. But the determination of a port's operational capacity involves reviewing operations in other areas of the port, mission sets, how many individuals are already in custody, the demographics and characteristics of these individuals, and the physical capacity at the given time. *Id*. 286:22-287:7. Operational capacity is also impacted by the types of admissibility cases that present on a given day because the port may be faced with individuals attempting to enter with fraudulent documents. *Id*. at 287:9-25. Further, the nature of the available holding cells plays into the calculation; certain holding cells within the port's infrastructure cannot be used to hold migrants because it is not operationally feasible due to location or staffing issues. *See id*. 128:10-129:5 (testifying the cells in cargo lots do not provide an operationally feasible option to detain individuals despite having the ability to do so). Processing times are also a factor, and these times may increase if there is a need to secure the proper translators for individuals who speak certain languages other than Spanish. *Id*. 288:3-12. Population demographics also affect the port's operational capacity

because vulnerable populations generally need to be held separately from other populations for protection. *See id*. 289:8-290:3 (discussing how unaccompanied alien children or family units may need to be detained separately from others). The port's operational capacity is also impacted when individuals in custody require trips to the hospital, which requires sending port personnel to conduct those transports. *Id*. 290:10-13.

On August 7, Defendants disclosed that they may offer the testimony of Mr. Harris on the factors considered relevant by the Port of Laredo when determining its operational capacity to process individuals without documents sufficient for lawful entry. Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures at 6. Mr. Harris would also opine on the use of queue management as a tool to increase safety and efficiency at ports of entry. *Id*. at 7. Finally, Mr. Harris would offer testimony that on June 17, 2018, the Port of Laredo balanced its competing priorities, including processing trade and travelers, and was operating at its capacity that day. *Id*.

### III.    Mariza Marin – San Ysidro Port of Entry

Mariza Marin is the Assistant Director of Field Operations, Border Security for OFO's San Diego Field Office (SDFO). Ex. 4, Declaration of Mariza Marin (Sept. 11, 2020) ("Marin Decl.") ¶ 1. She currently oversees "the planning, implementation, and execution of Border Security programs and other law enforcement activities for the entirety of the SDFO," including fourth-line oversight of the SDFO's Admissibility Enforcement Units (AEUs), the specialty unit that processes individuals without documents sufficient for lawful entry. *Id*. ¶ 2. Before she became the Assistant Director of Field Operations, Ms. Marin was the Assistant Port Director for Passenger Operations at the Otay Mesa Port of Entry, as a Watch Commander and as a Branch Chief, both which are considered Supervisory CBP officer positions, at the San Ysidro Port of Entry. *Id*. ¶ 3

Ms. Marin began working as a CBP officer in San Diego at the Otay Mesa port of entry between mid-2011 and early-2012. Pls.' Ex. 6, Marin Dep. Tr., 53:12-

22. She originally worked in primary and secondary inspection of passenger processing, working both on processing vehicles and pedestrians. *Id*. 54:9-55:13. She then "switched out" and worked for the AEU, processing individuals without sufficient documents for lawful entry. *Id*. 54:16--56:11. She was then promoted to be a supervisory CBP officer, of which responsibilities included mentoring a team and ensuring compliance with policy. *Id*. 56-12-57:15. She was again promoted to second-line chief, which requires supervision over supervisory CBP officers. *Id*. 58:7-24. As a second-line chief, she was also an "operations chief," which required reviewing vehicle traffic management, scheduling, staffing, and overtime concerns. *Id*. 59:5-9. She then became watch commander at San Ysidro, which who are responsible for the operations on the shift and have the ability to "augment staffing with overtime" under certain circumstances. *Id*. 60:3-61:23.

During her deposition, Ms. Marin testified extensively regarding operational capacity at the San Ysidro port of entry. Operational capacity is not a new concept, and had been used at least since Ms. Marin has worked in detention, going back to 2015-2016. *Id*. 70:11-13. Operational capacity "fluctuates from day to day, minute to minute" at the San Ysidro Port of Entry. *Id*. 68:4-6. Thus, operational capacity is not a hard number or ceiling but rather a "ballpark" that the port "attempt[s] to stay around to safely have the resources available to process and adequately care for people" in custody. *Id*. 101:8-14.

Ms. Marin also testified as to different factors that determine the port's operational capacity. Individuals presenting with a contagious disease would affect the port's operational capacity by limiting the use of available holding space. *Id*. 112:19-113:4 (discussing how a family of four seeking admission with a child infected with chickenpox would need to be held in a cell isolated from other populations, regardless of the actual capacity of that cell to hold additional individuals). Similarly, individuals who are members of rival gangs or potentially vulnerable populations would also need to be held separately, thereby limiting the use of available holding

space and thus the port's ability to process more individuals. *Id*. 310:11-18 (discussing how members of rival gangs or LGTBQ individuals would be required to be detained separately and would therefore impact the port's capacity to process and hold individuals). The port's operational capacity would also be affected by the time detainees have already spent in custody, which may be prolonged by the inability to move them out of CBP's custody into longer-term detention. *Id*. 312:1-6. Budgetary constraints and man-hours would all also play a role in port management's decisions on processing individuals on a given day. *Id*. 312:7-14.

On August 7, Defendants disclosed that Defendants may offer the testimony of Ms. Marin as to the "physical holding space in the AEU and the mandatory and discretionary factors that impact the AEU's operational capacity to process individual's without documents sufficient for lawful entry to the United States." Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures at 2. She would also testify as to how the AEU must act conservatively when processing individuals to account for various unknowns. *Id*. at 3. Further, to illustrate these principles in practice, Ms. Marin would testify that on June 17, 2018, the AEU took these various factors into consideration when determining how many individuals it may detained. *Id*. Defendants provided a declaration from Ms. Marin attesting to these matters in support of their Opposition to Plaintiffs' Motion for Summary Judgment. Ex. 4, Marin Decl.

## **ARGUMENT**

Defendants properly disclosed their proffered experts under Rule 26(a)(2)(C). These witnesses are OFO employees who work or have worked at ports of entry along the U.S.-Mexico border, and their expert testimony is based on their percipient knowledge of how operational capacity works at their respective ports. They have never before testified as expert witnesses. Therefore, these witnesses are not subject to the strict standards set forth for "retained" experts under Rule 26(a)(2)(B) and are not required to submit an expert report. Because Defendants timely disclosed their expert witnesses in good faith, there is no basis to exclude their opinion testimony.

8

The testimony offered by Defendants' expert witnesses is relevant and reliable, thereby making it admissible. Because the witnesses' opinions are based on professional experience and knowledge, the *Daubert* factors do not govern the reliability of their testimony. *Hangarter v. Provident Life Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). And, contrary to Plaintiffs' arguments, the three experts' testimony is entirely consistent with their previous testimony about: (1) the various factors that affect a port's operational capacity; and (2) why operational capacity cannot be quantified or calculated.

Accordingly, the Court should deny Plaintiffs' motion to exclude and allow the expert opinion testimony of Ms. Marin, Mr. Cleaves, and Mr. Harris.

## I. Defendants' Expert Witnesses Are Not Required to Produce Expert Reports.

As government employees who do not regularly provide expert testimony, the Defendants' proffered expert witnesses are properly designated as under Rule 26(a)(2)(C). Therefore, the Court should admit the proffered expert opinions.

### A. Defendants' Experts Are Subject to the Requirements Under Rule 26(a)(2)(C).

Rule 26(a)(2) governs the disclosure of expert witnesses and their proffered testimony. *Hill v. U.S. Dep't of Homeland Sec.*, 570 F. App'x 667, 670 (9th Cir. 2014). Witnesses who are *retained* or *specially employed* to provide expert testimony are required to produce a written report that comports with numerous requirements. Fed. R. Civ. P. 26(a)(2)(B). But if a witness is not retained as an expert, then a report is not required, and less stringent requirements govern the expert disclosures. Fed. R. Civ. P. 26(a)(2)(C); *Hill*, 570 F. App'x at 670. The rules were amended to add this distinction to "'resolve[] a tension that [had] sometimes prompted courts to require reports under Rule 26(a)(2)(B) even from witnesses exempted from the report requirement.'" *Copart Inc. v. Sparta Consulting, Inc.*, 2017 WL 85824, at *3 (E.D. Cal. Jan. 9, 2017) (quoting Fed. R. Civ. P. 26, advisory notes (2010)).

9

The Ninth Circuit has reiterated that experts subject to the requirements under Rule 26(a)(2)(C) include "treating physicians or *a party's employees who do not regularly provide expert testimony*." *Republic of Ecuador v. Mackay*, 742 F.3d 860, 865 n.1 (9th Cir. 2014) (emphasis added) (citing N. Lee Cooper & Scott S. Brown, *Selection of Experts, Expert Disclosure and Pretrial Exclusion of Expert Testimony*, in 3 Robert L. Haig, *Business and Commercial Litigation in Federal Courts*, S 28:10 (3d ed. 2012)).

Defendants' proffered expert witnesses are utilizing the knowledge and experience gained through their on-the-job experience, including at the particular port of entry, to testify about the concept of operational capacity and provide opinions relating to the operational capacity of that port on a specific date. Ex. 2, Cleaves Decl. ¶ 4; Ex. 4, Marin Decl. ¶ 5; Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures at 8; Ex. 3, Harris Decl. 3-8 (listing out Mr. Harris's extensive experience working for CBP). As employees of CBP during the entire relevant time period and beyond, they have expertise "that is particularized to the case at hand." *GroundMetrics, Inc. v. Wells Fargo & Co.*, 2017 WL 4512141, at *1 (S.D. Cal. Aug. 14, 2017). Having been in supervisory positions, all three witnesses have firsthand knowledge of the intricacies of port operations at the El Paso, Laredo, and San Ysidro ports of entry. *See supra* at 2-8. Further, none of these witnesses have ever testified as experts before. Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures. Nor do their duties include regularly providing expert testimony. Therefore, these government witnesses are properly "subject to the less demanding requirements of Rule 26(a)(2)(C)." *See Copart*, 2017 WL 85824, at *3 (E.D. Cal. Jan. 9, 2017) (concluding that "three employee-experts" who did not regularly provide expert testimony or ever provide expert testimony or ever prepared an expert report before were properly designated under Rule 26(a)(2)(C)).

Plaintiffs contend that *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817 (9th Cir. 2011) supports their argument that Defendants' expert witnesses

10

were required to produce reports because they were directed to review documents by counsel. Pls.' Mot. at 9-10. But the holding of *Goodman* does not control here.

Defendants' three expert witnesses were asked to review documents and facts from a particular day at the Laredo, El Paso, and San Ysidro ports of entry in order to apply their firsthand knowledge of the particular port's operations to a particular date to illustrate how operational factors influence the port's capacity to process individual aliens. Plaintiffs misleadingly present the nature of this proffered testimony to fit the holding of *Goodman*, when it is clearly distinguishable.[2] In *Goodman*, the Ninth Circuit held that "a treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment." *Goodman*, 644 F.3d at 826. The Ninth Circuit reached its holding after noting that Goodman's attorney had directed treating physicians to opine on the injuries caused by the plaintiff's fall based on their review and understanding of the patient's medical records, which included documents that they did not review

---

[2] Indeed, Plaintiffs repeatedly distort Defendants' counsel's statements in this regard to suit the purposes of their arguments. Plaintiffs state that counsel for Defendants "admitted that 'they asked [Mr. Cleaves, Mr. Harris, and Ms. Marin] to review documents and facts from a specific day.'" Pls. Mot. at 6. But Plaintiffs omit the rest of the quoted statement, however, which says that the witnesses were asked to review those materials from a specific day "as an example that is illustrative of the overall practices, procedures, and considerations that go into determining the port's operational capacity, which is subject of the witness's firsthand, percipient knowledge." Sampat Decl. ¶ 6. Plaintiffs' selective omission changes the meaning of the email. Plaintiffs then imply that Defendants' counsel stated that the analysis of a particular day's operational capacity is to serve as an example of the considerations "*other* POEs used to calculate operational capacity *for years*." Pls. Mot. at 6 (emphases added). But Defendants' counsel clearly did not state as much, and each witness intends to provide expert testimony only with respect to the operations of one port of entry.

11

during the course of their treatment, to provide opinions "outside the scope of the treatment they rendered." *Id.* at 819, 826 n.2. Unlike in *Goodman*, Defendants' proffered experts are not treating physicians but are government employees who participate in the running of the three ports of entry on a daily basis. Unlike *Goodman*, a personal injury case, the current litigation involves a challenge to the government's policy and practices, including its justifications, that serve to protect a 1,900 mile border by "attempting to control the movement of people and goods across the border," which is a daunting task. *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020). These government witnesses are opining on operational capacity based on what they have experienced and observed in their respective roles at OFO, aided by a review of the information and documents that memorialized aspects of the ports' operations on a particular day. Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures.[3] Unlike the physicians in *Goodman*, the government witnesses' review of documents that relate to one day of port operations was to provide an example to illustrate how the larger practice of determining operational capacity works. Sampat Decl. ¶ 5. Unlike in *Goodman*, the government witnesses are not being asked to provide an opinion outside the scope of their work and they were not presented with documents that fall outside the scope of that work. Plaintiffs cannot dispute that the government witnesses have firsthand knowledge of their ports' operations, and assessing operational capacity is or has been a part of their job. *See supra* at 2-8. Accordingly, *Goodman* does not dictate the application of Rule 26(a)(2)(B) to these government employees testifying about aspects of their jobs.

Indeed, Plaintiffs' argument would undermine the purpose of Rule 26(a)(2)(C). Plaintiffs advance an extreme argument that simply by the act of being

---

[3] Indeed, it would be impossible for any witness to reconstruct the events of a port of entry's operations on any given day without reviewing the contemporaneous records and data.

12

1  asked to review documents and facts, an individual converts from a non-retained to
2  a retained expert. Pls.' Mot. 8-9. Rule 26(a)(2)(C) disclosures are meant to "in-
3  crease[e] efficiency and reduc[e] unfair surprise." *Cantu v. United States*, 2015 WL
4  12743881, at *3 (C.D. Cal. Apr. 6, 2015). Plaintiffs' theory does the opposite of
5  increasing efficiency – it imposes a burdensome requirement to prepare an expert
6  report even when the individual is testifying as to firsthand knowledge.

7       Ultimately, the government witnesses are all testifying as percipient witnesses
8  regarding their experiences of running these ports of entry and how they go about
9  determining whether it is operating at capacity. Therefore, these witnesses are not
10 required to produce expert reports per Rule 26(a)(2)(B). *See Bauer Bros., LLC v.*
11 *Nike, Inc.*, 2011 WL 12828588, at *3 (S.D. Cal. Oct. 19, 2011) (holding that an
12 expert report is not required from a witness who would testify regarding his work on
13 licensing agreements that he negotiated).

14      B. Defendants' Disclosure Under Rule 26(a)(2)(C) Is Both Substantially Jus-
15         tified and Harmless.

16      Even if the Court believes that Defendants' experts are "retained" and thus
17 subject to the requirements of Rule 26(a)(2)(B), it should still admit their testimony
18 because Defendants were substantially justified in designating them as non-retained
19 experts, and there is no prejudice to Plaintiffs because Defendants timely disclosed
20 the identity of the witnesses and the subject of their testimony.

21      Although Federal Rule of Civil Procedure 37(c)(1) provides for the exclusion
22 of expert testimony if the disclosure requirements of Rule 26 are not met, *see Macias*
23 *v. Perez*, 2011 WL 2669475, at *2 (S.D. Cal. July 7, 2011), such sanctions are not
24 available if the failure was substantially justified or harmless. *Id* (citing Fed. R. Civ.
25 P. 37(c)(1)). As this Court has previously held, "[d]iscovery conduct is 'substantially
26 justified if it is a response to a 'genuine dispute or if reasonable people could differ
27 as to the appropriateness of the contested action.'" *Cervantes v. Zimmerman*, 2019
28 WL 1598219, at *7 (S.D. Cal. Apr. 15, 2019) (quoting *Devaney v. Continental Am.*

13

*Ins. Co.*, 989 F.2d 1154, 1163 (11th Cir. 1993)). The Ninth Circuit has stated that party employees who do not regularly provide expert testimony are properly designated experts under Rule 26(a)(2)(C). *Mackay*, 742 F.3d at 865 n.1. Recent district court cases support this position as well. See *Copart*, 2017 WL 85824, at *2-3 (holding that employee-experts were subject to the requirements of Rule 26(a)(2)(C) rather than 26(a)(2)(B)). And Plaintiffs have not pointed to any Ninth Circuit case that extends *Goodman*'s holding outside of the narrow context of a treating physician who was asked to review records that he or she did not review at the time of treatment, let alone to party employees who had never before provided expert testimony, and who reviewed records as a means to provide an illustration of how the practice challenged in the lawsuit works in context.[4] "When faced with this uncertain, unsettled law," Defendants "certainly cannot be faulted" for their position. *See Adams v. AllianceOne, Inc.*, 2011 WL 2066617, at *10 (S.D. Cal. May 25, 2011) (choosing not to impose sanctions on a party after recognizing that there was an unsettled area of law).

Further, no harm has resulted from Defendants making good-faith expert disclosures under Federal Rule of Civil Procedure 26(a)(2)(C) rather than 26(a)(2)(B). On August 7, 2020, Defendants identified their expert witnesses, disclosed the "subject matter on which the witness is expected to present evidence," and a detailed "summary of the facts and opinions to which the witness is expected to testify." *See* Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures; Fed. R. Civ. P. 26(a)(2)(C). And on September 25, 2020, Defendants provided Plaintiffs with testimony from Mr. Cleaves and Ms. Marin identifying with even more particularity the "facts or data

---

[4] Notably, the dispute in *Goodman* arose before the addition of Federal Rule 26(a)(2)(C), and the Plaintiff in *Goodman* apparently never made such a disclosure. *See Goodman*, 644 F.3d at 820-21; 2010 Advisory Committee Note to Fed. R. Civ. P. 26. The *Goodman* Court never mentions Rule 26(a)(2)(C).

considered by" these witnesses. *See* Exs. 2 and 4 (previously submitted with Defendants' Cross-Motion for Summary Judgment, at ECF Nos. 563-60 and 563-62). Plaintiffs did not avail themselves of opportunities to learn more about these expert witnesses. They declined to seek a second deposition of any of the three witnesses to question them about the factual bases for their expert opinions. *See* ECF No. 420 ¶ 2 (requiring Defendants to make their expert witnesses available by deposition). Plaintiffs never requested additional information about the expert witness's opinions before threatening and filing a motion to exclude. Even in their motion, Plaintiffs identify no deficiencies in Defendants' disclosures or any reason why they have been prejudiced by receiving disclosures under Rule 26(a)(2)(C). Their only argument is a speculative and unexplained claim that the absence of an expert report will delay the litigation. *See* Pls. Mot. 11.

Therefore, the Court should not exclude the expert testimony proffered by Defendants' witnesses.

## II. The Opinions Proffered by Defendants' Expert Witnesses Are Admissible.

Defendants' expert witnesses intend to provide relevant and reliable opinions on their respective ports' operational capacities on a particular day. Plaintiffs improperly rely on *Daubert* and its progeny in an attempt to exclude the experts. Because these experts proffer non-scientific opinions and testimony, the *Daubert* factors are inapplicable.

Further, Defendants' expert witnesses proffer opinions that are supported by their prior deposition testimony and are consistent with the factual record. They all previously testified, and now offer expert testimony, about the various factors that go into determining whether a port is operating at capacity at a given moment or on a given day. Their proffered testimony illustrates how those factors work together to affect a particular port's operations. Each witness's proffered expert opinion—which involves a qualitative assessment of their respective ports' operational capacities on

15

a given day—in no way contradicts any of their prior testimony. Therefore, Defendants' expert testimony is admissible.

A. Defendants' Expert Witnesses Are Not Subject to the *Daubert* Factors Because They Proffer Testimony Based on Specialized Knowledge, Not Scientific Expert Testimony.

Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." A court may admit expert testimony under this rule only if it finds that the testimony is "relevant and reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 597 (1993)). "Relevancy simply requires that '[t]he evidence . . . logically advance a material aspect of the party's case.'" *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (brackets and ellipses in original) (quoting *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)). Reliability turns on "whether an expert's testimony has a 'reliable basis in the knowledge and experience of the relevant discipline.'" *Barabin*, 740 F.3d at 463 (quoting *Kumho Tire Co.*, 526 U.S. at 149).

In *Daubert*, the Supreme Court presented several factors a court may consider to assess the reliability of expert testimony based on scientific knowledge. *See United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (listing out the *Daubert* factors) (citing *Daubert*, 509 U.S. at 592-94). But "[t]he fields of knowledge which may be drawn upon" to provide expert testimony in the course of litigation "are not limited merely to the 'scientific' and 'technical' but extend to all 'specialized' knowledge. Fed. R. Evid. 702 advisory committee note. "Thus within the scope of [expert testimony] are not only experts in the strictest sense of the word, *e.g.*, physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values." Fed. R.

16

Evid. 702 advisory committee note. "Rule 702 does not rank academic training over demonstrated practical experience." *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir. 2012) (citation and quotation marks omitted). When a court assesses "the admissibility of testimony based on some 'other specialized knowledge,' rather than testimony based on scientific or technical knowledge, "Rule 702 generally is construed liberally.'" *Sabadin v. Hartford Casualty Ins. Co.*, 2015 WL 12698445, at *2 (C.D. Cal. Jan. 13, 2015) (quoting *Hankey*, 203 F.3d at 1168).

The test for reliability is "flexible," and the *Daubert* factors "neither necessarily nor exclusively appl[y] to all experts in every case." *Kumho*, 526 U.S. at 141-142 (citing *GE Co. v. Joiner*, 522 U.S. 136, 144 (1997)); *accord Primiano v. Cook*, 598 F.3d 558, 546 (9th Cir. 2010). In fact, the *Daubert* factors "'simply are not applicable to [non-scientific] testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" *Sabadin*, 2015 WL 12698445, at *2 (C.D. Cal. Jan. 13, 2015) (quoting *Hangarter*, 373 F.3d at 1017). As the Advisory Committee explains, "Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise." Fed. R. Evid. 702 advisory committee notes to 2000 amendments. "For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations." *Id*.

Here, Defendants' expert witnesses are offering testimony relating to the operations of various ports of entry along the U.S.-Mexico border. Their opinions are based on their experiences gained through their employment, allowing them to opine on the factors that influence the ports' respective operational capacity to process individuals without documents sufficient for lawful entry on a given day. They are

employing their knowledge and experience and applying it to one day's data to il-lustrate how various factors impact a port's operations on any given day. *See* Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures (affirming that all three experts will opine on how operations affected the individual port's ability to process individuals with insufficient documents for admission). Clearly, the experts' experience, trainings, and education "provide a sufficient foundation for reliability," thereby warranting admission. *Victorino v. FCA US LLC*, 2018 WL 2551192, at *4 (S.D. Cal. June 4, 2018).

Defendants' experts are analogous to experts at issue in *Victorino*. There, the plaintiffs unsuccessfully moved to exclude two witness. *Id*. at *4. Similar to Plain-tiffs' arguments here, the party moving to exclude argued that both experts should be excluded in part because their observations and inferences were based in part on insufficient data and no methodology was provided. *Id*. at *4, 5. The court, however, reviewed the extensive experience brought by both experts and how that tied into the testimony being proffered. *Id*. Ultimately, the court saw the challenge for what it was: a thinly veiled attempt to challenge the conclusions reached by the experts, which does not affect admissibility. *Id*. Here, Defendants' experts have first-hand-edly experienced the various considerations that go into port operational decisions. *See supra* at 2-8. Plaintiffs do not dispute that the experts are sufficiently experi-enced to discuss these topics. Pls.' Mot. at 16. Therefore, Plaintiffs cannot mask their challenge to the conclusions reached by Defendants' experts in the cloak of invoking *Daubert* and seek exclusion. *See Victorino*, 2018 WL 255192, at *5-6 (dismissing party's argument that the non-retained expert's conclusions were based on insuffi-cient data and lack of methodology by recognizing that the challenge was to the ultimate conclusion of the opinion).

Instead, Plaintiffs rely on *Open Text S.A. v. Box, Inc.*, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015) to support their contention that the government witnesses' opin-

ions were formed in a "black box" and that the witnesses have not adequately disclosed their methodology. Pls.' Mot. at 13. But, as noted, Plaintiffs' emphasis on methodology is misplaced, because here the proffered expert witnesses are testifying based on their experience rather than a particular scientific methodology. By contrast, the expert in *Open Text* was proffering opinions regarding patent damages by calculating royalty rates, which requires a careful analysis of judicially-created factors. *See Open Text SA*, 2015 WL 349197 at *1 (discussing how damages are calculated). Plaintiffs also overlook that the expert in *Open Text* was required to produce an expert report. *Id.* at *1.[5] Plaintiffs thus overlook that the expert disclosures under Rule 26(a)(2)(C)—like those made by Defendants in this case—are designed to be "considerably less extensive," and therefore, courts "must take care against requiring undue detail." *Epitech, Inc. v. Krause*, 2016 WL 7637660, at *3 (C.D. Cal. Sept. 21, 2016) (internal citations and quotations omitted). Rule 26(a)(2)(C) only requires that the disclosure must state the subject matter on which the witnesses are expected to present evidence and a summary of the facts and opinions to which they are expected to testify. Fed. R. Civ. P. 26(a)(2)(C); *see also Sherwin-Williams Co. v. JB Collision Serv., Inc.*, 2015 WL 11237466, at *3 (S.D. Cal. Nov. 6, 2015). Plaintiffs cannot circumvent the explicit language and intent of Rule 26(a)(2)(C), which was designed to be "considerably less extensive" for those non-retained experts. *Krause*, 2016 WL 7637660, at *3.

Accordingly, Defendants' expert testimony is reliable and should be admitted.

B. <u>The Testimony Proffered by Defendants' Experts is Supported by the Record and Consistent with Prior Testimony.</u>

Plaintiffs contend that the government expert witnesses cannot testify for various other reasons. These arguments are incorrect, and provide no basis for excluding

---

[5] The district court references the expert's report 11 times. *Box*, 2015 WL 349197 at *1-5.

19

1    the proffered testimony.

2    First, Plaintiffs argue that the witnesses have previously testified that opera-

3    tional capacity cannot be calculated, and thus that their proffered testimony contra-

4    dicts their prior sworn testimony. Pls.' Mot. at 15, 17; *see also id*. at 18-19. This

5    argument is incorrect because it ignores the witnesses' actual testimony and misrep-

6    resents their proffered expert witness testimony.

7    Defendants' witnesses have testified that operational capacity "is fluid" and

8    "differs from port to port and from day-to-day." ECF No. 535-12, Pls.' MSJ Ex. 10,

9    at 186:11-12, 186:22-187:3 (deposition testimony of former Executive Assistant

10   Commissioner Todd Owen). So OFO does not regularly quantify, record, or report

11   the ports' operational capacity. It "would be too cumbersome to record every event

12   that's taking place in the port through out [sic] the day, which has had an impact on

13   how many migrants we would come across. If a port was working multiple simulta-

14   neous seizures, and then we had to pull officers to do that, we wouldn't record all of

15   those activities. It's just too cumbersome of a report to come together for the 46

16   crossings along the southwest border as to what's taking place." ECF No. 535-12, at

17   186:11-21. Tracking operational capacity in real time would be impossible because

18   "it would be different after you get done writing it down." Pls.' Ex. 7, Cleaves Dep.

19   Tr., 66:15-16. It is thus true that Defendants cannot provide a numerical "calcula-

20   tion" that shows operational capacity for any given day. *See* Pls.' Ex. 6, Marin Dep.

21   Tr., 101:8-14. "Operational capacity is not --- for us is not a hard number or ceiling.

22   It's a ballpark that we attempt to stay around to safely have the resources available

23   to process and adequately care for people in our custody." *Id.*

24   Neither the summaries provided in Defendants' Rule 26(a)(2)(C) Disclosures,

25   nor the declarations of Ms. Marin and Mr. Cleaves that were later filed with Defend-

26   ants' Cross-Motion for Summary Judgment, contradict this deposition testimony.

27   The government experts' analyses are qualitative. Their testimony about operational

28   capacity does not rely on one-size-fits-all factors or hard calculations, but instead on

the government employees' experience in running passenger operations at their particular ports of entry, and the factors that influence those ports' capacities. *See* Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures; *see also e.g.*, Exs. 2, Cleaves Decl., and 4, Marin Decl. And Plaintiffs declined to "examine" the witnesses "at length" as to how operational capacity may be determined, if it is not a hard number. *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975). A party is "not precluded from elaborating upon, explaining, or clarifying prior testimony elicited by opposing counsel on deposition." *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 999 (9th Cir. 2009).

Second, and relatedly, Plaintiffs argue that there is no consensus among the witnesses on what factors are relevant to determining operational capacity. *Id*. at 15. Yet different ports have their own unique challenges and operational environments, so this is hardly a reason to disqualify each witness's opinion related to his or her own port's operations. *See* ECF No. 535-12, Pls.' MSJ Ex. 10, at 186:11-12, 186:22-187:3 (deposition testimony of former Executive Assistant Commissioner Todd Owen).

As Mr. Cleaves states in his declaration, "[t]he resources that a port of entry has assigned to each location on any given day, the current workload at any given time at each of these locations, combined with any unique facility challenges, are what constitutes the Port of El Paso's operational capacity." Ex. 2, Cleaves Decl. ¶ 10; *see also* Pls.' Ex. 7, Cleaves Dep. Tr., 65:21-66:5. He goes on to illustrate how the different factors impacting operational capacity work in conjunction with each other. For example, the availability of space in the El Paso short-term holding rooms are dependent on "characteristics and demographics of the individuals in custody, transfer of detainees from the port of entry, and the day-to-day operational needs of the port of entry" or on where the cells are located. Ex. 2, Cleaves Decl. ¶ 13; *see also* Pls.' Ex. 7, Cleaves Dep. Tr., 72:13-18, 73:3-19. Staffing numbers are also a consideration, as CBP officials may have to conduct transport to pick up jail releases

21

under certain circumstances or have to transport detainees to one of the various hospitals in the area because the Port of El Paso has no medical contract. Ex. 2, Cleaves Decl. ¶ 13.

Similarly, Ms. Marin testified that operational capacity "fluctuates from day to day, minute to minute" at the San Ysidro Port of Entry. Pls.' Ex. 6, Marin Dep. Tr. 68:4-6. CBP is required to consider the length of time that detainees have been in custody because the National Standards on Transportation, Escort, Detention and Search provides that detainees "should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities." Ex. 4, Marin Decl. ¶ 8. The hold rooms in the AEU were designed for short-term detention, which is why they do not have beds. *Id*. The operational capacity at of the AEU at San Ysidro is also impacted by the number of individuals brought to the facility on prior days because the intake and processing of individuals without documents sufficient for lawful entry are labor-intensive steps that can function as a bottleneck in the AEU's operations. *Id*. Sometimes, these individuals must be processed and held until another agency can assume custody over them. *Id*. ¶ 10. Ms. Marin also notes that CBP has to act conservatively in processing individuals because of "inherent unknowns," such as the demographics and characteristics of the population [the agency] will encounter on any given day." *Id*. ¶ 11. The agency must consider but cannot predict if a person with an infectious disease will attempt to enter, which would then require the individual to be detained in isolation. *Id*. ¶ 11; *see also* Pls.' Ex. 6, Marin Dep. Tr. 112:21-113:4 (testifying as to how processing a family unit where one of the children has chicken pox may affect operational capacity before being cut off by the questioner); *id.* 118:12-24 (providing further context on how the port must balance the risk of outbreaks of contagious illnesses, such as scabies and chicken pox, against processing of individuals after the questioner omitted a pivotal sentence from a document being referenced) . Ms. Marin also discusses how staffing impacts the number

22

of individuals the AEU can process. Ex. 4, Marin Decl. ¶ 12. Law enforcement operations also impacts the operational capacity at the San Ysidro AEU. *Id*. ¶ 13. If CBP expects a migration surge, the AEU may have to limit its intake so that it may "maximize space to intake, process and detain individuals expected to enter the AEU's custody" during the surge. *Id*. ¶ 13.

At his deposition, Mr. Harris testified extensively as to what factors impact operational capacity at the Laredo Port of Entry. It begins "primarily" with looking at "what else is going on at the port," such as "other missions sets," "how many people" are already in custody, "whether or not they are migrant cases or other types of admissibility cases," and the actual "physical space" available. Pls.' Ex. 8, Harris Dep. Tr. 286:22-287:7. The demographics of the individuals who seek entry will also impact operational capacity because in some circumstances, OFO must retain translators to assist in the processing of individuals, which adds to the processing time. *Id*. 288:3-12. Law enforcement operations and trade also play role in impacting the port's operational capacity. *Id*. 288:13-21. Operational capacity is also affected by the downstream processing of individuals, which may including expending personnel to conduct hospital runs to ensure migrants receive adequate and proper medical treatment. *Id*. 288:4-14.

<u>Third</u>, Plaintiffs argue that the opinions offered by the government expert witnesses are "counterfactual" because they purport to apply to "every POE." This is a strawman. Defendants' experts do not purport to provide an opinion that applies to "every POE," and Defendants' counsel never so stated. *See generally* Ex. 1, Defendants' Rule 26(a)(2)(C) Disclosures; *see also supra* n. 2. Instead, each witness provides an opinion specific to their particular POE.

In sum, Plaintiffs' arguments about the merits of operational capacity—clothed as arguments for exclusion—should be rejected. The Court should decline to exclude the government witnesses' expert testimony.

1

## **CONCLUSION**

2       For the foregoing reasons, Defendants respectfully request that the Court deny

3    Plaintiffs' motion to exclude the government witnesses' expert testimony.

4

5    Dated: October 5, 2020                    Respectfully submitted,

6                                              JEFFREY BOSSERT CLARK

7                                              Acting Assistant Attorney General
                                               Civil Division
8

9                                              WILLIAM C. PEACHEY
                                               Director
10

11                                             KATHERINE J. SHINNERS
                                               Senior Litigation Counsel
12

13                                             ALEXANDER J. HALASKA

14                                             ARI NAZAROV
                                               HAYDEN WINDROW
15                                             Trial Attorneys

16
                                               *s/ Dhruman Y. Sampat*
17                                             DHRUMAN Y. SAMPAT

18                                             Trial Attorney
                                               U.S. Department of Justice
19                                             Civil Division

20                                             Office of Immigration Litigation
                                               District Court Section
21                                             P.O. Box 868, Ben Franklin Station

22                                             Washington, D.C. 20044
                                               Tel: (202) 532-4281| Fax: (202) 305-7000
23                                             dhruman.y.sampat@usdoj.gov

24
                                               *Counsel for Defendants*
25

26

27

28

24

1

## **CERTIFICATE OF SERVICE**

2       I certify that I served a copy of this document on the Court and all parties by

3  filing this document with the Clerk of the Court through the CM/ECF system, which

4  will provide electronic notice and an electronic link to this document to all counsel

5  of record.

6

7  DATED: October 5, 2020          Respectfully submitted,

8                                  *s/ Dhruman Y. Sampat*
                                   DHRUMAN Y. SAMPAT
9                                  Trial Attorney
10                                 U.S. Department of Justice
                                   Civil Division
11                                 Office of Immigration Litigation
12                                 District Court Section

13
                                   *Counsel for Defendants*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25