JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
DHRUMAN Y. SAMPAT (NJ 270892018)
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation – District
Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4120 | Fax: (202) 305-7000

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | **DEFENDANTS' EXHIBIT 4** |
| v. | [Redacted Public Version] |
| Chad F. WOLF, Acting Secretary of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants.* | |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Chad WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity, *et al.*,<br><br>*Defendants*. | Case No. 3:17-cv-02366-BAS-KSC |

### DECLARATION OF MARIZA MARIN

I, Mariza Marin, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am the Assistant Director of Field Operations, Border Security, San Diego, for the San Diego Field Office (SDFO), Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP). I have held this position since September of 2019.

2. In this capacity, I oversee the planning, implementation, and execution of Border Security programs and other law enforcement activities for the entirety of the SDFO. The SDFO includes five land ports of entry, including the San Ysidro Port of Entry (San Ysidro POE); an international airport; a seaport; and multiple general aviation centers. I serve as the fourth-line supervisor for SDFO's Admissibility Enforcement Units and Criminal Enforcement Units, and I serve as the third-line supervisor for the SDFO's International Liaison Unit, a specialty unit comprised of select OFO managers who perform ancillary duties coordinating with foreign governmental officials.

3. Prior to my current position, I served as the Assistant Port Director for Passenger Operations at the Otay Mesa Port of Entry, as a Supervisory CBP Officer (Watch Commander) at the San Ysidro POE, as a Supervisory CBP Officer (Branch Chief) at the San Ysidro POE, and as a first-line Supervisory CBP Officer at the San Ysidro POE since February of 2014. I entered on duty as a CBP Officer in 2008.

4. OFO is the largest component in CBP and is responsible for border security—including anti-terrorism, immigration, anti-smuggling, trade compliance, and agriculture protection—while simultaneously facilitating international trade and travel critical to our Nation's economy. Operations in the SDFO are diverse and voluminous. In fiscal year 2019, for example:

   a. The SDFO processed more than 78 million travelers, accounting for 19% of the total travelers processed by OFO nationwide; more than 31 million vehicles, accounting for 31% of the total vehicles processed by OFO nationwide; and more than 21 million pedestrians, accounting for 44% of the total pedestrians processed by OFO nationwide.

   b. The SDFO apprehended approximately 2,800 individuals seeking admission to the United States using fraudulent documents, accounting for 73% of the fraud cases apprehended by OFO nationwide.

   c. The SDFO intercepted 13% of the cocaine, 47% of the heroin, 63% of the methamphetamine, and 58% of the fentanyl seized by OFO nationwide; apprehended approximately 1,400 individuals for whom arrest warrants had been issued, accounting for 62% of OFO's total such apprehensions nationwide; and arrested nearly 8,000 individuals for criminal offenses, accounting for nearly 20% of OFO's total arrests nationwide.

The San Ysidro POE is the busiest land border crossing in the western hemisphere, and was responsible for much of the aforementioned activity within the SDFO.

5. I am the SDFO's foremost subject matter expert on operations in the San Ysidro POE's Admissibility Enforcement Unit (the AEU), a specialty unit within the SDFO's Enforcement Division. The AEU principally processes and provides short-term care for inadmissible aliens pending their transfer to U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations (ICE ERO), repatriation to Mexico, or parole into the United States. I have overseen the AEU for the last five years—as a second-line, then third-line, and now fourth-line supervisor. Additionally, I was assigned to the AEU as a line CBP Officer for approximately two years. I have extensive firsthand knowledge of the work performed in the AEU; the laws, regulations, and policies applied by CBP Officers assigned to the AEU; and the operational constraints and significant events that have impacted the AEU since January 2016.

6. The AEU has 31 hold rooms[1] with an aggregate physical capacity of ▮▮▮. That figure, however, does not take into account the various factors—some mandatory and others discretionary—that CBP considers in determining the operational capacity of these hold rooms.

7. To start, within those hold rooms, CBP must ensure compliance with the requirements set forth in CBP's National Standards on Transportation, Escort, Detention and Search. For example, male and female adult detainees must generally be separated at all times in hold rooms, while family units with juveniles must generally be kept together, and unaccompanied children must be held separately from adult detainees. Accordingly, a hold room that has a physical capacity of 24 may be fully occupied, for CBP's purposes, with just one single unaccompanied child or one three-person family unit.

8. In addition, CBP takes into account the length of time that detainees have been in its custody. CBP only detains inadmissible aliens and other individuals temporarily. Indeed, CBP's National Standards on Transportation, Escort, Detention and Search provides that detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities, and that every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible. Accordingly, the hold rooms in the AEU were designed for short-term detentions—they do not have beds, and when they are filled to their physical capacity, the individuals in them have minimal personal space.

9. Over the last four years, ICE ERO has often not assumed custody of aliens from CBP until well after 72 hours, at times leaving them in CBP's custody in the AEU's hold rooms for weeks. This operational reality means that individuals are often spending much longer in the AEU's hold rooms than those hold rooms were designed for. As such, CBP takes into account the length of time that individuals have spent in its custody, known as "time in custody times" or "TIC times," when determining the operational capacity of the AEU: When TIC times increase, CBP endeavors to give those in custody more space by decreasing the intake of aliens from the queue.

10. The operational capacity of the AEU is also often impacted by the number of individuals brought to the AEU on days prior. When an individual is first brought into the AEU,

---

[1] Four of these hold rooms are "rubber rooms" that do not comply with the requirements set forth in CBP's National Standards on Transport, Escort, Detention, and Search, and are typically reserved for individuals who are assaultive or suicidal.

s/he goes to an area known as "intake." There, CBP gathers the individual's biographical information, starts a record for the individual in CBP's Unified Secondary database, inventories the individual's personal property, and determines whether the individual needs to visit the onsite medical provider for medical care. The individual is then brought to another area of the AEU for processing. There, a specially trained CBP Officer determines the appropriate course of action for the individual. In many cases, the appropriate course of action may be an expedited removal order or an expedited removal order with a credible fear referral. In other cases, the appropriate course of action may be placing the individual in removal proceedings before an immigration judge or allowing the individual to withdraw his/her application for admission. Once processing is complete, the individual is generally placed in a hold room until an outside agency, typically ICE ERO, assumes custody over him/her. All of these procedural steps require manpower, but the first two—intake and processing—are especially labor-intensive and can function as a bottleneck. Accordingly, if the AEU brings in a large number of individuals on one day, such that it is still intaking and/or processing some of them the next day, the AEU's ability to bring in individuals that next day will likely be diminished.

11. The operational capacity of the AEU is also impacted by the necessity that CBP act conservatively in taking in individuals from the queue in order to safeguard operations against inherent unknowns. CBP does not know in advance the demographics and characteristics of the population it will encounter on any given day. CBP does not know, for instance, whether an individual brought in from the queue will have a contagious disease, requiring a hold room all to him/herself or requiring CBP Officers from the AEU to transport him/her to a hospital and stay there on "hospital watch." CBP also has no way of predicting how many inadmissible aliens may be apprehended attempting to run or surreptitiously enter through the port of entry, and what the characteristics and demographics of those aliens will be, and all of those inadmissible aliens will need to be processed and cared for in the AEU.

12. Additionally, staffing impacts the extent to which CBP Officers assigned to the AEU can intake, process, and care for individuals in its custody. The SDFO has sought to accommodate the near-continuous influx of inadmissible aliens over the last four years in a variety of ways. For instance, the SDFO and OFO Headquarters have bolstered the AEU's staffing by temporarily detailing CBP Officers from around the nation, and from other divisions and units within the SDFO, to the AEU. The SDFO has also adjusted budgetary allocations to allow for

increased overtime spending in the AEU. Even with these accommodations, however, there are necessary limits to the AEU's staffing as OFO has multiple mission sets and cannot devote all of its resources to the AEU. Those limits to the AEU's staffing can and do affect the operational capacity of the AEU at any given point in time.

13.     The operational capacity of the AEU may also be impacted by law enforcement operations and significant incidents occurring or expected to occur at or near a particular POE. For example, if a migrant incursion is expected, CBP may deem it necessary to limit the intake of individuals from the queue in order to maximize space to intake, process, and detain individuals expected to enter the AEU's custody through the incursion. Similarly, the operational capacity of the AEU may be impacted by significant events impacting the community or society at large. For example, cross-border travel at land ports of entry is currently limited due to the COVID-19 pandemic. As a result, the AEU is not able to intake individuals from the queue, and individuals who do enter CBP's custody in the AEU—such as individuals apprehended attempting to illegally enter the United States through the San Ysidro POE—are, to the extent possible, not being placed in hold rooms with others.

14.     I have reviewed records[2] pertaining to the AEU's operations on June 17, 2018 and surrounding dates as an example of how the above concepts may apply to a particular day, and I have found as follows:

---

[2] I reviewed the following records:
- "Admissibility Enforcement Unit Daily Report for June 17, 2018" email from Elixer Manalo to "SDFO-Bullets" (Bates numbered AOL-DEF-00604411)
- Admissibility Enforcement Unit Shift Passdown Report for June 16, 2018 (Bates numbered AOL-DEF-01085476)
- Admissibility Enforcement Unit Shift Passdown Report for June 17, 2018 (Bates numbered AOL-DEF-01085521)
- Admissibility Enforcement Unit Shift Passdown Report for June 18, 2018 (Bates numbered AOL-DEF-01085439)
- "AEU Stats" email from Mariza Marin to Robert Hood (June 17, 2018) (Bates numbered AOL-DEF-00748702)
- SDFO Operational Snapshot for Fiscal Year 2019
- San Ysidro POE's Overtime Budget for Fiscal Year 2018
- "SYS AEU Custody Report 06-18-2018" (Bates numbered AOL-DEF-00541227)
- "SYS AEU Custody Report for 06/16/2018" (Bates numbered AOL-DEF-00328749)
- "SYS AEU Custody Report for 06/17/2018" (Bates numbered AOL-DEF-01172890)
- "SYS AEU Custody Report for 6/18/18" email from Christian Calvillo to multiple recipients (Bates numbered AOL-DEF-00541224)

  a. At 2200 hours on June 17, 2018, 188 individuals were in CBP's custody in the AEU.

  b. Of those 188 total individuals, 126 were processed, meaning that their CBP paperwork was complete and they were awaiting pick up by ICE ERO. Of those 126 individuals, 6 were unaccompanied children, 38 were part of family units, and 82 were single adults.

  c. The day prior, on June 16, 2018, the AEU took in 81 individuals from the queue. Many of those individuals were still pending processing at 2200 hours on June 17, 2018.

  d. On June 17, 2018, the AEU asked the Instituto Nacional de Migración (INAMI) to bring 50 individuals forward from the queue. For reasons unknown to CBP, INAMI only brought 31 individuals from the queue. Additionally, CBP apprehended 4 individuals attempting to enter the United States illegally, and brought them to the AEU, as well. Accordingly, on June 17, 2018, 35 individuals entered CBP's custody in the AEU.

  e. Also over the course of the day, 39 individuals were taken out of CBP's custody in the AEU. Of those 39 individuals, 1 was an unaccompanied child who was granted a withdrawal of his application for admission and repatriated to Mexico, 4 were single adults who were repatriated to Mexico as expedited removals, 3 were United States citizens who were released, and 31 were inadmissible aliens picked up by ICE ERO.

  f. On June 18, 2018, at 0456 hours, the AEU had 190 individuals in custody. Of those, 39 had a TIC time of longer 72 hours, and 1 had a TIC time of 10 days.

  g. On June 18, 2018, the AEU took into custody 63 individuals seeking asylum and 10 individuals who were apprehended attempting illegal entry to the United States.

---

- "SYS AEU movement and pass down for 06/17/2018 (1400-2200)" email from Justin Kelemen (AOL-DEF-01085517)

6

15. I have also reviewed records relating to the San Ysidro POE's overtime budget and expenditures for fiscal year 2018.

    a. At the beginning of fiscal year 2018, the Director of Field Operations, San Diego allocated approximately $20.1M to the San Ysidro POE for overtime, across all operations. Of that, he allocated approximately $3.1M to Tactical Operations, which at the time included the AEU. Of that, he allocated approximately $1.7M to the AEU.

    b. Over the course of fiscal year 2018, the AEU not only spent its allocated overtime funds for every quarter, but accrued a deficit of approximately $394,00.00 at the end of the first quarter, approximately $594,000.00 at the end of the second quarter, approximately $756,000.00 at the end of the third quarter, and approximately $979,000.00 at the end of the fourth quarter.

    c. During the third quarter, comprising the months of April, May, and June, the AEU made a concerted effort to decrease its overtime spending. To illustrate, in April 2018, the AEU spent an average of $9,254.00 in overtime funds per day. In May 2018, the AEU spent an average of $6,046.00 in overtime funds per day. Then in June 2018, the last month of the third quarter, the AEU spent an average of $4,032.00 in overtime funds per day, or 44% of its average daily spending in April 2018. The decrease was not strictly linear—it had ups and downs—but it was a general trend.

    d. The decrease was especially marked in the weeks preceding June 17, 2018: From May 21, 2018 through June 16, 2018, the AEU spent an average of $801.70 in overtime funds per day as the AEU sought to curb its deficit.

16. The number of individuals that the AEU had in custody at 2200 hours on June 17, 2018, can be attributed to many of the factors that I have described above: (1) the demographics, characteristics and TIC times of the individuals in CBP's custody in the AEU on that day and the days leading up to that day; (2) the number of individuals that INAMI brought forward from the queue on that day and the preceding days; (3) the number of individuals in AEU custody pending intake and/or processing on June 17, 2018; (4) CBP's need to proceed conservatively in taking in individuals from the queue in order to safeguard operations against inherent unknowns; and (5)

the AEU's reduction in overtime spending in the weeks leading up to June 17, 2018, resulting in decreased staffing in the AEU for these weeks.

     I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed on the 11th day of September, 2020.

**MARIZA MARIN**
Digitally signed by MARIZA MARIN
Date: 2020.09.11 16:09:40 -07'00'

Mariza Marin
Assistant Director Field Operations, Border Security
San Diego Field Office
Office of Field Operations
U.S. Customs and Border Protection

# APPENDIX

A. The following documents were considered by ADFO Mariza Marin in preparing her declaration and were produced during discovery.

1. Email, "Admissibility Enforcement Unit Daily Report for June 17, 2018" [AOL-DEF-00604411]
2. Admissibility Enforcement Unit Shift Passdown Report, 6/16/18 [AOL-DEF-01085476]
3. Admissibility Enforcement Unit Shift Passdown Report, 6/17/18 [AOL-DEF-01085521]
4. Admissibility Enforcement Unit Shift Passdown Report, 6/18/18 [AOL-DEF-01085439]
5. Email, "AEU Stats", dated June 17, 2018 [AOL-DEF-00748702]
6. "SYS AEU Custody Report 06-18-2018" [AOL-DEF-00541227]
7. "SYS AEU Custody Report for 06/16/2018" [AOL-DEF-00328749]
8. "SYS AEU Custody Report for 06/17/2018" [AOL-DEF-01172890]
9. Email, "SYS AEU Custody Report for 6/18/18" [AOL-DEF-00541224]
10. Email, "AEU Movement & Pass Down for 6/17/18 14:00-22:00", dated 6/17/18 14:00 [AOL-DEF-01085517]
11. SIGMA Report 2018 [AOL-DEF-01412876]

B. The following documents considered by ADFO Mariza Marin in preparing her declaration, but were not initially produced during discovery.

1. SDFO Operational Snapshot for Fiscal Year 2019
2. San Ysidro POE's Overtime Budget for Fiscal Year 2018

ADFO Marin also considered CBP's National Standards on *Transport, Escort, Detention, and Search* (TEDS) [AOL-DEF-00039041].