MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
*mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
*olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
*smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | *PUBLIC REDACTED VERSION* |
| Defendants. | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

---

[1] Defendants have represented that Mr. Wolf is the Acting Secretary of the U.S. Department of Homeland Security. Numerous courts disagree. *Casa de Md., Inc. v. Wolf*, 2020 WL 5500165, at *23 (D. Md. Sept. 11, 2020); *Immigrant Legal Res. Ctr. v. Wolf*, 2020 WL 5798269, at *7-9 (N.D. Cal. Sept. 29, 2020); *N.W. Immigrant Rights Project v. USCIS*, 2020 WL 5995206, at *24 (D.D.C. Oct. 8, 2020).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................... 1

II.    THE TURNBACK POLICY VIOLATES THE APA ............................... 5

       A.    The Turnback Policy and Turnbacks Are Final Agency
             Actions ........................................................................................... 5

       B.    The Turnback Policy Violates Congress's Unambiguous
             Statutory Scheme and Exceeds Defendants' Authority ................ 9

       C.    The Turnback Policy is Arbitrary and Capricious ..................... 11

       D.    This Court Has Already Rejected Defendants § 706(1)
             Arguments ................................................................................... 18

III.   THE TURNBACK POLICY IS UNCONSITUTIONAL ....................... 21

IV.    THE TURNBACK POLICY VIOLATES THE ATS ............................ 21

V.     PLAINTIFFS' STAND-ALONE INA CLAIM IS VALID ................... 24

VI.    CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aguayo v. Jewell*,
  827 F.3d 1213 (9th Cir. 2016) ................................................................. 7

*Al Otro Lado, Inc. v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) .................................................... 1, 8, 19

*Al Shimari v. CACI Premier Tech., Inc.*,
  263 F. Supp. 3d 595 (E.D. Va. 2017) .................................................. 23

*Al Shimari v. CACI Premier Tech., Inc.*,
  320 F. Supp. 3d 781 (E.D. Va. 2018) .................................................. 23

*Al Shimari v. CACI Premier Tech., Inc.*,
  758 F.3d 516 (4th Cir. 2014) ................................................................. 23

*Amuur v. France*,
  App. No. 19776/92 ..................................................................................... 22

*Aracely, R. v. Nielsen*,
  319 F. Supp. 3d 110 (D.D.C. 2018) ........................................................ 5

*Bark v. U.S. Forest Serv.*,
  37 F. Supp. 3d 41 (D.D.C. 2014) ............................................................ 5

*Barrios v. Holder*,
  581 F.3d 849 (9th Cir. 2009), *abrogated on other grounds by
  Hernandez-Rivas v. Holder*, 707 F. 3d 1081 (9th Cir. 2013).......................... 20

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................ 7, 8

*Burrage v. United States*,
  571 U.S. 204 (2014) ......................................................................... 3, 11

*Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ............................................................................... 3

*Columbia Riverkeeper v. U.S. Coast Guard*,
  761 F.3d 1084 (9th Cir. 2014).................................................................. 7

*Compassion Over Killing v. FDA*,
  849 F.3d 849 (9th Cir. 2017) ................................................................. 11

*DHS v. Thuraissigiam*,
  140 S. Ct. 1959 (2020) ........................................................................... 19

*EBSC v. Trump*,
  932 F.3d 742 (9th Cir. 2018) ............................................................. 4, 11

*EBSC v. Trump*,
  950 F.3d 1242 (9th Cir. 2020) ................................................................ 11

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,
  543 F.3d 586 (9th Cir. 2008) ................................................................... 8

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................................. 3

*Gilmore v. Wells Fargo Bank N.A.*,
  2014 U.S. Dist. LEXIS 104219 (N.D. Cal. 2014) .................................. 13

*Hernandez v. Mesa*,
  140 S. Ct. 735 (2020) ....................................................................... 11, 23

*Hispanic Affairs Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018) ................................................................. 5

*Hosseini v. Johnson*,
  826 F.3d 354 (6th Cir. 2016) ................................................................... 8

*INS v. Stevic*,
  467 U.S. 407 (1984) ......................................................................... 22, 23

*Jesner v. Arab Bank, PLC*,
  138 S. Ct. 1386 (2018) ........................................................................... 24

*Keene Corp. v. United States*,
  508 U.S. 200 (1993) ............................................................................... 25

*Kiobel v. Royal Dutch Petroleum Co*,
  569 U.S. 108 (2013) ............................................................................... 22

*Lewis v. City of Chi.*,
  560 U.S. 205 (2010) ................................................................................. 4

*Lightfoot v. District of Columbia*,
   273 F.R.D. 314 (D.D.C. 2011) ............................................................ 6

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ...................................................................... 5

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) .................................................................... 11

*Ms. L v. ICE*,
   302 F. Supp. 3d 1149 (S.D. Cal. 2018) ........................................ 25

*New Mexico v. McAleenan*,
   19-cv-00534 (D.N.M. June 10, 2019) ............................................ 25

*New Mexico v. McAleenan*,
   450 F. Supp. 3d 1130 (D.N.M. 2020) ............................................ 25

*ONRC Action v. Bureau of Land Mgmt.*,
   150 F.3d 1132 (9th Cir. 1998) ...................................................... 8

*Or. Natural Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006) ........................................................ 8

*Pereira v. Sessions*,
   138 S. Ct. 2105 (2018) ................................................................. 3

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ............................................ 5, 6

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) .................................................................... 10

*Ragsdale v. Wolverine World Wide, Inc.*,
   535 U.S. 81 (2002) ........................................................................ 3

*Ramirez v. ICE*,
   310 F. Supp. 3d 7 (D.D.C. 2018) ................................................. 5

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................ 12

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993) .................................................................... 19

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ................................................................. 12

*Sierra Club v. Trump*,
  963 F.3d 874 (9th Cir. 2020) ........................................................... 24, 25

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) ........................................................................ 22, 23

*Telecomms. Research & Action Ctr. v. FCC ("TRAC")*,
  750 F.2d 70 (D.C. Cir. 1984) ................................................................. 21

*United States v. Locke*,
  471 U.S. 84 (1985) ............................................................................... 4

*Util. Air Regulatory Grp. v. EPA*,
  573 U.S. 302 (2014) .............................................................................. 3

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002) .............................................................. 16

*Wild Fish Conservancy v. Jewell*,
  730 F.3d 791 (9th Cir. 2013) ................................................................. 5

*Wyeth v. Sandoz, Inc.*,
  570 F. Supp. 2d 815 (E.D.N.C. 2008) ..................................................... 2

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ........................................................................ 23

**Statutes**

5 U.S.C. § 551(13) ................................................................................... 7

5 U.S.C. § 706(2) ............................................................................... 5, 20

6 U.S.C. § 111(b)(1) ........................................................................... 9, 10

6 U.S.C. § 111(b)(1)(D) ...................................................................... 1, 10

6 U.S.C. § 111(b)(1)(E) ...................................................................... 1, 10

6 U.S.C. § 202 ........................................................................................ 9

6 U.S.C. § 211(c) .................................................................................... 9

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

6 U.S.C. § 211(g)(3) ................................................................................. 10

8 U.S.C. 1101(a)(18), (34) ........................................................................ 1

8 U.S.C. § 1158 ........................................................................................ 19

8 U.S.C.§ 1158(a)(1) ............................................................................... 19

8 U.S.C. § 1158(d) .................................................................................... 25

8 U.S.C. § 1158(d)(7) ............................................................................... 25

8 U.S.C. § 1225 .................................................................................. *passim*

8 U.S.C. § 1225(a) .................................................................................... 10

8 U.S.C. § 1225(a)(1) ............................................................................... 19

8 U.S.C. § 1225(a)(3) ........................................................................... 10, 19

8 U.S.C. § 1225(b) .................................................................................... 10

8 U.S.C. §1225(b)(1) .................................................................................. 8

8 U.S.C. § 1225(b)(1)(A)(i) ..................................................................... 19

8 U.S.C. § 1225(b)(1)(A)(ii) ............................................................... 19, 20

8 U.S.C. § 1229a ................................................................................. 16, 17

18 U.S.C. § 2340A ................................................................................... 22

28 U.S.C. § 1350 ................................................................................. 22, 23

**Other Authorities**

Alice Edwards, *Human Rights, Refugees, and the Right to Enjoy
    Asylum* INT'L J. REFUGEE L. 293 .................................................. 22

Cambridge Dictionary (2020) ..................................................................... 1

Fed. R. Civ. P. 23 ........................................................................................ 6

Fed. R. Civ. P. 30(c)(2) ............................................................................ 14

Fed. R. Evid. 611(c)(2) ............................................................................. 14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mark Gibney, ENCYCLOPEDIA OF HUMAN RIGHTS (Oxford University Press, 2009) ................................................................................. 22

Oxford English Dictionary (2020) ........................................................ 1, 2

**abbreviation and Citation form**

"ATS" refers to the Alien Tort Statute.

"CBP" refers to U.S. Customs and Border Protection.

"CM" refers to Defendants' Cross-Motion for Summary Judgment (*see* Dkt. 562).

"Def. Ex." refers to the exhibits to Defendants' Cross-Motion for Summary Judgment (*see* Dkt. 562-2, *et seq.*).

"DHS" refers to the U.S. Department of Homeland Secuirty.

"HSA" refers to the Homeland Security Act.

"INA" refers to the Immigration and Nationality Act.

"Op. Br." refers to Plaintiffs' Opening Brief in Support of their Motion for Summary Judgment (*see* Dkt. 533).

"Op. Ex." refers to the exhibits to Plaintiffs' Opening Brief in Support of their Motion for Summary Judgment (*see* Dkt. 533-2, *et seq.*).

"POE" refers to Class A Ports of Entry on the U.S.-Mexico border.

# I.    INTRODUCTION

There is no genuine dispute about what happened here. Defendants implemented a policy that resulted in asylum seekers being turned back from POEs on the U.S.-Mexico border. There is also no genuine dispute that CBP officers turned back asylum seekers who either (a) were in the process of arriving in the United States at a POE or (b) had already set foot on U.S. soil.

Rather than addressing *what* occurred, Defendants' cross-motion spends dozens of pages on *post-hoc* rationalizations for *why* the turnbacks happened. Plaintiffs have shown that the purported reason for these turnbacks—so-called "capacity" constraints—is pretextual, *see* Op. Br. at 26-29, but more fundamentally, Defendants' asserted justification for the turnbacks is not relevant. The INA *mandates* that Defendants inspect and process asylum seekers arriving in the United States. Dkt. 280 at 47; *Al Otro Lado, Inc. v. Wolf*, 952 F.3d 999, 1011, 1013 (9th Cir. 2020) (this Court's interpretation of the INA has "considerable force" and is "likely correct"). Moreover, the HSA states that "ensur[ing] that the functions of [CBP] . . . that are not related directly to securing the homeland," such as inspecting and processing asylum seekers, are not  "*diminished or neglected except by a specific explicit Act of Congress*." 6 U.S.C. § 111(b)(1)(E) (emphasis added). In addition, Defendants' mandatory duty to inspect and process asylum seekers in the process of arriving in the U.S is a co-equal part of Defendants' "primary mission."[2] 6 U.S.C. § 111(b)(1)(D) (DHS' "primary mission" includes "carry[ing] out all functions of entities transferred to [DHS]").[3] Defendants are not permitted to diminish[4] that duty

---

[2] Primary means "of chief importance." *Primary*, Oxford English Dictionary (2020); *Primary*, Cambridge Dictionary (2020) ("more important than anything else").

[3] 8 U.S.C. § 1225 sets out duties to be performed by "immigration officers," defined in 8 U.S.C. 1101(a)(18), (34), to include employees of DHS's predecessor agency, the Immigration and Naturalization Service.

[4] Diminished means "to make or cause to appear less; reduce in size, number, or degree." *Wyeth v. Sandoz, Inc.*, 570 F. Supp. 2d 815, 829 (E.D.N.C. 2008); *Diminished*, Oxford English Dictionary (2020) ("Made smaller or lessened").

by relegating it to secondary status absent a specific and explicit Act of Congress. And no Act of Congress authorizes a diminishment or neglect of the duty to inspect arriving noncitizens at POEs due to Defendants' own analysis of the relative importance of their missions.

Defendants turned back asylum seekers who were in the process of arriving in the U.S. at POEs. *See, e.g.*, Op. Br. at 22-23. Defendants did so because they chose to diminish the priority given to inspecting and processing asylum seekers. For example, on June 5, 2018, Defendants adopted a policy memorandum that ***explicitly diminishes*** the importance of inspecting and processing asylum seekers, ordering POEs to prioritize other missions over that one. Op. Ex. at 98 at 296. DHS adopted this policy with ***specific knowledge*** that de-prioritizing the inspection and processing of asylum seekers would result in ████████████████████████████ ██████████████. *See* Op. Exs. 93-97.

Defendants have admitted what they did. The former head of CBP's Office of Field Operations ("OFO"), Todd Owen, testified that Defendants decided to de-prioritize inspecting and processing asylum seekers. Op. Ex. 10 at 201:20-203:3; *see also* Def. Ex. 1 at ¶ 10 (conceding that "priority is given" to missions other than processing and inspecting asylum seekers). The question is, was it legal? If the separation of powers means anything, the answer is clearly no. Defendants had no discretion to turn back asylum seekers who were in the process of arriving in the U.S. Nor did they have the authority to make inspection and processing of asylum seekers a secondary mission. Therefore, every turnback is illegal regardless of Defendants' justification for it. That ends the inquiry.

Defendants spend most of their brief explaining why breaking the law might result in preferable policy outcomes. They claim that by unilaterally diminishing their capacity to inspect and process asylum seekers they have been able to focus on interdicting drugs and to reduce overtime. CM at 25-31; Def. Ex. 1 at ¶ 9. They argue that turning back asylum seekers enables them to avoid taxing the resources of CBP

during upticks in the number of noncitizens arriving at POEs. *See* CM at 25-30. But Defendants are executive-agency officials, not legislators. They are not authorized to rewrite the INA. *See* Dkt. 280 at 65 ("the Executive cannot 'amend the INA' . . . through executive action to establish a procedure at variance with the scheme Congress chose."). As heads of agencies, they are bound to comply with the non-discretionary directives of governing statutes. *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327-28 (2014) ("The power of executing the laws . . . does not include a power to revise clear statutory terms," and a "core administrative-law principle [is] that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."); *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91 (2002) ("Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure Congress enacted into law.").[5] Congress gave Defendants specific and mandatory instructions on inspecting and processing asylum seekers and no discretion to diminish their capacity to do so. *See Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) ("If the intent of Congress is clear, that is the end of the matter."). Defendants' desire to manage the "'flow of traffic' across the border," does not give them "the authority to rewrite specific congressional mandates or to pretend that such mandates do not exist." Dkt. 280 at 58; *see also Burrage v. United States*, 571 U.S. 204, 218 (2014) ("The role of this Court is to apply the statute as it is written—even if we think some other approach might 'accor[d] with good policy.'"); *Pereira v. Sessions*, 138 S. Ct. 2105, 2118 (2018) (the government may not "pivot away from [a statute's] plain language" by "rais[ing] . . . practical concerns" because "practical considerations . . . do not justify departing from the statute's clear text").

---

[5] *See also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125-26 (2000) (despite the fact that the FDA was acting to address "one of the most troubling public health problems facing our Nation today," it lacked the authority to act where "Congress ha[d] clearly precluded" the agency from doing so).

Defendants conjure a parade of horribles that might emerge if they are forced to obey governing statutes, *see* Def. Ex. 1 at ¶¶ 16-26, but that is an issue for Congress to address. *See, e.g.*, *Lewis v. City of Chi.*, 560 U.S. 205, 217 (2010) ("[I]t is not our task to assess the consequences of each approach [to interpreting a statute] and adopt the one that produces the least mischief. Our charge is to give effect to the law Congress enacted."); *United States v. Locke*, 471 U.S. 84, 95 (1985) ("[T]he fact that Congress might have acted with greater . . . foresight does not give courts a carte blanche to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do."). Even if the Court were to credit Defendants' speculation about what would occur absent the turnback policy, "[t]here surely are enforcement measures that [Defendants] can take to ameliorate the crisis" that they claim exists, and Defendants' speculation "is not a sufficient basis under our Constitution for the Executive to rewrite our immigration laws." *EBSC v. Trump*, 932 F.3d 742, 774-75 (9th Cir. 2018) ("[A]s much as we might be tempted to revise the law as we think wise, revision of the laws is left with . . . Congress.").

There are three principal reasons why Plaintiffs should prevail on summary judgment. ***First***, Congress gave Defendants no discretion to turn back asylum seekers who are in the process of arriving in the U.S. Defendants' policy preferences do not permit them to ignore the plain language of the INA. Moreover, Defendants misconstrue the factual record; the undisputed facts show that the turnback policy was arbitrary and capricious. ***Second***, this Court has already rejected Defendants' due process argument, and Defendants provide no reason to reconsider that prior holding. ***Third***, this Court should grant Plaintiffs' motion for summary judgment on their ATS claim because Defendants in no way dispute that the duty of *non-refoulement* is a non-derogable *jus cogens* norm that is cognizable under the ATS.[6]

---

[6] Defendants oppose Plaintiffs' request for declaratory and injunctive relief. *See* CM at 58-60. Plaintiffs will address this oppositional argument in their forthcoming reply in support of their motion for summary judgment.

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

## II.    THE TURNBACK POLICY VIOLATES THE APA

### A. The Turnback Policy and Turnbacks Are Final Agency Actions

Like the policies reviewed in *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138-39 (D.D.C. 2018) and *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 174-77, 184-85 (D.D.C. 2015), the turnback policy is a final agency action reviewable under 5 U.S.C. § 706(2). *See* Dkt. 280 at 51-52. Defendants' arguments to the contrary, which merely recycle their motion to dismiss briefing, fare no better this time.

Defendants attempt to conflate the turnback policy with programs found unreviewable in *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014), *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892-93 (1990), and *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013). But in those cases, plaintiffs challenged agencies' general "continuing (and thus constantly changing) operations." *Lujan*, 497 U.S. at 890; *see Bark*, 37 F. Supp. 3d at 50-51 ("generalized complaints about agency behavior"); *Wild Fish Conservancy*, 730 F.3d at 801 (challenging "day-to-day operations that merely implement operational plans").

Here, by contrast, Plaintiffs "attack *particularized* agency action," *R.I.L-R*, 80 F. Supp. 3d at 184—specifically, Defendants' decisions to purposefully restrict access to the asylum process in violation of their statutory obligations. *See Ramirez v. ICE*, 310 F. Supp. 3d  7, 20-21 (D.D.C. 2018) ("aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action" is not "a broad programmatic attack"); *see also Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (distinguishing *Lujan* where plaintiffs challenged "cabined and direct" "identified transgression" of statutes and regulations). Plaintiffs use the term "turnback policy" as shorthand to refer to the particularized agency action they challenge; Defendants need not refer to the policy with a succinct label in a formal policy document for it to be challengeable. *See R.I.L-R*, 80 F. Supp. 3d at 184 (noting that a policy of "consideration of an allegedly impermissible factor" is "*particularized* agency

action," without discussing whether ICE had a formal label for the policy).[7]

Defendants mistakenly suggest that Plaintiffs have "attach[ed] a policy label to disparate agency practices or conduct." CM at 32-33. Yet all the agency practices enumerated by Defendants—including turnbacks of asylum seekers between May and November 2016, returns of asylum seekers standing on U.S. soil in late 2017, removal of seats at the Hidalgo POE to reduce processing capacity, and the issuance of metering guidance and the prioritization-based queue management memorandum in 2018—bolster the existence of the turnback policy. No part of this policy, which originated in 2016, was memorialized in writing until 2018 because CBP believed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Op. Br. at 12-13. Defendants' intentional decision ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ meant that before then, CBP officers used a variety of tactics to turn back asylum seekers from POEs. *See id.* at 5. Nonetheless, the result was the same: denial of access to the asylum process for tens of thousands of asylum seekers.

Plaintiffs have presented overwhelming evidence of verbal, and later written, directives from high-level CBP officials that officers at POEs should "return individuals who enter the U.S. and request asylum back to Mexico without" being processed, *see, e.g.*, Op. Br. at 19. CBP officers lied to asylum seekers about their lack of capacity to inspect and process them. Op. Ex. 1 at 100:22-101:6; Op. Ex. 118 at 93:4-12; Op. Ex. 3 at 157:15-18. Incredibly, Defendants argue that neither first-hand testimony by CBP officers concerning lies to asylum seekers at POEs, nor internal CBP documents disclosing the use of coercive tactics, constitute evidence

---

[7] *Lightfoot v. District of Columbia* is inapposite. That case addressed class certification under Fed. R. Civ. P. 23, not the APA "final agency action" standard. In any event, it did not involve particularized agency action but instead an "amorphous claim of systemic or widespread [government] misconduct," and the *Lightfoot* plaintiffs were seeking to aggregate claims that were not "susceptible to class-wide treatment" and that required individualized relief. 273 F.R.D. 314, 324, 327, 330, 335 (D.D.C. 2011). Unlike *Lightfoot*, Plaintiffs seek class-wide injunctive relief based on "questions of law applicable in the same manner to each member of the class." *Id.* at 324 (citation omitted); Dkt. 513 at 10-12.

of a border-wide policy. CM at 44. This "rogue officers" argument strains credulity. Defendants standardized the turnback policy across all POEs out of a perceived ███████████████████████████████████████████ Op. Ex. 117. Given this standardization, Defendants have no explanation for why conduct at multiple POEs is not indicative of a border-wide policy. Defendants' turnback policy is precisely the type of final, particularized agency action appropriate for APA review. *See* Op. Br. at 27-29.

Like the turnback policy, individual turnbacks are final agency actions and are likewise amenable to APA review. First, each turnback "mark[s] the 'consummation' of the agency's decisionmaking process," *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997), because it functionally denies individuals access to the U.S. asylum process. *See Aguayo v. Jewell*, 827 F.3d 1213, 1223 (9th Cir. 2016) ("denial" of relief and "failure to act" are "agency action" that can be "final" under 5 U.S.C. § 551(13)); *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094-95 (9th Cir. 2014) (considering the practical effect of agency action). CBP officers may tell some asylum seekers to "wait," but the practical and intended effect is to deprive them of access to the asylum process. *See, e.g.*, Op. Ex. 2 at 132 (Defendants "lack[ed] candor to the public [by not] stating the true facts that [CBP is] … blocking asylum to persons and families in order to block the flow of asylum applicants."). Indeed, CBP officers do not tell asylum seekers to "wait," contemporaneous recordings show that they tell asylum seekers to "go back to Mexico." Op. Ex. 18 (audio recording of CBP officer telling asylum seeker to "go back to Mexico" multiple times); Op. Ex. 17 at 308:4-8. After being turned back, asylum seekers put their names on "waitlists" and attempt to find shelter in Mexican border towns. *See* Op. Ex. 10 at 138:17 ("generally the migrants have returned to the shelters"); Op. Ex. 17 at 292:2-11 (CBP generally does not process asylum seekers who are not on a waitlist). Given the risks of living in Mexican border towns (including physical violence and pursuit by persecutors) and the extraordinary delays

in processing asylum seekers, there is no guarantee that individuals who have been turned back will ever have an opportunity to access the U.S. asylum process. *See* Op. Br. at 16-18, 31. Thus, being told to "wait" has no bearing on whether an asylum seeker is permitted to present herself at a POE in a "future yet distinct administrative process." *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593 (9th Cir. 2008); *see also Hosseini v. Johnson*, 826 F.3d 354, 362 (6th Cir. 2016) (an applicant's ability to "reapply … as often as he wants" does not make a denial non-final). And each turnback reflects a "conscious" and "deliberate decision" to limit access to the asylum process at POEs. *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998).

Second, each individual turnback constitutes agency action "by which rights and obligations have been determined, or from which legal consequences will flow." *See Bennett*, 520 U.S. at 177-78. In examining finality, courts "focus on the practical and legal effects of the agency action." *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006). This Court has already held that those who are "in the process of arriving in" the U.S. fall within the scope of 8 U.S.C. §1225(b)(1) and are entitled to be processed for asylum. Dkt. 280 at 46; *Al Otro Lado*, 952 F.3d at 1013 (this Court's "linguistic and contextual analysis" "has considerable force" and "is likely correct"). However, Defendants use turnbacks to deprive class members of the right to seek asylum, in violation of the INA, which is a legal consequence of each turnback. Even under Defendants' erroneous interpretation of § 1225, legal consequences flow from turnbacks. Their argument to the contrary is internally contradictory. Defendants assert that individuals arriving in the U.S. have no rights until they physically cross the border. The decision to prevent them from doing so therefore determines the extent of their rights, under Defendants' theory. Defendants cannot have it both ways—they cannot argue both that asylum seekers have no rights if they have not crossed the border *and* that their actions to prevent asylum seekers from crossing the border have no legal consequences.

1    Citing the case of Plaintiff Roberto Doe, Defendants disingenuously argue

2 that his denial of access to the U.S. asylum process was not a direct consequence of

3 CBP's action. CM at 36. Defendants should read Roberto Doe's declarations again.

4 Roberto Doe was turned back by CBP officers, which facilitated his detention by

5 Mexican officials, and was subsequently deported by the Mexican government. Dkt.

6 390-75 at ¶ 6; Dkt. 390-97 at ¶¶ 6-7. Defendants' argument that Roberto Doe was

7 not deprived of his rights under the INA when he was turned back by CBP is based

8 on their mistaken belief that his turnback somehow does not count.

9    **B. The Turnback Policy Violates Congress's Unambiguous Statutory**

10    **Scheme and Exceeds Defendants' Authority**

11    Defendants have no meaningful response to Plaintiffs' claim that the turnback

12 policy exceeds Defendants' statutory authority. They advocate a fundamentally

13 incorrect reading of their authorizing statutes and a shocking power grab by the

14 Executive Branch. Defendants assert that because they prefer the agency to function

15 with fewer asylum seekers being processed at POEs, that turning asylum seekers

16 away must be lawful—effectively conceding that they are substituting their view for

17 that of Congress. But the relevant statutes could not be clearer: Defendants must

18 inspect all arriving noncitizens and process those seeking asylum according to law.

19    The plain text of Defendants' authorizing statutes puts this matter to bed.

20 Congress delegated a number of functions to DHS and CBP. *See* 6 U.S.C. §

21 111(b)(1) (DHS's "primary mission" functions); 6 U.S.C. § 202 (DHS Secretary's

22 "border, maritime, and transportation responsibilities" functions); 6 U.S.C. § 211(c)

23 (CBP Commissioner's functions); 6 U.S.C. § 211(g)(3) (OFO duties at POEs). These

24 lists generally delegate authority—a far cry from a "detailed statutory scheme," CM

25 at 43; they also do not detail discrete, mandatory ministerial duties enforceable under

26 APA § 706(1). None of these lists specifically grant Defendants the power to refuse

27 to inspect any noncitizens arriving at POEs or to block asylum seekers from crossing

28 the international border to present themselves for inspection at POEs.

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

In contrast, Congress specifically mandated that Defendants carry out the ministerial duty to inspect all noncitizens arriving at POEs. 8 U.S.C. § 1225(a)(3). The mandatory duty to inspect all arriving noncitizens exists in the context of a statutory scheme by which noncitizens seeking asylum may do so at POEs in accordance with established procedures; in order to access that process, the first step is inspection. *See id.* § 1225(a), (b). The duty to inspect is simply incompatible with the unwritten power the agency asserts here: to refuse to inspect arriving asylum seekers and to block their passage to POEs. *See* Op. Br. at 25; *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (applying the "commonplace of statutory construction that the specific governs the general").

Defendants' argument that in 6 U.S.C. § 111(b)(1) Congress "elevated DHS's national security functions over all others, including processing undocumented migrants," is untrue. CM at 43. That subsection lists eight items that together constitute DHS's "primary mission"; it does not state that item (A), "prevent[ing] terrorist attacks within the United States," is *more* primary than items (B) through (H). *See* 6 U.S.C. § 111. To the contrary, the same subsection states that "carry[ing] out all functions of entities transferred to [DHS]," § 111(b)(1)(D), including inspections at POEs, is *equally* a part of DHS's "primary mission," as is "ensur[ing] that the functions of the agencies and subdivisions within [DHS] that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress," § 111(b)(1)(E). And Defendants cite no Act of Congress that authorizes a diminishment or neglect of the duty to inspect arriving noncitizens at POEs for any reason, much less Defendants' decision to re-prioritize their missions. Defendants' decision to prioritize other missions by limiting the number of inspections of asylum seekers is invalid as a matter of law and not authorized by statute.

None of Defendants' case law compels a different result. *Massachusetts v. EPA*, 549 U.S. 497 (2007), is inapplicable because Defendants have no statutory

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

10

authority to turn away asylum seekers. That case counsels that courts should defer when an agency decides not to engage in enforcement or, to a lesser extent, rulemaking activities. *Id.* at 527. It says nothing about an agency's power to circumvent a mandatory duty and thereby undermine a statutory scheme. *See id.* And it should go without saying that discretion not to make a rule does not also encompass discretion to forgo a ministerial duty. *Compassion Over Killing v. FDA*, 849 F.3d 849 (9th Cir. 2017) is similarly irrelevant to this case. *Compassion* merely outlines agency discretion to use case-by-case rulemaking rather than promulgating regulations. *Id.* at 857. Finally, Defendants cite *Hernandez v. Mesa* for the unremarkable proposition that controlling the movement of people and goods across the border "implicates an element of national security." 140 S. Ct. 735, 746 (2020).

Defendants are left to argue that turning asylum seekers away is a better policy outcome, and therefore they should be allowed to do it. CM at 42-43. Between the lines, Defendants effectively concede that as a policy, turnbacks are useful to them because they lower the number of asylum seekers who are inspected at POEs relative to what the number would otherwise be. But Defendants are not legislators. They do not get to amend the INA or the HSA to suit their needs. *Supra* at 3-4. Congress gave them no discretion to do so. *Supra* at 3-4. Defendants' arguments about purported necessity are irrelevant. They have improperly substituted their judgment for Congress's. *Burrage*, 571 U.S. at 218; *EBSC*, 932 F.3d at 774.

### C. The Turnback Policy is Arbitrary and Capricious

The turnback policy is also arbitrary and capricious. First, the turnback policy is inconsistent with congressional intent. *See EBSC v. Trump*, 950 F.3d 1242, 1273 (9th Cir. 2020) (agency interpretation that "is inconsistent with clearly expressed congressional intent" is arbitrary and capricious). As Plaintiffs explain above, the INA requires Defendants to inspect and process asylum seekers who are in the process of arriving in the U.S. *Supra* at 8. Inspecting and processing asylum seekers is a part of Defendants' "primary mission" that cannot be "neglected or diminished"

except by an explicit and specific Act of Congress. *See supra* at 1-4.

Second, Defendants' stated reason for adopting the turnback policy was a "factor[] which Congress has not intended [them] to consider." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). As Defendants admit, they diminished inspection and processing of arriving asylum seekers by turning them back to Mexico to alleviate "capacity" constraints *in order to focus on other missions*. *See* CM at 25-31. But Congress never gave Defendants authority to reprioritize their various primary mission sets. *Supra* at 1-4. In fact, it said the opposite. *Supra* at 1-4. Defendants' asserted reason for adopting the turnback policy is therefore arbitrary and capricious. *Locke*, 776 F.3d at 994.

Finally, if the Court wants to go beyond the clear language of the INA and HSA, Plaintiffs have submitted substantial evidence, including direct testimony from a whistleblower, that the turnback policy is based on a pretext. *See Saget v. Trump*, 375 F. Supp. 3d 280, 361 (E.D.N.Y. 2019) ("[A]gency[ ] actions are arbitrary and capricious under the APA if they are pretextual."). Specifically, that Defendants' "capacity" excuse is a lie. *See* Op. Ex. 1 at 100:22-101:6; Op. Ex. 118 at 93:4-12; Op. Ex. 3 at 157:15-18. This evidence shows that the turnback policy is actually a deterrence policy. And, contrary to Defendants' position (CM at 52-53), because inspecting and processing asylum seekers in the process of arriving in the U.S. is a "primary mission" that cannot be "diminish[ed] or neglect[ed]" except as authorized by an explicit and specific Act of Congress, "there is no room for deterrence under the scheme that Congress has enacted." Dkt. 280 at 65.

Defendants' attempt to dispute the mountain of pretextual evidence runs head-long into the undisputed record. ***First***, Plaintiffs presented the testimony of a whistleblower who testified that he was instructed to lie when turning asylum seekers back to Mexico, Op. Ex. 1 at 99:25-100:2, and that "it was obvious to everybody that was implementing [the turnback] policy" that the "capacity excuse was a lie." *Id.* at 100:25-101:6. Defendants attempt to dismiss this testimony as

coming from merely "a single first-line officer" that is "probative only of what the officer believed occurred" at his POE. CM at 47. But Defendants ***cite nothing*** to support their argument. *See id.* For example, they do not claim that officers elsewhere were not instructed to lie. *See id.* And there is evidence elsewhere in the record that CBP officers at other POEs *were* acting dishonestly. *See* Op. Ex. 2 (CBP "lacks candor to the public in stating the true facts that the [a]gency intentionally . . . block[ed] asylum to persons and families in order to block the flow of asylum applicants" and to create a "chilling [e]ffect[] to all others attempting entry into the United States."); Op. Ex. 3 at 157:15-18 ████████████████████████████████ ████████████████████████████; Op. Ex. 118 at 93:4-12 (CBP officers told asylum seekers that a POE was "at capacity," but never checked to see if that was true); Op. Ex. 117 ███████████████████████████████████████. Defendants cannot rely on mere attorney argument in hopes of avoiding this damning testimony. *Gilmore v. Wells Fargo Bank N.A.*, 2014 U.S. Dist. LEXIS 104219, at *11 (N.D. Cal. 2014) ("Attorney argument is not evidence.").[8]

***Second***, Defendants claim that a DHS Rule 30(b)(6) witness, Joseph Eaton, never said that CBP officers "were telling travelers that the [Otay Mesa] facility was at capacity but weren't actually checking on the capacity of the facility." CM at 47-48. To be clear, here is the testimony that is in the record:

> Q.    So these conclusions indicate that officers at Otay Mesa were telling travelers that the facility was at capacity but weren't actually checking on the capacity of the facility; correct?
>
> A.    That's how I read it, yes.

Op. Ex. 118 at 93:4-12 (objection omitted).[9]

---

[8] Defendants claim that the whistleblower "supports" their arguments, citing his testimony that the Tecate POE might "back up" if it did not turn asylum seekers back to Mexico. CM at 47. But the whistleblower clarified that his testimony on that point was a "guess." Op. Ex. 1 at 146:19-25.

[9] Defendants' claim that this was a leading question is a red herring. CM at 47. Mr. Eaton was a Rule 30(b)(6) witness for a party opponent. Fed. R. Evid. 611(c)(2).

**Third**, Defendants argue that David Atkinson's testimony concerning seats being removed from the Hidalgo POE is inadmissible because he lacked foundation to testify about the issue. CM at 48. But Defendants' argument is misleading. Defendants *never objected* to the question at issue for any reason, including lack of foundation. Op. Ex. 3 at 157:14-18. Since Defendants did not raise an objection at the time the question was posed, that objection is waived. Fed. R. Civ. P. 30(c)(2).

**Fourth**, Defendants' assertion that asylum seekers were turned back solely due to operational exigencies is not true. For instance, Defendants' lead declarant Beverly Good claims that the turnback policy was just the result of increased numbers of asylum seekers coming to POEs. *See* Def. Ex. 1 at ¶ 21. But in November 2016, she emphasized to Todd Owen, the senior-most official at OFO, that in the Laredo Field Office, ███████████████████████████ Rep. Ex. 1 at 389. Ms. Good does not attempt to explain this statement anywhere in her 16-page declaration.

And with good reason. The record is filled with evidence that Defendants adopted the turnback policy to deter asylum seekers. For example, Defendants cite Todd Owen's self-serving statement that the turnback policy was not "designed to deter migrants from entering the U.S." Op. Ex. 10 at 70:1-5. But Mr. Owen ███████ ██████████████████████████████████████████████████ █████████████████████████████████████ Op. Ex. 97. He explained that the policy would result in █████████████████████████ ██████████████████████████████████████████████████ ███████████ Op. Ex. 96. With knowledge of that likely consequence, Secretary Nielsen issued the prioritization-based queue management memorandum. *See* Op. Ex. 98. Then, CBP officers ███████████████████████████████ ███████████████████████████████████ Op. Ex. 107. Defendants claim that Secretary Nielsen was just "[r]equesting information about the potential costs and impacts of implementing a policy." CM at 49. That is

1    ridiculous. Secretary Nielsen was briefed about the fact that a contemplated policy

2    would result in ███████████████████████████████████████ *then she*

3    *adopted the policy*, and then **CBP followed up** ████████████████████████

4    ████████████████████ Op. Exs. 96, 97, 98, 107.[10]

5         *Fifth*, Defendants say that turnbacks "for the most part" stopped in January

6    2017. *See* CM at 3. The record says otherwise. ███████████████████████████

7    ████████████████████████████ in January 2017 in order to effect a turnback.

8    CM at 20 n.1. █████████████████████████████████████████████████████

9    ███████████ *Id.* And the record is replete with evidence that turnbacks occurred in

10   2017. *See* Op. Ex. 17; CM at 21 n.2; Op. Ex. 7 █████████████████████████

11   █████████████████████████████████████████████████████████████████████

12   ████████████; Op. Ex. 19 at 1, 5 (DHS Office of Inspector General report

13   explaining that Tecate POE had been turning back asylum seekers "[s]ince 2016"

14   with no mention of stopping in 2017 and identified turnbacks that occurred in

15   February 2017); Rep. Ex. 2 at 724 (turnback in January 2017); Rep. Ex. 3 at 779

16   (same); Rep. Ex. 4 at 822 (April 2017). Defendants' claims are belied by the record.

17        *Sixth*, citing no evidence, Defendants claim that they could not use parole to

18   respond to surges in immigration. CM at 49. Here's what Exhibit 62 to their brief

19   says about the Haitian "surge" in 2016: "The majority of the arriving Haitian

20   nationals are processed under [8 U.S.C. § 1229a] removal proceedings, in lieu of

21   expedited removal under [8 U.S.C. § 1225]. This action circumvents mandatory

22   detention provisions under [§ 1225] and allows [ICE] to parole the aliens, utilizing

23   existing alternatives to detention." Def. Ex. 62 at 712. Defendants cannot defeat

24   summary judgment with arguments that are contradicted by their own exhibits. *See*

25

26   [10] Even if the Court were to ignore Secretary Nielsen's actions, Defendants'
27   operational exigency argument is undermined by the record. Defendants'
     contemporaneous reports show that, even in the rare instances where POEs were
28   operating above 100% capacity, the number of asylum seekers ████████████
     ███████. *See* Op. Exs. 21-25; Op. Ex. 20 at ¶¶ 23, 88-91.

1    *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002).

2    **Seventh**, Defendants argue that they did not actually shift from using

3    detention capacity to operational capacity as the metric for determining the capacity

4    of a POE to temporarily detain asylum seekers and had "long" used operational

5    capacity as the measure. CM at 49-50. The record disagrees. Emails show that in

6    early June 2018 OFO █████████████████████████████████████████████████

7    Rep. Ex. 5 at 915. Witnesses testified that this shift occurred in June 2018. Op. Ex.

8    100 at 78:18-25; Op. Ex. 14 at 137:25-138:12.

9    The evidence Defendants cite does not contradict this record. The mere fact

10    that an email used the phrase "operational capacity" prior to June 2018 does not

11    mean that Defendants were using operational capacity as a metric justifying turning

12    back asylum seekers. *See* Def Ex. 62 at 712. While Mariza Marin testified "we have

13    always used operational capacity," Op. Ex. 17 at 70:12-13, she could not point to a

14    scintilla of evidence that supported her story. *Id.* at 95:16-108:3. And, despite

15    claiming that she "always used" operational capacity, when Ms. Marin wrote █████

16    ████████████████████████████████████████████████████████████████████

17    **she did not use the phrase "operational capacity" once**. *Id.* at 95:16-97:11, 102:13-

18    108:3. There is no genuine dispute that Defendants shifted from using detention

19    capacity to using operational capacity in June 2018.

20    **Eighth**, Defendants claim that they implemented "contingency plans," CM at

21    49, but "those efforts were insufficient to prevent overcrowding." *Id.* This argument

22    is a non sequitur. The contingency plans exist to address periods when a POE is

23    experiencing an influx of migrants. *See, e.g.*, Op. Ex. 28 at 261 (policy ███████

24    ████████████████████████); Op. Ex. 30 at 011 (policy designed to address

25    ████████████████). Complaining that there was overcrowding when a contingency

26    plan is activated is like complaining about getting wet when standing in the rain.

27    **Ninth,** Defendants claim that their "prioritization regime" was "successful"

28    because the number of credible fear interviews increased in 2018 and 2019. CM at

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

16

4. This statistic is misleading. Since CBP can either refer arriving asylum seekers for credible fear interviews under § 1225 or place them directly into removal proceedings under 8 U.S.C. § 1229a, *see* Def. Ex. 62 at 712, increased credible fear referrals does not necessarily mean CBP inspected more arriving asylum seekers. It may simply mean that CBP chose to refer a higher percentage of arriving asylum seekers for a credible fear interview. Beyond that, even if the number of asylum seekers referred for credible-fear interviews increased by 108%, as Defendants claim, the number of asylum seekers forced to wait in Mexican border towns due to the turnback policy increased *327%* from 2018 to 2019. The increases in some border cities were considerably higher.

| Mexican Border City | December 2018[11] | August 2019[12] | Increase |
|---|---|---|---|
| Tijuana | 5,000 | 10,000 | 100% |
| Mexicali | 350 | 2,000 | 471% |
| San Luis Rio Colorado | 0 | 1,050 | N/A |
| Nogales | 170 | 680 | 300% |
| Ciudad Juarez | 170 | 5,645 | 3,220% |
| Ciudad Acuna | 0 | 303 | N/A |
| Piedras Negras | 0 | 1,000 | N/A |
| Nuevo Laredo | 80 | 1,000 | 1150% |
| Reynosa | 0 | 3,600 | N/A |
| Matamoros | 283 | 600 | 112% |
| **Total** | **6,053** | **25,878** | **327%** |

Even if the percentage of asylum seekers processed at POEs increased, the percentage of asylum seekers that Defendants turned back increased *more*.

---

[11] Rep. Ex. 6 at 7.
[12] Rep. Ex. 7 at 4-13.

Defendants' turnback policy was only a "success" with respect to turning back asylum seekers and breaking the law.

*Finally*, citing misleading statistics regarding asylum seeker processing, Defendants argue that there were no arbitrary caps on processing asylum seekers. But Defendants do nothing to suggest that their contemporaneous emails referencing arbitrary caps are inaccurate. *See, e.g.*, Op. Ex. 12 at 742 (San Ysidro POE had a ███████████████████████████████████); Op. Ex. 104 (██████████████ ████████████████████████████████████); Op. Ex. 105 (CBP sent guidance about ██████████████████████████████). And the mere fact that a number of asylum seekers were inspected and processed does not mean that the number of asylum seekers processed and inspected would not have been higher but for the turnback policy. Instituting such caps is wholly inconsistent with Defendants' duty to inspect and process all noncitizens arriving at POEs.

### D. This Court Has Already Rejected Defendants § 706(1) Arguments

Defendants continue to argue that they can withhold their mandatory duties of inspection and referral from asylum seekers who have not yet set foot across the physical border (because Defendants will not let them cross). CM at 37-39. According to Defendants, they can decide who is permitted to cross the border and thus to whom they owe the mandatory duties Congress imposed. *See id.* This Court has already rejected these arguments multiple times and held that Defendants do, in fact, owe mandatory inspection and referral duties to asylum seekers "who are in the process of arriving in the United States," including those not yet on U.S. soil. Dkt. 280 at 46; *see also* Dkt. 330 at 31 (similar). The Court should do so again here. Defendants add nothing to their previous arguments that would alter the Court's "sound and persuasive" analysis on this issue. *Al Otro Lado*, 952 F.3d at 1011-12.[13]

---

[13] Defendants' attempt to minimize the testimony of CBP's 30(b)(6) witness notwithstanding, *see* CM at 40 n.7, CBP's testimony establishes that the *agency itself*, not just its officers, views noncitizens seeking asylum who are turned back at

1   Defendants' first three points arguing against this Court's previous holdings

2   concerning the meaning of 8 U.S.C. §§ 1158 and 1225, CM at 37-38, which touch

3   on verb tense,[14] the definition of "arrive," and the presumption against

4   extraterritoriality, have already been rejected by this Court.[15] Dkt. 280 at 35-47.

5   Defendants' fourth and fifth points about the structure of the INA and the

6   "overall statutory scheme" are equally unavailing. CM at 38. Defendants refer to an

7   observation in *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993), that

8   deportation and exclusion proceedings do not occur outside the U.S., and to two

9   other cases discussing the significance of a noncitizen's entry into or "land[ing]" in

10  the U.S. (not arrival at a POE), and make reference to § 1225(b)(1)(A)(i), which is

11  not part of any of Plaintiffs' claims. CM at 38. None of these citations address the

12  import of the statutory provisions at issue here: § 1158(a)(1) or § 1225(a)(1), (a)(3),

13  and (b)(1)(A)(ii). These provisions establish a series of procedures by which

14  noncitizens seeking asylum may do so at POEs. The first step in this procedural

15  structure is inspection, which governs access to the remainder of the process.

16  If anything, the overall statutory scheme protects asylum seekers and does not

17  allow Defendants to discriminate among arriving noncitizens, instead requiring

18  Defendants to inspect and process them all. *See supra* 1-4.

19  Defendants' final point, on the legislative history of § 1225, is unconvincing

20  for two reasons. First, they quote a report on H.R. 2202, the Immigration in the

21  National Interest Act of 1995 (later renamed the Immigration Control and Financial

22

23  the border as "attempting" to come into the United States at a POE. *See* Op. Ex. 17
    at 197:21-202:3; *see also* 8 C.F.R. § 1.2 (defining "arriving alien" as "an applicant
24  for admission . . . attempting to come into the [U.S.] at a [POE]").

25  [14] Defendants' citation to *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020), *see*
    CM at 37-38, adds nothing to the Court's existing statutory interpretation of the
26  relevant INA sections. The quoted fragment from *Thuraissigiam* has nothing to do
    with the meaning of the present-tense use of "arrives" in §§ 1158 or 1225.

27  [15] This Court has also rejected Defendants' argument about the use of the present
    progressive tense ("arriving in"). *See* CM at 38 n.6; Dkt. 280 at 38-39, 46-47.
28

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

19

Responsibility Act of 1996), which **never became law**. *See* H.R. Rep. No. 104-469, pt. 1, at 1 (noting bill number); Immigration Control and Financial Responsibility Act of 1996, H.R. 2202, 104th Cong. (1995). Second, the section of the bill they quote discusses a proposed 30-day deadline to file an affirmative asylum application, which never became law and is wholly distinct from the government's duty to provide access to the asylum process at POEs.[16]

In addition to arguing against this Court's prior statutory analysis, Defendants argue that Plaintiffs' § 706(1) claim should fail because CBP continues to process *some* asylum seekers, notwithstanding the turnback policy.[17] But, the fact that some number of asylum seekers were eventually inspected at POEs and referred for interviews does not establish that they were not initially turned back or metered. Every turnback is a § 706(1) violation in the moment it occurs because it is mandatory "agency action unlawfully withheld," and the undisputed facts show that turnbacks occurred. *See* Op. Br. at 22-23. Second, Defendants argue that there can be no "categorical" turnback policy if at least *some* asylum seekers were inspected and processed. CM at 39-40. But, as this Court already explained, "Plaintiffs . . . do not claim that the Turnback Policy is a policy to categorically deny asylum seekers entry into the United States. Instead, Plaintiffs have demonstrated this is a policy aimed at deterring or limiting asylum seekers from seeking asylum in the United States." Dkt. 280, at 53. Even if credible fear referrals occurred, there is no genuine

---

[16] Defendants make the mistake of conflating access to the asylum process with a specific step in the process—the determination of inadmissibility necessary to proceed to the referral mandate in § 1225(b)(1)(A)(ii). *See* CM at 38 n.6. The same footnote also runs directly counter to controlling case law, in particular the Ninth Circuit's holding that "physical presence" is not a term of art, *Barrios v. Holder*, 581 F.3d 849, 863 (9th Cir. 2009), *abrogated on other grounds by Hernandez-Rivas v. Holder*, 707 F. 3d 1081, 1093 (9th Cir. 2013), and thus cannot be read as applying only to noncitizens who have effectuated an "entry."

[17] Defendants argue that this demonstrates that there is no overarching agency policy to withhold mandatory action required under the INA. But the existence of an overarching agency policy goes only to Plaintiffs' § 706(2) claims.

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

20

dispute that the turnback policy "deterr[ed] or limit[ed]" class members from
seeking asylum in the U.S., which is the core of Plaintiffs' claims. *Id.*[18]

Plaintiffs, not Defendants, are entitled to summary judgment on their APA
claims.

## III.    THE TURNBACK POLICY IS UNCONSITUTIONAL

Defendants concede up front that, at a minimum, Plaintiffs' constitutional due
process rights are coextensive with their statutory rights. As Plaintiffs have
demonstrated, *see supra* 1-4; Op. Br. at 21-25, the turnback policy denies class
members statutorily guaranteed procedures governing the inspection of asylum
seekers. Thereby, Defendants deny class members due process of law.

Defendants claim that class members cannot invoke constitutional procedural
protections at the border. CM at 54. But this Court has already recognized that there
is nothing "'impracticable [or] anomalous' in applying elementary due process
protection at the U.S. border." Dkt. 280 at 74 (quotation omitted). This is especially
so where "the practical necessities" warrant application of the Due Process Clause.
*Id.* at 76. Summary judgment for Plaintiffs is warranted on this ground as well.

## IV.    THE TURNBACK POLICY VIOLATES THE ATS

Seemingly ignoring the wealth of authority Plaintiffs marshal in support of
their ATS claim, Defendants accuse Plaintiffs of failing to demonstrate why this
Court should "fashion [such] a cause of action" under the ATS for violations of the
duty of *non-refoulement*. CM at 55. Defendants' ATS arguments all miss the mark.

First, Defendants correctly identify the *Sosa* standard—*i.e.*, that to be
cognizable under the ATS, a norm must be "specific, universal and obligatory," *Sosa
v. Alvarez-Machain*, 542 U.S. 692,  732 (2004)—but do nothing to contest the fact
that the duty of *non-refoulement* has reached that *jus cogens* status, *see* Op. Br. at

---

[18] Defendants oppose Plaintiffs' motion for summary judgment under § 706(1) by
citing the factors analyzed in *Telecomms. Research & Action Ctr. v. FCC ("TRAC")*,
750 F.2d 70, 80 (D.C. Cir. 1984). CM at 40. Plaintiffs will address the *TRAC* factors in
their forthcoming reply in support of their motion for summary judgment.

33. Through the ATS, Congress conferred on federal courts the power to "recognize private causes of action" involving serious violations of the law of nations. *Sosa*, 542 U.S. at 724. *Non-refoulement* is just such a violation, as evidenced by the consensus of international law opinion and jurisprudence. Despite Defendants' assertion, it is no valid objection that this duty was not part of "the law of nations" as it existed in 1789. *See Kiobel v. Royal Dutch Petroleum Co*, 569 U.S. 108, 115 (2013) ("the First Congress did not intend the provision to be 'stillborn'").

Second, Defendants incorrectly assert that *non-refoulement*-type claims are actionable only in removal proceedings because the U.S. incorporated the norm into domestic law through the withholding of removal statute. CM at 55. Not so.[19] The norms cognizable under the ATS routinely mirror domestic law enactments, as one would expect from a statute that is designed to make violations of "universal" legal norms actionable. For example, both the ATS on the one hand and the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350, and 18 U.S.C. § 2340A, on the other hand, reflect the *jus cogens* norm prohibiting torture; yet courts do not hold that the domestic implementation of a parallel norm defeats ATS jurisdiction. *See Sosa* 542 U.S. at 713, 731; S. Rep. No. 102-249, at 5 (1991) (explaining the TVPA is designed to "enhance the remedy already available under" the ATS by "extend[ing] a civil remedy also to U.S. citizens who may have been tortured abroad"); *see also Al Shimari v. CACI Premier Tech., Inc.*, 263 F. Supp. 3d 595

---

[19] This Court should reject Defendants' reliance on *Stevic* for the proposition that the *non-refoulement* obligation is not "available to aliens at the border." CM at 57. The citation to *Stevic* reflects only that the 1952 withholding of removal statute did not apply to those seeking "admission." *INS v. Stevic*, 467 U.S. 407, 421 (1984). Importantly, the "prevailing international interpretation" of *non-refoulement* states that the principle applies not only to those individuals who are admitted within a country's borders, but to those at the border as well. Mark Gibney, *Refugees*, 4 ENCYCLOPEDIA OF HUMAN RIGHTS 315, 318 (Oxford University Press, 2009). *See also Amuur v. France*, App. No. 19776/92, ¶ 52 (Eur. Ct. H.R. June 25, 1996) ("Where a State is deemed to have control, it may only return an asylum seeker to another country if that country will also abide by the principle of nonrefoulement and allow the individual to seek asylum in accordance with international law."); Alice Edwards, *Human Rights, Refugees, and the Right to Enjoy Asylum*, 17 INT'L J. REFUGEE L. 293, 301 ("[W]ithout appropriate asylum procedures, obligations of *non-refoulement*, including rejection at the frontier, could be infringed").

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

22

(E.D. Va. 2017) (finding ATS jurisdiction over claims grounded in international law prohibitions on torture despite congressional enactments also prohibiting torture). That Congress amended the INA to "conform[] it to the language of Article 33 of the United Nations Protocol," *Stevic*, 467 U.S. at 421, counsels in *favor* of ATS recognition. *Sosa*, 542 U.S. at 725-26 (conferral of ATS jurisdiction is strengthened by looking "for legislative guidance").

Third, Defendants' analogy to *Bivens* is particularly misplaced. *Bivens* is fundamentally distinct from the ATS: judicial skepticism of new *Bivens* claims derives from its status as a *wholly* judicially created cause of action. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1848 (2017). By contrast, Congress created the ATS, delegating to courts authority to recognize certain common law causes of action. *Sosa*, 542 U.S. at 732. No court has held that the "judicial caution" already built into the *Sosa* inquiry is remotely similar to the *Bivens* test's "special factors [that] counsel[] hesitation." *See Al Shimari v. CACI Premier Tech., Inc.*, 320 F. Supp. 3d 781, 783-85 (E.D. Va. 2018) (rejecting *Bivens*-type limitations on ATS).

Finally, Defendants invoke *Hernandez v. Mesa*, 140 S. Ct. 735 (2020)—a case that turns on *Bivens* "special factors" not material here—for the proposition that the U.S. government merits special protection and deference at the border. CM 56. But the mere incantation of "national security," "foreign relations," and "border security" cannot defeat application of the ATS. *Ziglar*, 137 S. Ct. at 1862 (invocation of "national-security concerns" cannot be a "talisman used to ward off inconvenient claims"). Courts have enforced the ATS in contexts far more connected with bona fide national security concerns than Defendants claim here. *See Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 528-29 (4th Cir. 2014) (upholding ATS jurisdiction over claims arising out of abuse of detainees held by U.S. military in Abu Ghraib prison). Indeed, as the Supreme Court emphasizes, the primary objective of the ATS is "to promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations." *Jesner v. Arab Bank,*

1   *PLC*, 138 S. Ct. 1386, 1406 (2018). That is no less true when the violations are

2   committed by the U.S. government and is precisely why an ATS cause of action

3   exists here. Defendants cannot simply send back asylum seekers *en masse* to another

4   country in flagrant disregard for the norm of *non-refoulement*, and they must be held

5   accountable for their repeated violations of international law.

6   **V.    PLAINTIFFS' STAND-ALONE INA CLAIM IS VALID**

7        Defendants argue that the Court should grant summary judgment in their favor

8   on Plaintiffs' standalone INA claim because Plaintiffs supposedly "lack a private

9   right of action under the INA." CM at 31-32. But Defendants are wrong that the INA

10  can be enforced only through the APA or the grant of an explicit cause of action in

11  the INA itself.[20] The Ninth Circuit recently recognized a court's inherent power—

12  independent of the APA—to constrain executive violations of law, explaining:

13  "[e]quitable actions to enjoin *ultra vires* official conduct do not depend upon the

14  availability of a statutory cause of action; instead they seek a 'judge-made remedy'

15  for injuries stemming from unauthorized government conduct, and they rest on the

16  historic availability of equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890-

17  91 (9th Cir. 2020) (citation omitted). Like the *Sierra Club* plaintiffs, Plaintiffs claim

18  that Defendants lack statutory authority to turn back asylum seekers at POEs; and

19  just as Plaintiffs' due process claim may proceed separately from the APA's

20  strictures under nonstatutory review, so too may their *ultra vires* claim. *Id.* at 891.

21        Defendants' reliance on *Ms. L v. ICE* is misguided. The portion of the case

22  they cite relies on § 1158(d)(7), in which Congress *explicitly* precluded private

23  enforcement of a short list of procedures found in § 1158(d) related to the filing of

24  asylum applications, and not access to the asylum process itself. 302 F. Supp. 3d

25

26  [20] Defendants would have the Court believe that it already decided this question in
    Defendants' favor. *See* CM at 31-32. Not so. As this Court explained, "its prior
27  statement regarding the scope of judicial review flowed from the nature of the
    parties' prior dismissal briefing," which was "limited . . . to the sufficiency of
28  Plaintiffs' APA claims" as pled in the original complaint. Dkt. 280 at 67.

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

24

1149, 1168 (S.D. Cal. 2018); *see* § 1158(d)(7) ("Nothing *in this subsection* shall be construed to [create an enforceable right or benefit.]") (emphasis added); *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Here, Plaintiffs do not seek enforcement of the procedures in § 1158(d), and *Ms. L v. ICE* does not limit nonstatutory review of the INA provisions actually at issue in this case. *See* 302 F. Supp. 3d at 1168. Defendants' only other cited case, *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1166 (D.N.M. 2020), involved only APA and constitutional claims, so the court's offhand remark about a private right of action under "the INA" as a whole was dicta, not a holding, and is neither binding nor persuasive. *Id.*; *see also* Complaint at ¶¶ 40-62, *New Mexico v. McAleenan*, 19-cv-00534 (D.N.M. June 10, 2019) (Dkt. 1) (not asserting a private right of action under the INA).

Defendants' arguments on the INA provide no basis for summary judgment.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to summary judgment.

Dated: October 16, 2020

MAYER BROWN LLP
    Matthew H. Marmolejo
    Ori Lev
    Stephen M. Medlock

SOUTHERN POVERTY LAW CENTER
    Melissa Crow
    Sarah Rich
    Rebecca Cassler

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy
    Ghita Schwarz
    Angelo Guisado

OPP'N TO DEFS' CROSS-MOTION FOR S.J.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMERICAN IMMIGRATION
COUNCIL
    Karolina Walters


By: */s/ Stephen M. Medlock*
    Stephen M. Medlock

*Attorneys for Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2         I certify that I caused a copy of the foregoing document to be served on all

3    counsel via the Court's CM/ECF system.

4    Dated:  October 16, 2020                    MAYER BROWN LLP

5

6                                               By  /s/ Stephen M. Medlock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28