# EXHIBIT B

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, ) | |
|     *Plaintiffs,* ) | |
| ) | |
| ) | |
| v. ) | No. 3:17-cv-02366-BAS-KSC |
| ) | |
| Chad Wolf, *et al.*, ) | |
|     *Defendants.* ) | |
| _____ ) | |

## DECLARATION OF RANDY HOWE

I, Randy Howe, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am currently the Director, Field Operations (Laredo), Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). Until January 18, 2020, I was the Executive Director for Operations, OFO in Washington, DC. I was employed as the Executive Director of Operations from October 2017 until my transfer to Laredo in January 2020. I began my career in 1988 with the legacy U.S. Immigration and Naturalization Service. During my 31 years of federal service, I have held various leadership positions, including Area Port Director, Buffalo; Assistant Director for Border Security; and Border Security Coordinator. Prior to becoming the Executive Director for Operations, I served as Director of Field Operations for the Preclearance Office. As the Executive Director for Operations, I oversaw more than 23,000 employees, with operations at 20 major field offices, 328 POEs, and 16 Preclearance locations.

2. I make this declaration to supplement my previous declaration, filed on September 26, 2019, in support of a Motion to File Documents under Seal. Specifically, I make this declaration to provide further explanation as to why CBP's Queue Management Reports, Migration Crisis Action Team (MCAT) reports, internal CBP emails, and the Laredo Field Office Mass Migration Contingency Plan must be filed under seal.

3. As recognized by Executive Order 13773, Drug Trafficking Organizations (DTOs), Transnational Criminal Organizations (TCOs), and other criminal and hostile actors, pose a real and serious threat to the safety of the United States. OFO's operations at ports of entry are designed to recognize and counter that threat and thus protect the security of the United States. As part of executing that mission, , CBP along the Southwest Border intercepted over 117,000 pounds of methamphetamine, 19,000 pounds of cocaine, 2,400 pounds of fentanyl, 4,700 pounds of heroin, and 253,900 pounds of marijuana in fiscal year 2019. Additionally, in fiscal year 2019, OFO encountered 12,705 criminal aliens at ports of entry nationwide, as well as 4,269 individuals wanted by law enforcement agencies.

4. In order to execute this mission, OFO – as well as others within CBP, DHS, and across the executive branch – must be able to internally share detailed operational information, including potential vulnerabilities and weakness. This information is shared through documents such as the Queue Management Reports, MCAT reports, and the Laredo Field Office Mass Migration Contingency Plan. The public release of such information undermines its ability to execute that mission.

*Field Queue Management Reports*

5. The first group of documents or information that needs to be filed under seal consists of email chains containing, or information derived from, OFO's Field Queue Management

2

Reports for various days in January through March 2019.  These documents are indexed as AOL-DEF-00027614 – AOL-DEF-00027615 (October 2, 2018), AOL-DEF-00038931 (December 19, 2018), AOL-DEF-00038923 (December 20, 2019), AOL-DEF-00038927 (December 21, 2018), AOL-DEF-00012012–17, AOL-DEF-00012022, AOL-DEF-00012033, AOL-DEF-00012041, AOL-DEF-00012051, AOL-DEF-00012061, AOL-DEF-00012071, AOL-DEF-00012081, AOL-DEF-00012099 (Feb. 1, 2019), AOL-DEF-00038929 (Feb. 2, 2019), AOL-DEF-00012109, AOL-DEF-00012119, AOL-DEF-00012129, AOL-DEF-00012144, AOL-DEF-00012154, AOL-DEF-00012164, AOL-DEF-00012175, AOL-DEF-00012186, AOL-DEF-00012196, AOL-DEF-00012206, AOL-DEF-00012217, AOL-DEF-00012227 (, AOL-DEF-00012236, AOL-DEF-00012246, AOL-DEF-00012256, AOL-DEF-00012266, AOL-DEF-00012284, AOL-DEF-00012307 (Mar. 4, 2019), AOL-DEF-00012236–41 (February 22, 2019), AOL-DEF-00012335 – AOL-DEF-00012336 (Mar. 6, 2019), AOL-DEF-00012345, AOL-DEF-00012355, AOL-DEF-00012365, AOL-DEF-00012376, AOL-DEF-00012394 (Mar. 13, 2019), AOL-DEF-00012407 – AOL-DEF-00012410 (Mar. 14, 2019).

6. As explained in my previous declaration, Queue Management Reports are reports which compile data from the OFO Field Offices on the southwest border.  These are provided on a daily basis to OFO and CBP leadership, and provide raw data points on a number of factors that impact the operations of southwest border ports of entry.  These reports are generated strictly for internal CBP and DHS use, and are used for maintaining awareness of any resource or operational vulnerabilities at the various ports of entry (POEs) along the southwest border.

3

7. The main operational vulnerabilities or resource constraints that these Queue Management reports highlight is the total number of individuals in custody at a particular port, as well as the percentage of total holding capacity that port has reached based on the number of individuals in custody. It is important for CBP leadership to be aware of this information, as high numbers of individuals in custody may be caused by any number of factors, such as changes in migrant flows that need to be monitored; potential difficulties in transferring individuals out of CBP custody, which may need to be addressed with CBP's interagency partners; or other operational or resource issues that may require action.

8. However, this information may also reveal operational vulnerabilities or weaknesses that could be exploited if released publicly. While the number of individuals in custody at a particular port of entry is not the only factor affecting a port's total capacity to process individuals, it impacts how a port of entry manages its resources.

9. For instance, in my experience, if a port has a high number of individuals in custody, or if individuals in custody have been held for an extended period of time, port management may need to reallocate staffing and other resources towards addressing these capacity issues. For instance, if a port has a high number of individuals in custody, officers at the port must devote significant time and energy towards ensuring that these individuals have adequate food and water, and are housed in sanitary conditions. OFO policy requires that officers conduct welfare checks at regular intervals for individuals in custody. Officers must also provide individuals in custody with meals and snacks, as well as ensure that any children are adequately supervised. Additionally, if a port is operating at a high capacity, or if individuals have been in custody for a long period of time, officers must work to transfer these individuals out of CBP custody, by working with U.S. Immigration and Customs

Enforcement (ICE), the U.S. Department of Health and Human Services (HHS), and other partners, to secure transportation. This work of addressing the needs of individuals in custody, and attempting to move those individuals out of the POE, takes officers away from other inspection and enforcement duties including detecting and seizing drug and other contraband. This, in turn, makes the port more vulnerable to outside threats such as drugs, weapons, contraband, and individuals attempting to enter the port without inspection, such as by running through the vehicle lanes. Fentanyl, in particular, is a drug that is difficult to detect, as it is easily concealed in small packages and other small compartments. If the port is more vulnerable to such threats, the American people are as well -- most of the cocaine, heroin, foreign-produced marijuana, and foreign-produced methamphetamine available in the United States enters through the southwest border.

10. Conversely, if a port has fewer individuals in custody, the port will be able to allocate more resources towards other mission sets, such as seizing drugs, weapons, and other contraband.

11. Therefore, publicly releasing port-level capacity data, especially data covering a period of several days or weeks, would provide outside entities with a picture of when certain ports are operating below, at, or above capacity., and thus how resources may be allocated at those ports. This data, combined with other publicly available data, such as seasonal migration trends and the number of individuals encountered or found inadmissible in certain areas, could be exploited by DTOs, TCOs, and other hostile actors. Specifically, if a TCO or smuggling organization had knowledge that a particular port consistently operated at or above capacity for a period of several days or several weeks, the TCO or smuggling organization could utilize that information, along with other information in its possession or gleaned from other sources, to develop a picture of when the port's resources may be

5

strained, and reallocate its own resources to exploit this vulnerability. Similarly, if a TCO or smuggling organization had knowledge that a particular port consistently operated *below* capacity for a period of time, the TCO or smuggling organization could reallocate its own resources towards *creating* capacity constraints at that particular POE.

12. For instance, if a TCO gained knowledge that a particular port was operating at capacity during a certain month of the year, or during certain days in the month, the TCO could specifically wait until that period of time to send additional levels of drugs or other contraband to that port, or by instructing a group of individuals to enter without inspection, such as by running through the vehicle lanes. For example, if a TCO had knowledge that a particular POE had been operating at over 100% capacity for two weeks, it could further harm port operations by instructing a large group of individuals to attempt to enter without inspection. In the same vein, if a smuggling organization had knowledge that a particular POE had been operating at 30% of its capacity for two weeks, it could similarly instruct a large group to enter without inspection, creating a diversion of OFO resources towards that group, and away from other priority missions.

*MCAT Reports*

13. The second set of documents that should be filed under seal, indexed as AOL-DEF-00012000-00012001, is an email chain containing CBP's Migration Crisis Action Team (MCAT) report. As described in my previous declaration, the MCAT, which operates out of CBP headquarters, provides daily reports to CBP leadership on the number of individuals apprehended or found inadmissible along the southwest border, the demographics of those individuals (e.g., family units or unaccompanied minors), as well as information relating to the capacity of various CBP facilities and the immigration system overall. These reports

provide senior leadership at CBP, DHS, and other agencies with detailed information about migration trends impacting the system as a whole, so that senior leadership can assess, in real time, operational constraints on the system as a whole, and make appropriate decisions about the allocation of resources and the potential need for policy or operational change.

14. The degree of detail contained in these reports, however, is such that it would also provide hostile actors with a clear picture of system-wide operational vulnerabilities that could be exploited. For instance, the MCAT reports provide detailed information regarding the number of individuals apprehended or found inadmissible in certain areas along the southwest border, as well as information about the capacity of CBP to hold these individuals, and ICE's capacity to transfer such individuals out of CBP custody. This information is provided at the level of individual CBP facilities (e.g., POEs or Border Patrol stations).

15. This facility-level capacity data can easily be exploited by hostile actors. Even though the holding capacity is, for OFO, only one factor in the equation of a port's total capacity, these numbers can easily be exploited and manipulated to cripple CBP operations and the overall system. Specifically, the MCAT report shows that Port A has a capacity of (for instance) 75, but that Port B has a capacity of 20. It also shows that Station A has a capacity of (for instance) 300, but that Station B has a capacity of 150. A hostile actor could cripple operations at all four of these facilities by staging a mass incursion of 200 individuals through the vehicle lanes at Port A, and by sending multiple groups totaling 400 people to be apprehended near Station A. It could also then send much smaller groups of 30 and 200, respectively, to Port B and Station B. In this way, the operations at all four locations would be overwhelmed.

16. The information on the number of individuals apprehended or found inadmissible in certain areas also provides a detailed picture of which areas of the southern border may be facing resource constraints. For instance, if a particular Border Patrol station or POE, or even a particular Border Patrol Sector or OFO Field Office, is facing a significant influx of individuals apprehended or encountered, agents and officers in those locations must devote a significant portion of their time to processing those individuals, ensuring that those individuals receive appropriate treatment, and transporting those individuals to and out of CBP facilities. CBP has a finite number of employees. Thus, with more agents and officers focused on the individuals already in custody, this leaves fewer agents and officers available to actually patrol and secure the border, particularly in remote areas of the southwest border. For example, during the unprecedented influx of aliens apprehended between the ports of entry this summer, 40-60% of Border Patrol agents were diverted from their primary mission of patrolling the border to ensure that individuals in custody received appropriate treatment. OFO, similarly, sent several hundred officers to assist in processing and providing humanitarian care, diverting these officers away from their primary mission of protecting the border. In my experience, DTOs and TCOs often target areas with high numbers of individuals in custody, and thus fewer agents and officers conducting enforcement duties, as areas in which to attempt to smuggle large loads of drugs. Conversely, smugglers often send large groups of individuals to areas that consistently have *lower* numbers of individuals in custody, thereby *creating* significant – and urgent – staffing needs in that particular area that can be further exploited.

17. In other words, if the MCAT reports for a period of several weeks revealed that the Rio Grande Valley (RGV) Border Patrol Sector was consistently over capacity, but the Del Rio

Border Patrol Sector was consistently under capacity, a DTO or TCO could make a calculated determination to send large groups of aliens to Del Rio, overwhelming the area. At the same time, the entity could send large quantities of drugs to RGV, knowing that it was already overwhelmed and operating at its maximum capacity. The entity could also use past data on patterns and trends of capacity numbers to specifically target certain areas in this way. Thus, the entity could use this information to essentially cripple CBP's ability to secure and defend the border.

*Laredo Mass Migration Contingency Plan*

18. AOL-DEF-00011011 through AOL-DEF-00011121, which is the Laredo Field Office Mass Migration Contingency Plan (Mass Migration Plan), also must be filed under seal. As outlined in the previous declaration of Rodney Harris, the Mass Migration Plan is a contingency plan designed to ensure that the Laredo Field Office has the appropriate resources to address a possible influx of aliens. This Mass Migration Plan, like all of OFO's contingency plans, provides operational and strategic details for responding to a potential influx or other emergency. While this particular plan is no longer in effect, many of the operational details in this plan, such as the maximum holding capacities at particular ports, methods for converting areas of the port into temporary holding areas, and the staffing and resource contingency planning, remain pertinent and are incorporated into existing contingency planning. Therefore, by its very nature, this document could be exploited by hostile groups seeking to exploit these details.

19. For instance, this document provides detailed information, for each port of entry in the Laredo Field Office, about staffing needs during an influx, how such staffing needs will shift in the face of an influx, and the allocation of other resources during an influx The Mass

9

Migration Plan details how many staff may be required to process individuals arriving at the port, how many cells may be able to hold such individuals, and the specific technical and physical resources required to process such individuals. For instance, the plan details the number of holding cells available at each port of entry in the Field Office, as well as the maximum capacity of these cells. The plan also details the areas of each port that may be used as overflow holding cells, if needed, the approximate time it may take officers to process cases during an influx, and assumptions about the technological and other resources required to maintain that rate of processing. Taken together, these details show the maximum number of individuals that a port can process and hold in a crisis situation, using all of its resources to the maximum level. With knowledge of this number, a hostile actor could essentially shut down the port's operations by directing even five additional individuals to run through the vehicle lanes, for instance. The hostile actor could then take advantage of this crippling of operations to smuggle drugs, weapons, or other contraband into the port. .

20. The plan also provides details regarding each port of entry's triggers for requesting assistance from interagency partners, such as Border Patrol, CBP's Air and Marine Operations, and ICE, as well as which specific neighboring ports of entry and Border Patrol stations to contact for assistance. Thus, hostile actors could use this information to also overwhelm those neighboring ports of entry and stations, in order to and further exploit the crisis.

21. The risk of vulnerability is particularly high in Texas' Rio Grande Valley (an area covered by the Laredo Field Office). In the Rio Grande Valley, there are five POEs over a 100 mile stretch of border. The information in the Mass Migration Plan for these five POEs could easily be utilized by DTOs and TCOs to easily route contraband into the U.S. through or away from specific POEs, by exploiting different operational vulnerabilities at different

locations. For instance, as described above, the plan details the specific overflow areas that each POE may utilize in the event of an influx, as well as the capacity of those areas. The plan also details the specific processing times, and the assumptions underlying those processing times, at various POEs in the Field Office. Thus, this plan provides hostile actors with specific information as to how many individuals it would take to overwhelm a particular port, compared with the number of individuals it would take to overwhelm another port. The relatively close proximity of these ports makes it easy for hostile actors to shift their resources with such knowledge of OFO's capacities, methods of responding to incidents, and staffing capabilities. Public release of the Mass Migration Plan thus has a very real potential to cause serious harm to CBP's ability to secure the ports of entry in the Rio Grande Valley.

22. This risk would be particularly acute if the Queue Management and MCAT reports described above also were also publicly available. As indicated above, the Queue Management and MCAT reports provide port-specific data regarding migration trends, capacity, and other operational constraints. Hostile actors could use this information, combined with the detailed contingency details contained in the Mass Migration Plan, to come up with detailed plans for how to circumvent operations at different POEs. For instance, if a DTO gained, through the MCAT and Queue Management reports, knowledge that a particular POE frequently operating at a certain capacity during a particular period of time, and also gained knowledge of the specific steps the port may take to address such a contingency, the DTO would have a very clear picture as to the specific actions it needed to take to cripple the port's operations.

23. The Mass Migration Plan also contains phone numbers for CBP internal operation and command centers, as well as contact information for CBP employees, state and local partners, and the Mexican government. Should hostile actors obtain this information, they could use it

11

to threaten or harass these individuals, or to distract these individuals from their primary duties (for instance, by calling in fake or phony threats) and enabling the hostile actor to utilize that distraction to its advantage.

*CBP Emails*

24. Lastly, AOL-DEF-00012141, which is an email chain containing data provided by the MCAT to CBP leadership, contains material that must be kept confidential. This email chain provides CBP leadership with detailed information about the number of individuals in custody on a particular day, information about the demographics of those particular individuals, as well as specific areas of operational concern for the agency. The original email was sent directly to CBP leadership, and shows the agency email addresses of the individuals who received the message. Other parts of the email chain provide the opinions and reactions of certain individuals to the information presented to them.

25. While agency email addresses are, at times, released to the public, such releases are usually limited in nature and for a specific purpose. The widespread publication of agency email addresses leaves personnel susceptible to spam, malware, phishing, and other cyber security vulnerabilities. Given the fluid and often time-sensitive nature of CBP operations, it is critical that CBP personnel have the ability to receive information in a timely manner, including over email. Spam or malware can thus dramatically interfere with CBP's ability to execute its mission. Additionally, the publication of individuals' email addresses opens these individuals up to harassment and potential threats to their safety. Thus, it is critically important that this information be protected from widespread release to the public.

26. Additionally, release of the substance of this email chain would provide hostile actors with information about a particular set of facts that the MCAT determined to be sufficient enough

to warrant notification to CBP leadership to determine the best way to address or mitigate those facts. This information thus provides insight into the agency's operations. The email also provides insight into the reactions of specific individuals to this information, thus alerting outside entities as to why these facts are important and the concerns associated with those facts. These facts, combined with the reactions to those facts, would give those actors better context about the significance of the underlying information and facts presented, and provide further opportunities for exploitation of these potential vulnerabilities.

27. Therefore, publication of any of the above documents – and particularly publication of all of the documents at once – has the potential to reveal a large amount of critical operational data that could be exploited by hostile actors seeking to harm CBP operations and undermine the agency's ability to secure the border. Because all of the information in these documents consists of such detailed operational information, it is not possible to meaningfully segregate or redact any information for purposes of filing other portions of the documents publicly. For these reasons, the documents listed above, as well any charts, exhibits, or representations of information that contain information derived therefrom, should be filed under seal and kept confidential.

28. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this __12__ day of February, 2020.

_____
Randy Howe
Director, Field Operations (Laredo)
Office of Field Operations
U.S. Customs and Border Protection