Anne Aufhauser (SBN 300952)*
(anne.aufhauser@friedfrank.com)
Stephen M. Juris
(stephen.juris@friedfrank.com)
Sarah F. Warren
(sarah.warren@friedfrank.com)
Courtney D. Morphet
(courtney.morphet@friedfrank.com)
Avani Uppalapati
(avani.uppalapati@friedfrank.com)
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
One New York Plaza
New York, NY 10004
(212) 859-8000 (phone)
(212) 859-4000 (fax)
*Counsel of Record

Attorneys for Amici Curiae
Haitian Bridge Alliance,
Institute for Justice & Democracy in Haiti,
Ira Kurzban, and
Irwin Stotzky

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

AL OTRO LADO, INC, *et al.*,

            Plaintiffs,

    v.

CHAD F. WOLF, *et al.*,

            Defendants.

Case No.: 3:17-cv-02366-BAS-KSC

**BRIEF OF HAITIAN BRIDGE ALLIANCE, INSTITUTE FOR JUSTICE & DEMOCRACY IN HAITI, IRA KURZBAN, AND IRWIN STOTZKY AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

1

## <u>CORPORATE DISCLOSURE STATEMENT</u>

2     Pursuant to Federal Rule of Civil Procedure 7.1 and CivLR 40.2. proposed

3 *Amici curiae* Haitian Bridge Alliance ("HBA"), Institute for Justice & Democracy

4 in Haiti ("IJDH"), Ira Kurzban, and Irwin Stotzky (together, the "*Amici*"), by their

5 undersigned counsel, hereby certify that *Amici* have no parent corporation and that

6 no publicly held corporation owns 10% or more of their stock, if any.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES .......................................................................iv

INTRODUCTION AND STATEMENT OF INTEREST.........................1

SUMMARY OF ARGUMENT ...................................................................2

ARGUMENT ..............................................................................................3

I.    U.S. IMMIGRATION POLICY HAS LONG DISCRIMINATED
AGAINST HAITIAN MIGRANTS. ...........................................................3

    A.    American Influence Led to the Destruction of Haiti's
Economy and the Rise of Authoritarianism, Forcing
Haitians to Flee.........................................................................4

    B.    The Arrival of the Haitian "Boat People" and
Accelerated Processing To Remove Them. ...........................5

    C.    A Rise in the Use of Detention of Haitian Migrants as a
Deterrent. .................................................................................6

        1.    Disparate Treatment of Haitian as Compared to
Cuban Migrants.............................................................7

        2.    Detention Gives Rise to Interdiction of Haitian
Refugees. .......................................................................8

II.    PRESENT DAY TREATMENT OF HAITIAN AND BLACK
MIGRANTS...............................................................................................10

    A.    The U.S. Government Recognized the Discriminatory
Treatment of Haitians in the 1990s, But This Recognition
was Short-Lived. ....................................................................10

    B.    Recent Government Actions Perpetuate Discrimination
Against Haitian Migrants. ....................................................12

III.    METERING DISPROPORTIONATELY AFFECTS HAITIANS..............14

    A.    Metering Is Illegal. ...............................................................14

B.     Metering is Colored by Deep-Seated Racial and Ethnic
       Animus and is Used to Deny Haitians Access to the
       Asylum Process. ...................................................................15

       1.     Life at the Border under the Metering Policy. ...........15

       2.     Haitians are Illegally Denied Asylum under the
              Metering Policy.........................................................17

Conclusion ...............................................................................19

# TABLE OF AUTHORITIES

**Cases**

*East Bay Sanctuary Covenant v. Trump*,
   950 F.3d 1242 (9th Cir. 2020) ...................................................................... 19

*Haitian Ctrs. Council v. Sale*,
   823 F. Supp. 1028 (E.D.N.Y. 1993) .............................................................. 10

*Haitian Refugee Ctr. v. Smith*,
   676 F.2d 1023 (5th Cir. 1982) ..................................................................... 5, 6

*Haitian Refugee Ctr. v. Civiletti*,
   503 F. Supp. 442 (S.D. Fla. 1980) .............................................................. 5, 6

*Jean v. Nelson*,
   472 U.S. 846 (1985) ........................................................................................ 8

*Louis v. Nelson*,
   544 F. Supp. 973 (S.D. Fla. 1982) ............................................................. 7, 8

*Munyua v. U.S.*,
   2005 U.S. Dist. LEXIS 11499 (N.D. Cal. 2005) .......................................... 14

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) .......................................................... 12

*Sale v. Haitian Ctrs. Council*,
   509 U.S. 155 (1993) ...................................................................................... 10

**Federal Authorities**

Alien Tort Statute, 28 U.S.C. § 1350 ................................................................. 15

Administrative Procedure Act, 5 U.S.C. § 704 .................................................. 15

CivLR 40.2 ............................................................................................................. i

Cuban Adjustment Act, Pub. L. 89-732, 80 Stat. 1161 (codified as
   amended at 8 U.S.C. § 1255 (1988)) ............................................................. 7

Federal Rule of Civil Procedure 7.1 .................................................................... i

Haitian Refugee Immigration Fairness Act of 1998 ("HRIFA") ................. 11, 12

Immigration and Nationality Act ("INA") 8 U.S.C. §§ 1225, 1229............................2, 14

Implementation of Haitian Family Reunification Parole Program ,
    79 Fed. Reg. 75,581 (Dec. 18. 2014).................................................................12

Naturalization Act of 1790, 1 Stat. 103 .......................................................................3

Naturalization Act of 1870, Pub. L. 41-254, § 7, 16 Stat. 254 ....................................3

Nicaraguan Adjustment and Central American Relief Act
    ("NACARA"), Pub. L. No. 105-100, 111 Stat. 2160 (1997) (as
    amended, Pub. L. No. 105-139, 111 Stat. 2644 (1997)................................11

U.S. Const. amend. V .................................................................................................15

**Other Authorities**

A.G. Mariam, *International Law and the Preemptive Use of State
    Interdiction Authority on the High Seas: The Case of Suspected
    Illegal Haitian Immigrants Seeking Entry Into the U.S.*, 12 Md. J.
    Int'l L. & Trade 211 (1988) .......................................................................9, 10

Alex Stepick, *Haitian Boat People: A Study in the Conflicting Forces
    Shaping U.S. Immigration Policy*, 45 U.S. Immigr. Pol'y 163
    (1982) ......................................................................................................5, 6

Ariane Francisco & Josefina Salomon, *Mexican Officials Extort
    Asylum Seekers on Way to USA*, InSight Crime (Mar. 25, 2019),
    https://www.insightcrime.org/news/analysis/mexican-officials-
    extort-asylum-seekers/ ...................................................................................16

*Black Immigrants Lives Are Under Attack*, The Refugee and
    Immigrant Center for Education and Legal Services (2020),
    https://www.raicestexas.org/2020/07/22/black-immigrant-lives-
    are-under-attack/ ............................................................................................18

C. Nicholas Cuneo and Hannah Janeway, *From Icebox to Tinderbox—
    A View from the Southern Border*, N. Engl. J. Med. 2020, 383:
    e81(2) (Sept. 24, 2020),
    https://www.nejm.org/doi/pdf/10.1056/NEJMp2009985?articleToo
    ls=true ............................................................................................................17

Carl Lindskoog, *How the Haitian refugee crisis led to the detention of immigrants*, Washington Post (Apr. 9, 2018), https://www.washingtonpost.com/news/made-by-history/wp/2018/04/09/how-the-haitian-refugee-crisis-led-to-the-indefinite-detention-of-immigrants/ ................................................................................ 9, 13

Carlos Ortiz Miranda, *Haiti and the U.S. in the 1980s and 1990s: Refugees, Immigration, and Foreign Policy*, 32 San Diego L. Rev. 673 (1995) ....................................................................................... 10

Dan Sperling, *In 1825, Haiti Paid France $21 Billion To Preserve Its Independence—Time for France To Pay It Back*, Forbes (Dec. 6, 2017), https://www.forbes.com/sites/realspin/2017/12/06/in-1825-haiti-gained-independence-from-france-for-21-billion-its-time-for-france-to-pay-it-back/#2a3d48e7312b ................................................. 4

Deborah E. Anker, *Determining Asylum Claims in the U.S.: A Case Study on the Implementation of Legal Norms in an Unstructured Adjudicatory Environment*, 19 N.Y.U. Rev. L. & Soc. Change 433, 455 (1992) ............................................................................. 6, 7

DHS, Off. of Inspector General, *Special Review-Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* (Sept. 27, 2018) ........................................................ 18

Elizabeth M. Iglesias, *Foreword: Identity, Democracy, Communicate Power, Inter/National Labor Rights and the Evolution of LatCrit Theory and Community*, 53 U. Miami L. Rev. 575, 601 (1999) ................................. 11

Embassy of Haiti in Washington D.C., http://www.haiti.org/haiti-at-a-glance. (last visited Oct. 26, 2020) ........................................ 18

Geneva Sands, *Trump admin ends family-based reunification programs for Haitians and Filipino World War II vets* (Aug. 2, 2019), https://www.cnn.com/2019/08/02/politics/trump-end-two-family-reunification-programs/index.html ................................... 12

Harold Koh *et al.*, *The Haiti Paradigm in United States Human Rights Policy,* 103 Yale L.J. 2391 (1994) .......................................... 9

Hillel R. Smith, *The Department of Homeland Security's Reported "Metering" Policy: Legal Issues* (Aug. 13 2019) https://fas.org/sgp/crs/homesec/LSB10295.pdf .............................. 15

Ibram X. Kendi, *The Day Shithole Entered the Presidential Lexicon*
(Jan. 13, 2019),
https://www.theatlantic.com/politics/archive/2019/01/shithole-
countries/580054/...............................................................................13

Joe Penney, *Despite closed borders, the US is still deporting Africans
during the pandemic* (July 27, 2020),
https://qz.com/africa/1885398/us-ice-deporting-africans-even-
with-closed-borders-due-to-covid/ .......................................................13, 17

Jordan E. Dollar and Allison D. Kent, *In Times of Famine, Sweet
Potatoes Have No Skin: A Historical Overview and Discussion of
Post-Earthquake U.S. Immigration Policy Towards the Haitian
People* .................................................................................................12

Julian Borger, *U.S. Ice officers 'used torture to make Africans sign
own deportation orders'* (Oct. 22, 2020),
https://www.theguardian.com/us-news/2020/oct/22/us-ice-officers-
allegedly-used-torture-to-make-africans-sign-own-deportation-
orders..................................................................................................14

Karla McKanders, *Immigration and Blackness: What's Race Got to
Do With It*, 44 Human Rights Magazine No. 1 (May 16, 2019),
https://www.americanbar.org/groups/crsj/publications/human_right
s_magazine_home/black-to-the-future/immigration-and-blackness/ ....................13, 18

Kira Olsen-Medina & Jeanne Batalova, *Haitian Immigrants in the
U.S.*, Migration Policy Institute (Aug. 12, 2020),
https://www.migrationpolicy.org/article/haitian-immigrants-united-
states-2018 ..........................................................................................15

Kirk Simple, *'There is No Hope': Crisis Pushes Haiti to Brink of
Collapse*, N.Y. Times (Oct. 21, 2019)..................................................16

Laura Ley, *The American dream of Haitians ends at the border
between Tijuana and San Diego*, Univision Noticias (Sept. 28,
2016), https://www.univision.com/noticias/amexica/el-sueno-
americano-de-los-haitianos-acaba-en-la-frontera-entre-tijuana-y-
san-diego .............................................................................................16

Letter to Biden (Oct. 13, 2020), http://www.ijdh.org/wp-
content/uploads/2020/10/Biden-Harris-Letter-10-2020-k-grouped-
FINAL-full-letter-2.pdf.......................................................................13

Mae M. Ngai, *The Architecture of Race in American Immigration Law: A Reexamination of the Immigration Act of 1924*, 86 J. Am. Hist. 67 (1999) ................................................ 4

Malissia Lennox, Note, *Refugees, Racism, and Reparations: A Critique of the U.S.' Haitian Immigration Policy*, 45 Stan. L. Rev. 687  (1993) ................................................ 4, 5, 7

Maya Srikrishnan, *Border Report: Surviving in Tijuana Has Gotten Even Harder for Haitian Migrants,* Voice of San Diego (July 20, 2020), https://www.voiceofsandiego.org/topics/news/border-report-surviving-in-tijuana-has-gotten-even-harder-for-haitian-migrants/ ................................................ 16

Nancy Adossi, et al., *Black Lives at the Border*, Black Alliance for Just Immigration (Jan. 2018), http://baji.org/wp-content/uploads/2020/03/black-lives-at-the-borderfinal-2.pdf ................................................ 18

National Immigrant Justice Center, *A Better Way: Community-Based Programming As An Alternative to Immigrant Incarceration* (Apr. 2019), https://immigrantjustice.org/research-items/report-better-way-community-based-programming-alternative-immigrant-incarceration ................................................ 7

Maya Averbuch, *Stranded in Tijuana: A Forgotten Community of Haitians with No Place to Go*, The Progressive (Apr. 1, 2018), https://progressive.org/magazine/stranded-in-tijuana-immigration-haiti/ ................................................ 16

Rachel Ida Buff, *How President Trump is dismantling the world's refugee regime*, Washington Post (Feb. 11, 2019), https://www.washingtonpost.com/outlook/2019/02/11/why-president-trump-has-won-immigration-standoff-even-if-he-doesnt-get-wall-funding/ ................................................ 8

Rick Jervis, *At US-Mexico border, migrants from Africa, Haiti wait to seek asylum*, USA Today (June 4, 2019), https://amp.usatoday.com/amp/1319996001.  ................................................ 18

Robbie Whelan, *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program*, Wall Street Journal (Dec. 28, 2019) ................................................ 24

Shayna S. Cook, *The Exclusion of HIV-Positive Immigrants Under the Nicaraguan Adjustment and Central American Relief Act and the Haitian Refugee Immigration Fairness Act*, 99 Mich L. Rev. 452 (2000) ............................................................................................ 11

Southern Poverty Law Center, *The Attorney General's Judges: How the U.S. Immigration Courts Became a Deportation Tool* (June 2019), https://www.splcenter.org/20190625/attorney-generals-judges-how-us-immigration-courts-became-deportation-tool ...................................... 6

Thomas Reinhardt, *200 Years of Forgetting: Hushing up the Haitian Revolution*, 35 J. Black Stud. 246 (2005) ...................................... 4

Tom Jawetz & Scott Shuchart, *Language Access Has Life-or-Death Consequences for Migrants*, Center for American Progress (Feb. 20, 2019), https://www.americanprogress.org/issues/immigration/reports/2019/02/20/466144/language-access-life-death-consequences-migrants/ ................................ 18

*U.S. Immigration Policy on Haitian Migrants* (2011), https://www.everycrsreport.com/files/20110517_RS21349_c6a8bc391c450f3244b0151c20deab7110d31290.pdf ...................................... 9, 11

BRIEF OF *AMICI CURIAE*
Case No.: 3:17-cv-02366-BAS-KSC

## **INTRODUCTION AND STATEMENT OF INTEREST**

*Amici* HBA, IJDH, Ira Kurzban and Irwin Stotzky respectfully submit this brief in support of the Motion for Summary Judgment filed by Plaintiffs *Al Otro Lado, Inc.*, *et al.* (Dkt. #535).[1]

HBA is a non-profit community organization based in San Diego that provides direct services to asylum seekers and other detained immigrants in California, and across the U.S., from Haiti and Africa. The organization responds to the ongoing Haitian immigration crisis that has affected Southern California and the U.S. more broadly as Haitians attempt to seek refuge from the tumultuous political and economic conditions in Haiti, and/or acclimate to new lives in America.

Similarly, IJDH is a U.S.-based, non-profit human rights organization that joins human rights practitioners in the U.S. and Haiti to advance justice for Haitian communities in Haiti and abroad through pursuit of legal claims, dissemination of information about human rights abuses, advocacy, and partnership with grassroots organizations.

Messrs. Kurzban and Stotzky are experts in the field of immigration, particularly as it pertains to Haitian migrants. Mr. Kurzban is a founding partner in the law firm of Kurzban, Kurzban, Tetzeli, & Pratt P.A. in Miami and chair of the firm's immigration department. Mr. Stotzky is Professor of Law at the University of Miami School of Law. For over thirty years, Mr. Kurzban and Professor Stotzky have advocated for Haitian refugees in constitutional and human rights cases, including several before the U.S. Supreme Court.

---

[1] The parties to this action have consented to the filing of this brief. No party's counsel authored this brief in whole or in part. No party or counsel to any party contributed money intended to fund preparing or submitting this brief. No person other than *Amici*, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief. "Dkt. #" refers to documents filed in the instant action.

1                                    BRIEF OF *AMICI CURIAE*

*Amici* have a direct and deep-seated interest in this litigation, as Haitian migrants account for a significant number of those being unlawfully turned back from multiple ports of entry ("POE") under Defendants' present metering policy. *Amici*'s unique experience and perspective concerning the plight of Haitian migrants is directly relevant to the substantive issues to be decided in this case. *Amici* therefore respectfully ask that this Court consider this brief in connection with Plaintiffs' Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

"Metering" constitutes an unprecedented infringement on the rights of foreign migrants trying to enter America. In contradiction to the clear processes established by the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1225, 1229, Defendants' metering policy mandates summarily turning back asylum seekers and refugees at the border before they are ever given a meaningful opportunity to plead their legal case for entry. With no safe home country to return to, migrants wait, in squalid and dangerous conditions, for their opportunity to seek asylum. Haitians are disproportionately impacted by metering due to longstanding racial and ethnic animus. Haitians have historically been denied access to the U.S., and continue to be disproportionately denied such access, despite conditions that clearly entitle them to refuge under the law.

Looking back on the history of relations between Haiti and the U.S., it is clear that anti-Haitian sentiment drives U.S. immigration policy. This discrimination and disparate treatment continue to this day, as Haitians struggle to recover from the 2010 earthquake, Hurricane Matthew in 2016, and the largest cholera outbreak in modern times, all of which have led to increased economic and political turmoil. Haitians validly seek asylum in America, only to be systematically denied access due to Defendants' illegal metering policy. This policy reflects yet another discriminatory measure designed to make it more difficult for Haitian immigrants to apply for asylum. It should be struck down to

2                                    BRIEF OF *AMICI CURIAE*

ensure that domestic and international laws are respected, and that all migrants are treated equally under U.S. immigration policy.

## ARGUMENT

An examination of the history of U.S. discrimination against Haitians and Haitian migration to the U.S. underscores that Defendants' present metering policy constitutes yet the latest of a long series of illegal and discriminatory policies designed to keep Haitian and other Black migrants out of the U.S.  The history of U.S. anti-Haitian animus and disparate treatment is long and sordid, and Defendants will continue that tradition unless they are forced by the Court to follow the law as it was enacted.  This is a matter of utmost urgency because Haiti is currently experiencing a profound economic and political crisis.  Accordingly, the metering policy should be struck down.

## I.    U.S. IMMIGRATION POLICY HAS LONG DISCRIMINATED AGAINST HAITIAN MIGRANTS.

To understand the full implications of Defendants' metering policy, it is crucial to understand the plight of Haitian migrants and the legacy of injustices that have been perpetrated against Haitians and other Black migrants.

The U.S. has a long history of discrimination in the application of its immigration laws.   In the first codification of U.S. naturalization law, the Naturalization Act of 1790, Congress specified that "any alien, *being a free white person*" could apply for citizenship.  Naturalization Act of 1790, § 1, 1 Stat. 103, (emphasis added).  It was not until 1870, after the passage of the Fourteenth Amendment, that the naturalization laws were extended to persons of "African nativity and . . . descent."  Naturalization Act of 1870, Pub. L. 41-254, § 7, 16 Stat. 254, 256.

BRIEF OF *AMICI CURIAE*
Case No.: 3:17-cv-02366-BAS-KSC

A.    **American Influence Led to the Destruction of Haiti's Economy and the Rise of Authoritarianism, Forcing Haitians to Flee.**

America's history has long been intertwined with Haiti's. While the U.S. was enacting discriminatory immigration laws, the enslaved people of Haiti were fighting to overthrow the richest colony in the Americas, the French colony of Saint Domingue. *See generally*, Thomas Reinhardt, *200 Years of Forgetting: Hushing up the Haitian Revolution*, 35 J. Black Stud. 246 (2005). In 1804, Haiti declared its independence and became the first country to abolish slavery, threatening the U.S. racial hierarchy and driving fears in the U.S. that news of the Haitian Revolution could lead to violent uprisings by enslaved people at home. *Id.* at 247, 249-51. In response, the U.S. refused to recognize the new Haitian state and helped France impose "reparations" with high interest rates on Haiti—paid to former French slaveholders for their lost slaves—that crippled the young country's economy for decades. *See* Dan Sperling, *In 1825, Haiti Paid France $21 Billion To Preserve Its Independence—Time for France To Pay It Back*, Forbes (Dec. 6, 2017), https://www.forbes.com/sites/realspin/2017/12/06/in-1825-haiti-gained-independence-from-france-for-21-billion-its-time-for-france-to-pay-it-back/#2a3d48e7312b.

Following its independence, Haiti served as America's military stronghold in the Caribbean, and the U.S. military occupied Haiti from 1915 to 1934. *See* Malissia Lennox, *Refugees, Racism, and Reparations: A Critique of the U.S.' Haitian Immigration Policy*, 45 Stan. L. Rev. 687, 692 (1993) [hereinafter "*Refugees, Racism and Reparation*"]. During that time, Congress passed the Immigration Act of 1924, establishing new immigration laws under which the whiteness of European immigrants was considered to "facilitate[] their Americanization," while non-European immigrants were racialized, rendering them "unalterably foreign and unassimilable to the nation." Mae M. Ngai, *The*

*Architecture of Race in American Immigration Law: A Reexamination of the Immigration Act of 1924*, 86 J. Am. Hist. 67, 70 (1999).

By the time the U.S. exited Haiti, "twenty years of racism and exploitation had created an economically crippled and politically bankrupt nation." *Refugees, Racism, and Reparations* at 695. Worse yet, the U.S.'s intervention left Haiti vulnerable to authoritarianism, and the U.S. even supported Francois Duvalier's rise to the presidency in 1957. *Id.* at 696. The Duvalier regime has been called "the most oppressive regime in the hemisphere," and was responsible for the deaths of over 30,000 people, leading hundreds of thousands of Haitians to flee for safety. *Haitian Refugee Ctr. v. Civiletti*, 503 F. Supp. 442, 475-77 (S.D. Fla. 1980); *see also, Refugees, Racism, and Reparations*, at 696 n. 74. But America turned them away.

B.     **The Arrival of the Haitian "Boat People" and Accelerated Processing To Remove Them.**

In 1972, Haitian migrants began arriving in Southern Florida at scale in rickety and often unseaworthy boats. *See* Alex Stepick, *Haitian Boat People: A Study in the Conflicting Forces Shaping U.S. Immigration Policy*, 45 U.S. Immigr. Pol'y 163, 163 (1982). Upon arriving in Miami, migrants were typically met by unsympathetic Immigration and Naturalization Service ("INS") officials. *Id.* at 164. INS regularly contended that the Haitians were economic refugees merely attracted to U.S. employment opportunities, rather than fleeing true political persecution that would obligate the U.S. to protect Haitians under both domestic and international law. *Id.* at 164-65.

In furtherance of this exclusionary practice, INS established a "Haitian Program" in 1978. *See Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1029 (5th Cir. 1982). Described (in Orwellian fashion) as "accelerated processing," "[t]he goal of the [Haitian] Program was to expel Haitian asylum applicants as rapidly as possible." *Civiletti*, 503 F. Supp. at 512-13, 519. As the court in *Civiletti*

5
BRIEF OF *AMICI CURIAE*
Case No.: 3:17-cv-02366-BAS-KSC

observed, "[t]he existence of the program, and its impact, [were] uncontroverted. All of the asylum claims were denied." *Id.* at 510-11. A judicial determination that the procedures used to process asylum claims were violations of due process came too late for over 4,000 Haitians processed under the Haitian Program. *Smith*, 676 F.2d at 1039. Upon being returned to Haiti, persons who had fled and sought asylum elsewhere were seen as opponents of the Duvalier regime and imprisoned, persecuted, and in many cases, killed. *Civiletti*, 503 F. Supp. at 476-82.

C. **A Rise in the Use of Detention of Haitian Migrants as a Deterrent.**

In the early 1980s, immigration judges were removed from the purview of INS. *See* Southern Poverty Law Center, *The Attorney General's Judges: How the U.S. Immigration Courts Became a Deportation Tool* (June 2019), https://www.splcenter.org/20190625/attorney-generals-judges-how-us-immigration-courts-became-deportation-tool. The stated intent was "to increase judicial independence and remove the appearance of prosecutorial bias." *Id.* In practice, however, "the newly formed immigration courts faced immediate critique for their biased treatment of asylum seekers from Haiti and Central America." *Id.* at 11.

For example, an eighteen-month study that concluded in 1988 examined one immigration court and reported that "although there existed extensive documentation of human rights abuses and high levels of politically motivated violence in Guatemala, Haiti, and El Salvador, the immigration court . . . granted asylum to no Guatemalans or Haitians and granted asylum to only one Salvadoran application." Deborah E. Anker, *Determining Asylum Claims in the United States: A Case Study on the Implementation of Legal Norms in an Unstructured Adjudicatory Environment*, 19 N.Y.U. Rev. L. & Soc. Change 433, 455 (1992). The study also found that immigration judges viewed asylum claims with "presumptive skepticism" and "appeared to be reluctant to grant asylum claims over the objections of the government's attorney." *Id.* at 450.

BRIEF OF *AMICI CURIAE*
Case No.: 3:17-cv-02366-BAS-KSC

1

2

### 1.  **Disparate Treatment of Haitian as Compared to Cuban Migrants.**

The evident bias displayed by immigration courts and INS became even more pronounced when Cuban refugees also began arriving to the U.S. in large numbers.  While Haitians were fleeing the U.S.-backed Duvalier regime, boats began to leave South Florida for Cuba's Mariel Harbor, kicking off the Mariel Boatlift of 1980, during which some 125,000 Cuban migrants were brought to the U.S.  *See Louis v. Nelson*, 544 F. Supp. 973, 978 (S.D. Fla. 1982).  By contrast to Haitians, escaping Cubans were immediately greeted with preferential treatment. *See Refugees, Racism, and Reparations* at 712-16.  For example, under the Cuban Adjustment Act, Pub. L. 89-732, 80 Stat. 1161 (codified as amended at 8 U.S.C. § 1255 (1988)), which remains in effect to this day, any native or citizen of Cuba or their immediate relatives may apply for lawful permanent residence just one year after inspection, admission, or parole in the U.S.  *Refugees, Racism, and Reparations*, at 716.  Haitians, by contrast, were consistently portrayed as economic refugees "lacking any political conviction." *Louis*, 544 F. Supp. at 979.

Prior to the 1980s, the U.S. rarely jailed people for alleged immigration violations.  *See* National Immigrant Justice Center, *A Better Way: Community-Based Programming As An Alternative to Immigrant Incarceration* (Apr. 2019), https://immigrantjustice.org/research-items/report-better-way-community-based-programming-alternative-immigrant-incarceration.  But as Haitian migrants continued to arrive in the U.S., President Reagan convened a special task force to address illegal immigration in 1981.  *Louis*, 544 F. Supp. at 979.  The task force issued several recommendations, including that the U.S. return to a policy of detaining migrants until they established a prima facie claim for admission, rather than granting parole.  *Id.* at 979-80.  Thus, in 1983, the Mass Immigration Emergency Plan was formed, requiring that 10,000 immigration detention beds be located and ready for use at any given time.  *See* Rachel Ida Buff, *How President*

7

*Trump is dismantling the world's refugee regime*, Washington Post (Feb. 11, 2019), https://www.washingtonpost.com/outlook/2019/02/11/why-president-trump-has-won-immigration-standoff-even-if-he-doesnt-get-wall-funding/.

Haitian petitioners who were incarcerated, rather than paroled, upon arrival in the U.S. under this plan, challenged their parole denials in federal court as discriminatory based on race or national origin.  *Louis*, 544 F. Supp. at 984.  The district court acknowledged that INS' use of parole was racially inconsistent, stating:

> The evidence shows that both Haitians and non-Haitians are being detained, but that more Haitians are being detained and for longer periods of time than non-Haitians. The evidence also demonstrates that a larger percentage of non-Haitians are granted parole or deferred inspection than the percentage of Haitians.  The only conclusion that can be drawn from this evidence is that Haitians are being impacted by the detention policy to a greater degree than aliens of any other nationality at the present time.

*Id.* at 982.   On appeal to the Supreme Court, however, the Court avoided addressing why Haitians were being detained more often and for longer periods than other migrants.  *See Jean v. Nelson*, 472 U.S. 846, 854-57 (1985).  Instead, the Court decided, based only on statutory grounds, that neither the parole statute at issue, nor the INS regulations that implemented it, authorized race or national origin based discrimination.  *Id.*

### 2.    Detention Gives Rise to Interdiction of Haitian Refugees.

In September 1981, Haiti and the U.S. entered into an unprecedented agreement whereby the U.S. would interdict vessels in the high seas transporting Haitian migrants and return them to Haiti.[2]  Harold Koh *et al.*, *The Haiti Paradigm*

---

[2] Carl Lindskoog, *How the Haitian refugee crisis led to the detention of immigrants*, Washington Post (Apr. 9, 2018), https://www.washingtonpost.com/ne

8

*in United States Human Rights Policy,* 103 Yale L.J. 2391, 2392-93 (1994) [hereinafter "*The Haiti Paradigm in United States Human Rights Policy*"]. Interdiction was never before used for immigration purposes.   A.G. Mariam, *International Law and the Preemptive Use of State Interdiction Authority on the High Seas: The Case of Suspected Illegal Haitian Immigrants Seeking Entry Into the U.S.*, 12 Md. J. Int'l L. & Trade 211, 213, 225 (1988) [hereinafter "*International Law and the Preemptive Use of State Interdiction Authority on the High Seas*"].

When interdiction began, the U.S. generally viewed Haitians as economic migrants deserting one of the poorest countries in the world, rather than seeking political asylum.   Under the 1981 interdiction agreement, an inspector from INS and a Coast Guard official would check the immigration status of the passengers and return to Haiti those passengers deemed to be undocumented.   Although President Reagan tasked the Coast Guard with screening interdicted migrants and allowing those with a credible fear of persecution to enter the U.S., in practice, an alien must have *volunteered* information regarding her fear of persecution in order to have been considered for asylum.   *The Haiti Paradigm in United States Human Rights Policy* at 2392-93; *see also U.S. Immigration Policy on Haitian Migrants*, 3-4 (2011),

https://www.everycrsreport.com/files/20110517_RS21349_c6a8bc391c450f3244b

---

ws/made-by-history/wp/2018/04/09/how-the-haitian-refugee-crisis-led-to-the-indefinite-detention-of-immigrants/ (explaining that, "[w]hile oppressive, the Haitian regime was an anti-communist ally that the U.S. government did not want to alienate.   When state and local officials began to protest the arrival of these overwhelmingly poor and black migrants, the U.S. government classified them as economic migrants rather than as refugees, making them ineligible to receive asylum and remain in the United States.   And to deter future asylum seekers from Haiti, the government placed the Haitians in a hastily-assembled network of detention centers, jails and prisons.") [hereinafter *How the Haitian refugee crisis led to the detention of immigrants*].

BRIEF OF *AMICI CURIAE*
Case No.: 3:17-cv-02366-BAS-KSC

0151c20deab7110d31290.pdf [hereinafter "*U.S. Immigration Policy on Haitian Migrants*"].   In fact, there was "no indication that individual 'interviews' were undertaken," and it was unlikely that migrants were given a meaningful chance to state a credible fear.   *International Law and the Preemptive Use of State Interdiction Authority on the High Seas*, at 239-40.

Between 1981 and 1991, the U.S. interdicted approximately 25,000 Haitians. *Haitian Ctrs. Council, Inc. v. Sale*, 823 F. Supp. 1028, 1034 (E.D.N.Y. 1993).  Not all vessels were bound for the U.S.; it is likely that many would have landed on the shores of other countries.   *See id.* at 1034-35.   Nevertheless, the Coast Guard interdicted these vessels, removed all passengers, and destroyed the vessels.  *Id.* at 1035.

Because so many interdicted Haitians could not be safely processed by the Coast Guard, the Department of Defense established temporary facilities at the U.S. Naval Base in Guantanamo, Cuba, to hold Haitian migrants during the screening process.  INS began interviewing Haitians at Guantanamo Bay, where the migrants were denied legal representation.  *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 163, 166-67 (1993)  When Guantanamo Bay filled to capacity, President George H. Bush signed the Kennebunkport Order, directing the Coast Guard to turn around interdicted Haitian vessels without screening migrants for asylum claims.  Carlos Ortiz Miranda, *Haiti and the U.S. in the 1980s and 1990s: Refugees, Immigration, and Foreign Policy*, 32 San Diego L. Rev. 673, 697 (1995).

## II.  PRESENT DAY TREATMENT OF HAITIAN AND BLACK MIGRANTS.

### A.  The U.S. Government Recognized the Discriminatory Treatment of Haitians in the 1990s, But This Recognition was Short-Lived.

In November 1997, Congress enacted the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Pub. L. No. 105-100, 111 Stat. 2160

10

(1997) (as amended, Pub. L. No. 105-139, 111 Stat. 2644 (1997), which enabled Nicaraguans and Cubans to become legal permanent residents and permitted certain unsuccessful Central American and East European asylum applicants to seek another form of immigration relief. However, Congress deliberately opted not to include Haitian asylum seekers in that relief, concerned that including Haitians would "kill the bill." Elizabeth M. Iglesias, *Identity, Democracy, Communicate Power, Inter/National Labor Rights and the Evolution of LatCrit Theory and Community*, 53 U. Miami L. Rev. 575, 601 (1999) (noting that "thousands of refugees and immigrants from Nicaragua, Cuba, El Salvador, Guatemala, the former Soviet Union and Warsaw pact countries are enjoying the benefits of NACARA, leaving Haitians to wonder whether their self-restraint and self-sacrifice in this instance [would] be remembered and reciprocated in the next.").

The following year, Congress enacted the Haitian Refugee Immigration Fairness Act of 1998 ("HRIFA"), which enabled Haitians who filed asylum claims or were paroled into the U.S. before December 31, 1995 to adjust to legal permanent residence. *See U.S. Immigration Policy on Haitian Migrants* at 5. The bill was modeled on NACARA, and, in a major departure from historical U.S. policy, was motivated by a desire to treat Haitian immigrants fairly and consistently with other immigrant populations. Shayna S. Cook, *The Exclusion of HIV-Positive Immigrants Under the Nicaraguan Adjustment and Central American Relief Act and the Haitian Refugee Immigration Fairness Act, Statutory Interpretation, Communicable Disease, Public Health, Legislative Intent*, 99 Mich L. Rev. 452, 471-72 (2000). However, HRIFA nonetheless was more restrictive than NACARA, as it excluded individuals who entered the U.S. with false or fraudulent documents and Haitians who were not issued parole. *See* Jordan E. Dollar & Allison D. Kent, *In Times of Famine, Sweet Potatoes Have No Skin: A Historical Overview and Discussion of Post-Earthquake U.S. Immigration Policy*

11

*Towards the Haitian People*, 6 Intercultural Hum. Rts. L. Rev. 87, 102-03 (2011). Unfortunately, Haitian migrants were often forced to use fraudulent or photo-switched documents to protect themselves from government-sponsored violence, and INS did not issue parole to all Haitians before 1995. *Id.* As such, HRIFA failed to protect many vulnerable Haitians validly seeking asylum.

B. **Recent Government Actions Perpetuate Discrimination Against Haitian Migrants.**

Although the Obama-Biden administration implemented the Haitian Family Reunification Parole Program ("HFRP") in 2014 (seven years after Cubans were offered the same benefit), Implementation of HFRP, 79 Fed. Reg. 75,581 75,582 (Dec. 18. 2014), which allowed U.S. citizens and lawful permanent residents to apply for parole for family members in Haiti, the current administration abruptly discontinued that program. Geneva Sands, *Trump admin ends family-based reunification programs for Haitians and Filipino World War II vets* (Aug. 2, 2019), https://www.cnn.com/2019/08/02/politics/trump-end-two-family-reunification-programs/index.html.

The Trump administration continues to erode lawful protections and treat Haitians and other Black migrants discriminatorily. In November 2017, the Department of Homeland Security ("DHS") ended Temporary Protected Status ("TPS") for Haitians that were the victims of the 2010 earthquake that reportedly killed more than 200,000 people and left over one million homeless. *See Saget v. Trump*, 375 F. Supp. 3d 280, 323, 360, 379 (E.D.N.Y. 2019) (issuing preliminary injunction and enjoining termination of TPS, citing "political motivations" and "the White House's grander 'America First' strategy" as reasons for the government's ending TPS). The current administration also abruptly, and without justification, removed Haiti from the list of nations whose citizens may participate in the H-2A and H-2B visa programs, meaning Haitians may no longer enter the U.S. to do temporary work. *See* Letter to Biden, 2 (Oct. 13, 2020),

http://www.ijdh.org/wp-content/uploads/2020/10/Biden-Harris-Letter-10-2020-k-grouped-FINAL-full-letter-2.pdf.

That the present administration is motivated by racial animus is made manifest by its own public statements. For example, the government's disdain towards Haitian and Black immigrants was on full display when President Trump stated: "Why are we having all these people from shithole countries come here?" and "Why do we need more Haitians? . . . Take them out." Ibram X. Kendi, *The Day Shithole Entered the Presidential Lexicon* (Jan. 13, 2019), https://www.theatlantic.com/politics/archive/2019/01/shithole-countries/580054/. President Trump also expressed a preference for immigrants from European and Asian countries, continuing the construction of a racial hierarchy in U.S. immigration law. *Id.* Journalists have even commented that "[w]e are in a moment that is strikingly reminiscent of the early 1980s, when fear and hatred of Haitians was used to justify the reinstitution and expansion of immigration detention." *How the Haitian refugee crisis led to the detention of immigrants*.

Moreover, under the Trump administration, African migrants are being deported at far higher rates than migrants from other countries. Joe Penney, *Despite closed borders, the US is still deporting Africans during the pandemic* (July 27, 2020), https://qz.com/africa/1885398/us-ice-deporting-africans-even-with-closed-borders-due-to-covid/ [hereinafter "*Despite closed borders, the US is still deporting Africans during the pandemic*"]. In fact, although the overall numbers of removals have declined, Immigration and Customs Enforcement ("ICE") removed African nationals at an increased rate in 2017. Karla McKanders, *Immigration and Blackness: What's Race Got to Do With It?*, 44 Human Rights Magazine No. 1 (May 16, 2019), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/black-to-the-future/immigration-and-blackness/ [hereinafter "*Immigration and Blackness: What's Race Got to Do With It?*"]. The removal of African nationals

BRIEF OF *AMICI CURIAE*
Case No.: 3:17-cv-02366-BAS-KSC

appears to be on the rise again.  For example, in 2020, Cameroonian and Congolese asylum seekers experienced an increase in deportations, and have reported being tortured and forced to sign their own deportation orders.  Julian Borger, *U.S. Ice officers 'used torture to make Africans sign own deportation orders'* (Oct. 22, 2020), https://www.theguardian.com/us-news/2020/oct/22/us-ice-officers-allegedly-used-torture-to-make-africans-sign-own-deportation-orders.

The indisputable common denominator for this disparate treatment of Haitians and Africans is the color of their skin.  President Trump has made very clear that his policies are not based on capacity constraints, or even on the legitimacy of migrants' asylum claims.  Instead, his administration has based its immigration policies on race and exclusionism, perpetuating racist and xenophobic opposition to Haitian and Black migrants.

## III.   METERING DISPROPORTIONATELY AFFECTS HAITIANS.

### A.   Metering Is Illegal.

Pursuant to the INA, asylum seekers fleeing their home countries out of fear are supposed to be referred to an asylum officer for an interview, *see* 8 U.S.C. §§ 1225(a)(1), (3), b(1)(A)(i)-(ii), or to be placed into removal proceedings, where they may pursue their claim in immigration court, *see* 8 U.S.C. §§ 1225(b)(2), 1229(a).  The metering policy, which began in 2016, contradicts these practices without justification or process.  *See Munyua v. United States*, 2005 U.S. Dist. LEXIS 11499, at *16 (N.D. Cal. Jan. 10, 2005) (holding that inspection and processing provisions of Section 1225 are "not discretionary").

Under the current metering policy, asylum seekers passing through Mexico to various POE along the Southern border of the U.S. are turned back to Mexico in lieu of formal inspection and processing.  Hillel R. Smith, *The Department of Homeland Security's Reported "Metering" Policy: Legal Issues*, 2-3 (Aug. 13 2019) https://fas.org/sgp/crs/homesec/LSB10295.pdf.  The government seeks to justify this practice by arguing that it is done only when POE are at operational

capacity. *See id*. However, as detailed by Plaintiffs in their briefing, the metering policy specifically violates the INA because, *inter alia*, Defendants are defying the asylum processing framework without following the procedure required by the Administrative Procedure Act. S*ee* 5 U.S.C. § 704. This is in addition to the separate and distinct violations of the Due Process Clause, *see* U.S. Const. amend. V, and the Alien Tort Statute, *see* 28 U.S.C. § 1350. *See* Dkt. #535-1 at 18-36.

B.     **Metering is Colored by Deep-Seated Racial and Ethnic Animus and is Used to Deny Haitians Access to the Asylum Process.**

1.     **Life at the Border under the Metering Policy.**

This illegal metering policy is especially relevant to Haitians as they continue to grapple with the desperate political and other circumstances that have required them to seek sanctuary in the U.S. Multiple environmental and health crises, such as the 2010 Earthquake and Hurricane Matthew in 2016, coupled with the Haitian government's failure to adequately protect its citizens from harm, have destabilized Haitian government infrastructure and undermined the rule of law. Ensuing political and economic instability, as well as increased political violence, forced Haitians to flee, causing them to arrive at the U.S. border in record numbers in 2016 as metering went into effect. *See* Kira Olsen-Medina & Jeanne Batalova, *Haitian Immigrants in the U.S.*, Migration Policy Institute (Aug. 12, 2020), https://www.migrationpolicy.org/article/haitian-immigrants-united-states-2018. To this day, Haitians continue to flee to the U.S.-Mexico border, despite the high risk of deportation, because of the volatile political situation in Haiti, which includes daily riots, civil unrest, and the targeting of disfavored groups. *See* Kirk Simple, *'There is No Hope': Crisis Pushes Haiti to Brink of Collapse*, N.Y. Times (Oct. 21, 2019), https://www.nytimes.com/2019/10/20/world/americas/Haiti-crisis-violence.html.

Life at the border for Haitians turned away because of metering is dangerous and tragic. One Haitian woman, Nounoune Jules, says that living in Tijuana requires being constantly vigilant. *See* Maya Averbuch, *Stranded in Tijuana: A*

15

BRIEF OF *AMICI CURIAE*
Case No.: 3:17-cv-02366-BAS-KSC

*Forgotten Community of Haitians with No Place to Go*, The Progressive (Apr. 1, 2018), https://progressive.org/magazine/stranded-in-tijuana-immigration-haiti/. Jules says that she must try to keep her children safe from warring drug cartels, sex workers, and drug users. *Id.* Other Haitians are forced to live in shelters, which face supply shortages, or otherwise set up tents in parking lots and city streets throughout Mexico. *See* Laura Ley, *The American dream of Haitians ends at the border between Tijuana and San Diego*, Univision Noticias (Sept. 28, 2016), https://www.univision.com/noticias/amexica/el-sueno-americano-de-los-haitianos-acaba-en-la-frontera-entre-tijuana-y-san-diego. Living on the streets in Mexico puts Haitians at risk of violent attack as "organized crime groups . . . prowl the streets," and kidnap, rape, and torture stranded migrants. Robbie Whelan, *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program*, Wall Street Journal (Dec. 28, 2019), https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000. Mexican officials have also begun extorting vulnerable Haitian asylum seekers who face unexpected extended stays in the country. Ariane Francisco & Josefina Salomon, *Mexican Officials Extort Asylum Seekers on Way to USA*, InSight Crime (Mar. 25, 2019), https://www.insig htcrime.org/news/analysis/mexican-officials-extort-asylum-seekers/.

Border conditions also have worsened because of COVID-19. Haitians are not only dealing with a devastating sickness, but they have been losing the few menial jobs they managed to secure along the border and are being cut off from outside aid due to the virus' spread. *See* Maya Srikrishnan, *Border Report: Surviving in Tijuana Has Gotten Even Harder for Haitian Migrants,* Voice of San Diego (July 20, 2020), https://www.voiceofsandiego.org/topics/news/border-report-surviving-in-tijuana-has-gotten-even-harder-for-haitian-migrants/. Doctors have described the conditions at border clinics as "tinderboxes for infectious diseases such as varicella, mumps, and norovirus, and now COVID-19" and have noted "[t]he situation on the border is a public health crisis of our country's own

manufacturing." C. Nicholas Cuneo & Hannah Janeway, *From Icebox to Tinderbox—A View from the Southern Border,* N. Engl. J. Med. 2020; 383: e81(2) (Sept. 24, 2020), https://www.nejm.org/doi/pdf/10.1056/NEJMp2009985?articleTools=true. The government has exacerbated the pandemic by deporting thousands of detainees, some of whom have contracted COVID-19 in ICE detention facilities. *See Despite closed borders, the US is still deporting Africans during the pandemic*. For example, as of July 2020, ICE sent over 270 deportation flights to countries in the Caribbean and Latin America. *Id.*

These desperate and degrading conditions, in and of themselves, warrant reconsideration of the metering policy. Failure to directly address the metering policy will only result in more death and devastation for the already disadvantaged Haitian people.

2.    **Haitians are Illegally Denied Asylum under the Metering Policy.**

As Plaintiffs note, the current administration's metering policy is unlawful because agency determination cannot be pretextual, arbitrary and capricious, or an abuse of discretion. *See* Dkt. #535-1 at 26-31 (citing 5 U.S.C. § 706(2)(A); *San Luis & Delta-Mendota Walter Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014)). In response, Defendants claim that POE are at operational capacity, and that metering is necessary for effective border maintenance. *See id.* However, the available evidence demonstrates that these capacity arguments are spurious, and there also is clear evidence of Haitian and Black discrimination at POE, as well as in immigration policy more generally. S*ee* DHS, Off. of Inspector General, *Special Review-Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, 4-7 (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

Given existing immigration law's extensive protections for asylum-seekers, these race-based barriers to entry make a mockery of our laws. As one Black

17

migrant at the border noted, "[w]e are suffering . . . [t]hey tell us to wait and write down our names[,] but nothing happens." Rick Jervis, *At US-Mexico border, migrants from Africa, Haiti wait to seek asylum*, USA Today (June 4, 2019), https://amp.usatoday.com/amp/1319996001. This sentiment tracks with the fact that migrants of African descent, particularly Haitians, are detained and deported at a greater rate, face higher bail rates, have higher percentages of family detention, and have among the highest asylum denial rates, when compared to their non-African peers. *See Immigration and Blackness: What's Race Got to Do With It*; *Black Immigrants Lives Are Under Attack*, The Refugee and Immigrant Center for Education and Legal Services (2020), https://www.raicestexas.org/2020/07/22/black-immigrant-lives-are-under-attack/.

Haitians also face another barrier at the border in that they predominantly speak Haitian Creole. S*ee* Embassy of Haiti in Washington D.C., http://www.haiti.org/haiti-at-a-glance. (last visited Oct. 26, 2020). English is the primary language employed at the border, followed by Spanish. Limited French or Haitian Creole interpreters or materials are available. *See* Tom Jawetz & Scott Shuchart, *Language Access Has Life-or-Death Consequences for Migrants*, Center for American Progress (Feb. 20, 2019), https://www.americanprogress.org/issues/immigration/reports/2019/02/20/466144/language-access-life-death-consequences-migrants/. For example, one Haitian woman was deported in absentia due to a communication gap, which caused her to miss her court appearance. Nancy Adossi, *et al.*, *Black Lives at the Border*, Black Alliance for Just Immigration (Jan. 2018), http://baji.org/wp-content/uploads/2020/03/black-lives-at-the-borderfinal-2.pdf.

In sum, both the history of U.S. treatment of Haitian migrants and the application of Defendants' present metering policy reflect clear racial discrimination and the uncontested abdication of the INA's mandatory processing and inspection requirements. Accordingly, the metering policy reflects the

BRIEF OF *AMICI CURIAE*
Case No.: 3:17-cv-02366-BAS-KSC

arbitrary and capricious implementation of the INA and should be deemed unlawful. *See East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1273-74 (9th Cir. 2020) (finding that interpretation of immigration statute to summarily deny entry to certain types of people, in contradiction to Congressional intent, was arbitrary and capricious).

## CONCLUSION

For all of the reasons stated above, as well as those submitted to this Court by Plaintiffs, Defendants' metering policy should be found unlawful. *Amici* respectfully request that summary judgment be granted to Plaintiffs affording them both declaratory relief and a permanent injunction.

DATED: October 27, 2020

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
Anne Aufhauser*
Stephen M. Juris
Sarah F. Warren
Courtney D. Morphet
Avani Uppalapati
*Counsel of Record*

Respectfully submitted

By: */s/ Anne Aufhauser*
Anne Aufhauser

*Attorneys for* Amici Curiae
*Haitian Bridge Alliance*
*Institute for Justice & Democracy in Haiti,*
*Ira Kurzban, and*
*Irwin Stotzky*

BRIEF OF *AMICI CURIAE*
Case No.: 3:17-cv-02366-BAS-KSC

22639057