# EXHIBIT

**Brief of Amici Curiae Center for Gender & Refugee Studies,**

**Harvard Immigration & Refugee Clinical Program, and Boston**

**University School of Law Immigrants' Rights and Human**

**Trafficking Program in Support of Plaintiffs**

Annie Daher (CA SBN #294266)
CENTER FOR GENDER & REFUGEE STUDIES
UC Hastings College of the Law
200 McAllister Street
San Francisco, CA 94102
daherannie@uchastings.edu

Zachary A. Albun (IL ARDC #6323553)*
HARVARD IMMIGRATION & REFUGEE
CLINICAL PROGRAM
6 Everett Street, WCC 3109
Cambridge, MA 02138
zalbun@law.harvard.edu

Sarah Sherman-Stokes (MA SJC #682322)*
IMMIGRANTS' RIGHTS AND HUMAN
TRAFFICKING PROGRAM
Boston University School of Law
765 Commonwealth Ave.
Boston, MA 02215
sstokes@bu.edu

* Application for admission *pro hac vice* forthcoming

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, INC. et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>CHAD P. WOLF et al.,<br><br>                              Defendants. | Case No.:3:17-cv-02366-BAS-KSC<br><br>**BRIEF OF AMICI CURIAE CENTER FOR GENDER & REFUGEE STUDIES, HARVARD IMMIGRATION & REFUGEE CLINICAL PROGRAM, AND BOSTON UNIVERSITY SCHOOL OF LAW IMMIGRANTS' RIGHTS AND HUMAN TRAFFICKING PROGRAM IN SUPPORT OF PLAINTIFFS** |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

STATEMENT OF INTEREST OF AMICI ............................................................... 3

ARGUMENT ............................................................................................................. 4

I. The Principle of *Non-Refoulement* Is a Universal, Specific, and Obligatory Norm of International Law Actionable Under the ATS ............................................................ 4

   A.   A Norm Is Actionable Under the ATS if It Is Universal, Specific, and Obligatory ................................................................................................................ 4

   B.   *Non-Refoulement* Constitutes an Actionable Norm Under *Sosa* ......................... 5

II. The Agency's Turnback Policy Violates the Principle of *Non-Refoulement*, in Violation of the Government's International and Domestic Law Obligations .......... 10

   A.   International and Domestic Law Requires the United States to Accept and Process Asylum Seekers ...................................................................................... 10

   B.   Instead of Accepting and Processing Asylum Seekers, the Government Is Enforcing a Policy that Leads to the Expulsion and Return of Refugees to Mexico and Other Countries, in Violation of the United States' *Non-Refoulement* Obligations .............................................................................................................. 12

      1. The U.S. Government's Turnback Policy Violates Core *Non-Refoulement* Obligations by Returning Mexican Asylum Seekers to the Territory Where Their Lives Are Threatened ...................................................................................... 13

      2. The U.S. Government Has Endangered the Lives of Non-Mexican Asylum Seekers, Placing Them at Risk of Indirect *Refoulement* and Other Serious Human Rights Violations .................................................................................................... 14

III.   There Is Nothing Controversial About Holding the Turnback Policy a Violation of International Law that Is Actionable Under the ATS ........................................... 16

   A.   *Non-Refoulement* Is Deeply Embedded in International and Domestic Law .... 16

   B.   The Harms of the Turnback Policy Are Devastating for Individuals and Undermines U.S. Credibility and the Sanctity of the *Non-Refoulement* Norm ......... 19

CONCLUSION ....................................................................................................... 20

3:17-cv-02366-BAS-KSC

# TABLE OF AUTHORITIES

## Cases

*Abagninin v. AMVAC Chem. Corp.*,
　545 F.3d 733 (9th Cir. 2008)..................................................................4

*Abdullahi v. Pfizer, Inc.*,
　562 F.3d 163 (2d Cir. 2009)..............................................................5, 8

*Al Otro Lado, Inc. v. McAleenan*,
　394 F. Supp. 3d 1168 (S.D. Cal 2019)................................................11

*Al-Skeini and Others v. United Kingdom*,
　No. 55721/07, Eur. Ct. H.R. (2011)...................................................18

*Cabello v. Fernandez-Larios*,
　402 F.3d 1148 (11th Cir. 2005) ...........................................................5

*Diaz Reynoso v. Barr*,
　968 F.3d 1070 (9th Cir. 2020) ...........................................................13

*Doe I v. Nestle USA, Inc.*,
　766 F.3d 1013 (9th Cir. 2014) ...............................................4, 5, 8, 9

*Flores v. S. Peru Pepper Corp.*,
　414 F.3d 233 (2d Cir. 2003).................................................................8

*Haitian Ctr. for Human Rights v. United States*,
　Case 10.675, Inter-Am. Comm'n H.R., Report No. 51/96, OEA/Ser.L/V/II.95, doc. 7
　rev...........................................................................................................18

*Hirsi Jamaa and Others v. Italy*,
　No. 27765/09, Eur. Ct. H.R. (2010)...................................................18

*I.N.S. v. Cardoza-Fonseca*,
　480 U.S. 421 (1987)........................................................................9, 13

*I.N.S. v. Stevic*,
　467 U.S. 428 (1984).............................................................................6

*MacLeod v. United States*,
　229 U.S. 416 (1913)...........................................................................19

ii

*Murray v. Schooner Charming Betsy*,
   2 Cranch 64 (1804) ...................................................................................18

*N.A. v. Finland*,
   No. 24244/18, Eur. Ct. H.R. (2019) .........................................................9

*Pacheco Tineo Family v. Bolivia*,
   Inter-Am. Ct. H.R. (ser. C) No. 272 (Nov. 25, 2013)...............................9

*Revenko v. Sec'y of State for the Home Dep't*,
   [2001] QB 601 (Eng.) .............................................................................18

*Siderman de Blake v. Republic of Argentina*,
   965 F.2d 699 (9th Cir. 1992).................................................................9, 10

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) .........................................................................passim

*The Paquete Habana*,
   175 U.S. 677 (1900)..................................................................................4

*Zaoui v. Attorney-General*,
   [2005] 1 NZLR 690 (CA) ........................................................................18

**Statutes**

28 U.S.C. § 1350 ...........................................................................................2, 4

8 U.S.C. § 1101 .................................................................................................2

8 U.S.C. § 1158 ...................................................................................11, 18, 19

8 U.S.C. § 1231 ...................................................................................10, 18, 19

**International Law Authorities**

1969 American Convention on Human Rights, Nov. 22, 1969, S. Treaty Doc. No. 95-21, 1144 U.N.T.S. 123. .......................................................................................7

Charter of Fundamental Rights of the European Union, Oct. 26, 2012, 2012 O.J. (C 326) 2 ...............................................................................................................7

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, T.I.A.S. No. 94-1120.1, 1465 U.N.T.S. 85 ........................6

Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137....*passim*

iii

Declaration of States Parties to the 1951 Convention or Its 1967 Protocol Relating to the Status of Refugees, U.N. Doc. HR/MMSP/2001/09 (Jan. 16, 2002) ..............................9

G.A. Res. 2312 (XXII), Declaration on Territorial Asylum (Dec. 14, 1967). ...................7

G.A. Res. 51/75 (Feb. 12, 1997) ...................................................................................9

G.A. Res. 57/187 (Feb. 6, 2003) ...................................................................................9

International Convenant on Civil and Political Rights, Dec. 16, 1966, T.I.A.S. No. 92-908, 999 U.N.T.S. 171 ...........................................................................................6, 7

International Convention for the Protection of All Persons From Enforced Disappearance, Dec. 20, 2006, 2716 U.N.T.S. 3 ...........................................................................6

Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ..................................................................................................6, 8, 17

U.N. High Comm'r for Refugees, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol* (Jan. 26, 2007), https://www.refworld.org/docid/45f17a1a4 ...........................................................13, 14

UNHCR Executive Committee, General Conclusion on International Protection No. 25 (XXXIII), U.N. Doc. No. A/37/12/Add.1 (Nov. 10, 1982) ............................................9

U.N. Human Rights Comm., General Comment 31: The Nature of the General Legal Obligation Imposed on States Parties to the Covenant, U.N. Doc. CCPR/C/21/Rev. 1/Add. 1326 (May 26, 2004) .......................................................................................6

**Other Authorities**

ACLU Ltr. to J. Cuffari *et al.* (Nov. 14, 2019) ...................................................14

Amnesty Int'l, *USA: 'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States* (2018), https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF ...15

Andrea Pitzer, *Trump's 'Migrant Protection Protocols' Hurt The People They're Supposed to Help*, WASH. POST (July 18, 2019), https://www.washingtonpost.com/outlook/2019/07/18/trumps-migrant-protection-protocols-hurt-people-theyre-supposed-help/ ...........................................................20

iv

Cathryn Costello & Michelle Foster, *Non-Refoulement as Custom and Jus Cogens? Putting the Prohibition to the Test, in* NETHERLANDS YEARBOOK OF INTERNATIONAL LAW (2016)..................................................................................8, 9, 18, 19

*Details on MPP (Remain in Mexico) Deportation Proceedings*, TRAC IMMIGRATION, https://trac.syr.edu/phptools/immigration/mpp/...........................................19

Doctors Without Borders, *Unacceptable Treatment of Migrants in Piedras Negras, Mexico* (Feb. 16, 2019), https://www.doctorswithoutborders.org/what-we-do/news-stories/news/unacceptable-treatment-migrants-piedras-negras-mexico.......................15

Ellen F. D'Angelo, Non-Refoulement*: The Search for a Consistent Interpretation of Article 33*, 42 VAND. J. TRANSNAT'L L. 279 (2009) .....................................................17

European Union Agency for Fundamental Rights, *Scope of the Principle of* Non-Refoulement *in Contemporary Border Management* (2016), https://fra.europa.eu/sites/default/files/fra_uploads/fra-2016-scope-non-refoulement-0_en.pdf........................................................................................13

Human Rights First, *Barred at the Border: Wait "Lists" Leave Asylum Seekers in Peril at Texas Ports of Entry* (Apr. 2019), https://www.humanrightsfirst.org/resource/barred-border-wait-lists-leave-asylum-seekers-peril-texas-ports-entry ..................11, 13, 14, 15

Human Rights Watch, "U.S.: Mexican Asylum Seekers Ordered to Wait," (Dec. 23, 2019), https://www.hrw.org/news/2019/12/23/us-mexican-asylum-seekers-ordered-wait ........................................................................................................14

Jean Allain, *The* Jus Cogens *Nature of* Non-Refoulement, 13 INT'L J. REFUGEE L. 533 (2001) .......................................................................................................9, 10

Kristina Cooke, Mica Rosenberg, and Reade Levinson, *U.S. Migrant Policy Sends Thousands of Children, Including Babies, Back to Mexico*, REUTERS (Oct. 11, 2019), https://www.reuters.com/article/us-usa-immigration-babies-exclusive-idUSKBN1WQ1H1 ..........................................................................................19

*Oversight of Customs and Border Protection's Response to the Smuggling of Persons at the Southern Border: Hearing Before the S. Comm. on the Judiciary*, 116th Cong. (2019), available at https://www.pbs.org/newshour/nation/watch-live-senate-judiciary-committee-holds-hearing-on-human-trafficking-at-u-s-southern-border......................11

Sabrineh Ardalan, *EU and US Border Policy: Externalisation of Migration Control and Violation of the Right to Asylum, in* SECURITISING ASYLUM FLOWS (Valsamis Mitsilegas et al. eds., 2020)........................................................................1, 15

v

Scott M. Martin, Non-Refoulement *of Refugees: United States Compliance with International Obligations*, 7 IMMIGR. NAT'LITY L. REV. 650 (1983-1984) ..............6, 17

# INTRODUCTION

This case challenges conduct by the U.S. Government that is unlawful under domestic and international law. As a result of the Turnback Policy, which is described in detail in Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment,[1] thousands of would-be asylum seekers await their chance to seek asylum in the United States in unhygienic, dangerous conditions in makeshift camps on the Mexican side of the U.S. – Mexico border. The threat of attack, robbery, rape, and murder is a daily reality for asylum seekers who wait in camps that can only be described as humanitarian catastrophes for days, weeks, or sometimes up to months, simply for the opportunity to be processed at a U.S. port of entry.

The right to leave a country where one faces persecution, the right to seek asylum, and the *non-refoulement* obligation together constitute the basis of refugee protection,[2] under both domestic and international law. By excluding people at the border and forcing them to wait in Mexico, the United States is shirking binding duties that are enshrined under U.S. and international law. The Turnback Policy unlawfully forces people who are entitled to seek refuge in this country to remain in Mexico for extended periods of time before they can even begin the process, subjecting adults and children who have already fled persecution and torture to live in constant fear. The goal is clear: to deter people who arrive at the U.S. – Mexico border from pursuing protection here, despite binding international and domestic law requiring that the United States allow any person arriving at the border to apply for asylum or other humanitarian protection. This is unlawful.

---

[1] *See* Pls.' Mem. of Points & Authorities ISO Mot. for Summ. J. at 4–6 (ECF No. 535-1) (hereinafter "Pls.' Mem."). The Turnback Policy includes a practice the Government refers to as "metering," by which government officials refuse to inspect or process asylum applicants, forcing them instead to put their name on a waitlist that regularly forces asylum seekers to wait months before their number is called.

[2] *See* Sabrineh Ardalan, *EU and US Border Policy: Externalisation of Migration Control and Violation of the Right to Asylum*, *in* SECURITISING ASYLUM FLOWS 307-09 (Valsamis Mitsilegas et al. eds., 2020).

First, the challenged conduct gives rise to liability under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, because it forces people who seek refuge in the United States to face unfathomable safety risks in Mexico. This violates the norm of *non-refoulement*, which prohibits the United States from returning individuals to their home country or to a third country such as Mexico where their life or freedom is in danger or they would likely face persecution or torture. The norm of *non-refoulement* is not only customary international law but also reaches the status of *jus cogens*. It is unquestionably actionable under the ATS because it is universal, specific, and obligatory. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 713–14 (2004).

Second, the United States' conduct constitutes both direct and indirect *refoulement*. It forces Mexican citizens to await a turn to seek asylum from the United States in dangerous conditions in the same country they are attempting to flee. It furthermore subjects non-Mexican nationals to the risk of serious harm or torture in Mexico as well as the very real possibility that they will be forcibly returned by Mexico to their home countries. The United States' actions make this country an unenviable exception—out of step with prevailing customary international law norms, treaty obligations, and the domestic law codifying those treaty obligations.

Third, it requires no legal stretch for the Court to hold the United States to account for violating the principle of *non-refoulement* pursuant to the Turnback Policy. The Government errs in suggesting such a holding would constitute an "extraordinary exercise" of power. *Cf.* Mem. ISO Defs.' Cross-Mot. for Summ. J. (ECF No. 563-1) at 56 (hereinafter "Defs.' Mem."). To the contrary, the norm of *non-refoulement* is a deeply embedded principle of international and domestic law, and it is codified in binding legal instruments that form the basis of the U.S. refugee protection system as well as the federal Immigration and Nationality Act ("INA"), *codified at* 8 U.S.C. § 1101 *et seq.* The United States' blatant disregard for this well-established principle protecting the most vulnerable makes the United States a global outlier and undermines our credibility as a leader in the pursuit of human rights worldwide.

3:17-cv-02366-BAS-KSC

For the reasons set forth below, Amici Curiae Center for Gender & Refugee Studies ("CGRS"), Harvard Immigration & Refugee Clinical Program ("HIRC"), and Boston University School of Law Immigrants' Rights and Trafficking Program ("Boston University Clinic") (collectively "Amici") respectfully request the Court to grant summary judgment for Plaintiffs and immediately enjoin the Turnback Policy as a violation of both domestic and international law.

## STATEMENT OF INTEREST OF AMICI

CGRS has a direct interest and extensive expertise in the proper development of refugee and asylum law, including with regard to gender-based claims. CGRS advances the human rights of refugees through litigation, scholarship, and policy recommendations. It also provides technical assistance for attorneys representing asylum seekers nationwide reaching over 8,000 unique asylum cases at all levels of the immigration and federal court system in the past year alone. The majority of those cases involved persecution based on membership in a particular social group, including a significant number based on domestic violence. The questions presented in this petition for review relate directly to CGRS's core mission to ensure that asylum protections under U.S. law comport with our international obligations.

HIRC has been a leader in the field of refugee and asylum law for over 35 years and has a direct interest and extensive expertise in the proper development and application of immigration and asylum law, so that claims for protection receive fair and full consideration under existing standards of law. Since its founding in 1984, HIRC has worked with thousands of immigrants and refugees from around the world, including asylum seekers turned back at the U.S.-Mexico border. HIRC combines representation of individual applicants for asylum and related relief with appellate litigation and policy advocacy. HIRC attorneys are recognized experts in asylum law. HIRC has filed briefs as amicus curiae and directly represented immigrants in cases before the U.S. Supreme Court, federal courts of appeals, federal district courts, the Board of Immigration Appeals, and various international tribunals.

The Boston University Clinic represents vulnerable immigrants and asylum seekers in a broad range of complex legal proceedings before the immigration courts, state, local and federal courts and before immigration agencies. Under the supervision of professors and instructors, law students represent children and adults seeking protection in the United States including survivors of torture and trauma, survivors of domestic violence, and detained and non-detained individuals in removal proceedings. The Boston University Clinic has also provided in person Know Your Rights trainings and asylum workshops for noncitizens subject to the Turnback Policy in Tijuana, Mexico, in collaboration with Al Otro Lado, and has represented noncitizens previously subject to the Turnback Policy after their arrival in New England.

## ARGUMENT

I.    **The Principle of *Non-Refoulement* Is a Universal, Specific, and Obligatory Norm of International Law Actionable Under the ATS**

A.    **A Norm Is Actionable Under the ATS if It Is Universal, Specific, and Obligatory**

The ATS is a jurisdictional statute that empowers courts to hear claims brought by foreign nationals for torts "committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350; *Sosa*, 542 U.S. at 713–14. The "law of nations" refers to customary international law, which exists "independently of any express treaty." *The Paquete Habana*, 175 U.S. 677, 708 (1900). Customary international law consists of those rules universally acceded to by states "out of a sense of legal obligation and mutual concern." *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1019 (9th Cir. 2014); *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 738 (9th Cir. 2008).

When the ATS was enacted in 1789, the historical context suggests that it was primarily intended to confer jurisdiction over offenses against ambassadors, violations of safe conduct, and piracy. *Sosa*, 542 U.S. at 719–20. As international law has developed over the centuries, however, courts have recognized that additional norms are actionable

4

under the ATS once they attain the same kind of "definite content and acceptance among civilized nations" as these historical examples. *Id.* at 732.

A norm may form the basis of an ATS claim if it has become "specific, universal, and obligatory," a three-part test adopted by the Supreme Court in *Sosa*, 542 U.S. at 732. *See Doe I*, 766 F.3d at 1019. When assessing whether a norm meets the *Sosa* standard, courts look to "international conventions, international customs, the general principles of law recognized by civilized nations, judicial decisions, and the works of scholars," as well as sources "that provide an authoritative expression of the views of the international community." *Doe I*, 766 F.3d at 1019–20 (internal quotation marks omitted). In addition to examining the status of the norm in international law, *Sosa* also requires courts to weigh any prudential concerns associated with recognizing a new norm. *Sosa*, 542 U.S. at 732-33.

Over the past two decades, courts have recognized a number of norms under the *Sosa* framework and found ATS claims based upon these norms to be viable. For example, the Ninth Circuit has recognized prohibitions against slavery, genocide, war crimes, torture, and supporting terrorism as actionable norms under the ATS. *See Doe I*, 766 F.3d at 1019, 1022; *see also Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 183–84 (2d Cir. 2009) (recognizing nonconsensual medical experimentation as an actionable norm); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154, 1158 (11th Cir. 2005) (holding that extrajudicial killing and cruel, inhumane, or degrading treatment or punishment are actionable norms).

### B.    *Non-Refoulement* Constitutes an Actionable Norm Under *Sosa*

The principle of *non-refoulement* requires the United States to protect individuals from return to their home countries or to a third country where they face a serious risk of torture, persecution, or other threats to their life or freedom.[3]

---

[3] Scott M. Martin, *Non-Refoulement of Refugees: United States Compliance with International Obligations*, 7 IMMIGR. NAT'LITY L. REV. 650, 651 (1983-1984).

The norm of *non-refoulement* is actionable under the ATS because it is universal, specific, and obligatory. *Non-refoulement* has its modern origins in the 1951 Convention Relating to the Status of Refugees ("1951 Convention")[4] and the 1967 Protocol Relating to the Status of Refugees ("1967 Protocol"),[5] where it forms the cornerstone of the refugee protection regime. *See I.N.S. v. Stevic*, 467 U.S. 428 n.22 (1984) ("Foremost among the rights which the Protocol would guarantee to refugees is the prohibition (under Article 33 of the 1951 Convention) against [*refoulement*]."). Building off these treaties, *refoulement* is further prohibited by the Convention Against Torture and the International Convention for the Protection of All Persons from Enforced Disappearances.[6]

*Non-refoulement* is also implicitly included in the International Covenant on Civil and Political Rights ("ICCPR").[7] For example, Article 13 of the ICCPR recognizes rights under international law for migrants facing expulsion, stating:

> An alien lawfully in the territory of a State Party to the present Convention expelled therefrom only in pursuance of a decision reached in accordance with law and shall . . . be allowed to submit the reasons against his expulsion and to have his case reviewed by . . . the competent authority . . . .[8]

---

[4] Convention Relating to the Status of Refugees art. 33(1), July 28, 1951, 189 U.N.T.S. 137.

[5] Protocol Relating to the Status of Refugees art. I(1), Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267.

[6] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, T.I.A.S. No. 94-1120.1, 1465 U.N.T.S. 85; International Convention for the Protection of All Persons From Enforced Disappearance art. 16, Dec. 20, 2006, 2716 U.N.T.S. 3.

[7] ICCPR arts. 2, 6, 7, Dec. 16, 1966, T.I.A.S. No. 92-908, 999 U.N.T.S. 171; U.N. Human Rights Comm., General Comment 31: The Nature of the General Legal Obligation Imposed on States Parties to the Covenant, ¶12, U.N. Doc. CCPR/C/21/Rev. 1/Add. 1326 (May 26, 2004) (explaining ICCPR necessarily includes *non-refoulement*).

[8] ICCPR, *supra* note 7, art. 13 (containing an exception for cases in which compelling reasons of national security warrant otherwise).

6

This provision binds states to provide due process to those seeking protection from persecution and torture.

Article 3(1) of the 1967 Declaration on Territorial Asylum of the U.N. General Assembly provides as follows, further underlining the continued commitment by the international community to not deport refugees to any country where they may face persecution:

> No person [seeking asylum from persecution] shall be subjected to measures such as rejection at the frontier or, if he has already entered the territory in which he seeks asylum, expulsion or compulsory return to any State where he may be subjected to persecution.[9]

In addition, many regional agreements address *non-refoulement*. For example, Article 22(8) of the American Convention on Human Rights ("American Convention") prohibits *refoulement* of refugees, using language aligned with Article 33 of the 1951 Convention.[10] Article 22 of the American Convention allows no exceptions, unlike the 1951 Convention's restriction of refugees who pose a threat to the security of the host country or have been convicted of a serious crime.[11]

The inclusion of the norm in several widely ratified global and regional treaties establishes its universality. *Doe I*, 766 F.3d at 1019-20. There are currently 147 states parties to the 1967 Protocol, including the United States.[12] As early as 2003,

---

[9] G.A. Res. 2312 (XXII), Declaration on Territorial Asylum art. 3(1) (Dec. 14, 1967).

[10] 1969 American Convention on Human Rights art. 22(8), Nov. 22, 1969, S. Treaty Doc. No. 95-21, 1144 U.N.T.S. 123.

[11] *See also* Charter of Fundamental Rights of the European Union art. 19(2), Oct. 26, 2012, 2012 O.J. (C 326) 2; American Convention on Human Rights; Convention Governing the Specific Aspects of Refugee Problems in Africa art. 2(3), Sept. 10, 1969, 1001 U.N.T.S. 45.

[12] *See Status of Treaties: Protocol Relating to the Status of Refugees*, U.N. TREATY COLLECTION (Oct. 21, 2020), https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=V-5&chapter=5.

7

approximately 90% of U.N. member states were party to one or more of the global
treaties prohibiting *refoulement*, and participation has only increased since then.[13] When
nearly every nation recognizes the norm by acceding to treaties that codify its terms, its
universality is beyond dispute. *See Flores v. S. Peru Pepper Corp.*, 414 F.3d 233, 256–57
(2d Cir. 2003).

The prohibition against *refoulement* also has the requisite specificity to satisfy the
*Sosa* three-part test. The 1951 Convention and 1967 Protocol define the norm of *non-
refoulement* with precision, prohibiting states from returning refugees "in any manner
whatsoever" to any territory where their "life or freedom" would be threatened.[14] Though
subsequent treaties prohibiting *refoulement* contain minor variations in the form of the
harm they protect against, they unanimously require states to guard against returning
people to any location where they risk death, torture, or other serious harms. *See
Abdullahi*, 562 F.3d at 184 (finding norm sufficiently specific to be actionable under the
ATS because the acts alleged violated "the core of any reasonable iteration of the
prohibition"). Because *non-refoulement* is consistently and specifically articulated in
multiple international treaties, it easily satisfies the specificity element of the *Sosa*
framework. 542 U.S. at 732 (discussing specificity of "piracy").

The norm of *non-refoulement* is also obligatory, meeting the final prong of the
three-part test in *Sosa*. More than 125 states, including the United States, have enacted
domestic procedures to operationalize the right of *non-refoulement*.[15] International

---

[13] *See* Cathryn Costello & Michelle Foster, Non-Refoulement *as Custom and Jus
Cogens? Putting the Prohibition to the Test, in* NETHERLANDS YEARBOOK OF
INTERNATIONAL LAW 283-84 (2016).

[14] 1951 Convention art. 33(1); *see* 1967 Protocol art. I(1).

[15] *See* Costello & Foster, *supra* note 13, at 299; *I.N.S. v. Cardoza-Fonseca*, 480
U.S. 421, 440 n.25 (1987).

tribunals hold states accountable when they violate the norm.[16] The U.N. General Assembly has affirmed that *non-refoulement* forms part of customary international law, establishing that the international community understands the norm as obligatory (and further demonstrating its universality).[17] *Doe I*, 766 F.3d at 1019.

*Non-refoulement* is widely recognized not only as customary international law, but also as a *jus cogens* norm,[18] the non-derogable nature of which further establishes that *non-refoulement* is obligatory upon states. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714–15 (9th Cir. 1992). *Jus cogens* norms are "an elite subset of the norms recognized as customary international law." *Id.* at 715. They are distinguished from the rest of the body of customary international law by their non-derogable nature, meaning that states cannot suspend or modify their application and that they "prevail over and invalidate international agreements and other rules of international law in conflict with them." *Id.* at 715–16 (internal quotation marks omitted).[19] As a *jus cogens* norm, *non-refoulement* binds even those states that have not yet ratified one of the relevant treaties.[20]

---

[16] *See, e.g.*, *N.A. v. Finland*, No. 24244/18, Eur. Ct. H.R., ¶¶71-73, 85 (2019); *Pacheco Tineo Family v. Bolivia*, Inter-Am. Ct. H.R. (ser. C) No. 272, ¶¶180, 189, 197-99 (Nov. 25, 2013).

[17] G.A. Res. 57/187, ¶1 (Feb. 6, 2003) (endorsing Declaration of States Parties); *see* Declaration of States Parties to the 1951 Convention or Its 1967 Protocol Relating to the Status of Refugees, ¶4, U.N. Doc. HR/MMSP/2001/09 (Jan. 16, 2002) (concluding *non-refoulement* is customary international law).

[18] *See* UNHCR Executive Committee, General Conclusion on International Protection No. 25 (XXXIII), ¶(b), U.N. Doc. No. A/37/12/Add.1 (Nov. 10, 1982); G.A. Res. 52/132, preamble ¶12 (Dec. 12, 1997); G.A. Res. 51/75, ¶3 (Feb. 12, 1997); *see also* Costello & Foster, *supra* note 13, at 307; Jean Allain, *The* Jus Cogens *Nature of* Non-Refoulement, 13 INT'L J. REFUGEE L. 533, 557 (2001).

[19] *See also* Allain, *supra* note 18, at 533 (describing *jus cogens* as "a peremptory norm of international law from which no derogation is permitted).

[20] *Id.*

9

While the ATS only requires that a norm attain the status of customary international law before it may be actionable under the statute, *Sosa*, 542 U.S. at 733, the status of *non-refoulement* as a *jus cogens* norm—the "highest status within international law" as the Ninth Circuit wrote in *Siderman de Blake*, 965 F.2d at 715—is powerful evidence that the prohibition is sufficiently specific, universal, and obligatory to satisfy the *Sosa* test for recognition under the ATS. 542 U.S. at 733.

In sum, the principle of *non-refoulement* is a binding norm under customary international law. The Government's undisputed dereliction of its *non-refoulement* obligations through the Turnback Policy is actionable under the ATS and should be enjoined immediately.

## II. The Agency's Turnback Policy Violates the Principle of *Non-Refoulement*, in Violation of the Government's International and Domestic Law Obligations

The Turnback Policy violates U.S. obligations under international and domestic law. Through coercive tactics and outright preclusion of access to ports of entry, the United States denies the right to seek asylum and other protection and has returned countless asylum seekers to "the frontiers of territories where [their] life or freedom would be threatened," precisely what Article 33 of the 1951 Convention and the withholding of removal statute, 8 U.S.C. § 1231(b)(3), prohibit.

By denying the right to seek asylum at ports of entry along the southern border, the United States has directly *refouled* Mexican asylum seekers to Mexico, the very country from which they have fled to escape persecution and torture. The United States has also subjected non-Mexican asylum seekers to indirect *refoulement* to countries where they fear persecution, and to a high risk of serious harm in Mexico itself.

### A. International and Domestic Law Requires the United States to Accept and Process Asylum Seekers

This Court has recognized that refugees approaching ports of entry must be afforded the right to seek asylum. *See Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1200–04 (S.D. Cal 2019). Domestic law does as well. *See* 8 U.S.C. § 1158(a)(1)

("Any alien . . . who arrives in the United States (whether or not at a designated port of arrival . . . may apply for asylum." (internal parenthetical omitted)).

The Government has acknowledged that it has both returned asylum seekers already on U.S. soil to Mexico and prevented asylum seekers from entering the United States through metering at the U.S. – Mexico border. Former Customs and Border Protection Commissioner ("CBP") Kevin McAleenan admitted use of an illegal metering practice in March 2019 when he testified about "metering" or "queue management" before the Senate Judiciary Committee.[21] The Government has therefore in essence admitted that it engaged in turnbacks or exclusions that are prohibited under domestic and international law.

In multiple instances, the Government coordinated with Mexican officials to block access to asylum—turning asylum seekers back from bridges to the United States, Pls.' Mem. at 5, 35; subjecting asylum seekers to a metering process in Mexico that requires them to put their name on a waitlist to even apply for asylum, *id.* at 6; and engaging in a misinformation campaign to deter asylum seekers from accessing protection by telling asylum seekers that they "could not pass" and that "the port was closed." *Id.* at 5; *see also* Defs.' Mem. at 19 ("Ports of El Paso and Hidalgo were turning people away on U.S. soil. . . ."). And, even after asylum seekers cross into the United States at ports of entry, Government officials have used coercive measures to force them to sign forms abandoning their asylum claims. These measures included threatening asylum seekers

----

[21] *See* Human Rights First, *Barred at the Border: Wait "Lists" Leave Asylum Seekers in Peril at Texas Ports of Entry* (Apr. 2019), https://www.humanrightsfirst.org/resource/barred-border-wait-lists-leave-asylum-seekers-peril-texas-ports-entry (hereinafter "*Barred at the Border*"); *Oversight of Customs and Border Protection's Response to the Smuggling of Persons at the Southern Border: Hearing Before the S. Comm. on the Judiciary*, 116th Cong. (2019), available at https://www.pbs.org/newshour/nation/watch-live-senate-judiciary-committee-holds-hearing-on-human-trafficking-at-u-s-southern-border.

that they would be separated from their children or deported to the country where they feared persecution. Pl.'s Mem. at 5.

As discussed next, the Government's concerted actions to bar people from seeking asylum have forced thousands of asylum seekers to return to Mexico, where they face ongoing threats to their lives and freedom and/or fear of likely torture or persecution, in direct violation of this country's binding *non-refoulement* obligations under domestic and international law.

> **B.    Instead of Accepting and Processing Asylum Seekers, the Government Is Enforcing a Policy that Leads to the Expulsion and Return of Refugees to Mexico and Other Countries, in Violation of the United States' *Non-Refoulement* Obligations**

The 1951 Convention's prohibition against "expel[ling] or return[ing]" individuals "in any manner whatsoever" to a territory where their life and freedom would be threatened on account of a protected ground[22] includes conduct like the Turnback Policy that results in excluding asylum seekers at the border. Indeed, during the preparation of the 1951 Convention, the U.N. Secretary-General stated in a Memorandum to the Ad Hoc Committee on Statelessness and Related Problems that "turning a refugee back to the frontier of the country where his life or liberty is threatened . . . . would be tantamount to delivering him into the hands of his persecutors."[23] Likewise, during the discussions of the Committee, the representative of the United States vigorously argued that:

> [w]hether it was a question of closing the frontier to a refugee who asked admittance, or of turning him back after he had crossed the frontier, or even expelling him after he had been admitted to residence in the territory, the problem was more or less the same.[24]

---

[22] 1951 Convention, *supra* note 4, art. 33.

[23] U.N. High Comm'r for Refugees, *Advisory Opinion on the Extraterritorial Application of* Non-Refoulement *Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol* 14 (Jan. 26, 2007), https://www.refworld.org/docid/45f17a1a4.html (hereinafter "UNHCR Guidance").

[24] *Id.*

12

The United Nations High Commissioner for Refugees ("UNHCR") has similarly emphasized that Article 33 encompasses "non-admission[s] at the border" and "informal transfer[s]," as well as "forcible removal[s]."[25] This UNHCR Guidance is directly relevant to the interpretation of the Refugee Act of 1980. *See Diaz Reynoso v. Barr*, 968 F.3d 1070, 1082–87 (9th Cir. 2020); *see also Cardoza-Fonseca*, 480 U.S. at 438–39 ("In interpreting the Protocol's definition of 'refugee' we are further guided by the analysis set forth in the Office of the United Nations High Commissioner for Refugees[.]").[26]

### 1. *The U.S. Government's Turnback Policy Violates Core* Non-Refoulement *Obligations by Returning Mexican Asylum Seekers to the Territory Where Their Lives Are Threatened*

Up to 80% of asylum seekers stuck at some U.S. – Mexico ports of entry are Mexican citizens seeking refuge from persecution in their home country.[27] By subjecting Mexican asylum seekers to metering pursuant to the Turnback Policy, among other coercive practices, the Government is, *per se*, returning refugees to a territory where their lives or freedom are threatened on account of a protected ground. *See* UNHCR Guidance at 2 ("[A] person is a refugee within the meaning of the 1951 Convention as soon as he or she fulfills the criteria contained in the refugee definition . . . . [A] person does not become a refugee because of recognition, but is recognized because he or she is a refugee.").

CBP forces metered asylum seekers to put their names on a waitlist maintained by the Mexican government, which increases the risk that they will be "discovered by their persecutors—whether members of the [Mexican] government or non-state persecutors,"

---

[25] *Id.* at 3.

[26] *See also* European Union Agency for Fundamental Rights, *Scope of the Principle of* Non-Refoulement *in Contemporary Border Management* (2016), https://fra.europa.eu/sites/default/files/fra_uploads/fra-2016-scope-non-refoulement-0_en.pdf (explaining that *non-refoulement* obligations adhere at designated border crossing points).

[27] *See Barred at the Border*, *supra* note 21, at 4.

13

whom the government is unable or unwilling to control. *See Barred at the Border*, *supra* note 21, at 8 (explaining Mexican immigration authorities "have been implicated in organized crime and extortion of migrants"); Pls.' Mem. at 5–6. The waitlist process often requires asylum seekers to provide "their biographical information, photograph, and location to a Mexican local or federal official," making them easy targets for persecution. *Barred at the Border*, *supra* note 21, at 8.

Concerns that Mexican citizens will be persecuted due to metering at the border are far from theoretical. *See, e.g.*, Human Rights Watch, "U.S.: Mexican Asylum Seekers Ordered to Wait," (Dec. 23, 2019), https://www.hrw.org/news/2019/12/23/us-mexican-asylum-seekers-ordered-wait (documenting dangers facing Mexican asylum-seekers stuck waiting at the border where their Mexican persecutors may be able to locate them); ACLU Ltr. to J. Cuffari *et al.* (Nov. 14, 2019), https://www.aclutx.org/sites/default/files/aclu_oig_complaint_metering.pdf (OIG complaint documenting threats to Mexican nationals subjected to metering).

### 2. The U.S. Government Has Endangered the Lives of Non-Mexican Asylum Seekers, Placing Them at Risk of Indirect **Refoulement** and Other Serious Human Rights Violations

The Turnback Policy also places non-Mexican asylum seekers at grave risk, given Mexico's systematic deportation of thousands of asylum seekers back to their home countries as well as the widespread attacks on asylum seekers from Central America and other countries whom Mexican authorities fail to protect.

The flaws in Mexico's asylum system are well documented, with numerous reports of asylum seekers returned to their home countries without consideration for their fears of return to persecution or torture.[28] Yet the United States has both explicitly and implicitly

---

[28] *See* Amnesty Int'l, *USA: 'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States* 22–23 (2018),

encouraged Mexican officials to deport asylum seekers in violation of U.S. *non-refoulement* obligations. Amnesty Report, *supra* note 28, at 23 (quoting a senior Mexican official who described U.S. officials as making Mexico 'do their dirty work').[29] Thus, when plaintiffs like Roberto Doe are deported from Mexican custody, the United States bears responsibility for their indirect *refoulement* to a country where they face threats to life or freedom or danger of persecution or torture. Defs.' Mem. at 36 (conceding Mexico detained and deported Roberto Doe).

In addition, due to the U.S. government's illegal Turnback Policy, bona fide asylum seekers left waiting in limbo in Mexico are vulnerable to kidnappings, rape, and threats of death.[30] Mexican authorities have, for example, beaten and jailed transgender asylum seekers from Central America, and armed men have targeted, threatened and attacked LGTBQ individuals, including transgender women and minors, with impunity.[31] Plaintiffs' Memorandum further documents dangers in which the Turnback Policy unconscionably places non-Mexican asylum seekers trapped on the Mexican side of the border. Pls.' Mem. at 35. The Turnback Policy thus subjects asylum seekers to significant risks of forced return to their countries of origin and to pervasive mistreatment and victimization in direct contravention of U.S. *non-refoulement* obligations.

---

https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF ("Amnesty Report").

[29] The United States has also specifically funded initiatives like the Programa Frontera Sur that systematically return Central Americans in Mexico to the Northern Triangle. *See* Ardalan, *supra* note 2, at 284–92.

[30] *Barred at the Border*, *supra* note 21; Doctors Without Borders, *Unacceptable Treatment of Migrants in Piedras Negras, Mexico* (Feb. 16, 2019), https://www.doctorswithoutborders.org/what-we-do/news-stories/news/unacceptable-treatment-migrants-piedras-negras-mexico.

[31] Amnesty Report, *supra* note 28, at 23.

15

### III. There Is Nothing Controversial About Holding the Turnback Policy a Violation of International Law that Is Actionable Under the ATS

Defendants argue that it would be an unwarranted expansion of the ATS to recognize *non-refoulement* as an actionable norm and to hold the Government to account for violating its international and domestic law obligations through enforcement of the Turnback Policy. On the contrary, *non-refoulement* is such a deeply rooted and undisputed norm that, as noted above in Part I, it has attained the status of *jus cogens*, making it an unremarkable candidate for recognition under the ATS. By contrast, allowing the Government to continue flouting its obligations under these binding sources of law would not only endanger the lives of thousands who are waiting in Mexican border camps simply for the chance to apply for asylum or other protection in the United States, but it would furthermore erode the status of this critical international norm.

### A. *Non-Refoulement* Is Deeply Embedded in International and Domestic Law

For nearly seventy years, *non-refoulement* has been the crux of refugee protection worldwide. The 1951 Convention and 1967 Protocol, currently the guiding instruments on refugee law, provide the minimum foundation for the rights of refugees and are the two most significant international accords expounding the principle of *non-refoulement*.[32] The 1951 Convention established important concepts as binding international law, including the principle of *non-refoulement*.[33] Article 33 is the only major substantive article in the 1951 Convention to which no reservation of any kind may be made, highlighting the articulable and intentional commitment to adhere to *non-refoulement* principles.[34] The text of the article imposes a duty for states to comply with such

---

[32] Ellen F. D'Angelo, Non-Refoulement*: The Search for a Consistent Interpretation of Article 33*, 42 VAND. J. TRANSNAT'L L. 279, 283 (2009); Martin, *supra* note 3.

[33] *See* D'Angelo, *supra* note 32, at 281.

[34] Martin, *supra* note 3, at 654.

16

commitments. The 1967 Protocol expanded the scope of the 1951 Convention, which by its terms, had only applied to persons who became refugees as a result of events prior to January 1, 1951.[35] The 1967 Protocol notably eliminated the temporal and geographical limitations of the 1951 Convention, applying its protective mandate to all future refugees regardless of origin.[36] This underlines the continued commitment to the principle of *non-refoulement* by the international community, creating an expansive scope of refugee protections to which all signatories were bound—a deeply rooted and well-established principle.

Consistent with the *non-refoulement* provisions in the many international and regional treaties addressed above in Part I, international and domestic courts have attempted to hold states to their international obligations against *refoulement*. The International Criminal Court has observed that the *non-refoulement* principle is considered to be a norm of customary international law, an integral part of the international human rights protection and that all individuals are entitled to enjoy its application.[37] Domestic courts of several nations have accordingly found that *non-refoulement* applies not only to the parties that have signed and ratified the 1951 Convention and 1967 Protocol but also to non-signatories as a norm established by state practice.[38]

---

[35] 1951 Convention, *supra* note 4.

[36] 1967 Protocol, *supra* note 5, art. I.

[37] Costello and Foster, *supra* note 13, at 304; *see Hirsi Jamaa and Others v. Italy,* No. 27765/09, Eur. Ct. H.R., ¶¶76-82, 138 (2010) (reaffirming the principle that the duty of *non-refoulement* applies extraterritorially where a person is under the effective control of the state, whether or not the person was on its territory); *see also Al-Skeini and Others v. United Kingdom*, No. 55721/07, Eur. Ct. H.R. (2011).

[38] *See Zaoui v. Attorney-General*, [2005] 1 NZLR 690 at ¶ 34 (CA), *aff'd*, [2005] 1 NZLR 577 (SC) (N.Z.) (exerting court's power of judicial review from 1951 Convention application to nonparties, i.e. refugees such as Mr. Zaoui); *see also Revenko v. Sec'y of State for the Home Dep't*, [2001] QB 601, ¶ 18 (Eng.) ("[I]t is common ground that Articles 31 and 33 [of the 1951 Convention] sufficiently reflect customary international

As shown above in Part II, Defendants' Turnback Policy constitutes unlawful *refoulement*, in violation of the Government's international and domestic law obligations, with dire real-life consequences for impacted individuals and for the rule of law. Allowing the Government to continue implementing this practice would mean keeping thousands of individual asylum seekers in jeopardy. As a flagrant derogation of our *non-refoulement* obligations, the Turnback Policy furthermore undermines our global credibility and shines an undesirable spotlight on how far out of step with international consensus on refugee protections U.S. policy has gone.

Absent a clear conflict, the Court should construe the Government's obligation under domestic law establishing the right to apply for asylum and the right not to be *refouled*, 8 U.S.C. §§ 1158(a)(1), 1231(b)(3), to conform to international legal obligations.[39] The importance and clarity of the international law obligation against *refoulement* further supports Plaintiffs' interpretation of §§ 1158(a) and 1231(b). Our international obligations to practice *non-refoulement* are undisputed. The U.N. has made it clear that adherence to the principle of *non-refoulement* is not a mere recommendation. It has not refrained from reprimanding and denouncing actions of states that have violated *non-refoulement* in the past. When a violation has been brought to either the General Assembly or the UNHCR Executive Committee, both have, "repeatedly responded by 'deploring the *refoulement* and unlawful expulsion of refugees and asylum-

---

law."); *Haitian Ctr. for Human Rights v. United States*, Case 10.675, Inter-Am. Comm'n H.R., Report No. 51/96, OEA/Ser.L/V/II.95, doc. 7 rev. ¶ 88 (1997) (holding that the principle of *non-refoulement* was part of customary international law).

[39] *See Murray v. Schooner Charming Betsy*, 2 Cranch 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."); *see also MacLeod v. United States*, 229 U.S. 416, 434 (1913) ("[I]t should not be assumed that Congress proposed to violate the obligations of this country to other nations.").

18

seekers.'"[40] Our continuing violations of *non-refoulment* do not go unnoticed by the world community.

### B. The Harms of the Turnback Policy Are Devastating for Individuals and Undermines U.S. Credibility and the Sanctity of the *Non-Refoulement* Norm

Moreover, the current Turnback Policy has placed tens of thousands of people—including many asylum seekers—in an indefinite holding pattern at our Southern border. The harms of the Turnback Policy are part of a broader effort on the part of the Government to outsource the refugee protections it is obligated to uphold. For example, more than 67,000 people are currently subject to the so-called Migrant Protection Protocols ("MPP"),[41] which forces asylum seekers to await their day in immigration court in Mexico. Among the 67,000 people subject to MPP are 20,000 children, all exposed to the dangerous and inhumane conditions in makeshift border camps.[42]

With the Turnback Policy, the United States is now directly responsible for the creation of perilous border camps, holding tens of thousands of vulnerable asylum seekers and others in need of protection in the United States. Through metering and the MPP, the United States is impermissibly outsourcing the refugee protections to which it is obligated; instead of processing migrants and asylum seekers within our borders, as U.S. law requires, these policies contract out the financial and human cost of that protection and processing to Mexico.[43] The rule of law—and the norms of equality and

---

[40] Costello and Foster, *supra* note 13, at 300.

[41] *Details on MPP (Remain in Mexico) Deportation Proceedings*, TRAC IMMIGRATION, https://trac.syr.edu/phptools/immigration/mpp/ (last visited Oct. 26, 2020).

[42] Kristina Cooke, Mica Rosenberg, and Reade Levinson, *U.S. Migrant Policy Sends Thousands of Children, Including Babies, Back to Mexico*, REUTERS (Oct. 11, 2019), https://www.reuters.com/article/us-usa-immigration-babies-exclusive-idUSKBN1WQ1H1.

[43] Andrea Pitzer, *Trump's 'Migrant Protection Protocols' Hurt The People They're Supposed to Help*, WASH. POST (July 18, 2019), https://www.washingtonpost.com/outlook/2019/07/18/trumps-migrant-protection-protocols-hurt-people-theyre-supposed-help/.

3:17-cv-02366-BAS-KSC

consistency with human rights principles—should prevail over the whims of an Administration seemingly intent on violating the rights of those most entitled to our protection.

## CONCLUSION

The Government's Turnback Policy violates the principle of *non-refoulement*, an international law norm that is binding on the United States and actionable under the ATS. Amici Curiae respectfully urge the Court to hold that the Turnback Policy is unlawful under domestic law, both as codified in the ATS and the INA, as well as a total derogation of our obligations under international human rights conventions, and to permanently enjoin its continued implementation.[44]

Dated: October 28, 2020

Respectfully submitted,


*s/ Annie Daher*
Annie Daher (CA SBN #294266)
CENTER FOR GENDER & REFUGEE STUDIES
UC Hastings College of the Law
200 McAllister Street
San Francisco, CA 94102
daher.annie@uchastings.edu
(415) 565-4877


Zachary A. Albun (IL ARDC #6323553)*
HARVARD IMMIGRATION & REFUGEE
CLINICAL PROGRAM
6 Everett Street, WCC 3109
Cambridge, MA 02138
zalbun@law.harvard.edu
(617) 496-5497

---

[44] Amici thank Harvard Immigration & Refugee Clinical Program law students Stephanie Powers and Jason Golfinos, and Boston University Immigrants' Rights and Human Trafficking Program law students Julian Bugarin and Margaret Rodriguez for their assistance in drafting this brief.

Sarah Sherman-Stokes (MA SJC #682322)*
IMMIGRANTS' RIGHTS AND HUMAN
TRAFFICKING PROGRAM
Boston University School of Law
765 Commonwealth Ave.
Boston, MA 02215
sstokes@bu.edu
(617) 358-6272

* Application for admission *pro hac vice* forthcoming

*Attorneys for Amici Curiae*