MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | Special Briefing Schedule Ordered (*see* Dkt. 518) |
| | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

[1] Defendants have represented that Mr. Wolf is the Acting Secretary of the U.S. Department of Homeland Security. Numerous courts disagree. *Casa de Md., Inc. v. Wolf*, 2020 WL 5500165, at *23 (D. Md. 2020); *Immigrant Legal Res. Ctr. v. Wolf*, 2020 WL 5798269, at *7-9 (N.D. Cal. 2020); *N.W. Immigrant Rts. Project v. USCIS*, 2020 WL 5995206, at *24 (D.D.C. 2020).

1

2   CENTER FOR CONSTITUTIONAL RIGHTS
       Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
3       *bazmy@ccrjustice.org*
       Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
4       *gschwarz@ccrjustice.org*
       Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
5       *aguisado@ccrjustice.org*
6   666 Broadway, 7th Floor
    New York, NY 10012
7   Telephone: +1.212.614.6464
    Facsimile: +1.212.614.6499

8

9   SOUTHERN POVERTY LAW CENTER
       Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
10      *sarah.rich@splcenter.org*
       Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
       *rebecca.cassler@splcenter.org*
11  150 E. Ponce de Leon Ave., Suite 340
12  Decatur, GA 30030
    Telephone: +1.404.521.6700
13  Facsimile: +1.404.221.5857

14  AMERICAN IMMIGRATION COUNCIL
       Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
15      *kwalters@immcouncil.org*
16  1331 G St. N.W., Suite 200
    Washington, D.C. 20005
17  Telephone: +1.202.507.7523
    Facsimile: +1.202.742.5619

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ......................................................................... 1

II.  THE DHS OIG REPORT ENDS THIS CASE ................................. 2

III. DEFENDANTS IGNORE FACTS THAT UNDERMINE THEIR
     CASE ......................................................................................... 3

     A.   Defendants Ignore What Actually Occurred in May 2016 ................. 4

     B.   Defendants' Pattern of Refusing to Process Asylum Seekers ............. 6

     C.   Defendants Continued to Turnback Asylum Seekers in 2017 ............. 7

     D.   The April 2018 Migrant Caravan Never Materialized ...................... 8

     E.   The Turnback Policy Is Costly and Dangerous ................................. 9

     F.   Defendants Rely on Self-Contradictory Arguments ......................... 10

IV.  EVEN IF DEFENDANTS ARE CORRECT THAT TURNBACKS
     ARE A DELAY RA, THAT DELAY IS UNREASONABLE ................... 10

V.   PLAINTIFFS ARE ENTITLED TO THE RELIEF THEY SEEK ............. 15

     A.   The Court Should Enter a Permanent Injunction .............................. 16

     B.   Vacatur is Not Appropriate or Sufficient Relief .............................. 16

     C.   Plaintiffs Meet the Remaining Factors for Injunctive Relief ............. 17

     D.   8 U.S.C. § 1252(f)(1) Does Not Bar Relief ................................... 19

     E.   The Court Should Enter Declaratory Relief ..................................... 20

VI.  CONCLUSION ........................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ali v. Ashcroft*,
    346 F.3d 873 (9th Cir. 2003) .................................................................. 19

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .............................................................................. 3

*Asmai v. Johnson*,
    182 F. Supp. 3d 1086 (E.D. Cal. 2016) ................................................. 12

*In re Barr Labs., Inc.*,
    930 F.2d 72 (D.C. Cir. 1991) ................................................................ 15

*In re Community Voice*,
    878 F.3d 779 (9th Cir. 2017) ................................................................ 14

*Cutler v. Hayes*,
    818 F.2d 879 (D.C. Cir. 1987) ......................................................... 14, 15

*Day v. D.C. DCRA*,
    191 F. Supp. 2d 154 (D.D.C. 2002) ...................................................... 17

*EBSC v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ................................................................ 18

*GEICO v. Dizol*,
    133 F.3d 1220 (9th Cir. 1998)............................................................... 20

*Hong Wang v. Chertoff*,
    550 F. Supp. 2d 1253 (W.D. Wash. 2008) ............................................ 12

*Indep. Mining Co. v. Babbitt*,
    105 F.3d 502 (9th Cir. 1997).......................................................... 11, 15

*Innovation Law Lab v. Wolf*,
    951 F.3d 1073 (9th Cir. 2020) .............................................................. 17

*LaDuke v. Nelson*,
    762 F.2d 1318 (9th Cir. 1985)............................................................... 17

## TABLE OF AUTHORITIES
(Continued)

Page(s)

*Latifi v. Neufeld*,
　2015 WL 3657860 (N.D. Cal. 2015)...................................................14

*League of Women Voters of U.S. v. Newby*,
　838 F.3d 1 (D.C. Cir. 2016)...............................................................18

*McGraw-Edison Co. v. Preformed Line Products Co.*,
　362 F.2d 339 (9th Cir. 1966)............................................................20

*Mugumoke v. Curda*,
　2012 WL 113800 (E.D. Cal. 2012) ...................................................14

*Nken v. Holder*,
　556 U.S. 418 (2009) .........................................................................18

*Orantes-Hernandez v. Thornburgh*,
　919 F.2d 549 (9th Cir. 1990)............................................................16

*Rodriguez v. Hayes*,
　591 F.3d 1105 (9th Cir. 2010).....................................................19, 20

*Santillan v. Gonzales*,
　388 F. Supp. 2d 1065 (N.D. Cal. 2005) ...........................................13

*Scott v. Harris*,
　550 U.S. 372 (2007) .......................................................................3, 10

*Sierra Club v. Trump*,
　963 F.3d 874 (9th Cir. 2020)............................................................17

*Singh v. Napolitano*,
　909 F. Supp. 2d 1164 (E.D. Cal. 2012)............................................14

*Torres v. U.S. Dep't of Homeland Sec.*,
　411 F. Supp. 3d 1036 (C.D. Cal. 2019)............................................19

*Tufail v. Neufeld*,
　2016 WL 1587218 (E.D. Cal. 2016) .................................................14

**Statutes**

REPLY  IN SUPP. OF PLTFS'
MOT. TO EXCLUDE

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

6 U.S.C. § 211(c) ........................................................................................ 18

8 U.S.C. § 1225(b) ............................................................................... 19, 20

8 U.S.C. § 1252(f)(1) ........................................................................... 19, 20

**Other Authorities**

Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*,
   N.Y. Times (Oct. 25, 2020) ........................................................................ 9

Fed. R. Civ. P. 53(a)(1)(C) ........................................................................ 18

# CITATION FORM

"CBP" refers to U.S. Customs and Border Protection.

"CM" refers to Defendants' Cross-Motion for Summary Judgment (Dkt. 563).

"CM Opp." refers to Plaintiffs' Opposition to Defendants' Cross-Motion for Summary Judgment (Dkt. 585).

"CM Opp. Ex." refers to the exhibits attached to Plaintiffs' Opposition to Defendants' Cross-Motion for Summary Judgment (Dkt. 585).

"DHS" refers to the U.S. Department of Homeland Security.

"Ex." refers to the exhibits attached to the Declaration of Stephen Medlock filed concurrently with this reply brief.

"INA" refers to the Immigration and Nationality Act.

"OFO" refers to CBP's Office of Field Operations.

"Op. Br." refers to Plaintiffs' Opening Brief in Support of their Motion for Summary Judgment (Dkt. 533).

"Op. Ex." refers to the exhibits attached to Plaintiffs' Opening Brief in Support of their Motion for Summary Judgment (Dkt. 533).

"POE" refers Class A ports of entry on the U.S.-Mexico border.

REPLY IN SUPP. OF
PLTFS' MOT S.J.

## I.       INTRODUCTION

As a report issued this morning by DHS' Office of Inspector General ("OIG") makes clear, Plaintiffs caught the Government red-handed. *See* Ex. 1. Unrebutted evidence that OIG has now corroborated shows that when asylum seekers were in the process of arriving at POEs, CBP officers lied to them. Under instructions from their superiors, CBP officers told asylum seekers that POEs were "at capacity" when those POEs were actually operating well below 100% capacity. Rule 30(b)(6) witnesses admitted that these asylum seekers were attempting to enter the U.S. Therefore, they should have been inspected and processed as the INA requires.

Defendants' turnback policy had the intent and effect of turning back asylum seekers and denying them access to the asylum process. The Secretary of DHS requested information on how many asylum seekers would be turned back at POEs if a memorandum that memorializes certain aspects of the turnback policy were implemented. After learning that 650 asylum seekers per day would be turned back, she issued the memo. Ex. 1 at 6.

In addition, ██████████████████████████████████████████████████████████████████████████████████████████████. The reason for this decision is obvious. Defendants believed that processing asylum seekers more efficiently would undermine the purpose of the turnback policy by creating a "pull factor" that would cause more asylum seekers to arrive at POEs. As a result, they ██████████████████████████████████████████████████████████████████████████████████████████.

Defendants also admitted that their actions broke the law. In a flagrant violation of the law, Defendants routinely turned back asylum seekers who were standing on U.S. soil. And, behind closed doors, POE leadership told union officials that all turnbacks broke the law. *See* Ex. 1 at 17 ("I know from what came down from [CBP] HQ, we are trying to process the least amount of people.").

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

Amazingly, Defendants' primary response—that they simply made inspecting and processing asylum seekers a lower priority—*is itself a violation of law*. Defendants repeatedly admitted that they were diminishing inspection and processing of asylum seekers by making it a subordinate priority.

What is going on here is a shocking abuse of power by the Executive Branch and abdication of Defendants' statutory and international law obligations. Defendants claim that they alone have the discretion to decide when to inspect and process an asylum seeker, and how many asylum seekers will be inspected and processed. That is not true. In the INA and Homeland Security Act, Congress gave Defendants specific instructions about when and how asylum seekers were to be inspected and processed and the level of priority that should be given to that mission.

The goal of the turnback policy is to end asylum. Defendants' core argument is that, despite clear statutory language, they alone have the discretion to end asylum as we know it by standing astride the border and blocking access to the U.S. and to the asylum process no matter what other missions they have and no matter what the true facts are on the ground. Defendants argue that as long as POEs want to focus on other missions, Defendants can process zero asylum seekers every day and this Court can do nothing about it. That is not, and never has been, what the law says.

Plaintiffs are entitled to summary judgment on that basis alone. In this brief, Plaintiffs address the remaining chaff in Defendants' opposition brief. First, the OIG report is powerful evidence that Defendants broke the law. Second, Plaintiffs explain why Defendants' cherry-picked factual recitation is wrong. Third, even if turnbacks can be characterized as delay rather than denial of a mandatory duty, application of the *TRAC* factors shows that delay is unreasonable. Finally, this Court can, and should, enter declaratory and injunctive relief.

## II.    THE DHS OIG REPORT ENDS THIS CASE

This morning, DHS OIG issued a report that puts the lie to all of Defendants' factual arguments. In the blockbuster report, OIG concludes that "while DHS

2

REPLY IN SUPP. OF
PLTFS' MOT S.J.

leadership urged asylum seekers to present themselves at [POEs], the agency took deliberate steps to limit the number of undocumented aliens who could be processed each day at the Southwest Border [POEs]." Ex. 1 at 10. According to the report, Defendants "stopped the routine processing of . . . asylum seekers . . . at 7 of the 24" POEs. *Id.* Asylum seekers that presented themselves for inspection at those POEs were told to return to Mexico and were forced to walk miles through harsh terrain to place themselves on a waitlist with hundreds of others. *Id.* at 12-13. Moreover, at four POEs, CBP officers regularly turned back asylum seekers that had already crossed the international border and entered the U.S. *Id.* at 15. Furthermore, using the *exact same methodology* as Plaintiffs' expert, Stephanie Leutert, OIG concluded that although increasing numbers of asylum seekers were waiting to be inspected and processed in Mexico, POEs "were not using all available detention space." *Id.* And OIG directly observed detention cells sitting empty while POEs were continuing to turn back asylum seekers. *Id.* at 17. OIG also discounted DHS' operational capacity excuse, stating "our evidence . . . indicates that [CBP] used these reasons regardless of the port's actual capacity and capability." *Id.* at 20. As the OIG concludes: "The law does not set limits as to the number of asylum seekers the Government can or must process. Nevertheless, the [DHS] Secretary and CBP have effectively limited access for undocumented aliens wishing to claim asylum in the United States, sometimes without notice to the public." *Id.* at 19. This remarkable admission ends this case. Defendants' own Inspector General has confirmed all of Plaintiffs' substantive factual arguments are true. Summary judgment should be issued in Plaintiffs' favor.

## III.    DEFENDANTS IGNORE FACTS THAT UNDERMINE THEIR CASE

Defendants mischaracterize the record in an effort to manufacture disputed facts where none exist. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there can be no *genuine* issue of *material*

fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Factual disputes that are irrelevant or unnecessary" do not count. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiffs have explained why every turnback is illegal regardless of the excuse for it, Op. Br. at 18-25; CM Opp. at 1-4, and will not belabor that point here. In addition, Defendants' attempt to excuse their conduct have no factual support. The record shows that (a) the decision to start turning back asylum seekers in 2016 was caused by media pressure, not the number of arriving noncitizens; (b) the decision to expand metering had nothing to do with the number of noncitizens arriving at Texas POEs; (c) turnbacks continued in 2017, when there were no capacity concerns at POEs; (d) Defendants' concerns about the April 2018 migrant caravan were overblown; and (e) the turnback policy is costly and dangerous.

### A.    Defendants Ignore What Actually Occurred in May 2016

Defendants claim that their actions were justified because they were dealing with a "sustained and overwhelming surge of undocumented" noncitizens, and that by late May 2016 the San Ysidro POE simply could not hold any more noncitizens and started turning back asylum seekers. *See* CM at 1-3, 11. That is not true. In late May 2016, CBP officials on the ground at the San Ysidro POE repeatedly explained the steps that they were taking to deal with an uptick in arriving noncitizens at the port and their future plans for doing so. ██████████████████████████ ███████████████████. *See, e.g.*, Op. Ex. 34 (██████████████████ ████████████████████████████████████████████████████████ ████████████████); Op. Ex. 39 (██████████████████████████ ████████████████████████████); Op. Ex. 38 (█████████████████ ████████████████████████████████████████████████████████); Ex. 2 (██████████████████████████████████████████████████████████ ████████████████████████████████████████). However, on May 25, 2016, Pete Flores, the Director of Field Operations for OFO's San Diego Field Office, told Todd Owen, then the Executive Assistant Commissioner of OFO, that

1 ██████████████████████████████████████████

2 ████████████████████████████ Ex. 3. For his part, Todd Owen, the head of

3 OFO, ████████████████████████████████████████

4 ██████████████ *Id.*

5      A day later, their nightmare came true—a day before Donald Trump, then the

6 presumptive Republican nominee for President, was scheduled to hold a campaign

7 rally in San Diego,[2] OFO's San Diego Field Office ████████████████████

8 ███████████████████████████████████████████████

9 ██████ Ex. 4; Ex. 5. A reporter sent CBP questions concerning ████████████

10 ████████████████████████████████████████████ many of

11 whom "████████████████████████████████████████" She

12 informed CBP that she would be "writing an article" in the near future. Op. Ex. 40

13 at 872. Members of California's Congressional delegation also knew that ████████

14 ███████████████████████████████████████████████

15 ██████████ Op. Ex. 40 at 870; Ex. 6; Ex. 7.

16      On May 26, 2016, the San Diego Union-Tribune published a story entitled

17 "Surge of Haitians at San Ysidro Port of Entry." The story noted that "more than

18 200 people were crowded inside the port's pedestrian entrance," even though the

19 San Ysidro POE had the ability to "process close to 25,000 northbound pedestrians

20 a day."[3] This story got the attention of senior DHS officials, ████████████████

21 ████████████████████████████████████. Ex. 8 at 631.

22      This was the breaking point for Defendants. They did not want to deal with

23 the media attention at the San Ysidro POE. On May 26, 2016, Pete Flores forwarded

24 an email chain regarding ████████████████████████████████████████

25 ████████████████ to Sidney Aki, the Port Director of the San Ysidro POE. Ex. 9 at

26 _____

27 [2] *See, e.g.*, https://www.youtube.com/watch?v=tl5CJy1Fijc.

28 [3]https://www.sandiegouniontribune.com/news/border-baja-california/sdut-haitians-flood-san-ysidro-port-entry-2016may26-story.html.

REPLY IN SUPP. OF
PLTFS' MOT S.J.

1   354. Mr. Flores told Mr. Aki: "

2   ▇▇▇▇▇▇▇" *Id.* Mr. Aki responded: "▇▇▇▇" *Id.*; Ex. 10. Mr. Aki told his deputies:

3   "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

4   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" Op. Ex. 41. As Mr. Aki requested,

5   on May 27, 2016, the San Ysidro POE took steps to ▇▇▇▇▇▇▇▇▇▇

6   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

7   ▇▇▇▇▇▇▇▇▇. *See, e.g.*, Op. Ex. 43.

8   Therefore, it was *media attention*, not increased numbers of undocumented

9   noncitizens, that caused the San Ysidro POE to begin turning back asylum seekers.

10  Defendants wanted those asylum seekers out of sight and out of mind. *See, e.g.*, Ex.

11  1 at 10 ("We are hoping this thing just goes away."). They also did not want to send

12  a message that the San Ysidro POE had an efficient system for inspecting and

13  processing asylum seekers, because that might be a "pull factor" for future

14  immigration. *See* Op. Ex. 1 at 155:14-16 (Defendants refused to process asylum

15  seekers because "[t]he more you process, the more will come.").

16  **B.   Defendants' Pattern of Refusing to Process Asylum Seekers**

17  Defendants claim that it is mere happenstance that they decided to abandon

18  plans to open processing centers for undocumented noncitizens. *See* CM at 18. Not

19  so—it was, in fact, part of a pattern of refusing to efficiently process asylum seekers

20  for fear of "pulling" more of them to the border. On May 27, 2016, ▇▇▇▇▇▇▇

21  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

22  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

23  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Ex. 11; Ex.

24  12 at 828. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

25  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

26  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

27  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 12 at 828. Because

28  Defendants were afraid that efficiently processing asylum seekers would be a "pull



factor," they repeatedly refused to implement plans to inspect and process asylum seekers more efficiently. In November 2016, ████████████████

████████████████████████████████████████████

████████████████████████████████████████ Op. Br. 9-11. ████

████████████████████████████████████████████

████████ Op. Ex. 3 at 69:12-70:2 (Hidalgo POE ████████████

████████████). Then, when the leadership of OFO's San Diego Field Office

████████████████████████████████████████████

████████████, DHS Secretary Kirstjen Nielsen ordered ████████████

████████████ *See, e.g.*, Op. Ex. 109 at 473-474; Op. Ex. 110; Op. Ex. 111.

Defendants' attempt to isolate and explain away these incidents makes no sense.[4]

## C.    Defendants Continued to Turnback Asylum Seekers in 2017

Defendants claim that the "surge" of undocumented noncitizens arriving at POEs ended in 2017 and that turnbacks ended "for the most part" shortly thereafter. Opp. at 3, 21. Not so. CBP officers turned back asylum seekers at POEs in 2017. *See, e.g.*, Op. Ex. 8 at 043 (January 2, 2017); Ex. 14 (January 26, 2017); Ex. 15 (February 6, 2017); Ex. 16 at 388 (February 2017 ████████████████

████████████); Ex. 17 (April 1, 2017); Op. Ex. 52 (DHS received ████████████████████████████████); Ex. 18 (April 10, 2017); Ex. 19 (████████████████████████████████

---

[4] It is incorrect that "████████" caused the closure of El Centro. *See* CM at 18. The head of CBP's Crisis Action Team noted that ████████████████████████ ████. Ex. 13 at 878. Furthermore, Defendants' excuse for closing the Nogales Facility makes no sense. ████████████████████████████████████ ████████████. CM at 18. ████████████████████████████████ ████████████████████████████████. Op. Ex. 61 at 530. The only significant change between November 4, 2016, when the Nogales Facility was on the path to opening, and November 15, 2016 when it was placed on hold, was that Donald Trump had been elected President and OFO had rolled out turnbacks border-wide. *See* Op. Br. at 10-11. ████████████████████████████████ ████████████. *See* CM at 20.

REPLY IN SUPP. OF
PLTFS' MOT S.J.

1 ██████████████████████); Ex. 20  (May 12, 2017); Ex. 21 (May 18,
2 2017); Ex. 22 at 395 (August 26, 2017); Ex. 23 at 411 (December 5, 2017); Ex. 24
3 (December 7, 2017); Ex. 25 (December 8, 2017);  Ex. 26 (December 9, 2017); Ex.
4 27 (December 11, 2017); Ex. 28 (December 12, 2017); Ex. 29 (December 15, 2017);
5 Ex. 30 (December 17, 2017); Ex. 31 at 450 (December 18, 2017). And those exhibits
6 are a drop in the bucket. It is simply not true that Defendants stopped turning back
7 asylum seekers in 2017. They kept turning back asylum seekers because the turnback
8 policy has nothing to do with the capacity of POEs. *See* Ex. 38 at ¶¶ 22, 102-23; Ex.
9 1 at 16 (San Luis POE staff admitted "they could process more asylum seekers than
10 they were processing").

11 **D.    The April 2018 Migrant Caravan Never Materialized**

12 Defendants claim that CBP's April 2018 metering guidance was issued in
13 response to a fast-approaching migrant caravan that would overwhelm POEs. *See*
14 CM at 22-23. But Defendants ignore their own data. From late March until late April
15 2018, ████████████████████████████. *See, e.g.*, Ex. 32. That
16 data shows that ████████████████████████████████.
17 On March 31, 2018, █████████████████ Op. Ex. 80 at 793. By
18 April 22, 2018, ████████████████████████. *Id.* at 784. A
19 day later, on April 23, 2018, there were only "████████████" in the group.
20 *Id.* at 783. These ██ asylum seekers did not even reach Tijuana at the same time.
21 *Id.* The Mexican government saw to it that caravan members "████████████
22 ██████████████████████████████" *Id.* Many of
23 the asylum seekers who reached Tijuana ████████████ were not even able
24 to make it to the border. *Id.* Mexican authorities set up "████████████
25 ██████████████████" *Id.* That is why, by April 29, 2018,
26 "██████████████████████" Ex. 33 at 694. Even
27 though the April 2018 migrant caravan was dispersed and would clearly pose *no*
28 logistical challenges to POEs, Defendants persisted with their plan to memorialize

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

1   the turnback policy on April 27, 2018 and enforced that policy. *See* Op. Ex. 82.

2   **E.    The Turnback Policy Is Costly, Dangerous, and Illegal**

3   Defendants claim that the turnback policy was "successful." CM at 4. The

4   thousands of class members living in unofficial refugee camps on the Mexican side

5   of the border beg to differ.[5]



15  Under the turnback policy, CBP officers lied, and asylum seekers died. Op. Br. at

16  16-18, 26-27. Anyone who calls that a "success" needs to open a dictionary.

17  Even measured by other standards, the turnback policy is a terrible idea. CBP

18  officers repeatedly complained that it put their safety at risk. *See, e.g.*, Op. Ex. 1 at

19  172:14-17; Op. Ex. 3 at 149:23-150:1. Because "[t]he safety of CBP employees" is

20  supposed to be "paramount during all aspects of CBP operations," CM Ex. 59 at

21  044, these safety flaws should have doomed the turnback policy from the start.

22  Moreover, turning back asylum seekers at the limit line between the U.S. and

23  Mexico created a new problem at POEs—so-called ▮▮▮▮▮▮▮▮▮" Op. Ex. 14 at

24  189:6-191:20. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 198:25-

26

27  [5] Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*, N.Y. Times
    (Oct. 25, 2020), https://www.nytimes.com/2020/10/23/us/mexico-migrant-camp-
28  asylum.html.

REPLY IN SUPP. OF
PLTFS' MOT S.J.

1   199:16. This meant that CBP had to 

2   ███████████████. Ex. 34. As a result, ████████████

3   ████████████████████. *See, e.g.*, Ex. 35 at 190-191; Ex. 36 at 277 ("██████

4   ██████████████████████████████████████████████

5   ████████████"); Ex. 37 ("████████████████████

6   ████████████████████████████"). So, sure, the turnback policy was a wild

7   "success"—all you need to do is ignore the fact that it killed and endangered asylum

8   seekers, cost more money, placed CBP officers in harm's way, and broke the law.

9       **F.    Defendants Rely on Self-Contradictory Arguments**

10          In addition to getting the facts wrong, Defendants' view of the facts is self-

11  contradictory. A chief example of this is how Defendants cite CBP's capacity data.

12  When Defendants believe that POEs had high capacity utilization numbers,

13  Defendants cite those documents as a justification for turning back asylum seekers.

14  *See* CM at 15. But when POEs reported low capacity utilization numbers,

15  Defendants argue that those figures are meaningless because "[a] port's capacity to

16  hold individuals is not a fixed number," CM at 24, and the figures are therefore

17  incomplete and inaccurate. *Id.* These figures are either meaningful or meaningless,

18  but Defendants cannot have it both ways. And "capacity" is certainly not a one-way

19  ratchet. Defendants focus on factors constraining capacity ignores ways that they

20  could expand their capacity by utilizing U.S. Border Patrol stations and soft-sided

21  facilities. Therefore, Defendants' attempt to conjure factual disputes is not genuine.

22  It cannot defeat summary judgment. *See Scott*, 550 U.S. at 380 ("When opposing

23  parties tell two different stories, one of which is blatantly contradicted by the record,

24  so that no reasonable jury could believe it, a court should not adopt that version of

25  the facts for purposes of ruling on a motion for summary judgment.").

26  **IV.    EVEN IF DEFENDANTS ARE CORRECT THAT TURNBACKS ARE
         A DELAY, THAT DELAY IS UNREASONABLE**

27

28          Plaintiffs maintain that turnbacks amount to unlawful withholding of a

REPLY IN SUPP. OF
PLTFS' MOT S.J.

mandatory duty in every instance, but Plaintiffs are entitled to summary judgment on their APA § 706(1) claim even if Defendants are correct in characterizing turnbacks as "[a]t most, agency action [that] is delayed." CM at 40. Such delays are unreasonable across the board under the "*TRAC* factors." *See Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 & n.7 (9th Cir. 1997) (citing *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984)).[6] Based on the undisputed facts, the *TRAC* analysis weighs heavily in Plaintiffs' favor.

**Factor 1:** When and whether a metered asylum seeker will ever be processed under the turnback policy is an arbitrary decision made in a black box and is not based on a "rule of reason." Wait times for metered asylum seekers have ranged from days to many months, ███████████████████████████. CM Opp. Exs. 6-7; Op. Ex. 100 at 247:2-5. Various features of the turnback policy make clear the arbitrary nature of these inspection delays. Defendants require asylum seekers to use a waitlist system operated by third parties in Mexico, but do not know how the system works or even *if* it works, or how long the delay might take. Op. Ex. 14 at 108:1-5 ("



"); Op. Ex. 17 at 301:13-16 ("C

██████████████████"). Defendants merely inspect and process the number of

---

[6] The *TRAC* factors are: (1) whether the agency's timeline is governed by a "rule of reason"; (2) whether "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute"; (3) & (5) (usually considered together) the "nature and extent of the interests prejudiced by the delay," with delays "that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake"; (4) "the effect of expediting delayed action on agency activities of a higher or competing priority"; and (6) whether the agency acted in bad faith, though bad faith is not necessary to find a delay unreasonable. *Id.* at 507 n.7.

REPLY IN SUPP. OF
PLTFS' MOT S.J.

1    individuals Defendants requested from Mexican officials that day (if they requested

2    any at all). *See* Op. Ex. 4 at 171:7-13. But there is no guarantee that operation of the

3    waitlists is not completely arbitrary—that Mexican officials will follow the order on

4    the lists, Dkt. 591-1 ¶¶ 8-10, or that all class members will even be allowed to utilize

5    the lists, Dkt. 390-101 ¶¶ 12-13. Class members are thrown to the proverbial

6    wolves—turned back, told to participate in an opaque, informal waitlist "process"

7    that may or may not return them to the POE for processing and inspection, and left

8    to survive on their own in the interim.[7] "The 'rule' appears to be that once"

9    Defendants prevent an asylum seeker from accessing the POE, they "abdicate[]

10   responsibility for" what happens next. *Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253,

11   1259 (W.D. Wash. 2008). "Where [Defendants] ha[ve] been assigned the mandatory

12   duty to [inspect arriving noncitizens], this policy cannot be considered a 'rule of

13   reason.'" *Id.*

14        Furthermore, the "Prioritization-Based Queue Management" memos inject

15   unwarranted discretion into the decision to inspect any asylum seekers at all, which

16   in turn impacts inspection wait times. Op. Ex. 98; CM Ex. 5. Under the memos,

17   POEs "must" prioritize certain activities ahead of inspecting and processing asylum

18   seekers, after which they "have discretion to allocate resources and staffing" as they

19   wish. Op. Ex. 98; CM Ex. 5. Purporting to grant agency actors *discretion* to

20   undertake a *mandatory* duty runs counter to the principle of reasoned

21   decisionmaking; "[t]he APA is not intended to permit agencies to define the

22   reasonability of their actions by issuing their own memoranda." *Asmai v. Johnson*,

23   182 F. Supp. 3d 1086, 1095 (E.D. Cal. 2016). Merely adopting a policy to delay

24

25

---

26   [7] Op. Ex. 14 at 234:25-235:20 (if CBP prevents an asylum seeker from crossing the
     limit line. "█████████████████████████████████████████████████████████████████

27   ███████████████████████████████████████████████████████████████████████████████████

28   ███████████████████████████████████████████████████████████████).

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

1    inspecting asylum seekers, as Defendants did here, is not a rule of reason. *Id.*[8]

2    **Factor 2:** The "statutory context" strongly suggests that any delay of days,

3    weeks, or months before an asylum seeker is inspected is unreasonable. *Santillan v.*

4    *Gonzales*, 388 F. Supp. 2d 1065, 1083 (N.D. Cal. 2005). As this Court has previously

5    held, § 1225(a)(3) requires Defendants to inspect all noncitizens who are in the

6    process of arriving at a POE. Dkt. 280 at 45-46. The duty does not apply only with

7    regard to asylum seekers—it encompasses all who are "applicants for admission" or

8    "otherwise seeking admission." Inspections must occur around the time that a

9    noncitizen arrives at the POE, rather than days, weeks, or months, later.[9] And CBP

10   handily inspects nearly all of the hundreds of thousands of people subject to

11   inspection each day, in roughly the order the applicants arrive. These inspections are

12   the bread and butter of POEs' functioning, and international travel would grind to a

13   halt if such inspections did not occur as a matter of course upon arrival. If CBP

14   officers at airports delayed inspections for weeks, arriving travelers would be stuck

15   sleeping inside airports. At land borders, students would never make it to school,

16   and employees would miss work if inspections were not required at the time of

17   arrival. Indeed, Defendants never acted otherwise prior to the adoption of the

18   turnback policy. Op. Ex. 14 at 53:21-56:1 (CBP 30(b)(6) witness with 21 years of

19   service at CBP and its predecessor agency could not recall ███████████████████

20   ████████████████████████████████████████████████████████████████████

21   █████████████████). The reasonable timeframe for the statutory inspection duty must

22   be interpreted in the context of this daily hubbub at POEs that the statute is meant to

23   regulate.

---

24

25   [8] In addition, wait times are disconnected from the actual capacity of ports of entry, further eroding any claim that the challenged delays are based on a rule of reason. *See* Op. Br. 26-29; CM Opp. at 11-18.

26

27   [9] Congress's decision to create special protections for asylum seekers arriving in the United States—barring their expedited removal without first giving them access to the asylum process, § 1225(b)(1)(A)(i)-(ii)—reinforces the point that metering is unreasonable because it places such individuals in danger.

28

REPLY IN SUPP. OF
PLTFS' MOT S.J.

***Factors 3 & 5:*** The nature and extent of the interests prejudiced by the turnback policy—human life and physical well-being—cannot be overstated and weigh strongly in Plaintiffs' favor. The scale of the crisis created by turnbacks has been enormous, and it includes makeshift camps in Mexican border towns that lack toilets and clean water, as well as human trafficking and violence against those forced to wait. *See* Op. Br. at 16-18. Courts routinely find these factors weigh in favor of relief based on much less serious harm. *Singh v. Napolitano*, 909 F. Supp. 2d 1164, 1176 (E.D. Cal. 2012) (finding this factor weighed in a petitioner's favor because it involved "humanitarian concerns"—Singh was "an asylee who [was] attempting to become a lawful permanent resident"); *Tufail v. Neufeld*, 2016 WL 1587218, at *8 (E.D. Cal. 2016) (ongoing insecurity about one's immigration status weighed in favor of relief); *Latifi v. Neufeld*, 2015 WL 3657860, at *7 (N.D. Cal. 2015) (being required to renew work authorization ever year was a hardship weighing in plaintiff's favor).

***Factor 4:*** While Defendants argue that turnbacks are justified by a discretionary decision to prioritize other activities, Defendants' own records show that they routinely engaged in metering even when the processing of asylum seekers was not impacting port operations. Op. Ex. 38 at ¶¶ 22, 101-23. But "[e]ven assuming that [Defendants] have numerous competing priorities under the fourth factor," delay may still be unreasonable when other factors weigh heavily in favor of relief, and particularly when "there is a clear threat to human welfare." *In re Community Voice*, 878 F.3d 779, 787 (9th Cir. 2017) (finding unreasonable delay when children were "severely prejudiced" by lead poisoning, even assuming the agency acted in good faith to juggle competing priorities); *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987) ("[An agency's] plea[s] of . . . administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources . . . become less persuasive as delay progresses, and must always be balanced against the potential for harm."). Furthermore, "if the only effect

REPLY IN SUPP. OF
PLTFS' MOT S.J.

1   of expediting [agency action] is the loss of an authority that . . . is *ultra vires*," such

2   as turning away asylum seekers, *see* Op. Br. at 7-16, the fourth factor "does not

3   militate in [the agency's] favor." *Mugumoke v. Curda*, 2012 WL 113800, at *9 (E.D.

4   Cal. 2012).

5        ***Factor 6:***  This Court may also invalidate the turnback policy because it was

6   adopted in bad faith. While a finding of bad faith is not necessary for a court to find

7   unreasonable delay, in this case each turnback and the turnback policy are

8   unlawful—resulting in delay that is unreasonable *per se* under the *TRAC* factors

9   because turnbacks were based on a pretext and not driven by capacity constraints,

10  and are therefore the result of bad faith. *Cutler*, 818 F.2d at 898 ("If the court

11  determines that the agency delays in bad faith, it should conclude that the delay is

12  unreasonable."). Here, Defendants have "manifested bad faith . . . by singling . . .

13  out [asylum seekers] for bad treatment," based on a pretextual excuse of lack of

14  capacity, and therefore, they "will have a hard time claiming legitimacy for [their]

15  priorities." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991); Op. Br. at 26-

16  29; CM Opp. 11-18.[10]

17       In addition, Defendants are not "free to make . . . administrative changes with

18  the intent to defeat the mandate of the law by making the process so slow and/or

19  cumbersome to ensure" that only a small number of asylum seekers are ever

20  processed at POEs. *Babbitt*, 105 F.3d at 510. Yet that is exactly what Defendants

21  did. Defendants engaged in turnbacks to avoid projecting a public image of an

22  efficient system for processing asylum seekers at the border, in an effort to deter

23  people from attempting to access that system. *See supra* at 3-5. This manufactured

24  delay evinces bad faith. *Babbitt*, 105 F.3d at 510.

25  **V.    PLAINTIFFS ARE ENTITLED TO THE RELIEF THEY SEEK**

26  _____

27  [10] The turnback policy was also adopted in bad faith because it is the result of long-
standing racial animus toward Haitian asylum seekers, Dkt. 600-2 at 3-19, and a
28  desire to deter all asylum seekers, Dkt. 601-2 at 3-19.

### A.    The Court Should Enter a Permanent Injunction

The Court should enter a permanent injunction prohibiting all forms of turnbacks, requiring Defendants to inspect asylum seekers as they arrive at POEs, and restoring those previously metered to their legal status quo ante. Injunctive relief is necessary because Defendants' turnback policy reveals "past and present misconduct [that] indicates a strong likelihood of future violations." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990). This "past and present misconduct" consists of more than the countless individual turnbacks committed by CBP officers, because Defendants chose not to memorialize the turnback policy for nearly two years. *See* Op. Br. at 12-15, 36. Thus, appropriate relief for Defendants' policy of denying asylum seekers access to the U.S. asylum process must address not only the memorialized aspects of this policy but all the past and present practices that have been used under the policy to effectuate and legitimize turnbacks. This Court should not ignore the likelihood of future violations that Defendants' past practice reveals, and that injunctive relief is meant to address.[11]

### B.    Vacatur Is Not Appropriate or Sufficient Relief

Defendants' argument that vacatur is an adequate alternative remedy is without merit. Tellingly, Defendants never specify *what* exactly this court could vacate to provide Plaintiffs the relief they seek. Nor could they. Plaintiffs do not challenge a single regulation, memo, or executive order, but rather a comprehensive policy to deny asylum seekers access to the U.S. asylum process that was enacted through multiple directives because Defendants decided not to memorialize their illegal conduct for nearly two years. Vacating a single memorandum or directive will not stop Defendants from creating new directives to achieve the same objective. In fact, the uncontested facts demonstrate that since 2016, when challenges to

---

[11] Although Plaintiffs submit that they are entitled to injunctive and declaratory relief, the parties agree that briefing on the appropriate scope of the remedy following the Court's ruling on the merits may be warranted. *See* CM at 58.

REPLY IN SUPP. OF
PLTFS' MOT S.J.

Defendants' practices of turning back asylum seekers first arose, Defendants' created new directives to explain and justify these practices. *See* Op. Br. at 12-15. Even after OIG suggested that CBP's decision to stop processing asylum seekers at seven POEs was illegal, CBP still refused to change its conduct. Ex. 1 at 21. The only way "to combat [such] a 'pattern' of illicit . . . behavior" is to prohibit all forms of turnbacks and affirmatively require Defendants to inspect asylum seekers as they arrive at POEs. *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985) ("[t]he Supreme Court has repeatedly upheld the appropriateness of federal injunctive relief" to address such patterns of behavior), *amended on other grounds by* 796 F.2d 309 (9th Cir. 1986). That vacatur may be an adequate remedy for certain APA violations does not make it an adequate remedy for the APA violations in this case.[12]

## C.    Plaintiffs Meet the Remaining Factors for Injunctive Relief

Plaintiffs meet all the requisite factors for permanent injunctive relief. *See Sierra Club v. Trump*, 963 F.3d 874, 895 (9th Cir. 2020); Op. Br. 26-39; *supra* at 16. *First*, Defendants do not argue that Plaintiffs have failed to show irreparable injury, and therefore Defendants concede the harm. *See* CM at 58-60; *see Day v. D.C. DCRA* 191 F. Supp. 2d 154, 159 (D.D.C. 2002). Regardless, it is uncontroversial that Defendants' commission of statutory, constitutional, and international legal violations that put asylum seekers in grave danger in Mexico and deny them access to the U.S. asylum process constitutes irreparable harm. *See Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1093 (9th Cir. 2020) (returning non-Mexicans to Mexico where they "risk substantial harm, even death" while waiting for further steps in the U.S. asylum process constitutes irreparable injury).

---

[12] The two cases Defendants cite to support their vacatur argument are inapposite. *California Wilderness Coalition v. U.S. Dep't of Energy* analyzed a specific government study issued in violation of statutory guidelines—not a series of multiple directives and practices comprising an unwritten policy. 631 F.3d 1072, 1095 (9th Cir. 2011). *Monsanto Co. v. Geertson Seed Farms* is irrelevant because the Plaintiff in that case agreed that vacatur was sufficient—not so here. 561 U.S. 139, 165-66 (2010).

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

*Second*, the balance of the hardships and the public interest—which should be considered together when the government is a party—weigh in favor of Plaintiffs. *See Sierra Club*, 963 F.3d at 895. Without injunctive relief, class members will continue to face the statutory, constitutional, and international law violations that result in grave risk of serious harm and even death in Mexico. *See* Op. Br. at 26-39. Defendants' hardship, even if administratively burdensome, amounts to fulfilling their statutory mandate, which they are not allowed to neglect or diminish in any way. Defendants direct the Court to 6 U.S.C. § 211(c), *see* CM at *passim*, which requires that CBP "enforce and administer all immigration laws . . . including . . . the inspection, processing, and admission of persons who seek to enter . . . the United States." *Id.* § 211(c)(8)(A). Until the turnback policy, CBP fulfilled this statutory mandate and processed asylum seekers in the same way they process everyone else arriving at the U.S.-Mexico border; that is, in the order that they arrive. Any diversion of resources or costs associated with enjoining the turnback policy and returning to prior lawful practices would be hardships of Defendants' own making.

And, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also EBSC v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (the public "has an interest in ensuring that 'statutes enacted by [their] representatives' are not imperiled by executive fiat"). An injunction ensuring access to the U.S. asylum process will "prevent[ ] [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm," which is "of course" in the public interest. *Nken v. Holder*, 556 U.S. 418, 436 (2009). Thus, Plaintiffs have satisfied the requirements for injunctive relief and the Court should enter an injunction prohibiting all forms of turnbacks, requiring Defendants to inspect asylum seekers as they arrive at POEs, and restoring previously-metered asylum seekers to

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

1  the same legal status they would have had absent metering.[13]

2  **D.    8 U.S.C. § 1252(f)(1) Does Not Bar Relief**

3      Section 1252(f)(1) does not bar injunctive relief in this case, because Plaintiffs

4  seek to enforce 8 U.S.C. § 1225(a) and (b), and not to "enjoin or restrain the

5  operation of" the statute. Although § 1252(f)(1) serves to limit injunctive relief, it

6  does so only so far as an injunction would "enjoin or restrain the operation of" certain

7  removal statutes within the INA. It does not limit an injunction seeking to enjoin "a

8  violation of the statutes." *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010);

9  *see Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1050 (C.D. Cal.

10  2019) (holding that § 1252(f)(1) does not apply where the relief, "far from

11  preventing the operation of the INA, seeks to enforce its provisions").

12      Plaintiffs seek to enjoin agency action that violates Defendants' inspection

13  and processing duties under § 1225(a) and (b). *See* Op. Br. at 36-38. Where, as here,

14  Plaintiffs "seek[] to enjoin conduct that allegedly is not even authorized by the

15  statute, the court is not enjoining the operation of [the removal statutes], and §

16  1252(f)(1) therefore is not implicated." *Ali v. Ashcroft*, 346 F.3d 873, 886 (9th Cir.

17  2003), *vacated on other grounds sub nom. Ali v. Gonzales*, 421 F.3d 795 (9th Cir.

18  2005). Defendants strain to make § 1252(f)(1) apply by arguing that Plaintiffs are

19  seeking to enjoin the operation of §1225(a) and (b) "by rewriting it to apply to aliens

20  outside the United States." CM at 58. First, this mischaracterization blatantly

21  disregards this Court's prior finding that "the plain language and legislative

22  histor[y]" of § 1225(b) "support[ ] the conclusion that the statute applies to asylum

23  seekers in the process of arriving." Dkt. 330 at 5. Furthermore, because the turnback

24  policy denies the operation of § 1225(a) and (b) to those asylum seekers in the

25  process of arriving, Plaintiffs seek to enjoin a violation of the statute. Defendants

26  
_____

27  [13] If questions about interpretation and implementation arise with respect to any
permanent injunction, this Court can appointment a special master to oversee the

28  implementation of the injunction. *See* Fed. R. Civ. P. 53(a) (1)(C).

may not like the Court's prior holding, but they certainly may not buttress a failed legal argument into a bar to relief. Section 1252(f)(1) "is not implicated" in this case and, therefore, does not bar the injunctive relief Plaintiffs seek. *Ali*, 346 F.3d at 886.

### E.    The Court Should Enter Declaratory Relief

In addition to injunctive relief, this Court should enter a declaratory judgment that the turnback policy violates the INA, the APA, class members' procedural due process rights under the Fifth Amendment, and the Alien Tort Statute.[14] "[D]eclaratory relief has long been recognized as distinct in purpose from . . . injunctions." *Rodriguez*, 591 F.3d at 1120; *see McGraw-Edison Co. v. Preformed Line Products Co.,* 362 F.2d 339, 342 (9th Cir. 1966). Here, in addition to an injunction prohibiting all turnbacks, a declaration from the Court that turnbacks violate § 1225(b) "will serve a useful purpose in clarifying the legal relations at issue" between arriving noncitizens and CBP officers. *GEICO v. Dizol*, 133 F.3d 1220, 1225 n.5 (9th Cir. 1998).[15] Declaratory relief would also be of assistance to CBP officers who are "still unclear" on whether turnbacks are illegal. Ex. 1 at 12. This Court should grant the requested injunctive and declaratory relief.

## VI.    CONCLUSION

Summary judgment should be entered for Plaintiffs.

Dated:  October 30, 2020

MAYER BROWN LLP

---

[14] Notably, a declaratory judgment is not barred by 8 U.S.C. § 1252(f)(1).

[15] Defendants' reliance on *Sanchez-Espinoza v. Reagan* is misplaced. 770 F.2d 202, 208 n.8 (D.C. Cir. 1985). In *Sanchez-Espinoza*, the court questioned whether it could grant discretionary relief of any kind where it was asked to address the legality of support for military operations in a foreign country. *Id.* at 208. The court clarified that "*in a context such as this* where federal officers are defendants," a declaratory judgment to terminate support would be "the practical equivalent of specific relief such as an injunction or mandamus." *Id.* at 208 n.8 (emphasis added). Here, the declaratory and injunctive relief would not have an equivalent effect. The declaratory relief would establish CBP officers' legal obligations to those in the process of arriving, something that ███████████████████████████. *See* Op. Ex. 1 at 163:11-165:18; Op. Ex. 76 at 110, 115-126. In contrast, injunctive relief would prohibit specific actions by CBP officers. In *this* case, both are necessary to afford Plaintiffs and class members complete relief.

Matthew H. Marmolejo
Ori Lev
Stephen M. Medlock

SOUTHERN POVERTY LAW CENTER
Melissa Crow
Sarah Rich
Rebecca Cassler

CENTER FOR CONSTITUTIONAL
RIGHTS
Baher Azmy
Ghita Schwarz
Angelo Guisado

AMERICAN IMMIGRATION COUNCIL
Karolina Walters

By:  */s/ Stephen M. Medlock*
Stephen M. Medlock

*Attorneys for Plaintiffs*

REPLY  IN SUPP. OF
PLTFS' MOT S.J.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the foregoing document to be served on all counsel via the Court's CM/ECF system.

Dated:  October 30, 2020

MAYER BROWN LLP


By  */s/ Stephen M. Medlock*

REPLY  IN SUPP. OF
PLTFS' MOT S.J.