1   MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
    350 S. Grand Avenue
3   25th Floor
    Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7   1999 K Street, N.W.
    Washington, D.C. 20006
8   Telephone:  +1.202.263.3000
    Facsimile:   +1.202.263.3300
9
    SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
    1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
    Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
    *Attorneys for Plaintiffs*

15              **UNITED STATES DISTRICT COURT**

16             **SOUTHERN DISTRICT OF CALIFORNIA**

17

18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC

19                Plaintiffs,              **EXHIBIT 1 IN SUPPORT OF**
                                           **PLAINTIFFS' REPLY IN SUPPORT**
20        v.                               **OF THEIR MOTION FOR**
                                           **SUMMARY JUDGMENT**
21  Chad F. Wolf,[1] *et al.*,

22                Defendants.

23

24

25

26

27  _____
    [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary
28  McAleenan pursuant to Fed. R. Civ. P. 25(d).

                                    EXHIBIT 1 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
                                                              MOT. FOR S.J.

1  CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
2    *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
3    *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
4    *aguisado@ccrjustice.org*
5  666 Broadway, 7th Floor
   New York, NY 10012
6  Telephone: +1.212.614.6464
7  Facsimile: +1.212.614.6499

8  SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
9    *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
10   *rebecca.cassler@splcenter.org*
   150 E. Ponce de Leon Ave., Suite 340
11 Decatur, GA 30030
   Telephone: +1.404.521.6700
12 Facsimile: +1.404.221.5857

13
   AMERICAN IMMIGRATION COUNCIL
14   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
     *kwalters@immcouncil.org*
15 1331 G St. NW, Suite 200
   Washington, D.C. 20005
16 Telephone: +1.202.507.7523
17 Facsimile: +1.202.742.5619

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1 IN SUPP. OF REPLY IN SUPP. OF PLTFS'
MOT. FOR S.J.

OFFICE OF INSPECTOR GENERAL

# CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry



**October 27, 2020**

**OIG-21-02**

# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

October 27, 2020

MEMORANDUM FOR:    Mark A. Morgan
Senior Official Performing the Duties of the
Commissioner
U.S. Customs and Border Protection

FROM:    Joseph V. Cuffari, Ph.D.
Inspector General

JOSEPH V
CUFFARI

Digitally signed by JOSEPH
V CUFFARI
Date: 2020.10.27 14:48:03
-04'00'

SUBJECT:    *CBP Has Taken Steps to Limit Processing of
Undocumented Aliens at Ports of Entry*

For your action is our final report, *CBP Has Taken Steps to Limit Processing
of Undocumented Aliens at Ports of Entry*.  We incorporated the formal
comments provided by U.S. Customs and Border Protection (CBP).

The report contains three recommendations aimed at bringing CBP operations
in line with long-established practices and promoting the efficient processing of
undocumented aliens.  CBP concurred with two of the three recommendations.
Based on information provided in the response to the draft report, we consider
one recommendation unresolved and open and two recommendations resolved
and open.  Once your office has fully implemented the recommendations,
please submit a formal closeout letter to us within 30 days so that we may
close the recommendations.  The memorandum should be accompanied by
evidence of completion of agreed-upon corrective actions.  Please send your
response or closure request to OIGSREFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we will
provide copies of our report to congressional committees with oversight and
appropriation responsibility over the Department of Homeland Security.  We
will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Thomas Kait,
Assistant Inspector General for Special Reviews and Evaluations,
at (202) 981-6000.



# DHS OIG Highlights

## *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry*

**October 27, 2020**

## Why We Did This Review

We conducted this review to determine whether U.S. Customs and Border Protection (CBP) was turning away asylum seekers at the Southwest Border ports of entry.

## What We Recommend

We made three recommendations aimed at bringing CBP operations in line with long-established practices and promoting the efficient processing of undocumented aliens.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at
DHS-OIG.OfficePublicAffairs@oig.dhs.gov

# What We Found

In May 2018, DHS and CBP leaders anticipated an increase in undocumented aliens seeking entry at the southern border. In response, the leaders urged undocumented aliens seeking protection under U.S. asylum laws ("asylum seekers") to enter the United States legally at ports of entry rather than illegally between ports. At the same time, the leaders asked CBP for "the number of [undocumented aliens] that would likely be turned away" if all ports conducted "Queue Management," a practice that posts CBP officers at or near the U.S.-Mexico border to control the number of undocumented aliens entering U.S. ports of entry. After learning that 650 aliens would be prevented from entering ports every day, in June 2018, then-DHS Secretary Kirstjen Nielsen authorized the practice. Nielsen also informed CBP ports that while processing undocumented aliens is a component of its mission, they should focus on other priorities, including detection and apprehension of narcotics and currency smugglers.

We found CBP took several additional actions to limit the number of undocumented aliens processed each day at Southwest Border land ports of entry. For instance, without prior public notice, seven ports of entry stopped processing virtually all undocumented aliens, including asylum seekers. Instead, CBP redirected them to other port locations. This redirection contravenes CBP's longstanding practice to process all aliens at a "Class A" port of entry or reclassify the port of entry. Moreover, although asylum seekers legally must be processed once physically within the United States, we found CBP staff turned away asylum seekers at four ports *after* they had already entered the United States. After waiting in Queue Management lines or being redirected to other ports, some asylum seekers and other undocumented aliens crossed the border illegally between ports of entry.

# CBP Response

CBP concurred with all recommendations, except one.



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

## Table of Contents

Introduction ................................................................................................. 3

Background ................................................................................................. 3

Results of Review ..................................................................................... 6

    DHS Urged Asylum Seekers to Come to Ports of Entry, But Reassigned
    Staff away from Asylum Processing ...................................................... 7

    Without Notice to the Public, CBP Stopped Routine Processing of Most
    Undocumented Aliens, Including Asylum Seekers, at Seven Ports and
    Redirected Them to Other Ports .......................................................... 10

    CBP Returned to Mexico Asylum Seekers Who Had Already Entered the
    United States ...................................................................................... 15

    CBP Did Not Use All Available Detention Space.................................. 16

Conclusion................................................................................................. 18

Recommendations..................................................................................... 19

## Appendixes

    Appendix A:  Objective, Scope, and Methodology  ................................ 23
    Appendix B:  CBP Comments to the Draft Report................................. 25
    Appendix C:  Timeline of Asylum Processing Significant
                 Events in 2018 ................................................. 31
    Appendix D:  Office of Special Reviews and Evaluations Major
                 Contributors to This Report ............................. 32
    Appendix E:  Report Distribution.......................................................... 33

## Abbreviations

| | |
|---|---|
| AUSA | Assistant United States Attorney |
| CBP | U.S. Customs and Border Protection |
| C.F.R. | Code of Federal Regulations |
| ICE | U.S. Immigration and Customs Enforcement |
| INA | Immigration and Nationality Act |
| MPP | Migrant Protection Protocol |



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

| | |
|---|---|
| NTA | Notice to Appear |
| OFO | Office of Field Operations |
| OIG | Office of Inspector General |
| POE | Port of Entry |
| TEDS | CBP National Standards on Transport, Escort, Detention, and Search |
| U.S.C. | United States Code |



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## Introduction

From May through June 2018, in response to a surge of undocumented aliens attempting to enter the United States DHS senior leaders publicly urged those seeking asylum to lawfully present themselves at U.S. ports of entry, where U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) officers would process them.  However, DHS and CBP leadership did not take steps to maximize CBP's processing capability at ports of entry.  Instead, they instituted policies and took actions that limited the number of undocumented aliens, including asylum seekers, processed at the ports.

## Background

The *Immigration and Nationality Act* (INA) allows individuals who have fled their home countries because of persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion to apply for asylum or other humanitarian protections in the United States.[1] These individuals may express fear of persecution or torture, a fear of return to their country, or an intent to seek asylum to the CBP OFO officers they encounter when they arrive at U.S. ports of entry, or to U.S. Border Patrol agents if these individuals are apprehended after crossing illegally between ports.

### CBP Processing of Asylum Seekers at Southwest Border Ports of Entry

CBP refers to aliens who are not in possession of documents allowing them entry into the United States — e.g., a travel visa — as "undocumented aliens." This category of aliens includes asylum seekers,[2] who generally arrive without visas or other legal documentation that authorize entry to the United States.[3] When an undocumented alien arrives at a land port of entry and is processed for expedited removal, CBP OFO officers ask specific questions during processing[4] to determine whether the alien has a fear of persecution or torture in his or her home country or intends to seek asylum, such that the individual

---

[1] *See* 8 U.S.C. §§ 1158, 1225(b)(1)(A)(ii), 1231(b)(3)(A) & note.

[2] Throughout this report, we refer to undocumented aliens who express a fear of returning to their home country or intention to apply for asylum in the United States as asylum seekers.

[3] Other undocumented aliens could potentially include individuals who seek temporary humanitarian entry to attend a funeral or obtain medical care.

[4] CBP's processing includes verifying the alien's identity, checking databases for outstanding warrants or criminal history, searching the alien for drugs or contraband, taking statements from the alien, and requesting follow-on placement with U.S. Immigration and Customs Enforcement.  CBP also refers asylum seekers to U.S. Citizenship and Immigration Services for further processing of their asylum claims.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

should be placed in the asylum adjudication process.  In fiscal year 2018, CBP Southwest Border ports processed 38,269 undocumented aliens seeking asylum, representing approximately one-third of the nearly 125,000 undocumented aliens who arrived at U.S. ports of entry that year.

After processing, CBP OFO holds asylum seekers and other undocumented aliens at the port of entry until U.S. Immigration and Customs Enforcement (ICE) takes custody of the aliens and determines whether to place them in immigration detention or release them.  ICE maintains detention centers for single adults and families, but transfers unaccompanied or separated alien children to the Department of Health and Human Services, Office of Refugee Resettlement, for placement pending adjudication of the asylum claim.

From 2014 through 2018, surges, or "caravans," of undocumented aliens sought to enter the United States through the Southwest Border.  For example, CBP experienced a surge of unaccompanied alien children in 2014, and a surge of Haitian migrants in 2016.  Some came through the ports, while others entered illegally, between the ports of entry.[5]  In 2018, the caravans consisted of more families and unaccompanied alien children, and a greater number of asylum seekers, than in the past.

At times, these surges created overcrowded conditions at CBP port of entry holding facilities, which presented health and safety concerns to both officers and aliens.  The increase in families and unaccompanied children posed additional challenges for ports of entry because CBP national standards require holding vulnerable populations, such as families and children, separately and generally for no longer than 72 hours.[6]  Most ports were designed before the standards were established and before CBP OFO experienced surges of asylum seekers, especially families.  As a result, many ports do not have enough room to hold vulnerable populations separately.[7]  Similarly, ICE has limited detention bed space available to hold families.

---

[5] CBP's U.S. Border Patrol is responsible for processing aliens who have crossed into the United States illegally, between the ports of entry, including those who express an intent to seek asylum.

[6] U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search* (TEDS), October 2015. For example, TEDS, 5.0, requires CBP to hold families, unaccompanied children, single adults, and transgender individuals in separate spaces. TEDS, 4.1, also provides that "[d]etainees should generally not be held for longer than 72 hours in CBP holding rooms or holding facilities.  Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible."

[7] As reported in *Results of Unannounced Inspections of Conditions for Unaccompanied Alien Children in CBP Custody,* OIG-18-87, in the past, some CBP ports converted offices and conference rooms to hold rooms to accommodate more people in the processing areas.



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

In 2016, during the surge of Haitian asylum seekers, CBP's San Ysidro port of entry in California, in cooperation with the Mexican government, developed a new approach for preventing overcrowding and health and safety concerns. CBP officers and Mexican government officials began stopping asylum seekers and other undocumented aliens from crossing the international boundary into the U.S. port of entry. Instead, those aliens were required to put their names on a waiting list until CBP had space and staff to process them. The asylum seekers and other undocumented aliens waited in Mexico until CBP notified the Mexican government of the number of aliens CBP could take, and the Mexican government then delivered that number to the port. This practice became known as "Queue Management," though it is also referred to as "metering" or establishing a "limit line."[8]

Since 2016, CBP has used Queue Management at various times to control the flow of undocumented aliens into ports of entry. Most recently, in 2018, as migrant caravans arrived to the Southwest Border and the number of undocumented aliens seeking to enter the United States increased, CBP again began assigning officers to the limit line in an effort to control the number of aliens entering the ports. Since July 2018, Queue Management has become standard practice, with all Southwest Border ports implementing limit lines.

We initiated this review in response to two congressional requests and significant public interest in how CBP processes asylum seekers at ports of entry. Additionally, the U.S. Office of Special Counsel forwarded a whistleblower complaint related to similar issues at one port of entry. In 2018, we conducted unannounced site visits to 12 of the 24 land ports of entry across the four CBP field offices along the Southwest Border, where we interviewed CBP staff and observed port operations.[9] We also evaluated CBP's policies and procedures for processing asylum seekers and other undocumented aliens.[10]

---

[8] At the time of our fieldwork, CBP OFO was piloting another initiative. On January 28, 2019, the San Diego Field Office started the Migrant Protection Protocol (MPP). Under the MPP, certain undocumented aliens arriving from Mexico are required to stay in Mexico to await future immigration proceedings in the United States (e.g., hearing before a U.S. immigration court).

[9] CBP operates 24 land ports of entry along the Southwest Border comprising 46 crossing points; some ports have multiple crossing points or gates, e.g., the Nogales port of entry has three crossing points: DeConcini, Mariposa, and Morley Gate. Four field offices oversee the ports: San Diego in California; Tucson in Arizona; and El Paso and Laredo in Texas.

[10] Some laws and policies apply specifically to asylum seekers, while others apply to the broader category of undocumented aliens, which includes both asylum seekers and other aliens attempting to enter the country without valid documents. Throughout this report, we



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Some of the issues we discuss in this report are similar to or the same as issues raised in lawsuits filed by a non-governmental organization and state governments. Specifically, the legality of CBP's Queue Management practice — i.e., the practice of CBP officers standing at a "limit line" position at or near the U.S.-Mexico border to control the number of undocumented aliens entering U.S. ports of entry — currently is being litigated in the court system. See *Al Otro Lado, Inc. v. Nielsen*, 17-cv-2366 (S.D. Cal. 2017).[11]

Accordingly, DHS Office of Inspector General (OIG) does not take a position on the legality of this practice, and will await a final determination by the courts.

## Results of Review

In May 2018, DHS and CBP leaders anticipated an increase in undocumented aliens seeking entry at the southern border. In response, the leaders urged asylum seekers to present their claims at ports of entry rather than presenting the claims after the individuals crossed the border illegally. However, a few weeks later, then-Secretary Kirstjen Nielsen asked CBP for the estimated "number of [undocumented aliens] that would likely be turned away" if all ports conducted "Queue Management." After learning that CBP could turn away 650 undocumented aliens every day, - the Secretary instructed ports to implement Queue Management. This involved CBP officers standing at a "limit line" position at or near the U.S.-Mexico border to control the flow of undocumented aliens entering CBP ports for processing. Further, the Secretary told the ports that processing inadmissible aliens (who include asylum seekers) was not one of CBP's main priorities, and they should consider re-assigning staff away from processing such aliens to focus instead on detection and apprehension of narcotics and currency smugglers.[12]

In addition, we found CBP took several actions to limit the number of undocumented aliens who could be processed each day at the Southwest Border land ports of entry. Seven ports effectively stopped processing undocumented aliens, despite being designated as Class A ports, which are "Port[s] of Entry for all aliens," not just those with documents, according to 8

---

refer to asylum seekers and undocumented aliens, both together and separately as appropriate.

[11] The plaintiffs allege violations of 8 U.S.C. §§ 1158, 1225, 1229; 8 C.F.R. Parts 208, 235; U.S. Const. Amend. V; the *1951 Convention on the Rights of Refugees*; and section 706 of the *Administrative Procedure Act*.

[12] June 5, 2018 Memorandum from Secretary Nielsen, "Prioritization-Based Queue Management."



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

C.F.R. § 100.4.  CBP broke with a longstanding practice by changing the categories of aliens it would process at these seven ports without changing the ports' classification.  When asylum seekers and other undocumented aliens appeared at these seven ports, CBP officers redirected them to other ports, some of which were more than 30 miles away.  We observed CBP officers telling aliens the port was at capacity and did not have the capability to process them, regardless of actual capacity and capability at the time.  Further, four CBP ports turned away asylum seekers who had already stepped into the United States, telling them to return to Mexico.  Also, at two other ports we visited, CBP had stopped using blocks of available holding cells, allowing those cells to sit empty while asylum seekers and other undocumented aliens waited in the Queue Management lines in Mexico.  As the lines grew longer, some asylum seekers and other undocumented aliens may have crossed the border illegally, between ports of entry, where U.S. Border Patrol is responsible for apprehending and holding them.

## DHS Urged Asylum Seekers to Come to Ports of Entry, But Reassigned Staff away from Asylum Processing

Following the April 2018 announcement of the Zero Tolerance Policy, DHS and CBP began urging asylum seekers in May 2018 to come to ports of entry rather than attempt to enter the United States illegally between ports of entry.  At the same time, DHS and CBP directed ports to assign staff away from processing undocumented aliens, including asylum seekers, to other duties at the ports.  Appendix C provides a brief timeline of significant events from April to August 2018 related to CBP's asylum processing.

On April 6, 2018, then-Attorney General Jeff Sessions announced a "Zero Tolerance Policy,"[13] which, as implemented by DHS, required CBP to refer for prosecution every adult who entered the United States illegally, including those

---

[13] In an April 6, 2018 memo, the Attorney General directed United States Attorney's Offices along the Southwest Border, in consultation with the Department of Homeland Security, to adopt a Zero Tolerance Policy for all Improper Entry by Alien offenses, and refer them for prosecution under 8 United States Code (U.S.C.) § 1325(a).  In a press release announcing the "Zero Tolerance Policy," the Department of Justice said, "The implementation of the Attorney General's zero-tolerance policy comes as the Department of Homeland Security reported a 203 percent increase in illegal border crossings from March 2017 to March 2018, and a 37 percent increase from February 2018 to March 2018—the largest month-to-month increase since 2011." https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

traveling with their children.  As a result, parents who entered illegally were separated from their children upon referral for prosecution.[14]

After implementation of the Zero Tolerance Policy, then-DHS Secretary Nielsen and OFO Executive Assistant Commissioner Todd Owen made several public statements urging asylum seekers to come to the ports of entry instead of crossing illegally and risking separation from family members.  For instance, on May 8, 2018, Secretary Nielsen testified before Congress, "Help me message: If you are fleeing and coming to the United States please come to the ports of entry.  [We] will process your claim there."[15]  On June 18, 2018, at a White House Press Briefing, Secretary Nielsen also told reporters, "As I said before, if you're seeking asylum, go to a port of entry.  You do not need to break the law of the United States to seek asylum."[16]  When reporters noted media accounts of families turned away at ports of entry, the Secretary described that reporting as "incorrect."  Further, on July 9, 2018, OFO Executive Assistant Commissioner Owen said during a press conference:

> The lawful way is to claim asylum, present yourself for inspection at the port of entry.  We will keep the family unit together, again, absent concerns for the well-being of the child, absent criminal history for the adult.

However, despite encouraging asylum seekers to enter the United States through the ports of entry, DHS and CBP took actions that limited the number of undocumented aliens, including asylum seekers, CBP could process each day at the Southwest Border land ports of entry.[17]

On April 27, 2018, OFO Executive Assistant Commissioner Owen emailed a memorandum authorizing Southwest Border land ports of entry to establish Queue Management lines[18] when appropriate to facilitate "safe and orderly

---

[14] We assessed CBP's implementation of the policy in our report, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy,* OIG-18-84, September 27, 2018.

[15] *Homeland Security Secretary Nielsen on Fiscal Year 2019 Budget.*  Testimony before the Senate Appropriations Subcommittee on Homeland Security, May 8, 2018.

[16] White House Press Conference, June 18, 2018, "DHS Secretary Nielsen's Remarks on the Illegal Immigration Crisis."  *See* transcript at https://www.dhs.gov/news/2018/06/18/dhs-secretary-nielsens-remarks-illegal-immigration-crisis.

[17] Numerous factors affect CBP's ability to process undocumented aliens at ports of entry.  The exact number of asylum seekers who were unable to enter the United States because of CBP's Queue Management actions could not be stated with certainty.

[18] The memorandum specified ports "may not create a line specifically for asylum seekers," but could create lines "based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents."



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

processing of travelers" based on the ports' processing capacity. Shortly thereafter, on May 24, 2018, DHS Chief of Staff Chad Wolf, on behalf of Secretary Nielsen's Office, asked CBP officials to determine "the number of [undocumented aliens] that would likely be turned away" every day if ports ran Queue Management operations full-time. Then-CBP Commissioner Kevin McAleenan instructed OFO Executive Assistant Commissioner Owen to report to the Secretary that if CBP assigned 200 officers to work limit lines, they would turn away approximately 650 undocumented aliens per day.

On June 5, 2018, Secretary Nielsen signed a memorandum authorizing port directors to establish Queue Management lines at all the Southwest Border ports.[19] The memorandum also informed port directors that processing inadmissible arriving aliens[20] (which may include asylum seekers) was not a priority,[21] and authorized port directors to reassign staff away from processing inadmissible arriving aliens, stating:

> CBP personnel and resources that would otherwise be deployed to process inadmissible arriving aliens can focus on the detection and apprehension of narcotics and currency smugglers.

Following this directive, the number of undocumented aliens waiting in Mexico to enter U.S. ports increased from 942 on June 20, 2018, to more than 2,000 on October 1, 2018.[22] In an October 5, 2018 email addressing the surge of aliens seeking asylum at the ports, then-DHS Deputy Secretary Claire Grady told senior CBP staff, "Business as usual, no matter how outstanding your officers are[,] isn't going to be a match for what we are facing." Nevertheless, CBP officials did not allocate additional resources to increase processing

---

[19] We made multiple requests to CBP for policies and guidance related to the "Queue Management" program. Despite the memorandum's title, "Prioritization-Based Queue Management," and the Secretary's initiation of an accompanying pilot program, CBP did not provide the document in response to our requests and none of the CBP staff we interviewed informed us of the memorandum's existence. DHS OIG only learned about the document through forensic email analysis.

[20] Documents we reviewed such as the "Prioritization-Based Queue Management" memorandum and CBP staff with whom we spoke use the term "inadmissible aliens" interchangeably with "undocumented aliens."

[21] The memorandum reiterated four superseding missions for the ports: 1) National security; 2) Counter-narcotics operations; 3) Economic security; and 4) Trade and travel facilitation.

[22] We derived this number from CBP daily Queue Management reports, which list the number of aliens awaiting processing on the Mexican side of the border. During OIG site visits and interviews, we learned CBP officials obtain these numbers from sources such as Mexican government officials, non-governmental organizations, and CBP officers' estimates of aliens in line. CBP does not track the number of aliens arriving at ports who are redirected to another port or told to place their names on a waiting list in Mexico.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

capability at ports of entry.  For instance, in response to an October 18, 2018 email suggesting ways for CBP to mitigate the growing surge of undocumented aliens, a CBP executive told his staff that expanding the operating hours of ports was "too resource intensive just to help the migrants."  In the same email, the executive wrote:

> We might consider adding officers when the port is closed to help secure against breaches [*sic*], but don't want to add extra hours to process more migrants.

In other emails, the executive declined to consider establishing temporary detention facilities for undocumented aliens, or increasing the number of aliens released with Notices to Appear (NTA).[23]  In a March 2019 DHS OIG interview with a senior CBP official on the Southwest Border, the official summarized CBP's response to the surge of undocumented aliens by stating, "We are hoping this thing just goes away."

Thus, while DHS leadership urged asylum seekers to present themselves at ports of entry, the agency took deliberate steps to limit the number of undocumented aliens who could be processed each day at Southwest Border land ports of entry.  By October 30, 2018, the number of undocumented aliens waiting outside the ports to be processed grew to more than 3,000.

## Without Notice to the Public, CBP Stopped Routine Processing of Most Undocumented Aliens, Including Asylum Seekers, at Seven Ports and Redirected Them to Other Ports

During our fieldwork, we learned CBP had stopped the routine processing of most undocumented aliens[24] — including asylum seekers — at 7 of the 24 Southwest Border land ports of entry.[25]  At these seven ports, CBP staff at the limit line do not simply control the flow of undocumented aliens into the port

---

[23] A Notice to Appear (NTA) is a legal document placing an alien in removal proceedings before the U.S. Department of Justice, Executive Office for Immigration Review.  Typically, ICE determines whether to release an individual from DHS custody with an NTA.  Although CBP OFO also has authority to issue NTAs, according to CBP officials, CBP OFO does not exercise that authority routinely.

[24] CBP officials said they make exceptions for some vulnerable populations, such as unaccompanied alien children or pregnant asylum seekers.  This exception does not appear to be documented in CBP policy, and OIG did not independently corroborate CBP's claim.

[25] The seven ports are Otay Mesa, Tecate, Calexico East, and Andrade, which fall under the San Diego field office; and Roma, Rio Grande City, and Progreso, which fall under the Laredo field office.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

facility; rather, they "redirect"[26] undocumented aliens who approach the limit line to different ports, telling the aliens the other port can process them more quickly. "Redirected" aliens must then travel through Mexico to another port and take their place behind others already waiting in the Queue Management line at that port.

The seven ports are designated as Class A ports, "Port[s] of Entry for all aliens," according to 8 C.F.R. § 100.4.[27] CBP has authority to change a port's classification[28] and has done so in the past to restrict, expand, open and close specific ports.[29] Designation of a port of entry is a formal DHS action.[30] When changing a port's classification, CBP has published a final rule in the Federal Register.[31] In a break from these longstanding practices, CBP has redirected undocumented aliens appearing at the seven ports yet has not redesignated those ports from Class A to another classification.

As discussed previously, DHS leadership made public pronouncements encouraging undocumented aliens to arrive at ports of entry, but never notified the public of its decision to stop processing aliens at the seven ports of entry. When DHS OIG asked a senior CBP official at one of the field offices about the lack of notification to the public, the official expressed concern about the legality of the redirection practice. At the Tecate port of entry in California, several officers also questioned the legality of the redirecting practice and said

---

[26] In this report, "redirect" means the practice of intercepting asylum seekers at a port's limit line position and instructing them to go to another port to apply for asylum.

[27] 8 C.F.R. § 100.4 regulates the type of individuals and cargo that ports process: "Class A means that the port is a designated Port-of-Entry for all aliens." The regulation also designates other classes of ports that do not process most undocumented aliens. For example, Class B ports process only certain aliens who are exempt from specific document requirements, in lawful possession of Lawful Permanent Resident cards, or who meet other eligibility requirements.

[28] The Regulation provides, "The designation of such a Port–of–Entry may be withdrawn whenever, in the judgment of the Commissioner, such action is warranted."

[29] *See, e.g.*, CBP, Closing the Jamieson Line, New York Border Crossing, 79 Fed. Reg. 42,449-01 (July 22, 2014); *see also* INS, DOJ, *Freedom of Information Act*, 32 Fed. Reg. 9,616, 9,618 (July 4, 1967) (quoting 8 C.F.R. § 100.4 that Class A ports are "for all aliens" and that designation may be withdrawn by Commissioner whenever warranted). CBP has added a Class B port and terminated one, after providing the public with notice and a period for commenting on the proposed changes.

[30] *United States v. Nunez-Soberanis*, 406 F. Supp. 3d. 835, 841 (S.D. Cal. 2019).

[31] Statement of Organization; Ports of Entry for Aliens Arriving by Vessel or by Land Transportation, and by Aircraft, 54 Fed. Reg. 47,673 (Nov. 16, 1989) (redesignating St. Aurelie, Maine, from a "Class A" port of entry to "Class B"); Statement of Organization; Ports of Entry for Aliens Arriving by Vessel or by Land Transportation, 49 Fed. Reg. 31,054 (Aug. 3, 1984) (redesignating Fort Hancock, Texas from a "Class B" port of entry to "Class A"); Statement of Organization; Field Service Realignment, 49 Fed. Reg. 30,057-01 (July 26, 1984) (redesignating Richford, Vermont station to a substation).



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

they were unwilling to work the limit line position.  These officers addressed their concerns with port management and their union representatives, which in turn led to a modification in the redirecting practice — i.e., port management instituted a protocol allowing limit line officers to contact a supervisor to come to the line and assume responsibility for redirecting aliens.  Although Tecate now has this protocol in place, the union representative is still unclear whether the practice is legal.

At these seven ports, which fall within the Laredo and San Diego field offices, CBP routinely told undocumented aliens at the limit line that the port currently lacked the capacity (holding space) or capability (staffing and resources) to process them, regardless of the port's actual capacity and capability.[32]  For instance, CBP's daily Queue Management reports indicated that from June 20, 2018, until November 8, 2018, all seven ports redirected undocumented aliens to other ports every day for which data was available, even though these records also show the ports did not detain a single undocumented alien in their available hold rooms on 80 percent of those days.[33]

Meanwhile, the ports to which CBP staff redirected the undocumented aliens range from a few miles to more than 30 miles away.  Often, this required traversing difficult desert terrain and potentially placed undocumented aliens at risk of encountering criminals who may exploit them, as areas in Mexico along the border with the United States are known to be controlled by criminal cartels.  Figures 1 and 2 illustrate the distance redirected undocumented aliens had to travel to a port that might process them.

---

[32] Reports emailed to CBP headquarters indicate the policy of redirecting was known at least to the level of then-CBP Commissioner Kevin McAleenan.
[33] We obtained this data from CBP's daily Queue Management reports, which track how many ports engage in redirecting and how many aliens each port has in its hold rooms.  CBP did not provide this data to OIG despite multiple requests, necessitating a forensic analysis of key CBP staff members' emails.  CBP OFO did not always generate a daily Queue Management report; however, we were able to obtain and analyze reports for 95 of the 141 days that fall between June 20, 2018, the date of the first report we obtained, and November 8, 2018, the date of the last report we obtained.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Figure 1. San Diego Field Office Redirecting Ports**



*Source*: OIG depiction of CBP data

**Figure 2. Laredo Field Office Redirecting Ports**



*Source*: OIG depiction of CBP data

Moreover, because CBP officers at the limit line do not generally ask migrants where they are from before redirecting them to another port, Mexican nationals



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

seeking asylum may be redirected along with asylum seekers from other countries. Redirected Mexican nationals must therefore remain in and travel through the very country in which they claim they are subject to persecution.

Our fieldwork indicated other destination ports have long lines of undocumented aliens already waiting to be processed. Accordingly, those who are redirected from one port must then go to the end of the Queue Management line at another port. For example, the Otay Mesa and Tecate ports of entry routinely redirected undocumented aliens to the San Ysidro port of entry. Once there, the aliens must enter the Queue Management line by putting their names on a list that often contains thousands of names, meaning they will wait in Mexico for weeks, if not months, before being granted access to the port to be processed by CBP.[34]

As shown in the following examples, creating barriers to entry at ports of entry may incentivize undocumented aliens to attempt to cross into the United States illegally, between ports of entry. For example, we interviewed 17 aliens who either were in detention or were recently released, 5 of whom said after growing frustrated with Queue Management and redirection practices at ports of entry, they decided to enter the United States illegally. We interviewed representatives from several non-profit and non-governmental organizations who stated they had similar concerns. We also learned of one case in which an asylum seeker crossed the border illegally after waiting in a Queue Management line for 2 days. When U.S. Border Patrol referred the asylum seeker's case to an Assistant United States Attorney (AUSA) for prosecution, the AUSA refused to prosecute given the long wait to which the asylum seeker was subjected.[35]

While temporarily holding aliens at ports of entry, CBP must directly supervise detained aliens and provide access to appropriate medical care, as detailed in TEDS.[36] CBP OFO leadership stated they implemented the redirecting procedure at these seven ports because they are remote ports with few staff and outdated facilities. For example, they said these ports closed at night and are far from medical care. Before implementing the redirecting procedure, CBP staff drove undocumented aliens to other ports for overnight holds and to medical facilities when necessary. We found four of the seven redirecting ports close at night, and one is more than 50 minutes away from medical care. Most

---

[34] CBP officials said they do not have direct access to the list, which is maintained in Mexico. In order to obtain the number of aliens waiting outside each port, CBP port officials and Mexican government officials communicate regularly to identify and schedule waiting aliens for entry and processing.
[35] We learned about this incident during our forensic email analysis.
[36] *See* TEDS, 4.6; TEDS, 4.10.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

of the ports' holding capacity is less than 20, but Tecate and Otay Mesa have capacity for 35 and 31, respectively.  Table 1 shows the capacity, distance from a medical center, and hours of operation for each redirecting port.

**Table 1.  Redirecting Ports of Entry Capacity, Distance to Medical Facilities, and Hours of Operation**

| Port | Capacity | Drive Time to Nearest Hospital | Port Hours of Operation |
|------|----------|-------------------------------|-------------------------|
| Tecate | 35 | Sharp Grossmont Hospital (53 min) | 5:00 am–11:00 pm, Daily |
| Calexico East | 10 | El Centro Medical Center (25 min) | 6:00 am–8:00 pm, Mon–Fri 10:00 am–6:00 pm, Sat |
| Andrade | 10 | Yuma Regional Medical Center (21 min) | 6:00 am–10:00 pm Daily |
| Otay Mesa | 31 | Sharp Chula Vista Medical Center (20 min) | 24 hours/7 days a week |
| Roma | 16 | Star County Memorial Hospital (15 min) | 24 hours/7 days a week |
| Rio Grande | 10 | Star County Memorial Hospital (10 min) | 7:00 am–12:00 am, Daily |
| Progreso | 17 | Knapp Medical Center (15 min) | 24 hours/7 days a week |

*Source:* OIG analysis of information CBP provided and information we identified from CBP.gov

## CBP Returned to Mexico Asylum Seekers Who Had Already Entered the United States

Despite provisions in the INA, CBP guidance, and statements from CBP senior leaders requiring CBP staff to process asylum seekers once they have physically entered the United States, at least four CBP ports returned to Mexico some asylum seekers who had crossed the international border and entered the United States.

The INA states any alien who is physically in the United States may apply for asylum.[37]  Consistent with this provision, CBP's April 27, 2018 Queue Management guidance states that once a traveler has entered the United States, he or she must be fully processed by CBP.  DHS also communicated its position on this matter to the public when, on June 18, 2018, it posted on its website:

> Myth: DHS is turning away asylum seekers at ports of entry;
> FACT: CBP processes all aliens arriving at all ports of entry without documents as expeditiously as possible....[38]

---

[37] 8 U.S.C. § 1225 requires CBP to inspect aliens who are seeking admission to the United States and 8 U.S.C. § 1158 states that any alien who is physically present or arrives in the United States may apply for asylum.
[38] https://www.dhs.gov/news/2018/06/18/myth-vs-fact-dhs-zero-tolerance-policy.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Similarly, on July 9, 2018, OFO Executive Assistant Commissioner Owen said in a press conference, "…despite what you may have heard, we never turn away individuals seeking asylum at port[s] of entry."

However, we found that, at four ports of entry — Otay Mesa, San Ysidro, Tecate, and Nogales' Morley Gate — CBP did not process asylum seekers who had entered the United States, returning them to Mexico instead. For instance, our fieldwork indicated, CBP officers at San Ysidro and Tecate ports returned to Mexico asylum seekers who had not only crossed over the international boundary into the United States, but also had entered the ports' buildings.

In addition, all four ports established their limit lines inside the boundary line on the U.S. side of the international border. As a result, asylum seekers and other undocumented aliens stepped into the United States to reach the Queue Management line, where they were instructed either to go to another port, or to return to Mexico to wait in line.[39] Two of the ports, San Ysidro and Otay Mesa, eventually moved their limit lines to the border, but as of August 2019, the Tecate and Nogales' Morley Gate limit lines had not moved, and remained inside the United States. Asylum seekers and other undocumented aliens who approach those limit lines are physically present in the United States at the time CBP turns them away by redirecting them to another port.

## CBP Did Not Use All Available Detention Space

We found two ports had stopped using available detention space, even though undocumented alien families were waiting in Queue Management lines. Management at those ports said staffing was insufficient to monitor the rooms. However, other staff we interviewed disagreed with that assessment. Although CBP is short-staffed at Southwest Border ports, fiscal year 2018 staffing had improved from FY 2016, when larger numbers of aliens were processed.

On June 18, 2018, field offices began sending daily summaries from the ports of entry to CBP headquarters, detailing the number of aliens in custody, the number waiting to be processed, and available holding capacity.[40] The reports

---

[39] CBP officers at the San Ysidro Pedestrian East entry would tell asylum seekers they had to put their names on the Queue Management list and wait for their turn to be processed.
[40] Available holding capacity does not always reflect the ability of a port to accommodate additional detainees. CBP detention standards mandate aliens be segregated by gender and age, and other factors to protect at risk detainees. For example, if a port has only 2 cells, each able to hold 10 detainees, and CBP encounters 10 adult male aliens and 1 unaccompanied alien child, the adult males will all be placed in one cell, while the unaccompanied alien child will be placed in the other cell. The port is then unable to process more adult male aliens, despite being at only 55 percent capacity.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

show increasing numbers of aliens waiting to be processed on the Mexican side of the border, yet they also indicate the ports were not using all available detention capacity.

For example, we observed this scenario during our visit to the San Luis port of entry in Arizona. At the San Luis port, which has the capacity to hold 48 detainees, we found at the time of our visit in October 2018 that CBP was detaining only 5 undocumented aliens while a line of at least 30 more waited along the international border.[41] Yet, we observed several empty holding cells and an empty trailer fully equipped to hold undocumented families, even though there was a line of waiting aliens. We later learned from CBP's daily Queue Management Report that 105 aliens were in the queue to enter the port that day.

When interviewed by DHS OIG, staff at the San Luis port said they could process more asylum seekers than they were processing.[42] When we asked why the San Luis port elected not to process the undocumented aliens waiting at the Queue Management line, we received a range of answers. The senior port official said the undocumented aliens waiting outside were not real asylum seekers, but rather came to seek economic opportunity. However, this assumption on the part of the official is not an appropriate basis for CBP to refuse to process the individuals, as CBP officials do not have the authority to evaluate the credibility of asylum claims and must process all claiming to seek asylum, regardless of the officials' opinions about the strength of their claims. Alternatively, two staff members at the San Luis port of entry said management "above" the port sets limits on the numbers of undocumented aliens the port should process. One of these officers told us, "I know from what came down from HQ, we are trying to process the least amount of people."

During our visit in November 2018, we observed a similar situation at the Nogales port of entry, which consists of three separate crossing points close to each other geographically: the Mariposa facility, DeConcini crossing, and Morley Gate. CBP added family unit holding cells to the Mariposa facility when it renovated the port in 2014, but CBP was not using those cells during our fieldwork. We observed at least six hold rooms and office space that were either empty or used for storage. A port official said the staff had used these hold rooms during the 2016 surge of Haitian migrants, but did not recall the last time they were used since then.

---

[41] CBP provided us with internal reports stating the port's capacity is 48 aliens. However, in an interview, a senior port official told us the port's capacity was 35 aliens.
[42] We visited the San Luis port of entry on October 30, 2018 to observe operations, including the Queue Management line, and to interview CBP employees familiar with processing undocumented aliens.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

According to the official, the port does not use the hold rooms because it does not have enough staff to monitor aliens in the rooms, and the facility closes at night.  The official told us when his staff encounter undocumented aliens, they drive them a short distance to the DeConcini crossing.  However, on the day of our visit, the DeConcini crossing's hold rooms were full.  As a result, the 20 or more aliens waiting outside the DeConcini facility would not be processed until the DeConcini crossing's hold rooms became available.  In the meantime, the hold rooms in the Mariposa facility, 3 miles away, were empty.

It is unclear why officials at the Nogales port assigned staff to transport undocumented aliens to other CBP facilities rather than assigning the officers to monitor these aliens at the Nogales port.  Additionally, by assigning staff to operate the limit line, the port reduced its capability to process undocumented aliens.

Although CBP has been attempting to hire more officers to fill vacant positions, many ports of entry are not at full staffing.  According to CBP OFO's port of entry staffing data, shown in Table 2, overall staffing rates at four field offices' ports have improved since FY 2016, when three of four CBP field offices processed more undocumented aliens than in FYs 2017 and 2018.

**Table 2.  Southwest Border Land Port of Entry CBP OFO Staffing Levels and Numbers of Undocumented Aliens Processed in FYs 2016 – 2018**

| Field Office | FY 16 Staff % | Aliens Processed in FY 2016 | FY 17 Staff % | Aliens Processed in FY 2017 | FY 18 Staff % | Aliens Processed in FY 2018 |
|---|---|---|---|---|---|---|
| El Paso | 98.4% | 23,787 | 101.2% | 17,308 | 99.7% | 23,509 |
| Laredo | 90.0% | 68,957 | 94.5% | 48,524 | 99.2% | 48,059 |
| San Diego | 83.1% | 49,075 | 86.5% | 31,252 | 90.3% | 35,288 |
| Tucson | 73.9% | 12,105 | 71.9% | 13,885 | 78.7% | 17,303 |
| **All Southwest Border** | **87.1%** | **153,924** | **90.0%** | **110,969** | **93.6%** | **124,159** |

*Source*: CBP

## Conclusion

In 2018, as surges of undocumented aliens sought asylum in the United States, the DHS Secretary and CBP leadership urged asylum seekers to come to ports of entry to be processed.  However, DHS and CBP took actions to reduce the number of asylum seekers CBP processed daily.  Under the INA, the



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

U.S. Government must process all those who are physically in the United States and express fear of persecution in their home country or an intention to seek asylum.  The law does not set limits as to the number of asylum seekers the Government can or must process.  Nevertheless, the Secretary and CBP have effectively limited access for undocumented aliens wishing to claim asylum in the United States, sometimes without notice to the public.  As a result, the numbers of asylum seekers in Queue Management lines grew.  As the lines grew and asylum seekers were redirected to other ports, some undocumented aliens attempted to enter the United States illegally, exacerbating the very problem DHS sought to solve.

## Recommendations

We recommend the CBP Acting Commissioner:

**Recommendation 1:** Resume processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or formally redesignate the ports to exclude undocumented aliens.

**Recommendation 2:** Provide written guidance and training to CBP personnel at ports of entry relating to the proper handling of aliens who are physically present in the United States and indicate an intention to apply for asylum.

**Recommendation 3:** Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

## Management Comments and OIG Analysis

We have included a copy of CBP's Management Response in its entirety in Appendix B.  We also received technical comments from CBP and incorporated them into the report where appropriate.  CBP did not concur with Recommendation 1, but concurred with Recommendations 2 and 3.  We consider Recommendation 1 unresolved and open.  Recommendations 2 and 3 are resolved and open.  A summary of CBP's responses and our analysis follows.

In its response to our report, CBP expressed concerns that the report "demonstrates a fundamental misunderstanding of Office of Field Operations (OFO) holding capacity holding capacity [*sic*] compared to its operational capacity."  CBP said its capacity to detain individuals in its short-term facilities depends on many factors, including:

- Demographics of the individual in custody;
- Medical or other needs of individuals in custody;



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

- Ability of ICE ERO or HHS to transfer individuals out of CBP custody;
- OFO's available resources to process and hold individuals;
- Competing priority missions; and
- Availability of staff, room, and resources.

In our report, we acknowledge the difference between holding and operational capacity, though we use the terms capacity and capability. The report explains that capacity (holding space) and capability (staffing and resources) were the reasons for CBP's stated limitations to process undocumented aliens. However, our evidence also indicates that CBP OFO used these reasons regardless of the port's actual capacity and capability, as detailed on page 10 of the report.

Moreover, throughout the report, we address the confluence of factors that affect the capability/operational capacity of a given port. For example, we explain in footnote 40,

> Available holding capacity does not always reflect the ability of a port to accommodate additional detainees. CBP detention standards mandate aliens be segregated by gender and age. For example, if a port has only 2 cells, each able to hold 10 detainees, and CBP encounters 10 adult male aliens and 1 unaccompanied alien child, the adult males will all be placed in one cell, while the unaccompanied alien child will be placed in another cell. The port is then unable to process more adult male aliens, despite being at only 55 percent capacity.

The report also recognizes the constraints facing CBP. As described on page 12, we detail that while temporarily holding aliens at ports of entry, CBP must directly supervise detained aliens and provide access to appropriate medical care. The report explains how and why CBP OFO leadership implemented the redirecting procedure at some ports. Finally, the report's background provides historical context for how challenging it has been for CBP to manage the surges of undocumented aliens in its facilities given CBP OFO's complex mission.

As the report describes, DHS leadership directed ports to focus resources and staff on all other OFO missions other than processing inadmissible aliens despite improved levels of staffing in every field office since 2016 and available holding capacity. The 2018 queue management reports showed that the redirecting ports rarely reported anyone in custody. Finally, the report details that staff at the ports we visited received instructions to redirect all asylum seekers, and port staff were not checking the port's capability or capacity before doing so. These findings were further corroborated by the OIG's



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

previous review, *Investigation of Alleged Violations of Immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel (OSC File No. DI-18-5034).*

In its response, CBP also raised concerns about OIG's analysis and conclusions regarding 8 CFR § 100.4., stating "…it is not within OIG's mission or authority to provide legal advice to the Department." We note that the IG is duty-bound to promote efficiency and prevent and detect abuse within agency programs and operations.

**Recommendation 1:** Resume processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or formally redesignate the ports to exclude undocumented aliens.

**CBP Response:** CBP did not concur with the recommendation. CBP officials said their decision to redirect the processing of undocumented aliens at the seven ports of entry to other ports depended on operational capacity and the resources available to execute its primary mission of securing the border. Additionally, CBP stated that specific dynamics at each port of entry affect the port's capacity to process and hold aliens without documents and each port director must maintain a discretionary balance between processing aliens and facilitating trade, travel, and counter-narcotics missions. CBP requested that OIG consider this recommendation resolved and closed.

**OIG Response:** We consider this recommendation unresolved and open. The intent of the recommendation is for CBP to address the "discretionary balance" of missions at the seven redirecting ports. We understand that port directors consider many factors when prioritizing port resources and missions, however, these seven ports have effectively ceased processing aliens without regard to other missions. The recommendation will remain unresolved and open until CBP can show it is processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or CBP has formally reclassified those ports consistent with long-established procedures.

**Recommendation 2:** Provide written guidance and training to CBP personnel at ports of entry relating to the proper handling of aliens who are physically present in the United States and indicate an intention to apply for asylum.

**CBP Response:** CBP concurred with the recommendation. In its response, CBP said it has issued the following guidance to its employees:

1. *Processing of Expedited Removal Cases*, October 2, 2014
2. *Metering Guidance*, April 27, 2018



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

3. *Metering Guidance*, April 30, 2020

CBP requested that OIG consider this recommendation resolved and closed as implemented.

**OIG Analysis:**  We consider these actions responsive to the intent of the recommendation, which is resolved and open.  CBP issued two of the three documents before we initiated our fieldwork, and based on our findings, those documents alone may be insufficient for training.  CBP's April 30, 2020 "Metering Guidance" memorandum restates CBP policy on metering to Directors of Field Offices, however, it does not address officer training or provide any indication the guidance was disseminated to the OFO's line officers.  We will close this recommendation when we receive documentation showing that CBP employees have received training on how to follow the metering guidance.

**Recommendation 3:**  Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

**CBP Response:**  CBP concurred with the recommendation.  CBP said its port directors use discretion in balancing mission requirements with respect to activities occurring at the port as well as available resources when evaluating the operational capacity to ensure the most efficient use of resources.  CBP requested that OIG consider this recommendation resolved and closed as implemented.

**OIG Analysis:**  We consider this action responsive to our recommendation, which is resolved and open.  However, the intent of the recommendation is for CBP to assess the use of each port's available holding spaces to identify areas where port directors could address capacity and capability issues to enable more flexibility in balancing mission needs.  CBP did not provide any documentation showing that it conducted an evaluation of available holding spaces.  We will close this recommendation when we receive documentation that CBP has performed such an evaluation of more efficient use of available holding spaces to process undocumented aliens.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Objective, Scope, and Methodology

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Public Law 107−296) by amendment to the *Inspector General Act of 1978*.

We initiated this review in response to 2 congressional requests signed by 53 members that our office received in June 2018, with the following objectives, to determine whether CBP's OFO is: (1) turning away those who present themselves for asylum at ports of entry; and (2) separating family units seeking asylum and documenting this practice appropriately. We have split discussion of our findings into two separate reports. This report addresses the first objective, whether CBP's ports of entry are turning away asylum-seeking aliens. We are issuing a second report, which addresses the second objective, separation of family units at CBP OFO ports of entry.

To answer our objectives, we conducted unannounced site visits to 12 land ports of entry across 4 field offices along the Southwest Border, listed below, where we interviewed CBP staff and observed port operations. We also interviewed officials in CBP headquarters, Washington D.C.

<u>Laredo, Texas, Field Office and ports of entry:</u>
1. Brownsville
   a. Brownsville and Matamoros Bridge
   b. Gateway International Bridge
2. Hidalgo

<u>El Paso, Texas, Field Office and ports of entry:</u>
3. Paso Del Norte Bridge

<u>Tucson, Arizona, Field Office and ports of entry:</u>
4. Nogales
   a. DeConcini crossing
   b. Mariposa facility
   c. Morley Gate
5. Douglas
6. Lukeville
7. Naco
8. San Luis

<u>San Diego, California, Field Office and ports of entry:</u>
9. Calexico



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

10. Otay Mesa
11. San Ysidro
12. Tecate

To obtain a different perspective of the issues, we spoke with representatives of six non-governmental organizations.

We used forensic means to gather and search CBP emails because we had not received complete and accurate information from CBP during our fieldwork. Early in the review, we asked CBP for policies, procedures, and training related to CBP's asylum processing at the ports of entry, and received few, marginally related documents in response. We did not receive any policies or procedures for conducting Queue Management lines or redirecting undocumented aliens. During our interviews in the field, we heard conflicting accounts of CBP policies and procedures, and learned of policies CBP had not provided to us, despite their relevance to our work. As a result, we requested the email accounts of 49 senior OFO officials at Headquarters, Field Offices, and ports of entry from April 2018 through November 8, 2018. CBP provided the emails and because of this search, we identified the Secretary's June 5, 2018 announcement of the Prioritization-based Queue Management pilot program, preparations for it, and subsequent actions at the ports, such as Queue Management lines and redirecting procedures.

We conducted the preliminary research for this review between June and October 2018, and conducted fieldwork between November 2018 and April 2019, under the authority of the *Inspector General Act of 1978*, as amended, and according to the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

## Appendix B
## CBP Comments to the Draft Report



1300 Pennsylvania Avenue NW
Washington, DC 20229

U.S. Customs and
Border Protection

September 8, 2020

MEMORANDUM FOR:   Joseph V. Cuffari, Ph.D.
                  Inspector General

FROM:             Henry A. Moak, Jr.                    X _____  9/8/2020
                  Senior Component Accountable Official
                  U.S. Customs and Border Protection    Signed by: HENRY A MOAK JR

SUBJECT:          Management Response to Draft Report: "CBP Has Taken Steps
                  to Limit Processing of Undocumented Aliens at Ports of Entry"
                  (Project No. 18-122-ISP-CBP)

Thank you for the opportunity to comment on this draft report. U.S. Customs and Border
Protection (CBP) appreciates the work of the Office of Inspector General (OIG) in
planning and conducting its review and issuing this report.

CBP is pleased that the OIG's draft report recognizes that CBP has taken disciplinary
action against CBP Officers (CBPO) found, in violation of asylum-processing policies, to
have returned individuals physically present in the U.S. and who expressed a fear of
return to Mexico. Integrity is one of CBP's Core Values and it is essential to the
effective functioning of the Agency. As an Agency charged with law enforcement
activities, it is imperative that all CBP employees demonstrate high standards.

CBP is concerned, however, that the draft report demonstrates a fundamental OIG
misunderstanding of the Office of Field Operations (OFO) holding capacity *holding
capacity* compared to its *operational capacity*. Title 6, United States Code (U.S.C.)
Section 211(g), assigns CBP OFO its multifaceted mission set to coordinate enforcement
activities at air, land, and sea ports of entry (POEs); safeguard the United States from
illegal entry of persons; and facilitate the flow of legitimate travelers and trade. As part
of its mission to secure the border and facilitate lawful trade and travel, CBP OFO takes
steps, as needed, to regulate the flow of travelers into the POEs. Regulating the flow
ensures that each POE has enough operational capacity to safely process all individuals,
as well as execute its priority mission sets. In recent years, CBP has seen an increasing
number of aliens presenting at POEs who do not possess appropriate travel and
identification documents required by law. Processing these aliens requires a substantial
amount of time and resources that, if not carefully managed, negatively affects the flow



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

of trade and other travel. Thus, CBP must carefully balance its space and resources to ensure that the POEs have enough capacity to address all aspects of its mission set, including the safety of all travelers accessing the POE.

In 2016, there was a significant influx of aliens, without appropriate documents, seeking entry into the United States along the U.S.-Mexico border. The demographics of the inadmissible applicants for admission also began evolving from single adults to include families. In addition, the number of individuals who presented themselves at the border exceeded CBP OFO's operational capacity to safely process, and hold, these individuals in its short-term detention facilities. It also strained the resources of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) long-term custodial facilities. Regardless, upon completion of the inspection of an inadmissible applicant for admission, the U.S. Government is statutorily required to detain the inadmissible applicant for admission in accordance with the provisions of Sections 235(b)(1) and (2) of the Immigration and Nationality Act (INA) [8 U.S.C. 1225(b)(1)-(2)].

CBP's capacity to detain individuals in its short-term facilities depends on many factors, including:

- Demographics of the individuals in custody;
- Medical or other needs of individuals in custody;
- Ability of ICE ERO (or, if an unaccompanied alien child, the U.S. Department of Health and Human Services) to transfer individuals out of CBP custody; and
- OFO's available resources to safely process and hold individuals.

The operational capacity of a POE also depends largely on the resources available to the POE to execute its primary mission of securing the border. CBP's capacity to process and hold aliens without documents sufficient for lawful entry is dependent on more than the amount of available physical holding space. It is also dependent on other activities occurring at the POE, including:

- Encounters with individuals who have terrorist, criminal, or gang ties;
- Volume of trade and trade enforcement issues;
- Detection of contraband; and
- Volume of other travelers seeking entry into the United States.

Regarding OIG's analysis and conclusions that CBP actions were inconsistent with 8 CFR § 100.4, it is important to note that it is not within OIG's mission or authority to provide legal advice to the Department. It is also inappropriate for the OIG to infer that the Department must act in accordance with OIG's conclusions. To ensure that CBP maintains a safe inspectional environment for personnel, as well as all travelers and goods processed at POEs, CBP may engage, as necessary, in steps to regulate the flow of

2



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

travelers without documents sufficient for lawful entry. Queue management (also known as "metering") allows CBP to engage in all aspects of its multifaceted mission set at POEs along the U.S.-Mexico border. During queue management, CBPOs are required to stand at, or as close as operationally possible, to the international boundary, also known as the "limit line," to determine whether travelers approaching the POE have documents sufficient for lawful entry to the United States. If an alien does not have the requisite documents to apply for admission to the United States, the alien may be required to wait in Mexico until resources and capacity allows for processing.

CBP must have enough operational capacity, including personnel, space, and technology, to execute its full mission set of protecting national security, interdicting narcotics and other contraband, protecting the country's economic security and facilitating lawful trade and travel. When a POE lacks operational capacity to safely process and hold aliens without documents sufficient for lawful entry and execute its full mission set, queue management, which is consistent with principles of determining when, where, and how aliens may apply for admission to the United States may be required. This ensures CBP resources are efficiently balancing its multifaceted mission set until resources to process aliens without documents sufficient for lawful entry are operationally available.

CBP policy prohibits personnel from taking any steps to discourage travelers from waiting at the international border to be processed from claiming fear of return to another country or from seeking any other protections. On April 27, 2018, CBP's OFO issued guidance on metering, which states in part, "Once a traveler is in the United States, he or she must be fully processed …." Therefore, it is CBP policy that upon an individual's arrival at a POE that individual shall be inspected and processed. If, upon arrival in the United States, an individual (of any nationality) expresses an intention to apply for asylum, a fear of return to their home country, or a fear of persecution or torture in their home country, that individual's claim is referred to an asylum officer or an immigration judge for further consideration. CBP OFO holds its managers, supervisors, and CBPOs accountable to correctly follow the laws, regulations, and procedures in the processing of inadmissible applicants for admission, including those who express a fear of return or a desire to seek asylum. DHS and CBP have repeatedly provided CBPOs guidance to reinforce the correct laws, regulations, and help ensure procedures are adhered to in the processing of inadmissible applicants for admission. And, as recognized by the OIG, personnel that violate CBP's asylum-processing policies have been disciplined.

The draft report contained three recommendations, including two with which CBP concurs (Recommendations 2 and 3) and one with which CBP non-concurs (Recommendation 1). Attached find our detailed response to each recommendation. CBP previously submitted technical comments under a separate cover for OIG's consideration.

3



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Again, thank you for the opportunity to review and comment on this draft report.  Please feel free to contact me if you have any questions.

Attachment

4



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

## Attachment: Management Response to Recommendations Contained in 18-122-ISP-CBP

OIG recommended that the CBP Acting Commissioner:

**Recommendation 1:** Resume processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or formally redesignate the ports to exclude undocumented aliens.

**Response:** Non-concur. CBP will ensure public notification, as necessary, when POEs make changes to better align with operational capacity. However, CBP's decision to redirect the processing of undocumented aliens at the seven ports of entry to other posts was dependent on operational capacity, and the resources available to the POEs to execute its primary mission of securing the border. CBP's capacity to process and hold aliens without documents sufficient for lawful entry is dependent on many factors, not just on the amount of available holding space. It is also contingent on other POE specific dynamics, including:

- Operating hours;
- Access to medical facilities/personnel to comply with screening requirements;
- Isolation and quarantine requirements for certain individuals and those with communicable diseases;
- Encounters of individuals with terrorist, criminal, or gang ties;
- Volume of trade and other trade enforcement issues;
- Detection of contraband; and,
- Volume of other travelers seeking entry to the United States.

There is a discretionary balance by port directors assessing their mission requirements to process lawful trade and travel, to address CBP's counter-narcotics mission, and to process people arriving without documents. This balance must be maintained.

CBP requests that the OIG consider this recommendation resolved and closed.

**Recommendation 2:** Provide written guidance and training to CBP personnel at ports of entry relating to the proper handling of aliens who are physically present in the United States and indicate an intention to apply for asylum.

**Response:** Concur. On October 2, 2014, CBP OFO issued a memorandum "Processing of Expedited Removal Cases," which has been in effect through the period of OIG's audit and which outlines the requirement that once an alien expresses a fear of return or a

5



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

desire to apply for asylum, the alien must be processed accordingly. Additionally, on April 27, 2018, CBP OFO issued a memorandum "Metering Guidance," which emphasizes that once a traveler is in the United States, he or she must be processed. CBP OFO reiterated these requirements on April 30, 2020, with the issuance of second memorandum titled "Metering Guidance." Copies of these memorandums were previously provided to the OIG under separate cover.

CBP requests that the OIG consider this recommendation resolved and closed, as implemented.

**Recommendation 3:** Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

**Response:** Concur. CBP port directors evaluate operational capacity daily at the POEs to ensure the most efficient use of resources. The assessment of operational capacity is based on the activities occurring at a POE at any given time, as well as the resources necessary to balance national security, and facilitating legitimate travel and trade. There is a discretionary balance by the port director assessing their mission requirements to process lawful trade and travel, to address our counter-narcotics mission, and to process people arriving without documents.

CBP requests that the OIG consider this recommendation resolved and closed, as implemented.

6



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix C
## Timeline of Asylum Processing Significant Events in 2018



**Zero-Tolerance Policy**
As implemented by DHS, required CBP to refer for prosecution every adult who entered the United States illegally, including those traveling with their children. By early May, CBP separated parents, who entered illegally, from their children.

April 6, 2018

**Initial Queue Management Guidance**
CBP issued guidance for establishing queue management lines to slow the flow of undocumented aliens arriving in Southwest border ports.

April 27, 2018

**DHS Secretary Public Statement**
Secretary Nielsen told Congress, "Help me message: If you are fleeing and coming to the United States please come to the ports of entry. [We] will process your claim there."

May 9, 2018

**DHS Secretary Request**
Secretary Nielsen asked CBP officials to examine the number asylum seekers CBP could turn away every day if CBP ports ran queue management lines full-time.

May 24, 2018

**DHS Secretary Memo on CBP Priorities**
Secretary Nielsen signed an internally-circulated memo emphasizing that processing undocumented aliens was not one of CBP's main priorities and encouraging Port Directors to re-assign CBP staff away from processing such aliens.

June 5, 2018

**DHS Secretary White House Press Briefing**
Secretary Nielsen told reporters, "As I said before, if you're seeking asylum, go to a port of entry. You do not need to break the law of the United States to seek asylum." When reporters told the Secretary that media reported families turned away at ports of entry, she described that reporting as 'incorrect.'

June 18, 2018

**CBP OFO EAC Statement**
Executive Assistant Commissioner Owen said during a press conference, "despite what you may have heard, we never turn away individuals seeking asylum at port[s] of entry."

July 9, 2018

**OIG Observations**
During our site visit to San Ysidro POE, we observed a CBPO turn away a mother and two children who had crossed the border into the U.S.

August 28, 2018



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix D**
**Office of Special Reviews and Evaluations Major Contributors to This Report**

Tatyana Martell, Chief Inspector
Elizabeth Kingma, Team Lead
Adam Brown, Senior Inspector
Stephen Farrell, Senior Inspector
Paul Lewandowski, Senior Inspector
Jason Wahl, Senior Inspector
Jon Goodrich, Investigative Counsel
Gregory Flatow, Program Analyst
Michael Brooks, Independent Reference Reviewer

 **OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix E
## Report Distribution

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Strategy, Policy, and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Commissioner, CBP
CBP Component Liaison

### Office of Management and Budget

Chief, Homeland Security Branch
DHS OIG Budget Examiner

### Congress

Congressional Oversight and Appropriations Committees

## Additional Information and Copies

To view this and any of our other reports, please visit our website at:
www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General
Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click
on the red "Hotline" tab. If you cannot access our website, call our hotline at
(800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305