JEFFREY BOSSERT CLARK
Acting Assistant Attorney General,
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| CHAD F. WOLF, Acting Secretary of Homeland Security, *et al.*, in their official capacities,* | |
| *Defendants*. | |

---

\* Pursuant to Federal Rule of Civil Procedure 25(d), Acting Commissioner Morgan is automatically substituted as a Defendant for former Commissioner McAleenan, and Executive Assistant Commissioner Ferrara is automatically substituted as a Defendant for former Executive Assistant Commissioner Owen.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................. ii

INTRODUCTION ............................................................................1

ARGUMENT ...................................................................................1

I.    Plaintiffs Lack a Private Right of Action to Enforce the INA. .................1

II.   Defendants Have Not Taken Discrete and Final Agency Action
      of the Sort Plaintiffs Contend. .................................................3

III.  Defendants Have Not "Direct[ed] CBP Officers to Unlawfully
      Withhold a Discrete, Mandatory Ministerial Action." ..........................8

IV.   Metering is Statutorily Permissible. .........................................12

V.    Defendants' Actions are Not Arbitrary and Capricious. .......................14

      A.    Defendants' Border-Wide Actions are Not Based on
            "Pretext." ............................................................14

      B.    Metering is Consistent with Congressional Intent. ....................21

VI.   Metering Does Not Deprive Class Members of Procedural Due
      Process. .....................................................................22

VII.  Plaintiffs' International-Law Claim is Not Actionable. .......................23

CONCLUSION .................................................................................25

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

# TABLE OF AUTHORITIES

**Federal Cases**

*AID v. All. for Open Soc. Int'l*,
    140 S. Ct. 2082 (2019)..................................................................23

*Al Otro Lado v. McAleenan*,
    394 F. Supp. 3d 1168 (S.D. Cal. 2019) ............................................. 10, 12, 24

*Al Otro Lado v. Nielsen*,
    327 F. Supp. 3d 1284 (S.D. Cal. 2018) .........................................3

*Al Shimari v. CACI Premier Tech., Inc.*,
    320 F. Supp. 3d 781 (E.D. Va. 2018)..................................................25

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)..................................................................2

*Bark v. U.S. Forest Serv.*,
    37 F. Supp. 3d 41 (D.D.C. 2014)..................................................4, 6

*Barrios v. Holder*,
    581 F.3d 849 (9th Cir. 2009) ................................................. 10, 11

*Boumediene v. Bush*,
    553 U.S. 723 (2008)..................................................................23

*Carmen v. San Francisco Unif. School District*,
    237 F.3d 1026 (9th Cir. 2001) ................................................. 4, 16

*Cath. Charities CYO v. Chertoff*,
    622 F. Supp. 2d 865 (N.D. Cal. 2008)..................................................2

*Compassion Over Killing v. FDA*,
    849 F.3d 849 (9th Cir. 2017) ................................................. 13, 14

*D.A.M. v. Barr*,
    — F. Supp. 3d —, 2020 WL 5525056 (D.D.C. Sept. 15, 2020)....................7

*Dalton v. Specter*,
    511 U.S. 462 (1994)..................................................................2

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

*Dept. of Commerce v. New York*,
 139 S. Ct. 2551 (2019)............................................................ 14, 15, 17, 20

*DHS v. Regents of the Univ. of Cal.*,
 140 S. Ct. 1891 (2020)....................................................................17

*DHS v. Thuraissigiam*,
 140 S. Ct. 1959 (2020)................................................................ 9, 23

*Eberle v. City of Anaheim*,
 901 F.2d 814 (9th Cir. 1990) .........................................................12

*Hawkins v. Comparet-Cassani*,
 33 F. Supp. 2d 1244 (C.D. Cal. 1999)...............................................24

*Hells Canyon Preservation Council v. U.S. Forest Serv.*,
 593 F.3d 923 (9th Cir. 2010) .........................................................11

*Hernandez v. Mesa*,
 140 S. Ct. 735 (2020).............................................................. 2, 25

*Hispanic Affairs Project v. Acosta*,
 901 F.3d 378 (D.C. Cir. 2018).........................................................7

*Hoefer v. Fluor Daniel, Inc.*,
 92 F. Supp. 2d 1055 (C.D. Cal. 2000).............................................10

*In re Barr Labs, Inc.*,
 930 F.2d 72 (D.C. Cir. 1991).........................................................14

*INS v. Stevic*,
 467 U.S. 407 (1984)....................................................................24

*Jean v. Nelson*,
 472 U.S. 846 (1985)....................................................................15

*Jennings v. Rodriguez*,
 138 S. Ct. 830 (2018)..................................................................19

*Keene Corp. v. United States*,
 508 U.S. 200 (1993)......................................................................2

iii

*Lujan v. Nat'l Wildlife Fed.*,
    497 U.S. 871 (1990).................................................................................4, 7

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)....................................................................................13

*Moriarty v. County of San Diego*,
    No. 17-cv-1154, 2020 WL 5656689 (S.D. Cal. Sept. 23, 2020)..................15

*Ms. L. v. ICE*,
    302 F. Supp. 3d 1149 (S.D. Cal. 2018) .....................................................2, 3

*New Mexico v. McAleenan*,
    450 F. Supp. 3d 1130 (D. N.M. 2020)...........................................................3

*Pfingston v. Ronan Eng'g Co.*,
    284 F.3d 999 (9th Cir. 2002) ......................................................................15

*Quidel Corp. v. Siemens Med. Solutions USA, Inc.*,
    — F. Supp. 3d —, 2020 WL 1820247 (S.D. Cal. Apr. 9, 2020)...................16

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015).............................................................3, 6

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)....................................................................................13

*Ramirez v. ICE*,
    310 F. Supp. 3d 7 (D.D.C. 2018)..................................................................7

*Rodriguez v. Swartz*,
    899 F.3d 719 (9th Cir. 2018) ......................................................................23

*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) ............................. 9, 10, 24

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ......................................................................22

*SEC v. Total Wealth Mgmt., Inc.*,
    No. 15-cv-226, 2018 WL 3456007 (S.D. Cal. July 18, 2018) ........................5

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ....................................................................1, 2

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

*Snapp v. United Transp. Union,*
    559 F.3d 1088 (9th Cir. 2018) ................................................................8

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004)................................................................ 24, 25

*Swartz v. Rodriguez,*
    140 S. Ct. 1258 (2020)........................................................................23

*Telecommunications Research and Action Center v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984)............................................................12

*Trump v. Sierra Club,*
    — S. Ct. —, 2020 WL 6121565 (U.S. Oct. 19, 2020) ....................2

*Trump v. Sierra Club,*
    140 S. Ct. 1 (2019)..............................................................................1

*Trump v. Sierra Club,*
    140 S. Ct. 2620 (2020)........................................................................2

*United States v. Aldana,*
    878 F.3d 877 (9th Cir. 2017) ............................................................9

*United States v. Crawford,*
    239 F.3d 1086 (9th Cir. 2001) ........................................................8

*Webster v. Doe,*
    486 U.S. 592 (1988)............................................................................3

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017)......................................................................25

**Federal Statutes**

5 U.S.C. § 551(13) ..................................................................................4

6 U.S.C. § 111(b) ..................................................................................12

6 U.S.C. § 202................................................................................ 12, 22

6 U.S.C. § 211(c) ............................................................................ 12, 22

6 U.S.C. § 211(g)(3)........................................................................ 12, 22

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

8 U.S.C. § 1158(a)(2)(B) ................................................................11

8 U.S.C. § 1225(a)(1) .......................................................................9

8 U.S.C. § 1225(a)(3) ......................................................................12

8 U.S.C. § 1225(b)(1)(A)(ii) ..........................................................11

8 U.S.C. § 1225(b)(2)(C) ................................................................19

**Federal Regulations**

8 C.F.R. § 1.2 .....................................................................................9

**Federal Rules**

Fed. R. Civ. P. 30(c)(2) .....................................................................5

Fed. R. Civ. P. 32(d)(3)(A) ..............................................................5

Fed. R. Evid. 602 ..............................................................................4

**Acts of Congress**

Illegal Immigration Reform and Immigrant Responsibility Act,
Pub. L. No. 104-208, 110 Stat. 3009 (1996) ..............................10

**Legislative Materials**

H. Rept. 104-469, pt. 1 (1996) .......................................................19

H. Rept. 104-879 (1997) .................................................................11

S. Exec. Rep. No. 14, 90th Cong., 2d Sess. (1968) .......................24

# INTRODUCTION

This Court should grant summary judgment for Defendants on all counts and deny Plaintiffs' Motion for Summary Judgment in its entirety. As the government has demonstrated, Plaintiffs have no cause of action under the Immigration and Nationality Act (INA), the alleged "turnback policy" is neither discrete nor final agency action reviewable under the Administrative Procedure Act (APA), the Department of Homeland Security (DHS) and Customs and Border Protection (CBP) have not implemented a southwest border-wide policy to withhold statutory immigration inspection and processing duties on a class- or subclass-wide basis, Defendants' border-wide metering decisions are statutorily permissible and eminently reasonable actions to prevent and address the burdens imposed on port-of-entry operations and the immigration system caused by surges of undocumented migrants while continuing to process inadmissible aliens, class members have no procedural-due-process right to enter the United States (and even if they did, that right is not violated by metering), and this Court should decline to fashion a novel cause of action against the sovereign United States for violations of the international-law norm of non-refoulement. Plaintiffs' arguments to the contrary are meritless.

# ARGUMENT

## I. Plaintiffs Lack a Private Right of Action to Enforce the INA.

Defendants are entitled to summary judgment on Plaintiffs' free-standing INA claim because Plaintiffs lack any cause of action to enforce §§ 1158 and 1225 except through the APA. *See* Def. MSJ 31–32 (ECF No. 563-1). Plaintiffs do not offer any authority or evidence to the contrary. *See* Pl. Opp. 24–25.

*First*, Plaintiffs contend that under *Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020), this Court has "inherent power—independent of the APA—to constrain executive violations of law." Pl. Opp. 24. A majority of the Supreme Court has ruled that this is likely incorrect. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (order staying preliminary injunction because the plaintiffs likely "have no cause of

action"); *see also Trump v. Sierra Club*, 140 S. Ct. 2620 (2020) (order denying motion to lift stay); *Trump v. Sierra Club*, — S. Ct. —, 2020 WL 6121565 (U.S. Oct. 19, 2020) (order granting certiorari). Even if correct, *Sierra Club* says only that a plaintiff has a "cause of action to enjoin" official action alleged to be "*unconstitutional*" because it exceeds statutory authority. *Sierra Club*, 963 F.3d at 891 (emphasis added). Plaintiffs do not argue in their free-standing INA claim that Defendants' purportedly *ultra vires* conduct is on that basis unconstitutional. *See* SAC ¶¶ 244–55; Pl. MSJ 18–31; Pl. Opp. 24–25. Claims merely alleging that an official "has exceeded his statutory authority are not 'constitutional claims,'" *Dalton v. Specter*, 511 U.S. 462, 473 (1994), and not "all executive actions in excess of statutory authority [are] *ipso facto* unconstitutional," *id.* at 472. Thus, *Sierra Club* does not show that Plaintiffs have a free-standing cause of action under the INA.

*Second*, Plaintiffs contend that Congress included in § 1158(d)(7) an express no-cause-of-action provision regarding asylum procedures in § 1158(d), so under the negative-implication canon Congress did not intend to prohibit causes of actions as to the other portions of § 1158. Pl. Opp. 24–25 (citing *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)). But "[a] private right of action to enforce an alleged violation of a federal statute must be *created* by Congress." *Cath. Charities CYO v. Chertoff*, 622 F. Supp. 2d 865, 883 (N.D. Cal. 2008) (emphasis added) (citing *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001)). Congressional silence is insufficient to infer a cause of action. *See id.*; *Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020) (noting "tension between" "routinely inferr[ing] causes of action that were not explicit in the [statute's] text" and "the Constitution's separation of legislative and judicial power"). Plaintiffs offer no authority that a cause of action exists.

*Third*, Plaintiffs contend that Defendants' reliance on *Ms. L* is "misguided" because the decision supposedly "relies on" § 1158(d)(7)'s no-cause-of-action language, which does not apply to § 1158(a)(1). Pl. Opp. 24–25 (citing *Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1168 (S.D. Cal. 2018)). This is incorrect. While the *Ms. L*

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

court cited § 1158(d)(7), it did so merely to underscore that "it [was] unclear to the Court whether Plaintiffs have a private right of action under the Asylum Statute in the first instance." 302 F. Supp. 3d at 1168. "Absent any authority that a private right of action exists," the court dismissed the asylum claim. *Id.* So too here.

*Finally*, Plaintiffs say that the statement that "the INA does not provide a private right of action" in *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1166 (D. N.M. 2020), "[is] dicta." Pl. Opp. 25. But Plaintiffs do not dispute that *New Mexico* is consistent with the weight of authority holding (as this Court has) that judicial review of agency action is "subject to the judicial review provisions of the APA unless specifically excluded." *Webster v. Doe*, 486 U.S. 592, 607 n.* (1988) (Scalia, J., dissenting); *Al Otro Lado v. Nielsen*, 327 F. Supp. 3d 1284, 1316 (S.D. Cal. 2018).

## II. Defendants Have Not Taken Discrete and Final Agency Action of the Sort Plaintiffs Contend.

Defendants are entitled to summary judgment on Plaintiffs' APA claims because Plaintiffs do not challenge discrete and final agency action. *See* Def. MSJ 32–37. Plaintiffs' arguments to the contrary, *see* Pl. Opp. 5–9, are flawed.

*First*, Plaintiffs say that they satisfy the "discrete agency action" requirement because they "'attack *particularized* agency action'—specifically, Defendants' decisions to purposefully restrict access to the asylum process in violation of their statutory obligations." Pl. Opp. 5 (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015)). Plaintiffs say that APA challenges are not limited to policies "with a succinct label in a formal policy document," *id.* at 5, and that "turnbacks of asylum seekers between May and November 2016, returns of asylum seekers standing on U.S. soil in late 2017, removal of seats at the Hidalgo POE," and the four border-wide metering decisions all "bolster the existence of the turnback policy," *id.* at 6.

These points are flawed. Although APA challenges are not necessarily limited to "formal policy document[s]," *id.* at 5, Plaintiffs must show the existence of "some particular measure [that applies] across the board," *Lujan v. Nat'l Wildlife Fed.*, 497

3

U.S. 871, 890 n.2 (1990); *see* 5 U.S.C. § 551(13). And Plaintiffs offer no direct evidence of an across-the-board measure "to purposefully restrict access to the asylum process," Pl. Opp. 5, which is strong evidence that such an agency action does not exist in the form alleged, *see Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (rejecting challenge to alleged "policies" because "Plaintiffs point to no written rules, orders, or even guidance documents ... that set forth the supposed policies"). Plaintiffs try to prove such an agency action circumstantially, but pre-November 2016 "turnbacks," returning asylum seekers from U.S. soil, or the removal of seats at the Hidalgo POE do not show the existence of "the turnback policy" because there is *no evidence* connecting these events to one another as part of a discrete agency action, and some of this conduct *violates* the very CBP metering policies that Plaintiffs also challenge. *See* Def. MSJ 32–35. Pre-November 2016 "turnbacks" occurred only at ports of entry in the San Diego Field Office, and there is no evidence that those "turnbacks" were done pursuant to a border-wide policy or action. *See* Def. MSJ 10–15. Returning asylum seekers to Mexico from U.S. soil violates CBP's stated policy. Def. Ex. 2 (traveler "in the United States ... must be fully processed"). CBP has worked to correct instances when metering occurred on U.S. soil, *see* Def. MSJ 19–20, and it has investigated allegations of improper returns and imposed discipline when appropriate, *see* Pl. Ex. 8 (CBP OPR investigation); Def. Ex. 40 (30-day suspension letter). The removal of chairs at the Hidalgo POE does not show the existence of a "turnback policy" because the first-line officer and full-time union representative, *see* Pl. Ex. 3 at 45:20–21, who testified about the removal has no knowledge of the reasons why the chairs were removed. He was merely providing his "opinion" and "understanding," *id.* at 154:21–157:18, and he never testified to any facts supporting his opinion. This speculation cannot be credited as fact. *See* FRE 602; *Carmen v. San Francisco Unif. School District*, 237 F.3d 1026, 1028 (9th Cir. 2001) (the "belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation

about whether the defendant really did act from an unlawful motive"); *SEC v. Total Wealth Mgmt., Inc.*, No. 15-cv-226, 2018 WL 3456007, at *3 (S.D. Cal. July 18, 2018) ("[A] witness cannot simply state conclusions without an evidentiary basis.").[1] Even if credited, the officer was asked only about events at the Hidalgo POE, *see* Pl. Ex. 3 at 154:21–157:18, not a border-wide "turnback policy."

Relatedly, Plaintiffs say that Defendants "have no explanation" why other disparate conduct, such as "firsthand testimony by CBP officers concerning lies" or "internal CBP documents disclosing the use of coercive tactics," are not "evidence of a border-wide policy." Pl. Opp. 6–7. But the testimony—which, in any event, does not show "lies," *see* Def. MSJ 47–48—is not evidence of a "border-wide policy" because the witnesses only testified to their understanding of particular events at specific POEs. *See* Def. MSJ 34–35. Plaintiffs do not cite any testimony showing that the officers were testifying to events at other POEs or to instructions received from the Office of Field Operations' (OFO) headquarters. *See* Pl. MSJ 4–18; Pl. Opp. 6–7. Likewise, Defendants explained that the single email Plaintiffs cite regarding streamlined-withdrawal procedures at the San Ysidro POE shows only that such procedures may be used to mitigate overcrowding, Def. MSJ 20 n.1, not that there is a border-wide policy to use "coercive tactics" during immigration inspection. Defendants also submitted evidence that the streamlined-withdrawal policy is a *San Diego Field Office* policy, not a "border-wide" policy. *Id.* (citing Def. Ex. 41). The

---

[1] Plaintiffs say that this argument is "waived" because Defendants "never objected to the question." Pl. Opp. 14 (emphasis omitted; citing FRCP 30(c)(2)). But Defendants object to the *testimony*, not the question. The testimony is inadmissible for lack of foundation and competence because the witness offered only his "opinion" and "understanding" and did not claim to have personal knowledge of the reason why the chairs were removed, nor did he testify to any facts supporting his opinion. *See* Pl. Ex. 3 at 157:7–13. Plaintiffs do not argue that the gaps in the witness's testimony "might have been corrected at" the deposition, so Defendants' objection "to the competence, relevance, or materiality of testimony [] is not waived." FRCP 32(d)(3)(A). Rule 30(c)(2) is not to the contrary because the rule is permissive, not mandatory.

email does not show that *any* POE uses streamlined-withdrawal procedures to coerce aliens into withdrawing applications for admission; indeed, such action would violate the policy governing such procedures. *See* Def. Ex. 41 at 619 ("applicant [who] indicates a request for asylum or articulates a fear of returning" "must" be referred for a credible-fear interview). And instances of CBP officers returning an alien from the United States to Mexico, by physical force or otherwise, do not evidence a "turnback policy" because such conduct *violates* agency policy. *See* Def. Ex. 2; Def. Ex 69 (suspending for 30 days an officer who engaged in this misconduct). Plaintiffs' evidentiary inferences are either unsupported or directly contradicted by the record and thus do not show a broader "turnback policy" to "restrict access to the asylum process." And Plaintiffs' cited evidence in fact *demonstrates* that the alleged "turnback policy" is not a discrete agency action because the disparate conduct that Plaintiffs claim makes up a broader "turnback policy" lacks defined contours, rendering it impossible to evaluate its lawfulness on a class-wide basis.

The cases that Plaintiffs cite do not aid them. In fact, they illustrate that Plaintiffs cannot challenge a non-existent agency action merely by grouping together multiple discrete actions under their own "shorthand" policy label. Pl. Opp. 5. In *R.I.L-R*, the court rejected the plaintiffs' allegation that Immigration and Customs Enforcement (ICE) had adopted a categorical "No-Release Policy." 80 F. Supp. 3d at 174. The court found instead (based in part on ICE's acknowledgment) that ICE considered "deterrence of mass migration" as a factor in all class members' custody determinations, and that this across-the-board consideration showed the existence of a sufficiently discrete "policy." *Id.* at 175–76. Here, there is no "turnback policy." Pl. Opp. 5. There are only the four border-wide metering decisions, and even if challenged in the same litigation, each must be evaluated on its merits. *See Bark*, 37 F. Supp. 3d at 51 ("limiting [] analysis to the five special use permits identified in the complaint"). Defendants dispute that these four decisions meet the standard for "final agency action," but there is no genuine dispute that these decisions are the only

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

discrete actions that Plaintiffs identify that apply across the entire southwest border.

Similarly, *Hispanic Affairs Project* and *Ramirez* do not help Plaintiffs because, in those courts' views, the records at the motion-to-dismiss and preliminary-injunction stages showed the "'appl[ication of] some particular measure across the board,'" *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (quoting *Lujan*, 497 U.S. at 890 n.2), namely, the "routine[] exten[sion]" of H-2A visas, *id.* at 201, or the wholesale failure to consider statutorily required factors before making placement decisions, *Ramirez v. ICE*, 310 F. Supp. 3d 7, 21 (D.D.C. 2018). Here, in contrast, the evidence shows that the four border-wide metering decisions—which do not permit or even discuss non-metering measures that are purportedly part of the "turnback policy"—are the only discrete measures Plaintiffs identify that arguably apply across the board. *See* Def. MSJ 10–31.

*Second*, Plaintiffs argue that "each individual turnback" is a final agency action because it has the "legal consequence" of "depriv[ing] class members of the right to seek asylum." Pl. Opp. 8. Plaintiffs thus conspicuously do not address Defendants' argument that the border-wide metering decisions—the focus of Plaintiffs' § 706(2) claim—lack independent, final legal consequences. *See* Def. MSJ 35–36; *accord D.A.M. v. Barr*, — F. Supp. 3d —, 2020 WL 5525056, at *8 (D.D.C. Sept. 15, 2020) (distinguishing in the relief context between "an agency rule" and "decision[s] the agency made pursuant to the" rule). Instead, Plaintiffs sidestep and argue that the actual application of metering or of the claimed "turnback policy" to individual class members is "final agency action" amenable to APA review. *See* Pl. Opp. 6–9. In any event, neither the border-wide metering decisions nor an individual instance of metering is final agency action, because class members have no rights under the INA to be altered or deprived of before they cross the border. *See* Def. MSJ 35–39. This argument is not "internally contradictory," Pl. Opp. 8, because class members also lack any right to entry in the first place. Thus, there is no change in

class members' legal rights when they are subject to metering.[2]

Plaintiffs' imagined "turnback policy" is not discrete and final agency action, and the border-wide metering decisions, while discrete, are not final because they do not alter the parties' legal relationship.

## III. Defendants Have Not "Direct[ed] CBP Officers to Unlawfully Withhold a Discrete, Mandatory Ministerial Action."

As the government has demonstrated, Defendants have not directed CBP officers to unlawfully withhold discrete mandatory actions mandated by 8 U.S.C. §§ 1158 or 1225. *See* Def. MSJ 37–40. Defendants respectfully maintain their position that these statutes do not apply to aliens in Mexico, but even if they did, CBP has demonstrably not withheld this action, having referred for credible-fear screening a high volume of inadmissible arriving aliens subject to expedited removal concurrently with the implementation of metering. *Id.* Plaintiffs' arguments to the contrary, *see* Pl. Opp. 18–21, are incorrect.

*First*, Plaintiffs argue that §§ 1158 and 1225 apply to aliens in Mexico because the government has conceded that "noncitizens seeking asylum who are turned back at the border [are] 'attempting' to come into the United States at a POE." Pl. Opp. 18–19 n.13 (citing Pl. Ex. 17 at 197:21–202:3 and 8 C.F.R. § 1.2). This argument is flawed. Plaintiffs cannot use fact deposition testimony to bind Defendants to a legal conclusion. *See* Pl. Ex. 17 at 199:6–7, 13–14 (objections to questions as outside the scope of 30(b)(6) topics); *United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001) ("The lay witness may  not ...  testify as to a legal conclusion."); *see also Snapp v. United Transp. Union*, 559 F.3d 1088, 1104 (9th Cir. 2018) ("A 30(b)(6)

---

[2] Plaintiffs say that Defendants "disingenuously" argue that Roberto Doe did not suffer a "direct consequence" of being subject to metering. Pl. Opp. 9. But Defendants argued that Roberto Doe's removal from Mexico by Mexican officials was "not a direct *legal* consequence" of being subject to metering. Def. MSJ 36 (emphasis added). Nothing about metering automatically subjects an alien to removal from Mexico, as evidenced by the fact that many aliens continue to be processed at U.S. ports of entry and referred for credible-fear interviews. *See* Def. Ex. 4 at 2.

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

witness's legal conclusions are not binding on the party who designated him, and a designee's testimony likely does not bind [its employer] in the sense of a judicial admission." (citations and quotation marks omitted)). Even if credited for that purpose, the witness merely confirmed examining counsel's statement that "asylum seekers that are at the border ... want to make it onto U.S. soil so they can claim asylum in the United States." Pl. Ex. 17 at 199:2–9. Further, the regulation defining "arriving alien" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry," 8 C.F.R. § 1.2, does not support Plaintiffs' argument: An "applicant for admission," *id.*, is an alien who is "present in the United States" or "arrives in the United States," 8 U.S.C. § 1225(a)(1). And to be "at a port-of-entry," 8 C.F.R. § 1.2, the alien must be on U.S. soil, *see United States v. Aldana*, 878 F.3d 877, 880–82 (9th Cir. 2017), *cert. denied* 139 S. Ct. 157 (2018); *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("[w]hen an alien arrives at a port of entry ... the alien is on U.S. soil").

*Second*, Plaintiffs urge this Court to disregard *Thuraissigiam*, asserting that it "has nothing to do with the meaning of the present-tense use of 'arrives' in §§ 1158 or 1225." Pl. Opp. 19 n.14. Yet the Supreme Court's analysis was informed by its thorough overview of § 1225. *See* 140 S. Ct. at 1964–65. Its clear declaration that "[w]hen an alien arrives at a port of entry ... the alien is on U.S. soil," *id.* at 1982, strongly supports the conclusion that the plain language of § 1225 does not encompass aliens on Mexican soil.

*Third*, Plaintiffs urge this Court to disregard *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), because it does not "address the import" of §§ 1158 or 1225. Pl. Opp. 19. This is inaccurate. In *Sale*, the Supreme Court held that protections typically sought in former deportation and removal proceedings were not available to aliens interdicted on the high seas because "there is no provision in the statute for the conduct of [deportation and exclusion] proceedings outside the United States," and the provisions governing such proceedings "and other provisions of the

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

INA"—specifically, § 1158—"obviously contemplate that such proceedings would be held in the country." *Sale*, 509 U.S. at 173 & n.29. Although Congress later amended these statutes, *see* IIRIRA, Pub. L. No. 104-208, §§ 302, 604, 110 Stat. 3009 (1996), the amended language is just as *or more* territorially-focused than the language interpreted in *Sale*. Compare 8 U.S.C. § 1226(a) (1952) (officer shall "determine whether an arriving alien ... shall be excluded and deported"), *with* 8 U.S.C. § 1225 (1996) (referring to alien who "arrives in" or "is arriving in"); *compare* 8 U.S.C. § 1158 (1980) (requiring asylum procedures for an alien "at a land border or port of entry"), *with* 8 U.S.C. § 1158 (1996) (permitting an alien who "arrives in" the United States to apply for asylum). That the *Sale* Court interpreted the arguably *broader* language not to cover aliens outside the United States is dispositive of the inquiry here: Sections 1158 and 1225 do not apply to class members.[3]

*Fourth*, Plaintiffs argue that this Court has "rejected Defendants' argument about the use of the present progressive tense ('arriving in')" in § 1225(b)(1)(A)(ii), Pl. Opp. 19 n. 15, that Defendants' argument about the threshold at which their duty to "refer" is triggered (following the requisite determination of inadmissibility) "conflat[es] access to the asylum process with a specific step in the process," *id.* at 20 n.16, and that Defendants' argument is contrary to the Ninth Circuit's holding in *Barrios v. Holder*, 581 F.3d 849, 863 (9th Cir. 2009), "that 'physical presence' is not a term of art," *id.* These points are incorrect. This Court held that the phrase "arriving in" "encompasses aliens who are in the process of arriving," but it did not hold that "arriving in" is by itself sufficient to trigger the duty to "refer." *Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168, 1204 (S.D. Cal. 2019). That duty is triggered when an immigration officer "determines" that an alien "who is arriving in the

---

[3] Defendants respectfully submit that this Court did not address *Sale* in its prior analysis of the statutory language and therefore should reconsider its analysis. *See Al Otro Lado*, 394 F. Supp. 3d at 1199–1201, 1203–05; *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1059 (C.D. Cal. 2000) ("Reconsideration is proper if the Court's prior ruling was clear error.").

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

United States" is inadmissible on certain grounds, 8 U.S.C. § 1225(b)(1)(A)(ii), and Plaintiffs do not claim that CBP fails to make such referrals following the requisite inadmissibility determinations. Similarly, it is irrelevant to Plaintiffs' § 706(1) claim that class members seek "access to the asylum process" writ large. Pl. Opp. 20. Under § 706(1), a court may compel performance only of *discrete* legal obligations, *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010), and the only discrete legal obligation set forth in § 1225(b)(1)(A)(ii) is to refer an alien for an interview, not to "grant access" to a process. *Barrios* is not to the contrary, as it says only that "the definition of 'physical presence' does not require a specific 'status, intent, or state of mind'" and does not address §§ 1158 or 1225 at all. 581 F.3d at 863.

*Fifth*, Plaintiffs downplay H. Rept. 104-469 (1996) because it is associated with H.R. 2202, a bill that supposedly "never became law," and because the legislative history relates to a "proposed 30-day deadline to file an affirmative asylum application, which never became law." Pl. Opp. 19–20 (emphasis omitted). This is wrong. H.R. 2202 was enacted as IIRIRA, and H. Rept. 104-469 is part of its legislative history. *See* "Actions Overview," https://www.congress.gov/bill/104th-congress/house-bill/2202/actions; H. Rept. 104-879, at 104 (1997) ("[m]ore complete detail on the ... legislative history of [IIRIRA] may be found in ... Rept. 104–469, Part I" (parenthesis omitted)). And although Congress ultimately provided more than 30 days to file an affirmative asylum application, that does not alter the point for which Defendants cited H. Rept. 104-469: Congress clearly intended such applications to be made after "the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B).

*Sixth*, Plaintiffs contend that the Court should disregard the drastic increase in CBP's credible-fear referrals, *see* Def. Ex. 4, because it "does not establish that [class members] were not initially turned back or metered," Pl. Opp. 20. But Plaintiffs challenge a class-wide policy "'aimed at deterring or limiting asylum seekers from

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

seeking asylum in the United States.'" *Id.* (quoting *Al Otro Lado*, 394 F. Supp. 3d at 1208). That there has been such a drastic increase in credible-fear referrals concurrent with the implementation of metering (and other alleged measures purportedly part of a "turnback policy") defeats the inference that Defendants have implemented such a policy or have taken such action for that purpose as to the entire class.

Plaintiffs' § 706(1) claim fails on the facts and the law.[4]

## IV.    Metering is Statutorily Permissible.

As the government has demonstrated, metering to facilitate safe and efficient processing or the prioritization of CBP's resources is statutorily permissible. *See* Def. MSJ 40–44. Plaintiffs' arguments to the contrary, *see* Pl. Opp. 9–11, rest on the incorrect view that CBP's duties to inspect applicants for admission are elevated over all other statutory duties.

*First*, Plaintiffs argue that 6 U.S.C. §§ 111(b), 202, 211(c), and 211(g)(3) do not "specifically grant Defendants the power to" meter, Pl. Opp. 9, whereas Congress in 8 U.S.C. § 1225(a)(3) "specifically mandated" that the government "inspect all noncitizens arriving at POEs," *id.* at 10. Relatedly, Plaintiffs contend that Defendants lack authority "to amend the INA or the HSA [Homeland Security Act] to suit their needs." *Id.* at 11. These points misapprehend the statutory obligations at

---

[4] Plaintiffs indicate that they will argue "in their forthcoming reply" that metering imposes unreasonable delays. Pl. Opp. 21 n.18 (citing *Telecommunications Research and Action Center v. FCC* (*TRAC*), 750 F.2d 70 (D.C. Cir. 1984)). But "Plaintiffs ma[d]e no attempt" in their opening brief "to argue that these delays are unreasonable," Def. MSJ 40, so they cannot raise an unreasonable delay argument for the first time in reply, *see Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) ("general rule" is that parties "cannot raise a new issue for the first time in their reply briefs"). Plaintiffs will likely argue that their unreasonable-delay argument is responsive to Defendants' arguments, *see* Pl. Opp. 18 n.21 (asserting that "Defendants oppose Plaintiffs' motion for summary judgment under § 706(1) by citing the [*TRAC*] factors"), but Defendants never cited the *TRAC* factors at all, *see* Def. MSJ 1–60, and "merely not[ing] that [Plaintiffs] ... failed to raise the issue" "does not constitute raising the issue," *Eberle*, 901 F.2d at 818.

12

issue. That § 1225 includes specific procedures does not give those duties higher priority than those imposed by 6 U.S.C. §§ 111(b), 202, 211(c), or 211(g)(3). CBP's immigration inspection duty is only one of many statutory obligations, *see id.* § 211(c)(8), and Defendants have broad discretion to allocate their limited resources and personnel to accomplish those obligations, *see* Def. MSJ 43–44 (citing *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007), and *Compassion Over Killing v. FDA*, 849 F.3d 849, 857 (9th Cir. 2017)). Plaintiffs invoke the interpretive canon that the "specific governs the general," Pl. Opp. 10 (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)), but that canon applies where a statute's "general permission or prohibition is contradicted by a specific prohibition or permission," or where "a general authorization and a more limited, specific authorization exist side-by-side," *RadLAX Gateway Hotel*, 566 U.S. at 645. This case, in contrast, involves multiple statutory *obligations*. CBP does not claim authority to avoid obligations imposed by § 1225, *see* Def. MSJ 40–44, and it continues to discharge such obligations, *see* Def. Ex 4. Metering to help facilitate multiple statutory obligations is well within the government's authority.

*Second*, Plaintiffs contend that *Massachusetts v. EPA* and *Compassion Over Killing* apply only to an agency's discretion "not to engage in enforcement" or to "use case-by-case rulemaking rather than promulgating regulations." Pl. Opp. 11. This is wrong. *Massachusetts* says that an agency's discretion "is at its height when the agency decides not to bring an enforcement action," but the Supreme Court separately emphasized that, as a general rule, "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities." 549 U.S. at 527. Nothing in the decision limits its application to non-enforcement decisions. Likewise, the Ninth Circuit in *Compassion Over Killing* held that an agency may choose between various forms of rulemaking *and* stated that "the agency's decision to prioritize other projects is entitled to great deference by a reviewing court." 849 F.3d at 857. Thus, the case is consistent with black-letter

administrative law that an agency is in the "unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *In re Barr Labs, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) (cited in *Compassion Over Killing*, 849 F.3d at 857). DHS and CBP have exercised that inherent authority to prioritize and facilitate CBP's national-security, counter-narcotics, economic-security, and trade-and-travel mission sets, while concurrently processing the same volume of inadmissible arriving aliens and referring significantly more of those aliens for credible-fear interviews. *See* Def. MSJ 25–31. Where the government is discharging its multiple obligations concurrently, courts sitting in APA review "have no basis for reordering agency priorities." *In re Barr Labs*, 930 F.2d at 76. Defendants' actions are statutorily permissible.

## V. Defendants' Actions are Not Arbitrary and Capricious.

As Defendants have demonstrated, each of the border-wide metering decisions is well supported by the factual record that was before the agency, is logical and coherent, is the product of reasoned decisionmaking, and readily satisfies the narrow standard for arbitrary-and-capricious review. *See* Def. MSJ 44–54. Plaintiffs contend that the government's actions are based on pretext, that the true motivations for metering are unlawful, and the metering is inconsistent with Congressional intent, *see* Pl. Opp. 11–18, but those arguments are flawed.

### A. Defendants' Border-Wide Actions are Not Based on "Pretext."

Plaintiffs make several arguments that the border-wide metering decisions are arbitrary and capricious because the stated reasons for metering are allegedly "pretextual" and have a deterrence motive. *See* Pl. Opp. 12–18. These points are flawed.

As a general matter, Plaintiffs' arguments continue to ignore the APA standard for when an agency action is challenged as "pretextual." *See* Def. MSJ 44–54. In such cases, "an agency must disclose the basis of its action." *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (quotation marks omitted). Defendants have disclosed the basis of the border-wide metering decisions—to facilitate orderly

processing and the prioritization of CBP's resources. *See* Def. Exs. 2, 3, 5; Def. MSJ 45–47. Even if the government "might also have had other unstated reasons" for acting, "a court may not reject an agency's stated reasons" on that basis. *Dept. of Commerce*, 139 S. Ct. at 2573. This Court could vacate the metering decisions only if "the evidence tells a story that does not match the explanation the [government] gave for [its] decision," *id.* at 2575, but that is simply not the case here. Further, it is a "valid immigration goal [to] reduc[e] the number of undocumented aliens arriving at our borders." *Jean v. Nelson*, 472 U.S. 846, 880 (1985) (Marshall, J., dissenting).

In any event, Plaintiffs' arguments are wrong on their own terms. *First*, Plaintiffs contend that they have shown "pretext" because they presented evidence that an officer at the Tecate POE was "instructed to lie." Pl. Opp. 12 (citing Pl. Ex. 1). This does not show "pretext" because it does not rebut the ample and undisputed factual support that Defendants were *in fact facing capacity constraints* and resultant overcrowding and diversion of resources away from other missions because of surge events when they made the border-wide metering decisions. *See* Def. MSJ 10–31, 45–47. Plaintiffs assert that Defendants "cite nothing" in support of their argument that the Tecate officer lacked knowledge of events at other POEs. Pl. Opp. 12–13 (emphasis omitted). But *Plaintiffs* have the burden of establishing the scope of a witness's firsthand knowledge, including that he has knowledge of a border-wide policy. *See Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002) (party seeking admission "bears the burden of proof of admissibility"); *Moriarty v. County of San Diego*, No. 17-cv-1154, 2020 WL 5656689, at *3 (S.D. Cal. Sept. 23, 2020) ("a percipient witness' testimony must be based on personal knowledge, not speculation or conjecture"). At his deposition, the witness was responding to questions about his experience at the Tecate POE. *See* Pl. Ex. 1 at 98:15–101:6. This is facially insufficient to establish a border-wide agency action to "lie" to aliens who intend to seek asylum. It is no answer to say that Defendants "do not claim that officers elsewhere were not instructed to lie," Pl. Opp. 13, because *Plaintiffs* have the burden of

pointing to evidence supporting their claims of "pretext," *see Quidel Corp. v. Siemens Med. Solutions USA, Inc.*, — F. Supp. 3d —, 2020 WL 1820247, at *2 (S.D. Cal. Apr. 9, 2020) ("[i]f the moving party fails to discharge [its] initial burden, summary judgment must be denied"). Plaintiffs cite Pl. Ex. 117 for the proposition that CBP "standardized its conduct across POEs," Pl. Opp. 13, but that Exhibit shows that "*holding the line*" would be standardized across the border. Pl. Ex. 117 at 620 (emphasis added). It misrepresents the facts to insinuate that this Exhibit shows that "lies" or other allegedly "dishonest[]" acts were CBP's standard practice.

*Second*, Plaintiffs again suggest that Otay Mesa officers lied by telling travelers that the facility was at "capacity" without actually checking. Pl. Opp. 13. But they have no response to Defendants' point that officers at the limit line do not make metering decisions, so it would not necessarily show "lies" even if the officers did not check the port's capacity at every turn. *See* Def. MSJ 48; Def. Ex. 2 ("DFOs [Directors of Field Operations] may elect to meter"); Pl. Ex. 102 at 44:17–20 (Assistant Port Director "ha[s] responsibility for implementing" metering).

*Third*, Plaintiffs contend that David Atkinson's testimony opining on the reasons why the Hidalgo POE removed chairs from the secondary inspection area is admissible because "Defendants never objected to the question." Pl. Opp. 14 (emphasis omitted). As explained, Defendants object to the testimony, not the question, and that objection is not waived. *See supra* at pp. 4–5 & n.1. David Atkinson's "belief that [Defendants] acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive." *Carmen*, 237 F.3d at 1028.

*Fourth*, Plaintiffs say it is "not true" that "asylum seekers were turned back solely due to operational exigencies," because in a November 22, 2016 email, Beverley Good stated in passing that metering in the Laredo Field Office at that time "seems to have had a deterrent effect." Pl. Opp. 14 (citing Pl. Opp. Ex. 1). But Defendants do not claim that metering occurs "solely" due to "operational exigencies."

Metering is authorized to facilitate safe and efficient processing and to facilitate CBP's priority missions, and the factual record shows that metering is used for those purposes. *See* Def. MSJ 45–50. Ms. Good's email is not to the contrary, nor is it inconsistent with her declaration. Moreover, an after-the-fact characterization of a policy's effects by an individual who did not issue the policy does not show why the policy was implemented in the first place. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (agency's contemporaneous explanation is the "natural starting point" for assessing agency action); *id.* at 1916 (Roberts, C.J., plurality) (non-contemporaneous statements by persons not involved in policy decision "are unilluminating").

*Fifth*, Plaintiffs contend that Mr. Owen's sworn testimony that metering is "not 'designed to deter migrants from entering the U.S.'" should not be credited because Mr. Owen briefed the Secretary on, among other things, the estimated number of undocumented aliens whom would be affected by metering, and the Secretary issued the June 2018 memorandum with that knowledge. Pl. Opp. 14 (quoting Pl. Ex. 10 at 70:1–5; citing Pl. Ex. 97). But as explained, knowledge of a policy's impact does not establish that the stated reasons for the policy—avoiding overcrowding at the ports and managing capacity—are untrue. Def. MSJ 48–49; *see Dept. of Commerce*, 139 S. Ct. at 2573.

*Sixth*, Plaintiffs say that the government's "operational exigency argument is undermined" by contemporaneous reports purportedly showing that even "where POEs were operating above 100% capacity, the number of asylum seekers did not impact POE operations." Pl. Opp. 15 n.10.  Yet the adverse impacts of exceeding or approaching physical detention capacity are otherwise well documented in different contemporaneous reports. *See, e.g.*, Def. MSJ 10–22; Pl. Ex. 42 at 127 ("We have no space [at San Ysidro POE] and it is ugly."). In any event, not all ports reported "no impact" when operating above 100% physical detention capacity.  *See, e.g.*, Pl. Ex. 24 at 8–10 (the El Paso POE reported "Queue Management in Process" in the

"Impact to Port Operations" column for several days that exceeded 100% capacity).[5]

*Seventh*, Plaintiffs argue that the government is wrong that "turnbacks 'for the most part' stopped in January 2017" because there is evidence of "turnbacks" occurring in 2017. Pl. Opp. 15 (quoting Def. MSJ 15). Presumably, this is an argument that metering is pretextual, and therefore arbitrary and capricious, because it occurred when there were relatively few arrivals. But Defendants never contended that CBP categorically ceased metering at all POEs in 2017. Rather, the evidence—including Plaintiffs' class-certification expert's report—shows that metering decreased in prevalence in 2017 roughly in tandem with the decrease in inadmissible arriving aliens. *See* Def. MSJ 21 & n.2; Pl. Ex. 20 ¶ 41. This shows that CBP has used metering to mitigate operational issues stemming from overcrowded ports of entry. The instances that Plaintiffs cite are not evidence that CBP continued to meter as its default operational posture in 2017 despite a decline in numbers. Instead, the evidence shows that CBP suspended for 30 days the officer who improperly returned an asylum seeker from U.S. soil, Def. Ex. 40; that the San Diego Field Office's streamlined-withdrawal policy requires officers to refer an applicant for a credible-fear interview if he "indicates a request for asylum or articulates a fear of returning," Def. Ex. 41 at 619; that, in any event, San Ysidro personnel were instructed not to use streamlined withdrawals in June 2017 because "apprehensions [were] currently manageable," Pl. Ex. 7 at 611; and that upon learning of a metering complaint in April 2017 (*see* Pl. Opp. Ex. 2), San Ysidro leadership reminded all managers that the Port "ha[d] adequate detention space" and that "[a]ny asylum applicant should

---

[5] There is no consensus among the reporting Field Offices as to the meaning of the column labeled "Impact to Port Operations" in the reports Plaintiffs summarize. For example, the San Ysidro POE did not agree that this column meant "whether the number of detainees held at the AEU had an impact on port operations." Pl. Ex. 17 at 183:21–184:1. Instead, because everyone knew that the San Ysidro POE had a queue and "was regularly operating at its operational capacity," that Port defined "impact to port operations" to mean "anything out of the norm." *Id.* at 184:2–11.

be taken into custody ... for proper intake and processing," Def. Ex. 45. These are not actions to restrict access to the asylum process "for its own sake." Pl. MSJ 29.

*Eighth*, Plaintiffs say: "citing no evidence, Defendants claim that they could not use parole to respond to surges in immigration." Pl. Opp. 15 (citing Def. MSJ 49). But Defendants actually said: "mass parole would be manifestly contrary to the plain language of § 1225." Def. MSJ 49 (citing *Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018), and H. Rept. 104-469, pt. 1, at 141 (1996)). In contrast to mass parole, it is consistent with Congress's intent that undocumented aliens wait in Mexico, as evidenced by its enactment of 8 U.S.C. § 1225(b)(2)(C).

*Ninth*, Plaintiffs dispute Defendants' point that OFO used "operational capacity" before June 2018. *See* Pl. Opp. 16. To start, whether and when CBP used the term "operational capacity" is immaterial to whether any of the four border-wide metering decisions are arbitrary and capricious or whether the reasons for those decisions were pretextual. It merely shows that CBP accounts for operational factors consistent with the directive in the June 2018 memorandum. In any event, Plaintiffs are wrong. OFO has always accounted for operational factors in detention contexts, as evidenced by CBP's National Standards on Transportation, Escort, and Detention Standards, Def. Ex 59 at 055, and OFO personnel's testimony, Pl. Ex. 17 at 101:8–14; Def. Ex. 57 ¶ 10; Def. Ex. 58 ¶¶ 13–15; Def. Ex. 60 ¶ 7; Def. Ex. 61 at 279.

*Tenth*, Plaintiffs suggest that it is immaterial that Defendants implemented their contingency plans before implementing metering border-wide. *See* Pl. Opp. 16. Specifically, they contend that Defendants' argument is "a non sequitur" because contingency plans are exclusively associated with influx events, and "[c]omplaining that there was overcrowding when a contingency plan is activated is like complaining about getting wet when standing in the rain." *Id.* Not so. At the risk of extending the analogy, choosing to meter after contingency plans prove insufficient is more like choosing to wear a raincoat after learning that your umbrella has a hole. The border-wide metering decisions are reasonable attempts to solve a problem that, in

2016, almost pushed DHS past its breaking point and could not be mitigated through the Department's existing plans. *See* Def. MSJ 10–31. Such actions must be upheld under deferential arbitrary-and-capricious review because "the choice between reasonable policy alternatives in the face of uncertainty [is] the [government's] to make." *Dept. of Commerce*, 139 S. Ct. at 2570.

*Eleventh*, Plaintiffs take issue with Defendants' purported argument that the "'prioritization regime' was 'successful' because the number of credible fear interviews increased in 2018 and 2019." Pl. Opp. 16–17 (citing Def. MSJ 4). They argue that the border Field Offices' drastic increase in credible-fear referrals is "misleading" because it "may simply mean that CBP chose to refer a higher percentage of arriving asylum seekers for a credible fear interview" instead of full removal proceedings. *Id.* at 17. And they claim that "even if" there was a drastic increase in credible-fear referrals from 2018 to 2019, there was a 327% increase in the number of aliens waiting in Mexican border towns. *Id.* Plaintiffs' points are flawed. There was nothing "misleading" in the government's citation to the increase in credible-fear referrals—the government explained that this "figure represents only a subset of class members whom CBP referred for asylum processing." Def. MSJ 39. Further, the government did not argue that the prioritization regime was successful because it increased credible-fear referrals; it argued that the regime was successful because it allowed the border Field Offices to increase their drug-seizure weights and outbound currency interdictions *while also* permitting them to maintain the overall level of inadmissible-alien processing. *See* Def. MSJ 4, 50. Plaintiffs speculate that the drastic increase in credible-fear referrals "may" not mean that Defendants "inspected more arriving asylum seekers," but they offer no facts supporting that contention, and they have no meaningful response to the prioritization regime's successes. *See* Pl. Opp. 16–18. This Court may consider those points uncontested. And Plaintiffs never explain why an increase in the number of undocumented aliens waiting in border towns supports their argument that metering is arbitrary and capricious. *See*

*id.* If anything, the fact that there was such a drastic increase in undocumented aliens at the same time that the border ports were inspecting roughly the same number of inadmissible aliens overall, *see* Def. Ex. 4 at 2, corroborates Defendants' argument that there was an unmanageable surge of undocumented aliens in 2019, and that metering helped to prevent another operational crisis. No part of Plaintiffs' response overcomes Defendants' strong factual showing on these points.

*Finally*, Plaintiffs say that Defendants "do nothing" to contest that some ports sometimes had "arbitrary caps" on intakes after June 2018. Pl. Opp. 18. But the documents Plaintiffs cite do not in fact demonstrate that ports imposed an arbitrary ceiling on intakes. *See, e.g.*, Pls.' Ex. 105 (suggesting that capacity should not be lower than 60–70%). And even if this were true for some ports at some times, Plaintiffs have not explained how this renders the Secretary's June 2018 prioritization-based queue management memorandum arbitrary and capricious. Defendants pointed out that the border Field Offices referred more inadmissible arriving aliens for credible-fear interviews overall, *see* Def. MSJ 50, and the evidence shows that the ports inspected the same number of inadmissible aliens overall, *see* Def. Ex. 4 at 2. In a border-wide class action such as this, the overall numbers are more probative of whether CBP adopted an *agency-wide* policy designed to restrict "access to the asylum process" than any given port's numbers viewed in isolation.

The border-wide metering decisions were well-supported by the factual record before the agency, are logical and coherent, are the product of reasoned decisionmaking, and more than satisfy the narrow and deferential standard for arbitrary-and-capricious review. None of Plaintiffs' evidence demonstrates pretext or shows that Defendants' stated reasons for metering are untrue. At minimum, evidence of pretext is genuinely disputed and precludes summary judgment for Plaintiffs.

## B.    Metering is Consistent with Congressional Intent.

Plaintiffs' contentions that metering is inconsistent with Congressional intent are also incorrect. *See* Pl. Opp. 9–10. *First*, Plaintiffs say that metering is arbitrary

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC

and capricious because it is contrary to Congress's intent that the government "inspect and process asylum seekers who are in the process of arriving in the" United States. Pl. Op. 11. But the government has explained why this is incorrect: (1) metering is merely a means of controlling the flow of undocumented aliens, and Defendants continue to intake and, as applicable, refer inadmissible arriving aliens for credible-fear interviews, *see* Def. Ex. 4; (2) Congress did not object to inadmissible aliens being instructed to wait in Mexico, as evidenced by its enactment of the contiguous-return provision at 8 U.S.C. § 1225(c)(2)(C), *see* Def. MSJ 53; and (3) policies that authorize metering to facilitate safe processing and the prioritization of CBP's resources to accomplish its coequal or higher-priority statutory functions are consistent with the Acts of Congress that impose those functions, *see id.* at 53–54. Plaintiffs do not have any meaningful response to these points. *See* Pl. Opp. 11–12.

 *Second*, Plaintiffs say that Congress did not intend DHS and CBP to consider "alleviat[ing] capacity constraints in order to focus on other missions" when operating POEs. Pl. Opp. 12 (citing *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (emphasis omitted). This argument fails. Congress established all of DHS's and CBP's "other missions," so it necessarily intended them to focus on those missions while discharging their obligations under § 1225. Further, "[i]n carrying out [DHS's] functions"—including immigration enforcement functions—Congress ordered the Secretary, the CBP Commissioner, and the OFO Executive Assistant Commissioner to "ensur[e] the speedy, orderly, and efficient flow of lawful traffic and commerce." 6 U.S.C. § 202(8); *id.* § 211(c)(3); *id.* § 211(g)(3)(D). In light of this command, it is perfectly reasonable for CBP to consider capacity constraints at ports of entry when performing its immigration processing duties.

## VI. Metering Does Not Deprive Class Members of Procedural Due Process.

 As Defendants explained, metering does not deprive class members of any purported procedural-due-process rights because neither the Fifth Amendment nor

§§ 1158 and 1225 (in which Plaintiffs claim a protected interest) apply to non-resident aliens outside the United States. In any event, Plaintiffs cannot obtain more than the statutes provide—specifically, referral to an asylum officer following a claim of fear and the requisite determination of inadmissibility. *See* Def. MSJ 54–55.

Plaintiffs' only response is that this Court previously agreed with Plaintiffs' argument (under *Boumediene v. Bush*, 553 U.S. 723 (2008), and *Rodriguez v. Swartz*, 899 F.3d 719 (9th Cir. 2018)) that there is "nothing impracticable or anomalous in applying elementary due process protection at the U.S. border." Pl. Opp. 21 (internal quotation marks and alterations omitted). Recent Supreme Court decisions confirm that this is incorrect. *Rodriguez* was vacated and remanded for reconsideration in light of *Hernandez v. Mesa*, *see Swartz v. Rodriguez*, 140 S. Ct. 1258 (2020), so it is no longer binding on this Court. And in *Thuraissigiam*, the Supreme Court confirmed that *Boumediene* is confined to the holding that "suspected foreign terrorists could challenge their detention at the naval base in Guantanamo Bay, Cuba." 140 S. Ct. at 1981. The case "is not about immigration at all," and "nothing in the Court's discussion of the Suspension Clause" gives Plaintiffs "a means of gaining entry" to the United States. *Id.* "[I]t is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *AID v. All. for Open Soc. Int'l*, 140 S. Ct. 2082, 2086 (2019).

## VII.  Plaintiffs' International-Law Claim is Not Actionable.

The government has demonstrated that Defendants are entitled to summary judgment on Plaintiffs' international-law claim. *See* Def. MSJ 55–58. Plaintiffs' arguments to the contrary, *see* Pl. Opp. 21–24, are meritless.

*First*, Plaintiffs contend that Defendants "do nothing to contest" that Plaintiffs' interpretation of the non-refoulement obligation has "reached *jus cogens* status." Pl. Opp. 21. Relatedly, they contend that the United States' accession to the Protocol Relating to the Status of Refugees "counsels in favor of ATS recognition" because ATS causes of action "routinely mirror domestic law enactments." *Id.* at

22–23. These points wholly fail to grapple with the government's central contention: Plaintiffs have not shown why this Court should use its extremely restricted authority under the ATS to recognize a novel non-refoulement cause of action against the sovereign United States when the Executive and Legislative Branches embraced a clearly narrower obligation than the one for which Plaintiffs advocate.

The United States acceded to the Protocol Relating to the Status of Refugees on the understanding "that the Protocol was largely consistent with existing [domestic] law." *INS v. Stevic*, 467 U.S. 407, 421 (1984); *see* Def. MSJ 55. International and domestic non-refoulement protections were not "available to aliens at the border seeking refuge in the United States, and "it was 'absolutely clear' that the Protocol would not 'requir[e] the United States to admit new categories or numbers of aliens.'" *Stevic*, 467 U.S. at 415, 417 (quoting S. Exec. Rep. No. 14, 90th Cong., 2d Sess., at 19 (1968)); *see also Sale*, 509 U.S at 179–87 (same conclusion). Plaintiffs urge this Court to reject *Stevic* because "the prevailing international interpretation" of the non-refoulement obligation covers aliens "at the border." Pl. Opp. 22 n.19 (citation and quotation marks omitted). But even if they are correct, *nothing compels this Court to create a cause of action. See Sosa v. Alvarez-Machain*, 542 U.S. 692, 726 (2004) (noting the "substantial element of discretionary judgment" in recognizing an ATS claim). Plaintiffs cite *no cases* where a court invoked the ATS to bind the United States to an obligation considerably broader than the one to which it acceded. *See* Pl. Opp. 21–24; *see Al Otro Lado*, 394 F. Supp. 3d at 1225 (noting Plaintiffs' failure to provide supporting cases); *accord Hawkins v. Comparet-Cassani*, 33 F. Supp. 2d 1244, 1255 (C.D. Cal. 1999) (cases finding "*jus cogens* norms of international law involved either acts committed on a foreign citizen or acts committed by a foreign government or government official"), *partially reversed on other grounds*, 251 F.3d 1230 (9th Cir. 2001). There is no reason for this Court to exercise its restricted power under the ATS in the manner requested.

*Second*, Plaintiffs assert that the government's "analogy" to *Hernandez* is

"misplaced" because "judicial skepticism of new *Bivens* claims derives from its status as a *wholly* judicially created cause of action," whereas "Congress created the ATS." Pl. Opp. 23 (citing *Al Shimari v. CACI Premier Tech., Inc.*, 320 F. Supp. 3d 781, 783–85 (E.D. Va. 2018)). But the ATS is jurisdictional only, and "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Sosa*, 542 U.S. at 727. *Hernandez* is materially similar to this case in that both sets of plaintiffs urge the Judiciary to create a non-statutory cause of action against U.S. officials stationed at the border for acts performed in the course of their official duties. The Supreme Court rejected that invitation in *Hernandez* because of "the potential effect on foreign relations" and on CBP's function to "control the movement of people and goods across the border," which "implicates an element of national security." *Hernandez*, 140 S. Ct. at 744, 746. Those exact factors are present here: Queue management, by definition, touches on the government's foreign relations with Mexico, *e.g.*, Def. MSJ 11–12, which "should make courts particularly wary" of creating a cause of action. *Sosa*, 542 U.S at 727. And metering is implemented to allow OFO to perform its "daunting task" to "control the movement of people and goods across the border," *Hernandez*, 140 S. Ct. at 746, which implicates national security and "is the prerogative of the Congress and the President," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017); Def. MSJ 15–31. Defendants offer binding Supreme Court precedent on these points, not "mere incantation[s]" of "'national security,' 'foreign relations,' and 'border security,'" Pl. Opp. 23 (citing *Ziglar*, 137 at S. Ct. 1862), and Plaintiffs are "incorrect in deprecating" these conclusions without meaningful analysis, *Hernandez*, 140 S. Ct. at 745–46. These facts plainly "argue for judicial caution" against recognizing Plaintiffs' ATS claim. *Sosa*, 542 U.S. at 725.

## CONCLUSION

For the reasons discussed, this Court should grant summary judgment for the government and deny Plaintiffs' Motion for Summary Judgment in its entirety.

DATED: October 30, 2020                     Respectfully submitted,

                                            JEFFREY BOSSERT CLARK
                                            Acting Assistant Attorney General
                                            Civil Division

                                            WILLIAM C. PEACHEY
                                            Director

                                            KATHERINE J. SHINNERS
                                            Senior Litigation Counsel

                                            */s/ Alexander J. Halaska*
                                            ALEXANDER J. HALASKA
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division
                                            Office of Immigration Litigation
                                            District Court Section
                                            P.O. Box 868, Ben Franklin Station
                                            Washington, D.C. 20044
                                            Tel: (202) 307-8704 | Fax: (202) 305-7000
                                            alexander.j.halaska@usdoj.gov

                                            *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

*Al Otro Lado v. Wolf*, No. 17-cv-02366-BAS-KSC (S.D. Cal.)

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.


DATED: October 30, 2020                    Respectfully submitted,


                                                   */s/ Alexander J. Halaska*
                                                   ALEXANDER J. HALASKA
                                                   Trial Attorney
                                                   United States Department of Justice

DEFS.' REPLY IN SUPPORT
OF CROSS-MSJ
Case No. 3:17-cv-02366-BAS-KSC