1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT & LAW**<br><br>Pretrial Conference: December 14, 2020<br>Trial Date: TBD<br><br>***REDACTED PUBLIC VERSION*** |

---

[1] Defendants have represented that Mr. Wolf is the Acting Secretary of the U.S. Department of Homeland Security ("DHS"). Numerous courts disagree. *Casa de Md., Inc. v. Wolf*, 2020 WL 5500165, at *23 (D. Md. 2020); *Immigrant Legal Res. Ctr. v. Wolf*, 2020 WL 5798269, at *7-9 (N.D. Cal. 2020); *N.W. Immigrant Rts. Project v. USCIS*, 2020 WL 5995206, at *24 (D.D.C. 2020).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

# TABLE OF CONTENTS

                                                                                    **Page**

I.      INTRODUCTION ................................................................. 1

II.     CONTENTIONS OF FACT ................................................... 5

        A.      Overview of Defendants' Unlawful Conduct ................... 5

        B.      Defendants Adopt the Turnback Policy ........................... 8

        C.      Defendants Implement the Turnback Policy Border-Wide ............ 11

        D.      Defendants Knew that the Turnback Policy Violated the Law ........ 13

        E.      Defendants Memorialize Aspects of the Turnback Policy ............ 14

        F.      Defendants Begin Using "Operational Capacity" As a Metric ........ 16

        G.      Defendants Harmed the Class and Al Otro Lado ............. 18

III.    CONTENTIONS OF LAW .................................................. 19

        A.      The Turnback Policy Violates the APA and INA ............. 19

                a.      The Turnback Policy Is a Final Agency Action ..................... 20

                b.      The Policy Directs CBP Officers to Unlawfully Withhold a Discrete, Mandatory Ministerial Action .............................. 21

                c.      The Policy Contravenes Congress' Unambiguous Statutory Scheme and Exceeds Defendants' Authority ......... 24

                d.      The Turnback Policy Is Arbitrary and Capricious ................. 25

                        i.      The Turnback Policy Is Based On Pretext ................... 26

                        ii.     The True Motivations for Metering Are Unlawful ....... 28

                        iii.    The Policy Amounts to an Arbitrary and Capricious Interpretation of the INA ........................... 29

        B.      The Turnback Policy Violates the Due Process Clause................... 30

        C.      The Turnback Policy Violates the ATS ............................. 32

        D.      The Court Should Enter a Permanent Injunction and Declaratory Relief .............................................................. 34

IV.     ABANDONED ISSUES ...................................................... 35

V.      EXHIBIT AND WITNESS LISTS ......................................... 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdolkhani & Karimnia v. Turkey*,
   App. No. 30471/08 (Eur. Ct. H.R. Sep. 22, 2009) ............................................. 29

*Al Otro Lado v. Wolf*,
   952 F.3d 999 (9th Cir. 2020) ..................................................................... 19, 20

*Aracely, R. v. Nielsen*,
   319 F. Supp. 3d 110 (D.D.C. 2018) ................................................................. 25

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................... 16, 17

*Bostock v. Clayton Cnty., Ga.*,
   140 S. Ct. 1731 (2020) ............................................................................... 21

*County of Sacramento v. Lewis*,
   523 U.S. 833 (1998) ................................................................................... 27

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ............................................................................... 22

*DHS v. Regents of the Univ. of Calif.*,
   140 S. Ct. 1891 (2020) ........................................................................... 23, 24

*EBSC v. Barr*,
   964 F.3d 832 (9th Cir. 2020) ....................................................................... 22

*EBSC v. Trump*,
   932 F.3d 742 (9th Cir. 2018) ....................................................................... 21

*EBSC v. Trump*,
   950 F.3d 1242 (9th Cir. 2020) ..................................................................... 26

*Goldberg v. Kelly*,
   397 U.S. 254 (1970) ................................................................................... 28

*Graham v. FEMA*,
   149 F.3d 997 (9th Cir. 1998) ....................................................................... 27

*Hirsi Jamaa and Others v. Italy*,
   App. No. 27765/09 (Eur. Ct. H.R., Sep. 22, 2009) ....................................29, 30

*I.N.S. v. Stevic*,
   467 U.S. 407 (1984) ........................................................................................ 29

*Ilias v. Hungary*,
   App. No. 47287/15 (Eur. Ct. H.R., Mar. 14, 2017)........................................ 29

*Innovation Law Lab v. Wolf*,
   951 F.3d 1073 (9th Cir. 2020) ....................................................................... 30

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ..................................................................................21, 27

*Lujan v. Nat'l Wildlife Federation*,
   497 U.S. 871 (1990) ........................................................................................ 18

*Lyng v. Payne*,
   476 U.S. 926 (1986) ........................................................................................ 20

*M.S.S. v. Belgium and Greece*,
   App. No. 30696/09 (Eur. Ct. H.R., Jan. 21, 2011)........................................ 29

*Marincas v. Lewis*,
   92 F.3d 195 (3d Cir. 1996) ............................................................................ 28

*McGraw-Edison Co. v. Preformed Line Products Co.*,
   362 F.2d 339 (9th Cir. 1966) ........................................................................... 4

*Meachum v. Fano*,
   427 U.S. 215 (1976) ........................................................................................ 27

*Munyua v. United States*,
   2005 WL 43960 (N.D. Cal. 2005) .................................................................... 5

*Navajo Nation v. Dep't of the Interior*,
   876 F.3d 1144 (9th Cir. 2017).......................................................................16

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .......................................................................................... 19

*ONRC Action v. Bureau of Land Mgmt.*,
   150 F.3d 1132 (9th Cir. 1998)........................................................................17

MEMO OF CONTENTIONS OF FACT & LAW

*Perales v. Reno*,
    48 F.3d 1305 (2d Cir. 1995) ................................................................. 27

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of*
    *Health & Human Servs.*,
    946 F.3d 1100 (9th Cir. 2020) ............................................................ 19

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ................................................ 17, 26

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ........................................................................... 22

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ......................................................... 22, 25

*Siderman de Blake v. Rep. of Arg.*,
    965 F.2d 699 (9th Cir. 1992) ............................................................... 29

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ...................................................................... 28, 29

*Superintendent v. Hill*,
    472 U.S. 445 (1985) ...................................................................... 27, 28

*T.I. v. United Kingdom*,
    App. No. 43844/98 (Eur. Ct. H.R., Mar. 7, 2000) .............................. 31

*Tripoli Rocketry Ass'n, Inc. v. ATF*,
    437 F.3d 75 (D.C. Cir. 2006) .................................................. 22, 23, 24

*Util. Air Regulatory Grp. v. E.P.A.*,
    573 U.S. 302 (2014) ........................................................................... 20

*Wagafe v. Trump*,
    2017 WL 2671254 (W.D. Wash. 2017) ......................................... 17, 18

**Statutes**

5 U.S.C. § 704 ...................................................................................... 16

5 U.S.C. § 706 ............................................................................... *passim*

8 U.S.C. § 1158 ..................................................................................... 18

8 U.S.C. § 1225 ..................................................................................*passim*

28 U.S.C. § 1350 ................................................................................ 28

**Other Authorities**

8 C.F.R. § 235.3(b)(4) ...................................................................... 19

Elyssa Pachico and Maureen Meyer, *One Year After U.S.-Mexico
    Migration Deal, a Widespread Humanitarian Disaster* ..................... 31

H.R. Conf. Rep. No. 104-828 (1996) ................................................. 26

https://twitter.com/SecNielsen/status/1008467103857463298 ............... 13

Local Rule 16.1.f.2 ..................................................................... 1, 31

*Metering*, CSPAN, https://www.c-span.org/video/?c4919626/user-
    clip-kirstjen-nielsen-statement-metering (last visited November 9,
    2020) ........................................................................................ 13

U.N. High Comm'r for Refugees, *Note on International Protection* .............. 29, 30

Pursuant to Civil Local Rule 16.1.f.2 of the United States District Court for the Southern District of California (the "Local Rules") and the Court's March 10, 2020 Order setting a pretrial schedule (Dkt. 420), Plaintiffs hereby submit their Memorandum of Contentions of Fact and Law.

In particular, in accordance with Local Rule 16.1.f.2, Plaintiffs set forth herein: (1) a concise statement of the material facts and points of law claimed by Plaintiffs and citations to the authorities upon which Plaintiffs intend to rely at trial; (2) a statement of any issues raised by the pleadings that have been abandoned; (3) a list of the exhibits Plaintiffs expect to or may offer at trial (other than for impeachment or demonstrative purposes only); and (4) a list of trial witnesses.

As outlined below, Plaintiffs contend that no material facts are genuinely in dispute and this Court should enter summary judgment in Plaintiffs' favor when it takes up the matter at the December 14, 2020 pretrial conference. *See, e.g.*, Fed. R. Civ. P. 16(c)(2)(E) ("At any pretrial conference, the Court may consider and take appropriate action on . . . determining the appropriateness of summary adjudication under Rule 56."); Dkt. 560 (ex parte application for oral argument on Plaintiffs' motion for summary judgment suggesting oral argument take place during December 14, 2020 pre-trial conference).

## I.    INTRODUCTION

Plaintiffs' summary judgment briefing outlined the undisputed facts demonstrating that Defendants adopted a policy of unlawfully turning back asylum seekers who are in the process of arriving at Class A ports of entry ("POEs") on the U.S.-Mexico border. Specifically, in 2016, U.S. Customs and Border Protection ("CBP") and the U.S. Department of Homeland Security ("DHS") adopted policies that contemplated turning back hundreds of asylum seekers—and only asylum seekers—to Mexico each day, despite the thousands of people that CBP officers inspect and process daily at POEs. At that time, CBP officers began telling asylum seekers that if they wanted to be inspected and processed—actions required by

statute—they needed to go back to Mexico and return to the POE "later." Instead of finding solutions that would enable Defendants to inspect and process asylum seekers as they arrived at POEs in accordance with their statutorily prescribed mandate, Defendants doubled down and decided to expand their turnback policy.

Initially, Defendants did not put the turnback policy in writing, keeping it in a self-admitted legal gray area that CBP used to justify turning back asylum seekers by various means. Then, in the spring of 2018, CBP and DHS issued memos memorializing aspects of the turnback policy—referred to as "metering" or "queue management." As Defendants drafted these memos, they explicitly contemplated turning back hundreds of asylum seekers at POEs each day pursuant to the memos, disregarding obvious signs that a humanitarian disaster in Mexico would result. Then, they denied POEs permission to inspect and process asylum seekers more quickly.

Moreover, Defendants' turnback policy had both *intent* and the *effect* of turning back asylum seekers and denying them access to the asylum process. Not only did Defendants admit that they turned back asylum seekers who were in the process of arriving at POEs, but Plaintiffs also adduced damning deposition testimony that ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████. Indeed, an equally damning report issued on October 30, 2020 by DHS' Office of Inspector General ("OIG") explicitly and independently underscored these very same findings. And when Defendants had the opportunity to enact measures that would more efficiently process asylum seekers at POEs rather than turning them back, Defendants repeatedly chose to continue turning back asylum seekers. The reason for this decision is obvious. Defendants believed that processing asylum seekers more efficiently would undermine the purpose of the turnback policy by creating a "pull factor" that would cause more asylum seekers to arrive at POEs.

MEMO OF CONTENTIONS OF FACT & LAW

1   Plaintiffs are entitled to summary judgment because these facts are undisputed
2   and dispositive.  Defendants' cross-motion for summary judgment should be denied
3   because Defendants cannot obtain summary judgment merely by arguing against the
4   deposition testimony of their own employees and the statements of their own
5   Inspector General. More to the point, the turnback policy violates the Immigration
6   and Nationality Act ("INA"), the Administrative Procedure Act ("APA"), the Due
7   Process Clause of the Fifth Amendment, and the Alien Tort Statute ("ATS") for
8   several reasons. ***First,*** as this Court has already recognized, turnbacks amount to
9   unlawful withholding of a discrete mandatory duty to inspect and process asylum
10  seekers in violation of APA § 706(1). ***Second***, turnbacks are at odds with the
11  statutory scheme governing POEs and exceed Defendants' statutory authority in
12  violation of APA § 706(2). ***Third***, overwhelming and undisputed evidence shows
13  that Defendants' stated justification for the turnback policy is a pretext, their real
14  motivations are unlawful, and the policy is otherwise arbitrary and capricious in
15  violation of APA § 706(2). ***Fourth***, since the turnback policy denies asylum seekers
16  access to statutorily mandated inspection and processing, the policy violates the Due
17  Process Clause. ***Fifth***, the turnback policy violates the ATS because it violates the
18  specific, universal, and obligatory norm of *non-refoulement*.

19  Defendants claim that they turned back asylum seekers to maintain the
20  "operational capacities" of POEs. *See* Dkt. 283 at ¶ 7. This argument fails for two
21  reasons. ***First***, turnbacks are unlawful regardless of Defendants' justification for
22  them. ***Second***, even if Defendants' justification was theoretically relevant, it is
23  undisputed that Defendants never defined the term "operational capacity," do not
24  track "operational capacity," cannot calculate the "operational capacity" of any POE,
25  and cannot link the decision to turn back asylum seekers to particular changes in
26  "operational capacity." Since Defendants cannot define, track or calculate
27  "operational capacity"—or link it to the decision to turn back asylum seekers—it is
28  not, in fact, a justification for their conduct. Indeed, Defendants' primary response—

MEMO OF CONTENTIONS OF FACT & LAW

3

that they simply made inspecting and processing asylum seekers a lower priority because of operational constraints—*is itself a violation of their mandatory statutory obligations*. Defendants repeatedly admitted that they were decreasing inspection and processing of asylum seekers by making these tasks a subordinate priority. At any rate, Defendants' own inspector general specifically investigated these claims concerning "operational capacity" and found that they did not justify turning back asylum seekers that were in the process of arriving at POEs.

Because Plaintiffs succeed on the merits, a permanent injunction is warranted. *First*, Plaintiffs have suffered irreparable injuries. Class members have been killed, raped, and seriously injured after Defendants turned them back to Mexico. In addition, class members' loss of the right to seek asylum constitutes a loss of statutory and constitutional rights that courts recognize as irreparable harm. Similarly, Al Otro Lado suffered irreparable harm when it was forced to radically overhaul its operations in order to account for the turnback policy. *Second*, there is no adequate remedy at law. Neither a declaratory judgment, vacatur, nor monetary damages could adequately ensure access to the asylum process or prevent the harm that results from turning back class members at the U.S. border and leaving them stranded in dangerous border towns in Mexico. *Third*, the balance of hardships tips decisively in Plaintiffs' favor. Plaintiffs only ask that asylum seekers be treated the same as others who approach POEs, consistent with Defendants' longstanding practices. Any asserted administrative burden on Defendants cannot outweigh the risk of persecution, serious injury, and death that class members face when turned back. *Fourth*, there is a strong public interest in Executive Branch agencies following the plain language of the INA and complying with international law. There is no public interest in violating the law. Accordingly, Plaintiffs request that the Court enter a permanent injunction prohibiting all forms of turnbacks and requiring Defendants to inspect and process asylum seekers as they arrive at Class A POEs on

MEMO OF CONTENTIONS OF FACT & LAW

1    the U.S.-Mexico border.[2]

2    Furthermore, since the evidence shows that Defendants broke the law, this

3    Court should enter a declaratory judgment that the turnback policy violates the INA,

4    the APA, class members' procedural due process rights under the Fifth Amendment,

5    and the international norm of non-refoulement, as actionable through the ATS. *See*

6    *McGraw-Edison Co. v. Preformed Line Products Co.*, 362 F.2d 339, 342 (9th Cir.

7    1966) (declaratory relief is appropriate regardless of "whether . . . further relief is

8    . . . sought").

9    **II.    CONTENTIONS OF FACT**

10    **A.    Overview of Defendants' Unlawful Conduct**

11    There is no cap on the number of asylum seekers who may arrive in the U.S.

12    in a particular time period. Dkt. 260 at 4:24-5:2 ("there aren't limits on the number

13    of people who can seek asylum."). When a person without entry documents is

14    arriving at a POE and asserts a fear of persecution in her country of origin or an

15    intention to seek asylum, CBP must inspect her, *see* 8 U.S.C. § 1225(a)(3), and

16    process her—generally by referring her for an interview with an asylum officer, *see*

17    8 U.S.C. § 1225(b)(1). CBP's statutory duty to inspect and process arriving asylum

18    seekers is "not discretionary." *Munyua v. United States*, 2005 WL 43960, at *6 (N.D.

19    Cal. 2005).

20    In 2016, Defendants departed from this congressionally-mandated process

21    and implemented a policy to turn back asylum seekers who were in the process of

22    arriving at POEs on the U.S.-Mexico border. *See* SJ Ex. 1[3] at 46:12-21; SJ Ex. 3 at

23    ────────────

24    [2] This Court previously granted a preliminary injunction in this case based on the
likelihood of success of Plaintiffs' claims challenging the turnback policy. Plaintiffs
25    ask that the Court convert the current preliminary injunction into a permanent
injunction.

26    [3] For ease of reference, Plaintiffs do not attach exhibits to this Memorandum but cite
to those filed in conjunction with the parties' summary judgment briefing. Exhibits
27    to Plaintiffs' Motion for Summary Judgment are cited herein as "SJ Ex. __."
Exhibits to Plaintiffs' Reply in Support of Their Motion for Summary Judgment are
28    cited as "Reply Ex. __." Citations to the memoranda of law in support are cited as
"MOL" and "Reply MOL."

55:8-15. The policy was first implemented at the San Ysidro POE, the largest POE on the U.S.-Mexico border. By the end of 2016, it had spread to other major POEs. Shortly thereafter, it was implemented at every Class A POE on the U.S.-Mexico border.

Initially, CBP management decided ████████████████████ — a practice that CBP uses when ████████████████████████ SJ Ex. 5 at 366; SJ Ex. 6. This ██████████████████ meant that, initially, CBP turned back asylum seekers from POEs using a variety of tactics. CBP officers lied to some, coerced some to withdraw their applications for admission, and used physical force to turn back others. *See* MOL at 5. Although the methods varied, the common result was clear: asylum seekers were turned back to Mexico without being inspected or processed for asylum.

Over time, Defendants formalized these practices into what is known as "metering" or "queue management." *See* MOL at 5-6 & n.5. When a POE is metering, "a non-citizen without proper travel documents [who] arrives at the border, . . . will be told that the port is at capacity and they should return to be processed later." SJ Ex. 4 at 171:7-13. While metering, CBP often stations officers near the physical border line between the U.S. and Mexico and attempts to physically block those being metered from setting foot on U.S. soil. *Id.*[4] Initially, class members remained in a line at the border, for days or even weeks, waiting to be processed. *See* MOL at 6. This resulted in a growing humanitarian crisis in Mexico. *Id.* Subsequently, a new system arose in which asylum seekers placed their names on waitlists in Mexico in order to be inspected at a POE, and when a particular POE decided to inspect more asylum seekers, CBP would direct and coordinate with its Mexican counterparts to bring a certain number of asylum seekers to the POE for

---

[4] *See, e.g.*, Dkt. 390-103 at ¶¶ 5-8 (Plaintiff Juan Doe was turned back after requesting protection at the middle of a bridge leading to a POE by two American officials who said that he "could not pass," "the port was closed," and that he had to "wait [his] turn"); Dkt. 390-104 at ¶¶ 5-6 (same for Ursula Doe).

MEMO OF CONTENTIONS OF FACT & LAW

6

1   processing.[5] *See* MOL at 6.

2       Importantly, CBP concedes that asylum seekers approaching the U.S.-Mexico

3   border are "attempting to enter the United States at a [POE]" when they are turned

4   back. *Id.* CBP also admits that it has turned back asylum seekers who were standing

5   on U.S. soil, in flagrant violation of the law. *Id.*; *see also* Reply MOL at 1-2. Beyond

6   that, POE leadership admitted behind closed doors that *all* turnbacks broke the law,

7   regardless of whether they were on U.S. soil. Reply MOL at 1-2.

8       Defendants' justification for the turnback policy—a purported lack of

9   "operational capacity" and a de-prioritization of inspection and processing of asylum

10  seekers—is both itself a violation of law and a pretext. Defendants have repeatedly

11  admitted that they were decreasing inspection and processing of asylum seekers by

12  making it a subordinate priority. Moreover, CBP kept daily records of POE

13  capacities, which show that POEs generally operated well below 100% capacity.

14  POEs almost never reported that the number of asylum seekers at the POEs had █

15  ███████████████. *See* MOL at 7. In the few instances of high numbers of

16  asylum seekers arriving at POEs, Defendants could have operated in line with their

17  historical practice by inspecting and processing asylum seekers as they arrived,

18  utilizing established contingency plans created specifically for that purpose. Instead,

19  Defendants turned asylum seekers back to Mexico.

20      As mentioned above, a DHS OIG report issued on October 30, 2020

21  resoundingly confirms the evidence that Plaintiffs adduced during discovery. *See*

22  Reply Ex. 1. In the report, OIG concludes that "while DHS leadership urged asylum

23  seekers to present themselves at [POEs], the agency took deliberate steps to limit the

24  number of undocumented aliens who could be processed each day at the Southwest

---

[5] *See, e.g.*, Dkt. 390-100 at ¶¶ 8-9, 14 (Plaintiff Bianca Doe put herself on a waitlist maintained by Mexican authorities who were restricting people from approaching the POE and was turned back by CBP officers who told her that the POE was "full"); Dkt 390-105 at ¶¶ 8-12 (a CBP officer told Plaintiff Emiliana Doe that "everywhere was full and they could not accept any more people" and she put her name on a waitlist).

Border [POEs]." *Id.* at 10. According to the report, Defendants "stopped the routine processing of . . . asylum seekers . . . at 7 of the 24" POEs. *Id.* Asylum seekers who presented themselves for inspection at those POEs were told to return to Mexico and were often forced to walk miles through harsh terrain to place themselves on a waitlist with thousands of others. *Id.* at 12-13. Moreover, at four POEs, CBP officers regularly turned back asylum seekers who had already crossed the international border and entered the U.S. *Id.* at 15. Furthermore, using the *exact same methodology* as Plaintiffs' expert, Stephanie Leutert, OIG concluded that although increasing numbers of asylum seekers were waiting to be inspected and processed in Mexico, POEs "were not using all available detention space." *Id.* And OIG directly observed detention cells sitting empty while POEs were continuing to turn back asylum seekers. *Id.* at 17. OIG also discounted DHS' operational capacity excuse, stating "our evidence . . . indicates that [CBP] used these reasons regardless of the port's actual capacity and capability." *Id.* at 20. As the OIG concludes: "The law does not set limits as to the number of asylum seekers the Government can or must process. Nevertheless, the [DHS] Secretary and CBP have effectively limited access for undocumented aliens wishing to claim asylum in the United States, sometimes without notice to the public." *Id.* at 19. In short, Defendants' own Inspector General has confirmed that all of Plaintiffs' substantive factual contentions are true.

## B.    Defendants Adopt the Turnback Policy

In early 2016, CBP undertook a construction project that drastically cut the San Ysidro POE's detention capacity for asylum seekers. *See* MOL at 7. That spring, the San Ysidro POE saw an increase in the number of asylum seekers seeking entry. Like all POEs, San Ysidro had established plans for dealing with the increase. *Id.* Indeed, despite the decrease in capacity due to the construction project, until May 2016, ██████████████████████████████████████████████

██████████████████████████████████████████████

1    ██████████████████████ *Id.* On May 26, 2016, San Ysidro POE leadership

2    wrote to CBP headquarters ████████████████████████████

3    ████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5    ██████. *Id.* at 7-8. Notably, at that time the leadership of the San Ysidro POE did

6    not ████████████████████████████████████████████████

7    ██████. *Id.*

8        It was not until the San Ysidro POE received media inquiries about asylum

9    seekers at the port that CBP ████████████████████████████████

10   ████████████████████████████████████████. *See* Reply at 4-6. On May 25, 2016, Pete

11   Flores, the Director of Field Operations for OFO's San Diego Field Office, told Todd

12   Owen, then the Executive Assistant Commissioner of OFO, that ████████████████

13   ████████████████████████████████████████████████████

14   ██████████████ Reply Ex. 3. For his part, Todd Owen, the head of OFO, ████████

15   ████████████████████████████████████████████████████ *Id.*

16       By May 26, 2016, CBP's San Diego Field Office[6] "████████████████████

17   ████████████████████████████████████████████████" SJ Ex. 39 at

18   741; Reply Exs. 4-5. A reporter sent CBP questions concerning "████████████████

19   ████████████████████████████████████████████" many of

20   whom "████████████████████████████████████████████" She

21   informed CBP that she would be "writing an article" in the near future. SJ Ex. 40 at

22   872. Members of California's Congressional delegation also knew that ████████████

23   ████████████████████████████████████████████████████

24   ██████. SJ Ex. 40 at 870; Reply Exs. 6-7. On the same day, the offices of Senator

25   Barbara Boxer and Representative Susan Davis asked questions about the asylum

26   seekers at the San Ysidro POE. SJ Ex. 40 at 870. In response to those inquiries,

27   ─────────────────

28   [6] CBP's Office of Field Operations has four field offices on the U.S.-Mexico border: San Diego, Tucson, El Paso, and Laredo.

1    Sidney Aki, the Port Director of the San Ysidro POE, wrote, ████████████
2    ████████████████████████████████████ SJ Ex. 41 at 552.

3         Also on May 26, the San Diego Union-Tribune published a story entitled
4    "Surge of Haitians at San Ysidro Port of Entry." The story noted that "more than
5    200 people were crowded inside the port's pedestrian entrance," even though the
6    San Ysidro POE had the ability to "process close to 25,000 northbound pedestrians
7    a day."[7] This story got the attention of senior DHS officials, ████████████
8    ████████████████████████████████. Reply Ex. 8 at 631.

9         This was the breaking point for Defendants. They did not want to deal with
10   the media attention at the San Ysidro POE. Pete Flores forwarded an email chain
11   regarding ████████████████████████████████████████████
12   ████████████████████████████████. Reply Ex. 9 at 354.
13   Mr. Flores told Mr. Aki: "████████████████████████████████████
14   ████ *Id.* Mr. Aki responded: "████" *Id.*; Reply Ex. 10. Mr. Aki told his deputies:
15   "████████████████████████████████████████████████████
16   ████████████████████████████" SJ Ex. 41.

17        As Mr. Aki requested, on May 27, 2016, the San Ysidro POE took steps to
18   ████████████████████████████████████████████████████████
19   ████████████████████████████ *See, e.g.*, SJ Ex. 43. That same
20   day, the San Ysidro POE began turning back asylum seekers that were in the process
21   of arriving at the POE and preventing them from crossing the international boundary.
22   *See* MOL at 8. By the end of May 2016, CBP was ████████████████████
23   ████████████████████████████████████████████████████████
24   ████████████████████████████. *Id.*

25        Therefore, it was *media attention*, not increased numbers of undocumented
26   noncitizens, that caused the San Ysidro POE to begin turning back asylum seekers.

27   ────────────────────
28   [7]https://www.sandiegouniontribune.com/news/border-baja-california/sdut-haitians-flood-san-ysidro-port-entry-2016may26-story.html.

1    Defendants wanted those asylum seekers out of sight and out of mind. *See, e.g.*,

2    Reply Ex. 1 at 10 ("We are hoping this thing just goes away."). They also did not

3    want to send a message that the San Ysidro POE had an efficient system for

4    inspecting and processing asylum seekers, because that might be a "pull factor" for

5    future immigration. *See* SJ Ex. 1 at 155:14-16 (█████████████████████████████████

6    █████████████████████████████████████████████").

7    ### C.    Defendants Implement the Turnback Policy Border-Wide

8    In the run up to the 2016 election, Defendants vacillated between turning back

9    asylum seekers and seeking ways to increase inspection and processing of them. In

10   September 2016, Defendants began turning back asylum seekers at the Calexico

11   West POE, in addition to the San Ysidro POE. *See* SJ Ex. 48 at 086; SJ Ex. 49 at

12   715, 718. They did so despite knowing that the turnback policy had created a

13   ███████████████████ in Tijuana, Mexico, and that there were already ████████

14   ████████████████████████████████████. *See* MOL at 9. But by October

15   2016, Defendants had made plans to find a way to inspect and process asylum

16   seekers arriving at POEs, instead of ignoring their statutory duty and turning back

17   asylum seekers at POEs. These included █████████████████████████████████████

18   ██████████████████████, along with plans to ████████████████████████████████

19   ████████████████████████████████████████████████████████████████████████████

20   ████████████████████████. *See id.* at 9-10.

21   On November 9, 2016, Donald Trump won the 2016 presidential election. At

22   the same time, there was a drastic increase in media attention directed at

23   undocumented noncitizens arriving at the San Ysidro POE. Reply at 6. Within hours

24   of the election, CBP ███████████████████████████████████████████████████████

25   ████████████████████████████████████████████. *See* MOL at 10-11. At a

26   meeting the next day, then-Deputy Commissioner McAleenan proposed "████████

27   ████████████████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████" SJ Ex. 67 at 936.

MEMO OF CONTENTIONS OF FACT & LAW

1  Shortly after the meeting, then-DHS Secretary Johnson ████████████
2  ███████████████████████████████. *Id.*; *see also* SJ Ex. 68 at 880.
3      Todd Owen told McAleenan that he was "████████████████████." SJ Ex.
4  6. However, Mr. Owen explained that he "█████████████████████████
5  ████████████████████████████████" *Id.* Although CBP decided ████
6  ██████████████████████████████████████████████████████████████
7  each field office on the U.S.-Mexico border gave similar directions concerning
8  turnbacks at POEs. *See* MOL at 11 (collecting evidence from each field office).
9  Finally, on November 15, 2016, CBP leadership ████████████████████
10 ██████████████████. SJ Ex. 72 at 939. Thus, within a week of the 2016
11 presidential election, Defendants largely abandoned their Congressionally-mandated
12 duty of inspecting and processing asylum seekers who were in the process of arriving
13 at POEs, electing instead to expand turnbacks.
14      In 2017, as the number of asylum seekers arriving at POEs on the U.S.-Mexico
15 border declined precipitously, *see* Dkt. 390-91 at ¶¶ 5, 8, CBP continued to turn back
16 asylum seekers arriving at those POEs. *See* MOL at 12 n.11. Defendants claim that
17 the "surge" of undocumented noncitizens arriving at POEs ended in 2017 and that
18 turnbacks ended for the most part shortly thereafter. Not so. CBP officers turned
19 back asylum seekers at POEs in 2017. *See, e.g.*, SJ Ex. 8 at 043 (January 2, 2017);
20 Reply Ex. 14 (January 26, 2017); Reply Ex. 15 (February 6, 2017); Reply Ex. 16 at
21 388 (████████████████████████████████████████████████████████
22 ████████); Reply Ex. 17 (April 1, 2017); SJ Ex. 52 (███████████████
23 ████████████████████████████████████); Reply Ex. 18 (April 10,
24 2017); Reply Ex. 19 (██████████████████████████████████████████
25 ████████████████████████); Reply Ex. 20 (May 12, 2017); Reply Ex. 21
26 (May 18, 2017); Reply Ex. 22 at 395 (August 26, 2017); Reply Ex. 23 at 411
27 (December 5, 2017); Reply Ex. 24 (December 7, 2017); Reply Ex. 25 (December 8,
28 2017); Reply Ex. 26 (December 9, 2017); Reply Ex. 27 (December 11, 2017); Reply

Ex. 28 (December 12, 2017); Reply Ex. 29 (December 15, 2017); Reply Ex. 30 (December 17, 2017); Reply Ex. 31 at 450 (December 18, 2017). And those exhibits are a drop in the bucket. It is simply not true that Defendants stopped turning back asylum seekers in 2017. They kept turning back asylum seekers because the turnback policy has nothing to do with the capacity of POEs. *See* Reply Ex. 38 at ¶¶ 22, 102-23; Reply Ex. 1 at 16 (San Luis POE staff admitted "they could process more asylum seekers than they were processing").

### D.    Defendants Knew that the Turnback Policy Violated the Law

Defendants implemented the turnback policy despite acknowledging that it broke the law. In some cases, asylum seekers standing on U.S. soil were returned to Mexico. *See* MOL at 11. A CBP officer at the San Ysidro POE ██████████ ████████████████████████████████. SJ Ex. 8 at 045-046. At another POE, a CBP officer "██████████████████████████████████████████████████████ ████" SJ Ex. 75 at 272. At the Hidalgo POE, "██████████████████████████████████" from the secondary inspection area to reduce the number of asylum seekers processed at the port. SJ Ex. 3 at 157:15-18; *see also* SJ Ex. 76 at 113; SJ Ex. 14 at 96:17-99:6 (Nogales POE ██████████████████████████████████).

In the Laredo Field Office, multiple CBP officers observed asylum seekers being returned from U.S. territory to Mexico without being processed. SJ Ex. 77 at 136. The CBP officers who witnessed these turnbacks summarized them in emails sent to Chapter 149 of the National Treasury Employees Union ("NTEU").[8] *See, e.g.*, SJ Ex. 78 at 139-40. NTEU Chapter 149 sent a letter to the director of the Pharr POE, to invoke a Step 1 grievance concerning "the Agency . . . unilaterally implement[ing] a policy that prevents and/or blocks CBP Officers . . . from processing political asylum seekers." SJ Ex. 79 at 142-43. During a grievance meeting with representatives of the NTEU, CBP "***acknowledged that***" the turnback

---

[8] The NTEU represents CBP officers in the Laredo Field Office.

policy "***broke . . . Federal immigration rules and Laws***." SJ Ex. 2 at 0132 (emphasis added). Although CBP officials would freely state that the turnback policy violated the law in conversations, they refused to say so in writing. SJ Ex. 3 at 125:17-21. Eventually, NTEU Chapter 149 asked then-CBP Commissioner McAleenan to provide the legal authority to support CBP's "instructions to return individuals who enter the U.S. and request asylum back to Mexico without" being processed. SJ Ex. 76 at 110.

### E.   Defendants Memorialize Aspects of the Turnback Policy

In 2018, Defendants memorialized aspects of the turnback policy in writing. On April 23, 2018, "███████████████████████████████████████████████████████████████████████████████████████████████" SJ Ex. 80 at 784. On April 24, 2018, CBP Commissioner McAleenan directed his deputies to "█████████████████████████████████████████████" SJ Ex. 81 at 778. Then, on April 27, 2018, CBP issued its metering guidance memorandum, which was distributed to the four Directors of Field Operations who oversee the operations of all POEs on the U.S.-Mexico border. SJ Ex. 82. Under the metering guidance, Directors of Field Operations are permitted to "meter the flow of travelers at the land border" between the U.S. and Mexico. *Id.* When "metering" is in place, CBP officers physically block arriving asylum seekers from crossing the international boundary (often referred to by CBP officers as the "limit line") and tell "waiting travelers that processing at the port of entry is currently at capacity and CBP is permitting travelers to enter the port once there is sufficient space and resources to process them." *Id.*

Although the metering guidance was supposed to address "█████████" Ex. 83 at 332, there was no appreciable surge in asylum seekers in April 2018. *See* MOL at 13. Because the low numbers of caravan members at the border could not justify border-wide turnbacks, DHS began writing guidance on turning back asylum seekers to permit turnbacks to occur outside of "surge events." In late May 2018, DHS Secretary Nielsen began considering a "prioritization-based queue management"

approach that would allow port directors to turn back asylum seekers, purportedly as a matter of "discretion," on the basis of amorphous considerations related to port capacity and resources. During a May 24, 2018 meeting, DHS Secretary Nielsen "██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████ SJ Ex. 93 at 317. In response, OFO's San Diego Field Office indicated that ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ *Id.* at 316. OFO's El Paso Field Office reported that ██████████████████████████ ████████████████████████ " SJ Ex. 94 at 575. The Tucson Field Office said that ██████████████████████████████ SJ Ex. 95. Synthesizing this information, Todd Owen reported to CBP Commissioner McAleenan that ███ ████████████████████████████████████████████████████████ ██████████████████████████████ SJ Ex. 96. However, he warned that this policy would result in "████████████████████████████████████████████ ████████████████████████████████████ " *Id.* ███████████ ████████████████████████████████████████████████████████ ████ SJ Ex. 97. On June 5, 2018, Defendants adopted the prioritization-based queue management memorandum. SJ Ex. 98 at 294. The memorandum directs POEs to focus on other missions, such as inspecting incoming food and other cargo, instead of processing asylum seekers. *Id.* at 296.

Meanwhile, then-Secretary Nielsen was busy trying to convince the public and the media that nothing had changed and that asylum seekers need only present themselves at POEs in order to be processed, even though she *knew* that Defendants had just completely de-prioritized the processing of asylum seekers. *See* https://twitter.com/SecNielsen/status/1008467103857463298 ("This misreporting by Members, press & advocacy groups must stop. It is irresponsible and unproductive. As I have said many times before, if you are seeking asylum for your

family, there is no reason to break the law and illegally cross between ports of entry."). Several months later, in December 2018, Secretary Nielsen told Congress that DHS and CBP were not doing anything that "would reduce [their] capacity to process X number of people per day at the ports." *See Kirstjen Nielsen Statement on Metering*, CSPAN, https://www.c-span.org/video/?c4919626/user-clip-kirstjen-nielsen-statement-metering (last visited November 9, 2020); Reply Ex. 1. This was untrue.

## F.    Defendants Begin Using "Operational Capacity" As a Metric

At the same time, CBP began using a new metric to justify its turnbacks of asylum seekers. While the stated "███████████" for implementing the April 2018 metering policy was "detention capacity" (*i.e.*, the number of persons who can be held at a POE), in June 2018, CBP began using "operational capacity" as its new metric to justify turning back asylum seekers. MOL at 14. This change was significant. Detention capacity is a known, quantifiable number that CBP regularly tracks. *See id.* (collecting examples). On the other hand, operational capacity has no definition and is not tracked by CBP. *Id.* Defendants thus shifted from the measurable metric of detention capacity to an unmeasurable and pretextual metric of operational capacity, in order to "███████████████" SJ Ex. 100 at 207:7-14.

"Operational capacity," as Defendants use the term, is essentially a fiction. Breaking from decades of established practice, CBP did not begin using the term "operational capacity" until 2018—after the turnback policy was already in effect and this litigation was filed. *Id.* at 161:8-10. The distinction between detention capacity and operational capacity is not memorialized in any statute, regulation, guidance, memorandum, or official document. ████████████
████████████████████████████████████████
MOL at 15. In fact, the term "operational capacity" has no concrete definition. *Id.* CBP never even wrote down the factors that a port director should consider when

1  determining a POE's operational capacity. *Id.* CBP did not track operational capacity
2  at any of its ports. *Id.* CBP has no way of reconstructing what the operational
3  capacity of a POE would have been at any given time. *Id.* In the end, operational
4  capacity is what the port director says it is, without any reference to a port's actual
5  holding space. *Id.*

6  　　　　The reason that Defendants changed the metric they used to justify metering
7  is no secret. According to CBP's daily capacity figures, POEs routinely operated
8  below capacity. *See* SJ Ex. 20 at ¶¶ 22, 101-23. Contemporaneous reports also show
9  that the number of asylum seekers detained at POEs ████████████████████
10 ██████████. *See* SJ Exs. 14-15, 17-19. Once CBP higher-ups enabled port
11 directors to ignore the actual capacity of their POEs, ████████████████████
12 ████████████████████████ *See* MOL at 15-16 (collecting examples).

13 　　　　As the turnback policy was rolled out border-wide, POEs tracked ████████
14 ████████████████████████████████████████████. *See*
15 MOL at 16. Meanwhile, in numerous instances, Defendants ████████████████
16 ████████████████████████████████████████████████
17 ██████. *See id.*

18 　　　　Defendants argue in their summary judgment briefing that the turnback policy
19 was successful. The thousands of class members living in unofficial refugee camps
20 on the Mexican side of the border beg to differ.[9]  Under the turnback policy, CBP
21 officers lied, and asylum seekers died. MOL at 16-18, 26-27. Anyone who calls that
22 a "success" needs to open a dictionary.

23 　　　　But even measured by other standards, the turnback policy is a terrible idea.
24 CBP officers repeatedly complained that it put their safety at risk. *See, e.g.*, SJ Ex. 1
25 at 172:14-17; SJ Ex. 3 at 149:23-150:1. These safety flaws alone should have
26

27 ────────────────────
[9] Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*, N.Y. Times
28 (Oct. 25, 2020), https://www.nytimes.com/2020/10/23/us/mexico-migrant-camp-asylum.html.

1 doomed the turnback policy from the start.

2       Moreover, turning back asylum seekers at the limit line between the U.S. and

3 Mexico created a new problem at POEs—so-called "███████████." SJ Ex. 14 at

4 189:6-191:20. ████████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████ *Id.* at 198:25-

6 199:16. This meant that CBP had to ██████████████████████████████████████

7 ███████████████. Ex. 34. As a result, ████████████████████████████████

8 █████████████████████████████. *See, e.g.*, Reply Ex. 35 at 190-191; Reply Ex. 36

9 at 277 (████████████████████████████████████████████████████

10 ████████████████████████████); Reply Ex. 37 (████████████████

11 ████████████████████████████████████████████). So, sure, the

12 turnback policy was a wild "success"—all you need to do is ignore the fact that it

13 killed and endangered asylum seekers, cost more money, placed CBP officers in

14 harm's way, and broke the law.

15       **G.    Defendants Harmed the Class and Al Otro Lado**

16       The turnback policy seriously harmed asylum seekers, returning them to

17 Mexican border cities that Defendants knew were dangerous. *See* MOL at 16. For

18 one, the turnback policy is responsible for thousands of class members living in

19 unofficial refugee camps on the Mexican side of the border. Reply at 9. And as has

20 been well documented in both this action and by the media, turnbacks were

21 responsible for the deaths of asylum seekers. *See id.* at 17; Reply at 9. Moreover,

22 turnbacks often result in individuals being permanently deprived of the ability to

23 access the asylum process.

24       Defendants' turnback policy also harmed Al Otro Lado. In response to "the

25 needs of particularly vulnerable migrants who ha[d] been metered[, s]pecifically

26 those who are in imminent danger of harm or death in Tijuana," Plaintiff Al Otro

27 Lado, as the only organization that offered comprehensive, emergency services to

28 migrants in Tijuana, found itself "constantly having to pull resources from [its] other

1    offices" to address those needs. SJ Ex. 113 at 92:12-96:4. The need to provide

2    services in Tijuana to asylum seekers who had been turned back strained Al Otro

3    Lado's resources and frustrated its other missions, including its deportee program

4    and medical-legal program. *Id.* at 153:3-154:23.

5    **III.    CONTENTIONS OF LAW**

6         The turnback policy violates the Immigration and Nationality Act ("INA"),

7    the Administrative Procedure Act ("APA"), the Due Process Clause of the Fifth

8    Amendment, and the Alien Tort Statute ("ATS") for several reasons. ***First,*** as this

9    Court has already recognized, turnbacks amount to unlawful withholding of a

10   discrete mandatory duty to inspect and process asylum seekers in violation of APA

11   § 706(1). ***Second***, turnbacks are at odds with the statutory scheme governing POEs

12   and exceed Defendants' statutory authority in violation of APA § 706(2). ***Third***,

13   overwhelming and undisputed evidence shows that Defendants' stated justification

14   for the turnback policy is a pretext, their real motivations are unlawful, and the policy

15   is otherwise arbitrary and capricious in violation of APA § 706(2). ***Fourth***, since the

16   turnback policy denies asylum seekers access to the statutory procedure for

17   inspecting and processing them, the policy violates the Due Process Clause. ***Fifth***,

18   the turnback policy violates the ATS because it violates the specific, universal, and

19   obligatory norm of *non-refoulement*.

20        **A.    The Turnback Policy Violates the APA and INA**

21        Section 706 of the APA directs courts to "compel agency action unlawfully

22   withheld" and to "hold unlawful and set aside agency action" that is "not in

23   accordance with law," "in excess of statutory jurisdiction, authority, or limitations,"

24   or otherwise "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(1),

25   (2)(A), (C). The turnback policy is a final agency action that is unlawful and must

26   be set aside under those standards. ***First***, as this Court recognized, the policy violates

27   the specific mandates in the INA governing how Defendants must treat arriving

28   noncitizens at POEs. Similarly, each instance when a class member is turned back

1    amounts to the unlawful withholding of agency action. **Second**, as this Court

2    likewise recognized, the policy violates the statutory scheme Congress created to

3    ensure access to the asylum process for noncitizens at POEs. **Third**, the policy is

4    arbitrary, capricious, and an abuse of discretion because Defendants' stated

5    justification is a pretext, the real reasons for the policy are unlawful, and the policy

6    is at odds with congressional intent.

7            **a.    The Turnback Policy Is a Final Agency Action**

8            The APA permits judicial review over agency actions that are "final." 5 U.S.C.

9    § 704; *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017).

10   Agency action is "final" when (1) it "mark[s] the 'consummation' of the agency's

11   decisionmaking process" and (2) as a result of the action, "'rights or obligations have

12   been determined,' or … 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S.

13   154, 177-78 (1997). The turnback policy, under which CBP officers at POEs along

14   the U.S.-Mexico border restrict the flow of asylum seekers by turning them back to

15   Mexico, fulfills both requirements. *See* Dkt. 280 at 49-54 (concluding Plaintiffs'

16   allegations, which the evidence now substantiates, satisfy the *Bennett* test).

17           The turnback policy satisfies the finality test's first prong because it reflects a

18   "conscious" and "deliberate decision" by Defendants, *ONRC Action v. Bureau of*

19   *Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998), and is "an active program

20   implemented by the agency." *Wagafe v. Trump*, 2017 WL 2671254, at *10 (W.D.

21   Wash. 2017); *see R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (an

22   implemented policy directing an ongoing practice affecting individual cases is final

23   agency action).

24           Defendants first began turning back asylum seekers at the San Ysidro POE in

25   May 2016. In the fall of 2016, Defendants expanded the turnback policy to other

26   POEs along the U.S.-Mexico border. Both decisions amounted to "conscious" and

27   "deliberate" choices by Defendants to reject their standard contingency plans and

28   pursue a different option. *See* MOL at 20.  Defendants previously had plans to utilize

MEMO OF CONTENTIONS OF FACT & LAW

temporary facilities near POEs to fulfill their congressionally-mandated duty to inspect and process asylum seekers, yet they abdicated this duty following the 2016 election by expanding the turnback policy. *Id.*

Then, in April and June 2018, Defendants memorialized aspects of the turnback policy in formal guidance documents. *See id.* CBP also disseminated instructions to POEs requiring them to meter asylum seekers, assign staff to "limit line" positions to prevent asylum seekers from entering U.S. territory, and avoid surpassing an arbitrary cap on POEs' detention capacity. *Id.* The implementation of the policy has been confirmed by high-level government officials, as well as CBP officers with firsthand experience implementing it. *Id.* Defendants' top-down, calculated efforts to restrict the flow of asylum seekers leaves no doubt that it "mark[s] the 'consummation' of the agency's decisionmaking process." *Bennett*, 520 U.S. at 177-78.

With respect to the second prong, legal consequences flow from the turnback policy because it instructs CBP officers to reject asylum seekers at POEs and deny them access to the asylum process, in contravention of their mandatory statutory duties. Asylum seekers are forced to wait in dangerous Mexican border towns, where they risk grave harm or even death. Many are ultimately deprived of any ability to access the asylum process at a POE as a result of the policy. *See, e.g.*, Dkt. 390-75 at ¶ 6 (Roberto Doe was turned back from Hidalgo POE); Dkt. 390-97 at ¶¶ 6-7 (Roberto Doe was subsequently deported from Mexico). These "actual or immediately threatened effect[s]" satisfy the finality test's second prong. *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 894 (1990); *Wagafe*, 2017 WL 2671254, at *10 (action was final when policy resulted in "thousands of . . . qualified applications [being] allegedly indefinitely delayed or denied").

> **b.    The Policy Directs CBP Officers to Unlawfully Withhold a Discrete, Mandatory Ministerial Action**

Congress has spoken clearly about what Defendants are required to do when

1    noncitizens come to POEs—inspect them when they arrive and allow those seeking

2    asylum to access the asylum process. *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), (3),

3    and (b)(1)(A)(ii). Because Defendants have a discrete mandatory duty to inspect and

4    refer asylum seekers arriving at POEs, *see* Dkt. 280 at 31-46; 8 U.S.C. § 1225, each

5    turnback amounts to the unlawful withholding of mandatory agency action. 5 U.S.C.

6    § 706(1). Moreover, the turnback policy—which is an overarching agency policy

7    directing this unlawful withholding of mandatory action—is "not in accordance with

8    law" and is "in excess of statutory jurisdiction, authority, or limitations." *Id.* §

9    706(2)(A), (C).

10        Section 706(1) of the APA requires a court to "compel agency action

11    unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Agency actions

12    that are "legally *required*," *i.e.*, that are "ministerial or non-discretionary," are

13    subject to § 706(1), and courts may compel them as in a mandamus action. *Norton*

14    *v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004). Section 706(2) of the APA

15    directs the court to "hold unlawful and set aside agency action," 5 U.S.C. §

16    706(2)(A), (C), that is "contrary to clear congressional intent" or "inconsistent with

17    the statutory mandate," or that "frustrate[s] the policy that Congress sought to

18    implement." *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of*

19    *Health & Human Servs.*, 946 F.3d 1100, 1112 (9th Cir. 2020) (quotations omitted).

20        This Court previously concluded that "the mandatory duties to inspect all

21    aliens and refer certain aliens seeking asylum are discrete actions for which this

22    Court can compel Section 706(1) relief under 8 U.S.C. § 1225(a)(3), 8 U.S.C.

23    § 1225(b)(1)(a)(ii), and 8 C.F.R. § 235.3(b)(4)." Dkt. 280 at 31. Defendants' duty to

24    inspect and refer applies to those "who are in the process of arriving in the United

25    States," including those who may not yet have set foot across the physical border.

26    Dkt. 280 at 46. The Ninth Circuit found this analysis "sound and persuasive." *Al*

27    *Otro Lado v. Wolf*, 952 F.3d 999, 1011-12 (9th Cir. 2020). The Court's prior

28    conclusion stems directly from a straightforward interpretation of sections 1158 and

1225 of the INA, aided by traditional canons of statutory construction and Defendants' own regulations. *See* Dkt. 280 at 31-46. Similarly, the turnback policy—a policy to evade those mandatory duties—is "contrary to clear congressional intent" and "inconsistent with the statutory mandate," and would "frustrate the policy that Congress sought to implement." *Planned Parenthood*, 946 F.3d at 1112.

Plaintiffs' should prevail on their 706(1) and 706(2) claims because Defendants plainly have a policy of turning back asylum seekers and refusing to inspect and process them when they are arriving at POEs along the U.S.-Mexico border, and they routinely apply this policy to individual asylum seekers. Multiple CBP 30(b)(6) witnesses conceded this basic proposition. Another Rule 30(b)(6) witness admitted that asylum seekers approaching POEs are attempting to enter the United States. MOL at 23. Thus, Defendants have admitted that it is their policy to turn back asylum seekers who are in the process of arriving in the United States. Dkt. 280 at 31-46; *see also Al Otro Lado*, 952 F.3d at 1012.[10] Defendants have also turned back to Mexico asylum seekers who were standing *on U.S. soil*. *See* MOL at 23 (collecting evidence). No statutory analysis of the term "arriving in" is required to determine that CBP broke the law by turning back asylum seekers *who were already on U.S. soil*.

Plaintiffs are thus entitled to an order compelling Defendants to comply with their mandatory, ministerial inspection and processing duties set out in § 1225. *See* 5 U.S.C. § 706(1). Furthermore, it is undisputed that it is agency policy to withhold these mandatory actions, and therefore the Court should set aside the policy because it is incompatible with applicable law. *See id.* § 706(2)(A), (C).

Defendants will likely argue that the turnback policy amounts to agency action

---

[10] To the extent the turnback policy purports to grant POEs discretion to turn back asylum seekers, *see e.g.* Ex. 98, the policy is unlawful because, as the Court has stated, the duty to inspect and process asylum seekers is mandatory. *See* Dkt. 280 at 29.

1   that is delayed rather than withheld. But for all of the reasons set forth in Plaintiffs'

2   Reply brief on summary judgment, Plaintiffs *still* succeed on their APA § 706(1)

3   claim even if that is the case.  That is because such delays are unreasonable under

4   the "*TRAC* factors." *See* Reply at 10-15.

### c.    The Policy Contravenes Congress' Unambiguous Statutory Scheme and Exceeds Defendants' Authority

7          Even if CBP's ministerial duties to inspect and process were not triggered

8   until an asylum seeker steps onto U.S. soil, Plaintiffs still succeed on their APA

9   § 706(2) claim because the turnback policy contravenes Congress' statutory scheme

10  governing inspection at POEs and exceeds Defendants' statutory authority. "[A]n

11  agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*,

12  476 U.S. 926, 937 (1986); *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 328

13  (2014) ("[A] core administrative-law principle [is] that an agency may not rewrite

14  clear statutory terms to suit its own sense of how the statute should operate."). In

15  particular, agencies lack authority to "abandon" a "detailed scheme" established by

16  Congress if they think it is not working well. *EBSC v. Trump*, 932 F.3d 742, 774

17  (9th Cir. 2018). Because Congress designed a "statutory scheme" by which all

18  noncitizens are to be inspected at POEs and asylum seekers must be referred for

19  credible fear interviews, Dkt. 280 at 62, Defendants have no authority to turn back

20  any noncitizens at POEs, much less single out asylum seekers for such treatment.

21  *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1747 (2020) (when Congress makes

22  a "broad rule" and includes no exceptions, the rule applies and no "tacit exception"

23  may be inferred).

24          Since 2016, it has been Defendants' policy to turn back asylum seekers at

25  POEs. Asylum seekers are turned back when they are "attempting to enter the United

26  States at a [POE]." SJ Ex. 17 at 201:22-202:3. CBP officers have carried out these

27  turnbacks in a number of ways.  Sometimes, CBP officers at POEs physically block

28  those perceived to be asylum seekers—and only asylum seekers—from crossing the

MEMO OF CONTENTIONS OF FACT & LAW

1   border, and tell them "that the port is at capacity and they should return to be

2   processed later." SJ Ex. 4 at 171:7-13. In other instances, CBP officers have lied to

3   asylum seekers, turned back asylum seekers who are already on U.S. soil, or even

4   forcibly removed asylum seekers back to Mexico.

5        The formulation of policies "prescrib[ing] the terms and conditions upon

6   which [noncitizens] may come to this country" "is entrusted exclusively to

7   Congress," not the executive. *Kleindienst v. Mandel*, 408 U.S. 753, 766-67 (1972);

8   *see also* Dkt. 280 at 23 ("[O]ver no conceivable subject is the legislative power of

9   Congress more complete than it is over the admission of [noncitizens]."). Here,

10  Defendants claim that they have the power to selectively screen out asylum seekers

11  and deny them processing. The logical result of Defendants' argument is that they

12  would have sole authority to end asylum for noncitizens arriving at POEs, without

13  any involvement by Congress—an interpretation of the INA that plainly conflicts

14  with Congress' statutory scheme. *See* 5 U.S.C. § 706(2)(A), (C).[11]

15       Defendants may not usurp Congress' role in this way. Because Congress

16  never authorized Defendants to turn back any noncitizens at POEs or de-prioritize

17  the inspection and processing of noncitizens, and in fact created a statutory scheme

18  that "specifically addresse[s]" how Defendants must treat individuals who are

19  coming to POEs to seek asylum, *EBSC v. Barr*, 964 F.3d 832, 848 (9th Cir. 2020),

20  the turnback policy is "not in accordance with law" and is "in excess of statutory . . .

21  authority," 5 U.S.C. § 706(2)(A), (C).

22          **d.    The Turnback Policy Is Arbitrary and Capricious**

23       In addition to the turnback policy's categorical incompatibility with the INA,

24  the policy is also illegal under APA § 706(2)(A) because it is "arbitrary, capricious,

---

25

26  [11] CBP's general power to operate POEs does not include authority to contravene
    more specific provisions of the INA. "[I]t is a commonplace of statutory construction
27  that the specific governs the general," particularly where "Congress has enacted a
    comprehensive scheme and has deliberately targeted specific problems with specific
28  solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645
    (2012) (citations omitted).

1  [and] an abuse of discretion" for a number of reasons, each of which provides an

2  independent basis to provide Plaintiffs with relief.

3              i.       **The Turnback Policy Is Based On Pretext**

4          It is arbitrary and capricious for an agency to "offer[] an explanation for its

5  decision that runs counter to the evidence before the agency, or is so implausible that

6  it could not be ascribed to a difference in view or the product of agency expertise."

7  *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014)

8  (citation omitted). "[A]gencies [must] offer genuine justifications for important

9  decisions." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019). An

10 agency is due no deference when the explanation provided for its action "lacks any

11 coherence." *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006).

12 Courts must not "simply accept whatever conclusion an agency proffers merely

13 because the conclusion reflects the agency's judgment." *Id.* "[R]easoned

14 decisionmaking" is required. *Id.* Similarly, an agency action cannot survive APA

15 review if it is supported only by post hoc rationalizations. *DHS v. Regents of the*

16 *Univ. of Calif.*, 140 S. Ct. 1891, 1907-09 (2020).

17         The evidence shows that Defendants' stated justification for the turnback

18 policy—a "lack of capacity" at POEs, Dkt. 283 ¶ 7—is pretextual. CBP's own daily

19 internal statistics capturing "capacity" show that POEs generally operated well

20 below 100% during the policy's implementation and that the number of asylum

21 seekers at POEs ███████████████████████. *See* MOL at 26-27. Indeed,

22 a CBP officer at the Tecate POE testified that this "capacity excuse" is a lie. *Id.*

23 Meanwhile, CBP ████████████████████████████

24 ████████████████████████████████████████"

25 SJ Ex. 118 at 93:4-12. A CBP officer from the Laredo Field Office testified that

26 there was no justification for metering because CBP could process asylum seekers

27 in the order that they came to a POE without resorting to turnbacks. *Id.* at 71:9-16.

28 Finally, prior to issuing the prioritization-based queue management guidance, then-



1  DHS Secretary Nielsen ████████████████████████

2  ████████████████████████████████████████████

3  ████████████████████████████████████████████

4  *Supra* at 12-13.

5      Moreover, Defendants have repeatedly ███████████████

6  ████████████████████████████████████████████.

7  Defendants also intentionally ██████████████████████

8  ████████████████████████████████████████████

9  ████████████████████. MOL at 27. For instance, at the Hidalgo POE, CBP

10  ████████████████████████████████████████████

11  ████████████████████████████████████" SJ Ex. 3 at 157:15-

12  18.

13      In June 2018—well after this litigation began—CBP began using "operational

14  capacity," as opposed to "detention capacity," as its justification for turnbacks. *See*

15  *supra* at 13-14. But as discussed, the new metric, "operational capacity," has no

16  definition and is not—and has never been—tracked, and it is impossible to

17  reconstruct a port's operational capacity. *Id.* "Operational capacity" means ███████

18  ████████████████████████████████████████████

19  ████████████████████ "Operational capacity" as a reason

20  for turning back asylum seekers "lacks any coherence," and is anything but a

21  "concrete standard." *Tripoli Rocketry*, 437 F.3d at 77. Defendants have offered no

22  contemporaneous data or documents to support an "operational capacity" defense.

23  *Id*. Reliance on the "operational capacity" concept demonstrates a lack of "reasoned

24  decisionmaking" and is therefore arbitrary and capricious. *Id*.

25      Around the same time as the shift to "operational capacity," Defendants issued

26  the prioritization-based queue management memo. *See* Ex. 98 at 294. The memo

27  purports to give port directors "discretion" not to inspect and process asylum seekers

28  at all. *Id*. at 296. The combination of "operational capacity" and "prioritization-based

MEMO OF CONTENTIONS OF FACT & LAW

1  queue management" meant that POEs could rely on CBP's explicit policies to justify

2  not inspecting and processing any asylum seekers at all, independent of the actual

3  availability of processing or detention capacity at a given POE. Indeed, after June

4  2018, POEs ████████████████████████████████████████████████████████████

5  ██████████████████. *See supra* at 15-16.

6      Defendants' sole stated rationale for the turnback policy—that they lacked

7  "capacity" to inspect and process asylum seekers—has always been pretextual.

8  When CBP officers told asylum seekers at POEs that they could not be processed

9  due to lack of "capacity" under the turnback policy, these were "obvious" "lies" in

10  violation of APA § 706(2)(A). SJ Ex. 1 at 99:19-101:2. This is textbook arbitrary

11  and capricious action. *See DHS*, 140 S. Ct. at 1907-09 (post hoc rationalization

12  violates § 706(2)(A)).

13                    **ii.    The True Motivations for Metering Are Unlawful**[12]

14      Defendants needed to fabricate a seemingly legitimate excuse to turn back

15  asylum seekers from POEs because their true motivations—limiting access to the

16  asylum process, deterring asylum seekers from seeking protection in the U.S., and

17  evading a statutory command—are arbitrary and capricious and an abuse of

18  discretion. It is a violation of APA § 706(2)(A) for an agency to "rel[y] on factors

19  which Congress has not intended it to consider." *Locke*, 776 F.3d at 994 (citation

20  omitted).

21      A desire to limit access to the asylum process at POEs for its own sake is not

22  a legitimate basis for the turnback policy. *See* Dkt. 280 at 63 (explaining that unlike

23  the statutory numerical limit on refugee admissions, the INA does not cap the

24  number of people who may access the asylum process at ports, and a "*de facto*

25  numerical limit" would be "unlawful"). The evidence shows that Defendants

26

---

27  [12] Although not discussed at length here, there is also ample evidence to suggest that
   metering and its consequences are directly tied to racial and ethnic animus. *See* Dkt.
28  600-2, at 15-19.

1  nonetheless proceeded with the turnback policy in pursuit of this purpose.

2        In addition, deterring lawful migration is not a proper basis for the turnback
3  policy, yet deterrence has always been at the core of the policy. In fall 2016, CBP
4  ███████████████████████████████████████████████████████████████████
5  █████████" SJ Ex. 57 at 577-578. In November of that year, McAleenan proposed
6  ████████████████████████████████████████. SJ Ex. 67 at 936; SJ Ex. 68
7  at 880. After the turnback policy's adoption, Defendants sought to determine
8  whether ████████████████████████████████████████████████████████████
9  ████ *See, e.g.*, SJ Ex. 109 at 2. As this Court has correctly observed, "there is no
10 room for deterrence under the scheme Congress has enacted." Dkt. 280 at 65; *see*
11 *also Locke*, 776 F.3d at 994; *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 154 (D.D.C.
12 2018) (finding challenge to a policy that took deterrence into account showed a
13 likelihood of success on the merits by "demonstrat[ing] the incompatibility of the
14 deterrence policy and [applicable law]"); *R.I.L-R*, 80 F. Supp. 3d at 174–76 (similar).

15        **iii.    The Policy Amounts to an Arbitrary and Capricious**
16                 **Interpretation of the INA**

17        Even if the Court were to conclude that the INA's text is ambiguous as to
18 whether turnbacks could be permissible in some form and even if, contrary to the
19 evidence, Defendants adopted the turnback policy for a legitimate reason, the fact
20 that the policy turns asylum seekers back to danger *en masse* nevertheless amounts
21 to an arbitrary and capricious interpretation of § 1225 because it is "inconsistent with
22 clearly expressed congressional intent." *EBSC v. Trump*, 950 F.3d 1242, 1273 (9th
23 Cir. 2020).

24        The turnback policy has resulted in a humanitarian crisis across the border in
25 contravention of the INA and the humanitarian principles Congress sought to
26 enshrine in it. Under the policy, Defendants have forced thousands of asylum seekers
27 to wait in dangerous border towns where they risk physical harm or death. *See* MOL
28 at 31. And Defendants are well aware of the dangers asylum seekers face in Mexico.

1   But in enacting § 1225, Congress adopted inspection and processing requirements

2   to ensure that despite CBP's general ability to perform summary expedited removal,

3   those with claims for humanitarian protection have the ability to seek asylum *before*

4   they are summarily sent back to Mexico. *See* H.R. Conf. Rep. No. 104-828, at 209

5   (1996). Thus, Congress intended to require processing of asylum seekers—and only

6   asylum seekers—instead of expedited removal, to avert the harm such individuals

7   might face if summarily removed. The human toll of the turnback policy evinces an

8   abject failure to consider Congress's guiding concern in crafting the relevant

9   portions of § 1225—preventing just such harm. Thus, in the context of the current

10  dangers asylum seekers face in Mexico, the turnback policy is "inconsistent with

11  clearly expressed congressional intent." *EBSC v. Trump*, 950 F.3d at 1273.

12  **B.      The Turnback Policy Violates the Due Process Clause**

13      As this Court has already held and as Defendants concede, Plaintiffs have

14  Fifth Amendment due process rights that are coextensive with their statutory rights

15  under the INA. Dkt. 280 at 70, 76; *see also Meachum v. Fano*, 427 U.S. 215, 226

16  (1976) (minimum due process rights attach to statutory rights); *Graham v. FEMA*,

17  149 F.3d 997, 1001 & n.2 (9th Cir. 1998). "In the enforcement of [congressional

18  immigration] policies, the Executive Branch of the Government must respect the

19  procedural safeguards of due process." *Kleindienst v. Mandel*, 408 U.S. 753, 767

20  (1972) (quotation omitted). Congress "has plainly established procedural protections

21  for" class members, requiring that they "shall" be inspected and processed for

22  asylum at POEs pursuant to § 1225 of the INA. Dkt. 280 at 76-77; *cf. Perales v.*

23  *Reno*, 48 F.3d 1305, 1314 (2d Cir. 1995) (Congress's use of word "shall" in IRCA

24  gives rise to statutory entitlements which are subject to due process protections).

25  This is so even if the Court concludes that Plaintiffs have not met all the technical

26  requirements necessary to succeed on their APA claims. Dkt. 280 at 67 n.13, 68.

27  Accordingly, Plaintiffs have proven a due process violation on this basis alone.

28      In addition, the government's policy to categorically deny class members their

1  statutorily mandated entitlement to the asylum scheme also constitutes a violation of

2  fundamental due process principles. At its core, due process is a "protection of the

3  individual against arbitrary action of government," *County of Sacramento v. Lewis*,

4  523 U.S. 833, 845 (1998), and its procedural component protects against "denial of

5  fundamental procedural fairness." *Id.* at 845-46. In applying procedural due process,

6  courts are to prevent an "arbitrary deprivation" of rights "without threatening

7  institutional interests or imposing undue administrative burdens." *Superintendent v.*

8  *Hill*, 472 U.S. 445, 455 (1985).

9      The evidence shows that the turnback policy violates this due process

10  requirement. The weight of the procedural right at stake here is enormous: Plaintiffs'

11  statutorily enshrined right to seek protection from persecution for themselves and

12  their families. *See Goldberg v. Kelly*, 397 U.S. 254, 264-65 (1970) (potential for

13  grave consequences necessitates maximum procedural due process protections); SJ

14  Ex. 20 at ¶ 86 ("[T]here are . . . cases of turn-backs and metering that have led to an

15  effective end to asylum seekers' claims, and even their lives."); *cf. Marincas v.*

16  *Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) ("The basic procedural rights Congress

17  intended to provide asylum applicants . . . are particularly important because an

18  applicant erroneously denied asylum could be subject to death or persecution if

19  forced to return to his or her home country."). Further, it is self-evident that in a

20  system of separation of powers, the executive branch is not free to ignore statutorily

21  mandated procedures by claiming that they impose a "burden." Defendants need

22  only return to inspecting and processing asylum seekers in accordance with the

23  statutorily required procedure, as Defendants were doing before the turnback policy.

24  *Hill*, 472 U.S. at 454 ("Due process is "flexible and depend[s] on a balancing of the

25  interests affected by the relevant government action."). Where individual interest in

26  the mandatory, life-saving protections of a statute is so grave, and the government's

27  actual—as opposed to manufactured and pretextual—burden to abide by the statute

28  is negligible, Defendants' willful and arbitrary decision to deny individuals access

MEMO OF CONTENTIONS OF FACT & LAW

1    to those statutory protections violates fundamental due process principles.

2        **C.    The Turnback Policy Violates the ATS[13]**

3        As this Court recognized, the ATS allows noncitizens to seek redress for a

4    "violation of the law of nations," 28 U.S.C. § 1350, that is "specific, universal, and

5    obligatory." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) (quotation omitted);

6    Dkt. 280 at 80. The duty of *non-refoulement* has achieved the status of a *jus cogens*

7    norm—*i.e.* "an elite subset of . . . customary international law" from which no

8    derogation is ever permitted. *Siderman de Blake v. Rep. of Arg.*, 965 F.2d 699, 714-

9    15 (9th Cir. 1992). Plaintiffs have previously summarized the international law

10   authorities recognizing *non-refoulement* as a *jus cogens* norm, *see* Dkt. 210 at 27-

11   30, a point which Defendants "concede[d]." Dkt. 280, at 82. That should be

12   sufficient to meet the *Sosa* standard and authorize jurisdiction under the ATS. *Id.*

13       The duty of *non-refoulement* forbids a government from returning or

14   expelling an individual to a country where he or she has a well-founded fear of

15   persecution, torture, or other harm, whether it is the individual's home country or

16   another country, *see I.N.S. v. Stevic*, 467 U.S. 407, 417 & n.20 (1984) (referencing

17   obligations under 1951 Refugee Convention), and it "encompass[es] any measure

18   . . . which could have the effect of returning an asylum-seeker or refugee to the

19   frontiers of territories where his or her life or freedom would be threatened[.]" U.N.

20   High Comm'r for Refugees, *Note on International Protection*, ¶ 16 (citing Refugee

21   Convention, art. 33(1)). The principle of *non-refoulement* "essentially means that

22   States must refrain from returning a person (directly or indirectly) to a place where

23   he or she could face a real risk of being subjected to torture or to inhuman[e] or

24    

---

25   [13] The amicus brief submitted by amici curiae Center for Gender and Refugee
     Studies, Harvard Immigration and Refugee Clinical Program, and Boston University
26   School of Law Immigrants' Rights and Trafficking Program provides a more
     fulsome analysis of why Defendants' conduct gives rise to liability under the ATS
27   because it (1) violates the norm of *non-refoulement*, (2) constitutes direct and
     indirect *refoulement*, and (3) contravenes deeply embedded principles of domestic
28   and international law, and such a holding would not be novel or controversial. *See*
     Dkt. 602-1.

MEMO OF CONTENTIONS OF FACT & LAW

1    degrading treatment."[14]

2         Defendants' turnback policy violates the duty of *non-refoulement*—and thus

3    the ATS—on multiple grounds. First, Defendants have *refouled* class members to

4    Mexico where they fear persecution or other harm, and Defendants "knew or should

5    have known" of those likely risks. *Hirsi Jamaa and Others v. Italy*, App. No.

6    27765/09 ¶¶ 131, 156 (Eur. Ct. H.R., Feb. 23, 2012). Three of the Plaintiffs—

7    Abigail, Beatrice, and Carolina—are Mexican nationals who claimed fear of

8    persecution in Mexico, the country to which they were *refouled*. *See* Dkt. 390-11 at

9    ¶¶ 18-20; 390-12 at ¶¶ 26-27; 390-13 at ¶¶ 28-31. Many other class members stated

10   a substantial fear of harm in Mexico. *See, e.g.*, Dkts. 390-11, 390-12, 390-13, 390-

11   14, 390-15, 390-16, 390-73, 390-74, 390-75, 390-76, 390-77, 390-78, 390-79, 390-

12   80, 390-81, 390-82, 390-83, 390-85.

13        Further, Defendants knew that class members were at risk of such harms in

14   Mexico. Other Executive agencies had stated the risks publicly. Many border towns

15   are so dangerous the Department of State prohibits U.S. government employees from

16   traveling there, a fact of which this Court may take judicial notice. Dkt. 216 at 10,

17   n.32; *see also* SJ Ex. 14 at 97:4-99:5 (CBP is aware of State Department's travel

18   advisories for Mexican border states). Plaintiffs also have adduced substantial

19   evidence that non-Mexican asylum seekers are at particular risk of harm in Mexico

20   after CBP *refoulement*. Although these class members do not claim persecution from

21   Mexico, this showing is not required under *non-refoulement* doctrine if Plaintiffs

22   otherwise show that their "life or freedom would be threatened," UNHCR, *Note on*

23   *International Protection*, ¶ 16, or that they have a substantial fear of "inhuman[e]

24   treatment." *See supra* note 10. A full panoply of dangers, including "disappearances,

25   [14] *Hirsi Jamaa and Others v. Italy*, App. No. 27765/09  ¶ 34 (Eur. Ct. H.R., Feb. 23,
26   2012), available at shorturl.at/nEHNQ.  Numerous courts are in accord. *See, e.g.*,
     *Ilias v. Hungary*, App. No. 47287/15 ¶ 98, 244 (Eur. Ct. H.R. Mar. 14, 2017)
27   available at shorturl.at/aizK2; *M.S.S. v. Belgium and Greece*, App. No. 30696/09 ¶
     (Eur. Ct. H.R., Jan. 21, 2011) available at shorturl.at/yKWY7; *Abdolkhani &*
28   *Karimnia v. Turkey*, App. No. 30471/08, ¶ 88 (Eur. Ct. H.R., Sep. 22, 2009),
     available at shorturl.at/dyTU8.

1  kidnappings, rape[,]  sexual and labor exploitation," and worse, await migrants
2  marooned on the Mexican side of the border. Dkt. 104-C at 16; *see Innovation Law*
3  *Lab v. Wolf*, 951 F.3d 1073, 1078 (9th Cir. 2020) (discussing danger). It has been
4  described as a "human rights catastrophe," Dkt. 293-34 at 1, and overwhelming
5  evidence corroborates the existence of these threats. Defendants are or should be
6  fully aware of the peril the turnback policy places on its targets, and have thus
7  violated their duty of *non-refoulement* by implementing it.

8       Finally, Defendants' turnback policy subjects asylum-seekers to
9  impermissible chain *refoulement*—that is, the risk that CBP's expulsion of migrants
10 to Mexico will lead to Mexican-initiated deportation.[15] Mexico—whose asylum
11 system has been described as on "the brink of collapse"[16]—has continually violated
12 migrants' rights. To wit, when CBP turned back Plaintiff Roberto Doe in October
13 2018, it specifically instructed Mexican immigration officials to remove him from
14 the bridge, and Roberto was later deported from Mexico. Dkt. 390-75 at ¶ 4, 9, 390-
15 97 at ¶¶ 6-7. Plaintiff Cesar Doe would have suffered the same fate were it not for
16 the timely intervention of an attorney who thwarted his deportation twelve days into
17 his Mexican-ordered detention. Dkt. 390-101 at ¶¶ 8-9. CBP's cooperation with
18 Mexican immigration authorities jeopardizes hundreds—if not thousands—of
19 individuals' legitimate claims to asylum through the *chain refoulement* process. *See,*
20 *e.g.*, Dkt. 293-47 at ¶¶ 11-16; 293-46 at ¶¶ 39-46.

21       **D.    The Court Should Enter a Permanent Injunction and Declaratory**
22            **Relief**

23       As discussed more fully in Plaintiffs' summary judgment briefing, Plaintiffs
24 have succeeded on the merits of their claims and can easily satisfy the remaining

25 ---
26 [15] *See, e.g.*, *Hirsi Jamaa and Others v. Italy*, App. No. 27765/09 (Eur. Ct. H.R., Feb. 23, 2012) (Italy violated *non-refoulement* when it refused to consider whether Libya would onwardly deport asylum seekers); *T.I. v. United Kingdom*, App. No.
27 43844/98, ¶ 2 (Eur. Ct. H.R., Mar. 7, 2000) available at shorturl.at/iHK68 (same).
28 [16] Elyssa Pachico and Maureen Meyer, *One Year After U.S.-Mexico Migration Deal, a Widespread Humanitarian Disaster*, WOLA (Jun. 6, 2020).

factors warranting permanent injunctive relief. *See* MOL at 36-38. In addition, the
Court should enter a declaratory judgment that Defendants have violated the APA,
Fifth Amendment, and ATS. *Id.* at 38-39. Moreover, because Plaintiffs have
demonstrated success on the merits of their claims, the Court also should convert the
current preliminary injunction into a permanent injunction.

## IV.    ABANDONED ISSUES

Plaintiffs are pursuing all of the claims and relief they have pleaded. Plaintiffs
are not aware of any abandoned issues at this time.

## V.    EXHIBIT AND WITNESS LISTS

Filed concurrently with this Memorandum are Plaintiffs' exhibit and witness
lists, prepared and submitted in accordance with Local Rules 16.1.f.2.c-d.

Dated: November 9, 2020

MAYER BROWN LLP
Matthew H. Marmolejo
Ori Lev
Stephen M. Medlock

SOUTHERN POVERTY LAW
CENTER
Melissa Crow
Sarah Rich
Rebecca Cassler

CENTER FOR CONSTITUTIONAL
RIGHTS
Baher Azmy
Ghita Schwarz
Angelo Guisado

AMERICAN IMMIGRATION
COUNCIL
Karolina Walters

By: */s/ Stephen M. Medlock*
Stephen M. Medlock

*Attorneys for Plaintiffs*

MEMO OF CONTENTIONS OF FACT & LAW

1

**CERTIFICATE OF SERVICE**

2       I certify that I caused a copy of the foregoing document to be served on all

3   counsel via the Court's CM/ECF system.

4   Dated:  November 9, 2020                    MAYER BROWN LLP

5

6                                              By  /s/ Stephen M. Medlock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28