1  JEFFREY BOSSERT CLARK
2  Acting Assistant Attorney General
   Civil Division
3  WILLIAM C. PEACHEY
4  Director, Office of Immigration Litigation –
   District Court Section
5  KATHERINE J. SHINNERS (DC 978141)
6  Senior Litigation Counsel
   United States Department of Justice
7  Civil Division
8  Office of Immigration Litigation
   P.O. Box 868, Ben Franklin Station
9  Washington, D.C. 20044
10 Tel: (202) 598-2859 | Fax: (202) 305-7000
11 katherine.j.shinners@usdoj.gov
   ALEXANDER J. HALASKA (IL 6327002)
12 DHRUMAN Y. SAMPAT
13 Trial Attorneys

14 *Counsel for Defendants*

15
16        **UNITED STATES DISTRICT COURT**
   **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
17              **(San Diego)**

18
   AL OTRO LADO, Inc., *et al.*,          Case No. 3:17-cv-02366-BAS-KSC
19
20              *Plaintiffs*,             Hon. Cynthia A. Bashant

21         v.                             **DEFENDANTS' MEMORANDUM OF**
                                          **CONTENTIONS OF FACT AND**
22                                        **LAW**
   CHAD F. WOLF, Acting Secretary of
23 Homeland Security, *et al.*, in their  [Redacted Public Version]
24 official capacities,

25              *Defendants*.

26
27
28

## I.    SUMMARY OF CASE

Plaintiffs brought this case asserting claims under the Immigration and Naturalization Act ("INA"), the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(1) and 706(2), the Due Process Clause of the Fifth Amendment, and the Alien Tort Statute ("ATS"), challenging Defendants' alleged "turnback policy" at land ports of entry located along the southern border of the United States. Pursuant to Local Rule 16.1(f)(2), Defendants respectfully submit the following Memorandum of Contentions of Fact and Law.

## II.    CONTENTIONS OF FACT[1]

<u>DHS and CBP's Missions and Structure</u>

1.    Congress has charged U.S. Customs and Border Protection ("CBP") with multiple duties, including to: coordinate and integrate the security, trade facilitation, and trade enforcement functions of CBP; ensure the interdiction of persons and goods illegally entering or exiting the United States; facilitate and expedite the flow of legitimate travelers and trade; direct and administer the commercial operations of CBP, and the enforcement of the customs and trade laws of the United States; detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States, in cases in which such persons are entering, or have recently entered, the United States; safeguard the borders of the United States to protect against the entry of dangerous goods; ensure the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland; in coordination with U.S. Immigration and Customs Enforcement ("ICE") and U.S. Citizenship and Immigration Services ("USCIS"), enforce and administer all immigration laws, as such term is defined in paragraph (17) of section

---

[1] Defendants respectfully reserve the right to seek amendment of this filing should the Court's ruling on the Parties' pending motions for summary judgment materially change the evidence or argument that should be submitted at trial.

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

1101(a) of title 8, including (A) the inspection, processing, and admission of persons who seek to enter or depart the United States; and (B) the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States; develop and implement screening and targeting capabilities, including the screening, reviewing, identifying, and prioritizing of passengers and cargo across all international modes of transportation, both inbound and outbound; enforce and administer the laws relating to agricultural import and entry inspection; and other duties and powers set forth in 6 U.S.C. § 211, prescribed by law, or delegated by the Secretary.

2.    CBP's mission is "to safeguard America's borders thereby protecting the public from dangerous people and materials while enhancing the Nation's global economic competitiveness by enabling legitimate trade and travel."

3.    CBP's Office of Field Operations ("OFO") is one of several components within CBP.

4.    OFO is the operational component within CBP that is responsible for the management of operations at ports of entry into the United States.

5.    A "port of entry" (POE) has multiple functions, including serving as a specific place where one may lawfully enter the United States.

6.    OFO is the largest component of the largest law-enforcement agency in the United States, with operations spanning over 328 POEs within 20 field offices, as well as 70 international locations.

7.    Congress mandated OFO to "coordinate the enforcement activities of [CBP] at United States air, land, and sea ports of entry to[:]" "(A) deter and prevent terrorist weapons from entering the United States at such ports of entry; (B) conduct inspections at such ports of entry to safeguard the United States from terrorism and illegal entry of persons; (C) prevent illicit drugs, agricultural pests, and contraband

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

from entering the United States; (D) in coordination with the Commissioner, facili-
tate and expedite the flow of legitimate travelers and trade; … (F) coordinate with
the Executive Assistant Commissioner for the Office of Trade with respect to trade
facilitations and trade enforcement activities of [CBP]; and (G) carry out other duties
and powers prescribed by the Commissioner." 6 U.S.C. § 211(g)(3).

8.    CBP is only one component agency of the Department of Homeland
Security ("DHS").

9.    DHS's other component agencies include: Cybersecurity and Infra-
structure Security Agency; U.S. Citizenship and Immigration Services; the Federal
Emergency Management Agency (FEMA); U.S. Coast Guard; U.S. Immigration and
Customs Enforcement; United States Secret Service; and the Transportation Security
Administration.  DHS's primary missions focus on securing the nation and the pre-
vention of terrorism and terrorist attacks.

10.    Congress charged DHS with, among other duties: "preventing the entry
of terrorists and instruments of terrorism into the United States; securing the borders,
territorial waters, ports, terminals, waterways, and air, land, and sea transportation
systems of the United States, including managing and coordinating those functions
transferred to the Department at ports of entry; Carrying out the immigration en-
forcement functions vested by statute in, or performed by, the Commissioner of Im-
migration and Naturalization (or any officer, employee, or component of the Immi-
gration and Naturalization Service) …; establishing and administering rules… gov-
erning the granting of visas or other forms of permission including parole, to enter
the United States to individuals who are not a citizen or an alien lawfully admitted
for permanent residence in the United States; establishing national immigration en-
forcement policies and priorities; … administering the customs laws of the United
States; conducting the inspecting and related administrative functions of the Depart-
ment of Agriculture transferred to the Secretary of Homeland Security; [and], [i]n

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

carrying out the foregoing responsibilities, ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce."

11.     Congress has thus charged the Secretary of the DHS with ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce while carrying out these responsibilities.

12.     In 2019, the ports of entry along the southwest border processed approximately 49.2 million pedestrians; 73 million personal vehicles and 136.9 million personal passenger vehicles; 2.2 million bus passengers; and 6.4 million trucks and 6.5 million truck containers.

13.     It takes significant resources to manage the highly variable environments of POEs along the southwest border.

14.     OFO has finite resources to conduct its operations at POEs and accomplish its missions.

15.     The vast majority of opioids interdicted by CBP are seized at POEs.

16.     From 2013 to 2017, 88% of CBP's opioid seizures occurred at POEs, and 75% of those seizures occurred at ports on the southern border.

17.     In Fiscal Year 2020 (through August), OFO nationwide seized 37,830 pounds of cocaine; 4,552 pounds of heroin; 313,813 pounds of marijuana; 141,663 pounds of methamphetamine; and 3,302 pounds of fentanyl.

18.     In Fiscal Year 2019, OFO had seized along the Southwest Border over 117,000 pounds of methamphetamine, 19,000 pounds of cocaine, 2,400 pounds of fentanyl, 4,700 pounds of heroin, and 253,900 pounds of marijuana.

19.     POEs in the San Diego and Tucson field offices together accounted for 57% of all opioid seizures by CBP officers in 2016 and 2017. In fiscal year 2020 (through September), OFO along the southern border seized more than 412,658 pounds of illicit narcotics.

20.     CBP does not have technology that screens all packages, cargo, or vehicles, so the agency's ability to detect narcotics hidden on individuals, in vehicles,

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

or comingled with shipments of goods relies heavily on targeting intelligence and officer training and experience.

21.    In Fiscal Year 2019, OFO encountered 9,297 individuals with outstanding warrants at POEs across the country.

22.    CBP's Tactical Terrorism Response Teams (TTRT), which are comprised of CBP officers and Border Patrol agents who are specially trained in counterterrorism response, are currently operational at 77 U.S. POEs.

23.    The POEs often operate with shortages of CBP officers.

24.    As of September 25, 2020, OFO faced ongoing staffing shortages at air, land, and sea ports across the country, and officers were often required to work overtime to meet the operational needs that arise on a daily basis.

25.    CBP has needed to assign temporary staff details to fulfill staffing needs POEs in the San Diego and Tucson Field Offices; this practice of detailing staff was in 2018 described by the Senate as "systemic." For instance, OFO deployed 1,865 officers over the course of five fiscal years to supplement critical staffing shortages in the San Diego and Tucson Field Offices, at a cost of over $41,757,580 in travel expenditures.

26.    The senior-most official in OFO is the Executive Assistant Commissioner of OFO.  Within OFO headquarters, the Executive Director of Operations is responsible for oversight of operations of POEs.  The Executive Director of Admissibility and Passenger Programs is responsible for the development, management, and implementation of policies concerning the entry, admission, and processing of travelers to the United States.

27.    OFO's POEs are overseen by regional field offices.  There are four field offices that oversee the land POEs along the U.S.-Mexico border: San Diego, Tucson, El Paso, and Laredo.

28.    The senior-most official in each OFO field office is the director of field

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

operations (DFO).  Depending on the size of the field office, a director of field operations may be assisted by one or more assistant directors of field operations.

29.    The San Diego Field Office's land border POEs are the San Ysidro, Otay Mesa, Tecate, Calexico, and Andrade POEs.

30.    The Tucson Field Office's land border POEs are the Nogales, Douglas, Naco, Lukeville, Sasabe and San Luis POEs.

31.    The El Paso Field Office's land border POEs are the El Paso, Santa Tersa, Columbus, Presidio, and Tornillo POE.

32.    The Laredo Field Office's land border POEs are the Laredo, Hildalgo, Brownsville, Roma, Progreso, Rio Grande City, Del Rio, and Eagle Pass POEs.

 Background Regarding POE Operations and Inadmissible Aliens

33.    At POEs, CBP officers inspect all individuals who arrive at primary inspection.  Individuals who are determined to require further inspection are referred to secondary inspection.  Aliens determined to be inadmissible upon inspection are then processed for appropriate immigration proceedings, which may be an expedited removal order, or an expedited removal order with a credible fear referral, or placement in removal proceedings before an immigration judge, or permitting the individual to withdraw his/her application for admission.

34.    The San Ysidro POE's Admissibility Enforcement Unit (AEU) is the unit designated for processing inadmissible aliens at the San Ysidro POE, including aliens without documents sufficient for lawful entry.

35.    At the San Ysidro POE, when an individual is first brought into the AEU, he/she goes to an area known as "intake." There, CBP gathers the individual's biographical information, starts a record for the individual in CBP's database, inventories the individual's personal property, and determines whether the individual needs to visit the onsite medical provider for medical care. The individual is typically then brought to another area of the AEU for processing. The processing is conducted by a specially trained CBP officer who determines the appropriate course of action

for the individual, which may be an expedited removal order, or an expedited removal order with a credible fear referral, or placement in removal proceedings before an immigration judge, or allowing the individual to withdraw his/her application for admission.

36.     At all land POEs along the Southwest border, when an inadmissible alien is pending processing or has completed processing and is awaiting transfer to another agency, such as ICE or the U.S. Department of Health and Human Services, CBP generally detains that individual at the POE in accordance with statute and governing standards for short-term holding.

37.     While individuals are in CBP's short-term detention facilities, CBP must comply  with various standards, such as its National Standards on Transportation, Escort, Detention and Search (TEDS) standards, and legal requirements such as those set forth in the *Flores* settlement governing minors, and the requirements of the Prison Rape Elimination Act (PREA).

38.     CBP's facilities are generally designed for such short-term holding pending the transfer of custody to another agency, and are not designed to hold individuals for more than a few days.  In accordance with TEDS, detainees should generally not be held longer than 72 hours, and CBP makes every effort to hold individuals for the least amount of time required for their processing and transfer out of CBP custody.  . Consequently, the longer a detainee is in custody at the POE, the more space CBP endeavors to accord him/her, and the less space is available in the holding rooms to house other detainees.

39.     Additionally, CBP generally segregates male and female detainees from each other, and holds minors separately from unrelated adults.  CBP also takes steps to ensure that populations who may be at-risk, such as transgender individuals, are held apart from other populations.  Thus, CBP may need to utilize one entire cell for a single family unit, or a single unaccompanied minor, and is not able to hold other individuals in that cell.

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

40.    A POE's physical detention capacity is based on its available physical holding space, and does not take into account operational factors. "Physical detention capacity" is typically reported by POEs as their numeric "capacity."

41.    However, a POE's ability to intake, process, and hold inadmissible aliens (including aliens without documents sufficient for lawful entry) depends on a number of factors, and not just physical detention capacity. The concept of the influence of other factors on capacity is sometimes referred to as "operational capacity."

42.    While each POE has its own unique capacity constraints, the type of factors that influence a POE's capacity to intake, process, and hold aliens without documents sufficient for lawful entry include: the volume of trade and travel flowing through a particular POE; the physical detention capacity; the demographics and other characteristics of the individuals in custody; the length of time those individuals have been in custody; the type and complexity of the immigration cases pending processing; the amount of available staffing, including the availability of overtime staffing; the need to divert staff for transportation or escort of detainees; daily tactical and enforcement activities; and the need to dedicate resources to other statutory mission sets.

43.    Further, operational impact at POEs cannot always be planned, and CBP must act conservatively in intaking individuals to account for inherent variations in operations, such as the demographics and characteristics of the next inadmissible aliens that arrive at the POE, smuggling attempts, criminal encounters, or other events that will impact a port's operations.

44.    POEs have myriad other missions and tasks to execute. OFO has several priority missions, including protecting national security, counter-narcotic and outbound operations, economic security, and facilitating lawful trade and travel. CBP is responsible for inspecting all persons and goods at ports of entry, and for ensuring that those persons and goods are in compliance with a variety of criminal

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

1   and civil laws.  POEs engage in a number of complex operations to enforce these

2   laws   such as conducting inspections on all inbound pedestrian, vehicle, and com-

3   mercial traffic to determine admissibility under both immigration and customs laws;

4   inspecting all merchandise to determine admissibility under customs, trade, agricul-

5   tural, and other laws; inspecting both inbound and outbound passengers and vehicles

6   for narcotics, weapons and ammunition, undeclared currency, and counterfeit goods;

7   and detecting terrorists, criminals, and other threats to the United States.  A POE's

8   operational capacity to process individuals without documents sufficient for lawful

9   entry must take into account its need to perform all of its missions, as well its finite

10  resources available to perform these missions.

11      45.    Operational capacity is dependent on these fluid factors and thus cannot

12  be readily or reliably captured in a report. CBP thus does not track and report "op-

13  erational capacity" in numerical form.

14      46.    Over the relevant time period, CBP has tracked its use of its physical

15  detention capacity by tracking the number of individuals in custody at POEs. Such

16  tracking reports—including the MCAT Report, and the Field Queue Management

17  Report—provide information about the number of detainees in custody at the partic-

18  ular time the information is reported, and thus reflect only a snapshot in time.  They

19  do not reflect, for example, whether more individuals came in for processing in the

20  hours after the time the information is reported.

21  Inception of Metering in May 2016

22      47.    In its January 22, 2016, Maximum Capacity Contingency plan for its

23  Admissibility Enforcement Unit (AEU), the San Ysidro POE noted that, at that time

24  and based on the facilities then available, it could hold 209 detainees safely. The

25  plan noted that the San Ysidro POE could use detention cells, repurposed spaces,

26  offsite locations, and an intake seating area to hold up to 367 people total, but not

27  overnight; the San Ysidro POE could hold only 262 people overnight.

28      48.     Beginning in February 2016, CBP saw an increase in the number of

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

inadmissible Haitian nationals seeking admission at ports of entry at POEs in the San Diego Field Office. The majority of these Haitian nationals were traveling from Brazil, where many had resided for some time.

49.    As of April 2016, POEs in the San Diego field office were experiencing a significant increase in the number of Haitian nationals seeking admission at the POEs.

50.    By the end of May 2016, CBP officials at the San Ysidro POE had utilized numerous options to expand processing and short-term detention capacity to accommodate this influx.

51.    In May 2016, the San Ysidro POE took numerous measures to address the influx of migrants.

52.    In May 2016, one of the steps taken by the San Ysidro POE to address the influx of migrants was to activate its maximum capacity contingency plan, which involved using converted administrative spaces of the POE facility as holding areas for family units and low-risk detainees and closing its "Old Port" building in order to process Haitian nationals

53.    Another step taken at the San Ysidro POE in May 2016 was to convert a maintenance area recently vacated by the General Services Administration ("GSA") into a temporary holding area.

54.    Although the use of converted spaces temporarily increased holding capacity at the San Ysidro POE to approximately 800 to 900 persons in May 2016, these converted spaces were overcrowded and were not appropriate for even short-term detention, as they lacked restroom facilities.  Further, the use of makeshift detention space required diverting CBP officers from frontline and other duties  to the care of detainees.

55.    In May 2016, the San Ysidro AEU almost doubled its staffing on all three daily shifts, from ███ officers to ███ officers per shift.

56.    In May 2016, the San Ysidro POE requested, coordinated, and activated

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

virtual processing with local POEs within the San Diego Field Office. "Virtual Processing" is where some portion of the processing of an inadmissible alien is done virtually, using technology, rather than in person.

57.    In May 2016, CBP also used virtual processing to allow CBP officers in the San Diego, Los Angeles, Detroit, and Miami Field Offices and Border Patrol agents in the El Centro Sector to assist in processing migrants at San Ysidro.

58.    In May 2016, the San Ysidro POE diverted ███████████████ ████████████████████████████ to assist its AEU with processing.

59.    In May 2016, the San Ysidro POE reassigned 3 CBP Officers who spoke Creole to interview Haitian nationals for processing.

60.    In May 2016, the San Ysidro POE utilized several U.S. Border Patrol facilities, if those facilities were not already at capacity, to hold detainees.

61.    In May 2016, all of the San Ysidro POE's I-94 permit processing was transferred to the Otay Mesa POE in order to clear out the ground floor of the Old Port Building to secure additional workstations to conduct in person or virtual interviews.

62.    Even with all of these measures, undocumented aliens at San Ysidro POE in May 2016 still had to wait in line to go through intake.

63.    In May 2016, before the inception of metering at the San Ysidro POE, when the AEU was full, aliens without documents for lawful entry would queue in an area between the limit line at the port of entry and the primary inspection booths to wait until there was sufficient space in the AEU for their intake.

64.    In late May 2016, this queue from the primary inspection booths at the San Ysidro POE stretched clear south into Mexico.

65.    The numbers of undocumented aliens seeking entry at San Ysidro POE continued to grow during May 2016, to the point that the Port surpassed 1,000 individuals in custody.

66.    On May 25, 2016, OFO officials at the San Ysidro POE reported that

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

the San Ysidro POE had saturated its temporary holding/detention space.

67.    On or around May 27 or 28, 2016, after taking the actions described above, the San Ysidro POE stopped intake at the international boundary because there was no space left in the AEU to intake more individuals.

68.    Because continued intake and processing of all aliens without documents sufficient for lawful entry at the same time would overcrowd the facility yet again, the San Ysidro POE Port Director advised his reports to "coordinate and bring small groups at a time and hold the line to prevent any from entering."

69.    On May 29, 2016, San Ysidro POE leadership notified supervisors that the government of Mexico had set up shelters in Tijuana to house those waiting to claim credible fear/asylum at the San Ysidro POE, rather than continue to allow them to wait unsheltered in a line on the Mexican side of the border, and that the Mexican government would coordinate the transportation of those individuals from the shelters to the POE, where they would be brought into the AEU for processing. CBP officers were to staff the "Limit Line" (at the international boundary line) to ensure that travelers had documents.

70.    During this spring 2016 surge, San Ysidro was already in the middle of a multi-phase, multi-year GSA project involving a complete reconfiguration and expansion of the port that included the demolition and construction of the land POE, including primary and secondary inspection areas, administration and pedestrian buildings, and all other support structures.

71.    In late June 2016, as phase 2 of the GSA construction project began, the facilities that San Ysidro used in May to create makeshift detention space for the overflow of inadmissible aliens in custody were demolished.

72.    Accordingly, as of July 2016, all aliens in custody were housed in temporary trailers at the new PedWest pedestrian entrance with holding cells with a physical detention capacity of █.

73.    The increase in numbers of migrants continued through the summer and

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

into the fall of 2016.  For example, at least 950 Haitian nationals arrived in Tijuana to be processed at San Ysidro on September 12, 2016.

74.    On October 6, 2016, Chiara Cardoletti-Carrol, Deputy Regional Representative for the USA and Caribbean of the United Nations High Commissioner for Refugees (UNHCR), issued a report based on UNCHR's site visit at the San Ysidro POE during the week of September 12, 2016.  That report noted that as many as 950 Haitian nationals were seeking to present themselves for admission to the United States at the San Ysidro POE, and that Haitian nationals were also arriving in increasing numbers at other POEs, such as Calexico, which is "far less resourced than San Ysidro."  The report also "confirmed" CBP's reports that most of the Haitian nationals were not seeking asylum but expressed interest in working and/or reuniting with family in the United States. Ms. Cardoletti-Carrol wrote that UNHCR "was particularly impressed to see the sincere efforts made by the various DHS counterparts at the border to ensure access to the United States protect for vulnerable persons despite ongoing capacity challenges and increasing number of arrivals," and concluded that "both CBP and ICE in Southern California are currently doing what they can with existing resources to process the Haitians expeditiously and humanely and maintain regular processing of asylum-seekers."

75.    Throughout the 2016 surge, officers at the San Ysidro POE were regularly reminded (on or about at least July 27, 2016, September 1, 2016, and November 15, 2016) that no asylum applicant should be denied entry into the U.S and that the officers should direct all applicants to the Pedestrian West ("PedWest") facility for proper intake and processing; and that any applicants for asylum encountered at primary inspection must be taken into custody and transported to the PedWest facility for intake and processing..

Metering in Fall 2016

76.    The migrant surge continued into the fall of 2016, began spreading east, and began to include increasing numbers of family units ("FAMU" or

13

"FMUA") and UACs in addition to the extremely high numbers of Haitian nationals.

77.     Other ports, in addition to the San Ysidro POE, began to experience severe overcrowding, case processing delays, and related adverse impacts to their operations.

78.     On September 3, 2016, the El Paso POE in Texas, which around that time reported a physical detention capacity of ███ persons, received 92 cases in one shift.

79.     In the ten-day span between September 4 and September 13, the El Paso POE averaged ███ subjects in custody per day. During this period, an average of 23% of the members of family units were held at the POE for longer than 72 hours pending placement. On September 14, 2016, the El Paso POE was providing up to 1,000 meals per day using microwaves, a volume for which the facility was not equipped to handle. The El Paso POE was managing its caseload by transporting cases for processing to less affected Ports. Because the El Paso Field Office has no ground transportation contract, all transports were performed by OFO officers; accordingly, the increased transports between POEs, to ERO facilities, and to the airport strained OFO vehicle and personnel resources. Meanwhile, the El Paso Field Office was scheduled to detail eight officers to the San Diego Field Office on October 3, 2016.

80.     On September 27, 2016, the El Paso POE reported 361 detainees in custody, surpassing its September 9 all-time high of 265, as FAMU and UAC continued to arrive.

81.     On September 28, 2016, the El Paso POE reported that it had diverted resources from various other operational areas to address the high numbers of individuals in at the Port at the Port. It redirected officers who work on terrorism-related enforcement, training, and other duties to assist with inadmissible alien case processing and related duties and suspended all training so that trainees could also assist with case processing.

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

82.    On September 30, 2016, POEs in the El Paso Field Office ports surpassed 400 in custody. OFO was nonetheless in the process of transporting Haitian migrants into the El Paso Field Office from the San Diego Field Office to relieve the pressure at the California ports.

83.    On October 3, 2016, the El Paso Field Office reported that the surge of UACs and FAMUs continued to have adverse impacts to port operations, as UACs and FAMUs were being placed throughout administrative spaces of the port. CBP personnel were also being reassigned to manage the influx, impacting other critical area of El Paso operations.

84.    The same day, the El Paso Border Patrol Sector (which apprehends inadmissible aliens between POEs, and has its own holding facilities) reported that it was "barely staying afloat" and thus requested that the El Paso Field Office move its detainees out of Border Patrol's Paso Del Norte holding facility because Border Patrol desperately needed the space to hold its own subjects.

85.    Other Southwest border ports, such as Brownsville, Laredo, Hidalgo, San Luis, and Nogales, experienced similar overcrowding and adverse impacts on port operations from September through November of 2016 due to the migration surge.

86.    On October 3, 2016, the Brownsville POE reported that it "continue[d] to experience an increasing surge of [UACs, family units] and ER/CF cases.  This surge continues to create adverse impacts to port operations . . . ." The port reported that it had reassigned: (1) Port Support Personnel "to assist with transportation and vehicle primary;" and (2) CBP administrative staff to assist "(feeding, restocking supplies, etc.)," which allowed officers "to focus on case processing.

87.    On October 5, 2016, in response to a direct request from the commissioner of Mexico's federal immigration agency ("INM" or "INAMI") for increased capacity to process Haitians in Southern California, the Deputy CBP Commissioner asked ICE about increasing the rate of pickups from the San Ysidro and Calexico

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

POEs. The Acting ICE Director responded that ICE had 39,650 aliens in custody, the highest level in its history.

88.    On October 10, 2016, the Port of San Luis, in the Tucson Field Office, reported that 65 individuals were "lined in the pedestrian pathway from Mexico to our pedestrian entrance," which "severally limit[ed] the space" the port had and needed "for the field workers and the general travelling public."

89.    On October 14, 2016, the Laredo Field Office reported that "CBP personnel are being reassigned to support the influx, resulting in an impact to other critical areas." Specifically, the Field Office reported that it had: (1) reassigned "personnel to assist with alien transportation and support daily port operations;" (2) reassigned "CBP administrative staff to assist with alien special needs (feeding, restocking supplies, etc.) allowing our officers to focus on case processing;" (3) farm[ed] out aliens to neighboring ports of entry to assist with case processing;" (4) "provid[ed] internal Field Office TDY support to the Port of Hidalgo (one supervisor and ten officers) to assist with case processing."

90.    On October 16, 2016, at 7:14 pm, the Port of Hidalgo reported that "got hard hit with arrivals yesterday [and] were up to 185 [individuals in custody]," and had to deal with medical issues among some of the individuals in custody, which caused delays in processing.

91.    On October 17, 2016, the CBP Crisis Action Team reported that the San Diego Field Office was utilizing 155% of its detention capacity, the Tucson Field Office was utilizing 231% of its physical detention capacity, the El Paso Field Office was using 99% of its physical detention capacity, and the Laredo Field Office was utilizing 106% of its physical detention capacity.

92.    On October 18, 2016, CBP Deputy Commissioner Kevin McAleenan reported that ICE ERO had 2,000 Haitian nationals in custody and "has crested 41,000 beds overall."

93.    On October 19, 2016, at 7:33 am, the Nogales POE reported that it had

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

20 adult male Haitian Nationals at one of its pedestrian crossings. The port had "brought in 3 so far and the remainder are waiting outside the turnstile on the Mexican side." The port reported that it would "bring in and process as we can facilitate, due to current PCU [Passport Control Unit] detention status."

94.    On October 25, 2016, the Director of Field Operations for the Tucson Field Office reported that the ports of San Luis and Nogales had "far exceeded capacity and are in desperate need of relief."

95.    In the whole of fiscal year 2016 (from October 1, 2015, to September 30, 2016), the southwest border POEs encountered more than 150,800 inadmissible aliens, a 70% increase over FY 2014.

96.    Against this backdrop, in the fall of 2016, DHS and CBP evaluated and took additional, overarching steps to address overcrowding, lessen the strain of the unprecedented migrant surge on DHS operations and mitigate humanitarian concerns.

97.    These steps involved plans to increase processing and holding capacity, as well as to meter the intake of aliens without documents sufficient for lawful entry.

98.    In October 2016, the CBP Commissioner established a Crisis Action Team ("CAT") to mitigate impact to mission essential functions and to learn lessons from and avoid repeating mistakes made during a prior UAC surge in 2014.

99.    The CAT, composed of representatives from various CBP and DHS components, compiled data and developed strategies to address the surge and overcrowding. The CBP Commissioner designated Gloria Chavez from U.S. Border Patrol to oversee the CBP mass migratory response.

100.    Around the time it was developed, the CAT began reporting on the ongoing DHS-coordinated plans for addressing the surge of migration along the Southwest border.

101.    On November 2, 2016, the OFO Executive Assistant Commissioner Todd Owen wrote to his deputies that he was seeing engagement by senior leaders

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

at the Department and in the Administration on migration and detention issues.

102.    DHS was working to create additional temporary holding space, seeking ███████████████████████████████████████████████ ███████████████████████████.

103.    In November 2016, DHS led the coordination efforts for developing, a multi-phased plan to "address the surge of migration along the Southwest border": (1) in Phase 1, "ICE/ERO [would] increase the rate of custodial transfer from CBP;" (2) in Phase 2, which would "run semi-concurrently" with Phase 1, CBP would potentially open processing facilities in El Centro, California, and Nogales, Arizona; (3) in Phase 3, ████████████████████████, CBP would potentially erect a larger soft-sided holding facility, ████████████████████████████ ████████ and (4) in Phase 4, ██████████████████████, CBP would develop contingency planning for four soft-sided facilities adjacent to POEs to be rolled out in ███████████████████████████████████████ ██████████.

104.    On November 7, 2016, the CAT reported that the San Ysidro and Calexico POEs were at capacity and prioritizing intake to manage the flow.

105.    Although plans for a temporary processing center for Haitian nationals in El Centro, California, were put on hold on November 9, 2016, CBP moved forward with plans on two potential soft-sided holding facilities in Texas (in Tornillo and San Marcos).

106.    On November 10, 2016, DHS Secretary Jeh Johnson approved CBP's proposal to meter "non-UACs and non-Mexican credible fear cases" at the middle of POE bridges at some Texas POEs to prevent overflow and overcrowding at the actual POE.

107.    CBP Deputy Commissioner McAleenan informed OFO Executive Assistant Commissioner Todd Owen of this approval so they could start this new operational alignment to bring relief at the POEs.

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

108.   On November 11, 2016, the OFO Executive Assistant Commissioner informed the CBP Deputy Commissioner that OFO was "on board with metering" and that he had advised the Directors of Field Operations via telephone the prior night to start metering. The Deputy Commissioner responded that the implementation of metering was subject to Mr. Owen's "discretion and [the discretion of DFOs and Port Directors] on what will work best operationally and whether it is required on any given day or any specific location." The Deputy Commissioner explained that they should try to bring INAMI on board and that he wanted to provide his people with an "additional tool to keep conditions safe and working at [the] POEs."

109.   On November 11, the El Paso POE reported 406 detainees in custody. The Port thus began metering at the middle of the pedestrian bridge at all three of tis crossing locations.

110.   On November 11 and 12, 2016, the Tucson, Laredo, and El Paso Field Offices transmitted instructions to their ports authorizing metering.

111.   When metering began in November 2016, metering practices were not standardized.

112.   For example, on November 17, 2016, the Port of El Paso reported using an appointment system to meter and that it was metering aliens while on the U.S. side of the bridge walkway into the port. Upon learning that aliens may be being turned away after stepping foot on U.S. soil, OFO headquarters immediately began working to address the issue.

113.   On November 15, 2016, OFO headquarters specifically advised the Laredo Field Office that they could not send individuals who were already at the POE back to Mexico, "but must process them upon arrival."

114.   In addition to metering, CBP stood up two soft-sided facilities, one on November 25, 2016, in Tornillo, Texas, and the other on December 10, 2016, in Donna, Texas, to hold inadmissible aliens. From November 25, 2016, until February 14, 2017, when the facility went to stand-by status, the Tornillo facility held 5,721

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

aliens. From December 10, 2016, until February 10, 2017, when the facility went to stand-by status, the Donna facility held 2,172 aliens.

115.   In December 2016, as the numbers of migrants arriving at the southwest border abated, most POEs that had been employing metering stopped doing so, although it remained a tool for ports to use in the event they needed to control intake of aliens without documents sufficient for lawful entry facilitate orderly processing and maintain safe conditions.

116.   In January 2017, the migrant surge across the Southwest border "abruptly, drastically, and unexpectedly ended."

117.   The numbers of aliens without documents sufficient for lawful entry seeking to present themselves at the San Ysidro POE also lessened; accordingly, the San Ysidro POE was typically not engaged in metering from March through November 2017.

118.   Between October 1, 2016, and April 12, 2017, CBP spent over $45.25 million to address the migrant surge, including OFO's expenditure of $15.76 million in overtime, temporary duty assignments ("TDY"), and operations support; Border Patrol's expenditure of $9.13 million in overtime, TDY, and operations support; and more than $20.24 million in facilities and maintenance costs.

119.   In Fiscal Year 2016, OFO approved overtime and temporary details to the southwest border at a cost of more than $14 million.

Metering Guidance and Prioritization-Based Queue Management as Numbers of Inadmissible Aliens Again Begin to Surge

120.   Between December 2017 and early 2018, the number of undocumented aliens approaching the border began to rise toward a high point in spring 2018.

121.   The southwest border Field Offices processed 9,930 inadmissible arriving aliens in January 2018; 10,085 in February 2018; 12,957 in March 2018; and 12,295 in April 2018.

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

122.   By early April 2018, POEs were reporting impacts on frontline functions and increased expenditures and staffing from the increase in detainees.

123.   On April 3, 2018, the Laredo Field Office reported that the number of single adult credible fear cases in its Field Office had increased for the fourth week in a row, with a 73% increase week to week.  It also noted that there was an impact on the processing and holding capacity of smaller POEs within its jurisdiction.

124.   Between March 31, 2018, and April 23, 2018, CBP received information that a migrant caravan originating in Central America was making its way north from southern Mexico to the U.S.-Mexico border. ████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████ e.

125.   On April 21, 2018, ██████████████████
████████████████████████████████████████
████████

126.   On April 24, CBP Commissioner McAleenan wrote to his deputies:

> While we are working diligently with Mexico to address as many caravan members as possible, pressing ICE and others to prepare effective coordination of detention and immigration proceedings, and recommending strong posture changes for [the Secretary's] decision, it is increasingly likely that we will face the arrival of a large portion of these 500–600 individuals ... in the coming days without a change in enforcement posture .... I know that you have been planning and preparing, and that our field leadership and our officers will act with utmost professionalism and competence, in accordance with law, regulation, and CBP policy, as well as the guidance from the Secretary to effectively enforce the immigration laws of the United States, while appropriately considering and processing claims of fear for those seeking protection. Please confirm that you have sent out guidance regarding safe processing and port security and capacity issues relating to queue management. Please confirm that, absent special circum-

DEFS.' MEM. OF CONTENTIONS OF LAW & FACT

stances, we will utilize ER [expedited removal], vice NTA [notice to appear], and that release decisions will be made by ICE unless there is a medical emergency or humanitarian emergency.

127.    On April 25, 2018, at about 9:00 AM, the San Ysidro POE had ███ individuals in custody, ████████████████████

128.    Around 1:00 PM, the Mexican government notified CBP that three buses containing ████████████████████████ ████████████████████████████████ ███████

129.    That day, the San Ysidro POE had brought in fifty Mexican Family Units claiming asylum.

130.    On April 26, 2018, at about 9:00 AM, the San Ysidro Port of Entry had ███ individuals in custody, representing 104% of its detention capacity.

131.    On April 27, 2018, the OFO Executive Assistant Commissioner issued a memorandum with the subject line "Metering Guidance" to the Directors of Field Operations (DFOs) for the El Paso, Laredo, San Diego, and Tucson Field Offices.

132.    The memorandum stated: "When necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public, DFOs may elect to meter the flow of travelers at the land border to take into account the port's processing capacity." When metering, "[p]orts should inform the waiting travelers that processing at the port is currently at capacity and CBP is permitting travelers to enter the port once there is sufficient space and resources to process them." DFOs "may establish and operate physical access controls at the borderline." Ports "may not create a line specifically for asylum-seekers only, but could, for instance, create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents." "At no point may an officer discourage a traveler from waiting to

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

be processed, claiming fear of return, or seeking any other protection." "Once a traveler is in the United States, he or she must be fully processed."

133. Thus, the metering guidance memorandum clarifies that port leaders may exercise their discretion to engage in metering to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public.

134. The metering guidance memorandum was issued solely to give the ports the ability to address the capacity for large numbers of inadmissible aliens attempting to enter the United States.

135. The metering guidance memorandum was not designed to deter migrants from entering the United States.

136. Under the Metering Guidance, CBP officers may ask aliens without documents sufficient for lawful entry to wait on the Mexican side of U.S.-Mexico border until there is sufficient space and resources to process them.

137. From FY 2017 to FY 2018, the number of inadmissible arriving aliens processed by the southwest border Field Offices crept upward, and the proportion of those aliens who were placed into expedited removal and referred for a credible-fear interview nearly doubled.

138. In FY 2017, the southwest border Field Offices processed 111,275 inadmissible aliens, 17,284 of whom were placed into expedited removal and referred for a credible-fear interview.

139. In FY 2018, the southwest border Field Offices processed 124,879 inadmissible arriving aliens, 38,399 of whom were placed into expedited removal and referred for a credible-fear interview.

140. On June 5, 2018, the Secretary of Homeland Security issued a memorandum to the CBP Commissioner with the subject "Prioritization-Based Queue Management."

141. "Queue management" is synonymous with "metering."

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

142.   In the June 5, 2018 Prioritization-Based Queue Management memorandum, the Secretary explained that apprehensions of those crossing our border illegally between the POEs and the number of arriving aliens determined to be inadmissible at POEs continued to rise, while CBP's resources remained strained along the Southwest Border.

143.   The June 5, 2018 Prioritization-Based Queue Management Memo stated: "Inadmissible arriving aliens presenting at POEs, many of whom arrive without possessing appropriate travel and identity documents required by law, such as a visa and passport, require additional processing time that delays the flow of legitimate trade and travel."

144.   In the June 5, 2018 Prioritization-Based Queue Management memorandum, the Secretary instructed CBP to remain focused on its primary mission: "to protect the American public from dangerous people and materials while enhancing the country's economic competitiveness through facilitating legitimate trade and travel." The Secretary stated that the processing of travelers without documentation draws resources away from CBP's fundamental responsibilities. The Secretary also stated that staffing at Southwest Border POEs was below target level for almost all major ports, and officers [were] increasingly working extensive overtime hours each pay period, leading to increased fatigue and stress on the workforce. At several of the largest POEs, upward of 10 percent of the CBP officer workforce was engaged in immigration secondary screening and processing functions, primarily addressing persons presenting without documents sufficient for admission or other lawful entry." Thus, in recognition of: "(1) the continued prevalence of security threats, (2) the dire consequences of illicit narcotics on our communities (especially the devastating opioid epidemic), (3) the staffing and resource challenges summarized above, and (4) the increase of irregular migration flows, in the Prioritization-Based Queue Management," the Secretary directed the Commissioner to initiate a 30-day pilot

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

program to prioritize staffing and operations at all Southwest Border POEs in accordance with the following order of priority: (1) National security efforts; (2) Counter-narcotics operations; (3) Economic security: trade and cargo processing efforts to facilitate lawful commerce into the United States, while enforcing trade laws, protecting agriculture, and addressing anticompetitive elements in the supply chain; and (4) Trade and travel facilitation.

145.    The Prioritization-Based Queue Management memorandum memorialized the prioritization scheme that has been CBP's policy since its creation in 2003.

146.    In the Prioritization-Based Queue Management memorandum, the Secretary explained that "processing persons without documents required by law for admission arriving at the Southwest Border remains a component of CBP's mission, but that priority should be given to the efforts described above in the prescribed order. Field leaders have the discretion to allocate resources and staffing dedicated to areas of enforcement and trade facilitation not covered by the above priorities and queue management process based on the availability of resources and holding capacity at the local port level. Depending on port configuration and operating conditions, DFOs may establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible. DFOs may create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents. As in all operations, the safety of employees and the public is paramount in operational decisions."

147.    Thus, under the June 5, 2018 memo, when determining whether and when to conduct metering, ports were to ensure they allocated sufficient resources towards priority mission sets, and to avoid diverting resources away from those mission sets.

148.    On June 16, 2018, the Migration Crisis Action Team ("MCAT") Deputy Commander reported to ICE that the ports along the southwest border would increase their daily intake as much as possible without negatively impacting their

other responsibilities, which would result in a significant increase of referrals of FMUAs and single adults to ICE.

149.    From FY 2018 to FY 2019, the number of inadmissible arriving aliens processed by the southwest border Field Offices continued to grow, and the proportion of those inadmissible arriving aliens who were placed into expedited removal and referred for a credible-fear interview nearly doubled.

150.    In FY 2018, those Field Offices processed 124,879 inadmissible arriving aliens, 38,399 of whom were referred for a credible-fear interview.

151.    In FY 2019, those Field Offices processed 126,001 inadmissible arriving aliens, 80,055 of whom were referred for a credible-fear interview.

152.    On November 27, 2019, Mark Morgan, the Acting CBP Commissioner issued a memorandum to the OFO Executive Assistant Commissioner with the subject "Prioritization-Based Queue Management."

153.    The Acting Commissioner cited the sustained increase in the number of "inadmissible aliens presenting at POEs without appropriate travel and identification documents," and reiterated that processing such individuals requires a substantial amount of resources. The Memo stated that "CBP must carefully balance its space and resources to ensure that each POE has sufficient capacity to address its mission sets, in order of priority, including the safety and expeditious processing of all travelers accessing the port."

154.    The Acting Commissioner explained that Secretary Nielsen previously instructed the southwest border Field Offices to structure their staffing and resources to accomplish four priority mission sets.

155.    In Fiscal Year 2019, while the Nielsen memorandum was in effect, CBP officers at the southwest border POEs arrested 1,800 convicted criminals, encountered 1,601 Special Interest Aliens, and found inadmissible three aliens who were on the terrorist watch list.

156.    A Special Interest Alien is a non-U.S. person who, based on an analysis

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

of travel patterns, potentially poses a national security risk to the United States or its interests.

157.    The Memo stated that CBP officers at the southwest border ports seized 19% more methamphetamine and 58% more fentanyl and interdicted $2.4 million more in outbound currency than the previous fiscal year.

158.    Accordingly, the Acting Commissioner reiterated that field leaders "must continue to balance resources" in the following order: national security efforts, counter-narcotics and outbound operations, economic security, and trade and travel facilitation.

159.    On or about November 18 and November 22, 2019, OFO HQ held two calls with the southwest border DFOs to reiterate the importance of implementing CBP's priority mission sets, which OFO HQ understood would likely have the effect of reducing the daily intake of aliens without documents sufficient for lawful entry waiting to be processed, and to convey that a memorandum would be forthcoming.

Metering/Queue Management and Redirection at POEs

160.    When a POE is metering (or engaged in queue management), it generally assigns officers at or as near the international boundary line (limit line) as is operationally feasible, who determine whether individuals approaching the border have documents that would permit them lawful entry to the United States.  Those officers generally instruct travelers without documents sufficient for lawful entry that the port is currently at capacity and CBP will permitt travelers to enter the port once there is sufficient space and resources to safely process and hold them.

161.    The determination as to whether a POE should engage in metering at any given time is left to the discretion of the DFOs and the Port Directors.

162.    The determination of the POE's operational capacity and the number of individuals without documents that can be permitted to enter on any given day is generally determined by Port Directors or supervisors at the POE.

163.    The process by which individuals waiting in Mexico are taken into the

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

port for processing differs somewhat by POE. At the San Ysidro POE, for example, the AEU contacts Mexican immigration officials approximately once or twice daily to advise how many individuals CBP can take in and at what time. Mexican immigration officials then transport approximately that number of individuals to the limit line at the POE. Similarly, at the El Paso POE, the port also contacts Mexican immigration officials, generally twice a day, to advise how many individuals can be taken into the port for processing.

164.    At times, certain smaller POEs—such as the Roma, Rio Grande City, and Progreso POEs in the Laredo Field Office, and the Tecate, Andrade, and Otay Mesa POEs in the San Diego Field Office—have engaged in a practice of redirecting individuals without documents sufficient for lawful entry to larger POEs. This practice was generally implemented because smaller POEs, like Tecate, -- which lacks the staffing to process, oversee, and transport inadmissible aliens and closes at 11 p.m. -- have limited ability to hold detainees overnight, and thus engage in redirection to avoid unsafe and overcrowded conditions.

165.    Even when a POE is engaged in metering or redirection, POE officials, at times, have utilized their discretion to permit more immediate access to the port for individuals who may be vulnerable, , such as unaccompanied minors, pregnant women, or transgender individuals, and who approach the limit line.

166.    Coercing individuals to withdraw their applications for admission is not consistent with CBP policy.

167.    Returning an alien from U.S. soil to Mexico without processing is not consistent with metering or with CBP policy.

168.    Lies, misrepresentations, threats, coercion, physical or verbal abuse, and discrimination are inconsistent with CBP policy.

169.    OFO headquarters and/or the southwest border field offices have not instructed the field offices or the POEs to turn away or "turn back" any alien from U.S. soil without appropriate processing.

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

170.   OFO headquarters and/or the southwest border field offices have not instructed the field offices or the POEs to return any individuals who have entered U.S. Territory to Mexico without processing.

171.   OFO headquarters and/or the southwest border field offices have not instructed the field offices or the POEs to engage in lies, misrepresentations, threats, coercion, physical or verbal abuse, and discrimination toward any traveler.

Harms to CBP if Not Permitted to Control Intake of Inadmissible Aliens

172.   If CBP were not permitted to engage in any form of metering, it would require OFO to divert staffing and resources from across the country away from priority missions and toward the processing of aliens without documents sufficient for lawful entry.

173.   Diversion of resources from priority missions has had a significant negative impact on OFO operations, as well as on the United States.

174.   Diversion of resources from priority missions results in lane closures and a slow-down for pedestrian, vehicle, and cargo traffic at POEs across the country, which impacts both local and national economies.

175.   For example, when the San Ysidro POE closed for five and a half hours in late 2018 in response to an emergency, the San Ysidro Chamber of Commerce reported an estimated loss of $5.3 million to the region and local economy.

176.   Diversion of resources from priority missions will decrease CBP's ability to seize fentanyl and methamphetamine, and engage in other narcotic interdiction measures, and render POEs more vulnerable to drug and alien smuggling.

177.   If CBP were not permitted to engage in any form of metering would likely result in overcrowding and other unsafe or unsanitary conditions for aliens who are being held at POEs.  It would also pose dangers to CBP officers and the traveling public due to lack of space and sufficient monitoring.

## III.   POINTS OF LAW

The Government's Obligations to and Duties Regarding Arriving Aliens.

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

1.    8 U.S.C. § 1158(a)(1) allows an alien to apply for asylum if he "is physically present in the United States" or "arrives in the United States."

2.    8 U.S.C. § 1225(a)(3) requires that "[a]ll aliens ... who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States" be inspected by immigration officers.

3.    8 U.S.C. § 1225(a)(1) defines an applicant for admission as "[a]n alien present in the United States who has not been admitted or who arrives in the United States."

178.    By regulation, anyone seeking admission must do so "at a U.S. port-of-entry," all of which are located within the United States, *United States v. Aldana*, 878 F.3d 877, 880–82 (9th Cir. 2017), *cert. denied* 139 S. Ct. 157 (2018), "when the port is open for inspection," 8 C.F.R. § 235.1(a) ("Aliens applying for admission to the United States must present themselves to immigration officer at a U.S. port-of-entry when the port is open for inspection.").

4.    8 U.S.C. § 1225(a)(4) provides that "an alien applying for admission ma, in the discretion of [DHS] . . . be permitted to withdraw the application for admission and depart immediately from the United States."  "The alien's decision to withdraw his or her application for admission must be made voluntarily .. . ." 8 C.F.R. § 235.4.

5.    8 U.S.C. § 1225(b)(1)(A)(ii) requires an immigration officer to refer for a credible-fear interview an alien "who is arriving in the United States," "[i]f" it "determines" that the alien is inadmissible on certain grounds, processes the alien for expedited removal, "and the alien indicates either an intention to apply for asylum" or fear.

6.    8 U.S.C. §§ 1158 and 1225 apply exclusively to aliens "in the United States." This reading is supported by: (1) the statutes' present-tense language, *see DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("When an alien arrives at a port of entry ... the alien is on U.S. soil ...."); *United States v. Balint*, 201 F.3d 928,

933 (7th Cir. 2000); (2) the definition of the word "arrive," which means "to reach a destination," The American Heritage Dictionary of the English Language 102 (3d ed. 1992); (3) the presumption against extraterritoriality, *see Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255, 261 (2010) ("When a statute gives no clear indication of extraterritorial application, it has none."); (4) the structure of the INA, *see Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993) (there is "no provision in the statute for the conduct of such proceedings outside the United States"); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."); *Matter of Lewiston-Queenston Bridge*, 17 I. & N. Dec. 410, 413 (BIA 1980) ("[W]hen an individual comes to this country by way of an international bridge, he has 'landed' when he touches United States soil."); (5) the rule that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (citation and quotation marks omitted), which here is a scheme for expedited "remov[al] *from* the United States," 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added); and (6) the legislative history of § 1225, *see* H.R. Rep. No. 104-469, pt. 1, at 175–76 (1996) (an asylum claim should "be commenced as soon as possible *after* the alien's arrival in the U.S." (emphasis added)).

7.      The obligation to refer an alien for a credible-fear interview does not attach until the government "determines" the alien is inadmissible on certain grounds and will be processed for expedited removal. 8 U.S.C. § 1225(b)(1)(A)(ii).

8.      Congress wrote 8 U.S.C. § 1225 to ensure that aliens encountered within the United States (the alien who "is physically present") and aliens subject to expedited removal (the alien "who arrives in") may apply for asylum, which was an important clarifying measure included as part of Congress's enactment of major immigration legislation in 1996. *See* H.R. Rep. No. 104-828, at 209 (1996) ("The pur-

pose of these provisions is to expedite [] removal *from* the United States ….” (emphasis added)).

9.     8 U.S.C. § 1225(b)(1)(B)(IV) “mandate[s]” the detention of an arriving alien  “pending a final determination of credible fear and persecution and, if found have such a fear, until removed.” *Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018).

10.     Legislative history of the 1996 modifications to the INA demonstrate that parole “should not be used to circumvent Congressionally-established immigration policy.” H.R. Rep. No. 104-469, pt. 1, at 141.

11.     Congress included in 8 U.S.C. § 1225 a provision expressly permitting the government to “return [an] alien” “who is arriving on land ... from a foreign territory contiguous to the United States” back “to that territory pending” full removal proceedings. 8 U.S.C. § 1225(b)(2)(C).

Causes of Action Brought Under the Immigration and Naturalization Act.

12.     There is no private right of action under the INA. *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1166 (D. N.M. 2020); *Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1168 (S.D. Cal. 2018).

13.     Judicial review of agency action is “subject to the judicial review provisions of the APA unless specifically excluded.” *Webster v. Doe*, 486 U.S. 592, 607 n.* (1988) (Scalia, J., dissenting); *Al Otro Lado v. Nielsen*, 327 F. Supp. 3d 1284, 1316 (S.D. Cal. 2018).

The Administrative Procedure Act, 5 U.S.C. § 500, *et seq.*

14.     “The APA [Administrative Procedure Act] authorizes suit by ‘[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.’” *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61 (2004) (brackets in original) (quoting 5 U.S.C. § 702).

15.     “‘[A]gency action’ is defined in § 551(13) to include ‘the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial

DEFS.’ MEM. OF CONTENTIONS OF
LAW & FACT

thereof, or failure to act.'" *Id.* at 62 (brackets in original) (emphasis removed). These are "circumscribed, discrete agency actions, as their definitions make clear." *Id.* APA challenges can succeed only where the plaintiff "identif[ies] a discrete 'agency action' that fits within the APA's definition of that term." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013) (citations omitted).

16.    "A plaintiff may not simply attach a policy label to disparate agency practices or conduct" to satisfy the APA's discrete agency action requirement. *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1207 (S.D. Cal. 2019) (citations omitted). They must identify an actual government policy. *See Lightfoot v. District of Columbia*, 273 F.R.D. 314, 326 (D.D.C. 2011). It is "entirely certain" that an "entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892–93 (1990).

17.    An agency action challenged under the APA must be "final." 5 U.S.C. § 704; *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017). Agency action is final when it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations and quotation marks omitted). "The general rule" under the second *Bennett* prong is that agency action must "impose an obligation, deny a right, or fix some legal relationship" to be final. *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th Cir. 1990) (citation and quotation marks omitted).

18.    Section 706(1) of the APA requires plaintiffs to show "that an agency failed to take a *discrete* agency action that it is *required* to take." *Norton*, 542 U.S. at 64; *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).

19.    The APA "requires a reviewing court to uphold agency action unless it

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *San Luis & Delta-Mendota Water Authority v. Locke*, 774 F.3d 971, 994 (9th Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)). "Under this standard, [courts] will sustain an agency action if the agency has articulated a rational connection between the facts found and the conclusions made." *Id.*

20.  Arbitrary-and-capricious review "is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (citations omitted); *see San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) (collecting cases). This rule "reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Dep't of Commerce*, 139 S. Ct. at 2573 (quoting *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)).

21.  "[A] court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dep't of Commerce*, 139 S. Ct. at 2573 (citation omitted).

22.  Claims of unreasonable delay under 5 U.S.C. § 706(1) are governed by the fact-intensive TRAC factors. *Independence Min. Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997). Those factors are: (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not "find any impropriety

lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *Id.* at 507 n.7 (citing *Telecomms. Research and Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)).

The Multiple Missions of the Department of Homeland Security and Its Components.

23.    In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), Congress created DHS with its "primary mission" to prevent terrorism in the United States and, in so doing, "ensure that the functions of the agencies and subdivisions within [DHS] that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1).

24.    Congress made the Secretary "responsible for" "preventing the entry of terrorists," "securing the borders [and] ports," "carrying out the immigration enforcement functions," "establishing and administering rules" governing "forms of permission ... to enter the United States," "establishing national immigration enforcement policies and priorities," and, "in carrying out the foregoing responsibilities, ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce." *Id.* § 202 (capitalization altered).

25.    In the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, 130 Stat. 122 (2016), Congress mandated that the CBP Commissioner "shall" "coordinate and integrate [CBP's] security, trade facilitation, and trade enforcement functions," ensure the interdiction of illegal entrants and goods, "facilitate and expedite the flow of legitimate travelers and trade," "direct and administer [CBP's] commercial operations" and "enforce[] the customs and trade laws," "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers" and other dangerous persons, "safeguard the borders" against "the entry of dangerous goods," coordinate with ICE and USCIS to "enforce

DEFS.' MEM. OF CONTENTIONS OF LAW & FACT

and administer all immigration laws," including "the inspection, processing, and admission of persons who seek to enter or depart the United States" and "the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States," and various other functions. 8 U.S.C. § 211(c).

26.    In the same Act, Congress directed the OFO Executive Assistant Commissioner to "coordinate [CBP's] enforcement activities" at the POEs to "deter and prevent terrorists and terrorist weapons from entering," "conduct inspections at [the] ports of entry to safeguard [against] ... terrorism and illegal entry of persons," "prevent illicit drugs, agricultural pests, and contraband from entering the United States," "in coordination with the Commissioner, facilitate and expedite the flow of legitimate travelers and trade," administer the National Targeting Center, coordinate the agency's "trade facilitation and trade enforcement activities" with CBP's Office of Trade, and "carry out other duties and powers prescribed by the Commissioner." *Id.* § 211(g)(3).

27.    As part of the detailed statutory scheme setting forth CBP's and OFO's functions at the POEs, Congress elevated DHS's national security functions over all others, including processing undocumented migrants. *Id.* § 111(b)(1).

28.    The Supreme Court "ha[s] repeated time and again" that when faced with competing obligations, "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities." *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007).

29.    An "agency's decision to prioritize other projects is entitled to great deference." *Compassion Over Killing v. FDA*, 849 F.3d 849, 857 (9th Cir. 2017).

30.    "[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities. Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *Id.* (quoting *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981)).

31.    "[R]educing the number of undocumented aliens arriving at our borders" is a "valid immigration goal." *Jean v. Nelson*, 472 U.S. 846, 880 (1985) (Marshall, J., dissenting).

The Due Process Clause and Arriving Aliens.

32.    "[I]t is long settled as a matter of American constitutional law that aliens outside U.S. territory do not possess rights under the U.S. Constitution." *AID v. All. for Open Soc. Int'l*, 140 S. Ct. 2082, 2086 (2019) (collecting cases); *Zadvydas*, 533 U.S. at 693.

The Alien Tort Statute

33.    The "torts" cognizable under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, include "three primary offenses," namely, "violation of safe conducts, infringements of the rights of ambassadors, and piracy." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004). While courts in certain circumstances may create a federal common law cause of action for an additional offense that would incorporate a "specific, universal, and obligatory" international law standard, *id.* at 732 (citation and quotation marks omitted), the Supreme Court has stated that courts must exercise "great caution in adapting the law of nations to private rights," *id.* at 728, and enumerated reasons why the courts must engage in "vigilant doorkeeping" in creating causes of action, *id.* at 729.

34.    The non-refoulement obligation is binding on the Executive only by statute and regulation. *See* 8 U.S.C. § 1231(b)(3)(A) (prohibiting the government from "remov[ing] an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country" on a protected ground); *INS v. Stevic*, 467 U.S. 407, 421 (1984) (Congress amended the INA to "basically

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

conform[] it to the language of Article 33 of the United Nations Protocol").

35.    When it acceded to the non-refoulement obligation, Congress made clear that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h).

36.    Congress divested district courts of authority to hear claims for review of withholding-of-removal decisions and channeled them instead into the courts of appeals to be reviewed alongside a final order of removal. *Id.* §§ 1252(a)(5), (b)(9).

37.    The Supreme Court recently held that courts may not fashion a cause of action for damages under *Bivens* against U.S. officials based on claimed violations arising out of cross-border shootings, reasoning that "the conduct of agents positioned at the border has a has a clear and strong connection to national security" and "regulating the conduct of agents at the border unquestionably has national security implications." *Hernandez v. Mesa*, 140 S. Ct. 735, 746, 747 (2020); *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000) ("Securing the border ... [is], of course, [a] law enforcement activit[y] ....") "[T]he risk of undermining border security provides reason to hesitate before extending *Bivens* into this field." *Hernandez*, 140 S. Ct. at 747. The Court further reasoned that the claimed violations arose from cross-border shooting (which "is by definition an international incident," *id.* at 744) and therefore "implicated" foreign relations and provided "even greater reason for hesitation" before creating a cause of action. *Id.* The Court reasoned that "[w]here Congress has not spoken at all, the likelihood of impinging on its foreign affairs authority is especially acute." *Id.* at 748.

38.    The act of state doctrine "prevents federal courts from 'declar[ing] invalid ... the official act of a foreign sovereign' involving activities undertaken 'within its own territory.'" *Hourani v. Mirtchev*, 796 F.3d 1, 11–12 (D.C. Cir. 2015) (brackets and ellipses in original) (quoting *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp.*, 493 U.S. 400, 405 (1990); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S.

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

398, 401 (1964)); *cf. Munaf v. Geren*, 553 U.S. 674, 700–01 (2008) (under the rule of non-inquiry, "it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments").

Remedies

39.    8 U.S.C. § 1252(f)(1) prohibits class-wide injunctions that "create[] out of thin air a requirement ... that does not exist in the statute." *Hamama v. Adducci*, 912 F.3d 869, 879–80 (6th Cir. 2018), *cert. denied* 2020 WL 3578681 (July 2, 2020).

40.    8 U.S.C. § 1252(f)(1) also "restrict[s] courts' power to impede" re-moval statutes "on the basis of suits brought by organizational plaintiffs and noncit-izens not yet facing [removal] proceedings." *Padilla v. ICE*, 953 F.3d 1134, 1151 (9th Cir. 2020).

41.    Injunctive relief is an "extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citation omitted); *Nken v. Holder*, 129 S. Ct. 1749, 1757 (2009).

42.    To obtain a permanent injunction, a party must demonstrate "(1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent in-junction." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir. 2019) (citation, quota-tion marks, and footnote omitted).

43.    "[I]t must be presumed that federal officers will adhere to the law as declared by the court . . . ." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985) (Scalia, J.).

44.    An injunction "should be no more burdensome to the defendant than necessary to provide complete relief." *E. Bay Sanctuary Covenant*, 950 F.3d 1242, 1282 (9th Cir. 2020) (citation and quotation marks omitted).

45.    Vacatur is the customary remedy for actions brought under the APA. *See* 5 U.S.C. § 706(2); *Cal. Wilderness Coal. v. DOE*, 631 F.3d 1072, 1095 (9th Cir.

2011) ("[T]he appropriate remedy is to vacate th[e] action.").

## IV.    ABANDONED ISSUES

Defendants do not maintain that any issues have been abandoned.

## V.    DEFENDANTS' EXHIBITS

The following is a list of exhibits that Defendants expect to offer at trial, other than those used solely for impeachment, with a description of each exhibit sufficient for identification. In addition to the following, Defendants incorporate any exhibits identified in Plaintiffs' pretrial disclosures and reserve the right to offer such exhibits.

**A. Exhibits Defendants Expect to Use at Trial**

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| A | | | Owen Mem., Metering Guidance (April 27, 2018), CBPALOTRO000299 |
| B | | | Kirstjen M. Nielsen Mem., Prioritization-Based Queue Management (June 5, 2018), AOL-DEF-00273294 |
| C | | | Mark A. Morgan Mem., Prioritization-Based Queue Management (Nov. 27, 2019), CBP-ALOTRO-000303 |
| D | | | [DMSJ[2] Ex. 6] Executive Assistant Commissioners' Officers (last modified Sept. 4, 2020) |
| E | | | [DMSJ Ex. 8] Summary of Department of Transportation Border Crossing Data (downloaded Aug. 26, 2020) |
| F | | | [DMSJ Ex. 9] Senate Report, "Combating the Opioid Epidemic"  (May 10, 2018) |
| G | | | [DMSJ Ex. 10] San Diego Field Office FY |

---

[2] "DMSJ" refers to Defendants' Motion for Summary Judgement, filed at ECF Docket No. 563.

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
| | | | 2016 Report, AOL-DEF-00216804 |
| H | | | [PMSJ[3] Ex. 33] OFO Incident Management Division Report (July 13, 2017), AOL-DEF-00031442 |
| I | | | [DMSJ Ex. 11] GSA Fact Sheet, San Ysidro Land Port of Entry (Dec. 11, 2019) |
| J | | | [Max Capacity Contingency Plan] AOL-DEF-00392542 |
| K | | | [PMSJ Ex. 35] Email, "Actions Taken for Influx of Haitians" (May 26, 2016), AOL-DEF-00030271 |
| L | | | [PMSJ Ex. 34] Email, "Credible Fear Influx Spot Report," (May 25, 2016), AOL-DEF-00056315 |
| M | | | [PMSJ Ex. 42] Email, "Update" (May 28, 2016), AOL-DEF-00243127 |
| N | | | [PMSJ Ex. 44] Email, "RE: SYS AEU MOVEMENT AND PASS DOWN FOR 5/28/16 0600-1400" (May, 28, 2016), AOL-DEF-00321316 |
| O | | | [PMSJ EX. 11] Email, "FW: GOM transports from Shelters" (May 29, 2018), AOL-DEF-00030298 |

---

[3] "PMSJ" refers to Plaintiffs' Motion for Summary Judgment, filed at ECF Docket No. 535.

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
| P | | | "Updated Queue Management Report", Email, "Limit Line Muster" (Nov. 15, 2016) AOL-DEF-00030538 |
| Q | | | "Muster re: Limit Line" (Sept. 1, 2016), AOL-DEF-00597789 |
| R | | | "Muster Regarding Limit Line 07272016" (July 27, 2016), AOL-DEF-00595014 |
| S | | | [PMSJ Ex. 26] "DFO Briefing Bullets Admissibility Enforcement Unit (AEU)", AOL-DEF-00030002 |
| T | | | Email, "San Ysidro End of Day Reporting for 05/22/2016 as of 23:59 hrs," AOL-DEF-00303645 |
| U | | | Email, "San Ysidro End of Day Reporting for 05/27/2016 as of 23:59 hrs," AOL-DEF-00030274 |
| X | | | Email, "San Ysidro End of Day Reporting for 05/28/2016 as of 23:59 hrs," AOL-DEF-00243139 |
| Y | | | Email, "San Ysidro End of Day AEU Reporting for May 29, 2016," AOL-DEF-00243150 |
| Z | | | Email, "San Ysidro End of Day AEU Reporting for July 30, 2016," AOL-DEF-00065120 |

DEFS.' MEM. OF CONTENTIONS OF LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| AA | | | [DMSJ Ex. 13] Email, "FW: PCR Activity Report, 0800-1600, 11/11/16", AOL-DEF-00799100 |
| AB | | | [DMSJ Ex. 14] Email, "FW: Spike in CF/FAMU cases at Port of El Paso in Month of September", AOL-DEF-00797893 |
| AC | | | [DMSJ Ex. 15] Email, "FW: PCS Activity 09/09/2016 07:30 hours", AOL-DEF-00797737 |
| AD | | | [DSMJ Ex. 16] Email, "Overflow Staging Area – Port of Tornillo – Temporary Duty (TDY) Solicitation DUE: September 28, 2016", AOL-DEF-00798098 and attachment: "Overflow Staging Area – Port of Tornillo – Temporary Duty (TDY) Solicitation", AOL-DEF-00798099 |
| AE | | | [PMSJ Ex. 12] "UNHCR Site Visit to San Ysidro Port of Entry", AOL-DEF-00046740 |
| AF | | | [DMSJ Ex. 17] Email, "RE: Spike in CF/FAMU cases at Port of El Paso in Month of September – Update", AOL-DEF-00806817 |
| AG | | | [DMSJ Ex. 18] Email, "Implementations to address Credible Fear workload", AOL-DEF-00890684 |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
| AH | | | [DMSJ Ex. 19] Email, "FW: PCS Activity 9/28/2016 0000-0800 Shift", AOL-DEF-00891856 and attachment: "CF Detainees Overcrowding PDF", AOL-DEF-00891859 |
| AI | | | [DMSJ Ex. 20] Email, "FW: Current Posture", AOL-DEF-00806830 |
| AJ | | | [DMSJ Ex. 21] Email, "FW: Limited Distribution EAC Bullets – El Paso, TX; Surge of EAC and FAMUs Impacting POEs in the El Paso Field Office", AOL-DEF-00893755 |
| AK | | | [DMSJ Ex. 22] Email, "RE:  USBP requesting Port to cease using PDT", AOL-DEF-00802270 |
| AL | | | [DMSJ Ex. 23] Email, "INFLUX of detainees at Brownsville, Texas Port of Entry 10/03/16 @1800 hrs.", AOL-DEF-00896692 |
| AM | | | [DMSJ Ex. 24] Email, "Daily Snapshot of Laredo Field Office Immigration Case Processing – FAMU and UAC for Oct. 14, 2016", AOL-DEF-00903363 |
| AN | | | [DMSJ Ex. 25] Email, "RE: ICE/ERO Traffic (Pending Placement) – Hidalgo POE", AOL-DEF-00906636 |
| AO | | | [DMSJ Ex. 26] Email, "FW: Hidalgo Port of Entry – 10/25/2016 09:45 a.m.", AOL-DEF- |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
|     |             |               | 00896989 |
| AP  |             |               | [DMSJ Ex. 27] Email, "FW: Pedestrian Pathway and temp staging area.", AOL-DEF-01265180 |
| AQ  |             |               | [DMSJ Ex. 28] Email, "FW: ***Situational Awareness*** 20 Adult Male Haitian Nationals in Nogales AZ", AOL-DEF-01266827 |
| AR  |             |               | [DMSJ Ex. 29] Email, "FW: Pending Placement", AOL-DEF-01393904 |
| AS  |             |               | [DMSJ Ex. 30] Email, "FW: Two Urgent Issues", AOL-DEF-00044527 |
| AT  |             |               | [DMSJ Ex. 31] "U.S. Customs and Border Protection Office of Field Operations Bullets for the Executive Assistant Commissioner October 18, 2016", AOL-DEF-00793584 |
| AU  |             |               | [DMSJ Ex. 32] "Southern Border Inadmissibility Processing Report for October 21, 2016", AOL-DEF-00035554 |
| AV  |             |               | [DMSJ Ex. 33] DHS OIG Mem., "Investigation of Allegations Related to Temporary Holding Facilities and Non-Intrusive Inspection Equipment at U.S. Customs and Border Protection" (Oct. 10, 2017) |
| AW  |             |               | [DMSJ Ex. 34] Email, "FW: 20161103 CBP |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Ad-mitted | Description |
|---|---|---|---|
| | | | Migration Crisis Action Team Daily Report", AOL-DEF-00019710 |
| AX | | | [PMSJ Ex. 59] Email, "RE: CBP MIGRATION CAT UPDATE 11/02/16," AOL-DEF-00272845 |
| AY | | | [PMSJ Ex. 61] Email, "FW: CBP MIGRATION CAT – COB 11/04/16", AOL-DEF-00904527 |
| AZ | | | [PMSJ Ex. 62] Email, "RE: CBP MIGRATION CAT – COB 11/07/16", AOL-DEF-00272790 |
| BA | | | [DMSJ Ex. 35] Email, "FW: 20161112 CBP Crisis Action Team Daily Report", AOL-DEF-00522433 and attachment: "20161112 Daily Reporting Matrix.xlsx", AOL-DEF-00522435 |
| BB | | | [PMSJ Ex. 69] Email: "RE: Metering in TX" (Nov. 11, 2016), AOL-DEF-00272935 |
| BC | | | [PMSJ Ex. 70] Email, "Metering Flow", AOL-DEF-01266662 |
| BD | | | [PMSJ Ex. 71] Email, "Consolidated Weekly highlights", AOL-DEF-01267496 |
| BE | | | [PMSJ Ex. 13] Email, "RE: Meeting with INM," AOL-DEF-00576607 |
| BF | | | [DMSJ Ex. 36] Email, "FW: Meeting with |

| No. | Date Marked | Date Ad-mitted | Description |
|---|---|---|---|
| | | | INM," AOL-DEF-00814130 |
| BG | | | [PMSJ Ex. 74] Email, "RE: **RFI** Please Provide Response by COB today," AOL-DEF-00799450 |
| BH | | | [DMSJ Ex. 37] Email, "FW: SWB Meter-ing.pptx", AOL-DEF-00562927 |
| BI | | | [DMSJ Ex. 38] Email "RE: SWB Meter-ing.pptx," (Nov. 18, 2016), AOL-DEF-00370791 |
| BJ | | | [DMSJ Ex. 39] Email "RE: Appointments," (Nov. 22, 2016), AOL-DEF-00022783 |
| BK | | | [DMSJ Ex. 42] Email "20161217 Crisis Action Team Daily Report," (Dec. 17, 2016), AOL-DEF-00089288 |
| BL | | | [DMSJ Ex. 43] Email "20161217 Crisis Action Team Daily Report," (Dec. 17, 2016), AOL-DEF-00034127 |
| BM | | | [DMSJ Ex. 50] Email "Cadence Calls - Supplemental Information," (Apr. 4, 2018), AOL-DEF-00801853 |
| BN | | | [DMSJ Ex. 51] Email "RE: Leadership Cadence Call," (Apr. 3, 2018), AOL-DEF-00909574 |
| BO | | | [DMSJ Ex. 52] Email "FW: Emergency AEU support," (Apr. 18, 2018), AOL-DEF- |

DEFS.' MEM. OF CONTENTIONS OF LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| | | | 00729220 |
| BP | | | [PMSJ Ex. 80] Email "FW: General Update on Migrant Caravan," (Apr. 23, 2018), AOL-DEF-00280783 |
| BQ | | | [PMSJ Ex. 81] Email "RE: Increased Flow and Caravan Anticipated Arrival," (Apr. 25, 2018), AOL-DEF-00041777 |
| BR | | | [DMSJ Ex. 53] Email "RE: Migrant Caravan Pulse Reporting," (Apr. 25, 2016), AOL-DEF-00010711 |
| BS | | | [DMSJ Ex. 54] Email "RE: Migrant Caravan Pulse Reporting," (Apr. 25, 2018), AOL-DEF-00704631 |
| BT | | | [DMSJ Ex. 56] Email "SYS AEU Custody Report for 04/26/2018," (Apr. 26, 2018), AOL-DEF-00011644 |
| BU | | | Email "Re: Checking in," (Apr. 29, 2018), AOL-DEF-00287778 |
| BV | | | SYS AEU Custody Report for 04/29/2018," AOL-DEF-00010726 |
| BW | | | [DMSJ Ex. 63] Email "FW: Increase Intake at the Ports," (June 16, 2018), AOL-DEF-00380555 |
| BX | | | [DMSJ Ex. 65] Email, "TDY Personnel to Tornillo," (Sept. 14, 2016), AOL-DEF- |

49

| No. | Date Marked | Date Ad-mitted | Description |
|---|---|---|---|
|  |  |  | 00806910 |
| BY |  |  | [DMSJ Ex. 66] Email "FW: Implementa-tions to address Credible Fear workload," (Sept. 28, 2016), AOL-DEF-00806828 |
| BZ |  |  | [DMSJ Ex. 61] Howe Senate Testimony (April 9, 2019), AOL-DEF-00003273 |
| CA |  |  | [DMSJ Ex. 62] Email "Re: Haitian Migra-tion Surge Briefing," (Sept. 14, 2016), AOL-DEF-00023711 |
| CB |  |  | [DMSJ Ex. 46] SW Border Inadmissibles By Field Office January 2018, (Oct. 23, 2018) |
| CC |  |  | [DMSJ Ex. 47] SW Border Inadmissibles By Field Office February 2018, (Oct. 23, 2018) |
| CD |  |  | [DMSJ Ex. 48] SW Border Inadmissibles By Field Office March 2018, (Oct. 23, 2018) |
| CE |  |  | [DMSJ Ex. 49] SW Border Inadmissibles By Field Office April 2018, (Oct. 23, 2018) |
| CF |  |  | [DMSJ Ex. 4] Fear Claims FY 2017-2019 |
| CG |  |  | CSIS Data 2016, AOL-DEF-00013950 |
| CH |  |  | CSIS Data 2017, AOL-DEF-00013951 |
| CI |  |  | CSIS Data 2018, AOL-DEF-00013952 |
| CJ |  |  | CSIS Data 2019, AOL-DEF-00013953 |
| CK |  |  | USEC/SIGMA Data 2017, AOL-DEF-01412875 |
| CL |  |  | USEC/SIGMA Data 2018, AOL-DEF- |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
|     |             |               | 01412876 |
| CM  |             |               | USEC/SIGMA Data 2020, AOL-DEF-01412877 |
| CN  |             |               | USEC/SIGMA Data January-June 2016, AOL-DEF-01412878 |
| CO  |             |               | USEC/SIGMA Data January-June 2019, AOL-DEF-01412879 |
| CP  |             |               | USEC/SIGMA Data July-December 2016, AOL-DEF-01412880 |
| CQ  |             |               | USEC/SIGMA Data July-December 2019, AOL-DEF-01412881 |
| CR  |             |               | Foret Mem., Metering Guidance (April 30, 2020), CBPALOTRO000314-315 |
| CS  |             |               | [DMSJ Ex. 59] CBP's National Transportation, Escort, and Detention Standards (TEDS), AOL-DEF-00039041 |
| CT  |             |               | "Admissibility Enforcement Unit Daily Report for June 17, 2018," AOL-DEF-00604411 |
| CU  |             |               | "Admissibility Enforcement Unit Shift Passdown Report, 6/16/18," AOL-DEF-01085476 |
| CV  |             |               | "Admissibility Enforcement Unit Shift Passdown Report, 6/17/18," AOL-DEF-01085521 |

DEFS.' MEM. OF CONTENTIONS OF LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
| CW | | | "Admissibility Enforcement Unit Shift Passdown Report, 6/18/18," AOL-DEF-01085439 |
| CX | | | Email, "AEU Stats," (June 17, 2018), AOL-DEF-00748702 |
| CY | | | "SYS AEU Custody Report 06-18-2018," AOL-DEF-00541227 |
| CZ | | | "SYS AEU Custody Report for 06/16/2018," AOL-DEF-00328749 |
| DA | | | "SYS AEU Custody Report for 06/17/2018," AOL-DEF-01172890 |
| DB | | | Email, "SYS AEU Custody Report for 6/18/18," AOL-DEF-00541224 |
| DC | | | Email, "AEU Movement & Pass Down for 6/17/18 14:00-22:00," (June 17, 2018), AOL-DEF-01085517 |
| DD | | | SDFO Operational Snapshot for Fiscal Year 2019, AOL-DEF-01438007 |
| DE | | | San Ysidro POE Overtime Budget for Fiscal Year 2018, AOL-DEF-01438008 |
| DF | | | Email, "Daily MCAT Report – June 17, 2018," (June 17, 2018), AOL-DEF-01403785, and attachment: 20180617 MCAT Daily Brief, AOL-DEF-01403787 |
| DG | | | Email, "Daily MCAT Report June 18, |

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
|     |             |               | 2018," (June 18, 2018), AOL-DEF-01405568, and attachment: 20180618 MCAT Daily Brief, AOL-DEF-01405570-74 |
| DH  |             |               | Email, "CBP_UAC_FMUA_CAT_RE-PORT_6:15," (June 17, 2018), AOL-DEF-00146210, and attachment: CBP Crisis Action Team Daily Report, June 17, 2018, AOL-DEF- 00146211-26 |
| DI  |             |               | Email, "CBP_UAC_FMUA_CAT_RE-PORT_6:15," (June 18, 2018), AOL-DEF-00146227, and attachment: CBP Crisis Action Team Daily Report, June 18, 2018, AOL-DEF-00146228-43 |
| DJ  |             |               | Email, "SWB Daily Intake & Custody Report_2018-06-17-05-51-01," (June 17, 2018), AOL-DEF-00069499, and attachment: SWB Daily Intake & Custody Report_2018-06-17-05-51-01, AOL-DEF-00069500 |
| DK  |             |               | Email, "SWB Daily Intake and Custody Report_2018-06-18-05-51-07," (June 18, 2018), AOL-DEF-00069501, and attachment: SWB Daily Intake and Custody Report_2018-06-18-05-51-07, AOL-DEF-00069502 |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
| DL | | | Email, "Field Queue Management," (June 18, 2018), AOL-DEF-00527340, and attachment: Field Offices, AOL-DEF-00527342 |
| DM | | | Email, "Morning Report for 6/16/2018," (June 17, 2018), AOL-DEF-00689964-71, and attachment: Morning Report 06-16-18, AOL-DEF-00689972 |
| DN | | | Email, "Morning Report for 6/17/2018," (June 17, 2018), AOL-DEF-01321927-33, and attachment: Morning Report 06-17-18, AOL-DEF-01321934-44 |
| DO | | | Email, "End of Shift Report: June 15, 2018, 1600-2400 shift," (June 17, 2018), AOL-DEF-00576446-49 |
| DP | | | Email, "Laredo Ports of Entry Beginning of Shift Report – Item ID2421 has been assigned to you," (June 17, 2018), AOL-DEF-00578665-67 |
| DQ | | | Email, "Laredo Ports of Entry Beginning of Shift Report – Item ID2421 has been reassigned," (June 17, 2018), AOL-DEF-00578668-70 |
| DR | | | Email, "Laredo Ports of Entry Beginning of Shift Report – Item ID2425 has been assigned to you," (June 18, 2018), AOL-DEF- |

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| | | | 00578672-74 |
| DS | | | Email, "Correspondence/Questions Regarding Queue Management and/or Family Separations," (June 18, 2018), AOL-DEF-00578671 |
| DT | | | Email, "FW: Report Needed," (June 18, 2018), AOL-DEF-00812469-72, and attachment: Queue Management, AOL-DEF-008124673 |
| DU | | | Email, "RE: Report Needed," (June 18, 2018), AOL-DEF-01037070-71, and attachment: Queue Management, AOL-DEF-01037072 |
| DV | | | Email, "RE: Report Needed," (June 18, 2018), AOL-DEF-01037073-75, and attachment: Queue Management, AOL-DEF-01037076 |
| DW | | | Email, "RE: Queue Management," (June 18, 2018), AOL-DEF-00899320-21, and attachment: LFO Queue Management Summary 061818, AOL- DEF-00899322-25 |
| DX | | | Email, "LFO Queue Management Process Report / 1200 Hours CST – Monday 6/18/2018," (June 18, 2018), AOL-DEF-00692725, and attachment: Copy of LFO |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Ad-mitted | Description |
|---|---|---|---|
| | | | Queue Management Report, AOL-DEF-00692726 |
| DY | | | Email, "LFO Queue Management Process Report / 1600 Hours CST," (June 17, 2018), AOL-DEF-00692728-29, and attachment: Laredo LFO Queue Management Report, AOL-DEF-00692730 |
| DZ | | | Email, "LFO Queue Management Process Report /1600 Hours CST," (June 17, 2018), AOL-DEF-00692731-32, and attachment: LFO Queue Management Report, AOL-DEF-00692733 |
| EA | | | Email, "Queue Management Report – LFO June 18, 2018," (June 18, 2018), AOL-DEF-00902055-57 |
| EB | | | Email, "LFO Queue Management Report / June 17 @ 16:00 CST," (June 17, 2018), AOL-DEF-00910328-29 |
| EC | | | Email, "LFO Queue Management Report / June 17 @ 16:00 CST," (June 17, 2018), AOL-DEF-01037272-75, and attachment: LFO Queue Management Report, AOL-DEF-01037276 |
| ED | | | Email, "LFO Queue Management Report – LFO June 18, 2018," (June 18, 2018), AOL- |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| | | | DEF-01037284-88 |
| EE | | | Email, "LFO Queue Management Report – LFO June 18, 2018," (June 18, 2018), AOL-DEF-01037279, and attachment: LFO Queue Management Report, AOL-DEF-01037283 |
| EF | | | Email, "LFO Queue Management Report/ June 17 @ 16:00 CST," (June 17, 2018), AOL-DEF-00902048-50, and attachment: LFO Queue Management Report, AOL-DEF-00902051 |
| EG | | | Email, "06172018 2019 AR0029269," AOL-DEF-01437588 |
| EH | | | Email, "AR 06172018 2019 AR0029349," AOL-DEF-01437590 |
| EI | | | Laredo Situational Awareness Report, "06172018 LAR BRV GOV Accident," AOL-DEF-01437594 |
| EJ | | | "June 17 Laredo Referrals," AOL-DEF-01437955 |
| EK | | | "IO-94 Laredo Stats 6 17 2018," AOL-DEF-01437837 |
| EL | | | Email, "IOILs for 06172018," AOL-DEF-01437832 |
| EM | | | "RFI 06172018," AOL-DEF-001437831 |
| EN | | | "2304 Cargo Release Report" (June 17, |

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| | | | 2018), AOL-DEF-01437596 |
| EO | | | "IO04 Laredo Stats 6 17 2018," AOL-DEF-01437713 |
| EP | | | "IO95 June 17 Laredo Referrals," AOL-DEF-01437779 |
| EQ | | | Email, "FW: Daily MCAT Report – June 17, 2018," (June 17, 2018), AOL-DEF-1395150, 57, and attachment: 20180617 MCAT Daily Brief, AOL-DEF-01395152 |
| ER | | | Email, "FW: Daily MCAT Report June 18, 2018" (June 18, 2018), AOL-DEF-1395168, and attachment: 20180618 MCAT Daily Brief, AOL-DEF-01395170 |
| ES | | | CBP Directive 3340-030B, "Secure detention, Transport and Escort Procedures at Ports of Entry," AOL-DEF-00197091 |
| ET | | | Email, "FW: Report needed" (June 17, 2018), AOL-DEF-00802741 |
| EU | | | Email, "EPFO Detention Report for June 17, 2018 at 0600 hours," (June 17, 2018), AOL-DEF-00802766, and attachment, AOL-DEF-00802767 |
| EV | | | Email, "CBS Network Crew in Area" (June 18, 2018), AOL-DEF-00802775 |

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| EW | | | Email, "El Paso Field Office Que Management Report of June 17, 2018," AOL-DEF-00802754, and attachment, AOL-DEF-00802757 |
| EX | | | Email, "RE: Report Needed" (June 18, 2018), AOL-DEF-00802782, and attachment, "Queue Management," AOL-DEF-00802787 |
| EY | | | Email, "RE: Asylum Seekers" (June 18, 2018), AOL-DEF-00802788 |
| EZ | | | Email, "EPFO Queue Management Reporting – June 18, 2018," AOL-DEF-00802790 |
| FA | | | Email, "EPFO Queue Management Reporting – June 18, 2018," AOL-DEF-00802794 |
| FB | | | Email, "El Paso Field Office Detainee Activity Report, 6/16/18 23:00," AOL-DEF-00805956 |
| FC | | | Email, "El Paso Field Office Detention Capacity Report," (June 17, 2018), AOL-DEF-00805959 |
| FD | | | Email, "El Paso Field Office (EPFO) Detention Capacity Percentages – June 17, 2018 (0000-0800 hours)," AOL-DEF-00893259, and attachment: EPFO Detention Capacity 06172018 0000-0800, AOL-DEF-00893260 |

| No. | Date Marked | Date Ad-mitted | Description |
|---|---|---|---|
| FE | | | Email, "El Paso Field Office (EPFO) Detention Capacity Percentages – June 17, 2018 (0800-1600 hours)," AOL-DEF-00805960 |
| FF | | | Email, "El Paso Field Office Detainee Activity Report for 6/17/2018 23:00," AOL-DEF-00805964 |
| FG | | | Email, "El Paso Field Office (EPFO) Detention Capacity Percentages for June 18, 2018 (1600-2400 hours)," AOL-DEF-00893262 and attachment: EPFO Detention Capacity 06172018 1600-2400, AOL-DEF-00893263 |
| FH | | | Email, "El Paso Field Office (EPFO) Detention Capacity Percentages for June 18, 2018 (0000-0800 hours)," AOL-DEF-00893265, and attachment: EPFO Detention Capacity 06182018 0000-0800, AOL-DEF-00893266 |
| FI | | | Email, "Update#1) Event Notification - El Paso TX SIGMAIDENTSearch and Enroll (E3)ATS System Outage," AOL-DEF-01437956 |
| FJ | | | Email, "06/17/2018 - PD - CBP El Paso PCS Activity Report - EOS - EVE WATCH," AOL-DEF-01437958 |
| FK | | | El Paso Field Office Daily Summary Report for June 17, 2018, AOL-DEF-01437960 |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
| FL | | | Email, "Bullets - El Paso, TX: U.S. Representative Joe Kennedy III applies for entry at the Paso Del Norte Border Crossing," AOL-DEF-01437962 |
| FM | | | Email, "FINAL: BOA POE / TECS Hit Wanted / Adult MX Male," AOL-DEF-01437964 |
| FN | | | Email, "FW: El Paso Field Office Que Management Report for 06/17/2018," AOL-DEF-01437968, and attachment: AOL-DEF-0143796 |
| FO | | | FY 2018 Combined Daily Stats, AOL-DEF-01437971 |
| FP | | | Email, "Hourly Wait and Staffing Report 06/17/2018 00:00 Hours (AMENDED)," AOL-DEF-01437972 |
| FQ | | | Email, "Hourly Wait and Staffing Report 06/17/2018 01:00 Hours," AOL-DEF-01437974 |
| FR | | | Email, "Hourly Wait and Staffing Report 06/17/2018 02:00 Hours," AOL-DEF-01437976 |
| FS | | | Email, "Hourly Wait and Staffing Report 06/17/2018 03:00 Hours," AOL-DEF-01437978 |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| FT | | | Email, "Hourly Wait and Staffing Report 06/17/2018 04:00 Hours," AOL-DEF-01437980 |
| FU | | | Email, "Hourly Wait and Staffing Report 06/17/2018 05:00 Hours," AOL-DEF-01437982 |
| FV | | | Email, "Hourly Wait and Staffing Report 06/17/2018 10:00 Hours," AOL-DEF-01437984 |
| FW | | | Email, "Hourly Wait and Staffing Report 06/17/2018 11:00 Hours," AOL-DEF-01437986 |
| FX | | | Email, "Hourly Wait and Staffing Report 06/17/2018 12:00 Hours," AOL-DEF-01437988 |
| FY | | | Email, "Hourly Wait and Staffing Report 06/17/2018 13:00 Hours," AOL-DEF-01437990 |
| FZ | | | Email, "Hourly Wait and Staffing Report 06/17/2018 22:00 Hours," AOL-DEF-01437992 |
| GA | | | Email, "Hourly Wait and Staffing Report 06/17/2018 23:00 Hours," AOL-DEF-01437994 |
| GB | | | Email, "RE Hourly Wait and Staffing Report |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| | | | 06/17/2018 23:00 Hours," AOL-DEF-01438000 |
| GC | | | "IP – Impact of Operation Bus Pass 12292017," AOL-DEF-01437996 |
| GD | | | "PCS – Activity Report 06-16-2018-NEW," AOL-DEF-001437998 |
| GE | | | PCS – Activity Report 06-17-2018-NEW," AOL-DEF-001437999 |
| GF | | | Email, "UPDATE: BOTA PEDs/Medical Assistance/Adult MX Male," AOL-DEF-01438003 |
| GG | | | Email, "EAC Bullets – San Ysidro, CA: Admissibility Enforcement Unit (AEU) – Detainees in CBP Custody" (Sept. 22, 2016), AOL-DEF-00019287 |
| GH | | | Email, "EAC Bullets – San Ysidro, CA: Admissibility Enforcement Unit (AEU) – Detainees in CBP Custody" (Oct. 1, 2016), AOL-DEF-00013235 |
| GI | | | Email, "FW: Dail Snapshot of Laredo Field Office Immigration Case Processing – FAMU and UAC for Oct 06, 2016, AOL-DEF-00017024 |
| GJ | | | Email, "HID POE Monday 08/22/2016," AOL-DEF-00532538 |

DEFS.' MEM. OF CONTENTIONS OF LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
| GK | | | Email, "Update 5: Limited Distribution EAC Bullets: San Luis, AZ: Surge in Inadmissible Family Units," AOL-DEF-01262948 |
| GL | | | Email, "Family Unit and UAC Surge – El Paso" (July 15, 2016), AOL-DEF-01420776 and attachment: "IP (EPFO) – Family Unit and UAC Surge 07152016" |
| GM | | | Email, "FW: TFO Migrant Surge Bullets" (Aug. 25, 2016), AOL-DEF-01263373 |
| GN | | | Email, "FW: TFO Migrant Surge Bullets" (Aug. 25, 2016), AOL-DEF-01265884 |
| GO | | | Email, "RE: [SLU Status Report 9/30/16] As of 1213 hours," AOL-DEF-01263494 |
| GP | | | Email, "SYS/OTM OFO Barracks 5 list for 11/11/2016," AOL-DEF-00937438 |
| GQ | | | Email, "FW: PCU Status Update" (Nov. 8, 2016), AOL-DEF-01266511 |
| GR | | | Email, "PCU Status Update 11/9/2016 @1400 hrs," AOL-DEF-01266548 |
| GS | | | Email, "Field Office Report 1200-2000 Nogales AZ" (Nov. 12, 2016), AOL-DEF-01266668 |
| GT | | | Email, "Limited Distribution: EAC Bullets – Southwest Border Daily operations report – November 12, 2016" (Nov. 12, 2016), AOL- |

DEFS.' MEM. OF CONTENTIONS OF LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| | | | DEF-00260606 |
| GU | | | Email, "FW: 20161109 CAT SWB Status Brief" (Nov. 9, 2016), AOL-DEF-00031317 |
| GV | | | [PMSJ Ex. 65] Email, "FW: CBP MIGRRA-TION CAT – COB 11/09/16", (Nov. 9, 2016), AOL-DEF-00272878 |
| GW | | | [PMSJ Ex. 72] Email, "RE: CBP MIGRA-TION CAT – COB 11/15/16" (Nov. 15, 2016), AOL-DEF-00272938 |
| GX | | | "CBP Crisis Action Team Daily Report" (Apr. 16, 2018), AOL-DEF-00802065 |
| GY | | | Email, "FW: EPFO Detention Update, 10/22" (Oct. 22, 2018), AOL-DEF-00807288 |
| GZ | | | Email, "Re: El Paso Area Impacts of TDYs to SECURE LINE" (Nov. 18, 2018), AOL-DEF-00383903 |
| HA | | | Email, "RE: PCU Status Update 11/10/16 @2130hrs" (Nov. 11, 2016), AOL-DEF-01267304 |
| HB | | | Email, "RE: El Paso impact – Day 1" (Mar. 29, 2019), AOL-DEF-00269815 |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

## B. Exhibits Defendants May Use at Trial if the Need Arises.

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| HC | | | Any MCAT, Field Queue Management, or local custody/detainee/capacity report to rebut or explain information from a particular date and/or particular port that may be introduced by Plaintiffs |
| HD | | | [DMSJ Ex. 12] Email, "RE: Due NLT 12:00 pm Friday March 25th – Commissioner's Management Staff – OMM #5 (OFO)", AOL-DEF-00237660 |
| HE | | | [PMSJ Ex. 8] OPR Report of Investigation, AOL-DEF-00014041 |
| HF | | | [DMSJ Ex. 40] Disciplinary Letter, AOL-DEF-01408293 |
| HG | | | [DMSJ Ex. 41] 2009 Streamlined Withdrawal Procedures, AOL-DEF-00069617 |
| HH | | | [PMSJ Ex. 7] Email, "FW: Streamlined Withdrawals and I-275's", AOL-DEF-00069611 |
| HI | | | [DMSJ Ex. 44] Email, "RE: OIG Reviewing a Complaint from a Nicole Ramos Client", AOL-DEF-00722915 |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
| HJ | | | [DMSJ Ex. 45] Email, "AEU Detention Space and Asylum Seekers", AOL-DEF-00090443 |
| HK | | | CSIS Data, "Copy of RPT_2014_v2.REDACTED.xlsx", AOL-DEF-0013948 |
| HL | | | CSIS Data, "Copy of RPT_2015_v2.REDACTED.xlsx", AOL-DEF-0013949 |
| HM | | | Email, "[Action] Operation Overflow TDY Solicitation FY17 (Phase 1)- San Diego and Tucson TDY Solicitation" (Aug. 18, 2016) AOL-DEF-01393855 and attachment: "San Diego and Tucson – Temporary Duty (TDY) Solicitation" AOL-DEF-01393857 |
| HN | | | Email, "RE: El Paso Area Impacts of TDYs to SECURE LINE" (Nov. 18, 2018), AOL-DEF-00383910 |
| HO | | | Email, "FW: Queue Point" (Feb. 17, 2019), AOL-DEF-00017120 |
| HP | | | Email, "FW: Limit Line" (Dec. 18, 2018), AOL-DEF-00661840 |
| HQ | | | Email, "RE: Path Forward" (Nov. 9, 2016), AOL-DEF-01391826 |

67

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
|     |             |               |             |
| HR  |             |               | Email, "FW: TPs re DHS efforts/constraints in processing/handling Haitians" (Nov. 9, 2016) AOL-DEF-01392597 |
| HS  |             |               | Email, "El Paso OFO Daily Summary Report for November 8, 2016" (Nov. 9, 2016), AOL-DEF-00889851 (El Paso), |
| HT  |             |               | Email, "End of Shift 0000-0800: June 19, 2016" (June 19, 2016), AOL-DEF-00810353 (Laredo) |
| HU  |             |               | Email, "RE: ERO at capacity" (Oct. 20, 2016), AOL-DEF-01265192 |
| HV  |             |               | Email, "RE: Credible Fear Influx Spot Report" (May 25, 2016), AOL-DEF-00219534 |
| HW  |             |               | Email, "AEU detention Space and Asylum Seekers" (Apr. 14, 2017), AOL-DEF-00597783 |
| HX  |             |               | Email, "Limit Line Muster" (Nov. 15, 2016), AOL-DEF-00597788 |
| HY  |             |               | Email, "FW: San Ysidro End of Day AEU Reporting for 05/27/2016 as of 23:59hrs" (May 28, 2016), AOL-DEF-00303651 |

DEFS.' MEM. OF CONTENTIONS OF LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| HZ | | | Email, "RE: SYS AEU movement and pass down for 5/27/2016 1400-2200" (May 28, 2016), AOL-DEF-00303657 |
| IA | | | Email, "San Ysidro End of Day AEU Report for May 31, 2016" (June 1, 2016), AOL-DEF-00061941 |
| IB | | | Email, "San Ysidro End of Day AEU Reporting for May 24, 2016" (May 25, 2016), AOL-DEF-00243091 |
| IC | | | Email, "FW: END OF SHIFT PASSDOWN MIDS SYS/OTM/CBX 5/25/16" (May 25, 2016), AOL-DEF-00321005 |
| ID | | | Email, "Old Port" (May 25, 2016), AOL-DEF-00030225 |
| IE | | | Email, "FW: Detention Capacity at IMB" (May 25, 2016), AOL-DEF-00321026 |
| IF | | | Email, "San Ysidro End of Day AEU Reporting for May 25, 2016)" (May 26, 2016), AOL-DEF-00243105 |
| IG | | | Email, "RE: Update" (May 28, 2016), AOL-DEF-00243126 |
| IH | | | Email, "RE: SYS AEU movement and pass down for 5/27/2016 1400-2200" |

DEFS.' MEM. OF CONTENTIONS OF LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
|  |  |  | (May 28, 2016), AOL-DEF-00067706 |
| II |  |  | Email, "San Ysidro End of Day AEU Reporting for May 30, 2016" (May 31, 2016), AOL-DEF-00243158 |
| IJ |  |  | Email, "RE: San Ysidro End of Day AEU Reporting for July 28, 2016" (July 29, 2016), AOL-DEF-00596668 |
| IK |  |  | Email, "FW: AEU Move to Detention Trailers (Updated Version – Week of 6/20" (June 20, 2016), AOL-DEF-00310825 |
| IL |  |  | Email attachment to AOL-DEF-00310825 (Exhibit IK): "AEU Move Plan (updated)", AOL-DEF-00310827 |
| IM |  |  | Email, "San Ysidro Port of Entry AEU (current status)" (May 27, 2016), AOL-DEF-00067687 |
| IN |  |  | Email, "RE: SYS AEU MOVEMENT AND PASS DOWN FOR 5/28/16 0600-1400" (May 28, 2016), AOL-DEF-00321316 |
| IO |  |  | Email, "AEU SUPPORT SCHEDULES 05/26 2200 through 06/02 1400" (May 26, 2016), AOL-DEF-00242927 and attachments: |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| No. | Date Marked | Date Admitted | Description |
|-----|-------------|---------------|-------------|
|     |             |               | "AEU SUPPORT FRIDAY 05-27", AOL-DEF-00242928 |
|     |             |               | "AEU SUPPORT MONDAY 05-30", AOL-DEF-00242930 |
|     |             |               | "AEU SUPPORT SATURDAY 05-28", AOL-DEF-00242931 |
|     |             |               | "AEU SUPPORT SUNDAY 05-29", AOL-DEF-00242932 |
|     |             |               | "AEU SUPPORT THURSDAY 05-26", AOL-DEF-00242933 |
|     |             |               | "AEU SUPPORT THURSDAY 06-02", AOL-DEF-00242934 |
|     |             |               | "AEU SUPPORT TUESDAY 05-31", AOL-DEF-00242935 |
|     |             |               | "AEU SUPPORT WEDNESDAY 06-01", AOL-DEF-00242936 |
|     |             |               | "AEU SUPPORT", AOL-DEF-00242937 |

## VI.   DEFENDANTS' WITNESSES

Witnesses, except witnesses offered solely for impeachment, who Defendants expect to or may call at trial are listed below. In addition to the following, Defendants incorporate any witnesses called by Plaintiffs in their case in chief or whose deposition testimony is designated by Plaintiffs, and reserve the right to call such witnesses. Defendants also designate the deposition testimony of Todd Owen and Scott Glabe in the event they are unavailable for trial. Defendants also reserve the right to counter-designate any deposition testimony in response to testimony designated by Plaintiffs, and to object to the designation of testimony under Federal Rule of Civil Procedure 32(a)(4) for a witness who actually testifies at trial.

### A.    Fact Witnesses Defendants Expect to Call at Trial

| Name | Address & Telephone Information |
| --- | --- |
| Randy Howe, Director, Field Operations, Laredo Field Office; former Executive Director, Operations, Office of Field Operations, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 109 Shiloh Dr. Ste. 300, Laredo, TX 78045<br>This witness may be contacted through counsel for Defendants. |
| James Ryan Hutton, Assistant Port Director, Area Port of San Francisco; former Deputy Executive Director, Admissibility and Passenger Programs, Office of Field Operations, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 555 Battery Street, San Francisco, CA 94111<br>This witness may be contacted through counsel for Defendants. |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| Name | Address & Telephone Information |
|---|---|
| Beverly Good, Acting Executive Director, Admissibility and Passenger Programs, Office of Field Operations, U.S. Customs and Border Protection; Port Director, Port of El Paso, Office of Field Operations, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 1300 Pennsylvania Ave. NW, Washington, D.C., 20229<br>This witness may be contacted through counsel for Defendants |
| Kirby Hunolt, Executive Director, Mission Support, Office of Field Operations, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 1300 Pennsylvania Ave. NW, Washington, D.C., 20229<br>This witness may be contacted through counsel for Defendants |
| Pete R. Flores, Director, Field Operations, San Diego, U.S. Customs and Border Protection; currently Acting Executive Assistant Commissioner, Operations Support, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 1300 Pennsylvania Ave. NW, Washington, D.C. 20229<br>This witness may be contacted through counsel for Defendants. |
| Mariza Marin, Assistant Director of Field Operations, Border Security, San Diego Field Office, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 720 East San Ysidro Blvd., San Ysidro, CA 92173<br>This witness may be contacted through counsel for Defendants. |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| Name | Address & Telephone Information |
|---|---|
| Ryan Koseor, Assistant Port Director, Calexico Port of Entry, Office of Field Operations, U.S. Customs and Border Protection; formerly Deputy Commander, Migration Crisis Action Team (MCAT) | U.S. Customs and Border Protection, 200 East 1st Street, Calexico, CA 92231 This witness may be contacted through counsel for Defendants. |
| Rodney Harris, Deputy Assistant Director of Field Operations, Laredo Field Office, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 109 Shiloh Dr., Ste. 300, Laredo, TX 78045 This witness may be contacted through counsel for Defendants. |
| Ray Provencio, Assistant Director of Field Operations, El Paso Field Office, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 9400 Viscount, El Paso, TX 79925 This witness may be contacted through counsel for Defendants. |
| Samuel Cleaves, Assistant Port Director, El Paso Port of Entry, Office of Field Operations, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 3600 E. Paisano, El Paso, TX 79905 This witness may be contacted through counsel for Defendants. |
| Jeffrey Bequette, Border Security Coordinator, Tucson Field Office, U.S Customs and Border Protection | U.S. Customs and Border Protection, 4760 Oracle Rd, Ste. 316, Tucson, AZ 85705 This witness may be contacted through counsel for Defendants |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| Name | Address & Telephone Information |
|------|-------------------------------|
| Emilia Bakopoulos, Director, Systems Enforcement Analysis and Review (SEAR), Admissibility and Passenger Programs, Office of Field Operations, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 1300 Pennsylvania Avenue NW Washington, D.C., 20229 This witness may be contacted through counsel for Defendants. |
| Michael Gorman, Director, Mission Systems and Data Services, Planning, Program Analysis, and Evaluation (PPAE), Office of Field Operations, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 1300 Pennsylvania Avenue NW Washington, D.C., 20229 This witness may be contacted through counsel for Defendants. |

**B.    Expert Witnesses Defendants Expect to Call at Trial**

| Name | Address | Qualifications | Testimony |
|------|---------|----------------|-----------|
| Rodney Harris, Deputy Assistant Director of Field Operations, Laredo Field Office, Office of Field Operations, U.S. Customs and Border Protection | 109 Shiloh Dr. Ste. 300, Laredo, TX 78045. | Deputy ADFO Harris has worked at CBP or its legacy agency, U.S. Customs Service, since September 1999. In 2003, after the creation of the Department of Homeland Security, Mr. Harris became a CBP officer at the Laredo Port of Entry. In addition to his experience in passenger processing operations, Mr. Harris was | Deputy ADFO Harris will testify as to his opinion that the Port of Laredo's operational capacity, and any port's operational capacity, is fluid and is based on many factors, which may not be known in advance. Deputy ADFO Harris will testify to factors the Port of Laredo deems relevant in determining the Port's operational capacity to process individuals without |

| Name | Address | Qualifications | Testimony |
|------|---------|----------------|-----------|
| | | also responsible for numerous narcotics and commercial seizures. In 2006, Mr. Harris was promoted to a supervisory CBP officer and primarily worked at the passenger bridges at the Port of Laredo. In 2011, he became a program manager at the Laredo Field Office, where he was involved with, among other duties, port-hardening infrastructure to address absconders and port runners. As program manager, Deputy ADFO Harris also oversaw the completion of Continuity of Operations Plans and Occupant Emergency Plans. In 2015, Deputy ADFO Harris became the Supervisory Program Manager for Border Security at the Laredo Field Office. Deputy ADFO Harris currently serves as the Deputy Assistant Director of Field | travel documents, including, but not limited to, the missions of the port and how it prioritizes those missions sets; resources available to the port at any given time, such as funds, personnel, durable assets, and Port facility constraints; the number, nature, and complexity of seizures, arrests, and admissibility issues; the volume, characteristics, demographics, and medical needs of individuals in custody; and the functionality of the Port's resources, such as physical space and assets designated for migrant processing.  Deputy ADFO Harris will also testify to the unique challenges each of these factors pose and explain, in detail, how these facts impact a port's operational capacity. Deputy ADFO Harris will also testify that queue management is a tool ports use to manage their operational capacity and that allows port directors to regulate the flow of persons without appropriate entry |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| Name | Address | Qualifications | Testimony |
|------|---------|----------------|-----------|
| | | Operations, Border Security, Laredo Field Office and has been in this role since July 2018. In this position, Deputy ADFO Harris oversees the daily business of the Laredo Field Office's Border Security Division. | documents into the port for processing. He will opine that queue management has, among other things, made ports more secure; led to an increase in safety for travelers, undocumented persons waiting to be process, and personnel; and led to more sanitary and safe facilities. He will further opine that queue management has allowed the port to manage its resources to process safely and effectively. Deputy ADFO Harris will opine that on Sunday, June 17, 2018, the Port of Laredo did an adequate job of balancing its competing priorities in relation to its mission sets, such as processing trade and travelers. He will testify that he came to this conclusion after drawing from his past experience and expertise of port operations and reviewing documents, daily intake and custody reports, shift reports, SIGMA and CSIS data, and various emails pertaining to port operations on or about June |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| Name | Address | Qualifications | Testimony |
|------|---------|----------------|-----------|
| | | | 17, 2018 and the surrounding dates. Deputy ADFO Harris may also testify regarding the facts and conclusions set forth in his February 10, 2020 Declaration (*see* ECF No. 406-29). |
| Samuel Cleaves, Assistant Port Director, El Paso Port of Entry, Office of Field Operations, U.S. Customs and Border Protection | 3600 E. Paisano, El Paso, TX 79905 | Since 1999, APD Cleaves has held a number of positions within the Office of Operations. In 2016 and 2018, he served as the Acting Assistant Director, Field Operations, El Paso Field Office. In this role, he oversaw all Passenger and Tactical operations for all ports within the El Paso Field Office. He has also served as the Watch Commander and Chief Supervisory CBP Officer (2nd Line) at the Port of El Paso. APD Cleaves currently serves as the Assistant Port Director for Passenger Operations at the Port of El Paso. In this capacity, APD Cleaves oversees all | APD Cleaves will testify to the factors the Port of El Paso deems relevant in determining the port's operational capacity to process individuals without travel documents. He will testify that, in determining the Port's operational capacity to process undocumented migrants, the Port considers a number of factors, including, but not limited to, the characteristics and demographics of individuals in custody; the ability to transfer individuals to third-party federal or state agencies, such as U.S. Immigration and Customs Enforcement (ICE) and the U.S. Department of Health and Human Services (HHS); port staffing levels; the resources available to the port on a given day; and |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| Name | Address | Qualifications | Testimony |
|------|---------|----------------|-----------|
| | | aspects of passenger operations and provides managerial oversight in policy and procedure and program implementation and compliance | the need to re-allocate resources when necessary to respond to other various mission sets. APD Cleaves will also testify that the physical characteristics and infrastructure of the Port of El Paso affect its operational capacity. He will testify to the size, location, and makeup of the Port's facilities; the unique challenges these facts pose; and how these facts impact the Port's operational capacity. He will also testify to the concerns that arise because of these considerations, such as the potential for overcrowding, officer safety, and limited resources, and the impact these concerns have on the Port's overall ability to receive, process, hold, and transport individuals. In addition to these factors, APD Cleaves will testify to the various mission sets over which the Port of El Paso is responsible for executing. He will testify to the nature of the mission sets, the Port's |

79

| Name | Address | Qualifications | Testimony |
|------|---------|----------------|-----------|
| | | | involvement, and the fluidity of the operational needs in responding to the various missions on a given day. |
| | | | APD Cleaves will opine that on Sunday, June 17, 2018, the Port of El Paso was operating beyond its operational capacity during its midnight shift and at or near its operational capacity for all other shifts, based on the El Paso Field Office Queue Management Reports, MCAT reports, shift and daily intake reports, SIGMA data, CSIS data, and emails pertaining to port operations on or about June 17, 2018. He will provide testimony that offers a snapshot into port operations for that specific day and provide an overview of significant events and the impact those events had on the Port's operational capacity to process undocumented migrants. |
| Mariza Marin, Assistant Director of Field Operations, Border | 720 East San Ysidro Blvd., San Ysidro, CA 92173 | ADFO Marin is the San Diego Field Office's foremost subject matter expert in operations in the San | ADFO Marin will testify as to physical holding space in the AEU and the mandatory and discretionary factors that |

| Name | Address | Qualifications | Testimony |
|------|---------|----------------|-----------|
| Security, San Diego Field Office, U.S. Customs and Border Protection | | Ysidro Port of Entry's Admissibility Enforcement Unit (AEU). ADFO Marin has overseen the AEU for the last five years—as a second-line, then third-line, and now fourth-line supervisor. She also spent approximately two years in the AEU as a line CBP Officer. ADFO Marin has extensive firsthand knowledge of the work performed in the AEU; the laws, regulations, and policies applied by CBP Officers assigned to the AEU; and the operational constraints and significant events that have impacted the AEU since January 2016 | impact the AEU's operational capacity to process individuals without documents sufficient for lawful entry to the United States. ADFO Marin will testify as to how the requirements set forth in CBP's National Standards on Transportation, Escort, Detention and Search impact the AEU's operational capacity. She will testify that, since January 2016, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations has often not assumed custody of individuals from CBP's AEU until after 72 hours. She will testify that, as a result, CBP takes into account the length of time that individuals have spent in its custody when determining the operational capacity of the AEU, and that, as those times increase, CBP endeavors to give those in custody more space by taking in fewer individuals from the queue. ADFO Marin will also testify that the operational capacity of the |

| Name | Address | Qualifications | Testimony |
|------|---------|----------------|-----------|
|      |         |                | AEU is often impacted by the number of individuals brought to the AEU on days prior and the extent to which they are still pending intake and/or processing. ADFO Marin will testify that the operational capacity of the AEU is impacted by the necessity that CBP act conservatively in taking in individuals from the queue in order to safeguard operations against inherent unknowns, such as the number of individuals who will enter CBP's custody in the AEU after being apprehended attempting to illegally enter the United States. She will further testify that the operational capacity of the AEU is impacted by staffing and other resource allocations and constraints amongst OFO's mission sets. She will further testify that the operational capacity of the AEU is impacted by law enforcement operations and significant incidents occurring or expected to occur at or near a particular POE, and, at |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| Name | Address | Qualifications | Testimony |
|------|---------|----------------|-----------|
| | | | times, by significant events impacting the community or society at large, such as the current pandemic.

ADFO Marin will testify that she reviewed AEU Custody Reports, AEU Shift Passdown Reports, the San Diego Field Office's overtime budget for fiscal year 2018, and emails pertaining to the AEU's operations on June 17, 2018 and surrounding dates. ADFO Marin will opine that the number of individuals that were in CBP's custody in the AEU at 2200 hours on Sunday, June 17, 2018, can be attributed to factors such as (1) the demographics, characteristics, and length of time in custody of the individuals in the AEU on that day and the days leading up to that day; (2) the number of individuals that the Instituto Nacional de Migración (INAMI) brought forward from the queue on that day and preceding days; (3) the number of individuals in |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| Name | Address | Qualifications | Testimony |
|------|---------|----------------|-----------|
| | | | AEU custody pending intake and/or processing on June 17, 2018; (4) CBP's need to proceed conservatively in taking in individuals from the queue in order to safeguard operations against inherent unknowns; and (5) the AEU's reduction in overtime spending in the weeks leading up to June 17, 2018, resulting in decreased staffing in the AEU for these weeks.<br><br>ADFO Marin may also testify regarding the facts and conclusions set forth in her October 9, 2019 Declaration (*see, e.g.*, ECF No. 406-28). |

## C.    Fact Witnesses Defendants May Call if Need Arises at Trial

| Name | Address & Telephone Information |
|------|-------------------------------|
| Any witness called by Plaintiffs in their case in chief. | N/A |
| Any individual necessary to authenticate or respond to evidentiary objections to documents listed on Defendants' exhibit lists or used for impeachment purposes. | N/A |

| Todd Owen, former Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection | ███████████ ██████ This witness would be testifying concerning work done in his official capacity, and may be contacted through counsel for Defendants. |
| --- | --- |
| Hector Mancha, Director, El Paso Field Office, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 9400 Viscount, El Paso, TX 79925 This witness may be contacted through counsel for Defendants. |
| Joseph Draganac, Deputy Executive Director, Operations, Office of Field Operations, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 1300 Pennsylvania Avenue NW, Washington, D.C., 20229 This witness may be contacted through counsel for Defendants |
| Guadalupe Ramirez, Director, Field Operations, Tucson Field Office, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 4760 Oracle Rd, Ste. 316, Tucson, AZ 85705 This witness may be contacted through counsel for Defendants |
| Efrain de los Santos, Supervisory CBP Officer (Chief), Hidalgo Port of Entry, Office of Field Operations, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 9901 S. Cage Boulevard, Ste. B, Pharr, TX 78577 This witness may be contacted through counsel for Defendants. |
| Adriana Gonzalez, Assistant Port Director, Brownsville Port of Entry, Office of Field Operations, U.S. Customs and | U.S. Customs and Border Protection, 3300 S. Expressway 77/83, Brownsville, TX 78251 |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| Border Protection | This witness may be contacted through counsel for Defendants. |
|---|---|
| Gloria Chavez, Chief Patrol Agent, El Paso Sector, U.S. Border Patrol; former Commander, Migration Crisis Action Team (MCAT), U.S. Customs and Border Protection | U.S. Customs and Border Protection, 8901 Montana Avenue, El Paso, TX 79925<br><br>This witness may be contacted through counsel for Defendants. |
| Bryan Molnar, former Assistant Director, Administrative Investigations and Intake, Office of Professional Responsibility, U.S. Customs and Border Protection | U.S. Attorney's Office for the District of Columbia<br><br>555 4th Street NW, Washington, DC 20530<br><br>This witness would be testifying concerning work done in his official capacity, and may be contacted through counsel for Defendants |
| Sidney Aki, Port Director, San Ysidro Port of Entry, Office of Field Operations, U.S. Customs and Border Protection | U.S. Customs and Border Protection, 720 East San Ysidro Blvd., San Ysidro, CA 92173<br><br>This witness may be contacted through counsel for Defendants. |
| Scott Glabe, Assistant Secretary, U.S. Department of Homeland Security | U.S. Department of Homeland Security, 2707 Martin Luther King Jr. Avenue, SE Washington, DC 20032<br><br>This witness may be contacted through counsel for Defendants. |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

## D.    Deposition Designations

| Deposition | Beginning Page: Line | Ending Page: Line |
|---|---|---|
| Todd Owen | 9:11 | 10:6 |
| Todd Owen | 17:6 | 18:20 |
| Todd Owen | 27:14 | 32:1 |
| Todd Owen | 32:7 | 34:13 |
| Todd Owen | 35:7 | 36:20 |
| Todd Owen | 37:19 | 40:4 |
| Todd Owen | 43:2 | 43:6 |
| Todd Owen | 44:8 | 45:19 |
| Todd Owen | 63:17 | 72:14 |
| Todd Owen | 72:17 | 73:1 |
| Todd Owen | 74:2 | 75:22 |
| Todd Owen | 76:1 | 77:1 |
| Todd Owen | 94:21 | 95: 6 |
| Todd Owen | 97:22 | 98: 12 |
| Todd Owen | 98:15 | 100:1 |
| Todd Owen | 113:4 | 115:4 |
| Todd Owen | 116:6 | 117:1 |
| Todd Owen | 151:14 | 152:13 |
| Todd Owen | 154: 17 | 155:8 |
| Todd Owen | 186:7 | 190:19 |
| Todd Owen | 199:10 | 203:20 |
| Todd Owen | 215:9 | 219:15 |
| Todd Owen | 274:13 | 275:6 |
| Todd Owen | 285:6 | 287:1 |
| Todd Owen | 312:20 | 319:8 |

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

| Deposition | Beginning Page: Line | Ending Page: Line |
|---|---|---|
| Todd Owen | 320:2 | 322:1 |
| Scott Glabe | 110:11 | 116:20 |
| Scott Glabe | 173:6 | 178:7 |
| Scott Glabe | 183:11 | 188:21 |

DATED: November 9, 2020                 Respectfully submitted,

                                        JEFFREY BOSSERT CLARK
                                        Acting Assistant Attorney General
                                        Civil Division

                                        WILLIAM C. PEACHEY
                                        Director, Office of Immigration Litigation –
                                        District Court Section

                                        */s/ Katherine J. Shinners*
                                        KATHERINE J. SHINNERS
                                        Senior Litigation Counsel
                                        United States Department of Justice
                                        Civil Division
                                        Office of Immigration Litigation
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, D.C. 20044
                                        Tel: (202) 598-8259 | Fax: (202) 305-7000
                                        katherine.j.shinners@usdoj.gov

                                        ALEXANDER J. HALASKA
                                        DHRUMAN Y. SAMPAT
                                        Trial Attorneys

                                        *Counsel for Defendants*

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT

## **CERTIFICATE OF SERVICE**

No. 17-cv-02366-BAS-KSC

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: November 9, 2020          Respectfully submitted,

*/s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
United States Department of Justice

DEFS.' MEM. OF CONTENTIONS OF
LAW & FACT