MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, DC 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, DC 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | Hearing Date: January 19, 2021 |
| | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, DC 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

I.   INTRODUCTION ...................................................................................... 1

II.  BACKGROUND ........................................................................................ 2

    A.   The Preliminary Injunction ............................................................ 2

    B.   The Clarification Order & Order on Plaintiffs' Emergency
    Motion .............................................................................................. 3

    C.   The Parties' Conferrals Regarding Compliance Obligations .......... 5

III. ARGUMENT .............................................................................................. 7

    A.   The Court Should Issue an Order Enforcing Its Prior Orders in
    Light of Defendants' Continued Non-Compliance ........................... 7

    B.   Defendants and EOIR Lack a Plan or Timeline to Comply with
    the Preliminary Injunction and the Clarification Order ................... 9

    C.   Defendants and EOIR Have Not Taken Appropriate Steps To
    Comply with the PI ........................................................................ 12

        a.   Making all reasonable efforts to identify class members ........ 12

        b.   Informing certain PI class members of their potential
        class membership and the existence and import of the
        preliminary injunction ............................................................. 19

        c.   Affirmative steps to reopen or reconsider ineligibility
        determinations that violated the preliminary injunction ........... 22

IV.  CONCLUSION ......................................................................................... 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

**Cases**

3

4

*A.H.R. v. Washington State Health Care Auth.*, 469 F. Supp. 3d 1018 (W.D. Wash. 2016)................................................................11

5

*Al Otro Lado, Inc. v. Wolf*, 945 F.3d 1223 (9th Cir. 2019) .........................................3

6

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) ..................................3, 8, 13, 14

7

8

*Armstrong v. Brown*, 857 F. Supp. 2d 919 (N.D Cal. 2012), *aff'd*, 732 F.3d 955 (9th Cir. 2013) .............................................................8

9

10

11

*Capital Area Immigrants' Rights Coalition v. Trump ("CAIR")*, 2020 WL 3542481 (D.D.C. June 30, 2020), *appeal filed*, No. 20-5271 (D.C. Cir. Aug. 31, 2020).............................................................24, 25

12

*Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000).............................................................21

13

14

15

*Fraihat v. U.S. Immigr. & Customs Enf't*, 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020), *appeal filed,* No. 20-56297 (9th Cir. Dec. 7, 2020).............................................................8, 9

16

*Fraihat v. U.S. Immigr. & Customs Enf't*, 2020 WL 2758553 (C.D. Cal. May 15, 2020).............................................................20

17

18

*Gonzalez v. Barr*, 2020 WL 3402227 (N.D. Cal. June 19, 2020) .........................20

19

*Hadix v. Caruso*, 461 F. Supp. 2d 574 (W.D. Mich. 2006) ...................................11

20

*Johnson v. Rank*, 1984 WL 48801 (N.D. Cal. Dec. 7, 1984)................................11

21

*Laube v. Haley*, 234 F. Supp. 2d 1227 (M.D. Ala. 2002) ......................................11

22

*Meinhold v. U.S. Dep't. of Def.*, 34 F.3d 1469 (9th Cir. 1994)...............................8

23

*Ms. L v. ICE*, No. 18-cv-428 (S.D. Cal. Dec. 2, 2020), Dkt. 560 ..........................12

24

25

*Hoffman ex rel. N.L.R.B. v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268 (9th Cir. 1976) ....................................................9

26

27

*Nat'l Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163 (9th Cir. 2001)..............................................................7, 8, 9

28

*Scholl v. Mnuchin*, 2020 WL 5877674 (N.D. Cal. Oct. 2, 2020) ........................... 20

*Shillitani v. United States*, 384 U.S. 364 (1966) ....................................... 7

*Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) ................................. 20, 21

*Wyatt By and Through Rawlins v. Poundstone*, 892 F. Supp. 1410
    (M.D. Ala. 1995) ........................................................................... 11

**Statutes, Rules and Regulations**

8 C.F.R. §§ 208.6, 1208.6 ................................................................ 19

8 C.F.R. § 1003.1(d)(3)(iv) .............................................................. 24

Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829
    (July 16, 2019), *codified at* 8 C.F.R. §§ 208.13(c)(4),
    1208.13(c)(4) ....................................................................... 2

Fed. R. Civ. P. 62(d) .................................................................... 8

**Other Authorities**

Daniel Gonzalez, "628 Parents of Separated Children Are Still
    Missing. Here's why Immigrant Advocates Can't Find Them.",
    USA Today (Dec. 11, 2020),
    https://www.usatoday.com/story/news/nation/2020/12/11/immigra
    nt-advocates-cant-locate-parents-separated-border-
    children/3896940001/ ............................................................ 12

*Metering Update: November 2019*, Strauss Ctr. for Int'l Sec. & Law
    at the Univ. of Tex. at Austin & Ctr. for U.S.-Mex. Studies at the
    Univ. of Cal. San Diego Sch. of Global Policy and Strategy (Nov.
    2019), available at https://www.strausscenter.org/wp-
    content/uploads/MeteringUpdate_191107.pdf. ............................ 15

# I.      INTRODUCTION

Over a year ago, the Court entered a preliminary injunction ("PI") ordering the government not to apply the Asylum Ban to individuals who were metered prior to July 16, 2019. After the government's selective compliance with the PI, the Court issued an order clarifying the steps the government must take to ensure compliance ("Clarification Oder"). Six weeks have passed since the entry of the Clarification Order, and it is clear that Defendants never intended to fully comply with the Court's PI or the Clarification Order. Instead, Defendants have appealed the Clarification Order to the Ninth Circuit, rehashing failed arguments in the hope that the same court will issue a different ruling on a motion to stay effectively the same injunction it denied nine months ago. But this Court retains jurisdiction to enforce its prior orders—despite the pending appeal—and should exercise that authority here.

PI class members living with the consequences of Defendants' refusal to provide them access to the U.S. asylum process should not have to wait any longer to receive the benefits of the PI. The more time that passes, the more difficult it will be to identify, locate, provide notice to, and reopen or reconsider cases of those entitled to PI relief—time is of the essence. The parties have conferred extensively about the meaning and requirements of the PI and the Clarification Order (collectively, "the Orders"), yet Defendants have not developed a comprehensive plan for implementing the Orders, have not obtained copies of metering waitlists to ascertain the class, have resisted adopting adequate notice that would plainly and simply explain the existence and import of the PI, have not developed a process for reopening and reconsidering the cases of PI class members who received negative asylum determinations based on the Asylum Ban, and have refused to share class member information with Plaintiffs without an unduly restrictive protective order. Defendants are myopically focused on pushing through the removals of those PI class members slated for imminent removal, without a concrete plan for how to properly screen such individuals for PI relief. Defendants single-mindedly pursue

MEMO OF P. & A. IN SUPP. OF PLS' MOT. TO
ENFORCE PRELIMINARY INJUNCTION

this goal to the detriment of efforts to ensure compliance for the majority of class members, including those who were removed to countries where they face potential persecution or torture. Without class member information and an implementation plan for individuals not in custody or removal proceedings, Plaintiffs are unable to move forward with their efforts to notify and protect the rights of those PI class members. Thus, Court oversight of the government's compliance efforts and enforcement of its prior orders are necessary and appropriate at this time.

## II.   BACKGROUND

### A.   The Preliminary Injunction

This case concerns a challenge to the government's practice of turning back asylum seekers at the U.S.-Mexico border, including through the practice of metering. While the case was pending, on July 16, 2019, the government issued a regulation that generally rendered individuals ineligible for asylum if they transited through a third country en route to the United States but did not seek asylum in that third country (the "Asylum Ban").[2]

On November 19, 2019, the Court provisionally certified a class consisting of "*all* non-Mexican asylum-seekers who were unable to make a direct asylum claim at a U.S. POE before July 16, 2019 because of the government's metering policy, and who continue to seek access to the U.S. asylum process" ("PI class members"). Dkt. 330 at 36 (emphasis added). The court also (a) enjoined the government from "applying the Asylum Ban to members of the aforementioned provisionally certified class" and (b) ordered the government to "return to the pre-Asylum Ban practices for processing asylum applications of members of the certified class." *Id.* (the "PI"). The Court's order was based on its interpretation of the Asylum Ban as not applying to PI class members, who by definition attempted to enter or arrived at the southern border before July 16, 2019. *Id.* at 31.

---

[2] Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019), *codified at* 8 C.F.R. §§ 208.13(c)(4), 1208.13(c)(4).

MEMO OF P. & A. IN SUPP. OF PLS' MOT. TO
ENFORCE PRELIMINARY INJUNCTION

Defendants appealed the PI and sought a stay pending appeal. The Ninth Circuit entered an administrative stay on December 20, 2019. *Al Otro Lado, Inc. v. Wolf*, 945 F.3d 1223, 1224 (9th Cir. 2019). But, after briefing and oral argument, the Ninth Circuit denied the government's motion for a stay, finding that "[t]he government has made a weak showing that it will suffer harm" while the appeal is pending and that the "the government has most definitely failed" to make a strong showing of likelihood of success on the merits because this Court's legal reasoning "has considerable force" and "is likely correct." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007-14 (9th Cir. 2020).

**B.    The Clarification Order & Order on Plaintiffs' Emergency Motion**

On July 17, 2020, Plaintiffs filed a Motion for Clarification of the Preliminary Injunction. Dkt. 494. The motion was predicated on Defendants' minimal and insufficient steps to identify class members and to ensure that the Asylum Ban does not impact their eligibility for asylum. Dkt. 494-1 at 1.

While the Motion for Clarification was pending, Plaintiffs learned that Defendants were about to deport a PI class member whose name was on the Tijuana waitlist and who had been deemed ineligible for asylum under the Asylum Ban (the "Applicant"). Plaintiffs filed an Emergency Motion to enjoin the Applicant's removal from the United States until she was afforded a credible fear determination on the merits. Dkt. 574.

On October 30, 2020, the Court issued an Order granting Plaintiffs' Motion for Clarification. The Court rejected Defendants' argument that the Asylum Ban does not apply to PI class members whose asylum denials became administratively final prior to issuance of the injunction or while the injunction was administratively stayed. Recognizing that the purpose of the PI was to return PI class members to the status quo ante prior to promulgation of the Asylum Ban, the Court concluded that the PI "must provide redress to all those metered [before July 16, 2019] in order to restore equity." Dkt. 605 at 11 (noting PI "was structured to restore class members

to the status quo by preventing the application of the Asylum Ban to class members who, but for metering, would have had the opportunity to enter the United States before the regulation imposed additional asylum eligibility requirements.").

The Court also held that "requiring class members to identify their right to relief under the Preliminary Injunction is an unreasonable allocation of the notice burdens under Rule 23(d)" and that it is thus "appropriate for Defendants to make reasonable efforts to aid in identifying potential class members at all stages of removal proceedings." Dkt. 605 at 21-22. At the same time, the Court held that Defendants' notice obligation should be limited to those in removal proceedings or in U.S. Department of Homeland Security ("DHS") custody, as Plaintiffs' counsel will "have access to the same contact details of class members and can facilitate the notification process" for those who either were removed from the United States or are otherwise not in custody or pending proceedings. *Id.* at 22. Relatedly, the Court ordered Defendants to share existing lists of potential PI class members and other information regarding the identities of PI class members with Plaintiffs. *Id.* at 23.

In light of the above, the Court clarified the PI, in relevant part, as follows:

"(2) DHS and EOIR must take immediate affirmative steps to reopen or reconsider past determinations that potential class members were ineligible for asylum based on the Asylum Ban, for all potential class members in expedited or regular removal proceedings. . . .;

(3) Defendants must inform identified class members in administrative proceedings before USCIS or EOIR, or in DHS custody, of their potential class membership and the existence and import of the preliminary injunction; and

(4) Defendants must make all reasonable efforts to identify class members, including but not limited to reviewing their records for notations regarding class membership . . . and sharing information regarding class members' identities with Plaintiffs."

*Id.* at 25.[3]

On that same day, the Court also granted Plaintiffs' Emergency Motion. *See*

---

[3] The Court also clarified that EOIR is bound by the injunction. *Id.* at 24. That aspect of the Clarification Order is not directly pertinent to the present dispute.

MEMO OF P. & A. IN SUPP. OF PLS' MOT. TO
ENFORCE PRELIMINARY INJUNCTION

Dkt. 607. The Court found that the class-screening questions that had been asked of the Applicant were ambiguous and that the photocopy of the Tijuana waitlist with the Applicant's name on it established her class membership. *Id.* at 10-11. The Court ordered Defendants to provide the Applicant with a merits-based determination on her asylum claim, in compliance with the PI. *Id.* at 11-13, 15.

## C.    The Parties' Conferrals Regarding Compliance Obligations

The parties have conferred on several occasions regarding Defendants' efforts to implement the PI, including as clarified in the Clarification Order (collectively, the "Orders"). *See generally* Lev Decl. In the course of these consultations Plaintiffs realized that Defendants did not have, and did not intend to develop, a comprehensive plan to comply with the Clarification Order; read the Clarification Order in an unduly narrow light; and were inappropriately focused on providing notice to, and reopening or reconsidering the cases of, discrete subsets of PI class members. *Id.* ¶ 5. Moreover, Defendants insisted on moving forward with screening this discrete subset of potential PI class members for class membership, prior to developing appropriate class membership screening procedures. *Id.* In these consultations, the last of which took place over three weeks after issuance of the Clarification Order, Defendants were often unable to provide meaningful answers to Plaintiffs' questions regarding specific steps they intended to take to comply with the Clarification Order or a timeline for compliance. *Id.* For example, Defendants could not provide answers to questions about next steps in the comprehensive identification of PI class members, including a process by which PI class members affirmatively could assert class membership. *Id.*

Defendants were also unwilling to share information with Plaintiffs regarding the identities of PI class members, as required by the Clarification Order, absent entry of a restrictive protective order ("PO"). *Id.,* ¶ 6. Plaintiffs do not believe a PO is required but agreed to the entry of a reasonable PO. The parties conferred but were unable to reach agreement regarding the terms of such a PO. *Id.*

In light of these discussions, on November 25, 2020, Plaintiffs sent Defendants a letter requesting that Defendants provide a written implementation plan outlining the steps they intend to take to comply with the Clarification Order and a timeline for taking those steps. The letter also set out Plaintiffs' understanding of the requirements of the Orders, Plaintiffs' position with respect to a PO and the issues as to which the parties appeared to be at an impasse. *Id.*, ¶¶ 7, 23-29.

Defendants responded by letter dated December 2, 2020, and the parties held their final conference regarding these issues on December 4, 2020. *Id.*, ¶¶ 7, 30-48. On December 7, 2020, Defendants rejected Plaintiffs' final proposal regarding Defendants' proposed PO. *Id.*, ¶ 7, 30-49.

The parties' discussions and correspondence make clear that the parties are at an impasse regarding the following issues:

*Overall implementation*

1.     Defendants' refusal to provide a written implementation plan outlining the steps they intend to take to comply with the Clarification Order and a timeline for taking those steps;

*Paragraph (4) of the Clarification Order*

2.     Defendants' unwillingness to obtain additional metering waitlists from their Mexican counterparts;

3.     Defendants' unwillingness to treat an individual's name on a metering waitlist prior to July 16, 2019 as presumptive evidence of PI class membership;

4.     Defendants' unwillingness to treat an individual's inspection at a POE on a date when the waitlist numbers being called for entry at that POE were issued prior to July 16, 2019 as presumptive evidence of PI class membership;

5.     Defendants' unwillingness to disclaim reliance on statements made during Defendants' faulty prior efforts at PI class membership screening (such as the screening of the Applicant) in determining class membership;

6.     Defendants' insistence that a PO is required to provide Plaintiffs with

information regarding potential PI class members and the provisions of such a PO (discussed in greater detail below);

> *Paragraph (3) of the Clarification Order*

7.      What constitutes adequate notice under paragraph (3) of the Clarification Order;

> *Paragraph (2) of the Clarification Order*

8.      Defendants' failure to establish a process by which individuals potentially eligible for reopening/reconsideration can submit evidence of class membership equivalent to any procedures adopted for those in DHS custody;

9.      Defendants' intent to exclude from reopening/reconsideration relief PI class members who were deemed ineligible for asylum based on the Asylum Ban, where the asylum denial decision also identifies an alternative non-categorical reason for denying asylum;

10.     Defendants' intent to exclude from reopening/reconsideration relief PI class members to whom the Asylum Ban was applied at an intermediate stage of the process (e.g., immigration court), where the final adjudicator (e.g., the Board of Immigration Appeals ("BIA")) denied asylum only on a basis other than the Asylum Ban;

11.     Defendants' intent to not screen individuals with final determinations after June 30, 2020 for PI class membership or reopening/reconsideration relief. *Id.*, ¶ 51.

## III.    ARGUMENT

### A.    The Court Should Issue an Order Enforcing Its Prior Orders in Light of Defendants' Continued Non-Compliance

"[C]ourts have inherent power to enforce compliance with their lawful orders." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). The general rule that a district court loses jurisdiction over a matter with the filing of a notice of appeal is "not . . . absolute." *Nat'l Res. Def. Council, Inc. v. Sw. Marine Inc.* ("*NRDC*"), 242

F.3d 1163, 1166 (9th Cir. 2001). "The district court retains jurisdiction during the pendency of an appeal to act to preserve the status quo." *Id.* This exception is "codified in [then-]Rule 62(c) [now Rule 62(d)] of the Federal Rules of Civil Procedure, which allows a district court to 'suspend, modify, restore, or grant an injunction during the pendency of the appeal […].'" *Id.* Accordingly, despite a pending appeal, a district court may clarify, modify, supervise compliance with, or enforce an injunction, so long as "the changes preserve[] the status quo and d[o] not materially alter the status of the case on appeal." *Id.* (affirming modification of injunction while appeal was pending); *Meinhold v. U.S. Dep't. of Def.*, 34 F.3d 1469, 1480 n.14 (9th Cir. 1994) (clarifying and supervising compliance with injunction while appeal pending was proper); *Fraihat v. U.S. Immigr. & Customs Enf't*, 2020 WL 6541994, at *6-13 (C.D. Cal. Oct. 7, 2020), *appeal filed,* No. 20-56297 (9th Cir. Dec. 7, 2020) (clarifying and ordering additional monitoring of compliance with injunction while appeal pending); *Armstrong v. Brown*, 857 F. Supp. 2d 919, 949, 951 (N.D Cal. 2012), *aff'd*, 732 F.3d 955 (9th Cir. 2013) (enforcing prior order and finding that "a district court has continuing jurisdiction in support of its judgment, and 'until the judgment has been properly stayed or superseded, the district court may enforce it ....' " (citations omitted)).

Given Defendants' continued noncompliance, *see infra*, the Court should issue an order enforcing its prior Orders to preserve the status quo, Defendants' appeals of the Orders notwithstanding. *See* Dkt. 335 (notice of appeal of PI); Dkt. 634 (notice of appeal of Clarification Order). On March 5, 2020, the Ninth Circuit denied Defendants' motion to stay the PI pending appeal; thus, the PI is in effect. *Al Otro Lado*, 952 F.3d at 1015-16. On October 30, 2020, the Court entered the Clarification Order—in part—to preserve the status quo enshrined in the PI because of developing information regarding Defendants' noncompliance with the "equitable purpose of" the PI. Dkt. 605 at 10-12. Enforcing the Orders would not "materially alter the status of the case on appeal" because it would merely further

explain and order compliance with the Court's prior decision regarding the applicability of the Asylum Ban to those metered before July 16, 2019, as set forth in the PI. *NRDC*, 242 F.3d at 1166-67 (no material alteration where defendant "had a full and fair hearing on the[] core issues before the district court . . . .").

More than a month after its issuance, Defendants have failed to comply or even provide a plan for compliance with the terms of the Clarification Order. Defendants' disregard for preserving the status quo as required under the Orders is particularly troubling given the potential harm to PI class members. *See* Dkt. 607 (granting emergency relief to stay removal of the Applicant). Enforcing this Court's prior Orders to ensure compliance with the purpose and intent of the PI is appropriate and necessary. *See Hoffman ex rel. N.L.R.B. v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1276 (9th Cir. 1976) (court retains jurisdiction "where the court supervises a continuing course of conduct and where as new facts develop additional supervisory action by the court is required, . . . even though in the course of that supervision the court acts upon or modifies the order from which the appeal is taken."); *Fraihat*, 2020 WL 6541994, at *6 (modifying and clarifying an injunction, "in keeping with the original purposes of the PI Order," in order "[t]o ensure the twin goals of compliance and not disturbing the appeal").

**B.    Defendants and EOIR Lack a Plan or Timeline to Comply with the Preliminary Injunction and the Clarification Order**

As discussed above and set forth in greater detail in the Lev Declaration, the parties' consultations have demonstrated that Defendants do not have, and do not intend to timely develop, a comprehensive plan governing their compliance with the Orders. Lev Decl., ¶¶ 5, 9, 51(a). To the contrary, Defendants' compliance efforts appear to consist of disparate efforts to comply with only certain provisions of the Clarification Order in a haphazard manner, with no logical sequencing of steps, no sense of urgency, and no targeted end date. For example, Defendants have repeatedly stated that their first priority is to provide notice to individuals in DHS custody

whose removal has been stayed pending a determination of such individuals' class membership. *Id.*, ¶ 5, 13. But Defendants are intent on providing such notice before they have developed specific plans for how such class membership will be determined or what will happen to those individuals found to be class members. *Id.*, ¶¶ 5, 10, 14. This is putting the cart before the horse. While Plaintiffs do not object in principle to providing such notice, Defendants' drafted notice was confusing and did not contain critical information necessary to inform recipients of how to establish class membership and vindicate their rights under the PI. *Id.*, ¶ 13.

Moreover, this piecemeal approach to compliance has rendered Defendants often unable to answer questions regarding the compliance steps that they intend to take, *id.*, ¶ 5, which in turn impedes a meaningful opportunity to meet and confer about such issues. For example, over a month after issuance of the Clarification Order, Defendants are still unable to answer questions about: the steps they intend to take comprising "all reasonable efforts to identify PI class members," *id.*; how officials conducting class member screening for those currently in DHS custody will have access to the waitlists that Plaintiffs have provided to the government and that the government has agreed to consult as part of its process of class member identification, *id.*, ¶ 46(e); whether or how individuals potentially entitled to reopening/reconsideration relief will be able to provide evidence of class membership, *id.*, ¶¶ 21, 42, 46(b); or who will make class membership determinations in such cases, *id.*, ¶¶ 21, 46(b). Nor have Defendants been able to provide a timeline by which they intend to meet their obligations under the Orders. *Id.*, ¶¶ 5, 34. To date, Defendants have also been unwilling to share key documents with Plaintiffs, such as the screening questions that will be used to ascertain class membership or the instructions or training to be provided to those tasked with making such determinations. *Id.*, ¶¶ 14, 46(d).

The government's failure to provide any meaningful plan to comply with the PI has hamstrung Plaintiffs' efforts to protect PI class members' rights. The

Clarification Order contemplates information-sharing that will allow Plaintiffs to provide notice to certain PI class members. Having no information about the steps PI class members can take to seek any relief they are due, it is unclear how Plaintiffs can provide meaningful notice to class members.

Defendants' failure to comply with the PI for over a year, their substantive positions regarding compliance with the Clarification Order (discussed below), and their lack of compliance plans or a timeline all demonstrate the need for this Court's intervention. Courts have the discretion to direct parties to submit compliance plans in conjunction with the issuance of preliminary injunctions. *See, e.g., A.H.R. v. Washington State Health Care Auth.,* 469 F. Supp. 3d 1018, 1049-50 (W.D. Wash. 2016) (ordering parties to confer and develop plan for implementing injunction); *Hadix v. Caruso,* 461 F. Supp. 2d 574, 597 (W.D. Mich. 2006) (ordering defendants to provide court with plan for compliance with preliminary injunction); *Laube v. Haley,* 234 F. Supp. 2d 1227, 1253 (M.D. Ala. 2002) (same); *Wyatt By and Through Rawlins v. Poundstone,* 892 F. Supp. 1410, 1423-24 (M.D. Ala. 1995) (requiring defendants to develop implementation plan after seeking and receiving input from plaintiffs); *Johnson v. Rank,* 1984 WL 48801, at *4 (N.D. Cal. Dec. 7, 1984) (requiring defendants to submit implementation plan). Accordingly, Plaintiffs request that the Court direct Defendants to prepare a written implementation plan setting forth the steps that Defendants intend to take to comply with each paragraph of the Clarification Order and a timeline for doing so.

Moreover, in light of the number of issues involved in implementing the Orders (particularly in light of Defendants' failure to maintain appropriate records), Defendants' conduct to date, and the parties' inability to reach agreement on numerous aspects of implementation, Plaintiffs request that Defendants be required to propose an implementation plan to Plaintiffs, that the parties meet and confer, and that the Court establish a mechanism by which remaining areas of disagreement regarding implementation can be raised with this Court in a timely manner. To this

end, Plaintiffs propose that the Court establish regular status conferences regarding Defendants' implementation of and compliance with the Orders.

Finally, time is of the essence. The Court entered the PI over one year ago and the Clarification Order over one month ago. Defendants have been unable or unwilling to provide Plaintiffs with a date certain by which they intend to comply with the Clarification Order. Lev Decl. ¶¶ 5, 9, 34. The passage of time permits more PI class members to be removed from the United States under removal orders that violate the PI. Locating a PI class member and providing them meaningful notice is vastly more difficult when the person has been removed from the United States. *See* Joint Status Report at 7-10, *Ms. L v. ICE*, No. 18-cv-428 (S.D. Cal. Dec. 2, 2020), Dkt. 560 (describing the immense efforts required to attempt to locate deported parents whom the government previously separated from their children, many of whom still have not been found, including extensive phone calls, letters sent via international mail, physical searches in the home country, toll-free hotlines set up in five countries, and broad-based media outreach); *see also* Daniel Gonzalez, "628 Parents of Separated Children Are Still Missing. Here's why Immigrant Advocates Can't Find Them.", USA Today (Dec. 11, 2020), https://www.usatoday.com/story/news/nation/2020/12/11/immigrant-advocates-cant-locate-parents-separated-border-children/3896940001/ (describing in detail the difficulties of physical searches in countries of origin). A firm deadline for production of an implementation plan that includes a timeline for compliance is therefore critical to effectuate the PI's equitable purpose.

## C. Defendants and EOIR Have Not Taken Appropriate Steps To Comply with the PI

### a. Making all reasonable efforts to identify class members

To date, Defendants refuse to make "all reasonable efforts to identify class members," (Dkt. 605 at 25), in four ways.

***First,*** as the Court has previously explained, the metering waitlists from

before July 16, 2019, are the obvious source for identifying the majority of class members. *See, e.g.*, Dkt. 330 at 28 ("Class members are defined by a completely objective criteria: whether these individuals were . . . required to place themselves on a waitlist and effectively 'take a number' before July 16, 2019 pursuant to the U.S. Government's metering policy. *Class membership can be determined by cross-checking a class member's name with the names included on these waitlists*.") (emphasis added); Dkt. 607 at 10-11 (Applicant's name on Tijuana waitlist sufficient to prove class membership); *see also* Dkt. 605 at 23 n. 6 (discussing the waitlists and class ascertainability); *Al Otro Lado*, 952 F.3d at 1009 ("[T]he government could use the waitlists maintained by the Mexican government and others—waitlists it relied on to facilitate the metering policy—as a starting point in determining whether a noncitizen is part of the provisional class"). Plaintiffs maintain "all reasonable efforts to identify class members" means that Defendants should obtain copies of the waitlists from their Mexican counterparts and treat an individual's name on a waitlist prior to July 16, 2019 as presumptive evidence of metering, which Defendants may rebut if they discover facts defeating the presumption in a specific case.

Defendants, however, refuse to obtain copies of the waitlists, despite their prior reliance on and easy access to them. Plaintiffs have made immense efforts to obtain copies of metering waitlists from Tijuana, Mexicali, and Ciudad Juárez and have provided those to Defendants in electronic, text-searchable form. Cassler Decl. ¶¶ 6-7. Plaintiffs lack the ability to access lists from other border towns. *Id.* ¶¶ 3-5. But Defendants' own records and testimony show that they initiate daily contact with Mexican officials who control or have access to the lists, and that Defendants could easily request copies of the waitlists from their Mexican counterparts. *See, e.g.* Dkt. 626-1 at 224:10-15, 280:5-285:16. Based on CBP's own testimony, obtaining the waitlists should be easy for Defendants; they simply do not want to.

Defendants further refuse to consider the metering waitlists as presumptive evidence of metering. Lev Decl., ¶¶ 17-39. Defendants argue that relying on the

waitlists is too difficult because they are not organized by A-number and they may contain occasional typographical errors. Lev Decl., ¶ 17. This "deficiency in Defendants' recordkeeping is . . . of their own making." Dkt. 641 at 2. Furthermore, Defendants have not provided Plaintiffs with any examples of spelling errors on the three lists they possess, let alone the extent of such errors, and they cannot know the rate of spelling errors for other lists, which they have represented they do not possess. Their claims that the lists are unusable ring hollow. But even occasional errors in the lists would not defeat the weight of the waitlists as evidence of metering for those individuals whose names *can* be matched to DHS records. AOL, a small non-profit organization, has successfully utilized copies of the waitlists in their possession to identify individual PI class members. Dkt. 607 at 3 (citing declaration from AOL). DHS, a vast government agency that processes considerable quantities of data on a daily basis, is certainly capable of doing the same.

Defendants also complain that the waitlists may be underinclusive, Lev Decl., ¶ 17, but that only suggests that the waitlists should not be the sole source of evidence of class membership, not that the names on the list should be disregarded. *See Al Otro Lado*, 952 F.3d at 1009 (rejecting Defendants' argument that because the lists are underinclusive, Defendants may refuse to rely on them to determine class membership). Defendants' argument that the lists are unreliable because individuals may be able to bribe their way to inspection before their numbers are called is also nonsensical, as such conduct would not result in an individual wrongly being identified as having been added to the list prior to July 16, 2019.

Finally, Defendants argue that in some instances individuals could add their names to the list remotely. While Plaintiffs agree that if such a practice occurred, the individual's inclusion on the list would not necessarily demonstrate class membership, this is the exception that Defendants would have swallow the rule. But Defendants have not provided any evidence that joining a waitlist remotely was

possible prior to July 16, 2019.[4] If such evidence exists, it is precisely in such circumstances that the presumption of class membership could be rebutted. Defendants' position on the waitlists is indefensible, given this Court's and the Ninth Circuit's prior orders and because Defendants already relied on the waitlists to determine who had previously been metered and was next "in line" for inspection.

*Second*, Defendants refuse to refer to their internal records and available data points about the waitlists to identify potential class members, which means Defendants may decline to recognize class membership even when they have evidence of class membership in their possession. Defendants know when they were metering at particular ports and the dates when they inspected each potential class member. Yet Defendants assert they may ignore this critical evidence bearing on class membership. The case of the Applicant illustrates the problem: she was inspected at the San Ysidro POE on July 29, 2019. Dkt. 626-9 at 22. Defendants argued the Applicant had not proven she was metered. However, Defendants' own Rule 30(b)(6) witness testified that when the San Ysidro POE is metering, as it was on July 29, 2019, all asylum seekers who are not part of a "vulnerable population" (i.e., children) are refused inspection if they did not go through the waitlist. Dkt. 535-19 at 292:3-293:11. Moreover, Defendants also know (for Tijuana) and can easily learn from their Mexican counterparts (for other POEs) the dates on which various waitlist numbers were assigned and called, including the date on which the last waitlist number issued on July 15, 2019 was called (the "last entry date"). *See, e.g.*, Dkt. 607 at 4. Defendants also have access to information regarding whether

---

[4] The quarterly "Metering Updates" authored by Plaintiffs' expert first mention in November 2019 that it was possible to remotely join the metering waitlist in the small border town of Agua Prieta, Sonora. *Metering Update: November 2019*, Strauss Ctr. for Int'l Sec. & Law at the Univ. of Tex. at Austin & Ctr. for U.S.-Mex. Studies at the Univ. of Cal. San Diego Sch. of Global Policy and Strategy (Nov. 2019), available at https://www.strausscenter.org/wp-content/uploads/MeteringUpdate_191107.pdf. In May 2020 (after the COVID-19 pandemic began), a second waitlist was reported to be accepting remote sign-ups. *See* Dkt. 539-3 at 7 n.9.

particular individuals are seeking asylum. Armed with this information, Defendants could readily determine that individuals who were inspected and processed at a POE prior to the last entry date for that POE and sought asylum are likely class members, absent evidence to the contrary. Defendants have refused to take this simple step.

*Third*, as part of their efforts to identify PI class members, Defendants intend to rely on statements made during prior USCIS class member screening interviews. The limited information Defendants have agreed to share about these interviews indicates they resulted in deeply flawed determinations and unreliable statements. The list of questions used for these interviews is, on its face, written in a way that would have certainly excluded class members. Lev Decl., ¶¶ 14-16 & Exh. 1.[5] For example, at the beginning of the interview, if an interviewee responded that she had not "[sought] to enter" the United States prior to July 16, 2019, the interview would end with no additional questioning. *Id.* Exh. 1 at 1 (Question 2(a), directing "no need for additional questions"). But the phrase "seek to enter" is ambiguous, both as to "seek" and as to "enter." Those terms are not defined, interpretation and translation could vary, and the phrase may be understood as referring to attempts to enter without inspection between ports or the physical act of approaching the limit line (as opposed to putting one's name on the waitlist); thus, the answer to this question does not definitively determine class membership. Yet Defendants want to be able to rely on such statements in determining class membership.[6]

---

[5] On November 23, 2020, Defendants for the first time shared with Plaintiffs the class member screening questions used in Defendants' prior efforts to identify class members. Lev Decl., ¶ 14. Plaintiffs subsequently shared some concerns with Defendants about the misleading and confusing way the questions were written. *Id.*, ¶ 16. To date, Defendants have not shared the screening questions that they intend to use for class member screening in conformity with the Clarification Order, notwithstanding Plaintiffs' requests that they do so. *Id.*, ¶¶ 14, 46(d).

[6] There are myriad other problems with the prior screening questions. For example, Question 3 asks whether the interviewee "put [their] name on any sort of list," yet it is likely that the listkeeper, rather than the asylum seeker, physically writes or otherwise enters names on the list. *Id.* at 1. Question 3(a) states that if a person "put [their] name on th[e] list after 7/16/1**6**," rather than July 16, 201**9** (the proper

The case of the Applicant demonstrates the problem: after being asked confusing questions, the interviewer asked the Applicant to confirm an inaccurate summary of her prior testimony, which the Applicant did. Dkt. 607 at 10. As the Court concluded, "[w]hile the Applicant confirmed the accuracy of this summary, the Court finds that this cursory response is outweighed by the ambiguity of the screening questions" and documentary evidence. *Id.* To avoid future errors in determining class membership, Defendants should be precluded from relying on statements made during the prior, faulty screening interviews.

***Fourth***, Defendants contend they may not share class member information with Plaintiffs, despite the Court's prior order to do so, *see* Dkt. 605 at 25, without another Court order that (a) requires such disclosure *again* and (b) limits Plaintiffs' use of such information. Plaintiffs do not oppose entering a mutually agreeable PO covering such information, but such an order is not necessary to authorize the sharing of this information in the first place, given the Court's prior order.

Plaintiffs also reject Defendants' proposed limits on the use of information shared pursuant to the Clarification Order. Plaintiffs would agree to a PO that would limit their use of class member information—including any sharing of such information—for the purpose of facilitating compliance with the Court's Orders. Yet Defendants seek to preemptively and unnecessarily limit Plaintiffs' efforts to do just that. Defendants insist that Plaintiffs must agree to (a) only share class member information with (i) class members, (ii) their attorneys who have filed one of three specific DHS forms used for entering an appearance in agency proceedings, which are not required to establish an attorney-client relationship, or (iii) those individuals for whom the PI class member has provided signed, written consent; and (b) keep records of each disclosure of class member information to be shared with Defendants

---

date), there was no need for additional questions and the interview would end, potentially excluding all PI class members if followed to the letter. *Id.* (emphasis added). And if the interview ended at Question 3(a) as instructed, the interviewer would never ask the following questions about trying and failing to get on a waitlist or opting not to do so. *Id.* at 1-2.

MEMO OF P. & A. IN SUPP. OF PLS' MOT. TO
ENFORCE PRELIMINARY INJUNCTION

at Defendants' request. *See* Lev Decl. ¶ 50 & Exh. 2.

Defendants lack a sound legal basis for these demands, which would unnecessarily limit Plaintiffs' ability to protect the rights of PI class members. The logistics of locating and communicating with PI class members will not be straightforward. PI class members are likely located throughout the world, with varying access to technology, and many may be living in hiding. It may not be possible to obtain a PI class member's written signature on a specified form. And Plaintiffs may need to communicate with such individuals through family members in order to provide notice of the Orders, gather information to determine possibilities for relief, and/or assist in facilitating reopening or reconsideration of prior asylum ineligibility determinations as appropriate. It is commonplace in such situations for counsel to use their professional judgment to act in their clients' best interest, including communicating with family members where direct communication with a client is impossible. Plaintiffs do not anticipate sharing personal class member information willy-nilly—much to the contrary—but Plaintiffs are unwilling to prematurely limit their ability to act to protect PI class members' rights if the need arises. Thus, Plaintiffs propose that they be permitted to share class member information with family members as well as with individuals with whom the PI class member or her attorney or family member consents to share such information, whether such consent be oral or in writing, with the overarching limitation that the Plaintiffs may only do so for the purpose of facilitating compliance with the Orders.

Defendants' refusal to allow Plaintiffs to share information with PI class members' attorneys without the filing of one of three DHS forms would similarly limit Plaintiffs' efforts to protect class members' rights. The specified DHS forms are used to enter an appearance in an agency proceeding. The forms are unnecessary to establish an attorney-client relationship, and PI class members have the right to counsel even if their attorney did not represent them in the past in any agency proceedings. Plaintiffs also have no way of verifying that such a form has in fact

MEMO OF P. & A. IN SUPP. OF PLS' MOT. TO
ENFORCE PRELIMINARY INJUNCTION

been filed. Furthermore, it may be impossible for a PI class member to sign any form authorizing disclosure of information, given the logistical challenges noted above. Defendants refuse to acknowledge that government forms do not apply to non-government actors such as Plaintiffs and they have provided no basis for transposing their own internal administrative rules on Plaintiffs after the Court ordered they share class member information. Given the context, it is unclear what these burdensome requirements would accomplish other than unnecessarily hindering Plaintiffs' efforts to vigorously pursue PI class members' rights.

Finally, Defendants demand that any new PO impose an independent record-keeping obligation on Plaintiffs beyond existing professional and ethical obligations, and they further demand a right to access Plaintiffs' records documenting disclosures of class member information upon request. Again, Defendants have not articulated a legal basis for this requirement other than a belief, unsupported by any authority, that the limits on disclosure of asylum-related information that bind the government, *see* 8 C.F.R. §§ 208.6, 1208.6, must also bind Plaintiffs. This makes no sense, given Defendants' acknowledgement that they may in fact share such information with Plaintiffs upon court order.

Defendants' unwillingness to share class member information with Plaintiffs—which was ordered a month and a half ago—has hindered Plaintiffs' ability to meaningfully assist in identifying, providing notice to, and protecting the rights of PI class members. Plaintiffs therefore seek (another) Court order directing Defendants to share this information.

> **b.   Informing certain PI class members of their potential class membership and the existence and import of the preliminary injunction.**

The Court has required Defendants to provide notice to identified class members "in expedited removal proceedings, regular removal proceedings, or otherwise in DHS custody." Dkt. 605 at 22 ("Paragraph 3 Notice"). Paragraph 3

Notice must inform the recipients of their "potential class membership," and must describe the PI—its "existence"—and the injunction's meaning and significance—its "import." *See* "Import," Merriam-Webster.com, https://www.merriam-webster.com/dictionary/import ("to bear or convey as meaning or portent: SIGNIFY"). To explain the meaning and significance of the PI to a PI class member, the notice should address: (i) the process for establishing PI class membership, including a meaningful description of next steps that allows individuals to prepare to establish class membership (e.g., USCIS screening interview and its timing, opportunity to provide evidence, and description of evidence accepted); (ii) the relief afforded to PI class members (i.e., that the Asylum Ban may not be applied to them and that certain class members may be entitled to have prior determinations reopened or reconsidered); and (iii) any additional process required to obtain the reopening and reconsideration relief afforded to certain PI class members. Notice that fails to adequately explain these aspects of the PI or explains them in a confusing or misleading manner would not satisfy the Paragraph 3 Notice requirement.

Adequate Paragraph 3 Notice may not fail to inform PI class members "*how* to take advantage of*" the relief granted under the PI. *Walters v. Reno*, 145 F.3d 1032, 1043 (9th Cir. 1998). Furthering this principle, district courts in the Ninth Circuit have ordered class notice or otherwise required the dissemination of information specifying how class members can assert class membership and how to access relief afforded in a court order. *See, e.g.*, *Fraihat v. U.S. Immigr. & Customs Enf't*, 2020 WL 2758553, at *6 (C.D. Cal. May 15, 2020) (requiring notice to "advise detainees of how to inform" government officials and detention facility staff of eligibility for relief); *Gonzalez v. Barr*, 2020 WL 3402227, at *2 (N.D. Cal. June 19, 2020) (addressing prior order requiring Defendants to provide detailed information about "the process by which Defendants review the cases of detained individuals to determine whether they fall within the class definition" and "the process by which Defendants notify individuals that they will be receiving [relief]"); *Scholl v.*

MEMO OF P. & A. IN SUPP. OF PLS' MOT. TO
ENFORCE PRELIMINARY INJUNCTION

*Mnuchin*, 2020 WL 5877674, at \*5-7 (N.D. Cal. Oct. 2, 2020) (ordering parties to file "a proposed notice plan," including information on how to file for relief).

Adequate notice also must "simply and plainly communicate" the required information. *Walters,* 145 F.3d at 1053; *see id.* at 1041 (criticizing notice "so bureaucratic and cumbersome and in some respects so uninformative and in others so misleading that even those [noncitizens] with a reasonable command of the English language would not receive adequate notice from [it]."); *Fogel v. Zell*, 221 F.3d 955, 962 (7th Cir. 2000) ("If the notice is unclear, the fact that it was received will not make it adequate.").

As explained above, Defendants' implementation efforts have focused on those potential PI class members whose imminent removal was stayed pending a determination of their PI class membership. On December 8, 2020, Plaintiffs received Defendants' proposed final Notice of Potential Class Membership in Cases Subject to Removal ("Proposed Notice"), which Defendants asserted "more than complies with the requirements of Paragraph 3." Lev Decl., ¶ 13. But the Proposed Notice does not adequately explain the import of the PI because it fails to explain when potential PI class members will be screened for class membership—and consequently, by when PI class members would be required to obtain evidence to establish class membership. *Id.* In addition, the Proposed Notice fails to explain how those who have established class membership will be afforded relief. *Id.* PI class members who are not notified about the process for asserting and establishing class membership—including how and when to submit supporting evidence—cannot fully understand the meaning and significance of the PI.

The Proposed Notice also fails to adequately explain the import of the PI because it is unnecessarily confusing and provides misleading definitions of metering and the PI class. *Id.* Specifically, the Proposed Notice mischaracterizes the PI class as including only those who "were subject to metering at a port of entry," as opposed to applying to those subject to the government's metering policy—

MEMO OF P. & A. IN SUPP. OF PLS' MOT. TO
ENFORCE PRELIMINARY INJUNCTION

including those who did not make it physically to a port of entry, but nevertheless were unable to seek asylum at a port of entry. *Id.* The Proposed Notice also adopts Defendants' unnecessarily legalistic definition of metering, as opposed to more neutral and simple language from prior court orders as Plaintiffs had proposed. *Id.* PI class members must understand the core concept of metering to be able to identify themselves as class members, understand what the PI is about, and thereby understand the import of the PI. Therefore, the Court should find that Defendants' Proposed Notice does not satisfy the Paragraph 3 Notice requirements and clarify that Paragraph 3 Notice requires information about how to assert class membership and how to access relief under the PI, which should be explained in plain and simple terms. In addition, the language of the Notice should be either agreed by the parties or approved by the Court as part of the implementation plan discussed above.

### c.  Affirmative steps to reopen or reconsider ineligibility determinations that violated the preliminary injunction

Even without knowing the full extent of Defendants' plans for implementing the Court's Orders, the parties are at an impasse regarding four aspects of the government's duty to "take immediate affirmative steps to reopen or reconsider past determinations that potential class members were ineligible for asylum" based on the Asylum Ban. Dkt. 605 at 25.

***First***, the Court's order to reopen or reconsider such cases applies to *all* PI class members who were previously deemed ineligible for asylum based on the Asylum Ban, whereas Defendants' notice responsibility applies to only those in proceedings or in Defendants' custody. *Id.* But for those to whom Defendants are not required to give notice (i.e., PI class members who were already removed, who were released after entry of a final removal order, or who were granted a different form of relief from removal such as withholding), such individuals must at a minimum have access to a process by which they may assert and provide evidence of class membership and have their cases reopened or reconsidered once they learn

of the PI (likely through notice provided by Plaintiffs). Without access to such a process, a presumably large portion of eligible PI class members will not benefit from the ordered reopening or reconsideration. Yet Defendants have thus far failed to commit to instituting any such process, and without information about how these PI class members can access the relief they may be owed, Plaintiffs are at a loss as to how to provide them with meaningful notice of the PI. The Court should order Defendants to establish a process by which potential PI class members can submit evidence and by which Defendants will make class membership determinations, at least equivalent to the process afforded to those in DHS custody, and include such a proposed process as part of the written implementation plan discussed above.

*Second*, the PI requires that the government "return to the pre-Asylum Ban practices for processing the asylum applications of members of the certified class." Dkt. 330 at 36. Yet Defendants take the position that PI class members who were deemed ineligible for asylum based on the Asylum Ban are not eligible for relief under the PI if the adjudicator also opined that another basis for asylum denial might also apply. Defendants essentially take the position that an ineligibility determination on the basis of the Asylum Ban was something akin to harmless error in such situations. This assertion is misplaced for a number of reasons. First, the Court was clear that PI class members must have the "pre-Asylum Ban practices" for processing asylum applications applied to them. The pre-Asylum Ban practices included an initial eligibility determination untainted by the Asylum Ban in any way. Thus, an adjudicator's offhand remark that she may have, or could have, or even would have denied asylum on an alternative basis should be taken with a grain of salt. The adjudicator would have known at the time that her analysis on any alternative basis for denial would never matter because such an individual was deemed absolutely barred from asylum under the Asylum Ban. It is thus impossible to know if the adjudicator would have reached the same discretionary conclusion if the Asylum Ban did not apply. Second, PI class members to whom the Asylum Ban

was applied had little incentive to challenge legally or factually questionable alternative bases for asylum denial, even if an IJ articulated such a basis in her decision, given that the Asylum Ban was deemed an absolute bar to asylum. Any appeal would have been unwinnable even if the alternative basis for denial amounted to reversible error, leaving little reason to file such an appeal. A "return to pre-Asylum Ban practices" in such cases—new proceedings untainted by the Asylum Ban, in which an adjudicator decides the asylum application on the merits alone—is necessary to effectuate the PI's equitable purpose.

**Third**, there appear to be cases in which an IJ deemed a PI class member ineligible for asylum based on the Asylum Ban, but the BIA dismissed the appeal on some other basis, without remanding to the IJ for an initial asylum determination on the merits. Cases where the IJ decision came before the nationwide vacatur of the Asylum Ban in *Capital Area Immigrants' Rights Coalition v. Trump ("CAIR")*, 2020 WL 3542481 (D.D.C. June 30, 2020), *appeal filed*, No. 20-5271 (D.C. Cir. Aug. 31, 2020), but the BIA dismissed the appeal after *CAIR*, are possible examples. As with the prior group of cases, the government refuses to reopen or reconsider such cases for an asylum decision on the merits in the first instance, despite the Court's order that the government "return to pre-Asylum Ban practices." This is problematic because, under Defendants' plan, PI class members will never have their asylum cases considered by an adjudicator with the authority to engage in factfinding. *See* 8 C.F.R. § 1003.1(d)(3)(iv) (barring the BIA from engaging in factfinding). Given the differences in the burden of proof between asylum (requiring a well-founded fear of persecution, or a 10% chance) and other similar forms of relief like withholding (requiring a probability of persecution or torture, or a 51% chance), *see* Dkt. 605 at 12, being deprived of the opportunity for a factfinder to evaluate the evidence based on the proper burden of proof could change the outcome of a case. Thus, there is no basis for Defendants to refuse to reopen cases in which an IJ never reviewed the application and evidence in light of the asylum standard

MEMO OF P. & A. IN SUPP. OF PLS' MOT. TO
ENFORCE PRELIMINARY INJUNCTION

(the pre-Asylum Ban practice) in the first instance.

*Fourth*, Defendants refuse to screen for further relief those cases in which asylum was denied by an IJ after June 30, 2020—the date the Asylum Ban was vacated in *CAIR*. Defendants have refused, however, to share any guidance distributed to IJs notifying them of the *CAIR* decision; nor have Defendants stated that the Asylum Ban was not applied to any PI class members after that date. Plaintiffs are concerned, based on past examples, that some IJs may not have recognized the import of *CAIR* immediately on July 1, 2020, especially in light of the government's appeal of that decision. *See* Dkt. 605 at 6 (describing IJ decisions refusing to apply the PI in light of the government's appeal). More recently, Plaintiffs learned of a separate IJ decision involving a PI class member denied asylum based on the Asylum Ban. The IJ denied a motion to reopen and reconsider based on the PI, stating that "this Ninth Circuit decision does not govern Fifth Circuit law." Lev Decl., ¶ 52 & Exh. 3. And Plaintiffs are aware of at least one case in which an IJ denied a PI class member asylum after *CAIR* on the basis that the individual did not seek protection in the countries through which she traveled—essentially applying the Asylum Ban under the guise of a "discretionary" determination. Lev Decl., ¶ 53 & Exh. 4. These disturbing mis-applications of the Asylum Ban undermine confidence in the government's contention that decisions made after June 30, 2020 need not be reviewed for application of the Asylum Ban. It may be reasonable for the Defendants to establish a cutoff date after which asylum denials need not be screened. But absent concrete evidence that the government is no longer applying the Asylum Ban as a factual matter, Defendants should not be permitted to treat post-June 30, 2020 asylum denials as outside the scope of the Court's Orders.

## IV. CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court enter the attached proposed order enforcing its prior Orders.

Dated: December 15, 2020

MAYER BROWN LLP
    Matthew H. Marmolejo
    Ori Lev
    Stephen M. Medlock

SOUTHERN POVERTY LAW
CENTER
    Melissa Crow
    Sarah Rich
    Rebecca Cassler

CENTER FOR CONSTITUTIONAL
RIGHTS
    Baher Azmy
    Ghita Schwarz
    Angelo Guisado

AMERICAN IMMIGRATION
COUNCIL
    Karolina Walters

By: */s/ Ori Lev*
    Ori Lev

*Attorneys for Plaintiffs*

MEMO OF P. & A. IN SUPP. OF PLS' MOT. TO
ENFORCE PRELIMINARY INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the foregoing document to be served on all counsel via the Court's CM/ECF system.

Dated:  December 15, 2020                    MAYER BROWN LLP


By  */s/ Ori Lev*