1          United States District Court

2        for the Southern District of California

3                                    )
   AL OTRO LADO, Inc., et al.,       )
4                                    )   No. 17cv2366-BAS
        Plaintiffs,                  )
5                                    )   October 19, 2020
             v.                      )
6                                    )   San Diego, California
   KIRSTJEN NIELSEN, Secretary,      )
7  U.S. Department of Homeland       )
   Security, in her official         )
8  capacity, et al.,                 )

9        Defendants.


10                    TRANSCRIPT OF PROCEEDINGS
11           BEFORE THE HONORABLE CYNTHIA BASHANT
                  United States District Judge
12
   APPEARANCES:
13
   For the Plaintiffs:     SOUTHERN POVERTY LAW CENTER
14                             REBECCA CASSLER
                               Attorney at Law
15
                           AMERICAN IMMIGRATION COUNCIL:
16                             KAROLINA WALTERS
                               Attorney at Law
17
   For the Defendants:     U.S. DEPARTMENT OF JUSTICE
18                             ALEXANDER JAMES HALASKA
                               KATHERINE SHINNERS
19                             Attorneys at Law

20

21

22

23 Court Reporter:         Dana Peabody, RDR, CRR
                           District Court Clerk's Office
24                         333 West Broadway, Suite 420
                           San Diego, California 92101
25                         DanaPeabodyCSR@gmail.com

1       San Diego, California, October 19, 2020

2                          *   *   *

3       THE CLERK:  Good morning, Judge.  It sounds like we

4  have a few more people joining, but I believe we have all

5  counsel present.

6       Counsel, this is Stephanie, Judge Bashant's CRD, and I just

7  wanted to give you some brief information about there's no

8  recording of the proceedings and that all the transcripts can

9  be obtained from Dana, our court reporter, and if you can mute

10  your phone while you're not talking, that would be very helpful

11  because we do tend to pick up a lot of background noise.  So

12  far, everybody seems to have it down.

13       With that, I'm going to go ahead and call the case.

14       Calling Matter Number 10, 17cv2366, Al Otro Lado v.

15  McAleenan, et al., on calendar for oral argument hearing.

16  Thank you.

17       THE COURT:  Counsel, state your appearances for the

18  record, please.

19       MS. CASSLER:  Good afternoon.  This is Rebecca Cassler

20  from Southern Poverty Law Center for the plaintiff, and joining

21  me is my co-counsel, Karolina Walters from the American

22  Immigration Council, also for plaintiffs.

23       MS. WALTERS:  Good morning, Judge.  Karolina Walters.

24       THE COURT:  I'm sorry.  I have Ms. Cassler and

25  Ms. Walters.

1        MS. WALTERS:  I was just saying good morning.  This is

2    Ms. Walters.

3        THE COURT:  Good morning.

4        MS. WALTERS:  There are a number of other members on

5    the line that won't be speaking.  Would you like their

6    appearances also?

7        THE COURT:  No, just the ones that are speaking.

8        Do we have anyone from the government?

9        MR. HALASKA:  Good morning, Your Honor.  This is

10   Alexander Halaska from the U.S. Department of Justice for the

11   government.  I am joined by Katherine Shinners, and I'll be

12   handling the argument this morning.

13       THE COURT:  Okay.  Good morning.

14       And I would ask anyone else who is not speaking, if you

15   could mute your microphone.  As Stephanie pointed out, we do

16   pick up even very slight things, like typing on a keyboard gets

17   translated over the phone a lot more than you might expect.

18       Okay.  I have reviewed all of the documents in this case,

19   including the documents that were filed this morning by the

20   plaintiff.

21       I think I'd like to hear from the plaintiff first.  And the

22   first question I have is when I look through the documents, it

23   looks to me like the asylum officer, and eventually the

24   immigration judge, made a negative credible fear determination,

25   I mean, basically made a credibility determination that she was

1   not entitled to asylum, not necessarily based on the asylum

2   transit ban, but on whether she was entitled to the asylum, and

3   whether or not I agree with that, it seems like if that's the

4   case, then that would take her out of the class.

5       So I guess that's what I'd like to hear from the plaintiffs

6   first, is why hasn't this already been decided by an asylum

7   officer and immigration judge?

8           MS. CASSLER:   Thank you, Your Honor.   This is

9   Ms. Cassler.

10      Before I get into the substance of answering that question,

11  there are a few housekeeping points I'd like to just run

12  through real quick.

13      One, we're going to be referring to this person as the

14  applicant to protect her confidentiality, and we would

15  appreciate if everybody on the line could do that.

16      Second, we would like to discuss the contents of documents

17  that the government has labeled as confidential or highly

18  confidential, so I don't see -- we --

19          THE COURT:   We don't need to seal the proceedings.

20  You can -- you may do so.

21          MS. CASSLER:   Okay.

22      And third, just so you're aware of how we've broken things

23  up, I'm prepared to speak about the facts of the applicant's

24  case, including the question that you just asked, and my

25  colleague, Ms. Walters, is prepared to respond to defendant's

1    other legal arguments as well as the broader questions that

2    this raises about defendant's compliance with the preliminary

3    injunction.

4        So your question whether this was decided or not.  So the

5    paperwork that the government submitted makes clear that her

6    case was only reviewed under the reasonable fear standard,

7    which is a higher burden of proof from the credible fear

8    standard.  And that can be found -- it's laid out in -- so the

9    interim final rule that -- to which the transit ban was

10   promulgated is set out, and I can give you a pin cite if you

11   would like.  It was a different standard of proof that

12   corresponds with the higher standard of proof required to

13   qualify for the removal and CAT release, and the paperwork that

14   the government provided makes clear that she was deemed

15   ineligible for asylum based solely on the asylum ban and any

16   additional review was only under that higher burden of proof.

17       So I'm looking at, for example, Exhibit E to the

18   declaration of Graham Doeren.  I think that's how you say his

19   name --

20               THE COURT:  Can you spell it for the court reporter?

21               MS. CASSLER:  D-O-E-R-E-N.

22       And that's the government's declaration that they submitted

23   on Friday night.

24               THE COURT:  Okay.

25               MS. CASSLER:  It's Exhibit 1 for the opposition.

1          And I'm looking at Exhibit E to Exhibit 1, which is the

2    notice of referral to the immigration judge.  Item Number 1 on

3    that list is checked, which states -- oh, wait, hold on.

4    Sorry, Your Honor.  That's a different exhibit.  I apologize.

5    Let me find it.  Sorry.  Exhibit D, not Exhibit E.  This is the

6    record of negative credible/reasonable fear finding and the

7    request for IJ review.  And this form was provided to the

8    applicant after her credible fear interview.

9          And the first item on this document states that she was

10   deemed to be described in 8 CFR Section 208.13(c)(4), which is

11   the asylum ban.

12          THE COURT:  Where is that?  I'm looking at the

13   document.

14          MS. CASSLER:  So the whole document -- the contents of

15   Number 1A applies to the recipient of this document.  That's

16   how I read it.

17          And on top of that, Your Honor, and looking also at

18   Exhibit E to the claim declaration, and this is the form I-870,

19   which documents the asylum officer's analysis of an individual

20   case.  And on page 6, according to the internal pagination,

21   there's a narrative that was written out, presumably by the

22   asylum officer, stating that she is barred from asylum pursuant

23   to 8 CFR 208.13(b)(4).  That's the asylum ban.  And then it

24   goes on to explain that she was screened for potential

25   entitlement to withholding under INA 231 for CAT protection

1    under a reasonable possibility of persecution.

2         (Interruption by the court reporter.)

3         MS. CASSLER:  So as I was saying, according to page 6

4    of the internal pagination to this exhibit, the beginning of

5    the asylum officer's narrative here explains that she was

6    deemed ineligible for asylum pursuant to the asylum ban, and

7    she was subsequently screened for potential entitlement to

8    withholding or CAT under the reasonable possibility standard,

9    which is a higher burden of proof.

10        THE COURT:  So reasonable fear -- tell me what the

11   difference is between a reasonable fear and a credible fear.

12        MS. CASSLER:  Uh-huh.  So under the credible fear

13   standard, which is the asylum screening standard, the person

14   being interviewed needs to establish what's called -- they're

15   all terms of art, but a significant possibility of establishing

16   eligibility for asylum.  And asylum eligibility generally

17   requires what's understood to be about a ten percent likelihood

18   of future persecution, and a significant possibility of

19   establishing ten percent likelihood of future persecution is

20   meant to cast a broader net than that ten percent number.  So

21   the way that that standard was written, it was meant to be a

22   little overinclusive, so it would include people who not

23   necessarily will establish eligibility for asylum, but who just

24   have a significant possibility of doing so.  And in contrast,

25   the reasonable possibility standard, I believe the government

1    submission -- and they should jump in if I'm wrong here -- is

2    that that corresponds with the actual burden of proof required

3    to establish eligibility for withholding, which is actually

4    more likely than not, so it's 51 percent essentially.  It's a

5    much higher standard.  And there's a regulation that sets out

6    the process for reasonable fear interviews, which historically

7    have only been used in very few types of cases.  Individuals

8    who were deemed absolutely ineligible for asylum to begin with,

9    but who still expressed a fear, they would be screened under

10   that reasonable fear standard and only a certain subset of such

11   individuals.  In that regulation -- let me find the exact

12   provision in the code.  It is 8 CFR Section 208.31.  That's the

13   regulation governing reasonable fear interviews.  And the -- I

14   believe it's now been vacated, but 8 CFR Section

15   208.30(e)(5)(iii) explains that there's a higher burden of

16   proof -- or excuse me.  It's direct individuals who are deemed

17   ineligible for asylum to be evaluated under that higher burden

18   of proof.  And the text of the interim final rule also explains

19   this.  That can be found at 84 Fed Reg 33829, and then the pin

20   cite is 338372838.

21           THE COURT:  Okay.

22           MS. CASSLER:  So plaintiff's position is that she's

23   never received a credible fear interview of the type that

24   existed prior to the promulgation of the asylum ban.  And

25   that's what your preliminary injunction entitles her to because

1    clearly she's a class member.

2        THE COURT:  But doesn't it say on the documents that

3    they have made a negative credible fear determination?

4        MS. CASSLER:  Could I ask exactly which document

5    you're referring to, Your Honor?

6        THE COURT:  Well, it seems like there were several of

7    them.  Let me look.  I'm looking -- go ahead.

8        MS. CASSLER:  So my understanding -- and I don't think

9    the government disagrees with this -- is that she is evaluated

10   only under the reasonable fear standard.

11       THE COURT:  Even though they call it a credible fear

12   interview?

13       MS. CASSLER:  Correct.

14       THE COURT:  Okay.  All right.

15       MS. CASSLER:  Yes, so she has not been afforded the

16   process that was available prior to July 16th in your PI order

17   mandates.

18       And I would also add to that that the narrative at the end

19   of her credible fear interview talks about an inability to

20   establish her identity.  And the government's own record, which

21   we submitted this morning, document that that's no longer a

22   question, that the government has reasonable degree of

23   certainty about her identity based on records in their

24   possession.

25       THE COURT:  Well, I guess -- again, I am not in a

1   position -- I don't think I'm able to or have the authority to

2   second-guess if they made a credible fear determination and

3   based it on the fact that they didn't find her identity correct

4   or they didn't find her to be credible.  All those issues

5   really are not relevant when we're talking about whether she's

6   part of a class or not, which is really the underlying issue

7   is, is she part of the class, and so my concern was that if she

8   was able to make a direct asylum claim by having the credible

9   fear determination, then she's not part of the class.  So

10  that's really why I was asking you those questions, is I don't

11  think I'm going to -- I don't think I'm in a position, and I

12  don't think it's appropriate, for me to second-guess a

13  determination on a direct asylum claim, only whether she was

14  able to make a direct asylum claim, if that makes sense.

15          MS. CASSLER:  Absolutely, Your Honor.  And we take the

16  same position.  We think it would be inappropriate and,

17  frankly, irrelevant to get into the details of, you know, the

18  basis for her reasonable fear determination.

19      But it's clear from the record, and I don't believe the

20  government disputes that she did not actually receive a

21  credible fear interview based on the credible fear standard.

22          THE COURT:  Okay.  And the second question I have is

23  if I do get to the point where we're determining whether she

24  was -- put her name on this list, whether she was actually part

25  of the class -- there seems to be a difference as to whether

1    she put her name on the list or not -- do I need to have an

2    evidentiary hearing on that issue?  You say one thing, and the

3    government says another, and without evaluating the credibility

4    of the witnesses involved, I don't know how I would determine

5    whether that happened or not.

6            MS. CASSLER:  Certainly.  So I actually don't think

7    that the evidence that we've submitted is contradicted by the

8    evidence that the government submitted.  Certainly if

9    Your Honor would like an evidentiary hearing, we would be more

10   than happy to do that, but we believe that we've submitted

11   sufficient evidence to establish her class membership.

12           THE COURT:  What about the fact that they say, were

13   you told to put your name on any sort of list to get into a

14   port of entry?  And she allegedly said no.  And they said, you

15   testified you never put your name on a list, and you only tried

16   to come across the border once.  Is that right?  And she said

17   yes.  Doesn't that seem to contradict saying, were you told to

18   put your name on any sort of a list?  Doesn't that contradict

19   what she's now saying?

20           MS. CASSLER:  I don't think that that's a precisely

21   accurate representation of the government's records,

22   Your Honor.  And I'd like to turn to Exhibit I to the Doeren

23   declaration, which is that transcript that you're referring to.

24       And one overarching point I'd like to make before we get

25   into the details is that there's no dispute that metering was

1  happening at the San Ysidro Port of Entry in late July of 2019.

2  So the only way that this applicant could have reached the

3  point of inspection was to go through the metering process.

4  She was presented to U.S. officials by Mexican government

5  officials, and so defendants should be on notice and should

6  have internal records demonstrating that fact.  So the idea

7  that, oh, they don't know she could have been metered, it

8  really is beyond the pale because everyone who was inspected --

9  I suppose there could have been a few stragglers who got

10 through somehow, but our understanding and the records before

11 the Court on summary judgment is that basically everybody who

12 was inspected at San Ysidro at that time went through a wait

13 list process.

14     So moving on to the transcript of her -- excuse me.  It's

15 not a transcript.  It's just an interview, her AOL screening

16 interview on March 25th, so first it states she tried to cross

17 the border only once on July 29, 2019.  That's on page 4.  That

18 is consistent with her declaration submitted to the Court.  She

19 only attempted to physically cross the border one time, and it

20 was when she was told that she had permission to do so.

21     When she arrived in Tijuana, as set out in her declaration,

22 she spoke with other migrants who told her the way to access

23 the asylum process is to put your name on the list so that's

24 what she did.  She never tried to present herself apart from

25 that process.  She never tried to enter without inspection.  So

she only went through the physical motion of walking up to the physical borderline on the 29th of July, 2019, and that's consistent with the process that defendants required at that time in order to be inspected at the port.

Second, the transcript says that she sought to enter the United States before July 29, 2019 -- and that's on page 3 -- when she was asked, quote, did you ever seek to enter the United States before that time, July 29, 2019?

She said, "Yes, in Tijuana.

"Question:  Are you sure?"

And she said, "Yes."

Third, she was asked did she ever put her name on a wait list to enter the U.S. to a port of entry besides San Ysidro on July 29, 2019, and she said no, because she didn't put her name on a wait list other than the San Ysidro wait list.

Fourth, she was asked if she put her name on this wait list in Tijuana, and she asked for the question to be repeated, and it was not repeated.  So this is evidence of interpretation issues that call into question the validity of the whole screening, but more importantly, she never answered the question.  She asked for it to be repeated, and it was not.

THE COURT:  What they were repeating was did you ever place your name on a list.

MS. CASSLER:  What they repeated was, did you ever place your name on a list to enter the U.S. through a port of

1    entry besides San Ysidro --

2            THE COURT:  I see.

3            MS. CASSLER:   -- on July 29, 2019."

4    So this was a very confusing screening process, Your Honor,

5    and it simply doesn't contradict her declaration.

6            And there's a few more points I'll just make about this.

7    The screening record says while in Tijuana she never was told

8    to come back to appeal the process on another day.  And in her

9    declaration, she was told she would be processed on July 29th,

10   and then she was processed that same day.  So she didn't come

11   back on a different day after she was told that she would be

12   processed, and I think given the preceding questioning, that

13   question was potentially misleading and confusing as well.

14           And then the summary, first of all, that summary is

15   infected by the confusing prior testimony.  According to

16   applicant's understanding, which is that the one list question

17   she was asked was about other courts, the summary says, "You

18   testified that you never wrote your name down on a list."

19   Well, if it's summarized in her prior answer and the proper

20   answer is no, she didn't, but beyond that, she didn't

21   personally write her name on the list as full.  A list manager

22   wrote her name on the list.  That's consistent with the

23   procedures used by list managers at that place and at that

24   time, and it's consistent with her declaration.

25           So the screening was quite confusing, it was inadequate,

1   and it didn't actually get to the heart of the issue, which is

2   whether she put her name on the wait list in Tijuana in order

3   to be inspected and processed at the San Ysidro Port of Entry.

4        I mean, at this point, plaintiff has provided evidence

5   that's undisputed to defendants that shows that her name was on

6   the wait list, both her sworn statement and independent

7   corroborating evidence showing her name on the wait list around

8   the date that she said she put her name on the list.  So

9   defendants have refused to comply with the terms of the PI,

10  even given this evidence which they have no way of rebutting or

11  if they do, we don't know what it is.

12       Does Your Honor have any other questions about whether or

13  not as a factual matter the applicant is a class member?

14            THE COURT:  No.

15            MS. CASSLER:  So I'm happy to turn it over to my

16  co-counsel if the Court has no more questions about the facts

17  of this case.

18            THE COURT:  Okay.  Ms. Walters.

19            MS. WALTERS:  Yes.  Once again, good morning,

20  Your Honor.  Can you hear me okay?

21            THE COURT:  I can.

22            MS. WALTERS:  Wonderful.

23       So, you know, I think my colleague, Ms. Cassler, has

24  pointed out why we've established that the applicant is a class

25  member.

1           Defendants also assert in their opposition papers that the

2   PI just doesn't apply to the applicant.  And they make this

3   argument by suggesting that they're enjoined only from applying

4   the asylum ban to class members whose cases are pending when or

5   after this Court's preliminary injunction order issued.   In

6   this case, the applicant received a final order on

7   November 14th, 2019, five days before the preliminary

8   injunction order issued.  But the government, defendants, are

9   wrong on this point.  The injunction is not limited in the

10  manner that they suggest.  The preliminary injunction prohibits

11  defendants from applying the asylum ban to, quote, all

12  non-Mexican asylum-seekers who are unable to make a direct

13  asylum claim, end quote, at a port of entry before July 16,

14  2019, the government metering policy and continue to seek

15  asylum.  The injunction is not permitted to certain stages of

16  removal proceedings until relief for class members under the

17  preliminary injunction should not be arbitrarily limited as

18  well.

19          I would also point out to the fact that defendant's

20  argument is internally inconsistent.  The government's own

21  guidance calls for screening people with final orders.  That's

22  how the applicant got the AOL screening that she received in

23  the first place.

24          Now, this sort of ties back to some of the briefing that

25  was done on plaintiff's motion for clarification.   In

1  defendant's opposition to that briefing, Exhibit 5, there was a

2  December 8, 2019, email from enforcement --

3  　　　　　THE COURT:  You're kind of breaking up, Counsel.  I

4  don't know if there's anything you can do, but your voice goes

5  in and out.

6  　　　　　MS. WALTERS:  Can you hear me better now?

7  　　　　　THE COURT:  I can hear you, but it's just a little

8  fuzzy.  I'm not sure why.  Go ahead.

9  　　　　　MS. WALTERS:  Okay.  I'll try to continue.  If it

10  continues to be a problem, I have another phone I could try to

11  call from.

12  　　　　　THE COURT:  Okay.

13  　　　　　MS. WALTERS:  In the email -- excuse me.  In the

14  December 8, 2019, email that's Exhibit 5 to defendant's

15  opposition to the motion for clarification, the email attaches

16  data providing a list of all those noncitizens who entered the

17  U.S. on or after July 16, 2019, through November 19, 2018, who

18  USCIS applied the asylum ban to and who an asylum officer made

19  a negative fear determination for.  And it suspends the removal

20  of all of those listed immediately, and it has --

21  　　　　　THE COURT:  I can't -- I'm sorry.  I missed the first

22  part of your sentence.

23  　　　　　MS. WALTERS:  I was simply stating that the email

24  requires the suspension of the removal of all those individuals

25  identified who had entered the U.S. on or after July 16th,

1   2019, through November 19, 2019, that had received negative

2   fear determinations in order for them to be screened for Al

3   Otro Lado preliminary injunction class membership.

4        So defendant's own argument that the preliminary injunction

5   doesn't apply to individuals in the applicant's position is

6   internally inconsistent with the own guidance that they've

7   given to their officers regarding how such individuals should

8   be screened.

9        It's also important to note that the logical consequence of

10  defendant's argument is that virtually no one would benefit

11  from the (Indiscernible), and here I'm referring to the

12  declaration of Karen (Indiscernible) attached with the notice

13  that plaintiff's submitted this morning.  In that declaration

14  it states that the last number that was called for inspection

15  and processing on July 15, 2019, from the Tijuana wait list was

16  Number 2702, and the last number given out on that date was

17  3667.  So everyone was given a number on the wait list

18  between --

19        (Interruption by the court reporter.)

20           MS. WALTERS:  It also established a number given to

21  ten people, so, therefore, a total of approximately 9,640

22  people were metered at San Ysidro are covered by the

23  preliminary injunction.

24       We also have learned from copies of the list that the last

25  number called for inspection and processing off of the Tijuana

1    wait list off November 19, 2019, was 3487.  That means that of

2    the approximately 9,640 people who were metered at San Ysidro

3    and would be covered by the PI, only 800 had not started the

4    CFI process, had not been called on the list at the time --

5           THE COURT:  I'm going to stop you for a minute.  Is

6    there someone in the background?  Can everyone please mute

7    their phones because I hear someone else talking.  I'm having a

8    hard time hearing all the words, and it's partly because I hear

9    someone talking in the background.  Everyone, make sure you

10   mute your microphone, please.

11        Sorry, Counsel.

12           MS. WALTERS:  Understandable.

13        My final point regarding these numbers was that that leaves

14   approximately 7,840 might not have final CFI determination.

15   The large majority already have, and under the government's

16   interpretation (Indiscernible), these individuals and similarly

17   situated at other ports of entry would not be entitled to the

18   protections of the PI.

19        Plaintiffs respectfully submit (Indiscernible) of the

20   preliminary injunction.

21        I was going to make one additional point, but I wanted to

22   make sure Your Honor can hear me.  I can try another phone, if

23   it would be easier this time.

24           THE COURT:  You sounded louder when you made this last

25   statement, so keep your mouth close to the microphone, and

1    maybe we can hear you.

2         MS. WALTERS:  All right.  In that case, the other

3    point I want to make regarding the PI application to the

4    applicant --

5         THE COURT:  I'm sorry.  I'm not understanding you.  I

6    think it probably would be better if you were on a different

7    phone.  I only get about half of what you say.

8         MS. WALTERS:  I will call back.  And please excuse the

9    interruption.

10        THE COURT:  Okay.

11        MS. CASSLER:  Your Honor, this is Ms. Cassler.  While

12   my colleague calls back in, there's one additional point I

13   should have made.  Is it all right?

14        THE COURT:  Sure.  Go ahead.

15        MS. CASSLER:  All right.  So I want to clarify that

16   the paperwork says that she has credible fear determination and

17   she was deemed not to have shown a credible fear and that -- my

18   understanding is that the reference to the fact that they

19   started a credible fear interview and they realized she was

20   barred under the asylum ban, so the asylum ban -- to the extent

21   the paperwork demonstrates that she has credible fear

22   determination, it was simply the asylum ban (Indiscernible)

23   asylum.

24        THE COURT:  Okay.  Where is that that you're looking

25   at that?

1           MS. CASSLER:   Yeah.   So Exhibit B is the transcript,

2  and this is, again, to the Doeren declaration.   Exhibit B is

3  the transcript of her October 23rd credible fear interview, but

4  it eventually became a reasonable fear interview in terms of

5  the standard applied.

6           Internally paginated numbers, I'm looking at the bottom of

7  6, where the interviewer announced to the applicant, there's a

8  new regulation in the U.S. that says you're not eligible for

9  asylum if you pass through another country, like Mexico, and

10 did not apply for protection in those countries.   Since you did

11 not apply for asylum in those countries, you are barred from

12 the credible fear process.   And that determination runs through

13 all of the documents before you.

14          Additionally, in Exhibit E, this is a notice of referral to

15 the immigration judge.   Box 1 is checked, which says, "An

16 asylum officer has reviewed the matter and concluded that the

17 alien does not have a credible fear of persecution or torture."

18 I believe that the reference to the application of the asylum

19 ban giving rise to a negative credible fear determination, and

20 additionally she was also deemed not to have a, quote,

21 reasonable fear of persecution as the standard applied for

22 withholding in CAT.

23          So the documents are not obvious about that for someone who

24 doesn't practice immigration law, but I don't think there's a

25 dispute about the fact that she was never evaluated under the

1   credible fear standard.

2            THE COURT:  Okay.  Thank you.

3        Do we have Ms. Walters on the phone?

4            MS. WALTERS:  Yes, Your Honor.  Apologies.

5            THE COURT:  Okay.  That's fine.  Let's try again, your

6   last statement there.

7            MS. WALTERS:  Thank you very much.

8        So again, my last point on the issue of why the PI applies

9   to individuals in the applicant's position is this was briefed

10  fully in plaintiff's pending motion for clarification of the

11  PI, but the preliminary injunction granted relief both to

12  asylum-seekers whose proceedings were still pending by ordering

13  defendants to return to the pre-asylum ban practices for

14  processing asylum applications of class members.  And it

15  provided relief to those who had already received negative

16  credible fear determinations based on the asylum ban by

17  enjoining defendants from, quote, applying the asylum ban to

18  class members.

19       Now, defendants assert that the asylum ban cannot be

20  applied to class members with final asylum denials because --

21  and again, this is fleshed out more in the motion, the

22  defendant's opposition to the motion for clarification.  Such

23  class members had the rule applied to them, but the government

24  is no longer applying it to them in violation of the injunction

25  because the irreparable injury already occurred.

1       But by defendant's logic, the class members who have been

2  injured the most are entitled to no injunctive relief.  The

3  irreparable injury here, and the one that the injunction

4  addresses, is the lack of access to the asylum process, the

5  lack of receiving that credible fear interview, not a

6  reasonable fear interview.  And the status quo that the

7  injunction speaks to restore is that opportunity.  The

8  applicant's case, this very case, demonstrates how the

9  government continues to apply the asylum ban in her case and in

10  the cases of those that are similarly situated.  She currently

11  faces imminent deportation based on a final removal order that

12  issued because of a determination that she was ineligible for

13  asylum by application of the asylum ban.

14       And defendants rely on case law that interprets retroactive

15  application, and particularly, I suppose, significant points of

16  vacatur of the asylum ban in a D.C. district case.

17       That case, *DAM*, and the question of retroactive application

18  in *DAM* addresses retroactive applications to nonparties to a

19  case where relief was granted.  This case is more like

20  *LLM v. Cuccinelli*.  It's referenced in the DAM decision and

21  also out of the D.C. District Court where the district court

22  set aside agency action and the unlawful negative credible fear

23  determinations for the plaintiff.  The Court did decline to

24  extend the relief to other asylum-seekers who were processed

25  under the defective directive, but it did so stating that those

1  individuals are not parties to this case nor is this case a
2  class action.

3      But that's precisely what we have here.  Prior to the
4  vacatur of the asylum ban in litigation challenging that rule,
5  this Court enjoined its application to class members, to all
6  non-Mexican asylum-seekers who had been denied the access to
7  the asylum process because of the government's metering policy
8  before July 16th.  And that injunction is a remedy for the
9  impact of that agency action of the metering policy on class
10 members' claims in this particular action.

11     So at this juncture the Court doesn't need to reach the
12 issue of the scope of the injunction as it's argued in the
13 motion for clarification at this time because fundamentally in
14 this case, the government can see is the PI applied to the
15 applicant by screening her, but the deficiencies in the AOL
16 screening interview that I believe Ms. Cassler very explicitly
17 explained highlight the relevance and importance of the pending
18 motion for clarification and how those deficiencies infect the
19 screening interviews and the relief under the preliminary
20 injunction for class members generally.

21     If Your Honor does not have additional questions about my
22 argument on that point, I was going to make one additional
23 point related to defendant's argument that plaintiffs are
24 seeking a new preliminary injunction in this case.

25         THE COURT:  Okay.

1          MS. WALTERS:   So one of the final points I'd like to
2    make is simply that defendants in their opposition papers make
3    a number of jurisdictional arguments cloaked in an argument
4    that plaintiffs cannot seek a separate injunction to prohibit
5    the removal of the applicant.   But what's important is that
6    plaintiffs here have never asserted that they're seeking such
7    an injunction.   This Court interpreted plaintiff's motion as a
8    TRO for purposes of granting the emergency relief until this
9    hearing could occur.   That doesn't change the nature of
10   plaintiff's request for relief, which was to enforce the
11   Court's prior PR -- excuse me, PI order.   And defendants
12   themselves concede in their papers that this Court has inherent
13   authority to enforce its PI order, and they can see that the
14   jurisdictional arguments that they make don't apply to that
15   inherent authority to enforce the PI, but they spend countless
16   pages discussing the applicant's expedited removal proceedings
17   and the merits of the claim for protection in order to argue
18   that if we were to seek a new PI in this instance, the Court
19   would have no jurisdiction.   But none of those arguments are
20   relevant, and they're also not applicable.   Applicants' claims
21   here do not arise from -- excuse me -- arise from the
22   government's failure to enforce the PI and not from her final
23   Order of Removal or decision to deport the applicant.   We're
24   not challenging that removal order.   We're challenging
25   defendant's conduct in not fulfilling what this court ordered

1   as part of its preliminary injunction.

2        And even if the Court were to apply a traditional four-part

3   test of plaintiff's motion, what defendants do is they've

4   applied the wrong test.  Again, we're not asserting that the

5   applicant is likely to succeed on the merits of her asylum

6   claim.  We are arguing that she's likely to succeed on the

7   merits of her claim that she is an AOL PI class member because

8   she's demonstrated that she is a class member as to what we

9   think is the sufficient evidence that's been put before the

10  Court, and, therefore, she's owed a CFI that does not apply the

11  transit ban to her case.

12       The applicant is a class member; therefore, the PI applies,

13  and the Court has inherent authority to enforce its prior

14  order.

15            THE COURT:  Okay.  Thank you.

16       Is that it for the plaintiffs?

17            MS. WALTERS:  Yes, Your Honor, unless there are

18  further questions.

19            THE COURT:  Okay.  The government, and maybe you could

20  start by addressing my first question to the plaintiff.  Did

21  she have a credible fear screening or not?

22            MR. HALASKA:  Good morning, Your Honor.

23  Alexander Halaska for the government.

24       We do dispute that she did not have a credible fear

25  standard applied to her.  We believe that the documents show

1  that, at minimum, she was known to be ineligible.  The final

2  order was entered both under the negative credible fear

3  determination and as a negative reasonable fear determination.

4  That's reflected both in the USCIS papers that are attached to

5  Government Exhibit 1, and it's reflected in the EOIR documents

6  that were provided at page 14 of Government Exhibit 2 that show

7  that the IJ entered a negative credible fear determination and

8  then hand-wrote in the notes, "Respondent is not credible in

9  totality of circumstances."

10     So we do believe that we -- plaintiffs are incorrect when

11  they say that she did not have a negative credible fear

12  interview.  We believe the documents, at minimum, show that

13  both were -- both determinations were made as to her case.

14          THE COURT:  Okay.

15          MR. HALASKA:  And on the second point, I think

16  turning -- so to just clarify, Your Honor, the point being made

17  that the adverse credibility determination that underlies the

18  documents and which is not called into question by plaintiff's

19  filing this morning, the adverse credibility determination is

20  sufficient to supply the basis for both of them.  And so there

21  was both -- both determinations were made, and it appears that

22  the adverse credibility determination -- it runs throughout

23  proceedings.  I just want to make that point clear to the Court

24  so there's no confusion.

25          THE COURT:  Okay.

1        MR. HALASKA:  And the second thing, I believe with

2   plaintiff Your Honor asked about the possibility of an

3   evidentiary hearing.  We believe that that's not necessary,

4   that plaintiff's evidence fails on its own merits to establish

5   that she was a class member.  But in any event, an evidentiary

6   hearing, as Your Honor has noted, would have to be sharply

7   limited to the question of her time in Tijuana and not to the

8   underlying merits of the -- these expedited removal proceedings

9   themselves.

10      So kind of turning to the actual, you know, document, that

11  issue, we think that an 11th hour, self-serving declaration is

12  insufficient to establish that applicant was actually subject

13  to metering during the relevant time period.  She --

14          THE COURT:  But wasn't everyone subject to metering

15  during that time period?  I mean, it wasn't possible for

16  someone to cross the border and come across without getting on

17  the list, was it?

18          MR. HALASKA:  So I believe -- I have no reason to

19  dispute the proposition that metering was in effect during the

20  relevant time, but just because metering is in effect during

21  the relevant time doesn't mean that everyone is precluded in

22  that moment from applying, in this case, before July 16, 2019.

23      CBP, you know, has discretion sometimes to take people as

24  they approach the port.  As the evidence that plaintiffs have

25  offered in their filings, and have set today at this hearing,

1   individuals are taken from the wait list, you know, by Mexican

2   authorities in a different order, that is not always taken in

3   the order that people, you know, show up and put their names on

4   the wait list.  So just because metering is in effect at the

5   time doesn't necessarily mean that applicant was prevented from

6   making a direct asylum claim at a port of entry before July 16,

7   2019, because of metering.  I think applicant had several

8   opportunities to establish that she was subject to metering,

9   the first of which was -- were the -- she sought

10  reconsideration from USCIS in December 2019, and this is in the

11  Government Exhibit 1 that we submitted with our papers.  She

12  sought reconsideration from USCIS, and the only basis for her

13  reconsideration was to attempt to clean up the inconsistencies

14  in her testimony.

15       So that first opportunity shows the applicant herself

16  through counsel didn't seek to invoke this Court's preliminary

17  injunction order.

18       The second opportunity came in the actual affirmative USCIS

19  Al Otro Lado screening itself.  Plaintiff was asked --

20  applicant was asked many questions about her time in Tijuana,

21  and certainly one would expect that she says in her declaration

22  if she were an individual who was actually involved in managing

23  the wait list or volunteering to help the wait list, that these

24  questions would have prompted her to say something like that.

25  Nothing about that appears in the interview notes.

1      THE COURT:   But is there any evidence that she was

2   directly asked, did you put your name -- did you ask to have

3   your name put on the list?   Were you told to put your name on

4   the list?   And, did you put your name on the list?

5      MR. HALASKA:   I think the interview summary notes, the

6   summary of the notes on the native pages 148 to 149 -- excuse

7   me, the PDF pagination 148 to 149 and the native pages, pages 4

8   to 5, the interviewer summarized her understanding of the

9   testimony.   She said, you know, quote, you arrived in Tijuana,

10  Mexico, in May 2019.   You testified that you worked in Tijuana

11  for a couple months to earn some money.   You stated that you

12  never wrote your name down on a list, and your first and only

13  attempt to cross the border into the U.S. was on July 29 at

14  San Ysidro.

15     "Question:   Is this summary correct?

16     "Answer:   Yes," end quote.

17     So I think right there is where you get your direct

18  question of the individual.   This is -- the interviewer says,

19  "This is what I understand you to have told me today.   If

20  that's correct?"   And she says yes.   So I think that's the

21  direct evidence that she didn't put her name on the wait list

22  before July 29, 2019, or was subject to metering before that

23  time.

24     After reading the summary, the interviewer says, "Are there

25  any changes or additions that you would like to make?"   And she

1  says, "Yes," and then proceeds to discuss some of the -- you

2  know, what she expected of the interview vis-à-vis the actual

3  underlying merits of her determination, but at that point, she

4  doesn't actually discuss, you know, on page -- this is pages 5

5  into 6 of the notes.  She does not discuss, you know, her

6  belief or assert that she was subject to metering before

7  July 16, 2019.  So that's the second opportunity when USCIS

8  affirmatively asked her, "Were you subject to the rule?  Are

9  you a member of the class?"  And she provided no evidence

10  saying that that was the case.

11     And then the third opportunity came shortly thereafter when

12  she submitted a motion to reopen to the Otay Mesa Immigration

13  Court, through counsel again, and the basis again of her -- of

14  the request for reconsideration, the request for a new credible

15  fear interview, was based on the U.S. District Court for the

16  District of Colombia's order in the *CAR* decision that vacated

17  the rule.  Again, applicant raised no arguments relating to

18  this Court's preliminary order injunction, the Ninth Circuit

19  order denying the government's motion for a stay pending

20  appeal, and this was, again, through counsel.  One would expect

21  that -- you know, you expect counsel to make the arguments that

22  are available to the client, and the fact that that's not there

23  I think is good evidence that applicant herself did not believe

24  that she was subject to preliminary injunction order.  So I

25  have -- Your Honor has three different occasions in the record

1    where you can see that applicant was given an opportunity to

2    show that she was subject to the rule -- or excuse me, subject

3    to metering, and she failed to do so, and now an 11th hour

4    declaration, very self-serving declaration, that shows, you

5    know, that she claims to have been part of the managing of the

6    wait list, but never raised that in any of the opportunities.

7    That shouldn't be given much credit here, especially in light

8    of the fact that applicant on several previous occasions has

9    been found to not be a credible witness.

10       I think the fact also -- to address some of plaintiff's

11   points, I think the fact that she was given an Al Otro Lado

12   screening, one, it doesn't change the text of this Court's

13   preliminary injunction order; but two, more importantly, in

14   this context, it doesn't show that the government is applying

15   things inconsistently.  The fact that USCIS cast a wide net at

16   the outset of its compliance efforts to make sure that no one

17   was -- you know, inadvertently had the rule applied to them in

18   violation of the order is not -- it doesn't bind the government

19   to a later, you know, broader interpretation of the order.  It

20   just shows the government, if anything, made good-faith efforts

21   to comply with the order.  The fact that this individual didn't

22   establish her entitlement to eligibility doesn't mean that the

23   fact that the government gave the interview in the first place

24   shows that she is a class member.

25       I think if there are no more questions on that point, I

1   think, then, I'd also like to discuss the issues raised in the

2   government's opposition to plaintiff's motion for

3   reconsideration, if the Court is interested in hearing those

4   arguments.

5          THE COURT:   Okay.   Go ahead.

6          MR. HALASKA:   Sure.   So as we stated in our opposition

7   brief, the text of this -- we think the Court's order is clear.

8   It says, "Defendants hereby are enjoined from applying the

9   rule."   That language is prospective only.   From the date of

10  the order forward, November 19, 2019, the government is

11  enjoined from applying the rule to individuals.   As we've

12  explained in our briefing, the only times when a rule -- the

13  rule is applied to individuals is during proceedings, so before

14  USCIS or before EOIR removal or full removal proceedings.   So

15  those are the only opportunities that the government would even

16  have to apply the rule to an individual.

17     If someone's proceedings were already final and closed

18  before November 19, 2019, that means that the government

19  doesn't violate the order by not affirmatively reopening or

20  re-adjudicating those cases.

21     I think you can see that in *DAM* decision out of D.C. that

22  we cite in our motion papers where it says it's one thing --

23  you know, and this is in the context of vacatur.   That the

24  Court says it's one thing for a final rule to be vacated, and

25  it's an entirely separate thing to say that orders issued

1   pursuant to that rule are automatically vacated because of an

2   injunction vacating the rule.  And I think that's a similar

3   analogy here.  The fact that the Court enjoined -- defendants

4   are hereby enjoined from applying the rule is different from

5   saying the defendants must reopen previous orders already

6   issued pursuant to the rule.  So I think that's consistent with

7   the normal rule in civil litigation that final judgments would

8   stand later changes in the law and that unless someone

9   affirmatively and successfully reopens their proceedings, which

10  is entirely within the discretion of the government, unless

11  those proceedings are reopened during the time when the

12  injunction is in effect, it doesn't violate the rule -- excuse

13  me -- the injunction to have, you know, that final removal

14  order in place.

15      Plaintiffs also make the point that the government is

16  cloaking their statutory arguments in a -- you know, an attempt

17  to show that plaintiffs are not entitled to a separate

18  preliminary injunction under the four-factor test.  The

19  government's point there was that to the extent that plaintiffs

20  do seek a separate injunction, these statues would apply.  It

21  sound to me like plaintiffs have kind of disavowed that, they

22  don't seek relief under the four-factor test, so in that case,

23  the Court doesn't need to reach the government's arguments

24  under that Roman numeral 2, but to the extent plaintiffs were

25  seeking that, this is brief and short notice where

1    plaintiffs -- you know, we would expect them to say that their
2    affirmative papers could have been more developed, but we were
3    just quickly trying to seek relief.   This was the government's
4    attempt to put forward its arguments, but if plaintiffs are
5    disavowing that, then the Court does not need to reach those
6    points.

7        If there are no further questions from Your Honor, I think
8    that covers the points that the government wanted to make aside
9    from the points we make in our opposition papers.

10       I'm happy to discuss anything in addition to that, but we
11   do think, you know, this individual has an adverse credibility
12   determination that doesn't change from the papers that
13   plaintiffs submitted this morning, even on their own Form I-870
14   that they submitted.   Still has the box checked that she was
15   found to be not credible.   The immigration judge on de novo
16   review affirmed that finding, and so that adverse credibility
17   determination is in and of itself -- makes any -- you know,
18   even assuming that the rule's applied in error, which we don't
19   think it was, but even assuming that's the case, it means the
20   government's error was harmless.

21       THE COURT:   Okay.   Anything further from the
22   plaintiff?

23       MS. CASSLER:   Yes, Your Honor.   I've got a number of
24   points in response.

25       So, first of all, a negative credibility determination is

1   not the same as a negative credible fear determination under

2   the CFI merit standard, which is a significant likelihood or --

3   excuse me -- a significant possibility of establishing asylum

4   eligibility.  So the mere notion that there was a negative

5   credibility determination made back in October of 2019 does not

6   mean that the credible fear standard was applied to applicant

7   during her screening.

8        And to the government's point that the immigration judge

9   affirmed her negative credible fear determination on the basis

10  of both credibility and the lack of a reasonable fear of

11  persecution under the more stringent standard was prohibited by

12  the regulations themselves.  So first I'll point the Court to

13  the since vacated asylum ban regulation, specifically

14  8 CFR 208.30(e)(5)(iii).  It says, "If the alien is found to be

15  an alien described as ineligible for asylum under the ban, then

16  the asylum officer shall enter a negative credible fear

17  determination with respect to alien's application for asylum."

18  That was the basis for her negative credible near determination

19  by USCIS.

20       And then it goes on to state that under IJ review, that

21  must be, quote, consistent with paragraph G of this section

22  except that the immigration judge will review the reasonable

23  fear findings under the reasonable fear standard instead of the

24  credible fear standard described in paragraph G in 8 CFR

25  Section 1208.30(g).

1    And if we turn to that regulation, 8 CFR Section

2    1208.30(g)(1)(ii), the only thing that the immigration judge

3    was permitted to review with regard to her credible fear

4    determination was whether or not she was subject to the ban.

5    Beyond that, the immigration judge was required to apply the

6    reasonable fear standard and review the RFI determination under

7    the reasonable fear standard.

8    So the immigration judge did not have the authority to

9    determine whether she had established a credible fear other

10   than reviewing whether or not she was subject to the asylum

11   ban.  At the time that this occurred, there was no PI in place,

12   so she was subject to the asylum ban.

13   Moving on, your preliminary injunction does not call for

14   defendants to make their own evaluation of whether complying

15   with the preliminary injunction would be harmless or not.  Or

16   failure to comply with the PI would be harmless or not.  That's

17   simply not what the Court's order says.  It says that the

18   applicant is entitled to the procedures that were in place

19   prior to July 16, 2019.  As this Court has noted, it's not for

20   the Court or for the parties to say whether she would

21   ultimately meet her burden under CFI standard.  So under the

22   PI, she is entitled to a review under that standard.

23   The government's argument that she had several

24   opportunities to establish that she was subject to metering,

25   how was she supposed to have notice of the preliminary

1    injunction when she was detained?  I think it's beyond the pale
2    to infer that because her counsel did not argue that she was
3    subject to the PI that that was somehow good evidence that she
4    did not believe that she was subject to a rule.  Plaintiffs
5    have put forward undisputed evidence that she was on the
6    metering wait list prior to July 16th and that she entered
7    after July 16th.  And frankly, it's a matter of attorneys not
8    learning about the PI, not something about the facts of her
9    case that explain why she did not raise this argument through
10   counsel.  And on December 19, I would note that your order was
11   stayed, so it wouldn't have made sense for her counsel at that
12   time to argue that she was entitled to (Indiscernible).

13       The applicant stated in her declaration she did not
14   understand the purpose of the AOL screening, and she was not
15   counseled during that screening.  Given that the government
16   didn't ask her any question that squarely got to the issue of
17   whether or not she was metered at the relevant time, I don't
18   think it's fair to assume that her failure to volunteer that
19   information when she did not know the purpose of the screening
20   makes much sense.

21       Overall, the government's argument puts the burden on the
22   applicant, but the PI puts the burden on the government to
23   comply with the Court's order.

24       And furthermore, the Court and the Ninth Circuit have both
25   stated that the wait list for relevant evidence determines

1    whether or not an individual was metered.  The government has
2    provided 30(b)(6) testimony explaining that it has access to
3    wait list, but apparently it has failed to obtain those wait
4    lists.

5         The government knows when individuals go through its own
6    alternative process to approach the Court rather than the
7    organic process set out (Indiscernible) to approach without
8    going to the wait list.  The government should have a record of
9    the fact that this person is brought to the port of entry by
10   Mexican government officials, so it's disingenuous to claim
11   that it's possible that maybe she didn't go through the wait
12   list process.

13        And with that, I'll turn it over to my co-counsel for a few
14   other points.

15        MS. WALTERS:  Yes, thank you.  Ms. Walters for
16   plaintiffs back on the line here.  And I just wanted to make
17   one final point in addition to the ones that Ms. Cassler made,
18   Your Honor.

19        And that's merely that government stated in its argument
20   here that it initially or perhaps provided guidance that
21   initially and thereafter screened broadly to ensure that the
22   government was not violating the PI.  And by saying that, the
23   government makes plaintiff's point here.  Again, we are not
24   arguing about the merits of the applicant's underlying claim.
25   We are arguing that there must be a proper screening process

1  that is broad enough to ensure that the government is not

2  violating the terms of the PI.

3      And what we have here is a screening interview that was

4  misleading and confusing to the applicant, and to accuse her of

5  having multiple opportunities to have raised this claim when

6  the government has had ample time and accessibility to wait

7  lists that would have demonstrated her presumptive eligibility

8  for class membership is concerning.

9      And along with that, again, it's the government's position

10  regarding those who had orders as of November 19, 2019, were to

11  be correct, the logical consequence would be that nobody would

12  benefit from this PI.  I won't go through the numbers again in

13  such detail.  I understand that it was probably gobbled a bit

14  with the phone issue, but I will just say that based on the

15  numbers called for inspection and processing and given out for

16  inspection and processing on the Tijuana wait list as of

17  November 19th, there would have been approximately 7,840 people

18  who were metered at San Ysidro and should be covered by the PI

19  who would have been inspected and processed prior to

20  November 19, 2018.

21      And while maybe not all of them would have final credible

22  fear determinations, a large majority already have had, and the

23  government's interpretation would be that these individuals,

24  that large, large number of individuals that are covered by the

25  PI, would not be entitled to the protections of the PI,

1  including those that are similarly situated at other ports of

2  entry.  That just cannot be the intended scope of the PI.

3  Thank you, Your Honor.

4          THE COURT:  Okay.  Thank you.  I will take the matter

5  under submission.

6          MR. HALASKA:  Your Honor, this is Mr. Halaska.  I

7  apologize.  May I be heard on just a couple points that

8  plaintiffs raised?

9          THE COURT:  Okay.

10          MR. HALASKA:  I want to emphasize the point first that

11  nothing in plaintiff's reply arguments address the adverse

12  credibility determination.  That still stands.  We believe it

13  provides an independent sufficient basis for the order.

14      The second thing is, I believe Ms. Cassler said this

15  Court's preliminary injunction order entitled people to prerule

16  standards.  That's not what the plain text of the order says.

17  It says, "Defendants are hereby enjoined."

18      And the third point I would make is that government can go

19  ahead and look into the actual recording that the immigration

20  judge -- of the immigration judge's de novo review, but I

21  believe that would shed light.  We haven't had a full

22  opportunity to do that in this short time period and put forth

23  our firm position about what it says, but we can do that and

24  provide submission, supplemental submission, to the Court.

25          THE COURT:  Okay.  I will take the matter under

42

submission.  I will order that the temporary restraining order

that I put in place last week remain until I issue an order on

the underlying issue.  Any questions about that?

        MR. HALASKA:  No, Your Honor.

        THE COURT:  Okay.  Thank you.

                ---OOO---

C-E-R-T-I-F-I-C-A-T-I-O-N

I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.

Dated December 16, 2020, at San Diego, California.

/Dana Peabody/
Dana Peabody,
Registered Diplomate Reporter
Certified Realtime Reporter