MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
   Melissa Crow (DC Bar No. 453487)
   (*pro hac vice*)
   *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>        Plaintiffs,<br><br>   v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>        Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**DECLARATION OF ERIKA PINHEIRO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER CONCERNING ASYLUM INFORMATION OF POTENTIAL PRELIMINARY-INJUNCTION CLASS MEMBERS** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

DECLARATION OF ERIKA PINHEIRO

1  CENTER FOR CONSTITUTIONAL RIGHTS
2     Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
      *bazmy@ccrjustice.org*
3     Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
      *aguisado@ccrjustice.org*
4  666 Broadway, 7th Floor
   New York, NY 10012
5  Telephone: +1.212.614.6464
   Facsimile: +1.212.614.6499
6
7  SOUTHERN POVERTY LAW CENTER
      Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
8     *sarah.rich@splcenter.org*
      Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
9     *rebecca.cassler@splcenter.org*
   150 E. Ponce de Leon Ave., Suite 340
10 Decatur, GA 30030
   Telephone: +1.404.521.6700
11 Facsimile: +1.404.221.5857
12
   AMERICAN IMMIGRATION COUNCIL
13    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
      *kwalters@immcouncil.org*
14 1331 G St. NW, Suite 200
15 Washington, D.C. 20005
   Telephone: +1.202.507.7523
16 Facsimile: +1.202.742.5619

17
18
19
20
21
22
23
24
25
26
27
28

# DECLARATION OF ERIKA PINHEIRO

I, Erika Pinheiro, hereby declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am the Litigation and Policy Director of Al Otro Lado, a binational nonprofit serving refugees, deportees, and other migrants in Tijuana, Mexico and throughout Southern California. I am currently based primarily in Tijuana, Mexico, and oversee various programs and operations in our Tijuana, Los Angeles and San Diego offices. In particular, I oversee our Adelanto and Otay Mesa Release Projects, focused on representation of detained immigrants in Southern California, and our Southeast Litigation Project, focused on representation of immigrants detained in Louisiana and Georgia. I also oversee and have done substantial work in Al Otro Lado's Family Reunification Program, which primarily represents parents who were separated from their children at the US-Mexico border in 2017 or 2018 and subsequently deported without them. Our current Family Reunification Program clients were deported to and reside in Honduras, El Salvador, Guatemala, and Mexico.

3. Prior to joining Al Otro Lado, I had significant experience working with detained and deported migrants. In 2006 and 2007, I led a human rights

1

fact finding mission to Guatemala focused on the phenomena of return migration following deportation and "transnational" gangs; a summary of our findings was published by the Georgetown Law Center Human Rights Institute.[1] In 2008, I traveled to Haiti with the Georgetown Human Rights Institute and met with deportee-led organizations in Port-au-Prince as part of a larger research project focused on Haiti-US migration. From 2010-2015, I worked with detained immigrant adults and unaccompanied children at the Esperanza Immigrant Rights Project, where I became the Director of Community Education. In that position, I oversaw Department of Justice-funded Legal Orientation Programs at the Mira Loma and Adelanto Detention Facilities; oversaw legal orientation for unaccompanied children detained in Office of Refugee Resettlement facilities; oversaw legal orientation for sponsors of unaccompanied children recently released from detention; oversaw a legal orientation program for immigrants detained in L.A. County jails, and created an all-volunteer Legal Orientation Program at ICE facilities in Orange County, California. In my subsequent role as Managing Attorney for CARECEN, I created a legal orientation program for refugee families in removal proceedings at the Los Angeles immigration court. Many participants were mothers with minor children whose husbands/partners had been separated

---

[1] https://scholarship.law.georgetown.edu/hri_papers/2/.

2

from them at the border and were either detained by ICE or CBP, or had already been deported to Central America.

*Challenges in Working with Detained Migrants*

4. Representation of migrants detained in CBP custody poses significant challenges due to an almost complete lack of access to counsel. Often, Al Otro Lado is called upon to advocate for migrants in CBP custody, but in almost every case, we are unable to speak to or meet with the migrants while they are in Border Patrol or CBP facilities. In some cases, we have met with the individual in Tijuana prior to their crossing the border and being placed into CBP custody. In other cases, we are contacted by a family member seeking legal assistance on behalf of a detained migrant who contacted them directly. We frequently submit G-28 forms (Notice of Entry of Appearance as Attorney or Accredited Representative) to CBP without detained migrants' signatures because it is impossible to communicate with – much less obtain verbal consent or a signature from – individuals already in CBP or Border Patrol custody. Most of the time, CBP and Border Patrol accept an unsigned G-28 for purposes of communication regarding an individual's case, but their practice is inconsistent. On many occasions, we have been unable to make any contact with individuals

3

for whom we have submitted unsigned G-28s until they are in ICE custody or after they have been deported.

5. Al Otro Lado also receives requests for legal services from and on behalf of immigrants in ICE detention facilities all over the country. Barriers to access exist at every detention facility I have encountered, and these challenges have become more acute due to COVID outbreaks in numerous ICE facilities. The time required to travel to a detention facility, obtain access to a person held there, and navigate other barriers to access (e.g. need for telephonic interpretation, restrictions on attorney-client meetings during certain time periods), all significantly increase the resources required to advocate on behalf of detained individuals.

6. In-person visits to ICE detention facilities to obtain signatures and conduct other legal business are time-consuming and risky. Even before the pandemic, our attorneys and staff often faced long wait times to see clients, sometimes stretching to several hours. On several occasions, Al Otro Lado staff, volunteers, and I have been locked inside of ICE facilities for hours due to security lockdowns, some of which were instituted due to protests outside of the facilities. In some cases, our staff have not been able to access detained individuals at all due to the facility's failure to train front desk staff on legal access rules and frequently-changing facility clearance procedures.

7. Since the pandemic started, various ICE detention facilities have limited or eliminated in-person access to detainees, which can make obtaining signatures on legal documents difficult or impossible. Early in the pandemic, Al Otro Lado staff and other attorneys were denied access to ICE detention facilities for lack of an N95 mask, even though N95 masks were difficult to obtain at that time.[2] At various points throughout the pandemic, Al Otro Lado has discouraged or prohibited staff from making in-person visits to ICE facilities due to the elevated danger of contracting COVID, especially after Al Otro Lado staff observed multiple detention facility personnel not wearing masks and failing to comply with other public health protocols.

8. Even telephonic communication with detained immigrants can be challenging. At various times over the past few years, Al Otro Lado clients and others seeking our assistance have been unable to make free, confidential legal calls to our staff. Even during paid, recorded phone calls from ICE detention facilities, the connection is often poor and can terminate after only a few minutes. Clients making paid calls from ICE detention facilities must have

---

[2] Policies requiring attorneys and other legal representatives to obtain N95 masks and other PPE in order to access the Adelanto Detention Facility, as well as other policies restricting phone and in-person access to detained individuals, were challenged by the ACLU of Southern California and other legal groups. A subsequent settlement has improved attorney access at Adelanto, https://www.aclusocal.org/sites/default/files/aclu_socal_torres_20200326_tro.pdf, but challenges at that and other ICE facilities continue.

5

money in their accounts to initiate the calls, during which they are often surrounded by other detained individuals, making confidentiality impossible. In order to obtain free, confidential calls with individuals detained at ICE facilities, Al Otro Lado has at times submitted unsigned G-28 forms at the request of detained individuals' family members; the facilities have generally accepted these forms, especially since COVID outbreaks have dramatically increased the risk of obtaining in-person signatures.

*Challenges in Working with Deported Migrants*

9. Over the past 14 years, I have personally interviewed dozens of deported individuals. Since I joined Al Otro Lado, our organization has screened hundreds of deported individuals. Through my personal experience and the experience of my organization, I have observed numerous challenges to communication with and representation of deported individuals, all of which have been exacerbated by the COVID crisis and recent natural disasters in Central America.

10. The biggest challenge to communication with deported individuals is locating them. Locating deported individuals is especially challenging immediately following deportation due to U.S. and country-of-origin processing procedures. Individuals deported from the United States often report that they

are missing cash, cell phones, written contact information, and other property, even if they entered CBP or ICE custody with these items. In some countries, officials send migrants from the repatriation point to the interior of the country without giving them an opportunity to contact attorneys or other advocates. For example, when migrants are deported to Mexico City, Mexican immigration officials work with the International Organization for Migration (IOM) to screen migrants, take them directly from the airport to the bus station, and send them back to their states of origin. Deported individuals can end up in remote locations without a cell phone, cash, or any means of communication with legal representatives or family members.

11. Deported individuals often lack official identity documents upon arrival in their countries of origin, making it practically impossible to receive money sent from abroad to pay for an international phone call or purchase a cell phone. Many recently deported individuals fall completely out of communication and are often unable to access basic needs until they are able to obtain new identity documents or find a trusted individual to facilitate communication.

12. Many deported people cannot be located in their home countries because they go into hiding or migrate shortly after being deported, especially if they are at risk of persecution. For example, Al Otro Lado has represented

numerous separated parents who suffered threats, beatings, and attempted killings after being deported. Some went into hiding, while others had migrated to another city or country by the time we made contact.

13. Locating deported asylum seekers in their home countries can be difficult and risky for advocates. For example, Al Otro Lado works closely with the steering committee in *Ms. L v. ICE*, No. 3:18-cv-00428-DMS-MDD (S.D. Cal.) to represent separated and deported parents. The *Ms. L* Steering Committee is comprised of several nonprofit organizations and a *pro bono* law firm, and their main task now is locating separated class member parents in countries of origin to determine whether they could reunify with their children under the terms of the settlement agreement. Our partners at Justice in Motion send human rights "defenders" into Central American and Mexican towns to locate *Ms. L* class members before they are screened and potentially referred to Al Otro Lado for representation. Defenders have thus far been unable to find almost 600 parents, due in part to the risks and challenges inherent in conducting in-person searches. Defenders seeking information regarding deported asylum seekers may not receive accurate information if local townspeople are seeking to protect the deported individual from their persecutors. In addition, such inquiries may put the defender at risk if they come into contact with persecutors still searching for the individual. For these

8

reasons, on-the-ground searches for deported individuals must be conducted with the utmost care and with rigorous security protocols, which require significant resources. Even where such resources are available, finding deported individuals is sometimes impossible.

14. Once Al Otro Lado makes contact with deported clients, representation presents its own challenges. In many cases, our deported clients live in remote areas that lack internet access, phone reception, or even electricity. When we need to obtain signatures on legal documents, we often have to contract with a local attorney or organization (like Justice in Motion) to send a local staff member to obtain the signature, or provide resources for the client to safely travel to a local attorney's office to sign documents. In many cases, either clients or defenders have to travel for a full day, often through dangerous territory, to obtain signatures. Without substantial resources and local contacts, it is impossible to obtain signatures on legal documents for deported individuals living in remote locations.

15. The COVID crisis has exacerbated the challenges of working with deported individuals. Many countries have instituted various levels of lockdown which make contact with deported clients more difficult. For example, during much of the pandemic, Honduras has allowed citizens to exit their homes only on certain days, based on the last digit of their identity documents. Al Otro

Lado has routinely contracted with a local attorney to obtain signatures on legal documents, but we have recently been unable to obtain signatures for clients who live more than a few hours away from her. Due to the dangers of traveling at night in Honduras, the attorney would have to stay in the client's location until her designated "travel" day arrived, which could be more than a week later. We have faced similar challenges working with deported clients in other countries that are enforcing restrictions on movement due to COVID. In addition, many deported clients have lost their ability to work in their home countries due to the COVID crisis, making communication with counsel more difficult unless we can raise funds to cover the costs of calls, phones, or internet access.

16. Finally, the recent hurricanes in Central America have impeded our work with deported clients living in affected areas. The resulting infrastructure damage has displaced thousands and severely limited communication. Most of our clients affected by the hurricanes have no source of income, and some are still living without power. In many cases, there are no accessible locations where a client could print, sign, and scan a document, and phone communication is unpredictable.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 4th day of January 2021 in Tijuana, Mexico.

_____
Erika Pinheiro