MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, DC 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, DC 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>                    Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Hearing Date: February 15, 2021<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, DC 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................... 1

BACKGROUND ..................................................................................... 3

I.    The First Asylum Ban and the Preliminary Injunction ...................... 3

II.   Discovery Showed that Metering is Illegal ........................................ 5

III.  The Second Asylum Ban ..................................................................... 6

ARGUMENT ........................................................................................... 7

I.    Because The Second Asylum Ban Directly Contravenes A Binding Order Of This Court, The Court Can Enjoin Its Application To PI Class Members Based On Its Inherent Equitable Authority And The All Writs Act ..................................... 7

    A.   The Executive Branch Has No Authority to Implement a Regulation that Contravenes a Judicial Order Binding Upon It. ....................................................................................... 8

    B.   The Court is Authorized to Modify Its Prior Injunction to Expressly Cover the Second Ban ............................................... 10

        1.   The Court Has Authority to Modify its Injunction to Cover the Substantively Identical Second Asylum Ban. ....................................................................... 10

        2.   The Court Has Power Under the AWA to Preserve its Jurisdiction ......................................................... 11

II.   Alternatively, this court should issue a TRO ................................... 13

    A.   Plaintiffs are Likely to Succeed on the Merits of Their Claims. ............................................................................. 13

    B.   The Remaining Factors Decisively Favor Entering a TRO. ............................................................................. 15

CONCLUSION ..................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
284 F.3d 1091 (9th Cir. 2002)............................................................................. 11

*Al Otro Lado, Inc. v. McAleenan*,
394 F. Supp. 3d 1168 (S.D. Cal. 2019) ........................................................... 2, 7

*Al Otro Lado, Inc. v. Wolf*,
952 F.3d 999 (9th Cir. 2020).......................................................................*passim*

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)............................................................................. 13

*Auer v. Robbins*,
519 U.S. 452 (1945) ............................................................................................. 9

*Berger v. Heckler*,
771 F.2d 1556 (2d Cir. 1985)............................................................................. 11

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016)............................................................................. 16

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ............................................................................................. 8

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014)............................................................................. 13

*E. Bay Sanctuary Covenant v. Trump*,
349 F. Supp. 3d 838 (N.D. Cal. 2018) ............................................................... 17

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018)............................................................................... 19

*F.T.C. v. Dean Foods Co.*,
384 U.S. 597 (1966) ........................................................................................... 11

*Freeman v. Pitts*,
   503 U.S. 467 (1992) ........................................................................... 10

*FTC v. Americans for Financial Reform*,
   720 Fed. App'x 380 (9th Cir. 2017) ................................................. 12

*Hutto v. Finney*,
   437 U.S. 678 (1979) ........................................................................... 10

*Kirwa v. U.S. Dep't of Defense*,
   285 F. Supp. 3d 21 (D.D.C. 2007) .................................................... 17

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ......................................................................... 9

*Klay v. United Healthgroup, Inc.*,
   376 F.3d 1092 (11th Cir. 2004) ......................................................... 12

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011) ............................................................. 17

*Marbury v. Madison*,
   5 U.S. 137 (1803) .................................................................................. 7

*Nat'l Org. for Reform of Marijuana Laws v. Mullen*,
   828 F.2d 536 (9th Cir. 1987) ............................................................. 12

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................... 19

*P.J.E.S. v. Wolf*,
   2020 WL 6770508 (D.D.C. Nov. 18, 2020)......................................... 9

*Salehpour v. INS*,
   761 F.2d 1442 (9th Cir. 1985)......................................................... 8, 9

*Saravia for A.H. v. Sessions*,
   905 F.3d 1137 (9th Cir. 2018) ........................................................... 13

*Sharp v. Weston*,
   233 F.3d 1166 (9th Cir. 2000) ........................................................... 11

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
   739 F.2d 1415 (9th Cir. 1984)........................................................... 16

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

*Singleton v. Kernan,*
   2017 WL 4922849 (S.D. Cal. 2017) ................................................................ 16

*Small v. Avanti Health Sys., LLC,*
   661 F.3d 1180 (9th Cir. 2011) ....................................................................... 19

*State v. Trump,*
   871 F.3d 646 (9th Cir. 2017) ......................................................................... 11

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
   402 U.S. 1 (1971) .......................................................................................... 10

*Synopsys, Inc. v. AzurEngine Techs., Inc.,*
   401 F. Supp. 3d 1068 (S.D. Cal. 2019) ......................................................... 13

*Textile Unlimited, Inc. v. A. BMH & Co., Inc.,*
   240 F.3d 781 (9th Cir. 2001) ......................................................................... 13

*United States v. De-Jesus,*
   2020 WL 1149911 (E.D. Wash. 2020) ............................................................ 9

*United States v. N.Y. Tel. Co.,*
   434 U.S. 159 (1977) ...................................................................................... 12

*United States v. Washington,*
   853 F.3d 946 (9th Cir. 2017) ......................................................................... 11

*Villanueva-Bustillos v. Marin,*
   370 F. Supp. 3d 1083 (C.D. Cal. 2018) ......................................................... 17

*Walker v. City of Birmingham,*
   388 U.S. 307 (1967) ...................................................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................... 13, 16, 18

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) (Jackson, J., concurring) ................................................ 3

**Statutes**

5 U.S.C. § 706(1) .............................................................................................. 15

5 U.S.C. § 706(2) .............................................................................................. 15

iii

8 U.S.C. § 1158(a)(1) ...................................................................................... 15

8 U.S.C. § 1225 ................................................................................................... 4

8 U.S.C. § 1225(a)(1) ...................................................................................... 15

8 U.S.C. § 1225(a)(3) ................................................................................. 14, 15

8 U.S.C. § 1225(b)(1)(A)(ii) ...................................................................... 14, 15

28 U.S.C. § 1651 ................................................................................................. 4

**Other Authorities**

8 C.F.R. § 208.13(c)(4) ........................................................................ 14, 17, 18

8 C.F.R. § 1208.13(c)(4) .................................................................................. 17

84 Fed. Reg. 33,829, 33,844 (July 16, 2019), *codified at* 8 C.F.R. §§
    208.13(c)(4), 1208.13(c)(4) ...................................................................*passim*

85 Fed. Reg. 82,260 (Dec. 17, 2020) ............................................................... 1

Rule 30(b)(6) ......................................................................................... 5, 7, 15

# **INTRODUCTION**

In its dying days, the Trump administration is attempting to explicitly override this Court's November 19, 2019 preliminary injunction via a new agency rule. *See Asylum Eligibility and Procedural Modification*, 85 Fed. Reg. 82,260 (Dec. 17, 2020) ("Second Asylum Ban" or "SAB"). The Second Asylum Ban is preposterous. This Court *already* held that the government cannot apply a prior, identical rule to a provisional class consisting of "all-non Mexican asylum-seekers who were unable to make a direct asylum claim at a U.S. POE [port of entry] before July 16, 2019 because of the Government's metering policy, and who continue to seek access to the U.S. asylum process" ("PI class"). Dkt. 330 at 36. This Court enjoined the government from applying to the PI class an asylum ineligibility rule which provided that, with narrow exceptions, "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one [third] country . . . en route to the United States, shall be found ineligible for asylum." *See Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829, 33,844 (July 16, 2019), *codified at* 8 C.F.R. §§ 208.13(c)(4), 1208.13(c)(4) ("First Asylum Ban"); Dkt. 330 at 36.

The November 19, 2019 preliminary injunction turned on the extensive statutory construction analysis in this Court's prior motion to dismiss opinion, in which this Court rejected the Defendants' proposed bright-line territorial rule and found that the PI class members who were metered were "in the process of arriving in the United States through a POE," and therefore were "arriv[ing] in" the United States prior to July 16, 2019. Dkt. 330 at 31-32. This Court also found that the First Asylum Ban was "quintessentially inequitable." *Id.* at 34. A Ninth Circuit motions panel agreed with both of this Court's conclusions, finding that this Court's statutory analysis "has considerable force" and is "likely correct." *Al Otro Lado, Inc. v. Wolf*, 952 F.3d 999, 1013 (9th Cir. 2020).

The Second Asylum Ban will give this Court a serious case of déjà vu. The

1    rule purports to "adopt[] as final" the exact asylum ineligibility provisions of the

2    First Asylum Ban. SAB at 82,289. Yet, in promulgating the Second Asylum Ban,

3    the agencies explain: "For clarity, . . . this rule applies to . . . aliens who may have

4    approached the U.S. border but were subject to metering by DHS at a land border

5    port of entry and did not physically cross the border into the United States before

6    July 16, 2019." *Id.* at 82,268. But this new interpretation is not formally recognized

7    through any change to the operative language of the regulations. Indeed, the Second

8    Asylum Ban makes no changes to the operative language, tinkering only with one

9    of the exceptions and making other minor technical edits. *See* SAB at 82,262 ("this

10   final rule makes no additional changes to the IFR beyond the changes described

11   below")

12        This Court might be asking itself: didn't I already enjoin this rule?  In fact, it

13   did.  *See* Dkt. 330 at 29-36.  Because this Court has already enjoined application of

14   the First Asylum Ban to the PI class, and the Second Asylum Ban employs the exact

15   same operative regulatory language purporting to render PI class members ineligible

16   for asylum, Plaintiffs sought confirmation from Defendants that the preliminary

17   injunction applies with equal force to the Second Asylum Ban. Defendants indicated

18   that they believe that the Second Asylum Ban will operate as a mandatory bar to

19   asylum for members of the PI class.

20        The government fundamentally misunderstands the limits of its authority in a

21   system of separation of powers.[2] Courts say what the law is; not executive branch

22   agencies.  An agency cannot override this Court's a binding order, even if it

23   disagrees with this Court's interpretation of the law.  That can be done only by the

24   Ninth Circuit (which has agreed with this Court's statutory interpretation), the

25   Supreme Court, or an act of Congress.  As a result, this Court's prior preliminary

---

[2] In a footnote, the government insinuates that it can simply ignore this Court's preliminary injunction because it disagrees with it.  SAB at 82,268 n.22 ("The Departments note that this result is different from the district court's reasoning in granting a preliminary injunction in . . . *Al Otro Lado, Inc. v. McAleenan*").

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

injunction analysis applies to the Second Asylum Ban with particular force. Moreover, the discovery record developed since this Court's preliminary injunction opinion leads to one inevitable conclusion: metering is illegal, and Plaintiffs are likely to succeed on the merits of that claim as well.

The only question left for this Court is one of remedy. This Court can issue a temporary restraining order enjoining the Second Asylum Ban and clarifying that its November 19, 2019 preliminary injunction opinion, as well as all orders subsequently clarifying or enforcing that opinion, apply to the now-purportedly final regulatory language of the Second Asylum Ban. Alternatively, this Court can amend its November 19, 2019 preliminary injunction opinion to apply expressly to the Second Asylum Ban. Either way, in light of the government's failure to comply with the original injunction, the Court should make clear that enjoining the application of the Second Asylum Ban to the class includes all of the relief granted in the preliminary injunction as well as the Court's October 30, 2020 order clarifying the preliminary injunction (Dkt. 605).

The executive branch's relentless assault on asylum seekers and the rule of law—of which this attempted executive fiat forms a natural part—is, mercifully, coming to an end. Yet, ensuring the executive's compliance with judicial decrees remains as important as ever. "[O]urs is a government of laws, not of men, and . . . we submit ourselves to rulers only if under rules." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 646 (1952) (Jackson, J., concurring). The Second Asylum Ban should be enjoined.

## **BACKGROUND**

## I.    **THE FIRST ASYLUM BAN AND THE PRELIMINARY INJUNCTION**

On July 16, 2019, the government issued the First Asylum Ban. Dkt. 330 at 5. On November 19, 2019, this Court issued a preliminary injunction prohibiting the government from applying the First Asylum Ban to members of the PI class and ordering the government to "return to the pre-Asylum Ban practices for processing

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

1    the asylum applications of members of the [provisional] class." *Id.* at 36.

2         Importantly, the district court found that none of the jurisdictional bars in 8

3    U.S.C. § 1225 prohibited this Court from issuing a preliminary injunction. Dkt. 330

4    at 9-18.  This Court also concluded that the it had separate authority under the All

5    Writs Act ("AWA"), 28 U.S.C. § 1651, to issue an injunction to preserve the Court's

6    jurisdiction and prevent Plaintiffs' claims from being "prematurely extinguished" by

7    application of the Ban to the PI class.  *Id.* at 19-21.

8         The Court also found that each prong of the traditional four-part preliminary

9    injunction test favored entering a preliminary injunction.  *See* Dkt. 330 at 30-36.  The

10   Court explicitly drew upon on its extensive analysis of the statutory text of the

11   Immigration and Nationality Act ("INA") at the motion to dismiss stage, *see* Dkt.

12   280, in which this Court rejected the Defendants' proposed bright-line territorial

13   interpretation of Sections 1158 and 1225 of the INA, as the terms "arriving in" the

14   United States contemplate those in the process of arriving to the border to seek

15   asylum.  Accordingly, in issuing the injunction, this Court found that asylum seekers

16   who were subject to metering prior to July 16, 2019 were in the process of arriving

17   in the United States and should have been inspected and processed under the asylum

18   rules that existed prior to the issuance of the First Asylum Ban.  Dkt. 330 at 30-32;

19   *see also* Dkt. 280 at 35-47.  Critically, the Court concluded that "by its express

20   terms" the First Asylum Ban "does not apply" to those individuals.  Dkt. 330 at 31.

21   Next, this Court found that failing to return the provisional class members to the pre-

22   Ban regime for asylum processing would irreparably harm them.  Dkt. 330 at 33-34.

23   Finally, the district court found that the balance of the equities and the public interest

24   also weighed in Plaintiffs' favor because "[t]his situation, at its core, is

25   quintessentially inequitable."  *Id.* at 34.

26        On appeal, a motions panel of the Ninth Circuit found that this Court's

27   "linguistic and contextual analysis" of the INA "has considerable force" and "is

28   likely correct."  *Al Otro Lado*, 952 F.3d at 1013. The panel also agreed with this

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

1  Court's analysis that the First Asylum Ban created a "quintessentially inequitable"

2  situation.  *Id.* at 1015 (quotation marks omitted).

3  **II.    DISCOVERY SHOWED THAT METERING IS ILLEGAL**

4         After losing the preliminary injunction, things got worse for the government

5  in discovery.  Mariza Marin, a Rule 30(b)(6) witness designated to testify regarding

6  the government's "practice of metering," testified that asylum-seekers who are at

7  standing near the border at a port of entry are attempting to enter the United States.

8  *See* Ex. 1 at 24:14-25:8; *see also* Ex. 2 at Topic 2.[3]

9         Q.    Okay.  In your experience[], are asylum seekers who are at the

10              border between the United States and Mexico attempting to enter

11              the United States at a port of entry?

12        . . .

13        A.    Yes.

14  Ex. 1 at 201:22-202:3 (objection omitted).

15        That was just the tip of the iceberg.  Discovery also showed that:

16  • U.S. Customs and Border Protection ("CBP") officers lied to asylum

17    seekers about POE capacity in order to turn them back to Mexico;

18  • CBP officials privately told union representatives that they knew that

19    turning back asylum seekers violated the law;

20  • CBP leadership knew that turning back asylum seekers would create a

21    local humanitarian crisis in Mexican border towns, but went ahead with

22    implementing the policy anyway; and

23  • The U.S. Department of Homeland Security ("DHS") Secretary was

24    specifically told that implementing the metering policy would result in

25    hundreds of asylum seekers being turned back to Mexico every day, but

26    she approved the policy anyway.

27  _____

28  [3] "Ex." refers to exhibits to the declaration of Stephen M. Medlock, which is filed
concurrently with this motion.

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

1   *See* Dkt. 535-3 at 98:22-101:6; Dkt. 535-4 at 132; Dkt. 610 at 1-3; Dkt. 610-2 at 6.

2        Finally, the DHS Inspector General concluded that the government turned

3   back asylum seekers despite having the capacity to inspect and process them. *See*

4   Dkt. 610-2 at 10, 15. And the government's principal explanation for its conduct—

5   that it was simply making inspection and processing of asylum seekers a lower-level

6   priority—is itself a violation of the Homeland Security Act. *See* Dkt. 585 at 1-4.

7   **III.    THE SECOND ASYLUM BAN**

8        In December 2020, the Trump Administration embarked on a last-minute

9   effort to deport as many asylum seekers as possible before President-Elect Biden

10  takes office. For many asylum seekers, the government had one impediment to

11  deportation—this Court's preliminary injunction. So, on December 17, 2020, DHS

12  and the Executive Office of Immigration Review ("EOIR") issued the Second

13  Asylum Ban. *See* SAB at 82,260.

14       The Second Asylum Ban is nothing more than a slapdash effort to overturn

15  this Court's preliminary injunction ruling via agency rulemaking. It contains

16  *precisely* the same third-country transit ban on eligibility for asylum. *See* SAB at

17  82,289-90. The Second Asylum Ban does nothing to comply with this Court's

18  preliminary injunction or even work around it. It simply "note[s]" that its "result is

19  different than the district court's reasoning in granting [the] preliminary injunction."

20  *Id.* at 82,268 n.22. The government claims that it can overturn the preliminary

21  injunction because "[t]he district court's interpretation is contrary to the

22  Departments' intent." *Id.* This intent is based on the government's interpretation

23  that "[a]liens whom [CBP] encounter [sic] at the physical border line of the United

24  States and Mexico, who have not crossed the border line at the time of the encounter,

25  have . . . not attempted to enter [the United States]." *Id.* at 82,269. For that reason,

26  and in spite of a binding court order directly to the contrary, the government

27  "reiterate[s] that 'entry,' 'attempted entry,' and 'arrival' require the alien to be

28  physically present in the United States." *Id.*

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

1    But that "rationale" is little more than a new variation of the government's
2  failed arguments in opposition to the preliminary injunction. *Compare* SAB at
3  82,269, *with* Dkt. 307 at 17 ("But aliens standing in Mexico are simply not
4  'applicants for admission,' nor are they 'seeking admission' in the manner that
5  would trigger CBP's duties."). And the Second Asylum Ban entirely ignores the fact
6  that a Rule 30(b)(6) witness' testimony in this case directly contradicts the
7  government's purported statutory construction.

8                                      **ARGUMENT**

9   **I.   BECAUSE THE SECOND ASYLUM BAN DIRECTLY
10        CONTRAVENES A BINDING ORDER OF THIS COURT, THE
          COURT CAN ENJOIN ITS APPLICATION TO PI CLASS MEMBERS
11        BASED ON ITS INHERENT EQUITABLE AUTHORITY AND THE
          ALL WRITS ACT.**
12

13        This Court previously enjoined application of the First Asylum Ban to PI class
14  members, Dkt. 330, based upon its prior opinion that had thoroughly considered and
15  rejected Defendants' proposed interpretation of sections 1158 and 1225 of the INA.
16  *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1199-1205 (S.D. Cal. 2019).
17  The Court recognized that these provisions do not, as Defendants then and now
18  contend, create a bright-line territorial rule that would exclude from mandatory
19  screening requirements those asylum seekers otherwise in the process of "arriving
20  in" the United States or who are "at ports of entry." *Id.* Yet Defendants—who are
21  still subject to that injunction—now wish to undertake the same prohibited conduct
22  against PI class members under the guise of a new "final" regulation. This is a
23  clumsy sleight of hand; but all can see that Defendants seek to evade this Court's
24  mandate by blithely redeploying in regulations an interpretation of the governing
25  statutory provisions that the Court already rejected.  This arrogant attempt to invert
26  the separation of powers would undo our most elementary constitutional
27  commitment, namely that "[i]t is emphatically the province and duty of the judiciary
28  to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

**A.    The Executive Branch Has No Authority to Implement a Regulation that Contravenes a Judicial Order Binding Upon It.**

This Court ruled (1) that the First Asylum Ban, "by its express terms, does not apply to [the certified subclass in this case]," Dkt. 330 at 31, precisely because of (2) the Court's prior ruling, which held that those "who may not yet be in the United States, but who [are] in the process of arriving in the United States through a POE[,]" are "arriving in the United States" such that the INA's asylum protections apply to them. *See Al Otro Lado*, 394 F. Supp. 3d at 1199–1205. The agencies seek to evade the constraints of (1), the injunction barring application of the substantive terms of the (First or Second) Asylum Ban to PI class members by simply substituting its own preferred reading of (2), the Court's interpretation of relevant statutory terms.  Yet the principle that the executive cannot contravene a court order is as basic as the commitment to the rule of law itself.  The agencies cannot treat the law like a shell game, disappearing critical judicially-imposed constraints in order to achieve their desired executive outcomes.

While *Chevron* deference may apply when a court is considering, *ex ante*, an agency's proposed interpretation of a statute that has not been previously interpreted by the judiciary, *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 838 (1984), no administrative or constitutional law principle permits an agency to simply disregard a court's duly considered *rejection* of the agency's preferred interpretation of the statute the next time it wants to act. *See Salehpour v. INS*, 761 F.2d 1442, 1445 (9th Cir. 1985) (emphasizing that "[t]he courts," and not agencies, "are the final authorities on statutory construction"). This Court's prior injunction—premised as it was on the Court's rejection of the agencies' proposed interpretation of the relevant INA provisions, §§ 1158 and 1225—is binding on the agencies in this case, and forecloses any agency attempt to apply the terms of the Second Asylum

Ban to PI class members.[4]  *Cf. P.J.E.S. v. Wolf*, 2020 WL 6770508, \*36 (D.D.C. 2020) (adopting report and recommendation that found preliminary injunction to cover Title 42 expulsions after finding "no relevant material difference" between authority under Final Rule and Interim Final Rule).

Nor does *Auer*[5] deference save the government here. Setting to one side the illegality of ignoring the binding judicial interpretation of the statutory terms the new regulation seeks to override, the agencies cannot claim that the regulatory terms at issue are sufficiently ambiguous to authorize deference to their interpretation. *Compare* Dkt. 330 at 32 (concluding that the regulation's "unambiguous" terms exclude PI class members), *with Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) (limiting *Auer* deference to regulations that are "genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation").  This is particularly warranted where, as here, a court's prior judicial construction of a regulation follows from its "unambiguous terms." *United States v. De-Jesus*, 2020 WL 1149911, at \*4 (E.D. Wash. 2020) (citing *Brand X Internet Servs.*, 545 U.S. 967, 982 (2005)).[6]

Under our constitutional system of governance, Defendants' remedy for their disagreement with this Court's prior rulings was an appeal as of right.  Having elicited an unfavorable opinion from the Ninth Circuit on that appeal, the

---

[4] As before, Plaintiffs do not seek to enjoin application of the Second Asylum Ban across the board.  They seek to ensure that the Second Asylum Ban—like the First Asylum Ban—does not apply to PI class members and that the government is therefore foreclosed for the same reasons from applying the categorical ineligibility standards from either Ban to PI class members.

[5] *Auer v. Robbins,* 519 U.S. 452 (1945).

[6] Nor can the government manufacture ambiguity by issuing a *post-hoc* interpretation that runs counter to the interpretation of this Court.  Where the "objective criteria of [the] regulation are clearly met," based on this Court's statutory construction analysis of what it means to "arrive in" the United States, "there is no room for an agency to interpret [the] regulation so as to add another requirement," such as physical presence. *Salehpour*, 761 F.2d at 1447.  Even assuming that the original regulation is ambiguous and needs clarification—which Plaintiffs do not concede—the government cannot simply issue a new rule with the exact same language and say it means something entirely different. After all, "*Auer* deference . . . serves to ensure consistency in federal regulatory law, for everyone who needs to know what it requires." *Kisor*, 139 S. Ct. at 2414.

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

1  government now seeks to dispense with the process of law.  But mere disagreement

2  does not justify avoidance of the terms of an existing injunction out of, at a

3  minimum, "respect for judicial process." *Walker v. City of Birmingham*, 388 U.S.

4  307, 321 (1967).   Accordingly, any action by the government to apply the Second

5  Asylum Ban to PI class members would contravene this Court's prior order.

### B.    The Court is Authorized to Modify Its Prior Injunction to Expressly Cover the Second Ban

8      Defendants cannot evade the force of the Court's prior rulings by

9  formalistically labeling substantive rules "Final" and claiming they are not bound by

10  rulings governing identical "Interim" rules.  Rulemaking does not permit an agency

11  to play Whack-a-Mole with the judicial branch.   Any affirmative action by

12  Defendants to subject PI class members to the identical substantive provisions of the

13  Second Asylum Ban would contravene this Court's injunction.  The law does not

14  bend to such manipulative formalisms.  The Court retains the power to issue orders

15  to protect and enforce a prior injunction as well as power to preserve its jurisdiction

16  under the AWA.

### 1.    The Court Has Authority to Modify its Injunction to Cover the Substantively Identical Second Asylum Ban.

19      Where "a right and a violation have been shown, the scope of a district court's

20  equitable powers to remedy past wrongs is broad, for breadth and flexibility are

21  inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402

22  U.S. 1, 15 (1971).  This includes, by necessity, broad equitable power and discretion

23  to ensure compliance with a court's orders. *Hutto v. Finney*, 437 U.S. 678, 687, 690

24  (1979) ("[F]ederal courts are not reduced to issuing injunctions against state officers

25  and hoping for compliance. Once issued, an injunction may be enforced."); *see also*

26  *Freeman v. Pitts*, 503 U.S. 467, 487 (1992) (courts have "inherent capacity to adjust

27  remedies in a feasible and practical way to eliminate the conditions or redress the

28  injuries caused by unlawful action.").

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

1      This Court is thus empowered "to supervise compliance with an injunction
2  and to 'modify a preliminary injunction in consideration of new facts.'" *State v.*
3  *Trump*, 871 F.3d 646, 654 (9th Cir. 2017) (quoting *A&M Records, Inc. v. Napster,*
4  *Inc.,* 284 F.3d 1091, 1098 (9th Cir. 2002)); *see also United States v. Washington*,
5  853 F.3d 946, 979 (9th Cir. 2017) (permitting modification of a preliminary
6  injunction based on changed circumstances); *A&M Records,* 284 F.3d at 1098
7  (power to modify an injunction based on changed circumstances or new facts).
8  "Ensuring compliance with a prior order is an equitable goal which a court is
9  empowered to pursue even absent a finding of contempt." *Berger v. Heckler*, 771
10  F.2d 1556, 1569 (2d Cir. 1985). While the party requesting a modification of an
11  injunction "bears the burden of establishing that a significant change in facts . . .
12  warrants revision . . . of the injunction," *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th
13  Cir. 2000), a significant change plainly exists here. The government is attempting
14  to overturn this Court's preliminary injunction via the Second Asylum Ban.

15      Accordingly, the Court can modify the scope of its prior injunction to make
16  clear that it covers the substantively identical provisions of the Second Asylum Ban
17  and continues to apply to the enjoined regulations notwithstanding their "adopt[ion]
18  as final." SAB at 82,289.

19      **2.    The Court Has Power Under the AWA to Preserve its**
20          **Jurisdiction.**

21      This Court enjoined the application of the First Asylum Ban to the provisional
22  class pursuant to its power under the AWA to "issue injunctive relief to preserve its
23  jurisdiction in the underlying action." Dkt. 330 at 19; *see id.* (observing that the
24  AWA allows a court "'to preserve [its] jurisdiction or maintain the status quo by
25  injunction pending review of an agency's action through the prescribed statutory
26  channels.'") (quoting *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966)). As this
27  Court found, "the improper application of the [First] Asylum Ban affects this Court's
28  jurisdiction because it would effectively moot Plaintiffs' request for relief in the

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

1    underlying action by extinguishing their asylum claims." Dkt. 330 at 20.

2    The Court's holding applies precisely the same way here. Just as the improper

3    application of the First Asylum Ban would destroy the court's jurisdiction over

4    pending claims (which by now are ripe for disposition via pending summary

5    judgment motions), the improper application of the Second Asylum Ban would do

6    precisely the same and thus merits an AWA injunction.

7    Indeed, the authority to enjoin the Second Asylum Ban under the AWA is

8    even stronger here. Not only would application of the Second Asylum Ban to PI

9    class members deprive the court of jurisdiction over pending claims, but also

10    allowing the Second Asylum Ban to go into force with respect to PI class members

11    would undermine the force of a prior court order—the preliminary injunction. *See*

12    *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) (injunctions under the AWA

13    are authorized "as may be necessary or appropriate to effectuate and prevent the

14    frustration of orders it has previously issued in its exercise of jurisdiction"); *FTC v.*

15    *Americans for Financial Reform*, 720 Fed. App'x 380, 383 (9th Cir. 2017) (AWA

16    authorized district court order enforcing preliminary injunction); *Nat'l Org. for*

17    *Reform of Marijuana Laws v. Mullen,* 828 F.2d 536, 544 (9th Cir. 1987) ("One of

18    the recognized applications of the All Writs Act is the issuance of orders necessary

19    to ensure the integrity of orders previously issued."); *Klay v. United  Healthgroup,*

20    *Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004) (an injunction under the AWA "must

21    simply point to some ongoing proceeding, or some past order or judgment, the

22    integrity of which is  being threatened by someone else's action or behavior.").

23    * * *

24    The Court is thus fully authorized to clarify or modify the injunction to cover

25    the Second Asylum Ban and ensure it does not apply to PI class members in the same

26    way the First Asylum Ban does not, and the Court can do so based on its inherent

27    authority—without a finding on the traditional preliminary injunction factors.

28

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

## II.    ALTERNATIVELY, THIS COURT SHOULD ISSUE A TRO

Alternatively, this Court should issue a temporary restraining order to preserve the status quo and prevent the provisional class members' "irreparable loss of rights" before a final judgment on the merits.  *Textile Unlimited, Inc. v. A. BMH & Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001).  Specifically, because Plaintiffs are likely to succeed on their claim that metering is unlawful, and because application of the Asylum Ban to individuals subject to this unlawful practice would be outrageous, this Court should issue an order prohibiting the government from applying the Second Asylum Ban to provisional class members at any stage of their immigration proceedings and returning the provisional class members to the pre-Ban rules for processing their asylum applications.

"The standard for obtaining a temporary restraining order is identical to the standard for obtaining a preliminary injunction."  *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1072 (S.D. Cal. 2019).  A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "When the government is a party, these last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  Therefore, preliminary injunctive relief should be ordered where the plaintiff raises "serious questions going to the merits . . . and the balance of hardships tips sharply in . . . plaintiff's favor."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).  As they did with respect to the First Asylum Ban, Plaintiffs easily satisfy each of these requirements with respect to the Second Asylum Ban.

### A.    Plaintiffs are Likely to Succeed on the Merits of Their Claims.

This Court correctly held that the First Asylum Ban, which applies only to a

1  noncitizen who "enters, attempts to enter, or arrives in the United States … on or

2  after July 16, 2019," 8 C.F.R. § 208.13(c)(4), facially does not apply to provisional

3  class members, who "attempted to enter or arrived at the southern border *before* July

4  16, 2019 to seek asylum but were prevented from making a direct claim at a POE

5  pursuant to the metering policy." Dkt. 330 at 31. Given the identical language of the

6  Second Asylum Ban, the same reasoning applies here.

7       And, as described above, the Court has already rejected all of the Defendants'

8  proffered bright-line interpretation of the relevant INA provisions, which they

9  impermissibly seek to resuscitate by fiat.  As part of the Second Asylum Ban, the

10  government tries to resurrect its failed argument that even if individuals metered

11  prior to July 16, 2019 were exempt from the Final Asylum Ban, they would still

12  become subject to the Ban upon any subsequent entry into the United States. But

13  this would create a glaring loophole in the INA. If class members arrived before July

14  16, 2019 under the INA, then the government's absolute, nondiscretionary

15  obligations to inspect class members and process them for asylum were already

16  triggered. *See* 8 U.S.C. § 1225(a)(3), (b)(1)(A)(ii). The government's interpretation

17  of the Ban would negate the compulsory nature of the INA's inspection and

18  processing provisions, since it would let the government avoid its statutory duties

19  toward class members simply by metering them.  In this context, the Final Asylum

20  Ban's reference to noncitizens who enter the United States after July 16, 2019 is

21  properly understood not to include people who had begun the process of entering—

22  by virtue of "arriving" in the United States—prior to the Ban's effective date but

23  were prevented from doing so by the government's own conduct. The Ban must

24  cover only noncitizens to whom the government's duty of inspection and processing

25  did not yet attach.

26       This Court has even more support to reach the same conclusion regarding its

27  statutory interpretation here.  Since the preliminary injunction ruling, a motions

28  panel of the Ninth Circuit has concluded that this Court's statutory exegesis was

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

forceful and "likely correct." *Al Otro Lado*, 952 F.3d at 1013. In addition, a Rule 30(b)(6) witness has agreed that asylum seekers standing at the U.S.-Mexico border are attempting to enter the United States. *See supra* at 5.

Finally, Plaintiffs are likely to succeed on the merits because the pending summary judgment briefing in this case clearly shows that the government's metering policy is illegal. *See supra* at 5; Dkt. 535-3 at 98:22-101:6; Dkt. 535-4 at 132; Dkt. 610 at 1-3; Dkt. 610-2 at 6. In brief, the reasons that Plaintiffs will prevail are these. First, each individual "turnback"—or failure of the government to carry out its mandatory inspection and processing duties—of an arriving asylum seeker violates the INA and section 706(1) of the Administrative Procedure Act (APA), and the government's capacity excuse is pretextual. *See* 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), 1225(a)(3), 1225(b)(1)(A)(ii). *See* Dkt. 535-1 at 21-23. Second, the government's metering policy violates the INA and Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), because it contravenes the statutory scheme Congress created to ensure access to the asylum process at POEs and exceeds the government's statutory authority. *Id.* at 24-25. It is also arbitrary, capricious, and an abuse of discretion because Defendants' stated justification is based on pretext, the real reasons for the policy are unlawful, and the policy is at odds with congressional intent. *Id.* at 26-31. Finally, because class members have statutory rights under the INA and APA §§ 706(1) and 706(2), they cannot be deprived of those rights without due process. Because metering is unlawful, a prohibitory injunction restoring provisional class members to the position they would have been in but for that unlawfulness, *i.e.* preserving the status quo *ante*, is justified.

Therefore, for reasons that this Court articulated over a year ago and those explained in Plaintiffs' summary judgment briefing, Plaintiffs are likely to succeed on the merits.

### B.    The Remaining Factors Decisively Favor Entering a TRO.

Irreparable harm is "[p]erhaps the single most important prerequisite for the

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

1    issuance of a preliminary injunction." *Singleton v. Kernan*, 2017 WL 4922849, at

2    *3 (S.D. Cal. 2017) (*quoting* 11A Wright & Miller, *Fed. Prac. & Proc*. § 2948.1 (3d

3    ed.)). "A threat of irreparable harm is sufficiently immediate to warrant preliminary

4    injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision

5    on the merits can be rendered.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011,

6    1023 (9th Cir. 2016) (quoting *Winter*, 555 U.S. at 22).  Through issuance of the

7    Second Asylum Ban, the government would rip the protections of the preliminary

8    injunction from PI class members and subject them to removal through application

9    of the Asylum Ban just as they face the prospect of judgment on their underlying

10   challenge to metering.  This is clearly irreparable harm.  Dkt. 330 at 32-34; *see Sierra*

11   *On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984) (finding

12   that injunctive relief is "a device for preserving the status quo and preventing the

13   irreparable loss of rights before judgment.").

14          On October 30, 2020, the parties completed summary judgment briefing on

15   the merits of the government's policy and practice of metering.  If this Court finds

16   for the Plaintiffs, appropriate injunctive relief would include an order directing that

17   those class members who would have crossed the southern border prior to July 16,

18   2019, but for the government's illegal conduct should have their asylum claims

19   adjudicated based on the law that was then in place—the relief currently afforded to

20   PI class members under the terms of the PI.  Such an order would be necessary to

21   place those individuals in the same position they would have been in had the

22   government not engaged in metering.  But the Second Asylum Ban undermines the

23   government's obligations under the PI. Under the Second Asylum Ban, the

24   government would continue applying precisely the same enjoined rule to PI class

25   members, even where that application would lead to the removal of such class

26   members—without having their claims for asylum considered on the merits—to

27   countries where they risk persecution, torture and death.  *See, e.g.*, Dkt. 607 at 9-11,

28   15 (granting emergency stay of removal for individual determined to be PI class

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

member who had the Asylum Ban applied in her case and ordering a determination of her asylum claim on the merits). This constitutes irreparable harm. *See E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 864 (N.D. Cal. 2018) (loss of the right to seek asylum constitutes irreparable harm); *Kirwa v. U.S. Dep't of Defense*, 285 F. Supp. 3d 21, 43 (D.D.C. 2007) (irreparable harm where government "block[s] access to an existing legal avenue for avoiding removal" after making representations that such an avenue would be available). The persecution, torture and death PI class members face upon such removal also constitutes irreparable harm. *See Leiva-Perez v. Holder*, 640 F.3d 962, 970-71 (9th Cir. 2011) (holding that persecution on account of political opinion, in the form of extortion and beatings, "would certainly constitute irreparable harm"); *see also Villanueva-Bustillos v. Marin*, 370 F. Supp. 3d 1083, 1090 (C.D. Cal. 2018) (torture and death are irreparable harm). Only preservation of the status quo—that is, an injunction prohibiting the application of 8 C.F.R. § 208.13(c)(4) and § 1208.13(c)(4) to PI class members—would obviate these irreparable injuries.

This Court previously determined that injunctive relief was warranted because "Plaintiffs are simply seeking an opportunity to have their asylum claims heard," and the "[f]ailure to grant [the preliminary injunction] and return Plaintiffs to the status quo before the Asylum Ban went into effect . . . would therefore lead Plaintiffs to suffer irreparable harm." Dkt. 330 at 34. On the other hand, the preliminary injunction enjoining the application of 8 C.F.R. § 208.13(c)(4) and § 1208.13(c)(4) to provisional class members now has been in effect for over nine months. *See Al Otro Lado*, 952 F.3d at 1016 (denying motion to stay the preliminary injunction pending appeal). Continuing to enjoin the application of those regulations to PI class members would not cause the government any harm beyond that which this Court already determined to be outweighed by the harm facing Plaintiffs in issuing the preliminary injunction.

In evaluating the final preliminary injunction factors—the balance of the

equities and the public interest—a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the request for relief," and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotations omitted). Both this Court and the Ninth Circuit already have determined that Defendants' conduct is "quintessentially inequitable" because PI class members face ineligibility for asylum through application of 8 C.F.R. § 208.13(c)(4) or § 1208.13(c)(4) only because they relied on the government's representations regarding metering. *See* Dkt. 330 at 34; *Al Otro Lado*, 952 F.3d at 1015. Nothing has changed with the issuance of the Second Asylum Ban, which does not change the operative language of the regulations, to alter this determination on the equities.

Moreover, this Court previously found that "[t]he fact that the Government is now so broadly interpreting a regulation that could have, but did not, include those who were metered, also leads the Court to [con]nclude that the balance of equities tips in favor of Plaintiffs." Dkt. 330 at 35. Therefore, as this Court previously instructed, if Defendants wanted the Second Asylum Ban to apply to those who had been metered prior to July 16, 2019, "the regulation could simply have said so." *Id.* But, as explained *supra*, the Second Asylum Ban does not change the operative language of 8 C.F.R. § 208.13(c)(4) or § 1208.13(c)(4), but rather purports to change the interpretation of the INA and the regulations to avoid the obligations of this Court's order. The fact that despite the prior warning, yet again the government seeks merely to "so broadly interpret[ ] a regulation that could have, but did not, include those who were metered" should tip the balance of the equities heavily in favor of Plaintiffs. Dkt. 330 at 35.

Finally, it is in the public interest to "ensur[e] that 'statutes enacted by [their] representatives' are not imperiled by executive fiat," or a combination of fiats, as in this case. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018)

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

1   (citation omitted). To the extent the government's metering policy forecloses access

2   to the statutorily guaranteed asylum process through newly determined ineligibility

3   criteria that affect PI class members, the public interest is served by issuing

4   additional injunctive relief that preserves PI class members' eligibility for asylum

5   pending a determination on the merits of metering. This is particularly true where a

6   federal court—this Court—already has determined that such injunctive relief is

7   appropriate. *See Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir.

8   2011) ("[T]he public interest favors applying federal law correctly."). In addition,

9   "preventing [noncitizens] from being wrongfully removed, particularly to countries

10  where they are likely to face substantial harm," clearly is in the public interest. *Nken*

11  *v. Holder*, 556 U.S. 418, 436 (2009). Thus, all of the factors for injunctive relief

12  strongly favor granting relief to PI class members.

13  **CONCLUSION**

14      For the foregoing reasons, Plaintiffs' motion for a temporary restraining order

15  should be granted.

16  Dated: January 6, 2021                MAYER BROWN LLP

17                             Matthew H. Marmolejo
                                Ori Lev

18                             Stephen M. Medlock

19

20                        SOUTHERN POVERTY LAW
                        CENTER

21                             Melissa Crow

22                           Sarah Rich
                           Rebecca Cassler

23

24                        CENTER FOR CONSTITUTIONAL
                        RIGHTS

25                           Baher Azmy
                           Angelo Guisado

26

27                        AMERICAN IMMIGRATION
                        COUNCIL

28                         Karolina Walters

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

1

2     By: /s/ Stephen M. Medlock
      Stephen M. Medlock

3     *Attorneys for Plaintiffs*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO OF P. & A. IN SUPP. OF PLS'
MOT. FOR TRO

1

**CERTIFICATE OF SERVICE**

2          I certify that I caused a copy of the foregoing document to be served on all

3    counsel via the Court's CM/ECF system.

4    Dated:  January 6, 2021                         MAYER BROWN LLP

5

6                                                    By  */s/ Stephen M. Medlock*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28