# EXHIBIT B

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
**(San Diego)**

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | **DEFENDANTS' EXHIBIT 1** |
| v. | |
| Chad F. WOLF, Acting Secretary of Homeland Security, in his official capacity, *et al.*, | |
| *Defendants*. | |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Al Otro Lado, Inc., *et al.*, *Plaintiffs*, | ) ) ) ) | |
| v. | ) ) | No. 3:17-cv-02366-BAS-KSC |
| Chad Wolf, *et al.*, *Defendants*. | ) ) ) ) | |

**DECLARATION OF BEVERLY GOOD**

I, Beverly Good, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am currently on a temporary duty assignment as the Acting Executive Director, Admissibility and Passenger Programs, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I have been on this assignment since September 7, 2020. In this role, I oversee policy and procedures related to primary and secondary system requirements and processes at over 328 ports of entry (POEs). My permanent position is Port Director, El Paso Port of Entry (ELP POE). I have held that position since November 2014. In this role, I lead over 1,000 CBP Officers (CBPOs), Agriculture Specialists, Import and Entry Specialists, and administrative personnel with a strong commitment to achieve the CBP mission, through collaboration, innovation, integration and necessary training. Until March 18, 2020, the ELP POE encompassed four distinct international bridges (two with commercial import lots), two international railroad operations, an international airport operation and a Foreign Trade Zone. CBPOs in ELP POE inspected approximately 14.9 million travelers, 7.2 million passenger vehicles, and more than

1

389,000 commercial conveyances, and processed an estimated $26.3 billion in trade in Fiscal Year 2019. From August 2016–December 2016, I was temporarily assigned as the Acting Executive Director for Operations, where I oversaw operations at 20 field offices across the entire United States, as well as overseas locations. I had oversight over 20 Directors of Field Operations, provided guidance to the field and reported back to the Executive Assistant Commissioner (EAC) and the Deputy EAC daily. I have also held several other positions within the Office of Field Operations throughout my 29 years of service.

2. CBP has a broad mission of both protecting the United States from external threats (such as terrorists and other dangerous individuals, narcotics and other substances that can harm U.S. citizens, and counterfeit goods and other products that can undermine U.S. economic prosperity) and facilitating lawful trade and travel in ways that can help support and enhance the U.S. economy and the U.S. population. Implementing these dual mission sets requires a careful balancing of resources, personnel, and attention. OFO is the main component of CBP that is responsible for implementing these missions, as OFO is responsible for inspecting everything and everyone that enters the United States at its 328 POEs across the country (e.g., all vehicles, conveyances, goods, people, plants, animals, food, medicine, merchandise, etc.), and determining whether that person or thing complies with U.S. law. Therefore, OFO is the first line of defense against threats entering the nation and is primarily responsible for facilitating the free flow of travel and trade.

3. I am aware of the above captioned case. Specifically, I understand that Plaintiffs allege that OFO has taken steps to deny individuals access to the asylum process at POEs along the southern border. I understand that Plaintiffs have requested that this court "enter a permanent injunction prohibiting all forms of turnbacks and requiring Defendants to inspect asylum seekers as they arrive at Class A POEs on the U.S.-Mexico border." It is my understanding that plaintiffs define "turnbacks" to include acts of misconduct by CBP officers (such as lies,

2

misrepresentations, threats, coercion, physical or verbal abuse, and discrimination), as well as actions that OFO takes to manage the flow of aliens without documents sufficient for lawful entry into land POEs on the southern border. I understand that plaintiffs are requesting an order that would prohibit OFO from taking any of the above actions, including metering or queue management.

4. I also understand that plaintiffs are seeking an order from this court that would require OFO to inspect and process "asylum seekers" in the order in which they arrive at the POE, or an order that would require OFO to inspect and process "asylum seekers" in the order in which they arrive *and* at the time they arrive at a port of entry.

5. I make this declaration in support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment in this case, specifically to explain the harm that would result if OFO were enjoined from managing the flow of pedestrian travel into land ports of entry on the southwest border.

6. Queue management is an operational practice by which OFO ensures that land ports of entry along the southwest border only take in as many aliens who arrive without documents sufficient for lawful entry to the United States as they are able to safely process and hold in accordance with CBP's short-term detention standards, and ensures that ports have sufficient resources to fulfill their priority mission sets. When ports engage in queue management, officers generally stand at the physical border between the United States and Mexico and determine whether individuals approaching the border have documents that would permit them lawful entry to the United States. Individuals who do not have such documents may be required to wait to proceed to the port until there is sufficient operational capacity to safely process them. Port directors have discretion to determine how many aliens without documents sufficient for lawful entry can be processed at a particular time on a particular

3

day, based on an assessment of all the factors influencing the port's operational capacity to both safely process and hold such individuals in appropriate conditions at that particular time.

7. Under the law and policy, OFO has a duty to inspect and process all individuals, regardless of nationality or citizenship, who enter the United States at a designated port of entry. For those individuals who are aliens and are determined to be inadmissible, OFO processes them for appropriate removal proceedings or other appropriate action (such as criminal prosecution). Engaging in acts such as lies, misrepresentations, threats, coercion, physical or verbal abuse, and discrimination is viewed as misconduct. Such actions are prohibited by OFO policy, and officers who engage in such actions may be subject to disciplinary action. Additionally, OFO policy specifically prohibits officers from returning any individual who has crossed the international boundary onto U.S. soil without appropriate processing.

8. There are several avenues for individuals to bring complaints or concerns about conduct to the attention of the agency for appropriate action, including the DHS Office of Inspector General, DHS's Office of Civil Rights and Civil Liberties, and directly to CBP. Complaints submitted to any of these entities will be referred to the appropriate entity within DHS, including CBP's Office of Professional Responsibility, for appropriate investigation and action.

9. As outlined above, OFO utilizes queue management in order to appropriately allocate resources to address the myriad of missions being executed at a POE, to protect against unsafe conditions at the POEs, and to ensure that individuals who do enter the United States can be properly processed. Were port directors enjoined from utilizing queue management when there are a significant number of individuals entering the United States without sufficient entry documents, they would be required to divert resources away from their other priority missions. This diversion of resources would leave the southwest border vulnerable to

4

        drug-trafficking organizations, transnational criminal organizations, and other nefarious actors.

10.   OFO's operations at ports of entry generally fall within executing the following priority missions: National Security, Counter-Narcotics and Outbound Operations, Economic Security, and Trade and Travel Facilitation. As explained above, OFO is charged with defending the nation's borders. As a result, OFO must ensure not only that aliens who seek to enter without sufficient entry documents are processed, but also that dangerous individuals, counterfeit goods which do direct harm to the nation's economy (and, depending on the product, physical harm to individuals), and illicit narcotics that cause significant harm to the country, are intercepted. OFO also inspects outbound travelers and vehicles for undeclared currency, firearms, and ammunition, which fund and facilitate the activities and fuel the violence of transnational criminal organizations in Mexico. OFO has made significant outbound seizures along the southwest border every year. While processing individuals without documents required by law for admission arriving at the southwest border remains a component of CBP's mission, priority is given to the efforts described above. I outline below some information to provide an overview of these missions and explain their breadth and significance. When OFO must reallocate resources towards the processing of aliens without sufficient entry documents it is, by necessity, taking resources from other critical missions that are important in keeping the United States safe, secure, and prosperous. Therefore, any order preventing OFO from utilizing queue management would have the effect of forcing OFO to shift a significant portion of its finite resources towards safely processing aliens without documents, and holding such individuals in conditions consistent with CBP's short-term detention standards, and away from OFO's other priority missions.

11.   *National Security*: This includes detecting and identifying potential public safety and security threats, including known or suspected terrorists, criminals, other violent actors, and

5

implements of terror such as biological and other potential weapons of mass destruction (WMD). CBP is uniquely positioned to enhance the safety of the United States and needs to be exceptionally focused on addressing the threats posed by counter intelligence activities, terrorism, transnational criminal organizations and others who wish to do us harm.

a. In Fiscal Year 2019, OFO encountered 9,297 individuals with outstanding warrants at POEs across the country. In Fiscal Year 2020 (through August), OFO encountered 6,406 individuals with outstanding warrants.

b. CBP's Tactical Terrorism Response Teams (TTRT), which are comprised of CBP officers and agents who are specially trained in counterterrorism response, are currently operational at 77 U.S. POEs and all 20 U.S. Border Patrol Sectors. TTRT officers and agents utilize information derived from targeting and inspection to mitigate possible threats. TTRT members are immersed in the current and developing threat picture through the continuous review of information, and are responsible for the examination of travelers suspected of having a nexus to terrorism who are encountered at or apprehended between the POE. CBP officers and agents also support FBI Joint Terrorism Taskforces with manpower and CBP's unique information holdings to assist with counterterrorism investigations.

c. CBP employs a counter network approach that leverages CBP's unique authorities, data holdings, intelligence enterprise, and partnerships as part of a coordinated approach against cross-border threat networks. In order to identify, disrupt, dismantle and degrade threats, which include terrorists and transnational criminal organizations, CBP participates with whole of government and international partners to illuminate, analyze, and understand threat networks, takes action with our partners to affect these networks, and grows, enhances, and sustains CBP capabilities critical to effective execution of counter network activities.

6

    d. CBP officers use various mechanisms to identify travelers of possible counterterrorism and other national security concerns, and coordinate with our partners to further their investigations based on information discovered during CBP inspections.

12. *Counter-Narcotics and Outbound Operations*: OFO's mission includes countering transnational criminal organizations, whose networks continue to threaten U.S. public health and safety, undermine our nation's economic prosperity, and provide support to hostile foreign powers. These organizations smuggle humans and illicit narcotics, infest the legitimate supply chain with counterfeit items and launder proceeds through the trade, and smuggle weapons and currency to fund and fuel their violent control in areas they operate. OFO collaborates with our partner agencies to disrupt and dismantle these criminal enterprises.

    a. In Fiscal Year 2020 (through August), OFO nationwide seized 37,830 pounds of cocaine; 4,552 pounds of heroin; 313,813 pounds of marijuana; 141,663 pounds of methamphetamine; and 3,302 pounds of fentanyl. The amount of fentanyl, in particular, increased significantly from Fiscal Year 2019 (when OFO seized 2,545 pounds). More specifically, OFO along the southern border intercepted over 117,000 pounds of methamphetamine, 19,000 pounds of cocaine, 2,400 pounds of fentanyl, 4,700 pounds of heroin, and 253,900 pounds of marijuana in fiscal year 2019. In FY20 (through September), CBP OFO seized more than 412,658 pounds of illicit narcotics on the southern border.

    b. In the month of August 2020 alone, OFO nationwide seized 41,021 pounds of marijuana; 3,633 pounds of cocaine; 503 pounds of heroin; 23,452 pounds of methamphetamine; and 451 pounds of fentanyl.

7

    c. Further, the amount of methamphetamine seized along the southern border increased to 117,532.67 pounds in Fiscal Year 2019 (a more than 66% increase from Fiscal Year 2018). In Fiscal Year 2020 (through August), OFO on the southern border has seized more than 130,000 pounds of methamphetamine (another 22% increase).

    d. In Fiscal Year 2019, along the southwest border, OFO intercepted $9,442,827 in illicit outbound currency along the southwest border. Further, OFO also intercepted 170 firearms and 104,740 rounds of ammunition outbound along the southwest border in Fiscal Year 2019.

    e. In FY 2020 (through Sept. 5, 2020), OFO along the southwest border has seized 340 firearms, 3,200 firearms parts and accessories, 190,171 rounds of ammunition, and $16,907,507 in outbound currency.

13. *Economic Security*: CBP facilitates legitimate trade, enforces import and export laws, and protects the American economy to create a level playing field for American businesses. CBP focuses its enforcement efforts around priority trade issues that include interdicting counterfeit and unsafe goods, enforcing trade agreements, protecting revenue, and protecting American agricultural from pests and other threats .

    a. During Fiscal Year 2019, CBP processed 35.5 million entries valued at over $2.7 trillion and more than 28.7 million imported cargo containers at POEs across the United States.

    b. Since the end of March 2020, CBP's COVID-19 Cargo Resolution Team, working with interagency and private sector partners, has facilitated the importation of approximately $1.2 billion in medical supplies critical for the U.S.'s COVID-19 response.

    c. Of particular importance in the pandemic, since the pandemic began through the first week of September 2020, OFO has seized more than 170,000 unlawful COVID-19

8

Case 3:17-cv-02366-BAS-KSC Document 563-8 Filed 09/25/20 PageID.52209 Page 10 of
Page 11 of 18

        test kits in 368 separate incidents. OFO seized more than 12 million counterfeit face masks in 309 separate incidents; nearly 3,000 EPA-prohibited anti-virus lanyards in 105 incidents; more than 24,000 FDA-prohibited chloroquine and hydrochloroquine tablets in 180 incidents; and more than 45,000 tablets of counterfeit or unsafe antibiotics (such as azithromycin) in 92 incidents.

    d. In Fiscal Year 2020 (through September 1, 2020), CBP has had over 23,700 seizures of counterfeit goods with an estimated value of $1.2 billion.

14. *Facilitation of Lawful Trade and Travel*: This includes effectively anticipating, detecting and intercepting threats prior to and at ports of entry to enable the flow of travelers, including U.S. citizens, lawful permanent residents, and visa holders, at POEs across the country. International trade and tourism are two of the biggest drivers for the U.S. economy. Many local economies on the southern border depend on cross-border trade and travel.

    a. In Fiscal Year 2019, the Field Offices on the southwest border processed 73,365,568 personally-owned vehicles; 136,931,326 vehicle passengers; and 48,749,851 pedestrians. In Fiscal Year 2020 (through August), the Field Offices on the southwest border processed 53,037,706 personally-owned vehicles; 94,884,249 vehicle passengers; and 30,565,954 pedestrians.

15. These priority missions must be implemented in conjunction with the mandate to inspect, process, and temporarily detain those aliens who are determined to be inadmissible to the United States. A port must maintain sufficient personnel and resources to be able to simultaneously identify national security threats; detect and seize illicit narcotics; facilitate the entry of vehicles, cargo, and travelers; and inspect, process, and hold those aliens that are determined to be inadmissible to the United States. Each port must therefore carefully allocate its limited resources to ensure that it is able to devote sufficient resources towards each of these missions. OFO has a finite number of personnel, resources, and space, and so

9

any requirement to focus more resources towards a particular area – for any reason – necessarily means that OFO will have fewer personnel and resources to devote to other mission sets. This is particularly important when considering the broader impact of diverting resources from OFO across the country. OFO faces ongoing staffing shortages at air, land, and sea ports across the country, and officers are often required to work overtime to meet the operational needs that arise on a daily basis. Many officers, however, reach their statutory overtime cap each fiscal year, which may lead, and has led, to critical staffing shortages across POEs. While OFO often grants overtime cap exemptions to involuntary overtime, significant involuntary overtime can cause significant fatigue of front-line officers, making them more vulnerable to officer assaults. There have been 200 reported assaults on CBP officers at southwest border POEs for Fiscal Year 2020 (through September).

16. Since we do not know the specific parameters of an order enjoining OFO from utilizing queue management, it is difficult to say precisely what the harm of such an order may be. However, at a minimum, any order that enjoins the use of queue management would require OFO to divert staffing and resources, both at the southwest land border POEs and across the country, away from their priority missions and towards the processing of aliens without documents sufficient for lawful entry. Such diversion of resources has, in the past, had a significant negative impact on OFO operations, as well as on the U.S. population and the U.S. economy, across the country. As outlined above, local economies depend on cross-border trade and travel, and will be negatively impacted by the inevitable lane closures and processing slow-downs in pedestrian, vehicle, and cargo traffic. Such a negative impact would be of particular significance during this time when state and local economies – indeed, the entire country – are trying to recover from the impact of the COVID-19 pandemic and associated economic shutdowns.

17. For instance, in the summer of 2019, OFO deployed 731 officers to assist the U.S. Border Patrol to address the significant surge of individuals apprehended in between ports of entry along the southwest border as part of Operation Southern Support. These 731 officers came from all across the country. During that extreme circumstance where the agency was forced to divert its resources to address an emergent issue, wait times for passengers, pedestrians, passenger vehicles, and commercial trucks trying to cross the border increased at some airports and land ports of entry. Some ports of entry were forced to close travel lanes and curtail weekend cargo processing hours, which affected the flow of commerce and travel into the United States. Similarly, when the port of San Ysidro closed for five and a half hours in late 2018 in response to an emergency (and thus was required to divert *all* of its resources away from its priority mission sets), the San Ysidro Chamber of Commerce reported an estimated loss of $5.3 million to the region and local economy. I have every expectation that any order enjoining the use of queue management would have at least the same impact. However, unlike the impacts of Operation Southern Support, these would be lasting, not temporary impacts. Longer-lasting deployments of officers have previously led to significant financial cost for OFO. For instance, OFO deployed 1,865 officers over the course of five fiscal years to supplement critical staffing shortages in the San Diego and Tucson Field Offices, at a cost of over $41,757,580 in travel expenditures. I expect that similar financial costs would arise from an order preventing OFO from utilizing queue management, in addition to the operational impacts described above.

18. Similar impacts would be seen for narcotic-interdiction and national-security efforts. For instance, if ports were forced to divert officers from front-line duties to assist in processing and holding individuals in custody, the ports would become more vulnerable to illicit drugs successfully being smuggled into the ports. Fentanyl, in particular, is a drug that is difficult to detect, as it is easily concealed in small packages and other small compartments. OFO's

11

fentanyl seizures have increased significantly over the past several years, but having fewer officers available to detect this drug makes it significantly more likely that it will be successfully smuggled into the United States, contributing to the ongoing opioid crisis plaguing the country. Methamphetamine smuggling is also significantly increasing. Mexico is the largest supplier of methamphetamine to the United States. While OFO's seizures of methamphetamine have increased over the last few fiscal years, a decrease in front-line officers would similarly make the ports more vulnerable to this smuggling.

19. In addition to the harms that would be caused by taking officers away from priority missions, I expect that if OFO were not permitted to use queue management, significant humanitarian challenges would also follow. Specifically, OFO's facilities are not designed for nor equipped to hold large numbers of individuals, nor are they designed to hold individuals for long periods of time. They do not have showers, beds, laundry facilities, or space for recreation. They are not equipped to meet the needs of families with small children, nor of those with unique medical needs. This also makes it difficult to segregate vulnerable populations from the rest of those in custody. Without any method of managing the flow into the ports of entry, they can quickly become overcrowded, especially if large groups of individuals are encountered at once. Indeed, this was the very reason why ports of entry began utilizing queue management in the first place – to prevent such overcrowding and to ensure safe conditions for everyone in custody. Such overcrowding would be particularly dangerous during the current COVID-19 pandemic, as having large numbers of people in close, overcrowded conditions would increase the likelihood of the virus spreading in OFO's facilities, putting both officers and individuals in custody at risk.

20. I base my humanitarian concerns, in part, on my experience working to address how OFO managed a large surge of migrants at ports of entry prior to the implementation of queue management. Specifically, in 2016, OFO across the southwest border faced a significant

12

surge in the number of aliens without travel documents entering the ports. Many of these individuals were families and unaccompanied alien children. To help mitigate the humanitarian concerns caused by the surge, various POEs converted office space, areas designated for cargo or other inspections, and other available space into hold rooms in an attempt to process and hold more individuals in a safe manner. POEs also worked to hold as many individuals as possible at local U.S. Border Patrol facilities, and worked with U.S Immigration and Customs Enforcement (ICE) to increase transportation of individuals out of CBP custody. POEs also diverted resources from other OFO mission sets, including outbound enforcement and vehicle processing. During this surge, OFO detailed officers from across the country and increased overtime, at significant cost to the agency.

21. While such actions did permit OFO to process more individuals and bring them indoors from the elements, such actions had a significant cost to both officers and the individuals in custody. Repurposed office space, for example, often did not have restrooms, and so officers were required to escort individuals back and forth to restrooms. Such spaces were not designed for sleeping or provide comfortable living conditions. Additionally, converting spaces such as cargo processing space and office space into hold rooms, and diverting officers from frontline duties, further diverted resources and personnel from other mission sets at the POE. In particular, the humanitarian crisis in 2016 had a negative impact on OFO's ability to detect and intercept illicit narcotics along the southwest border. Hard narcotics drug seizure weights decreased by 8.147% to 542,925 pounds in Fiscal Year 2016, when compared to Fiscal Year 2015. This decrease was not on par with rising seizure trends over the prior years, and in the subsequent years.

22. Even when undertaking such actions, some ports quickly reached a point at which the POE became overcrowded and unsafe. On October 24, 2016, for instance, the San Diego Field Office was operating at 207% of its detention capacity, the Tucson Field Office was

13

operating at 192% of its detention capacity; the El Paso Field Office was operating at 146% of its detention capacity; and the Laredo Field Office was operating at 96% of its detention capacity. By October 30, 2016, the Field Offices on the southwest border were collectively operating at 140% of their stated detention capacity. Additionally, and because of these safety concerns, individuals waited in line – on U.S. soil – until the port had the capability to process and hold additional individuals. These individuals were essentially camped out in this space, sitting for extended periods of time, and at times sleeping on the bare ground. These individuals did not have access to showers or hygiene supplies, or regular access to toilet facilities. These lines stretched far beyond the port building, exposing some of these individuals to the elements.

23. Addressing these humanitarian issues, even on a temporary basis, resulted in significant costs for OFO and CBP. For instance, OFO spent more than $1.5 million on supplies such as blankets, food, and other hygiene products, in addition to the costs spent on overtime and other travel expenses. The U.S. Border Patrol also spent more than $9 million on overtime, travel expenses, and humanitarian supplies. Additionally, in November of 2016, CBP opened a soft-sided facility at the Tornillo POE. This facility initially had a capacity of 500 beds, with a scalable capacity up to 3,000. However, the cost to operate each 500-bed unit of the facility was $2.6 million for 30 days, and the facility required 50 CBP employees (either CBP officers or Border Patrol agents) for adequate staffing, again taking both CBP officers and Border Patrol agents away from critical mission sets. CBP opened a similar facility at the Donna POE in December 2016, at similar costs. Such facilities are intended to be temporary, but were necessary at the time due to the extremely high numbers in custody at both POEs and at the facilities of the U.S. Border Patrol.

24. Based on past experience, I expect that any order preventing OFO from utilizing queue management and requiring OFO to process aliens without documents as they arrive at POEs

14

would lead to similar humanitarian concerns and would require CBP to take similar steps to address these concerns, regardless of the exact scope or mechanisms of the order. Regardless of the exact requirements of any order enjoining the use of queue management, I expect that large numbers of aliens without documents would arrive at POEs in large groups, which would present similar humanitarian concerns for CBP as those that existed in 2016. This is particularly so because CBP's role in the immigration system is to inspect, process, and refer individuals to other agencies as appropriate. As such, CBP is heavily reliant on partner agencies, particularly ICE, to accept custody of individuals for long-term detention. In my experience, ICE has similarly limited and finite resources. Therefore, ICE does not always have available bed space. This would be particularly so if OFO were unable to utilize queue management. If ICE is limited in its ability to transfer individuals out of CBP custody, OFO must either parole individuals from custody or locate an appropriate place to hold these individuals while securing space with ICE.

25. However, paroling large numbers of individuals in this way would be inconsistent with both longstanding OFO policy and the legal guidelines for parole. CBP officers exercise their parole authority by weighing the totality of circumstances for each encounter. Specifically, under the law and OFO policy, parole is intended to be exercised on a limited and case-by-case basis. Paroling large numbers of individuals would create an additional "pull factor" for those who have no intention of appearing for all required portions of their removal proceedings. Additionally, executing releases in this manner places a significant strain on local NGOs, shelters, and other community organizations that often provide assistance to aliens released from DHS custody, as these organizations often have limited resources and limited personnel. Additionally, in some border communities, there is not extensive public transportation that would permit individuals released from the POEs to efficiently travel to other parts of the country.

26. If ICE is limited in its ability to transport individuals out of OFO custody, individuals will likely remain in OFO custody for longer than 72 hours. OFO facilities are only designed for processing and short-term detention. Holding individuals for extended periods of time in OFO facilities therefore leads to increased risks to the health and safety of both these individuals and CBP Officers – particularly during the current pandemic. Such high numbers in custody and increased time-in-custody would also require additional OFO resources to ensure detention standards are met, including increased costs for food and other humanitarian supplies. As described above, such a diversion of resources increases the likelihood of successful smuggling events and poses a national security risk at the border that is frequently exploited by organized transnational criminal organizations and other nefarious actors. CBP officers have a responsibility to meet priority missions, including performance of secondary inspections of high-risk conveyances and travelers, and facilitation of lawful trade and travel. I have witnessed the challenges of maintaining the integrity of border security operations when unable to manage the flow of aliens without documents sufficient for lawful entry at the southwest border. Without being able to utilize queue management, OFO's operations and facilities would be negatively impacted.

27. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 25th day of September, 2020.

*[signature]*
Beverly Good
Acting Executive Director,
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection

16