# EXHIBIT C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Al Otro Lado, Inc., *et al.*, ) | | |
|     *Plaintiffs*, ) | | |
| ) | | |
| ) | | |
| v. ) | | No. 3:17-cv-02366-BAS-KSC |
| ) | | |
| Chad Wolf, *et al.*, ) | | |
|     *Defendants.* ) | | |
| ) | | |

## DECLARATION OF JOSEPH DRAGANAC

I, Joseph Draganac, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am currently the Acting Executive Director, Operations, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I have been employed in this role since November 2020. I have been the Deputy Executive Director, Operations, since October 2017. I began my career in April 2000. During my 20 years of federal service, I have held various leadership positions, including Assistant Port Director at the Port of Buffalo and Deputy Director of the Field Operations Academy. In my current position, I oversee more than 24,000 employees, with operations at 20 major field offices, 328 POEs, and 16 Preclearance locations. In my current role, I am responsible for reinforcing the frontline by supporting Field and Executive leaders with critical information, guidance, and expertise.

1

2. I make this declaration to support the filing of portions of two of the exhibits, AOL-DEF-00235276 and AOL-DEF-00547009, to Plaintiffs' Reply in Support of their Motion for Summary Judgment under seal.

3. The first exhibit, AOL-DEF-00235276, is a July 24, 2018 email chain between individuals in the Laredo Field Office and the Hidalgo Port of Entry describing the operational impacts of prioritization-based queue management. The email chain is an effort to gather information, in response to a request from OFO headquarters, about "success statistics" resulting from ports implementing prioritization-based queue management and taking steps to ensure that resources were devoted to OFO's priority missions, such as counter-narcotics and national security efforts.

4. The Laredo Field Office circulated this email from headquarters to the ports of entry within the Field Office, and provided some specific examples of such successful efforts that it had already received from some of the ports within the Field Office. This email contained specific examples of increased enforcement actions over the previous 30 days that had resulted from shifting CBP officers from passport control operations back towards increased enforcement actions, such as increased narcotics seizures and increased immigration enforcement actions. These examples contain details of these enforcement actions, such as the number of enforcement actions taken during the 30-day period, and the amount and type of narcotics seized and the specific immigration enforcement actions taken, broken down by port of entry.

5. The Assistant Port Director of the Hidalgo POE then forwarded this same email chain to individuals within the port, asking for a detailed assessment of relevant positive and negative operational impacts from prioritization-based queue management at the Hidalgo POE. In forwarding this email, the Assistant Port Director provided some examples of

2

        increased enforcement actions taken as a result of queue management, as well as a discussion of the specific techniques that individuals had used to circumvent the queue management position at the port.

6.    Taken together, these two email chains reveal details about port operations and potential vulnerabilities that should be protected from public disclosure. More specifically, the email from the Laredo Field Office summarizing increased enforcement actions provides details of seizures and other increased enforcement actions taken at specific ports of entry in the Field Office as a result of queue management. This email reveals which specific ports had an increase in narcotics seizures and immigration enforcement actions, as well as the type of narcotics seized and the nature of the immigration enforcement actions. This information thus reveals that, because of these increased enforcement actions, it would likely be more difficult for smuggling groups or other hostile actors to successfully smuggle narcotics or contraband through these ports of entry. Although the email does not contain information about each of the eight POEs in the Field Office, the specific information that is included about a subset of the ports provides hostile actors with sufficient information to reallocate their resources in such a way as to disrupt operations across the Field Office. Specifically, the information would permit hostile actors to allocate their resources *away* from these ports of entry that had more enforcement actions and towards other ports that may be perceived as being easier to successfully penetrate. Conversely, hostile actors could use the information in this email to deliberately instruct a large number of individuals to attempt to enter without inspection at those ports that *were* able to successfully increase enforcement actions, knowing that such an action would overwhelm operations and require the diversion of officers from frontline enforcement actions towards the processing and detention of such individuals.

3

7. Similarly, the email from the Hidalgo POE contains a discussion of vulnerabilities in the queue management process – namely, circumventing the queue – and explains a particular technique that individuals had utilized to circumvent the queue. The discussion of this specific technique thus provides outside entities with a specific roadmap for how to circumvent the queue at the Hidalgo POE, which could easily be exploited by large groups of individuals. Should large numbers of individuals take steps to circumvent the queue at Hidalgo, the port would see higher numbers of individuals in custody, which could potentially cause the port to become overcrowded. Additionally, if a port has a high number of individuals in custody, officers at the port must devote significant time and energy towards expeditiously processing the individuals, and ensuring that all individuals have adequate food and water, and are housed in sanitary conditions. For instance, OFO policy requires that officers conduct welfare checks at regular intervals for individuals in custody. Officers must also provide individuals in custody with meals and snacks, as well as ensure that any children are adequately supervised. Because the port has finite resources, these increased requirements draw officers away from their frontline enforcement duties. This is not only a theoretical possibility – the Hidalgo POE has, at several points over the past few years, faced capacity constraints as a result of individuals circumventing the queue.

8. Thus, a hostile actor could use this information to instruct an increased number of individuals to continue to utilize this tactic at the Hidalgo POE, in an attempt to disrupt operations and make the port more vulnerable to smuggling attempts. Additionally, the same hostile actor could use this information, combined with the insights gathered from the information above, to instruct individuals to utilize a similar tactic at other ports perceived to be vulnerable. If individuals sought to utilize this tactic at multiple POEs, it

4

could lead to overcrowding and resulting security threats at multiple ports within the Field Office.

9. The second exhibit, AOL-DEF-00547009, reveals similar operational vulnerabilities about ports within the San Diego Field Office. This document is a "report card" of the mission-critical priorities in the San Diego Field Office as of June 2018. This summary provides an explanation of the Field Offices' successes, continued challenges, efforts to address current threats, and ongoing operational initiatives/programs, as of June 2018.

10. The following information in the section entitled "Countered Persistent Threats" should remain under seal and protected from public disclosure:

   a. The second and third lines of the first bullet;

   b. The specific description following the words "distribution of" in the second bullet;

   c. The numbers contained within the third bullet.

11. These specific details reveal the Field Office's techniques, tactics, and methods to provide support to ongoing law enforcement investigations; specific intelligence collection techniques and methods; and the results of these specific law enforcement actions and intelligence collection efforts. This information provides specific details about actions the Field Office had taken in identifying and responding to two specific threats, including the specific nature of the threats and the specific law enforcement actions the Field Office had taken to address the threats. The summary also details the specific actions and steps that certain intelligence and targeting personnel within the Field Office took in furtherance of certain ongoing law enforcement initiatives, and links those actions to certain outcomes and trends.

12. Thus, this information provides a snapshot of the Field Office's law enforcement priorities and the threats to which the Field Office determined it was most appropriate to devote its law enforcement resources. It also provides a detailed snapshot of the Field Office's efforts to respond to specific threats, provides hostile actors with detailed insight into the nature of those threats, and details the actions the Field Office takes to counter these threats. Should this information be disclosed publicly, hostile actors would be able to utilize the insight into the nature of the Field Office's law enforcement priorities, combined with knowledge of the specific actions taken to address these priority threats, and change their behavior so as to take steps to *evade* detection by those same law enforcement actions. This would permit hostile actors to evade law enforcement detection, and would significantly harm the Field Office's ability to respond to similar threats in the future.

13. Similarly, the number of National Guard personnel deployed within the San Diego Field Office in the section entitled "Moving Forward" should be filed under seal. Over the past few years, National Guard personnel have been deployed to assist both OFO and the U.S. Border Patrol with tasks such as providing appropriate support duties for cargo operations, inspecting unoccupied vehicles, monitoring electronic equipment, and non-intrusive inspections, which has enabled officers and agents to be able to return to the front lines for enforcement activities. The specific number of National Guard personnel deployed to the San Diego Field Office, therefore, provides insight into the resource capabilities of both the Field Office and the National Guard, and thus provides insight into how many officers the Field Office may have available for such enforcement actions. This number, especially when combined with other publicly available data about migration trends and overall OFO staffing numbers, provides insight into whether the

      Field Office has staffing capabilities to respond to any smuggling attempts or hostile actors, or whether officer resources must be devoted to humanitarian duties. Hostile actors could use this data, in combination with other publicly available data, to analyze trends in the staffing levels across both Border Patrol and OFO, and to assess which Field Offices and Border Patrol Sectors may be most vulnerable to smuggling attempts or other similar actions. Such a comparative analysis would permit these hostile actors to target their resources towards those Field Offices and Sectors perceived to have fewer officers and agents available for enforcement actions. Thus, this information reveals operational vulnerabilities that can be exploited to harm operations across the entire border.

14. Lastly, the last sentence in the second bullet in the section entitled "Challenges" should be filed under seal, as it consists of intelligence about migration trends and the numbers of individuals waiting in Mexico to enter the United States. Intelligence such as that contained here provides CBP frontline operators and other decision makers with a distinct understanding of threats and trends within a given area of responsibility, and thus enables such decision makers to effectively plan and execute CBP's law enforcement and border security operations. The information contained in this section contains specific intelligence about migration trends impacting the San Diego Field Office, specifically, the number of individuals estimated to be waiting in Mexico to enter the United States. This information is compiled in order to provide Field leadership with sufficient information to make accurate decisions regarding how to plan for the potential arrival of such numbers of individuals, including through providing a basis for factual assumptions underlying contingency planning and other preparatory actions.

15. However, if these details were publicly disclosed, it would also permit hostile actors to compare the specifics of the intelligence with information in its own possession, to assess

whether the Field Office had any information or knowledge gaps, and, if so, to exploit those gaps. This would provide the hostile actor with a valuable way to assess the relative strengths and weaknesses of the Field Office's own operating assumptions, and thus would provide it with details that could be used to manipulate or change its own behavior to either evade law enforcement or take certain actions to specifically harm operations.

16. For the foregoing reasons, all of this information would reveal operational vulnerabilities, and should be filed under seal.

17. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 30 day of November, 2020.

Joseph Draganac
Deputy Executive Director, Operations
Office of Field Operations
U.S. Customs and Border Protection