SARAH HARRINGTON
Deputy Assistant Attorney General
Civil Division
AUGUST E. FLENTJE
Special Counsel
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation –
District Court Section
SAMUEL P. GO
Assistant Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-8259 | Fax: (202) 305-7000
katherine.j.shinners@usdoj.gov
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR DISCOVERY CONCERNING COMPLIANCE WITH PRELIMINARY INJUNCTION** |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*, in their official capacities, | |
| *Defendants*. | |

# **TABLE OF CONTENTS**

BACKGROUND ................................................................................2

    A.    The Court's Preliminary Injunction Orders Concerning Application of the Transit Rule. .................................................2

    B.    Implementation of the PI Order and the October 30 Order. .....................4

    C.    Certain Areas of Agreement and Dispute Concerning Implementation of the October 30 Order. ...............................10

    D.    Defendants' Request for a Protective Order ............................13

    E.    Further Engagement with Plaintiffs and Plaintiffs' Discovery Motion. ...............................................................................15

ARGUMENT ..................................................................................17

    A.    Plaintiffs Have or Can Obtain the Information They Require and Discovery is Thus Unnecessary. ...................................18

    B.    Plaintiffs Have Not Raised Significant Questions Regarding Compliance. ......................................................................20

    C.    Plaintiffs' Proposed Discovery is Not "Limited" and is Overly Broad. ...............................................................................24

CONCLUSION ...............................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Abdi v. McAleenan*, No. 17-cv-00721,
2019 WL 191506 (W.D.N.Y. April 30, 2019).....................................................23

*Al Otro Lado v. Wolf*,
945 F.3d 1223 (9th Cir. 2019) ...............................................................................3

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) .................................................................................3

*Al Otro Lado, Inc. v. McAleenan*,
423 F. Supp. 3d 848 (S.D. Cal. 2019).....................................................................2

*Cal. Dep't of Soc. Servs. v. Leavitt*,
523 F.3d 1025 (9th Cir. 2008) ............................................................. 17, 19, 21

*Gates v. Shinn*,
98 F.3d 463 (9th Cir.1996) ...................................................................................22

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
10 F.3d 693 (9th Cir. 1993) ..................................................................................22

*Reno Air Racing Ass'n, Inc. v. McCord*,
452 F.3d 1126 (9th Cir. 2006) ..............................................................................22

*CAIR v. Trump*,
471 F.Supp.3d 25 (D.D.C. 2020) ............................................................... passim

**Statutes**

8 U.S.C. § 1252(a) .................................................................................................11

8 U.S.C. § 1252(b) .................................................................................................11

**Rules**

Fed. R. Civ. P. 33 ..................................................................................................25

**Regulations**

8 C.F.R. § 208.6(b) ................................................................................................13

8 C.F.R. § 208.6(c)(2)(ii) .......................................................................................15

1

8 C.F.R. § 1003.1(b)(3) ............................................................................................5

2

8 C.F.R. § 1208.13(c) ...............................................................................................5

3

84 Fed. Reg. 33 ........................................................................................................2

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' OPP. TO PLS.' MOT. FOR
DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

1    The Court should decline to grant leave for Plaintiffs to take open-ended dis-
2    covery into the government's multi-faceted compliance with the Court's prelimi-
3    nary-injunction orders. As a threshold matter, Plaintiffs already have or can obtain
4    much of the information they seek without resorting to discovery. First, Plaintiffs
5    will be able to obtain information about the identities of preliminary-injunction class
6    members (and even potential class members) upon entry of an order that protects
7    class members' asylum information from disclosure to third parties that would con-
8    travene regulations to which the government is bound. Although the parties dispute
9    the precise terms of a protective order, the government offered reasonable solutions
10   to facilitate its sharing of information about class members (and even potential class
11   members) with Plaintiffs pending resolution of that dispute. The Court has also now
12   ordered the parties to mediation to resolve this dispute. Second, Plaintiffs are already
13   largely aware of the government's procedures for implementing the Court's prelim-
14   inary-injunction orders. Defendants maintain their procedures are adequate and com-
15   pliant. Plaintiffs disagree with some aspects of those procedures, and they have filed
16   a motion to enforce that seeks clarification on those points, which the Court is in the
17   process of addressing. Plaintiffs do not explain why they require discovery to estab-
18   lish what Plaintiffs already know: that the parties disagree on the requirements of
19   the Court's October 30 Order.

20       Nor do Plaintiffs raise significant questions regarding noncompliance with the
21   Court's orders to warrant discovery. Again, the only noncompliance concern they
22   raise is the subject of a good-faith disagreement between the parties as to whether
23   individuals who were ultimately denied asylum on grounds other than the transit rule
24   are entitled to have their cases reopened or reconsidered under the terms of the Oc-
25   tober 30 Order. Defendants believe their position is manifestly correct and in line
26   with the language and the intent of the Court's preliminary-injunction orders, and
27   thus that Plaintiffs have not raised questions regarding noncompliance. At a mini-
28

DEFS.' OPP. TO PLS.' MOT. FOR
DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

mum, however, discovery is not warranted because any "questions regarding non-compliance" are the subject of less-than-clear terms of the Court's orders. Finally, the discovery Plaintiffs seek is extremely burdensome and is not in any way limited to these claimed concerns. For these reasons, the Court should deny Plaintiffs' Motion.

## **BACKGROUND**

### A. The Court's Preliminary Injunction Orders Concerning Application of the Transit Rule.

The Court is familiar with its orders regarding the interim final rule, which established a substantive immigration rule known as the "transit rule" or "third-country transit bar" under which an alien "who enters or attempts to enter the United States across the southern border after failing to apply for protection in a third country . . . through which the alien transited en route to the United States is ineligible for asylum." *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829, at 33,830 (July 16, 2019). The transit rule "also require[s] asylum officers and immigration judges to apply this new bar on asylum eligibility when administering the credible-fear screening process applicable to stowaways and aliens who are subject to expedited removal." *Id.* On November 19, 2019, this Court enjoined Defendants from applying the transit rule to a provisional class of "all non-Mexican asylum-seekers who were unable to make a direct asylum claim at a U.S. POE [port of entry] before July 16, 2019 because of the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process," and ordered Defendants "to return to pre-Asylum Ban practices for processing" provisional class members' "asylum applications." ECF No. 330 ("PI Order"), *Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 878 (S.D. Cal. 2019).

Defendants timely appealed and sought a stay of the PI Order from the Court of Appeals for the Ninth Circuit. *See generally Al Otro Lado v. Mayorkas*, No. 19-56417. On December 20, 2019, the Ninth Circuit granted an administrative stay of

2

the PI Order pending adjudication of Defendants' stay motion. *Al Otro Lado v. Wolf*, 945 F.3d 1223, 1224 (9th Cir. 2019). On March 5, 2020, a divided panel of the Ninth Circuit denied that stay motion, terminating the administrative stay, and the PI order went back into effect. *Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020). Defendants' appeal of the PI Order remains pending. On June 30, 2020, the transit rule was vacated in separate litigation. *CAIR v. Trump*, 471 F.Supp.3d 25 (D.D.C. 2020).

In July 2020, Plaintiffs filed a motion asking the Court to order the government to immediately reopen or reconsider class members' asylum applications that were denied based on the transit rule before the PI Order issued or while it was stayed, and to identify class members and notify them of the preliminary injunction. *See* Pls.' Mem. in Supp. of Mot. for Clarification (ECF No. 494-1) at 3. Plaintiffs also asked the Court to order that the Executive Office for Immigration Review (EOIR) is bound by the PI Order. *Id.* Plaintiffs contended that the PI Order "mandates both prospective relief—by ordering Defendants to 'return to the pre-[rule] practices for processing the asylum applications' of class members—*and retroactive relief*—by enjoining Defendants 'from applying the [rule]' to class members," and posited that "[c]larification is warranted because Defendants' current implementation efforts effectively limit retroactive relief to an arbitrary subset of class members." *Id*. Plaintiffs cited five instances in which EOIR immigration judges (IJs) lawfully applied the transit rule to deny asylum to PI class members before the PI order was issued or while it was stayed, and argued that the PI Order required EOIR to reopen the proceedings for these individuals, each of whom had already been granted withholding of removal. *Id.* at 6-7; Defs.' Opp. (ECF No. 508) at 8-11.

On October 30, 2020, the Court granted Plaintiffs' motion. ECF No. 605 (October 30 Order). The Court reasoned that to preserve that status quo, the preliminary injunction applies to those who received final asylum denials based on the transit rule before the PI Order issued or while it was stayed, and that "affirmative action" by Defendants was required. October 30 Order at 11-14. The Court also found it

DEFS.' OPP. TO PLS.' MOT. FOR DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

"appropriate for Defendants to make reasonable efforts to aid in identifying potential class members at all stages of removal proceedings." *Id.* at 22. These identification and notice efforts would not substitute for proving class membership: "As Plaintiffs readily concede, individuals would still bear the burden of demonstrating their class membership, and therefore their eligibility for relief, to immigration officials." *Id.* Ultimately, the Court ordered that EOIR would be bound by the terms of the preliminary injunction, and directed the following actions:

(2) DHS and EOIR must take immediate affirmative steps to reopen or reconsider past determinations that potential class members were ineligible for asylum based on the [transit rule], for all potential class members in expedited or regular removal proceedings. . . .;

(3) Defendants must inform identified class members in administrative proceedings before USCIS or EOIR, or in DHS custody, of their potential class membership and the existence and import of the preliminary injunction; and

(4) Defendants must make all reasonable efforts to identify class members, including but not limited to reviewing their records for notations regarding class membership . . . and sharing information regarding class members' identities with Plaintiffs.

October 30 Order at 25.

Defendants and EOIR timely appealed and sought a stay of the October 30 Order. *See generally Al Otro Lado v. Mayorkas*, No. 20-56287 (9th Cir.). The Ninth Circuit has denied the government's motion to stay, *see id.*, Dkt. Entry No. 30 (Jan. 15, 2021), and the appeal remains pending.

**B. Implementation of the PI Order and the October 30 Order.**

***The Government's Compliance with the PI Order.*** The PI Order enjoined application of the transit rule to members of the PI class. When the transit rule was in effect, it was applicable to individual asylum-seekers in two basic ways. *See* 84 Fed. Reg. at 33,843; *see also* Gov't Opp'n to Pls.' Mot. for Prelim Inj. (ECF No. 307) at 3-4. First, it was applied at the credible fear stage of expedited removal proceedings. The transit rule required asylum officers from United States Citizenship

4

and Immigration Services (USCIS) and IJs from EOIR to apply the bar on asylum eligibility when conducting and reviewing credible-fear determinations. 84 Fed. Reg. at 33,830. Thus, when a noncitizen in expedited removal proceedings was ineligible for asylum based on the transit rule, the asylum officer would enter a negative credible-fear determination and then apply the "reasonable-fear standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted." *Id.* at 33,837. If the asylum officer made a negative credible- or reasonable- fear determination, the noncitizen could seek review of that determination by an IJ, who would conduct a de novo review of the asylum officer's determination that the transit rule bars the noncitizen from asylum eligibility and consider whether he or she has a reasonable fear. 84 Fed. Reg. at 33,838. If the asylum officer made a positive reasonable-fear determination, the noncitizen would be placed into regular removal proceedings before an immigration judge for further consideration of the withholding or CAT claims and de novo review of the applicant's eligibility for asylum. *Id.*

Second, the transit rule was applicable to applications for asylum made by noncitizens in regular removal proceedings—both those noncitizens who were referred to regular removal proceedings by USCIS after the credible-fear process in expedited removal as described above, and those who were initially placed in regular removal proceedings without going through the expedited removal process. In regular removal proceedings, IJs were required to determine whether an asylum applicant is ineligible for asylum under the transit rule or other mandatory bars. 84 Fed. Reg. at 33,830 (modifying 8 C.F.R. § 1208.13(c)). An IJ's decision is subject to appeal to the administrative appellate body, the Board of Immigration Appeals (BIA). *See* 8 C.F.R. § 1003.1(b)(3), (d).

The government's efforts to comply with the PI Order thus focused on conducting factfinding to identify class members during the course of these immigration proceedings before USCIS and EOIR.  Upon entry of the PI Order, the government

took prompt steps to identify class members with pending immigration proceedings so that the transit rule would not be applied to them. For example, USCIS instructed asylum officers to begin asking a series of questions during credible-fear interviews to ascertain whether the interviewee had been subject to metering before July 16, 2019, and ordered officers not to apply the transit rule to any interviewee who established that he was more likely than not a class member. ECF No. 508-2 (USCIS Guidance) at 7-9. EOIR issued privileged legal guidance to its adjudicators regarding the injunction. ECF No. 508-4 (Aug. 3, 2020 Anderson Decl.) ¶ 4. And out of an abundance of caution, U.S. Immigration and Customs Enforcement (ICE) instructed field leadership to suspend the removals of certain aliens then in ICE's custody, pending class-membership screening. ECF No. 508-6 (ICE Guidance) at 1. Although the government discontinued certain of these compliance procedures while the PI Order was stayed by the Ninth Circuit, once the stay was lifted the impacted agencies promptly returned to the policies under which they were complying with the injunction. *See* ECF No. 508-2 at 2-3; ECF No. 508-4 ¶ 6; ECF No. 508-7.

After entry of the October 30 Order, Defendants began further efforts to comprehensively identify potential class members and look backward to identify cases where individuals were determined to be ineligible for asylum based on the transit rule. In November and December 2020, counsel for Defendants also engaged in numerous conferences with Plaintiffs' counsel to report on and discuss these efforts.

***Reasonable Efforts to Identify Class Members Under the October 30 Order.*** The government moved forward with implementation of Paragraphs 3 and 4 of the October 30 Order to conduct a comprehensive identification and notice process for potential class members. After consultation with Plaintiffs to discuss possible methods of fulfilling these requirements, Defendants initiated a plan—very similar to that proposed by Plaintiffs—to identify a broad swath of asylum applicants who entered along the southern land border and who *may* be class members. *See* Lev. Decl. Mot. to Enforce (ECF No. 644-2) ¶ 24(a); Declaration of Katherine J. Shinners (Shinners

Decl.) ¶¶ 14, 25. This list of potential class members would be shared with Plaintiffs and could be used to facilitate the provision of notice of how to submit evidence of class membership, depending on the nature and stage of class members' proceedings and the requirements of the October 30 Order. *See* Shinners Decl. ¶ 25.

To create this list, the government began with data from CBP for non-Mexican noncitizens CBP had encountered between July 16, 2019 and June 30, 2020, and who may be asylum-seekers. Ex. A[1] (Visconti Decl.) ¶ 5. The government is narrowing the list to individuals who sought asylum or similar forms of protection from removal (and is also excluding those that have already been finally granted asylum and are thus no longer "continu[ing] to seek access to the U.S. asylum process"). *See* Shinners Decl. ¶ 14; Ex. B (Mura Decl.) ¶ 18 (explaining that USCIS matched these A numbers against its asylum pre-screening case management data). The government can then use still other data points—such as information concerning execution of removal orders and alien and attorney contact information—to assist in determining whether and how notice will be provided to such individuals as contemplated by Paragraph 3 and page 22 of the October 30 Order. *See* Shinners Decl. ¶¶ 14, 25.

To enable sharing of this and other lists in the government's possession while also protecting potential class members' private asylum-related information, the government worked with Plaintiffs to negotiate a protective order that would set conditions on the use and further disclosure of that asylum-related information. *See generally* Defs.' Mem. in Supp. of Mot. for Protective Order (ECF No. 647-1) at 4-6; Shinners Decl. ¶¶ 6, 11-12. On December 15, 2020, Defendants sought a protective order from the Court, as explained further below.

***Affirmative Steps to Reopening or Reconsidering Asylum Denials Under Paragraph 2 of the October 30 Order.*** The government also took separate "immediate, affirmative steps" to identify cases with final asylum denials that may need to

---

[1] All lettered exhibits refer to the lettered exhibits to the Shinners Declaration.

DEFS.' OPP. TO PLS.' MOT. FOR DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

be reopened or reconsidered under the October 30 Order.

<u>Notice and USCIS Interviews</u>. USCIS promptly developed procedures to determine class membership for certain individuals who have final removal orders (from either expedited or regular removal proceedings) and are in the custody of U.S. Immigration and Customs Enforcement (ICE). Under these carefully-drafted procedures, ICE refers certain potential class members in its custody to the local USCIS asylum office and provides notice to the interviewee. Ex. B ¶¶ 3-5 & Ex. 2; Ex. C (notice); Ex. D (Guadian Decl.) ¶ 7 & Ex. 3 (referral process).[2]

After the ICE referral, an asylum officer conducts an interview. Ex. B ¶ 5 & Ex. 2. Asylum officers, who are already trained in non-adversarial interview techniques and effectively eliciting testimony, Ex. B ¶ 8, are instructed to ask a list of questions to determine whether the individual sought to enter the United States at a POE to seek asylum before July 16, 2019, to consult waitlists maintained by Mexican entities (obtained from Plaintiffs or CBP), and to consult DHS records. Ex. B ¶¶ 6-7 & Exs. 2-3 (Screening Guidance; Interview Questions). The interview questions are designed to determine whether the individual was metered at the international boundary line, placed his/her name on a waitlist, or otherwise tried to enter at a southwest-border POE before July 16, 2019, but was unable to. *See generally* Ex. B ¶ 6 & Exs. 2-3. The asylum officer is instructed to prompt individual for additional information if the individual's name appears on a waitlist but the individual states that he did not arrive near the U.S.-Mexico border until after July 16, 2019. *See* Ex. B ¶ 6 & Ex. 3 at 3. The asylum officer is also instructed to ask potential class members whether they have additional documentary evidence to submit (although such

---

[2] Defendants' counsel asked Plaintiffs to include a phone number for Class Counsel on this notice that could be used by ICE detainees to make free, unmonitored/unrecorded calls to Class Counsel from any detention facility telephone. Shinners Decl. ¶¶ 18, 33, 42. Plaintiffs have declined to include a phone number, based in part on their disagreement with the Notice and because they state they have insufficient information about procedures at this time. *Id.* ¶ 34.

DEFS.' OPP. TO PLS.' MOT. FOR DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

1    documentation is not required to demonstrate class membership). *See id.*; Ex. B ¶
2    13. The officer must also document these activities and the resulting class member-
3    ship determination. Ex. B ¶¶ 14, 17 & Ex. 2 at 5-9.

4        If the asylum officer determines that an individual is more likely than not a
5    class member (that is, could not enter at a POE before the transit rule's effective date
6    because he/she was subject to metering before July 16, 2019), the individual will be
7    referred for further action depending on the nature of their proceedings. For example,
8    an individual with an order of expedited removal who previously had the transit rule
9    applied at the USCIS credible fear determination stage will receive a new credible
10   fear interview without application of the transit rule. Ex. B ¶ 16 & Ex. 3 at 5-8. For
11   individuals who received a final removal order in regular removal proceedings,
12   USCIS notifies EOIR of its determinations on a rolling basis so that EOIR can re-
13   view those cases to determine whether reopening or reconsideration is warranted.
14   Ex. B ¶ 17 & Ex. 3 at 8-9; *see also* Ex. E (Anderson Decl.) ¶ 9.

15       EOIR Case Review. As for EOIR, it promptly notified its adjudicators of the
16   October 30 Order. Ex. E ¶ 7. EOIR also promptly reviewed its data—as well as
17   relevant data from DHS components—to identify cases in which asylum denials
18   were recorded in potential class members' regular removal proceedings, in order to
19   conduct burdensome manual review of the Records of Proceedings (ROPs) for each
20   identified case to determine whether the case qualifies for relief under Paragraph 2.
21   *See* Ex. E ¶¶ 9-10. This file review is in process. Ex. E ¶¶ 9, 16-17. EOIR is also
22   reviewing on an ongoing basis the cases referred to it by USCIS after a positive class
23   membership determination. Ex. E ¶ 9. Approximately 73 cases have been affirma-
24   tively reopened by IJs or the BIA pursuant to the October 30 Order. Ex. E ¶ 17.

25       ICE Removal Screening and Referral Procedures. As a corollary to the proce-
26   dures for identifying cases that may need to be reopened or reconsidered under Par-
27   agraph 2 of the October 30 Order, ICE also developed screening procedures for use
28

9

in its removal operations. Specifically, it paused removals for a broad swath of individuals and developed removal screening criteria to determine whether those individuals could be removed without further screening—either because objective criteria such as entry date or location demonstrated that they were not class members, or the decisions or circumstances of their case demonstrated that they would not be entitled to relief under Paragraph 2 (for example, because the transit rule was not applied to their case, or because the final adjudicator denied asylum on grounds other than the transit rule). *See* Ex. D ¶¶ 5-6 & Exs. 1, 2 (removal criteria). If an individual on that list was subject to imminent removal, local ICE would review the file to determine whether any of the removal screening criteria were met. *Id.* Ex. 2. If not, the individual would be referred to USCIS for an interview under the USCIS procedures described above. *Id.*; *see also id.* Exs. 3-4 (referral procedures).

## C. Certain Areas of Agreement and Dispute Concerning Implementation of the October 30 Order.

In developing the procedures discussed above, Defendants proactively addressed many of Plaintiffs' ideas and concerns expressed during the parties' conferences of counsel in November 2020. For example, when interviewing potential class members, USCIS asylum officers are required to consult available waitlists to determine whether the individual's name appears on a waitlist, which would serve as evidence that the individual was present in a Mexican border town across from a POE and potentially subject to metering practices before July 16, 2019. Ex. B-Ex. 3 at 3-4 (screening guidance). Defendants have also agreed, as a compromise, not to rely on prior negative class membership determinations by USCIS to rule out individuals for class membership. Ex.B-Ex. 3 at 4-5; Shinners Decl. ¶ 27. These are just a few of the areas on which the parties have agreed, or where Defendants have incorporated Plaintiffs' requests. *See, e.g.*, Shinners Decl. ¶¶ 13, 14, 33.

However, there remain areas of disagreement between the parties as to how to identify and notify class members and as to the reach of the October 30 Order's

DEFS.' OPP. TO PLS.' MOT. FOR DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

requirement to reopen or reconsider past determinations of asylum ineligibility based on the transit rule. *See* Mem. in Supp. of Pls.' Mot. to Enforce (ECF No. 646); Lev Decl. Mot. to Enforce (ECF No. 644-2) ¶ 12.

As relevant here, one of the parties' disputes involves how to treat cases in which the final asylum denial does not rely on the transit rule in any way, but where a prior (and lower-level) adjudicator determined that the transit rule rendered the individual ineligible for asylum. The government maintains that the Court's orders do not require the reopening or reconsideration of such a case. That is because where the BIA—the administrative appellate tribunal—ultimately affirms an IJ's denial of asylum without relying on the transit rule, that BIA decision is the decision of the agency, and the denial of asylum on a different ground is the final decision and reasoning. That final decision does not apply the transit rule, and it is not a determination of asylum ineligibility based on the transit rule that could be eligible for reopening or reconsideration under Paragraph 2 of the October 30 Order, but instead a denial of asylum on completely separate, independent grounds. That BIA decision also thus cures any prior application of the transit rule by the IJ. Further, a final asylum denial from the BIA based on a different ground is not reviewable in any court other than the Court of Appeals on a petition for review. *See* 8 U.S.C. §§ 1252(a)(1), (a)(2)(D), (b)(9). The Court's injunctions do not purport to disturb these asylum denials made on independent grounds, but were instead concerned only with preventing the application of the transit rule.

Moreover, if the BIA affirms that denial without relying on the transit rule, it generally means that the individual already factually developed their persecution claims before the IJ despite the IJ's application of the transit rule. For example, in the case ███████ one of the cases that Plaintiffs note in their Motion, *see* Pls.' Ex. 1 ███████ the IJ initially denied asylum based on the transit rule, but also based on the IJ's adverse credibility determination with respect to the "application's claims of past persecution and fear of future harm," and the IJ's conclusion that ███ failed to

11

meet his burden to establish other elements of his asylum claim. Ex. E at E0258-261. The IJ reached these findings after consideration of ███ 's testimony as well as other evidence ███ submitted. *Id.* at E0244-256. On appeal from that IJ decision, the BIA determined on November 19, 2020, that, although the transit rule "no longer barred [███] from seeking asylum," it was "not persuaded to disturb the Immigration Judge's decision to deny the respondent's asylum claim due to a lack of credibility." *Id.* at E0240.[3]

Because individuals with cases similar to ███ 's case—in which the final adjudicator denied asylum based on grounds *other than* the transit rule—would not be entitled to any relief as result of the PI Order or the October 30 Order, ICE was not referring such individuals for class membership interviews before removal. *See* Ex. D-Ex. 2 at 2-3 (setting forth categories of cases that would not be referred for interviews). For similar reasons, ICE was also not referring individuals with final decisions issued after June 30, 2020, *see, e.g., id.*, given that the transit rule interim final rule was vacated on that date and was no longer to be applied. At this time, however, ICE is expanding its removal screening procedures to require a pre-removal review of cases like those described (at least pending a decision on Plaintiffs' Motion to Enforce). Ex. D ¶ 10 & Ex. 5. ICE is also expanding its list of cases for screening to include noncitizens who were denied asylum by an IJ between July 16, 2019 and June 30, 2020, and who received a decision from the BIA affirming the asylum denial after June 30, 2020. Ex. D ¶ 9.

Because the parties were unable to come to agreement on these and certain other issues, on December 15, 2020, Plaintiffs filed a "Motion to Enforce Prelimi-

---

[3] It also appears from the IJ's description of ███ s testimony that ███ is likely not a class member, because the date of his departure from his home country and the length of his subsequent travels to and through Mexico indicate that he did not arrive at the U.S.-Mexico border until after July 16, 2019. Ex. E at E0251.

DEFS.' OPP. TO PLS.' MOT. FOR DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

nary Injunction," asking the Court to require Defendants to submit an implementation plan and engage in status reporting, as well as asking the Court to provide clarification on certain points of dispute with respect to the proper implementation of the Court's October 30 Order. ECF Nos. 644, 646. As relevant here, Plaintiffs noted that the parties disagreed over whether Paragraph 2 of the Order requires the government to reopen or reconsider cases like those described above, *supra* at 11-12, or to screen cases where the final decision was issued after June 30, 2020. Pls.' Mem. in Supp. of Mot. to Enforce (ECF No. 646) at 23-25.

### D. Defendants' Request for a Protective Order

The parties also discussed in November 2020 the entry of a confidentiality protective order to enable Defendants and EOIR to share information about potential class members' identities as required by the October 30 Order, as well as additional information that Plaintiffs may request related to the PI Order's implementation, while ensuring proper treatment of those class members' asylum information as required by regulations to which the government is bound. *See* Mem. in Supp. of Defs.' Mot. for Protective Order (ECF No. 647-1) at 2-7. Asylum information includes not only details regarding an asylum-seeker's claim, but also other records kept by DHS or EOIR "that indicate that a specific alien has applied for asylum, received a credible fear or reasonable fear interview, or received a credible fear or reasonable fear review." 8 C.F.R. §§ 208.6(b), 1208.6(b). Thus, asylum information includes any class lists, which are based on the individuals having claimed fear or sought asylum.

When negotiations between the parties over the terms of the protective order broke down, Defendants filed a motion seeking entry of a confidentiality protective order. *See* ECF No. 647-1 at 3-7. Plaintiffs do not in principle oppose the entry of such a protective order, but they disagree with certain of the government's proposed conditions for disclosure to third parties. The government's proposed conditions are

DEFS.' OPP. TO PLS.' MOT. FOR
DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

rooted in the regulations to which the government is bound and are designed to protect asylum-seekers from the harm of disclosure, as those asylum-seekers have not themselves expressly consented to the disclosure of their asylum information. *See id.* at 2-7; Mem. in Supp. of Defs.' Mot. for Protective Order (ECF No. 647-1) at 6-7. The Court recently ordered the parties to mediation to resolve this dispute. ECF No. 691.[4]

Before filing their motion for a protective order, Defendants proposed that the parties seek to enter a conditional protective order to facilitate information-sharing

_____

[4] Although this dispute will now be resolved through mediation, Defendants note that the government's proposed protective order only limits the use and disclosure to third parties of asylum information shared by the government with Plaintiffs, and conditions such disclosures on the asylum-seeker's written consent. It does not limit Plaintiffs' or Class Counsel's ability to discuss individual immigration cases or asylum applications with potential class members, or prevent a potential class member from independently disclosing information to Class Counsel or her own attorneys or family members. It does not prevent Class Counsel from contacting potential class members' family to assist in locating those class members, so long as Class Counsel does not, in doing so, divulge asylum information from the government's records without the applicant's written consent. It is thus not true, as Plaintiffs argue, that the protective order would prevent Plaintiffs from disclosing the names of class members to the class members' relatives. *See* Pls.' Mem. in Supp. of Mot. for Discovery ("Pls.' Mem.") at 10. What it prevents is disclosing the fact that the individual has sought asylum in the United States, if that information was obtained from the government, absent the individual's written consent.

Plaintiffs also assert that obtaining written consent from certain potential class members is burdensome, citing their inability to obtain instructions as to how to schedule a legal call at a particular detention facility. Pls.' Mem. at 5 (citing Pls.' Ex. 3, Escoto Decl.). Yet Plaintiffs were offered the ability to set up a free number for detainees to use to call Class Counsel from any detention facility's phone, which would eliminate many of Plaintiffs' claimed difficulties. Shinners Decl. ¶¶ 33-34, 42. Further, Plaintiffs' counsel state that they made several calls to the particular facility "over the course of two weeks" but not once during that time did they ask Defendants' counsel for assistance or instructions as to how to schedule a legal call with the particular individual. *See* Pls.' Ex. 3 ¶ 3; Shinners Decl. ¶ 42.

14

1   pending the Court's resolution of this dispute, but Plaintiffs declined. Shinners Decl.
2   ¶ 31. Defendants reiterated their proposal several times, so as to allow Defendants
3   to more fully respond to Plaintiffs' requests for information about potential class
4   members, but Plaintiffs again declined. Shinners Decl. ¶¶ 50-51.

5   **E. Further Engagement with Plaintiffs and Plaintiffs' Discovery Motion.**

6       While these motions were being briefed, the government moved forward with
7   implementing its procedures as set forth above. Plaintiffs have since reached out via
8   email with some questions about the government's procedures, to which Defendants
9   have responded by detailing the relevant procedures and by inviting additional ques-
10  tions and a conference call. Shinners Decl. ¶¶ 38-41, 53-54.

11      On February 2 and 3, 2021, Plaintiffs' counsel sent several emails inquiring
12  about the status of 17 individuals who they claimed were class members and were
13  scheduled for a removal flight. Pls.' Ex. 1 ¶¶ 13-34; Shinners Decl. ¶¶ 43-44. The
14  government furnished information that was not foreclosed by regulation, in the ab-
15  sence of a protective order governing asylum information. *See id.*; Pls.' Ex. 1
16  (Cassler Decl.)  ¶¶ 27, 33, 38 (detailing information provided).  Defendants provide
17  additional information herein for purposes of defending against this motion under 8
18  C.F.R. §§ 208.6(c)(2)(ii) and 1208.6(c)(2)(ii).

19      Certain of those 17 individuals Plaintiffs inquired about were not interviewed
20  by USCIS for class membership because, as part of the removal screening proce-
21  dures: (i) they were ruled out as class members based on objective criteria, (ii) their
22  cases were decided after June 30, 2020, the date the transit rule was vacated, and/or
23  (iii) they were denied asylum by the final adjudicators on grounds other than the
24  transit rule:

25      (1) ████████████████████████ and thus is not a class
26      member. Ex. D ¶ 12.

27      (2) ███ was ordered removed by an IJ on August 13, 2020. Ex. E ¶ 18. His order
28      of removal is not final because his appeal is still pending before the BIA. *Id.*

DEFS.' OPP. TO PLS.' MOT. FOR
DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

(3) ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

(4) Ten of the 17 individuals had final decisions from the BIA that affirmed the denial of asylum on independent grounds based on the record below, and which thus did not rely on the application of the transit rule. Ex. E at ███████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████.[6] In the case of TN, the IJ also did not apply the transit rule, although she noted that it appeared to apply: "But because the Court finds that it must deny asylum because he has failed to establish a well-founded fear of persecution, the Court need not base its decision on the third-country transit rule." Ex. E at E0220.

The government re-examined the cases of three of the 17 individuals out of an abundance of caution to ensure that they were not entitled to relief under the October 30 Order. As to one individual, ███—█████████████████████████████████████
██████████████████████████████—██████████████████████████
████████████████████████████████████████████████████████████

---

[5] ███ is also unlikely a class member, having left his home country on July 9, 2019, and traveled through nine countries en route to the United States. Ex. E at E0229-230.

[6] Plaintiffs note that one of these individuals, J███ was subsequently referred for a class member interview, *see* Ex. B ¶ 9 & Exs. 4-5, but his case did not require class membership screening under the original removal screening criteria because the final adjudicator affirmed the denial of asylum on grounds other than the transit rule. Ex. D-Ex. 2 at 2-3

███████████████████████████████. *See* Ex. B ¶ 12 & Ex. 9. In the remaining

two cases ███████ the individuals had post-June 30, 2020 decisions from the

BIA that summarily dismissed the appeal. Ex. E at E0263-295. Thus, although these

two individuals ██████████████████████████████████████████

██████—having effectively abandoned their appeals by failing to file the proper

briefs, *see id.*—they were ████████████████████████████████████

████████████████████████████████████████, *see* Ex. B ¶¶

10-11 & Exs. 6-7, as ICE has now expanded the categories of cases it is screening

and referring to USCIS. Ex. D ¶¶ 9-10. One individual, ███, had already testified

before the IJ █████████████████████████████████████. Ex. E at

E0272, E0279. Based on his testimony at ████████████████ and his attor-

ney's statement, ███████████████████████████, having con-

firmed that ████████████████████████. Ex. B ¶ 10 & Ex. 6 at 3, 5.

The other individual, ████████████████████████████████████████

████████████████████████████████████████████████████

████. Ex. B ¶ 11. However, the underlying IJ decision in ████ case initially and

primarily ██████████████████████████████████████████████

████████████████████████████████████████████████████

t███" Ex. E at E0290.

On February 16, 2021, Plaintiffs filed the instant motion.

## **ARGUMENT**

As part of the Court's inherent power to enforce its judgments, the Court in

its discretion may allow "appropriate" discovery into a party's compliance with a

court order in where the party requesting discovery raises "significant questions re-

garding noncompliance." *See Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025,

1034 (9th Cir. 2008). The Court should decline to allow the burdensome discovery

Plaintiffs seek. Plaintiffs do not require discovery for purposes of their motion to

enforce or otherwise, they do not raise significant questions regarding noncompliance, and the discovery they seek is not sufficiently limited in scope.

### A. Plaintiffs Have or Can Obtain the Information They Require and Discovery is Thus Unnecessary.

As a threshold matter, burdensome discovery is not necessary because Plaintiffs already have or can obtain much of the information they seek.

<u>First</u>, Plaintiffs do not need discovery to obtain information about the identities of class members (or potential class members). Once an appropriate confidentiality protective order that safeguards class members' asylum information is entered, Defendants can share the identities of potential class members, and, on an as-needed basis, additional information about class members' cases. As discussed above, the government is developing a comprehensive list of potential class members based on a methodology it developed in consultation with Plaintiffs and which it has previously shared with Plaintiffs. *See supra* at 6-7; Shinners Decl. ¶¶ 14, 25. The government will share that list with Plaintiffs, as well as available information in government records to facilitate Plaintiffs' provision of notice to those who are not in DHS custody or currently in immigration proceedings. The government also plans to share other lists identified in the Court's October 30 Order (at pages 21 and 22), as well as lists of prior USCIS class membership determinations. And, although not required by the Court's orders, the government is further willing to share more detailed information about class members' cases based on a particularized need.[7]

---

[7] The October 30 Order does not require the production of detailed immigration records for each of the tens of thousands of potential class members. However, the government recognizes that Class Counsel may at times seek more detailed information about class members beyond their identities, to allow them to better assist class members, or request information to confirm that a certain individual is not a class member. The entry of a protective order will help facilitate the provision of such information if needed. And Plaintiffs' requested discovery would not assist with this type of case-specific inquiry that Plaintiffs may make as the need arises, as Plaintiffs

18

DEFS.' OPP. TO PLS.' MOT. FOR DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

Plaintiffs suggest that the government has engaged in bad-faith delay in providing information regarding the identities of class members to Plaintiffs, but this is not the case. When negotiations between the parties about the terms of an appropriate protective order broke down, Defendants immediately moved forward with seeking entry of the protective order. *See supra* at 13-14. Defendants also immediately offered to Plaintiffs that the parties jointly ask the Court to enter Defendants' version of the order pending resolution of the parties' dispute to facilitate providing available class-member information to Plaintiffs more quickly. *See id.*; Shinners Decl. ¶¶ 31. Plaintiffs declined. *See id.* ¶ 32. The government recently renewed that proposal in the hopes of avoiding disputes and costly discovery, and Plaintiffs again declined. *See id.* ¶¶ 50-51. Plaintiffs cannot in good faith accuse the government of "stonewalling" when the government has proposed reasonable solutions to allow information-sharing. Granting Plaintiffs' discovery motion will also not resolve these issues, because an appropriate protective order governing the use of asylum information is still needed.

Second, discovery is not needed because Plaintiffs have and can obtain the information they need about Defendants' procedures through informal methods. Defendants have disclosed their general procedures during discussions in the fall of 2020, in response to Plaintiffs' Motion to Enforce, and in more recent emails and communications. *See* Shinners Decl. ¶¶ 40, 53-54. Indeed, Plaintiffs already know that they disagree with some aspects of the government's implementation of the October 30 Order and have filed a motion asking the Court to clarify the meaning of that order. *See supra* at 11-13; ECF Nos. 644, 646. Discovery is not required to confirm procedures of which Plaintiffs are already aware and have already disputed.

And to the extent Plaintiffs require more information or have questions about

---

cannot possibly predict at this time which particular class members as to whom Plaintiffs may require additional information during the course of implementing the October 30 Order.

DEFS.' OPP. TO PLS.' MOT. FOR DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

the government's general procedures, Defendants have shown that they are willing to share that information. Plaintiffs argue that Defendants have only provided "non-answers," and that there has been no "collaborative process," Pls.' Mem. at 17, but that is not true. Defendants have provided information about their procedures as those procedures are developed. In November and December 2020, Defendants engaged in frequent conferences with Plaintiffs, employed many of Plaintiffs' suggestions, and agreed to implement various procedures requested by Plaintiffs. Shinners Decl. ¶¶ 4-34; *supra* at 10. Although Plaintiffs largely discontinued the parties' conferences after filing their motion to enforce, Defendants have continued to provide information about the government's procedures at Plaintiffs' request. Shinners Decl. ¶¶ 40, 53-54.

Third, and relatedly, discovery is not necessary for the government to proactively address Plaintiffs' concerns. Indeed, Defendants recently altered their removal screening procedures. Although Defendants were constrained in their ability to share information about individual class members with Plaintiffs due to the lack of a protective order, they nonetheless implemented changes in response to Plaintiffs' inquiries. Specifically, ICE is expanding the categories of cases it will refer to USCIS interviews for class membership screening. *See supra* at 12.

For these reasons, Plaintiffs have not demonstrated that discovery is necessary to obtain information about the government's implementation of, and compliance with, the Court's preliminary-injunction orders.

**B. Plaintiffs Have Not Raised Significant Questions Regarding Compliance.**

Plaintiffs' motion presents scattershot suggestions of noncompliance, which do not rise to the level of "significant questions" warranting discovery.

First, Plaintiffs claim that Defendants have "refused" to provide information about the identities of class members, and that this constitutes evidence of noncompliance. Pls.' Mem. at 16. This is not true. As explained, the government merely requires the entry of an appropriate protective order to safeguard individuals' asylum

DEFS.' OPP. TO PLS.' MOT. FOR
DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

information. The government has repeatedly offered reasonable solutions to allow it to share this information more freely with Plaintiffs in furtherance of implementation of the Court's October 30 Order, and Plaintiffs have declined.

Second, Plaintiffs argue that imminent removals of individuals who have some indicia of class membership raises questions of noncompliance and demonstrates that the government's procedures are inadequate. *See* Pls.' Mem. at 16, 17. Yet the fact that potential class members were, or may have been, scheduled to be removed does not itself indicate noncompliance or deficient procedures. The Court's orders do not prevent the removal of class members. They instead preclude, or seek to remedy, applications of the transit rule to those class members. If a class member is ordered removed after receiving a determination on the merits of his or her asylum claim, or after being otherwise denied asylum on grounds other than the transit rule, there is no reason that the government cannot execute that lawful removal order. Thus, for example, two of the 17 individuals who were supposedly scheduled for a removal flight and whom Plaintiffs inquired about applied for asylum in regular removal proceedings, and did not have the transit rule applied to their asylum applications in those proceedings. *See supra* at 16 ████████████████ ). Instead, these individuals were denied asylum on separate and independent grounds. *See id.* And Plaintiffs acknowledge that 10 of the 17 individuals had final decisions from the BIA that denied asylum on independent grounds and did not rely on the application of the transit rule. *See supra* at 16 (referencing decisions in ████████, ████████████████████ ); Pls.' Ex. 1 ¶ 34. One of the 17 individuals had asylum denied by the IJ on credibility grounds, and the IJ decision only addresses transit rule ineligibility as an alternative ground for denial. *See supra* at 17 (referencing ██ decision). Thus, removals of these individuals would be nonetheless proper even if they were class members. The remaining four individuals either are not yet subject to removal ██ or are not class members ████████ *See supra* at 16-17.

To the extent Plaintiffs claim that the government should not be removing individuals who were ultimately denied asylum by the BIA on grounds other than the transit rule, but where the IJ had previously applied the transit rule in some fashion, *see* Pls.' Mem. at 3, this is an aspect of the Court's October 30 Order on which the parties have a good-faith disagreement.[8] Indeed, Plaintiffs are currently seeking clarification on this point from the Court.[9] Although Defendants maintain that the Court's orders plainly do not require such cases to be reopened, at a minimum, the Court's order is unclear on this issue, as this is not the type of case that Plaintiffs sought to have reopened in their initial Motion to Clarify (ECF No. 494). And discovery is not warranted where the "questions regarding noncompliance" are the subject of less-than-clear terms of the Court's orders. *Cf. Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir.1996) ("If an injunction does not clearly describe prohibited or required conduct, it is not enforceable by contempt."); *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) ("Civil contempt … consists of a party's disobedience to *a specific and definite court order* by failure to take all reasonable steps within the party's power to comply." (emphasis added); *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) ("[A] person should not be held in contempt if his action 'appears to be based on a good faith and reasonable interpretation of the court's order.'" (quoting *In re Dual-Deck Video*, 10 F.3d at 695)).

Nor does the fact that the government engaged in further review of certain of

---

[8] Plaintiffs initially agreed that individuals who were denied asylum by the final adjudicator solely on grounds other than the transit rule were not eligible for relief under the October 30 Order, but after further clarification, Plaintiffs no longer agreed. Lev Decl. Mot. to Enforce (ECF No. 644-2) ¶ 12 n.2.

[9] Although Defendants maintain that their position is manifestly correct, Defendants nonetheless considered also moving for clarification on this point because Plaintiffs disagreed and maintained that these cases required further review. *See* Joint Status Conference Report (ECF No. 635) at 4. However, given that Plaintiffs sought clarification in their own motion, Defendants' motion would have been redundant.

the 17 individuals' cases raise significant questions indicating noncompliance. Instead, it demonstrates that the government is taking care concerning the proper application of its procedures, and that it is willing to adapt its procedures upon learning of new information. It does not indicate that any of these individuals are ultimately entitled to relief under the October 30 Order, and indeed, they are not. *See supra* at 15-17.

Third, Plaintiffs point to the Applicant's case, which predates the Court's October 30 Order and Defendants' new procedures. *See* Pls.' Mem. at 2-3. Not only is this one case insufficient evidence of broader questions about compliance, but this case does not even reflect Defendants' current procedures. Defendants have revised their class membership interview questions based on Plaintiffs' input, and have agreed as a matter of compromise not to rely on USCIS's prior class membership determinations in identifying class members. *See* Shinners Decl. ¶ 16; *supra* at 10. Accordingly, the Applicant's case does not raise significant questions about compliance with the PI Order or October 30 Order.

Finally, contrary to Plaintiffs' argument, the government's pursuit of good-faith legal challenges to the Court's orders does not constitute or suggest noncompliance. *See* Pls.' Mem. at 17. The government has of course implemented and complied with the PI Order and the October 30 Order despite appealing those orders. *See, e.g*, Ex. B ¶ 3 & Ex. 1 (USCIS disseminated class interview procedures on December 22, 2020); Ex. A ¶¶ 5-8 (demonstrating work on data compilation in November and December 2020); Shinners Decl. ¶¶ 5-34 (demonstrating work before and after appealing from October 30 Order).

For all of these reasons, this case is dissimilar from the case Plaintiffs rely on, *Abdi v. McAleenan*, No. 17-cv-00721, 2019 WL 191506 (W.D.N.Y. April 30, 2019). In *Abdi*, the Court granted limited discovery about the government's processes for identifying subclass members after the plaintiffs pointed to evidence that class members were being scheduled for bond hearings "several weeks or, in some cases,

DEFS.' OPP. TO PLS.' MOT. FOR DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

months beyond [the ordered] six-month time limitation" for such hearings. *Id.* at *3. Here, Plaintiffs request much broader discovery, and have not pointed to any similar evidence of non-compliance such as a class member whose case should have been, but was not, reopened under Paragraph 2 of the Court's October 30 Order. And to the extent they argue that they lack information about class members to make such assertions, this can be remedied by the entry of an appropriate protective order. Plaintiffs have thus not met their burden to permit discovery.

## C. Plaintiffs' Proposed Discovery is Not "Limited" and is Overly Broad.

The Court should likewise reject Plaintiffs' request because the discovery they seek is exceedingly broad and is thus not appropriate. Plaintiffs ask the Court to approve discovery of four different entities, including 30(b)(6) depositions of those entities, but they make no effort to limit or tailor their proposed discovery to particular claimed non-compliance concerns, or even to a particular time frame. This fishing expedition is unwarranted and would only detract from implementation efforts.

The disproportionate nature of Plaintiffs' request is patent. Implementation of the Court's preliminary-injunction orders is, as the government has consistently stated, an extremely complex task that affects nearly all aspects of the immigration system, from an individual's arrival at a port of entry or encounter after entering illegally, through expedited removal and/or regular removal proceedings in the immigration court and on appeal to the BIA, through, in some cases, preparation for executing a final order of removal. Implementation and compliance thus depend on EOIR, USCIS, and ICE (including ICE attorneys who represent the government in regular removal proceedings as well as ICE's Enforcement and Removal Operations (ERO)), with assistance from CBP. The procedures used by these entities develop and change to account for new information. The complexity of implementation, when combined with the sheer number of requests and depositions Plaintiffs seek, renders Plaintiffs' request exceedingly overbroad. Plaintiffs seek to serve up to 20

DEFS.' OPP. TO PLS.' MOT. FOR DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

requests for production, each of which is potentially applicable to four different en-
tities, for what amounts to up to 80 different requests. *See* Pls.' Mem. at 4.[10] Their
request to serve up to 10 interrogatories similarly amounts to a total of up to 40
interrogatories, *see id.*, which far exceeds the presumptive limit of 25 for an entire
lawsuit. *See* Fed. R. Civ. P. 33. Plaintiffs also ask the Court to pre-approve 30(b)(6)
depositions of four different government entities. Yet they make no effort to cabin
or define the topics of those requested depositions; depending on the list of topics,
and particularly given that implementation of aspects of the Court's orders take place
on a local as well as national level, the number of actual depositions could easily
exceed four. Plaintiffs also expect all this to be accomplished on an exceedingly
truncated time frame. Not only does this impose substantial, unwarranted burdens
on the affected government agencies, but it also requires litigation counsel to focus
on discovery rather than coordinating with those agencies and with Plaintiffs on ac-
tual implementation. Particularly given the absence of evidence of noncompliance
or a showing of necessity, this request is out of proportion to the needs of the case.

## CONCLUSION

For the reasons discussed, Defendants respectfully request that the Court deny
Plaintiffs' request to take discovery concerning compliance with the PI Order and
October 30 Order.

//

---

[10] Plaintiffs also ask that the parties' prior ESI protocol (ECF No. 277) apply to their
discovery requests. *See* Proposed Order ¶ 2. If the Court is inclined to permit dis-
covery, Defendants strongly oppose the imposition of the ESI Protocol. EOIR, ICE,
and USCIS had no say in the ESI Protocol. Defendants did not intend for the ESI
Protocol to apply to the type of discovery Plaintiffs seek here. Should the Court al-
low discovery, the government would be willing to directly collect responsive doc-
uments and to work with Plaintiffs to produce documents in a useable format—sub-
ject to the government's substantive objections—but it is unable to fully comply
with the requirements of the ESI Protocol in this context, particularly given the ex-
pedited time frames for production that Plaintiffs request.

DEFS.' OPP. TO PLS.' MOT. FOR
DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

DATED: March 8, 2021

Respectfully submitted,

SARAH HARRINGTON
Deputy Assistant Attorney General
Civil Division

AUGUST E. FLENTJE
Special Counsel

WILLIAM C. PEACHEY
Director

SAMUEL P. GO
Assistant Director

*/s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-8259 | Fax: (202) 305-7000
katherine.j.shinners@usdoj.gov

ALEXANDER J. HALASKA
DHRUMAN Y. SAMPAT
Trial Attorneys

*Counsel for Defendants*

DEFS.' OPP. TO PLS.' MOT. FOR
DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC

1

## **CERTIFICATE OF SERVICE**

2

*Al Otro Lado v. Mayorkas*, No. 17-cv-02366-BAS-KSC (S.D. Cal.)

3

I certify that I served a copy of this document on the Court and all parties by

4

filing this document with the Clerk of the Court through the CM/ECF system, which

5

will provide electronic notice and an electronic link to this document to all counsel

6

of record.

7

8

DATED: March 8, 2021                  Respectfully submitted,

9

                                      */s/ Katherine J. Shinners*

10

                                      KATHERINE J. SHINNERS
                                      Senior Litigation Counsel

11

                                      United States Department of Justice

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' OPP. TO PLS.' MOT. FOR
DISCOVERY
Case No. 3:17-cv-02366-BAS-KSC