1                    United States District Court

2                for the Southern District of California

3                                    )
    AL OTRO LADO, Inc., et al.,      )
4                                    )   No. 17cv2366-BAS
            Plaintiffs,              )
5                                    )   March 24, 2021
                v.                   )
6                                    )   San Diego, California
    ALEJANDRO MAYORKAS, Secretary,   )
7   U.S. Department of Homeland      )
    Security, et al.,                )
8                                    )
            Defendants.

9

10                   TRANSCRIPT OF TELEPHONIC HEARING
                 BEFORE THE HONORABLE KAREN S. CRAWFORD
11                   United States Magistrate Judge

12  APPEARANCES:

13  For the Plaintiffs:      MAYER BROWN LLP
                             ORI LEV
14                           Attorney at Law

15  For the Defendants:      U.S. DEPARTMENT OF JUSTICE
                             KATHERINE J. SHINNERS
16                           Attorney at Law

17  (See Page 2 and 3 for additional attendees.)

18

19

20
    Court Reporter:          Dana Peabody, RDR, CRR
21                           District Court Clerk's Office
                             333 West Broadway, Suite 420
22                           San Diego, California 92101
                             DanaPeabodyCSR@gmail.com

23

24
    (Transcribed from an audio recording.)
25

```
 1                 San Diego, California, March 24, 2021
 2                              *   *   *
 3          THE COURT:  For plaintiffs, I'll let you go ahead.
 4          MR. LEV:  Good afternoon, Your Honor.  This is Ori Lev
 5  from Mayer Brown on behalf of the plaintiff.
 6          THE COURT:  Thank you.
 7          MS. CASSLER:  This is Rebecca Cassler from Southern
 8  Poverty Law Center on behalf of the plaintiff.
 9          THE COURT:  Thank you.
10          MS. WALTERS:  Your Honor, this is Karolina Walters
11  from the American Immigration Council on behalf of plaintiffs.
12          THE COURT:  Thank you.
13          MS. MOTA:  Your Honor, this is Elsa Mota from the
14  Center of Constitutional Rights on behalf of the plaintiff.
15          THE COURT:  Thank you.
16       And is Angelo Guisado joining us as well today?
17          UNIDENTIFIED SPEAKER:  No, Your Honor.
18          MR. LEV:  I believe that's everyone for plaintiffs,
19  Your Honor.
20          THE COURT:  Okay.  Thank you very much.
21       Is Ms. Shinners on the line?
22          MS. SHINNERS:  I am, Your Honor.  Good afternoon.
23          THE COURT:  Thank you.
24       Mr. Sampat?
25          MR. SAMPAT:  Yes, Your Honor, I'm here.
```

```
 1           THE COURT:  Thank you.
 2      Brianna Evans?
 3           MS. EVANS:  Good afternoon, Your Honor.
 4           THE COURT:  Linda Alberti (phonetic)?
 5           MS. ALBERTI:  Hello, Your Honor.
 6           THE COURT:  Christina Baptista?
 7           MS. BAPTISTA:  Yes, Your Honor.
 8           THE COURT:  Thank you.
 9      Bear with me a moment, please.
10      Is Jill Anderson also with us?
11           MS. ANDERSON:  Yes, Your Honor.  Thank you.
12           THE COURT:  Thank you.
13      Amber Nepolitano?
14           MS. NEPOLITANO:  Yes, Your Honor.  Good afternoon.
15           THE COURT:  Good afternoon.
16      Diana Perry-Elby?  Okay.
17      And Miriam Abdoni (phonetic)?
18           MS. ABDONI:  Hello, Your Honor.
19           THE COURT:  Hi, there.
20      Okay.  Are we expecting Ms. Perry-Elby to join us?
21           MS. SHINNERS:  We are, Your Honor.  This is
22 Katherine Shinners.  I -- she should be joining, but, Miriam,
23 could we move forward if she's not able to connect?
24           MS. ABDONI:  Yes, we can move forward.
25           THE COURT:  Thank you.
```

1    Did someone else just join us on the line?

2         MR. HALASKA:  This is Alexander Halaska from the

3    Department of Justice.

4         THE COURT:  Thank you.

5    All right.  Thank you all for calling, calling in today.

6    As you likely heard at the beginning of this call, we are

7    recording it.

8    The reason we're here today is to address issues

9    surrounding the motion for protective order which was filed by

10   the defense in this case.

11   It basically flows from the Court's clarification order

12   which was entered on October 30th of last year at Docket Number

13   605 in which the defendants were directed to identify class

14   members that the Court had provisionally certified.

15   So at this time I do have some questions that I would like

16   to pose to the parties so that we can move forward with the

17   entry of a protective order, if necessary, and get the

18   information produced expeditiously so that we can further

19   proceed in this case.

20   At the outset, let me ask the defense whether the

21   information which has been requested is ready for production

22   subject to the entry of a protective order?

23        MS. SHINNERS:  There is -- parts of it are.  So there

24   are --

25        THE COURT:  I'm sorry.  Hold on.  One of the rules I'm

1   going to ask you to follow so that we're all on the same page

2   is if you could please say who you are before you speak so we

3   have a clear record.

4           MS. SHINNERS:  Absolutely, Your Honor.  My apologies.

5   This is Katherine Shinners.

6       So as recounted to plaintiffs in briefing and at other

7   communication, some of what they have requested in terms of

8   what the Court has asked to be shared required to be heard

9   about identities of class members or potential class members

10  are in lists that were already generated, and those are ready

11  for production.

12      Defendants are working on a master list of potential class

13  members that's overly comprehensive and would include a large

14  swath of people who have sat asylum or gone through

15  credible-fear proceedings during the relevant time period.

16      So that list is not complete, although we could provide

17  portions of it probably fairly quickly.  That list is not

18  complete because we require some additional information,

19  contact information, detention status information.  That is not

20  yet complete.

21          THE COURT:  Okay.  And as I understand it, no

22  supplemental information has been provided in response to the

23  Court's order by the defense?  Is that correct?  Ms. Shinners?

24          MS. SHINNERS:  I guess I'm just trying to make sure I

25  answer the question correctly.  This is Ms. Shinners.

6

1      I -- I -- we have provided information about class members

2    to plaintiffs' counsel upon their request when they've had a

3    Privacy Act waiver, but in terms of the information that

4    relates to the Court's order, as far as the identities or,

5    like, listings of class members, no, we have not.

6            THE COURT:  All right.  Thank you.

7      And from plaintiffs, do you have anything to supplement on

8    this particular issue?  And please identify yourself.

9            MR. LEV:  Good afternoon, Your Honor.  This is Ori Lev

10   for the plaintiffs.

11     I would just posit, Your Honor, frame this issue as we view

12   it, which is that many months ago the government was ordered to

13   produce information to us to allow us to both provide notice to

14   members of the class, as the Court recognized that we should do

15   so in certain cases, and to help ensure compliance with the

16   preliminary injunction, and it's our view that no protective

17   order whatsoever is needed in this case which agree to the

18   entry of one that we thought had reasonable limitations as a

19   compromise, but the government was unwilling to agree to that

20   and go into greater detail, but we find the government's

21   proposals on limiting the use of the information that the Court

22   has ordered them to share to be completely arbitrary.  They

23   point to a regulation that doesn't --

24           THE COURT:  Mr. Lev, can I interrupt you right now?  I

25   will let you present argument.  What I'm asking for right now

1    is whether the government has produced any information

2    responsive to the clarification order from October of last

3    year, and she did indicate some narrow information which the

4    government has produced.  I'm just asking for your response

5    with respect to that one issue.

6             MR. LEV:  I'm sorry, Your Honor.

7        Ms. Shinners is correct, we have engaged with the

8    government on numerous occasions with respect to specific

9    individuals who have come to our attention as potential class

10   members.

11       On some occasions the government has shared information

12   concerning those individuals because we were able to obtain

13   Privacy Act waivers from those individuals, and other occasions

14   the government has shared some information with respect to

15   individuals and labeled it under the existing protective order

16   in the case, and yet on other occasions, the government has

17   been unwilling to share information on the grounds that no

18   protective order has been entered along the lines that we're

19   discussing today.

20             THE COURT:  So would you --

21             MR. LEV:  Tidbits regarding various individuals.

22             THE COURT:  All right.  So would you categorize or

23   describe the information produced thus far by the government to

24   be limited?

25             MR. LEV:  Yes, Your Honor, extremely limited.  It

1    relates to just a handful of individuals that we identified.

2          THE COURT:  All right.  So let me take a step back for

3    a moment, Ms. Shinners.  Mr. Lev raises an issue which I think

4    is deserving of analysis, and that is, we have a protective

5    order in this case already.

6       May I ask who just joined us?

7          MS. PERRY-ELBY:  This is Diana Perry-Elby.  My

8    apologies for being late.  I did not have the number.

9          THE COURT:  Okay.  Thank you.  This is Judge Crawford.

10      Taking a step backwards, Ms. Shinners, we have a protective

11   order in place already in this case.  We have an order that was

12   entered which did not have any limitations or qualifications

13   set forth by Judge Bashant.  Why do we need a further

14   protective order in this case?

15         MS. SHINNERS:  Sure.  So the prior protective

16   order -- I just want to note that the prior protective order is

17   actually more restrictive to plaintiffs than the protective

18   order that the government is proposing that specifically

19   addresses the sharing of class member and potential class

20   member asylum information.

21      But the -- the issue with the old protective order

22   initially is that it does not address and specifically provide

23   for the sharing of asylum information.  There are a couple of

24   other issues in that EOIR whose records form part of the

25   identification of class members as not a part to that

1   protective order, and that would require an amendment to the

2   protective order.

3       And in addition to allowing or providing, that protective

4   order specifically contemplates the production of information

5   that's otherwise protected from disclosure under 208.6 and

6   1208.6.

7       But even leaving that aside, if the existing protective

8   order, the parties had tried modifying that, and plaintiffs had

9   requested to share that information with additional people that

10  are not contemplated under the existing confidentiality

11  protective order, and thus that in addition to a host of other

12  reasons, in order to allow for sharing with -- in order to

13  allow that sharing, defendants proposed rather than modifying

14  the existing protective order and potentially creating

15  ambiguities to create a new protective order that was more

16  tailored for this specific information.

17          MR. LEV:  If I may, Your Honor, this is Mr. Lev.

18          THE COURT:  Yes, I was going to give you an

19  opportunity.

20      Have you completed your comments, Ms. Shinners?

21          MS. SHINNERS:  Well, I just want -- I guess I should

22  point out again that the reason the prior protective order --

23  it does not expressly cover 208.6 information, it doesn't

24  expressly cover EOIR records, it does not allow for the type of

25  sharing that plaintiff had requested, so although -- excuse

1  me -- that plaintiffs have requested, but also that defendants

2  are willing to agree to some of those categories of individuals

3  to -- defendants are willing to agree that plaintiffs upon

4  receipt of this information that defendants and EOIR are, of

5  course, willing to share with plaintiffs, that they may also

6  share it with the individual asylum seeker him or herself, with

7  particular attorneys who have particular forms on file, and to

8  others with the written consent of the individual asylum

9  seeker.

10      So none of that is in the current confidentiality

11  protective order either.

12          THE COURT:  Okay.  Thank you.

13      Mr. Lev.

14          MR. LEV:  So Your Honor, we agree that the current

15  protective order is more restrictive than what we're talking

16  about today, and I wasn't suggesting that the government should

17  be providing us the information that the Court ordered it to

18  produce months ago and label it "Confidential" under the

19  current protective order because that would not allow us to

20  share it with those -- with whom we need to share it to

21  effectuate the purposes of the sharing.

22      I was referencing the existing protective order, one, to

23  provide some context to the question of what information the

24  government has shared to date, the very limited information,

25  and it is also relevant to another argument the government has

1    raised, which has been while we're waiting on all this to play

2    out, they have wanted us to enter into their restricted

3    protective order, have selectively agreed to share information

4    on some occasions but not on others.

5        It's not clear to us why they couldn't just share the list,

6    label them "Confidential" under the existing protective orders.

7    That wouldn't be sufficient for us.  It wouldn't make this

8    issue go away because we think we're entitled to just get those

9    lists without restrictions.

10       It's just demonstrative of the government's unwillingness

11   to share information until now, and I find it interesting that

12   Ms. Shinners continuously refers to the information that

13   plaintiffs have requested as opposed to the information that

14   the Court has ordered the government to provide, and I think

15   that that's the core of our disagreement, I think, is our

16   different perspectives of this issue.

17            THE COURT:  Okay.  Thank you.

18       All right.  Yes, Ms. Shinners, you want to respond?

19            MS. SHINNERS:  Only to one point.  When I refer to

20   what plaintiffs have requested, what I was saying are the

21   categories of people that plaintiffs have requested that they

22   be permitted to further share the information with.  Again,

23   defendants and EOIR have no problem with -- under the Court's

24   order sharing what the Court has required defendants to

25   provide.

1      What we're saying plaintiffs were requesting was the

2   ability to further share that information.

3          THE COURT:  All right.  And you have given me your

4   explanation as to why you feel a supplemental protective order

5   is needed in this case; however, Judge Bashant's October order

6   doesn't call for the use of any protective order.  It just

7   calls for the production of information to plaintiff.

8          MS. SHINNERS:  May I respond?

9          THE COURT:  Yes.

10          MS. SHINNERS:  So, again, both defendants and EOIR

11   greater share such information about asylum seekers with

12   plaintiffs and their counsel as required by the Court's orders

13   or as may facilitate compliance even with the Court's

14   preliminary injunction orders.

15      But what they don't agree to is just share such information

16   without sufficient protections against disclosure to third

17   parties or with the knowledge that plaintiffs will share it

18   with others without the asylum seeker's consent, and that's

19   really what plaintiffs are insisting on.

20      The government regulations governing asylum information,

21   which includes the fact that a person has sought asylum, which

22   is the defining characteristic of the class, as well as

23   the -- substance of their claims that this should be provided

24   or that this only limited exception shall not be disclosed

25   without the written consent of the applicant.  So the

1   government is essentially required to restrict access to this
2   information to prevent potential harm to the asylum seekers
3   themselves.  Disclosure of this information to certain
4   individuals may result in retaliation by the very entities or
5   persons from which the asylum seeker is claiming protection.
6       Now, I understand plaintiffs say that they will only
7   disclose the information to third parties if they need to to
8   facilitate the preliminary injunction order and if it's in the
9   best interest of the asylum seeker if they haven't already
10  obtained that asylum seeker's written consent.  They say they
11  will use their professional judgment.  But it's -- plaintiff
12  cannot always know whether it is in the best interest of the
13  asylum seeker if they haven't obtained that asylum seeker's
14  consent.  And there's also a possibility that in particular
15  cases, their judgment could be wrong, and the results could
16  result in harm to the asylum seeker.
17      So, for example, a family member with whom class counsel is
18  communicating might share information with the persecutor of
19  the asylum seeker or the persecuting entity or that family
20  member might even be the very persecutor that the asylum seeker
21  is -- from whom the asylum seeker is seeking protection.
22      And so the broader the categories of people that plaintiffs
23  want to share the information with, the higher the potential
24  for harm, and the more degrees of people that plaintiffs will
25  share the information with, the higher the potential for harm.

1          I mean, the government remains willing to try to address

2     plaintiffs' concerns about assisting and contacting class

3     members and finding a safe middle ground that retains the basic

4     safeguards for asylum seekers, but during the course of

5     discussing this, you know, plaintiffs made clear that they

6     don't want restrictions on sharing with third parties, and that

7     could cause harm to the asylum seeker, and, again, we're not

8     assigning their, you know -- their good -- or we're not

9     doubting that they have good intent, but the point is that

10    without the clarity of a protective order, those

11    protections -- those protections for asylum seekers are eroded,

12    and I believe really the starting point here is that I think

13    plaintiffs agree that there should be protections for this

14    information, so I -- we're -- really, the dispute is as to the

15    conditions for sharing with third parties and the parameters of

16    those.

17          THE COURT:  I do have concerns, however, that you are

18    endeavoring to restrict plaintiffs' counsel's use of the

19    information as they see fit to vigorously protect their class

20    members' rights, and you're challenging, really, their

21    professionalism in carrying out their fiduciary

22    responsibilities to those class members.  You're basically

23    trying to micromanage how they deal with information which they

24    know is sensitive and they know needs to be safeguarded in

25    order to protect their clients' interests.  But why does the

1    government have an interest in micromanaging how plaintiffs'

2    counsel uses this information to identify class members?

3        Ms. Shinners?

4            MS. SHINNERS:  Right.  I don't -- yes, Your Honor.  I

5    don't believe that's what the protective order would do.

6    I -- again, we're -- the proposed protective order would allow

7    them to share information, protected asylum information, of

8    course, with the individual asylum seeker him or herself to

9    whom that information pertains with that individual's attorney

10   and to other people if that asylum seeker consents.  This is

11   the asylum seeker's information.  It's not the government's

12   information.  I mean -- well, it is the government's

13   information about the asylum seeker claim.  It pertains

14   specifically to that asylum seeker, and the protections that

15   are in place by regulation and which are sort of mirrored in

16   the terms of the proposed protective order are for that asylum

17   seeker's protection.

18       The protective order also doesn't prevent class counsel

19   from using that information that it received from the

20   government to try to contact class members.  It merely prevents

21   them from disclosing protected asylum information.

22       And while that information might be -- that might include,

23   of course, the fact that someone has sought asylum, plaintiffs

24   and class counsel can still reach out using that information

25   about identities to try to contact class members and to try to

 1  assist them, and I -- again, the terms of the protective order

 2  are not designed to micromanage in any way.  They're simply

 3  designed to make sure that the individual consents to the

 4  release of that information to those third parties, the

 5  individual asylum seeker.

 6              THE COURT:  Okay.  Thank you.

 7              MS. SHINNERS:  And to that end --

 8              THE COURT:  Go ahead.

 9              MS. SHINNERS:  To that end, I mean, I think we

10  can -- I think the government -- we've indicated we are quite

11  willing to remove any sort -- not -- to modify some of the

12  recordkeeping provisions that are in the current version of the

13  proposed protective order statute if that's the reason for the

14  assertion of micromanagement.  We're willing to negotiate on

15  that, certainly.

16              THE COURT:  Okay.  Mr. Lev, before -- I have some

17  pointed questions.  Any response?

18              MR. LEV:  I think we share Your Honor's view that what

19  the government is proposing is micromanaging how we use this

20  information.  You know, plaintiff AOL's sole mission is to aid

21  asylum seekers, and my other co-counsel organizations regularly

22  work with and aid asylum seekers, so to hear Ms. Shinners

23  explain why the government needs to impose limitations on how

24  we can do our work representing the class so that we can

25  protect asylum seekers is a bit jarring.

1       At the end of the day, you know, they point to this
2  regulation that doesn't apply to us, it applies to the
3  government.  They somehow seek to transform that into a
4  requirement that limits our use of information the Court has
5  ordered them to provide us without any limitation, so none of
6  what she has said is compelling to us.
7       And I guess the other point I would make is that it might
8  sound all well and good in some abstract universe where
9  it's -- you know, we can readily -- you know, once we have a
10 list of asylum seekers, of course, we can just readily reach
11 all of them and obtain their written consent to share, and
12 that's great, and what's the big deal?  But that's not the
13 world we live in.
14      We live in a world where it's often very difficult to reach
15 asylum seekers either because they're in the government's
16 custody, and it's been very challenging to reach them there or
17 because they've already been removed from the United States,
18 and that's part of the class for whom we're responsible for
19 providing notice.
20      And the reality is that it's attorneys and family members
21 who often communicate with us on behalf of these asylum seekers
22 who we are unable to reach.
23      So I think there's sort of the legal questions, and then
24 there are the practical implications of what the government is
25 proposing, and those practical implications that -- the reason

1   that we have opposed this is because we know it's going to

2   impede our ability to do our job of representing this class and

3   ensuring that they get the benefits of the preliminary

4   injunction.  And it has been like pulling teeth over a year to

5   do this and over the past few months to do this, and, you know,

6   the burdens they're seeking to impose on us would mean it's

7   going to be continue to be pulling teeth.

8                THE COURT:  Okay.  Thank you.

9        All right.  The next -- the next series -- of -- I want to

10  move on, Ms. Shinners.

11               MS. SHINNERS:  Sure.  Of course.

12               THE COURT:  And you'll have an opportunity to address

13  specifics as well because I'm going to go to the various

14  provisions of the contested protective order paragraph.

15       The next question I have, and I'll pose it first to

16  Ms. Shinners, is the government relies predominantly on ATFR

17  Section 208 and Section 1208.6 when I say "208.6" and "1208.6."

18  Getting back to what I addressed, Ms. Shinners, earlier, why do

19  these regulations have any application to the production of

20  information pursuant to a court order by the government?  Why

21  are they applicable at all here?

22               MS. SHINNERS:  Right.  Because, again, defendants in

23  EOIR have been ordered to share such information with

24  plaintiffs and class counsel, and that is understood.  The

25  issue is that it -- that does not address, then, the agreement

1   to further share that with those who plaintiffs' counsel want

2   to share, but without that individual asylum seeker's consent.

3   So those regulations, again, they have this protection to

4   protect the asylum seeker, and so while, again, we're not

5   trying to say that plaintiffs or class counsel have that

6   intent, we are only seeking to impose what are very routine and

7   actually much less restrictive terms on the sharing of

8   information about class member identities that the government

9   has been able to agree to with various other organizations

10  never have gone to litigation, and this protective order, like

11  I said, it's actually less restricted than those other

12  protective orders that have been agreed to time and time again

13  about the sharing of class member information pursuant to court

14  order.

15      So -- but back to your question, Your Honor, 208.6 and

16  1208.6 sets forth what the government -- what the government

17  may or may not do and may or may not disclose.  And while,

18  again, they will have -- understand that the Court's order

19  requires them to disclose the information to plaintiffs and

20  class counsel, they still have an obligation to assure that

21  that information is not further disclosed to other third

22  parties, and they've assured asylum seekers of that

23  confidentiality as well in those proceedings in that the

24  information will not be further shared.

25          THE COURT:  But doesn't -- don't the regulations

20

1    really address what the purview of the government's obligations

2    are as opposed to having any bearing on a third party such as

3    plaintiffs or -- let me rephrase that.  Don't regulations

4    pertain to what the government's obligations are with respect

5    to its voluntarily production of information as contrasted to a

6    situation such as the one at hand where you've been ordered to

7    produce information without limitation by the Court?

8            MS. SHINNERS:  Your Honor, I -- while I think we have

9    to agree that this sets forth the government's obligations, but

10   if there really were no need for further limitations on further

11   disclosure, there would -- that's the point of the protective

12   order.  The protective order is designed to make sure the

13   government can share this information without running afoul of

14   its own obligations.

15           THE COURT:  I understand your position or maybe I

16   don't understand your position because you already have a court

17   order in place which in my mind would trump that regulation.

18   You've already been ordered by Judge Bashant to produce the

19   information without restriction.  So why is that regulation

20   even applicable?  What you're saying is regardless of the

21   order, you still have to comply with the regulation?  Is that

22   your position?

23           MS. SHINNERS:  Well, yes, in terms of the further

24   sharing to third parties.  Again, if plaintiffs were to say

25   we're not going to share this with anyone, we're not going to

1    share protective information -- and, again, I want to

2    reemphasize that this does not -- the protective order does not

3    prevent plaintiffs from talking to individual class members.

4    It doesn't prevent class members from sharing their own

5    information with plaintiffs.  It doesn't prevent plaintiffs

6    from talking to individual class members about that individual

7    class member's record.  It doesn't prevent them from contacting

8    people.  Again, so long as they just simply don't reveal that

9    that person has sought asylum absent the -- unless it's

10   information that's provided to class counsel independently, for

11   example, if the individual -- it doesn't prevent any of that.

12       But the order -- again, and plaintiffs didn't initially

13   disagree that protection is warranted.  We were very -- we were

14   just going to -- I apologize, Your Honor.  We were -- we were

15   planning to enter into a protective order that -- or modify the

16   existing protective order to account for the production of this

17   information.  And I think -- I guess I'm not quite

18   understanding that the Court's order wouldn't allow us to

19   designate this information as confidential.  I didn't

20   understand the Court's order to preclude the entry of a

21   protective order that puts these protections that are for the

22   benefit of the asylum seeker in place.  I mean, protective

23   orders again, these are routine.  They're often put in place

24   before discovery.  Even discovery that's been ordered by the

25   Court can be produced.  I -- we never briefed in -- I mean, I

1    think -- I think the issue wasn't raised squarely by the motion

2    for clarification that was in front of the Court on -- and so I

3    did not think this issue had been decided by the Court,

4    Your Honor.

5         THE COURT:  Okay.  Thank you.

6       Mr. Lev.

7         MR. LEV:  I don't have much to add, Your Honor.  I

8    mean, we obviously think that regulation limits the

9    government's sharing information and that the Court order

10   trumps that in that -- I, frankly, don't follow the logic of

11   why the regulation has anything to do with the proposed

12   limitations of plaintiffs sharing of information that the Court

13   has ordered be provided to them.

14        THE COURT:  Okay.  Okay.  There are several issues

15   that were raised in the briefing by the parties pertaining to

16   this section that the government has requested be included in

17   the protective order.  I'll break it down by subcategory.

18      The defense has requested that information be produced to

19   the asylum applicant, and I understand there's no objection,

20   obviously, by plaintiff that that can stand, that information

21   can be produced by the defense directly to the applicant.

22   That's correct.  Is that right, Mr. Lev?

23        MR. LEV:  That's correct, Your Honor.

24        THE COURT:  When I say --

25        MR. LEV:  I'm sorry.

```
 1            THE COURT:  To counsel for the applicant.  When I say
 2   the information can be produced to the applicant, obviously
 3   that means can be produced by the government to counsel for the
 4   applicant.  The asylum seeker.
 5            MR. LEV:  Well, Your Honor I think that the
 6   information is to be produced to plaintiffs, and then the
 7   question is --
 8            THE COURT:  Okay.
 9            MR. LEV:  -- with whom can plaintiff share that
10   information --
11            THE COURT:  I'm going to get that.  I'm going to get
12   to that.
13            MR. LEV:  I'm sorry.  I'm not following your question
14   then, Your Honor.  I apologize.
15            THE COURT:  Okay.  The information can be produced at
16   the outset for plaintiffs' use -- for plaintiff without any
17   restriction.  Is that correct?  Just solely to
18   plaintiff -- plaintiff can review it themselves, the asylum
19   seekers themselves can review it.  There's no objection to
20   that, right?
21            MR. LEV:  Correct.
22            THE COURT:  Okay.  And looking at the court order
23   itself, I'm looking at Section 6(b)(4), which says, "May
24   disclose asylum material to the individual to whom asylum
25   material solely pertains."  You agree with that?  There's no
```

1   objection to plaintiff for the first clause of subparagraph 4,

2   correct?

3           MR. LEV:  This is the government's proposed protective

4   order, no, we don't have a problem with being allowed to share

5   this with the asylum seekers themselves.

6           THE COURT:  Right.  So the second provision that they

7   include is that they want the attorneys -- they want it to be

8   shared with attorneys only insofar as they have entered an

9   appearance in asylum proceedings, and that's in the second

10  portion of subparagraph 4 that I just referenced.

11      So let me ask Ms. Shinners, why is that necessary, that

12  they have entered an appearance, as you described in

13  subparagraph 4?

14          MS. SHINNERS:  Right, that is just -- that is

15  documented evidence that the attorney -- or that the individual

16  asylum seeker has consented to the disclosure of this

17  information or of specifically asylum information because these

18  document appearance in the individual's immigration

19  proceedings.

20          THE COURT:  Well, can't an attorney have an

21  attorney-client relationship with an asylum seeker without

22  having entered an appearance in proceedings and submitted

23  certain forms related to that?

24          MS. SHINNERS:  I think there could be an

25  attorney-client relationship, and I think -- you know, I

 1   think -- there may be other ways you could document
 2   representation in a case relating -- or in a case that relates
 3   to the asylum claims, but I -- not to be overly formalistic,
 4   but there are circumstances where I don't think these are the
 5   type of attorneys necessarily that plaintiffs mean, but there
 6   are circumstances where there are attorneys in other types of
 7   cases to whom that represent the individual in other types of
 8   cases and to whom the individual would not consent to providing
 9   their asylum information.
10       So, for example, someone might have an attorney-client
11   relationship with a personal injury attorney for a car
12   accident, but that doesn't mean that the asylum seeker has
13   consented to that -- to disclosure of his or her asylum
14   information to that person.  No, I mean, I think -- again, I
15   don't think that's the type of attorney that plaintiffs mean;
16   however, there needs to be some sort of definition, there needs
17   to be clarity in these terms so that they can't be interpreted
18   too broadly.
19           THE COURT:  Well, would Mr. Lev fall under the
20   definitions as you've contained them in
21   paragraph -- subparagraph 4?
22           MS. SHINNERS:  Well, I mean, no, but Mr. Lev
23   would -- Mr. Lev, who's already receiving the information
24   through his role as class counsel, he doesn't individually
25   represent the class members.  But they could also document

1    agreement -- I mean, if the individual asylum seeker agreed to

2    share such information with that attorney, that could also be

3    documented through a consent form as provided in paragraph 5.

4           THE COURT:  So would Mr. Lev -- if he hasn't entered

5    an appearance in the immigration proceedings, would he then

6    need to submit a separate consent form under the protective

7    order provisions that you've described?

8           MS. SHINNERS:  Well, again, I -- I'm a

9    little -- Mr. Lev would not.  Mr. Lev would not because he

10   already has the information, so I'm having trouble --

11          THE COURT:  Well, I mean, "described as that

12   information can be produced to the individual to whom asylum

13   material pertains," but, and then you go on and say, "Or such

14   individual's attorney or credited information provided that

15   they have filed various forms."  I don't know that Mr. Lev has

16   filed any of those forms, so, arguably, it could be produced

17   directly to the asylum seeker, but not to Mr. Lev under the

18   terms that you have.

19          MS. SHINNERS:  Oh, no, again, the terms of the

20   protective order -- and I'm sorry if there's misunderstanding.

21   The terms of the protective order don't govern Mr. Lev at all.

22   Again, defendants in EOIR agree that the Court has ordered them

23   to provide information to plaintiffs and their counsel of

24   record, so because he's counsel of record, he would already

25   have access to the information.  If it's any further disclosure

1   that's governed by plaintiff or by their counsel, that's

2   governed by -- well, I guess I should say Mr. Lev is governed

3   by paragraph 1.  I should back up, but my answer was a little

4   confusing, and I do apologize, but Mr. Lev is governed by

5   paragraph 1 of this section.

6          THE COURT:  All right.  I'm really at a loss as to why

7   it's necessary for immigration counsel who has been retained or

8   who has engaged in conversation with a -- an asylum seeker

9   needs to specifically enter some kind of written record as to

10  their appearance in those proceedings in order to have access

11  to the information.  Would they need to have access either

12  through Mr. Lev or through the asylum seeker?  Wouldn't that be

13  sufficient?

14         MS. SHINNERS:  I think -- so I just want to make sure

15  I understand your question, Your Honor.  Are you saying an

16  attorney who represents the individual in his or her asylum

17  proceedings would probably already have the information?  The

18  forms that are listed here are those that the attorney would

19  file before USCIS or the -- or EOIR in the course of that

20  representation.  They have already entered an appearance, and

21  so they don't need to actually enter anything else.  They've

22  already done that.  So they don't need to fill out a new form.

23         THE COURT:  I just don't understand why you have this

24  provision at all.  Why can't it just be that it can be produced

25  to the individual to whom asylum materials solely pertains on

1    their retained immigration counsel?  Why does it need to say

2    anything more?

3          MS. SHINNERS:  This is just to clarify who retained

4    immigration counsel is.

5          THE COURT:  Well, are you proposing that this

6    information would be subject to production to the defense or

7    just plaintiff needs to keep good recordkeeping of who they

8    disclose information to and have a copy of their notice of

9    appearance in the immigration proceedings?  I'm not

10   understanding why you need it at all, why this provision is

11   necessary.  Clearly plaintiffs are going to take care not to

12   just willy-nilly produce information to immigration counsel

13   unless for sure they're representing the asylum seeker's

14   interests in contemplated immigration proceedings or actual

15   immigration proceedings, so I don't understand why they need to

16   have entered a formal appearance.

17         MS. SHINNERS:  I mean, I think there's some room for

18   negotiation on this point in terms of so long as it's -- I do

19   think there's some room for negotiations on this point about

20   attorneys and how they may be able to -- how plaintiffs may be

21   able to share information with attorneys for the individual.

22         THE COURT:  Well, don't you think Mr. Lev and his

23   group would be able to make a determination about whether

24   immigration counsel is actually representing an asylum seeker's

25   interests?  I mean, isn't that all that's necessary?

1          MS. SHINNERS:  Well, again, the purpose of the

2    protective order is just to set the clarity for the terms of

3    further disclosure, and so, again, I -- we don't -- there's

4    not -- this is not an effort to say that Mr. Lev and his

5    counsel have bad intent or intend to use bad judgment.  The

6    question is placing some clarity on the limits for further

7    disclosure and ensuring that the person does, in fact,

8    represent someone in an immigration proceeding such that the

9    individual to whom the information pertains, that asylum

10   seeker, has consented.

11       Again, this all goes back to we're not trying to

12   micromanage, we're just trying to make sure that the interests

13   of the asylum seeker are -- that they're protected in terms

14   that are clear and present clear lines, but, again, I do think

15   there's some room for negotiation as to the asylum seeker's

16   attorneys and the documentation that might be required.

17          THE COURT:  Okay.  So when you say "room to negotiate

18   on this point," what are you willing to modify on this

19   provision?

20          MS. SHINNERS:  Well, again, I just want to make sure

21   that I understand -- we're trying to ensure that there's some

22   clarity to the terms.  I think maybe we would want to discuss

23   those in a caucus, but I want to just point out that we may be

24   able to negotiate further as to the attorney provision.

25          THE COURT:  Mr. Lev, with respect to this one

1    provision, which is the second portion of subparagraph 4, do

2    you wish to respond to any of the arguments raised by

3    Ms. Shinners or add anything else with respect to this

4    particular provision?

5            MR. LEV:  Your Honor, I'll just note that -- I was

6    surprised to hear Ms. Shinners saying they're not trying to

7    micromanage because as I was hearing the argument, the word

8    that kept coming to mind is this is, in fact, micromanaging,

9    but I don't have anything to add to Your Honor's comments.

10           THE COURT:  Okay.  Okay.  The next -- did somebody

11   just join us?

12           MS. ABDONI:  I'm so sorry, Your Honor.  I got knocked

13   off, and I had to dial back in.  This is Miriam Abdoni.  I'm so

14   sorry.

15           THE COURT:  Okay.  No problem.  Thank you.

16       All right.  The next provision I want to address is

17   subparagraph 5, which in the defense version is on paragraph 7

18   starting at line 10 that provides that information can be

19   disclosed to any person who the individual to whom asylum

20   material solely pertains and has given written consent, and it

21   goes on to describe what that written consent form should be as

22   DOJ 361 or by written statement by the individual authorizing

23   release of asylum information, et cetera.

24       Ms. Shinners, why is it necessary that there be written

25   consent as opposed to oral consent?  And it has been pointed

1    out, as you know by the plaintiff, that requiring written

2    consent has some practical hurdles that would be difficult for

3    the plaintiffs to comply with.  Why do we need some kind of

4    written consent?

5            MS. SHINNERS:  Written consent just ensures that --

6    both that the asylum seeker is knowingly consenting, again, to

7    the further release of his or her asylum information, and oral

8    consent does not have the same safeguards.  I mean, that's why

9    we have the -- generally we use forms.  Now, this stems from

10   the requirement that the government is required to ensure that

11   information shall not be disclosed without the written consent

12   of the asylum applicant as set forth in 8 --

13           THE COURT:  Go ahead.

14           MS. SHINNERS:  8 CFR.  I think you're familiar with

15   the regulations now, Your Honor, 8 CFR 28.6 and 1208.6.

16           THE COURT:  Okay.  Mr. Lev?

17           MR. LEV:  Your Honor, I mean, I'll just note that this

18   is just another example of the government conflating its

19   obligations under the regs and the Privacy Act and its

20   recordkeeping obligations with what would be the normal

21   practice of counsel representing, you know, a client and acting

22   in the client's best interest and that the ability to obtain

23   written consent, again, returning to the practicalities,

24   is -- this is not sort of your typical case where I can just,

25   you know, call my client up and send them an email and they'll

1   sign it and print it and send it back to me.  It's much more

2   challenging than that for many of our class members, so as a

3   practical matter, this would substantially limit our ability to

4   do our job on behalf of the people we represent.

5           MS. SHINNERS:  I --

6           THE COURT:  And, Ms. Shinners, go ahead.

7           MS. SHINNERS:  Well, I guess, and I think what would

8   be helpful for us is -- and this is the point I was trying to

9   make earlier.  If there are such difficult -- I mean, if there

10  are difficulties, I don't know that it's a difficulty for

11  everyone, but there are very practical difficulties with

12  obtaining written consent.  There is a provision in paragraph

13  6, and it's for particular -- on a case-by-case basis to

14  evaluate whether that person -- whether information could be

15  disclosed to someone.  Again, this is on a case-by-case basis

16  subject to their signing on to the protective order if this

17  becomes an issue.  I guess I'm -- and this is what we did try

18  to get through in the briefing and talk about in our

19  negotiations with plaintiffs' counsel.

20      What the government's not sure about is how this poses an

21  impediment to identifying and locating class members and

22  where -- where -- where this -- essentially where they would

23  need to share government records with the third party in order

24  to assist the class member, and thus they would need the class

25  member's written consent to begin with, but I think there

1   haven't really been concrete examples.  I think --

2           THE COURT:  Let me pose one for you, and it's not

3   something Mr. Lev raised, and I'm not sure that it would be

4   applicable, but let's say you've got an asylum seeker who's in

5   a detention facility who wants to speak with Mr. Lev, but

6   Mr. Lev doesn't have his written consent, so he can't have a

7   conversation with this individual, he can't discuss any of the

8   information that might be produced by the government related to

9   his asylum claim because he's not provided Mr. Lev with a

10  written consent form?

11          MS. SHINNERS:  Well, the protective order would not

12  prevent the asylum seeker from speaking with class counsel or

13  from Mr. Lev sharing information from the government records

14  with the asylum seeker.

15      To the extent that, you know, the court order actually

16  requires production, I mean, the court orders only requires the

17  production of -- well, I digress.  That wouldn't -- the

18  protective order wouldn't prevent that conversation or the

19  sharing of information about the asylum -- about the fact that

20  the person has sought asylum.

21          THE COURT:  Okay.  Anything further, Mr. Lev?

22          MR. LEV:  Yes, Your Honor, just two points.

23      One is a -- just a broader point of principle, and that is

24  something that runs through a lot of this, which is the way the

25  government would have this all work is that they can share the

1   information they've been ordered to share with us with us, but

2   then at numerous points along the way, as we try to do our job

3   representing our clients, we need to check back with the

4   government, right?

5       The example Ms. Shinners gave, well, if you have a hard

6   time getting written consent from your client, then come back

7   to us, and we can agree to that or in other filings with the

8   Court, oh, well, you weren't able to reach this detained

9   individual, you should have contacted us.

10      We shouldn't have to go through defense counsel to

11  represent our clients.  That raises all sorts of ethical

12  issues.  That's the broad point.

13      The more narrow point, and to respond to your question to

14  Ms. Shinners, Your Honor, to provide you a concrete example of

15  why we would need to share information with third parties is

16  because family members of class members reach out to us on

17  behalf of their family members and ask us for our help and ask

18  us questions about what's happening with respect to the PI and

19  what the next status in their family's member case is.

20      As Ms. Shinners has said even the fact that this individual

21  has an asylum application pending is protected information

22  under the reg that they want to control.  So, you know, when we

23  get a class list from the list that they've been ordered to

24  provide us, if we ever finally get it, we can't even

25  acknowledge that the individual on the list is an asylum

1    seeker, and we're speaking to a family member who's called us

2    or an attorney who's called us, and we don't have that written

3    consent from the asylum seeker to speak to these people, so the

4    oral, written question ties into whom we're talking to, but

5    those are the real-life examples that we are living with

6    already even before the government has shared the class list

7    that it's been ordered to share where we have a reason and a

8    need to share this information with somebody other than the

9    class member where we don't have a written authorization from

10   the class member.

11          THE COURT:  All right.  So, Ms. Shinners, what -- the

12   provision you're describing, which is subparagraph 5, what

13   you're proposing is that, let's say, a family member contacts

14   Mr. Lev.  He would only be able to share information with him

15   regarding the asylum seeker if he had written consent from the

16   asylum seeker?  Is that how you interpret your provision?

17          MS. SHINNERS:  Yes, information obtained from the

18   government's records, yes, that's asylum information, but --

19          THE COURT:  Okay.

20          MS. SHINNERS:  But that -- so, I mean, there are -- I

21   think there are other -- let me --

22          THE COURT:  Hold that thought for a minute.

23          MS. SHINNERS:  Sure.

24          THE COURT:  The plaintiff would need to get written

25   consent from plaintiffs' counsel, would need to get written

1    consent from the asylum seeker in order to enable Mr. Lev and

2    his group or the other lawyers representing their interests to

3    share any information regarding the asylum seeker with family

4    members.  What about that written consent?  Is the government

5    then -- does it feel that it's entitled to review those

6    consents?

7            MS. SHINNERS:  No.

8            THE COURT:  Okay.  So it would just be recordkeeping

9    for the plaintiffs to keep track of?

10           MS. SHINNERS:  Right, I mean, I think that it would be

11   documentation.  If there were ever an issue, potentially if

12   there were a claim by the asylum seeker that they were

13   retaliated against by the disclosure of information, then that

14   would be documentation that the asylum seeker actually

15   permitted the information to be disclosed.  So it's not just

16   for its own sake, but it also -- yeah.  If that makes sense.

17           THE COURT:  Well, who would use those consent forms?

18   Do you mean if there was a claim brought against the government

19   for retaliation or damages flowing from that, that you would

20   seek those consent forms?  I mean, why would plaintiff need

21   to -- I'm not following you, why you feel those consent forms

22   are needed, why Mr. Lev needs to retain those consent forms at

23   all unless you think ultimately the government may need them if

24   a retaliation claim is brought.

25           MS. SHINNERS:  Sure, I mean, I think it -- it

1    documents the agreement of the individual asylum seeker to the

2    further sharing of information, and so, yes, in the event that

3    there were -- just as the one cited in our briefing or

4    allegations against the government for sharing his or her

5    information, then that consent would be documented.  The -- I

6    think it -- maybe it would also, like, to refer back to sort of

7    a basic point that, I mean, this is probably true for

8    many -- well, this is certainly true generally for -- for

9    information that is -- this is -- I apologize.  I'm trying to

10   formulate my thoughts, and I appreciate your patience.  This is

11   something that would come up probably with any attorney, and

12   they're not permitted to share confidential information with

13   someone without the consent of their client, and so the written

14   consent form here, again, is something that is a condition for

15   disclosure that's in the regulation.  It's designed to protect

16   the asylum seeker, and then it could be used in the future to

17   document that the asylum seeker agrees to that information, but

18   the other -- the other purpose of the written consent form is

19   that it ensures, and I think I forgot to mention this, but I

20   did mention it earlier, that it ensures that the applicant is

21   knowledgeably agreeing to the disclosure of the asylum

22   information in particular to that family member.

23          THE COURT:  Okay.

24          MS. SHINNERS:  And so that's why the written consent

25   would include an authorization, specifically a release of

1    asylum information, and just not a general release of

2    information.

3         THE COURT:  What about the impracticality that was

4    suggested by Mr. Lev where, you know, not always possible, in

5    fact, may not be possible at all, for an asylum seeker, who may

6    be restrained in some way, to actually provide written notice?

7    What's your response to that?

8         MS. SHINNERS:  Yeah, I mean, again, that is -- if they

9    do have those difficulties in particular cases, then paragraph

10   6 would provide another avenue to allow sharing with that

11   individual.

12        THE COURT:  I don't understand how paragraph 6

13   applies.  It says, "Any other person or entity upon such terms

14   or conditions as the parties and the Executive Office of

15   Immigration Review may agree."  So basically you're saying that

16   if you can't -- if Mr. Lev can't get the written consent of his

17   client, he has to go to you and to EOIR to consent to

18   proceeding and having discussions or sharing information with

19   family members without a written consent?  Is that what you're

20   saying?

21        MS. SHINNERS:  Yeah, but I also think that this -- I

22   want to go back to what the Court has required defendants to

23   provide, and it's really only the identities of potential class

24   members.  So it seems that, you know -- plaintiffs -- class

25   counsel can have conversations with family members about

1    things, about how to contact the class member, about the

2    general nature of the preliminary injunction, the release it

3    affords, what could happen if it -- like what -- what the -- if

4    the person is in X situation, what they could do to obtain

5    relief under the preliminary injunction, if they haven't

6    already been afforded it, they can say if you're in this

7    situation, you can provide this, they can say here is what it

8    means to be a member of the class.  There's a lot of

9    information that class counsel can provide without revealing

10   that the individual is an asylum seeker if -- and, of course,

11   they can also, like, instead of saying asylum seeker to reveal

12   that information, they could also potentially have three-way

13   calls with the individual asylum seeker and the family member

14   to the extent that that's a possibility as well where the

15   asylum seeker can then share his own information about what he

16   or she knows about his proceedings that doesn't come from the

17   government records.

18       There's a few other things that could happen here that

19   would, you know, allow class counsel to provide the information

20   needed by that asylum seeker without running afoul of the

21   protections -- the conditions on disclosure.

22       So it wouldn't necessarily be in every case that they would

23   need to come and employ paragraph 6.

24            THE COURT:  Okay.  Thank you.

25       Mr. Lev, any response?

40

1           MR. LEV:  Yes, Your Honor.

2       Just a couple -- a few points.  More than a couple, I

3   guess.

4       One is the discussion sort of discussed two separate but

5   related questions.  One was the requirement that the government

6   proposes that we obtain written authorization from asylum

7   seekers before we can share information with anyone; and second

8   was a recordkeeping requirement with regard to that.

9       I'm just going to start with the latter.  I mean, it's hard

10  to pick the most troubling aspect of the government's proposal,

11  but the recordkeeping requirement is there, and, you know,

12  wouldn't -- Ms. Shinners discussed it in the government's

13  brief.  They completely ignore the most troubling aspect of

14  what they propose, which is not only would plaintiffs have to

15  keep records of all these disclosures, which is not grounded in

16  any legal principle that we're aware of, but we would, in fact,

17  have to provide those records to the defendants upon their

18  request.

19      So I think the government is just realizing that's

20  indefensible, and that's why they don't address this, but it

21  does reflect, again, going back to the principle I mentioned

22  earlier, their entire proposal is infected with this notion

23  that, well, we should just have to work through them.  You

24  know, that's how paragraph 6 works.  We'll come to the

25  government.

1          With respect to the written -- the requirement for written
2     authorization itself, a few points.  One is, you know, the
3     government keeps saying, well, the written authorization is
4     necessary to ensure the asylum seeker, you know, understands
5     what's happening, but with all due respect, there is absolutely
6     no basis to think that an asylum seeker signing a Privacy Act
7     waiver in English has a better understanding of what they're
8     authorizing than they would in other circumstances that don't
9     involve signing that particular piece of paper.  So that's just
10    an entirely unfounded statement.  It's the government again
11    imposing its bureaucratic requirements that apply to it, third
12    parties, where they make no sense and don't apply.
13         And the last point I'll make is that, you know, some of
14    Ms. Shinners' points might may sense if we were talking about
15    one or two individuals, right, and then you say, well, you
16    know, it's not that big of a deal, and it's not such a big
17    burden, and you can jump through this extra hoop.  We're
18    talking about thousands of individuals, and a large proportion
19    of them are going to be individuals where it is going to be
20    very challenging for us to obtain oral or written consent from
21    the individual before we can even acknowledge to a family
22    member or an attorney that they are an asylum seeker, which
23    we're not allowed to do under the government's views without
24    that written consent.
25         And so, you know, this notion of we'll set up three-way

1    calls.  I mean, it's fanciful, it's disconnected from the
2    reality we live in where we have thousands of class members who
3    have been entitled to PI protections for a year and a half now.
4    We were ordered to receive their identities four months ago.
5    And the government wants to impose these utterly unreasonable
6    burdens on us that require that we obtain a written document in
7    English signed by these individuals before we can talk to their
8    family members or other attorneys who represent them or may
9    represent them about their cases so that we can help them.
10   That's what this boils down to, and it just makes no sense.
11       I think one thing that came out in Ms. Shinners' statements
12   is this isn't about protecting the asylum seeker, this is about
13   protecting the government from some lawsuit they're afraid of
14   down the road from some third party.  I don't see how any of
15   this protects the government in such a lawsuit.
16       I think a court order telling them to produce this
17   information to us should be sufficient protection from them if
18   they complied with that order.  But I'll just leave it there,
19   Your Honor.
20           THE COURT:  Okay.  Thank you.
21           MS. SHINNERS:  I mean, just to note that if --
22           THE COURT:  Ms. Shinners.
23           MS. SHINNERS:  -- if -- just to clarify that, again,
24   if there's information that's received independently from other
25   entities that the person is an asylum seeker, that is not

1  governed by this protective order.  I mean, that -- nothing in

2  the protective order precludes talking about that, if that

3  makes sense.

4           THE COURT:  I'm really not sure what specifically

5  you're referencing.

6           MS. SHINNERS:  Well, if class counsel, plaintiffs,

7  were to receive information from the individual asylum seeker

8  himself that he or she applied for asylum or asserted a fear of

9  return to their home country, then that's not information that

10 was provided by the government.

11          THE COURT:  Whether they're asylum seekers would be

12 information -- on forms provided by the government, wouldn't

13 it?

14          MS. SHINNERS:  It would be, but that doesn't mean that

15 if there's information that's obtained independently from the

16 asylum seeker him or herself that that's information that's

17 independently obtained.

18          THE COURT:  I understand, but how would Mr. Lev know

19 to reach out to someone unless he's got your list that

20 identifies that person as an asylum seeker?

21          MS. SHINNERS:  Sure.  And Mr. Lev can do that with the

22 list, but if the -- it's -- if the individual -- if -- if the

23 individual gives him records and -- from his case, and, again,

24 the order doesn't require us to provide records about

25 individual cases, but if he gives people information about it,

1    if the individual asylum seeker gives family members

2    information about his case and those family members can then

3    talk to class counsel about that information that was provided

4    by the individual asylum seeker.

5            THE COURT:  Okay.  I understand what you're saying.

6    You're saying that he can provide that information regarding

7    the fact that the individual's seeking asylum so long as he

8    gets that information as confirmed by the asylum seeker and not

9    from the government's records exclusively.  Is that right?

10           MS. SHINNERS:  Right.  I guess what I'm saying is the

11   individual asylum seeker might take -- might give some records

12   to his family members, and his family members might say, "Can I

13   discuss these with you, these documents that my brother gave

14   me," or whatever.  Mr. Lev would be able to use the

15   records -- those records to have a discussion, but, again, I

16   mean, the Court doesn't require the government to produce those

17   records, so, really, we're only talking about the -- but that's

18   just an example of how class counsel could use independently

19   obtained information to have discussions with family members.

20           THE COURT:  Okay.  There is a provision in the

21   proposal by the defendants on page 7 after paragraph 6 that

22   says, "Records each disclosure provided in sections 6(b)(4),

23   6(b)(5), and 6(b)(6) shall be preserved by each of the parties

24   while the action is pending and shall be provided to the

25   parties or the EOIR upon request and to the Court upon its

1    order.

2        And I guess that means the notices of appearance, of

3    written consent from the asylum seeker, and -- I'm looking to

4    see what 4 -- 4 would be the entries of appearance by counsel.

5    So you're suggesting that all of that information, then, be

6    retained by plaintiff and produced to the defense upon request

7    or upon order, right?

8            MS. SHINNERS:  Yeah, I mean -- I apologize.  I didn't

9    mean to cut you off, Your Honor.

10            THE COURT:  That was my question.

11            MS. SHINNERS:  Sure.  So I think, as I said at the

12    outset, I would like to caucus with you, Judge, but

13    there's -- there -- defendants and EOIR are willing to

14    negotiate on this point or pare back on this point and perhaps,

15    for example -- well, we'd like to caucus with you, if possible.

16            THE COURT:  Okay.  All right.

17        Do you wish to be heard on that point, Mr. Lev, before

18    there's any individual caucus?

19            MR. LEV:  No, Your Honor, I've said my piece about

20    that already.  Thank you.

21            THE COURT:  Okay.  All right.  I have heard now from

22    the parties on the issues that I feel are pending.  Are there

23    any other provisions related to the protective order that I

24    have not already addressed which either side would like to have

25    an opportunity to address?  Mr. Lev?

1           MR. LEV:   Thank you, Your Honor.

2       Yeah, I guess -- the way we think about this, I mean, I'm

3   not sure we touched on the provision of family members in

4   particular.   I know we talked about attorneys and why -- why

5   there shouldn't be a need for these specific forms the

6   government would require us to have before we could share with

7   attorneys, but we didn't really talk about family members, and

8   I just wanted to note that the reason that -- well, one, we

9   don't think any protective order is required and that there

10  should be any limitation on our use of this information.

11      What we offered up in compromise was that we could share

12  with attorneys and family members, and the reason we included

13  family members is because of our experience that is often

14  family members who reach out to us on behalf of their family

15  members and with whom we're dealing, and that that's sort of,

16  again, bringing this back to the reality that we're operating

17  in.   So that's one point on family members.

18      And the second is like attorneys, for the most part, and in

19  the circumstances in which we've been experiencing it, they

20  typically have their family member's best interests at heart,

21  as does an attorney, and so that's why we propose that we be

22  allowed to share with other third parties who an attorney or a

23  family member may direct us to as somebody who's involved or

24  who could be helpful, all again for the purpose of facilitating

25  compliance.

1        So this conversation was framed in looking at the

2    government's proposed order, which is understandable, and, you

3    know, we're happy to just not have any protective order.  We

4    think that's what's appropriate here.

5        I just did want to touch base on those other points that we

6    had raised in our compromise that we had previously offered up

7    to the government and in our briefing before the Court.

8            THE COURT:  And do you have any objection, then, for a

9    third party other than a family member, something like that,

10   agreeing to be bound by the protective order as recommended or

11   proposed by the defense?

12           MR. LEV:  I guess I'd like to talk to co-counsel about

13   that when we caucus.  The concern would be one of

14   practicalities, you know, in effectuating that, but the

15   question is if we shared with people other than family members

16   or counsel, would we --

17           THE COURT:  Yes.

18           MR. LEV:  -- be willing to bind those other people to

19   the protective order?  If we can chat when we caucus, we'll

20   have an answer on that, Your Honor.

21           THE COURT:  Okay.  All right.  Now I'm looking for the

22   piece of paper.  Here it is with phone numbers.  The

23   confidential line I have for plaintiff is 888-299-9913, access

24   code 2633270 pound.  Is that accurate?

25           MR. LEV:  Yes, Your Honor.

1        THE COURT:  And for the defense I have 877-465-7975,

2   access code 1995189471.  Is that correct, Ms. Shinners?  You

3   may be muted.

4        MS. SHINNERS:  I apologize.  I was actually trying to

5   find the information.  877-465-7975, access code 1995189471.

6   Correct.

7        THE COURT:  That's correct.

8        MS. SHINNERS:  Yes, correct.

9        THE COURT:  All right.  I understand -- I understand,

10  Mr. Lev, that you want to confer regarding the third-party

11  issue.  How much time do you need to confer about that?

12        MR. LEV:  Ten minutes, Your Honor.

13        THE COURT:  Okay.  And, Ms. Shinners, there are a

14  couple of areas that you said you wanted to caucus with the

15  others on the line regarding where you might be willing to

16  negotiate and also the paragraph that I referenced, which is

17  following paragraph -- subparagraph 6 on page 7 immediately

18  before the subsection entitled "Filing asylum material."  How

19  much time do you need to confer about that?

20        MS. SHINNERS:  I think probably about 10 to 15

21  minutes.

22        THE COURT:  Okay.

23        MS. SHINNERS:  If that's --

24        THE COURT:  First what I'll do is, Mr. Lev, I'll give

25  you ten minutes.  It's now 3:18 on my clock.  I'll call you at

1   3:30 or 6:30 your time, and we can confer, and then after that,

2   I will call the defense line.  Okay?

3       And it goes without saying, obviously, no one from

4   plaintiffs' side is to call on defense line, no one from the

5   defense is calling plaintiffs' line while we're conferring.

6   Okay?

7               MR. LEV:  Understood, Your Honor.  Thank you.

8               THE COURT:  All right.  Before we -- before we

9   separate at this point, are there any other questions that you

10  would like or any comments that you would like to make at this

11  time?

12      Okay.  I expect that we may all get back on this 877 number

13  as well, but for the time being, we'll all hang up from this

14  call.

15      Again, the same rules apply.  When I do call in, if you

16  could identify yourselves before speaking.  If you're not

17  speaking, if you could mute your phones, that would be very

18  helpful, and I do plan, as I indicated, to call plaintiffs'

19  group in about ten minutes.

20      Any questions?  Okay.  I will call into plaintiffs' line,

21  then, in about ten minutes.

22              MR. LEV:  Thank you, Your Honor.

23              THE COURT:  Thank you.

24              MS. SHINNERS:  Thank you.

25      (Recess.)

1          THE COURT:  All right, folks.  I don't believe we yet

2     have Mr. Lev on the line, do we?

3          MR. LEV:  I'm here, Your Honor.

4          THE COURT:  Okay, great.  Thank you.

5      And, Ms. Shinners, are you on?

6          MS. SHINNERS:  I am.  Thank you, Your Honor.

7          THE COURT:  Okay.  Thank you.  I'll just wait a moment

8     for some others to join us.

9          LAW CLERK:  And I did start recording the call,

10    Judge Crawford.

11         THE COURT:  Thank you.

12     All right.  I'll just go ahead from here.  I have had an

13    opportunity now to review the very substantial briefing that

14    has been done by both sides and the proposed protective order.

15     As I indicated at the outset, I question why we need an

16    additional protective order at all.  I have heard arguments

17    which have been presented, and I am going to issue a ruling in

18    short order pertaining to the protective order.

19     I certainly have sufficient information to make that

20    determination based upon the briefing which has been submitted

21    and the arguments of counsel.

22     So expect that an order will be issued shortly pertaining

23    to this.  Again, I have kept in mind the arguments which have

24    been advanced by both sides and did have an opportunity, as you

25    know, to have a separate private caucus with both plaintiff and

1    defense.

2        Let me also indicate that the application for leave to file

3    the surreply will be granted, and we'll issue an order to that

4    effect.

5        Having said this, Suzanne, is there anything else that you

6    feel I should address at this juncture?

7            LAW CLERK:  Not at this time.

8            THE COURT:  Thank you.

9        Anything further from plaintiff?

10            MR. LEV:  Your Honor, this is Mr. Lev.  I just wanted

11   to note that in our pending motion to enforce that's pending

12   before Judge Bashant, there is a short section that relates to

13   this issue as well.

14            THE COURT:  Which issue?

15            MR. LEV:  As referenced in our -- the protective order

16   issue, and I think we cite that brief in our opposition to that

17   motion for protective order --

18            THE COURT:  Okay.

19            MR. LEV:  -- to sort of tee this up in the motion to

20   enforce.

21        I just wanted to make sure you were aware of that.

22            THE COURT:  Okay.  Do you have the docket number on

23   that?  That's the motion to enforce, you said?

24            MR. LEV:  Yes, and I can get it for you in just a

25   moment.

1          THE COURT:  That's okay.  I'll find it.  That's fine.

2    I'm sure it was recently filed and hasn't yet been ruled on, so

3    that shouldn't be difficult to find.

4        Yes, she did refer this particular protective order issue

5    to me, so I'll be making a determination on that issue, so I'll

6    take a look at your motion to enforce and any responsive

7    arguments that may have been advanced by the defense on this

8    specific issue, but I would imagine it's somewhat duplicative

9    of what you've already addressed today in your papers.  Is that

10   correct?

11         MR. LEV:  It is, Your Honor.  There's sort of

12   overlapping, and it's Docket Number 646 is our memo in support

13   of that motion.

14         THE COURT:  Okay.  All right.

15         MR. LEV:  Thank you.

16         THE COURT:  Thank you.

17       Let me reiterate as well that at such time as the parties

18   feel it would be useful to reconvene for any settlement

19   discussions, I would be happy to assist the parties in that all

20   you need to do is contact chambers, and we'd be happy to confer

21   with you.

22       Anything further that you want to address at this time,

23   Mr. Lev?

24         MR. LEV:  No, thank you, Your Honor.

25         THE COURT:  Ms. Shinners?

1          MS. SHINNERS:  Just checking with my colleagues,

2   Your Honor, but I don't think so.  We appreciate you taking the

3   time.

4          THE COURT:  You're more than welcome.  Thank you,

5   counsel, and, again, thank you to the lawyers who are

6   participating after hours.  Your availability is very much

7   appreciated.  Okay.  Thank you, everybody.  Stay safe.

8          MS. SHINNERS:  Thank you, Your Honor.

9          MR. LEV:  Thank you.

10                      ---oOo---

11                 C-E-R-T-I-F-I-C-A-T-I-O-N

12

13      I hereby certify that the foregoing is a correct transcript

14   from the electronic sound recording of the proceedings in the

15   above-entitled matter.

16      Dated March 28, 2021, at San Diego, California.

17

18
                        /Dana Peabody/
19                      Dana Peabody, Transcriber

20

21

22

23

24

25