MAYER BROWN LLP
Matthew H. Marmolejo (CA Bar No. 242964)
*mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
Ori Lev (DC Bar No. 452565)
*(pro hac vice)*
*olev@mayerbrown.com*
Stephen M. Medlock (VA Bar No. 78819)
*(pro hac vice)*
*smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, DC 20006
Telephone: +1.202.263.3000
Facsimile: +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
Melissa Crow (DC Bar No. 453487)
*(pro hac vice)*
*melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, DC 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

Al Otro Lado, Inc., *et al.*,

Plaintiffs,

v.

Alejandro Mayorkas,[1] *et al.*,

Defendants.

Case No. 17-cv-02366-BAS-KSC

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO FACILITATE NOTICE TO CLASS MEMBERS OF HUMANITARIAN EXCEPTION PROCESSES**

***Declaration of Stephen M. Medlock Filed Concurrently***

[1] Secretary Mayorkas is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
*bazmy@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
*sarah.rich@splcenter.org*
Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
*kwalters@immcouncil.org*
Gianna Borroto (IL Bar No. 6305516) (*pro hac vice*)
*gborroto@immcouncil.org*
1331 G St. NW, Suite 200
Washington, DC 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1
Relevant Background .......... 4
I. Defendants Relied on Waitlists to Facilitate the Turnback Policy .......... 4
II. Defendants Create Humanitarian Exception Processes to Facilitate Entry of a Limited Numbers of Asylum Seekers .......... 5
ARGUMENT .......... 7
I. This Court Has Broad Discretion to Facilitate Notice to the Class of Important Developments Related to this Litigation .......... 7
II. Defendants' Failure to Incorporate the Class into the Humanitarian Exception Processes Jeopardizes the Rights of Class Members. .......... 9
III. Defendants' Purported "Lack of Control" Is Irrelevant .......... 11
CONCLUSION .......... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229 (10th Cir. 2013) .......... 13

*Al Otro Lado v. McAleenan*, 423 F. Supp. 3d 848 (S.D. Cal. 2019) .......... 4

*Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914 (S.D. Cal. 2020) .......... 8, 9

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) .......... 4

*Barahona-Gomez v. Reno*, 167 F.3d 1228 (9th Cir. 1999) .......... 8

*In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999) .......... 12

*City of Seattle v. Pro. Basketball Club, LLC*, 2008 WL 539809 (W.D. Wash. 2008) .......... 12

*In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091 (9th Cir. 1997) .......... 14

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .......... 8

*In re Gypsum Antitrust Cases*, 565 F.2d 1123 (9th Cir. 1977) .......... 7

*Hawaiian Paradise Pork Corp. v. Friendly Broad. Co.*, 414 F.2d 750 (9th Cir. 1969) .......... 13, 14

*Hitachi, Ltd. v. AmTRAN Tech. Co.*, 2006 WL 2038248 (N.D. Cal. 2006) .......... 15

*Hollingsworth v. Perry*, 570 U.S. 693 (2013) .......... 14

*Mantha v. QuoteWizard.com, LLC*,
2021 WL 981815 (D. Mass. 2021) .... 15

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
873 F.3d 1045 (9th Cir. 2017) .... 12, 13

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) .... 8

*St. Jude Med. S.C., Inc. v. Janssen-Counotte*,
305 F.R.D. 630 (D. Or. 2015) .... 15

*United States v. Bonds*,
608 F.3d 495 (9th Cir. 2010) .... 14

*United States v. Int'l Union of Petroleum & Indus. Workers*,
870 F.2d 1450 (9th Cir. 1989) .... 11

**Federal Statutes**

42 U.S.C. §§ 265 and 268 .... 1

**Other Authorities**

Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060 (March 26, 2020) .... 6

Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1786 (3d ed. 2020) .... 8

Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2210 (3d ed. 2020) .... 12

Fed. R. Civ. P. 23 .... 7

Fed. R. Civ. P. 23(c)(2) .... 8

Fed. R. Civ. P. 23(d) .... 8, 12, 15

Fed. R. Civ. P. 23(d)(1)(B) .... 7, 9

Fed. R. Civ. P. 23(d)(1)(B)(i) .... 7

Fed. R. Civ. P. 23(d)(2) .... 7

Fed. R. Civ. P. 34 .... 12, 15

Fed. R. Civ. P. 34(a) .......... 11

Former President Donald Trump, *Remarks in a Roundtable Discussion on Immigration and Border Security and an Exchange With Reporters in Calexico, California* (Apr. 5, 2019), https://www.govinfo.gov/content/pkg/DCPD-201900208/html/DCPD-201900208.htm .......... 2, 3

Restatement (Third) of Agency § 1.01 cmt. C (2006).......... 14, 15

Restatement (Third) of Agency § 1.01 cmt. D (2006) .......... 14

Restatement (Third) of Agency § 1.01 cmt. E (2006).......... 13

Restatement (Third) of Agency § 1.02 (2006) .......... 12

Restatement (Third) of Agency § 1.03 (2006) .......... 13

Restatement (Third) of Agency § 3.01 (2006) .......... 13

Restatement (Third) of Agency § 3.03 (2006) .......... 13

Restatement (Third) of Agency § 8.01 (2006) .......... 13

Sabrina Rodriguez, *Harris' Blunt Message in Guatemala: 'Do Not Come' to U.S.*, Politico (June 7, 2021) .......... 2

**INTRODUCTION**

Under the Biden administration, the U.S. Department of Homeland Security ("DHS") and U.S. Customs and Border Protection ("CBP," and together with DHS, "Defendants") have begun allowing certain migrants waiting in Mexico to gain access to the U.S. asylum process despite the government's continuing reliance on a public health rationale to expel most asylum seekers from Class A ports of entry (POEs) along the U.S.-Mexico border. Specifically, Defendants are employing a humanitarian exception to the order issued by the Centers for Disease Control and Prevention ("CDC") pursuant to 42 U.S.C. §§ 265 and 268 ("Title 42") to allow limited numbers of pre-vetted asylum seekers into the United States.[2] Defendants have implemented this exception through various processes, all of which have the potential to materially benefit members of the class that this Court certified on August 6, 2020. *See* Dkt. 513.

However, Defendants are doing nothing to give *Al Otro Lado* ("*AOL*") class members access to these new humanitarian exception processes—processes for which they would likely be eligible, if only they knew about them. Specifically, (1) Defendants are not informing class members that these processes exist, and (2) Defendants will not provide Plaintiffs with information that would enable Plaintiffs to inform the class. Defendants have access to the waitlists that were kept by Mexican authorities and shelters and relied upon by Defendants to facilitate the Turnback Policy at the heart of this case. Many of these waitlists contain detailed information about the asylum seekers turned back by Defendants, including names,

---

[2] The legality of the Administration's continued use of Title 42 is currently being litigated. *Huisha-Huisha v. Mayorkas*, No. 21-cv-00100 (D.D.C.). That litigation has led to the creation of one process by which certain migrants may gain access to the U.S. asylum process, called the *Huisha* process, which is primarily focused on families. Ex. 5 at ¶ 10.

contact information, and date of enrollment on the list. *See* Ex. 1 at ¶ 10.[3] Having this information would allow Plaintiffs' counsel to provide notice of the processes that Defendants have created to implement the humanitarian exception to Title 42 to class members who are still waiting to access the U.S. asylum process.

Moreover, providing notice of this key development in the class members' case would partially right a longstanding wrong. Starting in May 2016, Defendants began turning back asylum seekers at POEs, telling them either explicitly or implicitly that they could return to be inspected and processed at a later date. In many cases, after fleeing persecution in their home countries and enduring long, arduous journeys to POEs on the border, asylum seekers with no legal status and few employment prospects in Mexico were forced to wait in overcrowded shelters or to live in makeshift arrangements in border towns that the U.S. government has long recognized to be extremely dangerous. Those asylum seekers—all of whom are *AOL* class members—waited for months or years during the Trump administration to access the U.S. asylum process, and many are still waiting. The Biden administration, however, has not only not ended metering, it has created secretive, opaque processes to grant limited access to the U.S. asylum process to certain asylum seekers—processes that, in practice, privilege recent arrivals, well-connected individuals, and individuals represented by counsel.[4]

---

[3] "Ex." refers to the exhibits to the contemporaneously-filed declaration of Stephen M. Medlock.

[4] *Compare* Sabrina Rodriguez, *Harris' Blunt Message in Guatemala: 'Do Not Come' to U.S.*, Politico (June 7, 2021) (quoting Vice President Harris as stating: "At the same time, I want to be clear to folks in the region who are thinking about making the dangerous trek to the United States-Mexico border: Do not come. Do not come. . . . I believe if you come to our border, you will be turned back."), *with* Former President Donald Trump, *Remarks in a Roundtable Discussion on Immigration and Border Security and an Exchange With Reporters in Calexico, California* (Apr. 5, 2019) ("[T]here's nothing you can do. You have to say, 'I'm sorry, we can't take

These new humanitarian exception processes ostensibly aim to serve the most vulnerable, including those who have spent substantial periods waiting in Mexico, but make no effort to include *AOL* class members. For example, class members could now be eligible for inspection and processing through the "consortium process," under which CBP has inspected and processed some pre-vetted asylum seekers at POEs despite COVID-19 restrictions. But Defendants would apparently prefer that many, if not most, of the class members in this case not know about that process. Defendants have objected to Plaintiffs' suggestion that Defendants, who clearly have much more reach than Plaintiffs, provide notice to the class, or alternatively, transparency to the public, including to waiting asylum seekers, about how to access the consortium process. Plaintiffs are willing to provide notice themselves but need limited assistance from Defendants to obtain waitlists with invaluable contact information for likely class members—waitlists that Defendants could obtain easily but that are inaccessible to Plaintiffs despite multiple, repeated attempts to obtain them. See Dkt. 644-1 at ¶ 5.

Therefore, Plaintiffs ask this Court to order Defendants to make all reasonable efforts to collect and produce all remaining waitlists of individuals that Defendants turned back at POEs to facilitate the process of identifying and providing notice to class members about the consortium process, and any other similar process that would allow class members access to the U.S. asylum process. Specifically, Defendants should obtain waitlists for the POEs at San Luis, AZ, Nogales, AZ, Douglas, AZ, Del Rio, TX, Laredo, TX, and Hidalgo, TX, as well as any updated versions of waitlists for the POEs at San Ysidro, CA, and Mexicali, CA.[5]

---

you.'"), https://www.govinfo.gov/content/pkg/DCPD-201900208/html/DCPD-201900208.htm.

[5] Plaintiffs obtained previous versions of the San Ysidro, CA, Mexicali, CA, and El Paso, TX waitlists, which they shared with Defendants to facilitate implementation of the preliminary injunction in this case. *See* Dkt. 644-1 at ¶¶ 3, 4, 7.

## Relevant Background

### I. Defendants Relied on Waitlists to Facilitate the Turnback Policy

The waitlists that developed in Mexican border towns in response to Defendants' Turnback Policy are central to Defendants' practice of "metering" asylum seekers. Defendants relied on those waitlists to facilitate metering, a policy that denied access to the asylum process to all but a chosen number of asylum seekers each day. *Al Otro Lado v. McAleenan*, 423 F. Supp. 3d 848, 873 (S.D. Cal. 2019); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1009 (9th Cir. 2020) ("[T]he record establishes that the government has been using [the waitlists] in determining the order in which applicants for asylum are allowed to enter, submit their asylum applications, and undergo credible fear interviews."). Implicit in Defendants' reliance on the waitlists is "the idea that those who were metered would have to wait—but were not precluded from—applying for asylum in the United States." *Al Otro Lado v. McAleenan*, 423 F. Supp. 3d at 873.

As part of their reliance on the waitlists, Defendants were in regular contact with counterparts in Mexico, including Mexican federal and state government officials and staff at nongovernmental organizations ("NGOs") and migrant shelters, who maintained the lists. See Dkt. 657-2 at ¶¶ 6-8; Dkt. 665-3 ("[REDACTED]" with "[REDACTED]" to meter asylum seekers in Piedras Negras/Eagle Pass); Dkt. 665-4 (reporting [REDACTED]); Dkt. 665-5 ([REDACTED]). Defendants would sometimes tell migrants to put their names on a waitlist, Dkt. 533-15 at 966 ("[REDACTED]."), and would direct their Mexican counterparts to send a specific number of asylum seekers to a POE for processing. Dkt. 533-16 at 140:1-16 ("[REDACTED]

i[REDACTED].”); *see also* Dkt. 533-14 at 108:1-10 (“[REDACTED].”).

Beginning at the outset of the pandemic in March 2020, some waitlists stopped accepting new names due to the border’s closure to asylum seekers, and the number of asylum seekers on these lists has remained frozen ever since. Ex. 1 at ¶ 12. In addition, waitlists in Piedras Negras, Ciudad Juarez, and Matamoros dissolved after few or no names remained on them. *Id.* Asylum waitlists remain open in Reynosa, Nuevo Laredo, Ciudad Acuña, and Agua Prieta, and individuals continue to enroll on those lists. *Id.* The waitlists are currently managed by Mexican federal or municipal government officials or by staff of migrant shelters. *Id.* at ¶ 9. These list managers have coordinated directly with Defendants to manage the process of getting asylum seekers from the waitlists to POEs when Defendants have requested a specific number for processing. *Id.* at ¶ 11. As of May 2021, nearly 18,700 people were still on waitlists in eight Mexican border cities: Reynosa, Nuevo Laredo, Ciudad Acuña, Agua Prieta, Nogales, San Luis Rio Colorado, Mexicali, and Tijuana. *Id.* at ¶ 8. Individuals at the top of those lists have been waiting between 16 and 20 months to access the U.S. asylum process. *Id.* at ¶ 12.

## II. Defendants Create Humanitarian Exception Processes to Facilitate Entry of a Limited Numbers of Asylum Seekers

Since March 20, 2020, Defendants have rejected tens of thousands of asylum seekers at POEs along the southern border under the pretense of protecting public health due to the onset of the coronavirus pandemic. Ex. 3 at 1-2, 5. Under pressure from the Trump administration, the CDC disregarded their own senior experts’ objections and issued an order based on an arcane provision of Title 42 that DHS has since used to justify its ongoing expulsions of asylum seekers, including class

members, to danger in Mexico or their home countries. Ex. 4 at 1.[6] This policy, which remains in force under the Biden administration, has been condemned by public health experts, legal scholars, former government officials, and members of Congress. *See, e.g.*, Ex. 4 at 1 (citing criticism from public health experts, members of Congress, legal scholars, and former government officials). Since February 2021, the Biden administration has used Title 42 to expel over 290,000 people who entered the United States at or between POEs, leaving many migrants stranded in dangerous Mexican border towns. Ex. 5 at ¶ 2.[7]

The CDC order includes an exception for anyone who DHS determines should be allowed into the United States upon "consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." Ex. 5 at ¶ 1. In May 2021, DHS, in collaboration with six NGOs (informally known as the "consortium partners"), launched the consortium process—a process for screening and processing a limited number of vulnerable individuals without travel documents at POEs along the southern border pursuant to this exception. *See* Ex. 6; Ex. 5 at ¶ 2; Ex. 7.

The consortium partners identify potentially eligible individuals consistent with vulnerability criteria developed by DHS. Ex. 5 at ¶ 4. These criteria include [redacted]

---

[6] The CDC order does not apply to U.S. citizens, lawful permanent residents, and their spouses and children; members of the U.S. armed forces and their spouses and children; people from foreign countries who arrive at POEs with valid travel documents; or people from foreign countries in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060 (March 26, 2020).

[7] During the first three months of the Biden administration, Human Rights First documented at least 492 violent attacks along the Mexican border, including rapes, kidnappings, and assaults. Ex. 5 at ¶ 1.

[REDACTED]. *Id.* [REDACTED] [REDACTED]. *Id.* at ¶ 5. Defendants designed and approved CBP One, and thus determined which information is collected through the app prior to processing at a POE. *See* Ex. 8. Once such information has been submitted, the consortium partners arrange COVID-19 testing for the individuals concerned. Ex. 5 at ¶ 6. Those who test negative are referred to a POE at a date and time designated by CBP. *Id.* To Plaintiffs' knowledge, the consortium process is currently active in [REDACTED], but it is expected to expand to other ports of entry and eventually allow for the processing of up to [REDACTED] people per day. Ex. 5 at ¶ 9.

**<u>Argument</u>**

## I. This Court Has Broad Discretion to Facilitate Notice to the Class of Important Developments Related to this Litigation

The implementation of the humanitarian exemption process is a key development that affects class members' access to the U.S. asylum process—an issue at the heart of this litigation. Under Federal Rule of Civil Procedure 23(d)(1)(B), a district court may order notice to class members of any aspect of a class action "to protect class members and fairly conduct the action." The rule does not limit the circumstances under which a court may grant notice and allows for notice at "any step in the action." Fed. R. Civ. P. 23(d)(1)(B)(i); *see also* Fed. R. Civ. P. 23, Advisory Committee's Note to 1966 Amendment (Rule 23(d)(2), now codified at 23(d)(1)(B), which "sets out a non-exhaustive list of possible occasions for orders requiring notice to the class"); *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir. 1977) (language now found at Rule 23(d)(1)(B) "'does not provide for a specific manner of notice or the form of the notice. These are matters left to the court's discretion to be dictated by the circumstances of each case.'") (citation omitted).

The Court's power to direct notice to the class under Rule 23(d) has been described as a "safety valve," one which courts "should utilize" to protect the rights of class members "whenever there is any question of the need to do so." Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1786 (3d ed. 2020). Such a need exists here.

Normally, the plaintiff bears the burden of providing notice to the class. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178-79 (1974). However, under Rule 23(c)(2), the "'court shall direct' notice, which is commonly understood to mean that the court 'should order one of the parties to perform the necessary tasks'." *Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914, 932 (S.D. Cal. 2020) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 354 n.21 (1978)). In instances where defendants "may be able to perform a necessary task with less difficulty or expense than could the representative plaintiff," a district court can "properly . . . exercise its discretion under Rule 23(d) to order the defendant to perform the task in question." *Oppenheimer*, 437 U.S. at 355-56. Therefore, the government may be required to assist in providing notice to class members where the government is "unique[ly] positioned to ascertain class membership." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).

Class members followed the government's instructions to wait in Mexico to access the U.S. asylum process, and many were able to add their names to waitlists in border cities to secure their "place in line." Now that the government has resumed limited processing at the border, class members, who have long been shut out of the U.S. asylum process, should be able to come forward to be inspected and processed—particularly because length of time spent waiting to access protection is a primary factor that DHS has identified to prioritize cases for humanitarian exceptions to Title 42.

Defendants are uniquely situated to facilitate the identification of class members. In its Order granting Plaintiffs' Motion for Clarification, the Court found it "appropriate for Defendants to make reasonable efforts to aid in identifying potential class members at all stages of removal proceedings." *Al Otro Lado*, 497 F.

Supp. 3d at 933. Despite Plaintiffs' continued diligent efforts to obtain the waitlists, they have been able to obtain only three of them. *See* Dkt. 644-1 at ¶¶ 4, 5. In an administratively complex case such as this one, there is "no reason" for information relevant to identifying class members "to be withheld." *Id.* Even when information is "imperfect," this Court has ordered Defendants to "aid in the identification of class members" by sharing such information with Plaintiffs. *Id.*

By refusing to obtain the waitlists—an important source of information on the length of time class members have spent trying to access the U.S. asylum process—from its counterparts in Mexico, Defendants have failed to give class members meaningful access to the humanitarian exemption process, unnecessarily furthering the ongoing harm caused by the Turnback Policy. Thus, Plaintiffs request that this Court once again exercise its broad discretion under Rule 23(d)(1)(B) to facilitate notice to class members in this litigation. Specifically, Plaintiffs ask the Court to order Defendants to make all reasonable efforts to obtain the waitlists from their Mexican contacts including, at a minimum requesting, those lists, and produce all waitlists they receive to Plaintiffs. This would protect the rights of class members by ensuring that they are aware of and can fairly access the humanitarian exemption process, or any similar process that would allow class members access to the U.S. asylum process.

## II. Defendants' Failure to Incorporate the Class into the Humanitarian Exception Processes Jeopardizes the Rights of Class Members.

Class members have expressed [redacted] . *See* Ex. 2 at ¶ 7. Since at least 2016, instead of inspecting and processing asylum seekers upon arrival at POEs, Defendants implemented a system by which tens of thousands of asylum seekers were turned back and told to return to the POE "later." Dkt. 535-4, 171:7-13. While asylum seekers were left stranded and resourceless on the U.S.-

Mexico border, Defendants simply told them to get in line and "wait [their] turn."[8] Dkt. 390-103 at ¶¶ 5-8. The class did exactly that; it is Defendants who are now failing to live up to their end of the bargain. Defendants now appear willing to begin processing asylum seekers with more regularity under the humanitarian exception processes, but they are conveniently ignoring their implied agreement with thousands of class members who are still waiting in line as instructed.

Under the consortium process, the consortium partners effectively serve as gatekeepers who decide which asylum seekers should be included in this new process. Ex. 5 at ¶ 8. In practice, the consortium process privileges individuals with connections to the consortium partners or their local partners, as well as individuals who are represented by counsel. *Id.* However, due to the lack of transparent, publicly available messaging, the vast majority of asylum seekers waiting in Mexico or elsewhere, including most class members, are completely unaware of the consortium process. *Id.* at ¶ 9. To date, neither Defendants nor the consortium partners have advised the thousands of individuals turned back at POEs of their potential eligibility for the consortium process or told them how to register. *Id.* Although limited information about the consortium process has begun to appear in the English-language U.S. press, it is unclear whether that information is circulating in Mexico or other countries where *AOL* class members currently reside.

The situation in [REDACTED], illustrates the importance of obtaining the waitlists and providing notice of the consortium process to *AOL* class members. [REDACTED] [REDACTED]. Ex. 2 at ¶ 4. [REDACTED]

[8] Even then-Attorney General Jeff Sessions agreed, publicly advising asylum seekers "Apply to enter lawfully. Wait your turn." Ex. 9.

[REDACTED]. *Id.* at ¶¶ 5-6. To this end, t[REDACTED]. *Id.* at ¶¶ 1, 4, 10; Ex. 10 at 8.

Although Defendants may claim that the consortium process will offer many class members safe haven, they have made no effort to inform class members of even *the existence* of this process. Defendants' lack of transparency belies the representations they made to the class and further jeopardizes the health and safety of class members. As Plaintiffs advised this Court in their Motion for Summary Judgment, the Turnback Policy is responsible for the deaths of numerous asylum seekers stranded at the border. *See* Dkt. 531-113 at 161:25-162:9 (discussing murders of and assaults on unaccompanied minors who were turned back). Those who have survived live in destitution and squalor and continue to face an imminent risk of kidnapping, rape, and extortion. Dkt. 104-1, Ex. C at 16.

To avoid further harm to class members, this Court should facilitate notice to the class by ordering Defendants to make all reasonable efforts to collect and produce all remaining waitlists of individuals turned back at POEs. Though the egregious harm caused by the Turnback Policy can never be undone, the opportunity for fair and orderly processing remains.

## III. Defendants' Purported "Lack of Control" Is Irrelevant

Defendants' response to this motion is likely to be a red herring. Federal Rule of Civil Procedure 34(a) states that requests for production may only seek information that is within "the possession, custody, or control of the party upon whom the request is served." Defendants will likely note that the Ninth Circuit defines "control" as "the legal right to obtain documents upon demand." *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir.

1989); *see also In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999). And, as they have done on several occasions, Defendants will likely claim that they do not control the waitlists kept in Mexico. *See* Dkt. 657 at 15; Dkt. 657-2 at ¶ 5.

That is irrelevant. Plaintiffs are not asking this Court to compel the production of documents in response to a request for production made under Federal Rule of Civil Procedure 34. Instead, they are asking for the Court to facilitate notice to the class under Federal Rule of Civil Procedure 23(d), which contains no such limitation regarding "possession, custody, or control" of information. *See* Fed. R. Civ. P. 23(d).

And, even if the "control" test did apply, "[d]ocuments may be within the 'custody' or 'control' of a party even though they are in the possession of nonparties." *City of Seattle v. Pro. Basketball Club, LLC*, 2008 WL 539809, at *1 (W.D. Wash. 2008). The test for determining control over information is highly fact-specific. *See* Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2210 (3d ed. 2021) ("Rather than adopting an overarching rule for such situations, the courts have tended to focus on the facts shown in a particular case.") A legal right to obtain a document upon demand "can also be established by the existence of a principal-agent relationship." *City of Seattle*, 2008 WL 539809, at *1.

Agency is determined by the substance of the agreement between two entities, not how those entities choose to characterize their agreement. *See* Restatement (Third) of Agency § 1.02 (2006). Instead, an agent-principal relationship exists wherever "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Id.* at § 1.01; *see also Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) ("For an agency relationship to exist, an agent must have authority to act on behalf of the principal and '[t]he person represented [must have] a right to control the actions of the agent.'") (quoting Restatement (Third) of Agency § 1.01 cmt. C (2006)).

"An agency relationship may be created through actual or apparent authority."

*Mavrix Photographs*, 873 F.3d at 1054. Actual authority arises through "the principal's assent that the agent take action on the principal's behalf." Restatement (Third) of Agency § 3.01 (2006). Importantly, assent may be manifested "through written or spoken words or other conduct." Restatement (Third) of Agency § 1.03 (2006).

On the other hand, apparent authority arises by "a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." Restatement (Third) of Agency § 3.03 (2006). "The principal's manifestations giving rise to apparent authority may consist of direct statements to the third person, directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts . . . under circumstances which create in him a reputation of authority." *Hawaiian Paradise Pork Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969).[9]

In this case, the persons that kept the waitlists in Mexican border towns were doing so as the agents of CBP under either actual or apparent authority. As explained above (and in more detail in Plaintiffs' summary judgment submissions), starting in May 2016 Defendants adopted a Turnback Policy under which CBP officers told asylum seekers who were in the process of arriving in the United States to return to Mexico. *Supra* at 4-6. When Defendants wanted to inspect and process asylum seekers, they relayed to the list managers how many asylum seekers to send to a particular POE. *Supra* at 4-6. Then, the list keepers would inform class members

[9] Agents also owe certain fiduciary duties to their principals. *See* Restatement (Third) of Agency § 1.01, cmt. E & § 8.01 (2006). However, "[t]o establish that a relationship is one of agency, it is not necessary to prove its fiduciary character as an element." *Id.* at § 1.01, cmt. E; *see also 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1250 (10th Cir. 2013) ("[O]ne need not show a fiduciary relationship to establish an agency relationship exists; rather, fiduciary duties arise as a result of circumstances establishing the agency relationship.").

which of them were being sent to the POE to be inspected and processed. *See, e.g.*, Dkt. 294-6 at ¶ 7. By directing asylum seekers to the list keepers and then utilizing the list keepers as the intermediaries who would inform asylum seekers when they would be inspected and processed, CBP made "direct statements" to asylum seekers manifesting the authority of the list keepers to act on CBP's behalf and CBP granted the list keepers "permission . . . to perform acts . . . under circumstances which create[d] in [them] a reputation of authority." *Hawaiian Paradise Pork*, 414 F.2d at 756. Moreover, by dictating the number of people that the list keepers could send to the POE each day, CBP exercised significant control over the actions of the list keepers. *See, e.g.*, *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (referring to control as one of "the basic features of an agency relationship"); *United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010) (explaining the "the extent of control exercised by [a principal]" is an "essential ingredient" in determining an agency relationship). Indeed, the list keepers were effectively the eyes, ears, and mouthpieces for CBP with respect to the class members waiting to be summoned to the POEs. And CBP repeatedly manifested its assent to this relationship by utilizing the list keepers on a day-to-day basis to assist in controlling the flow of asylum seekers being inspected and processed at POEs.[10] As a result, there was a principal-agent relationship between the list keepers and Defendants, and Defendants therefore

[10] Defendants may claim that they did not exercise control over all aspects of the work of the list keepers. That is immaterial. "The right to control, rather than its exercise, is sufficient to meet [the agency] standard." *In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997); Restatement (Third) of Agency § 1.01 cmt. C (2006) ("[A] person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment."). It would similarly be irrelevant if Defendants did not compensate the list keepers. *See, e.g.*, Restatement (Third) of Agency § 1.01 cmt. D (2006) ("Many agents act or promise to act gratuitously."). And it is equally meaningless that in this case the principal and its agents were on different sides of an international border. *See, e.g.*¸ *id.* at § 1.01 cmt. C (2006) ("nor is [the principal's right of control] eliminated by physical distance between the agent and principal.").

have control over the waitlists. *See, e.g.*, *St. Jude Med. S.C., Inc. v. Janssen-Counotte*, 305 F.R.D. 630, 639 (D. Or. 2015) (holding that where "it is reasonable to infer that persons . . . were acting as agents for [the defendant]," there is "sufficient indicia of effective control" to require the production of documents); *Hitachi, Ltd. v. AmTRAN Tech. Co.*, 2006 WL 2038248, at *2 (N.D. Cal. 2006) (relying on agency relationship to establish control over documents); *Mantha v. QuoteWizard.com, LLC*, 2021 WL 981815, at *4 (D. Mass. 2021) (same).

Accordingly, under either the Rule 23(d) "safety valve" standard or the Rule 34 "control" standard, this Court has the authority to require Defendants to obtain copies of the lists to facilitate notice to the previously-certified class.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion should be granted.

Dated: June 17, 2021

MAYER BROWN LLP
Matthew H. Marmolejo
Ori Lev
Stephen M. Medlock

SOUTHERN POVERTY LAW CENTER
Melissa Crow
Sarah Rich
Rebecca Cassler

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Angelo Guisado

AMERICAN IMMIGRATION COUNCIL
Karolina Walters
Gianna Borroto

By: */s/ Stephen M. Medlock*
Stephen M. Medlock

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that I caused a copy of the foregoing document to be served on all counsel via the Court's CM/ECF system.

Dated: June 17, 2021

MAYER BROWN LLP

By *<u>/s/ Stephen M. Medlock</u>*