BRIAN M. BOYNTON
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO FACILITATE NOTICE TO CLASS MEMBERS OF HUMANITARIAN EXCEPTION PROCESSES** |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*, in their official capacities,* | |
| *Defendants*. | |

---

* Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Mayorkas is automatically substituted as a Defendant for former Acting Secretary Wolf.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................. 3

    A.    Third Parties in Mexico Created and Maintain Waitlists Without Input From DHS or CBP. ............................................. 3

    B.    The COVID-19 Pandemic and the CDC's Section 265 Order ................. 5

ARGUMENT ..................................................................................... 9

    I.    Rule 23(d)(1)(B) Does Not Permit the Court to Order the Government to Help Facilitate Notice of Non-Procedural Matters. ................................................................................. 9

    II.    Even if Permissible, This Court Should Decline to Order the Government to Attempt to Procure the Waitlists. ................................... 13

        A.    Plaintiffs Have Not Demonstrated That Defendants Are Better Positioned to Obtain the Waitlists. ...................................... 14

        B.    Requesting the Waitlists Risks Harming Defendants' Relationships With the Mexican Government. ............................... 16

        C.    The Waitlists Likely Would Not Facilitate Notice to Most Class Members Outside the United States. ........................... 16

    III.    Plaintiffs' Rule 34(a) Argument is Misplaced. ................................. 17

CONCLUSION .................................................................................. 20

# TABLE OF AUTHORITIES

**Federal Cases**

*Al Otro Lado v. Wolf*,
497 F. Supp. 3d 914 (S.D. Cal. 2020) ............................................15

*Barahona-Gomez v. Reno*,
167 F.3d 1228 (9th Cir. 1999) ........................................ 10, 15

*Cobell v. Kempthorne*,
455 F.3d 317 (D.C. Cir. 2006)..................................... 2, 10, 11

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974)........................................................14

*In re Gypsum Antitrust Cases*,
565 F.2d 1123 (9th Cir. 1977) ........................................ 10, 12

*In re Victor Technologies Securities Litigation*,
792 F.2d 862 (9th Cir. 1986) ...........................................18

*In re Williams-Sonoma, Inc.*,
947 F.3d 535 (9th Cir. 2020) ...........................................18

*ING Bank, FSB v. Chang Seob Ahn*,
758 F. Supp. 2d 936 (N.D. Cal. 2010) ...................................19

*Mavrix Photography, LLC v. Livejournal, Inc.*,
873 F.3d 1045 (9th Cir. 2017) ..........................................19

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978)............................................... *passim*

*Puffer v. Allstate Ins. Co.*,
614 F. Supp. 2d 905 (N.D. Ill. 2009)....................................10

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) ...........................................16

*Scholl v. Mnuchin*,
No. 20-cv-5309, 2020 WL 5877674 (N.D. Cal. Oct. 2, 2020).....................10

*Urban v. Breier,*
    401 F. Supp. 706 (E.D. Wis. 1975) ................................................................17

**Federal Statutes**

6 U.S.C. § 203 ........................................................................................................7

19 U.S.C. § 1401(i) ................................................................................................6

42 U.S.C. § 265 ......................................................................................................5

42 U.S.C. § 268(b) .................................................................................................6

**Federal Rules**

Federal Rule of Civil Procedure 23(d)(1) ................................................ 2, 9, 11, 12

Federal Rule of Civil Procedure 34(a) .................................................................17

**Acts of Congress**

Dep't of Education Organization Act,
    Pub. L. No. 96-88, 93 Stat. 668 (1979) .........................................................5

Reorganization Plan No. 3 of 1966,
    80 Stat. 1610 (1966) .......................................................................................5

**Other Authorities**

Herbert B. Newberg, *Orders in the Conduct of Class Actions: A*
    *Consideration of Subdivision (d)*, 10 B.C.L. Rev. 577 (1969).....................10

Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1786 (3d ed. 2020) ...................13

## **INTRODUCTION**

The Court should deny Plaintiffs' Motion to Facilitate Notice to Class Members (ECF No. 720), which seeks to compel Defendants to try to obtain certain "wait-lists" created by third parties outside of Defendants' control. Plaintiffs seek the wait-lists so that Class Counsel can attempt to provide notice to the class in this case centering on U.S. Customs and Border Protection's (CBP) prior "metering" practices at ports of entry along the U.S.-Mexico border. But the notice Plaintiffs seek to provide has no relation to any procedural aspect of this case. Rather, Plaintiffs wish to provide notice of a process for seeking an exception to a later-adopted public health measure aimed at protecting the United States against Coronavirus Disease 2019 (COVID-19). Plaintiffs' attempt to use class action procedural rules to obtain a substantive benefit to the class unrelated to their claims should be rejected.

Since March 2020, CBP has assisted the Centers for Disease Control and Prevention (CDC) in enforcing its Orders issued under the Public Health Service Act generally suspending the right to introduce certain noncitizens into the United States, in order to protect against the introduction and spread of Coronavirus Disease 2019 (COVID-19). The CDC Director found it necessary to temporarily suspend the right to introduce noncitizens covered by the CDC Order because, among other reasons, such noncitizens are typically held for hours, and sometimes days, in congregate settings at border facilities for immigration processing. The border facilities' holding areas were not designed, and are not equipped, to quarantine, isolate, or enable social distancing of noncitizens who are or may be carriers of COVID-19. Introducing such noncitizens into these facilities would present a significant risk of transmitting COVID-19 to CBP personnel, other noncitizens in custody, and the American public.

Years before the CDC Order issued, some entities in Mexican border cities created "waitlists" in response to CBP's separate practice of "metering" noncitizens without entry documents at southwest border ports of entry. *See* Pl. Ex. 10, at 1. The

1

1   waitlists are maintained exclusively by entities in Mexico without input or oversight
2   from CBP. *See* Pl. Ex. 1, ¶ 7; Def. Ex. 1, Decl. of Office of Field Operations (OFO)
3   Deputy Executive Director for Operations Joseph Draganac ¶¶ 5–8 (Jan. 5, 2021).
4   Plaintiffs now ask the Court to order Defendants to make "all reasonable efforts" to
5   obtain these waitlists, so that Class Counsel can provide notice to *Al Otro Lado* class
6   members—who were subject to CBP's metering practices before the first CDC Or-
7   der issued—of their ability to identify themselves for consideration for an individu-
8   alized exception to the current CDC Order. Plaintiffs call this "the consortium pro-
9   cess."

10          This Court should deny Plaintiffs' request. *First*, Federal Rule of Civil Proce-
11   dure 23(d)(1) does not supply a legal basis to order notice of the consortium process
12   to *Al Otro Lado* class members. The Rule permits courts to order notice "of any step
13   in the action" or issue orders "that deal with other similar procedural matters," in
14   order to protect absent class members' right to participate in the litigation. Fed. R.
15   Civ. P. 23(d)(1)(B), (E). But it does not authorize orders seeking to "protect[] the
16   very rights class members seek to vindicate." *Cobell v. Kempthorne*, 455 F.3d 317,
17   325 (D.C. Cir. 2006). Thus, it does not authorize notice of a process for identifying
18   vulnerable noncitizens in facilitating DHS's exercise of discretion under the CDC
19   Order, which Plaintiffs contend advances the substantive "rights of class members,"
20   Mot. at 9 (capitalization altered), but which is unrelated to any procedural matters or
21   any practices challenged in this litigation. Consequently, the Court may not order
22   Defendants to request the waitlists from third parties in Mexico to facilitate such
23   notice. The authority to direct a defendant to assist in notice-related tasks is attendant
24   to the authority to order notice in the first place. *See Oppenheimer Fund, Inc. v.*
25   *Sanders*, 437 U.S. 340, 355 (1978). As the notice Plaintiffs seek to provide is not
26   permissible under Rule 23(d)(1), neither is an order compelling Defendants to re-
27   quest the waitlists in aid of that notice.

28

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

*Second*, even if Rule 23 authorizes the notice, the Court should decline to exercise its discretion to order Defendants to request the waitlists. Plaintiffs cannot meet their burden to demonstrate that Defendants are able to obtain the waitlists "with less difficulty or expense" than Plaintiffs. *Id.* Further, Defendants risk damaging relationships with Mexican counterparts, as "Mexican officials [could] perceive that CBP is attempting to regulate the method in which Mexico manages its own migration trends." Def. Ex. 1, ¶ 13; *id.* ¶ 12. Plaintiffs also insufficiently explain how the waitlists would facilitate their provision of notice, as their evidence demonstrates that the waitlists do not contain many individuals' contact information.

For these reasons, this Court should deny Plaintiffs' Motion.

## **BACKGROUND**

**A.    Third Parties in Mexico Created and Maintain Waitlists Without Input From DHS or CBP.**

In 2016, in response to a significant influx of undocumented migrants applying for admission to the United States, CBP personnel implemented an informal "metering" or "queue management" process at several land ports of entry along the U.S.-Mexico border. *See* Defs.' Mot. for Summ. J., at 10–12 (ECF No. 563-1); *see also* Def. Ex. 1, ¶ 4 (describing the process of metering). "As a subsequent backlog of asylum seekers grew in Mexico's border cities, Mexican authorities and civil society groups responded by providing humanitarian assistance and creating informal waitlists." Pl. Ex. 10, at 1; *see also* Def. Ex. 2, Dep. of Rodney Harris 108:11–109:3 (June 2, 2020) (explaining that lists arose as a result of choices made by Mexican entities).

CBP's metering guidance does not contemplate the creation or use of waitlists to implement metering, and it prohibits CBP officers from informing metered individuals that CBP will process them on a specific timeline. *See* ECF No. 563-4, at 299 ("Officers may not provide tickets or appointments or otherwise schedule any person for entry."). The guidance does not instruct CBP officers to tell individuals

to register for any waitlist. *See id.*; Def. Ex. 3, Dep. of Randy J. Howe, 170:15–171:4 ("We do not refer [individuals who are metered] to somebody to get on a list."). "CBP played no role in the development of . . . waitlists, has no control or oversight over such lists, does not require to see or be provided copies of the lists, and does not require individuals to place their names on a list in order to be processed at a port of entry." Def. Ex. 1, ¶ 5. Instead, as Plaintiffs' evidence demonstrates, the lists were created by "Mexican authorities and civil society groups" in response to metering, as a substitute for the physical queues of individuals waiting outside ports of entry. Pl. Ex. 10, at 1. Plaintiffs' declarant states: "List managers have cited the following reasons for creating the waitlists: to prevent confusion and conflict about the order in which asylum seekers were being processed at U.S. ports of entry; to allow asylum seekers to wait in shelters while maintaining their places in line; to minimize security and health risks for asylum seekers waiting outside ports of entry, given the insecurity and extreme temperatures in Mexican border cities; and to halt the congregation of asylum seekers outside ports of entry, which blocked pedestrian traffic and led local residents to complain," Pl. Ex. 1, ¶ 7. The waitlists "[c]urrently . . . are run by the Mexican federal or municipal governments in four cities and by migrant shelters in four cities." *Id.* ¶ 9.

Before the CDC Order issued, when OFO personnel determined a port had capacity to process noncitizens without entry documents, the port would "inform a designated point of contact [] in Mexico." Def. Ex. 1, ¶ 6. "In response," the Mexican point of contact would "generally transport to the port the specific number of individuals who can be processed." *Id.* "In general," ports did "not play any role in how the individuals brought to the port are selected, the waitlist number these individuals were assigned, or whether their names were even on a waitlist at all. OFO simply processe[d] the individuals who arrive[d] at the port." *Id.*; *see also* Pl. Ex. 1, ¶ 11 ("In most cities," CBP personnel "called the list managers and told them the number of asylum seekers they would accept that day at the port of entry," and "[t]he list

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

managers then notified the asylum seekers that they could present at the port."). CBP "does not require individuals to place their names on a list in order to be processed at a port of entry." Def. Ex. 1, ¶ 5.

**B.    The COVID-19 Pandemic and the CDC's Section 265 Order**

In March 2020, the Director of the CDC took action to mitigate the public health dangers from COVID-19 by temporarily suspending the right to introduce into the United States certain noncitizens traveling from Canada and Mexico who lack valid travel documents, and thus are generally required to be held in congregate settings for processing. As the Court is aware, COVID-19 is a communicable disease that spreads easily and rapidly without regard to national borders. *See* Def. Ex. 4, Notice of Order Under Sections 362 & 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where A Communicable Disease Exists, 85 Fed. Reg. 17,060, 17,062 (Mar. 26, 2020) (March 2020 CDC Order). The COVID-19 pandemic highlighted the need for an efficient regulatory mechanism to implement the federal government's long-standing authority under the Public Health Service Act, 42 U.S.C. § 265,[1] to suspend the right to introduce

---

[1] Section 265 states: "Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose." This authority is transferred to the CDC Director. *See* Reorganization Plan No. 3 of 1966, § 1(a), 80 Stat. 1610, 1610 (1966) (transferring the Surgeon General's functions to the Secretary of Health, Education, and Welfare); Dep't of Education Organization Act, Pub. L. No. 96-88, § 509(b), 93 Stat. 668, 695 (1979) (transferring the Secretary of Health, Education, and Welfare's functions to the Secretary of Health and Human Services); Mem., Delegation of Authority Under

persons who would otherwise increase the serious danger of introducing a communicable disease into the United States. *See* Def. Ex. 5, Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559, 16,562 (Mar. 24, 2020). As the CDC found, "[i]nternational travel and migration play a significant role in the global transmission of infectious biological agents or their toxic products," as travelers can serve as carriers of pathogenic agents and potential sources of infection for others. *Id.* at 16,560. That risk increases when travelers are in congregate settings with shared sitting, sleeping, eating, or recreational areas, *id.* at 16,560–61, such as the temporary detention settings of ports of entry and Border Patrol stations.

Accordingly, on March 20, 2020, the Department of Health and Human Services (HHS) issued an interim final rule to allow the CDC Director to implement the authority in Section 265. *See id.* at 16,559–67. Also on March 20, 2020, explaining that the "public health risks of inaction are stark"—including increased transmission and spread of COVID-19 and the concomitant strain on the U.S. healthcare system and supply chain—the CDC Director issued an order temporarily prohibiting the introduction of certain noncitizens traveling from Canada and Mexico into the United States because of the serious danger of the introduction of COVID-19 into the border facilities and the interior of the country. Def. Ex. 4, 85 Fed. Reg. at 17,060, 17,061. Consistent with 42 U.S.C. § 268(b),[2] the CDC requested DHS's as-

---

Title III of the Public Health Service Act, As Amended, General Powers and Duties of the Public Health Service, at 1 (Sept. 12, 1988) (delegating the HHS Secretary's Section 265 authority to the CDC Director).

[2] Section 268(b) states: "It shall be the duty of the customs officers and of Coast Guard officers to aid in the enforcement of quarantine rules and regulations . . . ." *See also* 19 U.S.C. § 1401(i) (defining "customs officer" as "any officer of the

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

sistance in implementing the Order because the CDC lacks the capability and re-sources to do so. *Id.* at 17,067.

The CDC Director determined that ports of entry and Border Patrol stations at or near the northern and southern borders are not structured or equipped to effec-tively mitigate the risks presented by COVID-19—*i.e.*, to implement quarantine, isolation, or social distancing protocols—for even small numbers of noncitizens. *Id.* at 17,066–67. Rather, these facilities were designed for short-term holding in a con-gregate setting where noncitizens (typically those who lack valid travel documents, and would therefore be found inadmissible) are held in close proximity to one an-other for hours, and sometimes days, as they undergo immigration processing. *Id.*

The CDC Director also found CBP's then-existing screening protocol for COVID-19 to be unworkable for large numbers of individuals. An influx of infected, asymptomatic noncitizens would present significant infection control challenges be-cause the screening of such individuals might not trigger testing, and they would remain in congregate areas while CBP completed processing where they could infect CBP personnel or other noncitizens with COVID-19. *Id.* at 17,065. The CDC Direc-tor also found that, for those noncitizens who did test positive for COVID-19, ports of entry and Border Patrol stations "would lack the capacity to provide the medical monitoring and care that would be needed by covered [noncitizens] confirmed to be infected with COVID–19." *Id.* at 17,067.

Based on the foregoing findings, and to mitigate the risks presented by COVID-19, the CDC Order requires returning all covered noncitizens as rapidly as possible, and with the least amount of time spent in congregate settings as is feasible, to the country from which they entered the United States, their country of origin, or

United States Customs Service of the Treasury Department"), *and* 6 U.S.C. § 203(1) (transferring "to the Secretary [of Homeland Security] the functions, personnel, as-sets, and liabilities of the United States Customs Service of the Department of the Treasury, including the functions of the Secretary of the Treasury relating thereto").

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

to another location as practicable and appropriate. *Id.* at 17,067. Covered noncitizens include those traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal port of entry or Border Patrol station at or near the U.S. borders with Canada and Mexico. They do not include, among others, Lawful Permanent Residents and those who arrive at a port of entry with valid travel documents. *Id.* at 17,067. In addition, the March 2020 CDC Order allowed for "case-by-case, individualized exceptions" to the requirement to return covered noncitizens. *Id.* at 17,061. Customs officers may, with supervisor approval, except otherwise covered noncitizens from the CDC Order on a case-by-case basis, considering the totality of the circumstances, including considerations of significant law enforcement, officer and public safety, humanitarian, and public health interests. *Id.* The March CDC Order was subsequently amended slightly and extended multiple times. On September 11, 2020, HHS published the final rule in the Federal Register. *See* Def. Ex. 6, Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into The United States From Designated Foreign Countries of Places for Public Health Purposes, 85 Fed. Reg. 56,424 (Sept. 11, 2020). The final rule reiterated and expanded significantly on the findings of the interim final rule and previous CDC Orders.

On October 13, 2020, the CDC Director issued a new Order, which is "substantially the same as the amended and extended March 20, 2020 Order." *See* Def. Ex. 7, Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806, 65,808 (Oct. 16, 2020) (October 2020 CDC Order).[3] The CDC Director found that the March 2020 CDC Order had reduced the number of covered noncitizens in congre-

---

[3] As Plaintiffs note, the CDC Order has been challenged in separate litigation. *See P.J.E.S. by and through Escobar Francisco v. Mayorkas*, No. 20-cv-2254 (D.D.C.); *Huisha-Huisha v. Mayorkas*, No 21-cv-00100 (D.D.C.).

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

gate settings in border facilities, thereby reducing the danger of COVID-19 trans-mission into the United States. *Id.* at 65,810. The Director also found that the March 2020 Order reduced the utilization of local health care systems by covered noncitizens. *Id.* The October 2020 CDC Order continued to permit customs officers to make individualized exceptions based on the totality of the circumstances. *Id.* at 65,807. DHS has taken steps to identify and lawfully process particularly vulnerable individuals who, based on the totality of the circumstances and on a case-by-case basis, warrant an exception from the CDC Order. This involves coordination with international and non-governmental organizations in Mexico and COVID-19 testing prior to the presentation of such individuals at a port of entry. *See* Pl. Ex. 6. Allowing exceptions (in consultation with the CDC) for particularly vulnerable individuals on a case-by-case basis under the totality of the circumstances is contemplated by the Order.

## ARGUMENT

### I.     Rule 23(d)(1)(B) Does Not Permit the Court to Order the Government to Help Facilitate Notice of Non-Procedural Matters.

Plaintiffs base their waitlist request on Rule 23(d)(1)(B), which gives courts discretion to "issue orders that require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of: (i) any step in the action; (ii) the proposed extent of the judgment; or (iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims and defenses, or to otherwise come into the action." Fed. R. Civ. P. 23(d)(1)(B). Courts also "may issue orders that deal with similar procedural matters." Fed. R. Civ. P. 23(d)(1)(E). Plaintiffs' proposed notice meets none of these criteria.

While Rule 23(d)(1)(B) "sets out a non-exhaustive list of possible occasions for orders requiring notice to the class," the purpose of this notice provision was to clarify that courts may take "measures . . . during the course of the action to assure

procedural fairness." Fed. R. Civ. P. 23 advisory committee's note to 1966 amend-
ment. "Other occasions" for sending such notice may be to encourage interventions
to improve class members' representation; to poll class members on a proposed mod-
ification of a consent decree; to notify class members of the deadline to file state-
ments of intention to present claims; to identify class counsel and provide their con-
tact information; and even to notify interested governmental agencies of the class
action. Herbert B. Newberg, *Orders in the Conduct of Class Actions: A Considera-
tion of Subdivision (d)*, 10 B.C.L. Rev. 577, 595 (1969) (citations omitted); *see also
Barahona-Gomez v. Reno*, 167 F.3d 1228, 1236 (9th Cir. 1999) (holding that the
district court did not abuse its discretion by ordering the government "to provide
notice of the pending action and the injunction"); *Scholl v. Mnuchin*, No. 20-cv-
5309, 2020 WL 5877674, at *4 (N.D. Cal. Oct. 2, 2020) (holding that "the simulta-
neous certifying of a class and issuing a preliminary injunction . . . falls within the
'any step in the action' category of Rule 23(d)(1)(B)"); *Puffer v. Allstate Ins. Co.*,
614 F. Supp. 2d 905, 910 (N.D. Ill. 2009) (holding that "the denial of class certifi-
cation is a 'step in the action'"").

Courts have correctly recognized that Rule 23(d)(1)(B) "contem-
plates . . . only notice of procedural matters—such as 'any step in the action, . . . the
proposed extent of the judgment,' and 'the opportunity of members to signify
whether they consider the representation fair and adequate, to intervene and present
claims or defenses, or otherwise to come into the action.'" *Cobell*, 455 F.3d at 324;
*see also In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir. 1977) (recog-
nizing the Rule helps a court fulfill its due-process obligation "to ensure that [absent
class members] are apprised of proceedings that may finally affect them."). Rule
23(d)(1)(B) "authorizes notice to protect class members' right to participate in the
litigation," but it does not authorize orders seeking to "protect[] the very rights class
members seek to vindicate." *Cobell*, 455 F.3d at 324–25; *see Scholl*, 2020 WL
5877674, at *5 ("The court agrees with defendants that an order extending the IRS's

10

1    deadline [for class members to file claims under the CARES Act] is a form of sub-
2    stantive relief that is not properly within the scope of Rule 23.").

3    Plaintiffs ask the Court to order Defendants "to make all reasonable efforts to
4    collect and produce all remaining waitlists," so that "Plaintiffs' counsel [may] pro-
5    vide notice of the processes that Defendants have created to implement the humani-
6    tarian exception to Title 42 to [*Al Otro Lado*] class members." Mot. at 3, 2. But such
7    notice to *Al Otro Lado* class members is not permissible under Rule 23(d)(1), be-
8    cause it seeks to notify the class of a process related to a CDC Order that is wholly
9    separate from this case, and does not constitute a "step in the action" or a "similar
10    procedural matter[]." Fed. Rs. Civ. P. 23(d)(1)(B), (E). Nor is the requested notice
11    aimed at "assur[ing] procedural fairness" in this litigation. Fed. R. Civ. P. 23 advi-
12    sory committee's notes to 1966 amendment. To the contrary, Plaintiffs acknowledge
13    that the purpose of the requested notice is to advance the asserted substantive "rights
14    of class members." Mot. at 9; *see also* Mot. at 9:22–23. As Rule 23(d)(1)(B) "does
15    not authorize substantive orders protecting the very rights class members seek to
16    vindicate," *Cobell*, 455 F.3d at 325, the Court may not permit Plaintiffs to provide
17    such notice.

18    Further, because Rule 23(d)(1)(B) does not permit notice of the consortium
19    process to *Al Otro Lado* class members, the Court lacks authority to order Defend-
20    ants to request and produce the waitlists to facilitate such notice. The power to order
21    a party to perform particular tasks necessary to send notice is attendant to the au-
22    thority to provide notice at all. The Supreme Court explained in *Oppenheimer Fund,*
23    *Inc. v. Sanders* that Rule 23(d) "authorizes a district court in appropriate circum-
24    stances to require a defendant's cooperation in identifying the class members to
25    whom notice must be sent" because "identification [of class members] is simply an-
26    other task that must be performed to send notice." 437 U.S. at 355. If notice is not
27    permissible, there is no attendant basis to order Defendants to perform tasks that
28    would aid in such notice.

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

Plaintiffs advance several arguments why their requested relief is permitted under Rule 23(d), *see* Mot. at 7–11, but those arguments are flawed.

*First*, Plaintiffs contend that Rule 23(d)(1)(B) "does not limit the circumstances under which a court may grant notice and allows for notice at 'any step in the action.'" Mot. at 7. Yet, while the Rule "sets out a non-exhaustive list of possible occasions for orders requiring notice to the class," permissible orders are limited to "measures . . . during the course of the action [that] assure *procedural fairness*." Fed. R. Civ. P. 23 advisory committee's notes to 1966 amendment (emphasis added). That is why the Rule authorizes notice "*of* any step in the action," Fed. R. Civ. P. 23(d)(1)(B) (emphasis added), not "notice *at* 'any step in the action,'" as Plaintiffs contend, Mot. at 7 (emphasis added). As Plaintiffs do not seek to provide notice of any step in this action, their requested relief is outside Rule 23(d)(1)'s scope.

*Second*, Plaintiffs invoke *In re Gypsum Antitrust Cases* for the proposition that Rule 23(d)(1)(B) "'does not provide for a specific manner of notice or the form of the notice.'" Mot. at 7 (quoting 565 F.2d at 1127). But, as noted above, in *In re Gypsum Antitrust Cases*, the Ninth Circuit confirmed that Rule 23(d)(1)(B) exists to aid the Court in fulfilling its due-process "obligation to [absent class members] to ensure that they are apprised of *proceedings* that may finally affect them." 565 F.2d at 1127 (emphasis added). It did not hold that Rule 23(d) authorizes notice of non-procedural matters, such as Plaintiffs' intended notice here.[4]

*Third*, Plaintiffs contend that "[t]he Court's power to direct notice to the class under Rule 23(d) has been described as a 'safety valve,' one which courts 'should utilize' to protect the rights of class members 'whenever there is any question of the need to do so.'" Mot. at 8 (quoting Wright & Miller, 7AA Fed. Prac. & Proc. Civ.

---

[4] Further, Plaintiffs have not shared the proposed manner or form of their intended notice, so there is no way to determine whether their plan is appropriate. *See Oppenheimer Fund, Inc.*, 437 U.S. at 357 n.24 (Rule 23 "contemplates that the district court routinely must approve the form of the class notice and order how it should be sent.").

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

§ 1786 (3d ed. 2020)). But Rule 23(d)(1)(B) is a "safety valve" that allows courts "to protect the rights of the absentee members whenever there is any question of the need to do so *in order that a judgment in a Rule 23(b)(1) or a Rule 23(b)(2) action may be binding on all the class members*." Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1786 (3d ed.) (emphasis added). Accordingly, Rule 23(d)(1) is available to protect absent class members' right to participate in the litigation, not to further any substantive rights asserted in the litigation. And while Plaintiffs assert that "a need exists here" for the Court to authorize notice, Mot. at 8, they do not identify which "step in the action" warrants the contemplated notification, nor do they explain how the requested relief would further class members' rights to procedural fairness. *See id.* at 7–11.

*Finally*, all of Plaintiffs' remaining arguments merely confirm that they ask the Court for an order that seeks to vindicate their asserted substantive class claims.[5] Plaintiffs contend the Court should order notice because "[c]lass members [purport-edly] followed the government's instructions to wait in Mexico to access the U.S. asylum process" and now "should be able to come forward to be inspected and pro-cessed." Mot. at 8. Relatedly, Plaintiffs assert that "Defendants should seek out the waitlists in order "to give class members meaningful access to the humanitarian ex-emption process." Mot. at 9. But because Plaintiffs do not seek to provide class members with notice of any step in the action nor to protect class members' proce-dural rights, Plaintiffs' request under Rule 23(d)(1) must be denied.

## II.    Even if Permissible, This Court Should Decline to Order the Government to Attempt to Procure the Waitlists.

Even if Rule 23(d)(1)(B) permitted the Court to authorize notice of the so-called consortium process to *Al Otro Lado* class members, the Court should decline

---

[5] Moreover, Plaintiffs' own evidence about the methods and criteria used to identify individuals for a potential individualized exception to the CDC Order belies their assertion that notice is necessary. *See* Mot. at 10:23–11:1.

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

to exercise its discretion to order the government to seek the waitlists from third parties in Mexico. Where Rule 23(d) permits notice, "[t]he usual rule is that a plaintiff must initially bear the cost of notice to the class . . . as part of the ordinary burden of financing his own suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). A court may depart from this rule and "order the defendant to perform the task in question" if the defendant is "able to perform a necessary task with less difficulty or expense than could the representative plaintiff." *Oppenheimer Fund, Inc.*, 473 U.S. at 356. Plaintiffs' request fails under this framework for several reasons.

### A. Plaintiffs Have Not Demonstrated That Defendants Are Better Positioned to Obtain the Waitlists.

As an initial matter, Defendants do not have particular, unique access to the waitlists that Plaintiffs seek. *See* Def. Ex. 1, ¶¶ 9–10. As CBP has previously explained, "CBP has no control over the Mexican government." *Id.* ¶ 10. If CBP were to request the lists from the Mexican government, "Mexico could determine that it was only able to provide excerpts of waitlists, waitlists from certain ports, waitlists for a certain period of time, or may deny the request to provide any information at all." *Id.* Moreover, any request from CBP to the Mexican government would be "substantially different from routine information requests that CBP makes to foreign governments, including the Mexican government on a regular basis, which are for official and verified government documents and thus do not cover lists controlled and managed by NGOs, shelters, migrants, or other individuals." *Id.* ¶ 9. Defendants, therefore, are not likely to obtain the requested waitlists from the Mexican government.

Plaintiffs' evidence also does not demonstrate that Defendants are better positioned to obtain the waitlists. Plaintiffs' Declarant Savitri Arvey, who leads the Strauss Center's publication of periodic metering reports, states that she "ha[s] spoken numerous times to the individuals managing the asylum waitlists in" the Mexican border cities of Matamoros, Reynosa, Nuevo Laredo, Piedras Negras, Ciudad

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

1   Acuña, Ciudad Juárez, Agua Prieta, Nogales, San Luis Rio Colorado, Mexicali, and
2   Tijuana. Pl. Ex. 1, ¶ 4 & n.2. Yet, consistent with Deputy Executive Director Dra-
3   ganac's representations, neither Declarant Arvey nor any other declarant says wait-
4   list managers would provide the waitlists to DHS or CBP upon request. *See id.* ¶¶ 1–
5   12; Pl. Ex. 2, ¶¶ 1–10; Pl. Ex. 5, ¶¶ 1–11; ECF No. 644-1, ¶ 5.

6       Further, Declarant Arvey and her colleagues have seen copies of the lists in
7   eleven Mexican border cities, which confirms she has access to the lists and should
8   be able to provide them to Class Counsel. *See* Pl. Ex. 1, ¶ 4. Plaintiffs thus have the
9   same or better access to the waitlists than Defendants, which weighs against shifting
10  the burden to the government. *Oppenheimer Fund, Inc.*, 437 U.S. at 365; *see id.* at
11  360 ("As the expense of hiring the transfer agent would be no greater for respond-
12  ents, who seek the information, than for petitioners, respondents should bear the ex-
13  pense."); *Barahona-Gomez*, 167 F.3d at 1237 (finding notice permissible because
14  the government was "uniquely positioned to ascertain class membership").

15      Plaintiffs note that this Court found it "appropriate for Defendants to make
16  reasonable efforts to aid in identifying potential class members at all stages of re-
17  moval proceedings." Mot. at 8–9 (quoting *Al Otro Lado v. Wolf*, 497 F. Supp. 3d
18  914, 933 (S.D. Cal. 2020)). But Plaintiffs read this Court's Order too broadly. The
19  Order only required Defendants and the Executive Office for Immigration Review
20  (EOIR) to provide notice to certain "identified class members" of their potential
21  class membership and the existence and import of the preliminary injunction. *Al
22  Otro Lado*, 497 F. Supp. 3d at 935; *see Barahona-Gomez*, 167 F.3d at 1236 (holding
23  that the district court did not abuse its discretion by ordering the government "to
24  provide notice of the pending action and the injunction"). The Court did not order
25  the government to request the waitlists from entities in Mexico, and instead directed
26  Defendants and EOIR to "review *their own records* to aid in the identification of
27  class members." *Al Otro Lado*, 497 F. Supp. 3d at 934 (emphasis added).

28

**B.    Requesting the Waitlists Risks Harming Defendants' Relationships With the Mexican Government.**

Moreover, requiring Defendants to request the waitlists may come at the expense of Defendants' relationship with the Government of Mexico. Specifically, such a request risks harming CBP's relationship with its Mexican Immigration counterparts on the federal and local levels. *See* Def. Ex. 1, ¶¶ 12–13. As the OFO Deputy Executive Director for Operations explains, "a request for the waitlists could be perceived by individuals in the Mexican government as CBP attempting to monitor or regulate Mexico's internal processes for addressing migration," because "Mexican officials could perceive CBP as attempting to exert some degree of control over the regulation of these waitlists." *Id.* ¶ 12. He adds that the requests "could negatively impact already sensitive and critical relationships, which are often based on the regular and consistent flow of critical operational information, with officials on both sides of the border able to communicate freely and without concern for how the information may be used or perceived to be used." *Id.* If Mexican officials perceive CBP is attempting to regulate how they manage their migration trends, Mexican officials might be hesitant to share critical operational information, "which would greatly harm the ability of both CBP and Mexico to jointly ensure a safe and secure border." *Id.* ¶ 13. Such intangible harm constitutes a burden that weighs against requiring Defendants to request the waitlists from Mexico. *Accord Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (holding in the preliminary-injunction context that "intangible injuries . . . qualify as irreparable harm"). In contrast, Plaintiffs do not contend they are harmed by making such requests.

**C.    The Waitlists Likely Would Not Facilitate Notice to Most Class Members Outside the United States.**

Additionally, Plaintiffs have not demonstrated that the waitlists would meaningfully assist in providing notice to many *Al Otro Lado* class members outside the United States. *First*, according to Plaintiffs' submissions, a number of the lists

16

sought do not contain contact information. Plaintiffs' Declarant Arvey explains, "[t]he information that list managers collect from asylum seekers varies by city." Pl. Ex. 1, ¶ 10. Although the lists include names, nationality, and often the date of enrollment, only list managers from five cities (Reynosa, Ciudad Acuña, Agua Prieta, Nogales, and San Luis Rio Colorado) report they collect contact phone numbers. *Id.* These five lists contain 8,683 names, or less than half of the 18,680 names on all the waitlists border-wide. *See* Pl. Ex. 10, at 1, 5, 7, 8. Thus, given that the remainder of the waitlists sought do not apparently contain contact information, there is less reason to shift the burden to Defendants. *See Urban v. Breier*, 401 F. Supp. 706, 710 (E.D. Wis. 1975) ("Where the alleged class includes persons whose whereabouts are often unknown and unascertainable, as in this case, notice of any type would appear to be futile.").

*Second*, Plaintiffs disregard other means of identifying class members. For example, Plaintiffs acknowledge that consortium partners already work to identify "potentially eligible individuals" waiting in Mexican border cities, which is a process they could utilize to identify class members. Mot. at 6; *see also, e.g.*, Pl. Ex. 2, ¶ 7. Plaintiffs' requested relief is less certain to produce necessary information, does not justify shifting the burden to Defendants, and potentially adversely impacts CBP's critical relationship with Mexico.

## III. Plaintiffs' Rule 34(a) Argument is Misplaced.

Plaintiffs argue this Court should order Defendants to request waitlists because the Mexican federal government, Mexican municipal governments, and non-governmental organizations and individuals are CBP's "agents," and CBP thus has "control" over the lists under Rule 34(a). Mot. at 11–17 (citing Fed. R. Civ. P. 34(a)). Plaintiffs are incorrect.

*First*, as Plaintiffs expressly acknowledge, Rule 34 is inapplicable here because Plaintiffs do not request this Court to compel the production of documents. Mot. at 12. Nor could they under Rule 34. The Supreme Court and Ninth Circuit

DEFS.' OPP. TO PLS.' MOT. TO FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

have held that the discovery rules do not supply any authority for such requests because class members' identities, when sought to provide notice, "cannot be forced into the concept of 'relevancy'" under Rule 26(b). *Oppenheimer Fund, Inc.*, 437 U.S. at 352; *id.* at 354 ("[W]e do not think that the discovery rules are the right tool for this job."); *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020) ("Rule 26(b)(1) limits the scope of discovery to 'nonprivileged matter that is relevant to any party's claim or defense.' And the Supreme Court has determined that seeking discovery of the name of a class member . . . is not relevant within the meaning of that rule."); *In re Victor Technologies Securities Litigation*, 792 F.2d 862, 865 (9th Cir. 1986) ("The [Supreme] Court examined the power of a district court to order class-action defendants to assist in compiling a list of members of the plaintiff class. Rejecting the Second Circuit's approach, the Court found power for such an order, not in the discovery rules, but in Fed. R. Civ. P. 23." (emphasis omitted)). Thus, Plaintiffs' reference to the Rule 34(a) control standard is misplaced.

*Second*, Plaintiffs' argument would fail even if the control standard applied in this context. Plaintiffs contend there is a principal-agent relationship between CBP and waitlist managers because CBP purportedly directed asylum seekers to the list keepers, used them as intermediaries, and "manifest[ed] "the authority of the list keepers to act on CBP's behalf." Mot., at 14. Plaintiffs' argument misstates the relationship between CBP and list managers. "CBP played no role in the development of these waitlists." Def. Ex. 1, ¶ 5. Rather, entities in Mexico desirous of providing assistance to individuals waiting to be processed created the lists. *See* Pl. Ex. 1, ¶ 7; Pl. Ex. 10, at 1 ("As a subsequent backlog of asylum seekers grew in Mexico's border cities, Mexican authorities and civil society groups responded by providing humanitarian assistance and creating informal waitlists."). No waitlist manager cites a request from DHS or CBP as the impetus for the lists, nor do they claim to act at CBP's behest. *See* Pl. Ex. 1, ¶ 7 (listing the reasons why waitlist managers created waitlists). CBP "has no control or oversight over such lists." Def. Ex. 1, ¶ 5. CBP

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

guidance does not instruct CBP officers to direct individuals to the waitlist managers. *See* ECF No. 563-4, at 299; Def. Ex. 3 at 170:15–171:4 ("We do not refer [individuals who are metered] to somebody to get on a list."). CBP also did "not require to see or be provided copies of the lists, and does not require individuals to place their names on a list in order to be processed at a port of entry." Def. Ex. 1, ¶ 5. OFO Deputy Executive Director Draganac adds that OFO did not rely on the lists for processing and did not "cross-reference an individual's name with any information about his or her place on a waitlist at the time of processing." *Id.* ¶ 6. CBP only informed waitlist managers how many individuals the port could process that day, and the waitlist managers selected which migrants to send to the port for processing. CBP has not granted any waitlist manager "authority to act on" CBP's behalf, nor does CBP have a right to control the actions of waitlist managers. *Mavrix Photography, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) (quoting Restatement (Third) of Agency § 1.01, cmt. c). Accordingly, Plaintiffs' theory that the list-keepers had apparent or actual authority to act on behalf of CBP is belied by the facts.

Moreover, CBP disclaims any agency relationship with waitlist managers. *See* Def. Ex. 1, ¶ 8 ("As the waitlists themselves are administered by entities operating in Mexico, there is no need for, and no authority for, CBP to play any role in the decision as to who manages the lists and how they are managed."); *see also* ECF No. 563-4, at 299 ("Officers may not provide tickets or appointments or otherwise schedule any person for entry."). While not dispositive on its own, a disclaimer of an agency relationship "is a factor to be considered." *ING Bank, FSB v. Chang Seob Ahn*, 758 F. Supp. 2d 936, 942 (N.D. Cal. 2010). Defendants implemented metering in the past without use of the waitlists. As the waitlist managers did not "perform[] a vital function" in the implementation of metering, they are not Defendants' agents. *Mavrix Photography, LLC*, 873 F.3d at 1054.

# **CONCLUSION**

This Court should deny Plaintiffs' Motion. Rule 23(d)(1) does not provide legal authority to order notice, and does not provide the Court with discretion to shift notice-related tasks to Defendants. Further, even if permissible, Plaintiffs have not established cause to shift the burden to Defendants.

DATED: July 2, 2021                Respectfully submitted,

                                    BRIAN M. BOYNTON
                                    Acting Assistant Attorney General

                                    WILLIAM C. PEACHEY
                                    Director

                                    KATHERINE J. SHINNERS
                                    Senior Litigation Counsel

                                    */s/ Alexander J. Halaska*
                                    ALEXANDER J. HALASKA
                                    Trial Attorney
                                    United States Department of Justice
                                    Civil Division
                                    Office of Immigration Litigation
                                    District Court Section
                                    P.O. Box 868, Ben Franklin Station
                                    Washington, D.C. 20044
                                    Tel: (202) 307-8704 | Fax: (202) 305-7000
                                    alexander.j.halaska@usdoj.gov

                                    *Counsel for Defendants*

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC

# CERTIFICATE OF SERVICE

*Al Otro Lado v. Mayorkas*, No. 17-cv-02366-BAS-KSC (S.D. Cal.)

I certify that I served a copy of this document on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.

DATED: July 2, 2021                     Respectfully submitted,

                                     */s/ Alexander J. Halaska*
                                     ALEXANDER J. HALASKA
                                     Trial Attorney
                                     United States Department of Justice

DEFS.' OPP. TO PLS.' MOT. TO
FACILITATE CLASS NOTICE
Case No. 3:17-cv-02366-BAS-KSC