BRIAN M. BOYNTON
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

Counsel for Defendants

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' EXHIBIT 1** |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*, in their official capacities,[1] | |
| *Defendants*. | |

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Mayorkas is automatically substituted as a Defendant for former Acting Secretary Wolf.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Al Otro Lado, Inc., *et al.*,<br>    *Plaintiffs,* | )<br>)<br>)<br>) | |
| v. | )<br>) | No. 3:17-cv-02366-BAS-KSC |
| Chad Wolf, *et al.*,<br>    *Defendants.* | )<br>)<br>)<br>) | |

**DECLARATION OF JOSEPH DRAGANAC**

I, Joseph Draganac, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records, and reasonably relied upon in the course of my employment, hereby declare as follows relating to the above-captioned matter.

1. I am currently the Deputy Executive Director, Operations, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I have been employed in this role since October 2017. I began my career in April 2000. During my 20 years of federal service, I have held various leadership positions, including Assistant Port Director at the Port of Buffalo and Deputy Director of the Field Operations Academy. In my current position, I oversee more than 24,000 employees, with operations at 20 major field offices, 328 POEs, and 16 Preclearance locations. In my current role, I am responsible for reinforcing the frontline by supporting Field and Executive leaders with critical information, guidance, and expertise.

1

2. I am aware of the above captioned case. I am also aware of the court's November 2019 preliminary injunction preventing the government from applying the third-country transit rule to a class of non-Mexicans who were metered prior to July 16, 2019, as well as the October 30 Order concerning the preliminary injunction. I understand that, as part of the October 30 Order, the government was required to make all "reasonable efforts" to identify class members subject to the preliminary injunction. I also understand that the Plaintiffs have filed a "Motion to Enforce Preliminary Injunction," and maintain that, as part of the government's "reasonable efforts" to identify class members, CBP should reach out to its "Mexican counterparts" to obtain copies of any waitlists of individuals waiting to enter the United States to use as evidence of class membership.

3. I make this declaration in support of Defendants' Opposition to Plaintiffs' Motion to Enforce the Preliminary Injunction, specifically to provide additional factual context regarding CBP's relationship to, and use of, metering waitlists; CBP's ability to obtain copies of any existing waitlists; the operational difficulties in obtaining waitlists from Mexico; and the harm that would result if CBP were ordered to obtain the lists. I will also explain the efforts that CBP has undertaken to collect lists already in its possession.

4. As previously outlined in this case, land ports of entry along the southwest border may engage in queue management, which is an operational practice by which those ports only take in as many aliens who arrive without documents sufficient for lawful entry to the United States as they are able to safely process and hold in accordance with CBP's short-term detention standards, and which ensures that ports have sufficient resources to fulfill their priority mission sets. When ports engage in queue management, officers generally stand at the physical border between the United States and Mexico and determine whether individuals approaching the border have documents that would permit them

2

lawful entry to the United States. Individuals who do not have such documents may be required to wait to proceed to the port until there is sufficient operational capacity to safely process them. Port Directors have discretion to determine how many aliens without documents sufficient for lawful entry can be processed at a particular time on a particular day, based on an assessment of all the factors influencing the port's operational capacity to both safely process and hold such individuals in appropriate conditions at that particular time. Southwest land border ports have generally engaged in metering, as operationally necessary, since late 2016.

5. Based on information that I have received from the Field Offices along the southwest border, I understand that, in some Mexican towns across the border from U.S. ports of entry, migrants waiting to enter the United States may stay in shelters or other locations, rather than physically line up outside of the port to await their turn to be processed. I also understand that, in some locations, migrants may place their names on waitlists to hold their place in line to be processed. It is my understanding that these waitlists are managed by various individuals or entities, depending on the location. For instance, they may be managed by Mexican government officials, non-governmental organizations (NGOs), migrants themselves, or other individuals/entities. It is also my understanding that, in some locations, the manager of the list may have changed over time or may change on a continual basis. CBP played no role in the development of these waitlists, has no control or oversight over such lists, does not require to see or be provided copies of the lists, and does not require individuals to place their names on a list in order to be processed at a port of entry.

6. Many southwest border ports of entry communicate with individuals in Mexico about the number of migrants that the port can process on a given day. For instance, if the port has

3

       the capacity to process 10 individuals, the port will inform a designated point of contact (POC) in Mexico of this fact. Depending on the location, ports may communicate directly with Mexican government officials, with Mexican state government officials, or with various NGOs or shelters at which migrants may be waiting. This entity may or may not be a "manager" or "administrator" of a particular waitlist. While this process varies by port, generally, the port and its Mexican POC communicate only about the number of individuals that can be processed, and the port does not receive the waitlists or other potentially identifying information about the migrants that will be brought to the port from its POC. In response, the port's Mexican POC will generally transport to the port the specific number of individuals who can be processed. In general, ports do not play any role in how the individuals brought to the port are selected, the waitlist number these individuals were assigned, or whether their names were even on a waitlist at all. OFO simply processes the individuals who arrive at the port. While these individuals may have had their names on a waitlist in Mexico, OFO neither relies on such lists for processing nor has any need to know an individual's place on that list. The ports do not, for instance, cross-reference an individual's name with any information about his or her place on a waitlist at the time of processing.

7.   Some ports do communicate with their Mexican POCs about the estimated length of the queue. This information may assist ports in gauging any potential operational threats or concerns to adjust resources as necessary to address any vulnerabilities. This information is generally helpful for situational awareness at the time of the communication, but the ports do not generally have any way of verifying the accuracy or reliability of the information, and it is thus helpful mostly as a general overview of the operational reality at a particular time. Additionally, while some ports have, at times, received lists

      purporting to be portions or excerpts of wait lists, the ports do not generally have regular access to the waitlists themselves or the identifying information, dates, and/or waitlist numbers contained within such lists. For example, some ports in the San Diego and Laredo Field Offices have received purported excerpts of waitlists for a particular time period from, at varying times, the Mexican government, shelters, and the U.S. Department of State. While these excerpts can be helpful for operational purposes as described above, these communications have been ad hoc and sporadic, and CBP does not generally have any way of confirming the accuracy of the information, or whether it is up-to-date on the date it is communicated. Additionally, given the sporadic nature of these communications, and because there may be several shelters or several individual waitlists in some locations – not all of whom provide information to CBP – these communications likely do not constitute a "complete" list of individuals who may be waiting across the border in a particular area of Mexico, nor do they contain a "complete" list of everyone who may have been waiting in Mexico for a particular time frame.

8.     Therefore, while OFO does receive information about various waitlists from its Mexican POCs, there are, as discussed above, different entities and individuals that create and manage lists in various locations in Mexico. CBP does not have firsthand knowledge of who manages or controls the waitlists in every location and does not have firsthand knowledge of whether the Mexican government controls the list in every location or even has knowledge of the existence of such lists. To illustrate, the Tucson Field Office understands that there is currently a waitlist in the city of Nogales, Sonora, Mexico, which is currently administered by the Mexican city of Nogales, although it was administered at some point in the past by Mexican Immigration, who took over the administration of the list from several NGOs. The Field Office also understands that

5

there is a waitlist in San Luis Rio Colorado, although the Field Office is not aware of who administers this list. This lack of awareness is largely because, as described above, the ports have no operational need to understand this information, as the ports' role is to process those individuals who are brought to the port of entry for processing on a given day. As the waitlists themselves are administered by entities operating in Mexico, there is no need for, and no authority for, CBP to play any role in the decision as to who manages the lists and how they are managed.

9. Given the relationships described above, if CBP were ordered to obtain copies of waitlists from the government of Mexico, there is no guarantee that the government of Mexico could or would be able to provide all or even complete copies of the lists. As outlined above, it is my understanding that the Mexican government does not manage or control all of the waitlists in Mexico, and thus would not necessarily have complete information to provide. Any request for these lists would therefore be substantially different from routine information requests that CBP makes to foreign governments, including the Mexican government on a regular basis, which are for official and verified government documents and thus do not cover lists controlled and managed by NGOs, shelters, migrants, or other individuals. In other words, if CBP were to make an official records request to the Mexican government, any response would likely be limited to records within the control of the Mexican government. Accordingly, it is highly likely that any records received would be underinclusive of all current or past existent lists.

10. Additionally, even if CBP were to make such a request to the Mexican government, CBP has no control over the Mexican government. Therefore, Mexico could determine that it was only able to provide excerpts of waitlists, waitlists from certain ports, waitlists for a certain period of time, or may deny the request to provide any information at all. Indeed,

6

        given the patchwork of entities managing the lists, Mexico may only be able to provide certain limited information. Thus, CBP would be unable to verify that any information received in response to such a request is, in fact, complete.

11. Second, even if CBP were to request copies of the waitlists outside of the formal process to obtain governmental records, CBP lacks firsthand knowledge in some locations of which entity administers the lists and how the list is administered or compiled, especially those managed by NGOs or other private entities and individuals. In these locations, while CBP could reach out to its POCs at the port of entry, CBP lacks firsthand knowledge of whether this POC would, in fact, be able to provide an actual copy of any existing waitlist.

12. Additionally, were CBP to make a request to the Mexican government for the waitlists for use in this litigation, it could cause harm to CBP's relationship with Mexico, especially on the local level (where many of the requests may need to be directed). I am concerned that a request for the waitlists could be perceived by individuals in the Mexican government as CBP attempting to monitor or regulate Mexico's internal processes for addressing migration. This is particularly so because the Mexican government does not, as described above, necessarily exercise control over the waitlists in all locations. Therefore, I am concerned that, if CBP were to request copies of the waitlists, Mexican officials could perceive CBP as attempting to exert some degree of control over the regulation of these waitlists. I am concerned that this could negatively impact already sensitive and critical relationships, which are often based on the regular and consistent flow of critical operational information, with officials on both sides of the border able to communicate freely and without concern for how the information may be used or perceived to be used.

13. Any damage to CBP's local relationships could have a significant adverse impact to CBP operations. The United States and Mexico have a shared interest in ensuring that their joint border is safe and secure, and to further this interest, officials often work together on efforts to maintain security and manage the flow of trade and travel across the border. The exact nature of the partnership varies based on the particular location and particular operational issues, but officials must maintain regular communication in order to ensure that they have sufficient situational awareness of particular events of interest and areas of concern. As outlined above, CBP and Mexico frequently communicate about operational issues, including communications about any queues of individuals waiting to enter the United States, in order to facilitate safe and orderly processing on both sides of the border. They also communicate regularly about, among other things, issues related to cross-border events impacting public safety, intelligence, and migration flows. However, should Mexican officials perceive that CBP is attempting to regulate the method in which Mexico manages its own migration trends, Mexican officials may be hesitant to share such operational information, as well as other critical operational information, which would greatly harm the ability of both CBP and Mexico to jointly ensure a safe and secure border.

14. Therefore, OFO has undertaken reasonable efforts to identify waitlists and excerpts of waitlists in its possession for the purpose of identifying class members. Specifically, OFO conducted a southwest border-wide request for information, directing personnel who were in a position to possibly have received information about waitlists from Mexico to conduct a thorough review of past emails, texts, other messaging applications, photographs, and documents (both hard copy and electronically-saved) for any copies of the metering waitlists or portions/excerpts thereof and any messages containing the

8

names of individuals scheduled to be brought to the port for intake from July 2019 and earlier. CBP identified two relevant excerpts: excerpts of the waitlist from Mexicali/Calexico from November 2018-January 2019, and a list from Presidio/Ojinaga from 2019. These were forwarded to U.S. Citizenship and Immigration Services (USCIS) to assist in their efforts to determine provisional subclass membership for purposes of complying with the preliminary injunction.

15. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this __5th___ day of January, 2021.

Joseph Draganac
Deputy Executive Director, Operations
Office of Field Operations
U.S. Customs and Border Protection