BRIAN M. BOYNTON
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
(San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' EXHIBIT 7** |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*, in their official capacities,[1] | |
| *Defendants*. | |

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Mayorkas is automatically substituted as a Defendant for former Acting Secretary Wolf.

## EARLY TERMINATIONS GRANTED—Continued
[July 1, 2020 thru July 31, 2020]

| | | |
|---|---|---|
| 20201217 ........ | G | Oaktree Power Opportunities Fund V, L.P.; Montrose Environmental Group, Inc.; Oaktree Power Opportunities Fund V, L.P. |
| 20201220 ........ | G | General Atlantic Partners 100, L.P.; Doctor on Demand, Inc.; General Atlantic Partners 100, L.P. |
| **07/16/2020** | | |
| 20201198 ........ | G | Enviva Partners, LP; RWE Aktiengesellschaft; Enviva Partners, LP. |
| **07/17/2020** | | |
| 20201192 ........ | G | Vista Equity Partners Fund V, L.P.; 4C Insights, Inc.; Vista Equity Partners Fund V, L.P. |
| 20201207 ........ | G | Genstar Capital Partners IX, L.P.; Sentinel Capital Partners V, L.P.; Genstar Capital Partners IX, L.P. |
| **07/27/2020** | | |
| 20201218 ........ | G | Fiera Infrastructure Fund; CSC CUB Holdings, LP; Fiera Infrastructure Fund. |
| 20201219 ........ | G | Stichting Pensioenfonds ABP; CSC CUB Holdings, LP; Stichting Pensioenfonds ABP. |
| 20201221 ........ | G | Citadel Kensington Global Strategies Fund Ltd.; UP Energy Corporation; Citadel Kensington Global Strategies Fund Ltd. |
| 20201222 ........ | G | Sony Corporation; Timothy D. Sweeney; Sony Corporation |
| 20201223 ........ | G | Crescent Acquisition Corp; F45 Training Holdings Inc.; Crescent Acquisition Corp. |
| 20201224 ........ | G | VPI Holding Company, LLC; Centerbridge Capital Partners III, L.P.; VPI Holding Company, LLC. |
| 20201231 ........ | G | Thomas Tull; Acrisure Holdings, Inc.; Thomas Tull. |
| 20201234 ........ | G | Temasek Holdings (Private) Limited; LegalApp Holdings, Inc.; Temasek Holdings (Private) Limited. |
| 20201235 ........ | G | Authentic Brands Group LLC; LBD Parent Holdings, LLC; Authentic Brands Group LLC. |
| **07/29/2020** | | |
| 20201233 ........ | G | Roark Capital Partners III LP; Roark Capital Partners IV Cayman AIV LP; Roark Capital Partners III LP. |
| 20201238 ........ | G | Insurance Acquisition Corp.; Shift Technologies, Inc.; Insurance Acquisition Corp. |
| 20201241 ........ | G | GT Polaris Holdings, L.P.; I. Charles Widger; GT Polaris Holdings, L.P. |
| 20201242 ........ | G | GT Polaris Holdings, L.P.; NorthStar Topco, LLC; GT Polaris Holdings, L.P. |
| 20201248 ........ | G | KIA X (Breathe), L.P.; GlaxoSmithKline plc; KIA X (Breathe), L.P. |
| 20201249 ........ | G | Eppendorf AG; Promega Corporation; Eppendorf AG. |
| 20201250 ........ | G | Naspers Limited; Remitly Global, Inc.; Naspers Limited. |
| 20201251 ........ | G | Blackstone Capital Partners VII L.P.; Gregory Burgess; Blackstone Capital Partners VII L.P. |
| 20201258 ........ | G | Hargray Acquisition Holdings, LLC; Cable One, Inc.; Hargray Acquisition Holdings, LLC. |
| **07/31/2020** | | |
| 20201252 ........ | G | EQT VIII (No. 1) SCSp; Rancher Labs, Inc.; EQT VIII (No. 1) SCSp. |

**FOR FURTHER INFORMATION CONTACT:**
Theresa Kingsberry (202–326–3100), Program Support Specialist, Federal Trade Commission Premerger Notification Office, Bureau of Competition, Room CC–5301, Washington, DC 20024.

By direction of the Commission.

**April J. Tabor,**
*Acting Secretary.*
[FR Doc. 2020–22944 Filed 10–15–20; 8:45 am]
**BILLING CODE 6750–01–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

### Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), a component of the Department of Health and Human Services (HHS), announces the issuance of an Order suspending the right to introduce certain persons into the United States from countries where a quarantinable communicable disease exists. This Order is based on the CDC Director's determination that introduction of aliens, regardless of their country of origin, migrating through Canada and Mexico into the United States creates a serious danger of the introduction of COVID–19 into the United States, and the danger is so increased by the introduction of such aliens that a temporary suspension is necessary to protect the public health.

**DATES:** This action took effect October 13, 2020.

**FOR FURTHER INFORMATION CONTACT:** Nina B. Witkofsky, Office of the Chief of Staff, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS V18–2, Atlanta, GA 30329. Phone: 404–639–7000. Email: *cdcregulations@cdc.gov*.

**SUPPLEMENTARY INFORMATION:** The Director of the CDC (Director) is issuing this Order pursuant to Sections 362 and 365 of the Public Health Service (PHS) Act, 42 U.S.C. 265, 268, and their implementing regulations,[1] which authorize the Director of the Centers for Disease Control and Prevention (CDC) to

---
[1] 85 FR 56424.

suspend the right to introduce [2] persons into the United States when the Director determines that the existence of a quarantinable communicable disease in a foreign country or place creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of the right of such introduction is necessary to protect public health. This Order replaces the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March 20, 2020 Order), extended on April 20, 2020, and amended May 19, 2020, which were based on the prior interim final rule.[3]

This Order applies to persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry (POE) or Border Patrol station at or near the United States borders with Canada or Mexico, subject to the exceptions detailed below.

This Order does not apply to U.S. citizens and lawful permanent residents; members of the armed forces of the United States, and associated personnel, and their spouses and children; persons from foreign countries who hold valid travel documents and arrive at a POE; or persons from foreign countries in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE. Additionally, this Order does not apply to any alien who must test negative for COVID–19 before they are expelled to their home country. Further, this Order does not apply to persons whom customs officers determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS shall consult with CDC concerning how these types of case-by-case, individualized exceptions shall be made to help ensure consistency with current CDC guidance and public health assessments.

DHS has informed CDC that persons who are traveling from Canada or Mexico (regardless of their country of origin), and who must be held longer in congregate settings in POEs or Border Patrol stations to facilitate immigration processing, would typically be aliens seeking to enter the United States at POEs who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended at or near the border seeking to unlawfully enter the United States between POEs. This Order is intended to cover all such aliens. For simplicity, I shall refer to the persons covered by this Order as ''covered aliens.''

This Order, which is substantially the same as the amended and extended March 20, 2020 Order, is necessary to continue to protect the public health from an increase in the serious danger of the introduction of Coronavirus Disease 2019 (COVID–19) into the POEs, and the Border Patrol stations between POEs, at or near the United States borders with Canada and Mexico. Those facilities are operated by U.S. Customs and Border Protection (CBP), an agency within DHS. This Order is intended to help mitigate the continued risks of transmission and spread of COVID–19 to CBP personnel, U.S. citizens, lawful permanent residents, and other persons in the POEs and Border Patrol stations; further transmission and spread of COVID–19 in the interior of the United States; and the increased strain that further transmission and spread of COVID–19 would put on the United States healthcare system and supply chain during the current public health emergency.[4]

There is a serious danger of the introduction of COVID–19 into the POEs and Border Patrol stations at or near the United States borders with Canada and Mexico, and into the interior of the country as a whole, because COVID–19 exists in Canada, Mexico, and the other countries of origin of persons who migrate to the United States across the United States land and coastal borders with Canada and Mexico. Those persons are subject to immigration processing in the POEs and Border Patrol stations. Many of those persons (typically aliens who lack valid travel documents and are therefore inadmissible) are held in the common areas of the facilities, in close proximity to one another, for hours or days, as they undergo immigration processing. The common areas of such facilities were not designed for, and are not equipped to, quarantine, isolate, or enable social distancing by persons who are or may be infected with COVID–19. The introduction into congregate settings in land and coastal POEs and Border Patrol stations of persons from Canada or Mexico increases the already serious danger to the public health to the point of requiring a temporary suspension of the right of introduction of such persons into the United States.

The public health risks of inaction include transmission and spread of COVID–19 to CBP personnel, U.S. citizens, lawful permanent residents, and other persons in the POEs and Border Patrol stations; further transmission and spread of COVID–19 in the interior; and the increased strain that further transmission and spread of COVID–19 would put on the United States healthcare system and supply chain during the current public health emergency.

These risks are troubling because POEs and Border Patrol stations were not designed and are not equipped to deliver medical care to numerous persons exposed to or infected with a quarantinable communicable disease, nor are they capable of providing the level of medical care that would be necessary in the cases of serious COVID–19 infection that occur with greater frequency in vulnerable populations like the elderly and those with certain pre-existing conditions. Indeed, CBP transfers persons with acute presentations of illness to local or regional healthcare providers for treatment. Outbreaks of COVID–19 in POEs or Border Patrol stations would lead to transfers of such persons to local or regional health care providers, which would exhaust the local or regional healthcare resources, or at least reduce the availability of such resources to the domestic population, and further expose local or regional healthcare workers to COVID–19. The continuing availability of healthcare resources to the domestic population is a critical component of the federal government's overall public health response to COVID–19.

Based on these ongoing concerns and to protect the public health, I hereby suspend the introduction of all covered aliens into the United States until I determine that the danger of further introduction of COVID–19 into the United States has ceased to be a serious danger to the public health, and continuation of the Order is no longer necessary to protect the public health. Every 30 days, CDC shall review the latest information regarding the status of the COVID–19 pandemic and associated

---

[2] *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[3] 85 FR 16559, 85 FR 17060, 85 FR 22424, 85 FR 31503.

[4] As of October 1, 2020, CBP has had 2,195 employees contract COVID–19. In addition, 13 employees and one USBP transportation contractor have died due to the virus. Any outbreak of COVID–19 among CBP personnel in land POEs or Border Patrol stations would impact CBP operations negatively. Although not part of the CDC public health analysis, it bears emphasizing that the impact on CBP could reduce the security of U.S. land borders and the speed with which cargo moves across the same.

public health risks to ensure that the Order remains necessary to protect the public health. Upon determining that the further introduction of COVID–19 into the United States is no longer a serious danger to the public health necessitating the continuation of this Order, I will publish a notice in the **Federal Register** terminating this Order and its Extensions. I may amend this Order as necessary to protect the public health.

A copy of the Order is provided below and a copy of the signed Order can be found at *https://www.cdc.gov/coronavirus/2019-ncov/order-suspending-introduction-certain-persons.html.*

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention (CDC)

### Order Under Sections 362 & 365 of the Public Health Service Act

### (42 U.S.C. 265, 268):

### Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists

### I. Purpose and Application

I issue this Order pursuant to Sections 362 and 365 of the Public Health Service (PHS) Act, 42 U.S.C. 265, 268, and their implementing regulations,[5] which authorize the Director of the Centers for Disease Control and Prevention (CDC) to suspend the right to introduce [6] persons into the United States when the Director determines that the existence of a quarantinable communicable disease in a foreign country or place creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of the right of such introduction is necessary to protect public health. This Order replaces the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March 20, 2020 Order), extended on April 20, 2020, and amended May 19, 2020, which were based on the prior interim final rule.[7]

This Order applies to persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry (POE) or Border Patrol station at or near the United States borders with Canada or Mexico, subject to the exceptions detailed below.

This Order does not apply to U.S. citizens and lawful permanent residents; members of the armed forces of the United States or U.S. government personnel serving overseas, and associated personnel, and their spouses and children; persons from foreign countries who hold valid travel documents and arrive at a POE; or persons from foreign countries in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE. Additionally, this Order does not apply to any alien who must test negative for COVID–19 before they are expelled directly to their home country. Further, this Order does not apply to persons whom customs officers determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS shall consult with CDC concerning how these types of case-by-case, individualized exceptions shall be made to help ensure consistency with current CDC guidance and public health assessments.

DHS has informed CDC that persons who are traveling from Canada or Mexico (regardless of their country of origin), and who must be held longer in congregate settings in POEs or Border Patrol stations to facilitate immigration processing, would typically be aliens seeking to enter the United States at POEs who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended at or near the border seeking to unlawfully enter the United States between POEs. This Order is intended to cover all such aliens. For simplicity, I shall refer to the persons covered by this Order as "covered aliens."

This Order, which is substantially the same as the amended and extended March 20, 2020 Order, is necessary to continue to protect the public health from an increase in the serious danger of the introduction of Coronavirus Disease 2019 (COVID–19) into the POEs, and the Border Patrol stations between POEs, at or near the United States borders with Canada and Mexico. Those facilities are operated by U.S. Customs and Border Protection (CBP), an agency within the U.S. Department of Homeland Security (DHS). This Order is intended to help mitigate the continued risks of transmission and spread of COVID–19 to CBP personnel, U.S. citizens, lawful permanent residents, and other persons in the POEs and Border Patrol stations; further transmission and spread of COVID–19 in the interior of the United States; and the increased strain that further transmission and spread of COVID–19 would put on the United States healthcare system and supply chain during the current public health emergency.[8]

There is a serious danger of the introduction of COVID–19 into the POEs and Border Patrol stations at or near the United States borders with Canada and Mexico, and into the interior of the country as a whole, because COVID–19 exists in Canada, Mexico, and the other countries of origin of persons who migrate to the United States across the United States land and coastal borders with Canada and Mexico. Those persons are subject to immigration processing in the POEs and Border Patrol stations. Many of those persons (typically aliens who lack valid travel documents and are therefore inadmissible) are held in the common areas of the facilities, in close proximity to one another, for hours or days, as they undergo immigration processing. The common areas of such facilities were not designed for, and are not equipped to, quarantine, isolate, or enable social distancing by persons who are or may be infected with COVID–19. The introduction into congregate settings in land and coastal POEs and Border Patrol stations of persons from Canada or Mexico increases the already serious danger to the public health to the point of requiring a temporary suspension of the right of introduction of such persons into the United States.

The public health risks of inaction include transmission and spread of COVID–19 to CBP personnel, U.S. citizens, lawful permanent residents, and other persons in the POEs and Border Patrol stations; further transmission and spread of COVID–19 in the interior; and the increased strain that further transmission and spread of COVID–19 would put on the United States healthcare system and supply chain during the current public health emergency.

---

[5] 85 FR 56424, 42 CFR 71.40.

[6] *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[7] 85 FR 17060, 85 FR 22424, 85 FR 31503.

[8] As of October 1, 2020, CBP has had 2,195 employees contract COVID–19. In addition, 13 employees and one USBP transportation contractor have died due to the virus. Any outbreak of COVID–19 among CBP personnel in land and coastal POEs or Border Patrol stations would impact CBP operations negatively. Although not part of the CDC public health analysis, it bears emphasizing that the impact on CBP could reduce the security of U.S. borders and the speed with which cargo moves across the same.

These risks are troubling because POEs and Border Patrol stations were not designed and are not equipped to deliver medical care to numerous persons exposed to or infected with a quarantinable communicable disease, nor are they capable of providing the level of medical care that would be necessary in the cases of serious COVID–19 infection that occur with greater frequency in vulnerable populations like the elderly and those with certain pre-existing conditions. Indeed, CBP transfers persons with acute presentations of illness to local or regional healthcare providers for treatment. Outbreaks of COVID–19 in POEs or Border Patrol stations would lead to transfers of such persons to local or regional health care providers, which would exhaust the local or regional healthcare resources, or at least reduce the availability of such resources to the domestic population, and further expose local or regional healthcare workers to COVID–19. The continuing availability of healthcare resources to the domestic population is a critical component of the federal government's overall public health response to COVID–19.

Based on these ongoing concerns and to protect the public health, I hereby suspend the introduction of all covered aliens into the United States until I determine that the danger of further introduction of COVID–19 into the United States has ceased to be a serious danger to the public health, and continuation of the Order is no longer necessary to protect the public health. Every 30 days, CDC shall review the latest information regarding the status of the COVID–19 pandemic and associated public health risks to ensure that the Order remains necessary to protect the public health. Upon determining that the further introduction of COVID–19 into the United States is no longer a serious danger to the public health necessitating the continuation of this Order, I will publish a notice in the **Federal Register** terminating this Order and its Extensions. I may amend this Order as necessary to protect the public health.

## II. Factual Basis for Order [9]

### 1. COVID–19 is a global pandemic that has spread rapidly

COVID–19 is a quarantinable communicable disease caused by a novel (new) coronavirus, SARS–CoV–2, that was first identified as the cause of an outbreak of respiratory illness that began in Wuhan, Hubei Province, People's Republic of China (China). As of October 1, 2020, there were over 34,103,279 cases of COVID–19 globally, resulting in over 1,016,167 deaths.

COVID–19 spreads easily and sustainably within communities.[10] The virus is thought to transfer principally by person-to-person contact through respiratory droplets produced during exhalation, such as breathing, speaking, coughing, and sneezing. Droplets can span a wide spectrum of sizes that can remain airborne from seconds for larger droplets to several hours for smaller droplets and particles. The virus may also transfer through contact with surfaces or objects contaminated with these droplets.[11] There is also evidence of asymptomatic transmission, in which an individual infected with COVID–19 is capable of spreading the virus to others before exhibiting symptoms.[12]

Symptoms may include fever or chills, cough, and shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, and diarrhea, and typically appear 2–14 days after exposure to the virus.[13] Manifestations of severe disease have included severe pneumonia, acute respiratory distress syndrome (ARDS), septic shock, and multi-organ failure.[14] Mortality rates are higher among seniors and those with certain underlying medical conditions, such as chronic obstructive pulmonary disease (COPD), serious heart conditions, cancer, Type 2 diabetes, and those with compromised immune systems.[15]

Unfortunately, at this time, there is no vaccine against COVID–19, although several are in development. While U.S. Food and Drug Administration (FDA) has not approved drugs to treat patients with COVID–19 based on a demonstration of safety and efficacy in randomized controlled trials, FDA has granted an Emergency Use Authorization for the use of VEKLURY® (remdesivir) and other investigational therapeutics in the treatment of COVID–19 infection. Beyond these therapeutics, treatment is currently limited to supportive care to manage symptoms. Hospitalization may be required in severe cases and mechanical respiratory support may be needed in the most severe cases.

Global efforts to slow the spread of COVID–19 have included sweeping travel limitations and lockdowns. Nations such as the European Union (EU) Member States and Schengen Area countries,[16] Australia, New Zealand, and Canada have imposed restrictions on international travelers.[17] In many countries, individuals are being asked to self-quarantine for 14 days—the outer limit of the COVID–19's estimated incubation period—following return from a foreign country with sustained community transmission. For example, all returning citizens and residents of Australia and New Zealand are subject to a mandatory 14-day quarantine at

---

[9] Given the dynamic nature of the public health emergency, CDC recognizes that the types of facts and data set forth in this section may change rapidly (even within a matter of hours). The facts and data cited by CDC in this order represent a good-faith effort by the agency to present the current factual justification for the order.

[10] *COVID–19 Pandemic Planning Scenarios,* Ctrs. for Disease Control & Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html,* (last visited Oct. 3, 2020), (CDC estimates that the viral transmissibility (R₀) of COVID–19 is around 2.5, but may be as high as 4, meaning that a single infected person will on average infect between 2 to 4 others).

[11] *Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID–19) Pandemic,* Ctrs. for Disease Control & Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Finfection-control%2Fcontrol-recommendations.html* (last visited Sept. 29, 2020),

[12] *COVID–19 Pandemic Planning Scenarios,* Ctrs. for Disease Control & Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html,* (last visited Sept. 29, 2020), (CDC's current best estimate is that between 30 to 70% of infections are transmitted prior to symptom onset (pre-symptomatic transmission)).

[13] *Coronavirus Disease 2019 (COVID–19): Symptoms of Coronavirus,* Ctrs. for Disease Control & Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html* (last updated May 13, 2020).

[14] Sevim Zaim, et al., *COVID–19 and Multiorgan Response,* 00 Current Problems in Cardiology 2020, (available at: *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7187881/pdf/main.pdf*).

[15] *Coronavirus Disease 2019 (COVID–19): People with Certain Medical Conditions,* Ctrs. for Disease Control & Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed;-extra-precautions%2Fgroups-at-higher-risk.html* (last updated Sept. 11, 2020).

[16] *Migration and Home Affairs: Schengen Area,* Eur. Comm'n (Jan. 1, 2020), *https://ec.europa.eu/home-affairs/what-we-do/policies/order-and-visas/schengen_en* (''Today, the Schengen Area [of the EU] encompasses most EU States, except for Bulgaria, Croatia, Cyprus, Ireland and Romania. However, Bulgaria, Croatia and Romania are currently in the process of joining the Schengen Area. Of non-EU States, Iceland, Norway, Switzerland and Liechtenstein have joined the Schengen Area.''); *Travel to and from the EU during the pandemic: Travel restrictions,* Eur. Comm'n, *https://ec.europa.eu/info/live-work-travel-eu/health/coronavirus-response/travel-and-transportation-during-coronavirus-pandemic/travel-and-eu-during-pandemic_en* (last visited Aug. 31, 2020).

[17] *See* Andrea Salcedo, Sanam Yar, & Gina Cherelus, *Coronavirus Travel Restrictions, Across the Globe,* N.Y. Times (July 16, 2020), *https://www.nytimes.com/article/coronavirus-travel-restrictions.html*.

designated secure facilities, such as a hotel at their port of arrival.[18]

*2. The March 20, 2020 Order has reduced the risk of COVID–19 transmission in POEs and Border Patrol stations*

I issued the March 20, 2020 Order pursuant to Sections 362 and 365 of the Public Health Service (PHS) Act, 42 U.S.C. 265, 268, and an interim final rule implementing Section 362.[19] The March 20, 2020 Order suspended the introduction of certain ''covered aliens'' into the United States for a period of 30 days. The definition of ''covered aliens'' in the March 20, 2020 Order is substantially the same as in this Order. The March 20, 2020 Order was based on the following determinations:

• COVID–19 is a communicable disease that poses a danger to the public health;

• COVID–19 is present in numerous foreign countries, including Canada and Mexico;

• There is a serious danger of the introduction of COVID–19 into the land POEs and Border Patrol stations at or near the United States borders with Canada and Mexico, and into the interior of the country as a whole, because COVID–19 exists in Canada, Mexico, and the other countries of origin of persons who migrate to the United States across the land borders with Canada and Mexico;

• But for a suspension-of-entry order under 42 U.S.C. § 265, covered aliens would be subject to immigration processing at the land POEs and Border Patrol stations and, during that processing, many of them (typically aliens who lack valid travel documents and are therefore inadmissible) would be held in the congregate areas of the facilities, in close proximity to one another, for hours or days; and

• Such introduction into congregate settings of persons from Canada or Mexico would increase the already serious danger to the public health of the United States to the point of requiring a temporary suspension of the introduction of covered aliens into the United States.

The March 20, 2020 Order was extended on April 20, 2020 and amended on May 19, 2020, to clarify that it applies to all land and coastal POEs and Border Patrol stations [20] at or near the United States' border with Canada or Mexico that would otherwise hold covered aliens in a congregate setting.[21] Pursuant to the May 19, 2020 Amendment, the March 20, 2020 Order was again extended with CDC thereafter conducting reviews every 30 days.[22] Upon conducting these reviews, I have kept the amended Order in place; the current 30 day period lapses on October 17, 2020.

In general, the federal government's overall experience under the March 20, 2020 Order, together with the factual developments since May 20, 2020, sustain the policy rationales for issuing this Order.

Since the March 20, 2020 Order was issued, the daily average population in CBP custody is 1,134 individuals. This is a 64% reduction of daily in custody numbers since the March 20, 2020 Order went into effect and a 67% reduction from the same period in 2019. In the 50 days preceding the March 20, 2020 Order, CBP officers made over 1,600 trips to community hospitals to facilitate advanced medical care for individuals. For the first 80 days after the March 20, 2020 Order's implementation, CBP made only 400 trips for individuals to receive medical care from community hospitals. This represents a 75% decrease in utilization. In the 60 days preceding September 16, 2020, CBP made 746 trips for individuals to receive medical care from community hospitals. The increase in hospital utilization corresponds with a month-over-month increase in CBP enforcement encounters, including encounters with covered aliens who have subsequently tested positive for COVID–19. The risks of COVID–19 transmission and overutilization in community hospitals serving domestic populations would have been greater absent the March 20, 2020 Order.

The March 20, 2020 Order has reduced the risk of COVID–19 transmission in POEs and Border Patrol stations, and thereby reduced risks to DHS personnel and the U.S. health care system. The public health risks to the DHS workforce—and the erosion of DHS operational capacity—would have been greater absent the March 20, 2020 Order. DHS data shows that the March 20, 2020 Order has significantly reduced the population of covered aliens held in congregate settings in POEs and Border Patrol stations, thereby reducing the risk of COVID–19 transmission for DHS personnel and others within these facilities.

By significantly reducing the number of covered aliens held in POEs and Border Patrol stations, the March 20, 2020 Order reduced the density of covered aliens held in congregate custody within these facilities, which reduced the risk of exposure to COVID–19 for DHS personnel and others in POEs and Border Patrol stations.

*3. Conditions in Canada, Mexico, and the United States warrant issuing this Order*

COVID–19 has continued to spread since the March 20, 2020 Order. Canada, Mexico, and the countries of origin of many of the individuals who travel to the United States through Canada or Mexico continue to see increasing numbers of COVID–19 infections and deaths.

i. Canada

As detailed in the March 20, 2020 Order, approximately 33 million individuals crossed the Canadian border into the United States in 2017. Historically, inadmissible aliens attempting to unlawfully enter the United States from Canada have included not only Canadian nationals, but also nationals of countries experiencing, or suspected of experiencing, widespread COVID–19 transmission such as the member countries of the Schengen Area, China, and Iran.[23] From March through August, 2020, CBP has processed 28,841 inadmissible aliens at POEs at the U.S.-Canadian border, and CBP has apprehended 2,014 inadmissible aliens attempting to unlawfully enter the United States between POEs, of which DHS determined 1,126 were covered aliens subject to the March 20, 2020 Order.[24]

As of October 6, 2020, Canada reported over 171,300 cases of COVID–19 and over 9,500 confirmed deaths with a seven day average of 1,797 new

---

[18] *Id.; COVID–19 and the border: Travel restrictions,* Cmlth. of Austl, Dep't of Home Aff., *https://covid19.homeaffairs.gov.au/travel-restrictions-0* (last updated Aug. 28, 2020); *COVID–19: New Zealanders in the UK—Frequently Asked Questions,* N.Z. Foreign Aff. & Trade, *https://www.mfat.govt.nz/en/countries-and-regions/europe/united-kingdom/new-zealand-high-commission/living-in-the-uk/covid-19-coronavirus/* (last visited Aug. 28, 2020).

[19] 85 FR 16559.

[20] As explained below, air POEs are excluded from the Amended Order and Extension because they do not present the same public health risk as land and coastal POEs.

[21] 85 FR 22424.

[22] 85 FR 31503.

[23] U.*S. Border Patrol Nationwide Apprehensions by Citizenship and Sector in Fiscal Years 2007 to 2019,* U.S. Border Patrol, U.S. Dep't. of Homeland Security, *https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY%202007%20-%20FY%202019%29_1.pdf* (last visited Oct. 9, 2020).

[24] *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions,* U.S. Customs and Border Protection, U.S. Dep't. of Homeland Security, *https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics* (last visited Oct. 9, 2020).

cases.[25] In response to increases in the level of community transmission, authorities in Toronto, Ottawa, and several other Ontario cities have mandated indoor mask use. On September 19, 2020, Ontario issued new restrictions limiting indoor gatherings to 10 people and outdoor gatherings to 25.[26] In Quebec masks have been mandated in all indoor public places since July 27, 2020. In an effort to slow the transmission and spread of the virus, the Canadian government banned most foreign nationals from entry and mandated that returning Canadians and excepted foreign nationals (including Americans) self-monitor for COVID–19 symptoms for 14 days following their return.[27] Canadian public health officials have expressed alarm at the recent increase in new COVID–19 cases after several months of low level community transmission, particularly as Canada begins to enter influenza season.[28]

ii. Mexico

As of October 1, 2020, Mexico has 738,163 confirmed cases, and 77,163 reported deaths.[29] While Mexico's official statistics for COVID–19 infections and number of deaths provide insights to general trends, they have serious deficiencies that greatly understate actual totals. COVID–19 infections and deaths are likely multiples of what is reported as Mexico has the lowest diagnostic testing per capital of OECD countries. Mexico's positivity rate is estimated to be around 44% based on confirmed positive cases, confirmed negative tests, and suspected cases. This is an improvement from a positivity rate of approximately 50% in mid-July. However, Mexico's Health Ministry, SALUD, reported on September 4, 2020 excess mortality totals of 122,765 deaths through August 28, 2020 as compared to 2019 totals. This figure includes confirmed cases of COVID–19 and deaths confirmed from other causes, but the excess suggests the true number of deaths from COVID–19 in Mexico is much higher than official counts.

While the data on Mexico is more limited, there are signs that the rate of COVID–19 community transmission in Mexico is slowing as the overall public health situation improves somewhat. As of September 25, 2020, under SALUD's "stoplight" designation system, none of Mexico's 32 states are red, 15 are orange, 16 are yellow and 1, Colima, is green. According to SALUD, Mexico City has the most lab-confirmed cases with 121,087 and the most deaths with 11,814 as of September 24, 2020. Hospital occupancy rates have also improved in recent weeks—the national hospital occupancy rate is 28 percent—hospital occupancy rates remain elevated in Mexican border-states such as Nuevo Leon (47 percent). As of September 25, 2020, several Mexican border states report relatively high numbers of active COVID–19 infections: Tamaulipas (3,566 active cases), Nuevo Leon (6,028 actives cases) and Baja California (1,440 active cases).

The COVID–19 pandemic in Mexican states along the U.S.-Mexico border region presents increased concerns for the United States because all covered aliens crossing the U.S.-Mexico border necessarily travel through that region and the level of migration is so high. From March to August, 2020, DHS has processed 54,503 inadmissible aliens at POEs along the border, and U.S. Border Patrol has apprehended 345,267 aliens attempting to unlawfully enter the United States between POEs.[30] DHS determined 153,569 were covered aliens subject to the March 20, 2020 Order, of which over 70% were Mexican nationals. With the continued growth of COVID–19 cases in Central and South America, the overwhelming majority of covered aliens encountered on the U.S.-Mexico border are nationals of countries experiencing sustained human to human transmission of COVID–19.

The continued prevalence of COVID–19 in Mexico continues to present a serious danger of the introduction of COVID–19 into the United States. If community transmission in the Mexican border region accelerates, experience shows then the numbers of COVID–19 cases in that region are likely to increase, as are the numbers of infected covered aliens who seek to introduce themselves into the United States. The introduction of more infected covered aliens would likely have a negative impact on community transmission in the United States.

iii. United States

While pandemic conditions have improved, community transmission of COVID–19 is continuing across the United States. The United States has recorded over 7,200,000 cumulative confirmed cases; and more than 200,000 deaths.[31] The country is averaging around 36,000 to 40,000 new cases a day.[32] Nationally, since mid-July, there has been an overall decreasing trend in the percentage of specimens testing positive and a decreasing or stable (change of ≤0.1%) trend in the percentage of hospitalizations.[33] To wit, as of October 3, 2020, the seven day average of new cases and deaths are down 35.8% and 40.3% respectively from their peak levels. Similarly, the seven day positivity rate, as of October 3, 2020, was 4.6%. This low positivity rate is not shared uniformly, Arizona and Texas both report positivity rates of between 11–20%.[34]

Millions of Americans are subject to local and state public health restrictions and precautions calculated to slow the spread of, and protect others from, COVID–19. CDC continues to recommend that all Americans practice vigorous hand hygiene, engage in social distancing,[35] limit non-essential travel,[36] and wear cloth face coverings or masks when out in public.[37] Public health measures intended to slow the spread of COVID–19 in order to avoid

---

[25] *Coronavirus Disease (COVID–19): Outbreak Update,* Gov't of Can., https://www.canada.ca/en/public-health/services/diseases/2019-novel-coronavirus-infection.html (last updated Oct. 6, 2020).

[26] *Reopening Ontario in Stages: Gathering Limits,* Gov't of Ontario, https://www.ontario.ca/page/reopening-ontario-stages#restrictions (last updated Oct. 2, 2020).

[27] *Travel Restriction Measures: COVID–19 Program Delivery Travel Restriction Exemptions for Those Departing From a Country Other Than the U.S.,* Gov't of Canada, https://www.canada.ca/en/immigration-refugees-citizenship/corporate/publications-manuals/operational-bulletins-manuals/service-delivery/coronavirus/travel-restrictions.html#travel-restriction-exemptions (last updated Jul. 23, 2020).

[28] *Statement from the Chief Public Health Officer of Canada on October 3, 2020,* Gov't of Canada, https://www.canada.ca/en/public-health/news/2020/10/statement-from-the-chief-public-health-officer-of-canada-on-october-3-2020.html (last updated Oct. 3, 2020).

[29] *WHO Coronavirus Disease (COVID–19) Dashboard,* WHO, https://covid19.who.int/table (last visited Oct. 2, 2020).

[30] *Supra,* note 21.

[31] *CDC COVID Data Tracker: United States COVID–19 Cases and Deaths by State,* Ctrs. for Disease Control & Prevention https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last visited Oct. 6, 2020).

[32] *Id.*

[33] *COVID View: A Weekly Summary of U.S. COVID–19 Activity Week 39,* Ctrs. for Disease Control & Prevention https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (last visited Oct. 6, 2020).

[34] *CDC COVID Data Tracker: United States COVID Laboratory Testing,* Ctrs. for Disease Control & Prevention https://covid.cdc.gov/covid-data-tracker/#testing_totalpercentpositive (last visited Oct. 6, 2020).

[35] *How to Protect Yourself & Others,* Ctrs. for Disease Control & Prevention https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Oct. 6, 2020).

[36] *Travel During the COVID–19 Pandemic,* Ctrs. for Disease Control & Prevention https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html (last visited Oct. 6, 2020).

[37] *COVID–19: Use of Cloth Face Coverings to Help Slow the Spread of COVID–19,* Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html (last reviewed Oct. 6, 2020).

overwhelming healthcare systems have largely proven successful. However, several cities and states, including several located at or near U.S. borders, continue to experience widespread, sustained community transmission that has strained their healthcare and public health systems. Furthermore, continuing to slow the rate of COVID–19 transmission is critical as states and localities ease public health restrictions on businesses and public activities in an effort to mitigate the economic and other costs of the COVID–19 pandemic.

### III. Determination and Implementation

Based on the foregoing, I find that COVID–19 is a quarantinable communicable disease [38] and that there is a serious danger of the introduction of COVID–19 into the POEs and Border Patrol stations at or near the United States borders with Canada and Mexico, and the interior of the country as a whole, because COVID–19 exists in Canada, Mexico, and the countries or places of origin of the covered aliens who migrate to the United States across the land and coastal borders with Canada and Mexico. I also find that the introduction into land and coastal POEs and Border Patrol stations of covered aliens increases the seriousness of the danger to the point of requiring a temporary suspension of the right to introduce covered aliens into the United States. Therefore, I am suspending the right to introduce and prohibiting the introduction of covered aliens travelling into the United States from Mexico and Canada.

In making this determination, I have considered facts including the overall number of cases of COVID–19 reported in Mexico, Canada, and the countries or places of origin of the covered aliens who migrate to the United States across the land and coastal borders with Canada and Mexico, the influx of cases in areas near the U.S.-Mexico border, epidemiological factors including the viral transmissibility and asymptomatic transmission of the disease, the morbidity and mortality associated with the disease for individuals in certain risk categories, and the negative effects of the disease already experienced by CBP. Therefore, it is necessary for the United States to continue the suspension of the right to introduce covered aliens at this time.

The continued suspension of the right to introduce covered aliens requires the movement of all such aliens to the country from which they entered the United States, their country of origin, or another practicable location outside the United States, as rapidly as possible, with as little time spent in congregate settings as practicable under the circumstances. The faster a covered alien is returned to the country from which they entered the United States, to their country of origin, or another location as practicable, the lower the risk the alien poses of introducing, transmitting, or spreading COVID–19 into POEs, Border Patrol stations, other congregate settings, and the interior.

I consulted with DHS and other federal departments as needed before I issued this Order, and requested that DHS aid in the enforcement this Order because CDC does not have the capability, resources, or personnel needed to do so. As part of the consultation, CBP developed an operational plan for implementing this Order. The plan is generally consistent with the language of this Order directing that covered aliens spend as little time in congregate settings as practicable under the circumstances. Additionally, DHS will continue to use repatriation flights as necessary to move covered aliens on a space-available basis, as authorized by law. In my view, DHS's assistance with implementing the Order is necessary, as CDC's other public health tools are not viable mechanisms given CDC resource and personnel constraints, the large numbers of covered aliens involved, and the likelihood that covered aliens do not have homes in the United States.[39]

This Order is not a rule subject to notice and comment under the Administrative Procedure Act (APA). Notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Order and a delay in effective date. Given the public health emergency caused by COVID–19, it would be impracticable and contrary to public health practices—and, by extension, the public interest—to delay the issuing and effective date of this Order. In addition, because this Order concerns the ongoing discussions with Canada and Mexico on how best to control COVID–19 transmission over our shared border, it directly ''involve[s] . . . a . . . foreign affairs function of the United States.'' 5 U.S.C. 553(a)(1). Notice and comment and a delay in effective date would not be required for that reason as well.

\*    \*    \*    \*    \*

This Order shall remain effective until I determine that the danger of further introduction of COVID–19 into the United States has ceased to be a serious danger to the public health, and continuation of this Order is no longer necessary to protect public health. Every 30 days, the CDC shall review the latest information regarding the status of the COVID–19 pandemic and associated public health risks to ensure that the Order remains necessary to protect public health.

Upon determining that the further introduction of COVID–19 into the United States is no longer a serious danger to the public health necessitating the continuation of this Order, I will publish a notice in the **Federal Register** terminating this Order and its Extensions. I retain the authority to extend, modify, or terminate the Order, or implementation of this Order, at any time as needed to protect public health.

### Authority

The authority for this Order is Sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40.

**Nina B. Witkofsky,**
*Acting Chief of Staff, Centers for Disease Control and Prevention.*
[FR Doc. 2020–22978 Filed 10–13–20; 4:15 pm]
**BILLING CODE 4163–18–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

**[CMS–3399–FN]**

### Medicare and Medicaid Programs: Application from DNV–GL Healthcare USA, Inc. for Continued Approval of its Critical Access Hospital Accreditation Program

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), Health and Human Services (HHS).

**ACTION:** Final notice.

**SUMMARY:** This final notice announces our decision to approve DNV–GL Healthcare USA, Inc. (DNV–GL) for continued recognition as a national accrediting organization for critical access hospitals that wish to participate in the Medicare or Medicaid programs.

---

[38] COVID–19 is a severe acute respiratory syndrome, which is one of the diseases included in the ''Revised List of Quarantinable Communicable Diseases.'' Exec. Order 13295 (Apr. 4, 2003), as amended by Exec. Order 13375 (Apr. 1, 2005) and Exec. Order 13674 (July 31, 2014).

[39] CDC relies on the Department of Defense, other federal agencies, and state and local governments to provide both logistical support and facilities for federal quarantines. CDC lacks the resources, manpower, and facilities to quarantine covered aliens.