1              United States District Court

2          for the Southern District of California

3                                    )
   AL OTRO LADO, Inc., et al.,       )
4                                    )   No. 17cv2366-BAS
        Plaintiffs,                  )
5                                    )   JULY 30, 2020
             v.                      )
6                                    )   San Diego, California
   KIRSTJEN NIELSEN, Secretary,      )
7  U.S. Department of Homeland       )
   Security, in her official         )
8  capacity, et al.,                 )

9      Defendants.


10                    TRANSCRIPT OF PROCEEDINGS
11            BEFORE THE HONORABLE CYNTHIA BASHANT
                  United States District Judge
12
   APPEARANCES:
13
   For the Plaintiffs:        SOUTHERN POVERTY LAW CENTER
14                                 REBECCA CASSLER
                                   MELISSA CROW
15                                 SARAH RICH
                                   Attorneys at Law
16                            MAYER BROWN LLP
                                   STEPHEN MEDLOCK
17                                 ORI LEV
                                   Attorneys At Law
18                            CENTER FOR CONSTITUTIONAL RIGHTS
                                   ANGELO GUISADO
19                                 Attorney at Law

20 For the Defendants:        U.S. DEPARTMENT OF JUSTICE
                                   ALEXANDER JAMES HALASKA
21                                 KATHERINE SHINNERS
                                   Attorneys at Law
22

23
   Court Reporter:           Dana Peabody, RDR, CRR
24                           District Court Clerk's Office
                             333 West Broadway, Suite 420
25                           San Diego, California 92101
                             DanaPeabodyCSR@gmail.com

1          San Diego, California, July 30, 2020

2                          *   *   *

3          (Telephonic Hearing.)

4          THE CLERK:  Hi, Judge.

5    I let counsel know that we were going to be providing some

6    instructions after you joined, so --

7          THE COURT:  Okay.

8          THE CLERK:  -- hopefully that's our last joiner.

9    If everybody who is on the line can mute their phones if

10   they're not speaking.  You'd be surprised at how much we

11   actually pick up on these hearings.

12   Also, letting everybody know that there is no recordings of

13   this hearing, and any transcripts or information needed from

14   the hearing can be provided by Dana, our court reporter.

15   The same courtroom rules apply as they do as though we were

16   sitting in the courtroom, and only counsel is permitted to

17   provide argument, so any participants, please mute your phones.

18   Also, counsel, if you could speak slowly and state your

19   name each time you speak, just so that since we are not able to

20   see you, that we can actually understand who is speaking, and

21   if you could also state your appearance in the order that you

22   gave us on the phone list, I think it would be helpful to

23   prevent everybody from talking over each other at the same

24   time.

25   And, again, thank you for providing that list.

3

1    With that, I'm going to go ahead and call the case.

2    Calling Matter Number 1, 17cv2366, Al Otro Lado versus

3    McAlleenan, et al., on calendar for a motion hearing.

4        THE COURT:  Counsel, state your appearances for the

5    record, please.

6        MR. MEDLOCK:  Good afternoon, Your Honor.  This is

7    Stephen Medlock from Mayer Brown LLP.  I'll be arguing on

8    behalf of the plaintiff.

9        THE COURT:  Do we have any other counsel besides

10   Mr. Medlock?

11       MR. GUISADO:  Angelo Guisado.

12       MS. CROW:  Melissa Crow from Southern Poverty Law

13   Center appearing for the plaintiff.

14       MS. CASSLER:  Rebecca Cassler from Southern --

15       THE COURT:  I missed the name there.  Someone talked

16   on top of you.

17       MS. RICH:  I'm sorry, yeah, Sarah Rich for the

18   plaintiff.

19       THE COURT:  Thank you.

20       MS. CASSLER:  As well as Rebecca Cassler for the

21   plaintiff, also from Southern Poverty Law Center.

22       THE COURT:  Okay.  Is that all the plaintiffs'

23   counsel?

24       MR. LEV:  One more, Ori Lev from Mayer Brown on behalf

25   of plaintiffs.

1          THE COURT:  Okay.  Defense counsel.

2          MR. HALASKA:  Good afternoon, Your Honor.  This is

3    Alexander Halaska from the Department of Justice.  I'll be

4    arguing the case for the government, and I am also accompanied

5    by Katherine Shinners, and there should be no other counsel for

6    defendants.

7          THE COURT:  Great.  Thank you very much.

8       I did issue a tentative ruling.  Since the tentative is to

9    grant the class certification motion, I think I probably should

10   hear from defense counsel first.

11         MR. HALASKA:  Absolutely.  Thank you, Your Honor, and

12   thank you -- this is Alexander Halaska, and thank you for

13   providing the tentative order.  It's very helpful to kind of,

14   you know, have the government --

15         THE COURT:  Focus.

16         MR. HALASKA:  Exactly.

17      So I think, Your Honor, if I may, I'd like to focus the

18   Court on two distinct points that the government would like to

19   advance during this hearing.  One, we'd like to urge the Court

20   to reconsider the scope of the class definition that were

21   certified given the common questions that the Court found

22   plaintiffs had adequately presented; and, two, we'd like to

23   show the Court why we think that this case is much more

24   analogous to Wal-Mart Stores versus Dukes than it is to Parsons

25   versus Ryan.

1      So, to start, we think that the class definitions are much

2  broader than the common questions that the Court found in this

3  case are apt to answer.

4      Specifically, to start, we think that stretching back to

5  the beginning of 2016, that's much longer than the time period

6  that plaintiffs presented common evidence for.  We think that

7  the plaintiffs' own expert testified at the deposition that the

8  metering processes were not standardized prior to the

9  promulgation of the April 2018 metering memorandum, and so

10 that, we think, defeats any finding of commonality as to that

11 time period as to the metering class.

12     We also think -- excuse me -- the metering subclass.

13     We also think that the plaintiffs have failed to present

14 sufficient common evidence capable of generating class-wide

15 answers for the broader class.  We think that, at most,

16 plaintiffs have presented declarations from eight individuals

17 showing that their -- you know, alleging that there is a policy

18 other than metering, and we think that that is facially

19 insufficient to establish commonality, at least as it applies

20 to that class.

21          THE COURT:  Can I interrupt you for a minute and just

22 ask you, so do you agree that a subclass, if it was time

23 limited, if it didn't go all the way back to 2016, that the

24 subclass would be an appropriate class to be certified?

25          MR. HALASKA:  Well, Your Honor, we still have -- it's

6

1    certainly less objectionable than we find it now.  We still

2    think that there are commonality issues with the metering

3    subclass, but we do think that that would at least mitigate

4    some of the commonality issues based on the evidence that

5    plaintiffs have presented.

6              THE COURT:  Okay.

7              MR. HALASKA:  We also think that -- looking at pages 4

8    and 5 of plaintiffs' motion, and we discuss, you know, when

9    plaintiffs talk about the way that they claim CBP has denied

10   access to the asylum process, we think that, you know, to the

11   extent that these processes are not covered by the metering

12   memorandum and the subsequent iterations of the metering

13   policy, that these are not the types of things that can be

14   adjudicated on a class-wide basis, and that's because these are

15   the things that really do require an individualized

16   determination or rather, you know, an individualized

17   examination of what was going on within each applicant's, you

18   know, experience at the ports of entry.

19        So, for example, when you look -- when you talk about a

20   class, like, coercing someone to, you know, withdraw their

21   application or recant their credible fear claim, right,

22   coercion is something that's very fact specific.  You have to

23   look at what the CBP officer is alleged to have said to that

24   person, you have to look at whether, you know, that is true,

25   you have to ask the individual how they received, you know, the

1   information that was told to them, and that's how you kind of

2   determine, for example, whether someone was coerced.

3       Similarly, threatening is the same kind of individualized

4   analysis where you have to look at whether an individual was

5   threatened, what did CBP tell them was going to happen to

6   them --

7           THE COURT:  Let me just interrupt you.  I'm sorry to

8   keep interrupting you, but can't we address -- when we get to

9   trial, can't we address -- I think the plaintiffs are taking on

10  a fairly large burden here.  I mean, they would have to prove

11  that the defendant systematically denied all class members

12  access to the asylum process illegally through an overarching

13  policy to deter asylum-seekers.  Can't we just with jury

14  instructions require that that's what they have to prove, and

15  if they can't prove that -- and so then there are a variety of

16  ways they would prove that, which might include coercion, it

17  might include all the various things, but it seems to me that

18  that's really the question in this case, is, did the defendants

19  systematically deny all class members access to the asylum

20  process illegally?  And that would be something they'd have to

21  prove at trial.  I mean, it seems to me that that's the way it

22  would work at trial, and I'm not sure how it's any different

23  from the cases challenging prison conditions, for example,

24  healthcare services.  There's a million different ways that

25  people might be denied access to healthcare services, but if

1  you're saying you have to prove that they are systematically

2  denying prisoners access to healthcare, why is that not the

3  same thing?

4           MR. HALASKA:  I think two points in response to that,

5  Your Honor.  First is if that's going to be the common

6  question, the common question that the Court certifies, I think

7  plaintiffs have failed to present evidence at this stage as to,

8  you know, the non -- at least as to the non-metering claims I'm

9  talking about right now, and I think that they have not shown

10  that their -- they've shouldered their burden, in fact, that

11  due to things like misrepresentations, threats, verbal and

12  physical abuse, coercion, that those are as a matter occurring

13  pursuant to a class-wide policies.  If that's the question that

14  the Court is looking to certify for trial, then I think

15  plaintiffs have failed to satisfy their burden there.

16           THE COURT:  Do I have to make that decision at this

17  point?  Do I have to make a decision that they've proved that

18  there was an overarching policy?  Can't I just certify the

19  class to say this is what the class is claiming and that's the

20  question that will be answered by trial?

21           MR. HALASKA:  No, Your Honor, the Court does not have

22  to make the merits determination whether plaintiff has

23  satisfied -- whether plaintiffs have, in fact, shown a common

24  policy.  The Court, though, does have to state that the types

25  and modes of evidence that plaintiffs have offered at the class

1    certification stage are such that, you know, adjudicating that

2    form of evidence would lead to common class-wide answers, and

3    so here what you really have as to the broader class, the

4    non-metering claims, you have, I think it's eight total

5    declarations from individuals, right. This isn't, you know, a

6    single decision-maker saying that this is -- you know, go out

7    there and coerce people to withdraw their applications. It's

8    not, you know, single decision-maker in CBP saying, you need to

9    threaten people and get away with that, right? It's a class

10   member side kind of evidence. And so that, we think, under

11   these circumstances, is not going to be enough to show -- or,

12   rather, it's not the type of evidence, right, the type of form

13   of evidence that's going to generate class-wide answers because

14   even if the Court looks at these eight declarations and says, I

15   find that you have been coerced, I find that you have been

16   threatened, that only goes to that person's experience, it's

17   not going to generate the common class-wide answers as to the

18   non-metering class that are required to adjudicate on a

19   class-wide basis.

20           THE COURT:  Okay.

21           MR. HALASKA:  And then to answer the second part about

22   the healthcare cases, and I think this brings me to my second

23   point about why this case is Wal-Mart and not Parsons, right?

24   Those types of cases really are focused on the types of claims

25   that the plaintiffs there have raised.

1       So, for example, in Parsons, what we're talking about is an

2  Eighth Amendment claim where you'd have to show that you've

3  been placed at a substantial risk by the condition there.  You

4  don't have to look in those situations at, you know, what

5  happened with the affected policies of each individual class

6  member.

7       The government's contention here is not that the effect of

8  the policies matter on each of the individual asylum citizens

9  or noncitizens.  The government's contention is that, for

10 example, to prove a 706(1) unreasonable delay claim, you have

11 to look at the TRAC factors.  Some of those factors are whether

12 the effect of the mandamus order on priorities of

13 competing -- activities of a competing or higher priority, you

14 have to look at -- there's a number of factors under the TRAC

15 decision whether there's a rule of reason, the nature and

16 extent of the interests that are prejudiced by the delay, so

17 those -- it doesn't necessarily matter what happens at the

18 individual class members, right?  The individual class members

19 can allege a common policy, but, here, to show whether the

20 delay is reasonable or not, for example, right, whether CBP is

21 bringing people into the port at a reasonable pace, you have to

22 look at what else is going on at the ports.  It's not even a

23 defense, right?  It's part of the affirmative claim, the

24 affirmative set of factors that the Court would have to look at

25 to determine whether the government's actions are reasonable

1   here.

2       I think plaintiffs -- they do say that metering is unlawful

3   in no circumstances.  We think that the Court's ruling in its

4   motion to dismiss order where it talks about how there may

5   potentially be legitimate factors that would justify metering

6   really kind of defeats that claim that categorically metering

7   is unlawful.

8       So, really, unless these decisions are of the types that

9   can be categorically decided, and we don't think a 706(1) claim

10  can, then this is much, much more like Wal-Mart when you're

11  looking at -- the question there that the Court had to answer

12  was, why was I disfavored?  So here the question is, why was I

13  delayed from entering?  And so I think that's really the

14  distinction between this case and a case like Parsons where you

15  just look at whether there is a policy, whether it affects all

16  people, and whether that policy places someone at a substantial

17  risk.

18      And that's similar to cases like Lion where the Court there

19  held that there is a -- you know, a constitutional floor,

20  right, that has to be met by the policy.  And so in that case,

21  you're looking at the categorical application of the policies

22  as a class to see whether it does not meet the legal threshold.

23      Here, in 706(1) claims, there really aren't, you know,

24  legal thresholds.  No one disputes as a matter of policy,

25  right -- this is what all the memorandums say -- as a matter of

1  policy, CBP isn't precluding people from applying

2  asylum -- from entering and applying for asylum.  It's

3  metering, right?  It says that you may regulate the flow of

4  people into the ports of entry.  So if you're looking at

5  whether that delay is reasonable, you have to look at what's

6  going on at the ports.

7       I think also, yes, Your Honor, if we look at Footnote 15 of

8  the Court's tentative order, this kind of illustrates --

9  really, it does illustrate why in addition the types of

10  evidence that plaintiffs have presented are really not the

11  types that generate categorical classified answers.

12       So if you look at, for example, right, the whistle-blower,

13  the whistle-blower worked at one port of entry -- excuse me --

14  three ports of entry at various different times within one

15  field office on the southwest border.  Whatever his experiences

16  are, taken, you know, at face value, taken, you know, compared

17  against the government's evidence, whatever his experiences

18  are, he's only testifying about what happened at the places

19  that he worked.

20       Similarly, the -- some of the OIG -- or rather we'll look

21  at Exhibits, I believe, it's 52 -- some of the emails, 54

22  through 56, those emails that the Court cited as evidence that

23  implies an intended deterrence effect, those emails are also

24  combined to the places where those individuals worked, so the

25  Laredo field office, Pete Flores is the director of the field

1    operations in the San Diego field office.  So even then, those

2    statements, taking that at face value, which we, the

3    government, will dispute that those show, you know, a

4    prohibited deterrent effect or unlawful motive, we would say

5    that those, at best, are confined to the places where those

6    individuals work, which is not border-wide.

7        And we think this is really the fatal flaw in the types and

8    forms of evidence that plaintiffs have presented that they say

9    that will show on a class-wide basis that the basis that the

10   government is engaging in this unlawful activity.

11       We think, at best, that the classes have to be confined to

12   the time period where the Court has found that there were

13   actions that the government has taken that applies across the

14   entire border and across the entire class.

15       I'm happy to answer any questions that the Court has, but

16   those are the two main points that the government wanted to

17   make.

18           THE COURT:  Okay.  Thank you.

19       Let me hear from the plaintiff.  Who is arguing on behalf

20   of plaintiff?

21           MR. MEDLOCK:  Good afternoon, Your Honor.  This is

22   Stephen Medlock from Mayer Brown, and I'll be arguing.

23           THE COURT:  Okay.

24           MR. MEDLOCK:  Your Honor, we believe that the Court's

25   tentative class certification order is manifestly correct, and

1    that class certification in this case was and is not a close

2    question.

3        I'll start by addressing a few of Mr. Halaska's points and

4    then go on to make a few affirmative points starting with his

5    argument that, really, this case -- the metering subclass and

6    the class should be time limited, although he doesn't explain

7    when that time period should begin we're in.  That's just

8    a -- that's a red herring, Your Honor.

9        The evidence that we have submitted, which I'll point out

10   was the very beginning of discovery in this case, shows that

11   the metering of asylum-seekers and turn-backs of asylum-seekers

12   began at the San Ysidro Port of Entry sometime in May 2016.

13   The email traffic suggests that it occurred sometime around

14   Memorial Day 2016.  From there, by November 2016, the process

15   had spread to the Laredo field office and then spread to all

16   four field offices on the U.S./Mexico border and was then

17   formalized in April of 2018 by, I think, the assistant

18   commissioner Todd Owens' metering guidance memorandum.  The

19   mere fact that an ongoing, systemic practice is formalized at a

20   later date in writing should have no effect on the -- on the

21   date or the time period for class certification in this case.

22       Plaintiffs do recognize your comment that we are taking on

23   a big burden here, and we do so advisedly because the record

24   supports us on that.  And so we see there's no reason to limit

25   the class here.

1    I think it's -- it really goes to this argument that is

2    fleshed out more in the government's opposition where they want

3    to aggregate every form of turn-back and then claim that if you

4    aggregate our evidence, then perhaps the class should not be

5    certified, but that's not how the evidence will come in at

6    trial.

7    We will present evidence showing that there was a systemic

8    practice, and when you just look at this case reduced to its

9    simplest form, what this case is ultimately about is thousands

10   of asylum-seekers who were arriving at Class A ports of entry

11   on the U.S./Mexico border and were attempting to become -- to

12   be inspected and processed, as the law requires, but were

13   turned back, and they are moving for an injunctive relief to

14   prohibit the practice and policy of turning them back at ports

15   of entry.

16   Whether that practice is legal and whether it, in fact,

17   occurred are common questions of law and fact that can be

18   answered on a class-wide basis, and it's the quintessential

19   form of an injunctive relief class, as you noted has occurred

20   in prison rights cases and has occurred in other immigration

21   contexts.

22   I will move on to the Wal-Mart point raised by counsel.

23   This is -- this case is nothing like Wal-Mart, and the

24   defendants are overreading Wal-Mart vs. Dukes.  Apart from

25   stating the general legal standard for class certification, it

1   has no application here.

2       In Dukes, a putative class consisting of 1.5 million

3   current and former female Wal-Mart employees sued the company

4   arguing that local management discriminated against them in pay

5   and promotion decisions.  It turned out in the record that pay

6   and promotion decisions of Wal-Mart's 3,400 stores were not

7   subject to any form of uniform policy.  Instead, those

8   decisions were, quote, generally committed to local managers'

9   broad discretion and -- end quote, and they exercised that

10  authority in, quote, a largely subjective manner.  That's

11  Dukes, 564 U.S. 343.

12      In fact, the only policy that Wal-Mart had on promotions

13  and pay was effectively, quote, a policy against having uniform

14  employment practices.  That's Dukes at 353.  And because there

15  was no policy, the Court found that it was improper to find a

16  common issue of fact because what actually occurred was some

17  Wal-Mart managers were making pay and promotion decision on

18  gender neutral performance-based metrics.  Some had policies

19  that although they weren't specifically discriminatory had a

20  disparate impact on them, and some Wal-Mart store management

21  was, in fact, guilty of discriminating against women in pay and

22  promotion decisions.

23      This case is entirely different for several reasons.

24  First, there is a policy here.  There's a uniform policy that

25  was written, first written down, in April of 2018 in Todd

1  Owens' memorandum.  It has since been updated in several

2  iterations.

3       So, first off, unlike Wal-Mart, there is a policy.

4  Secondly, where the statistical evidence in Wal-Mart suggested

5  that some Wal-Mart stores followed the law, here the

6  contemporaneous statistical figures kept by CBP point in only

7  one direction.  The turn-back policies that they adopted was a

8  pretext.  The actual capacity numbers published on a daily

9  basis by CBP simply do not show that these ports were

10 overcrowded, whether there was a capacity-based reason to

11 implement turn-backs.

12      So we believe that, if anything, comparing this case to

13 Wal-Mart demonstrates why the Court's tentative order granting

14 certification was correct.

15      And, really, Mr. Halaska has the question wrong.  It's not,

16 why was I delayed?  It's, was I delayed?  And, does that

17 violate the law?  Those are common questions.

18      And the reason that defendants say that you need to get

19 into why was I delayed at the -- at the class certification

20 stage is based on a misreading in its application of the TRAC

21 factors.

22      I think it's important to consider, first off, the

23 procedural posture of TRAC.  TRAC was a decision on the merits.

24 And in their briefing, defendants cite no case that has ever

25 applied TRAC at the class certification stage.  And we're not

1    aware of one.  In fact, the only case that we're aware of that

2    explicitly cites the argument that you need to look at the TRAC

3    factors at the class certification stage is Burwell, which is

4    reported at 2015 U.S. District Lexis 75238, pages 14 -- pages

5    14 through 15 of that opinion, and in that opinion the district

6    court explicitly refused to apply the TRAC factors at the class

7    certification stage and wrote, quote, although the principles

8    that drive the application of these TRAC factors may be worth

9    considering at a later date, the government has pointed to no

10   authority that would impose the TRAC factors in a class

11   certification context like this, end quote.

12        And I think that that just shows Your Honor is on good

13   ground to not go into the merits of the TRAC argument at this

14   stage.

15        At any rate, I believe that defendants are misinterpreting

16   plaintiffs' argument under Section 706(1).  TRAC only applies

17   to agency delay.  Turn-back is not a delay.  The refusal to

18   inspect and process a noncitizen that is arriving in the

19   United States, i.e. an outright denial of the required agency

20   process; therefore, the 706(1) analysis that defendants suggest

21   is simply not a -- should not be governed by TRAC.

22        And I'll briefly touch on the legitimate factors argument

23   that defendants went into.

24        Defendants, I think, undermine this legitimate factors

25   argument by the concession that they made in oral argument a

1   few minutes ago where they told you that you don't have to get

2   into the merits of common questions, you simply need to

3   identify the common questions that can be litigated at the

4   merit stage of the case.  So whether there is or is not a

5   legitimate factor, I think they've undermined that point, but

6   be that as it may, it's always been the case that plaintiffs

7   have argued that turn-backs are illegal, full stop, regardless

8   of the justification for them.

9        And I believe defendants are misreading your opinion that

10  there must be some sort of justification analysis for them.  I

11  don't read your motion to dismiss opinion to say that.  At

12  most, I believe it's that there may be times when the duty to

13  inspect may not happen instantaneously, which I don't think

14  anybody actually disputes in this case.

15       But I think it's really important to look at the evidence

16  that has come in so far.  Mr. Halaska tries to minimize this

17  saying that, well, the whistle-blower is only one employee in

18  one field office, and then he says, well, there's also some

19  evidence from the Laredo field office.

20       Well, there's only four field offices on the U.S./Mexico

21  border, and as he pointed out, there's already evidence from

22  two of them.  So the argument that only 50 percent of the field

23  offices have direct evidence showing that the turn-back policy

24  was based on pretext doesn't hold much water.

25       But I'll just point out, Your Honor, that the testimony

1   that we cited from the whistle-blower, he's the first person

2   deposed in the case.  We'd only taken three depositions by the

3   time that class -- by the time our class certification motion

4   was due.  There is considerable evidence, including testimony

5   from the second whistle-blower-type witness from a different

6   field office and a different port of entry who have a very

7   similar experience as the whistle-blower and corroborates the

8   whistle-blower's testimony nearly in its entirety.

9        So I think that trying to limit this case to the testimony

10  of one whistle-blower from emails and some declarations is

11  simply incorrect at this stage of the case.

12       We have a mountain of evidence showing that the turn-back

13  policy existed, that the public statements given by the

14  government was a pretext and some examples of patently

15  inequitable conduct that was engaged in by CBP officers at the

16  direction of headquarters in order to enforce that policy.

17       So I'll pause there, Your Honor, and see if you have any

18  questions.

19            THE COURT:  No questions.

20       Anything further?

21            MR. MEDLOCK:  Nothing further from plaintiffs,

22  Your Honor.

23            THE COURT:  Okay.  Anything from the defendants?

24            MR. HALASKA:  Yes, Your Honor, I would like to respond

25  to Mr. Medlock's argument.

1          THE COURT:  Okay.

2          MR. HALASKA:  The notion that time limiting the

3   classes is a red herring is just flatly incorrect.  Mr. Medlock

4   just said now that we -- metering has been in place in some

5   form since May 2016 and that it slowly spread across the

6   border.  We said that in our class certification motion.  I

7   believe we said that on appeal.  The point, though, is, it

8   didn't become standardized at least until April 2018 when the

9   guidance memorandum exists, was promulgated.  That's what

10  plaintiffs' experts says in her class certification expert

11  report, I believe, at paragraph 47.  I don't understand -- I

12  don't know how you can square the statement that it wasn't

13  standardized before, you know, this day.  There should still be

14  a class based on the common question of how the policy was

15  implemented.

16       Second, Wal-Mart has no application.  I mean, I really

17  think that's wrong, and I think the Ninth Circuit in Parsons

18  versus Ryan says that plaintiffs' counsel is wrong on that

19  point.

20       In fact, Parsons -- this is starting on page 61 -- the

21  Court there begins to distinguish between, you know, the Eighth

22  Amendment claims at issue and the Title VII claims that were at

23  issue in Wal-Mart.

24       And one of the things that the Court points to that was an

25  important distinction, it says, "In this case, in Parsons, the

1   Court would look to whether current conditions in the
2   facilities create a risk of future harm not to the varied
3   reasons for millions of decisions made in the past."
4       I'm not saying that there's millions of decisions made in
5   the past here at CBP.  Certainly, though, we are looking at a
6   much broader set of factual circumstances than just the current
7   conditions in the facility.  You have to look at, you know, in
8   some respect at what was going on at the ports of entry to
9   determine whether defendants are telling the truth that they
10  are at capacity or whether plaintiffs claimed that there's a
11  pretext is, in fact, the actual truth.
12      And, finally, I don't think that anything I said about the
13  legitimate factor argument should be taken as a concession.
14  I'm not -- I'm really not sure what Mr. Medlock's argument was
15  there.
16      I do think, though, that my point is that the metering
17  memorandums, right, if you look at all the different memoranda,
18  they all say that the field leaders have discretion to
19  implement the policy, right, so even -- we would -- we still
20  think that there are commonality issues if you use the policy
21  memoranda as kind of the guideposts for the commonality
22  inquiry, right?  We still think that the Court has to delve
23  into how the different field offices exercise their discretion.
24  But, at minimum, there's nothing beyond that that standardizes
25  and brings all of these together.  It really is just one

1    individual, one whistle-blower working at a field office.  He's

2    not the person who sets priorities, he's not the person who

3    dictates how resources are allocated.  His testimony is limited

4    to his experiences.  That's just a fact.

5        And to the extent that plaintiffs try to hold them up as

6    more, I think that they have some nice testimony of what

7    happened with a line officer, but to the extent that they are

8    claiming that the whistle-blowers are the types of people who

9    are able to testify competently about, you know, what's going

10   on, you know, the full scope of the operations at the ports of

11   entry, I think we would disagree.

12       And I think -- unless there are no more questions from the

13   Court, that is all for the government.

14            THE COURT:  Okay.  I'll take the matter under

15   submission and issue an order.  Thank you very much.

16            MR. MEDLOCK:  Thank you, Your Honor.

17            MR. HALASKA:  Thank you, Your Honor.

18                       ---oOo---

19               C-E-R-T-I-F-I-C-A-T-I-O-N

20       I certify that the foregoing is a correct transcript from

21   the record of proceedings in the above-entitled matter.

22

23       Dated July 30, 2021, at San Diego, California.

24                    /Dana Peabody/
                     Dana Peabody,
25                   Registered Diplomate Reporter
                     Certified Realtime Reporter