1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

AL OTRO LADO, *et al.*,

                                    Plaintiffs,

        v.

ALEJANDRO MAYORKAS, Secretary
of Homeland Security, *et al.*,

                                    Defendants.

Case No. 17-cv-02366-BAS-KSC

**ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' PURPORTED EXPERT TESTIMONY**

**(ECF No. 536)**

        Plaintiffs file a Motion to Exclude Defendants' Purported Expert Testimony ("Motion") arguing that Defendants should not be allowed to admit the testimony of Mariza Marin, Rodney Harris, or Samuel Cleaves as to operational capacity at the ports of entry ("POEs").  (ECF No. 536.)  Specifically, Plaintiffs argue that: (1) the witnesses were not disclosed as expert witnesses and should not be admitted as non-retained experts under Rule 26(a)(2)(C); (2) the witnesses have no methodology for calculating "operational capacity" and thus should be excluded under *Daubert*; (3) Defendants fail to link any such capacity to the number of asylum seekers that can be processed and inspected; (4) their testimony regarding such capacity directly contradicts their previous testimony that operational capacity could not be defined or calculated; and (5) even if their testimony is allowed, it should be accorded no weight.  (*Id.*)  Defendants respond, and Plaintiffs reply.  (ECF Nos. 580, 592.)  For the reasons stated below, the Court **DENIES** the Motion.

## I.    BACKGROUND

In the Second Amended Complaint ("SAC"), which is the operative pleading in this case, Plaintiffs allege that Customs and Border Protection ("CBP") had a pattern and practice of systematically denying asylum seekers access to the asylum process along the U.S.-Mexico border.  (ECF No. 189.)   Plaintiffs claim "CBP refused to inspect and process" asylum seekers in accordance with governing statutes.  (*Id.*)  Instead, Plaintiffs allege, CBP prevents asylum seekers from accessing the asylum process through various means, including on the pretext that the POEs are at capacity (a process known as "metering"), when the true intent is to deter individuals from seeking asylum in the United States at all.  (*Id.*)  Defendants counter that although there may have been the physical capacity to process more asylum seekers at the POEs, the operational capacity at the ports limited the number of asylum seekers who could be processed at any given time. Defendants proffer three CBP officers to testify about this operational capacity.

The Court has certified a class consisting of all non-citizens seeking asylum in the United States by presenting themselves to a POE at the U.S.-Mexico border after January 1, 2016.  (ECF No. 513).  The Court also certified a subclass of all noncitizens denied access to the U.S.-asylum process at a POE on the U.S.-Mexico border as a result of CBP's "Turnback Policy" after January 1, 2016.  (*Id.*)

### A.    Mariza Marin

#### 1.    Rule 26(a)(2)(C) disclosure

Agent Mariza Marin is the Assistant Director of Field Operations at the San Diego Field Office.   Defendants intend to call Agent Marin to testify, in part, about the "mandatory and discretionary factors" that impact the San Ysidro POE's "operational capacity to process individuals without documents sufficient for lawful entry to the United States."  (Defs.' Rule 26(a)(2)(C) Disclosures ("Defs.' Disclosures") at 2, Ex. 4 to Mot., ECF No. 536-6.)

Specifically, Agent Marin will testify to how the following factors effect operational capacity:  (1) "the requirements set forth in CBP's National Standard on Transportation,

Escort, Detention and Search"; (2) "the length of time that individuals have spent in . . . custody;" (3) "the number of individuals brought in on days prior and the extent to which they are still pending intake and/or processing"; (4) "the necessity that CBP act conservatively in taking individuals from the queue in order to safeguard operations against inherent unknowns, such as the number of individuals who will enter CBP's custody . . . after being apprehended attempting to illegally enter the United States"; (5) "staffing and other resource allocations and constraints"; and (6) "law enforcement operations and significant incidents occurring or expected to occur at or near a particular POE," as well as "significant events impacting the community or society at large, such as the current pandemic." (*Id.*)

Additionally, Defendants plan to call Agent Marin to testify about the number of people in custody on June 17, 2018, the reasons for that number, and the facts and conclusions set forth in her declaration. (*Id.*)

### 2. Deposition testimony

At her deposition, Agent Marin was asked about operational capacity for processing undocumented migrants at the San Ysidro POE. She explained that this is an important concept at San Ysidro. (Dep. of Mariza Marin ("Marin Dep.") 111:4-7, Ex. 6 in supp. of Mot., ECF No. 536-8.) She testified that there are different capacities at POEs: a physical capacity and "an operational capacity that fluctuates from day to day, minute to minute." (Marin Dep. 68:1-5.) As she explained, "[o]perational capacity—for us is not a hard number or hard ceiling. It's a ballpark that we attempt to stay around to safely have the resources available to process and adequately care for people in our custody. This does not mean that there is a maximum ceiling of capacity for us." (Marin Dep. 101:8-14.)

Although Agent Marin stated she was unaware of any specific or written guidance on what is and what is not operational capacity, she attested that POEs "have always had an operational capacity." (Marin Dep. 69:4-8; 69:23–70:2; 70:22–71:4.) She has never seen a standard operating procedure that defines operational capacity but testifies that "[CBP] ha[s] always used [it]." (Marin Dep. 70:4-13.) Despite the lack of official

definition, she testified that she understands what the term means.  (Marin Dep. 71:11-24.)  Further, Agent Marin testified that "the decision-makers in the [admissibility and enforcement] unit clearly understood what operational capacity was and that it fluctuated on any given day."  (Marin Dep. 110:19-22.)

According to Agent Marin, the definition of operational capacity would differ from POE to POE, from day to day, and sometimes even from hour to hour.  (Marin Dep. 72:7-13.)  She was unable to reconstruct the daily operational capacity.  (Marin Dep. 129:7-14.)  Since the number "is fluid and varies from day to day," she testified that she did not believe anyone could reconstruct it.  (Marin Dep. 129:15-21.)  She could, however, provide "several factors that would change operational capacity at any given time."  (Marin Dep. 130:24–131:1.)

### B.    Samuel Cleaves

#### 1.    Rule 26(a)(2)(C) disclosure

Agent Samuel Cleaves is the Assistant Port Director in El Paso.  Defendants intend to call Agent Cleaves to "testify to the factors the Port of El Paso deems relevant in determining the port's operational capacity to process undocumented migrants."  (Defs.' Disclosures at 4.)  Agent Cleaves will testify that operational capacity takes into account the "characteristics and demographics of individuals in custody; the ability to transfer individuals to third party federal or state agencies . . . ; port staffing levels; the resources available to the port on a given day; and the need to re-allocate resources when necessary."  (*Id.*)  He will also attest to the "physical characteristics and infrastructure" of the port and how they impact operational capacity, including "the concerns that arise . . . such as the potential for overcrowding, officer safety, and limited resources[.]"  (*Id.* at 4–5.)

Agent Cleaves will also testify that on June 17, 2018, "the Port of El Paso was operating beyond its operational capacity during its midnight shift and at or near its operational capacity for all other shifts" that day.  (*Id.*)

2. <u>Deposition testimony</u>

At his deposition, Agent Cleaves testified that he has collected and compiled data on the capacity at the El Paso POE, including counting the number of people being held three times a day. (Dep. of Samuel Cleaves ("Cleaves Dep.") 47:20-24; 48:2-4, Ex. 7 in supp. of Mot., ECF No. 534-9.)

According to Agent Cleaves, when determining how many asylum seekers can be admitted, "you have to take in[to] consideration both physical capacity, the actual facility itself, and operational capacity, what you can process and . . . what's going on at that time throughout the port . . . ." (Cleaves Dep. 53:5-9.) He admitted there is no definition of operational capacity in any rule or regulation governing the port and no actual set definition. (Cleaves Dep. 50:4–41:14.) However, he explained that in the past the port had used the "wrong parameters" for capacity. (Cleaves Dep. 52:10-11.) For example, Agent Cleaves testified that the "facilities were never designed for overnight detention," but it was an important parameter for migrant processing because they typically required an overnight stay. (Cleaves Dep. 52:14–53:20; 54:3-8.)

He also clarified that "operational capacity is more complex" than physical capacity, which just refers to the size of the facility. (Cleaves Dep. 56:2-3, 8-14.) For example, he stated that operational capacity "takes into account the Port of El Paso is very spread out, it's very unique, so it has ten different locations and processes. So it takes into account all of the operations that are ongoing and what it would take for these operations to . . . operate well and successfully." (*Id.*) Additionally, he added that operational capacity considers workload issues: keeping migrants overnight requires food contracts, medical services, transportation, and guards. (Cleaves Dep. 56:15-22.)

Agent Cleaves also testified that no one tracks the operational capacity of the port on any given day because "it is a culmination of multiple factors" and changes quickly and frequently, making it "impossible to track." (Cleaves Dep. 66:10-16.) Further, he confirms that no reports capture operational capacity. (Cleaves Dep. 68:1-6.)

### C.    Rodney Harris

#### 1.    Rule 26(a)(2)(C) disclosure

Agent Rodney Harris is the Deputy Assistant Director of Field Operations, Border Security, at the Laredo Field Office.  Defendants intend to call Agent Harris to testify that queue management (or metering) is a tool POEs use to manage their operational capacity. (Defs.' Disclosures at 4.)  Agent Harris will testify that the Port of Laredo's and all POE's operational capacity is fluid and based on many factors.  (*Id.*)  These factors include, but are not limited to: "the missions of the port and how it prioritizes these mission sets; resources available to the port . . . such as funds, personnel, durable assets, and [p]ort facility constraints; the number, nature, and complexity of seizures, arrests, and admissibility issues; the volume, characteristics, demographics and medical needs of the individuals in custody; and the functionality of the [p]ort's resources such as physical space and assets designated for migrant processing."  (*Id.*)

Agent Harris would also testify that on June 17, 2018 the Port of Laredo balanced competing priorities "such as processing trade and travelers."  (*Id.*)  He would provide an overview of significant events that occurred on this date and the impact these events had on the Port's operational capacity to process undocumented migrants.  He also would explain what factors the Port considered on this date and why those factors impacted operational capacity.  (*Id.*)

#### 2.    Deposition testimony

At his deposition, Agent Harris testified that although the POEs may have had a higher detention capacity, it was just "not operationally feasible to hold a migrant at a lot of those locations."  (Dep. of Rodney Harris ("Harris Dep.") 129:4-5, Ex. 8 in supp. of Mot., ECF No. 536-10.)  Around June 2018, CBP started using the term "operational capacity" in relation to queue management or metering.  (Harris Dep. 137:25–138:4.)  At that point, according to Agent Harris, there was no clear definition of operational capacity—it was subject to "interpretation."  (Harris Dep. 140:19–141:1.)  Thus, the port

17cv2366

staff and ultimately the port director had discretion to decide how many asylum seekers to process in a given day.  (Harris Dep. 146:22–147:5.)

Agent Harris also testified that there has never been a calculation for "operational capacity," and it has never "really been defined." (Harris Dep. 107:1-7; 286:10-13.)  Agent Harris has ever seen a textbook definition of operational capacity and there is no official list of factors that go into operational capacity.   (Harris Dep. 286:10-13; 294:13-15.) Nonetheless, Agent Harris uses several factors to define it, including: "what else is going on at the port"; the port's other prioritized "mission sets"; how many and what types of people are already in custody; detention capacity; language barriers; prior criminal or immigration history of the detainees; whether the migrants are a part of a family unit or an unaccompanied minor; their genders; the "downstream process" and whether CBP has to wait for other agencies to respond; necessity for hospital or medical clinic runs; and how many personnel are assigned to the port in a given day.  (Harris Dep. 286:9-10; 286:25–287:7; 287:25-288:12; 288:13–20; 289:1–18; 290:4–13; 290:20–21.)

## II.    LEGAL STANDARD

### A.    Rule 26

Rule 26 of the Federal Rules of Civil Procedure requires the parties to disclose the identity of each expert.  Written reports are required for all experts "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."  Fed. R. Civ. P. 26(a)(2).  However, the court must distinguish "between a percipient witness who happens to be an expert and an expert who, without knowledge of the facts giving rise to the litigation, is recruited to provide expert opinion testimony." *Downey v. Bob's Furniture Holdings, Inc.*, 633 F.3d 1, 5–6 (1st Cir. 2011).  If the expert was not retained or specially employed in connection with the case, and his opinion is premised on personal knowledge and observations, no report is required under the terms of Rule 26(a)(2). *Id.* at 7.

### B.    Rule 702

Federal Rule of Evidence 702 establishes several requirements for admissibility of expert opinion evidence: (1) the witness must be sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge must "assist the trier of fact" either "to understand the evidence" or "to determine a fact in issue"; (3) the testimony must be "based on sufficient facts and data"; (4) the testimony must be "the product of reliable principles and methods"; and (5) the expert must reliably apply the principles and methods to the facts of the case.

Under *Daubert* and its progeny, the trial court is tasked with assuring that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).

"Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and careful instruction on the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. The judge is "to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In its role as gatekeeper, the trial court "is not tasked with deciding whether the expert is right or wrong, just whether his [or her] testimony has substance such that it would be helpful to a jury." *Id.* at 969–70; *see also Daubert*, 43 F.3d at 1318 ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."). "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758.

*Daubert* requires that the Court apply its gatekeeping role to all expert testimony, not just scientific testimony. But the tests for admissibility in general, and reliability in particular, are flexible. *Primiano*, 598 F.3d at 564 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). The court "has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted). Particularly when considering the reliability of non-scientific testimony, reliability "depends heavily on the knowledge and experience of the expert rather than the methodology or theory behind it." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).

After admissibility is established to the court's satisfaction, attacks aimed at the weight of the evidence are the province of the fact finder, not the judge. *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014). The court should not make credibility determinations that are reserved for the jury. *Id.*; *see also Primiano*, 598 F.3d at 565 ("When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony."),

## III.   ANALYSIS

Plaintiffs first argue that the above three witnesses are experts under Rule 26(a)(2) and thus Defendants were required to provide expert reports under this section. Fed. R. Civ. P. 26(a)(2)(B). However, the witnesses are not retained, specially employed to provide expert testimony in the case, or employees who regularly provide expert testimony for the Government. Their testimony largely concerns their opinions about the constraints placed on the respective POEs where they work and those ports' ability to process asylum seekers. As such, they are percipient witnesses whose opinions are premised on personal knowledge and observations and no report was required under Rule 26.

Defendants next argue that the testimony lacks relevance and reliability and therefore should be excluded under *Daubert* and its progeny. Relevant evidence is

evidence that has "any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." *Divero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) (quoting Fed. R. Evid. 401). One of the issues in this case is whether asylum seekers were denied access to the asylum process because the POEs truly had a capacity limit that prevented processing them or, as alleged by Plaintiffs, whether the claimed capacity limit was simply a pretext when the true intent was to deter individuals from seeking asylum in the United States altogether. Testimony from the Assistant Director of Field Operations at the San Ysidro POE, the Assistant Port Director at the El Paso POE, and the Deputy Assistant Direct of Field Operations, Border Security at the Laredo POE about what they believed to be the capacity limits on processing asylum seekers at their respective POEs is clearly relevant to this issue.

Furthermore, Plaintiffs do not challenge the qualifications of these witnesses to offer these opinions; in fact, each witness has spent many years working for CBP at their respective POEs. In addition, the testimony is within each witness's area of expertise and based on his or her perception as to what the capacity at each port consists of and what factors are considered in that capacity.

Plaintiffs' most vehement argument is that the witnesses each admitted in their depositions that there is no written or established definition of "operational capacity" and that the operational capacity at any given time is ever-changing and impossible to reconstruct. Therefore, citing *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991), Plaintiffs argue the witnesses should not be allowed to contradict their deposition testimony. The Court in *Kennedy* reiterated the general rule in the Ninth Circuit that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Id.* at 266. However, the Court reversed the district court's rejection of expert testimony in that case, concluding that the general rule "does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony." *Id.* at 266–67. Only in cases where the contradiction is actually "sham" testimony that flatly contradicts deposition testimony, solely concocted to "create"

- 10 -

an issue of fact and avoid summary judgment, should the sanction of rejecting the expert testimony be imposed.  *Id.* at 267.

In this case, Defendants' Rule 26 disclosures outline testimony about the factors that comprise "operational capacity"—as opposed to a hard-and-fast number indicating physical capacity—at any given time.  These factors were all outlined by the witnesses in their deposition testimony and thus there is no contradiction.  To the extent any of the witnesses attempts to reconstruct the operational capacity of a port on any given day, Plaintiffs can certainly attack this by using the deposition testimony as impeachment, but the Court finds this is not sham testimony and thus should not be excluded under *Kennedy.*

Finally, to the extent Plaintiffs argue that, even if the Court does not exclude the testimony, it should afford the testimony no weight, the Court will address this argument, if necessary, in its Order regarding Summary Judgment.

## IV.    CONCLUSION

Accordingly, Plaintiffs' Motion to Exclude the testimony of Agents Marin, Cleaves, and Harris (ECF No. 536) is **DENIED**.

**IT IS SO ORDERED.**

DATED:  **September 2, 2021**

Hon. Cynthia Bashant
United States District Judge

- 11 -

17cv2366