**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

AL OTRO LADO, *et al.*,

Plaintiffs,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*,

Defendants.

Case No. 17-cv-02366-BAS-KSC

**ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' PURPORTED EXPERT TESTIMONY**

**(ECF No. 539)**

Defendants move to exclude the expert opinion of Stephanie Leutert ("Motion") arguing that she lacks the expertise to offer opinions regarding operations and capacities at ports of entry ("POEs") and that her methodology in reaching her conclusions is flawed. (ECF No. 539.) Plaintiffs respond, and Defendants reply. (ECF Nos. 567, 593.) For the reasons stated below, the Court **GRANTS** Defendants' Motion.

## I. BACKGROUND

In the Second Amended Complaint ("SAC"), which is the operative pleading in this case, Plaintiffs allege that Customs and Border Protection ("CBP") had a pattern and practice of systematically denying asylum seekers access to the asylum process along the U.S.-Mexico border. (ECF No. 189.) Plaintiffs claim "CBP refused to inspect and process" asylum seekers in accordance with governing statutes. (*Id.*) Instead, Plaintiffs allege, CBP prevents asylum seekers from accessing the asylum process through various

means, including on the pretext that the POEs are at capacity (a process known as "metering"), when the true intent is to deter individuals from seeking asylum in the United States at all. (*Id.*) Defendants counter that although there may have been the physical capacity to process more asylum seekers at the POEs, the operational capacity at the ports limited the number of asylum seekers who could be processed at any given time. Defendants proffer three CBP officers to testify about this operational capacity.

The Court has certified a class consisting of all non-citizens seeking asylum in the United States by presenting themselves to a POE at the U.S.-Mexico border after January 1, 2016. (ECF No. 513). The Court also certified a subclass of all noncitizens denied access to the U.S.-asylum process at a POE on the U.S.-Mexico border as a result of CBP's metering policy after January 1, 2016. (*Id.*)

Plaintiffs offer Stephanie Leutert as an expert. (*See* Merits Expert Rep. of Stephanie Leutert ("Leutert Report"), Ex. 1 to Mot., ECF No. 539-3.) Leutert is the Director of the Central America and Mexico Policy Initiative ("CAMPI") at the Strauss Center for International Security and Law at the University of Texas at Austin. (*Id.*) She has an undergraduate degree from Skidmore College in international affairs and Spanish literature. (Dep. of Stephanie Leutert dated Aug. 11, 2020 ("Aug. 2020 Leutert Dep.") 7:20-24, Ex. 2 to Mot., ECF No. 538-1.) She attended classes in microeconomics and statistics at the Harvard Extension School and received a master's degree in global affairs from Yale. (Aug. 2020 Leutert Dep. 7:25–8:15.) She is now admitted into a PhD program in public policy at University of Texas at Austin focusing on the U.S.-Mexico border. (Aug. 2020 Leutert Dep. 6:24–7:12; Leutert Report ¶ 1.) She also teaches graduate courses on Central American migration and Mexico's migration policy. (Leutert Report ¶ 4.)

Leutert has researched metering, reviewed CBP's practices, and documented conditions faced by asylum seekers waiting at Mexico border cities. (Leutert Report ¶ 3.) She has completed fieldwork at eight of Mexico's border cities; conducted interviews with affected asylum seekers, migrant shelter staff, and Mexican federal and local government

officials; observed individuals being turned back to Mexico; and has spoken to individuals in charge of the asylum wait list. (Leutert Report ¶ 5.)

At the request of Plaintiffs, she has reviewed the extensive documents submitted by Defendants in this case to determine whether the Turnback Policy can be explained by a lack of capacity at the POEs, the need to focus on other operational exigencies at the expense of inspecting and processing asylum seekers, and/or the lack of capacity to detain asylum seekers in Immigration and Customs Enforcement ("ICE") custody. (Leutert Report ¶ 21.) After reviewing the documents, Leutert concludes: (1) the data kept by CBP show that many POEs engaged in metering when capacity was far less than 100%; (2) when capacity came close to 100%, it had "no impact" on port operations; (3) according to CBP's analysis, 80% of the smaller POEs redirected asylum seekers to larger POEs despite being completely empty; (4) "operational capacity" is not defined or tracked by the U.S. government in any way; (5) there are contingency plans to temporarily boost capacity at a POE. (Leutert Report ¶ 22a–c.)

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 establishes several requirements for admissibility of expert opinion evidence: (1) the witness must be sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge must "assist the trier of fact" either "to understand the evidence" or "to determine a fact in issue"; (3) the testimony must be "based on sufficient facts and data"; (4) the testimony must be "the product of reliable principles and methods"; and (5) the expert must reliably apply the principles and methods to the facts of the case.

Under *Daubert* and its progeny, the trial court is tasked with assuring that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558,

565 (9th Cir. 2010) (citation and quotation marks omitted). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).

"Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and careful instruction on the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. The judge is "to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In its role as gatekeeper, the trial court "is not tasked with deciding whether the expert is right or wrong, just whether his [or her] testimony has substance such that it would be helpful to a jury." *Id.* at 969–70; *see also Daubert*, 43 F.3d at 1318 ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."). "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758.

*Daubert* requires that the Court apply its gatekeeping role to all expert testimony, not just scientific testimony. But the tests for admissibility in general, and reliability in particular, are flexible. *Primiano*, 598 F.3d at 564 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). The court "has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted). Particularly when considering the reliability of non-scientific testimony, reliability "depends heavily on the knowledge and experience of the expert rather than the methodology or theory behind it." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).

## III. ANALYSIS

Stephanie Leutert has undeniable specialized knowledge of migrant issues at the southern border, including the turnbacks of asylum seekers. Generally, experts can use specialized knowledge of this type to

> tie observations to conclusions through the use of . . . 'general truths derived from ... specialized experience.'  And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to [the jury's] own.'

*Kumho*, 526 U.S. at 148–49 (citation omitted) (quoting Learned Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L.Rev. 40, 54 (1901)). Here, however, Leutert's testimony is not based on her specialized experience or the observations derived from that experience.  She does not rely upon her observations, or any theory originating therefrom, to draw the conclusions in her Declaration or Report about port capacities or operations.  Rather, she is being offered as a summary witness, reviewing the documents produced by Defendants and opining about port capacity and its impact on port operations, neither of which she has any particular expertise in.  Plaintiffs appear to be using her exclusively to provide a synopsis of the documents produced by the Government.  However, "it is traditionally the lawyer's job to summarize the evidence for the jury.")  *United States v. Singh*, No. 2:13-CR-00084-GEB, 2017 WL 4700042, at *2 (E.D. Cal. Oct. 19, 2017), *aff'd sub nom. United States v. Sharma*, No. 18-10460, 2021 WL 1054562 (9th Cir. Mar. 19, 2021).

Plaintiffs can simply point the trier of fact to the documents reviewed by Leutert as evidence that the "operational capacity" excuse is a sham.  If there are documents that demonstrate that CPB engaged in metering when a port capacity was far less than 100%, there is no need for a summary witness to testify to that fact.  If there are documents that reflect that, as capacity approached 100%, it had no impact on port operations, it would be appropriate for Plaintiffs to point the factfinder to those documents.  Indeed, Plaintiffs do so in their briefing, where they indicate that a report issued by the Department of Homeland Security's Office of Inspector General used the same methodology as Leutert to conclude that CBP was not using all available detention space at POEs when turning back asylum seekers.  (*See* Pls.' Reply in supp. of Pls.' Mot. for Summ. J. at 2–3, ECF No. 610.)  If

CBP's analysis reflects that 80% of smaller POEs redirected asylums seekers even when they were completely empty, Plaintiffs are free to introduce this analysis.

Therefore, Leutert's testimony regarding port capacity is neither relevant nor reliable because her conclusions about the data are not drawn from her specific knowledge, experience, or observation. *See Primiano*, 598 F.3d at 565.

## IV. CONCLUSION

To the extent Defendants argue to exclude Leutert's testimony regarding the capacity at the POEs or other operational exigencies that may have led CBP not to inspect or process asylum seekers, the Motion (ECF No. 539) is **GRANTED**.

**IT IS SO ORDERED.**

**DATED: September 1, 2021**

Cynthia Bashant

**Hon. Cynthia Bashant**
**United States District Judge**