**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

AL OTRO LADO, INC.; ABIGAIL DOE, BEATRICE DOE, CAROLINA DOE, DINORA DOE, INGRID DOE, ROBERTO DOE, MARIA DOE, JUAN DOE, VICTORIA DOE, BIANCA DOE, EMILIANA DOE, AND CÉSAR DOE, individually and on behalf of all others similarly situated,

         Plaintiffs,

 v.

ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security, in his official capacity; TROY A. MILLER, Acting Commissioner, U.S. Customs and Border Protection, in his official capacity; WILLIAM A. FERRERA, Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, in his official capacity,

        Defendants.[1]

Case No. 17-cv-02366-BAS-KSC

**ORDER:**

**(1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 535);**

**(2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT (ECF No. 563); AND**

**(3) REQUIRING SUPPLEMENTAL BRIEFING**

   This action challenges the lawfulness of the Government's practice of systematically denying asylum seekers access to the asylum process at ports of entry ("POEs") along the U.S.-Mexico border. Plaintiffs allege that in violation of existing statutory, constitutional, and international law, Customs and Border Protection ("CBP") officers do not inspect

---

[1] Because all Defendants are sued in their official capacities, the successors for these public offices are automatically substituted as Defendants per Fed. R. Civ. P. 25(d).

asylum seekers when they arrive at POEs and refer them for asylum interviews but instead turn them back to Mexico on the basis that the ports are "at capacity[.]"[2,3]  (Second Am. Compl. ("SAC") ¶ 13, ECF No. 189.)

Now before the Court are the parties' respective summary judgment motions.  (Pls.' Mot. for Summ. J. ("Pls.' MSJ"), ECF No. 535; Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Defs.' MSJ"), ECF No. 563.)  For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Summary Judgment and **GRANTS IN PART AND DENIES IN PART** Defendants' Cross-Motion for Summary Judgment.

## STATEMENT OF FACTS

### I. <u>Factual Background</u>[4]

#### A. Overview of CBP

CBP, a component agency of the Department of Homeland Security ("DHS"), is tasked with monitoring the flow of people and goods across United States borders.  (JSUF ¶ 1.)  The Office of Field Operations ("OFO"), a division of CBP, is responsible for the management of operations at POEs in the United States.  (JSUF ¶ 4.)  OFO operates various different classes of POEs.  (JSUF ¶ 5.)  Relevant here is a "Class A" land POE, designated for all aliens.  (*Id.*)  Class A POEs on the U.S.-Mexico border include, among others: San Ysidro, Otay Mesa, Calexico, Nogales, El Paso, Laredo, Hidalgo, and Brownsville.  (JSUF

---

[2] Plaintiffs in this case include Al Otro Lado and the above-captioned individuals on behalf of a class of "all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A [POE] on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [CBP] officials on or after January 1, 2016."  (ECF No. 513.)  The Court also certified a subclass consisting of "all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016."  (*Id.*)

[3] This practice of turning back asylum seekers at POEs is alternatively referred to as "metering" or "queue management."

[4] The parties filed a lengthy joint statement of undisputed facts ("JSUF") in support of their respective summary judgment motions.  For the sake of brevity, the Court includes an abridged version to provide an overview of the events since 2016 precipitating this litigation and relevant to this Order.  The complete joint statement is available on the docket.  (*See* ECF No 619.)

¶ 8.)  These POEs are overseen by four regional field offices: San Diego, Tucson, El Paso, and Laredo.  (JSUF ¶ 7.)

### B.  First Use of Metering in 2016

Before metering was implemented in 2016, migrants seeking asylum who lacked documents for lawful entry would queue between the limit line[5] at a POE and the primary inspection booths to wait until there was sufficient space for their intake.  (JSUF ¶ 49.)

Beginning in February 2016, CBP saw an increase in the number of inadmissible Haitian nationals seeking admission at San Diego POEs.  (JSUF ¶ 31.)  CBP had both border-wide and port-specific "contingency plans" in place for the purpose of responding to such "mass migration events."  (JSUF ¶¶ 28–29, 191.)  In response to the increase in Haitian migration in 2016, the San Ysidro POE converted spaces to create more temporary holding rooms, increased its staffing, and took other measures to increase capacity consistent with the contingency plans in place.  (JSUF ¶¶ 35–39, 40–41, 44–47, 55–58.) No contingency plan includes metering or queue management as a tactic for managing port capacity constraints during a period of high-volume arrivals.  (*Id.*)  However, in 2016, San Ysidro port officials began to stop migrants at the limit line outside the POE to prevent them from entering the port building and coordinated with the Government of Mexico to "meter" asylum seekers at the San Diego POEs "due to facility and processing constraints." (JSUF ¶¶ 66–69, 70, 86–87.)

The high volume of migration continued into the fall of 2016, spread east, and included more family units ("FAMUs") and unaccompanied alien children ("UAC") in addition to the Haitian nationals.  (JSUF ¶ 76.)  Ports reported challenges with managing the number of people in custody.  (JSUF ¶¶ 94–95, 105–07.)  CBP officials were informed that their counterparts in Mexico were under pressure for assisting with processing of

---

[5] The Court understands the "limit line" to be an area at or near the U.S.-Mexico border where CBP officers stand "to control the flow of undocumented aliens entering CBP ports for processing."  (*See* "CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry," Office of Inspector General (Oct. 27, 2020) ("OIG Report") at 4, Ex. 1 to Decl. of Stephen Medlock in supp. of Pls.' Reply, ECF No. 610-2.)

asylum seekers because of the "local humanitarian crisis" developing in border towns. (JSUF ¶ 81.)  After Hurricane Matthew struck in October 2016, the number of arrivals increased.  (JSUF ¶¶ 96–97.)  DHS, with the assistance of MCAT,[6] developed a multi-phased plan to "address the surge of migration along the Southwest border," including constructing "soft-sided holding facilities" to increase capacity.  (JSUF ¶¶ 116, 121–22, 125–26, 128.)

The presidential election was held on November 8, 2016.  (JSUF ¶ 133.)  On November 9, 2016, some soft-sided facilities were put on hold.  (JSUF ¶¶ 134, 151.)  Shortly after, then-CBP Deputy Commissioner Kevin McAleenan attended a meeting at DHS where he discussed increasing "efforts to meter arrivals of non-UAC, non-Mexican CF [credible fear] cases mid-bridge."  (JSUF ¶ 140.)  Then-DHS Secretary Jeh Johnson approved the proposal to increase metering on November 10, 2016.  (JSUF ¶ 141.)  Soft-sided facilities were ultimately scrapped or put on stand-by.  (JSUF ¶¶ 134, 151, 170–71.)

Metering was then adopted by POEs, although the way in which it was implemented varied.  (JSUF ¶¶ 142–44.)  At some ports, officers were stationed too far from the limit line and consequently turned back asylum seekers on U.S. soil.  (JSUF ¶¶ 157, 159, 160, 162–63, 166–67.)  There were also differences in approach, with some ports verbally providing "return" appointments to asylum seekers while others advised them only "to come back at a later time."  (JSUF ¶¶ 164–65.)  Officials at Laredo noticed that the so-called "turnbacks" were having a strong enough deterrent effect that constant metering was not necessary.  (JSUF ¶ 165.)

The levels of migration ebbed and flowed in the following 16 months.  In December 2016, the number of inadmissible arrivals presenting at POEs on the southwest border decreased.  (JSUF ¶ 168.)  In a 2017 report, the Office of the Inspector General ("OIG")

---

[6] In October 2016, the CBP Commissioner established a Migrant Crisis Action Team ("MCAT"), which was composed of various CBP and DHS components and headed by Border Patrol's Deputy Chief. (JSUF ¶¶ 117–18.)  The MCAT reported on DHS-coordinated plans "for addressing the surge of migration along the Southwest border."  (JSUF ¶ 120.)

stated that the "surge of migrants arriving on the Southwest border in 2016" "abruptly, drastically, and unexpectedly ended" in January 2017.  (JSUF ¶ 169.)  Nonetheless, some ports continued to meter in December 2017.  (JSUF ¶¶ 193–98.)  In 2018, the migration numbers again began to increase and peaked in the spring.  (JSUF ¶ 199.)  However, a "migrant caravan" reportedly making its way from Guatemala quickly dwindled and did not have an impact on port operations.  (JSUF ¶¶ 206–12, 214–17, 223, 227.)  One CBP officer in 2018 noted that metering "deterred [other than Mexican] traffic."  (JSUF ¶ 235.)

### C.    The Memorialization of Metering/Queue Management

On April 27, 2018, the then-Executive Assistant Commissioner of the OFO, Todd Owen, issued a memorandum with the subject line "Metering Guidance to the Directors of Field Operations ['DFOs'] overseeing operations at POEs on the U.S.-Mexico border." (JSUF ¶ 228.)  In the memorandum, Owen wrote, in part:

> When necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public, DFOs may elect to meter the flow of travelers at the land border to take into account the port's processing capacity. Depending on port configuration and operating conditions, DFOs may establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible.  DFOs may not create a line specifically for asylum-seekers only, but could, for instance, create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents.

> Ports should inform the waiting travelers that processing at the port is currently at capacity and CBP is permitting travelers to enter the port once there is sufficient space and resources to process them.  At no point may an officer discourage a traveler from waiting to be processed, claiming fear of return, or seeking any other protection. . . . Once a traveler is in the United States, he or she must be fully processed.

(*Id.*; *see also* "Metering Guidance," Ex. 82 to Decl. of Stephen Medlock in supp. of Pls.' MSJ ("Medlock Decl."), ECF No. 535-84.)  The guidance was disseminated to other executives as "processing guidance for surge events."  (JSUF ¶ 230.)

17cv2366

In May 2018, DHS made its position on metering publicly known.  The DHS Secretary at the time, Kirstjen Nielsen, publicly stated: "We are 'metering,' which means that if we don't have the resources to let them in on a particular day, they are going to have to come back."  (JSUF ¶ 238.)  Around this time, CBP officials responded to DHS's requests for information regarding the number of people likely to be turned away under a full implementation of the metering policy.  (JSUF ¶¶ 239–43.)

Shortly thereafter, in June 2018, Nielsen issued a "Prioritization-Based Queue Management" ("PBQM") memorandum to the CBP Commissioner.  (JSUF ¶ 244; *see also* "Prioritization-Based Queue Management," Ex. 3 to Decl. of Alexander Halaska in supp. of Defs.' MSJ, ECF No. 563-5.)   In the memorandum, Nielsen explained that apprehensions between POEs and arrivals at POEs of inadmissible migrants "continue to rise," but "CBP's resources remain strained along the Southwest Border."   (*Id.*) Specifically, she noted that inadmissible arrivals at POEs require additional processing because they lack documents, which "delays the flow of legitimate trade and travel" and "draws resources away from CBP's fundamental responsibilities."  (*Id.*)  Nielsen sought to refocus CBP "on its primary mission: to protect the American public from dangerous people and materials while enhancing our economic competitiveness through facilitating legitimate trade and travel."  (*Id.*)

To this end, she directed the CBP Commissioner to "initiate a 30-day pilot program to prioritize staffing and operations in accordance with the following order of priority at all Southwest border ports of entry:" (1) national security efforts, (2) counter-narcotics operations, (3) economic security, and (4) trade and travel facilitation.  (*Id.*)  The PBQM memorandum further explains how these priorities function practically: Nielsen further granted DFOs the discretion to "establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible."  (JSUF ¶ 245.)  Thus, according to Nielsen, ports could process asylum seekers to the extent their capacity would allow "without negatively impacting their other responsibilities" under this priority-based regime.  (JSUF ¶ 247.)  Port officials subsequently began to use "operational

capacity" instead of "detention capacity" to determine when to employ metering at their respective POEs.  (JSUF ¶ 50.)  CBP has not officially defined the term "operational capacity" in its written policy and procedure documents.  (JSUF ¶ 251.)

Additional metering guidance was issued by CBP in 2019 and 2020, reiterating the objectives in the PBQM memorandum.  (JSUF ¶¶ 263–65.)  The 2020 guidance cautioned immigration officers not to "discourage any traveler from waiting to be processed, claiming fear of return, or seeking any other protection."  (JSUF ¶ 265.)  Port officials were also informed that if they "determine that, due to a particular port's operating conditions, it is not operationally feasible to safely process" inadmissible arrivals at the port, these individuals could "be encouraged to initiate their processing and entry at another port that is better positioned to process" them.  (*Id.*)  However, the guidance made clear that "[o]nce a traveler is in the United States, he or she must be inspected and processed, and may not be directed to return to Mexico."  (*Id.*)

## II.   **Statutory and Regulatory Framework**

Two statutory provisions in the Immigration and Nationality Act ("INA") are implicated in this case.  The first, 8 U.S.C. § 1158(a)(1), provides:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or . . . section 1225(b) . . . ."

Section 1225 concerns the process of "inspection."  This section requires immigration officials to inspect all applicants for admission to the United States.  8 U.S.C. § 1225(a)(1)(3); *see also* 8 C.F.R. § 235.1(a) ("Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection . . . .").  Applicants for admission are noncitizens "present in the United States who have not been admitted" or those "who arrive[] in the United States."  8 U.S.C. § 1225(a)(1).

Section 1225(b) establishes the specific procedure by which immigration officials must conduct this inspection.  8 U.S.C. § 1225(b)(1)(A).  Officers are required to order all noncitizens determined to be "inadmissible" removed without further hearing or review—a process known as "expedited removal"—"unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution."  8 U.S.C. § 1225(b)(1)(A)(i).  Once an applicant for admission indicates either of the above, "the officer shall refer the alien for an interview by an asylum officer under subparagraph (B)." 8 U.S.C. § 1225(b)(1)(A)(ii).[7]  Subparagraph (B) elaborates on the interview process and events following the credible fear determination.  *See* 8 U.S.C. § 1225(b)(1)(B)(i)–(iii).

## LEGAL STANDARD

### I.   **Summary Judgment**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

When cross-motions for summary judgment are filed by the parties, as here, "[e]ach motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  In other words, a court must review the evidence submitted in support of each cross-motion, *id.*, and "giv[e] the nonmoving party in each instance the benefit of all reasonable inferences," *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 791 (9th Cir. 2006).  Further, even where neither party disputes

---

[7] The Court refers to the asylum provision in § 1158(a)(1) and the specific actions listed in § 1225(a)(1)(3) and § 1225(b)(1)(A)(i)–(ii) as the "inspection and referral duties."

issues of material fact, the court is still required to analyze the record to determine whether disputed issues of material fact are present. *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978); *see also Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000) ("[T]he district court is responsible for determining whether the requirements of [Rule 56] are met, whether or not the parties believe that they are.").

Summary judgment can turn on factual issues or legal questions. "Where a case turns on a mixed question of law and fact and . . . the only disputes relate to the legal significance of undisputed facts, the controversy collapses into a question of law suitable to disposition on summary judgment." *Blue Lake Rancheria v. United States*, 653 F.3d 1112, 1115 (9th Cir. 2011) (quotations omitted); *see also Johnson v. Allstate Ins. Co.*, 126 Wash. App. 510, 515 (2005) (questions of law include the interpretation of contracts, statutes, "and other writings"), *cited with approval in Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 973 (9th Cir. 2017).

## II.  Administrative Procedure Act

The Administrative Procedure Act ("APA") generally limits the scope of judicial review to the administrative record. 5 U.S.C. § 706 (directing the court to "review the whole record or those parts of it cited by a party"); *see, e.g.*, *GB Int'l v. Crandall*, 403 F. Supp. 3d 927, 931 (W.D. Wash. 2019) ("[T]he Court reviews the evidence included in the administrative record to determine whether, as a matter of law, the evidence permitted the agency to make the decision it did." (citing *Nw. Motorcycle Ass'n v. U.S. Dep't Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994) and *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769–70 (9th Cir. 1985))), *aff'd sub nom. GB Int'l, Inc. v. Crandall*, 851 F. App'x 689 (9th Cir. 2021).

The parties did not designate an administrative record in this action. However, because this Court's evaluation of the APA claims is limited to Plaintiffs' contention that Defendants failed to act under § 706(1), an administrative record is not necessary here. *See San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) ("[W]hen a court considers a claim that an agency has failed to act in violation of a legal obligation, review

is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." (quoting *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000))); *Cherokee Nation v. United States Dep't of the Interior*, No. 19-CV-2154-TNM-ZMF, 2021 WL 1209205, at *6 (D.D.C. Mar. 31, 2021) ("Review under [§ 706(1)] is not limited to the administrative record."); *see also Consejo de Desarrollo Economico de Mexicali, AC v. United States*, 438 F. Supp. 2d 1207, 1221 (D. Nev. 2006) (refusing to limit its review to the administrative record when evaluating a § 706(1) claim, instead considering "materials submitted by Plaintiffs as they relate to the present matter"), *rev'd on other grounds*, 482 F.3d 1157 (9th Cir. 2007).

Accordingly, when evaluating the APA claims in this case, the Court considers all materials submitted by the parties.

## ANALYSIS

Plaintiffs move for summary judgment on all claims in this case, arguing that Defendants' act of turning back asylum seekers at POEs violates the INA, the APA, the Fifth Amendment to the United States Constitution, and the Alien Tort Statute ("ATS"). Defendants move for summary judgment on the basis that turning back class members does not violate their statutory duties of inspection and referral and is therefore lawful under the Constitution.  They further argue that metering does not violate the duty of non-refoulement and that, even where the Court finds it does, various factors counsel again this Court's recognition of a cause of action under the ATS.  (*Id.*)

The Court confronts two threshold questions on summary judgment: (1) whether, as a matter of law, Defendants' metering policy satisfies their inspection and referral duties under the INA; and (2) if it does, whether the record evinces any genuine issues of material fact as to whether Defendants' decision to turn back asylum seekers at POEs was pretextual such that it is unlawful under the APA.  In addition, the Court determines whether turnbacks violate due process and the ATS.  The Court states below its conclusions as to each claim.

## I.    Immigration and Nationality Act

Plaintiffs' first claim for relief alleges that Defendants have violated their inspection and referral duties under the INA by turning back asylum seekers at POEs and thereby denying them the statutorily prescribed access to the asylum process. (SAC ¶¶ 244–52.) They request as relief a judicial determination of their rights under these provisions. (*Id.* ¶¶ 253–55.) Defendants move for summary judgment against this claim on the basis that the INA provides no private right of action allowing for standalone claims, leaving Plaintiffs to seek enforcement of its provisions only through the APA. (Mem. of P. & A. in supp. of Defs.' MSJ ("Defs.' Mem. of P. & A.") at 31–32, ECF No. 563-1.) Plaintiffs do not argue that the INA creates a private right of action but instead contend that this Court can, under its inherent authority, issue equitable relief even in the absence of a statutory cause of action. (Pls.' Opp'n to Defs.' MSJ ("Pls.' Opp'n") at 24–25, ECF No. 585.)

"[S]ection 706 of the APA functions as a default judicial review standard" for decisions made by administrative agencies. *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000) (construing *Dickinson v. Zurko*, 527 U.S. 150, 154–55 (1999)). Some courts have understood the APA to displace traditional equitable authority to set aside ultra vires actions taken by the executive branch while others have found that this inherent power persists. *Compare Eagle Tr. Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 65–66 (D.D.C. 2019) (finding that no "pre-APA equitable review" of agency action was available because the APA was "a catch-all cause of action for plaintiffs who seek to challenge agency decisionmaking where none otherwise exists"), *aff'd*, 811 F. App'x 669 (D.C. Cir. 2020), *with Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (finding that notwithstanding the APA, courts still maintain judicial authority to review ultra vires actions taken by the executive).

Recently, in a set of related cases, the Ninth Circuit has expressed support for the view that ultra vires claims independent of the APA are viable. *See California v. Trump*, 963 F.3d 926, 941 n.12 (9th Cir. 2020) (finding that an equitable ultra vires cause of action

and APA cause of action can proceed separately, but declining to address the ultra vires claims because the plaintiffs sought "the same scope of relief" under both and prevailed under the APA), *cert. granted sub nom. Trump v. Sierra Club*, 141 S. Ct. 618 (2020); *see also Sierra Club v. Trump*, 963 F.3d 874, 890–92 (9th Cir. 2020) (citing *Dart* to support holding that the Sierra Club could assert an equitable ultra vires cause of action to hold unconstitutional an agency's conduct), *majority op. vacated sub nom.*, *Biden v. Sierra Club*, __ U.S. __, __ S. Ct. __, 2021 WL 2742775 (July 2, 2021).  However, both decisions were addressing requests to enjoin ultra vires activities alleged to be unconstitutional, which the Court does not understand to be the basis of Plaintiffs' INA claim here.

In the context of this case, the Court finds instructive *E. V. v. Robinson*, 906 F.3d 1082 (9th Cir. 2018), which established that ultra vires claims independent of the APA and of any statutory private right of action can be brought against federal officers on a non-constitutional and constitutional basis.  Specifically, the Ninth Circuit held that these ultra vires claims are available in "(1) suits alleging that a federal official acted ultra vires of statutorily delegated authority, and (2) suits alleging that a federal official violated the Constitution."  *Id.* at 1090 (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 687–89 (1949) (noting that these suits are not considered "suits against the sovereign" and therefore did not require a waiver of sovereign immunity)).

The defendant-appellees in *Robinson* argued that ultra vires claims under *Larson* were no longer available because they were abrogated by the APA's express waiver of sovereign immunity.[8]  *Id.* at 1092.  The Ninth Circuit found that while Congress intended the APA's sovereign immunity waiver to "'replace[] the [*Larson* exceptions] as the doctrinal basis for a claim for prospective relief'" against federal officers, it did not intend for the APA to eliminate the *Larson* exceptions altogether.  *Id.* at 1092–93 (quoting

---

[8] The APA's waiver of sovereign immunity states: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party."  5 U.S.C. § 702.

17cv2366

*E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1085 (9th Cir. 2010)).  Thus, the Ninth Circuit concluded that the APA's waiver "superseded the *Larson* exceptions only for suits in which the . . . waiver applies[.]"  *Id.* at 1092.  Finding the APA waiver did not apply, the court held that the ultra vires claim was not abrogated by the APA.

Here, on summary judgment, neither party argues that the APA's waiver of sovereign immunity does not apply to Plaintiffs' claims.  The Court also independently finds no reason why the APA's waiver would not apply in this case.  Thus, in keeping with the rule as articulated in *Robinson*, the Court finds that the APA waiver applies to Plaintiffs' claims and consequently abrogates Plaintiffs' ultra vires INA claim.  *Cf. Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017) (dismissing plaintiffs' ultra vires claim for adjustment of status under the INA because plaintiffs could obtain review under the APA).  Summary judgment in favor of Defendants on this claim is therefore warranted.

## II.   Unlawful Withholding Under the APA (5 U.S.C. § 706(1))

The purpose of the APA is, in part, to provide an avenue for judicial review of "agency action."  *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").  Reviewing courts "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  *Id.* § 706.  In relevant part, courts must "compel agency action unlawfully withheld or unreasonably delayed."  *Id.* § 706(1).

Plaintiffs state that summary judgment is warranted on their § 706(1) claims because Defendants' undisputed act of turning asylum seekers arriving at POEs back to Mexico violates their statutorily mandatory duties to inspect and refer asylum seekers.  Defendants argue that, as a matter of law, summary judgment should be granted on Plaintiffs' § 706(1) claim because: (1) Plaintiffs have not identified a final or discrete agency action; (2) their inspection and referral duties under § 1225 are not mandatory ministerial actions as to class

17cv2366

members not on U.S. soil,[9] and; (3) in any event, their inspection and referral duties were not unlawfully withheld because asylum seekers were still ultimately provided access to the process, although it was delayed.

### A.   Final Agency Action

Defendants move for summary judgment on both APA claims on the basis that no final agency action exists (Defs.' Mem. of P. & A. at 32–34), while the context of Plaintiffs' arguments implies that finality only applies to Defendants' affirmative "Turnback Policy," which is a feature only of the § 706(2) claim.  (Pls.' Mem. of P. & A. in supp. of Pls.' MSJ ("Pls.' Mem. of P. & A.") at 20–21, ECF No. 535-1.)

Section 704 of the APA limits judicial review to "final agency actions," a standard which "does not easily accommodate an agency's *failure to act*."  *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1247 (D.C. Cir. 2018) (Edwards, J., concurring).  There remains confusion over whether the finality requirement applies to § 706(1) "failure to act" claims. *Id.*   However, the Ninth Circuit has given several indications that finality is not a consideration when evaluating § 706(1) claims.  *See, e.g.*, *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010) (stating that plaintiffs were required to identify a final agency action for § 706(2) claims but not stating the same for § 706(1) claims); *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 681 n.10 (9th Cir. 2007) (distinguishing between "seek[ing] redress for agency inaction under § 706(1)" and "challeng[ing] a final agency action under" § 706(2)); *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997) ("Judicial review of an agency's actions under § 706(1) for alleged delay has been deemed an exception to the 'final agency decision' requirement."); *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 926 (9th Cir. 1999) ("Courts have permitted jurisdiction under the limited exception to the finality doctrine only when there has been a genuine failure to act.").

---

[9] Defendants conceded at oral argument that turning back asylum seekers on U.S. soil is unlawful.

Accordingly, the Court finds no "final agency action" is necessary for Plaintiffs' § 706(1) claim and rejects Defendants' arguments as to the same.

**B.     Discrete Agency Action**

A § 706(1) claim "can only proceed where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 64 (2004); *Hells Canyon Pres. Council*, 593 F.3d at 932. "This condition precludes attacks that seek broad programmatic improvements of agency behavior and also precludes judicial review of 'even discrete agency action that is not demanded by law.'" *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 20 (D.D.C. 2018) (quoting *SUWA*, 542 U.S. at 65); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("[R]espondent cannot seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.").

Defendants argue that no "discrete" action has been identified here because the record shows only that the alleged "Turnback Policy" is a "constellation of actions" with "different factual bases" that do not show "an across-the-board measure to purposefully restrict access to the asylum process." (Defs.' Mem. of P. & A. at 34–35; *see also* Defs.' Reply in supp. of MSJ ("Defs.' Reply") at 4, ECF No. 611.)  Plaintiffs maintain that the agency practices cited identify a discrete and particularized action by Defendants "to purposefully restrict access to the asylum process in violation of their statutory obligations." (Pls.' Opp'n at 5–6.)

Preliminarily, to the extent the parties make this argument as to the § 706(1) claim, the Court notes that the parties slightly misconstrue the issue.  The discreteness element of a § 706(1) failure to act claim is intended to identify the contours of the agency duty or responsibility that has purportedly been withheld or delayed by the agency.  Plaintiffs identify that duty as the inspection of asylum seekers for admissibility when they arrive at POEs and refer them for credible fear interviews under 8 U.S.C. § 1158(a)(1) and § 1225. (Pls.' Mem. of P. & A. at 21.)  Defendants have agreed throughout this litigation that these

- 15 -

are mandatory duties for which this Court can compel § 706(1) relief and do not raise any argument on summary judgment to the contrary. *See Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1196 (S.D. Cal. 2019) ("The parties agree that the mandatory duties to inspect all aliens and refer certain aliens seeking asylum are discrete actions for which this Court can compel Section 706(1) relief . . . .").

This defeats any argument that the record reflects a "broad programmatic attack" on agency action that is not permitted under § 706(1). These types of attacks occur when a plaintiff fails to identify a discrete agency action to which the court should compel compliance and instead identifies several purported agency "failures" that constitute violations of the law. *See Lujan*, 497 U.S. at 891 n.2 (finding that "land withdrawal review program" was not an agency action because it did not identify "some specific order or regulation" that applied to everyone but instead constituted "a generic challenge to all aspects" of the program). But Plaintiffs here have identified specific statutory duties to inspect and refer every applicant for admission who approaches a POE. This is the discrete agency action Plaintiffs claim Defendants failed to take when they turned class members back. *See Ramirez*, 310 F. Supp. 3d at 20–21 ("Plaintiffs in this case seek to compel an agency to take the discrete and concrete action of considering statutorily specified factors in determining where and how to place [unaccompanied minors] . . . now that they have aged out of HHS's care and custody."); *Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015) (finding discrete agency action where plaintiff "point[ed] to a precise section of the INA, establishing a specific principle of temporal priority that clearly reins in the agency's discretion, and argues that the disparate cut-off dates for various subcategories manifest a violation of the principle").

Further, the record does not contain a grab bag of miscellaneous CBP practices which have been merged under an amorphous and broad programmatic umbrella for purposes of demonstrating multiple and varied failures to act on the part of Defendants. Rather, the record contains undisputed evidence that in 2016, 2017, and 2018, CBP officers did not carry out their discrete statutory duties to inspect and refer asylum seekers to start

the asylum process once they arrived at POEs; instead, Defendants stationed CBP personnel at the limit line to "turn away" or "push back" asylum seekers as they reached POEs.

These "turnbacks" involved a combination of CBP officers (1) coordinating with Mexican immigration officials to "control the flow" of migrants seeking asylum before they reached the border and (2) affirmatively turning asylum seekers away from the border when Mexican immigration officials did not control the flow. This second step, which the Court understands to be the "turnbacks" at issue, involved "placing CBP personnel at the international line to screen legitimate passengers with entry documents . . . while asking those that do not have documents and that may otherwise be seeking some sort of benefit to return to Mexico with a date and time issued by our personnel." (Nov. 18, 2016 "RE: Consolidated Weekly highlights" email, Ex. 71 Medlock Decl., ECF No. 535-73 (referring to port-initiated "push back" of migrants as "self-metering").)

This strategy has been used on-and-off since 2016. The DHS's own Office of Inspector General identified that "[s]ince 2016, CBP has used Queue Management at various times to control the flow of undocumented aliens into ports of entry." (*See* OIG Report at 4.) Additionally, in response to the Haitian migrant surge, CBP officials discussed coordination with Mexican immigration to meter based on POE capacity. (JSUF ¶¶ 68, 70; AOL-DEF-00023718, Ex. 49 to Medlock Decl., ECF No. 535-51.) During the same period, CBP officials also instructed officers "to not allow any asylees past the limit line" and "hold the line to prevent any [migrants] from entering." (JSUF ¶¶ 68–70, 86–87.) Similarly, when metering was authorized after the November 2016 election, officers were instructed to meet with their immigration counterparts in Mexico to discuss controlling the flow of migrants to POEs and, if Mexican officials did not assist with metering, Port Directors were authorized "to return the individuals claiming fear without valid entry documents to Mexico with an alternate date and time to return" if a port exceeded capacity. (JSUF ¶¶ 141, 149, 155–56, 158 ("[O]ur ports will be pushing migrants without entry documents back to Mexico to await an appointment to be processed at the

POEs."); Nov. 11, 2016 "Metering Flow" email, Ex. 70 to Medlock Decl., ECF No. 535-72; Nov. 12, 2016 "Meeting with INM" email, Ex. 13 to Medlock Decl., ECF No. 535-15 (noting that CBP officers are "to meet with [their] INM counterpart and request they control the flow of aliens to the [POE]" and "[i]f [Mexican immigration] cannot or will not control the flow, your staff is to provide the alien with a piece of paper identifying a date and time for an appointment and return them to Mexico").)  At least one CBP official expressly understood the metering of South and Central American migrants at POEs as an extension of the previous measure used by CBP concerning Haitian migrants.  (*See* JSUF ¶ 145 (email from CBP official explaining that the metering practices that had been applied to "Haitians at most locations" was now being extended to South and Central Americans).) It is also undisputed that turnbacks, including of asylum seekers "on the U.S. side of the [POE] bridge," continued in 2017.  (JSUF ¶¶ 157, 174–76, 181.)

Finally, the 2018 Metering Guidance and PBQM memorandum formally implemented the same "self-metering" measures by authorizing turnbacks at points nearest the border.  Both documents authorized Directors of Field Operations to "meter the flow of travelers at the land border" based on capacity by "establish[ing] and operat[ing] physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible."  (JSUF ¶¶ 244–45, 228.)  Metering continued to be used into 2020 as a part of the PBQM model.  (JSUF ¶¶ 263–65.)

While the aforementioned circumstances in which CBP turned away asylum seekers span several years and have "different factual bases," they all involve CBP "pushing back" asylum seekers without inspecting and referring them upon arrival.  The fact that Defendants sought to turn back asylum seekers in different contexts does not transform Plaintiffs' claim into a programmatic attack.  *See Ramirez*, 310 F. Supp. 3d at 21 ("Defendants confuse aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action—for a broad programmatic attack.").  Thus, it remains undisputed on summary judgment that Defendants did not inspect and refer class members as they arrived at POEs and instead

turned them away.  The Court addresses below whether these turnbacks violated the statutes at issue.  (*See infra* Section II.C.4.)  But here, finding no dispute of fact regarding the aforementioned evidence, the Court finds a discrete agency action exists for purposes of Plaintiffs' § 706(1) claim.

## C.   Mandatory and Ministerial Duties

"An agency 'ministerial act' for purposes of mandamus relief has been defined as a clear, non-discretionary agency obligation to take a specific affirmative action, which obligation is positively commanded and so plainly prescribed as to be free from doubt." *Indep. Min. Co.*, 105 F.3d at 508 (quotations omitted).  The issue on summary judgment is whether Defendants' duties to inspect and refer class members for asylum upon their arrival to a POE are mandatory and ministerial.  Specifically, the Court must address to whom and when these duties attach.

### 1.   Duties attach to class members arriving at POEs but outside the U.S.

Defendants reiterate their position that the relevant statutes do not apply to asylum seekers who are outside the United States.  (Defs.' Mem. of P. & A. at 37–40.)  In support, Defendants raise many of the same arguments in their MSJ that they made on dismissal regarding the scope of § 1158(a)(1) and the relevant subsections of § 1225 as applied to individuals not on U.S. soil.  (*Id.* at 38.)  As Plaintiffs note, the Court has already conducted an extensive analysis of the text of both § 1158(a)(1) and § 1225 to determine their scope as they apply to class members who were standing in Mexico, due to metering efforts, when they raised their asylum requests with CBP officers at POEs.  *See Al Otro Lado*, 394 F. Supp. 3d at 1198–1205.  The Court found that the plain language of both statutes applies to migrants who are "in the process of arriving," which includes "aliens who have not yet come into the United States, but who are 'attempting to' do so" and may still be physically outside the international boundary line at a POE.  *Id.* at 1205 (quoting 8 C.F.R. § 1.2).[10]

---

[10] The Court also incorporated this conclusion in its preliminary injunction order regarding the Asylum Ban.  *See Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 859 (S.D. Cal. 2019).  In denying a motion to stay the injunction, the Ninth Circuit noted that the Court's statutory analysis "has considerable force" and is "likely correct."  *Al Otro Lado v. Wolf*, 952 F.3d 999, 1011–13 (9th Cir. 2020).

This analysis expressly rejected Defendants' arguments concerning plain meaning and the presumption against extraterritoriality.  *Id.* at 1199–1202.

Defendants do not cite to a different factual basis or intervening legal developments to alter the Court's previous holding that both statutes mandate inspection and referral for asylum seekers not standing on U.S. soil at the time they interacted with CBP officers who turned them back.  Thus, the Court abides by its previous conclusion regarding the scope of the statutes in this case.  *See Huynh v. Harasz*, No. 14-CV-02367-LHK, 2016 WL 2757219, at *21 (N.D. Cal. May 12, 2016) (applying the "law of the case" doctrine to preclude summary judgment on legal issues previously decided by a court on a motion to dismiss "[i]f no factual issues have changed between the initial decision and the instant [summary judgment] motion" (citing *Bollinger v. Oregon*, 172 F. App'x 770, 771 (9th Cir. 2006) (unpublished))).

## 2.    Defendants' statutory scheme argument fails.

Defendants also rehash an argument regarding the statutory scheme.  They argue that metering is a "reasonable exercise of CBP's 'broad discretion' to allocate its limited resources to accomplish it many statutory functions."  (Defs.' Mem. of P. & A. at 43.) Defendants argue that metering helps DHS balance the allocation of its limited resources to its multiple congressionally mandated "mission sets"—including facilitating lawful trade and travel, carrying out immigration enforcement measures, and interdicting unlawful entrants and goods—of which processing asylum seekers is only a part.  (Defs.' Mem. of P. & A. at 41–43 (citing 6 U.S.C. §§ 202, 211(c), 211(g)(3)).)  Defendants also repeatedly state that in 2002, Congress "elevat[ed] . . . DHS's national-security function over all others" by making antiterrorism efforts the agency's "primary mission."  (*Id.* (citing 6 U.S.C. § 111(b)(1)(A), (E).)

These statutes do not support Defendants' arguments.  First, the Court again finds that Defendants' citations to broad delegations of statutory authority to the DHS Secretary, CBP Commissioner, and the OFO are insufficient, as a matter of law, to establish that their ability to meter asylum seekers is "committed to agency discretion by law."  *See Al Otro*

*Lado*, 394 F. Supp. 3d at 1210 ("Sections 1158 and 1225 cannot be nullified by general statutory provisions regarding the Secretary's authority unless Congress clearly intended so.").  Defendants' reliance on additional statutes in their summary judgment motion is similarly futile, as these provisions still do not provide a basis for agency discretion that supplants Defendants' duty to inspect and refer asylum seekers in § 1158(a)(1) and § 1225.

As this Court previously found, § 1225 codifies Congress's specific and detailed instructions regarding "how immigration officers are to 'manage the flow' of arriving aliens who express to an immigration officer an intention to apply for asylum or a fear of persecution."  *Id.* at 1210; *see also P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 542 (D.D.C. 2020) ("[T]he immigration laws cited are clearly part of a 'comprehensive scheme [that] has deliberately targeted specific problems with specific solutions.'" (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012))).  None of the enumerated lists of various responsibilities and missions in 6 U.S.C. § 111, 211(c), 211(g)(3) include any indication that Congress intended to supersede the duties established by § 1225.  *See BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 766 (9th Cir. 2018) ("[W]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987))).  Section 211(c)(8)(A) states that the CBP Commissioner shall "enforce and administer all immigration laws" including "the inspection, processing, and admissions of persons who seek to enter or depart the United States."  Similarly, § 211(g)(3)(B) indicates that OFO is responsible for "conduct[ing] inspections" at POEs to prevent illegal entry and "carry out other duties and power prescribed by the Commissioner."  Nothing indicates that these lists are exhaustive or in order of priority such that one duty takes precedence over another, let alone that they preempt other specific statutory mandates.

Indeed, one of the cited provisions includes as a "primary mission" that DHS "ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland *are not diminished or neglected except by a*

*specific explicit Act of Congress*."   6 U.S.C. § 111(1)(b)(E) (emphasis added).   This language belies Defendants' entire argument.   Rather than signaling that general national security directives displace more specific processing obligations, § 111(1)(b)(E) preserves DHS's other responsibilities absent a specific act of Congress.   Defendants cite to no such act.

### 3.   Defendants' citations to case law are inapposite.

Defendants also cite to several cases to support their position that, as a matter of law, inspection and referral duties are not conferred on asylum seekers physically outside the United States.   (Defs.' Reply at 9–11.)   The Court addresses these cases below and finds they do not support Defendants' proposition that inspection and referral under § 1225 is a discretionary duty.

### (a)   *Sale v. Haitian Centers Council, Inc.*

First, Defendants cite to *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), for the proposition that certain INA provisions, including § 1158, contemplate that immigration proceedings can only occur in the United States.   In *Sale*, the Supreme Court addressed the lawfulness of the Coast Guard's interdiction of vessels on the high seas illegally transporting passengers from Haiti to the United States, after which the Coast Guard immediately repatriated passengers to Haiti.   *Id.* at 159.   Plaintiffs brought suit challenging the interdiction program as violating § 243(h)(1) of the INA.   *Id.* at 166.   This statute prohibited the deportation or return of "any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion."   *Id.* at 170.   The Court concluded that the Coast Guard's actions did not violate this provision because the statute's protection did not extend outside the United States where deportation and exclusion hearings were not authorized.   *Id.* at 177.

The Court finds *Sale* inapposite.   First, § 243(h)(1) no longer exists.   This provision was ultimately repealed by the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA" or "1996 amendments"), which also overhauled entirely the

deportation and exclusion systems that are referenced in *Sale*.  *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, §§ 307, 309, 110 Stat. 3009, 3009-612 to 3009-614 (1996) (revising § 243 to exclude subparagraph (h)).  Thus, the statutory interpretation in *Sale* is not applicable here.

Second, Defendants cite to a footnote in *Sale* that uses § 1158 as an example of "other provisions of the INA" that "obviously contemplate that such proceedings would be held in the country[.]"  509 U.S. at 173 n.29.  First, the Supreme Court's citation to § 1158(a) in *Sale* is purely dicta.  The asylum statute serves as an example and is not the subject of the Court's holding.  Second, the text of § 1158(a) referenced in *Sale* is significantly different than the current version.  The Supreme Court quotes § 1158(a) as instructing the Attorney General to "establish a procedure for an alien *physically present in the United States or at a land border or port of entry*."  *Id.* at 161 n.11.  The present-day statute—which, again, is the subject of this Court's prior, extensive statutory interpretation—states that asylum is available to "any alien who is physically present in the United States *or who arrives in the United States* . . . ."  8 U.S.C. § 1158(a)(1) (2009) (emphasis added); *see* Pub. L. No. 104-208, 110 Stat. at 3009-690 (revising § 208 of the INA, codified as 8 U.S.C. § 1158).  This is not a trivial distinction.  The former requires physical presence in one of three places: (1) the United States; (2) a land border; or (3) a POE.  The new statute requires either physical presence in the United States or arrival in the United States, which is not, as Defendants suggest, "just as or more territorially-focused" than the statute at issue in *Sale*.  The Court has already found this language to cover class members in the process of arriving at a POE but physically outside the United States.  *See Al Otro Lado*, 394 F. Supp. 3d at 1199.

Third, as to the presumption of extraterritoriality, *Sale* is distinguishable because, unlike here, the alleged unlawful conduct of U.S. government actors took place outside of the territorial United States.  In this Court's previous extraterritoriality analysis, it found § 1158(a)(1) imposed inspection and referral duties on immigration officers via § 1225(b), and that the conduct relevant to § 1225(b)'s focus—"whether the Court looks

- 23 -

at the alleged Turnback Policy or the alleged acts of individual CBP officers standing on the U.S. side of the international bridge between Mexico and the United States"—occurs within the United States and therefore involves a permissible domestic application of the statute. *See id.* at 1202 (citing *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016)).

The Court therefore finds *Sale* inapposite and rejects Defendants' arguments based on this case.

### (b)   *DHS v. Thuraissigiam*

The second case Defendants cite to support their position is *DHS v. Thuraissigiam*, __ U.S. __, 140 S. Ct. 1959 (2020), a recent Supreme Court decision that post-dates this Court's dismissal order.  In *Thuraissigiam*, the respondent asylum seeker filed a habeas action to challenge his expedited removal order after he entered the United States without inspection or entry documents.  *Id.* at 1967.  In relevant part, the respondent asserted that his due process rights were violated by a jurisdiction-stripping provision of the INA that precluded judicial review of his allegedly deficient credible fear proceeding.  *Id.* at 1981. In rejecting his claim, the Supreme Court held that because respondent had not "effected an entry" when he illegally crossed into the United States, he "ha[d] only those rights regarding admission that Congress has provided by statute."  *Id.* at 1983.  In so finding, the Court cited, as an equivalent example, noncitizens who seek admission at a POE, stating that "[w]hen an alien arrives at a port of entry . . . the alien is on U. S. soil" but still not considered to have entered the country.  *Id.* at 1982 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 215 (1953)) (other quotations and citations omitted).

Defendants argue that this language subverts the Court's determination that the scope of "arriving in the United States" at a POE includes those not on U.S. soil.  The Court disagrees.  First, as with *Sale*, the language in *Thuraissigiam* is mere dicta.  The respondent in the case was not, in fact, arriving at a POE.  This cursory example assumes a usual state of affairs—which, notably, would have been true for some class members had metering not been in effect—and does not involve any close readings of the relevant statutes or their

- 24 -

applicability under the factual circumstances present here.  Second, shortly after making this statement, the Supreme Court uses more expansive language when referring to the respondent by stating that "an alien who *tries to enter the country illegally* is treated as an 'applicant for admission'" who has also not "effected an entry."  *Id.* at 1983 (citing § 1225(a)(1)) (emphasis added).  The Court could have, but did not, state that the noncitizen who "enters the country illegally" and is therefore on U.S. soil is an applicant for admission, but instead extends it to those who "try to enter."  This is incongruent with the notion that the Court's earlier language limited "arrival" at a POE to include only those on U.S. soil and would therefore exclude those "trying to enter" a POE but being obstructed by U.S. officials at the international boundary line.  It makes little sense to use more expansive language to encompass those seeking to enter unlawfully and not those attempting to enter lawfully.  This would be contrary to DHS implementing regulations, which the Court previously noted define "arriving aliens" as those "attempting to come into the United States at a port-of-entry."  8. C.F.R. § 1.2.  It would also defeat the purpose of the 1996 amendments to the INA.  *See Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (explaining that § 1225(a)(1) "ensures that all immigrants who have not been lawfully admitted, *regardless of their physical presence in the country*, are placed on equal footing in removal proceedings under the INA—in the position of an 'applicant for admission'" (emphasis added)).[11]  Thus, the Court does not read the language used by the Supreme Court in *Thuraissigiam* as a definitive statement about the specific territorial scope of § 1158.

Once again, the Court abides by its prior finding that the statutes at issue apply to those who may be physically outside the United States but who are in the process of arriving at a POE.  Thus, the Court finds that the duties to inspect and refer contained in § 1158(a)(1) and § 1225 are mandatory ministerial duties under § 706(1).

---

[11] The Court discusses this in more depth below.  (*See infra* Section II.C.4(b)).

1

### 4.   Turnbacks unlawfully withhold inspection and referral duties.

2        Plaintiffs' position is that, as a matter of law, Defendants' undisputed act of turning

3   asylum seekers arriving at POEs back to Mexico unlawfully withholds their statutorily

4   mandatory duties to inspect and refer asylum seekers.  Defendants argue that they did not,

5   in fact, withhold statutorily mandated duties under § 1158(a)(1) and § 1225 because class

6   members were instructed to return to POEs and later inspected and referred, as reflected in

7   Defendants' continued processing of asylum seekers throughout the relevant period.

8   (Defs.' Mem. of P. & A. at 39.)  Plaintiffs contend that this still constitutes an unlawful

9   withholding of inspection of referral because "[g]iven the risks of living in Mexican

10  border towns . . . and the extraordinary delays," turning back asylum seekers deprives

11  them of a guaranteed opportunity to access the asylum process.[12]  (Pls.' Opp'n at 7–8.)

12       The Ninth Circuit has said that judicial authority to "compel agency action" pursuant

13  to § 706(1) "is carefully circumscribed to situations where an agency has ignored a specific

14  legislative command."  *Hells Canyon Pres. Council*, 593 F.3d at 932; *see also Vietnam*

15  *Veterans of Am. v. Central Intelligence Agency*, 811 F.3d 1068, 1075–76 (9th Cir. 2016)

16  ("[S]ection 706(1) applies to the situation where a federal agency refuses to act in disregard

17  of its legal duty to act.").  In a § 706(1) context, the Court must apply the two-step analysis

18  in *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), to determine

19  the meaning of the statutory language and whether it establishes whether Defendants can

20

21       [12] The parties also appear to dispute whether Plaintiffs raise that immediate inspection and referral
22  of asylum seekers on their first arrival to the port should be compelled as an agency action "unreasonably
    delayed."  *See In re Ctr. for Auto Safety*, 793 F.2d 1346, 1353 (D.C. Cir. 1986) (noting that a party can
23  also obtain judicial review "of a prolonged agency inaction" under § 706(1)'s "unreasonable delay" prong
    (quoting *Costle v. Pacific Legal Found.*, 445 U.S. 198, 220 n.14 (1980))).  Defendants argue that Plaintiffs
24  have not properly raised the issue in their opening brief; however, Defendants do not move for summary
    judgment on this claim themselves.  (*See* Defs.' Mem. of P. & A. at 40; Defs.' Reply in supp. of MSJ at
25  12, ECF No. 611.)  Plaintiffs do not expressly raise this argument but address this issue for the first time
    in reply to Defendants' characterization of metering as a delayed agency action.  (Pls.' Reply in supp. of
26  MSJ at 11, ECF No. 610.)  For these reasons, the Court does not understand either party to move for
    summary judgment on this claim and does not address it in this Order.  *See Zamani v. Carnes*, 491 F.3d
27  990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply
    brief.").
28

defer processing asylum seekers after they have arrived at a POE.  *See San Francisco Baykeeper*, 297 F.3d at 885–86 (following *Chevron* framework when considering the EPA's interpretation of the law it was charged with administering); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019) (applying *Chevron* even where not explicitly invoked by the parties because "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions . . . which are contrary to clear congressional intent" (quotations omitted)).

The *Chevron* analysis "mandates that absent a clear expression of congressional intent to the contrary, courts should defer to reasonable agency interpretations of ambiguous statutory language." *Friends of Cowlitz v. FERC*, 253 F.3d 1161 (9th Cir. 2001); *T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1065–67 (9th Cir. 1997) ("A court should accept the 'reasonable' interpretation of a statute chosen by an administrative agency except when it is clearly contrary to the intent of Congress.").  This requires courts to first consider "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter." *Campos-Hernandez v. Sessions*, 889 F.3d 564, 568 (9th Cir. 2018) (quoting *Chevron*, 467 U.S. at 842).  However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  The Court understands the specific legal question here to be whether § 1158(a)(1) and § 1225 permit metering where asylum seekers who were turned back were ultimately processed for asylum.

### (a)  *Chevron* Step One

"To determine whether the statute unambiguously bars an agency interpretation we apply the normal tools of statutory construction." *Valenzuela Gallardo v. Lynch*, 818 F.3d 808, 815 (9th Cir. 2016) (quotations omitted).  This includes "ask[ing] whether Congress intended to permit the agency interpretation." *Id.* at 815–16.  If a court "ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9.

"To implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). "That process of decision," captured in part by 8 U.S.C. § 1225, "generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible." *Id.* As the Court previously summarized, § 1225(a) establishes a general inspection duty and § 1225(b)(1) sets forth additional specific duties that arise for aliens arriving in the United States.

With regard to the inspection duty, the statute states that "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . . ) shall be deemed for purposes of this chapter an applicant for admission." *Id.* § 1225(a)(1); *see also* 8 C.F.R. § 1001.1(q) ("The term arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry."). All applicants for admission, moreover, "shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). With regard to referral, the statute requires the following:

> [i]f an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible . . . and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

*Id.* § 1225(b)(1)(A)(ii). Under a straightforward reading of the statutes, a noncitizen must do two things for inspection and referral to be triggered: first, arrive at a POE, which prompts inspection (§ 1225(a)(1), (3)) and second, indicate an intention to apply for asylum, which prompts referral (§ 1225(b)(1)(A)(ii)). At each stage, once arriving asylum seekers satisfy their end of the bargain, immigration officers must satisfy theirs.[13]

----

[13] There is no temporal element to this statute, i.e., how much time can elapse between arrival and inspection or inspection and referral. However, because the Court is addressing only unlawful

The plain text requires that an asylum seeker "arrives" or "is arriving" in the United States to prompt inspection, the first step in this process of decision. "Arrive" is not modified or conditioned to contemplate, let alone require, more than one arrival at a POE before Defendants' duties attach. *See, e.g.*, *Matter of F-P-R*, 24 I & N Dec. 681, 683, Int. Dec. 3630, 2008 WL 4817462 (BIA 2008) (distinguishing, for purposes of one-year asylum application deadline, between "arrival"—"to come to a certain point in the course of travel; reach one's destination" and "to come to a place after traveling,"—and "last arrival" which "refer[s] to an alien's most recent coming or crossing into the United States after having traveled from somewhere outside the country"). But the Court acknowledges, as it has previously, Congress's instruction that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise—words used in the present tense include the future as well as the present." 1 U.S.C. § 1; *see Al Otro Lado*, 394 F. Supp. at 1200 (noting that this provision of the Dictionary Act has been applied to the INA). The present and present progressive use of "arrive," then, can be understood to encompass both the asylum seekers' present arrival at a POE and any future arrival at a POE.

However, construing "arrives" or "is arriving" in this way deprives the word of any real meaning. *See Chowdhury v. I.N.S.*, 249 F.3d 970, 973 (9th Cir. 2001) (stating that courts must interpret a statute in a way that "giv[es] effect to each word"). If immigration officers can forgo inspection upon an asylum seeker's first arrival and defer this duty to some unspecified future arrival without flouting the statute, the first arrival loses legal significance. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1013–14 (9th Cir. 2020) ("It is the INA . . . that makes an alien's first arrival legally significant.").[14] Moreover, if the statute

---

withholding and not unreasonable delay (*see supra* note 12), the Court does not find this omission relevant to its analysis.

[14] As such, regulations promulgated after class members were turned back have not applied to them because their "first arrival triggered a statutory right to apply for asylum and have that application considered" and thus the regulations in question, which were "not in place at the time each class member's right to apply for asylum attached," could not apply. *See id.* (regarding "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019)); *see also Al Otro Lado v. Gaynor*, 513 F. Supp. 3d 1253, 1260 (S.D. Cal. 2021) (regarding "Asylum Eligibility and Procedural Modification," 85 Fed. Reg. 82,260 (Dec. 17, 2020)).

17cv2366

is construed in this way, this would permit Defendants to turn back asylum seekers any number of times—perhaps indefinitely—without running afoul of their statutory obligations.

The Court finds the plain meaning of the statutory text cuts in favor of a finding that inspection and referral attach when asylum seekers arrive at a POE the first time. Nonetheless, out of an abundance of caution, the Court proceeds to the second *Chevron* step.

(b)    *Chevron* Step Two

Where statutes are silent or ambiguous, the Court "must give effect to an agency's reasonable interpretation of a statute, unless the interpretation is inconsistent with clearly expressed congressional intent." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 671 (9th Cir. 2021). "[D]eference is not owed to an agency decision if it construes a statute in a way that is contrary to congressional intent or frustrates congressional policy." *CHW W. Bay v. Thompson*, 246 F.3d 1218, 1223 (9th Cir. 2001). Accordingly, the Court next turns to Congress's intent in establishing the inspection and referral procedures in § 1225 and whether metering is consistent with that intent.

The INA's inspection and referral duties were enacted as part of the larger expedited removal process. *See United States v. Barajas-Alvarado*, 655 F.3d 1077, 1080 n.2 (9th Cir. 2011) ("Expedited removal proceedings provide a streamlined process by which U.S. officers can remove aliens who attempt to gain entry to the United States but are not admissible." (citing 8 U.S.C. § 1225(b))). This process accelerates secondary inspection by authorizing immigration officers who find a noncitizen inadmissible after inspection to order the noncitizen removed "without further hearing or review." *See Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1354–55 (D.C. Cir. 2000) (citing 8 U.S.C. § 1225(b)(1)(A)(i)); *see also* H.R. Conf. Rep. No. 104–828, at 209 (1996) (stating that reforms to secondary inspection were intended to "expedite the removal from the United States of aliens who indisputably have no authorization to be admitted . . . ."). In this way, IIRIRA sought to deter illegal immigration by "simplify[ing] removal proceedings *while*

- 30 -

*protecting credible asylum applicants*." *Arcinega-Contreras v. Gonzales*, 138 F. App'x 961, 963 (9th Cir. 2005) (citing H.R. Rep. No. 104–469, pt. 1, at 1 (1996)) (emphasis added); *see also* H.R. Rep. No. 104–469(I), at 111 (1996) (stating that the purpose behind IIRIRA was to "*enable the prompt admission of those who are entitled to be admitted*, the prompt exclusion or removal of those who are not so entitled, and *the clear distinction between these categories*" (emphasis added)).  Specifically, the amendments were intended to eliminate the "anomaly" in which noncitizens who were unlawfully present in the country were subject to "deportation proceedings," which afforded them greater procedural and substantive rights, "while non-citizens who presented themselves at a port of entry for inspection were subjected to more summary exclusion proceedings" and were therefore "in a worse position than persons who had crossed the border unlawfully."  *Torres*, 976 F.3d at 927–28; H.R. Rep. No. 104-469, pt. 1, at 225–29.

Under the current metering framework, the right to an asylum determination is more onerous to an inadmissible individual who seeks to lawfully make a claim at a POE than to an inadmissible individual who illegally enters the country.  A migrant who is apprehended after unlawfully crossing the border is afforded "the right to a determination whether he had a significant possibility of establish[ing] eligibility for asylum . . . ." *Thuraissigiam*, 140 S. Ct. at 1982.  Because of metering, migrants who approach POEs to lawfully request asylum face a far more complicated process.  Defendants, by turning away immigrants at POEs who are lawfully seeking admission into the United States, sending them to shelters in Mexico, and requiring them to make their way back to the POE at least a second time to access asylum, create additional, logistical barriers to entry that contravene the attempt of IIRIRA to put all those not lawfully admitted "on equal footing."  *Id.*  (*See* OIG Report at 7, 14 (noting that implementation of queue management in 2018 and creation of other "barriers to ports of entry" created incentive to cross illegally)

This reality is undisputed.  In fact, the record is replete with uncontroverted evidence that Defendants' interpretation of their inspection and referral duties under the statute creates multiple logistical hurdles for migrants seeking asylum who have otherwise

complied with the statute by "arriving" at a POE and stating that they seek asylum.  For example, the evidence in this case shows that class members, at the instruction of CBP officers, are required to leave the ports, coordinate with Mexican immigration officials to put their name on a list (which, evidence shows, itself sometimes required a wait), and spend additional time in Mexico waiting for their "appointments." (*See* JSUF ¶¶ 81, 157–58, 161, 163, 164, 260; Decl. of Stephanie Leutert ("Leutert Decl.") ¶¶ 51–52, Ex. 20 to Medlock Decl., ECF No. 535-22.)[15]  The evidence shows that Defendants did not monitor the list and were not aware how Mexican officials determined who came over from the list. (Leutert Decl. ¶¶ 52–53; OIG Report at 9 n.22; Dep. of Samuel Cleaves 216:12–217:10; 221:8–10, Ex. 102 to Medlock Decl., ECF No. 535-102.)  There is also evidence that the lists themselves have been subject to fraud and corruption.  (Leutert Decl. ¶¶ 53–54.)

The failure to inspect and refer as asylum seekers first arrived also creates additional burdens by requiring that asylum seekers stay in Mexico and make return trips to POEs to access the process.  The risks of waiting in Mexico, often for an extended period of time, are high.  The evidence submitted shows that turnbacks resulted in asylum seekers' deaths, assaults, and disappearances after they were returned to Mexico.  (Dep. of Erika DaCruz Pinheiro 161:25–162:9, Ex. 113 to Medlock Decl., ECF No. 535-115; *see also* Dep. of Frank Longoria 202:24–203:5 (migrants waiting in Mexico for more than a day waiting to be processed at the Hidalgo POE would be in danger), Ex. 100 to Medlock Decl., ECF No. 535-102).)  This is further supported by evidence that turnbacks created humanitarian issues in border communities and local pressure to remove them.  (*See* May 24, 2018 "RE: Today's Meeting – A few items" email (noting that queue management would increase the number of people waiting in Mexico "and begin to strain local [Mexican] border communities" as seen with Haitians in Tijuana in 2016), Ex. 96 to Medlock Decl., ECF

---

[15] The Court grants Defendants' Motion to Exclude Stephanie Leutert's Expert Testimony only as it pertained to port operations or capacities.  Ms. Leutert has directly observed turnbacks at POEs and personally conducted fieldwork in Mexican border cities with asylum seekers, shelter staff, civil society organizations, and Mexican government officials as part of her work.  (Leutert Decl. ¶ 6.)  She therefore has personal knowledge of the steps imposed by metering on asylum seekers.

No. 535-98); Sept. 13, 2016 "RE: Haitians arriving in Tijuana" email (Haitian migrants waiting in Tijuana for appointments were causing a local humanitarian crisis and political pressure was mounting in Mexico to manage the situation), Ex. 50 to Medlock Decl., ECF No. 535-52.)

As the Court has stated before, "it is entirely possible that there may exist potentially legitimate factors that prevent CBP officers from immediately discharging the mandatory duties set forth in 8 U.S.C. § 1158(a)(1) and 8 U.S.C. § 1225." *Al Otro Lado*, 394 F. Supp. 3d at 1212. There may in fact be times when capacity or resource constraints prevent Defendants from processing asylum seekers expeditiously. However, it is also true that because courts "are not at liberty to rewrite the words chosen by Congress," *United States v. Vargas-Amaya*, 389 F.3d 901, 906 (9th Cir. 2004), the Court cannot find that these statutory duties are subject to modification or displacement based on Defendants' assessments. *See O.A.*, 404 F. Supp. 3d at 151 (holding that an executive assessment of a large-scale arrival of unlawful entrants does not override a statutory mandate permitting all aliens present in the United States to apply for asylum). As stated by the Ninth Circuit, "[w]here Congress itself has significantly limited executive discretion by establishing a detailed scheme that the Executive must follow in [dealing with] aliens," the Executive cannot "abandon that scheme because [it] thinks it is not working well[.]" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018).

As aforementioned, an asylum seeker must only arrive and indicate an intention to apply for asylum for inspection and referral to commence. Requiring asylum seekers to arrive again at POEs requires an additional step neither stated in nor contemplated by § 1225(b)(1)(A)(ii). Therefore, failing to inspect and refer class members upon arrival, and instead turning them back, conditions the ability to apply for asylum "on a migrant's manner of entry," and "flouts this court's and the BIA's discretionary, individualized treatment of refugees' methods of entry[.]" *E. Bay Sanctuary Covenant*, 993 F.3d at 675. Accordingly, the Court concludes that turning back asylum seekers at POEs without inspecting and referring them upon their arrival unlawfully withholds Defendants'

statutory duties under 8 U.S.C. § 1158(a)(1) and § 1225.  Because the Court concludes that turnbacks are unlawful regardless of their purported justification, the Court finds it unnecessary to address the parties' arguments regarding the § 706(2) arbitrary and capricious claim based on pretext.[16]

## III.   Fifth Amendment

Plaintiffs' second claim alleges that Defendants' act of turning back asylum seekers from POEs violates the Fifth Amendment.  The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.  "The touchstone of due process is protection of the individual against arbitrary action of government[.]" *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

Plaintiffs argue that Defendants' violation of the procedural protections embodied in the INA provisions alone prove a violation of due process.  (Pls.' Mem. of P. & A. at 32.)  Alternatively, they argue that weighing the individual interest in seeking asylum outweighs any governmental interest or burden.  (*Id.* at 31–32.)  Defendants argue that summary judgment is appropriate on this issue because: (1) neither § 1225 nor due process protects foreign nationals outside U.S. territory; and (2) "class members cannot obtain more than what the statute already provides: to be inspected and processed for admission." (Defs.' Mem. of P. & A. at 54.)  The Court addresses each argument below.

### A.   The Fifth Amendment Still Applies

Defendants first take issue with the Court's prior conclusion regarding the extraterritorial application of due process.  The Court previously held that the extraterritorial application of constitutional rights under the Fifth Amendment was not

---

[16] Other courts have found significant overlap between § 706(1) and the contrary to law provisions in § 706(2).  *See Ramirez*, 471 F. Supp. 3d at 191 (finding, after bench trial, that ICE's failure to follow procedures was "otherwise not in accordance with law" and an unlawful withholding or unreasonable delay of agency action); *N.A.A.C.P. v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149, 160 (1st Cir. 1987) (finding no difference between a "failure to exercise" discretion and "abuse" of discretion as revealed by a pattern of activity); *Ligon Specialized Hauler, Inc. v. I. C. C.*, 587 F.2d 304, 315 (6th Cir. 1978) (noting that "unlawful" in § 706(1) includes but is not limited to the meaning given in § 706(2)(A) and (D)); *see also* Eric Biber, *Two Sides of the Same Coin: Judicial Review of Administrative Agency Action and Inaction*, 26 Va. Environmental L.J., 461–503 (2008).

17cv2366

subject to a bright-line test but instead required that the court examine the "particular circumstances, the practical necessities, and the possible alternatives which Congress had before it and, in particular, whether judicial enforcement of the provision would be impracticable and anomalous." *Al Otro Lado, Inc.*, 394 F. Supp. 3d at 1218 (citing the "functional approach" in *Boumediene v. Bush*, 553 U.S. 723 (2008)). The Court specifically found that the "substantial connection" test articulated by the Supreme Court in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)—applied alongside *Boumediene*'s functional approach by the Ninth Circuit in *Ibrahim v. Department of Homeland Security*, 669 F.3d 983 (9th Cir. 2012)—"does not constitute a ceiling on the application of the Constitution to aliens." *Id.* Relying on *Rodriguez v. Swartz*, 899 F.3d 719 (9th Cir. 2018), this Court rejected Defendants' argument that class members outside the country were required to allege a "prior significant voluntary connection" with the United States to receive the protections of the Fifth Amendment, particularly where the defendant's conduct occurred on American soil. *Id.* at 1219–21.

Defendants argue that two intervening Supreme Court decisions invalidate these previous legal conclusions. First, the Supreme Court vacated the judgment in *Rodriguez* and remanded the decision to the Ninth Circuit "for further consideration in light of *Hernandez v. Mesa*, 589 U.S. __, 140 S. Ct. 735 (2020)." In *Hernandez*, the Court found it improper to extend *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971), to provide a damages remedy for a cross-border shooting in which a Border Patrol agent standing on American soil shot and killed a 15-year-old Mexican national standing on Mexican soil. The Court's analysis focused on the "special factors counseling hesitation" unique to the *Bivens* context, specifically the separation of powers and Congress's role in providing for a damages remedy. *Hernandez*, 140 S.Ct. at 749–50 ("[T]his case features multiple factors that counsel hesitation about extending *Bivens*, but they can all be condensed to one concern—respect for the separation of powers.").

Although *Rodriguez* was remanded in light of *Hernandez*, the Court does not understand *Hernandez* to invalidate the propositions in *Rodriguez* on which this Court

relied.  While the Supreme Court in *Hernandez* found that the particular circumstances of that case implicated foreign policy and national security in a way that counseled against fashioning a *Bivens* remedy "for injuries incurred on foreign soil," it did not hold that due process itself cannot extend extraterritorially in any circumstance or that exterritorial application would require a "previous voluntary significant connection."  Indeed, the Fifth Circuit's earlier decision found Hernandez was not entitled to protection under the Fourth Amendment because of his lack of "significant voluntary connection."  *Hernandez v. United States*, 785 F.3d 117, 120 (5th Cir. 2015).  The Supreme Court ultimately vacated this decision and remanded to the Fifth Circuit for consideration of a completely different question: whether Hernandez had a cause of action under *Bivens* to bring a due process claim in the first place.  *Hernandez v. Mesa*, 137 S. Ct. 2003 (2017).  Thus, this particular holding in *Rodriguez* that a substantial connection is not necessary for extraterritorial application was never addressed by the Supreme Court in its *Hernandez* decision.

Second, Defendants argue that *Thuraissigiam* contravenes the Court's reliance on *Boumediene*'s functional test for due process.  As aforementioned, the Court in *Thuraissigiam* addressed a constitutional challenge to 8 U.S.C. § 1252(e)(2), which limits habeas review of expedited removal orders.  The Court indeed distinguished *Boumediene* because it "is not about immigration at all."  *Id.* at 1981.  The decision, however, makes this distinction in the context of habeas relief, noting that the challengers in *Boumediene* "were apprehended on the battlefield in Afghanistan and elsewhere, not while crossing the border," and "sought only to be released from Guantanamo, not to enter this country."  *Id.* (quotations omitted).  However, this Court did not cite to *Boumediene* for its conclusions regarding the propriety of habeas relief; rather, the Court relied on its instruction to conduct fact-specific extraterritoriality analyses and not rely on formalism.  *See Al Otro Lado*, 394 F. Supp. 3d at 1218.  Nothing in *Thuraissigiam* has any bearing on this principle.[17]

---

[17] While *Thuraissigiam* primarily concerned whether the statute violated the Suspension Clause, the respondent also raised a due process claim related to his "allegedly flawed credible-fear proceeding." *Id.* at 1982.  The Court addresses the Supreme Court's holding into its analysis below.

While future case law could alter this holding, the cases cited by Defendants do not, at this juncture, displace the Court's adoption of the extraterritorial application of the Fifth Amendment.  Thus, the Court finds no basis in the case law cited by Defendants to depart from its original conclusion that, under the functional approach in *Boumediene*, the Fifth Amendment applies to conduct that occurs on American soil and therefore applies here, where CBP failed to inspect and refer class members for asylum under statute.  *See id.* at 1218–21.

### B.   Denial of Due Process

The Supreme Court recently emphasized that "the only procedural rights of an alien seeking to enter the country are those conferred by statute," and as such "'the decisions of executive or administrative officers, *acting within powers expressly conferred by congress*, are due process of law.'"  *Thuraissigiam*, 140 S. Ct. at 1977 (emphasis added) (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)); *see also Wolff*, 418 U.S. at 557 ("A liberty interest created by statute is protected by due process."); *Meachum v. Fano*, 427 U.S. 215, 226 (1976) ("[A] person's liberty is equally protected, even when the liberty itself is a statutory creation of the State." (quotation omitted) (quoting *Wolff*, 418 U.S. at 557)).  As Plaintiffs point out, Defendants have conceded this point.  *See Al Otro Lado*, 394 F. Supp. 3d at 1221 (quoting Defendants' argument that "[w]here plaintiffs premise their procedural due process challenge on having a protected interest in a statutory entitlement, the protections of the Due Process Clause . . . extend only as far as the plaintiffs' statutory rights").

Plaintiffs allege that their due process rights derive from a congressionally enacted statute; namely, the process of inspection and referral afforded in § 1225 by way of § 1158(a)(1).  Plaintiffs' due process rights therefore extend as far as their rights under these provisions.  *Thuraissigiam*, 140 S. Ct. at 1977.  The Court determined above that turning asylum seekers away from POEs constitutes an unlawful exercise of Defendants' authority under the INA to inspect and refer asylum seekers both on U.S. soil and outside the international boundary line who are arriving at POEs.  (*See supra* Section II.C.4.)  *Al*

- 37 -

*Otro Lado*, 394 F. Supp. 3d 1168, 1198–1205.   Because Defendants' turning back of asylum seekers unlawfully withholds their duties under statute, it violates the process due to class members.[18]   Thus, the Court finds summary judgment appropriate in Plaintiffs' favor on their due process claim.

## IV.   **Alien Tort Statute**

The ATS confers on district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.   "The ATS 'is a jurisdictional statute creating no new causes of action,' although the First Congress adopted it on the assumption that 'district courts would recognize private causes of action for certain torts in violation of the law of nations . . . .'" *Mujica v. AirScan Inc.*, 771 F.3d 580, 591 (9th Cir. 2014) (quoting *Sosa v. Alvarez–Machain*, 542 U.S. 692, 724 (2004)).   When a plaintiff seeks to plead an ATS claim based on an alleged violation of the law of nations, the plaintiff must identify an international norm that is specific, universal, and obligatory.   *Sosa*, 542 U.S. at 732.   Courts must "determine whether a norm of customary international law has attained the status of jus cogens" by consulting scholarship, judicial decisions, and "the general usage and practice of nations" but "must also determine whether the international community recognizes the norm as one from which no derogation is permitted." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 715 (9th Cir. 1992) (quotations omitted).

Even where a jus cogens norm exists, the Supreme Court has advised courts to exercise "a restrained conception of the discretion [it] should exercise in considering a new cause of action" under the ATS.   *Id.* at 724–25.   Specifically, the Court cited to the following five reasons:

---

[18] During oral argument, Defendants argued that Plaintiffs' due process argument fails because they cannot show a deprivation on a class-wide basis.   However, the Court found above that Defendants unlawfully withhold the duties of inspection and referral for all asylum seekers by turning them back upon their arrival at a POE.   Thus, the class was uniformly subject to the same deprivation of process.   (*See supra* note 2.)   Defendants' argument regarding this issue therefore fails.

> First, . . . the [modern] understanding that the law is not so much found or discovered as it is either made or created[;] . . . [s]econd, . . . an equally significant rethinking of the role of the federal courts in making it [;] . . . [t]hird, [the modern view that] a decision to create a private right of action is one better left to legislative judgment in the great majority of cases[;] . . . [f]ourth, . . . risks of adverse foreign policy consequences [; and] . . . fifth[,] . . . [the lack of a] congressional mandate to seek out and define new and debatable violations of the law of nations.

*Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 255 (2d Cir. 2009) (quoting *Sosa*, 542 U.S. at 725–28).

The norm at issue in this case is the duty of non-refoulement.  The principle is defined in Article 33 of the United Nations Convention Relating to the Status of Refugees ("Refugee Convention") as follows:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

Jan. 31, 1967, 19 U.S.T. 6223, 6276 ("Article 33").  Plaintiffs have previously provided extensive citation to sources—including findings and conclusions from the Executive Committee of the United Nations High Commissioner for Refugees ("UNHCR"), the Oxford Encyclopedia of Human Rights, and academic journals and other scholarship—to establish that non-refoulement is a jus cogens norm. (*See* Pls.' Opp'n to Defs.' Mot. to Dismiss the SAC at 28–29, ECF No. 210 (citing to sources).)  The UNHCR, in particular, has expressly concluded that non-refoulement had achieved the status of a jus cogens norm "not subject to derogation."  UNHCR Executive Cmty. Conclusion No. 79 (XLVII), General Conclusion on Int'l Protection (1996).

The more nuanced question in this case is whether the duty of non-refoulement is universally understood to provide protection to those who present themselves at a country's borders but are not within a country's territorial jurisdiction.  This is analogous to the earlier question addressed by the Court regarding the scope of the INA provisions governing

17cv2366

inspection and referral.  (*See supra* Section II.C.1.)   Concerning the ATS, however, the Court cannot rely on its previous interpretation of the relevant domestic statutes but must instead determine here, with reference to scholarship, judicial decisions, and "the general usage and practice of nations," whether this understanding of the duty of non-refoulement is specific, universal, and obligatory from which no derogation is permitted.

"Turnbacks" or "pushbacks" have been acknowledged in international legal literature as a "direct arrival prevention measure" that, on land, usually involve some tactics or measures "to prevent migrants from approaching or crossing the border" such that "screening for protection needs will be summary or non-existent."  Rep. of the Special Rapporteur on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, U.N. Human Rights Council, at ¶ 51, U.N. Doc. A/HRC/37/50 (Nov. 23, 2018).   Several international legal authorities have expressed that pushbacks are incompatible with the duty of non-refoulement because they deprive migrants of their right to seek international protection on an individualized basis.  *Id.* ¶ 52; *see also* Advisory Op. on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol ("Advisory Op."), U.N. High Comm'r for Refugees (UNHCR), ¶ 43 (Jan. 26, 2007).  This is premised on the legal principle that the source of this duty, Article 33, applies extraterritorially to asylum seekers approaching land borders from contiguous countries.  *See* UNHCR Advisory Op. ¶ 7 ("The prohibition of refoulement to a danger of persecution under international refugee law is applicable to any form of forcible removal, including . . . non-admission at the border . . . ."); UNHCR Executive Cmty. Conclusion No. 22 (XXXII), Protection of Asylum-Seekers in Situations of Large-Scale Influx (1981) ("In all cases the fundamental principle of non-refoulement— including non-rejection at the frontier—must be scrupulously observed."); *see also* Mark Gibney, Refugees, 4 Encyclopedia of Human Rights 315, 318 (Oxford University Press, 2009) ("In practice, [the duty of non-refoulement] means that a . . . state must either admit

17cv2366

the person to its territory and process her claim for protection or send the person to a safe third state.").[19]

However, acceptance of this specific extraterritorial application of non-refoulement is not universal.  Several countries have adopted pushback or "offshoring" policies that seek to "offload" the obligations of non-refoulement on other countries and "seal" borders from asylum seekers.[20]  *See* Azadeh Erfani and Maria Garcia, "Pushing Back Protection: How Offshoring and Externalization Imperil the Right to Asylum," at 7, Nat'l Immigrant Justice Center and FWD.us (Aug. 3, 2021).  This practices, in some form or another, has been implemented in some European Union members states and Australia.  *See generally*, *id.*; *see also* Marianna Karakoulaki, et al., *Critical Perspectives on Migration in the Twenty-First Century*, at 144, (E-International Relations Publishing, July 30, 2018) (noting "states are able to significantly limit the activation of their Convention obligations through the implementation of 'non-arrival regimes' that aim to directly impede access to asylum").  This stems from significant disagreement over the scope and extent of countries' jurisdictions, within which they are obligated not to refoul asylum seekers.  *See* Cathryn Costello and Itamar Mann, "Border Justice: Migration and Accountability for Human Rights Violations," 21 German L.J. 311, 313–14 & n.19 (Cambridge Univ. Press, March 3, 2020) (describing the definition of "jurisdiction" in human rights treaties as "constantly contested").

---

[19] These resources do not expressly address whether the duty of non-refoulement is breached where a country turns back asylum seekers temporarily and processes them at a later date.  However, many seem to embrace a broad view of this obligation as prohibiting any country from subjecting or exposing asylum seekers, for any amount of time, to foreseeable risks of violence (including not only persecution on a protected ground, but also ill-treatment, abuse, and other forms of bodily harm).  Because the Court's conclusion here is that the extraterritorial application of the duty has not been established as a jus cogens norm, the Court need not determine whether the duty of non-refoulement extends to these other circumstances.

[20] Evidence in this case demonstrates that some of these "offshoring" techniques are used by CBP in coordination with the Government of Mexico to interdict migrants en route to United States POEs.  The Court does not address the lawfulness of any measures taken by CBP, beyond metering, regarding asylum seekers in contiguous countries.

17cv2366

This rift has manifested itself in judicial and tribunal determinations as well. Some courts have adopted an expansive understanding of jurisdiction and even applied it to find an extraterritorial duty regarding non-refoulement obligations.[21]   The United States Supreme Court, however, has not.  In *Sale v. Haitian Centers Council, Inc.*, the Court held that "the text of Article 33 cannot reasonably be read to say anything at all about a nation's actions toward aliens outside its own territory[.]"  509 U.S. at 183 (1993).  The Court in *Sale* relied heavily on statutory interpretation of the text of Article 33 and the "negotiating history" of this provision to conclude that it was not intended to apply outside the territorial seas of the United States.  *See id.* at 179–87.  The Court acknowledges that this precedent is almost three decades old, and its conclusion is dependent on an interpretation of Article 33 that has since been explicitly disagreed with by the UNHCR itself.  UNHCR Advisory Op. ¶¶ 24 n.54, 28–29, 31; *see also The Haitian Centre for Human Rights et al. v. United States*, Inter-American Comm. on Human Rights, Case 10.675 (1997).   Nonetheless, its interpretation of Article 33 remains binding precedent on this Court.   *See Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("Binding authority within this regime cannot be considered and cast aside; it is not merely evidence of what the law is.  Rather,

---

[21] *See Hirsijamaa and Others v. Italy*, Application No. 27765/09, European Court of Human Rights ("ECHR") (2012) ("[T]he Italian border control operation of 'push-back' on the high seas, coupled with the absence of an individual, fair and effective procedure to screen asylum seekers, constitutes a serious breach of the prohibition of collective expulsion of aliens and consequently of the principle of non-refoulement."); *Bankovic et al. v. Belgium and 16 other contracting States (Admissibility)*, Application No. 52207/99, ECHR (Dec. 12, 2001) (recognizing exercise of extraterritorial jurisdiction when a "State, through the effective control of the relevant territory and its inhabitants abroad as a consequence of military occupation or through the consent, invitation or acquiescence of the Government of that territory, exercises all or some of the public powers normally to be exercised by that Government"); *see also*, *Coard et al. v. United States*, Report No. 109/99, Case No. 10.951, Inter-American Comm. on Human Rights ("IACHR") (Sept. 29, 1999) (noting that extraterritorial application may be "required by the norms which pertain" and as such, the focus should not be "on the presumed victim's nationality or presence within a particular geographic area, but on whether, under the specific circumstances, the State observed the rights of a person subject to its authority and control"); *Loizidou v. Turkey (Preliminary Objections)*, Application No. 15318/89, ECHR (Feb. 23, 1995), Series A, No. 310, para. 62 (finding, in the context of the convention at issue, that "the concept of 'jurisdiction' under this provision is not restricted to the national territory of the High Contracting Parties" but also extends to "acts of their authorities, whether performed within or outside national boundaries, which produce effects outside their own territory").

caselaw on point is the law.  If a court must decide an issue governed by a prior opinion that constitutes binding authority, the later court is bound to reach the same result, even if it considers the rule unwise or incorrect.  Binding authority must be followed unless and until overruled by a body competent to do so."); *cf. Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 136 (2d Cir. 2005) ("[C]lear congressional action trumps customary international law and previously enacted treaties.").[22, 23]

Abiding by non-refoulement principles in the instant circumstances is an objective toward which all countries—including this one—should undoubtedly strive.  However, given both controlling case law and the ongoing debate over the proper scope of countries' jurisdictions, the Court regrettably cannot find that this norm is universally applied beyond borders.  As such, the Court finds that the duty of non-refoulement as it applies to migrants at the border but physically outside the territorial United States is not a norm from which no derogation is permitted.  *See Sosa*, 542 U.S. at 725 (limiting the international norms actionable under the ATS to only those that "rest on a norm of international character accepted by the civilized world").  In the absence of jus cogens norm, the Court finds Plaintiffs' ATS claim is not actionable as a matter of law.

---

[22] The Department of Justice ("DOJ") also does not recognize the extraterritoriality of Article 33, even after the UNHCR stated that it applies extraterritorially.  *See* Legal Obligations of the United States Under Article 33 of the Refugee Convention, Dep't of State Mem. Op. for the Legal Adviser (Dec. 12, 1991), accessed at https://www.justice.gov/file/23326/; U.S. observations on UNCHR Advisory Opinion on Extraterritorial Application of Non-Refoulement Obligations (Dec. 28, 2007), accessed at https://2001-2009.state.gov/s/l/2007/112631.htm.

[23] Although the law is not conclusive on customary international laws' relationship with domestic laws, lower courts have held that federal statutes have supremacy.  *See, e.g.*, *Flores-Nova v. Att'y Gen. of U.S.*, 652 F.3d 488, 495 (3d Cir. 2011) (finding customary international law not binding on the court to the extent that it conflicted with a statute); *Payne–Barahona v. Gonzales*, 474 F.3d 1, 3–4 (1st Cir. 2007) (stating that where customary international law conflicts with a federal statute, "the clear intent of Congress would control"); *Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 136 (2d Cir. 2005) (same); *Martinez–Lopez v. Gonzales*, 454 F.3d 500, 502–03 (5th Cir. 2006) (same).  The Court finds no reason why this well-established rule establishing the supremacy of federal statutes over customary international law would not also apply to the decisions of the Supreme Court.

## V.      Equitable Relief

Plaintiffs seek declaratory relief on the basis that Defendants violated the law by implementing turnbacks.  (Pls.' Mem. of P. & A. at 38–39.)  Further, Plaintiffs request a permanent injunction on the basis that the denial of access to the asylum process causes irreparable harm, no remedy at law will cure the violations, and access to the asylum process is both in the public interest and outweighs any burden to Defendants in complying with asylum procedure.  (Pls.' Mem. of P. & A. at 36–38.)  Defendants argue that equitable relief is unwarranted because Plaintiffs fail on the merits and raise several, specific objections to a permanent injunction, including based on 8 U.S.C. § 1252(f)(1) and an argument that vacatur, rather than an injunction, is the proper remedy here.  (*See* Defs.' Mem. of P. & A. at 59 (citing *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011)).

Although the parties raise several arguments regarding this limitation, both parties agree that additional briefing on the scope of the remedy is warranted due to the complexity of the issues.  (Defs.' Mem. of P. & A. at 58; Pls.' Reply at 16 n.11.)  Because the parties request an additional opportunity to fully explore the legal questions related to the requested remedy, the Court orders further briefing below.

### CONCLUSION

Accordingly, the Court orders as follows:

(1)      As to Plaintiffs' first claim for ultra vires violations of the right to seek asylum under the INA, Plaintiffs' MSJ is **DENIED** and Defendants' MSJ is **GRANTED**;

(2)      As to Plaintiffs' second claim for violations of APA § 706(1), Plaintiffs' MSJ is **GRANTED** and Defendants' MSJ is **DENIED**;

(3)      As to Plaintiffs' second claim for violations of APA § 706(2), Plaintiffs' MSJ and Defendants' MSJ are **DENIED AS MOOT**;

(4)      As to Plaintiffs' third claim for a violation of the Fifth Amendment's Due Process clause, Plaintiffs' MSJ is **GRANTED** and Defendants' MSJ is **DENIED**;

(5)     As to Plaintiffs' fourth claim for a violation of the ATS, Plaintiffs' MSJ is **DENIED** and Defendants' MSJ is **GRANTED**;

(6)     As to Plaintiffs' fifth claim for equitable relief, both parties are **DENIED WITHOUT PREJUDICE** pending further briefing on the following questions:

> a.     What remedy is appropriate in light of the Court's § 706(1) finding?
>
> b.     How does 42 U.S.C. § 265 ("Title 42") affect the implementation of a remedy in this case?

The parties shall submit their supplemental briefs regarding the appropriate remedy in this action, not to exceed 20 pages each, by **October 1, 2021**.

    **IT IS SO ORDERED.**

**DATED: September 2, 2021**

Hon. Cynthia Bashant
United States District Judge

17cv2366