Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


AL OTRO LADO, INC, ET AL.    )

                                    )

                                    ) CIVIL ACTION NO.

VS.                            ) 17-CV-02366-BAS-KSC

                                    )

KEVIN K. MCALEENAN, ET AL. )


------------------------------------

VIDEOTAPED DEPOSITION OF

STEPHANIE LEUTERT

AUGUST 11, 2020

DEPOSITION VIA WEBEX


------------------------------------



ANSWERS AND DEPOSITION OF STEPHANIE
LEUTERT, produced as a witness at the instance of
the Defendant, taken in the above-styled and
-numbered cause on AUGUST 11, 2020, at 10:37 a.m.,
before CHARIS M. HENDRICK, a Certified Shorthand
Reporter in and for the State of Texas, witness
located in the city of Austin, County of Travis and
State of Texas, in accordance with the Federal
Rules of Civil Procedure and the provisions stated
on the record or attached hereto.



```
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3       MR. STEPHEN M. MEDLOCK
         MAYER BROWN
 4       1999 K Street, N.W.
         Washington, District of Columbia  20006
 5       (202) 263-3221
         smedlock@mayerbrown.com
 6
         MS. REBECCA CASSLER
 7       SOUTHERN POVERTY LAW CENTER
         400 Washington Avenue
 8       Montgomery, Alabama  36104
         (678) 954-4996
 9       rebecca.cassler@splcenter.org
10       MR. ANGELO GUISADO
         CENTER FOR CONSTITUTIONAL RIGHTS
11       666 Broadway, 7th Floor
         New York, New York  10012
12       (212) 614-6464
         aguisado@ccrjustice.org
13
14   FOR THE DEFENDANTS:
15       MR. ARI NAZAROV
         MR. ALEXANDER HALASKA
16       MR. DHRUMAN SAMPAT
         U.S. DEPARTMENT OF JUSTICE
17       OFFICE OF IMMIGRATION LITIGATION
         Ben Franklin Square, P.O. Box 868
18       Washington, District of Columbia  20044
         (202) 598-8259
19       ari.nazarov@usdoj.gov
         alexander.j.halaska@usdoj.gov
20
21
     ALSO PRESENT:  MR. JOSH PINKUS - VIDEOGRAPHER
22
23
24
25
```



Page 3

```
 1                     INDEX

 2   Appearances ..................................2

 3   STEPHANIE LEUTERT

 4        Examination by Mr. Nazarov...............5

 5

 6   Signature and Changes.......................67

 7   Reporter's Certificate......................69
```

```
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    PROCEEDINGS
 2              THE VIDEOGRAPHER:  We are now on the
 3    record.  This begins Videotape Number 1 of -- in
 4    the deposition of Stephanie Leutert in the matter
 5    of Al Otro Lado vs. McAleenan.  Today is
 6    August 11th, 2020 and the time is 10:38 a.m.
 7              This deposition is being taken
 8    remotely via Magna Legal Vision at the request of
 9    the US Department of Justice.  The videographer is
10    Joshua Pinkus of Magna Legal Services, and the
11    court reporter is Charis Hendrick of Magna Legal
12    Services.
13              Will counsel and all parties present
14    state their appearances and whom they represent.
15              MR. MEDLOCK:  Good morning, everyone.
16    This is Stephen Medlock from Mayer Brown, LLP on
17    behalf of Al Otro Lado, the class and the witness.
18    With me are Michelle Webster from Mayer, Brown,
19    LLP, Angelo Guisado from the Center for
20    Constitutional Rights, and Rebecca Cassler from the
21    Southern Poverty Law Center, who all also represent
22    Al Otro Lado, the class and the witness.
23              MR. NAZAROV:  My name is Ari Nazarov.
24    I'm with the US Department of Justice, Civil
25    Division.  I represent the defendants.  With me via
```



1   telephone are Alex Halaska and Dhru Sampat, also of

2   the Civil Division.

3            THE VIDEOGRAPHER:  Will the court

4   reporter please swear in the witness?

5            THE REPORTER:  This deposition is

6   being conducted remotely in accordance with the

7   current emergency order regarding the COVID-19

8   State of Disaster.  The witness is located in

9   Austin, Texas.

10           And, Ms. Leutert, if you would please

11  raise your right hand, I'm going to swear you in.

12                STEPHANIE LEUTERT,

13  having been duly sworn, testified as follows:

14                  EXAMINATION

15  BY MR. NAZAROV:

16   Q.  Good morning, Ms. Leutert.  My name is Ari

17  Nazarov.  We previously met during your

18  January 28th deposition in Austin.  It's nice to

19  see you again.

20   A.  Thank you.

21   Q.  Since your -- since you're a deposition

22  veteran, familiar with the process, I will move

23  quickly through the instructions and please let me

24  know if you have any questions.

25           Do you understand that you're under



Page 6

1    the same oath today as you were -- as if you were

2    in a courtroom?

3        A.   Yes.

4        Q.   Is there anything that would prevent you

5    from thinking clearly and testifying truthfully

6    today?

7        A.   No.

8        Q.   If at any time you need to take a break

9    during the deposition, please let me know.  I will

10   try to take one every hour or so.

11              Finally -- and this is most

12   important -- from time to time your counsel may

13   object.  After his or her objection, I'm going to

14   ask you to go ahead and answer the question unless

15   he instructs you not to do so.  Do you understand?

16       A.   Yes.

17       Q.   Okay.  During the January 28th deposition

18   we had talked about your CV, your resume.  Have

19   there been any changes or updates to your resume in

20   your education or employment history since January

21   of this year?

22       A.   Yes.

23       Q.   And what are those?

24       A.   I was accepted to a Ph.D. in Public Policy

25   program at the University of Texas at Austin.



1      Q.   Congratulations.

2      A.   Thank you.

3      Q.   What would this Ph.D. program be in?

4      A.   In public policy.

5      Q.   And what would be your focus?

6      A.   The US-Mexico border.

7      Q.   Tell me more about that.

8      A.   My proposed research is --

9           THE REPORTER:   I'm sorry.   I'm sorry.

10  You cut out.   Say it again, please.

11     A.   My proposed research topic is on migration

12  dynamics in south Texas along the US-Mexico border.

13     Q.   (By Mr. Nazarov)   Okay.   Now, I remember

14  that you previously testified about your

15  educational background.   Let's take it up to -- to

16  this Ph.D. program.

17           Has the Ph.D. program started yet, or

18  you're about to start in the fall?

19     A.   I'm about to start in the fall.

20     Q.   Okay.   I remember you previously testified

21  that you graduated from Skidmore College in 2011

22  with a bachelor's degree in international affairs

23  and Spanish literature; is that correct?

24     A.   Correct.

25     Q.   And then you did some classes at Harvard,



Page 8

1    I believe, that were online; is that correct?

2        A.  Yes, through the Harvard Extension School.

3        Q.  Did that lead to a certificate or a

4    degree?

5        A.  I think I got a certificate of completion

6    for the courses, but no broader certificate or

7    degree.

8        Q.  Okay.  And what did those courses involve?

9        A.  It was a course in microeconomics and a

10   course in statistics.

11       Q.  Then you went to -- I believe you -- you

12   testified that then you went to Yale University and

13   graduated with a master's degree in global affairs;

14   did I get that right?

15       A.  Correct.  Yes.

16       Q.  Okay.  Now, while obtaining your education

17   through your master's, did you ever take any

18   courses related to data analysis?

19             MR. MEDLOCK:  Objection.  Vague.

20       A.  How do you define data analysis?

21       Q.  (By Mr. Nazarov)  Collecting and

22   processing data.

23             MR. MEDLOCK:  Objection.  Vague.

24       A.  What do you mean by processing data?

25       Q.  (By Mr. Nazarov)  Analyzing data that you



Page 9

1    have collected or coming to conclusions based on

2    that data.  Have you ever taken a course that

3    taught that?

4         A.  Yes.

5              MR. MEDLOCK:  Object to form.

6         Q.  (By Mr. Nazarov)  Tell me about that.

7         A   I took a course, I believe it was actually

8    called data analysis or it might be Stata:  Data

9    Analysis.  It was a follow-up to the statistics for

10   policymakers class that I took.  In that class we

11   had to collect data -- find data online and then

12   use statistical software and analysis to analyze it

13   throughout the course of the semester as one large

14   independent project.

15             I also took a follow-up class to that

16   the following year where I did something similar;

17   it was with the same professor, but I chose a

18   different set of data and carried out a different

19   project.

20        Q.  Was this while you were in undergrad or in

21   graduate school?

22        A.  In graduate school.

23        Q.  Okay.  So that would have been at Harvard

24   or at Yale?

25        A.  At Yale.



Page 10

1      Q.  At Yale.  Okay.  Did you ever take classes
2  that deal with police or law enforcement
3  administration and operations?
4           MR. MEDLOCK:  Objection.  Vague.
5      A.  Not specifically, no.
6      Q.  (By Mr. Nazarov)  Okay.  Did you take any
7  classes in public administration of governmental
8  operations?
9           MR. MEDLOCK:  Objection.  Vague.
10      A.  Yes.
11      Q.  (By Mr. Nazarov)  Tell me about that,
12  please.
13      A.  Well, my degree was in global affairs
14  and -- with a focus on public policy and
15  international relations, so governmental affairs
16  was a pretty integral part of the entire program.
17  As for specific classes, I would say actually that
18  framework was built into almost every class, even
19  statistics and microeconomics.  They were
20  statistics for policymakers, economics for
21  policymakers.
22           Our -- this is our core class.  This
23  is -- our core history class was focused on a lot
24  of different topics, but covered -- among it --
25  political philosophy.  It was a program that was



Page 11

1    designed for people who were coming from government

2    or going into government, and so that framework and

3    focus was really present in almost every class that

4    I took through the program.

5        Q.   Okay.  So you were -- were you learning

6    how -- how to manage a government organization, the

7    staffing involved, the budgets involved?

8            MR. MEDLOCK:  Objection.  Vague and

9    compound.

10       A.   That -- I don't think I had a class -- I

11   did not have a class specifically focused solely on

12   those topics.  I'm sure that those issues came up

13   in some of the classes.

14       Q.   (By Mr. Nazarov)  Did you ever study any

15   labor management relations?

16           MR. MEDLOCK:  Objection.  Vague.

17       A.   How do you define labor management

18   relations?

19       Q.   (By Mr. Nazarov)  Negotiations, contracts

20   between you and some government organizations, how

21   they managed those contracts.

22           Just to throw out an example, you

23   know, CBP officers having -- those relations and

24   those -- those going-ons.

25           MR. MEDLOCK:  Object to the form.



Page 12

1      A.  I did not take a class specific -- that

2   focused specifically on that topic alone.

3      Q.  (By Mr. Nazarov)  My -- I believe you

4   previously testified that you've never been

5   employed by the US Federal Government; is that

6   still correct?

7      A.  Correct.

8      Q.  And have you ever done an internship or

9   externship at a Federal Government agency?

10         MR. MEDLOCK:  Object to the form.

11      A.  No.

12      Q.  (By Mr. Nazarov)  Have you ever done an

13   externship or internship at a State Government

14   agency?

15         MR. MEDLOCK:  Object to the form.

16      A.  No.

17      Q.  (By Mr. Nazarov)  Have you ever been

18   employed by a State Government agency?

19      A.  I don't think so, but I do work at the

20   University of Texas at Austin, which is a public

21   university, so I don't know how -- how that works,

22   but directly with the State Government or municipal

23   government, no.

24      Q.  Okay.  Have you ever been advised -- I'm

25   sorry.  I withdraw that.  Let me rephrase that.



Page 13

1            Have you ever been hired or retained

2    to advise a Federal Government agency?

3            MR. MEDLOCK:  Objection.  Vague.

4        A.  No.

5        Q.  (By Mr. Nazarov)  Okay.  Have you ever

6    been hired or retained to advise a State agency?

7        A.  No.

8            MR. MEDLOCK:  Same objection.

9        Q.  (By Mr. Nazarov)  Okay.  Have you ever

10   been inside the San Ysidro Port of Entry?

11       A.  No.

12       Q.  Have you ever conducted any fieldwork in

13   Tijuana?

14       A.  No.  I have been on the other side of the

15   border fence on the beach, but that is one of the

16   only border cities I have not visited.

17       Q.  What about Baja California?

18       A.  Mexicali is in Baja California, correct?

19   Then, I have been.

20       Q.  Okay.  Have you ever visited and been

21   inside the Otay Mesa Port of Entry?

22       A.  No.

23           MR. NAZAROV:  Can we go off the record

24   for a minute?  This is for the court reporter.

25           (Off-the-record discussion had.)



Page 14

1      Q.  (By Mr. Nazarov)  Have you ever visited or

2  been inside the Calexico Port of Entry?

3      A.  Yes.

4      Q.  Which parts?

5      A.  The pedestrian walkway.

6      Q.  Have you been actually inside the port of

7  entry?

8      A.  In so as much as I crossed from Mexicali

9  back to Calexico.

10      Q.  But inside the building?

11          MR. MEDLOCK:  Objection.  Vague.

12      A.  Trying to remember the Mexicali Port of

13  Entry.  You would have had to go inside to the --

14  be processed by CBP officers, so, yes.  But if you

15  mean to secondary, no.

16      Q.  (By Mr. Nazarov)  Okay.  But you've been

17  beyond the limit line at Calexico Port of Entry?

18      A.  Yes.  I went to Mexicali and then crossed

19  back to Calexico.

20      Q.  Okay.  Did you talk to any of the CBP

21  personnel in the port of entry?

22      A.  Beyond processing my mission back into the

23  United States, no.

24      Q.  Okay.  Have you been in the Tecate Port of

25  Entry?



Page 15

1      A.  Yes.

2      Q.  Which part?

3      A.  I crossed through Tecate and then came

4   back.

5      Q.  Were you ever inside for processing?

6           MR. MEDLOCK:  Objection.  Form.

7      A.  For secondary, I was processed -- my

8   admission back into the United States was processed

9   in -- within that port of entry.

10     Q.  (By Mr. Nazarov)  Okay.  Did you talk to

11  any OFO officers while you were there?

12     A.  I would have, yes.  My husband would have

13  needed to be paroled back in at that time.  And so

14  there were certain ports of entry that we spoke at

15  length to CBP officers.

16     Q.  Okay.  Did you discuss with the OFO

17  officers you spoke with the running of the port at

18  any point?

19     A.  No.

20          MR. MEDLOCK:  I just object to that

21  last question as vague.

22     Q.  (By Mr. Nazarov)  Have you ever visited or

23  been inside the Hidalgo Port of Entry?

24     A.  Yes.

25          MR. MEDLOCK:  Object to the form.



Page 16

1        Q.   (By Mr. Nazarov)   Which parts?

2        A.   The pedestrian processing.

3        Q.   Okay.   Beyond the pedestrian processing,

4    were you inside the port of entry?

5        A.   In Hidalgo, no.

6        Q.   Have you ever visited or been inside the

7    Laredo Port of Entry?

8        A.   Yes.

9             MR. MEDLOCK:   Object to the form.

10       Q.   (By Mr. Nazarov)   And which parts?

11       A.   Pedestrian processing.

12       Q.   And that's the only part?

13       A.   Yes.

14            MR. MEDLOCK:   Object to the form to

15   the last question.

16       Q.   (By Mr. Nazarov)   Did you discuss with any

17   CBP personnel while you were there the operations

18   or the running of the port?

19            MR. MEDLOCK:   Object to the form.

20       A.   In Laredo?

21       Q.   (By Mr. Nazarov)   Laredo, yes, ma'am.

22       A.   No.

23       Q.   Okay.   Have you ever visited or been

24   inside the El Paso Port of Entry?

25       A.   Yes.



Page 17

1      Q.   Which parts?

2      A.   Multiple ports of entry.  There are

3   multiple bridges in El Paso.  I have been actually

4   both in primary inspection and secondary

5   inspection.

6      Q.   And that's in connection with your

7   husband?

8      A.   Yes, where he went to secondary

9   inspection.

10      Q.   Okay.

11      A.   Because he was being --

12           THE REPORTER:  I'm sorry --

13      Q.   (By Mr. Nazarov)  I'm sorry.  I didn't

14   hear that last part.

15      A.   Because he was being paroled in.

16      Q.   Okay.  I see.  Did you speak to any port

17   personnel, C- -- or CBP officers about the

18   operations of the port?

19           MR. MEDLOCK:  Objection to form and

20   vague.

21      A.   Yes.

22      Q.   (By Mr. Nazarov)  I'm sorry?

23      A.   Yes.

24      Q.   Yes?  Tell me about that.

25      A.   I was speaking to them in relation to my



Page 18

1   husband's parole situation.  There had been some

2   confusion, and so they were explaining to us what

3   was going on at the port of entry at the time.

4       Q.  And what did they -- what did they explain

5   to you?

6       A.  To quote them, they said the port of the

7   entry was not Newark, and so we were going to have

8   to wait a very long time for him to be paroled into

9   the United States.

10      Q.  What happened after that?

11      A.  Well, that was before I arrived.  I was

12  waiting outside, and then they went and got me and

13  brought me in.  And about 20 minutes later, they

14  said there had been a misunderstanding, and they

15  provided him with the parole document and actually

16  with an additional document they said we'd need in

17  the interior checkpoints.  And they let him go into

18  the United States.

19      Q.  How long did all of this take, this

20  inspection?

21      A.  About an hour.

22      Q.  About an hour.  Have you had similar

23  exchanges at other ports of entry regarding him?

24          MR. MEDLOCK:  Objection.  Vague.  I

25  assume by him, you mean her husband?



Page 19

1          MR. NAZAROV:  Let me rephrase that.

2     That was -- that was vague.

3     Q.  (By Mr. Nazarov)  Has anything like this

4     happened with your husband at other ports of entry?

5     A.  So during this period in his paperwork, it

6     was only -- it was a short time period of about six

7     months, and we had similar conversations -- nothing

8     like the occurrence at the El Paso Port of Entry,

9     but we had similar discussions at Sasabe, Tecate.

10    I believe those were the only other two ports of

11    entry.

12    Q.  Okay.  While you were in El -- El Paso,

13    did you ever discuss with any of the CBP personnel

14    the overall running of the port, their missions or

15    budgets or contracts or anything like that?

16    A.  No.

17    Q.  So it mostly dealt with your husband's

18    situation?

19    A.  Inside the port of entry, yes.  It might

20    be unrelated, but I also met with El Paso Border

21    Patrol.  And actually in that discussion they did

22    discuss overall CBP budget and staffing, but that

23    was through the border patrol.

24    Q.  When did you meet with them?

25    A.  That would have been spring -- winter --



Page 20

1    winter or January of 2018, I believe.

2         Q.   Okay.   And do you remember who you met

3    with?

4         A.   No.   It was a meeting for a group of

5    students that I brought to El Paso.

6         Q.   Why did you bring them to El Paso?

7         A.   I wanted them to understand migratory

8    dynamics in that part of the border.

9         Q.   And did you meet with OFO or --

10        A.   No.   I met with border --

11             MR. MEDLOCK:   Asked and answered.

12        Q.   (By Mr. Nazarov)   And how many students

13   did you bring?

14        A.   I believe it was eight or nine.   It was

15   about half the class, and I had a 16-person class

16   at that time.

17        Q.   Okay.   Was that a day-long meeting?

18        A.   It was a presentation and a ride-along.

19        Q.   I'm sorry.   I didn't catch the first thing

20   you said.

21        A.   A presentation and a ride-along.

22        Q.   Oh, interesting.   Who gave the

23   presentation?

24        A.   I -- I don't remember.   I've now done this

25   three times, and they're all blending together in


MAGNA
LEGAL SERVICES

Page 21

1   my head, three different -- entry -- or port of

2   patrol sectors.  I don't remember the person.

3   Usually there's multiple border patrols that

4   provide the presentation, but I don't remember who

5   they were.

6        Q.  What do they talk about in their

7   presentation?

8        A.  They always hit on the same themes, which

9   are generally their work in apprehensions, their

10  work in -- in their other missions, drug

11  trafficking, seizures, national security.  They

12  probably talked about staffing; they probably

13  talked about budget.  They would have answered

14  questions for my students.

15       Q.  Did you ask any questions?

16       A.  I'm sure I did.  I always ask questions in

17  those presentations.

18       Q.  Okay.  Do you remember what those

19  questions were, what areas you covered?

20            MR. MEDLOCK:  Object to the form.

21       A.  I don't.  That was three years ago.  I

22  don't remember what specific questions I asked.

23       Q.  Okay.

24       A.  I usually would ask questions if I thought

25  there would be something interesting that they



Page 22

1    hadn't covered yet and that I thought the students

2    would benefit from hearing, kind of spur them to

3    explain something more.

4         Q.  Tell me about the ride-along.

5         A.  In El Paso?

6         Q.  Yeah.

7         A.  We -- actually, we drove out in a small

8    van, and they took us to various points.  And then,

9    the highlight at the end, the highlight for the

10   students is this higher ledge where you can kind of

11   see into a valley, you can see the border wall.

12   And then they explained the entire dynamics in that

13   region.

14        Q.  Did your students like it?

15        A.  They did.

16        Q.  So did you do this visit with your

17   students at any other ports of entry or just El

18   Paso?

19             MR. MEDLOCK:  Objection.  Misstates

20   prior testimony.  I believe she didn't say it was a

21   port of entry.

22        A.  Yeah.  To the border patrol sector.  I

23   have taken them to the Nogales Border Patrol Sector

24   and as well to the RGV Border Patrol Sector for

25   ride-alongs -- for presentations and ride-alongs.



Page 23

1      Q.   (By Mr. Nazarov)  Are they done outside,

2   these presentations?

3      A.   I'm sorry?

4      Q.   Are they done in the building or outside?

5      A.   If I remember correctly, the El Paso and

6   the Nogales presentations were done inside the

7   border patrol station in that sector.  And the RGV

8   presentation was outside in a park.

9      Q.   Okay.  Have you ever visited or been

10  inside the Brownsville Port of Entry?

11     A.   Yes.

12     Q.   Which parts?

13     A.   Well, two of the group bridges and the

14  pedestrian processing.

15     Q.   Okay.  But were you ever in secondary?

16     A.   No.  I've -- I've also been in the MPP

17  court that is part of the -- it's right next to the

18  Gateway Bridge Port of Entry.  I think it's

19  actually on their territory, within the

20  jurisdiction of the port.

21     Q.   Tell me about that.

22     A.   I went to witness an MPP court hearing.

23     Q.   Is that with an immigration judge?

24     A.   Yes.  Remotely.

25     Q.   Okay.



Page 24

1      A.   She was videoed in.

2      Q.   Okay.  At the Brownsville Port of Entry,

3  did you ever discuss the operations of the port or

4  the mission with any personnel, CBP personnel?

5           MR. MEDLOCK:  Object to the form.

6  Compound.

7      A.   Not -- no, not specifically at the ports

8  of entry, no.

9      Q.   (By Mr. Nazarov)  You previously testified

10  that you've been to the Nogales Port of Entry; is

11  that correct?

12      A.   Correct.

13      Q.   Can you tell me which parts again?

14      A.   The pedestrian processing.

15      Q.   Okay.  Anyplace outside of the pedestrian

16  processing?

17      A.   No.

18      Q.   Have you been to any ports of entry that I

19  have not asked about?

20      A.   Yes.

21      Q.   Tell me about it.

22      A.   Progreso.

23           MR. MEDLOCK:  Object to the form.  Go

24  ahead.

25      A.   Roma, Eagle Pass, Del Rio, Sasabe, which I



Page 25

1    believe I previously covered, Lukeville.  I think

2    that's it.

3         Q.  (By Mr. Nazarov)  Have you been inside any

4    of those ports of entry?

5         A.  I have gone through pedestrian processing

6    in all of them.  I have also sat in secondary in

7    Eagle Pass.

8         Q.  But you have not been outside of secondary

9    in any of those ports?

10              MR. MEDLOCK:  Misstates prior

11   testimony.  Go ahead.

12        A.  No.

13        Q.  (By Mr. Nazarov)  Have you heard the

14   acronym AEU?

15        A.  Yes.

16        Q.  What does that mean?

17        A.  It's, like, admissibility enforcement

18   unit.

19        Q.  What do you think it mean -- what does it

20   mean to you?

21              MR. MEDLOCK:  Objection.  Asked and

22   answered.

23        A.  It is a group of -- it's a unit within

24   OFO.

25        Q.  (By Mr. Nazarov)  Do you know what it



Page 26

1   does?

2        A.   It would be operating in secondary.

3        Q.   Are you aware of whether every port of

4   entry uses that acronym?

5        A.   I would imagine Class A ports of entry

6   would.

7        Q.   Will you define metering for me?

8        A.   Sure.  Sure.  Actually, I'm opening my

9   merits expert report just to point you to a

10  footnote, if that's okay.

11       Q.   That -- that is okay.  Let me --

12       A.   I can do it without.

13       Q.   Yeah.  Let's do it without now.  And then

14  we'll introduce the exhibit and -- I, frankly,

15  don't mind if you refer to the exhibit, so why

16  don't you give --

17       A.   Okay.

18       Q.   Let me -- let me control the exhibits for

19  now.

20       A.   That sounds perfect.  Thank you.  It's

21  just that I have a footnote that explains the way

22  that I am discussing metering in the report, which

23  I think is relevant, which is that -- when in the

24  report I use metering, queue management and

25  turn-backs interchangeably.  So in the definition



Page 27

1   I'm about to give, I'm kind of encompassing all of

2   that.

3       Q.  Okay.  Give me the definition.

4       A.  The way that I view metering is -- what

5   metering is, is multipronged.  It is essentially

6   when individuals arrive at a port of entry,

7   asylum-seekers arrive at a point of entry.  They

8   are turned back to Mexico and told they cannot be

9   processed at that time.

10              Now, the way this looks right now is

11  that there are CBP officers that are stationed at

12  the limit line, at the international line and

13  provide an explanation that the port is at

14  capacity.

15              Now, simultaneously, the port director

16  or an individual in the port is determining how

17  many asylum-seekers that port of entry can process

18  every day.  So that in a combination of saying

19  we're going to process a certain number a day and

20  we're not going to process people immediately when

21  they arrive at the port of entry.  That entire

22  combination is metering.

23      Q.  Okay.  And what would be your definition

24  of queue management, then?

25      A.  As I said in the footnote, I'm -- I am



Page 28

1    using that term interchangeably:  metering, queue

2    management and turn-backs.

3        Q.  Can you define physical capacity?

4        A.  It is the number of people that can fit in

5    a physical space.

6        Q.  So what would it mean for a port of entry

7    to be operating at 100 percent physical capacity?

8        A.  Well, it's slightly complicated because

9    physical capacity is also -- maybe I should have

10   said this in the definition.  It's also subjective

11   to certain things, given that CBP determines its

12   own physical numbers at times, but what it is, is

13   taking the number -- it is the number of people

14   within a port of entry matches the total number

15   that CBP believes can fit safely in that port of

16   entry, or it's been determined by a fire marshal in

17   these certain areas where they have people

18   watching, supervising at a certain time.

19       Q.  How would you define turn-back?

20       A.  I'm sorry?

21       Q.  How would you define the term "turn-back"?

22            MR. MEDLOCK:  Objection.  Asked and

23   answered.

24       A.  I'm defining turn-back, metering and queue

25   management as synonymous in my report.



Page 29

1      Q.  (By Mr. Nazarov)  Okay.  So they're all

2  the same in your definition?

3      A.  I'm using them as -- as being all the

4  same, yeah.

5      Q.  Do you know if your definition is

6  different from CBP's definition?

7      A.  It's possible.

8           MR. MEDLOCK:  Objection.  Vague.

9      Q.  (By Mr. Nazarov)  Are you familiar with

10  CBP's TEDS standards?

11      A.  Could you repeat that?

12      Q.  Yeah.  So are you familiar with CBP's TEDS

13  standards?

14           And I'm going to give you the

15  definition of TEDS, which is National Standards in

16  Transport, Escort, Detention and Search; that's

17  TEDS.

18      A.  I may have reviewed it, but I -- I'm not

19  that familiar with it.

20      Q.  Okay.  Are you familiar at all with the

21  requirements of the Flores Agreement?

22      A.  Yes.

23      Q.  Tell me about it.

24      A.  A settlement that determined the detention

25  conditions or the conditions in which minors should



Page 30

1    be held.

2         Q.   Okay.  Are you familiar with the general

3    length of time that CBP facilities are designed to

4    hold individuals?

5         A.   Yes.

6              MR. MEDLOCK:  Objection.  Vague as to

7    facilities.

8         Q.   (By Mr. Nazarov)  And what is that length

9    of time?

10        A.   72 hours.

11             MR. MEDLOCK:  Same objection.

12        Q.   (By Mr. Nazarov)  Have -- are you --

13   scratch that.

14             Are you familiar with the Prison Rape

15   Elimination Act?

16        A.   No.

17        Q.   Okay.  Are you familiar with the

18   requirement of the Trafficking Victims Protection

19   Reauthorization Act?

20        A.   In what -- in what way?

21        Q.   Well, have you heard of it?

22        A.   Yes.

23        Q.   Okay.  Tell me what you've heard.

24        A.   It would be determining the processing for

25   minor -- accompanying minors from non-contiguous



Page 31

1    countries.

2        Q.  Have you ever written about it or

3    lectured?

4        A.  I might have --

5        Q.  Okay.

6        A.  Sorry?

7        Q.  I'm sorry.  Have you ever written about

8    it, published anything about it or lectured about

9    it?

10       A.  I might have when mentioning the

11   difference between unaccompanied minors from Mexico

12   versus from non-contiguous countries, like Central

13   America.

14       Q.  Okay.  Can you give me your definition of

15   operational capacity?

16              MR. MEDLOCK:  Objection.  Vague.

17       A.  I actually went back to my deposition and

18   read what I had written as the definition of

19   operational capacity, which were all the factors

20   that CBP discusses for -- discusses that affect its

21   filing processing beyond physical capacity, but I

22   have also learned through this discovery period in

23   deposition that CBP does not have a standardized

24   definition of operational capacity.  So it is a

25   little difficult to define.  I -- I hesitate now to



Page 32

1    define as I did before.

2        Q.   (By Mr. Nazarov)   Okay.   So you would say

3    your testimony on operational capacity is different

4    now than it was during the deposition in January?

5              MR. MEDLOCK:   Object to the form.

6        A.   I was -- I was under the understanding

7    that it was a more defined term.   And one of the

8    things that I have learned through this discovery

9    is that it's -- it appears to be less defined than

10   I had originally believed it was.

11       Q.   (By Mr. Nazarov)   I see.   Will you take a

12   stab at it for me and just define it the best you

13   can?

14       A.   I can define it the way --

15             MR. MEDLOCK:   Objection.   Asked and

16   answered.

17       A.   I can define it the way that I defined it

18   in the previous deposition, which were all the

19   other factors that CBP has noted that influenced

20   its ability to process asylum-seekers beyond --

21   perhaps including physical capacity, but beyond

22   physical capacity as well as -- my explanation.

23       Q.   (By Mr. Nazarov)   Okay.   All right.   Well,

24   now I want to briefly turn to your merits report

25   dated July 20, 2020.



Page 33

1              MR. NAZAROV:  Josh, would you be

2     able -- do you have it in front of you?  Josh can

3     put it up, maybe.

4              THE VIDEOGRAPHER:  Yes, I can.  Did

5     you want the -- I'm sorry.  You're going to have to

6     clarify.  Did you want the --

7              MR. NAZAROV:  Let's go off the --

8              THE VIDEOGRAPHER:  -- expert report or

9     the merits report?

10              MR. NAZAROV:  The merits report.

11              THE VIDEOGRAPHER:  Got it.  Sorry

12     about that.

13              MR. NAZAROV:  No problem.

14              MR. MEDLOCK:  Just to clarify, I think

15     you got the date of it wrong.  I believe it's

16     July 10th, 2020.

17              MR. NAZAROV:  It's July 10th?  Well,

18     July 2020.

19     Q.  (By Mr. Nazarov)  Okay.  Just a minute.

20     Will you please tell me about the methodology you

21     used to prepare this report?

22     A.  Sure.  I based my understanding of this

23     report first in fieldwork that I conducted along

24     the US-Mexico border primarily over the past three

25     and a half years, but in-depth since October 2018



Page 34

1    on this specific issue.

2              And in that time period, I used

3    methodologies that I would use that are pretty

4    well-known in the political science and public

5    policy fields.  They are observation at port of

6    entry of metering practices; semi-structured

7    interviews with different individuals, primarily in

8    Mexico, but also at times in the United States; and

9    a review of primary documents such in this case

10   were the asylum waitlists.  And I used that as my

11   foundation for going into this report; and then

12   received questions from plaintiff's counsel and I

13   reviewed quite a few documents that were produced

14   in discovery; and I attempted to answer plaintiff's

15   counsel in this report.

16       Q.  Is this the same methodology you used in

17   your December 2019 report?

18       A.  Yes, more or less.

19       Q.  Are there any differences between the key

20   terminology used in this July 2020 report and the

21   December 2019 report?

22              MR. MEDLOCK:  Objection.  Vague as to

23   key terminology.

24       A.  There are differences between the two

25   reports because I was able to review additional



Page 35

1    information that I had not reviewed in writing the

2    first expert report.

3        Q.  (By Mr. Nazarov)  What additional

4    information did you review?

5        A.  When -- quite -- quite a few additional

6    documents that were produced during discovery.  I

7    had also reviewed more than 100 new queue

8    management reports that I included in the data, and

9    in certain places I came to -- to different

10   conclusions and perhaps used different terminology

11   than I did in the first report.

12               MR. NAZAROV:  I'm sorry.  Can we go

13   off the record for a second?

14               (Off-the-record discussion.)

15               (Record read by Reporter.)

16       Q.  (By Mr. Nazarov)  So, Ms. Leutert, you

17   mentioned that you had different conclusions.

18               What are these different conclusions

19   from your December 2019 report?

20               MR. MEDLOCK:  Objection.  Misstates

21   prior testimony.

22       Q.  (By Mr. Nazarov)  You can still go ahead

23   and answer.

24       A.  One second.  I'm so sorry, but my computer

25   just minimized the -- the Webex screen for a



Page 36

1    second, and I cannot find it.

2         Q.   Let's go off the record.

3         A.   Sorry.  Some technical difficulties on my

4    end.

5         Q.   Are you okay now, or should we take a

6    little break?

7         A.   No.  I'm perfect now.  Sorry.  I don't

8    know what just happened.

9         Q.   That happens sometimes on Webex.

10        A.   That was very strange.

11             I think the findings that -- that

12   differed from the first report, the -- one of the

13   main things -- and this came up in our previous

14   deposition -- was that I had believed that metering

15   in 2016 and 2017 was more of a practice versus a

16   policy.

17             And one of the findings that came up

18   for me, in reading through more of the documents

19   produced in discovery, is that this actually was a

20   policy using the definition that it was guidance

21   that came from CBP leadership and went down to the

22   field office heads and then was disseminated out

23   across the ports of entry.  And I did not know that

24   in writing the first expert report.

25             That was something new that I included



Page 37

1    in this report and changes my view of it being a

2    practice initially and then a policy.  I would now

3    be more confident in saying it was a policy from

4    2016 onward.

5         Q.  Any other conclusions that you would have

6    changed from the original report?

7         A.  Another conclusion was my understanding of

8    operational capacity and its origins.  Again, as I

9    mentioned earlier in this deposition, I had been

10   under the impression that operational capacity was

11   a widely used term throughout the entire time

12   period in question.

13             Now, when I read through the other

14   depositions, when I reviewed additional documents,

15   it became clear to me that operational capacity,

16   the term was -- began to be widely used in -- mid

17   in the summer of 2018.  And this was a shift that I

18   had not known about before and I included in this

19   report, and it creates -- it is an evolution of my

20   understanding of the term "operational capacity".

21        Q.  Well, let's stay on operation (sic)

22   capacity.  In evolving to this new understanding of

23   operational capacity, did you at any point discuss

24   it with any CBP or OFO personnel?

25             MR. MEDLOCK:  Object to the form.



Page 38

```
 1      A.  No.  I read their depositions, though.

 2      Q.  (By Mr. Nazarov)  Okay.  So your -- your

 3  definition now is based on reading their

 4  depositions?

 5      A.  As well as their emails that were produced

 6  during discovery.

 7      Q.  Okay.  Let's go back.  You said that

 8  there's different terminology in the merits report

 9  of July 2020 and the December 2019 report.  What's

10  different in the terminology?

11      A.  I said -- I believe I said it -- there

12  could be differences.

13      Q.  Okay.

14      A.  I can't think of any right now, but I

15  wouldn't be surprised because my thinking on some

16  of these issues did evolve.

17      Q.  Okay.  When you -- let me stay on this

18  methodology a little bit.

19          Did you develop this methodology, or

20  was this developed by somebody else?

21          MR. MEDLOCK:  Objection.  Asked and

22  answered, also vague.

23      A.  Which methodology are you referring to?

24      Q.  (By Mr. Nazarov)  The methodology that you

25  listed on Page 10 of your report.  And let me --
```



Page 39

1   let me put it into evidence.  Did we put it into

2   evidence?  I think we did already put it into

3   evidence.  Exhibit A is your report.  It's right

4   there in front of me.

5            That methodology, is this something

6   that you developed or somebody else developed that

7   you copied?

8            MR. MEDLOCK:  Objection.  Vague.  Are

9   you referring to a particular paragraph, Ari?  And

10  if -- put it on the screen.

11           MR. NAZAROV:  I'm referring to

12  Paragraph 18 and -- let's put that on the screen.

13  Josh, could we see Page 10, Paragraph 18 and 19?

14  Q.  (By Mr. Nazarov)  Are you able to read

15  that?

16  A.  Yes.

17  Q.  Okay.

18  A.  And what was the question?

19  Q.  The question was, these two paragraphs,

20  did you develop this methodology?

21           MR. MEDLOCK:  Objection.  Vague.

22  A.  Can I see the second paragraph, because I

23  only see one paragraph.  It's just 18.

24  Q.  (By Mr. Nazarov)  Of course.

25  A.  Well, I am -- my team and I are the only



Page 40

1    ones who have collected consistent metering data at

2    ports of entry over the past almost -- almost three

3    years, more than two and a half years.  However,

4    the methodologies we use are very standard within

5    the field of public policy or political science.

6        Q.  Can you give me an example of where else

7    this type of methodology has been used?

8        A.  The methodologies of reviewing primary

9    sources of observation, of semi-structured

10   interviews are pretty core tenets of qualitative

11   research in actually not just political science and

12   public policy, which are more my fields, but also

13   sociology and probably even anthropology, although

14   I'm not as familiar with their methods.

15       Q.  Do you know if anyone else has used this

16   methodology that you've listed there for any kind

17   of publication or for their own studies?

18           MR. MEDLOCK:  Objection.  Asked and

19   answered.  Also, vague and compound.

20       A.  Are you referring to -- which -- I'm

21   sorry.  I don't fully understand.  Which part of

22   the methodology are you referring to?

23       Q.  (By Mr. Nazarov)  Both.

24       A.  The original data selection or --

25       Q.  Yeah.  Just, you know, both 18 and 19, but



Page 41

1   I guess I would focus on, you know, looking at

2   MCAT, queue management reports.  I believe --

3   that's -- that's outlined here -- semi-structured

4   interviews.

5           Has anybody else used that for their

6   methodology related to immigration?

7           MR. MEDLOCK:  Objection.  Form, vague.

8   A.  Most people would not have access to MCAT

9   and queue management reports considering that

10  they're classified and not released to the public,

11  so that's -- that would be difficult for other

12  restrictors to evaluate.

13          With that said, CBP assigned an

14  analyst to look at metering at ports of entry and

15  used a very similar methodology in terms of

16  documenting the numbers into an Excel spreadsheet

17  and analyzing and doing -- coming up with basic

18  descriptive statistics.

19  Q.  (By Mr. Nazarov)  Do you know who this

20  individual was?

21  A.  I don't know the person's name, but I do

22  cite that Excel in one of my footnotes.

23  Q.  Okay.  Do you know when that Excel sheet

24  was dated?

25  A.  It was the end of 2018 --



Page 42

1      Q.  Okay.

2      A.  -- because it only contained about six

3   months of data.  It was from the beginning of

4   metering or around -- or at the beginning of the

5   pilot program, so June all the way through perhaps

6   November or December of 2018, about six months of

7   data.

8      Q.  But let me go back to the methodology.

9   When you were preparing this report, did you make

10  any factual assumptions?

11     A.  What do you mean by factual assumptions?

12     Q.  Did you assume any facts?  For example,

13  that there are 24 hours in a day; that's what I

14  would consider a factual assumption.

15          MR. MEDLOCK:  Objection.  Vague.  It's

16  also using assumptions with facts.

17     A.  I'm slightly confused by the question

18  because, yes, I did use basic parameters of time in

19  my report, but I don't know if those are

20  assumptions.

21     Q.  (By Mr. Nazarov)  Okay.  What parameters

22  did you use, just so that I know?

23     A.  I did assume --

24          MR. MEDLOCK:  Objection.  Vague.

25     A.  I assumed there were 24 hours in a day.



Page 43

1    I -- I also -- I mean, I -- I'm sorry.  I really

2    don't understand exactly what I'm being asked.

3        Q.  (By Mr. Nazarov)  Let me move on, and we

4    can maybe come back to that.

5              Are there any weaknesses in your

6    methodology?

7              MR. MEDLOCK:  Objection.  Vague.

8    Weakness is vague.

9        Q.  (By Mr. Nazarov)  You can answer the

10   question.

11       A.  I would say the biggest weakness is that

12   I'm relying on CBP's data, and even CBP themselves

13   have noted that some of their data isn't correct

14   for certain days.

15       Q.  In an ideal world, if you could have other

16   data for this report, what data would you want?

17       A.  To be able to answer the questions that I

18   was asked --

19             MR. MEDLOCK:  Objection.  Incomplete

20   hypothetical.  Continue.

21       A.  To be able to answer the questions that I

22   was asked, it would have been helpful to have a

23   definition of operational capacity and to have had

24   metrics that CBP has outlined over time and

25   collected data for, because I -- I was asked to



Page 44

1    look at operational capacity, but CBP itself has

2    said that it does not have a definition, nor does

3    it collect data to measure operational capacity.

4    And so it makes it difficult to measure what CBP is

5    saying if I don't have the definition or the data

6    to do so because they don't collect it.

7        Q.   (By Mr. Nazarov)  Do you believe the data

8    you did have and your methodology is reliable in

9    providing an overview of CBP overall operations?

10            MR. MEDLOCK:   Objection.   Vague.

11       A.   What do you mean by CBP overall

12   operations?

13       Q.   (By Mr. Nazarov)  Well, CBP overall

14   missions and operations involved narcotics and

15   trade; do you believe that the data you collected

16   and the methodology you used provides an overview

17   of -- of those operations?

18       A.   Well, I'd consider them, but I was

19   specifically focusing on the processing of

20   asylum-seekers at ports of entry.

21       Q.   Okay.

22       A.   So I looked at the data that -- that CBP

23   also looks at to help me understand what was going

24   on.

25       Q.   Would you agree that this data does not



Page 45

1    represent all of the missions of CBP at the ports

2    of entry?

3        A.   There are certainly other missions and

4    other data that reflects that, but what I was asked

5    to look at is metering, and in looking at those

6    other data sources, which I did, I did not believe

7    that it would be methodologically sound to include

8    them because I could not link them to metering in

9    the type of way I would have needed to, to have

10   appropriate analysis.

11       Q.   Okay.  We've been going at this about an

12   hour.  Are you okay with taking a 10-minute break?

13       A.   Yes.

14       Q.   Okay.

15           MR. NAZAROV:  Steve, you okay with

16   that?

17           MR. MEDLOCK:  Yeah.  I'm fine with

18   that.  Thank you.

19           MR. NAZAROV:  So it's 11:35 your time.

20   Why don't we meet back here at 11:45; how about

21   that?

22           MR. MEDLOCK:  Great.  Thank you.

23           THE VIDEOGRAPHER:  The time is 11:35.

24   We are off the record.

25               (Recess taken.)



Page 46

1          THE VIDEOGRAPHER:  The time is 11:47.

2    We are back on the record.

3        Q.   (By Mr. Nazarov)  Ms. Leutert, you realize

4    that you are still under oath to tell the truth?

5        A.   Yes.

6        Q.   Okay.  Do you know how CBP uses the MCAT

7    reports and the queue management reports?

8          MR. MEDLOCK:  Objection.  Vague and

9    compound.

10       A.   What do you mean by uses?

11       Q.   (By Mr. Nazarov)  In the daily practice of

12   running the ports, how do they utilize the data for

13   their day-to-day operations?

14       A.   I know that they review them -- the

15   leadership reviews those reports to get a sense --

16   a snapshot of what's going on at the port of entry.

17       Q.   Okay.  Let me go back to your methodology.

18          Is it fair to say that this

19   methodology has not been subject to peer review?

20       A.   The methodology --

21          MR. MEDLOCK:  Objection.  Vague.

22       A.   The methodologies themselves or my report?

23       Q.   (By Mr. Nazarov)  Yeah, your report.  I'm

24   sorry.  Let me rephrase that.  I withdraw the

25   previous question.


MAGNA
LEGAL SERVICES

Page 47

1           Is it fair to say that this report has

2  not been subject to peer review?

3      A.  I couldn't get it subject to peer review

4  because it's based upon nonpublic information.

5      Q.  Okay.  So would you agree that port of

6  entry contingency plans are designed for

7  emergencies and not for a sustained level of

8  migration?

9           MR. MEDLOCK:  Objection.  Vague.

10     A.  My understanding is that contingency plans

11 are designed for increases in -- in levels of

12 migration.

13     Q.  (By Mr. Nazarov)  But they're not

14 sustainable over the long-term; would you agree

15 with that?

16          MR. MEDLOCK:  Same objection.

17     A.  There are possibly elements in them that

18 could be sustainable in the long-term, but they are

19 not -- they're certainly not a overall policy shift

20 that would be more long-term.

21          It's -- it is a response to -- to

22 something versus a new policy.

23     Q.  (By Mr. Nazarov)  Do I hear you saying

24 that they're not sustainable over the long-term?

25          MR. MEDLOCK:  Objection.  Asked and



Page 48

1    answered.  Also, vague.

2        A.   I believe that they're -- they're not

3    designed to be long-term policy shifts.  They are

4    designed to be responses to higher levels of

5    migration.

6             With that said, the reason why I'm not

7    stating yes or no is there are elements of those --

8    of those contingency reports that might be

9    sustainable over a long period of time; there are

10   others that might not be.

11       Q.   (By Mr. Nazarov)  What elements do you

12   think can be sustainable over a long period of

13   time?

14       A.   Potentially, something like virtual

15   processing; that might be a way to relieve --

16   relieve pressure in the port of entry.

17       Q.   Tell me about virtual processing.

18       A.   Well --

19            MR. MEDLOCK:  Objection to the form.

20       A.   It was in some of the contingency reports

21   as a way to relieve pressure at ports of entry.

22       Q.   (By Mr. Nazarov)  Have you ever -- have

23   you ever witnessed virtual processing?

24       A.   No.

25       Q.   Do you know if there's any publication on



Page 49

1    virtual processing?

2        A.  I'm not sure if CBP --

3            MR. MEDLOCK:  Objection.  Vague.

4        A.  -- has placed recently.

5        Q.  (By Mr. Nazarov)  I'm sorry.  I didn't

6    hear your answer.

7        A.  I'm not sure that CBP has put it in place

8    recently, so it wouldn't -- it wouldn't likely be

9    in a publication or --

10       Q.  Okay.

11       A.  -- an evaluation of it somewhere.

12       Q.  Do you know if CBP has used virtual

13   processing?

14       A.  I believe at certain points they may have,

15   but that would have been years ago.  I think I saw

16   some emails relating to either trying to put it in

17   place or maybe trying it out.  But, again, that

18   would have been multiple years ago.  I have had

19   something recently.

20       Q   Okay.  To the best of your knowledge, do

21   you know why they stopped using virtual processing?

22       A.  I don't think they ever really got it up

23   and running across the whole border.  So, no, I

24   don't know why an individual port of entry would

25   have put it in place and then come back.



Page 50

1    Q.  Okay.  Let me just go back to your

2  methodology again and just quickly ask you, what is

3  the potential error rate for this methodology if --

4  if it's used by other experts?

5    A.  Well, can I refer to the -- to my expert

6  report?

7    Q.  Sure.  Where is it in your expert report?

8    A.  Page 63, Footnote 190.

9    Q.  I'm sorry.  You said Page 63?

10    A.  63.

11    Q.  And where is it on Page 63?

12    A.  Footnote 190.

13    Q.  Okay.

14    A.  Which is the -- using -- similar to CBP, I

15  also discovered multiple errors in the capacity

16  percentages, so there are errors in the data.  So

17  there is an error.

18    Q.  How did you discover these errors?

19    A.  Two ways.  The first is that CBP actually

20  highlighted some of the cells in the Excel, noting

21  that they seem to be wrong.  The other way that I

22  also did was the MCAT reports provide the detention

23  capacity for every port of entry.  They also

24  provide the number of people that are detained and

25  they provide the person capacity filled.



Page 51

1           So it's a pretty basic calculation of

2    total capacity, total number of people; one divided

3    by the other should give you the percent capacity

4    filled.  And when that number did not equal that

5    simple calculation, I also flagged it.  It

6    pretty -- it's what CBP was also doing.

7           I actually have it in the -- in the

8    Excel that I submitted with my expert report; there

9    is a tab, I think, called double-checking or

10   something like that.  And that's what I was doing

11   is just that very simple calculation to make sure

12   these numbers matched; and, if not, flagging them

13   with -- highlighting the cell.  And I did not

14   attempt to fix the calculations, however.  I just

15   flagged them.

16       Q.  So does this have a percentage error rate,

17   that this -- these errors?

18       A.  You could calculate it based on the

19   numbers that appear to be wrong.

20       Q.  And did you calculate it?

21       A.  No, I didn't.

22       Q.  Okay.  So I want to get back to the

23   methodology again.  The methodology you employed,

24   is it able to demonstrate how OFO makes staffing

25   decisions to protect against national security



Page 52

1   threats?

2              MR. MEDLOCK:  Objection.  Vague.

3   A.  If OFO makes staffing decisions -- how OFO

4   makes staffing decisions to protect against

5   national security threats?

6              I -- I'm thinking, because I don't

7   even know -- there are multiple sets of data you

8   could have even to measure that.  I don't even know

9   if CBP collects data that could say that.  And so,

10  no, I did not include that.  I don't even think CBP

11  has the data to be able to say that they have each

12  component, but taken together, that would be

13  something different.

14  Q.  (By Mr. Nazarov)  Is the methodology you

15  employed able to demonstrate how OFO makes staffing

16  decisions to address national security threats?

17             MR. MEDLOCK:  Objection.  Vague and

18  asked and answered.

19  A.  Again, OFO has staffing data and they have

20  data perhaps on national security; the combination

21  of the two would require additional analysis of

22  those two data sets, if it's even possible.

23             With that said, I did consider these

24  elements.  I could not include them in the report

25  because I didn't find that it would be



Page 53

1   methodologically sound to -- to try to link them to

2   metering in a way that -- let me pause; let me go

3   back.  It would be difficult to link them to

4   metering because the data wasn't collected with

5   that purpose, and it doesn't -- it's collected with

6   different methodology over different time periods

7   in the reports.

8            So I considered it, but I was not able

9   to -- or I chose not to put it in the report

10  because it did not allow me to conduct the analysis

11  I was trying to do.

12  Q.  Is the methodology you employed able to

13  demonstrate how OFO makes staffing decisions to run

14  counter-narcotics programs?

15           MR. MEDLOCK:  Objection.  Vague.

16  Objection.  Asked and answered.

17  A.  I considered -- again, I considered CBP

18  staffing data, and I considered some of the other

19  information I was provided on drug seizures or

20  other operations.  I, ultimately, decided to use

21  the data that CBP uses because my questions that I

22  was asked were based on metering.  So I used the

23  only data that I had that would allow me to get an

24  operational picture of what was happening, was

25  metered, which was physical capacity data.


MAGNA
LEGAL SERVICES

Page 54

1    Q.   (By Mr. Nazarov)  Okay.  So the data you

2    had on counter-narcotics programs and staffing

3    decisions related to counter-narcotics programs,

4    you did not use that data; is that correct?

5              MR. MEDLOCK:  Objection.  Asked and

6    answered, misstates prior testimony, vague.

7    A.   I considered that data, the data that I

8    had that included elements of what you are saying.

9    I just -- I chose not to use it because it wasn't

10   useful in answering the questions I was asked to

11   answer.

12   Q.   (By Mr. Nazarov)  Is the methodology you

13   employed able to demonstrate and consider resources

14   of staffing that may be needed to be allocated to

15   run counter-narcotics operations?

16             MR. MEDLOCK:  Objection.  Asked and

17   answered, vague, compound.

18   A.   Again, I considered data related to some

19   of the elements of what you're saying, but I was

20   unable to use it because it did not allow me to

21   answer the questions I was asked to answer.

22   Q.   (By Mr. Nazarov)  And that's a fair

23   answer.

24             Is the methodology you employed in

25   your merits report able to demonstrate how staffing



Page 55

1   and resources are made by OFO to protect economic

2   security?

3            And let me define economic security

4   for you.  You probably know it, but I will just

5   throw it out there.  It's trade and cargo

6   processing, enforcing trade laws, protecting

7   agriculture and addressing anti-competitive

8   elements in the supply chain.

9            MR. MEDLOCK:  Object to the form.

10  Asked and answered.

11     A.  I, again, looked at data relating to the

12  elements of what you just said.  I was unable to

13  include it in the report because it did not allow

14  me to answer the questions I was asked to answer.

15     Q.  (By Mr. Nazarov)  Is the methodology you

16  employed in your report able to evaluate how

17  staffing and resources are allocated to facilitate

18  trade and travel facilitation?

19            MR. MEDLOCK:  Object to the form,

20  vague, asked and answered.

21     A.  Again, I considered this data -- these

22  data sources.  I even tried to build a model that

23  could include it all.  I was unable to do so.  And

24  I did not find that it allowed me to answer the

25  questions that I wanted to answer because CBP does



Page 56

1    not collect these type of data in a way that allows

2    you to answer questions relating to metering at

3    ports of entry in asylum processing.

4        Q.  (By Mr. Nazarov)  You have to agree that

5    neutralizing national security threats and running

6    counter-narcotics operations are an important

7    part -- a critical part of the CBP mission?

8            MR. MEDLOCK:  Objection.  Form, vague.

9        A.  Correct.

10           MR. MEDLOCK:  Also compound.

11       A.  Correct.

12       Q.  (By Mr. Nazarov)  I'm sorry.  I didn't

13   hear the answer.

14       A.  Correct.

15       Q.  You would have to agree that economic

16   security and trade and travel facilitation are also

17   critical to the larger border missions?

18           MR. MEDLOCK:  Objection.  Form,

19   compound, vague.

20       A.  Correct.

21       Q.  (By Mr. Nazarov)  So, really, in answering

22   the question that you were set out to answer, this

23   methodology only focuses on the small sliver of

24   what goes on at a port of entry; is that correct?

25           MR. MEDLOCK:  Objection.  Asked and



Page 57

1   answered, misstates prior testimony, vague.

2       A.   My focus is understanding metering at

3   ports of entry along the US-Mexico border.   In

4   doing so, I used the only data source that allows

5   me to get that picture.   It is also the only data

6   source that CBP collects to provide an

7   understanding of metering and the one that CBP

8   leadership uses to get a sense of metering in ports

9   of entry.

10              That is ultimately why I used it.   I

11  did consider these other data sources.   I was

12  interested to see if there was a way that I could

13  reconstruct what was going on.   I wasn't able to do

14  that, and I later learned that CBP in this sixth

15  interrogatory also noted that they could not

16  reconstruct what was going on at a port of entry at

17  any given time.

18              And with that, I went back to using

19  the data that CBP uses to look at metering, and

20  that's how I constructed and wrote my report.

21      Q.   (By Mr. Nazarov)   In your data, in your

22  conclusions are focused only on the processing of

23  asylum-seekers; is that correct?

24      A.   Yes, it focuses on the processing of

25  asylum-seekers.



Page 58

1     Q.  I want to take a look -- I want to go to

2     your report, and I have a few questions about that.

3     A.  Okay.

4     Q.  I want to --

5           MR. MEDLOCK:  Which report are you

6     referring to, Ari?  I just want to make sure.

7           MR. NAZAROV:  Yes.  That makes a lot

8     of sense.  I'm referring to Exhibit A, which is

9     your merits report.

10     Q.  (By Mr. Nazarov)  I want to go back and

11    look at Page 73.  That is Section F, titled

12    Operational Capacity Does Not Justify the Turn-Back

13    Policy.  Do you see that?

14     A.  Yes.

15     Q.  Do you want to take a minute to read over

16    that, or can I go ahead and -- why don't I ask the

17    question, and if you think you need to read over

18    it, then you may take the time to do so.

19           If the judge in this case disagrees

20    with your conclusion and finds that operational

21    capacity is a legitimate explanation, how does that

22    affect your conclusion for the report?

23           MR. MEDLOCK:  Objection.  Incomplete

24    hypothetical, calls for a legal conclusion and

25    vague.



Page 59

1      A.  Can I read the section?

2      Q.  (By Mr. Nazarov)  Please.  In fact, if you

3   could, Josh will run it up for you on the screen so

4   you can see it.  Just when you're done with the

5   section, ask him to turn the next page and we'll do

6   that for you.

7      A.  Okay.

8      Q.  Sorry.  Just throw that in there.  We've

9   done that with other witnesses.

10      A.  Next page, please.  Next page, please.

11   Next page, please.  Next page.  Next page, please.

12   Next page, please.  Next page, please.  Next page,

13   please.  Next page, please.  Next page, please.

14   Next page, please.  Next page, please.  Next page,

15   please.  Next page, please, or just maybe perhaps

16   scroll down to the end of the -- that.  Okay.

17      Q.  Would you like the court reporter to read

18   the question to you again?

19      A.  Yes, please.

20          (Record read by Reporter.)

21          MR. MEDLOCK:  I assert my same

22   objection to that question.

23      A.  It wouldn't change it at all.

24      Q.  (By Mr. Nazarov)  Okay.  Let's focus on

25   your Conclusion G, which is right there.  We got to



Page 60

1    it.  I was -- let me go back.

2              I want to ask one last question.  Why

3    wouldn't it change it?

4       A.  What I outline is the history of CBP's use

5    of operational capacity.  It's transitioned from

6    detention capacity to operational capacity.  That

7    would not change regardless of whether it's deemed

8    to be a legitimate or not-legitimate explanation

9    for metering.

10             The second part discusses the lack of

11   data to be able to assess whether operational

12   capacity is a legitimate reason for metering.

13   If -- it would stay the same even if it's deemed a

14   justif- -- a justifiable explanation.  There still

15   wouldn't be the data to be able to assess that

16   because CBP, in assessing the metering policy,

17   collects detention capacity, to make that a

18   different conclusion would require that CBP defines

19   operational capacity and collects different data.

20             If they did that, it might be possible

21   to run a different analysis.  Unfortunately, I

22   don't have that data or that definition and, thus,

23   was unable to do that.

24      Q.  Okay.  Let me turn to your conclusion at

25   G, which is on Page 79.  I believe we're right



Page 61

1   there, a lack of ICE/ERO capacity does not justify

2   turn-backs.

3            If the judge in this case finds that

4   ICE/ERO's slow responses or failure of other

5   agencies to coordinate with OFO affects OFO's

6   ability to move asylum-seekers, how would that

7   change your conclusion?

8            MR. MEDLOCK:  Objection.  Incomplete

9   hypothetical, vague, calls for a legal conclusion.

10      Q.  (By Mr. Nazarov)  Would you like to

11  read -- would you like to read your section before

12  you answer?

13      A.  Yes.

14      Q.  Okay.

15      A.  Next page, please.  Next page, please.

16  Next page, please.  Next page, please.  Next page,

17  please.  Next page, please.  Next page, please.

18            Is it possible to have the court

19  reporter repeat the question like last time?

20      Q.  Of course.

21            MR. NAZAROV:  Ms. Hendrick?

22            (Record read by Reporter.)

23            MR. MEDLOCK:  I will assert the same

24  objections.

25      A.  It would not.



Page 62

1      Q.  (By Mr. Nazarov)  And why not?

2      A.  Can we scroll up to Paragraph 138?  So as

3    I write in Paragraph 138, while ICE/ERO's slow

4    responses or limited pick-ups may affect OFO's

5    ability to move asylum-seekers quickly out of ports

6    of entry, these situations constitute self-imposed

7    bottlenecks.

8            And then I go on.  And that's -- that

9    would be the same regardless of the judge's

10   conclusion.  I do note that slow responses or

11   limited pick-up times affect OFO's ability to move

12   asylum-seekers out of ports of entry; however, I

13   also conclude that this is a self-imposed

14   bottleneck on processing asylum-seekers.

15           THE REPORTER:  I'm sorry.  Say that

16   last part again.

17      A.  I said that conclusion would remain the

18   same.

19      Q.  (By Mr. Nazarov)  What do you mean by

20   self-imposed bottlenecks?

21      A.  I mean that there are other ways to move

22   asylum-seekers through ports of entry that do not

23   need to be immediate mandatory detention.  In fact,

24   in other points of time CBP has pursued these

25   alternatives, including creating alternative



Page 63

1   processing centers or moving forward in that

2   creation, which I also mentioned earlier in that

3   report, or paroling individuals.

4           However, there has been a focus on

5   mandatory detention, as I write in the next line.

6   The mandatory detention for asylum-seekers and the

7   reluctance and refusal to use NTAs or paroles,

8   these are policy and leadership decisions, not

9   immutable rules.

10   Q.  Okay.  I have one more question before I

11   pass the witness.

12           If someone else were to analyze your

13   work and try to replicate it, how would they go

14   about doing it?

15   A.  Well --

16           MR. MEDLOCK:  Objection.  Vague.

17   A.  -- there are multiple ways.  Primarily, if

18   they wanted to just write the report, they could

19   review the documents that I reviewed.  And --

20   apologies; things moved around on my screen -- they

21   could review the documents that I reviewed; they

22   could review the queue management reports and the

23   MCAT reports; they could build the database that I

24   built.  You can easily build that again.

25           In fact, for every column in that



Page 64

1   Excel, I note the Bates number of the report that I
2   used, so you could very clearly rebuild it.  You
3   could review the documents.  I used primarily all
4   the documents that were provided in discovery.  And
5   I also used other reports, outside reports, when
6   relevant.
7                You could essentially build this by
8   reviewing everything that I reviewed.  However --
9   and that's why I paused in the beginning -- I think
10  you would also want to have the foundational
11  knowledge, having visited ports of entry, having
12  spoken to asylum-seekers, having spoken to CBP
13  officers at the limit line, having watched metering
14  take place.
15               Because, in taking all this data and
16  taking all these emails and the reports, having
17  that foundational knowledge and having conducted
18  that fieldwork previously helps to put it into a
19  context and helps to be able to pick out what's
20  actually important and what is irrelevant to
21  answering these specific questions.
22               MR. NAZAROV:  Okay.  Well, thank you,
23  Ms. Leutert.  I'm going to pass you to your
24  attorney, Steve.  And he can decide whether he has
25  any questions for you, and then I might come and



Page 65

1    redirect depending on whatever questions he has.

2              MR. MEDLOCK:  Sure.  Ari, can we go

3    off the record for maybe 10 minutes so I can

4    discuss with my co-counsel whether I do have

5    questions?

6              MR. NAZAROV:  Sure.  Can we take more

7    than 10 minutes?  Can we take 15 minutes?

8              MR. MEDLOCK:  Absolutely.  So come

9    back at -- let's say we come back at 1:40 Eastern,

10   12:40 Central.

11             MR. NAZAROV:  1:40.  Okay.  That

12   sounds good.  Thank you both.

13             THE VIDEOGRAPHER:  The time is 12:22.

14   We are off the record.

15             (Recess taken.)

16             THE VIDEOGRAPHER:  The time is 12:41.

17   We are back on the record.

18             MR. MEDLOCK:  Ms. Leutert, thank you

19   very much for your time today.  Al Otro Lado and

20   the class has no questions for you at this time.

21             MR. NAZAROV:  I would like to also

22   thank you for your time today.  Thank you, and I

23   guess this concludes our deposition.

24             Josh, what do we do next?

25             MR. MEDLOCK:  I say we are off the



Page 66

1    record.   The time is 12:41, and that concludes

2    today's deposition.

3              MR. MEDLOCK:   We'll, obviously, read

4    and sign this.

5              MR. NAZAROV:   That's fine with us.

6              (End of Proceedings, 12:42 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 67

```
 1                    CHANGES AND SIGNATURE

 2    WITNESS NAME:  STEPHANIE LEUTERT

 3    DATE OF DEPOSITION:  AUGUST 11, 2020

 4    PAGE           LINE     CHANGEREASON

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```



Page 68

1        I, STEPHANIE LEUTERT, have read the foregoing
    deposition and hereby affix my signature that same
2   is true and correct, except as noted above.

3

4

5   _____
    STEPHANIE LEUTERT

6

7   THE STATE OF __Texas_____

    COUNTY OF __Travis_____

8

9

10  Before me, _____, on this day
    personally appeared STEPHANIE LEUTERT, known to me
11  (or proved to me under oath or through
    _____) to be the person whose name is
12  subscribed to the foregoing instrument and
    acknowledged to me that they executed the same for
13  the purposes and consideration therein expressed.

14

15  Given under my hand and seal of office this _____
    day of _____, 2020.

16

17

18  _____
    NOTARY PUBLIC IN AND FOR THE
19  STATE OF _____

20

21  MY COMMISSION EXPIRES:_____

22

23

24

25



Page 69

```
  1                   REPORTER'S CERTIFICATION
  2            IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF CALIFORNIA
  3

      AL OTRO LADO, INC, ET AL.  )
  4                              )
                                 )  CIVIL ACTION NO.
  5   VS.                        )  17-CV-02366-BAS-KSC
                                 )
  6   KEVIN K. MCALEENAN, ET AL. )
  7            ------------------------------------
  8            DEPOSITION OF STEPHANIE LEUTERT
                     AUGUST 11, 2020
  9                 REPORTED REMOTELY
 10            ------------------------------------
 11
 12            I, CHARIS M. HENDRICK, Certified Shorthand
 13   Reporter in and for the State of Texas, do hereby
 14   certify to the following:
 15            That the witness, STEPHANIE LEUTERT, was
 16   by me duly sworn and that the transcript of the
 17   oral deposition is a true record of the testimony
 18   given by the witness.
 19            I further certify that pursuant to Federal
 20   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)
 21   as well as Rule 30(e)(2), that review of the
 22   transcript and signature of the deponent:
 23      __xx__ was requested by the deponent and/or a
 24   party before completion of the deposition.
 25      _____ was not requested by the deponent and/or
```



Page 70

1    a party before the completion of the deposition.

2           I further certify that I am neither

3    attorney  nor counsel for, nor related to or

4    employed by any of the parties to the action in

5    which this deposition is taken and further that I

6    am not a relative or employee of any attorney of

7    record in this cause, nor am I financially or

8    otherwise interested in the outcome of the action.

9           The amount of time used by each party at

10   the deposition is as follows:

11          Mr. Nazarov - 1:44 hours/minutes

12

13          Subscribed and sworn to on this 21st day

14   of August, 2020.

15

16

17   _____

     CHARIS M. HENDRICK, CSR # 3469

18   Certification Expires: 10-31-21

     MAGNA LEGAL SERVICES

19   (866) 624-6221

     Firm Registration No. 633

20

21

22

23

24

25



**A**

**ability** 32:20 61:6
62:5,11
**able** 33:2 34:25
39:14 43:17,21
51:24 52:11,15
53:8,12 54:13
54:25 55:16
57:13 60:11,15
64:19
**above-styled**
1:18
**Absolutely** 65:8
**accepted** 6:24
**access** 41:8
**accompanying**
30:25
**acknowledged**
68:12
**acronym** 25:14
26:4
**Act** 30:15,19
**action** 1:3 69:4
70:4,8
**additional** 18:16
34:25 35:3,5
37:14 52:21
**address** 52:16
**addressing** 55:7
**administration**
10:3,7
**admissibility**
25:17
**admission** 15:8
**advise** 13:2,6
**advised** 12:24
**AEU** 25:14
**affairs** 7:22 8:13
10:13,15
**affect** 31:20
58:22 62:4,11
**affix** 68:1
**agencies** 61:5
**agency** 12:9,14
12:18 13:2,6

**ago** 21:21 49:15
49:18
**agree** 44:25 47:5
47:14 56:4,15
**Agreement** 29:21
**agriculture** 55:7
**aguisado@ccrj...**
2:12
**ahead** 6:14 24:24
25:11 35:22
58:16
**AI** 1:2,2,5 4:5,17
4:22 65:19 69:3
69:3,6
**Alabama** 2:8
**Alex** 5:1
**ALEXANDER**
2:15
**alexander.j.hal...**
2:19
**allocated** 54:14
55:17
**allow** 53:10,23
54:20 55:13
**allowed** 55:24
**allows** 56:1 57:4
**alternative** 62:25
**alternatives**
62:25
**America** 31:13
**amount** 70:9
**analysis** 8:18,20
9:8,9,12 45:10
52:21 53:10
60:21
**analyst** 41:14
**analyze** 9:12
63:12
**analyzing** 8:25
41:17
**and/or** 69:23,25
**Angelo** 2:10 4:19
**answer** 6:14
34:14 35:23
43:9,17,21 49:6
54:11,21,21,23

55:14,14,24,25
56:2,13,22
61:12
**answered** 20:11
21:13 25:22
28:23 32:16
38:22 40:19
48:1 52:18
53:16 54:6,17
55:10,20 57:1
**answering** 54:10
56:21 64:21
**ANSWERS** 1:16
**anthropology**
40:13
**anti-competitive**
55:7
**anybody** 41:5
**Anyplace** 24:15
**apologies** 63:20
**appear** 51:19
**appearances** 3:2
4:14
**appeared** 68:10
**appears** 32:9
**apprehensions**
21:9
**appropriate**
45:10
**areas** 21:19
28:17
**Ari** 2:15 4:23
5:16 39:9 58:6
65:2
**ari.nazarov@u...**
2:19
**arrive** 27:6,7,21
**arrived** 18:11
**asked** 20:11
21:22 24:19
25:21 28:22
32:15 38:21
40:18 43:2,18
43:22,25 45:4
47:25 52:18
53:16,22 54:5

54:10,16,21
55:10,14,20
56:25
**assert** 59:21
61:23
**assess** 60:11,15
**assessing** 60:16
**assigned** 41:13
**assume** 18:25
42:12,23
**assumed** 42:25
**assumption**
42:14
**assumptions**
42:10,11,16,20
**asylum** 34:10
56:3
**asylum-seekers**
27:7,17 32:20
44:20 57:23,25
61:6 62:5,12,14
62:22 63:6
64:12
**attached** 1:25
**attempt** 51:14
**attempted** 34:14
**attorney** 64:24
70:3,6
**August** 1:10,19
4:6 67:3 69:8
70:14
**Austin** 1:22 5:9
5:18 6:25 12:20
**Avenue** 2:7
**aware** 26:3
**a.m** 1:19 4:6

**B**

**B** 69:20
**bachelor's** 7:22
**back** 14:9,19,22
15:4,8,13 27:8
31:17 38:7 42:8
43:4 45:20 46:2
46:17 49:25
50:1 51:22 53:3

54:10,16,21
55:10,14,20
56:25
57:18 58:10
60:1 65:9,9,17
**background** 7:15
**Baja** 13:17,18
**based** 9:1 33:22
38:3 47:4 51:18
53:22
**basic** 41:17 42:18
51:1
**Bates** 64:1
**beach** 13:15
**began** 37:16
**beginning** 42:3,4
64:9
**begins** 4:3
**behalf** 4:17
**believe** 8:1,11 9:7
12:3 19:10 20:1
20:14 22:20
25:1 33:15
38:11 41:2 44:7
44:15 45:6 48:2
49:14 60:25
**believed** 32:10
36:14
**believes** 28:15
**Ben** 2:17
**benefit** 22:2
**best** 32:12 49:20
**beyond** 14:17,22
16:3 31:21
32:20,21
**biggest** 43:11
**bit** 38:18
**blending** 20:25
**border** 7:6,12
13:15,16 19:20
19:23 20:8,10
21:3 22:11,22
22:23,23 23:7
33:24 49:23
56:17 57:3
**bottleneck** 62:14
**bottlenecks** 62:7
62:20
**Box** 2:17



**break** 6:8 36:6
45:12
**Bridge** 23:18
**bridges** 17:3
23:13
**briefly** 32:24
**bring** 20:6,13
**broader** 8:6
**Broadway** 2:11
**brought** 18:13
20:5
**Brown** 2:3 4:16
4:18
**Brownsville**
23:10 24:2
**budget** 19:22
21:13
**budgets** 11:7
19:15
**build** 55:22 63:23
63:24 64:7
**building** 14:10
23:4
**built** 10:18 63:24

**C**

**C** 2:1 17:17
**calculate** 51:18
51:20
**calculation** 51:1
51:5,11
**calculations**
51:14
**Calexico** 14:2,9
14:17,19
**California** 1:1
13:17,18 69:2
**called** 9:8 51:9
**calls** 58:24 61:9
**capacity** 27:14
28:3,7,9 31:15
31:19,21,24
32:3,21,22 37:8
37:10,15,20,22
37:23 43:23
44:1,3 50:15,23

50:25 51:2,3
53:25 58:12,21
60:5,6,6,12,17
60:19 61:1
**cargo** 55:5
**carried** 9:18
**case** 34:9 58:19
61:3
**Cassler** 2:6 4:20
**catch** 20:19
**cause** 1:19 70:7
**CBP** 11:23 14:14
14:20 15:15
16:17 17:17
19:13,22 24:4
27:11 28:11,15
30:3 31:20,23
32:19 36:21
37:24 41:13
43:12,24 44:1,4
44:9,11,13,22
45:1 46:6 49:2
49:7,12 50:14
50:19 51:6 52:9
52:10 53:17,21
55:25 56:7 57:6
57:7,14,19
60:16,18 62:24
64:12
**CBP's** 29:6,10,12
43:12 60:4
**cell** 51:13
**cells** 50:20
**Center** 2:7,10
4:19,21
**centers** 63:1
**Central** 31:12
65:10
**certain** 15:14
27:19 28:11,17
28:18 35:9
43:14 49:14
**certainly** 45:3
47:19
**certificate** 3:7
8:3,5,6

**Certification**
69:1 70:18
**Certified** 1:20
69:12
**certify** 69:14,19
70:2
**chain** 55:8
**change** 59:23
60:3,7 61:7
**changed** 37:6
**CHANGEREA...**
67:4
**changes** 3:6 6:19
37:1 67:1
**Charis** 1:20 4:11
69:12 70:17
**checkpoints**
18:17
**chose** 9:17 53:9
54:9
**cite** 41:22
**cities** 13:16
**city** 1:22
**Civil** 1:3,24 4:24
5:2 69:4,20
**clarify** 33:6,14
**class** 4:17,22 9:10
9:10,15 10:18
10:22,23 11:3
11:10,11 12:1
20:15,15 26:5
65:20
**classes** 7:25 10:1
10:7,17 11:13
**classified** 41:10
**clear** 37:15
**clearly** 6:5 64:2
**collect** 9:11 44:3
44:6 56:1
**collected** 9:1 40:1
43:25 44:15
53:4,5
**Collecting** 8:21
**collects** 52:9 57:6
60:17,19
**College** 7:21

**Columbia** 2:4,18
**column** 63:25
**combination**
27:18,22 52:20
**come** 43:4 49:25
64:25 65:8,9
**coming** 9:1 11:1
41:17
**COMMISSION**
68:21
**completion** 8:5
69:24 70:1
**complicated** 28:8
**component** 52:12
**compound** 11:9
24:6 40:19 46:9
54:17 56:10,19
**computer** 35:24
**conclude** 62:13
**concludes** 65:23
66:1
**conclusion** 37:7
58:20,22,24
59:25 60:18,24
61:7,9 62:10,17
**conclusions** 9:1
35:10,17,18
37:5 57:22
**conditions** 29:25
29:25
**conduct** 53:10
**conducted** 5:6
13:12 33:23
64:17
**confident** 37:3
**confused** 42:17
**confusion** 18:2
**Congratulations**
7:1
**connection** 17:6
**consider** 42:14
44:18 52:23
54:13 57:11
**consideration**
68:13
**considered** 53:8

53:17,17,18
54:7,18 55:21
**considering** 41:9
**consistent** 40:1
**constitute** 62:6
**Constitutional**
2:10 4:20
**constructed**
57:20
**contained** 42:2
**context** 64:19
**contingency** 47:6
47:10 48:8,20
**Continue** 43:20
**contracts** 11:19
11:21 19:15
**control** 26:18
**conversations**
19:7
**coordinate** 61:5
**copied** 39:7
**core** 10:22,23
40:10
**correct** 7:23,24
8:1,15 12:6,7
13:18 24:11,12
43:13 54:4 56:9
56:11,14,20,24
57:23 68:2
**correctly** 23:5
**counsel** 4:13 6:12
34:12,15 70:3
**counter-narcot...**
53:14 54:2,3,15
56:6
**countries** 31:1,12
**County** 1:22 68:7
**course** 8:9,10 9:2
9:7,13 39:24
61:20
**courses** 8:6,8,18
**court** 1:1 4:11
5:3 13:24 23:17
23:22 59:17
61:18 69:2
**courtroom** 6:2



**covered** 10:24
  21:19 22:1 25:1
**COVID-19** 5:7
**co-counsel** 65:4
**creates** 37:19
**creating** 62:25
**creation** 63:2
**critical** 56:7,17
**crossed** 14:8,18
  15:3
**CSR** 70:17
**current** 5:7
**cut** 7:10
**CV** 6:18

**D**

**daily** 46:11
**data** 8:18,20,22
  8:24,25 9:2,8,8
  9:11,11,18 35:8
  40:1,24 42:3,7
  43:12,13,16,16
  43:25 44:3,5,7
  44:15,22,25
  45:4,6 46:12
  50:16 52:7,9,11
  52:19,20,22
  53:4,18,21,23
  53:25 54:1,4,7
  54:7,18 55:11
  55:21,22 56:1
  57:4,5,11,19,21
  60:11,15,19,22
  64:15
**database** 63:23
**date** 33:15 67:3
**dated** 32:25
  41:24
**day** 27:18,19
  42:13,25 68:10
  68:15 70:13
**days** 43:14
**day-long** 20:17
**day-to-day** 46:13
**deal** 10:2
**dealt** 19:17

**December** 34:17
  34:21 35:19
  38:9 42:6
**decide** 64:24
**decided** 53:20
**decisions** 51:25
  52:3,4,16 53:13
  54:3 63:8
**deemed** 60:7,13
**Defendant** 1:18
**defendants** 2:14
  4:25
**define** 8:20 11:17
  26:7 28:3,19,21
  31:25 32:1,12
  32:14,17 55:3
**defined** 32:7,9,17
**defines** 60:18
**defining** 28:24
**definition** 26:25
  27:3,23 28:10
  29:2,5,6,15
  31:14,18,24
  36:20 38:3
  43:23 44:2,5
  60:22
**degree** 7:22 8:4,7
  8:13 10:13
**Del** 24:25
**demonstrate**
  51:24 52:15
  53:13 54:13,25
**Department** 2:16
  4:9,24
**depending** 65:1
**deponent** 69:22
  69:23,25
**deposition** 1:9,10
  1:16 4:4,7 5:5
  5:18,21 6:9,17
  31:17,23 32:4
  32:18 36:14
  37:9 65:23 66:2
  67:3 68:1 69:8
  69:17,24 70:1,5
  70:10

**depositions** 37:14
  38:1,4
**descriptive** 41:18
**designed** 11:1
  30:3 47:6,11
  48:3,4
**detained** 50:24
**detention** 29:16
  29:24 50:22
  60:6,17 62:23
  63:5,6
**determined**
  28:16 29:24
**determines** 28:11
**determining**
  27:16 30:24
**develop** 38:19
  39:20
**developed** 38:20
  39:6,6
**Dhru** 5:1
**DHRUMAN**
  2:16
**differed** 36:12
**difference** 31:11
**differences** 34:19
  34:24 38:12
**different** 9:18,18
  10:24 21:1 29:6
  32:3 34:7 35:9
  35:10,17,18
  38:8,10 52:13
  53:6,6 60:18,19
  60:21
**difficult** 31:25
  41:11 44:4 53:3
**difficulties** 36:3
**directly** 12:22
**director** 27:15
**disagrees** 58:19
**Disaster** 5:8
**discover** 50:18
**discovered** 50:15
**discovery** 31:22
  32:8 34:14 35:6
  36:19 38:6 64:4

**discuss** 15:16
  16:16 19:13,22
  24:3 37:23 65:4
**discusses** 31:20
  31:20 60:10
**discussing** 26:22
**discussion** 13:25
  19:21 35:14
**discussions** 19:9
**disseminated**
  36:22
**District** 1:1,1 2:4
  2:18 69:2,2
**divided** 51:2
**Division** 4:25 5:2
**document** 18:15
  18:16
**documenting**
  41:16
**documents** 34:9
  34:13 35:6
  36:18 37:14
  63:19,21 64:3,4
**doing** 41:17 51:6
  51:10 57:4
  63:14
**double-checking**
  51:9
**drove** 22:7
**drug** 21:10 53:19
**duly** 5:13 69:16
**dynamics** 7:12
  20:8 22:12

**E**

**E** 2:1,1
**Eagle** 24:25 25:7
**earlier** 37:9 63:2
**easily** 63:24
**Eastern** 65:9
**economic** 55:1,3
  56:15
**economics** 10:20
**education** 6:20
  8:16
**educational** 7:15

**eight** 20:14
**either** 49:16
**El** 16:24 17:3
  19:8,12,12,20
  20:5,6 22:5,17
  23:5
**elements** 47:17
  48:7,11 52:24
  54:8,19 55:8,12
**Elimination**
  30:15
**emails** 38:5 49:16
  64:16
**emergencies** 47:7
**emergency** 5:7
**employed** 12:5
  12:18 51:23
  52:15 53:12
  54:13,24 55:16
  70:4
**employee** 70:6
**employment** 6:20
**encompassing**
  27:1
**enforcement**
  10:2 25:17
**enforcing** 55:6
**entire** 10:16
  22:12 27:21
  37:11
**entry** 13:10,21
  14:2,7,13,17,21
  14:25 15:9,14
  15:23 16:4,7,24
  17:2 18:3,7,23
  19:4,8,11,19
  21:1 22:17,21
  23:10,18 24:2,8
  24:10,18 25:4
  26:4,5 27:6,7
  27:17,21 28:6
  28:14,16 34:6
  36:23 40:2
  41:14 44:20
  45:2 46:16 47:6
  48:16,21 49:24



50:23 56:3,24
57:3,9,16 62:6
62:12,22 64:11
**equal** 51:4
**error** 50:3,17
51:16
**errors** 50:15,16
50:18 51:17
**Escort** 29:16
**essentially** 27:5
64:7
**ET** 1:2,5 69:3,6
**evaluate** 41:12
55:16
**evaluation** 49:11
**evidence** 39:1,2,3
**evolution** 37:19
**evolve** 38:16
**evolving** 37:22
**exactly** 43:2
**Examination** 3:4
5:14
**example** 11:22
40:6 42:12
**Excel** 41:16,22
41:23 50:20
51:8 64:1
**exchanges** 18:23
**executed** 68:12
**exhibit** 26:14,15
39:3 58:8
**exhibits** 26:18
**expert** 26:9 33:8
35:2 36:24 50:5
50:7 51:8
**experts** 50:4
**Expires** 68:21
70:18
**explain** 18:4 22:3
**explained** 22:12
**explaining** 18:2
**explains** 26:21
**explanation**
27:13 32:22
58:21 60:8,14
**expressed** 68:13

**Extension** 8:2
**externship** 12:9
12:13

**F**

**F** 58:11
**facilitate** 55:17
**facilitation** 55:18
56:16
**facilities** 30:3,7
**fact** 59:2 62:23
63:25
**factors** 31:19
32:19
**facts** 42:12,16
**factual** 42:10,11
42:14
**failure** 61:4
**fair** 46:18 47:1
54:22
**fall** 7:18,19
**familiar** 5:22
29:9,12,19,20
30:2,14,17
40:14
**Federal** 1:23
12:5,9 13:2
69:19
**fence** 13:15
**field** 36:22 40:5
**fields** 34:5 40:12
**fieldwork** 13:12
33:23 64:18
**filing** 31:21
**filled** 50:25 51:4
**Finally** 6:11
**financially** 70:7
**find** 9:11 36:1
52:25 55:24
**findings** 36:11,17
**finds** 58:20 61:3
**fine** 45:17 66:5
**fire** 28:16
**Firm** 70:19
**first** 20:19 33:23
35:2,11 36:12

36:24 50:19
**fit** 28:4,15
**fix** 51:14
**flagged** 51:5,15
**flagging** 51:12
**Floor** 2:11
**Flores** 29:21
**focus** 7:5 10:14
11:3 41:1 57:2
59:24 63:4
**focused** 10:23
11:11 12:2
57:22
**focuses** 56:23
57:24
**focusing** 44:19
**following** 9:16
69:14
**follows** 5:13
70:10
**follow-up** 9:9,15
**footnote** 26:10,21
27:25 50:8,12
**footnotes** 41:22
**foregoing** 68:1
68:12
**form** 9:5 11:25
12:10,15 15:6
15:25 16:9,14
16:19 17:19
21:20 24:5,23
32:5 37:25 41:7
48:19 55:9,19
56:8,18
**forward** 63:1
**foundation** 34:11
**foundational**
64:10,17
**framework** 10:18
11:2
**Franklin** 2:17
**frankly** 26:14
**front** 33:2 39:4
**fully** 40:21
**further** 69:19
70:2,5

**G**

**G** 59:25 60:25
**Gateway** 23:18
**general** 30:2
**generally** 21:9
**give** 26:16 27:1,3
29:14 31:14
40:6 51:3
**given** 28:11
57:17 68:15
69:18
**global** 8:13 10:13
**go** 6:14 13:23
14:13 18:17
24:23 25:11
33:7 35:12,22
36:2 38:7 42:8
46:17 50:1 53:2
58:1,10,16 60:1
62:8 63:13 65:2
**goes** 56:24
**going** 5:11 6:13
11:2 18:3,7
27:19,20 29:14
33:5 34:11
44:23 45:11
46:16 57:13,16
64:23
**going-ons** 11:24
**good** 4:15 5:16
65:12
**government** 11:1
11:2,6,20 12:5
12:9,13,18,22
12:23 13:2
**governmental**
10:7,15
**graduate** 9:21,22
**graduated** 7:21
8:13
**Great** 45:22
**group** 20:4 23:13
25:23
**guess** 41:1 65:23
**guidance** 36:20

**Guisado** 2:10
4:19

**H**

**Halaska** 2:15 5:1
**half** 20:15 33:25
40:3
**hand** 5:11 68:15
**happened** 18:10
19:4 36:8
**happening** 53:24
**happens** 36:9
**Harvard** 7:25 8:2
9:23
**head** 21:1
**heads** 36:22
**hear** 17:14 47:23
49:6 56:13
**heard** 25:13
30:21,23
**hearing** 22:2
23:22
**held** 30:1
**help** 44:23
**helpful** 43:22
**helps** 64:18,19
**Hendrick** 1:20
4:11 61:21
69:12 70:17
**hereto** 1:25
**hesitate** 31:25
**Hidalgo** 15:23
16:5
**higher** 22:10
48:4
**highlight** 22:9,9
**highlighted**
50:20
**highlighting**
51:13
**hired** 13:1,6
**history** 6:20
10:23 60:4
**hit** 21:8
**hold** 30:4
**hour** 6:10 18:21



18:22 45:12
**hours** 30:10
42:13,25
**hours/minutes**
70:11
**husband** 15:12
17:7 18:25 19:4
**husband's** 18:1
19:17
**hypothetical**
43:20 58:24
61:9

**I**

**ICE/ERO** 61:1
**ICE/ERO's** 61:4
62:3
**ideal** 43:15
**imagine** 26:5
**immediate** 62:23
**immediately**
27:20
**immigration**
2:17 23:23 41:6
**immutable** 63:9
**important** 6:12
56:6 64:20
**impression** 37:10
**include** 45:7
52:10,24 55:13
55:23
**included** 35:8
36:25 37:18
54:8
**including** 32:21
62:25
**Incomplete** 43:19
58:23 61:8
**increases** 47:11
**independent** 9:14
**INDEX** 3:1
**individual** 27:16
41:20 49:24
**individuals** 27:6
30:4 34:7 63:3
**influenced** 32:19

**information** 35:1
35:4 47:4 53:19
**initially** 37:2
**inside** 13:10,21
14:2,6,10,13
15:5,23 16:4,6
16:24 19:19
23:6,10 25:3
**inspection** 17:4,5
17:9 18:20
**instance** 1:17
**instructions** 5:23
**instructs** 6:15
**instrument** 68:12
**integral** 10:16
**interchangeably**
26:25 28:1
**interested** 57:12
70:8
**interesting** 20:22
21:25
**interior** 18:17
**international**
7:22 10:15
27:12
**internship** 12:8
12:13
**interrogatory**
57:15
**interviews** 34:7
40:10 41:4
**introduce** 26:14
**involve** 8:8
**involved** 11:7,7
44:14
**in-depth** 33:25
**irrelevant** 64:20
**issue** 34:1
**issues** 11:12
38:16

**J**

**January** 5:18
6:17,20 20:1
32:4
**Josh** 2:21 33:1,2

39:13 59:3
65:24
**Joshua** 4:10
**judge** 23:23
58:19 61:3
**judge's** 62:9
**July** 32:25 33:16
33:17,18 34:20
38:9
**June** 42:5
**jurisdiction**
23:20
**Justice** 2:16 4:9
4:24
**justif** 60:14
**justifiable** 60:14
**justify** 58:12 61:1

**K**

**K** 1:5 2:4 69:6
**KEVIN** 1:5 69:6
**key** 34:19,23
**kind** 22:2,10 27:1
40:16
**know** 5:24 6:9
11:23 12:21
25:25 29:5 36:8
36:23 40:15,25
41:1,19,21,23
42:19,22 46:6
46:14 48:25
49:12,21,24
52:7,8 55:4
**knowledge** 49:20
64:11,17
**known** 37:18
68:10

**L**

**labor** 11:15,17
**lack** 60:10 61:1
**Lado** 1:2 4:5,17
4:22 65:19 69:3
**Laredo** 16:7,20
16:21
**large** 9:13

**larger** 56:17
**law** 2:7 4:21 10:2
**laws** 55:6
**lead** 8:3
**leadership** 36:21
46:15 57:8 63:8
**learned** 31:22
32:8 57:14
**learning** 11:5
**lectured** 31:3,8
**ledge** 22:10
**legal** 4:8,10,11
58:24 61:9
70:18
**legitimate** 58:21
60:8,12
**length** 15:15 30:3
30:8
**let's** 7:15 26:13
33:7 36:2 37:21
38:7 39:12
59:24 65:9
**Leutert** 1:9,17
3:3 4:4 5:10,12
5:16 35:16 46:3
64:23 65:18
67:2 68:1,5,10
69:8,15
**level** 47:7
**levels** 47:11 48:4
**limit** 14:17 27:12
64:13
**limited** 62:4,11
**line** 14:17 27:12
27:12 63:5
64:13 67:4
**link** 45:8 53:1,3
**listed** 38:25
40:16
**literature** 7:23
**LITIGATION**
2:17
**little** 31:25 36:6
38:18
**LLP** 4:16,19
**located** 1:22 5:8

**long** 18:8,19 48:9
48:12
**long-term** 47:14
47:18,20,24
48:3
**look** 41:14 44:1
45:5 57:19 58:1
58:11
**looked** 44:22
55:11
**looking** 41:1 45:5
**looks** 27:10 44:23
**lot** 10:23 58:7
**Lukeville** 25:1

**M**

**M** 1:20 2:3 69:12
70:17
**Magna** 4:8,10,11
70:18
**main** 36:13
**manage** 11:6
**managed** 11:21
**management**
11:15,17 26:24
27:24 28:2,25
35:8 41:2,9
46:7 63:22
**mandatory** 62:23
63:5,6
**marshal** 28:16
**master's** 8:13,17
**matched** 51:12
**matches** 28:14
**matter** 4:4
**Mayer** 2:3 4:16
4:18
**ma'am** 16:21
**McAleenan** 1:5
4:5 69:6
**MCAT** 41:2,8
46:6 50:22
62:3
**mean** 8:24 14:15
18:25 25:16,19
25:20 28:6



42:11 43:1
44:11 46:10
62:19,21
**measure** 44:3,4
52:8
**Medlock** 2:3 4:15
4:16 8:19,23
9:5 10:4,9 11:8
11:16,25 12:10
12:15 13:3,8
14:11 15:6,20
15:25 16:9,14
16:19 17:19
18:24 20:11
21:20 22:19
24:5,23 25:10
25:21 28:22
29:8 30:6,11
31:16 32:5,15
33:14 34:22
35:20 37:25
38:21 39:8,21
40:18 41:7
42:15,24 43:7
43:19 44:10
45:17,22 46:8
46:21 47:9,16
47:25 48:19
49:3 52:2,17
53:15 54:5,16
55:9,19 56:8,10
56:18,25 58:5
58:23 59:21
61:8,23 63:16
65:2,8,18,25
66:3
**meet** 19:24 20:9
45:20
**meeting** 20:4,17
**mentioned** 35:17
37:9 63:2
**mentioning**
31:10
**merits** 26:9 32:24
33:9,10 38:8
54:25 58:9

**Mesa** 13:21
**met** 5:17 19:20
20:2,10
**metered** 53:25
**metering** 26:7,22
26:24 27:4,5,22
28:1,24 34:6
36:14 40:1
41:14 42:4 45:5
45:8 53:2,4,22
56:2 57:2,7,8
57:19 60:9,12
60:16 64:13
**methodologica...**
45:7 53:1
**methodologies**
34:3 40:4,8
46:22
**methodology**
33:20 34:16
38:18,19,23,24
39:5,20 40:7,16
40:22 41:6,15
42:8 43:6 44:8
44:16 46:17,19
46:20 50:2,3
51:23,23 52:14
53:6,12 54:12
54:24 55:15
56:23
**methods** 40:14
**metrics** 43:24
**Mexicali** 13:18
14:8,12,18
**Mexico** 27:8
31:11 34:8
**Michelle** 4:18
**microeconomics**
8:9 10:19
**mid** 37:16
**migration** 7:11
47:8,12 48:5
**migratory** 20:7
**mind** 26:15
**minimized** 35:25
**minor** 30:25

**minors** 29:25
30:25 31:11
**minute** 13:24
33:19 58:15
**minutes** 18:13
65:3,7,7
**mission** 14:22
24:4 56:7
**missions** 19:14
21:10 44:14
45:1,3 56:17
**misstates** 22:19
25:10 35:20
54:6 57:1
**misunderstand...**
18:14
**model** 55:22
**Montgomery** 2:8
**months** 19:7 42:3
42:6
**morning** 4:15
5:16
**move** 5:22 43:3
61:6 62:5,11,21
**moved** 63:20
**moving** 63:1
**MPP** 23:16,22
**multiple** 17:2,3
21:3 49:18
50:15 52:7
63:17
**multipronged**
27:5
**municipal** 12:22

**N**

N 2:1
**name** 4:23 5:16
41:21 67:2
68:11
**narcotics** 44:14
**national** 21:11
29:15 51:25
52:5,16,20 56:5
**Nazarov** 2:15 3:4
4:23,23 5:15,17

7:13 8:21,25
9:6 10:6,11
11:14,19 12:3
12:12,17 13:5,9
13:23 14:1,16
15:10,22 16:1
16:10,16,21
17:13,22 19:1,3
20:12 23:1 24:9
25:3,13,25 29:1
29:9 30:8,12
32:2,11,23 33:1
33:7,10,13,17
33:19 35:3,12
35:16,22 38:2
38:24 39:11,14
39:24 40:23
41:19 42:21
43:3,9 44:7,13
45:15,19 46:3
46:11,23 47:13
47:23 48:11,22
49:5 52:14 54:1
54:12,22 55:15
56:4,12,21
57:21 58:7,10
59:2,24 61:10
61:21 62:1,19
64:22 65:6,11
65:21 66:5
70:11
**need** 6:8 18:16
58:17 62:23
**needed** 15:13
45:9 54:14
**Negotiations**
11:19
**neither** 70:2
**neutralizing** 56:5
**never** 12:4
**new** 2:11,11 35:7
36:25 37:22
47:22
**Newark** 18:7
**nice** 5:18
**nine** 20:14

**Nogales** 22:23
23:6 24:10
**nonpublic** 47:4
**non-contiguous**
30:25 31:12
**NOTARY** 68:18
**note** 62:10 64:1
**noted** 32:19
43:13 57:15
68:2
**noting** 50:20
**not-legitimate**
60:8
**November** 42:6
**NTAs** 63:7
**number** 4:3
27:19 28:4,13
28:13,14 50:24
51:2,4 64:1
**numbered** 1:19
**numbers** 28:12
41:16 51:12,19
**N.W** 2:4

**O**

**oath** 6:1 46:4
68:11
**object** 6:13 9:5
11:25 12:10,15
15:20,25 16:9
16:14,19 21:20
24:5,23 32:5
37:25 55:9,19
**objection** 6:13
8:19,23 10:4,9
11:8,16 13:3,8
14:11 15:6
17:19 18:24
22:19 25:21
28:22 29:8 30:6
30:11 31:16
32:15 34:22
35:20 38:21
39:8,21 40:18
41:7 42:15,24
43:7,19 44:10



46:8,21 47:9,16
47:25 48:19
49:3 52:2,17
53:15,16 54:5
54:16 56:8,18
56:25 58:23
59:22 61:8
63:16
**objections** 61:24
**observation** 34:5
40:9
**obtaining** 8:16
**obviously** 66:3
**occurrence** 19:8
**October** 33:25
**office** 2:17 36:22
68:15
**officers** 11:23
14:14 15:11,15
15:17 17:17
27:11 64:13
**Off-the-record**
13:25 35:14
**OFO** 15:11,16
20:9 25:24
37:24 51:24
52:3,3,15,19
53:13 55:1 61:5
**OFO's** 61:5 62:4
62:11
**Oh** 20:22
**okay** 6:17 7:13
7:20 8:8,16
9:23 10:1,6
11:5 12:24 13:5
13:9,20 14:16
14:20,24 15:10
15:16 16:3,23
17:10,16 19:12
20:2,17 21:18
21:23 23:9,15
23:25 24:2,15
26:10,11,17
27:3,23 29:1,20
30:2,17,23 31:5
31:14 32:2,23

33:19 36:5 38:2
38:7,13,17
39:17 41:23
42:1,21 44:21
45:11,12,14,15
46:6,17 47:5
49:10,20 50:1
50:13 51:22
54:1 58:3 59:7
59:16,24 60:24
61:14 63:10
64:22 65:11
**ones** 40:1
**online** 8:1 9:11
**onward** 37:4
**opening** 26:8
**operating** 26:2
28:7
**operation** 37:21
**operational**
31:15,19,24
32:3 37:8,10,15
37:20,23 43:23
44:1,3 53:24
58:12,20 60:5,6
60:11,19
**operations** 10:3,8
16:17 17:18
24:3 44:9,12,14
44:17 46:13
53:20 54:15
56:6
**oral** 69:17
**order** 5:7
**organization**
11:6
**organizations**
11:20
**original** 37:6
40:24
**originally** 32:10
**origins** 37:8
**Otay** 13:21
**Otro** 1:2 4:5,17
4:22 65:19 69:3
**outcome** 70:8

**outline** 60:4
**outlined** 41:3
43:24
**outside** 18:12
23:1,4,8 24:15
25:8 64:5
**overall** 19:14,22
44:9,11,13
47:19
**overview** 44:9,16

---

**P**

**P** 2:1,1
**page** 38:25 39:13
50:8,9,11 58:11
59:5,10,10,11
59:11,11,12,12
59:12,13,13,14
59:14,14,15
60:25 61:15,15
61:16,16,16,17
61:17 67:4
**paperwork** 19:5
**paragraph** 39:9
39:12,13,22,23
62:2,3
**paragraphs**
39:19
**parameters**
42:18,21
**park** 23:8
**parole** 18:1,15
**paroled** 15:13
17:15 18:8
**paroles** 63:7
**paroling** 63:3
**part** 10:16 15:2
16:12 17:14
20:8 23:17
40:21 56:7,7
60:10 62:16
**particular** 39:9
**parties** 4:13 70:4
**parts** 14:4 16:1
16:10 17:1
23:12 24:13

**party** 69:24 70:1
70:9
**Paso** 16:24 17:3
19:8,12,20 20:5
20:6 22:5,18
23:5
**pass** 24:25 25:7
63:11 64:23
**patrol** 19:21,23
21:2 22:22,23
22:24 23:7
**patrols** 21:3
**pause** 53:2
**paused** 64:9
**pedestrian** 14:5
16:2,3,11 23:14
24:14,15 25:5
**peer** 46:19 47:2,3
**people** 11:1
27:20 28:4,13
28:17 41:8
50:24 51:2
**percent** 28:7 51:3
**percentage** 51:16
**percentages**
50:16
**perfect** 26:20
36:7
**period** 19:5,6
31:22 34:2
37:12 48:9,12
**periods** 53:6
**person** 21:2
50:25 68:11
**personally** 68:10
**personnel** 14:21
16:17 17:17
19:13 24:4,4
37:24
**person's** 41:21
**philosophy** 10:25
**physical** 28:3,5,7
28:9,12 31:21
32:21,22 53:25
**Ph.D** 6:24 7:3,16
7:17

**pick** 64:19
**pick-up** 62:11
**pick-ups** 62:4
**picture** 53:24
57:5
**pilot** 42:5
**Pinkus** 2:21 4:10
**place** 49:7,17,25
64:14
**placed** 49:4
**places** 35:9
**PLAINTIFFS**
2:2
**plaintiff's** 34:12
34:14
**plans** 47:6,10
**please** 5:4,10,23
6:9 7:10 10:12
33:20 59:2,10
59:10,11,11,12
59:12,13,13,13
59:14,14,15,15
59:19 61:15,15
61:16,16,17,17
61:17
**point** 15:18 26:9
27:7 37:23
**points** 22:8 49:14
62:24
**police** 10:2
**policy** 6:24 7:4
10:14 34:5
36:16,20 37:2,3
40:5,12 47:19
47:22 48:3
58:13 60:16
63:8
**policymakers**
9:10 10:20,21
**political** 10:25
34:4 40:5,11
**port** 13:10,21
14:2,6,12,17,21
14:24 15:9,17
15:23 16:4,7,18
16:24 17:16,18



18:3,6 19:8,14
19:19 21:1
22:21 23:10,18
23:20 24:2,3,10
26:3 27:6,13,15
27:16,17,21
28:6,14,15 34:5
46:16 47:5
48:16 49:24
50:23 56:24
57:16
ports 15:14 17:2
18:23 19:4,10
22:17 24:7,18
25:4,9 26:5
36:23 40:2
41:14 44:20
45:1 46:12
48:21 56:3 57:3
57:8 62:5,12,22
64:11
possible 29:7
52:22 60:20
61:18
possibly 47:17
potential 50:3
Potentially 48:14
Poverty 2:7 4:21
practice 36:15
37:2 46:11
practices 34:6
prepare 33:21
preparing 42:9
present 2:21 4:13
11:3
presentation
20:18,21,23
21:4,7 23:8
presentations
21:17 22:25
23:2,6
pressure 48:16
48:21
pretty 10:16 34:3
40:10 51:1,6
prevent 6:4

previous 32:18
36:13 46:25
previously 5:17
7:14,20 12:4
24:9 25:1 64:18
primarily 33:24
34:7 63:17 64:3
primary 17:4
34:9 40:8
prior 22:20 25:10
35:21 54:6 57:1
Prison 30:14
probably 21:12
21:12 40:13
55:4
problem 33:13
Procedure 1:24
69:20
Proceedings 4:1
66:6
process 5:22
27:17,19,20
32:20
processed 14:14
15:7,8 27:9
processing 8:22
8:24 14:22 15:5
16:2,3,11 23:14
24:14,16 25:5
30:24 31:21
44:19 48:15,17
48:23 49:1,13
49:21 55:6 56:3
57:22,24 62:14
63:1
produced 1:17
34:13 35:6
36:19 38:5
professor 9:17
program 6:25
7:3,16,17 10:16
10:25 11:4 42:5
programs 53:14
54:2,3
Progreso 24:22
project 9:14,19

proposed 7:8,11
protect 51:25
52:4 55:1
protecting 55:6
Protection 30:18
proved 68:11
provide 21:4
27:13 50:22,24
50:25 57:6
provided 18:15
53:19 64:4
provides 44:16
providing 44:9
provisions 1:24
public 6:24 7:4
10:7,14 12:20
34:4 40:5,12
41:10 68:18
publication
40:17 48:25
49:9
published 31:8
purpose 53:5
purposes 68:13
pursuant 69:19
pursued 62:24
put 33:3 39:1,1,2
39:10,12 49:7
49:16,25 53:9
64:18
p.m 66:6
P.O 2:17

Q
qualitative 40:10
question 6:14
15:21 16:15
37:12 39:18,19
42:17 43:10
46:25 56:22
58:17 59:18,22
60:2 61:19
63:10
questions 5:24
21:14,15,16,19
21:22,24 34:12

43:17,21 53:21
54:10,21 55:14
55:25 56:2 58:2
64:21,25 65:1,5
65:20
queue 26:24
27:24 28:1,24
35:7 41:2,9
46:7 63:22
quickly 5:23 50:2
62:5
quite 34:13 35:5
35:5
quote 18:6

R
R 2:1
raise 5:11
Rape 30:14
rate 50:3 51:16
read 31:18 35:15
37:13 38:1
39:14 58:15,17
59:1,17,20
61:11,11,22
66:3 68:1
reading 36:18
38:3
realize 46:3
really 11:3 43:1
49:22 56:21
reason 48:6
60:12
Reauthorization
30:19
Rebecca 2:6 4:20
rebecca.cassler...
2:9
rebuild 64:2
received 34:12
Recess 45:25
65:15
reconstruct
57:13,16
record 1:25 4:3
13:23 35:13,15

36:2 45:24 46:2
59:20 61:22
65:3,14,17 66:1
69:17 70:7
redirect 65:1
refer 26:15 50:5
referring 38:23
39:9,11 40:20
40:22 58:6,8
reflects 45:4
refusal 63:7
regarding 5:7
18:23
regardless 60:7
62:9
region 22:13
Registration
70:19
related 8:18 41:6
54:3,18 70:3
relating 49:16
55:11 56:2
relation 17:25
relations 10:15
11:15,18,23
relative 70:6
released 41:10
relevant 26:23
64:6
reliable 44:8
relieve 48:15,16
48:21
reluctance 63:7
relying 43:12
remain 62:17
remember 7:13
7:20 14:12 20:2
20:24 21:2,4,18
21:22 23:5
remotely 4:8 5:6
23:24 69:9
repeat 29:11
61:19
rephrase 12:25
19:1 46:24
replicate 63:13



**report** 26:9,22,24
28:25 32:24
33:8,9,10,21,23
34:11,15,17,20
34:21 35:2,11
35:19 36:12,24
37:1,6,19 38:8
38:9,25 39:3
42:9,19 43:16
46:22,23 47:1
50:6,7 51:8
52:24 53:9
54:25 55:13,16
57:20 58:2,5,9
58:22 63:3,18
64:1
**REPORTED**
69:9
**reporter** 1:21
4:11 5:4,5 7:9
13:24 17:12
35:15 59:17,20
61:19,22 62:15
69:13
**Reporter's** 3:7
69:1
**reports** 34:25
35:8 41:2,9
46:7,7,15 48:8
48:20 50:22
53:7 63:22,23
64:5,5,16
**represent** 4:14
4:21,25 45:1
**request** 4:8
**requested** 69:23
69:25
**require** 52:21
60:18
**requirement**
30:18
**requirements**
29:21
**research** 7:8,11
40:11
**resources** 54:13

55:1,17
**response** 47:21
**responses** 48:4
61:4 62:4,10
**restrictors** 41:12
**resume** 6:18,19
**retained** 13:1,6
**review** 34:9,25
35:4 46:14,19
47:2,3 63:19,21
63:22 64:3
69:21
**reviewed** 29:18
34:13 35:1,7
37:14 63:19,21
64:8
**reviewing** 40:8
64:8
**reviews** 46:15
**RGV** 22:24 23:7
**ride-along** 20:18
20:21 22:4
**ride-alongs** 22:25
22:25
**right** 5:11 8:14
23:17 27:10
32:23 38:14
39:3 59:25
60:25
**Rights** 2:10 4:20
**Rio** 24:25
**Roma** 24:25
**Rule** 69:20,21
**rules** 1:24 63:9
69:20
**run** 53:13 54:15
59:3 60:21
**running** 15:17
16:18 19:14
46:12 49:23
56:5

___

**S**

**S** 2:1
**safely** 28:15
**Sampat** 2:16 5:1

**San** 13:10
**Sasabe** 19:9
24:25
**sat** 25:6
**saw** 49:15
**saying** 27:18 37:3
44:5 47:23 54:8
54:19
**school** 8:2 9:21
9:22
**science** 34:4 40:5
40:11
**scratch** 30:13
**screen** 35:25
39:10,12 59:3
63:20
**scroll** 59:16 62:2
**seal** 68:15
**Search** 29:16
**second** 35:13,24
36:1 39:22
60:10
**secondary** 14:15
15:7 17:4,8
23:15 25:6,8
26:2
**section** 58:11
59:1,5 61:11
**sector** 22:22,23
22:24 23:7
**sectors** 21:2
**security** 21:11
51:25 52:5,16
52:20 55:2,3
56:5,16
**see** 5:19 17:16
22:11,11 32:11
39:13,22,23
57:12 58:13
59:4
**seizures** 21:11
53:19
**selection** 40:24
**self-imposed**
62:6,13,20
**semester** 9:13

**semi-structured**
34:6 40:9 41:3
**sense** 46:15 57:8
58:8
**Services** 4:10,12
70:18
**set** 9:18 56:22
**sets** 52:7,22
**settlement** 29:24
**sheet** 41:23
**shift** 37:17 47:19
**shifts** 48:3
**short** 19:6
**Shorthand** 1:20
69:12
**sic** 37:21
**side** 13:14
**sign** 66:4
**signature** 3:6
67:1 68:1 69:22
**similar** 9:16
18:22 19:7,9
41:15 50:14
**simple** 51:5,11
**simultaneously**
27:15
**situation** 18:1
19:18
**situations** 62:6
**six** 19:6 42:2,6
**sixth** 57:14
**Skidmore** 7:21
**slightly** 28:8
42:17
**sliver** 56:23
**slow** 61:4 62:3,10
**small** 22:7 56:23
**smedlock@ma...**
2:5
**snapshot** 46:16
**sociology** 40:13
**software** 9:12
**solely** 11:11
**somebody** 38:20
39:6
**sorry** 7:9,9 12:25

17:12,13,22
20:19 23:3
28:20 31:6,7
33:5,11 35:12
35:24 36:3,7
40:21 43:1
46:24 49:5 50:9
56:12 59:8
62:15
**sound** 45:7 53:1
**sounds** 26:20
65:12
**source** 57:4,6
**sources** 40:9 45:6
55:22 57:11
**south** 7:12
**Southern** 1:1 2:7
4:21 69:2
**space** 28:5
**Spanish** 7:23
**speak** 17:16
**speaking** 17:25
**specific** 10:17
12:1 21:22 34:1
64:21
**specifically** 10:5
11:11 12:2 24:7
44:19
**spoke** 15:14,17
**spoken** 64:12,12
**spreadsheet**
41:16
**spring** 19:25
**spur** 22:2
**Square** 2:17
**stab** 32:12
**staffing** 11:7
19:22 21:12
51:24 52:3,4,15
52:19 53:13,18
54:2,14,25
55:17
**standard** 40:4
**standardized**
31:23
**standards** 29:10



29:13,15
**start** 7:18,19
**started** 7:17
**Stata** 9:8
**state** 1:21,23 4:14
  5:8 12:13,18,22
  13:6 68:7,19
  69:13
**stated** 1:24
**States** 1:1 14:23
  15:8 18:9,18
  34:8 69:2
**stating** 48:7
**station** 23:7
**stationed** 27:11
**statistical** 9:12
**statistics** 8:10 9:9
  10:19,20 41:18
**stay** 37:21 38:17
  60:13
**Stephanie** 1:9,16
  3:3 4:4 5:12
  67:2 68:1,5,10
  69:8,15
**Stephen** 2:3 4:16
**Steve** 45:15
  64:24
**stopped** 49:21
**strange** 36:10
**Street** 2:4
**students** 20:5,12
  21:14 22:1,10
  22:14,17
**studies** 40:17
**study** 11:14
**subject** 46:19
  47:2,3
**subjective** 28:10
**submitted** 51:8
**subscribed** 68:12
  70:13
**summer** 37:17
**supervising**
  28:18
**supply** 55:8
**sure** 11:12 21:16

26:8,8 33:22
  49:2,7 50:7
  51:11 58:6 65:2
  65:6
**surprised** 38:15
**sustainable** 47:14
  47:18,24 48:9
  48:12
**sustained** 47:7
**swear** 5:4,11
**sworn** 5:13 69:16
  70:13
**synonymous**
  28:25

**T**

**tab** 51:9
**take** 6:8,10 7:15
  8:17 10:1,6
  12:1 18:19
  32:11 36:5 58:1
  58:15,18 64:14
  65:6,7
**taken** 1:18 4:7
  9:2 22:23 45:25
  52:12 65:15
  70:5
**talk** 14:20 15:10
  21:6
**talked** 6:18 21:12
  21:13
**taught** 9:3
**team** 39:25
**Tecate** 14:24
  15:3 19:9
**technical** 36:3
**TEDS** 29:10,12
  29:15,17
**telephone** 5:1
**tell** 7:7 9:6 10:11
  17:24 22:4
  23:21 24:13,21
  29:23 30:23
  33:20 46:4
  48:17
**tenets** 40:10

**term** 28:1,21
  32:7 37:11,16
  37:20
**terminology**
  34:20,23 35:10
  38:8,10
**terms** 41:15
**territory** 23:19
**testified** 5:13
  7:14,20 8:12
  12:4 24:9
**testifying** 6:5
**testimony** 22:20
  25:11 32:3
  35:21 54:6 57:1
  69:17
**Texas** 1:21,23 5:9
  6:25 7:12 12:20
  69:13
**thank** 5:20 7:2
  26:20 45:18,22
  64:22 65:12,18
  65:22,22
**themes** 21:8
**thing** 20:19
**things** 28:11 32:8
  36:13 63:20
**think** 8:5 11:10
  12:19 23:18
  25:1,19 26:23
  33:14 36:11
  38:14 39:2
  48:12 49:15,22
  51:9 52:10
  58:17 64:9
**thinking** 6:5
  38:15 52:6
**thought** 21:24
  22:1
**threats** 52:1,5,16
  56:5
**three** 20:25 21:1
  21:21 33:24
  40:2
**throw** 11:22 55:5
  59:8

**Tijuana** 13:13
**time** 4:6 6:8,12
  6:12 15:13 18:3
  18:8 19:6 20:16
  27:9 28:18 30:3
  30:9 34:2 37:11
  42:18 43:24
  45:19,23 46:1
  48:9,13 53:6
  57:17 58:18
  61:19 62:24
  65:13,16,19,20
  65:22 66:1 70:9
**times** 20:25
  28:12 34:8
  62:11
**titled** 58:11
**today** 4:5 6:1,6
  65:19,22
**today's** 66:2
**told** 27:8
**topic** 7:11 12:2
**topics** 10:24
  11:12
**total** 28:14 51:2,2
**trade** 44:15 55:5
  55:6,18 56:16
**trafficking** 21:11
  30:18
**transcript** 69:16
  69:22
**transitioned** 60:5
**Transport** 29:16
**travel** 55:18
  56:16
**Travis** 1:22
**tried** 55:22
**true** 68:2 69:17
**truth** 46:4
**truthfully** 6:5
**try** 6:10 53:1
  63:13
**trying** 14:12
  49:16,17 53:11
**turn** 32:24 59:5
  60:24

**turned** 27:8
**turn-back** 28:19
  28:21,24 58:12
**turn-backs** 26:25
  28:2 61:2
**two** 19:10 23:13
  34:24 39:19
  40:3 50:19
  52:21,22
**type** 40:7 45:9
  56:1

**U**

**ultimately** 53:20
  57:10
**unable** 54:20
  55:12,23 60:23
**unaccompanied**
  31:11
**undergrad** 9:20
**understand** 5:25
  6:15 20:7 40:21
  43:2 44:23
**understanding**
  32:6 33:22 37:7
  37:20,22 47:10
  57:2,7
**Unfortunately**
  60:21
**unit** 25:18,23
**United** 1:1 14:23
  15:8 18:9,18
  34:8 69:2
**university** 6:25
  8:12 12:20,21
**unrelated** 19:20
**updates** 6:19
**use** 9:12 26:24
  34:3 40:4 42:18
  42:22 53:20
  54:4,9,20 60:4
  63:7
**useful** 54:10
**uses** 26:4 46:6,10
  53:21 57:8,19
**usually** 21:3,24



**US-Mexico** 7:6
7:12 33:24 57:3
**utilize** 46:12
**U.S** 2:16

**V**

**vague** 8:19,23
10:4,9 11:8,16
13:3 14:11
15:21 17:20
18:24 19:2 29:8
30:6 31:16
34:22 38:22
39:8,21 40:19
41:7 42:15,24
43:7,8 44:10
46:8,21 47:9
48:1 49:3 52:2
52:17 53:15
54:6,17 55:20
56:8,19 57:1
58:25 61:9
63:16
**valley** 22:11
**van** 22:8
**various** 22:8
**versus** 31:12
36:15 47:22
**veteran** 5:22
**Victims** 30:18
**videoed** 24:1
**videographer**
2:21 4:2,9 5:3
33:4,8,11 45:23
46:1 65:13,16
**Videotape** 4:3
**VIDEOTAPED**
1:9
**view** 27:4 37:1
**virtual** 48:14,17
48:23 49:1,12
49:21
**Vision** 4:8
**visit** 22:16
**visited** 13:16,20
14:1 15:22 16:6

16:23 23:9
64:11
**vs** 1:4 4:5 69:5

**W**

**wait** 18:8
**waiting** 18:12
**waitlists** 34:10
**walkway** 14:5
**wall** 22:11
**want** 32:24 33:5
33:6 43:16
51:22 58:1,1,4
58:6,10,15 60:2
64:10
**wanted** 20:7
55:25 63:18
**Washington** 2:4
2:7,18
**wasn't** 53:4 54:9
57:13
**watched** 64:13
**watching** 28:18
**way** 26:21 27:4
27:10 30:20
32:14,17 42:5
45:9 48:15,21
50:21 53:2 56:1
57:12
**ways** 50:19 62:21
63:17
**weakness** 43:8,11
**weaknesses** 43:5
**Webex** 1:10
35:25 36:9
**Webster** 4:18
**well-known** 34:4
**went** 8:11,12
14:18 17:8
18:12 23:22
31:17 36:21
57:18
**we'll** 26:14 59:5
66:3
**we're** 27:19,20
60:25

**We've** 45:11 59:8
**widely** 37:11,16
**winter** 19:25
20:1
**withdraw** 12:25
46:24
**witness** 1:17,21
4:17,22 5:4,8
23:22 63:11
67:2 69:15,18
**witnessed** 48:23
**witnesses** 59:9
**work** 12:19 21:9
21:10 63:13
**works** 12:21
**world** 43:15
**wouldn't** 38:15
49:8,8 59:23
60:3,15
**write** 62:3 63:5
63:18
**writing** 35:1
36:24
**written** 31:2,7,18
**wrong** 33:15
50:21 51:19
**wrote** 57:20

**X**

**xx** 69:23

**Y**

**Yale** 8:12 9:24,25
10:1
**yeah** 22:6,22
26:13 29:4,12
40:25 45:17
46:23
**year** 6:21 9:16
**years** 21:21
33:25 40:3,3
49:15,18
**York** 2:11,11
**Ysidro** 13:10

**1**

**1** 4:3
**1:40** 65:9,11
**1:44** 70:11
**10** 38:25 39:13
65:3,7
**10th** 33:16,17
**10-minute** 45:12
**10-31-21** 70:18
**10:37** 1:19
**10:38** 4:6
**100** 28:7 35:7
**10012** 2:11
**11** 1:10,19 67:3
69:8
**11th** 4:6
**11:35** 45:19,23
**11:45** 45:20
**11:47** 46:1
**12:22** 65:13
**12:40** 65:10
**12:41** 65:16 66:1
**12:42** 66:6
**138** 62:2,3
**15** 65:7
**16-person** 20:15
**17-CV-02366-...**
1:4 69:5
**18** 39:12,13,23
40:25
**19** 39:13 40:25
**190** 50:8,12
**1999** 2:4

**2**

**2** 3:2
**20** 18:13 32:25
**20006** 2:4
**20044** 2:18
**2011** 7:21
**2016** 36:15 37:4
**2017** 36:15
**2018** 20:1 33:25
37:17 41:25
42:6
**2019** 34:17,21
35:19 38:9

**202** 2:5,18
**2020** 1:10,19 4:6
32:25 33:16,18
34:20 38:9 67:3
68:15 69:8
70:14
**21st** 70:13
**212** 2:12
**24** 42:13,25
**263-3221** 2:5
**28th** 5:18 6:17

**3**

**30(e)(1)(A)** 69:20
**30(e)(2)** 69:21
**3469** 70:17
**36104** 2:8

**4**

**400** 2:7

**5**

**5** 3:4
**598-8259** 2:18

**6**

**614-6464** 2:12
**624-6221** 70:19
**63** 50:8,9,10,11
**633** 70:19
**666** 2:11
**67** 3:6
**678** 2:8
**69** 3:7

**7**

**7th** 2:11
**72** 30:10
**73** 58:11
**79** 60:25

**8**

**866** 70:19
**868** 2:17

**9**

**954-4996** 2:8



| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 4 | 18 | Mayer, Brown | Mayer Brown | Unnecessary comma |
| 14 | 22 | mission | admission | Transcription error |
| 21 | 1 | Port of | Border | Transcription error |
| 23 | 13 | Two of the group bridges | Two of the bridges | I don't know what the group was saying but it's not correct. |
| 27 | 7 | point of entry | Port of entry | Transcription error |
| 27 | 7 | point of entry. They | point of entry, they | This was one sentence; not two sentences |
| 30 | 25 | accompanying | unaccompanied | Transcription error |
| 31 | 21 | filing | asylum | Transcription error |
| 34 | 9 | Such | which | Transcription error |
| 41 | 12 | Restrictors | researchers | Transcription error |
| 52 | 11 | that they have each | that. They have each | This was two sentences; not one sentence. |
| 57 | 14 | this | its | Transcription error |
| 60 | 5 | Transitioned | transition | Transcription error |

1     ACKNOWLEDGMENT OF DEPONENT

2
              I,_____, do
3    hereby certify that I have read the
     foregoing pages,  1 - PGS, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.

7

8    _____
     WITNESS NAME            DATE
9

10
     Subscribed and sworn
11   to before me this
     _____ day of _____, 20____.
12
     My commission expires:_____
13

14   _____
     Notary Public
15

16

17

18

19

20

21

22

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103