MAYER BROWN LLP
Matthew H. Marmolejo (CA Bar No. 242964)
*mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
Ori Lev (DC Bar No. 452565)
(*pro hac vice*)
*olev@mayerbrown.com*
Stephen M. Medlock (VA Bar No. 78819)
(*pro hac vice*)
*smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: +1.202.263.3000
Facsimile: +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
Melissa Crow (DC Bar No. 453487)
(*pro hac vice*)
*melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Al Otro Lado, Inc., *et al.*,

Plaintiffs,

v.

Chad F. Wolf,[1] *et al.*,

Defendants.

Case No.: 17-cv-02366-BAS-KSC

**EXHIBIT 5 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
*bazmy@ccrjustice.org*
Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
*gschwarz@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
*sarah.rich@splcenter.org*
Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
*kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619





**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

December 19, 2018

MEMORANDUM FOR: [REDACTED]
Director
Special Reviews Group

FROM: [REDACTED]
Investigative Counsel

[REDACTED]
Senior Program Analyst

SUBJECT: *Memorandum of Interview with* [REDACTED]
*CBP Officer, Port of Tecate, CA*

On December 11, 2018, [REDACTED] Investigative Counsel, Special Reviews Group (SRG), Office of Inspector General (OIG), and [REDACTED] Senior Program Analyst, SRG, OIG conducted a teleconference with [REDACTED] Officer, Port of Tecate, Office of Field Operations (OFO), U.S Customs and Border Protection (CBP) regarding allegations made to the U.S. Office of Special Counsel (OSC) that employees at the Port of Tecate, California, engage in conduct that may constitute a violate of law, rule, or regulation. OSC referred this matter to the OIG for investigation.

[REDACTED] provided the following information in substance:

[REDACTED] has been an officer at the port of Tecate for 6 years, and the main [REDACTED] there for 3 years. He stated that in his position as the [REDACTED] officers frequently raise any issues they have with their position with him.

Instruction to Redirect Asylum Seekers to San Ysidro at the Limit Line

When asked when the limit line position was first introduced, [REDACTED] recalled that he was out for a long time after [REDACTED] starting in January 2018, but when he started working again in March or April 2018 he believed the limit line was already in place. [REDACTED] said that the decision to implement the limit line position was mandated by the San





**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Diego field office. It was not an independent decision by the Port of Tecate. [redacted] said San Ysidro has had a limit line position for years.

When asked how officers at the limit line identify aliens to be redirected, [redacted] said that management instructed officers to ask to see people's documents before they pass through the limit line. Tecate is a very small port and some people cross several times a day and officers are familiar with them. [redacted] said that those seeking asylum tend to stick out, and they would not have documents. The limit line position was intended to stop aliens without documents before they entered U.S. soil. [redacted] said that officers at the limit line were instructed to redirect aliens seeking asylum to San Ysidro because it was a much larger POE, with many more officers and physical facilities to handle asylum cases. That was the rationale management provided, according to [redacted]

[redacted] said that he is the [redacted] at the port of Tecate. He participated in a Labor-Management Relations Committee (LMRC) meeting between management and the union to address concerns about the limit line position. [redacted] thought the LMRC meeting was on October 22, 2018, but he was not positive. The limit line had become a "hot topic." At the LMRC meeting, the union tried to resolve several concerns officers had with the position. Some officers were unwilling to participate with the limit line position because of their concerns about its legality.

[redacted] said that after the LMRC meeting, the Port Director, [redacted] sent an email instructing officers on the limit line to call a supervisor if they came into contact with someone seeking asylum or making a credible fear claim, so that the supervisor would be the one responsible for making the decision to redirect that individual or not. [redacted] said he would forward this email to the OIG.

When asked if there was any written guidance on this position, [redacted] said the point of the LMRC meeting was to address union concerns with the lack of a standard operating procedure (SOP). [redacted] said that officers were confused and wanted better guidance. Port Director [redacted] said he would not write an SOP on the position, but in order to take the pressure off the officers, he agreed to a process whereby officers would contact their supervisor to come to the limit line and assume responsibility for redirecting aliens. [redacted] said that the officers were happy with this solution because it put the accountability on the supervisors. [redacted] said that officers were also concerned with whether they would be held





responsible if an individual made it past the limit line who should not have. [REDACTED] said they were told "no."

[REDACTED] said that Tecate has a protocol in place now for redirecting aliens, but it is still unclear to him if it is legal or illegal. [REDACTED] thought that management wanted to keep the process of redirecting individuals to another port in a "gray area" by not establishing official procedures or acknowledging limit line duty as a permanent position. Management's justification for the position was that the port of Tecate was a small facility with limited staff that is not open 24 hours per day, which made it a challenge to hold individuals.

[REDACTED] had concerns that there were no cameras covering the limit line position. If there was an incident, such as an allegation of sexual harassment, there would not be any video footage. Everywhere else within the port of Tecate had cameras. Officers had the impression that there were no cameras covering the limit line because management was doing something "shady." [REDACTED] understanding of the rationale for the position was that once someone was on U.S. soil seeking asylum, the port had to process that individual. But if that individual was stopped at the border, it would be a "loophole" in the law, and it was permissible to redirect that individual to another port.

[REDACTED] said that the language used by supervisors when redirecting an individual was precise. When an officer calls a supervisor to come to the limit line to talk to someone without documents that asserts an intent to apply for asylum, the supervisor will tell the migrant that they were not denying anyone entry and that they need to go to San Ysidro to be processed because it was a larger facility. [REDACTED] said that there was an example two or three months ago when a supervisor tried to turn around an alien who had a lawyer present. The lawyer said that their feet were on U.S. soil because they had stepped up a curb onto a small sidewalk in front of a tall fence that CBP considers to be U.S. soil. There is no official border marking at the pedestrian entryway at the POE. [REDACTED] acknowledged that due to the position of the limit line officer inside the U.S., individuals that approach are already on U.S. soil just before being asked to show their documents to the officer.

In this case, the lawyer and the asylum seeker left and came back an hour or so later with a G-28 form indicating that the lawyer was representing the individual seeking asylum. At that point, the Port Director informed a supervisor on duty that the officers should just bring the individual in to





be processed. [REDACTED] said he could not recall what country that individual was from, maybe Guatemala. [REDACTED] said that he thought an exception was made in this instance because of the presence of the attorney.

When asked whether supervisors made exceptions to redirecting, such as for unaccompanied children, or an injured individual, [REDACTED] said that he has not seen that specifically, but he imagines management would consider those factors, and he assumed if someone was injured they would definitely take them in. [REDACTED] said he has seen children as young as three to four with families redirected. But he thought unaccompanied children would be taken in. When asked whether any consideration was given to an alien's country of origin when the determination was made whether to redirect them to San Ysidro, [REDACTED] said no, it was not.

When asked how often he had called a supervisor to come assist with redirecting someone, [REDACTED] said that personally he has not done it very often. [REDACTED] said that the recent caravan activity has led to an increase in the last couple of weeks. [REDACTED] said that before the caravan influx, the port would often go all day without redirecting anyone, and sometimes there would be multiple in a day. When asked if there was ever a situation where those without documents were asked and decided to wait at the port's entrance on the Mexican side, [REDACTED] said "no," they have not had that.

[REDACTED] said that one officer is assigned to the limit line. Recently, they added a "rover" position who is supposed to go between the vehicle pre-primary position and the limit line officer as needed. [REDACTED] said that he was assigned to the rover position the previous night. He said there is no SOP for the new rover position leaving officers to make assumptions about what they should be doing – as with the limit line position, officers also need direction on the rover position. [REDACTED] said that the officers assigned to this position tend to either hang out with the limit line officer, or the vehicle pre-primary officer so he or she will have someone to talk to. He mentioned that there had been rain recently, and officers were unsure if they were supposed to stand out in the rain – another example of why an SOP was needed.

Escorting Asylum Seekers Arriving at Primary Back to Mexico

[REDACTED] said there have been individuals without valid entry documents that have gotten past the limit line and then expressed an intent to apply





for asylum and supervisors walked those individuals back to the border and redirected them to San Ysidro. Initially, some officers might have let them go past the limit line because they did not think the limit line position was legal.



There was an incident in which an Assistant Port Director (APD) wanted to write up an officer when an individual made it past the line limit and had to be turned back at primary inspection. said that because there was no SOP on the limit line position, the APD decided not to write the officer up.

said that before the limit line, Tecate had been redirecting aliens to San Ysidro for years. dentified the supervisors he knew of that had done this:

- 
- 
- (retired, first name uncertain)

said that he works the night shift, and so he doesn't know the names of day shift supervisors, but he has heard that they have done it too. One of the day shift supervisors who may have done it is

said that supervisor was often the one who redirected them because he was nearing retirement and was not concerned about whether walking individuals back to the border was permissible. retired about a year ago. There was an impression among some officers that it was illegal, but once started doing it, others did it too. If an officer encountered an alien raising an intent to apply for asylum, he or she would call the Watch Commander who would tell the officer whether to walk them back to the border.

said that three or four years ago, the Port Director at that time, got word this was going on and sent out an email telling personnel that they could not walk people back to the border and should stop. is now the Port Director at Otay Mesa. recommended that the OIG speak to said he would look for s email and send it to the OIG.

Prior to the limit line, estimated that there were quite a few cases in which an individual arrived at pedestrian primary and was walked back to the border and redirected. thought this practice had been







going on as far back as he could remember – at least 5 years. [redacted] said that after Port Director [redacted] got word of the practice and sent an email to stop, some supervisors stopped for a while. There was a point when the port had enough credible fear cases that personnel had to stay at the port from 11pm to 4am to monitor individuals held at the port. [redacted] said that management's fear was that word would get out that Tecate was no longer redirecting individuals and the port might go from receiving one case every other day to being overwhelmed. [redacted] said that supervisor [redacted] continued to redirect aliens even after [redacted]s email stating that officers should not walk individuals back to Mexico from pedestrian primary. [redacted] was not sure about the timeframe, but eventually after [redacted]s email, the practice of redirecting resumed as before.

When asked if he could estimate the number of times individuals have been redirected since the limit line was put in place, [redacted] said his buest guess would be about 100 people. [redacted] estimated that maybe 20-30 individuals made it past the limit line that should have been redirected and were walked back to Mexico and redirected to San Ysidro. Prior to the LMRC meeting, officers may have allowed more individuals past the limit line. Since that meeting, [redacted] estimates there have been less than 10 individuals that have made it past the limit line. Officers like being able to call their supervisor to handle these cases, and 90% of the time individuals are caught at the limit line now. [redacted] said the supervisor who walked the individual back to the border might comment to the limit line officer that he or she had "let one past." But officers know they cannot get in trouble for this.

When asked if there were any records created when an individual was redirected at the limit line or at primary, [redacted] said "no." [redacted] explained that that was the point of the limit line position – individuals could be redirected even before they enter primary where there are cameras or records created. When individuals are redirected at primary, there is also no record created, but the interaction is on camera.

[redacted] recommended that the OIG also speak to:

- [redacted] Assistant Port Director – [redacted] was the supervisor who considered writing an officer up for letting someone past the limit line.
- [redacted] Supervisory Officer - [redacted] was involved with the individual who arrived with a lawyer and was initially redirected,





but returned with a G-28 form and the Port Director decided to take the individual in.

- [redacted] Officer – [redacted] said that [redacted] may have been involved with an instance where someone making a credible fear claim made it past the Limit Line and was walked back to Mexico and redirected to San Ysidro.