MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:  +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Chad F. Wolf,[1] *et al.*, <br><br> Defendants. | Case No.:  17-cv-02366-BAS-KSC <br><br> **EXHIBIT 33 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

1

2  CENTER FOR CONSTITUTIONAL RIGHTS
      Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
3     *bazmy@ccrjustice.org*
      Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
4     *gschwarz@ccrjustice.org*
      Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
5     *aguisado@ccrjustice.org*
   666 Broadway, 7th Floor
6  New York, NY 10012
7  Telephone: +1.212.614.6464
   Facsimile: +1.212.614.6499
8
   SOUTHERN POVERTY LAW CENTER
9     Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
      *sarah.rich@splcenter.org*
10    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
      *rebecca.cassler@splcenter.org*
11 150 E. Ponce de Leon Ave., Suite 340
   Decatur, GA 30030
12 Telephone: +1.404.521.6700
13 Facsimile: +1.404.221.5857

14 AMERICAN IMMIGRATION COUNCIL
      Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
15    *kwalters@immcouncil.org*
16 1331 G St. NW, Suite 200
   Washington, D.C. 20005
17 Telephone: +1.202.507.7523
   Facsimile: +1.202.742.5619
18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 33 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

Office of Field Operations
Incident Management Division
July 13, 2017

**Action Required:** Information Only

**Time Constraint:** July 14, 2017

**Issue:** CBP Southwest Border Migration Surge – Asylum Issue

**Executive Summary:**
On July 12, 2017, Al Otoro Lado, Incorporated, filed a complaint with the United States District Court for the Central District of California (Los Angeles) alleging that U.S. Customs and Border Protection (CBP) officers systematically violated U.S. and International law by refusing to allow individuals to seek protection in the United States.

During the time period listed in the complaint, CBP was on the forefront of a global migration crisis. Increased numbers of unaccompanied alien children (UAC), family units (FAMUs), and single adults, seeking to unlawfully enter the United States, overwhelmed CBP's capabilities to protect and process those persons in an expeditious manner.

It is CBP's attempts to manage these challenges, in concert with the Government of Mexico, which are being challenged as a willful violation of human and civil rights by CBP officers and agents.

**Context:**
To understand the context of the large numbers of illegal migration experienced in 2016 and 2017, it is necessary to acknowledge that the immigration policies of Panama, Costa Rica, El Salvador, Guatemala, and Mexico, all sought to allow unlawful entry of person into those countries with the understanding that those persons would only transit, while en route to the United States. Years of unrestrained access through these countries facilitated the amassing of record numbers of unlawful migrants at, and between, United States southwest border ports of entry.

Beginning in early 2016 and cumulating in October 2016, unexpected levels of illegal migration caused a large draw on resources and outpaced temporary holding capacities at POEs (Figure 1). In that same month, CBP's total apprehensions were 76 percent above the previous five-year average.

Confidential                                             AOL-DEF-00031442

Figure 1: CBP Internal In-Custody Report vs. Capacity for October 30, 2016




While surges in illegal immigration on the southern Texas border created holding capacity challenges for the U.S. Border Patrol, the catalyst for detention space challenges for CBP' Office of Field Operations (OFO) occurred in San Ysidro California. As early as April 2016, OFO ports of entry in the San Diego area began experiencing a surge of Haitian nationals attempting to seek refuge in the U.S. when fleeing the economic collapse in Brazil (figure 2).

Figure 2 – Inadmissible Haitian nationals at San Diego Ports of Entry



Confidential                                                                                          AOL-DEF-00031443



Figure 3 – Total Inadmissible Alien Nationals at San Diego Area Ports of Entry

Concurrently, the San Ysidro Port of Entry began extensive renovations which decreased temporary holding capacities by two-thirds. Detention space at the port of entry was originally certified for occupancy at ▮ persons. By May of 2016, port leadership had converted office and administrative spaces to temporary holding areas to increase capacity to over 900 persons awaiting transfer to ICE/ERO for detention. However, the ultimate demolition of that building required the use of semi-mobile facilities to be set up, and the legal occupant capacity for the holding of inadmissible persons was again decreased to ▮ individuals.

As construction at San Ysidro continued, it was necessary for officers to re-direct foreign nationals arriving by foot away from the old pedestrian entrance on the east side of port, to the **new** pedestrian facility, located on the west side of the port. It is believed that this redirection for processing may have been misconstrued as a denial of the applicant's request.

Additionally, because CBP was forced to limit intake of pedestrian applicants due to legal and safety capacity requirements, the Government of Mexico, in collaboration with the Government of Tijuana, and Non-Governmental Organizations (NGOs), sought to relieve the unsafe and unsanitary conditions created by people awaiting CBP processing outside the port of entry. Those entities established shelters to ensure their health and safety, and escorted them away from the elements while they waited. This humanitarian service is believed to be the source of allegations of collusion by CBP with the Government of Mexico to deny the illegal migrants the opportunity to ask for asylum in the U.S.

Confidential                                                                AOL-DEF-00031444

**Management of Illegal Migration Surge:**
To mitigate, overcrowding at POEs, CBP:
- Modified administrative space to meet the needs of the growing detention population.
- POEs leveraged U.S. Border Patrol (USBP) facilities, if USBP locations were not already at capacity.
- CBP continued to coordinate with ICE-ERO as lack of available detention space limited their ability receive those referred by CBP for detention under sections 235 and 236 of the INA, as amended.
    - Due to the slow turn-over of custody, the numbers of those in CBP's temporary custody continued to increase, making conditions potentially unsafe and unsustainable.
- CBP surged agents and officers to southwest border locations in California, Arizona, and Texas (Figure 4)
- CBP further deployed agents and officers with special language abilities to assist in the immigration processing of persons representing many foreign language needs.
- CBP immediately began efforts to establish temporary holding facilities at heavily impacted areas on the southwest border.
    - On November 23, 2017 the first of these facilities became operational at Tornillo, TX at a cost of $2.6M for 30-days.
    - On December 10, 2017, the second facility became operational at Donna, TX at a cost of $3.8M for 30 days.
    - CBP spent a total of $20.2M on the operation of these facilities to ensure the health and safety of inadmissible family units (Figure 4).

Confidential

AOL-DEF-00031445

Figure 4 – FY17 Migrant Surge Cost Actuals

| Office | Actuals as of 4/12/17 | Comments |
|---|---|---|
| **USBP** | **$9,126,299** | |
| Overtime | $4,385,823 | Includes FEPA OT only (excludes BPAPRA OT) |
| TDY | $1,743,714 | Actual TDY personnel supporting overflow operations in RGV |
| Operations Support | $2,996,763 | Increased wraparound services (laundry, shower, medical) and purchase card consumables/supplies |
| **OFO** | **$15,757,187** | |
| Overtime | $6,246,029 | OFO OT includes all overtime above what was originally planned pre surge |
| TDY | $7,972,128 | OFO TDY personnel supporting overflow operations in Tucson and San Diego, and TDY personnel for the Haitian Crisis |
| Operations Support | $1,539,030 | Includes purchase card purchases, supplies, blankets, care and feeding etc. |
| **Facilities and Maintenance** | **$20,244,931** | |
| Overtime | $14,952 | Site prep/stand-up and maintenance |
| TDY | $13,546 | Site prep/stand-up and maintenance |
| Facilities | $20,169,683 | Includes funding for both Donna and Tornillo soft sided facilities (as of 4.15.17 softsides are closed) |
| Operations Support | $46,749 | Site prep/stand-up and maintenance |
| **OIT** | **$121,786** | |
| Overtime | $23,128 | OIT overtime for support of El Centro Haitian efforts |
| Operations Support | $98,658 | Site prep/stand-up and maintenance |
| **Surge Total** | **$45,250,204** | |

- On November 11, 2016, Office of Field Operations (OFO) leadership held a conference call with southwest border Directors of Field Operations to discuss mitigation strategies to ensure the safety of officers and the individuals being processed by CBP. Discussion focused on utilizing available options to mitigate overcrowding such as:
  o Leveraging OFO headquarters for additional resources.
  o Utilizing all available space at ports of entry, adapting to supplement detention space.
  o Collaborating with ERO to transfer and transport processed detainees.

Confidential

- o Coordinating with USBP on available detention space.
- o Coordinating with local Government of Mexico officials on managing the flow of migrants without lawful status to enter the United States (referred to as "metering").

**Figure 5 - Collaborative Migration Management Efforts with the Government of Mexico**

| Location | Start | End |
|---|---|---|
| **San Diego Field Office:** | | |
| San Ysidro | May 30, 2016 | February 5, 2017 |
| Calexico | September 19, 2016 | February 5, 2017 |
| **Tucson Field Office:** | Not applicable | |
| **El Paso Field Office:** | | |
| Bridge of America | November 11, 2016 | December 2, 2016 |
| Paso Del Norte | November 11, 2016 | December 2, 2016 |
| Ysleta | November 11, 2016 | December 2, 2016 |
| **Laredo Field Office:** | | |
| Brownsville | November 2016 | January 2017 |
| Eagle Pass | November 2016 | January 2017 |
| Laredo | November 2016 | January 2017 |
| Hidalgo/Pharr/Anzalduas | November 2016 | January 2017 |

**Conclusion:**
The laws of the United States allow people to seek asylum on the grounds that they are being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion. CBP policies and procedures are based on these laws and are designed to protect vulnerable and persecuted persons. Those policies include compliance with federal and state laws, including Sections 101(b)(1) and 101(c)(1) of the Immigration and Naturalization Act (INA), 8 C.F.R. § 1236.2, 8 C.F.R. § 1236.3, Reno v. Flores settlement (including 9th Circuit ruling of Judges Gee and Moskowitz), and Certifications of Occupancy issued for CBP facilities.

It was the convergence of the high work demand and the legal guidelines which predicated CBP's otherwise extraordinary, efforts to ensure the health and welfare of all would-be asylum seekers, as well as the officers and agents on the front lines of this migration tsunami.

In unusual circumstances, where the number of individuals at a particular port of entry is more than the facility can safely accommodate, CBP limited the number of people permitted to enter at one time. This process was designed to ensure the safety of officers and those being processed, in compliance with the laws and policies listed in paragraph 6, above). In these rare instances where a port of entry could not accommodate all of those individuals seeking admission to the United States at one time, the Government of

Confidential

AOL-DEF-00031447

Mexico, in collaboration with the Government of Tijuana, and Non-Governmental Organizations (NGOs), established shelters to ensure their health and safety, while they waited. Representatives of these humanitarian programs would keep in close contact with CBP to escort those awaiting processing to the port of entry, when it was safe to do so.

Confidential

AOL-DEF-00031448