MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **EXHIBIT 115 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Chad F. Wolf,[1] *et al.*, | |
| Defendants. | |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      *olev@mayerbrown.com*
5     Stephen M. Medlock (VA Bar No. 78819)
      *smedlock@mayerbrown.com*
6  1999 K Street, N.W.
   Washington, D.C. 20006
7  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
8
   SOUTHERN POVERTY LAW CENTER
9     Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
10    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
11 Washington, D.C. 20036
   Telephone: +1.202.355.4471
12 Facsimile: +1.404.221.5857

13 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
14
                   **UNITED STATES DISTRICT COURT**
15
                  **SOUTHERN DISTRICT OF CALIFORNIA**
16

17 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
   |---|---|
18 | Plaintiffs, | |
   | | **PLAINTIFFS' CONSOLIDATED** |
19 | v. | **ANSWERS AND OBJECTIONS TO** |
   | | **DEFENDANTS' FIRST SETS OF** |
20 | Chad F. Wolf,[1] *et al.*, | **INTERROGATORIES TO ALL** |
   | | **NAMED PLAINTIFFS** |
21 | Defendants. | |
22
23
24
25
26

   _____
27 [1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan
   pursuant to Fed. R. Civ. P. 25(d).
28
                                   PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
                                        DEFS' FIRST SET OF INTERROGS.

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

1

# **PREAMBLE**

2       Pursuant to Federal Rules of Civil Procedure 26 and 33, the Local Rules of

3   the U.S. District Court for the Southern District of California, and U.S. Magistrate

4   Judge Karen S. Crawford's Chambers' Rules Regarding Civil Pretrial Procedures

5   (the "applicable rules"), Named Plaintiffs Abigail Doe, Beatrice Doe, Carolina Doe,

6   Dinora Doe, Ingrid Doe, Roberto Doe, Maria Doe, Juan Doe, Úrsula Doe, Victoria

7   Doe, Bianca Doe, Emiliana Doe, and César Doe (collectively, the "Named

8   Plaintiffs"), through their undersigned counsel, provide the following consolidated

9   answers and objections to Defendants' First Sets of Interrogatories directed to the

10  Named Plaintiffs (the "interrogatories").   Named Plaintiffs reserve the right to

11  amend or supplement these answers and objections to the extent allowed by the

12  applicable rules.

13      Named Plaintiffs' answers do not constitute admissions relative to the

14  existence of any information or documents, to the relevance or admissibility of any

15  information or documents, or to the truth or accuracy of any statements or

16  characterizations contained in Defendants' interrogatories.   All objections as to

17  relevance, authenticity, or admissibility are expressly reserved.   Named Plaintiffs

18  designate their answers to Defendants' interrogatories as "Highly Confidential"

19  pursuant to the Court's Protective Order.

20      Named Plaintiffs further object to Defendants' interrogatories to the extent

21  that they seek Named Plaintiffs' contentions regarding particular matters before

22  discovery—fact and expert—has concluded.   Named Plaintiffs reserve the right to

23  amend and supplement these responses upon the conclusion of fact and expert

24  discovery.

25      Named Plaintiffs also object to Defendants' interrogatories to the extent that

26  they call for publicly available information or information in the possession,

27  custody, or control of Defendants, and are therefore of no greater burden for

28  Defendants to obtain than for Named Plaintiffs to obtain and produce.   Named

3    PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1   Plaintiffs will not conduct a literature or library search to collect or organize
2   information or documents that are as accessible to Defendants as they are to the
3   Named Plaintiffs.

4          Named Plaintiffs object to Defendants' interrogatories to the extent they seek
5   information protected by the attorney-client privilege, the attorney work product
6   doctrine, or any other applicable privilege or immunity. None of Named Plaintiffs'
7   answers are intended to be, or should be construed as, a waiver or relinquishment,
8   in whole or in part, of any protection from disclosure afforded by attorney-client
9   privilege, the attorney work product doctrine, or any other applicable privilege or
10  immunity.

11         Finally, Named Plaintiffs object to Defendants' interrogatories to the extent
12  that they require the recitation of all facts relevant to Plaintiffs' case-in-chief. Such
13  interrogatories, "insofar as they seek every fact, every piece of evidence, every
14  witness, and every application of fact to law—rather than, for example, certain
15  principal or material facts, pieces of evidence, witnesses and legal applications—
16  supporting the identified allegations, are overly broad and unduly burdensome."
17  *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 273
18  F.R.D. 367, 369 (S.D.N.Y. 2010); *see also Susquehanna Comm. Fin., Inc. v.*
19  *Vascular Resources, Inc.*, 2010 U.S. Dist. LEXIS 127125, at *25-37 (M.D. Pa. 2010)
20  (denying motion to compel detailed response to interrogatories requesting "all facts"
21  supporting plaintiffs' contentions, holding that defendants' demand for specific and
22  "narrative response[s]" to contention interrogatories was "little more than a make-
23  work request . . . since they do not only have the information, they have the written
24  materials themselves"); *IBP, Inc. v. Mercantile Bank*, 179 F.R.D. 316, 321 (D. Kan.
25  1998) ("To the extent [the interrogatories] ask for every fact and every application
26  of law to fact which supports the identified allegations, the court finds them overly
27  broad and unduly burdensome. An interrogatory may reasonably ask for the material
28  or principal facts which support a contention."); *Clean Earth Remediation & Constr.*

1    *Servs. v. Am. Int'l Grp., Inc.*, 245 F.R.D. 137, 141 (S.D.N.Y. 2007) ("a number of

2    cases have held that interrogatories seeking identification of all facts supporting a

3    particular allegation are inherently improper") (collecting cases); *Grynber v. Total*

4    *S.A.*, 2006 U.S. Dist. LEXIS 28854, at *16 (D. Colo. 2006) ("blockbuster

5    interrogatories" that seek all facts related to a theory of liability have been

6    "repeatedly condemned by the trial courts" because they "constitute an unduly

7    burdensome request as a matter of law and are an abuse of the discovery process.

8    Interrogatories should not require a party to provide a narrative account of his

9    case."); *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186-87 (D. Kan. 1997) ("Whatever may

10   be said for the virtues of discovery and the liberty of the federal rules, which perhaps

11   all courts recognize, there comes at some point a reasonable limit against

12   indiscriminately hurling interrogatories at every conceivable detail and fact which

13   may relate to a case. . . . Indiscriminate use of blockbuster interrogatories, such as

14   these, do not comport with the just, speedy, and inexpensive determination of the

15   action. To require answers for them would more likely cause delay and unreasonable

16   expense of time, energy, and perhaps money.").

17                    **<u>OBJECTIONS TO DEFINITIONS</u>**

18        1.      Named Plaintiffs object to Defendants' definitions to the extent that

19   they render the interrogatories vague or ambiguous by attributing meanings to

20   ordinary words that depart from the common usage of such words or define multiple

21   words to have the same or overlapping meanings. Named Plaintiffs will interpret

22   Defendants' interrogatories reasonably and in good faith in accordance with

23   common English usage.

24        2.      Named Plaintiffs object to Defendants' definition of "you" and "your"

25   to the extent that it includes "agents, representatives, . . . attorneys, and investigators"

26   and therefore seeks information protected from disclosure by the attorney-client

27   privilege and the attorney work product doctrine. Named Plaintiffs further object to

28   the definition of "you" and "your" to the extent that it can be construed to require

1    the premature and non-reciprocal disclosure of expert reports or the disclosure of

2    communications with expert witnesses in violation of Fed. R. Civ. P. 26(b)(4)(C)-

3    (D).

4          3.    Named Plaintiffs object to Defendants' definition of "DHS" as

5    incomplete, vague, ambiguous, not relevant to the claims and defenses in the

6    litigation, and not proportional to the needs of the case  to the extent that it requires

7    Named Plaintiffs to provide interrogatory answers regarding every constituent

8    agency within the U.S. Department of Homeland Security, including agencies that

9    Named Plaintiffs currently understand to be entirely unrelated to this matter, such as

10   FEMA, the U.S. Coast Guard, and the U.S. Secret Service.

11         4.    Named Plaintiffs object to Defendants' definition of "CBP" as vague,

12   ambiguous, and not proportional to the needs of the case to the extent that it requires

13   Named Plaintiffs to provide interrogatory answers concerning the U.S. Border Patrol

14   when Defendants have refused to produce information in the possession, custody, or

15   control of the U.S. Border Patrol.  Named Plaintiffs cannot be expected to provide

16   answers to interrogatories regarding the U.S. Border Patrol when Defendants have

17   not produced discovery from the U.S. Border Patrol.

18         5.    Named Plaintiffs object to Defendants' definition of "OFO" as vague,

19   ambiguous, and not proportional to the needs of the case to the extent that

20   Defendants seek answers with respect to the whole of the Office of Field Operations

21   when Defendants have refused to produce discovery from particular ports of entry

22   and have limited their production of documents to particular custodians.  Named

23   Plaintiffs cannot be expected to provide answers to interrogatories regarding the

24   whole of the Office of Field Operations when Defendants have refused to produce

25   discovery from the whole of the Office of Field Operations.

26         6.    Named Plaintiffs object to Defendants' multiple definitions of the terms

27   "identify," "identity," and "identified" to the extent that it adds discrete subparts to

28   Defendants' interrogatories rendering the numbering of Defendants' interrogatories

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

incorrect.  Named Plaintiffs will provide the additional information called for by the term "identify" when it is logically related to the subject matter of the interrogatory. *See, e.g.*, *Bell v. Woodward Governor Co.*, 2005 WL 3829134, at *1 (N.D. Ill. 2005) ("[I]nterrogatory subparts are to be counted as one interrogatory . . . if they are logically or factually subsumed within and necessarily related to the primary questions."); *Willingham v. Ashcroft*, 226 F.R.D. 57, 59 (D.D.C. 2005) ("[O]nce a subpart of an interrogatory introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it, the subpart must be considered a separate interrogatory no matter how it is designated.").  To the extent that Named Plaintiffs provide information responsive to subparts that are not logically related to an interrogatory, they do so without waiving any argument that Plaintiffs have served more interrogatories than permitted under Fed. R. Civ. P. 33(a) or any applicable Court order.

## OBJECTION TO INSTRUCTIONS

1.      Named Plaintiffs object to Defendants' instructions because they seek to expand the requirements of applicable rules.  Named Plaintiffs will provide answers and objections consistent with the applicable rules.

## CONSOLIDATED AND SPECIFIC ANSWERS AND OBJECTIONS TO DEFENDANTS' INTERROGATORIES BY ALL NAMED PLAINTIFFS

1.      State the date, time, and location of each and every instance in which you crossed, attempted to cross, or approached with the intent to cross the U.S.-Mexico border at a U.S. port of entry from Mexico.

**Specific Objections:** Named Plaintiffs object to this interrogatory to as vague and ambiguous to the extent that it seeks "each and every instance" of a crossing or attempted crossing of the U.S.-Mexico border without a reasonable time limitation and can be read as inconsistent with Defendants' prior instruction that answers should only be provided for the period January 1, 2016 to May 11, 2020.  For purposes of clarity, Named Plaintiffs will only provide answers for the time period

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1    January 1, 2016 to May 11, 2020.

2          Named Plaintiffs also object to this interrogatory to the extent that it calls for

3    publicly available information or information in the possession, custody, or control

4    of Defendants, and are therefore of no greater burden for Defendants to obtain than

5    for Named Plaintiffs to obtain and produce.  Named Plaintiffs will not conduct a

6    literature or library search to collect or organize information or documents that are

7    as accessible to Defendants as they are to the Named Plaintiffs.

8          Named Plaintiffs object to this interrogatory to the extent it seeks information

9    protected by the attorney-client privilege, the attorney work product doctrine, or any

10   other applicable privilege or immunity.  None of Named Plaintiffs' answers are

11   intended to be, or should be construed as, a waiver or relinquishment, in whole or in

12   part, of any protection from disclosure afforded by attorney-client privilege, the

13   attorney work product doctrine, or any other applicable privilege or immunity.

14         Named Plaintiffs object to this interrogatory as unduly burdensome to the

15   extent that the it calls for Named Plaintiffs to speculate regarding their precise

16   location when it is not immediately apparent to travelers whether fences, jersey

17   barriers, and turnstiles are on U.S. territory or Mexican territory.  Named Plaintiffs

18   will provide their best recollection of their location during their interactions with

19   CBP officers to the extent that they can recall their location relative to the U.S.-

20   Mexico border.

21         **Response:**  Subject to and without waiving the foregoing objections, see

22   response to interrogatory 3. In addition, see Named Plaintiffs' responses to

23   interrogatories 1, 2, 8 and 9 in the table at the end of these Responses and Objections.

24         2.     For each instance identified in response to Interrogatory 1, describe in

25   detail your physical location in relation to the U.S.-Mexico border, including

26   whether you physically crossed the U.S.-Mexico border and, if so, whether you

27   remained in the United States or crossed back into Mexico following the crossing,

28   attempt, or approach.

**Specific Objections:** Named Plaintiffs object to this interrogatory to as vague and ambiguous to the extent that it seeks "each and every instance" of a crossing or attempted crossing of the U.S.-Mexico border without a reasonable time limitation and can be read as inconsistent with Defendants' prior instruction that answers should only be provided for the period January 1, 2016 to May 11, 2020. For purposes of clarity, Named Plaintiffs will only provide answers for the time period January 1, 2016 to May 11, 2020.

Named Plaintiffs also object to this interrogatory to the extent that it calls for publicly available information or information in the possession, custody, or control of Defendants, and are therefore of no greater burden for Defendants to obtain than for Named Plaintiffs to obtain and produce. Named Plaintiffs will not conduct a literature or library search to collect or organize information or documents that are as accessible to Defendants as they are to the Named Plaintiffs.

Named Plaintiffs object to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity. None of Named Plaintiffs' answers are intended to be, or should be construed as, a waiver or relinquishment, in whole or in part, of any protection from disclosure afforded by attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.

Named Plaintiffs object to this interrogatory as unduly burdensome to the extent that the it calls for Named Plaintiffs to speculate regarding their precise location when it is not immediately apparent to travelers whether fences, jersey barriers, and turnstiles are on U.S. territory or Mexican territory. Named Plaintiffs will provide their best recollection of their location during their interactions with CBP officers to the extent that they can recall their location relative to the U.S.-Mexico border.

**Response:** Subject to and without waiving the foregoing objections, see response to interrogatory 3. In addition, see Named Plaintiffs' responses to

9    PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

interrogatories 1, 2, 8 and 9 in the table at the end of these Responses and Objections.

3.    For each instance identified in response to Interrogatory 1, identify any U.S. governmental policy(ies), practice(s), procedure(s), or action(s) that you challenge in this case and claim you were subjected to by any person at or near the time you crossed, attempted to cross, or approached with the intent to cross the U.S.-Mexico border at a U.S port of entry from Mexico.

**Specific Objections:** Named Plaintiffs object to this interrogatory to as vague and ambiguous to the extent that it seeks "each and every instance" of a crossing or attempted crossing of the U.S.-Mexico border without a reasonable time limitation and can be read as inconsistent with Defendants' prior instruction that answers should only be provided for the period January 1, 2016 to May 11, 2020.  For purposes of clarity, Named Plaintiffs will only provide answers for the time period January 1, 2016 to May 11, 2020.

Named Plaintiffs also object to this interrogatory to the extent that it calls for publicly available information or information in the possession, custody, or control of Defendants, and are therefore of no greater burden for Defendants to obtain than for Named Plaintiffs to obtain and produce.  Named Plaintiffs will not conduct a literature or library search to collect or organize information or documents that are as accessible to Defendants as they are to the Named Plaintiffs.

Named Plaintiffs object to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.  None of Named Plaintiffs' answers are intended to be, or should be construed as, a waiver or relinquishment, in whole or in part, of any protection from disclosure afforded by attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.

Named Plaintiffs object to this interrogatory as vague and ambiguous to the extent that the difference between "attempted to cross" and "approached with the intent to cross" is not defined or explained.

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

Named Plaintiffs further object to this interrogatory because "contention interrogatories are more appropriate after a substantial amount of discovery has been conducted." *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 110 (D.N.J. 1990); *see also In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("the wisest general policy is to defer propounding and answering contention interrogatories until near the end of the discovery period."). Named Plaintiffs have not complete all discovery (fact and expert), their investigation of the facts, or their preparation for trial in this case, and therefore Named Plaintiffs reserve the right to rely on any legal theories, facts, documents, testimony, or evidence which may come to light as fact and expert discovery progresses.

**Response:**  Subject to and without waiving such objections, Named Plaintiffs answer as follows:

***The Turnback Policy.***  Since 2016 and continuing to the present, Defendants implemented a policy to restrict access to the asylum process at Class A Ports of Entry on the U.S.-Mexico border ("POEs") by mandating that CBP officers directly or constructively turn back asylum seekers at the border (the "Turnback Policy"). To effectuate the Turnback Policy, CBP officers have engaged in an unlawful, widespread pattern and practice of denying asylum seekers, including the Named Plaintiffs, access to the asylum process at POEs through a variety of illegal tactics. Initially, these tactics included metering; lying; using intimidation or coercion; employing verbal abuse and applying physical force; physically obstructing access to ports of entry; and denying outright access to the asylum process.  CBP communicated and collaborated with the Mexican immigration authority, INM, to effectuate this Turnback Policy.  Over time, this illegal conduct was formalized into a single metering policy that was implemented at POEs.

***The Origins of the Turnback Policy.***  There is no cap on the number of asylum seekers that may arrive in the United States in a particular period of time. ECF No. 260 at 4:24-5:2 ("There are limits on the number of refugees, but there

aren't limits on the number of people who can seek asylum. Anyone who wants to seek asylum can seek asylum."). A CBP officer's duty to allow noncitizens access to the U.S. asylum process is "not discretionary." *Munyua v. United States*, 2005 WL 43960, at *6 (N.D. Cal. 2005) (citing 8 U.S.C. § 1225(b); 8 C.F.R. § 235.3(b)(4)). All applicants for admission at POEs must be inspected by an immigration officer (*see* 8 U.S.C. § 1225(a)(3)). If a noncitizen who is arriving at a POE asserts a fear of return to his or her home country or an intention to apply for asylum, a CBP officer *must* either refer the asylum seeker for an interview with an Asylum Officer (*see* 8 U.S.C. § 1225(b)(1)), or place the asylum seeker directly into regular removal proceedings, which will then allow the asylum seeker to pursue his or her asylum claim before an immigration judge (*see* 8 U.S.C. § 1225(b)(2), 1229, 1229a). Failure to inspect and process asylum seekers as set out in § 1225 constitutes a violation of the statute as well as a violation of asylum seekers' Fifth Amendment procedural due process rights and the international *jus cogens* norm of *non-refoulement*.

Despite these legal requirements, beginning in 2016 Defendants began using various means to turn back asylum seekers who were arriving at Class A POEs on the U.S.-Mexico border. These tactics included lies regarding the capacity of the POE, threats and intimidation, and the use of physical force to block access to the POE. *See, e.g.*, Dkt. 98-2 at ¶¶ 9-19; Dkt. 98-3 at ¶¶ 9-22; Dkt. 98-4 at ¶¶ 13-29; Dkt. 98-5 at ¶¶ 8-18; Dkt. 98-6 at ¶¶ 11-18; Dkt. 98-8 at ¶¶ 10-23. Starting in 2016, Defendants began formalizing this Turnback Policy under the more anodyne names "metering" and "queue management." As explained in more detail below, under metering and queue management, CBP officers are stationed at "limit line" positions that are typically several feet away from the border between the U.S. and Mexico, and at times have been several hundred feet away from the border at certain ports. CBP officers at these limit line positions intercept arriving non-citizens and tell them, falsely, that the port of entry is at "capacity"; they then direct the migrant back

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

to Mexico. *See, e.g.*, ALOTROLADO_00018604 (audio recording of Turkish national with valid U.S. visa being turned back to Mexico). Metering began at the Otay Mesa port of entry in May 2016. Defs.' Resp. to Interrog. 21 at 11. Then, metering spread to the San Ysidro port of entry in July 2016. *Id.* Metering began at the Calexico, Brownsville, Hidalgo, and El Paso ports of entry. *Id.* at 11-14. In January 2017, metering started at the Laredo port of entry. *Id.* at 13.

### *CBP Leadership Implemented a Policy Designed to Turn Back Asylum Seekers.*

On January 25, 2017, President Trump issued an Executive Order directing CBP and DHS to end paroling and releasing asylum seekers into the United States to the greatest extent possible. *See* AOL-DEF-00000004 at 004-5. Pursuant to this Executive Order, CBP ended its prior practice of paroling and releasing asylum seekers and began implementing a policy of "mandatory detention" of asylum seekers arriving at POEs. *Id.* at 005; *see also* AOL-DEF-00019429 at 430.

On April 24, 2018, CBP Commissioner McAleenan expressed his fear that a migrant caravan consisting of "500-600 individuals" would soon arrive at the U.S.-Mexico border. AOL-DEF-00041757 at 758. He used this opportunity to push his deputies to "sen[d] out guidance regarding safe processing and port security and capacity issues relating to queue management." *Id.* at 758. On April 25, 2018, Todd Owen, Executive Assistant Commissioner of CBP for the Office of Field Operations responded, "We will only intake those that we have capacity for and will hold the limit line until processing and temporary detention space becomes available." *Id.* at 757.

On April 27, 2018, Mr. Owen issued a version of CBP's metering policy, which was distributed to the four directors of field operations that oversee the operations of all POEs on the U.S.-Mexico border. *See* Pls.' Dep. Ex. 3. Under that metering policy, directors of POEs were empowered to "meter the flow of travelers at the land border." *Id.* When "metering" is in place, CBP officers tell "waiting

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1   travelers that processing at the port of entry is currently at capacity." *Id.*  Therefore,

2   "while the Government encouraged all asylum-seekers to come to ports of entry to

3   make their asylum claims, CBP managed the flow of people who could enter at those

4   ports of entry through metering."  AOL-DEF-00205051 at 057.

5         There was no need for the metering policy.  The April 2018 migrant caravan

6   largely fizzled. ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████  AOL-DEF-

8   00041825 at 825.  As of April 28, 2018, only 100 individuals associated with the

9   migrant caravan had presented themselves at a POE.  AOL-DEF-00027054 at 054.

10  And all of CBP's POEs were operating at less than 100% detention capacity from

11  April 27-29, 2018.  *See* AOL-DEF-00060695 at 695; AOL-DEF-00028127 at 128;

12  AOL-DEF-00274287 at 289.  The San Ysidro POE, which according to CBP can

13  handle ███ asylum cases per day, could have easily processed these migrant caravan

14  members in an expeditious manner.  *See* AOL-DEF-00063246 at 246.

15        Then, on June 5, 2018, Secretary of Homeland Security Kirstjen Nielsen

16  issued a memorandum containing guidance for CBP entitled "Prioritization-Based

17  Queue Management."  AOL-DEF-00041455 at 455.  This memorandum directed

18  CBP to prioritize every one of its other missions over processing asylum seekers, *id.*

19  at 457, and to deploy resources "that would otherwise be deployed to process

20  inadmissible arriving aliens" to other CBP missions.  *Id.* at 456.

21        Around  the  same  time  that  CBP  leadership  "initiated  [this]  Queue

22  Management  Strategy,"  CBP  "shifted  from  [using]  'detention'  capacity  to

23  'operational'  capacity."  AOL-DEF-00060768-69  at  768.    This  change  was

24  significant. Detention capacity is a known number that is regularly tracked by the

25  Migration Crisis Action Team ("MCAT") at CBP. *See, e.g.*, Owen Dep. at 185:9-

26  20. On the other hand, operational capacity is not tracked by CBP, and port directors

27  can  lower  the  operational  capacity  of  a  POE  can  lower  the  alleged  operational

28  capacity of a POE at a particular point in time by simply asserting that the port is at

1  capacity. Owen Dep. at 74:11-76:15, 189:8-191:6.

2    These policies continue to be in effect to today.  *See* CBPALOTRO000303-

3  08 (November 17, 2019 memorandum extending Prioritization-Based Queue

4  Management); CBPALOTRO000314-15 (April 30, 2020 email and memorandum

5  maintaining metering policy).

6    ***Ports of Entry Adopted Policies Designed to Turn Back Asylum Seekers.***

7  Shortly after the Prioritization-Based Queue Management memo was issued, all

8  POEs began to deploy CBP officers to queue management control points at or near

9  the international border between the U.S. and Mexico.  AOL-DEF-00190370 at 370.

10  This deployment was haphazard and prioritized blocking asylum seekers over the

11  safety of CBP officers.  *See* ▮▮▮▮▮▮ Dep. at 171:20-172:20.  As one CBP officer

12  testified:

13    Q.    [D]o you think that its' true that whoever came up with this

14        policy wasn't thinking about officer safety?

15    A.    Yes.

16    Q.    Do you think that this policy put officers at risk?

17    A.    Yes.

18    Q.    From that perspective, did you think that this policy was not well

19        thought through?

20    A.    Yes.

21  *Id.* at 172:14-23.

22    CBP officers stationed at these control points informed asylum seekers that

23  the POE is at "capacity" and that asylum seekers should return to Mexico.  In some

24  instances, asylum seekers were told that they should make contact with particular

25  groups on the Mexican side of the border, such as the Mexican immigration agency,

26  Grupo Beta.  Instead of utilizing their full capacity, POEs have implemented caps

27  on processing asylum seekers.  *See, e.g.*, Ex. AOL-DEF-00041453 at 453.  For

28  example, in 2018, CBP leadership at the Hidalgo, Texas POE told Senator Patrick

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1  Leahy that the Hidalgo POE "set a 'ceiling' of processing 48 asylum claims per day."

2  AOL-DEF-00041453 at 453; *see also* AOL-DEF-00046740 at 742 (San Ysidro POE

3  instituted a "ceiling of 50 Mexican asylum-seekers per day.").

4      Likewise, on July 6, 2018, Ryan Koseor, Deputy Commander of CBP's

5  MCAT group, advised the Deputy Director of the Office of Field Operations'

6  ("OFO's") Laredo Field Office that, "The view is that we [should be] processing up

7  to 70% of detention/holding capacity[.]"  AOL-DEF-01037408-10 at 408.  Then, on

8  August 29, 2018, the Deputy Commander of CBP's MCAT group reiterated the

9  belief that agency guidance mandated "keeping our capacity numbers around 60-

10  70%."  AOL-DEF-00039597 at 597.  When asked about this *explicit evidence* that

11  Defendants set an artificially low ceiling for inspecting and processing asylum

12  seekers, Randy Howe, the former Executive Director of OFO and CBP's 30(b)(6)

13  witness, could only come up with answers such as "I really don't recall," "Not that

14  I can recall," and "I really don't remember."  Howe Dep. at 153:10-21.

15      Unsurprisingly, the processing levels at POEs cannot be justified by the actual

16  capacity of particular POEs.  For example, CBP's *Laredo Field Office Contingency*

17



SOURCES: AOL-DEF-00012202; AOL-DEF-00012022; AOL-DEF-00012033; AOL-DEF-00012041; AOL-DEF-00012075; AOL-DEF-00012961; AOL-DEF-00012071; AOL-DEF-00012081; AOL-DEF-00012099; AOL-DEF-00012199; AOL-DEF-00012119; AOL-DEF-00012129; AOL-DEF-00012144; AOL-DEF-00012154; AOL-DEF-00012164; AOL-DEF-00012175; AOL-DEF-00012186; AOL-DEF-00012196; AOL-DEF-00012206; AOL-DEF-00012217; AOL-DEF-00012227; AOL-DEF-00012236; AOL-DEF-00012246; AOL-DEF-00012256; AOL-DEF-00012266; AOL-DEF-00012294; AOL-DEF-00012307; AOL-DEF-00012317; AOL-DEF-00012335; AOL-DEF-00012345; AOL-DEF-00012355; AOL-DEF-00012365; AOL-DEF-00012376; AOL-DEF-00012384; AOL-DEF-00012404; AOL-DEF-00011924

1  *Plan* for addressing "[i]ncreases in persons and family units . . . claiming 'credible

2  fear'," AOL-DEF-00011011 at 11124, states that the Brownsville POE "has a

3  capacity to process approximately ███ cases every 24 hours." *Id.* at 11135.

4  However, daily data compiled and kept by CBP's MCAT concerning the number of

5  asylum seekers processed at particular POEs shows that the Brownsville POE was

6  processing far fewer than ███ asylum seekers per day in the first quarter of 2019.

7      In the limited instances where a POE decides to inspect and process asylum

8  seekers, they rely on waitlists maintained in Mexico. *See* AOL-DEF-00205966 at

9  967. As an officer at the San Ysidro POE explained, port management would "reach

10 out via telephone to Grupo Beta, the humanitarian arm of the Mexican Immigration

11 system," and "let them know how many people we can process." *Id.* Mexican

12 authorities then reference wait lists to determine which asylum seekers will be

13 allowed to return to the POE to seek asylum. *See* Dkt. 390-48 at ¶¶ 7-9.

14      In many cases, asylum seekers are metered and turned back to Mexico when

15 they are actually standing on U.S. soil. On September 26, 2019, the DHS Office of

16 Inspector General issued a report that concluded that "contrary to Federal law and

17 [CBP] policy, CBP officials at the Tecate, California [POE] returned some asylum

18 applicants from inside the United States back to Mexico and instructed those

19 individuals to go to other [POEs] to make their asylum claims." AOL-DEF-

20 00615546 at 547. A whistleblower also testified that "in most cases" asylum seekers

21 crossed the border on to U.S. soil before interacting with him at a queue management

22 point. ███ Dep. at 96:11-97:18. And, CBP's Executive Assistant

23 Commissioner, Todd Owen, conceded, "When we started metering in 2016, we did

24 not hold at the limit line. We simply allowed people to line up outside the doors to

25 the [POE]," before metering them. Owens Dep. at 151:11-17, 152:16-155:2. And,

26 even when CBP officers are stationed at control points near the international

27 boundary, they are often several feet away from the border. *Id.* at 93:1-94:18. For

28 instance, at the PedEast entrance to the San Ysidro port of entry, "there [was]

17    PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
      DEFS' FIRST SET OF INTERROGS

1  approximately ███ feet of distance from the man-gates and turnstile [at the border]

2  to the actual limit line." NTEU-000001. At the Otay Mesa port of entry, "there

3  [was] approximately ███ feet distance from the man-gate and turnstile [at the border]

4  to the actual limit line." *Id.* And, at the Tecate port of entry, "there is approximately

5  ███ feet of distance from the man-gate and turnstile [at the border] to the actual

6  limit line." *Id.*; *see also* AOL-DEF-00074330 (September 4, 2018 email noting that

7  "the Andrade port of entry does not have turnstiles at [the] limit line, and pedestrian

8  ingress point is ███ meters north of the international boundary" and "deploying limit

9  line controls for travelers/migrants entering the Calexico East . . . port pedestrian

10 facilit[y] is particularly challenging."); Defs' Am. Resp. to Interrog. 18 (admitting

11 that San Ysidro limit line position is currently ███ feet away from the border, the

12 Calexico West limit line position is ██ feet away from the border, the Nogales limit

13 line position is "a few feet" away from the border, the Brownsville limit line position

14 is ███ feet away from the border, and the El Paso limit line positions are ███ feet

15 away from the border).[2]

16       Turnbacks on U.S. soil were not limited to ports of entry in California; they

17 also occurred in New Mexico, Arizona, and Texas. For example, at the Hidalgo port

18 of entry, as early as December 2016, NTEU-000040, member of the Chapter 149 of

19 the National Treasury Employees Union ("NTEU"), the union that represents certain

20 non-managerial CBP employees, raised concerns that arriving non-citizens were

21 being "returned to Mexico without any type of adverse action" and that CBP

22 "initiated this practice of circumventing the political asylum process." NTEU-

23 000136. NTEU Chapter 149 collected multiple reports from CBP officers that

24 directly witnessed these turnbacks and had concerns about what they saw. *See*

25 NTEU-000138; NTEU-000139. During meetings with CBP supervisors concerning

26

27 [2] *ee also* AOL-DEF-00093916 (February 13, 2019 email indicating that there was
   ███ feet between the limit line position and the border and that the turnstiles at the

28 rt were on U.S. soil); AOL-DEF-00090872 (May 18, 2018 email explaining that
   there are "approximately ███ meters" between the border and the limit line position).

18  PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

NTEU Chapter 149's grievance, "Agency Representatives acknowledged that [CBP's] unilateral work policies broke CBP mandates [and] Federal Immigration rules and Laws" because CBP "intentionally . . . den[ied] and block[ed] asylum to persons and families in order to block the flow of asylum applicants." NTEU-000132. NTEU Chapter 149 wrote that this Turnback Policy had "chilling [e]ffects [on] all others attempting entry into the United States." *Id.* NTEU Chapter 149 believed that the Turnback Policy "caused traumatic and emotional injury to children" by "return[ing] [them] to Mexico without processing" where they were "kept in unsafe and unsanitary conditions." *Id.* NTEU Chapter 149 warned that this Turnback Policy "places CBP Officers' safety, integrity and position to be questioned as the Agency lacks candor to the public in stating the true facts" concerning the Turnback Policy. *Id.* Although NTEU Chapter 149 first raised this issue in December 2016, by 2019, the union's grievance was still "pending arbitration." NTEU-000040. NTEU Chapter 149 did not stop there in trying to raise its concerns regarding the Turnback Policy. On March 19, 2019, the president of NTEU Chapter 149, David Atkinson, took the unusual step of writing directly to CBP Commissioner Kevin McAleenan. *See* NTEU-000110-14. Mr. Atkinson wrote, "The Port of Hidalgo, Texas employees would like a written order provided to them that mirrors their instructions to return individuals who enter the U.S. and request asylum back to Mexico without appointment or system for a future appointment." NTEU-000110. He went on to note that this guidance was necessary because "the Agency is claiming publicly that they are not conducting these activities when they really are." *Id.* Mr. Atkinson sent photos to Commissioner McAleenan showing that chairs had been removed and secondary inspection workstations went unstaffed in an apparent effort to artificially limit the capacity of the Hidalgo port of entry. *Id.* at 113-14. Mr. Atkinson also attached a letter signed by dozens of CBP officers at the Hidalgo port of entry requesting that CBP provide formal written guidance on the Turnback Policy. NTEU-000115-26.

1    Consequently, even the Executive Assistant Commissioner of CBP would not

2    rule out the possibility that CBP officers are routinely turning back asylum seekers

3    on U.S. soil. *Id.* at 94:9-20. And Defendants have subsequently admitted that

4    arriving non-citizens stepped foot on U.S. soil before they were turned back. *See*

5    Defs' Resp. to Req. for Admis. 7 ("Defendants admit that, between January 1, 2016

6    and the date of these requests, there has been at least one instance in which a CBP

7    Officer instructed an alien without documents sufficient for lawful entry who was

8    standing on U.S. soil to return to Mexico without inspecting or processing them.").

9    At the same time, in addition to metering, some smaller POEs also "funnel"

10   asylum seekers from smaller Class A POEs to larger Class A POEs, known as

11   "hubs." AOL-DEF-00190370 at 370. "Funneling" means that, although smaller

12   Class A POEs are designated to process asylum seekers and have staff capable of

13   processing asylum seekers, those ports refuse to inspect and process asylum seekers

14   and instead advise them to travel through Mexico to larger POEs that have long wait

15   times due to the metering policy, regardless of the unused capacity at the smaller

16   POE. ████ Dep. at 120:17-121:17; *see also, e.g.*, AOL-DEF-00036343 at 643-

17   44 (Tecate and Andrade POEs referred asylum seekers to hubs at San Ysidro and

18   Calexico West POEs); AOL-DEF-00190370 at 370 (Progreso, Roma, Rio Grande

19   City, Del Rio, and Eagle Pass POEs referred asylum seekers to hubs at Brownsville,

20   Hidalgo, and Laredo POEs); AOL-DEF-00788114 (Douglas, Naco, and Lukeville

21   POEs referred asylum seekers to hubs at Nogales and San Luis POEs).

22   The line officers within CBP understood that the purpose of this Turnback

23   Policy was to deter asylum seekers. Indeed, internal CBP documents show that

24   CBP attempted to measure whether metering was having a deterrent effect. *See, e.g.*,

25   AOL-DEF-00546942 (San Diego Field Office of CBP conducted a survey of asylum

26   seekers to determine whether metering and family separation policies were

27   "deterrent factors" for them); AOL-DEF-00205672 (document metadata showing

28   that Department of Homeland Security Office of Inspector General investigator

1  concluding that CBP's goal for queue management policy was, in part,
2  "deterrence"); AOL-DEF-00022783-84 at 783 (email explaining that "metering
3  seems to have had a deterrent effect"); AOL-DEF-00566881 ("Metering has deterred
4  [other-than-Mexican] traffic"); AOL-DEF-00036004 at 004 ("We want to create
5  deterrence from coming to [the] San Ysidro [POE]"). In fact, during a staff briefing
6  on December 6, 2018, CBP Acting Assistant Commissioner Jud Murdock justified
7  metering by stating "[t]he more we process, the more will come." AOL-DEF-
8  00028457 at 457.

9      Further underlying this deterrent motivation, CBP refused to implement
10 contingency plans that could have considerably increased the capacity of POEs to
11 process asylum seekers. For instance, in November 2018, Pete Flores, the Port
12 Director of the San Ysidro POE, ████████████████████
13 ████████████████████████████████████████
14 ████████████████████████████████████████
15 ██████████████████████████ AOL-DEF-00028473 at 473; AOL-DEF-
16 00028469 at 469. ████████████████████████████ AOL-
17 DEF-00050247 at 247. ██████████████████████████████
18 ████████████████████████████████████████
19 ████████████████████████████████████████
20 █████████████ *Id.*

21     Similarly, in August 2018, Ryan Koseor, the Deputy Commander of CBP's
22 MCAT Team, was tasked to determine whether the San Ysidro POE could increase
23 its capacity to process asylum seekers by requiring all asylum seekers at the port to
24 be processed in 24 hours. AOL-DEF-00602802 at 802. However, CBP
25 Commissioner McAleenan did not "want to just throw money at" San Ysidro
26 "because that would defeat the purpose of queue management. *Id.*

27     ***Defendants Implemented the Turnback Policy as a Part of a Larger Suite***
28 ***of Policies Designed to Deter Asylum Seekers.*** The metering/Turnback Policy is a

key part of the Government's overall effort to deter asylum seekers. Beginning in 2017, the Government has enacted a series of executive orders[3], administrative rules[4], and presidential proclamations[5] aimed at deterring asylum seekers and denying them access to the U.S. asylum process.

These public policy pronouncements are no surprise. As the Government began throwing up administrative and actual obstacles to asylum seekers, President Trump and other prominent members of his campaign and administration repeatedly expressed antipathy toward asylum seekers, refugees, and undocumented non-citizens seeking admission to the U.S.

---

[3] *See, e.g.*, Exec. Order No. 13767, 11, 82 Fed. Reg. 8,793 (Jan. 25, 2017) (calling for building a physical wall on U.S.-Mexico border, construction of new detention facilities, returning asylum seekers to Mexico, and restricting use of parole with respect to asylum seekers); Exec. Order No. 13769, 82 Fed. Reg. 8,977 (Jan. 27, 2017) (denying all immigration benefits to migrants from certain "terrorist" countries); Exec. Order No. 13780, 82 Fed. Reg. 13209 (Mar. 6, 2017) (denying asylum benefits to refugees from Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen, subject to certain exceptions).

[4] *See, e.g.*, Aliens Subject to Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018) (banning migrants that entered the U.S. between POEs from accessing U.S. asylum process); Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019) (third-country transit rule); Removal of 30-Day Processing for Asylum Application-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47,148 (Sept. 9, 2019) (extending time period for issuance of employment authorization to asylum applicants); Asylum Application, Interview, and Employment Authorization for Applicants, 84 Fed. Reg. 62,374 (Nov. 14, 2019) (making it more difficult for asylum seekers to receive employment authorization in the U.S.); U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280 (Nov. 14, 2019) (charging asylum seekers a fee for filing application); Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69,640 (Dec. 19, 2019) (expanding bars to asylum for migrants with certain types of criminal convictions and ending automatic review of discretionary denials of asylum).

[5] *See, e.g.*, Proclamation No. 9822, Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57,661 (Nov. 9, 2018) (banning migrants from seeking asylum in any location other than a port of entry); Proclamation No. 9842, Addressing Mass Migration Through the Southern Border of the United States, 84 Fed. Reg. 3665 (Feb. 7, 2019) (same); Proclamation No. 9880, Addressing Mass Migration Through the Southern Border to the United States, 84 Fed. Reg. 21,229 (May 8, 2019) (same).

- On June 16, 2015, Presidential Candidate Donald Trump stated: "When Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with [them]. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people. But I speak to border guards and they tell us what we're getting. And it only makes common sense. They're sending us not the right people. It's coming from more than Mexico. It's coming from all over South and Latin America, and its coming probably from the Middle East. But we don't know. Because we have no protection and we have no competence, we don't know what's happening. And it's going to stop and it's going to stop fast."

- On June 19, 2015, Donald Trump stated: "Druggies, drug dealers, rapists, and killers are coming across the southern border. When will the U.S. get smart and stop this travesty?"

- On June 28, 2015, Donald Trump stated: "I do business with the Mexican people, but you have people coming through the border that are from all over. And they're bad. They're really bad. I've spoken to border guards and I said, 'How bad is it?' And they said, 'Mr. Trump, you have no idea how bad.' But you have people coming in and I'm not just saying Mexicans, I'm talking about people that are from all over that are killers and rapists and they're coming into this country."

- On July 6, 2015, Donald Trump stated: "The Mexican Government is forcing their most unwanted people into the United States. They are, in many cases, criminals, drug dealers, rapists, etc. . . . The United States has become a dumping ground for Mexico and, in fact, for many other parts of the world. . . . The Mexican Government wants an open border as long as it's a ONE WAY open border into the United States. Not only are they killing us at the border, but they are killing us on trade . . . and the country of Mexico is making

23     PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1    billions of dollars in doing so."

2    • On August 24, 2015, Donald Trump stated: "Jeb Bush is crazy, who cares that

3       he speaks Mexican, this is America, English!!"

4    • On October 12, 2015, Donald Trump stated: "Syrian Muslims escorted into

5       U.S. through Mexico.  Now arriving to Oklahoma and Kansas!  Congress?"

6    • On November 17, 2015, Donald Trump stated: "Refugees from Syria are now

7       pouring into our great country.  Who knows who they are – some could be

8       ISIS.  Is our president insane?"

9    • On November 22, 2015, Donald Trump stated: "There were people that were

10      cheering on the other side of New Jersey, where you have large Arab

11      populations.  They were cheering as the World Trade Center came down."

12   • On December 7, 2015, Donald Trump stated: "Donald J. Trump is calling for

13      a total and complete shutdown of Muslims entering the United States until our

14      country's representatives can figure out what is going on.  According to Pew

15      Research, among others, there is great hatred towards Americans by large

16      segments of the Muslim population."

17   • On December 10, 2015, Donald Trump stated: "The United Kingdom is trying

18      hard to disguise their massive  Muslim problem.  Everybody is wise to what

19      is happening, very sad!  Be honest."

20   • On March 22, 2016, Donald Trump stated: "Incompetent Hillary, despite the

21      horrible attack in Brussels today, wants borders to be weak and open – and let

22      the Muslims flow in.  No way!"

23   • On May 22, 2016, Donald Trump stated: "Crooked Hillary wants a radical

24      500% increase in Syrian refugees.  We can't allow this.  Time to get smart

25      and protect America!"

26   • On June 5, 2016, Donald Trump said of U.S. District Judge Gonzalo P. Curiel:

27      "He's a Mexican. . . . We're building a wall between here and Mexico.  The

28      answer is, he is giving us very unfair rulings – rulings that people can't even

24    PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
      DEFS' FIRST SET OF INTERROGS

believe."

- On September 9, 2016, Donald Trump stated: "Refugees from Syria over 10k plus more coming.  Lots of your males, poorly vetted."

- On October 27, 2016, at a political rally, Donald Trump stated: "Thousands of Americans have been killed by illegal immigrants."

- On October 30, 2016, at a political rally, Donald Trump said of Hillary Clinton: "She wants to let people just pour in. You could have 650 million people pour in, and we do nothing about it. Think of it. That's what could happen. You triple the size of our country in one week."

- On January 30, 2017, President Donald Trump stated: "If the ban were announced with a one week notice, the 'bad' would rush into our country during the week.  A lot of bad 'dudes' out there!"

- On February 1, 2017, President Donald Trump stated: "Everybody is arguing whether or not it is a BAN.  Call it what you want, it is about keeping bad people (with bad intentions) out of country!"

- On February 11, 2017, President Donald Trump stated: "Our legal system is broken! '77% of refugees allowed into U.S. since travel reprieve hail from seven suspect countries.' (WT) SO DANGEROUS!"

- On April 18, 2017, President Donald Trump stated: "The weak illegal immigration policies of the Obama Admin. allowed bad MS 13 gangs to form in cities across U.S. We are removing them fast!"

- In 2017, Steven Miller, a Senior Adviser for Policy to President Trump, stated, "I would be happy if not a single refugee foot ever again touched America's soil."

- On October 12, 2017, in a speech delivered at the Executive Office for Immigration Review, former Attorney General Jefferson Beauregard Sessions III stated: "These changes — and case law that has expanded the concept of asylum well beyond congressional intent — created even more incentives for

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

illegal aliens to come here and claim a fear of return. . . . The consequences are just what you'd expect. Claims of fear to return have skyrocketed, and the percentage of claims that are genuinely meritorious are down."

- On October 12, 2017, in a speech delivered at the Executive Office for Immigration Review, former Attorney General Jefferson Beauregard Sessions III stated: "We also have dirty immigration lawyers who are encouraging their otherwise unlawfully present clients to make false claims of asylum providing them with the magic words needed to trigger the credible fear process. . . . There are almost no costs, but potentially many rewards, for filing a meritless asylum application. . . . President Trump understands this is a crisis. And so do the American people. The President promised voters he would return this country to a lawful system of immigration during his campaign and he is going to deliver. . . . Congress must pass the legislative priorities President Trump announced this week, which included significant asylum reform, swift border returns, and enhanced interior enforcement. We can impose and enforce penalties for baseless or fraudulent asylum applications and expand the use of expedited removal. We can elevate the threshold standard of proof in credible fear interviews. We can expand the ability to return asylum seekers to safe third countries. . . . We can turnaround this crisis under President Trump's leadership."

- In a November 3, 2017 memorandum to the National Security Council entitled "Principals Small Group Meeting on Temporary Protected Status," the National Security Council recommended "engag[ing] Congress to pass a comprehensive immigration reform to include a merit based entry system." This memorandum summarized a meeting that was attended by Acting Secretary of Homeland Security Elaine Duke, White House advisor Stephen Miller, former Homeland Security advisor Tom Bossert, former Attorney General Jefferson Sessions, and former Homeland Security advisor Gene

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1    Hamilton.

2    • On January 30, 2018, during his State of the Union address, President Donald

3    Trump stated that MS-13 gang members "took advantage of glaring loopholes

4    and our laws to enter the country as illegal, unaccompanied, alien minors."

5    • On February 15, 2018, the DHS published a document on its website entitled

6    "We Must Secure The Border and build the Wall to Make America Safe

7    Again." In that document, the DHS wrote: "Illegal immigrants are

8    incentivized to illegally enter by the low standard for credible fear and the

9    lack of cost or sanction for filing a baseless asylum claim, which allows many

10    of them to assert meritless claims that will not be adjudicated for years."

11    • On April 2, 2018, President Donald Trump stated: "Mexico is making a

12    fortune on NAFTA...They have very strong border laws - ours are pathetic.

13    With all of the money they make from the U.S., hopefully they will stop

14    people from coming through their country and into ours, at least until

15    Congress changes our immigration laws!"

16    • On May 15, 2018, Kirstjen Nielsen, the Secretary of the DHS, gave an

17    interview to Fox News. During this interview, Secretary Nielsen stated: "We

18    are 'metering,' which means that if we don't have the resources to let them in

19    on a particular day, they are going to have to come back. They will have to

20    wait their turn and we will process them as we can, but that's the way that the

21    law works. Once they come into the United States, we process them. We

22    have asked Congress to fix this loophole. It's a hug gaping loophole that we

23    need to fix because it is so abused."

24    • On May 16, 2018, President Donald Trump stated: "We have people coming

25    into the country or trying to come in, we're stopping a lot of them, but we're

26    taking people out of the country. You wouldn't believe how bad these people

27    are. These aren't people. These are animals."

28    • On June 11, 2018, former Attorney General Jefferson Sessions delivered a

speech to the Executive Office of Immigration Review's Legal Training Program, during that speech he stated: "As you all well know, one of our major difficulties today is the asylum process. The asylum process is being abused to the detriment of the rule of law, sound public policy, and public safety—and to the detriment of people with just claims. Saying a few simple words—claiming a fear of return—is now transforming a straightforward arrest for illegal entry and immediate return into a prolonged legal process, where an alien may be released from custody into the United States and possibly never show up for an immigration hearing. This is a large part of what has been accurately called, 'catch and release.'"

- On June 18, 2018, President Donald Trump stated: "We don't want what is happening with immigration in Europe to happen with us!"

- On June 18, 2018, President Donald Trump stated: "The people of Germany are turning against their leadership as migration is rocking the already tenuous Berlin coalition. Crime in Germany is way up. Big mistake made all over Europe in allowing millions of people in who have so strongly and violently changed their culture!"

- On June 18, 2018, the DHS published a document on its website entitled "DHS Secretary Nielsen's Remarks on the Illegal Immigration Crisis." In that document, the DHS wrote: "Second, we need to reform our asylum laws to end the systemic abuse of our asylum system and stop fraud."

- On June 19, 2018, President Donald Trump stated: "Democrats are the problem. They don't care about crime and want illegal immigrants, no matter how bad they may be, to pour into and infest our Country, like MS-13. They can't win on their terrible policies, so they view them as potential voters!"

- On June 24, 2018, President Donald Trump stated: "We cannot allow all of these people to invade our Country. When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they

came.  Our system is a mockery to good immigration policy and Law and Order.  Most children come without parents. . . . Our Immigration policy, laughed at all over the world, is very unfair to all of those people who have gone through the system legally and are waiting in line for years!  Immigration must be based on merit – we need people who will help Make America Great Again!"

- On July 19, 2018, in an interview at the Aspen Security Forum, DHS Secretary Kirstjen Nielsen stated: "There are billboards in Central America in the Northern Triangle countries advertising how to grab a kid to get into the United States illegally. Because that loophole is so big. Billboards."

- On October 18, 2018, President Donald Trump stated: "I am watching the Democrat Party led (because they want Open Borders and existing weak laws) assault on our country by Guatemala, Honduras, and El Salvador, whose leaders are doing little to stop this large flow of people, INCLUDING MANY CRIMINALS, from entering Mexico to U.S. . . . In addition to stopping all payments to these countries, which seem to have almost no control over their population, I must, in the strongest of terms, ask Mexico to stop this onslaught – and if unable to do so I will call up the U.S. Military and CLOSE OUR SOUTHERN BORDER! . . . The assault on our country at our Southern Border, including Criminal elements and DRUGS pouring in, is far more important to me, as President, than Trade or the USMCA.  Hopefully Mexico will stop this onslaught at their Northern Border.  All Democrats fault for weak laws!"

- On October 19, 2018, at a political rally, President Donald Trump stated: "Democrats want to give illegal aliens free welfare, free health care, and free education. Give them a driver's license. Give them a driver's license. Next thing you know, they want to buy them a car. Then they'll say the car's not good enough, how about a Rolls-Royce?"

29   PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

- On October 21, 2018, President Donald Trump stated: "Full efforts are being made to stop the onslaught of illegal aliens from crossing our Southern Border. People have to apply for asylum in Mexico first, and if they fail to do that, the U.S. will turn them away. The courts are asking the U.S. to do things that are not doable!"

- On October 26, 2018, at a political rally, President Donald Trump stated: "The Democrats want to invite caravan after caravan of illegal aliens into our country. And they want to sign them up for free health care, free welfare, free education, and for the right to vote."

- On November 9, 2018, Acting Attorney General Matthew Whitaker stated: "Our southern border is in crisis. The hundreds of thousands of illegal aliens who have unlawfully crossed our border are posing a significant threat to the government's ability to effectively enforce our nation's immigration laws. Plain and simple, there are too many loopholes in our current immigration system."

- On November 16, 2018, President Donald Trump stated: "Isn't it ironic that large Caravans of people are marching to our border wanting U.S.A. asylum because they are fearful of being in their country – yet they are proudly waiving . . . their country's flag. Can this be possible? Yes, because it is all a BIG CON, and the American taxpayer is paying for it!"

- On November 18, 2018, President Donald Trump stated: "Catch and Release is an obsolete term. It is not Catch and Detain. Illegal Immigrants trying to come into the U.S.A., often proudly flying the flag of their nation as they ask for U.S. Asylum, will be detained or turned away. Dems must approve Border Security & Wall NOW!"

- On December 6, 2018, Jud Murdock, the Acting Assistant Commissioner of CBP, said of arriving non-citizens at port of entry: "The more we process, the more will come."

- On December 20, 2018, the DHS published a document on its website entitled "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration." In that document, the DHS wrote: "Illegal aliens have exploited asylum loopholes at an alarming rate."

- On December 28, 2018, President Trump stated: "We will be forced to close the Southern Border entirely if the Obstructionist Democrats do not give us the money to finish the Wall & also change the ridiculous immigration laws that our Country is saddled with. Hard to believe there was a Congress & President who would approve!"

- On March 2, 2019, President Donald Trump gave a speech to the Conservative Political Action Conference ("CPAC"). In his speech, President Donald Trump stated: "Those caravans – you look at those caravans, and some are phenomenal people. But in those caravans you have stone-cold killers. You had the interview done by some innocent person who I think is actually back there now. 'And what is it that you want asylum for? What are you coming to America?' 'Uh, murder.' She goes, 'What?' 'Murder.'"

- On March 15, 2019, President Trump stated: "Our immigration system is stretched beyond the breaking point. And as I said, nothing much we can do. We can just do our job and do it well. But there's a point at which, if the Democrats would -- we'd get in, we'd be able to make a deal. Literally, in 15 minutes, we could make a deal on changing catch and release; changing the horrible asylum laws that are so unfair; changing visa lottery, chain migration."

- On April 2, 2019, President Trump stated: "We need to get rid of chain migration. We need to get rid of catch and release and visa lottery. And we have to do something about asylum. And to be honest with you, you have to get rid of judges."

- On April 5, 2019, President Trump stated: "I don't think anyone has ever

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1   expressed it like that, but I'm expressing it like that. When it's full, it's full;

2   you can't take them. They go back to Mexico and Mexico will bring them

3   back to their country, okay?"

4   • On April 5, 2019, President Trump stated: "And I was telling some of the

5   people before: If it's full, there's nothing you can do about it. We have some

6   horrible court decisions that have been made over the years. It's very unfair

7   and that's the way it is. But the system is full. And when it's full, there's

8   nothing you can do. You have to say, "I'm sorry, we can't take you." We've

9   been trying to take people, and I have to disagree with it. We've been trying

10   to take people and you can't do it. You can't do it."

11   • On April 5, 2019, President Trump stated: "So, as I say, and this is our new

12   statement: The system is full. Can't take you anymore. Whether it's asylum,

13   whether it's anything you want, it's illegal immigration.  We can't take you

14   anymore. We can't take you. Our country is full. Our area is full. The sector

15   is full. Can't take you anymore, I'm sorry. Can't happen. So turn around. That's

16   the way it is."

17   • On April 5, 2019, President Trump stated: " The system is full. Can't take

18   anymore. Sorry, folks. Can't take anymore. Asylum -- you know, I look at

19   some of these asylum people; they're gang members. They're not afraid of

20   anything.  They have lawyers greeting them. They read what the lawyer tells

21   them to read. They're gang members. And they say, 'I fear for my life.  I . . .'

22   They're the ones that are causing fear for life. It's a scam. Okay? It's a scam.

23   It's a hoax. I know about hoaxes. I just went through a hoax. So, our system is

24   full.  We're not taking them anymore. Okay? We can't do it. You can't do it.

25   You know, you can go up to a point, but we can't do it anymore."

26   • On April 5, 2019, CBP Commissioner Kevin McAleenan stated: "We realize

27   that current law -- the way asylum is applied, the way they catch and release

28   -- does not allow you to do your job correctly. And I don't believe it was the

1    intent of what American intended when they passed these laws. . . . It is a

2    crisis. We know that you are being overloaded. But I want you to know that

3    we think it's a top priority and we will work with this President and we will

4    work with anybody who wants to solve this problem."

5    • In an April 5, 2019 Fox News interview, President Trump stated: "And I told

6    our people today our system is full we can't take anymore. The asylum is being

7    scammed. The whole asylum system and you have gang members tough

8    people saying they're afraid to be in their country they're not afraid. And then

9    they'll come up with flags holding flags from their country."

10   • On April 6, 2019, President Trump stated: "Do you think they're putting their

11   finest? Do you think they're putting their great people there? No and then

12   people come in and you see what happens with the crime and murders, 4,000

13   murders last year, four thousand. How stupid can we be to put up with this?

14   How stupid can we be? And the asylum program is a scam, some of the

15   roughest people you've ever seen, people that looked like they should be

16   fighting for the UFC.  Asylum. Oh, give him asylum, he's afraid, he's afraid.

17   We don't love the fact that he's got tattoos on his face, that's not a good sign.

18   We don't love the fact that he's carrying the flag of Honduras or Guatemala or

19   El Salvador only to say he's petrified to be in his country."

20   • On April 9, 2019, President Trump stated: "We have the worst laws of any

21   country anywhere in the world, whether it's catch and release or any one of

22   them. I mean, I could name -- I could sit here and name them, but if you got

23   rid of catch and release, chain migration, visa lottery -- you have to fix the

24   asylum situation; it's ridiculous. You have people coming in, claiming asylum.

25   They're all reading exactly what the lawyer gives them. They have a piece of

26   paper. 'Read what that is.' And all of the sudden, you're entitled to asylum.

27   And some of these people are not people you want in our country."

28   • On April 10, 2019, President Trump stated: "I think that the whole asylum

33   PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
     DEFS' FIRST SET OF INTERROGS

rules, laws, and regulations have been taken advantage of by people that are very bad people, in many cases. These are the people running the cartels. They're gaming the system; they have been for years."

- On April 15, 2019, President Trump stated: "What do you think -- I mean, who do you think these countries are giving us? They're not giving us their finest, that I can tell you. So it's just insane. And, of course, asylum. Asylum is a ridiculous situation. People come in, they read a line from a lawyer that a lawyer hands them out online. They read it. You look at some of these people; you want protection from them. And they're saying, 'We need protection from our country.' In the meantime, they're carrying their country's flag thousands -- 2,000 miles walking up the journey. It's a big con job. That's what it is. And Congress -- and Congress has to get smart."

- On April 26, 2019, President Trump stated: "And the Democrats want to eliminate ICE. Can you believe that? Boy, oh, boy. But it's incredible what they've done. It's incredible what we've done. But they stand there -- asylum -- and they read a statement, 'I am afraid for my life. I am afraid to go back to my country. I want to be an American!' And you look and you see a toughness that you don't see. And you just see what happens with the mayor of Tijuana and others. They say, 'These people, we try and help them, and they start hitting us. They start punching us.' We don't want them in our country, and they're not getting into our country. And when they have in the past – a lot of them have come in – we're throwing them the hell out. They're out. We're getting them out. But we can fix the problem so easy. And when we fix the problem -- the wall is one thing. And that will have an incredible impact. But they won't even be coming up if we change our old, broken, ridiculous, weak immigration laws. They won't even be coming up. They won't make the journey."

- On April 26, 2019, President Trump stated on The Mark Levin Show: "Now

34   PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

it could all be solved very easily if Congress would sit down with, I say 45 minutes, but it's really 15 minutes. In 15 minutes I could have the whole problem solved. You get rid of Catch and Release you work on the asylum laws, which are very simple to work on. Mark, people come up that are the roughest looking people you've ever seen, they read a statement given them -- given to them by one of our lawyers, living in California."

- On May 8, 2019, President Trump stated: "We can't have this folks. We can't have this. This is crazy, what's happening. And what we really need, more than anything else, we need the loopholes closed by Congress. It would take 15 minutes. Everybody knows what they are, asylum asylum. They walk in, they read a statement by a lawyer, written by a lawyer at the border, who probably gets paid by somebody that's not exactly friendly to this crowd."

- On May 16, 2019, President Trump stated: "As soon as possible, we must also restore the integrity of our broken asylum system."

- On May 16, 2019, President Trump stated: "Asylum abuse also strains our public school systems, our hospitals, and local shelters, using funds that we should, and that have to, go to elderly veterans, at-risk youth."

- On May 30, 2019, President Trump stated: "And the asylum procedures are ridiculous. No place in the world has what we have in terms of ridiculous immigration laws."

- On June 11, 2019, President Trump stated: "So, Congress has to get their act together. They have to pass immigration laws. They have to get rid of -- I mean, as far as I'm concerned, the most important thing is to get rid of the loopholes, because you have loopholes and asylum problems that they could do in 15 minutes if they wanted to. The Democrats in Congress are causing this country tremendous drug problems, tremendous security problems, and they have to get together and they have to work out asylum and the loopholes."

- On June 12, 2019, President Trump stated: "We can solve our problem on the

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1   border in 15 minutes if the Democrats would sit down, straighten out asylum

2   -- which is a total mess, but very uncomplicated -- straighten out asylum, and

3   get rid of the loopholes. It would take, Jeff, 15 minutes. Okay? Thank you.

4   Please."

5   • On June 13, 2019, President Trump stated: "We could solve the asylum

6   problem quickly and we could solve the few loopholes; they have a few

7   loopholes that are just horrible. No other country in the world has them. And

8   if the Democrats would agree, we could sit down and solve that problem."

9   • On June 20, 2019, President Trump stated: "The economy is -- you could

10  make the case it's never been stronger than it is now, and the people are trying

11  to come up for the economy. They're not coming up for asylum. They're

12  coming up for money."

13  • On June 22, 2019, President Trump stated: "But again, if Congress gave us

14  something quickly on asylum; something quickly on loopholes, where we get

15  rid of the loopholes; the border would be so beautiful. But the Democrats just

16  won't do it. But maybe now they will, because there's no question you have a

17  national emergency. They said that, in the last caravan, they had hundreds of

18  people that commit crimes trying to come into our country.  Now, with that

19  being said, the border is in much better shape. Mexico is doing a good job.

20  We need Congress to fix the loopholes and fix asylum, and we will have the

21  cleanest border there is."

22  • On June 22, 2019, President Trump stated: "At the request of Democrats, I

23  have delayed the Illegal Immigration Removal Process (Deportation) for two

24  weeks to see if the Democrats and Republicans can get together and work out

25  a solution to the Asylum and Loophole problems at the Southern Border. If

26  not, Deportations start!"

27  • On June 23, 2019, President Trump stated: "I want to give the Democrats

28  every last chance to quickly negotiate simple changes to Asylum and

36   PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

Loopholes. This will fix the Southern Border, together with the help that Mexico is now giving us. Probably won't happen, but worth a try. Two weeks and big Deportation begins!"

- On June 25, 2019, President Trump stated: "They have very, very -- Mexico has very, very powerful immigration laws. They can do things. Our laws are so bad. What we would like to do -- and I'll do it right now officially, is ask the Democrats to give us help on asylum, help on all of the loopholes -- the horrible loopholes that signed in over a period of years that don't allow us to do what we should be able to do. We need the votes of Democrats."

- On June 26, 2019, President Trump stated: "I had loop -- if I had the loopholes taken care of and asylum taken over, you'd have no -- zero problem at the border without Mexico."

- On June 26, 2019, President Trump stated: "It wasn't a manufactured crisis -- which they were saying. It wasn't manufactured at all. We have a crisis at the border. We can solve the problem if they would change some of the rules and regulations, change asylum, change so many different things. The loopholes, in particular, could be done very quickly, and you wouldn't have this problem."

- On June 26, 2019, President Trump stated: "You're going to really see numbers drop, but we don't need anybody if they -- if the democrats would get rid of the loopholes. They're called loopholes for a reason. They're loopholes. They're loopholes to come into the country. If the democrats would get rid of the loopholes and would fix asylum, it would take an hour, we could sit there, we could make a deal."

- On June 26, 2019, President Trump stated: "I've been saying it for a year and a half. I've been saying, 'You have to change the loopholes. You have to change asylum.' You wouldn't have this problem. They're not working on that unfortunately, today."

- On June 26, 2019, President Trump stated: "But they should take a little time off and they should go and fix the loopholes and fix asylum. And, frankly, coupled with Mexico and what Mexico is doing now on stopping people from coming through Mexico, you would have a border that would be better than it's ever been. And we'll be there pretty soon in any event."

- On June 29, 2019, President Trump stated: "Their immigration laws are very strong. Ours are a disaster. Ours are a disgrace to our country. We have loopholes and asylum that -- we could fix the asylum very quickly. We could get rid of and fix the loopholes, but we could get rid of the loopholes, and we would have absolutely no problem at the border."

- On July 1, 2019, President Trump stated: "And they have to restore the integrity of the United States' asylum system. Without these changes, more than 1 million immigrants will arrive at the borders this year, many of them lodging frivolous asylum claims. And that's what they do to gain access into the country: they lodge claims on asylum. And they're totally bogus claims. . . . It's very simple. These changes are very simple. It's changes to the asylum. If we change asylum, we can have 75 percent of it done. The rest has to be done on the loopholes."

- On July 5, 2019, President Trump stated: "They're crowded because the Democrats will not give us any relief from these loopholes. We have loopholes that are so bad. We have asylum that's so bad."

- On July 7, 2019, President Trump stated: "It's a crisis. We were right about that. We told them that the detention centers are really full, and they've got to change the loopholes and they have to change asylum; they have to change the immigration laws. We could do it quickly, but we have no votes to do it because the Democrats won't vote. We need some of their votes."

- On July 12, 2019, President Trump stated: "They all have papers. And it's a process. And I have an obligation to do it. They came in illegally; they go out

legally. What the Democrats should be doing now is they should be changing the loopholes. They should be changing asylum. I've been talking to that -- to you about this for a long time. They should be changing asylum."

- In an email concerning a July 26, 2019, a National Security Council official stated: "My mantra has persistently been presenting aliens with multiple unsolvable dilemmas to impact their calculus for choosing to make the arduous journey to begin with."

- On July 27, 2019, President Trump stated: "Democrats don't care about Border Security. They refuse to give the votes necessary to fix the Loopholes and Asylum. Would be so easy! They want Open Borders, which means CRIME,CRIME,CRIME!"

- On July 29, 2019, President Trump stated: "Elijah Cummings never even went to the Southern Border and then he screams at the very good people who, despite Congresses failure to fix the Loopholes and Asylum, make it work (crossings are way down and the Wall is being built). Even with zero Dem help, Border getting strong!"

- On August 2, 2019, President Trump stated: "I will tell you, I would love to see the Democrats sit down and work out the loopholes in 20 minutes – because that's what it would take – and work out asylum."

- On August 13, 2019, President Trump stated: "Our numbers are plummeting – the people coming in."

- On September 16, 2019, President Trump stated: "We could do – whether it's asylum, whether it's – any of the laws.  We have so many of them that are so bad."

- On September 25, 2019, President Trump stated: "Despite that – and we have asylum also, which we could solve immediately.  But we sort of solved asylum by going through different countries.  Can you believe it?  Where we go to El Salvador, Honduras; we go to Mexico; we go to Guatemala to solve problems

of asylum because we can't go to the United States Congress because the Democrats are playing games."

- On September 26, 2019, President Trump stated: "We can't get the Democrats to do anything. They won't change any of the loopholes, and they would make it much easier, as you know. They won't change loopholes. They won't change asylum."

- On September 26, 2019, President Trump stated: "I'm using Mexico to protect our border because the Democrats won't change loopholes and asylum."

- On September 27, 2019, President Trump stated: "We can't get the Democrats to do what they're supposed to do with the loopholes or with asylum. No, they're not doing their job."

- In a November 2019 meeting concerning limiting asylum claims from Central America, Stephen Miller stated: "I didn't mean to come across as harsh. It's just that this is all I care about. I don't have a family. I don't have anything else. This is my life."

- On December 21, 2019, President Trump stated: "We have massively reduced asylum fraud. We have achieved record prosecutions of chronic immigration violators. And the southern border wall is going up at a much faster rate than anybody thought possible."

***Defendants' Justifications for the Turnback Policy Are Baseless.*** Defendants argue that there are justifications for the Turnback Policy, but those arguments are legally and factually flawed.

*First*, Defendants postulate that POEs may have resorted to turning back asylum seekers because they had to deal with other, unidentified operational exigencies. But that is not the case. For instance, all of the Queue Management reports produced concerning the San Ysidro POE show that the capacity of that port's holding facilities and other goings on at the port had "no impact" on port operations, yet asylum seekers were nonetheless metered.

**San Ysidro Port of Entry: Impact to Port Operations**

| Date | Capacity | Impact to Port Operations | Bates Number |
|------|----------|---------------------------|--------------|
| June 16, 2018 | 63% | No impact | AOL-DEF-00037621 |
| June 17, 2018 | 63% | No impact | AOL-DEF-00028028 |
| June 18, 2018 | 66% | No impact | AOL-DEF-00374755 |
| June 19, 2018 | 75% | No impact | AOL-DEF-00047974 |
| June 20, 2018 | 77% | No impact | AOL-DEF-00517099 |
| June 21, 2018 | 80% | No impact | AOL-DEF-00736882 |
| June 22, 2018 | 76% | No impact | AOL-DEF-00517095 |
| June 23, 2018 | 76% | No impact | AOL-DEF-00256996 |
| June 24, 2018 | 75% | No impact | AOL-DEF-00074302 |
| June 25, 2018 | 78% | No impact | AOL-DEF-00517097 |
| June 26, 2018 | Not listed[6] | Not listed | AOL-DEF-00600153 |
| June 27, 2018 | 75% | No impact | AOL-DEF-00257183 |
| June 28, 2018 | 75% | No impact | AOL-DEF-00517105 |
| June 29, 2018 | 76% | No impact | AOL-DEF-00517103 |
| June 30, 2018 | 81% | No impact | AOL-DEF-00257002 |
| July 1, 2018 | 81% | No impact | AOL-DEF-00517101 |
| July 2, 2018 | 69% | No impact | AOL-DEF-00257004 |
| July 3, 2018 | 76% | No impact | AOL-DEF-00257019 |
| July 4, 2018 | 78% | No impact | AOL-DEF-00257006 |
| July 5, 2018 | 75% | No impact | AOL-DEF-00257008 |
| July 6, 2018 | 76% | No impact | AOL-DEF-00257017 |
| July 7, 2018 | 85% | No impact | AOL-DEF-00257072 |

[6] "Not listed" means that none of the reports produced for a given date contain data regarding the San Ysidro

| July 8, 2018 | 83% | No impact | AOL-DEF-00257074 |
| July 9, 2018 | 76% | No impact | AOL-DEF-00257082 |
| July 10, 2018 | 75% | No impact | AOL-DEF-00257078 |
| July 11, 2018 | 76% | No impact | AOL-DEF-00257084 |
| July 12, 2018 | 72% | No impact | AOL-DEF-00257080 |
| July 13, 2018 | 72% | No impact | AOL-DEF-00257088 |
| July 14, 2018 | 76% | No impact | AOL-DEF-00257086 |
| July 15, 2018 | 78% | No impact | AOL-DEF-00257090 |
| July 16, 2018 | 73% | No impact | AOL-DEF-00768937 |
| July 17, 2018 | 71% | No impact | AOL-DEF-00257092 |
| July 18, 2018 | 76% | No impact | AOL-DEF-00257094 |
| July 19, 2018 | 72% | No impact | AOL-DEF-00257100 |
| July 20, 2018 | 68% | No impact | AOL-DEF-00257102 |
| July 21, 2018 | 64% | No impact | AOL-DEF-00257098 |
| July 22, 2018 | 60% | No impact | AOL-DEF-00257096 |
| July 23, 2018 | 64% | No impact | AOL-DEF-00257109 |
| July 24, 2018 | 48% | No impact | AOL-DEF-00257111 |
| July 25, 2018 | 49% | No impact | AOL-DEF-00090800 |
| July 26, 2018 | 52% | No impact | AOL-DEF-00257115 |
| July 28, 2018 | 66% | No impact | AOL-DEF-00075863 |
| July 29, 2018 | 63% | No impact | AOL-DEF-00257117 |
| July 30, 2018 | 51% | No impact | AOL-DEF-00257121 |
| July 31, 2018 | 57% | No impact | AOL-DEF-00257119 |
| August 1, 2018 | 64% | No impact | AOL-DEF-00257123 |
| August 2, 2018 | 63% | No impact | AOL-DEF-00736185 |
| August 3, 2018 | 61% | No impact | AOL-DEF-00600173 |
| August 4, 2018 | 66% | No impact | AOL-DEF-00257126 |

| August 5, 2018 | 67% | No impact | AOL-DEF-00351662 |
| August 6, 2018 | 57% | No impact | AOL-DEF-00090606 |
| August 7, 2018 | 56% | No impact | AOL-DEF-00257128 |
| August 8, 2018 | 75% | No impact | AOL-DEF-00257130 |
| August 9, 2018 | 59% | No impact | AOL-DEF-00257145 |
| August 10, 2018 | 72% | No impact | AOL-DEF-00257134 |
| August 11, 2018 | 70% | No impact | AOL-DEF-00257136 |
| August 12, 2018 | 67% | No impact | AOL-DEF-00257139 |
| August 13, 2018 | 75% | No impact | AOL-DEF-00257141 |
| August 14, 2018 | 57% | No impact | AOL-DEF-00257143 |
| August 15, 2018 | Not listed | Not listed | AOL-DEF-00802568 |
| August 16, 2018 | 24% | No impact | AOL-DEF-00257149 |
| August 17, 2018 | 35% | No impact | AOL-DEF-00257147 |
| August 18, 2018 | 30% | No impact | AOL-DEF-00257151 |
| August 19, 2018 | 43% | No impact | AOL-DEF-00256904 |
| August 20, 2018 | 45% | No impact | AOL-DEF-00257155 |
| August 21, 2018 | 42% | No impact | AOL-DEF-00257157 |
| August 22, 2018 | 42% | No impact | AOL-DEF-00256894 |
| August 23, 2018 | 43% | No impact | AOL-DEF-00256900 |
| August 24, 2018 | Not listed | Not listed | AOL-DEF-00802629 |
| August 25, 2018 | 44% | No impact | AOL-DEF-00256896 |
| August 26, 2018 | 45% | No impact | AOL-DEF-00256902 |
| August 27, 2018 | 56% | No impact | AOL-DEF-00256906 |
| August 28, 2018 | 41% | No impact | AOL-DEF-00075870 |
| August 29, 2018 | 49% | No impact | AOL-DEF-00256912 |
| August 30, 2018 | Not listed | Not listed | AOL-DEF-00803198 |
| August 31, 2018 | Not listed | Not listed | AOL-DEF-00803200 |

| | | | |
|---|---|---|---|
| September 1, 2018 | 80% | No impact | AOL-DEF-00256918 |
| September 2, 2018 | 69% | No impact | AOL-DEF-00074293 |
| September 3, 2018 | 86% | No impact | AOL-DEF-00256920 |
| September 4, 2018 | 71% | No impact | AOL-DEF-00090855 |
| September 5, 2018 | 70% | No impact | AOL-DEF-00256928 |
| September 6, 2018 | 52% | No impact | AOL-DEF-00256924 |
| September 7, 2018 | 79% | No impact | AOL-DEF-00256926 |
| September 8, 2018 | 75% | No impact | AOL-DEF-00256922 |
| September 9, 2018 | 70% | No impact | AOL-DEF-00256930 |
| September 10, 2018 | 82% | No impact | AOL-DEF-00256934 |
| September 11, 2018 | 74% | No impact | AOL-DEF-00256932 |
| September 12, 2018 | 78% | No impact | AOL-DEF-00074295 |
| September 13, 2018 | 78% | No impact | AOL-DEF-00256936 |
| September 14, 2018 | 85% | No impact | AOL-DEF-00256940 |
| September 15, 2018 | 87% | No impact | AOL-DEF-00351321 |
| September 16, 2018 | 78% | No impact | AOL-DEF-00256943 |
| September 17, 2018 | 86% | No impact | AOL-DEF-00256938 |
| September 18, 2018 | 78% | No impact | AOL-DEF-00256945 |
| September 19, 2018 | 78% | No impact | AOL-DEF-00257185 |
| September 20, 2018 | 90% | No impact | AOL-DEF-00257187 |
| September 21, 2018 | 90% | No impact | AOL-DEF-00074338 |
| September 22, 2018 | 92% | No impact | AOL-DEF-00074332 |
| September 23, 2018 | 96% | No impact | AOL-DEF-00257189 |
| September 24, 2018 | 96% | No impact | AOL-DEF-00257191 |
| September 25, 2018 | 91% | No impact | AOL-DEF-00257195 |
| September 26, 2018 | 92% | No impact | AOL-DEF-00257193 |
| September 27, 2018 | Not listed | Not listed | AOL-DEF-00567469 |

| September 28, 2018 | 79% | No impact | AOL-DEF-00257601 |
| September 29, 2018 | 94% | No impact | AOL-DEF-00257431 |
| September 30, 2018 | Not listed | Not listed | AOL-DEF-00807179 |
| October 1, 2018 | 89% | No impact | AOL-DEF-00257603 |
| October 2, 2018 | 90% | No impact | AOL-DEF-00257609 |
| October 3, 2018 | 86% | No impact | AOL-DEF-00257605 |
| October 4, 2018 | 88% | No impact | AOL-DEF-00257607 |
| October 5, 2018 | 78% | No impact | AOL-DEF-00257611 |
| October 6, 2018 | 79% | No impact | AOL-DEF-00257613 |
| October 7, 2018 | 86% | No impact | AOL-DEF-00257617 |
| October 8, 2018 | 84% | No impact | AOL-DEF-00257615 |
| October 9, 2018 | 87% | No impact | AOL-DEF-00257197 |
| October 10, 2018 | 87% | No impact | AOL-DEF-00257205 |
| October 11, 2018 | 87% | No impact | AOL-DEF-00257199 |
| October 12, 2018 | 84% | No impact | AOL-DEF-00257201 |
| October 13, 2018 | 87% | No impact | AOL-DEF-00351697 |
| October 14, 2018 | 86% | No impact | AOL-DEF-00257203 |
| October 15, 2018 | 82% | No impact | AOL-DEF-00257211 |
| October 16, 2018 | 81% | No impact | AOL-DEF-00257207 |
| October 17, 2018 | 83% | No impact | AOL-DEF-00257215 |
| October 18, 2018 | 81% | No impact | AOL-DEF-00257213 |
| October 19, 2018 | 90% | No impact | AOL-DEF-00257223 |
| October 20, 2018 | 79% | No impact | AOL-DEF-00257219 |
| October 21, 2018 | 80% | No impact | AOL-DEF-00257217 |
| October 22, 2018 | 82% | No impact | AOL-DEF-00257225 |
| October 23, 2018 | 74% | No impact | AOL-DEF-00257221 |
| October 24, 2018 | 87% | No impact | AOL-DEF-00257229 |

| October 25, 2018 | 76% | No impact | AOL-DEF-00257227 |
| October 26, 2018 | 76% | No impact | AOL-DEF-00257239 |
| October 27, 2018 | 92% | No impact | AOL-DEF-00257231 |
| October 28, 2018 | 95% | No impact | AOL-DEF-00257233 |
| October 29, 2018 | 90% | No impact | AOL-DEF-00257235 |
| October 30, 2018 | 79% | No impact | AOL-DEF-00257243 |
| October 31, 2018 | 84% | No impact | AOL-DEF-00257237 |
| November 1, 2018 | 74% | No impact | AOL-DEF-00768946 |
| November 2, 2018 | 77% | No impact | AOL-DEF-00074340 |
| November 3, 2018 | 81% | No impact | AOL-DEF-00257241 |
| November 4, 2018 | 85% | No impact | AOL-DEF-00090925 |
| November 5, 2018 | 83% | No impact | AOL-DEF-00257245 |
| November 6, 2018 | 76% | No impact | AOL-DEF-00090927 |
| November 7, 2018 | 73% | No impact | AOL-DEF-00257247 |
| November 8, 2018 | 70% | No impact | AOL-DEF-00257249 |
| November 9, 2018 | 83% | No impact | AOL-DEF-00257251 |
| November 10, 2018 | 96% | No impact | AOL-DEF-00093397 |
| November 11, 2018 | 109% | No impact | AOL-DEF-00309972 |
| November 12, 2018 | 111% | No impact | AOL-DEF-00257255 |
| November 13, 2018 | 88% | No impact | AOL-DEF-00257257 |
| November 14, 2018 | 77% | No impact | AOL-DEF-00074342 |
| November 15, 2018 | 87% | No impact | AOL-DEF-00257261 |
| November 16, 2018 | 117% | No impact | AOL-DEF-00257271 |
| November 17, 2018 | 102% | No impact | AOL-DEF-00257259 |
| November 18, 2018 | 95% | No impact | AOL-DEF-00257263 |
| November 19, 2018 | 107% | No impact | AOL-DEF-00257265 |
| November 20, 2018 | 98% | No impact | AOL-DEF-00517172 |

| November 21, 2018 | 90% | No impact | AOL-DEF-00257269 |
| November 22, 2018 | 93% | No impact | AOL-DEF-00257273 |
| November 23, 2018 | 98% | No impact | AOL-DEF-00768948 |
| November 24, 2018 | 98% | No impact | AOL-DEF-00257288 |
| November 25, 2018 | 96% | No impact | AOL-DEF-00768950 |
| November 26, 2018 | 100% | No impact | AOL-DEF-00768954 |
| November 27, 2018 | 92% | No impact | AOL-DEF-00768952 |
| November 28, 2018 | 91% | No impact | AOL-DEF-00257290 |
| November 29, 2018 | 90% | No impact | AOL-DEF-00517176 |
| November 30, 2018 | 102% | No impact | AOL-DEF-00257294 |
| December 1, 2018 | 93% | No impact | AOL-DEF-00517174 |
| December 2, 2018 | 110% | No impact | AOL-DEF-00257292 |
| December 3, 2018 | 95% | No impact | AOL-DEF-00257304 |
| December 4, 2018 | 92% | No impact | AOL-DEF-00257296 |
| December 5, 2018 | 85% | No impact | AOL-DEF-00768956 |
| December 6, 2018 | 96% | No impact | AOL-DEF-00257298 |
| December 7, 2018 | 99% | No impact | AOL-DEF-00257300 |
| December 8, 2018 | 98% | No impact | AOL-DEF-00517180 |
| December 9, 2018 | 86% | No impact | AOL-DEF-00517178 |
| December 10, 2018 | 99% | No impact | AOL-DEF-00257302 |
| December 11, 2018 | 92% | No impact | AOL-DEF-00257308 |
| December 12, 2018 | 90% | No impact | AOL-DEF-00257306 |
| December 13, 2018 | 94% | No impact | AOL-DEF-00257323 |
| December 14, 2018 | 94% | No impact | AOL-DEF-00768961 |
| December 15, 2018 | 93% | No impact | AOL-DEF-00517182 |
| December 16, 2018 | 94% | No impact | AOL-DEF-00517184 |
| December 17, 2018 | 97% | No impact | AOL-DEF-00257325 |

| December 18, 2018 | 95% | No impact | AOL-DEF-00762246 |
|---|---|---|---|
| December 19, 2018 | 96% | No impact | AOL-DEF-00257327 |
| December 20, 2018 | 97% | No impact | AOL-DEF-00768965 |
| December 21, 2018 | 97% | No impact | AOL-DEF-00257345 |
| December 22, 2018 | 92% | No impact | AOL-DEF-00517190 |
| December 23, 2018 | 90% | No impact | AOL-DEF-00517186 |
| December 24, 2018 | 100% | No impact | AOL-DEF-00257343 |
| December 25, 2018 | 100% | No impact | AOL-DEF-00351879 |
| December 26, 2018 | 92% | No impact | AOL-DEF-00517188 |
| December 27, 2018 | 71% | No impact | AOL-DEF-00257351 |
| December 28, 2018 | 79% | No impact | AOL-DEF-00257347 |
| December 29, 2018 | 92% | No impact | AOL-DEF-00517194 |
| December 30, 2018 | 101% | No impact | AOL-DEF-00517192 |
| December 31, 2018 | 105% | No impact | AOL-DEF-00517196 |
| January 1, 2019 | 100% | No impact | AOL-DEF-00093554 |
| January 2, 2019 | 90% | No impact | AOL-DEF-00093563 |
| January 3, 2019 | 85% | No impact | AOL-DEF-00600947 |
| January 4, 2019 | 95% | No impact | AOL-DEF-00527975 |
| January 5, 2019 | 83% | No impact | AOL-DEF-00036631 |
| January 6, 2019 | 89% | No impact | AOL-DEF-00196408 |
| January 7, 2019 | 101% | No impact | AOL-DEF-00600550 |
| January 8, 2019 | 92% | No impact | AOL-DEF-00550244 |
| January 9, 2019 | 97% | No impact | AOL-DEF-00600862 |
| January 10, 2019 | Not listed | Not listed | AOL-DEF-00932689 |
| January 11, 2019 | Not listed | Not listed | AOL-DEF-00779369 |
| January 12, 2019 | 93% | No impact | AOL-DEF-00036571 |
| January 13, 2019 | 98% | No impact | AOL-DEF-00550472 |

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

| January 14, 2019 | 101% | No impact | AOL-DEF-00092938 |
| January 15, 2019 | 99% | No impact | AOL-DEF-00092948 |
| January 16, 2019 | 98% | No impact | AOL-DEF-00092965 |
| January 17, 2019 | 101% | No impact | AOL-DEF-00092968 |
| January 18, 2019 | 96% | No impact | AOL-DEF-00092980 |
| January 19, 2019 | 100% | No impact | AOL-DEF-00092997 |
| January 20, 2019 | 100% | No impact | AOL-DEF-00093000 |
| January 21, 2019 | 99% | No impact | AOL-DEF-00093665 |
| January 22, 2019 | Not listed | Not listed | AOL-DEF-00916717 |
| January 23, 2019 | 96% | No impact | AOL-DEF-00093674 |
| January 24, 2019 | 96% | No impact | AOL-DEF-00093274 |
| January 25, 2019 | 93% | No impact | AOL-DEF-00083797 |
| January 26, 2019 | Not listed | Not listed | AOL-DEF-00916783 |
| January 27, 2019 | 104% | No impact | AOL-DEF-00093278 |
| January 28, 2019 | 98% | No impact | AOL-DEF-00093685 |
| January 29, 2019 | 88% | No impact | AOL-DEF-00523445 |
| January 30, 2019 | 87% | No impact | AOL-DEF-00523545 |
| January 31, 2019 | 102% | No impact | AOL-DEF-00093694 |
| February 1, 2019 | 88% | No impact | AOL-DEF-00093697 |
| February 2, 2019 | Not listed | Not listed | AOL-DEF-00916740 |
| February 3, 2019 | 97% | No impact | AOL-DEF-00093720 |
| February 4, 2019 | 102% | No impact | AOL-DEF-00093725 |
| February 5, 2019 | 94% | No impact | AOL-DEF-00083742 |
| February 6, 2019 | 94% | No impact | AOL-DEF-00083722 |
| February 7, 2019 | 88% | No impact | AOL-DEF-00093737 |
| February 8, 2019 | 92% | No impact | AOL-DEF-00083619 |
| February 9, 2019 | 96% | No impact | AOL-DEF-00083685 |

| | | | |
|---|---|---|---|
| February 10, 2019 | 98% | No impact | AOL-DEF-00035032 |
| February 11, 2019 | 89% | No impact | AOL-DEF-00093753 |
| February 12, 2019 | 93% | No impact | AOL-DEF-00093761 |
| February 13, 2019 | 89% | No impact | AOL-DEF-00083623 |
| February 14, 2019 | 80% | No impact | AOL-DEF-00083680 |
| February 15, 2019 | 92% | No impact | AOL-DEF-00035030 |
| February 16, 2019 | 92% | No impact | AOL-DEF-00035027 |
| February 17, 2019 | 92% | No impact | AOL-DEF-00916970 |
| February 18, 2019 | 92% | No impact | AOL-DEF-00083579 |
| February 19, 2019 | 85% | No impact | AOL-DEF-00083554 |
| February 20, 2019 | 87% | No impact | AOL-DEF-00035021 |
| February 21, 2019 | 84% | No impact | AOL-DEF-00083710 |
| February 22, 2019 | 96% | No impact | AOL-DEF-00093797 |
| February 23, 2019 | 96% | No impact | AOL-DEF-00035018 |
| February 24, 2019 | 96% | No impact | AOL-DEF-00093803 |
| February 25, 2019 | 87% | No impact | AOL-DEF-00083457 |
| February 26, 2019 | 82% | No impact | AOL-DEF-00083727 |
| February 27, 2019 | 83% | No impact | AOL-DEF-00093812 |
| February 28, 2019 | 83% | No impact | AOL-DEF-00083516 |
| March 1, 2019 | 89% | No impact | AOL-DEF-00083445 |
| March 2, 2019 | 90% | No impact | AOL-DEF-00083454 |
| March 3, 2019 | 97% | No impact | AOL-DEF-00093866 |
| March 4, 2019 | 83% | No impact | AOL-DEF-00093869 |
| March 5, 2019 | 76% | No impact | AOL-DEF-00035046 |
| March 6, 2019 | 79% | No impact | AOL-DEF-00093892 |
| March 7, 2019 | 97% | No impact | AOL-DEF-00035038 |
| March 8, 2019 | 95% | No impact | AOL-DEF-00085096 |

| | | | |
|---|---|---|---|
| March 9, 2019 | 94% | No impact | AOL-DEF-00035041 |
| March 10, 2019 | 84% | No impact | AOL-DEF-00035076 |
| March 11, 2019 | 84% | No impact | AOL-DEF-00035057 |
| March 12, 2019 | 79% | No impact | AOL-DEF-00085243 |
| March 13, 2019 | 88% | No impact | AOL-DEF-00035052 |
| March 14, 2019 | 95% | No impact | AOL-DEF-00085252 |
| March 15, 2019 | 93% | No impact | AOL-DEF-00085037 |
| March 16, 2019 | 93% | No impact | AOL-DEF-00085045 |
| March 17, 2019 | 95% | No impact | AOL-DEF-00085034 |
| March 18, 2019 | 97% | No impact | AOL-DEF-00085040 |
| March 19, 2019 | 96% | No impact | AOL-DEF-00085083 |
| March 20, 2019 | 96% | No impact | AOL-DEF-00085072 |
| March 21, 2019 | 93% | No impact | AOL-DEF-00084965 |
| March 22, 2019 | 88% | No impact | AOL-DEF-00084880 |
| March 23, 2019 | 85% | No impact | AOL-DEF-00085004 |
| March 24, 2019 | 85% | No impact | AOL-DEF-00085014 |
| March 25, 2019 | 70% | No impact | AOL-DEF-00085031 |
| March 26, 2019 | 67% | No impact | AOL-DEF-00084860 |
| March 27, 2019 | 97% | No impact | AOL-DEF-00084869 |
| March 28, 2019 | 92% | No impact | AOL-DEF-00035061 |
| March 30, 2019 | 83% | No impact | AOL-DEF-00084723 |
| March 31, 2019 | 95% | No impact | AOL-DEF-00084689 |
| April 1, 2019 | 99% | No impact | AOL-DEF-00084662 |
| April 2, 2019 | 92% | No impact | AOL-DEF-00084601 |
| April 3, 2019 | 85% | No impact | AOL-DEF-00084794 |
| April 4, 2019 | 83% | No impact | AOL-DEF-00084720 |
| April 5, 2019 | 77% | No impact | AOL-DEF-00084672 |

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

| April 6, 2019 | 92% | No impact | AOL-DEF-00084541 |
| April 7, 2019 | Not listed | Not listed | AOL-DEF-00588514 |
| April 8, 2019 | 101% | No impact | AOL-DEF-00084598 |
| April 9, 2019 | 99% | No impact | AOL-DEF-00084488 |
| April 10, 2019 | 93% | No impact | AOL-DEF-00084536 |
| April 11, 2019 | 96% | No impact | AOL-DEF-00084527 |
| April 12, 2019 | 84% | No impact | AOL-DEF-00365853 |
| April 13, 2019 | 87% | No impact | AOL-DEF-00365628 |
| April 14, 2019 | 86% | No impact | AOL-DEF-00084544 |
| April 15, 2019 | 95% | No impact | AOL-DEF-00084547 |
| April 16, 2019 | 94% | No impact | AOL-DEF-00365856 |
| April 17, 2019 | 93% | No impact | AOL-DEF-00365631 |
| April 18, 2019 | 92% | No impact | AOL-DEF-00365608 |
| April 19, 2019 | 97% | No impact | AOL-DEF-00365332 |
| April 20, 2019 | 97% | No impact | AOL-DEF-00084485 |
| April 21, 2019 | 90% | No impact | AOL-DEF-00365255 |
| April 22, 2019 | 86% | No impact | AOL-DEF-00365619 |
| April 23, 2019 | 83% | No impact | AOL-DEF-00365370 |
| April 24, 2019 | 90% | No impact | AOL-DEF-00365778 |
| April 25, 2019 | Not listed | Not listed | N/A[7] |
| April 26, 2019 | 86% | No impact | AOL-DEF-00365611 |
| April 27, 2019 | 95% | No impact | AOL-DEF-00365258 |
| April 28, 2019 | 95% | No impact | AOL-DEF-00365622 |
| April 29, 2019 | 83% | No impact | AOL-DEF-00365038 |
| April 30, 2019 | 92% | No impact | AOL-DEF-00364993 |

---

[7] "N/A" means that no report was produced for this date.

| May 1, 2019 | 92% | No impact | AOL-DEF-00364613 |
| May 2, 2019 | Not listed | Not listed | AOL-DEF-00082281 |
| May 3, 2019 | 91% | No impact | AOL-DEF-00374848 |
| May 4, 2019 | Not listed | Not listed | N/A |
| May 5, 2019 | 86% | No impact | AOL-DEF-00364577 |
| May 6, 2019 | 97% | No impact | AOL-DEF-00364851 |
| May 7, 2019 | 100% | No impact | AOL-DEF-00523768 |
| May 8, 2019 | 83% | No impact | AOL-DEF-00364318 |
| May 9, 2019 | 89% | No impact | AOL-DEF-00523762 |
| May 10, 2019 | Not listed | Not listed | AOL-DEF-00082253 |
| May 11, 2019 | 90% | No impact | AOL-DEF-00364330 |
| May 12, 2019 | 87% | No impact | AOL-DEF-00364205 |
| May 13, 2019 | 84% | No impact | AOL-DEF-00364580 |
| May 14, 2019 | 84% | No impact | AOL-DEF-00364574 |
| May 15, 2019 | 84% | No impact | AOL-DEF-00364487 |
| May 16, 2019 | 92% | No impact | AOL-DEF-00364490 |
| May 17, 2019 | 92% | No impact | AOL-DEF-00523765 |
| May 18, 2019 | 84% | No impact | AOL-DEF-00364528 |
| May 19, 2019 | 85% | No impact | AOL-DEF-00523759 |
| May 20, 2019 | Not listed | Not listed | N/A |
| May 21, 2019 | 85% | No impact | AOL-DEF-00084200 |
| May 22, 2019 | 95% | No impact | AOL-DEF-00084242 |
| May 23, 2019 | 97% | No impact | AOL-DEF-00084259 |
| May 24, 2019 | 88% | No impact | AOL-DEF-00364315 |
| May 25, 2019 | 95% | No impact | AOL-DEF-00084281 |
| May 26, 2019 | 98% | No impact | AOL-DEF-00084290 |
| May 27, 2019 | 93% | No impact | AOL-DEF-00084268 |

| May 28, 2019 | 93% | No impact | AOL-DEF-00084250 |
| May 29, 2019 | Not listed | Not listed | N/A |
| May 30, 2019 | 85% | No impact | AOL-DEF-00084256 |
| May 31, 2019 | Not listed | Not listed | N/A |
| June 1, 2019 | 88% | No impact | AOL-DEF-00084143 |
| June 2, 2019 | 93% | No impact | AOL-DEF-00084089 |
| June 3, 2019 | 93% | No impact | AOL-DEF-00084098 |
| June 4, 2019 | 98% | No impact | AOL-DEF-00084153 |
| June 5, 2019 | Not listed | Not listed | N/A |
| June 6, 2019 | 89% | No impact | AOL-DEF-00084040 |
| June 7, 2019 | 95% | No impact | AOL-DEF-00084179 |
| June 8, 2019 | 94% | No impact | AOL-DEF-00084132 |
| June 9, 2019 | 96% | No impact | AOL-DEF-00084025 |
| June 10, 2019 | 96% | No impact | AOL-DEF-00084176 |
| June 11, 2019 | Not listed | Not listed | N/A |
| June 12, 2019 | 92% | No impact | AOL-DEF-00084117 |
| June 13, 2019 | 87% | No impact | AOL-DEF-00084005 |
| June 14, 2019 | 95% | No impact | AOL-DEF-00084015 |
| June 15, 2019 | 98% | No impact | AOL-DEF-00083995 |
| June 16, 2019 | 102% | No impact | AOL-DEF-00084058 |
| June 17, 2019 | 96% | No impact | AOL-DEF-00083977 |
| June 18, 2019 | 91% | No impact | AOL-DEF-00084008 |
| June 19, 2019 | 104% | No impact | AOL-DEF-00362926 |
| June 20, 2019 | 96% | No impact | AOL-DEF-00084002 |
| June 21, 2019 | 85% | No impact | AOL-DEF-00083936 |
| June 22, 2019 | 104% | No impact | AOL-DEF-00083917 |
| June 23, 2019 | 102% | No impact | AOL-DEF-00083939 |

| June 24, 2019 | 104% | No impact | AOL-DEF-00523714 |
| June 25, 2019 | 102% | No impact | AOL-DEF-00083928 |
| June 26, 2019 | 98% | No impact | AOL-DEF-00523687 |
| June 27, 2019 | 101% | No impact | AOL-DEF-00523680 |
| June 28, 2019 | 98% | No impact | AOL-DEF-00523468 |
| June 29, 2019 | 100% | No impact | AOL-DEF-00523462 |
| June 30, 2019 | 103% | No impact | AOL-DEF-00035024 |
| July 1, 2019 | 98% | No impact | AOL-DEF-00083448 |
| July 2, 2019 | 98% | No impact | AOL-DEF-00523370 |
| July 3, 2019 | 96% | No impact | AOL-DEF-00367412 |
| July 4, 2019 | 98% | No impact | AOL-DEF-00035055 |
| July 5, 2019 | 88% | No impact | AOL-DEF-00084595 |
| July 6, 2019 | 97% | No impact | AOL-DEF-00085153 |
| July 7, 2019 | 83% | No impact | AOL-DEF-00365210 |
| July 8, 2019 | 80% | No impact | AOL-DEF-00364694 |
| July 9, 2019 | 78% | No impact | AOL-DEF-00084336 |
| July 10, 2019 | 82% | No impact | AOL-DEF-00084191 |
| July 11, 2019 | 86% | No impact | AOL-DEF-00084052 |
| July 12, 2019 | 84% | No impact | AOL-DEF-00083956 |
| July 13, 2019 | 73% | No impact | AOL-DEF-00523457 |
| July 14, 2019 | 74% | No impact | AOL-DEF-00083442 |

*Second*, in response to this evidence, Defendants claim that the daily MCAT and Queue Management reports generated by CBP officials are not reliable. This makes no sense. Defendants would have the Court believe that CBP officials created hundreds of reports that contained inaccurate information for months on end and no one sent a contemporaneous email complaining or asked for the reports to be refined.

1   In fact, the evidence shows the opposite.  The first Queue Management report was
2   drafted by Ryan Koseor, Deputy Commander of CBP's MCAT team, on June 16,
3   2018.  *See* AOL-DEF-00038629.  Mr. Koseor sent this report to Randy Howe,
4   Executive Director of Operations for CBP's Office of Field Operations ("OFO"), at
5   7:17pm.  *See id.*  On 7:19pm, Mr. Howe forwarded the Queue Management report
6   to his supervisor, Todd Owen, the highest career official at OFO.  AOL-DEF-
7   00373067.  At 7:20pm, Mr. Howe responded that the Queue Management report
8   "looks great."  AOL-DEF-00170594.  At 7:39pm, Mr. Howe responded that the
9   report was "[a]ccepted as is," and asked Mr. Koseor if he was "able to repeat
10  [drafting the report] tomorrow same time?"  AOL-DEF-00170592.  Thus, within 22
11  minutes of receiving the initial Queue Management report, Mr. Howe praised the
12  report, forwarded it on to his boss, and then asked for the report to be repeated daily.

13      For his part, Todd Owen forwarded the Queue Management report to Kevin
14  McAleenan, the Commissioner of CBP at 7:23pm on June 16, 2016.  AOL-DEF-
15  00038629.  So, within ***six minutes*** of receiving the initial Queue Management report,
16  the email had been forwarded through several levels of CBP management to the
17  Commissioner of CBP.  This is simply not how one treats a report that contains
18  errors.

19      *Third*, contemporaneous documents show that the maximum detention
20  capacity of a port of entry was not simply a theoretical number that was never
21  reached in practice.  Instead, the maximum detention capacity was a meaningful
22  number that defined when the port of entry would begin to utilize overflow
23  contingency plans.  For instance, the August 2017 Standard Operating Procedure for
24  the San Ysidro Port of Entry Admissibility Enforcement Unit defines the maximum
25  detention capacity of the San Ysidro port of entry as ████ individuals.  AOL-DEF-
26  00749858.  The San Ysidro POE's overflow contingency plan is not triggered until
27  the port reaches its "maximum capacity of ███."  AOL-DEF-00749860.  *See also*
28  AOL-DEF-00600149 (April 18, 2018 email to San Ysidro port management: "If we

1    reach ███ tonight and have to hold, I will send you notification."). In fact, on

2    November 9, 2018, Todd Owen, the Executive Assistant Commissioner of CBP and

3    the most senior career official in the Office of Field Operations ("OFO"), instructed

4    Pete Flores, the Director of Field Operations for OFO's San Diego Field Office, that

5    the San Ysidro port of entry should "[i]mmediately increase migrant processing up

6    to the point where the port has reached full capacity of the authorized temporary

7    holding rooms," even though the port should "[c]ontinue to use qu[eue] management

8    and hold the limit line." AOL-DEF-00348764.

9         *Fourth*, contemporaneous documents show that, if anything, the MCAT and

10    Queue Management Reports *underestimate* the capacity of ports of entry on the

11    U.S.-Mexico border. For instance, on April 26, 2018, Sidney Aki, the Port Director

12    of the San Ysidro Port of Entry, emailed Robert Hood, an Assistant Port Director at

13    the San Ysidro Port of Entry. *See* AOL-DEF-00072448. "Bob, What is our

14    capacity? ███ for this time period[,] correct?" *Id.* Assistant Port Director Hood

15    responded, "Yes, but internally and unofficially. MCAT has our capacity at ███."

16    *Id.* This email chain is corroborated by an internal spreadsheet that Mr. Hood drafted

17    in October 2016. *See* AOL-DEF-00062088-89. That spreadsheet shows that the

18    San Ysidro port of entry has holding space for asylum seekers in ███ holding cells

19    and █ "audience" areas. *Id.* at 088. The holding cells have a maximum capacity of

20    ███ individuals; the audience areas have a total capacity of ███ individuals; resulting

21    in a total capacity of ███ *Id.* at 088.

22         *Fifth*, Defendants' claim that the "operational capacity" of ports of entry can

23    often be lower than the ports' "detention capacity" is inaccurate. To begin with, the

24    term "operational capacity" is, essentially, fictitious. The distinction between

25    operational capacity and detention capacity is not memorialized in any sort of

26    statute, regulation, guidance, memorandum, standard operating procedure, muster,

27    or any other official document. *See* Marin Dep. (Rough) at 57:2- 59:22, 61:23-62:3.

28    CBP does not provide training to CBP officers regarding the definition of operational

capacity. *Id.* at 66:10-15. CBP has not told the public about the difference between operational capacity and detention capacity. *Id.* at 66:17-21. CBP has not provided any testimony to Congress explaining the difference between operational capacity and detention capacity. *Id.* at 66:22-67:4. The phrase "operational capacity" appears nowhere in the operating procedures that govern the day-to-day operations of CBP's largest pedestrian land port of entry. *Id.* at 95:21-98:2. Indeed, CBP's 30(b)(6) witness could not explain why the term "operational capacity" was never written down or defined once:

> Q.    Can you explain to me why, if operational capacity was such an important concept for day-to-day operations of the admissibility enforcement unit at San Ysidro, why it was never defined or written down once?
>
> A.    I can't explain why it was never written down.

*Id.* at 98:21-99:3 (objection omitted). No one at CBP wrote down the factors to be considered when calculating a port of entry's operational capacity. *Id.* at 99:10-100:9. CBP cannot reconstruct the operational capacity of a port of entry at any given time. *Id.* at 117:1-15. CBP does not produce any form of report showing the operational capacity of a port of entry. *Id.* at 117:17-118:2.

CBP created a distinction between "detention capacity" and "operational capacity" in an apparent effort to shore up its queue management policy, despite the fact that senior CBP officials expressed misgivings about the redefinition of the term. For instance, in a July 6, 2018 email, Frank S. Longoria, the Assistant Director of Field Operations for OFO's Laredo Field Office, noted that in early June 2018, CBP "initiated the Queue Management Strategy and shifted from 'detention' capacity to 'operational' capacity." AOL-DEF-00274915. He then instructed port directors in the Laredo Field Office to dig up "achievements" that would justify this policy change. *Id.* Assistant Field Director Longoria's search for justifications for the Queue Management Strategy and switch to "operational" capacity came after he

had expressed serious concerns about the redefinition of the term capacity.  *See* AOL-DEF-00899313-16.  On June 11, 2018, Mr. Longoria emailed Ryan Koseor, the Deputy Commander of the MCAT Team.  *Id.* at 313.  Mr. Longoria was blunt: "You need to clear up the 'operational' capacity issue."  *Id.*  Mr. Longoria explained, "There's confusion on this point and the field keeps alluding to the fact that immigration processing is not our priority anymore."  *Id.*  Mr. Longoria noted that this was why the Roma, Texas Port of Entry was continuing to meter arriving non-citizens despite being at 25% capacity.  *Id.*  Mr. Longoria went on to note that where "detention capacity" was "a clearly defined number," "[i]f you leave it at 'operational capacity,'" Ports of Entry were being given *carte blanche* to meter any arriving non-citizen at any time.  *Id.*  This was particularly true at the Roma, Texas Port of Entry, which was continuing to meter while being well below 50% capacity despite "a significant decrease" in credible fear cases at the port.  AOL-DEF-01037220.

Mr. Longoria was right to worry that ports of entry would use the shift to operational capacity as an excuse to set targets for migrant intake that were well below their full capacity and to continue to meter when the port was at far less than 100% capacity.  For instance, on September 8, 2018, Mariza Marin, a Watch Commander at the San Ysidro Port of Entry, told a subordinate that ██ [individuals] is our new target number," despite the fact that the San Ysidro POE could detain up to ██ individuals at a time.  AOL-DEF-00603278.  In a July 11-12, 2019 email exchange, Sidney Aki, the Port Director of the San Ysidro Port of Entry, confirmed that the port planned to decrease its number of detainees to ██.  AOL-DEF-00084038.

Other CBP officials had misgivings regarding the import of the shift to operational capacity.  On June 8, 2018, following a "guidance call" regarding the Queue Management Strategy and shift to operational capacity, Javier Vasquez, an Assistant Port Director at the Laredo, Texas Port of Entry wrote to Frank Longoria,

1    stating, "I don't understand why ports are doing queue management if they are not

2    at capacity."  AOL-DEF-00899300.  Mr. Longoria replied: "No argument from me."

3    *Id.*

4            The use of "operational" capacity remained a topic of conversation amongst

5    CBP leadership through the end of the summer of 2018.  *See* AOL-DEF-00910155.

6    On August 29, 2018, Frank Longoria suggested that an upcoming conference of

7    directors of field operations with responsibility for ports of entry on the U.S.-Mexico

8    border have agenda items that included "Queue Management: Detention Capacity

9    or Operational Capacity."  *Id.*

10           *Sixth*, Defendants claim that the Turnback Policy was a rational response to

11   capacity constraints and large numbers of migrants that were distracting Defendants

12   from their core missions.   In reality, the Turnback Policy was a costly and

13   haphazardly implemented endeavor that took thousands of hours away from other

14   border security priorities.  In order to implement the metering policy, CBP had to

15   assign at least two CBP officers per shift to a new limit line position near the U.S.-

16   Mexico border.  This resulted in thousands of officer hours being diverted from other

17   tasks to the Turnback Policy.  *See* Harris Dep. at 173-174, 176-178.[8]

18           In addition, placing officers at these limit line positions created additional

19   costly problems for ports of entry.  Asylum seekers attempted to circumvent the limit

20   line positions by running onto U.S. territory through vehicle lanes or taking taxis in

21   the vehicle lanes to get them to the border between the U.S. and Mexico.  *See id.* at

22   139, 189. As a result, CBP had to divert more resources to deal with the newly-

23   created "circumventer" problem.  *Id.* at 187-94.

24           The limit line position also created serious concerns regarding CBP officer

25   safety.  When the limit line position was implemented, the position was not covered

26   by existing security cameras.  ██████ Dep. at 171:25-172:3.  The limit line position

27

28   ────────────────────

     [8] References to the Deposition of Rodney Harris refer to page numbers in the rough
     transcript.

1    was also close to the U.S.-Mexico border and no structures existed that officers could

2    hide behind if their safety was threatened. *Id.* at 172:4-13.  Back-up for incidents at

3    the limit line was also often far away and behind security gates. *Id.*   In addition,

4    officers were placed at positions that were outside and exposed to the elements in

5    areas that had extreme weather. *See* Harris Dep. at 179-81, 193-94. And, while many

6    of these concerns could be addressed by CBP's management, those structural fixes

7    also required government expenditures. *Id.* at 178-80.

8        *Finally*, many of Defendants' claims regarding operational exigencies are

9    incorrect.  For example, Defendants argue that ports of entry do not reach their

10   maximum detention capacity because arriving non-citizens with communicable

11   diseases need to be isolated from the rest of the population in holding cells at the

12   port of entry.  But this is contrary to CBP's own standard of conduct.  On August 8,

13   2008, CBP issued directive number 3340-030B. *See* AOL-DEF-00372536.[9]   That

14   directive states: "Generally, no one who is pregnant, on life sustaining or lifesaving

15   medication, or who appears ill, shall be detained in a secure area (e.g., detention cell)

16   within a POE.  They should be seated in the secondary [inspection] area under direct

17   supervision of an officer or contracted guard services." *Id.* at 542.  Thus, it is simply

18   incorrect that non-citizens with an illness must be placed in a temporary holding cell.

19       Likewise, Defendants claim that family units need to be placed in temporary

20   holding cells and isolated from the rest of the population being detained at the port

21   of entry.  But that also violates directive number 3340-030B. *See* AOL-DEF-

22   00372536.  The directive states that "[n]ormally" family units "should be seated in

23   a secondary [inspection] area." *Id.* at 542.  As a result, Defendants' arguments

24   regarding operational capacity ignore CBP's own binding directives.

25       Similarly, Defendants have claimed that even if ports of entry are below 100%

26

27   [9] This policy remained in effect through at least May 2016 when Pete Flores, the
     Director of Field Operations for the San Diego Field Office, sent a copy of it to Todd
28   Owen, the Executive Assistant Commissioner of CBP. *See* AOL-DEF-00372532.

capacity, metering is still necessary because a large number of non-citizens are waiting in shelters on the Mexican side of the border. Even in Tijuana, the border town with the most non-citizens in migrant shelters due to a backlog that CBP created by consistently metering for over two years, this is not the case. CBP officials estimates that it would take only about 3 weeks to work through the backlog in Tijuana. In August 2018, Sidney Aki, the port director of the San Ysidro port of entry, asked Mariza Marin how long it would take to inspect and process the 1,150 individuals waiting in migrants shelters in Mexico. AOL-DEF-00072964. Ms. Marin responded that inspecting and processing those individuals would take only "22 days." *Id.* As with the other assumptions that underlie the "operational capacity" excuse, Defendants' justification is undermined by CBP's internal documents.

***Defendants repeatedly lied about the true capacity of ports of entry on the U.S.-Mexico border.*** CBP officers realized that the "capacity" excuse was a lie. ██████ Dep. at 99:19-101:2; NTEU-000110 (email to CBP Commissioner: "The employees would like you to provide them the proper authority and sections of law that allows them to . . . prevent [asylum seekers] from entering the U.S. after presenting themselves for inspection and requesting asylum. . . . [T]he agency is claiming publicly that they are not conducting these activities when they really are."); NTEU-000132 ("the Agency intentionally . . . den[ied] and block[ed] asylum to persons and families in order to block the flow of asylum applicants" and to create "a chilling [e]ffect[] to all others attempting entry into the United States.").

CBP officers also understood that there were legal problems with the Turnback Policy. For example, on December 11, 2018, CBP Officer ██████ told Investigative Counsel from the U.S. Department of Homeland Security Office of Inspector General that he "thought that management wanted to keep the process of redirecting individuals to another port in a 'gray area' by not establishing official procedures or acknowledging limit line duty as a permanent position." AOL-DEF-

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1  00210366. In the same meeting, ████████ stated that CBP officers believed that

2  "management was doing something 'shady'" with respect to the limit line. *Id.* Mr.

3  ████ also relayed his understanding from CBP management that "once someone

4  was on U.S. soil seeking asylum, the port had to process that individual," but that

5  "stop[ping] [them] at the border, . . . would be a 'loophole' in the law." *Id.* As a

6  whistleblower testified, he was concerned that the Turnback Policy was illegal and

7  could expose him to personal liability:

8      Q.    So when officers receive[d] an order to turn back individuals at

9             the limit line [between the U.S. and Mexico], they wouldn't

10            ignore that order, right?

11      A.    No.

12      Q.    And, in fact, you have never ignored an order to turn back asylum

13             seekers at the limit line?

14      A.    I have not[.]

15      . . .

16      Q.    Did you have a concern that following the order could expose

17             you to a lawsuit?

18      A.    Yes.

19      Q.    Did you have a concern that following the order might be illegal?

20      A.    Yes.

21  ████ Dep. at 75:23-76:19; *see also id.* at 165:4-18 (whistleblower testifying that

22  the implementation of the Turnback Policy was the first time that he was asked to

23  do something he believed was illegal).

24      The fact that the capacity excuse was a lie is further underscored by the words

25  of former CBP Commissioner Kevin McAleenan. On June 16, 2018, shortly after

26  the April 27, 2018 metering guidance and the June 5, 2018 Prioritization-Based

27  Queue Management memo were adopted, Mr. McAleenan received a copy of a

28  queue management report for all ports of entry on the U.S.-Mexico border. *See*

1    AOL-DEF-00047772-73. Commissioner McAleenan's response to this information

2    was that supposed capacity constraints at port of entry was, at most, "[r]eally just a

3    San Ysidro challenge." *Id.* at 773.

4        ***The Systematic Effect of Defendants' Conduct.*** While the Government lied,

5    migrants died. On June 23, 2019, Óscar Alberto Martínez Ramírez, a native of El

6    Salvador, and his 23-month-old daughter, Valeria, attempted to enter the United

7    States at the Brownsville, Texas port of entry and were turned back by CBP Officers.

8    AOL-DEF-00211139; *see also* Reis Thebault, Luis Velarde, and Abigail

9    Hauslohner, *The Father and Daughter Who Drowned at the Border Were Desperate*

10   *for a Better Life, Family Says*, Washington Post (June 26, 2019). But, on that day,

11   the Brownsville Port of Entry was operating at only 33% capacity. AOL-DEF-

12   00035288. Oscar was desperate to enter the United States. *See* Reis Thebault, Luis

13   Velarde, and Abigail Hauslohner, *The Father and Daughter Who Drowned at the*

14   *Border Were Desperate for a Better Life, Family Says*, Washington Post (June 26,

15   2019). He had sold his motorcycle, borrowed money from family, and travelled over

16   1,000 miles with his daughter from El Salvador to Matamoros, Mexico. *Id.* Now

17   aid workers in Matamoros were advising him that there were hundreds of people in

18   front of him and his daughter in line waiting for their number to be called. *Id.* So,

19   Oscar and his daughter waded into the Rio Grande river near the Brownsville port

20   of entry. *Id.* However, the rapid current of the river pulled them under, drowning

21   both other them. AOL-DEF-00211139. Their bodies washed up along the

22   riverbank. *Id.* Their feet were in the water; their heads were face-down nestled in

23   brown reeds. *Id.* Valeria's hand was wrapped around her father's shoulders. *Id.*

24

25

26

27

28



Pls.' Dep. Ex. 51.

Executive Assistant Commissioner Todd Owen made it clear that CBP takes no responsibility for the deaths of Oscar and Valeria or any other harm caused by the Turnback Policy. As Mr. Owen testified at his deposition:

> Q.  Do you take any responsibility for what's happened . . . to migrants who are living on the Mexican side of the border due to the metering policy?
>
> A.  Do I take --?
>
> Q.  Yeah. Do you take any responsibility for that?
>
> A.  No.

Owen Dep. at 289:21-290:6. Mr. Owen then specified that he takes no responsibility for children that were forced to sleep outside on the streets of Matamoros in the

summer heat after they were turned back at ports of entry. *Id.* at 291:6-14. He went on to testify:

> Q. Do you take any responsibility for what occurs to asylum seekers who, when f[aced] with waiting . . . for months in Mexico due to metering decide to cross illegally between ports and are harmed? Do you take any responsibility for that?
>
> A. No.

*Id.* at 291:15-20. Then, when Mr. Owen realized that he was going to be shown a picture taken of Oscar and Valeria, he became angry, saying "[G]o ahead. Show me the pictures from the river." *Id.* at 292:1. When asked whether he took any responsibility for the deaths of Oscar and Valeria, Mr. Owen provided a callous, one-word answer: "No." *Id.* at 292:8-21.

It should have been no surprise to Mr. Owen that the Turnback Policy was forcing migrants into dangerous situations. He was told as early as September 2016 that Mexican officials believed that a ▮▮▮▮▮▮▮▮▮▮▮ was unfolding at the border as a result of the Turnback Policy. *See* AOL-DEF-00762746. At his deposition, Mr. Owen denied that he was told about the ▮▮▮▮▮▮▮▮ caused by metering. Owen Dep. at 73:16-20 ("Q. Were you told that the metering policy created a ▮▮▮▮▮▮▮▮▮▮? A. ▮▮▮▮▮▮▮▮▮▮? Q. Yeah. A. No."). When Mr. Owen was confronted with an email showing that he had, in fact, been told that metering was causing a ▮▮▮▮▮▮▮▮ the only answer he could muster was "I received this e-mail in 2016, so, yes, I would have read that." *Id.* at 126:18-22.

Although not always ending in death, what happened to Oscar and Valeria at the Brownsville port of entry has played out in thousands of interactions at Class A ports of entry along the U.S.-Mexico border. Defendants have made clear that the policy applies to all ports of entry on the U.S.-Mexico border, meaning that any asylum seeker who approaches a POE can be turned back. As former Executive

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

Director of OFO, Randy Howe, testified before the U.S. Senate's Homeland and Security and Governmental Affairs Committee on June 26, 2019:

> Q.    I want to go back and talk about metering at the port of entry. . .
>
>        Is it happening across all ports of entry?
>
> A.    Thank you, Senator.  Yes, it is. . . .

*Human Smuggling at the U.S.-Mexico Border: Hearing Before the S. Homeland Sec. & Governmental Affairs Comm.*, 116th Cong., C-SPAN (June 26, 2019), https://tinyurl.com/wzorwct;  *see also* Howe Dep. at 13:7-17 (Mr. Howe affirming that he testified accurately during the Senate hearing).

Each Named Plaintiff was harmed by the Turnback Policy.

***Abigail Doe.***   Named Plaintiff Abigail Doe is a female native and citizen of Mexico.  She is the mother of two children, aged 10 and 12. Abigail, her children, and her husband lived in Central Mexico.  Abigail's husband drove a tractor-trailer to transport food and goods across Mexico.  Then, in May 2017, individuals approached Abigail's husband asking him to transport drugs for them.  Abigail's husband said "no."

One day in May 2017, per his usual routine, Abigail's husband awoke early in the morning and left for a long delivery trip.  By mid-morning, Abigail's husband had not called her, which was highly unusual.  Typically, Abigail's husband was in nearly constant contact with her when he was making a delivery.  The lack of communication worried Abigail greatly because of the drug cartel members that he had spurned.  About two days after Abigail's husband disappeared, she went to the local government authorities to file a missing person's report; however, she was denied the ability to file a report.

A few hours after trying to file a report concerning her husband, while Abigail was on her way to pick her children up from school, she was stopped at gunpoint by three armed men.  The men grabbed Abigail and forced her into the car.  The men told Abigail that if she continued to ask about her husband's disappearance they

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1  would kill Abigail and her children.  They told Abigail that if she kept trying to find

2  her husband, she would find him in pieces.  The armed men told Abigail that if she

3  and her children wanted to stay alive, they needed to leave.

4      After being grabbed by the armed men, Abigail was terrified, anxious, and

5  confused.  She called her parents, who lived in San Clemente, California, and asked

6  for advice.  Abigail and her parents decided that the only hope of being safe and

7  protecting the lives of her children was to seek asylum in the United States.

8      On May 20, 2017, Abigail quickly gathered her children, packed some

9  clothes, and boarded the first available bus for Tijuana.  Abigail and her children

10  arrived in Tijuana on May 24, 2017.  They immediately proceeded to the San Ysidro

11  port of entry.  When the family reached the front of the line, Abigail told an

12  immigration officer in a dark-blue uniform that they wanted to apply for asylum.

13  Abigail told him about her husband's disappearance and the threats to her and her

14  children.  Abigail also told him that she feared to return to Mexico.

15      The officer led Abigail and her children to the inside of a building where she

16  met with more immigration officers.  Abigail repeated her desire to apply for asylum,

17  but she was not allowed to explain her circumstances again in detail.  In the building,

18  Abigail was searched, photographed, and fingerprinted, as were her children.

19      Next, Abigail was led to another room and asked to wait.  Eventually, other

20  immigration officers approached Abigail.  Abigail was only able to explain briefly

21  that she was seeking asylum.

22      The officers told Abigail that she could not get asylum in the United States.

23  Abigail tried to explain in greater detail her circumstances and why she wanted to

24  apply for asylum.  But she was met with the same response: "Well, yes ma'am, but

25  we're not giving [you] political asylum."  Abigail Doe Dep. at 39:14-17.  Then the

26  officer told her that he could let Abigail into the United States, but that if he let her

27  in, the American government would take away Abigail's children.  *Id.* at 39:18-21.

28  Occasionally, the officers spoke amongst themselves in English and laughed.  *Id.* at

40:15-17.

The officers gave Abigail a document that was written in English and told her to sign it. *See* Abigail Doe Dep. at 40:11-14. Abigail asked what the document meant and she was told that it was so that "Mexican authorities can help you," that it was "not a deportation form," and that "it was not anything bad." Then, the officers recorded Abigail with a video camera and told her to say that she agreed to accept the help of the Mexican authorities. The officers repeated the taped statements multiple times, at no point did they explain anything further to Abigail about what she was signing and doing. *See* Abigail Doe Dep. at 40:11-14.

Abigail agreed to sign the document even though she did not understand it. The document was not translated for her. She had been taken at gun-point two days earlier and had taken a two-day bus ride directly to Tijuana. She was tired, frightened, and confused. She was afraid that if she did not sign the document, her children would be taken away.

Later, Abigail was taken to a different office where an immigration officer translated the document for her. However, Abigail was not sure that the document was translated accurately because she does not speak English. Abigail does not recall being asked any questions by the officer or seeing the officer write he answers down in the document. Abigail now understands that the document states that she did not have a fear of returning home to Mexico. *See* AOL-DEF-00010794-96. That is false. Abigail was threatened by men at gunpoint and believed that her husband was killed by a drug cartel.

After Abigail signed the document, an immigration officer escorted Abigail and her family back to Mexico. Initially, Abigail and her children stayed in a migrant shelter in Tijuana because they had no money to stay anywhere else. At the shelter, Abigail met other families who were also turned back to Mexico when they attempted to apply for asylum.

***Beatrice Doe.*** Named Plaintiff Beatrice Doe is a native and citizen of Mexico.

1   She has three children, aged 10, 14, and 18.  On May 24, 2017, she fled southern
2   Mexico with her three children and nephew, after the family was targeted by the
3   Zetas drug cartel.  Beatrice also fled southern Mexico because she had suffered
4   terrible domestic abuse at the hands of her husband, who beat her regularly.
5   Beatrice, her children, and nephew first attempted to seek asylum at the Otay Mesa
6   port of entry on May 25, 2017.  They walked up to the port and stood in line to enter.
7   They passed by the first security post.  A man standing in a black uniform motioned
8   for them to get into one of two lines.  He did not ask them for any documents, or say
9   anything else to them.  They passed through a turnstile and then encountered two
10  immigration officers in blue uniforms.  One of the officers asked them for their
11  documents.  Beatrice told him that they were from Mexico and showed him her
12  Mexican identification card.  The immigration officer told her to wait while he got
13  another officer.  When the officer returned with backup, Beatrice informed the
14  officers that the family wanted to apply for asylum.  One of the officers told Beatrice
15  that it was not possible to apply for asylum at the Otay Mesa port of entry and that
16  the family should go to the San Ysidro port of entry instead.

17       The family took a taxi cab to the San Ysidro port of entry.  Once they were
18  dropped, off the family approached the port of entry on foot until they encountered
19  a large gate.  There were immigration officers in blue uniforms near the gate.  The
20  family got in line. One of the immigration officers asked for the family's documents,
21  Beatrice handed him her Mexican identification card.  She told the officer that the
22  family was in danger in Mexico due to the Zetas drug cartel and her husband's
23  domestic violence.  The immigration officer told Beatrice that many people from
24  Veracruz, Guerrero, Michoacán, and other states in Mexico had come the U.S. and
25  asked for help.  He asked Beatrice why the family had to come to the United States.
26  He pointed out that Mexico has 32 states and said that the family could have gone to
27  any of those states to be safe.  He also told Beatrice that the United States had no
28  obligation to help us.  He also told Beatrice that the family did not have a right to

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1  enter the United States because they were not born in the United States.  He told
2  Beatrice that she had not rights.  He told her that she should be seeking help from
3  the Mexican government.

4      While in the office, Beatrice saw another mother with two small children who
5  appeared to be going through the same process.  The mother was crying as an
6  immigration officer searched her.

7      Eventually, the immigration officer led Beatrice's family to an office.  In the
8  office, a female immigration officer patted the family down.  Then, the family was
9  taken into a nearby room where two men and two women were speaking English to
10  each other.  They asked Beatrice again why the family was trying to go to the United
11  States.  Beatrice explained that the family was fleeing violence and that they wished
12  to ask for asylum in the United States.  One of the immigration officers replied that
13  Beatrice had probably kidnapped her nephew.  Another immigration officer was
14  walking around the room saying, "it was always the same."

15      After taking the family's birth certificates and fingerprints, Beatrice's nephew
16  was separated from the rest of the family and taken to a separate room to be
17  interrogated.  The officers told him that it did not matter that he was afraid to return
18  to Mexico because there were many other places he could live in Mexico.

19      Meanwhile, in a separate room, an immigration officer presented Beatrice
20  with a document.  The officer told Beatrice that they were going to take Beatrice's
21  nephew away from her unless she signed the document.  He told her that if she signed
22  the document, she would still have the opportunity in the future to get a work visa
23  in the United States.  He told her that she did not have a right to be in the United
24  States and that if she persisted with seeking asylum she was going to jail.  The
25  officers said that for Beatrice's own good, she should sign the document and that it
26  would not affect her "record."  Beatrice was afraid and felt that she did not have any
27  other option but to sign the document.  She told the officer that she did not
28  understand what she was signing because the document was in English and she only

71   PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1  spoke Spanish.

2       After she signed the document, the immigration officer took Beatrice and her

3  family from the room, returned their belongings, and handed her a copy of the

4  document she had just signed.  He then escorted the family to another office with

5  Mexican immigration officials in Tijuana.

6       The next day, on May 26, 2017, Beatrice and her family again went to the San

7  Ysidro port of entry very early in the morning to try for a third time to seek asylum

8  in the United States.  Beatrice saw one of the same female immigration officers

9  wearing a blue uniform that she had seen the day before.  The female officer

10 recognized Beatrice and said, "You again!?"  The female immigration officer asked

11 Beatrice how she could assure her children that they were not going to become

12 delinquents in the United States.  She told Beatrice and her family that they had no

13 right to ask for asylum and no right to enter the United States.  The officer told

14 Beatrice that if she attempted to return, she would put Beatrice in jail for three years.

15 Beatrice told the officer that she was afraid to return to Mexico because she and her

16 family feared for their lives.  The officer said that did not matter.

17      Beatrice and her family were against taken to an office where she was again

18 separate from her nephew.  The officers threatened to transfer Beatrice's nephew to

19 Mexican authorities and return him to southern Mexico.  Eventually, the entire

20 family was escorted back to Tijuana.

21      Shortly after learning of Beatrice's claims the Office of Inspector General of

22 the U.S. Department of Homeland Security ("DHS OIG") opened a criminal

23 investigation into her claims, only to quickly close the investigation after an August

24 24, 2017 telephone conference with a DHS OIG attorney.  *See* AOL-DEF-

25 00014547-59.  A February 2, 2018 email from Anne L. Maricich, Deputy Director

26 of Field Operations, appeared to acknowledge that Beatrice's account of being

27 turned back was accurate, although she sought to limit the import of it.  *See* AOL-

28 DEF-00071817 ("the Beatrice Doe case is a one off"); *see also* AOL-DEF-00602529

1   (San Diego Field Office employee confirming that Beatrice Doe attempted to enter
2   the U.S. on May 25, 2017 and signed an I-275 Withdrawal of Application for
3   Admission and attempted to enter again on May 26, 2017); AOL-DEF-00069611
4   (streamlined withdrawal of application should "be used to mitigate overcrowding");
5   AOL-DEF-00707315-16 at 315 (CBP Branch Chief explaining that she did not sign
6   an I-275 because "it appears to me that the adult female was forced into a
7   withdrawal").

8       ***Carolina Doe.***  Named Plaintiff Carolina Doe is a citizen and national of
9   Mexico.  She has three children, aged 11, 18, and 21.  In May 2017, her brother-in-
10  law was kidnapped, tortured, and killed by members of a drug cartel.  This was
11  apparently retribution for Carolina's brother-in-law, who was a police officer,
12  investigating the drug cartels.  At the funeral for Carolina's brother-in-law, cartel
13  members approached Carolina's husband, who was a police officer, and threatened
14  to kill him.  Carolina's husband went into hiding.  Soon afterwards, a cartel member
15  threatened to harm Carolina and her three children.  After that, suspicious cars began
16  following Carolina and driving by the family's home.

17      On May 16, 2017, Carolina and her three children fled to Tijuana, Mexico.
18  On May 17, 2017 in the evening, they arrived at the San Ysidro port of entry.
19  Carolina and her children walked across the bridge and up to a door where officers
20  wearing dark blue uniforms were standing.  The officers asked Carolina where she
21  was going; Carolina replied that she wanted to apply for asylum.  The officers
22  directed the family to an area with cubicle workstations where other immigration
23  officers were waiting.  One of the officers looked at the family's documents,
24  including the U.S. birth certificate of Carolina's U.S.-citizen daughter and her
25  daughter's U.S. passport, which has expired.  Carolina explained what had happened
26  to her family in Mexico and that they were afraid of returning to Mexico.

27      Afterwards, the family was taken to another room where they were finger-
28  printed and searched.  The officer took Carolina and her family to a separate room,

1    which was locked by another officer. The family spent the night in that room, which
2    had mats on the floor.

3            The next morning, May 18, 2017, immigration officers took Carolina to a
4    large room with a table. Her children were told to wait outside the room. Two male
5    officers sat on one side of the table. The two men asked her question in Spanish
6    about why she came to the U.S. from Southern Mexico. Carolina recounted what
7    had happened to her family. The two officers searched on the internet and found
8    information showing that Carolina's brother-in-law had been murdered.

9            Then the two officers spoke to one another in English. After a while, one of
10   the officers told Carolina that, in his experience, she would not receive asylum in the
11   United States. Carolina Doe Dep. at 48:17-21. Then the officer threatened to place
12   Carolina's U.S.-born daughter in foster care in the United States, effectively
13   separating her from the rest of her family. *See id.* at 48:22-49:2. The officer told
14   Carolina that if she applied for asylum, she would not receive it and would be
15   deported and banned from entering the U.S. for 10 years, meaning that she would
16   not get to see her U.S.-born daughter again until she was an adult.

17           The officer told Carolina that there was a way to avoid all of this—she could
18   voluntarily leave the United States. They told her that she had to make a statement
19   on video that she was not afraid of returning to southern Mexico. Carolina felt like
20   she had no choice and agreed. Prior to recording Carolina, the two officers went
21   over the questions that they would ask her and told her how to answer each question.

22           Then the officers began recording Carolina with their laptop as they asked her
23   questions. One officer asked her if she was scared to go back to Mexico, and
24   Carolina responded, "Yes." The officer stopped the recording and instructed her to
25   say "no" to all of the questions if she wanted to prevent the government from taking
26   her U.S.-born daughter. The officers went over the questions with Carolina twice
27   more and made her practice saying "no." *See* Carolina Doe Dep. at 54:10-55:1.

28           Then the officers began recording Carolina again. This time she did not

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
      DEFS' FIRST SET OF INTERROGS

respond as the officers had instructed her because she did not want to lie on camera. Carolina was afraid and wanted to say that she was very scared of returning to Mexico. The officer repeated that the only way Carolina and her children could leave voluntarily was if she stated confidently on the video that she was not scared. *See* Carolina Doe Dep. at 54:10-55:1.

Carolina was tired and scared. She believed that she had no choice but to do what the officer wanted or else her U.S.-born daughter would be taken from her. The officers continued to pressure Carolina what they wanted on video. She finally did what they told her to do, and the officers were satisfied with her responses.

Then, the officers made Carolina sign a document in English that had her picture on it. The officers did not read the document to her in Spanish, nor did they explain what the document meant. One of the officers said that if Carolina signed the document, it would keep her from violating the law. Carolina agreed to sign the document because she did not want to violate the law and because she believed that her U.S.-born child would be taken from her if she did not do so. However, Carolina did not understand what he was signing.

Then, the officers made Carolina's 18-year-old daughter sign an English-language document that her daughter did not understand. The officers did not read the document to her in Spanish, nor did they explain the document to her in Spanish. The family was escorted back to Mexico and went into hiding in Tijuana.

***Dinora Doe.*** Named Plaintiff Dinora Doe is a native and citizen of Honduras. She has one adult son and three daughters who are 21, 20, and 19, respectively. Dinora and her daughter, Emilia, fled from Honduras to the U.S.-Mexico border for several reasons. In November 2015, Dinora and her family were targeted by the MS-13 gang, which controlled her neighborhood in Honduras. Dinora's home was in MS-13 gang territory and the gang wanted to use the home. Dinora and Emilia received several notes from the gang saying that if Dinora and Emilia did not leave the house, the gang would kill them. Another note said that if Dinora and Emilia did

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1   not leave the house, Dinora's head would hang from the doorway.  At that point,
2   Dinora and Emilia went into hiding.

3       A few weeks later, Dinora and Emilia returned home.  When they walked into
4   the house, they found three MS-13 members there.  The MS-13 gang members
5   repeatedly raped Dinora and Emilia in front of each other for three days.

6       After Dinora and Emilia escaped, they hid at several hotels in San Pedro Sula,
7   Honduras.  Eventually a friend sent them money that allowed them to escape
8   Honduras and flee to southern Mexico.

9       However, in July 2016, Dinora and Emilia were spotted by a group of eight
10  MS-13 gang members who told Dinora and Emilia that they knew that Dinora and
11  Emilia were from Honduras and knew the shelter where they were staying.

12      Dinora and Emilia were terrified and soon fled southern Mexico.  In August
13  2016, they attempted to seek asylum in the United States by walking up to the
14  entrance of the Otay Mesa port of entry.  They encountered a group of officers in
15  uniforms.  Dinora told them that they wanted to ask for asylum in the United States.
16  The officers signaled for back up.

17      Approximately five more officers came up to speak with Dinora and Emilia.
18  One of the officers told them that there was no asylum in the United States.  The
19  same officer told Dinora and Emilia to go back to Mexico.  Dinora noticed that there
20  were other people asking for asylum at the Otay Mesa port of entry that were also
21  being turned back to Mexico.  Dinora overheard them asking for asylum and the
22  officers telling them that they could not get asylum in the United States.  Officers
23  then escorted Dinora and Emilia back to Mexico.

24      A few hours later, around 5:00 pm the same afternoon, Dinora and Emilia
25  approached the Otay Mesa port of entry again.  They walked up to the port and again
26  told the officers that they were from Honduras and wanted to apply for asylum in
27  the United States. One of the officers told Dinora and Emilia that Central Americans
28  did not understand that there was no asylum in the United States for them.  The

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1   officer told Dinora and Emilia that if they returned to the port again, the officers
2   would transfer them to Mexican immigration officials who would deport them back
3   to Honduras.  Then, the five officers escorted Dinora and Emilia back to Mexico.

4   The next morning, around 7:00 am, Dinora and Emilia approached the Otay
5   Mesa port of entry to ask for asylum a third time.  Dinora told the first officer that
6   she encountered that she wanted to apply for asylum because she and Emilia were
7   scared for their lives and could not return to Honduras.  At the gate, officers
8   separated Dinora and Emilia.  They told Dinora that she could pass through the port,
9   but that Emilia would have to stay behind.  Dinora told the officers that she could
10  not leave her daughter behind, and that her daughter had a right to apply for asylum.
11  Dinora told the officers that what they were doing was illegal.

12  The officers told Dinora and Emilia that there was no asylum for them.  Dinora
13  continued to insist that they had a right to apply for asylum, but the officers still did
14  not let them in.  The officers escorted them out of the port; one of the officers tried
15  to drag Dinora by the arm.

16  **_Ingrid Doe._**  Named Plaintiff Ingrid Doe is a native and citizen of Honduras
17  She has three children—a daughter who is 6 years old, a son who is 4 years old, and
18  a son who is 2 years old.

19  Toward the end of 2014, Ingrid's ex-boyfriend, Carlos, the father of her sons,
20  began abusing her.  Ingrid suffered abuse at the hands of Carlos for two years.  Carlos
21  would rape her regularly, at times in front of her children.  He would heat up a knife
22  and burn Ingrid's skin; he would beat her with a belt.  He tried to kill Ingrid on
23  multiple occasions.

24  The day before Ingrid fled Honduras with her children, Carlos tried to kill her
25  again.  Ingrid's daughter was frightened and began to cry.  Carlos grabbed Ingrid's
26  daughter and threw her across the room.  Carlos asked Ingrid if she wanted to see
27  what he could do to her daughter.  Ingrid cried and implored him to stop hurting her.
28  Ingrid told Carlos that he could hurt her, but begged him not to hurt her daughter.

1   Carlos threw Ingrid's daughter on the bed and asked Ingrid if she wanted to have the
2   same ending as her mother.  Carlos began to beat Ingrid again.  He beat her stomach
3   even though she was pregnant.  He pointed a gun at Ingrid's head and threatened to
4   kill her if she left him.

5       The next morning, Ingrid gathered up her children, grabbed her documents,
6   and fled the country.  After crossing Guatemala and Mexico, Ingrid and her children
7   arrived in Tijuana around June 10, 2017.  After staying in a migrant shelter for two
8   weeks, on June 24, 2017, Ingrid and her children approached the Otay Mesa port of
9   entry along with another mother, Rosa, and her three children, who were also seeking
10  asylum in the United States.  When they arrived at the port entrance, Rosa provided
11  two immigration officers with her documents and stated that the group wished to
12  seek asylum in the United States.  One of the officers said that there was no asylum
13  at the port and that asylum had ended.  Rosa asked the officer why there was no more
14  asylum.  One of the officers responded that a new law had passed which meant no
15  more asylum.  Rosa left the port with her family.

16      After Rosa was turned back, Ingrid approached the same officers.  She told
17  them that she wished to speak to an immigration officer.  One of the officers asked
18  her why.  Ingrid told them that she was there to apply for asylum.  The officer told
19  her to step aside and wait.  After about a half hour, the same officer who told Ingrid
20  to wait said that they could not assist her.  He told her to go to the San Ysidro port
21  of entry, and that the officers there could help her.  Ingrid and her family returned to
22  Mexico.

23      Later that afternoon, Ingrid and her children arrived at the San Ysidro port of
24  entry.  As they approached the port entrance, they encountered three male
25  immigration officers.  One of the officers asked Ingrid what she was doing there.
26  Ingrid told them that she wanted to apply for asylum.  The officer told her that there
27  was no asylum and she could not pass through the port because she did not have any
28  documents.  Ingrid told the officer again that she wanted to ask for asylum.  She told

1   him that she could not go back to her country because she would be killed.  The

2   officer told Ingrid that there was a new law that meant no asylum.  Again, the officer

3   told Ingrid that because she did not have the correct documents, she did not have a

4   right to enter the United States.  A different immigration officer escorted Ingrid and

5   her children out of the port of entry and back to Mexico.

6       ***Roberto Doe.***   Named Plaintiff Roberto Doe is a native and citizen of

7   Nicaragua.  He is married and has three children, aged 12, 21, and 21 years old.  He

8   fled from Nicaragua because he fears for his life and the lives of his family members

9   due to threats of violence from the Nicaraguan government and paramilitaries allied

10  with the government.  Roberto participated in protests, marches, and strikes against

11  the government.  When Roberto closed his carpentry business during a general

12  strike, the police and paramilitary organizations threatened him for participating.

13  They said that if Roberto closed his business, they would burn it down.  The police

14  walked by Roberto's house nearly every day and sometimes threatened him and

15  pointed a gun at Roberto and his son.  Roberto feared that the government would

16  hurt his family if he stayed in Nicaragua, so he fled in the middle of the night so that

17  the government would not notice.  The day after Roberto left, someone wrote

18  "plomo," which means lead (as in bullets) three times on the garage door of his

19  business.  This marked Roberto as a target to be killed.  Roberto's wife and children

20  are also living in hiding.

21      On September 29, 2018, Roberto arrived in Reynosa, Tamaulipas, Mexico.

22  On October 2, 2018, he attempted to present himself at the Reynosa-Hidalgo port of

23  entry to apply for asylum.  Roberto was at the back of a line of six Nicaraguan

24  nationals and on Honduran that tried to apply for asylum.  As Roberto and the group

25  walked on the bridge leading to the port of entry, they saw several U.S. immigration

26  officers standing at the exact middle point of the bridge, near the dividing line

27  between the U.S. and Mexico.  Roberto's group approached the U.S. immigration

28  officials and told them that they wanted to apply for asylum.

After the group asked for asylum, one of the immigration officers said that he had to talk to his office first and made a call on his radio in English. Then the officer asked Roberto's group to stand to the side. After that, the immigration officer told the group that the port of entry was "all full" and that Roberto and the rest of the group could not enter. The immigration officer told Roberto and the rest of the group that they might have to wait for "hours, days, or weeks" before they could apply for asylum. This was a lie. Contemporaneous records show that that Hidalgo port of entry was only utilizing 21% of its capacity to detain asylum seekers on October 2, 2018 and that the port was experiencing "[n]o impact" due to the number of asylum seekers detained at the port. AOL-DEF-00027615; AOL-DEF-00190359; AOL-DEF-01039172.

A short while after that, Roberto overheard a female U.S. immigration officer make a different call on her radio. Roberto heard the U.S. immigration officer say that someone needed to come pick up some people. A few minutes later, a Mexican immigration official approached from the Mexican side of the border and asked to see the papers of Roberto and the other members of the group. The Mexican immigration officials looked at the papers and asked the group to come with him. One of the Nicaraguans in the group asked the U.S. immigration officer to help, saying that the Mexican immigration officials would deport the group. The U.S. immigration officer said that he did not care and did nothing to assist the group.

The Mexican official walked the group back down the bridge to Mexico and took the group into an office. The Mexican official left the group with other INM officers. The group waited for a long time while various officials talked on the phone. Roberto believed that they were trying to scare the group into believing that they were being deported even though Roberto had a legal visa to travel to Mexico.

Eventually, a Mexican official entered the room, he told Roberto and the group that they did not have the right to apply for asylum in the U.S. and that it was a crime for them to attempt to apply for asylum in the United States. The INM

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1  official told the group that he would tear up their visas and deport them if they tried

2  to come back to the port of entry.  He told the group that they were in communication

3  with U.S. authorities and that if they came back to the bridge and attempted to apply

4  for asylum again, they would be deported back to Nicaragua.

5          On October 18, 2018, Roberto attempted to present himself at the Hidalgo

6  POE again, this time pursuant to an agreement with Defendants that he would be

7  inspected upon arrival. As he was walking across the bridge, Mexican immigration

8  officials arrested him. After a period of detention following his arrest, Mexico

9  deported Roberto Doe from the country.

10          ***Maria Doe.***  Named Plaintiff Maria Doe is a native and citizen of Guatemala.

11  She has two children, aged 14 and 9.  She is a permanent resident of Mexico and

12  both of her children were born in Mexico.

13          Maria lived with her husband and children in Chiapas, Mexico for seven years.

14  Over time, her husband became involved with a drug cartel and became very abusive

15  toward Maria and her children.  When Maria found out that her husband was

16  involved with a drug cartel, she left him.  After Maria left her husband, the cartel he

17  was associated with started searching for Maria and her children.  Maria and her

18  children searched for a safe place to live in Guatemala and Mexico for two years.

19  But, wherever they went, the cartel found them and came after them.

20          In September 2018, Maria traveled with her children to Nuevo Laredo,

21  Mexico, where Maria intended to cross the bridge and seek asylum in the United

22  States. On September 10, 2018, Maria went to the port of entry with her two children

23  around 8pm.   At the mid-point of the bridge they were stopped by two U.S.

24  immigration officers after she had crossed the yellow line painted on the bridge.  The

25  officers asked to see their identification.  Maria showed them her identification card

26  and told them that she wished to seek asylum in the United States.  The officers told

27  Maria to wait on the Mexican side of the bridge for her turn and they would call her.

28          Maria waited for just a few minutes and then two Mexican officials walked

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1  toward her from the Mexican side of the bridge. The Mexican officials told Maria

2  that the U.S. officials would not let her cross the bridge, but if she paid the Mexican

3  officials $1500, they would arrange for Maria and her two children to cross the

4  bridge. Maria did not have the money, so she traveled to Reynosa, Mexico to try to

5  cross a different bridge to apply for asylum in the United States.

6       On September 19, 2018, Maria and her children walked up to the bridge to

7  present herself at the Reynosa-Hidalgo port of entry. Maria and her children were

8  at a turnstile to walk onto the bridge on the Mexican side of the border when a

9  Mexican immigration official demanded to see Maria's documents. Maria gave him

10  her identification documents. The Mexican official started screaming at the top of

11  his lungs, saying that Maria was abusing her Mexican residence for an illegal

12  purpose by trying to cross the bridge to ask for asylum. The official warned that he

13  would rip up Maria's identity documents if she continued to "abuse" her permanent

14  residence in Mexico. The officer's manner of speaking was very verbally abusive

15  and many people were watching. Maria was afraid that the Mexican official would

16  hurt her family, destroy her documents, or deport them to Guatemala, so the family

17  left the bridge.

18       Maria and her family walked up to the bridge leading up to the Reynosa-

19  Hidalgo port of entry again on October 9, 2018 with the intent of applying for asylum

20  in the United States. Maria and her family walked to the middle of the bridge where

21  U.S. immigration officers were checking people's documents. Maria started to tell

22  the U.S. immigration officers that the family wanted asylum in the United States,

23  but at that moment a Mexican immigration official grabbed her arm and demanded

24  to see her papers. Maria told the Mexican official that she was a legal resident of

25  Mexico with two Mexican-citizen children and showed him their papers. The

26  Mexican officer told Maria that her permanent residency in Mexico did not permit

27  her to go to the United States.

28       The Mexican officer told Maria and her children to go to the station on the

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

Mexican side of the border. Maria argued with the officer that she had a right to leave Mexico and seek asylum in the United States. The Mexican officer called for backup and two more officers arrived from the Mexican side. Maria tried to argue with them, but they ordered her to go with them.

The U.S. immigration officers were standing at the mid-point of the bridge and heard everything that the Mexican officers were saying to Maria and her children, but they did not intervene. The America officers said that what was happening had nothing to do with them, that it was a Mexican action.

The Mexican immigration officers took Maria and her children to a Mexican immigration office at the foot of the bridge. They separated Maria from her children and took her into a small room. They told Maria that if she returned to that port of entry, they would revoke her Mexican residency and that she could possibly try another port of entry if she still wanted to cross to the United States, but she could not cross at Reynosa-Hidalgo.

***Juan and Úrsula Doe.*** Named Plaintiffs Juan and Úrsula Doe are nationals and citizens of Honduras. Juan is 64 years old. Úrsula is 41 years old. Juan and Úrsula are married and have two children, twin boys who are 14 years old. Juan also has four adult children in Honduras from a prior marriage.

Juan and Úrsula left Honduras with their two sons in early August 2018. They left because they were afraid for their lives and the lives of their children. A gang from Honduras killed Úrsula 's brother in 2014. Úrsula witnessed the murder and the gang knows that she saw the murder and knows who committed the murder. The gang warned that they were going to harm Juan and Úrsula's family. First, they warned them on the phone, then gang members came to their house. The gang members said that they would hurt Juan and Úrsula's children.

As a result of these threats, Juan, Úrsula and their twins fled from Honduras in order to seek asylum in the United States. They took the train and the bus through Honduras, Guatemala, and Mexico. In Mexico they were robbed at gunpoint by three

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1    men who took all the money that they had.  Afterwards, the family went to a doctor

2    because they were so traumatized by the robbery.  The doctor prescribed them

3    medication to help calm their nerves.

4          Eventually, the family made it to Nuevo Laredo, Mexico in late September

5    2018.  The family stayed in a migrant shelter for about eight days.  The day after

6    Juan, Úrsula and their twins arrived in Nuevo Laredo, they went to the bridge in

7    Nuevo Laredo to the port of entry.  They paid four coins per person in the turnstile

8    to enter the pedestrian sidewalk on the bridge to the port of entry.

9          The family walked to the middle of the bridge to the port of entry.  There were

10    two or three U.S. officers at the middle of the bridge.  The U.S. officers said they

11    could not pass and that the port was closed.  Juan told the U.S. officers that the family

12    was at the port to request asylum.  One of the U.S. officers said that the family would

13    have to wait their turn, the port was closed to them, and they could not pass.

14          Juan, Úrsula, and their twins were afraid because there was also a Mexican

15    immigration official standing nearby who saw the whole conversation and they

16    feared that they would be deported from Mexico.  Juan, Úrsula, and their twins

17    walked back to the Mexican side and returned to the migrant shelter where they had

18    been staying.

19          Eventually, the family was able to buy bus tickets to travel to Reynosa because

20    people in Nuevo Laredo were saying that it was easier to apply for asylum in

21    Reynosa.  In Reynosa the family stayed at a migrant shelter trying to decide what to

22    do for about a week.  The family decided to try to ask to apply for asylum at a port

23    of entry a second time.  At the end of September 2018, Juan, Úrsula, and their twins

24    went to the bridge in Reynosa to the port of entry.  They arrived at the bridge around

25    5am.  They paid four coins to enter the pedestrian walkway on the bridge.  Shortly

26    after they passed through the turnstile on the Mexican side of the bridge there was a

27    Mexican official standing on the sidewalk checking people's documents before they

28    could reach the U.S. officials standing in the middle of the bridge.  The Mexican

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

official asked to see their documents.   After Juan showed him the family's documents, the Mexican official grabbed the documents and ordered the family to walk with him back to Mexico.  He took the family to a waiting room.  A different Mexican official took Juan aside and warned him that the official could do whatever he wanted to the family and could deport them.  The family waited all day without much food or water.  Eventually, the Mexican official let Juan, Úrsula, and their twins leave around 6pm or 7pm.  Juan, Úrsula, and their twins went back to the migrant shelter.

***Victoria Doe.***   Named Plaintiff Victoria Doe is a native and citizen of Honduras.   Victoria fled Honduras at sixteen because she was threatened and assaulted by members of the 18th Street Gang that controlled the neighborhoods and areas where she lived.  She was singled out by men who were standing on the corner near Victoria's school.  They asked Victoria to come with them because their boss wanted her to be his girlfriend.  Victoria refused.  The gang members threatened Victoria with a knife.  However, Victoria was able to escape.

Victoria left school and moved to Colon, Honduras to live with her mother. It was there that Victoria realized that she was pregnant with the child of her then-boyfriend.

About two weeks after Victoria got to Colon, she was approached by the same two men that had previously threatened her with a knife.  This time they threatened her with a gun.  They said that if Victoria did not become their boss' girlfriend, they would hurt her entire family.  Because the men approached Victoria as she was leaving her doctor's office, the gang members quickly learned that Victoria was pregnant.  They threatened Victoria and told her that they would make sure that her son would not be born.  Victoria understood this to mean that the gang members would kill her child, either during her pregnancy or after he was born.  The gang members wanted Victoria that "people who don't obey [them], suffer consequences."

1    A while later, gang members assaulted one of Victoria's cousins who had been

2 escorting Victoria in order to protect her. In July 2017, Victoria and her cousin fled

3 to a small village in the mountains where they found jobs. However, they were very

4 scared.

5    Scared for their lives, Victoria and her cousin left Honduras in October 2017.

6 They traveled through Guatemala to Tapachula, Mexico. They worked in Tapachula

7 for a couple of months.

8    Victoria gave birth to her son in Tapachula. Victoria used to take her baby to

9 her work at a plastics factory because she had no one else to care for him. One

10 evening, Victoria was leaving work with her baby when she was the victim of yet

11 another assault.

12    Victoria was so scared that she left Tapachula with her cousin and son the next

13 day. Around that time, Victoria and her cousin heard about a refugee caravan that

14 was travelling toward Tijuana. They joined the caravan so that they could have

15 protection during the journey. They arrived in Tijuana along with the caravan in

16 April 2018.

17    When Victoria arrived in Tijuana, she was once again threatened by two men

18 who, like the man in Tapachula, demanded that she tell them what she knew about

19 some drugs. Victoria told them that she did not know anything about drugs.

20    Victoria was afraid to present herself to U.S. immigration officers at the port

21 of entry because she did not have a birth certificate for her son. Victoria had to flee

22 Tapachula before she was able to register him. Victoria heard stories about mothers

23 being separated from their children by U.S. immigration officials and she did not

24 want that to happen to her and her son.

25    In Tijuana, Victoria shared an apartment for a while with another woman.

26 There were a lot of murders and drugs in the neighborhood, but Victoria could not

27 afford to live anywhere else. She was afraid to walk around because women could

28 easily be forced into prostitution. She was eventually able to find space in a shelter

1    for migrant youth.

2    On October 8, 2018, Victoria went to the port of entry to seek political asylum.

3    She wanted to seek asylum much sooner, but she was afraid to present herself as an

4    asylum seeker to the U.S. immigration officers at the port of entry.  Victoria heard

5    from people that the U.S. government was taking away people's children.  She was

6    afraid that they would take away her baby because he did not have a birth certificate.

7    Victoria was not able to register his birth in the state of Chiapas because of threats

8    that she received there that caused her to flee.

9    When Victoria arrived at the port of entry on October 8, 2018, she got to the

10   gate where there were two CBP officers.  One CBP officer was a black man and the

11   other was a white man.  The white guard spoke to Victoria in broken Spanish.

12   Victoria explained to him that she wanted to apply for political asylum in the United

13   States.  The officer asked Victoria where she was from.  Victoria told him that she

14   was from Honduras.  Then the CBP officer told Victoria that she could not apply for

15   asylum in the United States at that time, instead she needed to return to Mexico and

16   speak to a Mexican official.  The CBP officer did not tell her how to find the Mexican

17   officer.  He also did not ask Victoria any questions about her baby, who was with

18   her.  Victoria was confused and scared so she went back to the plaza outside the

19   Mexican side of the port of entry.  Victoria was not given instructions about how to

20   apply for political asylum, where she needed to go, or when she could come back to

21   the port of entry.  She was too afraid to look for a Mexican official because she did

22   not have legal status in Mexico.

23   ***Bianca Doe.***  Named Plaintiff is a Honduran native and citizen of Honduras.

24   She fled Honduras on April 2, 2018 because of the constant threats of violence and

25   extreme discrimination that she experienced as a transgender woman.  Bianca went

26   to the Honduran police requesting their assistance, but they refused to help her and

27   insulted her for being a transgender woman.

28   Bianca entered Mexico and arrived in Tapachula, Chiapas, Mexico.  After she

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

1    crossed the border and entered Mexico, Bianca was arrested and taken to a detention
2    center. While she was detained, she told the Mexican authorities about her fear of
3    being a transgender woman in Honduras. Bianca was detained for around 15 days.
4    She was later released and given a document that stated the she had 45 days to
5    regularize her immigration status in Mexico. Bianca filed an application with the
6    Mexican immigration authorities and, after an interview, was granted refugee status
7    in Mexico.

8          During the 45 days that Bianca was in Tapachula, she suffered discrimination
9    and violence similar to what she had endured in Honduras. On one occasion, she
10   was beaten so badly that she still has a scar on her left breast. After that, Bianca
11   rarely went outside.

12         On June 24, 2018, after Bianca's refugee status was approved, she moved to
13   Mexico City, believing that she would be safer in a larger town. But, to Bianca's
14   dismay, the situation was just as bad, if not worse, in Mexico City. For three months,
15   Bianca tried to find a job but everywhere she went, people would only hire her if she
16   cut her hair and dressed and acted like a man. Bianca was also harassed by the police
17   and federal officials because she is transgender.

18         After approximately three months, Bianca left Mexico City and made her way
19   to Tijuana with the intention of seeking asylum in the United States. She reached
20   Tijuana in late September 2018. The next day, Bianca presented herself at the port
21   of entry in Tijuana to seek asylum in the United States. The American immigration
22   officials told her that she could not apply for asylum because the port of entry was
23   full. Then, a few Mexican immigration officials told Bianca that she could not wait
24   outside the gate to the U.S. port of entry and that she needed to move. The Mexican
25   officials told her to put her name on a waitlist in Tijuana in order to seek asylum in
26   the United States.

27         Bianca left the border and went to a shelter in Tijuana. At the shelter, Bianca
28   learned that to put her name on the waitlist she had to return to the plaza outside the

1    port of entry. She returned to the plaza the next day and put her name on the waitlist,

2    and received the number "919." At the plaza outside of the port of entry, Bianca

3    saw two women and two men asking for people's documents in order to be placed

4    on the waitlist. They asked Bianca for her identification. She provided her national

5    identification card from Honduras and was given her number. Bianca was told that

6    when her number was called, she would be able to present her claim for asylum to

7    U.S. immigration officials. Bianca learned that her number would not be called for

8    several weeks and was devastated.

9        Bianca felt so desperate that she decided to climb the fence on the beach in

10    Tijuana a few days later. On the day that she climbed over the fence, Bianca went

11    to the beach around 1:00 a.m. Bianca was with two transgender women from El

12    Salvador. They climbed the fence to the beach and got to the other side. After

13    walking about ten minutes, they saw a man in a truck. The man was wearing the

14    uniform of U.S. Border Patrol, and the truck was white with a green stripe. Bianca

15    and her compatriots explained to the officer that they wanted to seek asylum in the

16    United States. The officer said that they could not seek asylum in the United States

17    because all of the detention centers were full. After the officer refused to help the

18    group, they continued walking. The officer became very angry and threatened to

19    call the Mexican police if Bianca and the others did not climb back over the fence

20    and return to Mexico. Terrified, the group walked back towards the fence; the officer

21    followed in his truck. The officer waited there until the group climbed back over the

22    fence to Mexico.

23        Then, the group walked to a different part of the fence near the beach and

24    again climbed the wall. Soon, the group saw another border patrol officer and tried

25    to hide. However, the officer saw them and got out of his truck. The officer shined

26    a flashlight on them and told them to return to Mexico. Bianca and her compatriots

27    told the officer that they wanted to seek asylum. But the officer replied that there

28    was "no asylum" in the United States. After the officer told them that, the group

1    climbed back over the fence and returned to Mexico.

2        On October 8, 2018, Bianca again attempted to seek asylum by going to the

3    port of entry in Tijuana. At the port of entry, a U.S. immigration officer by the name

4    of "Soto" told Bianca and other asylum seekers that they could not seek asylum

5    because the port of entry was full. The officer instructed Bianca to stand aside and

6    wait for a Mexican official. Bianca and the other asylum seekers with her waited,

7    but the Mexican officer never came.

8        ***Emiliana Doe.*** Named Plaintiff Emiliana Doe is a native and citizen of

9    Honduras. Emiliana fled Honduras on June 5, 2018. She was forced to leave

10   Honduras because of constant threats of violence against her because she is a

11   transgender woman. Transnational drug dealers have threatened Emiliana that if she

12   did not leave Honduras within 15 days, she would be killed. Emiliana asked them

13   whether she could relocate to another part of Honduras, but they warned her that if

14   she did not leave Honduras, they would find her and she would be killed.

15       Emiliana left Honduras on foot. She crossed the border from Honduras to

16   Guatemala. She slept outside whenever she could, and got up early in the morning

17   to keep walking.

18       It took Emiliana five months to get to Tijuana. She rode the freight train "La

19   Bestia" for three weeks from Coatepeque to Mexico City, and walked and caught

20   rides for the rest of the way. While Emiliana was on the train, she was raped six

21   times by different men. They would demand money and since she did not have any,

22   they would take everything that she had. Emiliana was threatened with machetes

23   and called terrible names for transgender people.

24       Emiliana got off the train in Mexico City. She stayed in the city for five days,

25   living on the street and sleeping in a park. Then she decided to get back on the train.

26   Emiliana traveled on the train until she could not go any farther. Then she met a

27   truck driver who gave her a ride to Tijuana. Emiliana decided to come to Tijuana to

28   seek asylum because she had heard that other border crossings are very dangerous

1    for transgender women.

2        Emiliana is not certain of the date that she reached Tijuana but it was
3    sometime in late September 2018. She slept in a park for two nights. Men would
4    tell Emiliana the most vulgar things and demand sex. Emiliana felt very afraid that
5    she would be raped again. She did not have money for food and was very hungry.
6    After that, Emiliana met a young gay man from El Salvador who let Emiliana stay
7    in his hotel room.

8        Feeling unsafe in Tijuana, Emiliana decided to apply for asylum in the United
9    States but was not sure how to do so. Emiliana eventually found out that she had to
10   put her name on a "waiting list." The next day Emiliana went to the border and
11   walked to a nearby office where she understood that she could place her name on
12   the waiting list. The officials in the office told Emiliana that she needed to go to the
13   parking lot next to the Chaparral Port of Entry and that she should go there the next
14   day in the morning.

15       The following morning, Emiliana went to the parking lot next to the port of
16   entry. She asked a woman who was accompanied by two children where to go. The
17   woman pointed to two other women, one sitting on the curb and the other lying in a
18   car nearby. Emiliana approached the women and asked if she could get a number
19   and be placed on the waitlist for political asylum in the United States. They told
20   Emiliana that in order to be placed on the list, she had to show them identification.
21   Emiliana showed them her identification card from Honduras, and one of them put
22   her name down on a clipboard and gave her a tiny piece of paper with the number
23   1014 on it. She told Emiliana to come back in six weeks to see what number they
24   were on and if it was her turn to enter the United States.

25       On October 8, 2018, Emiliana went to the Chaparral Port of Entry in Tijuana.
26   She waited in the line, along with four other transgender women. When it was
27   Emiliana's turn to speak to the CBP officer, she said that she wanted to ask for
28   asylum. The CBP officer spoke Spanish to Emiliana. He told Emiliana that

1    everywhere was full and they could not accept any more people.  The CBP officer

2    asked Emiliana and the other transgender women to wait on one side of the walkway

3    until a Mexican immigration official could come.     Emiliana and the other

4    transgender women stood there for some time, but they did not see any Mexican

5    immigration officials.

6        ***César Doe.***   Named Plaintiff César Doe is a native and citizen of Honduras.

7    César fled Honduras in June 2018.   The 18th Street Gang, a notorious gang in

8    Honduras, controlled César's neighborhood.   On multiple occasions, César was

9    asked to join the gang on threat of death.  César refused.  Later in May 2018, multiple

10   members of the gang kidnapped César.  César was able to escape.   César was very

11   scared, and fled Honduras the next day. *See* César Doe Dep. at 29:18-30:23.

12       César reached Tijuana on August 1, 2018.  He went to the port of entry to

13   apply for asylum in the United States.  Before he was able to see a U.S. immigration

14   officer, in the plaza adjacent to the bridge that leads to the port of entry known as

15   "Chaparal," members of Grupo Beta approached César.  Grupo Beta informed César

16   that he needed to go through them to apply for asylum.  They explained to César that

17   once his number was called, he could proceed to the port of entry and apply for

18   asylum. *See* César Doe Dep. at 52:10-53:10.

19       Soon thereafter, Grupo Beta began physically organizing a number of

20   individuals who also appeared intent on applying for asylum.  Grupo Beta organized

21   César and others into three groups: group one consisted of individuals from Central

22   American countries; group two consisted of African-appearing individuals; and

23   group three consisted of Mexicans.  César did not understand why the groups were

24   segregated in this manner.  César spent about a half-hour in the first group believing

25   that the group would soon proceed to the port of entry.  When nothing happened,

26   César asked a Grupo Beta member if he could leave.  He said that César did not have

27   permission to leave and that César had to wait with the group.

28       Then, a Mexican immigration officer appeared.  The officer stated telling the

group that they needed a paper to present to the U.S. immigration officials in order to ask for asylum. The Mexican immigration officer said that he would give them the paper at a detention center. Then the Mexican immigration officials took 15 Central Americans and 4-5 African-looking migrants to four vans that were parked in the plaza of El Chaparal. César asked the Mexican officer why the group needed to go to the van and to the detention center. The officer said that it was necessary to go there to get this paper so that the group could ask for political asylum in the United States. The Mexican officers put the group in three of the four vans and drove the group about 5 kilometers from El Chaparal.

When the group arrived at the detention center, the Mexican immigration officers asked if they had permission to be in Mexico and they asked the group members' their names and dates of birth. When the migrants said that they did not have permission to be in Mexico, the Mexican immigration officers locked them up. There were four cells in the detention center: one for minors, one for women, and two for men. As soon as César got to the detention cell, he asked for permission to make a phone call. César called the shelter where he was staying in Tijuana to ask if they could help him. When César started to tell the shelter what happened, a detention officer came and hung the phone up. César did not have the opportunity to tell the shelter where he was. César asked for another telephone call, but the Mexican authorities at the detention center would not allow it.

While César was in the detention center, he met a Mexican human rights worker, who told César that the Mexican authorities planned to deport César to Honduras. However, after approximately 12-15 days, the person in charge of the migrant shelter where César had been staying secured César's release.

About three days after his release, César went with an employee of the organization Al Otro Lado to try to put his name on the waitlist for asylum seekers waiting to speak with U.S. officials. When César arrived at the plaza on the Mexican side of the port of entry, he spoke to a member of Grupo Beta. The member of Grupo

1    Beta seemed to be the person who was in charge of registering migrants for numbers
2    on the waitlist.  In order to get on the list, César told him his age and showed him a
3    copy of his birth certificate.  The Grupo Beta member gave César a number around
4    740 or 745.

5         A few weeks later, during early September 2018, César returned to the port of
6    entry to try again to present himself to U.S. immigration officers and ask for political
7    asylum in the United States.  César wanted to present himself again at the port of
8    entry because he did not feel safe.  He was followed by a group of gang members
9    before arriving in Tijuana.  It appeared to César that there even more gang members
10   in Tijuana.  As a result, César was afraid to leave the migrant shelter in Tijuana.
11   César was also afraid that Mexican immigration officers would once again take him
12   into custody and attempt to deport him to Honduras.  César was accompanied to the
13   port of entry by two female lawyers from Al Otro Lado.  The attorneys spoke to U.S.
14   immigration officers and told them that César wanted to apply for asylum.  The U.S.
15   immigration officers told the lawyers that César could not apply for political asylum
16   and that he would not be accepted at the port of entry.  César left with the two Al
17   Otro Lado attorneys and returned to the shelter.

18        A few weeks later, toward the end of September 2018, César returned to the
19   port of entry because it was the day that his number on the waitlist was expected to
20   be called.  When César approached the port of entry, a group of officers from Grupo
21   Beta began asking him questions.  The Grupo Beta officers told César that he did
22   not have sufficient documentation to prove his identity.  They accused César of being
23   a minor even though he had a birth certificate showing that he was 18 years old.
24   When the Grupo Beta officers learned that César did not have a legal right to be in
25   Mexico, they threatened to call Mexican Immigration and to have him picked up by
26   the Mexican child protective services agency, DIF.  However, an Al Otro Lado
27   employee intervened and escorted César away from the Grupo Beta officers and
28   back to the migrant shelter.

4.    For each policy, practice, procedure, or action identified in response to Interrogatory 3, describe in detail how each such policy, practice, procedure, or action was applied to you.

**Specific Objections:** Named Plaintiffs object to this interrogatory to as vague and ambiguous to the extent that it seeks "each and every instance" of a crossing or attempted crossing of the U.S.-Mexico border without a reasonable time limitation and can be read as inconsistent with Defendants' prior instruction that answers should only be provided for the period January 1, 2016 to May 11, 2020. For purposes of clarity, Named Plaintiffs will only provide answers for the time period January 1, 2016 to May 11, 2020.

Named Plaintiffs also object to this interrogatory to the extent that it calls for publicly available information or information in the possession, custody, or control of Defendants, and are therefore of no greater burden for Defendants to obtain than for Named Plaintiffs to obtain and produce. Named Plaintiffs will not conduct a literature or library search to collect or organize information or documents that are as accessible to Defendants as they are to the Named Plaintiffs.

Named Plaintiffs object to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity. None of Named Plaintiffs' answers are intended to be, or should be construed as, a waiver or relinquishment, in whole or in part, of any protection from disclosure afforded by attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.

Named Plaintiffs further object to this interrogatory because "contention interrogatories are more appropriate after a substantial amount of discovery has been conducted." *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 110 (D.N.J. 1990); *see also In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("the wisest general policy is to defer propounding and answering

contention interrogatories until near the end of the discovery period."). Named Plaintiffs have not complete all discovery (fact and expert), their investigation of the facts, or their preparation for trial in this case, and therefore Named Plaintiffs reserve the right to rely on any legal theories, facts, documents, testimony, or evidence which may come to light as fact and expert discovery progresses.

**Response:** Subject to and without waiving the foregoing objections, see response to interrogatory 3.

5.    For each policy, practice, procedure, or action identified in response to Interrogatory 3, identify each and every person who applied each such policy, practice, procedure, or action to you.

**Specific Objections:** Named Plaintiffs object to this interrogatory to as vague and ambiguous to the extent that it seeks "each and every instance" of a crossing or attempted crossing of the U.S.-Mexico border without a reasonable time limitation and can be read as inconsistent with Defendants' prior instruction that answers should only be provided for the period January 1, 2016 to May 11, 2020. For purposes of clarity, Named Plaintiffs will only provide answers for the time period January 1, 2016 to May 11, 2020.

Named Plaintiffs also object to this interrogatory to the extent that it calls for publicly available information or information in the possession, custody, or control of Defendants, and are therefore of no greater burden for Defendants to obtain than for Named Plaintiffs to obtain and produce. Named Plaintiffs will not conduct a literature or library search to collect or organize information or documents that are as accessible to Defendants as they are to the Named Plaintiffs.

Named Plaintiffs object to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity. None of Named Plaintiffs' answers are intended to be, or should be construed as, a waiver or relinquishment, in whole or in part, of any protection from disclosure afforded by attorney-client privilege, the

1    attorney work product doctrine, or any other applicable privilege or immunity.

2        Named Plaintiffs further object to this interrogatory because "contention

3    interrogatories are more appropriate after a substantial amount of discovery has been

4    conducted." *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 110

5    (D.N.J. 1990); *see also In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 336

6    (N.D. Cal. 1985) ("the wisest general policy is to defer propounding and answering

7    contention interrogatories until near the end of the discovery period."). Named

8    Plaintiffs have not complete all discovery (fact and expert), their investigation of the

9    facts, or their preparation for trial in this case, and therefore Named Plaintiffs reserve

10    the right to rely on any legal theories, facts, documents, testimony, or evidence which

11    may come to light as fact and expert discovery progresses.

12        **Response:** Subject to and without waiving the foregoing objections, see

13    response to interrogatory 3.

14        6.    For each policy, practice, procedure, or action identified in response to

15    Interrogatory 3, state whether you contend that each such policy, practice, procedure,

16    or action is part of "an unlawful, widespread pattern and practice of denying asylum

17    seekers access to the asylum process at [ports of entry] on the U.S.-Mexico border"

18    alleged in the Second Amended Complaint ¶ 2 (ECF No. 189), and state the factual

19    basis for your contention.

20        **Specific Objections:** Named Plaintiffs object to this interrogatory to as vague

21    and ambiguous to the extent that it seeks "each and every instance" of a crossing or

22    attempted crossing of the U.S.-Mexico border without a reasonable time limitation

23    and can be read as inconsistent with Defendants' prior instruction that answers

24    should only be provided for the period January 1, 2016 to May 11, 2020. For

25    purposes of clarity, Named Plaintiffs will only provide answers for the time period

26    January 1, 2016 to May 11, 2020.

27        Named Plaintiffs also object to this interrogatory to the extent that it calls for

28    publicly available information or information in the possession, custody, or control

of Defendants, and are therefore of no greater burden for Defendants to obtain than for Named Plaintiffs to obtain and produce.  Named Plaintiffs will not conduct a literature or library search to collect or organize information or documents that are as accessible to Defendants as they are to the Named Plaintiffs.

Named Plaintiffs object to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.  None of Named Plaintiffs' answers are intended to be, or should be construed as, a waiver or relinquishment, in whole or in part, of any protection from disclosure afforded by attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.

Named Plaintiffs further object to this interrogatory because "contention interrogatories are more appropriate after a substantial amount of discovery has been conducted." *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 110 (D.N.J. 1990); *see also In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("the wisest general policy is to defer propounding and answering contention interrogatories until near the end of the discovery period.").  Named Plaintiffs have not complete all discovery (fact and expert), their investigation of the facts, or their preparation for trial in this case, and therefore Named Plaintiffs reserve the right to rely on any legal theories, facts, documents, testimony, or evidence which may come to light as fact and expert discovery progresses.

**Response:**  Subject to and without waiving the foregoing objections, see response to interrogatory 3.

7.    For each policy, practice, procedure, or action identified in response to Interrogatory 3, state whether you contend that each such policy, practice, procedure, or action is part of the "Turnback Policy" alleged in the Second Amended Complaint ¶ 3 (ECF No. 189), and state the factual basis for your contention.

**Specific Objections:** Named Plaintiffs object to this interrogatory to as vague and ambiguous to the extent that it seeks "each and every instance" of a crossing or

attempted crossing of the U.S.-Mexico border without a reasonable time limitation and can be read as inconsistent with Defendants' prior instruction that answers should only be provided for the period January 1, 2016 to May 11, 2020. For purposes of clarity, Named Plaintiffs will only provide answers for the time period January 1, 2016 to May 11, 2020.

Named Plaintiffs also object to this interrogatory to the extent that it calls for publicly available information or information in the possession, custody, or control of Defendants, and are therefore of no greater burden for Defendants to obtain than for Named Plaintiffs to obtain and produce. Named Plaintiffs will not conduct a literature or library search to collect or organize information or documents that are as accessible to Defendants as they are to the Named Plaintiffs.

Named Plaintiffs object to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity. None of Named Plaintiffs' answers are intended to be, or should be construed as, a waiver or relinquishment, in whole or in part, of any protection from disclosure afforded by attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.

Named Plaintiffs further object to this interrogatory because "contention interrogatories are more appropriate after a substantial amount of discovery has been conducted." *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 110 (D.N.J. 1990); *see also In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("the wisest general policy is to defer propounding and answering contention interrogatories until near the end of the discovery period."). Named Plaintiffs have not complete all discovery (fact and expert), their investigation of the facts, or their preparation for trial in this case, and therefore Named Plaintiffs reserve the right to rely on any legal theories, facts, documents, testimony, or evidence which may come to light as fact and expert discovery progresses.

**Response:** Subject to and without waiving the foregoing objections, see

1  response to interrogatory 3.

2      8.    For each instance identified in response to Interrogatory 1, identify each

3  and every person who accompanied you during your crossing, attempt to cross, or

4  approach. For the purposes of this Interrogatory, "accompanied" means "went with."

5      **Specific Objections:**  Named Plaintiffs object to this interrogatory to as vague

6  and ambiguous to the extent that it seeks "each and every instance" of a crossing or

7  attempted crossing of the U.S.-Mexico border without a reasonable time limitation

8  and can be read as inconsistent with Defendants' prior instruction that answers

9  should only be provided for the period January 1, 2016 to May 11, 2020.  For

10 purposes of clarity, Named Plaintiffs will only provide answers for the time period

11 January 1, 2016 to May 11, 2020.

12     Named Plaintiffs also object to this interrogatory to the extent that it calls for

13 publicly available information or information in the possession, custody, or control

14 of Defendants, and are therefore of no greater burden for Defendants to obtain than

15 for Named Plaintiffs to obtain and produce.  Named Plaintiffs will not conduct a

16 literature or library search to collect or organize information or documents that are

17 as accessible to Defendants as they are to the Named Plaintiffs.

18     Named Plaintiffs object to this interrogatory to the extent it seeks information

19 protected by the attorney-client privilege, the attorney work product doctrine, or any

20 other applicable privilege or immunity.  None of Named Plaintiffs' answers are

21 intended to be, or should be construed as, a waiver or relinquishment, in whole or in

22 part, of any protection from disclosure afforded by attorney-client privilege, the

23 attorney work product doctrine, or any other applicable privilege or immunity.

24     Named Plaintiffs further object to this interrogatory because "contention

25 interrogatories are more appropriate after a substantial amount of discovery has been

26 conducted."  *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 110

27 (D.N.J. 1990); *see also In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 336

28 (N.D. Cal. 1985) ("the wisest general policy is to defer propounding and answering

contention interrogatories until near the end of the discovery period.").  Named Plaintiffs have not complete all discovery (fact and expert), their investigation of the facts, or their preparation for trial in this case, and therefore Named Plaintiffs reserve the right to rely on any legal theories, facts, documents, testimony, or evidence which may come to light as fact and expert discovery progresses.

Named Plaintiffs object to this interrogatory as vague and ambiguous to the extent that the difference between "attempted to cross" and "approached with the intent to cross" is not defined or explained.

Named Plaintiffs object to this interrogatory because it seeks information that is privileged under the First Amendment. In particular, Named Plaintiffs objects to this interrogatory because identifying persons affiliated with fellow plaintiff AOL or supportive of AOL's mission and activities—i.e., "each and every person who created such recording(s)"—would infringe upon those individuals' First Amendment associational rights. *See NAACP v. Alabama*, 357 U.S. 449, 462 (1958) ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."); *Perry v. Schwarzenegger*, 591 F.3d 1126, 1139-1140 (9th Cir. 2009) (recognizing that the "compelled disclosure of political associations" can "have a chilling effect on, and therefore infringe, the exercise of fundamental rights" and that the First Amendment privilege serves "to protect the identities of rank-and-file members and volunteers"). Given Defendants' documented and repeated harassment of AOL staff, interns, and volunteers, *see, e.g.*, *Phillips v. U.S. Customs & Border Protection*, Case No. 2:19-cv-06338-SVW-JEM (C.D. Cal.), Named Plaintiffs are particularly concerned that providing names of anyone affiliated with AOL or supportive of AOL's mission and activities will subject those individuals to the same government harassment and will "affect adversely the[ir] ability . . .  to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from [AOL]

and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure," *NAACP*, 357 U.S. at 462-63, and will significantly impact AOL's ability to carry out its mission. Named Plaintiffs will not provide names of any of AOL's staff, interns, or volunteers, or those of anyone affiliated with or supportive of AOL's mission other than public figures, who may have accompanied Named Plaintiffs in the manner described by the interrogatory.

**Response:**   Subject to and without waiving the foregoing objections, see response to interrogatory 3. In addition, see Named Plaintiffs' responses to interrogatories 1, 2, 8 and 9 in the table at the end of these Responses and Objections.

9.    For each instance identified in response to Interrogatory 1, state whether any portion of your crossing, attempt to cross, or approach was recorded by any audio, visual, or audio/visual means and identify each and every person who created such recording(s). For the purposes of this Interrogatory, Defendants do not seek information about recordings created by U.S. government employees or contractors.

**Specific Objections:** Named Plaintiffs object to this interrogatory to as vague and ambiguous to the extent that it seeks "each and every instance" of a crossing or attempted crossing of the U.S.-Mexico border without a reasonable time limitation and can be read as inconsistent with Defendants' prior instruction that answers should only be provided for the period January 1, 2016 to May 11, 2020.  For purposes of clarity, Named Plaintiffs will only provide answers for the time period January 1, 2016 to May 11, 2020.

Named Plaintiffs also object to this interrogatory to the extent that it calls for publicly available information or information in the possession, custody, or control of Defendants, and are therefore of no greater burden for Defendants to obtain than for Named Plaintiffs to obtain and produce.  Named Plaintiffs will not conduct a literature or library search to collect or organize information or documents that are

as accessible to Defendants as they are to the Named Plaintiffs.

Named Plaintiffs object to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity. None of Named Plaintiffs' answers are intended to be, or should be construed as, a waiver or relinquishment, in whole or in part, of any protection from disclosure afforded by attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.

Named Plaintiffs further object to this interrogatory because "contention interrogatories are more appropriate after a substantial amount of discovery has been conducted." *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 110 (D.N.J. 1990); *see also In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("the wisest general policy is to defer propounding and answering contention interrogatories until near the end of the discovery period."). Named Plaintiffs have not complete all discovery (fact and expert), their investigation of the facts, or their preparation for trial in this case, and therefore Named Plaintiffs reserve the right to rely on any legal theories, facts, documents, testimony, or evidence which may come to light as fact and expert discovery progresses.

Named Plaintiffs object to this interrogatory as vague and ambiguous to the extent that the difference between "attempted to cross" and "approached with the intent to cross" is not defined or explained.

**Response:** Subject to and without waiving the foregoing objections, see response to interrogatory 3. In addition, see Named Plaintiffs' responses to interrogatories 1, 2, 8 and 9 in the table at the end of these Responses and Objections.

10. Identify each and every instance that you have contacted or attempted to contact your attorneys in this lawsuit, including the date and time of the contact, the means of contact, and the duration of any communication.

**Specific Objections:** Named Plaintiffs object to this interrogatory to as vague and ambiguous to the extent that it seeks "each and every instance" of a crossing or

1   attempted crossing of the U.S.-Mexico border without a reasonable time limitation
2   and can be read as inconsistent with Defendants' prior instruction that answers
3   should only be provided for the period January 1, 2016 to May 11, 2020. For
4   purposes of clarity, Named Plaintiffs will only provide answers for the time period
5   January 1, 2016 to May 11, 2020.

6       Named Plaintiffs object to this interrogatory to the extent it seeks information
7   protected by the attorney-client privilege, the attorney work product doctrine, or any
8   other applicable privilege or immunity. None of Named Plaintiffs' answers are
9   intended to be, or should be construed as, a waiver or relinquishment, in whole or in
10  part, of any protection from disclosure afforded by attorney-client privilege, the
11  attorney work product doctrine, or any other applicable privilege or immunity.

12      Named Plaintiffs further object to this interrogatory as not related to the claims
13  and defenses in the litigation. By way of further explanation, this case is about
14  Defendants' illegal implementation of the Turnback Policy. See Answer to Interrog.
15  3. Defendants have not asserted any defense based on the frequency of
16  communication between Plaintiffs and their counsel. Nor have Defendants asserted
17  any argument that Plaintiffs' counsel is inadequate in their opposition to the pending
18  motion for class certification. Nor have Defendants filed (or even met and conferred
19  with Plaintiffs about) a motion to decertify, strike class allegations, or disqualify
20  Plaintiffs' counsel. As a result, this interrogatory answer is not relevant. *See, e.g.,*
21  *Sinohui v. CEC Entm't, Inc.*, 2016 U.S. Dist. LEXIS 62481, at *17-22 (C.D. Cal.
22  2016) (denying motions to compel answers to interrogatories regarding when
23  retainer agreements were signed, the names of attorneys who communicated with
24  putative class members, and communications between plaintiffs' attorneys and
25  putative class members).

26      **Response**: Subject to and without waiving the foregoing objections, Named
27  Plaintiffs are willing to meet and confer with Defendants about the relevance of this
28  request.

104 PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

| Plaintiff | Date | Time (appx.) | Location (POE) | Crossed U.S.-MX border? | Crossed back into Mexico? | Accompani-ment | Recording? |
|-----------|------|--------------|----------------|-------------------------|---------------------------|----------------|------------|
| | | | | Table of Responses to Interrogatories 1, 2, 8, and 9 | | | |
| Bianca Doe | Late September 2018 | Unknown | San Ysidro or Otay Mesa | Unknown | | | Unknown |
| | Late September 2018 | Unknown | San Ysidro | No | | | Unknown |
| | October 8, 2018` | Unknown | San Ysidro or Otay Mesa | Unknown | | | Unknown |
| | October 18, 2018 | 1:30 p.m. | San Ysidro | Yes | No | Nicole Ramos, other asylum seekers and children | No |
| Juan Doe | September 19, 2018 | 2:00 p.m. | Laredo | No | | Úrsula Doe (wife), J.A.C.U. (child), J.A.C.U.X. (child) | No |
| | Late September 2018 | 5:00 a.m. | Hidalgo | No | | Úrsula Doe (wife), J.A.C.U. (child), J.A.C.U.X. (child) | No |
| | October 18, 2018 | 10:30 a.m. | Hidalgo | No | | Úrsula Doe (wife), J.A.C.U. (child), J.A.C.U.X. (child), Roberto Doe, Jennifer Harbury | No |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | October 19, 2018 | 2:00 or 3:00 p.m. | Brownsville | Yes | No | Úrsula Doe (wife), J.A.C.U. (child), J.A.C.U.X. (child) | No |
| Úrsula Doe | September 19, 2018 | 2:00 p.m. | Laredo | No | | Juan Doe (husband), J.A.C.U. (child), J.A.C.U.X. (child) | No |
| | Late September 2018 | 5:00 a.m. | Hidalgo | No | | Juan Doe (husband), J.A.C.U. (child), J.A.C.U.X. (child) | No |
| | October 18, 2018 | 10:30 a.m. | Hidalgo | No | | Juan Doe (husband), J.A.C.U. (child), J.A.C.U.X. (child), Roberto Doe, Jennifer Harbury | No |
| | October 19, 2018 | 2:00 or 3:00 p.m. | Brownsville | Yes | No | Juan Doe (husband) J.A.C.U. (child), J.A.C.U.X. (child) | No |
| César Doe | August 1, 2018 | Unknown | San Ysidro | No | | No | No |
| | A few weeks later | Unknown | San Ysidro | No | | A friend (name unknown) | No |
| | Early September 2018 | Unknown | San Ysidro | No | | An assistant from Al Otro Lado (name unknown) | No |
| | Early September 2018 | Unknown | San Ysidro | No | | Two women (names unknown) | No |
| | Late September 2018 | Unknown | San Ysidro | No | | A shelter worker (name unknown) | No |
| | October 18, 2018 | 1:30 p.m. | San Ysidro | Yes | No | Two or three people from Al Otro Lado including | No |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | Nicole Ramos (other names unknown) and other asylum seekers and children | |
| Abigail Doe | May 24, 2017 | 4:00 p.m. | San Ysidro | Yes | Yes | L.E.C.F. (child), E.M.C.F. (child) | No |
| | July 15, 2017 | Morning | San Ysidro | Yes | No | Erika Pinheiro and other individuals from Al Otro Lado, L.E.C.F. (child), E.M.C.F. (child), other asylum seekers and children | No |
| Roberto Doe | October 2, 2018 | 10:30 a.m. | Hidalgo | No | | A group of seven other migrants (names unknown) and some human rights activists (names unknown) | No |
| | October 18, 2018 | 10:30 a.m. | Hidalgo | No | | Juan Doe, Úrsula Doe, J.A.C.U. (child), J.A.C.U.X. (child), Jennifer Harbury | No |
| Beatrice Doe | May 25, 2017 | 8:30 a.m. | Otay Mesa | No | | B.R.V. (child), U.R.V. (child), P.R.V. (child), L.L.A. (nephew) | No |
| | May 25, 2017 | 10:30 a.m. | San Ysidro | Yes | Yes | B.R.V. (child), U.R.V. | No |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | (child), P.R.V. (child), L.L.A. (nephew) | |
| | May 26, 2017 | 5:00 a.m. | San Ysidro | Unknown | | B.R.V. (child), U.R.V. (child), P.R.V. (child), L.L.A. (nephew) | No |
| Emiliana Doe | Late September 2018 | Unknown | San Ysidro | No | | Alan and Arnold (two men from El Salvador, last names unknown) | No |
| | Late September 2018 | Unknown | San Ysidro | No | | Alan and Arnold (two men from El Salvador, last names unknown) | No |
| | October 8, 2018 | Unknown | San Ysidro | No | | Daniela, Brittany, Bianca Doe, Jade, Alan and Arnold (two men from El Salvador, last names unknown) | No |
| | October 18, 2018 | 1:30 p.m. | San Ysidro | Yes | No | Nicole Ramos, other asylum seekers and children | No |
| Maria Doe | September 10, 2018 | 8:00 p.m. | Laredo | Yes | Yes | J.E.E.M. (child), A.Y.E.M. (child) | No |
| | September 19, 2019 | Unknown | Hidalgo | No | | J.E.E.M. (child), A.Y.E.M. (child), Jennifer Harbury | No |
| | October 9, 2018 | Unknown | Hidalgo | Yes | Yes | J.E.E.M. (child), A.Y.E.M. (child), Jennifer Harbury | No |

4     PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | October 18, 2018 | 1:30 p.m. | San Ysidro | Yes | No | Nicole Ramos, J.E.E.M. (child), A.Y.E.M. (child), other asylum seekers and children | No |
| Carolina Doe | May 17, 2017 | 6:30 p.m. | San Ysidro | Yes | Yes | M.M.V.B (child), E.I.V.B. (child), J.Y.V.B. (child) | No |
| | July 15, 2017 | Morning | San Ysidro | Yes | No | Erika Pinheiro and other volunteers from Al Otro Lado, M.M.V.B. (child), E.I.V.B. (child), J.Y.V.B. (child), other asylum seekers and children | No |
| Dinora Doe | August 2016 | 8:00 a.m. | Otay Mesa | No | | J.A.G.R. (child), Jessica Sherman, Abraham Avila, Lolito [last name unknown], Mario Avila, Merary Avila | Yes, journalists from various news outlets including N.Y. Times |
| | August 2016 | 5:00 p.m. | Otay Mesa | No | | J.A.G.R. (child), Jessica Sherman, Abraham Avila, Lolito [last name unknown], Mario Avila, Merary Avila | Yes, journalists from various news outlets including N.Y. Times |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | August 2016 | 7:00 a.m. | Otay Mesa | No | | J.A.G.R. (child), Jessica Sherman, Abraham Avila, Lolito [last name unknown], Mario Avila, Merary Avila | Yes, journalists from various news outlets including N.Y. Times |
| | July 18, 2017 | Morning | San Ysidro | Yes | No | Erika Pinheiro, J.A.G.R. (child), Noe Cruz | No |
| Ingrid Doe | June 24, 2017 | Unknown | Otay Mesa | No | | A.Y.L.Z. (child), D.R.J.Z. (child), (child), another migrant named Rosa and three children | No |
| | June 24, 2017 | Afternoon | San Ysidro | No | | A.Y.L.Z. (child), D.R.J.Z. (child) | No |
| | July 15 2017 | Morning | San Ysidro | Yes | No | Erika Pinheiro, A.Y.L.Z. (child), D.R.J.Z. (child), other asylum seekers and children | No |
| Victoria Doe | October 8, 2018 | Unknown | San Ysidro | No | | C.Y.M. (child) | No |
| | October 18, 2018 | 1:30 p.m. | San Ysidro | Yes | No | Nicole Ramos, C.Y.M. (child), other asylum seekers and children | No |

PLAINTIFFS' CONSOL. ANSWERS AND OBJS. TO
DEFS' FIRST SET OF INTERROGS

Dated: June 10, 2020

MAYER BROWN LLP
   Matthew H. Marmolejo
   Ori Lev
   Stephen M. Medlock

SOUTHERN POVERTY LAW CENTER
   Melissa Crow
   Sarah Rich
   Rebecca Cassler

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy
   Ghita Schwarz
   Angelo Guisado

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters

By: */s/ Stephen M. Medlock*
   Stephen M. Medlock

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 10, 2020 a copy of Named Plaintiffs'
Consolidated Answers and Objections to Defendants' First Set of Interrogatories to
All Named Plaintiffs has been served by electronic mail to all counsel of record for
Defendants.


*s/ Stephen M. Medlock*
Stephen M. Medlock

CERTIFICATION OF ABIGAIL DOE



## CERTIFICATION OF BEATRICE DOE



Certifico bajo pena de suvidio bajo las leyes de los estados unidos que las respuestas anteriores estan veridicas y correctas a lo mejor de mí conocimiento, información, y creencía.

Me relató el contenido de las respuestas anteriores un representante de mis abogados; el representante relacto al contenido de las respuestas a los interrogativos numero 3 - 7 segun las requisitos de la orden protectora en este caso

Firmado el 10 de Junio del 2020

CERTIFICATION OF CAROLINA DOE

Certifico bajo pena de perjuicio bajo las leyes de los Estados Unidos que las respuestas anteriores están verídicas y correctas a lo mejor de mi conocimiento, información y creencia.

Me relató el contenido de las respuestas anteriores un representante de mis Abogados; el representante redactó el contenido de las respuestas a los interrogativos número 3-7 según los requisitos de la órden protectora en este caso.

Firmado el 8 de Junio del año 2020

# CERTIFICATION OF CESAR DOE



# CERTIFICATION OF DINORA DOE

### CERTIFICACION

Certifico bajo pena de perjurio bajo las leyes de los Estados Unidos que las respuestas anteriores están verídicas y correctas a lo mejor de mi conocimiento, información, y creencia. Me relató el contenido de las respuestas anteriores un representante de mis abogados; el representante redactó el contenido de las respuestas a los interrogativos número 3-7 según los requisitos de la Órden Protectora en este caso.

Firmado el 09 de junio, del ano 2020.

[Firma del cliente]

CERTIFICATION OF EMILIANA DOE



CERTIFICATION OF INGRID DOE

Certificación.

Certifico bajo pena de perjucio
bajo las leyes de los Estados Unidos
que las respuestos anteriores estan
veridicas y correctas a lo mejor de mi
conocimiento información, y creencia.
Me relató el contenido de las respuestos
anteriores un represenante de mis
abogados; el representante redactó
el contenido de las respuestas a los
interrogativos número 3-7 según los
requisitos de la orden protectora en este
caso.

Firmado el 9 de Junio, del año 2020.

Firma del Cliente

CERTIFICATION OF JUAN DOE



CERTIFICATION OF MARIA DOE



# CERTIFICATION OF ROBERTO DOE



CERTIFICATION OF URSULA DOE



"Certificacion"

Certifico bajo pena de perjurio bajo Las Leyes de Los Estados Unidos que las Respuestas Anteriores estan veridicas y correctas, a lo mejor de mi conocimiento informacion y creencia. me Reluto en el contenido de las Respuestas Anteriores un Representante de mis abogados, el Representante Redacto el contenido de las Respuestas a los interrogativos Numero 3-> Segun Los Requisitos de la órden protectora en este caso

Firma el 9 de Junio del año 2020

Firma cliente: ███████████

CERTIFICATION OF VICTORIA DOE



Certificación

Certifico bajo pena de perjurio bajo
las leyes de los Estados Unidos que
las respuestas anteriores están
verídicas y correctas a lo mejor de
mi conocimiento, información, y
creencia. Me relató el contenido de
los respuestas anteriores un representante de
mis abogados; el representante redactó el
contenido de las respuestas a los interrogativos
número 3-7 según las requisitos de la
órden Protectora en este caso.

Firmado el __09__ de junio, del año 2020.

[Firma del cliente]

Translation of Named Plaintiffs' Certification of Interrogatories

CERTIFICATION

I certify under penalty of perjury under the laws of the United States that the foregoing answers are true and correct to the best of my knowledge, information, and belief. A representative of my counsel related the content of the answers to me; the representative redacted the content of the answers to Interrogatories 3-7 according to the requirements of the Protective Order in this case.

Signed this _____ day of June, 2020.


_____
(Client Name)




*****

TRANSLATOR'S CERTIFICATE

My name is Sarah Rich and I am fluent in both English and Spanish. I translated the text of the foregoing interrogatory response Certifications, written by hand and signed by the Named Plaintiffs. The English-language text above is a true and accurate translation of the Spanish-language Certifications written and signed by the Named Plaintiffs.

This 10th day of June, 2020.


_____
Sarah Rich

TRANSLATOR'S CERTIFICATION

My name is Viviana Garcia and I am fluent in both English and Spanish.  On June 8, 2020 I reviewed a redacted version of Abigail Doe's interrogatory responses with her by phone by translating the redacted responses orally into Spanish. Abigail Doe verified to me that these responses are accurate.

This 8 day of June, 2020.

_/s/ Viviana Garcia_
Viviana Garcia

TRANSLATOR'S CERTIFICATION

My name is Angelo and I am fluent in both English and Spanish.  On June 10, 2020 I reviewed a redacted version of Beatrice Doe's interrogatory responses with her by phone by translating the redacted responses orally into Spanish.  Beatrice Doe verified to me that these responses are accurate.

This 10th day of June, 2020.


_____
Angelo Guisado

TRANSLATOR'S CERTIFICATION

My name is Gabriela Maxcy and I am fluent in both English and Spanish. On June 8, 2020 I reviewed a redacted version of Caroline Doe's interrogatory responses with her by phone by translating the redacted responses orally into Spanish. Caroline Doe verified to me that these responses are accurate.

This 8th day of June 2020.


*/s/ Gabriela Maxcy*
Gabriela Maxcy

TRANSLATOR'S CERTIFICATION

My name is Gabriela Maxcy and I am fluent in both English and Spanish.  On June 8, 2020 I reviewed a redacted version of Cesar Doe's interrogatory responses with him by phone by translating the redacted responses orally into Spanish. Cesar Doe verified to me that these responses are accurate.

This 8th day of June 2020.


*/s/ Gabriela Maxcy*
Gabriela Maxcy

TRANSLATOR'S CERTIFICATION

My name is Sarah Rich and I am fluent in both English and Spanish. On June 9, 2020 I reviewed a redacted version of Dinora Doe's interrogatory responses with her by phone by translating the redacted responses orally into Spanish. Dinora Doe verified to me that these responses are accurate.

This 9th day of June, 2020.


_____
Sarah Rich

TRANSLATOR'S CERTIFICATION

My name is Carmen Martínez and I am fluent in both English and Spanish.  On June 9, 2020 I reviewed a redacted version of Emiliana Doe's interrogatory responses with her by phone by translating the redacted responses orally into Spanish.  Emiliana Doe verified to me that these responses are accurate.

This 9th day of June, 2020.

*/s/ Carmen Martínez*
Carmen Martínez

TRANSLATOR'S CERTIFICATION

My name is Rebecca Cassler and I am fluent in both English and Spanish. On June 9, 2020 I reviewed a redacted version of Ingrid Doe's interrogatory responses with her by phone by translating the redacted responses orally into Spanish. Ingrid Doe verified to me that these responses are accurate.

This 9th day of June, 2020.


/s/ Rebecca Cassler
_____
Rebecca Cassler

TRANSLATOR'S CERTIFICATION

My name is Sarah Rich and I am fluent in both English and Spanish. On June 9, 2020 I reviewed a redacted version of Juan Doe's interrogatory responses with her by phone by translating the redacted responses orally into Spanish. Juan Doe verified to me that these responses are accurate.

This 9th day of June, 2020.


_____
Sarah Rich

TRANSLATOR'S CERTIFICATION

My name is Sarah Rich and I am fluent in both English and Spanish.  On June 9, 2020 I reviewed a redacted version of Maria Doe's interrogatory responses with her by phone by translating the redacted responses orally into Spanish.  Maria Doe verified to me that these responses are accurate.

This 9th day of June, 2020.


_____
Sarah Rich

TRANSLATOR'S CERTIFICATION

My name is Carmen Martínez and I am fluent in both English and Spanish.  On June 9, 2020 I reviewed a redacted version of Roberto Doe's interrogatory responses with him by phone by translating the redacted responses orally into Spanish.  Roberto Doe verified to me that these responses are accurate.

This 9th day of June, 2020.

*/s/ Carmen Martínez*
Carmen Martínez

TRANSLATOR'S CERTIFICATION

My name is Sarah Rich and I am fluent in both English and Spanish. On June 9, 2020 I reviewed a redacted version of Ursula Doe's interrogatory responses with her by phone by translating the redacted responses orally into Spanish. Ursula Doe verified to me that these responses are accurate.

This 9th day of June, 2020.


_____
Sarah Rich

## TRANSLATOR'S CERTIFICATION

My name is Rebecca Cassler and I am fluent in both English and Spanish. On June 9, 2020 I reviewed a redacted version of Victoria Doe's interrogatory responses with her by phone by translating the redacted responses orally into Spanish. Victoria Doe verified to me that these responses are accurate.

This 9th day of June, 2020.


/s/ Rebecca Cassler
_____
Rebecca Cassler