MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  *(pro hac vice)*
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  *(pro hac vice)*
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, DC 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  *(pro hac vice)*
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, DC 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| Al Otro Lado, Inc., *et al.*, | Case No.: 17-cv-02366-BAS-KSC |
|---|---|
| Plaintiffs, | **PLAINTIFFS' BRIEF CONCERNING DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| Alejandro Mayorkas,[1] *et al.*, | |
| Defendants. | ***DECLARATION OF STEPHEN M. MEDLOCK FILED CONCURRENTLY*** |

_____

[1] Secretary Mayorkas is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740)
   (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688)
   (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985)
   (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309)
   (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113)
   (*pro hac vice*)
   *kwalters@immcouncil.org*
   Gianna Borroto (IL Bar No. 6305516)
   (*pro hac vice*)
   *gborroto@immcouncil.org*
1331 G St. NW, Suite 200
Washington, DC 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................. 1

II.  RELEVANT BACKGROUND ............................................................ 3

    A.   Defendants' Failure to Comply with the PI and Clarification
        Order ............................................................................................ 3

    B.   Defendants' Conduct After Summary Judgment................................. 4

    C.   Defendants' Recalcitrance Should Be Met With Definitive
        Relief ........................................................................................... 5

III. ARGUMENT ....................................................................................... 6

    A.   This Court Should Enter a Declaratory Judgment ............................... 6

    B.   This Court Should Enter a Permanent Injunction ............................... 8

    C.   Monitoring Measures Are Necessary ................................................ 12

        1.   This Court Should Appoint a Special Master........................... 12

        2.   This Court Should Grant Additional Monitoring Relief .......... 16

    D.   The Court Should Order Defendants to Provide Class Notice
        After Receiving Input from Plaintiffs and the Special Master .......... 19

IV.  CONCLUSION .................................................................................. 20

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*ADAC v. Brewer*,
     855 F.3d 957 (9th Cir. 2017) ................................................................... 8

6

7

*Al Otro Lado, Inc. v. Mayorkas*,
     2021 WL 3931890 (S.D. Cal. 2021) ....................................... 1, 8, 9, 10

8

9

*Al Otro Lado, Inc. v. McAleenan*,
     423 F. Supp. 3d 848 (S.D. Cal. 2019) .................................................. 3

10

11

*Al Otro Lado v. Wolf*,
     497 F. Supp. 3d 914 (S.D. Cal. 2020) .......................................... 19, 20

12

13

*Allee v. Medrano*,
     416 U.S. 802 (1974) ............................................................................. 9

14

15

*United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v.*
     *Westchester Cnty.*, No. 06 Civ. 2860 (S.D.N.Y. Aug. 10, 2009) ..................... 15

16

*Ass'n of Surrogates v. N.Y.*,
     966 F.2d 75 (2d Cir. 1992) .................................................................. 13

17

18

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
     950 F.2d 1401 (9th Cir. 1991) .............................................................. 8

19

20

*Biden v. Tex.*,
     --- S. Ct. ---, 2021 WL 3732667 (2021) ............................................... 7

21

22

*Brown v. Plata*,
     563 U.S. 493 (2011) ............................................................................. 6

23

24

*Cal. Dep't of Soc. Servs. v. Leavitt*,
     523 F.3d 1025 (9th Cir. 2008) ............................................................. 18

25

26

*Crossley v. Cal.*,
     479 F. Supp. 3d 901 (S.D. Cal. 2020) ............................................. 6, 7

27

*eBay Inc. v. MercExchange, L.L.C.*,
     547 U.S. 388 (2006) ............................................................................. 8

28

-ii-

*Eldredge v. Carpenters 46,*
   94 F.3d 1366 (9th Cir. 1996) ......................................................................... 6

*Garcia Ramirez v. U.S. Immigr. & Customs Enf't,*
   No. 18-cv-00508 (D.D.C. Sept. 21, 2021) ................................................ 17, 19

*Griffin v. Mich. Dep't of Corr.,*
   5 F.3d 186 (6th Cir. 1993) ........................................................................... 14

*HM Elecs., Inc. v. R.F. Techs., Inc.,*
   2016 WL 4063806 (S.D. Cal. 2016) ............................................................. 19

*Hook v. Ariz.,*
   120 F.3d 921 (9th Cir. 1997) ....................................................................... 13

*Huisha-Huisha v. Mayorkas,*
   --- F. Supp. 3d ---, 2021 WL 4206688 (D.D.C. 2021) ........................... 3, 4, 7, 10

*Huisha-Huisha v. Mayorkas,*
   No. 21-5200 (D.C. Cir. Sept. 30, 2021) ......................................................... 3

*Hutto v. Finney,*
   437 U.S. 678 (1978) ...................................................................................... 6

*Juan F. v. Weicker,*
   37 F.3d 874 (2d Cir. 1994) .......................................................................... 14

*Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.,*
   263 F.3d 1041 (9th Cir. 2001) ..................................................................... 14

*LaDuke v. Nelson,*
   762 F.2d 1318 (9th Cir. 1985) ..................................................................... 10

*Leiva-Perez v. Holder,*
   640 F.3d 962 (9th Cir. 2011) ......................................................................... 8

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ........................................................................ 9

*Moore v. Tangipahoa Par. Sch. Bd.,*
   843 F.3d 198 (5th Cir. 2016) ....................................................................... 13

*Nat'l Org. For Reform of Marijuana Ls. v. Mullen,*
   828 F.2d 536 (9th Cir. 1987) ....................................................................... 12

-iii-

*Orantes-Hernandez v. Thornburgh*,
  919 F.2d 549 (9th Cir. 1990) ........................................................................... 9, 20

*Shenzhenshi Haitiecheng Sci. & Tech. Co. v. Rearden LLC*,
  2019 WL 1560449 (N.D. Cal. 2019) ..................................................................... 14

*Shillitani v. United States*,
  384 U.S. 364 (1966) ............................................................................................. 19

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ............................................................................................... 7

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
  402 U.S. 1 (1971) ............................................................................................. 6, 13

*United States v. City of N.Y.*,
  717 F.3d 72 (2d Cir. 2013) .................................................................................. 15

*United States v. City of New Orleans*,
  No. 12-1924 (E.D. La. July 24, 2012) ............................................................. 15, 16

*United States v. Suquamish Indian Tribe*,
  901 F.2d 772 (9th Cir. 1990) ............................................................................... 13

*United States v. Yonkers Bd. of Educ.*,
  29 F.3d 40 (2d Cir. 1994) .................................................................................... 14

*Unknown Parties v. Nielsen*,
  No. CV-15-00250 (D. Ariz. Apr. 17, 2020) ................................................ 16, 17, 19

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ............................................................................... 9

*Vascular Imaging Pros., Inc. v. Digirad Corp.*,
  401 F. Supp. 3d 1005 (S.D. Cal. 2019) ................................................................. 7

*Walters v. Reno*,
  145 F.3d 1032 (9th Cir. 1998) ............................................................................... 9

**Statutes**

8 U.S.C. § 1252(f)(1) .............................................................................................. 7

28 U.S.C. § 636(b)(2) ............................................................................................ 13

28 U.S.C. § 1651 ...................................................................................... 13

28 U.S.C. § 2201 ........................................................................................ 6

42 U.S.C. § 265 ................................................................................ 2, 3, 10

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 424 ........................... 1

**Regulations**

Control of Communicable Diseases; Foreign Quarantine: Suspension
    of the Right to Introduce and Prohibition of Introduction of Persons
    Into United States From Designated Foreign Countries or Places for
    Public Health Purposes, 85 Fed. Reg. 56,424-01 (Sept. 11, 2020) ...................... 3

Order Suspending the Right to Introduce Certain Persons from
    Countries Where a Quarantinable Communicable Disease Exists,
    86 Fed. Reg. 42,828 (Aug. 5, 2021) ......................................................... 3

**Other Authorities**

Fed. R. Civ. P. 23 ..................................................................................... 19

Fed. R. Civ. P. 53 ............................................................................... 13, 14

**Other Sources**

Lloyd C. Anderson, *Implementation of Consent Decrees in Structural
    Reform Litigation*, Univ. Ill. L. Rev. 725, 733 (1986) ......................... 13

Estefania Castañeda Pérez, @ transb0rder, Twitter (Sept. 3, 2021),
    https://twitter.com/transb0rder/status/1433890940985487361 ........................... 13

Reuters, *Explainer: Here's What We Know About How U.S. Will Lift
    Travel Restrictions* (Sept. 22, 2021),
    https://www.reuters.com/world/us/heres-what-we-know-about-
    how-us-will-lift-travel-restrictions-2021-09-22/ .................................. 11

Stipulated Settlement Agreement ⸗ 33, *Flores v. Reno*, No. CV 85-
    4544 (Nov. 13, 2014) .......................................................................... 17

# I.    INTRODUCTION

For over four decades, United States law has guaranteed access to the asylum process to individuals who come to our country seeking protection from persecution and torture. *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 424 at § 208. For most of that time, the inspection and processing of arriving asylum seekers at ports of entry on our land borders occurred without incident—a humanitarian but bureaucratic process that drew neither the public's nor policymakers' attention. But in 2016, the U.S. government decided to ignore the law.

Rather than inspecting and processing asylum seekers as the Immigration and Nationality Act requires, Defendants began turning back asylum seekers who were in the process of arriving in the United States. Defendants turned back those asylum seekers with the knowledge that many of them would be assaulted, kidnapped, or murdered in dangerous Mexican border towns or would suffer serious harm or die trying to cross between ports of entry. Defendants did so because they wanted to avoid the negative attention associated with images of lines of migrants waiting outside of ports of entry. But, to be clear, a line is not an emergency and asylum is a statutory right.

Defendants' conduct was not only deplorable, but also illegal. This Court found that turning back an asylum seeker in the process of arriving at a Class A port of entry on the U.S.-Mexico border ("POE") is illegal "regardless of [Defendants'] purported justification" for doing so. *Al Otro Lado, Inc. v. Mayorkas*, 2021 WL 3931890, at *18 (S.D. Cal. 2021). Based on that conclusion, this Court found that turning back asylum seekers in the process of arriving at a POE violates Section 706(1) of the Administrative Procedure Act ("APA") and class members' Fifth Amendment right to due process. *See id.* at *23. This Court then asked the parties to address two questions: "(a) What remedy is appropriate in light of the Court's § 706(1) finding?," and "(b) How does 42 U.S.C. § 265 . . . affect the implementation of a remedy in this case?" *Id.*

This Court should definitively end Defendants' lawless behavior and provide for continued monitoring of Defendants' compliance with this Court's orders. The appropriate remedy is three-fold. ***First***, this Court should enter a declaratory judgment finding that turning back asylum seekers in the process of arriving in the United States at a POE violates Section 706(1) of the APA and the Due Process Clause of the Fifth Amendment regardless of Defendants' justification for doing so. ***Second***, this Court should enter injunctive relief prohibiting Defendants from turning back asylum seekers in the process of arriving in the United States at a POE. ***Third***, this Court's order should include monitoring procedures to ensure that Defendants are complying with it. This Court's prior preliminary injunction order, while clear on its face, has generated a considerable amount of motions practice due to Defendants' continual foot-dragging and purported lack of understanding of certain key aspects of that order. Plaintiffs want to avoid a repeat of that scenario. *See* Dkt. 605, 607, 644, 680, 736, 760. Therefore, Plaintiffs request that this Court name Magistrate Judge Karen S. Crawford as a special master for purposes of monitoring Defendants' compliance with the injunctive relief that this Court orders. Also, this Court should order that Defendants provide Plaintiffs and the special master with certain information concerning POE operations, and allow Plaintiffs' counsel to conduct a limited number of inspections, to determine whether Defendants are complying with this Court's injunction. These procedures follow a "trust, but verify" approach that is sensible in light of the parties' prior difficulties in enforcing the preliminary injunction order.

Finally, this Court need not address 42 U.S.C. § 265. While Plaintiffs doubt the validity of recent regulations promulgated under 42 U.S.C. § 265, Plaintiffs are not challenging them in this case.[2] The U.S. District Court for the District of

---

[2] *See, e.g.*, Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed.

Columbia recently issued a class-wide preliminary injunction prohibiting Defendants from utilizing regulations promulgated under 42 U.S.C. § 265 to expel certain asylum seekers arriving in the United States at POEs. *See Huisha-Huisha v. Mayorkas*, --- F. Supp. 3d ---, 2021 WL 4206688, at *18 (D.D.C. 2021). Yesterday, the D.C. Circuit granted the government's motion to stay that injunction pending appeal. *See* Order, *Huisha-Huisha v. Mayorkas*, No. 21-5200 (D.C. Cir. Sept. 30, 2021) (setting briefing schedule between October and November 2021 and scheduling oral argument for January 2022).

Regardless of the outcome of *Huisha-Huisha*, this Court can enter final injunctive relief on Plaintiffs' Section 706(1) and Fifth Amendment claims. This Court can prohibit Defendants from turning back asylum seekers who are in the process of arriving at POEs absent a showing that Defendants had independent statutory authority for doing so. Moreover, if an asylum seeker was turned back prior to March 20, 2020, when the government promulgated the "Title 42" regulations purportedly authorizing the expulsion of asylum seekers, that person should be inspected and processed under the rules and regulations that would have applied to them when they first arrived at a POE. *See Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 878 (S.D. Cal. 2019) (ordering Defendants to "return to the pre-Asylum Ban practices for processing the asylum applications of members of the certified class.").

## II. RELEVANT BACKGROUND

### A. Defendants' Failure to Comply with the PI and Clarification Order

Nearly two years after this Court's issuance of the preliminary injunction in this case ("PI"), Dkt. 330, and one year after its order clarifying the terms of the PI,

---

Reg. 56,424-01 (Sept. 11, 2020); Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021).

Dkt. 605 (the "Clarification Order," and collectively, "the Orders"), certain PI class members continue to lack access to relief under these Orders. This is due to Defendants' intransigence in developing and implementing certain compliance procedures and feigned ignorance about their obligations under the Orders. Following motions practice (*see* Dkt. 605, 607, 644), extensive telephone conversations, and the exchange of written correspondence regarding various aspects of PI compliance, Plaintiffs—in a last-ditch effort to avoid any further implementation delays—requested that this Court provide ongoing supervision of Defendants' PI compliance efforts. Dkt. 734-1. In their opposition to Plaintiffs' Motion for Oversight, Defendants implicitly conceded that they have not finalized, let alone implemented, many aspects of their PI compliance plans over eleven months after the entry of the Clarification Order. *See* Dkt. 759 at 4-8 (summarizing Defendants' concessions). Moreover, even where Defendants have taken steps to comply with the PI, these steps are so problematic from an implementation standpoint that both sides agree mediation may be necessary to resolve certain disputes. *See id.* at 1-3. Defendants' continued refusal to comply with the PI leaves no doubt that third-party oversight will be required to implement the more comprehensive remedies discussed herein.

### B. Defendants' Conduct After Summary Judgment

This Court issued its opinion and order finding metering unlawful and unconstitutional on September 2, 2021. Dkt. 742. The very next day, CBP responded— not by taking steps to stop metering asylum seekers in compliance with this Court's order, but instead by making an intimidating show of force at the border and shutting off an entire pedestrian lane leading to the San Ysidro POE. *See* Ex. 1 ¶¶ 8-9;[3] *see also* Estefania Castañeda Pérez, @ transb0rder, Twitter (Sept. 3, 2021,

---

[3] "Ex." refers to the exhibits to the Declaration of Stephen M. Medlock.

4:33pm), https://twitter.com/transb0rder/status/1433890940985487361.



At the same time, Defendants' counsel conveyed the government's cavalier approach to the Court's summary judgment order. Rather than acknowledging that a federal court had found the government's conduct unlawful and unconstitutional and immediately taking steps to begin rectifying that conduct, Defendants instead took the position that absent a specific ruling on remedy no action was necessary on the government's part. *See* Medlock Decl. ¶¶ 6-9. When asked what steps the government was taking in light of the Court's finding that metering was unlawful and unconstitutional, counsel for the government responded that because the Court sought further briefing on remedies the government does "not believe there are any particular steps needed 'to comply with the Court's summary judgment ruling.'" *Id.* ¶ 7. The government has thus made plain what its conduct to date has made obvious—prescriptive and precise injunctive relief is necessary to vindicate Plaintiffs' rights.

**C.    Defendants' Recalcitrance Should Be Met With Definitive Relief**

This Court should not sit idly while Defendants drag their feet on providing meaningful relief to Plaintiffs who have been waiting for months in dire circumstances just to receive access to the U.S. asylum process at POEs. Extensive

illegal conduct, difficulties in enforcing this Court's PI Orders, and the government's current recalcitrance to this Court's summary judgment order all support issuance of definitive injunctive relief, in addition to declaratory relief. This Court's equitable powers are broad: "breadth and flexibility are inherent in equitable remedies." *Brown v. Plata*, 563 U.S. 493, 538 (2011) (internal quotation marks omitted); *see also Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

Here, the government's failure to comply with the PI Orders (under both the prior and current administrations) and its response to the Court's summary judgment order finding metering unlawful and unconstitutional demonstrate the need for meaningful monitoring and enforcement provisions. Where, as here, a defendant has displayed "recalcitrance and foot-dragging" in complying with the law, prescriptive injunctive relief—including but not limited to the appointment of a monitor—is appropriate. *See Eldredge v. Carpenters 46*, 94 F.3d 1366, 1371-72 (9th Cir. 1996) (district court's failure to adopt affirmative action plan and appoint a monitor was abuse of discretion in light of defendant's recalcitrant conduct). *See also Hutto v. Finney*, 437 U.S. 678, 687 (1978) ("But taking the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to insure against the risk of inadequate compliance.").

## III.  ARGUMENT

### A.    This Court Should Enter a Declaratory Judgment

A necessary first step in remedying Defendants' conduct is calling it what it is—illegal. Declaratory relief is proper here because a judgment declaring the parties' respective "rights and other legal relations," 28 U.S.C. § 2201, will both "serve a useful purpose in clarifying and settling the legal relations in issue" and "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the

proceeding." *Crossley v. Cal.*, 479 F. Supp. 3d 901, 920 (S.D. Cal. 2020) (quoting Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2759 (4th ed.)). Specifically, this Court should issue a judgment declaring, pursuant to its earlier opinion on the parties' cross-motions for summary judgment, that turnbacks of noncitizens in the process of arriving at POEs on the U.S.-Mexico border violate the INA, section 706(1) of the APA, and the Due Process Clause of the Fifth Amendment.[4] *See* Second Amended Complaint ¶¶ 304(d)(1), (2), (4), Dkt. 189.[5]

This Court should exercise its discretion to grant declaratory relief because the probability of future turnbacks "is real and substantial," and is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Crossley*, 479 F. Supp. 3d at 920 (quoting *Steffel*, 415 U.S. at 460). The situation at the southern border remains uncertain and complicated, with various border-related policies subject to litigation and the government's border policy in flux. *See, e.g.*, *Biden v. Tex.*, --- S. Ct. ---, 2021 WL 3732667, at *1 (2021); *Huisha-Huisha*, 2021 WL 4206688, at *18. Defendants have not yet rescinded the Metering Guidance or Prioritization-Based Queue Management memos, or repudiated metering or turnbacks more generally. Instead, they have taken the express position that no action is necessary on their part absent further Court orders, even after this Court's summary judgment order found the conduct at issue to be unlawful and unconstitutional. A declaratory judgment will "resolve uncertainties or disputes that may result in future litigation" should this Administration or another one wish to experiment with new

---

[4] Declaratory relief does not require a showing of irreparable injury or the other "traditional equitable prerequisites to the issuance of an injunction." *Steffel v. Thompson*, 415 U.S. 452, 471 (1974).

[5] Plaintiffs previously presented arguments on the appropriate scope of declaratory and injunctive relief in their summary judgment papers, explaining among other things why 8 U.S.C. § 1252(f)(1) does not bar injunctive relief. *See* Dkts. 535-1 at 36-39, 610 at 15-20. Plaintiffs incorporate those arguments by reference herein.

ways of denying arriving noncitizens access to the asylum process at POEs. *Vascular Imaging Pros., Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1010 (S.D. Cal. 2019).

## B.   This Court Should Enter a Permanent Injunction

The next step in remedying Defendants' illegal conduct is the issuance of permanent injunctive relief. Permanent injunctive relief is appropriate because Plaintiffs have suffered irreparable injury, legal remedies are inadequate to compensate for that injury, the balance of hardships warrants an equitable remedy, and the public interest would not be disserved by a permanent injunction. *ADAC v. Brewer*, 855 F.3d 957, 977 (9th Cir. 2017); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Here, these standards are easily met.

First, Plaintiffs clearly suffered an irreparable injury that cannot be remedied absent injunctive relief. "[T]he record is replete with uncontroverted evidence that Defendants' interpretation of their inspection and referral duties under the statute creates multiple logistical hurdles for [arriving] migrants seeking asylum" and that Defendants' failure to comply with their statutory obligations forces asylum seekers to wait in Mexico, where they risk kidnapping, assault, and death. *Al Otro Lado*, 2021 WL 3931890, at *17. By turning back asylum seekers when they first arrive at a port of entry, Defendants violate class members' right to access the asylum process as well as their Fifth Amendment due process rights. *Id.* at *18, *20. Both the deprivations of class members' rights and the risks that they are forced to endure in Mexico constitute irreparable harm. *See Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (infringement of a constitutional right alone may constitute irreparable injury); *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (prospect that individual will be in physical danger if returned to home country may constitute component of irreparable harm). Moreover, asylum seekers who were turned back prior to a change in rule or law inhibiting their access to the asylum process, and who are later subject to the new

1  rule or law because of their delayed entry into the United States, lose the legal rights
2  to which they would have been entitled but for the turnback.[6] Legal remedies are
3  unavailable because there is no way to calculate the damages resulting from the
4  denial of rights or threats to physical safety. *See Walters v. Reno*, 145 F.3d 1032,
5  1048 (9th Cir. 1998).

6  Second, permanent injunctive relief is warranted because this case involves a
7  persistent pattern of government misconduct that violates Plaintiffs' rights. *See Allee*
8  *v. Medrano*, 416 U.S. 802, 825 (1974); *see also Orantes-Hernandez v. Thornburgh*,
9  919 F.2d 549, 561-68 (9th Cir. 1990) (upholding permanent injunction based on
10 persistent pattern of government misconduct that violated noncitizens' rights). Here,
11 Defendants engaged in a persistent pattern of misconduct designed to make it
12 difficult, if not impossible, for asylum seekers to access the U.S. asylum process at
13 POEs. *Al Otro Lado*, 2021 WL 3931890, at *17. Therefore, Plaintiffs' requests are
14 consistent with this Court's broad equitable authority to remedy past wrongs and
15 warranted by the strong likelihood of erroneous deprivation of class members' rights
16 in the future. *See Walters*, 145 F.3d at 1048-49.

17 Third, both the balance of equities and the public interest weigh in Plaintiffs'
18 favor. "[I]t is clear that it would not be equitable or in the public's interest to allow
19 the [government] to violate the requirements of federal law, especially when there
20 are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006,
21 1029 (9th Cir. 2013) (first alteration in original; ellipses and internal quotation marks
22 omitted). Moreover, it is difficult to imagine a burden on Defendants that could

23

24  ---

[6] The Court recognized this principle with regard to the Asylum Ban at issue in the
25 preliminary injunction currently in place, characterizing Defendants' bait-and-switch
   as "at best, misleading, and at worst, duplicitous" and "quintessentially inequitable."
26 *See* ECF 330 at 33-34; *see also id.* at 34 ("But for the Government's metering policy,
   these asylum-seekers would have entered the United States and started the asylum
27 process without delay. . . . under the law in place at the time of their metering . . . .").

28

PLS' BRIEF CONCERNING DECLARATORY AND INJUNCTIVE RELIEF

1   outweigh protection of Plaintiffs' legal rights, *see Melendres v. Arpaio*, 695 F.3d 990,

2   1002 (9th Cir. 2012) (preventing violation of constitutional rights is always in the

3   public interest), or the substantial risk that Plaintiffs will be the victims of violence

4   while waiting in Mexico, *see Al Otro Lado*, 2021 WL 3931890, at *17.

5       Fourth, injunctive relief, not vacatur, is an insufficient remedy in this case.

6   This Court found that Plaintiffs have proven all elements of their § 706(1) claim and

7   that this Court should "compel agency action" that had been "unlawfully withheld."

8   5 U.S.C. § 706(1); *Al Otro Lado*, 2021 WL 3931890, at *18. The Court did not

9   address the merits of Plaintiffs' § 706(2) claim. *Id.* Thus, this is not a case in which

10  an agency policy can simply be vacated. Rather, this Court must compel that agency

11  action that has been withheld using injunctive relief. *LaDuke v. Nelson*, 762 F.2d

12  1318, 1324 (9th Cir. 1985) ("The Supreme Court has repeatedly upheld the

13  appropriateness of federal injunctive relief" to address patterns of illicit conduct.),

14  *amended on other grounds by* 796 F.2d 309 (9th Cir. 1986).

15      Finally, 42 U.S.C. § 265 is not a barrier to permanent injunctive relief. While

16  Plaintiffs doubt that the government's recent regulations promulgated under the guise

17  of Title 42 have a sufficient legal basis, the legality of the government's orders

18  purporting to restrict the inspection and processing of asylum seekers under Title 42

19  are being litigated in other courts. *See, e.g., Huisha-Huisha*, 2021 WL 4206688, at

20  *18. This Court need not wade into that debate to resolve this case, and Plaintiffs are

21  not asking this Court to do so. Instead, this Court can fashion injunctive relief by

22  allowing for the possibility that there might be independent and legally sufficient

23  grounds for withholding the inspection and processing of asylum seekers at POEs. In

24  the future, if Defendants believe that they have an independent legal basis to turn

25  back asylum seekers at POEs, they will have the burden of demonstrating that fact to

26  the special master monitoring compliance with this Court's orders.

27      Moreover, as with the Asylum Ban, this Court should hold that Plaintiffs

28

should be treated as though they had arrived in the United States on the date they first attempted to arrive at a POE and should order Defendants to process class members under the rules and regulations that existed as of that date. In this context, that means that if an asylum seeker was turned back before the U.S. government issued orders restricting the processing of asylum seekers under Title 42, then those orders should not apply to that individual.[7]

Accordingly, Plaintiffs are entitled to permanent injunctive relief. Specifically, Plaintiffs request that the Court permanently enjoin Defendants from turning back or otherwise denying access to inspection and/or asylum processing to noncitizens who are in the process of arriving in the United States at POEs, absent any independent and express statutory authority to do so outside of Title 8 of the U.S. Code. Plaintiffs further request that this Court vacate all current versions of the Metering Guidance and Prioritization-Based Queue Management memoranda, and order Defendants to issue written notice formally rescinding all such guidance and memoranda within seven days of its order. In addition, Plaintiffs request that the preliminary injunctions currently in place, *see* Dkts. 330, 605, 676, be made permanent, and that changes to rules or regulations affecting access to the asylum process effective between the time a person was initially turned back and the time she ultimately entered the United

---

[7] Defendants will likely claim that COVID-19 should limit their ability to inspect and process these individuals. That argument stretches the facts too far. Defendants have inspected and processed thousands of asylum seekers at POEs this year. Ex. 1 at ¶ 6. Some border states, such as California, have also set up resources to test and vaccinate incoming asylum seekers. *Id.* at ¶¶ 4-5. travelers in November 2021 and to issue humanitarian exemptions for travel to the United States when individuals agree to be vaccinated upon arrival in the country. *See, e.g.*, Reuters, *Explainer: Here's What We Know About How U.S. Will Lift Travel Restrictions* (Sept. 22, 2021), https://www.reuters.com/world/us/heres-what-we-know-about-how-us-will-lift-travel-restrictions-2021-09-22/.

States be inapplicable to that person's case.[8] For similar reasons, this Court should also order that Defendants put the Named Plaintiffs in this case in the same position that they would have been but for the government's illegal conduct. In other words, Defendants should provide the named plaintiffs with the documentation necessary to arrive in the United States and access the U.S. asylum process. *See* Ex. 2 ¶¶ 2-9; Ex. 3 ¶¶ 3-11 (detailing Roberto Doe's difficulty in arriving in the United States due to Defendants' failure to facilitate his arrival).

### C.    Monitoring Measures Are Necessary

#### 1.    This Court Should Appoint a Special Master

This Court should provide for meaningful monitoring of Defendants' compliance with the permanent injunction. Such monitoring is necessary because Plaintiffs have had considerable difficulty monitoring and enforcing compliance with this Court's preliminary injunction regarding the Asylum Ban. *See* Dkt. 760 at 2-3. At times, the U.S. government has come perilously close to deporting individuals in violation of the Court's preliminary injunction ruling. *See* Dkts. 607, 680-3, 680-4. Plaintiffs fear that this noncompliance will continue absent meaningful monitoring.

Rather than clogging this Court's docket with motions concerning Defendants' compliance with the permanent injunction, Plaintiffs seek a few commonsense monitoring provisions in the permanent injunction order itself. Namely, this Court should designate U.S. Magistrate Judge Karen Crawford as a special master to oversee Defendants' compliance with the permanent injunction and should allow Plaintiffs and the special master to monitor compliance with the permanent injunction via regular data sharing, court hearings, and on-site inspections of POEs.

---

[8] The Court need not create an exhaustive list of such changes in rules or regulations to order that the principle should apply to any change in rule or regulation that would not have applied to a person but for the fact that they were turned back at a POE. The list of those regulations are best left to the advocates and Immigration Judges involved in an asylum seeker's case.

These monitoring provisions are legally warranted. Federal courts retain broad authority to appoint a special master or an independent monitor[9] to remedy systemic unconstitutional government conduct. *See Swann*, 402 U.S. at 15. The power to appoint a special master is codified in Federal Rule of Civil Procedure 53, and the Advisory Committee Notes detail the wide variety of judicial functions that a special master may perform. *See also* 28 U.S.C. § 1651 (All Writs Act authorizes appointment of a special master to monitor compliance). Under 28 U.S.C. § 636(b)(2), courts are authorized to designate a federal magistrate judge to serve as a Rule 53-appointed master. Taken together, this framework establishes that this Court may—and should—designate Magistrate Judge Crawford to oversee the complex structural changes needed to implement a permanent injunction in this case.

Rule 53 requires that the court identify "some exceptional condition" before making such an appointment. Under the court's "broad discretion," *Ass'n of Surrogates v. N.Y.*, 966 F.2d 75, 78 (2d Cir. 1992), *modified on reh'g by* 969 F.2d 1416 (2d Cir. 1992), any number of conditions may justify a master's appointment; among the most common are (1) the complexity of underlying litigation, (2) a history

---

[9] Courts sometimes obscure the distinction between a master and a monitor. *See Nat'l Org. For Reform of Marijuana Ls. v. Mullen*, 828 F.2d 536, 539 (9th Cir. 1987) ("[circumstances] call for the appointment of a Special Master (hereafter "Monitor") pursuant to Federal Rule of Civil Procedure 53 to monitor compliance with the injunction") (internal quotation marks omitted); *Moore v. Tangipahoa Par. Sch. Bd.*, 843 F.3d 198, 201-02 (5th Cir. 2016) ("The fact that the district court referred to Massey as a special master is a distinction without a difference."). However, at least one scholar has observed that the difference between a monitor and a special master is that, whereas a monitor's sole authority is to gather information, assess the extent to which defendants are complying with a potential decree, and issue a report to the court, a master retains the ability also to make adjudicative decisions binding on the parties of their own force. *See* Lloyd C. Anderson, *Implementation of Consent Decrees in Structural Reform Litigation*, 1986 Univ. Ill. L. Rev. 725, 733 (1986). Plaintiffs believe a special master, with adjudicatory power, is most appropriate in these circumstances, but would welcome the appointment of an independent monitor in the alternative.

of noncompliance as well as the potential complexity of compliance, and (3) the strain on a district court to constantly monitor compliance. *See, e.g., Hook v. Ariz.*, 120 F.3d 921 (9th Cir. 1997); *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990). Courts routinely appoint masters to monitor compliance with permanent injunctions involving organizational change. *See, e.g., Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 263 F.3d 1041, 1045 (9th Cir. 2001) (oversight of compliance with settlement agreement to remedy transit overcrowding); *Griffin v. Mich. Dep't of Corr.*, 5 F.3d 186, 188 (6th Cir. 1993) (master to monitor compliance with order regarding promotions of victims of gender discrimination in employment); *Juan F. v. Weicker*, 37 F.3d 874, 876 (2d Cir. 1994) (master to oversee defendants' compliance with court-ordered improvements in child welfare system). These cases show that a master is particularly appropriate where a court orders broad systemic reform to address widespread and longstanding unconstitutional or unlawful policies or practices. *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir. 1994) ("The power of the federal courts to appoint special masters to monitor compliance with their remedial orders is well-established.").

The complexity of this litigation and the scope of reform needed to remediate Defendants' conduct constitute the kind of "exceptional condition[s]" contemplated by Rule 53. First, as this Court's extensive findings have shown, CBP's unlawful practices are systemic and longstanding, *see* Dkt. 742, necessitating a strong monitoring mechanism. Moreover, as Defendants' prior lackluster compliance efforts have demonstrated, *see* Dkt. 736, an oversight apparatus with adjudicatory powers is needed to prevent the persistent risk of backsliding and evasion. *See Shenzhenshi Haitiecheng Sci. & Tech. Co. v. Rearden LLC*, 2019 WL 1560449, at *6 (N.D. Cal. 2019) (chronic "problems associated with compliance with the district court order[s]" justified appointment of master) (internal quotation marks omitted).

Second, the complexity of compliance counsels in favor of a special master.[10]
The implementation of a permanent injunction will require widespread reform across
multiple Defendant agencies, including the nation's largest law enforcement force
(CBP), at numerous POEs along the southern border. A special master could hold
hearings, collect evidence, monitor compliance, and review detailed quarterly reports
summarizing Defendants' efforts and fulfilment of the injunction's requirements and,
if necessary, issue decisions to mandate compliance. Further, the master could
oversee Defendants' publication of certain written notices advising CBP officers of
this Court's orders, as well as the publication of written notice to the class. In
addition, compliance and monitoring will require Defendants' cooperation as well as
significant input from Plaintiffs and advocates across the border, a requirement that
both federal courts and legal scholars agree is essential to develop lasting solutions
to systemic governmental misconduct. *See, e.g.*, Stipulation and Order of Settlement
and Dismissal ¶ 33(a), *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y.,
Inc. v. Westchester Cnty.*, No. 06 Civ. 2860 (S.D.N.Y. Aug. 10, 2009), Dkt. 320;
Consent Decree, *United States v. City of New Orleans*, No. 12-1924 (E.D. La. July
24, 2012), Dkt. 159-1. Appointment of a Special Master to oversee Defendants'
compliance with this Court's forthcoming order offers the best opportunity to create
a meaningful and lasting judicial remedy for Defendants' illegal conduct.

Should the Court decline to appoint a special master, it should otherwise
appoint an independent monitor that is likewise fully authorized to assist the Court
considerably in monitoring Defendants' compliance with the required remedial
measures. *See, e.g., United States v. City of N.Y.*, 717 F.3d 72, 97 (2d Cir. 2013)
(upholding appointment of monitor to oversee the FDNY's long-awaited progress

---

[10] Magistrate Judge Crawford also has a significant experience with the facts and
parties in this case. Therefore, she will not need to "get up to speed" learning the
complex web of laws, regulations, and conduct in this case.

toward ending discrimination and ordering development of policies to assure compliance with anti-discrimination requirements).

*Floyd v. City of New York* provides instructive support for adoption of a broad enforcement mechanism through either a special master or a monitor. In *Floyd,* which ordered significant, wholesale changes to the NYPD's unconstitutional stop-and-frisk policy, the district court observed that the sheer "complexity of the reforms" needed to bring the NYPD into compliance made it "impractical for this Court to engage in direct oversight." Remedy Opinion at 9, *Floyd,* No. 08-cv-01034 (S.D.N.Y. Aug. 12, 2013), Dkt. 372. In appointing an independent monitor, the district court noted that "police reform injunctions teach that [an] independent monitor is a critically important asset to the court, the parties, and the community in cases involving patterns or practices of unlawful conduct by law enforcement officials." *Id.* at 11 (internal quotation marks omitted). As in *Floyd*, "[a] court-appointed monitor in this case would help the Court ensure that . . . any pattern or practice . . . is effectively and sustainably remedied." *Id*.

### 2.    This Court Should Grant Additional Monitoring Relief

***Regular data reporting and inspections.*** Plaintiffs request specific and quarterly data reporting as part of the permanent injunction, *see* Proposed Order at ¶ 8(d), to ensure that Defendants do not evade their mandatory duty to inspect and process asylum seekers through rationalizations about purported capacity. Such relief is consistent with the relief ordered to monitor compliance in other class action lawsuits where courts determined that the government violated constitutional or statutory mandates *See, e.g.*, Order for Permanent Injunction at 5, *Unknown Parties v. Nielsen*, No. CV-15-00250 (D. Ariz. Apr. 17, 2020), Dkt. 494 (ordering the government to track and record conditions of confinement in short-term CBP detention facilities and to provide plaintiffs with the data on a quarterly basis where court determined that the current conditions of confinement violated the

Constitution); Final Judgment and Permanent Injunction at 6-7, *Garcia Ramirez v. U.S. Immigr. & Customs Enf't*, No. 18-cv-00508 (D.D.C. Sept. 21, 2021), Dkt. 368 (ordering monthly reporting where court determined that the government violated a mandatory statutory duty to consider placing unaccompanied children in the least restrictive setting when they turn 18).

In this case, discovery demonstrated that Defendants used POE capacity as a pretext to turn back asylum seekers at the southern border. Specifically, the daily capacity reports obtained through discovery show that POEs frequently operated below 100% capacity and that the number of asylum seekers at POEs had minimal— if any—impact on POE operations. *See, e.g.*, Dkts. 535-23, 535-24, 535-25, 535-26, 535-27. Nevertheless, Defendants asserted capacity constraints as a basis to turn back asylum seekers at POEs without inspecting or processing them. *See, e.g.*, Dkt. 563-1 at 10-31. Defendants had numerous resources at their disposal to address capacity concerns—such as mass migration protocols and contingency plans, utilization of temporary or soft-sided facilities, remote inspection and processing—but simply did not use them. *See, e.g.*, Dkts. 535-30, 535-31, 535-32, 535-33, 535-34, 535-37, 535-40. Given this history, Defendants should regularly, and on demand, report relevant capacity data to Plaintiffs and the special master.

In addition to such regular reporting, specific relief should include an announced, quarterly inspections of POEs by Plaintiffs' counsel and unannounced inspections by the special master of POEs, as needed, throughout the duration of the monitoring provisions. *See* Order for Permanent Injunction at 5, *Unknown Parties*, No. CV-15-00250-TUC-DCB (granting Plaintiffs quarterly class access visits in CBP detention facilities); *cf.* Stipulated Settlement Agreement ¶ 33, *Flores v. Reno*, No. CV 85-4544 (Nov. 13, 2014), https://www.aila.org/File/Related/14111359b.pdf (permitting counsel visits to detention facilities upon approved request in class action challenging constitutionality of detention and release of minors in immigration

custody). Discovery in this case showed that, in at least one instance, Defendants removed seating from a POE inspection area to artificially limit capacity. *See, e.g.*, Dkt. 535-5 at 157:15-18; Dkt. 535-78 at 113. Such admissions warrant specific relief that would allow for inspection of POEs to monitor compliance with the Court's directive that CBP officers fulfill their mandatory statutory duty to inspect and process those in the process of arriving in the United States, in addition to the data reporting.

*Authority to Issue Post-Judgment Discovery and Notice of Future Rulemaking.* Plaintiffs also request specific relief empowering the special master to permit Plaintiffs to take discovery to monitor compliance with the Court's ordered relief, upon a showing of good cause. A court may grant post-judgment discovery "as part of its inherent power to enforce its judgments." *Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033-34 (9th Cir. 2008). Defendants' general failure to comply with this Court's past orders is well-documented in motion practice concerning the preliminary injunction. *See, e.g.*, Dkts. 574, 646. This Court already exercised its inherent power to grant post-order discovery in response to that general failure. Dkt. 760. Although the data reporting and inspections discussed *supra* would provide information on the capacity of POEs across the southern border, Defendants' history of non-compliance warrants inclusion of specific relief that would empower the special master to permit Plaintiffs to take discovery to monitor compliance with a permanent injunction, upon a showing of good cause.

Moreover, recognizing that Defendants may seek to rely on independent and express statutory authority outside of Title 8 of the U.S. Code to deny inspection and processing to arriving asylum seekers, the potential need for post-order discovery becomes even more apparent to ensure that the cited legal authority itself justifies denial of inspection and processing.

Because independent legal authority could be misused to circumvent the

-18-

permanent injunction, Plaintiffs also request seven days' written notice of any policy, guidance, memorandum, directive, or muster, whether written or unwritten, that could result in a noncitizen in the process of arriving at a POE being turned away from, turned back from, expelled from, denied inspection or asylum processing at, or prohibited from arriving at a POE. Granting such advance notice is consistent with the Court's "inherent power to enforce compliance with [its] lawful orders." *Shillitani v. United States*, 384 U.S. 364, 370 (1966).

**Ongoing jurisdiction.** Finally, Plaintiffs request that the Court retain jurisdiction for purposes of enforcing compliance with the permanent injunction requested and the Court's summary judgment order. As this Court has held, "[w]hen a court has issued a permanent injunction, jurisdiction over the injunction is not a question of ancillary jurisdiction, but rather stems from the court's inher[ent] authority to enforce its own orders." *HM Elecs., Inc. v. R.F. Techs., Inc.*, 2016 WL 4063806, at *2 (S.D. Cal. 2016). Other courts have similarly retained jurisdiction over permanent injunctions issued in their cases. *See, e.g.*, *Unknown Parties*, No. CV-15-00250-TUC-DCB, at 6; *Garcia Ramirez*, No. 18-cv-508-RC, at 7-8. Ongoing jurisdiction is particularly important here where, throughout this litigation, Defendants have stubbornly refused to take meaningful steps to comply with Court orders. The Court should retain jurisdiction to enforce compliance with a permanent injunction and the judgment in this case.

## D.     The Court Should Order Defendants to Provide Class Notice After Receiving Input from Plaintiffs and the Special Master

Federal Rule of Civil Procedure 23(d)(1)(B)(ii) permits courts to order the parties to provide notice to class members of "the proposed extent of [a] judgment." Fed. R. Civ. P. 23(d)(1)(B)(ii). In addition, in instances where defendants "may be able to perform the necessary task with less difficulty or expense than could the representative plaintiff," a district court may "order the defendant to perform the task

in question." *Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914, 932 (S.D. Cal. 2020). In this case, "given the general complexity of immigration law and its recently changing landscape, . . . requiring class members to identify their right to relief . . . is an unreasonable allocation of the [class] notice burdens." *Id.* at 933. Thus, it is reasonable for Defendants to facilitate providing notice to class members. *Id.*

Specifically, this Court should require Defendants to post notice at POEs that is reasonably calculated to inform class members of this Court's summary judgment opinion and permanent injunction. Requiring such notice is consistent with the relief a court in this circuit granted in a case that similarly challenged the government's interference with asylum-seeking noncitizens' ability to access their rights during inspection and processing. *See, e.g., Orantes-Hernandez*, 919 F. 2d at 559-61 (approving permanent injunction that required, among other relief, that the government provide asylum-seeking class members notice of the right to apply for asylum where evidence showed that the government had used coercive tactics to deny class members this right). This notice should be translated into languages commonly spoken by asylum seekers, and be placed in areas of POEs where they will be visible and easily read by class members. In addition, video notice should be provided so that asylum seekers who are illiterate can understand their rights. Finally, both the special master and Plaintiffs should have the ability to review and revise the draft notices before they are posted at POEs.

## IV.    CONCLUSION

For the foregoing reasons, declaratory and injunctive relief should be granted in Plaintiffs' favor, and the Court should enter the proposed order submitted by Plaintiffs.

1    Dated: October 1, 2021

                              MAYER BROWN LLP
                                  Matthew H. Marmolejo
                                  Ori Lev
                                  Stephen M. Medlock

                              SOUTHERN POVERTY LAW
                              CENTER
                                  Melissa Crow
                                  Sarah Rich
                                  Rebecca Cassler

                              CENTER FOR CONSTITUTIONAL
                              RIGHTS
                                  Baher Azmy
                                  Angelo Guisado

                              AMERICAN IMMIGRATION
                              COUNCIL
                                  Karolina Walters
                                  Gianna Borroto

                              By: */s/ Stephen M. Medlock*
                                  Stephen M. Medlock

                              *Attorneys for Plaintiffs*

-21-

PLS' BRIEF CONCERNING DECLARATORY AND INJUNCTIVE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I certify that I caused a copy of the foregoing document to be served on all counsel via the Court's CM/ECF system.

Dated: October 1, 2021                    MAYER BROWN LLP

By *_/s/ Stephen M. Medlock_*