MAYER BROWN LLP
   Matthew H. Marmolejo (CA Bar No. 242964)
   *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
   Ori Lev (DC Bar No. 452565)
   (*pro hac vice*)
   *olev@mayerbrown.com*
   Stephen M. Medlock (VA Bar No. 78819)
   (*pro hac vice*)
   *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
   Melissa Crow (DC Bar No. 453487)
   (*pro hac vice*)
   *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>              Plaintiffs,<br><br>      v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>              Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 3 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>**FILED UNDER SEAL** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 3 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

AL OTRO LADO, INC., ET            )
AL.,                              )
                                  )
    Plaintiffs,                   )
                                  ) CIVIL ACTION
VS.                               )
                                  ) NO.: 17-cv-02366-BAS-KSC
KEVIN K. MCALEENAN, ET            )
AL.,                              )
                                  )
    Defendants.                   )
            ------------------------------------

ORAL AND VIDEOTAPED CONFIDENTIAL

DEPOSITION OF

DAVID ATKINSON

JUNE 12, 2020

TAKEN VIA REMOTE VIDEOCONFERENCE

            ------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF DAVID ATKINSON,
produced as a witness at the instance of the Plaintiffs,
and duly sworn, was taken in the above-styled and
numbered cause on June 12, 2020, from 9:32 a.m. to 3:19
p.m., before Annette Peltier, CSR, Texas Certified
Realtime Reporter, in and for the State of Texas,
reported by machine shorthand from Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.



Page 2

```
 1                    A P P E A R A N C E S
 2
 3

    FOR THE PLAINTIFFS:
 4
           (Appearing via Videoconference)
 5
           MR. STEPHEN M. MEDLOCK
 6         MR. ORI LEV
           Mayer Brown
 7         1999 K Street, N.W.
           Washington, D.C.  20006
 8         Phone: 202.263.3221
           E-Mail: Smedlock@mayerbrown.com
 9
10
11    FOR THE DEFENDANTS:
12         (Appearing via Videoconference)
13         MR. ALEXANDER HALASKA
           MS. KATHERINE J. SHINNERS
14         U.S. Department of Justice
           Office of Immigration Litigation
15         Ben Franklin Square, P.O. Box 868
           Washington, D.C.  20044
16         Phone: 202.598.8259
           E-Mail: Alexander.j.halaska@usdoj.gov
17                  Katherine.j.shinners@usdoj.gov
18                    - and -
           MR. BENJAMIN WOLARSKY, CBP In-House Counsel
19
20
    FOR THE WITNESS:
21
           (Appearing via Videoconference)
22
           MR. DENIS DOWNEY
23         Attorney at Law
           1185 Ruben Torres Sr. Blvd., Suite 3
24         Brownsville, Texas 78521-1743
           Phone: 956.555.1234
25
```



Page 3

1

ALSO PRESENT:

2

    (Appearing via Videoconference)

3

    Solange Tran, Videographer

4    Kevin Cranford, Exhibit Tech

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
                                                      Page 4
  1                        Index
  2                                                   Page
  3
     Appearances.............................    2
  4
     Examination by Mr. Medlock..............    6
  5
     Examination by Mr. Halaska..............  166
  6
     Adjournment.............................  180
  7
     Court Reporter's Certificate............  182
  8
                         Exhibits
  9  Number        Description                  Page
 10  Exhibit 288   March 30, 2017 E-Mail
                   From Walter Dressler to
 11                William T. Haralson,
                   Concerning an incident
 12                On December 6, 2016,
                   Et al
 13                (NTEU 000136-137)..........   73
 14
     Exhibit 289   December 23, 2016
 15                E-Mail from Jessica Ibarra
                   To William T. Haralson,
 16                Concerning the incident
                   On December 6, 2016
 17                (NTEU 000138)..............   79
 18  Exhibit 290   December 27, 2016
                   E-Mail from Eric Clough
 19                To David Atkinson, concerning
                   The incident on December 6,
 20                2016
                   (NTEU 000139-40)...........   84
 21
     Exhibit 291   April 12, 2017, E-Mail
 22                From William T. Haralson
                   To Walter Dressler, Pages 1-19
 23                (NTEU 00141-159)...........   91
 24
 25
```



Page 5

```
 1   Exhibit 292   March 15, 2017, E-Mail
                   From William T. Haralson to
 2                 David Higgerson, Step 3
                   Grievance(Failure to
 3                 Process ER/CF & Asylum HID 2017)
                   (NTEU 000132)..............    122
 4
     Exhibit 293   March 15, 2017, Letter from
 5                 William Haralson to David
                   Higgerson, Director of
 6                 Field Operations, Step 3
                   Grievance, et al,
 7                 (NTEU 000133-135)..........    140
 8   Exhibit 294   March 19, 2017, E-Mail
                   From David Atkinson to
 9                 Tony Reardon, Requesting
                   Asylum,
10                 (NTEU 000110-131)..........    140
```

```
11                       * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 6

1            THE VIDEOGRAPHER:  We are now on the

2     record.  This begins Media Number 1 in the deposition of

3     David Atkinson in the matter of Al Otro Lado, Inc., et

4     al, versus Kevin K. McAleenan, et al, in the United

5     States District Court for the Southern District of

6     California.

7                 Today is Friday, June 12th, 2020; and

8     the time is 9:32 a.m.  This deposition is being held

9     remotely at the request of Mayer Brown, L.L.P.

10                The videographer is Sol Tran, the trial

11    tech is Kevin Cranford and the court reporter is Annette

12    Peltier, all three of Magna Legal Services.

13                All counsel and parties present will be

14    noted on the stenographic record.

15                Will the court reporter please swear in

16    the witness.

17                    DAVID ATKINSON,

18    having been first duly sworn, testified upon his oath

19    as follows:

20                    EXAMINATION

21    BY MR. MEDLOCK:

22        Q.  Good morning, Mr. Atkinson.

23        A.  Good morning, sir.

24        Q.  Can you please state and spell your full name

25    for the record.



1      A.   David Atkinson, D-A-V -- D-A-V-I-D and Atkinson,

2   A-T-K-I-N-S...

3      Q.   Are you presently employed, sir?

4      A.   No, I'm not.

5      Q.   Did you recently retire?

6      A.   I recently separated from the agency.  I'm going

7   to take my deferred retirement next year.

8      Q.   When you say you recently separated from the

9   agency, what agency are you referring to?

10     A.   The CBP agency.

11     Q.   Okay.  And CBP is an acronym for U.S. Customs

12   and Border Protection, correct?

13     A.   Yes, correct.

14     Q.   And if I use the acronym "CBP" to refer to U.S.

15   Customs and Border Protection today, will you

16   understand my use of that acronym?

17     A.   Yes, I will.

18     Q.   And have you -- are you presently or have you

19   ever been associated with the National Treasury

20   Employees Union or NTEU?

21     A.   I'm the current -- current local chapter

22   president.

23     Q.   For which chapter of the NTEU?

24     A.   Chapter 149.

25     Q.   And I'll get back to the -- to NTEU Chapter 149



Page 8

1   a little bit later today.

2              I'd like to start today just going over

3   some of your prior experience testifying.

4              Have you ever testified in a -- in a

5   courtroom before?

6   A.  Yes, I have.

7   Q.  How many times?

8   A.  Maybe two, three.

9   Q.  In those two or three times, do you recall what

10  you were testifying about?

11  A.  Some was personal, and some was work.

12  Q.  Okay.  I don't want to go into the personal.

13             Can you just tell me what the testimony you

14  offered that was for work purposes was about?

15  A.  Divorce, civil suit, and CBP.

16  Q.  Okay.  And for the CBP testimony, what were you

17  testifying about related to CBP?

18  A.  It must have been some kind of drug seizure

19  way, way in the past.  I don't recall.

20             My younger days when I was a CBP officer,

21  canine enforcement officer, I was involved in --

22             (Talking over each other.)

23  Q.  (BY MR. MEDLOCK)  Do you recall -- sorry.  I

24  didn't mean to talk over you.

25             Do you recall when you would have testified



Page 9

1   about that drug seizure?

2       A.  My God.  No, I don't.

3       Q.  Was it -- was it in the 2000s?  1990s?  Do you

4   recall?

5       A.  I got hired in 1991, so I figured maybe in the

6   late Nineties or early Twenties.

7       Q.  Okay.  Have you ever testified in a deposition

8   before?

9       A.  Yes, I have.

10      Q.  How many times?

11      A.  I would have to say maybe three or four.

12      Q.  Were those three or four times related to your

13  personal life or to your work at CBP?

14      A.  Personal life.

15      Q.  Okay.  Have you ever been involved in any form

16  of arbitration proceeding where live testimony was

17  taken?

18      A.  Yes.

19      Q.  Were those arbitrations for personal reasons or

20  for your work?

21      A.  They were for -- I think I participated in one

22  arbitration for personal and numerous for work.

23      Q.  And in those arbitrations you participated in

24  for work, were those in connection with your role as

25  president of NTEU Chapter 149?



Page 10

1          A.   Yes.

2          Q.   Have you ever provided written testimony under

3    oath in the form of an affidavit or a declaration

4    before?

5          A.   Geez, I would say yes.  Yes, I have.

6          Q.   When you said -- when you said "geez," you were

7    having a little trouble remembering it; is that right?

8          A.   Yes.

9               Well, I've -- I've -- I've participated in

10   several forums as the chapter president, as an EEOC

11   representative; so I'm trying to provide you the

12   correct answer to that.

13         Q.   Okay.  But your memory's a little cloudy around

14   that?

15         A.   Kind of.

16         Q.   Okay.  All right.  As we were talking about

17   before we got on the record, even if you've been in a

18   deposition before where we all, in the old days, got --

19   all got into an office together and met face-to-face,

20   things have obviously changed with COVID-19; so it's

21   good to go over some of the ground rules.  So I'm going

22   to do that with you now so that we're all on the same

23   page.  Okay?

24         A.   Okay.

25         Q.   Okay.  A deposition is essentially a



Page 11

1   conversation in which I ask you questions and you

2   answer them.

3              It's important that you give audible

4   responses to my questions that can be clearly written

5   down by the court reporter.  That means if the answer

6   to a question is "yes," you should say "yes" instead of

7   shaking your head yes.

8              And you should also avoid words like

9   "uh-huh" and "huh-uh," which can sound very similar.

10             Do you understand that, sir?

11        A.  Yes, sir.

12        Q.  Most importantly today, if you don't understand

13   one of my questions, please say so.  I'll go back, I'll

14   try to reask it in a way that you understand it.  Okay?

15        A.  Yes, sir.

16        Q.  And if at any point today you think of

17   information that you should have provided to one of my

18   questions as you're testifying about other topics, just

19   let me know, we'll go back, and you can add the

20   information that you -- that you forgot.

21             That's very typical, you remember things

22   as we're looking at documents and talking through

23   subjects.

24             Do you understand that, sir?

25        A.  Yes, sir.



Page 12

1    Q.  And because we're doing this deposition over

2    WebEx, it's very, very important that we don't talk

3    over each other because this platform can only record

4    one person's audio at a time.

5                So please pause a couple of seconds before

6    you answer my questions.  I'll try to pause a couple of

7    seconds to make sure you're done with your answer, and

8    that way we won't talk over each other.

9                Do you understand that?

10   A.  Yes.

11   Q.  From time to time today, either your attorney,

12   Mr. Downey, or attorney -- the attorney for the

13   government, Mr. Halaska, may object to my questions.

14               Generally, in federal court, objections at

15   depositions are something that a judge rules on later.

16               So unless you are instructed not to answer

17   one of my questions by either the government attorney

18   or your own attorney, I'm going to ask that you answer

19   the question.

20               Do you understand that?

21   A.  Yes, sir.

22   Q.  We'll try to take a break approximately every

23   hour.  Please remind me of that.  I -- sometimes I

24   forget.

25               But my only request to you is that if



Page 13

1    there's an answer pending to one of my questions,

2    please answer my question, then we can go out -- go and

3    have our break.  Okay?

4        A.  Yes, sir.

5        Q.  Okay.  So unless I state otherwise today, my

6    questions are going to relate to the time period from

7    January 1st, 2016, through the present.

8            Do you understand that, sir?

9        A.  Yes, sir.

10       Q.  And during today's deposition, I'm going to

11   refer to the U.S. Department of Homeland Security as

12   DHS.

13           Will you understand that acronym if I use

14   it, sir?

15       A.  Yes, sir.

16       Q.  During -- sure.  During today's deposition, I

17   may refer to a port of entry as a POE.

18           Will you understand that acronym if I use

19   it, sir?

20       A.  Yes, sir.

21       Q.  And I -- during today's deposition, I may also

22   refer to the Office of Field Operations of CBP as OFO.

23           If I use that acronym, will you understand

24   it today, sir?

25       A.  Yes, sir.



Page 14

1     Q.  Do you understand you've taken an oath to tell

2  the truth today?

3     A.  Yes, sir.

4     Q.  Is there any reason that you can think of, as

5  you sit here today, that you won't be able to answer my

6  questions fully and truthfully?

7     A.  I'm going to let my attorney answer that.

8                    THE COURT REPORTER:  We can't --

9     Q.  (BY MR. MEDLOCK)  Well, I need you to answer

10  my --

11                    THE COURT REPORTER:  -- hear you,

12  Mr. Downey.

13     Q.  (BY MR. MEDLOCK)  I need you to answer my

14  questions.

15     A.  Huh?

16     Q.  So, Mr. Atkinson, I just -- my only question,

17  is there any reason you can't fully testify to my

18  questions today?

19     A.  Yes.

20                    MR. DOWNEY:  We -- and can everyone

21  hear me?

22                    MR. MEDLOCK:  Yes, Mr. Downey.  Go

23  ahead.

24                    MR. DOWNEY:  Because of a letter that

25  was received by my client from the CBP, there's really



Page 15

1    a statement I need to read into the record relevant to

2    that.

3              MR. MEDLOCK:  Sure.  Go ahead,

4    Mr. Downey.

5              MR. DOWNEY:  Mr. Atkinson --

6    Mr. Atkinson hired me on -- through the union on April

7    the 30th of this year; and during that period of

8    representation, Bennett Khoury, associate general

9    counsel of enforcement of operations for CBP, sent a

10   letter directly to my client on -- on May the 27th.

11             That letter, I feel, was a breach of

12   professional ethics.  More than that, it was -- it was

13   sent at a time when he was -- when Mr. Atkinson was not

14   an employee.

15             The substance of that letter was an

16   attempt to give Mr. Atkinson, my client, legal advice,

17   which I feel would be highly inappropriate if given to

18   any -- any person, but especially a person known, as

19   shown in the letter, that that person was represented

20   by counsel.

21             The essence of the letter was a clear

22   attempt to intimidate a witness in a federal court

23   case.  I think the letter could be fairly characterized

24   as a violation of 18 U.S.C. Section 1512 and should be

25   brought to the attention of the presiding judge in the



Page 16

1    California federal court.

2                    One of the letter's instructions was

3    not to violate any U.S. treaty.

4                    I doubt that any Border Patrol

5    employee and not many attorneys would have any

6    comprehension of -- of -- of what treaties are in force

7    in the United States and what the substance of that --

8    of the -- of those treaties would mean.

9                    My client is a fact witness, and he

10   does not intend to be intimidated or deterred to give

11   truthful testimony.

12                   In that letter the CBP counsel

13   attempted to instruct my client as to what he could or

14   could not testify to.

15                   My view is that those parameters are

16   established by the federal court's protective order or

17   by agreement of the actual parties.  I assume that the

18   United States Department of Justice is the legal

19   representative of the -- of the United States Customs

20   and Board Patrol and that the DOJ is the only

21   representative of the United States in this matter and

22   that the objections made to or -- that have -- that will

23   be made to Mr. Atkinson about documents or testimony

24   will be governed exclusively by -- by DOJ counsel and

25   the federal court.



Page 17

1          My client will consciously,

2   conclusively determine if the questions that he's been

3   asked or documents as produced is not objected to,

4   which include that there is no objection by the United

5   States.

6          My client [sic] intent is to follow

7   the law, to give truthful testimony in the interest of

8   public justice, and to exercise his constitutional

9   rights of free speech.

10          Thank you.

11          MR. MEDLOCK:  All right.  Do you --

12   thank you, Mr. Downey.

13          And, Mr. Halaska, I don't know if you

14   have a response.

15          MR. HALASKA:  Just briefly for the

16   record:  We dispute Mr. Downey's characterization of

17   the record.

18          I am not aware of any contact with the

19   witness while he was represented by the government.  In

20   fact, I was the one who sent the letter to Mr. Downey.

21   I copied Mr. Medlock, and I did not send it directly to

22   the witness.

23          I think we can resolve any factual

24   disputes about the content of the letter at a later

25   date, but I wanted to put that on the record.



Page 18

 1                    MR. MEDLOCK:  All right.  Thank you

 2    both.

 3                    I'll continue with my examination, if

 4    that's all right.

 5        Q.  (BY MR. MEDLOCK)  Mr. Atkinson, did you, in

 6    fact, review a copy of a letter sent to you -- sent by

 7    Bennett Khoury on May 27th, 2020?

 8        A.  Can I see that document, please?  I don't

 9    remember it.

10        Q.  Okay.  We -- we can get that in front of you

11    later on.  I just -- I just wanted to know if you

12    actually saw the letter that your attorney was

13    referring to in his statement.

14        A.  Hold on.  Hold on.  I have it -- I have it in

15    front of me.  It says:  (Reading)  Marco B. Khoury --

16    I'm just reading it right now.

17        Q.  Sure.

18        A.  Yes, I did -- I did see it, and my -- my --

19    right.

20        Q.  And when -- when you saw that letter, did you

21    feel like you were being intimidated --

22        A.  Right.

23        Q.  -- from offering particular testimony today?

24        A.  Yes.

25        Q.  Why did you feel like you were being



Page 19

1   intimidated?

2      A.  Because it says:  (Reading)  You may not

3   discuss the existence of any ongoing investigations.

4   You may not testify in a matter as an expert witness,

5   provide opinion testimony, or discuss any matters that

6   may result in operational harm to CBP.

7              I mean, you know the documents that were

8   provided to you specifically deals with all that stuff.

9   I mean, I don't know how I would be able to -- to --

10  to -- to make a statement on any of the issues without

11  violating what they're telling me I would violate on the

12  matter by disclosing anything.

13     Q.  And do you feel that the letter that you

14  received from Mr. Khoury has prevented you from

15  answering my questions fully and truthfully today?

16     A.  I -- I would -- I would -- I would do so with

17  so much anxiety that I might be arrested or something

18  for it, for making any kind of comments to you dealing

19  with CBP today.

20     Q.  Okay.  I don't want you to feel anxious, sir.

21  I'm going to go forward with asking questions today.

22  If you feel that you -- you know, that you would be

23  violating anything in that letter and that you feel

24  that you can't answer my questions fully because of

25  that letter, please let me know when I ask you -- ask



Page 20

1    you that question.  Okay?

2        A.  Yes.

3        Q.  Okay.  Sir, do you understand that you're here

4    today to testify pursuant to a subpoena?

5        A.  Yes.

6        Q.  And you're represented by an attorney today in

7    connection with your deposition; is that correct?

8        A.  Yes.

9        Q.  To your understanding, which attorney or

10   attorneys are representing you today?

11       A.  I want to say there are two attorneys.

12   Mr. Halaska told me that he was going to represent me

13   as a CBP officer, and then Mr. Denis Downey is

14   representing me as an NTEU attorney because Mr. Haska

15   [sic] said he couldn't represent me as an NTEU

16   president.

17       Q.  I understand.

18              And I don't want to go into the substance

19   of any conversations that you've had with either

20   Mr. Halaska or Mr. Downey, but I do want to ask you:

21   Did you meet with either Mr. Downey or Mr. Halaska,

22   whether in person or over videoconference, to prepare

23   for today's deposition?

24       A.  The only person I -- I spoke to was Mr. Downey,

25   on and off.



1    Q.  And how many times did you speak to Mr. Downey

2    to prepare for today's deposition?

3    A.  To prepare for the deposition, maybe about --

4    geez, going over the materials and stuff -- he would

5    have the documented hours that we went through.

6    Q.  Uh-huh.

7    A.  It was a lot because I provided him a lot of

8    information and stuff.  We met in person and we met on

9    phone and this morning.

10    Q.  What's your best guess as to how many hours you

11    spent with Mr. Downey preparing for today's deposition?

12    A.  Oh, God.  I'd say way over about 15, 20 hours.

13    Q.  And in that 15, 20 hours, how many meetings

14    were -- did -- were you in with Mr. Downey that

15    compromised those 15 to 20 hours?

16    A.  Maybe about -- on the phone numerous times, and

17    on the -- on [sic] person, maybe about three times.

18    Q.  Besides Mr. Downey, did anyone else participate

19    with you and Mr. Downey in those meetings?

20    A.  Oh, not that I know of, no, no.

21    Q.  During the meetings you've had with Mr. Downey,

22    did you look at any documents?  And that's just a "yes"

23    or "no" question.

24    A.  Yes.

25    Q.  How many documents did you look at with him?



Page 22

```
 1      A.  Whatever that was on -- I provided him.  We
 2  kind of speed through them.
 3      Q.  Okay.
 4      A.  It was a lot of them.
 5      Q.  Outside -- yes, it is.  I -- I agree with that.
 6          Outside of your meetings with Mr. Downey,
 7  did you personally do anything to prepare for today's
 8  deposition?
 9      A.  Yes; I guess providing all the documents.  I'm
10  having some other ones I'm trying to look for at this
11  time -- they haven't gotten to me yet -- to provide
12  you; but other than that, I was -- hours and hours
13  because I had to -- I'm retired, so I had to go back
14  and -- and contact my guys, and they delivered stuff.
15          But NTEU national provides you most of --
16  half of the information, I was understood, by our field
17  attorney.
18      Q.  Right.
19          And when you say "contact my guys," what
20  did you mean by that?
21      A.  I talked to Dennis Schneider (phonetics), and he
22  was the one that -- that approved the -- the hiring of
23  the local attorney, and he informed me that NTEU
24  national provided you guys with all the information.
25          So I told him that I needed that
```



Page 23

1   information to provide you.  So Mr. Schneider was

2   providing me the materials that he had already provided

3   you.

4       Q.  Okay.  Did you ever meet with Mr. Halaska or

5   anybody from the U.S. Department of Justice or CBP as --

6   CBP's office of chief counsel to prepare for today's

7   deposition?

8       A.  The only person that I -- well, two people I

9   spoke to today -- I mean, not today, but in the past --

10  was an Eric Drootman, which he notified me that I need

11  to talk to -- Mr. -- Mr. Halaska was trying to get

12  ahold of him.

13          And I spoke to Mr. Halaska on phone and by

14  e-mail, where he told me that he would be representing

15  me as a CBP officer but not an NTEU president, as I was

16  the full-time president.

17          And that was about the -- the -- the extent

18  of our discussions.  Once he knew I had an attorney, I

19  went through my attorney.

20      Q.  You said there was an individual named Eric

21  that you talked to who told you that Mr. Halaska was

22  trying to get in touch with you.

23          What -- can you spell Eric's last name for

24  the record, if you know?

25      A.  D-R-O-O-T-M-A-N, Drootman.



Page 24

1      Q.   Okay.  Thank you.

2           Besides looking for documents, talking to

3  Mr. Downey for several hours, and reviewing documents

4  with Mr. Downey, can you think of anything else you did

5  to prepare for today's deposition?

6      A.   Contacted my national office, contacted the

7  local stewards to bring me the grievances, went through

8  files, met with Mr. Downey to provide you the stuff,

9  and I guess he provided them to Mr. -- Mr. Halaska.

10     Q.   That's correct.

11          When you say you talked to the NTEU

12 national office, did anybody at the NTEU national

13 office do anything to prepare you for today's

14 deposition?

15     A.   Other than to provide me unlimited amount of

16 documents that pertained to my chapter.

17     Q.   And that's it?  That's all they did?

18     A.   That's all they did.

19          I was very upset that they didn't advise us

20 that they were actually providing any of our documents

21 that could have put us in a very difficult position.

22     Q.   I can understand that.

23          Have you and I ever met before today?

24     A.   No, sir.

25     Q.   Have you spoken to any of the attorneys in this



Page 25

1    case who represent the plaintiffs before today?

2         A.  No, no.

3         Q.  Okay.  Has -- has anyone from the plaintiffs'

4    side in this case promised you anything in -- in

5    connection with your testimony today?

6         A.  No, sir.

7         Q.  Other than giving honest and factual answers to

8    my questions, is there anything that you hope to gain

9    from today's testimony?

10        A.  No, sir.

11        Q.  All right.  I'd like to talk a little bit about

12   your educational and professional background, if we

13   could.

14        A.  Yes, sir.

15        Q.  What is the highest level of education that you

16   have completed?

17        A.  I think I have -- have a total of 60 hours of

18   college hours, graduated from high school, graduated...

19   went to the military and took some business courses.

20        Q.  Okay.  Let's start with high school.

21             When did you graduate high school?

22        A.  1983.

23        Q.  And where did you go to high school?

24        A.  James Pace High School, Brownsville, Texas.

25        Q.  And after you graduated high school, what was



Page 26

1    the next thing you did for -- either for education or

2    to get income?

3        A.   I went to college.

4        Q.   Where did you go to college?

5        A.   Texas Southmost College.

6        Q.   And where is that located?

7        A.   Brownsville, Texas.

8        Q.   And you said that you had approximately 60

9    college hours.

10            Did -- did you take those 60 college hours

11   consecutively at Texas Southwest [sic] College?

12       A.   No.  I -- I took at Texas Southmost College,

13   and I took some at the Favio (phonetics) Institute,

14   College -- Community College in North Carolina, and I

15   took some -- some -- I forgot what they call when they

16   mail in the -- the books to you from the Department of

17   Education when I was in the military overseas, took

18   some courses.

19       Q.   So how long were you enrolled at Texas

20   Southwest [sic] College?

21       A.   Maybe two summers.

22       Q.   Okay.

23       A.   I don't really remember the times.

24       Q.   After those two summers that you were at Texas

25   Southwest [sic] College, what did you do next?



Page 27

1       A.  I went to the military, as I can recall.

2       Q.  What branch of the military did you join?

3       A.  I was in the U.S. Army.

4       Q.  Thank you for your service.

5           What -- were you -- did you join as an

6   enlisted man or as an officer?

7       A.  Enlisted.

8       Q.  What was the highest rank that you attained in

9   the U.S. Army?

10      A.  Due to the specialized group that I was in, I

11  was in 80 -- in the 82nd Airborne, which is a close-knit

12  group, I was an E-4 at the time.

13      Q.  Can you explain what E-4 means to those of us

14  who --

15      A.  It -- it --

16      Q.  -- are not in the military?

17      A.  -- it's a specialist -- a specialist rank.

18  It's right below a -- a sergeant.

19      Q.  And you said you were in the 82nd Airborne.

20          Did you ever complete any jumps during your

21  time as -- in the 82nd Airborne?

22      A.  Yes.  I had over a hundred jumps.

23      Q.  Wow.

24          Did you see any active duty in a war zone

25  during your time in the 82nd Airborne?



Page 28

1       A.   I think in 1988 we were deployed in Operation

2  Golden Pheasant when the Contras were fighting the

3  Hondurans, and we jumped in.  And I guess it was -- at

4  the time I guess it was labeled as a campaign, but we

5  saw a lot of action there.

6       Q.   Was that in Nicaragua?

7       A.   Yes.  It was the Contras against the

8  Sandinistas.  We were training the -- the Contras to

9  find the -- the Sandinistas.

10      Q.   Right.  Right.

11           And outside of your service in -- in the

12  Nicaragua Contra campaign, did you see any other active

13  duty service?

14      A.   I guess with the government, the U.S.

15  Immigration Service.

16      Q.   Oh, sure.  I -- I was -- I was wondering --

17  it -- it -- it sounded like you left the military in

18  1991.

19           Were you part of either Desert Storm or

20  Desert Shield?

21      A.   No -- no, I wasn't.  I left -- I left the

22  service in 1988.

23      Q.   Oh, okay.  I -- thank you for that

24  clarification.

25           So you left the U.S. military in 1988, and



Page 29

 1   at that time you were -- had a rank as E-4; is that

 2   right?

 3        A.   Yes.

 4        Q.   During your time in the 82nd Airborne, did you

 5   receive any metals or commendations for your service?

 6        A.   Yes, I did.

 7             I received a -- a Army Achievement Medal.

 8   Actually received a First Leaf Clover and a Second Leaf

 9   Clover for outstanding work there.  I also received an

10   Expert Infantry Badge, which is the highest

11   peatime [sic] -- peacetime combat award, among other

12   awards.  I don't -- you know, I don't have my 215 with

13   me to tell you.

14        Q.   Uh-huh.  Okay.  That -- that's fair.

15             When -- when you left the U.S. Army and the

16   82nd Airborne in 1988, did you -- why did you leave?

17        A.   I had a goal in life to be a -- my dad was a

18   U.S. Customs officer, and my goal in life was to follow

19   in his footsteps.  So that's why I didn't go higher in

20   rank in the military, was my eagerness to -- to -- to

21   get out and -- and -- and -- and follow his footsteps.

22             So I applied for U.S. government.  My whole

23   goal was to do my three years and -- and get that

24   veteran status and -- and join the U.S. government.

25        Q.   Okay.  So your -- your enlistment was up, and



Page 30

1    you decided not to reenlist; is that right?

2        A.  Yes.

3        Q.  Were you formally discharged from the U.S.

4    military then?

5        A.  Honorable -- honorably discharged.

6        Q.  Okay.  Okay.  During your time in the U.S.

7    military, were you ever -- did you ever receive any

8    sort of -- we -- we -- did you ever receive any form of

9    discipline for anything you did while on duty?

10       A.  No, huh-uh.

11       Q.  Okay.  You -- you mentioned that you left the

12   military in 1988.

13               When did you first apply to become a U.S.

14   Customs officer?

15       A.  I applied earlier, I think, in -- geez, I don't

16   remember -- maybe '89, '90, or when I got out.  I

17   don't -- I don't recall.  It was sometime when I got

18   out of the military.

19       Q.  Okay.  When did you actually get sworn in and

20   become a member of the U.S. Customs service?

21       A.  I got -- I got -- I got sworn in, I want to say,

22   March of 1991.

23       Q.  Okay.  What was going on in your life between

24   1988 and March 1991?  What were you doing for

25   employment?



Page 31

1     A.  I was -- I was working as a -- two things.  I

2     was working as a security guard at the U.S. immigration

3     camp.  I was a supervisor out there, supervising the

4     movement and care of detainees.

5             And second, I was hired as a -- as a cook

6     foreman out there.  I actually was going to become a --

7     selected for a detection officer, but a -- a freeze

8     happened and they asked me if I wanted to go back as a

9     security guard or take this position, so I took the cook

10    foreman position as a government position first.

11    Q.  And when you said you were a security guard and

12    a cook foreman, what government installation were you

13    working at at that time?

14    A.  At the Port Isabel Immigration Processing

15    Center for the Immigration and National --

16    Naturalization Service in Bayview, Texas.

17    Q.  Okay.  And at -- at that time, Port Isabel was

18    dealing -- was dealing with an influx of migrants from

19    Cuba and other countries, correct?

20    A.  Correct.

21    Q.  And to your observation, how did the INS

22    facility at Port Isabel deal with that influx of

23    migrants from Cuba?

24    A.  They did it very professionally, very

25    professionally.  They -- they -- they made sure they



Page 32

1    had bathing equipment, food, essentials.  They made

2    adequate space for them in the facility, and -- it was

3    a 24-hour operation.

4                Due to the limited amount of -- of

5    equipment spaces, it had to be a 20 -- 24-hour service

6    for the -- for the immigrants.

7    Q.  So is it the -- is it your opinion that when

8    CBP or its predecessor organization wants to deploy the

9    resources necessary to handle a spike in migrants, it

10   can do so?

11               MR. HALASKA:  Objection to the extent

12   that it calls for expert testimony.

13               Mr. Atkinson -- or excuse me -- yes,

14   Mr. Atkinson, you may answer the question.

15               THE WITNESS:  I may answer the

16   question?

17               MR. HALASKA:  You may.

18               THE WITNESS:  Is the CBP attorney

19   going to allow me to answer the question?

20               MR. HALASKA:  I represent the United

21   States government.  You may answer the question.

22               THE WITNESS:  Thank you, sir.

23   A.  Yes, I do.

24   Q.  (BY MR. MEDLOCK)  Why do you believe that,

25   then?



Page 33

1    A.  I've -- I've seen it firsthand of -- of how it

2    worked, how it worked in the Covid.  I think the --

3    the -- the lack of -- of -- lack of competent people

4    running the -- the -- the system didn't allow it to

5    happen.

6    Q.  When you say "lack of people running" --

7    "competent people running the system didn't allow it to

8    happen," are you talking about what's going on today?

9    A.  I'm talking about the agency's official that --

10   that -- agency officials that -- that ran it at the

11   time --

12   Q.  The --

13   A.  -- at the local and national level.

14   Q.  Okay.  And when you -- in March 1991, when you

15   were sworn in to be a U.S. Customs officer, did you

16   receive any training prior to being sworn in?

17   A.  No.

18   Q.  How about afterwards?  Did you receive any

19   training --

20   A.  Yes.

21   Q.  -- from U.S. Customs?

22   A.  Yes.

23   Q.  Where did that training take place?

24   A.  It took place in Front Royal, Virginia.

25   Q.  Was that the -- at the Federal Law Enforcement



Page 34

1    Training Center?

2        A.  No.  It was at the Canine -- Canine --

3        Q.  Ah.

4        A.  -- Enforcement Academy, Training Academy.

5        Q.  Oh, okay.  I know where that is.  I've driven

6    by that on I-66.  Okay.

7            Is it -- and was your first position at --

8    at the U.S. Customs Service to -- to be a canine

9    officer?

10       A.  My understanding, I was hired -- hired as a

11   CBP -- I mean, I'm sorry, as a Customs inspector; but I

12   was assigned a canine enforcement position.  And I

13   found that out when they were doing my background

14   investigation.  They told me it was for an inspector,

15   and they had me in -- you know, I mean, they had sent

16   me to a -- to a canine enforcement officer position.

17           I applied for both of them.  It was

18   just crisscrossed --

19       Q.  When -- when you -- sorry.  I didn't mean to

20   talk over you.

21           After you received training to be a canine

22   enforcement officer, where was your first posting

23   within U.S. Customs?

24       A.  I was assigned to the Port of Hidalgo, Texas;

25   but my assignment was unique, as I was hired as one of



Page 35

1    the first passive handler programs in -- in that field

2    operations [sic], which allowed me to work multiple

3    bridges up to the -- the Port of Laredo, Texas, for a

4    couple of years until I was finally and permanently

5    assigned to the Port of Hidalgo, Texas.

6        Q.  Okay.  When -- when you say "bridges," is it

7    the case that at the Laredo port of entry and the

8    Hidalgo port of entry there are several bridges that

9    span the Rio Grande River that lead into those ports of

10   entry?

11       A.  Say again, please.

12       Q.  I'm just trying to get a sense of the -- of the

13   geography of the Laredo and Hidalgo ports of entry.

14           Those ports of entry are located near the

15   Rio Grande River, correct?

16       A.  Some are.

17       Q.  Okay.  And when we talk about bridges, those

18   are bridges that span the river and go into the port of

19   entry; is that right?

20       A.  Yes, sir.

21       Q.  Okay.  During the time that you were -- you

22   said you were a passive -- you were doing passive

23   operations; is that right?

24       A.  Yes, sir.  Yes, sir.

25       Q.  What does that mean?



Page 36

1       A.  It was a -- a -- a canine -- a canine that was

2   specifically trained to sniff out contraband on

3   individuals, on their bodies.  So...

4       Q.  Okay.  Okay.  I think I understand what you --

5   I think I understand what you're saying.

6           When did you become permanently assigned to

7   the Hidalgo port of entry?

8       A.  I don't remember, sir.

9       Q.  Okay.  Sometime in the 1990s?

10      A.  Late 1990s or 2- -- early 2000s.

11      Q.  Okay.  When did you join the National Treasury

12  Employees Union or NTEU?

13      A.  In the early Nineties.

14      Q.  Why did you join?

15      A.  Why did I join?

16          It was one of the things to do at the time.

17  You know, you get hired, and you hear all these stories

18  about -- about employees, you know, often getting

19  retaliated in -- on, so I -- I joined the union at that

20  time.

21      Q.  Okay.  What chapter did you join?

22      A.  149.

23      Q.  When did you become a member of the leadership

24  of NTEU Chapter 149?

25      A.  I want to say in 1998 I was vice president, and



Page 37

1    then late 1998 -- I've been union president ever since.

2        Q.  So you've been union president of NTEU Chapter

3    149 for approximately 22 years?

4        A.  About.

5        Q.  In your time that you were employed at CBP,

6    what's the highest rank that you achieved in the

7    organization?

8        A.  My rank which I separated in was a 12 step, I

9    think 7 or 8.  I don't remember what...

10       Q.  Okay.  What was your title?  Were you a CBP

11   officer?

12       A.  Yes, sir.

13       Q.  Supervisory CBP officer?

14       A.  CBP officer.

15       Q.  And when you were separated from CBP, what was

16   the reason why you were separated?

17       A.  Just the -- the -- my disabilities I have from

18   the military and the stress I was going through and

19   stuff.  I just decided to -- to leave, my health.

20       Q.  Okay.  It -- it was your own decision to leave;

21   is that right?

22       A.  Yes, yes, to the extent that I felt that I was

23   indirectly forced out by -- by the -- by the work

24   environment that was there.

25       Q.  When you say you --


MAGNA
LEGAL SERVICES

Page 38

```
 1        A.  My -- my health -- my health --
 2                  (Talking over each other.)
 3        Q.  (BY MR. MEDLOCK)  Sorry, go ahead.  Go ahead.
 4        A.  I felt my health was more important, to stay
 5    away from the -- from the -- from the stress.
 6        Q.  I'm sorry to hear about that stress and I don't
 7    want to make you relive it today, but I -- I do want to
 8    ask you just a few follow-up questions.
 9                  When you say you felt like you were
10    indirectly forced out, can you explain to me what you
11    mean by that?
12        A.  Well, it's just -- it's just, you know, you get
13    hired -- you get hired with the agency with the -- with
14    the understanding that you're going to uphold so much --
15    so much law and -- and protect individuals and -- and --
16    and -- and you -- you just -- you break -- it breaks
17    your -- your spirit, you know, to see it done that way.
18                  As a union president, not only did I see
19    the -- the -- the good side, but I saw the bad side of
20    the agency.
21        Q.  When you said that it broke your spirit to see
22    the law not being upheld, was one of the things that --
23    where you -- that broke your spirit about the law not
24    being upheld the way that asylum seekers were treated
25    by CBP?
```


MAGNA
LEGAL SERVICES

Page 39

1      A.   I would have to say that that was a -- you know,

2    the main reason, but I think the way the agency were

3    allowing the -- the employees to be portrayed in -- in

4    the manner they were following orders did.

5      Q.   Okay.  I -- during your time at CBP, have you

6    ever -- were you ever disciplined for being dishonest?

7      A.   No, I haven't.

8           I have -- I have received a letter of

9    reprimand from an arbitrator.  I had one incident where

10   he -- where I -- I reported my weapon lost, stolen from

11   my -- from my house, and they came to conclusion that

12   at the time I didn't know where it was.  I felt the

13   union official wasn't really representing me right, but

14   he failed to disclose that other items in the police

15   report was -- like, my son's Xbox and other items that

16   were stolen from the house to show that the -- the

17   weapon was actually taken from my house, but they gave

18   me a letter --

19     Q.   Sorry to hear about that.

20     A.   -- they gave me a letter of reprimand, and that

21   was it.

22     Q.   Other than that letter of reprimand, have you

23   received any other form of formal or informal

24   discipline from anyone at CBP?

25     A.   I have received a -- a -- some kind of cease



Page 40

1    and desist letter in the past, and I don't remember

2    what issue it was.  It was years and years and years

3    ago.

4        Q.  When you say "years and years ago" --

5        A.  Yes.

6        Q.  -- did it happen in the last decade?

7        A.  I want to say it happened -- there was a port

8    director, David Higgerson.

9        Q.  What did David Higgerson --

10                (Talking over each other.)

11       A.  I --

12       Q.  (BY MR. MEDLOCK)  Sorry, go ahead.  Go ahead.

13       A.  I remember just mainly appealing it verbally

14   and stuff.

15                And I think they just said, "Oh, forget

16   it," you know.  But that was the issue with that.

17       Q.  What did David Higgerson tell you to cease and

18   desist from doing?

19       A.  I don't remember.  It was something -- it was

20   something so minute that I just don't remember.

21                We were going at each other because I was

22   filing grievances and stuff, and they reached out

23   somehow to give it -- given it to me (transmission

24   cutting out).

25                THE COURT REPORTER:  I didn't hear the



Page 41

1    last part of what you said, sir.

2                    THE WITNESS:  Oh, I'm sorry.  I said I

3    felt at that time, since we were so constant in filing

4    grievances, that they retaliated by giving me that

5    cease and desist.  And I don't remember what it was.

6                    In fact, I was given -- now, going

7    back, recently, I was given a cease and desist letter

8    when I -- by Carlos Rodriguez before I left.  I think

9    it was several months before.

10                   I reported wrongdoing by a port

11   director to an employee, and they wanted me to cease

12   and desist from reporting this conduct to the -- to the

13   Cus- -- to the commissioner of Customs.

14       Q.  (BY MR. MEDLOCK)  Okay.  Were you -- and did

15   you ever receive a cease and desist letter regarding

16   your complaints or grievances, if any, regarding the

17   treatment of asylum seekers?

18       A.  No, I haven't.  I don't think I have.  I don't

19   think I have other than persons coming up to me

20   wondering why I'm -- I'm -- I'm filing grievances on --

21   on certain metering sites and stuff.

22       Q.  Okay.  When you joined the U.S. military, did

23   you take a -- an oath?

24       A.  Yes, sir.

25       Q.  And that -- did that oath include defending the



Page 42

1    Constitution of the United States?

2         A.   Yes, sir.

3         Q.   And when you joined U.S. Customs, did you also

4    take an oath?

5         A.   Yes, I did.

6         Q.   And did that oath also include the concept of

7    defending the Constitution of the United States?

8         A.   To tell you the truth, sir, I don't remember.

9    It should -- it should have said it --

10        Q.   Okay.

11        A.   -- but --

12        Q.   Were those oaths meaningful to you that you

13   took?

14        A.   Yes, it was.

15        Q.   Why is that?

16        A.   Because, I mean, it's the core values that we

17   have as an American citizen that gives us the benefits

18   to live the way we do.

19             See, the only thing that separates us from

20   -- from different countries and different governments,

21   for -- it's a balancing tool to preserve our rights,

22   the right to live free.

23        Q.   Do you believe that when -- that when or if CBP

24   does not act in accordance with the law and the

25   Constitution that it undermines those values that you



Page 43

1    were just talking about?

2        A.  Do I feel it does?

3        Q.  Yes.

4        A.  I would say with the recent -- recent -- recent

5    decision we got from CBP themselves, I would have to

6    say no.

7        Q.  Okay.  What's that recent decision you're

8    talking about?

9        A.  The EOC [sic] decision from the office of, I

10   guess their chief counsel, on a discrimination

11   complaint that we filed on the CBP Nation Web site that

12   affected the -- a female employee.

13       Q.  What's the CBP Nation Web site?

14       A.  Well, there's three CBP Nation Web sites that

15   are -- that came public.  One CBP Nation was the Real

16   CBP Nation that was founded to -- to have so many

17   thousands of border patrol agents.  Those are the

18   officers in green.  It was called the Real CBP Nation

19   Web site.

20            Then they have another one called the 10-15

21   Web site that was created by -- amongst people from

22   border patrol.  Those were the green officers.

23            And then we have what they call the CBP

24   Nation that was -- had members of -- up to the Office of

25   Integrity and Professionally [sic] Standards of CBP,



Page 44

1    running the admin section of it.

2         Q.   And the Real CBP Nation, 10-15, and CBP Nation,

3    is it the case that those are all private Facebook

4    groups?

5                   MR. HALASKA:  I'll make an objection --

6    I'll make a standing objection to relevance to this line

7    of questioning.

8                   Mr. Atkinson, you should feel free --

9    you should feel free to answer.

10        A.   The only reason I feel -- the relevance, I feel,

11   in CBP Nation, number one, the discriminatory way CBP

12   had immigrants, cartoons showing them heading to the

13   border, heading to the meeting sites.

14        Q.   (BY MR. MEDLOCK)  Uh-huh.

15        A.   And --

16        Q.   Did --

17        A.   Go ahead.

18        Q.   Go ahead, sir.

19        A.   No, go ahead.

20        Q.   Sorry.

21                   Isn't it true that there were posts on Real

22   CBP Nation, 10-15, and CBP Nation that portrayed

23   immigrants in a negative way?

24        A.   I'm not -- I'll be honest with you, I have no --

25   other than knowing that they're separate, the only one



Page 45

1   I dealt with personally in which I received a decision

2   on was a totally different Web site that was driven by

3   a person in the CBP headquarters, Office of Integrity

4   and Professional Standards division.

5       Q.  Okay.  All right.  I'd -- I'd -- I'd like to

6   ask you about a few things that have been said about

7   you in the course of this litigation.

8       A.  Sure.

9       Q.  It's been said by somebody in this litigation

10  that you are an unethical officer.

11              Do you agree with that statement?

12      A.  No.

13      Q.  Why do you disagree that -- with the statement

14  that you are an unethical officer?

15      A.  Why would I be an unethical officer?  What

16  reasons would they be for I could better answer that

17  question?

18      Q.  Okay.  Do -- do you think you've ever behaved

19  unethically when you've been working at CBP?

20      A.  No.  I think the only thing I've done was --

21  was -- my full-time position as CBP was as -- as a

22  U.S. -- was an NTEU president.

23              And I'm always filing EOC complaints,

24  whistleblower.  I've done stuff to -- to correct the --

25  the behavior of -- of the agency, the agency's repre- --



Page 46

1   certain representatives toward employees.

2       Q.  Elsewhere in this case --

3               (Talking over each other.)

4       A.  I --

5       Q.  (BY MR. MEDLOCK)  I'm sorry.  Go ahead, sir.

6       A.  May I ask who said it?

7       Q.  I can't tell you because there's a protective

8   order.  I'm sorry.

9       A.  Oh, okay.  Okay.

10      Q.  Elsewhere in this case, you've -- someone has

11  said that you mislead other people.

12              Do you agree that you mislead people?

13      A.  No.

14      Q.  And can you think of any reason why someone

15  would say that you mislead others at CBP?

16      A.  No, I don't.

17      Q.  Elsewhere in the testimony in this case, it's

18  been insinuated that you've just raised complaints and

19  grievances in order to get back pay.

20              Do you agree that the only reason you're

21  raising complaints and grievances is to win back pay?

22      A.  That's not the -- the -- my -- my position as

23  NTEU president is to enforce the -- the national

24  agreement between CBP and NTEU.

25              As you know or you're not aware of, we've --



1    we've won several arbitrations from arbitrators

2    concerning staffings that affected employees.  We also

3    received -- won that EOC decision.

4              So I would assume that they're saying

5    those -- those -- those -- those statements in

6    retali- -- in retaliation of -- of our success in --

7    in -- in trying to phrase some of the hostile working

8    environment that we have in our -- in our ports of

9    entries.

10   Q.  Did you in your course of your work as NTEU

11   president for Chapter 149 raise complaints and

12   grievances about CBP conduct during the Obama

13   administration?

14   A.  Yes, we did.

15   Q.  And in that same role, have you raised

16   complaints and grievances about CBP conduct during the

17   Trump administration?

18   A.  Yes.

19   Q.  Have politics or your own political views

20   affected your decision to raise complains and

21   grievances about CBP's conduct in any way?

22   A.  Oh, negative.  No.

23   Q.  I want to talk to you about the treatment of

24   asylum seekers who attempt to enter the United States at

25   ports of entry, and I'd like to start by asking you:



Page 48

1    Was there a period in which you observed asylum -- ever

2    observed asylum seekers attempting to enter ports of

3    entry on the U.S./Mexico border and being turned away

4    without being inspected or processed?

5                    THE WITNESS:  Am I allowed to answer

6    that?

7                    MR. HALASKA:  If that question is

8    directed to me, Mr. Atkinson, yes, you should feel free

9    to answer the question.

10                   THE WITNESS:  Yes.  Thank you, sir.

11   A.  Yes, I have.

12   Q.  (BY MR. MEDLOCK)  How many times have you

13   observed asylum seekers be -- who are attempting to

14   enter the United States being turned away from ports

15   of entry on the U.S./Mexico border without being

16   inspected or processed?

17   A.  Hmm, well, initially they get inspected when we

18   first make contact.  So they get the prescreening, and

19   they only turn it back afterwards.

20   Q.  Okay.

21   A.  We also --

22                   (Talking over each other.)

23   Q.  (BY MR. MEDLOCK)  So let me make sure -- go

24   ahead, sir.  Sorry.  I didn't mean to interrupt you.

25   A.  We also have incidents in which you received in



Page 49

1    your -- in your -- in your documents where -- where

2    people would -- it was reported to the union where --

3    where people were -- were -- entered and returned back

4    to Mexico without being processed.

5        Q.  Okay.  So is it the case that you have seen

6    asylum seekers step onto U.S. soil, interact with a CBP

7    officer at primary inspection, and then be turned back

8    to Mexican territory without going to second- -- being

9    referred to secondary?

10       A.  Well, there were different -- different phases

11   of it.

12              You know, there were some that would make

13   them wait.  There were sometimes where they -- where

14   they were -- entered one bridge and they were told to

15   go back to another bridge, to enter over there.  And

16   there was -- at times where we would tell them just to

17   wait, to turn back to Mexico, have a seat and wait.

18       Q.  Okay.  So there were some times when people --

19   when asylum seekers stepped on to U.S. soil, told a CBP

20   officer that they wanted asylum in the United States,

21   and then those asylum seekers were told to go back to

22   Mexico and wait?

23       A.  Yes.

24       Q.  How often did you see that occur?

25       A.  I -- I've seen it when I was assigned out there



Page 50

1    firsthandedly [sic] and what was reported by the -- the

2    employees at the time, which -- which fueled a petition

3    to be written to headquarters, CBP headquarters.

4        Q.   Correct.  I'll get to that in just a second.

5             Based on what you saw and observed at the

6    Hidalgo port of entry, do you believe that CBP had a

7    pattern and practice of turning back asylum seekers to

8    Mexico without inspecting them and processing them as

9    the law requires?

10            MR. HALASKA:  Objection to the

11   extent -- objection to the extent that it calls for a

12   legal conclusion or expert opinion testimony.

13            Mr. Atkinson, please feel free to

14   answer the question.

15            THE WITNESS:  Thank you, sir.

16       A.   I think they -- they inspected them and they

17   provided a modified way of processing back, which may

18   not be, you know, in conjunction of what we've learned.

19   But it was done in a manner of -- of -- of -- in which

20   they -- they ordered us to do so.  We only knew --

21       Q.   (BY MR. MEDLOCK)  And they -- sorry go ahead.

22       A.   We only did what they --

23            (Talking over each other.)

24       Q.   (BY MR. MEDLOCK)  Did they --

25       A.   -- told us to do.


MAGNA ▶
LEGAL SERVICES

Page 51

1    Q.  When you say "they ordered us to do so" and you

2  "only did what they told us to do" --

3    A.  Uh-huh.

4    Q.  -- who is the "they" in that sentence?

5    A.  Local management.

6    Q.  Who in local management first instructed CBP

7  officers at the Hidalgo port of entry to turn asylum

8  seekers back to Mexico and tell them to wait?

9    A.  It was a -- well, when I was there -- can I

10  name names?

11    Q.  Yes, go ahead.

12    A.  Okay.  Was Ismael Hernandez, supervisor Ismael

13  Hernandez; supervisor Sergio Salinas; chief supervisor

14  Gonzalez; Richard Diaz -- I'm sorry -- assistant port

15  director at the time or acting port director Gonzalez.

16    Q.  Any others?

17    A.  I would say I guess in relation to the

18  petitions that I've forgot about, we received a

19  response; but the response that we received wasn't --

20  wasn't in concert in which we were -- what we were

21  doing at the bridge.

22            That's what fueled more of the -- of the

23  dissension that the -- the employees were going to be

24  put to blame on what was going on.  We were unsure what

25  was going on.



Page 52

```
 1                    THE COURT REPORTER:  You were unsure --
 2                    MR. MEDLOCK:  Okay.
 3                    THE COURT REPORTER:  Hold on one
 4    second.
 5                    You were unsure what?
 6                    THE WITNESS:  Unsure of the real policy
 7    that was going on.
 8        A.  My -- my understanding through -- through --
 9    through my leadership as NTEU president is the rules and
10    the policies belonged to the CBP agency and at any time
11    they can modify them to protect the employees, to
12    protect the immigrants, and whatever other matters in
13    the best interest of the government.
14                    So we just took the orders that they gave
15    us and -- and -- and applied them appropriately.
16        Q.  (BY MR. MEDLOCK)  So the orders that you
17    received from local management was to turn back asylum
18    seekers to Mexico and to tell them to wait in Mexico;
19    is that right?
20        A.  Yeah.
21                    Well, it was their way of -- of -- of
22    modifying a process, sending them back to -- like, we
23    would inspect if they had any documents, we'd screen
24    them, and send them back.
25        Q.  Besides looking at the asylum seekers'
```



Page 53

1  documents, was anything else done to inspect or process

2  those asylum seekers before they were sent back to

3  Mexico?

4      A.  They had a -- a process, where at one time there

5  was no process.  We would just have them turn back,

6  telling them that we had a date and time.

7           Then they created lists later on the time

8  where it would work with the Mexican side in -- in

9  sending immigrants over for processing.

10          THE COURT REPORTER:  Hold on one sec.

11          Mr. Downey, did you unmute your other

12  device?  I'm getting a bad feedback.

13          MR. DOWNEY:  We had a computer crash

14  on this computer, so I just came back on.

15          THE COURT REPORTER:  Be sure you're

16  muted, sir.  It's creating such a feedback that I'm

17  having trouble understanding them.  Thank you.

18          Okay, Mr. Medlock.  I'm sorry.  Go

19  ahead, please.

20          MR. MEDLOCK:  No worries.

21      Q.  (BY MR. MEDLOCK)  So when was the first time

22  that you recall CBP officers getting instructions from

23  local management to turn asylum seekers back to Mexico?

24      A.  We've -- we filed some grievances concerning

25  that issue.  So whatever those grievances say would be



Page 54

1    the time line.  I don't remember without the grievances

2    in front of me.

3         Q.  Okay.  Okay.  I'll show you those in just a --

4    in -- in a few minutes.

5               Was there ever a period of time in which

6    asylum seekers who were turned back to Mexico were

7    given an appointment or some sort of written document

8    by the CBP officers in the Hidalgo port of entry?

9         A.  I want to believe at the beginning they

10   weren't, and then at a certain time allegedly they were

11   doing it.  I don't know whether or not they were doing

12   it or not, but I was informed at some time after we

13   actually complained about not giving them schedules or

14   having appointments that -- that they implemented

15   something.  I never kept up on it after that.

16        Q.  Do you believe that CBP had a policy, whether

17   formal or informal, of turning asylum seekers back to

18   Mexico?

19               MR. HALASKA:  Objection to the extent

20   that it calls for a legal conclusion or expert

21   testimony.

22               Mr. Atkinson, please feel free to

23   answer.

24               THE WITNESS:  Thank you, sir.

25        A.  Can you say it again, please?  Repeat your --



Page 55

1      Q.  (BY MR. MEDLOCK)  Sure.

2      A.  -- question.

3      Q.  Sure.

4              MR. MEDLOCK:  And -- and just for

5  Mr. Halaska's benefit, let's just say your objection

6  will apply when I reask the question.

7              MR. HALASKA:  Sure.

8      Q.  (BY MR. MEDLOCK)  My question was:  Do you

9  believe that CBP had a policy, whether formal or

10  informal, of turning asylum seekers back to Mexico?

11     A.  Yes.

12     Q.  Why do you believe that?

13     A.  We believe that in the -- or we believe that

14  in -- in -- in the manner it was done -- I saw it

15  firsthandedly.

16     Q.  When asylum seekers -- sorry, go ahead.

17  Continue.

18     A.  No, go ahead.

19     Q.  When asylum seekers were turned back to Mexico

20  by CBP officers, were they told that the port was at

21  capacity, or were they told any other reason why they

22  weren't being processed at that time?

23     A.  Well, it happened in two phases.

24              At the beginning it was an everyday

25  business.  We ran a matter -- I mean, the amount of --



Page 56

1   amount of -- amount of -- of people in the building

2   never bothered anybody, you know.

3              And then overnight, chairs were taken off.

4   It's showing it to be less filled.  There was less

5   people being put in.  It was -- it was shocking us to

6   see certain things take place.

7              And if you relate it to the amount of

8   chairs that were there at the present time, sure, it

9   was, you know.

10     Q.  When you said chairs were taken out, what do

11  you mean by that?

12     A.  We had mul- -- we had our -- our secondary area

13  with many num- -- a large number of -- of chairs to --

14  to -- to sit individuals, and from some -- one day to

15  the next, it's -- they -- you know, some of them just

16  disappeared, created the -- the lobby, a little of --

17  about 60 percent capacity in there.

18     Q.  So just so I understand, about 40 percent of

19  the chairs were removed from the secondary seating area?

20     A.  Maybe from 30 to 40 percent.

21     Q.  Okay.  And do you recall when those chairs were

22  removed from the secondary seating area?

23     A.  No, I don't.

24     Q.  How do you know that the chairs were -- were

25  removed?



Page 57

1      A.  Because the seating were -- was closely --

2  maybe about 10 feet away from the -- from the -- from

3  the counter at the time, and now they were pushed all

4  the way back and there was less seats.  I mean, in

5  other words, we could see the floor.  We could see the

6  floor.

7      Q.  Did you observe that firsthand?

8      A.  Yes.

9      Q.  Did anyone tell you why those chairs had been

10  removed from the secondary seating area?

11      A.  I believe -- I believe the discussion they said

12  at the time was for safety reasons.

13      Q.  Did you believe that to be true?

14      A.  I -- I believe -- I believe -- I believe that

15  it was true at the time.

16      Q.  When you say "they said it was for safety

17  reasons," who's the "they" in that sentence?

18      A.  The people during the -- the grievances

19  process.  We raised --

20              (Talking over each other.)

21      Q.  (BY MR. MEDLOCK)  The agency representatives?

22      A.  Yes.

23      Q.  Who were the agency representatives who told

24  you that the chairs were removed for safety reasons?

25      A.  I want to say at the time it was -- the -- the



Page 58

1  person I deal with a lot would be David Gonzalez,

2  acting port director at the time, Carlos Gonzalez at

3  the time.

4      Q.  Uh-huh.

5          You said that you believed it was for --

6  that these chairs were removed for safety reasons at

7  the time.

8      A.  Uh-huh.

9      Q.  Did your opinion as to whether this was

10  actually for safety reasons change at some point?

11     A.  Well, I -- I -- I believe the officers and

12  the -- the -- the -- the persons that were coming over

13  with -- we were getting officers getting sick; and they

14  were getting lice in their heads and, you know, I

15  figured that, well, shoot, you know, it -- it seems like

16  it's helping the employees out and it may help the

17  immigrants out at the same time, having less people in

18  there.

19     Q.  So is it -- is it still your opinion today that

20  those chairs were removed for safety reasons?

21     A.  After -- after seeing the long-term effect of --

22  of -- of the persons getting sick in -- in different

23  areas, I would assume that that was the reason that it

24  was done for.

25     Q.  Okay.  Did anybody actually tell you it was



Page 59

1    done for health reasons?

2        A.  Not health reasons, just safety reasons.  They

3    said something about a fire marshal or something like

4    that, too, at the time I think, that they had too many

5    people --

6        Q.  Did --

7        A.  -- in the building.

8        Q.  Did you ever see the fire marshal inspect the

9    building?

10       A.  My understanding, I heard there was a fire

11   marshal report; but my argument before was, well, he

12   was never -- it was never a problem before.

13              But then again, like I said, those changes

14   did help the working environment for the employees and

15   the detainees that were being detained and held there.

16       Q.  It -- regardless of whether it helped the

17   working environment, did it reduce the capacity of the

18   port of -- of the Hidalgo port of entry --

19       A.  Yes.

20       Q.  -- to -- to process asylum seekers?

21       A.  Yes.

22       Q.  So just so I understand, when, to your

23   recollection were these chairs removed?

24       A.  I don't remember, sir.  I think there's a -- in

25   the grievances there might be some photos that were



Page 60

1   included in it, you know.

2               THE COURT REPORTER:  Some -- there

3   might be some what included?

4               THE WITNESS:  Some photos included.  I

5   don't know if it's to the petition, to the commissioner

6   or assistant commissioner, or to the grievances

7   attached.  I don't remember.  It's been a long time.

8       Q.  (BY MR. MEDLOCK)  Do you believe that CBP took

9   steps to intentionally decrease the capacity of the

10  Hidalgo port of entry to process asylum seekers?

11      A.  Knowing -- knowing the -- the -- the effects,

12  the positive effects of how it affected the employees

13  in there, I would have to say it was done for safety

14  reasons at the time.  I mean, starting to look at,

15  like, everything that happened at the detention center

16  and everywhere else, I mean, I think that was the

17  best -- best position they had, even though at the time

18  they didn't know whether or not it -- it -- it would

19  have that effect.

20              I couldn't -- I couldn't -- I couldn't

21  answer that one other than, you know, it took that --

22  that -- that -- it positively impacted the employees

23  and the immigrants that were being held there.

24      Q.  Okay.  I'd -- I'd like to go back to the

25  interactions between the CBP officers and the asylum



Page 61

1   seekers when they first -- when the asylum seekers

2   first approached the -- the CBP officers at the port of

3   entry.

4              Where -- to your observation, did those

5   interactions take place on Mexican soil or U.S. soil?

6       A.  I think it was both.

7       Q.  Okay.  When you say it was both, were there

8   cases in which the asylum seeker was standing on U.S.

9   soil and interacting with a CBP officer?

10      A.  Yes.  They had to make entry in order for us to

11  stop -- to stop the interview.

12      Q.  Right.

13              And -- and were those -- were some of those

14  asylum seekers that were standing on U.S. soil turned

15  back to Mexico and told to wait?

16      A.  Yes.

17      Q.  When those asylum seekers were turned back,

18  were they sometimes told that the port was at capacity?

19      A.  I wasn't aware to -- I wasn't privy to any of

20  that communication.

21      Q.  Okay.  Do you know whether CBP officers were

22  instructed to lie to asylum seekers in order to get

23  them to turn back to Mexico?

24      A.  I don't think there were -- they were -- lied.

25  I don't think they lied.  I think the officers told --



Page 62

1    told asylum seekers to do exactly what management had

2    informed them to do.

3        Q.  Okay.  And what did -- what did management

4    inform them to do?

5        A.  Well, I can't speak what -- what management

6    had -- had -- had informed anybody to do, but I can

7    speak to what they had told me to do, was to have

8    documents --

9        Q.  Okay.

10       A.  -- screen them, and do whatever little -- I --

11   we call it modified processing, where you say, "Hey,

12   you got to go back over there, got to sit down, or go

13   back to Mexico."

14       Q.  When did that modified processing begin?

15       A.  Oh, my God.  I don't -- I don't -- I would say

16   it began when they started the metering points.

17       Q.  And did you receive written guidance on how

18   that modified processing where asylum seekers were told

19   to go back to Mexico should work?

20       A.  Yes, I did.

21       Q.  When did you first receive that guidance?

22       A.  Well, I received it in a grievance reply and

23   then I also received it from -- I think it's the -- the

24   current DFO and -- and OFO in Laredo, Texas.  We

25   responded to a -- to a petition that was --



Page 63

```
 1      Q.  Randy Howe?

 2      A.  Yes, it was.  Yes, it was.

 3      Q.  And that guidance that you saw, was that an

 4  April 27, 2018, memorandum from Todd Owen?

 5      A.  I would have to see it.  I would have to see

 6  it.

 7      Q.  Okay.

 8      A.  I would -- something --

 9      Q.  Okay.

10      A.  -- I think -- it was a memorandum form, title

11  is, in response to the petition?

12      Q.  Fair enough.

13      A.  Yes, I think -- and there was the one, yes.

14      Q.  Okay.  And when you say --

15              (Talking over each other.)

16      A.  It's one of --

17      Q.  (BY MR. MEDLOCK)  When you say "in response to

18  the petition," what do you mean by that?

19      A.  The petition that was written by employees of --

20  we were very concerned that the -- as you know, the --

21  the media and -- and -- and -- and the national public

22  interest at the time, that we were stopping -- stopping

23  and returning people.

24              And, of course, Customs at one time, their

25  spokespeople would say that they wouldn't tolerate
```



Page 64

1    misconduct.

2                 And we were in fear that we didn't know if

3    the employees were going to be put in the middle of a

4    war, so we had to request stuff in writing to protect

5    them just in case they would be put in the middle, that

6    we would have to defend them and saying, "Look, this is

7    what they told us to do, but they didn't allow us to do

8    it."

9        Q.   Were you or other CBP officers at the Hidalgo

10   port of entry concerned that CBP was breaking the law

11   by turning asylum seekers back to Mexico?

12       A.   It appeared -- it appeared they were.

13   That's the reason why we requested clarification for

14   it.  But then again, you know, we need to follow up

15   what the letter had told us to do.

16       Q.   Were you concerned that CBP officers might be

17   sued for participating in turning asylum seekers back

18   to Mexico?

19       A.   We were -- we were in the understanding that

20   there was some kind of lawsuit filed at the time or

21   prior to.

22       Q.   As you sit here today, do you regret having

23   turned asylum seekers back to Mexico from the United

24   States?

25       A.   At the time -- at the time that I personally



Page 65

1    did it, of course, I was following orders from my

2    supervisors that were there in front of me, which I

3    kind of observed them do themselves.

4            We were just following orders.  We were

5    confused.  We didn't know what was right, what was

6    wrong, what the agency can -- can -- can follow or not

7    follow because they were the ones that wrote the

8    policy, and they're -- they have the right to change

9    that policy at any time.

10           We're just here to follow orders,

11   regardless of who -- what supervisor's there, what

12   president's there.  Like I said, it was multiple

13   presidents we were under, you know; so we were just

14   following orders.

15   Q.  And I get that you were just following orders.

16           And I guess my question is:  Given the fact

17   that there was a concern that the turn-backs might have

18   violated the law, as you sit here today, are you -- do

19   you regret having turned asylum seekers back to Mexico?

20   A.  Hmm, could you repeat that question again

21   because I -- I'm -- I'm trying to digest it a little

22   bit.

23   Q.  Sure.  Yeah, yeah, yeah.  Okay.  Then let me

24   try and improve it actually.

25           I -- I get that you were just following



Page 66

1   orders, and that's -- I don't -- I don't have a qualm

2   with that.

3               My question is:  Were -- did you -- were

4   you personally regretful that you had to turn asylum

5   seekers back to Mexico?

6   A.   Hmm, yes.

7   Q.   Why?

8   A.   Hmm, I felt the people were -- were in a

9   position of -- of -- of disadvantage, of -- of

10  possibly -- we had -- we had intel --

11              THE WITNESS:  Well, I don't know.  Can

12  I answer the question?

13              MR. HALASKA:  If -- if that's directed

14  to me, yes, Mr. Atkinson.

15              And for the remainder of the

16  deposition, you should feel free to answer the

17  questions unless I specifically tell you otherwise.

18  A.   Okay.  We had -- we had information -- or I had

19  personally information of people that were screaming

20  in -- in -- in the pedestrian area or the vehicle area,

21  that they would make claim that -- that the Boys Town

22  areas were -- were -- had new girls, had this and that,

23  and there were new prostitutes and stuff like that.

24              And we asked them where they were getting

25  them from; and they were, well, you know, these people



Page 67

1  that are being returned from Mexico or they're being

2  waited in Mexico.

3          And knowing that one of those people could

4  be my -- my daughter or sister, I was very upset.

5      Q.  (BY MR. MEDLOCK)  And I -- I -- I get that

6  you're very upset.  And I just want to clarify something

7  you said.

8          You -- you were upset because the people

9  who were being turned back to Mexico could be sold into

10  prostitution or taken advantage of by criminal gangs;

11  is that right?

12     A.  Well, that's what we were being told or I was

13  being told through people that were coming across

14  Mexico, the passengers that were making entry into the

15  United States.  We would question them about stuff and

16  the issues of what was happening across and stuff like

17  that.  The young kids would come back on a Saturday

18  night or Friday night and tell us that -- or tell me

19  that.

20     Q.  Okay.

21         MR. MEDLOCK:  Why don't we take a

22  quick break; and then after the break, I'll start

23  showing you some documents to help refresh your memory.

24  Okay?

25                 THE WITNESS:  Yes, sir.



Page 68

```
 1                    MR. MEDLOCK:  All right.  Can we go
 2   off the record?
 3                    THE VIDEOGRAPHER:  The time is
 4   10:53 a.m.  We're going off the record.
 5                    (Break taken from 10:53 a.m. to
 6                    11:08 a.m.)
 7                    THE VIDEOGRAPHER:  The time is
 8   11:08 a.m.  We're back on the record.
 9        Q.  (BY MR. MEDLOCK)  Welcome back, Mr. Atkinson.
10        A.  Welcome back.
11        Q.  Prior to 2016, have you seen any searches or
12   spikes in the number of migrants coming to the Hidalgo
13   port of entry?
14        A.  I would say yes.
15        Q.  In the instances where there were surges or
16   spikes in the number of migrants coming to the Hidalgo
17   port of entry, was CBP or its predecessor organizations
18   able to handle those prior surges or spikes without
19   resorting to metering or turn-backs?
20        A.  I would say that they had the capability of
21   doing it.
22        Q.  Why would you say they had the capability of
23   processing the spike or surge in migrants without
24   turning back asylum seekers?
25        A.  Oh, because we have a -- a -- you know, when --
```



Page 69

1    when we were having a -- a -- difficulties in -- in

2    processing individuals the second -- the second surge,

3    we had a vast amount of -- of port of entries that had

4    areas that could have easily created standalone tents

5    and -- and detention areas that -- in order to handle

6    those -- those -- those processing and they weren't

7    done.

8             We proposed them.  It just never -- never

9    came to be.  They had the areas --

10   Q.  So --

11   A.  -- and the people to do it, but they didn't.

12   Q.  So there were proposals --

13   A.  Yes.

14   Q.  -- to increase the capacity of the Hidalgo port

15   of entry, but management never acted on them; is that

16   right?

17   A.  Yes.

18             MR. HALASKA:  Objection, leading.

19   Q.  (BY MR. MEDLOCK)  You can answer, sir.

20   A.  We -- we verbally proposed putting up tents in

21   parking lots and -- and controlled fence areas from

22   port of entries, and they didn't want to do it.

23             We came with solutions, and they felt what

24   they implemented was in the best interest of the

25   government at the time.



Page 70

1    Q.  When you say "they," who's "they"?

2    A.  The port director at the time, David Gonzalez.

3    Q.  So from your perspective, if the metering or

4    turn-back policy did not exist and CBP just processed

5    people in the order that they came to the -- to the

6    border at the port of entry, CBP would have the

7    resources to do that; is that right?

8    A.  I would feel like they would.

9                 MR. HALASKA:  Objection, leading.

10                Go ahead.

11                THE WITNESS:  Go ahead?

12                MR. HALASKA:  Go ahead.

13   A.  I felt they did have the resources because we

14   were doing it before.

15   Q.  (BY MR. MEDLOCK)  When you say "we were doing

16   it before," what do you mean by that?

17   A.  Well, we were funneling out detainees at

18   different areas to different points of areas to ensure

19   they got processing.  In other words, overtime

20   assignments -- there was assignments, there was TDYs,

21   there was -- they were using all the ports of entry.

22                I've actually had the opportunity to

23   represent several ports, not just the Port of Hidalgo.

24   I represent the ports from Roma port of entry all the

25   way to Harlingen port of entry that -- which includes



Page 71

1    the airport, Progresso, Donna, Mission, Los Ebanos,

2    Rio Grande City, Roma, Falcon -- Falcon Heights port of

3    entry.  So I have numerous ports of entries that --

4    that I represent.

5        Q.  And thank you for that clarification.

6            For each of those ports of entry that you

7    represent, are they in the Laredo field office of CBP?

8        A.  Yes.

9        Q.  And based on your representation and

10   observations of those ports of entry in the Laredo

11   field office, do you believe that CBP could process

12   asylum seekers in the order that they came to the port

13   of entry without resorting to metering or turn-backs?

14       A.  I would have to say they've done it before

15   under Obama.  I couldn't see a reason why they couldn't

16   do it when it was Trump's administration.

17       Q.  Okay.  Sir, I'd like to move on to some

18   documents that will hopefully refresh your recollection

19   about some of the things you testified to before.

20           What we'll do is we'll put them on the

21   screen.  Kevin, who is our exhibit tech, will

22   occasionally blow parts of them up so you can see them

23   better.

24           But at any point, if you're having trouble

25   looking at a document, just let myself or Kevin know



Page 72

1    and we'll try to enlarge it and get it in a version

2    that you can see.  But today -- today is about what you

3    know.  It's not a vision test.  Okay?

4         A.  Okay.  Thank you, sir.

5         Q.  Okay.

6                   MR. MEDLOCK:  Kevin, can you please

7    bring up Tab 1, please?

8         Q.  (BY MR. MEDLOCK)  Okay, Mr. Atkinson.  I've

9    put --

10        A.  I -- I surely can't -- I surely can't see it.

11        Q.  Okay.  Thank you.  We'll -- we'll make it

12   bigger.

13        A.  I need at least three times as big.

14        Q.  So I'm going to have just some general

15   questions about the exhibits, sir; and then I'll -- we

16   can --

17        A.  Can -- can you make it bigger, please?

18        Q.  Sure.

19                   EXHIBIT TECH:  We'll have to go one by

20   one per e-mail to make them each bigger one at a time.

21                   MR. MEDLOCK:  Okay.

22                   THE WITNESS:  Okay.  I can't -- it's

23   still -- it's still blurry.  I mean, I can't see it.

24                   MR. MEDLOCK:  Can you see that, sir?

25                   THE WITNESS:  I see part of it.



Page 73

1          EXHIBIT TECH:  Okay.

2          THE WITNESS:  Okay.

3          EXHIBIT TECH:  All right.

4     Q.  (BY MR. MEDLOCK)  So I've put in front of you

5   what will be marked as Exhibit 288 to your deposition.

6   This is a two-page e-mail chain that has the Bates

7   numbers NTEU 136 through NTEU 137.

8              (Whereupon Exhibit 288 was marked for

9              identification.)

10    Q.  (BY MR. MEDLOCK)   And just so I'm not

11  confusing you, sir, when we talk about Bates numbers,

12  that's a lawyer term for the special numbers put at the

13  bottom right-hand corner of the document.  It just

14  helps us keep track of the pages that we're on.

15             And this appears to be, at least in part, a

16  December 23rd, 2016, e-mail from William Haral- --

17  William Haralson to Jessica Ibarra, Christopher Perez,

18  Sylvia Guerra, Abraham -- and Abraham Pena, with a copy

19  to Eric Clough.

20             Do you see that, sir?

21    A.  Uh-huh.  Yes.

22    Q.  Do you know who William Haralson is?

23    A.  Yes.

24    Q.  What's William Haralson's position or title

25  within NTEU Chapter 149, if any?



Page 74

1     A.  He actually took -- none now, but at the time

2     he was a -- a second -- appointed -- assigned as the

3     second full-time representative for the office.

4               We have two full-time representative --

5     well, two and a half full-time representative positions

6     in the office; and I assigned him one and he was one of

7     those positions at the time when he wrote this.

8     Q.  Okay.  And at the time that Mr. Haralson wrote

9     this e-mail, would he have told you about the -- what

10    was going on with respect to this e-mail?

11    A.  Yes, yes.

12              Actually, I believe he told me -- I mean,

13    he told me about that incident; and I told him to grab

14    the statements and send a -- send a message out.

15    Q.  Okay.  So this December 23rd, 2016, e-mail was

16    sent by Mr. Haralson at your direction; is that right?

17    A.  Yes.

18    Q.  Okay.  I'd like to -- and I -- I notice that

19    you're not copied on this e-mail and didn't receive a

20    copy of it.

21              At some point did you receive a copy of

22    this e-mail?

23    A.  I -- I want to say I did.  I mean, I knew about

24    it.  But see, since I have a -- enormous geographic

25    locations, I tend to -- depending on the competency they



Page 75

1  have in handling stuff, they just tell me about the

2  issue, and I guide them which way to go, you know.

3  But --

4      Q.  Okay.

5      A.  -- since he's asking for statements and stuff,

6  it's something that -- that I would do to ensure that

7  when we file a grievance or file an incident report,

8  that -- that -- that I -- we wouldn't be accused of

9  being unethical and making something up or something.

10  So we would grab this page --

11     Q.  Okay.

12     A.  -- to prove that the issue happened in order

13  to -- to -- to protect the employees from -- from any

14  kind of repercussions for their actions, whether

15  they're following an order or not.

16     Q.  Okay.  Understood.

17          So this -- I'm looking at this e-mail that

18  was sent December 23rd, 2016, that appears on the page

19  NTEU 136.  The subject line of that e-mail is:

20  "Incident 12/6/2016."

21          Do you see that?

22     A.  Yes.

23     Q.  And then I'd like to move into the text of the

24  e-mail.

25          Mr. Haralson begins the e-mail with:



Page 76

1    "Alcon."

2              Do you see that?

3        A.   Yes.

4        Q.   And that means "all concerned"?

5        A.   Yes.

6        Q.   Okay.  And he writes, quote:  (Reading)  I am

7    contacting you all regarding an incident that occurred

8    on December 2nd, 2016, at the Pharr, Texas -- Pharr,

9    Texas, port of entry.  The union has received reports

10   that a large group of undocumented aliens were

11   apprehended at the Pharr, Texas, port of entry and were

12   subsequently transported to the Hidalgo, Texas, port of

13   entry and returned to Mexico without any type of

14   adverse action.

15             Did I read that correctly, sir?

16       A.   Yes, sir.

17       Q.   Okay.  What does -- if you know, what does

18   "adverse action" mean in that paragraph?

19       A.   I guess it's -- it's -- it's whether they're

20   claiming criminal fear or they're claiming asylum, they

21   have to go through a -- through a -- a process in which

22   the agency chooses.  There were so many at the time.

23   They get processed to document their arrival, the

24   questions, and they are either detained to go forward

25   for bases?  God knows what they do with them.  So many



Page 77

1    things --

2        Q.  Okay.

3        A.  -- have happened.  Yeah.

4        Q.  So regardless of what process happened

5    afterwards, it seems like in this e-mail, Mr. Haralson

6    is saying none of those processes happened.  They were

7    just returned to Mexico; is that right?

8        A.  Correct.

9        Q.  Okay.  And do you know whether any statements

10   were taken in -- from CBP officers in connection with

11   the incident described in this e-mail?

12       A.  Hmm, I believe this e-mail was internal for our

13   use to report to management.  I believe we did use it

14   as evidence in a grievance or evidence in -- in a -- in

15   a report of wrongdoing.

16              Now, you know, I don't remember when; but

17   we did use it because we had to protect the employees,

18   regardless of what orders the employees -- lawful order

19   the employees received from their supervisors.

20       Q.  Okay.  Understood.

21              Based on the statements that were taken and

22   your interactions with Mr. Haralson and the CBP officers

23   listed in this e-mail, do you believe that the incident

24   that Mr. Haralson describes in this e-mail actually

25   occurred?



Page 78

    1    A.  After reviewing the -- the -- the statement or

    2    statements that we had received, yes, it did.

    3    Q.  When NTEU Chapter 149 asked for statements from

    4    CBP officers, does the union tell the CBP officers what

    5    to write?

    6    A.  No.  They give us the details; and, you know, we

    7    assist them in -- in -- in writing some of the

    8    statements, you know.  We get an interpretation of what

    9    they said, and we say:  "Okay.  Well, this is what it

   10    is, you know."

   11    Q.  Uh-huh.

   12    A.  So we can -- we'll help them at times.

   13    Q.  When you say "we'll help them" --

   14    A.  Uh-huh.

   15    Q.  -- did -- does the NTEU Chapter 149 ever put

   16    words into someone's mouth?

   17    A.  No, but we help them -- we help them

   18    interpret -- interpret what they're saying in a -- in a

   19    very fair and concise manner, you know.

   20    Q.  Uh-huh.

   21        But you -- you don't change their story; is

   22    that right?

   23    A.  No, no.  Our intentions are never to -- to --

   24    to change the -- their stories.  They're -- it's their

   25    statement.



Page 79

1      Q.  All right.

2                  MR. MEDLOCK:  Let's bring up Tab 2, if

3      we could, please, Kevin.

4      Q.  (BY MR. MEDLOCK)  All right, sir.  I've put in

5      front of you what will be marked as Exhibit 289 to your

6      deposition.

7      A.  Uh-huh.

8                  (Whereupon Exhibit Number 289 was

9                  marked for identification.)

10     Q.  (BY MR. MEDLOCK)  It is a one-page e-mail that

11     has the Bates number NTEU 138.

12                 And my first question is:  Can you see this

13     e-mail in front of you clearly, sir?

14     A.  Yes.

15     Q.  Okay.  This is an e-mail that was sent from

16     Jessica Ibarra --

17     A.  Uh-huh.

18     Q.  -- to William Haralson with a copy to Eric

19     Clough on December 23rd, 2016, at 5:59 p.m.

20     A.  Uh-huh.

21     Q.  Do you see that, sir?

22     A.  Yes.

23     Q.  And the subject line of this e-mail is:  "RE:

24     Incident 12/6/2016," correct?

25     A.  Yes.



Page 80

1       Q.  Okay.  And do you know Jessica Ibarra?

2       A.  Yes, I do.

3       Q.  At the time of this e-mail, December 23rd, 2016,

4   where was -- what was Jessica Ibarra's position at CBP,

5   if any?

6       A.  She was a CBP officer.

7       Q.  And where was she assigned, if you know?

8       A.  I don't know that, sir.  I just -- I -- I

9   remember getting the -- the -- the report.  I don't

10  remember if it was from Eric or Will that this was

11  happening and I told them to state an answer, that was

12  as simple as saying, look, you know what, we need to

13  just know the short specifics.

14              And usually, when you tell one employee,

15  you know, where -- okay, they'll give us an -- an hour

16  story and we'll say, okay.  This is the important part,

17  to cover your ass, is just that they made you do this,

18  period.

19              So they'll write a little short three- or

20  four-liner, and that should suffice in just protecting

21  them -- we feel that would protect them in what the

22  agency had ordered them to do.

23      Q.  Okay.  Were you on the phone with Ms. Ibarra

24  when she gave the longer statement about what she

25  observed at the Hidalgo port of entry on December 6th,



Page 81

1    2016?

2        A.   I could have talked to her.  I'm not -- I mean,

3    I could have talked to any of them; but I don't

4    remember.

5        Q.   Okay.  And so I take it you don't recall the

6    specifics of what was said on the phone when you took --

7    when you went through the longer statement from these

8    officers regarding what happened at the Hidalgo port of

9    entry on December 6th, 2016?

10       A.   Yeah.  I -- I -- I believe the way it happened,

11   it -- I think it was Mr. Eric Clough that was there that

12   night or it was reported to him and he was cc'd on the

13   e-mail, and I think -- I don't know if it was the day

14   that that happened, December 6th.

15               And I told him:  You know what?  You guys go

16   back...  the statements.  They may come back and bite

17   you.  You know, protect yourselves.

18               And -- and that's what they did, as you can

19   tell.

20       Q.   Okay.

21       A.   So I don't know whether or not -- I could have

22   talked to all of them.  I don't recall.

23       Q.   Okay.  Okay.  Understood.

24               Let's move into the body of the e-mail that

25   Officer Ibarra sent.  She writes, quote:  (Reading)



Page 82

1    To whom it may concern, on December 6th, 2016, I, CBPO

2    J. Ibarra, along with CBP -- CBPO A. Pena, transported

3    a group of undocumented aliens from the Pharr, Texas,

4    port of entry to the Hidalgo, Texas, port of entry.

5    Once arriving at the Hidalgo, Texas, port of entry,

6    undocumented aliens were returned to Mexico with no

7    adverse action taken.

8              Did I read that correctly?

9        A.  Yes, sir.

10       Q.  To your knowledge, does this e-mail describe

11   undocumented noncitizens being returned -- being turned

12   back from U.S. soil to Mexican soil without being

13   inspected or processed?

14       A.  Yes, not inspected, though, because they had to

15   take their -- their -- their -- their -- had to --

16   apparently they didn't, but they had to inspect them by

17   asking them their names and blah, blah, blah before

18   they sent them.  They -- they -- they -- now, whether

19   they got processed would mean that they didn't get

20   processed at all.

21       Q.  Okay.  So let me clarify my question because

22   that's a good clarification.

23             Did this e-mail describe undocumented

24   noncitizens being turned back from U.S. soil to Mexican

25   soil without being processed?



Page 83

1      A.  I think it's without an adverse action taken.

2  It's not -- I mean, it's -- it's kind of hard, because

3  that agency implemented certain -- certain ways of

4  processing them, and we weren't really informed.

5              I'll give you an example, where they

6  would -- we will take 20, 30 questions, which on the

7  form they reduced it to 10.  So did they get processed?

8  Well, maybe they got processed, but they didn't get

9  processed in which state they were supposed to get

10 processed.  So, I mean, there's different --

11     Q.  Right.

12     A.  -- I mean, and if this is the new way of them

13 processing the individuals, where, you know, I can't --

14 I -- I -- I can't speak to that other than they're

15 saying that they didn't do an adverse action to them.

16              So I don't know whether they got -- their

17 understanding that they didn't do the form and they

18 weren't processed right, their -- their way of

19 interpreting the process.

20     Q.  Okay.  Certainly these individuals weren't

21 taken into custody at the port of entry, correct?

22     A.  They were taken into custody.

23     Q.  I'm sorry.  They -- certainly they weren't put

24 into holding rooms at the port of entry, correct?

25     A.  I wouldn't know, sir.


MAGNA
LEGAL SERVICES

Page 84

1      Q.  Okay.  It doesn't appear that these individuals

2  were allowed to meet with an asylum officer, correct?

3      A.  Well, we don't have asylum off- -- well, I

4  think we maybe do; but at the time it was late at night,

5  I think.

6      Q.  Okay.

7      A.  It might have been the evening -- I'm not sure.

8  I think the asylum officers are -- might be -- I'm not

9  sure, might be off the port -- port of entry.  I'm not

10  sure.

11     Q.  Okay.

12     A.  They might have had some there or what.  I'm

13  not sure.

14              But my interpretation is they didn't --

15  what -- what -- my understanding was this:  They didn't

16  do any paperwork for them.

17     Q.  I got it.  Thank you.  That's -- that's --

18  that's helpful.

19              MR. MEDLOCK:  All right.  Kevin, can

20  you please bring up Tab 3.

21              (Whereupon Exhibit Number 290 was

22              marked for identification.)

23              MR. HALASKA:  I apologize.

24  Mr. Atkinson, could you just repeat the last part of

25  your answer to the previous question?  I just had some



Page 85

 1    trouble hearing it.

 2                    THE WITNESS:  I said -- I told him --

 3    he asked me about the adverse action, and I don't -- so

 4    my interpretation of it is that whatever process CBP

 5    had in place, I don't know.

 6                    But my understanding is they didn't

 7    process the paperwork to document his -- his request.

 8                    MR. HALASKA:  Okay.  Thank you.

 9        Q.  (BY MR. MEDLOCK)  Okay.  Mr. Atkinson, I've put

10    in front of you a document that has the Bates number

11    NTEU 139.  It appears to be a December 26th, 2016,

12    through December 27, 2016, e-mail exchange between

13    Sylvia Guerra, Eric Clough, and yourself and William

14    Haralson.

15                    Do you see that, sir?

16        A.  Yes, sir.

17        Q.  Okay.  So you would have received this e-mail

18    in the course of your work as NT -- the president of

19    NTEU Chapter 149; is that right?

20        A.  Yes, sir.

21        Q.  And you would have received this e-mail on or

22    about the dates and times listed in the e-mail chain,

23    correct?

24        A.  Yes, sir.

25        Q.  And you would have kept and maintained this



Page 86

1   e-mail chain in your e-mail system, correct?

2       A.  Yes.  I think this was one that was provided to

3   you by --

4       Q.  Right --

5       A.  -- either NTEU National or myself.

6       Q.  Okay.

7       A.  I think both of us provided it to you.

8       Q.  Correct.

9           And do you have any reason to believe that

10  this e-mail exchange is inauthentic in any way?

11      A.  Oh, no.  Like I said before, Mr. Clough reported

12  it.  You know, I told him to get statements, and which I

13  guess he did, and he asked them to send it to you.

14      Q.  Okay.

15      A.  So...

16      Q.  I'd like to focus on the e-mail that Sylvia

17  Guerra sent to Mr. Clough on December 26th, 2016, at

18  2:46 p.m.

19          Do you see that e-mail, sir?

20      A.  Yes, sir.

21      Q.  The subject line of that e-mail is:  "OTM memo."

22          Did I read that correctly?

23      A.  Yes.

24      Q.  Do you have an understanding of what the acronym

25  "OTM" means?



Page 87

 1      A.  "Other than Mexican."

 2      Q.  And this -- this refers to migrants who are not

 3  Mexicans, right?

 4      A.  Yes, or not considered to be Mexicans.

 5      Q.  Fair enough.

 6          In Sylvia Guerra's e-mail, she writes

 7  Mr. Clough --

 8      A.  I -- I don't have it.

 9      Q.  Oh, I'm sorry.  Do you -- do you see the second

10  e-mail in the chain where Sylvia Guerra writes to Eric

11  Clough?

12      A.  No.  I just see the (reading) Here's my memo you

13  requested one.

14      Q.  Well, that's what I was going to read from.

15      A.  Oh, okay.

16      Q.  She writes:  (Reading)  Here is -- here's the

17  memo you requested.  If you need any additional

18  information, please let me know.

19          Did I read that correctly?

20      A.  Yes, sir.

21      Q.  Okay.

22          MR. MEDLOCK:  And can we go to the

23  next page of the exhibit, please, Kevin, and expand

24  that?

25      Q.  (BY MR. MEDLOCK)  All right.  I've put in front



Page 88

1    of you an expanded version of the page -- of the second

2    page of Exhibit 290, which is NTEU 140.

3               This appears to be a short statement from

4    Sylvia Guerra, correct?

5        A.   Yes.

6        Q.   And Sylvia Guerra writes, quote:  (Reading)  On

7    December 6th, 2016, I, CBPO Sylvia Guerra, was advised

8    by SCBPO Ismael Hernandez to aid in transporting a

9    group of OTMs that had arrived to the Pharr POE earlier

10   in the evening.  The transport was from Pharr POE to

11   Hidalgo POE.  We drove up to the back entry of INS

12   where I witnessed the group of OTMs entered in a single

13   file into INS; and as they walked in, they were

14   escorted to the front of INS through the pedestrian

15   entry and were told to go back to Mexico.  No adverse

16   actions were taken.

17               Did I read that correctly?

18       A.   Yes, sir.

19       Q.   There's a reference in here to SCBPO.  Does that

20   refer to a supervisory CBP officer?

21       A.   Yes.

22       Q.   And that's a rank that's right above CBP

23   officer, correct?

24       A.   Yes, sir.

25       Q.   Okay.  There's a reference in this note to INS.



Page 89

1    Do you understand what that means?

2        A.  Yes.

3        Q.  What does that mean?

4        A.  Before we -- before we -- before we became an

5    agency -- we're two separate agencies.  We're

6    Immigration Naturalization Service and the U.S. Customs

7    Service.

8              When they were -- when they were unified to

9    create DHS, we -- we -- CBP took over that building,

10   and that building as -- as called -- it's INS.  It's a

11   secondary area where -- where the adverse actions and

12   the asylees and the permits and everything else is --

13   is -- and where people are screened and -- and

14   processed.

15       Q.  Okay.  So --

16       A.  That's what --

17       Q.  -- INS refers to this secondary inspection

18   area?

19       A.  Yeah.  It's a passport control processing

20   center.

21       Q.  I understand that.  Okay.

22              So what Sylvia Guerra is saying in this

23   note is essentially that the -- this group of other

24   than Mexican migrants came in the back entry to

25   secondary, they were walked through secondary, and



Page 90

1   escorted out the front of secondary through the

2   pedestrian entry; is that right?

3        A.   Yes.

4        Q.   And then once they got to the pedestrian entry,

5   the secondary, they were told to go back to Mexico; is

6   that right?

7        A.   Yes.

8        Q.   Okay.  So these -- these individuals were

9   actually taken through the port of entry building and

10  then told to go back to Mexico, right?

11       A.   Can I read it?  Let me see.  (Reading)  On

12  December --

13       Q.   Sure.

14       A.   -- (reading) transporting a group of OTMs

15  arrived at the Pharr early in the evening and

16  transported from Pharr to POE.  We drove up the back

17  entry of INS where I witnessed a group of OTMs enter a

18  single file to INS and were... (garbled)... and were

19  told to go back to Mexico.

20               Right -- yes, okay.

21       Q.   So if -- is it the case that these individuals

22  were actually escorted through the Hidalgo port of

23  entry, or at least part of it, before they were told to

24  go back to Mexico?

25       A.   Yes, sir.



Page 91

1    Q.  So there's -- there's no question from
2  Ms. Guerra's statement that these -- this group of
3  other than Mexican undocumented migrants were standing
4  on U.S. soil when they were told to go back to Mexico --
5    A.  Yes.
6    Q.  -- is that right?
7             MR. HALASKA:  Objection, leading.
8    Q.  (BY MR. MEDLOCK)  I'm sorry.  I couldn't hear
9  your answer, sir.
10    A.  Yes.
11             MR. MEDLOCK:  All right.  Kevin, could
12  you please bring up Tab 4.
13    Q.  (BY MR. MEDLOCK)  All right, sir.  I've put in
14  front of you --
15    A.  Okay.
16    Q.  -- what we will mark as Exhibit 291 to your
17  deposition.
18             (Whereupon Exhibit Number 291 was
19             marked for identification.)
20    Q.  (BY MR. MEDLOCK)  It is a e-mail with an
21  attachment -- with a multipage attachment that has the
22  Bates -- the leading Bates number NTEU 141.
23             And I want to focus with you on the e-mail
24  that's been expanded in front of you --
25    A.  Okay.


MAGNA
LEGAL SERVICES

Page 92

1     Q.  -- which appears to be an e-mail from William

2     Haralson on April 12th, 2017, to Walter Dresslar with a

3     copy to yourself, Eric Clough, and Eduardo Ponce.

4          Do you see that, sir?

5     A.  Yes, sir.

6     Q.  All right.  You would have received this e-mail

7     and the attachment to it --

8     A.  Yes, sir.

9     Q.  -- in the course of your work as the chapter

10    president for NTEU 149; is that right?

11    A.  Yes, sir.

12    Q.  And you would have received this e-mail on or

13    about the date and time listed on the e-mail; is that

14    right?

15    A.  Yes, sir.

16    Q.  And you kept and maintained this e-mail in your

17    e-mail system; is that right?

18    A.  At the time I was a CBP, yes.

19    Q.  Okay.  And at the time you were a CBP, you were

20    an authorized user of the C- -- you were authorized to

21    use the CBP e-mail system for the business of NTEU

22    Chapter 149; is that right?

23    A.  Correct.  This is part of my NTEU records at

24    this current time.

25    Q.  Okay.  And do you have any reason to believe



Page  93

 1    that this exhibit, Exhibit 291, is inauthentic in any

 2    way?

 3         A.   No.  I believe it's true and factual.

 4         Q.   Okay.  So this e-mail is addressed to Walter

 5    Dresslar.  Who is Walter Dresslar?

 6         A.   Walter Dresslar is our field attorney.

 7         Q.   Okay.  What does "field attorney" mean?

 8         A.   Our -- he's our national field attorney.  He's

 9    the ones that -- the attorneys that represent us in

10    arbitration hearings.

11         Q.   Okay.  I understand.

12         A.   And it's --

13                   (Talking over each other.)

14         Q.   (BY MR. MEDLOCK)  And we haven't talked about

15    Eduardo Ponce, who got a copy of this e-mail.

16                   What was his position with respect to NTEU

17    Chapter 149 at this point?

18         A.   He was the vice president.

19         Q.   Okay.

20         A.   Both Eric Clough and Eduardo Ponce are vice

21    presidents.

22         Q.   Okay.  And the subject line of this e-mail is:

23    "Arbitration Invocation Request."  And then in

24    parentheses:  "Failure to process asylum/credible fear

25    seekers HID 2017," close parentheses.



Page 94

1                  Do you see that, sir?

2        A.  Yes.

3        Q.  What does "HID" mean in that subject line, if

4    you know?

5        A.  Hidalgo.

6        Q.  Okay.

7        A.  Or Hidalgo, Texas.

8        Q.  Okay.  Thanks for that -- thanks for that

9    explanation.

10                William Haralson writes in his e-mail at

11   the -- in the first paragraph:  (Reading)  Mr. Dresslar,

12   Chapter 149 would like to invoke the attached grievance

13   into arbitration as the agency has continuously failed

14   to properly process asylum and/or credible fear seekers

15   at the ports of Hidalgo, Texas.

16                Did I read that correctly?

17       A.  Yes, sir.

18       Q.  Do you believe that to be true?

19       A.  Yes, sir.  He was a -- a -- an individual that

20   actually belonged to that processing team, that passport

21   processing.  That's why he was tasked to interpret what

22   needed to be done and what needed to be grieved to

23   protect the employees.

24       Q.  When you say "he," are you referring to

25   Mr. Haralson?



Page 95

1      A.  Yes.

2      Q.  Okay.  Can you briefly explain to me how the

3   NTEU grievance process works?

4      A.  We request -- well, first of all, what we've --

5   what we've done, we -- we tend to verbally talk to them

6   about it and -- and if -- if they don't correct the

7   matter, I would say within a reasonable set of time,

8   whether it's three days, two days -- attempt determine

9   on the importance of the matter, we file a step -- a

10  Step 1 grievance.

11             Historically, with this -- historically,

12  with -- the management team in the OFO office and -- and

13  the Port of Hidalgo has been hostile for years.

14  We've -- we've come to -- to -- to the point where we --

15  they ignore what we're proposing or requesting.

16             So at times, we -- we start with a Step 1

17  grievance meeting to document it and -- and start the

18  process because, you know, for an issue that might

19  happen and could be fixed in that day, if we approach

20  it informally with certain proposed solutions, it might

21  take a month before we file it.

22             And -- and, you know, there's -- there's

23  more employees injured in the process.

24             So we usually generate a grievance on its

25  face because we figure if management's going to fix it,



Page 96

1    they're going to fix it, that's the first step.

2        Q.  And after a Step 1 grievance is filed, are there

3    other steps in the grievance process?

4        A.  Yes, there's three steps or four.

5        Q.  Can you describe the subsequent steps in the

6    grievance process --

7                    (Talking over each other.)

8        A.  There's a step -- there's a -- well, we tend to

9    do it informal, but it turns to a -- a -- a Step 1

10   grievance, Step 2 grievance, Step 3 grievance, then

11   arbitration, and then an arbitration itself, and then

12   any appeal is afterwards.

13       Q.  (BY MR. MEDLOCK)  When you say Step 1 grievance,

14   Step 2 grievance, and Step 3 grievance, is there a

15   difference between each of the steps?  Is there more

16   formality or some sort of different process around it?

17       A.  Yes.  It goes -- it goes -- usually -- usually

18   the managers -- or, I mean, the agency has a -- the

19   option ei- -- either to designate one person or to --

20   to start off with a first line supervisor.

21                    But usually it -- the -- the agency has

22   designated one person to receive grievances in our case;

23   and after the first step, it goes to the -- to the port

24   director afterwards.

25                    And from the port -- local port director at



Page 97

1    the port, it goes to the Laredo field operations person.

2    Then after that, when it gets invoked, it gets invoked

3    nationally between our national president and, I guess,

4    a commissioner.

5        Q.  And when you say "invoked," you mean invoking

6    arbitration?

7        A.  Yes.

8        Q.  Okay.  And earlier you were saying that prior to

9    the Step 1 grievance, you might verbally talk to them;

10   and if they don't correct the matter, then you move to a

11   Step 1 grievance -- when you said "them" and "they," who

12   were you referring to?

13       A.  That would be local management, local

14   management.

15       Q.  And would local management include the port

16   director, or would it be one of his or her direct

17   reports?

18       A.  Local management would include -- could --

19   well, our chain of command from the -- from the -- from

20   the first line supervisor up to the commissioner.

21       Q.  Okay.  I understand.

22               MR. MEDLOCK:  I'd like to move to the

23   next page of the exhibit, which is NTEU 142, if you

24   could please bring that up, Kevin.

25       Q.  (BY MR. MEDLOCK)  And I apologize for the --



Page 98

 1   for the -- smudged nature of some of the -- of the copy

 2   on this letter, sir.

 3             Does this appear to be a letter sent on

 4   NTEU letterhead?

 5       A.  Yes.

 6       Q.  Okay.  And this is sent from NTEU Chapter 149

 7   in Hidalgo, Texas, correct?

 8       A.  Yes, sir.

 9       Q.  And beneath that the letter is dated January 19,

10   2017, correct?

11       A.  Yes, sir.

12             MR. MEDLOCK:  And, Kevin, can you move

13   to the last page of this letter, which is NTEU 144.

14       Q.  (BY MR. MEDLOCK)  All right, sir.

15             MR. MEDLOCK:  Oh, you had it there,

16   Kevin.  Sorry.

17       Q.  (BY MR. MEDLOCK)  And if you'd look at the last

18   page of this letter, sir, do you see a signature on that

19   page?

20       A.  That's my signature.

21       Q.  Okay.  So this is a letter that you either wrote

22   or signed; is that right?

23       A.  Yes, sir.

24       Q.  And you would have reviewed this letter before

25   it was sent out, correct?



Page 99

1      A.  Yes, sir.

2      Q.  Okay.  Let's move back to the first page of the

3   letter, which is NTEU 142.

4      A.  Okay.

5      Q.  And at the very bottom of that page, do you see

6   a section called "Brief Summary"?

7      A.  Yes.

8      Q.  Okay.  And are you able to see the text beneath

9   "Brief Summary"?

10      A.  Yes.

11      Q.  Okay.  In that section, the letter reads, quote:

12   (Reading)  Since on or about December 6th, 2016, and in

13   a continuing manner, the agency has unilaterally

14   implemented a policy that prevents and/or blocks CBP

15   officers, open parentheses, pedestrian primary, slash,

16   secondary, close parentheses, from processing political

17   asylum seekers and assessing their possible persecution

18   or torture.

19            Did I read that correctly?

20      A.  Yes.

21      Q.  And do you believe that statement to be true,

22   sir?

23      A.  I believed that at the time, and I just do.

24   Yes, I do.

25      Q.  Okay.  And does this refresh your recollection



Page 100

1    that asylum seekers were being turned back at the

2    Hidalgo Port of entry from at least December 6th, 2016?

3        A.   If that's the time line at the time, yes, I

4    did.

5        Q.   Okay.  And the letter refers to CBP officers

6    preventing and/or blocking asylum seekers.

7                 What does that mean?

8        A.   Well, I need to see the rest of the -- the

9    paragraph where I can -- I can coincide it with it,

10   because I --

11       Q.   Oh, sure.

12               MR. MEDLOCK:  Kevin, can you blow up

13   the -- the paragraph on both sides of the page?

14       Q.   (BY MR. MEDLOCK)  Let me know when you're done

15   reviewing that --

16       A.   Uh-huh.

17       Q.   -- Mr. Atkinson.

18       A.   Okay.

19               THE COURT REPORTER:  While he's

20   reviewing that, Mr. Medlock, can I make a clarification,

21   please, sir?

22               MR. MEDLOCK:  Sure.

23               THE COURT REPORTER:  Is this to be

24   marked as an exhibit?

25               MR. MEDLOCK:  Uh-huh.  Yes, it will be



Page 101

1    used as an exhibit.  This -- I think it's 291.

2                THE WITNESS:  Okay.  I got it.

3        Q.  (BY MR. MEDLOCK)  Okay, Mr. Atkinson.  Having

4    reviewed that paragraph, do you understand what the

5    phrase "prevents and/or blocks" means?

6        A.  Yes, sir.

7        Q.  What does it mean?

8        A.  Well, I mean, I think it -- at the time of the

9    incident -- I don't know when -- when it was written --

10   I was one of the individuals that were actually working

11   pedestrian; and there was a supervisor, Richard Diaz,

12   that was behind me.

13               And I was -- asylum seekers were getting

14   through, and I would be referring them to -- to

15   secondary or to be processed.

16               And he came behind me and told me:  "No,

17   you can't be doing that.  They need to go back to

18   Mexico."  So, you know --

19       Q.  Well --

20       A.  Supervisor Richard Diaz.

21       Q.  So Supervisor Rich Diaz told you personally that

22   you could not refer asylum seekers who were on U.S. soil

23   to secondary; is that right?

24       A.  Yes.

25       Q.  And Supervisor Rich Diaz told you that asylum



Page 102

1   seekers who were on U.S. soil, not only should not be

2   referred to secondary, they should be sent back to

3   Mexico; is that right?

4        A.  Yes.  I think the --

5                  MR. HALASKA:  Objection; leading.

6        A.  I -- I think the only one -- I think the only

7   ones that were allowed were -- I think they're Eritheans

8   [sic] or some other individuals of color that were

9   allowed to be processed that were -- that were

10  requesting asylum, that's right.

11       Q.  (BY MR. MEDLOCK)  Okay.  So your recollection is

12  the only asylum seekers that were being let through were

13  Eritreans?

14       A.  I think so.

15       Q.  All right.  Let's move down in the exhibit to

16  the page NTEU 143 and --

17       A.  149.

18       Q.  -- I'm looking -- sorry.  Go ahead, sir.

19       A.  149.

20       Q.  Oh, sure.

21                  The -- do you see that there's numbered

22  paragraphs on that page?

23       A.  I can't see the page at all, sir.

24       Q.  Okay.

25                  MR. MEDLOCK:  If you can make it



Page 103

1    bigger, please, Kevin.  Thank you.

2        A.  Okay.

3        Q.  (BY MR. MEDLOCK)  Do you see that there's

4    certain numbered paragraphs on that page?

5        A.  Yes, sir.

6        Q.  Okay.  I would like to focus on the paragraph

7    that's numbered paragraph 3.

8            Do you see that?

9        A.  Yes, sir.

10       Q.  All right.  That paragraph begins, quote:

11   (Reading)  Reducing the safety environment for employees

12   at the passenger and secondary site by not evaluating or

13   screening persons who are other than Mexican, open

14   parentheses, OTM, close parentheses, seeking political

15   asylum -- and then there's a parenthetical and then the

16   text goes on -- as lawfully mandated in past practice.

17           Did I read that correctly, sir?

18       A.  Yes, sir.

19       Q.  Okay.  What did you mean by "reducing the safety

20   environment for employees"?

21       A.  (Reading) Secondary site by not evaluating or

22   screening persons -- I can't -- I can't -- can you

23   please make it bigger?

24       Q.  Is that better, sir?

25       A.  Yeah.



Page 104

1    Q.  Okay.  Please take the time to review the

2    paragraph; and when you're done reviewing it, my -- my

3    question is:  What did you mean by "reducing the safety

4    environment for employees"?

5    A.  Well, I guess they were -- they were reducing

6    the amount of employees that they would have in the

7    locations at the time.

8    Q.  All right.  And when you say "the locations,"

9    what locations are you referring to?

10   A.  I would have to say the locations at the time

11   that it's on the document because I can't read all the

12   document.

13        We had several reasons for different times

14   and different phases of orientation (phonetics) or how

15   it affected employees.  This would be one of the -- the

16   -- the very first ones I would think -- right?  In

17   2016?

18   Q.  Correct.  All right.  And in that --

19   A.  I would have to -- I would have to read the --

20   since -- since it's been 2016, I would read -- have to

21   read the whole document to have a better understanding

22   to -- to -- to what I'm going to give testimony to here.

23        MR. MEDLOCK:  Okay.  Why don't we do

24   this:  It's almost lunchtime both in Texas and in the

25   Washington, D.C., area.  Let's go off the record.  We'll



Page 105

1    take lunch.

2                    And during that lunch, Kevin, if you

3    could blow up the exhibit for Mr. Atkinson so he has a

4    chance to read the full document, that would be great;

5    and that way he can answer questions intelligently about

6    it.  Okay?

7                    EXHIBIT TECH:  Yeah, can do.

8                    MR. MEDLOCK:  Okay.  So can we be read

9    off the record, please.

10                   THE VIDEOGRAPHER:  The time is

11   11:57 a.m.  We're going off the record.

12                   (Break taken from 11:57 a.m. to

13                    12:44 p.m.)

14                   THE VIDEOGRAPHER:  The time is

15   12:44 p.m.  We're back on the record.

16        Q.  (BY MR. MEDLOCK)  Welcome, back, Mr. Atkinson.

17        A.  Is Downey on?  I don't see him.

18        Q.  I believe Mr. Downey's on.

19                   MR. MEDLOCK:  If you're -- if you're

20   on, Mr. Downey, could you please let us know?

21                   MR. DOWNEY:  Yes, I'm here.  Yeah, I'm

22   here.

23                   THE WITNESS:  Okay.

24        Q.  (BY MR. MEDLOCK)  Okay.  All right.  Are -- are

25   you comfortable proceeding, Mr. Atkinson?



Page 106

1      A.  Sure.

2      Q.  Okay.

3             MR. MEDLOCK:  Could we please bring up

4  Tab 4, again, Kevin, which we've marked as Exhibit 291?

5             Thank you very much.  And, yeah, I'd

6  like to focus on the page you have in front of you

7  there, Kevin.

8             Can you please expand paragraphs 3 and

9  4?

10     Q.  (BY MR. MEDLOCK)  All right.  Mr. Atkinson,

11 we're still looking at the January 19, 2017, letter that

12 you sent on NTEU Chapter 149 letterhead.

13     A.  Uh-huh.

14     Q.  And we're looking at the beginning of the list

15 of numbered paragraphs.

16     A.  Okay.

17     Q.  Before we went on break, I asked you what

18 "reducing the safety environment for employees" meant;

19 and I was wondering if you could just answer that again

20 so I can make sure I understand it.

21     A.  I would say reducing the staffing that was there

22 at the time to -- to follow the CBP protocols that were

23 in place at the time, where there's contact and covered

24 procedures and stuff and such.

25     Q.  So when you say "reducing the staffing that was



Page 107

1    there at the time," what do you mean?

2        A.  Well, I mean, what I'm looking at right there,

3    just like, you know:  (Reading)  Lawfully, mandated and

4    past practiced, private security guards are instructed

5    by the agency to stop certain asylum seekers, they

6    would have the security guards in place of a CBP

7    officer, escorting them back, you know, or stopping

8    them, where it would in -- in turn, it would be a CBP

9    officer.

10       Q.  And does -- does that reduce the safety

11   environment in some way?

12       A.  Well, yeah, because we didn't have those

13   additional officers in place.

14       Q.  I see.

15            So by putting -- by metering asylum seekers

16   at the port of entry, there were less officers that

17   could be assigned to other tasks; is that right?

18       A.  Hmm, say it again.  Repeat yourself, please.

19       Q.  Sure.

20            I'm just trying to make sure I understand

21   what you're saying.

22            At -- at this time, CBP officers were

23   participating in turning back asylum seekers to Mexico,

24   correct?

25       A.  Correct.



Page 108

```
 1      Q.  And by those -- when those CBP officers were
 2   participating in turning back those asylum seekers to
 3   Mexico, that drew those asylum seekers -- let me ask the
 4   question better.
 5           When this turn-back policy was in effect at
 6   the port of entry, that meant that the CBP officers who
 7   were engaging in those turn-backs were being taken away
 8   from other tasks that they could have been doing at the
 9   port of entry; is that right?
10               MR. HALASKA:  Objection, leading.
11               THE WITNESS:  Can I answer?
12               MR. HALASKA:  Yes.
13      Q.  (BY MR. MEDLOCK)  Yeah.
14      A.  No, they actually tasked private security guards
15   that were assisting the security at the bridge to -- to
16   take some of those tasks.
17           So what happened, we were -- we were
18   working around usually -- I'll give you an example.
19   Where there's four officers in place or five officers in
20   place, now there were two, for an example, because they
21   had private security guards doing the work instead of
22   CBP officers.
23      Q.  Oh, I see.
24           So the private security guards normally
25   would have been maintaining the security at the bridges
```



Page 109

1    leading to the port of entry; is that right?

2        A.  Right, right, or around the port of entry.

3        Q.  And they would be -- right.  And they'd be --

4    and now they were taken away from that task and

5    participating in turning back asylum seekers.

6               Is that what you're saying?

7        A.  Right.

8               And there was less CBP officers that were

9    assigned to that particular area because they used those

10   security officers.

11       Q.  Okay.  That -- that -- thank you for explaining.

12   Now I understand.

13              I want to focus on paragraph 4 on Page 143

14   of Exhibit 291.  There's a -- that begins, quote:

15   (Reading)  Continuation of preventing, slash, blocking

16   CBP officers from referring all asylum seekers into

17   secondary for evaluation and processing.

18              Did I read that correctly?

19       A.  Yes, sir.

20       Q.  And does that refer to what you were describing

21   earlier, where the supervisory CBPO told you that you

22   couldn't refer asylum seekers to secondary?

23       A.  Yes.

24       Q.  Do you know of any other CBP officers who were

25   told by supervisory CBP officers or port management that



Page 110

1  they could not refer asylum seekers to secondary?

2      A.  That was a -- a big dilemma between -- again, I

3  go back to that petition that we sent off that generated

4  a response that we should -- technically should -- we

5  should allow them in.

6          People were confused because the shift

7  supervisors were telling them not to.  Now, I can't

8  identify which ones; but we generated a -- a -- a

9  letter, as we provided, showing that we wanted

10  clarifications because this is what's happening and it's

11  different than what CBP's telling the public.

12      Q.  You said:  "We were told that technically we

13  should allow them in."

14          When CBP officers were told that they

15  should technically allow asylum seekers who were

16  standing on U.S. soil into the port of entry, does that

17  actually change the way asylum seekers were being turned

18  back at the port of entry?

19      A.  No.  They came out with a different method of

20  moving the -- the -- I guess the detention center, where

21  we would hold them before, in part, to -- we would hold

22  them in line or hold them outside of the door; but they

23  moved them out to a different location, up to the

24  bridge.

25          See, like I said, we had different phases;



Page 111

1   so depending on what phase we're at at the time, which I
2   don't remember, you know, it's -- it's -- it's kind of
3   hard to pinpoint what they did.
4       Q.  Okay.
5       A.  I just -- I think there was a -- go ahead.
6       Q.  Go ahead.  I didn't mean to interrupt you.
7       A.  I mean, I believe that this is the first time
8   everybody was -- was -- one of the reasons why they
9   were shocked this was happening, and we're -- in our
10  newspaper they were saying that, well, you know, I
11  guess it wasn't supposed to be happening, but, you know,
12  that employees were -- were -- you know, that they
13  don't -- they don't accept employee misconduct or blah,
14  blah, and they dealt with.
15          And we were like -- we were shocked that the
16  -- that that would be coming out of CBP PR's mouth.
17          So that's when we stood up and -- employees,
18  you know, we said we're going to write this up and...
19      Q.  Okay.  When you say "in our newspaper there was
20  a statement that this shouldn't be happening," what
21  newspaper are you referring to?
22      A.  I -- I think prior to that, there were something
23  coming out with -- American civilties (phonetics) and
24  rights came out and publicized what was happening at
25  different ports of entries and different comments at the



Page 112

1    time.

2        Q.  Uh-huh.

3        A.  And they -- the CBP came out nationally and they

4    said something about, you know, that they don't --

5    they're preserving their rights and employees that

6    were -- you know, alleged misconduct would be dealt --

7    dealt with.  I forgot it.  I guess I -- I can see if I

8    can pull it up later or something, but...

9        Q.  Okay.  That's all right.

10       A.  If it's still on the Web.

11       Q.  I'm just asking you for a -- as best as you can

12   remember it right now, so I appreciate that.

13       A.  Yes, sir.

14               MR. MEDLOCK:  Kevin, can we move down

15   to -- to expand paragraph 6, please.

16       Q.  (BY MR. MEDLOCK)  Sir, do you see an enlarged

17   version of paragraph 6 in front of you?

18       A.  Yes, sir.

19       Q.  And that paragraph reads:  (Reading)

20   Implementation of a policy and procedure that places

21   officers in jeopardy of violating federal law, rules,

22   and regulations pertaining to asylum seekers which

23   threatens a CBP officer's employment, credibility, and

24   integrity with the U.S. government.

25               Did I read that correctly?



Page 113

1        A.  Yes.

2        Q.  And when you referred to implementation of a

3    policy and procedure, is that the policy of turning back

4    asylum seekers that are attempting to enter the port of

5    entry that we talked about earlier today?

6        A.  Yes, it would be the -- the -- the -- the

7    returning and the processing.

8        Q.  Okay.

9        A.  And the reason -- and the reason -- the reason

10   we put "jeopardy" in there is because we didn't know at

11   the time -- I mean, you know, the past practice is past

12   practice; and, you know, we -- we -- we didn't -- you

13   know, the parties were saying we were violating it and

14   we were doing something different and it didn't match.

15   So we had to pick the middle to say:  Hey, got to pick

16   a -- a way to protect the officers.

17              So we said:  You know what?  This is going

18   to be -- we're going to jeopardize them because there's

19   no clear rule out there for employees to follow because

20   they're saying one thing and we're doing something

21   different.

22       Q.  So but was there confusion amongst CBP officers

23   about whether the order to turn back asylum seekers at

24   the port of entry was legal?

25       A.  Yes.



Page 114

1      Q.  And at the time that that order first came out,

2  there was no written guidance from management, correct?

3      A.  No.

4                  MR. HALASKA:  Objection, leading.

5      Q.  (BY MR. MEDLOCK)  Could you say your answer

6  again, sir?  I couldn't hear you.

7      A.  No.

8      Q.  Do you believe that -- that CBP's management did

9  not put out written guidance because the -- there --

10  because the turn-back policy was a dubious legality?

11     A.  I think that -- I think the policy that we

12  received -- the only policy we received was from that --

13  from D.C. after that petition has come out.

14                  And we didn't -- we didn't know whether or

15  not -- again, they're telling us we won't; and then I

16  had a port director, David Gonzalez, telling me

17  personally that the -- the union were not taught to let

18  them go through, you know.  So, I mean, we were doing

19  totally something different.

20     Q.  Uh-huh.

21                  MR. MEDLOCK:  Kevin, can we please

22  bring up Tab -- I believe Tab 13.

23     Q.  (BY MR. MEDLOCK)  And, sir, we've put in front

24  you --

25                  MR. MEDLOCK:  If you'd just highlight



Page 115

1    the -- everything but -- yeah, that's fine.

2        Q.  (BY MR. MEDLOCK)  Sir, we put in front of you

3    marked as -- what was previously marked as Exhibit 3 way

4    back when -- in this case --

5        A.  Uh-huh.

6        Q.  -- it's a one-page memorandum for the -- that

7    is from Todd Owen with the subject line:  "Metering

8    Guidance."  That's dated April 27, 2018.

9            Do you see that, sir?

10       A.  Yes, sir.

11       Q.  Okay.  And is this the written guidance that you

12   were referring to earlier that came from D.C.?

13       A.  No, sir.

14       Q.  Okay.  So there was -- was there -- there was

15   different writ- -- written guidance that you received

16   from Washington, D.C., regarding turning back asylum

17   seekers; is that right?

18       A.  Yeah.  This -- these -- this -- this memo was

19   sent to DFOs only.

20       Q.  But you received -- you may have received the

21   muster or something else that summarized this metering

22   guidance; is that right?

23       A.  No, sir.

24       Q.  Okay.  What do you recall receiving from

25   Washington, D.C., regarding the implementation of the



Page 116

1    turn-back policy that we've been discussing?

2        A.  Only the stuff that we grieved through and the

3    stuff that -- that the petition created, those

4    guidelines.  That's why they were being grieved, and

5    nobody was really -- really giving a -- a definite

6    answer into what was happening other than our actions

7    were -- you know, we weren't going to allow them to

8    come through.

9        Q.  All right.  I want to focus on --

10                MR. MEDLOCK:  And again, if you could

11   expand this.

12       Q.  (BY MR. MEDLOCK)  -- the second paragraph of

13   this guidance.

14                And in particular, I want to focus on the

15   last sentence, which reads, quote:  (Reading)  Once a

16   traveler is in the United States, he or she must be

17   fully processed.

18                Did I read that correctly?

19       A.  Yes, sir.

20       Q.  And you -- you were told by CBP management on a

21   few occasions that asylum seekers that were on U.S. soil

22   should be fully processed; is that right?

23       A.  At one time, yes, during our curric -- during

24   my career.

25       Q.  Okay.



Page 117

```
 1        A.   And they were, but prior to them --

 2        Q.   Uh-huh.  Go ahead.

 3        A.   They were prior to -- to us implementing the --

 4   I guess what I would call the -- the metering points.

 5        Q.   Okay.  When the -- after the metering points

 6   were implemented, though, isn't it the case that asylum

 7   seekers who were on U.S. soil were not fully processed

 8   and were turned back to Mexico?

 9        A.   I would have to say that the people -- because

10   the people that claimed asylum were in the United

11   States, you know, we inspected them.

12             And depending on what time of the year

13   we're talking about -- because now we're talking about

14   2018 -- that might have been the time where we would

15   return them back to -- to -- well, actually, we

16   detained them on the Mexican side, 3 feet from the

17   border.  We would tell them to wait and sit.  So we --

18        Q.   So -- so -- so the CBP off- -- I just want to

19   make sure I understand.

20             Around this 2018 time period, the CBP

21   officers would order the Mexicans -- or would order the

22   asylum seekers to go back to Mexico, just over the

23   border, and wait there; is that right?

24        A.   Just feet away.  We'd --

25        Q.   Okay.
```



Page 118

1    A.  -- hold them there.  We'd -- actually, we would

2    detain them there --

3    Q.  What do you mean:  "We would take [sic] them

4    there"?

5    A.  Well, I mean, they would come to the United

6    States; and then we would send them back maybe 3 feet

7    and say:  Look, you need to wait there.

8              You know, for us, you know, we were

9    conducting a primary inspection; and usually, if they're

10   sent to secondary, we'd have them wait in the lobby or

11   wait, you know, in the coachella (phonetics) area.

12             The only difference was, is that we made

13   them wait in Mexico.  We pushed the -- the -- the

14   inspection line to the border line, and we had a -- I

15   would have to say a controlled site because we had

16   officers blocking their entry from coming in.

17   Q.  Okay.  I just want to make sure I can unpack

18   exactly what happened.

19             So an asylum seeker in this -- during this

20   time period would approach the border between the

21   United States and Mexico at -- on the bridge at the

22   Hidalgo port of entry, and then they would come onto

23   U.S. soil and interact with a CBP officer at primary --

24             (Talking over each other.)

25   Q.  (BY MR. MEDLOCK)  -- is that right?



Page 119

1      A.  No.

2          Well, what I'm trying to say is the

3   metering point to us was the primary pedestrian lane

4   because we would screen -- screen the people there first

5   before we'd allow them to go through.

6      Q.  Okay.  When -- when you screen the people --

7          (Talking over each other.)

8      A.  You know, we only allowed --

9      Q.  (BY MR. MEDLOCK)  -- at the -- go ahead.  Sorry.

10     A.  We would only allow the -- the -- the function

11  that we had for the metering process was to inspect

12  them.  It was like an extension of the primary lane.  We

13  extended them there.

14          So they would conduct an inspection up

15  there and then return them back to wait in 2018.

16     Q.  When -- during this metering process in 2018,

17  when the asylum seeker first made contact with a CBP

18  officer and went through that initial inspection that

19  you were talking about --

20     A.  Uh-huh.

21     Q.  -- where was the asylum seeker standing?  Were

22  they standing in Mexico, or were they standing in the

23  United States?

24     A.  Well, like I said before, we had two metering

25  points.  We had one meter point that was maybe 20 feet



Page 120

1    from the entry door on the United States side; and then

2    at some time later, within the year, they moved it on

3    top of the border.

4               So depending when it happened, I would have

5    to say, you know, the metering site -- they had two

6    metering sites, one in the United States -- technically

7    two in the United States, because we were inside the

8    United States on the -- on the second -- second one,

9    too.

10    Q.  Okay.

11    A.  We weren't inspecting on the -- on the Mexico

12    side.

13    Q.  Right.

14               So at all points the CBP officers who were

15    doing the inspection were standing in the U.S.

16    territory, right?

17    A.  With the -- with the person claiming asylum.

18    Q.  Right.

19               Okay.  And then you said after that

20    inspection happened, the individual was returned to a

21    site where they were detained about 3 feet into Mexican

22    territory; is that right?

23    A.  Yes, and that's depending on what time it

24    happened, because, again, the other metering site --

25    there's a different area -- area where the metering site



Page 121

1    was way down, and it -- near the -- the entry door

2    coming into the building.

3              I would have to say it would be a good,

4    maybe -- it was way into the United States.  It wasn't

5    even near the border.  They moved it to the border at a

6    later date.

7              So depending on what area it happened in,

8    they were told to wait at times on the American side.

9    Q.  Okay.  So when you say "they moved it to the

10   border," who is "they" in that sentence?

11   A.  Hmm, we had a couple port directors at the time

12   and assistant port directors.  So whoever that was in

13   charge of the bridge at the time would do it.

14             At one time, I think we took a tour with

15   Tony Reardon; and I think it was our director, David

16   Gonzalez, at the time -- acting port director at the

17   time.

18   Q.  Okay.  And you -- you said that the individuals

19   were brought back onto Mexican territory and -- at one

20   point and detained there.

21             When asylum seekers were brought back to

22   Mexican territory, who, if anyone, escorted them back to

23   Mexican territory?

24   A.  We didn't have to -- well, yeah, the officer

25   would -- really wouldn't have to escort them back



Page 122

1    because he was only 3 feet away from the officer.  He

2    would return back.

3         Q.  Okay.  So the -- the asylum seeker would

4    voluntarily go back onto Mexican territory and wait; is

5    that right?

6         A.  Yes.

7         Q.  Okay.  All right.

8              MR. MEDLOCK:  Kevin, can you please

9    bring up Tab 5.

10        Q.  (BY MR. MEDLOCK)  All right, sir.  I've put in

11   front of you what we will mark as Exhibit 292 to your

12   deposition.  It is a one-page e-mail that appears to

13   have been sent by William Haralson to David Higgerson

14   with a copy to you and others that bears the Bates

15   number NTEU 132.

16              Do you see that e-mail in front of you,

17   sir?

18              (Whereupon Exhibit 292 was marked for

19              identification.)

20        A.  Yes.  Yes, sir.

21              Can you make it bigger, though, please?

22        Q.  (BY MR. MEDLOCK)  Sure.

23              And I -- I just want to focus on the first

24   paragraph of the e-mail, which might make it easier.

25        A.  Yes.



Page 123

 1      Q.  Okay.  And as I talked about earlier, you
 2  received a copy of this e-mail, correct?
 3      A.  Yes.
 4      Q.  Okay.  And you would have received a copy of
 5  this e-mail in the course of your duties as the
 6  president of the -- of NTEU Chapter 149, correct?
 7      A.  Yes.
 8      Q.  And you would have received this e-mail on or
 9  about the date and time shown on the e-mail; is that
10  right?
11      A.  Yes.
12      Q.  And when you -- after you received this e-mail,
13  you would have kept it in your e-mail -- in your CBP
14  e-mail system; is that right?
15      A.  Yes.
16      Q.  And receiving e-mails like this one from
17  Mr. Haralson was part of your job as the N -- the
18  president of NTEU Chapter 149, correct?
19      A.  Yes.
20      Q.  Do you have any reason to believe that this
21  exhibit, Exhibit 292, is inauthentic in any way?
22      A.  No, it's authentic.
23      Q.  Okay.  I'd like to focus on the first
24  paragraph.
25              In this e-mail, Mr. Haralson writes:


MAGNA
LEGAL SERVICES

Page 124

1    "Mr. Higgerson, during the grievance meetings, agency

2    representatives acknowledged that the agency's

3    unilateral work policies broke CBP mandates, federal

4    immigration rules and laws in formally processing

5    persons who seek political asylum and screening for

6    possible terrorists or fugitive status."

7              Did I read that correctly?

8         A.   Yes.

9         Q.   Did you attend the grievance meetings that are

10   referenced in this e-mail?

11        A.   On -- on -- on some of them, yes.

12        Q.   Okay.  Do you recall attending a grievance

13   meeting in which an agency representative acknowledged

14   that CBP's policies broke its own mandate and federal

15   immigration laws?

16        A.   I think the majority of the meetings we had

17   acknowledged that it wasn't their policy, that they're

18   doing what -- what headquarters is telling them to do.

19        Q.   And did they acknowledge that what headquarters

20   was telling them to do broke the law?

21        A.   Well, that's what they said, we understand that

22   the -- you know, or it's for them to work it out in

23   court, you know, that -- that they're interpreting what

24   they can do, you know.  They interpret the law

25   differently; and they're going to do what they're going



Page 125

1    to do, you know.

2        Q.  Who was the agency representative or

3    representatives that told NTEU Chapter 149

4    representatives that the turn-back policy at ports of

5    entry broke federal immigration laws?

6        A.  I would have to say technically everybody we

7    met with, you know; but, you see, it was weird because

8    they would admit it but then they would -- they would --

9    the -- the response they gave was -- didn't say it in

10   there.  We took a more --

11       Q.  Right.

12       A.  -- they took a different stance.

13       Q.  So they -- they told you one thing verbally and

14   another thing in writing; is that right?

15       A.  Yeah.  Yes, sir.

16               MR. HALASKA:  Objection, leading.

17       Q.  (BY MR. MEDLOCK)  So verbally, they told you

18   they were breaking the law; and when they -- it came

19   time to put it down in writing, CBP's representatives

20   wouldn't say that?

21       A.  Right.

22               MR. HALASKA:  Objection, leading.

23       Q.  (BY MR. MEDLOCK)  Did that lead you to believe

24   that CBP did not want to put down in writing that they

25   knew they were breaking the law when implementing the


MAGNA
LEGAL SERVICES

Page 126

1    turn-back policy?

2       A.  I think at the time they understood that it

3    wasn't something normal, that it -- they were violating

4    the law, but they interpreted it -- interpreted it in a

5    way that they could do it for certain reasons.

6       Q.  Right.

7       A.  They -- they always add that.  And if

8    headquarters think they can do it, they can do it.  You

9    know, it's for them to work it out.

10      Q.  But the agency representatives on the ground at

11   the port of entry believed that what headquarters was

12   doing was breaking the law?

13                  MR. HALASKA:  Objection; calls for

14   speculation and leading.

15      A.  They thought it was incorrect, that it was

16   wrong.

17                  And for us, we interpreted it as it was

18   breaking the law.

19      Q.  (BY MR. MEDLOCK)  I understand.

20                  Did -- did the represent -- the agency

21   representatives ever say to you directly that the

22   turn-back policy broke the law?

23      A.  Hmm, they -- they would tell me that -- that

24   technically it would violate the law, but their

25   interpretation of the law will allow them to do what



Page 127

1    they're doing.  So, you know, it's a double-sided

2    answer.

3        Q.  So they -- so do you understand that to mean

4    that someone in CBP's head office in D.C. had

5    reinterpreted the law so that this wouldn't be a

6    violation anymore?

7        A.  Yes.

8        Q.  I'd like to move on to the next sentence of

9    this paragraph.  Do -- that begins with "which places."

10            Do you see that, sir?

11       A.  Yes, sir.

12       Q.  Okay.  That sentence reads, quote:  Which

13   places CBP officers' safety, integrity, and position to

14   be questioned as the agency lacks candor to the public

15   in stating the true facts that the agency intentionally

16   placed the changes of denying and blocking asylum to

17   persons and families in order to block the flow of

18   asylum applicants in a chilling affects [sic] to all

19   others attempting entry into the United States.

20            Did I read that correctly, sir?

21       A.  Yes, sir.

22       Q.  Okay.  Do you have an understanding of what the

23   phrase "chilling affects" means in that sentence?

24       A.  Yes.

25       Q.  What does it mean?



Page 128

1    A.  It means something that -- that is horrifying,

2    something that -- that creates a lot of fear, a lot of

3    intimidation to someone.

4    Q.  From your perspective, was one of the purposes

5    of the turn-back policy to create fear and intimidate

6    asylum seekers?

7    A.  I think -- I think their -- their lawyers

8    created that because there was children that were

9    crying, there was family that was crying, there was

10   people that were separated, whether, you know, they

11   were determined to be one unit or not.  That was the --

12   the impression that I got when I was out there.

13            It seemed like their feelings were Teflon,

14   in -- in -- in that state.  Whether they did it

15   intentionally to create it is different to them

16   changing the way they handled it and correcting it.

17   Q.  This -- this sentence also says CBP "lacks

18   candor to the public."

19   A.  Yes, sir.

20   Q.  Do you have an understanding of what "lacks

21   candor to the public" means?

22   A.  Yes.

23   Q.  What does it mean?

24   A.  It means that they're saying they're not --

25   they're telling them -- they're giving them information



MAGNA
LEGAL SERVICES

Page 129

1    but not telling them the true facts of -- they're

2    hiding facts of actually what -- the true information

3    that would help support actually what they're doing,

4    you know.

5        Q.  Do you believe that CBP was hiding facts from

6    the public regarding the turn-back policy?

7                    MR. HALASKA:  Objection, calls for

8    speculation.

9        A.  I be -- I be -- I be--

10                   MR. HALASKA:  You can answer, sir.

11                   THE REPORTER:  I'm sorry?

12       A.  I believe the agency was using the employees as

13   a shield -- as a shield to -- to -- to implement their

14   new policy that created and stained the employees'

15   integrity and stuff.

16       Q.  (BY MR. MEDLOCK)  What do you mean, the

17   employees were being used as a shield?

18       A.  Well, because, you know, they're saying they're

19   not doing it and now they're saying they're doing it.

20                   Depends on what era you're in now.  There's

21   a certain time -- time line in -- in -- in -- in the --

22   in the process in which CBP finally accepted it and

23   said:  Look, we're taking it to court, you know.  But

24   beforehand they were denying it.

25       Q.  So before this lawsuit was filed, CBP was



Page 130

1    denying to the public that they were engaged in a

2    turn-back policy?  Is that your understanding?

3        A.  Yes.

4        Q.  And then after this lawsuit was filed, CBP had

5    to admit they were turning back asylum seekers but said

6    it was a matter to be resolved in litigation?

7        A.  I don't know really what --

8                MR. HALASKA:  Objection, leading.

9        A.  I don't know what CBP ever said other than the

10   time line of that petition.

11               We still didn't know what was going on

12   because we were still denying entry.

13       Q.  (BY MR. MEDLOCK)  Thanks.

14               MR. MEDLOCK:  All right.  Kevin, can

15   you move down to the next paragraph, please?

16       Q.  (BY MR. MEDLOCK)  Mr. Atkinson, we've expanded

17   the next paragraph of the e-mail.  It -- it -- can you

18   see that paragraph, sir?

19       A.  Yes.

20       Q.  Okay.  That paragraph begins, quote:  The

21   agency's actions caused traumatic and emotional injury

22   to children, persons, and families seeking asylum when

23   denying and blocking entry, threatening that they would

24   be processed separately, returned to Mexico without

25   processing.



Page 131

1            Did I read that correctly?

2       A.  Yes.

3       Q.  Okay.  And is that consistent with what you

4   were testifying earlier about how asylum seekers were

5   harmed by being turned back to Mexico?

6       A.  That's --

7       Q.  Is that right?

8       A.  That's part of the reasons, yes.  Yeah, that's

9   part -- part of the examples of how they were harmed.

10      Q.  Are there other examples of how they were

11  harmed that you're aware of?

12      A.  I don't know if the agency's going to allow me

13  to answer that.

14            MR. HALASKA:  Mr. Atkinson, you can

15  speak freely.

16      A.  Okay.  We had a -- a -- a -- times where the

17  agency -- where we had a supervisor, ███, allegedly --

18  or was accused of assaulting a -- a -- a migrant at the

19  metering point.

20            The employee was -- was -- the

21  investigation was -- was concluded.  The supervisor was

22  reassigned to a different location.

23      Q.  (BY MR. MEDLOCK)  Okay.

24      A.  And we had -- go ahead.

25      Q.  Go ahead.





Page 132

```
 1                    I was going to say:  Assault's a pretty
 2    broad term.  What -- what do you understand
 3    the supervisor --
 4                    (Talking over each other.)
 5        A.  Well, my -- my -- my understanding, he told the
 6    person to get back and pushed them, pushed them back;
 7    and that's the way the -- the -- it was reported, I
 8    guess, at the time.
 9        Q.  (BY MR. MEDLOCK)  Do you know how to spell
10    supervisor ████'s last name?
11        A.  ████████
12        Q.  Okay.  I cut you off.
13                    Are you aware of any other way that asylum
14    seekers had been harmed by the turn-back policy?
15        A.  We had a -- a -- a -- a certain port director at
16    the -- at the port of entry who was reported by another
17    employee of stealing water from the detainees' food
18    packages.
19        Q.  Who was that port director?
20                    THE WITNESS:  Am I allowed to say his
21    name?
22                    MR. HALASKA:  Sure.
23        A.  ██████████████
24        Q.  (BY MR. MEDLOCK)  Okay.
25        A.  The food -- the water -- the water count for
```



Page 133

1  immigrants -- the bottles of water was bought for them

2  were rarely -- rarely used for them.  They were -- they

3  were given bottled water in canteens in a certain way --

4  not canteens, but what do you call those orange

5  thermos?

6       Q.  I -- I don't -- I don't know, sir; but you can

7  describe it.

8       A.  Yeah.  It was an ice box, some kind of

9  thermos -- Igloo, water, with the little spout.

10            There was monies allocated, fenced in for

11  detainee waters.  We found out that the detainees

12  weren't -- weren't getting those waters, that they were

13  possibly being used in supervisors' offices to stock

14  their -- their -- their refrigerators.

15            At one time, I guess they were -- they

16  stopped that and a -- ended up going back to the -- to

17  the detainees -- I'm -- I'm sorry, to the immigrants

18  that were being processed.

19       Q.  Okay.

20            MR. MEDLOCK:  Let's move on, if we

21  could, to tab 6, please, Kevin.

22       Q.  (BY MR. MEDLOCK)  All right.  So showing you

23  what we've marked as tab 6 to your deposition, sir.

24            It is a multipage e-mail -- or letter, I

25  should say, that begins with the Bates number NTEU 133.



Page 134

1    And it appears to be a letter sent by William Haralson

2    to David Higgerson on March 15, 2017.

3                    Do you see that, sir?

4    A.  Yes, sir.

5    Q.  In this letter, Mr. Haralson writes that the

6    grievance entitled Failure to Process ER, slash, CF &

7    Asylum HID 2017 is being escalated to a Step 3

8    grievance.

9                    Do you see that?

10   A.  Yes, sir.

11   Q.  Did the grievance about the failure to process

12   ER, slash, CF & asylum that -- that started in 2017

13   ultimately go to arbitration?

14   A.  It got invoked to arbitration.

15   Q.  Okay.  Did it actually -- did an arbitration

16   actually take place?

17   A.  Not yet, sir.

18   Q.  When is that arbitration scheduled to take

19   place?

20   A.  I don't know, sir.

21                    We've -- we're -- at this time, we did an

22   internal business decision, depending on all the cases

23   that we have; and we've been taking all the -- all the

24   scheduled cases up front at this time to make sure that

25   the impact on the employees are relieved right now.



Page 135

 1                    We've been very successful in -- in some --

 2    scheduling -- scheduling cases, that we are taking the

 3    ones that are going to better the lives of the

 4    employees first since this -- this 2017 case is an old

 5    case.

 6                    For some reason, it wasn't -- it wasn't

 7    taken to arbitration up front by the national union.

 8    Q.  Okay.  Do you know why the national union has

 9    waited to take this case to arbitration?

10    A.  I don't know.  I don't know.  I know that we

11    had over a hundred and something cases.  The agency

12    recently combined two victories that we had that had

13    enormous back pay.  They settled those two cases with

14    us, and it cleared up a lot of the cases.

15                    So we need to -- I actually left these

16    cases on there; so I don't know when they're going to

17    come up next.

18    Q.  Okay.  I wanted to talk to you a little bit

19    about the NTEU Chapter 149's practice of filing

20    grievances --

21    A.  Yes, sir.

22    Q.  -- if I could.

23                    Is it the case that NTEU Chapter 149 has

24    filed a large number of grievances against CBP?

25    A.  We filed a -- a -- because of our area, right,



Page 136

1    that encompasses thousands of -- of -- of -- of

2    employees, right, and we have different facets and

3    different areas, it's my fiduciary duty that if an item

4    violates the contract, I have to file a grievance on it.

5             And since our -- our -- there's certain --

6    certain instances where things can be handled --

7    handled informally without putting the grievance on.

8    There's some that have to be put down in writing

9    because of the time line needed to correct the -- the --

10   the matter in -- at hand.

11            And usually, when our -- when we file our

12   grievances, such as the ones we filed, we usually have

13   the complaining party or examples of the complaining

14   party in the grievances to ensure that the agency knows

15   that the complaint is coming from the -- from -- from

16   the employees themselves.

17        Q.  I see.

18            Have you ever knowingly filed a false

19   grievance with CBP?

20        A.  Never.

21        Q.  Ever caused a false grievance to be filed with

22   CBP?

23        A.  Hmm, I think there's -- there's grievances that

24   are filed in a manner where employees bring up an issue;

25   and sometimes due to their -- to their emotional



Page 137

1    state -- and when we're taking their stuff to be filed,

2    sometimes it's -- it's -- it's not -- it's not correct.

3        Q.  Okay.  And in those cases you're sort of the

4    messenger for those employees, right?

5        A.  Well, I'm the messenger in all of them unless

6    I'm actually in them.

7        Q.  Right.

8            So when people attack your credibility as

9    an NTEU president because of the grievances you've

10   filed, they're just shooting the messenger, aren't

11   they?

12       A.  Well, I think it's because of the large

13   victories that we've had and the large -- recent large

14   settlement, enormous large settlement, they're going to

15   attack me because, you know, I enforce the contract.

16           And it's costing them money in arbitration.

17   It's not like I'm losing --

18       Q.  Right.

19       A.  -- arbitrations.

20       Q.  Okay.

21           MR. MEDLOCK:  Let's move down, if we

22   could, to the next page of the Exhibit 292.

23       Q.  (BY MR. MEDLOCK)  All right.  Sir, this appears

24   to be a March 9, 2017, letter that was sent to you,

25   correct?



Page 138

1      A.  Yes.

2      Q.  And if you look at the first sentence of the

3  letter, it states that (reading) This is a response to

4  the grievance letter that's dated January 19, 2017, that

5  we looked at earlier today, correct?

6      A.  Yes.  Yes, sir.

7      Q.  Okay.  And I --

8              MR. MEDLOCK:  Kevin, can you please go

9  to the next page of Exhibit 292?

10     Q.  (BY MR. MEDLOCK)  And if you look at this --

11 the end of the letter, it looks like it was signed by

12 Javier Cantu, the assistant port director?

13     A.  Yes.

14     Q.  Okay.  And I want to focus on the first

15 paragraph on Page 2, that begins with Chief Carlos

16 Gonzalez?

17     A.  Yes.

18     Q.  Do you see that?

19     A.  Yes.

20     Q.  Okay.  It states:  "Chief Carlos Gonzalez, Watch

21 Commander Richard Diaz, and SCBPO Lauro Hinojosa met

22 with you in an effort to address the concerns

23 identified in the grievance."

24              Did I read that correctly?

25     A.  Yes, sir.



Page 139

1    Q.  Does that refresh your recollection that one of

2    those three individuals were -- was -- was the person

3    who told you that they believed CBP was technically

4    breaking the law by engaging in turn-backs but that

5    CBP's management had reinterpreted the law?

6              MR. HALASKA:  Objection, improper

7    foundation; objection, leading; objection, form,

8    compound.

9    A.  I would -- I would say that --

10   Q.  (BY MR. MEDLOCK)  You can ignore his objections

11   and answer the question.

12   A.  I would say that -- that the person that had --

13   had more or less told me was David John Gonzalez, you

14   know, expressed by Chief Carlos Gonzalez; but it was

15   followed and -- and it's, like, you know, Richard Diaz

16   and Lauro Hinojosa -- that's what the higher-ups want,

17   that's what they get.

18   Q.  Uh-huh.

19            At the time, David John Gonzalez was the

20   port director; is that right?

21   A.  I don't know.

22   Q.  Okay.  He -- but he was certainly in the

23   management of the Port of Hidalgo at that time,

24   correct?

25   A.  I don't know if that time he was.  I don't know



MAGNA
LEGAL SERVICES

Page 140

1    if that time he was.  That's why I'm trying to say, it's

2    different -- you're asking me a question, and it

3    involves different areas at different times.

4        Q.  Okay.

5        A.  So it's -- it's kind of hard to -- to -- to

6    pinpoint who said what on what year since it's been so

7    long.

8        Q.  Okay.  I understand that, and it's -- it's hard

9    because we're going back several years.  So I'll --

10   I'll try to do my best to refresh your recollection as

11   we go along.

12                MR. MEDLOCK:  Kevin, can you please

13   bring up tab 7.

14                And I should note, just for the

15   record, that tab 6 will be -- was marked as 293.

16                (Whereupon Exhibit Number 293 was

17                marked for identification.)

18                MR. MEDLOCK:  We'll mark tab 7 as

19   Exhibit 294, sir.

20                (Whereupon Exhibit Number 294 was

21                marked for  identification.)

22       Q.  (BY MR. MEDLOCK)  It's a multipage e-mail with

23   an attached letter that begins with the Bates number

24   NTEU, dash, 000110.

25       A.  Uh-huh.



Page 141

1      Q.  And, sir, this appears to be an e-mail exchange

2  between yourself, Tony Reardon, Kevin McAleenan,

3  William Haralson, and others; is that correct?

4      A.  Yes.

5      Q.  And the e-mail shown at the top of Exhibit 294

6  is entitled:  (Reading) Safety Alert, slash, Rule

7  Clarification.

8              Is that right?

9      A.  Yes.

10              THE WITNESS:  Can you do me a big

11  favor, can you enlarge it, please?

12              EXHIBIT TECH:  Which section?

13              THE WITNESS:  Whatever section you

14  want me to read.  It's pretty -- for me, it's pretty

15  small.

16              MR. MEDLOCK:  Sure.  Let's do this:

17  Why don't we enlarge the second e-mail in the chain and

18  the first full paragraph of that e-mail.

19              Oh.  Kevin can you get the header

20  information in, as well, for the e-mail?  I need to ask

21  him a few questions about that.  Thank you.

22      Q.  (BY MR. MEDLOCK)  All right, Mr. Atkinson.  Can

23  you read the text a little bit better now?

24      A.  Yes, sir.

25      Q.  Okay.  This is an e-mail that you sent on or



Page 142

1   about March 19, 2019, at 2:55 p.m. to Kevin McAleenan,

2   correct?

3         A.  Yes.

4         Q.  At this time, Mr. McAleenan was the commissioner

5   of CBP, correct?

6         A.  Yes.

7         Q.  Okay.  You would have sent this e-mail in the

8   course of your duties as chapter president for NT --

9   for NTEU Chapter 149, correct?

10        A.  Yes, sir.

11        Q.  And you would have sent this e-mail on or about

12  the dates and times listed in the e-mail's identifying

13  information, correct?

14        A.  Yes, sir.

15        Q.  And you would have kept and maintained a copy

16  of this e-mail in your CBP e-mail system, correct?

17        A.  Yes.

18        Q.  And sending e-mails like this one was part of

19  your job as the president of NTEU Chapter 149, correct?

20        A.  It was my fiduciary duty to do it.

21        Q.  Do you have any reason to believe that this

22  exhibit we've put in front of you, Exhibit 294, is

23  inauthentic in any way?

24        A.  No, I don't.

25        Q.  Okay.  Do you recall sending this e-mail to



Page 143

1    Kevin McAleenan?

2        A.   Somewhat, yes.

3        Q.   This is -- you're sort of communicating outside

4    of your normal -- outside of the normal chain of

5    command for communications, correct?

6        A.   No.

7        Q.   Okay.  But -- you -- you -- why do you believe

8    this was in the normal chain of command for your

9    communication?

10       A.   Because as an NTEU president, I don't have no

11   chain of -- I can --

12                  (Talking over each other.)

13       Q.   (BY MR. MEDLOCK)  I understand --

14       A.   I can -- to me, it's -- it's practice.

15              I've had numerous e-mails to McAleenan,

16   Mr. Owens, commissioners in the past; I've been doing

17   this for so long.  We don't recognize the chain of

18   command unless I'm -- I'm -- I'm working as a CBP

19   officer.

20              We have a contract with CBP that allows me

21   to -- to be away from my CBP officer duties.  It's in

22   the national contract how I've be performing my duties.

23              And historically, I have a practice of --

24   of -- of communicating with the commissioners directly

25   in writing.


MAGNA
LEGAL SERVICES

Page 144

1        Q.  And when you communicate with the commissioners

2   in writing, do you do that when you believe it's a

3   serious issue that needs to be addressed?

4        A.  Usually, it's -- it's something that -- yes,

5   yes, or requiring this contract.

6        Q.  Okay.  In this e-mail, you begin, quote:

7   Mr. Commissioner, first, the Port of Hidalgo, Texas,

8   employees would like a written order provided to them

9   that mirrors their instructions to return individuals

10  who enter the U.S. and request asylum back to Mexico

11  without appointment or system for a future appointment.

12           Did I read that correctly?

13       A.  Yes, sir.

14       Q.  Okay.  Does this reflect what you were talking

15  about earlier, that there was a concern amongst CBP

16  officers that they had not received written guidance on

17  the process and legality of turning asylum seekers back

18  to Mexico?

19       A.  Technically, there was two parts.  One part is

20  they were telling the public that they were receiving

21  appointments and stuff when they weren't receiving

22  appointments at the time this written.  They were

23  claiming they were giving them appointments, but they

24  weren't, you know.

25           And another thing is -- is there was --



Page 145

1    they're all saying that they should -- they would be

2    allowing them in, and we weren't allowing them in.

3        Q.  So essentially, CBP was lying to the public; is

4    that right?

5                    MR. HALASKA:  Objection -- objection,

6    leading.

7        A.  I would -- I would say that -- yes.

8        Q.  (BY MR. MEDLOCK)  And do you believe that this

9    statement that you made to Commissioner McAleenan about

10   what was going on on the ground at the ports of entry

11   is true?

12       A.  Yes.

13       Q.  Okay.  Let's move to the next that was in this

14   paragraph.  You write, quote:  The agency is allowing

15   the Mexico officials to create a list and detention

16   area mid bridge to facilitate who would be next to

17   enter the United States from that detention site on the

18   Mexican side, which is under the control and direction

19   of CBP officers on the U.S. side.

20                    Did I read that correctly?

21       A.  Yes.

22       Q.  What did you mean when you said "which is under

23   the control and direction of CBP officers on the U.S.

24   side"?

25       A.  My understanding, when I questioned it, they



Page 146

1    had told me that the Mexico people will be creating a

2    list -- creating a list for the -- for the people who

3    were going to cross when they were returned back to

4    Mexico.

5        Q.  Uh-huh.

6            And when you said "under the control and

7    direction of CBP officers," what did you mean by

8    "control and direction"?

9        A.  "Under the control," it's not really, I guess I

10   would have to say, as CBP officers.  I think maybe that

11   was an error at the time.

12           But it was supposed to include the

13   supervisors because they would call -- they had a

14   system in place where they would call the Mexican side,

15   whether or not to call some back up, and whether to

16   call some back up to process them.  Now, I don't know at

17   the time --

18               (Talking over each other.)

19       A.  Go ahead.

20       Q.  (BY MR. MEDLOCK)  Go ahead.  Yeah.  I didn't

21   mean to cut you off.

22       A.  They had an agreement with the Mexican side how

23   it would be done.

24       Q.  Who's "they" in that sentence?

25       A.  CBP.



Page 147

1      Q.  Have you ever been told what the contents of

2   that agreement with the Mexican side was?

3      A.  No.

4      Q.  I --

5      A.  No.  The details?  No, sir.

6      Q.  From your perspective -- okay.

7           Do you know generally?

8      A.  Other than -- than what had been mentioned is

9   that they were working with the Mexican side while they

10  were returning people, that they would -- the Mexican

11  side would create a list and send them back in.

12           And I told them:  Well, I thought you said

13  that we were going to create the list and tell them

14  when to come back in?  Because there was a -- a lot of

15  headache on -- headache on -- on, you know, people

16  complaining that, you know, shit, it's my third or

17  fourth day, fifteenth day.  I've never -- I'm not even

18  on the list, you know.

19           And we never saw a list when they were

20  claiming that we were creating them.  And I actually

21  worked that area, so I knew there wasn't no list being

22  created by us.

23      Q.  When you said "under the control and direction,"

24  did the supervisors who worked with the Mexican

25  government effectively control what the Mexican


MAGNA
LEGAL SERVICES

Page 148

1    government was doing, detaining the asylum seekers on

2    the other side of the bridge?

3        A.  My -- my -- my understanding was -- and my

4    interpretation of that when I wrote that is that CBP

5    came out with a process in which Mexican officials were

6    going to follow -- that would allow the processing of

7    asylum seekers to come into the United States when we

8    sent them back.

9        Q.  Okay.  So your understanding is that the Mexican

10   government -- the Mex -- I should say, the Mexican

11   immigration authorities were acting at the direction of

12   CBP?

13       A.  Yes, and -- and -- and how the asylees would

14   come across to be processed.

15       Q.  Got it.

16            MR. MEDLOCK:  Kevin, can we move down

17   to the next paragraph, please?

18       Q.  (BY MR. MEDLOCK)  Can you see that paragraph in

19   front of you, sir?

20       A.  Yes.

21       Q.  All right.  In this paragraph, you write, quote:

22   The employees would like you to provide them the proper

23   authority and sections of law that allows them to

24   detain these asylum seekers on the Mexican side and

25   prevent them from entering the U.S. after presenting



Page 149

1    themselves for inspection and requesting asylum.  The

2    employees would like something in writing to protect

3    their ordered activities, as the agency is claiming

4    publicly that they are not conducting these activities

5    when they -- they really are.

6              Did I read that correctly?

7    A.  Yes, sir.

8    Q.  Did this describe what you were talking about

9    earlier where CBP was telling the public that asylum

10   seekers who came on to U.S. soil would be processed

11   when they actually weren't?

12   A.  Yes.

13             MR. MEDLOCK:  Kevin, can you please

14   expand the next paragraph down?

15   Q.  (BY MR. MEDLOCK)  Can you see that paragraph,

16   Mr. Atkinson?

17   A.  Yes, sir.

18   Q.  All right.  In this paragraph, you describe

19   federal safety concerns that you and the union have

20   about the metering point that are close to the mid

21   bridge position at the port of entry; is that right?

22   A.  Yes.

23   Q.  Do you believe that putting officers at

24   metering points close to the border created --

25   endangered the safety of those officers?



Page 150

```
 1        A.  Yes.  Actually, we have a --

 2        Q.  Why?

 3        A.  Because they're out of site, out of mind.

 4                We had numerous alter -- altercations

 5    with -- with asylees trying to make entry.

 6                At the time it -- we found that the asylees

 7    knew that the only way that they're going to be able to

 8    -- to -- to -- to expedite their -- their processing

 9    was to run through the border.

10                And it created crowds of people entering --

11    I think at one time we had close to 30, 40 people up

12    there and then now they only had -- we had -- they

13    reduced it to ▮▮▮▮ people on each side of the bridge,

14    sometimes ▮▮▮▮, sometimes -- it's a de minimus amount

15    of people that were stationed there.

16        Q.  Do you think whoever came up with this policy

17    of moving the metering points to positions close to the

18    border was considering officer safety?

19                MR. HALASKA:  Objection, leading.

20        A.  I think with the amount of people that got hurt

21    out there, who were left out there without proper -- in

22    fact, we got a -- a letter to Trump going out next week

23    where over 300 people signed concerning the metering --

24    metering sites are concerned being abandoned out there.

25                And we strongly believe that they know -- I
```



Page 151

1  had a conversation with Mr. Owens in August of 2019

2  where he admitted in front of everybody that Hidalgo

3  couldn't track the amount of -- of people that were in

4  place, wasn't sufficient, was not safe.

5              And to this day the same numbers exist out

6  there, and these are -- these are areas that are

7  complete site -- where employees has in the past, years

8  ago, has been dragged into Mexico.

9              These are areas where students [sic] have

10 transpired, assaults in the middle of the bridge.  It's

11 very -- it's very -- it's very dangerous for the amount

12 of employees to be placed out there, especially with --

13 with attempted radio communications.  ███████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16     Q.  (BY MR. MEDLOCK)  Okay.  I think -- I want to

17 just follow up on a couple of things you said in that

18 answer.

19              First, you said that Todd Owen admitted in

20 2019 that the metering point at Hidalgo put officers in

21 danger but nothing has changed; is that right?

22     A.  Yes.  It was actually a -- he had a -- a

23 question and answer.  -- he gave a presentation.  We

24 had a conference in Vegas; and he gave a long

25 presentation on where we were at, where was the stance,



Page 152

1    the metering points.

2              He had a question and answer where people

3    complained about him.  Of course, I was one of them.  It

4    was videotaped by Troy Reardon.  We -- he understands

5    the dangerous work there in the middle of the bridges.

6    Q.  So -- so as I understand, there was a

7    conference in Las Vegas where Mr. Owen gave a

8    presentation about metering; and then CBP officers

9    complained to him about being put in -- their -- their

10   safety being put in danger about metering and that that

11   exchange has been captured on videotape ; is that

12   right?

13   A.  Yeah, video and audio.

14             I think a lot of people took audio -- I

15   mean, video off their cell phones and stuff like that.

16   Q.  Do you have a copy of that videotape?

17   A.  Not now, but I'm sure I can get one.

18   Q.  Hmm.  And you've mentioned that there's a

19   letter that is going to be sent to President Trump

20   explaining that these metering points being near the

21   border endangers officer safety; is that right?

22   A.  Correct.

23   Q.  Has that letter been sent out yet?

24   A.  Not yet.  We got it compiled.

25             The -- the past letters -- these petitions



Page 153

1    to show that -- that nothing has been done about it,

2    that we've tried informally to get all this stuff done,

3    even with the grievance -- sometimes, I mean, we have

4    to -- you know, we have to go to the extreme to -- to

5    try to get help for our agents.

6               You know, we've gotten agents hit by

7    vehicles, passing vehicles.  I mean, we've gotten

8    them -- rush -- I think there was one nationally by --

9    covered by CNN.  We had 30, 40 immigrants rushed a

10   total of maybe ███████ officers that were guarding the

11   metering point.

12              I mean, it's just like they know this can

13   happen at any time and they still leave that amount

14   left.  It seems like they're trying to entice something

15   to happen and that the employee's life is meaningless

16   just to prove a point that these guys might be hostile

17   when all they want to do is get into the United States

18   to claim asylum.

19   Q.   Is there a -- a time if we -- that you're

20   targeting for sending this letter to President Trump?

21   A.   Well, I just need to get time myself to do it.

22   You know what I mean?

23   Q.   I understand.

24   A.   I mean, I -- I --

25   Q.   I understand.



Page 154

 1        A.  It's just -- is -- is -- getting all these

 2    documents together.

 3                And, you know, if you figure -- figure this

 4    out, you've got 2018, 2019, 2020.  You know, we've

 5    contacted the commissioner, the citizen commissioner,

 6    the local management.

 7                You know, now we need the -- the President

 8    to see if he's going to do anything for us, you know;

 9    and it's -- it's one of these things that -- you know,

10    at what point do -- do we exhaust our -- our

11    administrative remedy -- remedy until somebody gets --

12    until somebody dies out there.

13                We've already been hurt out there.

14    There's -- just about the whole reason for -- for --

15    for all these grievances.  Nobody's out there to help

16    us.

17        Q.  So -- and I -- I appreciate that.

18                I wanted to focus, if I could, with you on

19    some of the pictures that you attached to this e-mail.

20        A.  Yes, sir.

21                MR. MEDLOCK:  And let's start with the

22    picture on NTEU 113, please, Kevin.

23        Q.  (BY MR. MEDLOCK)  I'm sorry for the quality of

24    the photos, sir.  I only have this one e-mail in black

25    and white.



Page 155

1    A.  Yes, sir.

2    Q.  You write underneath this picture, quote:

3  Chairs reduced to minimize the amount of persons held

4  in the seating area, leaving a huge blank space.

5         Did I read that correctly?

6    A.  Yes.

7    Q.  Okay.  And is -- is this the instance -- the

8  incident we were talking about earlier where chairs

9  were removed from a secondary inspection area?

10   A.  Well -- well, like I said, it happened in --

11  in -- in different times.  This was happening at one of

12  the worst times.  You're saying -- there's different --

13         (Talking over each other.)

14   Q.  (BY MR. MEDLOCK)  -- multiple --

15   A.  -- you have to tell them --

16         (Talking over each other.)

17   A.  -- there's multiple times that -- this was the

18  worst -- worst time it happened.

19   Q.  (BY MR. MEDLOCK)  Okay.  So there were multiple

20  incidents where CBP decided to remove chairs from the

21  secondary inspection area of the Port of Hidalgo; is

22  that right?

23   A.  Yes.

24   Q.  And you said initially you thought that

25  creating some space there was good for officer safety,



Page 156

1    correct?

2        A.   Correct, the -- at this time --

3        Q.   And --

4        A.   -- too many.

5        Q.   Right.

6             So there -- so CBP is actually removing

7    more chairs than is necessary to ensure officer safety;

8    is that right?

9             MR. HALASKA:  Objection, leading.

10       A.   I don't understand.

11            Can you repeat?

12       Q.   (BY MR. MEDLOCK)  Oh, sure.

13            So you said there were different phases in

14   which CBP removed chairs from the secondary inspection

15   area at the Port of Hidalgo.

16            And you said that this picture shows the

17   worst time.

18       A.   Yes, sir.

19       Q.   In your opinion, has CBP removed more chairs

20   than is necessary for ensuring officer safety?

21            MR. HALASKA:  Same objection.

22       A.   I still don't understand your -- your -- your --

23   your question.

24       Q.   (BY MR. MEDLOCK)  Okay.  Let me see if I can

25   say it a different way.



Page 157

1                You write:  (Reading) Chairs reduced to

2     minimize the amount of persons held in the seating

3     area.

4                What did you mean when you said it -- they

5     were reduced to minimize the amount of persons held in

6     the seating area?

7     A.   Well, my understanding at the time, at that

8     time, at this particular time, if we can -- my -- my --

9     my memory a little bit -- is that -- is that they're

10    moving the metering point to somewhere else, and they

11    wanted to claim that there was less room to sit people,

12    so they -- they reduced the amount of chairs in order

13    to push the people back to the metering points.

14    Q.   I see.

15                So CBP at this time intentionally removed

16    seats so that they could say that they couldn't process

17    as many people at the Port of Hidalgo; is that right?

18    A.   Yes.

19    Q.   Let's move to the next page, NTEU 114.

20    A.   Uh-huh.

21    Q.   And underneath this -- underneath this photo,

22    you write:  (Reading) No officers stationed to process

23    work at 10 to 11 p.m. and only for employees to process

24    the family unit credible -- creditable fear cases.

25                Did I read that correctly?



Page 158

1      A.  Yes.

2      Q.  And I think you meant "credible" fear cases; is

3   that right?

4      A.  Yes.

5      Q.  Okay.  What is this picture showing?

6      A.  Well, it shows that management isn't processing

7   the people from that time to that time.  They were

8   shutting down the area for some reason.

9      Q.  So --

10     A.  When I talk --

11     Q.  Go ahead.

12     A.  Go ahead.

13     Q.  Go ahead.

14     A.  No, go ahead.

15         I think I spoke to David John, and this is

16  before -- whoo, when he was acting port director.  And

17  he was stating at the time -- and I don't know if it

18  was this time of year or not.

19         He said that we had sent a total of 80

20  people to San Diego on TDY and we had all the services

21  open and we're processing all these people.  And it

22  shows that we can do more with less.

23         So in order to ask for more money and to

24  show how it's interfering with the -- with the agency,

25  they started closing services.



Page 159

1    Q.  Hmm.  So --

2    A.  In reality --

3    Q.  -- just so --

4    A.  -- in reality they had the people -- go ahead.

5    Q.  You said, "in reality they had the people."

6         Can you finish that sentence?

7    A.  In reality, they had the people.  All they

8  needed was the -- was the funding to have them there or

9  their realignment.

10   Q.  So in reality, CBP had the resources to inspect

11 and process the asylum seekers that were coming to the

12 Port of Hidalgo; but it chose to remove seats from the

13 secondary inspection area and at times shut down the

14 secondary inspection area.

15        Do I understand that correctly?

16   A.  They would shut down certain services, like the

17 one that is -- that is pictured.

18        When you brought that up to Mr. Owens at --

19 at the meeting -- and I think he made claim that the

20 southwest border was fully staffed.

21   Q.  Do you think that statement was true?

22   A.  Of course it's true.  You can't deploy 80 people

23 from every border -- a large amount of people at every

24 port to California, you know, and say -- still run full

25 services when they were out there and then come back



Page 160

1   and deploy less and say that you don't have enough

2   people.

3              You know, it's just the -- the money was --

4   was -- depending on their budgetary, what they felt

5   they had authorized at the time.

6   Q.  Okay.  So CBP, to your mind, made a decision to

7   prioritize things other than processing asylum seekers;

8   is that right?

9              MR. HALASKA:  Objection, leading.

10  A.  I -- I believed in -- in what I was told, that

11  they had to create some kind of disruption in the

12  service in order to get more money to handle the

13  situation because beforehand, when -- when they deployed

14  all the people, we had a hundred percent of everything

15  opened up; but they couldn't tell -- they couldn't show

16  Congress, they couldn't show anybody that they needed

17  more money if they didn't create some kind of suffrage

18  (phonetics) in -- in the orders.

19  Q.  (BY MR. MEDLOCK)  So they intentionally slowed

20  down work so that they could get more funding?

21  A.  Yes.

22  Q.  Okay.  Let's move to the next page of

23  Exhibit 294.  This was an attachment to your e-mail

24  that is a March 6th, 2019, letter from -- that was

25  signed by dozens of CBP officers.



Page 161

1      A.   Yes.

2      Q.   Do you recall this letter, sir?

3      A.   (Witness mumbling while reading to himself.)

4                THE COURT REPORTER:  Mr. Atkinson,

5      either read out loud and slow down so I can understand

6      you or read to yourself, sir.

7                THE WITNESS:  I apologize.  I just --

8                THE COURT REPORTER:  I just can't

9      understand you when you do that.  Thank you.

10     A.   Yes, I'm aware of this letter.

11     Q.   (BY MR. MEDLOCK)  Did you play any role in

12     drafting this letter?

13     A.   Yes, I did.

14     Q.   What was the role that you played?

15     A.   I -- I got the input from people that were out

16     there working, to include what I first candidly

17     experienced, and we typed something up requesting --

18     requesting some kind of clarifications in the stuff

19     that we were doing to make sure that we were,

20     number one, covered, you know, and -- and to ensure

21     that -- that we had the defense that the agency ordered

22     us to do such things, you know, and that if we were in

23     compliance with the stuff that they wanted because we --

24     we never knew what kind of policy they were creating.

25     Q.   Let's focus in on the section after "to whom it



Page 162

1   may concern" on this letter.

2           The letter states quote:  We, CBP officers

3   assigned the Port of Hidalgo, Texas, have been ordered

4   by CBP supervisors to inspector persons seeking, slash,

5   requesting asylum status near the middle of the United

6   States Mexico bridge in Hidalgo, Texas, on the U.S.

7   side.  We are posted mere feet into the U.S. from the

8   U.S./Mexico border line and are intercepting and

9   immediately preventing asylees who request asylum from

10  entering the United States.  After their immediate

11  request, we instantly sending them back into Mexico

12  without a date, time, or appointment to be allowed into

13  the United States for processing.

14          Did I read that section correctly, sir?

15      A.  Yes, sir.

16      Q.  And is that a true statement of how the

17  turn-back policy was being implemented at the Port of

18  Hidalgo, Texas in March, 2019?

19      A.  Around that time or on that time, yes.

20      Q.  Then the letter goes on to state, quote:  We

21  are not aware of any process used to inform these

22  asylum seekers to return to the port for processing

23  into the U.S. and feel there is a need for

24  clarification for the authority or law allowing us to

25  immediately deny entry to these asylum seekers into the



Page 163

1    United States and returning them back into Mexico.

2    Therefore, we are requesting the person of authority or

3    section of law that grants us the power to act as

4    ordered and mentioned above.

5              Did I read that correctly?

6    A.  Yes.

7    Q.  When you said "allowing us to immediately deny

8    entry to these asylum seekers into the United States,"

9    are you referring to the turn-backs that we had talked

10   about earlier today?

11   A.  You're talking about the metering points?

12             In our area --

13   Q.  Yes, sir.

14   A.  I think every area has a different name to it.

15   You know what I mean?  We were -- we were called -- we

16   named it the -- the metering points.

17   Q.  Okay.  And these are -- these are the points at

18   which asylum seekers were turned back to Mexico; is

19   that right?

20   A.  Yes.

21   Q.  Okay.

22             MR. MEDLOCK:  If you flip through,

23   Kevin, the next few pages...

24   Q.  (BY MR. MEDLOCK)  You'll see, Mr. Atkinson,

25   that many, many CBP officers signed this letter.



Page 164

1      A.  Yes.

2      Q.  Did you force any CBP officers to sign this

3  letter?

4      A.  No, sir.  The way it is, is that, depending on

5  the employee's input, right, I would create a letter

6  and then send it out to the chiefs and they would sign

7  it out there and then it would come back to me.

8      Q.  Did you or anyone else from NTEU Chapter 149

9  force any of the CBP officers that signed this letter

10  to sign it?

11      A.  No.  As you can tell, we have several petitions

12  that always go out.  That's our pattern of -- of

13  complaint, to show unity, to show the people in the

14  adverse areas that it's a -- it's an employee problem,

15  it's not just us creating chaos.

16      Q.  All right, sir.

17              MR. MEDLOCK:  Kevin, you can bring

18  down that exhibit.

19      Q.  (BY MR. MEDLOCK)  I just have a few more

20  questions for you today, sir.

21              So I want to make sure that I -- that the

22  Court and I understand your testimony today.

23              Is it your testimony that there have been

24  and is a pattern and practice of turning back asylum

25  seekers that are seeking to enter the United States at



Page 165

1    ports of entry on the U.S./Mexico border?

2                    MR. HALASKA:  Object to the extent it

3    calls for a legal conclusion or expert opinion.

4                    Mr. Atkinson, you can answer the

5    question.

6                    THE WITNESS:  Thank you, sir.

7    A.  I would say that there's a longstanding

8    practice of -- of returning immigrants who's seeking

9    asylum into the United States from the Mexican -- from

10   the U.S. American side, yes.

11   Q.  (BY MR. MEDLOCK)  And is there, in fact, a

12   policy of returning asylum seekers from the U.S. side

13   to the Mexican side?

14   A.  I don't know --

15                   MR. HALASKA:  Object --

16   A.  I don't know if there's a policy, but I know

17   there's a practice.

18   Q.  (BY MR. MEDLOCK)  Okay.  And did -- did you --

19   have you been told in the past by CBP representatives

20   that that practice may violate the law?

21   A.  Yes.

22   Q.  All right.  Sir, those are all the questions I

23   have for you now.  I understand that Mr. Halaska may

24   ask you some questions, so I'll reserve time at the

25   end.



Page 166

1    A.  Okay.

2                    MR. MEDLOCK:  Alex, do you want to

3    start now or go off the record and get your ducks in a

4    row?

5                    MR. HALASKA:  I was going to suggest

6    we maybe take a 15-minute break, everyone can use the

7    restroom, I can confer with my colleagues, and then we

8    can jump back on around 3:20.

9                    MR. MEDLOCK:  That sounds great.

10                   THE VIDEOGRAPHER:  The time is

11   2:05 p.m.  We're going off the record.

12                   (Break taken from 2:05 p.m. to

13                   2:57 p.m.)

14                   THE VIDEOGRAPHER:  The time is

15   2:58 p.m.  We're back on the record.

16                        EXAMINATION

17   BY MR. HALASKA:

18   Q.  Good afternoon, Mr. Atkinson.

19                   My name is Alex Halaska.  I represent the

20   U.S. Government.

21                   THE COURT REPORTER:  Guys, just a

22   minute.  I'm getting that feedback again.  Are we --

23   let's try again.

24                   MR. HALASKA:  Sure.

25   Q.  (BY MR. HALASKA)  so I was just saying good



Page 167

1    afternoon.  My names Alex Halaska.  I represent the U.S.

2    Government.

3              I'd like to ask you some questions about

4    what you spoke with Mr. Medlock regarding earlier and

5    then perhaps show you a couple more documents and get

6    your reactions and thoughts on those.

7         A.  Yes, sir.

8         Q.  All right.  Earlier towards the start of the

9    deposition, your attorney, Mr. Downey, indicated that

10   you felt that a letter that CBP had sent you regarding

11   the scope of your testimony constituted witness

12   intimidation.

13             Do you remember that?

14        A.  Yes.

15        Q.  Now having answered Mr. Medlock's questions, do

16   you still feel that that was witness intimidation?

17        A.  Yes.

18        Q.  Were there any question --

19             (Talking over each other.)

20        Q.  (BY MR. HALASKA)  Go ahead.

21        A.  Not by you.

22        Q.  Were there any questions that Mr. Medlock asked

23   during the deposition today that you didn't answer

24   fully and completely because of the letter?

25        A.  Hmm.  Not that -- not that I can put together.



Page 168

1    I -- I answered them to the best of my ability and at

2    the -- with the lack of memory that I have, you know,

3    since it's been so long, I did the best job I could

4    today.

5        Q.  Is there anything that you'd like to add to

6    your testimony that you perhaps didn't basically before

7    because of the letter?

8        A.  I would say depending on the questions you're

9    going to ask.

10       Q.  Okay.

11                MR. HALASKA:  Kevin, can you please

12   pull up Exhibit 291, which is the document labeled

13   NTEU 141.

14                While Kevin's doing that, I just want

15   to note for the record that Ori Lev from Mayer Brown,

16   LLP, who also represents plaintiffs, has joined us.

17                MR. LEV:  Hi.  I think I'm going to

18   take over for Mr. Medlock.

19                EXHIBIT TECH:  Alex, what was that

20   exhibit number again?

21                MR. HALASKA:  I believe it's 291.  The

22   Bates number is NTEU 141.

23                EXHIBIT TECH:  It's being presented

24   now.

25       Q.  (BY MR. HALASKA)  Okay.  Mr. Atkinson, earlier


MAGNA ➤
LEGAL SERVICES

Page 169

1    Mr. Medlock showed you this document and asked you some

2    questions about it.

3              Do you generally recall seeing this

4    document earlier in the deposition?

5        A.  Yes.

6              MR. HALASKA:  Kevin, if you wouldn't

7    mind scrolling to the next page, 142.

8        Q.  (BY MR. HALASKA)  So just to recap,

9    Mr. Atkinson -- and I'm looking right where it starts a

10   "Brief Summary," this document is a grievance submitted

11   by the agency -- excuse me -- submitted by the NTEU,

12   and I'm going to read from the "Brief Summary" section.

13             And it says, quote:  Since on or about

14   December 6th, 2016, and in a continuing manner the

15   agency has unilaterally implemented a policy that

16   prevents and/or blocks CBP officers, open parens,

17   pedestrian primary, slash, secondary, close parens,

18   from processing political asylum seekers and assessing

19   their possible persecution or torture.

20             Did I read that correctly?

21       A.  Yes.

22       Q.  Okay.  So this is a grievance, essentially,

23   about metering; is that right?

24       A.  Yes.  Yes, it is.

25       Q.  Do you believe that metering is unlawful?



Page 170

1    A.  I would have to say it depends where -- where

2  it's at.  You know, if the metering is done in -- in --

3  in Mexico, yes; if it's done on the U.S. side, no.

4    Q.  So the -- so the question was:  Do you believe

5  it's unlawful.

6              And you think -- so do you think it's

7  lawful when it's done in Mexico?

8    A.  I think it would be -- you know what, sir?  To

9  interpret -- to interpret that, I -- I wouldn't know

10  whether it's -- really be unlawful for the -- for -- the

11  purpose of just metering would be unlawful itself.

12              Let me re rephrase that because I'm getting

13  confused what you mean by "metering."  You're meaning

14  the metering activities that took place on the metering

15  line or the detention aspect of it or where the

16  officers are standing, conducting their inspections at

17  the metering site?

18    Q.  So when I refer to "metering," I mean the --

19  the act of posting CBP officers at the border line and

20  instructing individuals about documents, that they may

21  have to wait for the port to have sufficient space to

22  process their applications for admission before they're

23  permitted to enter.

24    A.  No, sir.

25    Q.  My question is -- well, my question is:  Do you



Page 171

1    think it's lawful if that's done in Mexico?

2        A.  If it's done in Mexico?

3                I wouldn't know, sir.

4        Q.  You wouldn't know?

5        A.  I wouldn't know.

6        Q.  If you don't know whether it's lawful or

7    unlawful, can you explain to me the nature of why the

8    NTEU local Chapter 149 submitted this grievance?

9        A.  Because we were returning people back without

10   being processed correctly, and it's putting --

11       Q.  Why would --

12       A.  -- it was putting the employees into area

13   control because the agency was -- was saying that we

14   were allowing them while we weren't.

15               I mean, this has transpired, the totality

16   of the circumstances, from 2016 to 2019.  It's the

17   repeated grievances on different people with different

18   inspectors.  I mean, I was just, I would say, part of

19   it; but I was also the messenger.

20       Q.  What was the NTEU Local 149 seeking through

21   this grievance?

22       A.  Excuse me?

23       Q.  The NTEU local Chapter 149, what were you all

24   seeking by filing this grievance?

25       A.  We're -- we're -- let me see.



Page 172

1            In other words, it was more of a past

2    practice thing where we were -- they implemented

3    something without any kind of explanation to us at all.

4            It says:  (Reading) The agency failed [sic]

5    to exercise the referenced authorities or discretion

6    fairly and consistently as to avoid adverse impact to

7    employee's working conditions.

8            It was impacting -- as you can see, the

9    employees were troubled about the manner and response --

10   their responsibilities were being conducted to include

11   the public bashing of why the CBP officers were turning

12   them back.

13   Q.  Would it be fair to say that the primary

14   motivation for speaking -- excuse me -- for filing this

15   grievance was to improve the CBP officers' working

16   conditions?

17            MR. LEV:  Objection, leading.

18   A.  It is two-part, and I'm going to give you an --

19   an example.

20            These petitions that you've seen, they've

21   been started since 2016 and probably longer before that,

22   you know.  And there's nobody out there to help us.

23            So what we do is we file these grievances

24   and we go outside the agency to help protect the

25   officers but -- but we can't do that without improving



Page 173

1    the lives of the immigrants or the people who are being

2    detained there because our officers have to work in

3    those infested areas, has to work on those stench

4    areas.  We're the ones that get assaulted because we

5    have to block certain people from coming over, you

6    know.

7                    We -- it seemed like -- it seemed like

8    there was no relief for the officers, and the only --

9    the only way to -- to -- to -- to protect the officers

10   is to enforce the rights that are -- that are given to

11   the immigrants in their -- in seeking an asylum.

12                   If we improved the --

13   Q.  (BY MR. HALASKA)  Okay.

14   A.  -- the process for the immigrants, improved the

15   areas where they're being detained, it piggybacks on

16   the officers and they're -- they're protected and

17   they're working in a clean environment and their

18   integrity's not -- not challenged.

19                   MR. HALASKA:  Kevin, would you mind

20   scrolling down?  It's the page that's stamped 144.

21                   And just highlight -- yes, please.

22   Q.  (BY MR. HALASKA)  This is the "Remedy" section

23   that the union requested when it -- excuse me --

24   submitted when it submitted this grievance.

25                   It says, quote:  The union is requesting



Page 174

1    that all employees that were not allowed to process

2    asylum seekers due to the agency's orders and unilateral

3    practices be exonerated from all wrongdoing, as

4    mandated by the NCBA.  The union requests that health

5    checks be completed on asylum-seeking detainees prior

6    to their extended stay during processing.  The union

7    requests that a job hazards plan be implemented for the

8    affected work environments that detain and handle

9    temporarily detained individuals in the A, B, and C

10    buildings.  The union requests back pay for all

11    mandated work that would have been conducted if the

12    asylum processing, transportation, care, and detainment

13    procedures would have been followed pursuant to CBP

14    mandates, law, rule, and regulations.

15           Did I read that correctly?

16    A.  Yes, sir.

17    Q.  So -- and correct me if I'm wrong, it looks

18    like the remedy that the union requested here does not

19    include an end to metering; is that right?

20    A.  Why would we request an end to metering when

21    you guys have not informed us whether it was legal or

22    illegal?

23           We just wanted to know exactly what we were

24    doing or were supposed to do, put it in writing.  We're

25    requesting a job analysis plan to ensure that the



Page 175

1  officers didn't get sick, which they were getting sick.

2  They got influenza in there.  They got lice.  They got

3  flu.  The filed numerous CA -- CA -- worker compers

4  [sic] claims in there, you know.

5           They were working in an asbestos --

6  asbestos-infected building.  You know, there was a lot

7  of stuff that was going on at that time, you know.

8           The metering part was a big issue for us;

9  but who are we, as an NTEU, to tell management what

10 they can -- how they can assign work.  They assign it.

11 We just make sure it's -- it's -- it's -- it's done

12 safely and in compliance with the national collective

13 bargain [sic] agreement and we -- and -- and with laws,

14 rules, and regulations.

15          We don't tell managers how to do it.

16 Where -- or -- or -- or -- or -- or when to stop.  It's

17 not our decision to tell them how to stop.

18    Q.  Sure.

19          I just want to make sure I understand that

20 through this grievance, the union, the local chapter,

21 was not seeking an end to metering.

22    A.  It's not our position.  We can't -- it's not

23 within our rights or -- that allows us to do unless

24 management allows us to negotiate it.

25          But we're not -- the union doesn't dictate



Page 176

1    to management the number, types, and grades put in any

2    location.  We don't have that right.

3              And sorry if you -- if you think I'm

4    shouting or -- I just -- I have these things, and I

5    can't really hear myself talk.

6    Q.  No, you're -- you're perfectly fine.

7    A.  Okay.  So I apologize if my tone seems loud.

8    Q.  No, I understand completely.

9              MR. HALASKA:  Kevin can you pull up

10   Exhibit 293, which is NTEU 132; and just -- yeah, so if

11   you wouldn't mind highlighting it from -- or extending

12   from where it says "Haralson" at the top left, and I

13   just want to catch that down through the first

14   paragraph.  Perfect.

15   Q.  (BY MR. HALASKA)  This was another document,

16   Mr. Atkinson, that Mr. Medlock showed you during the

17   deposition.

18              And I'm going to read from it; and it

19   says -- well, let me, you know, say it's an e-mail from

20   William Haralson.  It was sent to David Higgerson, and

21   you and other individuals are copied on it.

22              And it says, quote:  Mr. Higgerson, during

23   the grievance meetings, agency representatives

24   acknowledged that the agency's unilateral work policies

25   broke CBP mandates, federal immigration rules and laws



Page 177

1    in formally processing persons who seek political

2    asylum and screening for possible terrorists or

3    fugitive status.

4              Did I read that right?

5    A.  Yes.

6    Q.  Who were the agency representatives that

7    acknowledged this?

8    A.  The -- the agencies through -- frankly, the

9    agencies that met the -- the agency representatives

10   that participated in the meetings, they would say:  Hey,

11   this is what management -- we know it's wrong, but

12   management -- this is what upper wants.  Don't kill the

13   messenger.  Don't kill the messenger.

14   Q.  Do you -- do you remember who those

15   representatives were?

16   A.  On the first and second steps, that's usually

17   the -- the officers.

18              Now, on the third step, with Mr. Higgerson,

19   he would rarely participate in the grievances, if any.

20   But third step, they're just -- if you look at the

21   grievance responses, they just go back and repeat what

22   the first and second steps say.  There's no relief,

23   there's no explanation, or anything like that.

24   Q.  Sure.

25              At the moment, though, I'm just asking if



Page 178

1    you remember who the agency representatives were that

2    Mr. Haralson claims acknowledged that the agency's work

3    policies broke the law.

4        A.   It would usually be the first -- the first and

5    second step supervisor or supervisors that participated

6    in the meeting.

7        Q.   Do you remember who those individuals are?

8        A.   Hmm, no, I don't; but there might be a -- there

9    might be a recording of it.  There might be a recording

10   of it.

11       Q.   Where might that recording be?

12       A.   It may be -- it may be at the office.

13       Q.   And when you say "office," you're referring to

14   the --

15       A.   NTEU office.

16       Q.   The national or the local?

17       A.   The -- well, the local, local office.

18       Q.   And you said this was during the grievance

19   meetings, quote, unquote.

20             Do you remember when those meetings were?

21       A.   Whenever the -- the -- the -- the grievance

22   dates stater [sic] is, you know, whenever the dates

23   are.  I mean, it's been such a long time ago, 2017,

24   '16.

25       Q.   Do you recall whether you attended any of those



Page 179

1   meetings?

2       A.  I don't know which grievance it was; but I

3   participated in the Army discussions before and after

4   them, you know.

5       Q.  Can you say for certain as you sit here today

6   that you actually witnessed agency representatives

7   acknowledge during grievance meetings that the agency

8   policy broke the law?

9       A.  Yeah.

10      Q.  You can say that?

11      A.  On the meetings -- at the meetings that I sat --

12  and I believe that there has to be a couple of tape

13  recordings of all of it.  I have -- I have a traumatic

14  brain injury, so I can't recall a lot of stuff.  So

15  I've got to have a recording and stuff to aid me in my

16  disability.

17      Q.  Okay.

18      A.  So, I mean, a lot of these things are kept at

19  files at the NTEU office.  Now, whether they're there or

20  not, who knows; but they could pop up.

21          Would you want me to look for them?

22      Q.  Not right now.  I think we can discuss later.

23      A.  Okay.

24      Q.  I just want to double back about the letter that

25  was sent to you, just one more time.



Page 180

1          Are there any questions today from either

2    myself or Mr. Medlock that you did not answer fully or

3    completely because of the letter?

4        A.  I can't, you know, consciously say that it --

5    it hasn't affect me, you know, because it has; so, I

6    mean, going back and -- and -- and looking at that

7    stuff, it's -- it's -- it's kind of hard to say it

8    didn't.

9          I know that you've been very professional.

10          MR. HALASKA:  I think defendants have

11   no more questions.

12          MR. ORI:  We don't have anything

13   further.

14          THE COURT REPORTER:  Is that it,

15   everyone?  Anything else?  Can we go off the record?

16          THE VIDEOGRAPHER:  The time is

17   3:19 p.m.  Oops.  The time is 3:19 p.m.  This concludes

18   the deposition of David Atkinson.  We're off the

19   record.

20          (Deposition concluded.)

21

22          Reporter's Note:  According to Federal

23   Rule 30(e)(1), the request for review of the deposition

24   by the witness is accomplished "on request by the

25   deponent or a party before the deposition completed."



Page 181

1

2              Since this was not done, signature is

3    considered waived for this transcript.

4                        * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 182

```
 1            IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF CALIFORNIA
 2
 3    AL OTRO LADO, INC., ET        )
      AL.,                          )
 4                                  )
        Plaintiffs,                 )
 5                                  ) CIVIL ACTION
      VS.                           )
 6                                  ) NO.: 17-cv-02366-BAS-KSC
      KEVIN K. MCALEENAN, ET        )
 7    AL.,                          )
                                    )
 8      Defendants.                 )
 9                REPORTER'S CERTIFICATION
10              DEPOSITION OF DAVID ATKINSON
11                   JUNE 12, 2020
12        I, Annette Peltier, Certified Shorthand Reporter in
13    and for the State of Texas, hereby certify to the
14    following:
15        That the witness, DAVID ATKINSON, was duly sworn by
16    the officer and that the transcript of the oral
17    deposition is a true record of the testimony given by
18    the witness;
19        That the original deposition was delivered to
20    Mr. Steve Medlock, Custodial Attorney.
21        That a copy of this certificate was served on all
22    parties shown herein on _____.
23        I further certify that pursuant to FRCP Rule
24    30(f)(1) that the signature of the deponent:
25        ____ was requested by the deponent or a party before
```



Page 183

1    the completion of the deposition and that signature is

2    to be returned within 30 days from the date of receipt

3    of the transcript.  If returned, the attached changes

4    and signature page contains any changes and the reasons

5    therefore.

6         XX was not requested by the deponent or party before

7    the completion of the deposition.

8         I further certify that I am neither counsel for,

9    related to, nor employed by any of the parties or

10   attorneys in the action in which this testimony was

11   taken.  Further, I am not a relative or employee of any

12   attorney of record in this cause, nor am I financially

13   or otherwise interested in the outcome of the action.

14        Certified to by me this 24th day of June, 2020.

15

16        _____

         Annette Peltier, Texas CSR 3263

17        Expiration Date:  10/20/21

         Firm Registration No. 633

18         Magna Legal Services

         Seven Penn Center - 8th Floor

19        1635 Market Street

         Philadelphia, Pennsylvania 19103

20        Phone: 215.207.9460

         Fax: 215.207.9461

21

22

23

24

25



| A |
|---|

**abandoned**
150:24
**ability** 168:1
**able** 14:5 19:9
68:18 99:8
150:7
**above-styled**
1:18
**Abraham** 73:18
73:18
**Academy** 34:4,4
**accept** 111:13
**accepted** 129:22
**accomplished**
180:24
**accused** 75:8
131:18
**achieved** 37:6
**Achievement**
29:7
**acknowledge**
124:19 179:7
**acknowledged**
124:2,13,17
176:24 177:7
178:2
**acronym** 7:11,14
7:16 13:13,18
13:23 86:24
**act** 42:24 163:3
170:19
**acted** 69:15
**acting** 51:15 58:2
121:16 148:11
158:16
**action** 1:5 28:5
76:14,18 82:7
83:1,15 85:3
182:5 183:10
183:13
**actions** 75:14
88:16 89:11
116:6 130:21
**active** 27:24

28:12
**activities** 149:3,4
170:14
**actual** 16:17
**add** 11:19 126:7
168:5
**additional** 87:17
107:13
**address** 138:22
**addressed** 93:4
144:3
**adequate** 32:2
**Adjournment**
4:6
**admin** 44:1
**administration**
47:13,17 71:16
**administrative**
154:11
**admission** 170:22
**admit** 125:8
130:5
**admitted** 151:2
151:19
**advantage** 67:10
**adverse** 76:14,18
82:7 83:1,15
85:3 88:15
89:11 164:14
172:6
**advice** 15:16
**advise** 24:19
**advised** 88:7
**affect** 180:5
**affidavit** 10:3
**afternoon** 166:18
167:1
**agencies** 89:5
177:8,9
**agency** 7:6,9,9,10
33:10 38:13,20
39:2 45:25
52:10 57:21,23
65:6 76:22
80:22 83:3 89:5
94:13 96:18,21

99:13 107:5
124:1,13 125:2
126:10,20
127:14,15
129:12 131:17
135:11 136:14
145:14 149:3
158:24 161:21
169:11,15
171:13 172:4
172:24 176:23
177:6,9 178:1
179:6,7
**agency's** 33:9
45:25 124:2
130:21 131:12
174:2 176:24
178:2
**agents** 43:17
153:5,6
**ago** 40:3,4 151:8
178:23
**agree** 22:5 45:11
46:12,20
**agreement** 16:17
46:24 146:22
147:2 175:13
**Ah** 34:3
**ahead** 14:23 15:3
38:3,3 40:12,12
44:17,18,19
46:5 48:24
50:21 51:11
53:19 55:16,18
70:10,11,12
102:18 111:5,6
117:2 119:9
131:24,25
146:19,20
158:11,12,13
158:14 159:4
167:20
**ahold** 23:12
**aid** 88:8 179:15
**Airborne** 27:11
27:19,21,25

**airport** 71:1
**al** 1:3,3,7 4:12
5:6 6:3,4,4
182:3,3,7
**Alcon** 76:1
**Alert** 141:6
**Alex** 166:2,19
167:1 168:19
**ALEXANDER**
2:13
**Alexander.j.ha...**
2:16
**aliens** 76:10 82:3
82:6
**alleged** 112:6
**allegedly** 54:10
131:17
**allocated** 133:10
**allow** 32:19 33:4
33:7 64:7 110:5
110:13,15
116:7 119:5,10
126:25 131:12
148:6
**allowed** 35:2
48:5 84:2 102:7
102:9 119:8
132:20 162:12
174:1
**allowing** 39:3
145:2,2,14
162:24 163:7
171:14
**allows** 143:20
148:23 175:23
175:24
**alter** 150:4
**altercations**
150:4
**American** 42:17
111:23 121:8
165:10
**amount** 24:15
32:4 55:25 56:1
56:1,7 69:3

104:6 150:14
150:20 151:3
151:11 153:13
155:3 157:2,5
157:12 159:23
**analysis** 174:25
**and/or** 94:14
99:14 100:6
101:5 169:16
**Annette** 1:20
6:11 182:12
183:16
**answer** 10:12
11:2,5 12:6,7
12:16,18 13:1,2
14:5,7,9,13
19:24 32:14,15
32:19,21 44:9
45:16 48:5,9
50:14 54:23
60:21 66:12,16
69:19 80:11
84:25 91:9
105:5 106:19
108:11 114:5
116:6 127:2
129:10 131:13
139:11 151:18
151:23 152:2
165:4 167:23
180:2
**answered** 167:15
168:1
**answering** 19:15
**answers** 25:7
**anxiety** 19:17
**anxious** 19:20
**anybody** 23:5
24:12 56:2
58:25 62:6
160:16
**anymore** 127:6
**apologize** 84:23
97:25 161:7
176:7
**apparently** 82:16



**appeal** 96:12
**appealing** 40:13
**appear** 84:1 98:3
**Appearances** 4:3
**appeared** 64:12
64:12
**Appearing** 2:4
2:12,21 3:2
**appears** 73:15
75:18 85:11
88:3 92:1
122:12 134:1
137:23 141:1
**applicants**
127:18
**applications**
170:22
**applied** 29:22
30:15 34:17
52:15
**apply** 30:13 55:6
**appointed** 74:2
**appointment**
54:7 144:11,11
162:12
**appointments**
54:14 144:21
144:22,23
**appreciate**
112:12 154:17
**apprehended**
76:11
**approach** 95:19
118:20
**approached** 61:2
**appropriately**
52:15
**approved** 22:22
**approximately**
12:22 26:8 37:3
**April** 4:21 15:6
63:4 92:2 115:8
**arbitration** 9:16
9:22 93:10,23
94:13 96:11,11
97:6 134:13,14

134:15,18
135:7,9 137:16
**arbitrations** 9:19
9:23 47:1
137:19
**arbitrator** 39:9
**arbitrators** 47:1
**area** 56:12,19,22
57:10 66:20,20
89:11,18
104:25 109:9
118:11 120:25
120:25 121:7
135:25 145:16
147:21 151:14
155:4,9,21
156:15 157:3,6
158:8 159:13
159:14 163:12
163:14 171:12
**areas** 58:23
66:22 69:4,5,9
69:21 70:18,18
136:3 140:3
151:6,9 164:14
173:3,4,15
**argument** 59:11
**Army** 27:3,9 29:7
29:15 179:3
**arrested** 19:17
**arrival** 76:23
**arrived** 88:9
90:15
**arriving** 82:5
**asbestos** 175:5
**asbestos-infected**
175:6
**asked** 17:3 31:8
66:24 78:3 85:3
86:13 106:17
167:22 169:1
**asking** 19:21
47:25 75:5
82:17 112:11
140:2 177:25
**aspect** 170:15

**ass** 80:17
**assaulted** 173:4
**assaulting** 131:18
**assaults** 151:10
**Assault's** 132:1
**assessing** 99:17
169:18
**assign** 175:10,10
**assigned** 34:12
34:24 35:5 36:6
49:25 74:2,6
80:7 107:17
109:9 162:3
**assignment** 34:25
**assignments**
70:20,20
**assist** 78:7
**assistant** 51:14
60:6 121:12
138:12
**assisting** 108:15
**associate** 15:8
**associated** 7:19
**assume** 16:17
47:4 58:23
**asylees** 89:12
148:13 150:5,6
162:9
**asylum** 5:3,9
38:24 41:17
47:24 48:1,2,13
49:6,19,20,21
50:7 51:7 52:17
52:25 53:2,23
54:6,17 55:10
55:16,19 59:20
60:10,25 61:1,8
61:14,17,22
62:1,18 64:11
64:17,23 65:19
66:4 68:24
71:12 76:20
84:2,3,8 94:14
99:17 100:1,6
101:13,22,25
102:10,12

103:15 107:5
107:15,23
108:2,3 109:5
109:16,22
110:1,15,17
112:22 113:4
113:23 115:16
116:21 117:6
117:10,22
118:19 119:17
119:21 120:17
121:21 122:3
124:5 127:16
127:18 128:6
130:5,22 131:4
132:13 134:7
134:12 144:10
144:17 148:1,7
148:24 149:1,9
153:18 159:11
160:7 162:5,9
162:22,25
163:8,18
164:24 165:9
165:12 169:18
173:11 174:2
174:12 177:2
**asylum-seeking**
174:5
**asylum/credible**
93:24
**Atkinson** 1:12,16
4:19 5:8 6:3,17
6:22 7:1,1
14:16 15:5,6,13
15:16 16:23
18:5 32:13,14
44:8 48:8 50:13
54:22 66:14
68:9 72:8 84:24
85:9 100:17
101:3 105:3,16
105:25 106:10
130:16 131:14
141:22 149:16
161:4 163:24

165:4 166:18
168:25 169:9
176:16 180:18
182:10,15
**attached** 1:24
60:7 94:12
140:23 154:19
183:3
**attachment**
91:21,21 92:7
160:23
**attack** 137:8,15
**attained** 27:8
**attempt** 15:16,22
47:24 95:8
**attempted** 16:13
151:13
**attempting** 48:2
48:13 113:4
127:19
**attend** 124:9
**attended** 178:25
**attending** 124:12
**attention** 15:25
**attorney** 2:23
12:11,12,12,17
12:18 14:7
18:12 20:6,9,14
22:17,23 23:18
23:19 32:18
93:6,7,8 167:9
182:20 183:12
**attorneys** 16:5
20:10,11 24:25
93:9 183:10
**audible** 11:3
**audio** 12:4
152:13,14
**August** 151:1
**authentic** 123:22
**authorities**
148:11 172:5
**authority** 148:23
162:24 163:2
**authorized** 92:20
92:20 160:5



**avoid** 11:8 172:6
**award** 29:11
**awards** 29:12
**aware** 17:18
 46:25 61:19
 131:11 132:13
 161:10 162:21
**A-T-K-I-N-S** 7:2
**a.m** 1:19 6:8 68:4
 68:5,6,8 105:11
 105:12

**B**
**B** 18:15 174:9
**back** 7:25 11:13
 11:19 22:13
 31:8 41:7 46:19
 46:21 48:19
 49:3,7,15,17,21
 50:7,17 51:8
 52:17,22,24
 53:2,5,14,23
 54:6,17 55:10
 55:19 57:4
 60:24 61:15,17
 61:23 62:12,13
 62:19 64:11,17
 64:23 65:19
 66:5 67:9,17
 68:8,9,10,24
 81:16,16 82:12
 82:24 88:11,15
 89:24 90:5,10
 90:16,19,24
 91:4 99:2 100:1
 101:17 102:2
 105:15,16
 107:7,23 108:2
 109:5 110:3,18
 113:3,23 115:4
 115:16 117:8
 117:15,22
 118:6 119:15
 121:19,21,22
 121:25 122:2,4
 130:5 131:5

132:6,6 133:16
135:13 140:9
144:10,17
146:3,15,16
147:11,14
148:8 157:13
159:25 162:11
163:1,18 164:7
164:24 166:8
166:15 171:9
172:12 174:10
177:21 179:24
180:6
**background**
 25:12 34:13
**bad** 38:19 53:12
**Badge** 29:10
**balancing** 42:21
**bargain** 175:13
**based** 50:5 71:9
 77:21
**bases** 76:25
**bashing** 172:11
**basically** 168:6
**Bates** 73:6,11
 79:11 85:10
 91:22,22
 122:14 133:25
 140:23 168:22
**bathing** 32:1
**Bayview** 31:16
**bears** 122:14
**began** 62:16
**beginning** 54:9
 55:24 106:14
**begins** 6:2 75:25
 103:10 109:14
 127:9 130:20
 133:25 138:15
 140:23
**behaved** 45:18
**behavior** 45:25
**believe** 32:24
 42:23 50:6 54:9
 54:16 55:9,12
 55:13,13 57:11

57:11,13,14,14
57:14 58:11
60:8 71:11
74:12 77:12,13
77:23 81:10
86:9 92:25 93:3
94:18 99:21
105:18 111:7
114:8,22
123:20 125:23
129:5,12
142:21 143:7
144:2 145:8
149:23 150:25
168:21 169:25
170:4 179:12
**believed** 58:5
 99:23 126:11
 139:3 160:10
**belonged** 52:10
 94:20
**Ben** 2:15
**beneath** 98:9
 99:8
**benefit** 55:5
**benefits** 42:17
**BENJAMIN**
 2:18
**Bennett** 15:8
 18:7
**best** 21:10 52:13
 60:17,17 69:24
 112:11 140:10
 168:1,3
**better** 45:16
 71:23 103:24
 104:21 108:4
 135:3 141:23
**big** 72:13 110:2
 141:10 175:8
**bigger** 72:12,17
 72:20 103:1,23
 122:21
**bit** 8:1 25:11
 65:22 135:18
 141:23 157:9

**bite** 81:16
**black** 154:24
**blah** 82:17,17,17
 111:13,14
**blame** 51:24
**blank** 155:4
**block** 127:17
 173:5
**blocking** 100:6
 109:15 118:16
 127:16 130:23
**blocks** 99:14
 101:5 169:16
**blow** 71:22
 100:12 105:3
**blurry** 72:23
**Blvd** 2:23
**Board** 16:20
**bodies** 36:3
**body** 81:24
**books** 26:16
**border** 7:12,15
 16:4 43:17,22
 44:13 48:3,15
 70:6 117:17,23
 118:14,20
 120:3 121:5,5
 121:10 149:24
 150:9,18
 152:21 159:20
 159:23 162:8
 165:1 170:19
**bothered** 56:2
**bottled** 133:3
**bottles** 133:1
**bottom** 73:13
 99:5
**bought** 133:1
**box** 2:15 133:8
**Boys** 66:21
**brain** 179:14
**branch** 27:2
**breach** 15:11
**break** 12:22 13:3
 38:16 67:22,22
 68:5 105:12

106:17 166:6
166:12
**breaking** 64:10
125:18,25
126:12,18
139:4
**breaks** 38:16
**bridge** 49:14,15
51:21 108:15
110:24 118:21
121:13 145:16
148:2 149:21
150:13 151:10
162:6
**bridges** 35:3,6,8
35:17,18
108:25 152:5
**Brief** 99:6,9
169:10,12
**briefly** 17:15
95:2
**bring** 24:7 72:7
79:2 84:20
91:12 97:24
106:3 114:22
122:9 136:24
140:13 164:17
**broad** 132:2
**broke** 38:21,23
124:3,14,20
125:5 126:22
176:25 178:3
179:8
**brought** 15:25
121:19,21
159:18
**Brown** 2:6 6:9
168:15
**Brownsville** 2:24
25:24 26:7
**budgetary** 160:4
**building** 56:1
59:7,9 89:9,10
90:9 121:2
175:6
**buildings** 174:10



business 25:19
  55:25 92:21
  134:22

—————
C
C 2:1 92:20 174:9
CA 175:3,3
California 1:1
  6:6 16:1 159:24
  182:1
call 26:15 43:23
  62:11 117:4
  133:4 146:13
  146:14,15,16
called 43:18,20
  89:10 99:6
  163:15
calls 32:12 50:11
  54:20 126:13
  129:7 165:3
camp 31:3
campaign 28:4
  28:12
candidly 161:16
candor 127:14
  128:18,21
canine 8:21 34:2
  34:2,8,12,16,21
  36:1,1
canteens 133:3,4
Cantu 138:12
capability 68:20
  68:22
capacity 55:21
  56:17 59:17
  60:9 61:18
  69:14
captured 152:11
care 31:4 174:12
career 116:24
Carlos 41:8 58:2
  132:23 138:15
  138:20 139:14
Carolina 26:14
cartoons 44:12
case 15:23 25:1,4

35:7 44:3 46:2
  46:10,17 49:5
  64:5 90:21
  96:22 115:4
  117:6 135:4,5,9
  135:23
cases 61:8 134:22
  134:24 135:2
  135:11,13,14
  135:16 137:3
  157:24 158:2
catch 176:13
cause 1:19
  183:12
caused 130:21
  136:21
CBP 2:18 7:10,11
  7:14 8:15,16,17
  8:20 9:13 13:22
  14:25 15:9
  16:12 19:6,19
  20:13 23:5,15
  32:8,18 34:11
  37:5,10,13,14
  37:15 38:25
  39:5,24 42:23
  43:5,11,13,14
  43:15,16,18,23
  43:25 44:2,2,11
  44:11,22,22
  45:3,19,21
  46:15,24 47:12
  47:16 49:6,19
  50:3,6 51:6
  52:10 53:22
  54:8,16 55:9,20
  60:8,25 61:2,9
  61:21 64:9,10
  64:16 68:17
  70:4,6 71:7,11
  77:10,22 78:4,4
  80:4,6 82:2
  85:4 88:20,22
  89:9 92:18,19
  92:21 99:14
  100:5 106:22

107:6,8,22
  108:1,6,22
  109:8,16,24,25
  110:14 111:16
  112:3,23
  113:22 116:20
  117:18,20
  118:23 119:17
  120:14 123:13
  124:3 125:24
  127:13 128:17
  129:5,22,25
  130:4,9 135:24
  136:19,22
  139:3 142:5,16
  143:18,20,21
  144:15 145:3
  145:19,23
  146:7,10,25
  148:4,12 149:9
  152:8 155:20
  156:6,14,19
  157:15 159:10
  160:6,25 162:2
  162:4 163:25
  164:2,9 165:19
  167:10 169:16
  170:19 172:11
  172:15 174:13
  176:25
CBPO 82:1,2
  88:7 109:21
CBP's 23:6 47:21
  110:11 114:8
  124:14 125:19
  127:4 139:5
cc'd 81:12
cease 39:25 40:17
  41:5,7,11,15
cell 152:15
center 31:15 34:1
  60:15 89:20
  110:20 183:18
certain 41:21
  46:1 54:10 56:6
  83:3,3 95:20

103:4 107:5
  126:5 129:21
  132:15 133:3
  136:5,6 159:16
  173:5 179:5
certainly 83:20
  83:23 139:22
certificate 4:7
  182:21
CERTIFICAT...
  182:9
Certified 1:20
  182:12 183:14
certify 182:13,23
  183:8
CF 134:6,12
chain 73:6 85:22
  86:1 87:10
  97:19 141:17
  143:4,8,11,17
chairs 56:3,8,10
  56:13,19,21,24
  57:9,24 58:6,20
  59:23 155:3,8
  155:20 156:7
  156:14,19
  157:1,12
challenged
  173:18
chance 105:4
change 58:10
  65:8 78:21,24
  110:17
changed 10:20
  151:21
changes 59:13
  127:16 183:3,4
changing 128:16
chaos 164:15
chapter 7:21,23
  7:24,25 9:25
  10:10 24:16
  36:21,24 37:2
  47:11 73:25
  78:3,15 85:19
  92:9,22 93:17

94:12 98:6
  106:12 123:6
  123:18 125:3
  135:19,23
  142:8,9,19
  164:8 171:8,23
  175:20
characterization
  17:16
characterized
  15:23
charge 121:13
checks 174:5
chief 23:6 43:10
  51:13 138:15
  138:20 139:14
chiefs 164:6
children 128:8
  130:22
chilling 127:18
  127:23
chooses 76:22
chose 159:12
Christopher
  73:17
circumstances
  171:16
citizen 42:17
  154:5
City 71:2
civil 1:5,23 8:15
  182:5
civilties 111:23
claim 66:21
  153:18 157:11
  159:19
claimed 117:10
claiming 76:20
  76:20 120:17
  144:23 147:20
  149:3
claims 175:4
  178:2
clarification
  28:24 64:13
  71:5 82:22



100:20 141:7
162:24
**clarifications**
110:10 161:18
**clarify** 67:6
82:21
**clean** 173:17
**clear** 15:21
113:19
**cleared** 135:14
**clearly** 11:4
79:13
**client** 14:25
15:10,16 16:9
16:13 17:1,6
**close** 93:25 99:16
103:14 149:20
149:24 150:11
150:17 169:17
**closely** 57:1
**close-knit** 27:11
**closing** 158:25
**cloudy** 10:13
**Clough** 4:18
73:19 79:19
81:11 85:13
86:11,17 87:7
87:11 92:3
93:20
**Clover** 29:8,9
**CNN** 153:9
**coachella** 118:11
**coincide** 100:9
**colleagues** 166:7
**collective** 175:12
**college** 25:18
26:3,4,5,9,10
26:11,12,14,14
26:20,25
**color** 102:8
**combat** 29:11
**combined** 135:12
**come** 67:17 81:16
95:14 114:13
116:8 118:5,22
135:17 147:14

148:7,14
159:25 164:7
**comfortable**
105:25
**coming** 41:19
58:12 67:13
68:12,16
111:16,23
118:16 121:2
136:15 159:11
173:5
**command** 97:19
143:5,8,18
**Commander**
138:21
**commendations**
29:5
**comments** 19:18
111:25
**commissioner**
41:13 60:5,6
97:4,20 142:4
144:7 145:9
154:5,5
**commissioners**
143:16,24
144:1
**communicate**
144:1
**communicating**
143:3,24
**communication**
61:20 143:9
**communications**
143:5 151:13
151:14
**Community**
26:14
**compers** 175:3
**competency**
74:25
**competent** 33:3,7
**compiled** 152:24
**complained**
54:13 152:3,9
**complaining**

136:13,13
147:16
**complains** 47:20
**complaint** 43:11
136:15 164:13
**complaints** 41:16
45:23 46:18,21
47:11,16
**complete** 27:20
151:7
**completed** 25:16
174:5 180:25
**completely**
167:24 176:8
180:3
**completion** 183:1
183:7
**compliance**
161:23 175:12
**compound** 139:8
**comprehension**
16:6
**compromised**
21:15
**computer** 53:13
53:14
**concept** 42:6
**concern** 65:17
82:1 144:15
162:1
**concerned** 63:20
64:10,16 76:4
150:24
**concerning** 4:11
4:16,19 47:2
53:24 150:23
**concerns** 138:22
149:19
**concert** 51:20
**concise** 78:19
**concluded**
131:21 180:20
**concludes** 180:17
**conclusion** 39:11
50:12 54:20
165:3

**conclusively** 17:2
**conditions** 172:7
172:16
**conduct** 41:12
47:12,16,21
119:14
**conducted**
172:10 174:11
**conducting** 118:9
149:4 170:16
**confer** 166:7
**conference**
151:24 152:7
**CONFIDENTI...**
1:10
**confused** 65:5
110:6 170:13
**confusing** 73:11
**confusion** 113:22
**Congress** 160:16
**conjunction**
50:18
**connection** 9:24
20:7 25:5 77:10
**consciously** 17:1
180:4
**consecutively**
26:11
**considered** 87:4
181:3
**considering**
150:18
**consistent** 131:3
**consistently**
172:6
**constant** 41:3
**constituted**
167:11
**Constitution**
42:1,7,25
**constitutional**
17:8
**contact** 17:18
22:14,19 48:18
106:23 119:17
**contacted** 24:6,6

154:5
**contacting** 76:7
**contains** 183:4
**content** 17:24
**contents** 147:1
**Continuation**
109:15
**continue** 18:3
55:17
**continuing** 99:13
169:14
**continuously**
94:13
**Contra** 28:12
**contraband** 36:2
**contract** 136:4
137:15 143:20
143:22 144:5
**Contras** 28:2,7,8
**control** 89:19
145:18,23
146:6,8,9
147:23,25
171:13
**controlled** 69:21
118:15
**conversation**
11:1 151:1
**conversations**
20:19
**cook** 31:5,9,12
**copied** 17:21
74:19 176:21
**copy** 18:6 73:18
74:20,21 79:18
92:3 93:15 98:1
122:14 123:2,4
142:15 152:16
182:21
**core** 42:16
**corner** 73:13
**correct** 7:12,13
10:12 20:7
24:10 31:19,20
35:15 45:24
50:4 77:8 79:24



83:21,24 84:2
85:23 86:1,8
88:4,23 92:23
95:6 97:10 98:7
98:10,25
104:18 107:24
107:25 114:2
123:2,6,18
136:9 137:2,25
138:5 139:24
141:3 142:2,5,9
142:13,16,19
143:5 152:22
156:1,2 174:17
**correcting**
128:16
**correctly** 76:15
82:8 86:22
87:19 88:17
94:16 99:19
103:17 109:18
112:25 116:18
124:7 127:20
131:1 138:24
144:12 145:20
149:6 155:5
157:25 159:15
162:14 163:5
169:20 171:10
174:15
**costing** 137:16
**counsel** 2:18 6:13
15:9,20 16:12
16:24 23:6
43:10 183:8
**count** 132:25
**counter** 57:3
**countries** 31:19
42:20
**couple** 12:5,6
35:4 121:11
151:17 167:5
179:12
**course** 45:7
47:10 63:24
65:1 85:18 92:9

123:5 142:8
152:3 159:22
**courses** 25:19
26:18
**court** 1:1 4:7 6:5
6:11,15 11:5
12:14 14:8,11
15:22 16:1,25
40:25 52:1,3
53:10,15 60:2
100:19,23
124:23 129:23
161:4,8 164:22
166:21 180:14
182:1
**courtroom** 8:5
**court's** 16:16
**cover** 80:17
**covered** 106:23
153:9 161:20
**Covid** 33:2
**COVID-19** 10:20
**Cranford** 3:4
6:11
**crash** 53:13
**create** 89:9 128:5
128:15 145:15
147:11,13
160:11,17
164:5
**created** 43:21
53:7 56:16 69:4
116:3 128:8
129:14 147:22
149:24 150:10
**creates** 128:2
**creating** 53:16
146:1,2 147:20
155:25 161:24
164:15
**credibility**
112:23 137:8
**credible** 94:14
157:24 158:2
**creditable** 157:24
**criminal** 67:10

76:20
**crisscrossed**
34:18
**cross** 146:3
**crowds** 150:10
**crying** 128:9,9
**CSR** 1:20 183:16
**Cuba** 31:19,23
**current** 7:21,21
62:24 92:24
**curric** 116:23
**Cus** 41:13
**Custodial** 182:20
**custody** 83:21,22
**Customs** 7:11,15
16:19 29:18
30:14,20 33:15
33:21 34:8,11
34:23 41:13
42:3 63:24 89:6
**cut** 132:12
146:21
**cutting** 40:24

———————
**D**
**dad** 29:17
**danger** 151:21
152:10
**dangerous**
151:11 152:5
**dash** 140:24
**date** 17:25 53:6
92:13 121:6
123:9 162:12
183:2,17
**dated** 98:9 115:8
138:4
**dates** 85:22
142:12 178:22
178:22
**daughter** 67:4
**David** 1:12,16
4:19 5:2,5,8 6:3
6:17 7:1 40:8,9
40:17 58:1 70:2
114:16 121:15

122:13 134:2
139:13,19
158:15 176:20
180:18 182:10
182:15
**day** 56:14 81:13
95:19 147:17
147:17 151:5
183:14
**days** 8:20 10:18
95:8,8 183:2
**de** 150:14
**deal** 31:22 58:1
**dealing** 19:18
31:18,18
**deals** 19:8
**dealt** 45:1 111:14
112:6,7
**decade** 40:6
**December** 4:12
4:14,16,18,19
73:16 74:15
75:18 76:8
79:19 80:3,25
81:9,14 82:1
85:11,12 86:17
88:7 90:12
99:12 100:2
169:14
**decided** 30:1
37:19 155:20
**decision** 37:20
43:5,7,9 45:1
47:3,20 134:22
160:6 175:17
**declaration** 10:3
**decrease** 60:9
**defend** 64:6
**defendants** 1:8
2:11 180:10
182:8
**defending** 41:25
42:7
**defense** 161:21
**deferred** 7:7
**definite** 116:5

**delivered** 22:14
182:19
**Denis** 2:22 20:13
**Dennis** 22:21
**deny** 162:25
163:7
**denying** 127:16
129:24 130:1
130:12,23
**Department** 2:14
13:11 16:18
23:5 26:16
**depending** 74:25
111:1 117:12
120:4,23 121:7
134:22 160:4
164:4 168:8
**depends** 129:20
170:1
**deploy** 32:8
159:22 160:1
**deployed** 28:1
160:13
**deponent** 180:25
182:24,25
183:6
**deposition** 1:11
1:16 6:2,8 9:7
10:18,25 12:1
13:10,16,21
20:7,23 21:2,3
21:11 22:8 23:7
24:5,14 66:16
73:5 79:6 91:17
122:12 133:23
167:9,23 169:4
176:17 180:18
180:20,23,25
182:10,17,19
183:1,7
**depositions** 12:15
**describe** 82:10
82:23 96:5
133:7 149:8,18
**described** 77:11
**describes** 77:24



**describing**
109:20
**Description** 4:9
**Desert** 28:19,20
**designate** 96:19
**designated** 96:22
**desist** 40:1,18
41:5,7,12,15
**details** 78:6
147:5
**detain** 118:2
148:24 174:8
**detained** 59:15
76:24 117:16
120:21 121:20
173:2,15 174:9
**detainee** 133:11
**detainees** 31:4
59:15 70:17
132:17 133:11
133:17 174:5
**detaining** 148:1
**detainment**
174:12
**detection** 31:7
**detention** 60:15
69:5 110:20
145:15,17
170:15
**determine** 17:2
95:8
**determined**
128:11
**deterred** 16:10
**device** 53:12
**DFO** 62:24
**DFOs** 115:19
**DHS** 13:12 89:9
**Diaz** 51:14
101:11,20,21
101:25 138:21
139:15
**dictate** 175:25
**Diego** 158:20
**dies** 154:12
**difference** 96:15

118:12
**different** 42:20
42:20 45:2
49:10,10 58:22
70:18,18 83:10
96:16 104:13
104:14 110:11
110:19,23,25
111:25,25
113:14,21
114:19 115:15
120:25 125:12
128:15 131:22
136:2,3 140:2,3
140:3 155:11
155:12 156:13
156:25 163:14
171:17,17
**differently**
124:25
**difficult** 24:21
**difficulties** 69:1
**digest** 65:21
**dilemma** 110:2
**direct** 97:16
**directed** 48:8
66:13
**direction** 74:16
145:18,23
146:7,8 147:23
148:11
**directly** 15:10
17:21 126:21
143:24
**director** 5:5 40:8
41:11 51:15,15
58:2 70:2 96:24
96:25 97:16
114:16 121:15
121:16 132:15
132:19 138:12
139:20 158:16
**directors** 121:11
121:12
**disabilities** 37:17
**disability** 179:16

**disadvantage**
66:9
**disagree** 45:13
**disappeared**
56:16
**discharged** 30:3
30:5
**discipline** 30:9
39:24
**disciplined** 39:6
**disclose** 39:14
**disclosing** 19:12
**discretion** 172:5
**discrimination**
43:10
**discriminatory**
44:11
**discuss** 19:3,5
179:22
**discussing** 116:1
**discussion** 57:11
**discussions** 23:18
179:3
**dishonest** 39:6
**dispute** 17:16
**disputes** 17:24
**disruption**
160:11
**dissension** 51:23
**District** 1:1,1 6:5
6:5 182:1,1
**division** 45:4
**Divorce** 8:15
**document** 18:8
54:7 71:25
73:13 76:23
85:7,10 95:17
104:11,12,21
105:4 168:12
169:1,4,10
176:15
**documented** 21:5
**documents** 11:22
16:23 17:3 19:7
21:22,25 22:9
24:2,3,16,20

49:1 52:23 53:1
62:8 67:23
71:18 154:2
167:5 170:20
**doing** 12:1 30:24
34:13 35:22
40:18 51:21
54:11,11 68:21
70:14,15
101:17 108:8
108:21 113:14
113:20 114:18
120:15 124:18
126:12 127:1
129:3,19,19
143:16 148:1
161:19 168:14
174:24
**DOJ** 16:20,24
**Donna** 71:1
**door** 110:22
120:1 121:1
**double** 179:24
**double-sided**
127:1
**doubt** 16:4
**Downey** 2:22
12:12 14:12,20
14:22,24 15:4,5
17:12,20 20:13
20:20,21,24
21:1,11,14,18
21:19,21 22:6
24:3,4,8 53:11
53:13 105:17
105:20,21
167:9
**Downey's** 17:16
105:18
**dozens** 160:25
**drafting** 161:12
**dragged** 151:8
**Dresslar** 92:2
93:5,5,6 94:11
**Dressler** 4:10,22
**drew** 108:3

**driven** 34:5 45:2
**Drootman** 23:10
23:25
**drove** 88:11
90:16
**drug** 8:18 9:1
**dubious** 114:10
**ducks** 166:3
**due** 27:10 32:4
136:25 151:13
174:2
**duly** 1:18 6:18
182:15
**duties** 123:5
142:8 143:21
143:22
**duty** 27:24 28:13
30:9 136:3
142:20
**D-A-V** 7:1
**D-A-V-I-D** 7:1
**D-R-O-O-T-M...**
23:25
**D.C** 2:7,15
104:25 114:13
115:12,16,25
127:4

---

**E**

**E** 2:1,1
**eagerness** 29:20
**earlier** 30:15
88:9 97:8
109:21 113:5
115:12 123:1
131:4 138:5
144:15 149:9
155:8 163:10
167:4,8 168:25
169:4
**early** 9:6 36:10
36:13 90:15
**easier** 122:24
**easily** 69:4
**Ebanos** 71:1
**Eduardo** 92:3



93:15,20
**education** 25:15
26:1,17
**educational**
25:12
**EEOC** 10:10
**effect** 58:21
60:19 108:5
**effectively**
147:25
**effects** 60:11,12
**effort** 138:22
**ei** 96:19
**either** 12:11,17
20:19,21 26:1
28:19 76:24
86:5 96:19
98:21 161:5
180:1
**emotional** 130:21
136:25
**employed** 7:3
37:5 183:9
**employee** 15:14
16:5 41:11
43:12 80:14
111:13 131:20
132:17 164:14
183:11
**employees** 7:20
36:12,18 39:3
46:1 47:2 50:2
51:23 52:11
58:16 59:14
60:12,22 63:19
64:3 75:13
77:17,18,19
94:23 95:23
103:11,20
104:4,6,15
106:18 111:12
111:17 112:5
113:19 129:12
129:14,17
134:25 135:4
136:2,16,24

137:4 144:8
148:22 149:2
151:7,12
157:23 171:12
172:9 174:1
**employee's**
153:15 164:5
172:7
**employment**
30:25 112:23
**encompasses**
136:1
**endangered**
149:25
**endangers**
152:21
**ended** 133:16
**enforce** 46:23
137:15 173:10
**enforcement**
8:21 15:9 33:25
34:4,12,16,22
**engaged** 130:1
**engaging** 108:7
139:4
**enlarge** 72:1
141:11,17
**enlarged** 112:16
**enlisted** 27:6,7
**enlistment** 29:25
**enormous** 74:24
135:13 137:14
**enrolled** 26:19
**ensure** 70:18
75:6 136:14
156:7 161:20
174:25
**ensuring** 156:20
**enter** 47:24 48:2
48:14 49:15
90:17 113:4
144:10 145:17
164:25 170:23
**entered** 49:3,14
88:12
**entering** 148:25

150:10 162:10
**entice** 153:14
**entitled** 134:6
141:6
**entries** 47:9 69:3
69:22 71:3
111:25
**entry** 13:17 35:7
35:8,10,13,14
35:19 36:7
47:25 48:3,15
50:6 51:7 54:8
59:18 60:10
61:3,10 64:10
67:14 68:13,17
69:15 70:6,21
70:24,25 71:3,6
71:10,13 76:9
76:11,13 80:25
81:9 82:4,4,5
83:21,24 84:9
88:11,15 89:24
90:2,4,9,17,23
100:2 107:16
108:6,9 109:1,2
110:16,18
113:5,24
118:16,22
120:1 121:1
125:5 126:11
127:19 130:12
130:23 132:16
145:10 149:21
150:5 162:25
163:8 165:1
**environment**
37:24 47:8
59:14,17
103:11,20
104:4 106:18
107:11 173:17
**environments**
174:8
**EOC** 43:9 45:23
47:3
**equipment** 32:1

32:5
**ER** 134:6,12
**era** 129:20
**Eric** 4:18 23:10
23:20 73:19
79:18 80:10
81:11 85:13
87:10 92:3
93:20
**Eric's** 23:23
**Eritheans** 102:7
**Eritreans** 102:13
**error** 146:11
**ER/CF** 5:3
**escalated** 134:7
**escort** 121:25
**escorted** 88:14
90:1,22 121:22
**escorting** 107:7
**especially** 15:18
151:12
**essence** 15:21
**essentially** 10:25
89:23 145:3
169:22
**essentials** 32:1
**established** 16:16
**et** 1:3,6 4:12 5:6
6:3,4 182:3,6
**ethics** 15:12
**evaluating**
103:12,21
**evaluation**
109:17
**evening** 84:7
88:10 90:15
**everybody** 111:8
125:6 151:2
**everyday** 55:24
**evidence** 77:14
77:14
**exactly** 62:1
118:18 174:23
**examination** 4:4
4:5 6:20 18:3
166:16

**example** 83:5
108:18,20
172:19
**examples** 131:9
131:10 136:13
**exchange** 85:12
86:10 141:1
152:11
**exclusively** 16:24
**excuse** 32:13
169:11 171:22
172:14 173:23
**exercise** 17:8
172:5
**exhaust** 154:10
**exhibit** 3:4 4:10
4:14,18,21 5:1
5:4,8 71:21
72:19 73:1,3,5
73:8 79:5,8
84:21 87:23
88:2 91:16,18
93:1,1 97:23
100:24 101:1
102:15 105:3,7
106:4 109:14
115:3 122:11
122:18 123:21
123:21 137:22
138:9 140:16
140:19,20
141:5,12
142:22,22
160:23 164:18
168:12,19,20
168:23 176:10
**exhibits** 4:8
72:15
**exist** 70:4 151:5
**existence** 19:3
**exonerated** 174:3
**expand** 87:23
106:8 112:15
116:11 149:14
**expanded** 88:1
91:24 130:16



expedite 150:8
experience 8:3
experienced
161:17
expert 19:4 29:10
32:12 50:12
54:20 165:3
Expiration
183:17
explain 27:13
38:10 95:2
171:7
explaining
109:11 152:20
explanation 94:9
172:3 177:23
expressed 139:14
extended 119:13
174:6
extending 176:11
extension 119:12
extent 23:17
32:11 37:22
50:11,11 54:19
165:2
extreme 153:4
e-mail 2:8,16
4:10,15,18,21
5:1,8 23:14
72:20 73:6,16
74:9,10,15,19
74:22 75:17,19
75:24,25 77:5
77:11,12,23,24
79:10,13,15,23
80:3 81:13,24
82:10,23 85:12
85:17,21,22
86:1,1,10,16,19
86:21 87:6,10
91:20,23 92:1,6
92:12,13,16,17
92:21 93:4,15
93:22 94:10
122:12,16,24
123:2,5,8,9,12

123:13,14,25
124:10 130:17
133:24 140:22
141:1,5,17,18
141:20,25
142:7,11,16,16
142:25 144:6
154:19,24
160:23 176:19
e-mails 123:16
142:18 143:15
e-mail's 142:12
E-4 27:12,13 29:1

_____

**F**

face 95:25
Facebook 44:3
facets 136:2
face-to-face
10:19
facilitate 145:16
facility 31:22
32:2
fact 16:9 17:20
18:6 41:6 65:16
150:22 165:11
facts 127:15
129:1,2,5
factual 17:23
25:7 93:3
failed 39:14
94:13 172:4
failure 93:24
134:6,11
fair 29:14 63:12
78:19 87:5
172:13
fairly 15:23
172:6
Falcon 71:2,2
false 136:18,21
families 127:17
130:22
family 128:9
157:24
Favio 26:13

favor 141:11
Fax 183:20
fear 64:2 76:20
93:24 94:14
128:2,5 157:24
158:2
federal 1:23
12:14 15:22
16:1,16,25
33:25 112:21
124:3,14 125:5
149:19 176:25
180:22
feedback 53:12
53:16 166:22
feel 15:11,17
18:21,25 19:13
19:20,22,23
43:2 44:8,9,10
44:10 48:8
50:13 54:22
66:16 70:8
80:21 162:23
167:16
feelings 128:13
feet 57:2 117:16
117:24 118:6
119:25 120:21
122:1 162:7
felt 37:22 38:4,9
39:12 41:3 66:8
69:23 70:13
160:4 167:10
female 43:12
fence 69:21
fenced 133:10
fiduciary 136:3
142:20
field 5:6 13:22
22:16 35:1 71:7
71:11 93:6,7,8
97:1
fifteenth 147:17
fighting 28:2
figure 95:25
154:3,3

figured 9:5 58:15
file 75:7,7 88:13
90:18 95:9,21
136:4,11
172:23
filed 43:11 53:24
64:20 96:2
129:25 130:4
135:24,25
136:12,18,21
136:24 137:1
137:10 175:3
files 24:8 179:19
filing 40:22 41:3
41:20 45:23
135:19 171:24
172:14
filled 56:4
finally 35:4
129:22
financially
183:12
find 28:9
fine 115:1 176:6
finish 159:6
fire 59:3,8,10
Firm 183:17
first 6:18 29:8
30:13 31:10
34:7,22 35:1
48:18 51:6
53:21 61:1,2
62:21 79:12
94:11 95:4 96:1
96:20,23 97:20
99:2 104:16
111:7 114:1
119:4,17
122:23 123:23
135:4 138:2,14
141:18 144:7
151:19 161:16
176:13 177:16
177:22 178:4,4
firsthand 33:1
57:7

firsthandedly
50:1 55:15
five 108:19
fix 95:25 96:1
fixed 95:19
flip 163:22
floor 57:5,6
183:18
flow 127:17
flu 175:3
focus 86:16 91:23
103:6 106:6
109:13 116:9
116:14 122:23
123:23 138:14
154:18 161:25
follow 17:6 29:18
29:21 64:14
65:6,7,10
106:22 113:19
148:6 151:17
followed 139:15
174:13
following 39:4
65:1,4,14,15,25
75:15 182:14
follows 6:19
follow-up 38:8
food 32:1 132:17
132:25
footsteps 29:19
29:21
force 16:6 164:2
164:9
forced 37:23
38:10
foreman 31:6,10
31:12
forget 12:24
40:15
forgot 11:20
26:15 51:18
112:7
form 9:15 10:3
30:8 39:23
63:10 83:7,17



139:7
**formal** 39:23
54:17 55:9
**formality** 96:16
**formally** 30:3
124:4 177:1
**forums** 10:10
**forward** 19:21
76:24
**found** 34:13
133:11 150:6
**foundation** 139:7
**founded** 43:16
█████ 9:11,12 96:4
108:19 150:14
**fourth** 147:17
**four-liner** 80:20
**Franklin** 2:15
**frankly** 177:8
**FRCP** 182:23
**free** 17:9 42:22
44:8,9 48:8
50:13 54:22
66:16
**freely** 131:15
**freeze** 31:7
**Friday** 6:7 67:18
**front** 18:10,15
33:24 54:2 65:2
73:4 79:5,13
85:10 87:25
88:14 90:1
91:14,24 106:6
112:17 114:23
115:2 122:11
122:16 134:24
135:7 142:22
148:19 151:2
**fueled** 50:2 51:22
**fugitive** 124:6
177:3
**full** 6:24 105:4
141:18 159:24
**fully** 14:6,17
19:15,24
116:17,22

117:7 159:20
167:24 180:2
**full-time** 23:16
45:21 74:3,4,5
**function** 119:10
**funding** 159:8
160:20
**funneling** 70:17
**further** 180:13
182:23 183:8
183:11
**future** 144:11

───────── **G** ─────────

**gain** 25:8
**gangs** 67:10
**garbled** 90:18
**geez** 10:5,6 21:4
30:15
**general** 15:8
72:14
**generally** 12:14
147:7 169:3
**generate** 95:24
**generated** 110:3
110:8
**geographic** 74:24
**geography** 35:13
**getting** 36:18
53:12,22 58:13
58:13,14,22
66:24 80:9
101:13 133:12
154:1 166:22
170:12 175:1
**girls** 66:22
**give** 11:3 15:16
16:10 17:7
40:23 78:6
80:15 83:5
104:22 108:18
172:18
**given** 15:17
40:23 41:6,7
54:7 65:16
133:3 173:10

182:17
**gives** 42:17
**giving** 25:7 41:4
54:13 116:5
128:25 144:23
**go** 8:12 10:21
11:13,19 13:2,2
14:22 15:3
19:21 20:18
22:13 25:23
26:4 29:19 31:8
35:18 38:3,3
40:12,12 44:17
44:18,19 46:5
48:23 49:15,21
50:21 51:11
53:18 55:16,18
60:24 62:12,12
62:19 68:1
70:10,11,12
72:19 75:2
76:21,24 81:15
87:22 88:15
90:5,10,19,24
91:4 101:17
102:18 104:25
110:3 111:5,6
114:18 117:2
117:22 119:5,9
122:4 131:24
131:25 134:13
138:8 140:11
146:19,20
153:4 158:11
158:12,13,14
159:4 164:12
166:3 167:20
172:24 177:21
180:15
**goal** 29:17,18,23
**God** 9:2 21:12
62:15 76:25
**goes** 96:17,17,23
97:1 103:16
162:20
**going** 7:6 8:2

10:21 12:18
13:6,10 14:7
19:21 20:12
21:4 30:23 31:6
32:19 33:8
37:18 38:14
40:21 41:6 49:8
51:23,24,25
52:7 64:3 68:4
72:14 74:10
87:14 95:25
96:1 104:22
105:11 111:18
113:17,18
116:7 124:25
124:25 130:11
131:12 132:1
133:16 135:3
135:16 137:14
140:9 145:10
146:3 147:13
148:6 150:7,22
152:19 154:8
166:5,11 168:9
168:17 169:12
172:18 175:7
176:18 180:6
**Golden** 28:2
**Gonzalez** 51:14
51:15 58:1,2
70:2 114:16
121:16 138:16
138:20 139:13
139:14,19
**good** 6:22,23
10:21 38:19
82:22 121:3
155:25 166:18
166:25
**gotten** 22:11
153:6,7
**governed** 16:24
**government**
12:13,17 17:19
28:14 29:22,24
31:10,12 32:21

52:13 69:25
112:24 147:25
148:1,10
166:20 167:2
**governments**
42:20
**grab** 74:13 75:10
**grades** 176:1
**graduate** 25:21
**graduated** 25:18
25:18,25
**Grande** 35:9,15
71:2
**grants** 163:3
**great** 105:4 166:9
**green** 43:18,22
**grievance** 5:6
62:22 75:7
77:14 94:12
95:3,10,17,24
96:2,3,6,10,10
96:10,13,14,14
97:9,11 124:1,9
124:12 134:6,8
134:11 136:4,7
136:19,21
138:4,23 153:3
169:10,22
171:8,21,24
172:15 173:24
175:20 176:23
177:21 178:18
178:21 179:2,7
**grievances** 24:7
40:22 41:4,16
41:20 46:19,21
47:12,16,21
53:24,25 54:1
57:18 59:25
60:6 96:22
135:20,24
136:12,14,23
137:9 154:15
171:17 172:23
177:19
**Grievance(Fail...**



5:2
**grieved** 94:22
116:2,4
**ground** 10:21
126:10 145:10
**group** 27:10,12
76:10 82:3 88:9
88:12 89:23
90:14,17 91:2
**groups** 44:4
**guard** 31:2,9,11
**guarding** 153:10
**guards** 107:4,6
108:14,21,24
**Guerra** 73:18
85:13 86:17
87:10 88:4,6,7
89:22
**Guerra's** 87:6
91:2
**guess** 21:10 22:9
24:9 28:3,4,14
43:10 51:17
65:16 76:19
86:13 97:3
104:5 110:20
111:11 112:7
117:4 132:8
133:15 146:9
**guidance** 62:17
62:21 63:3
114:2,9 115:8
115:11,15,22
116:13 144:16
**guide** 75:2
**guidelines** 116:4
**guys** 22:14,19,24
81:15 153:16
166:21 174:21

**H**
**Halaska** 2:13 4:5
12:13 17:13,15
20:12,20,21
23:4,11,13,21
24:9 32:11,17

32:20 44:5 48:7
50:10 54:19
55:7 66:13
69:18 70:9,12
84:23 85:8 91:7
102:5 108:10
108:12 114:4
125:16,22
126:13 129:7
129:10 130:8
131:14 132:22
139:6 145:5
150:19 156:9
156:21 160:9
165:2,15,23
166:5,17,19,24
166:25 167:1
167:20 168:1
168:21,25
169:6,8 173:13
173:19,22
176:9,15
180:10
**Halaska's** 55:5
**half** 22:16 74:5
**hand** 136:10
**handle** 32:9
68:18 69:5
160:12 174:8
**handled** 128:16
136:6,7
**handler** 35:1
**handling** 75:1
**happen** 33:5,8
40:6 95:19
153:13,15
**happened** 31:8
40:7 55:23
60:15 75:12
77:3,4,6 81:8
81:10,14
108:17 118:18
120:4,20,24
121:7 155:10
155:18
**happening** 67:16

80:11 110:10
111:9,11,20,24
116:6 155:11
**Haral** 73:16
**Haralson** 4:11,15
4:22 5:1,5
73:17,22 74:8
74:16 75:25
77:5,22,24
79:18 85:14
92:2 94:10,25
122:13 123:17
123:25 134:1,5
141:3 176:12
176:20 178:2
**Haralson's** 73:24
**hard** 83:2 111:3
140:5,8 180:7
**Harlingen** 70:25
**harm** 19:6
**harmed** 131:5,9
131:11 132:14
**Haska** 20:14
**hazards** 174:7
**head** 11:7 127:4
**headache** 147:15
147:15
**header** 141:19
**heading** 44:12,13
**headquarters**
45:3 50:3,3
124:18,19
126:8,11
**heads** 58:14
**health** 37:19 38:1
38:1,4 59:1,2
174:4
**hear** 14:11,21
36:17 38:6
39:19 40:25
91:8 114:6
176:5
**heard** 59:10
**hearing** 85:1
**hearings** 93:10
█████ 131:17

█████ 132:10
**Heights** 71:2
**held** 6:8 59:15
60:23 155:3
157:2,5
**help** 58:16 59:14
67:23 78:12,13
78:17,17 129:3
153:5 154:15
172:22,24
**helped** 59:16
**helpful** 84:18
**helping** 58:16
**helps** 73:14
**hereto** 1:24
**Hernandez** 51:12
51:13 88:8
**Hey** 62:11 113:15
177:10
**Hi** 168:17
**HID** 5:3 93:25
94:3 134:7
**Hidalgo** 34:24
35:5,8,13 36:7
50:6 51:7 54:8
59:18 60:10
64:9 68:12,16
69:14 70:23
76:12 80:25
81:8 82:4,5
88:11 90:22
94:5,7,15 95:13
98:7 100:2
118:22 139:23
144:7 151:2,20
155:21 156:15
157:17 159:12
162:3,6,18
**hiding** 129:2,5
**Higgerson** 5:2,5
40:8,9,17
122:13 124:1
134:2 176:20
176:22 177:18
**high** 25:18,20,21
25:23,24,25

**higher** 29:19
**higher-ups**
139:16
**highest** 25:15
27:8 29:10 37:6
**highlight** 114:25
173:21
**highlighting**
176:11
**highly** 15:17
**Hinojosa** 138:21
139:16
**hired** 9:5 15:6
31:5 34:10,10
34:25 36:17
38:13,13
**hiring** 22:22
**historically**
95:11,11
143:23
**hit** 153:6
**Hmm** 48:17
65:20 66:6,8
77:12 107:18
121:11 126:23
136:23 152:18
159:1 167:25
178:8
**hold** 18:14,14
52:3 53:10
110:21,21,22
118:1
**holding** 83:24
**Homeland** 13:11
**Hondurans** 28:3
**honest** 25:7
44:24
**Honorable** 30:5
**honorably** 30:5
**hope** 25:8
**hopefully** 71:18
**horrifying** 128:1
**hostile** 47:7
95:13 153:16
**hour** 12:23 80:15
**hours** 21:5,10,12



22:12 24:3 25:17,18 26:9 26:10
**house** 39:11,16 39:17
**Houston** 1:22
**Howe** 63:1
**huge** 155:4
**Huh** 14:15
**huh-uh** 11:9 30:10
**hundred** 27:22 135:11 160:14
**hurt** 150:20 154:13
**H-E-C-K** 132:11

**I**

**Ibarra** 4:15 73:17 79:16 80:1,23 81:25 82:2
**Ibarra's** 80:4
**ice** 133:8
**identification** 73:9 79:9 84:22 91:19 122:19 140:17,21
**identified** 138:23
**identify** 110:8
**identifying** 142:12
**Igloo** 133:9
**ignore** 95:15 139:10
**illegal** 174:22
**immediate** 162:10
**immediately** 162:9,25 163:7
**immigrants** 32:6 44:12,23 52:12 53:9 58:17 60:23 133:1,17 153:9 165:8 173:1,11,14

**immigration** 2:14 28:15 31:2 31:14,15 89:6 124:4,15 125:5 148:11 176:25
**impact** 134:25 172:6
**impacted** 60:22
**impacting** 172:8
**implement** 129:13
**implementation** 112:20 113:2 115:25
**implemented** 54:14 69:24 83:3 99:14 117:6 162:17 169:15 172:2 174:7
**implementing** 117:3 125:25
**importance** 95:9
**important** 11:3 12:2 38:4 80:16
**importantly** 11:12
**impression** 128:12
**improper** 139:6
**improve** 65:24 172:15
**improved** 173:12 173:14
**improving** 172:25
**inappropriate** 15:17
**inauthentic** 86:10 93:1 123:21 142:23
**incident** 4:11,16 4:19 39:9 74:13 75:7,20 76:7 77:11,23 79:24 101:9 155:8

**incidents** 48:25 155:20
**include** 17:4 41:25 42:6 97:15,18 146:12 161:16 172:10 174:19
**included** 60:1,3,4
**includes** 70:25
**income** 26:2
**incorrect** 126:15
**increase** 69:14
**Index** 4:1
**indicated** 167:9
**indirectly** 37:23 38:10
**individual** 23:20 94:19 120:20
**individuals** 36:3 38:15 56:14 69:2 83:13,20 84:1 90:8,21 101:10 102:8 121:18 139:2 144:9 170:20 174:9 176:21 178:7
**Infantry** 29:10
**infested** 173:3
**influenza** 175:2
**influx** 31:18,22
**inform** 62:4 162:21
**informal** 39:23 54:17 55:10 96:9
**informally** 95:20 136:7 153:2
**information** 11:17,20 21:8 22:16,24 23:1 66:18,19 87:18 128:25 129:2 141:20 142:13
**informed** 22:23 54:12 62:2,6

83:4 174:21
**initial** 119:18
**initially** 48:17 155:24
**injured** 95:23
**injury** 130:21 179:14
**input** 161:15 164:5
**INS** 31:21 88:11 88:13,14,25 89:10,17 90:17 90:18
**inside** 120:7
**insinuated** 46:18
**inspect** 52:23 53:1 59:8 82:16 119:11 159:10
**inspected** 48:4,16 48:17 50:16 82:13,14 117:11
**inspecting** 50:8 120:11
**inspection** 49:7 89:17 118:9,14 119:14,18 120:15,20 149:1 155:9,21 156:14 159:13 159:14
**inspections** 170:16
**inspector** 34:11 34:14 162:4
**inspectors** 171:18
**installation** 31:12
**instance** 1:17 155:7
**instances** 68:15 136:6
**instantly** 162:11
**Institute** 26:13
**instruct** 16:13

**instructed** 12:16 51:6 61:22 107:4
**instructing** 170:20
**instructions** 16:2 53:22 144:9
**integrity** 43:25 45:3 112:24 127:13 129:15
**integrity's** 173:18
**intel** 66:10
**intelligently** 105:5
**intend** 16:10
**intent** 17:6
**intentionally** 60:9 127:15 128:15 157:15 160:19
**intentions** 78:23
**interact** 49:6 118:23
**interacting** 61:9
**interactions** 60:25 61:5 77:22
**intercepting** 162:8
**interest** 17:7 52:15 63:22 69:24
**interested** 183:13
**interfering** 158:24
**internal** 77:12 134:22
**interpret** 78:18 78:18 94:21 124:24 170:9,9
**interpretation** 78:8 84:14 85:4 126:25 148:4
**interpreted** 126:4,4,17



**interpreting**
 83:19 124:23
**interrupt** 48:24
 111:6
**interview** 61:11
**intimidate** 15:22
 128:5
**intimidated**
 16:10 18:21
 19:1
**intimidation**
 128:3 167:12
 167:16
**investigation**
 34:14 131:21
**investigations**
 19:3
**Invocation** 93:23
**invoke** 94:12
**invoked** 97:2,2,5
 134:14
**invoking** 97:5
**involved** 8:21
 9:15
**involves** 140:3
**In-House** 2:18
**Isabel** 31:14,17
 31:22
**Ismael** 51:12,12
 88:8
**issue** 40:2,16
 53:25 75:2,12
 95:18 136:24
 144:3 175:8
**issues** 19:10
 67:16
**item** 136:3
**items** 39:14,15
**I-66** 34:6

**J**

**J** 2:13 82:2
**James** 25:24
**January** 13:7
 98:9 106:11
 138:4

**Javier** 138:12
**jeopardize**
 113:18
**jeopardy** 112:21
 113:10
**Jessica** 4:15
 73:17 79:16
 80:1,4
**job** 123:17
 142:19 168:3
 174:7,25
**John** 139:13,19
 158:15
**join** 27:2,5 29:24
 36:11,14,15,21
**joined** 36:19
 41:22 42:3
 168:16
**judge** 12:15
 15:25
**jump** 166:8
**jumped** 28:3
**jumps** 27:20,22
**June** 1:13,19 6:7
 182:11 183:14
**justice** 2:14
 16:18 17:8 23:5

**K**

**K** 1:6 2:7 6:4
 182:6
**KATHERINE**
 2:13
**Katherine.j.shi...**
 2:17
**keep** 73:14
**kept** 54:15 85:25
 92:16 123:13
 142:15 179:18
**Kevin** 1:6 3:4 6:4
 6:11 71:21,25
 72:6 79:3 84:19
 87:23 91:11
 97:24 98:12,16
 100:12 103:1
 105:2 106:4,7

112:14 114:21
122:8 130:14
133:21 138:8
140:12 141:2
141:19 142:1
143:1 148:16
149:13 154:22
163:23 164:17
168:11 169:6
173:19 176:9
182:6
**Kevin's** 168:14
**Khoury** 15:8
 18:7,15 19:14
**kids** 67:17
**kill** 177:12,13
**kind** 8:18 10:15
 19:18 22:2
 39:25 64:20
 65:3 75:14 83:2
 111:2 133:8
 140:5 160:11
 160:17 161:18
 161:24 172:3
 180:7
**knew** 23:18
 50:20 74:23
 125:25 147:21
 150:7 161:24
**know** 11:19
 17:13 18:11
 19:7,9,22,25
 21:20 23:24
 29:12 34:5,15
 36:17,18 38:12
 38:17 39:1,12
 40:16 46:25
 49:12 50:18
 54:11 56:2,9,15
 56:24 58:14,15
 60:1,5,18,21
 61:21 63:20
 64:2,14 65:5,13
 66:11,25 68:25
 71:25 72:3
 73:22 75:2

76:17 77:9,16
78:6,8,10,19
80:1,7,8,12,13
80:15 81:13,15
81:17,21 83:13
83:16,25 85:5
86:12 87:18
94:4 95:18,22
100:14 101:9
101:18 105:20
107:3,7 109:24
111:2,10,11,12
111:18 112:4,6
113:10,11,12
113:13,17
114:14,18
116:7 117:11
118:8,8,11
119:8 120:5
124:22,23,24
125:1,7 126:9
127:1 128:10
129:4,18,23
130:7,9,11
131:12 132:9
133:6 134:20
135:8,10,10,10
135:16 137:15
139:14,15,21
139:25,25
144:24 146:16
147:7,15,16,18
150:25 153:4,6
153:12,22
154:3,4,7,8,9
158:17 159:24
160:3 161:20
161:22 163:15
165:14,16,16
168:2 170:2,8,9
171:3,4,5,6
172:22 173:6
174:23 175:4,6
175:7 176:19
177:11 178:22
179:2,4 180:4,5

180:9
**knowing** 44:25
 60:11,11 67:3
**knowingly**
 136:18
**knowledge** 82:10
**known** 15:18
**knows** 76:25
 136:14 179:20

**L**

**labeled** 28:4
 168:12
**lack** 33:3,3,6
 168:2
**lacks** 127:14
 128:17,20
**Lado** 1:3 6:3
 182:3
**lane** 119:3,12
**Laredo** 35:3,7,13
 62:24 71:7,10
 97:1
**large** 56:13 76:10
 135:24 137:12
 137:13,13,14
 159:23
**Las** 152:7
**late** 9:6 36:10
 37:1 84:4
**Lauro** 138:21
 139:16
**law** 2:23 17:7
 33:25 38:15,22
 38:23 42:24
 50:9 64:10
 65:18 112:21
 124:20,24
 125:18,25
 126:4,12,18,22
 126:24,25
 127:5 139:4,5
 148:23 162:24
 163:3 165:20
 174:14 178:3
 179:8



MAGNA ▶
LEGAL SERVICES

lawful 77:18
  170:7 171:1,6
lawfully 103:16
  107:3
laws 124:4,15
  125:5 175:13
  176:25
lawsuit 64:20
  129:25 130:4
lawyer 73:12
lawyers 128:7
lead 35:9 125:23
leadership 36:23
  52:9
leading 69:18
  70:9 91:7,22
  102:5 108:10
  109:1 114:4
  125:16,22
  126:14 130:8
  139:7 145:6
  150:19 156:9
  160:9 172:17
Leaf 29:8,8
learned 50:18
leave 29:16 37:19
  37:20 153:13
leaving 155:4
left 28:17,21,21
  28:25 29:15
  30:11 41:8
  135:15 150:21
  153:14 176:12
legal 6:12 15:16
  16:18 50:12
  54:20 113:24
  165:3 174:21
  183:18
legality 114:10
  144:17
letter 5:4 14:24
  15:10,11,15,19
  15:21,23 16:12
  17:20,24 18:6
  18:12,20 19:13
  19:23,25 39:8

39:18,20,22
  40:1 41:7,15
  64:15 98:2,3,9
  98:13,18,21,24
  99:3,11 100:5
  106:11 110:9
  133:24 134:1,5
  137:24 138:3,4
  138:11 140:23
  150:22 152:19
  152:23 153:20
  160:24 161:2
  161:10,12
  162:1,2,20
  163:25 164:3,5
  164:9 167:10
  167:24 168:7
  179:24 180:3
letterhead 98:4
  106:12
letters 152:25
letter's 16:2
let's 25:20 55:5
  79:2 81:24 99:2
  102:15 104:25
  133:20 137:21
  141:16 145:13
  154:21 157:19
  160:22 161:25
  166:23
Lev 2:6 168:15
  168:17 172:17
level 25:15 33:13
lice 58:14 175:2
lie 61:22
lied 61:24,25
life 9:13,14 29:17
  29:18 30:23
  153:15
limited 32:4
  151:14
line 44:6 54:1
  75:19 79:23
  86:21 93:22
  94:3 96:20
  97:20 100:3

110:22 115:7
  118:14,14
  129:21 130:10
  136:9 162:8
  170:15,19
list 106:14
  145:15 146:2,2
  147:11,13,18
  147:19,21
listed 77:23
  85:22 92:13
  142:12
lists 53:7
litigation 2:14
  45:7,9 130:6
little 8:1 10:7,13
  25:11 56:16
  62:10 65:21
  80:19 133:9
  135:18 141:23
  157:9
live 9:16 42:18,22
lives 135:3 173:1
LLP 168:16
lobby 56:16
  118:10
local 7:21 22:23
  24:7 33:13 51:5
  51:6 52:17
  53:23 96:25
  97:13,13,15,18
  154:6 171:8,20
  171:23 175:20
  178:16,17,18
located 26:6
  35:14
location 110:23
  131:22 176:2
locations 74:25
  104:7,8,9,10
long 26:19 60:7
  140:7 143:17
  151:24 168:3
  178:23
longer 80:24 81:7
  172:21

longstanding
  165:7
long-term 58:21
look 21:22,25
  22:10 60:14
  64:6 80:12
  98:17 118:7
  129:23 138:2
  138:10 177:20
  179:21
looked 138:5
looking 11:22
  24:2 52:25
  71:25 75:17
  102:18 106:11
  106:14 107:2
  169:9 180:6
looks 138:11
  174:17
Los 71:1
losing 137:17
lost 39:10
lot 21:7,7 22:4
  28:5 58:1 128:2
  128:2 135:14
  147:14 152:14
  175:6 179:14
  179:18
lots 69:21
loud 161:5 176:7
lunch 105:1,2
lunchtime 104:24
lying 145:3
L.L.P 6:9

————————————
M
————————————

M 2:5
machine 1:22
Magna 6:12
  183:18
mail 26:16
main 39:2
maintained
  85:25 92:16
  142:15
maintaining

108:25
majority 124:16
making 19:18
  67:14 75:9
man 27:6
management
  51:5,6 52:17
  53:23 62:1,3,5
  69:15 77:13
  95:12 97:13,14
  97:15,18
  109:25 114:2,8
  116:20 139:5
  139:23 154:6
  158:6 175:9,24
  176:1 177:11
  177:12
management's
  95:25
managers 96:18
  175:15
mandate 124:14
mandated 103:16
  107:3 174:4,11
mandates 124:3
  174:14 176:25
manner 39:4
  50:19 55:14
  78:19 99:13
  136:24 169:14
  172:9
March 4:10 5:1,4
  5:8 30:22,24
  33:14 134:2
  137:24 142:1
  160:24 162:18
Marco 18:15
mark 91:16
  122:11 140:18
marked 73:5,8
  79:5,9 84:22
  91:19 100:24
  106:4 115:3,3
  122:18 133:23
  140:15,17,21
Market 183:19



marshal 59:3,8
59:11
match 113:14
materials 21:4
23:2
matter 6:3 16:21
19:4,12 55:25
95:7,9 97:10
130:6 136:10
matters 19:5
52:12
Mayer 2:6 6:9
168:15
McAleenan 1:6
6:4 141:2 142:1
142:4 143:1,15
145:9 182:6
mean 8:24 16:8
19:7,9 22:20
23:9 34:11,15
34:19 35:25
38:11 42:16
48:24 55:25
56:11 57:4
60:14,16 63:18
70:16 72:23
74:12,23 76:18
81:2 82:19 83:2
83:10,12 89:3
93:7 94:3 96:18
97:5 100:7
101:7,8 103:19
104:3 107:1,2
111:6,7 113:11
114:18 118:3,5
127:3,25
128:23 129:16
145:22 146:7
146:21 152:15
153:3,7,12,22
153:24 157:4
163:15 170:13
170:18 171:15
171:18 178:23
179:18 180:6
meaning 170:13

meaningful
42:12
meaningless
153:15
means 11:5 27:13
76:4 86:25 89:1
101:5 127:23
128:1,21,24
meant 106:18
108:6 158:2
Medal 29:7
media 6:2 63:21
Medlock 2:5 4:4
6:21 8:23 14:9
14:13,22 15:3
17:11,21 18:1,5
32:24 38:3
40:12 41:14
44:14 46:5
48:12,23 50:21
50:24 52:2,16
53:18,20,21
55:1,4,8 57:21
60:8 63:17 67:5
67:21 68:1,9
69:19 70:15
72:6,8,21,24
73:4,10 79:2,4
79:10 84:19
85:9 87:22,25
91:8,11,13,20
93:14 96:13
97:22,25 98:12
98:14,15,17
100:12,14,20
100:22,25
101:3 102:11
102:25 103:3
104:23 105:8
105:16,19,24
106:3,10
108:13 112:14
112:16 114:5
114:21,23,25
115:2 116:10
116:12 118:25

119:9 122:8,10
122:22 125:17
125:23 126:19
129:16 130:13
130:14,16
131:23 132:9
132:24 133:20
133:22 137:21
137:23 138:8
138:10 139:10
140:12,18,22
141:16,22
143:13 145:8
146:20 148:16
148:18 149:13
149:15 151:16
154:21,23
155:14,19
156:12,24
160:19 161:11
163:22,24
164:17,19
165:11,18
166:2,9 167:4
167:22 168:18
169:1 176:16
180:2 182:20
Medlock's
167:15
meet 20:21 23:4
84:2
meeting 44:13
95:17 124:13
159:19 178:6
meetings 21:13
21:19,21 22:6
124:1,9,16
176:23 177:10
178:19,20
179:1,7,11,11
member 30:20
36:23
members 43:24
memo 86:21
87:12,17
115:18

memorandum
63:4,10 115:6
157:9 168:2
memory 67:23
157:9 168:2
memory's 10:13
mentioned 30:11
147:8 152:18
163:4
mere 162:7
message 74:14
messenger 137:4
137:5,10
171:19 177:13
177:13
met 10:19 21:8,8
24:8,23 125:7
138:21 177:9
metals 29:5
meter 119:25
metering 41:21
62:16 68:19
70:3 71:13
107:15 115:7
115:21 117:4,5
119:3,11,16,24
120:5,6,24,25
131:19 149:20
149:24 150:17
150:23,24
151:20 152:1,8
152:10,20
153:11 157:10
157:13 163:11
163:16 169:23
169:25 170:2
170:11,13,14
170:14,17,18
174:19,20
175:8,21
method 110:19
Mex 148:10
Mexican 49:8
53:8 61:5 82:12
82:24 87:1
89:24 91:3
103:13 117:16

120:21 121:19
121:22,23
122:4 145:18
146:14,22
147:2,9,10,24
147:25 148:5,9
148:10,24
165:9,13
Mexicans 87:3,4
117:21
Mexico 48:3,15
49:4,17,22 50:8
51:8 52:18,18
53:3,23 54:6,18
55:10,19 61:15
61:23 62:13,19
64:11,18,23
65:19 66:5 67:1
67:2,9,14 76:13
77:7 82:6 88:15
90:5,10,19,24
91:4 101:18
102:3 107:23
108:3 117:8,22
118:13,21
119:22 120:11
130:24 131:5
144:10,18
145:15 146:1,4
151:8 162:6,8
162:11 163:1
163:18 165:1
170:3,7 171:1,2
mid 145:16
149:20
middle 64:3,5
113:15 151:10
152:5 162:5
migrant 131:18
migrants 31:18
31:23 32:9
68:12,16,23
87:2 89:24 91:3
military 25:19
26:17 27:1,2,16
28:17,25 29:20



30:4,7,12,18
37:18 41:22
**mind** 150:3 160:6
169:7 173:19
176:11
**minimize** 155:3
157:2,5
**minimus** 150:14
**minute** 40:20
166:22
**minutes** 54:4
**mirrors** 144:9
**misconduct** 64:1
111:13 112:6
**mislead** 46:11,12
46:15
**Mission** 71:1
**modified** 50:17
62:11,14,18
**modify** 52:11
**modifying** 52:22
**moment** 177:25
**money** 137:16
158:23 160:3
160:12,17
**monies** 133:10
**month** 95:21
**months** 41:9
**morning** 6:22,23
21:9
**motivation**
172:14
**mouth** 78:16
111:16
**move** 71:17
75:23 81:24
97:10,22 98:12
99:2 102:15
112:14 127:8
130:15 133:20
137:21 145:13
148:16 157:19
160:22
**moved** 110:23
120:2 121:5,9
**movement** 31:4

**moving** 110:20
150:17 157:10
**mul** 56:12
**multipage** 91:21
133:24 140:22
**multiple** 35:2
65:12 155:14
155:17,19
**mumbling** 161:3
**muster** 115:21
**muted** 53:16

---

**N**

**N** 2:1 123:17
**name** 6:24 23:23
51:10 132:10
132:21 163:14
166:19
**named** 23:20
163:16
**names** 51:10
82:17 167:1
**Nation** 43:11,13
43:14,15,16,18
43:24 44:2,2,11
44:22,22
**national** 7:19
22:15,24 24:6
24:12,12 31:15
33:13 36:11
46:23 63:21
86:5 93:8 97:3
135:7,8 143:22
175:12 178:16
**nationally** 97:3
112:3 153:8
**Naturalization**
31:16 89:6
**nature** 98:1
171:7
**NCBA** 174:4
**near** 35:14 121:1
121:5 152:20
162:5
**necessary** 32:9
156:7,20

**need** 14:9,13 15:1
23:10 64:14
72:13 80:12
87:17 100:8
101:17 118:7
135:15 141:20
153:21 154:7
162:23
**needed** 22:25
94:22,22 136:9
159:8 160:16
**needs** 144:3
**negative** 44:23
47:22
**negotiate** 175:24
**neither** 183:8
**never** 54:15 56:2
59:12,12 69:8,8
69:15 78:23
136:20 147:17
147:19 161:24
**new** 66:22,23
83:12 129:14
**newspaper**
111:10,19,21
**Nicaragua** 28:6
28:12
**night** 67:18,18
81:12 84:4
**Nineties** 9:6
36:13
**Nobody's** 154:15
**noncitizens** 82:11
82:24
**normal** 126:3
143:4,4,8
**normally** 108:24
**North** 26:14
**note** 88:25 89:23
140:14 168:15
180:22
**noted** 6:14
**notice** 74:18
**notified** 23:10
**NT** 85:18 142:8
**NTEU** 4:13,17,20

4:23 5:3,7,10
7:20,23,25 9:25
20:14,15 22:15
22:23 23:15
24:11,12 36:12
36:24 37:2
45:22 46:23,24
47:10 52:9 73:7
73:7,25 75:19
78:3,15 79:11
85:11,19 86:5
88:2 91:22
92:10,21,23
93:16 95:3
97:23 98:4,6,13
99:3 102:16
106:12 122:15
123:6,18 125:3
133:25 135:19
135:23 137:9
140:24 142:9
142:19 143:10
154:22 157:19
164:8 168:13
168:22 169:11
171:8,20,23
175:9 176:10
178:15 179:19
**num** 56:13
**number** 4:9 6:2
44:11 56:13
68:12,16 79:8
79:11 84:21
85:10 91:18,22
122:15 133:25
135:24 140:16
140:20,23
161:20 168:20
168:22 176:1
**numbered** 1:19
102:21 103:4,7
106:15
**numbers** 73:7,11
73:12 151:5
**numerous** 9:22
21:16 71:3

143:15 150:4
175:3
**N.W** 2:7

---

**O**

**oath** 6:18 10:3
14:1 41:23,25
42:4,6
**oaths** 42:12
**Obama** 47:12
71:15
**object** 12:13
165:2,15
**objected** 17:3
**objection** 17:4
32:11 44:5,6
50:10,11 54:19
55:5 69:18 70:9
91:7 102:5
108:10 114:4
125:16,22
126:13 129:7
130:8 139:6,7,7
145:5,5 150:19
156:9,21 160:9
172:17
**objections** 12:14
16:22 139:10
**observation**
31:21 61:4
**observations**
71:10
**observe** 57:7
**observed** 48:1,2
48:13 50:5 65:3
80:25
**obviously** 10:20
**occasionally**
71:22
**occasions** 116:21
**occur** 49:24
**occurred** 76:7
77:25
**offered** 8:14
**offering** 18:23
**office** 2:14 10:19



13:22 23:6 24:6
24:12,13 43:9
43:24 45:3 71:7
71:11 74:3,6
95:12 127:4
178:12,13,15
178:17 179:19
**officer** 8:20,21
20:13 23:15
27:6 29:18
30:14 31:7
33:15 34:9,16
34:22 37:11,13
37:14 45:10,14
45:15 49:7,20
61:9 80:6 81:25
84:2 88:20,23
107:7,9 118:23
119:18 121:24
122:1 143:19
143:21 150:18
152:21 155:25
156:7,20
182:16
**officers** 43:18,22
51:7 53:22 54:8
55:20 58:11,13
60:25 61:2,21
61:25 64:9,16
77:10,22 78:4,4
81:8 84:8 99:15
100:5 107:13
107:16,22
108:1,6,19,19
108:22 109:8
109:10,16,24
109:25 110:14
112:21 113:16
113:22 117:21
118:16 120:14
127:13 144:16
145:19,23
146:7,10
149:23,25
151:20 152:8
153:10 157:22

160:25 162:2
163:25 164:2,9
169:16 170:16
170:19 172:11
172:15,25
173:2,8,9,16
175:1 177:17
**officer's** 112:23
**offices** 133:13
**official** 33:9
39:13
**officials** 33:10
145:15 148:5
**OFO** 13:22 62:24
95:12
**Oh** 21:12,20
28:16,23 34:5
40:15 41:2 46:9
47:22 62:15
68:25 86:11
87:9,15 98:15
100:11 102:20
108:23 141:19
156:12
**okay** 7:11 8:12
8:16 9:7,15
10:13,16,23,24
10:25 11:14
13:3,5 18:10
19:20 20:1,3
22:3 23:4 24:1
25:3,20 26:22
28:23 29:14,25
30:6,6,11,19,23
31:17 33:14
34:5,6 35:6,17
35:21 36:4,4,9
36:11,21 37:10
37:20 39:5
41:14,22 42:10
43:7 45:5,18
46:9,9 48:20
49:5,18 51:12
52:2 53:18 54:3
54:3 56:21
58:25 60:24

61:7,21 62:3,9
63:7,9,14 65:23
66:18 67:20,24
71:17 72:3,4,5
72:8,11,21,22
73:1,2 74:8,15
74:18 75:4,11
75:16 76:6,17
77:2,9,20 78:9
79:15 80:1,15
80:16,23 81:5
81:20,23,23
82:21 83:20
84:1,6,11 85:8
85:9,17 86:6,14
87:15,21 88:25
89:15,21 90:8
90:20 91:15,25
92:19,25 93:4,7
93:11,19,22
94:6,8 95:2
97:8,21 98:6,21
99:2,4,8,11,25
100:5,18 101:2
101:3 102:11
102:24 103:2,6
103:19 104:1
104:23 105:6,8
105:23,24
106:2,16
109:11 111:4
111:19 112:9
113:8 115:11
115:14,24
116:25 117:5
117:25 118:17
119:6 120:10
120:19 121:9
121:18 122:3,7
123:1,4,23
124:12 127:12
127:22 130:20
131:3,16,23
132:12,24
133:19 134:15
135:8,18 137:3

137:20 138:7
138:14,20
139:22 140:4,8
141:25 142:7
142:25 143:7
144:6,14
145:13 147:6
148:9 151:16
155:7,19
156:24 158:5
160:6,22
163:17,21
165:18 166:1
168:10,25
169:22 173:13
176:7 179:17
179:23
**old** 10:18 135:4
**once** 23:18 82:5
90:4 116:15
**ones** 22:10 65:7
93:9 102:7
104:16 110:8
135:3 136:12
173:4
**one-page** 79:10
115:6 122:12
**ongoing** 19:3
**Oops** 180:17
**open** 99:15
103:13 158:21
169:16
**opened** 160:15
**operation** 28:1
32:3
**operational** 19:6
**operations** 5:6
13:22 15:9 35:2
35:23 97:1
**opinion** 19:5 32:7
50:12 58:9,19
156:19 165:3
**opportunity**
70:22
**option** 96:19
**oral** 1:10,16

182:16
**orange** 133:4
**order** 16:16 46:8
46:19 61:10,22
69:5 70:5 71:12
75:12,15 77:18
113:23 114:1
117:21,21
127:17 144:8
157:12 158:23
160:12
**ordered** 50:20
51:1 80:22
149:3 161:21
162:3 163:4
**orders** 39:4
52:14,16 65:1,4
65:10,14,15
66:1 77:18
160:18 174:2
**organization**
32:8 37:7
**organizations**
68:17
**Ori** 2:6 168:15
180:12
**orientation**
104:14
**original** 182:19
**OTM** 86:21,25
103:14
**OTMs** 88:9,12
90:14,17
**Otro** 1:3 6:3
182:3
**outcome** 183:13
**outside** 22:5,6
28:11 110:22
143:3,4 172:24
**outstanding** 29:9
**overnight** 56:3
**overseas** 26:17
**overtime** 70:19
**Owen** 63:4 115:7
151:19 152:7
**Owens** 143:16



151:1 159:18

**P**

**P** 2:1,1
**Pace** 25:24
**packages** 132:18
**page** 4:2,9 10:23 75:10,18 87:23 88:1,2 97:23 98:13,18,19 99:2,5 100:13 102:16,22,23 103:4 106:6 109:13 137:22 138:9,15 157:19 160:22 169:7 173:20 183:4
**pages** 4:22 73:14 163:23
**paperwork** 84:16 85:7
**paragraph** 76:18 94:11 100:9,13 101:4 103:6,7 103:10 104:2 109:13 112:15 112:17,19 116:12 122:24 123:24 127:9 130:15,17,18 130:20 138:15 141:18 145:14 148:17,18,21 149:14,15,18 176:14
**paragraphs** 102:22 103:4 106:8,15
**parameters** 16:15
**parens** 169:16,17
**parentheses** 93:24,25 99:15 99:16 103:14 103:14
**parenthetical** 103:15
**parking** 69:21
**part** 28:19 41:1 72:25 73:15 80:16 84:24 90:23 92:23 110:21 123:17 131:8,9,9 142:18 144:19 171:18 175:8
**participate** 21:18 177:19
**participated** 9:21 9:23 10:9 177:10 178:5 179:3
**participating** 64:17 107:23 108:2 109:5
**particular** 18:23 109:9 116:14 157:8
**parties** 6:13 16:17 113:13 182:22 183:9
**parts** 71:22 144:19
**party** 136:13,14 180:25 182:25 183:6
**passenger** 103:12
**passengers** 67:14
**passing** 153:7
**passive** 35:1,22 35:22
**passport** 89:19 94:20
**patrol** 16:4,20 43:17,22
**pattern** 50:7 164:12,24
**pause** 12:5,6
**pay** 46:19,21 135:13 174:10
**peacetime** 29:11
**peatime** 29:11
**pedestrian** 66:20 88:14 90:2,4 99:15 101:11 119:3 169:17
**Peltier** 1:20 6:12 182:12 183:16
**Pena** 73:18 82:2
**pending** 13:1
**Penn** 183:18
**Pennsylvania** 183:19
**people** 23:8 33:3 33:6,7 43:21 46:11,12 49:2,3 49:18 56:1,5 57:18 58:17 59:5 63:23 66:8 66:19,25 67:3,8 67:13 69:11 70:5 89:13 110:6 117:9,10 119:4,6 128:10 137:8 146:1,2 147:10,15 150:10,11,13 150:15,20,23 151:3 152:2,14 157:11,13,17 158:7,20,21 159:4,5,7,22,23 160:2,14 161:15 164:13 171:9,17 173:1 173:5
**percent** 56:17,18 56:20 160:14
**Perez** 73:17
**Perfect** 176:14
**perfectly** 176:6
**performing** 143:22
**period** 13:6 15:7 48:1 54:5 80:18 117:20 118:20
**permanently** 35:4 36:6
**permits** 89:12
**permitted** 170:23
**persecution** 99:17 169:19
**person** 15:18,18 15:19 20:22,24 21:8,17 23:8 45:3 58:1 96:19 96:22 97:1 120:17 132:6 139:2,12 163:2
**personal** 8:11,12 9:13,14,19,22
**personally** 22:7 45:1 64:25 66:4 66:19 101:21 114:17
**persons** 41:19 58:12,22 103:13,22 124:5 127:17 130:22 155:3 157:2,5 162:4 177:1
**person's** 12:4
**perspective** 70:3 128:4 147:6
**pertained** 24:16
**pertaining** 112:22
**petition** 50:2 60:5 62:25 63:11,18,19 110:3 114:13 116:3 130:10
**petitions** 51:18 152:25 164:11 172:20
**Pharr** 76:8,8,11 82:3 88:9,10 90:15,16
**phase** 111:1
**phases** 49:10 55:23 104:14 110:25 156:13
**Pheasant** 28:2
**Philadelphia** 183:19
**phone** 2:8,16,24 21:9,16 23:13 80:23 81:6 183:20
**phones** 152:15
**phonetics** 22:21 26:13 104:14 111:23 118:11 160:18
**photo** 157:21
**photos** 59:25 60:4 154:24
**phrase** 47:7 101:5 127:23
**pick** 113:15,15
**picture** 154:22 155:2 156:16 158:5
**pictured** 159:17
**pictures** 154:19
**piggybacks** 173:15
**pinpoint** 111:3 140:6
**place** 33:23,24 56:6 61:5 85:5 106:23 107:6 107:13 108:19 108:20 134:16 134:19 146:14 151:4 170:14
**placed** 127:16 151:12
**places** 112:20 127:9,13
**plaintiffs** 1:4,17 2:3 25:1,3 168:16 182:4
**plan** 174:7,25
**platform** 12:3
**play** 161:11
**played** 161:14
**please** 6:15,24

11:13 12:5,23
13:2 18:8 19:25
35:11 50:13
53:19 54:22,25
72:6,7,17 79:3
84:20 87:18,23
91:12 97:24
100:21 103:1
103:23 104:1
105:9,20 106:3
106:8 107:18
112:15 114:21
122:8,21
130:15 133:21
138:8 140:12
141:11 148:17
149:13 154:22
168:11 173:21
**POE** 13:17 88:9
88:10,11 90:16
**point** 11:16 58:10
71:24 74:21
93:17 95:14
119:3,25
121:20 131:19
149:20 151:20
153:11,16
154:10 157:10
**points** 62:16
70:18 117:4,5
119:25 120:14
149:24 150:17
152:1,20
157:13 163:11
163:16,17
**police** 39:14
**policies** 52:10
124:3,14
176:24 178:3
**policy** 52:6 54:16
55:9 65:8,9
70:4 99:14
108:5 112:20
113:3,3 114:10
114:11,12
116:1 124:17

125:4 126:1,22
128:5 129:6,14
130:2 132:14
150:16 161:24
162:17 165:12
165:16 169:15
179:8
**political** 47:19
99:16 103:14
124:5 169:18
177:1
**politics** 47:19
**Ponce** 92:3 93:15
93:20
**pop** 179:20
**port** 13:17 31:14
31:17,22 34:24
35:3,5,7,8,18
36:7 40:7 41:10
50:6 51:7,14,15
54:8 55:20 58:2
59:18,18 60:10
61:2,18 64:10
68:13,17 69:3
69:14,22 70:2,6
70:23,24,25
71:2,12 76:9,11
76:12 80:25
81:8 82:4,4,5
83:21,24 84:9,9
90:9,22 95:13
96:23,25,25
97:1,15 100:2
107:16 108:6,9
109:1,2,25
110:16,18
113:4,24
114:16 118:22
121:11,12,16
126:11 132:15
132:16,19
138:12 139:20
139:23 144:7
149:21 155:21
156:15 157:17
158:16 159:12

159:24 162:3
162:17,22
170:21
**portrayed** 39:3
44:22
**ports** 35:9,13,14
47:8,25 48:2,14
70:21,23,24
71:3,6,10 94:15
111:25 125:4
145:10 165:1
**position** 24:21
31:9,10,10 34:7
34:12,16 45:21
46:22 60:17
66:9 73:24 80:4
93:16 127:13
149:21 175:22
**positions** 74:5,7
150:17
**positive** 60:12
**positively** 60:22
**possible** 99:17
124:6 169:19
177:2
**possibly** 66:10
133:13
**posted** 162:7
**posting** 34:22
170:19
**posts** 44:21
**power** 163:3
**practice** 50:7
103:16 113:11
113:12 135:19
143:14,23
164:24 165:8
165:17,20
172:2
**practiced** 107:4
**practices** 174:3
**predecessor** 32:8
68:17
**prepare** 20:22
21:2,3 22:7
23:6 24:5,13

**preparing** 21:11
**prescreening**
48:18
**present** 3:1 6:13
13:7 56:8
**presentation**
151:23,25
152:8
**presented** 168:23
**presenting**
148:25
**presently** 7:3,18
**preserve** 42:21
**preserving** 112:5
**president** 7:22
9:25 10:10
20:16 23:15,16
36:25 37:1,2
38:18 45:22
46:23 47:11
52:9 85:18
92:10 93:18
97:3 123:6,18
137:9 142:8,19
143:10 152:19
153:20 154:7
**presidents** 65:13
93:21
**president's** 65:12
**presiding** 15:25
**pretty** 132:1
141:14,14
**prevent** 148:25
**prevented** 19:14
**preventing** 100:6
109:15 162:9
**prevents** 99:14
101:5 169:16
**previous** 84:25
**previously** 115:3
**primary** 49:7
99:15 118:9,23
119:3,12
169:17 172:13
**prior** 8:3 33:16
64:21 68:11,18

97:8 111:22
117:1,3 174:5
**prioritize** 160:7
**private** 44:3
107:4 108:14
108:21,24
**privy** 61:19
**probably** 172:21
**problem** 59:12
164:14
**procedure** 1:23
112:20 113:3
**procedures**
106:24 174:13
**proceeding** 9:16
105:25
**process** 5:3 52:22
53:1,4,5 57:19
59:20 60:10
71:11 76:21
77:4 83:19 85:4
85:7 93:24
94:14 95:3,18
95:23 96:3,6,16
119:11,16
129:22 134:6
134:11 144:17
146:16 148:5
157:16,22,23
159:11 162:21
170:22 173:14
174:1
**processed** 48:4
48:16 49:4
55:22 70:4
76:23 82:13,19
82:20,25 83:7,8
83:9,10,18
89:14 101:15
102:9 116:17
116:22 117:7
130:24 133:18
148:14 149:10
171:10
**processes** 77:6
**processing** 31:14



50:8,17 53:9
62:11,14,18
68:23 69:2,6
70:19 83:4,13
89:19 94:20,21
99:16 109:17
113:7 124:4
130:25 148:6
150:8 158:6,21
160:7 162:13
162:22 169:18
174:6,12 177:1
**produced** 1:17
17:3
**professional**
15:12 25:12
45:4 180:9
**professionally**
31:24,25 43:25
**programs** 35:1
**Progresso** 71:1
**promised** 25:4
**proper** 148:22
150:21
**properly** 94:14
**proposals** 69:12
**proposed** 69:8,20
95:20
**proposing** 95:15
**prostitutes** 66:23
**prostitution**
67:10
**protect** 38:15
52:11,12 64:4
75:13 77:17
80:21 81:17
94:23 113:16
149:2 172:24
173:9
**protected** 173:16
**protecting** 80:20
**Protection** 7:12
7:15
**protective** 16:16
46:7
**protocols** 106:22

**prove** 75:12
153:16
**provide** 10:11
19:5 22:11 23:1
24:8,15 148:22
**provided** 10:2
11:17 19:8 21:7
22:1,24 23:2
24:9 50:17 86:2
86:7 110:9
144:8
**provides** 22:15
**providing** 22:9
23:2 24:20
**provisions** 1:24
**PR's** 111:16
**public** 17:8 43:15
63:21 110:11
127:14 128:18
128:21 129:6
130:1 144:20
145:3 149:9
172:11
**publicized**
111:24
**publicly** 149:4
**pull** 112:8 168:12
176:9
**purpose** 170:11
**purposes** 8:14
128:4
**pursuant** 1:23
20:4 174:13
182:23
**push** 157:13
**pushed** 57:3
118:13 132:6,6
**put** 17:25 24:21
51:24 56:5 64:3
64:5 71:20 72:9
73:4,12 78:15
79:4 83:23 85:9
87:25 91:13
113:10 114:9
114:23 115:2
122:10 125:19

125:24 136:8
142:22 151:20
152:9,10
167:25 174:24
176:1
**putting** 69:20
107:15 136:7
149:23 171:10
171:12
**p.m** 1:20 79:19
86:18 105:13
105:15 142:1
157:23 166:11
166:12,13,15
180:17,17
**P.O** 2:15

---

## Q

**quality** 154:23
**qualm** 66:1
**question** 11:6
12:19 13:2
14:16 20:1
21:23 32:14,16
32:19,21 45:17
48:7,9 50:14
55:2,6,8 65:16
65:20 66:3,12
67:15 79:12
82:21 84:25
91:1 104:3
108:4 139:11
140:2 151:23
152:2 156:23
165:5 167:18
170:4,25,25
**questioned**
127:14 145:25
**questioning** 44:7
**questions** 11:1,4
11:13,18 12:6
12:13,17 13:1,6
14:6,14,18 17:2
19:15,21,24
25:8 38:8 66:17
72:15 76:24

83:6 105:5
141:21 164:20
165:22,24
167:3,15,22
168:8 169:2
180:1,11
**quick** 67:22
**quote** 76:6 81:25
88:6 99:11
103:10 109:14
116:15 127:12
130:20 144:6
145:14 148:21
155:2 162:2,20
169:13 173:25
176:22 178:19

---

## R

**R** 2:1
**radio** 151:13
**raise** 47:11,20
**raised** 46:18
47:15 57:19
**raising** 46:21
**ran** 33:10 55:25
**Randy** 63:1
**rank** 27:8,17
29:1,20 37:6,8
88:22
**rarely** 133:2,2
177:19
**reached** 40:22
**reactions** 167:6
**read** 15:1 76:15
82:8 86:22
87:14,19 88:17
90:11 94:16
99:19 103:17
104:11,19,20
104:21 105:4,8
109:18 112:25
116:18 124:7
127:20 131:1
138:24 141:14
141:23 144:12
145:20 149:6

155:5 157:25
161:5,6 162:14
163:5 169:12
169:20 174:15
176:18 177:4
**reading** 18:15,16
19:2 76:6 81:25
87:12,16 88:6
90:11,14 94:11
99:12 103:11
103:21 107:3
109:15 112:19
116:15 138:3
141:6 157:1,22
161:3 172:4
**reads** 99:11
112:19 116:15
127:12
**real** 43:15,18
44:2,21 52:6
**realignment**
159:9
**reality** 159:2,4,5
159:7,10
**really** 14:25
26:23 39:13
83:4 116:5,5
121:25 130:7
146:9 149:5
170:10 176:5
**Realtime** 1:21
**Reardon** 5:9
121:15 141:2
152:4
**reask** 11:14 55:6
**reason** 14:4,17
37:16 39:2
44:10 46:14,20
55:21 58:23
64:13 71:15
86:9 92:25
113:9,9,9
123:20 135:6
142:21 154:14
158:8
**reasonable** 95:7



**reasons** 9:19
  45:16 57:12,17
  57:24 58:6,10
  58:20 59:1,2,2
  60:14 104:13
  111:8 126:5
  131:8 183:4
**reassigned**
  131:22
**recall** 8:9,19,23
  8:25 9:4 27:1
  30:17 53:22
  56:21 81:5,22
  115:24 124:12
  142:25 161:2
  169:3 178:25
  179:14
**recap** 169:8
**receipt** 183:2
**receive** 29:5 30:7
  30:8 33:16,18
  41:15 62:17,21
  74:19,21 96:22
**received** 14:25
  19:14 29:7,8,9
  34:21 39:8,23
  39:25 45:1 47:3
  48:25 51:18,19
  52:17 62:22,23
  76:9 77:19 78:2
  85:17,21 92:6
  92:12 114:12
  114:12 115:15
  115:20,20
  123:2,4,8,12
  144:16
**receiving** 115:24
  123:16 144:20
  144:21
**recognize** 143:17
**recollection**
  59:23 71:18
  99:25 102:11
  139:1 140:10
**record** 1:24 6:2
  6:14,25 10:17

12:3 15:1 17:16
  17:17,25 23:24
  68:2,4,8 104:25
  105:9,11,15
  140:15 166:3
  166:11,15
  168:15 180:15
  180:19 182:17
  183:12
**recording** 178:9
  178:9,11
  179:15
**recordings**
  179:13
**records** 92:23
**reduce** 59:17
  107:10
**reduced** 83:7
  150:13 155:3
  157:1,5,12
**reducing** 103:11
  103:19 104:3,5
  106:18,21,25
**reenlist** 30:1
**refer** 7:14 13:11
  13:17,22 88:20
  101:22 109:20
  109:22 110:1
  170:18
**reference** 88:19
  88:25
**referenced**
  124:10 172:5
**referred** 49:9
  102:2 113:2
**referring** 7:9
  18:13 94:24
  97:12 101:14
  104:9 109:16
  111:21 115:12
  163:9 178:13
**refers** 87:2 89:17
  100:5
**reflect** 144:14
**refresh** 67:23
  71:18 99:25

139:1 140:10
**refrigerators**
  133:14
**regarding** 41:15
  41:16 76:7 81:8
  115:16,25
  129:6 167:4,10
**regardless** 59:16
  65:11 77:4,18
**Registration**
  183:17
**regret** 64:22
  65:19
**regretful** 66:4
**regulations**
  112:22 174:14
  175:14
**reinterpreted**
  127:5 139:5
**relate** 13:6 56:7
**related** 8:17 9:12
  183:9
**relation** 51:17
**relative** 183:11
**relevance** 44:6
  44:10
**relevant** 15:1
**relief** 173:8
  177:22
**relieved** 134:25
**relive** 38:7
**remainder** 66:15
**remedy** 154:11
  154:11 173:22
  174:18
**remember** 11:21
  18:9 26:23
  30:16 36:8 37:9
  40:1,13,19,20
  41:5 42:8 54:1
  59:24 60:7
  77:16 80:9,10
  81:4 111:2
  112:12 167:13
  177:14 178:1,7
  178:20

**remembering**
  10:7
**remind** 12:23
**REMOTE** 1:14
**remotely** 6:9
**remove** 155:20
  159:12
**removed** 56:19
  56:22,25 57:10
  57:24 58:6,20
  59:23 155:9
  156:14,19
  157:15
**removing** 156:6
**repeat** 54:25
  65:20 84:24
  107:18 156:11
  177:21
**repeated** 171:17
**repercussions**
  75:14
**rephrase** 170:12
**reply** 62:22
**report** 39:15
  59:11 75:7
  77:13,15 80:9
**reported** 1:22
  39:10 41:10
  49:2 50:1 81:12
  86:11 132:7,16
**reporter** 1:21
  6:11,15 11:5
  14:8,11 40:25
  52:1,3 53:10,15
  60:2 100:19,23
  129:11 161:4,8
  166:21 180:14
  182:12
**Reporter's** 4:7
  180:22 182:9
**reporting** 41:12
**reports** 76:9
  97:17
**repre** 45:25
**represent** 20:12
  20:15 25:1

32:20 70:23,24
  71:4,7 93:9
  126:20 166:19
  167:1
**representation**
  15:8 71:9
**representative**
  10:11 16:19,21
  74:3,4,5 124:13
  125:2
**representatives**
  46:1 57:21,23
  124:2 125:3,4
  125:19 126:10
  126:21 165:19
  176:23 177:6,9
  177:15 178:1
  179:6
**represented**
  15:19 17:19
  20:6
**representing**
  20:10,14 23:14
  39:13
**represents**
  168:16
**reprimand** 39:9
  39:20,22
**request** 6:9 12:25
  64:4 85:7 93:23
  95:4 144:10
  162:9,11
  174:20 180:23
  180:24
**requested** 64:13
  87:13,17
  173:23 174:18
  182:25 183:6
**requesting** 5:9
  95:15 102:10
  149:1 161:17
  161:18 162:5
  163:2 173:25
  174:25
**requests** 174:4,7
  174:10



requires 50:9
requiring 144:5
reserve 165:24
resolve 17:23
resolved 130:6
resorting 68:19
  71:13
resources 32:9
  70:7,13 159:10
respect 74:10
  93:16
responded 62:25
response 17:14
  51:19,19 63:11
  63:17 110:4
  125:9 138:3
  172:9
responses 11:4
  177:21
responsibilities
  172:10
rest 100:8
restroom 166:7
result 19:6
retali 47:6
retaliated 36:19
  41:4
retaliation 47:6
retire 7:5
retired 22:13
retirement 7:7
return 117:15
  119:15 122:2
  144:9 162:22
returned 49:3
  67:1 76:13 77:7
  82:6,11 120:20
  130:24 146:3
  183:2,3
returning 63:23
  113:7 147:10
  163:1 165:8,12
  171:9
review 18:6
  104:1 180:23
reviewed 98:24

101:4
reviewing 24:3
  78:1 100:15,20
  104:2
Rich 101:21,25
Richard 51:14
  101:11,20
  138:21 139:15
right 10:7,16
  17:11 18:1,4,16
  18:19,22 22:18
  25:11 27:18
  28:10,10 29:2
  30:1 35:19,23
  37:21 39:13
  42:22 45:5
  52:19 61:12
  65:5,8 67:11
  68:1 69:16 70:7
  73:3 74:16 77:7
  78:22 79:1,4
  83:11,18 84:19
  85:19 86:4 87:3
  87:25 88:22
  90:2,6,10,20
  91:6,11,13 92:6
  92:10,14,17,22
  98:14,22
  101:23 102:3
  102:10,15
  103:10 104:8
  104:16,18
  105:24 106:10
  107:2,17 108:9
  109:1,2,2,3,7
  112:9,12
  115:17,22
  116:9,22
  117:23 118:25
  120:13,16,18
  120:22 122:5,7
  122:10 123:10
  123:14 125:11
  125:14,21
  126:6 130:14
  131:7 133:22

134:25 135:25
  136:2 137:4,7
  137:18,23
  139:20 141:8
  141:22 145:4
  148:21 149:18
  149:21 151:21
  152:12,21
  155:22 156:5,8
  157:17 158:3
  160:8 163:19
  164:5,16
  165:22 167:8
  169:9,23
  174:19 176:2
  177:4 179:22
rights 17:9 42:21
  111:24 112:5
  173:10 175:23
right-hand 73:13
Rio 35:9,15 71:2
river 35:9,15,18
Rodriguez 41:8
  132:23
role 9:24 47:15
  161:11,14
Roma 70:24 71:2
room 157:11
rooms 83:24
row 166:4
Royal 33:24
Ruben 2:23
rule 113:19 141:6
  174:14 180:23
  182:23
rules 1:23 10:21
  12:15 52:9
  112:21 124:4
  175:14 176:25
run 150:9 159:24
running 33:4,6,7
  44:1
rush 153:8
rushed 153:9

———————
S

S 2:1
safe 151:4
safely 175:12
safety 57:12,16
  57:24 58:6,10
  58:20 59:2
  60:13 103:11
  103:19 104:3
  106:18 107:10
  127:13 141:6
  149:19,25
  150:18 152:10
  152:21 155:25
  156:7,20
Salinas 51:13
San 158:20
Sandinistas 28:8
  28:9
sat 179:11
Saturday 67:17
saw 18:12,20
  28:5 38:19 50:5
  55:14 63:3
  147:19
saying 36:5 47:4
  64:6 77:6 78:18
  80:12 83:15
  89:22 97:8
  107:21 109:6
  111:10 113:13
  113:20 128:24
  129:18,19
  145:1 155:12
  166:25 171:13
says 18:15 19:2
  128:17 169:13
  172:4 173:25
  176:12,19,22
SCBPO 88:8,19
  138:21
scheduled 134:18
  134:24
schedules 54:13
scheduling 135:2
  135:2
Schneider 22:21

23:1
school 25:18,20
  25:21,23,24,25
scope 167:11
screaming 66:19
screen 52:23
  62:10 71:21
  119:4,4,6
screened 89:13
screening 103:13
  103:22 124:5
  177:2
scrolling 169:7
  173:20
searches 68:11
seat 49:17
seating 56:19,22
  57:1,10 155:4
  157:2,6
seats 57:4 157:16
  159:12
sec 53:10
second 29:8 31:5
  49:8 50:4 52:4
  69:2,2 74:2,3
  87:9 88:1
  116:12 120:8,8
  141:17 177:16
  177:22 178:5
secondary 49:9
  56:12,19,22
  57:10 89:11,17
  89:25,25 90:1,5
  99:16 101:15
  101:23 102:2
  103:12,21
  109:17,22
  110:1 118:10
  155:9,21
  156:14 159:13
  159:14 169:17
seconds 12:5,7
section 15:24
  44:1 99:6,11
  141:12,13
  161:25 162:14



MAGNA
LEGAL SERVICES

163:3 169:12
173:22
**sections** 148:23
**security** 13:11
31:2,9,11 107:4
107:6 108:14
108:15,21,24
108:25 109:10
**see** 18:8,18 27:24
28:12 38:17,18
38:21 42:19
49:24 56:6 57:5
57:5 59:8 63:5
63:5 71:15,22
72:2,10,23,24
72:25 73:20
74:24 75:21
76:2 79:12,21
85:15 86:19
87:9,12 90:11
92:4 94:1 98:18
99:5,8 100:8
102:21,23
103:3,8 105:17
107:14 108:23
110:25 112:7
112:16 115:9
122:16 125:7
127:10 130:18
134:3,9 136:17
138:18 148:18
149:15 154:8
156:24 157:14
163:24 171:25
172:8
**seeing** 58:21
169:3
**seek** 124:5 177:1
**seeker** 61:8
118:19 119:17
119:21 122:3
**seekers** 38:24
41:17 47:24
48:2,13 49:6,19
49:21 50:7 51:8
52:18,25 53:2

53:23 54:6,17
55:10,16,19
59:20 60:10
61:1,1,14,17,22
62:1,18 64:11
64:17,23 65:19
66:5 68:24
71:12 93:25
94:14 99:17
100:1,6 101:13
101:22 102:1
102:12 107:5
107:15,23
108:2,3 109:5
109:16,22
110:1,15,17
112:22 113:4
113:23 115:17
116:21 117:7
117:22 121:21
128:6 130:5
131:4 132:14
144:17 148:1,7
148:24 149:10
159:11 160:7
162:22,25
163:8,18
164:25 165:12
169:18 174:2
**seeking** 103:14
130:22 162:4
164:25 165:8
171:20,24
173:11 175:21
**seen** 33:1 49:5,25
68:11 172:20
**seizure** 8:18 9:1
**selected** 31:7
**send** 17:21 52:24
74:14,14 86:13
118:6 147:11
164:6
**sending** 52:22
53:9 142:18,25
153:20 162:11
**sense** 35:12

**sent** 15:9,13
17:20 18:6,6
34:15 53:2
74:16 75:18
79:15 81:25
82:18 86:17
98:3,6,25 102:2
106:12 110:3
115:19 118:10
122:13 134:1
137:24 141:25
142:7,11 148:8
152:19,23
158:19 167:10
176:20 179:25
**sentence** 51:4
57:17 116:15
121:10 127:8
127:12,23
128:17 138:2
146:24 159:6
**separate** 44:25
89:5
**separated** 7:6,8
37:8,15,16
128:10
**separately**
130:24
**separates** 42:19
**sergeant** 27:18
**Sergio** 51:13
**serious** 144:3
**served** 182:21
**service** 27:4
28:11,13,15,22
29:5 30:20
31:16 32:5 34:8
89:6,7 160:12
**services** 6:12
158:20,25
159:16,25
183:18
**set** 95:7
**settled** 135:13
**settlement**
137:14,14

**Seven** 183:18
**shaking** 11:7
**shield** 28:20
129:13,13,17
**shift** 110:6
**SHINNERS** 2:13
**shit** 147:16
**shocked** 111:9,15
**shocking** 56:5
**shoot** 58:15
**shooting** 137:10
**short** 80:13,19
88:3
**shorthand** 1:22
182:12
**shouting** 176:4
**show** 39:16 54:3
153:1 158:24
160:15,16
164:13,13
167:5
**showed** 169:1
176:16
**showing** 44:12
56:4 67:23
110:9 133:22
158:5
**shown** 15:19
123:9 141:5
182:22
**shows** 156:16
158:6,22
**shut** 159:13,16
**shutting** 158:8
**sic** 17:6 20:15
21:17 26:11,20
26:25 29:11
35:2 43:9,25
50:1 102:8
118:3 127:18
151:9 172:4
175:4,13
178:22
**sick** 58:13,22
175:1,1
**side** 25:4 38:19

38:19 53:8
117:16 120:1
120:12 121:8
145:18,19,24
146:14,22
147:2,9,11
148:2,24
150:13 162:7
165:10,12,13
170:3
**sides** 100:13
**sign** 164:2,6,10
**signature** 98:18
98:20 181:2
182:24 183:1,4
**signed** 98:22
138:11 150:23
160:25 163:25
164:9
**similar** 11:9
**simple** 80:12
**single** 88:12
90:18
**sir** 6:23 7:3 11:10
11:11,15,24,25
12:21 13:4,8,9
13:14,15,19,20
13:24,25 14:3
19:20 20:3
24:24 25:6,10
25:14 32:22
35:20,24,24
36:8 37:12 41:1
41:24 42:2,8
44:18 46:5
48:10,24 50:15
53:16 54:24
59:24 67:25
69:19 71:17
72:4,15,24
73:11,20 76:15
76:16 79:4,13
79:21 80:8 82:9
83:25 85:15,16
85:20,24 86:19
86:20 87:20



88:18,24 90:25
91:9,13 92:4,5
92:8,11,15 94:1
94:17,19 98:2,8
98:11,14,18,23
99:1,22 100:21
101:6 102:18
102:23 103:5,9
103:17,18,24
109:19 112:13
112:16,18
114:6,23 115:2
115:9,10,13,23
116:19 122:10
122:17,20
125:15 127:10
127:11,20,21
128:19 129:10
130:18 133:6
133:23 134:3,4
134:10,17,20
135:21 137:23
138:6,25
140:19 141:1
141:24 142:10
142:14 144:13
147:5 148:19
149:7,17
154:20,24
155:1 156:18
161:2,6 162:14
162:15 163:13
164:4,16,20
165:6,22 167:7
170:8,24 171:3
174:16
**sister** 67:4
**sit** 14:5 56:14
62:12 64:22
65:18 117:17
157:11 179:5
**site** 43:11,13,19
43:21 45:2
103:12,21
118:15 120:5
120:21,24,25

145:17 150:3
151:7 170:17
**sites** 41:21 43:14
44:13 120:6
150:24
**situation** 160:13
**slash** 99:15
109:15 134:6
134:12 141:6
162:4 169:17
**slow** 161:5
**slowed** 160:19
**small** 141:15
**Smedlock@ma...**
2:8
**smudged** 98:1
**sniff** 36:2
**soil** 49:6,19 61:5
61:5,9,14 82:12
82:12,24,25
91:4 101:22
102:1 110:16
116:21 117:7
118:23 149:10
**Sol** 6:10
**Solange** 3:3
**sold** 67:9
**solutions** 69:23
95:20
**somebody** 45:9
154:11,12
**someone's** 78:16
**Somewhat** 143:2
**son's** 39:15
**sorry** 8:23 34:11
34:19 38:3,6
39:19 40:12
41:2 44:20 46:5
46:8 48:24
50:21 51:14
53:18 55:16
83:23 87:9 91:8
98:16 102:18
119:9 129:11
133:17 154:23
176:3

**sort** 30:8 54:7
96:16 137:3
143:3
**sound** 11:9
**sounded** 28:17
**sounds** 166:9
**Southern** 1:1 6:5
182:1
**Southmost** 26:5
26:12
**southwest** 26:11
26:20,25
159:20
**space** 32:2 155:4
155:25 170:21
**spaces** 32:5
**span** 35:9,18
**speak** 21:1 62:5,7
83:14 131:15
**speaking** 172:14
**special** 73:12
**specialist** 27:17
27:17
**specialized** 27:10
**specifically** 19:8
36:2 66:17
**specifics** 80:13
81:6
**speculation**
126:14 129:8
**speech** 17:9
**speed** 22:2
**spell** 6:24 23:23
132:9
**spent** 21:11
**spike** 32:9 68:23
**spikes** 68:12,16
68:18
**spirit** 38:17,21,23
**spoke** 20:24 23:9
23:13 158:15
167:4
**spoken** 24:25
**spokespeople**
63:25
**spout** 133:9

**Square** 2:15
**Sr** 2:23
**staffed** 159:20
**staffing** 106:21
106:25
**staffings** 47:2
**stained** 129:14
**stamped** 173:20
**stance** 125:12
151:25
**standalone** 69:4
**Standards** 43:25
45:4
**standing** 44:6
61:8,14 91:3
110:16 119:21
119:22,22
120:15 170:16
**start** 8:2 25:20
47:25 67:22
95:16,17 96:20
154:21 166:3
167:8
**started** 62:16
134:12 158:25
172:21
**starting** 60:14
**starts** 169:9
**state** 1:21 6:24
13:5 80:11 83:9
128:14 137:1
162:20 182:13
**stated** 1:24
**statement** 15:1
18:13 19:10
45:11,13 78:1
78:25 80:24
81:7 88:3 91:2
99:21 111:20
145:9 159:21
162:16
**statements** 47:5
74:14 75:5 77:9
77:21 78:2,3,8
81:16 86:12
**stater** 178:22

**states** 1:1 6:5
16:7,18,19,21
17:5 32:21 42:1
42:7 47:24
48:14 49:20
64:24 67:15
116:16 117:11
118:6,21
119:23 120:1,6
120:7,8 121:4
127:19 138:3
138:20 145:17
148:7 153:17
162:2,6,10,13
163:1,8 164:25
165:9 182:1
**stating** 127:15
158:17
**stationed** 150:15
157:22
**status** 29:24
124:6 162:5
177:3
**stay** 38:4 174:6
**stealing** 132:17
**stench** 173:3
**stenographic**
6:14
**step** 5:2,6 37:8
49:6 95:9,10,16
96:1,2,8,9,10
96:10,13,14,14
96:23 97:9,11
134:7 177:18
177:20 178:5
**STEPHEN** 2:5
**stepped** 49:19
**steps** 60:9 96:3,4
96:5,15 177:16
177:22
**Steve** 182:20
**stewards** 24:7
**stock** 133:13
**stolen** 39:10,16
**stood** 111:17
**stop** 61:11,11



107:5 175:16
175:17
**stopped** 133:16
**stopping** 63:22
63:22 107:7
**stories** 36:17
78:24
**Storm** 28:19
**story** 78:21 80:16
**Street** 2:7 183:19
**stress** 37:18 38:5
38:6
**strongly** 150:25
**students** 151:9
**stuff** 19:8 21:4,8
22:14 24:8
37:19 40:14,22
41:21 45:24
64:4 66:23
67:15,16 75:1,5
106:24 116:2,3
129:15 137:1
144:21 152:15
153:2 161:18
161:23 175:7
179:14,15
180:7
**subject** 75:19
79:23 86:21
93:22 94:3
115:7
**subjects** 11:23
**submitted** 169:10
169:11 171:8
173:24,24
**subpoena** 20:4
**subsequent** 96:5
**subsequently**
76:12
**substance** 15:15
16:7 20:18
**success** 47:6
**successful** 135:1
**sued** 64:17
**suffice** 80:20
**sufficient** 151:4

170:21
**suffrage** 160:17
**suggest** 166:5
**suit** 8:15
**Suite** 2:23
**summarized**
115:21
**Summary** 99:6,9
169:10,12
**summers** 26:21
26:24
**supervising** 31:3
**supervisor** 31:3
51:12,13,13
96:20 97:20
101:11,20,21
101:25 131:17
131:21 132:3
132:10 178:5
**supervisors** 65:2
77:19 110:7
133:13 146:13
147:24 162:4
178:5
**supervisory**
37:13 88:20
109:21,25
**supervisor's**
65:11
**support** 129:3
**supposed** 83:9
111:11 146:12
174:24
**sure** 12:7 13:16
15:3 18:17
28:16 31:25
45:8 48:23
53:15 55:1,3,7
56:8 65:23
72:18 84:7,9,10
84:13 90:13
100:11,22
102:20 106:1
106:20 107:19
107:20 117:19
118:17 122:22

132:22 134:24
141:16 152:17
156:12 161:19
164:21 166:24
175:11,18,19
177:24
**surely** 72:10,10
**surge** 68:23 69:2
**surges** 68:15,18
**swear** 6:15
**sworn** 1:18 6:18
30:19,21 33:15
33:16 182:15
**Sylvia** 73:18
85:13 86:16
87:6,10 88:4,6
88:7 89:22
**system** 33:4,7
86:1 92:17,21
123:14 142:16
144:11 146:14

---

**T**

**T** 4:11,15,22 5:1
**tab** 72:7 79:2
84:20 91:12
106:4 114:22
114:22 122:9
133:21,23
140:13,15,18
**take** 7:7 12:22
26:10 31:9
33:23 41:23
42:4 56:6 61:5
67:21 81:5
82:15 83:6
95:21 104:1
105:1 108:16
118:3 134:16
134:18 135:9
166:6 168:18
**taken** 1:14,18
9:17 14:1 39:17
56:3,10 67:10
68:5 77:10,21
82:7 83:1,21,22

88:16 90:9
105:12 108:7
109:4 135:7
166:12 183:11
**talk** 8:24 12:2,8
23:11 25:11
34:20 35:17
47:23 73:11
95:5 97:9
135:18 158:10
176:5
**talked** 22:21
23:21 24:11
81:2,3,22 93:14
113:5 123:1
163:9
**talking** 8:22
10:16 11:22
24:2 33:8,9
38:2 40:10 43:1
43:8 46:3 48:22
50:23 57:20
63:15 93:13
96:7 117:13,13
118:24 119:7
119:19 132:4
143:12 144:14
146:18 149:8
155:8,13,16
163:11 167:19
**tape** 179:12
**targeting** 153:20
**task** 109:4
**tasked** 94:21
108:14
**tasks** 107:17
108:8,16
**taught** 114:17
**TDY** 158:20
**TDYs** 70:20
**team** 94:20 95:12
**tech** 3:4 6:11
71:21 72:19
73:1,3 105:7
141:12 168:19
168:23

**technically** 110:4
110:12,15
120:6 125:6
126:24 139:3
144:19
**Teflon** 128:13
**tell** 8:13 14:1
29:13 40:17
42:8 46:7 49:16
51:8 52:18 57:9
58:25 66:17
67:18,18 75:1
78:4 80:14
81:19 117:17
126:23 147:13
155:15 160:15
164:11 175:9
175:15,17
**telling** 19:11 53:6
110:7,11
114:15,16
124:18,20
128:25 129:1
144:20 149:9
**temporarily**
174:9
**tend** 74:25 95:5
96:8
**tents** 69:4,20
**term** 73:12 132:2
**territory** 49:8
120:16,22
121:19,22,23
122:4
**terrorists** 124:6
177:2
**test** 72:3
**testified** 6:18 8:4
8:25 9:7 71:19
**testify** 14:17
16:14 19:4 20:4
**testifying** 8:3,10
8:17 11:18
131:4
**testimony** 8:13
8:16 9:16 10:2



16:11,23 17:7
18:23 19:5 25:5
25:9 32:12
46:17 50:12
54:21 104:22
164:22,23
167:11 168:6
182:17 183:10
**Texas** 1:20,21,22
2:24 25:24 26:5
26:7,11,12,19
26:24 31:16
34:24 35:3,5
62:24 76:8,9,11
76:12 82:3,4,5
94:7,15 98:7
104:24 144:7
162:3,6,18
182:13 183:16
**text** 75:23 99:8
103:16 141:23
**thank** 17:10,12
18:1 24:1 27:4
28:23 32:22
48:10 50:15
53:17 54:24
71:5 72:4,11
84:17 85:8
103:1 106:5
109:11 141:21
161:9 165:6
**thanks** 94:8,8
130:13
**thermos** 133:5,9
**they'd** 109:3
**thing** 26:1 42:19
45:20 113:20
125:13,14
144:25 172:2
**things** 10:20
11:21 31:1
36:16 38:22
45:6 56:6 71:19
77:1 136:6
151:17 154:9
160:7 161:22

176:4 179:18
**think** 9:21 11:16
14:4 15:23
17:23 24:4
25:17 28:1
30:15 33:2 36:4
36:5 37:9 39:2
40:15 41:8,18
41:19 45:18,20
46:14 50:16
59:4,24 60:16
61:6,24,25,25
62:23 63:10,13
81:11,13 83:1
84:4,5,8 86:2,7
101:1,8 102:4,6
102:6,7,14
104:16 111:5
111:22 114:11
114:11 121:14
121:15 124:16
126:2,8 128:7,7
136:23 137:12
146:10 150:11
150:16,20
151:16 152:14
153:8 158:2,15
159:19,21
163:14 168:17
170:6,6,8 171:1
176:3 179:22
180:10
**third** 147:16
177:18,20
**thought** 126:15
147:12 155:24
**thoughts** 167:6
**thousands** 43:17
136:1
**threatening**
130:23
**threatens** 112:23
**three** 6:12 8:8,9
9:11,12 21:17
29:23 43:14
72:13 80:19

**time** 6:8 12:4,11
12:11 13:6
15:13 22:11
27:12,21,25
28:4 29:1,4
30:6 31:13,17
33:11 35:21
36:16,20 37:5
39:5,12 41:3
50:2 51:15
52:10 53:4,6,7
53:21 54:1,5,10
54:12 55:22
56:8 57:3,12,15
57:25 58:2,3,7
58:17 59:4 60:7
60:14,17 63:22
63:24 64:20,25
64:25 65:9 68:3
68:7 69:25 70:2
72:20 74:1,7,8
76:22 80:3 84:4
92:13,18,19,24
95:7 99:23
100:3,3 101:8
104:1,7,10
105:10,14
106:22,23
107:1,22 111:1
111:7 112:1
113:11 114:1
116:23 117:12
117:14,20
118:20 120:2
120:23 121:11
121:13,14,16
121:17 123:9
125:19 126:2
129:21,21
130:10 132:8
133:15 134:21
134:24 136:9
139:19,23,25
140:1 142:4

144:22 146:11
146:17 150:6
150:11 153:13
153:19,21
155:18 156:2
156:17 157:7,8
157:8,15 158:7
158:7,17,18
160:5 162:12
162:19,19
165:24 166:10
166:14 175:7
178:23 179:25
180:16,17
**times** 8:7,9 9:10
9:12 21:1,16,17
26:23 48:12
49:16,18 72:13
78:12 85:22
95:16 104:13
121:8 131:16
140:3 142:12
151:13,15
155:11,12,17
159:13
**title** 37:10 63:10
73:24
**today** 6:7 7:15
8:1,2 11:12,16
12:11 13:5,24
14:2,5,18 18:23
19:15,19,21
20:4,6,10 23:9
23:9 24:23 25:1
25:5 33:8 38:7
58:19 64:22
65:18 72:2,2
113:5 138:5
163:10 164:20
164:22 167:23
168:4 179:5
180:1
**today's** 13:10,16
13:21 20:23
21:2,11 22:7
23:6 24:5,13

25:9
**Todd** 63:4 115:7
151:19
**told** 20:12 22:25
23:14,21 34:14
49:14,19,21
50:25 51:2
55:20,21 57:23
61:15,18,25
62:1,7,18 64:7
64:15 67:12,13
74:9,12,13,13
80:11 81:15
85:2 86:12
88:15 90:5,10
90:19,23 91:4
101:16,21,25
109:21,25
110:12,14
116:20 121:8
125:3,13,17
132:5 139:3,13
146:1 147:1,12
160:10 165:19
**tolerate** 63:25
**tone** 176:7
**Tony** 5:9 121:15
141:2
**tool** 42:21
**top** 120:3 141:5
176:12
**topics** 11:18
**Torres** 2:23
**torture** 99:18
169:19
**total** 25:17
153:10 158:19
**totality** 171:15
**totally** 45:2
114:19
**touch** 23:22
**tour** 121:14
**Town** 66:21
**track** 73:14
151:3
**trained** 36:2



**training** 28:8
33:16,19,23
34:1,4,21
**Tran** 3:3 6:10
**transcript** 181:3
182:16 183:3
**transmission**
40:23
**transpired**
151:10 171:15
**transport** 88:10
**transportation**
174:12
**transported**
76:12 82:2
90:16
**transporting**
88:8 90:14
**traumatic** 130:21
179:13
**traveler** 116:16
**Treasury** 7:19
36:11
**treated** 38:24
**treaties** 16:6,8
**treatment** 41:17
47:23
**treaty** 16:3
**trial** 6:10
**tried** 153:2
**trouble** 10:7
53:17 71:24
85:1
**troubled** 172:9
**Troy** 152:4
**true** 44:21 57:13
57:15 93:3
94:18 99:21
127:15 129:1,2
145:11 159:21
159:22 162:16
182:17
**Trump** 47:17
150:22 152:19
153:20
**Trump's** 71:16

**truth** 14:2 42:8
**truthful** 16:11
17:7
**truthfully** 14:6
19:15
**try** 11:14 12:6,22
65:24 72:1
140:10 153:5
166:23
**trying** 10:11
22:10 23:11,22
35:12 47:7
65:21 107:20
119:2 140:1
150:5 153:14
**turn** 48:19 49:17
51:7 52:17 53:5
53:23 61:23
66:4 107:8
113:23
**turned** 48:3,14
49:7 54:6 55:19
61:14,17 64:23
65:19 67:9
82:11,24 100:1
110:17 117:8
131:5 163:18
**turning** 50:7
54:17 55:10
64:11,17 68:24
107:23 108:2
109:5 113:3
115:16 130:5
144:17 164:24
172:11
**turns** 96:9
**turn-back** 70:4
108:5 114:10
116:1 125:4
126:1,22 128:5
129:6 130:2
132:14 162:11
**turn-backs** 65:17
68:19 71:13
108:7 139:4
163:9

**Twenties** 9:6
**two** 8:8,9 20:11
23:8 26:21,24
31:1 55:23 74:4
74:5 89:5 95:8
108:20 119:24
120:5,7 135:12
135:13 144:19
**two-page** 73:6
**two-part** 172:18
**type** 76:13
**typed** 161:17
**types** 176:1
**typical** 11:21

——————
**U**

**uh-huh** 11:9 21:6
29:14 44:14
51:3 58:4,8
73:21 78:11,14
78:20 79:7,17
79:20 100:16
100:25 106:13
112:2 114:20
115:5 117:2
119:20 139:18
140:25 146:5
157:20
**ultimately**
134:13
**undermines**
42:25
**underneath**
155:2 157:21
157:21
**understand** 7:16
11:10,12,14,24
12:9,20 13:8,13
13:18,23 14:1
20:3,17 24:22
36:4,5 56:18
59:22 89:1,21
93:11 97:21
101:4 106:20
107:20 109:12
117:19 124:21

126:19 127:3
132:2 140:8
143:13 152:6
153:23,25
156:10,22
159:15 161:5,9
164:22 165:23
175:19 176:8
**understanding**
20:9 34:10
38:14 52:8
53:17 59:10
64:19 83:17
84:15 85:6
86:24 104:21
127:22 128:20
130:2 132:5
145:25 148:3,9
157:7
**understands**
152:4
**understood**
22:16 75:16
77:20 81:23
126:2
**undocumented**
76:10 82:3,6,11
82:23 91:3
**unethical** 45:10
45:14,15 75:9
**unethically** 45:19
**unified** 89:8
**unilateral** 124:3
174:2 176:24
**unilaterally**
99:13 169:15
**union** 7:20 15:6
36:12,19 37:1,2
38:18 39:13
49:2 76:9 78:4
114:17 135:7,8
149:19 173:23
173:25 174:4,6
174:10,18
175:20,25
**unique** 34:25

**unit** 128:11
157:24
**United** 1:1 6:4
16:7,18,19,21
17:4 32:20 42:1
42:7 47:24
48:14 49:20
64:23 67:15
116:16 117:10
118:5,21
119:23 120:1,6
120:7,8 121:4
127:19 145:17
148:7 153:17
162:5,10,13
163:1,8 164:25
165:9 182:1
**unity** 164:13
**unlawful** 169:25
170:5,10,11
171:7
**unlimited** 24:15
**unmute** 53:11
**unpack** 118:17
**unquote** 178:19
**unsure** 51:24
52:1,5,6
**upheld** 38:22,24
**uphold** 38:14
**upper** 177:12
**upset** 24:19 67:4
67:6,8
**use** 7:14,16 13:13
13:18,23 77:13
77:13,17 92:21
166:6
**user** 92:20
**usually** 80:14
95:24 96:17,17
96:21 108:18
118:9 136:11
136:12 144:4
177:16 178:4
**U.S** 2:14 7:11,14
13:11 16:3 23:5
27:3,9 28:14,25



29:15,18,22,24
30:3,6,13,20
31:2 33:15,21
34:8,23 41:22
42:3 45:22 48:3
48:15 49:6,19
61:5,8,14 82:12
82:24 89:6 91:4
101:22 102:1
110:16 112:24
116:21 117:7
118:23 120:15
144:10 145:19
145:23 148:25
149:10 162:6,7
162:8,23 165:1
165:10,12
166:20 167:1
170:3
**U.S.C** 15:24

——————
**V**
——————
**values** 42:16,25
**vast** 69:3
**Vegas** 151:24
152:7
**vehicle** 66:20
**vehicles** 153:7,7
**verbally** 40:13
69:20 95:5 97:9
125:13,17
**version** 72:1 88:1
112:17
**versus** 6:4
**veteran** 29:24
**vice** 36:25 93:18
93:20
**victories** 135:12
137:13
**video** 152:13,15
**videoconference**
1:14 2:4,12,21
3:2 20:22
**videographer** 3:3
6:1,10 68:3,7
105:10,14

166:10,14
180:16
**videotape** 152:11
152:16
**videotaped** 1:10
1:16 152:4
**view** 16:15
**views** 47:19
**violate** 16:3
19:11 126:24
165:20
**violated** 65:18
**violates** 136:4
**violating** 19:11
19:23 112:21
113:13 126:3
**violation** 15:24
127:6
**Virginia** 33:24
**vision** 72:3
**voluntarily** 122:4
**VS** 1:5 182:5

——————
**W**
——————
**wait** 49:13,17,17
49:22 51:8
52:18 61:15
117:17,23
118:7,10,11,13
119:15 121:8
122:4 170:21
**waited** 67:2
135:9
**waived** 181:3
**walked** 88:13
89:25
**Walter** 4:10,22
92:2 93:4,5,6
**want** 8:12 19:20
20:11,18,20
30:21 36:25
38:7,7 40:7
47:23 54:9
57:25 67:6
69:22 74:23
91:23 109:13

116:9,14
117:18 118:17
122:23 125:24
138:14 139:16
141:14 151:16
153:17 164:21
166:2 168:14
175:19 176:13
179:21,24
**wanted** 17:25
18:11 31:8
41:11 49:20
110:9 135:18
154:18 157:11
161:23 174:23
**wants** 32:8
177:12
**war** 27:24 64:4
**Washington** 2:7
2:15 104:25
115:16,25
**wasn't** 28:21
39:13 51:19,20
61:19,19
111:11 121:4
124:17 126:3
135:6,6 147:21
151:4
**Watch** 138:20
**water** 132:17,25
132:25 133:1,3
133:9
**waters** 133:11,12
**way** 8:19,19
11:14 12:8
21:12 38:17,24
39:2 42:18
44:11,23 47:21
50:17 52:21
57:4 70:25 75:2
81:10 83:12,18
86:10 93:2
105:5 107:11
110:17 113:16
115:3 121:1,4
123:21 126:5

128:16 132:7
132:13 133:3
142:23 150:7
156:25 164:4
173:9
**ways** 83:3
**weapon** 39:10,17
**Web** 43:11,13,14
43:19,21 45:2
112:10
**WebEx** 12:2
**week** 150:22
**weird** 125:7
**Welcome** 68:9,10
105:16
**went** 21:5 23:19
24:7 25:19 26:3
27:1 81:7
106:17 119:18
**weren't** 54:10
55:22 69:6 83:4
83:18,20,23
116:7 120:11
133:12,12
144:21,24
145:2 149:11
171:14
**we'll** 11:19 12:22
71:20,20 72:1
72:11,11,19
78:12,13 80:16
104:25 140:18
**we're** 10:22
11:22 12:1
65:10 68:4,8
73:14 89:5,5
95:15 105:11
105:15 106:11
106:14 111:1,9
111:18 113:18
113:20 117:13
117:13 129:23
134:21 137:1
140:9 158:21
166:11,15
171:25,25

173:4 174:24
175:25 180:18
**we've** 46:25 47:1
50:18 53:24
95:4,5,14,14
106:4 114:23
116:1 130:16
133:23 134:21
134:23 135:1
137:13 142:22
153:2,6,7 154:4
154:13
**whistleblower**
45:24
**white** 154:25
**whoo** 158:16
**William** 4:11,15
4:22 5:1,5
73:16,17,22,24
79:18 85:13
92:1 94:10
122:13 134:1
141:3 176:20
**win** 46:21
**witness** 1:17 2:20
6:16 15:22 16:9
17:19,22 19:4
32:15,18,22
41:2 48:5,10
50:15 52:6
54:24 60:4
66:11 67:25
70:11 72:22,25
73:2 85:2 101:2
105:23 108:11
132:20 141:10
141:13 161:3,7
165:6 167:11
167:16 180:24
182:15,18
**witnessed** 88:12
90:17 179:6
**WOLARSKY**
2:18
**won** 47:1,3
**wondering** 28:16



41:20 106:19
**words** 11:8 57:5
  70:19 78:16
  172:1
**work** 8:11,14
  9:13,20,22,24
  29:9 35:2 37:23
  47:10 53:8
  62:19 85:18
  92:9 108:21
  124:3,22 126:9
  152:5 157:23
  160:20 173:2,3
  174:8,11
  175:10 176:24
  178:2
**worked** 33:2,2
  147:21,24
**worker** 175:3
**working** 31:1,2
  31:13 45:19
  47:7 59:14,17
  101:10 108:18
  143:18 147:9
  161:16 172:7
  172:15 173:17
  175:5
**works** 95:3
**worries** 53:20
**worst** 155:12,18
  155:18 156:17
**wouldn't** 63:25
  75:8 83:25
  121:25 125:20
  127:5 169:6
  170:9 171:3,4,5
  176:11
**Wow** 27:23
**writ** 115:15
**write** 78:5 80:19
  111:18 145:14
  148:21 155:2
  157:1,22
**writes** 76:6 81:25
  87:6,10,16 88:6
  94:10 123:25

134:5
**writing** 64:4 78:7
  125:14,19,24
  136:8 143:25
  144:2 149:2
  174:24
**written** 10:2 11:4
  50:3 54:7 62:17
  63:19 101:9
  114:2,9 115:11
  115:15 144:8
  144:16,22
**wrong** 65:6
  126:16 174:17
  177:11
**wrongdoing**
  41:10 77:15
  174:3
**wrote** 65:7 74:7,8
  98:21 148:4

**X**

**Xbox** 39:15
**XX** 183:6

**Y**

**yeah** 52:20 65:23
  65:23,23 77:3
  81:10 89:19
  103:25 105:7
  105:21 106:5
  107:12 108:13
  115:1,18
  121:24 125:15
  131:8 133:8
  146:20 152:13
  176:10 179:9
**year** 7:7 15:7
  117:12 120:2
  140:6 158:18
**years** 29:23 35:4
  37:3 40:2,2,2,4
  40:4 95:13
  140:9 151:7
**young** 67:17
**younger** 8:20

**Z**

**zone** 27:24

**0**

**000110** 140:24
**000110-131** 5:10
**000132** 5:3
**000133-135** 5:7
**000136-137** 4:13
**000138** 4:17
**000139-40** 4:20
**00141-159** 4:23

**1**

**1** 6:2 72:7 95:10
  95:16 96:2,9,13
  97:9,11
**1st** 13:7
**1-19** 4:22
**10** 57:2 83:7
  157:23
**10-15** 43:20 44:2
  44:22
**10/20/21** 183:17
**10:53** 68:4,5
**11** 157:23
**11:08** 68:6,8
**11:57** 105:11,12
**113** 154:22
**114** 157:19
**1185** 2:23
**12** 1:13,19 4:21
  37:8 182:11
**12th** 6:7 92:2
**12/6/2016** 75:20
  79:24
**12:44** 105:13,15
**122** 5:3
**13** 114:22
**132** 122:15
  176:10
**133** 133:25
**136** 73:7 75:19
**137** 73:7
**138** 79:11
**139** 85:11

**140** 5:7,10 88:2
**141** 91:22 168:13
  168:22
**142** 97:23 99:3
  169:7
**143** 102:16
  109:13
**144** 98:13 173:20
**149** 7:24,25 9:25
  36:22,24 37:3
  47:11 73:25
  78:3,5 85:19
  92:10,22 93:17
  94:12 98:6
  102:17,19
  106:12 123:6
  123:18 125:3
  135:23 142:9
  142:19 164:8
  171:8,20,23
**149's** 135:19
**15** 5:1,4 21:12,13
  21:15 134:2
  153:10
**15-minute** 166:6
**1512** 15:24
**16** 153:10 178:24
**1635** 183:19
**166** 4:5
**17-cv-02366-B...**
  1:6 182:6
**18** 15:24
**180** 4:6
**182** 4:7
**19** 5:8 98:9
  106:11 138:4
  142:1
**19103** 183:19
**1983** 25:22
**1988** 28:1,22,25
  29:16 30:12,24
**1990s** 9:3 36:9,10
**1991** 9:5 28:18
  30:22,24 33:14
**1998** 36:25 37:1
**1999** 2:7

**2**

**2** 4:3 36:10 79:2
  96:10,14
  138:15
**2nd** 76:8
**2:05** 166:11,12
**2:46** 86:18
**2:55** 142:1
**2:57** 166:13
**2:58** 166:15
**20** 21:12,13,15
  32:5 83:6
  119:25
**2000s** 9:3 36:10
**20006** 2:7
**20044** 2:15
**2016** 4:12,14,16
  4:18,20 13:7
  68:11 73:16
  74:15 75:18
  76:8 79:19 80:3
  81:1,9 82:1
  85:11,12 86:17
  88:7 99:12
  100:2 104:17
  104:20 169:14
  171:16 172:21
**2017** 4:10,21 5:1
  5:3,4,8 92:2
  93:25 98:10
  106:11 134:2,7
  134:12 135:4
  137:24 138:4
  178:23
**2018** 63:4 115:8
  117:14,20
  119:15,16
  154:4
**2019** 142:1 151:1
  151:20 154:4
  160:24 162:18
  171:16
**202.263.3221** 2:8
**202.598.8259**
  2:16



**2020** 1:13,19 6:7
  18:7 154:4
  182:11 183:14
**215** 29:12
**215.207.9460**
  183:20
**215.207.9461**
  183:20
**22** 37:3
**23** 4:14
**23rd** 73:16 74:15
  75:18 79:19
  80:3
**24th** 183:14
**24-hour** 32:3,5
**26th** 85:11 86:17
**27** 4:18 63:4
  85:12 115:8
**27th** 15:10 18:7
**288** 4:10 73:5,8
**289** 4:14 79:5,8
**290** 4:18 84:21
  88:2
**291** 4:21 91:16,18
  93:1 101:1
  106:4 109:14
  168:12,21
**292** 5:1 122:11,18
  123:21 137:22
  138:9
**293** 5:4 140:15,16
  176:10
**294** 5:8 140:19,20
  141:5 142:22
  160:23

---
**3**

**3** 2:23 5:2,6
  84:20 96:10,14
  103:7 106:8
  115:3 117:16
  118:6 120:21
  122:1 134:7
**3:19** 1:19 180:17
  180:17
**3:20** 166:8

**30** 4:10 56:20
  83:6 150:11
  153:9 183:2
**30th** 15:7
**30(e)(1)** 180:23
**30(f)(1)** 182:24
**300** 150:23
**3253** 183:16

---
**4**

**4** 91:12 106:4,9
  109:13
**40** 56:18,20
  150:11 153:9

---
**5**

**5** 122:9
**5:59** 79:19

---
**6**

**6** 4:4,12,16,19
  112:15,17
  133:21,23
  140:15
**6th** 80:25 81:9,14
  82:1 88:7 99:12
  100:2 160:24
  169:14
**60** 25:17 26:8,10
  56:17
**633** 183:17

---
**7**

**7** 37:9 140:13,18
**73** 4:13
**78521-1743** 2:24
**79** 4:17

---
**8**

**8** 37:9
**8th** 183:18
**80** 27:11 158:19
  159:22
**82nd** 27:11,19,21
  27:25 29:4,16
**84** 4:20

**868** 2:15
**89** 30:16

---
**9**

**9** 137:24
**9:32** 1:19 6:8
**90** 30:16
**91** 4:23
**956.555.1234**
  2:24

