Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

----------------------------x

AL OTRO LADO, INC., et al., :

     Plaintiff,         :

     -vs-             : Case No.

KEVIN K. McALEENAN, et al., : 17-cv-02366-BAS-KSC

     Defendants.       :

----------------------------x


CONFIDENTIAL

Remote Videotape Deposition of

TODD HOFFMAN

Wednesday, June 10, 2020

9:34 a.m.



Job No.:  578769

Pages 1 - 343

Reported by:  Tammy S. Newton

Magna Legal Services

866-624-6221

www.MagnaLS.com



Page 2

```
 1              A P P E A R A N C E S

 2        ON BEHALF OF PLAINTIFFS:

 3              STEPHEN M. MEDLOCK, ESQUIRE

 4              Mayer Brown

 5              1999 K Street, N.W.

 6              Washington, D.C. 20006

 7              (202) 263-3221

 8              smedlock@mayerbrown.com

 9                  and

10              MELISSA CROW, ESQUIRE

11              Southern Poverty Law Center

12              1101 17th Street, N.W.

13              Suite 705

14              Washington, D.C. 20036

15              (202) 355-4471

16              melissa.crow@splcenter.org

17

18

19

20

21

22
```



MAGNA
LEGAL SERVICES

Page 3

```
 1        ON BEHALF OF DEFENDANTS:

 2             KATHERINE J. SHINNERS, ESQUIRE

 3             SUSAN IMERMAN, ESQUIRE

 4             U.S. Department of Justice

 5             Office of Immigration Litigation

 6             Ben Franklin Square, P.O. Box 868

 7             Washington, D.C. 20044

 8             (202) 598-8259

 9             katherine.j.shinners@usdoj.gov

10

11

12        Also Present:

13             Louisa Slocum, Esquire, CBP

14             Stephanie Muffett, Esquire, CBP

15             Josh Pinkus, Magna

16             Sol Tran, Videotape Operator

17

18

19

20

21

22
```



Page 4

1                   C O N T E N T S

2    EXAMINATION OF TODD HOFFMAN                 PAGE:

3        By Mr. Medlock                             8

4        By Ms. Crow                              270

5

6    DEPOSITION EXHIBITS                          PAGE:

7    Number 252 - Plaintiff's Third Deposition

8                 Notice                           21

9    Number 253 - New Yorker Article by Jonathan

10                Blitzer                          78

11   Number 254 - Meeting Invite                   90

12   Number 255 - November 14, 2018 e-mail

13                exchange                         96

14   Number 256 - October 31 - November 2nd,

15                2016 e-mail exchange            106

16   Number 257 - July 13, 2017 e-mail chain      112

17   Number 258 - (Document clawed back)          116

18   Number 259 - November 12th - November 15,

19                2016 e-mail chain               122

20   Number 260 - December 6, 2017 e-mail chain   133

21   Number 261 - December 6, 2017 e-mail chain   138

22



Page 5

```
 1   DEPOSITION EXHIBITS                          PAGE:
```

```
 2   Number 262 - Memorandum dated April 27, 2018

 3                entitled "Metering Guidance"     140

 4   Number 263 - Migration Crisis Action Team

 5                Report                           159

 6   Number 264 - April 24th - 25th, 2018 e-mail

 7                chain                            177

 8   Number 265 - (Document clawed back)          188

 9   Number 266 - E-mail sent by Luis Mejia on

10                April 25th, 2018                 193

11   Number 267 - Meeting invitation              195

12   Number 268 - E-mail Dated April 27, 2018     203

13   Number 269 - E-mail Dated April 27, 2018     206

14   Number 270 - E-mail Dated April 27, 2018     213

15   Number 271 - September 19 - 25th, 2018

16                e-mail chain                     216

17   Number 272 - October 16, 2018 e-mail chain   224

18   Number 273 - February 22nd, 2019 e-mail      230

19   Number 274 - April 30th, 2020 e-mail         235

20   Number 275 - E-mail chain from

21                February 1st, 2019               252

22   Number 276 - E-mail chain                    262
```



Page 6

1    DEPOSITION EXHIBITS                          PAGE:

2    Number 277 - Photograph of Nora Phillips      265

3    Number 278 - Declaration                      266

4    Number 279 - E-mail chain                     274

5    Number 280 - Three-page e-mail chain          280

6    Number 281 - Draft 2017 Action Plan           283

7    Number 282 - Four-page e-mail chain           289

8    Number 283 - E-mail dated November 1st,

9               2018                               296

10   Number 284 - E-mail chain                     303

11   Number 285 - E-mail Dated December 22nd,

12              2018                               307

13   Number 286 - E-mail chain                     311

14   Nubmer 287 - Declaration of Todd Hoffman      331

15

16          (All exhibits attached to transcript.)

17

18

19

20

21

22



Page 7

1                   P R O C E E D I N G S

2                   VIDEOTAPE OPERATOR:  We are now on the

3    record.  This begins Media Number 1 in the

4    deposition of Todd Hoffman in the matter of Al

5    Otro Lado, Inc., et al. versus Kevin McAleenan,

6    et al., in the United States District Court for

7    the Southern District of California.

8                   Today's Wednesday, June 10th, 2020,

9    and the time is 9:04 a.m.  This deposition is

10   being held remotely at the request of Mayer Brown

11   LLP.

12                  The videographer is Solange Tran.  The

13   tech is Josh Pinkus, and the court reporter is

14   Tammy Newton, all three of Magna Legal Services.

15   All counsel and parties present will be noted on

16   the stenographic record.

17                  Will the court reporter please swear

18   in the witness.

19                  COURT REPORTER:  Before I swear in, I

20   need to put a stipulation on.

21                  Does everyone stipulate to the

22   following:  No party to the litigation will



Page 8

1    object to the remote deposition on the grounds

2    that the stenographer may not have the legal

3    authority to swear in the witness?

4            MR. MEDLOCK:  We so stipulate.

5            MS. SHINNERS:  Defendants stipulation.

6                TODD HOFFMAN,

7    after having been duly sworn remotely by the

8    stenographer, was examined and testified as

9    follows:

10       EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

11   BY MR. MEDLOCK:

12       Q    Good morning, Mr. Hoffman.

13       A    Good morning.

14       Q    Can you please state and spell your

15   full name.

16       A    Todd Hoffman.  T-O-D-D, H-O-F-F-M-A-N.

17       Q    Have you ever gone by any other name,

18   Mr. Hoffman?

19       A    No.

20       Q    Are you presently employed?

21       A    Yes.

22       Q    Who are you employed by?



Page 9

```
 1        A      U.S. Customs & Border Protection.

 2        Q      You're currently the executive

 3   director for admissions and passenger programs at

 4   the U.S. -- at U.S. Customs & Border Protection,

 5   correct?

 6        A      Yeah, Admissibility and Passenger

 7   Programs.

 8        Q      Thank you for that correction.

 9               Is that sometimes referred to as APP?

10        A      Correct.

11        Q      If I use the acronym "APP", will you

12   understand me to be referring to Admissibility

13   and Passenger Programs?

14        A      Yes.

15        Q      Okay.  If I use the acronym "CBP" to

16   refer to U.S. Customs and Border Protection

17   today, will you understand the use of that

18   acronym?

19        A      Yes.

20        Q      If I use the acronym "OFO" to refer to

21   the Office of Field Operations within CBP, will

22   you understand the use of that acronym?
```



Page 10

```
 1        A      Yes.

 2        Q      How long have you worked at CBP or its

 3   predecessor organizations?

 4        A      Coming up on 29 years.

 5        Q      So I take it you joined the U.S.

 6   Customs and Inspection Service before CBP was

 7   formed?

 8        A      Yes, U.S. Customs Service.

 9        Q      Have you ever testified in court

10   before, sir?

11        A      Yes.

12        Q      How many times?

13        A      I believe twice.

14        Q      When was the first time that you

15   testified in court?

16        A      When you say "court", I think it was

17   an administrative proceeding, EEO proceeding, I

18   believe before an administrative judge.  That's

19   probably 2008, 2010 time frame.

20        Q      And in that 2008 to 2010 EEO

21   proceeding before an administrative judge, can

22   you tell me what that case was about?
```



Page 11

1        A      I believe it was a non-selection case.

2        Q      Can you explain what you mean by

3    non-selection case?

4        A      Someone felt they were not selected

5    for a position, and they filed an EEO complaint.

6    And that was to the best of my recollection --

7    recollection the proceeding that I was involved

8    with.

9        Q      What did you testify about

10   specifically related to that non-selection case

11   in 2008 or 2010?

12       A      I'm not -- I'm not sure.  Just

13   elements around the selection process, I'm sure,

14   how that position was advertised, how the

15   selection process was formulated, how we

16   ultimately made the decision.  I probably was the

17   recommending official, so it was probably along

18   those lines.

19       Q      Were you given a copy of your written

20   testimony in that case?

21       A      I don't recall.

22       Q      You mentioned that there was a second



Page 12

1    case that you testified in.  When did that case

2    occur?

3        A    That was about two years ago, spring

4    two years ago.

5        Q    What was the nature of that case?

6        A    That was SB-54 with the State of

7    California.

8        Q    Was that case referred to as the

9    United States versus California?

10       A    It could very well be.

11       Q    Was that a deposition or testimony in

12   a courtroom?

13       A    Deposition, I believe.

14       Q    Okay.

15       A    Not in a courtroom.

16       Q    I understand.  What did you testify

17   about specifically regarding SB-54?

18       A    Essentially the impact of the State of

19   California not honoring detainers on undocumented

20   aliens released from custody, state and local

21   custody in the State of California.

22       Q    Do you still have a copy of that



Page 13

1    deposition transcript from --

2         A     I believe --

3         Q     -- the spring of 2018?

4         A     Sorry.  I believe I do, yes.

5         Q     Where is it located, if you know?

6         A     It could be somewhere on my desk or

7    filed in one of my drawers.

8         Q     If we ask you to look for that

9    transcript, do you think that you could find it

10   without too much effort?

11        A     I believe so.

12        Q     Besides the case we were just talking

13   about in spring 2018 related to SB-54, has your

14   deposition ever been taken in any other case?

15        A     I don't believe so.

16        Q     Other than the EEO proceeding in front

17   of the administrative judge, have you ever been

18   involved in an arbitration proceeding before?

19        A     Arbitration, not that I recall.  I

20   don't believe so.  Actually, maybe early on -- I

21   think it was an informal proceeding.  So I'm not

22   sure of arbitration, but it was another type of



Page 14

1    informal EEO proceeding.  I don't think it

2    qualifies for what you're asking.

3         Q    Okay.  And this informal EEO

4    proceeding, do you recall when it occurred?

5         A    2006, I believe.

6         Q    Did you give testimony under oath in

7    that case -- in that informal proceeding?

8         A    No.

9         Q    Okay.  Have you ever testified before

10   a committee or subcommittee of either the U.S.

11   House of Representatives or the United States

12   Senate?

13        A    Yes.

14        Q    On September 24, 2019, you testified

15   before a joint oversight hearing put on by the

16   House Foreign Affairs Committee Subcommittee on

17   Oversight and Investigations -- and

18   Investigation, and the House Judiciary Committee

19   Subcommittee on Immigration and Citizenship; is

20   that right?

21        A    Yes.  That's correct.

22        Q    Was the testimony that you offered to



Page 15

1    that joint hearing truthful?

2         A    Of course.  I was under oath.

3         Q    Sure.  Have you ever provided written

4    or any other written or oral testimony to any

5    Congressional committee or subcommittee?

6         A    Can I have that question again?

7         Q    Sure.  Sometimes you don't show up and

8    sit down and take an oath and testify before

9    Congress, but you provide written answers to

10   questions under oath.

11             Have you ever done that?

12        A    I don't believe so.  Not under oath.

13        Q    Have you ever given any other sworn

14   testimony to the United States Congress, whether

15   in written form or testified orally?

16        A    No, I don't believe so.

17        Q    Outside this case, have you ever

18   provided written testimony under oath in the form

19   of an affidavit or declaration?

20        A    I believe again for the California

21   case, I believe there -- there was an affidavit

22   as well.  But other than that, I don't think so.



Page 16

1      Q     To -- to your recollection, outside of

2   this case, you provided an affidavit or

3   declaration under oath in one other case; is that

4   correct?

5      A     Correct.

6      Q     What was your affidavit or declaration

7   in United States versus California about?

8      A     Again, as I said previously,

9   essentially impact of the State of California not

10  honoring detainers when they are releasing

11  undocumented aliens from custody.

12     Q     Do you still have a copy of that

13  declaration?

14     A     I'm sure I do.

15     Q     Do you know where it would be located?

16     A     Somewhere in my office.  I'm not sure

17  if it's on the corner of my desk or in files.

18     Q     If we asked you to find that

19  declaration, could you do that without too much

20  effort?

21     A     I believe so.

22     Q     Sir, I know this is not your first



Page 17

1    rodeo when it comes to giving testimony under

2    oath.  But just so we're on the same page, I'd

3    like to give you a brief overview of some of the

4    ground rules for today.  Okay?

5         A     Sure.

6         Q     All right.  So a deposition is

7    essentially a conversation, and like I ask you

8    questions and you answer them.  It's important

9    today that you give audible responses.

10              Our court reporter, Ms. Newton, is

11   extremely good, but she can't take down shakes of

12   the head and sometimes words like "uh-huh" and

13   "uh-uh" can sound very similar.  So it's

14   important that you answer my questions verbally

15   and enunciate when doing so.

16              Do you understand that?

17        A     Yes.

18        Q     Most importantly today, if you don't

19   understand my question or if I'm using language

20   that's confusing to you, please say so, and I'll

21   try and improve my question.  Okay?

22        A     Okay.



Page 18

1    Q    But if you don't tell me that you --

2    there's something you don't understand about my

3    question, I'll assume that you understood it.

4    All right?

5    A    Yes.

6    Q    We talked about this before we went on

7    the record, but it's really important in this

8    WebEx environment that we don't talk over each

9    other, and you've been doing a great job of that

10   so far.  Since we can't be in the same room with

11   one another today, please try to pause a couple

12   of seconds before -- before answering my

13   questions.  I'll try to give you the same

14   courtesy.  Okay?

15   A    Yes.

16   Q    All right.  From time to time your

17   attorneys or other attorneys attending this

18   deposition may object to questions that are

19   asked.  That is their right under the Federal

20   Rules of Civil Procedure.  However, for the most

21   part, objections at depositions are something

22   that a judge will rule on later.  So unless your



Page 19

1    attorney instructs you not to answer one of my

2    questions, I'll have -- I'll ask that you answer

3    it today.

4                Do you understand that?

5         A    Yes.

6         Q    Okay.  Also, a very important ground

7    rule.  We will take breaks.  We'll take breaks

8    approximately every hour.  Sometimes I forget

9    that I said that about taking a break every hour.

10   So please remind me.  My only request is that if

11   I have a question pending, that you answer the

12   question before we go on break.

13               Do you understand that?

14        A    Yes, I do.

15        Q    Okay.  Unless I state otherwise today,

16   my questions are going to relate to the time

17   period from January 1st, 2016, through the

18   present.  Do you understand that?

19        A    Yes.

20        Q    Okay.  We went over a few acronyms

21   that relate to this case.  I'd like to go over a

22   couple others.



Page 20

1            During this deposition, I may refer to

2    U.S. Department of Homeland Security as "DHS."

3    Will you understand that acronym if I use it

4    today?

5        A    Yes, I will.

6        Q    During the deposition, I may also

7    refer to a port of entry as a "POE."  If I use

8    that acronym, will you understand that today?

9        A    Yes.

10       Q    From time to time today I may ask you

11   questions about certain practices or policies of

12   CBP.  When I do that, I'm asking you for your

13   personal knowledge.

14           Do you understand that?

15       A    I do.

16       Q    And you understand that you have taken

17   an oath to tell the truth today, correct?

18       A    Yes, I do.

19       Q    And you understand that's the same

20   oath that you would take to tell the truth when

21   you're testifying in a courtroom, correct?

22       A    Yes, I do.



Page 21

1       Q      Do you know of any reason why you

2    cannot testify fully and truthfully in response

3    to my questions today?

4       A      No.

5       Q      Okay.

6              MR. MEDLOCK:   Josh, can we pull up Tab

7    1, please.

8              (Deposition Exhibit Number 252 was

9    marked for identification and attached to the

10   transcript.)

11   BY MR. MEDLOCK:

12      Q      All right, sir.  I put in front of you

13   what we'll mark as exhibit -- we will be marking

14   as Exhibit 252 to your deposition.  It's a

15   multipage document that's entitled on the bottom

16   right corner of the first page "Plaintiff's Third

17   Deposition Notice."

18             Do you see that?

19      A      Yes, I do.

20      Q      Have you ever seen a copy of this

21   document before, sir?

22      A      Not sure.  I may have.  I would have



Page 22

 1    to see more of it.

 2            MR. MEDLOCK:  Josh, can you scroll in

 3    a couple to the second and to the third page of

 4    the notice, please.

 5    BY MR. MEDLOCK:

 6    Q    Looking at the third page of this

 7    notice, sir, do you see your name listed as an

 8    individual whose deposition that's going to be

 9    taken in this case?

10    A    Yes.

11    Q    Okay.  Does that refresh your

12    recollection about whether you've seen this

13    document before?

14    A    Yes, now it does.  Yes, I do.

15    Q    And do you understand that your -- you

16    are here today to testify pursuant to this

17    deposition notice?

18    A    Yes, I do.

19    Q    Are you being represented by any

20    attorneys in connection with this deposition

21    today?

22    A    Other than Katie?



Page 23

1        Q       Well, that's a fair -- that's a fair

2   answer to the question.  Ms. Shinners is one of

3   the attorneys that's representing you today,

4   correct?

5        A       Yes.

6        Q       Okay.  Without going into the

7   substance of any conversations that you've had

8   with Ms. Shinners or any other attorneys

9   regarding this case, have you met with anyone to

10  prepare for today's deposition?

11       A       No, just with our own attorneys and

12  Ms. Shinners.

13       Q       When you say, "our own attorneys,"

14  what do you mean?

15       A       Our CBP, Office of Chief Counsel

16  attorneys.

17       Q       Who are the CBP Office of Chief

18  Counsel attorneys that you met with to prepare

19  for this deposition?

20       A       Louisa Slocum, Stephanie Muffett, and

21  I believe on a couple meetings there was one more

22  attorney and I can't recall her name offhand.



Page 24

1       Q    You said there were at least a couple

2  meetings.  How many attorneys -- how many

3  meetings, sorry, did you have with attorneys from

4  the Office of Chief Counsel at CBP to prepare for

5  today's deposition?

6       A    I believe it's three or four one-hour

7  meetings.

8       Q    So in total, you spent three to four

9  hours with the attorneys from the Office of Chief

10  Counsel, correct?

11       A    Correct.

12       Q    And is Office of Chief Counsel

13  sometimes abbreviated "OCC"?

14       A    Yeah.

15       Q    Where did those meetings with the

16  attorneys from OCC to prepare for your deposition

17  take place?

18       A    Either telephonically or via WebEx.

19       Q    That's fair.  We're not meeting with

20  each other in person any more.  So that's an

21  obvious answer to my question.  Thank you, sir.

22              During those telephonic or WebEx



Page 25

1    meetings, was there anyone who was not an

2    attorney either on the WebEx or on the telephone?

3         A    The first meeting, my deputy may have

4    been invited.  I'm not sure.  Matt Davies.  I

5    don't think he played a role but I think the

6    first meeting he may have been invited on the

7    call.

8         Q    You say he was invited.  Did he

9    actually attend to your recollection?

10        A    Yeah, he was on -- I believe he was

11   on, but I don't recall if he had a speaking role.

12        Q    During those three to four one-hour

13   meetings with OCC to prepare for your deposition

14   today, were you shown any documents?

15        A    Yes.

16        Q    Approximately how many documents were

17   you shown during those three to four one-hour

18   meetings with OCC?

19        A    They provided us several e-mails.  I'm

20   not sure --

21        Q    When you say --

22             (Simultaneous talking.)



Page 26

1       A       -- give or take.

2               COURT REPORTER:  Excuse me.  This is

3       the court reporter.  You were talking over each

4       other.

5       BY MR. MEDLOCK:

6       Q       Sorry.  I'll try to clarify.

7               So in total, your best recollection is

8       that during those three to four meetings with

9       OCC, you were shown approximately 10 documents;

10      is that right?

11      A       Yeah, I think that's kind of ballpark.

12      Q       Did revealing those documents refresh

13      your memory about docs you had forgotten related

14      to metering or queue management?

15      A       I believe so, yes.

16      Q       What were the docs that you had

17      forgotten that were refreshed by looking -- where

18      your memory was refreshed by looking at those

19      documents?

20              MS. SHINNERS:  Objection.  Go ahead.

21      Go ahead, Mr. Hoffman.

22              THE WITNESS:  Yeah, I'm not sure.  I'd



Page 27

1  have to see the documents to be able to respond

2  to that.  I don't know offhand.

3  BY MR. MEDLOCK:

4      Q     Okay.  Do you recall generally what

5  you had forgotten that you then remembered

6  regarding queue management or metering by looking

7  at the documents that were provided to you by

8  OCC?

9      A     No.  Again --

10          MS. SHINNERS:  Object.

11          THE WITNESS:  Sorry.

12          MS. SHINNERS:  Go ahead, Mr. Hoffman.

13          THE WITNESS:  No, I think --

14          MR. MEDLOCK:  Go ahead.

15          THE WITNESS:  I just want to clarify

16  another issue as well.  The Office of Chief

17  Counsel also provided me with the deposition of

18  EAC Owen and Randy Howe.

19          COURT REPORTER:  I'm sorry.  I

20  couldn't understand your answer.

21          THE WITNESS:  I also received the

22  depositions from EAC Todd Owen and Executive



Page 28

1  Director at the time Randy Howe.

2         COURT REPORTER:  What was the last

3  part?

4         THE WITNESS:  Randy Howe.  I'm not

5  sure what you missed.

6         COURT REPORTER:  That's what I missed.

7  BY MR. MEDLOCK:

8     Q    Did you actually review the deposition

9  transcripts of Mr. Owen and Mr. Howe?

10    A    Yes, I did.

11    Q    How long did you spend reviewing those

12  deposition transcripts?

13    A    Probably a couple hours.  They're

14  rather lengthy.

15    Q    I asked too many questions during

16  those depos.  Sorry.

17         Did you review those deposition

18  transcripts in the presence of counsel, or did

19  you do that on your own time without counsel

20  present?

21    A    On my own time.

22    Q    When you reviewed those deposition



Page 29

1   transcripts, did you underline, highlight them,

2   or make any notations on the deposition

3   transcripts?

4        A    I'm sure I did.  I think I probably

5   used highlighter or tabs in some locations.

6        Q    When you highlighted a particular

7   portion of the deposition transcript or put a tab

8   next to them, why did you do that?

9        A    Why did I do it?  Probably to

10  essentially flag a piece of information if I

11  wanted to flip back to it.

12       Q    Was it because you didn't previously

13  know that information or because that testimony

14  refreshed your memory about something you had

15  forgotten?

16       A    It could have been both.

17       Q    Okay.  Do you still have those

18  deposition transcripts that you marked up in

19  preparation for today's deposition?

20       A    Yes, I do.

21       Q    Where are they located?

22       A    Behind me in my conference table.



Page 30

1     Q     So I take it since you know that

2   they're on your conference table, you could find

3   those and produce those to us, if necessary,

4   without much effort at all; is that correct?

5     A     That's correct.

6     Q     Please don't destroy or throw out

7   those deposition transcripts.  All right, sir?

8     A     Yes.

9     Q     In preparation for today's deposition,

10  did you speak to anyone who had previously had

11  their deposition taken in this case?

12    A     I would speak to Executive Director

13  Howe at the time, now field director in Laredo,

14  and EAC Owen.

15    Q     When you spoke to Mr. Howe and Mr.

16  Owen, were any attorneys present for those

17  conversations?

18    A     No.

19    Q     Okay.  When did you speak to Mr. Howe?

20    A     I speak to him routinely.  Probably

21  over the last several weeks.

22    Q     When did you speak to him specifically



Page 31

1    about the -- his deposition?

2        A    Just essentially went through his

3    deposition, just any parts really didn't have

4    much substance just how long the deposition took.

5    Didn't really get into any substance of what he

6    may have testified to.

7        Q    You mentioned that you spoke to EAC

8    Owen regarding his deposition.  When did that

9    conversation take place?

10        A    Probably over the last couple weeks.

11        Q    How long did that conversation last

12    with EAC Owen?

13        A    Just a few minutes.  It was just in

14    passing when I became aware that I was going to

15    be deposed.  Essentially informing him.

16        Q    What, if anything, did Mr. Owen tell

17    you about his experience having his deposition

18    taken in this case?

19        A    He kind of alluded to it's rather

20    uncomfortable and one of the more difficult times

21    in his career.

22        Q    Sorry to hear that.



Page 32

 1          Did Mr. Howe express the same level of

 2    discomfort?

 3      A     No, he did not.

 4      Q     Did Mr. Howe have any comments about

 5    his experience having a deposition taken in this

 6    case other than what you previously mentioned?

 7      A     No, nothing specific.

 8      Q     So we talked about the attorneys from

 9    OCC that you met with.  Did you meet with any

10    attorneys from the U.S. Department of Justice to

11    prepare for today's deposition?

12      A     Yes.

13      Q     I don't want to go into the substance

14    of any conversations you had with the attorneys

15    from the U.S. Department of Justice, but can you

16    tell me how many times you met with the attorneys

17    from the U.S. Department of Justice?

18      A     I believe we had three sessions.

19      Q     And how long were those three

20    sessions?

21      A     About eight hours combined.

22      Q     Who were the attorneys from the U.S.



Page 33

1    Department of Justice that attended those three

2    sessions, if you know?

3        A    Well, Katie Shinners and I believe

4    Susan -- I believe Susan was the other attorney.

5        Q    Okay.  Susan Imerman?

6        A    I'm not sure.

7        Q    Is that correct?  Okay.

8             During those three sessions with the

9    U.S. Department of Justice, and this is just a

10   yes or no question, were you shown any documents?

11       A    During the three sessions?

12       Q    Yes.

13       A    Shown documents?  I'm not sure.  I'm

14   trying to recall.  It might be a WebEx, and I

15   don't know -- I don't believe I was shown

16   documents, but I'm just trying to think.  I think

17   it was just discussion.

18       Q    Okay.  Did anybody who was not an

19   attorney, other than yourself, attend those three

20   WebEx sessions with the attorneys from the U.S.

21   Department of Justice?

22       A    No.



Page 34

1      Q      We've gone over several things you did

2   to prepare for today's deposition, including

3   meeting with attorneys from OCC, meeting with

4   attorneys from U.S. DOJ, having conversations

5   with Mr. Howe and Mr. Owen and reviewing the

6   deposition transcripts of Mr. Howe and Mr. Owen.

7             Can you think of anything else you did

8   to prepare for today's deposition?

9      A      No.  Just in the nature of flipping

10  through my notebooks, just any type of material

11  that may be -- may have been responsive that's

12  been provided.

13     Q      You say you flipped through your

14  notebooks.  What do you mean by "notebooks"?

15     A      The books that I keep -- that I keep

16  notes in when I attend various meetings.

17     Q      How many notebooks do you have in your

18  office that contain notes from meetings that you

19  attend?

20     A      Six notebooks.

21     Q      Okay.  And are they -- do you begin

22  using a new -- a new notebook every year, or do



Page 35

1    you just wait until it fills up with notes and

2    then you move on to the next notebook?

3         A     The latter.  I wait until it fills up

4    and go to the next one.

5         Q     Okay.  Since July 2017, have you

6    thrown out any notebooks that you used to have in

7    your office?

8         A     No.

9         Q     When you take notes regarding a

10   meeting that you attend, do you have a particular

11   process that you use for taking notes?  And by

12   that I mean, do you write down verbatim what is

13   being said, or do you just try to capture the

14   gist of what's being said?

15        A     Probably the gist.  I'm not a very

16   good notetaker.  I don't keep great records as

17   far as when the meeting dates were and things of

18   that nature.  It would just be a greater guide

19   for me.

20        Q     Okay.  Is there some sort of standard

21   that you'll use to decide "I need to take notes

22   at this meeting", or do you just generally take



Page 36

1    notes at every meeting you attend?

2        A      No.   There's no standard.   I may or

3    may not take notes, depending on the nature of

4    the meetings.   I attend a lot of meetings.   So it

5    depends on the nature and if I feel I need to

6    take notes.   Or if I'm going to be briefing out

7    material, kind of what I'm going to say, may be

8    outlined in that same notebook, you know, as far

9    as notes.

10       Q      So sometimes before attending a

11   meeting where you'll need to be speaking, you

12   will jot down a few bullet points to remind you

13   about what you should be saying?

14       A      Correct.

15       Q      When you said you went through your

16   notebooks prior to today's deposition, how long

17   did you spend doing that?

18       A      I believe I did it twice.   In total,

19   probably maybe an hour.

20       Q      And did you do that on your own

21   volition, or did your attorneys instruct you to

22   go through your notebooks?



Page 37

1       A       I did it on my own.

2       Q       Did there come a time at which you

3   gave your notebooks to the attorneys that

4   represent you in this case?

5       A       Yes.  I mean, they reviewed.  They

6   came into the office and reviewed.

7               MS. SHINNERS:  I just want to counsel

8   you, Mr. Hoffman.  I know you're not asking for

9   the substance of the communications.  I just want

10  to make sure he's aware that you're not asking

11  for the substance of communications.

12  BY MR. MEDLOCK:

13      Q       When those attorneys came into your

14  office to essentially take your notebooks, did

15  you have tabs on them of relevant pages, or did

16  you point them to relevant pages of your notes?

17      A       Yes.  I flagged what I believed --

18  what I flagged to be responsive.

19      Q       When you say "responsive", what do you

20  mean by that?

21      A       Anything relating to queue management

22  and, of course, meetings I may have attended.



Page 38

1        Q      Is it possible that you attended

2     meetings related to metering or queue management

3     and did not take notes at those meetings?

4        A      Sure.  It's possible.

5        Q      So it is possible that your notes in

6     your notebook may not reflect every meeting that

7     you -- that you attended related to queue

8     management or metering; is that right?

9        A      It's possible.

10       Q      Do you have any reason to doubt that

11    your notes may not capture the -- every meeting

12    you had related to queue management or metering?

13       A      I would think my notes are pretty

14    comprehensive in that regard.  Queue management

15    was not within my portfolio, but it would come up

16    on occasions where I maybe cared to brief it out

17    in the context of broader immigration issues.

18       Q      What do you mean by it was not in your

19    portfolio?

20       A      It was -- it wasn't my area of

21    responsibility of -- queue management was under

22    Executive Director Randy Howe at the time.



Page 39

1       Q     Who made the decision that queue

2    management would be under Executive Director

3    Randy Howe?

4       A     I'm not sure who exactly made it.  It

5    just was kind of just a natural progression.

6    Probably EAC Todd Owen.  It had to do with the --

7    with the application of resources at ports of

8    entry within the purview --

9              COURT REPORTER:  I'm sorry.  It had to

10   do with application of resources and then what

11   did you say?

12             THE WITNESS:  Within the purview of

13   executive director of operations.

14   BY MR. MEDLOCK:

15      Q     So as I understand it, at the time

16   that Mr. Howe was the executive director of

17   operations, he was responsible for the operations

18   of ports of entry on the U.S.-Mexico border,

19   amongst other responsibilities in his portfolio;

20   is that right?

21      A     That's correct.

22      Q     And as the executive director of



Page 40

1  Admissibility and Passenger Programs, what was

2  under your portfolio?

3      A     Essentially just the policies

4  regarding admissibility and passenger entry.

5  Anything from how to process passengers in

6  primary, how to process processors in secondary,

7  how to conduct adverse action cases, how to

8  properly --

9            COURT REPORTER:  Excuse me.  This is

10 the court reporter.  I'm sorry.  I'm having a

11 hard time, Mr. Hoffman, hearing you.  Is there a

12 way for you to get closer to the mic or get the

13 mic closer to you?  I'm hearing Mr. Medlock fine.

14           THE WITNESS:  I don't know where the

15 mic is on this.  I'll try to speak -- I'll try to

16 get close.

17           COURT REPORTER:  It seems to be a

18 little delay sometimes when you're speaking.  I

19 don't know why, but anyway, sorry.  Go ahead.

20           THE WITNESS:  Again, so I would be

21 responsible for policies regarding admissibility

22 along the border whether --



Page 41

```
 1              COURT REPORTER:  I'm sorry.  I'm still
 2  -- is anybody -- can we go off the record,
 3  please?
 4              MR. MEDLOCK:  Sure.  Let's go off the
 5  record.
 6              MS. Shinners:  Let's go off the
 7  record.
 8              VIDEOTAPE OPERATOR:  The time is 9:41
 9  a.m.  We are going off the record.
10              (Discussion off the record.)
11              VIDEOTAPE OPERATOR:  The time is 9:43
12  a.m.  We're back on the record.
13  BY MR. MEDLOCK:
14     Q     All right.  Thank you for bearing with
15  us, Mr. Hoffman, with the audio issues.  I think
16  before we had the audio problems, the question I
17  asked you was what -- essentially what
18  responsibilities fall under your portfolio as the
19  executive director of Admissibility and Passenger
20  Programs?  Would you mind indulging us in
21  answering that question again?
22     A     Yeah, I mean, many programs.  I have
```



Page 42

1    eight different directors.  It could be anything

2    on the admissibility side as to how to process

3    the policies, how to process passengers on both

4    primary and in secondary, how to collect the

5    proper adverse action cases into our systems of

6    record.

7             In the passenger program side, it's

8    programs like migration, MPP, migration --

9    migration protection protocol; ACA, asylum

10   cooperative agreement; HARP, Humanitarian

11   Assistance Review Program.  Things of that

12   nature.  As they need us for passengers who want

13   to go overseas, global entry, immigration

14   advisory program, and there's many different

15   programs within my portfolio.

16       Q    Thank you for that explanation.  This

17   may be a gross oversimplification.  But is it

18   essentially the case that you work on the

19   admissibility policies, and at the time Executive

20   Director Howe was the executive director of

21   operation, he put those policies into action at

22   the ports of entry at the Southwest border?



Page 43

 1      A      Yeah.  I mean, again, we have the

 2   responsibility within my portfolio policies.  Mr.

 3   Howe is more the day-to-day operations, having

 4   oversight of all the field directors.

 5      Q      Okay.  Thank you.  You mentioned that

 6   you have eight directors who are under you.  Are

 7   those your direct reports?

 8      A      Yes, they are.

 9      Q      Today, who are your direct reports?

10      A      Today, my deputy is Matt Davies, and

11   Luis Mejia, John Maulella.  He's currently on

12   TDY.

13      Q      Can you spell the last names of these

14   individuals for the benefit of the court reporter

15   as you go through.

16      A      Mejia is M-E-J-I-A.

17      Q      And Mr. Maulella's last name?

18      A      I think it's M-A-U-L-E-L-L-A.

19      Q      Okay.  And who were the other five

20   direct reports you have?

21      A      Sikina Hasham, Kurry Pastilong, Peter

22   Acosta.



Page 44

```
 1                COURT REPORTER:  Can you spell these?

 2                THE WITNESS:  Where do I start?  Which

 3      ones do you need?

 4      BY MR. MEDLOCK:

 5           Q     With Mr. Hasham.

 6           A     Hasham, H-A-S-H-A-M.

 7           Q     And then you had another direct report

 8      whose first name was Kurry, I believe.  Can you

 9      give us --

10           A     Kurry Pastilong, P-A-S-T-I-L-O-N-G.

11           Q     Is Mr. Acosta's last name A-C-O-S-T-A?

12           A     Correct.

13           Q     That brings us up to six direct

14      reports.  Who are the remaining two?

15           A     Belinda Garcia.  And then another

16      currently acting as of Monday is Frank Willson.

17           Q     During the period 2016 to the present,

18      was J. Ryan Hutton ever your deputy?

19           A     Yes, he was.

20           Q     And I believe his first name is James,

21      but he goes by Ryan; is that correct?

22           A     That's correct.
```



Page 45

```
 1       Q      What was Mr. Mejia's role or title at

 2   CBP, if you know?

 3       A      Right now, he's my director of --

 4              COURT REPORTER:  Director of what?

 5              THE WITNESS:  Enforcement programs

 6   division.

 7   BY MR. MEDLOCK:

 8       Q      What is the enforcement programs

 9   division responsible for?

10       A      Many of the admissibility issues that

11   I already alluded to.  Essentially how to process

12   adverse action cases, expedited removal.  He's

13   got MPP within his portfolio, ACA, HARP, parole

14   policy, refugee processing, things of that

15   nature.

16       Q      Is there anything -- is there anything

17   else beyond those -- beyond what you mentioned

18   within his portfolio?

19       A      Those are the major and any type of

20   policy changes related to processing different --

21              COURT REPORTER:  I can't hear you

22   again.
```



Page 46

1              THE WITNESS:  I'm up on my computer

2    and speaking pretty loud, so I'm not sure what

3    more I can do.

4              COURT REPORTER:  Well, I could hear

5    you there.

6    BY MR. MEDLOCK:

7         Q    That last answer one more time please.

8         A    I can try to -- the camera

9    is [unintelligible] --

10             MR. MEDLOCK:  Why don't we go off the

11   record for a second while he fixes this.

12             VIDEOTAPE OPERATOR:  The time is 9:49

13   a.m.  We are going off the record.

14             (Discussion off the record.)

15             VIDEOTAPE OPERATOR:  The time is 9:56

16   a.m.  We're back on the record.

17   BY MR. MEDLOCK:

18        Q    Thank you for your patience, Mr.

19   Hoffman.  I appreciate it.

20             Before we went off the record, you had

21   told me a little bit about the portfolio of

22   responsibilities that Luis Mejia has, and I asked



Page 47

1    you whether there was anything else that was

2    within his purview.

3              Do you mind repeating your answer for

4    me?

5        A     Yeah.  I'm not sure where I left off,

6    but I mean, it's not -- you know, that's just not

7    all encompassing what I mentioned.  You know, he

8    has the adverse actions, expedited removal,

9    credible fear, removal process, how to put the

10   policy, how to put the proper adverse actions

11   into our system of record, the migrant protection

12   protocol, MPP, ACA, HARP, refugee processing, and

13   also visa processing, any changes that, you know,

14   as it comes up.  Changes in policy regarding

15   various visa holders, he'll send out the field

16   and things of that nature.

17             So that's the general gist of it.  He

18   probably has other things in his portfolio as

19   well, but those are the main items.

20       Q     Would the metering guidance have

21   fallen into Mr. Mejia's portfolio?

22       A     No.



Page 48

1       Q      Okay.  You mentioned Kurry Pastilong

2  is one of your direct reports.  What -- is it Mr.

3  Pastilong or Ms. Pastilong?

4       A      Mr.

5       Q      What falls into the portfolio of Mr.

6  Pastilong?

7       A      He's in charge of our overseas

8  deployment, the immigration advisory program.

9       Q      Okay.  What is the immigration

10  advisory program?

11      A      It's a program whereby we have our

12  officers stationed at foreign locations, foreign

13  airports.  There's about 20 different locations

14  throughout the world where they work with their

15  foreign counterparts and they're prepositioned.

16  They work closely with our National Targeting

17  Center, and they will adjudicate any security

18  concerns overseas to decide if people are

19  cleared, you know, an acceptable risk to continue

20  to fly on to the United States.

21      Q      Okay.  Thank you for that.  I'd like

22  to go a little bit through your professional



Page 49

1  background.

2          You graduated from Michigan State

3  University in 1990, correct?

4      A     That's correct.

5      Q     And Michigan State did not have the

6  best year in football last year; is that right?

7      A     That is very much correct.

8      Q     Do you think 7 and 6 is an acceptable

9  result?

10     A     I'll take 7 and 6 this year, but yes,

11 it's not -- the program's on the down slide.

12     Q     It's okay.  I'm an Oklahoma State fan.

13 We're always little brother.  So I understand

14 your pain.

15     A     Yeah.

16     Q     But what degree did you receive upon

17 graduation?

18     A     What degree?  Bachelor of arts.

19     Q     And what was your major?

20     A     Criminal justice.

21     Q     You've also completed management

22 development programs at Columbia University,



Page 50

1    Harvard University, and the Naval Postgraduate

2    School; is that correct?

3        A    That's correct.

4        Q    Have you received any other

5    postcollege training outside of your on-the-job

6    training?

7        A    No.

8        Q    And you're a career member of the

9    Senior Executive Service; is that right?

10       A    Yes, that's correct.

11       Q    What is the Senior Executive Service?

12       A    What is it?

13       Q    Yes.

14       A    Just that.  You have -- within the

15   government, Senior Executive Service is above the

16   grade of GS-15.

17       Q    I understand.  After graduating from

18   Michigan State, you joined the U.S. Customs

19   Service as a customs inspector in Buffalo, New

20   York; is that right?

21       A    That's correct.

22       Q    Did you serve with Randy Howe when he



Page 51

1    was at the Buffalo, New York port of entry?

2        A    Yes.  I mean, he -- I was with U.S.

3    Customs.  He was with immigration.  But I recall

4    seeing him in passing.

5        Q    Okay.  From March 1996 to March 1999,

6    you served as a program officer for outbound

7    programs at the U.S. Customs Service headquarters

8    in Washington, D.C., correct?

9        A    Yes, that's correct.

10       Q    If you recall, what does outbound

11   programs mean?

12       A    Outbound programs is just anything

13   relating to outbound enforcement, whether it was

14   the enforcement of currency going outbound,

15   stolen vehicles, you know, sensitive technology

16   and munitions, ensuring if munitions and

17   incentive technology are going out, sometimes

18   they required a license by Department of State

19   and Department of Commerce.

20       Q    From 2001 to 2006, you served at OFO

21   headquarters as the director of the nonintrusive

22   inspection division and a program manager for the



Page 52

1    anti-smuggling division; is that correct?

2         A    Yes, that's correct.

3         Q    And around 2003, DHS was created, and

4    OFO was put under DHS, correct?

5         A    Yes, that's correct.

6         Q    From 2006 to 2011, you served as the

7    area port director for the Los Angeles and Long

8    Beach seaport, correct?

9         A    Yes, that's correct.

10        Q    That's the busiest -- one of the

11   busiest seaports in the world, correct?

12        A    It is.

13        Q    In 2011, you became the area port

14   director for the Los Angeles International

15   Airport, correct?

16        A    Yes, that's correct.

17        Q    How long did you serve in that

18   position?

19        A    I believe around four years.

20        Q    Was your next position executive

21   director of APP?

22        A    Yes, that's correct.



Page 53

1        Q       So sometime around 2015, you became

2   the executive director of APP; is that right?

3        A       Yes.  August 2015.

4        Q       Okay.  Thank you for that precision.

5                In your current role, you have a staff

6   of over 120, correct?

7        A       Correct.

8        Q       But you only have around eight direct

9   reports at any given time; is that right?

10       A       Yes, that's correct.

11       Q       Is there anybody who is not one of

12   your eight direct reports who on an ad hoc basis

13   reports to you?

14       A       No, not that I'm -- no, I don't

15   believe so.

16       Q       Who do you report to, if anyone?

17       A       Yes.  I report to Deputy Executive

18   Assistant Commissioner John Wagner, and the next

19   would be Executive Assistant Commissioner Todd

20   Owen.

21       Q       At any time have you ever had a formal

22   or informal reporting relationship with anyone



Page 54

1   who sits on or staffs the National Security

2   Council?

3       A      Can you ask the question again?

4       Q      Sure.  Let me just try and improve it.

5              At any time have you ever had

6   discussions about immigration policy, or the

7   implementation thereof, with anyone who sits on

8   or staffs the National Security Council?

9       A      Yeah, it's difficult to answer.  I've

10  been to the National Security Council many times,

11  but I don't exactly recall the subject matter, if

12  they were immigration related or otherwise.

13      Q      Do you ever recall attending a meeting

14  of the National Security Council, either the

15  principals or deputy committees, that discussed

16  metering or queue management?

17      A      No.

18      Q      Do you recall ever discussing metering

19  or queue management with any staffer to the

20  National Security Council?

21      A      No.

22      Q      Have you ever attended meetings either



Page 55

1    of the principals committee or the deputies

2    committee of the Domestic Policy Council?

3         A     Not to my knowledge.  Where is the

4    Domestic Policy Council?

5         Q     It's sort of a --

6         A     Where does it reside?

7         Q     It's under the Executive Office of the

8    Presidency, and it's sort of the domestic analog

9    to the National Security Council.

10        A     Yeah, I'm not sure.  I don't recall.

11   I don't believe so.

12        Q     In the course of your work, have you

13   ever spoken to anyone in the Executive Office of

14   the Presidency regarding U.S. immigration policy?

15        A     Yes.  There was a December meeting

16   with Stephen Miller.

17        Q     December of what year?

18        A     2019.

19        Q     And where did this meeting with

20   Stephen Miller take place?

21        A     At the White House.

22        Q     Can you be more specific?  Where in



Page 56

1    the White House?

2         A      I think it was the Situation Room off

3    the west wing.

4         Q      Who else attended this December 2019

5    meeting with Stephen Miller in the Situation

6    Room?

7         A      I'm going to ask if I can speak with

8    Katie regarding privilege.  I'm not sure if I

9    should -- it makes it difficult.

10        Q      Why don't we go off the record, and

11   you all can talk amongst yourselves about the

12   privilege issue.

13              VIDEOTAPE OPERATOR:  The time is 10:07

14   a.m.  We're going off the record.

15              (A brief recess was taken.)

16              VIDEOTAPE OPERATOR:  The time is 10:24

17   a.m.  We are back on the record.

18   BY MR. MEDLOCK:

19        Q      Welcome back, Mr. Hoffman.  Before we

20   took our break, I was asking you about a December

21   2019 meeting with Stephen Miller that occurred in

22   a Situation Room at the White House.  And my



Page 57

1    question was, who else attended the meeting

2    besides yourself and Mr. Miller?

3             Can you answer that question for me,

4    please?

5        A    Yes, I can.  To the best of my ability

6    who I can recall being there, I know is Gene

7    Hamilton from Department of Justice.  With me --

8    with me from CBP was Debbie Seguin and Christina

9    Bobb, and Mark Koumans was there from CIS,

10   Valerie Boyd from the department, Scott Glabe

11   from the department, and there's probably a few

12   others folks in there, several other folks in

13   there.  I don't recall or didn't know their

14   names.  Probably someone from ICE.  I'm not sure

15   who attended from ICE.

16       Q    So it sounds like around the table at

17   this meeting, there was Mr. Miller, Mr. Hamilton,

18   and then representatives from CBP, USCIS, and

19   ICE.  And then you said "the department."  What

20   department were you referring to?

21       A    I'm sorry.  Department of Homeland

22   Security.



Page 58

1      Q      Okay.  How long did this meeting last

2   for?

3      A      At least an hour and a half to two

4   hours, maybe an hour and 45.

5      Q      Were any written materials distributed

6   either in advance of the meeting or at the

7   meeting?

8           MS. SHINNERS:  I'm just going to

9   instruct the witness not to answer to the extent

10   it's asking for the substance of any written

11   materials.

12           MR. MEDLOCK:  Sure.  I was asking what

13   was distributed.  So I'm not asking for the

14   substance.

15           THE WITNESS:  I don't recall.  We may

16   have distributed materials, but I don't -- I

17   don't recall.

18   BY MR. MEDLOCK:

19      Q      Do you recall, without going into the

20   substance of it, whether a presentation in the

21   form of a PowerPoint or other presentation was

22   put up on a screen during that December 2019



Page 59

1    meeting?

2         A     No.  No presentations, no PowerPoint.

3         Q     Were any attorneys present for those

4    meetings?

5         A     I'm not sure how to answer that.  I

6    don't know exactly who was in the room.  And I'm

7    not sure Scott Glabe's position is, if he's an

8    attorney, an advisor, or what his role is.

9         Q     Okay.  That's fair.

10              Do you know whether anyone took notes

11   at this meeting?

12        A     No, not specifically aware.

13        Q     Did you take notes during the meeting?

14        A     I don't recall if I did or not.

15        Q     Do you recall whether there was any

16   instruction that notes should not be taken at the

17   meeting?

18              MS. SHINNERS:  Objection.  I'm going

19   to instruct the witness not to answer.

20   BY MR. MEDLOCK:

21        Q     Are you going to follow your

22   attorney's advice?



Page 60

1        A      Yes.

2               MR. MEDLOCK:  And Katie, just so I

3    understand the privilege objection, is it

4    deliberative process or is it another privilege

5    that you're relying on for that instruction?

6               MS. SHINNERS:  For that instruction, I

7    am instructing the witness not to answer.  I --

8    based on executive privilege.  I only -- only the

9    President can assert the presidential

10   communications privilege, but we are instructing

11   the witness not to answer so the privilege can be

12   preserved.

13              MR. MEDLOCK:  Okay.  We'll probably

14   follow up with you on that in written

15   correspondence, but thank you for explaining.

16   BY MR. MEDLOCK:

17       Q      Sir, do you recall the substance of

18   what was discussed at the meeting?

19              MS. SHINNERS:  I just want to object

20   to the extent it's asking for the substance of

21   the meeting.

22              MR. MEDLOCK:  Sure.  You can answer



Page 61

1    yes or no, whether you recall what was -- what

2    was discussed at the meeting.

3              THE WITNESS:  Katie?

4              MS. SHINNERS:  Again, I just -- he's

5    not asking for the substance.  He clarified.  So

6    I'm not instructing you not to answer this

7    question whether or not you recall the substance.

8              THE WITNESS:  Yes, I do.

9    BY MR. MEDLOCK:

10       Q     Do you recall whether any final policy

11   decisions were arrived at during the meeting with

12   Stephen Miller and Gene Hamilton in December

13   2019?

14             MS. SHINNERS:  Objection; instruct not

15   to answer to the extent it's asking for anything

16   other than his recollection of whether or not a

17   policy decision was reached at the meeting.

18             MR. MEDLOCK:  Sure.  My question --

19   my -- just to clarify my question is yes or no.

20   BY MR. MEDLOCK:

21       Q     Were any final policy decisions

22   reached at that meeting with Stephen Miller and



Page 62

1    Gene Hamilton in December 2019?

2              MS. SHINNERS:  Okay, yeah.  Objection.

3    I'm going to instruct not to answer.

4    BY MR. MEDLOCK:

5        Q    Are you going to follow your

6    attorney's advice, sir?

7        A    Yes.

8              MR. MEDLOCK:  And Katie, is that based

9    on the executive privilege and the presidential

10   privilege as you stated before?

11             MS. SHINNERS:  Again, only the

12   president can assert the presidential

13   communications privilege.  But we are instructing

14   the witness not to answer so that privilege can

15   be preserved.

16   BY MR. MEDLOCK:

17       Q    Sir, can you tell me the substance of

18   what was discussed during this December 2019

19   meeting in the Situation Room with Stephen

20   Miller, Gene Hamilton, and others?

21             MS. SHINNERS:  Objection.  I'm going

22   to instruct Mr. Hoffman not to answer.



Page 63

1   BY MR. MEDLOCK:

2       Q     Are you going to follow your

3   attorney's advice, sir?

4       A     Yes.

5             MR. MEDLOCK:  And so I have a clean

6   record on this, Katie, are you instructing Mr.

7   Hoffman not to answer the prior question based on

8   the executive privilege and the potential that

9   the presidential communications privilege could

10  be invoked?

11            MS. SHINNERS:  Yes.  And I'm sorry if

12  I may not have heard you.  But we are instructing

13  the witness not to answer to preserve the

14  presidential communications privilege and only

15  the President can invoke the privilege.

16            MR. MEDLOCK:  Okay.  Thank you for

17  clarifying.

18  BY MR. MEDLOCK:

19      Q     Sir, what, if anything, did you do as

20  a result of attending this December 2019 meeting

21  with Stephen Miller and Gene Hamilton?

22            MS. SHINNERS:  Objection.  I just want



Page 64

1    to instruct the witness not to answer to the

2    extent if answering would reveal any of the

3    contents of the substance of the meeting in

4    question.  But if you can answer without --

5    without revealing the substance, then please do

6    so.

7            THE WITNESS:  I don't believe I can.

8    BY MR. MEDLOCK:

9        Q    Okay.  So you're going to follow your

10   attorney's advice and not answer the question; is

11   that correct?

12       A    Yes.

13       Q    Did anyone, to your knowledge, call in

14   to this meeting in the Situation Room?

15       A    No.  I don't believe anyone called in.

16       Q    Did anyone attend the meeting remotely

17   via video conference?

18       A    No, not -- I don't recall that.  I

19   don't believe so.

20       Q    Was there anybody who attended the

21   role -- who attended the meeting in the role as a

22   secretary or assistant or adjutant who took



Page 65

1    minutes of the meeting?

2        A    Not to my knowledge.

3        Q    After the meeting, did you receive an

4    e-mail or any written materials containing a

5    readout of what was discussed at the meeting?

6        A    No, I did not.

7        Q    Prior to the meeting taking place, did

8    you receive a meeting invitation or any other

9    communication that laid out an agenda for what

10   would be discussed at the meeting?

11       A    I'm not -- I don't believe so.  I

12   think it was just a typical calendar invite with

13   no agenda.

14       Q    Did you need to do anything to prepare

15   to attend this meeting?

16           MS. SHINNERS:  Objection.  I just want

17   to caution the witness not to answer about the

18   substance, if anything, that you did to prepare,

19   but to the extent the question does not call for

20   that, you can answer.

21           THE WITNESS:  No.  I mean in terms of

22   preparation was just gathering the latest data.



Page 66

 1            MS. SHINNERS:  Objection.  It's a yes

 2   or no question, Mr. Hoffman.

 3            THE WITNESS:  I'm sorry.  Can you

 4   repeat?

 5   BY MR. MEDLOCK:

 6       Q    Sure.  My question was, do you recall

 7   doing anything to prepare for the December 2019

 8   meeting in the Situation Room with Stephen Miller

 9   and Gene Hamilton?

10       A    Yes.

11       Q    Okay.  And you mentioned you were

12   gathering the latest data.  What was the latest

13   data that you were gathering?

14            MS. SHINNERS:  Objection and instruct

15   the witness not to answer on deliberative process

16   privilege grounds and --

17            MR. MEDLOCK:  I think he's -- I think

18   he's waived to the extent he said he gathered

19   data.

20            MS. SHINNERS:  He didn't talk about

21   the substance of the data.

22            MR. MEDLOCK:  I think that's a waiver.


MAGNA
LEGAL SERVICES

Page 67

1  Are you instructing him not to answer the

2  question?

3           MS. SHINNERS:  I'm instructing him not

4  to answer the question on deliberative process

5  privilege grounds.

6           MR. MEDLOCK:  Okay.  We will follow up

7  with you on correspondence about that.

8  BY MR. MEDLOCK:

9     Q     Are you going to follow your

10 attorney's advice, Mr. Hoffman, not to answer my

11 question about what data you were gathering?

12    A     Yes.

13    Q     During the meeting with Stephen Miller

14 and Gene Hamilton in the Situation Room at the

15 White House on December 2019, was metering or

16 queue management discussed?

17          MS. SHINNERS:  Objection.  I'm going

18 to instruct the witness not to answer on

19 deliberative process grounds and -- yeah, go

20 ahead.

21          MR. MEDLOCK:  Are you also preserving

22 the presidential communications privilege, Katie?



Page 68

1              MS. SHINNERS:  Yes, correct.  We are

2    preserving the privilege -- the instruction is to

3    preserve that privilege as well.

4    BY MR. MEDLOCK:

5       Q     Okay.  Sir, are you going to follow

6    your attorney's advice about answering that

7    question?

8       A     Yes.

9       Q     Did the topic of the capacity of ports

10   of entry on the U.S.-Mexico border come up as a

11   topic of discussion during the December 2019

12   meeting with Stephen Miller and Gene Hamilton in

13   the Situation Room at the White House?

14             MS. SHINNERS:  Objection.  Instruct

15   the witness not to answer on deliberative process

16   grounds.

17   BY MR. MEDLOCK:

18      Q     Are you going to follow your

19   attorney's advice, sir, and not answer the

20   question?

21      A     Yes.

22      Q     Do you know whether anyone from the



Page 69

1    National Security staff or the Executive Office

2    of the Presidency listened into the conversation

3    that was occurring in the Situation Room at the

4    White House on December 2019?

5            MS. SHINNERS:  If I may ask -- I

6    apologize, Mr. Medlock.  Can you repeat the

7    question?  I appreciate --

8    BY MR. MEDLOCK:

9        Q    Sure.  That's no problem.  Let me

10   explain.

11           My understanding is that when you have

12   a meeting in the Situation Room, it's quite

13   common for National Security staffers to listen

14   in to that meeting in the Situation Room and take

15   notes that sometimes take the form of a

16   transcript.  Do you know whether that occurred

17   for this December 2019 meeting with Stephen

18   Miller and Gene Hamilton in the Situation Room?

19           THE WITNESS:  Katie?

20           MS. SHINNERS:  If you want to take a

21   break, we can -- we can discuss whether -- the

22   context of any privilege issues.  Mr. Medlock?



Page 70

1           MR. MEDLOCK:  That's fine.  Do you

2    want to take 5 or 10 minutes?

3           MS. SHINNERS:  That works.  Thank you.

4           MR. MEDLOCK:  Thank you.

5           VIDEOTAPE OPERATOR:  The time is 10:39

6    a.m.  We are going off the record.

7              (A brief recess was taken.)

8           VIDEOTAPE OPERATOR:  The time is 10:50

9    a.m.  We're back on the record.

10   BY MR. MEDLOCK:

11      Q    Welcome back, Mr. Hoffman.  Before we

12   went on break, I was asking you whether there was

13   a readout or summary of the meeting you attended

14   in the Situation Room with Stephen Miller, Gene

15   Hamilton, and others that was prepared by the

16   national -- a National Security Council's

17   staffer.

18           Are you able to answer my question?

19      A    Actually, you know, since we're using

20   this format, Katie's -- I don't know if Katie

21   your video is on?

22           MS. SHINNERS:  I'm sorry.  I think you



Page 71

1    asked a slightly different question before the

2    break --

3              MR. MEDLOCK:  Okay.

4              MS. SHINNERS:  -- Mr. Medlock.  I

5    think that's probably the source of confusion for

6    both me and the witness.

7              MR. MEDLOCK:  Okay.  Let me try -- let

8    me try to improve the question then and maybe get

9    around any sort of objection.

10   BY MR. MEDLOCK:

11       Q    My improved question is yes or no.  Do

12   you recall whether there was a readout summary or

13   transcript of the meeting that you attended in

14   the Situation Room with Stephen Miller or Gene

15   Ham -- and Gene Hamilton?

16             MS. SHINNERS:  Objection to, Mr.

17   Hoffman, again to the extent this calls just for

18   do you recall whether there was one of these

19   things, you can answer whether you recall whether

20   there was such a communication.

21             THE WITNESS:  No, I don't recall.

22   BY MR. MEDLOCK:



Page 72

1        Q      Okay.  So it might have existed.  You

2    just don't remember as you sit here today?

3        A      Correct.

4        Q      And you mentioned that you believe

5    this meeting took place in December of 2019.  Is

6    it possible the meeting took place in November?

7        A      No.  I'm pretty clear on the date.

8        Q      Okay.  Have you ever attended any

9    other meetings with either Mr. Miller or Mr.

10   Hamilton?

11       A      One other telephonic meeting with Mr.

12   Miller and several meetings with Mr. Hamilton

13   over the years.

14       Q      Okay.  Let's start with the telephonic

15   meeting with Mr. Miller.  When did that occur?

16       A      I want to say about a year ago.

17       Q      So approximately June of 2019; is that

18   correct?

19       A      Correct.

20       Q      Who else was on the phone besides you

21   and Mr. Miller?

22       A      A couple -- myself -- with me was my



Page 73

1    deputy, Matt Davies.  I believe we had counsel on

2    the phone.  I want to say Julie Koller from our

3    CBP counsel and then Department of State was on

4    the call as well.

5        Q    Do you recall who from the Department

6    of State was on the call?

7        A    Yeah, I can't recall his first name.

8    But Risch.

9        Q    Can you spell that, if you know?

10       A    Maybe it's R-E-I-S-C-H [sic] or

11   something along those lines.

12       Q    Okay.  That's a guess though I guess;

13   is that right?

14       A    Yeah, that's a guess.

15       Q    Okay.  Is there anyone else you recall

16   being on the telephone?

17       A    I think his name is Carl.  Carl Risch.

18       Q    Anyone else who was on this June 2019

19   call?

20       A    Probably one or two Department of

21   State folks that work for Mr. Risch.  I can't

22   recall their names.



Page 74

1        Q        During the meeting, did Ms. Koller

2    provide any legal advice or did anyone provide

3    information to Ms. Koller for the purpose of her

4    providing legal advice?  It's just a yes or no

5    question.

6                MS. SHINNERS:  Objection; calls for

7    legal conclusion.  If possible, I'd actually

8    request another conference with the witness

9    regarding privilege issues.

10               MR. MEDLOCK:  That's fine.  How long

11   do you.

12               MS. SHINNERS:  Thank you.  Five, 10

13   minutes.  I appreciate it.

14               VIDEOTAPE OPERATOR:  The time is 10:55

15   a.m.  We are going off the record.

16                 (A brief recess was taken.)

17               VIDEOTAPE OPERATOR:  The time is 11:15

18   a.m.  We're back on the record.

19               MR. MEDLOCK:  Mr. Hoffman, welcome

20   back.  Just so there's no ambiguity, I'll have

21   the court reporter read back the last question I

22   asked before we went on break.



Page 75

1            COURT REPORTER:  "During the meeting,

2     did Ms. Koller provide any legal advice or did

3     anyone provide information to Ms. Koller for the

4     purpose of her providing legal advice?  It's just

5     a yes or no question."

6            MS. SHINNERS:  And I'm going to insert

7     the same objection.  It calls for legal

8     conclusion, and also, I'm going to instruct the

9     witness not to answer any questions regarding the

10    substance of this conversation on deliberative

11    process and attorney-client privilege grounds.

12    BY MR. MEDLOCK:

13        Q     Mr. Hoffman, are you going to follow

14    your attorneys's advice of not answering my

15    question?

16        A     Yes.

17        Q     Okay.  I don't know if I asked this

18    earlier, but how long did this telephone call

19    last for?

20        A     I'd say probably an hour.

21        Q     Okay.  And did you receive a written

22    agenda of the topics to be discussed prior to the



Page 76

1    June 2019 phone call with Mr. Miller and others?

2              MS. SHINNERS:  And I object to the --

3    instruct the witness not to answer to the extent

4    it would reveal the contents of any agenda, if

5    any.  But you can answer to the extent you can

6    without revealing the contents of any agenda.

7              THE WITNESS:  No, I don't recall

8    receiving an agenda.

9    BY MR. MEDLOCK:

10      Q     Do you recall receiving a summary or

11   readout of the conference call with Stephen

12   Miller and others on June 2019 after it occurred?

13             MS. SHINNERS:  Same instruction.

14             THE WITNESS:  No, I don't believe -- I

15   don't recall, and I don't believe I received a

16   readout.

17   BY MR. MEDLOCK:

18      Q     So, as you sit here today, the only

19   evidence that you can recall what was discussed

20   during this meeting is your own recollection of

21   the events of that meeting; is that correct?

22             MS. SHINNERS:  I'm not -- I'm not



Page 77

1    going to instruct you not to answer, Mr. Hoffman.

2                THE WITNESS:  Okay.  Correct.

3    BY MR. MEDLOCK:

4        Q     Okay.  So we talked about the

5    telephone call with Stephen Miller on June 2019

6    and the Situation Room with Mr. Miller and Mr.

7    Hamilton on December 2019.

8                Do you recall any other meetings,

9    whether in person, over the phone, or over video

10   conference that you have had with Stephen Miller?

11       A     No, I do not.

12       Q     Do you recall, regardless of whether

13   they were a formal meeting, any other

14   communications that you have had with Stephen

15   Miller, whether in person, over the phone, or

16   over e-mail?

17       A     No other communication.

18       Q     I'd like to bring out what we'll mark

19   as Exhibit 253.

20               MR. MEDLOCK:  Josh, can you please

21   bring up the article that I sent you over e-mail

22   recently.



Page 78

1              (Deposition Exhibit Number 253 was

2      marked for identification and attached to the

3      transcript.)

4      BY MR. MEDLOCK:

5          Q      All right, sir.  I put in front of you

6      what we will mark as Exhibit 253 to your

7      deposition.  It is a New Yorker profile piece

8      that appeared in the March 2nd, 2020, issue of

9      The New Yorker.  It is entitled "How Stephen

10     Miller Manipulates Donald Trump to Further his

11     Immigration Obsession," and it is written by

12     Jonathan Blitzer and also confusingly has a

13     second date of February 21st, 2020.

14             Do you see that at the top of exhibit

15     253, sir?

16         A      Yes I do.

17         Q      Have you ever read this piece in The

18     New Yorker before?

19         A      I recall seeing it.  I don't know if I

20     read it.  I don't know if I read the whole

21     article, but I vaguely remember seeing it in a

22     Washington Post.



Page 79

1            MR. MEDLOCK:  Josh, can you please

2    flip to the second page of the article.  I am

3    focused on the first full paragraph of the

4    article.  Josh, can you please blow that up.  All

5    right.

6    BY MR. MEDLOCK:

7        Q    There is a quote here in this article

8    that is attributed to a former administration

9    official regarding meetings with Stephen Miller,

10   and I quote it.  "You go into meetings with

11   Miller and try to get out with as little damage

12   as possible."

13           Did I read that correctly, sir?

14       A    Yes.  You read that correctly.

15       Q    Do you agree with that assessment?

16       A    No, I --

17           MS. SHINNERS:  Objection.

18           THE WITNESS:  -- don't have an opinion

19   one way or another.

20   BY MR. MEDLOCK:

21       Q    After that quote, there is a sentence

22   that begins with "Miller has a habit."



Page 80

1           Do you see that sentence, sir?

2      A     I do.

3      Q     Okay.  That sentence reads, "Miller

4  has a habit of berating officials, essentially

5  lower-ranking ones, for an agency's perceived

6  failures."

7           Did I read that correctly, sir?

8      A     Yes, you did.

9      Q     Okay.  Do you agree with that

10  statement, sir?

11           MS. SHINNERS:  Objection.  I just want

12  counsel -- I just want to note that consistent

13  with former instructions, the witness is not to

14  reveal the substance of any conversations with

15  president -- that were accounted earlier.

16           But otherwise, you can answer the

17  question, Mr. Hoffman.

18           THE WITNESS:  Sure.

19  BY MR. MEDLOCK:

20      Q     Mr. Hoffman, my questions are very

21  simple.  There's a statement about Mr. Miller in

22  this article that I read to you.  Do you agree



Page 81

```
 1   that -- with the assessment that is made in that

 2   sentence?

 3              MS. SHINNERS:  I'm also going to note

 4   for the record that this is irrelevant.

 5              MR. MEDLOCK:  Okay.  Relevance

 6   objections are, of course, observed -- reserved.

 7   So you don't need to make that objection.  We'll

 8   talk about it later.

 9   BY MR. MEDLOCK:

10       Q    Mr. Hoffman, can you answer my

11   question?

12       A    If I could, I'd like to consult with

13   Katie regarding privilege.

14              MR. MEDLOCK:  Okay.  Sure.  Do you

15   want to take 5 or 10 minutes?

16              THE WITNESS:  Yes, that works for me.

17              MR. MEDLOCK:  Okay.  Let's go off the

18   record, and then we can do that.

19              VIDEOTAPE OPERATOR:  The time is 11:24

20   a.m.  We're going off the record.

21              (Discussion off the record.)

22              VIDEOTAPE OPERATOR:  The time is 11:29
```



Page 82

1    a.m.  We're back on the record.

2              MR. MEDLOCK:  All right.  Josh, could

3    you please bring up Exhibit 253.  Thank you.  And

4    I'll have the court reporter read back the last

5    question just so there's no -- we're clear on

6    what's pending.

7              COURT REPORTER:  "My questions are

8    very simple.  There's a statement about Mr.

9    Miller in this article that I read to you.  Do

10   you agree that -- with the assessment that is

11   made in that sentence?"

12             Do you want me to go back further?

13             MR. MEDLOCK:  That's fine.

14   BY MR. MEDLOCK:

15       Q    Sir, can you answer that question?

16       A    What is the question again?  I'm

17   sorry.

18       Q    I'll improve it.  There's a statement

19   in this article from The New Yorker that reads,

20   "Miller has a habit of berating officials,

21   especially lower-ranking ones, for an agency's

22   perceived failures."



Page 83

1            My question is, do you agree with that

2    sentence?

3       A    Yeah.  I'm really not in a position

4    to -- it's tough that I don't always have it.

5    I've only had limited interaction with him.

6            MR. MEDLOCK:  Okay.  Let's move to the

7    second and third paragraph of this article.  Can

8    you please blow those up, Josh.

9    BY MR. MEDLOCK:

10      Q    The second and third paragraphs of

11   this article reads, "One participant in the

12   November meeting pointed out that El Salvador

13   didn't have a functioning asylum system.  'They

14   don't need a system,' Miller interrupted.  He

15   began speaking over people, asking questions,

16   then cutting off the answers.  As the meeting

17   ended, Miller held up his hand to make a final

18   comment.  'I didn't mean to come across as

19   harsh,' he said.  His voice dropped.  'It's just

20   that this is all I care about.  I don't have a

21   family.  I don't have anything else.  This is my

22   life.'"



Page 84

1           Did I read that correctly, sir?

2      A    Yes, it appears so.

3      Q    Okay.  The meeting that you attended

4  with Stephen Miller and Gene Hamilton in the

5  Situation Room of the White House, did that

6  meeting touch on whether El Salvador had a

7  functioning asylum system?

8           MS. SHINNERS:  Objection.  Instruct

9  the witness not to answer.  Same objections as

10  before regarding the content of the meeting in

11  December 2019.

12  BY MR. MEDLOCK:

13     Q    Are you going to follow your

14  attorney's instruction and not answer my

15  question, sir?

16     A    Yes.

17     Q    Okay.  Do you -- during -- I'm sorry.

18  Let me back up and ask the question correctly.

19           During the meeting that you attended

20  with Stephen Miller and Gene Hamilton and others

21  in the White House Situation Room, did Stephen

22  Miller say, "It's just that this is all I care



Page 85

 1    about.  I don't have a family.  I don't have

 2    anything else.  This is my life"?

 3             MS. SHINNERS:  Objection.  Same

 4    instruction not to answer on the same grounds

 5    regarding the content of the December 2019

 6    meeting.

 7    BY MR. MEDLOCK:

 8       Q    Mr. Hoffman, are you going to follow

 9    your attorney's advice and not answer my

10    question?

11       A    Yes.

12       Q    Okay.  I'd like to move on to Gene

13    Hamilton, if I could.  I think you previously

14    said you had several interactions with Mr.

15    Hamilton.  Approximately how many actions --

16    interactions have you had with Gene Hamilton?

17       A    Three or four.

18       Q    And we talked about the December 2019

19    meeting in the Situation Room at the White House.

20    Is that amongst the three or four interactions

21    you had with Gene Hamilton?

22       A    Yes.



Page 86

1      Q      Can you tell me whether the other

2   three interactions you had with Gene Hamilton

3   occurred?

4          MS. SHINNERS:  So counsel, the line of

5   questioning, while -- while I understand your

6   note that relevance objections are preserved, I

7   do want to note that you're not asking questions

8   about communications that may relate to any

9   issues in this lawsuit.  That Mr. Hoffman --

10         MR. MEDLOCK:  We disagree.  That's a

11  speaking objection.  As you understand under

12  Federal Rules of Civil Procedure 30(d), the

13  objection should be short, not argumentative, and

14  not suggest a question -- and not suggest an

15  answer.  What you're basically doing there is

16  testifying.  I won't have it.  So please confine

17  yourself to actually objecting and not

18  testifying.  And I disagree with your assessment.

19  BY MR. MEDLOCK:

20      Q      So I'll go back to my question, Mr.

21  Hoffman.  We talked about one interaction that

22  you had with Mr. Hamilton in December -- around



Page 87

1    December 2019.

2              When did the other three interactions

3    that you had with Mr. Hamilton occur?

4        A    I believe two interactions were dating

5    back to 2017 with the executive orders related to

6    travel restrictions, and it might have been two

7    or three at that time.

8        Q    Okay.

9              MS. SHINNERS:  And --

10   BY MR. MEDLOCK:

11       Q    So all -- all the other three related

12   to -- occurred in 2017?

13       A    To my knowledge, there may have been

14   one meeting in between 2017 and 2019, but I can't

15   say for sure.

16       Q    Okay.  In the course of your

17   interactions with Gene Hamilton, has the topic of

18   metering or queue management ever come up?

19              MS. SHINNERS:  Object to the extent

20   that -- again, I'm going to have to consult again

21   with the witness about each of these

22   conversations to determine what privilege issues



Page 88

1    are present.  So I am going to have to take

2    another break.

3                MR. MEDLOCK:  Okay.  How long do you

4    want?

5                MS. SHINNERS:  At least 10 minutes.

6                MR. MEDLOCK:  Okay.  That's fine.

7                MS. SHINNERS:  Thank you.

8                VIDEOTAPE OPERATOR:  The time is 11:36

9    a.m.  We're going off the record.

10               (A brief recess was taken.)

11               VIDEOTAPE OPERATOR:  The time is 11:52

12   a.m.  We're back on the record.

13               MR. MEDLOCK:  All right, Mr. Hoffman.

14   Welcome back.  I'll ask the court reporter to

15   read back my last question.

16               COURT REPORTER:  "In the course of

17   your interactions with Gene Hamilton, has the

18   topic of metering or queue management ever come

19   up?"

20               MS. SHINNERS:  And I'm --

21   BY MR. MEDLOCK:

22       Q    Can you answer that, sir?  Sorry.



Page 89

1          MS. SHINNERS:  I'm going to instruct

2     the witness not to answer to the extent --

3     because the question encompasses the December

4     2019 meeting for the same reasons asserted

5     previously.

6     BY MR. MEDLOCK:

7          Q     All right, sir.  Are you going to

8     follow your attorney's instruction to not answer

9     my question?

10         A     Yes.

11         Q     Okay.  All right.  Have you ever heard

12     of something called the Homeland Security

13     Advisory Council?

14         A     Yes.

15         Q     What is it?

16         A     It is an advisory council, as you say.

17     It's usually made up of senior representatives

18     that will typically, you know -- best way I can

19     probably say, typically may research specific

20     issues that provide advice to leadership within

21     the Department of Homeland Security.

22         Q     And the members of the Homeland



Page 90

1    Security Advisory Council or HSAC are typically

2    in the private sector; is that right?

3         A      That's correct.

4         Q      And in some cases, the members of HSAC

5    have prior experience at DHS or one of its

6    components, correct?

7         A      That is correct.

8         Q      Have you ever heard of something

9    called the FCCP subcommittee of the -- of HSAC?

10        A      I'm not aware of the acronym.  If you

11   could maybe say the name, maybe I would be aware.

12        Q      Okay.  I believe the FCC committee --

13   FCCP subcommittee stands for Families and

14   Children Care Panel.  Have you ever heard of

15   that?

16        A      I don't recall that name, but I recall

17   that's a topic they were looking into

18   researching.

19             MR. MEDLOCK:  All right.  Josh, can

20   you please pull up Tab 2, please.

21                (Deposition Exhibit Number 254 was

22   marked for identification and attached to the



Page 91

1    transcript.)

2    BY MR. MEDLOCK:

3        Q    All right, sir.  I'm showing you what

4    will be marked as Exhibit 254 to your deposition.

5    It's a multipage meeting invitation that bears

6    the Bates numbers AOL-DEF-00222388 through '390.

7             Do you see that document in front of

8    you, sir?

9        A    I do.

10       Q    Okay.  If you focus at the top of the

11   document, this appears to be a meeting invitation

12   for a November 14, 2018, conference call.

13            Do you see that?

14       A    Yes, I do.

15            MR. MEDLOCK:    Okay.  And Josh, can

16   you please blowup the list of required attendees.

17   BY MR. MEDLOCK:

18       Q    If you look on this list, do you see

19   your name listed as a required attendee for the

20   meeting, sir?

21       A    I do.

22       Q    Okay.  You would have received this



Page 92

1   meeting invitation in the course of your work at

2   CBP, correct?

3        A     Yes, that's correct.

4        Q     And you would have kept and maintained

5   this meeting invite in your calendaring system,

6   correct?

7        A     Yes, it should be there.  I wouldn't

8   delete it.

9        Q     Okay.  Do you use Microsoft Office?

10       A     Yes.

11       Q     Okay.  All right, cool.  So I'll use

12  that as a reference point going forward.

13             Would receiving and responding to

14  meeting invitations like this one be part of your

15  job at CBP?

16       A     I'm sorry.  Can you repeat the

17  question?

18       Q     Sure.  Part of your job at CBP was

19  that you would -- amongst many other things, that

20  you would receive meeting invitations, and you

21  would respond to them?

22       A     Yeah.  I would -- I don't respond to



Page 93

1    them.  I would receive.

2        Q    Okay.  Understood.  Do you have any

3    reason to believe that this meeting invitation

4    that we've marked as Exhibit 254 to your

5    deposition is inauthentic in any way?

6        A    No, I have no reason to question the

7    authenticity.

8            MR. MEDLOCK:  Okay.  Josh, can we,

9    please, focus on the subject of the meeting.  All

10    right.

11    BY MR. MEDLOCK:

12        Q    Mr. Hoffman, if you look at the

13    subject line, it states that the subject of the

14    meeting is "Wednesday, November 14 conference

15    call at 3 p.m. Eastern; CBP subcommittee briefing

16    on forecasted impact of POTUS proclamation and

17    rule on asylum."

18            Did I read that correctly?

19        A    You did.

20        Q    Okay.  And if you look at the meeting

21    organizer section of the invitation, it shows

22    that the meeting was organized by Catherine



Page 94

1    Fraser; is that right?

2         A    Correct.

3         Q    Okay.  What was Ms. Fraser's position

4    or role at CBP at this time, if you know?

5         A    I know she work for Randy Howe I

6    believe in operations, and I think she was

7    designated as the point person to assist HSAC in

8    anything that they needed.  She was kind of the

9    point of contact for the agency.

10        Q    Do you know if any outside attorney

11   participates in HSAC meetings?

12        A    I'm not aware.

13        Q    Okay.  Did you ever speak during HSAC

14   meetings, or were you primarily listening?

15        A    No.  I mean, I've had some interaction

16   with them.  I believe we briefed a certain number

17   of members of HSAC in the past, and I probably --

18   I recall being involved in a conference call with

19   them as well.

20        Q    Do you recall whether you spoke on

21   this November 14, 2018, conference call with

22   HSAC?



Page 95

1    A    That I can't tell you. Really the

2    subject does not ring a bell with me.

3    Q    Okay. Do you know --

4    A    Sorry.

5    Q    Sorry. I didn't mean to interrupt.

6    Go ahead.

7    A    No. I just said I'm not aware of that

8    specific topic.

9    Q    Do you know a member of HSAC named

10   Karen Tandy?

11   A    Yes, I believe she was the lead.

12   Q    When you say, "she was the lead," was

13   she the lead on the Families and Child Care

14   Panel?

15   A    I believe so.

16   Q    Do you know an individual named Jayson

17   Ahern who was on HSAC?

18   A    Yes.

19   Q    Do you know whether he had a role with

20   respect to the FCCP subcommittee?

21   A    Yes, I believe he was on that

22   committee.


MAGNA
LEGAL SERVICES

Page 96

1      Q     Do you know a member of HSAC who goes

2   by the name of Stewart Baker?

3      A     Yes.

4      Q     And Mr. Baker was also on the FCCP

5   subcommittee; is that right?

6      A     I believe he was.

7      Q     And Mr. Baker is a lawyer at the law

8   firm Steptoe LLP, correct?

9      A     I -- I don't know.

10          MR. MEDLOCK:  Okay.  Josh, can we

11   bring up Tab 3, please.

12          (Deposition Exhibit Number 255 was

13   marked for identification and attached to the

14   transcript.)

15   BY MR. MEDLOCK:

16      Q     I put in front of what we will mark as

17   Exhibit 255 to your deposition.  It's a multipage

18   e-mail exchange bearing the Bates numbers

19   AOL-DEF-00027534 through '535.

20          And my question to you, sir, is this

21   appears to be a November 14, 2018, e-mail

22   exchange between Stewart Baker, Jay Visconti,



Page 97

1    Randy Howe, yourself, and others; is that

2    correct?

3        A      Yes, that's what it appears to be.

4        Q      Okay.  And the subject line of the top

5    e-mail in the chain reads, "Re: Today's CBP

6    subcommittee call."

7               Did I read that correctly?

8        A      Yes, you did.

9        Q      And you would have received this

10   e-mail chain in the course of your work at CBP,

11   correct?

12       A      Correct.

13       Q      You would have kept and maintained

14   this e-mail in your e-mail system at CBP,

15   correct?

16       A      Correct.

17       Q      And receiving e-mail chains like this

18   one was a part of your job at CBP; is that right?

19       A      That's correct.

20       Q      Do you have any reason to believe that

21   this e-mail chain is inauthentic in any way?

22       A      No, I do not.



Page 98

1      Q     At the top of this e-mail there's an

2   e-mail from Jay Visconti.  Do you see that?

3      A     I do.

4      Q     Do you recall what Mr. Visconti's role

5   or title was at CBP at the time this e-mail

6   exchange occurred in November 2018?

7      A     No.  I was believe he was assigned --

8   he's a border patrol agent, I believe, assigned

9   to the commissioner's office.

10      Q     Okay.  I'd like to focus on the e-mail

11   that Stewart Baker sent on November 14, 2018, at

12   10:32 a.m.  It starts on the bottom of the first

13   page of this exhibit, which ends in 534, and goes

14   on to the next page, which ends 535.

15           MR. MEDLOCK:  Josh, is there a way you

16   can blowup the contents of that e-mail?  Thanks

17   very much, Josh.

18   BY MR. MEDLOCK:

19      Q     So the subject line of Mr. Baker's

20   e-mail is "Today's call," correct?

21      A     Correct.

22      Q     And Mr. Baker sent that e-mail from



Page 99

1    the e-mail address sbaker@steptoe.com.

2            Do you see that?

3    A    I do.

4    Q    And in his e-mail, Mr. Baker notes he

5    has to drop off the call early at 3:30 but there

6    were some questions he'd love to hear answers on.

7            Do you see that?

8    A    Yes, I do.

9    Q    And beneath that he has four bullet

10   points that have several questions associated

11   with them, correct?

12   A    Correct.

13   Q    I want to focus on the second bullet

14   point.  Mr. Baker writes, "How will we handle

15   asylum seekers at the POEs?  Will they have a

16   line separate from others seeking to cross -

17   tourists, businessmen, et cetera?  Do the asylum

18   seekers wait in Mexico while their case is

19   scheduled and adjudicated?"

20           Did I read that correctly?

21   A    Yes, you did.

22   Q    The last question in that sentence



Page 100

1   relates to the migration protocols or MPP,

2   correct?

3       A     State your question again.

4       Q     Sure.  So there's several questions in

5   that bullet point that I read to you.  The last

6   question about whether asylum seekers will wait

7   in Mexico, does that relate to MPP?

8             MS. SHINNERS:  Objection; calls for

9   speculation.  Go ahead.  You can answer.  Sorry,

10  Mr. Hoffman.

11            THE WITNESS:  Yeah, I'm not aware of

12  what he's referring to.  I can't -- I'm not sure

13  what he's referring to.

14  BY MR. MEDLOCK:

15      Q     Do you recall whether Mr. Stewart's

16  questions in the second bullet point were

17  answered during the November 14, 2018, HSAC

18  meeting?

19      A     I don't recall.  I don't believe I

20  attended this meeting.  So I'm -- I'm not sure.

21      Q     What leads you to believe you didn't

22  attend this meeting?



Page 101

1      A      I don't recall again, like I said

2  earlier, the topic and these questions, these

3  specific questions.  I just -- I don't recall

4  attending this meeting.

5      Q      Okay.  So you don't recall, meaning

6  you might have attended but you don't know right

7  now; is that right?

8      A      Correct.  I don't believe I did, but

9  again, it's going back a few years.

10     Q      Okay.  Let's focus on the third bullet

11 point in this e-mail.  That bullet point reads,

12 "The litigation: DHS has cited parts of the INA

13 that confer great discretion on the secretary;

14 opponents cite a provision making clear that

15 asylum will be granted to everyone who shows up

16 on U.S. soil and claims it.  What's our best

17 legal argument in defense of denying asylum

18 claims for illegal border crossers?"

19            Did I read that correctly?

20     A      You did.

21     Q      Do you recall whether this question

22 was discussed during the November 14, 2018,



Page 102

1   meeting?

2       A    No, I don't recall.  Again, I don't

3   believe I attended this meeting.

4            MR. MEDLOCK:  Okay.  You can take that

5   down, Josh.

6   BY MR. MEDLOCK:

7       Q    I'd like to move on and ask you about

8   metering and queue management more directly.

9   First, I just want to make sure that we're

10  talking about the same thing, Mr. Hoffman.  Do

11  you -- sorry.

12           MS. SHINNERS:  I thought now might be

13  an okay break.  I need a quick test break because

14  some of my chat functions are not enabled.  We

15  can either go off the record or --

16           MR. MEDLOCK:  Sure.  Can I just finish

17  this one question because it will be pretty

18  simple?

19           MS. SHINNERS:  Certainly.

20  BY MR. MEDLOCK:

21      Q    Mr. Hoffman, do you use the terms

22  queue management and metering to mean the same



Page 103

1    thing?

2        A     Yes, I do.

3        Q     Okay.  Now we can take this break.

4    Let's go off the record.

5              VIDEOTAPE OPERATOR:  The time is 12:10

6    p.m.  We're going off the record.

7              (A brief recess was taken.)

8              VIDEOTAPE OPERATOR:  The time is 12:13

9    p.m.  We're back on the record.

10   BY MR. MEDLOCK:

11       Q     Welcome back, Mr. Hoffman.  When did

12   CBP first issue written metering guidance to the

13   field offices on the U.S.-Mexico border?

14       A     I believe that was January 28th, 2019.

15       Q     Sorry.  Can you say that time again?

16             (Simultaneous crosstalk)

17       A     I believe it was January 28th, 2019.

18       Q     Okay.  And that's the best of your

19   recollection; is that correct?

20       A     I'm sorry.  Can you say the -- what

21   was -- did you say MPP?

22       Q     No.  Let me -- let me clarify.  Maybe



Page 104

1   we're talking past each other.  I'll repeat my

2   question.

3           When did CBP first issue written

4   guidance regarding metering or queue management

5   to field offices on the U.S.-Mexico border?

6       A    I apologize.  I was -- I heard MPP.  I

7   misunderstood.  So that was the MPP date I gave

8   you.  I believe it was April 27th, 2018.

9       Q    Okay.  Are you aware of whether there

10  was previous guidance issued by CBP prior to

11  April 27th, 2018, regarding metering travelers at

12  land border -- at Southwestern border ports of

13  entry?

14      A    No, I'm not aware.

15      Q    Have you ever seen a copy of final

16  metering guidance that was issued prior to April

17  27th, 2018?

18      A    Not that I recall.

19      Q    Would you doubt that metering guidance

20  existed in the written form prior to April 27,

21  2018?

22      A    It may have existed because I know it



Page 105

1    was being done in locations such as San Ysidro,

2    but I don't know if it was in any formal policy.

3    I'm not aware --

4         Q    Did you ever -- sure.

5              Did you ever see a memoranda from Todd

6    Owen or anyone else in the Senior Executive

7    Service at OFO regarding metering that was issued

8    prior to April 27, 2018?

9         A    No, not that I recall.

10        Q    Okay.  Isn't it true that in November

11   2016, senior CBP officials were looking for

12   proposals that would have a deterrent effect on

13   sending populations?

14        A    What was that last -- can you -- the

15   last part?

16        Q    Sure.  Would have a deterrent effect

17   on sending populations.

18        A    I'm sorry.  I don't -- I can't pick up

19   that second to last word, what you're saying.

20        Q    Sending.  Sending populations.

21        A    Sending?

22        Q    Yep.



Page 106

1          A       I'm sorry.  I don't understand the

2    term or the question.

3          Q       Okay.  Do you recall ever seeing

4    e-mail communication in which CBP officials were

5    looking for proposals that would have a deterrent

6    effect on asylum seekers coming to ports of entry

7    on the Southwestern border?

8          A       Not offhand.  I don't recall.

9               MR. MEDLOCK:  Okay.  Josh, can we

10   bring up Tab 4, please.

11               (Deposition Exhibit Number 256 was

12   marked for identification and attached to the

13   transcript.)

14   BY MR. MEDLOCK:

15         Q       Sir, I put in front of you what will

16   be marked as Exhibit 255 [sic] to your

17   deposition.  It's an October 31st through

18   November 2nd, 2016, e-mail exchange that bears

19   the Bates numbers AOL-DEF-00043575 through '83.

20               Do you see that document in front of

21   you, sir?

22         A       I do --


MAGNA
LEGAL SERVICES

Page 107

1              COURT REPORTER:  This is the court

2    reporter.  This is the court reporter.  You said

3    Exhibit 255.  It's actually 256.

4              MR. MEDLOCK:  Thank you for the

5    correction.  This will be 256.  Thank you.

6    BY MR. MEDLOCK:

7        Q    All right, sir.  I'd like to focus

8    with you on an e-mail that Blas Nunez-Neto sent

9    on November 1st, 2016, at 7:14 p.m., which starts

10   on the page Bates number AOL-DEF-00043577.

11             MR. MEDLOCK:  Josh, could you, please,

12   turn to that page.

13   BY MR. MEDLOCK:

14       Q    At the very bottom of '577 sir, do you

15   see an e-mail that begins from Blas Nunez-Neto on

16   November 1st, 2016, at 7:14 p.m.?

17             MR. MEDLOCK:  Actually, one further

18   down.  Josh, the very last two sentences on the

19   page.

20   BY MR. MEDLOCK:

21       Q    Do you see the header for that e-mail,

22   sir?



Page 108

1      A      I do.

2      Q      Okay.  To your recollection, what was

3    Mr. Nunez-Neto's role or title at CBP in November

4    2016?

5      A      He was a counselor to the

6    commissioner.

7      Q      And who would the commissioner of CBP

8    been in November 2016?

9      A      I believe it was Commissioner

10   Kerlikowske.

11             MR. MEDLOCK:  Okay.  Can we flip in

12   one page further, please, Josh.  And can you

13   please enlarge the e-mail.

14   BY MR. MEDLOCK:

15     Q      The subject line of this e-mail that

16   goes from Page '577 to '578 on Exhibit 256 is

17   "Re: IJ and asylum surge."  Is that correct?

18     A      Correct.

19     Q      Okay.  And I want to look at the

20   bottom of this e-mail, the last paragraph that's

21   blown up in front of you, that begins with a

22   number of proposals.



Page 109

1              Do you see that paragraph, sir?

2       A      I do.

3       Q      Okay.  Mr. Nunez-Neto writes, "A

4  number of proposals are being considered to more

5  quickly process and transfer individuals in CBP

6  custody to Immigration and Customs Enforcement

7  (ICE), as well as to add temporary detention

8  capability."

9              Did I read that correctly, sir?

10      A      You did.

11      Q      And was that actually the case in

12  November 2016?

13      A      I believe so.  I believe there were

14  considerations to adding capacity.

15      Q      Was one of those considerations

16  opening a combined processing center in El

17  Centro, California?

18      A      Yes, that was one of the potential

19  options or something that we were pursuing.

20      Q      Did that joint processing center in El

21  Centro, California ever open?

22      A      No, it did not.



Page 110

1      Q      Do you know why it did not open?

2      A      No, I do not.

3      Q      Do you know who made the decision to

4   not open the processing center in El Centro,

5   California?

6      A      No, I do not.

7      Q      Let's move to the next sentence in Mr.

8   Nunez-Neto's e-mail in the same paragraph.  He

9   writes, "There is also a need for proposals, such

10  as the one below, that would have a deterrent

11  effect on the sending populations."

12             Did I read that correctly?

13     A      Yes, you did.

14     Q      Okay.  And if you look at the top of

15  this e-mail, you received this e-mail; is that

16  correct?

17     A      Yes.

18     Q      And you would have received this

19  e-mail in the course of your duties at CBP,

20  correct?

21     A      Yes, that's correct.

22     Q      And this e-mail would have been kept



Page 111

1    and maintained by you in your e-mail system at

2    CBP, correct?

3         A    Correct.

4         Q    And receiving e-mails like this one

5    from Mr. Nunez-Neto was part of your job at CBP,

6    correct?

7         A    Correct.

8         Q    Do you have any reason to believe that

9    this e-mail from Mr. Nunez-Neto in November 2016

10   is inauthentic in any way?

11        A    No, I do not.

12        Q    All right.  Let's move -- let me ask

13   you this question actually, sir, if I can back up

14   for a second.

15             Isn't it true that as early as

16   November 2016, CBP had written guidance

17   concerning metering?

18        A    I'm not aware.  It's possible.  I'm

19   not sure if there was written guidance.  I don't

20   think there was formal policy guidance.  But

21   again, I'm not aware of it.  I don't recall any

22   type of guidance.



Page 112

1     Q     Do you expect -- would you expect as

2   the executive director of APP that you would have

3   known if written metering guidance was issued in

4   November 2016?

5     A     No, not necessarily.  I mean, I might

6   be aware of it or might recall it if shown

7   specific documents.  But again, I became aware of

8   the April 27th, 2018, guidance that was sent out.

9          MR. MEDLOCK:  Okay.  Let's bring up

10  Tab 5, if we could, Josh.

11          (Deposition Exhibit Number 257 was

12  marked for identification and attached to the

13  transcript.)

14  BY MR. MEDLOCK:

15    Q     Sir, what's in front of you is what

16  will be marked as Exhibit 257 to your deposition.

17  It's a July 13, 2017, e-mail chain that has the

18  Bates number AOL-DEF-0094022 through '23.  And if

19  you look at the top of the e-mail chain, sir,

20  this appears to be an exchange of e-mails amongst

21  Jennifer Schroeder-Fawcett, Sidney Aki, Julie

22  Koller -- Julie Koller, Luis Mejia, and yourself;



Page 113

1    is that correct, sir?

2         A     Yes.

3         Q     You would have received this e-mail in

4    the course of your work at CBP, correct?

5         A     Yes, that's correct.

6         Q     And you would have kept and maintained

7    this e-mail -- sorry.  Go ahead, Katie.

8              MS. SHINNERS:  If I could interject,

9    given that this e-mail has lawyers on it, I just

10   want to look at it more closely.  It appears that

11   it may be a privileged --

12             COURT REPORTER:  It may be what?  I'm

13   sorry?

14             MS. SHINNERS:  Excuse me.

15   Attorney-client privileged.

16             MR. MEDLOCK:  Okay.  Do you want a

17   moment to look at it, Katie?

18             MS. SHINNERS:  Yeah, I was going to

19   mute my -- hold on just a second.

20             MR. MEDLOCK:  Katie, can we go off the

21   record real quick?  I think I can tell you

22   something that will help with your decision here.



Page 114

1  You're on mute.

2           MS. SHINNERS:  Yes, that will be

3  helpful.  Thank you.

4           MR. MEDLOCK:  Okay.  Can we please go

5  off the record.

6           VIDEOTAPE OPERATOR:  The time is 12:28

7  p.m.  We're going off the record.

8           (Discussion off the record.)

9           VIDEOTAPE OPERATOR:  The time is 12:29

10  p.m.  We're back on the record.

11           MR. MEDLOCK:  Josh, can you please

12  enlarge the top e-mail in the chain, which would

13  be the July 13, 27 e-mail -- 2017 e-mail at 4:29

14  p.m.

15  July 13, 2017, e-mail chain

16     Q     All right.  Mr. Hoffman, I want to

17  focus on this e-mail for a moment, if I can.  You

18  would have received this e-mail in the course of

19  your duties as an employee of CBP, correct?

20     A     Correct.

21     Q     And this e-mail -- you would have kept

22  this e-mail and maintained it in your e-mail



Page 115

1    system at CBP, correct?

2         A    Yes.

3         Q    And receiving e-mails like this one

4    from Jennifer Schroeder-Fawcett was a part of

5    your job at CBP, correct?

6         A    Correct.

7         Q    Do you have any reason to believe that

8    this e-mail that Ms. Schroeder-Fawcett sent on

9    July 13, 2017, at 4:29 p.m. is inauthentic in any

10   way?

11        A    No, I do not.

12        Q    Okay.  I want to focus with you on the

13   attachment to this e-mail, and I'm looking at the

14   last attachment to the e-mail.  That

15   attachment -- the name of that attachment is

16   "Metering of travelers guidance.docx."

17             Do you see that?

18        A    Up in the attachments, yes.

19        Q    Okay.  Do you have any explanation for

20   why CBP would have a document called "Metering of

21   travelers guidance.docx" that existed on July 13,

22   2017, if, to your recollection, there was no



Page 116

1    formal metering guidance issued until April 2018?

2         A    No.  I mean, again, I thought the lead

3    in San Diego was doing metering as needed and

4    maybe some other ports at that time.  But again,

5    it was not formalized to later guidance.  So I'm

6    not sure if it was informal policy.  I'm not

7    sure.

8         Q    Okay.  You -- as you sit here right

9    now, you don't believe that any sort of metering

10   was happening in ports of entry prior to April

11   27, 2018, was formalized until the metering

12   guidance memo was sent to the field on April 27,

13   2018; is that right?

14        A    Correct.  That's my understanding.

15             MR. MEDLOCK:  Okay.  Josh, can we

16   please bring up Tab 6.

17   BY MR. MEDLOCK:

18        Q    All right, sir.  I'm showing you what

19   we will mark as Exhibit 258 to your deposition.

20   I'll represent to you that the metadata for this

21   document shows that it was created on November

22   12th, 2016, and it is a memorandum with the



Page 117

1    subject line Metering at the south -- at

2    Southwest border POEs.

3              Do you see that, sir?

4              MS. SHINNERS:  I'm sorry.  It looks

5    like this is a draft document that -- for

6    which -- that was not finalized.  So I would like

7    to claw it back as deliberative process.

8              MR. MEDLOCK:  So okay.  So we will

9    oppose that deliberative process invocation.

10   This is the only existing version of this 2016

11   metering guidance that was produced to us by CBP.

12   And it appears to us to be in a final format.

13             I will make an offer of proof for the

14   record when we move on this that I had

15   approximately 40 to 50 questions to ask about

16   this document and to compare it to the 2018

17   metering guidance and was going to focus on many

18   aspects of this document.  We strongly disagree

19   with the deliberative process.

20             MS. SHINNERS:  There's also --

21             MR. MEDLOCK:  Can I just finish my --

22             MS. SHINNERS:  Absolutely.



Page 118

1  Absolutely.

2          MR. MEDLOCK:  Sure.  We also believe

3  that this document goes to the intentions, the

4  motivations of CBP as an organization with

5  respect to metering, especially when compared to

6  the April 2017 -- April 27, 2018, metering

7  guidance, and that this falls squarely within the

8  rubric of documents that Magistrate Judge

9  Crawford has already ruled.  Even if they were

10 somehow deliberative and pre-decisional are

11 nevertheless discoverable because the

12 deliberative process privilege is not an absolute

13 privilege.

14         I'm done with my statement, Katie.  Go

15 ahead.

16         MS. SHINNERS:  Okay.  Yeah, I just

17 wanted to note that I believe our assertion of

18 privilege extends also to AC privilege, the

19 attorney-client privilege, because to the extent

20 attorneys were involved in drafting.  So it is a

21 draft that is not a final version.

22         In addition, it -- it will reflect



Page 119

1    legal advice of counsel.  So I just wanted to add

2    the attorney-client privilege objection.

3              MR. MEDLOCK:  Okay.

4              MS. SHINNERS:  Excuse me -- assertion.

5    And I think we will -- for the record of this

6    deposition, you are agreeing not to ask questions

7    about this document for the time?

8              MR. MEDLOCK:  Well, you've invoked a

9    clawback.  We need to discuss it.  I won't ask

10   questions about the document.  I will say we are

11   going to hold this deposition open, and we will

12   issue a new deposition notice for Mr. Hoffman to

13   bring him back and ask him questions about this.

14             We will put in June 19, 2020, as a

15   placeholder date, with the understanding that if

16   we have to bring Mr. Hoffman back, it will likely

17   be after the close of discovery.  So I think

18   we'll need to cooperate on that issue, Katie.

19   But you know, I can't ask questions about a

20   document you've clawed back, even though I

21   strongly disagree with your assertion that this

22   document is privileged.



Page 120

1            MS. SHINNERS:  Okay.  Thank you.

2            MR. MEDLOCK:  Okay.  Josh, can you

3    take down exhibit -- Tab 6, which is Exhibit 258.

4    BY MR. MEDLOCK:

5        Q     All right, Mr. Hoffman.  Do you have

6    any recollection independent of the document that

7    was just shown to you of written metering

8    guidance being issued to field offices on the

9    Southwest land border with Mexico in November

10   2016?

11       A     I do not recall any guidance being

12   issued.

13       Q     Do you recall -- do you recall Todd

14   Owen issuing a memorandum in November of 2016

15   that said that metering would be implemented due

16   to recent -- a recent migratory surge along the

17   Southwest land border?

18       A     No, I do not recall.

19       Q     Do you recall Todd Owen issuing a

20   memorandum in November of 2019 [sic] that said

21   that metering was being implemented in

22   collaboration with the government of Mexico?



Page 121

1      A      November 2019 you said?

2      Q      2016.  If I misspoke, I apologize.

3      A      No, I'm not -- I don't recall.

4      Q      Do you recall Mr. Owen issuing a

5  memorandum in November of 2019 [sic] that stated

6  in substance that ports of entry could create two

7  lines outside the port of entry, one for asylum

8  seekers and one for everyone else?

9      A      Again, for clarification, you said

10  November 2019?

11      Q      2016.  Again, if I misspoke, I'm

12  sorry.

13      A      No, I do not recall.

14      Q      Do you recall a memorandum that was

15  issued by Todd Owen in November 2016 that stated

16  in substance that metering should only begin when

17  a port of entry hit its maximum holding capacity?

18      A      No, I do not recall.

19      Q      Ports of entry on the U.S.-Mexico

20  border have holding rooms for migrants that have

21  designated maximum holding capacities; is that

22  right?



Page 122

1      A      Correct.

2      Q      And A holding capacity for a port of

3  entry is, in your mind, different than the

4  operational capacity of the (unintelligible) at a

5  port of entry, correct?

6            COURT REPORTER:  This is court

7  reporter.  You kind of broke up in your question.

8  BY MR. MEDLOCK:

9      Q      Okay.  I'll ask it again.

10           Mr. Hoffman, isn't it true that there

11  is a difference between the holding capacity of a

12  space in a port of entry on the U.S.-Mexico

13  border and the operational capacity of a space at

14  a port of entry on the U.S.-Mexico border?

15      A      Correct.  That's my understanding.

16           MR. MEDLOCK:  Okay.  Josh, can you,

17  please, bring up Tab 7.

18           (Deposition Exhibit Number 259 was

19  marked for identification and attached to the

20  transcript.)

21  BY MR. MEDLOCK:

22      Q      All right, sir.  I put in front of you



Page 123

1   what will be marked as Exhibit 259 to your

2   deposition.  It's a November 12th, 2016, to

3   November 15, 2016, e-mail chain that bears the

4   Bates numbers AOL-DEF-00056133 through '36.

5           Do you see that document in front of

6   you, sir?

7       A    I do.

8       Q    If you look at the very top of the

9   first page of the exhibit, there's an e-mail from

10  James Ryan Hutton to yourself; is that correct?

11      A    Yes.

12      Q    Okay.  And so you would have received

13  this e-mail chain in the course of your duties at

14  CBP, correct?

15      A    Correct.

16      Q    And you would have kept and maintained

17  the e-mails in this chain in your e-mail system

18  at CBP, correct?

19      A    Correct.

20      Q    And receiving e-mails like this one

21  was part of your job at CBP, correct?

22      A    Correct.



Page 124

1       Q     Do you have any reason to believe that

2   this e-mail chain shown in Exhibit 259 is

3   inauthentic in any way?

4       A     No, I do not.

5             MR. MEDLOCK:  Josh, can we go to the

6   last page of the exhibit?  And if you could go up

7   one more page.  I apologize.

8   BY MR. MEDLOCK:

9       Q     All right.  At the bottom of the page

10  ending in '135 of Exhibit 259, there's an e-mail

11  that Frank Longoria sent on Saturday, November

12  12th on 2016 at 2:42 p.m.

13            Do you see that, sir?

14      A     Yes, I do.

15      Q     And the subject line of that e-mail is

16  "Meeting with INM."

17            Do you see that?

18      A     Yes.

19      Q     What is INM, sir?

20      A     INAMI or Mexican immigration.

21      Q     Okay.  And the e-mail is addressed to

22  port directors; is that right?



Page 125

1       A      Yes.

2              MR. MEDLOCK:  Okay.  Josh, can you

3    flip to the next page, please.  And can you

4    blowup -- enlarge the e-mail for us, Josh.

5    BY MR. MEDLOCK:

6       Q      All right, sir.  Focused on the first

7    paragraph of the e-mail that begins with "At the

8    request of C-1 and C-2, you are to meet with your

9    INM counterpart and request they control the flow

10   of aliens to the port of entry."

11             Did I read that correctly, sir?

12      A      Correct.

13      Q      What does "C-1" and "C-2" mean in that

14   sentence?

15      A      Typically, we use that for shorthand

16   for commissioner and deputy commissioner.

17      Q      And at the time of this e-mail in

18   November 2016, the commissioner of CBP was Gil

19   Kerlikowske, correct?

20      A      I believe so.

21      Q      Was the -- at the time this e-mail,

22   was the deputy commissioner of CBP Kevin



Page 126

1   McAleenan?

2       A      Potentially.  I'm not sure if he was

3   in that role at that time.  Probably.  But I'm

4   not exactly sure.

5       Q      Okay.  I'd like to move down to the

6   second paragraph of this e-mail.  Mr. Longoria

7   writes, "If INM cannot or will not control the

8   flow, your staff is to provide the alien with a

9   piece of paper identifying a date and time for an

10  appointment and return then to Mexico."

11          Did I read that correctly, sir?

12      A      Correct.

13      Q      There appears to be a typo in that

14  sentence.  That should say "return them to

15  Mexico," not "return then to Mexico," correct?

16      A      Correct.

17          MS. SHINNERS:  Object; calls for

18  speculation.  But yes, go ahead.

19          MR. MEDLOCK:  Fair enough.

20  BY MR. MEDLOCK:

21      Q      And then the next sentence in that

22  paragraph -- sorry.  I should back up.  Let me



Page 127

1   ask a better question.

2          That paragraph goes on to state, "This

3   is similar to what San Diego is doing.  We

4   understand the alien may express a fear of

5   returning to Mexico, and we will address as the

6   situation dictates."

7          Did I read that correctly, sir?

8      A   You did.

9      Q   Do you have any recollection of Gil

10  Kerlikowske or Kevin McAleenan requesting that

11  the port director in the Laredo field office meet

12  with their counterparts at INM to request that

13  they control the flow of aliens coming to the

14  port of entry in November of 2016?

15     A   No, I have no knowledge related to

16  that issue.

17     Q   The next paragraph of the e-mail from

18  Frank Longoria reads, "Please schedule a meeting

19  with your INM counterparts ASAP."

20          Did I read that correctly?

21     A   Correct.

22     Q   And he goes on to write that he will



Page 128

1    "need a summary of the meeting to include who at

2    INM the CBP officers met with, what was

3    discussed, what was agreed to, and

4    issues/concerns and timeline."

5            Did I read that correctly?

6      A     Correct.

7      Q     Okay.  Do you recall receiving any

8    e-mails regarding agreements between CBP officers

9    in the Laredo field office and their counterparts

10   at INM?

11     A     No, I don't recall receiving e-mails.

12     Q     Do you recall whether CBP officers in

13   the Laredo field office reached any agreements

14   with their counterparts of INM to meter the flow

15   of noncitizens coming to ports of entry in the

16   Laredo field office?

17     A     No, I'm not aware of any agreement.

18     Q     I want to make sure that I understand.

19   You, as you sit here today, are not aware of any

20   formal metering guidance issued by Todd Owen on

21   November 12th, 2016; is that right?

22     A     Correct.  I'm not aware of that


MAGNA
LEGAL SERVICES

Page 129

1    guidance.

2        Q     And you are not aware of any request

3    from Commissioner Kerlikowske or Deputy

4    Commissioner McAleenan in November 2016 for the

5    Laredo field office to work with INM to control

6    the flow of noncitizens coming to the ports of

7    entry in the Laredo field office; is that right?

8        A     Correct.

9        Q     Do you have any reason to doubt that

10   Commissioner Kerlikowske and Deputy Commissioner

11   McAleenan did, in fact, instruct ports of entry

12   to meet with their counterparts at INM to help

13   meter the flow of noncitizens coming to ports of

14   entry in November 2016?

15       A     Again, it's difficult for me to

16   comment back in 2016.  I do not know if any of

17   this -- if there was any direction for this to

18   occur.

19       Q     Do you believe that Frank Longoria is

20   stating something inaccurate in this e-mail?

21       A     I know Mr. Longoria kind of had a

22   reputation of getting ahead of himself for doing



Page 130

1    things that were not exactly always appropriate

2    or proper at times or following the proper chain

3    of command.

4        Q    Do you know whether Mr. Longoria is

5    lying in this e-mail about a directive coming

6    from Commissioner Kerlikowske and/or Commissioner

7    McAleenan regarding metering the flow of

8    noncitizens coming to ports of entry with the

9    assistance of INM?

10       A    Again, I don't know.  I'm -- I'm not

11   familiar.  I don't recall this specific e-mail or

12   his motivation for authoring it to his port

13   directors.

14       Q    Based on your interactions with Mr.

15   Longoria, do you believe him to be a liar?

16       A    No.  I've had limited interactions

17   with Mr. Longoria, if any.  I just know my

18   deputies and Mr. Hutton and others, Mr. Mejia who

19   followed Mr. Hutton have had issues with Mr.

20   Longoria.

21       Q    So what you know about the issues

22   for -- regarding Mr. Longoria, it's all



Page 131

1    secondhand information, correct?

2        A    Correct.

3        Q    You don't have any direct interactions

4    with Mr. Longoria that would lead you to believe

5    that he did not do things by the book?

6        A    Not direct, no.

7        Q    So that I can be really clear here,

8    everything that you testified to regarding Mr.

9    Longoria not doing things by the book comes from

10   statements made by other employees at CBP; is

11   that correct?

12       A    Correct.  And again, I want to

13   clarify, not necessarily doing things by the

14   book, but, you know, not following -- maybe

15   taking liberties and twisting direction that was

16   given to him or not following policy as

17   appropriate are some of the issues that my

18   deputies and directors had with Mr. Longoria.

19       Q    Do you know whether Mr. Longoria was

20   taking liberties when he sent this e-mail on

21   November 12th, 2016?

22       A    I don't know for sure, no.



Page 132

1      Q     Do you know whether Mr. Longoria was

2   twisting guidance when he sent this e-mail on

3   November 12th, 2016?

4      A     It gives me pause that he may have

5   been twisting guidance.  For him at his level to

6   say that this came from C-1 and C-2 gives me

7   pause.

8      Q     Do you have any direct evidence that

9   Mr. Longoria was twisting guidance that was given

10  to him when he wrote this e-mail on November

11  12th, 2016?

12     A     No.  No direct guidance.

13     Q     When you -- when you said "direct

14  guidance," you meant no direct evidence; is that

15  right?

16     A     I'm sorry.  Direct evidence.

17     Q     And when you said that the phrase at

18  "the request of C-1 and C-2" gave you pause, you

19  don't have any evidence to backup the -- your

20  assumption that Mr. Longoria was twisting words

21  from guidance that was given to him?

22     A     Correct.  I have no evidence.



Page 133

1          Q      It's just a hunch on your part; is

2     that right?

3          A      Correct.

4          Q      You're guessing and speculating that

5     Mr. Longoria was twisting guidance in this

6     e-mail, correct?

7          A      Correct.

8          Q      Do you have any direct evidence that

9     Mr. Longoria was not following CBP policy when he

10    sent this e-mail on November 12th, 2016?

11              MS. SHINNERS:  Objection; vague.

12              THE WITNESS:  No, I do not.

13              COURT REPORTER:  Did you object, Ms.

14    Shinners?

15              MS. SHINNERS:  I did.  Objection,

16    vague.  Thank you.

17              MR. MEDLOCK:  Let's bring up Tab 8, if

18    we can please, Josh.

19              (Deposition Exhibit Number 260 was

20    marked for identification and attached to the

21    transcript.)

22    BY MR. MEDLOCK:



Page 134

1      Q      All right, Mr. Hoffman.  I put in

2    front of you what we marked Exhibit 260 to your

3    deposition.  It's a December 6, 2017, e-mail

4    chain between Randy Howe, Pete Flores, yourself,

5    and others that have the Bates numbers

6    AOL-DEF-00538311 through '12.

7              Do you see that document in front of

8    you, sir?

9      A      Yes.

10     Q      I should explain.  The Bates numbers

11   are just a word that attorneys use.  This guy

12   named John Bates many, many years ago came up

13   with a way of sequentialing labeling documents

14   and patented it.  So we've used that word ever

15   since.  So it just refers to the document to the

16   number in the bottom right-hand corner if you

17   were curious about that.

18     A      Okay.

19     Q      Do you see those numbers, sir?

20     A      I do.

21     Q      If you look at the top e-mail in this

22   e-mail chain it is an e-mail from you to Pete



Page 135

1    Flores with a copy to Randy Howe on December 6,

2    2017, at 10:13 a.m.

3              Do you see that e-mail, sir?

4    A      Yes.

5    Q      Okay.  So you would have sent and

6    received the e-mail in this e-mail chain in the

7    course of your duties at CBP, correct?

8    A      That's correct.

9    Q      And you would have kept and maintained

10   the e-mails in Exhibit 260 in your e-mail -- in

11   your e-mail system at CBP; is that right?

12   A      That's correct.

13   Q      And sending e-mails -- sending and

14   receiving e-mails, like the ones in this chain,

15   was part of your job at CBP, correct?

16   A      Correct.

17   Q      Do you have any reason to believe that

18   the e-mail chain depicted in Exhibit 260 is

19   inauthentic in any way?

20   A      No, I do not.

21             MR. MEDLOCK:  Let's go to the last

22   page of the exhibit, if we can, Josh.  All right.



Page 136

1    The last e-mail in -- Josh, can you enlarge the

2    last e-mail in the chain?

3    BY MR. MEDLOCK:

4         Q    All right.  Mr. Hoffman, this e-mail

5    chain starts with what appears to be a meeting

6    invitation that was sent by Elmer A. Jarava,

7    J-A-R-A-V-A, at CBP.

8              Do you see that, sir?

9         A    I do.

10        Q    Okay.  And the subject line of that --

11   the subject for that meeting was "Metering at San

12   Ysidro."

13             Do you see that?

14        A    Yes.

15        Q    And this meeting was supposed to take

16   place on December 6, 2017, from 1 p.m. to 2 p.m.

17             Do you see that?

18        A    Yes.

19        Q    And in the description that

20   accompanies this meeting invitation, Mr. Jarava

21   writes, "Directors, XD Howe requests your

22   participation on a conference call regarding



Page 137

1    metering at San Ysidro and the messaging

2    describing the process."

3              Did I read that correctly?

4    A      Correct.

5    Q      And in addition to you, Pete Flores,

6    Sidney Aki, Ryan Hutton, Joseph Draganac, Carl

7    Campbell, and Randy Howe are invited to the

8    meeting, correct?

9    A      Correct.

10   Q      Do you recall attending this meeting?

11   A      No, I don't recall it offhand.

12   Q      Do you recall anything that was

13   discussed at this meeting?

14   A      No.  Unfortunately, I don't.  Being

15   dated so far back, I do not.

16   Q      Did you take any notes at this

17   meeting, to your recollection?

18   A      Not to my recollection.

19   Q      Do you have any reason to doubt that a

20   meeting did occur on December 6, 2017, discussing

21   the messaging describing the process of metering

22   at San Ysidro?



Page 138

1        A    No.  No reason to doubt.

2             MR. MEDLOCK:  Josh, can we please

3    bring up Tab 9.

4             (Deposition Exhibit Number 261 was

5    marked for identification and attached to the

6    transcript.)

7    BY MR. MEDLOCK:

8        Q    Sir, I put in front of you what we

9    will mark as Exhibit 261 to your deposition.  It

10   is a December 6, 2017, e-mail chain between Randy

11   Howe, Pete Flores, yourself, and others.  And it

12   has the Bates numbers AOL-DEF-00538311 through

13   '12 -- Oh, I'm sorry.  I put the wrong number 9

14   in front -- I apologize.  This is a -- let me go

15   back and redescribe it.

16            This is a December 6, 2017, e-mail

17   chain that is only a one-page document appears

18   the Bates number AOL-DEF-00091729.

19            Do you see that, sir?

20       A    Yes.

21            MR. MEDLOCK:  Okay.  And can we go

22   ahead and enlarge the last e-mail in the chain



Page 139

1    please, Josh.

2    BY MR. MEDLOCK:

3        Q       Sir, I put in front of you an enlarged

4    version of a December 6, 2017, e-mail that was

5    sent by Randy Howe at 5:34 a.m. to Pete Flores.

6                Do you see that?

7        A       Yes.

8        Q       And the subject line of that is

9    "Call", correct?

10       A       Correct.

11       Q       And I realize you weren't on this

12   e-mail, so I'll read it to you and ask you a

13   follow-up question.

14               Mr. Howe writes, "Pete, we had a

15   discussion with OCC this morning on metering and

16   our messaging describing it.  Can you and Sidney

17   can on a call with me Hoffman and Hutton."

18               Did I read that correctly?

19       A       Yes.

20       Q       There's evidently a typo in the last

21   sentence in that e-mail, correct?

22       A       It appears to be a typo, yes.


MAGNA
LEGAL SERVICES

Page 140

1       Q      Okay.  Do you recall getting on a call

2    with Sidney Aki, Pete Flores, and Ryan Hutton on

3    December 6, 2017, to discuss metering and the

4    messaging describing it?

5       A      No, it doesn't stand out.  I don't

6    recall it offhand.

7       Q      Do you have any reason to doubt that

8    such a call actually did occur?

9       A      No, no reason to doubt.

10             MR. MEDLOCK:  All right.  Can we

11   please bring up Tab 10, please, Josh.

12             (Deposition Exhibit Number 262 was

13   marked for identification and attached to the

14   transcript.)

15   BY MR. MEDLOCK:

16      Q      All right, Mr. Hoffman.  I put in

17   front of you a memorandum that has the date April

18   27, 2018, entitled "Metering Guidance."  It bears

19   the Bates number AOL-DEF-0009133.

20             Do you see that, sir?

21      A      I do.

22      Q      And this is the metering guidance



Page 141

1    memorandum that you were speaking about earlier

2    today, correct?

3         A    That's correct.

4         Q    This is the first written guidance on

5    metering that you recall CBP disseminating to

6    field offices on the U.S.-Mexico border, correct?

7         A    Correct.  That's my understanding.

8    This was the first uniform guidance across the

9    entire Southwest border.

10        Q    Okay.  You would have received a copy

11   of this metering guidance on or about the time it

12   was issued on April 27, 2018, correct?

13        A    Correct.

14        Q    In fact, you sent the metering

15   guidance to the director of field operations for

16   the -- for land border crossings on the

17   U.S.-Mexico border on April 27, 2018; is that

18   right?

19        A    I believe that's correct.  I believe I

20   sent it out.

21        Q    And you would have kept and maintained

22   a copy of the April 27, 2018, metering guidance



Page 142

1    in your file at CBP, correct?

2          A      That's correct.

3          Q      And receiving and sending the metering

4    guidance was a part of your job at CBP, correct?

5          A      Correct.

6          Q      Looking at Exhibit 262, do you have

7    any reason to believe that the exhibit is

8    inauthentic in any way?

9          A      No, I do not.

10         Q      I'd like you to take a look at the

11   metering guidance, which I assume you're familiar

12   with; is that right?

13         A      Yes, that's correct.

14         Q      Do you see any reference in the April

15   27, 2018, metering guidance to the metering

16   guidance being issued in response to a surge of

17   migrants on the Southwest border with Mexico?

18         A      I don't see anything specific to the

19   surge.

20         Q      There's no reference to that in the

21   text of the memorandum; is that right?

22         A      I'm -- I'm not seeing it.



Page 143

1      Q     And there's no reference in the text

2    of the April 27, 2018, metering guidance to the

3    guidance being implemented in cooperation with

4    the government of Mexico, is there?

5      A     Well, it alludes to in cooperation

6    with Mexico.  Obviously we have to work with

7    INAMI.

8      Q     There's no direct reference in the

9    memorandum, is there?

10     A     No direct reference.

11     Q     I think you said it alludes to such

12   cooperation; is that right?

13     A     Correct.

14           MS. SHINNERS:  Objection.

15           COURT REPORTER:  What was -- what was

16   your objection?

17           MS. SHINNERS:  The document speaks for

18   itself.

19   BY MR. MEDLOCK:

20     Q     Okay.  Let's help the document speak a

21   little bit, Mr. Hoffman.  The April 27, 2018,

22   metering guidance also does not mention the



Page 144

1    phrase "maximum holding capacity" anywhere in the

2    text of the guidance, correct?

3        A    Well, it alludes to it in ports'

4    processing capacity.

5        Q    You think that's a reference to the

6    maximum holding capacity of a port of entry?

7        A    Yes.  It could be a part of it.

8        Q    Okay.  Is it a reference, in your

9    mind, to holding capacity or operational

10   capacity?

11       A    It could be a combination of both.

12       Q    Do you know, as you sit here today,

13   whether this April 27, 2018, metering guidance

14   intended to allow [unintelligible] to the meter

15   when they hit their maximum holding capacity or

16   when they hit their maximum operational capacity?

17            COURT REPORTER:  Can you repeat your

18   question?  I'm sorry.  You broke up a little in

19   the middle.

20            MR. MEDLOCK:  I apologize.

21   BY MR. MEDLOCK:

22       Q    My question was, Mr. Hoffman, do you



Page 145

1    know whether the April 27, 2018, metering

2    guidance was intended to allow ports of entry to

3    meter when they hit their maximum holding

4    capacity or when they hit their maximum

5    operational capacity?

6         A    Well, again, it's a combination of

7    both because it says ports processing capability,

8    which includes resource capability and detention

9    capacity as well.

10        Q    So one of the factors that ports of

11   entry are supposed to look at when deciding

12   whether they should meter the flow of noncitizens

13   without proper travel documents entering the port

14   of entry under this April 27, 2018, metering

15   guidance is whether the port had hit its maximum

16   detention capacity; is that right?

17        A    Yeah, I believe that was the main

18   driver from the issue the ports experienced in

19   2016.

20        Q    So the main driver of the April 27,

21   2018, metering guidance was concerns regarding

22   detention capacity, correct?



Page 146

1     A     Correct.

2     Q     Did you assist in drafting the April

3  27, 2018, metering guidance?

4     A     No, I don't believe I assisted in any

5  way.

6     Q     Did any one of your direct reports at

7  APP assist in drafting the April 27, 2018,

8  metering guidance?

9     A     Yes, I believe my deputy at the time,

10  Ryan Hutton, worked on that.

11     Q     How about Luis Mejia, did he work on

12  it?

13     A     He may have.  I believe he was here.

14  He may have assisted Mr. Hutton.

15     Q     Did you provide any feedback on draft

16  of the April 27, 2018, metering guidance?

17     A     I may have.  I remember Mr. Hutton

18  vaguely, I remember him working on it, and he may

19  have either informed me verbally or maybe showed

20  me a draft or two.  I don't recall.  But if any

21  input, I had minimal input.

22     Q     To your knowledge, who else at CBP or



Page 147

1    DHS played a role in drafting the April 27, 2018,

2    metering guidance?

3         A     From my recollection, a couple

4    attorneys within the Office of Chief Counsel here

5    at CBP.

6         Q     Do you recall who those attorneys at

7    OCC were?

8         A     I believe it was Bennett Courey and

9    Julie Koller.

10        Q     Do you recall whether anyone outside

11   of CBP or DHS played a role in drafting the 20 --

12   the April 27 -- sorry.  Let me -- I keep getting

13   my words mixed up.  Let me back up.  I'll ask a

14   better question.

15             Mr. Hoffman, you testified to an

16   individual at CBP who played a role in drafting

17   the April 27, 2018, metering guidance.  Do you

18   know whether anyone outside of CBP or DHS played

19   a role in drafting the April 27, 2018, metering

20   guidance?

21        A     Yes.  I believe our Office of Chief

22   Counsel also worked with Department of Justice.



Page 148

1    Q    Do you recall who at the Department of

2  Justice assisted in drafting the April 27, 2018,

3  metering guidance?

4    A    No, I do not.

5    Q    Do you know whether attorneys at the

6  Office of Immigration Litigation, or OIL, at DOJ

7  played a role in drafting the April 27, 2018,

8  metering guidance?

9    A    No, I'm not sure.  I do not know.

10    Q    Do you know whether any member,

11  deputy, or staffer of the National Security

12  Council was consulted about drafts of the April

13  27, 2018, metering guidance?

14    A    Not to my knowledge.

15    Q    Do you know whether any member of the

16  HSAC or Homeland Security Advisory Council was

17  consulted about drafts of the April 27, 2018,

18  metering guidance?

19    A    No, not to my knowledge.

20    Q    Do you know whether Stephen Miller was

21  consulted about the April 27, 2018, metering

22  guidance?



Page 149

1        A      No, not to my knowledge.

2        Q      When you say -- when you say, "No, not

3    to my knowledge" in response to my question, are

4    you saying that those individuals might have been

5    consulted, but you're just not aware of it?

6        A      From my point of view, I'm saying no,

7    I have no knowledge that they were involved.

8        Q      Okay.  So they could have been

9    consulted, but you just might not have been in

10   the loop on that?

11       A      My answer -- my answer stands as I

12   stated.

13       Q      Do you know whether Gene Hamilton was

14   consulted about the April 27, 2018, metering

15   guidance?

16       A      No, not to my knowledge.

17       Q      Do you know whether anyone at the

18   Executive Office of the President was consulted

19   about the April 27, 2018, metering guidance?

20       A      No, not to my knowledge.

21       Q      Do you know whether any White House

22   staffer was consulted about the April 27, 2018,



Page 150

1    metering guidance?

2         A      No, not to my knowledge.

3         Q      Do you know whether the President or

4    Vice-President were consulted about the April 27,

5    2018, metering guidance either before or after it

6    was issued?

7         A      No, not to my knowledge.

8         Q      Besides the attorneys at DOJ, Mr.

9    Hutton, Mr. Mejia, and the attorneys at OCC, are

10   you aware of anyone else that played a role in

11   drafting the April 27, 2018, meeting guidance?

12        A      In drafting it, no, I'm not -- I don't

13   recall anyone else being involved.

14        Q      Do you recall anyone other than Mr.

15   Hutton, Mr. Mejia, the attorneys at OCC, and the

16   attorneys at DOJ who played any role in

17   finalizing, drafting, or reviewing the April 27,

18   2018, metering guidance before it was issued?

19        A      No.  I don't have any -- I'm not sure

20   if I -- I don't recall who may have been

21   involved.  I'm sure this obviously Todd Owen

22   signed it, and it probably had to clear the



Page 151

1  commissioner's office.  Maybe Patrick Flanagan or

2  some of the counselors down there may have put

3  eyes on it.  But again -- which would be typical

4  for something like that.  But I don't necessarily

5  recall this specific document.  But they could

6  have been involved.

7       Q     Do you recall whether there were any

8  interagency consultations regarding the April 27,

9  2018, metering guidance, for example, with the

10  U.S. Department of State or any other executive

11  branch or agency?

12      A     No, I'm not aware offhand.  I don't

13  recall.

14      Q     Do you know whether anyone from U.S.

15  Border Patrol was consulted about the April 27,

16  2018, metering guidance before it was issued to

17  the field?

18      A     I'm not aware.  I don't know.

19      Q     Do you know whether anyone from

20  Immigration and Customs Enforcement or ICE was

21  consulted about the April 27, 2018, metering

22  guidance before it was issued to the field?



Page 152

1        A       No, I'm not aware.

2        Q       Do you know whether anyone from U.S.

3    Citizenship and Immigration Services was

4    consulted about the April 27, 2018, metering

5    guidance before it was issued to the field?

6        A       No, I'm not aware.

7        Q       Do you know whether anyone in the

8    Office of the Secretary of the U.S. Department of

9    Homeland Security was consulted about the

10   metering guidance before -- the April 27, 2018,

11   metering guidance before it was issued to the

12   field?

13       A       No, I'm not aware.

14       Q       Do you know who at CBP would be aware

15   of whether consultations with individuals other

16   than Mr. Hutton, Mr. Mejia, the attorneys at OCC,

17   and the attorneys at DOJ occurred regarding the

18   April 27, 2018, metering guidance before it was

19   issued to the field?

20       A       Typically it would be any type of

21   involvement would be at the commissioner's

22   office, and any type of interagency coordination



Page 153

1    potentially could have taken place at that level.

2        Q    Who in the commissioner's office would

3    typically be responsible for interagency

4    communication in April 2018?

5        A    I don't know.  There's been so much

6    turnover there.  I don't know if Patrick

7    Flanagan, if he was still on his role at that

8    time.  But he was a key counselor down there,

9    chief of staff.  It was Mr. McAleenan's chief of

10   staff.  But, again, I don't know.  I'm just

11   saying if any coordination was done, interagency

12   coordination typically would be done through the

13   commissioner's office.

14       Q    So as you sit here today, your belief

15   that the person who could best answer that

16   question -- my questions about interagency

17   consultation would be someone from the

18   commissioner's office at CBP; is that right?

19       A    Yes, to determine if in fact it took

20   place.

21       Q    Who came up with the idea of drafting

22   the written metering guidance that was issued on



Page 154

1   April 27, 2018?

2            MS. SHINNERS:  Objection.  I'm going

3   to instruct the witness not to answer on

4   grounds -- attorney-client privilege grounds.

5   BY MR. MEDLOCK:

6       Q    Sir, can you answer my question

7   without going into conversations that you had

8   with attorneys?

9       A    I'm looking at Katie.

10           THE WITNESS:  And do you want me to

11  answer?

12           MS. SHINNERS:  One second.  You know,

13  I -- I don't actually know.  I think I may need

14  -- require a consultation to answer that

15  question, Mr. Hoffman.

16           MR. MEDLOCK:  Do you want to take a

17  break to do that?

18           MS. SHINNERS:  Yeah.  Yes.  We can go

19  off the record.

20           MR. MEDLOCK:  Let's go off the record.

21           VIDEOTAPE OPERATOR:  The time is 1:22

22  p.m.  We are going off the record.



Page 155

 1                (A brief recess was taken.)

 2                VIDEOTAPE OPERATOR:  The time is 1:33

 3    p.m.  We're back on the record.

 4                MR. MEDLOCK:  Welcome back, Mr.

 5    Hoffman.  Josh, can you please put up Exhibit

 6    262, please.  And Tammy, can you please read the

 7    last question that was asked before the

 8    conference regarding privilege issue.

 9                COURT REPORTER:  "Who came up with the

10    idea of drafting the written metering guidance

11    that was issued on April 27, 2018?"

12                THE WITNESS:  Yes.  My recollection

13    was refreshed by reading -- I don't know if it

14    was EAC Owen's deposition or XD Howe's deposition

15    that I believe Commissioner McAleenan at the time

16    asked if guidance was -- the field given

17    guidance.  This was in response to the migrant

18    caravans beginning to descend toward the

19    Southwest border, San Ysidro in particular.  So

20    it was at his prompting that we ensure that we

21    got guidance out across the entire Southwest

22    border.



Page 156

1   BY MR. MEDLOCK:

2        Q     Okay.  I just want to make sure I

3   understand something.  Before this -- before the

4   break, I asked this question and Ms. Shinners

5   objected to privilege, and then you came back

6   after the break and offered this narrative

7   answer; is that right?

8        A     I'm sorry.  You're asking me?

9        Q     Sure.  Yeah, that's what I'm asking

10  you.

11            Before the break, Ms. Shinners

12  objected to privilege, and then you met with Ms.

13  Shinners outside -- off the record and outside of

14  my presence and now you're coming back and giving

15  this answer to my question; is that right?

16       A     Yeah.  I mean, I don't know what the

17  record states, if she objected when she took our

18  break or not.  If that's what the record

19  reflects.

20       Q     Okay.  And during your break, did you

21  discuss the -- yes or no.  Did you discuss the

22  substance of your testimony with Ms. Shinners as



Page 157

1    opposed to whether your answer would be

2    privileged?

3        A    No.

4            MS. SHINNERS:  Objection.

5            COURT REPORTER:  What was that, Ms.

6    Shinners?

7            MS. SHINNERS:  I was just going to --

8    that's fine.

9    BY MR. MEDLOCK:

10       Q    Mr. Hoffman, we'll get to the e-mail

11   from Commissioner McAleenan, but I want to get

12   your recollection.  In April of 2018, was --

13   sorry.  Let me back up.

14           On April 27, 2018, when the metering

15   guidance was issued, was the -- the San Ysidro

16   port of entry using 100 percent of its detention

17   capacity?

18       A    I have no idea.

19       Q    Do you have any idea whether on April

20   27, 2018, whether any port of entry on the

21   U.S.-Mexico border was using 100 percent of its

22   detention capacity?



Page 158

1        A      No, I'm not aware of that specific

2   time frame or have that kind of granularity

3   regarding their detention space.

4        Q      Okay.  And -- but the detention

5   capacity was a driving factor for the April 27,

6   2018, metering guidance; is that right?

7        A      Correct.  That's my understanding.

8             MR. MEDLOCK:  Okay.  Can we please

9   bring up Tab 22.

10            MS. SHINNERS:  Sorry, Steve.  I

11  thought we were going to take a break for lunch.

12            MR. MEDLOCK:  This is going to take

13  maybe five minutes.  I want to quickly follow up.

14  The document follows up on the testimony.

15            MS. SHINNERS:  Okay.

16            MR. MEDLOCK:  I'm sorry.  Can we go --

17  perhaps my numbering is off.  Can we bring up Tab

18  23.  I apologize.  Can you please flip the

19  document.

20            MR. PINKUS:  You were correct.  I'm

21  sorry.

22            MR. MEDLOCK:  No worries.  Can you



Page 159

1   please flip the document to landscape.  It's

2   right side up.

3            (Deposition Exhibit Number 263 was

4   marked for identification and attached to the

5   transcript.)

6   BY MR. MEDLOCK:

7       Q    Mr. Hoffman, I put in front of you

8   what will be marked as Exhibit 263 to your

9   deposition.  It is a Migration Crisis Action Team

10  report that has the leading Bates number

11  AOL-DEF-00028127.

12           Do you see that, sir?

13      A    Yes, I do.

14      Q    And you have seen Migration Crisis

15  Action Team reports, correct?

16      A    Correct.

17      Q    And the Migration Crisis Action Team

18  routinely created daily reports showing, amongst

19  other things, the detention capacities of ports

20  of entry on the U.S.-Mexico border, correct?

21      A    Some reports might show the detention

22  capacity.



Page 160

1        Q      Okay.  If you look at the top

2    right-hand corner of this document on the

3    first -- on the first page of Exhibit 263, the --

4    it says, "Report run date: 4/28/2018, 10:57:38

5    a.m."

6               Do you see that?

7        A      Yes, I do.

8        Q      And then on the left side it says,

9    "Data is through: 4/27/2018," correct?

10       A      Correct.

11       Q      That 4/27/2018 is the date that the

12   metering guidance was issued to the field,

13   correct?

14       A      That is correct.

15       Q      Okay.  Let's turn to the second page

16   of Exhibit 263, which has the Bates number

17   AOL-DEF-00028128.

18              MR. MEDLOCK:  And Josh, if you could

19   enlarge the two tables on the right side of the

20   page.

21   BY MR. MEDLOCK:

22       Q      Mr. Hoffman, this is a portion of the



Page 161

1    Migration Crisis Action Team report that shows

2    the capacity, number of individuals in custody,

3    and percentage of potential capacity used for

4    ports of entry on the U.S.-Mexico border and

5    field offices on the U.S.-Mexico border, correct?

6         A     Yes, that's correct.

7         Q     Okay.  And let's look at a few of

8    those ports -- few of those ports of entry.

9               On April 27, 2018, the Brownsville

10   port of entry was using 4 percent of its

11   capacity, correct?

12        A     That's what's indicated there.

13        Q     And the Calexico port of entry was

14   using 35 percent of its capacity, correct?

15        A     Correct, that's what's listed there.

16        Q     And the El Paso port of entry was

17   using 81 percent of its capacity, correct?

18        A     Correct.

19        Q     And the highest capacity number on

20   here is the San Ysidro port of entry, which was

21   using 93 percent of its capacity, correct?

22        A     That's correct.



Page 162

1     Q     There's nowhere in this table that a

2     port of entry was using 100 percent of its

3     capacity, correct?

4     A     One would say as they see this chart,

5     but I'm not -- again, this chart is just a guide,

6     and it's a point in time.  So again, you take it

7     for what it is.  San Ysidro being at 93 percent

8     capacity, they could actually be over their

9     capacity in a sense because ███, my

10    understanding, that's under the best of

11    circumstances based on the number of hold rooms

12    and what -- how much capacity you have.  But you

13    have vulnerable populations.

14          Your capacity on any given day could

15    be -- theoretically it could be ███ at San Ysidro

16    if a transgender is taking up one hold room.  So

17    again, it's just kind of a guide as a moving

18    target.  And again, a lot of variables are

19    involved here.

20          MR. MEDLOCK:  Okay.  Move to strike

21    everything after the first sentence as

22    nonresponsive.



Page 163

1  BY MR. MEDLOCK:

2      Q    I'll ask my question again.  It

3  relates just to this table.  There's no port of

4  entry on this table that is listed as using 100

5  percent or more of its capacity; is that right?

6      A    Again, I would state not on this

7  table, but there are many variables that this is

8  just a guide.  You can't say --

9      Q    What is so hard about giving me a

10  direct answer to my question?  I'm just asking

11  about the table, sir.

12          Is there any port of entry, reading

13  this table, that's using more than 100 percent of

14  its detention capacity?

15      A    Not --

16          MS. SHINNERS:  Objection; asked and

17  answered.  Go ahead.

18          MR. MEDLOCK:  Not answered.  I want to

19  ask it again.

20  BY MR. MEDLOCK:

21      Q    I'm looking at the table.  Reading

22  this table, is any port of entry using more than



Page 164

1   100 percent of its capacity on the table?

2      A      I would say not as depicted on the

3   table, but that does not mean they are not

4   overcapacity based on the variables and the

5   composition of the aliens or migrants that they

6   have in detention.

7             MR. MEDLOCK:  Move to strike

8   everything after "not as depicted in the table"

9   as not responsive.

10  BY MR. MEDLOCK:

11     Q      I want to follow up with something you

12  said in the nonresponsive part of your answer.

13             You said that there could be

14  transgenders in the hold rooms at some of these

15  ports of entry.  In the San Ysidro port of entry

16  on April 27, 2018, how many transgenders were in

17  the hold room?

18     A      I have no idea.

19     Q      How many vulnerable populations were

20  in the hold rooms at San Ysidro on April 27,

21  2018?

22     A      I do not know.



Page 165

1       Q       How many vulnerable pop -- vulnerable

2   persons were in the hold rooms at any port of

3   entry on April 27, 2018?

4       A       I do not know.

5       Q       What were the factors on April 27,

6   2018, that would have led to the capacity -- let

7   me back up.

8               Are you aware of any port of entry

9   whose actual capacity was lower than the stated

10  capacity on this chart on April 27, 2018?

11      A       Ask your question again, please.

12      Q       Sure.  On April 27, 2018, do you have

13  any direct evidence that the capacities of the

14  ports of entry stated on this chart were in

15  actuality less than the stated capacities on the

16  chart?

17      A       Again, I do not know enough about how

18  the capacity information -- I don't know.

19      Q       You don't have --

20              (Simultaneous crosstalk)

21              COURT REPORTER:  I'm sorry.  You were

22  talking over each other.



Page 166

1    BY MR. MEDLOCK:

2        Q      I'm sorry.  You don't have

3    responsibility for operations at ports of entry.

4    That's Mr. Howe's responsibility, correct?

5        A      Correct.

6        Q      Your responsibility relates to policy,

7    correct?

8        A      Correct.

9        Q      So when you stated that the -- that

10   the capacity of the San Ysidro port of entry

11   could have been lower than ███ on April 27, 2018,

12   that was a guess, right?

13       A      No.  What I'm stating is, based on my

14   knowledge and understanding how capacity is

15   derived, ███ is the capacity at San Ysidro under

16   the best conditions.  But when you have different

17   compositions of aliens in custody, vulnerable

18   populations, family units, older teenagers as far

19   as family units, NCIC arrests, and so forth, that

20   capacity, and whether they're at 100 percent,

21   changes based on my understanding and knowledge.

22       Q      Sorry.  I didn't mean to talk over



Page 167

1    you.

2              How many family units were in the hold

3    room at the San Ysidro port of entry on April 27,

4    2018?

5       A    I don't know, but I bet they had quite

6    a few.

7       Q    You bet that.  You're guessing, aren't

8    you?

9       A    Based on my experience.

10      Q    What direct evidence do you have that

11   the number of family units that were in the hold

12   rooms at the San Ysidro port of entry on April

13   27, 2018?

14      A    I do not have any specific direct

15   numbers for that given day.

16      Q    You don't have any specific direct

17   numbers for the number of older teenagers that

18   were in hold rooms at any port of entry on April

19   27, 2018; isn't that right?

20      A    That's correct.

21      Q    You don't have any specific direct

22   numbers for any family units that were in the



Page 168

1    hold room at any port of entry on the U.S.-Mexico

2    border on April 27, 2018; isn't that right, sir?

3           MS. SHINNERS:  Objection.  You

4    promised us a lunch break after a couple minutes,

5    and I think we all need a break.

6           MR. MEDLOCK:  I'm sorry.  He's being

7    squirrelly.  I want answers to my questions.

8           MS. SHINNERS:  Just let the record

9    reflect --

10          THE WITNESS:  For the record --

11          MS. SHINNERS:  Let the record reflect

12   that we -- that we requested a lunch break and a

13   bathroom break.  Go ahead.

14          MR. MEDLOCK:  All right.  Let me get

15   the answers to my questions.  I apologize for

16   calling you squirrelly, sir.  I don't know if you

17   are or not.  So I'll take that back.

18   BY MR. MEDLOCK:

19       Q    My question is, how many -- what

20   directive to specific numbers do you have

21   regarding the number of family units who were in

22   the hold rooms at any port of entry on the



Page 169

1   U.S.-Mexico border on April 27, 2018?

2       A    I do not have specific information

3   down to specific ports of entry for hold rooms

4   based on --

5       Q    Sorry.  Go ahead.

6       A    -- based on this report.  I mean, I

7   think the page prior has it rolled up across the

8   entire Southwest border but not by -- I don't

9   think this report had the level of granularity by

10  location.

11      Q    Do you have any direct or specific

12  numbers regarding the number of NCIC arrests that

13  were in the hold rooms at any port of entry on

14  the U.S.-Mexico border on April 27, 2018?

15      A    No, I do not have that specific

16  information.

17      Q    As you sit here today, can you tell me

18  what factors specifically were at play on April

19  27, 2018, that would have caused the capacity of

20  any port of entry to be less than the stated

21  capacities on this chart on Exhibit 263?

22      A    I don't understand your question.



Page 170

1    Q    Sure.  Do you see the "Capacity"

2  column on this chart from Exhibit 263?

3    A    Yes.

4    Q    Okay.  So the capacity of the

5  Brownsville port of entry is ▮▮▮ correct?

6    A    Correct.

7    Q    And they only had six people in

8  custody on April 27, 2018; is that right?

9    A    That's correct.

10    Q    Can you think of any combination of

11  factors that would have led to being maximum

12  holding capacity of the Brownsville port of entry

13  being ▮▮▮persons on April 27, 2018?

14    A    No, I would not have that information.

15    Q    Do you have any direct information

16  regarding the factors that were specifically at

17  play on April 27, 2018, that would have led to

18  ▮▮▮ persons being the maximum holding capacity of

19  the San Ysidro port of entry?

20    A    No, I'm not aware of any specific

21  factors.

22    Q    And you're not aware of any --



Page 171

1            (Simultaneous crosstalk)

2       Q      -- for any port of entry, correct?

3       A      Again, and I would say that is a

4   number taken at a point of time whenever the data

5   was pulled.  Sometimes the data has to settle.

6   Sometimes the data is incomplete.  So there may

7   be more in custody than what this report is

8   showing and/or when they conducted a pickup,

9   again it's kind of a moving target based on when

10  the data was pulled.

11      Q      When was the ERO pickup conducted at

12  San Ysidro on April 27, 2018?

13      A      I do not know.

14      Q      Do you know when any ERO pickups

15  happened at any port of entry on April 27, 2018?

16      A      No, I do not.

17      Q      As you sit here today, do you have any

18  direct information that would lead you to believe

19  that this chart on Exhibit 263 is incomplete or

20  inaccurate?

21      A      I wouldn't say incomplete or

22  inaccurate.  It's a snapshot at a point in time.



Page 172

1   There are many variables and factors going in to

2   how this data is derived and pulled and how based

3   on a composition of aliens in custody.

4           So again, I don't think you can take

5   it at face value and necessarily say San Ysidro,

6   they have 7 percent more capacity.  It's not that

7   clean.  There's not that much detail in these

8   charts.  By the time they were pulled, time that

9   we had people being processed but the data hadn't

10  settled in our system and things are offset.

11  Q    Okay.  What evidence do you have that

12  the data had not settled before this MCAT report

13  shown in Exhibit 263 was pulled?

14  A    I don't have any direct data, but

15  again, based on my experience, I know that's

16  often an issue where data doesn't settle, and it

17  doesn't -- it's not properly categorized in the

18  system.

19  Q    What evidence do you have that the --

20  any data related to this MCAT report shown in

21  Exhibit 263 was not properly categorized in the

22  system?



Page 173

1        A      I don't have any specific evidence.

2        Q      Okay.  And you said that these reports

3    take a snapshot in time, correct?

4        A      Correct.

5               MR. MEDLOCK:  Josh, can we go back to

6    the first page of Exhibit 263.  Can you reorient

7    the page, please.  And can you highlight -- can

8    you expand the section that says "data is

9    through" in the top left corner.

10               MS. SHINNERS:  I just want to object

11    again.  Let the record reflect we requested a

12    lunch break I think some 10 minutes ago at least.

13    BY MR. MEDLOCK:

14        Q      So the snapshot in time for when this

15    report was taken was April 27, 2018; is that

16    right?

17        A      Correct.  That's what it says.

18        Q      And that's the same day the metering

19    guidance was issued, correct?

20        A      Yes.

21               MR. MEDLOCK:  Okay.  We can take our

22    break now.  Let's go off the record.



Page 174

 1                VIDEOTAPE OPERATOR:  The time is 1:55

 2    p.m.  We're going off the record.

 3                (A lunch recess was taken.)

 4                VIDEOTAPE OPERATOR:  The time is 2:20

 5    p.m.  We're back on the record.

 6    BY MR. MEDLOCK:

 7        Q      Welcome back, Mr. Hoffman.  During the

 8    lunch break, did you have any conversations with

 9    your attorney?

10        A      Just a quick call just two minutes

11    before we got on.

12        Q      Okay.  During that quick two-minute

13    call, did you discuss the substance of your

14    testimony in today's deposition?

15        A      No.

16                MR. MEDLOCK:  Okay.  Can we, please,

17    bring up on the screen the metering guidance

18    which I believe is Tab 10 and Exhibit 262.

19    BY MR. MEDLOCK:

20        Q      Mr. Hoffman, I want --

21                MR. MEDLOCK:  Actually, can we enlarge

22    the last paragraph of the guidance, please --



Page 175

1    actually the paragraph below that.  Sorry.

2    BY MR. MEDLOCK:

3        Q    Mr. Hoffman, do you see the paragraph

4    that begins with "Please ensure that this

5    memorandum"?

6        A    Yes.

7        Q    Okay.  The last sentence of that

8    paragraph reads, "Should you have any questions

9    or require additional information, please contact

10   Mr. Todd A. Hoffman, executive director, APP,"

11   and then it gives your phone number; is that

12   correct?

13       A    Correct.

14       Q    Did anyone ever contact you with

15   questions or seeking additional information

16   regarding the April 27, 2018, metering guidance?

17       A    No, I don't believe so.

18       Q    Do you have an understanding as to why

19   you were listed as the point of contact in this

20   memorandum?

21       A    Yeah.  Again, I think primarily

22   because my deputy, Ryan Hutton, worked closely



Page 176

1    with the Office of Chief Counsel on many matters,

2    and they had a great familiarity.  So I think he

3    was essentially the person that they were

4    comfortable working with, and he worked on it

5    with them.

6              I think, if I recall, there was some

7    question from Ryan when he was finished with it

8    just for this piece who should be the point of

9    contact.  I think he suggested should it be

10   operations, and I'm not sure if we discussed it

11   or not.  I probably just said, "Well since you

12   worked on it, just put me down."

13        Q    Okay.  And I noted that this paragraph

14   gives your phone number, not your e-mail address;

15   is that correct?

16        A    That's correct.

17        Q    Do you know why the decision was made

18   to get the people to call you over the phone

19   instead of to e-mail you an e-mail?

20        A    No, that's just standard practice.  A

21   lot of memos, you put your phone number in there

22   as a point of contact.  I mean, they know how to



Page 177

1  get me.  They e-mail me, call me, or whatever.

2      Q     Was one of the factors behind giving

3  the phone number that CBP wanted to create a

4  single telephone point of contact to avoid e-mail

5  traffic regarding the metering guidance?

6      A     No, not at all.

7            MR. MEDLOCK:  Okay.  Let's pull up Tab

8  11, please.

9            (Deposition Exhibit Number 264 was

10 marked for identification and attached to the

11 transcript.)

12 BY MR. MEDLOCK:

13     Q     All right, sir.  I put in front of you

14 what we will mark as Exhibit 264 to your

15 deposition.  It's an April 24th through 25th,

16 2018, e-mail chain that has the Bates number

17 AOL-DEF-00027121 through '22.

18           And my first question to you, sir, is

19 this appears -- does this appear to be a copy of

20 an e-mail chain between Kevin McAleenan, Todd

21 Owen, Randy Howe, Pete Flores, Sidney Aki,

22 yourself, and others?



Page 178

1        A      Yeah, I don't know myself.  I think it

2    was forwarded to me late.  I don't see my name as

3    in the chain, other than I think it was forwarded

4    later.

5        Q      Okay.  So after -- so you did receive

6    a copy of this e-mail chain, although you weren't

7    amongst the group that was included on the

8    original e-mail for the chain; is that right?

9        A      That's correct.

10       Q      Okay.  Do you have an understanding as

11   to -- let me back up.

12              Randy Howe forwarded this e-mail chain

13   to you and Ryan Hutton on April 25th, 2018, at

14   2:39 a.m. it appears.

15       A      Yes.

16       Q      Was it unusual for Mr. Howe to send

17   you an e-mail at 2:39 a.m.?

18       A      Yeah, it would be fairly unusual at

19   that hour.  It could be a discrepancy in the

20   timestamp.  I don't know.  But -- or he could

21   have sent it.  I don't know.

22       Q      Okay.  Mr. Howe worked out of the



Page 179

1   Washington headquarters of OFO, correct?

2        A    Yes.

3        Q    You also work out of that headquarters

4   in the Ronald Reagan Building as well, correct?

5        A    Correct.

6             COURT REPORTER:  In the what building?

7   I'm sorry.

8             MR. MEDLOCK:  Ronald Reagan Building.

9             COURT REPORTER:  Thank you.

10            MR. MEDLOCK:  No problem.

11  BY MR. MEDLOCK:

12       Q    Do you know whether the 2:39 a.m.

13  timestamp is a result of a time zone issue?

14       A    No, I do not know.  Unless he might

15  have been elsewhere.  I don't know -- I don't

16  know how those timestamps work.  Sometimes

17  they're off.  I'm not sure if he was on travel or

18  maybe he did send it locally at that hour.  I'm

19  not sure.

20       Q    Okay.  Regardless, you received a copy

21  of this e-mail chain from Mr. Howe in the course

22  of your duties at CBP; is that right?



Page 180

1      A      I did.

2      Q      And you kept and maintained a copy of

3  this e-mail chain in your e-mail system at CBP;

4  is that right?

5      A      Correct.

6      Q      And receiving e-mail traffic like this

7  from Mr. Howe was a part of your job at CBP; is

8  that right?

9      A      That's correct.

10      Q      Do you have any reason to believe that

11  the e-mail exchanges depicted in Exhibit 264 are

12  inaccurate in any way?

13      A      No.

14      Q      I'd like to focus with you on the

15  e-mail that Kevin McAleenan sent on April 24th,

16  2018, at 8:26 p.m.  You will see at the bottom of

17  the first page, Exhibit 264, that the -- do you

18  see the header for that e-mail?

19      A      Yes.

20      Q      The "from," "sent," and "to"

21  information?

22      A      Yes.



Page 181

1             MR. MEDLOCK:  Okay.  Can we go to the

2     second page of the exhibit, please.  And can you

3     please enlarge the body of the e-mail.

4     BY MR. MEDLOCK:

5         Q     First off, do you see at the top of

6     that enlarged section that the e-mail was a

7     carbon copy to Patrick Flanagan?

8         A     Yes, I see that.

9         Q     Does that refresh your recollection

10    that Patrick Flanagan was the chief of staff to

11    Commissioner McAleenan or counselor to him around

12    April of 2018?

13        A     Yes, it does.

14        Q     Okay.  And then the subject line of

15    this e-mail is "Increased flow and caravan

16    anticipated arrival."

17              Did I read that correctly?

18        A     Yes.

19        Q     Okay.  And Mr. McAleenan at the top of

20    this e-mail in all caps writes, "FOR OFFICIAL USE

21    ONLY/PRE-DECISIONAL/DELIBERATIVE."

22              Did I read that correctly?



Page 182

1          A       Correct.

2          Q       Do you have an understanding as to why

3    someone would put that header on an e-mail at

4    CBP?

5          A       No, I have no idea.

6          Q       Isn't it -- isn't it possible that Mr.

7    McAleenan put this header on this e-mail because

8    he wanted to ensure that it would not be produced

9    in response to a FOIA request or in litigation?

10              MS. SHINNERS:  Objection; foundation,

11   calls for speculation.  You can answer, Mr.

12   Hoffman.

13              THE WITNESS:  Again, you'd have to ask

14   him.  I have no idea.

15   BY MR. MEDLOCK:

16         Q       So that could be the case, you just

17   don't know; is that right?

18         A       No.  As I stated, I don't know.  You'd

19   have to ask him what his intent was.

20         Q       Okay.  In this e-mail, Mr. McAleenan

21   expresses his concern about a supposedly incoming

22   migrant caravan, correct?



Page 183

1       A       Correct.

2       Q       And I want to focus on the second

3   paragraph in the e-mail that begins with "That

4   said, I know."

5               Do you see that paragraph?

6       A       I do.

7       Q       Okay.  In that second paragraph of Mr.

8   McAleenan's e-mail, he references sending out

9   guidance regarding state processes and port

10  security and capacity issues relating to queue

11  management.

12              Do you see that?

13      A       Yes, I do.

14      Q       That's a reference to the metering

15  guidance that would be issued on April 27, 2018,

16  correct?

17      A       Correct.

18      Q       Do you have an understanding as to why

19  Mr. Howe forwarded this e-mail from Mr. McAleenan

20  to you?

21      A       No.  Just keep myself and Mr. Hutton

22  in the loop.  And we worked closely together.



Page 184

1      Q      Was one of the reasons -- sure, sorry.

2  Go ahead.  I didn't mean to interrupt you.

3      A      We worked closely on many issues.

4  It's just, you know, for my situational

5  awareness.

6      Q      And you needed the situational

7  awareness because Mr. Hutton had begun work on

8  drafting the metering guidance by this point,

9  correct?

10     A      That I don't know the timing.  This

11 very may have prompted the issuance of the

12 preparation of the guidance.  I don't know.  This

13 is dated the 24th, and this may have been the

14 prompting to get started on the guidance.

15     Q      Do you know -- I'll represent to you

16 that this e-mail was sent on April 24th, 2018.

17            Do you know whether Ryan Hutton and

18 OCC were working on drafting the April 27, 2018,

19 metering guidance before Commissioner McAleenan

20 sent this e-mail?

21     A      No.  I'm not aware.

22     Q      Commissioner McAleenan writes, "Please



Page 185

1   confirm that you have sent out guidance regarding

2   safe processing and port security and capacity

3   issues relating to queue management."

4           Did I read that correctly?

5       A   That's correct.

6       Q   Does it sound to you like Mr.

7   McAleenan is aware that that guidance is already

8   being drafted in this e-mail?

9       A   No, not --

10          MS. SHINNERS:  Objection.  Go ahead.

11  Sorry.

12          THE WITNESS:  I said no, not

13  necessarily.

14  BY MR. MEDLOCK:

15      Q   Okay.  Isn't it true that as early as

16  April 23rd, 2018, you, the Office of Chief

17  Counsel, the U.S. Department of Justice, and

18  others and senior leadership at OFO had already

19  begun working on drafting the guidance regarding

20  metering?

21      A   You said on April 23rd?

22      Q   Yes.



Page 186

1       A       I'm not sure the timeline.  My

2   recollection, it was a pretty -- done in one day.

3   I'm not sure if this took place over multiple

4   days or if we already started the guidance.  That

5   I do not know.

6       Q       Isn't it true that Todd Owen had

7   concerns about issuing written guidance on

8   metering?

9           MS. SHINNERS:  Objection.  I'm going

10  to caution -- I'm going to caution the witness

11  not to answer to reveal pre-decisional

12  deliberations about how or when to issue written

13  guidance.  So if -- if you can answer without

14  revealing pre-decisional deliberations, you can

15  do so.  But again, I'm instructing you not to

16  reveal deliberations, expressions of what

17  advantages or disadvantages of particular courses

18  of action might be.

19          THE WITNESS:  Okay.  I'd have to hear

20  the question again.

21  BY MR. MEDLOCK:

22      Q       Sure.  Isn't it true that Todd Owen



Page 187

1    had concerns about issuing written metering

2    guidance?

3        A    I -- I don't recall if he had concerns

4    or not.

5        Q    Isn't it true that Admissibility and

6    Passenger Programs, the Office of Chief Counsel,

7    and attorneys at DOJ worked together to delete

8    portions of a previously drafted set of metering

9    guidance from November 2016 so that the new

10   metering guidance would cause less problems for

11   the ongoing Al Otro Lado litigation?

12           MS. SHINNERS:  Objection.  I'm going

13   to instruct the witness not to answer to the

14   extent it would reveal attorney-client -- if it

15   would reveal attorney-client communication, the

16   work product, or mental impressions of attorneys

17   or pre-decisional deliberation.

18   BY MR. MEDLOCK:

19       Q    Can you answer my question?

20       A    Can you state it one more time?

21       Q    Sure.  Isn't it true that in April

22   2018 Admissibility and Passenger Programs, the



Page 188

1  Office of Chief Counsel, and attorneys at the

2  Department of Justice worked together to delete

3  portions of a previously drafted November 2016

4  memorandum regarding metering to create a version

5  of the metering guidance that would cause less

6  problems for the ongoing Al Otro Lado litigation?

7       A    No, not to my knowledge.

8            MR. MEDLOCK:  All right.  Can we

9  please bring up Tab 12.

10 BY MR. MEDLOCK:

11      Q    All right, sir.  I put in front of you

12 what will be marked as Exhibit 265 to your

13 deposition.  It's an e-mail exchange from April

14 23rd to April 25th, 2018, that has the Bates

15 numbers AOL-DEF-000665934 through '37.

16           If you look at the top e-mail on the

17 chain, sir, do you see that you received that top

18 e-mail from Luis Mejia on April 25th, 2018, at

19 9:12 a.m.?

20      A    Yes.

21      Q    And you would have received the

22 e-mails in the e-mail chain in the course of your



Page 189

1   duties at CBP; is that right?

2        A     That's correct.

3        Q     And you would have kept and maintained

4   the e-mails in this e-mail chain in your e-mail

5   system at CBP, correct?

6        A     Yes, that's correct.

7        Q     Receiving the e-mails in this e-mail

8   chain was part of your job at CBP, correct?

9        A     Correct.

10       Q     Do you have any reason to believe that

11  the Exhibit 265 is inauthentic in any way?

12       A     No.

13       Q     Okay.  The subject line of Mr. Mejia's

14  e-mail at the top of the first page of this

15  exhibit --

16             MS. SHINNERS:  I think we -- we

17  haven't all received the document yet, Mr.

18  Medlock.  If you could hold on for one moment.

19             MR. MEDLOCK:  Sure.  It should be in

20  the docs.com folder.

21             MS. SHINNERS:  Understood.

22  Understood.  It looks like the document may have



Page 190

1    some insufficient redactions regarding

2    attorney-client communications, as well as

3    pre-decisional deliberations.  So it's likely we

4    will be clawing this back.

5              MR. MEDLOCK:  Okay.  Can I just make a

6    quick statement on this?

7              MS. SHINNERS:  Sure.

8              MR. MEDLOCK:  Just for the record.  At

9    this -- at this point, we have spent a

10   considerable amount of time off the record in

11   multiple conferences regarding privilege issues.

12   We have -- there have been several -- have been,

13   at this point now, multiple documents that have

14   been clawed back.

15             This has impeded the course of this

16   deposition and the questioning in this

17   deposition.  It has caused me to not be able to

18   ask, at this point if we're going to claw this

19   document back, almost 70 questions that are in my

20   outline.  I have a substantial number of

21   questions about this document.

22             Again, even if the document were



Page 191

1  somehow pre-decisional, it goes directly to the

2  motive and intent behind the April 27, 2018,

3  metering policy which Magistrate Judge Crawford

4  has already stated is -- regardless of the

5  pre-decisionality, the deliberative nature of the

6  document is sufficient reason for that document

7  to be disclosed in discovery.

8            Furthermore, the -- I believe the

9  portion that you were referring to that you may

10  be claiming should be covered by attorney-client

11  privilege contains no legal advice.  It contains

12  no -- it contains no request for legal advice,

13  and it does not discuss the substance of the

14  legal advice.  Rather it discusses logistics of

15  drafting the April 27, 2018, metering guidance.

16  That is well outside the scope of the

17  attorney-client privilege.

18            Again, I will also -- I think also the

19  witness has essentially testified to the

20  substance of that e-mail, and I'll also reiterate

21  that if this document is going to be clawed back,

22  we will notice Mr. Hoffman's deposition again and


MAGNA
LEGAL SERVICES

Page 192

1    bring him back and ask him questions about this

2    as soon as the Court ruled on this issue.  The --

3    and we reserve the right to hold this deposition

4    open, and we will do so.  We will recall him.

5            MS. SHINNERS:  Okay.  Thanks.  And we

6    are going to claw this document back.  The

7    primary basis to actually counter your concerns

8    regarding deliberative process privilege, which I

9    don't necessarily agree with, but the basis is

10   attorney-client privilege.

11           These communications relate -- our

12   communications that relate to the provision of

13   legal advice, seeking legal advice, and are, I

14   think, quite clearly covered by the

15   attorney-client privilege.  So we are going to be

16   clawing this back because it's been

17   insufficiently redacted.  And sorry, the

18   attorney-client privilege.  We're not going to

19   waive it here.

20           MR. MEDLOCK:  Well, we just see the

21   world differently on this document, and I guess

22   we'll have to file a motion about it.



Page 193

1           Okay.  Thank you for letting me know.

2    I will move on with my questioning, despite the

3    fact that I believe this document is not

4    privileged whatsoever.

5           Can we please bring up Tab 14.

6           (Deposition Exhibit Number 266 was

7    marked for identification and attached to the

8    transcript.)

9    BY MR. MEDLOCK:

10     Q    Sir, I put in front of you what will

11   be marked as Exhibit 266 to your deposition.

12   It's a one-page e-mail that bears the Bates

13   number AOL-DEF-00560422, and at the top of the

14   e-mail it appears to be an e-mail sent by Luis

15   Mejia on April 25th, 2018, to yourself and Ryan

16   Hutton.

17          Do you see that, sir?

18     A    I do.

19          MR. MEDLOCK:  And can we please expand

20   the text of the e-mail.

21   BY MR. MEDLOCK:

22     Q    Your eyes may be better than mine,



Page 194

1  sir, but I was having trouble with that one.

2           So on April 25th, 2018, Luis Mejia

3  wrote to you at 9:49 a.m., "Sirs, edited version

4  with track changes."

5           Did I read that correctly?

6      A     Correct.

7      Q     And there's an attachment to that

8  e-mail called "Metering guidance OCC.docx."

9           Did I read that correctly?

10     A     Yes.

11     Q     Without going into the substance of

12 what was in that document, is it true that the

13 Office of Chief Counsel created a redlined

14 version of the metering guidance memo that was

15 eventually issued to the field on April 27, 2018?

16     A     I can't make that assessment from this

17 e-mail.  I do not know.  It's just what it says,

18 "edited version."  I don't know who made the

19 edits.

20     Q     What does "track changes" mean to you?

21     A     A track changes is where you go

22 through and redline the document electronically.



Page 195

1       Q       And what does "OCC" mean to you?

2       A       Office of Chief Counsel.

3       Q       Does this document refresh your

4    recollection that Luis Mejia played a role in

5    drafting the April 27, 2018, metering guidance?

6       A       Yes, it does.

7       Q       Okay.  So when you previously

8    testified that he did not play a role in drafting

9    the guidance, that was inaccurate, correct?

10      A       No.  I think I said I thought Ryan

11   Hutton did the bulk of the work and Louie may

12   have assisted him.  Now, I see I'm refreshed here

13   that Louie was -- played a more instrumental

14   role.

15      Q       Okay.  Is it Louie or Luis?

16      A       Either way.

17      Q       Okay.  All right.  Fair enough.  Thank

18   you.

19              MR. MEDLOCK:  Can we please bring up

20   Tab 19?

21              (Deposition Exhibit Number 267 was

22   marked for identification and attached to the



Page 196

1    transcript.)

2    BY MR. MEDLOCK:

3        Q    All right, sir.  I have put in front

4    of you a one-page meeting invitation that bears

5    the Bates number AOL-DEF-00027152.  And if you

6    look at the required attendees section of this

7    meeting invitation, you're listed as a required

8    attendee; is that correct?

9        A    That's correct.

10       Q    And this is a meeting set for

11   Thursday, April 26, 2018, from 10:30 to 10:45

12   a.m., correct?

13       A    Yes.

14       Q    And the subject line of the meeting

15   invitation reads "10:30 to 10:45 discussion: Al

16   Otro/Metering."

17            Did I read that correctly?

18       A    Yes.

19       Q    You would have received this meeting

20   invitation in the course of your work at CBP; is

21   that right?

22       A    Correct.



Page 197

1      Q      And you would have kept and maintained

2   this meeting invitation in the calendar on your

3   Microsoft Office system; is that correct?

4      A      That's correct.

5      Q      And receiving the invitation like this

6   one was part of your job, correct?

7      A      Yes, that's correct.

8      Q      Okay.  Do you have any reason to

9   believe that the -- this document

10  AOL-DEF-00027152 is inauthentic in any way?

11     A      No.

12            MR. MEDLOCK:  Okay.  I'd like to

13  expand the pasted text underneath the required

14  attendees, if you can.  Josh, can you please

15  expand that text underneath the require

16  attendees, thanks.

17  BY MR. MEDLOCK:

18     Q      Okay.  So this appears to be pasted

19  text from an e-mail that Julie Koller sent on

20  April 25th, 2018, at 7:28 a.m., correct?

21     A      Pasted text?  I don't know.

22     Q      Okay.  This appears to be the text of



Page 198

1    an e-mail --

2          A     Yeah.

3          Q     -- that was sent -- okay.  And Julie

4    Koller is an attorney with the Office of Chief

5    Counsel; is that correct?

6          A     That's correct.

7          Q     And she sent this e-mail to Tyesha

8    Bordeaux, correct?

9          A     Correct.

10          Q     What was Ms. Bordeaux's position or

11    title at CBP in April 2018?

12          A     I believe she was at that time Mr.

13    Owen's chief of staff.

14          Q     Okay.  Do you see a reference in the

15    cc line to an attorney from OCC named Louisa

16    Slocum?

17          A     Yes.

18          Q     Does that refresh your recollection

19    that Ms. Slocum also participated in the process

20    of drafting the April 27, 2018, metering

21    guidance?

22          A     I know she's on the invite, but I



Page 199

1    don't know what role she played.

2        Q    Okay.  Do you recall attending this

3    meeting on April 26, 2018?

4        A    No, I don't specifically recall it.

5        Q    Do you generally recall it?

6        A    No.  I'm not saying I wasn't there.

7    But it's not jumping out at me for a quick

8    15-minute meeting.  I don't know.

9        Q    Do you -- are you aware of any notes

10   you have from this meeting?

11       A    No.

12       Q    Do you believe that you took notes

13   during this meeting?

14       A    No.  I'm not sure.  I don't know.

15            MR. MEDLOCK:  Okay.  Josh, can we

16   expand the text beneath what we were just looking

17   at?

18   BY MR. MEDLOCK:

19       Q    This is a text from Ms. Koller's

20   e-mail to Tyesha Bordeaux.  She writes, "Tyesha,

21   does EAC Owen have 15 minutes today for us to

22   meet with him about advice we have on potential



Page 200

1   metering and in relation to ongoing litigation in

2   Al Otro?"

3           Did I read that correctly?

4       A    Yes.

5       Q    Okay.  To the best of your

6   recollection, were people discussing the Al Otro

7   Lado litigation in connection with issuing the

8   new metering guidance that was sent out on April

9   27, 2018?

10          MS. SHINNERS:  Objection.  Instruct

11  the witness not to answer, attorney-client

12  communication, and work product of a party.

13          MR. MEDLOCK:  I'm sorry.  I didn't ask

14  about attorneys.  I just asked if people were

15  saying that.  Is there a reason why he can't

16  answer if it didn't come from an attorney?

17          MS. SHINNERS:  Well, it sort of

18  depends.  I mean you asked it in connection with

19  an attorney asking about Al Otro, so hence my

20  objection.  I will instruct the witness not to

21  answer to the extent it would reveal

22  attorney-client communication or the mental



Page 201

1   impressions of counsel.

2   BY MR. MEDLOCK:

3       Q      All right, sir.  Are you aware of

4   anyone other than attorneys who discussed with

5   you the connection between issuing the new

6   metering guidance on April 27, 2018, and the Al

7   Otro Lado litigation?

8            MS. SHINNERS:  I want to, again,

9   instruct the witness not to answer to the extent

10  it would be reveal someone relaying to him

11  communications of counsel or legal advice or the

12  mental impressions of counsel.

13  BY MR. MEDLOCK:

14      Q      Can you answer my question, sir?

15      A      I -- I don't recall.

16      Q      Okay.  Do you believe there is a

17  linkage between the issuing of the new metering

18  guidance on April 27, 2018, and the Al Otro Lado

19  litigation?

20      A      I don't know what you're referring to

21  by "the new metering guidance."

22      Q      Okay.  Let me ask it --



Page 202

1              (Simultaneous crosstalk)

2      A      -- metering guidance on April 27th?

3              COURT REPORTER:  I'm sorry.  I'm

4    sorry.  You guys were talking over top of each

5    other.

6    BY MR. MEDLOCK:

7      Q      Sorry.  Why don't we do this, Mr.

8    Hoffman, and I'll try to ask the question a

9    little bit better.

10             Do you believe that there was a

11   linkage between the metering guidance that was

12   issued on April 27, 2018, and the Al Otro Lado

13   litigation?

14     A      No, I don't -- I don't recall having

15   any insight into that issue.

16     Q      And you don't recall that even though

17   this e-mail seems to link the two of them; is

18   that right?

19     A      No, I don't specifically recall.

20     Q      But you don't recall this meeting at

21   all; is that right?

22     A      I don't recall.  I may have attended.



Page 203

1   I may have had a conflict.  I don't know if I was

2   there or not.

3        Q     Okay.

4        A     I just don't recall --

5        Q     Can we --

6        A     -- as the meeting if I was in fact

7   there.

8   BY MR. MEDLOCK:

9        Q     Okay.  Understood.

10             MR. MEDLOCK:  Can we please bring out

11   Tab 20.

12             (Deposition Exhibit Number 268 was

13   marked for identification and attached to the

14   transcript.)

15   BY MR. MEDLOCK:

16        Q     All right, sir.  I put in front of you

17   what will be marked Exhibit 268 to your

18   deposition.  It's a copy of an e-mail that was

19   sent to you by Ryan Hutton on April 27, 2018, at

20   9:58 a.m.

21             Do you see that, sir?

22        A     Yes, I do.



Page 204

```
 1        Q      At the top -- at the top of the

 2   e-mail -- I should -- I don't know if I gave the

 3   Bates numbers, so I apologize.

 4              MR. MEDLOCK:  Counsel, the Bates

 5   number is AOL-DEF-00026393 through '94.

 6              MS. SHINNERS:  Thank you.

 7   BY MR. MEDLOCK:

 8        Q      The subject line of Mr. Hutton's

 9   e-mail to you is "Forward:  Metering guidance

10   memo," correct?

11        A      Correct.

12        Q      And there's an attachment to his

13   e-mail called "Metering guidance memo.pdf,"

14   correct?

15        A      Yes.

16        Q      Okay.  And if you look -- I'm sorry.

17   Let's focus on the top of the e-mail.  Mr. Hutton

18   writes, "XD tee'd up ready for you to send to

19   field."

20              Did I read that correctly?

21        A      That's correct.

22        Q      This is the final draft of the
```



Page 205

1   metering guidance that you sent out on April 27,

2   2018, correct?

3        A    Yeah, I imagine that the attachment is

4   a signed copy from EAC Owen.

5        Q    And I'll represent to you that it is.

6   I wanted to move down in the e-mail, if I can.

7   There's an e-mail -- the e-mail that Ryan Hutton

8   sent to you that was sent by Michael Ahn, A-H-N,

9   on April 27, 2018, at 9:57.

10            Do you see that, sir?

11       A    Yes, I do.

12       Q    What was Michael Ahn's role or title

13   at CBP in April 2018?

14       A    He was providing admin support for the

15   office.

16       Q    Which office?

17       A    My office, APP, and me in particular.

18       Q    Okay.  What role, if any, do you

19   recall Mr. Ahn playing in the drafting of the

20   April 27, 2018, metering guidance?

21       A    He didn't have any role.

22       Q    Okay.  Do you have an understanding of



Page 206

1  why he was sending the final draft of the

2  guidance to Mr. Hutton?

3      A    Just because, again, he was serving

4  kind of as my admin assistant/chief of staff.  So

5  he was handling those administrative matters.

6      Q    Okay.  Thank you for clarifying.

7           MR. MEDLOCK:  Josh, can we bring up

8  Tab 21, please.

9           (Deposition Exhibit Number 269 was

10  marked for identification and attached to the

11  transcript.)

12  BY MR. MEDLOCK:

13      Q    I put in front of you what will be

14  marked Exhibit 269 to your deposition.  It's a

15  copy of an e-mail that you sent on April 27,

16  2018, at 10:08 a.m., and it bears the Bates

17  number AOL-DEF-00091332.

18           Do you see that e-mail in front of

19  you, sir?

20      A    I do.

21      Q    This is the e-mail that you sent out

22  to the director of the field operations for the



Page 207

1    Southwestern border with Mexico communicating the

2    April 27, 2018, metering guidance, correct?

3        A       That's correct.

4        Q       Sending e-mails like this one was part

5    of your job at CBP; is that right?

6        A       That's correct.

7        Q       And you would have kept and maintained

8    this e-mail in your e-mail system at CBP,

9    correct?

10       A       That's correct.

11       Q       And this was an e-mail that you sent

12   in the course of your normal duties at CBP,

13   correct?

14       A       Correct.

15       Q       Do you have any reason to believe that

16   Exhibit 269 is inauthentic in any way?

17       A       No.

18       Q       So there's a section at the beginning

19   of this e-mail above the phrase "Memorandum for."

20               MR. MEDLOCK:   Josh, can you please

21   expand that?

22   BY MR. MEDLOCK:



Page 208

1     Q     You write, Directors, please see the

2  attached guidance during surge events.

3              Did I read that correctly?

4              Actually, I did not, so let me

5  rephrase.  You write, "Directors, please see the

6  attached processing guidance during surge

7  events."

8              Did I read that correctly?

9     A     Yes, you did.

10    Q     Okay.  That reference to processing

11 guidance during surge events did not appear in

12 the draft e-mail that Ryan Hutton sent you; isn't

13 that right?

14    A     That specific language I don't believe

15 is in there.

16    Q     Okay.  That's something you decided to

17 add when you sent the e-mail out, correct?

18    A     That appears so, yes.

19    Q     What did you mean by "surge events"?

20    A     I guess at the time what I meant

21 during surge events is, again, this was in

22 response to Commissioner McAleenan's message to



Page 209

1   ensure we had uniform guidance across the entire

2   Southwest border as the migrant caravans were

3   beginning to formulate down in Southern Mexico

4   and making their way -- or Central America and

5   making their way toward the Southwest border

6   ports of entry.

7        Q     Isn't it true that the -- that ports

8   of entry continued to meter even when there was

9   no migrant caravan approaching those ports of

10  entry?

11       A     I'm not sure.  I'm not aware.

12       Q     Are you aware of whether ports of

13  entry continued to meter even when there was not

14  a surge event going on?

15       A     Again, not -- I'm not aware of that

16  level of detail, if they did or didn't.

17       Q     Besides migrant caravan, is there

18  anything else that was encompassed -- that you

19  wanted to encompass in the phrase "surge events"

20  when you used it in this e-mail?

21       A     Not that I recall, no.

22       Q     Has anyone at CBP told you that you



Page 210

1    should not have added the verbiage about using

2    this guidance during surge events?

3         A      No, not at all.

4         Q      Has anyone outside of CBP told you

5    that it was improper to use this reference to

6    surge events?

7         A      No.

8         Q      As you [unintelligible] is it your

9    opinion metering guidance event was only supposed

10   to be during surge events?

11             COURT REPORTER:  I'm sorry.  This is

12   the court reporter.  Can you repeat your

13   question?

14   BY MR. MEDLOCK:

15        Q      Sure.  As you sit here today, is it

16   your opinion that the metering guidance was only

17   supposed to be used during surge events?

18        A      No.  I mean, at this point in time

19   when this was being -- this guidance was being

20   provided to the field, it was anticipating the

21   surge that we're going to receive from the

22   migrant caravan's descending on the Southwest



Page 211

1    border ports of entry.

2         Q     Can you define -- I'm sorry.  I didn't

3    mean to interrupt you.  Go ahead.

4         A     Go ahead

5         Q     Did you define the term "surge events"

6    anywhere in your e-mail?

7         A     No, I did not.

8         Q     Did you explicitly reference the April

9    2018 migrant caravan anywhere in this e-mail?

10        A     No, not in the e-mail.

11        Q     To your knowledge, did the April 27,

12   2018, metering guidance reference an incoming

13   migrant caravan anywhere in the text of the

14   guidance?

15        A     No, not in the text of the guidance,

16   but I'm sure we must have had at least one or two

17   calls with the Southwest border field directors

18   to give them the -- you know, the policy that

19   we're working on and having those types of

20   discussions.

21        Q     When did the first call with the

22   Southwest border field directors about the April



Page 212

1   27, 2018, metering guidance occur?

2        A      I'm not sure if we -- when it occurred

3   or if we actually had a call.  But I'm just

4   saying from experience, we may have a call with

5   the Southwest border field directors to let them

6   know that the policy like this was forthcoming.

7        Q      Okay.  Did you -- do you recall

8   actually having one of those telephone

9   conferences, or are you surmising that one may

10  have occurred?

11       A      I'm surmising one may have occurred.

12  I don't recall specifically.

13       Q      Okay.  Are you aware of a particular

14  award CBP gives out called an innovation award?

15       A      I think I have.  I believe I've heard

16  of it before.

17       Q      What is it?

18       A      I don't know.  I mean, I think -- it

19  might come from PPAE, and it might be some type

20  of innovation award.  If somebody improved a

21  process out there in the field that saved

22  resource hours or money, they may be eligible if



Page 213

1   they submit for some type of innovation award.

2       Q    I'm sorry.  I just kind of got caught

3   up in alphabet soup there.  What was the acronym

4   you used?

5       A    PPAE.

6       Q    What does that stand for, if you know?

7       A    Policy, programs, analysis, and

8   evaluation, I believe.

9       Q    Fair enough.  I had no idea what that

10  could have been.

11           The award that PPAE gives out, is that

12  -- what form does it take?  Is it a plaque, or is

13  it money?  What's the innovation award?

14      A    I have no idea.

15      Q    I take it you've never received one?

16      A    Nor have I applied.

17      Q    Fair enough.

18           MR. MEDLOCK:  Can we please bring up

19  Tab 23.

20           (Deposition Exhibit Number 270 was

21  marked for identification and attached to the

22  transcript.)



Page 214

1    BY MR. MEDLOCK:

2        Q    All right, sir.  This we will mark as

3    Exhibit 270 to your deposition.  It's an April

4    27, 2018, e-mail exchange between yourself, MP

5    Pete Flores.  It has the Bates numbers

6    AOL-DEF-00011883 through '84.

7              Do you see this -- that e-mail in

8    front of you, sir?

9        A    Yes, I do.

10       Q    Okay.  It appears that Mr. Flores

11   responded to your e-mail setting out the metering

12   guidance on the morning of April 27, 2018; is

13   that right?

14       A    Yes, it appears he did.

15       Q    Okay.  And then do you see the subject

16   line of his e-mail on April 27, 2018, at 11:53

17   a.m.?

18       A    Yes, I do.

19       Q    The subject line of that e-mail is

20   "Re" and then the rest is blank; is that right?

21       A    Correct.

22       Q    So it appears that Mr. Flores deleted



Page 215

1    a subject line of the e-mail that you had sent

2    out previously; is that right?

3         A    I have no idea.  I'm not an I.T. guy.

4    I don't know how that works.

5         Q    Okay.  But certainly he didn't -- the

6    subject line of his e-mail doesn't say "Metering

7    guidance memo," does it?

8         A    It doesn't say it there, no.

9         Q    Okay.  And Mr. Flores wrote to you,

10   "Sounds like an innovation award."

11             Did I read that correctly?

12        A    Yes.

13        Q    Did you understand Mr. Flores to be

14   joking in that e-mail?

15        A    Yes.

16        Q    And can you explain to me what the

17   joke is?

18        A    The joke is --

19             MS. SHINNERS:  Objection; calls for

20   speculation.  But --

21   BY MR. MEDLOCK:

22        Q    Okay.  Let me ask you a different way.



Page 216

1            Was that -- was that what you

2    understood to be a joke funny to you?

3        A    I know Mr. Flores very well.  He's

4    kind of being cute in e-mail.

5        Q    Why did you think he was -- why did

6    you think he was kind of being cute in this

7    e-mail?

8        A    Because the nature of what he said in

9    the message.

10       Q    Okay.  And why was -- why was joking

11   about an innovation award funny to you?

12       A    Just the way he used it.

13       Q    Okay.  Nothing beyond that as to

14   why --

15       A    No.

16       Q    -- you thought this was a funny joke?

17       A    No.

18            MR. MEDLOCK:  Let's turn to Tab 24,

19   please.

20            (Deposition Exhibit Number 271 was

21   marked for identification and attached to the

22   transcript.)



Page 217

1  BY MR. MEDLOCK:

2      Q     Sir, I put in front of you what will

3  be marked as Exhibit 271 to your deposition.  It

4  is a September 19 through 25th, 2018, e-mail

5  chain that bears the Bates numbers

6  AOL-DEF-00640410 through '11.

7            Do you have that e-mail chain in front

8  of you, sir?

9      A     I do.

10     Q     Okay.  The subject line of the top of

11 the e-mail chain is "SWB DFO strategy session

12 agenda."

13           Do you see that, sir?

14     A     Yes.

15     Q     What are DFO strategy sessions, if you

16 know?

17     A     Well, I'm pretty sure that's alluding

18 to a DFO off-site conference that was probably

19 coming up with the Southwest border directors.

20     Q     Okay.  If you look down into the

21 e-mail, the second e-mail in the chain that comes

22 from the e-mail alias "OFO field liaison."



Page 218

1              Do you see that you received that

2    e-mail?

3         A    Yes.

4         Q    Okay.  Do you recall attending an

5    off-site DFO strategy session in September 2018?

6         A    I don't recall offhand.  I'm sure I

7    was there.  We've had several.  So I would just

8    assume I was there.

9         Q    Okay.  Is it your regular practice to

10   attend the off-site DFO strategy session?

11        A    Yes.

12        Q    Okay.  I want to focus on the first

13   e-mail at this top of the Exhibit 271.

14             MR. MEDLOCK:  Josh, could you please

15   enlarge that e-mail.

16   BY MR. MEDLOCK:

17        Q    All right.  I realize you weren't on

18   this e-mail, sir, just part of the e-mail chain.

19   So I will read the portion I'm interested in, and

20   then I'll follow up with you to ask you if you

21   remember some stuff about it.

22             The -- this is an e-mail from Anne



Page 219

1    Maricich; is that right?

2         A    Yes.

3         Q    What was Ms. Maricich's position at

4    CBP in September 2018, if you know?

5         A    At that point she may have been P4,

6    the deputy.  Or -- she was working in the San

7    Diego field office.  I don't know at that point

8    if she was Mr. Flores' deputy or not.

9         Q    Do you see an individual by the name

10   of Johnny Armijo is copied on this e-mail?

11        A    Yes, I do.

12        Q    Okay.  Do you recall what Mr. Armijo's

13   position was at CBP in September of 2018?

14        A    I believe he was the assistant

15   director for border security.

16        Q    In the San Diego field office?

17        A    Correct.

18        Q    Okay.  In Ms. Maricich's e-mail she

19   writes, the CW -- "The SWB agenda is packed with

20   several topics.  Here are the topics the SDFO

21   will lead with suggestions for assignments to

22   prepare the briefing material."



Page 220

1           Do you see that, sir?

2     A     Yes.

3     Q     And SWB there refers to the Southwest

4  border?

5     A     Correct.  That's my understanding.

6     Q     And your understanding is that SDFO

7  means the San Diego field office, correct?

8     A     Correct.

9     Q     Okay.  And beneath that, she has seven

10  topics with various people assigned to them,

11  correct?

12    A     Yes.

13    Q     The seventh is "Queue management" and

14  that's assigned to Sid and Dave.

15          Do you see that?

16    A     Yes, I do.

17    Q     Is it your understanding that Sid

18  refers to Sidney Aki?

19    A     Yes, that's my understanding.

20    Q     And at this time he was the port

21  director of San Ysidro, correct?

22    A     Correct.



Page 221

1      Q      Do you have any understanding of who

2  Dave would be in that e-mail?

3      A      If it's San Diego, it could be Dave

4  Salazar.

5      Q      Okay.  And what was his position in

6  the San Diego field office in September 2018?

7      A      I believe he may have been port

8  director in Calexico.

9      Q      Okay.  And do you recall a discussion

10  regarding queue management at an off-site

11  Southwest border DFO strategy session that you

12  attended?

13      A      I do remember queue management being

14  discussed at Southwest border conferences.

15  Whether typically each and everyone -- whether

16  this particular one, I don't recall.  We've had

17  several in the last few years.  So it's hard.

18      Q      Did legal counsel typically attend the

19  Southwest border DFO strategy session?

20      A      Occasionally they do, yes.

21      Q      Do you recall legal counsel being

22  present for the discussion of queue management at



Page 222

1   the September 2018 off-site meeting with the

2   directors of field operations?

3        A     No, I don't recall.

4        Q     Do you recall taking any notes at the

5   September -- I should say fall 2018 off-site

6   meeting of the directors of field operations for

7   the Southwest border?

8        A     No, I do not.

9        Q     Do you recall receiving any advanced

10  materials prior to that strategy session?

11       A     No, other than it would have been just

12  probably the agenda only.

13       Q     Do you recall how long the discussion

14  of queue management would have lasted at that

15  fall 2018 off-site meeting?

16       A     No, I do not.

17       Q     Do you recall with any specificity

18  what was discussed regarding queue management

19  during that fall of 2018 off-site meeting?

20       A     No.

21       Q     Isn't it true that APP has been

22  involved in planning for what would happen if the



Page 223

1    judge in this case issues an order prohibiting

2    metering?

3        A     If we were involved in the planning?

4        Q     Yes.

5        A     We may have.  I know we've had

6    contingency plans in place for whether it's queue

7    management, MPP in particular.  It might have

8    been part of the same document that we

9    collectively worked on with our other offices, to

10   include border patrol.

11       Q     How long has CBP had a contingency

12   plan for what would happen if the judge in this

13   case issues an injunction prohibiting metering or

14   queue management?

15       A     Again, I don't recall any specific

16   contingency plan for queue management.  I'm

17   thinking more in the context of MPP.  So I'm not

18   aware of the queue management piece.  Not to say

19   that's not in the same document.  But MPP comes

20   to mind, not queue management.

21       Q     Okay.

22             MR. MEDLOCK:  Josh, can we pull up Tab



Page 224

1    25, please.

2                   (Deposition Exhibit Number 272 was

3    marked for identification and attached to the

4    transcript.)

5    BY MR. MEDLOCK:

6        Q    All right, sir.  I put up in front of

7    you what will be marked as Exhibit 272 to your

8    deposition.  It's an October 16, 2018, e-mail

9    chain that has the Bates number AOL-DEF-00560270.

10                  Do you have that e-mail in front of

11   you, sir?

12       A    Yes, I do.

13       Q    All right.  And this is an e-mail

14   chain between Luis Mejia -- Luis Mejia, Kenneth

15   Sava, and others; is that right?

16       A    Yes.

17       Q    Okay.  And at this time Mr. Mejia was

18   one of your direct -- direct reports, correct?

19       A    Can we make that a little bigger?  Is

20   that possible?

21       Q    It's absolutely possible.

22                  MR. MEDLOCK:  Josh, can you please



Page 225

1    expand the e-mail?

2              MR. PINKUS:  The whole thing?

3              MR. MEDLOCK:  Yes, please.

4              Sorry about that.  The last thing

5    either of us need is a vision test.

6    BY MR. MEDLOCK:

7        Q    Looking at the expanded version, this

8    appears to be an October 16, 2018, e-mail chain

9    between Luis Mejia, Kenneth Sava, and John

10   Maulella; is that right?

11       A    Yes.  I see that.

12       Q    And at this time, Mr. Mejia and Mr.

13   Maulella were both direct reports of you; is that

14   right?

15       A    That's correct.

16       Q    Okay.  I know you did not receive this

17   e-mail, so I'm just going to read part of it to

18   you and ask you some follow-up questions.

19              I'm focused on the second e-mail in

20   the chain that was sent by Kenneth Sava on

21   October 16, 2018, at 1:37 p.m.

22              Do you see that e-mail, sir?



Page 226

1      A      Yes, I do.

2      Q      Okay.  In that e-mail Mr. Sava writes,

3    "EAC also wants ops/APP to draft a white paper on

4    what happens if we get a TRO prohibiting

5    metering."

6             Did I read that correctly, sir?

7      A      Yes, you did.

8      Q      Does this refresh your recollection

9    that Todd Owen asked APP and ops to put together

10   a white paper on what would happen if the judge

11   in this case issued an order prohibiting

12   metering?

13     A      I don't recall it, but obviously it's

14   there in text.  So yes, I will agree that yes,

15   that direction was given.

16     Q      Do you know whether such a white paper

17   was actually drafted?

18     A      I don't recall.  I don't know.

19     Q      Can you recall Mr. Owen ever relaying

20   his direction and saying that he didn't want a

21   white paper on what would happen if the judge in

22   this case issued an order prohibiting metering?



Page 227

1    A    Can you ask the question again?  I'm

2    sorry.

3    Q    Sure.  It seems like Mr. Owen gave a

4    direction to craft a white paper about what would

5    happen if the judge in this case issued an order

6    prohibiting metering.  Do you know whether he

7    ever pulled that order back and said he didn't

8    want the white paper?

9    A    No, I'm not aware.

10   Q    Is it possible that a white paper

11   exists that contains a contingency plan for what

12   would happen if the judge in this case issues an

13   order prohibiting metering?

14   A    Yeah, I guess it's possible.  I'm not

15   aware of it, but I guess it's possible.  I'm not

16   sure what ops or Enrique Tamayo was working on.

17   Q    Fair enough.  What was Kenneth Sava's

18   position at CBP in October 2018, if you know?

19   A    He would have been one of my

20   directors.  At that time he was probably director

21   over EFTA and EVUS and the call center.

22             COURT REPORTER:  What was that?  I'm



Page 228

1    sorry.

2              MR. MEDLOCK:  This is actually an

3    e-mail -- Sorry.  Go ahead.

4              THE WITNESS:  The EVUS and the call

5    center.

6              COURT REPORTER:  I know.  What was the

7    first one?

8              MR. MEDLOCK:  Can you spell EVUS

9    please.

10             THE WITNESS:  I'm sorry?  EVUS is

11   electronic verification update system.

12             COURT REPORTER:  What was the first

13   one is my question.

14             THE WITNESS:  EFTA, electronic System

15   for travel authorization.

16             MR. MEDLOCK:  Okay.  Thank you, sir.

17   BY MR. MEDLOCK:

18      Q    This e-mail is between three of your

19   direct reports discussing something that Todd

20   Owen asked them to do with respect to drafting a

21   white paper regarding what would happen if there

22   was a TRO prohibiting metering; is that right?



Page 229

1      A      Yes, that's what it looks like.

2      Q      Okay.  Actually, let me ask a question

3   before we get to the next exhibit.

4             Do you know whether CBP prepared an

5   issue paper in 2019 that was entitled "Metering

6   return to Mexico and detention at POEs"?

7      A      No, I'm not aware of a specific memo.

8   I would have to see it.

9      Q      Okay.  Does issue paper have a

10  particular meaning in parlance of CBP?

11     A      Yes.

12     Q      What's that meaning?

13     A      That they -- if somebody asks about a

14  given topic, it could be someone going to testify

15  before Congress, and they want issue papers on a

16  variety of topics.  Kind of give them issue

17  papers are typically one or two pages, top-line

18  information on a specific program.

19     Q      Has CBP ever created issue paper in

20  connection with the presidential budgeting

21  process?

22     A      Presidential budgeting process?  I



Page 230

1    don't know.

2        Q    Yes.  Okay.

3        A    Probably.  I don't know.

4        Q    All right.

5            MR. MEDLOCK:  Let's pull up Tab 26,

6    please, Josh.  Could you please enlarge the text

7    of the e-mail because no one's going to be able

8    to read that.

9            (Deposition Exhibit Number 273 was

10   marked for identification and attached to the

11   transcript.)

12   BY MR. MEDLOCK:

13       Q    All right.  Mr. Hoffman, I put in

14   front of you what we will mark as Exhibit 273 to

15   your deposition.  It's a February 22nd, 2019,

16   e-mail from Joanne Fitzgerald to Luis Mejia,

17   Timothy Lemaux, Kenneth Sava, Andrew Bolton, and

18   you received a copy, a cc copy of the e-mail.

19           Do you see that, sir?

20       A    Yes, I do.

21       Q    So you received a copy of this e-mail

22   in the course of your duties with CBP; is that



Page 231

1    right?

2         A      Correct.

3         Q      And you kept and maintained this

4    e-mail in your e-mail system at CBP; is that

5    right?

6         A      That's correct.

7         Q      And receiving e-mails like this one

8    was part of your job at CBP; is that right?

9         A      Correct.

10        Q      Do you have any reason to believe that

11   Exhibit 273 is inauthentic in any way?

12        A      No.

13        Q      All right.  If you look at the footer

14   of the Fitzgerald e-mail, it appears she was the

15   branch chief for budget formulation in the budget

16   division of the Office of Field Operation; is

17   that right?

18        A      Correct.

19        Q      What was Mr. Timothy Lemaux's position

20   at CBP at the time of this e-mail?

21        A      At the time of this e-mail, he may

22   have also been here -- he's working as a director



Page 232

1    for the EFTA EVUS office and call center.

2        Q    He was a direct report of yours

3    potentially at the time of this e-mail?

4        A    Yes.

5        Q    And what position did Andrew Bolton

6    hold at CBP at the time of this e-mail?

7        A    I'm not sure his position.  He's

8    probably a branch chief for Mr. Lemaux.

9        Q    Okay.  And the subject line of this

10   e-mail is "Action OFO issue paper FY20

11   President's budget - due Wednesday, February 27."

12            Did I read that correctly?

13       A    Yes.

14       Q    And Ms. Fitzgerald writes in her

15   e-mail, "Good afternoon APP.  CBP has begun

16   preparations for release of the FY 2020

17   President's budget, which is to occur mid-March

18   2019.  It is now time to update issue papers.

19   Your office is being tasked with the following

20   issue papers."

21            Did I read that correctly?

22       A    Correct.



Page 233

1    Q    And there's three bullets beneath that

2    statement, correct?

3    A    Yes.

4    Q    The third bullet reads, "Metering,

5    return to Mexico, and detention at POEs."

6         Did I read that correctly?

7    A    That's correct.

8    Q    Does this refresh your recollection

9    that sometime in February or March 2018, APP

10   drafted an issue paper in connection with the

11   President's 2020 budget entitled "Metering,

12   return to Mexico, and detention at POEs"?

13   A    Yes, I imagine we did prepare the

14   issue papers.

15   Q    Do you know who at APP would have been

16   responsible for drafting the issue paper entitled

17   "Metering, return to Mexico and detention at

18   POEs"?

19   A    It would have been a combination of

20   Mr. Sava and probably Mr. Mejia.  And probably

21   Mr. Mejia, some of those topics I think are

22   within operations under XD Howe.  So I'm sure



Page 234

1   there was some coordination.

2       Q    Would you have received a final

3   version of the -- of this issue paper before it

4   was sent to Ms. Fitzgerald?

5       A    Not necessarily.

6       Q    Would Mr. Mejia had received one?

7       A    Well, if he authored it, he would have

8   it.

9            MR. MEDLOCK:  Okay.  Counsel, we don't

10  have a copy of this issue paper anywhere in the

11  document production.  It seems to be plainly

12  responsive to our prior request, so we would

13  request that you produce it.

14           MS. SHINNERS:  Okay.  We'll look into

15  whether it exists.

16           MR. MEDLOCK:  Okay.

17           UNKNOWN VOICE:  Sorry.  I don't

18  understand.

19           MR. MEDLOCK:  Who doesn't understand?

20           MS. SHINNERS:  Alexa doesn't

21  understand anything.

22           MR. MEDLOCK:  Oh, ok.  Understood.



Page 235

```
 1   People don't often understand my questions.

 2                  (Alexa talking)

 3            MS. SHINNERS:  I apologize.  I muted

 4   it.  But it -- okay.

 5            MR. MEDLOCK:  No worries.

 6            Josh, can we please bring up Tab 27.

 7            COURT REPORTER:  Did you say 27?

 8            MR. MEDLOCK:  Yes, I did.

 9            (Deposition Exhibit Number 274 was

10   marked for identification and attached to the

11   transcript.)

12   BY MR. MEDLOCK:

13       Q    Sir, I put in front of you what we

14   will mark as Exhibit 274 to your deposition.  It

15   is a two-page document that bears the Bates

16   number CBPALOTRO0000314 through '15.

17            And my first question to you, sir,

18   have you seen this document before?

19       A    I probably have or probably was a

20   recipient of it.  I may have been a recipient

21   when it was sent out.  I'm not sure.

22       Q    Okay.  And this is an April -- sorry.
```



Page 236

1    This is an April 30th, 2020, e-mail with an

2    attachment entitled "Metering guidance," correct?

3        A    Correct.

4        Q    This appears to be a reissued version

5    of the April 27, 2018, metering guidance,

6    correct?

7        A    I'd have to read it to be sure.

8    But --

9        Q    Well, go ahead and take a look at it

10   and let me know if that's true.

11       A    Okay.

12       Q    Having reviewed the e-mail, do you

13   believe this to be an updated version of the

14   April 27, 2018, metering guidance that we were

15   discussing earlier today?

16       A    Yes.  I guess you can say that's an

17   updated version.

18       Q    And this memorandum is from Vernon

19   Foret, the executive director of operations for

20   OFO, correct?

21       A    That's correct.

22       Q    Mr. Foret is the person who succeeded



Page 237

1  Mr. Howe as executive director for operations,

2  correct?

3        A     Correct.

4        Q     Do you know where Mr. Howe is working

5  currently in CBP?

6        A     Yes.  He's the director of Laredo

7  field office.

8        Q     Do you know why Mr. Howe was

9  transferred to the Laredo field office?

10       A     Yes, because he volunteered to take on

11  that assignment.

12       Q     Do you have any understanding as to

13  why he volunteered to take on that assignment?

14       A     Yes.  He essentially told me he wanted

15  a change, and his last three, four years wanted

16  to do something different, get back into the

17  field.

18       Q     Okay.  I'd like to focus with you on

19  the -- on how this April 30th, 2020, version of

20  the metering guidance was drafted.

21             Did Admissibility and Passenger

22  Programs play any role in drafting this April



Page 238

1   30th, 2020, metering guidance, to your knowledge?

2       A    No, not to my knowledge.

3       Q    Did operations play any role in

4   drafting the April 30th, 2020, metering guidance,

5   to your knowledge?

6       A    I don't know for sure, but my

7   assumption would be that they did have some role

8   since it was sent out by Mr. Foret.

9       Q    Oh, I'm sorry.  Mr. Foret.  Thank you

10  for telling me how to pronounce his name.

11           Despite the fact that this memorandum

12  is from Mr. Foret, do -- you have no direct

13  evidence that operations played a role in

14  drafting this guidance, do you?

15      A    No, no direct knowledge.

16      Q    Do you know whether the Office of

17  Chief Counsel played any role in drafting this

18  guidance?

19      A    I don't know.

20      Q    Do you know whether the Department of

21  Justice played any role in drafting this

22  guidance?


MAGNA
LEGAL SERVICES

Page 239

1        A      No, I do not know.

2        Q      Do you know whether DHS's Office of

3   Inspector General played any role in drafting

4   this guidance?

5        A      No, I do not know.

6        Q      Do you know whether the April 30th,

7   2020, metering guidance was issued as a result of

8   an investigation by DHS's Office of Inspector

9   General?

10       A      No, not aware.

11       Q      Are you aware of any ongoing or past

12  investigation by DHS's Office of Inspector

13  General related to metering or queue management

14  at ports of entry?

15       A      I'm not sure.  I know their OIG and

16  GAO, they're doing a tremendous amount of work.

17  I suspect they are looking at this.  But I don't

18  know -- they're looking at each and every

19  program.  So it's hard to really pinpoint exactly

20  what they're looking at.

21       Q      Have you been interviewed by anybody

22  at OIG regarding metering or queue management?



Page 240

1        A      No, I have not.

2        Q      To your knowledge, have OIG reviewed

3   any of your e-mails or documents in connection

4   with an investigation into metering or queue

5   management?

6        A      No.  In fact, I am recalling that -- I

7   know there is a draft.  I think it's an OIG.  I

8   want to say it's queue management.  I think

9   there's a draft OIG document now.  Probably ready

10   to be --

11            MS. SHINNERS:  So -- okay.  That's

12   fine.  I'm sorry to interrupt.

13            THE WITNESS:  I just wanted to clarify

14   I recall that there is a specific OIG.

15   BY MR. MEDLOCK:

16        Q      What's the draft document you're

17   thinking of?

18            MS. SHINNERS:  Yeah.  I just want to

19   instruct the witness not to answer to the extent

20   it would reveal the substance of the draft

21   document, which is not final and pre-decisional.

22   If I may, you can -- you can say the topic in



Page 241

1   very general terms.

2   BY MR. MEDLOCK:

3       Q      Can you, please, state the topic of

4   the draft OIG memorandum in very general terms,

5   sir?

6       A      I don't know the topic.  I believe it

7   is regarding metering or queue management.

8       Q      Do you know whether there is any

9   timetable for the release of a final OIG report

10  on metering or queue management?

11      A      No, I don't know the timetable.

12      Q      Do you know whether the release of any

13  draft OIG report on metering or queue management

14  have been held up due to this ongoing litigation?

15      A      No, not aware.

16      Q      Are you aware of any statements being

17  inserted into a draft OIG report regarding

18  metering or queue management that would be

19  consistent to the Department of Justice in

20  dissenting the Al Otro Lado litigation?

21      A      No.

22      Q      Have you seen a draft, the actual



Page 242

1    draft, of the OIG report regarding metering or

2    queue management?

3         A     Yes.

4         Q     Who showed you that draft?

5         A     I'm not sure.  I might have it via

6    e-mail.  I'm not sure how I acquired it.

7         Q     Do you recall when you received a copy

8    of the draft OIG report regarding metering or

9    queue management?

10        A     Might have been a couple weeks ago.

11        Q     Do you recall anyone else who received

12   a copy of the draft OIG report regarding metering

13   or queue management?

14        A     No, I'm not aware of who else received

15   it.

16        Q     Is it the case that there is currently

17   an open period for comment on the draft OIG

18   report regarding metering or queue management?

19        A     Am I aware of the comment period is

20   opened are you saying?

21        Q     Yeah.

22        A     Yeah, I don't know.



Page 243

1      Q      Have you provided any comment or

2   feedback on the draft OIG report regarding

3   metering or queue management?

4      A      Not me personally, no.

5      Q      Are you aware of anyone else providing

6   comments or feedback regarding the draft OIG

7   report regarding metering or queue management?

8      A      I believe my staff and operation

9   staff, they're both working on it, I believe.

10      Q      Who on your staff is working on

11   providing comments or feedback regarding the

12   draft OIG report regarding metering or queue

13   management?

14      A      I would -- I'm not sure, but it

15   probably would be Luis Mejia, and he may have

16   others working on it as well.

17      Q      Do you know who from operations is

18   working on providing comments or feedback

19   regarding the draft OIG report on metering or

20   queue management?

21      A      Not for sure.  But it might be Joe

22   Draganac might be also working on it.



Page 244

1      Q      Have you yourself weighed in with Mr.

2  Mejia or Mr. Draganac regarding comments or

3  feedback that should be provided to OIG regarding

4  any draft report on metering or queue management?

5      A      No.

6      Q      Have you seen a draft of the comments

7  that either Mr. Mejia or Mr. Draganac intends to

8  send to OIG regarding the OIG report on metering

9  or queue management?

10      A      No.

11      Q      How many pages long is the draft OIG

12  report on metering or queue management?

13      A      I don't know.  Maybe 50, 60.

14      Q      Does the draft OIG report regarding

15  metering or queue management contain a discussion

16  of the Al Otro Lado litigation?

17            MS. SHINNERS:  Objection.  I'm going

18  to instruct him not to answer about the substance

19  of the draft report.  If you can answer without

20  revealing the substance of the draft report, go

21  ahead, Mr. Hoffman.  Thank you.

22            THE WITNESS:  I don't recall.



Page 245

1    BY MR. MEDLOCK:

2        Q     Do you recall whether the draft OIG

3    report regarding metering or queue management

4    comes to any conclusion regarding the legality of

5    metering or queue management?

6             MS. SHINNERS:  Same objection.  I'm

7    going to instruct him not to answer the question

8    to the extent it would reveal anything about the

9    substance of the DHS OIG report, the draft.

10   BY MR. MEDLOCK:

11       Q     Are you able to answer my question, or

12   are you going to follow your attorney's

13   instruction and not answer my question?

14       A     I'll follow my attorney's instruction.

15       Q     Okay.  How -- to your knowledge, how

16   many drafts of the OIG report regarding metering

17   or queue management have been distributed to APP

18   or ops?

19       A     I have no idea.

20       Q     Do you recall anything else that you

21   can disclose to me today regarding the substance

22   of the draft OIG report regarding metering or



Page 246

1    queue management?

2            MS. SHINNERS:  Object.  I'm going to

3    instruct the witness not to answer because it

4    asks for information about the substance of the

5    draft OIG report.

6            MR. MEDLOCK:  Okay.  Before I move on

7    to another -- to another topic, I just want to

8    make a quick statement for the record, and then

9    we can take a break after that because I think

10   that's what you were going to ask for Katie.

11           MS. SHINNERS:  Yes.

12           MR. MEDLOCK:  It's our position that

13   regardless of whether the draft -- the draft OIG

14   report and comments to it are pre-decisional or

15   deliberative, they go directly to the heart of

16   this litigation.  If, for example, OIG made an

17   initial determination that metering or queue

18   management was illegal and was pushed away from

19   making that determination, that's highly relevant

20   both to the legality of metering and to the

21   intent and motivation of CBP.

22           So our position is it fits squarely



Page 247

1   within Magistrate Judge Crawford's prior opinion

2   regarding the application of a deliberative

3   process privilege and the prior clawback push

4   that we've already litigated and that these --

5   and that all documents regarding this draft OIG

6   report and the comments to it should be produced.

7   And we will request that, because I think we've

8   already requested this information in previous --

9   in prior requests for production.

10          Katie, I don't know if you have a

11  response.

12          MS. SHINNERS:  I have a lot of

13  responses.  I'll try to be brief.

14          Judge Crawford's order is currently in

15  the field but obviously the draft OIG reports do

16  not fall at all within the type of documents that

17  were addressed by Judge Crawford's order, which

18  are internal CBP documents and not OIG documents.

19  I don't think it falls at all within that.  It is

20  currently on appeal with the district court

21  judge.

22          We have logged any drafts that were



Page 248

1   collected and -- collected previously on the

2   privilege log.  And we disagree -- I will just

3   note that the comment period, as you suggest, is

4   a typical part of the process regarding OIG's

5   work.  And that's all I -- I -- I think you are

6   noting your position for the record.  And is

7   there any action to be taken now?

8           MR. MEDLOCK:  I don't think there's

9   any action to be taken now.  Thank you for asking

10  that question.  I think we need to deal with it

11  in subsequent correspondence after this

12  deposition.

13          I did think of one quick question I

14  wanted to ask Mr. Hoffman before we take a much

15  needed break.

16  BY MR. MEDLOCK:

17     Q    And that question, Mr. Hoffman, is,

18  typically OIG reports reference investigation

19  numbers or report numbers.  Do you recall any

20  number associated with the draft report that you

21  saw?

22     A    I do not.



Page 249

1          MR. MEDLOCK:  Okay.  Why don't we go

2    off the record and take our break.

3          MS. SHINNERS:  Great, thank you.

4          VIDEOTAPE OPERATOR:  The time is 3:51

5    p.m.  We're going off the record.

6          (A brief recess was taken.)

7          VIDEOTAPE OPERATOR:  The time is 4:06

8    p.m.  We're back on the record.

9    BY MR. MEDLOCK:

10     Q     Mr. Hoffman, when did you first become

11   aware of the organization Al Otro Lado?

12     A     When did I first become aware?

13   Probably a couple years ago.  I'm not exactly

14   certain.

15     Q     Was it around the time that this

16   lawsuit was filed?

17     A     I imagine so.  Sure.

18     Q     To your knowledge, does CBP or DHS

19   have any open investigations into Al Otro Lado or

20   any of its members?

21     A     Not to my knowledge.

22     Q     To your knowledge, has CBP ever



Page 250

1    investigated Al Otro Lado or any of its members?

2         A     No, not to my knowledge.

3         Q     To your knowledge, are there any

4    current or former federal law enforcement

5    investigations into Al Otro Lado or any of its

6    members?

7         A     No, not to my knowledge.

8         Q     Have you been following this

9    litigation off and on since it was first filed?

10        A     No, not really.

11        Q     Do you sometimes get updates on the

12   course of the litigation from the Office of Chief

13   Counsel?

14        A     No.  Or if I do, I don't read them.

15        Q     That's a terrible admission.  I'm just

16   joking.

17              Do you know who the principals of Al

18   Otro Lado are?

19        A     No.

20        Q     Do you know a woman named Nora

21   Phillips who is one of the principals of Al Otro

22   Lado?



Page 251

1     A     I don't -- I don't know her

2  personally.

3     Q     You'd say you've never met her; is

4  that right?

5     A     No.  No.

6     Q     Do you have any opinions, one way or

7  the other, about Nora Phillips personally?

8     A     No.

9     Q     Have you ever met anybody who works

10  for Al Otro Lado?

11     A     No, not to my knowledge.

12     Q     Do you have any opinions about Al Otro

13  Lado as an organization?

14     A     No.

15     Q     In your work at CBP, do you try to --

16  as a member of the senior executive ranks, do you

17  try to model professionalism for those who serve

18  under you?

19     A     I try, yes.

20     Q     And do you try to model

21  professionalism in your interactions with the

22  public?



Page 252

1        A      Yes.

2        Q      I'd like to bring up Tab 34, if I can,

3    please.

4               (Deposition Exhibit Number 275 was

5    marked for identification and attached to the

6    transcript.)

7    BY MR. MEDLOCK:

8        Q      Sir, I'm showing you what we will mark

9    as Exhibit 275 to your deposition.  It's an

10   e-mail chain from February 1st, 2019, between

11   Randy Howe, yourself, Kurry Pastilong, and others

12   at CBP, and it has the Bates numbers

13   AOL-DEF-0021702 through '07.

14               Do you have that document in front of

15   you, sir?

16       A      Yes.

17       Q      All right.  If you look at the top of

18   the e-mail chain at the header, it appears that

19   you sent the first e-mail in the chain -- last

20   e-mail in the chain, I should say, on February

21   1st, 2019, at 7:20 p.m. to Randy Howe with a copy

22   to Kurry Pastilong; is that right?



Page 253

1        A      Yes, that's correct.

2        Q      So you would have sent and received

3    the e-mail that was in Exhibit 275 in the course

4    of your work at CBP; is that correct?

5        A      Yes, that's correct.

6        Q      And you would have kept and maintained

7    this e-mail chain in your e-mail system at CBP;

8    is that right?

9        A      Correct.

10       Q      And sending and receiving e-mails like

11   those in this e-mail chain was part of your job

12   at CBP; is that right?

13       A      Correct.

14       Q      Do you have any reason to believe that

15   the e-mails in this e-mail chain are inauthentic

16   in any way?

17       A      No, I do not.

18              MR. MEDLOCK:  Okay.  I'd like to start

19   at the very start of the e-mail chain, which is

20   on the last page, if you could, Josh.  If you

21   could actually go up one page.  I forgot that the

22   e-mail spanned two pages.  If you could, Josh,



Page 254

1    please expand the bottom e-mail of that page.

2    Thanks very much.

3    BY MR. MEDLOCK:

4         Q     Okay.  So this, Mr. Hoffman, this

5    e-mail change starts with an e-mail from Talia

6    Inlender on February 1st, 2019, at 10:05 a.m. to

7    Enrique Robles who has a "mail.house.gov" e-mail

8    address?

9              Do you see that?

10        A     Yes, I do.

11        Q     Okay.  And if you look at the body of

12   the e-mail, starting with the second paragraph,

13   there's a discussion of Nora, Phillips, "an

14   attorney with Al Otro Lado, being detained at the

15   Guadalajara, Mexico airport with her

16   seven-year-old daughter."

17             Do you see that, sir?

18        A     Yes, I do.

19        Q     Do you recall this incident, sir?

20        A     I recall the incident, yes.

21        Q     Okay.  And is this the only time that

22   you've ever dealt directly with an incident



Page 255

1    related to Nora Phillips?

2         A      Yeah.   That's to my recollection, yes.

3               MR. MEDLOCK:   Okay.   Let's move up the

4    e-mail chain, if we could, Josh, and look at the

5    e-mail that was sent by Enrique Robles on

6    February 1st, 2019 at 12:52 p.m.

7               It should be the next e-mail up on the

8    next page.   Can you please expand that e-mail

9    that was sent at 12:52, please, Josh.

10   BY MR. MEDLOCK:

11        Q      So this is an e-mail from Enrique

12   Robles to Carlos Martel with a cc to Scott

13   Jackson.

14              Do you see that, sir?

15        A      I do.

16        Q      The subject line is "(Urgent)

17   Congressional casework: Al Otro Lado attorney

18   deported to LAX."

19              Did I read that correctly?

20        A      Yes.

21        Q      At the time of this e-mail, what was

22   Mr. Martel's position at CBP?



Page 256

1        A       He would have been the director of

2    field operations in L.A.

3        Q       What was Scott Jackson's position at

4    CBP at the time of this e-mail?

5        A       At the time of this e-mail, I imagine

6    he was the director over the tactical teams.

7        Q       And in this e-mail, Mr. Robles is

8    essentially boarding on a summary of the issue

9    that is going on with Nora Phillips and her

10   seven-year-old daughter being detained at the

11   Guadalajara, Mexico airport, correct?

12       A       That's what it appears to be.

13               COURT REPORTER:  Excuse me.  Can we

14   stop?  Excuse me.  Can we stop?  My dog is going

15   off.  Let me put her in the other room.  Two

16   seconds.  Two seconds.

17               VIDEOTAPE OPERATOR:  The time is 4:15

18   p.m.  Going off the record.

19               (A brief recess was taken.)

20               VIDEOTAPE OPERATOR:  The time is 4:17

21   p.m.  We're back on the record.

22   BY MR. MEDLOCK:



Page 257

1       Q      All right.  Mr. Hoffman, let's move up

2   this e-mail chain.

3              MR. MEDLOCK:  Josh, if you could exit

4   out of this enlarged version and flip to the next

5   page -- enlarge the next e-mail in the chain,

6   please.

7              MR. PINKUS:  Is it this page -- I'm

8   sorry -- or the next one?

9              MR. MEDLOCK:  This page.  The e-mail

10  from Scott Jackson at February 1st, 2019, at

11  12:09 p.m.

12  BY MR. MEDLOCK:

13      Q      All right.  So Mr. Hoffman, if you

14  look at this e-mail in the chain, it appears

15  Scott Jackson forwarded the request from Enrique

16  Robles to Donald Kusser and Cheryl Davies with

17  importance attached as high.

18             Do you see that?

19      A      Yes.

20      Q      Okay.  And at the time of this e-mail,

21  what was Donald Kusser's position at CBP?

22      A      Port director at LAX.



Page 258

1      Q    And what was Cheryl Davies' position

2    at CBP at the time of this e-mail?

3      A    I believe she was assistant port

4    director at LAX.

5      Q    Okay.  Do you recall over a process of

6    hours yourself, Kurry Pastilong, Randy Howe, and

7    officials from CBP who worked at LAX were working

8    on this issue related to Nora Phillips on

9    February 1st, 2019?

10     A    Yes, I do remember it, and I remember

11   it over a number of hours, yes.

12          MR. MEDLOCK:  Okay.  Can you, Josh,

13   please go to the first page of the e-mail chain,

14   and can you please expand the e-mail that Randy

15   Howe sent on February 1st, 2019, at 7:17 p.m.

16   Thanks very much, Josh.

17   BY MR. MEDLOCK:

18     Q    On February 1st, 2019, at 7:17 p.m.,

19   Randy Howe wrote, "Thank you both.  Sorry for the

20   fire drill.  I'm gonna drink now finally" and he

21   used an exclamation point after finally.

22          Do you see that, sir?



Page 259

1        A     I do.

2        Q     And do you recall -- essentially with

3    this e-mail, Mr. Howe is relieved that the issue

4    has been worked through; is that correct?

5              MS. SHINNERS:  Objection; calls for

6    speculation.

7    BY MR. MEDLOCK:

8        Q     Is that how you read his e-mail?

9        A     No.  I don't read it as being

10   relieved.  You know, I was a little annoyed that

11   Mr. Howe was behind the curve a little bit that

12   this issue was handled several hours earlier.

13       Q     Okay.  So by this point, you were a

14   bit annoyed with how the problem was being worked

15   by others at CBP; is that right?

16       A     Yes.  Double tasking, multiple people

17   working on it, and incomplete information and

18   incorrect information.  I was very much annoyed

19   with tracking this issue over a number of hours.

20       Q     Okay.

21             MR. MEDLOCK:  Josh, can you expand the

22   final e-mail that was sent in this chain.



Page 260

1    BY MR. MEDLOCK:

2        Q    So this is an e-mail you sent on

3    February 1st, 2019, at 7:20 p.m. to Randy Howe

4    with copy to Kurry Pastilong.

5             Do you see that, Mr. Hoffman?

6        A    Yes.

7        Q    And can you read the body of the

8    e-mail that you sent to Mr. Hoffman into the

9    record?

10       A    You want me to read it that I sent to

11   Mr. Howe you mean?

12       Q    Yes.

13       A    Sent to Mr. Howe.  Yeah.  "Kusser

14   called me on this --" I'm sorry.

15       Q    Go ahead.  I'm sorry.  Go ahead.  You

16   can read it in.

17       A    "Kusser called me on this about 2:00."

18   It should be "they."  "They expedited the bitch

19   at LAX."

20       Q    Okay.  And when you said "the bitch,"

21   were you referring to Nora Phillips or her

22   seven-year-old daughter?



Page 261

1     A     I imagine Nora Phillips.  I would

2  never be referring to the seven-year-old

3  daughter.

4     Q     Okay.  You see that you sent this

5  e-mail calling Nora Phillips a bitch from your

6  iPhone; is that right?

7     A     Yes, I do see that.

8     Q     Okay.  And you don't -- this is an

9  iPhone you use for work purposes?

10    A     Yeah, that would have been my work

11  phone.

12    Q     Okay.  And were you drinking at the

13  time you sent this e-mail calling Nora Phillips a

14  bitch?

15    A     I'm sure I was.  I probably said that

16  in poor taste, used poor judgment, and

17  essentially probably trying to be funny to Mr.

18  Howe.  And again, I was annoyed by the level of

19  effort that was put into this issue.

20         MR. MEDLOCK:  Can we bring up Tab 35,

21  please, Josh.

22  BY MR. MEDLOCK:



Page 262

1      Q      I'd like to focus on the top e-mail in

2  this chain, Mr. Hoffman.  But before we enlarge

3  it, actually does this appear to you to be a

4  continuation of the same e-mail chain that we

5  were looking at in Exhibit 275?

6      A      It could very well be.  I don't know

7  why all the -- yeah, I guess it is, yeah.  It is.

8              (Deposition Exhibit Number 276 was

9  marked for identification and attached to the

10  transcript.)

11  BY MR. MEDLOCK:

12     Q      Okay.  And I'm going to state for the

13  record that this is what will be marked as

14  Exhibit 276 to your deposition.  It's a multipage

15  e-mail chain that bears the Bates number

16  AOL-DEF-00217710 through '16.  And it appears to

17  be a February 1st, 2019, e-mail chain.

18              MR. MEDLOCK:  With that said, Josh,

19  can you please enlarge the top e-mail in the

20  chain.

21  BY MR. MEDLOCK:

22     Q      You recall earlier that Mr. Howe said



Page 263

1    that finally he could now go drink, correct?

2        A    Correct.

3        Q    And you responded to Mr. Howe with a

4    copy to Kurry Pastilong from your iPhone writing,

5    "And, already indulging.  Good evening."

6             Did I read that correctly?

7        A    That's correct.

8        Q    By "indulging", did you mean you were

9    drinking?

10       A    Correct.

11       Q    Okay.  And were you, in fact, drinking

12   when you sent that e-mail?

13       A    Yeah, I'm sure I was.

14       Q    Were you drinking when you sent the

15   e-mail on your work phone calling Nora Phillips a

16   bitch?

17       A    Yes, I believe so.

18       Q    Do you think it's an example of strong

19   leadership to call someone who you've never met a

20   bitch?

21            MS. SHINNERS:  Objection.

22            THE WITNESS:  No, it was a poor



Page 264

 1    judgment --

 2              MS. SHINNERS:  Harassing.

 3              THE WITNESS:  -- to put that type of

 4    language in e-mail.  Again, that was a -- not her

 5    specifically as a person.  I was just probably

 6    trying to be funny with Randy and Kurry because

 7    the amount of effort I put into this tracking

 8    down misinformation.  We got information she went

 9    through Mexico City.

10              We put a lot of hours into this

11    research, much of it being misinformation.  So

12    with Randy pinging me that hour of the night, I

13    was already annoyed to begin with, and he was a

14    couple hours behind.  So just kind of manifested

15    itself in poor language.  It was not intended

16    against Ms. Phillips.  It was just poor judgment.

17    BY MR. MEDLOCK:

18       Q    You said you were trying to be funny

19    with Randy Howe.  Do you think it's funny to call

20    someone who you've never met a bitch?

21              MS. SHINNERS:  Objection; harassing.

22    You can answer, Mr. Hoffman.



Page 265

1                    THE WITNESS:  No.  Again, I exercised

2    poor judgment to put that in e-mail like that and

3    to use that language.

4    BY MR. MEDLOCK:

5         Q     Is it poor judgment because you wrote

6    it down, or is it poor judgment because you

7    called someone a bitch behind their back?

8         A     Poor judgment all the way around.

9              MR. MEDLOCK:  Let's bring up Tab 36,

10   please, Josh.

11             (Deposition Exhibit Number 277 was

12   marked for identification and attached to the

13   transcript.)

14   BY MR. MEDLOCK:

15        Q     I'll represent to you, sir, that this

16   is a photograph that appeared in the Los Angeles

17   Times on February 2nd, 2019, and the -- I know

18   you haven't met her before, but the woman who's

19   crying in the foreground of the picture is Nora

20   Phillips, and this is taken at LAX Airport.

21             Have you ever seen this picture

22   before, sir?



Page 266

1        A     No.  First time.

2        Q     Okay.  In this photograph, does Nora

3   Phillips look like a bitch to you?

4              MS. SHINNERS:  Objection.  That's an

5   improper question.  You can answer, Mr. Hoffman.

6              THE WITNESS:  No.

7              MR. MEDLOCK:  Let's go to Tab 37,

8   please.

9              (Deposition Exhibit Number 278 was

10  marked for identification and attached to the

11  transcript.)

12  BY MR. MEDLOCK:

13       Q     Tab 37 is a copy of a declaration that

14  was provided by Nora Phillips in the course of

15  litigation.  It was filed with the court February

16  22nd, 2019.  It's a docket entry 227-2.

17             Have you ever seen a copy of this

18  declaration from Nora Phillips before, sir?

19       A     Not to my knowledge.  I may have, but

20  I'm not sure.

21             MR. MEDLOCK:  Okay.  Josh, can you,

22  please, flip to Page 5 of what we'll mark as



Page 267

1    Exhibit 278.

2             MR. PINKUS:  Do you want to go to the

3    fifth page of the document?

4             MR. MEDLOCK:  The fifth page, at the

5    bottom of it.

6    BY MR. MEDLOCK:

7        Q    All right, sir.  I want to --

8             MR. MEDLOCK:  Josh, can you please

9    enlarge Paragraph 18 at the very bottom of Page

10   5.

11   BY MR. MEDLOCK:

12       Q    All right.  Sir, I don't know if

13   you've seen this or not, so I'll just read to you

14   the statement and then I will follow up with you

15   with some questions on it.

16             Ms. Phillips states in her

17   declaration, "I informed the INM officers that I

18   had Ehlers-Danlos syndrome, hypermobility type, a

19   rare degenerative disorder that causes chronic

20   joint and connective tissue pain, organ rupture,

21   and other medical issues."

22             Did I read that correctly, sir?



Page 268

1          A      Yes.

2          Q      At the time that you called Nora

3   Phillips a bitch, did you know that she suffered

4   from a rare degenerative disorder?

5          A      Again, I was not referring to Ms. Nora

6   Phillips as a bitch.  What I told you, I said it

7   in a context where I was frustrated by these

8   events and used improper language and poor

9   judgment in the context of that e-mail.

10         Q      So I mean, when you say "they

11  expedited the bitch through LAX," when you say

12  "bitch," you are referring to Nora Phillips; is

13  that right?

14              MS. SHINNERS:  Objection; asked and

15  answered, and this line of questioning is

16  extremely harassing and unnecessary.  You can

17  answer, Mr. Hoffman.

18              THE WITNESS:  Asked and answered, yes.

19  BY MR. MEDLOCK:

20         Q      Okay.  And after you sent that e-mail

21  on February 1st, 2019, did you ever give a second

22  thought to having called Nora Phillips a bitch?



Page 269

1      A      No.

2             MS. SHINNERS:  Same objection.

3  BY MR. MEDLOCK:

4      Q      Isn't it true that you called Ms.

5  Phillips a bitch because Al Otro Lado was causing

6  problems for the implementation of the metering

7  policy?

8      A      No, absolutely not.

9      Q      Isn't it true that you called Ms.

10  Phillips a bitch because you viewed Al Otro Lado

11  as a problem for implementing policies on the

12  Southwest border?

13      A      No, absolutely not.

14      Q      Isn't it true that you called Ms.

15  Phillips a bitch because her organization filed a

16  lawsuit against CBP?

17      A      No, absolutely not.

18      Q      Isn't it true that you called Ms.

19  Phillips a bitch behind her back because you have

20  a problem with women challenging your authority?

21             MS. SHINNERS:  Objection; harassing,

22  irrelevant.  You can answer, Mr. Hoffman.



Page 270

 1                THE WITNESS:  No, absolutely not.

 2                MR. MEDLOCK:  Okay.  Why don't we take

 3      a break.  Those are all the questions I have.  I

 4      know that Ms. Crow will have questions when we

 5      come back.

 6                MS. SHINNERS:  Okay.  We can go off

 7      the record.

 8                VIDEOTAPE OPERATOR:  The time is 4:32

 9      p.m.  We're going off the record.

10                (A brief recess was taken.)

11                VIDEOTAPE OPERATOR:  The time is 4:41

12      p.m.  We're back on the record.

13                MS. CROW:  Thank you.

14          EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

15      BY MS. CROW:

16          Q    Good afternoon, Mr. Hoffman.  I know

17      it's been a long day, and I promise not to keep

18      you too much longer.

19                As you know, my name is Melissa Crow,

20      and I also represent the plaintiffs in this case.

21      I just want to make sure that you understand that

22      the same rules that Mr. Medlock outlined at the



Page 271

1    beginning of today's deposition also apply to the

2    questions that I'm going to ask you.

3            Do you understand that?

4    A     Yes, I do.

5    Q     In the course of your responsibilities

6    at CBP, do you ever interact with individuals who

7    are Mexican government officials?

8    A     No, not typically.  I'm not sure -- I

9    have in the past, through not necessarily on the

10   border, but various programs that we have in

11   Mexico City.  We have meetings in Mexico City.

12   Q     Since 2016, have any of your

13   interactions with Mexican government officials

14   related to the processing of asylum seekers or

15   other migrants at ports of entry along the

16   Southern border?

17   A     No.

18   Q     Did such interactions relate to

19   metering or queue management?

20   A     No, I don't believe so.

21   Q     What did you interact with Mexican

22   government officials about?



Page 272

1       A       Various programs, whether it could be

2    trusted traveler programs, you know, combining

3    them with privileges in the United States and

4    Mexico, essentially programs like trusted

5    traveler programs, a lot of cargo-related

6    programs, joint inspection programs, and so

7    forth.  I was the lead for a while representing

8    CBP as kind of the lead negotiator working with

9    my Mexican counterpart, and those were unrelated

10   to migration issues.

11      Q       So who in the Office of Field

12   Operations would generally interact with Mexican

13   government officials about queue management or

14   metering or processing of asylum features at the

15   Southern border?

16      A       I'm not aware of anyone at the

17   headquarters level doing that.  That's typically

18   done at the field director level to interact with

19   their local INAMI counterparts.

20      Q       To your knowledge, has CBP officials

21   ever coordinated with Mexican officials to deny

22   asylum seekers access to inspection or processing



Page 273

1    at a port of entry?

2         A    Can you ask the question again?

3         Q    Sure.  To your knowledge, have CBP

4    officials ever coordinated with Mexican officials

5    to deny asylum seekers at the Southern border

6    access to inspection or processing at a port of

7    entry?

8         A    No, not to my knowledge.

9         Q    To your knowledge, have CBP officials

10   ever coordinated with Mexican officials to turn

11   away individuals seeking asylum at a port of

12   entry along the Southern border?

13              MS. SHINNERS:  Objection; vague.

14              THE WITNESS:  They may locally -- I'm

15   sorry.

16              MS. SHINNERS:  I said objection;

17   vague.  You can go ahead, Mr. Hoffman.  You said?

18              THE WITNESS:  Maybe the local field

19   directors or management teams coordinated with

20   local INAMI.

21   BY MS. CROW:

22        Q    Do you have any idea which field



Page 274

1    directors those would have been?

2        A      All of them to some degree or --

3    and/or their staffs to some degree would

4    coordinate with their Mexican counterparts as

5    necessary.  That's my understanding.

6            MS. CROW:  Josh, if you could put up

7    Tab 38, please.  Thank you.  And my eyes I think

8    are worse than Mr. Medlock's.  So if you could

9    make it a little bigger, that would be great.

10   We'll mark that as Exhibit 279.  Thank you.

11           (Deposition Exhibit Number 279 was

12   marked for identification and attached to the

13   transcript.)

14   BY MS. CROW:

15       Q    Mr. Hoffman, I'm showing you a

16   document that is now marked as Exhibit 279 to

17   your deposition.  It's a one page e-mail chain

18   with Bates number AOL-DEF-00090986.  Please take

19   a moment to review it, and let me know when you

20   have finished.

21           MS. CROW:  I apologize.  I need to

22   step away for about 30 seconds because somebody



Page 275

1    is locked out of my house.  I'll be right back.

2    Sorry about that.

3    BY MS. CROW:

4        Q     Are you finished reviewing it?

5        A     Yes.

6              MS. CROW:  Okay.  Let's start at the

7    bottom, Josh.

8    BY MS. CROW:

9        Q     This document is an e-mail chain from

10   September 17th, 2016, that started with a request

11   from John Wagner to the four directors of field

12   operations requesting the average daily intake of

13   Haitians at the ports, correct?

14       A     I'm sorry.  You're asking me?

15       Q     Yes.

16       A     Yes.

17       Q     And what position did Mr. Wagner hold

18   at that point in time?

19       A     His current position, he would have

20   been deputy executive assistant commissioner.

21       Q     Thank you.

22             And this information is needed for an



Page 276

1   operations plan that was being prepared for the

2   DHS secretary, correct?

3       A    Yes, that's what it appears to be.

4       Q    And you received the initial request

5   from Mr. Wagner on or around September 17th,

6   2016, at 2:49 p.m., correct?

7       A    Yes.

8       Q    And you received the response from

9   Pete Flores on or around September 17, 2016, at

10  3:59 p.m., correct?

11      A    That's correct.

12      Q    And you would have received both of

13  these e-mails in the course of your duties at

14  CBP, right?

15      A    Yes.  Correct.

16      Q    And you would have read and understood

17  those e-mails at the time you received them,

18  correct?

19      A    Yes.

20      Q    In the e-mails from Pete Flores, he

21  states, and I quote, "We are currently under an

22  agreement with Mexican immigration to limit the



Page 277

1    flow of OTMs (Haitians included) to the port of

2    San Ysidro and Calexico due to facility and

3    processing constraints.  The agreement at San

4    Ysidro is currently 50 to 60 a day and at

5    Calexico it is 40 a day.  These numbers are

6    mostly Haitians."

7              Did I read that correctly?

8        A     You did.

9        Q     And "OTMs" means other than Mexicans,

10   correct?

11       A     Correct.

12       Q     Are you familiar with the terms of the

13   agreement between the San Ysidro port of entry

14   and Mexican immigration?

15       A     No, I'm not familiar with the terms of

16   the agreement.

17       Q     Do you have a general sense of the --

18   what the agreement is meant to do?

19       A     I think the agreement is just a

20   verbal -- it's just a -- I don't think it's an

21   agreement in writing.  It's just an agreement in

22   that they'll work together and coordinate to



Page 278

1    control the intake at the San Ysidro port of

2    entry and obviously to include Calexico.

3        Q    What is the Mexican government's

4    obligations under the agreement?

5            MS. SHINNERS:  Objection to

6    foundation.

7            THE WITNESS:  I'm sorry.

8            MS. SHINNERS:  It's okay.  You can

9    answer, Mr. Hoffman.

10           THE WITNESS:  They don't have any

11   specific obligation.

12   BY MS. CROW:

13       Q    So there is an agreement or there's

14   not an agreement?

15       A    This apparently said there's an

16   agreement.  There's an agreement in principle

17   whereby they'll coordinate with the Mexican

18   government, whether it's INAMI group of beta or

19   an outfit similar, whereby they'll coordinate so

20   they can control and monitor the intake to the

21   port of entry so it's not overwhelmed.

22       Q    Do you have any understanding of the



Page 279

1    terms of this cooperation as I believe you called

2    it?

3         A     No, I do not.

4         Q     Do you know when this agreement was

5    put in place?

6         A     Probably around that time or maybe a

7    bit sooner.  I'm not sure.

8         Q     Do you know who was involved in

9    negotiating or putting in place the terms of this

10   agreement?

11        A     No, I do not.  I imagine it was

12   probably DFO Flores and Port Director Aki.

13        Q     And do you know who would have been

14   involved on the Mexican side?

15        A     No, I do not.

16        Q     Do you know if that agreement is still

17   in place?

18        A     I'm sure it is, yes.

19        Q     Do you know if the agreement has

20   changed -- the terms of the agreement have

21   changed over time?

22        A     I do not know.



Page 280

```
 1              MS. CROW:  Josh, let's look at Tab 39.

 2   Again, if you can make it just a bit bigger.

 3              (Deposition Exhibit Number 280 was

 4   marked for identification and attached to the

 5   transcript.)

 6   BY MS. CROW:

 7     Q    I'm showing you a document marked as

 8   Exhibit 280 to your deposition, Mr. Hoffman.

 9   It's a three-page e-mail chain with Bates numbers

10   AOL-DEF-00027116 through '118.  Please take a

11   moment to review it, and let me know when you

12   finished.

13              COURT REPORTER:  What was the second

14   number?  Through what?

15              MS. CROW:  Through '118.

16              THE WITNESS:  I don't seemingly have

17   the ability to scroll.  Am I just looking at the

18   face of this?

19              MS. CROW:  Actually, let's zero in

20   on -- well, yeah, why don't you start at the

21   bottom and just let him take a quick look at it.

22              MS. SHINNERS:  I'm sorry.  Is this the
```



Page 281

1    whole e-mail, Ms. Crow?

2           MS. CROW:  Yes.

3           MS. SHINNERS:  It just cuts off there?

4           MS. CROW:  I'm sorry.  There should be

5    three pages.

6           MR. PINKUS:  I'm sorry.  I thought you

7    wanted to see just the bottom half first, and

8    then I was going to move through the rest of the

9    document.  Like when I was zooming in, it kind of

10   keeps it close to the same size for the whole

11   thing.

12          MS. CROW:  I'm sorry.

13          MR. PINKUS:  Whatever you want me to

14   do, just let me know.

15          MS. CROW:  Yeah.  So just start at the

16   bottom and then scroll up -- the bottom should be

17   Page 118.  There you go.  There is not much on

18   118, so we can start on 117.

19          MS. SHINNERS:  I think it would be

20   benefit, if he's going to read the whole thing,

21   then he should probably read '118 as well.

22          MS. CROW:  By all means.



Page 282

1          MS. SHINNERS:  Thank you.

2          THE WITNESS:  Okay.  Okay.

3   BY MS. CROW:

4     Q     So this is an e-mail chain from

5   September 29th of 2016 that appears to be

6   prompted by a request from you regarding the

7   number of OTMs being brought to the San Ysidro

8   port of entry as part of metering, right?

9     A     Yes, it appears so.

10    Q     You received a copy of this e-mail

11  chain from Jennifer Schroeder-Fawcett on or

12  around September 29th, 2016, at 4:15 p.m.,

13  correct?

14    A     Correct.

15    Q     You would have received this e-mail in

16  the course of your duties at CBP, right?

17    A     Yes.

18    Q     The third e-mail on Page 1 of this

19  chain, which was sent by Steven Donnelly to

20  Enrique Tamayo states, and I quote, "Yes, the

21  Mexicans have reserved slots through October for

22  metering OTMs."



Page 283

1              Did I read that correctly?

2        A      Yes.

3        Q      Do you know what that statement means,

4    Mr. Hoffman?

5        A      No, I don't know what that statement

6    means.

7        Q      Thank you.

8              MS. CROW:  Let's turn to Tab 40, Josh.

9              (Deposition Exhibit Number 281 was

10   marked for identification and attached to the

11   transcript.)

12   BY MS. CROW:

13       Q      Mr. Hoffman, I'm not going to make you

14   read the entire document, which we're going to

15   mark as Exhibit 281 to your deposition.  It's a

16   three-page document entitled "U.S.-Mexico 21st

17   Century Border Management Initiative, Draft 2017

18   Action."  This particular section with Bates

19   number AOL-DEF-0026701 to '3 appears to relate to

20   the secure flow subcommittee, and it's dated as

21   of October 20th, 2016.

22             Can you tell me what the "secure flow



Page 284

1    subcommittee" is?

2         A    That's what I was alluding to earlier.

3    I was kind of the CBP lead for working with the

4    government of Mexico on these various

5    initiatives, many of which, as I mentioned, you

6    see trusted travelers program in there.  Some are

7    cargo related, doing joint inspections, and

8    secure flow is essentially just finding ways to

9    work together to increase throughput along the

10   border, more efficient flows.  Mostly cargo

11   related.

12        Q    I was going to ask you, when you said

13   "more efficient flows," I presume that could be

14   cargo or people, correct?

15        A    Yes.  It could be both, but I think

16   most of the agenda items, they -- the action

17   plans differed from year to year, but they were

18   mostly cargo related.

19        Q    Okay.  So I assume you've seen this

20   document before, correct?

21        A    Yes, I would have.

22        Q    Under what circumstances?



Page 285

1        A       Again, having -- at the time we had

2    monthly meetings with the government of Mexico

3    and we go through this action plan, and each of

4    the respective parties would provide updates to

5    where we're at on any of these given initiatives.

6        Q       Did you have a role in

7    conceptualizing, drafting, or reviewing this

8    document?

9        A       A role in overseeing it.  Most of it

10   was done at the staff level.

11       Q       Please look at Paragraph 5 on the

12   second page of the document.

13               MS. CROW:  Josh, let's load that up so

14   we can see that a little better.

15   BY MS. CROW:

16       Q       Does that paragraph state "Implement a

17   capability to exchange information on the entry

18   and exit of persons along the common border."

19               Did I read that correctly?

20       A       That's correct.

21       Q       Can you explain to me what that

22   language means?


MAGNA
LEGAL SERVICES

Page 286

1       A       It's basically the entry/exit program

2    was instituted by Congress years ago, and we're

3    very good in the air environment then where, you

4    know, when people leave because the airlines

5    assist in collecting data.  It's very difficult

6    in the land border environment.  So this was a

7    pilot working with the government of Mexico.  So.

8               I believe this pilot was stood up in

9    Otay Mesa or San Ysidro whereby certain subset of

10   people going back to Mexico could go to a kiosk

11   and essentially log their exit, so you know they

12   left the country.  So it was a pilot that has

13   since ended.  Basically a data collection to know

14   when someone actually departed the country

15   because most often we don't know if someone

16   actually departed via a vehicle or pedestrian

17   going back to Mexico until they arrive next time

18   to the United States.

19      Q       Would the information referenced here

20   regarding the entry of persons include

21   individuals seeking asylum?

22      A       No.



Page 287

1        Q      Based on the headings in the rest of

2    the document, are there any other parts of this

3    document that relate to managing the flow of

4    migrants at ports of entry along the U.S.-Mexico

5    border?

6        A      Can you ask that question again?  I'm

7    sorry.

8        Q      Sure.  Based on the heading in the

9    different sections of the document -- actually,

10   you know what, I'm just going to ask you about

11   Paragraph 1.

12              MS. CROW:  Josh, can you load that up?

13   BY MS. CROW:

14       Q      So if you look at Paragraph 1, there's

15   a part that reads -- hold on one second.

16   "Implement the regional traffic management center

17   in Tijuana and expand the model to other border

18   locations."

19              Does that relate at all to queue

20   management, metering, or processing of asylum

21   seekers?

22       A      No, not at all.



Page 288

1       Q      What does it relate to?

2       A      Essentially a RFID systems primarily

3   for trucks initially whereby you can monitor the

4   wait times, and the vehicle traffic management

5   center which never took off with a concept within

6   Tijuana whereby you can post signage back into

7   Mexico so you can make an informed decision at

8   which border location you want to cross.

9              If you want to go to San Ysidro, the

10  wait time is going to be 90 minutes, but you can

11  veer and going to Otay Mesa with a 35-minute wait

12  time.  It's kind of to make an informed decision

13  with the concept of traffic and vehicles and

14  those with, you know -- coming -- arriving via

15  vehicle.

16      Q      Thank you.  And the reference in the

17  next sentence to "border wait time solutions

18  planning and development," does that have

19  anything to do with wait times for people who are

20  subject to metering?

21      A      No.  It's the same concept as those in

22  vehicle lanes or commercial lanes so they could



Page 289

1    make informed decisions with more predictability

2    at the border knowing which crossing to go to.

3    This information could essentially be available

4    via an app so you can make an informed decision

5    where to cross was the concept.

6        Q      Thanks.

7               MS. CROW:  Let's shift to Tab 41,

8    Josh, which we're going to mark as Exhibit 282 to

9    your deposition.

10              (Deposition Exhibit Number 282 was

11   marked for identification and attached to the

12   transcript.)

13   BY MS. CROW:

14       Q      It is a four-page e-mail chain, much

15   of which is redacted, and as you can see at the

16   top there is a two-page attachment.  The whole

17   document goes from Bates number AOL-DEF-00027765

18   through --

19              COURT REPORTER:  Through what?

20   Through what?

21              MS. CROW:  '70.

22              And Josh, if you could just scroll



Page 290

1    from the bottom up so that Mr. Hoffman can take a

2    quick look.

3                THE WITNESS:  Okay.

4    BY MS. CROW:

5        Q    Actually, I'm not going to ask you

6    about the details of the queue management brief.

7    I stand corrected.  I am going to ask you about a

8    few paragraphs, but we'll blow them up.

9        A    Okay.  Okay.

10       Q    We're good there.

11               MS. SHINNERS:  I'm sorry.  In terms of

12   what this exhibit is, is this an e-mail, plus the

13   attachment?

14               MS. CROW:  Yes.  Can I proceed, Mr.

15   Hoffman?

16               THE WITNESS:  Yes, you can.

17   BY MS. CROW:

18       Q    So this is an e-mail chain from

19   October 24th of 2018, through October 30th of

20   2018, and it relates to a request from CBP's

21   press secretary that you do a background phone

22   interview regarding CBP's procedures and policies



Page 291

1    at ports of entry with a member of the Wall

2    Street Journal's editorial board who would be

3    covering the CBP commissioner's upcoming visit to

4    the San Ysidro/Otay Mesa port of entry, correct?

5         A    Correct.

6         Q    And you would have received this

7    e-mail chain and the attachment in the course of

8    your duties at CBP, correct?

9         A    Yes, that's correct.

10        Q    In preparation for the interview, you

11   reached out to Pete Flores and Sidney Aki,

12   correct?

13        A    Correct.

14        Q    And in response, Mr. Flores sent you,

15   among other things, the paper that they had

16   provided for the commissioner's visit, right?

17        A    That's correct.

18        Q    Okay.  You received a copy of that

19   attachment from Mr. Flores on or around October

20   25th, 2018, at 4:18 p.m., right?

21        A    That's correct.

22        Q    And that paper, which is attached to



Page 292

1    the e-mail chain, is entitled "Queue Management

2    Brief, Admissibility Enforcement Unit," right?

3              MS. CROW:  Josh, can you scroll down

4    the top of the queue management brief, which is

5    the attachment?

6              THE WITNESS:  Yes.

7              MS. CROW:  Josh, if you could blow up

8    the third paragraph, that would be great.

9    BY MS. CROW:

10       Q     So the third paragraph states "CBP has

11   established a collaborative binational effort

12   with the government of Mexico and

13   non-governmental organizations to assist in

14   slowing the flow of individuals to the border,

15   based on capacity and infrastructural

16   constraints."

17             Did I read that correctly?

18       A     Correct.

19       Q     Do you know how this collaborative

20   binational effort between CBP and the government

21   of Mexico came to be established?

22       A     Just their working relationship down



Page 293

1  there and working together to address this issue.

2      Q    Do you know who in the government of

3  Mexico was -- served as the point person here?

4      A    Who in the government of what?  I'm

5  sorry.

6      Q    Of Mexico.

7      A    No, I don't.  I imagine one of the

8  local officials.

9      Q    Okay.  If you look back at the third

10  paragraph, it states further that "Grupo Beta,

11  which is the INM's humanitarian branch, "has

12  developed a first-come first-served process in

13  order to address the number of asylum seekers

14  waiting in Mexico.  GoM works with NGOs to

15  include Desarrollos Sociales (social development

16  workers) and Derechos Humanos (human rights) to

17  assist individuals who have to wait for an intake

18  time by providing services at one of the

19  humanitarian shelters in Tijuana.  CBP

20  coordinates with Grupo Beta daily to advise them

21  the number of spaces available for intake, and

22  Grupo Beta coordinates NGOs to bring that number



MAGNA
LEGAL SERVICES

Page 294

1    of asylum seekers to the port of entry."

2              Did I read that correctly?

3         A    Correct.

4         Q    To your knowledge, does the language

5    that I just read accurately reflect the terms of

6    collaboration between CBP and the government of

7    Mexico at the time -- at the time that

8    collaboration was established?

9         A    I can only assume it does since that

10   was provided by Mr. Aki, and they worked this

11   agreement out locally with their government of

12   Mexico counterparts and NGOs.

13        Q    Do you know when the collaboration

14   first started?

15        A    I believe sometime in 2016, but I'm

16   not sure which month.

17        Q    Do you know if there's a written

18   agreement memorializing the collaboration?

19        A    No, I'm not aware of a written

20   agreement.

21        Q    But there could be?  You're just not

22   aware.  You don't know?



Page 295

1     A     I don't believe there is.  I think

2 that's why it says binational effort.  They don't

3 even say agreement.  I think this is all just an

4 understanding, an agreement to make the border

5 work more efficiently to address this

6 humanitarian issue.

7     Q     Is that collaboration still in place?

8     A     Yes, I believe it is.

9     Q     Are the terms of that collaboration

10 still consistent with Paragraph 3?

11     A     I don't know.

12     Q     Do you know what -- what is the

13 first-come first-served process referenced here?

14     A     I don't know.  I didn't write it.  I

15 can only imagine it's the order they come in.

16     Q     I imagine that too.  Assuming that

17 first-come first-served means the order that the

18 asylum seekers come in, Grupo Beta must maintain

19 a list of asylum seekers waiting in Mexico,

20 correct?

21     A     That's my understanding.

22     Q     Do you know if CBP and Grupo Beta kept



Page 296

1   in touch on a daily basis at the San Ysidro port

2   of entry?

3           MS. SHINNERS:  Objection; foundation.

4   Go ahead -- I'm sorry, Mr. Hoffman.  You can go

5   ahead.

6           THE WITNESS:  I'm not sure how often

7   they communicate.

8   BY MS. CROW:

9       Q    At the San Ysidro POE?

10      A    Correct.

11      Q    Do you know how often they communicate

12  with local officials at any POE?

13      A    No.  Just as needed.  I don't know how

14  often they communicate, but it would be obviously

15  as needed.

16      Q    Does CBP and Grupo Beta communicate

17  about other topics besides the number of spaces

18  available for intake?

19      A    I assume they do, but I don't know.

20          MS. CROW:  Josh, let's look at Tab 42.

21          (Deposition Exhibit Number 283 was

22  marked for identification and attached to the



Page 297

 1   transcript.)

 2   BY MS. CROW:

 3       Q     I'm showing you a document that we're

 4   going to mark as Exhibit 283 to your deposition.

 5   It's a one-page document with Bates number

 6   AOL-DEF-00228102.  I'm going to direct your

 7   attention to the top e-mail, which is dated

 8   November 1st, 2018, from John Wagner to you, Todd

 9   Owen, and Randy Howe; is that correct?

10       A     Yes.

11       Q     And you received this e-mail as well

12   as the one below it on or around November 1st of

13   2018?

14       A     Yes.  Correct.

15       Q     And you would receive these e-mails in

16   the course of your duties at CBP, right?

17       A     That's correct.

18       Q     The top e-mail states "OPA," which I

19   believe stands for the Office of Public Affairs;

20   is that correct?

21       A     That's correct.

22       Q     "OPA with the concurrence of C-1



Page 298

1    messaged the airlines about potential for moving

2    CBPO's to the border due to the caravan.  They

3    would like us to participate in the meeting below

4    early next week.  OPA feels that the airlines can

5    exert pressure on Mexico to do more.  I don't

6    think we should host it or be the lead.

7    Thoughts?"

8            Did I read that correctly?

9        A    You did.

10       Q    Okay.  We talked about OPA.  C-1 is

11   the CBP commissioner, who I believe was Kevin

12   McAleenan at that time, correct?

13       A    Correct.

14       Q    And CBPO stands for CBP officers?

15       A    That's correct.

16       Q    Do you know the purpose of the meeting

17   referenced in this e-mail?

18       A    The purpose of the meeting?

19       Q    Yep.

20       A    For the airlines, is that what you're

21   referring to?

22       Q    Yes.  I mean, all I have is the top



Page 299

1   e-mail.

2        A     It appears the airlines are requesting

3   a meeting, so I can only surmise the airlines are

4   requesting --

5        Q     Sorry.  Go ahead.

6        A     Yes.  I mean, that's how I read the

7   e-mails.  The airlines are requesting a follow-up

8   meeting.

9        Q     The top e-mail states that "OPA with

10  the concurrence of C-1 messaged the airlines."

11  So it sounds to me that OPA initiated that --

12  that request.

13       A     Yeah.  It's not clear to me whether

14  the airlines asked for the meeting or public

15  affairs wants us to have the meeting.  But --

16  okay.

17       Q     Do you know what more, to use the

18  language of the message, CBP wanted Mexico to do?

19  It says, "OPA feels that the airlines can exert

20  pressure on Mexico to do more."

21       A     Just from kind of recollection and a

22  little speculation perhaps, but I believe the



Page 300

```
 1   government of Mexico to do more to stop the

 2   caravans from transiting their country and

 3   arriving at the border whereby we have to receive

 4   this incredible surge at the border where we have

 5   to then relocate resources from the border --

 6   from the airports to the border.

 7        Q    So what did CBP specifically want

 8   Mexico to do?

 9             MS. SHINNERS:  Objection; foundation.

10   BY MS. CROW:

11        Q    Do you know what --

12             MS. SHINNERS:  Calls for speculation.

13   BY MS. CROW:

14        Q    Do you know what CBP wanted the

15   Mexican government to do?

16        A    Not exactly.  I mean, there's probably

17   other offices involved, our offices of

18   international affairs.  I don't know exactly what

19   kind of coordination was taking place.  But it's

20   my understanding that they wanted the Mexican

21   government to do more to stop the migrants from

22   transiting their country up to the border.
```



Page 301

 1            COURT REPORTER:  What was the word you

 2    said?  They wanted to stop the migrants from

 3    what?

 4            THE WITNESS:  Transiting their country

 5    to the U.S. border.

 6            COURT REPORTER:  Thank you.

 7    BY MS. CROW:

 8        Q    What leverage would the airlines have?

 9            MS. SHINNERS:  Objection; calls for

10    speculation.

11    BY MS. CROW:

12        Q    If you know.

13        A    Yeah, I'm not sure.

14        Q    Do you know why Mr. Wagner did not

15    think that CBP should host or lead the meeting?

16            MS. SHINNERS:  Objection; calls for

17    speculation.

18            MS. CROW:  I asked him if he knew.

19            THE WITNESS:  No, I don't know

20    specifically.

21    BY MS. CROW:

22        Q    Do you know if anyone from OFO



Page 302

1    participated in the meeting that's proposed in

2    this e-mail?

3        A    I don't recall.

4        Q    Did you attend the meeting?

5        A    I don't believe so.  I don't believe I

6    attended this meeting.  It could have been done

7    by Mr. Howe if it did take place, but I'm really

8    not sure at this point.

9        Q    Do you know if any decisions were made

10   at the meeting?

11       A    No, I do not know.

12       Q    Okay.  Mr. Hoffman, are you familiar

13   with the migrant protection protocols?

14       A    Yes, I am.

15       Q    So the migrant protection protocols

16   were implemented at the San Ysidro port of entry

17   on January 28th, 2019, correct?

18       A    That's correct.

19       Q    And they were subsequently expanded to

20   other ports of entry, correct?

21       A    That's correct.

22            MS. CROW:  Let's look at Tab 43, Josh.



Page 303

```
 1                (Deposition Exhibit Number 284 was

 2     marked for identification and attached to the

 3     transcript.)

 4     BY MS. CROW:

 5          Q     I'm showing you a document that is

 6     marked as Exhibit 28 -- sorry -- 284 to your

 7     deposition.  It's a two-page document with Bates

 8     number AOL-DEF-00287190 --

 9                MS. CROW:  Actually, Josh, can you

10     scroll down?  There's another page, I believe.

11     It probably has another number.

12     BY MS. CROW:

13          Q     -- through '191.  I'd like to direct

14     your attention to the second e-mail on the first

15     page, which is dated January 15th, 2019.  It was

16     sent by Valerie Boyd in the office of the CBP

17     commissioner to both you and Randy Howe at 12:15

18     a.m., correct?

19          A     Yes.

20          Q     And you received this e-mail on or

21     around January 15th, 2018, at 6:12 a.m., correct?

22          A     Yes.  Correct.
```



Page 304

1    Q    You would have received the e-mail in

2    the course of your duties at CBP, right?

3    A    Yes, that's correct.

4    Q    Okay.  And Ms. Boyd, through this

5    e-mail, forwarded an e-mail to you that was dated

6    January 15th, 2019, that she had previously sent

7    to Todd Owen and John Wagner, right?

8    A    Yes.

9    Q    That e-mail indicated that ███████

██████████████████████████████████████████████

10   ██████████████████████████████████████████████

11   ██████████████████████████████████████████████

12   ██████████████████████████████████████████████

13   ██████████████████████████████████████████████

14   ██████████████████████████████████████████████

15        Did I read that correctly?

16   A    That's correct.

17   Q    And "SYS" refers to the San Ysidro

18   port, correct?

19   A    Yes, that's correct.

20   Q    ███████████████████████████████

2    ██████████████████████████████████████████████

2    ██████████████████████████████████████████████

Page 305

```
 1        A      No.   I don't know why specifically

 2   that's in there.

 3        Q      What is your role in implementing MPP,

 4   Mr. Hoffman?

 5        A      I was essentially the agency lead for

 6   the migrant protection protocol.

 7        Q      ████████████████████████████████████

 8   ████████████████████████████████████████████████

 9   ████████████████████████████████████████████████

10        A      ████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19        Q      You stated previously that

20   subsequently MPP was expanded to other ports of

21   entry, correct?

22        A      That's correct.
```



Page 306

```
1       Q       On what basis did you decide to expand

2    MPP to particular ports of entry?  Were there --

3    go ahead, sorry.

4       A       Yeah.

5

6

7

8

9

10

11

12

13

14       Q

15

16

17

18

19

20

21

22
```



Page 307

5          MS. CROW:  Josh, let's look at Tab 44,

6    please.

7          (Deposition Exhibit Number 285 was

8    marked for identification and attached to the

9    transcript.)

10   BY MS. CROW:

11        Q    Mr. Hoffman, I'm showing you a

12   document that we're going to mark as Exhibit 285

13   to your deposition.  It's a one-page document

14   with Bates number AOL-DEF-00283636.  The e-mail

15   at the top of the page dated December 22nd of

16   2018, was sent by Joseph Draganac, deputy

17   executive director of operations, at OFO to Luis

18   Mejia on December 22nd, 2018, correct?

19        A    That's correct.

20        Q    That e-mail was sent with an

21   attachment which appears to be an Office queue

22   management report dated December 21st, 2018,



Page 308

1   correct?

2       A    Yes.

3       Q    And you were copied on that e-mail,

4   correct?

5       A    Yes.

6       Q    You would have received that e-mail

7   and attachment in the course of your duties at

8   CBP, correct?

9       A    That's correct.

10      Q    The e-mail states, ████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████

15           Did I read that correctly?

16      A    That's correct.

17      Q    Do you know what Mr. Draganac meant by

18  that statement?

19      A    ████████████████████████████████████

20  ████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████



Page 309

4      Q      What is your understanding of the

5   connection between MPP and queue management or

6   metering?

7           MS. SHINNERS:  And I just want

8   to counsel, Mr. Hoffman, not to reveal

9   pre-decisional deliberations.  Post-decisional

10  information is fine.  You can answer, Mr.

11  Hoffman.

12          THE WITNESS:  What's the question

13  again?

14  BY MS. CROW:

15     Q      What is your understanding of the

16  connection between MPP and metering or queue

17  management?

18     A      There's no specific connection per se.

19  It's just typically they're one in the same.

20  These are usually large locations where these

21  programs make sense.  We just happen to

22  ultimately have queues there because it follows



Page 310

1   migratory patterns.

2        Q    I'm not sure I understood what you

3   were saying about the connection between the two.

4   Is it just --

5        A    There's really -- what I'm saying, I

6   don't think there's really any tangible

7   connection.  It's just they happen to be at large

8   locations that coincide with the migratory

9   patterns.

10       Q    Thank you.  Switching gears, on July

11  16th of 2019, the Department of Justice and the

12  Department of Homeland Security implemented an

13  interim final rule providing that most

14  non-Mexicans entering the U.S. through the

15  Southern land border would generally be

16  ineligible for asylum in the United States.

17            Are you familiar with that rule?

18       A    Yes, I am.

19       Q    I'm going to refer to that rule today

20  as the transit rule, okay?

21       A    Yes.

22       Q    Okay.



Page 311

1              MS. CROW:  Josh, let's put up Tab 45.

2              (Deposition Exhibit Number 286 was

3    marked for identification and attached to the

4    transcript.)

5    BY MS. CROW:

6      Q    I'm showing you a document marked as

7    Exhibit 286 to your deposition.  It's a

8    three-page document with Bates numbers

9    AOL-DEF-0075553941.

10             MS. CROW:  Josh, if you could scroll

11   to the bottom, please.

12   BY MS. CROW:

13     Q    So at the bottom you'll see an e-mail

14   chain --

15             MS. CROW:  Josh, if you could scroll

16   up just a bit.

17   BY MS. CROW:

18     Q    -- dated Sunday, February 3rd, 2019,

19   and it's initiated by Andrew Meehan, the

20   assistant commissioner in CBP's Office of Public

21   Affairs about a media inquiry from a journalist

22   working in Tijuana; is that correct?



Page 312

1       A       Yes.

2       Q       And Mr. Meehan sent this e-mail to

3   both you and Randy Howe at 8:20 a.m., right?

4       A       Yes.

5       Q       And you would have received the e-mail

6   in the course of your duties at CBP, correct?

7       A       That's correct.

8       Q       According to Mr. Meehan's e-mail, he

9   received the note from the journalist saying,

10  "The migrant I spoke with said that he was

11  interviewed by an Officer ███████ on the morning of

12  January 30th at the San Ysidro port of entry in

13  the morning.  He said that the officer told him

14  that he was not going to get asylum and that said

15  he should have applied for asylum in another

16  country."

17          Did I read that correctly?

18      A       Yes, you did.

19      Q       Are CBP officers at ports of entry

20  supposed to give legal advice to asylum seekers?

21      A       No.

22      Q       It sounds to me like Officer ██████ was



Page 313

1    trying to apply the transit rule about six months

2    before it was even implemented.  That would have

3    been misconduct, correct?

4         A    If it happened as stated.

5         Q    At 1:14 p.m. that day --

6              MS. CROW:  If, Josh, if you could

7    scroll up a bit and let Mr. Hoffman just take a

8    look at the previous page.

9    BY MS. CROW:

10        Q    At 1:14 p.m. that day, Pete Flores

11   sent an e-mail saying, "There is no video of the

12   interview if asked."

13             Did I read that right?

14        A    Yeah, that's correct.

15        Q    Doesn't OFO usually video all

16   inspections at ports of entry, including San

17   Ysidro port of entry?

18        A    No, not necessarily.  I don't know --

19   again, I'm not over operations.  We have a -- we

20   have wide camera coverage and video and sometimes

21   booth by booth, sometimes secondary.  But again,

22   I don't know the specifics of this case.  I



Page 314

1    know -- I think a lot of construction was going

2    on in San Diego as well.  I don't know if they

3    were involved during construction.  But I don't

4    know.

5        Q    Did you take any further steps to

6    investigate Officer ███' interaction with the

7    migrant on the morning of January 30th, 2019?

8        A    I'm sorry.  Can you say again?

9        Q    Did you take any further steps to

10   investigate Officer ███' interaction with the

11   migrant on the morning of January 30th, 2019?

12       A    No.

13       Q    To your knowledge, did anyone else

14   conduct an investigation?

15       A    I do not know.

16       Q    In November 2019, the court in this

17   case, not the case of the migrant that we just

18   talked about, the Al Otro Lado case, granted a

19   preliminary injunction prohibiting application of

20   the transit rule to people who were metered prior

21   to July 16th of 2019.  You're aware of that

22   injunction, right?



Page 315

1       A       Yes.

2       Q       And the Ninth Circuit stayed that

3   injunction on December 19th of 2019 but listed

4   the stay on March 5th of 2020, correct?

5       A       I'll -- if you say so.  I'm not -- I

6   don't know the timing of the stays and the

7   injunction.

8       Q       Okay.  Fair enough.  I'm going to

9   refer to the injunction as the "transit rule

10  injunction," okay?

11      A       Okay.

12      Q       How did you become aware of the

13  transit rule injunction?

14      A       Probably through counsel.  I'm not

15  sure.

16      Q       Were you involved in determining how

17  to implement the transit rule injunction?

18              MS. SHINNERS:  Objection.  Never mind.

19  Objection withdrawn.

20              THE WITNESS:  ███████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████



Page 316

1

2

3    BY MS. CROW:

4         Q

5         A

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Page 317

1    Q    ████████████████████

2    ████████████

3    A    ████████████████████

4    ████████████████████████

5    ████████████████████████

6    ████████████████████████

7    ████████████████████████

8    ████████████████████████

9    ████████████████████████

10        A    Other than issuing that memorandum at

11   the field, no.

12        Q    When you say you issued a memorandum

13   to the field, to whom did you issue a memorandum?

14        A    It was to the directors.

15        Q    Which directors?

16        A    Along the Southwest border.

17        Q    The directors of -- which directors --

18   I'm sorry.

19        A    The directors of field operations

20   along the Southwest border.

21        Q    What was the substance of that

22   directive?



Page 318

1      A     Essentially if someone claims to have

2   been a party to the lawsuit, we would -- we had a

3   special code we instituted within our system, our

4   secondary processing system.  If they claim

5   they're a party to it, we would flag with that

6   specific code to ensure USCIS was aware.

7      Q     Isn't it true -- excuse me?  Isn't it

8   true that an individual would be -- that the

9   memorandum that was circulated to the directors

10   of field operations applied only to individuals

11   who affirmatively claimed to be Al Otro Lado

12   class members?

13            MS. SHINNERS:  Objection; misstates --

14   I'm sorry.  Objection withdrawn.

15            THE WITNESS:  Yes, that's my

16   understanding, correct.

17   BY MS. CROW:

18      Q     And just to be clear, what does it

19   mean to make an affirmative claim to have them

20   metered or subjected to queue management?

21      A     Essentially that they would

22   disclose -- proactively disclose that they are



Page 319

1   part of this -- in scope of the lawsuit or party

2   to it, that we don't have to ask individuals on

3   each and every case.

4        Q      When was that memorandum issued?

5        A     I don't know.  I'm not -- it would

6   have been several months ago or more.  So I don't

7   know the exact date.

8        Q     Was it before or -- do you remember if

9   it was before or after the Ninth Circuit stayed

10   the injunction?

11       A     I don't know.

12       Q     ████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████



Page 320

1          Q       Who else was involved in determining

2    how to implement the transit ban -- the transit

3    rule?  I'm sorry.

4               MS. SHINNERS:  Objection to the term

5    "implementation."  You can answer.

6               THE WITNESS:  That's all I really

7    recall.  It might have been Luis Mejia of my

8    staff.  I'm not sure who else was involved.

9    BY MS. CROW:

10         Q       Just to be clear, my question was who

11   else was involved in determining how to implement

12   the transit rule injunction, not the transit

13   rule.

14              MS. SHINNERS:  Right.  Same objection

15   to "implementation" to the question.  Go ahead.

16   You can answer, Mr. Hoffman.

17              THE WITNESS:  Probably -- again, other

18   than who I mentioned, maybe Luis Mejia in my

19   staff, but I'm not exactly sure.

20   BY MS. CROW:

21         Q       Do you remember -- do you remember how

22   many meetings you attended regarding the transit



Page 321

1    rule injunction and CBP's response to it?

2         A    One or two.

3         Q    Do you remember if either or both of

4    those meetings were before the injunction was

5    stayed by the Ninth Circuit?

6         A    No.  I have no idea.

7         Q    Other than the work that you've

8    already talked about in terms of ████████████

9    ████████████████████████████████████████████████

10   ██████████████, did you have any other role in

11   responding to the transit rule injunction?

12        A    No, I don't believe so.

13        Q    Once the memorandum was issued, do you

14   know if CBP officers at ports of entry along the

15   Southern border complied with that instruction?

16        A    Whether they complied with it, I have

17   no way to know if they actually complied with it,

18   but it was typically when we put out policy, then

19   it is provided to the front-line officers.

20        Q    How did CBP monitor compliance with

21   the instruction or the memo?

22        A    I'm not aware that we were monitoring



Page 322

1   compliance.

2       Q      When the Ninth Circuit listed the stay

3   of the transit rule injunction, which I will

4   represent to you was on March 5th of 2020, do you

5   know if CBP reinstated its prior memo?

6       A      Reinstated the prior memo?

7       Q      Right.  You -- you previously said

8   that following the transit rule injunction, there

9   was a memo that went to the directors of the

10  field operations about what they should do if

11  somebody makes -- if somebody affirmatively

12  claims to be a member of the Al Otro Lado class.

13      A      Yes.

14      Q      But then there came a time when the

15  Ninth Circuit stayed the injunction and then the

16  stay was lifted.  Do you know if the memo that

17  was -- that you referenced previously was

18  rescinded or suspended during the period when the

19  Ninth Circuit stay was in place?

20      A      I don't recall.

21      Q      If a noncitizen presents at a port of

22  entry after March 5th of 2020, so after the



Page 323

1    lifting of the stay, claims to have been metered

2    or claims to be a member of the Al Otro Lado

3    class, did CBP officers investigate whether those

4    individuals are on a wait list on the Mexican

5    side of the border?

6        A    I don't think we investigate.  We will

7    just flag and put it in the narrative and flag it

8    with the appropriate code for subsequent CIS

9    notification is my understanding.

10       Q    So CBP is not involved in verifying Al

11   Otro Lado class membership when it's asserted?

12       A    No, not to my knowledge.

13       Q    If an individual does not proactively

14   or affirmatively assert Al Otro Lado's class

15   membership, have CBP officers at ports of entry

16   been instructed to ask if such individuals have

17   been metered or subjected to queue management

18   prior to July 16th of 2019?

19       A    No, that's not the policy.

20       Q    And since the stay was lifted, has the

21   Office of Field Operations made any proactive

22   effort to identify inadmissible noncitizens who



Page 324

1    have been metered or subject to queue management

2    prior to July of 2019?

3        A    Not -- not to my knowledge.

4        Q    Give me a moment.

5             So apart from the memo that you

6    mentioned, has OFO issued any other guidance,

7    formal or informal, regarding the transit rule

8    injunction?

9        A    No.

10       Q    Do you know if border patrol has

11   issued any formal or informal guidance or other

12   information about the transit rule injunction?

13       A    I'm not sure.

14            MS. SHINNERS:  Would it be -- Melissa,

15   would it be an okay time to take a break, unless

16   you would prefer to keep going?

17            MS. CROW:  I think I can finish this

18   line of questioning pretty quickly, and then I've

19   got just a couple more.  But if you want to take

20   a break, we can.

21            MS. SHINNERS:  Mr. Hoffman, do you

22   want to finish this line of questioning or keep



Page 325

1    -- actually, why don't we go ahead and take a

2    break.

3              THE WITNESS:  I want to power through

4    and let's get this done.

5              MS. SHINNERS:  That's fine.  That's

6    fine.  We can keep going.

7              THE WITNESS:  Unless you need a break

8    desperately, then --

9              MS. SHINNERS:  No, I'm okay.

10              THE WITNESS:  Okay.

11              MS. SHINNERS:  Thank you.

12   BY MS. CROW:

13     Q    Mr. Hoffman, do you know if USCIS has

14   provided any formal or informal guidance or other

15   information about the transit rule injunction?

16     A    No, I'm not aware.

17     Q    Do you know if ICE had provided any

18   formal or informal guidance or other information

19   about the transit rule injunction?

20     A    No, not to my knowledge.

21     Q    They have not, or you're not aware?

22     A    Not aware.



Page 326

1        Q     Do you know if any other offices,

2   agencies, or headquarters within DHS have issued

3   any formal or informal guidance or other

4   information about the transit rule injunction?

5        A     I'm not aware.

6        Q     Has DHS headquarters issued any formal

7   or informal guidance or information about the

8   transit rule injunction?

9              COURT REPORTER:  Wait.  This is the

10  court reporter.  Can you -- you're breaking up

11  some.  Can you repeat -- repeat your question?

12             MS. CROW:  Sorry.  Is that better?

13             COURT REPORTER:  Yes.

14  BY MS. CROW:

15       Q     Has DHS headquarters issued any formal

16  or informal guidance or other information about

17  the transit rule injunction?

18       A     I'm not aware.

19       Q     What about EOIR?

20       A     I'm not aware.

21       Q     Okay.  When CBP inspects and processes

22  an individual who's seeking asylum, what types of



Page 327

1    records are created?

2        A      What types of records?  I don't know

3    the specific forms, but we prepare a

4    comprehensive case file.  Usually it takes an

5    experienced officer three to four hours to

6    prepare the case.  We'll have -- I think it's an

7    I-213 with a narrative.  Sworn statements taken,

8    that could take some time, especially if

9    translation is required.  Credible fear cases,

10   there will be a jurat, and there's usually

11   probably another form or two that needs to be

12   filled out.

13       Q      And do these -- does this case file

14   include identifying information about the

15   individual?

16       A      Yes.

17       Q      Does it include individual's address

18   in his or her home country?

19       A      Yes, if available.

20       Q      Does it include the address, what are

21   the persons's plans to go in the United States?

22       A      If provided.



Page 328

1      Q      Does it include the person's date of

2  birth?

3      A      Yes.

4      Q      Contact information for the

5  individual?

6      A      I imagine so.

7      Q      Date of inspection and processing?

8      A      Yeah, that should be obviously on the

9  paperwork.

10     Q      And would the A number be assigned at

11 that point?

12     A      Yes.  There would be an A file, given

13 an A number.

14     Q      Where are these records stored?

15     A      Well, the records are in our system

16 secondary systems either SIGMA or Unified

17 Secondary, the electronic records, and then the A

18 files, I believe the files are kept separately.

19     Q      How long are they retained?

20     A      I'm not sure on the retention.

21     Q      Does CBP have access to the wait lists

22 of asylum seekers in Mexico?



Page 329

1        A      I don't believe so.

2        Q      You mentioned earlier or we looked at

3    a document indicating that CBP communicates with

4    Mexican immigration on a daily basis, correct, at

5    the ports of entry?

6        A      They could, if necessary, and many

7    locations, I would imagine, are on a daily basis.

8        Q      So if CBP wanted to obtain copies of

9    the wait list, they could, right?

10        A      Obviously.  Theoretically, I suspect

11    they can ask if they wanted a copy.

12        Q      After the Ninth Circuit lifted the

13    stay of the transit rule injunction, did CBP

14    headquarters instruct any of its personnel at the

15    ports of entry to request copies of the wait list

16    from the Mexican immigration service or Grupo

17    Beta?

18        A      I don't -- I don't believe there was a

19    request, no.  Not to my knowledge anyway.

20        Q      Did CBP headquarters instruct any

21    personnel at ports of entry not to request copies

22    of such wait lists?



Page 330

 1      A     Not to request?  No, I'm not familiar

 2   with that, not to request.

 3      Q     Hello?  Are you there?

 4      A     Yes.  Can you hear me?

 5      Q     Can you hear me?

 6      A     Yes.

 7      Q     Oh, my goodness.  Can you hear me?

 8      A     Yes, I can.

 9      Q     We just had like a quick blackout.

10            Did CBP headquarters instruct any

11   personnel at POEs to destroy or delete copies of

12   wait lists in their possession?

13      A     No, not to my knowledge.

14            MS. CROW:  I have one more very quick

15   line of questioning, and then I'm done.  Katie,

16   do you want a break or keep going?

17            MS. SHINNERS:  That's up to you, Mr.

18   Hoffman.

19            THE WITNESS:  Let's go.  Let's

20   continue.

21            MS. SHINNERS:  Okay.

22   BY MS. CROW:



Page 331

1        Q     On November 19th of 2019, DHS

2    implemented an interim final rule called

3    implementing bilateral and multilateral asylum

4    cooperative agreement under the INA, correct?

5        A     I guess.  I'm not exactly sure.  I'd

6    have to see it.

7        Q     You're familiar with the interim final

8    rule about asylum cooperative agreements, right?

9        A     Yes.

10        Q     And in July 2019, the U.S. signed

11    asylum cooperative agreement or ACA with

12    Guatemala, correct?

13        A     That's my understanding around that

14    time frame, if that's what it says.

15        Q     And the U.S. has signed similar

16    agreements with Honduras and El Salvador, right?

17        A     Yes, I believe so.

18              MS. CROW:  Last document is Tab 46,

19    Josh.  I lost my numbers.

20              COURT REPORTER:  It would be 287.

21              (Deposition Exhibit Number 287 was

22    marked for identification and attached to the



Page 332

1    transcript.)

2    BY MS. CROW:

3        Q    We're going to mark this document as

4    Exhibit 287 to your deposition.  It's a two-page

5    declaration that you submitted in this case on

6    December 29th of 2019 to explain OFO's processing

7    of noncitizens pursuant to ACA rule that I just

8    mentioned.  Does this look familiar to you?

9        A    Actually, scary, no, it doesn't, but I

10   guess I did it.

11       Q    If I could direct your attention to

12   Paragraph 3.

13           MS. CROW:  Scroll up a page, Josh,

14   please.

15   BY MS. CROW:

16       Q    Paragraph 3 you state that "OFO began

17   applying the ACA rule on December 16th, 2019,"

18   correct?

19       A    Yes.

20       Q    Is that statement accurate?

21       A    I imagine so.  I know ACA started

22   around that time.  So, yeah, I would have no



Page 333

1   reason to question whether it would not be

2   accurate, especially being in an affidavit.

3        Q     In Paragraph 3 you also state "The ACA

4   is currently being applied in one field office:

5   El Paso," right?

6        A     Where does it say that?  I'm sorry?

7        Q     Sorry.

8        A     Yeah, I got you.

9        Q     Yeah.

10       A     Correct.

11             MS. SHINNERS:  I think you're

12   referring to Paragraph 4.

13             MS. CROW:  Yes, I was.  I'm sorry.

14   BY MS. CROW:

15       Q     Is that statement still accurate in

16   Paragraph 4?

17       A     No.  We continued ACA to be

18   implementing across the border.  So it's

19   implemented in most locations to some degree.

20       Q     Do you know off the top of your head

21   which ports it's implemented in?

22       A     Well, I know obviously El Paso.  I



Page 334

1    believe Laredo.  I think we went after that

2    Laredo, maybe Brownsville, San Ysidro, and I

3    think San Ysidro and Nogales were issues.  I'm

4    not sure if we implemented there later.  I think

5    we're probably across the entire Southwest border

6    to some degree.

7

8

9

10

11

12

13

14         Q     Do you know the total number of people

15    who have presented at ports of entry along the

16    Southwest border who have been subject to the ACA

17    rule and returned to one of the ACA countries?

18         A     No, I don't know the number offhand.

19    I just know when I believe February time frame,

20    it was about 12.  So it was a low number.

21         Q     So it was about 12 in February of

22    2020?



Page 335

 1      A      Correct.  About mid-February, I

 2   believe it was 12.

 3      Q      And that's your most recent figure

 4   that you have?

 5      A      That's the most recent recollection.

 6   We may have applied it to a few more.  But being

 7   that with COVID-19, probably not too many more

 8   from February to March.

 9      Q      Okay.  Do you know how many people

10   total have been subject to the ACA rule on both

11   those who presented at ports and those who have

12   entered between ports?

13      A      No.  I'm just aware of the OFO

14   numbers.

15      Q      Is OFO currently applying the ACA rule

16   to noncitizens entering the U.S. at any ports of

17   entry?

18      A      No, not currently.

19      Q      When did you stop?

20      A      Everything essentially stopped March

21   20th with COVID-19.

22      Q      And does OFO plan on resuming applying



Page 336

1    the ACA rule to noncitizens entering the U.S. at

2    ports of entry?

3              MS. SHINNERS:  Objection.

4              THE WITNESS:  I would imagine -- GO

5    ahead.

6              MS. SHINNERS:  I was going to say

7    calls for speculation, as well as projections

8    about plans that are pre-decision -- would

9    reflect pre-decisional deliberations.

10             So Mr. Hoffman, I'm going to instruct

11   you not to answer to the extent it would call for

12   the revelation of communications or documents

13   that have pre-decisional deliberations in them.

14   BY MS. CROW:

15      Q    Are you going to follow your

16   attorney's instructions?

17      A    Yes.

18      Q    Is there any reason that CBP could not

19   in the future apply the ACA rule to a noncitizen

20   entering the U.S. at any port of entry?

21             MS. SHINNERS:  Objection; calls for

22   speculation.



Page 337

1              MS. CROW:  You can answer.

2              MS. SHINNERS:  You can answer, Mr.

3     Hoffman.

4              THE WITNESS:  Can you ask the question

5     again?

6     BY MS. CROW:

7         Q     Is there any reason that CBP could not

8     in the future apply the asylum cooperation

9     agreement rule to a noncitizen presenting at a

10    port of entry -- at any port of entry along the

11    Southwest border?

12             MS. SHINNERS:  Objection; calls for

13    speculation.  You can answer.

14             THE WITNESS:  No, I don't see any

15    reason if they are amenable to the program.

16             MS. CROW:  Thank you.  I think -- give

17    me one second to confer with counsel.  But I

18    think -- I think that's it for us.

19             MR. LEV:  Do you want to go off the

20    record to confer?

21             MS. SHINNERS:  Why don't we go off the

22    record.  That sounds great.



Page 338

1              MS. CROW:  Great.

2              VIDEOTAPE OPERATOR:  The time is 6:01

3    p.m.  We're going off the record.

4              (A brief recess was taken.)

5              VIDEOTAPE OPERATOR:  The time is 6:23

6    p.m.  We're back on the record.

7              MS. CROW:  Thank you.  Plaintiffs have

8    no further questions.

9              MS. SHINNERS:  Okay.  And for

10   defendants, defendants have no questions for

11   today.  I do want to note for the record that the

12   witness would like to read and sign the

13   transcript and that the transcript is designated

14   confidential for 30 days after its receipt from

15   the court reporter, pending more specific

16   confidentiality designations.

17             And the other -- I did want to note

18   also for the record with respect to the video, I

19   just wanted to note what Mr. Hoffman had told us

20   off the record that his monitor was in a slightly

21   different place than his camera, so it looks like

22   it's looking to the side a little bit it's



Page 339

1   because he's looking at his monitor and his

2   camera is a little bit at an angle.  I just

3   wanted to note that on the record.  Thank you.

4           VIDEOTAPE OPERATOR:  The time is 6:24

5   p.m.  This concludes the deposition of Todd

6   Hoffman.  We're off the record.

7           COURT REPORTER:  Ms. Shinners, would

8   you like a copy of the transcript?

9           MS. SHINNERS:   Yes, we would like to

10  order a copy of the transcript.  Thank you.

11           (Discussion off the record.)

12           MS. CROW:  Just wanted to restate that

13  we do want to hold this deposition open pending

14  the resolution of some outstanding issues

15  regarding privilege claims and consequent

16  instructions to Mr. Hoffman not to answer.

17  (Whereupon, the signature not having been waived,

18  the deposition concluded at 6:25 p.m.)

19

20

21

22



Page 340

1                        *    *    *

2              ACKNOWLEDGMENT OF DEPONENT

3

4    I, Todd Hoffman, do hereby acknowledge I have

5    read and examined the foregoing pages of

6    testimony, and the same is a true, correct and

7    complete transcription of the testimony given by

8    me, and any changes and/or corrections, if any,

9    appear in the attached errata sheet signed by me.

10

11

12   _____         _____

13   Date          Todd Hoffman

14

15

16

17

18

19

20

21

22



Page 341

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2           I, Tammy S. Newton, the officer before

3   whom the foregoing proceedings was taken, do

4   hereby certify that the foregoing transcript is a

5   true and correct record of the proceedings; that

6   said proceedings were taken by me

7   stenographically and thereafter reduced to

8   typewriting under my supervision; and that I am

9   neither counsel for, related to, nor employed by

10  any of the parties to this case and have no

11  interest, financial or otherwise, in its outcome.

12          IN WITNESS WHEREOF, I have hereunto set

13  my hand and affixed my notarial seal this 16th

14  day of June, 2020.

15  My commission expires:

16  3/05/2022

17

18                  _____

19                  Notary Public in and for the

20                  State of Maryland

21

22



```
                                                    Page 342
 1                DEPOSITION ERRATA SHEET

 2    Page No. _____ Line No. _____ Change to:

 3    _____

 4    Reason for Change: _____

 5    PageNo. _____ Line No. _____ Change to:

 6    _____

 7    Reason for Change: _____

 8    Page No. _____ Line No. _____ Change to:

 9    _____

10    Reason for Change: _____

11    Page No. _____ Line No. _____ Change to:

12    _____

13    Reason for Change: _____

14    Page No. _____ Line No. _____ Change to:

15    _____

16    Reason for Change: _____

17    Page No. _____ Line No. _____ Change to:

18    _____

19    Reason for Change: _____

20

21    SIGNATURE:_____

22              Todd Hoffman
```



Page 343

1              DEPOSITION ERRATA SHEET

2    Page No. _____ Line No. _____ Change to:

3    _____

4    Reason for Change: _____

5    Page No. _____ Line No. _____ Change to:

6    _____

7    Reason for Change: _____

8    Page No. _____ Line No. _____ Change to:

9    _____

10   Reason for Change: _____

11   Page No. _____ Line No. _____ Change to:

12   _____

13   Reason for Change: _____

14   Page No. _____ Line No. _____ Change to:

15   _____

16   Reason for Change: _____

17   Page No. _____ Line No. _____ Change to:

18   _____

19   Reason for Change: _____

20

21   SIGNATURE: _____

22             Todd Hoffman



**A**

abbreviated 24:13
ability 57:5 280:17
able 27:1 70:18 190:17 230:7 245:11
absolute 118:12
absolutely 117:22 118:1 224:21 269:8 269:13,17 270:1
AC 118:18
ACA 42:9 45:13 47:12 331:11 332:7,17,21 333:3,17 334:16,17 335:10,15 336:1,19
acceptable 48:19 49:8
access 272:22 273:6 328:21
accompanies 136:20
accounted 80:15
accurate 332:20 333:2,15
accurately 294:5
acknowledge 340:4
ACKNOWLE... 340:2
Acosta 43:22
Acosta's 44:11
acquired 242:6
acronym 9:11 9:15,18,20,22 20:3,8 90:10 213:3

acronyms 19:20
acting 44:16
action 5:4 6:6 40:7 42:5,21 45:12 159:9,15 159:17 161:1 186:18 232:10 248:7,9 283:18 284:16 285:3
actions 47:8,10 85:15
active 309:1
actual 165:9 241:22
actuality 165:15
ad 53:12
add 109:7 119:1 208:17
added 210:1
adding 109:14
addition 118:22 137:5
additional 175:9 175:15
address 99:1 127:5 176:14 254:8 293:1,13 295:5 327:17 327:20
addressed 124:21 247:17
adjudicate 48:17
adjudicated 99:19
adjutant 64:22
admin 205:14 206:4
administration 79:8
administrative 10:17,18,21 13:17 206:5
admissibility

9:6,12 40:1,4 40:21 41:19 42:2,19 45:10 187:5,22 237:21 292:2
admission 250:15
admissions 9:3
advance 58:6
advanced 222:9
advantages 186:17
adverse 40:7 42:5 45:12 47:8,10
advertised 11:14
advice 59:22 62:6 63:3 64:10 67:10 68:6,19 74:2,4 75:2,4,14 85:9 89:20 119:1 191:11,12,14 192:13,13 199:22 201:11 312:20
advise 293:20
advisor 59:8
advisory 42:14 48:8,10 89:13 89:16 90:1 148:16
affairs 14:16 297:19 299:15 300:18 311:21
affidavit 15:19 15:21 16:2,6 333:2
affirmative 318:19
affirmatively 318:11 322:11 323:14

affixed 341:13
afternoon 232:15 270:16
agencies 326:2
agency 94:9 151:11 305:5
agency's 80:5 82:21
agenda 65:9,13 75:22 76:4,6,8 217:12 219:19 222:12 284:16
agent 98:8
ago 12:3,4 72:16 134:12 173:12 242:10 249:13 286:2 319:6
agree 79:15 80:9 80:22 82:10 83:1 192:9 226:14
agreed 128:3
agreeing 119:6
agreement 42:10 128:17 276:22 277:3 277:13,16,18 277:19,21,21 278:4,13,14,16 278:16 279:4 279:10,16,19 279:20 294:11 294:18,20 295:3,4 331:4 331:11 337:9
agreements 128:8,13 331:8 331:16
ahead 26:20,21 27:12,14 40:19 67:20 95:6 100:9 113:7 118:15 126:18 129:22 138:22

163:17 168:13 169:5 184:2 185:10 211:3,4 228:3 236:9 244:21 260:15 260:15 273:17 296:4,5 299:5 306:3 320:15 325:1 336:5
Ahern 95:17
Ahn 205:8,19
Ahn's 205:12
air 286:3
airlines 286:4 298:1,4,20 299:2,3,7,10 299:14,19 301:8
airport 52:15 254:15 256:11 265:20
airports 48:13 300:6
Aki 112:21 137:6 140:2 177:21 220:18 279:12 291:11 294:10
al 1:4,4,7 7:4,5,6 187:11 188:6 196:15 200:2,6 200:19 201:6 201:18 202:12 241:20 244:16 249:11,19 250:1,5,17,21 251:10,12 254:14 255:17 269:5,10 314:18 318:11 322:12 323:2 323:10,14
Alexa 234:20 235:2



alias 217:22
alien 126:8
  127:4
aliens 12:20
  16:11 125:10
  127:13 164:5
  166:17 172:3
allow 144:14
  145:2
alluded 31:19
  45:11
alludes 143:5,11
  144:3
alluding 217:17
  284:2
alphabet 213:3
ambiguity 74:20
amenable
  337:15
America 209:4
amount 190:10
  239:16 264:7
analog 55:8
analysis 213:7
Andrew 230:17
  232:5 311:19
and/or 130:6
  171:8 274:3
  340:8
Angeles 52:7,14
  265:16
angle 339:2
Anne 218:22
annoyed 259:10
  259:14,18
  261:18 264:13
answer 17:8,14
  19:1,2,11 23:2
  24:21 27:20
  46:7 47:3 54:9
  57:3 58:9 59:5
  59:19 60:7,11
  60:22 61:6,15
  62:3,14,22

63:7,13 64:1,4
64:10 65:17,20
66:15 67:1,4
67:10,18 68:15
68:19 70:18
71:19 75:9
76:3,5 77:1
80:16 81:10
82:15 84:9,14
85:4,9 86:15
88:22 89:2,8
100:9 149:11
149:11 153:15
154:3,6,11,14
156:7,15 157:1
163:10 164:12
182:11 186:11
186:13 187:13
187:19 200:11
200:16,21
201:9,14
240:19 244:18
244:19 245:7
245:11,13
246:3 264:22
266:5 268:17
269:22 278:9
309:10 320:5
320:16 336:11
337:1,2,13
339:16
answered
  100:17 163:17
  163:18 268:15
  268:18
answering
  18:12 41:21
  64:2 68:6
  75:14
answers 15:9
  83:16 99:6
  168:7,15
anticipated
  181:16

anticipating
  210:20
anti-smuggling
  52:1
anybody 33:18
  41:2 53:11
  64:20 239:21
  251:9
anyway 40:19
  329:19
AOL-DEF-00...
  214:6
AOL-DEF-00...
  204:5
AOL-DEF-00...
  280:10
AOL-DEF-00...
  177:17
AOL-DEF-00...
  196:5 197:10
AOL-DEF-00...
  96:19
AOL-DEF-00...
  289:17
AOL-DEF-00...
  159:11
AOL-DEF-00...
  160:17
AOL-DEF-00...
  106:19
AOL-DEF-00...
  107:10
AOL-DEF-00...
  123:4
AOL-DEF-00...
  188:15
AOL-DEF-00...
  274:18
AOL-DEF-00...
  140:19
AOL-DEF-00...
  206:17
AOL-DEF-00...
  138:18

AOL-DEF-00...
  252:13
AOL-DEF-00...
  262:16
AOL-DEF-00...
  91:6
AOL-DEF-00...
  297:6
AOL-DEF-00...
  283:19
AOL-DEF-00...
  307:14
AOL-DEF-00...
  303:8
AOL-DEF-00...
  134:6 138:12
AOL-DEF-00...
  224:9
AOL-DEF-00...
  193:13
AOL-DEF-00...
  217:6
AOL-DEF-00...
  311:9
AOL-DEF-00...
  112:18
apart 324:5
apologize 69:6
  104:6 121:2
  124:7 138:14
  144:20 158:18
  168:15 204:3
  235:3 274:21
app 9:9,11
  52:21 53:2
  112:2 146:7
  175:10 205:17
  222:21 226:9
  232:15 233:9
  233:15 245:17
  289:4
apparently
  278:15
appeal 247:20

appear 177:19
  208:11 262:3
  340:9
appeared 78:8
  265:16
appears 84:2
  91:11 96:21
  97:3 112:20
  113:10 117:12
  126:13 136:5
  138:17 139:22
  177:19 178:14
  193:14 197:18
  197:22 208:18
  214:10,14,22
  225:8 231:14
  236:4 252:18
  256:12 257:14
  262:16 276:3
  282:5,9 283:19
  299:2 307:21
application 39:7
  39:10 247:2
  314:19
applied 213:16
  312:15 318:10
  333:4 335:6
apply 271:1
  313:1 336:19
  337:8
applying 332:17
  335:15,22
appointment
  126:10
appreciate
  46:19 69:7
  74:13
approaching
  209:9
appropriate
  130:1 131:17
  306:8,11 307:4
  323:8
approximately



19:8 25:16
26:9 72:17
85:15 117:15
**April** 5:2,6,10
5:12,13,14,19
104:8,11,16,20
105:8 112:8
116:1,10,12
118:6,6 140:17
141:12,17,22
142:14 143:2
143:21 144:13
145:1,14,20
146:2,7,16
147:1,12,17,19
148:2,7,12,17
148:21 149:14
149:19,22
150:4,11,17
151:8,15,21
152:4,10,18
153:4 154:1
155:11 157:12
157:14,19
158:5 161:9
164:16,20
165:3,5,10,12
166:11 167:3
167:12,18
168:2 169:1,14
169:18 170:8
170:13,17
171:12,15
173:15 175:16
177:15 178:13
180:15 181:12
183:15 184:16
184:18 185:16
185:21 187:21
188:13,14,18
191:2,15
193:15 194:2
194:15 195:5
196:11 197:20

198:11,20
199:3 200:8
201:6,18 202:2
202:12 203:19
205:1,9,13,20
206:15 207:2
211:8,11,22
214:3,12,16
235:22 236:1,5
236:14 237:19
237:22 238:4
239:6
**arbitration**
13:18,19,22
**area** 38:20 52:7
52:13 334:12
**argument**
101:17
**argumentative**
86:13
**Armijo** 219:10
**Armijo's** 219:12
**arrests** 166:19
169:12
**arrival** 181:16
**arrive** 286:17
**arrived** 61:11
**arriving** 288:14
300:3
**article** 4:9 77:21
78:21 79:2,4,7
80:22 82:9,19
83:7,11
**arts** 49:18
**ASAP** 127:19
**asked** 16:18
18:19 28:15
41:17 46:22
71:1 74:22
75:17 155:7,16
156:4 163:16
200:14,18
226:9 228:20
268:14,18

299:14 301:18
313:12
**asking** 14:2
20:12 37:8,10
56:20 58:10,12
58:13 60:20
61:5,15 70:12
83:15 86:7
156:8,9 163:10
200:19 248:9
275:14
**asks** 229:13
246:4
**aspects** 117:18
**assert** 60:9
62:12 323:14
**asserted** 89:4
323:11
**assertion** 118:17
119:4,21
**assessment**
79:15 81:1
82:10 86:18
194:16
**assigned** 98:7,8
220:10,14
328:10
**assignment**
237:11,13
**assignments**
219:21
**assist** 94:7 146:2
146:7 286:5
292:13 293:17
**assistance** 42:11
130:9
**assistant** 53:18
53:19 64:22
219:14 258:3
275:20 311:20
**assistant/chief**
206:4
**assisted** 146:4
146:14 148:2

195:12
**associated** 99:10
248:20
**assume** 18:3
142:11 218:8
284:19 294:9
296:19
**Assuming**
295:16
**assumption**
132:20 238:7
**asylum** 42:9
83:13 84:7
93:17 99:15,17
100:6 101:15
101:17 106:6
108:17 121:7
271:14 272:14
272:22 273:5
273:11 286:21
287:20 293:13
294:1 295:18
295:19 310:16
312:14,15,20
326:22 328:22
331:3,8,11
337:8
**attached** 6:16
21:9 78:2
90:22 96:13
106:12 112:12
122:19 133:20
138:5 140:13
159:4 177:10
193:7 195:22
203:13 206:10
208:2,6 213:21
216:21 224:3
230:10 235:10
252:5 257:17
262:9 265:12
266:10 274:12
280:4 283:10
289:11 291:22

296:22 303:2
307:8 311:3
331:22 340:9
**attachment**
115:13,14,15
115:15 194:7
204:12 205:3
236:2 289:16
290:13 291:7
291:19 292:5
307:21 308:7
**attachments**
115:18
**attend** 25:9
33:19 34:16,19
35:10 36:1,4
64:16 65:15
100:22 218:10
221:18 302:4
**attended** 33:1
37:22 38:1,7
54:22 56:4
57:1,15 64:20
64:21 70:13
71:13 72:8
84:3,19 100:20
101:6 102:3
202:22 221:12
302:6 320:22
**attendee** 91:19
196:8
**attendees** 91:16
196:6 197:14
197:16
**attending** 18:17
36:10 54:13
63:20 101:4
137:10 199:2
218:4
**attention** 297:7
303:14 332:11
**attorney** 19:1
23:22 25:2
33:4,19 59:8



94:10 174:9
198:4,15
200:16,19
254:14 255:17
**attorneys** 18:17
18:17 22:20
23:3,8,11,13
23:16,18 24:2
24:3,9,16
30:16 32:8,10
32:14,16,22
33:20 34:3,4
36:21 37:3,13
59:3 118:20
134:11 147:4,6
148:5 150:8,9
150:15,16
152:16,17
154:8 187:7,16
188:1 200:14
201:4
**attorneys's**
75:14
**attorney's** 59:22
62:6 63:3
64:10 67:10
68:6,19 84:14
85:9 89:8
245:12,14
336:16
**attorney-client**
75:11 113:15
118:19 119:2
154:4 187:14
187:15 190:2
191:10,17
192:10,15,18
200:11,22
**attributed** 79:8
**audible** 17:9
**audio** 41:15,16
**August** 53:3
**authenticity**
93:7

**authored** 234:7
**authoring**
130:12
**authority** 8:3
269:20
**authorization**
228:15
**available** 289:3
293:21 296:18
327:19
**average** 275:12
**avoid** 177:4
**award** 212:14
212:14,20
213:1,11,13
215:10 216:11
**aware** 31:14
37:10 59:12
90:10,11 94:12
95:7 100:11
104:9,14 105:3
111:18,21
112:6,7 128:17
128:19,22
129:2 149:5
150:10 151:12
151:18 152:1,6
152:13,14
158:1 165:8
170:20,22
184:21 185:7
199:9 201:3
209:11,12,15
212:13 223:18
227:9,15 229:7
239:10,11
241:15,16
242:14,19
243:5 249:11
249:12 272:16
294:19,22
314:21 315:12
318:6 321:22
325:16,21,22

326:5,18,20
335:13
**awareness**
184:5,7
**A-C-O-S-T-A**
44:11
**A-H-N** 205:8
**a.m** 1:15 7:9
41:9,12 46:13
46:16 56:14,17
70:6,9 74:15
74:18 81:20
82:1 88:9,12
98:12 135:2
139:5 160:5
178:14,17
179:12 188:19
194:3 196:12
197:20 203:20
206:16 214:17
254:6 303:18
303:21 312:3

_____

**B**

**Bachelor** 49:18
**back** 4:17 5:8
29:11 41:12
46:16 56:17,19
70:9,11 74:18
74:20,21 82:1
82:4,12 84:18
86:20 87:5
88:12,14,15
101:9 103:9,11
111:13 114:10
117:7 119:13
119:16,20
126:22 129:16
137:15 138:15
147:13 155:3,4
156:5,14
157:13 165:7
168:17 173:5
174:5,7 178:11

190:4,14,19
191:21 192:1,6
192:16 227:7
237:16 249:8
256:21 265:7
269:19 270:5
270:12 275:1
286:10,17
288:6 293:9
307:1 319:12
338:6
**background**
49:1 290:21
**backup** 132:19
**Baker** 96:2,4,7
96:22 98:11,22
99:4,14
**Baker's** 98:19
**ballpark** 26:11
**ban** 320:2
**based** 60:8 62:8
63:7 130:14
162:11 164:4
166:13,21
167:9 169:4,6
171:9 172:2,15
287:1,8 292:15
306:18
**basically** 86:15
286:1,13
305:16 306:6
334:9
**basis** 53:12
192:7,9 296:1
306:1 329:4,7
**Bates** 91:6 96:18
106:19 107:10
112:18 123:4
134:5,10,12
138:12,18
140:19 159:10
160:16 177:16
188:14 193:12
196:5 204:3,4

206:16 214:5
217:5 224:9
235:15 252:12
262:15 274:18
280:9 283:18
289:17 297:5
303:7 307:14
311:8
**bathroom**
168:13
**Beach** 52:8
**bearing** 41:14
96:18
**bears** 91:5
106:18 123:3
140:18 193:12
196:4 206:16
217:5 235:15
262:15
**began** 83:15
332:16 334:13
**beginning**
155:18 207:18
209:3 271:1
**begins** 7:3 79:22
107:15 108:21
125:7 175:4
183:3
**begun** 184:7
185:19 232:15
**BEHALF** 2:2
3:1
**belief** 153:14
**believe** 10:13,18
11:1 12:13
13:2,4,11,15
13:20 14:5
15:12,16,20,21
16:21 23:21
24:6 25:10
26:15 32:18
33:3,4,15
36:18 44:8,20
52:19 53:15



55:11 64:7,15
64:19 65:11
72:4 73:1
76:14,15 87:4
90:12 93:3
94:6,16 95:11
95:15,21 96:6
97:20 98:7,8
100:19,21
101:8 102:3
103:14,17
104:8 108:9
109:13,13
111:8 115:7
116:9 118:2,17
124:1 125:20
129:19 130:15
131:4 135:17
141:19,19
142:7 145:17
146:4,9,13
147:8,21
155:15 171:18
174:18 175:17
180:10 189:10
191:8 193:3
197:9 198:12
199:12 201:16
202:10 207:15
208:14 212:15
213:8 219:14
221:7 231:10
236:13 241:6
243:8,9 253:14
258:3 263:17
271:20 279:1
286:8 294:15
295:1,8 297:19
298:11 299:22
302:5,5 303:10
316:2 319:18
321:12 328:18
329:1,18
331:17 334:1

334:12,19
335:2
**believed** 37:17
**Belinda** 44:15
**bell** 95:2
**Ben** 3:6
**beneath** 99:9
199:16 220:9
233:1
**benefit** 43:14
281:20
**Bennett** 147:8
**berating** 80:4
82:20
**best** 11:6 26:7
49:6 57:5
89:18 101:16
103:18 153:15
162:10 166:16
200:5 304:14
304:22 305:9
**bet** 167:5,7
**beta** 278:18
293:10,20,22
295:18,22
296:16 329:17
**better** 127:1
147:14 193:22
202:9 285:14
326:12
**beyond** 45:17,17
216:13
**bigger** 224:19
274:9 280:2
**bilateral** 331:3
**binational**
292:11,20
295:2
**birth** 328:2
**bit** 46:21 48:22
143:21 202:9
259:11,14
279:7 280:2
311:16 313:7

316:19,22
338:22 339:2
**bitch** 260:18,20
261:5,14
263:16,20
264:20 265:7
266:3 268:3,6
268:11,12,22
269:5,10,15,19
**blackout** 330:9
**blank** 214:20
**Blas** 107:8,15
**Blitzer** 4:10
78:12
**blow** 79:4 83:8
290:8 292:7
**blown** 108:21
**blowup** 91:16
98:16 125:4
**board** 291:2
**boarding** 256:8
**Bobb** 57:9
**body** 181:3
254:11 260:7
**Bolton** 230:17
232:5
**book** 131:5,9,14
**books** 34:15
**booth** 313:21,21
**Bordeaux** 198:8
199:20
**Bordeaux's**
198:10
**border** 9:1,4,16
39:18 40:22
42:22 68:10
98:8 101:18
103:13 104:5
104:12,12
106:7 117:2
120:9,17
121:20 122:13
122:14 141:6,9
141:16,17

142:17 151:15
155:19,22
157:21 159:20
161:4,5 168:2
169:1,8,14
207:1 209:2,5
211:1,17,22
212:5 217:19
219:15 220:4
221:11,14,19
222:7 223:10
269:12 271:10
271:16 272:15
273:5,12
283:17 284:10
285:18 286:6
287:5,17 288:8
288:17 289:2
292:14 295:4
298:2 300:3,4
300:5,6,22
301:5 310:15
317:16,20
321:15 323:5
324:10 333:18
334:5,9,16
337:11
**bottom** 21:15
98:12 107:14
108:20 124:9
134:16 180:16
254:1 267:5,9
275:7 280:21
281:7,16,16
290:1 311:11
311:13
**Box** 3:6
**Boyd** 57:10
303:16 304:4
**branch** 151:11
231:15 232:8
293:11
**break** 19:9,12
56:20 69:21

70:12 71:2
74:22 88:2
102:13,13
103:3 154:17
156:4,6,11,18
156:20 158:11
168:4,5,12,13
173:12,22
174:8 246:9
248:15 249:2
270:3 324:15
324:20 325:2,7
330:16
**breaking** 326:10
**breaks** 19:7,7
**brief** 17:3 38:16
56:15 70:7
74:16 88:10
103:7 155:1
247:13 249:6
256:19 270:10
290:6 292:2,4
338:4
**briefed** 94:16
**briefing** 36:6
93:15 219:22
**bring** 77:18,21
82:3 96:11
106:10 112:9
116:16 119:13
119:16 122:17
133:17 138:3
140:11 158:9
158:17 174:17
188:9 192:1
193:5 195:19
203:10 206:7
213:18 235:6
252:2 261:20
265:9 293:22
**brings** 44:13
**broader** 38:17
**broke** 122:7
144:18



**brother** 49:13
**brought** 282:7
**Brown** 2:4 7:10
**Brownsville**
 161:9 170:5,12
 334:2
**budget** 231:15
 231:15 232:11
 232:17 233:11
**budgeting**
 229:20,22
**Buffalo** 50:19
 51:1
**building** 179:4,6
 179:8
**bulk** 195:11
**bullet** 36:12
 99:9,13 100:5
 100:16 101:10
 101:11 233:4
**bullets** 233:1
**busiest** 52:10,11
**businessmen**
 99:17

———————
**C**
———————
**C** 2:1 4:1 7:1
**calendar** 65:12
 197:2
**calendaring**
 92:5
**Calexico** 161:13
 221:8 277:2,5
 278:2
**California** 1:2
 7:7 12:7,9,19
 12:21 15:20
 16:7,9 109:17
 109:21 110:5
**call** 25:7 64:13
 65:19 73:4,6
 73:19 75:18
 76:1,11 77:5
 91:12 93:15

94:18,21 97:6
98:20 99:5
136:22 139:9
139:17 140:1,8
174:10,13
176:18 177:1
211:21 212:3,4
227:21 228:4
232:1 263:19
264:19 319:20
336:11
**called** 64:15
 89:12 90:9
 115:20 194:8
 204:13 212:14
 260:14,17
 265:7 268:2,22
 269:4,9,14,18
 279:1 331:2
**calling** 168:16
 261:5,13
 263:15 306:15
 306:17
**calls** 71:17 74:6
 75:7 100:8
 126:17 182:11
 211:17 215:19
 259:5 300:12
 301:9,16 336:7
 336:21 337:12
**camera** 46:8
 313:20 338:21
 339:2
**Campbell** 137:7
**capability** 109:8
 145:7,8 285:17
**capacities**
 121:21 159:19
 165:13,15
 169:21
**capacity** 68:9
 109:14 121:17
 122:2,4,11,13
 144:1,4,6,9,10

144:15,16
145:4,5,9,16
145:22 157:17
157:22 158:5
159:22 161:2,3
161:11,14,17
161:19,21
162:3,8,9,12
162:14 163:5
163:14 164:1
165:6,9,10,18
166:10,14,15
166:20 169:19
170:1,4,12,18
172:6 183:10
185:2 292:15
**caps** 181:20
**capture** 35:13
 38:11
**caravan** 181:15
 182:22 209:9
 209:17 211:9
 211:13 298:2
**caravans** 155:18
 209:2 300:2
**caravan's**
 210:22
**carbon** 181:7
**care** 83:20 84:22
 90:14 95:13
**cared** 38:16
**career** 31:21
 50:8
**cargo** 284:7,10
 284:14,18
**cargo-related**
 272:5
**Carl** 73:17,17
 137:6
**Carlos** 255:12
**case** 1:6 10:22
 11:1,3,10,20
 12:1,1,5,8
 13:12,14 14:7

15:17,21 16:2
16:3 19:21
22:9 23:9
30:11 31:18
32:6 37:4
42:18 99:18
109:11 182:16
223:1,13
226:11,22
227:5,12
242:16 270:20
313:22 314:17
314:17,18
319:3 327:4,6
327:13 332:5
341:10
**cases** 40:7 42:5
 45:12 90:4
 327:9
**casework**
 255:17
**categorized**
 172:17,21
**Catherine** 93:22
**caught** 213:2
**cause** 187:10
 188:5
**caused** 169:19
 190:17
**causes** 267:19
**causing** 269:5
**caution** 65:17
 186:10,10
**CBP** 3:13,14
 9:15,21 10:2,6
 20:12 23:15,17
 24:4 45:2 57:8
 57:18 73:3
 92:2,15,18
 93:15 94:4
 97:5,10,14,18
 98:5 103:12
 104:3,10
 105:11 106:4

108:3,7 109:5
110:19 111:2,5
111:16 113:4
114:19 115:1,5
115:20 117:11
118:4 123:14
123:18,21
125:18,22
128:2,8,12
131:10 133:9
135:7,11,15
136:7 141:5
142:1,4 146:22
147:5,11,16,18
152:14 153:18
177:3 179:22
180:3,7 182:4
189:1,5,8
196:20 198:11
205:13 207:5,8
207:12 209:22
210:4 212:14
219:4,13
223:11 227:18
229:4,10,19
230:22 231:4,8
231:20 232:6
232:15 237:5
246:21 247:18
249:18,22
251:15 252:12
253:4,7,12
255:22 256:4
257:21 258:2,7
259:15 269:16
271:6 272:8,20
273:3,9 276:14
282:16 284:3
291:3,8 292:10
292:20 293:19
294:6 295:22
296:16 297:16
298:11,14
299:18 300:7



300:14 301:15
303:16 304:2
308:8 312:6,19
321:14,20
322:5 323:3,10
323:15 326:21
328:21 329:3,8
329:13,20
330:10 336:18
337:7
**CBPALOTR...**
235:16
**CBPO** 298:14
**CBPO's** 298:2
**CBP's** 290:20
290:22 311:20
321:1
cc 198:15
230:18 255:12
**center** 2:11
48:17 109:16
109:20 110:4
227:21 228:5
232:1 287:16
288:5
**Central** 209:4
**Centro** 109:17
109:21 110:4
**Century** 283:17
**certain** 20:11
94:16 249:14
286:9 306:10
**certainly** 102:19
215:5
**CERTIFICA...**
341:1
**certify** 341:4
**cetera** 99:17
**chain** 4:16,19,20
4:21 5:7,16,17
5:20,22 6:4,5,7
6:10,13 97:5
97:10,21
112:17,19

114:12,15
123:3,13,17
124:2 130:2
134:4,22 135:6
135:14,18
136:2,5 138:10
138:17,22
177:16,20
178:3,6,8,12
179:21 180:3
188:17,22
189:4,8 217:5
217:7,11,21
218:18 224:9
224:14 225:8
225:20 252:10
252:18,19,20
253:5,7,11,15,19
255:4 257:2,5
257:14 258:13
259:22 262:2,4
262:15,17,20
274:17 275:9
280:9 282:4,11
282:19 289:14
290:18 291:7
292:1 311:14
**chains** 97:17
**challenging**
269:20
**change** 237:15
254:5 342:2,4
342:5,7,8,10
342:11,13,14
342:16,17,19
343:2,4,5,7,8
343:10,11,13
343:14,16,17
343:19
**changed** 279:20
279:21
**changes** 45:20
47:13,14
166:21 194:4

194:20,21
340:8
**charge** 48:7
**chart** 162:4,5
165:10,14,16
169:21 170:2
171:19
**charts** 172:8
**chat** 102:14
**Cheryl** 257:16
258:1
**chief** 23:15,17
24:4,9,12
27:16 147:4,21
153:9,9 176:1
181:10 185:16
187:6 188:1
194:13 195:2
198:4,13
231:15 232:8
238:17 250:12
**Child** 95:13
**Children** 90:14
**Christina** 57:8
**chronic** 267:19
**Circuit** 315:2
319:9 321:5
322:2,15,19
329:12
**circulated** 318:9
**circumstances**
162:11 284:22
**CIS** 57:9 323:8
**cite** 101:14
**cited** 101:12
**Citizenship**
14:19 152:3
**City** 264:9
271:11,11
304:11
**Civil** 18:20
86:12
**claim** 318:4,19
**claimed** 318:11

**claiming** 191:10
**claims** 101:16
101:18 318:1
322:12 323:1,2
339:15
**clarification**
121:9
**clarified** 61:5
**clarify** 26:6
27:15 61:19
103:22 131:13
240:13
**clarifying** 63:17
206:6
**class** 318:12
322:12 323:3
323:11,14
**claw** 117:7
190:18 192:6
**clawback** 119:9
247:3
**clawed** 4:17 5:8
119:20 190:14
191:21
**clawing** 190:4
192:16
**clean** 63:5 172:7
**clear** 72:7 82:5
101:14 131:7
150:22 299:13
318:18 320:10
**cleared** 48:19
**clearly** 192:14
**clock** 316:22
**close** 40:16
119:17 281:10
**closely** 48:16
113:10 175:22
183:22 184:3
334:9
**closer** 40:12,13
**code** 318:3,6
323:8
**coincide** 310:8

**collaboration**
120:22 294:6,8
294:13,18
295:7,9
**collaborative**
292:11,19
**collect** 42:4
**collected** 248:1
248:1
**collecting** 286:5
**collection**
286:13
**collectively**
223:9
**Columbia** 49:22
**column** 170:2
**combination**
144:11 145:6
170:10 233:19
**combined** 32:21
109:16
**combining**
272:2
**come** 37:2 38:15
68:10 83:18
87:18 88:18
200:16 212:19
270:5 295:15
295:18
**comes** 17:1
47:14 131:9
217:21 223:19
245:4
**comfortable**
176:4
**coming** 10:4
106:6 127:13
128:15 129:6
129:13 130:5,8
156:14 217:19
288:14
**command** 130:3
**comment** 83:18
129:16 242:17



242:19 243:1
248:3
**comments** 32:4
243:6,11,18
244:2,6 246:14
247:6
**Commerce**
51:19
**commercial**
288:22
**commission**
341:15
**commissioner**
53:18,19 108:6
108:7,9 125:16
125:16,18,22
129:3,4,10,10
130:6,6 155:15
157:11 181:11
184:19,22
208:22 275:20
298:11 303:17
311:20 319:19
**commissioner's**
98:9 151:1
152:21 153:2
153:13,18
291:3,16
**committee**
14:10,16,18
15:5 55:1,2
90:12 95:22
**committees**
54:15
**common** 69:13
285:18
**communicate**
296:7,11,14,16
**communicates**
329:3
**communicating**
207:1
**communication**
65:9 71:20

77:17 106:4
153:4 187:15
200:12,22
**communicatio...**
37:9,11 60:10
62:13 63:9,14
67:22 77:14
86:8 190:2
192:11,12
201:11 336:12
**compare** 117:16
**compared** 118:5
**complaint** 11:5
**complete** 340:7
**completed**
49:21
**compliance**
321:20 322:1
**complied**
321:15,16,17
**components**
90:6
**composition**
164:5 172:3
**compositions**
166:17
**comprehensive**
38:14 327:4
**computer** 46:1
**concept** 288:5
288:13,21
289:5
**conceptualizing**
285:7 319:14
321:8
**concern** 182:21
**concerning**
111:17
**concerns** 48:18
145:21 186:7
187:1,3 192:7
**concluded**
339:18
**concludes** 339:5

**conclusion** 74:7
75:8 245:4
**concurrence**
297:22 299:10
**conditions**
166:16
**conduct** 40:7
314:14
**conducted**
171:8,11
**confer** 101:13
337:17,20
**conference**
29:22 30:2
64:17 74:8
76:11 77:10
91:12 93:14
94:18,21
136:22 155:8
217:18 319:18
**conferences**
190:11 212:9
221:14
**confidence**
305:15
**confidential**
1:11 338:14
**confidentiality**
338:16
**confine** 86:16
**confirm** 185:1
**conflict** 203:1
**confusing** 17:20
**confusingly**
78:12
**confusion** 71:5
**Congress** 15:9
15:14 229:15
286:2
**Congressional**
15:5 255:17
**connection**
22:20 200:7,18
201:5 229:20

233:10 240:3
309:5,16,18
310:3,7
**connective**
267:20
**consequent**
339:15
**considerable**
190:10
**considerations**
109:14,15
**considered**
109:4
**consistent** 80:12
241:19 295:10
**constraints**
277:3 292:16
**construction**
314:1,3
**consult** 81:12
87:20
**consultation**
153:17 154:14
**consultations**
151:8 152:15
**consulted**
148:12,17,21
149:5,9,14,18
149:22 150:4
151:15,21
152:4,9
**contact** 94:9
175:9,14,19
176:9,22 177:4
328:4
**contain** 34:18
244:15
**containing** 65:4
**contains** 191:11
191:11,12
227:11
**content** 84:10
85:5
**contents** 64:3

76:4,6 98:16
**context** 38:17
69:22 223:17
268:7,9 305:12
**contingency**
223:6,11,16
227:11
**continuation**
262:4
**continue** 48:19
330:20
**continued** 209:8
209:13 333:17
**control** 125:9
126:7 127:13
129:5 278:1,20
**conversation**
17:7 31:9,11
69:2 75:10
316:18
**conversations**
23:7 30:17
32:14 34:4
80:14 87:22
154:7 174:8
**cool** 92:11
**cooperate**
119:18
**cooperation**
143:3,5,12
279:1 337:8
**cooperative**
42:10 331:4,8
331:11
**coordinate**
274:4 277:22
278:17,19
**coordinated**
272:21 273:4
273:10,19
**coordinates**
293:20,22
**coordination**
152:22 153:11



**MAGNA**
**LEGAL SERVICES**

153:12 234:1
300:19
**copied** 219:10
308:3
**copies** 329:8,15
329:21 330:11
**copy** 11:19
12:22 16:12
21:20 104:15
135:1 141:10
141:22 177:19
178:6 179:20
180:2 181:7
203:18 205:4
206:15 230:18
230:18,21
234:10 242:7
242:12 252:21
260:4 263:4
266:13,17
282:10 291:18
329:11 339:8
339:10
**corner** 16:17
21:16 134:16
160:2 173:9
**correct** 9:5,10
14:21 16:4,5
20:17,21 23:4
24:10,11 30:4
30:5 33:7
36:14 39:21
44:12,21,22
49:3,4,7 50:2,3
50:10,21 51:8
51:9 52:1,2,4,5
52:8,9,11,15
52:16,22 53:6
53:7,10 64:11
68:1 72:3,18
72:19 76:21
77:2 90:3,6,7
92:2,3,6 94:2
96:8 97:2,11

97:12,15,16,19
98:20,21 99:11
99:12 100:2
101:8 103:19
108:17,18
110:16,20,21
111:2,3,6,7
113:1,4,5
114:19,20
115:1,5,6
116:14 122:1,5
122:15 123:10
123:14,15,18
123:19,21,22
125:12,19
126:12,15,16
127:21 128:6
128:22 129:8
131:1,2,11,12
132:22 133:3,6
133:7 135:7,8
135:12,15,16
137:4,8,9
139:9,10,21
141:2,3,6,7,12
141:13,19
142:1,2,4,5,13
143:13 144:2
145:22 146:1
158:7,20
159:15,16,20
160:9,10,13,14
161:5,6,11,14
161:15,17,18
161:21,22
162:3 166:4,5
166:7,8 167:20
170:5,6,9
171:2 173:3,4
173:17,19
175:12,13
176:15,16
178:9 179:1,4
179:5 180:5,9

182:1,22 183:1
183:16,17
184:9 185:5
189:2,5,6,8,9
194:6 195:9
196:8,9,12,22
197:3,4,6,7,20
198:5,6,8,9
204:10,11,14
204:21 205:2
207:2,3,6,9,10
207:13,14
208:17 214:21
219:17 220:5,7
220:8,11,21,22
224:18 225:15
231:2,6,9,18
232:22 233:2,7
236:2,3,6,20
236:21 237:2,3
253:1,4,5,9,13
256:11 259:4
263:1,2,7,10
275:13 276:2,6
276:10,11,15
276:18 277:10
277:11 282:13
282:14 284:14
284:20 285:20
291:4,5,8,9,12
291:13,17,21
292:18 294:3
295:20 296:10
297:9,14,17,20
297:21 298:12
298:13,15
302:17,18,20
302:21 303:18
303:21,22
304:3,16,18,19
305:21,22
307:18,19
308:1,4,8,9,16
311:22 312:6,7

313:3,14 315:4
318:16 329:4
331:4,12
332:18 333:10
335:1 340:6
341:5
**corrected** 290:7
**correction** 9:8
107:5
**corrections**
340:8
**correctly** 79:13
79:14 80:7
84:1,18 93:18
97:7 99:20
101:19 109:9
110:12 125:11
126:11 127:7
127:20 128:5
137:3 139:18
181:17,22
185:4 194:5,9
196:17 200:3
204:20 208:3,8
215:11 226:6
232:12,21
233:6 255:19
263:6 267:22
277:7 283:1
285:19 292:17
294:2 298:8
304:15 308:15
312:17
**correspondence**
60:15 67:7
248:11
**council** 54:2,8
54:10,14,20
55:2,4,9 89:13
89:16 90:1
148:12,16
**Council's** 70:16
**counsel** 7:15
8:10 23:15,18

24:4,10,12
27:17 28:18,19
37:7 73:1,3
80:12 86:4
119:1 147:4,22
176:1 185:17
187:6 188:1
194:13 195:2
198:5 201:1,11
201:12 204:4
221:18,21
234:9 238:17
250:13 270:14
309:8 315:14
319:20 337:17
341:9
**counselor** 108:5
153:8 181:11
**counselors**
151:2
**counter** 192:7
**counterpart**
125:9 272:9
**counterparts**
48:15 127:12
127:19 128:9
128:14 129:12
272:19 274:4
294:12
**countries**
334:17
**country** 286:12
286:14 300:2
300:22 301:4
312:16 327:18
**couple** 18:11
19:22 22:3
23:21 24:1
28:13 31:10
72:22 147:3
168:4 242:10
249:13 264:14
324:19
**Courey** 147:8



course 15:2
37:22 55:12
81:6 87:16
88:16 92:1
97:10 110:19
113:4 114:18
123:13 135:7
179:21 188:22
190:15 196:20
207:12 230:22
250:12 253:3
266:14 271:5
276:13 282:16
291:7 297:16
304:2 308:7
312:6
courses 186:17
court 1:1 7:6,13
7:17,19 10:9
10:15,16 17:10
26:2,3 27:19
28:2,6 39:9
40:9,10,17
41:1 43:14
44:1 45:4,21
46:4 74:21
75:1 82:4,7
88:14,16 107:1
107:1,2 113:12
122:6,6 133:13
143:15 144:17
155:9 157:5
165:21 179:6,9
192:2 202:3
210:11,12
227:22 228:6
228:12 235:7
247:20 256:13
266:15 280:13
289:19 301:1,6
306:20 314:16
326:9,10,13
331:20 338:15
339:7

courtesy 18:14
courtroom
12:12,15 20:21
coverage 313:20
covered 191:10
192:14
covering 291:3
COVID-19
335:7,21
craft 227:4
Crawford 118:9
191:3
Crawford's
247:1,14,17
create 121:6
177:3 188:4
created 52:3
116:21 159:18
194:13 229:19
327:1
credible 47:9
327:9
Criminal 49:20
Crisis 5:4 159:9
159:14,17
161:1
cross 99:16
288:8 289:5
crossers 101:18
crossing 289:2
crossings
141:16
crosstalk 103:16
165:20 171:1
202:1
Crow 2:10 4:4
270:4,13,15,19
273:21 274:6
274:14,21
275:3,6,8
278:12 280:1,6
280:15,19
281:1,2,4,12
281:15,22

282:3 283:8,12
285:13,15
287:12,13
289:7,13,21
290:4,14,17
292:3,7,9
296:8,20 297:2
300:10,13
301:7,11,18,21
302:22 303:4,9
303:12 307:5
307:10 309:14
311:1,5,10,12
311:15,17
313:6,9 316:3
318:17 320:9
320:20 324:17
325:12 326:12
326:14 330:14
330:22 331:18
332:2,13,15
333:13,14
336:14 337:1,6
337:16 338:1,7
339:12
crying 265:19
curious 134:17
currency 51:14
current 53:5
250:4 275:19
currently 9:2
43:11 44:16
237:5 242:16
247:14,20
276:21 277:4
333:4 335:15
335:18
curve 259:11
custody 12:20
12:21 16:11
109:6 161:2
166:17 170:8
171:7 172:3
customs 9:1,4

9:16 10:6,8
50:18,19 51:3
51:7 109:6
151:20
cute 216:4,6
cuts 281:3
cutting 83:16
CW 219:19
C-1 125:8,13
132:6,18
297:22 298:10
299:10
C-2 125:8,13
132:6,18

_____
**D**

D 7:1
daily 159:18
275:12 293:20
296:1 329:4,7
damage 79:11
data 65:22
66:12,13,19,21
67:11 160:9
171:4,5,6,10
172:2,9,12,14
172:16,20
173:8 286:5,13
315:21,22
316:4,8 317:2
317:4,4 319:12
319:14,15,17
321:9
date 72:7 78:13
104:7 119:15
126:9 140:17
160:4,11 319:7
328:1,7 340:13
dated 5:2,12,13
5:14 6:8,11
137:15 184:13
283:20 297:7
303:15 304:5
307:15,22

311:18
dates 35:17
316:1
dating 87:4
daughter
254:16 256:10
260:22 261:3
Dave 220:14
221:2,3
Davies 25:4
43:10 73:1
257:16 258:1
day 162:14
167:15 173:18
186:2 270:17
277:4,5 313:5
313:10 341:14
days 186:4
338:14
day-to-day 43:3
deal 248:10
dealt 254:22
Debbie 57:8
December 4:20
4:21 6:11
55:15,17 56:4
56:20 58:22
61:12 62:1,18
63:20 66:7
67:15 68:11
69:4,17 72:5
77:7 84:11
85:5,18 86:22
87:1 89:3
134:3 135:1
136:16 137:20
138:10,16
139:4 140:3
307:15,18,22
315:3 332:6,17
decide 35:21
48:18 306:1
decided 208:16
deciding 145:11



**decision** 11:16
39:1 61:17
110:3 113:22
176:17 288:7
288:12 289:4
**decisions** 61:11
61:21 289:1
302:9
**declaration** 6:3
6:14 15:19
16:3,6,13,19
266:13,18
267:17 332:5
**defendants** 1:8
3:1 8:5 338:10
338:10
**defense** 101:17
**define** 211:2,5
**degenerative**
267:19 268:4
**degree** 49:16,18
274:2,3 333:19
334:6
**delay** 40:18
**delete** 92:8
187:7 188:2
330:11
**deleted** 214:22
**deliberation**
187:17
**deliberations**
186:12,14,16
190:3 309:9
336:9,13
**deliberative**
60:4 66:15
67:4,19 68:15
75:10 117:7,9
117:19 118:10
118:12 191:5
192:8 246:15
247:2
**deny** 272:21
273:5

**denying** 101:17
**departed** 286:14
286:16
**department** 3:4
20:2 32:10,15
32:17 33:1,9
33:21 51:18,19
57:7,10,11,19
57:20,21 73:3
73:5,20 89:21
147:22 148:1
151:10 152:8
185:17 188:2
238:20 241:19
310:11,12
**depended**
306:19
**depending** 36:3
**depends** 36:5
200:18
**depicted** 135:18
164:2,8 180:11
**deployment**
48:8
**DEPONENT**
340:2
**deported** 255:18
**depos** 28:16
**deposed** 31:15
**deposition** 1:12
4:6,7 5:1 6:1
7:4,9 8:1
12:11,13 13:1
13:14 17:6
18:18 20:1,6
21:8,14,17
22:8,17,20
23:10,19 24:5
24:16 25:13
27:17 28:8,12
28:17,22 29:2
29:7,18,19
30:7,9,11 31:1
31:3,4,8,17

32:5,11 34:2,6
34:8 36:16
78:1,7 90:21
91:4 93:5
96:12,17
106:11,17
112:11,16
116:19 119:6
119:11,12
122:18 123:2
133:19 134:3
138:4,9 140:12
155:14,14
159:3,9 174:14
177:9,15
188:13 190:16
190:17 191:22
192:3 193:6,11
195:21 203:12
203:18 206:9
206:14 213:20
214:3 216:20
217:3 224:2,8
230:9,15 235:9
235:14 248:12
252:4,9 262:8
262:14 265:11
266:9 271:1
274:11,17
280:3,8 283:9
283:15 289:9
289:10 296:21
297:4 303:1,7
307:7,13 311:2
311:7 331:21
332:4 339:5,13
339:18 342:1
343:1
**depositions**
18:21 27:22
**deputies** 55:1
130:18 131:18
**deputy** 25:3
43:10 44:18

53:17 54:15
73:1 125:16,22
129:3,10 146:9
148:11 175:22
219:6,8 275:20
307:16
**Derechos**
293:16
**derived** 166:15
172:2
**Desarrollos**
293:15
**descend** 155:18
**descending**
210:22
**describing**
137:2,21
139:16 140:4
**description**
136:19
**designated** 94:7
121:21 338:13
**designations**
338:16
**desk** 13:6 16:17
**desperately**
325:8
**despite** 193:2
238:11
**destroy** 30:6
330:11
**detail** 172:7
209:16 316:5
316:17
**details** 290:6
317:7
**detained** 254:14
256:10
**detainers** 12:19
16:10
**detention** 109:7
145:8,16,22
157:16,22
158:3,4 159:19

159:21 163:14
164:6 229:6
233:5,12,17
**determination**
246:17,19
**determine** 87:22
153:19 316:11
316:20
**determining**
315:16 320:1
320:11
**deterrent**
105:12,16
106:5 110:10
**developed**
293:12
**development**
49:22 288:18
293:15
**DFO** 217:11,15
217:18 218:5
218:10 221:11
221:19 279:12
**DHS** 20:2 52:3,4
90:5 101:12
147:1,11,18
245:9 249:18
276:2 304:9
326:2,6,15
331:1
**DHS's** 239:2,8
239:12
**dictates** 127:6
**Diego** 116:3
127:3 219:7,16
220:7 221:3,6
314:2
**differed** 284:17
**difference**
122:11
**different** 42:1
42:14 45:20
48:13 71:1
122:3 166:16



215:22 237:16
287:9 338:21
**differently**
192:21
**difficult** 31:20
54:9 56:9
129:15 286:5
**direct** 43:7,9,20
44:7,13 48:2
53:8,12 131:3
131:6 132:8,12
132:13,14,16
133:8 143:8,10
146:6 163:10
165:13 167:10
167:14,16,21
169:11 170:15
171:18 172:14
224:18,18
225:13 228:19
232:2 238:12
238:15 297:6
303:13 332:11
**direction** 129:17
131:15 226:15
226:20 227:4
**directive** 130:5
168:20 317:22
**directly** 102:8
191:1 246:15
254:22
**director** 9:3
28:1 30:12,13
38:22 39:2,13
39:16,22 41:19
42:20,20 45:3
45:4 51:21
52:7,14,21
53:2 112:2
127:11 141:15
175:10 206:22
219:15 220:21
221:8 227:20
231:22 236:19

237:1,6 256:1
256:6 257:22
258:4 272:18
279:12 307:17
**directors** 42:1
43:4,6 124:22
130:13 131:18
136:21 208:1,5
211:17,22
212:5 217:19
222:2,6 227:20
273:19 274:1
275:11 317:14
317:15,17,17
317:19 318:9
322:9
**disadvantages**
186:17
**disagree** 86:10
86:18 117:18
119:21 248:2
**disclose** 245:21
318:22,22
**disclosed** 191:7
**discomfort** 32:2
**discoverable**
118:11
**discovery**
119:17 191:7
**discrepancy**
178:19
**discretion**
101:13
**discuss** 69:21
119:9 140:3
156:21,21
174:13 191:13
**discussed** 54:15
60:18 61:2
62:18 65:5,10
67:16 75:22
76:19 101:22
128:3 137:13
176:10 201:4

221:14 222:18
308:10 317:4
**discusses** 191:14
**discussing** 54:18
137:20 200:6
228:19 236:15
**discussion** 33:17
41:10 46:14
68:11 81:21
114:8 139:15
196:15 221:9
221:22 222:13
244:15 254:13
316:6 339:11
**discussions** 54:6
211:20 304:10
**disorder** 267:19
268:4
**disseminating**
141:5
**dissenting**
241:20
**distributed** 58:5
58:13,16
245:17
**district** 1:1,2 7:6
7:7 247:20
**division** 45:6,9
51:22 52:1
231:16
**docket** 266:16
**docs** 26:13,16
**docs.com**
189:20
**document** 4:17
5:8 21:15,21
22:13 91:7,11
106:20 115:20
116:21 117:5
117:16,18
118:3 119:7,10
119:20,22
120:6 123:5
134:7,15

138:17 143:17
143:20 151:5
158:14,19
159:1 160:2
189:17,22
190:19,21,22
191:6,6,21
192:6,21 193:3
194:12,22
195:3 197:9
223:8,19
234:11 235:15
235:18 240:9
240:16,21
252:14 267:3
274:16 275:9
280:7 281:9
283:14,16
284:20 285:8
285:12 287:2,3
287:9 289:17
297:3,5 303:5
303:7 307:12
307:13 311:6,8
329:3 331:18
332:3
**documents**
25:14,16 26:9
26:12,19 27:1
27:7 33:10,13
33:16 112:7
118:8 134:13
145:13 190:13
240:3 247:5,16
247:18,18
336:12
**dog** 256:14
**doing** 17:15
18:9 36:17
66:7 86:15
116:3 127:3
129:22 131:9
131:13 239:16
272:17 284:7

315:20
**DOJ** 34:4 148:6
150:8,16
152:17 187:7
**domestic** 55:2,4
55:8
**Donald** 78:10
257:16,21
**Donnelly** 282:19
**Double** 259:16
**doubt** 38:10
104:19 129:9
137:19 138:1
140:7,9
**draft** 6:6 117:5
118:21 146:15
146:20 204:22
206:1 208:12
226:3 240:7,9
240:16,20
241:4,13,17,22
242:1,4,8,12
242:17 243:2,6
243:12,19
244:4,6,11,14
244:19,20
245:2,9,22
246:5,13,13
247:5,15
248:20 283:17
**drafted** 185:8
187:8 188:3
226:17 233:10
237:20
**drafting** 118:20
146:2,7 147:1
147:11,16,19
148:2,7 150:11
150:12,17
153:21 155:10
184:8,18
185:19 191:15
195:5,8 198:20
205:19 228:20



233:16 237:22
238:4,14,17,21
239:3 285:7
**drafts** 148:12,17
245:16 247:22
**Draganac** 137:6
243:22 244:2,7
307:16 308:17
**drawers** 13:7
**drill** 258:20
**drink** 258:20
263:1
**drinking** 261:12
263:9,11,14
**driver** 145:18
145:20
**driving** 158:5
**drop** 99:5
**dropped** 83:19
**due** 120:15
232:11 241:14
277:2 298:2
305:16 309:1
**duly** 8:7
**duties** 110:19
114:19 123:13
135:7 179:22
189:1 207:12
230:22 276:13
282:16 291:8
297:16 304:2
308:7 312:6
**dynamic** 305:14
**D.C** 2:6,14 3:7
51:8

———————
**E**
———————
**E** 2:1,1 4:1 7:1,1
**EAC** 27:18,22
30:14 31:7,12
39:6 155:14
199:21 205:4
226:3
**earlier** 75:18

80:15 101:2
141:1 236:15
259:12 262:22
284:2 329:2
**early** 13:20 99:5
111:15 185:15
298:4
**Eastern** 93:15
**edited** 194:3,18
**editorial** 291:2
**edits** 194:19
**EEO** 10:17,20
11:5 13:16
14:1,3
**effect** 105:12,16
106:6 110:11
**efficient** 284:10
284:13
**efficiently** 295:5
**effort** 13:10
16:20 30:4
261:19 264:7
292:11,20
295:2 323:22
**EFTA** 227:21
228:14 232:1
**Ehlers-Danlos**
267:18
**eight** 32:21 42:1
43:6 53:8,12
308:22
**either** 14:10
24:18 25:2
54:14,22 58:6
72:9 102:15
146:19 150:5
195:16 225:5
244:7 316:7
319:13 321:3
328:16
**El** 83:12 84:6
109:16,20
110:4 161:16
331:16 333:5

333:22 334:12
**electronic**
228:11,14
328:17
**electronically**
194:22
**elements** 11:13
**eligible** 212:22
**Elmer** 136:6
**employed** 8:20
8:22 341:9
**employee**
114:19
**employees**
131:10
**enabled** 102:14
**encompass**
209:19
**encompassed**
209:18
**encompasses**
89:3
**encompassing**
47:7
**ended** 83:17
286:13
**ends** 98:13,14
**enforcement**
45:5,8 51:13
51:14 109:6
151:20 250:4
292:2
**enlarge** 108:13
114:12 125:4
136:1 138:22
160:19 174:21
181:3 218:15
230:6 257:5
262:2,19 267:9
**enlarged** 139:3
181:6 257:4
**Enrique** 227:16
254:7 255:5,11
257:15 282:20

**ensure** 155:20
175:4 182:8
209:1 318:6
**ensuring** 51:16
**entered** 335:12
**entering** 145:13
310:14 335:16
336:1,20
**entire** 141:9
155:21 169:8
209:1 283:14
334:5
**entitled** 5:3
21:15 78:9
140:18 229:5
233:11,16
236:2 283:16
292:1
**entry** 20:7 39:8
39:18 40:4
42:13,22 51:1
68:10 104:13
106:6 116:10
121:6,7,17,19
122:3,5,12,14
125:10 127:14
128:15 129:7
129:11,14
130:8 144:6
145:2,11,14
157:16,20
159:20 161:4,8
161:10,13,16
161:20 162:2
163:4,12,22
164:15,15
165:3,8,14
166:3,10 167:3
167:12,18
168:1,22 169:3
169:13,20
170:5,12,19
171:2,15 209:6
209:8,10,13

211:1 239:14
266:16 271:15
273:1,7,12
277:13 278:2
278:21 282:8
285:17 286:20
287:4 291:1,4
294:1 296:2
302:16,20
304:22 305:14
305:21 306:2
306:21 308:22
312:12,19
313:16,17
321:14 322:22
323:15 329:5
329:15,21
334:15 335:17
336:2,20
337:10,10
**entry/exit** 286:1
**enunciate** 17:15
**environment**
18:8 286:3,6
**EOIR** 306:20
326:19
**ERO** 171:11,14
**errata** 340:9
342:1 343:1
**especially** 82:21
118:5 327:8
333:2
**Esquire** 2:3,10
3:2,3,13,14
**essentially**
12:18 16:9
17:7 29:10
31:2,15 37:14
40:3 41:17
42:18 45:11
80:4 176:3
191:19 237:14
256:8 259:2
261:17 272:4



284:8 286:11
288:2 289:3
305:5 306:5
318:1,21
335:20
**established**
292:11,21
294:8
**et** 1:4,7 7:5,6
99:17
**evaluation**
213:8
**evening** 263:5
**event** 209:14
210:9
**events** 76:21
208:2,7,11,19
208:21 209:19
210:2,6,10,17
211:5 268:8
**eventually**
194:15
**evidence** 76:19
132:8,14,16,19
132:22 133:8
165:13 167:10
172:11,19
173:1 238:13
**evidently**
139:20
**EVUS** 227:21
228:4,8,10
232:1
**exact** 319:7
**exactly** 39:4
54:11 59:6
126:4 130:1
239:19 249:13
300:16,18
320:19 331:5
**EXAMINATI...**
4:2 8:10
270:14
**examined** 8:8

340:5
**example** 151:9
246:16 263:18
**excellent** 305:14
**exchange** 4:13
4:15 96:18,22
98:6 106:18
112:20 188:13
214:4 285:17
**exchanges**
180:11
**exclamation**
258:21
**excuse** 26:2 40:9
113:14 119:4
256:13,14
318:7
**executing**
319:15
**executive** 9:2
27:22 30:12
38:22 39:2,13
39:16,22 41:19
42:19,20 50:9
50:11,15 52:20
53:2,17,19
55:7,13 60:8
62:9 63:8 69:1
87:5 105:6
112:2 149:18
151:10 175:10
236:19 237:1
251:16 275:20
307:17
**exercised** 265:1
**exert** 298:5
299:19
**exhibit** 21:8,13
21:14 77:19
78:1,6,14 82:3
90:21 91:4
93:4 96:12,17
98:13 106:11
106:16 107:3

108:16 112:11
112:16 116:19
120:3,3 122:18
123:1,9 124:2
124:6,10
133:19 134:2
135:10,18,22
138:4,9 140:12
142:6,7 155:5
159:3,8 160:3
160:16 169:21
170:2 171:19
172:13,21
173:6 174:18
177:9,14
180:11,17
181:2 188:12
189:11,15
193:6,11
195:21 203:12
203:17 206:9
206:14 207:16
213:20 214:3
216:20 217:3
218:13 224:2,7
229:3 230:9,14
231:11 235:9
235:14 252:4,9
253:3 262:5,8
262:14 265:11
266:9 267:1
274:10,11,16
280:3,8 283:9
283:15 289:8
289:10 290:12
296:21 297:4
303:1,6 307:7
307:12 311:2,7
331:21 332:4
**exhibits** 4:6 5:1
6:1,16
**existed** 72:1
104:20,22
115:21

**existing** 117:10
304:12,20
305:7
**exists** 227:11
234:15
**exit** 257:3
285:18 286:11
**expand** 173:8
193:19 197:13
197:15 199:16
207:21 225:1
254:1 255:8
258:14 259:21
287:17 306:1
306:15 309:3
**expanded** 225:7
302:19 305:20
**expect** 112:1,1
**expedited** 45:12
47:8 260:18
268:11
**experience**
31:17 32:5
90:5 167:9
172:15 212:4
**experienced**
145:18 327:5
**expires** 341:15
**explain** 11:2
69:10 134:10
215:16 285:21
332:6
**explaining**
60:15
**explanation**
42:16 115:19
**explicitly** 211:8
**express** 32:1
127:4
**expresses**
182:21
**expressions**
186:16
**extends** 118:18

**extent** 58:9
60:20 61:15
64:2 65:19
66:18 71:17
76:3,5 87:19
89:2 118:19
187:14 200:21
201:9 240:19
245:8 306:10
336:11
**extremely** 17:11
268:16
**eyes** 151:3
193:22 274:7
**e-mail** 4:12,15
4:16,19,20,21
5:6,9,12,13,14
5:16,17,18,19
5:20,22 6:4,5,7
6:8,10,11,13
65:4 77:16,21
96:18,21 97:5
97:10,14,14,17
97:21 98:1,2,5
98:10,16,20,22
99:1,4 101:11
106:4,18 107:8
107:15,21
108:13,15,20
110:8,15,15,19
110:22 111:1,9
112:17,19
113:3,7,9
114:12,13,13
114:15,17,18
114:21,22,22
115:8,13,14
123:3,9,13,17
124:2,10,15,21
125:4,7,17,21
126:6 127:17
129:20 130:5
130:11 131:20
132:2,10 133:6



133:10 134:3
134:21,22,22
135:3,6,6,10
135:11,18
136:1,2,4
138:10,16,22
139:4,12,21
157:10 176:14
176:19,19
177:1,4,16,20
178:6,8,12,17
179:21 180:3,3
180:6,11,15,18
181:3,6,15,20
182:3,7,20
183:3,8,19
184:16,20
185:8 188:13
188:16,18,22
189:4,4,7,14
191:20 193:12
193:14,14,20
194:8,17
197:19 198:1,7
199:20 202:17
203:18 204:2,9
204:13,17
205:6,7,7
206:15,18,21
207:8,8,11,19
208:12,17
209:20 211:6,9
211:10 214:4,7
214:11,16,19
215:1,6,14
216:4,7 217:4
217:7,11,21,21
217:22 218:2
218:13,15,18
218:18,22
219:10,18
221:2 224:8,10
224:13 225:1,8
225:17,19,22

226:2 228:3,18
230:7,16,18,21
231:4,4,14,20
231:21 232:3,6
232:10,15
236:1,12 242:6
252:10,18,19
252:20 253:3,7
253:7,11,15,19
253:22 254:1,5
254:5,7,12
255:4,5,7,8,11
255:21 256:4,5
256:7 257:2,5
257:9,14,20
258:2,13,14
259:3,8,22
260:2,8 261:5
261:13 262:1,4
262:15,17,19
263:12,15
264:4 265:2
268:9,20
274:17 275:9
280:9 281:1
282:4,10,15,18
289:14 290:12
290:18 291:7
292:1 297:7,11
297:18 298:17
299:1,9 302:2
303:14,20
304:1,5,5,9
307:14,20
308:3,6,10
311:13 312:2,5
312:8 313:11
e-mails 25:19
111:4 112:20
115:3 123:17
123:20 128:8
128:11 135:10
135:13,14
188:22 189:4,7

207:4 231:7
240:3 253:10
253:15 276:13
276:17,20
297:15 299:7

_____

F

face 172:5
280:18
facility 277:2
fact 129:11
141:14 153:19
193:3 203:6
238:11 240:6
263:11
factor 158:5
factors 145:10
165:5 169:18
170:11,16,21
172:1 177:2
306:6
failures 80:6
82:22
fair 23:1,1 24:19
59:9 126:19
195:17 213:9
213:17 227:17
315:8
fairly 178:18
fall 41:18 222:5
222:15,19
247:16
fallen 47:21
falls 48:5 118:7
247:19
familiar 130:11
142:11 277:12
277:15 302:12
310:17 330:1
331:7 332:8
familiarity
176:2
Families 90:13
95:13

family 83:21
85:1 166:18,19
167:2,11,22
168:21
fan 49:12
far 18:10 35:17
36:8 137:15
166:18
FCC 90:12
FCCP 90:9,13
95:20 96:4
fear 47:9 127:4
327:9
features 272:14
February 5:18
5:21 78:13
230:15 232:11
233:9 252:10
252:20 254:6
255:6 257:10
258:9,15,18
260:3 262:17
265:17 266:15
268:21 311:18
334:19,21
335:8
federal 18:19
86:12 250:4
feedback 146:15
243:2,6,11,18
244:3
feel 36:5
feels 298:4
299:19
felt 11:4
field 9:21 30:13
43:4 47:15
103:13 104:5
116:12 120:8
127:11 128:9
128:13,16
129:5,7 141:6
141:15 151:17
151:22 152:5

152:12,19
155:16 160:12
161:5 194:15
204:19 206:22
210:20 211:17
211:22 212:5
212:21 217:22
219:7,16 220:7
221:6 222:2,6
231:16 237:7,9
237:17 247:15
256:2 272:11
272:18 273:18
273:22 275:11
317:11,13,19
318:10 322:10
323:21 333:4
fifth 267:3,4
figure 316:21
335:3
file 142:1
192:22 327:4
327:13 328:12
filed 11:5 13:7
249:16 250:9
266:15 269:15
files 16:17
328:18,18
filled 327:12
fills 35:1,3
final 61:10,21
83:17 104:15
117:12 118:21
204:22 206:1
234:2 240:21
241:9 259:22
310:13 331:2,7
finalized 117:6
finalizing
150:17
finally 258:20
258:21 263:1
financial 341:11
find 13:9 16:18



30:2
**finding** 284:8
**fine** 40:13 70:1
74:10 82:13
88:6 157:8
240:12 309:10
325:5,6
**finish** 102:16
117:21 324:17
324:22
**finished** 176:7
274:20 275:4
280:12
**fire** 258:20
**firm** 96:8
**first** 10:14 16:22
21:16 25:3,6
44:8,20 73:7
79:3 98:12
102:9 103:12
104:3 123:9
125:6 141:4,8
160:3,3 162:21
173:6 177:18
180:17 181:5
189:14 211:21
218:12 228:7
228:12 235:17
249:10,12
250:9 252:19
258:13 266:1
281:7 294:14
303:14
**first-come**
293:12 295:13
295:17
**first-served**
293:12 295:13
295:17
**fits** 246:22
**Fitzgerald**
230:16 231:14
232:14 234:4
**five** 43:19 74:12

158:13
**fixes** 46:11
**flag** 29:10 318:5
323:7,7
**flagged** 37:17,18
**Flanagan** 151:1
153:7 181:7,10
**flights** 334:10
334:11
**flip** 29:11 79:2
108:11 125:3
158:18 159:1
257:4 266:22
**flipped** 34:13
**flipping** 34:9
**Flores** 134:4
135:1 137:5
138:11 139:5
140:2 177:21
214:5,10,22
215:9,13 216:3
219:8 276:9,20
279:12 291:11
291:14,19
313:10
**flow** 125:9 126:8
127:13 128:14
129:6,13 130:7
145:12 181:15
277:1 283:20
283:22 284:8
287:3 292:14
**flows** 284:10,13
**fly** 48:20
**focus** 91:10 93:9
98:10 99:13
101:10 107:7
114:17 115:12
117:17 180:14
183:2 204:17
218:12 237:18
262:1
**focused** 79:3
125:6 225:19

**FOIA** 182:9
**folder** 189:20
**folks** 57:12,12
73:21
**follow** 59:21
60:14 62:5
63:2 64:9 67:6
67:9 68:5,18
75:13 84:13
85:8 89:8
158:13 164:11
218:20 245:12
245:14 267:14
336:15
**followed** 130:19
**following** 7:22
130:2 131:14
131:16 133:9
232:19 250:8
322:8
**follows** 8:9
158:14 309:22
**follow-up**
139:13 225:18
299:7
**football** 49:6
**footer** 231:13
**forecasted**
93:16
**foregoing** 340:5
341:3,4
**foreground**
265:19
**foreign** 14:16
48:12,12,15
**Foret** 236:19,22
238:8,9,12
**forget** 19:8
**forgot** 253:21
**forgotten** 26:13
26:17 27:5
29:15
**form** 15:15,18
58:21 69:15

104:20 213:12
327:11
**formal** 53:21
77:13 105:2
111:20 116:1
128:20 324:7
324:11 325:14
325:18 326:3,6
326:15
**formalized**
116:5,11
**format** 70:20
117:12
**formed** 10:7
**former** 79:8
80:13 250:4
**forms** 327:3
**formulate** 209:3
**formulated**
11:15
**formulating**
316:10
**formulation**
231:15
**forth** 166:19
272:7
**forthcoming**
212:6
**forward** 92:12
204:9
**forwarded**
178:2,3,12
183:19 257:15
304:5
**foundation**
182:10 278:6
296:3 300:9
**four** 24:6,8
25:12,17 26:8
52:19 85:17,20
99:9 237:15
275:11 327:5
**four-page** 6:7
289:14

**frame** 10:19
158:2 331:14
334:19
**Frank** 44:16
124:11 127:18
129:19
**Franklin** 3:6
**Fraser** 94:1
**Fraser's** 94:3
**front** 13:16
21:12 78:5
91:7 96:16
106:15,20
108:21 112:15
122:22 123:5
134:2,7 138:8
138:14 139:3
140:17 159:7
177:13 188:11
193:10 196:3
203:16 206:13
206:18 214:8
217:2,7 224:6
224:10 230:14
235:13 252:14
304:10
**front-line**
321:19
**frustrated** 268:7
**full** 8:15 79:3
305:15
**fully** 21:2
**functioning**
83:13 84:7
**functions**
102:14
**funny** 216:2,11
216:16 261:17
264:6,18,19
**further** 78:10
82:12 107:17
108:12 293:10
314:5,9 338:8
**Furthermore**



191:8
**future** 336:19
337:8
**FY** 232:16
**FY20** 232:10

**G**

**G** 7:1
**GAO** 239:16
**Garcia** 44:15
**gathered** 66:18
**gathering** 65:22
66:12,13 67:11
315:21
**gears** 310:10
**Gene** 57:6 61:12
62:1,20 63:21
66:9 67:14
68:12 69:18
70:14 71:14,15
84:4,20 85:12
85:16,21 86:2
87:17 88:17
149:13
**general** 47:17
239:3,9,13
241:1,4 277:17
**generally** 27:4
35:22 199:5
272:12 310:15
**getting** 129:22
140:1 147:12
**Gil** 125:18
127:9
**gist** 35:14,15
47:17
**give** 14:6 17:3,9
18:13 26:1
44:9 211:18
229:16 268:21
312:20 324:4
337:16
**given** 11:19
15:13 53:9

113:9 131:16
132:9,21
155:16 162:14
167:15 226:15
229:14 285:5
316:12,14,21
328:12 340:7
**gives** 132:4,6
175:11 176:14
212:14 213:11
**giving** 17:1
156:14 163:9
177:2
**Glabe** 57:10
**Glabe's** 59:7
**global** 42:13
**go** 19:12,21
26:20,21 27:12
27:14 32:13
35:4 36:22
40:19 41:2,4,6
42:13 43:15
46:10 48:22
56:10 67:19
79:10 81:17
82:12 86:20
95:6 100:9
102:15 103:4
113:7,20 114:4
118:14 124:5,6
126:18 135:21
138:14,21
154:18,20
158:16 163:17
168:13 169:5
173:5,22 181:1
184:2 185:10
194:21 211:3,4
228:3 236:9
244:20 246:15
249:1 253:21
258:13 260:15
260:15 263:1
266:7 267:2

270:6 273:17
281:17 285:3
286:10 288:9
289:2 296:4,4
299:5 306:3,19
320:15 325:1
327:21 330:19
336:4 337:19
337:21
**goes** 44:21 96:1
98:13 108:16
118:3 127:2,22
191:1 289:17
**going** 19:16 22:8
23:6 31:14
36:6,7 41:9
46:13 51:14,17
56:7,14 58:8
58:19 59:18,21
62:3,5,21 63:2
64:9 67:9,17
68:5,18 70:6
74:15 75:6,8
75:13 77:1
81:3,20 84:13
85:8 87:20
88:1,9 89:1,7
92:12 101:9
103:6 113:18
114:7 117:17
119:11 154:2,7
154:22 157:7
158:11,12
172:1 174:2
186:9,10
187:12 190:18
191:21 192:6
192:15,18
194:11 209:14
210:21 225:17
229:14 230:7
244:17 245:7
245:12 246:2
246:10 249:5

256:9,14,18
262:12 270:9
271:2 281:8,20
283:13,14
284:12 286:10
286:17 287:10
288:10,11
289:8 290:5,7
297:4,6 305:15
307:12 310:19
312:14 314:1
315:8 319:12
324:16 325:6
330:16 332:3
336:6,10,15
338:3
**GoM** 293:14
**gonna** 258:20
**good** 8:12,13
17:11 35:16
232:15 263:5
270:16 286:3
290:10
**goodness** 330:7
**govern** 308:12
**government**
50:15 120:22
143:4 271:7,13
271:22 272:13
278:18 284:4
285:2 286:7
292:12,20
293:2,4 294:6
294:11 300:1
300:15,21
306:5,8,13,14
307:1
**government's**
278:3
**grade** 50:16
**graduated** 49:2
**graduating**
50:17
**graduation**

49:17
**granted** 101:15
314:18
**granularity**
158:2 169:9
**great** 18:9 35:16
101:13 176:2
249:3 274:9
292:8 337:22
338:1
**greater** 35:18
**gross** 42:17
**ground** 17:4
19:6
**grounds** 8:1
66:16 67:5,19
68:16 75:11
85:4 154:4,4
**group** 178:7
278:18
**Grupo** 293:10
293:20,22
295:18,22
296:16 329:16
**GS-15** 50:16
**Guadalajara**
254:15 256:11
**Guatemala**
331:12
**guess** 73:12,12
73:14 166:12
192:21 208:20
227:14,15
236:16 262:7
331:5 332:10
**guessing** 133:4
167:7
**guidance** 5:3
47:20 103:12
104:4,10,16,19
111:16,19,20
111:22 112:3,8
116:1,5,12
117:11,17



128:20 129:1
132:2,5,9,12
132:14,21
133:5 140:18
140:22 141:4,8
141:11,15,22
142:4,11,15,16
143:2,3,22
144:2,13 145:2
145:15,21
146:3,8,16
147:2,17,20
148:3,8,13,18
148:22 149:15
149:19 150:1,5
150:11,18
151:9,16,22
152:5,10,11,18
153:22 155:10
155:16,17,21
157:15 158:6
160:12 173:19
174:17,22
175:16 177:5
183:9,15 184:8
184:12,14,19
185:1,7,19
186:4,7,13
187:2,9,10
188:5 191:15
194:8,14 195:5
195:9 198:21
200:8 201:6,18
201:21 202:2
202:11 204:9
204:13 205:1
205:20 206:2
207:2 208:2,6
208:11 209:1
210:2,9,16,19
211:12,14,15
212:1 214:12
215:7 236:2,5
236:14 237:20

238:1,4,14,18
238:22 239:4,7
324:6,11
325:14,18
326:3,7,16
**guidance.docx**
115:16,21
**guide** 35:18
162:5,17 163:8
**guy** 134:11
215:3
**guys** 202:4

_____

**H**

**habit** 79:22 80:4
82:20
**Haitians** 275:13
277:1,6
**half** 58:3 281:7
**Ham** 71:15
**Hamilton** 57:7
57:17 61:12
62:1,20 63:21
66:9 67:14
68:12 69:18
70:15 71:15
72:10,12 77:7
84:4,20 85:13
85:15,16,21
86:2,22 87:3
87:17 88:17
149:13
**hand** 83:17
341:13
**handle** 99:14
**handled** 259:12
**handling** 206:5
**happen** 222:22
223:12 226:10
226:21 227:5
227:12 228:21
309:21 310:7
**happened**
171:15 313:4

321:10
**happening**
116:10
**happens** 226:4
**harassing** 264:2
264:21 268:16
269:21
**hard** 40:11
163:9 221:17
239:19
**HARP** 42:10
45:13 47:12
**harsh** 83:19
**Harvard** 50:1
**Hasham** 43:21
44:5,6
**head** 17:12
333:20
**header** 107:21
180:18 182:3,7
252:18
**heading** 287:8
**headings** 287:1
**headquarters**
51:7,21 179:1
179:3 272:17
326:2,6,15
329:14,20
330:10
**hear** 31:22
45:21 46:4
99:6 186:19
330:4,5,7
**heard** 63:12
89:11 90:8,14
104:6 212:15
**hearing** 14:15
15:1 40:11,13
**heart** 246:15
**held** 7:10 83:17
241:14
**Hello** 330:3
**help** 113:22
129:12 143:20

**helpful** 114:3
**hereunto** 341:12
**he'll** 47:15
**high** 257:17
**highest** 161:19
**highlight** 29:1
173:7
**highlighted** 29:6
**highlighter** 29:5
**highly** 246:19
**hit** 121:17
144:15,16
145:3,4,15
**hoc** 53:12
**Hoffman** 1:13
4:2 6:14 7:4
8:6,12,16,18
26:21 27:12
37:8 40:11
41:15 46:19
56:19 62:22
63:7 66:2
67:10 70:11
71:17 74:19
75:13 77:1
80:17,20 81:10
85:8 86:9,21
88:13 93:12
100:10 102:10
102:21 103:11
114:16 119:12
119:16 120:5
122:10 134:1
136:4 139:17
140:16 143:21
144:22 147:15
154:15 155:5
157:10 159:7
160:22 174:7
174:20 175:3
175:10 182:12
202:8 230:13
244:21 248:14
248:17 249:10

254:4 257:1,13
260:5,8 262:2
264:22 266:5
268:17 269:22
270:16 273:17
274:15 278:9
280:8 283:4,13
290:1,15 296:4
302:12 305:4
307:11 309:8
309:11 313:7
320:16 324:21
325:13 330:18
336:10 337:3
338:19 339:6
339:16 340:4
340:13 342:22
343:22
**Hoffman's**
191:22
**hold** 113:19
119:11 162:11
162:16 164:14
164:17,20
165:2 167:2,11
167:18 168:1
168:22 169:3
169:13 189:18
192:3 232:6
275:17 287:15
339:13
**holders** 47:15
**holding** 121:17
121:20,21
122:2,11 144:1
144:6,9,15
145:3 170:12
170:18
**home** 327:18
**Homeland** 20:2
57:21 89:12,21
89:22 148:16
152:9 310:12
**Honduras**



331:16
**honoring** 12:19
  16:10
**host** 298:6
  301:15
**hour** 19:8,9
  36:19 58:3,4
  75:20 178:19
  179:18 264:12
**hours** 24:9
  28:13 32:21
  58:4 212:22
  258:6,11
  259:12,19
  264:10,14
  327:5
**house** 14:11,16
  14:18 55:21
  56:1,22 67:15
  68:13 69:4
  84:5,21 85:19
  149:21 275:1
**Howe** 27:18
  28:1,4,9 30:13
  30:15,19 32:1
  32:4 34:5,6
  38:22 39:3,16
  42:20 43:3
  50:22 94:5
  97:1 134:4
  135:1 136:21
  137:7 138:11
  139:5,14
  177:21 178:12
  178:16,22
  179:21 180:7
  183:19 233:22
  237:1,4,8
  252:11,21
  258:6,15,19
  259:3,11 260:3
  260:11,13
  261:18 262:22
  263:3 264:19

297:9 302:7
303:17 312:3
**Howe's** 155:14
  166:4
**HSAC** 90:1,4,9
  94:7,11,13,17
  94:22 95:9,17
  96:1 100:17
  148:16
**human** 293:16
**humanitarian**
  42:10 293:11
  293:19 295:6
**Humanos**
  293:16
**hunch** 133:1
**Hutton** 44:18
  123:10 130:18
  130:19 137:6
  139:17 140:2
  146:10,14,17
  150:9,15
  152:16 175:22
  178:13 183:21
  184:7,17
  193:16 195:11
  203:19 204:17
  205:7 206:2
  208:12
**Hutton's** 204:8
**hypermobility**
  267:18
**H-A-S-H-A-M**
  44:6
**H-O-F-F-M-...**
  8:16

———————
**I**
**ICE** 57:14,15,19
  109:7 151:20
  325:17
**idea** 153:21
  155:10 157:18
  157:19 164:18

182:5,14 213:9
213:14 215:3
245:19 273:22
305:7 321:6
**identification**
  21:9 78:2
  90:22 96:13
  106:12 112:12
  122:19 133:20
  138:5 140:13
  159:4 177:10
  193:7 195:22
  203:13 206:10
  213:21 216:21
  224:3 230:10
  235:10 252:5
  262:9 265:12
  266:10 274:12
  280:4 283:10
  289:11 296:22
  303:2 307:8
  311:3 331:22
**identify** 323:22
**identifying**
  126:9 327:14
**IJ** 108:17
**illegal** 101:18
  246:18
**imagine** 205:3
  233:13 249:17
  256:5 261:1
  279:11 293:7
  295:15,16
  308:19 328:6
  329:7 332:21
  336:4
**Imerman** 3:3
  33:5
**immigration** 3:5
  14:19 38:17
  42:13 48:8,9
  51:3 54:6,12
  55:14 78:11
  109:6 124:20

148:6 151:20
152:3 276:22
277:14 329:4
329:16
**impact** 12:18
  16:9 93:16
**impeded** 190:15
**implement**
  285:16 287:16
  315:17 317:8
  320:2,11
**implementation**
  54:7 269:6
  320:5,15
  334:13
**implemented**
  120:15,21
  143:3 302:16
  308:21 310:12
  313:2 331:2
  333:19,21
  334:4
**implementing**
  269:11 304:11
  305:3 331:3
  333:18
**importance**
  257:17
**important** 17:8
  17:14 18:7
  19:6
**importantly**
  17:18
**impressions**
  187:16 201:1
  201:12
**improper** 210:5
  266:5 268:8
**improve** 17:21
  54:4 71:8
  82:18
**improved** 71:11
  212:20
**INA** 101:12

331:4
**inaccurate**
  129:20 171:20
  171:22 180:12
  195:9
**inadmissible**
  323:22
**INAMI** 124:20
  143:7 272:19
  273:20 278:18
  306:11
**inauthentic** 93:5
  97:21 111:10
  115:9 124:3
  135:19 142:8
  189:11 197:10
  207:16 231:11
  253:15
**incentive** 51:17
**incident** 254:19
  254:20,22
**include** 128:1
  223:10 278:2
  286:20 293:15
  327:14,17,20
  328:1
**included** 178:7
  277:1
**includes** 145:8
**including** 34:2
  313:16
**incoming**
  182:21 211:12
**incomplete**
  171:6,19,21
  259:17
**incorrect**
  259:18
**increase** 284:9
**Increased**
  181:15
**incredible** 300:4
**independent**
  120:6



161:12 304:9
**indicating** 329:3
**individual** 22:8
95:16 147:16
219:9 318:8
323:13 326:22
327:15 328:5
**individuals**
43:14 109:5
149:4 152:15
161:2 271:6
273:11 286:21
292:14 293:17
318:10 319:2
323:4,16
**individual's**
327:17
**indulging** 41:20
263:5,8
**ineligible**
310:16
**informal** 13:21
14:1,3,7 53:22
116:6 324:7,11
325:14,18
326:3,7,16
**information**
29:10,13 74:3
75:3 131:1
165:18 169:2
169:16 170:14
170:15 171:18
175:9,15
180:21 229:18
246:4 247:8
259:17,18
264:8 275:22
285:17 286:19
289:3 309:10
324:12 325:15
325:18 326:4,7
326:16 327:14
328:4
**informed**

146:19 267:17
288:7,12 289:1
289:4
**informing** 31:15
**infrastructural**
292:15
**infrastructure**
307:4
**initial** 246:17
276:4
**initially** 288:3
**initiated** 299:11
311:19
**Initiative**
283:17
**initiatives** 284:5
285:5
**injunction**
223:13 314:19
314:22 315:3,7
315:9,10,13,17
317:9 319:10
320:12 321:1,4
321:11 322:3,8
322:15 324:8
324:12 325:15
325:19 326:4,8
326:17 329:13
**Inlender** 254:6
**INM** 124:16,19
125:9 126:7
127:12,19
128:2,10,14
129:5,12 130:9
267:17
**INM's** 293:11
**innovation**
212:14,20
213:1,13
215:10 216:11
**input** 146:21,21
**inquiry** 311:21
**insert** 75:6
**inserted** 241:17

**insight** 202:15
**inspection** 10:6
51:22 272:6,22
273:6 328:7
**inspections**
284:7 313:16
**inspector** 50:19
239:3,8,12
**inspects** 326:21
**instituted** 286:2
318:3
**instruct** 36:21
58:9 59:19
61:14 62:3,22
64:1 66:14
67:18 68:14
75:8 76:3 77:1
84:8 89:1
129:11 154:3
187:13 200:10
200:20 201:9
240:19 244:18
245:7 246:3
329:14,20
330:10 336:10
**instructed**
323:16
**instructing** 60:7
60:10 61:6
62:13 63:6,12
67:1,3 186:15
**instruction**
59:16 60:5,6
68:2 76:13
84:14 85:4
89:8 245:13,14
321:15,21
**instructions**
80:13 336:16
339:16
**instructs** 19:1
**instrumental**
195:13
**insufficient**

190:1
**insufficiently**
192:17
**intake** 275:12
278:1,20
293:17,21
296:18
**intended** 144:14
145:2 264:15
**intends** 244:7
**intent** 182:19
191:2 246:21
**intentions** 118:3
**interact** 271:6
271:21 272:12
272:18
**interaction** 83:5
86:21 94:15
314:6,10
**interactions**
85:14,16,20
86:2 87:2,4,17
88:17 130:14
130:16 131:3
251:21 271:13
271:18
**interagency**
151:8 152:22
153:3,11,16
**interest** 341:11
**interested**
218:19 306:21
**interim** 310:13
331:2,7
**interject** 113:8
**internal** 247:18
**international**
52:14 300:18
**interrupt** 95:5
184:2 211:3
240:12
**interrupted**
83:14
**interview**

290:22 291:10
313:12
**interviewed**
239:21 312:11
**investigate**
314:6,10 323:3
323:6
**investigated**
250:1
**investigation**
14:18 239:8,12
240:4 248:18
314:14
**investigations**
14:17 249:19
250:5
**invitation** 5:11
65:8 91:5,11
92:1 93:3,21
136:6,20 196:4
196:7,15,20
197:2,5
**invitations**
92:14,20
**invite** 4:11
65:12 92:5
198:22
**invited** 25:4,6,8
137:7
**invocation**
117:9
**invoke** 63:15
**invoked** 63:10
119:8
**involved** 11:7
13:18 94:18
118:20 149:7
150:13,21
151:6 162:19
222:22 223:3
279:8,14
300:17 304:10
314:3 315:16
319:13,20,21



320:1,8,11
323:10
**involvement**
152:21
**iPhone** 261:6,9
263:4
**irrelevant** 81:4
269:22
**issuance** 184:11
**issue** 27:16
56:12 78:8
103:12 104:3
119:12,18
127:16 145:18
155:8 172:16
179:13 186:12
192:2 202:15
229:5,9,15,16
229:19 232:10
232:18,20
233:10,14,16
234:3,10 256:8
258:8 259:3,12
259:19 261:19
293:1 295:6
317:13
**issued** 104:10,16
105:7 112:3
116:1 120:8,12
121:15 128:20
141:12 142:16
150:6,18
151:16,22
152:5,11,19
153:22 155:11
157:15 160:12
173:19 183:15
194:15 202:12
226:11,22
227:5 239:7
317:12 319:4
321:13 324:6
324:11 326:2,6
326:15

**issues** 38:17
41:15 45:10
69:22 74:9
86:9 87:22
89:20 130:19
130:21 131:17
183:10 184:3
185:3 190:11
223:1,13
227:12 267:21
272:10 305:17
334:3,7 339:14
**issues/concerns**
128:4
**issuing** 120:14
120:19 121:4
186:7 187:1
200:7 201:5,17
317:10
**items** 47:19
284:16
**I-213** 327:7
**I.T** 215:3

**J**

**J** 3:2 44:18
**Jackson** 255:13
257:10,15
**Jackson's** 256:3
**James** 44:20
123:10
**January** 19:17
103:14,17
302:17 303:15
303:21 304:6
312:12 314:7
314:11
**Jarava** 136:6,20
**Jay** 96:22 98:2
**Jayson** 95:16
**Jennifer** 112:21
115:4 282:11
**Joanne** 230:16
**job** 1:18 18:9

92:15,18 97:18
111:5 115:5
123:21 135:15
142:4 180:7
189:8 197:6
207:5 231:8
253:11
**Joe** 243:21
**John** 43:11
53:18 134:12
225:9 275:11
297:8 304:7
**Johnny** 219:10
**joined** 10:5
50:18
**joint** 14:15 15:1
109:20 267:20
272:6 284:7
**joke** 215:17,18
216:2,16
**joking** 215:14
216:10 250:16
**Jonathan** 4:9
78:12
**Joseph** 137:6
307:16
**Josh** 3:15 7:13
21:6 22:2
77:20 79:1,4
82:2 83:8
90:19 91:15
93:8 96:10
98:15,17 102:5
106:9 107:11
107:18 108:12
112:10 114:11
116:15 120:2
122:16 124:5
125:2,4 133:18
135:22 136:1
138:2 139:1
140:11 155:5
160:18 173:5
197:14 199:15

206:7 207:20
218:14 223:22
224:22 230:6
235:6 253:20
253:22 255:4,9
257:3 258:12
258:16 259:21
261:21 262:18
265:10 266:21
267:8 274:6
275:7 280:1
283:8 285:13
287:12 289:8
289:22 292:3,7
296:20 302:22
303:9 307:5
311:1,10,15
313:6 331:19
332:13
**jot** 36:12
**journalist**
311:21 312:9
**Journal's** 291:2
**judge** 10:18,21
13:17 18:22
118:8 191:3
223:1,12
226:10,21
227:5,12 247:1
247:14,17,21
**judgment**
261:16 264:1
264:16 265:2,5
265:6,8 268:9
**Judiciary** 14:18
**Julie** 73:2
112:21,22
147:9 197:19
198:3 319:21
**July** 4:16 35:5
112:17 114:13
114:15 115:9
115:21 310:10
314:21 323:18

324:2 331:10
**jumping** 199:7
**June** 1:14 7:8
72:17 73:18
76:1,12 77:5
119:14 341:14
**jurat** 327:10
**justice** 3:4 32:10
32:15,17 33:1
33:9,21 49:20
57:7 147:22
148:2 185:17
188:2 238:21
241:19 310:11
**J-A-R-A-V-A**
136:7

**K**

**K** 1:7 2:5
**Karen** 95:10
**KATHERINE**
3:2
**katherine.j.sh...**
3:9
**Katie** 22:22
33:3 56:8 60:2
61:3 62:8 63:6
67:22 69:19
70:20 81:13
113:7,17,20
118:14 119:18
154:9 246:10
247:10 330:15
**Katie's** 70:20
**keep** 34:15,15
35:16 147:12
183:21 270:17
324:16,22
325:6 330:16
**keeps** 281:10
**Kenneth** 224:14
225:9,20
227:17 230:17
**kept** 92:4 97:13



110:22 113:6
114:21 123:16
135:9 141:21
180:2 189:3
197:1 207:7
231:3 253:6
295:22 328:18
**Kerlikowske**
108:10 125:19
127:10 129:3
129:10 130:6
**Kevin** 1:7 7:5
125:22 127:10
177:20 180:15
298:11
**key** 153:8
**kind** 26:11
31:19 36:7
39:5 94:8
122:7 129:21
158:2 162:17
171:9 206:4
213:2 216:4,6
229:16 264:14
272:8 281:9
284:3 288:12
299:21 300:19
306:6 315:22
316:10,10,19
316:21
**kiosk** 286:10
**knew** 301:18
305:13
**know** 13:5 16:15
16:22 21:1
27:2 29:13
30:1 33:2,15
36:8 37:8
40:14,19 45:2
47:6,7,13
48:19 51:15
57:6,13 59:6
59:10 68:22
69:16 70:19,20

73:9 75:17
78:19,20 89:18
94:4,5,10 95:3
95:9,16,19
96:1,9 101:6
104:22 105:2
110:1,3 119:19
129:16,21
130:4,10,17,21
131:14,19,22
132:1 144:12
145:1 147:18
148:5,9,10,15
148:20 149:13
149:17,21
150:3 151:14
151:18,19
152:2,7,14
153:5,6,10
154:12,13
155:13 156:16
164:22 165:4
165:17,18
167:5 168:16
171:13,14
172:15 176:17
176:22 178:1
178:20,21
179:12,14,15
179:16 182:17
182:18 183:4
184:4,10,12,15
184:17 186:5
193:1 194:17
194:18 197:21
198:22 199:1,8
199:14 201:20
203:1 204:2
211:18 212:6
212:18 213:6
215:4 216:3
217:16 219:4,7
223:5 225:16
226:16,18

227:6,18 228:6
229:4 230:1,3
233:15 236:10
237:4,8 238:6
238:16,19,20
239:1,2,5,6,15
239:18 240:7
241:6,8,11,12
242:22 243:17
244:13 247:10
250:17,20
251:1 259:10
262:6 265:17
267:12 268:3
270:4,16,19
272:2 274:19
279:4,8,13,16
279:19,22
280:11 281:14
283:3,5 286:4
286:11,13,15
287:10 288:14
292:19 293:2
294:13,17,22
295:11,12,14
295:22 296:11
296:13,19
298:16 299:17
300:11,14,18
301:12,14,19
301:22 302:9
302:11 304:20
305:1,11
306:22 308:17
313:18,22
314:1,2,4,15
315:6 316:6,9
317:5 319:5,7
319:11,13,16
321:14,17
322:5,16
324:10 325:13
325:17 326:1
327:2 332:21

333:20,22
334:14,18,19
335:9
**knowing** 289:2
**knowledge**
20:13 55:3
64:13 65:2
87:13 127:15
146:22 148:14
148:19 149:1,3
149:7,16,20
150:2,7 166:14
166:21 188:7
211:11 238:1,2
238:5,15 240:2
245:15 249:18
249:21,22
250:2,3,7
251:11 266:19
272:20 273:3,8
273:9 294:4
314:13 323:12
324:3 325:20
329:19 330:13
**known** 112:3
**Koller** 73:2 74:1
74:3 75:2,3
112:22,22
147:9 197:19
198:4 319:21
**Koller's** 199:19
**Koumans** 57:9
**Kurry** 43:21
44:8,10 48:1
252:11,22
258:6 260:4
263:4 264:6
**Kusser** 257:16
260:13,17
**Kusser's** 257:21

——————
**L**
——————
**labeling** 134:13
**Lado** 1:4 7:5

187:11 188:6
200:7 201:7,18
202:12 241:20
244:16 249:11
249:19 250:1,5
250:18,22
251:10,13
254:14 255:17
269:5,10
314:18 318:11
322:12 323:2
323:11
**Lado's** 323:14
**laid** 65:9
**land** 104:12
120:9,17
141:16 286:6
310:15
**landscape** 159:1
**lanes** 288:22,22
**language** 17:19
208:14 264:4
264:15 265:3
268:8 285:22
294:4 299:18
**Laredo** 30:13
127:11 128:9
128:13,16
129:5,7 237:6
237:9 334:1,2
**large** 309:20
310:7
**largest** 305:13
**lasted** 222:14
**late** 178:2
**latest** 65:22
66:12,12
**law** 2:11 96:7
250:4
**lawsuit** 86:9
249:16 269:16
318:2 319:1
**lawyer** 96:7
**lawyers** 113:9



**LAX** 255:18
257:22 258:4,7
260:19 265:20
268:11
**lead** 95:11,12,13
116:2 131:4
171:18 219:21
272:7,8 284:3
298:6 301:15
305:5
**leadership**
89:20 185:18
263:19
**leading** 159:10
**leads** 100:21
**leave** 286:4
**leaving** 334:10
334:12
**led** 165:6 170:11
170:17
**left** 47:5 160:8
173:9 286:12
**legal** 1:21 7:14
8:2 74:2,4,7
75:2,4,7
101:17 119:1
191:11,12,14
192:13,13
201:11 221:18
221:21 312:20
**legality** 245:4
246:20
**Lemaux** 230:17
232:8
**Lemaux's**
231:19
**lengthy** 28:14
**letting** 193:1
**let's** 41:4,6
72:14 81:17
83:6 101:10
103:4 110:7
111:12 112:9
133:17 135:21

143:20 154:20
160:15 161:7
173:22 177:7
204:17 216:18
230:5 255:3
257:1 265:9
266:7 275:6
280:1,19 283:8
285:13 289:7
296:20 302:22
307:5 311:1
325:4 330:19
330:19
**LEV** 337:19
**level** 32:1 132:5
153:1 169:9
209:16 261:18
272:17,18
285:10 309:2
316:5,17
**leverage** 301:8
**liaison** 217:22
**liar** 130:15
**liberties** 131:15
131:20
**license** 51:18
**life** 83:22 85:2
**lifted** 322:16
323:20 329:12
**lifting** 323:1
**limit** 276:22
**limited** 83:5
130:16
**line** 86:4 93:13
97:4 98:19
99:16 108:15
117:1 124:15
136:10 139:8
181:14 189:13
196:14 198:15
204:8 214:16
214:19 215:1,6
217:10 232:9
255:16 268:15

324:18,22
330:15 342:2,5
342:8,11,14,17
343:2,5,8,11
343:14,17
**lines** 11:18
73:11 121:7
**link** 202:17
**linkage** 201:17
202:11
**list** 91:16,18
295:19 323:4
329:9,15
**listed** 22:7 91:19
161:15 163:4
175:19 196:7
315:3 322:2
**listen** 69:13
**listened** 69:2
**listening** 94:14
**lists** 328:21
329:22 330:12
**litigated** 247:4
**litigation** 3:5
7:22 101:12
148:6 182:9
187:11 188:6
200:1,7 201:7
201:19 202:13
241:14,20
244:16 246:16
250:9,12
266:15
**little** 40:18
46:21 48:22
49:13 79:11
143:21 144:18
202:9 224:19
259:10,11
274:9 285:14
299:22 316:19
316:22 338:22
339:2
**LLP** 7:11 96:8

**load** 285:13
287:12
**local** 12:20
272:19 273:18
273:20 293:8
296:12
**locally** 179:18
273:14 294:11
**located** 13:5
16:15 29:21
**location** 169:10
288:8 306:11
**locations** 29:5
48:12,13 105:1
287:18 306:9
309:20 310:8
329:7 333:19
**locked** 275:1
**log** 248:2 286:11
**logged** 247:22
**logistics** 191:14
**long** 10:2 28:11
31:4,11 32:19
36:16 52:7,17
58:1 74:10
75:18 88:3
222:13 223:11
244:11 270:17
316:12,14,20
328:19
**longer** 270:18
**Longoria**
124:11 126:6
127:18 129:19
129:21 130:4
130:15,17,20
130:22 131:4,9
131:18,19
132:1,9,20
133:5,9
**look** 13:8 91:18
93:12,20
108:19 110:14
112:19 113:10

113:17 123:8
134:21 142:10
145:11 160:1
161:7 188:16
196:6 204:16
217:20 231:13
234:14 236:9
252:17 254:11
255:4 257:14
266:3 280:1,21
285:11 287:14
290:2 293:9
296:20 302:22
307:5 313:8
332:8
**looked** 329:2
**looking** 22:6
26:17,18 27:6
90:17 105:11
106:5 115:13
142:6 154:9
163:21 199:16
225:7 239:17
239:18,20
262:5 280:17
338:22 339:1
**looks** 117:4
189:22 229:1
338:21
**loop** 149:10
183:22
**Los** 52:7,14
265:16
**lost** 331:19
**lot** 36:4 162:18
176:21 247:12
264:10 272:5
306:19,22
314:1
**loud** 46:2
**Louie** 195:11,13
195:15
**Louisa** 3:13
23:20 198:15



love 99:6
low 334:20
lower 165:9
    166:11
lower-ranking
    80:5 82:21
Luis 5:9 43:11
    46:22 112:22
    146:11 188:18
    193:14 194:2
    195:4,15
    224:14,14
    225:9 230:16
    243:15 307:17
    320:7,18
lunch 158:11
    168:4,12
    173:12 174:3,8
lying 130:5
L.A 256:2

**M**

M 2:3
Magistrate
    118:8 191:3
    247:1
Magna 1:21
    3:15 7:14
mail.house.gov
    254:7
main 47:19
    145:17,20
maintain 295:18
maintained 92:4
    97:13 111:1
    113:6 114:22
    123:16 135:9
    141:21 180:2
    189:3 197:1
    207:7 231:3
    253:6
major 45:19
    49:19
making 101:14

209:4,5 246:19
306:10
management
    26:14 27:6
    37:21 38:2,8
    38:12,14,21
    39:2 49:21
    54:16,19 67:16
    87:18 88:18
    102:8,22 104:4
    183:11 185:3
    220:13 221:10
    221:13,22
    222:14,18
    223:7,14,16,18
    223:20 239:13
    239:22 240:5,8
    241:7,10,13,18
    242:2,9,13,18
    243:3,7,13,20
    244:4,9,12,15
    245:3,5,17
    246:1,18
    271:19 272:13
    273:19 283:17
    287:16,20
    288:4 290:6
    292:1,4 304:13
    304:21 305:8
    307:22 308:11
    308:20 309:5
    309:17 318:20
    323:17 324:1
manager 51:22
managers
    305:14
managing 287:3
manifested
    264:14
Manipulates
    78:10
March 51:5,5
    78:8 233:9
    315:4 322:4,22

335:8,20
Maricich 219:1
Maricich's
    219:3,18
mark 21:13
    57:9 77:18
    78:6 96:16
    116:19 138:9
    177:14 214:2
    230:14 235:14
    252:8 266:22
    274:10 283:15
    289:8 297:4
    307:12 332:3
marked 21:9
    29:18 78:2
    90:22 91:4
    93:4 96:13
    106:12,16
    112:12,16
    122:19 123:1
    133:20 134:2
    138:5 140:13
    159:4,8 177:10
    188:12 193:7
    193:11 195:22
    203:13,17
    206:10,14
    213:21 216:21
    217:3 224:3,7
    230:10 235:10
    252:5 262:9,13
    265:12 266:10
    274:12,16
    280:4,7 283:10
    289:11 296:22
    303:2,6 307:8
    311:3,6 331:22
marking 21:13
Martel 255:12
Martel's 255:22
Maryland
    341:20
material 34:10

36:7 219:22
materials 58:5
    58:11,16 65:4
    222:10
Matt 25:4 43:10
    73:1
matter 7:4
    54:11
matters 176:1
    206:5
Maulella 43:11
    225:10,13
Maulella's
    43:17
maximum
    121:17,21
    144:1,6,15,16
    145:3,4,15
    170:11,18
Mayer 2:4 7:10
McALEENAN
    1:7 7:5 126:1
    127:10 129:4
    129:11 130:7
    155:15 157:11
    177:20 180:15
    181:11,19
    182:7,20
    183:19 184:19
    184:22 185:7
    298:12
McAleenan's
    153:9 183:8
    208:22
MCAT 172:12
    172:20
mean 11:2 23:14
    34:14 35:12
    37:5,20 38:18
    41:22 43:1
    47:6 51:2,11
    65:21 83:18
    94:15 95:5
    102:22 112:5

116:2 125:13
156:16 164:3
166:22 169:6
176:22 184:2
194:20 195:1
200:18 208:19
210:18 211:3
212:18 260:11
263:8 268:10
298:22 299:6
300:16 305:10
305:12 318:19
meaning 101:5
    229:10,12
    308:11
means 220:7
    277:9 281:22
    283:3,6 285:22
    295:17
meant 132:14
    208:20 277:18
    308:17
media 7:3
    311:21
medical 267:21
Medlock 2:3 4:3
    8:4,11 21:6,11
    22:2,5 26:5
    27:3,14 28:7
    37:12 39:14
    40:13 41:4,13
    44:4 45:7 46:6
    46:10,17 56:18
    58:12,18 59:20
    60:2,13,16,22
    61:9,18,20
    62:4,8,16 63:1
    63:5,16,18
    64:8 66:5,17
    66:22 67:6,8
    67:21 68:4,17
    69:6,8,22 70:1
    70:4,10 71:3,4
    71:7,10,22



| | | | | |
|---|---|---|---|---|
| 74:10,19 75:12 | 164:7,10 166:1 | 264:17 265:4,9 | 101:4 102:1,3 | **melissa.crow...** |
| 76:9,17 77:3 | 168:6,14,18 | 265:14 266:7 | 124:16 127:18 | 2:16 |
| 77:20 78:4 | 173:5,13,21 | 266:12,21 | 128:1 136:5,11 | **member** 50:8 |
| 79:1,6,20 | 174:6,16,19,21 | 267:4,6,8,11 | 136:15,20 | 95:9 96:1 |
| 80:19 81:5,9 | 175:2 177:7,12 | 268:19 269:3 | 137:8,10,13,17 | 148:10,15 |
| 81:14,17 82:2 | 179:8,10,11 | 270:2,22 | 137:20 150:11 | 251:16 291:1 |
| 82:13,14 83:6 | 181:1,4 182:15 | **Medlock's** | 196:4,7,10,14 | 322:12 323:2 |
| 83:9 84:12 | 185:14 186:21 | 274:8 | 196:19 197:2 | **members** 89:22 |
| 85:7 86:10,19 | 187:18 188:8 | **Meehan** 311:19 | 199:3,8,10,13 | 90:4 94:17 |
| 87:10 88:3,6 | 188:10 189:18 | 312:2 | 202:20 203:6 | 249:20 250:1,6 |
| 88:13,21 89:6 | 189:19 190:5,8 | **Meehan's** 312:8 | 222:1,6,15,19 | 318:12 |
| 90:19 91:2,15 | 192:20 193:9 | **meet** 32:9 125:8 | 298:3,16,18 | **membership** |
| 91:17 93:8,11 | 193:19,21 | 127:11 129:12 | 299:3,8,14,15 | 323:11,15 |
| 96:10,15 98:15 | 195:19 196:2 | 199:22 | 301:15 302:1,4 | **memo** 116:12 |
| 98:18 100:14 | 197:12,17 | **meeting** 4:11 | 302:6,10 | 194:14 204:10 |
| 102:4,6,16,20 | 199:15,18 | 5:11 24:19 | **meetings** 23:21 | 215:7 229:7 |
| 103:10 106:9 | 200:13 201:2 | 25:3,6 34:3,3 | 24:2,3,7,15 | 321:21 322:5,6 |
| 106:14 107:4,6 | 201:13 202:6 | 35:10,17,22 | 25:1,13,18 | 322:9,16 324:5 |
| 107:11,13,17 | 203:8,10,15 | 36:1,11 38:6 | 26:8 34:16,18 | **memoranda** |
| 107:20 108:11 | 204:4,7 206:7 | 38:11 54:13 | 36:4,4 37:22 | 105:5 |
| 108:14 112:9 | 206:12 207:20 | 55:15,19 56:5 | 38:2,3 54:22 | **memorandum** |
| 112:14 113:16 | 207:22 210:14 | 56:21 57:1,17 | 59:4 72:9,12 | 5:2 116:22 |
| 113:20 114:4 | 213:18 214:1 | 58:1,6,7 59:1 | 77:8 79:9,10 | 120:14,20 |
| 114:11 116:15 | 215:21 216:18 | 59:11,13,17 | 94:11,14 | 121:5,14 |
| 116:17 117:8 | 217:1 218:14 | 60:18,21 61:2 | 271:11 285:2 | 140:17 141:1 |
| 117:21 118:2 | 218:16 223:22 | 61:11,17,22 | 320:22 321:4 | 142:21 143:9 |
| 119:3,8 120:2 | 224:5,22 225:3 | 62:19 63:20 | **Mejia** 5:9 43:11 | 175:5,20 188:4 |
| 120:4 122:8,16 | 225:6 228:2,8 | 64:3,14,16,21 | 43:16 46:22 | 207:19 236:18 |
| 122:21 124:5,8 | 228:16,17 | 65:1,3,5,7,8,10 | 112:22 130:18 | 238:11 241:4 |
| 125:2,5 126:19 | 230:5,12 234:9 | 65:15 66:8 | 146:11 150:9 | 317:10,12,13 |
| 126:20 133:17 | 234:16,19,22 | 67:13 68:12 | 150:15 152:16 | 318:9 319:4 |
| 133:22 135:21 | 235:5,8,12 | 69:12,14,17 | 188:18 193:15 | 321:13 |
| 136:3 138:2,7 | 240:15 241:2 | 70:13 71:13 | 194:2 195:4 | **memorializing** |
| 138:21 139:2 | 245:1,10 246:6 | 72:5,6,11,15 | 224:14,14,17 | 294:18 |
| 140:10,15 | 246:12 248:8 | 74:1 75:1 | 225:9,12 | **memory** 26:13 |
| 143:19 144:20 | 248:16 249:1,9 | 76:20,21 77:13 | 230:16 233:20 | 26:18 29:14 |
| 144:21 154:5 | 252:7 253:18 | 83:12,16 84:3 | 233:21 234:6 | **memos** 176:21 |
| 154:16,20 | 254:3 255:3,10 | 84:6,10,19 | 243:15 244:2,7 | **memo.pdf** |
| 155:4 156:1 | 256:22 257:3,9 | 85:6,19 87:14 | 307:18 320:7 | 204:13 |
| 157:9 158:8,12 | 257:12 258:12 | 89:4 91:5,11 | 320:18 | **mental** 187:16 |
| 158:16,22 | 258:17 259:7 | 91:20 92:1,5 | **Mejia's** 45:1 | 200:22 201:12 |
| 159:6 160:18 | 259:21 260:1 | 92:14,20 93:3 | 47:21 189:13 | **mention** 143:22 |
| 160:21 162:20 | 261:20,22 | 93:9,14,20,22 | **Melissa** 2:10 | **mentioned** |
| 163:1,18,20 | 262:11,18,21 | 100:18,20,22 | 270:19 324:14 | 11:22 31:7 |



32:6 43:5
45:17 47:7
48:1 66:11
72:4 284:5
320:18 324:6
329:2 332:8
**Mesa** 286:9
288:11 291:4
**message** 208:22
216:9 299:18
**messaged** 298:1
299:10
**messaging**
137:1,21
139:16 140:4
**met** 23:9,18
32:9,16 128:2
156:12 251:3,9
263:19 264:20
265:18
**metadata**
116:20
**meter** 128:14
129:13 144:14
145:3,12 209:8
209:13
**metered** 314:20
318:20 323:1
323:17 324:1
**metering** 5:3
26:14 27:6
38:2,8,12
47:20 54:16,18
67:15 87:18
88:18 102:8,22
103:12 104:4
104:11,16,19
105:7 111:17
112:3 115:16
115:20 116:1,3
116:9,11 117:1
117:11,17
118:5,6 120:7
120:15,21

121:16 128:20
130:7 136:11
137:1,21
139:15 140:3
140:18,22
141:5,11,14,22
142:3,11,15,15
143:2,22
144:13 145:1
145:14,21
146:3,8,16
147:2,17,19
148:3,8,13,18
148:21 149:14
149:19 150:1,5
150:18 151:9
151:16,21
152:4,10,11,18
153:22 155:10
157:14 158:6
160:12 173:18
174:17 175:16
177:5 183:14
184:8,19
185:20 186:8
187:1,8,10
188:4,5 191:3
191:15 194:8
194:14 195:5
198:20 200:1,8
201:6,17,21
202:2,11 204:9
204:13 205:1
205:20 207:2
210:9,16
211:12 212:1
214:11 215:6
223:2,13 226:5
226:12,22
227:6,13
228:22 229:5
233:4,11,17
236:2,5,14
237:20 238:1,4

239:7,13,22
240:4 241:7,10
241:13,18
242:1,8,12,18
243:3,7,12,19
244:4,8,12,15
245:3,5,16,22
246:17,20
269:6 271:19
272:14 282:8
282:22 287:20
288:20 308:14
309:6,16
**Mexican** 124:20
271:7,13,21
272:9,12,21
273:4,10 274:4
276:22 277:14
278:3,17
279:14 300:15
300:20 323:4
329:4,16
**Mexicans** 277:9
282:21
**Mexico** 39:18
68:10 99:18
100:7 103:13
104:5 120:9,22
121:19 122:12
122:14 126:10
126:15,15
127:5 141:6,17
142:17 143:4,6
157:21 159:20
161:4,5 168:1
169:1,14 207:1
209:3 229:6
233:5,12,17
254:15 256:11
264:9 271:11
271:11 272:4
283:16 284:4
285:2 286:7,10
286:17 287:4

288:7 292:12
292:21 293:3,6
293:14 294:7
294:12 295:19
298:5 299:18
299:20 300:1,8
304:11 306:5,8
306:13,14
307:1 328:22
**mic** 40:12,13,15
**Michael** 205:8
205:12
**Michigan** 49:2,5
50:18
**Microsoft** 92:9
197:3
**middle** 144:19
**mid-February**
335:1
**mid-March**
232:17
**migrant** 47:11
155:17 182:22
209:2,9,17
210:22 211:9
211:13 302:13
302:15 304:11
305:6 312:10
314:7,11,17
**migrants** 121:20
142:17 164:5
271:15 287:4
300:21 301:2
307:3
**migration** 5:4
42:8,8,9 100:1
159:9,14,17
161:1 272:10
305:17
**migratory**
120:16 306:7
310:1,8
**Miller** 55:16,20
56:5,21 57:2

57:17 61:12,22
62:20 63:21
66:8 67:13
68:12 69:18
70:14 71:14
72:9,12,15,21
76:1,12 77:5,6
77:10,15 78:10
79:9,11,22
80:3,21 82:9
82:20 83:14,17
84:4,20,22
148:20
**mind** 41:20 47:3
122:3 144:9
223:20 315:18
**mine** 193:22
**minimal** 146:21
**minutes** 31:13
65:1 70:2
74:13 81:15
88:5 158:13
168:4 173:12
174:10 199:21
288:10
**misconduct**
313:3
**misinformation**
264:8,11
**missed** 28:5,6
**misspoke** 121:2
121:11
**misstates**
318:13
**misunderstood**
104:7
**mixed** 147:13
**model** 251:17,20
287:17
**moment** 113:17
114:17 189:18
274:19 280:11
324:4
**Monday** 44:16



money 212:22
213:13
monitor 278:20
288:3 321:20
338:20 339:1
monitoring
321:22
month 294:16
monthly 285:2
months 313:1
319:6
morning 8:12
8:13 139:15
214:12 312:11
312:13 314:7
314:11
motion 192:22
motivation
130:12 246:21
motivations
118:4
motive 191:2
move 35:2 83:6
85:12 102:7
110:7 111:12
117:14 126:5
162:20 164:7
193:2 205:6
246:6 255:3
257:1 281:8
306:13
moving 162:17
171:9 298:1
MP 214:4
MPP 42:8 45:13
47:12 100:1,7
103:21 104:6,7
223:7,17,19
304:22 305:3
305:20 306:2
306:16 308:12
309:5,16
Muffett 3:14
23:20

multilateral
331:3
multipage 21:15
91:5 96:17
262:14
multiple 186:3
190:11,13
259:16
munitions 51:16
51:16
mute 113:19
114:1
muted 235:3
M-A-U-L-E-L...
43:18
M-E-J-I-A
43:16

**N**

N 2:1 4:1,1 7:1
name 8:15,17
22:7 23:22
43:17 44:8,11
44:20 73:7,17
90:11,16 91:19
96:2 115:15
178:2 219:9
238:10 270:19
named 95:9,16
134:12 198:15
250:20
names 43:13
57:14 73:22
narrative 156:6
323:7 327:7
national 48:16
54:1,8,10,14
54:20 55:9
69:1,13 70:16
70:16 148:11
natural 39:5
305:10,17
naturally 309:2
nature 12:5 34:9

35:18 36:3,5
42:12 45:15
47:16 191:5
216:8 334:8
Naval 50:1
NCIC 166:19
169:12
necessarily
112:5 131:13
151:4 172:5
185:13 192:9
234:5 271:9
313:18
necessary 30:3
274:5 329:6
need 7:20 35:21
36:5,11 42:12
44:3 65:14
81:7 83:14
102:13 110:9
119:9,18 128:1
154:13 168:5
225:5 248:10
274:21 325:7
needed 94:8
116:3 184:6
248:15 275:22
296:13,15
needs 327:11
negotiated
306:4
negotiating
279:9
negotiation
306:12,18
negotiator
272:8
neither 341:9
never 213:15
251:3 261:2
263:19 264:20
288:5 315:18
316:16
nevertheless

118:11
new 4:9 34:22
34:22 50:19
51:1 78:7,9,18
82:19 119:12
187:9 200:8
201:5,17,21
Newton 1:20
7:14 17:10
341:2
NGOs 293:14
293:22 294:12
night 264:12
nine 308:22
Ninth 315:2
319:9 321:5
322:2,15,19
329:12
Nogales 334:3
noncitizen
322:21 336:19
337:9
noncitizens
128:15 129:6
129:13 130:8
145:12 323:22
332:7 335:16
336:1
nonintrusive
51:21
nonresponsive
162:22 164:12
non-governm...
292:13
non-Mexicans
310:14
non-selection
11:1,3,10
Nora 6:2 250:20
251:7 254:13
255:1 256:9
258:8 260:21
261:1,5,13
263:15 265:19

266:2,14,18
268:2,5,12,22
normal 207:12
notarial 341:13
Notary 341:1,19
notations 29:2
note 80:12 81:3
86:6,7 118:17
248:3 312:9
338:11,17,19
339:3
notebook 34:22
35:2 36:8 38:6
notebooks 34:10
34:14,14,17,20
35:6 36:16,22
37:3,14
noted 7:15
176:13
notes 34:16,18
35:1,9,11,21
36:1,3,6,9
37:16 38:3,5
38:11,13 59:10
59:13,16 69:15
99:4 137:16
199:9,12 222:4
notetaker 35:16
notice 4:8 21:17
22:4,7,17
119:12 191:22
notification
323:9
noting 248:6
November 4:12
4:14,18,18 6:8
72:6 83:12
91:12 93:14
94:21 96:21
98:6,11 100:17
101:22 105:10
106:18 107:9
107:16 108:3,8
109:12 111:9



111:16 112:4
116:21 120:9
120:14,20
121:1,5,10,15
123:2,3 124:11
125:18 127:14
128:21 129:4
129:14 131:21
132:3,10
133:10 187:9
188:3 297:8,12
314:16 331:1
**Nubmer** 6:14
**number** 4:7,9
4:11,12,14,16
4:17,18,20,21
5:2,4,6,8,9,11
5:12,13,14,15
5:17,18,19,20
5:22 6:2,3,4,5
6:6,7,8,10,11
6:13 7:3 21:8
78:1 90:21
94:16 96:12
106:11 107:10
108:22 109:4
112:11,18
122:18 133:19
134:16 138:4
138:13,18
140:12,19
159:3,10
160:16 161:2
161:19 162:11
167:11,17
168:21 169:12
171:4 175:11
176:14,21
177:3,9,16
190:20 193:6
193:13 195:21
196:5 203:12
204:5 206:9,17
213:20 216:20

224:2,9 230:9
235:9,16
248:20 252:4
258:11 259:19
262:8,15
265:11 266:9
274:11,18
280:3,14 282:7
283:9,19
289:10,17
293:13,21,22
296:17,21
297:5 303:1,8
303:11 307:7
307:14 311:2
328:10,13
331:21 334:14
334:18,20
**numbering**
158:17
**numbers** 91:6
96:18 106:19
123:4 134:5,10
134:19 138:12
167:15,17,22
168:20 169:12
188:15 204:3
214:5 217:5
248:19,19
252:12 277:5
280:9 308:14
311:8 331:19
335:14
**Nunez-Neto**
107:8,15 109:3
111:5,9
**Nunez-Neto's**
108:3 110:8
**N.W** 2:5,12

———————
**O**
**O** 4:1 7:1
**oath** 14:6 15:2,8
15:10,12,18

16:3 17:2
20:17,20
**object** 8:1 18:18
27:10 60:19
76:2 87:19
126:17 133:13
173:10 246:2
**objected** 156:5
156:12,17
**objecting** 86:17
**objection** 26:20
59:18 60:3
61:14 62:2,21
63:22 65:16
66:1,14 67:17
68:14 71:9,16
74:6 75:7
79:17 80:11
81:7 84:8 85:3
86:11,13 100:8
119:2 133:11
133:15 143:14
143:16 154:2
157:4 163:16
168:3 182:10
185:10 186:9
187:12 200:10
200:20 215:19
244:17 245:6
259:5 263:21
264:21 266:4
268:14 269:2
269:21 273:13
273:16 278:5
296:3 300:9
301:9,16
315:18,19
318:13,14
320:4,14 336:3
336:21 337:12
**objections** 18:21
81:6 84:9 86:6
**obligation**
278:11

**obligations**
278:4
**observed** 81:6
**Obsession** 78:11
**obtain** 329:8
**obvious** 24:21
**obviously** 143:6
150:21 226:13
247:15 278:2
296:14 328:8
329:10 333:22
**OCC** 24:13,16
25:13,18 26:9
27:8 32:9 34:3
139:15 147:7
150:9,15
152:16 184:18
195:1 198:15
**Occasionally**
221:20
**occasions** 38:16
**occur** 12:2
72:15 87:3
129:18 137:20
140:8 212:1
232:17
**occurred** 14:4
56:21 69:16
76:12 86:3
87:12 98:6
152:17 212:2
212:10,11
**occurring** 69:3
**OCC.docx**
194:8
**October** 4:14
5:17 106:17
224:8 225:8,21
227:18 282:21
283:21 290:19
290:19 291:19
**offer** 117:13
**offered** 14:22
156:6

**offhand** 23:22
27:2 106:8
137:11 140:6
151:12 218:6
334:18
**office** 3:5 9:21
16:16 23:15,17
24:4,9,12
27:16 34:18
35:7 37:6,14
55:7,13 69:1
92:9 98:9
127:11 128:9
128:13,16
129:5,7 147:4
147:21 148:6
149:18 151:1
152:8,22 153:2
153:13,18
176:1 185:16
187:6 188:1
194:13 195:2
197:3 198:4
205:15,16,17
219:7,16 220:7
221:6 231:16
232:1,19 237:7
237:9 238:16
239:2,8,12
250:12 272:11
297:19 303:16
304:10 307:21
311:20 323:21
333:4
**officer** 51:6
312:11,13,22
314:6,10 327:5
341:2
**officers** 48:12
128:2,8,12
267:17 298:14
312:19 321:14
321:19 323:3
323:15



offices 103:13
104:5 120:8
141:6 161:5
223:9 300:17
300:17 326:1
official 11:17
79:9 181:20
officials 80:4
82:20 105:11
106:4 258:7
271:7,13,22
272:13,20,21
273:4,4,9,10
293:8 296:12
offset 172:10
off-site 217:18
218:5,10
221:10 222:1,5
222:15,19
OFO 9:20 51:20
52:4 105:7
179:1 185:18
217:22 232:10
236:20 301:22
307:17 313:15
324:6 332:16
335:13,15,22
OFO's 332:6
Oh 138:13
234:22 238:9
330:7
OIG 239:15,22
240:2,7,9,14
241:4,9,13,17
242:1,8,12,17
243:2,6,12,19
244:3,8,8,11
244:14 245:2,9
245:16,22
246:5,13,16
247:5,15,18
248:18
OIG's 248:4
OIL 148:6

ok 234:22
okay 9:15 12:14
14:3,9 17:4,21
17:22 18:14
19:6,15,20
21:5 22:11
23:6 27:4
29:17 30:19
33:5,7,18
34:21 35:5,20
43:5,19 48:1,9
48:21 49:12
51:5 53:4 58:1
59:9 60:13
62:2 63:16
64:9 66:11
67:6 68:5 71:3
71:7 72:1,8,14
73:12,15 75:17
75:21 77:2,4
80:3,9 81:5,14
81:17 83:6
84:3,17 85:12
87:8,16 88:3,6
89:11 90:12
91:10,15,22
92:9,11 93:2,8
93:20 94:3,13
95:3 96:10
97:4 98:10
101:5,10 102:4
102:13 103:3
103:18 104:9
105:10 106:3,9
108:2,11,19
109:3 110:14
112:9 113:16
114:4 115:12
115:19 116:8
116:15 117:8
118:16 119:3
120:1,2 122:9
122:16 123:12
124:21 125:2

126:5 128:7
134:18 135:5
136:10 138:21
140:1 141:10
143:20 144:8
149:8 156:2,20
158:4,8,15
160:1,15 161:7
162:20 170:4
172:11 173:2
173:21 174:12
174:16 175:7
176:13 177:7
178:5,10,22
179:20 181:1
181:14,19
182:20 183:7
185:15 186:19
189:13 190:5
192:5 193:1
195:7,15,17
197:8,12,18,22
198:3,14 199:2
199:15 200:5
201:16,22
203:3,9 204:16
205:18,22
206:6 208:10
208:16 212:7
212:13 214:10
214:15 215:5,9
215:22 216:10
216:13 217:10
217:20 218:4,9
218:12 219:12
219:18 220:9
221:5,9 223:21
224:17 225:16
226:2 228:16
229:2,9 230:2
232:9 234:9,14
234:16 235:4
235:22 236:11
237:18 240:11

245:15 246:6
249:1 253:18
254:4,11,21
255:3 257:20
258:5,12
259:13,20
260:20 261:4,8
261:12 262:12
263:11 266:2
266:21 268:20
270:2,6 275:6
278:8 282:2,2
284:19 290:3,9
290:9 291:18
293:9 298:10
299:16 302:12
304:4 310:20
310:22 315:8
315:10,11
324:15 325:9
325:10 326:21
330:21 335:9
338:9
Oklahoma
49:12
older 166:18
167:17
Once 321:13
ones 44:3 80:5
82:21 135:14
one's 230:7
one-hour 24:6
25:12,17
one-page 138:17
193:12 196:4
297:5 307:13
ongoing 187:11
188:6 200:1
239:11 241:14
ONLY/PRE-...
181:21
on-the-job 50:5
OPA 297:18,22
298:4,10 299:9

299:11,19
open 109:21
110:1,4 119:11
192:4 242:17
249:19 339:13
opened 242:20
opening 109:16
operation 42:21
231:16 243:8
operational
122:4,13 144:9
144:16 145:5
operations 9:21
39:13,17,17
43:3 94:6
141:15 166:3
176:10 206:22
222:2,6 233:22
236:19 237:1
238:3,13
243:17 256:2
272:12 275:12
276:1 307:17
313:19 317:19
318:10 322:10
323:21
Operator 3:16
7:2 41:8,11
46:12,15 56:13
56:16 70:5,8
74:14,17 81:19
81:22 88:8,11
103:5,8 114:6
114:9 154:21
155:2 174:1,4
249:4,7 256:17
256:20 270:8
270:11 338:2,5
339:4
opinion 79:18
210:9,16 247:1
opinions 251:6
251:12
opponents



101:14
oppose 117:9
opposed 157:1
ops 226:9
  227:16 245:18
ops/APP 226:3
options 109:19
oral 15:4
orally 15:15
order 223:1
  226:11,22
  227:5,7,13
  247:14,17
  293:13 295:15
  295:17 339:10
orders 87:5
organ 267:20
organization
  118:4 249:11
  251:13 269:15
organizations
  10:3 292:13
organized 93:22
organizer 93:21
original 178:8
Otay 286:9
  288:11
OTMs 277:1,9
  282:7,22
Otro 1:4 7:5
  187:11 188:6
  200:2,6,19
  201:7,18
  202:12 241:20
  244:16 249:11
  249:19 250:1,5
  250:18,21
  251:10,12
  254:14 255:17
  269:5,10
  314:18 318:11
  322:12 323:2
  323:11,14
Otro/Metering

196:16
outbound 51:6
  51:10,12,13,14
outcome 341:11
outfit 278:19
outline 190:20
outlined 36:8
  270:22
outside 15:17
  16:1 50:5
  94:10 121:7
  147:10,18
  156:13,13
  191:16 210:4
outstanding
  339:14
overcapacity
  164:4
overseas 42:13
  48:7,18
overseeing
  285:9
oversight 14:15
  14:17 43:4
oversimplifica...
  42:17
overview 17:3
overwhelmed
  278:21
Owen 27:18,22
  28:9 30:14,16
  31:8,12,16
  34:5,6 39:6
  53:20 105:6
  120:14,19
  121:4,15
  128:20 150:21
  177:21 186:6
  186:22 199:21
  205:4 226:9,19
  227:3 228:20
  297:9 304:7
Owen's 155:14
  198:13

**P**
P 2:1,1 7:1
packed 219:19
page 4:2,6 5:1
  6:1 17:2 21:16
  22:3,6 79:2
  98:13,14
  107:10,12,19
  108:12,16
  123:9 124:6,7
  124:9 125:3
  135:22 160:3
  160:15,20
  169:7 173:6,7
  180:17 181:2
  189:14 253:20
  253:21 254:1
  255:8 257:5,7
  257:9 258:13
  266:22 267:3,4
  267:9 274:17
  281:17 282:18
  285:12 303:10
  303:15 307:15
  313:8 332:13
  342:2,8,11,14
  342:17 343:2,5
  343:8,11,14,17
PageNo 342:5
pages 1:19
  37:15,16
  229:17 244:11
  253:22 281:5
  340:5
pain 49:14
  267:20
Panel 90:14
  95:14
paper 126:9
  226:3,10,16,21
  227:4,8,10
  228:21 229:5,9
  229:19 232:10
  233:10,16

234:3,10
  291:15,22
papers 229:15
  229:17 232:18
  232:20 233:14
paperwork
  328:9
paragraph 79:3
  83:7 108:20
  109:1 110:8
  125:7 126:6,22
  127:2,17
  174:22 175:1,3
  175:8 176:13
  183:3,5,7
  254:12 267:9
  285:11,16
  287:11,14
  292:8,10
  293:10 295:10
  332:12,16
  333:3,12,16
paragraphs
  83:10 290:8
parameters
  315:22 317:1
  321:9
parlance 229:10
parole 45:13
part 18:21 28:3
  92:14,18 97:18
  105:15 111:5
  115:4 123:21
  133:1 135:15
  142:4 144:7
  164:12 180:7
  189:8 197:6
  207:4 218:18
  223:8 225:17
  231:8 248:4
  253:11 282:8
  287:15 319:1
participant
  83:11

participate
  298:3
participated
  198:19 302:1
participates
  94:11
participation
  136:22
particular 29:6
  35:10 155:19
  186:17 205:17
  212:13 221:16
  223:7 229:10
  283:18 306:2
parties 7:15
  285:4 341:10
parts 31:3
  101:12 287:2
party 7:22
  200:12 318:2,5
  319:1
Paso 161:16
  333:5,22
  334:12
passenger 9:3,6
  9:13 40:1,4
  41:19 42:7
  187:6,22
  237:21
passengers 40:5
  42:3,12
passing 31:14
  51:4
pasted 197:13
  197:18,21
Pastilong 43:21
  44:10 48:1,3,3
  48:6 252:11,22
  258:6 260:4
  263:4
patented 134:14
patience 46:18
Patrick 151:1
  153:6 181:7,10



**patrol** 98:8
151:15 223:10
324:10 334:10
**patterns** 310:1,9
**pause** 18:11
132:4,7,18
**pedestrian**
286:16 308:13
**pending** 19:11
82:6 338:15
339:13
**people** 48:18
83:15 170:7
172:9 176:18
200:6,14
220:10 235:1
259:16 284:14
286:4,10
288:19 314:20
334:14 335:9
**perceived** 80:5
82:22
**percent** 157:16
157:21 161:10
161:14,17,21
162:2,7 163:5
163:13 164:1
166:20 172:6
**percentage**
161:3
**period** 19:17
44:17 242:17
242:19 248:3
322:18
**person** 24:20
77:9,15 94:7
153:15 176:3
236:22 264:5
293:3
**personal** 20:13
**personally**
243:4 251:2,7
**personnel**
329:14,21

330:11
**persons** 165:2
170:13,18
285:18 286:20
**persons's**
327:21
**person's** 328:1
**Pete** 134:4,22
137:5 138:11
139:5,14 140:2
177:21 214:5
276:9,20
291:11 313:10
**Peter** 43:21
**Phillips** 6:2
250:21 251:7
254:13 255:1
256:9 258:8
260:21 261:1,5
261:13 263:15
264:16 265:20
266:3,14,18
267:16 268:3,6
268:12,22
269:5,10,15,19
**phone** 72:20
73:2 76:1 77:9
77:15 175:11
176:14,18,21
177:3 261:11
263:15 290:21
**photograph** 6:2
265:16 266:2
**phrase** 132:17
144:1 207:19
209:19
**pick** 105:18
**pickup** 171:8,11
**pickups** 171:14
**picture** 265:19
265:21
**piece** 29:10 78:7
78:17 126:9
176:8 223:18

**pilot** 286:7,8,12
**pinging** 264:12
**Pinkus** 3:15
7:13 158:20
225:2 257:7
267:2 281:6,13
**pinpoint** 239:19
**place** 24:17 31:9
55:20 65:7
72:5,6 136:16
153:1,20 186:3
223:6 279:5,9
279:17 295:7
300:19 302:7
304:14,22
305:9,11 306:9
307:2,4 309:1
322:19 338:21
**placeholder**
119:15
**places** 309:2
**plainly** 234:11
**Plaintiff** 1:5
**plaintiffs** 2:2
8:10 270:14,20
338:7
**Plaintiff's** 4:7
21:16
**plan** 6:6 223:12
223:16 227:11
276:1 285:3
316:7 335:22
**planning** 222:22
223:3 288:18
**plans** 223:6
284:17 327:21
336:8
**plaque** 213:12
**plausible** 316:13
**play** 169:18
170:17 195:8
237:22 238:3
**played** 25:5
147:1,11,16,18

148:7 150:10
150:16 195:4
195:13 199:1
238:13,17,21
239:3
**playing** 205:19
**please** 7:17 8:14
17:20 18:11
19:10 21:7
22:4 30:6 41:3
46:7 57:4 64:5
77:20 79:1,4
82:3 83:8
86:16 90:20,20
91:16 93:9
96:11 106:10
107:11 108:12
108:13 114:4
114:11 116:16
122:17 125:3
127:18 133:18
138:2 139:1
140:11,11
155:5,6,6
158:8,18 159:1
165:11 173:7
174:16,22
175:4,9 177:8
181:2,3 184:22
188:9 193:5,19
195:19 197:14
203:10 206:8
207:20 208:1,5
213:18 216:19
218:14 224:1
224:22 225:3
228:9 230:6,6
235:6 241:3
252:3 254:1
255:8,9 257:6
258:13,14
261:21 262:19
265:10 266:8
266:22 267:8

274:7,18
280:10 285:11
307:6 311:11
332:14
**plus** 290:12
**POE** 20:7 296:9
296:12
**POEs** 99:15
117:2 229:6
233:5,12,18
330:11
**point** 37:16
92:12 94:7,9
99:14 100:5,16
101:11,11
149:6 162:6
171:4,22
175:19 176:8
176:22 177:4
184:8 190:9,13
190:18 210:18
219:5,7 258:21
259:13 275:18
293:3 302:8
328:11
**pointed** 83:12
**points** 36:12
99:10
**policies** 20:11
40:3,21 42:3
42:19,21 43:2
269:11 290:22
**policy** 45:14,20
47:10,14 54:6
55:2,4,14
61:10,17,21
105:2 111:20
116:6 131:16
133:9 166:6
191:3 211:18
212:6 213:7
269:7 321:18
323:19
**poor** 261:16,16



263:22 264:15
264:16 265:2,5
265:6,8 268:8
**pop** 165:1
**populations**
105:13,17,20
110:11 162:13
164:19 166:18
**port** 20:7 51:1
52:7,13 121:7
121:17 122:2,5
122:12,14
124:22 125:10
127:11,14
130:12 144:6
145:13,15
157:16,20
161:10,13,16
161:20 162:2
163:3,12,22
164:15 165:2,8
166:10 167:3
167:12,18
168:1,22
169:13,20
170:5,12,19
171:2,15 183:9
185:2 220:20
221:7 257:22
258:3 273:1,6
273:11 277:1
277:13 278:1
278:21 279:12
282:8 291:4
294:1 296:1
302:16 304:18
304:21 305:13
306:21 312:12
313:17 316:16
322:21 336:20
337:10,10
**portfolio** 38:15
38:19 39:19
40:2 41:18

42:15 43:2
45:13,18 46:21
47:18,21 48:5
**portion** 29:7
160:22 191:9
218:19
**portions** 187:8
188:3
**ports** 39:7,18
42:22 68:9
104:12 106:6
116:4,10 121:6
121:19 128:15
129:6,11,13
130:8 144:3
145:2,7,10,18
159:19 161:4,8
161:8 164:15
165:14 166:3
169:3 209:6,7
209:9,12 211:1
239:14 271:15
275:13 287:4
291:1 302:20
305:20 306:2
308:13,22
312:19 313:16
321:14 323:15
329:5,15,21
333:21 334:15
335:11,12,16
336:2
**position** 11:5,14
52:18,20 59:7
83:3 94:3
198:10 219:3
219:13 221:5
227:18 231:19
232:5,7 246:12
246:22 248:6
255:22 256:3
257:21 258:1
275:17,19
**possession**

330:12
**possible** 38:1,4
38:5,9 72:6
74:7 79:12
111:18 182:6
224:20,21
227:10,14,15
**post** 78:22 288:6
**postcollege** 50:5
**Postgraduate**
50:1
**Post-decisional**
309:9
**potential** 63:8
109:18 161:3
199:22 298:1
**potentially**
126:2 153:1
232:3
**POTUS** 93:16
**Poverty** 2:11
**power** 325:3
**PowerPoint**
58:21 59:2
**PPAE** 212:19
213:5,11
**practice** 176:20
218:9
**practices** 20:11
**precision** 53:4
**predecessor**
10:3
**predictability**
289:1
**prefer** 324:16
**preliminary**
314:19
**preparation**
29:19 30:9
65:22 184:12
291:10
**preparations**
232:16
**prepare** 23:10

23:18 24:4,16
25:13 32:11
34:2,8 65:14
65:18 66:7
219:22 233:13
327:3,6
**prepared** 70:15
229:4 276:1
**prepositioned**
48:15
**presence** 28:18
156:14
**present** 3:12
7:15 19:18
28:20 30:16
44:17 59:3
88:1 221:22
**presentation**
58:20,21
**presentations**
59:2
**presented**
334:15 335:11
**presenting**
337:9
**presently** 8:20
**presents** 322:21
**preserve** 63:13
68:3
**preserved** 60:12
62:15 86:6
**preserving**
67:21 68:2
**Presidency** 55:8
55:14 69:2
**president** 60:9
62:12 63:15
80:15 149:18
150:3
**presidential**
60:9 62:9,12
63:9,14 67:22
229:20,22
**President's**

232:11,17
233:11
**press** 290:21
**pressure** 298:5
299:20
**presume** 284:13
**pretty** 38:13
46:2 72:7
102:17 186:2
217:17 324:18
**previous** 104:10
247:8 313:8
**previously** 16:8
29:12 30:10
32:6 85:13
89:5 187:8
188:3 195:7
215:2 248:1
304:6 305:19
322:7,17
**pre-decision**
336:8
**pre-decisional**
118:10 186:11
186:14 187:17
190:3 191:1
240:21 246:14
309:9 336:9,13
**pre-decisional...**
191:5
**primarily** 94:14
175:21 288:2
307:3
**primary** 40:6
42:4 192:7
**principals** 54:15
55:1 250:17,21
**principle** 278:16
**prior** 36:16 63:7
65:7 75:22
90:5 104:10,16
104:20 105:8
116:10 169:7
222:10 234:12



247:1,3,9
314:20 322:5,6
323:18 324:2
**private** 90:2
**privilege** 56:8
56:12 60:3,4,8
60:10,11 62:9
62:10,13,14
63:8,9,14,15
66:16 67:5,22
68:2,3 69:22
74:9 75:11
81:13 87:22
118:12,13,18
118:18,19
119:2 154:4
155:8 156:5,12
190:11 191:11
191:17 192:8
192:10,15,18
247:3 248:2
339:15
**privileged**
113:11,15
119:22 157:2
193:4
**privileges** 272:3
**proactive**
323:21
**proactively**
318:22 323:13
**probably** 10:19
11:16,17 28:13
29:4,9 30:20
31:10 35:15
36:19 39:6
47:18 57:11,14
60:13 71:5
73:20 75:20
89:19 94:17
126:3 150:22
176:11 217:18
222:12 227:20
230:3 232:8

233:20,20
235:19,19
240:9 243:15
249:13 261:15
261:17 264:5
279:6,12
281:21 300:16
303:11 315:14
320:17 327:11
334:5 335:7
**problem** 69:9
179:10 259:14
269:11,20
**problems** 41:16
187:10 188:6
269:6
**Procedure**
18:20 86:12
**procedures**
290:22 304:13
304:21 305:8
**proceed** 290:14
**proceeding**
10:17,17,21
11:7 13:16,18
13:21 14:1,4,7
**proceedings**
341:3,5,6
**process** 11:13
11:15 35:11
40:5,6 42:2,3
45:11 47:9
60:4 66:15
67:4,19 68:15
75:11 109:5
117:7,9,19
118:12 137:2
137:21 192:8
198:19 212:21
229:21,22
247:3 248:4
258:5 293:12
295:13
**processed** 172:9

**processes** 183:9
326:21
**processing**
45:14,20 47:12
47:13 109:16
109:20 110:4
144:4 145:7
185:2 208:6,10
271:14 272:14
272:22 273:6
277:3 287:20
318:4 328:7
332:6
**processors** 40:6
**proclamation**
93:16
**produce** 30:3
234:13
**produced**
117:11 182:8
247:6
**product** 187:16
200:12
**production**
234:11 247:9
**professional**
48:22
**professionalism**
251:17,21
**profile** 78:7
**program** 42:7
42:11,14 48:8
48:10,11 51:6
51:22 229:18
239:19 284:6
286:1 305:9,16
305:18 337:15
**programs** 9:3,7
9:13 40:1
41:20,22 42:8
42:15 45:5,8
49:22 51:7,11
51:12 187:6,22
213:7 237:22

271:10 272:1,2
272:4,5,6,6
309:21
**program's**
49:11
**progression**
39:5
**prohibiting**
223:1,13 226:4
226:11,22
227:6,13
228:22 314:19
**projections**
336:7
**promise** 270:17
**promised** 168:4
**prompted**
184:11 282:6
**prompting**
155:20 184:14
**pronounce**
238:10
**proof** 117:13
**proper** 42:5
47:10 130:2,2
145:13
**properly** 40:8
172:17,21
**proposals**
105:12 106:5
108:22 109:4
110:9
**proposed** 302:1
**protection** 9:1,4
9:16 42:9
47:11 302:13
302:15 304:12
305:6
**protocol** 42:9
47:12 305:6
**protocols** 100:1
302:13,15
304:12
**provide** 15:9

74:2,2 75:2,3
89:20 126:8
146:15 285:4
**provided** 15:3
15:18 16:2
25:19 27:7,17
34:12 210:20
243:1 244:3
266:14 291:16
294:10 321:19
325:14,17
327:22
**providing** 74:4
75:4 205:14
243:5,11,18
293:18 310:13
**provision**
101:14 192:12
**proximity**
306:20
**public** 251:22
297:19 299:14
311:20 341:1
341:19
**pull** 21:6 90:20
177:7 223:22
230:5 315:22
316:4,8 317:2
319:12,14,15
319:17 321:9
**pulled** 171:5,10
172:2,8,13
227:7 316:9
317:4
**purpose** 74:3
75:4 298:16,18
**purposes** 261:9
**pursuant** 22:16
332:7
**pursuing** 109:19
**purview** 39:8,12
47:2
**push** 247:3
307:1



pushed 246:18
put 7:20 14:15
　21:12 29:7
　42:21 47:9,10
　52:4 58:22
　78:5 96:16
　106:15 119:14
　122:22 134:1
　138:8,13 139:3
　140:14 151:2
　155:5 159:7
　176:12,21
　177:13 182:3,7
　188:11 193:10
　196:3 203:16
　206:13 217:2
　224:6 226:9
　230:13 235:13
　256:15 261:19
　264:3,7,10
　265:2 274:6
　279:5 311:1
　321:18 323:7
putting 279:9
P-A-S-T-I-L-...
　44:10
p.m 93:15 103:6
　103:9 107:9,16
　114:7,10,14
　115:9 124:12
　136:16,16
　154:22 155:3
　174:2,5 180:16
　225:21 249:5,8
　252:21 255:6
　256:18,21
　257:11 258:15
　258:18 260:3
　270:9,12 276:6
　276:10 282:12
　291:20 313:5
　313:10 338:3,6
　339:5,18
P.O 3:6

P4 219:5

---

**Q**

qualifies 14:2
question 15:6
　17:19,21 18:3
　19:11,12 23:2
　24:21 33:10
　41:16,21 54:3
　57:1,3 61:7,18
　61:19 63:7
　64:4,10 65:19
　66:2,6 67:2,4
　67:11 68:7,20
　69:7 70:18
　71:1,8,11 74:5
　74:21 75:5,15
　80:17 81:11
　82:5,15,16
　83:1 84:15,18
　85:10 86:14,20
　88:15 89:3,9
　92:17 93:6
　96:20 99:22
　100:3,6 101:21
　102:17 104:2
　106:2 111:13
　122:7 127:1
　139:13 144:18
　144:22 147:14
　149:3 153:16
　154:6,15 155:7
　156:4,15 163:2
　163:10 165:11
　168:19 169:22
　176:7 177:18
　186:20 187:19
　201:14 202:8
　210:13 227:1
　228:13 229:2
　235:17 245:7
　245:11,13
　248:10,13,17
　266:5 273:2

287:6 309:12
　320:10,15
　326:11 333:1
　337:4
questioning
　86:5 190:16
　193:2 268:15
　324:18,22
　330:15
questions 15:10
　17:8,14 18:13
　18:18 19:2,16
　20:11 21:3
　28:15 75:9
　80:20 82:7
　83:15 86:7
　99:6,10 100:4
　100:16 101:2,3
　117:15 119:6
　119:10,13,19
　153:16 168:7
　168:15 175:8
　175:15 190:19
　190:21 192:1
　225:18 235:1
　267:15 270:3,4
　271:2 338:8,10
queue 26:14
　27:6 37:21
　38:2,7,12,14
　38:21 39:1
　54:16,19 67:16
　87:18 88:18
　102:8,22 104:4
　183:10 185:3
　220:13 221:10
　221:13,22
　222:14,18
　223:6,14,16,18
　223:20 239:13
　239:22 240:4,8
　241:7,10,13,18
　242:2,9,13,18
　243:3,7,12,20

244:4,9,12,15
　245:3,5,17
　246:1,17
　271:19 272:13
　287:19 290:6
　292:1,4 304:12
　304:20 305:8
　307:21 308:11
　308:19,20
　309:1,5,16
　316:12,13,16
　316:16,20
　318:20 323:17
　324:1
queues 309:22
quick 102:13
　113:21 174:10
　174:12 190:6
　199:7 246:8
　248:13 280:21
　290:2 330:9,14
quickly 109:5
　158:13 324:18
quite 69:12
　167:5 192:14
quote 79:7,10
　79:21 276:21
　282:20

---

**R**

R 2:1 7:1
Randy 27:18
　28:1,4 38:22
　39:3 50:22
　94:5 97:1
　134:4 135:1
　137:7 138:10
　139:5 177:21
　178:12 252:11
　252:21 258:6
　258:14,19
　260:3 264:6,12
　264:19 297:9
　303:17 312:3

ranks 251:16
rare 267:19
　268:4
reached 61:17
　61:22 128:13
　291:11
read 74:21
　78:17,20,20
　79:13,14 80:7
　80:22 82:4,9
　84:1 88:15
　93:18 97:7
　99:20 100:5
　101:19 109:9
　110:12 125:11
　126:11 127:7
　127:20 128:5
　137:3 139:12
　139:18 155:6
　181:17,22
　185:4 194:5,9
　196:17 200:3
　204:20 208:3,8
　215:11 218:19
　225:17 226:6
　230:8 232:12
　232:21 233:6
　236:7 250:14
　255:19 259:8,9
　260:7,10,16
　263:6 267:13
　267:22 276:16
　277:7 281:20
　281:21 283:1
　283:14 285:19
　292:17 294:2,5
　298:8 299:6
　304:15 308:15
　312:17 313:13
　338:12 340:5
reading 155:13
　163:12,21
readout 65:5
　70:13 71:12



76:11,16
**reads** 80:3 82:19
83:11 97:5
101:11 127:18
175:8 196:15
233:4 287:15
**ready** 204:18
240:9
**Reagan** 179:4,8
**real** 113:21
**realize** 139:11
218:17
**really** 18:7 31:3
31:5 83:3 95:1
131:7 239:19
250:10 302:7
310:5,6 320:6
**reason** 21:1
38:10 93:3,6
97:20 111:8
115:7 124:1
129:9 135:17
137:19 138:1
140:7,9 142:7
180:10 189:10
191:6 197:8
200:15 207:15
231:10 253:14
333:1 336:18
337:7,15 342:4
342:7,10,13,16
342:19 343:4,7
343:10,13,16
343:19
**reasons** 89:4
184:1
**recall** 11:21
13:19 14:4
23:22 25:11
27:4 33:14
51:3,10 54:11
54:13,18 55:10
57:6,13 58:15
58:17,19 59:14

59:15 60:17
61:1,7,10
64:18 66:6
71:12,18,19,21
73:5,7,15,22
76:7,10,15,19
77:8,12 78:19
90:16,16 94:18
94:20 98:4
100:15,19
101:1,3,5,21
102:2 104:18
105:9 106:3,8
111:21 112:6
120:11,13,13
120:18,19
121:3,4,13,14
121:18 128:7
128:11,12
130:11 137:10
137:11,12
140:1,6 141:5
146:20 147:6
147:10 148:1
150:13,14,20
151:5,7,13
176:6 187:3
192:4 199:2,4
199:5 201:15
202:14,16,19
202:20,22
203:4 205:19
209:21 212:7
212:12 218:4,6
219:12 221:9
221:16,21
222:3,4,9,13
222:17 223:15
226:13,18,19
240:14 242:7
242:11 244:22
245:2,20
248:19 254:19
254:20 258:5

259:2 262:22
302:3 316:5
317:1 319:18
320:7 322:20
**recalling** 240:6
**receipt** 338:14
**receive** 49:16
65:3,8 75:21
92:20 93:1
178:5 210:21
225:16 297:15
300:3
**received** 27:21
50:4 76:15
91:22 97:9
110:15,18
113:3 114:18
123:12 135:6
141:10 179:20
188:17,21
189:17 196:19
213:15 218:1
230:18,21
234:2,6 242:7
242:11,14
253:2 276:4,8
276:12,17
282:10,15
291:6,18
297:11 303:20
304:1 308:6
312:5,9
**receiving** 76:8
76:10 92:13
97:17 111:4
115:3 123:20
128:7,11
135:14 142:3
180:6 189:7
197:5 222:9
231:7 253:10
**recess** 56:15
70:7 74:16
88:10 103:7

155:1 174:3
249:6 256:19
270:10 338:4
**recipient** 235:20
235:20
**recollection**
11:6,7 16:1
22:12 25:9
26:7 61:16
76:20 103:19
108:2 115:22
120:6 127:9
137:17,18
147:3 155:12
157:12 181:9
186:2 195:4
198:18 200:6
226:8 233:8
255:2 299:21
335:5
**recommending**
11:17
**record** 7:3,16
18:7 41:2,5,7,9
41:10,12 42:6
46:11,13,14,16
46:20 47:11
56:10,14,17
63:6 70:6,9
74:15,18 81:4
81:18,20,21
82:1 88:9,12
102:15 103:4,6
103:9 113:21
114:5,7,8,10
117:14 119:5
154:19,20,22
155:3 156:13
156:17,18
168:8,10,11
173:11,22
174:2,5 190:8
190:10 246:8
248:6 249:2,5

249:8 256:18
256:21 260:9
262:13 270:7,9
270:12 337:20
337:22 338:3,6
338:11,18,20
339:3,6,11
341:5
**records** 35:16
327:1,2 328:14
328:15,17
**redacted** 192:17
289:15
**redactions**
190:1
**redescribe**
138:15
**redline** 194:22
**redlined** 194:13
**reduced** 341:7
**refer** 9:16,20
20:1,7 310:19
315:9
**reference** 92:12
142:14,20
143:1,8,10
144:5,8 183:14
198:14 208:10
210:5 211:8,12
248:18 288:16
**referenced**
286:19 295:13
298:17 322:17
**references**
183:8
**referred** 9:9
12:8
**referring** 9:12
57:20 100:12
100:13 191:9
201:20 260:21
261:2 268:5,12
298:21 333:12
**refers** 134:15



220:3,18
304:17
**reflect** 38:6
118:22 168:9
168:11 173:11
294:5 336:9
**reflects** 156:19
**refresh** 22:11
26:12 181:9
195:3 198:18
226:8 233:8
**refreshed** 26:17
26:18 29:14
155:13 195:12
**refugee** 45:14
47:12
**regard** 38:14
**regarding** 12:17
23:9 27:6 31:8
35:9 40:4,21
47:14 55:14
56:8 74:9 75:9
79:9 81:13
84:10 85:5
104:4,11 105:7
128:8 130:7,22
131:8 136:22
145:21 151:8
152:17 155:8
158:3 168:21
169:12 170:16
175:16 177:5
183:9 185:1,19
188:4 190:1,11
192:8 221:10
222:18 228:21
239:22 241:7
241:17 242:1,8
242:12,18
243:2,6,7,11
243:12,19
244:2,3,8,14
245:3,4,16,21
245:22 247:2,5

248:4 282:6
286:20 290:22
316:19 320:22
324:7 339:15
**regardless**
77:12 179:20
191:4 246:13
**regional** 287:16
**regular** 218:9
**reinstated** 322:5
322:6
**reissued** 236:4
**reiterate** 191:20
**relate** 19:16,21
86:8 100:7
192:11,12
271:18 283:19
287:3,19 288:1
**related** 11:10
13:13 26:13
38:2,7,12
45:20 54:12
87:5,11 127:15
172:20 239:13
255:1 258:8
271:14 284:7
284:11,18
341:9
**relates** 100:1
163:3 166:6
290:20
**relating** 37:21
51:13 183:10
185:3
**relation** 200:1
**relationship**
53:22 292:22
**relaying** 201:10
226:19
**release** 232:16
241:9,12
**released** 12:20
**releasing** 16:10
**relevance** 81:5

86:6
**relevant** 37:15
37:16 246:19
**relieved** 259:3
259:10
**relocate** 300:5
**relying** 60:5
**remaining**
44:14
**remember** 72:2
78:21 146:17
146:18 218:21
221:13 258:10
258:10 315:20
316:18 317:7
319:8 320:21
320:21 321:3
**remembered**
27:5
**remind** 19:10
36:12
**remote** 1:12 8:1
**remotely** 7:10
8:7 64:16
**removal** 45:12
47:8,9
**reorient** 173:6
**repatriation**
334:11
**repeat** 66:4 69:6
92:16 104:1
144:17 210:12
326:11,11
**repeating** 47:3
**rephrase** 208:5
**report** 5:5 44:7
53:16,17
159:10 160:4
161:1 169:6,9
171:7 172:12
172:20 173:15
232:2 241:9,13
241:17 242:1,8
242:12,18

243:2,7,12,19
244:4,8,12,14
244:19,20
245:3,9,16,22
246:5,14 247:6
248:19,20
307:22 308:11
308:12,20
**Reported** 1:20
**reporter** 7:13,17
7:19 17:10
26:2,3 27:19
28:2,6 39:9
40:9,10,17
41:1 43:14
44:1 45:4,21
46:4 74:21
75:1 82:4,7
88:14,16 107:1
107:2,2 113:12
122:6,7 133:13
143:15 144:17
155:9 157:5
165:21 179:6,9
202:3 210:11
210:12 227:22
228:6,12 235:7
256:13 280:13
289:19 301:1,6
326:9,10,13
331:20 338:15
339:7 341:1
**reporting** 53:22
**reports** 43:7,9
43:20 44:14
48:2 53:9,12
53:13 146:6
159:15,18,21
173:2 224:18
225:13 228:19
247:15 248:18
**represent** 37:4
116:20 184:15
205:5 265:15

270:20 322:4
**representatives**
14:11 57:18
89:17
**represented**
22:19
**representing**
23:3 272:7
**reputation**
129:22
**request** 7:10
19:10 74:8
125:8,9 127:12
129:2 132:18
182:9 191:12
234:12,13
247:7 257:15
275:10 276:4
282:6 290:20
299:12 329:15
329:19,21
330:1,2
**requested**
168:12 173:11
247:8
**requesting**
127:10 275:12
299:2,4,7
**requests** 136:21
247:9
**require** 154:14
175:9 197:15
**required** 51:18
91:16,19 196:6
196:7 197:13
327:9
**rescinded**
322:18
**research** 89:19
264:11
**researching**
90:18
**reserve** 192:3
**reserved** 81:6



282:21
**reside** 55:6
**resolution**
339:14
**resource** 145:8
212:22
**resources** 39:7
39:10 300:5
307:2
**respect** 95:20
118:5 228:20
338:18
**respective** 285:4
**respond** 27:1
92:21,22
**responded**
214:11 263:3
**responding**
92:13 321:11
**response** 21:2
142:16 149:3
155:17 182:9
208:22 247:11
276:8 291:14
321:1
**responses** 17:9
247:13
**responsibilities**
39:19 41:18
46:22 271:5
**responsibility**
38:21 43:2
166:3,4,6
**responsible**
39:17 40:21
45:9 153:3
233:16
**responsive**
34:11 37:18,19
164:9 234:12
**rest** 214:20
281:8 287:1
**restate** 339:12
**restrictions** 87:6

**result** 49:9
63:20 179:13
239:7
**resuming**
335:22
**retained** 328:19
**retention**
328:20
**return** 126:10
126:14,15
229:6 233:5,12
233:17
**returned** 334:17
**returning** 127:5
**reveal** 64:2 76:4
80:14 186:11
186:16 187:14
187:15 200:21
201:10 240:20
245:8 309:8
**revealing** 26:12
64:5 76:6
186:14 244:20
**revelation**
336:12
**review** 28:8,17
42:11 274:19
280:11
**reviewed** 28:22
37:5,6 236:12
240:2
**reviewing** 28:11
34:5 150:17
275:4 285:7
█████ 312:11,22
314:6,10
**RFID** 288:2
█████ 334:13
**right** 14:20 17:6
18:4,16,19
21:12,16 26:10
30:7 38:8
39:20 41:14
45:3 49:6 50:9

50:20 53:2,9
73:13 78:5
79:5 82:2
88:13 89:7,11
90:2,19 91:3
92:11 93:10
94:1 96:5
97:18 101:6,7
107:7 111:12
114:16 116:8
116:13,18
120:5 121:22
122:22 124:9
124:22 125:6
128:21 129:7
132:15 133:2
134:1 135:11
135:22 136:4
140:10,16
141:18 142:12
142:21 143:12
145:16 153:18
156:7,15 158:6
159:2 160:19
163:5 166:12
167:19 168:2
168:14 170:8
173:16 177:13
178:8 179:22
180:4,8 182:17
188:8,11 189:1
192:3 195:17
196:3,21 201:3
202:18,21
203:16 207:5
208:13 214:2
214:13,20
215:2 218:17
219:1 224:6,13
224:15 225:10
225:14 228:22
230:4,13 231:1
231:5,8,13,17
251:4 252:17

252:22 253:8
253:12 257:1
257:13 259:15
261:6 267:7,12
268:13 275:1
276:14 282:8
282:16 291:16
291:20 292:2
297:16 304:2,7
307:2 312:3
313:13 314:22
320:14 322:7
329:9 331:8,16
333:5
**rights** 293:16
**right-hand**
134:16 160:2
**ring** 95:2
**Risch** 73:8,17
73:21
**risk** 48:19
**Robles** 254:7
255:5,12 256:7
257:16
**rodeo** 17:1
**role** 25:5,11
45:1 53:5 59:8
64:21,21 94:4
95:19 98:4
108:3 126:3
147:1,11,16,19
148:7 150:10
150:16 153:7
195:4,8,14
199:1 205:12
205:18,21
237:22 238:3,7
238:13,17,21
239:3 285:6,9
305:3 321:10
**rolled** 169:7
**Ronald** 179:4,8
**room** 18:10 56:2
56:6,22 59:6

62:19 64:14
66:8 67:14
68:13 69:3,12
69:14,18 70:14
71:14 77:6
84:5,21 85:19
162:16 164:17
167:3 168:1
256:15
**rooms** 121:20
162:11 164:14
164:20 165:2
167:12,18
168:22 169:3
169:13
**route** 306:7
**routinely** 30:20
159:18
**rubric** 118:8
**rule** 18:22 19:7
93:17 310:13
310:17,19,20
313:1 314:20
315:9,13,17
317:8 320:3,12
320:13 321:1
321:11 322:3,8
324:7,12
325:15,19
326:4,8,17
329:13 331:2,8
332:7,17
334:17 335:10
335:15 336:1
336:19 337:9
**ruled** 118:9
192:2
**rules** 17:4 18:20
86:12 270:22
**run** 160:4
**rupture** 267:20
**Ryan** 44:18,21
123:10 137:6
140:2 146:10



175:22 176:7
178:13 184:17
193:15 195:10
203:19 205:7
208:12
**R-E-I-S-C-H**
73:10

---

**S**

**S** 1:20 2:1 4:1
7:1 341:2
**safe** 185:2
**Salazar** 221:4
**Salvador** 83:12
84:6 331:16
**San** 105:1 116:3
127:3 136:11
137:1,22
155:19 157:15
161:20 162:7
162:15 164:15
164:20 166:10
166:15 167:3
167:12 170:19
171:12 172:5
219:6,16 220:7
220:21 221:3,6
277:2,3,13
278:1 282:7
286:9 288:9
291:4 296:1,9
302:16 304:13
304:17,21
305:8,10,13,18
312:12 313:16
314:2 334:2,3
**Saturday**
124:11
**Sava** 224:15
225:9,20 226:2
230:17 233:20
**Sava's** 227:17
**saved** 212:21
**saw** 248:21

**saying** 36:13
105:19 149:4,6
153:11 199:6
200:15 212:4
226:20 242:20
305:12 310:3,5
312:9 313:11
**says** 145:7 160:4
160:8 173:8,17
194:17 295:2
299:19 331:14
**sbaker@stept...**
99:1
**SB-54** 12:6,17
13:13
**scale** 304:14
**scary** 332:9
**schedule** 127:18
**scheduled** 99:19
**School** 50:2
**Schroeder-Fa...**
112:21 115:4,8
282:11
**scope** 191:16
316:11 319:1
**Scott** 57:10 59:7
255:12 256:3
257:10,15
**screen** 58:22
174:17
**scroll** 22:2
280:17 281:16
289:22 292:3
303:10 311:10
311:15 313:7
332:13
**SDFO** 219:20
220:6
**se** 309:18
**seal** 341:13
**seaport** 52:8
**seaports** 52:11
**second** 11:22
22:3 46:11

78:13 79:2
83:7,10 99:13
100:16 105:19
111:14 113:19
126:6 154:12
160:15 181:2
183:2,7 217:21
225:19 254:12
268:21 280:13
285:12 287:15
303:14 337:17
**secondary** 40:6
42:4 313:21
318:4 328:16
328:17
**secondhand**
131:1
**seconds** 18:12
256:16,16
274:22
**secretary** 64:22
101:13 152:8
276:2 290:21
**section** 93:21
173:8 181:6
196:6 207:18
283:18
**sections** 287:9
**sector** 90:2
**secure** 283:20
283:22 284:8
**security** 20:2
48:17 54:1,8
54:10,14,20
55:9 57:22
69:1,13 70:16
89:12,21 90:1
148:11,16
152:9 183:10
185:2 219:15
310:12
**see** 21:18 22:1,7
27:1 78:14
80:1 91:7,13

91:18 98:2
99:2,7 105:5
106:20 107:15
107:21 109:1
115:17 117:3
123:5 124:13
124:17 134:7
134:19 135:3
136:8,13,17
138:19 139:6
140:20 142:14
142:18 159:12
160:6 162:4
170:1 175:3
178:2 180:16
180:18 181:5,8
183:5,12
188:17 192:20
193:17 195:12
198:14 203:21
205:10 206:18
208:1,5 214:7
214:15 217:13
218:1 219:9
220:1,15
225:11,22
229:8 230:19
254:9,17
255:14 257:18
258:22 260:5
261:4,7 281:7
284:6 285:14
289:15 311:13
316:13 331:6
337:14
**seeing** 51:4
78:19,21 106:3
142:22
**seekers** 99:15
99:18 100:6
106:6 121:8
271:14 272:22
273:5 287:21
293:13 294:1

295:18,19
312:20 328:22
**seeking** 99:16
175:15 192:13
273:11 286:21
326:22
**seemingly**
280:16
**seen** 21:20 22:12
104:15 159:14
235:18 241:22
244:6 265:21
266:17 267:13
284:19
**Seguin** 57:8
**selected** 11:4
**selection** 11:13
11:15
**selections**
308:12
**Senate** 14:12
**send** 47:15
178:16 179:18
204:18 244:8
**sending** 105:13
105:17,20,20
105:21 110:11
135:13,13
142:3 183:8
206:1 207:4
253:10
**senior** 50:9,11
50:15 89:17
105:6,11
185:18 251:16
**sense** 162:9
277:17 309:21
**sensitive** 51:15
**sent** 5:9 77:21
98:11,22 107:8
112:8 115:8
116:12 124:11
131:20 132:2
133:10 135:5



136:6 139:5
141:14,20
178:21 180:15
180:20 184:16
184:20 185:1
193:14 197:19
198:3,7 200:8
203:19 205:1,8
205:8 206:15
206:21 207:11
208:12,17
215:1 225:20
234:4 235:21
238:8 252:19
253:2 255:5,9
258:15 259:22
260:2,8,10,13
261:4,13
263:12,14
268:20 282:19
291:14 303:16
304:6 307:16
307:20 312:2
313:11
**sentence** 79:21
80:1,3 81:2
82:11 83:2
99:22 110:7
125:14 126:14
126:21 139:21
162:21 175:7
288:17
**sentences**
107:18
**separate** 99:16
**separately**
328:18
**September** 5:15
14:14 217:4
218:5 219:4,13
221:6 222:1,5
275:10 276:5,9
282:5,12
**sequentialing**

134:13
**serve** 50:22
52:17 251:17
**served** 51:6,20
52:6 293:3
**service** 10:6,8
50:9,11,15,19
51:7 105:7
329:16
**services** 1:21
7:14 152:3
293:18
**serving** 206:3
**session** 217:11
218:5,10
221:11,19
222:10
**sessions** 32:18
32:20 33:2,8
33:11,20
217:15
**set** 187:8 196:10
341:12
**setting** 214:11
**settle** 171:5
172:16
**settled** 172:10
172:12
**seven** 220:9
**seventh** 220:13
**seven-year-old**
254:16 256:10
260:22 261:2
**shakes** 17:11
**shared** 316:9
**sheet** 340:9
342:1 343:1
**shelters** 293:19
306:9 307:3
**shift** 289:7
**Shinners** 3:2 8:5
23:2,8,12
26:20 27:10,12
33:3 37:7 41:6

58:8 59:18
60:6,19 61:4
61:14 62:2,11
62:21 63:11,22
65:16 66:1,14
66:20 67:3,17
68:1,14 69:5
69:20 70:3,22
71:4,16 74:6
74:12 75:6
76:2,13,22
79:17 80:11
81:3 84:8 85:3
86:4 87:9,19
88:5,7,20 89:1
100:8 102:12
102:19 113:8
113:14,18
114:2 117:4,20
117:22 118:16
119:4 120:1
126:17 133:11
133:14,15
143:14,17
154:2,12,18
156:4,11,13,22
157:4,6,7
158:10,15
163:16 168:3,8
168:11 173:10
182:10 185:10
186:9 187:12
189:16,21
190:7 192:5
200:10,17
201:8 204:6
215:19 234:14
234:20 235:3
240:11,18
244:17 245:6
246:2,11
247:12 249:3
259:5 263:21
264:2,21 266:4

268:14 269:2
269:21 270:6
273:13,16
278:5,8 280:22
281:3,19 282:1
290:11 296:3
300:9,12 301:9
301:16 309:7
315:18 318:13
320:4,14
324:14,21
325:5,9,11
330:17,21
333:11 336:3,6
336:21 337:2
337:12,21
338:9 339:7,9
**short** 86:13
**shorthand**
125:15 341:1
**shots** 306:15,17
**show** 15:7
159:21
**showed** 146:19
242:4
**showing** 91:3
116:18 159:18
171:8 252:8
274:15 280:7
297:3 303:5
307:11 311:6
**shown** 25:14,17
26:9 33:10,13
33:15 112:6
120:7 124:2
172:13,20
**shows** 93:21
101:15 116:21
161:1 308:13
**sic** 73:10 106:16
120:20 121:5
**Sid** 220:14,17
**side** 42:2,7
159:2 160:8,19

279:14 323:5
338:22
**Sidney** 112:21
137:6 139:16
140:2 177:21
220:18 291:11
**SIGMA** 328:16
**sign** 338:12
**signage** 288:6
**signature**
339:17 342:21
343:21
**signed** 150:22
205:4 331:10
331:15 340:9
**Sikina** 43:21
**similar** 17:13
127:3 278:19
331:15
**simple** 80:21
82:8 102:18
**Simultaneous**
25:22 103:16
165:20 171:1
202:1
**single** 177:4
**sir** 10:10 16:22
21:12,21 22:7
24:21 30:7
60:17 62:6,17
63:3,19 68:5
68:19 78:5,15
79:13 80:1,7
80:10 82:15
84:1,15 88:22
89:7 91:3,8,20
96:20 106:15
106:21 107:7
107:14,22
109:1,9 111:13
112:15,19
113:1 116:18
117:3 122:22
123:6 124:13



124:19 125:6
125:11 126:11
127:7 134:8,19
135:3 136:8
138:8,19 139:3
140:20 154:6
159:12 163:11
168:2,16
177:13,18
188:11,17
193:10,17
194:1 196:3
201:3,14
203:16,21
205:10 206:19
214:2,8 217:2
217:8,13
218:18 220:1
224:6,11
225:22 226:6
228:16 230:19
235:13,17
241:5 252:8,15
254:17,19
255:14 258:22
265:15,22
266:18 267:7
267:12,22
**Sirs** 194:3
**sit** 15:8 72:2
76:18 116:8
128:19 144:12
153:14 169:17
171:17 210:15
**sits** 54:1,7
**situation** 56:2,5
56:22 62:19
64:14 66:8
67:14 68:13
69:3,12,14,18
70:14 71:14
77:6 84:5,21
85:19 127:6
**situational**

184:4,6

**size** 281:10
**slide** 49:11
**slightly** 71:1
338:20
**Slocum** 3:13
23:20 198:16
198:19
**slots** 282:21
**slowing** 292:14
**small** 304:14
**smedlock@m...**
2:8
**snapshot** 171:22
173:3,14
**social** 293:15
**Sociales** 293:15
**soil** 101:16
**Sol** 3:16
**Solange** 7:12
**solutions** 288:17
**somebody**
212:20 229:13
274:22 322:11
322:11
**soon** 192:2
**sooner** 279:7
**sorry** 13:4 24:3
26:6 27:11,19
28:16 31:22
39:9 40:10,19
41:1 57:21
63:11 66:3
70:22 82:17
84:17 88:22
92:16 95:4,5
100:9 102:11
103:15,20
105:18 106:1
113:7,13 117:4
121:12 126:22
132:16 138:13

144:18 147:12
156:8 157:13
158:10,16,21
165:21 166:2
166:22 168:6
169:5 175:1
179:7 184:1
185:11 192:17
200:13 202:3,4
202:7 204:16
210:11 211:2
213:2 225:4
227:2 228:1,3
228:10 234:17
235:22 238:9
240:12 257:8
258:19 260:14
260:15 275:1
275:2,14 278:7
280:22 281:4,6
281:12 287:7
290:11 293:5
296:4 299:5
303:6 306:3
314:8 317:18
318:14 320:3
326:12 333:6,7
333:13
**sort** 35:20 55:5
55:8 71:9
116:9 200:17
**sound** 17:13
185:6
**sounds** 57:16
215:10 299:11
312:22 337:22
**soup** 213:3
**source** 71:5
**south** 117:1
**Southern** 1:2
2:11 7:7 209:3
271:16 272:15
273:5,12
310:15 321:15

**Southwest**
42:22 117:2
120:9,17 141:9
142:17 155:19
155:21 169:8
209:2,5 210:22
211:17,22
212:5 217:19
220:3 221:11
221:14,19
222:7 269:12
317:16,20
334:5,16
337:11
**Southwestern**
104:12 106:7
207:1
**space** 122:12,13
158:3
**spaces** 293:21
296:17
**spanned** 253:22
**speak** 30:10,12
30:19,20,22
40:15 56:7
94:13 143:20
**speaking** 25:11
36:11 40:18
46:2 83:15
86:11 141:1
**speaks** 143:17
**special** 318:3
**specific** 32:7
55:22 89:19
95:8 101:3
112:7 130:11
142:18 151:5
158:1 167:14
167:16,21
168:20 169:2,3
169:11,15
170:20 173:1
208:14 223:15
229:7,18

240:14 278:11
306:9,21
309:18 315:22
318:6 327:3
338:15
**specifically**
11:10 12:17
30:22 59:12
169:18 170:16
199:4 202:19
212:12 264:5
300:7 301:20
305:1,11
**specificity**
222:17
**specifics** 313:22
**speculating**
133:4
**speculation**
100:9 126:18
182:11 215:20
259:6 299:22
300:12 301:10
301:17 336:7
336:22 337:13
**spell** 8:14 43:13
44:1 73:9
228:8
**spend** 28:11
36:17
**spent** 24:8 190:9
**spoke** 30:15
31:7 94:20
312:10
**spoken** 55:13
**spreadsheets**
316:1
**spring** 12:3 13:3
13:13
**Square** 3:6
**squarely** 118:7
246:22
**squirrelly** 168:7
168:16



staff 53:5 69:1
126:8 153:9,10
181:10 198:13
206:4 243:8,9
243:10 285:10
320:8,19
staffer 54:19
70:17 148:11
149:22
staffers 69:13
staffing 306:11
staffs 54:1,8
274:3
stand 140:5
213:6 290:7
standard 35:20
36:2 176:20
stands 90:13
149:11 297:19
298:14
start 44:2 72:14
253:18,19
275:6 280:20
281:15,18
304:14,22
305:9,11,16,17
started 184:14
186:4 275:10
294:14 332:21
starting 254:12
starts 98:12
107:9 136:5
254:5
state 8:14 12:6
12:18,20,21
16:9 19:15
49:2,5,12
50:18 51:18
73:3,6,21
100:3 127:2
151:10 163:6
183:9 187:20
241:3 262:12
285:16 332:16

333:3 341:20
stated 62:10
121:5,15
149:12 165:9
165:14,15
166:9 169:20
182:18 191:4
305:19 313:4
statement 80:10
80:21 82:8,18
118:14 190:6
233:2 246:8
267:14 283:3,5
308:18 332:20
333:15
statements
131:10 241:16
327:7
states 1:1 7:6
12:9 14:11
15:14 16:7
48:20 93:13
156:17 267:16
272:3 276:21
282:20 286:18
292:10 293:10
297:18 299:9
308:10 310:16
327:21
stating 129:20
166:13
stationed 48:12
stay 315:4 322:2
322:16,19
323:1,20
329:13
stayed 315:2
319:9 321:5
322:15
stays 315:6
stenographer
8:2,8
stenographic
7:16

stenographica...
341:7
step 274:22
Stephanie 3:14
23:20
Stephen 2:3
55:16,20 56:5
56:21 61:12,22
62:19 63:21
66:8 67:13
68:12 69:17
70:14 71:14
76:11 77:5,10
77:14 78:9
79:9 84:4,20
84:21 148:20
steps 314:5,9
Steptoe 96:8
Steve 158:10
Steven 282:19
Stewart 96:2,22
98:11
Stewart's
100:15
stipulate 7:21
8:4
stipulation 7:20
8:5
stolen 51:15
stood 286:8
stop 256:14,14
300:1,21 301:2
335:19
stopped 335:20
stored 328:14
strategy 217:11
217:15 218:5
218:10 221:11
221:19 222:10
316:10
Street 2:5,12
291:2
strike 162:20
164:7

strong 263:18
strongly 117:18
119:21
stuck 316:15
stuff 218:21
subcommittee
14:10,16,19
15:5 90:9,13
93:15 95:20
96:5 97:6
283:20 284:1
subject 54:11
93:9,13,13
95:2 97:4
98:19 108:15
117:1 124:15
136:10,11
139:8 181:14
189:13 196:14
204:8 214:15
214:19 215:1,6
217:10 232:9
255:16 288:20
324:1 334:16
335:10
subjected
318:20 323:17
submit 213:1
submitted 332:5
subsequent
248:11 323:8
subsequently
302:19 305:20
subset 286:9
substance 23:7
31:4,5 32:13
37:9,11 58:10
58:14,20 60:17
60:20 61:5,7
62:17 64:3,5
65:18 66:21
75:10 80:14
121:6,16
156:22 174:13

191:13,20
194:11 240:20
244:18,20
245:9,21 246:4
317:21
substantial
190:20
succeeded
236:22
suffered 268:3
sufficient 191:6
suggest 86:14,14
248:3
suggested 176:9
suggestions
219:21
Suite 2:13
summary 70:13
71:12 76:10
128:1 256:8
Sunday 311:18
supervision
341:8
support 205:14
supposed
136:15 145:11
210:9,17
312:20
supposedly
182:21
sure 11:12,13
13:22 15:3,7
16:14,16 17:5
21:22 25:4,20
26:22 28:5
29:4 33:6,13
37:10 38:4
39:4 41:4 46:2
47:5 54:4
55:10 56:8
57:14 58:12
59:5,7 60:22
61:18 66:6
69:9 80:18



81:14 87:15
92:18 100:4,12
100:20 102:9
102:16 105:4
105:16 111:19
116:6,7 118:2
126:2,4 128:18
131:22 148:9
150:19,21
156:2,9 165:12
170:1 176:10
179:17,19
184:1 186:1,3
186:22 187:21
189:19 190:7
199:14 209:11
210:15 211:16
212:2 217:17
218:6 227:3,16
232:7 233:22
235:21 236:7
238:6 239:15
242:5,6 243:14
243:21 249:17
261:15 263:13
266:20 270:21
271:8 273:3
279:7,18 287:8
294:16 296:6
301:13 302:8
306:10 307:2
310:2 315:15
317:3 319:21
319:21 320:8
320:19 324:13
328:20 331:5
334:4
**surge** 108:17
120:16 142:16
142:19 208:2,6
208:11,19,21
209:14,19
210:2,6,10,17
210:21 211:5

300:4
**surmise** 299:3
**surmising** 212:9
212:11
**Susan** 3:3 33:4,4
33:5
**suspect** 239:17
329:10
**suspended**
322:18
**SWB** 217:11
219:19 220:3
**swear** 7:17,19
8:3
**Switching**
310:10
**sworn** 8:7 15:13
327:7
**syndrome**
267:18
**SYS** 304:13,17
**system** 47:11
83:13,14 84:7
92:5 97:14
111:1 115:1
123:17 135:11
172:10,18,22
180:3 189:5
197:3 207:8
228:11,14
231:4 253:7
306:20 318:3,4
328:15
**systems** 42:5
288:2 328:16

---
**T**

**T** 4:1,1
**tab** 21:6 29:7
90:20 96:11
106:10 112:10
116:16 120:3
122:17 133:17
138:3 140:11

158:9,17
174:18 177:7
188:9 193:5
195:20 203:11
206:8 213:19
216:18 223:22
230:5 235:6
252:2 261:20
265:9 266:7,13
274:7 280:1
283:8 289:7
296:20 302:22
307:5 311:1
331:18
**table** 29:22 30:2
57:16 162:1
163:3,4,7,11
163:13,21,22
164:1,3,8
**tables** 160:19
**tabs** 29:5 37:15
**tactical** 256:6
**take** 10:5 15:8
17:11 19:7,7
20:20 24:17
26:1 30:1 31:9
35:9,21,22
36:3,6 37:14
38:3 49:10
55:20 59:13
69:14,15,20
70:2 81:15
88:1 102:4
103:3 120:3
136:15 137:16
142:10 154:16
158:11,12
162:6 168:17
172:4 173:3,21
213:12,15
236:9 237:10
237:13 246:9
248:14 249:2
270:2 274:18

280:10,21
290:1 302:7
313:7 314:5,9
324:15,19
325:1 327:8
**taken** 13:14
20:16 22:9
30:11 31:18
32:5 56:15
59:16 70:7
74:16 88:10
103:7 153:1
155:1 171:4
173:15 174:3
248:7,9 249:6
256:19 265:20
270:10 308:19
327:7 338:4
341:3,6
**takes** 327:4
**Talia** 254:5
**talk** 18:8 56:11
66:20 81:8
166:22
**talked** 18:6 32:8
77:4 85:18
86:21 298:10
314:18 319:17
321:8
**talking** 13:12
25:22 26:3
102:10 104:1
165:22 202:4
235:2
**Tamayo** 227:16
282:20
**Tammy** 1:20
7:14 155:6
341:2
**Tandy** 95:10
**tangible** 310:6
**target** 162:18
171:9
**Targeting** 48:16

**tasked** 232:19
**tasking** 259:16
**taste** 261:16
**TDY** 43:12
**Team** 5:4 159:9
159:15,17
161:1
**teams** 256:6
273:19
**tech** 7:13
**technology**
51:15,17
**teenagers**
166:18 167:17
**tee'd** 204:18
**telephone** 25:2
73:16 75:18
77:5 177:4
212:8
**telephonic**
24:22 72:11,14
**telephonically**
24:18
**tell** 10:22 18:1
20:17,20 31:16
32:16 62:17
86:1 95:1
113:21 169:17
283:22
**telling** 238:10
**temporary**
109:7
**term** 106:2
211:5 320:4
**terms** 65:21
102:21 241:1,4
277:12,15
279:1,9,20
290:11 294:5
295:9 306:15
321:8
**terrible** 250:15
**test** 102:13
225:5



**testified** 8:8
  10:9,15 12:1
  14:9,14 15:15
  31:6 131:8
  147:15 191:19
  195:8
**testify** 11:9
  12:16 15:8
  21:2 22:16
  229:14
**testifying** 20:21
  86:16,18
**testimony** 11:20
  12:11 14:6,22
  15:4,14,18
  17:1 29:13
  156:22 158:14
  174:14 340:6,7
**text** 142:21
  143:1 144:2
  193:20 197:13
  197:15,19,21
  197:22 199:16
  199:19 211:13
  211:15 226:14
  230:6
**thank** 9:8 24:21
  41:14 42:16
  43:5 46:18
  48:21 53:4
  60:15 63:16
  70:3,4 74:12
  82:3 88:7
  107:4,5 114:3
  120:1 133:16
  179:9 193:1
  195:17 204:6
  206:6 228:16
  238:9 244:21
  248:9 249:3
  258:19 270:13
  274:7,10
  275:21 282:1
  283:7 288:16

  301:6 310:10
  325:11 337:16
  338:7 339:3,10
**thanks** 98:16
  192:5 197:16
  254:2 258:16
  289:6
**theoretically**
  162:15 329:10
**thereof** 54:7
**thing** 102:10
  103:1 225:2,4
  281:11,20
**things** 34:1
  35:17 42:11
  45:14 47:16,18
  71:19 92:19
  130:1 131:5,9
  131:13 159:19
  172:10 291:15
  334:8
**think** 10:16 13:9
  13:21 14:1
  15:22 25:5,5
  26:11 27:13
  29:4 33:16,16
  34:7 38:13
  41:15 43:18
  49:8 56:2
  65:12 66:17,17
  66:22 70:22
  71:5 73:17
  85:13 94:6
  111:20 113:21
  119:5,17
  143:11 144:5
  154:13 168:5
  169:7,9 170:10
  172:4 173:12
  175:21 176:2,6
  176:9 178:1,3
  189:16 191:18
  192:14 195:10
  212:15,18

  216:5,6 233:21
  240:7,8 246:9
  247:7,19 248:5
  248:8,10,13
  263:18 264:19
  274:7 277:19
  277:20 281:19
  284:15 295:1,3
  298:6 301:15
  305:12 308:21
  310:6 314:1
  315:21 316:1,8
  319:20 323:6
  324:17 327:6
  333:11 334:1,3
  334:4 337:16
  337:18,18
**thinking** 223:17
  240:17
**third** 4:7 21:16
  22:3,6 83:7,10
  101:10 233:4
  282:18 292:8
  292:10 293:9
**thought** 102:12
  116:2 158:11
  195:10 216:16
  268:22 281:6
  316:7
**Thoughts** 298:7
**three** 7:14 24:6
  24:8 25:12,17
  26:8 32:18,19
  33:1,8,11,19
  85:17,20 86:2
  87:2,7,11
  228:18 233:1
  237:15 281:5
  327:5
**three-page** 6:5
  280:9 283:16
  311:8
**throughput**
  284:9

**throw** 30:6
**thrown** 35:6
**Thursday**
  196:11
**Tijuana** 287:17
  288:6 293:19
  311:22
**time** 7:9 10:14
  10:19 18:16,16
  19:16 20:10,10
  28:1,19,21
  30:13 37:2
  38:22 39:15
  40:11 41:8,11
  42:19 46:7,12
  46:15 53:9,21
  54:5 56:13,16
  70:5,8 74:14
  74:17 81:19,22
  87:7 88:8,11
  94:4 98:5
  103:5,8,15
  114:6,9 116:4
  119:7 125:17
  125:21 126:3,9
  141:11 146:9
  153:8 154:21
  155:2,15 158:2
  162:6 171:4,21
  172:8,8 173:3
  173:14 174:1,4
  179:13 187:20
  190:10 198:12
  208:20 210:18
  220:20 224:17
  225:12 227:20
  231:20,21
  232:3,6,18
  249:4,7,15
  254:21 255:21
  256:4,5,17,20
  257:20 258:2
  261:13 266:1
  268:2 270:8,11

  275:18 276:17
  279:6,21 285:1
  286:17 288:10
  288:12,17
  293:18 294:7,7
  298:12 308:21
  316:12,15,21
  322:14 324:15
  327:8 331:14
  332:22 334:19
  338:2,5 339:4
**timeline** 128:4
  186:1
**times** 10:12
  31:20 32:16
  54:10 130:2
  265:17 288:4
  288:19 306:22
**timestamp**
  178:20 179:13
**timestamps**
  179:16
**timetable** 241:9
  241:11
**timing** 184:10
  315:6
**Timothy** 230:17
  231:19
**tissue** 267:20
**title** 45:1 98:5
  108:3 198:11
  205:12
**today** 9:17 17:4
  17:9,18 18:11
  19:3,15 20:4,8
  20:10,17 21:3
  22:16,21 23:3
  25:14 43:9,10
  72:2 76:18
  128:19 141:2
  144:12 153:14
  169:17 171:17
  199:21 210:15
  236:15 245:21



310:19 338:11
**today's** 7:8
23:10 24:5
29:19 30:9
32:11 34:2,8
36:16 97:5
98:20 174:14
271:1
**Todd** 1:13 4:2
6:14 7:4 8:6
8:16 27:22
39:6 53:19
105:5 120:13
120:19 121:15
128:20 150:21
175:10 177:20
186:6,22 226:9
228:19 297:8
304:7 339:5
340:4,13
342:22 343:22
**told** 46:21
209:22 210:4
237:14 268:6
312:13 338:19
**top** 78:14 91:10
97:4 98:1
110:14 112:19
114:12 123:8
134:21 160:1
173:9 181:5,19
188:16,17
189:14 193:13
202:4 204:1,1
204:17 217:10
218:13 252:17
262:1,19
289:16 292:4
297:7,18
298:22 299:9
307:15 333:20
**topic** 68:9,11
87:17 88:18
90:17 95:8

101:2 229:14
240:22 241:3,6
246:7
**topics** 75:22
219:20,20
220:10 229:16
233:21 296:17
**top-line** 229:17
**total** 24:8 26:7
36:18 334:14
335:10
**touch** 84:6
296:1
**tough** 83:4
**tourists** 99:17
**track** 194:4,20
194:21
**tracking** 259:19
264:7
**traffic** 177:5
180:6 287:16
288:4,13
**training** 50:5,6
**Tran** 3:16 7:12
**transcript** 6:16
13:1,9 21:10
29:7 69:16
71:13 78:3
91:1 96:14
106:13 112:13
122:20 133:21
138:6 140:14
159:5 177:11
193:8 196:1
203:14 206:11
213:22 216:22
224:4 230:11
235:11 252:6
262:10 265:13
266:11 274:13
280:5 283:11
289:12 297:1
303:3 307:9
311:4 332:1

338:13,13
339:8,10 341:4
**transcription**
340:7
**transcripts** 28:9
28:12,18 29:1
29:3,18 30:7
34:6
**transfer** 109:5
**transferred**
237:9
**transgender**
162:16
**transgenders**
164:14,16
**transit** 310:20
313:1 314:20
315:9,13,17
317:8 320:2,2
320:12,12,22
321:11 322:3,8
324:7,12
325:15,19
326:4,8,17
329:13
**transiting** 300:2
300:22 301:4
**translation**
327:9
**transportation**
334:8
**travel** 87:6
145:13 179:17
228:15
**traveler** 272:2,5
**travelers** 104:11
115:16,21
284:6
**tremendous**
239:16
**TRO** 226:4
228:22
**trouble** 194:1
**trucks** 288:3

**true** 105:10
111:15 122:10
185:15 186:6
186:22 187:5
187:21 194:12
209:7 222:21
236:10 269:4,9
269:14,18
318:7,8 340:6
341:5
**Trump** 78:10
**trusted** 272:2,4
284:6
**truth** 20:17,20
**truthful** 15:1
**truthfully** 21:2
**try** 17:21 18:11
18:13 26:6
35:13 40:15,15
46:8 54:4 71:7
71:8 79:11
202:8 247:13
251:15,17,19
251:20
**trying** 33:14,16
261:17 264:6
264:18 313:1
**turn** 107:12
160:15 216:18
273:10 283:8
**turnover** 153:6
**twice** 10:13
36:18
**twisting** 131:15
132:2,5,9,20
133:5
**two** 12:3,4 44:14
58:3 73:20
87:4,6 107:18
121:6 146:20
160:19 174:10
202:17 211:16
229:17 253:22
256:15,16

310:3 321:2
327:11
**two-minute**
174:12
**two-page**
235:15 289:16
303:7 332:4
**Tyesha** 198:7
199:20,20
**type** 13:22 34:10
45:19 111:22
152:20,22
212:19 213:1
247:16 264:3
267:18 317:6
**types** 211:19
326:22 327:2
**typewriting**
341:8
**typical** 65:12
151:3 248:4
**typically** 89:18
89:19 90:1
125:15 152:20
153:3,12
221:15,18
229:17 248:18
271:8 272:17
309:19 321:18
**typo** 126:13
139:20,22
**T-O-D-D** 8:16

_____ **U** _____
**uh-huh** 17:12
**uh-uh** 17:13
**ultimately** 11:16
309:22
**uncomfortable**
31:20
**underline** 29:1
**underneath**
197:13,15
**understand**



9:12,17,22
12:16 17:16,19
18:2 19:4,13
19:18 20:3,8
20:14,16,19
22:15 27:20
39:15 49:13
50:17 60:3
86:5,11 106:1
127:4 128:18
156:3 169:22
215:13 234:18
234:19,21
235:1 270:21
271:3
**understanding**
69:11 116:14
119:15 122:15
141:7 158:7
162:10 166:14
166:21 175:18
178:10 182:2
183:18 205:22
220:5,6,17,19
221:1 237:12
274:5 278:22
295:4,21
300:20 309:4
309:15 318:16
323:9 331:13
**understood** 18:3
93:2 189:21,22
203:9 216:2
234:22 276:16
310:2
**undocumented**
12:19 16:11
**Unfortunately**
137:14
**Unified** 328:16
**uniform** 141:8
209:1
**unintelligible**
46:9 122:4

144:14 210:8
**Unit** 292:2
**United** 1:1 7:6
12:9 14:11
15:14 16:7
48:20 272:3
286:18 310:16
327:21
**units** 166:18,19
167:2,11,22
168:21
**University** 49:3
49:22 50:1
**UNKNOWN**
234:17
**unnecessary**
268:16
**unrelated** 272:9
**unusual** 178:16
178:18
**upcoming** 291:3
**update** 228:11
232:18
**updated** 236:13
236:17
**updates** 250:11
285:4
**Urgent** 255:16
**USCIS** 57:18
316:2 318:6
325:13
**use** 9:11,15,17
9:20,22 20:3,7
35:11,21 92:9
92:11 102:21
125:15 134:11
181:20 210:5
261:9 265:3
299:17
**usually** 89:17
309:20 313:15
327:4,10
**U.S** 3:4 9:1,4,4
9:16 10:5,8

14:10 20:2
32:10,15,17,22
33:9,20 34:4
39:18 50:18
51:2,7 55:14
68:10 101:16
103:13 104:5
121:19 122:12
122:14 141:6
141:17 151:10
151:14 152:2,8
157:21 159:20
161:4,5 168:1
169:1,14
185:17 283:16
287:4 301:5
310:14 331:10
331:15 335:16
336:1,20

————————
**V**
**vague** 133:11,16
273:13,17
316:19
**vaguely** 78:21
146:18 315:20
**Valerie** 57:10
303:16
**value** 172:5
**variables**
162:18 163:7
164:4 172:1
**variety** 229:16
**various** 34:16
47:15 220:10
271:10 272:1
284:4
**vary** 308:22
**veer** 288:11
**vehicle** 286:16
288:4,15,22
**vehicles** 51:15
288:13
**verbal** 277:20

**verbally** 17:14
146:19
**verbatim** 35:12
**verbiage** 210:1
**verification**
228:11
**verifying** 323:10
**Vernon** 236:18
**version** 117:10
118:21 139:4
188:4 194:3,14
194:18 225:7
234:3 236:4,13
236:17 237:19
257:4
**versus** 7:5 12:9
16:7
**Vice-President**
150:4
**video** 64:17
70:21 77:9
313:11,15,20
338:18
**videographer**
7:12
**Videotape** 1:12
3:16 7:2 41:8
41:11 46:12,15
56:13,16 70:5
70:8 74:14,17
81:19,22 88:8
88:11 103:5,8
114:6,9 154:21
155:2 174:1,4
249:4,7 256:17
256:20 270:8
270:11 338:2,5
339:4
**view** 149:6
**viewed** 269:10
**visa** 47:13,15
**Visconti** 96:22
98:2
**Visconti's** 98:4

**vision** 225:5
**visit** 291:3,16
**voice** 83:19
234:17
**volition** 36:21
**volume** 309:2
**volumes** 308:13
**volunteered**
237:10,13
**vs** 1:6
**vulnerable**
162:13 164:19
165:1,1 166:17

————————
**W**
**Wagner** 53:18
275:11,17
276:5 297:8
301:14 304:7
**wait** 35:1,3
99:18 100:6
288:4,10,11,17
288:19 293:17
323:4 326:9
328:21 329:9
329:15,22
330:12
**waiting** 293:14
295:19
**waive** 192:19
**waived** 66:18
339:17
**waiver** 66:22
**Wall** 291:1
**want** 27:15
32:13 37:7,9
42:12 60:19
63:22 65:16
69:20 70:2
72:16 73:2
80:11,12 81:15
82:12 86:7
88:4 99:13
102:9 108:19



114:16 115:12
128:18 131:12
154:10,16
156:2 157:11
158:13 163:18
164:11 168:7
173:10 174:20
183:2 201:8
218:12 226:20
227:8 229:15
240:8,18 246:7
260:10 267:2,7
270:21 281:13
288:8,9 300:7
309:3,7 319:20
324:19,22
325:3 330:16
337:19 338:11
338:17 339:13
**wanted** 29:11
118:17 119:1
177:3 182:8
205:6 209:19
237:14,15
240:13 248:14
281:7 299:18
300:14,20
301:2 329:8,11
338:19 339:3
339:12
**wants** 226:3
299:15
**Washington** 2:6
2:14 3:7 51:8
78:22 179:1
**wasn't** 38:20
199:6
**way** 40:12 79:19
89:18 93:5
97:21 98:15
111:10 115:10
124:3 134:13
135:19 142:8
146:5 180:12

189:11 195:16
197:10 207:16
209:4,5 215:22
216:12 231:11
251:6 253:16
265:8 321:17
**ways** 284:8
**WebEx** 18:8
24:18,22 25:2
33:14,20
**Wednesday**
1:14 7:8 93:14
232:11
**week** 298:4
**weeks** 30:21
31:10 242:10
**weighed** 244:1
**welcome** 56:19
70:11 74:19
88:14 103:11
155:4 174:7
**went** 18:6 19:20
31:2 36:15
46:20 70:12
74:22 264:8
322:9 334:1
**weren't** 139:11
178:6 218:17
**west** 56:3
**we'll** 19:7 21:13
60:13 77:18
81:7 119:18
157:10 192:22
234:14 266:22
274:10 290:8
327:6
**we're** 17:2 24:19
41:12 46:16
49:13 56:14
70:9,19 74:18
81:20 82:1,5
88:9,12 102:9
103:6,9 104:1
114:7,10 155:3

174:2,5 190:18
192:18 210:21
211:19 249:5,8
256:21 270:9
270:12 283:14
285:5 286:2
289:8 290:10
297:3 305:15
307:12 332:3
334:5 338:3,6
339:6
**we've** 34:1 93:4
134:14 218:7
221:16 223:5
247:4,7
**whatsoever**
193:4
**WHEREOF**
341:12
**white** 55:21 56:1
56:22 67:15
68:13 69:4
84:5,21 85:19
149:21 226:3
226:10,16,21
227:4,8,10
228:21
**wide** 313:20
**Willson** 44:16
**wing** 56:3
**withdrawn**
315:19 318:14
**witness** 7:18 8:3
26:22 27:11,13
27:15,21 28:4
39:12 40:14,20
44:2 45:5 46:1
58:9,15 59:19
60:7,11 61:3,8
62:14 63:13
64:1,7 65:17
65:21 66:3,15
67:18 68:15
69:19 71:6,21

74:8 75:9 76:3
76:7,14 77:2
79:18 80:13,18
81:16 84:9
87:21 89:2
100:11 133:12
154:3,10
155:12 168:10
182:13 185:12
186:10,19
187:13 191:19
200:11,20
201:9 228:4,10
228:14 240:13
240:19 244:22
246:3 263:22
264:3 265:1
266:6 268:18
270:1 273:14
273:18 278:7
278:10 280:16
282:2 290:3,16
292:6 296:6
301:4,19
309:12 315:20
318:15 320:6
320:17 325:3,7
325:10 330:19
336:4 337:4,14
338:12 341:12
**woman** 250:20
265:18
**women** 269:20
**word** 105:19
134:11,14
301:1
**words** 17:12
132:20 147:13
**work** 42:18
48:14,16 55:12
73:21 92:1
94:5 97:10
113:4 129:5
143:6 146:11

179:3,16 184:7
187:16 195:11
196:20 200:12
239:16 248:5
251:15 253:4
261:9,10
263:15 277:22
284:9 295:5
315:21 317:6,8
321:7 334:9
**worked** 10:2
146:10 147:22
175:22 176:4
176:12 178:22
183:22 184:3
187:7 188:2
223:9 258:7
259:4,14
294:10
**workers** 293:16
**working** 146:18
176:4 184:18
185:19 211:19
219:6 227:16
231:22 237:4
243:9,10,16,18
243:22 258:7
259:17 272:8
284:3 286:7
292:22 293:1
311:22
**works** 70:3
81:16 215:4
251:9 293:14
**world** 48:14
52:11 192:21
**worries** 158:22
235:5
**worse** 274:8
**wouldn't** 92:7
171:21
**write** 35:12
127:22 208:1,5
295:14



**writes** 99:14
109:3 110:9
126:7 136:21
139:14 181:20
184:22 199:20
204:18 219:19
226:2 232:14
**writing** 263:4
277:21
**written** 11:19
15:3,4,9,15,18
58:5,10 60:14
65:4 75:21
78:11 103:12
104:3,20
111:16,19
112:3 120:7
141:4 153:22
155:10 186:7
186:12 187:1
294:17,19
**wrong** 138:13
**wrote** 132:10
194:3 215:9
258:19 265:5
**www.MagnaL...**
1:22

**X**

**x** 1:3,9
**XD** 136:21
155:14 204:18
233:22

**Y**

**yeah** 9:6 24:14
25:10 26:11,22
41:22 43:1
47:5 49:15
54:9 55:10
62:2 67:19
73:7,14 83:3
92:22 100:11
113:18 118:16

145:17 154:18
156:9,16
175:21 178:1
178:18 198:2
205:3 227:14
240:18 242:21
242:22 255:2
260:13 261:10
262:7,7 263:13
280:20 281:15
299:13 301:13
306:4 313:14
328:8 332:22
333:8,9
**year** 34:22 49:6
49:6,10 55:17
72:16 284:17
284:17
**years** 10:4 12:3
12:4 52:19
72:13 101:9
134:12 221:17
237:15 249:13
286:2
**Yep** 105:22
298:19
**York** 50:20 51:1
**Yorker** 4:9 78:7
78:9,18 82:19
**Ysidro** 105:1
136:12 137:1
137:22 155:19
157:15 161:20
162:7,15
164:15,20
166:10,15
167:3,12
170:19 171:12
172:5 220:21
277:2,4,13
278:1 282:7
286:9 288:9
296:1,9 302:16
304:13,17,21

305:8,10,13,18
312:12 313:17
334:2,3
**Ysidro/Otay**
291:4

**Z**

**zero** 280:19
**zone** 179:13
**zooming** 281:9

**0**

**07** 252:13

**1**

**1** 1:19 7:3 21:7
136:16 282:18
287:11,14
**1st** 5:21 6:8
19:17 107:9,16
252:10,21
254:6 255:6
257:10 258:9
258:15,18
260:3 262:17
268:21 297:8
297:12
**1:14** 313:5,10
**1:22** 154:21
**1:33** 155:2
**1:37** 225:21
**1:55** 174:1
**10** 1:14 26:9
70:2 74:12
81:15 88:5
140:11 173:12
174:18
**10th** 7:8
**10:05** 254:6
**10:07** 56:13
**10:08** 206:16
**10:13** 135:2
**10:24** 56:16
**10:30** 196:11,15
**10:32** 98:12

**10:39** 70:5
**10:45** 196:11,15
**10:50** 70:8
**10:55** 74:14
**10:57:38** 160:4
**100** 157:16,21
162:2 163:4,13
164:1 166:20
**106** 4:15
**11** 177:8 217:6
**11:15** 74:17
**11:24** 81:19
**11:29** 81:22
**11:36** 88:8
**11:52** 88:11
**11:53** 214:16
**1101** 2:12
**112** 4:16
**116** 4:17
**117** 281:18
**118** 280:10,15
281:17,18,21
**12** 134:6 138:13
188:9 334:20
334:21 335:2
**12th** 4:18
116:22 123:2
124:12 128:21
131:21 132:3
132:11 133:10
**12:09** 257:11
**12:10** 103:5
**12:13** 103:8
**12:15** 303:17
**12:28** 114:6
**12:29** 114:9
**12:52** 255:6,9
**120** 53:6
**122** 4:19
**13** 4:16 112:17
114:13,15
115:9,21
**133** 4:20
**135** 124:10

170:5
**138** 4:21
**14** 4:12 91:12
93:14 94:21
96:21 98:11
100:17 101:22
193:5
**140** 5:3
**15** 4:18 123:3
199:21 235:16
**15th** 303:15,21
304:6
**15-minute** 199:8
**159** 5:5
**16** 5:17 224:8
225:8,21
262:16
**16th** 310:11
314:21 323:18
332:17 341:13
**17** 276:9
**17th** 2:12
275:10 276:5
**17-cv-02366-...**
1:7
**177** 5:7
**18** 267:9
**188** 5:8
**19** 5:15 119:14
195:20 217:4
**19th** 315:3
331:1
**191** 303:13
**193** 5:10
**195** 5:11
**1990** 49:3
**1996** 51:5
**1999** 2:5 51:5

**2**

**2** 90:20 136:16
**2nd** 4:14 78:8
106:18 265:17
**2:00** 260:17

**2:20** 174:4
**2:39** 178:14,17
  179:12
**2:42** 124:12
**2:49** 276:6
**20** 48:13 147:11
  203:11
**20th** 283:21
  335:21
**20006** 2:6
**2001** 51:20
**2003** 52:3
**20036** 2:14
**20044** 3:7
**2006** 14:5 51:20
  52:6
**2008** 10:19,20
  11:11
**2010** 10:19,20
  11:11
**2011** 52:6,13
**2015** 53:1,3
**2016** 4:15,19
  19:17 44:17
  105:11 106:18
  107:9,16 108:4
  108:8 109:12
  111:9,16 112:4
  116:22 117:10
  120:10,14
  121:2,11,15
  123:2,3 124:12
  125:18 127:14
  128:21 129:4
  129:14,16
  131:21 132:3
  132:11 133:10
  145:19 187:9
  188:3 271:12
  275:10 276:6,9
  282:5,12
  283:21 294:15
**2017** 4:16,20,21
  6:6 35:5 87:5

87:12,14
112:17 114:13
114:15 115:9
115:22 118:6
134:3 135:2
136:16 137:20
138:10,16
139:4 140:3
283:17
**2018** 4:12 5:2,6
  5:10,12,13,14
  5:15,17 6:9,12
  13:3,13 91:12
  94:21 96:21
  98:6,11 100:17
  101:22 104:8
  104:11,17,21
  105:8 112:8
  116:1,11,13
  117:16 118:6
  140:18 141:12
  141:17,22
  142:15 143:2
  143:21 144:13
  145:1,14,21
  146:3,7,16
  147:1,17,19
  148:2,7,13,17
  148:21 149:14
  149:19,22
  150:5,11,18
  151:9,16,21
  152:4,10,18
  153:4 154:1
  155:11 157:12
  157:14,20
  158:6 161:9
  164:16,21
  165:3,6,10,12
  166:11 167:4
  167:13,19
  168:2 169:1,14
  169:19 170:8
  170:13,17

171:12,15
173:15 175:16
177:16 178:13
180:16 181:12
183:15 184:16
184:18 185:16
187:22 188:14
188:18 191:2
191:15 193:15
194:2,15 195:5
196:11 197:20
198:11,20
199:3 200:9
201:6,18
202:12 203:19
205:2,9,13,20
206:16 207:2
211:9,12 212:1
214:4,12,16
217:4 218:5
219:4,13 221:6
222:1,5,15,19
224:8 225:8,21
227:18 233:9
236:5,14
290:19,20
291:20 297:8
297:13 303:21
307:16,18,22
**2019** 5:18,21
  14:14 55:18
  56:4,21 58:22
  61:13 62:1,18
  63:20 66:7
  67:15 68:11
  69:4,17 72:5
  72:17 73:18
  76:1,12 77:5,7
  84:11 85:5,18
  87:1,14 89:4
  103:14,17
  120:20 121:1,5
  121:10 229:5
  230:15 232:18

252:10,21
254:6 255:6
257:10 258:9
258:15,18
260:3 262:17
265:17 266:16
268:21 302:17
303:15 304:6
310:11 311:18
314:7,11,16,21
315:3 323:18
324:2 331:1,10
332:6,17
**202** 2:7,15 3:8
**2020** 1:14 5:19
  7:8 78:8,13
  119:14 232:16
  233:11 236:1
  237:19 238:1,4
  239:7 315:4
  322:4,22
  334:22 341:14
**203** 5:12
**206** 5:13
**21** 4:8 206:8
**21st** 78:13
  283:16 307:22
**213** 5:14
**216** 5:16
**22** 158:9 177:17
**22nd** 5:18 6:11
  230:15 266:16
  307:15,18
**224** 5:17
**227-2** 266:16
**23** 112:18
  158:18 213:19
**23rd** 185:16,21
  188:14
**230** 5:18
**235** 5:19
**24** 14:14 216:18
**24th** 5:6 177:15
  180:15 184:13

184:16 290:19
**25** 224:1
**25th** 5:6,10,15
  177:15 178:13
  188:14,18
  193:15 194:2
  197:20 217:4
  291:20
**252** 4:7 5:21
  21:8,14
**253** 4:9 77:19
  78:1,6,15 82:3
**254** 4:11 90:21
  91:4 93:4
**255** 4:12 96:12
  96:17 106:16
  107:3
**256** 4:14 106:11
  107:3,5 108:16
**257** 4:16 112:11
  112:16
**258** 4:17 116:19
  120:3
**259** 4:18 122:18
  123:1 124:2,10
**26** 196:11 199:3
  230:5
**260** 4:20 133:19
  134:2 135:10
  135:18
**261** 4:21 138:4,9
**262** 5:2,22
  140:12 142:6
  155:6 174:18
**263** 5:4 159:3,8
  160:3,16
  169:21 170:2
  171:19 172:13
  172:21 173:6
**263-3221** 2:7
**264** 5:6 177:9,14
  180:11,17
**265** 5:8 6:2
  188:12 189:11



**266** 5:9 6:3
  193:6,11
**267** 5:11 195:21
**268** 5:12 203:12
  203:17
**269** 5:13 206:9
  206:14 207:16
**27** 5:2,12,13,14
  104:20 105:8
  114:13 116:11
  116:12 118:6
  140:18 141:12
  141:17,22
  142:15 143:2
  143:21 144:13
  145:1,14,20
  146:3,7,16
  147:1,12,17,19
  148:2,7,13,17
  148:21 149:14
  149:19,22
  150:4,11,17
  151:8,15,21
  152:4,10,18
  154:1 155:11
  157:14,20
  158:5 161:9
  164:16,20
  165:3,5,10,12
  166:11 167:3
  167:13,19
  168:2 169:1,14
  169:19 170:8
  170:13,17
  171:12,15
  173:15 175:16
  183:15 184:18
  191:2,15
  194:15 195:5
  198:20 200:9
  201:6,18
  202:12 203:19
  205:1,9,20
  206:15 207:2

**211**:11 212:1
  214:4,12,16
  232:11 235:6,7
  236:5,14
**27th** 104:8,11
  104:17 112:8
  202:2
**271** 5:15 216:20
  217:3 218:13
**272** 5:17 224:2,7
**273** 5:18 230:9
  230:14 231:11
**274** 5:19 6:4
  235:9,14
**275** 5:20 252:4,9
  253:3 262:5
**276** 5:22 262:8
  262:14
**277** 6:2 265:11
**278** 6:3 266:9
  267:1
**279** 6:4 274:10
  274:11,16
**28** 303:6
**28th** 103:14,17
  302:17
**280** 6:5,5 280:3
  280:8
**281** 6:6 283:9,15
**282** 6:7 289:8,10
**283** 6:6,8 296:21
  297:4
**284** 6:10 303:1,6
**285** 6:11 307:7
  307:12
**286** 6:13 311:2,7
**287** 6:14 331:20
  331:21 332:4
**289** 6:7
**29** 10:4
**29th** 282:5,12

332:6
170:18
**296** 6:9

**3**

**3** 93:15 96:11
  283:19 295:10
  332:12,16
  333:3
**3rd** 311:18
**3/05/2022**
  341:16
**3:30** 99:5
**3:51** 249:4
**3:59** 276:10
**30** 274:22
  338:14
**30th** 5:19 236:1
  237:19 238:1,4
  239:6 290:19
  312:12 314:7
  314:11
**30(d)** 86:12
**303** 6:10
**307** 6:12
**31** 4:14
**31st** 106:17
**311** 6:13
  62:9
  166:11,15
**331** 6:14
**34** 252:2
**343** 1:19
**35** 161:14
  261:20
**35-minute**
  288:11
**355-4471** 2:15
**36** 123:4 265:9
**37** 188:15 266:7
  266:13
**38** 274:7
**39** 280:1
**390** 91:6

**4**

**4** 106:10 161:10
  333:12,16
**4/27/2018** 160:9
  160:11
**4/28/2018** 160:4
**4:06** 249:7
**4:15** 256:17
  282:12
**4:17** 256:20
**4:18** 291:20
**4:29** 114:13
  115:9
**4:32** 270:8
**4:41** 270:11
**40** 117:15 277:5
  283:8
**41** 289:7
**42** 296:20
**43** 302:22
**44** 307:5
**45** 58:4 311:1
**46** 331:18

**5**

**5** 70:2 81:15
  112:10 266:22
  267:10 285:11
**5th** 315:4 322:4
  322:22
**5:34** 139:5
**50** 117:15
  244:13 277:4
**534** 98:13
**535** 96:19 98:14
**577** 107:14
  108:16
**578** 108:16
**578769** 1:18
**598-8259** 3:8

**6**

**6** 4:20,21 49:8
  49:10 116:16

120:3 134:3
  135:1 136:16
  137:20 138:10
  138:16 139:4
  140:3
**6:01** 338:2
**6:12** 303:21
**6:23** 338:5
**6:24** 339:4
**6:25** 339:18
**60** 244:13 277:4

**7**

**7** 49:8,10 122:17
  172:6
**7:14** 107:9,16
**7:17** 258:15,18
**7:20** 252:21
  260:3
**7:28** 197:20
**70** 190:19
  289:21
**705** 2:13
**78** 4:10

**8**

**8** 4:3 133:17
**8:20** 312:3
**8:26** 180:16
**81** 161:17
**83** 106:19
**84** 214:6
**866-624-6221**
  1:21
**868** 3:6

**9**

**9** 138:3,13
**9:04** 7:9
**9:12** 188:19
**9:34** 1:15
**9:41** 41:8
**9:43** 41:11
**9:49** 46:12 194:3
**9:56** 46:15



**9:57** 205:9
**9:58** 203:20
**90** 4:11 288:10
**93** 161:21 162:7
**94** 204:5
**96** 4:13

